

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 15, 2023

**VIA ECF & Email**
Hon. Katharine H. Parker
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *United States v. Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal,"* **23 Cr. 118 (AT)**

Dear Judge Parker:

Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok" or the "defendant") is charged with defrauding thousands of victims to invest more than $1 billion into Kwok's extensive, sophisticated, interrelated fraudulent offerings through material misrepresentations. Kwok and his co-conspirators then laundered their fraud proceeds and misappropriated hundreds of millions of dollars of fraud proceeds for their personal use.

As explained below, Kwok, who is not a citizen, presents a serious risk of flight based on the nature of the charges, the significant sentence that he faces, the strong evidence of his guilt, his substantial financial resources, and his ties to foreign jurisdictions. Further, if released Kwok would continue to pose a danger to the public. Kwok has caused severe economic distress to many, and has threatened those who complained about his criminal acts. Kwok's fraud has continued unabated for at least three years. Indeed, even after U.S. regulators put a stop to aspects of his fraud in 2021, Kwok was not dissuaded. He doubled down, adapted his techniques, and continued to rob thousands. Kwok's crimes are ongoing and continually evolving.

The defendant was arrested this morning and is expected to be presented in this District later today. As detailed herein, the Government seeks Kwok's pretrial detention due to his significant risk of flight and the danger he poses to the community.

I.     **Overview**

   A.  **Kwok's Background**

Kwok is a Chinese citizen who emigrated from China to the United States in approximately 2015, seeking political asylum from the Chinese Communist Party ("CCP"). Between March 2017

and August 2017, Kwok traveled internationally on three occasions.[1] On or about September 6, 2017, Kwok filed an application for political asylum, which remains pending. As a general matter, if an asylee is charged with serious criminal conduct while in the United States, the criminal charges can serve as a bar to a grant of asylum. Kwok is married with two children. One child resides in London, England. The other child, and Kwok's wife, are believed to reside in the United States. None of Kwok's immediate family members are U.S. citizens.

Once in the United States, Kwok settled in New York City and purchased a Manhattan apartment for approximately $68 million. *See* Indictment (Ex. A), at ¶ 6. Starting at least in or about 2017, Kwok participated in a number of press interviews, attracting widespread attention for his claimed fight against the CCP. In 2018, Kwok founded, promoted, and solicited donations to two purported nonprofit organizations—the Rule of Law Society and the Rule of Law Foundation. *See id*. Kwok announced the launch of the Rule of Law organizations during a lavish event in Manhattan. While both organizations' websites prominently feature Kwok's image and quotations from Kwok, the Rule of Law organizations simultaneously disclaim a formal association with the defendant and various entities that he controls, including entities that were instrumentalities of his fraud.[2] The Rule of Law organizations provide the foundation on which Kwok built his fraud; in particular, Kwok used the organizations to amass a large following of individuals who were predisposed to believe Kwok, and Kwok leveraged his followers' support into financial investments through false and materially misleading information.

Kwok maintains three residences in the tri-state area—the penthouse apartment on Fifth Avenue in Manhattan, where he was arrested on March 15, 2023; a mansion in Mahwah, New Jersey that was purchased for approximately $26 million in December 2021 using proceeds of the charged fraud; and a large Connecticut residence, which was purchased through a Kwok-controlled entity in February 2020 for more than several million dollars. According to witnesses, Kwok has surrounded himself with around-the-clock armed security guards who are formally employed by an entity that is funded by proceeds of Kwok's fraud scheme. In addition, Kwok appears to travel among his residences in a caravan of luxury automobiles.

### B. The Nature and Circumstances of the Offense

On March 6, 2023, a federal grand jury in this District returned a sealed indictment (the "Indictment"), charging the defendant and his co-conspirator, Kin Ming Je, a/k/a "William Je"

---

[1] Records reveal that one trip was to the United Kingdom, but it is not presently clear where Kwok traveled on the other two occasions. From 2006 through 2013, Kwok made at least approximately ten trips to the United States from other countries.

[2] *See, e.g.*, https://www.rolsociety.org/en/ (last accessed March 13, 2023) ("ROLS IS NOT ASSOCIATED WITH ANY FOR PROFIT BUSINESS OR INDIVIDUAL, INCLUDING BUT NOT LIMITED TO MR. GUO WENGUI, GTV MEDIA GROUP, INC.; G CLUB OPERATIONS LLC; GNEWS LLC; H COIN; OR H DOLLAR. NEITHER MR. GUO WENGUI NOR ANY ENTITY OR INDIVIDUAL ASSOCIATED WITH HIM IS AN AUTHORIZED REPRESENTATIVE OF ROLS. ANY STATEMENTS OR OTHER COMMUNICATIONS MADE BY MR. GUO WENGUI AND/OR ANY OTHER UNAUTHORIZED INDIVIDUAL ARE PERSONAL IN NATURE AND MAY NOT BE ATTRIBUTED TO ROLS.")

("JE"), with eleven counts:  conspiracy to commit wire, securities, and bank fraud, and money laundering, in violation of 18 U.S.C. § 371; four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and three counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1957, and 2.[3]

From at least in or about 2018 through in or about March 2023, Kwok, Je, and others conspired to defraud thousands of victims of more than $1 billion through a scheme that they operated using a series of complex fraudulent businesses and fictitious investment opportunities that connected dozens of interrelated entities controlled by Kwok.  *See* Ex. A at ¶ 1.  Kwok, Je, and their co-conspirators laundered their fraud proceeds through foreign and domestic bank accounts and entities, layering the fraud funds to conceal their source, as well as using the fraud proceeds to further promote the ongoing scheme.  Kwok and Je also misappropriated victim funds for their own personal use and for the use of their family members, including for personal investments and the purchase of luxury vehicles and goods.  *See* Ex. A at ¶¶ 1-4.

### 1)  *The GTV Private Placement*

In April 2020, in a recorded video broadcast on the Internet, Kwok personally announced an illegal private stock offering relating to his purported media company, GTV Media Group, Inc. ("GTV").  *See* Ex. A at ¶ 12.  In that launch video, Kwok detailed the investment terms of the GTV private placement (the "GTV Private Placement"), provided his cellphone number, and encouraged people to contact him directly with any questions.  Many did.  The Government's evidence includes direct communications between Kwok and prospective investors, including text messages and video and voice calls, during which Kwok endorsed GTV and made representations about the financial benefits of participating in the GTV Private Placement.  Kwok also sent, and directed his co-conspirators to send, GTV offering documents—including a "Confidential Information Memorandum" ("PPM") (attached as Exhibit B).  The PPM stated that the money raised through the GTV Private Placement would be used "to expand and strengthen [GTV's] business."  In videos posted on social media and in calls with potential investors, Kwok prophesized outsized returns on the GTV investment.  Investors relied on statements that Kwok made and on representations in the PPM.  In interviews with the Government and with the FBI, victims have explained that they expected their investment money would be used for GTV's business.

