**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 23-CR-118 (AT)** |
| **v.** | |
| **HO WAN KWOK, *et al.*,** | |
| Defendants. | |

## HO WAN KWOK'S MEMORANDUM IN SUPPORT OF APPLICATION FOR RELEASE ON BAIL PENDING TRIAL

**I.      PRELIMINARY STATEMENT**

The Eighth Amendment to the U.S. Constitution guarantees reasonable bail.  As the Supreme Court has recognized, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Even when defendants have been accused of the most notorious and massive frauds in our nation's history, liberty remains the norm:

- *Sam Bankman-Fried (FTX)*: Reported fraud losses of over $8 billion, released on a $250 million personal recognizance bond;[1]

- *Bernard Madoff (Bernard L. Madoff Investment Securities LLC)*: Reported fraud losses of over $50 billion, released on a $10 million personal recognizance bond;[2]

---

[1] *See* Appearance Bond at 1, *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Dec. 22, 2022), ECF No. 14.
[2] *See* Minute Entry, *United States v. Madoff*, No. 1:09-cr-00213-DC-1 (S.D.N.Y. Dec. 11, 2008).

- *Elizabeth Holmes (Theranos)*: Estimated $700 million in investor losses, released on a $500,000 (initially unsecured) bond;[3]

- *Jeffrey Skilling (Enron)*: Estimated losses of $60 billion, released on $5 million secured bond;[4]

- *Bernard Ebbers (WorldCom)*: Reported fraud losses of $11 billion, released on $10 million personal recognizance bond;[5]

- *Jordan Belfort (Stratton Oakmont)*: Reported fraud losses of $200 million, released on $10 million unsecured bond.[6]

Despite the notoriety of these cases, the number of victims, the massive dollar amounts, and the individual resources of each defendant, courts were nevertheless able to avoid detention and set conditions of release that allowed the defendants to be released and to participate meaningfully in their own defenses.  This case should be no different.

The Sixth Amendment to the U.S. Constitution guarantees Mr. Kwok the right to counsel. Mr. Kwok's continued detention will impact severely his ability to meaningfully participate in his own defense, and it will cripple his counsel's ability to investigate the Government's allegations and prepare for trial.  The Government has informed the undersigned that the volume of discovery in this case is voluminous, including an *initial* production of approximately two terabytes of data.  Much of that data is expected to be in Mandarin.

---

[3] *See* Order Setting Conditions of Release, *United States v. Holmes et al*, No. 5:18-cr-00258-EJD-1 (N.D. Cal. June 15, 2018), ECF No. 6.
[4] *See* Appearance Secured Bond, *United States v. Causey et al.*, No. 4:04-cr-00025-2 (S.D. Tex. Feb. 19, 2004), ECF No. 34.
[5] *See* Minute Entry, *United States v. Sullivan, et al.*, No. 1:02-cr-01144-VEC-3 (S.D.N.Y. Mar. 3, 2004).
[6] *See* Order Setting Conditions of Release and Bond, *United States v. Belfort, et al.*, No. 1:98-cr-00859-AMD-1 (E.D.N.Y. Sept. 4, 1998), ECF No. 5.

Currently detained at Metropolitan Detention Center, Brooklyn ("MDC Brooklyn"),
Mr. Kwok has limited access to his attorneys, and he is currently subject to unusually draconian
restrictions in an extraordinarily dangerous environment.  On March 24, 2023, the Warden of
MDC Brooklyn placed the facility on an indefinite lockdown, citing an increase in contraband,
including weapons.[7]  Inmates are reportedly allowed out of their cells for a total of twenty
minutes per day, with only one cell permitted to be out at any given time.  Access to phone,
internet, and all other services have been restricted, if not entirely revoked; inmates are served
only one hot meal a day, and all meals are eaten in cells.  And while the Warden's memorandum
states that "every attempt will be made to ensure the inmate population is provided . . . legal
phone calls and visits," Mr. Kwok's counsel have had significant challenges communicating with
their client.  Moreover, even when walk-in visits by attorneys are permitted at MDC Brooklyn
there are a limited number of visitation rooms available, often requiring attorney-client
privileged conversations be attempted in a large open room filled with other inmates and BOP
staff.  It is also not feasible—or allowed—for Mr. Kwok's legal team to transport the extensive
documentation that must be reviewed, analyzed and discussed with Mr. Kwok over many months
while seated at a small table designed for two persons located in an open room filled with other
inmates.  This constellation of circumstances is plainly inadequate for a case of this complexity,
and leaves Mr. Kwok with no meaningful opportunity to participate in and assist his defense,
effectively depriving him of his right to counsel.

---

[7] See *Memorandum for Inmate Population*, by S. Ma'at, Warden, MDC Brooklyn (Mar. 24,
2023) ("[T]his memorandum is declaring my decision to implement a planned lock-down on
various floors and units to slow operations down, conduct shakedowns, and gather additional
intelligence."), attached hereto as Ex. A.

Mr. Kwok respectfully submits that the bail proposal contained herein is sufficient to satisfy any legitimate concerns the Government may have and to ensure Mr. Kwok's appearance in court, and will allow Mr. Kwok to have meaningful access to his counsel.

## II.     LEGAL STANDARD

The Bail Reform Act codifies the Eighth Amendment's guarantee of bail, requiring district courts to order the pre-trial release of the defendant "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." *United States v. Boustani*, 932 F.3d 79, 81 (2d Cir. 2019) (quoting 18 U.S.C. § 3142(b)); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

However, even in circumstances where a court determines that a defendant poses a flight risk or a risk to the community, there remains a statutory presumption in favor of the defendant's release. *See Sabhnani*, 493 F.3d at 75 ("[I]t is only a limited group of offenders who should be denied bail pending trial.") (internal quotation marks and citations omitted). Accordingly, the presiding court must release the defendant on bail, subject to the *least restrictive* conditions that will reasonably assure the defendant's appearance at trial and the safety of the community. *See Boustani*, 932 F.3d at 81; *Sabhnani*, 493 F.3d at 75; *see also United States v. Madoff*, 586 F. Supp. 2d 240, 246 (S.D.N.Y. 2009).

