UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

HO WAN KWOK,

                                    Defendant.

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: _4/20/2023_____          │
└─────────────────────────────────────┘
```

23 Cr. 118-1 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On March 29, 2023, Defendant, Ho Wan Kwok, was indicted by a grand jury on charges of conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; international promotional money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; international concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2; and unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2.  Superseding Indictment, ECF No. 19.  On March 15, 2023, the Honorable Katharine H. Parker arraigned Defendant on the initial indictment dated March 6, 2023, ECF No. 2, and he was detained on consent, ECF No. 8.  On March 31, 2023, Defendant filed a motion for release on bail pending trial.  ECF No. 23.  On April 4, 2023, the Court arraigned Defendant on the Superseding Indictment and reserved decision on Defendant's bail application.  Dkt. Entries 4/4/2023.  For the reasons stated below, Defendant's motion for release pending trial is DENIED.

**DISCUSSION**

I.      <u>Allegations Against Defendant</u>[1]

Defendant and two co-defendants are charged with defrauding thousands of victims out of over $1 billion by using a series of fraudulent businesses and investment opportunities; misappropriating victims' funds by laundering those funds through approximately 500 bank accounts associated with at least eighty entities or individuals in several countries; and improperly using those funds to enrich themselves.  Superseding Indictment ¶¶ 1–3.  Defendant used the fraud proceeds to purchase extravagant goods and assets for himself and his family, including homes and vehicles.  *Id.* ¶ 4.  Defendant operated this scheme from 2018 through March 2023.  *Id.* ¶ 1.

In 2017, Defendant attracted a large online following after claiming to advance a movement against the Chinese Communist Party (the "CCP").  *Id.* ¶ 6(a).  In 2018, he founded nonprofit organizations aligned with his purported campaign and amassed more followers.  *Id.* ¶ 6(b).  Defendant subsequently advertised fraudulent investment opportunities to his followers.  *See, e.g.*, *id.* ¶¶ 14(a), 15.

During the relevant time period, Defendant functionally owned and controlled GTV Media Group, Inc. ("GTV"), a news-focused social media platform, and G Club Operations, LLC ("G Club"), a membership organization.  *Id.* ¶¶ 10–11.  He also designed purported cryptocurrencies offered on Himalaya Exchange, a platform that has business relationships with entities functionally owned and controlled by Defendant.  *Id.* ¶ 12.

Between April and June 2020, Defendant obtained more than $400 million from victims through an illegal private stock offering related to GTV.  *Id.* ¶ 13.  Defendant announced and promoted the offering on social media, directly contacted potential investors, and issued written

---

[1] The following facts are taken from the Superseding Indictment.

materials regarding the offering.  *Id.*  Contrary to Defendant's representations to investors, the vast majority of the funds raised were deposited directly into bank accounts in the name of GTV's parent company, which is owned by one of Defendant's family members.  *Id.* ¶¶ 13(e)–(f).  Another $100 million in raised funds was invested in a high-risk hedge fund for the benefit of the parent company.  *Id.* ¶ 13(h).

In June 2020, domestic banks began freezing and closing accounts associated with GTV, in part because the accounts had received large wire transfers that referenced an unregistered stock offering.  *Id.* ¶ 14(a).  Defendant then began encouraging victims to invest in "collectives of informal groups" known as "farms" by promising that those investments would be convertible to stock in GTV, and by misrepresenting GTV's market value.  *Id.* ¶ 14.  Defendant obtained over $150 million by doing so.  *Id.*  Defendant misappropriated these funds by transferring millions of dollars to family members.  *Id.* ¶ 14(f).

In October 2020, Defendant began inducing his followers to purchase online memberships in G Club by making false statements about the services included in such memberships.  *Id.* ¶ 15.  Defendant also used the membership organization to continue to induce his followers to invest in GTV, and other businesses affiliated with Defendant.  *Id.* ¶ 15(f).  The majority of the funds raised through the membership organization were used to pay Defendant's and his family's personal expenses, and purchase high-priced goods and real property, such as Defendant's mansion in New Jersey.  *Id.* ¶ 16.

