UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>YANPING WANG,<br>  a/k/a "Yvette,"<br><br>                 Defendant. | **S1 23 Cr. 118 (AT)** |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT YANPING WANG'S
MOTION FOR PRETRIAL RELASE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
   Of Counsel

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 1

PROCEDURAL HISTORY .................................................................................................... 2

    A.  Wang's Arrest and Apartment Search ...................................................................... 2

    B.  Charges Against Kwok and Je ................................................................................. 3

    C.  Wang's Presentment and Initial Bail Hearing ........................................................ 4

    D.  The Proposed Suretors (March 15, 2023 – March 21, 2023) ................................. 6

    E.  Conference Regarding Wang's Request for Reconsideration of Bail Conditions (March 22, 2023) ........................................................................................................................ 6

    F.  Additional Proposed Suretors (March 22, 2023 – March 24, 2023) ...................... 7

    G.  Wang's Bail Motion to Judge Lehrburger ............................................................. 7

    H.  Bail Hearing Regarding Wang's Motion (April 4, 2023) ...................................... 8

    I.  Judge Lehrburger's Decision .................................................................................. 8

    J.  The Instant Motion .................................................................................................. 12

APPLICABLE LAW ............................................................................................................. 13

ARGUMENT ......................................................................................................................... 15

    A.  Wang Poses a Serious Risk of Flight ...................................................................... 15

        1)  The Nature and Circumstances of the Offenses Charged ................................. 15

        2)  The Weight of the Evidence .............................................................................. 19

        3)  The History and Characteristics of the Defendant ............................................ 26

    B.  Wang Has, and Continues to, Engage in Obstructive Behavior ............................. 31

        1)  Wang's Lies to Pretrial Services ....................................................................... 31

        2)  Wang's Documented Failure to Obey Court Orders .......................................... 33

        3)  Wang Maintains Continued Control Over Fraud Entities from Jail .................. 35

    C.  There Are No Conditions or Set of Conditions that Would Reasonably Assure Wang's Future Appearance or Prevent Wang from Further Obstruction ...................................... 37

CONCLUSION ...................................................................................................................... 42

# TABLE OF AUTHORITIES

*Despins v. HCHK Technologies, Inc. et al.,* 23-05013 (D. Conn.) (JAM) .................................... 35

*In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM) ................................ 34, 35

*United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988)................................................................. 14

*United States v. Gotay*, 609 F. Supp. 156 (S.D.N.Y. 1985) .......................................................... 15

*United States v. Gotti*, 358 F. Supp. 2d 280 (S.D.N.Y. 2005) ...................................................... 16

*United States v. Kwok et al.*, S1 23 Cr. 118 (AT) ....................................................................... 2, 3

*United States v. Kwok*, No. 23-6421 (2d Cir. 2023) ....................................................................... 4

*United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000).......................................................... 14

*United States v. Leon,* 766 F.2d 77 (2d Cir. 1985) ....................................................................... 16

*United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009).................................................. 14

*United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020) .................................................................. 15

*United States v. Melville*, 309 F. Supp. 824 (S.D.N.Y. 1970) ....................................................... 9

*United States v. Mercedes*, 254 F.3d 433 (2d Cir. 2001).............................................................. 14

*United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) ............................................................... 14

*United States v. Smith,* No. 02 Cr. 1399, 2002 WL 31521159 (S.D.N.Y. Nov.13, 2002)............ 16

*United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130 (S.D.N.Y. Feb. 4, 1992) ........ 15

*United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371 (S.D.N.Y. Nov. 14, 2005).... 14

**PRELIMINARY STATEMENT**

The Government submits this brief in opposition to the motion ("Mot.") and memorandum of law ("Mem.") filed on June 5, 2023 by Yanping Wang, a/k/a "Yvette" ("Wang" or the "defendant") (*see* Dkts. 81, 81-1), seeking revocation of the detention order that was entered in the United States District Court for the Southern District of New York on April 21, 2023, by the Honorable Robert W. Lehburger, United States Magistrate Judge.  (Dkt. 56 ("Lehr. Op.").)  The defendant also asks this Court for pretrial release.  Wang presents both a serious risk of flight and a serious risk of obstruction.[1]  Accordingly, for the reasons set forth below, this Court should order Wang detained pending trial.

**RELEVANT BACKGROUND**

Wang played a key role in a sprawling and complex fraud spearheaded by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok") and their co-conspirator, Kin Ming Je, a/k/a "William Je" ("Je"), that defrauded thousands of victims to invest more than $1 billion into Kwok's extensive, sophisticated, interrelated fraudulent offerings.  The fraud relied on at least four interrelated parts:  the GTV Media Group, Inc. ("GTV") Private Placement, the Farm Loan Program, G Club Operations, LLC ("G|CLUBS"), and the Himalaya Exchange.  Kwok, Wang, Je, and their co-conspirators then laundered their fraud proceeds and misappropriated hundreds of millions of dollars of fraud proceeds for Kwok's and others' personal use.  As described in charging documents and during prior court appearances in this case, Wang effectively served as the chief of staff for Kwok and managed the day-to-day operations of the various entities that Kwok controlled and used to operate

---

[1] While the Government previously sought Wang's detention on the basis of her risk of flight, based on additional information, detention is also warranted based on Wang's risk of obstruction.

the fraud.  In that role, the defendant had access to, and signatory authority over, bank accounts that were used to obtain and launder fraud proceeds.

Wang presents a serious risk of flight based on her lack of ties to the United States, the nature of the charges, her central role in this serious offense conduct, her access to substantial financial resources, her ties to foreign jurisdictions, her relationship with co-conspirator and international money launderer William Je (who remains at large), her failure to be forthcoming regarding her assets and/or access to assets, the significant sentence that she faces, and the strong evidence of her guilt.  Not only is Wang a serious risk of flight, but she has also disobeyed court orders and engaged in other obstructive behavior, including since her arrest and while incarcerated. There are no conditions that can reasonably assure this Court that Wang will appear as required and not further obstruct these proceedings.

## PROCEDURAL HISTORY

### A.  Wang's Arrest and Apartment Search

On March 15, 2023, Wang was arrested at her Manhattan apartment on Criminal Complaint 23 Mag. 2007 (GWG), charging her with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and money laundering, in violation of 18 U.S.C. §§ 1957 and 2.[2]  (Dkt. 1 ("Compl."),)

That same day, the FBI conducted a judicially authorized search of Wang's apartment. During that search, the FBI recovered bulk U.S. and foreign currency from inside a safe;

---

[2] On March 29, 2023, a superseding indictment (the "Indictment") was filed, charging Kwok, Je, and Wang in various counts for their alleged participation in the fraud and money laundering conduct described therein.  *United States v. Kwok et al.,* S1 23 Cr. 118 (AT) (Dkt. 19).

specifically, more than approximately $138,000 in U.S. currency, approximately £3,000, approximately 1180 Hong Kong dollars, and approximately 600 Chinese Yuan. Additional items inside the safe included expired foreign passports for both Wang and Kwok from Vanuatu[3] and China. (Lehr. Op. at 3-4.) The FBI also recovered approximately 12 cellphones, two computers, and more than 25 USB flash drives from Wang's apartment. One of the laptops was tucked between sweaters in Wang's closet. (*Id.* at 4.)

### B. Charges Against Kwok and Je

An indictment charging Ho Wan Kwok ("Kwok") and Kin Ming Je ("Je") was unsealed on March 15, 2023—the same day as Wang's arrest. *United States v. Kwok et al.*, 23 Cr. 118 (AT) (Dkt. 2). Kwok was arrested in Manhattan on March 15, 2023, and the FBI conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment, his Greenwich, Connecticut residence, and his Mahwah, New Jersey mansion. During those searches, the FBI recovered, among other things, dozens of electronic devices, more than approximately $394,000 in U.S. currency, evidence of Kwok's foreign travel documents, and luxury vehicles that had been purchased with fraud proceeds. The Government sought, and this Court ordered, Kwok's pretrial detention based on Kwok's risk of flight, danger to the public, and risk of obstruction. (Dkt. 51 ("Kwok Op.")); *see also* Dkts. 7, 23, 24, 26, 50.) Kwok appealed this Court's opinion

---

[3] Vanuatu is a small island nation in the South Pacific. It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country. *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports). Wang obtained this passport after fleeing China. (Mem. at 14.)

3

and order to the Second Circuit Court of Appeals. *United States v. Kwok*, No. 23-6421 (2d Cir. 2023). On June 14, 2023, the Second Circuit affirmed this Court's order detaining Kwok. (*Id.*)

On the same day Wang and Kwok were arrested, U.K. law enforcement attempted to arrest Je in London and executed a judicially authorized search of Je's London residence. During the search, law enforcement recovered, among other items, cellphones, bulk cash in various currencies, and two cryptocurrency hardware wallets. Kwok and Je have significant ties to the United Arab Emirates—they moved substantial proceeds of the fraud scheme into and through at least one of Je's UAE bank accounts, which received at least approximately $128 million in fraud proceeds that was subsequently misappropriated to Kwok, Je, and their family members or wired to Kwok- and Je-controlled entities. (*See* Dkt. 7 at 9-10.) Moreover, Wang, Kwok, and Je recently undertook efforts to move the Himalaya Exchange's operations, and its money, to the UAE so it will be beyond the "long arm jurisdiction of the U.S." (*See* Dkt. 7 at 19.) Indeed, between in or about January and March 2023, at least two individuals affiliated with the Kwok-controlled entity HCHK Technologies, Inc.[4] spent more than approximately six weeks in the UAE, to assist in moving the operations and money of G|CLUBS, the Himalaya Exchange, and other Kwok-controlled entities abroad. Je remains at large and is believed to be in the UAE, where G|CLUBS and the Himalaya Exchange maintain operations.

