UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

YANPING WANG,
  a/k/a "Yvette,"

Defendant.

S1 23 Cr. 118 (AT)

# REPLY IN SUPPORT OF THE GOVERNMENT'S MOTION
## TO DISQUALIFY EMIL BOVE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
  *Of Counsel*

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................... 1

  A. The *Evans* Test Applies and Calls for Disqualification ........................................................ 1

  B. Bove Should be Disqualified Under New York Rule of Professional Conduct 1.11(a)(2)
     and 18 U.S.C. § 207 ........................................................................................................... 9

    1. The TIN Matter Should Be Deemed the Same Matter For Purposes of the Conflict
      Rules ............................................................................................................................... 9

    2. Bove Participated Personally and Substantially in the TIN Matter ............................. 11

  C. Bove Should Be Disqualified To Avoid Trial Taint ........................................................... 16

CONCLUSION ...................................................................................................................... 19

## PRELIMINARY STATEMENT

It has long been the law that a "defendant's right to counsel of his choice is not an absolute one, but must give way when required by the fair and proper administration of justice." *United States v. Ostrer*, 597 F.2d 337, 339–41 (2d Cir. 1979) (citations omitted) (disqualifying former AUSA because successive representation "considerations are pertinent not only where the issues involved in the lawyer's former and present representation are the same, but also where, as here, the privileged information obtained in the course of the former representation may be used . . . in a closely related matter"); *United States v. Hasarafally*, 529 F.3d 125, 128 (2d Cir. 2008) (recognizing that "a private party . . . can easily choose from a range of law firms"). Under the *Evans* test, statutes, and applicable ethical rules, and to avoid tainting the trial, Bove should be disqualified. Bove's disqualification is necessary to safeguard the United States's confidential information, ensure fairness, and preserve the integrity of this criminal prosecution. *See United States v. Prevezon Holdings, Ltd.*, 839 F.3d 227, 239 (2d Cir. 2016) (citing *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)).

## ARGUMENT

### A. The *Evans* Test Applies and Calls for Disqualification

Bove appears to suggest that the *Evans* test, which has been used "in civil cases involving private litigants," is separate and apart from the prohibitions in Rule 1.11 governing former government attorneys. (Opp'n 14). Bove is wrong. The applicable New York Rules of Professional Conduct are motivated by the same concerns as, and are consistent with, the *Evans* test. In particular, "[b]y requiring a former government lawyer to comply with Rule 1.9(c), Rule 1.11(a)(1) protects information obtained while working for the government to the same extent as

1

information learned while representing a private client." Rule 1.11, Cmt. 4.[1] That is the exact same concern that animates the *Evans* test, which "focuses on identifying situations in which there exists the *potential* that confidential information obtained during representation of an adverse party could be used in the present action." *Giambrone v. Meritplan Ins. Co.*, 117 F. Supp. 3d 259, 269 (E.D.N.Y. 2015) (emphasis in original). (*See* Gov't Br. 13-14 (citing additional cases)). The *Evans* test applies and is satisfied here, calling for Bove's disqualification.[2] (*See* Gov't Br. 20-24).

*First*, Bove's arguments that there is not a substantial relationship between the TIN Matter and this case are without merit. Notably, Bove does not dispute that the TIN Matter that Bove supervised involved facts that are relevant to the criminal case against Kwok and Wang. Indeed, Bove does not dispute that the facts underlying the prior matter, *i.e.*, the TIN Matter, may be offered in the Government's case in chief or rebuttal in this matter. (Gov't Br. 22-23 (asserting that the Government "may offer evidence or call witnesses in its case-in-chief, or as part of a rebuttal case, related to the TIN Matter.") (citing *United States v. Escobar-Orejuela*, 910 F. Supp. 92, 100 (E.D.N.Y. 1995); *Ostrer*, 597 F.2d at 340; *United States v. James*, 708 F.2d 40, 44–46 (2d Cir. 1983)). Indeed, the Government has already publicly relied on information derived from the

---

[1] This part of the Rule is in accord with Canon 4 of the former Code of Professional Responsibility. *See McBean v. City of New York*, No. 02 Civ. 5426 (GEL), 2003 WL 21277115, at *2, *4-5 (S.D.N.Y. June 3, 2003) (applying Canon 4 and the *Evans* test to former government attorney). Moreover, this prohibition would apply even if a former government attorney did not participate personally and substantially in a given matter. *See* Restatement (Third) of the Law Governing Lawyers § 133, Cmt. f(ii) ("Even if not personally and substantially participating in a matter, a government lawyer or employer might overhear or otherwise learn of confidential information of the employing agency. Its subsequent use against the interests of the agency is prohibited.").

