# Exhibit 4

[Filed Under Seal]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 6916

In the Matter of a Warrant for All Content and Other Information Associated with the Domain **himalaya.exchange** and

The Google account **hamiltoninvestmentmanagement@gmail.com** Maintained at Premises Controlled by Google LLC, USAO Reference No. 2020R00572

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK   )

  Robert Stout, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

  1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency").  I have been a Special Agent with the FBI since in or about September 2019.  Since in or about January 2021, I have been assigned to the FBI's Complex Financial Crimes squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

09.20.2021

USAO_00000379

**B.  The Provider, the Subject Account and the Subject Offenses**

2.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the domain **himalaya.exchange** ("**Subject Domain**") and the email account **hamiltoninvestmentmanagement@gmail.com** ("**Subject Email Account",** and with the **Subject Domain,** the "**Subject Accounts")** maintained by Google LLC ("Google" or the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3.  As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1349 (conspiracy to commit mail, bank, and wire fraud); 1341 (mail fraud); 1343 (wire fraud); 1344 (bank fraud); 1956 (money laundering and conspiracy to commit money laundering); 371 (conspiracy to commit securities fraud); 1960 (operating an unlicensed money transmitting business); and 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud), relating to a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, Miles GUO, William JE, and their associates (collectively, the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

09.20.2021

USAO_00000380

## C. Services and Records of the Provider

4.  I have learned the following about Google:

a.   Google offers email services to the public.  In particular, Google allow subscribers to maintain email accounts under particular domains (*e.g.*, gmail.com). A subscriber using a Google's services can access their email account from any computer connected to the Internet. Google maintains the following records and information with respect to every subscriber account:

i.   *Email contents.*  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Google's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Google's computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii.   *Address book.*  Google also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.   *Subscriber and billing information.*   Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber.  Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.   *Transactional information.*   Google also typically retains certain transactional information about the use of each account on its system. This information can include

4

USAO_00000381

records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Google's website).

v.    *Customer correspondence.*  Google also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

vi.    *Device Information.*  Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

vii.    *Cookie Data.*  Google uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at the provider using the same computer, or accesses accounts maintained by other companies while logged into an account.  One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

viii.    In addition, Google also maintains records with respect to other Google Services, which it stores in connection with subscriber accounts, which typically include the following:

09.20.2021

USAO_00000382

1.   *Google Drive content*.  Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content).   Users can purchase enhanced storage capacity for an additional monthly fee.   Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud," that is online.   A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet.   Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

2.   *Google Docs*.  Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs."  Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

3.   *Google Photos*.  Google provides users with a certain amount of free storage for photographs, through a service called Google Photos, which allows users to manually store photographs and videos, and which automatically uploads photographs and videos taken by registered mobile devices.  Google also retains the metadata—or data that provides information about the data in question, such afs the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Google Photos.  This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

4.   *Google Calendar*.  Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across

USAO_00000383

registered computers and mobile devices.  Users can share their calendars with other users, allowing the maintenance of joint calendars.

5. *Google Chats and Google Hangouts content*.  Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's email content.  Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images.  In general, Hangouts content is stored separately from a user's email and chat content.

6. *Location History data*.  Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.  For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

7. *Google Payments*.  Google allows for the storage of payment information associated with a Google Account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

8. *Chrome Browser and Search History*.  Google stores information regarding user Internet browser activity when a Google user is logged into his or her account, which includes logging information about websites viewed by the user, Internet search queries in the Google Internet search engine available at http://www.google.com, and also maintains lists of bookmarks maintained by the user so that he or she can quickly access frequently viewed websites.

09.20.2021

USAO_00000384

b.  Google also offers a service known as "Google Domains."  Google Domains enables users to register and use a unique domain name as well as build and host a website.  Google stores and maintains data for the website of its customers.  Customers that use Google Domains have access to the following services:

i.  Traffic and performance analytics:   Google offers its customers the ability to track the performance of their website including through Google Analytics.

ii.  DNS exports:  A DNS record is a database record used to map a URL to an IP address. DNS records are stored in DNS servers and work to help users connect their websites to the outside world.  DNS records indicate where data necessary for a website to operate is stored.

iii.  Google products:  Customers have access to Google services including Google Workspace which includes Gmail (a email application described above), Google Drive (a cloud storage application described above), Google chat (a text based communication platform described above), Google Calendar (a cloud based calendar described above), Google Documents (a word processing application), Google Sheets (a worksheet application) and Google Slides (a presentation application), Google Apps Script (which is a coding platform to automate functions across Google workspace) and Cloud Search (which enables users to search across their domains in Google).

### D.  Jurisdiction and Authority to Issue Warrant

5.  Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

09.20.2021

USAO_00000385

6.   A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

7.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8.   This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations

09.20.2021

USAO_00000386

with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

<b><u>Overview of the Fraudulent Investment Schemes</u></b>

9.   Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes (the "Investment Schemes") that pertain to several companies that are owned or operated by, or otherwise affiliated with, Miles GUO, William JE, and their associates (collectively, the "Target Subjects").  To date, the investigation ("Investigation") has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

10. The Investment Schemes are conducted through various, interrelated offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

10

09.20.2021

11. Certain of the interrelated Investment Schemes are historical, while others are ongoing. Specifically:

a.   The GTV stock offering and the G-Coin offering described below (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July 2020.   As a result of the Unregistered Stock Offerings, whose proceeds were commingled, companies affiliated with GUO, JE, and others collectively raised at least approximately $487 million from more than 5,000 investors, including individuals in the United States.

b.   Starting at least in or about July 2020, the leaders of the scheme began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").   The Convertible Loan Offering was carried out by the Guo-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.   Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.

c.   GUO, JE, and others continue to conduct the Investment Schemes, including relating to G Club (which has been operating since in or about October 2020) and the Himalaya Exchange (which has been operating since in or about April 2021).   As described below, G Club and the Himalaya Exchange have raised at least approximately $664 million between in or about September 2020 and the present.

