**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

        -against-

HO WAN KWOK,

           Defendant.

Case No. 1:23-CR-118-1 (AT)

**ORAL ARGUMENT REQUESTED**

**RESPONSE OF CHAPTER 11 TRUSTEE AND GENEVER DEBTORS IN OPPOSITION TO DEFENDANT HO WAN KWOK'S MOTION FOR AN ORDER AND WRIT STAYING BANKRUPTCY CASES OR IN THE ALTERNATIVE FOR OTHER RELIEF**

Luc A. Despins
Adam J. Fee
G. Alexander Bongartz
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
lucdespins@paulhastings.com
adamfee@paulhastings.com
alexbongartz@paulhastings.com

    *and*

Nicholas A. Bassett
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*Counsel for Luc A. Despins, as Chapter 11 Trustee, Genever Holdings Corporation, and Genever Holdings LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ............................................................................... 7

    I.     Bankruptcy Cases ................................................................................ 7

    II.    Trustee's Investigation ....................................................................... 8

    III.   Mahwah Adversary Proceeding .......................................................... 9

ARGUMENT ..................................................................................................... 11

         I.      Bankruptcy Court Is Proper Forum to Decide Stay Motion ................... 11

         II.     Stay Motion Fails on Its Merits ........................................................ 15

               A.     Applicable Legal Standard for Stay Request ............................... 16

                      i.     Balancing Test ................................................................. 16

                      ii.    Other Considerations ........................................................ 17

               B.     Debtor Has Not Satisfied Burden for Obtaining Requested Stay ............................................................................................. 18

                      i.     Factor 1: Limited Overlap Between Bankruptcy Cases and Criminal Case ................................................... 18

                      ii.    Factor 3: Global Stay of Bankruptcy Cases Would Unduly Prejudice Thousands of Creditors ...................... 19

                      iii.   Factor 4: Allowing Bankruptcy Cases to Proceed Does Not Prejudice Debtor ............................................. 22

                      iv.   Factor 5: Interests of the Bankruptcy Court Weigh Against Stay of Bankruptcy Cases .................................. 28

                      v.     Factor 6: Public Interests Weighs Against Stay of Bankruptcy Cases ............................................................ 28

         III.   Respondents Do Not Object to Categories (i), (ii), and (iv) of Debtor's Proposed Alternative Relief .......................................... 29

         IV.   Court Should Deny Ms. Wang's Request for Global Stay of Bankruptcy Cases ........................................................................ 30

CONCLUSION ................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*An v. Despins*,
   22-cv-10062 (VEC) (S.D.N.Y. Aug. 2, 2023) [Docket No. 29]................................2

*In re Atlas*,
   183 B.R. 978 (Bankr. S.D. Fla. 1995) ...................................................................13

*In re Baldwin-United Corp.*,
   770 F.2d 328 (2d Cir. 1985)...................................................................................14

*In re Bame*,
   251 B.R. 367 (Bankr. D. Minn. 2000) ..............................................................23, 24

*Bernard v. Lombardo*,
   No. 16 CV. 863, 2017 WL 2984022 (S.D.N.Y. June 9, 2017).........................16, 19

*Citibank, N.A. v. Super Sayin' Publ'n, LLC*,
   86 F. Supp. 3d 244 (S.D.N.Y. 2015)...............................................................14, 15, 16

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985)................................................................................................23

*Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*,
   No. 18-CV-2185 (LJL), 2021 WL 2554631 (S.D.N.Y. June 22, 2021) ....................2

*Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.)*,
   765 F.2d 343 (2d Cir. 1985)...............................................................................13, 14

*Gong v. Sarnoff*,
   23-cv-343 (LJL) (S.D.N.Y. Aug. 22, 2023) [Docket No. 72] ...................................3

*Gran Sabana Corp. N.V. v. Kossoff*,
   No. 21-CV-3154 (RA), 2021 WL 3666116 (S.D.N.Y. Aug. 17, 2021)..............16, 17

*Karimona Invs., LLC v. Weinreb*,
   No. 02CV1792WHPTHK, 2003 WL 941404 (S.D.N.Y. Mar. 7, 2003)................14

*Layng v. Garcia (In re Garcia)*,
   569 B.R. 480 (Bankr. N.D. Ill. 2017) ....................................................................28

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
   676 F.3d 83 (2d Cir. 2012)..................................................................15, 16, 17, 27

*Mango Labs, LLC v. Eisenberg*,
   No. 23-CV-00665 (LJL), 2023 WL 3510908 (S.D.N.Y. Apr. 12, 2023) ...............................14

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   No. 20 CIV. 8668 (VM), 2021 WL 694557 (S.D.N.Y. Feb. 22, 2021)............................14, 16

*PAX v. Kwok*,
   Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181]..........................1, 2

*In re Randolph Hosp., Inc.*,
   No. 20-10247, 2022 WL 19298765 (Bankr. M.D.N.C. Apr. 25, 2022) .................................21

*S.E.C. v. Credit Bancorp, Ltd.*,
   93 F. Supp. 2d 475 (S.D.N.Y. 2000)...............................................................................11, 12

*In re Sturman*,
   No. 10 CIV. 6725 RJS, 2011 WL 4472412 (S.D.N.Y. Sept. 27, 2011) .................................12

*In re U.S. Lines Inc.*,
   262 B.R. 223 (S.D.N.Y. 2001)............................................................................................21

*United States v. LaRouche Campaign*,
   682 F. Supp. 627 (D. Mass. 1987) ..........................................................................3, 11, 13

*United States v. Simon*,
   373 F.2d 649 (2d Cir. 1967)........................................................................................11, 18

*In re Walnut Hill, Inc.*,
   No. 16-20960 (JJT), 2018 WL 2672242 (Bankr. D. Conn. June 1, 2018).............................21

**Statutes**

11 U.S.C. §§ 108(a)(2); 546(a) ....................................................................................................21

Luc A. Despins, in his capacity as the chapter 11 trustee (the "Trustee") appointed in the chapter 11 case of Ho Wan Kwok (the "Debtor" or "Mr. Kwok"), and Genever Holdings Corporation ("Genever BVI") and Genever Holdings LLC ("Genever US" and, together with the Trustee and Genever BVI, the "Respondents")[1] hereby file this Response (the "Response") in opposition to (i) the Debtor's *Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief* [ECF No. 129] (the "Stay Motion") and the related memorandum of law [ECF No. 131] (the "Memorandum of Law") and (ii) the joinder of Yanping Wang ("Ms. Wang") in the Stay Motion [ECF No. 135] (the "Joinder").[2]  In support of this Response, the Respondents also submit the *Declaration of Nicholas A. Bassett in Support of Response of Chapter 11 Trustee and Genever Debtors in Opposition to Defendant Ho Wan Kwok's Motion for an Order and Writ Staying Bankruptcy Cases or in the Alternative for Other Relief* (the "Bassett Declaration"), filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.     The Debtor claims to need an unprecedented global stay of his chapter 11 case to protect his rights as a criminal defendant in this Court.  But the Stay Motion in reality has very little to do with this criminal case and everything to do with the Debtor's desire to obtain all the benefits of the bankruptcy process—including the worldwide automatic stay it imposes on civil litigation against him—while bearing none of its burdens.  The Debtor filed his chapter 11 case **voluntarily** in the Bankruptcy Court in February 2022 for the self-serving purpose of avoiding the enforcement of a New York state court judgment against him in excess of $250 million.[3]

---

[1]     The Debtor, Genever BVI, and Genever US are referred to, collectively, as the "Debtors".

[2]     Capitalized terms used but not defined in this Response have the meanings set forth in the Stay Motion.

[3]     Similarly, the Debtor chose to commence the chapter 11 case of Genever US, which he controlled at the time of its chapter 11 filing in October 2020.

Now that his chapter 11 case has gone exceedingly poorly for the Debtor and those close to him, he is trying desperately to make it stop.

2.      Before filing for bankruptcy, the Debtor had presented himself to the public as a billionaire who enjoyed all the trappings of a life of extreme luxury, including yachts, private jets, luxury cars, and multi-million dollar residences.  Yet, in the schedules of assets he filed in his chapter 11 case, the Debtor remarkably claimed to have a mere $3,850 in assets to his name.  As several courts have now observed, the Debtor was able to maintain his opulent lifestyle while professing to own virtually no assets by constructing a vast maze of shell companies in which he hid his wealth in the names of family members and close associates (such as Ms. Wang).[4]  The Trustee has spent months deconstructing the Debtor's "shell game" through an investigation of the Debtor's financial affairs and has already recovered tens of millions of dollars for the benefit of the estate.  Efforts to recover additional valuable assets are ongoing.

