# EXHIBIT H

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

```
-------------------------------------------------------x
                                               :
In re:                                         :      Chapter 11
                                               :
HO WAN KWOK, et al.,[1]                        :      Case No. 22-50073 (JAM)
                                               :
                Debtors.                       :      (Jointly Administered)
                                               :
-------------------------------------------------------x
```

**NOTICE OF CHAPTER 11 TRUSTEE REGARDING MOTION FOR RETURN OF**
**PROPERTY FILED BY ALLEGED CUSTOMERS OF HIMALAYA EXCHANGE IN**
**DEBTOR'S CRIMINAL PROCEEDINGS PENDING IN UNITED STATES DISTRICT**
**COURT FOR SOUTHERN DISTRICT OF NEW YORK**

Luc A. Despins, in his capacity as the trustee (the "Trustee") in the chapter 11 case of Ho

Wan Kwok (the "Debtor"), hereby provides notice that, on December 6, 2023, counsel

purportedly representing 3,345 customers of the Himalaya Exchange[2] filed a motion (the

"Motion") in the criminal case pending against the Debtor in the United States District Court for

the Southern District of New York [Case No. 1:23-cr-00118-AT] (the "Criminal Case") seeking

the return of property seize by the United States in connection with the Criminal Case.  The

deadline to respond to the Motion has been set for December 19, 2023.

---

[1]   The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles
      Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever
      Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation.  The
      mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings
      LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok
      (solely for purposes of notices and communications).

[2]   Himalaya Exchange is a British Virgin Island registered company named Himalaya International Clearing
      Limited.

A copy of the Motion [Criminal Case ECF No. 186] is attached hereto as **Exhibit A**.  The U.S. Department of Justice has already responded to the Motion.  A copy of that response is attached hereto as **Exhibit B**.

As the Court will recall, the Court previously found, in connection with its order granting a preliminary injunction against the Debtor and certain related parties, that Himalaya Exchange and various other affiliated Himalaya entities are "all under the leadership of the Debtor"[3] and "business vehicles for the Debtor."[4]  The Trustee also notes that numerous proofs of claims have been filed in this chapter 11 case asserting claims based on "investments" in or with Himalaya Exchange.

The Trustee is reviewing the Motion and evaluating next steps.  Given that the Motion, if granted, would interfere with the administration of this chapter 11 case, including as it relates to the resolution of claims and the distribution of estate property, the Trustee is available the Court's discretion, to the extent the Court wishes to schedule a status conference on this matter.

Dated:     December 8, 2023

LUC A. DESPINS,
CHAPTER 11 TRUSTEE

By: */s/ G. Alexander Bongartz*

G. Alexander Bongartz (admitted *pro hac vice*)
Avram E. Luft (admitted *pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue

---

[3]  *Corrected Memorandum of Decision Granting in Part Motion for Preliminary Injunction*, dated January 13, 2023, Adv. Proc. No. 22-5032 (JAM) at 60 ("[T]he Himalaya entities, NFSC, GTV, GNews, and ROLF are all **under the leadership of the Debtor** and share the same common goal of 'taking down the CCP.'") (emphasis added).  The Himalaya entities include Himalaya Exchange.  *See id.* ¶ 4 ("NFSC is associated, affiliated, and/or connected with the Himalaya Global Alliance (together with affiliated Himalaya entities, such as Himalaya Exchange and Himalaya Farms, 'Himalaya')").  *See also id.* ¶ 2 ("The GSeries includes the following entities: Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu.").

[4]  *See id.* ¶ 7 ("The Debtor is the **leader** of The Whistleblower Movement, NFSC, ROLF, and Himalaya. The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the purposes of the Debtor, serve as **business vehicles for the Debtor**, and their members are **personally loyal to the Debtor**.") (emphases added).

2

New York, New York 10166
(212) 318-6079
aviluft@paulhastings.com
alexbongartz@paulhastings.com

   *and*

Nicholas A. Bassett (admitted *pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C., 20036
(202) 551-1902
nicholasbassett@paulhastings.com

   *and*

Douglas S. Skalka (ct00616)
Patrick R. Linsey (ct29437)
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, Connecticut 06510
(203) 781-2847
dskalka@npmlaw.com
plinsey@npmlaw.com

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

-------------------------------------------------------x
                                                        :
In re:                                                  :      Chapter 11
                                                        :
HO WAN KWOK, *et al.*,[1]                               :      Case No. 22-50073 (JAM)
                                                        :
                        Debtors.                        :      (Jointly Administered)
                                                        :
-------------------------------------------------------x

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on December 8, 2023, the foregoing Notice was electronically filed. Notice of this filing was sent by e-mail to all parties to the above-captioned chapter 11 case by operation of the Court's electronic filing ("<u>CM/ECF</u>") system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Dated:      December 8, 2023                   By: */s/ G. Alexander Bongartz*

                                               G. Alexander Bongartz (admitted *pro hac vice*)
                                               Avram E. Luft (admitted *pro hac vice*)
                                               PAUL HASTINGS LLP
                                               200 Park Avenue
                                               New York, New York 10166
                                               (212) 318-6000
                                               aviluft@paulhastings.com

                                               *Counsel for the Chapter 11 Trustee*

---

[1] The Debtors in these chapter 11 cases are Ho Wan Kwok (also known as Guo Wengui, Miles Guo, and Miles Kwok, as well as numerous other aliases) (last four digits of tax identification number: 9595), Genever Holdings LLC (last four digits of tax identification number: 8202) and Genever Holdings Corporation. The mailing address for the Trustee, Genever Holdings LLC, and Genever Holdings Corporation is Paul Hastings LLP, 200 Park Avenue, New York, NY 10166 c/o Luc A. Despins, as Trustee for the Estate of Ho Wan Kwok (solely for purposes of notices and communications).

