UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"
    a/k/a "Boss,"

                  Defendant.

**S2 23 Cr. 118 (AT)**

# THE GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT KWOK'S MOTION TO DISMISS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD........................................................................................................ 9

ARGUMENT ................................................................................................................. 11

    I. Count One Properly Pleads RICO Conspiracy............................................................ 11

        A. Applicable Law ........................................................................................... 12

        B. The Law Does Not Require The Indictment To Allege A Pattern Of Racketeering
Activity ................................................................................................................ 12

        C. While Not Required, the Indictment Alleges a Pattern of Racketeering Activity. .......... 15

            1.   Kwok's Breach-of-Contract Argument is Baseless ................................................. 17

            2.   Kwok's "Continuity" Argument Is Baseless ......................................................... 17

        D. The Law Does Not Require the Indictment to Allege an Enterprise .............................. 20

        E. While Not Required, the Indictment Alleges an Enterprise ....................................... 21

    II.    Counts Eight and Ten Adequately Allege that the Farm Loan Program and G|CLUBS
Schemes Were "In Connection With" a Security ........................................................... 23

        A. Applicable Law ........................................................................................... 24

        B. Count Eight Adequately Alleges the Farm Loan Program Scheme Involved a Security. 25

        C. Count Ten Adequately Alleges the G|CLUBS Scheme Involved a Security.................. 30

    III. The Indictment Adequately Pleads Substantive Wire and Securities Fraud ..................... 33

        A. Applicable Law ........................................................................................... 33

            1.   Wire Fraud ................................................................................................ 33

            2.   Securities Fraud ......................................................................................... 35

        B. Discussion ................................................................................................. 36

            1.   The GTV Private Placement .......................................................................... 37

            2.   The Farm Loan Program ............................................................................... 39

            3.   G|CLUBS .................................................................................................. 40

            4.   The Himalaya Exchange ............................................................................... 42

            5.   Scheme Liability ........................................................................................ 42

    IV. The Indictment Adequately Pleads the Bank-Related Offenses......................................... 43

        A. Count Two Properly Alleges Conspiracy to Commit Bank Fraud ............................... 43

        B. Count Four Properly Alleges Conspiracy to Provide False Statements to Banks........... 45

    V. Count Twelve Properly Pleads a Violation of Section 1957 ............................................. 47

CONCLUSION............................................................................................................... 51

The Government respectfully submits this memorandum of law in opposition to defendant Ho Wan Kwok's motion to dismiss the Superseding Indictment.[1]  (Dkt. 238 ("Def. Mot.").)

## PRELIMINARY STATEMENT

On January 3, 2024, a grand jury returned Superseding Indictment S2 23 Cr. 118 (AT), ECF No. 215 ("Indictment").  That Indictment charged Ho Wan Kwok, Yanping Wang, and Kin Ming Je with a series of fraud and money laundering offenses for their acts in defrauding more than 1,000 victims out of more than $1 billion.  The Indictment also charged the defendants with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") by conspiring to establish, and operate, an enterprise in furtherance of several fraud and money laundering crimes.  Kwok now asks this Court to grant him extraordinary relief—dismissal of the Indictment—to save him from a trial, primarily arguing that the allegations in the Indictment are insufficient to state a crime.  But a motion to dismiss requires this Court to confront only a narrow, and limited, question:  whether the Indictment "track[s] the language of the statute[s] charged and state[s] the time and place (in approximate terms) of the alleged crime[s]." *United States v. Vilar*, 729 F.3d 62, 81 (2d Cir. 2013).  This Indictment easily satisfies that standard, and Kwok's motion can be denied on that basis alone.

Perhaps aware of the high burden he faces, Kwok's motion effectively seeks to morph a simple inquiry into the legal sufficiency of an indictment into a pseudo-summary judgment motion that implores the Court to make findings about evidentiary sufficiency based only on the allegations in the Indictment.  But this is not a civil case, and a motion to dismiss an indictment is

---

[1] Co-defendant Yanping Wang joins in Kwok's motion to dismiss, to the extent it challenges counts in which Wang is charged.  (Dkt. 241.)

not an opportunity for a court to evaluate the sufficiency of the evidence as recounted in an indictment. *United States v. Golston*, No. 23 Cr. 362 (AT), 2024 WL 149603, at *4 (S.D.N.Y. Jan. 12, 2024) ("At this pretrial motion-to-dismiss stage, however, the Court is required to evaluate only the sufficiency of the allegations in the Indictment, not the evidence."). That is the law, and it makes good sense because this Indictment, as is common, does not contain the entirety of the proof the Government will present at trial. Granting Kwok the relief he seeks based on his complaints about the failures of the Government's evidence, in a motion to dismiss, as opposed to after all of that evidence has been aired at trial, would fundamentally "risk[ ] invading 'the inviolable function of the jury' in our criminal justice system." *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018) (citation omitted).

Accordingly, and for the reasons discussed below, Kwok's motion to dismiss the Indictment should be denied.

## BACKGROUND

### A. Factual Overview

From at least in or about 2018 through in or about March 2023, Kwok, Je, Wang, and others conspired to defraud thousands of victims of more than $1 billion. The defendants effectuated the scheme through a complex series of fraudulent businesses and fictitious investment opportunities that connected dozens of interrelated entities controlled by Kwok. Indictment ¶ 1. Kwok, Je, Wang, and their co-conspirators laundered their fraud proceeds through foreign and domestic bank accounts and entities, layering the funds to conceal their source, as well as using the fraud proceeds to further promote the ongoing scheme. The defendants also misappropriated victim funds for their own personal use and for the use of their family members, including for personal investments and the purchase of luxury vehicles and goods. *See* Indictment ¶¶ 1-6. The defendants operated

the scheme for years by, among other things, expanding Kwok's criminal enterprise to include additional entities and individuals; continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States; and retaliating against individual victims, and others, who complained, requested return of invested funds, or criticized Kwok's enterprise.  Indictment ¶ 6.

Kwok is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million. Starting at least in or about 2017, Kwok, who then purported to be a billionaire, garnered a substantial online following.  Kwok granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.  Indictment ¶ 9(a).

In or about 2018, Kwok founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society.  Until 2020, the Chairman of the Rule of Law Society was Steve Bannon, and the Chairman of the Rule of Law Foundation was Kyle Bass, who founded and managed the hedge fund Hayman Capital.

The Rule of Law Society's website listed Kwok as its "founder, a promot[e]r, and a spokesperson."  Both organizations feature photographs of Kwok on their websites.  Kwok used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe Kwok's statements regarding investment and money-making opportunities.  In truth and in fact, and as Kwok well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud Kwok's followers and other victims.  Indictment ¶ 9(b).

Je owned and operated numerous companies and investment vehicles central to the scheme and served as its financial architect and key money launderer.  Indictment ¶ 10.

Wang has worked for Kwok and Kwok's family for several years, since at least in or about 2018, and has operated as a "chief of staff" for Kwok. In that capacity, Wang has held titles in a variety of entities that were instrumentalities of the fraud described herein. For example, Wang has served as the President, Treasurer, and Secretary of entities that purportedly managed Kwok's money. Indictment ¶ 11.

### 1. The GTV Private Placement

In April 2020, in a recorded online broadcast, Kwok personally announced an illegal private stock offering relating to his purported media company, GTV Media Group, Inc. ("GTV"). *See* Indictment ¶ 16. In that launch video, Kwok detailed the investment terms of the GTV private placement (the "GTV Private Placement"); he also provided his cellphone number and encouraged people to contact him directly with any questions about the GTV Private Placement. Indictment ¶ 16(a). An accompanying "Confidential Information Memorandum" (the "Private Placement Memorandum" or "PPM") represented that the money raised through the GTV Private Placement would be used "to expand and strengthen [GTV's] business" and included a chart setting out the "contemplated use of proceeds." Indictment ¶ 16(d).

Between approximately April 20, 2020, and June 2, 2020, Kwok and his co-conspirators sold approximately $452 million worth of GTV common stock to more than 5,500 investors. *See* Indictment ¶ 16(e). Certain of the bank accounts receiving investor funds were held in the name of Saraca Media Group, Inc. ("Saraca"), GTV's parent company, which was owned by Kwok's close relative ("Relative-1"). Relative-1's ownership of, and affiliation with, Saraca was not disclosed in the PPM or otherwise. Other bank accounts that received investor funds were held in the name of an intermediary entity that pooled small-dollar investors' funds for purposes of investing in GTV on behalf of those non-accredited investors, thereby flouting U.S. Securities and

4

Exchange ("SEC") regulations regarding limitations on the type of investors to whom securities may be offered via an unregistered securities offering. *See* Indictment ¶ 16(g).

Mere days after the GTV Private Placement closed, the defendants invested $100 million of the more than $500 million raised into a high-risk hedge fund ("Fund-1"). The investment was for the benefit of Saraca, and thereby Relative-1; however, the victims who supplied the $100 million did not own any shares of Saraca. The Fund-1 investment, of which $30 million was lost, was contrary to the PPM's representations about the use of GTV funds. *See* Indictment ¶ 16(h).

### 2. The Farm Loan Program

In response to the closure of bank accounts associated with GTV and Saraca, among other things, the defendants continued devising new "means and methods to evade the enforcement of investor-protection . . . laws in the United States" and solicit additional investments in GTV stock. Indictment ¶ 6; *id.* ¶ 17(c) (Kwok stating: "the money has been changed to a new way of cooperation"). The defendants raised further funds in the form of purported loans from Kwok's followers to a network of local groups (the "Himalaya Farm Alliance"; each, a "Farm"); Kwok and others represented that the "loans" would be convertible into GTV common stock (the "Farm Loan Program"). Indictment ¶ 17(c) (Kwok stated that "signing a loan contract with a local farm" would "giv[e] you equity" and that once such a "loan" was made by an investor "then you can ask for stocks"). To attract victim money to the Farm Loan Program, Kwok continued to endorse the purported value of the GTV shares that the "loans" purportedly entitled victim-investors to acquire. *E.g.*, Indictment ¶ 17(d). Using the Farm's bank accounts, and again without registering with the SEC, the defendants collected approximately $150 million from Kwok's followers through the Farm Loan Program. Indictment ¶ 17.

As with the GTV Private Placement, the defendants misappropriated money raised through the Farm Loan Program.  For example, approximately $20 million was transferred to Relative-1 and approximately $5 million was transferred to an entity owned by Kwok's spouse.  An additional approximately $2.3 million was used to fund maintenance of the 145-foot luxury yacht used by Kwok named the "Lady May."

