

**Sidhardha Kamaraju**

Direct Tel: 212-326-0895
Direct Fax: 212-326-0806
skamaraju@pryorcashman.com

April 4, 2024

**VIA ECF & EMAIL**

Hon. Analisa Torres
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

     Re:    <u>*United States v. Kwok et al.*, Case No. 1:23-cr-00118 (AT)</u>

Dear Judge Torres:

     We represent Ho Wan Kwok in the above-captioned matter. We write in response to the government's March 31, 2024 letter (the "Govt. Letter"), in which the government relies on overblown, stale, and false accusations against Mr. Kwok to essentially frighten the Court into entering draconian and unprecedented restrictions on discovery that would cripple the defense's ability to prepare adequately for trial. At the same time, the government has deliberately stonewalled the defense's requests for information as to whether and how it is complying with the Court's February 21, 2024 order (the "Fox Hunt Order"), thus leaving the defense unsure as to whether and how it can obtain evidence that the Court has already determined could undermine the government's allegations in this case. Finally, Mr. Kwok objects to the government's proposed pre-trial schedule and joins in the April 4, 2024 submission from Ms. Wang to the extent it pertains to that proposal. For these reasons, Mr. Kwok respectfully requests that the Court enter an order that (i) directs the government to confirm the scope of its search and production in response to the Fox Hunt Order, including whether it is searching for records related to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (ii) directs the government to produce all discovery pursuant to the Fox Hunt Order by April 10, 2024, including certain ▇▇▇▇▇▇▇▇▇▇ for which the government has already produced summaries, and (iii) denies the government's proposal with respect to the pre-trial schedule and restrictions on the defendant's access to purported victim material.



Hon. Analisa Torres
April 4, 2024
Page 2

**I.   The Court Should Direct the Government to Search for and Produce All Information from the FBI-NY's Case Files Responsive to the Fox Hunt Order or Authorize a Rule 17 Subpoena for the Same Information**

   **A.   Factual Background**

   **(i)   The Court's Fox Hunt Order**

As the Court is aware, Mr. Kwok first requested that the government produce materials concerning the CCP's targeting of him (including as part of Operation Fox Hunt) on September 29, 2023, more than six months ago. (Fox Hunt Order at 2.). When the government refused production, on the basis that such materials were purportedly irrelevant to this case, Mr. Kwok moved to compel the government to produce those materials. (Dkt. No. 170.) The Court granted Mr. Kwok's motion in part, ordering the government to produce evidence related to the CCP's targeting of Mr. Kwok, his family, his co-defendants, and the corporate entities relevant to the Superseding Indictment, as well as evidence of the Chinese government's targeting of the NFSC, including related intelligence assessments. (Fox Hunt Order at 6-9.) Critically, the Court held that Mr. Kwok was entitled to this evidence pursuant to Fed. R. Crim. P. 16 because it was material to his defense. (*See id*.)

Specifically, the Court ordered the government to produce this evidence because it could bolster Mr. Kwok's defenses at trial, including that (i) the purchase of the New Jersey property was not for Mr. Kwok or his family but was for the non-fraudulent purpose of providing "a secure meeting place for G|CLUBS members to conduct anti-CCP business out of view," (ii) that the Chinese's government's "measures to suppress Kwok's access to online platforms" could support Mr. Kwok's good faith belief that a "market niche existed," thus justifying his valuation of GTV, and (iii) that evidence of CCP targeting of Mr. Kwok could provide "an alternative explanation of Kwok's use of multiple cell phones and bank accounts" in that such was a "necessary by-product of Operation Fox Hunt—to avoid the Chinese government's efforts to interfere with his accounts or hack his phones." (Fox Hunt Order at 6-7, 8) (cleaned up).

The Court also held that that the government's duty to search for responsive materials was "limited to the materials within its possession," and that the government was not obligated to "conduct a government-wide search for documents" or search "another agency's files for discoverable materials." (*Id.* at 5-6) (cleaned up).

