**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA, |
|                   *Plaintiff,* |
|    v. |
| HO WAN KWOK, |
|                   *Defendant.* |

**FILED PARTIALLY UNDER SEAL**

Case No. 1:23-CR-118-1 (AT)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT HO WAN KWOK'S MOTIONS *IN LIMINE***

Sidhardha Kamaraju
E. Scott Schirick
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
sschirick@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490
sabrinashroff@gmail.com

*Attorneys for Defendant Ho Wan Kwok*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT ............................................................. 1

FACTUAL BACKGROUND .................................................................. 4

    I.  Operation Fox Hunt ................................................................... 4

    II.  The New Federal State of China (NFSC) ................................... 7

    III. The Indictment ......................................................................... 9

    IV. The PAX Contempt Order ........................................................ 10

    V.  The Bankruptcy Cases ............................................................. 11

ARGUMENT ...................................................................................... 14

    I.  MR. KWOK'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO UNCHARGED CONDUCT ............................................. 14

        A.  The Legal Standards Related to Uncharged Conduct Evidence ............................ 14

        B.  The Court Should Exclude Evidence Related to Uncharged "Means and Methods" of the Kwok Enterprise ........................................................ 16

            (1) The Court Should Exclude Evidence Concerning Mr. Kwok and His Followers' Responses to His Critics ................................. 17

                (a) The Government's Use of this Evidence Would Violate the First Amendment ....................................................... 17

                (b) The Court Should Exclude this Evidence Because It Is Irrelevant, Offered for an Improper Purpose and Unfairly Prejudicial ..................................... 19

            (2) The Court Should Exclude Evidence Concerning the Pax Contempt Order ... 23

            (3) The Court Should Exclude Evidence Related to the Bankruptcy Cases .......... 25

        C.  The Court Should Exclude Evidence Related to Allegations of Rape and Sexual Misconduct Against Mr. Kwok ....................................... 30

    II.  MOTION *IN LIMINE* TO PRECLUDE THE GOVERNMENT FROM USING CERTAIN PREJUDICIAL AND/OR INFLAMMATORY TERMS ......................... 33

A. The Government Should Be Precluded From Using the
Terms "Shell Company," "Shell Corporation" or "Alter Ego" ............................34

B. The Court Should Require that all References to the Mahwah
Facility Be Made Using The Term "675 Ramapo Valley Road" .........................35

III. MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO MR. KWOK'S
ASSERTION OF HIS FIFTH AMENDMENT RIGHTS ...........................................36

IV. THE COURT SHOULD ORDER THE GOVERNMENT TO IMMEDIATELY
PRODUCE ANY ORALLY COMMUNICATED *BRADY* MATERIAL IN ITS
POSSESSION .........................................................................................................36

V. MOTION *IN LIMINE* TO EXCLUDE THE GOVERNMENT'S
CRYPTOCURRENCY EXPERT.................................................................................38

A. Background ...............................................................................................................38

(1) The Indictment's Allegations About the Himalaya Exchange ........................38

(2) Prof. Shams' Expert Disclosure....................................................................39

B. The Legal Standard ..................................................................................................41

C. The Court Should Exclude Much of Prof. Shams' Proposed Testimony ............42

(1) Prof. Shams Disclosure Lacks Expert Opinions and Instead Merely Contains
Statements of Fact that Lack Relevance .........................................................43

(a) The Market Cap Ratio Testimony Should Be Excluded...........................43

(b) The Trading Correlation and Volume of On-Chain Trading Testimony
Should Be Excluded..................................................................................45

(c) The Smart Contract Customary Practice Testimony Should Be Excluded....
47

(2) Prof. Shams Offers No Reliable Methodology, or any Methodology at All ...52

(3) Prof. Shams' Should Largely Be Precluded from Testifying About the
Himalaya Exchange's Reserves ......................................................................53

(4) Prof. Shams Should Be Precluded from Giving Certain Proposed Testimony
That Is Improper, Irrelevant and More Prejudicial Than Probative................55

VI. TO THE EXTENT THE GOVERNMENT SEEKS TO ADMIT
    DOCUMENT METADATA, MR. KWOK RESERVES HIS
    RIGHT TO OPPOSE THE ADMISSIBILITY OF SUCH EVIDENCE .....................57

CONCLUSION...........................................................................................................................59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ........................................................................... 42

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
  No. 04 Civ. 10014 (PKL), 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ............................ 35

*Beede v. Stiefel Lab'ys, Inc.*,
  No. 13 Civ. 120 (MAD/DJS), 2016 WL 916418 (N.D.N.Y. Mar. 7, 2016) ..................... 44, 46

*Bloomberg, L.P.*,
  No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ............................. 49

*Boos v. Barry*,
  485 U.S. 312 (1988) ....................................................................................... 18

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ....................................................................................... 18

*Carey v. Brown*,
  447 U.S. 455 (1980) ....................................................................................... 17

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) .................................................................................... 23, 26

*Chavez v. Martinez*,
  538 U.S. 760 (2003) .................................................................................... 30, 36

*City of Provid., R.I. v. Bats Glob. Mkts.*,
  No. 14 Civ. 2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ................................ 42

*Colombo v. O'Connell*,
  310 F.3d 115 (2d Cir. 2002) ........................................................................... 18

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F.Supp.2d 314 (S.D.N.Y. 2009) ................................................................. 44

*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) .......................................................................... 41, 42, 51, 53

*Davis v. Carroll*,
  937 F. Supp. 2d 390 ....................................................................................... 48

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568 (1988)..................................................................................................19

*Edwards v. South Carolina*,
  372 U.S. 229 (1963)..................................................................................................18

*Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc.*,
  No. 20 Civ. 2378 (KAM)(CLP), 2023 WL 6136628 (E.D.N.Y. Sept. 20, 2023)........43, 46, 53

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)..................................................................................................42

*Highland Capital Management, L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)................................................................45, 46, 53

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008)........................................................................35

*In re Ho Wan Kwok*,
  Case No. 22-50073 (JAM) (Bankr. D. Conn.) ..........................................................30

*HTC Corp. v. Tech. Properties Ltd.*,
  No. 08 Civ. 882 (PSG), 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013)......................29

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00 Civ. 7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ....................41

*In re Lyondell*,
  558 B.R. (S.D.N.Y. 2016)........................................................................41, 45, 46, 54

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp 3d 558 (S.D.N.Y. 2017).....................................................................33, 35

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)..................................................................................................18

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).......................................................................... *passim*

*Old Chief v. United States*,
  519 U.S. 172 (1997)..............................................................................................16, 32

*Pedroza v. Lomas Auto Mall, Inc.*,
  No. 07 Civ. 0591 (JB)(RHS), 2009 WL 1325440 (D.N.M. Apr. 6, 2009) ................29

*Price v. L'Oréal USA Inc.*,
  No. 17 Civ. 614 (LGS) 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)....................44, 51, 53

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir.2017) ................................................................................49

*In re Rezulin Prods. Liability Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..........................................................41, 42

*Rui Ma v. Guo Wengui, et al.*,
    Index No. 158140/2017 (Sup. Ct. N.Y. Cnty.) ...............................................2, 30

*SEC v. Ripple Labs, Inc.*,
    No. 20 Civ. 10832, 2023 WL 5670711 (S.D.N.Y., Mar. 6, 2023) ..................49, 50

*Snyder v. Phelp*s,
    562 U.S. 443 (2011) .........................................................................................18

*Terminiello v. City of Chi.*,
    337 U.S. 1 (1949) .............................................................................................18

*Texas v. Johnson*,
    491 U.S. 397 (1989) .........................................................................................18

*United States v. Ayers*,
    No. 20 Cr. 239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024) ..............33

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000) ...............................................................................28

*United States v. Chun*,
    16 Cr. 518 (VM) (S.D.N.Y.) .............................................................................5

*United States v. Colombo*,
    909 F.2d 711 (2d Cir. 1990) .............................................................................31

*United States v. Coonan*,
    938 F.2d 1553 (2d Cir. 1991) ...........................................................................28

*United States v. Costello*,
    221 F.2d 668 (2d Cir. 1955) .............................................................................16

*United States v. Downing*,
    297 F.3d 52 (2d Cir. 2002) ...............................................................................15

*United States v. Feng*,
    20 Mag. 1025 (E.D.N.Y.) .................................................................................6

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008) ........................................................................24, 28

*United States v. Gatto*,
  986 F.3d 104 (2d Cir. 2021) ........................................................................51

*United States v. Gonzalez*,
  110 F.3d 936 (2d Cir. 1997) ........................................................................14

*United States v. Haywood*,
  280 F.3d 715 (6th Cir. 2002) ..................................................................27, 28

*United States v. Jackson*,
  No. 19 Cr. 356 (ARR), 2021 WL 62109 (E.D.N.Y. Jan. 7, 2021) .........................21

*United States v. Johnson*,
  469 F. Supp. 3d 193 (S.D.N.Y. 2019) ...........................................................15

*United States v. Johnson*,
  816 F. App'x 604 (2d Cir. 2020) ..................................................................22

*United States v. Kaplan*,
  490 F.3d 110 (2d Cir. 2007) ........................................................................14

*United States v. Levin*,
  No. 15 Cr. 101 (KBF), 2016 WL 8711458 (S.D.N.Y. Jan. 8, 2016) ......................24

*United States v. Liu*,
  No. 22 Cr. 311 (LDH) (E.D.N.Y.) ...................................................................5

*United States v. Lumpkin*,
  192 F.3d 28 (2d Cir. 1999) ..........................................................................42

*United States v. Malka*,
  602 F. Supp. 3d 510 (S.D.N.Y. 2022) ............................................................33

*United States v. Martoma*,
  No. 12 Cr. 973 (PGG), 2014 WL 31191 (S.D.N.Y. Jan. 6, 2014) .........................14

*United States v. Matera*,
  489 F.3d 115 (2d Cir. 2007) ..........................................................15, 20, 23, 25

*United States v. Midyett*,
  603 F. Supp. 2d 450 (E.D.N.Y. 2009) ............................................................22

*United States v. Morgan*,
  786 F.3d 227 (2d Cir. 2015) ........................................................................32

*United States v. Napout*,
  No. 15 Cr. 252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) ....................14

*United States v. Okatan*,
   728 F.3d 111 (2d Cir. 2013)...........................................................................36

*United States v. Rodriguez*,
   496 F.3d 221 (2d Cir. 2007)......................................................................36, 37

*United States v. Schatzle*,
   901 F.2d 252 (2d Cir. 1990)......................................................................32, 52

*United States v. Scott*,
   677 F.3d 72 (2d Cir. 2012)...................................................................20, 21, 24

*United States v. Stein*,
   521 F.Supp.2d 266 (S.D.N.Y.2007).............................................................14

*United States v. Turkette*,
   452 U.S. 576 (1981)...............................................................................15, 20, 26

*United States v. Ulbricht*,
   79 F. Supp. 3d 466 (S.D.N.Y. 2015).............................................................30

*United States v. Vaid*,
   No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017)...................37

*United States v. Watts*,
   934 F. Supp. 2d 451 (E.D.N.Y. 2013) .........................................................34

*United States v. Zhong*,
   26 F.4th 536 (2d Cir. 2022) .........................................................................15

**Statutes**

11 U.S.C. § 521(a)(3)..................................................................................13

11 U.S.C. § 521(a)(4)..................................................................................13

Fed. R. Crim. P. 16 ..........................................................................37, 39, 40

Fed. R. Evid. 401 ....................................................................................*passim*

Fed. R. Evid. 402 ..............................................................................14, 31, 42

Fed. R. Evid. 403 ....................................................................................*passim*

Fed. R. Evid. 404 ....................................................................................*passim*

Fed. R. Evid. 702 ....................................................................................*passim*

**Other Authorities**

CoinMarketCap, available at
    https://coinmarketcap.com/academy/article/4c191fce-5816-49d5-a2cb-
    4e95c6026eb2 ..................................................................................................................48

*Operation Fox Hunt: How China Exports Repression Using a Network of Spies
    Hidden in Plain Sight*, *available at*
    https://www.propublica.org/article/operation-fox-hunt-how-china-exports-
    repression-using-a-network-of-spies-hidden-in-plain-sight (last visited Oct.
    26, 2023) .................................................................................................................4, 5

## PRELIMINARY STATEMENT

Defendant Ho Wan Kwok respectfully submits this memorandum of law in support of his omnibus motion (1) precluding the government, pursuant to Federal Rules of Evidence 401, 402, 403 and 404(b), from introducing certain evidence, using certain terminology and/or making certain arguments, as discussed in further detail below; (2) requiring the government to produce all orally communicated *Brady* material immediately; (3) excluding the testimony of the government's purported cryptocurrency expert; (4) reserving his right to object to the admissibility of certain metadata evidence; and (5) granting Mr. Kwok such other and further relief as this Court deems just and proper.  These orders are necessary to ensure that the jury is not confused by irrelevant and inflammatory information that has little to do with the charged offenses, and to ensure that Mr. Kwok receives a fair trial.

*First*, Mr. Kwok moves to preclude certain evidence that the government apparently intends to introduce to demonstrate the purported "means and methods" of the alleged racketeering conspiracy.  In particular, based on the government's filings to date, it appears that it intends to offer evidence of (i) speeches by Mr. Kwok and protests by his fellow movement members against critics of their movement; (ii) a contempt order filed in New York State Supreme Court; and (iii) Mr. Kwok's bankruptcy proceedings, including the fact that the court there found him in contempt for asserting his Fifth Amendment rights.  None of these categories of evidence, however, can be offered for an admissible purpose.  For one, this evidence does not constitute direct evidence of the crimes charged here—it simply does not speak to whether Mr. Kwok made false statements about GTV, the Farm Loans, G|CLUBS or the Himalaya Exchange.  Nor can this evidence be introduced properly as "uncharged bad acts," because it does not go to a permissible use.  None of this evidence, for example, demonstrates that the purported Kwok Enterprise, as the Indictment

terms it, existed, or that Mr. Kwok had a motive or the intent to commit the charged offenses. Finally, even if the government could articulate some relevance for this evidence, it should still be excluded under Rule 403 grounds, because it creates a substantial risk of improperly inflaming or confusing the jury against Mr. Kwok, and invites mini-trials into issues not germane to this case.

