# EXHIBIT B



**PRYOR CASHMAN LLP**                    New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806          pryorcashman.com

**Sidhardha Kamaraju**

Direct Tel: 212-326-0895
Direct Fax: 212-326-0806
skamaraju@pryorcashman.com

April 1, 2024

**VIA EMAIL**

Ryan Finkel, Esq.
Juliana Murray, Esq.
Micah Ferguson, Esq.
Justin Horton, Esq.
United States Attorney's Office
Southern District of New York
26 Federal Plaza
New York, NY 10007

>    Re:    *United States v. Kwok et al.*, Case No. 1:23-cr-00118 (AT)

Dear Counsel:

Pursuant to Rule 16(a)(1)(G), Mr. Kwok provides notice of his intent to call Paul Doran as an expert witness about tactics and practices of the government of the People's Republic of China to target political dissidents.

### I.    Summary of Anticipated Testimony

Based on his experience and his review of, among other things, the Superseding Indictment filed in this proceeding, public statements by U.S. and foreign government officials, including U.S. Department of Justice officials, and discovery produced in this matter,[1] Mr. Doran is expected to testify on/regarding the following topics:

>    1. The nature of the transnational repression activities directed by the Chinese Communist Party (CCP) and carried out on its behalf internationally by the Ministry of State Security (MSS), the Ministry of Public Security (MPS), elements of the People's Liberation Army (PLA) and co-opted private citizens (such as so-called "patriotic hackers");

---

[1] Given that the government is continuing to produce discovery pursuant to the Court's February 21, 2024 order, Mr. Doran reserves the right to supplement or amend his opinions described herein.

8553749 v133977.00001

**PRYOR CASHMAN LLP**

April 1, 2024
Page 2

2. the structures of the PRC government and of the Chinese Communist Party (the "CCP") including both the relationship between the two and the roles of certain relevant entities (e.g., MPS, Central Commission for Discipline Inspection, National Supervision Commission, Overseas Chinese Affairs Office, United Front Work Department, People's Procuratorate, and People's Court;

3. certain key officials in the PRC government and their roles, responsibilities, and relationships;

4. the nature of corruption in the PRC government;

5. the CCP's anti-corruption campaign, particularly Xi Jinping's anti-corruption campaign announced in 2013;

6. the PRC government's policy objectives (both domestic and foreign) in seeking to repatriate (temporarily or permanently) PRC citizens living abroad;

7. the policy initiatives referred to by the PRC government as "Operation Fox Hunt" and "Operation Skynet," including its objectives, the roles and responsibilities of relevant PRC government entities (at both the national and local levels), and the ways in which the PRC government seeks to effectuate the initiative;

8. the CCP's global campaign to silence its critics time after President Xi Jinping came to power in China in 2013;

9. the manner in which the CCP identifies "critics";

10. the CCP's campaign to target specific groups including China's ethnic and religious minorities, dissidents and activists, journalists, students, and others;

11. how the CCP choses the targets of Operation Fox Hunt and Operation Sky Net and the methodical manner in which the targets are identified and targeted;

12. the victims of the CCP and the CCP's repressive tactics;

13. the suffering endured by the victims of the CCP and Western governments' difficulty in countering Operation Fox Hunt;

 **PRYOR CASHMAN LLP**

April 1, 2024
Page 3

14. the geography of the victims of CCP's repression, who they are and how the CCP targets not just Chinese citizens living abroad but also citizens and residents of the United States and other countries;

15. the broad toolkit the CCP employs and the CCP's ultimate goal -- controlling all forms of opposition to the CCP and its goals;

16. the CCP's perceived threats to its own stability and survival;

17. China's transnational tactics including Operation Fox Hunt, and Sky Net;

18. the goals and the steps Operation Fox Hung and Sky Net take to achieve their goals;

19. the creation of Overseas Chinese Service Centres;

20. spamouflage;

