# Exhibit 3



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 8, 2020

<u>Via ECF</u>
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
United State Courthouse
40 Foley Square, Courtroom 518
New York, New York 10007

        **Re:**    *United States v. Sayfullo Habibullaevic Saipov*, **S1 17 Cr. 722 (VSB)**

Dear Judge Broderick:

        We write in response to the defendant's September 24, 2020 letter concerning the Government's recent production of additional recorded statements involving Saipov (the "Defense Letter"). In November 2018, the Government produced to the defense 683 telephone calls, 135 text messages, and three emails involving Saipov that the Federal Bureau of Investigation had collected in separate terrorism investigations pursuant to classified surveillance of other individuals. Unbeknownst to the Government, this production did not include 41 intercepted telephone calls involving Saipov (the "Additional Saipov Intercepts") collected in the course of those investigations. Following an inquiry from the defense in April 2020, the Additional Saipov Intercepts were identified and subsequently produced on July 15 and 24, 2020, along with five additional calls.[1]

        The Government should have identified and produced the Additional Saipov Intercepts earlier, and we do not seek to excuse their late production through this letter. The Government explains below how the Additional Saipov Intercepts were identified, as well as the additional diligence the Government has undertaken since then to ensure its compliance with Rule 16. The Government further describes additional discovery diligence conducted since April 2020 in the Classified Supplement.

---

[1] These five additional calls (dated August 16, 2015, September 9, 2015, October 2, 2015, March 21, 2016, and June 13, 2016) were subject to the protective order entered by the Court on October 29, 2019 (Dkt. No. 191 at 2-3), and are addressed further in an *ex parte* classified supplement to this letter (the "Classified Supplement"). The Government discovered today that it produced these five calls on July 24, 2020 though the calls are subject to the protective order. The Classified Supplement addresses topics raised in the Government's motion pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"). Thus, the Government respectfully submits that the Court should review the Classified Supplement *in camera* and *ex parte* because it addresses matters subject to the protective order entered by the Court on October 29, 2019.

The Government's late production of the Additional Saipov Intercepts was the result of inadvertent human and technical errors. The undersigned prosecutors have worked in good faith for years to comply with their discovery obligations, respond to discovery requests and questions from the defense, and provide documents and information well beyond what Rule 16 requires. Given that context, the defendant's suggestions of intentional or outrageous misconduct are unfounded and thus no evidentiary hearing is required. If the defense believes that the Additional Saipov Intercepts provide a basis for reconsidering the discovery motion, reopening the suppression hearing, and/or seeking other relief, the defense should file an appropriate motion or motions setting forth the bases for those requests. *See, e.g.*, *United States v. Blumenberg*, 506 F. App'x 53, 54 (2d Cir. 2012) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." (citation and internal quotation marks omitted)); *United States v. Tzakis*, 736 F.2d 867, 872 (2d Cir. 1984) (denying motion to reopen suppression hearing because of defendant's failure to develop "any significant, new factual matters that would have been developed at such a hearing"); *United States v. Oliver*, 626 F.2d 254, 260 (2d Cir. 1980) (same). The Government does not object to Saipov filing such submissions, but they should not be *ex parte* and the Government should have an opportunity to respond to them. The Government ultimately believes that any such motions would be without merit. Like the interceptions produced in November 2018, the Additional Saipov Intercepts captured innocuous and non-pertinent conversations about topics including Saipov's work, family, friends, and travel.[2]

## I.      RELEVANT BACKGROUND

### A.      The FBI's Collection of Intercepted Communications and the Identification of the November 2018 Intercepts

In this case, when the service provider intercepted a telephone call transmitted through that provider's network, the service provider transmitted that call to the FBI's initial review platform (the "First Level Review Platform"). Because the call was likely to be in a foreign language, an FBI linguist conducted the initial review and, in most cases, entered a comment and/or a "tech cut" into the First Level Review Platform.[3] Once the FBI linguist entered a comment and/or tech cut into the First Level Review Platform, the comment and tech cut, along with identifying information for the call, such as the date, time, duration, and, if available, the phone numbers, were sent to a second review system (the "Second Level Review Platform"). Text messages and email communications collected in a similar fashion were automatically transmitted into the Second Level Review Platform or another review platform (the "Other Review Platform"), without a linguist preparing and entering a comment or tech cut.