Between approximately April 20, 2020 and June 2, 2020, Kwok and his co-conspirators sold approximately $452 million worth of GTV common stock to more than 5,500 investors.  *See* Ex. A at ¶ 12(e).  The victims' money was funneled through a series of bank accounts controlled by Kwok and/or his close associates, including Je and CC-1.  The accounts were primarily held in the name of Saraca Media Group, Inc. ("Saraca"), GTV's parent company, which was owned by a close relative of Kwok.  Other bank accounts were held in the name of an intermediary entity that effectively pooled small-dollar investors' funds for purposes of investing in GTV on behalf of those non-accredited investors, thereby flouting U.S. Securities and Exchange ("SEC") regulations regarding limitations on the type of investors to whom securities may be offered via an unregistered securities offering.  *See* Ex. A at ¶ 12(g).

---

[3] Je was also charged, in Count 12, with obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2).

Mere days after the GTV Private Placement generated nearly half a billion dollars, Je completed negotiations with a particular investment manager ("Manager-1") regarding an investment into a high-risk hedge fund ("Fund-1"). Fund-1 was designed as a hedge against severe Asia-related economic shocks for extremely high-net worth individuals. Kwok and Je—neither of whom held a formal position at GTV—directed the $100 million investment of GTV Private Placement funds into Fund-1.

On June 3, 2020, the day after the GTV Private Placement closed, a particular individual ("CC-1")—who has worked for Kwok since they both lived in China and has served as the President, Treasurer, and Secretary of various entities that manage the Kwok family's personal wealth—signed a subscription agreement with Manager-1 regarding the $100 million investment into Fund-1 by Saraca (*i.e.*, GTV's parent company). In April and May 2020, a particular bank account held in the name of Saraca ("Account-5601") received approximately 2,700 deposits and incoming wire transfers from individuals throughout the world seeking to invest, based on Kwok's representations, in GTV. The same day, CC-1 transferred $100 million from Account-5601 to another bank account held in the name of Saraca ("Account-2601"), which had a zero balance prior to the transfer. On June 5, 2020, acting at Kwok's direction, CC-1 transferred the $100 million to Fund-1. The $100 million investment in Fund-1 was comprised of funds raised through the GTV Private Placement; the Fund-1 investment was contrary to representations in the PPM concerning how GTV investor funds would be used. Indeed, the $100 million investment was not even made for the benefit of GTV; rather, it was made for the benefit of Saraca, which is beneficially owned by Kwok's close relative. Ex. A. ¶ 12(h). The unregistered GTV Private Placement drew the attention of the SEC and banks' anti-money laundering compliance regulators. As a result, many Kwok-affiliated bank accounts were frozen or closed. *See* Ex. A at ¶ 13(a)-(b). On September 13, 2021, the SEC filed a cease-and-desist order against Saraca, GTV, and an intermediary entity (the "SEC Settlement"), which required the three companies to pay more than $539 million in disgorgement and penalties relating to the GTV Private Placement. The funds recovered through the SEC Settlement have been consolidated into a "Fair Fund" for distribution to victims.[4]

The PPM did not contemplate that investor money would be invested in a high-risk hedge fund made for the ultimate benefit of Kwok's relative.

### 2) *The Farm Loan Program*

After the SEC's scrutiny and bank closures halted the GTV Private Placement fraud, Kwok—undeterred—devised new and creative methods to evade investor protection laws. In or about June 2020, Kwok devised a "loan offering" that enabled his victims to invest (or reinvest) into GTV through a network of "Farms," or collectives of individuals located in various cities who are purportedly focused on promoting democratic reforms in China (the "Farm Loan Program"). *See* Ex. A at ¶ 13. Kwok used his diffuse "Himalaya Farm Alliance," and the Farms' many affiliated bank accounts, to collect approximately $150 million in fraud proceeds, and to funnel those proceeds into accounts under his and Je's control.

To attract victim money to the Farm Loan Program, Kwok continued to endorse the purported value of GTV. For example, in an August 2, 2020 video, Kwok falsely represented that

---

[4] *See generally* https://www.sec.gov/enforcement/information-for-harmed-investors/gtv-media-group.

GTV had a "market value of 2 billion US dollars." At the time of that video, Kwok knew that valuation was false, because GTV was a new company that was not generating any revenue. Rather, Kwok's statement was designed to attract individuals to invest in the Farm Loan Program. Kwok also solicited participation in the Farm Loan Program through direct communications with victims, including by connecting victims with various Farm "leaders." In videos distributed on the Internet, Kwok described the Farm Loan Program as an opportunity for investors to acquire more stock in GTV. For example, on June 23, 2021, Kwok stated that "the comrades participating in the farm loan project will get new GTV stocks at a ratio of 1:10."[5]

Kwok and Je misappropriated money raised through the Farm Loan Program. Approximately $20 million was transferred to Kwok's close relative and approximately $5 million was transferred to an entity owned by Kwok's spouse. An additional approximately $2.3 million was used to fund maintenance for the 145-foot luxury yacht named the "Lady May" (pictured below) that Kwok used.



3) G|CLUBS

In or about June 2020, Kwok and his co-conspirators laid the groundwork for G|CLUBS, a purported high-end membership program that was, in reality, another vehicle for Kwok's fraud. As with the GTV Private Placement and the Farm Loan Program, Kwok himself promoted G|CLUBS to victims in videos that were broadcast on the Internet and distributed to Kwok's hundreds of thousands of online followers via social media. Kwok represented that G|CLUBS memberships included, among other benefits, stock in various Kwok-associated entities, including GTV and G Fashion.[6] For example, in a video dated June 20, 2020, Kwok made the following statements, among others:

---

[5] All statements attributed herein to KWOK have been translated from Mandarin to English, unless otherwise noted.

[6] The use of "G" refers to "Guo," the common alias Kwok uses. Thus, the various "G" entities promote their association with Kwok in their title.

- "We will roughly start selling G club in the beginning of July. We have now made a comprehensive arrangement. G club is a membership card [for] 50,000 US dollars. There are 10,000 to 50,000, and for the 50,000 US dollars option, it will automatically give you 10,000 US dollars that as interest-free financing capital, allowing you to own G fashion stocks for one dollar per share when they are listed in the future."

- "What is G club? G club is not a membership. G club is for you to get the original stocks. The comrades who have not invested in GTV original stocks this time to be given a channel, so that you can get legal G club, G fashion stocks, and that's it. Simple."

Several months after G|CLUBS launched in October 2020, Kwok and his co-conspirators encouraged victims to purchase "multiple" G|CLUBS memberships—which was, in effect, a way for Kwok, Je, and others to collect even more money from their victims. Victims have reported that they purchased "multiple" memberships for the express purpose of acquiring more GTV and/or G Fashion stock, which the victims understood to be a benefit of paying for G|CLUBS memberships. In another video dated July 30, 2021, Kwok stated, among other things:

- "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

Kwok and his co-conspirators employed a third-party entity ("Company-1") to assist in their laundering of G|CLUBS funds. Company-1 was created at CC-1's express recommendation and was operated by a one-time Kwok employee ("Individual-1"). Kwok participated in telephone calls with Individual-1, Je, and others regarding the movement of G|CLUBS funds into and through Company-1 bank accounts, among other things. Unbeknownst to Kwok, Individual-1 recorded certain of those calls; which make clear that it was Kwok who directed the disposition of G|CLUBS "membership fees" for purposes other than investment in G|CLUBS.