The Court's analysis is therefore twofold. First, the Court must determine whether the Government has met its burden and established by a preponderance of the evidence that the defendant "presents a risk of flight or obstruction of justice." *Madoff*, 586 F. Supp. 2d at 247. If the Court finds that the Government has met this initial burden, the Court must then evaluate whether there are reasonable conditions of release that can ameliorate the risk. *See id.*

4

In determining whether there are conditions of release that will reasonably assure the appearance of the defendant and the safety of the community, courts evaluate four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to the community posed by the defendant.  *See* 18 U.S.C. § 3142(g); *Boustani*, 932 F.3d at 81.  "An order of detention based on the safety of other persons and the community must rest on a finding supported by clear and convincing evidence," *United States v. Stein*, No. S1 05 Crim. 0888 (LAK), 2005 WL 8157371, at *1 (S.D.N.Y. Nov. 14, 2005), while detention based on the defendant's perceived flight risk must be supported by a preponderance of the evidence. *See Boustani*, 932 F.3d at 81; *Sabhnani*, 493 F.3d at 75.

## III.  **BACKGROUND OF HO WAN KWOK**

Mr. Kwok was born into a poor family in Shandong Province, China.  In his youth, Mr. Kwok worked in a radio repair shop and combined his earnings with those of his seven brothers to invest in real estate development.  In his early twenties, following the pro-democracy Tiananmen Square protests in 1989, Mr. Kwok spent approximately 20 months in jail—where he was tortured—for providing financial support to student protestors. Around the same time, he witnessed his younger brother brutally shot and left to die by two agents of the Chinese Communist Party ("CCP").  The murder of Mr. Kwok's brother and his arrest and subsequent torture in prison affected him profoundly.  While in jail, Mr. Kwok developed many meaningful personal connections with other prisoners of conscience who also had been jailed for supporting the Tiananmen Square pro-democracy movement.  They shared the same passion for pursuing freedom in China, and Mr. Kwok continued to maintain those relationships after his release from prison in 1991.

By around 1991, the Chinese government was beginning to loosen certain rules governing society, which enabled private citizens to start to achieve a sort of "quasi-private" ownership of real property in China.  While Mr. Kwok's family benefitted from this change, he personally could not, due to his prior politically-motivated arrest and detention.  Mr. Kwok left mainland China for Hong Kong in or around 2000, and became a Hong Kong citizen.  While his family was continuing to build its businesses in China, under Chinese law, as a citizen of Hong Kong, Mr. Kwok could neither keep his Chinese citizenship, nor own assets in China.

Mr. Kwok's family was active in commercial real estate development, and in 2002 the family acquired large tracts of land in Beijing, which became significantly more valuable when China was named the host country for the 2008 Olympics.  CCP officials attempted to appropriate this land for their own personal benefit, and Mr. Kwok reported the attempted seizure to higher-up Chinese government officials.  After a lengthy fight the land was recovered, enabling the development of Pangu Plaza—a hotel, convention center, and residential apartment complex in Beijing that eventually served as the backdrop to the 2008 and 2022 Olympics in Beijing.

Mr. Kwok continued to provoke the ire of the CCP by speaking out against corruption. In 2003, Mr. Kwok exposed the corruption of a prominent CCP official in Beijing.  Members of the Ministry of State Security requested and received Mr. Kwok's cooperation in their investigation of this official, who was ultimately tried and convicted of bribery.  Thereafter, that official and his political faction sought revenge against Mr. Kwok, using their political power to persecute Mr. Kwok and his family.

In the years after denouncing the Beijing official, Mr. Kwok and his family were under continuous threat.  Fearing for their safety, Mr. Kwok moved his family to Hong Kong, hoping

to avoid further conflict with the CCP.  However, in October 2014, Mr. Kwok developed a
friendship with a Deputy Minister of State Security. Although the Deputy Minister provided
some protection against the Beijing official, the Beijing official's attacks against Mr. Kwok and
his family persisted, inflicting reputational damage.  Amid this pressure and fearing for their
safety, Mr. Kwok moved his family to Hong Kong, hoping to avoid further conflict with the
CCP.  In October 2014, the Deputy Minister alerted Mr. Kwok that he was wanted by the
Chinese government on pretextual charges.  On January 1, 2015, Mr. Kwok fled from Hong
Kong to the United States, where he ultimately sought political asylum.  He has not returned to
China since.

Ten days after Mr. Kwok departed Hong Kong, his daughter, wife, brothers, and several
hundred employees were arrested during a Chinese government raid at the Pangu Hotel in
Beijing.  Over one hundred police agents descended on the hotel and began beating and arresting
everyone present.  Mr. Kwok's family were recognized and immediately taken into custody.  Mr.
Kwok's daughter and wife were detained and separately questioned repeatedly about Mr. Kwok,
his whereabouts, and allegations that he was serving as a spy for the United States.  They were
told that they would be detained until they convinced Mr. Kwok to return to China, but were
ultimately released.  Mr. Kwok's brothers were not so fortunate—several were convicted of false
charges and sentenced to months and years of detention.

Mr. Kwok's wife and daughter remained subject to constant surveillance by the Chinese
government and were expressly prohibited from traveling anywhere in or outside of China unless
given authority by security agents.  They were followed wherever they went and were required
each day to report telephonically to the security agents who had interrogated them, revealing
everywhere they went, and everyone with whom they had met.  They were not permitted to

return to their home for a year.  When they were permitted to return in February 2016, they found that most of their friends had distanced themselves from the family in fear of reprisals and interrogation by the Chinese government.

Mr. Kwok's daughter was taken into custody a second time in December 2016, this time detained for approximately 40 days and subjected to more aggressive questioning and abhorrent conditions.  Mr. Kwok's wife was not detained, but was required on numerous occasions to report to Beijing for interrogation.  Throughout this, the security agents remained intent on securing Mr. Kwok's return to China, using his family as leverage.  Mr. Kwok, then in New York, received calls on behalf of senior members of the CCP, informing him that his family would be released if he stopped publicly exposing CCP corruption.  Later they would try to convince him to return to China by assuring him that his position in society would be restored and his family's assets unfrozen.  In May 2017, the Chinese government permitted Mr. Kwok's wife and daughter to temporarily visit Mr. Kwok in New York on the condition that they persuade Mr. Kwok to agree to return, with his family, to China.