In April 2021, Defendant began promoting to his followers and making false statements about purported cryptocurrencies traded on Himalaya Exchange.  *Id.* ¶¶ 18–20, 22.  Defendant obtained over $262 million in funds through Himalaya Exchange, $37 million of which was used to purchase a luxury yacht in the name of one of Defendant's relatives.  *Id.* ¶¶ 17, 23.

On September 20 and 21, 2022, U.S. authorities served seizure warrants on several domestic banks, seizing approximately $335 million from Himalaya Exchange and other entities associated with Defendant.  *Id.* ¶ 24.  One of Defendant's co-conspirators then attempted to transfer $46 million from domestic bank accounts associated with Himalaya Exchange to a bank account in the United Arab Emirates.  *Id.*  On October 16, 2022, U.S. authorities seized an additional $274 million from Himalaya Exchange and G Club.  *Id.* ¶ 25.  Following the seizures, Himalaya Exchange continued to misrepresent the value of its purported cryptocurrencies.  *Id.* ¶ 25(b).

II.   Legal Standard

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, requires the Court to release a defendant pending trial subject to the least restrictive conditions that will reasonably assure the defendant's appearance as required and the safety of any other person and the community.  18 U.S.C. § 3142(c)(1)(B).  The Court may order that a defendant be held without bail only if there are no conditions that will reasonably assure the defendant's appearance and the safety of any other person and the community, after considering the factors set forth in 18 U.S.C. § 3142(g).  18 U.S.C. § 3142(e)(1).  Those factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

To support pretrial detention, the Government must establish by a preponderance of the evidence that the defendant presents a serious risk of flight or obstruction of justice, 18 U.S.C. § 3142(f)(2); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988), or by clear and convincing evidence that the defendant poses a danger to another person or the community, 18 U.S.C.

§ 3142(f)(2).  If the Government carries its burden, then the Court must determine whether there are reasonable conditions of release that can be set to ensure the defendant's appearance and the safety of any other person or the community.  18 U.S.C. § 3142(e)(1).

    III.   <u>Analysis</u>

        A.  Flight Risk

The Court finds that the Government has shown by a preponderance of the evidence that Defendant presents a serious risk of flight.

First, Defendant has limited connections to the United States.  He has a pending application for asylum, and if his application is denied, he will no longer be legally present in the United States. *See* Def. Mem. at 9, 15, ECF No. 24; Gov. Mem. at 2, ECF No. 7.  The charges in this case may be grounds for denial of Defendant's asylum application.  *See* Def. Mem. at 15; Gov. Mem. at 2. Defendant's wife and daughter reside in the United States and also have pending applications for asylum.  Def. Mem. at 13.  Defendant has a son who resides in the United Kingdom.  Gov. Mem. at 21.  Although Defendant claims that he would not leave behind "two of the most important people in his life," who cannot leave the United States due to their pending applications for asylum, Def. Mem. at 13, Defendant told Pretrial Services that he has "irregular" contact with his children, Pretrial Services Report at 3.  The Court concludes, therefore, that Defendant's incentive to remain in the United States due to his daughter's presence is tantamount to his incentive to flee to the United Kingdom, where his son resides.  And, Defendant previously left his family members, including his wife and daughter, in Hong Kong when he fled to the United States.  *See* Def. Mem. at 7.

Second, Defendant has substantial connections and resources abroad, including his son and a co-defendant who resides in the United Kingdom, but is currently believed to be a fugitive in the United Arab Emirates.  Gov. Mem. at 21; Gov. Reply at 10, ECF No. 26; Apr. 4, 2023 Tr. 7:18-20.