---

[4] As described herein, HCHK Technologies, Inc. and HCHK Property and Management, Inc. (together, "HCHK") were established in July 2021 and have facilitated the laundering of fraud proceeds through sham operating, services, and loan agreements with the instrumentalities of the fraud, including G|CLUBS. Wang held 99.9999% of the shares of the HCHK entities through her BVI-registered shell company, Holy City Hong Kong Ventures Ltd. While Wang has no formal employment with the HCHK entities, she controls them through her near-full ownership and manages the operations and employees of the HCHK entities.

### C.  Wang's Presentment and Initial Bail Hearing

Wang was presented on March 15, 2023, in the Southern District of New York before the Honorable Katharine H. Parker, United States Magistrate Judge.  During that proceeding, the Government presented then agreed-upon terms of a proposed bail package for Judge Parker's consideration, which included, among other conditions, a $5 million personal recognizance bond to be co-signed by two financial responsible persons approved by the Government and secured by $1 million in real property and/or cash.  (Lehr. Op. at 4-5.)  The Government then noted the following proposed conditions that were in dispute: (a) Wang's release to home detention, and (b) Wang's release only upon satisfaction of all bail conditions.  Pretrial Services recommended conditions of release consistent in all meaningful respects with the Government's proposed conditions, including home detention reinforced with electronic monitoring, that a bond be both secured in part and co-signed by two financially responsible persons, and that Wang remain detained pending satisfaction of all conditions.

Judge Parker heard arguments from the parties and determined that the Government had established by a preponderance of the evidence that the defendant posed a risk of flight.  Judge Parker imposed conditions that she stated were "the least restrictive I believe are necessary to" assure Wang's return to court and the safety of the community.  Those conditions included, among others, a $5 million bond co-signed by two financially responsible persons approved by the Government, and secured by $1 million in cash or property; travel restrictions; surrender of all travel documents; home detention enforced by location monitoring; disclosure of all assets to Pretrial Services and the U.S. Attorney's Office (including any accounts in her name or controlled by her or by companies in which she has an interest, any cryptocurrency, any cash and any other

5

property).  (Dkt. 10 Ex. C at 11; *see also* Lehr. Op. at 5-6.)  Judge Parker further ordered the defendant detained until all conditions were met.  (Dkt. 10 Ex. C at 11.)

### D.  The Proposed Suretors (March 15, 2023 – March 21, 2023)

On March 20, 2023 and March 21, 2023, the Government interviewed four proposed suretors and determined, among other things, that: (1) none exercised sufficient moral suasion over the defendant—in fact, most barely knew her at all; (2) three proposed suretors had invested in the charged fraud (and therefore were apparent victims of Kwok, Wang, and Je), and one was personally involved in the charged fraud (including as the listed purchaser and registrant of a 2021 Lamborghini and a 2021 Rolls Royce, both of which were purchased with funds traceable to the fraud and both of which the Government seized); and (3) the proposed suretors had insufficient assets to qualify as financially responsible persons for the purposes of the proposed $5 million personal recognizance bond.  The Government informed defense counsel that it could not approve any of the proposed suretors, for the reasons stated above.

### E.  Conference Regarding Wang's Request for Reconsideration of Bail Conditions (March 22, 2023)

On March 22, 2023, a conference was held before the Honorable Sarah Netburn, United States Magistrate Judge, at defense counsel's request.  During that conference, defense counsel asked Judge Netburn "to either [ap]prove the people we've proposed [as co-signers] or change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released."  Judge Netburn declined either to overrule Judge Parker's bail conditions or to direct the Government to accept Wang's proposed co-signers as suretors.  Judge Netburn set a briefing schedule and a conference before Judge Lehrburger.

**F.  Additional Proposed Suretors (March 22, 2023 – March 24, 2023)**

On March 23, 2023, the Government interviewed three additional proposed suretors and determined, among other things: (1) that none exercised sufficient moral suasion over the defendant; (2) that all three proposed suretors had invested in the charged fraud (and therefore were apparent victims of Kwok, Wang, and Je); and (3) that the proposed suretors had insufficient assets to qualify as financially responsible persons for the purposes of the proposed $5 million personal recognizance bond.  The Government informed defense counsel that it could not approve any of the three additional proposed suretors, for the reasons stated above.

**G.  Wang's Bail Motion to Judge Lehrburger**

On March 24, 2023, the defendant filed a motion before Judge Lehrburger "For an Order Directing Defendant Has Complied with the Terms of her Bail Conditions."  (Dkts. 8, 9.)  The defendant argued that the Government's "refusal to approve [Wang's] bond co-signers has been arbitrary."  (Mem. at 1.)  The defendant claimed that each of her proffered sureties was "eminently qualified to serve" as a co-signer on the $5 million personal recognizance bond that Judge Parker imposed as a condition of Wang's release.  (Dkt. 9 at 6.)  The defendant asked Judge Lehrburger either to approve two of Wang's proposed co-signers (without identifying which two) or, alternatively, to modify the bail conditions "such that [Wang's] inability to secure co-signers . . . does not prevent her release"; that is, to set aside Judge Parker's bail finding and "eliminat[e] the use of co-signers altogether."  (*Id.* at 10.)

The Government filed an opposition to Wang's motion on March 29, 2023.  (Dkt. 10.) The Government's opposition detailed the reasons that it determined that each of the proposed suretors was not qualified to co-sign Wang's bond.  The Government also argued that reconsideration of

7

Wang's bail conditions was unwarranted.  On March 31, 2023, the Government filed a supplemental opposition that outlined then-newly reviewed evidence recovered from Wang's apartment during the March 15, 2023 search, which evidence demonstrated that the defendant misled Pretrial Services and the Government and attempted to evade compliance with the asset disclosure bail condition Judge Parker had imposed.  (Dkt. 22.)  Accordingly, the Government sought Wang's pretrial detention based on her risk of flight.

On March 31, 2023, Judge Lehrburger held a conference regarding the defendant's motion. During that conference, the Government presented evidence that the defendant did not disclose the approximately $138,000 in U.S. currency that was in the safe in her apartment to Pretrial Services during her March 15, 2023 interview.  (Dkt. 22 at 2.)  The defendant requested, and Judge Lehrburger granted, an adjournment of the bail hearing.

### H.  Bail Hearing Regarding Wang's Motion (April 4, 2023)

On April 4, 2023, a bail hearing was held before Judge Lehrburger.  The transcript of that hearing is attached hereto as Exhibit A.  Following the hearing, Judge Lehrburger requested additional materials from the parties.  (Dkt. 39.)  Between April 6, 2023 and April 16, 2023, both parties made additional filings relating to Wang's bail motion.  (Dkts. 37, 39, 42, 43, 47.)

### I.  Judge Lehrburger's Decision

On April 21, 2023, Judge Lehrburger issued a written decision and order denying Wang's motion for pretrial release and ordering the defendant detained pending trial.  (Lehr. Op.)  Judge Lehrburger held that the conditions of release that Judge Parker previously imposed on the defendant had not been satisfied.  (*Id.* at 12-17.)  In addition, Judge Lehrburger found that the "co-signing of a bond by two financially responsible persons is a necessary component" of Wang's

conditions. (*Id.* at 16.)  In considering possible conditions of release, including the modified conditions of release proposed by the defendant, Judge Lehrburger found that the conditions were not sufficient to reasonably assure Wang's presence at future proceedings. (*Id.* at 12.)  Judge Lehrburger held that detention was warranted, because "there are no conditions that can reasonably assure Wang's attendance at future proceedings." (*Id.* at 23-24.)

*Conditions of Release Not Met*

Judge Lehrburger first addressed whether the conditions of release that Judge Parker imposed on Wang had been satisfied and found that they had not, "because Wang has not provided two financially responsible persons to co-sign the bond[] that are acceptable to the Government." (Lehr. Op. at 12.)  Judge Lehrburger found that the "Government did not act arbitrarily in rejecting [Wang's] proposed co-signers" where "none of them have a relationship with Wang that would provide the necessary moral suasion; they did not have sufficient net worth to be financially responsible; and each of them was either a victim of or participant in the alleged fraud." (*Id.*)

Judge Lehrburger discussed the rationale for moral suasion and what it means; particularly, that the "function of bail is not to purchase freedom for the defendant but to provide assurance of his reappearance after release on bail." (*Id.* at 13 (quoting *United States v. Melville*, 309 F. Supp. 824, 826-27 (S.D.N.Y. 1970)).)  And Judge Lehrburger agreed with the Government that "none of the individuals put forward by Wang as co-singers have any meaningful relationship with Wang that would incentivize Wang not to flee." (Lehr. Op. at 13.)  In responding to the defendant's contention that the proffered co-signers "hold moral suasion over Wang because they support the anti-CCP cause to which she is devoted," Judge Lehrburger observed:

> [T]hat connection may demonstrate the proposed co-signers devotion to Wang; it
> does not suggest that Wang would have any serious reservation about causing them

9

financial loss to purchase her freedom.  As noted above, Wang is alleged to have defrauded these very individuals.  They may be loyal to her, but the reverse is by no means apparent.  As the Government aptly notes, the deep devotion shown by the prospective co-signers potentially makes them less responsible in that they would be more likely to help Wang flee or go underground.