[2] Even if the *Evans* factors were not satisfied—and they are—disqualification is appropriate if "the record supports a finding of disqualifying taint," including where, as is the case here, "an attorney places himself in a position where he could use a client's privileged information against that client." *Prevezon Holdings Ltd.*, 839 F.3d at 241 (quotation and citation omitted).

TIN Matter in arguing for Kwok's detention. All of this is particularly significant, because as the Second Circuit recently explained, a "'substantial relationship' exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation." *Prevezon Holdings, Ltd.*, 839 F.3d at 239.[3]

Rather than contend with the fact that the two matters are related, Bove instead ignores context and leans on the Government's use of a single word, "unrelated," in describing the TIN Matter in the Government's detention memorandum. (*See* Opp'n 16; *see also id.* at 1, 4, 8, 14, 27). Bove puts more weight on that single adjective, used in an entirely different context, than it can bear. The Government used the word "unrelated" in an effort to convey, succinctly, that the CFU investigation "arose independently from and was conducted independently of the TIN Matter." (Gov't Br. 23). Needless to say, the Government's use of the adjective "unrelated" in that wholly different context was not an application of the "substantially related" standard under *Evans*, which focuses on the *possibility* that a former government attorney could use confidential information in a later representation. That the CFU investigation was independent of the TIN matter—that its initiation and progress was "unrelated" to that of the TIN Matter—does not make the two matters substantially unrelated for the purpose of evaluating disqualification. To the contrary, as set forth below, the substance of the TIN Matter may well play a role in the trial of the instant action.

---

[3] Bove relies on the standard enunciated decades ago in *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739–40 (2d Cir. 1978), ignoring the Second Circuit's explication of the standards, in 2016, in *Prevezon Holdings, Ltd.*, 839 F.3d 227. Despite citing *Gov't of India* twice, *see* 839 F.3d at 240, 241, the *Prevezon* Court did *not* include in its recitation of applicable standards that issues must be identical or essentially the same to be substantially related.

The Government expects that Kwok, and potentially Wang herself, will seek to bring into the trial events that occurred during and in relation to the TIN Matter that Bove supervised, ███ ████████████████████████████████████████████████████████████████ consider some of the items recovered during the execution of the March 15, 2023 search warrants that were obtained in this case.  At Kwok's mansion in Mahwah, New Jersey, the FBI located a large safe in the basement.  In that safe, Kwok maintained documents and materials including, for example: (a) a document labeled with the words "Top Secret" in a foreign language, and (b) a report in Mandarin (with English translations) documenting an October 15, 2018 meeting between officials in the United Arab Emirates and officials in China and further indicating that *Kwok* met with UAE officials at his Manhattan penthouse on October 4, 2018 to prepare the UAE officials for their meeting with Chinese officials.  These documents and materials were concealed in a brown box labeled "Poland Spring Water," which box was stored in the large basement safe.  That box also held documents that appear related to Kwok's business arrangements.  As another example, ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Significantly, Bove, as supervisor of the TIN Matter, has himself already opined on ███████████████████

████████████████████████████████████ ███████████ █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

4

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████

In an attempt to avoid this conflict, Bove incorrectly suggests that the Government is attempting "to expand the scope of the TIN Matter to include Mr. Kwok's earlier interactions with the FBI[.]"  (Opp'n 16).  ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████  Responding to the point that Kwok was the *focus* of the TIN Matter and that this is a criminal prosecution of the very same person, Bove cites a case related to an event (Hurricane Sandy) and another related in general to telecommunications mergers to argue that "general overlap" is insufficient.  (Opp'n 17 (citing *Giambrone*, 117 F. Supp. 3d at 274,  and *New York v. Deutsche Telekom, AG*, 19 Civ. 05434 (VM) (RWL), Dkt. 289, at 28 (S.D.N.Y. Nov. 26, 2019)).  Those comparisons ignore the character of a criminal investigation and a criminal prosecution, in which an individual's conduct, knowledge, and intent come under intense scrutiny.  There is no question that, as a Government attorney, Bove supervised a criminal investigation focused on a specific person (Kwok), who is the lead defendant in this criminal prosecution and Wang's (*i.e.*, Bove's client's) longtime boss and charged co-conspirator; nor is there a dispute that Bove was supervising the TIN Matter during part of the same time period that the subject offenses in this case took place.  The TIN Matter was not a general inquiry into a broad subject matter; it was focused on a person who is central to this case. Contrary to Bove's assertion, disqualifying Bove in light of the foregoing would not prevent "'a former government attorney from participating in *any* litigation that had *any* factual overlap with a matter on which the attorney had worked while in government service.'" (Opp'n 18 (quoting *In*