*Background on GUO and JE*

12. Based on my participation in this investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media

09.20.2021

USAO_00000388

platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

    a.    GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

    b.    GUO is involved with various entities relevant to the Investment Schemes, as described in greater detail below, including GTV, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr").  GUO does not hold formal titles or positions at these entities.

    c.    In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and Rule of Law Society ("ROLS").  Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by December 2018.[1] ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP").  At times, the board members for ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass").  GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson" and a sponsor.

    d.    JE, a close associate of GUO, has been described as a financier and entrepreneur. JE is involved with various other entities relevant to the Investment Schemes, as described in greater detail below.  Specifically:

        i.    JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[2]  Hamilton is headquartered in the British Virgin

---

[1]  *See*  https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

[2] *See* https://hamilton-im.com/

USAO_00000389

Islands and was incorporated on or about February 5, 2018.   JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.      JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[3] that was incorporated in the United Kingdom on or about July 10, 2020.

iii.     JE is listed as the founder and Chairman of Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is the 100% beneficial owner of various entities that operate Himalaya Exchange, including Himalaya International Clearing Ltd. ("Himalaya Clearing"), Major Lead International Ltd., Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

*GTV Stock Offering*

13. Between approximately April 20, 2020 and June 2, 2020, GTV, its parent company Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG"; collectively, the "Companies") solicited thousands of individuals to invest in an offering of GTV common stock (the "GTV Stock Offering").  During that time period, more than approximately 5,000 investors (including many in the United States) collectively paid approximately $452 million for purported GTV common stock.

14. Based on my review of the GTV Stock Offering's information memorandum dated April 20, 2020 (the "Memorandum"), interviews of witnesses, and review of public source information, as well as documents and records obtained during the course of the investigation, I have learned the following, among other things:

---

[3] *See* https://www.aca-capital.com/

13

USAO_00000390

a.   GTV was founded on or about April 17, 2020, as a Delaware corporation and a wholly owned subsidiary of Saraca.  GTV's principal place of business was located in the Southern District of New York, in a townhouse located at 162 E. 64th St., New York, NY, 10065 (the "Townhouse").

b.   According to the Memorandum, GUO was the "sponsor" of both Saraca and GTV, as well as the "adviser[sic]" and "key host" of GTV.  The Memorandum also stated that GUO was a billionaire, successful businessman, and dissident in China.  According to various witnesses, as well as social media content, GUO consistently presented himself as the founder and face of GTV.

c.   The Memorandum and a separate letter to prospective investors outlining "Investment Procedures Guidelines" listed GUO's phone number as the contact number for inquiries from potential investors.

d.   At the time of the GTV Stock Offering, the Companies had recently launched a news-focused social media platform called GTV, including the website www.gtv.org.  The Memorandum claimed GTV would be "the first ever platform which w[ould] combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and that GTV would be "the only uncensored and independent bridge between China and the Western world." The Memorandum also claimed that GTV would "be a bridge between China and the Western world . . . allowing for free and open communication, business transactions and trading, uncensored by the Chinese government."  The Memorandum boasted that GTV's platform would be so powerful as to "expos[e] corruption, obstruction, illegality, brutality, harassment, and

09.20.2021

USAO_00000391

inhumanity in China." The Memorandum also indicated that GTV would compete with companies such as Zoom, WeChat, TikTok, YouTube, Cisco, Citrix, Alibaba, Amazon, and eBay.

      e.  The Memorandum listed Yvette Y. Wang, Max Krasner, and Daniel Podhaskie as GTV's Executive Directors.

      f.  The Memorandum highlighted the credentials of GTV's non-executive Directors, including, among others, Bannon, Bass, and Darren Blanton ("Blanton"). As described above, Bannon and Bass were also board members of the ROLF and/or ROLS.

      g.  The Memorandum stated that investor funds would be used for the following, among other purposes: acquisition of companies; upgrading GTV technology and security; and marketing. The Memorandum did not contemplate that investor funds would be used to invest in hedge funds or any similar type of financial investment, or that investor funds would be given to other companies, such as Saraca.

      h.  Based on my conversations with a source of information ("SOI[4]") involved with the ROLF, the Companies, the GTV Stock Offering, and the Phoenix Farm, as well as my review of the metadata of the Memorandum, I have learned that JE was a primary author of the Memorandum.

*G-Coin Offering*

15. During the same period of April 2020 through June 2020, GTV and Saraca also solicited GTV Investors to invest in a companion digital asset security that was referred to as either G-Coins or G-Dollars (the "G-Coin Offering").

---

[4] The SOI is providing information to law enforcement in hopes of entering into a cooperation agreement and receiving leniency at sentencing. The SOI has provided reliable information that has been corroborated by, among other things, electronic evidence, videos, cellphone records, and subpoena and search warrant returns.

09.20.2021

USAO_00000392

16. Based on my participation in this investigation, training, experience, review of law enforcement reports, review of bank records and videos that were posted on social media platforms, as well as my review of reports of interviews with GTV Investors and conversations with others, including law enforcement, I have learned the following, among other things, about the G-Coin Offering:

a. From approximately in or about April 2020, through at least in or about June 2020, I have learned that the Companies, as well as representatives for the Companies, such as GUO, marketed the sale of G-Coins and G-Dollars to the public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.

b. The Companies' online promotions set forth that G-Coins (which the Companies indicated would eventually be merged into G-Dollars, forming a single digital asset), and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on an online platform. As part of its solicitation of G-Coin and G-Dollar investors, the Companies did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a whitepaper or private placement memorandum.

c. The Companies collected at least approximately $31 million from the G-Coin and G-Dollar investors, pooling the proceeds in bank accounts associated with the Companies and commingling them with proceeds from the GTV Stock Offering. As part of the G-Coin Offering, many investors received a purported 20% discount on the $.01 purchase price for G-Coins and G-Dollars. Investors participated in the G-Coin Offering by transferring funds directly to the Companies' U.S. bank accounts, by making payments to the Companies' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.

09.20.2021

USAO_00000393

17. Based on my participation in this Investigation, training, experience, and review of translations of statements that were made by GUO regarding the G-Coin Offering, as well as my conversations with others, I have learned that GUO made numerous false statements in order to solicit investments for the G-Coin Offering. Examples of some those statements are described below, in substance and in part:

      a.   In a statement contained within a video by GUO on or about May 9, 2020, Guo stated that G-Coins could be exchanged into U.S. dollars or physical gold.

      b.   In another statement contained within a video on or about May 16, 2020, GUO stated that the G-Coin and G-Dollar currencies could be exchanged with gold.

18. Based on my participation in this investigation, I believe that the above-described statements regarding G-Coins and G-Dollar are false. In particular, during the course of the investigation, I have not found any evidence that there is or has ever been an exchange where G-Coins or G-Dollars could be exchanged for U.S. dollars or gold.

19. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records, and review of videos that were posted on social media platforms, as well as my review of reports of interviewed individuals who invested in GTV (the "GTV Investors") and my conversations with others, including other law enforcement officers, I have learned the following, among other things, about the solicitation of investments for the GTV Stock Offering and G-Coin Offering:

      a.   GTV disseminated information about the two offerings to the general public through publicly-available videos on websites affiliated with the Companies, including www.gtv.org and www.gnews.org, as well as on social media platforms such as YouTube and Twitter. The first solicitation video, posted on YouTube on April 21, 2020, was entitled, as

09.20.2021

USAO_00000394

translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the GTV Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering. The Launch Video has had over 3,000 views. None of the GTV Stock Offering solicitation videos, including the Launch Video, were password protected or placed any restriction on who could view them or any limitations on their ability to be shared. As a result, the general public, including prospective U.S. investors, were able to access the online marketing videos about the GTV Stock Offering through, for example, independent online research, social media, or referrals from other investors.

        b.   GUO led the effort to solicit investors for the GTV Stock Offering. GUO, who is a prolific user of social media and has an enormous social media following, used various social media platforms to attract followers and to solicit investors for the GTV Stock Offering. Those social media platforms included WhatsApp and Discord, both of which have end-to-end encrypted chat services.[5] Among other things, the Companies sent the Launch Video via phone messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering material for the GTV Stock Offering, including the subscription agreement and investment instructions. GUO also assured potential investors that they would realize enormous returns, at one point suggesting that they would receive 1,000 times their investment. In another statement, in or about June 2020, GUO stated in substance and in part that GTV stock was worth 30 times what it had been worth before.

---

[5] End-to-end encryption is a system of communication where only the communicating users can read the messages. End-to-end encryption prevents law enforcement authorities from intercepting such communications through wiretaps or through search warrants on the service provider, such as WhatsApp.

09.20.2021

USAO_00000395

c.   Based on my review of a GTV confidentiality agreement, I have learned that in order to participate in the GTV Stock Offering, GTV Investors were required to sign a confidentiality agreement that required them to keep all information concerning GTV confidential, including the existence of the confidentiality agreement.

d.   The GTV Stock Offering was structured as a private placement offering of 10% into GTV, with the remaining 90% of GTV to be controlled by Saraca, which was its parent company.  According to due diligence records from an investment fund, Saraca is a wholly-owned subsidiary of Hudson Diamond Holding, Inc. ("Hudson BVI"), a British Virgin Islands company. Hudson BVI is in turn wholly owned by Qiang Guo ("QIANG GUO").  Based on my review of open-source material, I have learned that QIANG GUO is GUO'S son.

e.   By early June 2020, banks began to suspect that the Companies were engaged in potentially unlawful activity and started to close accounts that were linked to Saraca, GTV, and GUO.  Around that same time period, GTV Investors began to express concerns about GTV's use of their money, and the legitimacy of their investments.  Some of those investors expressed their concerns directly to GUO and many investors requested that their money be returned.  In response, GUO and his associates often attempted to shun and ostracize the investors.  For example, GUO suggested that one investor was a spy for the CCP and that other investors should not interact with that investor.

### *Misappropriation of Unregistered Stock Offering Funds*

20. A significant portion of the investor funds collected through the Unregistered Stock Offerings (collectively, "Offering Funds") were misappropriated through investments.

21. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations

09.20.2021

USAO_00000396

with others, including law enforcement and witnesses, I have learned the following, among other things:

      a. GUO, JE, and others arranged for approximately $100 million of the Offerings Funds to be invested on behalf of GTV's parent company, Saraca, in a high-risk hedge fund investment managed by a firm named Hayman Capital Management L.P. ("Hayman").  According to its website, Hayman is an SEC-registered asset management firm that was founded by Bass, who was a non-executive director of GTV at the time of the transfer.

      b.    In or about May 2020, Bass facilitated GUO's and JE's investment in a high-risk investment fund called the Hayman Hong Kong Opportunities Fund (the "Hayman Fund"), which was operated by Hayman.

      c.    JE coordinated with Hayman regarding the investment.  For example, in a May 29, 2020 email from JE to a Hayman representative ("Hayman Rep-1"), JE wrote, in substance and in part: "We will have one onshore and one offshore vehicle. The onshore one will invest USD100m and the offshore one will invest USD1m. The address of the onshore vehicle is: 162 E64th St., New York, NY 10065 United States." On or about May 31, 2020, JE wrote, in substance and in part, "The $1m will come from my personal account and I owned[sic] 100% of Hamilton Investment Management Ltd."

          i.    The address JE provided for the "onshore" vehicle is the address of the Townhouse.

          ii.    Based on my participation in this Investigation, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned that the Townhouse has been listed on corporate documents and/or bank account documentation as the business address for at least seven GUO-affiliated entities;

09.20.2021

USAO_00000397

specifically:  Saraca, GTV, Golden Spring, Hudson Diamond NY, Greenwich Land, ROLF (until approximately May 2022), and ROLS (until approximately May 2022).

      d.     Three days after the close of the GTV Stock Offering, on or about June 5, 2020, $100 million of the Offering Funds were transferred from a particular JP Morgan Chase bank account to an onshore bank account associated with Hayman for the purpose of investing in the Hayman Fund.  The funds were transferred on behalf of Saraca; as noted above, Saraca was the parent company to GTV and was 100% owned by GUO's son, QIANG QUO.

      e.     Three days later, on or about June 8, 2020, $1 million was transferred on behalf of Hamilton,[6] JE's company, from a bank account in the name of JE to an offshore bank account associated with Hayman, also for the purpose of investing in the Hayman Fund.

      f.     The transfer of Offering Funds to Hayman was completely inconsistent with GTV's representations to the GTV Investors about how their funds would be used.

    22. Based on my participation in this Investigation, training, experience, review of documents and records, as well as my conversations with others, including law enforcement, I have learned that on or about September 13, 2021, the SEC announced settled charges against the Companies, based on their violations of the registration requirements for the Unregistered Stock Offerings (*i.e.*, the GTV Stock Offering and the associated digital asset G-Coin Offering). The SEC's settlement required the Companies to pay more than $539 million in disgorgement and penalties.

---

[6] In April 2018, JE submitted on behalf of Hamilton an account opening document to a U.K. bank that claimed that he owns 100% of Hamilton and that the company "does not involve itself in investments."