3.      The Debtor has responded by seeking to obstruct and interfere with the Trustee's investigation by any means possible, including by seeking (twice) to remove the Trustee, by refusing to comply with the Trustee's discovery requests, and even by rallying his followers across the globe to harass the Trustee, his counsel, members of his family, and one of the Debtor's largest unsecured creditors—which harassment was enjoined by the Bankruptcy Court.[5]

---

[4]    *See, e.g.*, Decision and Order on Motion, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022) [Docket No. 1181] ("Ostrager Contempt Decision") (describing Debtor as "a self-declared multi-billionaire [who has] secreted his assets in a maze of corporate entities and with family members."), attached as **Exhibit 1** to the Bassett Declaration; *see also Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *1 (S.D.N.Y. June 22, 2021) (finding that that Eastern Profit Corporation Limited, an entity originally owned by one of the Debtor's chauffeurs and then transferred to the Debtor's daughter, was "in essence, a shell corporation" for the Debtor.)

[5]    *See Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction* ¶ 7 (Adv. Proc. No. 22-05032, Jan. 13, 2023) [Docket No. 133] (the "Harassment PI Decision"), attached as **Exhibit 2** to the Bassett Declaration.  In addition, various individuals filed a lawsuit in this district alleging the Trustee and his counsel violated the Foreign Agents Registration Act by failing to register as agents of the People's Republic of China or the Chinese Communist Party.  The district court found that the Debtor, although not a party, was "at the center" of this lawsuit.  Op. & Order at 2, *An v. Despins*, 22-cv-10062 (VEC) (S.D.N.Y. Aug. 2, 2023)

2

The Stay Motion is but the Debtor's latest tactic to stymie, at all costs, the Trustee's ongoing investigation.

4.      To conceal his true motivations in the Stay Motion, the Debtor fabricates nonexistent issues in his chapter 11 case that allegedly implicate his rights in this case.  For example, the Debtor baldly asserts, among other things, that (i) the Trustee has disposed of personal property of the Debtor located at his former Sherry Netherland apartment, (ii) the Debtor's mansion in Mahwah, New Jersey, has been "turned over" to the Trustee for disposition, and (iii) the Trustee has failed to comply with orders of the Bankruptcy Court relating to the Debtor's privileges.[6]  As explained in detail below, even a cursory review of the record in the Bankruptcy Court—with which the Debtor and his bankruptcy counsel should be intimately familiar—reveals that each of these statements is categorically untrue.

5.      Despite his allegations having no basis, the Debtor doubled down on them in another filing with this Court on September 21, 2023.  *See* ECF No. 143.  Although this new filing is styled as a motion to compel the production of documents from the Government, it reads as a transparent effort by the Debtor to repeat and buttress the same false accusations he makes in the Stay Motion.  For example, he repeats his erroneous allegation that the Trustee and the Government are collaborating to "fast track" the sale of the Mahwah Mansion, which is entirely

---

[Docket No. 29], attached as **Exhibit 3** to the Bassett Declaration.  The district court dismissed the lawsuit and imposed Rule 11 sanctions.  *Id.* at 13 ("[T]his lawsuit is just another part of a campaign of misbehavior designed to vex [the Trustee and Paul Hastings].").  Other judges in this district have made similar findings, dismissing and sanctioning lawsuits brought under FARA against other participants in the bankruptcy case.  *See* Op. & Order at 32, *Gong v. Sarnoff*, 23-cv-343 (LJL) (S.D.N.Y. Aug. 22, 2023) [Docket No. 72] ("The inescapable conclusion is that Zhang and Freeth are targeting those with interests opposed to Kwok's with the aim of chilling what they perceive as advocacy against him."), attached as **Exhibit 4** to the Bassett Declaration.

[6]     The Court should also reject the Debtor's self-serving rhetoric that he "attempted to resolve the Bankruptcy Cases through a potential global settlement."  Mem. of Law at 5.  The only source for this statement is the Debtor's own motion to remove the Trustee, *see* Bankr. ECF No. 1274, which no party in interest supported and which he withdrew.  Moreover, as it relates to the Debtor's characterization of the Trustee's purported "thinly veiled threats" during a settlement conference with the Debtor, *see* Mem. of Law at 6, the Trustee refers this Court to the Bankruptcy Court's description of these events in its Harassment PI Decision.

untrue because no sale process can even be initiated unless and until the Trustee prevails on the merits of his pending adversary proceeding. Equally specious is the Debtor's assertion that the Trustee and Government were somehow improperly communicating about the indictment against the Debtor before it was filed. He makes this allegation by citing to time entries showing the Trustee had discussions with the Government about the indictment on March 16 and 18, 2023, which he says was two weeks before the filing of the indictment on March 29, 2023. The Debtor, however, carelessly refers to the superseding indictment dated March 29, 2023, which merely added Ms. Wang as a defendant, and fails to acknowledge that the initial indictment against the Debtor was unsealed on March 15, 2023. It was, of course, this original indictment that the Trustee discussed with the DOJ after the fact in mid-March.

6.      Stripped of its factual inaccuracies and exaggerated rhetoric, the Stay Motion has no merit and should be denied. However, as a threshold matter, the Respondents submit that the Stay Motion should be considered and decided by the Bankruptcy Court, which has exclusive jurisdiction over all property of the estate. The Stay Motion offers no authority in support of the extraordinary relief it requests of staying an entire bankruptcy case. To the contrary, in *United States v. LaRouche Campaign*, 682 F. Supp. 627, 628 (D. Mass. 1987), the district court was asked to stay a bankruptcy case involving two of the defendants in a criminal case before it, and the district court held that ***it lacked jurisdiction to do so***. Other case law—including cases in which the Second Circuit reversed an order that would have temporarily enjoined a debtor (or trustee) from taking certain, limited, actions within the larger bankruptcy case—shows the reluctance with which other courts have invaded a bankruptcy court's jurisdiction or impaired its ability to administer an estate.[7]

---

[7]      As the Trustee advised this Court on September 6, 2023, the Trustee previously filed in the Bankruptcy Court an emergency motion (and a related motion to expedite) seeking to enjoin the Debtor's prosecution of the Stay

7.      To the extent this Court is inclined to consider the merits of the Stay Motion, it should deny the motion because the Debtor has not come close to satisfying his burden for obtaining a stay under Second Circuit law.  The Debtor all but ignores the extreme prejudice to his creditors that would result from the global stay he requests.  Contrary to the Debtor's unsupported assertion, the Bankruptcy Cases are not being run for the benefit of one large hedge fund.  In fact, more than 1,400 proofs of claims have been filed in the Bankruptcy Cases, almost all by individuals, asserting billions of dollars in claims.  While the Trustee expects that many of these claims are subject to reduction or disallowance (and the Trustee's analysis in this regard is ongoing), it is already clear that these claims cover a wide spectrum, including tort claims (including allegations by one of the Debtor's former employees of sexual assault by the Debtor), defamation claims, breach of contract claims, and, of course, claims of counterparties to the Debtor's alleged fraudulent schemes (which, to be clear, are not limited to the allegations in this criminal case).  All these creditors have waited for years to obtain a recovery and now must look to the Trustee to collect estate assets, resolve their claims, and make distributions.

8.      The delay in distributions is not the only harm a stay would cause to creditors. Delaying the Trustee's investigation would substantially increase the risk that the Debtor, his family members, and his business associates will continue their efforts to move assets beyond the reach of the Trustee.  This is not mere speculation, as there are several examples of the Debtor, members of his family, and/or his associates transferring or disposing of significant assets without Bankruptcy Court approval, including after the Debtor's and Ms. Wang's indictment and subsequent confinement.  In addition, a global stay of the Bankruptcy Cases would, for all

Motion.  The Bankruptcy Court denied the motion to expedite, but noted that a hearing on the emergency motion would be scheduled, if needed, after this Court has acted on the Stay Motion.  At the hearing on the Stay Motion, the Trustee can, as necessary, address the comments made by Bankruptcy Judge Manning at the hearing on the motion to expedite, including comments related to extending the statute of limitation to bring avoidance actions.

practical purposes, eliminate the Trustee's ability to bring avoidance actions to recover valuable property of the estate, as the statute of limitation to commence such actions is set to expire on February 15, 2024, *i.e.*, well before the scheduled April 2024 trial in this case.