**Exhibit A**

**Motion**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **23 Cr. 118 (AT)** |
| v. | |
| **HO WAN KWOK,** <br> a/k/a "Miles Guo," <br> a/k/a "Miles Kwok," <br> a/k/a "Guo Wengui," <br> a/k/a "Brother Seven," <br> a/k/a "The Principal," <br> **KIN MING JE,** <br> a/k/a "William Je," and <br> **YANPING WANG,** <br> a/k/a "Yvette," <br> Defendants., | **MOTION FOR RETURN OF PROPERTY** |

Undersigned counsel represents 3,345 customers of the Himalaya Exchange ("the Exchange"), who hold Himalaya Dollar (HDO) and Himalaya Coin (HCN) cryptocurrency ("petitioners"). Pursuant to Federal Rule of Criminal Procedure 41(g), petitioners move for return of their property seized by the United States in *United States v. Kwok et al,* 23 CR 118 (SDNY). The petitioners have a distinct, identifiable third-party interest in the forfeited property. Petitioners file the attached Memorandum in Support of this Motion.

Dated: December 6, 2023

> Myer and Scher LLP
> By:      /s/ Jamie Scher
> NY 2488435
> 377B South Oyster Bay Road
> Plainview, NY 118013
> Jamie@myerandscher.com
> (516) 713-0655
>
> FormerFedsGroup.Com LLC
> By:      /s/ Brad Geyer
> Bradford L. Geyer, PHV pending
> NJ 022751991
> Suite 141 Route 130 S., Suite 303
> Cinnaminson, NJ 08077
> Brad@FormerFedsGroup.Com
> (856) 607-5708

**CERTIFICATION OF CONFERENCE AND NOTICE**

I, Bradford Geyer, certify that counsel I have conferred with counsel for the Government in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court, and have been unable to reach agreement. I also hereby certify that on on December 6, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the Southern District of New York.

FormerFedsGroup.Com LLC
By:      /s/ Brad Geyer
Bradford L. Geyer, *PHV pending*
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA        S1 23 Cr. 118 (AT)

v.

HO WAN KWOK,
a/k/a "Miles Guo,"
a/k/a "Miles Kwok,"
a/k/a "Guo Wengui,"
a/k/a "Brother Seven,"
a/k/a "The Principal,"
KIN MING JE,
a/k/a "William Je," and
YANPING WANG,
a/k/a "Yvette,"
Defendants.

MEMORANDUM IN SUPPORT OF MOTION FOR RETURN OF PROPERTY

Table of Contents

I.    Introduction...........................................................................................................3

II.   Factual Background ...............................................................................................4

      A. The Seizure ......................................................................................................4

      B. The Himalaya Exchange ..................................................................................5

           1. Overview…………………………………………………………………..5

           2. Customer Onboarding Compliance, AML, and KYC Checks…………….8

           3. Customer Base…………………………………………………………… 9

           4. Jurisdiction and Registration…………………………………………….10

           5. Financial and Audits…………………………………………………….10

                a.    Coin Price Harmed By Seizure…………………………………….10

                b.    Audit Reports and Financial Analysis…………………………….12

                c.    No Loss to Customers or Redemptions………………………….12

III.  Suspicious Actors…………………………………………………...……………13

      A. Adverse Social Media………………………………………….……………13

      B. False Complaints to Regulators………………………………………………...14

      C. The United States Department of State Report……………………………………14

IV.   Motion for Return of Property Pursuant to Federal Rule Of Criminal Procedure 41(g)...15

      A. The Equities Require Return Without Further Delay……………………………..16
      B. Petitioners Have Distinct, Identifiable Interest in the Forfeited Funds and Were Not
         Given Proper Notice of the Seizure………………………………………………16
      C. Confidentiality is Imperative to Petitioners………………………………………17
      D. Procedures for Reasonable Conditions to Protect Access to the Property
         are available under Rule 41(g)…………………………………………………17
V.    Conclusion……………………………………………………………...……….19

# I.    INTRODUCTION

Undersigned counsel represents in excess of 3,345 customers of the Himalaya Exchange ("the Exchange"), who hold Himalaya Dollar (HDO) and Himalaya Coin (HCN) cryptocurrency ("petitioners").[1] Pursuant to Federal Rule of Criminal Procedure 41(g), petitioners move for return of their property seized by the United Stares in *United States v. Kwok et al,* 23 CR 118 (SDNY). The petitioners have a distinct, identifiable third-party interest in the forfeited property. In the GOVERNMENT'S MOTION PURSUANT TO TITLE 18, UNITED STATES CODE, SECTION 3771 filed in March 2023, the United States characterizes the petitioners as "victims" of the Defendants. As outlined in this Motion, the seizure of the assets in this case has made them "victims" of the seizure by the United States.

From its inception, the Himalaya Exchange has performed extensive due diligence in its establishment of a safe customer base and has consistently met stringent audit and compliance standards. At the date of the seizure the reserve was at 100%. Based on an analysis of financial records of the Exchange and Himalaya International Reserves Limited, key findings are as follows:

- The operating activity of the Himalaya Entities demonstrates an active business with highly vetted customers and has generated sufficient revenue to meet its operation cost without recourse to any customer funds.
- Customers were able to redeem $100,000 HDO per month back to USD into their accounts. All redemptions were honored unless they did not comply with specific compliance and/or AML rules. The Petitioner's deposits, current balances of HDO, HCN and redemptions indicate a properly run and actively traded exchange.
- The Petitioners have not experienced any misrepresentation, fraud or loss of funds from the Exchange.