### 3.  G|CLUBS

In or about June 2020, Kwok and his co-conspirators laid the groundwork for G|CLUBS, a purported high-end membership program that was, in reality, yet another vehicle for Kwok's fraud.  Indictment ¶ 18.  As with the GTV Private Placement and the Farm Loan Program, Kwok himself promoted G|CLUBS to his followers in broadcasts posted on the Internet, including by making false and misleading representations.  Among other things, Kwok represented that G|CLUBS was another vehicle to acquire stock in Kwok-associated entities, including GTV. Indictment ¶ 18(f).  For example, in a video dated July 30, 2021, Kwok stated:

> Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%.  Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both.

Indictment ¶ 18(f)(ii).

Through the G|CLUBS scheme, the defendants obtained over $250 million from Kwok's followers.  As with the GTV Private Placement and the Farm Loan Program, the defendants laundered and misappropriated a substantial portion of the G|CLUBS funds, including using G|CLUBS funds to pay for the following:

- a $2.6 million yacht;

- luxury automobiles costing millions of dollars;

- an approximately $4.4 million custom-built Bugatti sports car, which was purchased for the benefit of Relative-1; and

- the purchase and renovation of a 50,000-square-foot mansion in New Jersey for Kwok and his family, which cost approximately $40 million.

Indictment ¶ 18(h).

### 4. Himalaya Exchange

In or about April 2021, Kwok began to promote the Himalaya Exchange, a purported cryptocurrency "ecosystem." The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). Indictment ¶ 19. As a "stablecoin," HDO is purportedly backed 1-to-$1 by cash / gold reserves, whereas HCN allegedly is traded based on market supply and demand. *See* Indictment ¶ 19. As with the other schemes, Kwok promoted the Himalaya Exchange to his followers in his broadcasts posted on the Internet in which he made false and misleading representations. For example, on or about October 20, 2021, Kwok falsely stated the following:

- "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

- "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

- "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

Indictment ¶ 19(a)(i)-(iii). The initial coin offering for HDO and HCN occurred on November 1, 2021—just days after Kwok's statements, and the same day Kwok released a music video entitled "H Coin To the Moon." *Id.* ¶ 19(a)-(c). According to data posted on the Himalaya Exchange, HCN began trading at an equivalent value of 10 cents per coin. Within two weeks of the initial

coin offering, according to the Himalaya Exchange website, HCN was worth approximately $27, which represented a 26,900% increase in value and an approximately $27 billion total valuation. *Id.* ¶ 19(b).

Kwok and Je took steps to misleadingly bolster the purported legitimacy of HDO and HCN. For example, the defendants misleadingly referred to HDO and HCN as cryptocurrencies. In fact, HDO and HCN transactions could occur only within the Himalaya Exchange "ecosystem," where they were treated as mere "credits" and recorded on an internal database, not on a blockchain. Indictment ¶ 19(e)-(f). As another example, Je touted a Ferrari that was supposedly purchased using HDO, without disclosing either that the purchase was really conducted via international bank wires (not HDO), or that the purchaser was Relative-1. Indictment ¶ 19(d). After the United States seized, pursuant to court-authorized seizure warrants, the vast majority of the Himalaya Exchange's cash reserves, the Himalaya Exchange website continued to falsely represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets." Indictment ¶ 23(a).

As with the other schemes, and contrary to representations to investors, the defendants used Himalaya Exchange funds for their personal use. For example, in or about April 2022, the defendants used $37 million of Himalaya Exchange funds for a supposed "loan" that guaranteed the cost of Kwok's yacht. Indictment ¶ 19(g). In September 2022, following the United States's initial seizure of Himalaya Exchange accounts, Je tried to evade further seizures by attempting to transfer $46 million of Himalaya Exchange funds to a bank account in the UAE that Je controlled. Indictment ¶ 21.

### 5.      Laundering of Fraud Proceeds and Concealment of Ownership and Control

Kwok, Je, Wang, and others concealed the illegal source of their fraud proceeds by transferring the money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals.  Indictment ¶ 4.  Many of these money transfers were disguised as "loans" or "investments."  Indictment ¶ 20; *see id.* ¶ 19(g).  In a further effort to obscure the funds used and controlled by Kwok, Kwok filed for bankruptcy on or about February 15, 2022.  Indictment ¶ 20.

Ultimately, Kwok's fraud raised more than $1 billion from thousands of victims, including non-accredited investors who were induced to participate in Kwok's fraudulent offerings based on lies and deceit.

## LEGAL STANDARD

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  In other words, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  To state an offense, the Second Circuit has "often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted); *accord United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (same).

When considering whether a count states an offense, "all allegations in the indictment [are taken] as true." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012). Moreover, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made," *Stavroulakis*, 952 F.2d at 693 (internal quotation marks omitted). An indictment "need not be perfect, and common sense and reason are more important than technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

Importantly, on a motion to dismiss, it is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (citation omitted). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (citation omitted). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This rule is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*; *see, e.g., Golston*, 2024 WL 149603, at *4 (denying motion to dismiss because "[a]t this pretrial motion-to-dismiss stage . . . the Court is required to evaluate only the sufficiency of the allegations in the Indictment, not the evidence"); *United States v. Shea*, No. 20 Cr. 412-4 (AT), 2022 WL 1443918, at *4 (S.D.N.Y. May 6, 2022) (denying motion to dismiss because the defendant's "challenges are to the sufficiency of the Government's evidence to *satisfy*—as opposed to the sufficiency of the Indictment to *allege*—the

10

federal elements of the crimes charged," and "those arguments are not appropriately decided on a motion to dismiss").

Accordingly, a "defendant faces a high standard in seeking to dismiss an indictment" for failure to state an offense. *United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119, at *3 (S.D.N.Y. Apr. 1, 2022) (internal quotation marks omitted). Where, as here, the charging instrument meets the basic requirements set forth above, dismissal is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *De La Pava*, 268 F.3d at 165 (internal quotation marks omitted); *see also United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases").

## **ARGUMENT**

### I. Count One Properly Pleads RICO Conspiracy

Kwok argues that Count One, which charges that Kwok, Wang, and Je conspired to violate 18 U.S.C. § 1962(d), should be dismissed because it fails to allege a pattern of racketeering and fails to adequately allege a RICO enterprise. Kwok is wrong on the law of what the Indictment must allege, and wrong on the facts of what the Indictment does allege. The law does not require the Government to plead a pattern of racketeering activity or an enterprise to sustain an Indictment charging a RICO conspiracy. That ends the inquiry. But even though it is not required to, the Indictment *does* allege a pattern of racketeering activity and an enterprise. Kwok's arguments to the contrary (as with most of the arguments in his motion) boil down to complaints about the sufficiency of the evidence outlined in the Indictment. Those arguments are legally irrelevant.

Count One meets the requirements of Rule 7(b), and thus easily survives a motion to dismiss.

A. **Applicable Law**

  "To establish the existence of a RICO conspiracy, the government [is] required to prove [at trial] only the existence of an agreement to violate RICO's substantive provisions." *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997); *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). At trial, "[t]o prove a RICO conspiracy, the Government need not establish the existence of an enterprise, or that the defendant committed any predicate act. It need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *United States v. Arrington*, 941 F.3d 24, 36–37 (2d Cir. 2019) (citations omitted). "But there is a difference between what the Government must prove at trial and what it must plead in the indictment." *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) (sustaining RICO conspiracy charge on motion to dismiss). There is no requirement that an indictment charging a RICO conspiracy "spell out" each element of proof necessary to sustain a conviction. *See id*. Provided an indictment "contains all the essential elements of the charged racketeering conspiracy," dismissal is unwarranted. *United States v. Messina*, No. 11 Cr. 31 (KAM), 2012 WL 463973, at *3 (E.D.N.Y. Feb. 13, 2012).

B. **The Law Does Not Require the Indictment To Allege A Pattern Of Racketeering Activity**

  To properly allege a RICO conspiracy, an indictment need not allege a pattern of racketeering activity. *United States v. White*, No. 17 Cr. 611 (RWS), 2018 WL 4103490, at *2-5 (S.D.N.Y. Aug. 28, 2018) ("In the RICO conspiracy context, courts have repeatedly held that '[n]either overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proven for a section 1962(d) offense.'" (quoting *Applins*, 637 F.3d 59, 81 (2d Cir. 2011)). Ignoring this law, Kwok's motion seeks to apply the pleading standards for a *substantive* racketeering charge to Count One's racketeering *conspiracy* charge. But racketeering

12

conspiracy is its own crime, separate from a substantive racketeering offense, and the Supreme Court as well as the Second Circuit have noted significant differences between the elements required to prove a substantive RICO count and the elements required to prove a RICO conspiracy. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 65 (1997) (contrasting substantive RICO offenses with RICO conspiracy and explaining: "It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense"). "The conspiracy provision of [RICO] proscribes an agreement to conduct or to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity." *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019) (quotation marks, statutory reference, and alterations omitted). The objective of the conspiracy is to commit a substantive RICO violation, so a conspirator "must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive RICO offense," *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). But to demonstrate this, the government does not need to prove a substantive violation; the government need only prove "that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *Arrington*, 941 F.3d at 36-37.

Specifically, unlike a substantive RICO offense, RICO conspiracy does not require proof of the defendant's commission of a predicate act, *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008); and does not require proof that the defendant took part in directing the enterprise's affairs, *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000). As the Second Circuit has observed, "RICO conspiracy is thus a crime that can be committed simply by sitting around a table and agreeing with other individuals to create an organization . . . that would engage in criminal

acts . . . , whether or not the organization ever gets off the ground and whether or not the defendant, or any of his co-conspirators, ever commits any of the anticipated crimes." *United States v. Capers*, 20 F.4th 105, 118 (2d Cir. 2021).

This well-established law categorically forecloses Kwok's implicit argument that, to properly allege a racketeering conspiracy, the Indictment must contain allegations sufficient to establish a substantive racketeering offense. Kwok appears to fashion his mistaken principle from civil cases where plaintiffs alleged a racketeering conspiracy claim that depended upon a separately alleged substantive racketeering claim that had been dismissed. (*See* Def. Mot. 13-14 (citing *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 164 (2d Cir. 2004) ("[B]ecause Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the District Court's dismissal of the RICO Conspiracy claims.")); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 139 (E.D.N.Y. 2010) ("Because plaintiff's substantive RICO claims cannot survive defendants' motions to dismiss, plaintiffs' conspiracy claim must also be dismissed.") and *Goldfine v. Sichenzia*, 118 F Supp. 2d 392, 406 (S.D.N.Y. 2000) ("Plaintiffs' substantive claims under 18 U.S.C. § 1962(a) and (c) fail to state a cause of action, and have been dismissed. As a result, Plaintiffs' claim under section 1962(d) sounding in conspiracy to violate sections 1962(a) and (c) must also be dismissed.")). Whether or not such a pleading rule exists in civil law, the Indictment does not charge substantive civil RICO nor, indeed, any substantive RICO count at all, so these civil decisions have no bearing whatsoever on the validity of the Indictment's criminal RICO conspiracy charge.[2]

---

[2] More broadly, civil decisions are of little import to a motion to dismiss an indictment. *See United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) ("[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence on a motion for summary judgment, a judge generally cannot do the same for a federal criminal indictment." (alterations omitted)); *United*

Indeed, the defendant cites no authority, and the Government is aware of none, that would require an Indictment to allege a substantive racketeering count, or the facts to support one, in order to allege a separate racketeering conspiracy count. After all: "It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas,* 522 U.S. at 65. Not surprisingly, then, the Supreme Court has affirmed the conviction of a racketeering conspiracy charge even though the defendant had been acquitted of the substantive offense. *See id.* And the Second Circuit has recognized that the Supreme Court "rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed . . . ." *Applins*, 637 F.3d at 74. Because Count One does not require the grand jury to charge valid predicate acts in the Indictment, Kwok's argument is baseless.