   **(ii)   The Government's Discovery Productions in Response to the Fox Hunt Order**

For what it terms "internal tracking," the government has Bates-stamped material that it deems to be responsive to the Court's Fox Hunt Order with a separate designation from the other Rule 16 discovery produced in this proceeding: "USAOCO," with the "CO" prefix presumably



Hon. Analisa Torres
April 4, 2024
Page 3

meaning "Court Ordered." Based on that designation, the government first produced information responsive to the Fox Hunt Order on March 6, 2024, two weeks after the Court's Order. The government made five more productions on March 11, March 14, March 19, March 22, and April 1. As the government acknowledges in its letter, the government productions relate to a single investigation conducted by ▓▓▓▓ and supervised by ▓▓▓▓ which focuses on ▓▓▓▓

On March 25, 2024, the government produced records from an unidentified investigation described only as ▓▓▓▓ that the government stated "may be considered responsive to the [Fox Hunt Order]," even though the government did not—for whatever reason—designate these records with the government's "-CO" designation. The government's March 25, 2024 production cover letter is attached hereto as **Exhibit A** (the "March 25 Production Letter"). ▓▓▓▓ which was the basis of the government's (unsuccessful) motion to disqualify Ms. Wang's prior counsel, Emil Bove. Given the fact that the government produced these materials ▓▓▓▓

Despite the government's attempted hedge, there is no doubt that the ▓▓▓▓ are responsive to the Court's Order. For example, the government produced summary transcripts and translations of ▓▓▓▓ These summaries are attached hereto as **Exhibit B** (the "Summaries").[1] ▓▓▓▓ —in other words information that the Court recognized in the Fox Hunt Order as directly supporting Mr. Kwok's defenses. The government has confirmed that it has not, however, produced ▓▓▓▓ to date.

In addition to the missing ▓▓▓▓ the government's production to date appears to be devoid of any information concerning, for example, the CCP's "measures to suppress Kwok's access to online platforms," ▓▓▓▓ which the Court held would support Mr. Kwok's good faith belief that a "market niche existed," thus justifying his valuation of GTV. (Fox Hunt Order at 7).[2] Nor has the government apparently produced any records related

---

[1] We may discover more such summaries and documents as our review of the government's recent voluminous productions continues.

[2] On December 22, 2023, the government also filed a second motion pursuant to Section 4 of the Classified Information Procedures Act. Even though that motion was submitted *ex parte*, and thus



Hon. Analisa Torres
April 4, 2024
Page 4

to, in the words of the *Bai* complaint, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ which, as the Court found, supported Mr. Kwok's belief about the need for he and his movement members to have secure meeting locations and to take certain operational security measures that the government seeks to paint as nefarious. (Fox Hunt Order at 6-7).

### (iii) The Government's Refusal to Disclose the Extent of Its Rule 16 Search, Including Whether the Search Encompasses ▇▇▇▇▇ Materials

As of the date of this filing, the government still has not completed its production of discovery pursuant to the Fox Hunt Order, informed the defense as to when it intends to complete its production, or disclosed to the defense whether it will search other prosecutors' files in the USAO-SDNY or other case files in the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

As noted above, on March 19, 2024, the government made its fourth Fox Hunt production, and it became clear that the only documents the government had produced to that point dealt solely with the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ With trial scheduled to begin in just two months, on March 20, 2024, counsel for Mr. Kwok emailed the government to inquire (i) whether it had completed its production in response to the Fox Hunt Order, and if not, when it would do so; (ii) whether the government had or intended to search other sources at the USAO-SDNY ▇▇▇▇▇▇▇ or was taking the position that those were beyond the scope of the government's discovery obligations; and (iii) why the government's Fox Hunt productions to date had not included materials typically maintained ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*See* **Exhibit C**). The purpose of this inquiry was to facilitate a dialogue with the government to determine whether there was any issue that could be resolved now, sufficiently in advance of trial so as to not interfere with it. In particular, counsel was concerned that they would not receive these materials (if at all) with sufficient time (i) to investigate and prepare to use them at trial, and (ii) to resolve disputes over the scope of the government's obligations to search that should be resolved by the Court at that time, rather than weeks or days before trial.

A full week later, on March 27, 2024, the government responded and stated that it was complying with the Court's order to produce "materials within the prosecution's possession" and had produced substantial discovery in response to the Fox Hunt Order (and in the case generally) and would be making additional forthcoming productions. (*Id.*). With respect to timing, the government simply said that it would be making another production the week of April 1, and would know better then how long it would take for the government to complete its Fox Hunt productions. (*Id.*). The government did not respond to counsel's questions about where the government was searching for responsive documents. (*Id.*). When counsel asked whether the government intended to respond to those questions, the government said simply that "we understand our obligations and

---

Mr. Kwok cannot know what it pertains to, given the timing of the filing, it seems likely that it relates, at least in part, to information that is responsive to the Fox Hunt Order.