*Second*, Mr. Kwok moves to preclude evidence relating to allegations of threats, coercion and sexual misconduct made in a civil action filed in New York State Court captioned *Rui Ma v. Guo Wengui, et al.*, Index No. 158140/2017 (Sup. Ct. N.Y. Cnty.).  These highly prejudicial allegations of rape and other sexual misconduct are baseless, entirely unproven, and completely irrelevant to the charges in this case. They comprise exactly the type of sensational accusations that would cause a jury to punish someone for an improper purpose, and should be excluded under Rule 403. Put another way, Mr. Kwok should not be forced to stop and defend himself from rape charges in the midst of a purported "fraud" case.  This is particularly true where, as here, the Department of Justice (the "DOJ") acknowledges that the filing of false civil suits is precisely the type of tactic used by the CCP to discredit its critics, and the *Ma* action is being bankrolled by Bruno Wu, a registered agent of the Chinese government.

*Third*, Mr. Kwok moves to preclude the government from using certain prejudicial and inflammatory terms.  Courts are empowered to prohibit the use of certain terms which are unnecessary to prove a claim, but which would unfairly prejudice the jury against the defendant or otherwise suggest to the jury how it should find.  Here, the Court should prohibit the government from using such loaded terms as "shell company," shell corporation" or "alter ego" at trial, as these terms are inherently pejorative and intimate that Mr. Kwok was acting improperly.  Similarly, rather than referring to the Mahwah, New Jersey real property, allegedly misused by Mr. Kwok as

a personal residence, as a "mansion," the Court should require that the government refer to it by its address, *i.e.*, as "675 Ramapo Valley Road."

*Fourth*, Mr. Kwok moves to preclude any reference to or evidence of his prior invocations of his Fifth Amendment rights in unrelated civil proceedings, including the bankruptcy proceedings. As the Court is well aware, prosecutors are forbidden from commenting on a defendant's choice to invoke his right against self-incrimination because it risks poisoning the jury. That harm is no less pernicious or likely if the government is allowed to backdoor such references through evidence showing that Mr. Kwok invoked his constitutional right in other contexts concerning the same subject matter. For example, the government should not be permitted to introduce evidence concerning the contempt order in the bankruptcy proceedings, because, as the government knows, the reason why Mr. Kwok could not comply with the underlying order was because he had invoked his Fifth Amendment rights. As a result, allowing evidence of the contempt order would, by necessity, improperly inject Mr. Kwok's invocation of his Fifth Amendment rights into this proceeding.

*Fifth*, Mr. Kwok moves the Court to order the government to produce any orally communicated *Brady* material immediately. Under controlling Second Circuit precedent, the government's obligations under *Brady* and its progeny extend to both documentary evidence and information received in oral communications. The Court should order the government to produce all such evidence immediately.

*Sixth*, Mr. Kwok moves to exclude the government's cryptocurrency expert. The government's purported cryptocurrency expert does not offer any testimony that is relevant to the allegations in the Indictment, and instead, seeks to interject unmoored factual observations and blatantly prejudicial material about frauds occurring in other cases. As an initial matter, expert

testimony is not properly admitted where the expert purports to conduct some analysis, but then does not offer any opinion that can assist the jury in its determination. That is particularly true when the government's cryptocurrency expert relies on cherry-picked benchmarks as the basis for his factual narrative, but does not explain or describe why those benchmarks were chosen or how they relate to the allegations in this case. Moreover, the expert's attempt to inject information concerning other alleged instances of cryptocurrency fraud into this case are irrelevant and impermissibly inflammatory—there is simply no basis, for example, for the expert to testify as to how Sam Bankman-Fried, the founder of the cryptocurrency exchange FTX, committed his fraud or that he was sentenced to 25 years' imprisonment. All such testimony would do is suggest to the jury that because there was fraud in that case warranting significant punishment, there was also such fraud in this case. Accordingly, the Court should preclude the government's cryptocurrency expert from testifying about these subjects.

*Seventh*, Mr. Kwok reserves his right to object to the admissibility of certain metadata evidence, should the government seek to misapply such metadata in a misleading effort to prove that Mr. Kwok authored, accessed, edited. or reviewed a particular document.

## FACTUAL BACKGROUND

### I.    Operation Fox Hunt

In the nearly 75 years that the CCP has ruled the People's Republic of China ("PRC" or "China"), the party has brooked little dissent, for example, forcibly quashing peaceful pro-democracy protests in Beijing's Tiananmen Square on June 4, 1989. More recently, the CCP has embarked on a purported "anti-corruption" campaign, regularly using trumped-up charges of financial crimes to sideline whistleblowers and political dissidents. *See*, *e.g.*, *Operation Fox Hunt: How China Exports Repression Using a Network of Spies Hidden in Plain Sight*, *available at* https://www.propublica.org/article/operation-fox-hunt-how-china-exports-repression-using-a-

network-of-spies-hidden-in-plain-sight (last visited Oct. 26, 2023) (quoting former Assistant Attorney General John Demers as saying, "we also know that the Chinese government has used the anti-corruption campaign more broadly within the country with a political purpose," and that "some of these people didn't do what they are charged with having done").

As part of its campaign against its political enemies, the CCP launched "Operation Fox Hunt" to ruthlessly repress and silence its critics throughout the world, as acknowledged in the DOJ's—including the SDNY USAO's—own filings. *See id.*; *see also United States v. Ying*, 22 Mag. 1711 (S.D.N.Y.) (bringing criminal charges against alleged participants in Operation Fox Hunt). As described in the *Ying* complaint, since 2014, the CCP, through Operation Fox Hunt, "has engaged in unsanctioned, unilateral, and illegal practices, including coercion, extortion, and intimidation," to try to force "'fugitive' targets"—*i.e.*, Chinese nationals who have fled to foreign countries, including the United States—and their families to cooperate with, or repatriate to, the PRC. According to the government, the CCP's efforts even include actively co-opting the FBI and other U.S. law enforcement officers. (*See United States v. Ying*, 22 Mag. 1711 (S.D.N.Y.), Dkt. No. 1 ¶¶ 20, 22 ("*Ying* Complaint"); *see also United States v. Chun*, 16 Cr. 518 (VM) (S.D.N.Y.), Dkt. No. 7 (FBI employee pleading guilty to acting as an agent of China and providing sensitive FBI information to China); *United States v. Liu*, No. 22 Cr. 311 (LDH) (E.D.N.Y.), Dkt. No. 8 (charging, among others, Department of Homeland Security officer in connection with providing sensitive agency information to China).)

Mr. Kwok is one of the most prominent Operation Fox Hunt victims in the world. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

A primary goal of Operation Fox Hunt is to return so-called "fugitives" like Mr. Kwok back to China to face criminal charges. (*Ying* Complaint ¶ 10(a).)  In this regard, the CCP has gone to significant, and frankly remarkable, lengths to try to return Mr. Kwok to China and thus prevent him from continuing his criticism of the CCP. ████████████████████████████

filed an Interpol "red notice" against him, which the Department of Justice has recognized as a tactic of the CCP in furthering Operation Fox Hunt (*see United States v. Feng*, 20 Mag. 1025 (E.D.N.Y.), Dkt. No. 1 at ¶ 17); and bribed U.S. citizens to lobby senior U.S. government officials for the "removal and return" of Mr. Kwok to China. *See, e.g.*, https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdb-investigation-and *and* https://www.cnbc.com/2020/10/08/trump-ex-fundraiser-elliott-broidy-charged-with-lobbying-violation.html.  China even successfully corrupted a lawyer at the DOJ as part of the latter effort.  *See United States v. Higginbotham*, No. 18 Cr. 343 (CKK), Dkt.

No. 13 at ¶¶ 6-8, 11 (D.D.C. 2019) (describing how DOJ attorney attempted to illegally facilitate Mr. Kwok's extradition to China).

## II.     The New Federal State of China (NFSC)

To escape the CCP's targeting of him, Mr. Kwok sought refuge in the United States, arriving in 2014.  In or about 2017, Mr. Kwok began to speak publicly about corruption within the CCP and the urgent need for democratic reform.  As Mr. Kwok continued to broadcast his beliefs, he attracted more and more followers on social media, eventually developing a following of hundreds of thousands of pro-democracy Chinese dissidents from around the world, including in the United States, the United Kingdom, the European Union, Asia, and Australia.  Mr. Kwok's and his fellow dissidents' movement was referred to as the "Whistleblower Movement."  In 2018, to support this political movement, Mr. Kwok helped found two non-profit organizations, the Rule of Law Foundation (the "ROLF") and the Rule of Law Society (the "ROLS").  According to ROLF's website, the organization is "a nonprofit exposing the inherent evil of the authoritarian Chinese Communist Party government and supporting those seeking freedom and human rights for China."  *See* ROLF Website, *available at* https://rolfoundation.org/.

On or about June 4, 2020, Mr. Kwok publicly announced the formation of the New Federal State of China (the "NFSC") during a ceremony in New York, New York.  The NFSC continues to oppose the CCP and works in support of establishing democracy in China.  *See* NFSC Website, *available at* nfscofficial.com.  The NFSC's political activities in support of these goals include broadcasting news and opinion pieces about events in China, to counteract misinformation disseminated by the CCP; lobbying government officials on matters of concern to the Chinese pro-democracy movement; and organizing pro-democracy protests.  Mr. Kwok and other NFSC members regularly broadcast about the need for the Chinese people to be free of CCP oppression and for those opposed to the CCP to develop critical infrastructure not controlled by the CCP,

including communication channels and currency.  The NFSC's (and Mr. Kwok's) pro-democracy message was endorsed, amplified, and supported by prominent American businesspeople and political figures across the political spectrum.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    To evade the CCP, Mr. Kwok and other movement members began broadcasting through an independent media company called Guo Media, which was funded by Saraca Media Group ("Saraca").  Guo Media generated substantial excitement in the Chinese pro-democracy community, as well as significant investor interest.  In response to this investor interest in Guo Media, in 2020, GTV was founded to, among other things, break through the Chinese media censorship firewall (commonly known as the "Great Firewall of China") that operated to prevent the Chinese people from accessing accurate information that painted the CCP in a negative light.  (*See* Dkt. No. 7-2, GTV Confidential Information Memorandum at 11.)  In April 2020, a private placement offering in GTV was announced.  After the private placement Saraca was also the majority shareholder of GTV, owning 80% of the company.  On or about June 2, 2020, around the same time as the NFSC's founding, Mr. Kwok announced that GTV had gone live.

As the Court knows, many of the allegations in the Indictment relate to the private offering of GTV shares to members of the NFSC.  Despite the very public accusations of fraud by the government and the SEC against Mr. Kwok, and the government's continued denigration of that movement, the NFSC's political activism has not dampened.  Even after these charges were made public, on or about June 4, 2023, the NFSC hosted a third anniversary event at the Mahwah Facility.

The event was attended by multiple members of the U.S. Congress, some of whom addressed the gathering.  Other guests included a former U.S. ambassador and chairman of the House Intelligence Committee; a retired high-ranking U.S. military officer who had formerly served as Director for Cybersecurity Policy, Strategy, and International Affairs in the Office of the Secretary of Defense; and a sitting U.S. mayor.  The gathering was attended by hundreds of NFSC members. The NFSC also continued to broadcast informational materials from the Mahwah Facility, until the Bankruptcy Court enjoined NFSC members from accessing it.

## III.    **The Indictment**

On or about January 3, 2024, a grand jury sitting in this District returned a superseding indictment (the "Indictment") against Mr. Kwok, Ms. Wang and Mr. Je.  (Dkt. No. 215.)   The Indictment alleges that Mr. Kwok led a racketeering conspiracy which defrauded investors for the defendants' personal enrichment.  (*See* Ind. ¶¶ 1-2.)  The (disputed and incorrect) allegations of the defendants' purported misappropriation of funds are central to the Indictment.  (*See, e.g.*, *id.* ¶¶ 2, 16(h), 17, 17(f), 18(h).)

The Indictment alleges fraud in connection with four business ventures related to the NFSC. Specifically, the Indictment alleges that money was misappropriated from (i) the GTV private placement funds to make an investment in a hedge fund on behalf of Saraca, GTV's majority owner (Ind., ¶ 16); (ii) the fees paid to purchase memberships from G|CLUBS to pay for property for the benefit of Mr. Kwok and his family, most notably the Mahwah Facility (*id.*, ¶ 18(h)(ii)); and (iii) a lending program implemented by regional movement organizations called "Farms," referred to as the "Farm Loans Program," and used for, among others, Mr. Kwok's and his family's benefit, as well as for the benefit of Mr. Je's family (*id.*, ¶ 17). The Indictment also alleges that Mr. Kwok and Mr. Je defrauded alleged victims in connection with purchase of two digital currencies known as the H-Dollar and H-Coin, which were issued by the Himalaya Exchange. (*Id.*,

¶ 19.)  In connection with its allegations about these four schemes, the government relies heavily on purported "consciousness of guilt" evidence, including the use of multiple bank accounts in connection with the relevant financial transactions, and Mr. Kwok's use of dozens of multiple. (*Id*., ¶ 4; Govt. Opposition to Pretrial Release, Dkt. No. 26 at 3, 14.)