21. China's abuses of the INTERPOL's Red Notice system, including how the CCP's misuse of the Red Notice system which can lead to dissidents being denied banking services in their adopted countries, how the reaction to the Red Notice by commercial banks is required law and banking controls, and the banks' treatment of dissidents as "criminals" or "terrorists" based on spurious Chinese Red Notices;

22. systematic surveillance and harassment of dissidents on foreign soil including Canada, United States, and New Zealand, and how this issue is a primary counterintelligence concern of the United States, the FBI and for the police and intelligence agencies of allied countries;

23. recognition of these abuses of dissidents by the United States Department of Justice which has indicted and prosecuted, among others, Chinese and American citizens who have engaged in the targeting of US-based Chinese dissidents;

24. how other countries have addressed the targeting of dissidents by the CCP and the prosecutions that have taken place in other countries;

25. the treatment of dissidents by the CCP, including the Chinese authorities' perception of political dissidents, how Chinese authorities bring false and exaggerated charges against dissidents, and the CCP's true motivation to punish dissidents for publicly criticizing the CCP;

**PRYOR CASHMAN LLP**

April 1, 2024
Page 4

26. the CCP's tactic of conducting online smear campaigns against dissidents by Chinese cyber agents, including the online tactics include using pro-CCP trolls and bots to disseminate false or misleading information about dissidents on social media, using deep-fake images to discredit dissidents, intrusion into dissidents' private email accounts, and doxing of embarrassing or compromising material;

27. threats to dissidents' relatives still in China in order to put pressure on dissidents to return to China, including how the Chinese authorities can detain family members indefinitely without charge or trial, or they can reduce family members' so-called "social credit scores," which can result in them receiving penalties such as loan denials, restricted travel, or even public shaming; and

28. particular dissidents whom the CCP considers to be particularly dangerous to its goals and how the CCP targets them. CCP tactics to target them would include but not be limited to (a) physical surveillance and harassment including by undercover Chinese police and intelligence agents operating from clandestine "police stations," (b) online smear campaigns and cyber espionage (c) false accusations of criminality and the issuing of Interpol Red Notices – leading to debanking of dissidents in their adopted countries, (d) interference with their banking relationships; and (e) intimidation, harassment and even the "disappearance" of dissidents' relatives still in China.

## II.    Materials Relied Upon

In arriving at these opinions, Mr. Doran has relied on his extensive professional experience with security threats posed by the PRC and the CCP in particular, his review of the Superseding Indictment, public statements by government officials, including public filings and statements by the U.S. Department of Justice, and discovery produced in this proceeding concerning Operation Fox Hunt.

## III.    Disclosure, Reservation of Rights to Supplement

In connection with his testimony, Mr. Doran may prepare and offer summaries and demonstratives regarding the topics of his opinions, as well as other related items, which Mr. Kwok may seek to introduce into evidence. Such summaries will be offered pursuant to Federal Rule of Evidence 1006.

Mr. Doran may attend the testimony of other witnesses, including the government's expert witnesses, and may offer additional opinions and/or summary charts in response to the testimony given by such witnesses.

**PRYOR CASHMAN LLP**

April 1, 2024
Page 5

     Mr. Doran reserves the right to supplement and/or amend these disclosures, including in response to the government's disclosures and the evidence presented in its case-in-chief.

          Very truly yours,

          PRYOR CASHMAN LLP
          Sidhardha Kamaraju
          E. Scott Schirick
          Matthew S. Barkan
          Daniel J. Pohlman
          Clare P. Tilton

Reviewed, Approved, and Adopted by:

Paul Doran

# EXHIBIT A

# PAUL DORAN

**Mobile: +44 (0)7444 234 194**

**pd@broadwayintel.com**

## PERSONAL STATEMENT

Paul Doran is a security and intelligence professional with over 20 years of experience in providing expert geopolitical risk analysis to senior stakeholders in both government and the private sector. Holding a master's degree in Intelligence and International Relations, Paul spent some time as an employee of the UK government where he specialised in foreign intelligence policy and analysis.