---

[2] The Government is submitting full translations of the Additional Saipov Intercepts under seal along with translations of the five calls referenced in footnote 1 above and addressed in the Classified Supplement. The Government produced these translations to Saipov on August 3 and 17, 2020.

[3] While comments tend to be short descriptions of a call, tech cuts typically include a more fulsome summary or verbatim translation of the call.

As Saipov notes, the FBI conducted classified surveillance of ███████████
("Individual-1") in a separate terrorism investigation. As a result, the prosecutors directed the case agents to identify all intercepted communications involving Saipov and anyone in the FBI's holdings.

To do so, the FBI searched its classified communications holdings—including the Second Level Review Platform and Other Review Platform—for any potential communications involving Saipov. To identify telephone calls, text messages, or emails in which Saipov was a participant, the FBI case agents ran keyword searches for the following identifiers linked to Saipov across all of the FBI's holdings in the Second Level Review Platform and Other Review Platform (not simply related to Individual-1): sayfullo, sayfulloh, sayfulloh, sayfulla, sayfuloh, sayfula, sayfuloh, saipov, brightautollc@gmail.com, choyhona7007, s.s.0888, saipfulin, 513-828-7007, 862-285-7642, and 859-655-5338. Similarly, the FBI case agents also ran keyword searches across all linguist comments and tech cuts in the Second Level Review Platform and Other Review Platform for the following names: sayfullo, sayfulloh, sayfulloh, sayfulla, sayfuloh, sayfula, sayfuloh, and saipov.

Once the FBI case agents identified a telephone call, text message, or email involving Saipov, the FBI case agents manually entered identifying information for such communications onto a spreadsheet (the "Spreadsheet"). The FBI case agents then provided the Spreadsheet to the undersigned prosecutors. The prosecutors understood—incorrectly, but based on the information they had at the time—that the Spreadsheet contained all of the communications to which Saipov was a party that the FBI had intercepted in any investigation. The prosecutors and case agents then made an application to various components of the FBI and the Department of Justice to declassify the communications on the Spreadsheet and produce them in discovery.

After the communications on the Spreadsheet were declassified, the FBI case agents provided the Spreadsheet to a component of the FBI responsible for producing the communications in an unclassified format (the "Electronic Production Unit"). The Electronic Production Unit created 17 CDs containing the declassified communications, which the FBI then provided to the U.S. Attorney's Office. The U.S. Attorney's Office produced the communications from those CDs to the defense on November 19, 2018. This production included 683 telephone calls, 135 text messages, and three emails. The overwhelming majority of those communications were between Saipov and Individual-1, though some were between Saipov and another associate ("Individual-2").

In its disclosure letter to the defense producing the November 2018 interceptions, the Government described the interceptions as audio files, text messages, and email messages that were collected by the FBI during the course of investigations into individuals other than Saipov. The Government also produced draft summaries of certain of the interceptions that were prepared by FBI linguists. In correspondence to Saipov on November 28, 2018, the Government stated that it "does not intend to rely on [the interceptions] during trial or any potential penalty phase."

**B.     Subsequent Diligence Following the November 2018 Production of Intercepted Communications Involving Saipov**

On January 18, 2019, Saipov sent a letter to the Government with several additional discovery requests including, among other things, (i) confirmation that there were no additional written or recorded communications of Saipov in the Government's possession, and (ii) information regarding any of Saipov's contacts who exposed him to ISIS materials or any other form of Islamic extremism.  In response to the letter, the FBI, in consultation with the prosecutors, undertook further reviews of its files and coordinated with other agencies to ensure that it had identified any materials responsive to Saipov's requests.  This included reviewing the contents of phones searched in connection with the separate investigations of Individual-1, his associates, and Individual-2.  Furthermore, as part of the Saipov investigation, several individuals consented to searches of their phones, and the FBI also searched those phones for any communications with Saipov.