Indeed, although G|CLUBS members purchased hundreds of millions of dollars' worth of G|CLUBS memberships, the money did not fund G|CLUBS's illusory membership services. Rather, Kwok, Je, and others laundered and misappropriated a substantial portion of the funds, including for the following personal expenses, among others:

- A $4.4 million custom-built Bugatti luxury sports car that was purchased for a close family relative of Kwok (shown below):



- KWOK's $26.5 million mansion in Mahwah, New Jersey in December 2021 (shown below):





- Funding an escrow account holding an additional $13 million in G|CLUBS fraud proceeds that were used to pay for renovations to the Mahwah Mansion and furnishings for Kwok's homes, including the following:  more than approximately $1 million for rugs; a $53,00 fireplace log holder; more than $30,000 for a bed; $70,000 for two mattresses; a $59,000 box to store luxury watches; and two $180,000 tables.

4)   *Himalaya Exchange*

In or about April 2021, Kwok began to promote the Himalaya Exchange, a purported cryptocurrency "ecosystem."  The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin").  *See* Ex. A at ¶ 16.  As a "stablecoin," HDO is purportedly backed 1-to-$1 by cash / gold reserves, whereas HCN allegedly is traded based on market supply and demand.  *See* Ex. A at ¶ 16. In October 2021, prior to the so-called "initial coin offering" of Himalaya Exchange digital assets, Kwok promoted the Himalaya Exchange in videos that were broadcast on the Internet.  *See* Ex. A at ¶ 17.  For example, Kwok falsely stated the following:

- "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly.  No matter how much it raises, 20% will turn into gold."

- "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money.  Or take all the value of 20% gold and ask everyone to unify it and make it yours."

- "If anyone loses money, I can say that I will compensate 100%.  I give you 100%. Whoever loses money, I will bear it."

Kwok's representations are false.  The Government has uncovered no evidence suggesting that Kwok personally guaranteed victims against losses incurred on the Himalaya Exchange, nor any evidence that Himalaya assets can be redeemed for gold.  Indeed, the Whitepapers available on the Himalaya Exchange website provided (in fine print) that, contrary to Kwok's representations, HCN and HDO are mere "credits," not cryptocurrencies.  Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

On November 1, 2021, just days following Kwok's statements, , the initial coin offering for HDO and HCN occurred.  HCN began trading at an equivalent value of .10 cents per coin. Within two weeks, according to the Himalaya Exchange website, HCN was worth approximately $27.  This represented a 26,900% increase in value and an approximately $27 billion total valuation.

Kwok's association with HCN is also evidenced in a highly stylized music video for Kwok's original song "H Coin To The Moon," in which Kwok claimed H Coin would go "to the moon"—a reference to a profound increase in value used by many in the cryptocurrency space.[7] Kwok is the face of that video, appearing throughout in luxury cars and on a yacht, and smoking cigars, as shown in the screenshots below:

---

[7] https://www.youtube.com/watch?v=vgof8s0ahxE.



As explained in the Indictment, in September and October 2022, pursuant to judicially authorized seizure warrants, the Government seized $335 million in bank accounts associated with the Himalaya Exchange. Ex. A, ¶ 23. Days after the initial seizures in September 2022, Je, the financial architect of Kwok's billion-dollar fraud, tried to misappropriate approximately $46 million held by the Himalaya Exchange for his own benefit. Within approximately two days of the first judicially-authorized seizures of Himalaya Exchange-related accounts, Je and Himalaya Exchange staff contacted the management of a domestic bank that held Himalaya Exchange bank accounts to effectuate a HDO "redemption" for an unnamed VIP. That "VIP" was Je himself. Je was trying to "redeem" HDO and then transfer the money to a bank account he held in the United Arab Emirates ("UAE") before the Government could seize it. Je even told the bank that the "redemption" needed to happen "today or it is meaningless." In total, the Government has seized more than $630 million in proceeds from Kwok's fraud.[8]

5)  *Laundering and Misappropriation of Fraud Proceeds*

As described above, Kwok, Je, and their co-conspirators laundered a significant portion of fraud proceeds through dozens of entities and hundreds of bank accounts, including foreign bank accounts controlled by Je. For example, the UAE bank account that Je controlled under the name of one of his companies—the same account to which Je attempted to offshore approximately $46

---

[8] Since the Indictment was returned, the Government has obtained an additional approximately $25 million in fraud proceeds that had been held in bank accounts subject to seizure.

million in fraud proceeds following the Government's initial seizures—received at least approximately $128 million in fraud proceeds, which was then misappropriated to Kwok, Je, and their family members, transferred to other controlled bank accounts as purported "loans" or other legal arrangements, or wired to other Kwok- and Je-controlled entities.  An additional more than approximately $100 million in fraud proceeds passed through Je-controlled bank accounts in the Bahamas that were held in the name of another of his companies.

6) *Kwok's "New" A10 "Offering"*

The Government's September and October 2022 seizures led Kwok to adapt his tactics yet again.  In February 2023, Kwok announced a new "A10 offering."  As reported on the Kwok-controlled GNews website,[9] A10 is a purported stock offering for 5% of the Himalaya Exchange and 5% Gettr, a social media company that Kwok controls through a series of shell companies.[10]  Like other Kwok investment "opportunities," Kwok has purportedly guaranteed investors against any loss they incur through their investment in A10.  (*Id.*)  The A10 investment therefore has all the hallmarks of the prior instrumentalities of Kwok's fraud.

7) *Defrauding Victims of Their SEC Fair Fund Disbursements*

Not only is Kwok continuing to launch new "offerings," but Kwok also has attempted to recoup the money the companies he controlled were required to disgorge pursuant to the SEC Settlement.  As money in the Fair Fund was disbursed to victims starting in or around April 2022, victims reported that Kwok encourage them to (re-)invest any Fair Fund disbursements they obtained in Kwok's fraudulent offerings.  Far from being deterred from further criminal conduct by the SEC settlement, Kwok used the Fair Fund payments from that very settlement as an opportunity to re-victimize his victims.  Kwok's blatant disregard and contempt for U.S. laws protecting investors (among other laws) is another example of extensive and dangerous obstructive conduct described further below.

**C. Evidence Against Kwok**

The Government's evidence against Kwok, described in part in the 38-page Indictment, is strong.  It consists of, among other things, bank records, email and cellphone communications, recorded phone calls, Kwok's phone messages with victims and statements to the public, offering documents, and anticipated testimony from witnesses, including Individual-1 and victims, all establishing (i) Kwok's knowledge and control over the entities through which Kwok, Je, and others operated the fraud scheme, (ii) Kwok's fraudulent statements in connection with soliciting investors' funds, and (iii) Kwok's deceptive efforts to conceal the fraud and launder and misappropriate the fraud proceeds.  For example:

- The PPM did not allow Kwok to direct that $100 million in GTV investor money be invested in a high-risk hedge fund made for the ultimate benefit of Kwok's relative.