A week after Mr. Kwok's family arrived, four Chinese security officials traveled to New York on transit visas, which do not permit the holder to conduct business while in the United States.  The CCP agents demanded a meeting with Mr. Kwok.  They spent many hours in his apartment, trying to persuade him to return to China, offering him assurances that if he curtailed his criticism of the CCP he would be restored to good standing in China.  This visit caught the attention of the FBI, who interviewed Mr. Kwok about his visit from the Chinese officials. Mr. Kwok notified the FBI agents that the Chinese security officials were planning to return to his home in two days, allowing the FBI the opportunity to detain and question them about their activities in the United States.

In 2017, Mr. Kwok significantly increased his anti-CCP campaign by using social media and U.S.-based news outlets as platforms to expose the corruption of certain high-level CCP officials.  Mr. Kwok's public statements received widespread coverage in the United States and abroad, and Mr. Kwok provided information to U.S. authorities regarding CCP officials and their crimes.  Retaliation on the part of the CCP increased, as they attempted to gain leverage over, discredit, threaten, and silence Mr. Kwok.  Fearing for his life, Mr. Kwok filed for political asylum protection in the United States in September 2017.  His asylum application remains pending.

When these efforts to silence Mr. Kwok failed, the CCP resorted to trying to get him extradited to China, where he would almost certainly be executed.  The events that followed, and that continue to unfold today, are truly extraordinary.  An FBI investigation revealed that during the summer of 2017, Mr. Kwok was the target of lobbying attempts by the CCP in the United States, utilizing a corrupt Department of Justice official and a number of prominent U.S. businesspersons to lobby the President of the United States and his administration to extradite Mr. Kwok to China.[8]  The CCP's scheme resulted in the federal indictments and guilty pleas of the former Finance Chairman of the Republican National Committee Elliot Broidy,[9] lobbyist

---

[8] *See* Aruna Viswanatha, *Steve Wynn May Face Just. Dep't Action for Role in China's Push to Expel Businessman*, Wall Street Journal (May 26, 2021), https://www.wsj.com/articles/justice-department-wants-casinomogul-steve-wynn-to-register-as-foreign-lobbyist-11622054103).

[9] U.S. Dep't of Just., *Elliott Broidy Pleads Guilty for Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Chinese Foreign Nat'l* (Oct. 20, 2020), (https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdbinvestigation-and) (stating that "Broidy also agreed to lobby the Administration and DOJ on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A – a dissident of the PRC living in the United States"; Mr. Kowk is "PRC National A").

Nicki Lum Davis,[10] and former DOJ official George Higgenbotham,[11] all of whom admittedly took payments in exchange for lobbying top U.S. government officials for Mr. Kwok's extradition.  Prakazrel Michel, best known as part of the 90s hip-hop group the Fugees, is currently standing trial in the United States District Court for the District of Columbia for his role in the scheme.[12]  Senior DOJ official Higginbotham, for his part, facilitated the transfer of tens of millions of dollars, making it one of the biggest espionage and corruption scandals in DOJ history.[13]

The CCP has also targeted Mr. Kwok in various other ways starting that same year, including by: orchestrating false criminal charges against him that have led to the issuance of INTERPOL Red Notices; hacking the server of the law firm that filed his asylum application, extracting his highly sensitive information from that application, and then publicly disseminating it across the internet; bringing and funding numerous spurious litigations against him, some of

---

[10] U.S. Dep't of Just., *Hawaii Businesswoman Pleads Guilty to Facilitating Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Foreign Nat'l to China* (Aug. 31, 2020), https://www.justice.gov/opa/pr/hawaii-businesswoman-pleads-guilty-facilitating-back-channel-lobbyingcampaign-drop-1mdb (stating that "Lum Davis and others also agreed to lobby the Administration and Justice Department on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A — a dissident of the PRC living in the United States"; Mr. Kowk is "PRC National A").

[1111] U.S. Dep't of Just., *Former Just. Dep't Employee Pleads Guilty to Conspiracy to Deceive U.S. Banks about Millions of Dollars in Foreign Lobbying Funds* (Nov. 30, 2018), https://www.justice.gov/opa/pr/former-justice-department-employee-pleads-guilty-conspiracy-deceive-us-banks-about-millions (stating that "Higginbotham further admitted that another purpose of the lobbying campaign was an attempt to persuade high-level U.S. government officials to have a separate foreign national, who was residing in the United States on a temporary visa at the time, removed from the United States and sent back to his country of origin"; Mr. Kwok is that "separate foreign national").

[12] Robert Legare, *Rapper Pras Michel on trial in D.C., accused in multimillion-dollar int'l fraud scheme*, CNBC News (Mar. 30, 2023), https://www.cbsnews.com/news/pras-michel-rapper-trial-conspiracy-fraud/.

[13] Factual Basis for Plea, *United States v. Higginbotham*, No. 1:18-cr-00343 (D.D.C. Nov. 30, 2018).

which remain active today; and detaining, torturing, and imprisoning many of his family

members and former colleagues.  Since 2017, the CCP has frozen and seized family assets and

purported assets in China and Hong Kong, making it impossible for Mr. Kwok to even maintain

a bank account.

**IV.**      **PROPOSED CONDITIONS OF RELEASE**

Mr. Kwok respectfully proposes the following conditions of release:

1.      An appearance bond of $25 million, $5 million of which to be secured by cash deposited

with the Court, real estate assets, or a combination of both.  The appearance bond to be signed by

Mr. Kwok and two financially responsible adults, one of whom is not a family member.

2.      Mr. Kwok to surrender all travel documents (to the extent any exist).

3.      Mr. Kwok's U.S.-based family—his wife and daughter—to surrender any travel

documents that they possess.

4.      Mr. Kwok to be subject to home detention at the Connecticut residence where his wife

resides, or such other location approved by the Government or the Court.

5.      Mr. Kwok to be subject to GPS or other active location monitoring technology as

directed by pretrial services.

6.      Mr. Kwok to be subject to 24/7 surveillance by a security company which shall maintain

at least one licensed and qualified guard on-site at all times, reporting violations to the

Government and/or the Court.  The security company shall not have any prior affiliation with

Mr. Kwok or his family.

7.      Mr. Kwok shall not enter into any financial transactions without pre-approval of the

Government or the Court, except to pay legal costs and fees.