Defendant's businesses have bank accounts in various countries, including the United Arab Emirates, and two of Defendant's businesses have offices and personnel in the United Arab Emirates.  Gov. Reply at 13.  Defendant has an extensive network of devoted followers around the world.  Gov. Mem. 5, 12, 15–16, 20–21, 23; *see also In re: Ho Wan Kwok, et al.*, No. 22-50073 (Bankr. D. Conn. Jan. 11, 2023) ("Bankruptcy Opinion"), ECF No. 7-3 (finding that Defendant's followers are "personally loyal" to him and have referred to him as a "spiritual leader").

Third, Defendant has the means and know-how to flee.  In a search of Defendant's residences pursuant to a warrant on March 15, 2023 (the "March 15 Search"), law enforcement officers recovered two passports, including a Hong Kong passport which is still valid, and copies of a passport from the United Arab Emirates.  Gov. Reply at 4, 8; ECF No. 26-2; ECF No. 26-5; Apr. 4, 2023 Tr. 21:6-9, 25:4-14; 32:19–33:14.  Defendant previously claimed during an interview on April 19, 2017, that he had eleven passports.  Complaint Exhibit 1B, *HNA Grp. Co., Ltd., v. Guo Wengui*, No. 653281/2017, Dkt. No. 7 (N.Y. Sup. Ct. Aug. 30, 2017) (English translation of April 19, 2017, interview between Defendant and Voice of America).  Although law enforcement officials have confiscated the passports recovered during the March 15 Search, and Defendant previously surrendered his passport from the United Arab Emirates, *see* Apr. 4, 2023 Tr. 32:19–33:14, it is clear that Defendant is able to obtain travel documents with ease.  Moreover, a clever defendant with sufficient resources could figure out a way to leave the country without travel documents.  *See, e.g.*, Rupert Neate, *Ghosn 'Hid in Musical Instrument Case' During Escape from Japan*, GUARDIAN (Dec. 31, 2019), https://www.theguardian.com/business/2019/dec/31/carlos-ghosn-escaped-japan-hiding-in-a-musical-instrument-case.  Defendant has access to a yacht and a jet owned by his family members that were allegedly purchased with fraud proceeds derived from the charged scheme.  Gov.

Mem. at 5, 21; Superseding Indictment ¶¶ 4, 14(f)(i), 14(f)(iii).  And, the Government need not show that Defendant is likely to flee internationally, but only that Defendant is not likely to return to court.

Fourth, Defendant has much incentive to flee.  He is facing a maximum sentence of more than 100 years' imprisonment, Gov. Mem. at 21, and the evidence against him is strong.  He may also face deportation proceedings.  Defendant argues that he would not risk leaving the United States for fear of persecution by the CCP.  Def. Mem. at 13–14.  But, Defendant engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States.  Def. Mem. at 7, 9, 14; Gov. Reply at 3–4.  In other words, it is more likely than not that the pendency of Defendant's asylum application prevented him from traveling internationally between 2017 and the present, rather than his fear of persecution.  *See* TRAVEL DOCUMENTS, uscis.gov/green-card/green-card-processes-and-procedures/travel-documents (stating that individuals with a pending application for asylum must apply for and receive particular travel documents before leaving the United States, or else the application is deemed abandoned).  And, the charges in this case seriously undermine Defendant's eligibility for asylum.[2]

Therefore, the Court finds that the Government has met its burden of showing that Defendant poses a serious risk of flight.

B.  Obstruction of Justice

The Court also finds that the Government has shown by a preponderance of the evidence that Defendant poses a serious risk of obstruction.  *See United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009) (considering whether a defendant posed a serious risk of obstruction in the future);

---

[2] Defendant insists that he would still be eligible to remain in the United States pursuant to the Convention Against Torture, Def. Mem. at 15, but the success of such a future application is speculative, and, in any case, Defendant may still be removed to a third country other than China even if he is granted relief based on the Convention Against Torture, 8 C.F.R. § 1208.17(b)(2).

*United States v. Stein*, No. S1 05 Crim. 0888, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 4, 2005) (same).