(Lehr. Op. at 15.)  In considering all the circumstances, Judge Lehrburger found that the "co-signing of a bond by two financially responsible persons is a necessary component" of Wang's conditions.  (*Id.* at 16.)

### Proposed Modified Conditions of Release Not Sufficient

As an alternative to determining that Wang's existing conditions of release had been met, Judge Lehrburger considered the modified bail package proposed by Wang—removing the co-signer requirement entirely and offering that the entire $5 million be secured by cash or property.  (Lehr. Op. at 17.)  Judge Lehrburger observed that Wang's proposed bond "terms suffer from the same flaw as set forth above."  (*Id.*)  Under Wang's proposal, the majority "of the bond would be secured by the property of persons who hold no moral suasion over Wang," and while the additional security might put the Government in a better position of recouping the $5 million bond in the event of Wang's flight, "it does nothing to materially change the absence of any suretor who has sufficient moral suasion over Wang to incentivize her not to do so."  (*Id.*)  Accordingly, Judge Lehrburger found that Wang's proposed modified bail conditions (which, as discussed herein, were *more* restrictive than the conditions Wang now proposes) were "insufficient" to replace the requirement of two co-signers.  (*Id.*)

### Detention is Warranted

Judge Lehrburger then considered whether there were any conditions that could be set to reasonably assure that Wang would not flee and held that "there are no such conditions and that Wang should be detained."  (Lehr. Op. at 17.)  Judge Lehrburger evaluated the relevant Section

10

3142(g) factors, including the nature and circumstances of the charges, the weight of the evidence against Wang, and her history and characteristics. (*Id.* at 17-18.) In particular, Judge Lehrburger cited the following factors that pointed to Wang's risk of flight: (1) the massive scale of the alleged fraud in which Wang played a significant role; (2) the potential sentence of 24 to 30 years' imprisonment that Wang faces if convicted; (3) the Government's proffered strong evidence of Wang's guilt, including records reflecting her authorizing the $100 million transfer or misappropriation of GTV Private Placement funds and evidence of her knowledge that the transfer was improper (*see* Dkt. 19 at ¶ 32(b)); (4) Wang's history and characteristics, which "overwhelmingly demonstrate a serious risk of flight;" and (5) "strong indicia that Wang has considerable financial means at her disposal." (*Id.* at 17-19.)

Judge Lehrbruger then addressed information learned since Wang's initial bail hearing, which "only heightens the Court's concern." (*Id.* at 19.) Specifically, Judge Lehrburger viewed the fact that Wang had not been able to identify potential co-signers with moral suasion as "itself a substantial change in circumstances since conditions were set by Judge Parker," who assumed Wang would be able to satisfy that "least restrictive" condition of bail. (*Id.* at 19; *see also* Dkt. 10 Ex. C at 22-23.) Judge Lehrburger also found that Wang had "not been forthcoming in fully disclosing her assets." (Lehr. Op. at 20.) While Judge Lehrburger did not make a particular finding regarding whether or how much cryptocurrency Wang holds, he advised that the documentation the Government presented suggesting that Wang had received (purported) cryptocurrency holdings that she did not disclose "certainly gives the Court concern that there may be unaccounted-for assets to which Wang could have access," notwithstanding possible redemption restrictions associated with the Himalaya Exchange following the Government's seizures. (*Id.*) Judge

11

Lehrburger also noted that Wang "did not disclose to Pretrial Services the $138,000 cash that was seized from her residence" and reasoned that, regardless of the specific question asked, "it makes no sense" that Wang would have believed questions about assets she has to be "so limited" to cash on her person at the time of her arrest. (*Id.* at 21.)  Finally, as to Wang's 2023 request to travel internationally and her remaining in the United States in the months prior to her arrest, despite knowing that the Government had an investigation into Kwok-controlled companies, Judge Lehrburger considered—and rejected—the defense's contention that those facts mitigated Wang's risk of flight.  (Lehr. Op. at 21-22.)  Acknowledging that "staying put while known to be under investigation can be indicative of someone who is not likely to flee (although merely being under investigation and actually being charged are quite different)," Judge Lehrburger noted that Wang actually sought leave to "not stay put" and expressed a willingness to travel internationally, which "provides no comfort that Wang actually planned to return."  (*Id.* at 22-23.)  Having considered potential conditions of release, Judge Lehrburger found "that the Government ha[d] met its burden to show by a preponderance of the evidence that no condition or combination of conditions can reasonably assure the Defendant's appearance at future proceedings" and ordered Wang detained. (*Id.* at 23.)

### J.  The Instant Motion

On June 5, 2023, Wang filed the instant motion, seeking pretrial release.  (*See* Mem.)  The defendant proposed the following conditions of release:  (1) a $2 million personal recognizance bond, secured by $1 million in property, the cash in "one of her bank accounts,"[5] and the $138,000

---

[5] Wang does not identify which bank account or how much cash she proposes to post as security. At the time of her arrest on March 15, 2023, Wang represented that her two bank accounts held

in cash that was seized from the safe in her apartment; (2) restrictions on her use of her other bank account, requiring preapproval by Pretrial Services; (3) travel restricted to the Southern and Eastern Districts of New York; (4) surrender of all travel documents with no new applications; (5) strict supervision by Pretrial Services; (6) location monitoring as directed by Pretrial Services; (7) home confinement with GPS monitoring; (8) no contact with co-defendants, witnesses, or purported victims without attorneys present; and (9) home monitoring by a friend who will live with Wang and be responsible for reporting any violations.  (Mem. at 9-10.)  The defendant principally argues that the Government did not meet its burden to show that (1) Wang presents a serious risk of nonappearance, and (2) no combination of conditions would reasonably assure her appearance.[6]  Wang asserts that her proposed combination of bail conditions is sufficient and will make it "impossible for Ms. Wang to flee the U.S."  (Mem. at 3, 35.)

## APPLICABLE LAW

Under the Bail Reform Act, a defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  In assessing a defendant's risk of flight and the danger to the community presented by her release, Congress has directed courts to consider several factors:  (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and

---

approximately $400,000 and $500,000, respectively, but she has provided no updated account balances.

[6] The defendant also argues that pretrial detention hinders her ability to prepare her defense. (Mem. at 38-39.)

seriousness of the danger to any person or the community that would be posed by Wang's release. 18 U.S.C. § 3142(g).

In seeking pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community or risk of obstruction, and that no condition or combination of conditions can address those risks.  18 U.S.C. § 3142(f); *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Friedman*, 837 F.2d 48, 29 (2d Cir. 1988).  Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means.  *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (Government entitled to proceed by proffer in detention hearings).

"[O]bstruction [also] poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate.  *United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005).  Indeed, the Second Circuit has been clear that "obstruction of justice has been a traditional ground for pretrial detention by the courts." *LaFontaine*, 210 F.3d at 134.  Thus, where, as is the case here, there is "a *serious* risk of obstruction in the future," detention is appropriate where no court-imposed conditions can reasonably protect from that risk.  *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009); *see also* Kwok Op. at 7-11, 13 (holding that Kwok's obstructive conduct—which included failure to obey court orders, lies to Pretrial Services about his assets, his technological sophistication and ability to "delete, encrypt, or transfer electronic evidence and fraud proceeds if

14

released," and his moving fraud proceed abroad to evade U.S. jurisdiction—"demonstrate[s] that the Court does not have reasonable assurance that [Kwok] will abide by any conditions of pretrial release.").

"If the Government carries its burden, then the Court must determine whether there are reasonable conditions of release that can be set to ensure the defendant's appearance and the safety of any other person or the community." (Kwok Op. at 5); *see also* 18 U.S.C. § 3142(c)(1)(B). Even where the least restrictive set of conditions are imposed as conditions of bail, it is "not unique" for a defendant to be unable to meet those conditions and therefore to remain detained pending trial. *United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130, at \*1 (S.D.N.Y. Feb. 4, 1992); *see also United States v. Gotay*, 609 F. Supp. 156, 156 (S.D.N.Y. 1985) ("if a defendant cannot meet economic conditions of release reasonably necessary to assure his appearance, he must remain in pre-trial detention"). If a court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court is instructed to order the pretrial detention of a defendant. *United States v. Mattis*, 963 F.3d 285, 290 (2d Cir. 2020); 18 U.S.C. § 3142(e)(1).

"A district judge must undertake a *de novo* review of a magistrate judge's decision to release or detain a defendant." *United States v. Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005); *see also United States v. Leon,* 766 F.2d 77, 80 (2d Cir. 1985); *United States v. Smith,* No. 02 Cr. 1399, 2002 WL 31521159, at \*1 (S.D.N.Y. Nov.13, 2002).