*re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2006 WL 6846702, at *16) (emphasis added)). It would simply—and appropriately—prevent a former AUSA from representing a co-defendant of a central subject of an investigation that he supervised where, as here, there is the potential for substantial factual overlap.[4] The focus of the TIN Matter was Kwok; Kwok is the lead defendant in this criminal prosecution; the TIN Matter was prompted by Kwok's dealings with the FBI; TIN began investigating Kwok during the time period of the charged offenses in this case; ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Moreover, accepting Bove's arguments would require the conclusion that Bove would also be permitted to represent *Kwok* under the applicable Rules of Professional Conduct and the *Evans* test. That simply cannot be so. And if Bove is disqualified from representing Kwok, the same analysis applies to his representation of Wang. As set forth in the Government's opening brief, to the extent Wang and her counsel enter into a joint defense agreement with Kwok and others— through which information is shared among defendants and/or subjects, and which is not uncommon in cases with multiple defendants and/or subjects—confidential information from Bove's government service supervising the TIN Matter could be used improperly for the benefit

---

[4] That is not a controversial proposition. Indeed, in January 2022, Bove himself followed this Office's guidance to avoid representing Kwok's daughter (Mei Guo) in a civil matter due to Bove's supervision of the TIN Matter. While that civil matter did not involve the Sixth Amendment, the civil matter had far less potential for factual overlap with the TIN Matter. ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ during bail-related discussions, Wang's counsel represented to the Government that Mei Guo is Wang's best friend.

of others besides Wang.  (Gov't Br. 23 (footnote omitted)).  The possibility of a joint defense agreement is far from speculative.   On August 9, 2023, the Government learned from the Metropolitan Detention Center, where Kwok and Wang are incarcerated, that Bove had emailed MDC Legal on July 20, 2023 (*i.e.*, two days before Bove filed a notice of appearance on behalf of Wang), copying Kwok's counsel, Sidhardha Kamaraju, Esq., to inquire into the "process for setting up a *joint defense meeting* at MDC with our clients together."  (emphasis added).  (Ex. E).  The Government further learned that Kwok's counsel later requested to schedule a co-defendant's meeting with counsel in the MDC; in the request, Bove was listed as the sole attorney for Wang who would be attending the meeting.  *Id*.

    *Second*, Bove incorrectly argues that a presumption of access to relevant confidential information should not control here.  In doing so, Bove attempts to distinguish district court cases, but ignores the Second Circuit's opinion in *Prevezon Holdings, Ltd.*, 389 F.3d at 240.  (*See* Opp'n 19-20).  Bove then states repeatedly that he has no real recollection of the TIN Matter at present.[5] Or that he is not sure what he saw or did.  (Opp'n 4 ("I do not think that I saw the warrant applications"); *id*. ("it seems plausible to me that I discussed the TIN Matter with one or both of the line AUSAs").  Whether Bove remembers his substantial participation and oversight over the TIN Matter or claims not to is irrelevant.  The Government provided authority in this Circuit that

---

[5] *E.g.,* Bove Decl. ¶ 6 ("I do not recall accessing any case file"); ¶ 7 ("I do not recall ever seeing the warrant materials."); ¶ 9 ("I do not recall discussing the specific contents of any particular seized item, and I have no recollection of any other investigative steps being taken in the TIN Matter."); ¶ 12 ("I do not recall the substance of those conversations"); ¶ 13 ("I do not recall such a conflict [concerning the TIN Co-Chief] being communicated to me during my service"). Notably, however, Bove has not disclaimed *any* recollection of the TIN Matter.  Indeed, Bove concedes that he "was generally aware that the FBI was reviewing the contents of materials it had seized in connection with the TIN Matter" (*i.e.*, the Kwok TIN search warrant materials). However, he attempts to minimize his personal involvement by declaring that he does "not recall discussing the *specific* contents of any *particular* seized item." (Bove Decl. ¶ 9) (emphasis added).