09.20.2021

USAO_00000398

*The Convertible Loan Offering*

23. After the Unregistered Stock Offerings described above were discovered by banks and numerous bank accounts were frozen, leaders of the schemes began to pitch investors on a new set of investment opportunities.  One new investment scheme launched in or about July 2020 was marketed to prospective investors as an opportunity to convert their existing investments in GTV into a "loan" to GTV.  The Convertible Loan Offering was carried out by the "Himalaya Farm Alliance," a collective of informal groups—known as "Farms"—of Chinese expatriates located in various cities around the world, including New York and Phoenix.  The Himalaya Farm Alliance's purported purpose was to assist the Chinese pro-democracy movement; the Himalaya Farm Alliance existed primarily as private groups on social media platforms such as Discord.  The Farms were typically referred to by the names of preexisting companies that they affiliated themselves with for banking purposes; *e.g.*, Mountains of Spices LLC and Davy & Tony International Limited for the New York Farm; and Maywind Trading LLC, Medical Supply System International LLC and Santel LLC for the Phoenix Farm.

24. In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that disclosed that the loan would be made to the individual Farm (*e.g.*, "Phoenix Farm (Maywind Trading LLC)") and that the loaned funds would be used by that specific Farm for "general working capital purposes."  Investors executed the Loan Agreement and sent it to their Farm leaders after transferring their funds to the Farm, but were not provided counter-executed copies of the agreement.

25. Between in or about August 2020 and in or about March 2021, the U.S.-based Farms collectively raised approximately $148 million from the Convertible Loan Offering (the "Loan Funds").  Investors agreed to provide loans to the Farms for the purpose of acquiring GTV shares

22

USAO_00000399

(once the three-year note had matured).  Once the funds were collected by the U.S. Farms, they were transferred to domestic and foreign accounts owned by different legal entities, including an Abu Dhabi bank account in the name of ACA Capital (the "UAE ACA Capital Account"), which is owned and controlled by JE.

*Misappropriation of Convertible Loan Offering Funds*

26. A significant portion of the Loan Funds collected through the Convertible Loan Offering were misappropriated, as described below.

27. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.     JE was sole signatory of the UAE ACA Capital Account.  JE wired approximately $33.3 million of the Loan Funds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ring Rong), and his company, Hamilton. The wires to his and his wife's personal accounts—which amounted to more than approximately $10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities.

b.     JE arranged for approximately $34 million in transfers from UAE ACA Capital Account to U.S. bank accounts in the names of three companies that are each 100% owned by GUO's family members; specifically:

i.     Approximately $5 million to Greenwich Land LLC, which is owned by GUO's wife, Hing Chi Ngok;

09.20.2021

   ii. Approximately $18 million to Hudson Diamond NY LLC, which is owned by Guo's daughter, Mei Guo; and

   iii. Approximately $11 million to Lamp Capital LLC, which is owned by Guo's son, QIANG GUO.

  c. The $34 million was commingled with other investor funds, including GTV Offering Funds.  Based on my review of bank account records, I have learned that much of this GTV Investor money was used to fund lavish lifestyle expenses (*e.g.*, approximately $2.3 million in expenses relating to GUO's yacht, and approximately $600,000 for the purchase of luxury automobiles).

  d. JE also arranged for large transfers from UAE ACA Capital Account to other companies with ties to GUO; specifically:

   i. Approximately $19 million to Lexington Property and Staffing, Inc. ("Lexington Property"), which is owned by former GTV Treasurer, Anthony DiBattista ("DiBattista").  The registered address of Lexington Property is 750 Lexington Avenue, New York, NY;

   ii. Approximately $32 million to Savio Law LLC (as escrow agent), pursuant to a purported loan agreement between ACA Capital and Saraca (which is owned by GUO's son, QIANG GUO); and

   iii. Approximately $1 million to Bannon Film Industries, Inc., a company owned by Steve Bannon.  As described above, Bannon was listed in the Memorandum as a non-executive GTV Director and was a Director of the ROLF / ROLS.

09.20.2021

USAO_00000401

*The G Club Operations LLC Scheme*

28. Some of the Farms recruited investors to invest in GTV through the purchase of "G Club" memberships.  As described in greater detail below, law enforcement believes G Club is an ongoing fraudulent scheme operated by GUO, JE, and others.

29. Based on my participation in this Investigation, training, experience, review of the websites, subpoena returns, records and documents, including operating agreements and articles of incorporation, open-source research I have conducted on the Internet, and my conversations with others, including law enforcement, I have learned the following, among other things:

      a.     In or about October 2020, G Club Operations LLC ("G Club") was registered in Puerto Rico.  According to the Operating Agreement, the purpose of G Club is to "provide[] Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market."

      b.     An image from the G Club website ("G Club Website"), viewable at https://gclubs.com/en/, is shown below:



09.20.2021

USAO_00000402

30. G Club purportedly offers five membership tiers:  Tier 5 Membership ($50,000 annually); Tier 4 Membership ($40,000 annually); Tier 3 Membership ($30,000 annually); Tier 2 Membership ($20,000 annually); and Tier 1 Membership ($10,000 annually).  According to the G Club Membership Agreement, "A Member may subsequently elect a higher tier of membership," but "may not subsequently elect a lower tier of Membership."  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and absolute discretion.  The Membership Agreement further states: "If an Application is rejected and membership denied, G Clubs shall return the Membership Fee within ten (10) calendar days of such rejection . . . in the form of the original payment of the Membership Fee or, at the option of G Clubs, by check."

31. One photograph posted to the G Club Website depicted GUO living a lavish lifestyle; specifically, he is shown standing on top of what appears to be a large yacht smoking a cigar.  The G Club Website also states that:

> G Clubs memberships provide its members with access to a concierge customer service with Mandarin and English access and support.  G Clubs members will have the opportunity to attend the annual G Summit meeting which may occur in person or virtually.  G Clubs members will also get exclusive early access to the latest fashion collections and special member pricing on purchases made on the G Fashion website.

32. In a video summary posted on GNews on or about July 8, 2021, Guo claimed that G Club had approximately 25,000 members, and predicted that G Club would grow to at least 100 million users, attracting $16 trillion of investment.