9.      While the Debtors' estates and their creditors will suffer immense harm from a stay, the Debtor has not credibly shown that the Bankruptcy Cases somehow prejudice his rights as a criminal defendant.  The Debtor asserts that the Trustee is pursuing litigation over issues that overlap with his criminal case, but the Trustee's objectives and arguments are entirely different from those of the Government.  The Trustee is seeking to recover assets (regardless of whether such assets are fruits of a crime), not prove criminal liability.  And the Debtor's concerns regarding privilege issues and other evidentiary matters are illusory because, ultimately, this Court, not the Bankruptcy Court, will decide what evidence is admissible in this case and, in any event, do not justify the extraordinary remedy sought here by the Debtor.

10.     Perhaps realizing the dubious nature of his requested global stay, the Debtor requests four categories of relief in the alternative, namely an order from this Court (i) authorizing the Debtor to disclose to the Trustee the information produced to him by the Government, (ii) permitting the Debtor to access the Mahwah Mansion, (iii) precluding the Government from facilitating the sale of the Mahwah Mansion in the Bankruptcy Cases, and (iv) prohibiting the Trustee from sharing with the Government any documents or information subject to privileges held by the Debtor.  These requests are mostly acceptable to the Trustee.  As to the first request, the Trustee no longer presently intends to seek disclosure of the information provided to the Debtor by the Government, and the Trustee will be asking for the Bankruptcy Court to modify the Contempt Order accordingly.  In principle, and subject to certain safeguards regarding category (ii), with respect to which the Trustee is willing to meet and confer with the

Debtor, the Trustee has no objection to an order granting the relief set forth in categories (ii) and

(iv).  Finally, with respect to category (iii), it is not clear to the Trustee what the Debtor means in

seeking to preclude the Government from "facilitating the sale."  That said, that requested relief

is premature, as the Mahwah Mansion has not yet been determined to be property of the estate,

let alone is it subject to any sale motion.

## **FACTUAL BACKGROUND**

### I.    **Bankruptcy Cases**

11.    On February 15, 2022, the Debtor filed a voluntary petition for relief under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy

Court.  Notably, the Debtor filed his petition four business days after one of his largest unsecured

creditors, Pacific Alliance Asia Opportunity Fund L.P. ("PAX"), obtained an order from a New

York state court (a) holding the Debtor in contempt for removing his luxury superyacht (which

PAX sought to use to satisfy a $116.4 million judgment) outside the jurisdiction of the court and

(b) imposing on the Debtor a contempt fine of $134 million, which fine was due five business

entry of such order.[8]

12.    On June 15, 2022, after the Debtor's failed effort to propose a chapter 11 plan, the

Bankruptcy Court entered a memorandum of decision and order [Bankr. ECF No. 465][9] (the

"Trustee Order") directing the United States Trustee to appoint a chapter 11 trustee.  On July 8,

2022, the Bankruptcy Court entered an order [Bankr. ECF No. 523] appointing the Trustee.

13.    Genever BVI, an entity wholly owned by Mr. Kwok, and its wholly owned

subsidiary, Genever US, are also chapter 11 debtors in cases that have been administratively

---

[8]    *See* Ostrager Contempt Decision, at 10, Ex. A to the Bassett Decl.

[9]    Attached as **Exhibit 5** to the Bassett Declaration.  Filings on the docket of the administratively consolidated
       Bankruptcy Cases, Case No. 22-50073, are referred to as "Bankr. ECF No. ____."

consolidated with the Debtor's chapter 11 case.  Genever BVI's sole asset is the shares it holds in

Genever US, whose principal asset is the 18th floor apartment at the Sherry Netherland in

Manhattan (the "Sherry Netherland Apartment").[10]

## II.   Trustee's Investigation

14.     The Debtor's bankruptcy schedules, filed in March 2022, claimed only $3,850 in

assets compared to hundreds of millions of dollars of liabilities.[11]  The Debtor asserted in the

Bankruptcy Court that he was essentially penniless, and that his luxurious homes, the Lady May

yacht, and his other publicly flaunted trappings of wealth did not belong to him, but to

companies purportedly owned by his family members.[12]

15.     Since his appointment, the Trustee has been working diligently to identify and

recover for the benefit of the estate the assets the Debtor has hidden.  To that end, in accordance

with the Bankruptcy Court's directive, the Trustee has launched a complex and thorough

investigation and litigation process, focusing on the Debtor's "shell game"—*i.e.*, his use of *alter*

*ego* companies to hide his assets from creditors.  Broadly speaking, the process includes (a)

discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and (b) litigation to recover specific property and assets.

16.     Because the Debtor and others have refused to comply with the Trustee's

subpoenas, the Trustee has been forced to litigate a number of discovery disputes.  One such

---

[10]   The Stay Motion does not offer any basis for staying the chapter 11 cases of Genever BVI and Genever US.
The motion should be denied as to these debtors for this reason alone.  Nor does the Debtor have any economic
interest in Genever BVI, Genever US, or the Sherry Netherland Apartment.  Genever BVI was previously
transferred to the Trustee (and, as noted, Genever BVI wholly owns Genever US), and any beneficial interest
that had previously been asserted by Bravo Luck Limited (an entity purportedly owned by the Debtor's son)
and/or the Debtor's son in Genever BVI, Genever US, or the Sherry Netherland Apartment has been
relinquished as part of a settlement with Bravo Luck Limited and the Debtor's son.  *See* Bankr. ECF. 2153.

[11]   *See* Schedules of Assets and Liabilities at 1 [Bankr. ECF No. 78].

[12]   *See Declaration of Mr. Ho Wan Kwok in Support of the Chapter 11 Case and Certain Motions* [Bankr. ECF No.
107].

dispute involved the Debtor's contention that he could prevent the Trustee from obtaining information from his counsel and other professionals by seeking to invoke the attorney-client privilege and other privileges or protections. This dispute was ultimately resolved when the Debtor, after extensive negotiations, consented to the entry of an order governing the passage of the privilege to the Trustee [Bankr. ECF No. 856] (the "Privileges Order").

17.     In response to another discovery dispute, the Debtor asserted that his Fifth Amendment rights justified his refusal to produce any documents to the Trustee or to provide any description of how he searched for documents.[13] The Trustee disagreed with the Debtor's blanket assertion of the Fifth Amendment. On July 26, 2023, the Bankruptcy Court issued a detailed and carefully reasoned 42-page decision agreeing with the Trustee and holding the Debtor in contempt of court [Bankr. ECF No. 2035] (the "Contempt Order").[14]

18.     Notwithstanding the non-compliance of the Debtor and others with the Trustee's discovery efforts, the Trustee has brought a number of adversary proceedings to recover specific assets for the benefit of the estate. To date, the Trustee has recovered over $60 million in assets, and stands to recover more as his investigation and recovery efforts continue.

### III.   Mahwah Adversary Proceeding

19.     In the indictment in this case, the Government included forfeiture allegations with respect to, among other things, a 21-bedroom, 50,000 square foot, castle-styled private residence

---

[13]   *See* Bankr. ECF No. 1444 (stating that Debtor is "invok[ing] [his] rights under the 5th Amendment to the United States Constitution, including under the act of production doctrine, with respect to the Subpoena dated August 17, 2022, in its entirety, including all requests for documents and information set forth therein"), attached as **Exhibit 6** to the Bassett Declaration.

[14]   Attached as **Exhibit 7** to the Bassett Declaration. In addition to the Contempt Order, the Bankruptcy Court has issued six (6) other contempt orders against the Debtor and entities related to the Debtor for failure to surrender estate property or comply with court-approved subpoenas issued by the Trustee. *See* Bankr. ECF Nos. 1372, 1537, 1709, 1892, 2009, and 2093.

with 12.5-acre grounds located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion"), which was originally purchased for approximately $26.5 million.

20.    The Trustee has conducted an investigation into whether the Mahwah Mansion is property of the estate and, on July 11, 2023, commenced an adversary proceeding in the Bankruptcy Court (the "Mahwah Adversary Proceeding") against the purported owners of the mansion.[15]  The complaint seeks an order declaring, among other things, that the Mahwah Mansion is property of the Debtor's estate to be administered by the Trustee.  With the complaint, the Trustee filed a motion seeking to, among other things, preliminarily enjoin the Mahwah Defendants from encumbering, transferring, dissipating, or otherwise interfering with the Mahwah Mansion and restricting access to it.  The Bankruptcy Court granted this motion in an order dated August 24, 2023 [ECF No. 47 in Adv. Proc. No. 23-05017][16] (the "PI Order").