---

[1] https://himalaya.exchange/web/hex Undersigned counsel estimates the number of Exchange customers will increase by thousands as word of mouth reaches other victims who until now have never received notification from the Government about their funds being seized and it becomes clear that our intentions are authentic and genuine. Among the challenges that exist, many Exchange customers are fearful and ironically assume the U.S. government action may be a stalking horse for other governments.

## II.     FACTUAL BACKGROUND

### A.  THE SEIZURE

Pages 35-36 of the Superseding Indictment in *United States v. Kwok* has conclusory allegations regarding the Defendants' use of the Himalayan Exchange to perpetrate a fraud scheme. From the perspective of Exchange customers, these allegations have little or no connection or relevance to the forfeiture plight involving their funds held in constructive trust by the Himalaya Exchange. It then contains the relevant forfeiture allegations on pages 35-36 ¶ 55 j, k, m, o, p and s allowing the United States to seize millions of dollars in accounts of the Himalayan Exchange:[2]

> j. $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

> k. $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

> m.. $10,008,284.04 in United States currency formerly on deposit in Account Number MBil 0133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

> o. $272,350,313.76 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya International Reserves Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

> p. $310,594.31 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya International Financial Group Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

---

[2] This is also outlined in the Government's Bill of Particulars (Docket 38)with the addition of paragraph l. $7,715.00, in United States currency formerly on deposit in Account Number 7801000589 at FV Bank held in the name of "Himalaya International Financial Group, Ltd.," seized by the Government on or about September 20, 2022. There also seems to be discrepancy between the amount seized and the audit reports reviewed by counsel. Counsel suspects this is a result of banking transfers and activity that are not in the public record. For purposes of this filing, the money contained in hard currency contained in licensed bank accounts is held now by the U.S. government.

s. $161,809.47 in United States currency formerly on deposit in Account
Number MBI10183-0000 at Mercantile Bank International held in the name of
"Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October
16, 2022.

The seizure by the United States of these accounts comprises of the majority of the stable
coin reserve of which the Exchange customers and current petitioners are the beneficiaries. The
Exchange at all times since its launch has maintained the stable coin reserve at 100%. Hence, all
the stable coins issued were backed 1HDO:$1USD in the bank.  The reserve was at 100% at the
date of seizure from the Exchange account. There has been no fraudulent use of or
misappropriation of customer funds at any time. In fact, as outlined below, the Exchange had an
external audit of the stable coin reserve twice, the last being shortly before the seizure date. These
audits confirmed the reserve was fully intact.

## B.  THE HIMALAYA EXCHANGE

### 1.  OVERVIEW

The Himalaya Exchange ("Exchange") is a British Virgin Islands ("BVI") registered
company named Himalaya International Clearing Limited, trading as Himalaya Exchange. It
operates a user-to-user, centralized cryptocurrency exchange platform that consists of an engine
that operates a continuously matched order book in respect to virtual asset products. It is a platform
for clients to trade, store and manage the Himalaya cryptocurrencies, namely the Himalaya Coin
("HCN") and the Himalaya Dollar ("HDO"). HCN is the Exchange's trading coin, a
cryptocurrency priced by supply and demand. HDO is a stable coin, structured with the aim of
maintaining its value at 1:1 to the US Dollar. Exchange customers can redeem HDO to US Dollars
from their HDO balance in accordance with the exchange redemption terms outlined below. HCN

is issued by Himalaya International Financial Group Limited. HDO are issued by Himalaya International Reserves Limited.

The Exchange was launched to bring financial freedom to everyone in the world as well as to help those who are wrongly persecuted, including those having their assets taken illegally, or held for ransom with the threat of it being taken by the Chinese Communist Party ("CCP") without any justified reason. Exchange customers have no connection to Defendants. The Exchange is extremely popular among non-Americans, in particular those with Chinese ethnicity, as they rely on the Exchange being professionally and securely managed and the Exchange will not compromise any personal information to foreign governments, other than what is legally required. It also allows politically persecuted people a tool for financial security of their legitimate money (e.g. those people attending peaceful demonstration in Hong Kong have their bank accounts shut down and in general those targeted/persecuted/intimidated by the CCP that have had their assets confiscated). The Exchange is seen by the CCP as a threat which undermines their power to confiscate assets (illegally) and control the Chinese economy. Included in the affected group whose funds were seized by the United States are non-Americans whom the Chinese government views as being dissident.

The launch of the Exchange followed a staged process. Phase 1 client registration was launched in April 2021. This was pre-launch registration of private participation customers. Onboarding was in line within permitted jurisdictions only (non-US and others) and fully complied with "Know Your Customer" (KYC) procedures.

To sign up, the Petitioners had to undergo a formal on-boarding procedure and KYC and anti-money laundering (AML) checks. The onboarding process with KYC and AML checks is set out in more detail below. Once approved by the compliance officials the Petitioners had access to

their Himalaya Exchange account and deposited US dollars to purchase HDO Credits upon launch of the Exchange with US Dollars on a 1:1 ratio.