### C.  <u>While Not Required, the Indictment Alleges a Pattern of Racketeering Activity</u>

Even if there were a requirement (and there is not) that a racketeering pattern be alleged in order to properly plead the crime of RICO conspiracy, it would be met here.  Indeed, Kwok's argument that the Indictment fails to allege a "pattern of racketeering activity" is refuted by the Indictment's text:  The Indictment alleges that the defendants "willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate the racketeering laws of the United States," namely by agreeing "to conduct and participate, directly and indirectly in the conduct of the affairs of the Kwok Enterprise *through a pattern of racketeering activity*[.]" Indictment ¶ 24 (emphasis added). The Indictment further alleges that

---

*States v. Cooper*, 17 Cr. 296 (PKC), 2020 WL 2307646, at *3 (E.D.N.Y. May 8, 2020) ("Because the government's allegations in the superseding indictment clearly track and satisfy the elements, if proven, of the charged racketeering-related counts, they are sufficient under Rule 7(c).") (citation omitted).

the contemplated pattern of racketeering activity consisted of, among other things, (a) "Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud);" (b) "Acts indictable under Title 18, United States Code, Section 1344 (relating to financial institution fraud);" (c) "Acts indictable under Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments);" (d) "Acts indictable under Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity);" and (e) "Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5."  Indictment ¶¶ 24(a)-(e).

Each of these predicate acts—wire fraud, bank fraud, money laundering, unlawful monetary transactions, and securities fraud—are within the statutory definition of racketeering activity contained in 18 U.S.C. § 1961(1), a statute the Indictment expressly invokes.  Indictment ¶ 24.  And the Indictment alleges that "each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise." Indictment ¶ 25. Taken together, these allegations plainly and succinctly describe a "pattern of racketeering activity" and the defendants' conspiratorial objective, and they are therefore more than legally adequate to sustain the RICO count in the Indictment. *See* Fed. R. Crim. P. 7(c). Indeed, Courts in this District have held that  substantially  identical  allegations  suffice  to state  a  racketeering conspiracy claim. *See, e.g.*, *White*, 2018 WL 4103490, at *2-5; *United States v. Boyle*, No. 08 Cr. 534 (CM), 2009 WL 2032105, at *3-4 (S.D.N.Y. July 9, 2009). Accordingly, the Indictment sufficiently alleges a pattern of racketeering activity.

1.  **Kwok's Breach-of-Contract Argument is Baseless**

Kwok seeks to disregard the Indictment's text by arguing that the Court should analyze

the allegations underlying the fraud predicates and determine that they are merely failures to "live

up to contractual promises."  (Def. Mot. 12.)  That logic fails.  For one, it cannot withstand even

cursory review of the Indictment's actual allegations.  The Indictment charges seven total counts

of substantive wire and securities fraud based, in each instance, on obtaining money through

"false statements and misrepresentations"—*i.e.*, fraud.  Indictment ¶¶ 42, 44, 46, 48, 50, 52, 54.

And the mere "fact of a contractual relationship between the parties does not 'remove a party's

conduct from the scope of fraud.'"  *United States v. Murtha*, 803 F. App'x 425, 427 (2d Cir.

2020) (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d

Cir. 2016).  At bottom, Kwok seeks to have this Court make evidentiary conclusions that are

contrary to the Indictment's plain allegations, which is clearly improper on a motion to dismiss.

*See Aleynikov*, 676 F.3d at 76 (in assessing motion to dismiss, "all allegations in the indictment

[are taken] as true.").

2.  **Kwok's "Continuity" Argument Is Baseless**

Kwok's next argument is that Count One must be dismissed because the Indictment does

not allege "continuity."  (Def. Mot. 14.).  This argument, too, is fundamentally flawed because

there is no requirement that an Indictment must allege specific  facts regarding continuity.  As the

Seventh Circuit observed "an indictment does not have to allege continuity, which is not an

element of the offense, with particularity." *United States v. Torres*, 191 F.3d 799, 806-07 (7th

Cir. 1999); *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444, 452-53 (D. Conn.

2002), *abrogated on other grounds by United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). None

of the cases Kwok cites (which, except for one that affirmed a RICO conviction, are all *civil*

cases) holds otherwise. (*See* Def. Mot. 14-18.) Indeed, "[w]hile there is no Second Circuit ruling directly on point, other case law indicates overwhelmingly that the Government does *not* have to plead either subpart of the 'pattern' element—relatedness or continuity—with the particularity that [the defendant] suggest[s], and that, at most, an indictment need only specify predicate acts that evidence continuity and relatedness." *Raniere*, 384 F. Supp. 3d at 301 (quotation marks omitted) (collecting cases). "This follows from two general principles: (1) indictments need not 'specify evidence or details of how the offense was committed,' and (2) 'the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment.'" *Id.* (quoting *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) and *United States v. Messina*, No. 11 Cr. 31 (KAM), 2012 WL 463973, at *4 & n.1 (E.D.N.Y. Feb. 13, 2012)).

But, once again, even if the Indictment were required to allege continuity (and it is not), it does so. The Indictment alleges a pattern of racketeering activity and specifically alleges predicate acts of wire fraud and securities fraud relating to GTV, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange. Indictment ¶¶ 41-54. It further alleges that the pattern consisted of multiple acts of wire fraud, securities fraud, bank fraud, and money laundering, and provides specific examples of some of those acts. *E.g.*, Indictment ¶¶ 16(d) (describing misrepresentation concerning the GTV Private Placement); 16(g) (describing acts in furtherance of securities fraud); 16(h) (describing an unlawful money transaction related to the GTV Private Placement); 17(c) (quoting Kwok's false promises that loans were convertible to stock); 18(f)(ii) (Kwok falsely representing that G|CLUBS memberships guarantee "free stock"); 18(h) (describing money laundering related to G|CLUBS); 19(a) (Kwok's misrepresentations related to the Himalaya Exchange); 20 (concealing fraud proceeds though money movements "disguised as 'loans' or

18

'investments'").  That activity, among others, was undertaken "to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the Kwok Enterprise."  *Id.* ¶ 26.  Those allegations satisfy any continuity requirements.  *Nw. Bell Tel. Co.*, 492 U.S. at 241 ("'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.").

More specifically, and turning first to open-ended continuity, the Indictment's allegations give rise to "a distinct threat of long-term racketeering activity."  *Nw. Bell Tel. Co.*, 492 U.S. at 242.  *See, e.g.*, Indictment ¶ 3(b) ("The Kwok Enterprise constituted an *ongoing* organization whose members functioned as a *continuing* unit for the common purpose of achieving the objectives of the enterprise." (emphasis added).)  That threat is underscored because the Indictment demonstrates the defendants were "involved in multiple criminal schemes," which is "highly relevant to the inquiry into the continuity of the defendant's racketeering activity."  *Id.* at 240; (*see* Def. Mot. 6 (acknowledging at least "four distinct schemes")); *cf. GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) (noting even a "one-time mailing of 8,000 copies of fraudulent documents" was sufficient for open-ended continuity because it suggested ongoing activities).

Alternatively, and in addition, the Indictment sufficiently alleges closed-ended continuity.  Closed-ended continuity is "a series of related predicates extending over a substantial period of time,"  *Nw. Bell Tel. Co.*, 492 U.S. at 241-42.  Kwok concedes that in this Circuit, a period of "at least two years" of activity is sufficient to meet RICO's requirements.[3]  (Def. Mot. 14.)  The

_____

[3] Nor is a two-year period a bright-line rule.  The Second Circuit has acknowledged that "conduct persisting for a shorter period of time" than two years can establish closed-ended

Indictment meets that threshold, which Kwok acknowledges.  (Def. Mot. 14 ("the Indictment claims to allege an approximately five-year period")).  Moreover, the Indictment alleges a "number and [a] variety of acts, [involving a] number of participants, [a large] number of victims, and the presence of separate schemes."  *GICC Cap*, 67 F.3d at 467 (2d Cir. 1995).  Each of these "factors" weigh in favor of closed-ended continuity.  *Id*.  Kwok also asks this Court to make factual conclusions about the number of money laundering transactions and characterizes them as a "handful" of "isolated" activity.  (Def. Mot. 17-18.)  Here, too, Kwok ignores the text of the Indictment.  The Indictment alleges a "years-long efforts to obscure the funds used and controlled by KWOK . . . [by] *regularly* mov[ing] funds within the Kwok Enterprise and for the benefit of KWOK, his family, and his associates, by disguising the money movements as 'loans' or 'investments.'"  Indictment ¶ 20.  Even standing by themselves, these money laundering activities are enough to allege closed-ended continuity, if that were required under the law—and it is not.

### D.  The Law Does Not Require the Indictment to Allege an Enterprise

Kwok's next argument is that the Indictment does not allege a RICO enterprise.  As mentioned above, a RICO conspiracy charge does not require the Government to prove, even at a trial, that an enterprise was established.  *Applins*, 637 F.3d at 75 ("the establishment of an enterprise is not an element of the RICO conspiracy offense"); *United States v. White*, No. 19-3313-CR(L), 2021 WL 3355166, at *2 (2d Cir. Aug. 3, 2021) ("the government need only show

---

continuity, albeit in "rare" cases. *Id.*  Other circuits have confirmed that shorter time periods suffice to show closed-ended continuity. *See, e.g.*, *United States v. Henley*, 766 F.3d 893, 908 (8th Cir. 2014) (holding that where there was "no genuine dispute that the acts continued beyond the period of one year," the "jury thus had sufficient evidence to conclude that the acts had continuity"); *United States v. Wilson*, 605 F.3d 985, 1021 (D.C. Cir. 2010) (holding that where defendants were convicted of substantive drug distribution offenses spanning over 15 months, evidence demonstrated continuity through a closed period of repeated conduct).

that the defendants *agreed that an enterprise would be established* . . . and that the appellants were aware of the general nature of the conspiracy to secure a conviction for RICO conspiracy" (quotation marks and citation omitted)).  Thus, a court should not dismiss a RICO conspiracy charge if the Indictment does not allege that a RICO enterprise were established.  *See United States v. Pirk*, 267 F. Supp. 3d 406, 420 (W.D.N.Y. 2017) ("[u]nder *Applins*, it is clear that the government is not required to prove the establishment of an enterprise in order to convict Defendants of RICO conspiracy, and as a result, the indictment's allegations regarding the [charged enterprise] were not necessary in order to state the offense of a RICO conspiracy (quoting *United States v. Larson*, No. 07 Cr. 304 (WMS), 2011 WL 6029985, at *5 (W.D.N.Y. Dec. 5, 2011)).)