Hon. Analisa Torres
April 4, 2024
Page 5

are diligently complying with them." (*Id*.).  Given the government's refusal to engage substantively with defense counsel on this subject, the defense was left with no choice but to seek the Court's intervention, particularly given the apparent gaps in the government's productions and the rapidly approaching trial date.

That same day, Mr. Kwok's counsel also emailed the government to ask whether it had produced the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Two days later, on March 29, 2024, the government responded that it had not produced ▮▮▮▮▮▮▮▮ but the government "was looking into it" and "would circle back." (*See* **Exhibit D**).  On March 31, 2024, after Mr. Kwok's counsel followed up earlier that day, the government said that it was "looking into whether we have them, and if we do, we plan to produce them" and that it would "expect to have more information about those recording by mid-week."  As of the time of this filing, the government has not given the defense any new information about the production of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### (iv)   Mr. Kwok's Rule 17 Subpoena to the USAO-EDNY

The government has long taken the position that it is not required to search for or produce material from ▮▮▮▮▮▮▮▮▮▮  In its opposition to Mr. Kwok's motion to compel that resulted in the Fox Hunt Order, the government argued it had no such obligation because the United States Attorney's Office for the Eastern District of New York (the "USAO-EDNY") supervised that investigation and the government was not obliged to produce Rule 16 materials from another prosecution office. (Dkt. 205 at 6.).  Even after the Fox Hunt Order, it remained unclear how the government would interpret the Court's order with respect to *Bai*.  With trial rapidly approaching and so as to provide for the contingency that the government failed or refused to produce the relevant materials under Rule 16, Mr. Kwok moved *ex parte* for the issuance of a Rule 17 subpoena to the USAO-EDNY (the "USAO-EDNY Rule 17 Subpoena") on March 5, 2024.  (*See* March 5, 2024 Memorandum of Law in Support of Defendant's *Ex Parte* Motion for Early Return of Rule 17 Subpoenas at 17-18.)  Even after the Fox Hunt Order, as explained above, the government has been unwilling to tell the defense whether ▮▮▮▮▮▮▮▮▮▮ was included in its search or whether the government would maintain its position that it did not have to search for this material ▮▮▮▮▮▮▮▮  On April 2, 2024, the Court reserved judgment on Mr. Kwok's motion and directed Mr. Kwok to serve the USAO-EDNY Rule 17 Subpoena and supporting memoranda of law on the USAO-EDNY and the government by April 5, 2024.  The Court ordered the USAO-EDNY and the government to respond by April 10, 2024.  On April 3, 2024, Mr. Kwok sent the USAO-EDNY Rule 17 Subpoena and supporting papers to the USAO-EDNY, and on April 4, to the government.


Hon. Analisa Torres
April 4, 2024
Page 6

### B. Argument

#### (i) The Government Should Review and Produce Any Fox Hunt Material Found in Its Files or ▌▌▌▌▌▌▌▌ Files By April 14, 2024

In the Fox Hunt Order, the Court clearly stated that information concerning the CCP's targeting of Mr. Kwok, his family, his co-defendants, and the relevant corporate entities directly supported defenses that go to the heart of the charges in the Indictment, and that it was for a jury to weigh that evidence. (Fox Hunt Order at 6-7). Thus, there can be no dispute that any materials responsive to the Fox Hunt Order are evidence that should be produced and available to the defense for trial. Nor can there be any dispute that the government is aware of at least ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ that maintain precisely the type of information that the Court found to be discoverable. Thus, there is no mystery whether this evidence exists or where it can be found. The only thing that is unclear—*because the government refuses to discuss it*—is whether the government is taking the necessary steps to collect and produce this evidence, and, if so, how long that will take, or whether the defense needs to seek that evidence through Rule 17 subpoenas, such as the USAO-EDNY Rule 17 Subpoena. The defense cannot sit and wait, however, while the government continues to tap dance around direct questions and dribble out this critical discovery, all of which prejudices the defendants' ability to prepare for trial.