Under a heading titled "Means and Methods of the Enterprise," the government attempts to recast Mr. Kwok's Chinese pro-democracy movement as a purported criminal enterprise that operated by, among other things, "[o]bstructing and ignoring court orders" and "harassing, threatening, and silencing critics of [Mr. Kwok] and the Kwok Enterprise."  (Ind., ¶¶ 8(c) and (e).) The government also supplemented its allegations to reference an unrelated bankruptcy proceeding, which the government now alleges was another "means and method" of the Kwok Enterprise to "obscure the funds used and controlled by [Mr. Kwok]."  On March 31, 2024, the government filed a letter suggesting some of the purported "means and methods" the government may seek to introduce at trial, including (i) social media posts made by Mr. Kwok allegedly "threaten[ing]" his followers and branding them as CCP spies, (ii) political protests allegedly called for by Mr. Kwok, and (iii) a lawsuit brought by a Farm against a follower alleging that this follower stole millions of dollars from Mr. Kwok's supporters before that follower then accused Mr. Kwok of fraud.  (*See* Dkt. No. 255.)

## IV.    **The PAX Contempt Order**

On April 18, 2017, an Asian hedge fund, Pacific Alliance Asia Opportunity Fund L.P. ("PAX") sued Mr. Kwok in New York State Supreme Court for breach of contract, based on Mr. Kwok's purported failure to repay a loan.  *See Pacific Alliance Asia Opportunity Fund L.P. v. Kwok Ho Wan et al.*, 652077/2017 (Sup. Ct. N.Y. Cnty. 2017) (the "PAX Litigation").  Mr. Kwok was ultimately found liable, and the State Court ordered him to pay $116,402,016.57.  (PAX Litigation, NYSCEF No. 716.)  In addition, the State Court issued an order directing Mr. Kwok to

transport the Lady May, a yacht owned by a relative, to the jurisdiction of the court.  (*Id.*, NYSCEF No. 630.)  When the vessel was not returned on time, the State Court found Mr. Kwok in contempt on February 9, 2022, and imposed mounting fines.  (PAX Litigation, NYSCEF No. 1181 (the "PAX Contempt Order").)

On February 15, 2022, Mr. Kwok declared bankruptcy, as discussed below.  On April 19, 2022, $37 million was transferred to an escrow account on behalf of Relative-2 to act as a bond (the "Bond") for the Lady May.  Pursuant to an escrow agreement (the "Escrow Agreement") that money constituted a loan from, according to the Indictment, the Himalaya Exchange.  Under the terms of the Escrow Agreement, the $37 million was to be repaid to the Exchange once the vessel arrived back in New York.  While the vessel was returned to New York, the Bankruptcy Trustee took control of the funds.  *See U.S. Bank Nat. Ass'n, v. HK Int'l Funds Invs. (USA) Ltd LLC, et al.*, Adv. P. No. 23-05012 (JAM) (Bankr. D. Conn.), Dkt. No. 57.

## V.    The Bankruptcy Cases

In response to the Pax Contempt Order, on February 15, 2022, Mr. Kwok filed for chapter 11 bankruptcy protection (the "Kwok Chapter 11 Case") in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court").  Approximately five months later, on or about July 8, 2022, the Bankruptcy Court approved the appointment of Luc A. Despins, Esq. as the trustee (the "Bankruptcy Trustee") in the Kwok Chapter 11 Case.  The Kwok filing was followed by Genever Holdings Corporation filing for bankruptcy protection on October 11, 2022, and Genever Holdings LLC filing for bankruptcy protection on October 12, 2022.  These three bankruptcy cases were subsequently consolidated with the Kwok Chapter 11 Case (collectively, the "Bankruptcy Cases").

On July 26, 2023, the Bankruptcy Court, issued a Memorandum of Decision and Order Holding Individual Debtor [Mr. Kwok] in Contempt of Court and Denying Motion for Stay of

Order Compelling Production.  (*See* Dkt. No. 130-2 (the "Bankruptcy Contempt Order").)  The Bankruptcy Contempt Order resolved a dispute between the Bankruptcy Trustee and Mr. Kwok that began in July 2022 when the Bankruptcy Trustee filed a Motion for a Rule 2004 Subpoena (the "2022 Rule 2004 Subpoena").  Through the Rule 2004 Subpoena, the Trustee sought both to compel Mr. Kwok to testify in a deposition, and also for Mr. Kwok to produce broad categories of documents, including but not limited to communications between Mr. Kwok and his family, "[a]ll documents related to any investments or trading" by Mr. Kwok and various entities (including entities mentioned in the superseding indictment in this action), all documents "related to any obligation, claim, liability or debt associated with any legal dispute involving" Mr. Kwok, among numerous other requests.  (*See* Dkt. No. 130-3.)

In response to the Rule 2004 Subpoena and subsequent related motions and orders, Mr. Kwok invoked "his rights under the 5th Amendment to the United Constitution, including under the act of production doctrine . . . including all requests for documents and information." (Bankruptcy Contempt Order at 4.)  The Bankruptcy Court held multiple hearings regarding the interplay between Mr. Kwok's Fifth Amendment rights and the Bankruptcy Trustee's right to certain records pursuant to the bankruptcy code.  (*Id.* at 5-7.)  During oral argument in these hearings, the Bankruptcy Trustee stated explicitly and repeatedly that the discovery that he was seeking from Mr. Kwok was the discovery produced by the government in this action and that the Trustee knew that if he requested the discovery directly from the government, that request would be rejected.  (Dkt. No. 130-9 (May 2, 2023 H'ring Tr.) at 14:3-9.)

On July 26, 2023, the Bankruptcy Court issued the Contempt Order.  In relevant part, the court held that production of materials pursuant to the Rule 2004 Subpoena "would be testimonial

and incriminating both with regards to the documents in the possession of the prosecution and the documents that have not been seized by the prosecution." (Bankruptcy Contempt Order at 20.)

However, despite recognizing that Mr. Kwok properly invoked his Fifth Amendment right against self-incrimination, and despite finding that production pursuant to the Rule 2004 Subpoena would be testimonial, the Bankruptcy Court held that an exception to the act of production doctrine applied, namely the "required records doctrine." (*Id*. at 22, 33.) The Bankruptcy Court held that because Mr. Kwok had statutory duties to provide information to the Bankruptcy Trustee under 11 U.S.C. § 521(a)(3) and 521(a)(4), because Mr. Kwok allegedly had to customarily keep the records in question, and because the records related to "public aspects," the required records exception applied. As a result, the Bankruptcy Court held that "(i) it is not impossible for [Mr. Kwok] to comply with the Order Compelling Production and (ii) under the required records exception, the Individual Debtor may not properly invoke his Fifth Amendment right against self-incrimination in response to the Order Compelling Production." (*Id*. at 33.)

The Bankruptcy Court additionally addressed arguments that the Bankruptcy Contempt Order should be stayed given the risk that it could interfere with this Court's proceedings. The Bankruptcy Court rejected such arguments, stating "this Order does not substantially interfere with the Criminal Court's interest in the orderly administration of the Criminal Action." (*Id*. at 40.) As a result, the Bankruptcy Court ordered Mr. Kwok "to petition the Criminal Court to allow production to the Trustee." (*Id*. at 11.)

## ARGUMENT

### I. MR. KWOK'S MOTIONS *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO UNCHARGED CONDUCT

In several different ways, the government seeks to improperly smuggle in evidence of various uncharged conduct as part of its case-in-chief. The Court should not permit the government to do so. The Court should exclude all such evidence from trial for the reasons discussed below.

#### A. The Legal Standards Related to Uncharged Conduct Evidence

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also United States v. Kaplan,* 490 F.3d 110, 120–21 (2d Cir. 2007). "Irrelevant evidence is not admissible." Fed. R. Evid. 402. "Whether a fact is 'of consequence' is 'framed by the elements of, and cognizable defenses to,' the underlying charges." *United States v. Napout,* No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *9 (E.D.N.Y. Dec. 12, 2017) (citation omitted). Uncharged conduct can be admitted as direct evidence of the charged crimes only if "(1) it arose out of the same transaction or series of transactions as the charged offense, (2) if it is inextricably intertwined with the evidence regarding the charged offense, or (3) if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (internal quotations omitted).

Uncharged conduct is "inextricably intertwined" with charged conduct if "[the] details of the uncharged transaction are necessary to understand the charged transaction." *United States v. Stein*, 521 F.Supp.2d 266, 271 (S.D.N.Y.2007). Uncharged conduct is not inextricably intertwined where "[t]he charged crimes are straightforward and may be fully understood without reference to [the uncharged conduct]" or where the Indictment "tells a compelling, complete, and detailed story with almost no mention of the [uncharged conduct]." *United States v. Martoma*, No. 12 Cr. 973

(PGG), 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014) (citations omitted). "If necessary, the government may introduce evidence of uncharged criminal conduct to complete the story of the crime on trial, not to tell a new one." *United States v. Zhong*, 26 F.4th 536, 552 (2d Cir. 2022) (cleaned up).

Rule 404(b) governs the admissibility of evidence of "other crime[s], wrong[s], or act[s]" as indirect evidence of the crimes charged. Fed. R. Evid. 404(b). To be admissible under Rule 404(b), the government must show that the evidence is "(1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial." *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002). While evidence of other crimes, wrongs or acts may be offered for the purpose of showing "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," such evidence is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b).

"In the context of a racketeering charge, evidence of uncharged bad acts may be admitted if they are relevant to proving the existence of the alleged enterprise." *United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007). The existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Regardless of whether evidence is offered as direct evidence, Rule 404(b) evidence, or to show the existence of the alleged enterprise, "uncharged conduct must still survive scrutiny under the Fed. R. Evid. 403 balancing test to be admissible." *United States v. Johnson*, 469 F. Supp. 3d 193, 205 (S.D.N.Y. 2019). Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States,* 519 U.S. 172, 180 (1997); *see also United States v. Costello*, 221 F.2d 668, 674 (2d Cir. 1955) (evidence is inadmissible where it tends to "mislead [rather] than . . . enlighten the jury").

As set forth below, none of the uncharged conduct relates to charged crimes, the existence of the alleged Kwok Enterprise, or the permitted uses for "other acts" evidence under Rule 404(b). Moreover, even if it the uncharged conduct were offered for a proper purpose, any probative value is substantially outweighed by the danger of undue prejudice and misleading the jury. Accordingly, the Court should exclude this evidence.

### B. The Court Should Exclude Evidence Related to Uncharged "Means and Methods" of the Kwok Enterprise

As described above, the Indictment purports to describe three categories of evidence, among others, of the alleged "means and methods" of the Kwok Enterprise, including (i) "[h]arassing, threatening, and silencing critics or [Mr. Kwok] and the Kwok Enterprise" (Ind., ¶ 8(e)); (ii) "[obstructing and ignoring court orders" (*id.* ¶ 8(c)); and (iii) using the Bankruptcy Cases "to obscure the funds used and controlled by [Mr. Kwok]" (*id.*, ¶ 20). The Court should not permit this purported "means and methods" evidence to be introduced into trial by the government because this evidence does not relate to any of the elements of the charged offense, does not bear on the existence of the alleged Kwok Enterprise, and is not offered for a proper purpose under Rule 404(b). Furthermore, this evidence's probative value, if any, is substantially outweighed by a danger of unfair prejudice and confusing the issues, per Rule 403.

### (1)    The Court Should Exclude Evidence Concerning Mr. Kwok and His Followers' Responses to His Critics

The Indictment alleges as a purported "means and methods" of the alleged Kwok Enterprise that it operated through "harassing, threatening, and silencing critics" of Mr. Kwok. (Ind., ¶ 8(e).)  Given the government's filings to date, including its March 31, 2024 letter (Dkt. No. 255) and prior filings opposing Mr. Kwok's bail applications, it appears likely that the government intends to offer as evidence of this supposed conduct (i) social media statements allegedly made by Mr. Kwok; (ii) protests supposedly caused by Mr. Kwok's statements; and (iii) a lawsuit filed by one of the Farms against an individual who was alleged to have stolen millions of dollars from Mr. Kwok's supporters and then publicly claimed that Mr. Kwok was engaged in fraud (the "Farm Lawsuit").  None of this evidence should be admitted at trial.

### (a)    The Government's Use of this Evidence Would Violate the First Amendment

The government's attempt to use the comments and protests of Mr. Kwok and his followers, or their filing of a lawsuit, to support a criminal prosecution is deeply problematic from a constitutional perspective.  There is no question that when, for example, Mr. Kwok accused his detractors of being "demons" or "CCP spies" (the "Political Statements") and encouraged protests against those with whom he disagreed politically (the "Political Protests" and, together with the Political Statements, the "Political Activity"), he was engaged in protected Political Activity that should not form the basis of a criminal prosecution.

Political expression is "an exercise of basic constitutional rights in their most pristine and classic form," which "has always rested on the highest rung of the hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980) (citations omitted).  Denouncing those that abandon or oppose a political cause, even in caustic or distasteful terms, is still a form of political expression.  This is true, even if individuals may have felt intimidated, or were silenced, by Mr.

Kwok's speech. "Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982). Nor does it lose its protected character if a speaker advocates or urges others to protest, unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

The constitutional protections around protesting in support of one's political beliefs or in using speech to combat one's political adversaries are robust, and neither speech nor political protest may properly form the basis for civil or criminal liability. *See*, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (protecting religious protestors outside of a military funeral against the imposition of tort liability); *Boos v. Barry*, 485 U.S. 312 (1988) (protecting protestors against foreign governments from criminal prosecution); *Texas v. Johnson*, 491 U.S. 397 (1989) (protecting a protestor from criminal prosecution for flag burning). That is true even when those protests lead to general unrest and stir anger. *See Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) ("[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."). Equally protected under the First Amendment is the Farm Lawsuit. *See Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) (the right "to sue and defend in the courts is itself protected by the First Amendment because it is the right conservative of all other rights which lies at the foundation of orderly government") (cleaned up). Indeed, the peaceful redress of grievances through the court system should be encouraged; it should not form the basis of a criminal prosecution.