Later, in the private sector he held successively more senior security and intelligence roles in multinational companies where his responsibilities included the identification and mitigation of threats posed by hostile state actors, including from the People's Republic of China (PRC). Between 2012 and 2016 Paul worked in Shanghai, China, as the regional head of security for a European multinational company where he gained first-hand experience of the Chinese police state and the intrusive activities of the PRC's police and intelligence agencies.

Paul is a team player and accomplished team leader but is also comfortable working independently, and able to prioritise and manage multiple time-sensitive assignments at the same time. Additionally, he has excellent stakeholder management skills and is able to demonstrate an ability to demonstrate trusted adviser status while also being able to work cross-functionally with other teams.

## PROFESSIONAL EXPERIENCE

### Kellogg (Europe) – Director of Security and Corporate Services          2022 - 2023

I managed a team of security professionals across eight locations in Europe, ensuring that Group policies and standards on physical security were properly implemented across the region. I was also responsible for the execution of intelligence-led security investigations with the aim of preventing insider threat and corporate espionage by hostile state and non-state actors, particularly those from the PRC.

### Broadway Intelligence Limited – Founder and Managing Director          2023 to present

I provide gold-standard intelligence assessments and forecasting to blue-chip clients including major corporate entities, NGOs and several government agencies outside the UK:

- **Intelligence assessments** – Outlining the security and geopolitical risks faced by clients operating in complex or hostile environments, including the PRC

- **Awareness and Training** – responsible for training and awareness programmes for business travellers to the PRC and other locations, including on how to mitigate the risk of espionage and coercion by the Chinese police and intelligence agencies.

### Aperio Intelligence – Director of Investigations                               2020 – 2022

I provided clients with high-quality investigations consulting services across a number of sectors. For example, I was instrumental in assisting a well-known European pharmaceuticals company uncover and deal with the threat posed by hostile actors.

### Telenor – Vice-President and Global Head of Investigations                    2016 – 2020

I established and built out an investigations team which would handle whistle-blower allegations, triage and classify them and conduct professional investigations into the most credible and serious allegations of fraud and corruption. Over four years I built a global team that was acknowledged as best in class by the Norwegian Institute of Internal Auditors.

### Novartis AG – Regional Director of Security and Investigations                2013 – 2016

Based in Shanghai, I led a team of investigators based across the Asia-Pacific region. Our focus was on the prevention of espionage, coercion and other malfeasance by Chinese state actors and their proxies, including theft of intellectual property and corporate espionage.

### Mondelēz International – Regional Director of Security and Investigations      2011 – 2013

I led a team of ten investigators based across the EMEA region delivering professional investigations into employee malfeasance and harmful activities by third parties such as counterfeiters and grey market traders. Additionally, in West Africa I investigated allegations of child labour and a major procurement fraud in the cocoa supply chain.

### Previous roles from 1995 to 2011

- UK Secret Intelligence Service (SIS, or MI6). Grade 6 officer. Responsibilities included the collection of human intelligence on strategic political, military, and economic matters related to Asia (Bangladesh, India, and Pakistan). Represented SIS at Current Intelligence Groups (CIGs) providing input to the Joint Intelligence Committee (JIC) in the Cabinet Office. Liaised with other agencies to provide joint intelligence reports on the threat to UK national security presented by – inter alia – the Chinese intelligence services.

- Control Risks Group (CRG) – a UK-based international risk management consultancy, where I was Head of Investigations
- Head of OSINT and Research at Flagship Communications, a London (UK)-based public relations advisory company.

## EDUCATION AND QUALIFICATIONS

### University

- MA in Intelligence and International Relations - University of Salford (1996)
- BA (Hons) French and Hispanic Studies (2:1) – University of Liverpool (1990 – 1994)

### Professional Qualifications

- KPMG Norway – Certificate in forensic interviewing
- University of West Virginia – Diploma in forensic accounting and fraud investigation
- University of Pennsylvania – What is corruption? Anti-corruption and bribery
- Counter Terrorism Certification Board – Cryptocurrency investigation