In connection with its review in response to Saipov's January 2019 letter, the Government identified other materials that it then produced out of an abundance of caution in disclosures made on March 1, 8, and July 16, 2019.  In those disclosures, the Government identified certain individuals as Saipov's possible contacts and/or associates who are (or have been) suspected of being sympathetic to ISIS or other foreign terrorist organizations; provided detailed information concerning the roles several of those associates played in encouraging others (even though not Saipov) to, among other things, travel overseas to engage in jihad; and disclosed information provided by a cooperating witness about Saipov.  Moreover, prior to submitting its CIPA Section 4 motion on July 19, 2019, the Government conducted additional diligence with respect to classified information relating to Individual-1, his associates, and Individual-2 that is described in the Classified Supplement.

Unfortunately, in conducting these additional diligence searches, the FBI did not discover that the Additional Saipov Intercepts had not been previously produced.

**C.     Identification of the Additional Saipov Intercepts**

On April 19 and 23, 2020, the defense identified and alerted the Government to approximately 200 telephone calls that, based on its review of toll records and Saipov's call history, the defense believed should have been, but were not, produced in November 2018.  Based on the defense's correspondence, the Government and the FBI identified the 41 calls making up the Additional Saipov Intercepts.  Forty of those calls were between Saipov and Individual-1, and the remaining call was between Saipov and Individual-2.  The FBI has reviewed its prior procedure and identified the following explanations as to why those calls were not previously identified.

*First*, for 15 of the calls, the FBI linguist conducting the initial review on the First Level Review platform did not enter a comment or a tech cut.  As a result, those 15 calls were never migrated into the Second Level Review platform, where they would have been captured by the searches run by the case agents.  At the time of the searches, the FBI case agents believed that records of all telephone calls had been transmitted from the First Level Review Platform into the Second Level Review Platform.

*Second*, for 16 of the calls, the FBI case agents mistakenly did not record them on the Spreadsheet, even though those calls should have been returned through the FBI's searches in the Second Level Review Platform.

*Third*, for seven of the calls, the FBI case agents identified the calls in the Second Level Review Platform and recorded the calls on the Spreadsheet. The Electronic Production Unit, however, did not burn these calls onto the CDs that were provided to the U.S. Attorney's Office, and so the calls were not produced, though the summary translations for six of the seven of these calls were produced.

*Fourth*, for three of the calls, Saipov's phone number was not listed as the caller or call recipient, and Saipov was not identified in the linguist comments or tech cuts. For one of these calls, a phone number other than Saipov's was listed and for the other two, the telephone service provider left that field blank and so no number was listed. Accordingly, these three calls did not return in the FBI's prior searches, but were identified by the recent diligence the FBI conducted in response to Saipov's April 2020 correspondence.

### D. Subsequent Due Diligence Following the Discovery of the Additional Saipov Intercepts

The FBI has conducted the following additional diligence with respect to its classified communications holdings.

*First*, the FBI searched the First Level Review Platform for intercepted communications involving Saipov. The scope of that search is detailed in the Classified Supplement.

*Second*, the FBI compared toll records for three telephone numbers that Saipov was believed to use (and which previously had been searched through the Second Level Review Platform and Other Review Platform) to the FBI's holdings of intercepted communications in the Second Level Review Platform.[4] To do so, FBI case agents searched within the Second Level Review Platform to ensure that any calls identified in the toll records that are within the Second Level Review Platform were produced. An additional step as part of this toll review is described in the Classified Supplement.