---

[9] GNews—as in "Guo" News is a website controlled by Kwok which publishes and distributes Kwok's statements and videos.  GNews also links to news reported by other media outlets.

[10] *See* "Highlights of Mr. Miles Guo's Live Broadcast, Feb 8, 2023," *available at* https://gnews.org/articles/906377 (last accessed Mar. 13, 2023).

- Bank records clearly evidence the fraud scheme. For example, wires transmitted to the accounts that collected GTV Private Placement "investments" had reference memos that unquestionably tied the incoming funds to the fraud; for example: "Gtv Investment," "Stock Subscription," "Investment," "G- Tv Common Stock Subscription," "InvestmeNt [sic]," "Investment To G- Tv [sic]," "Gtv Stockpurchase," "Capital Injection Infusion," "To Inves Stment [sic]," "Private Placement Investment," "Gtv Media Investment," "Gtv Inv," and "Additional Stock Purchase."

- Bank records and tracing analysis show that Kwok, Je, and others stole much of the approximately $150 million victims "invested" into the Farm Loan Program, which was falsely represented to be used for "general working capital purposes," Ex. A ¶ 13.e, by transferring proceeds to their family members.

- The G|CLUBS multiple memberships mechanism is additional evidence that Kwok evaded U.S. securities regulations and, further, is clear evidence that G|CLUBS was merely a money laundering operation designed to "sell" stock under the cover of a membership program, which would not ordinarily be subject to SEC regulations.

- Recorded phone calls also establish that Kwok directed his co-conspirators to steal G|CLUBS money that victims sent to Company-1 bank accounts.[11] For example, during a recorded call on May 6, 2021, Kwok directed Je to, "transfer the [G|CLUBS membership] money to the [Je's company] as the third party. And then cancel all purchases of G-club." That is, Kwok effectively directed Je to arrange for Company-1 to process G|CLUBS members' purported "membership fees," transfer the money to a company that Je controlled, which is based abroad, and then *cancel* the associated memberships—thereby blatantly misappropriating that money.

- Contrary to representations on the G|CLUBS website and statements made by Kwok during video broadcasts, G|CLUBS offers few (if any) tangible services to its members. At most, G|CLUBS held online conferences and purported to host sweepstakes that awarded members cash prizes and luxury cars. Yet, as an example, a G|CLUBS member who won a BMW valued at approximately $37,500 did not receive the car, but instead had the value of the BMW applied toward an "upgrade" from a Tier 1 G|CLUBS Membership (worth $10,000) to a Tier 4 G|CLUBS Membership (worth $40,000), with the remainder of the "prize" partially credited toward annual membership fees for the next three years.

- The Government has obtained emails reflecting member complaints that G|CLUBS has neither provided promised membership services nor GTV or G Fashion stock in exchange for substantial G|CLUBS membership payments.

- Kwok's own video-recorded words show him falsely promoting the Himalaya Exchange and its purported cryptocurrencies. After amassing hundreds of millions

---

[11] Kwok's leadership on these calls is notable, given that Kwok and the various entities generally disclaim that Kwok has any managerial control.

of dollars in victim funds from G|CLUBS and from Kwok's online followers, Kwok's principal money launderer, Je, attempted to obstruct the Government's investigation and its seizures of those funds by seeking to transfer $46 million to the UAE bank account that has been used by Kwok and Je to misappropriate funds. Je's efforts to misappropriate the Himalaya Exchange funds are spelled out in text messages.

▪   The Himalaya Exchange was promoted as currency that could be used anywhere. Yet, bank records and emails reveal that Himalaya Exchange employees used a conventional bank transfer to pay for a Ferrari, and they falsely represented that the Ferrari was paid for with HDO.

## II.   Kwok's Obstruction

Kwok has aggressively used litigation and pressure tactics to confront his critics.  Indeed, he has fomented unrest directed toward those who have opposed and criticized him.

### A.   Kwok's Civil Litigation

Since his arrival in the United States, Kwok has been engaged in dozens of civil lawsuits. For example, in 2017, the investment fund Pacific Alliance Asia Opportunity Fund L.P. ("PAX") filed a civil lawsuit against Kwok in New York Superior Court, seeking the repayment of approximately $88 million for an overdue loan that Kwok had personally guaranteed.  On or about February 3, 2021, PAX secured a judgment against Kwok in the amount of approximately $116,402,000.  *See* PAX Lawsuit, No. 652077/2017, 2018 BL 236400, Dkt. 716. (N.Y. Sup. Ct. June 28, 2018) (Ostranger, J.).  After a year of Kwok hiding his assets and failing to pay PAX as ordered, on February 9, 2022, Justice Barry Ostranger entered an Order of Civil Contempt against Kwok for his "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members."  PAX Lawsuit, Index 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2018).  The total judgment of $254 million included $134 million in contempt fees, arising from what Judge Ostranger described as Kwok's "shell game" to shield his assets from PAX.  The February 9, 2022 decision and contempt order directed Kwok to pay the $134 million contempt fine to PAX within five days, or he would face contempt sanctions. Six days later, Kwok filed for bankruptcy.

### B.   Kwok's Chapter 11 Bankruptcy Case

On February 15, 2022, Kwok initiated a Chapter 11 bankruptcy case in Connecticut.  In his initial filings, Kwok claimed to have as much as $500 million in debt and, despite living in a luxury properties, surrounded by luxury cars and lavishly expensive furniture, claimed to have no more than $100,000 in assets.  *See In Re Ho Wan Kwok*, Case No. 22-50073 (JAM).  In bankruptcy court filings, Kwok has represented that specified assets—including his approximately $37 million yacht known as the Lady May and his penthouse at the Sherry-Netherland in Manhattan, where he was arrested this morning—were not his, but rather were properties belonging to family members, shell companies, and other financial entities.  Kwok's bankruptcy proceedings are ongoing.

### C.  Kwok's Threats and Attacks Against Others

1)  *Findings by the U.S. Bankruptcy Court in the District of Connecticut*

The bankruptcy court appointed a trustee (the "Trustee") to manage Kwok's financial affairs and to obtain assets for disbursement to Kwok's creditors.  Displeased with the Trustee's actions, Kwok mobilized his supporters to harass the Trustee.  For example, as described below, Kwok fomented protests and anger directed toward the bankruptcy trustee, which obstructed the bankruptcy process.  On November 23, 2022, to thwart the harassment, the Trustee sought—and was granted—a temporary restraining order.  But that did not deter Kwok from further obstructive actions.  Indeed, following a four-day evidentiary hearing, on January 11, 2023, the Honorable Julie A. Manning, United States Bankruptcy Judge for the District of Connecticut, preliminary enjoined Kwok from further harassment of the Trustee.  *In re: Ho Wan Kwok, et al.,* Chapter 11 Case No. 22-50073 (JAM) (Bankr. D. Conn. Jan. 11, 2023) (the "Order") (Exhibit C.).   In connection with the preliminary injunction, Judge Manning found the following facts:

- Kwok is associated with "Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu. The Farms are also known as Himalaya Farms, which are social media groups used by members of the [New Federal State of China, a Kwok controlled organization ("NFSC")] to communicate with each other."  And Kwok "founded and controls GNews[, which is] connected to Saraca Media."  (Order at 9.)