9.      Mr. Kwok to have no communications with co-defendants except in the presence of counsel.

## V.    <u>**ARGUMENT**</u>

The Court should grant Mr. Kwok's application for bail for several reasons.  First, the Government has failed to meet its burden of showing that Mr. Kwok poses either a risk of flight, a danger to the community, or will obstruct justice.  Indeed, the evidence demonstrates quite the opposite: Mr. Kwok likely would face a fate far worse than incarceration in the United States should he attempt to flee.  Moreover, the facts in this case are far from those that would require this Court to depart from the presumption in favor of release—Mr. Kwok plainly does not qualify as one of the "*limited* group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir.1987) (quoting S. Rep. No. 98–225, at 7 (1984)) (emphasis added) (internal quotation marks omitted).  Finally, should the Court determine that Mr. Kwok is a flight risk or poses some danger to the community, he should still not be detained, as there exists a combination of bail conditions adequate to address and eliminate these risks, and the Government has failed to make a showing to the contrary.

### A.  <u>**Mr. Kwok Does Not Pose a Risk of Flight**</u>

The Government asserts that Mr. Kwok "presents a substantial risk of flight and should be detained for this reason alone."  Letter Motion re: Detention Memorandum (Mar. 15, 2023) ("Gov't Detention Mem.") at 21 (ECF No. 7).  In fact, the opposite is true—Mr. Kwok has every reason ***not*** to flee and will remain in the United States to defend himself against allegations in the Indictment.

### 1.  <u>Mr. Kwok's Life in the United States</u>

The first (and most compelling) reason that Mr. Kwok is not a flight risk is that two of the most important people in his life—his wife of 38 years and his daughter live here in the United States.  Mr. Kwok's wife and daughter reside primarily in Connecticut and, like Mr. Kwok, they have sought asylum in the United States after experiencing harassment, imprisonment, and persecution at the hands of the CCP.  *See Section III, supra.* Neither Mr. Kwok's daughter nor his wife have passports that they could use to travel outside the United States.[14]  Mr. Kwok has a very close relationship with his wife and daughter and would not abandon them here in the United States.  Nor would he risk never seeing his wife and daughter again, which would likely be the result were he to flee the United States.  In sum, Mr. Kwok would not jeopardize his relationships with two of his three closest family members by abandoning them for a life on the run outside the United States.

Relatedly, Mr. Kwok and his family have established a life in the United States and could not relocate without substantial hardship.  In the first instance, it would be extremely difficult for Mr. Kwok to even logistically manage a way out of the country: his passports have been confiscated or otherwise previously relinquished, he has no access to a private plane or boat, his assets are unavailable to him, and there are INTERPOL red notices issued against him by China. Even if he wanted to flee the United States, Mr. Kwok would face intolerable risks to his life were he to expose himself to the long reach of the CCP outside the protection of this country. Indeed, as illustrated above, even while in the United States he has been subject to harassment by

---

[14] Mr. Kwok's daughter has one passport for Hong Kong, but for the reasons outlined *infra*, this is, in effect, a void passport because of the CCP and the threats to her liberty and safety that leaving the United States would present.  As noted above, Mr. Kwok's daughter is willing to surrender her passport to the Court in order to provide additional assurance to the Court that her father is not a flight risk.

the CCP and its agents.  It is simply not reasonable to assume Mr. Kwok to be a flight risk in light of the extreme and well documented dangers that would accompany a decision to run.

### 2.  Mr. Kwok has Not Left the Country Since 2017

Since immigrating to the United States in 2015, Mr. Kwok has, at a maximum, traveled abroad on only three occasions, all in 2017 or earlier.  ***Mr. Kwok has not left the United States since applying for political asylum over five years ago, in September 2017***.

In support of its argument that he is a flight risk, the Government relies on three trips Mr. Kwok allegedly took between March and August 2017.  *See* Gov't Detention Mem. at 1-2 ("Between March 2017 and August 2017, Kwok traveled internationally on three occasions").  As an initial matter, these three trips back in 2017 can hardly be considered evidence that the defendant is likely to flee the country.  Rather, the absence of *any* international travel since he filed his asylum application five years ago evidences Mr. Kwok's real and substantial security concerns about the threat posed by the CCP were he to travel abroad.  The Government also appears to rely on Mr. Kwok's pre-asylum travel over a decade ago as evidence that Mr. Kwok is a flight risk.  This assertion is meritless.  This travel, as the Government duly acknowledges, was *into* the United States.  Mr. Kwok's desire to travel to the United States for business and personal reasons and, ultimately, to seek asylum, is evidence of his desire and intent to stay, rather than flee.

The Government also points to Mr. Kwok's business relationships abroad, such as in the United Arab Emirates ("UAE"), as evidence that he will flee if released on bail.  To support this, the Government asserts, without support, that Mr. Kwok is "moving a portion of his criminal operations" to the UAE.  *See* Gov't Detention Mem. at 9.  Even if that were true—and, again, the Government has offered nothing in support—that is not evidence that Mr. Kwok would or could

flee to the UAE.  And, moreover, even if this were a legitimate concern, the proposed conditions

of release, including restrictions on his communications and round-the-clock physical

surveillance, make this issue moot.

The Government also argues that Mr. Kwok is a flight risk because, if convicted, he

would lose his eligibility for asylum.  *See* Gov't Detention Mem. at 21.  The Government's

argument presumes that Mr. Kwok's asylum claim is the only grounds upon which he may avoid

eventual deportation if he were convicted.  Not so.  Even if Mr. Kwok is convicted of all the

crimes charged, he would still be eligible for protection from deportation to China under the

Convention Against Torture ("CAT").  Given his anti-CCP dissident profile and the CCP's past

actions against him, including being arrested and tortured while in China, he will likely qualify

for CAT protection and be permitted to remain in the United States.  Again, the primary bases

for the Government's flight risk concerns are, in fact, the very reasons why Mr. Kwok is unlikely

to flee.

### B.  Mr. Kwok Does Not Pose a Danger to the Community

There also can be no serious argument that Mr. Kwok presents a danger to the

community, much less a danger so pervasive that no set of conditions could reasonably assure

the community's safety, as the Government argues.  The Government appears to focus its

concern upon purported "economic danger."  Gov't Detention Mem. at 18 (emphasis

added).  There is scant support in case law for the proposition that a defendant can be denied bail

due to the risk the defendant *might* cause financial or economic harm.[15]  While there is

---

[15] *See, e.g.*, *Madoff*, 586 F.Supp.2d at 251-54 (noting defendants' observation that the
Government's argument regarding economic harm was "conspicuously lacking in references to
Second Circuit authority," and concluding that while there is limited jurisprudence from other
jurisdictions recognizing economic harm in the context of detention, "the scope of the factor
remains uncertain").