Other courts have previously found that Defendant engaged in obstructive behavior by hiding his assets and failing to obey court orders.  On February 9, 2022, Justice Barry Ostrager entered an order of civil contempt against Defendant for avoiding and deceiving his creditors by hiding substantial personal assets with corporations, trusted confidants, and family members.  *Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan et al.*, No. 652077/2017, Dkt. 1181 (N.Y. Sup. Ct. Feb. 9, 2022); *id.* at 10 (finding that Defendant was "knowingly and intentionally violati[ng]" court orders). Six days after being ordered by Justice Ostrager to pay the judgment owed to the plaintiff in *Pacific Alliance Asia Opportunity Fund*, Defendant filed for bankruptcy.  *Pac. All. Asia Opportunity Fund L.P. v. Kwok Ho Wan et al.*, No. 652077/2017, Dkt. 1190 (N.Y. Sup. Ct. Feb. 15, 2022); *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1 (D. Conn.).

During the bankruptcy proceeding, Bankruptcy Judge Julie A. Manning issued a temporary restraining order on November 23, 2022, restraining Defendant from posting false and harassing materials about people associated with the Pacific Alliance Asia Opportunity Fund, their counsel, and their relatives; publishing online the home addresses and personal information of those individuals; encouraging, inciting, suggesting, or financing protests at the homes or offices of those individuals; and interfering with the integrity of the pending bankruptcy proceedings.  Bankruptcy Opinion at 5. The order also required Defendant to take down existing social media posts that published the home addresses and personal information of those individuals, or encouraged, incited, or suggested protests at their homes or offices.  *Id.* at 5–6.

On January 11, 2023, Judge Manning found that:

(1) Defendant used burner phones to communicate with members of his various businesses, including for communications related to his bankruptcy proceeding. *Id.* at 11.

(2) Defendant instructed his followers, who were protesting outside the home of the bankruptcy trustee, to avoid service of process. *Id.* at 23.

(3) Defendant told his followers in an internet broadcast that, "to deal with this rogue [the trustee], we have our rogue's ways.  In a few days you will see what would happen to him.  Calamities, I can tell you guys.  They will suffer calamities!"  *Id.*

(4) Defendant posted videos and social media posts encouraging his followers to "persevere" with protests at the homes and offices of the trustee and his counsel, and called the trustee and his counsel "enablers of" or "worse than" the CCP. *Id.* at 23–25.

(5) Defendant, or someone else at Defendant's direction, breached a nondisclosure agreement by publicly releasing documents from a settlement conference. *Id.* at 29.

(6) The protests Defendant publicly encouraged and supported resulted in threats against the trustee, false accusations against the trustee and his counsel, including accusations of association with the CCP, and harassment of individuals not involved with the bankruptcy proceeding, including the trustee's family and colleagues. *Id.* at 25, 27, 29–31.

(7) The protests and harassment delayed the bankruptcy proceedings and caused creditors to fear filing claims due to the protestors' actions. *Id.* at 33.

Judge Manning issued a preliminary injunction prohibiting Defendant and those acting in concert with him from continuing to threaten and harass the plaintiff and related employees, as well as the trustee, his family, and his counsel.  *Id.* at 60.  Two days after Judge Manning's order, Defendant posted a message on one of his social media accounts, encouraging followers to file claims in his bankruptcy proceeding.  *See* Miles Guo (@MilesGuo), Gᴇᴛᴛʀ (Jan. 13, 2023), https://gettr.com/post/p24ybdca10b (last accessed Apr. 11, 2023).[3]  Defendant later posted a video encouraging his followers to file claims in order to drive up the trustee's attorneys' fees.  Gov. Mem. at 15.

---

[3] It appears that the name associated with this account has since been changed, on some date after April 4, 2023, from "Miles Guo," one of Defendant's aliases, *see* Superseding Indictment, to "NFSC Today" (@NFSC_today).