## ARGUMENT

The nature and circumstances of the offenses charged, the weight of the evidence against Wang, her individual history and characteristics, the serious risk of obstruction that would be posed

by Wang's release, and her substantial risk of nonappearance are all factors that strongly counsel in favor of Wang's pretrial detention

### A. Wang Poses a Serious Risk of Flight

#### 1) *The Nature and Circumstances of the Offenses Charged*

Wang played a central role in a more than $1 billion fraud and money laundering conspiracy that Kwok spearheaded. As this Court is now familiar, for more than four years, Kwok, Wang, Je, and others, conspired to defraud thousands of victims of more than $1 billion through a series of complex fraudulent businesses and fictitious investment opportunities that connected dozens of interrelated entities controlled by Kwok, many of which were managed by Wang. (Dkt. 19 at ¶¶ 1-5, 8.) The depth and breadth of the fraud is difficult to overstate. To carry it out, Kwok, Wang, Je, and their co-conspirators laundered fraud proceeds through foreign and domestic bank accounts and entities, layering the fraud funds to conceal their source, as well as using the fraud proceeds to further promote the ongoing criminal activities. Wang ensured the successful day-to-day operation of the entities that implemented the fraud and made sure that Kwok could misappropriate victim funds for his own personal use and for the use of his family members. For this work, Wang was paid $400,000 in cash plus $100,000 in "benefits" each year and stood to gain more through ownership of Himalaya Coin, which—but for the law enforcement's success in seizing hundreds of millions of dollars traceable to fraud involving the Himalaya Exchange—

would have yielded her millions more in fraudulent proceeds. (*See* Mem. Ex. N. at 5 (notes from Wang's counsel).)[7]

The conspiracy operated through four interrelated arms—the GTV Private Placement, Farm Loan Program, G|CLUBS, and the Himalaya Exchange. As Kwok's chief of staff, Wang played roles in each of the arms and was particularly central to the GTV Private Placement and G|CLUBS. Through the GTV Private Placement, Kwok, Wang and other coconspirators raised approximately $452 million by selling "common stock" in GTV, a purported media company. In connection with the GTV offering, Kwok and others disseminated to victims offering documents— including a "Confidential Information Memorandum" ("PPM"). The PPM named Wang as an "executive director" and stated that the money raised through the GTV Private Placement would be used "to expand and strengthen [GTV's] business." But that was a lie. After selling approximately $452 million worth of GTV common stock to more than 5,500 victims, *see* Dkt. 19 at ¶ 12(e), in April and May 2020, the victims' money was funneled through a series of bank accounts that Wang controlled, and $100 million of the money raised was subsequently invested into an extremely high-risk hedge fund ("Fund-1"). Wang not only controlled the accounts that received hundreds of millions of dollars of victim money, but she also initiated the wire that sent $100 million of victim money to the hedge fund.

Specifically, on or about June 3, 2020, Wang signed a "Subscription Agreement" in her capacity as "President" of Saraca (the parent company of GTV). By virtue of Wang's signature,

---

[7] Notes from Wang's own counsel severely undercut the defendant's claim that Wang's involvement in the fraud did not provide her "funds for personal use." (Mem. at 12.) To the contrary, Wang was lavishly rewarded for her criminal acts through an approximately $500,000 annual salary, including benefits (Mem. Ex. N.), and the promise of earning millions through investments in purported cryptocurrencies.

Saraca agreed to invest $100 million into a high-risk hedge fund.  Wang identified an account she opened, controlled, and which received more than $300 million of victim funds, as the account which would fund that $100 million investment ("Account-5601").   The same day, Wang transferred $100 million from Account-5601 to a different bank account she had opened ("Account-2038"), which had a $0 balance prior to the $100 million transfer.  Bank records indicate that $100 million transfer was conducted online by the user "yvettewang2018."  (*See* Compl. at ¶ 12.)[8]

On June 5, 2020, Wang authorized the $100 million wire transfer (consisting of entirely money raised through the GTV Private Placement) from Account-2038 to Fund-1. [9]  The subscription agreement, which Wang signed, made clear that $100 million investment in Fund-1 was made on behalf of Saraca, whose ultimate beneficial owner is Kwok's son.  That is, Wang herself spent $100 million of victim money, thereby violating the terms of GTV's PPM.

Over the next several months, banks closed GTV-related accounts and issued checks for the balances of those accounts.  Wang received one such check in the amount of $137,999,970, made payable to GTV.  In July 2020, Wang and others attempted to open a bank account in the name of GTV in which to deposit two checks representing victim funds—the nearly $138 million check and a second check for $100 million.  To open this new bank account, Wang filled out an

---

[8] The defendant's motion argues that Wang's mention in 22 of 154 paragraphs in the Indictment somehow diminishes the serious nature of the charges.  (Mem. at 11-12.)  Not so.  As described above, the Government is not limited to information in the Indictment during bail considerations; moreover, the Government also filed a criminal complaint that detailed Wang's specific criminal conduct.  (*See* Compl.)  Finally, the defense simply ignores that Wang is charged in the first Count of the Indictment, which identifies her as Kwok's "chief of staff" for the *entirety* of the four-year long conspiracy.  (Dkt. 19 at ¶¶ 8, 26-32.)

[9] Although Wang identified Account-5601 as the source of the hedge fund investment, the money was transferred from her Account-2038.

18

"Enhanced Diligence Request," in which she stated that the initial deposit into the account would "be approximately $138 million that was raised from private placement in the form of a cashiers check." As Wang stated in that enhanced due diligence document, "Saraca Media Group was the recipient of [GTV] Private Placement funds on behalf of GTV . . . . [t]he funds in the account are funds of GTV Media Group and are strickly [sic] for operational purposes and acquisitions." (Compl. at ¶ 13.h.)  Accordingly, Wang well knew that the funds raised from the GTV Private Placement could not be invested in a high-risk hedge fund for the benefit of Kwok's son.

Standing alone, Wang played a critical role in the GTV Private Placement, which undergirds Counts Two, Three, and Eleven.  Even if her criminal acts stopped there—and they did not—she would be centrally involved in a $439 million theft from thousands of victims, which is an extraordinarily serious crime in and of itself.[10]  But the conspiracy, and Wang's involvement in it, persisted for years and has continued even since her arrest.  Wang served as a *de facto* G|CLUBS executive, had decision-making authority at the Kwok-controlled media platform, Gettr, was involved in money transfers to the Himalaya Exchange, and was active in transferring and consolidating assets of the various Kwok-controlled fraud instrumentalities abroad into a newly created UAE shell company.  Thus, far from "lead[ing] a dissident movement" as the defense

---

[10] Wang's attempt to minimize the serious of the GTV Private Placement should be rejected.  The defense attempts to reframe the GTV Private Placement as conduct that caused "$30 million [in] investment losses, no siphoning funds for personal use." (Mem. at 12.)  As an initial matter, a $30 million loss is very substantial.  More to the point, however, this was not a mere "investment loss[ ]." (*Id*.)  Wang and her coconspirators promised investors that their money would be used for GTV business but, instead, Wang transferred *$100 million* of it into an investment for Kwok's son.  That is quintessential fraud.  That the Securities and Exchange Commission was able to successfully mitigate losses for victims should not inure to the benefit of Wang, whose acts caused $30 million in actual loss and attempted another $70 million. (Mem. at 12.)

contends, Mem. at 1, the evidence reveals that Wang worked—day in and day out—to ensure the successful operation of a broad and serious fraud enterprise.

The severity of Wang's criminal conduct thus weighs in favor of detention.  (*See* Lehr. Op. at 18 ("nature and circumstances of the charges . . . counsel against release").)

### 2)  *The Weight of the Evidence*

The weight of the evidence against Wang similarly "counsel[s] against release."  (Lehr. Op. at 18.)  The evidence against Wang is particularly strong.  It convincingly demonstrates the essential hands-on role Wang played in the GTV Private Placement, the operation of G|CLUBS and other fraud instrumentalities, and the layering and laundering of fraud proceeds.  The Government's evidence consists of, among other things:  bank records, email and cellphone communications, recorded phone calls, Wang's own writings about her activities in journals and datebooks, offering documents, and anticipated testimony from witnesses, including other individuals who worked in various arms of the fraud.  Collectively, the multitude of evidence establishes Wang's many activities in furtherance of the fraud; it also provides compelling evidence of Wang's state of mind—her intent and knowledge that she played an essential role in serious criminality.

As described above, and as attested to in the Criminal Complaint (Dkt. 1), documents from banks overwhelmingly demonstrate Wang's active and knowing involvement in the GTV Private Placement.  Those documents identify bank accounts that Wang opened as the accounts that received the vast majority of money fraudulently raised through the GTV Private Placement.  And Wang well knew the source of the money in those accounts was from GTV investors.  Many of the hundreds of deposits bear reference or memo information explicitly referring to the GTV Private Placement.  For example, memo lines state, among other things, in substance and in part:

20

"Capital Injection Infusion," "To Inves Stment [sic]," "Private Placement Investment," "Gtv Media Investment," "Gtv Inv," and "Additional Stock Purchase."