clearly held so, and common sense tells us that faded memories often reappear and can be refreshed.  *See United States v. Uzzi*, 549 F. Supp. 979, 981–83 (S.D.N.Y. 1982) ("[m]emory is not so fixed and absolute that we can say with confidence: [the former AUSA] has forgotten everything"); *United States v. Huawei Techs. Co.*, No. 18 Cr. 457 (AMD), 2020 WL 903007, at *5 (E.D.N.Y. Feb. 25, 2020) ("The fact that [the former Deputy Attorney General of the United States] currently has 'no recollection of the matters' (ECF No. 51-1) does not change the analysis.").  Bove seeks to distinguish those cases on their facts, but provides no contrary authority, and fails to contend with the underlying principle for which the Government cited them—that a failure of recollection does not absolve a conflict. [6]  Disqualification jurisprudence recognizes the *potential* for conflict in the future even if there is no actual conflict at the time of a disqualification motion.  *Wheat*, 486 U.S. at 162-3 ("The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.").  A claimed lack of memory now does not nullify the serious potential for actual conflict later, because

---

[6] The two cases cited by Bove do not hold otherwise.  *First*, the Magistrate Judge's decision in the Southern District of Alabama case, *United States v. Haggard*, upon which Bove relies does not stand for the proposition that if a former Government attorney forgets about their involvement in one matter, they may participate in a subsequent matter from which they would otherwise be barred.  (Opp'n 19 (citing 08-00327-CG, 2009 WL 5207263 (S.D. Ala. Dec. 29, 2009)).  Rather, *Haggard* turned on the fact that the Government declined to offer "any evidence." *Id.* at *1.  That is not the case here.  *Second*, in the hearing transcript cited by Bove, Magistrate Judge Lehrburger, in an oral order, merely noted that the proposed counsel did not recall any confidential information as one "factor" (of five) when electing not to disqualify counsel.  *Deutsche Telekom, AG*, 19 Civ. 05434 (VM) (RWL), Dkt. 289, at 28 (S.D.N.Y. Nov. 26, 2019).  The lack of recollection appears to have played a minor role in the court's decision.  Magistrate Judge Lehrburger was instead focused on the moving parties' "untimely filing," prejudice to the public and the defendants if counsel were disqualified as compared with the potential prejudice to the moving party (which was "slim to none"), that the matters were different, that any confidential information was "either already or largely already in the public domain or subject of discovery," and that the prior matter occurred approximately eight years ago.  *Id.* at 27-29.  None of those factors is present here.  Indeed, Magistrate Judge Lehrburger caveated the importance of a lack of recollection and clearly asserted that, as to a lack of recollection, "I'm not saying that's necessarily the standard." *Id.*

memories can be refreshed.  That is of particular concern here, given that Bove has not yet "personally accessed the 2019 warrant materials," (Opp'n 16), some of which he recognizes he would receive in discovery in this case, *id.*, and which may well refresh his memories of a matter he supervised less than two years ago.

### B.   Bove Should be Disqualified Under New York Rule of Professional Conduct 1.11(a)(2) and 18 U.S.C. § 207

In addition to Rule 1.11(a)(1) and the *Evans* test, Bove should be disqualified under Rule 11(a)(2) and 18 U.S.C. § 207(a).  While Bove is correct that these conflict rules governing former government attorneys are "narrower" in certain respects than the considerations discussed above, such limitations are ultimately immaterial here.  That is because Bove participated personally and substantially in a particular matter that is the same "matter" as this prosecution for purposes of the applicable conflict rules.  (*See* Gov't Br. 25-26).

### 1.   The TIN Matter Should Be Deemed the Same Matter For Purposes of the Conflict Rules

Rule 1.11(a)(2) and similar prohibitions are based on "concerns similar to those protecting former private clients," but "apply somewhat differently to government clients."  Restatement (Third) of the Law Governing Lawyers § 133, Cmt. b.  In particular, such rules balance the potential for misuse of confidential information with the risk of disincentivizing government service by too broadly conflicting former government attorneys when in private practice.  *See* Rule 1.11, Cmt. 4.

In striking that balance, Rule 1.11—like Section 207(a) and other conflict-of-interest rules generally—first draws a distinction between, on the one hand, "matters involving a specific party or specific parties" (*i.e.*, particular matters) and, on the other, "all substantive issues on which the lawyer worked," and the Rule requires disqualification only with respect to the former.  Rule 1.11,

Cmt. 4; *accord* 18 U.S.C. § 207(a)(1) (permanent prohibition if, among other things, the prior matter "involved a specific party or specific parties at the time of" the former government employee's participation); *id.* § 207(a)(2) (two-year cooling-off period if the particular matter was under the former government employee's "official responsibility").