33. Despite the representations on the G Club Website about purported membership benefits, law enforcement believes that G Club is being used, at least in part, to perpetuate the fraud schemes, including by soliciting and receiving investments while evading regulatory

26

USAO_00000403

requirements.   Specifically, based on my review of an interview report of an August 2, 2021

interview (the "August 2, 2021 Interview") conducted by others of a GTV investor ("Investor-1"),

I have learned that Investor-1 stated the following, in substance and in part, during that interview:

        a.   Investor-1 invested $200,000 USD in GTV in or around May 2020.   Investor-

1's money came from Investor-1's savings.

        b.   Investor-1 came to believe that GTV was a scam because Investor-1 did not

receive any GTV shares, and when Investor-1 asked for a refund, no one responded to Investor-1.

        c.   Investor-1 invested in GTV because: 1) there were a lot of American politicians

supporting GUO; (2) Guo said it was original stock and there would be at least 1,000x growth; and

(3) Investor-1 thought Investor-1 would make money on the GTV stock because Guo said this in

videos.   Investor-1 did not think Investor-1 would lose money because Guo promised the GTV

investment would make money.

        d.   Investor-1 thought that GTV would use the money to build a website like

YouTube, Facebook and Twitter, but did not know for certain what it would be used for.

        e.   Investor-1 subsequently invested in the Convertible Loan Program through the

"Canada Farm" in or around August 2020.   Specifically, Investor-1 sent approximately $71,019 to

"Canada Himalayan Club Medica Inc." as a loan.   Investor-1 believed that the loan was for 3-5

years, with 3% interest and that at the end of that period Investor-1 would receive the money or

GTV stock.   Investor-1 never received an executed copy of the investment contract.   The money

Investor-1 sent was frozen by the Canadian SEC.

09.20.2021

USAO_00000404

f.   Investor-1 attempted to invest in GTV again in or around March 2021 through G Club.  Specifically, Investor-1 was instructed by members of an Australian based "Farm"[7] to send Investor-1's investment funds to "Crane Advisory Group," who in turn would send the money to G Club.  Investor-1 sent approximately $100,015 to Crane Advisory Group for the purchase of GTV shares at the price of $1 per ten shares.

g.   In or around July 2021, Investor-1 attempted to initiate a refund by contacting G Club online customer service department.  In response to Investor-1's refund request, G Club, through "notices@gclubs.com," sent the following email:

> You recently made a payment with respect to your G|CLUBS membership through Crane. Your wire payment transfer exceeded the amount of a single membership and you have not applied for multiple memberships. We received $100,015.00 via wire. You had applied for one Tier 5 membership and filled out the KYC package indicating the total amount was for multi membership of G|CLUBS (see attached).
>
> To credit the total amount to you, you must apply for additional memberships. Please fill and sign the attached, advising how many memberships you wish to purchase and their tier.
>
> If sending the excess funds was an error and you wish an immediate return of $50,015, please immediately advise. We sincerely apologize for any inconvenience caused.

h.   In response, Investor-1 informed G Club that Investor-1 had sent the $100,015.00 in funds not to purchase a G Club membership, but rather to invest in GTV, as Investor-1 had been instructed by Australian based farms.  Investor-1 requested that all of Investor-1's funds be returned.  In a subsequent email, Investor-1 also noted that it would not have made sense for Investor-1 to send a sum of $100,015.00, given that the most expensive G Club membership cost $50,000.  Investor-1 also explained in another email that, in a phone conversation with a

---

[7] As used herein farms are informal groups of Chinese expatriates located in various cities around the world, that I have learned are connected to Guo.  (*See supra* ¶  11.b.)

09.20.2021

USAO_00000405

representative of G Club, the representative had made it clear that Investor-1's funds were going to be used for an investment in GTV, not for the purchase of a G Club membership.

       i.   Investor-1 had not received any of Investor-1's $100,015 investment back as of the date of the interview.

    34. Based on my participation in this Investigation, training, experience, my review of documents, records, and email search warrant returns, as well as my conversations with others, including witnesses, I have learned the following, among other things:

       a.   An individual named Alex Hadjicharalambous ("Hadjicharalambous"), whose title was the Financial Controller for G Club, was the authorized signer listed on multiple bank accounts in the name of G Club.  On July 13, 2021, Hadjicharalambous received an email at his G Club email account (alexh@gclubs.com) from a G Fashion IT Manager entitled "HCHKTech email" that read, in substance and in part:  "Hello Alex, As you know we now work for HCHK Technologies.  Use the credentials in this email and follow the steps below to log into your new email account."

       b.   Based on my review of open-source material on the Internet and subpoena returns, I have learned the following, among other things:

       i. On or about April 29, 2021, HCHK Technologies, Inc. ("HCHK Technologies") was incorporated in the State of Delaware.  At the time of incorporation, Anthony DiBattista was director of HCHK Technologies.  Between on or about May 27, 2021 and November 10, 2021, DiBattista was Treasurer of HCHK Technologies.  On or about December 13, 2021, DiBattista resigned as President, CEO, and Director of HCHK Technologies.

       c.   On or about August 18, 2021, HCHK Property Management, Inc. ("HCHK Property") was incorporated in Delaware.  Yvette Wang was elected as the initial director of

USAO_00000406

HCHK Property.  On or about December 15, 2021, by written consent of the Board of Directors of HCHK Property (*i.e.*, Wang), DiBattista was appointed Treasurer of HCHK Property.  On or about January 1, 2022, Wang resigned and DiBattista was appointed as President, CEO, and Director of HCHK Property.

      d.    DiBattista's roles with various of the other GUO-affiliated entities included, among others, Treasurer of GTV, authorized signatory of Lexington Property bank accounts, and Treasurer of G Music LLC.

      e.    Based on my review of subpoena returns and my conversations with others, I have learned that on or about July 18, 2021, a G Fashion HR employee sent a "transition memo" to Alex Hadjicharalambous that, "[e]ffective as of July 19, 2021, all GFashion employees will have the option to transfer to GFashion's staffing company, HCHK Technologies, Inc.," which would "thereafter serve the role of staffing company for GFashion and other enterprises."  The transition memo further reflected that an employee's failure to execute the transition memo that same day would result in termination.

      f.    Based on my review of open-source Internet research and subpoena returns, I have learned that one of the Directors of HCHK Technologies is also the Director and Chairman of the Audit Committee of Gettr,[8] a social media platform that reportedly evolved from GTV Media.  I have further learned that JE's company, Hamilton, owns 95% of Gettr and contributed $35 million to Gettr in capital contribution.

---

[8] *See*  https://www.politico.com/news/2021/07/01/maga-app-bannon-chinese-billionaire-497767 (*last visited* August 2, 2022).  Based on my conversations with others, I have learned that Gettr is one of the companies for which HCHK Technologies provides purported staffing services.

USAO_00000407

g.      Based on the foregoing, I have learned that starting on or about July 19, 2021, certain employees of G Fashion, Gettr, and other GUO-affiliated entities began to operate under the company names HCHK Technologies and/or HCHK Property.