21.    On August 30, 2023, after the Mahwah Defendants admitted that the Mahwah Mansion and its contents were uninsured,[17] the Trustee filed an emergency motion [ECF No. 57 in Adv. Proc. No. 23-05017] (the "Emergency Motion") requesting that the Bankruptcy Court immediately modify the PI Order to limit access to the Mahwah Mansion to certain security services, officials, and others with the consent of the Trustee or as approved by this Court or the

---

[15]    The defendants are Taurus Fund LLC ("Taurus Fund"), Scott Barnett (the Debtor's bodyguard and chauffer), and Taurus Management LLC (together with Taurus Fund, collectively, the "Mahwah Defendants").

[16]    Filings on the docket of the Mahwah Adversary Proceeding are referred to as "ECF No. ____ in Adv. Proc. No. 23-05017."

[17]    As part of the PI Order, the Bankruptcy Court ordered the Mahwah Defendants to file, by August 28, 2023, proof of insurance for all assets and property of Taurus Fund (including the Mahwah Mansion) and all personalty and/or fixtures in, on, or at the Mahwah Mansion.  The Bankruptcy Court later extended the deadline to August 30, 2023, on which date the Mahwah Defendants filed a response revealing that Taurus Fund's property—including the Mahwah Mansion and its contents—were uninsured, see ECF No. 55 in Adv. Proc. No. 23-05017, and the Mahwah Mansion remains uninsured today.

Bankruptcy Court (collectively, the "Authorized Parties").  The Bankruptcy Court granted the

Emergency Motion on August 31, 2023.  *See* ECF No. 58 in Adv. Proc. No. 23-05017.[18]

22.     The Trustee knew when he filed the Mahwah Adversary Proceeding that issues

could arise from the fact that the Mahwah Mansion is subject to both potential forfeiture in the

criminal case and potential recovery in the bankruptcy case.  The Trustee reached out to the

Government to address these issues in a manner that could allow the Mahwah Adversary

Proceeding to proceed without interruption.  This resulted in a settlement agreement dated as of

July 13, 2023 (the "Settlement Agreement").  Under the Settlement Agreement, (i) the Trustee

would proceed with the Mahwah Adversary Proceeding without objection or interference by the

Government and (ii) the Trustee and the Government reserved their rights regarding the

distribution of the net proceeds (after payment of the estate's expenses in connection with taking

control of and selling the Mahwah Mansion) from the disposition of the Mahwah Mansion.  The

Trustee has filed a motion seeking Bankruptcy Court approval of the Settlement Agreement, and

a hearing was held on August 30, 2023.  The Bankruptcy Court has not yet ruled on the motion.

## **ARGUMENT**

### I.     **Bankruptcy Court Is Proper Forum to Decide Stay Motion**

23.     As a threshold matter, the Respondents respectfully submit that the Bankruptcy

Court is the proper forum to determine whether the Bankruptcy Cases should be stayed.  Under

28 U.S.C. § 1334(a), bankruptcy courts (through orders of reference from the applicable district

court) have exclusive jurisdiction over bankruptcy cases and property of a bankruptcy estate.

---

[18]     Attached as **Exhibit 8** to the Bassett Declaration.

24.     Notably, the Stay Motion does not cite a single case where a district court granted the extraordinary relief the Debtor seeks here, *i.e.*, staying an ***entire bankruptcy case***.[19]  In the *LaRouche* case, the district court was asked to stay a bankruptcy case involving two defendants in a criminal case before the court—and the district court held that ***it lacked jurisdiction to do so***. *LaRouche*, 682 F. Supp. at 628.  The court expressed skepticism "that a federal court having jurisdiction over a criminal case in one district has jurisdiction to enjoin the United States, or a United States Bankruptcy Judge, or others participating in a bankruptcy matter before that judge, to stay all proceedings in that matter."  *Id.*  The court, therefore, "conclude[d] that there is no direct support in precedent for the exercise of such jurisdiction."  *Id.*

25.     The Debtor notes that the All Writs Act "provides federal district courts with substantial authority to preserve their jurisdiction,"[20] citing to *S.E.C. v. Credit Bancorp, Ltd.*, 93 F. Supp. 2d 475 (S.D.N.Y. 2000).  The *Credit Bancorp* decision, however, supports the Trustee's position by demonstrating why it should be the ***Bankruptcy Court***, not this Court, that decides the Stay Motion.

26.     In *Credit Bancorp*, the SEC brought an enforcement action in the Southern District of New York against Credit Bancorp, its subsidiaries, and several individuals.  The district court appointed a receiver to, among other things, pursue insurance proceeds.  One of the individuals charged in the action filed his own civil case in the Eastern District of Kentucky against two of the insurers, and the court-appointed receiver moved in the New York case to stay the Kentucky case.  The court granted the stay, explaining that, "where a court has appointed a

---

[19]   The Memorandum of Law cites to *United States v. Simon*, 373 F.2d 649, 651-52 (2d Cir. 1967), in which the district court enjoined the bankruptcy trustee (for ninety days) from deposing certain individuals that were also named in a separate criminal matter.  But the district court did not stay the bankruptcy case itself.  Moreover, the Second Circuit ***reversed the district court***.  This case, therefore, offers the Debtor no support.  In fact, as discussed below, it strongly support the Trustee's position.

[20]   Mem. of Law at 14.

receiver and obtained jurisdiction over the receivership estate, as here, the power to stay competing actions falls within the court's inherent power to prevent interference with the administration of that estate." *Credit Bancorp*, 93 F. Supp. 2d at 477.  Just like the Trustee here, the receiver in *Credit Bancorp* was appointed to "protect the estate property and ultimately return that property to the proper parties in interest," and was charged with "marshaling and preserving the assets of the estate in order to effectuate an orderly, efficient, and equitable administration of the estate." *Id.* at 476-77.

27.     In essence, *Credit Bancorp* stands for the proposition that where a court-appointed fiduciary is charged with the equitable administration of an estate, the power and duty to prevent interference with that estate—including enjoining parallel proceedings—lies with the court supervising the estate.  Indeed, this principle applies even more forcefully in bankruptcy cases, where Congress has vested bankruptcy courts with exclusive jurisdiction over property of the debtor's estate, and the automatic stay prohibits interference with that jurisdiction.  *See generally In re Sturman*, No. 10 CIV. 6725 RJS, 2011 WL 4472412, at *2 (S.D.N.Y. Sept. 27, 2011) (state court motion to "enjoin any further activity in the bankruptcy estates" was a clear violation of the automatic stay).[21]

28.     Based on these authorities, the Trustee respectfully submits that jurisdiction to decide the Stay Motion lies with the Bankruptcy Court, not this Court.  But even if this Court *could* decide the Stay Motion, it should decline to do so and instead defer to the Bankruptcy

---

[21]    The Debtor's request that this Court decide the Stay Motion also violates the so-called *Barton* doctrine, which prohibits non-bankruptcy courts from ruling on issues that would interfere with the official duties of a bankruptcy trustee.  As one bankruptcy court has explained, "[u]nder Supreme Court precedent more than one hundred years old, parties may not interfere with a trustee's official duties by seeking injunctive relief in another court, unless they have obtained leave from the bankruptcy court that appointed the trustee."  *In re Atlas*, 183 B.R. 978, 980 (Bankr. S.D. Fla. 1995).

Court.  This was the alternative conclusion of the district court in the *LaRouche* case, which

reasoned as follows:

> Even if jurisdiction does exist, I conclude that it would be inappropriate
> to exercise it in this instance.  The bankruptcy proceeding involves not
> only interests of the United States and some (or perhaps all) of the
> defendants before this court, but as well many other persons who may
> have claims as creditors in those proceedings.  It is not feasible or
> sensible to attempt to give them notice and an opportunity to be heard
> here, and it would be offensive to fundamental principles of
> adjudication to enter an injunction effecting a stay such as defendants
> seek without appropriate consideration of their interests.

*LaRouche Campaign*, 682 F. Supp. at 628-29.