The Whitepaper,[3] which is discussed in the Superseding Indictment, explains that the HDO would only be available to members of the Exchange. Members of the Exchange were able to participate in an issuance of the Himalaya Dollar through purchase of HDO Credits through the Exchange. The Whitepaper also explains that in order to provide liquidity support for HDO Credits, and as a safeguard against price volatility, a reserve would be established by the Issuer (Himalaya International Reserves Limited). The Reserve was managed with the aim of maintaining its value at a level equal in value in US Dollars to the value of HDO in circulation.

In July 2021, during Phase 2, the Exchange launched two cryptocurrencies: HCN and HDO. Both coins are Ethereum-based tokens with backwards compatibility with the ERC-20 standard. The HDO is issued by Himalaya International Reserves and pegged to the US Dollar. HCN is not pegged to the value of any fiat currency and so its value is subject to supply and demand in the secondary market. This is the trading coin on the Exchange. Members are able to trade HCN Credits on the Exchange. Users who had registered with the Exchange were allowed to purchase pre-allocated HCN just before launch at the initial HCN issuance price of US $0.10 per HCN using HDO credits. The opening price for the HCN at launch was $0.10 per HCN.

On November 1, 2021, Phase 3 involved the full launch of the Himalaya Exchange. Registered users were now able to trade in HCN using HDO to purchase HCN and receive HDO on sales. Customer registration continued for those who applied to the Exchange with the same onboarding requirements outlined below.

---

[3] https://hch-hex-pub-lon-p5-compli-01.s3.eu-west-2.amazonaws.com/hedocs/hdo_whitepaper_eng_v6e.pdf

In January 2022, Phase 4 involved the launch of Himalaya Pay ("HPay"). This app, available in some permitted jurisdictions to existing Exchange members, allows peer to peer transfers of HDO and HCN for Exchange members only. The app also allows gift card purchases using HDO for use with Exchange approved merchants to purchase goods, again in some permitted jurisdictions. The app is not available for use in the US or for US residents.

The HDO is multi-functional and allows members to purchase the trading coin HCN and purchase gift cards which can be used to purchase goods from approved Exchange ecosystem merchants. Merchant purchases using gift cards can be undertaken by members via HPay, which also allows peer-to-peer transfers between Exchange customers.

As discussed below, the stable coin audit reports conducted on December 15, 2021 and July 31, 2022 show that the Exchange maintained a 100% reserve in US dollars with the ratio of equivalent 1 HDO to $1. The last audit report was done just prior to the seizure where the reserves were at 100%.

2. **CUSTOMER ONBOARDING COMPLAINCE, AML AND KYC CHECKS**

The Exchange operates strict onboarding procedures. As discussed above, these procedures include rigorous AML and KYC checks as part of the Exchange's on-boarding process. The compliance process also involves customer registration, identification and verification, name screening, risk assessment, and ongoing due diligence. The extensive AML and compliance procedures include enhanced due diligence (EDD), Sanction and Politically Exposed Person (PEP) screening, periodic account checks and reviews, and transaction monitoring.

When applying to register for an Exchange account, Petitioners were first required complete a KYC and AML questionnaire with a number of questions including, but not limited to, their personal details including their country of residence and source of funds. As a further

8

safeguard, before they submitted their registration, they were required to declare that they were not residents of the US, Canada or Japan. These are not the only jurisdictions which are prohibited but these three countries were further highlighted with a check box for the customer to declare they are not a resident in those jurisdictions. Petitioners were also required to verify their identity and provide official identity documentation. They were directed to identity verification software provided by Jumio, which provides artificial intelligence (AI) facial recognition checks against the ID submitted.

Some Petitioners experienced their paperwork being assessed by compliance officers and further review was undertaken before their account was approved. Some were asked to provide additional bank statements, source of wealth information, and source of funds information. Petitioners also experienced ongoing reviews of their accounts and transaction monitoring and they were asked for further financial or other documentation. Further, as part of their own AML and compliance procedures, the Exchange's banking partners also required customers' KYC and other information in order to allow deposits and redemptions from each customer. This shows the high standards the Exchange maintained as well as additional financial safeguards through the banks, who are independent.

### 3. CUSTOMER BASE

The Exchange customers are comprised of independent investors who reside in countries where it is permissible to invest in a stable coin/trading coin exchange. They range from small business owners to executives, people in the education and health care industries--pretty much any vocation you would associate with a given population. They are non-Americans with some level of disposable wealth to engage in speculative investments. The Exchange customers have no association with organized crime or illicit trade anymore that this can be alleged against customers

of the New York Stock Exchange. While many customers of Chinese ethnicity and are aligned philosophically with the pro-democracy movement in China, this is not true for all the  investors who merely saw the Exchange as a good investment opportunity.

### 4.  JURISDICTION AND REGISTRATION

It is clear from the onboarding process outlined above that the Exchange prohibited onboarding of U.S. residents. The  Exchange does not offer any of its products or services in those excluded jurisdictions. In order to register as a user of the Exchange, the prospective user is required to indicate their personal details including their country of residence. Anyone in an excluded jurisdiction is automatically rejected as the Country does not appear in the drop-down menu to select. The U.S. is one of the prohibited and excluded jurisdictions.  Petitioners are required to notify the Exchange if they move jurisdictions in which they are resident, so the Exchange can assess whether they can continue to provide services in the new Country.

### 5.  FINANCIALS AND AUDITS

Each Petitioner and customer of the Exchange is able to log into their own account and see all their records which includes HCN and HDO balances, deposits, trades, redemptions and HPay activity. Each Petitioner signed a consent Form for their information to be provided by the Exchange to their lawyer. This includes their deposits, redemptions, HDO and HCN balances. This was requested from the Exchange and has been provided.