### E.  <u>While Not Required, the Indictment Alleges an Enterprise</u>

In any event, the Indictment sufficiently alleges the existence of the Kwok Enterprise.  It identifies the defendants and a series of entities that form the Kwok Enterprise.  Indictment ¶ 3.  The Indictment further alleges the roles of the defendants within the Kwok Enterprise.  Indictment ¶ 9.a. ("KWOK . . . was the leader of, and directed, the Kwok Enterprise"); ¶ 10 ("JE owned and operated numerous companies and investment vehicles central to the scheme and served as the financial architect and key money launderer for the Kwok Enterprise"); ¶ 11 (WANG. . . operated as a 'chief of staff' for KWOK and the Kwok Enterprise).  The Indictment describes the purposes of the Kwok Enterprise as well as its means and methods.  Indictment ¶¶ 7-8, 26.  Thus, the existence of the enterprise is sufficiently alleged.

Lastly, Kwok also complains that there is no indication how the entities that form the Kwok Enterprise are related. [4]  Kwok provides no law which holds an Indictment is required to

---

[4] In a footnote, Kwok takes issue with the inclusion of the NFSC as an entity which is part of the Kwok Enterprise and contends the Indictment casts doubt on Kwok's anti-CCP activities.  In so doing, Kwok misrepresents the text of the Indictment claiming it "describes [Kwok] as a

specify the relationship between the entities that make up a RICO enterprise.  (Def. Mot. 19.) [5]
But even if the Indictment were required to allege the relationship between the entities—and it is
not—this Indictment does just that.  The entities listed in paragraph 3.a are a part of the Kwok
Enterprise and therefore under the direction of the "leader of" the Kwok Enterprise—*i.e.* Kwok.
Indictment ¶¶ 3., 9.a.  Further, a number of the listed entities plainly concern G|CLUBS, the
Farms, and the Himalaya Exchange—thus the Indictment reveals further details about those
entities' involvement in the Enterprise, and their relationship with other entities in the fraud.
Indictment ¶ 3.a. ("G Club International Limited, G Club Operations LLC . . . GTV Media Group,
Inc. . . . Himalaya Exchange, the Himalaya Farm Alliance, Himalaya Currency Clearing Pty Ltd.,
Himalaya International Clearing Limited, Himalaya International Financial Group Limited,
Himalaya International Reserves Limited").

---

'purported' dissident who 'claim[s] to advance a movement against the Chinese Communist
Party.'" (Def. Mot. n.3 (citing Indictment ¶ 9(a).)  Actually, that sentence of the Indictment reads
"KWOK, who then *purported to be a billionaire*, garnered a substantial online following."
Indictment ¶ 9.a (emphasis added).  The Indictment does not describe Kwok as a "purported
dissident," as Kwok claims.  It is troubling that this is the *second time* Kwok has misrepresented
that very sentence.  *See* ECF No. 172 (Kwok Mot. to Compel discovery, dated Nov. 17, 2023, at
10 ("the Indictment refers to Mr. Kwok as a 'purported' dissident.")).  Nor has the Government
"use[d] [Kwok's] political activism as evidence of motive" in this case.  (Def. Mot. n.3.)  That too
is another misrepresentation of the allegations contained in the Indictment.  In the same footnote,
Kwok calls the Government's allegations as to the defendant's conduct "bizarre" because Kwok
was the apparent victim of conduct unrelated to this case.  (Def. Mot. n. 3.)  That Kwok may have
been a victim of criminal conduct elsewhere has no bearing on whether he was the perpetrator of
the conduct charged in this case.  Those two sets of facts are not mutually exclusive.

[5] *United States v. Viola*, upon which Kwok relies, does not hold to the contrary.  35 F.3d
37, 44-45 (2d Cir. 1994).  That case concerned the sufficiency of the evidence after a trial on both
substantive and conspiracy RICO counts.  It makes no pronouncement on what an indictment must
allege to survive a motion to dismiss.

II.     **Counts Eight and Ten Adequately Allege that the Farm Loan Program and
        G|CLUBS Schemes Were "In Connection With" a Security**

Kwok next seeks the dismissal of Counts Eight and Ten—involving transactions in which
the defendants promised stock to investors for money—on the ground that these charges do not
allege a "connection" to the purchase or sale of a security.  Kwok's motion ignores that the
Indictment alleges the elements of securities fraud.  Indictment ¶¶ 48, 52.  That the Indictment
tracks the statutory language is itself sufficient for the Court to deny Kwok's motion as to Counts
Eight and Ten.  *See Stavroulakis*, 952 F.2d at 693 ("[A]n indictment need do little more than to
track the language of the statute charged and state the time and place (in approximate terms) of the
alleged crime." (internal quotation marks omitted)).

Rather than grapple with the case law that runs clearly contrary to his argument, Kwok
pretends this motion is an opportunity for summary judgement or a post-trial motion about the
sufficiency of evidence.  With one small exception—a pair of meritless arguments that these counts
violate the defendants' due process rights—the defendants' arguments focus on anticipated factual
disputes (long before a trial record exists) and irrelevant legal objections (such as whether investors
could reasonably have relied on the plainly alleged misrepresentations, which is not an element of
the charged offense).

The adequacy of these allegations begins and should end with the Indictment's express
charges that the defendants "willfully and knowingly, directly and indirectly, by use of a means
and instrumentality of interstate commerce and of the mails, and of a facility of a national securities
exchange, used and employed, *in connection with the purchase and sale of a security registered
on a national securities exchange and any security not so registered*, a manipulative and deceptive
device and contrivance."  Indictment ¶¶ 48 (Count Eight), 52 (Count Ten) (emphasis added).  This

allegation is sufficient "to call for trial of the charges on the merits" and thus the motion can be denied on this basis. *Costello v. United States*, 350 U.S. 359, 365 (1956).

But, as explained below, the Indictment alleges even more than is necessary—and the defendants' extraneous arguments, aimed at evidentiary sufficiency rather than sufficiency of the Indictment's allegations, are both meritless and premature.

### A.  **Applicable Law**

Under Section 10(b) of the Securities Exchange Act, it is "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance."  15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (providing means by which conduct may violate Section 10(b)).

The language "in connection with" should be construed broadly and encompasses circumstances in which a victim is defrauded into purchasing a security. *See Merrill Lynch, Pierce, Fenner, & Smith v. Dabit*, 547 U.S. 71, 85 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (explaining that the statute should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal quotation marks omitted)).  Indeed, the Second Circuit has observed that "[t]he Supreme Court has repeatedly held that Rule 10b-5's requirement that a fraud be 'in connection with' the purchase or sale of a security is easily satisfied." *United States v. Nouri*, 711 F.3d 129, 143-44 (2d Cir. 2013) (collecting cases, including where the requirement is satisfied "where the alleged fraud 'coincided' with the purchase or sale of securities and where "deceptive devices 'touch[]' a sale or purchase of a security"); *see also* Sand, *Modern Federal Jury Instructions*, Instr. 57-21 (stating that "in connection with" is satisfied "if you find that there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of

24

securities").   The Second Circuit "has broadly construed the phrase 'in connection with,'
interpreting the Congressional intent underlying the phrase to mandate only that the act complained
of somehow induced the purchaser to purchase the security at issue." *Press v. Chem. Inv. Servs.
Corp.*, 166 F.3d 529, 537 (2d Cir. 1999).

### B.   Count Eight Adequately Alleges the Farm Loan Program Scheme Involved a Security

The Indictment alleges in detail that the defendants used the Farm Loan Program to solicit
additional investment in GTV stock after banks reacted to the GTV Private Placement—the first,
but not the last, unregistered offering of GTV stock—by closing accounts under the defendants'
control.   Indictment ¶ 17, 17(a)-(c).   It alleges that investors were "promis[ed] that such loans
would be convertible into GTV common stock at a conversion rate of one share per dollar loaned."
*Id.* ¶ 17.   Even if the Indictment were required to do so, these allegations are themselves sufficient
to demonstrate that the Farm Loan Program was in connection with a sale or purchase of a security.
Indeed, the Indictment provides several examples of the defendants' repeated statements that the
Farm Loan Program was for "individuals seeking to invest (or reinvest) in GTV."   *Id.* ¶ 17(c).
Among others, it alleges that Kwok stated in an online broadcast that "signing a loan contract with
a local farm" would "giv[e] you equity," *id.*, and that once such a "loan" was made by an investor,
"then you can ask for stocks," *id.*   The Indictment does not have to "specify evidence or details of
how the offense was committed," *United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y.
2005), and so "[t]he foregoing allegations are more than sufficient detail to inform [the defendants]
of the charges against [them]," *United States v. Greebel*, No. 15 Cr. 637 (KAM), 2017 WL
3610570, at *6 (E.D.N.Y. Aug. 4, 2017) (denying motion to dismiss securities fraud charges).[6]

---

[6] Kwok also argues that Count Eight "should be dismissed on due process grounds alone,"
(Def. Mot. 21), in reliance on *Russell v. United States*, 369 U.S. 749 (1962).   Judge Nathan rejected

Disregarding the standard for the sufficiency of an indictment, Kwok offers a series of purported reasons that Count Eight's securities fraud charge cannot "rely[] on Mr. Kwok's alleged statements that Farm Loans would be convertible into GTV stock."  (Def. Mot. at 22-23).  These reasons—that there is no allegation "that any subsequent GTV stock offering or conversion was planned or even contemplated," that the written loan agreements did not include express conversion rights, and that Kwok's promises that the loans would convert into stock were too "indeterminate"—aim at anticipated factual disputes and "conflate[] the standard for sufficiency of the Government's *proof at trial* with the categorically less demanding standard for sufficiency of the Indictment's *allegations*."  *Wey*, 2017 WL 237651 at *9.[7]

---

an identical argument in denying a motion to dismiss securities fraud charges, explaining that *Russell* is a "'very rare' case that 'must be seen as addressed to the special nature of a charge of refusal to answer questions in a congressional inquiry and *not as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met*.'"  *See Wey*, 2017 WL 237651, at *5 (emphasis applied by Judge Nathan) (quoting *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013)).  Indeed, Judge Nathan noted that the unusual case arose out of the McCarthy-era hearings on "un-American Activities."  Kwok's effort to enlist *Russell* is baseless.