The Court compelled the production of the Fox Hunt material pursuant to Rule 16. To comply with Rule 16, the government must search for and produce the responsive material where that information is within the government's "possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). The "prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and indeed has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). The so-called "prosecution team" concept is a sliding scale, and can even reach agents who were not involved in investigating the charged offenses. *See*, *e.g.*, *United States v. Bin Laden*, 397 F. Supp. 2d 465, 484 (S.D.N.Y. 2005) (holding that U.S. Marshals who were part of cooperating witness's protection detail were members of the "prosecution team," even though they had not participated in the underlying investigation), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).

As the Court is well aware, disputes about the scope of the prosecution team are common. But here, it remains entirely unclear what guideposts are being applied by the government in response to the Fox Hunt Order when the government has already stated that it has produced Rule 16 discovery from other prosecution offices and government agencies.[3] Mr. Kwok's position that

---

[3] In its opposition to Mr. Kwok's motion to compel that resulted in the Fox Hunt Order, the government stated that "[b]eyond the materials within the possession of the prosecution team, the undersigned AUSAs requested, produced, and continue to produce files maintained by teams



Hon. Analisa Torres
April 4, 2024
Page 7

the prosecution team should be construed in this case to include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is not controversial or even uncommon, given (i) the significant overlaps between the facts in the two cases, and (ii) the fact that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had substantial involvement in investigating those facts. If anything, the government's obligation to search ▮▮▮▮ for Rule 16 material is heightened as a result of the Fox Hunt Order's conclusion that such responsive materials directly support Mr. Kwok's defenses in this case.

When counsel contacted the government, it had to be apparent that counsel was trying to ascertain whether there was going to be an issue over the scope of the government's searches. That inquiry is completely reasonable under the circumstances: Trial is fast approaching, and if there was going to be motion practice, then that would further delay Mr. Kwok's ability to use these materials at trial (particularly given at the same time, the government was producing tens of thousands of pages of other Rule 16 discovery). Moreover, given the fact that at least one of the Summaries had been declassified within the last three weeks, likely in response to the Fox Hunt Order, the risk that additional issues concerning classified information exist and will consume additional time before the trial is real.

Rather than engage in a substantive discussion on these issues, the government essentially side-stepped counsel's questions. When asked how much longer it would take for the government to complete its production, the response was only that another production of information from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (again) was forthcoming "next week" and that the government could give "an update on overall timing then." In other words, approximately six weeks after the Court entered the Fox Hunt Order, the government was still not in a position to even estimate when the defense would have all of the Fox Hunt discovery. Indeed, even in its letter to the Court, the government only offers a truism: its Fox Hunt Order productions will be complete when they're complete. (Govt. Ltr. at 3 ("[t]he Government will continue to provide materials responsive to the Court's February 21 order until its productions are complete").

Furthermore, when asked a straightforward question as to whether the government was searching ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the government still responded with a non-answer, leaving Mr. Kwok to guess at whether, after several more weeks of waiting for the government to finish its production, he would then have to litigate over issues concerning the scope of the prosecution team. It is simply untenable for a defendant facing potentially decades in prison over a purported billion-dollar fraud to have to wait until the last minute for evidence that the Court has already ruled helps his defense and which the government has known about for months. Indeed, that is precisely why Mr. Kwok sought issuance of the USAO-EDNY Rule 17 Subpoena—because he had no way of knowing if and when the

---

conducting separate investigations, including materials obtained from the SEC and materials related to an investigation of Kwok's criminal enterprise by a different U.S. Attorney's Office and federal agency." (Dkt. 205 at 6.)



government would produce evidence indisputably helpful to him. Mr. Kwok has every right, and the government has every obligation, to ensure he had access to that evidence in time to properly assess and use it at trial.

Far from clarifying these issues, the government's discovery productions to date have only further confused matters. The government's productions appear to establish the following:

- 

- **The government's production appears to have come from** ▇▇▇▇▇▇ ▇▇▇▇▇ The government purportedly created a specific Bates-stamp prefix (*i.e.*, "-CO") for materials that are responsive to the Fox Hunt Order for "internal tracking." To date, however, the government has only produced information concerning a single investigation under that prefix, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Because the materials produced from that investigation do not include ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and because of the government's refusal to answer basic questions, it is unclear whether even those records were produced after a search of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ Moreover, because much of this material is described in the government's production cover letters as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and is incredibly voluminous, the defense has no way of readily determining from which case the material is produced.