Attempts to criminally prosecute the free exercise of speech are constitutionally invalid. *See Boos*, 485 U.S. at 334; *Texas*, 491 U.S. at 420; *Edwards v. South Carolina*, 372 U.S. 229 (1963)

(protecting protestors of segregation from criminal prosecution for breaching the peace). The government's allegations here are tantamount to the same thing—characterizing this activity as "means and methods" of a criminal racketeering enterprise prosecutes Mr. Kwok for his Political Activity and punishes him for engaging in protected expression. Construing the RICO statute to encompass such conduct would bring the RICO law squarely in conflict with the First Amendment, a construction that the Court must avoid if a narrower reading is available. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (stating that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"). Accordingly, the Court should not permit the government to introduce evidence about any of Mr. Kwok's and his followers' Political Activity or the Farm Lawsuit, or permit the government to contend that this conduct constitutes the "means and methods" of the racketeering conspiracy charged in Count One.

> **(b)    The Court Should Exclude this Evidence Because It Is Irrelevant, Offered for an Improper Purpose and Unfairly Prejudicial**

Even assuming, *arguendo*, the government was permitted to introduce constitutionally-protected free speech as the "means and methods" of a RICO enterprise, the evidence concerning the Political Activity and the Farm Lawsuit should still be precluded because it is not relevant to any element of the offense, nor offered for a permitted use under Rule 404(b), and otherwise prohibited by Federal Rule of Evidence 403 because it is unfairly prejudicial, highly inflammatory, and will result in a trial-within-a-trial.

The Political Activity and Farm Lawsuit are not direct evidence of the charged offenses—they do not prove whether Mr. Kwok intentionally made false statements to deprive his alleged victims of money or property in connection with any of the GTV Private Placement, Farm Loans

Program, G|CLUBS, or the Himalaya Exchange.  Accordingly, to the extent the government seeks to contend that Mr. Kwok acted wrongly by rallying his fellow movement members through the Political Statements to engage in the Political Protests or commence the Farm Lawsuit, it must be offering such evidence as other bad act evidence.  And what flows naturally from that is that the government can only properly admit this evidence if it either (i) is evidence of the existence of the Kwok Enterprise, *see Matera*, 489 F.3d at 120; or (ii) is evidence that could be admitted under Rule 404(b)(2), *see United States v. Scott*, 677 F.3d 72, 78 (2d Cir. 2012).  The Political Activity and Farm Lawsuit cannot meet either standard.

*First*, neither the Political Activity nor the Farm Lawsuit prove the existence of the Kwok Enterprise.  This evidence does not show how the various corporate entities alleged to comprise the enterprise relate to or cooperate with one another—it doesn't say anything, for example about the interconnectedness of GTV, ACA, and GFashion.  *See Turkette*, 452 U.S. at 583 ("The existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.").  The only thing that the Political Activity or Farm Lawsuit arguably shows is that there is a group of individuals united in a common political goal, *i.e.*, a political movement.

But the Indictment does not allege that the Chinese pro-democracy movement writ large is the enterprise.  Indeed, it would make no sense to do so.  The Indictment alleges that Mr. Kwok's fellow movement members are the victims of the Kwok Enterprise—they are the ones who Mr. Kwok allegedly solicited with intentional misrepresentations.  But at the same time, these fellow movement members also engaged in the Political Activity and Farm Lawsuit the government misdescribes as the "means and methods" of the Kwok Enterprise.  The government cannot have it both ways.  Mr. Kwok's fellow movement members cannot logically be both the Kwok

Enterprise's victims and its perpetrators. Thus, the only rational construction of the Indictment is one where the Political Activity and Farm Lawsuit do not constitute "means and methods" of the Kwok Enterprise and cannot be used to prove the existence of that enterprise.

*Second*, the Political Activity and the Farm Lawsuit do not constitute admissible Rule 404(b) evidence. Initially, it does not matter that the Political Activity and the Farm Lawsuit do not constitute a crime—Rule 404(b)'s prohibitions still apply. *See Scott*, 677 F.3d at 78 ("While crimes, wrongs, or bad acts may be more likely than other kinds of acts to demonstrate criminal propensity and thus be inadmissible for that reason under Rule 404(b), the Rule itself is in no sense limited to such acts."). Accordingly, this uncharged evidence may only be admitted for one of the purposes set forth in Fed. R. Evid. 404(b)(2): "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The Political Activity and the Farm Lawsuit, however, do not show any of these things.

*Third*, even if the government could offer a relevant use for this type of evidence, it should still be excluded because it is highly inflammatory and would improperly invite and require a "trial within a trial." Fed. R. Evid. 403; *see United States v. Jackson*, No. 19 Cr. 356 (ARR), 2021 WL 62109, at *2 (E.D.N.Y. Jan. 7, 2021) (observing that Rule 404(b) evidence is "still subject to balancing under Rule 403 and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'") (citation omitted). In this regard, the government's portrayal of these subject protests as acts of intimidation, physical assault, and violence renders these protests as significantly more inflammatory than the charged conduct which, as the government repeatedly emphasized in filings prior to the Superseding Indictment, is essentially a financial fraud case. This far more inflammatory evidence should be excluded under Rule 403. *See, e.g.*, *Jackson*, 2021 WL 62109, at *2 ("Here, the danger of unfair prejudice is substantial; membership

in the Bloods gang, which is notorious for its violence and criminality, is more inflammatory than the charged crime of being a felon in possession of a firearm" (internal quotation omitted)); *United States v. Midyett*, 603 F. Supp. 2d 450, 456 (E.D.N.Y. 2009) ("[e]vidence shall be excluded as unduly prejudicial when it is more inflammatory than the charged crime" and where "the prior conduct, namely, the alleged scuffle and assault, bears no similarity to the crime charged, the inflammatory and non-probative nature of the prior conduct is almost assured" (cleaned up)).

Moreover, with respect to the Farm Lawsuit, introduction of that evidence as an act of purported retribution is inappropriate under Rule 403. If the government were permitted to introduce this evidence and claim that it showed witness intimidation, then Mr. Kwok would have to rebut that contention by showing that the filing of the lawsuit was appropriate. To do so, Mr. Kwok would need to demonstrate that there was a credible basis for the allegations in the Farm Lawsuit and to argue that it was within the constitutional rights of the Farm to pursue legal action against the defendant. Given the marginal probative value of the Farm Lawsuit and the fact that its filing is constitutionally protected, it would be inappropriate to admit this evidence and create a "trial-within-a-trial" on the allegations of the Farm Lawsuit.[1] *See, e.g.*, *United States v. Johnson*, 816 F. App'x 604, 610 (2d Cir. 2020) (upholding exclusion of evidence under Rule 403 where "the minimal probative value was substantially outweighed by a real risk of distraction and concerns regarding a potential trial within a trial") (cleaned up). Accordingly, evidence concerning the Political Activity and the Farm Lawsuit should be excluded.

---

[1] The government has produced material from the Farm Lawsuit showing that the defendant in that case lied to the government about her need to "go into hiding." (*See* USAO_00281018.) If that defendant testifies at trial, then, even if the Court grants Mr. Kwok's motion, she should still be subject to cross-examination about this and all her other misrepresentations.

**(2)    The Court Should Exclude Evidence Concerning the Pax Contempt Order**

The government should not be permitted to introduce any evidence concerning the PAX Contempt Order, the Bond, or its circumstances, as evidence in support of its racketeering charge. (*See supra* pp. 10-11 (discussing the Pax Contempt Order).)  The Indictment does not charge Mr. Kwok with contempt or obstruction, and does not include either crime as a predicate for the racketeering conspiracy.  Accordingly, at best, the PAX Contempt Order is purported other bad act evidence that may only be admissible for limited purposes, none of which are present here.

*First*, the PAX Contempt Order does not relate to the existence of the alleged enterprise. *See Matera*, 489 F.3d at 120.  The Pax Contempt Order is a court order in an unrelated civil breach of contract action against Mr. Kwok personally that shows nothing about, for example, the organization of the various alleged "enterprise" entities or how those entities allegedly function together.  All it shows is that, at most, Mr. Kwok was held in civil contempt of a court order.  That does nothing to prove the existence of the purported "Kwok Enterprise."  Indeed, permitting evidence of this personal court order against Mr. Kwok as proof of a purported "enterprise" will likely confuse the jury, who will also be required to determine that there is a "separateness" between Mr. Kwok and the enterprise he is alleged to have managed.  *See generally*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name.").

*Second*, evidence concerning the PAX Contempt Order should not be admitted as Rule 404(b) evidence.  As discussed above, evidence concerning the PAX Contempt Order may only be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence

of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *Scott*, 677 F.3d at 78. Evidence about the PAX Contempt Order does not relate to any of these permissible uses.

The government may argue that evidence concerning the PAX Contempt Order supplies a motive for the Bond that the government alleges came from the Himalaya Exchange. That, however, only serves to demonstrate further why the PAX Contempt Order and Bond should be excluded. If the motivation for the Bond was the PAX Contempt Order, then that motive *was not in existence at the time that the alleged misrepresentations were made*. And if the motive was not in existence at or before the making of the statements, then it cannot be the explanation for why Mr. Kwok purportedly made those misrepresentations, which is the relevant question for the jury. At most, the PAX Contempt Order would prove the motive for the alleged misappropriation of the money, which is not the charged offense—mere theft of funds without an accompanying fraudulent statement does not satisfy the federal fraud statutes. *See United States v. Finnerty*, 533 F.3d 143, 148-49 (2d Cir. 2008) (no securities fraud where government did not show that defendant had communicated anything misleading to his alleged victims and government merely "undertook to prove no more than garden variety conversion").

Finally, even assuming that the alleged motive behind paying the Bond is relevant, the fact that the State Court concluded that Mr. Kwok deliberately violated that order and found him in civil contempt adds nothing, but does create a substantial risk that the jury will convict him based on that contempt order. The PAX Contempt Order is thus barred by Rule 403. *See*, *e.g.*, *United States v. Levin*, No. 15 Cr. 101 (KBF), 2016 WL 8711458, at *12 (S.D.N.Y. Jan. 8, 2016) ("The Court believes that even to the extent this evidence is relevant, that relevance is substantially outweighed by the risk of unfair prejudice under Rule 403 given its inflammatory nature against the defendant.").

### (3)    The Court Should Exclude Evidence Related to the Bankruptcy Cases

In the Indictment, the government summarily alleges that "KWOK's claim of bankruptcy was based on years-long efforts to obscure the funds used and controlled by KWOK, which was a means and method of the KWOK Enterprise."  (Ind., ¶ 20.)  The government's rote assertion aside, the Bankruptcy Cases have no relevance to the charged conduct, and thus, evidence and argument concerning it should be precluded.  Moreover, even if the government could point to something relevant about the Bankruptcy Cases, any probative value would be far outweighed by the unfair prejudice and risk of jury confusion that would stem from dragging a heavily-litigated bankruptcy proceeding into this already-sprawling RICO prosecution.

The Indictment does not charge Mr. Kwok with any crimes concerning the Bankruptcy Cases, such as bankruptcy fraud or obstruction of the bankruptcy proceedings.  Nor are any bankruptcy-related offenses included as predicate acts supporting the alleged pattern of racketeering activity.  (*See* Ind., ¶¶ 24-58.)  Thus, nothing about the Bankruptcy Cases can be direct evidence of any charged offense.  Further, for the reasons set forth below, evidence concerning the Bankruptcy Cases also is not admissible as evidence of the existence of the enterprise, as 404(b) evidence, or as evidence of the background of the charged conduct.  In short, the Bankruptcy Cases are entirely irrelevant to the charges in the Indictment, and the Court should preclude the government from offering or eliciting any evidence concerning the Bankruptcy Cases.

*First*, as with the Political Activity, the government seems to be using this conduct not as predicate acts, but as uncharged conduct intended to demonstrate the existence of the purported Kwok Enterprise and its "means and methods."  *See Matera*, 489 F.3d at 120 ("In the context of a racketeering charge, evidence of uncharged bad acts may be admitted if they are relevant to proving the existence of the alleged enterprise.").  But Mr. Kwok's Bankruptcy Cases are an event personal to him—no other entities that are an alleged part of the purported Kwok Enterprise filed

for bankruptcy.  Thus, the Bankruptcy Cases shows nothing about, for example, the organization of the "enterprise," or how the various entities coordinated.  *See Turkette*, 452 U.S. at 583 (the existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit").  Indeed, Mr. Kwok and the Kwok Enterprise cannot overlap if the government's already questionable RICO theory is to survive.  *See generally*, *Cedric Kushner*, 533 U.S. at 161 ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").  Thus, the filing of the Bankruptcy Cases is not admissible to prove the existence of the Kwok Enterprise.

The same is true if the government tries to claim that Mr. Kwok's conduct during the Bankruptcy Cases shows that one of the "means and methods" of the Kwok Enterprise is "[o]bstructing and ignoring court orders."  (Ind. ¶ 8(c).)  Again, this argument would impermissibly conflate Mr. Kwok and the Kwok Enterprise.  Even accepting the government's (incorrect) characterization of the bankruptcy proceedings for purposes of argument, this evidence would show at most that Mr. Kwok personally disobeyed an order of the Bankruptcy Court (which, as discussed in more detail below, was due to Mr. Kwok's proper invocation of his Fifth Amendment rights).  This evidence does not show how the Kwok Enterprise was organized, how its constituent parts coordinated, or even how they engaged in the predicate acts of wire fraud, securities fraud, bank fraud, and money laundering.  Again, any purported obstruction was a personal act by Mr. Kwok.  However expansive the government believes the RICO statute to be, it is not so broad as to be able to vacuum up this alleged misconduct into its ambit.