*Third*, in Saipov's April 2020 letters, Saipov noted that the toll records and the call history on Saipov's phone recorded longer durations for 83 calls than what was produced and also that Saipov participated in an additional 60 calls with Individual-1 that have not been produced. The FBI has confirmed that, outside of what has already been produced to Saipov, those toll records

---

[4] The three numbers are those ending in 5338, 7007, and 7642. The 5338 number, while subscribed to Saipov, appears to have been used principally by his wife. The Government has toll records for the 5338 number from March 6, 2012 through March 2, 2016; for the 7007 number from July 1, 2015 through March 2, 2016, and March 4, 2017 through November 2, 2017; and for the 7642 number from March 11, 2017 through October 31, 2017. With respect to the 7007 number, Saipov was a Sprint customer for the period March 2, 2016 through March 4, 2017, and Sprint has advised that it did not retain toll records for that time period.

and call history do not correspond to any audio files within the FBI's holdings. With respect to the 83 calls identified by the defense for which the intercepted audio was shorter than that reflected in other records, an FBI linguist familiar with Saipov's voice (the "Linguist") reviewed each of those calls. For 70 of those calls, the Linguist heard the call participants begin and end the call in a manner that suggested the call was intercepted in full. For the other 13 of those calls, the Linguist confirmed that those calls were not intercepted in full, and as noted, the FBI has confirmed that there are no additional audio files associated with those calls. Where a call was recorded in part, it has been provided to the defendant.

*Fourth*, the FBI re-ran its searches in the Second Level Review Platform and Other Review Platform (described above) for all of Saipov's identifiers and variations on his name. The FBI ran these searches against all of the FBI's classified communications holdings within the Second Level Review Platform and Other Review Platform.

*Finally*, the Linguist reviewed any intercepted calls of Individual-1 and Individual-2 for which the telephone service provider did not provide complete call participant information. This amounted to a review of approximately 386 calls. As noted above, the telephone service provider does not always provide the FBI with phone numbers for all of the call participants, which results in those fields being left blank.

## II.   THE DEFENDANT HAS NOT ESTABLISHED THAT AN EVIDENTIARY HEARING IS APPROPRIATE

The Government fully intended to identify all of Saipov's statements in the FBI's possession, investigated discrepancies in its production immediately after they were identified by the defense, and then produced the Additional Saipov Intercepts following declassification. These efforts do not excuse the untimely production, but they illustrate why a hearing "to get to the bottom" of the Additional Saipov Intercepts is unnecessary. (Def. Ltr. at 9).

The defense claims that the Court should order a hearing to determine whether the untimely disclosure was intentional, to assess the Government's discovery diligence, and to obtain assurances regarding the Government's Rule 16 compliance. (Def. Ltr. at 2-3). The defendant's position is without merit—the Government has explained the errors that led to inadvertent late production of the Additional Saipov Intercepts, and the defendant's position is based on nothing more than unsupported speculation. Insofar as Saipov seeks to rely on the Additional Saipov Intercepts in connection with other motions, the Government has no objection to that and will respond to those arguments if and when they are presented in an appropriate motion.

### A.     Applicable Law

It is well settled that "[a]n argument supported by '[a]iry generalities, conclusory assertions' and inadmissible evidence is insufficient to create a genuine issue of fact necessitating an evidentiary hearing." *United States v. Solano*, 300 F. App'x 83, 85 (2d Cir. 2008) (summary order) (quoting *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987)); *see also id.* ("In support of her motion for an evidentiary hearing, [the defendant] proffered nothing more than hypothesis and speculation."); *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) ("In the absence of . . . a nonspeculative basis for inferring that . . . the government had not made available to [the defendant] all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary"). Moreover, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926); *see also United States v. Sanchez*, 517 F.3d 651, 671 (2d Cir. 2008) ("Generalized allegations of improper motive do not disturb the presumption of regularity." (citations and internal quotation marks omitted)).

### B.     Discussion

Defense counsel has offered no basis to support a colorable claim that the untimely disclosure of the Additional Saipov Intercepts was intentional, or the suggestion that the Government may have "acted in an outrageous manner." (Def. Ltr. at 13). Speculation and conclusory assertions regarding these topics are insufficient to justify defense counsel's request for a wide-ranging evidentiary hearing. *See, e.g.*, *Aiello*, 814 F.2d at 113-14; *Solano*, 300 F. App'x at 85.