- Kwok "uses, inter alia, single use 'burner' phones to communicate with members of" various entities he is associated with, including the Himalaya Farms.  (*Id.* at 11.)

- "On July 19, 2022, [Kwok's] Gettr [social media] account posted a statement about the Chapter 11 Trustee, stating 'Please spread the words about the revelations of the CCP military intelligence and the truths about the trustee of my bankruptcy case. All the U.S. DOJ officials and lawyers from various law firms who want to deport me and harm me will be sent to prison.'"  (*Id.* at 17.)

- On October 21, 2022, Kwok made a statement requesting that his followers stop their protesting activities.  (*Id*. at 17.)

- "On November 15, 2022, the NFSC Gettr Page, @NFSCSpeaks, posted personal home addresses of the Chapter 11 Trustee, the Chapter 11 Trustee's family members, the chairman of PAG [a creditor of Kwok], family members of the chairman of PAG, and the law offices of the Chapter 11 Trustee's Counsel, and PAX's counsel. The @NFSCSpeaks post called for a 90-day protest at these locations. The post also contained photographs of some of the individuals living at the home addresses listed in the post."  (*Id*. at 19.)[12]

---

[12] Elsewhere in the opinion, Judge Manning found that the @NFSCSpeaks Gettr account is controlled by NFSC, an entity associated with Kwok, and further found that Kwok communicates with NFSC members using burner phones.  *Id.* at 11, 16.

- "On November 20, 2022, the @NFSCSpeaks account posted a statement identifying the Chapter 11 Trustee's daughters and stating their father is aiding and abetting the CCP. The post also contained photographs of the Chapter 11 Trustee and his daughters and identified where they work.  The @Miles account reposted this @NFSCSpeaks post on its Gettr page." (*Id.* at 22 (citations omitted).)

- "On November 20, 2022, protests occurred directly in front of the Chapter 11 Trustee's home. The protesters held signs which for the most part, were targeted directly at the Chapter 11 Trustee." (*Id.* at 23.)

- "On November 21, 2022, [Kwok] participated in an internet broadcast . . . and advised the audience to avoid receipt of subpoenas by, *inter alia*, not going home. . . .  In the same internet broadcast described above, [Kwok] stated, that the Chapter 11 Trustee and Paul Hastings [the Trustee's law firm] would suffer 'calamities' because of the [ ] subpoenas. [Kwok] said "[t]o deal with this rogue, we have our rogue's ways. In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!" (*Id.* at 23.)

- In a video posted on social media, while protesting outside Paul Hastings, an individual associated with Kwok's entities stated "[t]o everyone at Paul Hastings . . . Millions of People that have been persecuted by the CCP with curse you, will curse your family, curse every single person in your life because there is blood on your hands" and "the people of the New Federal State of China, 500 million of us . . . we stand against Paul Hastings, and we stand against O'Melveny.[13] There is no going back, there is no recourse. You have committed a crime, and now you're going to suffer the consequences of your actions." (*Id.* at 24-25.)

- "On November 25, 2022, the Chapter 11 Trustee received a series of emails at his work email from [an] unknown ProtonMail [an encrypted email service] email address with consecutive subject lines, 'I wish' and 'i kill.' The 'I wish' email had the body text 'hhhhhhhhhahahahaha.' The 'i kill' email had no body text." (*Id.* at 25.)

- On November 26, 2022, an unknown caller left a voicemail for the Trustee stating "you are CCP's running dog. You need to go to Hell. You just did something so ridiculous and your end is so close. F-U-C-K." (*Id.* at 27.)

As a result of these findings, and to thwart further interference with the bankruptcy proceedings, Judge Manning enjoined Kwok "from inciting the picketing" of the Trustee, "such as by posting or reposting on social media the home addresses of the Chapter 11 Trustee, his counsel, and his family members and of [plaintiff's] chairman, his counsel, and his family members or by calling for protests at their homes. The Debtor cannot evade the injunction through calling on or supporting others to act in his stead." (*Id.* at 47.)  Protest limitations were also

---

[13] O'Melveny represents an entity that has sued Kwok and is one of Kwok's creditors.

imposed prescribing the time, place, and manner in which Kwok followers can protest the Trustee and Paul Hastings.

Despite this injunction, obstruction of Kwok's bankruptcy proceeding has continued.  Two days after the preliminary injunction was issued, on January 11, 2023, on his Gettr page, Kwok encouraged his followers to flood the bankruptcy docket with claims (regardless of their merit).  By so doing, Kwok sought to force the Trustee to incur unnecessary costs and expense as well as obstruct the proceedings.[14]  On January 23, 2023, Kwok posted a video on Getter in which he encouraged more of the same, and revealed the purpose of the filings was to obstruct the bankruptcy court and cause unnecessary expenses for the Trustee:

- ▪ "All of you go to the bankruptcy court . . . Let the attorney's fees of trustee accumulate to 1 trillion if possible."

- ▪ "Think about it, $1,860 an hour as the attorney's fees. How much attorney fees is it after you all registered? How good is that!"

### 2) *Kwok's Attacks Against Witnesses*

Not only has Kwok publicly harassed the court-appointed Trustee and the Trustee's law firm, Kwok also has publicly attacked his critics and turned the ire of his hundreds of thousands of followers against them.  For example, one particular individual ("Individual-2") who worked with Kwok in connection with the GTV Private Placement before cutting ties with Kwok, expressed on social media that Kwok misled his followers and defrauded his followers.  Kwok responded by publicly branding Individual-2 as a "Demon" and a CCP spy.  A Kwok-controlled Farm subsequently sued Individual-2, who now lives in fear and in hiding as a result of Kwok's public threats. In particular, and as Kwok well knew, branding Individual-2 as a CCP spy has had the effect of turning Kwok's thousands of followers against Individual-2.

Kwok has also threatened victims who have sought reimbursements or complained about his fraud.  Several victims have informed the Government that after complaining to Kwok about their money he branded them CCP spies, sometimes in social media or video posts, effectively directing the wrath of Kwok's follower base toward them.  Another victim reported they were concerned Kwok would post information about their family, who still resides in China, online.  Doing so would associate that victim's family with Kwok's anti-CCP movement and place those China-based family members in danger.  Indeed, Kwok and his co-conspirators collected detailed information about their victims including, sometimes, members of their families in China.  This information serves as an implied extortion threat for his critics reminding them to keep quiet, or he will place them and their family in grave danger.

---

[14] https://gettr.com/post/p24ybdca10b (last accessed March 14, 2023) ("Greetings, esteemed comrades. Paul Hastings Law Firm is launching a campaign to register creditors! If there are comrades who are not strong-willed, feeling their own investments and past investments, have no sense of security and need to be a debtor, and if you think it is a better choice, you must contact Paul Hastings Law Firm to register in the Bankruptcy Court of Connecticut as soon as possible, and maybe you can become a billionaire.")