"jurisprudence to support the consideration of economic harm in the context of detention to protect the safety of the community . . . [,] the scope of this factor remains uncertain[.]" *Madoff*, 586 F. Supp. 2d at 253 n.14; *see also United States v. Gulkarov*, 22 Cr. 20 (PGG), 2022 WL 205252, at *3 (S.D.N.Y. Jan. 24, 2022) ("Potential 'danger to any person or the community' includes the risk that a defendant might cause financial or 'economic harm' if granted pretrial release.") (quoting *Madoff*, 586 F. Supp.2d. at 252).  Moreover, in the handful of instances where courts have acknowledged economic harm absent the defendant being charged with one of the enumerated felonies set forth in 18 U.S.C. § 3142(e)(3), the ultimate detention order was premised on the defendant's risk of flight, and not the risk that the defendant would perpetrate a pecuniary or economic harm that requires detention.  *See Madoff*, 586 F.Supp.2d at 254; *see also United States v. Persaud*, No. 05-cr-368, 2007 WL 1074906, at *1-3 (N.D.N.Y. Apr. 5, 2007) (agreeing that economic harm qualifies as a danger for purposes of the Bail Reform Act, but ultimately granting the defendant pre-trial release); *accord United States v. Gentry*, 455 F.Supp.2d 1018, 1032 (D. Ariz. 2006).

The substance of the Government's argument for Mr. Kwok's detention on the basis of economic danger is merely this: the Government alleges that Mr. Kwok has committed fraud in the past, and because of that it believes he is likely to do so again.  This same argument was rejected by the Court in *United States v. Stein*, No. S1 05 Crim. 0888 (LAK), 2005 WL 8157371 (S.D.N.Y. Nov. 4, 2005).  In *Stein*, the Government sought detention based, in part, on the grounds that the defendant was a danger to the community.  *See* 2005 WL 8157371, at *1.  In support of its position, the Government proffered that the defendant, after becoming aware of the investigation, engaged in witness tampering and obstruction.  Even assuming *arguendo* that these allegations were true, the Court reasoned that the defendant's release pending trial could still be

"conditioned in a manner that would probably eliminate, and in any case greatly diminish, the risk of witness tampering or obstruction." *Id.* at *2. The Court should likewise reach the same conclusion here. The proposed conditions of release, including severe restrictions on his ability to engage in any financial transactions, are more than sufficient to address this concern.

**C. Mr. Kwok Does Not Pose a Risk of Obstruction**

While courts have recognized that "obstruction poses a danger to the community," *Stein,* 2005 WL 8157371, at *2,* it has rarely formed the articulated basis for ordering pre-trial detention, absent evidence of flight risk. Any risk must be forward-looking—"the question is not simply whether [the defendant's] actions can be considered obstruction, but whether there is a *serious* risk of obstruction in the future." *Madoff*, 586 F.Supp.2d at 250. In *Madoff*, the court assessed the extent to which the defendant's *continued* release subject to bail conditions posed a serious risk of future obstruction, on a motion by the Government to detain the defendant for violating a preliminary injunction barring the dissipation of assets. *See id.* at 249-50. *Even after* being presented with the Government's evidence of alleged past acts of obstruction by the defendant while out on bail, the court concluded that "substantial questions remain[ed]" whether the Government had met its burden of showing that the defendant posed a "serious risk" of obstruction of justice *in the future*. *See id.* at 250. Ultimately, the *Madoff* court found it unnecessary to determine whether the Government met its burden of showing that the defendant posed a serious risk of obstruction of justice, explaining that even if there was potential for obstruction in the future, the Government had not shown that there were no conditions of release that would adequately mitigate the risk, and the defendant was once again released on bail. *See id.* at 249. Similarly, the court in *Stein* did not premise its detention decision on the risk the defendant would engage in witness tampering or obstruction, reasoning that it was "not

persuaded by clear and convincing evidence that a release of [the defendant] pending trial could not be conditioned in a manner that would probably eliminate, and in any case greatly diminish, the risk[.]" *Stein*, 2005 WL 8157371, at *2.

Here too, the bail package proposed by Mr. Kwok would virtually eliminate any risk of obstruction of justice.  In its Detention Memorandum, the Government offers only a prediction that if released, Mr. Kwok is likely to "continue" to funnel assets and evidence.  In support of this, the Government points to: (1) protests allegedly fomented by Mr. Kwok; (2) vague allegations of threats and intimidation by Mr. Kwok; (3) a bank transfer allegedly made by Mr. Kwok's co-defendant Mr. Je; and (4) the number of electronic devices recovered by the FBI in an unrelated search of Mr. Kwok's apartment nearly five years ago.  Even if accepted as true, it is unclear how any of these things either relate to Mr. Kwok at all or would remain a concern if Mr. Kwok were released subject to the proposed bail conditions.  For example, the Government points to social media posts made by an account that is controlled by an organization "associated with [Mr.] Kwok," and a video of an "individual associated with Mr. Kwok's entities" "cursing" attorneys representing entities adverse to Mr. Kwok, while protesting outside the office of Paul Hastings.  *See* Gov't Detention Mem. at 13.  This conduct does not constitute obstruction of justice, nor was it directed by or attributable to Mr. Kwok. In any case, the limitations that would be imposed upon Mr. Kwok's ability to engage in the communication and coordination necessary to perpetrate such acts would eliminate any risk of obstruction of justice.

### D.  **The Facts Do Not Support Detention Without Bail**

Even in circumstances where the Court determines that a defendant poses a flight risk or a risk to the community, the Bail Reform Act requires the Court to release the defendant "subject to the least restrictive further condition, or combination of conditions, that . . . will reasonably

assure the appearance of the person."  *Boustani*, 932 F.3d at 81 (quoting 18 U.S.C.

§ 3142(c)(1)(B)); *see Sabhnani*, 493 F.3d at 75.  In making this determination, courts analyze (1)

the nature and circumstances of the offense charged; (2) the weight of the evidence against the

defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness

of the danger to the community posed by the defendant.  *See* 18 U.S.C. § 3142(g); *see also*

*Boustani*, 932 F.3d at 81.

1. **Similarly Situated Defendants in the Southern District of New York Have
Been Released on Bail**

Mr. Kwok is charged only with non-violent, white-collar crimes.  In its papers, the

Government recites allegations of fraud, involving lies told to investors, and misappropriation of

investors' capital to fund Mr. Kwok's "lavish lifestyle."  *See* Gov't Detention Mem. at 17.  In

substance, the Government's case alleges no more than "garden-variety" securities fraud.