Defendant continues to engage in obstructive behavior.  On March 30, 2023, after Defendant was detained in this case, a message posted on one of Defendant's social media accounts accused the prosecutors in this case of "represent[ing] the CCP kleptocrats."  *See* Miles Guo (@MilesGuo), GETTR (Mar. 30, 2023), https://gettr.com/post/p2cy7sycdbf (last accessed Apr. 11, 2023).  The Government also alleges that victims of Defendant's fraud scheme have reported that, when they sought reimbursement or complained about fraudulent practices, Defendant branded them "CCP spies" on social media to incite his followers to harass them, or threatened to post on social media that members of the victims' families who were residing in China were associated with Defendant's anti-CCP movement, which would place those family members at risk of Chinese government retaliation.  Gov. Mem. at 15.  And, Defendant falsely represented to Pretrial Services that he had a total of $10,000 in assets, including two phones and his clothing.  Pretrial Services Report at 3.  But, the March 15 Search recovered substantial assets that Defendant had not disclosed:  over $500,000 in cash in various currencies in a safe in Defendant's dressing room, thirty Brioni custom-made suits with "Brioni for Miles Kwok"[4] stitched into the jackets, seventeen computers, forty-three external media storage devices, and thirty cellphones.  Gov. Reply at 3.[5]

Moreover, Defendant is technologically sophisticated and likely to delete, encrypt, or transfer electronic evidence and fraud proceeds if released.  He has previously used burner phones to conceal communications with co-conspirators.  Gov. Mem. at 20; Bankruptcy Opinion at 11.  He has used Faraday bags to block the passage of radio frequency emissions and prevent electronic devices from electronic surveillance, as well as cellphone scramblers.  Gov. Mem. at 20; Apr. 4, 2023 Tr.

---

[4] "Miles Kwok" is one of Defendant's aliases.  *See* Superseding Indictment.
[5] Defendant claims that the cash does not belong to him, despite the fact that most of it was found in his dressing room. Apr. 4, 2023 Tr. at 27:22–28:3, 35:2-8.  However, Defendant admits that he owns the cellphones and other devices found in his residences.  *Id.* at 23:20-24.  He did not disclose these to Pretrial Services, and the value of these devices and the clothing found in one of his residences far exceeds $10,000.

23:20–24:2.  He has previously advised his followers via live web broadcast to use services provided by one of his businesses, Himalaya Reserve, which is involved in the alleged fraud scheme in this case, *see, e.g.*, Superseding Indictment ¶ 17, in order to secure money "against the long-arm jurisdiction of the United States," *The U.S. Is Planning to Sanction Singapore; Himalaya Wallet Is the Only Secure Option*, G NEWS (Feb. 21, 2023), gnews.org/article/949854 (last accessed Apr. 17, 2023).  And, one of Defendant's co-conspirators, who is still a fugitive, was indicted for attempting to move fraud proceeds outside the jurisdiction of the United States after the Government began seizing funds from the businesses involved in the alleged fraud scheme.  Superseding Indictment ¶¶ 24, 53–54.

Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released.[6]

### C.  Danger to the Community

The Court further finds that the Government has shown by clear and convincing evidence that Defendant poses a risk of economic harm to the community.  *See United States v. Gulkarov*, No. 22 Cr. 20, 2022 WL 205252, at *3 (S.D.N.Y. Jan. 24, 2022) (considering the risk of economic harm to the community); *Madoff*, 586 F. Supp. 2d at 253 (same); *United States v. Persaud*, No. 05 Cr. 368, 2007 WL 1074906, at *1–3 (N.D.N.Y. Apr. 5, 2007) (same).

On September 13, 2021, the U.S. Securities and Exchange Commission (the "SEC") filed a cease-and-desist order against GTV and its parent company with respect to the unregistered private stock offering described in the Superseding Indictment.  *See In the Matter of GTV Media Group, Inc.,*

---

[6] On March 29, 2023, Metropolitan Detention Center ("MDC") staff notified the Government that Defendant's family members had been improperly accessing a telephone line known as the "legal call system," which is intended to be used only by defendants and their counsel.  Gov. Reply at 14.  Defendant claims that this was a mistake, and the result of language barriers and miscommunication.  Apr. 4, 2023 Tr. 31:4-20.  But, the MDC staff stated that multiple family members "manipulat[ed]" the system and "provid[ed] false information to circumvent the legal call system."  ECF No. 26-6.  This behavior fits Defendant's pattern of obstructive behavior; nonetheless, the Court need not rely on this incident to support its finding that Defendant has engaged and will continue to engage in obstructive behavior if released.