Moreover, the PPM establishes that Wang was an executive director of GTV.  Wang therefore well knew that GTV investor money could not be used for a high-risk hedge fund investment for the benefit of Kwok's son.  Indeed, Wang herself stated, in a signed document that she submitted to a bank, that the money raised from the GTV private placement is "strickly [sic] for operational purposes and acquisitions."  (Compl. at ¶ 13.h.)[11]  And there is little doubt that it was Wang (using her online user account, "yvettewang2018") who initiated the transfer (and misappropriation) of $100 million dollars in GTV Private Placement fraud proceeds.

The Government has also obtained numerous emails sent by Wang's encrypted email accounts.[12]  Those emails demonstrate, *inter alia*, that Wang was an authorized signer on bank accounts held in the names of numerous entities used to launder fraud proceeds and Wang's involvement in G|CLUBS managerial decisions and meetings.  Indeed, the Government has recordings in which Wang, unbeknownst to her, was recorded making financial decisions and directing others regarding how to process money from G|CLUBS members, including by proposing that the money be routed through various Farms' bank accounts.  These recordings and documents corroborate the testimony of witnesses, who will establish that Wang had a leadership

_____

[11] Any claim that Wang's language skills interfered with her understanding of the English-language documents should be summarily dismissed.  The Government has several recordings of Wang fluently speaking English (and translating from Mandarin to English).  Indeed, Kwok's counsel has identified Wang as one of Kwok's English translators.  Messages recovered from Wang's cellphones are variously written in Mandarin and in fluent English.  Finally, notes from a meeting between Wang and her own counsel indicates her "Languages: Mandarin[,] English[, and] French" and she has a bachelor's degree in "English."  (Mem. Ex. N at 4, 5.)

[12] The defendant utilizes several email accounts hosted @protonmail.com; Proton Mail is an encrypted email service hosted in Switzerland.

role across the conspiracy.  It was Wang who interviewed and hired individuals who worked for G|CLUBS and other Kwok-associated entities that helped carry out the fraud.

Beyond documents from banks and other entities, emails, and recordings, the Government has obtained significant additional evidence pursuant to search warrants that were executed on the day of Kwok's and Wang's arrests—including during the search of Wang's apartment.  That search revealed multiple documents that further cement Wang's central role in all aspects of the wide-ranging conspiracy.  For example, the Government obtained Wang's weekly planners from 2018 through 2023.  Those planners each contain dozens of pages demonstrating—through Wang's own writings—her involvement in G|CLUBS and the Himalaya Exchange, as well as other entities associated with the fraud (*e.g.*, G Fashion, G Music, HCHK, and Gettr).

Indeed, Wang's notes reflect her involvement in Kwok's new "A10" offering in or about March 2023.  Around that time, Kwok began promoting the A10, which has all the hallmarks of other arms of the fraud, as a purported stock offering for 5% of the Himalaya Exchange and 5% Gettr.  (Dkt. 26 at 14.)  The below excerpt from Wang's March 2023 planner (*i.e.*, just before

22

Wang's arrest) demonstrates, among other things, her involvement with the A10 offering, the

HCHK and Golden Spring websites, and Himalaya Coin (HCN).



Despite the defense's claim that Wang was merely a volunteer fighting the CCP during this

time, Wang's work—as reflected in this planner excerpt—is centrally connected to the

conspiracy's fraudulent money-making activities and has little, if any, connection to pro-

democratic work.  Wang's planners contain meticulous notes about her activities in furtherance of

the conspiracy.  It appears that Wang's practice was to indicate completion of a task or meeting

with a red check mark.  The planners are mostly in Mandarin, and the Government's review and

translation of their contents is ongoing.

23

As another example, an undated document found inside the 2023 planner illustrates Wang's knowledge that HCN and HDO (the purported digital currencies traded on the Himalaya Exchange) were used to launder G|CLUBS membership fees:



The Government also seized 12 cellphones from Wang's apartment and has reviewed some of the content of certain of those cellphones. [13]   As an initial matter, Wang's electronic communications reflect her technological sophistication.   Wang communicated with others primarily using encrypted messaging applications, including Signal (which offers a feature that allows for the automatic deletion of messages after a customizable time period) and WhatsApp (which offers a feature that allows for the scrambling of message content); she set up separate Apple IDs for different of her cellphones, rather than consolidating the data under one iCloud account (*e.g.*, Wang's device named "August's iPhone" is associated with the Apple ID

---

[13] The Government is aware of cellphone messages between Wang and Kwok; however, because Kwok has claimed that Wang translated attorney-client communications, the Government has not yet been able to review the substance of those messages.  The Government's review of the evidence recovered from Wang's cellphones and her apartment is in its early stages.

"august[redacted]@icloud.com," whereas "March's iPhone" is associated with the Apple ID "march[redacted]@icloud.com"); and she deleted certain messages and call logs from her cellphones.[14]

Wang's electronic communications also corroborate that she was central to the conspiracy. Wang exercised control over finances and business decisions and continued in her critical role as Kwok's "chief of staff" through her arrest.  (*See* Mem. at 15.)  Wang's efforts to move the companies' operations to the UAE, beyond the jurisdiction of U.S. authorities, is reflected in Wang's communications with HCHK's Financial Controller ("Controller"), who was one of the U.S.-based employees spent several weeks in the UAE in early 2023.  *See supra* at 4.  Those communications—which were in English and took place via Signal—include the following, among others and in substance and part:

- On March 6, 2023, Controller wrote to Wang:  "Notes : I was advised this morning; [another individual] came to me given feedback to boss[15] on Daily … plus monthly writing a report to boss about the office and all moving parts and observation."

- Approximately 20 minutes later, Controller wrote to Wang:  "We have been approved FAB!!! / Account numbers tomorrow / Just opened another bank account NBF ! Should have account numbers soon too"[16]

- Later that day, Controller advised Wang that the entities were "Moving money into ADCB [*i.e.*, Abu Dhabi Commercial Bank PJSC]" and sent a screenshot of what appears to be a bank account balance screen reflecting several incoming deposits of $750,000 into an account that had grown to approximately $8.25 million as of March 6, 2023.  Approximately two hours later, Controller sent Wang a screenshot of a UAE entity account at a fourth UAE financial institution, reflecting a balance

---

[14] Forensic extraction tools for cellphones and other electronic devices are sometimes able to successfully recover deleted data, including messages, call logs, and contacts; in those instances, the extraction indicates when data was deleted from the device.

[15] The Government has learned that "Boss" is another alias for Kwok.

[16] FAB, or First Abu Dhabi Bank, and NBF, or National Bank of Fujairah, are financial institutions located in the UAE.

of approximately 41,831,901 AED (UAE Dirham), or approximately $11,389,308 USD.

- On March 7, 2023, Wang directed Controller to secure funds associated with the Himalaya Exchange, writing, in part: "Stay calm, focus on what you can get from H Reserve's banks for now" and indicating that she was "working on adding [Controller] as an extra bank signer."

- On March 9, 2023, Wang asked Controller to "pls find out the SWIFT code for FAB [*i.e.*, First Abu Dhabi Bank] bank of [UAE entity]?  I do have their IBAN here."[17]  Controller provided the SWIFT code, and Wang responded, "I'll use this one for the sender bank."

- The next day, Controller reported back to Wang:  "Good day lots of laughs a lot accomplished with [UAE entity] … / And gclubs".

- On March 11, 2023, Wang wrote to Controller:  "I'm thinking: you probably better no[t] bring any uae devices back to us.  Think about how to work as basic levels from here."  Later that day, she added:  "Yes, I thinking you come back home with less info better, or even zero info from there.  Including devices. / Advise [another individual who was in the UAE ("Employee-1")] the same my advice also pls."[18]

These select messages, from just one encrypted chat on one of the defendant's cellphones, clearly establish that Wang managed the Kwok-controlled entities and their finances; that she had access to and control over substantial fraud proceeds; that she was directing employees to secure fraud proceeds and transfer those proceeds to UAE-based bank accounts held in the name of a newly formed foreign entity; and that she did not want the U.S.-based employees of Kwok-controlled entities to bring evidence of the new UAE-based operations back into U.S. authorities' jurisdiction. Wang's motivation is clear and undeniable:  just a week before her arrest, she was knowingly

---

[17] A SWIFT code is a set of digits that represents a bank branch and is needed to send money internationally.  An IBAN, or an international bank account number, is a standard international numbering system developed to identify an overseas bank account.

[18] Wang's instructions that these U.S.-based employees should not travel back to the United States with any information relating to the fraud instrumentalities' UAE operations cannot credibly be explained as a concern about the CCP or its alleged monitoring of the activities of Kwok's "movement."  Rather, it is apparent from the face of these communications that Wang was concerned with the employees drawing the attention of U.S. criminal authorities.

continuing the fraud's operations, laundering fraud proceeds, obstructing the Government's investigation, moving cash abroad, and keeping evidence from entering the U.S.