While generally applicable legislation is not a "particular matter," a criminal investigation of a specific individual—here, Kwok—unquestionably is.[7]  *See* 18 U.S.C. § 207(i)(3) (a "particular matter" includes "any investigation, application, . . . or judicial or other proceeding"). The only question, then, is whether the TIN Matter qualifies as the same "matter" as this prosecution for purposes of Rule 1.11(a)(2) and 18 U.S.C. § 207(a).  The answer to that question is that it *does so qualify*, for the same reasons that the TIN Matter and this case are "substantially related," as described in detail above.

Bove's arguments otherwise are unpersuasive.  Bove cites to Rule 1.11 commentary as support for his claim that the phrase "substantially related" "has been excised from Rule 1.11," yet the commentary Bove relies on does not even mention the phrase "substantially related." (Opp'n 9 (citing Rule 1.11, Cmt. 4)).  Additionally, Bove's reliance on the rule of lenity (Opp'n 10) is inapposite; this motion is not a criminal prosecution and Bove is not a criminal defendant.  *See Hughey v. United States*, 495 U.S. 411, 422 (1990) (in criminal cases, rule of lenity "demand[s] resolution of ambiguities in criminal statutes in favor of the defendant").  Instead, statutes like 18 U.S.C. § 207 should inform the Court's disqualification analysis.

---

[7] The examples discussed by Bove illustrate the point. (*See* Opp'n 10 & n.4 (describing federal ethics regulations that contrast a government employee's work on an immigration reform bill (not a particular matter) with a government employee's work on granting "citizen to a specific individual" (a particular matter)).

## 2.   Bove Participated Personally and Substantially in the TIN Matter

In addition to limiting disqualification to "particular matters," Rule 1.11 also requires disqualification only if "the lawyer participated personally and substantially."  Rule 1.11, Cmt. 4; *accord* 8 U.S.C. § 207(a)(1); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05 Civ. 1720, 2006 WL 6846702, at \*6 (E.D.N.Y. Aug. 7, 2006) (contrasting disqualification of former private attorney, which would be required when "the attorney played *any* role" in the prior matter, with the requirement that former government attorneys have participated personally and substantially) (emphasis in original).[8]

It is an odd choice for Bove to claim, as he does in his brief, that he did not participate "personally or substantially" in the TIN Matter, (Opp'n 10-14), while at the same time admitting (as he must) that he was "one of two Co-Chiefs" of TIN from September 19, 2019 until he left the Office on December 20, 2021, and thus was responsible for supervising the TIN Matter for over two years.  (Bove Decl. ¶¶ 2-3).  As a TIN supervisor, when the line assistants working on any matter in that unit—including the TIN Matter—had issues or questions, they were brought to Bove's attention.  Yet, in his opposition and declaration in this case, Bove characterizes his involvement in the TIN Matter as "sporadic and limited," claims that his supervision was at times "nominal[ ]," and offers only that it is "plausible" he discussed the TIN Matter with the line assistants.  (Bove Dec. ¶ 11; Opp'n 2).

In October 2020, while employed with the Office, Bove prepared a sworn declaration to a court regarding another TIN matter.  In that 2020 declaration—unlike in the declaration that Bove

---

[8] To further minimize potential disincentives to government service, Rule 1.11 also discusses screening procedures that would prevent a law firm's disqualification if one its members were a former government attorney subject to disqualification.

submitted in this case—Bove confirmed that his oversight responsibilities extended to all of the matters in TIN:

> Since September 19, 2019, [my Co-Chief] and I have been Co-Chiefs of the Office's Terrorism and International Narcotics Unit (["TIN"]). . . . As one of the two Co-Chiefs of [TIN], I share responsibility for overseeing investigations and prosecutions by prosecutors in [TIN]. . . . My oversight responsibilities include providing guidance to prosecutors regarding discovery and disclosure issues, helping to train prosecutors. . . .

*United States v. Nejad*, No. 18 Cr. 224 (AJN), ECF No. 400-1, (S.D.N.Y. Feb. 22, 2021) (sworn declaration of Emil Bove) (Ex. F (excerpted)).  Bove's 2020 declaration is consistent with the Office's policy that unit chiefs' oversight responsibilities require that they personally and substantially participate in all the matters under their supervision.  (*See* Gov't Br. n. 15).