### *The Himalaya Exchange Scheme*

35. As described above, JE founded a purported cryptocurrency exchange platform called Himalaya Exchange, available at https://himalaya.exchange (*i.e.* **Subject Domain** or the "Himalaya Exchange Website").   Similar to the link between G-Coin / G-Dollar and the Unregistered Stock Offerings, Himalaya Coin (ticker: HCO or HCN) and Himalaya Dollar (ticker: HDO) (together, the "Himalaya Assets") were pitched by GUO as a digital asset security subsequent to the Convertible Loan Program.   Specifically, as reported by victims to the SEC, beginning in or about June 2020, GUO posted online that "farm" loan investors would be entitled to early purchase of "Himalaya assets."   Initially, per GUO's posting, investment in "Himalaya assets" was invite only, though it transitioned to the full public.   Nonetheless, in various postings, GUO maintained that G Club members, many of whom were investors in the Convertible Loan Program, would have special access to Himalaya assets.

36. Based on my participation in this investigation, training, experience, review of the **Subject Domain**, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

31

USAO_00000408

a.   The **Subject Domain** is described as a global digital exchange with a full ecosystem, that includes (or will include) a stablecoin (Himalaya Dollar),[9] a trading coin (Himalaya Coin), and a blockchain payment application called "Himalaya Pay."

b.   JE is described as the founder and Chairman of the Himalaya Exchange.

c.   As described above, JE is also the founder and CEO of BVI-based Hamilton and the Director of Hong Kong-based ACA Capital.

d.   An image from the Himalaya Exchange Website, viewable at the **Subject Domain**, is shown below:



37. Based on my participation in this Investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned, among other things, that investors

---

[9] A stablecoin is a cryptocurrency that seeks to peg itself to a stable currency, typically the U.S. dollar.

09.20.2021

USAO_00000409

were misled about how and when they would be able to trade their cryptocurrency assets. Specifically:

a.   When the **Subject Domain** was launched, investors were told that, as of June 2021, they would be able to exchange and withdraw their cryptocurrency.  An image of the website from May 2021 depicting this representation is shown below:



b.   The **Subject Domain** later changed its "trade" date to September 2021.  Based on my training, experience, and participation in this investigation, I have learned that it is common for fraudulent cryptocurrencies to use similar tactics to those used here; specifically it is common for fraudulent cryptocurrencies to: (1) not be tradable on a public exchange; and (2) induce investors to purchase the cryptocurrencies through false promises that the cryptocurrency will be available to trade on a public exchange soon.

c.   The initial coin offering ("ICO") of the Himalaya Assets purportedly took place on the Himalaya Exchange Website or about November 1, 2021.  According to data on the Himalaya Exchange Website, the price of a Himalaya Asset increased from 10 cents at the time of the ICO to $27 approximately two weeks later, resulting in a purported $27 billion valuation by mid-November 2021, as reflected in the graph below from the **Subject Domain**:

09.20.2021

USAO_00000410



d. According to Himalaya Exchange's promotional materials, the value of the Himalaya Dollar is pegged to the U.S. Dollar. "Credits" are used to secure positions within the Himalaya Ecosystem, which positions correspond to a particular type of crypto asset. Promotional materials also state that "[c]redits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem, representing a right to participating in trading on the Himalaya Exchange and do not carry any right to require their exchange for fiat currency or crypto-assets." Promotional materials clarify that references to Himalaya Coin, Himalaya Dollar, "or any other type of asset on an account at the Himalaya Exchange or through the Himalaya Pay App are references to Credits corresponding to that asset."

e. According to the Himalaya Dollar whitepaper dated April 2021 (the "Whitepaper"), available on the **Subject Domain**, Himalaya Dollar is an Ethereum-based token "structured with the aim of maintaining its value 1-to-1 to the United States Dollar. Himalaya Dollar Credits benefit

34

USAO_00000411

from potential liquidity support which may be provided through the [Himalaya] Reserve which will be managed with the aim of maintaining its value at a level equal in value in U.S. dollars to the value of Himalaya Dollars in circulation as described below."

      f.  The Whitepaper further states that Himalaya Reserves, the issuer of Himalaya Dollar, "intends to create and hold in the Reserve a mix of United States dollars or other currencies in cash and cash equivalents," and further states, "it is intended to make the Reserve transparent to the public. The Issuer intends to have the Reserve audited annually by independent auditors. The results of those audits will be made publicly available with details of the then-current composition of the Reserve and the market value of the assets as at[sic] the time of publication." To date, no such audit results have been published.

      g.  As described above, the Himalaya Assets have never traded on an open exchange, and instead purport to trade only on the private Himalaya Exchange. Himalaya Exchange restrains the flow of real currency out of the Himalaya Exchange by its members, as described above. Thus, the ability to convert Himalaya Dollars and Himalaya Coins back into U.S. currency was limited.

   38. Based on my participation in this investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

      a.  As described above, Himalaya Dollar purports to be a "stablecoin" that is pegged 1-to-1 to the value of the U.S. dollar. Other major stablecoins include TerraUSD, Tether, and USD Coin.

      b.  In a video summary posted on GNews in November 2021, GUO represented, in sum and substance, that Himalaya Coin was backed by the U.S. dollar through stablecoin

USAO_00000412

Himalaya Dollar, and further stated that Himalaya Coin is backed by a reserve of 20% of the proceeds in gold.

c.  In or about May 2022, there was a global stablecoin collapse that began when a particular stablecoin called TerraUSD lost its peg (*i.e.*, no longer had sufficient hard-asset reserves to back its cryptocurrency at a 1-to-1 ratio to the U.S. dollar).  As a result, the cryptocurrency market lost approximately $300 billion in value.  The valuation of TerraUSD through May 10, 2022 is reflected in the graph below:



d.  In contrast, data on the Himalaya Exchange Website reflects very little fluctuation or decrease in the purported value of the Himalaya Assets during the same time period, as reflected in the graph below from the Himalaya Exchange Website:

09.20.2021

USAO_00000413



39. I have reviewed the graph displayed above in paragraphs 37(d), showing the value of the Himalaya Assets' purported value between approximately November 1, 2021 and December 31, 2021. The graph reflects a steep increase in price over the first two weeks from a few dollars to above $30 per coin  and then fluctuation in price, but all within a narrow band that only occasionally dips below $30. Based on my review of the Himalaya Exchange, as of August 9, 2022, that pattern has continued. The price of HCN/HDO (Himalayan Assets) only dipped below $30 from in or about June 2022 through in or about early August 2022—and during that time only dipped to approximately $28. By contrast, the fluctuation on high side has reached as high as approximately $52. Freely tradable altcoin[10] cryptocurrencies have experienced much more significant fluctuation over that time. In particular, cryptocurrencies effectively crashed in or

---

[10] An "altcoin" is a cryptocurrency other than Bitcoin.  Colloquially, altcoins refer to cryptocurrencies that are speculative, newly issued, or not mainstream.