29.    The *LaRouche* court's reasoning is consistent with compelling precedent from the

Second Circuit.  *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp.*

*Litig.)*, 765 F.2d 343 (2d Cir. 1985), involved a multi-district securities fraud litigation pending

in the Southern District of New York.  One of the broker-dealer defendants filed a proof of claim

against Baldwin in its separate chapter 11 case pending in Ohio and also commenced a third-

party complaint against Baldwin in the securities litigation.  The broker-dealer then sought, and

the Southern District of New York issued, a TRO enjoining the debtor from seeking any relief

against any of the defendants (including the broker-dealer) in the securities litigation, including

seeking an order from the Ohio bankruptcy court to enforce the automatic stay.[22]  On appeal, the

Second Circuit held that the district court did have jurisdiction "to determine the applicability of

the automatic stay," *id.* at 347, but that "its issuance of the injunction challenged on this appeal

---

[22]    The Memorandum of Law cites another Second Circuit ruling in the Baldwin matter, *In re Baldwin-United*
*Corp.*, 770 F.2d 328, 339 (2d Cir. 1985).  *See* Mem. of Law at 15.  In that opinion, the Second Circuit left in
place a different TRO issued by the district court, which enjoined the 31 appellant states (and their attorneys
general) from commencing any action against any of the defendants in the securities litigation.  It is telling that
the Debtor cites this opinion, which has nothing to do with and does not discuss any proposed or ongoing
actions in Baldwin's separate bankruptcy case, while ignoring the Second Circuit's ruling, issued only two
months prior, that directly explored the exact issues relevant here, *i.e.*, the interplay between the authority of a
bankruptcy court to administer its case and the authority of district court to manage a separate civil proceeding.

was a misuse of its equitable power." *Id.*  The court explained that this injunction interfered with the Bankruptcy Court's jurisdiction because it prevented the debtor "from invoking the vital authority of the Bankruptcy Court" to carry out the provisions of the Bankruptcy Code (including the applicability of the automatic stay).  *Id.* at 357-48.  And while it was also true that the district court had the "power to issue all writs in aid of its jurisdiction," *id.* at 348, any conflict "between the authority of the Bankruptcy Court to administer this complex reorganization and the authority of the District Court to administer consolidated pretrial proceedings" should be resolved in favor of maintaining the "***unfettered authority of the Bankruptcy Court***."  *Id.* (emphasis added).[23]

30.    The Respondents submit that, consistent with that precedent, this Court should defer consideration of the Stay Motion to the Bankruptcy Court.[24]

## II.    Stay Motion Fails on Its Merits

31.    If this Court is nevertheless inclined to consider the Stay Motion on its merits, the Court should deny the motion because the Debtor has failed to satisfy his burden of justifying the extraordinary remedy of a stay of the Bankruptcy Cases under Second Circuit precedent.

---

[23]    The *Baldwin* court also pointed to the procedural history in the lower courts, and observed that the movant's procedural "maneuver" and its "litigating stance with respect to the reach of the stay reveals few, if any, equities in its favor."  765 F.2d at 349.  Similarly here, the Stay Motion is, at best, motivated by litigation tactics and strategy, not genuine concerns for the Debtor's constitutional rights.

[24]    This would also be consistent with the general (*i.e.*, not necessarily specific to bankruptcy) rule for such motions, pursuant to which motions to stay litigation are presented in the court in which such litigation is pending.  *See, e.g.*, *Mango Labs, LLC v. Eisenberg*, No. 23-CV-00665 (LJL), 2023 WL 3510908, at *1 (S.D.N.Y. Apr. 12, 2023) (government moved "to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure and for a full stay in this matter, including a stay of all discovery, until the conclusion of the parallel criminal case"); *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2021 WL 694557, at *1 (S.D.N.Y. Feb. 22, 2021) ("before the court is defendants' second motion for a stay pending resolution of the criminal proceedings against them"); *Citibank, N.A. v. Super Sayin' Publ'n, LLC*, 86 F. Supp. 3d 244, 245 (S.D.N.Y. 2015) ("defendants have moved to stay these two related civil actions pending the resolution of a related criminal investigation and prosecution"); *Karimona Invs., LLC v. Weinreb*, No. 02CV1792WHPTHK, 2003 WL 941404, at *1 (S.D.N.Y. Mar. 7, 2003) (in breach of contract and fraud action, denying defendant's "motion to stay his deposition pending the resolution of a related criminal matter").  Moreover, here, the Government sought a stay of the SEC litigation against the Debtor in the district court presiding over that litigation.

A.      Applicable Legal Standard for Stay Request

32.     The Memorandum of Law includes a lengthy discussion of what the Debtor

characterizes as the "applicable law" for granting a stay request.[25]  Yet, the Debtor fails to

acknowledge that, in the Second Circuit, "a stay of a civil case to permit conclusion of a related

criminal [proceeding]" is "an extraordinary remedy."  *Louis Vuitton Malletier S.A. v. LY USA,*

*Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (as modified) (internal quotation marks and citations

omitted).  The Debtor further fails to mention that "[i]n order to invoke this extraordinary

remedy of staying a civil case until the conclusion of a related criminal proceeding, the defendant

bears the burden of showing undue prejudice . . . or interference with his constitutional rights."

*Citibank, N.A. v. Super Sayin' Pub., LLC*, 86 F. Supp. 3d 244, 246 (S.D.N.Y. 2015) (internal

quotation marks and citation omitted).  In fact, the U.S. Constitution "rarely, if ever, ***requires***

such a stay."  *Louis Vuitton*, 676 F.3d at 98 (emphasis in original).[26]  This is because a

"defendant has no absolute right not to be forced to choose between testifying in a civil matter

and asserting his Fifth Amendment privilege."  *Id.* (internal quotation marks omitted).

*i.   Balancing Test*

33.     In determining whether to grant a stay of parallel proceedings, courts in the

Second Circuit usually consider six factors:

1) the extent to which the issues in the criminal case overlap with
   those presented in the civil case;
2) the status of the case, including whether the defendants have been indicted;
3) the private interests of the plaintiffs in proceeding expeditiously
   weighed against the prejudice to plaintiffs caused by the delay;
4) the private interests of and burden on the defendants;
5) the interests of the courts; and
6) the public interest.

---

[25]  *See* Mem. of Law at 14-17.

[26]  *See also id.* at 100 ("a plausible constitutional argument [requiring a stay] would be presented only if, ***at a***
***minimum***, denying a stay would cause '***substantial prejudice***' to the defendant") (emphasis added).

*See Citibank, N.A.*, 86 F. Supp. 3d at 246-47.  *See also Gran Sabana Corp. N.V. v. Kossoff*, No. 21-CV-3154 (RA), 2021 WL 3666116, at *2 (S.D.N.Y. Aug. 17, 2021); *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2021 WL 694557, at *3 (S.D.N.Y. Feb. 22, 2021); *Bernard v. Lombardo*, No. 16 CV. 863 (RMB), 2017 WL 2984022, at *2 (S.D.N.Y. June 9, 2017) (all applying six-factor test and denying stay).

34.     The Debtor seemingly asks this Court to discard this balancing test, based on the Second Circuit's description of the test as a "mechanical device."[27]  This mischaracterizes the Second Circuit's holding and guidance in *Louis Vuitton*.  In fact, courts in this Circuit overwhelmingly continue to apply the balancing test.  *Louis Vuitton* stands only for the unremarkable proposition that, when applying the balancing test, the trial court must not lose sight of the overall question, namely "whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court."  *Louis Vuitton*, 676 F.3d at 99-100.

### ii.   Other Considerations

35.     Another aspect of Louis *Vuitton* that the Stay Motion conveniently ignores is the Second Circuit's statement that the concerns relevant to a stay request can also be addressed through "alternative forms of relief, such as tailored stays, protective orders, quashing or modifying subpoenas, [or] sealing confidential material."  *Louis Vuitton*, 676 F.3d at 102.  In other words, "a blanket stay of the civil action is not the only means of safeguarding [the defendant]'s rights and assuaging the legitimate concerns he may harbor."  *Gran Sabana Corp.*, 2021 WL 3666116, at *3.

---

[27]   *See* Mem. of Law at 16 (citing *Louis Vuitton*, 676 F.3d at 99).

36.     The availability of less extreme measures leads directly to another consideration highlighted in *Louis Vuitton*, namely the true motivation or purpose behind the requested stay. Noting that there was "nothing in the record to indicate that the defendants ever pursued such alternative relief," the Second Circuit concluded that the defendants' "insistence that the civil proceedings be stayed" was really "part of a larger pattern of overall delay and obfuscation." *Louis Vuitton*, 676 F.3d at 102.  The Second Circuit further noted that the defendants' arguments for the requested stay "ring hollow in light of the defendants' plainly dilatory tactics . . . ***even prior to their indictments***."  *Id.* (emphasis added).