#### a)  Coin Price Harmed By Seizure

Exchange customers control their accounts and are able to buy and sell HCN. If they buy HCN they will use the HDO to purchase and if they sell they will receive HDO for the sale. This is reflected in their account trading activity and HCN and HDO balances. HCN is valued by supply and demand, which causes its trading price to fluctuate daily. Further, HCN is exclusive to the

Exchange and cannot be transferred to other Exchanges. Petitioners only have the ability to retain and realize their assets in the Exchange. The value of the HCN is an important asset to the Petitioners who have purchased the HDO with USD and used the HDO to purchase the HCN. The price of one HCN at the time of seizure was around 24 HDO equivalent to $24. The current price is fluctuating around 14HDO equivalent to $14USD.

The HCN price has dropped significantly as a result of the seizure and redemptions are now unavailable. This is because the Department of Justice has seized the reserve from which the Exchange paid out customer redemptions. Redemptions were paused by the Exchange as result. The value of the HCN just prior to seizure  compared to the current value reflects an HCN devaluation of approximately $136M USD. If the Exchange crashes and the HCN plumets or the Exchange has to cease doing business, due to the seizures and lack of long-term reserves, then the Petitioners will lose their entire HCN assets with no recourse. It seems little consideration has been given to the substantial loss which will be caused to the Petitioners by the seizures. The Department of Justice has claimed that seizing the funds will protect the "victims." Unfortunately, the effect is the opposite and the consequences of their actions will cause catastrophic losses to the Petitioners and many other customers of the Exchange who will be irreparably harmed.

Exchange customers supremely value trust and the herculean efforts the Exchange has endured to protect customer information, which to many customers is considered a "life or death" matter because of the human rights issues and other threats of persecution for a certain class of Exchange customers as stated above. There is no other reason for this protection of data, and  in particular protection of their personal details.   Since all customers of the Exchange have been vetted.

**b) Audit reports and Financial Analysis**

Stable coin audits undertaken by independent auditors concluded that all HDO are 100% backed by currency. They further expressed the opinion that Himalaya International Reserves Limited's financial reporting was accurate and complete. As noted above, at the date of the seizure the reserve was at 100%.

**c) No Loss to Customers or Redemptions**

Exchange records provided with the consent of the Petitioners show that no customer had any losses as a result of the initial HCN coin offering and those that did trade the initial coins in fact made profits. Some customers then requested redemptions of those profits which the Exchange processed in accordance with the redemption policy. Further, those that did not trade the initial HCN or part of their HCN also had no losses as the value of the HCN coin increased since issuance and has not dropped below the initial purchase price of $0.10 per coin. Subsequent trading of HCN between customers has been carried out at the current market price as would be expected from a trading.

Redemptions are the process where a customer makes a request to convert their HDO back into USD paid directly into the customer's named bank account. It is clear from their records that numerous Petitioners received redemptions from the Exchange. This process involved the customer requesting the redemption by logging into their account. The Exchange set the limit of $100k per month. The records received clearly indicate that the Petitioners were given many redemptions and the total figure is substantial in value. This again supports the fact that the Petitioners have not been defrauded and is indicative of a properly run Exchange. Further, from the information it is clear that there are not substantial losses as stated in the indictment but that there are substantial profits and gains made by the Petitioners.

### III.    SUSPICIOUS ACTORS

The Petitioners believe that they, and the Exchange itself, have been the target of a CCP operation, designed to harm them and the Exchange.  These efforts seem to have been designed to undermine the  credibility and reputation of the Exchange resulting in serious damage. There have also been efforts to discover who the Exchange customers are and this has resulted in anxiety and fear in the customers.

### A.    Adverse False Social Media Attacks:

The Exchange has seen a prolonged campaign of defamatory statements on social media in particular on Twitter (now X) as well as online and in other media articles. On examination of these posts several of the social media accounts involved show a prolonged defamatory campaign bearing the hallmarks of bot accounts created for this purpose. Bots have been used to spread adverse tweets. They use the Chinese language and the wording of messages by the different social media posts, adverse media articles and the nature of the complaints to the banking partners and regulators bear striking similarities  with consistent themes. There are a  large number of potentially "fake" Twitter (now X) accounts being used to distribute negative messages regarding the Exchange.

There are also YouTube videos and accounts, images, exposure of Exchange employees and customers, exposure of regulatory notices, encouragement to report the Himalaya Exchange to regulators and other law enforcement bodies and alerting the FBI, SEC, UKSFO and ActionFraud UK by adding them to the message thread. The general messaging of these posts refer to scams, frauds, financial crimes, money laundering, criminal organization and other negative commentary.

This social media attack appears to have commenced around the time of the pre-registration phase of the Exchange, when the Exchange had not even launched and trading had not even commenced.