[7] These arguments are flawed beyond their failure to address the sufficiency of the Indictment.  *First*, the objection that "the Indictment does not allege that any subsequent GTV stock offering or conversion was planned or even contemplated," (Def. Mot. 23), is contrary to Kwok's acknowledgment that the Indictment alleges he promised such a conversion would occur. (Def. Mot. 7-8 ("Allegedly, Mr. Kwok and others working for him and at his direction 'promised' that [the Farm Loans] would be convertible into GTV common stock." (citing Indictment ¶ 17)). And if no such conversion *was* "planned or even contemplated," (*id.* at 23), that would bolster rather than undermine the Indictment's charge of securities fraud in connection with promises that "loans" would convert into stock.  *See, e.g.*, *S.E.C. v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (rejecting defense that promised securities "do not exist" because it "would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws").  *Second*, the written agreements' purported inconsistency with the defendants' oral misrepresentations and the purported "indetermin[acy]" of the defendants' promises of stock are not only fact-bound defenses, but they "confuse materiality . . . for reliance, a concept without bearing in criminal fraud prosecutions."  *United States v. Ghilarducci*, 480 F.3d 542, 543 (7th Cir. 2007); *see also United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (holding that "contractual disclaimers . . . do not render prior false statements immaterial for purposes of criminal fraud statutes").  Tellingly, Kwok's argument about the significance of the written loan agreements relies on a *private civil*

Kwok's other arguments mischaracterize the Indictment's allegations. *See, e.g.*, *Wey*, 2017 WL 237651, at *10 (denying motion to dismiss that "contests the Indictment's characterizations of certain acts and statements . . . and seeks to recast them in legitimate terms"). *First*, Kwok states that "by the time the Farm Loan Program began, the GTV Private Placement had already been completed," and then asserts that "the GTV Private Placement cannot be the securities transaction that underlies Count Eight because the alleged fraud happened *after* the securities transactions." (Def. Mot. at 22). But the Indictment is clear that the *GTV Private Placement* was only the first of several means by which the defendants fraudulently solicited investment in *GTV stock*—and that the Farm Loan Program was the defendants' next such scheme. *See* Indictment ¶ 16(i) (alleging that after the GTV Private Placement, Kwok "continued to promote GTV using false and misleading representations"); *id.* 17(a), (b) (alleging that, shortly before the launch of the Farm Loan Program, banks closed accounts holding certain proceeds of the GTV Private Placement and "frustrated the ability of KWOK, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV"); *id.* ¶ 17(c) (alleging Kwok's statements on a broadcast that "signing a loan contract with a farm . . . giv[es] you equity" in GTV); *id.* (alleging that "[a]ccording to KWOK and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program"). Kwok's temporal argument conflates a particular defined term with a broader scheme: the Indictment more than adequately alleges that the defendants undertook the Farm Loan Program to "fraudulently solicit[] *further* investments" in GTV stock. Indictment ¶ 17 (emphasis added).

---

*case* about the enforceability of a contract between sophisticated parties—a context far removed from the adequacy of allegations of *criminal* fraud. (*See* Def. Mot. 23-24 (citing *Tierney v. Omnicom Grp. Inc.*, No. 06 Civ. 14302 (LTS) (THK), 2007 WL 2012412, at *5-6 (S.D.N.Y. July 11, 2007) (holding stock option award grant unenforceable because terms too indefinite)).

*Second*, Kwok asserts that "the Farm Loans were a distinct transaction—money was loaned to the Farms in exchange for recouping the principal plus interest—and *potentially* followed at some indeterminate point in the future by a *separate* securities transaction."  (Def. Mot. at 24). But the Indictment alleges that the purpose of these "loans" was to "fraudulently solicit[] further investments" in GTV stock, Indictment ¶ 17, and that Kwok expressly stated that "signing a loan contract with a local farm" is "giving you equity," *id.* ¶ 17(c).  That allegation is enough to render the charge adequately pleaded even if any particularity were required (which it is not).  *See Costello*, 360 U.S. at 365.  The Indictment's additional detail only underscores that Kwok's arguments for dismissal must fail.  *See United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *3 (E.D.N.Y. Sept. 11, 2018) (denying motion to dismiss securities fraud count where "there can be no serious debate that the Indictment satisfies the demands of due process and gives the defendant clear notice of the charges against him" and "goes further by incorporating by reference into each count an eight-page introduction, which outlines the framework and nuances of the crimes charged and recites, in more specific terms, [the defendant's] promotional efforts").  Contrary to Kwok's characterization that "the alleged fraud was designed to induce the lenders to make the Farm Loans, not to induce them to purchase a security," (Def. Mot. at 24), the Indictment plainly alleges that the defendants' purpose with the Farm Loan Program was "fraudulently soliciting further investments" in GTV by "promising that such loans would be convertible into GTV common stock," Indictment ¶ 17.  The Court "must accept as true the allegations contained in the indictment," and "[t]he label that [Kwok] chooses to attach to the alleged scheme does not control."  *Zaslavskiy*, 2018 WL 4346339 at *3.[8]

---

[8] The wholly different analogy in Kwok's sole cited authority only underscores how wide his argument falls from its mark.  In *United States v. O'Hagan*, 521 U.S. 642 (1997), the Court

In addition to arguing against common sense and the express allegations in the Indictment that the Farm Loan Program was not "*in connection with* the purchase and sale of any security," Kwok argues that the Farm Loans *themselves* were not securities.  (Def. Mot. at 21-22).  But courts routinely deny motions to dismiss securities fraud charges on the ground that an instrument involved in the transactions was not a security, as this is a mixed question of law and fact that is resolved (if necessary) after the presentation of the Government's evidence.  *See, e.g.*, *Zaslavskiy*, 2018 WL 4346339, at *4 (denying motion to dismiss indictment on this ground as it is "best left to the finder of fact"); *United States v. Han*, 280 F. Supp. 3d 144, 154 (D.D.C. 2017) ("Deciding, at this juncture, whether the promissory notes are securities would require the Court to improperly make 'a determination of facts that should [be] developed at trial").  The Court need not resolve this question at this stage given the Indictment's more than adequate allegations that the Farm Loan Program transactions were "in connection with the purchase and sale" of GTV stock—an indisputable security.  *See SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 451 n.33 (E.D.N.Y. 2016) (granting summary judgment to SEC in Section 10(b) action on grounds that, among other things, *all* of various means of investing in the defendants' company "may qualify as securities," including "convertible instruments, given defendants' representations that [a certain non-stock instrument] could be converted to stock").

---

illustrated one edge of Section 10(b)'s wide bounds by explaining that the antifraud provision would not apply to purchasing securities with the proceeds of an *entirely unrelated loan*—not, as alleged in the Indictment, a so-called "loan" that was expressly marketed as "giving you equity" and the right to "ask for stocks."  *Compare* Indictment ¶ 17(c) *with O'Hagan*, 521 U.S. at 656 (1997) (distinguishing hypothetical "in which a person defrauded a bank into giving him a loan or embezzled cash from another, and then used the proceeds of the misdeed to purchase securities").

**C.**   **Count Ten Adequately Alleges the G|CLUBS Scheme Involved a Security**

Even if it were required to do so—and as explained above, it is not—the Indictment also alleges that, like the Farm Loan Program, G|CLUBS memberships were marketed by the defendants as an additional means for investors to obtain stock.  *See, e.g.*, Indictment ¶ 18(f) (alleging that "KWOK, JE, and WANG also used G|CLUBS as a mechanism to continue fraudulent private placement stock offerings").  It alleges that "KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-related entities, such as GTV and G|Fashion." *Id.*  Among other specific allegations, the Indictment cites particular statements by Kwok that investors would "100%" "get a free stock offer when [they] buy a G|CLUBS membership," *id.* ¶ 18(f)(ii), and that "I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same," *id.  See also id.* (alleging that Kwok stated that "G-Club and the stock shares[:] You'll get both").

Kwok's motion to dismiss Count Ten relies even more heavily on "contrary assertions of fact by the defendants."  *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985) (denying motion to dismiss indictment).  It disputes "that a vaguely worded promise of a free stock 'kicker' overwhelmed G|CLUBS members' otherwise clear consumptive motive in buying a membership," (Def. Mot. 26), and argues instead that "supporters' consumptive motive in purchasing G|CLUBS memberships predominated," (*id.* at 27).  At best, this is an argument that the statements about free stock were not material—materiality, however, is fundamentally a jury question.  Thus, as before, *see supra* 26, Kwok "conflates the standard for sufficiency of the Government's *proof at trial* with the categorically less demanding standard for sufficiency of the Indictment's *allegations*."  *See Wey*, 2017 WL 237651 at *9.

Kwok's argument that Count Ten fails to allege that the G|CLUBS memberships transactions were "in connection with the purchase and sale of any security" fails for the same reasons as his identical argument with respect to the Farm Loan Program in Count Ten. *See supra* II.B. First and foremost, the Indictment expressly makes this allegation. Indictment ¶ 52 (incorporating prior allegations by reference and tracking statutory language). Beyond that, Kwok's temporal argument—that "the purported G|CLUBS scheme involved inducing members to pay membership fees . . . to be followed by, at some indeterminate time, the transfer of an unspecified amount of GTV stock," (Def. Mot. 28)—improperly contests the Indictment's detailed additional allegations that defendants told interested investors that they could obtain stock *by* transacting for G|CLUBS memberships. Indictment ¶ 18(f) (alleging that the defendants "also used G|CLUBS as a mechanism to continue fraudulent private placement stock offerings"); *id.* ("KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion"); *id.* 18(f)(ii) (alleging that Kwok stated it was "100%" that investors "*will* get a free stock offer *when* [they] buy a G|CLUBS membership" (emphasis added)).[9]

Other parts of Kwok's argument to dismiss Count Ten rely on complaints that the Indictment fails to answer certain questions. (*See* Def. Mot. 27 ("Would members be given one share, ten shares, or ten thousand shares as part of a package for buying a G|CLUBS membership?

---

[9] Kwok's complaint that applying the securities fraud laws to misrepresentations in the context of promising purchasers access to "free stock" is "an unprecedented construction of the rule," (Def. Mot. 28-29), is unfounded. The SEC has long held that Section 10(b) and Rule 10b-5 apply to fraudulent solicitations where investors are promised free stock in exchange for their purchase of other goods or services. *See, e.g.*, *In the Matter of Web Works Marketing.com, Inc. & Trace D. Cornell Respondents*, Release No. 7703, at *1-2 (July 21, 1999) (applying antifraud provisions to business and its principals who promised that customers "who subscribed to long distance telephone service . . . would receive 25 shares of stock").