- **The government appears not to have produced anything from** ▇▇▇▇▇▇ On the other hand, ▇▇▇▇▇▇▇▇▇ but, according to the government, those files only "may" be responsive to the Fox Hunt Order and were not marked with the government's special "-CO" prefix, even though (i) these records deal with, among other things, ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*i.e.*, exactly the type of information that would be responsive to the Fox Hunt Order), and (ii) were produced only after the Court issued the Order. Given that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



Hon. Analisa Torres
April 4, 2024
Page 9

> ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
> There is no indication, however, that any materials from ▇▇▇▇▇▇ have been reviewed and produced, and again, the government simply refuses to discuss it.
>
> - **No information appears to have been produced from** ▇▇▇▇▇▇
>   Finally, although difficult to tell given the government's unwillingness to disclose information about its searches and what has been produced to date, it appears that no information from ▇▇▇▇▇▇ has been produced to the defense so far. The government produced, however, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ even though it was from a separate investigation from this case, perhaps because of the government's prior position that Mr. Bove knew information from ▇▇▇▇▇▇ that "could" help Mr. Kwok. (Dkt. 120 at 23.). ▇▇▇▇▇▇ on the other hand, also works out ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and has information that the Court has already concluded *would* help Mr. Kwok. If the government views its obligation as reaching materials ▇▇▇▇▇▇ from distinct investigations that involve targeting Mr. Kwok, his family, and his supporters, then it should do the same with ▇▇▇▇▇▇ *See United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004) ("[d]ocuments that the Government has reviewed or *has access to* must be provided to aid a defendant in preparing his defense") (emphasis added). If the government does not intend to do so, then it should at least inform the defense that it is not doing so, so that the defense can promptly raise it with the Court or seek other relief, such as pursuing the USAO-EDNY Rule 17 Subpoena, or a subpoena to ▇▇▇▇▇▇ if necessary.

Finally, the government's unhelpful, generic response that it is "aware of" and "complying with" its discovery obligations gives little comfort in light of the apparently open dispute about the scope of those obligations and the fact that the government has already fumbled them. Specifically, there can be no doubt that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ are responsive to the Fox Hunt Order, given their content. Similarly, there can be no dispute about the power of that evidence for the defense—a ▇▇▇▇▇▇ (that can actually be admitted at trial) of the very CCP conduct that the Court found is helpful to Mr. Kwok's defense. Indeed, even the government cannot claim to be ignorant of the potential connection of this evidence to the defense, given that the government noted information about the CCP's targeting of Mr. Kwok as *Brady* evidence in *June of last year*. Nevertheless, ten months after that *Brady* disclosure, more than six weeks after the Fox Hunt Order, and a week after Mr. Kwok sought clarification from the government, the government has only stated that it does not even know if it has ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ let alone when it will produce them. The ▇▇▇▇▇▇ are highly relevant to Mr. Kwok's defense and are overdue. They should be produced immediately.



Hon. Analisa Torres
April 4, 2024
Page 10

Given the fact that trial is quickly approaching, Mr. Kwok respectfully requests that the Court direct the government to (i) immediately confirm the scope of its search and production in response to the Fox Hunt Order, including whether it is searching for records related to ▮▮▮ and (ii) produce all discovery pursuant to the Fox Hunt Order by April 10, 2024, including ▮▮▮▮▮▮▮▮▮.

**II. The Court Should Reject the Government's Request for Restrictions on Discovery and 3500 Material That Would Cripple Mr. Kwok's Ability to Participate in His Own Defense and Prepare for Trial**

Compounding its hindrance of Mr. Kwok's trial preparation through its conduct with respect to the Fox Hunt Order, the government now also asks the Court to further cripple his ability to prepare for trial and participate in his defense by imposing limitations that would make it impossible for him to effectively consult on the cross-examinations of some of the most significant government witnesses, the alleged victim-witnesses. The government's proposal is three-fold: (i) continue to deny Mr. Kwok access to any discovery that could identify purported victims; (ii) prevent him from *seeing or discussing* with his counsel any exhibit that the government deems could identify an alleged victim until four days before the exhibit is introduced; and (iii) preclude him from *seeing or discussing* with his counsel any purported victim 3500 material until four days before the witness testifies. These restrictions would make effective trial preparation impossible, particularly given the immense language barriers here, the hurdles to defense counsel's access to Mr. Kwok at the MDC, and the fact that defense counsel will also be in the middle of trial. The government points to its obligation to protect victims, but the Court has an even more overriding obligation to protect the fairness of these proceedings. *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2017 WL 1753466, at *2 (S.D.N.Y. Apr. 5, 2017) ("The trial court's primary obligation is to ensure that the defendant receives a fair trial."). Hamstringing Mr. Kwok's ability to help his counsel cross-examine his accusers strikes at the core of his Sixth Amendment right and ensures that the trial will not be a fair one.