*Second*, the government cannot introduce the Bankruptcy Cases or any of Mr. Kwok's actions in the Bankruptcy Cases as 404(b) evidence.  Other bad act evidence can only be introduced

to show a permissible purpose, *i.e.*, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" with respect to the charged conduct." Fed. R. Evid. 404(b)(2). The filing of the Bankruptcy Cases and the ensuing proceedings post-dated the alleged criminal activity, and any alleged misconduct in connection with those proceedings is not similar to the charged offenses and cannot be properly admitted under Rule 404. *See United States v. Haywood*, 280 F.3d 715 (6th Cir. 2002) (reversing conviction where lower court had permitted introduction of evidence showing defendant's possession of cocaine, which occurred months after the charged conduct, as evidence of defendant's intent, in a prosecution for possession of cocaine with intent to distribute). Of the permissible 404(b) uses, the government presumably relies on the Bankruptcy Cases to suggest that Mr. Kwok had the motive or intent to steal from the movement because he was in need of money. But Mr. Kwok's supposed need for money in February 2022 does not show that he similarly needed money at the time of (i) the alleged beginning of the racketeering conspiracy in 2018 (Ind. ¶ 1); (ii) the alleged misstatements in April 2020 in connection with the GTV Private Placement (*id.* ¶ 16); (iii) the alleged misstatements in July 2020 in connection with the Farm Loans Program (*id.* ¶ 17)*;* (iv) the alleged misstatements in October 2020 in connection with the sale of GCLUBS memberships (*id.* ¶ 18); and (v) the alleged misstatements in November 2021 in connection with the sale of HDO and H-Coin from the Himalaya Exchange (*id.* ¶ 19(c)). Furthermore, in the intervening months between the sale of HDO and H-Coin and the commencement of the Bankruptcy Cases, there were mounting fines as a result of the PAX Contempt Order to the tune of millions of dollars, meaning that Mr. Kwok's ability to pay his debts in November 2021 and February 2022 was dramatically different. Simply put, the February 2022 bankruptcy filing is irrelevant to the issue of Mr. Kwok's financial affairs in the past and should not be admitted at trial. *See Haywood, supra*.

27

The government may also argue that the April 2022 Bond securing the return of the Lady May is evidence of motive or intent. (Ind., ¶ 19(g).) This is a red herring. As discussed above, the motive or intent to allegedly take the loan would have arisen *after* all of the alleged misstatements, thus undercutting, rather than supporting, any argument the government might make that the February 2022 bankruptcy filing is admissible as "motive" for the charged offenses. Nor would it matter if the government tried to argue that the Bankruptcy Cases were the motive for or intent behind the subsequent Exchange loan because then that would mean that the Bond was divorced from any alleged misstatements—in other words, the government would be alleging "no more than garden variety conversion " *Finnerty*, 539 F.3d at 149. For these reasons, the February 2022 bankruptcy filing is not relevant even if proffered by the government as proof of motive or intent.

*Third*, for the same reasons, the Bankruptcy Cases cannot be evidence of the "background" of any of the charged offenses because it occurred after the start of the charged offenses. *See Haywood*, 280 F.3d 715 (evidence showing possession of cocaine months after charged conduct inadmissible to show intent); *see also United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). Equally, the Bankruptcy Cases are not "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). According to the Indictment, save the GTV Private Placement Offering, which is alleged to have completed several months before the Bankruptcy Cases (Ind., ¶ 16), the remaining alleged schemes are alleged to have continued until March 2023, more than a year after the bankruptcy filing. Thus, even according to the government's allegations, Mr. Kwok's Bankruptcy Cases are neither the start or the end of

28

the charged offenses, and thus cannot properly be admitted to "complete the story of the crime on trial."

*Fourth*, argument and evidence about the Bankruptcy Cases runs afoul of Rule 403. As described above, the probative value of evidence and argument about the Bankruptcy Cases is minimal. Balanced against this minimal relevancy is the stigma attached to filing for bankruptcy, such that "[a] reference to bankruptcy may trigger visceral reactions among jurors." *HTC Corp. v. Tech. Properties Ltd.*, No. 08 Civ. 882 (PSG), 2013 WL 4782598, at *2 (N.D. Cal. Sept. 6, 2013); *see also Pedroza v. Lomas Auto Mall, Inc.*, Civ. No. 07-0591 JB/RHS, 2009 WL 1325440, at *7 (D.N.M. Apr. 6, 2009) (excluding evidence of past bankruptcy and civil litigation and noting that "past civil litigation, especially bankruptcy, also poses such a risk [of significant and irrelevant prejudice]."). In such cases, including here, where the potential prejudice caused by injecting a defendant's bankruptcy proceedings is significant, but the relevance minimal, the proper course is to preclude evidence of the bankruptcy. *See HTC Corp.*, 2013 WL 4782598 at *2 (holding that references to the defendant's bankruptcy should be excluded, given the plaintiff's "failure to tie" the bankruptcy to issues of relevance in the case).

That evidence and argument about the Bankruptcy Cases should be excluded under Rule 403 is particularly true given the government's veiled reference to Mr. Kwok's purportedly ignoring and obstructing court orders in bankruptcy. (Ind. ¶ 8(c).) As discussed in connection with the PAX Contempt Order, any mention of contempt of court is pernicious for a defendant facing criminal charges (s*ee supra* pp. 23-24), but mention of the bankruptcy contempt is particularly objectionable and presents insurmountable Rule 403 problems.

As the Court knows, the contempt order entered in the Bankruptcy Cases pertained to Mr. Kwok's invocation of his Fifth Amendment rights—namely his act-of-production privilege

when ordered to disclose the discovery from this matter. *In re Ho Wan Kwok*, Case No. 22-50073 (JAM) (Bankr. D. Conn.), Dkt. 2035.

As a result, if the government sought to introduce the contempt order, Mr. Kwok would be forced to either (i) show that he was not seeking to frustrate the court's order as part of his management of the Kwok Enterprise but simply exercising his right against self-incrimination, or (ii) allow the government's claim to go unchallenged. In other words, Mr. Kwok would have an untenable choice—put before the jury the fact that he invoked the Fifth Amendment in connection to this prosecution, or, in his silence, concede he was endeavoring to aid the purported Kwok Enterprise through his alleged contempt in the Bankruptcy Cases. Mr. Kwok should not be forced to face such a Sophie's Choice because he exercised his Fifth Amendment rights. *See Chavez v. Martinez*, 538 U.S. 760, 768-69 (2003) ("no penalty may ever be imposed on someone who exercises his core Fifth Amendment right not to be a witness against himself in a criminal case"). Given the overwhelming prejudice that would ensue to Mr. Kwok from making this choice, evidence of the bankruptcy contempt order should be precluded. *See*, *e.g.*, *United States v. Ulbricht,* 79 F. Supp. 3d 466, 492–93 (S.D.N.Y. 2015) (excluding evidence that the defendant sold illicit goods and services not related to the charges in the indictment, as allowing such evidence "may mislead the jury and lead it to convict [the] defendant for uncharged conduct," and "may lead to a mini-trial on collateral issues").

### C.    The Court Should Exclude Evidence Related to Allegations of Rape and Sexual Misconduct Against Mr. Kwok

The government should be prohibited from offering or eliciting evidence related to the unproven and baseless allegations of rape and sexual assault against Mr. Kwok set forth in a New York State Court case captioned *Rui Ma v. Gui Wengui, et al.*, Index No. 158140/2017 (Sup. Ct. N.Y. Cnty.) (the "*Ma* Action"). While the government has not yet referred to these unfounded

allegations against Mr. Kwok, the Trustee in the Bankruptcy Cases has alluded to them, presumably in an attempt to poison the Court against Mr. Kwok. (*See* Dkt. No. 145 at 5 (bankruptcy claims include "allegations by one of [Mr. Kwok]'s former employees of sexual assault by [Mr. Kwok]").)  This Court should not permit the government to do the same with the jury.

*First*, the allegations in the *Ma* Action are entirely irrelevant to the criminal charges against Mr. Kwok.  Fed R. Evid. 401.  In the *Ma* Action, the plaintiff alleges that Mr. Kwok sexually assaulted and raped her on multiple occasions.  Mr. Kwok vehemently denies all of these charges, is actively defending himself against them, and will show that these allegations are just another instance of the CCP targeting dissidents like Mr. Kwok with lurid and false claims to harm their reputations.  *See*, *e.g.*, *United States v. An*, No. 22 Cr. 460, Dkt. No. 9 ¶ 40 (E.D.N.Y. 2022) (describing how defendant, an Operation Fox Hunt operative, sought to coerce victim to return to China by knowingly filing a false civil lawsuit in New York state court).  In any event, it is readily apparent that the unsubstantiated allegations in the *Ma* Action are not probative of the charged offenses here, which center around fraud and money laundering, Accordingly, the Court should prohibit the government from eliciting evidence or testimony concerning these allegations at trial. *See* Fed. R. Evid. 401, 402 ("irrelevant evidence is not inadmissible").

*Second*, even if some sort of dubious relevancy was somehow manufactured by the government, the *Ma* Action still should be excluded from trial under Rule 403.  Evidence of uncharged sexual misconduct is highly inflammatory and is exactly the type of evidence Rule 403 is designed to exclude.  *See, e.g., United States v. Colombo*, 909 F.2d 711, 714 (2d Cir. 1990) ("Evidence linking a defendant to a rape he is not charged with has always been considered extremely prejudicial . . . because it tends to muddle the jury, and to lead them to convict the

accused because he was in general so loathsome.") (internal citations and quotation omitted));
*United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015) (reversing conviction where court
admitted testimony concerning death threat letter that was "graphic and profane, and the proposed
crime was unrelated to the charged offenses[]").  The baseless allegations in the *Ma* Action present
exactly the type of extreme and undue prejudice that Rule 403 is designed to prevent by ensuring
that a jury does not make its decision "on an improper" or "emotional" basis. *Old Chief*, 519 U.S.
at 172.

    *Third*, the *Ma* Action also implicates Rule 403's prohibition on evidence that risks
"confusing the issues," "misleading the jury," or "wasting time." Fed. R. Evid. 403. Specifically,
if the *Ma* Action allegations are admitted at trial, Mr. Kwok will be entitled to present his defense
to those allegations – *viz*, that this is just another set of false allegations manufactured by the CCP
against him. To present that defense, the fraud case would effectively have to be stayed, while a
different case, a "rape" case, with a different set of witnesses—including Ms. Ma, the purported
victim, and Bruno Wu, the registered foreign agent of the People's Republic of China who is
funding the civil suit—is brought before the jury.[2] All this would confuse the jury and waste their
time on a collateral issue. For this reason too, the Court should prohibit the government from
introducing evidence related to the allegations in the *Ma* Action.  *See United States v. Schatzle*,
901 F.2d 252, 256 (2d Cir. 1990) (district court properly precluded evidence that would have
required a "mini trial" and "focus[ed] the jury upon the wrong event").

---

[2] As explained by Mr. Kwok's attorneys in the bankruptcy case, the plaintiff in the *Ma* Action
confirmed in a letter that her fees were being paid by Bruno Wu.  (*See* Declaration of Sidhardha
Kamaraju dated April 9, 2024 ("Kamaraju Decl.") Ex. A (Mar. 30, 2022 H'ring Tr.) at 19:14-18,
21:3-9; *see also* ███████████████████████████████████

*Fourth*, the allegations in the *Ma* Action are inadmissible under Rule 404(b).  Under Rule 404(b), evidence of a defendant's "crime[s], wrong[s], or other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  "In other words, evidence that a defendant committed crimes beyond those presented to the jury is not admissible to show that the defendant is a bad person who is therefore likely to be guilty of the crimes charged." *United States v. Malka*, 602 F. Supp. 3d 510, 530 (S.D.N.Y. 2022) (quoting *United States v. Hsu*, 9 F.3d 112, 118 (2d Cir. 2012)).  Here, evidence of the allegations in the *Ma* Action, which have nothing to do with the charged offenses, could only be offered for the improper purpose of showing Mr. Kwok's alleged bad character, and should therefore be excluded.  *See Malka*, 602 F. Supp. 3d at 531 (precluding evidence relating to defendant's sexual practices under Rule 404(b)); *United States v. Ayers*, No. 20 Cr. 239 (BMC), 2024 WL 1158686, at *9 (E.D.N.Y. Mar. 18, 2024) ("Evidence of the alleged, uncharged sexual abuse shall be excluded under Rules 403 and 404.").

## II. MOTION *IN LIMINE* TO PRECLUDE THE GOVERNMENT FROM USING CERTAIN PREJUDICIAL AND/OR INFLAMMATORY TERMS

"Courts often prohibit the use of certain pejorative terms when such categorizations [are] inflammatory and unnecessary to prove a claim and such statements do not bear on the issues being tried." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,* 232 F. Supp 3d 558, 570 (S.D.N.Y. 2017) (internal citation and quotation marks omitted). Such prohibitions will be needed here because Mr. Kwok anticipates that the government will seek to use certain inflammatory or prejudicial terms at trial that have little, if any, probative value and which would be far outweighed by the prejudice to Mr. Kwok from their use.  For example, Mr. Kwok expects the government to try to use such loaded terms as "shell company," "shell corporation," and "alter ego" to refer either to certain entities identified in the Indictment or other related entities.  Mr. Kwok also expects the

government to try to refer to a facility located in Mahwah, New Jersey as the "Mahwah Mansion," or some similar pejorative. The Court should stop the government from using these prejudicial terms.

### A. The Government Should Be Precluded From Using the Terms "Shell Company," "Shell Corporation" or "Alter Ego"

Based on prior filings in this matter, Mr. Kwok anticipates that the government will seek to use the terms "shell company" or "shell corporation" at trial. Use of these terms would be highly prejudicial to Mr. Kwok because they could be perceived by jurors as involving illegal or improper conduct. At the same time, the use of such terms has minimal probative value, especially where the use of such entities may be common in business. For example, a holding company could be said to be a "shell company," yet holding companies are ubiquitous, exist for many proper business purposes, and need not be described or identified in that pejorative way. Accordingly, the risk of poisoning the jury against Mr. Kwok by use of the terms "shell company" or "shell corporation" far outweighs whatever minimal relevance such terms may have. *See United States v. Watts*, 934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013) (precluding government use of the terms "shell company" and "shell corporation" because those terms "could be perceived to have a pejorative meaning" and "[n]o evidentiary value is added by allowing" their use).