The Government's approach was concededly imperfect, though its efforts to date have nevertheless been extensive in seeking to identify and produce Saipov's recorded statements. This included a discovery and review process detailed above that involved various components of the FBI and Department of Justice and that resulted in the November 2018 production of 683 telephone calls, 135 text messages, and three emails. In light of that production and the diligence that led to it, it is illogical to suggest, as the defense does, that the Government intentionally withheld the 41 Additional Saipov Intercepts containing similar content concerning Saipov's personal matters. Once the defense identified a discrepancy with the Government's November 2018 production, the Government investigated the issue, identified the Additional Saipov Intercepts, and produced them upon their declassification. The Government also engaged in additional due diligence to understand how the errors occurred and to ensure that no other recorded communications were in the FBI's possession.

Defense counsel also provides no basis to support a colorable claim that the Government's broader discovery diligence has been inadequate or that a hearing is necessary to review it. Throughout this case, the Government has endeavored to go above and beyond its disclosure obligations, seeking to produce more than is required earlier than is required. In light of the nature, seriousness, and unique circumstances of this case, the Government took, in essence, an open file approach to discovery, producing virtually everything from the case files of the FBI and NYPD, the lead investigating agencies. This is far beyond what is required by Rule 16. The Government also requested, reviewed, and produced potentially discoverable materials from numerous other

separate FBI investigations, including those run out of different field offices, the Department of Homeland Security, and various intelligence agencies. The Government also produced, and will continue to produce on a rolling basis, all statements of any potential witnesses even if the Government does not now plan to call them at trial. The Government also has continuously worked with the defense to respond to their discovery requests, producing additional materials even when they were not discoverable, one example of which was detailed above. *See supra* p. 4. Given the record of the Government's fulsome approach to discovery, no hearing is necessary to review the Government's discovery diligence.

It is, of course, true, as defense counsel notes, that the Government confirmed when asked that it believed it was in compliance with its Rule 16 obligations. (Def. Ltr. at 3-6). The Government's statements were made in good faith based not only on the due diligence conducted prior to the production of the November 2018 intercepts discussed above, but also on additional reviews conducted in response to defense requests. *See supra* pp. 3-4. All of these steps reinforce that the Government took its disclosure obligations seriously and made good faith representations based on the results of its due diligence. Additionally, the Government has described in this letter how the Additional Saipov Intercepts were identified for production and the diligence conducted by the Government since their identification. Contrary to defense counsel's assertion, litigation in the separate case of *United States v. Sadr*, No. 18 Cr. 224 (AJN) does not justify an evidentiary hearing in this case. (Def. Ltr. at 9-10).

Finally—while, again, not meant as an excuse for the Government's late production of the Additional Saipov Intercepts—it is important to note that, while trial was scheduled to begin in March 2020, it has been postponed in light of the pandemic. Accordingly, if the defense can articulate any specific prejudice suffered by Saipov as a result of the untimely production, the Court may fashion an appropriate remedy, including by setting a trial date that permits the defense sufficient time to address the Additional Saipov Intercepts. *See United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993) (noting that, in evaluating whether a defendant was prejudiced by an alleged Rule 16 violation, "the court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof"). Indeed, even where a court finds a Rule 16 violation, a continuance will typically be a sufficient remedy "because it gives the defense time to alleviate any prejudice it may have suffered from the late disclosure." *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) (citing *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1312 (11th Cir. 1985)); *see United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir. 1987) ("a court may allow previously undisclosed tapes to be introduced after a delay of a few days to permit counsel in the interim to inspect them and fashion a challenge to them").

## **CONCLUSION**

In sum, in light of the Government's approach to discovery since the outset of this case and steps the Government has taken in response to this issue since April 2020, the Government respectfully submits that an evidentiary hearing is unwarranted.  The Government has no objection to the Court setting a briefing schedule with respect to the motions proposed in the Defense Letter so that those issues can be fully explored.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney


by:  /s/
_____
Amanda Houle
Sidhardha Kamaraju
Matthew Laroche
Jason Richman
Assistant United States Attorneys
(212) 637-2194 / 6523 / 2420 / 2589

Enclosures (under seal)