3)  *Kwok's Attacks Against His Critics*

Kwok's campaign of threats and encouraging violence extends broadly.  In November 2020, an anti-CCP activist ("Activist-1") filed suit against Kwok, alleging that Kwok has led a campaign of harassment and threats against him.  *See Xiqui (Bob) Fu v. Guo Wengui GTV*, 20 Cv. 257 (W.D. Tx. 2020).  Defamatory posts about Activist-1 were spread on social media.  Kwok also called for actual violence and encouraged hundreds of thousands of followers to protest outside Activist-1's home, offering tens of thousands of dollars in cash and securities for anyone who succeeded in "getting rid of" Activist-1. *See id.* Compl., Dkt. 1, at 6.

Also in 2020, Kwok mobilized his followers to protest outside the house of a journalist in Canada, who had been critical of Kwok.  Kwok branded the journalist as a CCP spy, and supporters carrying banners with the names of Kwok-affiliated entities protested outside the journalist's Canadian home almost every day between September 14, 2020 and December 1, 2020.  Kwok celebrated those protests.  On November 25, 2020, two of the protesters physically assaulted one of the journalist's friends by repeatedly kicking the friend in the head and neck as he lay on the pavement outside the journalist's home.  As has been publicly reported, the friend suffered a facial fracture, swollen-shut eyes, and lost a tooth.[15]

## III.    **Applicable Law**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the defendant shall be detained pending trial.  18 U.S.C. § 3142(e).  In seeking pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks.  *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."  18 U.S.C. § 3142(e)(1).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means.  *See* 18 U.S.C. § 3142(f)(2); *see also*

---

[15] *See*  https://bc.ctvnews.ca/video-shows-activist-beaten-kicked-amid-unusual-protest-outside-b-c-journalist-s-home-1.5206591.

*United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (Government entitled to proceed by proffer in detention hearings).

**IV.    The Defendant Should Be Detained Pending Trial**

The nature and circumstances of the offense charged, the weight of the evidence against Kwok, his individual history and characteristics, and the nature and seriousness of economic danger and the serious risk of obstruction that would be posed by Kwok's release, and his substantial risk of flight are all factors that strongly counsel in favor of Kwok's pretrial detention.

**A.  The Nature and Circumstances of the Offense and the Strength of the Evidence Warrant Pre-Trial Detention**

The nature and circumstances of Kwok's criminal conduct is both extraordinary and brazen.  Kwok is a highly sophisticated fraudster who repeatedly lied to investors to fraudulently obtain more than $1 billion from thousands of victims, whom Kwok specifically targeted through his purported anti-CCP movement.  Kwok then misappropriated hundreds of millions of the fraud proceeds he raised from victims to fund his own lavish lifestyle.  Kwok also engaged in extensive efforts to conceal his crimes, including by assiduously maintaining a technical distance between himself and the entities he unquestionably controlled and used to carry out his fraud scheme. Kwok, Je, and others laundered their victims' money through a network of hundreds of bank accounts held in the names of at least 80 different entities or individuals, engaging in complex transactions and entering into sham loan and other legal agreements to further obfuscate the source and use of funds.  *See* Ex. A at ¶ 3.  Moreover, Kwok's escalation of his fraud scheme even after the SEC Settlement and the disgorgement of more than $500 million in GTV Private Placement fraud proceeds proves that he cannot be deterred and poses an ongoing economic danger to the community.  As a result, the defendant is charged in eleven counts.  The charged crimes are indisputably serious.

Moreover, the evidence against the defendant is overwhelming.  One need look no further than the dozens of video recorded statements featuring the defendant himself promoting and trumpeting the GTV Private Placement, Farm Loan Program, G|CLUBS, and the Himalaya Exchange.  Those videos establish that Kwok sought "investments" in those "opportunities" and that *Kwok himself* spouted dozens of spurious lies to encourage investments.  Critically, Kwok claimed to his victims that their money would be used for GTV or to provide capital for so-called "Farms," and that, as "investors," they would be entitled to stock in various companies and membership benefits in G|CLUBS.  The message from Kwok, at its core, was "invest" and you will benefit.  Testimony from victims cements that they invested based on Kwok's lies and misrepresentations.

Documentary evidence, including bank records, similarly makes clear that Kwok's statements were lies.  Victim funds have been traced through a sophisticated network of banks, shell companies, and entities until—hundreds of millions of dollars—of funds reached the pockets of Kwok and his family.  Indeed, Kwok's videos, which were broadcast throughout the world, evidence his control over the luxury items purchased with victim money.  That the victim money flowed through a complex network of accounts and entities also evidences Kwok's knowledge.  It demonstrates that he sought to conceal the fraud proceeds he collected and, in many cases, to transfer money abroad to avoid the reach of the Government.  Bank documents reflect that hundreds of millions of dollars in fraud proceeds were transferred, either directly or indirectly, to

bank accounts in the United States, Bahamas, and the UAE, among other places, and held in the name of companies owned or otherwise controlled by Kwok confidants, including his co-defendant, Je.

The Government's evidence also includes recorded communications of Kwok with co-conspirators discussing the fraud scheme and the laundering of fraud proceeds, and anticipated testimony from witnesses who worked at Kwok's direction.  Victims have provided to the Government copies of communications they personally had with Kwok about the fraud. Collectively, this evidence overwhelmingly establishes Kwok's knowledge and control over the fraudulent offerings and the various entities that he used to further the fraud, his misstatements to victims, and his deceptive efforts to conceal his fraud.

As a result of the charged offenses, the defendant is exposed to a statutory maximum of 195 years and faces a Guidelines sentence of the statutory maximum.[16]  By any measure, the charged crimes are extraordinarily serious, the evidence against Kwok is strong, and Kwok's actions have had a devastating impact on many victims, while thousands of more victims exist. These factors strongly weigh in favor of detention pending trial.

## B.  Kwok Presents Ongoing Economic Danger

If released, Kwok poses an ongoing economic danger to the community.  *See United States v. Madoff*, 586 F. Supp. 2d 240, 253 (S.D.N.Y. 2009) ("The Court recognizes . . . that there is jurisprudence to support the consideration of economic harm in the context of detention to protect the safety of the community").  Courts have recognized that a defendant's economic danger to the community may be taken into consideration—"even in the cases where pretrial detention is the relevant question"—based on the defendant's "propensity to commit further crimes, even if the resulting harm is solely economic." *Id.* (citation omitted); *see also United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) (denying bail pending appeal); *United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir. 1979) (denying bail pending appeal and noting that "a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the Act.").