Defendants facing similar charges in the Southern District of New York are routinely released on

bail, even in cases involving charges of widespread and egregious fraudulent conduct:

- In December 2022, Samuel Bankman-Fried, charged with a multi-billion-dollar securities fraud, was released on a $250 million bond and subject to home detention with location monitoring technology and various other financial and physical conditions.[16]

- In April 2022, Sung Kook ("Bill") Hwang was released on bail pending trial on charges of racketeering and fraud in connection with a scheme to manipulate the prices of publicly traded securities. Mr. Hwang was released on a $100 million personal recognizance bond, with travel restrictions, but no private security monitoring.[17]

- In January 2022, Alexander Gulkarov, charged in a $100 million healthcare fraud case, was released on a $10 million bond, subject to travel restrictions, pretrial supervision, and restriction on contacts with co-defendants.[18]

---

[16] *See United States v. Bankman-Fried,*  22-cr-673 (S.D.N.Y. 2022).
[17] *See United States v. Hwang*, 22-cr-240 (S.D.N.Y. 2022).
[18] *See United States v. Gulkarov, et al.*, No. 22-cr-20 (S.D.N.Y. 2022).

- In October 2022, Ahmad Akbar, charged in a multi-million-dollar fraud scheme, was released on a $100,000 bond, subject to travel restrictions, drug testing, pretrial supervision, electronic monitoring with a curfew, and various other physical and financial conditions.[19]

- In 2017, William ("Billy") McFarland, charged with multiple acts of fraud related to the Fyre Festival scandal, was released subject to financial conditions, travel limitations, regular pretrial supervision, and urinalysis.[20]

- In 2016, Scott Tucker, charged in a $3.5 billion payday loan scheme, was released on $2 million bond, subject to travel restrictions.[21]

None of the above defendants were denied bail even though they face similar charges and share many of the same attributes that the Government asserts warrant Mr. Kwok's detention.  One particularly illustrative example of these similarities is the case of defendant Sam Bankman-Fried (founder of the cryptocurrency exchange FTX), who was released on bail a few months ago, notwithstanding the multi-count indictment originally filed against him for: conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the Federal Election Commission and commit campaign finance violations.[22]  *See generally* Indictment, *United States v. Bankman-Fried*, No. 22-cr-673 (S.D.N.Y. 2022), ECF No. 1.  There, Judge Kaplan declined to detain Mr. Bankman-Fried, and instead released him subject to certain reasonable conditions.  *See* Minute Entry (Dec. 22, 2022), ECF No. 13.  These risk-ameliorating measures included a $250,000,000 personal recognizance bond; a prohibition against opening new lines of credit, businesses, and conducting certain financial transactions; the surrender of all travel documents;

---

[19] *See United States v. Akbar, et al.*, No. 20-cr-563 (S.D.N.Y. 2020).

[20] *See United States v. McFarland*, No. 17-cr-600 (S.D.N.Y. 2017).

[21] *See United States v. Tucker, et al.*, No. 16-cr-91 (S.D.N.Y. 2016).

[22] The Government filed a superseding indictment setting forth 12 counts against Mr. Bankman-Fried, including the additions of conspiracy to commit wire fraud and money laundering.  *See generally* Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-673 (S.D.N.Y. 2022), ECF. No. 80.

and home detention with electronic monitoring.  *See* Appearance Bond at 5 (Dec. 22, 2022), ECF
No. 14.

While bail was initially agreed to between the Government and defense counsel, issues
later arose regarding the sufficiency of those conditions for Mr. Bankman-Fried, particularly
with respect to his use of the internet, messaging applications, and a Virtual Private Network
("VPN").  The Government argued that this conduct raised potential concerns, such as hiding
online activities, covertly accessing cryptocurrency exchanges, and transferring data without
detection.  *See* Letter by USA re: Bail Conditions at 1-2 (Feb. 13, 2023), ECF No. 66.  But Judge
Kaplan did not revoke Mr. Bankman-Fried's bail; instead, he imposed additional conditions to
address these concerns and permitted the parties to work together to devise further ameliorative
conditions.  *See* Minute Entry (Jan. 3, 2023) (ordering that defendant remain on bail and
imposing restriction prohibiting him "from accessing or transferring any FTX or Alameda assets
or cryptocurrency, including assets or cryptocurrency purchased with funds from FTX or
Alameda");  Order (Feb. 14, 2023), ECF No. 68 (imposing additional condition prohibiting the
defendant's use of a VPN).  The docket in Mr. Bankman-Fried's case presently reflects that the
Government and defense counsel reached an agreement regarding additional bail conditions, and
are in the process of finalizing the proposed order for the Court's approval.  See Letter by USA
re: Status Report re Proposed Bail Modifications (Mar. 24, 2023), ECF No. 111.  Mr. Bankman-
Fried continues to remain out on bail while awaiting trial.

Many similarities exist between these two defendants that illustrate that similar outcomes
should be reached regarding their requests for pretrial release.  Like Mr. Bankman-Fried,
Mr. Kwok is also charged in a multi-count indictment with crimes such as conspiracy to commit
wire fraud (Count I), wire fraud (Count II), and money-laundering-related crimes (Counts IX and

X).  Moreover, both defendants are accused of perpetrating billion-dollar fraud conspiracies.

Mr. Bankman-Fried and Mr. Kwok are also both sophisticated businessmen who are purported to

have the means and opportunity to further perpetrate economic harm, and each of them have jobs

that can be conducted remotely.  Given these similarities (and others), and the bail decision

reached in Mr. Bankman-Fried's case, Mr. Kwok should likewise be released on bail while he

awaits the opportunity to defend himself at trial.

Moreover, in each of the above cases bail conditions were negotiated and agreed upon by

the parties, agreed to by the Government, and not imposed by the Court.  Here, despite

Mr. Kwok's willingness to accept reasonable conditions on his release, the Government has

refused to even entertain a discussion in the subject.  Nevertheless, the nature and circumstances

of Mr. Kwok's alleged crimes simply do not warrant his continued detention.