*et al. Admin. Proc. File No. 3-20537*, U.S. SEC. & EXCH. COMM'N (Jan. 19, 2023),

https://www.sec.gov/enforcement/information-for-harmed-investors/gtv-mediagroup.  The SEC

ordered disgorgement of funds collected through the improper stock offering and established a fund

to reimburse those who purchased stock.  *Id.*  In April 2022, when the fund began issuing

disbursements, *id.*, victims began reporting to the Government that Defendant encouraged them to re-

invest their disbursements in the fraud scheme alleged in this case.  Gov. Mem. at 10.  And, in

February 2023, Defendant announced a new stock offering to his followers that involves Himalaya

Exchange, one of the entities involved in the fraud scheme charged in the Superseding Indictment.

Gov. Mem. at 10.

Despite the SEC's order in September 2021 and the seizure of funds from Defendant's

businesses in September 2022, Defendant has continued to promote fraudulent investment

opportunities to his followers and attempted to revictimize those who received disbursements from

the SEC fund.  The Court finds that this conduct constitutes clear and convincing evidence that

Defendant will not abide by court orders and will continue to cause economic harm to the community

if released.

### D.  Conditions that Would Ensure Defendant's Appearance and the Safety of Others

The Court finds that no condition or set of conditions would ensure Defendant's return to

court or the safety of the community.  Defendant's proposed bail package is insufficient.  Defendant

has proposed a bond of $25 million, $5 million of which is to be secured by cash or real estate.  As

noted, Defendant has filed for bankruptcy and claims to have assets worth only $10,000.  In

attempting to enforce the bond against Defendant, the Government would be one in a long line of

creditors.  Defendant has also proposed that the bond be signed by two adults, one of whom is not a

family member.  But, several of Defendant's family members, including his wife and daughter, are

referred to in the Superseding Indictment as recipients of fraud proceeds. *See, e.g.*, Superseding Indictment ¶¶ 4, 9; Apr. 4, 2023 Tr. 8:11-18.  Moreover, Defendant has not identified any co-signers, let alone co-signers unrelated to the alleged fraud, with a net worth of sufficient unencumbered value to pay the bond, who have sufficient ties to the United States such that the Government would have a meaningful ability to enforce the bond against those individuals, and who would have moral suasion over Defendant.

Defendant has also proposed location monitoring.  GPS monitoring is inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee. *See United States v. Freeman*, No. 21 Cr. 88, ECF No. 50 at 5:4-6 (S.D.N.Y. Oct. 5, 2021) ("Anyone who knows the technology of electronic monitoring knows that it is far from foolproof."); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (stating that electronic monitoring "at best . . . limits a fleeing defendant's head start").  The Court also rejects Defendant's proposal regarding the use of private security because it is not as reliable as a federal jail.

Further, Defendant's past obstructive conduct in civil litigation, in his bankruptcy proceeding, and in this case, as well as his actions following the SEC order and the seizure of funds, demonstrate that the Court does not have reasonable assurance that Defendant will abide by any conditions of pretrial release.

Finally, the Court is not persuaded by Defendant's due process arguments.  Def. Mem. at 2–4. Defendant's continued pretrial detainment will not deny him the ability to meaningfully participate in his own defense, the right to the effective assistance of counsel, or a fair trial.

13

**CONCLUSION**

For these reasons, Defendant's motion for release on bail pending trial is DENIED.  The

Clerk of Court is directed to terminate the motions at ECF Nos. 7 and 23.

SO ORDERED.

Dated:  April 20, 2023
        New York, New York

_____
ANALISA TORRES
United States District Judge