The cumulative strength of the evidence means that, based solely on the present charges, Wang is exposed to a Sentencing Guidelines Range of 24 to 30 years.  (Lehr. Op. at 18.)  Given the weight of the evidence, the likelihood of Wang's conviction is very high, and thus a sentence of incarceration and accompanying immigration consequences is the expected outcome.  With this backdrop, it is not credible for Wang to claim she has "no intention to flee."  (Mem. 17-18.)

### 3)  *The History and Characteristics of the Defendant*

Wang's history and characteristics "overwhelmingly demonstrate a serious risk of flight." (Lehr. Op. at 18.)

*First*, Wang has very limited connections to the United States.  The defendant is a Chinese citizen who emigrated from China to the United States in approximately 2017.  (Mem. at 14; Lehr. Op. at 3.)  She has no family in the United States.  Wang's only son lives in China, and she has not seen him since she immigrated to the United States.  (Mem. at 14; Dkt. 10 Ex. D at 6-7.)  She has virtually no ties to the community (other than her criminal conduct) and, by her own admission, no connections to any individuals unaffiliated either with the Kwok-controlled entities involved in the fraud or with Kwok's "movement."[19]  (Dkt. 10 Ex. D at 7-8.)  Further highlighting her lack of

---

[19] The defendant claims that Judge Lehrburger and the Government "criticized [Wang] for not having put down sufficient roots" and for not seeming to "have close friends other than Chinese people who are also members of the anti-CCP movement that she helps lead." (Mem. at 19.)  This is meritless.  It is not a criticism to examine a criminal defendant's connections to a jurisdiction when assessing risk of flight. (*See* Kwok Op. at 5 (this Court examining Kwok's connections to the United States and finding them to be "limited").)  Moreover, as Judge Lehrburger correctly found, each of the proposed suretors "was either a victim of or participant in the alleged fraud," and the Government "did not act arbitrarily in rejecting" them. (Lehr. Op. at 12-15.)

connections to the U.S., none of the eight suretors the defendant proposed to the Government and to Judge Lehrburger has "any meaningful relationship with Wang that would incentivize Wang not to flee." (Lehr. Op. at 13.)

*Second*, Wang has substantial connections and resources abroad. Many of the Kwok-controlled entities the defendant effectively ran, in either a formal or informal capacity, have bank accounts, offices, and/or employees located in foreign jurisdictions—jurisdictions including the United Kingdom, the UAE, the British Virgin Islands, Kyrgyzstan, Switzerland, and Israel. As described above, Kwok and others have been moving the operations of the Himalaya Exchange and other Kwok-controlled entities to the UAE for the admitted purpose of evading the U.S. legal system. (*See* Kwok Op. at 5-6.) Her co-defendant, Je, is presently believed to be hiding in the UAE. (Kwok Op. at 5-6.) And, as evidenced by the information in her cellphones, Wang herself was central in moving money and operations to the UAE.

Wang also has access to, and the support of, an extensive network of her and Kwok's devoted followers dispersed throughout the world—followers who "are so loyal as to risk being liable for millions of dollars without knowing [Wang] well," and who therefore "could be a potential source of support and harbor for Wang if she were to flee." (Lehr. Op. at 18; *see also* Kwok Op. at 6 ("[Kwok] has an extensive network of devoted followers around the world").)

*Third*, Wang has considerable financial means at her disposal. At the time of her arrest on March 15, 2023, she maintained approximately $138,000 in cash in a safe in her apartment, and personal bank accounts with more than approximately $900,000 in liquid funds.[20] (Lehr. Op. at

---

[20] The conditions Judge Parker imposed included the requirement that Wang "disclose all assets to Pretrial Services and the U.S. Attorney's Office, *including any accounts* in her name or

28

19.)  Wang contends that she has "nothing else" by way of assets or access to funds.  (Mem. at 23.)  However, this claim is belied by Wang's role in the fraud and her effective control over tens of millions of dollars, as described in greater detail herein.

Indeed, the charged fraud operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities.  Wang, Kwok, and Je utilized more than approximately 500 accounts held in the names of at least 80 different entities or individuals to launder more than $1 billion in fraud proceeds.  (Dkt. 19 at ¶¶ 1, 3.)  By design, most of these shell companies were owned or operated by others on paper, but it was Kwok, Je, and the defendant who made the business decisions and controlled the flow of funds.  Wang's responsibilities as Kwok's "chief of staff" include managing the day-to-day operations of the dozens of instrumentalities of the fraud; accordingly, she has access to substantial sums of money, including funds held by entities where she was not formally employed[21] or held in bank accounts for which she was not listed as an authorized signer.[22]  (*See* Ex. A at 56-57.)  This fact is apparent from certain documents recovered from Wang's apartment on the day of her arrest reflecting, among other things, the following: (a) the *defendant* authorized February 2023 payroll

---

*controlled* by her or *by companies in which she has an interest*."  (Dkt. 10 Ex. C at 22-23) (emphases added).

[21] The Government's evidence reflects that Wang was formally employed only by the following Kwok family office entities during at least the following time periods:  Golden Spring New York Ltd. between April 2019 and March 2021; and Lamp Capital LLC between March 2021 and April 2022.

[22] The Government's evidence reflects that Wang has been an authorized signer on bank accounts held in the names of at least the following entities that are alleged to be involved in the charged offenses:  Saraca Media Group Inc.; GTV Media Group Inc.; Rule of Law Foundation III, Inc.; Rule of Law Society IV, Inc.; Leading Shine NY Ltd.; Lexington Property and Staffing LLC; Hudson Diamond NY LLC; Golden Spring New York Ltd.; Greenwich Land LLC; G Club Operations LLC; and G Fashion LLC.

expenses for employees of Kwok-controlled entities G Music, G Clubs, G Fashion, HCHK, Rule of Law Foundation, and Orbit Technology Corporation (Dkt. 42 at 3-4, Ex. F); and (b) the defendant had printed summaries of account balances for six bank accounts held in the names of Kwok-controlled GF Italy, GFNY, HCHK Technologies, and HCHK Property in her purse, which indicated that those six accounts alone held more than $55 million as of March 13, 2023. (Dkt. 42 at 3, Ex. E.)   In light of the above circumstances, the Court can have "no reasonable assurance . . . that there are not other substantial funds to which Wang has access." (Lehr. Op. at 19.)   Indeed, as described below, the defendant continues to oversee and effectively control fraudulent proceeds, even from jail.

*Fourth*, Wang has the means and know-how to flee.   She was able to obtain a passport from another jurisdiction shortly after leaving China.   Moreover, "a clever defendant with sufficient resources could figure out a way to leave the country without travel documents." (Kwok Op. at 6.)   Wang is the sole director of foreign entities used to facilitate the fraud, including her BVI-registered Holy City Hong Kong Ventures Ltd., which in turn owned the HCHK entities.   Indeed, the defense acknowledges that Wang "travelled a lot" after leaving China in 2015, before moving to New York in 2017 and seeking political asylum. (Mem. at 13-14.)

Wang's motion relies on the claim that she will remain in the United States if released because she cannot travel, *at all*, because of security concerns due to the threat posed to her by the CCP. (Mem. at 16-19.)   This argument does not withstand scrutiny.   As explained above, and as the defendant acknowledges, Wang "travelled a lot" after fleeing China.   This belies the claim that the CCP is in hot pursuit of her if she were to travel anywhere beyond U.S. borders.   Indeed, as recently as January 2023, the defendant sought authorization from the U.S. Department of

Homeland Security to make "multiple" international trips to the United Kingdom and the British Virgin Islands, for business purposes that she said would continue through "at least the remainder of 2023." (Dkt. 42, Ex. G.)  As Judge Lehrburger found, the defendant's statement of intended foreign travel significantly undermines Wang's argument that she poses no risk of flight, because it shows that she *is* willing to travel internationally—even despite the CCP's purported efforts to monitor her location and possibly repatriate her. (Lehr. Op. at 22-23.)

Wang's claim that her remaining in the United States after becoming aware of the Government's investigation in 2022 is a "strong indication" that she is not a serious flight risk is equally flawed.  To the contrary, the defendant renewed her request to obtain authorization to travel internationally, which allowed her to "preserve her asylum application rights" and "provides no comfort that Wang actually planned to return" to the U.S.—particularly if charged while abroad. (Lehr. Op. at 22-23.)  Further, there is a fundamental difference between having some awareness of the existence of an investigation and actually being charged—especially where, as is the case here, the charges are serious, the evidence is strong, and the potential criminal consequences are severe. (*See* Lehr. Op. at 22.)

*Fifth*, the defendant has an extremely powerful incentive to flee.  She is facing charges that, in total, carry a statutory maximum sentence of approximately 55 years in prison.  A conservative estimate of her applicable Sentencing Guidelines range reflects an exposure of approximately 24 to 30 years in prison—"a lengthy sentence that could cause most anyone to consider alternative courses of action." (Lehr. Op. at 18.)  Indeed, Wang fled her home country of China due to her political activities, leaving behind substantial connections to the community, including a "happy family" with whom she had "every reason to stay." (Mem. at 13.)  Wang certainly has a strong

31

incentive not to appear in Court, given the severity of the present charges, the evidence against her, and the serious adverse consequences to her liberty and immigration status to which she is now exposed.