Bove concedes that the TIN Matter was "pending" under his "official responsibility," (Opp'n 9 (citing 18 U.S.C. § 207(a)(2)), but the available record[9] demonstrates more: Bove's personal and substantial participation in the TIN Matter.

Government Exhibit A is an email *from Bove* requesting the internal reference number for the TIN Matter so that Bove could author a case update for the Office's executive leadership. Preparing case updates for the Office's executive leadership is the responsibility of the TIN Co-Chiefs, part of their oversight responsibilities, and a function that necessarily requires personal and

---

[9] Affidavits are not required for a court to disqualify an attorney, and Bove offers no law that says otherwise.  (Opp'n 13 (citing cases that included affidavits but not declaring they are required); *see also Decora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 138 (S.D.N.Y. 1995) ("a party seeking disqualification of an attorney on the basis of the substantial relationship test is not required to present evidence that the attorney possesses actual confidences as a result of the prior representation" and finding that to the extent materials are provided to the court they may be submitted *ex parte* to prevent disclosure of confidential information.).  Indeed, Bove is not even seriously disputing the majority Government's factual assertions; he simply interprets the record differently.  However, if the Court requests, the Government will provide affidavits relevant to issues raised herein.

substantial participation in a matter.  Indeed, in order to author an update on the TIN Matter, and to inform the Office's executive leadership of the status of that matter (as those updates are designed to do), Bove necessarily must have had an understanding of the substance and progress of the investigation.   Bove's contention that requesting the internal reference number is an "administrative task" divorced from any substance is not a credible reading of Exhibit A.  (Opp'n 12).   To author a monthly case update, unit chiefs prepare summaries about pending cases including events of significant and expected future events.  Those summaries are titled with the name of the matter and the internal tracking number, and are relied on by the Office's executive leadership, including the Chief of the Criminal Division.  Notably, Exhibit A is dated October 31, 2019, which is the end of the month (*i.e.*, when monthly updates were typically due to the Office's executive leadership).  Given that the Kwok search warrants were executed in early October 2019, the October 2019 monthly update would almost certainly describe the execution of those warrants and an initial assessment of the search warrant results.  (Bove Decl. ¶ 7).  Tellingly, Bove does not dispute that he was responsible for authoring case updates for the TIN Matter, and does not provide any reason why he would "perform the administrative task of requesting a case-tracking number" aside from drafting a monthly update.  (Opp'n 12).[10]

Government Exhibit B is an email from Bove to the then-Chief of the Criminal Division, which Bove contends is merely a "respon[se]" to a press inquiry forwarded to him and his Co-Chief.  (Opp'n at 13).  Far from it.  Exhibit B demonstrates that Bove had developed an opinion,

---

[10] Bove's emails have a retention period of only three years, which for the moment means the Government cannot locate the update Bove appears to have drafted for executive management. Exhibit A was collected from the archived electronic files of one of the line assistants assigned to the TIN Matter.  Most unit supervisor and line assistant communication in the Office is oral, particularly in sensitive matters.

and expressed that opinion, to the Chief of Criminal Division *regarding* ████████████

████████████████████████████  Exhibit B itself demonstrates that Bove was more

than "generally aware," Bove Decl. ¶ 9, of the TIN Matter, it shows he substantially participated

in the matter sufficient to form an opinion on an aspect of it.  In addition to the opinion Bove

developed, Exhibit B demonstrates that, as of July 2020, Bove *knew*:  (i) what "[t]he [TIN Matter]

team [wa]s working" on; (ii) that the investigation was ongoing and the line assistants were

"following up on leads" from the search warrant results; and (iii) there was a potential for factual

overlap between the TIN Matter and the CFU investigation.

Exhibit B further demonstrates that the AUSAs assigned to the TIN Matter must have been

briefing Bove about the TIN Matter and its potential for factual overlap with the CFU matter.  Just

15 minutes after the Criminal Division Chief's question, Bove responded that "████ [the TIN

Matter AUSA] is also aware of a CFU investigation . . . that involves Guo and relates to

cryptocurrency investments."   This demonstrates Bove's understanding that the matter he

supervised—the TIN Matter—might factually overlap with the CFU matter, and because Bove

stated "████ [the TIN Matter AUSA] [wa]s also aware of a CFU investigation," it follows that ████

updated Bove about what she was "aware of" that was relevant to the TIN Matter.  In light of

Exhibit B, it is not merely "plausible" that Bove "discussed the TIN Matter with one or both of the

line AUSAs" (Bove Decl. ¶ 11).  It is certain.