09.20.2021

USAO_00000414

about April 2022. To be sure, the Himalaya Exchange reports a dip in price at that time but not below approximately $30.

40. I have also reviewed the graphs displayed above in paragraphs 38(c) and (d), reflecting the price of stablecoin TerraUSD and the purported price of a Himalaya Asset between April 2021 and May 10, 2021.   The data reflected in the Himalaya Asset graph is inconsistent with the valuation of other stablecoins, including TerraUSD, during the stablecoin crash.   This demonstrates that Himalaya Assets are not performing consistent with other similarly designed crypto currencies.  Indeed, on or about June 15, 2022—in the midst of the cryptocurrency crash—it was reported that William Je said the following: "Despite the cryptocurrency market's recent dip, HDO has constantly remained stable with the US dollar 1:1 without fluctuation. Impressively, this makes HDO the only stable coin in the world to maintain 100% during this time-period of uncertainty."   *See*   https://www.newswire.ca/news-releases/iconic-ferrari-f1-car-sold-by-rm-sotheby-s-using-cryptocurrency-himalaya-dollar-883914213.html (*last visited* August 2, 2022). Because there does not appear to be any basis why HDO, if freely trading, would price itself differently than other stable coins or the cryptocurrency market more generally,  I believe that JE and GUO, together with others, are causing the Himalaya Exchange to falsely manipulate its price to ensure it does not experience significant pricing dips as other cryptocurrencies have, which is consistent with the other fraud schemes that they perpetrated as discussed above.

41. Based on a complaint made to the SEC, on or about July 15, 2022, a victim complained that their Himalaya Coins were reported on the Himalaya Exchange Website as being transferred to a particular company and the email address alexh@hchktech.com.[11]  The victim contacted Hadjicharalambous via email to complain but received no response.  The victim also advised the

---

[11] The username "Alexh" appears to refer to Hadjicharalambous (*see supra* ¶  34.)

09.20.2021

USAO_00000415

SEC that when they first considered investing in Himalaya Coins he had direct contact with GUO, and it was GUO who arranged for the victim to make payments for Himalaya Coins.  Locking up investors' coins, without their authorization, would be one way that the Target Subjects could artificially restrain transfers thereby manipulating the price of Himalaya Coins and ensuring they do not crash.

**B.  Probable Cause Regarding the Subject Accounts**

    42. Based on my involvement in this investigation, and my training and experience, I believe that there is probable cause that the **Subject Domain** will contain evidence of the Subject Offenses.  Specifically, I believe the **Subject Domain**, including the coding behind the website, may reveal that the Himalaya Exchange is not really an exchange at all and does not have any reserves as represented but is rather a fraud scheme.  Further, I believe that the Google Services used by those behind the **Subject Domain** may provide evidence of who created, and manages, the **Subject Domain** as well as provide evidence tending to show that the Target Subjects are using the **Subject Domain** to facilitate a fraud scheme.  For example, individuals involved in a fraud scheme may run searches which tend to show that the Himalaya Exchange is not authentic including searches targeted to learned how to program websites to appear as though they are real time exchanges.  Further, I have learned that individuals in fraud schemes use cloud storage, including the features offered by the Provider, to store evidence of their crimes.  Cloud services are more likely to be used when multiple people are involved in an activity, which is the case here, because cloud services, and Google Services, permits multiple individuals to more effectively work toward a common goal.  Evidence provided by the Provider for the **Subject Domain** may also provide evidence of computer servers or other depositories of data (e.g. cloud storage accounts or email accounts) necessary for the Target Subjects to carry out their fraud scheme,

09.20.2021

USAO_00000416

43. Based on subpoena returns, I have learned that the **Subject Email Account** is the email account registered to the **Subject Domain**. Therefore, the **Subject Email Account** has the ability to makes changes to the **Subject Domain** and otherwise manage the **Subject Domain**. Based on § 2703(d) returns for the **Subject Email Account** I have learned that the **Subject Email Account** received approximately 1,022 emails from on or about January 7, 2020 through on or about June 8, 2022. Based on the email addresses of the accounts that sent the **Subject Email Account** emails, the **Subject Email Account** appears to be used to manage websites, including the **Subject Domain**. Specifically, the **Subject Email Account** has received numerous emails from Google Domains (the Provider of the **Subject Domain**) as well as "Wix," which is a software used to code and manage websites. Therefore, I believe the content of the **Subject Email Account** will provide evidence that the users of the **Subject Email Account** use and manage the **Subject Domain** as well as reveal other locations, including additional servers, necessary for the **Subject Domain** to function. With the exception of one email, which is in the deleted folder, the **Subject Email Account** does not appear to be used to exchange personal emails.

44. Indeed, based on records provided by the Provider, the subscriber name of the **Subject Email Account** is "IT Admin," further indicating that its use is for Information Technology services and not as personal correspondence.

45. Further, it is notable that the username of the **Subject Email Account** contains the word "Hamilton" which is the company Je operates (*see supra* ¶ 12.d.i). This is further evidence of the **Subject Accounts'** use in the scheme above and, based on my training and experience, tends to suggest that the **Subject Email Account** is used in furtherance of schemes, described herein, other than that of the **Subject Domain**. For similar reasons I believe evidence of the Subject Offenses, and the identity of individuals involved in the Subject Offenses, will be found not only

40

USAO_00000417

in the content of the **Subject Accounts** but also in their use of Google Services and Cloud storage. Indeed, subpoena returns indicated that the **Subject Email Account** uses the following Google Services: Google Domains, Gmail, Location History, Google Payments, Android,[12] Google Hangouts, YouTube, My Maps, Google Ads and others. Further, the **Subject Email Account** was created on or about August 7, 2019, which is approximately five months after JE named as a director of Hamilton, and just eight months before the GTV unregistered stock offering.