B.     <u>Debtor Has Not Satisfied Burden for Obtaining Requested Stay</u>

37.     Applying the balancing test and the other considerations espoused by *Louis Vuitton* to the facts here, it is abundantly clear that there is ***no basis whatsoever***—let alone extraordinary circumstances—to grant a global stay of the Bankruptcy Cases.  Indeed, other than the second factor (*i.e.*, that the Debtor has been indicted), all factors and considerations in evaluating a stay motion weigh in favor of denying the Stay Motion.

*i.    Factor 1: Limited Overlap Between Bankruptcy Cases and Criminal Case*

38.     Contrary to the Debtor's hyperbole, there is only limited overlap between the Trustee's efforts to identify and recover property of the estate and these criminal proceedings.

39.     In *United States v. Simon*, 373 F.2d 649 (2d Cir. 1967), the district court enjoined the bankruptcy trustee (for ninety days) from deposing certain individuals that were also named in a separate criminal matter.  Reversing the district court, the Second Circuit held that the district court's reliance on cases where the civil and criminal matters arise out of the same or related transactions was flawed because the trustee was "pursuing an independent cause of action on behalf of [the debtor]'s creditors and security holders, which was commenced more than one year before the indictment was found."  *Id.* at 653-54.

18

40.     Like the trustee in *Simon*, the Trustee is acting solely to fulfill his fiduciary obligations to the bankruptcy estates and their creditors.  The Trustee is not seeking to establish the Debtor's criminal liability, but rather his focus is on demonstrating that certain companies nominally owned by the Debtor's family members or business associates are, in reality, *alter egos* of the Debtor and/or that their assets are equitably owned by the Debtor.  This does not require the Trustee to show that the Debtor committed any crimes or that the funds used to purchase the property in question were the proceeds of alleged fraudulent schemes.  In any event, to the extent the Debtor believes that the Trustee's investigation infringes on his rights as a criminal defendant in certain instances, there is no reason that the Bankruptcy Court or the Connecticut District Court would not be capable of addressing those issues.  The Debtor also remains free to seek specific relief from this Court, on a case-by-case basis.

        ii.  *Factor 3: Global Stay of Bankruptcy Cases Would Unduly Prejudice Thousands of Creditors*

41.     A global stay of the Bankruptcy Cases for the duration of these criminal proceedings would inflict great harm on the Debtors' creditors.  A stay of the Bankruptcy Cases would substantially delay—potentially for years—the resolution of thousands of claims and any distribution from the Debtors' assets.  Given the automatic stay, the Debtors' creditors have no alternative forum to resolve their claims against the Debtors or obtain a recovery from the Debtors' assets.  This stands in stark contrast to the Debtor who **chose** to commence his chapter 11 case (notwithstanding his displeasure with how the case has unfolded).

42.     A delay of distributions, however, is not the only harm to creditors.  Staying the Trustee's investigation will substantially increase the risk that the Debtor, his family members, and his business associates will continue to attempt to move assets beyond the reach of the Trustee.  *See Bernard*, 2017 WL 2984022, at *3 ("The risk to Plaintiffs is particularly great here

19

because the Court has already found, among other things, that Mr. Lombardo abused the

corporate form . . .").  This is no mere speculation, as the Debtor's family members and

associates have, on numerous occasions, already undertaken efforts to move or take control of

potential estate assets during the Bankruptcy Cases.  For example:

- As this Court already found in denying Ms. Wang's bail request, in January 2023, Ms. Yvette Wang transferred the shares of a Kwok-associated entity (Ace Decade Holdings Limited ("Ace Decade")) to another of the Debtor's associates in Switzerland.  *See* ECF No. 110.  This transfer occurred while the Bankruptcy Court was considering the Trustee's motion to hold the Debtor in contempt for failing to transfer Ace Decade to the Trustee (a motion that the Bankruptcy Court ultimately granted).  Worse, at the time of the transfer, the Debtor had already agreed (pursuant to an order entered by the Bankruptcy Court) not to contest the Bankruptcy Court's finding that he was, in fact, the beneficial owner of Ace Decade.[28]  *See* Bankr. ECF No. 1110.

- Similarly, this Court has found that, "[a]fter her arrest in this case, Wang continued directing co-conspirators to transfer funds from accounts associated with entities involved in the alleged fraud scheme."  *See* ECF No. 110.

- In the summer of 2022, Whitecroft Shore Limited, another shell company purportedly owned by the Debtor's daughter, transferred a private jet to an unknown third party for a purchase prices of over $10 million.  Incredibly, the Debtor's daughter has testified that she does not know the name of the buyer or the whereabouts of the proceeds from that sale.  The Trustee believes that the private jet was beneficially owned by the Debtor and has commenced an adversary proceeding to recover the proceeds of this unauthorized postpetition sale.

- In April 2022, Greenwich Land, an entity purportedly owned by the Debtor's wife, sold a property located in Greenwich, Connecticut, for $2.2 million. The Trustee has commenced an adversary proceeding against Greenwich Land seeking determinations that, among other things, Greenwich Land is the *alter ego* of the Debtor and the Debtor is the equitable owner of Greenwich Land.  The April 2022 property sale is particularly egregious as it occurred in violation of a restraining notice issued in connection with New York state court litigation brought by one of the Debtor's creditors against the Debtor.[29]

---

[28]   The Trustee intends to bring an action against Ms. Wang for this blatant violation of the automatic stay.

[29]   The restraining notice notified Greenwich Land, among other things, that "we understand [the Debtor] may have direct, indirect, or beneficial ownership in, or the right or ability to direct or control, you and your assets," and that "you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any property in which [the Debtor] has an interest, except as provided in [New York Civil Practice Law

43.     Based on the Trustee's investigation, the foregoing examples are just the tip of the iceberg of ongoing efforts by the Debtor and his associates to deprive the Debtor's creditors of their recoveries.  The Trustee is continuing to investigate millions of dollars of transfers made by various shell companies that, the Trustee believes, are beneficially owned by the Debtor.  If the Bankruptcy Cases are stayed, these transfers will be allowed to continue unabated.  Worse, the information regarding such transfers will become stale during the pendency of the global stay, and, once the stay is lifted, the Trustee would have to re-start his investigation at great cost and further delay to the estate.

44.     In addition, the requested stay would jeopardize the Trustee's ability to bring valuable avoidance actions within the applicable two-year statute of limitations, which expires in February 2024 (the second anniversary of the Debtor's chapter 11 filing).  *See* 11 U.S.C. §§ 108(a)(2); 546(a).  The Trustee acknowledges the Bankruptcy Court's statement that the Trustee could potentially seek to extend this deadline;[30] however, absent the consent of each defendant (which is impossible, especially if the Trustee's investigation is stayed) and/or equitable tolling (which is uncertain and would require expensive collateral litigation), the weight of the authority makes clear that this deadline ordinarily cannot be extended.  *See, e.g.*, *In re U.S. Lines Inc.*, 262 B.R. 223, 239 (S.D.N.Y. 2001) (holding that Bankruptcy Rule 9006, which ordinarily permits extensions of deadlines in bankruptcy, "by its text, does not authorize a court to extend such [statutes of limitations and 11 U.S.C. § 108(c)] deadlines.  The Rule only empowers a court to extend deadlines created 'by these rules or by a notice given thereunder or by order of court . . .' Bankr. R. 9006(b)(1)."); *In re Walnut Hill, Inc.*, No. 16-20960 (JJT), 2018

---

and Rules] § 5222(b)."  Restraining Notice, a copy of which was filed as part of ECF No. 1-47 in Adv. Proc. No. 23-5005, and which is attached as **Exhibit 9** to the Bassett Declaration.

[30]     *See* Sept. 12, 2023 Hr'g Tr. at 32:14-15.  Relevant excerpts of the hearing transcript are attached to the Bassett Declaration as **Exhibit 10**.

WL 2672242, at *2 (Bankr. D. Conn. June 1, 2018) ("Rule 9006(b) cannot apply to Section

546(a) without violating the separation of powers preserved in the Constitution.  Where the

legislature has spoken authoritatively, it is not within the province of the judiciary to modify its

determination."); *In re Randolph Hosp., Inc.*, No. 20-10247, 2022 WL 19298765, at *1 (Bankr.

M.D.N.C. Apr. 25, 2022) ("Federal Rule of Bankruptcy Procedure 9006(b) may not be used to

extend statutory deadlines such as those established under 11 U.S.C. §§ 108 and 546.").