### B. False Complaints to Regulators

The Exchange was subject to cautionary notices posted on individual regulator websites that then appeared on twitter. Some twitter messages actively provided the regulator links and encouraged others to complain. The notices were in the jurisdictions of New Zealand, British Columbia (Canada), Bahamas, Portugal, Italy and Hungary. The Petitioners understand that all of these notices are now removed. It is apparent from the removal of the notices that regulators in each jurisdiction would have investigated and found no wrongdoing and decided to remove the cautionary notices.[4]

### C. The United States Department of State Report

The United States Department of State's report "*2022 Country Reports on Human Rights Practices: China (Includes Hong Kong, Macau, and Tibet),*[5] described some of the circumstances where Chinese dissidents have been targeted outside of China. It is understood that the CCP and its agents engaged in acts to intimidate or took reprisal against dissidents (amongst other groups)

---

[4] The following are the dates upon each notice was issued:

- BCSC (Canada) caution list & CSA (Central regulator Canada);
- IOSCO (Global) caution list;
- CMVM (Portugal) caution list;
- FMA (New Zealand) caution list;
- CONSOB (Italy) caution list;
- Securities Commission (Bahamas) caution list; and
- MNB (Hungary) caution list.

These notices have now been removed..

[5] https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/china/

outside of China. For example, Foreign Policy reported on March 29, 2022 on the government targeting of the Chinese diaspora, particularly *"Hong Kongers, Uyghurs, Tibetans, and Chinese dissidents, in countries such as the United Kingdom and Morocco. They reported threatening calls, cyberattacks, and harassment, including of family members in the PRC."*[6]

### IV.    MOTION FOR RETURN OF PROPERTY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)

#### A.  The Equities Require Return Now Without Further Delay

Rule 41(g) provides:
A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Rule 41(g) motion is an equitable remedy that is available only when there is no adequate remedy at law and the equities favor the exercise of jurisdiction. *De Almeida v. United States,* 459 F.3d 377, 382 (2d Cir. 2006); *see also  U.S. (Drug Enforcement Agency) v. One 1987 Jeep Wrangler Automobile,* 972 F.2d 472, 479 (2d Cir. 1992).  A third-party claimant contesting a criminal forfeiture may lack an adequate remedy at law if the claimant faces months or years of delay before the claimant may seek an ancillary proceeding in the criminal forfeiture action. *De Almeida,  459 F.3d at 382.*  In this matter, the trial is not scheduled to commence until April 8, 2024. The equities favor resolution of this matter now rather than continued delay that will irreparably harm petitioners. Through no fault of their own, petitioners are unable to liquidate their holdings in the Exchange.

---

[6] https://foreignpolicy.com/2022/03/29/china-threats-target-regime-opponents/ See also, https://www.justice.gov/usao-edny/pr/five-individuals-indicted-crimes-related-transnational-repression-scheme-silence;  https://www.theguardian.com/us-news/2022/mar/16/china-smear-democratic-candidate-us-congress

**B. Petitioners Have Distinct, Identifiable Interest in the Forfeited Funds and Were Not Given Proper Notice of the Seizure**

The petitioners have a distinct, identifiable third-party interest in the forfeited property pursuant to 21 U.S. Code § 853(n). Despite the government's claim that the notice was not practicable[7], the Exchange maintains confidential information about the customers of the Exchange. The government could have worked with the Exchange to make viable notice and execute a speedy confidential return of the seized funds. As the United States understands, the customers of the Exchange are ALL foreign nationals. Publication on the SDNY website was insufficient to reach them in their given languages. Customers who contacted undersigned counsel expressed fear and frustration about how little information was available about the condition of their funds and they had no idea when or if they would ever receive their funds back. There is a suspicion within the community, ill-founded no doubt, that the U.S. Government is working with the CCP to expose Exchange customers who are viewed by the CCP as dissidents. The undersigned counsel is not a risk assessment expert in this area and has no position regarding the credibility of these concerns, but it is impossible not to notice that this is a strong inference that has been drawn by the community and its clients.

---

[7] The cases cited to the Court in its Motion Pursuant to Title 18, United States Code, Section 3771 (Docket 10) are distinguishable from this case. For example, *See, e.g., United States v. Brown*, 20 Cr. 524 (KPF) "Upon the motion of the United States of America dated January 23, 2023, it is found that: (a) there are over one hundred thousand potential individual victims in this case; (b) there is no readily available up-to-date compilation of such individuals; and (c) it is impracticable to accord all of the potential victims notice." In this case, there are a limited number of victims, there is an up to date, though confidential, list of the victims, and thus the Government could have notified the victims upon seizure by working with the Exchange.

16

### C.  Confidentiality is Imperative to Petitioners

Further, as noted above, confidentiality is imperative to members of the Exchange because of the potential for political persecution. Counsel certifies under penalty of perjury that based upon information he has been provided, the petitioners have right, title and interest in the seized property and can provide additional information confidentially to support petitioners' claims.

### D.      Procedures for Reasonable Conditions to Protect Access to the Property are Available under Rule 41(g)

A variety of reasonable conditions are available for the speedy and confidential return of the petitioners seized funds in this matter. See Department of Justice Manual  9-111.125 - Trustees and Monitors in Forfeiture Cases.[8]  Because of the meticulous compliance procedures followed by the Exchange, this confidential and speedy return of the funds to petitioners  who are completely innocent parties, can be effectuated with minor cooperation between a designate from the United States Attorney's Office and undersigned counsel, through a controlled and protected procedure, that can also be subject to approval by this Court *in camera*.  Because the petitioners have already endured punishment in the form of confiscated funds and loss of significant returns on their investment, we request that the Honorable Court refrain from the appointment of a trustee, monitor receiver[9] because this will exacerbate their injury and further diminish the corpus of their investment.

---

[8] https://www.justice.gov/jm/jm-9-111000-forfeitureseizure#:~:text=The%20selection%20and%20appointment%20of,of%20a%20trustee%20or%20monitor.