And when would the G|CLUBS members receive those shares—upon purchase, six months later, or several years down the road? The Indictment does not say."); *see id.* at 28 (asserting that the Indictment "describes no terms for how G|CLUBS members would receive this 'allot[ment]' in some 'Kwok-affiliated entities,' how much of an 'allot[ment]' they would get, when they would get this 'allot[ment],' or whether the members would have to pay anything more for their 'allot[ment]'")).   Just as above, *see supra* 25-26, these arguments fail on the ground that an indictment does not "have to specify evidence or details of how an offense was committed." *Coffey*, 361 F. Supp. 2d at 111; *see also Juwa*, 508 F.3d at 701 (explaining that an indictment "is not meant to serve an evidentiary function").   Nor does the Government even need to answer these questions to *convict* the defendants.   *See United States v. Bongiorno*, No. 05 Cr 390 (SHS), 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006) (explaining Rule 10b-5's three prongs generally prohibit schemes to defraud, material misrepresentations, and acts that operate as a fraud—and "the government can obtain a conviction by proving any one of them").   If anything, the lack of detail about the provisions of stock in connection with a G|CLUBS membership is a feature of Kwok's fraud, not a problem with the Government's proof.   More to the point, and once again, Kwok's objections are supported by citations to "a volley of cases decided in the civil arena," *Zaslavskiy*, 2018 WL 4346339 at *4, including the pleading standard for reliance in a private civil securities action.   (*See* Def. Mot. 28-29 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)).   But as with certain of Kwok's arguments to dismiss Count Eight, these arguments to dismiss Count Ten "confuse materiality . . . for reliance, a concept without bearing in criminal fraud prosecutions."   *Ghilarducci*, 480 F.3d at 543.

Finally, Kwok's arguments that the G|CLUBS memberships are not securities, (*see* Def. Mot. 25-27), and that the Court should evaluate and dismiss the Indictment under the unique and

otherwise unprecedented standard set forth in *Russell*, (*see* Def. Mot. 25), fail for the same reason as when they were first brought to bear in Kwok's arguments to dismiss Count Eight's securities fraud charge in connection with the Farm Loan Program scheme.  *See supra* II.B.

## III.   The Indictment Adequately Pleads Substantive Wire and Securities Fraud

Kwok next seeks dismissal of Counts Five through Eleven, again attempting to argue and contest issues of fact well in advance of trial.  Kwok does not, however, argue that the Indictment fails to: (i) allege the elements of the wire fraud offenses charged in Counts Five, Seven, Nine, or Eleven, or the securities fraud offenses charged in Counts Six, Eight, and Ten; (ii) fairly inform him of the charges; or (iii) enable him to plead an acquittal or conviction in bar of future prosecutions for the same offenses.  Accordingly, the motion to dismiss Counts Five through Eleven must be rejected as well.  *See, e.g., Resendiz-Ponce*, 549 U.S. at 108.

Instead, Kwok argues, prematurely, that (1) there were no material misrepresentations made in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, or the Himalaya Exchange; (2) Kwok was not the "maker" of the misrepresentations alleged in the Indictment; and (3) there is an insufficient basis for "scheme liability" under Section 10(b).  (Def. Mot. 33-54).  Even if they were properly raised at this stage—and they are not—these claims would be without merit.

### A.   <u>Applicable Law</u>

#### 1.   <u>Wire Fraud</u>

Title 18, United States Code, Section 1343 provides, in pertinent part, that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or

causes to be transmitted by means of wire . . . in interstate or foreign commerce . . . any writings, signs, [or] signals . . . for the purpose of executing such scheme or artifice," is guilty of a crime.

"[T]he essential elements of a . . . wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (internal quotation marks and brackets omitted).  Wire fraud "is limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987).  Thus, to prove a violation of the wire fraud statute, the Government need "show not only that" a defendant "engaged in deception, but that an 'object of the[ir] fraud [was] property.'"  *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quoting *Cleveland v. United*, 531 U.S. 12, 26 (2000)).  While money or property must be the scheme's object, there is no requirement that "the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive."  *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).

The wire fraud statute "penalize[s] using . . . a wire communication to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Greenberg*, 835 F.3d at 305.  Under the wire fraud statute, a representation is false not only if it is "actual[ly] false," but also if it involves "some form of deception, such as a half-truth." *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022); *see also, e.g.*, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 191 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation . . . ."); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made . . . not misleading.") (internal citation omitted); *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of a misrepresentation is also

broad, reaching not only false statements of facts but also misleading half-truths and knowingly false promises.").

The Second Circuit has recognized that conveying a particular intention that is not genuinely held can be a misrepresentation.  In *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, the Second Circuit explained that a contractual promise to take some action can be fraudulent if the party making the promise did not intend to keep it "at the time of contract execution."  822 F.3d 650, 658-59 (2d Cir. 2016).  To illustrate that principle, the Second Circuit cited *Durland v. United States*, 161 U.S. 306 (1896).  There, the Supreme Court held that a defendant had committed mail fraud by offering bonds with no intent to pay according to the schedule in the bond indentures.  *Id.* at 313-15.  The fact that the failure to pay also constituted a breach of contract did not mean that the empty promise was not also a misrepresentation.  *Id.*

### 2.  Securities Fraud

Counts Six, Eight, and Ten charge Kwok with "(a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person" in connection with the GTV Private Placement, the Farm Loan Program, and G|CLUBS, in violation of 15 U.S.C § 78j(b) & 78ff and 17 C.F.R. § 240.10b-5.  Indictment ¶¶ 44, 48, 52.

"A misrepresentation is material under Section 10(b) of the Securities Exchange Act and Rule 10b–5 where there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'"  *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (quoting *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir.2013),

35

cert. denied, – U.S. –, 134 S.Ct. 2684 (2014).  The Supreme Court has instructed that "§ 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, and to protect against fraudulent practices, which constantly vary."  *Litvak*, 808 F.3d at 177 (citing *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 221 (2d Cir.2014) (per curiam) (internal citations and quotation marks omitted)).

Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially "well suited for jury determination."  *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.) (*citing TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988).  Omissions are material under the securities laws if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mis' of information made available."  *TSC Indus., Inc.*, 426 U.S. at 449.

## B.  **Discussion**

Kwok moves to dismiss Counts Five through Eleven of the Indictment, claiming that the Indictment fails "to allege a material misstatement or omission, as required to make out securities and wire fraud charges."  (Def. Mot. 33.)

Kwok's challenge to the wire and securities fraud charges fails simply because he does not contend that the language in the Indictment omits "the elements of the offense charged," nor that it fails to "fairly inform[] [him] of the charge[s]," or "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Resendiz-Ponce*, 549 U.S. at 108. Nor could he make any such claims.  Counts Five, Seven, Nine, and Eleven each charge substantive

wire fraud. Those counts incorporate by reference the preceding factual allegations, specify locations and time frames, and further allege the essential elements of wire fraud offenses by tracking the statutory language. Indictment ¶¶ 41-42, 45-46, 49-50, 53-54. Accordingly, Counts Five, Seven, Nine, and Eleven are facially valid and survive a motion to dismiss. *See, e.g., United States v. Cornelson*, No. 15 Cr. 516 (JGK), 2022 WL 2334054, at *5 (S.D.N.Y. June 27, 2022) ("Courts generally find that indictments sufficiently allege wire fraud where they track the language of the wire fraud statute, and where they set forth approximate details about the alleged scheme to defraud.").

Counts Six, Eight, and Ten each charge substantive securities fraud. Those counts similarly incorporate by reference the preceding factual allegations, specify locations and time frames, and allege the essential elements of the charged securities fraud offenses by tracking the statutory language. Indictment ¶¶ 43-44, 47-48, 51-52. Accordingly, Counts Six, Eight, and Ten are also facially valid. *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.), cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.")

Kwok ignores that these substantive counts are adequately plead and, instead, makes factual arguments that the Indictment does not sufficiently allege material misrepresentations or omissions. Kwok is factually incorrect and, in any event, an Indictment need not specify or detail specific misrepresentations or omissions to survive a motion to dismiss.

### 1. **The GTV Private Placement**

Kwok claims that the Indictment fails to allege that "Kwok made any material misstatements or omissions with respect to GTV." (Def. Mot. 33.) Not so. The Indictment alleges

that the PPM—which Kwok distributed and caused to be distributed to investors—misrepresented that GTV "plan[ned] to use the proceeds from a private placement to expand and strengthen [GTV's] business." (PPM, Def. Ex. A at 10; *see* Indictment ¶ 13(d).) Kwok and others materially misled investors to believe that "*the* proceeds" of the GTV Private Placement—not merely a portion of the money raised, or an amount capped at the anticipated $200 million—would be invested in GTV's business. Indictment ¶ 16(d)(ii). That representation was false.

The vast majority of the more than $450 million raised through the GTV Private Placement were deposited directly into bank accounts held in the name of GTV's parent company, Saraca, which was owned by one of Kwok's close relatives—a fact neither Kwok nor the PPM disclosed to potential investors. Indictment ¶¶ 13(e), (f). In his motion, Kwok proffers several—of what he characterizes as "any number of legitimate reasons"—for the $100 million misappropriation. Kwok speculates, for example, that the excess $250 million somehow "would otherwise be dead cash on GTV's books" and it therefore "would be entirely rational for GTV to lend money to Saraca." (Def. Mot. 35-36.) While Kwok may attempt to make these arguments in his defense at trial, these disputes about the facts are wholly inappropriate on a motion to dismiss and do nothing to undermine the adequacy of Counts Five and Six of the Indictment.[10]

---

[10] Kwok also relies heavily on the boilerplate disclosures in the PPM about the risk of participation in the GTV Private Placement in a failed attempt to challenge the Indictment. (*See* Def. Mot. 39.) But while countervailing disclosures may be relevant to the actual reliance element in a private securities fraud suit, this argument "carries no weight" in government enforcement actions "because the [Government] need not prove here that investors relied upon [the defendants'] statements." *SEC v. Collector's Coffee, Inc.*, No. 19 Cv. 4355 (VM), 2023 WL 6453709, at *19 (S.D.N.Y. Oct. 4, 2023) (rejecting defense of "certain disclaimers in the PPMs" where government alleged oral misrepresentations).

### 2. **The Farm Loan Program**

In reliance on the reasoning in the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivatives Traders*, 564 U.S. 135 (2011), Kwok argues that the securities fraud counts should also be dismissed as to any misrepresentation (as opposed to scheme) liability because "the Indictment contains no allegations that Mr. Kwok authored, caused to be made, disseminated, or was even aware of" the statement that Farm Loan Program funds would be used for the Farms' "working capital." (Def. Mot. 43.) Kwok points to nothing that would suggest that such allegations are required in a criminal indictment, and they are not. And even if they were, the Indictment does in fact allege that Kwok made material misrepresentations in connection with the Farm Loan Program.