Although the government tries to brush past the significance of its proposal when it says that "victim materials are not insignificant," (Govt. Ltr. p. 12), the fact is that the government's proposal concerns the witnesses who, according to the government, will actually say (incorrectly) that Mr. Kwok defrauded them. Mr. Kwok's ability to help confront and cross-examine these accusers should not be infringed. "The critical importance of cross-examination is reflected in the Sixth Amendment right to confront one's accusers." *United States v. Detrich*, 865 F.2d 17, 20 (2d Cir. 1988); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."). A companion Sixth Amendment right is the guarantee that a criminal defendant may meaningfully help in his own defense. *See United States v. Fishenko*, 2014 WL 5587191 at *1-2, (E.D.N.Y. Nov. 3, 2014) (noting that criminal defendants have a "constitutional rights to assist in their own defense").



Hon. Analisa Torres
April 4, 2024
Page 11

The government's novel proposal makes it impossible for Mr. Kwok to exercise these rights because it gives him such a short and, frankly, illusory opportunity to consult with his counsel about the cross-examination of the alleged victims. The government's proposal ensures, for example, that Mr. Kwok cannot even know of the identity of the government's victim-witnesses until four days before they are called to testify. Combined with Mr. Kwok's incarceration, language issues, and the fact that these disclosures will take place mid-trial means that Mr. Kwok will have no meaningful opportunity to aid his counsel in making investigative decisions concerning these witnesses or preparing for their cross-examination. Indeed, Mr. Kwok and his counsel will be completely at the mercy of the government's discretion as to when they can even start discussing the cross-examination of these key witnesses. And that problem is particularly exacerbated by the fact that, as the Court well knows, the government's ability to predict when it will call a certain witness or seek to introduce a certain exhibit is far from perfect, which means that defense counsel and Mr. Kwok will simply be left often to guess as to when their preparation can begin.

But even once the meager four-day window opens, the circumstances of this case make even that period essentially useless for purposes of preparation. For example, the government's proposal creates the very likely scenario that Mr. Kwok's window for victim-witness preparation will fall during a trial week. If that happens, then, depending on the length of the trial day, Mr. Kwok's counsel may have little or no time to meet with him at the MDC on trial days because (i) the variability in when the U.S. Marshals will need to transport Mr. Kwok back to the MDC (which the Marshals typically will not reveal to defense counsel due to security concerns); (ii) the repeated and prolonged lock-downs occurring at the MDC; (iii) the substantial delays in defense counsel being able to access their clients at the MDC; (iv) the 7:30 pm evening cut-off for all visits at the MDC; and (v) the need for translation services[4] (likely from translators that may themselves have been working long hours at the trial), so that defense counsel can effectively communicate with Mr. Kwok about the purported victims. Only after all this can defense counsel investigate whatever information Mr. Kwok shared with them in whatever time is left between preparing for the upcoming trial days and the alleged victim's testimony. These circumstances create a substantial risk that the defense would have to request a mid-trial continuance to properly investigate these critical witnesses.

---

[4] It is no response to say that defense counsel could pre-translate these materials for Mr. Kwok. The government has given neither the Court nor defense any sense of the volume of these materials. The time it takes, and the costs involved, for translation—particularly in a case where much of the relevant communications occurred in a foreign language—are exorbitant. Without some ability to triage the government's 3500 productions for translation and discussion with Mr. Kwok before trial, it is simply not feasible for defense counsel to discuss this material with Mr. Kwok in a manner that allows for meaningful preparation, if the government's proposal is imposed upon Mr. Kwok.