The same risk is present with the term "alter ego," which is also a term of art and a (potentially adverse) legal conclusion. The Bankruptcy Trustee has repeatedly argued in the Bankruptcy Cases that some of the same entities referenced in the Indictment are "alter egos" of Mr. Kwok. While the Bankruptcy Court's rulings on those matters are excludable for entirely separate reasons as set forth above, a jury could perceive the term "alter ego" as inherently pejorative because it may imply that Mr. Kwok acted improperly or was trying to obscure his identity or role in the transactions at issue. At the same time, there is minimal (if any) probative

value in the use of such term, and the government should accordingly be precluded from using it because of the obvious risk of unfair prejudice. *See, e.g.*, *MF Glob. Holdings Ltd.*, 232 F. Supp. 3d at 570 (precluding use of terms "vulture funds" and "treasure hunters" as "derogatory" and "inflammatory" and "unnecessary to prove the claims at issue in this case"); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas,* No. 04 Civ. 10014 (PKL), 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009) (precluding the use of the phrase "tax haven" on the ground that it is inflammatory, and warning the parties to avoid "inflammatory terms and making derogatory statements that do not bear on the issues being tried.").

**B.    The Court Should Require that all References to the Mahwah Facility Be Made Using the Term "675 Ramapo Valley Road"**

A central allegation in the Indictment is that funds used to purchase memberships from G|CLUBS were used to purchase a facility in Mahwah, New Jersey, that Mr. Kwok and his family allegedly used as a residence. (Ind. ¶¶ 5, 18(h)(ii).) In support of its position that the facility is a residence, the government has frequently referred to the Mahwah facility as the "Mahwah Mansion." (*E.g.*, Dkt. No. 160 at 1-5, Dkt. No. 205 at 20, Dkt. No. 233 at 1 n.1.) Mr. Kwok vociferously denies the government's view and intends to demonstrate at trial that the Mahwah facility was purchased as a secure meeting place for G|CLUBS members to conduct anti-CCP business. The Court has acknowledged the viability of this defense. (*See* Dkt. 243 at 6.)

To avoid unfairly tainting Mr. Kwok's defense to this charge, the government should be precluded from using the term "Mahwah Mansion" at trial, a rhetorical trick that improperly prejudges an issue of fact to be determined by the jury based on the evidence before it. A simple solution is to have the parties refer to the facility by its street address – "675 Ramapo Valley Road" or "675 Ramapo." *See Highland Capital Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173, 193

(S.D.N.Y. 2008) (precluding parties from "characteriz[ing] admissible evidence and testimony as 'securities fraud,' 'illegal,' 'insider trading,' 'inside information,' and 'market manipulation.'").

## III.    MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO MR. KWOK'S ASSERTION OF HIS FIFTH AMENDMENT RIGHTS

The government may seek to introduce into evidence, or otherwise comment on, Mr. Kwok's choice to exercise his Fifth Amendment rights in response to SEC subpoenas, in the Bankruptcy Cases, or in other civil litigations. The government should be precluded from adversely introducing or raising any evidence that Mr. Kwok has asserted this foundational constitutional right in any prior instance.

The United States Supreme Court has instructed that "no penalty may ever be imposed on someone who exercises his core Fifth Amendment right not to be a witness against himself in a criminal case." *See Chavez*, 538 U.S. at 768-69 (internal quotations omitted). And in the Second Circuit, the "use of a defendant's invocation of the privilege imposes the same cost no matter the context in which that invocation is made." *United States v. Okatan*, 728 F.3d 111, 119 (2d Cir. 2013) (holding that prosecution may not use, in its case in chief, a defendant's assertion of the Fifth Amendment privilege during a non-custodial police interview"). Mr. Kwok's prior invocation of his Fifth Amendment rights in prior proceedings, including at depositions and in response to discovery devices, must accordingly remain off limits to the government.

## IV.    THE COURT SHOULD ORDER THE GOVERNMENT TO IMMEDIATELY PRODUCE ANY ORALLY COMMUNICATED *BRADY* MATERIAL IN ITS POSSESSION

Under controlling Second Circuit precedent, the government's obligation to produce *Brady* material extends to both documentary evidence and information that it has received in oral communications. That is true whether or not the information the government received orally was written down or audio-recorded. *See, e.g., United States v. Rodriguez*, 496 F.3d 221, 222 (2d Cir.

2007) ("When the Government is in possession of material information that impeaches its witness or exculpates the defendant, it does not avoid the obligation under *Brady*/*Giglio* to disclose the information by not writing it down.").

In this case, the government has identified *Brady* material to Mr. Kwok in two letters dated June 26, 2023 and December 11, 2023.  The December 11 letter included ███████████ ████████████████████████████████████████ (*See* Kamaraju Decl. Ex. C.) Documents in the government's production indicate that the prosecutors in this case have been in contact with several individuals associated with entities of the alleged Kwok Enterprise, including but not limited to the Rule of Law Foundation, Golden Spring, Hamilton Capital and G|CLUBS, as well as the Bankruptcy Trustee. The Court should Order the government to immediately produce any *Brady* material that has been orally communicated to the government – no matter the source and regardless of whether or not the communication was recorded.

This *Brady* material should be produced immediately. The government does not fulfill its *Brady* obligations with scatter-shot, last-minute disclosures.  Rather, "*Brady* material must be disclosed in time for its effective use at trial."  *United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *12 (S.D.N.Y. Sept. 5, 2017).  That is, the defendant must have "a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial," Rodriguez, 496 F.3d at 226.  The government has represented that it will complete its Rule 16 discovery by April 10, 2024 (*i.e.*, the day after motions *in limine* are due and less than six weeks to trial).  For the defense to be afforded full use of any remaining *Brady* in the government's possession (including orally communicated *Brady*), Mr. Kwok respectfully requests that the Court order immediate relief.

37

## V.    MOTION *IN LIMINE* TO EXCLUDE THE GOVERNMENT'S CRYPTOCURRENCY EXPERT

The government's expert notices show a plan to use expert testimony for an impermissible purpose: to smuggle in summary fact testimony, comparing and contrasting the Himalaya Exchange and related cryptocurrencies on a limited number of questionable data points that the government has selected with no discernable methodology, in the hopes that it will help convince a lay jury that the tokens at issue were not "real cryptocurrencies." But the Federal Rules of Evidence are clear and, as courts have repeatedly held, expert witnesses cannot simply recite a factual narrative masquerading as expert opinion and then fail to draw appropriate technical or scientific conclusions. The government's proposed expert testimony presents this and several other deficiencies, including an attempt to establish non-existent customary practices via an expert's mere say-so without the requisite grounding in appropriate technical or scientific study, experience, literature or learning, and proposed testimony that is facially inflammatory, unduly prejudicial and outright improper by referencing, for example, infamous cryptocurrency frauds including FTX (and Sam Bankman-Fried), Tether and The Squid Game Token. For these reasons and those explained further below, the Court should exercise its gatekeeping authority and preclude large swaths of the government's proposed expert testimony.

### A.    Background

#### (1)    The Indictment's Allegations About the Himalaya Exchange

Count 12 of the Indictment charges Mr. Kwok with a single count of wire fraud related to his involvement in promoting the Himalaya Exchange, which, according to the Indictment, was a "purported cryptocurrency 'ecosystem'." Ind. ¶ 19. The government alleges that the Himalaya Exchange included a "purported stablecoin" called the Himalaya Dollar ("HDO") and a trading coin called the Himalaya Coin ("HCN"). The Himalaya Exchange claimed that HDO was a

"stablecoin" with a fixed 1-to-$1 value backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. *Id.* The initial coin offering of HDO and HCN occurred on or around November 1, 2021. Ind. ¶ 19(b).

The Indictment alleges that Mr. Kwok and others made a variety of false or misleading statements or claims in connection with promoting the Himalaya Exchange, HDO and HCN. Mr. Kwok allegedly promoted the stablecoin HDO as backed by cash reserves and, in part, by gold reserves. Ind. ¶¶ 19(a)-(e). The Indictment also alleges that Mr. Kwok's co-defendant touted that a Ferrari was purchased using HDO, without disclosing that the purchase was in fact conducted via internal bank wires and that the purchaser was a relative of Mr. Kwok. Lastly--and critically for purposes of this motion—the government alleges that Mr. Kwok and others made false statements simply by publicly describing HDO and HCN as "cryptocurrencies." Ind. ¶ 19(a); ¶ 19(e) ("Contrary to [the] representations of [Mr. Kwok] . . . HCN and HDO were not cryptocurrencies.").

The government thus sets out to prove nothing less than that HDO and HCN were not real cryptocurrencies. *See id.* Just as important on this motion is what the Indictment does not allege. Nowhere does the Indictment claim that Mr. Kwok or his co-defendants manipulated the price of HCN or HDO using their purported control of the Himalaya Exchange. Nor does the Indictment allege that the defendants altered the code of HCN or HDO's smart contracts—because the contracts were not "immutable"—as part of the charged scheme to steal investor funds.

### (2)    Prof. Shams' Expert Disclosure

On April 1, 2023, the government provided disclosure pursuant to Rule 16(a)(1)(G), which identified an expert it may call during its case in chief concerning the Himalaya Exchange, HCN and HDO: Professor Amin Shams. According to the government's notice, if permitted by the Court, Prof. Shams' testimony will cover general background information about blockchains, smart

contracts and cryptocurrencies; stablecoins and reserves; on- and off-chain transactions; and "features" of cryptocurrencies. (*See* Kamaraju Decl., Ex. D (April 1, 2024 Expert Disclosure of Prof. Amin Shams) ("Shams Disclosure") at 2-13.) Prof. Shams' disclosure also shows that he plans chiefly to testify about a series of factual comparisons between HDO and HCN and other cryptocurrencies. Sometimes Prof. Shams uses a select set or subset of tokens as comparators, and in other cases he uses unsupported general observations about *all* cryptocurrencies as the point of reference. For example, if permitted, Professors Shams would testify about:

- The ratio of HCN's daily-trading-volume-to-market-cap compared to what he characterizes as twelve "benchmark exchange tokens" (Shams Disclosure at 15-24) (the "Market Cap Ratio");

- The price correlation between HCN and each of a crypto index, a basket of "100 similarly-sized tokens," ETH and Bitcoin (*id.* at 25-36) (the "Trading Correlation");

- A comparison of the largest on-chain HCN and HDO transactions to ETH, Bitcoin and four "benchmark exchange tokens" that Prof. Shams selected—which is different than the set of benchmark exchange tokens used in the Market Cap Ratio (*id.* at 38-55) (the "Volume of On-Chain Trading");

- A factual comparison of the smart contracts for HCN and HDO and what Prof. Shams characterizes as "most" or "typical" cryptocurrencies (*id.* at 63)—without reference to any support for those sweeping assertions—to show that the Himalaya token contracts departed from an unestablished customary practice that "most" smart contracts are immutable and have a greater level of undefined "decentralization." *Id.* at (56-65) (the "Smart Contract Customary Practice" or "Customary Practice"); and

- The importance of reserves for stablecoins like HDO and, based exclusively on hearsay from third-party sources, testify that "there does not appear to be evidence" that reserves were adequate (*id.* at 69).

Prof. Shams' notice also shows that he plans to include in his testimony along the way inapt and inflammatory references to frauds that even he does not contend are similar to the facts at hand, such as Squid Game Token, CP3R, Tether and FTX, including testimony that "crypto exchange FTX, and its founder Sam Bankman-Fried, were accused of having commingled FTX

customers' funds to make undisclosed venture investments, lavish real estate purchase, and large political donations" and that "Bankman-Fried was ultimately sentenced to 25 years in prison." (Shams Disclosure at 67 (cleaned up).)

### B.    Legal Standard

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product reliable facts and methods, that the expert has "reliable applied" to the case. Fed. R. Evid. 702.  Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose.  First, it "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury.  *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). The expert's testimony must actually assist the jury "understand facts that are *outside common understanding*."  *In re Lyondell*, 558 B.R. 661, 667 (S.D.N.Y. 2016) (emphasis in original) (internal quotation omitted).  The corollary is that an expert may not merely recite a factual narrative and then fail to draw technical or scientific conclusions. *See LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *1-2 (S.D.N.Y. July 16, 2002) (excluded in its entirety an expert report that offered an extended factual narrative, because it did "not address technical questions that may be difficult for a juror to comprehend.  Instead, it contain[ed]

arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language.")

Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999) (internal citation and quotation omitted); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *accord Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citation omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

### C.    The Court Should Exclude Much of Prof. Shams' Proposed Testimony

Prof. Shams' notice is almost entirely devoid of expert opinions in the form contemplated by Rule 702.  Instead, the disclosure is filled with factual statements or observations that lack any apparent relevance to proving HDO or HCN are "not real cryptocurrencies." Moreover, Prof. Shams' methodology for evaluating whether the tokens are "real cryptocurrencies" is not anchored in any accepted scientific or technical analysis, or any analysis of his own that would tend to show that his selected criteria and points of comparison are relevant to the core question at issue:  the authenticity of HDO and HCN.

### (1)    Prof. Shams Disclosure Lacks Expert Opinions and Instead Merely Contains Statements of Fact that Lack Relevance

As noted above, Fed. R. Evid. 702 contemplates that experts may testify in the form of expert opinions—opinions that require specialized knowledge, are based on facts and data, are the product of reliable principles and methods, and reflect a reliable application of said methods to the case  Fed. R. Evid. 702.  Prof. Shams' notice largely fails to provide expert opinions within the meaning of this rule.