As detailed above, Kwok's fraud scheme has escalated over the course of years.  He has continually modified his tactics to evade regulators, conceal the source of funds, and move stolen funds overseas.  Indeed, even after the GTV Private Placement was thwarted by the SEC, Kwok was not deterred—he brazenly continued to sell GTV stock through other mechanisms, including by embedding the stock within purported "convertible loan" agreements, which were extended to

---

[16] Pursuant to U.S.S.G. § 2S1.1 the base offense level is the underlying offense from which the laundered funds were derived.  Pursuant to U.S.S.G § 2B1.1 the base offense level is seven, which is increased, pursuant to § 2B1.1(b)(1)(P), by 30 levels because the loss exceeded $550,000,000. Pursuant to § 2B1.1(b)(2)(A), four levels are added because the offense resulted in substantial hardship to five or more victims.  Pursuant to § 2B1.1(b)(10)(C), two levels are added because the offense involved sophisticated means.  Pursuant to § 2S1.1(b)(2)(B), two levels are added if the defendant is convicted under 18 U.S.C. § 1956.  Pursuant to § 3B1.1(a), four levels are added because the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  The forgoing yields a total offense level of 49, which corresponds to a Guidelines sentence of life or the statutory maximum.

individual investors by a diffuse group of "Farms," and disguising the stock as one of the purported benefits of G|CLUBS "membership." These sophisticated adaptations have caused more than $500 million of additional harm to Kwok's victims and plainly demonstrates Kwok's ability, and desire, to continue his fraud, regardless of regulatory or other enforcement action.

The Himalaya Exchange is another example of Kwok's ongoing danger to the public. The Government's investigation has revealed that, for years, Kwok has sought to acquire his own bank, which would allow him to circumvent banking restrictions and regulations that have at times frustrated his fraud. In the absence of securing their own banking license, Kwok and Je created the next best thing: the Himalaya Exchange, a closed "ecosystem" that could facilitate their transfer and laundering of hundreds of millions of dollars in victim money, all under the auspices of an operational cryptocurrency.

Equally troubling is how Kwok and Je responded when the Government seized substantial fraud proceeds that purportedly "backed" the Himalaya Exchange's digital assets. First, despite the seizures, Kwok, Je, and others blatantly lied to "customers" of the Exchange by deliberately hiding the fact of the seizures. In the months since the Government's seizures—and to this day— the Himalaya Exchange website has consistently represented that HDO is backed by a "Reserve consisting of USD and cash-equivalent assets" when, in fact, it is not. *See* Ex. A at ¶ 24(b). Second, following the Government's seizures, Kwok adapted yet again to continue his fraud scheme—by moving the Himalaya Exchange operations, and its money, to the UAE so it will be beyond the "long arm jurisdiction of the U.S." (*See* gnews.org/articles/949854.)

Thus, even after the SEC put a stop to the GTV Private Placement, Kwok found ways to continue to offer the stock. And even after the U.S. Government seized proceeds under the control of entities associated with the Himalaya Exchange, Kwok has taken steps to move victim money abroad.[17]

Although the charged fraud scheme involves ongoing fraud vehicles, including G|CLUBS and the Himalaya Exchange, Kwok's greed is insatiable. Kwok continues to invent and promote new "investment opportunities" for his victims. Beginning at least in February 2023, and as described above, Kwok began to promote the "A10"—yet another sale of an amalgam of stock and digital assets that Kwok promises will make his investors rich. This new vehicle for Kwok's fraud comes *after* the SEC stopped the GTV Private Placement, *after* Kwok-affiliated bank accounts were shuttered, *after* numerous Kwok-affiliated entities received grand jury subpoenas, and *after* Government seizure warrants secured $630 million of Kwok and Je's fraud proceeds. Despite all of that, Kwok continues to create economic havoc and harm victims. There can be no reasonable assurance that Kwok will stop his criminal conduct due to pretrial conditions. Simply put, there are no conditions of release that the Court can impose that will protect the community from severe economic harm at Kwok's hands.

---

[17] Kwok's statements about moving money abroad are corroborated by other evidence in this case. For example, travel records reflect that two of Kwok's co-conspirators, who have worked for Kwok-controlled entities for years in finance and bank-related roles, recently spent more than a month in Abu Dhabi for work.

### C.    Kwok Presents a Danger of Obstruction

"[O]bstruction poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate.  *United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371, at \*2 (S.D.N.Y. Nov. 14, 2005).  Indeed, the Second Circuit has been clear that "obstruction of justice has been a traditional ground for pretrial detention by the courts." *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000).  Thus, where, as is the case here, there is a "a *serious* risk of obstruction in the future," detention is appropriate where no court-imposed conditions can reasonably protect from that risk.  *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009).

This Court need look no further than the findings of the U.S. bankruptcy judge in Connecticut to conclude that Kwok poses a serious risk of future obstruction if released.  Indeed, even after the bankruptcy court imposed a temporary restraining order on Kwok, Kwok and the followers under his control continued to threaten and harm the bankruptcy Trustee, his family, and his law firm, Paul Hastings.  Kwok also organized protests, which reportedly resulted in physical assaults, including of one of Kwok's critics and of a friend of a Kwok critic who happened to be at the protest site.  It is important to emphasize that Kwok has engaged in, and encouraged, these obstructive and dangerous actions in response to *civil* cases—that is, cases that have merely threatened Kwok's assets.  The stakes of a criminal case are much more significant, particularly given the strength of the evidence and the length of imprisonment Kwok is facing. The risks that Kwok will endeavor to obstruct here—and more dangerously—are gravely serious.

With respect to obstruction connected to victims of his criminal fraud, Kwok has already intimidated and threatened witnesses.  These threats have frightened many and the Government has evidence that others who have similarly been victimized by Kwok have been reluctant to speak up, for fear of Kwok's retribution and his ability to foment anger at anyone who complains.

If released, Kwok is also likely to continue to obstruct in this particular case.  The Government believes Kwok will continue to funnel his assets, and evidence, beyond the reach of the U.S. Government.  Kwok's enterprise has already done this.  As explained in the Indictment, co-defendant William Je attempted to move $46 million in fraud proceeds to the UAE to avoid further Government seizures.  *See* Ex. A at ¶ 23.  As discussed above, Kwok recently stated that the Himalaya Exchange would continue on that same path to avoid the "long arm jurisdiction" of the United States.  Kwok is extremely sophisticated and savvy regarding electronically stored information.  As the bankruptcy court found, Kwok uses single-use, or "burner," cellphones, which function (in part) to conceal Kwok's communications.  Moreover, in October 2019, in connection with an unrelated investigation of Kwok, the FBI executed a search warrant on Kwok's New York City penthouse.  During that judicially-authorized search, the FBI recovered approximately 252 electronic devices (*i.e.*, cellphones, hard drives, flash drives, computers, routers, audio pens, and voice recorders, among other devices), including approximately 96 cellphones, approximately 44 of which were located inside Faraday bags[18] in safes.  Another approximately six iPhones were maintained in a Faraday bag inside a desk drawer.  The Government contends that, if released,

---

[18] A faraday bag is a type of shielding device or enclosure that blocks the passage of radio frequency emissions and is used to, among other things, prevent electronic devices from electronic surveillance by blocking the transmission of radio waves that may be used to intercept or listen in on communications.

Kwok is likely to delete, encrypt, or transfer electronic evidence that the Government is still identifying and pursuing. Kwok's history demonstrates a significant level of sophistication and a willingness to flout court orders that would prohibit him from obstructing witnesses, moving money, or destroying evidence. The only way to mitigate such risks, and keep witnesses safe, is to order Kwok detained pending trial.