## 2.  <u>Mr. Kwok's History and Characteristics Demonstrate that Detention is Unwarranted</u>

Mr. Kwok's personal characteristics and history also counsel against detention.  As the

Government acknowledges in its Detention Memorandum, Mr. Kwok emigrated from China to

the United States in 2015 and applied for political asylum in 2017.  *See* Gov't Detention Mem.

at 1-2.  As discussed in detail in Section IV.A *supra*, as a long-time and vocal critic of the CCP,

Mr. Kwok experienced and continues to experience political persecution and credible threats

against his life and the lives of his wife and children, threats that are far more likely to become

realities should Mr. Kwok flee the United States.

Other facets of Mr. Kwok's personal characteristics also weigh in favor of release.

While these characteristics are fully set forth in Section III, it bears repeating that, despite the

Government's assertions to the contrary, Mr. Kwok does have roots in this country—two

immediate family members who would be unable to leave the United States without sacrificing their safety and asylum applications, his wife and his daughter.

### E. Any Risks Posed by Mr. Kwok's Release Can Be Adequately Mitigated with the Conditions Proposed by Defense Counsel

#### 1. Sufficient Bail Conditions Exist to Assure Mr. Kwok's Appearance

The Government must demonstrate by a preponderance of the evidence that there are no conditions that could be imposed on the defendant that would "reasonably assure" his presence in court. *See Sabhnani*, 493 F.3d at 75. This is simply not the case for Mr. Kwok. Even if the Court were to determine that he presents a flight risk, any such risk can be ameliorated through physical and financial conditions to his release. The Second Circuit has recognized circumstances in which a court may, as proposed here, release a defendant to home confinement subject to additional conditions, including the condition that the defendant pay for private armed security guards. *See Boustani*, 932 F.3d at 81; *Sabhnani*, 493 F.3d at 77.

There is ample precedent for this approach. For example, in *Sabhnani*, the Court determined that the defendants posed a risk of flight. *See* 493 F.3d at 64-65. The defendants were natives of Indonesia and India (respectively), and maintained extensive personal and business connections abroad, including in countries without extradition. *See id.* at 65-66. They had substantial financial resources which could be used to fund their flight, and their businesses could be operated from any location. *See id.* at 66-67. The court also noted concerns with defendants' financial disclosures, which failed to satisfactorily explain certain transactions, and reflected misrepresentations and omissions about the nature of their businesses and their finances. *See id.* at 72-73. Further, there was compelling evidence of the defendants' guilt on the grave charges of forced labor. Upon conviction, defendants faced terms of up to 40 years' imprisonment. *See id.* at 76-77. Nonetheless, the Second Circuit held that the flight risk

presented by the defendants in *Sahbnani could* be ameliorated with the imposition of both physical and financial restrictions. *See id.* at 77 (finding physical restrictions, including surrender of passports, home confinement with electronic monitoring, 24-hour-a-day visual surveillance of the home, and monitoring of phone and computer use by private security guards answerable to the court sufficient to mitigate flight risk).

Likewise, in *United States v. Weigand*, the court found that the defendant presented a flight risk that could be adequately mitigated with appropriate bail conditions. *See United States v. Weigand*, 492 F.Supp.3d 317, 319 (S.D.N.Y. 2020). The court assessed the defendant as a flight risk, citing the defendant's German nationality, the fact that Germany was unlikely to extradite him without his consent if he were to flee, and his substantial wealth. *See id.* The court also assessed the bail package proposed by the defendant, and ultimately concluded that because the proposed conditions would "reasonably assure" the defendant's presence at trial, the court was "statutorily obligated" to grant the defendant's motion for release. *Id.* at 318-19. Each of these cases demonstrate that, despite circumstances and concerns similar to those raised by the Government here, courts overwhelmingly favor pre-trial release for defendants—with conditions—*in lieu* of detention.

In *Boustani*, the Second Circuit addressed the result in *Sahbnani*, clarifying that the Bail Reform Act does not permit a "two-tiered bail system," allowing wealthy defendants to fund their own private prisons while similarly situated defendants of lesser means would be incarcerated. *See Boustani*, 932 F.3d at 82. The *Boustani* Court explained that the type of private security conditions endorsed in *Sahbnani* are appropriate where the defendant's wealth *is the reason* the defendant is deemed a flight risk. *See id.* ("a defendant may be released on such a condition only where, but for his wealth, he would not have been detained"). Conversely, the

Court explained, "if a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention." *Boustani*, 932 F.3d at 82 (holding that the District Court was not clearly erroneous in finding the defendant posed a flight risk).

Setting aside the wealth the Government ascribes to Mr. Kwok, there is no reasonable basis to consider him a flight risk. The Government points to Mr. Kwok's supposed ability to operate his businesses from nearly anywhere in the world as grounds for his detention. *See* Gov't Detention Mem. at 21. This argument was rejected by the *Sahbnani* court, which ordered the release of defendants subject to bail conditions, *despite* their wealth, *despite* their strong ties in their native countries, and *despite* their ability to recommence their business and personal lives elsewhere with little disruption. *See Sahbnani*, 493 F.3d 63, 66-67. Unlike the defendants in *Sahbnani, Mr. Kwok cannot return to his native country, and in fact cannot travel abroad at all.*

While Mr. Kwok arguably shares several other characteristics with the defendant in *Boustani*, he differs markedly with respect to international travel and in his ties to the United States. As explained above, Mr. Kwok and his family are political asylees residing in the United States, with no documents permitting them to travel internationally, who have been persistently targeted by the CCP. Mr. Kwok has not left the United States in over five years. That he would do so now is implausible. Moreover, Mr. Kwok has proposed physical and financial restrictions as conditions of his release that would effectively eliminate any flight risk that he may present. *See supra* Section IV. In addition to posting a substantial bond, Mr. Kwok would be under 24-hour monitoring by on-site security personnel answerable to the Court, he would be without travel documents, and he would be subject limitations on his communications, and he would be tracked 24/7 via active GPS monitoring.