A substantial amount of the fraud proceeds and operations of the fraud entities have already been moved abroad to the UAE (with Wang's assistance, as discussed herein), where Wang's other co-defendant, Je, remains at large. Given the substantial evidence of Wang's guilt and the expected length of her potential sentence, any individual would be highly incentivized to flee; with Wang's lack of ties to the United States, her ties and resources abroad, and the prospect of likely deportation after serving her sentence, the incentives to flee are even greater. (*See, e.g.*, Lehr. Op. at 18; Kwok Op. at 7.)

### B.  Wang Has, and Continues to, Engage in Obstructive Behavior

Wang has engaged in obstructive conduct, including disobeying court orders and making material misrepresentation to Pretrial Services, the Government, and the Court. Wang's obstructive behavior has continued since her arrest, even while she has been detained. The defendant's "history of obstructive behavior in prior cases and [her] conduct in this matter establish that [s]he is likely to continue this pattern if released." (Kwok Op. at 11.)

#### 1)  *Wang's Lies to Pretrial Services*

The defendant deliberately concealed material information from Pretrial Services during her March 15, 2023 interview. (*See* Kwok Op. at 10 (characterizing false representations to Pretrial Services as "obstructive behavior").) As discussed herein, and as the defendant has conceded, she did *not* disclose during her Pretrial Services interview that she had approximately $138,000 in cash in her safe at the time of her arrest. (Ex. A at 20.) The defendant continues to equivocate regarding whether she "lied" about the cash. During the April 6, 2023 bail hearing, counsel argued:

32

> [T]he question that she was asked, the relevant question was did you have any money cash on you when you were arrested.  She was arrested at 6:15 a.m., she was in her pajamas.  The truthful answer to that question is no.  We checked out notes, we don't see any other questions that would have elicited a different answer.  *So did she disclose it voluntarily?  No.*  I don't know that she was asked about it.

Ex. A at 20:12-19 (emphasis added).

The defendant now contends that "[t]he idea that [Wang] would lie about cash stored in her safe at home . . . makes no sense whatsoever."  (Mem. at 31.)  Yet she did just that—she "answered the questions about her assets untruthfully."  (Lehr. Op. at 21.)  As Judge Lehrburger correctly observed, "it makes no sense that Pretrial Services, in seeking to learn what assets Wang has, would have asked only about cash 'on her,' or that Wang, in answering such questions, would have believed the question to be so limited."  (*Id.*)

The defendant also falsely represented to Pretrial Services that she has been unemployed since September 2022, in a deliberate effort to mislead the Court and the Government and to distance herself from Kwok and the fraud-affiliated entities.  (*See* Lehr. Op. at n.17.)

In effect, the defendant asks this Court to believe that in September 2022—notably, the same month the Government seized hundreds of millions of dollars in fraud proceeds from bank accounts held by Kwok-controlled entities—she had a change of heart and decided to transition from well-paid "employment" to "volunteering."  (Ex. A at 67, 75-77; Lehr. Op. at n.17.)  The defendant offers no explanation whatsoever for her purported decision to forego her nearly $400,000 annual salary plus $100,000 of benefits and transition to volunteer work, after years of being a formal employee of Kwok family office entities, without any apparent change to her daily responsibilities.  And Wang's continued involvement with the Kwok-controlled entities is significant because, as described above, some of the purported "volunteer" work she engaged in

33

post-September 2022 included planned foreign travel as an "authorized representative" for a corporate matter involving $500 million; approving payroll expenses for entities with which she had no formal affiliation (*see supra* at 28; Dkt. 42 at 3-4, Ex. F); tracking the balances of bank accounts holding tens of millions of dollars in fraud proceeds; and ensuring the transfer of fraud proceeds to the UAE weeks before she was arrested. *See supra* at 4-5. None of these activities "gets rid of the communist party of China;"[23] they further the fraud. This Court simply cannot trust the defendant to obey its orders while on pretrial release. No conditions ameliorate that concern.

### 2) *Wang's Documented Failure to Obey Court Orders*

As the Court is aware, Kwok filed for bankruptcy in Connecticut in February 2022. *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM). (*See* Dkt. 7 at 12-15.) Months into the bankruptcy proceeding, the Trustee filed a contempt motion, asserting that Kwok had failed to comply with Judge Manning's order regarding Kwok's transfer of beneficially owned assets to the bankruptcy estate. In connection with that motion, Judge Manning made findings relevant to Wang and her involvement with, and work at the direction of, Kwok. On November 17, 2022, Bankruptcy Judge Julie A. Manning issued a partial resolution order regarding Kwok's ownership of two particular entities—Ace Decade Holdings Ltd. ("Ace Decade") and Dawn State

---

[23] Ex. A at 66-67 (Statements of Defense Counsel to Judge Lehrburger).) Counsel further explained Wang's obfuscation to Pretrial Services by contending that Pretrial's questions was improperly constructed. (*Id*. ("what was the question that was asked? Are you currently employed? No. No. If the question were asked are you still a member of a revolutionary movement that does whatever it is that they try to do to get rid of the communist party of China, the answer to that is yes").) During the same hearing, defense counsel ultimately conceded that "[t]here's no dispute that [Wang] had input into various things that happened," but claimed she was only "volunteering" and was not paid for her work.

Limited (together, the "Ace Decade entities").  *In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1110 (D. Conn.) (JAM) (Ex. B).  The Ace Decade entities are valued at approximately $500 million and have been engaged in civil litigation abroad.[24]  Judge Manning found that Kwok "exclusively beneficially owned and controlled" the Ace Decade entities and further found that Wang—who is the nominee shareholder of the Ace Decade entities—"is not and has never been a beneficial owner of the shares in" those entities.  (Ex. B at ¶ 1.)  Accordingly, Judge Manning ordered that Kwok transfer the Ace Decade entities to the Trustee and "not in any way interfere with or impede the Trustee's exercise of ownership and control over" the Ace Decade entities.  (*Id.* at ¶ 5.)  Kwok was directed to serve a letter and attached share transfer documents (collectively, the "Letter") on Wang, directing her to transfer the corporate and economic rights of the Ace Decade entities to the Trustee.

Despite Judge Manning's clear order that Wang transfer the Ace Decades entities to the Trustee, months later, Wang deliberately obstructed Judge Manning's order and transferred Ace Decade—which is valued at approximately $500 million—beyond the reach of the bankruptcy estate and Kwok's creditors.  *See Despins v. HCHK Technologies, Inc. et al.,* 23-05013, ECF No. 1 (D. Conn.) (JAM), at 9 (Ex. C) (Trustee's *ex parte* complaint seeking injunctive relief relating to the HCHK entities and another Kwok entity, which notes that "Yvette Wang, while the Ace Decade proceedings were ongoing (but after the Court found, on November 17, 2022, that [Kwok]

---

[24] The Government believes that Wang's travel request, in which she represented that she is "the authorized representative for two companies that have litigation seeking $500M USD in damages that is pending in the United Kingdom," relates to her role as nominee shareholder of the Ace Decade entities.  (Dkt. 42 Ex. G.)  *See* https://www.judiciary.uk/wp-content/uploads/2023/03/Kwok-Ho-Wan-v-UBS-AG-judgment-010323.pdf (last visited June 17, 2023).

exclusively beneficially owned and controlled Ace Decade as of the February 15, 2022 petition date), transferred the stock of Ace Decade that she nominally owned to an individual located in Switzerland (who, upon information and belief, is another associate of [Kwok] ).”); *see also In Re Ho Wan Kwok*, No. 22-50073, ECF No. 1372 (Contempt Order) (Ex. D).

Notably, Judge Manning cited Wang’s obstructive behavior as the basis for her granting the bankruptcy Trustee’s request to proceed *ex parte* regarding additional assets of the bankruptcy estate (including the HCHK entities).  Judge Manning found that “the allegation that Ms. Wang transferred Ace Decade Holdings Limited *after* this Court had already determined that Ace Decade Holdings Limited was property of the [bankruptcy] Estate is troubling.”  *Despins v. HCHK Technologies, Inc. et al.,* 23-05013, ECF No. 18, at 5 (Ex. E.) (emphasis added).  To be sure, it unambiguously demonstrates that Wang violated the order of a federal bankruptcy judge.  Accordingly, Judge Manning concluded that the Trustee’s concern that a similarly obstructive dissipation of assets could occur with respect to the HCHK entities—which Wang controlled— was “justified.”  Ex. E at 5.

If released, this Court can have no reasonable assurance that Wang will not violate this Court’s orders as well.

### 3)  *Wang Maintains Continued Control Over Fraud Entities from Jail*

The Government’s contention that Wang continues to engage in obstructive conduct following her arrest is not speculative.  Her post-arrest obstruction includes efforts to secretly obtain millions of dollars in fraud proceeds—assets over which she continues to exercise effective control, contrary to defense counsel’s claims that she has “nothing else” by way of financial means to flee, beyond her bank accounts and the value of her apartment—and to conceal those proceeds from the Government and Kwok’s bankruptcy Trustee.  (Mem. at 23.)