Exhibit B therefore demonstrates that Bove's involvement in the TIN Matter was not just

"sporadic and limited."  Indeed, if Bove was merely "respond[ing]" to a press inquiry, as he asserts,

then when asked whether Bove and his Co-Chief "have any investigation" (*i.e.*, are supervising

any cases) "related to the source of funds that ████████ received through his work

with . . . Guo," (Ex. B), he might have answered "no."  But rather than simply "respond" to the

14

press inquiry, Bove went two steps further and updated the Criminal Division Chief, *first*, on the status of the TIN Matter and, *second*—recognizing the potential for factual overlap—offered that the press inquiry may pertain to the CFU investigation, which the line assistant clearly updated him about.

Furthermore, the substance of Exhibit B and, in particular, of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was *not* (and still is not) "information about the CFU investigation in the public domain," as Bove claims.  (Opp'n at 13).   That information is confidential Government information known to Bove and it requires his disqualification from this case.

Bove next disputes his substantial participation in the TIN Matter by offering that, because he was not involved in the process of drafting the TIN search warrants, his participation must have been limited.  Approving a search warrant is not the *sine qua non* of substantial participation. Supervising the TIN Matter is sufficient to compel disqualification.  *See, e.g., United States v. Smith*, 995 F.2d 662, 675-76 (7th Cir. 1993) (affirming disqualification of former AUSA who "was the immediate supervisor of the attorney in charge of an investigation in South Florida which was intertwined with the investigation and prosecution of [the defendant]" and, as supervisor, signed immunity paperwork for a witness); *Huawei Techs. Co.*, 2020 WL 903007 (disqualifying the former Deputy Attorney General of the United States).[11]  Particularly where, as is the case here,

---

[11] In a footnote, Bove also says he does not recall being notified of a conflict concerning his co-chief.  (Opp'n 12.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, as of approximately early November 2020 through the date of that Co-Chief's departure from the Office at the end of November 2020, Bove was the only supervisor on the TIN Matter.

Bove was the direct supervisor of two (and for several months) just one line assistant, was regularly updated on the matter, provided guidance concerning the matter, updated executive leadership concerning the matter, and became the only direct supervisor of the matter after his Co-Chief was conflicted.

Bove points out semantic differences between arguments advanced here and by the Government in *Huawei*. (Opp'n 18). Specifically, Bove disputes that he knew of, or even had access to, classified information. (Opp'n 11). Classified discussions are, by their nature, classified, and often oral. But more to the point, Bove's contention that he did not have access to classified information and had but limited and sporadic involvement as the direct supervisor of the TIN Matter begs questions about what Bove did in his supervision of the TIN Matter. Bove does not dispute that he was the supervisor of the TIN Matter, and that he was aware of the TIN Matter; however, Bove does not include in his declaration his general duties and responsibilities as TIN's Co-Chief. Bove has chosen to highlight only what he does not recall rather than engage with what should be an undisputed point: in the Office, unit supervisors play an important and substantial role in all cases under their charge.

## C.   Bove Should Be Disqualified To Avoid Trial Taint

Whether counsel should be disqualified "is a matter committed to the sound discretion of the district court." *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). *Gonzalez-Lopez*, upon which Bove relies, makes clear that nothing in that opinion should "cast[ ] any doubt or place[ ] any qualification upon [the Supreme Court's] previous holdings that limit the right to counsel of choice." *See id.*, 548 U.S. at 151 (declaring that trial courts have "wide latitude in balancing the right to counsel of choice against the needs of fairness, . . . [including an] independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that

16

legal proceedings appear fair to all who observe them.").[12]  A district court is well within the bounds of its discretion "where it seems more likely than not that a number of conflicts will materialize," as is the case here.  *United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004).  Thus, disqualifying Bove in this case would not require "automatic reversal."  (Opp'n 21).

The Second Circuit has unambiguously held that district courts have "'substantial latitude' to require disqualification *even where defendants have attempted to waive any potential conflict*, and [the Court of Appeals] review[s] such a disqualification only for abuse of discretion."  *United States v. Zichettello*, 208 F.3d 72, 104 (2d Cir. 2000) (emphasis added).   For the many reasons stated above, Bove's disqualification is neither error nor an abuse of this Court's discretion. Disqualification is compelled by the actual, and also the mere potential, for a conflict in this case.