46. **Temporal Limitation.** The **Subject Domain** appears to be an instrumentality of the Subject Offenses. That is, it appears to be used to further the Himalaya Exchange scheme—and potentially other schemes described herein—and not for personal or other legitimate business. Indeed, the Subject Domain was registered on or about June 21, 2020, which is approximately two months *after* the "white paper" describing how Himalayan Coin will operate was issued. Accordingly, all of the data in the **Subject Domain** may be evidence of the Subject Offenses or lead to the identification and attribution of the Target Subjects involvement in the Subject Offenses. This application seeks information for the Subject Account from the date of its creation from August 7, 2019 through the date of this order. August 7, 2019 is approximately four months after JE was named as a director of Hamilton (*supra* ¶ 12.d.i). Hamilton is an entity described above that is interrelated to the fraud schemes mentioned herein. For example, Hamilton invested $1 million with Hayman (*see supra* ¶ 21.e). JE, the director of Hamilton, is also the director and founder of the Himalaya Exchange. Thus, I believe that there is a basis that evidence of the Subject

---

[12] Google offers Android's cellphone users the ability to backup their devices to Google's cloud. Based on my training and experience, I have learned web developers can use their cellphones to monitor and manage websites and domains. Further, such cellphones are often used to communicate with others related to the website and domain manage or otherwise store records relevant to the website and management of the domains. Information in any Android backups can often provide evidence of attribution—*i.e.* who are the individual(s) managing and controlling particular websites and domains.

USAO_00000418

Offenses will be found in the Subject Account from August 7, 2019 through the present. Further, because, the **Subject Email Account** is used to manage the **Subject Domain** it is also an instrumentality of the Subject Offenses.

### C. Evidence, Fruits and Instrumentalities

47. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the **Subject Accounts** will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

48. In particular, I believe the **Subject Accounts** are likely to contain the following information:

a. Evidence of the Subject Offenses, including but not limited to: (i) documents and communications that establish agreements to commit the Subject Offenses, (ii) documents and communications making reference to or containing discussion of the commission of the Subject Offenses, such as references to any variations on the following: "Miles Guo," "Guo Wengui," "Miles Kwok," "G Club Operations LLC," "G Club," "GTV Media Group, Inc.," "GTV," "GNews," "Rule of Law Fund," "Saraca Media Group, Inc.," "Saraca," "Voice of Guo Media, Inc.," "VOG," "G Fashion," "Hayman Capital Management L.P.," "Fiesta Property Development Ltd.," "Himalaya Farm," "Himalaya Exchange," "Himalaya Coin(s)," "Himalaya Dollar(s)," "Crane Advisory Group LLC," "Yvette Wang," "William Je," "Steve Bannon," and other individuals and entities involved in the administration of Himalaya Exchange, and other schemes perpetrated by Guo, related entities; (iii) documents and communications relating to the transfer and/or laundering of criminal proceeds, and the transmission of funds without a license;

b. Financial agreements, including loan agreements and other documents representing purported financial contracts or obligations, memoranda and other communications, spreadsheets,

USAO_00000419

ledgers, summaries, and logs relating to, or containing information regarding, transactions involving the individuals and entities described above;

     c. Communications constituting evidence of the Subject Offenses, including text messages, chats, emails, messages sent via messaging applications or social media accounts, and/or other communications seeking to induce victims to invest in the fraudulent investment schemes and/or relating to the transfer and/or laundering of criminal proceeds and the transmission of funds without a license;

     d. Evidence regarding efforts to avoid detection by law enforcement, including the use of encrypted methods of communication;

     e. Identities and locations of the user(s) co-conspirators or victims involved in the Subject Offenses, including but not limited to communications with co-conspirators and victims, photos or other attachments, and address book information;

     f. Communications with co-conspirators, including records of phone calls, text messages, other electronic communications that demonstrate the relationships among co-conspirators;

     g. Communications with victims, including messages, emails, and/or social media or other posts that contain fraudulent representations;

     h. Information identifying the user(s) of the **Subject Accounts** and their location(s), and co-conspirators and other individual(s) involved in the Subject Offenses, including photographs or videos depicting the user(ss) of the **Subject Accounts**, communications with individuals that the user(s) of the **Subject Accounts** trust, which reveal his or her identity or include information that can be used to ascertain his or her identity, such as travel information,

09.20.2021

USAO_00000420

receipts for online purchases, and payment information, or other communications with social network websites or third party service providers;

     i.   Information that would assist in identifying and locating victims or witnesses;

     j.   Documents, spreadsheets and ledgers tracking proceeds of the fraudulent investment schemes, investors, and entities used in connection with the Subject Offenses;

     k.   Passwords or other information needed to access or identify computer or other online accounts or other places where additional evidence, fruits, or instrumentalities of the Subject Offenses may be located;

     l.   Evidence relating to the use of financial accounts and transactions in furtherance of the Subject Offenses (including the means and methods used to obtain the accounts and funds therein, and how the transactions were undertaken), or other fraudulent activities;

     m.  Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times; and

     n.   Evidence concerning any other online accounts, devices, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

**III. Review of the Information Obtained Pursuant to the Warrant**

    49. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 14 days from the date of service. Law enforcement personnel (who may include,

09.20.2021

USAO_00000421

in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

50. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, as well as with server data, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

51. The scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution,

45

09.20.2021

or otherwise seriously jeopardize the investigation.  Specifically, as set forth above, the targets of this investigation appear to have the financial means that would facilitate their flight from prosecution, and have traveled internationally in the past to jurisdictions where extradition to the United States for purposes of prosecution is unlikely or impossible.  *See* 18 U.S.C. § 2705(b)(2), (5).  Further, the targets of this investigation are known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.  *See* 18 U.S.C. § 2705(b)(3).

52. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

53. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

54. Finally, based on my training and experience, it is possible that the Provider will request that the Government seek data related to an enterprise such as Himalaya Exchange, which would include data relating to the **Subject Accounts**, directly from the enterprise, pursuant to the U.S. Department of Justice Policy titled Seeking Enterprise Customer Data Held by Cloud Service

09.20.2021

USAO_00000423

Providers, December 2017, available at https://www.justice.gov/criminal-ccips/file/1017511/download. However, pursuant to that policy, because Himalaya Exchange appears to be solely controlled by the Target Subject(s) of this investigation as set forth above who would be in a position to delete, encrypt, or otherwise conceal the requested data if alerted to the Government's investigation, I respectfully request that the proposed order specifically require the Provider to produce enterprise data.

## V. Conclusion

55. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

/s Robert Stout  (By Court with Authorization)

_____

Robert Stout
Special Agent, FBI

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
23d day of August, 2022

_____

HONORABLE SARAH L. CAVE
United States Magistrate Judge
Southern District of New York

USAO_00000424