45.     Given that the Trustee could challenge potentially millions of dollars of

prepetition transfers going as far back as 10 years before the Debtor's chapter 11 petition date,

the inability to assert estate causes of action would be highly detrimental to creditors.

> iii. *Factor 4: Allowing Bankruptcy Cases to Proceed Does Not Prejudice Debtor*

46.     In the Stay Motion, the Debtor raises a handful of recent developments in the

Bankruptcy Cases that, in his view, have infringed upon his constitutional rights as a criminal

defendant.  However, upon closer inspection, none of the developments (whether viewed in

isolation or in combination) are prejudicial to the Debtor.

> 1.  Contempt Order Does Not Prejudice Debtor's Constitutional
>     Rights and Is Now Moot In Any Event

47.     Throughout the Bankruptcy Cases, the Debtor has had a full and fair opportunity

before the Bankruptcy Court to raise—and, in fact, did raise—his arguments in opposition to the

Trustee's discovery requests, including that he could refuse to produce documents on the basis of

the Fifth Amendment right against self-incrimination.  That the Bankruptcy Court ultimately

rejected the Debtor's arguments does not somehow mean he was prejudiced.  Nor was the

Bankruptcy Court doing the Trustee's bidding[31]—in fact, the Contempt Order rejected many of

---

[31]     The Debtor asserts that the Trustee somehow "procured" the Contempt Order from the Bankruptcy Court.
Mem. of Law at 2.

the Trustee's arguments, including as to the application of the Act of Production Doctrine.  It should be apparent from even a cursory review of the Contempt Order that Bankruptcy Judge Manning took very seriously her responsibility to consider the scope of the Debtor's constitutional rights.

48.    The Debtor contends his production to the Trustee of the disclosures he obtained from the Government in this case would somehow prejudice his rights as a criminal defendant. The Contempt Order, however, only required the Debtor to serve as a conduit for the production to the Trustee of information the Government provided to the Debtor, and thus the Debtor would not be authenticating the documents by producing them.  *But this argument is now moot in any event because, as noted above, the Trustee is not presently pursuing these documents and will ask the Bankruptcy Court to modify the Contempt Order accordingly.*

49.    To the extent the Debtor is dissatisfied with any other aspect of the Contempt Order, he is, of course, free to seek appellate review in the Connecticut District Court and the Second Circuit, including on an expedited basis.  In fact, the Debtor has already filed a motion with the Connecticut District Court requesting leave to appeal the Contempt Order (which motion the Trustee has opposed).[32]  Notably, however, the Debtor has not sought expedited consideration of his request for leave to appeal or moved for a stay pending appeal.

### 2.    Privileges Order Provides No Support for Requested Stay

50.    The Debtor's assertion that the Trustee has somehow infringed upon the Debtor's attorney-client privilege is completely unsupported.  It is hornbook law that, upon the appointment of a trustee, the debtor's attorney-client privilege and work product protection that could otherwise be asserted by a debtor or its counsel under any applicable law pass to the

---

[32]    As of the filing of this Opposition, the Connecticut District Court has not ruled on the Debtor's motion.

trustee.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353-54 (1985)

("[I]t is clear that the trustee plays the role most closely analogous to that of a solvent

corporation's management" and "vesting in the trustee control of the corporation's attorney-

client privilege most closely comports with the allocation of the waiver power to management

outside of bankruptcy without in any way obstructing the careful design of the Bankruptcy

Code.").  The Trustee recognizes, of course, that where the debtor is an individual, courts have

implemented the *Weintraub* ruling through a balancing test for prepetition[33] communications to

determine whether the privilege at issue relates most closely to a trustee's rights, obligations and,

allocation of responsibility under the Bankruptcy Code, or whether the privilege primarily

concerns the debtor's interests as an individual.  *See, e.g.*, *In re Bame*, 251 B.R. 367, 375 (Bankr.

D. Minn. 2000).  Indeed, all of these issues were briefed and argued in the Bankruptcy Court

shortly after the Trustee's appointment, with the Debtor vigorously opposing the Trustee's

request for an order confirming that the Debtor's privilege had passed to the Trustee (subject to

the aforementioned limitations).

     51.    In the end, given the overwhelming authority in support of the Trustee's position,

the Debtor agreed to the consensual resolution reflected in the Privileges Order, which contains

several negotiated protections for the Debtor.  Among other things:

> the Trustee shall not be entitled to waive any Trustee Privilege (for
> example, by disclosing privileged documents or information in open
> court or on any public docket or by sharing such documents or
> information with a third party) absent the Debtor's written consent or
> further order of the Court, and all filings by the Trustee containing or

---

[33]  For privileged documents created postpetition, but prior to the appointment of a trustee, courts do not apply a balancing test.  Rather, the privilege over such documents passes to the trustee automatically when the trustee takes over administration of the estate.  *See, e.g.*, *Bame*, 251 B.R. at 375 ("I find that the attorney-client privilege has passed to the Trustee with respect to communications between Kennedy & Graven and the Debtor during the period that the Debtor served as the DIP as to all matters having to do with administration of the estate, including, in particular, disclosure and recovery of assets.").

> describing documents or information covered by a Trustee Privilege
> shall be filed under seal.

Privilege Order ¶ 8.  Moreover, the Privileges Order provided that nothing in the order would

prevent the Debtor "from asserting any and all privileges concerning legal matters unrelated to

the Investigation Topics, such as **unrelated** criminal allegations . . ."  *Id.* ¶ 4 (emphasis added).

52.    Given that the privilege has passed to the Trustee (as confirmed in the Privileges

Order), there is nothing inappropriate about the Trustee seeking documents from the Debtor's

counsel, even if all of those documents were privileged (which is, by no means, a forgone

conclusion).  For these and other reasons, the Bankruptcy Court properly authorized the Trustee

to issue subpoenas upon the Debtor's counsel.  Consistent with the Privileges Order, the

subpoenas do not seek privileged materials unrelated to the Investigation Topics.[34]

53.    Moreover, the Trustee has **not** shared privileged communications with the

Government or otherwise violated his obligations under the Privileges Order.  The Debtor's

suggestion that the Trustee would have no "compunction" of doing so is entirely unfounded.[35]

Although the Trustee did share with the Government his **conclusion** that the Mahwah Mansion

was equitably owned by the Debtor, he did not (as the Debtor asserts) share his legal analysis,

which, in any event, was not based on privileged information the Trustee obtained during

discovery.

54.    To the extent the Trustee may seek to waive any privilege in the future, he will, of

course, comply with the terms of the Privileges Order—which, in the absence of the Debtor's

---

[34]  As defined in the Privileges Order, the "Investigation Topics" concern "(i) assets (including actual or potential causes of action) that (A) are or were held by the Debtor, (B) are or were held by others that the Trustee is investigating pursuant to the Rule 2004 Subpoenas for purposes of determining whether they hold or may have information about assets in which the Debtor holds or may have an interest, or (C) otherwise relate to, or could be brought into, the Debtor's estate, (ii) the Debtor's financial condition (including, without limitation, liabilities of the estate), or (iii) activities related to the administration of the estate . . ."  Privileges Order ¶ 2.

[35]  Mem. of Law at 25.

consent, would require relief from the Bankruptcy Court.  That there may be "disputes" over the Trustee's ability to waive the privilege is meaningless.[36]  If such disputes occur, they will be initiated on notice to the Debtor, and he will have the opportunity to be heard.

### 3.   Mahwah Adversary Proceeding Does Not Adversely Affect Debtor's Rights as Criminal Defendant

55.     The Debtor's stated concern about losing access to evidence at the Mahwah Mansion due to the PI Order is another red herring.  The Debtor has concocted this argument purely for strategic reasons.  The Debtor rests his concern on the idea that the Mahwah Mansion has been turned over to the Trustee for disposition, but this is flatly untrue.  The Bankruptcy Court will not determine whether the mansion is property of the estate until the Trustee's adversary proceeding has been litigated.  Even then, assuming the Trustee prevails on the ownership question, he will need further Bankruptcy Court approval of any sale, on notice and hearing to all parties in interest.  At that time, the Debtor will have the opportunity to raise any concerns he might have about the Trustee's proposed sale.[37]  And before that time, nothing precludes the Debtor's criminal counsel from accessing the Mahwah Mansion or taking photographs or recording necessary video of it.

56.     The PI Order provides interim relief to protect the Mahwah Mansion and in no way prejudices the Debtor.  If anything, the PI Order helps the Debtor insofar as it aims to preserve the mansion and its contents in their current condition.  Nothing in the PI Order

---

[36]   Mem. of Law at 14.