[9]  The purpose of the trustee and monitor policy is to provide guidance for the appointment of trustees and monitors in Department of Justice federal forfeiture cases involving complex assets or business enterprises. The key distinction between a monitor and a trustee is that only a *trustee* has the authority to manage an enterprise. A *monitor* observes and reports. A *receiver* is a fiduciary who is responsible only to the court, and a *custodian* takes actual custody of the assets and may be recommended where a number of assets are located in a foreign country. In this case, all the details about investor identity and investment activity are meticulously organized, protected and preserved by the Exchange and all the information relevant to the Government's obligation to release the funds can be readily obtained, provided and reviewed.

One of the aspects of the seizure that caused outright alarm by certain customers of the Exchange was the rumor that the U.S. Department of Justice had attempted to seize the customer lists of the Exchange.  It is clear that their information cannot be protected even with strict compliance protections.[10]  With lives at stake, petitioners implore the Court not to entrust personally identifiable information involving third-party investors, with no known connection to the alleged criminal conduct, to the Government.

Further, the forfeiture statutes do not preclude, as a matter of law, the imposition of a constructive trust to protect these victims from further injury. *See United States v. $4,224,958.57* (Boylan), 392 F.3d 1002, 1003–1005 (9th Cir. 2004) (holding that victims of a large, fraudulent investment scheme established a sufficient legal interest in the seized proceeds through a constructive trust to confer on them standing to contest the forfeiture); *see also Willis Mgmt. (Vermont), Ltd. v. United States*, 652 F.3d 236, 238 (2d Cir. 2011). Such a constructive trust should be ordered by the Court to allow for the clearing, release, and redemption of the Petitioners funds.

---

[10] Many of the attorneys and staff assigned to this matter at the U.S. Attorney's office may sympathize with undersigned counsel's expressions of concern about information security since many of us (undersigned counsel as a former DOJ employee) have had had our clearance files compromised. See Office of Personnel Management data breach - Wikipedia; Final notices going out this week to the 21 million people whose data was stolen in the security clearance breach - The Washington Post, The Office of Personnel Management data breach was a 2015 data breach targeting Standard Form 86 (SF-86) U.S. government security clearance records retained by the United States Office of Personnel Management (OPM). One of the largest breaches of government data in U.S. history, the attack was carried out by an advanced persistent threat based in China, widely believed to be the Jiangsu State Security Department, a subsidiary of China's Ministry of State Security spy agency.  Approximately 22.1 million records were affected, including records related to government employees, other people who had undergone background checks, and their friends and family.  The breach included personally identifiable information such as Social Security numbers, as well as names, dates and places of birth, and addresses. State-sponsored hackers working on behalf of the Chinese government carried out the attack.

In this matter it would be serious concern if  Government ever were to consider it to be a good idea to obtain all account information from thousands of vulnerable Exchange customers who are located outside the United States requiring the Himalaya Exchange to unencrypt it and provide it to the US Government, when the US Government has a terrible track record of protecting such information.

## V.     CONCLUSION

Based on the foregoing, pursuant to Federal Rule of Criminal Procedure 41(g), petitioners move for return of their property seized by the United Stares in *United States v. Kwok,* 23 CR 18 SDNY), and as that the Court adopt the aforementioned procedure for the confidential and speedy return of their property.

/s/ Jamie Scher
Jamie Scher
NY 2488435
Myer and Scher LLP
377B South Oyster Bay Road
Plainview, NY 118013
Jamie@myerandscher.com
(516) 713-0655


/s/ Brad Geyer
Bradford L. Geyer, PHV pending
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708


### CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the Southern District of New York.

/s/ Brad Geyer
Bradford L. Geyer, PHV pending
NJ 022751991
Suite 141 Route 130 S., 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>**HO WAN KWOK,**<br>a/k/a "Miles Guo,"<br>a/k/a "Miles Kwok,"<br>a/k/a "Guo Wengui,"<br>a/k/a "Brother Seven,"<br>a/k/a "The Principal,"<br>**KIN MING JE,**<br>a/k/a "William Je," and<br>**YANPING WANG,**<br>a/k/a "Yvette,"<br>  Defendants., | Case No. **23 Cr. 118 (AT)**<br><br><br>**<u>PROPOSED ORDER</u>** |

      The Court, having reviewed the Motion for Return of Property and Memorandum in Support hereby orders:

      1.      The United States Attorney's Office is directed to meet with the counsel for the 3,345 customers of the Himalaya Exchange to develop a secure and protected system for returning customer HDO Reserve to effectuate the immediate return of the petitioners property;

      2.      The procedure will allow for the confidentiality of the petitioners to be protected and at the same time to permit the United States to authenticate that the customers are real and that their account activity is authentic;

      3.      The procedure and plan will be submitted to the Court for *in camera* review and approval on or before January 5, 2024 to begin returning HDO Reserve on a rolling basis beginning no later than January 20, 2024.

4.      After the plan is approved by this Court and rolling returns of HDO Reserve begin, the parties will submit periodic status reports to the Court *in camera* and all HDO Reserve shall be returned to the petitioners (and any subsequent petitioners who join the class) no later than February 28, 2024.