As the Fourth Circuit has explained, *Janus* concerns private rights of action and does not apply in criminal cases. *Prousalis v. Moore*, 751 F.3d 272, 275-79 (4th Cir. 2014). Moreover, as the Second Circuit has recognized, the limitations on "maker" liability articulated in *Janus* and its progeny are inapplicable in criminal cases such as this one, where the Government has pled aiding-and-abetting and willfully causing liability under 18 U.S.C. § 2. *See Prousalis v. United States*, 692 F. App'x 675, 676 (2d Cir. 2017) (summary order) (declining to address whether *Janus* applied to criminal cases because the petitioner had allocuted in his plea to conduct that constituted aiding and abetting securities fraud).[11]

---

[11] Even if *Janus* did apply, the motion to dismiss would still be quickly dispensed with. First, the Indictment does include factual allegations making clear that Kwok was a "maker" of misrepresentations. For example, the Indictment alleges that "KWOK promoted the Farm Loan Program," including in a statement on a video distributed via social media in which Kwok described the Farm Loan Program as the "new way of cooperation," specifically, "a loan contract with a local farm, with 6% interest, giving you equity" in GTV. Indictment ¶ 17(b). The Indictment also alleges that Kwok misrepresented the market value of GTV in connection with his efforts to promote the Farm Loan Program, all to fraudulently induce investors to participate in the

### 3.   **G|CLUBS**

Kwok claims that the Indictment does not allege that Kwok (or anyone) made any representations to prospective G|CLUBS members about how G|CLUBS membership fees would be used, and therefore the G|CLUBS fraud charges should be dismissed.  (Def. Mot. 44-45.)  Kwok is wrong.   The Indictment explicitly alleges that Kwok and his co-defendants "promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money," and aided and abetted the same.  Indictment ¶¶ 50, 52.  This allegation is sufficient "to call for trial of the charges on the merits."  *Costello*, 350 U.S. at 365.

Kwok argues nonetheless that the allegations in the Indictment are insufficient "because the Indictment does not allege that Mr. Kwok, his co-defendants, or indeed anyone, made any representations to prospective G|CLUBS members about *how the G|CLUBS membership fees would be used*."   (Def. Mot. 44.)   The Indictment cites specific misrepresentations by Kwok regarding G|CLUBS, including his "promise that anyone who buys G-Club membership . . . must be allotted shares" in the future GTV; "G-Club and the stock shares.  You'll get both."  Indictment ¶ 17(f)(ii).   As alleged in the Indictment, despite his holding no formal position or title at G|CLUBS, Kwok functionally owned and controlled G|CLUBS.  Indictment ¶ 14.  Kwok claims that, absent any representation about how the G|CLUBS membership funds would be used, his misappropriation of tens of millions of dollars of G|CLUBS membership fund—money

Farm Loan Program.  Indictment ¶ 17(c).  Finally, the Indictment alleges that—contrary to Kwok's claims that the "loans" would be used for the Farms' working capital—Kwok and others misappropriated tens of millions of the Farm Loan Program funds to pay for their and their families' luxury lifestyle expenses.  Indictment ¶17(f).

prospective members paid in exchange for concierge services and stock shares—cannot constitute fraud.  (Def. Mot. 46-47.)   This argument defies logic and is, at best, a question for the jury. Kwok's failure to disclose that he would use G|CLUBS membership funds for his personal expenses was material for purposes of the securities fraud charged in Count Ten, because there is a substantial likelihood that a reasonable individual would have considered it important in deciding how to act.  *See TSC Indus., Inc.*, 426 U.S. at 449; *Basic Inc.*, 485 U.S. at 231-32.  Indeed, a reasonable investor may well have chosen *not* to purchase G|CLUBS memberships if they knew what Kwok omitted—that large chunks of their money would be used to fund Kwok's lavish lifestyle, including to purchase a mansion and maintain Kwok's luxury vehicles; rather than for services the membership never provided.  Indictment ¶ 18(h).

Kwok also contends that the allegations that G|CLUBS members did not receive benefits commensurate with the membership fees they paid "sounds in contract, not in fraud."  (Def. Mot. 47.)  This argument does not warrant dismissal of the G|CLUBS counts.  As discussed above, the fact that the failure to provide benefits "also constituted a breach of contract [does] not mean that the empty promise was not also a misrepresentation."  *Durland*, 161 U.S. at 313-15.  That is the case here—the multiple memberships were offered not to provide additional benefits to G|CLUBS members, but rather to enable Kwok and his co-conspirators to fraudulent raise even more money. Indictment ¶ 18(g); Def. Ex. C at 6.

In short, the Indictment includes allegations making clear that Kwok and his co-conspirators made material misrepresentations regarding G|CLUBS, including by omitting that G|CLUBS membership funds would be used not for member benefits or to operate G|CLUBS, but rather for Kwok's benefit.

41

### 4.  The Himalaya Exchange

The Indictment adequately pleads wire fraud as to the Himalaya Exchange, alleging a scheme to defraud through the operation of the Himalaya Exchange from in or about April 2021 up to and including March 2023, where the purpose of the scheme (which was furthered through use of the mails or wires) was to fraudulently obtain money from victims through false statements and misrepresentations.  Indictment ¶¶ 53-54.  Because Count Eleven is facially valid, Kwok's motion to dismiss necessarily fails.

### 5.  Scheme Liability

Finally, Kwok argues that Counts Six, Eight, and Ten should be dismissed as to any theory of scheme liability.  (Def. Mot. 55-56).  Kwok points to *SEC v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022), for the proposition that "[s]cheme liability cannot lie where its sole basis is an alleged misstatement or omission.'"  (Def. Mot. 55 (citing *Rio Tinto*, 41 F.4th at 49)).  Like *Janus*, *Rio Tinto* is not applicable in the criminal context, and Kwok offers no law stating otherwise.  *Rio Tinto*'s reasoning is derived from *Janus*'s holding regarding the distinction between "maker" liability and "scheme" liability under Rule 10b-5, and the opinion in *Rio Tinto* itself explains its basis as considerations under the PSLRA and application to private civil actions.  *Rio Tinto*, 41 F.4th at 52, 54-55.  Accordingly, *Rio Tinto* does not provide any useful guidance for evaluating the sufficiency of a criminal indictment.[12]

---

[12] Even assuming that *Rio Tinto* does apply here, however, the Indictment sufficiently alleges scheme liability to meet the standard articulated by the court in that case.  This is so, first, for the basic reason that the Indictment tracks the language of the statutes and is therefore sufficient to call for a trial on the facts.  *Dawkins*, 999 F.3d at 780; *Yannotti*, 541 F.3d at 127.  And, second, even if one were to consider the factual allegations contained in the Indictment, they are far more than sufficient to allege scheme liability under *Rio Tinto*.  Indeed, the Indictment describes at length and in detail a complex and multifaceted scheme to defraud investors, which included actions beyond misrepresentations and omissions.  Among other things, Kwok and his co-

Accordingly, the substantive offenses should not be dismissed.[13]

## IV. The Indictment Adequately Pleads the Bank-Related Offenses

Kwok's arguments regarding the bank-related offenses charged in Counts Two and Four are meritless and rely on misstating both the law and the allegations in the Indictment.

### A. Count Two Properly Alleges Conspiracy to Commit Bank Fraud

An object of the Section 1349 conspiracy charged in Count Two is substantive bank fraud, in violation of 18 U.S.C § 1344.  Section 1344, in turn, provides: "[w]however knowingly executes, or attempts to execute, a scheme or artifice — (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is guilty of a crime.  The two subsections of Section 1344 define "different ways in which a defendant may commit the offense of bank fraud." *United States v. Crisci*, 273 F.3d 235, 239 (2d Cir. 2001).  Bank fraud has three elements: (1) "that there was a scheme or artifice to defraud a bank . . . or that there was a scheme or artifice to obtain money or other property owned by a financial institution by means of materially false or fraudulent pretenses, representations, or promises"; (2) "that the defendant knowingly and willfully executed or attempted to execute the scheme or artifice; that is, that the defendant acted with knowledge of the

---

conspirators transferred the hundreds of millions of dollars they raised through the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange among more than approximately 500 bank accounts held in the names of at least 80 different entities that Kwok and others controlled.  Indictment ¶¶ 3, 4; *see also* Indictment ¶¶ 17(a), 18(f), 20, 21 (describing Kwok and his co-conspirators' actions to modify their investment fraud when they encountered obstacles, such as U.S. Government scrutiny).

[13] Because these substantive offenses are all sufficiently plead, and are each definitionally specified unlawful activities, *see* 18 USC § 1956(c)(7) (cross-referencing 18 U.S.C. § 1961(1)), Kwok's argument that the money laundering conspiracy counts should be dismissed fails.  (Def. Mot. 58-59.)

fraudulent nature of the scheme, and with the specific intent to defraud the bank or to obtain, by deceiving the bank, money or other property owned or controlled by the bank"; and (3) "that the deposits of the bank involved were, at the time of the scheme, insured by the Federal Deposit Insurance Corporation ['FDIC']." *United States v. Teman*, 19 Cr. 696 (Jan. 21, 2020 jury charge of Hon. Paul A. Engelmayer, Trial Tr. at 1074); *accord United States v. Wade*, 21 Cr. 472 (Dec. 5, 2023 jury charge of Hon. Katherine Polk Failla, Trial Tr. 1114); Sand, *Modern Federal Jury Instructions*, Instr. 44-9.

Without distinguishing between the two subsections, Kwok cites Second Circuit cases from the 1990s for the proposition that bank fraud under Section 1344 requires "'the intent to victimize the [financial] institution by exposing it to actual or potential loss.'" (Def. Mot. 57 (quoting *United States v. Rodriguez*, 140 F.3d 163, 167 (2d Cir. 1998) and also citing *United States v. Laljie*, 184 F.3d 180, 189-90 (2d Cir. 1999)). That proposition is wrong as a matter of law. The Supreme Court has made clear in recent years that there is no such requirement. *See Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014) (no requirement under Section 1344(2) that in obtaining money and property, "the defendant's scheme created a risk of financial loss to the bank"); *Shaw v. United States*, 580 U.S. 63, 67 (2016) (analyzing Section 1344(1) and concluding that "the statute . . . demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss" to a bank).

Kwok also wrongly asserts "the only conduct here alleged in support of the Bank Fraud counts" is "depositing funds allegedly procured by fraud into a federally-insured bank." (Def. Mot. 57). Not so. The Indictment alleges that the defendants fraudulently obtained funds held by banks. Indeed, the "to wit" clause for that Count alleges that "KWOK . . . made false representations, and caused others to make false representations, to financial institutions to . . .

obtain funds under the custody and control of those financial institutions." Indictment ¶ 30. The Indictment also alleges that the defendants "transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals, including entities that are part of the Kwok Enterprise." Indictment ¶ 4. The Indictment further alleges that the defendants misappropriated hundreds of millions of dollars of investor/customer money, Indictment ¶ 5, and that they "regularly moved funds within the Kwok Enterprise and for the benefit of KWOK, his family, and his associates, by disguising the money movements as 'loans' or 'investments.'" Indictment ¶ 20.