Hon. Analisa Torres
April 4, 2024
Page 12

  Thus, the practical impact of the government's proposal is to effectively deny him his constitutional right to aid his own defense with respect to some of the government's most critical witnesses.  Such harsh restrictions should only be imposed, if ever, in the rarest of circumstances, when justified by substantial need.  That point is frankly demonstrated best by the authorities on which the government relies, which all involve dramatically different situations where, unlike here, a real risk existed that any unidentified witness would be murdered.  For example, in *United States v. Jones*, the defendant was charged with conspiracy to commit murder and murder of a federal informant to prevent communication with a law enforcement officer.  (*See* **Exhibit E**).  In *United States v. Bilal*, the defendant was charged with murder in furtherance of a drug trafficking conspiracy.  (*See* **Exhibit F**).  And in *United States v. Garcia*, the defendant was charged with murder in aid of racketeering and attempted witness intimidation.  (*See* **Exhibit G**).  Finally, in all three cases—a fact which the government failed to disclose to the Court—the "attorney's eyes only" restrictions on 3500 material were entered with *the consent of the defendant*.  (*See* **Exhibits H, I, and J**).  The other authority upon which the government relies involves the terrorist group ISIS, a group that the government has alleged has engaged in the "killing and deliberate targeting of civilians, mass executions, persecution of individuals and communities on the basis of their religion, nationality, or ethnicity, kidnapping of civilians, forced displacement of Shia communities and minority groups, killing and maiming of children, rape, and other forms of sexual violence."  *United States v. Saipov*, 17 Crim. 722 (S.D.N.Y.) at  ¶ 2.  Indeed, the government has convicted defendants of bombing locations and killing civilians in New York City on behalf of ISIS.  *See United States v. Rahimi*, 16 Crim. 760 (S.D.N.Y.); *Saipov*, 17 Crim. 722.

  The common thread between the cases upon which the government relies is that the charged conduct in those cases involved heinous acts of violence.  No such allegations exist in this case.  Even the uncharged conduct which the government tries to rely on to support its position (and its self-serving, exaggerated description of same) does not come close to the type of violent conduct needed to ever support these draconian restrictions, particularly when much of what the government alleges is either stale, unattributable to Mr. Kwok, and/or protected speech.  Almost all of the conduct that the government describes as "obstructive" occurred between November 2020 and January 2023, more than a year ago, and before Mr. Kwok was detained and subject to monitoring and restrictions on access to social media.  In fact, while the government claims vaguely that an attorney unrelated to his defense team was used to "ferry messages between the defendants and the Kwok Enterprise," it does not point to a single instance after Mr. Kwok was detained in which he has directed the harassment of any witness or violated the protective order in this case.  Indeed, the government has not even alleged that these messages concerned anything other than the political aims of Mr. Kwok's political movement.  Thus, the government cannot show that at this time, leading into trial, that Mr. Kwok has either the inclination or ability to engage in any such obstruction.

  But even the pre-arrest conduct alleged by the government—however distasteful—does not warrant the substantial burden that the government seeks to impose on Mr. Kwok's ability to



Hon. Analisa Torres
April 4, 2024
Page 13

prepare for trial. The government does not allege that Mr. Kwok himself engaged in any acts of violence, but rather, that he used his platform to denounce critics, and that in one instance individuals who purportedly followed Mr. Kwok engaged in an act of violence. The core of Mr. Kwok's alleged statements, however, are encouraging protests against individuals who he described as CCP spies. While the government may not approve of that conduct, the fact is that Mr. Kwok's movement is a political one, its political enemy is the CCP, and Mr. Kwok is entitled to denounce those he views as aligned with the CCP's efforts to stop his pro-democracy movement. Protesting, or even encouraging protests, against political opponents or causes is core political speech, and cannot be used to punish the speaker. *See*, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (protecting religious protestors outside of a military funeral against the imposition of tort liability); *Texas v. Johnson*, 491 U.S. 397 (1989) (protecting a protestor from criminal prosecution for flag burning); *Boos v. Barry*, 485 U.S. 312 (1988) (protecting protestors against foreign governments from criminal prosecution); *NAACP v. Claiborne Hardware*, 458 U.S. 886, 907 (1982) (protecting a civil rights boycott from tort liability because it is "a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (protecting students' right to protest the Vietnam War from suppression by a school district); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (protecting protestors of segregation from criminal prosecution for breaching the peace). That, however, is precisely what the government seeks here—to punish Mr. Kwok by impairing his trial preparation based on political speech because the government disfavors it.