### (a)    The Market Cap Ratio Testimony Should Be Excluded

For example, with respect to the Market Cap Ratio, Prof. Shams provides merely a series of fact statements about "the market cap and volume of HCN and various exchange tokens []." (Shams Disclosure at 15.)  First, he points to data from the Himalaya Exchange website regarding the trading price of HCN, as well as its "Market Cap," the latter calculated based on all HCN issued.  (*Id.* at 15-20.)  Prof. Shams then identifies twelve other tokens, which he refers to as "benchmarks," selected solely because they are tokens linked to a centralized cryptocurrency exchange with the largest available market caps.  (*Id.* at 15.)  Prof. Shams' explanation as to why this particular set of twelve tokens is an appropriate "benchmark," however, is purely anecdotal.

This is not a proper subject of expert testimony. *Fantasia Distribution, Inc. v. Cool Clouds Distribution, Inc*., No. 20 Civ. 2378 (KAM)(CLP), 2023 WL 6136628, at *11 (E.D.N.Y. Sept. 20, 2023) (excluding expert testimony based individual anecdotes rather than random sampling/survey data); *see also Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co*., 650 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (excluding opinion that transshipping occurred in same proportion outside of the studied sales territories because expert offered no basis for assumption that the studied sales territory was representative).

From these cherry-picked benchmarks, Prof. Shams then creates a ratio of daily-trading-volume-to-market-cap for HCN and each of the twelve comparators and contrasts them in a chart. (Shams Disclosure at 23.) Finally, he offers the fact "conclusion[s]" that HCN's Market Cap Ratio is "starkly lower" and "unproportional" compared to the others, and that HCN's "trading volume [] does not appear to align with the size of its market cap."

Yet Prof hams goes no further. His disclosure does not indicate that he will testify or explain why a supposedly low "Market Cap Ratio" matters. He is not offered to give testimony on how the jury should interpret it. And, most importantly of all, he does not plan to testify *how* the Market Cap Ratio is relevant to determining the fact at issue—whether HCN and HDO are "real cryptocurrencies." In order to qualify as expert testimony, an expert must offer an opinion based on "the expert's scientific, technical, or other specified knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. General observations about a supposed disproportional Market Cap Ratio do no such thing. Nor is there any obvious relevance to Prof. Shams' observation. As a result, Prof. Shams' testimony concerning the Market Cap Ratio should be excluded under FRE 702 and 401. *See Beede v. Stiefel Lab'ys, Inc.*, No. 13 Civ. 120 (MAD/DJS), 2016 WL 916418, at *24 (N.D.N.Y. Mar. 7, 2016)

(rejecting proposed expert where expert "never rendered any opinion regarding" the relevant issues); *see also Price v. L'Oréal USA Inc.,* 17 Civ. 614 (LGS), 2020 WL 4937464, at *5, 7 (S.D.N.Y. Aug. 24, 2020) (rejecting expert testimony that was inadequately supported by relevant facts, leading to an "analytical gap" between expert analysis and opinions).

> **(b)    The Trading Correlation and Volume of On-Chain Trading Testimony Should be Excluded**

Professor Shams' proffered testimony concerning the three other criteria he selects suffers from the same fundamental defect.  Prof. Shams' comparison of the HCN's price movements to other tokens in the Trading Correlation disclosure also merely offers facts without explaining how, if at all, those facts matter in his expert view.  For instance, he intends to testify that (1) HCN's price movement is "largely unrelated" to the price movement of a crypto index, BTC and ETH, and (2) HCN's lack of correlation to an index of 100 similarly-sized tokens is "unusual" given a typically positive correlation across crypto trading prices.  (Shams Disclosure at 36.)

Again, Prof. Shams' disclosure does not explain, in his expert opinion, what this supposed "unusual" correlation means.  There is no technical or scientific analysis applied to the observed facts to lend import to the dissimilarities in correlation; no explanation of how that technical or scientific gloss has been used in the past such that it can reliably be applied here to draw inferences about cryptocurrencies lacking price correlation; nor any indication of how, ultimately, trading price correlation can help the jury determine whether HCN or HDO were "real cryptocurrencies." Expert testimony about purported technical analysis that merely recites a factual narrative and that "does not draw technical or scientific conclusions" should be excluded.  *In re Lyondell Chemical Company*, 558 B.R. 661, 667 (Bankr. S.D.N.Y. 2016) (excluding sections of testimony that was little more than an "extended factual narrative" and was predicated on "cherry-picking of evidence"); *see also Highland Cap. Mgmt., L.P.,* 379 F. Supp. 2d. at 467-69.

The same applies to Prof. Shams' "Volume of On-Chain Trading" analysis. There, Prof. Shams points out that other cryptocurrencies have a greater number of on-chain transactions than HCN or HDO.  The tokens he selects as comparators include the largest, most prevalent cryptocurrencies in the world, Bitcoin and ETH, together with four other "benchmark" tokens "selected because they are tokens associated with cryptocurrency exchanges." (Shams Disclosure at 38.)  Setting aside questions about the methodology of selecting these "benchmarks,"[3]  the Volume of On-Chain Trading analysis again yields exclusively factual observations: that HCN and HDO's trading activity were not recorded on a distributed ledger, and that the tokens were not transferred to other users on a public blockchain, which Prof. Shams actually finds "consistent with" "public blockchain records" showing custody of HCN and HDO tokens being concentrated with the Himalaya Exchange.  (*Id.* at 55.)  Having a witness testify that his technical observations are based on, and consistent with, public record information is not expert testimony.  *See In re Lyondell Chemical Co.*, 558 B.R. at 667; *Highland Cap. Mgmt.* 379 F. Supp. 2d. at 467-69 (S.D.N.Y. 2005) ("To the extent that [the expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible. … [A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."); *Beede*, 2016 WL 916418 at *25 (same).  Because the disclosure proffers Prof. Shams to recite facts about the Volume of On-Chain Trading, but not

---

[3] These four so-called "benchmark" tokens are a one-third subset of the twelve benchmark tokens selected for the Market Cap Ratio analysis—even though the disclosure says the latter were similarly selected because "they are tokens linked to a centralized cryptocurrency exchanges." (Shams Disclosure at 15.)  The difference is not explained, and the lack of consistency raises questions about both analyses and potential cherry-picking, which are bases for exclusion of expert testimony.  *See Fantasia Distribution,* 2023 WL 6136628, at *11.

for expert testimony concerning the import of those facts, his testimony should be excluded under Rules 702 and 401.

In sum, if Prof. Shams is permitted to testify to the jury as presented in the disclosure, the government would be asking the jury to find—without any reasoned basis offered by an expert to bridge the gap between the claimed factual dissimilarities and any plausible inference based thereon—that HCN and HDO are "not a real cryptocurrencies" based simply on the *fact* of those dissimilarities. That would be improper and risk confusing the jury by inviting them to draw an impermissible inference based on a logical fallacy: that because one thing is unlike a set of others in selected ways, the dissimilar thing is bad.

### (c)    The Smart Contract Customary Practice Testimony Should Be Excluded

In addition, Prof. Shams' proposed testimony concerning the Smart Contract Customary Practice suffers from multiple defects that require it to be excluded. First, Prof. Shams fails to establish under Rule 702—and, in fact, cannot establish as a matter of fact—that there is a customary practice with respect to the immutability of token contracts[4] and the decentralization of cryptocurrency exchanges.  (Shams Disclosure at 57-65.)  Presumably, this testimony is offered for the same purpose as the other criteria in the disclosure: to show that HCN was not a "real cryptocurrency" on the grounds that the HCN token contract was not immutable and the Himalaya Exchange was not decentralized. But, as explained in greater detail below, Prof. Shams' disclosure shows he cannot establish any such customary practice as a baseline against which to so judge

---

[4] It is important to distinguish between the immutability of token contracts and the immutability of a blockchain. Prof. Shams plans to testify that it is customary for crypto token smart contracts to be immutable, not that the blockchain on which transactions are recorded is immutable. Prof. Shams' statement about individual token contracts typically being immutable, as opposed to the blockchain, finds no support in these materials.

HCN or the Himalaya Exchange. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) (rejecting expert testimony regarding "customary practices" where there was a lack of support offered regarding the assumptions made regarding such practices). Moreover, even assuming such a customary practice could be established, Prof. Shams' disclosure cannot support the inference that the lack of immutable token contracts and decentralization in a crypto exchange has a high correlation to fraud. Lastly, the Customary Practice portion of Prof. Shams' proposed testimony is replete with entirely inapt and anecdotal references crypto frauds, such as the Squid Games Token and CP3R, that are both irrelevant, prejudicial and excludable under Rule 403. *See Nimely*, 414 F.3d at 398 (2d Cir. 2005) (trial court committed error by failing to preclude expert testimony that was more prejudicial than probative and ordering new trial)

*First*, Prof. Shams' disclosure shows that he cannot properly establish a customary practice relating to the mutability or immutability of cryptocurrency contracts. He simply states, under the heading "Qualities of Cryptocurrencies," that "*most* cryptocurrencies ensure that the token contracts are immutable and do not have a single entity controlling the smart contract." (Shams Disclosure at 63 (emphasis added).) That's it. No support or analysis, scientific or technical study, or citation or reference to reliable and accepted authority to ground that baseline assumption. How one can make such a categorical statement about a market with thousands of crypto tokens[5] without reference to a study or analysis is unclear. The statement is thus unreliable on its face. What's more, the use of the qualifier "most," shows that the supposed customary practice falls short of something that is always, or almost always, the case. Tellingly, Prof. Shams uses similar qualifying

---

[5] *See* "Different Types of CryptoCurrencies" COINMARKETCAP, available at https://coinmarketcap.com/academy/article/4c191fce-5816-49d5-a2cb-4e95c6026eb2 (noting that CoinMarketCap tracks more than 8,000 cryptocurrencies, and that "[t]he exact number of cryptocurrencies is difficult to determine").

language in his "conclusions" on this same issue. (*See id.* at 65 ("*Typical* exchange token smart contracts are immutable . . .") (emphasis added).) Thus, the disclosure offers nothing more than Prof. Shams' mere (hedged) say-so. Without more, Prof. Shams' proposed testimony asserting that it is a customary for crypto token contracts to be immutable is unreliable and inadmissible, as is any comparison of HCN/HDO to that non-existent standard. *See Bloomberg L.P.*, 2010 WL 3466370 at *15-16.

*Second*, Prof. Shams lacks adequate support for his sweeping proposed testimony that "[f]or *typical* cryptocurrency projects, the majority of tokens are not held by a single entity." (Shams Disclosure at 63 (emphasis added).) Again, Prof. Shams does not ground that critical premise in any study, technical analysis or accepted industry authority that has assessed what clearly is a vast number of crypto projects. It is simply his word, and that is insufficient. *See Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir.2017) ("[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court 'conclude[s]that there is simply too great an analytical gap between the data and the opinion proffered.'") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The same goes for the statement that "[i]f a single entity controls most of the tokens, this departs from the decentralized nature of blockchain." (Shams Disclosure at 64.) As this Court knows, how one defines "decentralization" in the context of crypto is in and of itself a complex question that requires an expert to appropriately ground his definition of the term. In *SEC v. Ripple Labs, Inc.*, 20 Civ. 10832 (AT), 2023 WL 5670711, *10-11 (S.D.N.Y. Mar. 6, 2023), the Court addressed defendants' challenge to an expert's proposed testimony that XRP is not a "decentralized system" and is "less decentralized than the Bitcoin and Ethereum blockchain." *Id.* Decentralization exists on a spectrum, and the Court noted that the SEC's expert identified "four

factors for comparing the relative decentralization of various blockchains: resilience, inclusiveness, in-protocol incentives, and governance." *Id.* The Court ultimately concluded that the expert's test for "decentralization" was appropriately grounded in reliable scientific literature, his own studies and definition of the term, and his twenty years of experience with distributed systems. *Id.* Prof. Shams offers no such definition of "decentralized" and how a system's relative token holdings impact whether a particular system falls within that term.

*Third*, the inferences Prof. Shams draws about the fraud risk associated with the failure to conform to the unestablished immutability and decentralization standards are likewise inadmissible. For instance, Prof. Shams' asserts that mutable token contracts, like HCN's, correlates to fraud. (*See* Shams Disclosure at 65 ("Features of HCN and HDO include centralized control along with a lack of immutability in the smart contract, characteristics akin to tokens that have led to investor losses.").) This testimony should be disallowed for at least three reasons.[6] First, the mutability of HCN's smart contract has nothing to do with this case and is irrelevant. As noted above, the Indictment does not allege that the HCN/HDO contracts were altered, and that investor funds were stolen as a result, as part of the scheme in Count 12. Nor could it. Prof. Shams' statement thus is not probative of any fact at issue in this case. Second, Prof. Sham's statement in the disclosure that the mutability of a token contract is a "characteristic akin to tokens that have led to investor losses" is entirely unsupported. Other than offering this generalized statement, he points to a single anecdotal instance in which a smart contract was altered as a part of a scheme to

---

[6] Various iterations of this mutability-correlates-to-fraud assertion are found in the Customary Practice disclosure. *See generally* Shams Disclosure at 57-65; *see also id*. at 64 ("When a contract is mutable, the terms of the contract can change after funds are invested. In the case of Squid Game Token and CP3R, someone maliciously changed the code to allow insiders to withdraw investor funds.") Mr. Kwok's moves to preclude this entire line of testimony, including but not limited to those specific assertions.

steal investor funds. (*See* Shams Disclosure at 64 (the Squid Game Token example).)  Yet he offers no support for the more generalized statement that mutable token contracts have a correlation to fraud.  He cites no studies or analyses to support this statement, nor did he perform any analysis of his own that would assure the Court that such sweeping testimony is reliable.  His proposed testimony thus epitomizes improper and excludable *ipse dixit*. *Nimely,* 414 F.3d at 397 (noting that expert opinion that are predicated on "data, a methodology, or studies that are simply inadequate to support the conclusions reached" exclusion is "mandated" under *Daubert*.); *L'Oréal USA*, 2020 WL 4937464 at *5, 7 (rejecting expert testimony that was inadequately supported).