### D.  Kwok is A Flight Risk

Kwok presents a substantial risk of flight and should be detained for this reason alone. His connections to the United States are limited. He emigrated to the United States in 2015, then made several trips abroad before applying for asylum in 2018. That application remains pending. Kwok has no other status in the United States. If his asylum application is denied, he would no longer be legally present. Kwok's connections to the United States consist primarily of his vast series of business entities that are instrumentalities of his fraud scheme. All of those businesses can be operated remotely. Kwok's media appearances are virtual; he can make recorded statements from nearly anywhere, and can use the Internet to attract further victims of his fraud.

While Kwok's connections in the United States are limited, he has substantial connections and resources abroad. His adult son and his co-defendant, Je, both live in the United Kingdom. Importantly, Kwok has an extensive network of loyal followers dispersed throughout the world. He has assets secreted in Switzerland, the UAE, the United Kingdom, and elsewhere. Kwok can easily re-plant his life in another country beyond the reach of U.S. law enforcement. Indeed, as mentioned, Kwok may be in the process of doing that at present. Kwok further appears to be moving a portion of his criminal operations to the UAE.

Moreover, Kwok has an extremely powerful incentive to flee. Kwok is facing charges that, in total, carry a statutory maximum sentence of more than 100 years in prison. Under the United States Sentencing Guidelines, his advisory Guidelines range—based on the presently charged conduct alone—is the statutory maximum. And the evidence of Kwok's guilt is overwhelming, as documented in the detailed Indictment and described above. Given the weight of the evidence and the expected length of the potential sentence, any individual would be highly incentivized to flee; with Kwok's lack of ties to the United States, his ties abroad, and the prospect of likely deportation after serving his sentence, the incentives to flee are even greater.

Kwok has the means to escape from the United States, even while subject to strict pretrial supervision. Kwok has assets located elsewhere, including a blue-water capable yacht, and a private jet aircraft, which is currently believed to be in the United Kingdom.

### E.  There Are No Conditions or a Combination of Conditions Which Can Assure the Court that the Community Will Be Safe and the Defendant Will Not Flee

There are no conditions that can be imposed to satisfy the Court that Kwok will neither flee nor pose a danger to the community.

*First*, Kwok is unable to pledge assets to the Government as a security against flight. Kwok has filed for bankruptcy and declared less than $100,000 in assets. The Government believes that declaration to be untrue, but regardless, Kwok's obfuscation and his pending bankruptcy case mean that, if Kwok were to flee, the Government would at best be in a long of line of creditors seeking to liquidate Kwok's limited, and hotly contested, estate.

*Second*, ankle-bracelet monitoring is insufficient.  Bracelets can easily be removed, and given the defendant's vast (hidden) resources and strong incentives to flee, do nothing more than reduce his head start should he decide to cut the bracelet and flee.  *See United States v. Freeman,* 21 Cr. 88 (JSR) (S.D.N.Y. Feb. 19, 2021) (noting during bail appeal that "what about the fact that it is well established that electronic monitoring, even before the pandemic, was often not adequate to secure someone's presence? I must have had . . . in my 25 years on the bench, 100 cases in which someone was under electronic monitoring, yet still managed to go other places. . . . Anyone who knows the technology of electronic monitoring knows that it is far from foolproof"); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *see also United States v. Casteneda*, No. 18 Cr. 047, 2018 WL 888744, at *9 (N.D. Cal. Feb. 2018) (same); *United States v. Anderson*, 384 F. Supp.2d 32, 41 (D.D.C. 2005) (same); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).  It would also be ironic for the defendant to be confined, in a home surrounded by lavish luxury items that he likely purchased with the proceeds of his crimes.

*Third*, to the extent the defendant argues that guards can serve as proto-U.S. marshals to ensure he does not flee, that proposal too should be rejected. At the outset, "there is a debate within the judiciary over whether a defendant, if [they are] able to perfectly replicate a private jail in [their] own home at [their] own cost, has a right to do so under the Bail Reform Act and the United States Constitution."  *United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (Bianco, J.) (collecting cases).  Moreover, courts have been rightfully troubled by private jail proposals which, "at best 'elaborately replicate a detention facility without the confidence of security such a facility instills.'"  *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (quoting *United States v. Gotti*, 776 F. Supp. 666, 672 (E.D.N.Y. 1991) (rejecting private jail proposal)).  The Second Circuit has noted that it was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail."  *United States v. Banki*, 369 Fed. App'x 152, 153-54 (2d Cir. 2010) (internal quotation marks omitted)).  At bottom, if the defendant's appearance can only be assured through use of round-the-clock guards, the defendant belongs in a federal detention center, not released under bail conditions that effectively create a private prison of one.  *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 3681423, at *12 (S.D.N.Y. June 16, 2016) ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" (quotation and citation omitted).)

*Fourth*, any offer by the defendant of a so-called "waiver of extradition" should be summarily rejected.  Such waivers provide no assurance whatsoever as many courts have recognized.  *See, e.g.*, *United States v. Morrison*, No. 16-MR- 118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016); *United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015); *United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013); *United States v. Cohen*, No. C 10-00547, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985). Any defendant who signs such a purported waiver and then flees will assuredly contest the validity and/or voluntariness of the waiver, and will get to do so in the jurisdiction to which he fled.

*Fifth*, there are no conditions which can prevent the defendant from refraining from committing further crimes or obstructing justice. Kwok's bankruptcy proceeding—and his obstructive conduct in litigation that led to an order of contempt that, in turn, prompted Kwok's claim of bankruptcy—underscore Kwok's complete and total lack of respect for the law and court orders. This Court can have no reasonable assurance that Kwok will regard any conditions of pretrial release differently. Kwok has not been dissuaded from continuing his brazen fraud despite regulatory involvement by the SEC and seizures by the Government of $630 million. Kwok's threats to witnesses and others involved in the judicial process, pose a particularly pernicious danger by threatening the sanctity of the judicial process. Kwok's critics have been attacked merely for voicing displeasure with his activities. Kwok now faces the prospect of witnesses coming forward to testify against him during a *criminal trial*. The stakes are higher, and the risks that Kwok poses—given the heightened seriousness of this litigation—are substantially increased. Ordering Kwok not to obstruct justice, commit crimes, or communicate with co-conspirators and witnesses is an insufficient remedy. To the contrary, if released pretrial, Kwok will have every incentive to disregard this Court's orders, as he has with other courts, and violate his conditions through flight, obstruction, fraud, and by covert commands to his vast network of followers who follow his orders.

## V.    <u>Conclusion</u>

Kwok is an extraordinary defendant, with limited ties to the United States and the resources to flee from this country and from the legal consequences of his fraud. He poses an ongoing danger to the community and the judicial process to which he is now exposed. There are no conditions or combination of conditions which can satisfy the Court that the community will be safe, or that the defendant will appear, if he is released. The defendant should be detained pending trial.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Ryan B. Finkel
Juliana N. Murray
Micah F. Fergenson
Assistants United States Attorney
(212) 637-6612 / 2314 / 2190

Enclosures

Copy to:   Guy Petrillo and Josh Klein, *counsel for the defendant Ho Wan Kwok*
Stephen Boose Pretrial Services, Southern District of New York