### 2.   **The Proposed Bail Conditions Are Sufficient to Mitigate Any Alleged Danger**

To detain Mr. Kwok on the basis of the alleged economic danger he presents to the community, the Government must present clear and convincing evidence demonstrating that there are no bail conditions that would reasonably ameliorate the risk. *See United States v. Madoff*, 586 F.Supp.2d 240, 246, 247 (S.D.N.Y. 2009).  In *Madoff*, as previously mentioned, the Government moved to detain defendant Bernard Madoff—an infamous fraudster who was charged with "perhaps the largest Ponzi scheme ever"—after he had been released on bail. *Id.* at 246, 253.  In support of its detention motion, the Government argued that Mr. Madoff presented a clear risk of economic harm, flight, and obstruction of justice. *See id.* at 245.  The Government further argued that neither Mr. Madoff's then-current conditions of release, nor any other conditions, would be sufficient to ensure the safety of the community from the speculative economic harm the Government alleged. *See id.*

The Government's disputed motion for detention was later filed following the discovery that Mr. Madoff, *while already out on bail*, had been mailing packages to friends and family containing personal items valued at over $1 million.  The Government asserted that "this type of economic harm represent[ed] a danger to the community as contemplated by § 3142 of the Bail Reform Act." *Id.*  In essence, the Government articulated their theory of economic harm as "the dissipation of assets that will arguably become part of Madoff's restitution debt for victim recovery." *Id.* at 246.  Ultimately, however, the court found that "[t]he Government . . . failed to meet the additional burden of proving by clear and convincing evidence that there [was] no condition or combination of conditions that [would] reasonably prevent [the threatened economic harm]." *Id.* at 254.  It is worth noting that, there, the Government did not seek detention of Mr. Madoff in the first instance because—as is the case here—there existed a set of conditions

that the Court could impose to ensure his appearance before the court and to mitigate risk to the community of financial danger.  *See id.* at 244.  It was only *after* the Government perceived a violation of those bail conditions that they sought detention.  *See id.* at 245-46.  Obviously, Mr. Kwok is not alleged to have violated any bail conditions and, if released, he would abide by any Court-imposed conditions.

Other courts in this district have favored release under appropriate bail conditions, again even where there were alleged threats of economic harm (and obstruction of justice), and even where the defendants in question were charged with serious financial crimes like a widespread conspiracy to commit fraud.  For instance, in *United States v. Gulkarov*, the defendants— Mr. Gulkarov and his brother-in-law—were charged with leading a "$30 million healthcare fraud, money laundering, and bribery conspiracy" that lasted for "approximately seven years[.]"  2022 WL 205252, at *3.  There, the defendants sought a modification of their bail conditions to permit limited communication between them, so as not to disrupt familial relationships and gatherings.  *See id.* at *4.  The court ultimately denied the bail modification request, yet it is important to note that the two family members charged with defrauding individuals were <u>not</u> detained in the first instance (nor later) based on the claimed risks of economic harm.  *See id.* at *4.  The dispute in *Gulkarov* was not *whether* bail was warranted, but rather *which* conditions were adequate to achieve the goals of the parties, and of the court.

The charges of fraud in *Gulkarov* are arguably as serious as those faced by Mr. Kwok.  *See, e.g.*, *id.* at *6 (describing the *Gulkarov* defendants as "the leaders of a *highly organized and complex* fraud scheme" that was perpetrated by "suborning perjury and fabricating documents for submission[.]" (emphasis added)).  Despite the seriousness of the charges in that case, the *Gulkarov* court found that certain conditions—such as a significant

personal recognizance bond, travel restrictions, surrender of passports, and no contact with co-defendants—could reasonably ensure the protection of the community from any further alleged economic harm.  *See id.* at *7.

The Government has failed to address substantively why a *combination* of conditions of pretrial release would not reasonably assure the safety of the community, as is required for pretrial detention.  *See* Gov't Detention Mem. at 21-23 (separately addressing only four possible conditions of bail).  In their Motion for Detention, after a lengthy recitation of their allegations against Mr. Kwok, the Government states in a conclusory fashion that "[t]here can be no reasonable assurance that Kwok will stop his criminal conduct due to pretrial conditions[,]"  and "[s]imply put, there are no conditions of release that the Court can impose that will protect the community from severe economic harm at Kwok's hands."  *Id.* at 19.  The Government does not elaborate on why a combination of conditions (or other conditions not considered in its motion) would not ensure the safety of the community.  *See id.* at 18-19.

Mr. Kwok's bail proposal offers more than adequate protection for the Government's (and any of the Court's) concerns.  The proposed electronic monitoring of Mr. Kwok and his residence, armed security guards answerable to the Court on-site 24-7, and monitoring of Mr. Kwok's telephone and computer use would ensure his presence at trial and the safety of the community.  Without travel documents, Mr. Kwok cannot travel, setting aside his unwillingness to do so.  Mr. Kwok's wife and daughter reside in the United States and have pending asylum applications; relocating would present a substantial hardship to them—particularly given their lack of travel documents as well.  Further, Mr. Kwok and his family now enjoy relative safety from CCP threats in the United States.  Mr. Kwok is himself insolvent, and the substantial secured bond Mr. Kwok proposes would severely impair the finances of his close family should

he fail to meet the conditions of his release, strongly incentivizing Mr. Kwok to appear at trial. Indeed, Mr. Kwok is willing to accept whatever conditions the Court deems appropriate.

Even assuming *arguendo* that the Government has shown that Mr. Kwok poses a danger to the community *and* that no condition or set of conditions can reasonably assure the safety of the community, "the Bail Reform Act does not permit detention on the basis of dangerousness in the absence of risk of flight, obstruction of justice or an indictment for the offenses enumerated [in 18 U.S.C. § 3142(f)(1)]." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (remanding case to district court to set conditions for defendant's release on bail). As discussed, the Government has not met its burden of showing that Mr. Kwok is a flight risk or will obstruct justice, and he is not charged with an offense that is enumerated in section 3142(f)(1) of the Bail Reform Act.

## VI. CONCLUSION

For the foregoing reasons, Mr. Kwok respectfully requests that this Court order that he be released on bail pursuant to the conditions he has proposed (and any other conditions the Court deems appropriate).

BROWN RUDNICK LLP

By:   */s/ William R. Baldiga*
William R. Baldiga
Seven Times Square
New York, NY 10036
Tel: (212) 209-4942
Fax: (212) 209-4801
E-mail: wbaldiga@brownrudnick.com

Stephen R. Cook (admitted *pro hac vice*)
211 Michelson Drive, 7th Floor
Irvine, CA 92612
Tel: (949) 440-0215
Fax: (949) 252-1514
E-mail: scook@brownrudnick.com

Stephen A. Best (admitted *pro hac vice*)
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
Tel: (202) 536-1737
Fax: (202) 536-1701
E-mail: sbest@brownrudnick.com

*Attorneys for Defendant Ho Wan Kwok*