36

Weeks after Wang's arrest, in April 2023, Wang directed a co-conspirator ("CC-1") to work with others to secure mail from a certain United States Parcel Service Post Office Box located in Manhattan (the "PO Box").  That PO Box, which was opened in the name of G Club Operations LLC on April 1, 2022, contained checks worth approximately $7.1 million of fraud proceeds obtained through G|CLUBS.  On March 7, 2023 (one week before Wang's arrest), a certain U.S. bank closed two bank accounts held in the name of G Club Operations LLC for suspected fraud and issued checks for the approximately $7.1 million collective balance of those two G|CLUBS accounts, which funds represent proceeds traceable to the fraud.  Subpoena returns reflect that those checks were sent to the mailing address on file for the accounts, which was the PO Box.

On June 15, 2023, pursuant to a judicially-authorized search warrant, the Government seized documents and electronic devices from CC-1.  A preliminary review of the contents of a notebook recovered from CC-1 (which is in Mandarin and English) reflects that CC-1 was in communication with Wang and was engaged in extensive tasks at the direction of Kwok, Wang, and other co-conspirators since Wang's arrest and detention.  For example, as shown in the images below, a task dated April 11, 2023 reflects that Wang directed CC-1 to provide her with information relating to the operations of the Kwok-controlled businesses:



Check-list:   Apr 11 2023.
. . .
⑨ Yvette wants a 账单明细 [25]

CC-1's notebook entries similarly reflect information requested by "Boss" (*i.e.*, Kwok) and what appears to be detailed tracking of finances and other operations of the various fraud

---

[25] Informally translated to, "Yvette wants a ***detailed billing statement***" (bolded Italics indicate text translated from Mandarin to English).

instrumentalities.  As relevant to the $7.1 million G|CLUBS checks in the PO Box, a notebook

entry dated April 18, 2023 references locating Employee-1 (*i.e.*, a G|CLUBS[26] employee who had

traveled to the UAE in 2023, *see supra* at 25).  Employee-1 was in possession of a physical key to

the PO Box.  The notebook entry (shown below in redacted form) reads, in sum and substance and

as informally translated:



> [Employee-1] → **have** HR [*i.e.*, Human Resources] **locate**
>> **Tell** HR **to locate** [Employee-1] – **get the check in the NY** mailbox
>>> HR **to locate** [Employee-1]
>
> **"Cherry Blossom"**[27] **authorized** [Employee-1] **to give the check to** 3C [*i.e.*, 3 Columbus Circle, where HCHK's offices are located]

From additional evidence the Government has collected, it is clear that *Wang* instructed CC-1 to

secure the checks located in the "NY mailbox," *i.e.*, the G|CLUBS PO Box in Manhattan.  One of

CC-1's cellphones contained messages with Employee-1 from April 2023.  Specifically, on April

27, 2023, Employee-1 wrote to CC-1:  "Hi [CC-1], this is [Employee-1].  [The Senior Director of

Human Resources at HCHK] asked me to connect with you *about Yvette's mailbox request*.  Can

I call you in the morning?"  (emphasis added).  These notes and communications reflect that Wang

---

[26] Employee-1 worked for G|CLUBS but was formally employed by HCHK.

[27] The Government has not been able to determine whether or not "Cherry Blossom" is a reference to Wang; however, for the reasons stated herein, the Government believes that Wang directed this outreach to Employee-1.

was coordinating with others to secure millions of dollars in G|CLUBS money, even after her arrest and detention and despite the fact that Wang has acknowledged no affiliation with G|CLUBS. (*See, e.g.*, Ex. A at 67:6-9.)

The above examples are deliberate and obstructive actions of an individual who continues to operate and direct Kwok's massive fraud and money laundering enterprise, who has access to substantial assets that could assist in her flight or nonappearance, has a network of people willing to assist her, and has zero respect for the judicial process.

Given the clear and convincing evidence that the defendant has engaged in obstructive behavior, including in her misrepresentations to Pretrial Services, the Government, and the Court on material matters, her efforts to thwart Kwok's bankruptcy proceeding and conceal assets from the Trustee, and her continued involvement in perpetrating the fraud and in laundering fraud proceeds, the Court and the Government "cannot have any confidence that Wang will abide by the terms of release or that she would not remove her electronic monitoring equipment."  (Lehr. Op. at 23.)

### C.  There Are No Conditions or Set of Conditions that Would Reasonably Assure Wang's Future Appearance or Prevent Wang from Further Obstruction

No conditions or combination of conditions would reasonably assure Wang's appearance or prevent her from further obstruction, and Wang's arguments to the contrary are meritless.

A bond secured by cash or property is insufficient, where, as here, the bond would be secured either by Wang's own assets (which may be subject to forfeiture) or by "the property of persons who hold no moral suasion over Wang." (Lehr. Op. at 17; *see also id.* at 13.)  Here, Wang is proposing that the Court impose *no* suretors for any bond; nor would any suretors be sufficient here, where none of the individuals Wang previously identified was "unrelated to the alleged fraud,

39

who have sufficient ties to the United States such that the Government would have a meaningful ability to enforce the bond against those individuals, and who would have moral suasion over" Wang.   (Kwok Op. at 13; *see also* Lehr. Op. at 13-15.)   Further, given that Wang spent years engaged in meticulous and careful work to separate victims from their money, no amount of money any suretor posted would dissuade Wang from fleeing.

Wang's proposal of home detention reinforced by location monitoring is also insufficient, because "ankle monitors can be removed and ensure only a reduced head start should [Wang] decide to flee." (*Id.*)   Nor can Wang's proposal that a "friend" live with her and report any violations provide the Court any comfort.   (Mem. at 3.)   Wang's past obstructive conduct in Kwok's bankruptcy proceeding and in this case—including her efforts to move the fraud's operations offshore to the UAE, her active involvement in transferring substantial fraud proceeds overseas, beyond the reach of U.S. authorities, and her apparent continued financial control over fraud proceeds even since her arrest and detention—demonstrates "that the Court does not have reasonable assurance that [Wang] will abide by any conditions of pretrial release." (*Id.*; *see* Lehr. Op. at 23.)   Finally, Wang's continued pretrial detention will not deny her the ability to meaningfully participate in her own defense.   (Kwok Op. at 13; *see also* Dkt. 86 (order granting Wang access to a laptop in the MDC to facilitate her review of discovery).)

Wang's claim that Judge Lehrburger did not adequately consider possible conditions of release is utterly baseless and is flatly contradicted by Judge Lehrburger's opinion.   Judge Lehrburger considered in methodical detail potential conditions of Wang's release, including those Wang proposed, and held that "there are *no* conditions that can be set to reasonably assure Wang's presence at future proceedings." (Lehr. Op. at 17) (emphasis added.).   As a threshold matter, Judge

Lehrburger agreed with Judge Parker's finding that co-signers were part of "the least restrictive" set of conditions that could reasonably assure Wang's future appearance. (Lehr. Op. at 16; Dkt. 10 Ex. C at 22-23.) While the defendant argued to Judge Lehrburger (unpersuasively) that she had satisfied the co-signers' condition, in a tacit admission of her limited ties to this country, she has abandoned that argument in her present application and instead seeks to be released on a bond with *no* co-signers. (Mem. at 2-3.) In light of the foregoing, Wang's claim that Judge Lehrburger did not properly consider conditions of release is utterly baseless.

In any event, the bail package the defendant proposes here is woefully insufficient. The defendant proposes *lowering* the bond amount by more than half, from $5 million to $2 million, and eliminating entirely the co-signers condition—a tacit concession that she has not, and cannot, meet such a condition because of her limited connections to this country. (Mem. 2-3.) In exchange, the defendant offers additional property as security: "one of her bank accounts" (although Wang does not specify which, or the amount it holds), and "138,000 in cash" (*i.e.*, the cash that the Government seized from Wang's safe and that is already in the Government's possession and likely forfeitable). (Mem. at 2.) That additional "security" provides no comfort to reasonably assure Wang's future appearance—specifically, it in no way compensates either for the $3 million reduction in bond or the complete elimination of *any* co-signers who would be liable for the bond, be able to exercise moral suasion over the defendant, and be strongly incentivized to assure that she does not flee. Additionally, the defendant proposes the new condition that she be monitored at home "by a friend who will live with her and will be responsible for reporting any violations." (Mem. at 3.) Such monitoring by an unspecified "friend" is meaningless in any criminal case, but particularly so when it is proposed by a defendant who concedes that she cannot

41

find a single person who would exercise moral suasion over her and who is not a victim of, or co-conspirator in, her crimes.

### CONCLUSION

As described herein, the Government has established by a preponderance of the evidence that the defendant poses a risk of nonappearance.  There is no combination of conditions that could reasonably assure her appearance at future proceedings if she were to be released pending trial.  In addition, the Government has established that the defendant presents a serious risk of obstruction. She has defied court orders and has continued to engage in obstructive behavior since her arrest and detention, including her active efforts to secretly obtain millions of dollars in fraud proceeds and to continue to conduct the fraud and launder its proceeds.  No conditions can mitigate the risk of further obstruction.

The defendant should be detained pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
(212) 637-2314 / 6612 / 2190

Enclosures

Cc:    Alex Lipman, Esq. (by ECF and Email)
       Priya Choudhry, Esq. (by ECF and Email)

42