Bove would have been correct to say that, on appeal, a defendant need not show prejudice *if a court abuses its discretion* when disqualifying counsel.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006).  But the same is true if a district court permits a defendant to proceed with counsel operating with an actual conflict of interest.  "Prejudice is presumed under such circumstances."  *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002).   And there are circumstances where counsel's conflicts cannot be overcome even by a knowing and intelligent waiver.  *United States v. Fulton*, 5 F.3d 605, 612 (2d Cir. 1993). ("When a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or *jeopardize* the federal court's institutional interest in the rendition of a just verdict, a trial judge has discretion to disqualify an attorney or decline a proffer of waiver." (emphasis added).)  "[E]ven where a defendant wants to

---

[12] Further, in *Gonzalez-Lopez*, the Government did not contest that the trial court erred when disqualifying criminal counsel for a series of capricious reasons, which are a far cry from the ethical rules and statutes implicated in this matter.

waive a potential conflict, a district court still has 'substantial latitude in refusing waivers of conflicts of interest.'" *United States v. Dipietro*, No. S1 02 CR.1237SWK, 2004 WL 613073, at *5 (S.D.N.Y. Mar. 29, 2004) (quoting *Wheat*, 486 U.S. at 162), *aff'd sub nom. United States v. Genua*, 274 F. App'x 53 (2d Cir. 2008).

Despite Bove's arguments, if this Court determines, in its sound discretion, that disqualification is appropriate—and it is—then it should disqualify Bove.[13]  Whether Wang can waive Bove's conflicts is a question that need only be reached if the Court declares that Bove may represent Wang despite the statutory prohibitions and *Evans* factors discussed above.  Moreover, Bove's assertion that Wang is willing to waive Bove's conflicts assumes too much.  A "waiver" by Wang cannot override the Government's lack of consent to its information being used by Bove to advance Wang's interest.  Nor does Wang's waiver ameliorate the potential harm to the Government, because even if Bove does not explicitly use confidential information in Wang's defense, his access to that information may implicitly—and impermissibly—inform Wang's defense strategy.[14]  *Prevezon Holdings Ltd.*, 839 F.3d at 238 ("There is a risk that [conflicted counsel], while not explicitly using confidences, may use such confidences to guide its defense of [defendant] in other ways.").  Such conduct taints the integrity of this matter.  *Id.* ("One recognized form of taint arises when an attorney places himself in a position where he could use a client's

---

[13] Bove overstates the import of *United States v. Liszewski*, No. 06 CR 130 NGG, 2006 WL 2376382, at *11 (E.D.N.Y. Aug. 16, 2006).  While the movant in *Liszewski* was the United States, the United States was not the former client to whom the conflicted attorney owed duties of loyalty and confidentiality.  The former and current clients of the conflicted attorney did not join the United States's motion.  As a result, the conflicts were waivable by the criminal defendant.  *Id.* at *11, *14.  That is far afield from the circumstances here, where *the Government* is Bove's former client on a substantially related matter, does not waive his conflict, and seeks his disqualification.

[14] This is to say nothing of the potential harm that Bove could cause Kwok, if Kwok were to testify or if Wang were to adopt a defense strategy of blaming Kwok for the charged conduct.

18

privileged information against that client." (quotation and citation omitted)); *United States v. Stein*, 410 F. Supp. 2d 316, 324 (S.D.N.Y. 2006) (use of information collected while in Government service is in the class of cases where an "attorney's conflict jeopardizes the integrity of judicial proceedings.").

## CONCLUSION

Upon learning that Bove sought to represent Wang, the Government promptly alerted this Court to the potential conflict, and swiftly filed its papers after conferring with Bove. This motion is not a tactical maneuver, as Bove implies. (Opp'n 5). Rather, this motion was made to safeguard the United States's confidential information, preserve fairness before this Court, protect the integrity of this matter, and ensure that the public can trust that Government employees join Government to serve the public good, rather than to use information gained during Government employment to advance their private interests. Bove was a unit supervisor in the Office. That position comes with considerable responsibility and opportunity. But it also carries some costs— namely, that Bove is now precluded from representations that put at issue the confidential information he learned, and to which he had access, in the cases he oversaw. In seeking to represent Wang, Bove threatens those values, and asks this Court to sanction a representation that statutes, rules of professional responsibility, and case law do not condone.

19

The Government's motion should be granted, and the Court should disqualify Bove from representing Wang.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
212-637-2314 / -6612 / -2190

20