[37]   The Court should also not give any credence to the Debtor's assertion that the Trustee has abandoned or sought to abandon property at the Sherry Netherland Apartment.  This is demonstrably false.  In fact, on April 14, 2023, the Trustee filed a motion seeking to limit notice with respect to a generic motion to abandon certain property [Bankr. ECF No. 1666].  Following the objection of Bravo Luck Limited (which raised the concern that such forthcoming motion would seek to abandon property at the Sherry Netherland apartment), the Trustee stated on the record at the hearing on April 20, 2023 that the property he sought to abandon has no impact on the Sherry Netherland Apartment, which statement was adopted by the Bankruptcy Court in its subsequent order.  *See* Bankr. ECF No. 1809, attached as **Exhibit 11** to the Bassett Declaration.

prevents the Debtor or his counsel from visiting the property.  In fact, the PI Order expressly states that anyone may enter the property with the approval of ***this Court or the Bankruptcy Court***,[38] and it also allows parties to access the mansion with the Trustee's consent.  The Trustee has no objection to the Debtor's counsel visiting the mansion, subject to appropriate safeguards, and does not contest the authority of this Court to grant such approval.  To date, however, counsel for the Debtor has never made any such request to the Trustee, which further demonstrates that this argument has been concocted for strategic reasons.[39]

57.     The Debtor's arguments related to the Settlement Agreement are also unfounded. The sole purpose of the Settlement Agreement is to address the fact that the Mahwah Mansion is both (i) an alleged asset of the Debtor's chapter 11 estate and (ii) a property identified by the Government for forfeiture in the event the Debtor is convicted.  This agreement is not only appropriate, but necessary, to protect the rights of both the Debtor's creditors in his chapter 11 case and the victims of his alleged fraud.  Nothing in the Settlement Agreement prejudices the Debtor's rights, nor does it reflect improper coordination by the Trustee and the Government.

58.     Finally, the Debtor's purported outrage about the Trustee having attached certain photographs taken at the Mahwah mansion to his complaint in the Mahwah Adversary Proceeding is entirely misplaced.  The Trustee redacted all private/personal information in these photographs before attaching them to his complaint.  The Trustee did not, as the Debtor asserts, acknowledge that the photos were "inadvertently" filed on the public docket.[40]  In reality, the

---

[38]   The situation is no different than with respect to the Sherry Netherland Apartment, where the related order entered by the Bankruptcy Court permitted the Debtor to seek authorization from this Court to visit the apartment, which his counsel did.  *See* ECF No. 79

[39]   In any event, the Debtor's professed concerns about the rights of his alleged victims in an eventual forfeiture proceeding are particularly precious, as forfeiture will only occur if the Debtor has been convicted.

[40]   Mem. of Law at 10 n. 4.

Trustee reached out to Debtor's counsel to coordinate the filing of a joint motion to seal certain exhibits of the Mahwah complaint,[41] and the Debtor's counsel never responded to the Trustee, which speaks volumes about the Debtor's "concerns" on this issue.

> ### iv.  Factor 5: Interests of the Bankruptcy Court Weigh Against Stay of Bankruptcy Cases

59.     A bankruptcy court, like any court, has a "well-recognized interest in disposing 'of the causes on its docket with economy of time and effort for itself.'" *Louis Vuitton*, 676 F.3d at 104 (*quoting Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).  This interest is particularly acute here, given the numerous dilatory tactics of the Debtor, his family members, and his business associates to slow the Trustee's investigation.  The Debtor's chapter 11 case has already been pending for nearly 19 months, leading the Bankruptcy Court to express frustration on multiple occasions with the various delays initiated by the Debtor and others.  Staying the case in its entirety for months, if not years, would clearly run counter to the Bankruptcy Court's interests in finally resolving the Debtor's case and removing it from the court's docket.

> ### v.  Factor 6: Public Interests Weighs Against Stay of Bankruptcy Cases

60.     The public has an interest in a well-functioning bankruptcy system.  The Stay Motion, however, seeks to put the Bankruptcy Cases on hold for an indeterminate amount of time; indeed, it may take years for all appeals to have been resolved in connection with these criminal proceedings.  The Debtor should not be able to enjoy the benefits of bankruptcy (including a worldwide automatic stay against creditor actions) while not having to comply with any of its burdens (including cooperating with the Trustee and surrendering property of the estate and any recorded information).  As one court aptly observed:

---

[41]   *See* E-mails to Eric Henzy regarding Motion to Seal Exhibit to Mahwah Complaint, attached as **Exhibit 12** to the Bassett Declaration.

> absent something more, it simply cannot be the case that protections
> afforded to an allegedly fraudulent debtor outweigh the need to protect
> creditors and the bankruptcy system as a whole. . . . [If that were the
> case,] . . . [d]ebtors would be entitled to hold their creditors in abeyance
> indefinitely while allegations of misconduct run their course.  To do so
> would frustrate the public interest in expeditious resolution of
> bankruptcy proceedings.

*Layng v. Garcia* (*In re Garcia*), 569 B.R. 480 (Bankr. N.D. Ill. 2017).  The stay the Debtor

requests would implicate these very concerns by allowing the Debtor to hold his creditors

hostage for an indeterminate amount of time while he and his assets remains insulated from civil

liability.  For this reason, the public interest weighs strongly against granting the Stay Motion.

**III.    Respondents Do Not Object to Categories (i), (ii), and (iv) of Debtor's Proposed
Alternative Relief**

61.    Implicitly acknowledging that less drastic measures exist to address his stated

concerns than a global stay of the Bankruptcy Cases, the Debtor seeks four categories of relief in

the alternative.  Specifically, he asks this Court to:

> (i) modify the Protective Order to allow production of the discovery in
> this case to the Trustee; (ii) direct that Mr. Kwok's defense team
> continue to be permitted access to the Mahwah Facility through the
> pendency of this case and any resulting appeals; (iii) preclude the
> government from facilitating the sale of the Mahwah Facility in the
> Bankruptcy Cases through the pendency of this case and any resulting
> appeals; (iv) order that the government not solicit or receive from the
> Trustee any information or records that are subject to any privileges
> belonging to Mr. Kwok and identify any such materials already
> provided by the Trustee.[42]

62.    The Trustee generally takes little issue with these requests.  As to the first item,

the Trustee is withdrawing his request for this discovery, at this time, as noted above.

Accordingly, the Debtor's concern in this regard is addressed and this matter is now moot.  Items

(ii) and (iv) are generally acceptable to the Trustee, subject to potential safeguards surrounding

---

[42]    Mem. of Law at 30.

the Debtor's counsel's access to the Mahwah Mansion.  Finally, item (iii) is a non-issue at present because any relief related to an eventual sale of the Mahwah Mansion is premature.  The Bankruptcy Court has not determined that the Mahwah Mansion is property of the estate, and therefore it cannot be sold by the Trustee.  Any concerns the Debtor may have regarding a sale of the mansion can be addressed later, if and when a proposed sale is presented to the Bankruptcy Court, or the Debtor can renew his request to this Court if appropriate.

IV.    **Court Should Deny Ms. Wang's Request for Global Stay of Bankruptcy Cases**

63.    Finally, and for the same reasons set forth above, the Court should also reject Ms. Wang's request for a global stay.  Indeed, her request stands on even weaker grounds than the Debtor's request, as she is ***not*** a debtor in the Bankruptcy Case, nor a defendant in any of the pending adversary proceedings in the Bankruptcy Cases.  Because there is no proceeding pending against her in connection with the Bankruptcy Cases, there is no proceeding as to Ms. Wang that this Court could even stay.

**CONCLUSION**

64.    For the reasons set forth above, the Stay Motion should be considered and decided by the Bankruptcy Court.  To the extent this Court is inclined to consider the merits of the Stay Motion, the Respondents submit that the Stay Motion and the Joinder should be denied as to the request for a stay, but granted as to the requested form of alternative relief (subject to the modifications discussed herein).

*[Remainder of page intentionally left blank.]*

Dated:      September 21, 2023

By: */s/ Nicholas A. Bassett*
Nicholas A. Bassett
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

*and*

Luc A. Despins
Adam J. Fee
G. Alexander Bongartz
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
lucdespins@paulhastings.com
adamfee@paulhastings.com
alexbongartz@paulhastings.com

*Counsel for Luc A. Despins, as Chapter 11
Trustee, Genever Holdings Corporation, and
Genever Holdings LLC*