Dated:

_____

**UNITED STATES DISTRICT JUDGE**

**Exhibit B**

**Response of U.S. Department of Justice**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 7, 2023

<u>VIA ECF</u>
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     ***United States v. Kwok, et al.*, S1 23 Cr. 118 (AT)**

Dear Judge Torres:

The Government writes in response to the Motion for Return of Property, dated December 6, 2023 (Dkt. 186 ("Motion")). The Motion, which was filed by counsel for 3,345 purported customers (the "Petitioners") of the Himalaya Exchange (the "Exchange"), seeks the "return of [Petitioners'] property seized by the United States" in connection with the above-captioned case. (Motion at 1.) As alleged in the Indictment in the above-captioned case, the Exchange is an instrumentality of the charged fraud crimes, and the funds in question—which were seized by the Government in between 2022 and 2023 pursuant to judicially authorized seizure warrants—are listed in the Indictment as assets subject to forfeiture. (Superseding Indictment, Dkt. 19 at ¶¶ 12, 17-24, 55(j), (k), (m), (o), (p), (s).) For the reasons described herein, the Government respectfully requests that the Court deny the Motion.

The Motion seeks the return of assets pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure. Courts have jurisdiction under Rule 41(g) only when (1) the movant has "no adequate remedy at law", and (2) "the equities favor the exercise of jurisdiction." *De Almeida v. United States*, 459 F.3d 377, 382 (2d Cir. 2006). When assessing jurisdiction, the Second Circuit has advised district courts that "[j]urisdiction under Rule 41 is to be exercised with great restraint and caution since it rests upon the court's supervisory power over the actions of federal law enforcement officials." *Id.* at 382 (internal quotation marks omitted) (citing *Floyd v. United States*, 860 F.2d 999, 1003 (10th Cir. 1988) and *Hunsucker v. Phinney*, 497 F.2d 29, 34 (5th Cir. 1974)).

Here, as a result of the Indictment's forfeiture allegations, which include the funds at issue, the Petitioners have an adequate remedy at law to resolve their claims—namely, the exclusive remedies available to claimants seeking to assert an interest in forfeitable property under Title 21, United States Code, Section 853. In particular, Title 21, United States Code, Section 853(n) provides the *exclusive* means by which a party may assert an interest in property subject to forfeiture. *DSI Assocs. LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007) ("It is . . . well settled that section 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets—after the preliminary forfeiture order has been entered."); *see also United States*

*v. Rashid*, 373 F. App'x 234, 238 (3d Cir. 2010). Consequently, there are no grounds to assert equitable jurisdiction pursuant to Rule 41(g). *See De Almeida*, 459 F.3d at 382.

It may well be that some, or all, of the Petitioners are entitled to the Government's seized funds at an appropriate time. But this is not that time. Following a conviction, a district court "must determine what property is subject to forfeiture under the applicable statute" and "promptly enter a preliminary order of forfeiture . . . without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b). Criminal forfeiture proceedings pursuant to Sections 981 and 982, including any related judicial proceedings, are governed principally by 21 U.S.C. § 853. *See* 18 U.S.C. § 982(b)(1). After a court issues a preliminary order of forfeiture, a third party may petition the court for an ancillary hearing to "adjudicate the validity of [the third-party's] alleged interest in [the criminally forfeited] property." 21 U.S.C. § 853(n); *see also United States v. Daugerdas*, 892 F.3d 545, 552 (2d Cir. 2018).

In any event, it is not clear to the Government that the Petitioners have satisfied threshold Article III standing requirements. The Government was first contacted by Petitioners' counsel yesterday. During a phone call, the Government requested that Petitioners' counsel provide information sufficient to demonstrate that the 3,345 Petitioners were all, in fact, customers of the Exchange. Counsel declined to provide any such information, claiming that doing so could, in sum and substance, jeopardize Petitioners' safety from the "Chinese Communist Party." The Government further inquired how Petitioners' counsel himself had verified that all 3,345 of his clients were customers of the Exchange. Counsel responded that each Petitioner had provided him with a "seven-digit unique identifier," which he then used to confirm the Petitioners' status as customers directly with counsel for the Exchange. However, Petitioners' counsel declined to share any of the information about the Petitioners with the Government, or to explain how he was able to verify their status as Exchange customers using such identifiers. Counsel also indicated that he has not yet obtained documentation in the Exchange's possession regarding his clients' Exchange accounts because, among other things, he did not want to be responsible for "getting someone killed." When the Government offered to confer to find a way to address counsel's privacy concerns, counsel stated, in substance, that he would be filing the Motion to "put the court on notice" that "there are people getting stomped on." Thus, the Government does not agree with Petitioners' counsel's certification that he "conferred with counsel for the Government in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court, and ha[s] been unable to reach agreement." (Dkt. 186 at 2.)

To be clear, and as explained above, the Government seized more than $600 million in proceeds of the charged crimes—including the Exchange funds in question—to preserve those funds for later disbursement and restitution to victims. When such distribution should occur, and the mechanism for doing so, will be determined after the completion of the pending criminal proceedings and as the law directs.

Congress has determined that the forfeiture process is the exclusive means for persons claiming an interest in forfeitable property to assert those interests. To allow some third parties to subvert that process and "jump the line" may prejudice other third parties seeking to claim an interest in the property. Ancillary forfeiture proceedings are specifically designed to ensure an orderly and efficient process for resolving competing claims to forfeitable assets. Accordingly, the Government requests that the Court deny Petitioners' Motion.

Case 22-2908, Document 104-1, 02/05/2024, 3608319, Page33 of 33   Case 1:20-cr-00425-JGK Document 189 Filed 03/25/22 Page 32 of 32

Page 3

The Government is available to address any questions the Court may have.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
_____
Ryan B. Finkel
Juliana N. Murray
Micah F. Fergenson
Justin Horton
Assistant United States Attorneys
(212) 637-6612 / 2314 / 2190 / 2276