Because there is no requirement that a defendant intend to cause financial loss to a bank in order to commit bank fraud, and because the Indictment amply alleges that the defendants conspired to violate Section 1344, Kwok's arguments with respect to Count Two are meritless.

**B.   Count Four Properly Alleges Conspiracy to Provide False Statements to Banks**

For many of the reasons discussed immediately above, Kwok's argument to dismiss part of Count Four—which charges that an object of the Section 371 conspiracy charged in Count Four was false statements to a financial institution, in violation of 18 U.S.C. § 1014—is also meritless. Section 1014 provides: "[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the [FDIC] . . . upon any application" is guilty of a crime. 18 U.S.C. § 1014 (emphasis added)). Section 1014 has no materiality requirement, let alone a risk-of-loss requirement. *United States v. Wells*, 519 U.S. 482, 499 (1997) (analyzing Section 1014's text to conclude that it has no materiality requirement and criminalizes "a false statement to one of the enumerated financial institutions . . . if the speaker knows the falsity of what he says and intends it to influence the

institution"); *United States v. Taylor*, 808 F.3d 1202, 1204–05 (9th Cir. 2015) ("proof of a risk of loss to a financial institution is not required" (discussing cases)).

Nor is Section 1014 limited, as Kwok suggests, to lies told "in connection with procuring a loan or any related transaction." (Def. Mot. 57). *See* 18 U.S.C. § 1014; *United States v. Wade*, 266 F.3d 574, 579-580 (6ᵗʰ Cir. 2001) ("Nowhere in the language of the statute has Congress stated that the statute applies only to applications seeking credit from one of the covered institutions. . . . Thus, an application to open a checking account at a covered institution falls within the statute."). To be sure, the Second Circuit has held— over 40 years ago in the context of a case about "the passing of worthless checks," and, notably, prior to the Supreme Court's decision in *Wells*—that "the language of the statute, limiting it to the specified credit transactions, must be given effect." *United States v. Krown*, 675 F.2d 46, 50 (2d Cir. 1982). But courts interpreting *Krown* have recognized the narrowness of its holding, questioned its textual analysis, and noted that almost every other Circuit does not apply such a limitation, particularly after the intervening decision of the Supreme Court in *Wells*. *See United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) ("This text is not ambiguous, and only last year the Supreme Court reminded us not to add elements to § 1014." (citing *Wells*)); *Wade*, 266 F.3d at 580 ("Our position that 18 U.S.C. § 1014 is not limited to applications for loans or credit is supported by the Supreme Court's holding in . . . *Wells*"); *United States v. Boren*, 278 F.3d 911, 915–16 (9th Cir. 2002) (at least seven Circuits hold that Section 1014 "is not limited to lending transactions"); *United States v. UBS Sec. LLC*, No. 18 Civ. 6369 (MKB), 2019 WL 6721718, at *18–20 (E.D.N.Y. Dec. 10, 2019) (discussing *Krown* and denying motion to dismiss after concluding that Section 1014 applies to a securities offering). Notably, even Sand's model jury instructions, generally authoritative in this Circuit, "have been

revised to incorporate the holdings in *Krilich, Wade*, and *Boren*."  Sand, 2 Modern Federal Jury Instructions-Criminal, comment to Instr. 37-15.

Accordingly, Kwok's arguments with respect to Count Four's bank fraud object are meritless.[14]

## V.   Count Twelve Properly Pleads a Violation of Section 1957

Kwoks' argument that Count Twelve must be dismissed due to a so-called "merger" problem is foreclosed by Second Circuit precedent.

Section 1957 provides that "[w]however . . . engages . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," is guilty of a crime.  A violation of that statute requires proof "'first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds.'" *United States v. Napoli*, 54 F.3d 63, 67 (2d Cir. 1995) (quoting *United States v. Piervinanzi*, 23 F.3d 670,

---

[14] Kwok's argument that Counts Two and Four should be dismissed because the underlying substantive crimes are invalid fails because the substantive crimes are not, in fact, insufficiently plead.  (Def. Mot. 58.)  Moreover, Kwok misunderstands that the conspiracies charged in Count Two and Four do not depend upon co-conspirators carrying out any substantive offense.  Thus, even if the substantive crimes in Counts Four through Eleven were dismissed (and they should not be) the conspiracies charged in Counts Two and Four should survive.  *See e.g.*, *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues"); *Callanan v. United States*, 364 U.S. 587, 593 (1961) ("the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses"); *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997) ("A conspiracy to commit a crime and the substantive crime itself are different offenses because each requires an element that the other does not").  Indeed, it is "well established that an indictment for conspiracy to commit a criminal offense may be stated with less specificity than an indictment charging the commission of that substantive offense."  *United States v. Urso*, 369 F. Supp. 2d 254, 267-68 (E.D.N.Y. 2005) (dismissing substantive extortionate extension and collection of credit offenses but sustaining a conspiracy to commit those acts) (citing *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002)).

679-80 (2d Cir. 1994)), *abrogated on other grounds by U.S. Sentencing Guidelines as stated in United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003).[15] That "two-step analytical process . . . requires the defendant to (1) acquire the proceeds of a specified unlawful activity, and then (2) engage in a financial transaction with those proceeds." *Napoli*, 54 F.3d at 68. A so-called "merger" problem arises where there is no laundering transaction distinct from the transaction through which those funds first become tainted by specified unlawful activity. *See generally United States v. Kennedy*, 707 F.3d 558, 563-65 (5th Cir. 2013).

Funds become "proceeds" under *Napoli*'s first prong when they are "'derived from an already completed offense, or a *completed phase* of an ongoing offense.'" *United States v. Szur*, 289 F.3d 200, 214 (2d Cir. 2002) (quoting and adding emphasis to *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001), *abrogated on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005)). The *Szur* defendants had been convicted of wire fraud and conspiracy to commit money laundering. 289 F.3d at 205. The president of a public company (the "Company President") had arranged for the defendants' brokerage firm to sell the company's stock to the firm's customers. *Id*. The Company President had agreed to pay the brokerage 50% of the proceeds as a commission, and the defendants had agreed not to disclose the commission to the brokerage's customers. *Id*. On appeal, the defendants raised a merger defense, arguing that "since the

---

[15] While the authorities discussed here concerned the other money laundering provision, Section 1956, the two statutory provisions share overlapping elements—to wit, that the defendant conduct a transaction in the proceeds of specified unlawful, with knowledge that the funds were criminally derived. *See* 18. U.S.C. § 1957(f)(3) ("the terms 'specified unlawful activity' and 'proceeds' shall have the meaning given those terms in section 1956 of this title."). The principal difference between Sections 1956 and 1957 is that whereas Section 1956 contains an intent element (for example, that the transaction be intended to conceal a specified attribute of the proceeds, *see* 18 U.S.C. § 1956(a)(1)(b)(i)), Section 1957 does not have such an intent element and instead includes a $10,000 threshold amount.

Indictment charged a scheme to pay the co-conspirators significant compensation for the sale of the stock without disclosing such payments to the investors, the wire fraud scheme was not complete until they received their payments, and thus, the transfers and deposits from [Company President] could not be 'proceeds.'" *Id.* at 213.

The Second Circuit rejected the merger argument. "[F]unds become proceeds when they are derived from an already completed offense, or a *completed phase* of an ongoing offense," the Court explained, so it "does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in transactions *distinct* from those transactions allegedly constituting money laundering." 289 F.3d at 214. Applying that principle, the Court concluded that although the Company President's acquisition of funds "as a result of fraudulent sales" by brokerage employees or agents "was only one phase of the larger scheme charged in the Indictment, which included subsequent payments to the [brokerage defendants], it was sufficiently distinct to generate 'proceeds' within the meaning of § 1956(a)(1)." *Id.* In particular, "the funds comprised 'proceeds' at the moment they were in the control of the perpetrators, and that moment occurred as soon as [the Company President] received them." *Id.* It therefore was "beside the point" that "the funds involved in the money laundering offenses constituted [the defendants'] compensation for their involvement in the wire fraud scheme." *Id.*

Here, Count Twelve, like the money laundering count in *Szur*, does not present a so-called "merger" problem. Count Twelve charges that the defendants violated Section 1957 when they "made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Five and Six"—which charge wire and securities fraud, [16]

---

[16] Wire fraud and securities fraud constitute "specified unlawful activity." *See* 18 USC § 1956(c)(7) (cross-referencing 18 U.S.C. § 1961(1)).

respectively, with respect to the GTV Private Placement—"to Fund-1." Indictment ¶ 56. No merger problem arises because the GTV Private Placement fraud proceeds arose from transactions distinct from the Section 1957 transaction charged in Count Twelve. That is, the fraud victims had already transferred their funds to bank accounts "in the control of the perpetrators" and were thus already "proceeds"—and that is so whether these funds derived from "an already completed offense, or a *completed phase* of an ongoing offense." *Szur*, 289 F.3d at 214; *see also United States v. Baxter*, 761 F.3d 17, 29–30 (D.C. Cir. 2014) (where defendant embezzled funds by writing check from her employer to front company, which in turn transferred funds to co-defendant, latter transactions occurred after the money was proceeds); *United States v. Seward*, 272 F.3d 831, 837 (7th Cir. 2001) (deposit of funds into bank account over which defendant had control completed the fraud; subsequent checks drawn on the account were Section 1957 offenses; "there is no requirement that the entire fraudulent scheme be complete before defendant starts laundering the proceeds from early portions of the scheme").

Kwok's argument to the contrary is unavailing. As an initial matter, the $100 million transfer is not "the alleged fraud" itself. (Def. Mot. 60). Rather, the fraud entailed obtaining money from victims based on misrepresentations about, "among other things, the purpose and use of victims' money." Indictment ¶ 42, 44. That $100 million was almost immediately misappropriated from the investors' funds is highly probative of the fact that the defendants were knowingly lying when making misrepresentations to investors about the intended purpose and use of the raised funds, but the $100 million transaction is still not "the alleged fraud" itself. In any

event, Kwok's argument is foreclosed by *Szur*, which Kwok does not address, much less distinguish.  Accordingly, the Court should deny Kwok's challenge to Count Twelve.[17]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Kwok's motion to dismiss.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Ryan B. Finkel
Micah F. Fergenson
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
212-637-6612/-2190/-2276/-6612

---

[17] With respect to Count Three, the Government is not proceeding on the theory that an object of the money laundering conspiracy was a violation of 18 U.S.C. § 1956(a)(1)(A)(i), which pertains to domestic promotional money laundering.  Count Three's objects are therefore limited to §§ 1956(a)(1)(B)(i), 1956(a)(2)(A), and 1956(a)(2)(B)(i).