To be sure, speech can cross into unprotected territory and become criminal. But even with respect to speech that advocates the use of force, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). None of the purported conduct the government cites comes close to that standard—indeed, even according to the government's description, Mr. Kwok's alleged statement that he would reward anyone who was successful in "getting rid of" Activist-1 was tied to Mr. Kwok's calls to *protest* outside of Activist-1's home, not to imminently harm him. The government cannot use the fact that those words may have inspired anger in others that resulted in those individuals purportedly engaging in violence as a basis upon which to dramatically restrict Mr. Kwok's constitutional rights. *See Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) ("[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.").

Moreover, the overwhelming majority of the government's allegations concerns conduct that occurred well before Mr. Kwok could even know that a criminal prosecution was imminent, and thus before he would have any reason to even seek to intimidate witnesses. Indeed, the only court proceedings that the government points to is a lawsuit filed by a Farm against an individual



Hon. Analisa Torres
April 4, 2024
Page 14

("Individual-1") who claimed that Mr. Kwok had engaged in fraud, and Mr. Kwok's bankruptcy proceedings. With respect to the first action, the filing of a lawsuit is not a violent act. With respect to the bankruptcy proceedings, the only statement that the government even attempts to attribute to Mr. Kwok is one in which Mr. Kwok is alleged to have encouraged his followers to file claims with the Bankruptcy Court to drive up the trustee's fees. As an initial matter, however, even setting aside Mr. Kwok's purported intent, the fact is that even the trustee himself has taken the (meritless) position that GTV, G|CLUBS, the Himalaya Exchange, and various Farm entities are alter egos for Mr. Kwok, meaning that Mr. Kwok's followers who contributed to those causes could be viewed as creditors of Mr. Kwok's estate. And even if Mr. Kwok made the alleged statement with the goal of making the trustee's job more difficult, that act is simply not equivalent, in any way, to murdering a federal informant or engaging in terrorist attacks.[5]

While the government now self-servingly claims that Mr. Kwok is a threat to cause actual violence, it omits key context. ████████████████████████████████████████████████

The undersigned acknowledges that the Court has relied on the government's allegations in denying Mr. Kwok bail. But at issue now is proposed restrictions on Mr. Kwok's ability to prepare for a trial that could result in him facing decades in prison. Nothing in the government's submission comes close to justifying the onerous burden it seeks to impose on Mr. Kwok's trial preparation. Indeed, to the undersigned's knowledge, the Department of Justice has not even sought such significant restrictions on a defendant's access to discovery, government exhibits, and 3500 material in a case where the defendant was alleged to have engaged in public statements that contributed to the storming of the U.S. Capitol building. *See United States v. Trump*, No. 23 Cr.

---

[5] Finally, the government points to social media posts made by "Kwok-controlled media accounts, including his Gettr account" to brand two of the prosecutors as aligned with the CCP. Mr. Kwok, of course, was detained without access to those accounts at the time those statements were posted, and the government has yet to come forth with any evidence showing that he directed those posts from jail. But, while those posts may have been distasteful or indecorous, claiming that a prosecution is politically motivated is a well-worn response to politically-charged cases—indeed, American politicians have done so regularly without a resulting curtailing of their constitutional rights to prepare for trial.



Hon. Analisa Torres
April 4, 2024
Page 15

257 (D.D.C), Dkt. # 10 (DOJ's proposed protective order, which contains no "attorneys' eyes only" provision), attached hereto as **Exhibit L**.

    For all these reasons, the Court should reject the government's application.

*      *      *

### Conclusion

    For the foregoing reasons, Mr. Kwok respectfully requests that the Court enter an order that (i) directs the government to confirm the scope of its search and production in response to the Fox Hunt Order, including whether it is searching for records related to ▌ (ii) directs the government to produce all discovery pursuant to the Fox Hunt Order by April 10, 2024, including ▌▌▌▌ for which the government has already produced summaries, and (iii) denies the government's proposal with respect to the pre-trial schedule and restrictions on the defendant's access to purported victim material.

                                         Respectfully submitted,

                                         Sidhardha Kamaraju
                                         E. Scott Schirick
                                         Matthew S. Barkan
                                         Daniel J. Pohlman
                                         John M. Kilgard
                                         Clare P. Tilton

                                         Sabrina P. Shroff

                                         *Attorneys for Defendant Ho Wan Kwok*