*Fourth*, even if these statements cleared the Rule 702 and 401 hurdles, the risk of prejudice would still far outweigh whatever minor probative value the statements have by inviting the jury to infer (improperly) that the Himalaya exchange planned to steal investor funds by adopting a mutable HCN token smart contract, even though no such thing is even alleged to have happened. This line of testimony should therefore be excluded in its entirety.  *Nimely,* 414 F.3d at 398 (finding trial court error in failing to preclude prejudicial expert testimony); *accord United States v. Gatto,* 986 F.3d 104, 118 (2d Cir. 2021).

*Last*, the same reasoning applies to Prof. Shams' proposed testimony concerning the fraud risk posed by a centralized cryptocurrency exchange project, like the Himalaya Exchange.[7]  First, as discussed above, he does not define or properly ground his application of the concept of decentralization under Rule 702.  Second, the centralized nature of the Himalaya Exchange is not relevant to evaluating whether it or HCN/HDO were "real cryptocurrencies," for the reasons explained above, *see supra* pp. 44-47.  And third, even if these statements were not excludable on

---

[7] Again, various iterations of the centralization-correlates-to-fraud assertion are found in the Customary Practice disclosure. Mr. Kwok moves to preclude both this line of testimony and the specific assertions in the disclosure.

Rule 702 and 401 grounds, the risk of prejudice would still far outweigh whatever minor probative value the statements have by inviting the jury to infer that the Himalaya Exchange was a fraud simply because it was not "decentralized" according to an undefined and unestablished customary practice.  Indeed, if the government were permitted to offer Prof. Shams' testimony about other alleged frauds and their similarity to aspects of the Himalaya Exchange, then that would necessarily require Mr. Kwok to litigate the nature of those frauds and how they were dissimilar here, thus creating a mini-trial on wholly unrelated purported frauds.  That is inappropriate.  *See Schatzle*, 901 F.2d at 256 (excluding evidence that would have required a "mini trial" and "focus[ed] the jury upon the wrong event")

### (2)    Prof. Shams Offers No Reliable Methodology, or any Methodology at All

An additional, independent reason to exclude Prof. Shams' testimony is that he while he purported to be conducting some form of analysis, he does not have any discernible, reliable methodology to apply to the evidence in this case.  As noted above, Prof. Shams selected four principal criteria for his analysis: (1) the Market Cap Ratio, (2) the Trading Correlation, (3) the Volume of On-Chain Trading; and (4) the Smart Contract Customary Practice.  However, the notice fails to tie his selection of these particular criteria to any scientific or technical research or studies that would allow the Court to find that they are the right ones to determine whether HCN and HDO were "real cryptocurrencies."  Presumably, there are any number of different characteristics, qualities or trading data that one could choose from for purposes of such an assessment.  But the government's disclosure does not explain why the ones Prof. Shams chose are indicative or appropriate, much less justify the choice with reference to scientific or technical literature or analyses.  Nor does the government propose to have Prof. Shams explain what each of those analyses indicates, in and of themselves, as noted above.  Similarly, Prof. Shams offers

no retrospective analysis, showing how his quantitative and qualitative assessments of these four criteria apply to known cryptocurrency frauds to establish his methodology and its reliability. *Daubert*, 509 U.S. at 593 (in analyzing the reliability of an expert's testimony, the "key question" is "whether it can be (and has been) tested."); *Fantasia*, 2023 WL 6136628, at *11 (rejecting expert testimony where expert "fail[ed] to cite any recognized methodology or sound principles" in support of testimony);

Proffered analytical testimony based on untested methodologies, like Prof. Shams' here, is not the proper subject of expert testimony. *See Nimely* 414 F.3d at 397 ("When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *accord L'Oréal USA* Inc., 2020 WL 4937464 at * 5, 7 (same). Accordingly, the Court should preclude Prof. Shams' testimony as to the four criteria.

### (3) Prof. Shams' Should Largely Be Precluded from Testifying About the Himalaya Exchange's Reserves

The final portion of Prof. Sham's disclosure, which speaks to the "importance of reserves" and the Exchange's currency reserves (Shams Disclosure at 57-74) should also largely be precluded. Outside of a small portion regarding the "[i]mportance" of reserves (*id.* at 57), Prof. Shams offers no opinions or testimony based on any identified expert analysis or his expertise in the relevant industry. Instead, Prof. Shams relays hearsay, loosely paraphrasing the whitepaper for HDO, public statements from the Exchange, the Exchange's blog, and analysis by Armanino LLP (*see, e.g., id.* at 68-69, 71). But "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P*, 379 F. Supp. 2d. at 467-69 ("To the extent that [the expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its

own—is inadmissible."); *see also In re Lyondell*, 558 B.R. at 667 (excluding "extended factual narrative" expert testimony).

Making matters worse, Prof. Shams states that "there does not appear to be evidence that HDO or HCN were backed by a reserve held in gold, based on public records." (Shams Disclosure at 69.) Prof. Shams thus attempts to draw an evidentiary conclusion based upon a *lack* of hearsay on a specific topic, without any reasoned basis—be it from direct evidence or otherwise—to support his statement. Such testimony should be excluded. *See Bloomberg, L.P.*, 2010 WL 3466370 at 15-16 (noting that expert opinion evidence may not be connected to existing data through mere *ipse dixit*, and rejecting expert testimony based merely upon the review of limited materials).

Other portions of this section of Prof. Shams' proposed testimony must be excluded as they are plainly prejudicial and have little to no relevance to this case. Prof. Shams starts with the innocuous statement that "[r]eserves are funds held exclusively for the purpose of supporting the price of a stablecoin," leaps to the supported statement that reserves are, necessarily, "separate from customer deposits" and on that slender reed offers testimony regarding the fact that "Tether Limited . . . faced legal action form the New York Attorney General for allegedly losing access to over $850 million dollars of co-mingled client and corporate funds" and that "FTX, and its founder Sam Bankman-Fried, were accused of having 'commingled FTX customers' funds…to make undisclosed venture investments, lavish real estate purchase, and large political donations" and that "Bankman-fried was ultimately sentenced to 25 years in prison." Prof. Shams' baseless and unhelpful invocation of FTX, Sam Bankman-Fried, and alleged fraud related to other cryptocurrencies is plainly more prejudicial than it is probative. *See Nimely*, 414 F.3d at 398 (trial

court committed error by failing to preclude expert testimony that was more prejudicial than probative and ordering new trial).

>            **(4)    Prof. Shams Should Be Precluded from Giving Certain Proposed Testimony That Is Improper, Irrelevant and More Prejudicial Than Probative.**

The Court should preclude Prof. Shams from giving the following testimony contained in his notice for the reasons explained below.

>    1.    **Proposed Testimony**: That "[s]everal tokens in the crypto market . . . typically have no real-world use case, technological advancements, or sustainable ecosystem, making them susceptible to price manipulation," and any other reference to manipulation of HDO or HCN.  (Shams Disclosure at 62.)

This statement is not expert testimony within the meaning of Rule 702 because it is a mere unsupported observation. It also is not relevant under 401 to any fact at issue in this case because the Indictment does not allege that the defendants manipulated the price of HCN or HDO using their control of the Himalaya Exchange through, for example, improper trading or depressing of the price of either token.  Lastly, it should be excluded under Rule 403 because the risk of prejudice that in making this statement the jury understands Prof. Shams to be referring obliquely to HCN/HDO far outweighs any of probative value, given the lack of any allegations about price manipulation.  *Compare United States v. Ignatov*, 17 Cr. 630 (ER) (S.D.N.Y.), Dkt. No. 1 at ¶ 10(b) (alleging that defendants manipulated price of alleged cryptocurrency by "simulating some volatility and intraday pricing").

>    2.    **Proposed Testimony**: That "[s]everal tokens in the crypto market lack genuine innovation or utility and are often created with the intent of quick profits, typically through deceiving investors."  (Shams Disclosure at 62.)

This statement is not expert testimony within the meaning of Rule 702 because it is a mere unsupported observation. It also is not relevant under 401 to any fact at issue in this case. Lastly, it should be excluded under Rule 403 because the risk of prejudice that in making this statement

the jury understands Prof. Shams to be referring obliquely to HCN/HDO far outweighs any of probative value.

3. **Proposed Testimony**: Comparing HCN and HDO to unidentified tokens where "founders in the past [changed] the smart contract in a way where investors cannot access their cryptocurrency and the founders can control the investors' funds." (Shams Disclosure at 65.)

These statements are not expert testimony within the meaning of Rule 702 because they are mere unsupported observations and based on hearsay. It also is not relevant under 401 to any fact at issue in this case—what "founders" of other cryptocurrencies are alleged to have done has no relation to what the defendants in this case did. Lastly, it should be excluded under Rule 403 because the risk of prejudice that in making this statement the jury understands Prof. Shams to be referring obliquely to HCN/HDO far outweighs any of probative value.

4. **Proposed Testimony**: All references to any "time lock," including references to Squid Game Token and CP3R. (*Id.* at 57-65.)

These statements are not expert testimony within the meaning of Rule 702 because they are mere unsupported observations and based on hearsay. They also are not relevant under 401 to any fact at issue in this case. There is no allegation in the Indictment that the defendants took advantage of some time-lock feature to steal investor funds. Lastly, and in particular with respect to the proposed Squid Game Token and CP3R testimony, these statements should be excluded under Rule 403 because they plainly are inflammatory, risk confusing the jury by allowing Prof. Shams to testify about infamous crypto frauds, invite a trial-within-a-trial, and their negligible probative value is vastly outweighed by the significant risk of prejudice.

5. **Proposed Testimony**: That HCN has features that "ha[ve] been manipulated in the past in some projects to allow investor funds to be stolen" without naming any such projects, and all similar statements. (*Id.* at 61-65.)

These statements are not expert testimony within the meaning of Rule 702 because they are mere unsupported observations and based on hearsay. They also are not relevant under 401 to any fact at issue in this case; as noted above, there are no allegations in the Indictment that the defendants changed the smart contract code to steal investor funds, and the features of other cryptocurrencies that allowed them to be manipulated has no connection to this case absent evidence that in fact these defendants exploited those features. Lastly, these statements should be excluded under Rule 403 because the risk of prejudice far outweighs any minimal probative value.

6. **Proposed Testimony**: All references to FTX, Sam Bankman-Fried, Squid Game Token, CP3R, and Tether. (*Id.* at 62-65, 67.)

These statements are not expert testimony within the meaning of Rule 702 because they are mere recitation of publicly available facts based on hearsay. They also are not relevant under 401 to any fact at issue in this case—how Bankman-Fried or any other cryptocurrency participants conducted their alleged frauds has no bearing on whether Mr. Kwok and his co-defendants perpetrated a fraud with respect to HDO or HCN. Lastly, these statements should be excluded under Rule 403 because they plainly are inflammatory, risk confusing the jury by allowing Prof. Shams to testify about infamous crypto frauds, would require Mr. Kwok to rebut allegations about fraud allegations from completely unrelated fraud prosecutions, and their negligible probative value is vastly outweighed by the significant risk of prejudice.

VI.    **TO THE EXTENT THE GOVERNMENT SEEKS TO ADMIT DOCUMENT METADATA, MR. KWOK RESERVES HIS RIGHT TO OPPOSE THE ADMISSIBILITY OF SUCH EVIDENCE**

Document metadata, as relevant here, refers to the set of data associated with a document that purports to describe certain attributes of that document. *See generally The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 169-71 (2018). Typical examples of metadata

include information about who authored the document, who accessed the document, when the document was first created, when the document was last edited and by whom, and other descriptive information.

Metadata is not necessarily accurate or intrinsic to a particular document. *See id.* at 170 (noting that "system metadata," such as the title of the document, the computer that created it, and file creation and modification dates, "generally is not embedded within the file it describes, but is stored externally on the organization's information management system"). For example, it is possible to overwrite metadata and manually input it into data fields on certain electronic document review platforms; this in turn encodes the document with the manually input metadata in subsequent productions. Metadata can also be altered as a result of user error in loading metadata files into an electronic database. Metadata may also be altered as a result of how documents are stored before they are migrated to an electronic database or review platform. *See id.* at 209 ("electronically stored information is more easily and more thoroughly changeable than paper documents," and may be altered by "booting up a computer" or "moving a word processing file from one location to another").

Should the Government seek to introduce metadata as evidence, for example to prove that Mr. Kwok authored, accessed, edited or reviewed a particular document, Mr. Kwok reserves his right to oppose such evidence on the grounds that it is incomplete, unreliable and misleading, and any other grounds that may be warranted.

## CONCLUSION

For the foregoing reasons, Mr. Kwok respectfully requests that the Court (1) grant his Motions *in Limine* in their entirety and (2) grant Mr. Kwok such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 9, 2024

PRYOR CASHMAN LLP

By: _____
    Sidhardha Kamaraju
    E. Scott Schirick
    Matthew S. Barkan
    Daniel J. Pohlman
    John M. Kilgard
    Clare P. Tilton

    7 Times Square
    New York, NY 10036
    (212) 421-4100
    skamaraju@pryorcashman.com
    sschirick@pryorcashman.com
    mbarkan@pryorcashman.com
    dpohlman@pryorcashman.com
    jkilgard@pryorcashman.com
    ctilton@pryorcashman.com

    Sabrina P. Shroff
    80 Broad Street, 19th Floor
    New York, NY 10004
    (646) 763-1490
    sabrinashroff@gmail.com

    *Attorneys for Defendant Ho Wan Kwok*