**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        v.

HO WAN KWOK,

        *Defendant.*

<u>**FILED PARTIALLY UNDER SEAL**</u>

Case No. 1:23-CR-118-1 (AT)

<br>

**DEFENDANT HO WAN KOWK'S OPPOSITION**
<u>**TO THE GOVERNMENT'S MOTIONS *IN LIMINE***</u>

Sidhardha Kamaraju
E. Scott Schirick
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
sschirick@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490
sabrinashroff@gmail.com

*Attorneys for Defendant Ho Wan Kwok*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ vi

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT ......................................................................................................1

I. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT HEARSAY STATEMENTS OF ALLEGED CO-CONSPIRATORS, AGENTS AND EMPLOYEES ................................................................................................1

    A. The Hearsay Statements of Alleged Co-Conspirators Fail to Satisfy Rule 801(d)(2)(E) ....................................................................................2

    B. The Hearsay Statements of Alleged Employees or Agents of Mr. Kwok Fail to Satisfy Rule 801(d)(2)(D) .............................................................3

II. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT CERTAIN EVIDENCE AS DIRECT EVIDENCE OR PURSUANT TO RULE 404(b) ........................................................................................................6

    A. The Government Should Be Precluded from Introducing Evidence of Uncharged, Allegedly "Interconnected" Schemes ...................................6

    B. The Government Should Be Precluded from Introducing Evidence or Argument Regarding Mr. Kwok's Alleged "False Promise" to Donate $100 Million to the Rule of Law Entities ......................................................10

        1. The News Publication the Government Has Identified Is Inadmissible Hearsay ...............................................................................................10

        2. Mr. Kwok's Alleged Statement, Made as an Individual in 2018, Is Not Relevant to the Charged Conspiracy to Commit Crimes that Allegedly Took Place in 2020 and Its Admission Would Unfairly Prejudice Mr. Kwok .........12

    C. The Court Should Deny the Government's Request to Admit Evidence of the Seizure of Mr. Kwok's Assets as Premature ..........................................14

    D. The Government Should Be Precluded from Offering Evidence of Phone Calls that Emphasize Mr. Kwok's Incarceration and Are Irrelevant to the Charged Offenses ............................................................................................16

    E. The Court Should Exclude Evidence About the Pax Contempt Order and Mr. Kwok's Bankruptcy Cases .............................................................20

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

IV. AUTHENTICATION UNDER 902(11) SHOULD NOT BE PERMITTED.............34

V. THE ABU DHABI BANK DOCUMENTS SHOULD BE EXCLUDED UNDER
   EVIDENTIARY AND CONSTITUTIONAL STANDARDS ...................................34

   A.  The Government Cannot Properly Authenticate the FAB Documents.................36

   B.  The FAB Documents Do Not Satisfy the Residual Exception to the Rule Against
       Hearsay ......................................................................................43

   C.  Admitting the FAB Documents Would Violate Mr. Kwok's Rights Under the
       Confrontation Clause of the Sixth Amendment....................................49

VI. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO
    PRECLUDE CERTAIN EVIDENCE AND ARGUMENT REGARDING THE
    CCP'S TARGETING OF MR. KWOK ...................................................51

   A.  The Court Should Deny the Government's Improper Attempt to Restrict Mr.
       Kwok from Attacking the Credibility and Motivations of the Government's
       Witnesses ...................................................................................51

   B.  The Government's Requests to Preclude Defendants from Offering Evidence
       Regarding the CCP's Targeting of Mr. Kwok, His Family and the NFSC Are
       Improper and Should Be Denied..........................................................52

       1.  Mr. Kwok Is Entitled to Introduce Extrinsic Evidence of the CCP's Targeting
           Efforts ..................................................................................53

2.   The Government's Motion Effectively Tries to Erase the Court's Fox Hunt Order ................................................................................................61

3.   The Government's Request that the Court "Closely Police" Defendants' Testimony Improperly Subverts the Trial Process, and Should Be Rejected ..62

4.   The Court Should Reject the Government's Straw Man Argument to Preclude Argument and Evidence Regarding Duress and Justification..........................63

5.   The Court Should Deny the Government's Request to Preclude "General Evidence" of Contact Between the Chinese Police and Victims .....................63

C.   The Court Should Reject the Government's Effort to Keep Evidence Regarding Legitimate Movement Activities Away from the Jury ...........................................64

D.   The Court Should Deny the Government's Request to Exclude Evidence of Risk Disclosures and Disclaimers .....................................................................................66

1.   The Government Improperly Conflates Risk Warnings With "Disclaimers" .67

2.   The Defense Is Entitled to Rely on Risk Disclosures and Other Cautionary Statements to Demonstrate the Absence of a Material Misstatement..............70

E.   The Government's Motion to Exclude Evidence that Victims Were Negligent Should Be Denied ......................................................................................................73

F.   Government Actions Are Relevant to the Story of the Charged Offenses and Mr. Kwok's Defenses, and He Must Be Permitted to Submit Evidence and Argument About Them to the Jury .........................................................................................74

G.   Evidence that Mr. Kwok Believed in the Value of Certain Entities and Intended to Repay Loans Is Admissible ....................................................................................76

H.   Mr. Kwok Should Be Permitted to Present Evidence About His Family Background and Personal History ...........................................................................78

VII. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO PRECLUDE DEFENDANTS FROM OFFERING THEIR STATEMENTS FOR THEIR TRUTH ..........................................................................................................80

iv

CONCLUSION................................................................................................................89

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*United States v. Colombo,*
   909 F.2d 711 (2d Cir. 1990)........................................................19

*Bibbins v. Dalsheim,*
   21 F.3d 13 (2d Cir. 1994)..........................................................49

*Bivens v. Six Unknown Named Agents,*
   403 U.S. 388 (1971).................................................................42

*Cedric Kushner Promotions, Ltd. v. King*
   533 U.S. 158 (2001)...................................................................9

*Chambers v. Mississippi,*
   410 U.S. 284 (1973).................................................................35

*Cheng v. Guo,*
   No. 20 Civ. 5678 (KPF) (S.D.N.Y. May 7, 2021).......................26

*In re Columbia Sec. Litig.,*
   155 F.R.D. 466 (S.D.N.Y. 1994)..............................................11

*Emerson v. Mutual Fund Series Trust,*
   393 F. Supp. 3d 220 (E.D.N.Y. 2019).......................................71

*Estelle v. Williams,*
   425 U.S. 501 (1976).................................................................18

*Greycas, Inc. v. Proud,*
   826 F.2d 1560 (7th Cir.1987)...................................................22

*Grunewald v. United States,*
   353 U.S. 391 (1957).................................................................23

*H.J. Inc. v. Nw. Bell Tel. Co.,*
   492 U.S. 229 (1989).................................................................65

*Halperin v. eBanker USA.com, Inc.,*
   295 F.3d 352 (2d Cir. 2002).....................................................70

*Hill v. Spiegel, Inc.,*
   708 F.2d 233 (6th Cir. 1983)......................................................6

*In re Ho Wan Kwok, et al.,*
  Case No. 22-50073 (JAM) (Bankr. D. Conn.) .......................................................21

*Holmes v. Gaynor,*
  313 F.Supp.2d 345 (S.D.N.Y.2004) ...................................................................11

*HSH Nordbank AG New York Branch v. Swerdlow,*
  259 F.R.D. 64 (S.D.N.Y. 2009) ...................................................................32, 33

*Idaho v. Wright,*
  497 U.S. 805 (1990) ...........................................................................44, 45, 49

*Jacobson v. Deutsche Bank, A.G.,*
  206 F. Supp. 2d 590 (S.D.N.Y. 2002) ..............................................................11

*Krulewitch v. United States,*
  336 U.S. 440 (1949) ...................................................................................3, 6

*Kuriakose v. Fed. Home Loan Mortg. Corp.,*
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ..............................................................72

*Lilly v. Virginia,*
  527 U.S. 116 (1999) ...........................................................................44, 46, 49

*McAllister v. New York City Police Dep't,*
  49 F.Supp.2d 688 (S.D.N.Y.1999) ..................................................................11

*In re Morgan Stanley Info. Fund Sec. Litig.,*
  592 F.3d 347 (2d Cir. 2010) ...........................................................................71

*Neder v. U.S.,*
  527 U.S. 1 (1999) ........................................................................................71

*Olkey v. Hyperion 1999 Term Trust, Inc.*
  98 F.3d 2 (2d Cir. 1996) ...............................................................................71

*Parsons v. Honeywell, Inc.,*
  929 F.2d 901 (2d Cir. 1991) ..........................................................................43

*Radio Corp. v. Matsushita Elec. Indus. Co.,*
  505 F. Supp. 1125 (E.D. Pa. 1980) ................................................................22

*S.E.C. v. Treadway,*
  438 F. Supp. 2d 218 (S.D.N.Y. 2006) ..............................................................81

*United States ex rel. Santiago v. Vincent,*
  No. 75 Civ. 3225, 1977 U.S. Dist. LEXIS 14046 (S.D.N.Y. Sept. 13, 1977) ........................52

*Scrimo v. Lee*,
   935 F.3d 103 (2d Cir. 2019)................................................................80

*SEC v. Am. Growth Funding II, LLC*,
   No. 16 Civ. 828 (KMW), 2019 WL 1748186 (S.D.N.Y. Apr. 19, 2019) .........................71, 74

*Shannon v. United States*,
   512 U.S. 573 (1994)...........................................................................78

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008).................................................................65

*TVT Records v. Island Def Jam Music Grp.*,
   250 F. Supp. 2d 341 (S.D.N.Y. 2003)....................................................62

*United States v. Aguirre-Parra*,
   763 F. Supp. 1208 (S.D.N.Y. 1991)........................................................2

*United States v. Amato*,
   No. 03 Cr. 1382 (NGG), 2006 WL 1495497 (E.D.N.Y. May 26, 2006) ..................81

*United States v. Battaglia*,
   No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008)...............78, 79

*United States v. Beqiraj*,
   788 F. App'x 73 (2d Cir. 2019) ............................................................52

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)................................................................75

*United States v. Bonventre et al.*,
   No. S1 13 Cr. 211 (NRB), 2013 WL 4457296 (S.D.N.Y.)....................................84

*United States v. Bruno*,
   383 F.3d 65 (2d Cir. 2004)..............................................................35, 50

*United States v. Bryant*,
   No. 19 Cr. 29, 2019 WL 3307393 (D. Minn. June 7, 2019)...............................38

*United States v. Bryce*,
   208 F.3d 346 (2d Cir. 1999).................................................................44

*United States v. Cheung Kin Ping*,
   555 F.2d 1069 (2d Cir. 1977)...............................................................76

*United States v. Connolly*,
   No. 16 Cr. 370 (CM), 2018 WL 2411760 (S.D.N.Y. May 15, 2018)..................86, 87

*United States v. Coonan,*
     938 F.2d 1554 (2d Cir. 1991)...................................................................59, 74

*United States v. Cruz,*
     894 F.2d 41 (2d Cir. 1990).................................................................................83

*United States v. Diaz,*
     176 F.3d 52 (2d Cir. 1999).................................................................................13

*United States v. DiMaria,*
     727 F.2d 265 (2d Cir. 1984)...............................................................................81

*United States v. Donavan,*
     577 F. Supp. 3d 107 (E.D.N.Y. 2021) .......................................................15, 16, 19

*United States v. Downing,*
     297 F.3d 52 (2d. Cir. 2002).................................................................................8

*United States v. Doyle,*
     130 F.3d 523 (2d Cir. 1997).....................................................................37, 43, 46

*United States v. Feliz,*
     467 F.3d 227 (2d Cir. 2006)...............................................................................50

*United States v. Feng,*
     20 Mag. 1025 (E.D.N.Y.) ....................................................................................88

*United States v. Finnerty,*
     533 F.3d 143 (2d Cir. 2008)...............................................................................24

*United States v. Gigante,*
     166 F.3d 75 (2d Cir. 1999)...................................................................................2

*United States v. Giovinco,*
     No. 18 Cr. 14 (JSR), 2020 WL 832920 (S.D.N.Y. Feb. 20, 2020)........................85

*United States v. Hammad,*
     858 F.2d 834 (2d Cir. 1988)...............................................................................31

*United States v. Han,*
     230 F.3d 560 (2d Cir. 2000)...............................................................................80

*United States v. Harris,*
     491 F.3d 440 (D.C. Cir. 2007).......................................................................78, 79

*United States v. Higginbotham,*
     No. 18 Cr. 343 (CKK) (D.D.C.) .........................................................................88

*United States v. Hill,*
    658 F. App'x 600 (2d Cir. 2016) ...................................................................45

*United States v. Hsu,*
    669 F.3d 112 (2d Cir. 2012).........................................................................12

*United States v. Inserra,*
    34 F.3d 83 (2d Cir. 1994).............................................................................13

*United States v. Jones,*
    381 F.3d 114 (2d Cir. 2004).........................................................................58

*United States v. Josephberg,*
    562 F.3d 478 (2d Cir. 2009).........................................................................76

*United States v. Kadir,*
    718 F.3d 115 (2d Cir. 2013)....................................................................81, 88

*United States v. Kim,*
    595 F.2d 755 (D.C. Cir. 1979)......................................................................44

*United States v. Krout,*
    66 F.3d 1420 (5th Cir. 1995) ........................................................................87

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016).....................................................................76, 77

*United States v. Lauersen,*
    348 F.3d 329 (2d Cir. 2003)...........................................................................5

*United States v. Livtak,*
    889 F.3d 56 (2d Cir. 2018).....................................................................71, 73

*United States v. Marin,*
    669 F.2d 73 (2d Cir. 1982)...........................................................................81

*United States v. Matera,*
    489 F.3d 115 (2d Cir. 2007)...........................................................................9

*United States v. McKeon,*
    738 F.2d 26 (2d Cir. 1984).............................................................................6

*United States v. Mendlowitz,*
    No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ...............8, 51

*United States v. Murray,*
    736 F.3d 652 (2d Cir. 2013)....................................................................61, 65

x

*United States v. Noriega*,
    917 F.2d 1543 (11th Cir. 1990) ............................................................30

*United States v. Paccione*,
    949 F.2d 1183 (2d Cir. 1991) ..........................................78, 79, 87, 88

*United States v. Patel*,
    No. 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017) ....................30

*United States v. Payne*,
    591 F.3d 46 (2d Cir. 2010) ..............................................................52

*United States v. Persico*,
    645 F.3d 85 (2d Cir. 2011) ..............................................................81

*United States v. Pforzheimer*,
    826 F.2d 200 (2d Cir. 1987) ............................................................62

*United States v. Philips*,
    No. 22 Cr. 138 (LJL), 2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) ....................55

*United States v. Prevezon Holdings, Ltd.*,
    319 F.R.D. 459 (S.D.N.Y. 2017) ........................................46, 47, 48, 49

*United States v. Rajaratnam*,
    No. S1 13 Cr. 211 (NRB), 2014 WL 2696568 (S.D.N.Y. June 10, 2014) ............84

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ............................................................81

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996) ..............................................................4, 5

*United States v. Rom*,
    528 F. App'x 24 (2d Cir. 2013) ..........................................................45

*United States v. Rosemond*,
    841 F.3d 95 (2d Cir. 2016) ..............................................................74

*United States v. Russo*,
    302 F.3d 37 (2d Cir. 2002) ..............................................................19

*United States v. Sampson*,
    No. 13 Cr. 269 (S-5)(DLI), 2015 WL 2066073 (E.D.N.Y. May 4, 2015) ..............10

*United States v. Saneaux*,
    365 F. Supp. 2d 493 (S.D.N.Y. 2005) ..............................................2, 3, 6

*United States v. Schatzle,*
901 F.2d 252 (2d Cir. 1990)........................................................................9

*United States v. Schwimmer,*
892 F.2d 237 (2d Cir. 1989)..........................................................28, 30, 33

*United States v. Stanley,*
No. 09 Cr. 141 (NGG), 2010 WL 1633459 (E.D.N.Y. Apr. 21, 2010) ...........83, 85

*United States v. Stein,*
521 F. Supp. 2d 266 (S.D.N.Y. 2007)........................................................84

*United States v. Thaler,*
229 F. App'x 7 (2d Cir. 2007) ...................................................................22

*United States v. Thomas,*
757 F.2d 1359 (2d Cir. 1985)...................................................................87

*United States v. Tin Yat Chin,*
371 F.3d 31 (2d Cir. 2004)........................................................................45

*United States v. Torres,*
604 F.3d 58 (2d Cir. 2010)........................................................................52

*United States v. Turkette,*
452 U.S. 576 (1981)...................................................................................9

*United States v. Ulbricht,*
79 F.Supp.3d 466 (S.D.N.Y 2015) .............................................................9

*United States v. Vario,*
943 F.2d 236 (2d Cir. 1991)................................................................87, 88

*United States v. Vayner,*
769 F.3d 125 (2d Cir. 2014).............................................................. *passim*

*United States v. Weaver,*
860 F.3d 90 (2d Cir. 2017).......................................................................72

*United States v. Weber,*
843 F. App'x 364 (2d Cir. 2021) ..............................................................54

*United States v. White,*
692 F.3d 235 (2d Cir. 2012)......................................................................76

*United States v. Wiggins,*
787 F. App'x 775 (2d Cir. 2019) ..............................................................18

*United States v. Ying*,
   No. 22 Mag. 1711 (S.D.N.Y.).................................................................14

*Upjohn Co. v. U.S.*,
   449 U.S.383 (1981)........................................................................30

*In re Von Bulow*,
   828 F.2d 94 (2d Cir. 1987)................................................................33

*Wade v. Mantello*,
   333 F.3d 51 (2d Cir. 2003)................................................................80

*Washington v. Texas*,
   388 U.S. 14 (1967)...............................................................53, 58, 64

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994)..............................................................72

*Zinaman v. Kingston Reg'l Sr. Living Corp.*,
   No. 11 Civ. 388 (RFT), 2014 WL 282633 (N.D.N.Y. Jan. 23, 2014).....................82

**Statutes and Rules**

18 U.S.C. § 3505.........................................................................34

Fed. R. Evid. 106.....................................................................15, 67

Fed. R. Evid. 402........................................................................61

Fed. R. Evid. 403..................................................................*passim*

Fed. R. Evid. 404..................................................................*passim*

Fed. R. Evid. 801..................................................................*passim*

Fed. R. Evid. 803.......................................................34, 37, 81, 82

Fed. R. Evid. 807..................................................................*passim*

Fed. R. Evid. 901(a)................................................................36, 37

Fed. R. Evid. 902(11)...............................................................34, 37

Defendant Ho Wan Kwok respectfully submits this Opposition to the government's motions *in limine* filed April 10, 2024 (Dkt. No. 273).  For the reasons set forth below, the government's motions *in limine* should be denied.

## PRELIMINARY STATEMENT

The government's motions in *limine* revolve around a central theme: it seeks, on the one hand, to introduce irrelevant, inadmissible, and prejudicial evidence to use against the defendants, while, on the other hand, to hamstring the defendants' ability to present evidence in support of their defense, including evidence that the Court has already concluded to be helpful to the defendants.  The Court should not countenance the government's efforts to secure a one-sided trial that defeats Mr. Kwok's right to defend himself.  Accordingly, the Court should reject each of the government's motions in *limine*.[1]

## ARGUMENT

### I.    THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT HEARSAY STATEMENTS OF ALLEGED CO-CONSPIRATORS, AGENTS AND EMPLOYEES

The government impermissibly seeks to introduce for their truth numerous statements from a wide-ranging number of declarants, including alleged Kwok Enterprise employees, Kwok Enterprise agents, Farm Leaders, and "volunteers" of the anti-CCP political movement lead by Mr. Kwok, as non-hearsay.  They allege that each statement is either "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D), or "was made by the party's co-conspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).

---

[1] Mr. Kwok has filed a separate opposition to the government's separate motion (Dkt. No. 272) to exclude *all* of his expert witnesses.

A.   **The Hearsay Statements of Alleged Co-Conspirators Fail to Satisfy Rule 801(d)(2)(E)**

The government's motion to introduce a raft of statements as "co-conspirator" statements pursuant to Rule 801(d)(2)(E) is premature—the government has offered only argument, not evidence to establish the exception's requirements.   As such, the Court should deny the government's motion.

Before a statement can be admitted under the co-conspirator exception to the hearsay definition, it must prove by a preponderance of the evidence "that a conspiracy existed that included the defendant." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "To admit a statement under the co-conspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." *Id*.  "[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *Id*. (internal quotation marks and citation omitted). The government has failed to provide this corroborating evince.

And where "[t]he present record makes it plain that the government has yet to produce or proffer proof sufficient" to satisfy the preponderance of the evidence standard, such "paucity of the government's proof" requires, "in the interest of fairness," that "the government . . . elicit and place before the jury all the evidence it will rely upon to satisfy all prerequisites of admissibility . . . before [the co-conspirator] declarations are placed before the jury." *United States v. Saneaux*, 365 F. Supp. 2d 493, 503-04 (S.D.N.Y. 2005); *see also United States v. Aguirre-Parra*, 763 F. Supp. 1208, 1217 (S.D.N.Y. 1991) ("The proper procedure is to determine the issues surrounding admissibility (the existence of the conspiracy, a particular defendant's role, whether the statements

were made in furtherance of the conspiracy) during the trial, and, if necessary, outside the presence

of the jury.").  The government here has offered no proof of any kind—it has simply summarized

what it expects its proof to show.  Given the "paucity of the government's proof" with respect to

alleged criminal conspiracies, this Court must not allow the prosecution to introduce coconspirator

hearsay statements until the "government . . . elicit[s] and place[s] before the jury all the evidence

it will rely upon to satisfy all prerequisites of admissibility."  *Saneaux*, 365 F. Supp. 2d. at 503-4.

To do so beforehand would unfairly prejudice Mr. Kwok in the likely event that the

government cannot satisfy Rule 801(d)(2)(E)'s requirements.  *See Krulewitch v. United States*,

336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("[A] conspiracy often is proved by evidence

that is admissible only upon assumption that conspiracy existed. The naive assumption that

prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be

unmitigated fiction.").  The Court should reject the government's invitation to simply skip the trial

and convict Mr. Kwok on the basis of motion papers.

## B.   The Hearsay Statements of Alleged Employees or Agents of Mr. Kwok Fail to Satisfy Rule 801(d)(2)(D)

The government offers an even more stunning proposal for hearsay that the government

intends to introduce as "party admissions" under Rule 801(d)(2)(D).  Specifically, the government

claims that "when assessing the admissibility of Kwok Enterprise employee or agent statements

that the Government will offer, the Court should apply the foregoing framework: the statements

are not hearsay and may be offered for the truth."  (Govt. Mot. at 10.)[2]  The government

breathlessly recites its allegations concerning Mr. Kwok's purported control over various entities,

---

[2] References to the "Govt. Mot." refer to the government's Motions *in Limine* filed April 10, 2024 (Dkt. No. 273).

(*see id*.), but nowhere in its motion does it reference the appropriate legal standard for when a statement can be admitted under the "agent" prong of the rule.

Specifically, "[u]nder Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when made 'by the party's agent or servant concerning a matter within the scope of the agency or employment, [and] during the existence of the relationship.'" *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (quoting Fed. R. Evid. 801(d)(2)(D)).   "To show that the statement is not hearsay, the government must show: (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Id*. (cleaned up).   In other words, contrary to the government's facile approach advocated in its motion, to introduce a statement of a purported agent against a principal, the government actually has to offer sufficient evidence to show that the purported agent and principal had an agency relationship at the time of the statement and that the statement was within the scope of that relationship.

The question of what satisfies this standard is necessarily context specific.   For instance, in *Rioux*, the Second Circuit considered whether the government had established that certain employees of a sheriff's department were agents of the sheriff.   *See* 97 F.3d at 660.   The court considered the government's evidence with respect to each of the factors discussed above.   With respect to the existence of an agency relationship, the court found that the government had satisfied that prong because the government "**proved**" that the employees "(1) were hand-picked by [the defendant]; (2) served at his pleasure; and (3) received their instructions through [the defendant] himself or [an employee who served in a position the defendant created]." *Id*. (emphasis added). Similarly, the Second Circuit found that the government "**presented evidence**" that the relevant statements were made during working hours, and that thus proved that the agency relationship

existed at the time of the statements.  *Id*. (emphasis added).  Finally, with respect to whether the purported statement was within the scope of the agency, the court found that "**documentary evidence presented by the government**" showed that the employees were "advisor[s] or other significant participant[s] in the decision-making process that is the subject matter of the statement." *Id*. (emphasis added).  In other words, in *Rioux*, the government introduced evidence at trial that supported its claim that there was an agency relationship sufficient to satisfy the exception's requirements.  *See also United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003) (finding government had sustained its burden to admit witness testimony concerning nurse's statement because the government had shown that "nurses in defendant's office were responsible for helping maintain patient files").

Moreover, while the government attempts to lump all of Mr. Kwok's purported agents— including employees, agents, and "volunteers"—into one bucket, the nature of the relationship may affect the type of proof the government has to offer. For example, in *Rioux*, the court found that with respect to employees, the Second Circuit found that the relevant employee needed to be an "advisor or other significant participant in the decision-making process that is the subject matter of the statement." *See* 97 F.3d at 661.  On the other hand, when it comes to introducing statements from attorneys, the Second Circuit has stated that "[t]he formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements," and that, as a result, "[s]ome participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant."

*United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984).  Put simply, what the government has to prove turns on which agency relationship the government is trying to assert.

The government glosses over all of this factual and legal nuance, and instead presumptuously claims that the Court should just assume that it can introduce any statement by anyone it claims to be an agent for Mr. Kwok for the truth of the matter asserted.  Again, the government's position invites the Court to commit reversible error.  *See, e.g., Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983) (finding reversible error where district court admitted employee statements under Rule 801(d)(2)(D) without evidence that the employees "had any involvement in [the employer]'s decision").  Just as with co-conspirator statements, the proper course would be for the government to identify which statements it wishes to introduce and through which agents the government plans to introduce these statements, and then introduce its evidence with respect to the purported agency relationship and connection to the asserted statement.  *See Saneaux*, 365 F. Supp. 2d. at 503-4.  Otherwise, the Court will have to potentially contend with a true evidentiary mess, having allowed the jury to hear hearsay for the truth of the matter asserted, only then to have to explain to the jury that the government has to retract that evidence at a later date.  *See Krulewitch*, 336 U.S. at 453 ("The naive assumption that prejudicial effects can be overcome by instructions to the jury all practicing lawyers know to be unmitigated fiction.").  Accordingly, the Court should deny the government's proposed "framework" and its motion.

## II.   THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO ADMIT CERTAIN EVIDENCE AS DIRECT EVIDENCE OR PURSUANT TO RULE 404(b)

### A.   The Government Should Be Precluded from Introducing Evidence of Uncharged, Allegedly "Interconnected" Schemes

The government seeks to introduce "interconnected schemes" on the basis that the "particulars of these various [alleged] fraud schemes were continually changing and evolving." (Govt. Mot. at 15.)   In particular, the government seeks to introduce evidence regarding multiple

entities that are included only in a broad, sweeping recitation of entities involved in what the government alleges was the "Kwok Enterprise" but which do not relate to *any* alleged misrepresentation identified in the Indictment, including GETTR, a social media company, and Freedom Media Ventures Limited, a BVI entity disconnected from any transfers identified in the Indictment.  (*Id.*)

Specifically, the government seeks to introduce evidence regarding the "A10 Project," which it contends involved seeking funds for investors to purchase "5% of GETTR and 5% of the Himalaya Exchange."  (*Id.*)  The government then pastes a lengthy excerpt from G News (the "A10 Article") regarding the "A10 Project."  (*Id.* at 16-18.)[3]  The government contends that evidence regarding the A10 Project is "admissible as direct evidence of the charges in the Indictment" and argues that it is, in some part, connected to G|CLUBS and to the Himalaya Exchange.  In reality, this is a thinly veiled attempt to introduce evidence of uncharged alleged crimes or other bad acts, which would be more prejudicial than probative and which would be cumulative.  The government's attempt to smuggle in this evidence fails for many reasons.

*First*, the government does not make clear what types of evidence it seeks to introduce about the so-called A10 Project, but to the extent it seeks to rely on the A10 Article, that is impermissible because the article is rank hearsay.  The article is not attributable to Mr. Kwok, so it cannot be a party admission against him.  Nor has the government made any showing that the author of the post is a co-conspirator, such that the A10 Article could be considered a co-conspirator statement for hearsay purposes.  Simply put, the government utterly fails to offer any

---

[3] In a footnote, the government contends that, shortly after producing a copy of the A10 Article, "this article (and others) are now no longer available on G News."  (Govt. Mot. at 18 n.9.)  The defense is not aware that any articles have been made unavailable, and has had no issue accessing the link provided by the government.

evidence showing how the A10 Article qualifies under any of the hearsay exceptions.  *See United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *9 (S.D.N.Y. Dec. 20, 2019) ("[t]he proponent of a hearsay statement bears the burden of demonstrating its admissibility"), *aff'd*, No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023).

*Second*, even if the government seeks to introduce evidence beyond the A10 Article, that evidence should be excluded as irrelevant.  Although the government claims summarily that the A10 Article is "interconnected" with the schemes alleged in the Indictment, it offers little evidence for that assertion.  For example, the government does not show that the A10 program relates in any way to the alleged misrepresentations made in connection with the GTV Private Placement, the Farm Loans Program, the sale of G|CLUBS memberships, or the marketing of H-Coin or H-Dollars, so as to demonstrate that the A10 program was an evolution of any of these purported schemes.  Indeed, the government does not even demonstrate that there is anything fraudulent about the A10 program at all—it simply asserts, without any support, that the program is a "scheme" that is somehow connected to the other alleged schemes charged in the Indictment.  This bald assertion of relevance is insufficient to inject an entirely unconnected purported scheme into this already sprawling case.

*Third*, even if the government could show that the A10 program was fraudulent in some way, then it still should not be permitted to introduce it as an uncharged bad act.  As an initial matter, given that the A10 program comes long after the alleged misrepresentations concerning the GTV Private Placement, the Farm Loans Program, G|CLUBS, or the Himalaya Exchange, it cannot serve as evidence of any of the permitted uses under Fed. R. Evid. 404(b).  *See, e.g., United States v. Downing,* 297 F.3d 52, 58 (2d. Cir. 2002).  Moreover, the government does not even allege that the A10 program sheds any light as to the existence of the alleged Kwok Enterprise.

*Cf. United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007); *United States v. Turkette*, 452 U.S. 576, 583 (1981) (noting that the existence of a RICO enterprise is "proved by evidence of an ongoing organization . . . and by evidence that the various associates function as a continuing unit").  Nor could it—the only evidence the government offers about the program is a social media post authored by someone that the government has failed to connect to the purported Kwok Enterprise, which Mr. Kwok supposedly endorses.  That is scant evidence of a purportedly years-long racketeering enterprise that engaged in its purported acts of fraud years before the alleged A10 program.

*Fourth*, even if the government could show a permissible use for the A10 program evidence, it still should not be allowed to introduce this evidence on Rule 403 grounds.  Introducing the A10 program will require the defense to not only rebut the government's claim that the program was fraudulent in some way, but also to get into details about purported investments into GETTR and the Himalaya Exchange, topics that have nothing to do with the charged offense.  That would result in a trial-within-a-trial that will only confuse the jury.  *See, e.g., Cedric Kushner Promotions, Ltd. v. King* 533 U.S. 158, 161 (2001); *United States v. Schatzle*, 901 F.2d 252, 256 (2d Cir. 1990) (no error in district court precluding evidence that would have required a "mini trial"); *see also United States v. Ulbricht,* 79 F.Supp.3d 466, 492–93 (S.D.N.Y 2015) (excluding introduction of certain evidence for fear that it "may lead to a mini-trial on collateral issues").  Moreover, to the extent the government intends to rely on this evidence to show that the "particulars of these various [alleged] fraud schemes were continually changing and evolving," then this evidence should be excluded as cumulative.  The Indictment already alleges four different successive schemes relating to a social media company, a loan program, an exclusive membership club, and a digital currency exchange, all of which the government claims are part of a thread of fraudulent conduct.  If it can

prove its allegations with respect to those schemes, then that is more than enough evidence for the jury to appreciate that these alleged schemes were evolving in nature.  Introduction of such cumulative evidence is prejudicial.  *See United States v. Sampson*, No. 13 Cr. 269 (S-5)(DLI), 2015 WL 2066073, at *8 (E.D.N.Y. May 4, 2015) (denying government motion to introduce potential propensity evidence on the ground that it was cumulative).

The government has estimated this to be an eight week long trial, and it is now it is easy to see why—because the government insists on injecting tangential and collateral matters that have no bearing on this case, including of a purported sexual relationship between the defendants, other purported unrelated cryptocurrency frauds and the criminal sentences the perpetrators received, and now, an unrelated investment program.  The Court should reject the government's "throw everything against the wall and see what sticks" approach to a criminal trial and preclude evidence concerning the A10 program.[4]

### B.    The Government Should Be Precluded from Introducing Evidence or Argument Regarding Mr. Kwok's Alleged "False Promise" to Donate $100 Million to the Rule of Law Entities

The evidence the government intends to submit purporting to prove that Mr. Kwok made and alleged "false promise" to donate $100 million to the Rule of Law Foundation in November 2018 is inadmissible, either as direct evidence or pursuant to Rule 404(b).

### 1.    The News Publication the Government Has Identified Is Inadmissible Hearsay

The government identified an article published in the Wall Street Journal as "proof" that Mr. Kwok promised to personally donate $100 million to the Rule of Law Foundation in

---

[4] The government also alludes to other "programs" like the "A15 Project" and Freedom Media Ventures Limited, but offers little argument about them.  Regardless, if the government does intend to introduce about these other events, that evidence should be excluded for the same reasons as the A10 program.

November 2018.  It did so without providing the document, which is attached to the accompanying Declaration of Matthew S. Barkan dated April 17, 2024 (the "Barkan Declaration" or "Barkan Decl.") as Exhibit A.  It is blackletter law that articles appearing in news publications, such as this one, are inadmissible hearsay.  *Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 594-597 (S.D.N.Y. 2002) (excluding an article published by the Bloomberg News Service which the proponent sought to introduce "to prove that [the defendant] uttered certain specific statements at a specific time," and noting that it "face[d] a situation where every word, their placement, order, and translations from German to English, [were] highly relevant"), *aff'd,* 59 F. App'x 430 (2d Cir. 2003); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474 (S.D.N.Y. 1994) ("Often, when offered to prove that certain statements were made, newspaper and magazine articles are held inadmissible as hearsay."); *McAllister v. New York City Police Dep't*, 49 F.Supp.2d 688, 705 n.12 (S.D.N.Y.1999) ("Newspaper articles are hearsay ... and ... are not admissible evidence."); *Holmes v. Gaynor*, 313 F.Supp.2d 345, 358 (S.D.N.Y.2004) (holding newspaper article inadmissible on hearsay grounds).

Furthermore, the article does not say that Mr. Kwok made a promise to donate $100 million to the Rule of Law Foundation ("ROLF").  It reports that he would "provide the funding" for some of the ROLF's activities, but it specifies that "[d]etails weren't provided of how the new organization would operate, what cases it would pursue, or how Mr. [Kwok] would pay for the initiative."  (Barkan Decl., Ex. A at 2.)  Nowhere does it say that Mr. Kwok made a promise to personally donate any sum—much less specifically $100 million—to fund the foundation.  As a result, the cited article is not probative of the government's proposition that Mr. Kwok made this alleged "promise."

    **2.**    **Mr. Kwok's Alleged Statement, Made as an Individual in 2018, Is Not Relevant to the Charged Conspiracy to Commit Crimes that Allegedly Took Place in 2020 and Its Admission Would Unfairly Prejudice Mr. Kwok**

Moreover, the alleged "false promise" made by Mr. Guo meets none of the requirements for admitting uncharged acts as direct evidence of the charges against Mr. Kwok. None of the government's contentions that this 2018 statement is "inextricably intertwined" with evidence of the charged conduct passes scrutiny.

*First*, the government's allegation that Mr. Kwok "used" ROLF "to amass followers who were aligned with his purported campaign" does not render all facts and argument regarding the organization, for the entirety of ROLF's existence, direct evidence of charges in the Indictment. (Govt Mot. at 20 (citing Ind., ¶9(b).) The government's bald assertion that there was overlap between staff at ROLF and other companies it has claimed are part of the alleged "Kwok Enterprise" fares no better, as no one except Mr. Kwok was allegedly involved in this alleged "false promise," and there is no allegation that Mr. Kwok is an agent of ROLF. (Govt. Mot. at 21.)

The government's cited case, *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), does not support the government's position. In that case, the court permitted the introduction of evidence concerning the defendant's prior involvement in a *Ponzi* scheme, to which the defendant had pled guilty, because the conduct showed the defendant's access to a pool of investors that he would tap for a later campaign finance fraud scheme. *See* 669 F.3d at 118. In this case, there is no connection between Mr. Kwok's alleged promise and the charged offenses—the government has not proffered any evidence that Mr. Kwok's alleged promise created or enticed anyone to participate in, for example, the GTV Private Placement, to lend money through the Farm Loans Program, to buy a G|CLUBS membership, or to purchase HDO or HCN. The government has not even suggested that it has any evidence that Mr. Kwok's alleged promise even induced anyone to donate to

ROLF—indeed, even if it did have such evidence, the government does not allege any fraud in connection with ROLF.[5]

*Second*, there is no basis to allow this argument regarding an alleged prior bad act as relevant to "intent, knowledge, lack of accident, [or] motive" under 404(b). (Govt. Mot. at 21.) The defense will not argue that Mr. Kwok acted negligently or by mistake. (*See infra*. pp. 73-75.) The government's theory of why this argument is relevant to Mr. Kwok's motive reveals the expansive, rambling narrative that the government intends to submit to the jury if its motions are granted. The government posits that "Kwok's false announcement of his supposed donation came just one month after Hong Kong authorities froze his assets, and is admissible evidence of Kwok's motive to raise funds by deception, as further described [elsewhere in its motion]." (Govt. Mot. at 21.) The government's theory makes no sense—if, as the government claims, Mr. Kwok needed money in 2018 and then lied about his pledge to ROLF, then why are there no allegations of Mr. Kwok engaging in any misappropriation until 2020? The government cannot bridge this disconnect—instead, it is offering this evidence principally as a means to smear Mr. Kwok and to argue (despite its protestations to the contrary) that Mr. Kwok is not truly committed to the movement. The government's disingenuous attempt to have it both ways—to claim that Mr.

---

[5] The other cases the government cites in support of this motion similarly miss the mark. The court's finding in *Baez* that evidence of uncharged *robberies* was admissible to establish a criminal enterprise is of little use in the government's attempt to admit evidence of prior *lying* by Mr. Kwok. *See also United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)(same, with respect to "uncharged drug sales and acts of violence committed on behalf of the gang"). *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) is essentially irrelevant, as it approved the admission of certain testimony that "provided a significant contextual basis for the jury to understand" the rest of the same witness's testimony, which was central to the case. This alleged "false promise" does not answer any question the jury would otherwise ask. It introduced irrelevant evidence that would only confuse to the jury further as to what alleged conduct is in fact relevant to the charges.

Kwok's commitment to the movement is irrelevant while seeking to introduce evidence to purportedly undermine it—should be rejected.

### C.      The Court Should Deny the Government's Request to Admit Evidence of the Seizure of Mr. Kwok's Assets as Premature

The government moves *in limine* to admit evidence that in 2017, "Chinese authorities" (*i.e.*, the CCP) began seizing Mr. Kwok's assets and that in 2018, authorities in Hong Kong issued restraining orders for the assets of Mr. Kwok, his son, and unidentified "associates." (Govt. Mot. at 22.)  Citing the purported "proximity" between the CCP's seizures of Mr. Kwok's assets and Mr. Kwok's launch of the Rule of Law charities, the government appears to assert that such evidence may be admitted as direct evidence because it is "background to, and [to] complete the story of, the crimes charged." (*Id.*)  The government further asserts that evidence of the CCP's seizure of Mr. Kwok's assets is admissible pursuant to Rule 404(b) as evidence to demonstrate "motive" and lack of mistake. (*Id.*)  The government's motion should be denied as premature, and in fact reveals the government's hypocrisy.

As an initial matter, the government's position is two-faced.  On the one hand, the government argues that evidence of the CCP's seizure of Mr. Kwok's assets should be admitted, "'to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.'" (Govt. Mot. at 22 (citation omitted).)  On the other hand, the government actually seeks to *hide* the complete story from the jury by precluding Mr. Kwok from introducing evidence of the CCP's *other* efforts to target Mr. Kwok and his family, including the very evidence this Court has already determined is relevant to Mr. Kwok's defenses. (*See id.* at 47-62 (seeking to preclude virtually all evidence of the CCP's targeting of Mr. Kwok).)

Moreover, the false confiscation of assets of Operation Fox Hunt targets is a prime tactic by the CCP, as even the government *itself has asserted.  See United States v. Ying*, No. 22 Mag.

1711) (S.D.N.Y.), Dkt. No. 1, ¶ 19(b) (describing how CCP seized property belonging to Operation Fox Hunt victim).  This is yet another attempt by the government to tell a one-sided and misleading story at trial.  If the government is permitted to introduce evidence concerning the CCP's seizing of Mr. Kwok's assets, then Mr. Kwok should be allowed to introduce evidence, including through the testimony of his expert, Mr. Doran, that such property confiscation is a part of the CCP's targeting of political dissidents like Mr. Kwok.

That is particularly important because the government claims that it will not seek to prove up the background of the seizure (Govt. Mot. at 22-23), meaning the jury could be left with the misleading impression that the seizure of Mr. Kwok's assets was part of a legitimate judicial process that found wrongdoing on his part (particularly given that the government apparently intends to introduce evidence of its own and the SEC's seizure of assets in this case).  If Mr. Kwok is not allowed to fully explain the circumstances around that seizure and its role in the larger CCP efforts to target Mr. Kwok, then the jury will not be presented with accurate version of the facts.[6]

That is not how fair criminal trials are conducted.  The government is not free to cherry-pick evidence the government considers helpful to its narrative and show it to the jury in a vacuum, free from critical background and context.  Indeed, the "'[p]urpose of [Federal Rule of Evidence 106] governing completeness is to correct, contemporaneously, misleading impression[s] created by taking matters out of context, and [the] rule requires generally that adversaries be allowed to prevent omissions that render matters in evidence misleading.'"  *United States v. Donavan*, 577 F.

---

[6] Moreover, that the government does not intend to introduce "any evidence regarding what underlies the asset seizures" undercuts the government's own argument as to the admissibility of evidence of the CCP's asset seizures under Rule 404(b).   (*See* Govt. Mot. at 22.)  The CCP's seizure of Mr. Kwok's assets is not any "act" on the part of Mr. Kwok—it is an act of the CCP.

Supp. 3d 107, 118 (E.D.N.Y. 2021) (citing *United States. v. Williams*, 930 F.3d 44, 58-59 (2d Cir. 2019), *cert. denied sub nom. Williams v. United States*, 141 S. Ct. 2816 (2021)).

If the government wishes to introduce evidence of the CCP's freezing of Mr. Kwok's assets (whether to "complete the story" or show his purported "motive"), then Mr. Kwok must also be given the same opportunity to "complete the story" and counter the government's narrative with evidence—including evidence that this Court has already found to be relevant to Mr. Kwok's defense—that the CCP's seizure of his assets was part and parcel of the CCP's long-running efforts to target Mr. Kwok, his family, and his movement.

For similar reasons, before granting the government's motion, the Court should require the government to state with particularity which evidence it intends to rely on to introduce these facts. For example, the government cites to a portion of Mr. Kwok's bankruptcy petition, but does not state whether that is the only section it seeks to introduce.  With respect to other statements, the government does no more than say that Mr. Kwok has stated on many occasions that his assets were seized by the CCP.  Mr. Kwok, however, is entitled to know which statements or portions of statements the government intends to rely on with particularity, so that he can argue, if appropriate, that additional segments of those statements should also be introduced for completeness.  *See*, *e.g.*, *Donovan*, 577 F. Supp. 3d at 118 (granting defendant's request to compel government to include additional parts of defendant's recorded jail calls when government introduced the statement). Accordingly, the Court should deny the motion as premature and direct the government to specifically identify the statements it wishes to use.

> **D.     The Government Should Be Precluded from Offering Evidence of Phone Calls that Emphasize Mr. Kwok's Incarceration and Are Irrelevant to the Charged Offenses**

The government seeks to introduce extensive evidence that not only reveals but emphasizes Mr. Kwok's incarceration.  The potential evidence against Mr. Kwok consists of "recorded jail

calls," as the government described them.  Only "[b]y way of example," the government listed six

such calls between Mr. Kwok and Qidong Xia that it intends to admit as evidence.  Those calls—

and presumably the other ones that the government wishes to submit to the jury but has not

identified (collectively, the "MDC Calls")—extensively discuss Mr. Kwok's incarceration

pending trial.  The government also seeks to admit evidence that both defendants sent messages

through an attorney while they have been detained at MDC (collectively with the MDC Calls, the

"MDC Evidence").

It is indisputable that the substance of these prison calls pertain to matters that occurred

after the time period of the alleged fraud.  (Ind., ¶ 24.)  Thus, for example, one of the calls deals

with Mr. Kwok's statement that Mr. Xia should assume leadership of the NFSC after Mr. Kwok's

arrest.  But who has led the NFSC after Mr. Kwok's arrest has little bearing on the conduct of that

organization during the period of the charged conduct.  Similarly, a call in which Mr. Kwok and

Mr. Xia discussed the financial difficulties of the "CEOs of the Himalaya Alliance [who allegedly]

are all in Abu Dhabi" and that Mr. Xia was trying to help them does not show anything with respect

to alleged prior transfers of funds abroad.  The same is true of a call in which Mr. Kwok allegedly

discusses the fact that his arrest was prompted by the government's wish to prevent him from

testifying in a separate prosecution or to stop a certain meeting from happening sheds no light on

any issue relevant to whether Mr. Kwok allegedly made misrepresentations in connection with any

of the business ventures identified in the Indictment.

Recognizing that, the government tries to muster some relevance out of the fact that these

calls purportedly show Mr. Kwok's control over the purported Kwok Enterprise.  To the extent

that it is the government's primary theory of relevance, these jail calls offer little more of probative

value.  The government has claimed that it has considerable evidence of Mr. Kwok's control even

without these calls (such as the fact that some people allegedly called him "Boss").  Introducing these calls does not add anything to that quantum of evidence.  The same is true with respect to the government's claim that this evidences "lack of good faith, willfulness, or fraudulent intent." Nothing in these calls pertains to the statements that Mr. Kwok is alleged to have made years before these calls occurred—neither he nor Mr. Xia make any reference to those prior statements or even to those businesses, based on the government's summaries of the calls.  Thus, these calls are simply irrelevant as to whether Mr. Kwok acted in good faith or with fraudulent intent in 2020 or 2021.  Thus, at best, this evidence is cumulative of the government's other proof, and at worst, irrelevant entirely.  *See United States v. Wiggins*, 787 F. App'x 775 (2d Cir. 2019) (finding exclusion of cumulative exhibits that "would only have corroborated police officers' proffered testimony" proper).

Moreover, even if relevant, the limited probative value of these calls is far outweighed by the unfair prejudice their admission would cause. "It is well-established that, unless *necessary* for the case, the jury should not know that a defendant is being held in jail before trial. *See, e.g., Estelle v. Williams*, 425 U.S. 501, 504-05 (1976).  This is due, in part, to the risk that the jury's knowledge of the defendant's pretrial detention will interfere with the presumption of innocence. *Id.* ("[A]n accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system.").  Yet, that is precisely what the government seeks to do—inject the fact of Mr. Kwok's detention to prove that *even after he was jailed*, he still purportedly has control of the Kwok Enterprise.

The government's suggestion that this prejudice can be cured by a limiting instruction is simply untrue.  (Govt Br. at 26.)  The cases to which the government cites do not hold as much.

In *United States v. Tussa,* the court was not considering the admission of jail calls at all, but rather evidence concerning prior narcotics offenses introduced as 404(b) evidence.  *See* 816 F.2d 58, 68 (2d Cir. 1987).  The same is true of *United States v. Snype*, which concerned the introduction of a co-defendant's allocution.  *See* 441 F.3d 119, 129 (2d Cir. 2006).  In the two cases that the government cites that do deal with recorded jail calls or conversations, the courts did not discuss whether that evidence was cumulative or engage in 403 balancing with respect to disclosure of the defendants' incarceration.  *See United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002); *Donovan*, 577 F. Supp. 3d at 117.

Moreover, "[a]lthough ordinarily [courts] presume that a jury adheres to the curative instructions of the trial court, this presumption is dropped where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) (internal quotation marks omitted).  In this case, the government intends to show that Mr. Kwok controlled the Kwok Enterprises, was then jailed for his involvement with those entities, and then purportedly continued to control the alleged enterprise from prison.  It is simply not credible for the government to suggest that the jury will not impermissibly read into the fact of Mr. Kwok's detention that he is guilty of the charged offenses.  Particularly in light of the minimal probative value of these recorded jail calls, Mr. Kwok respectfully submits that the Court simply should not take that risk.

That risk is particularly pernicious with respect to the government's suggestion that it should be allowed to introduce evidence that the defendants used lawyers to allegedly ferry messages to their fellow movement members.  For one, the government does not even describe what the contents of these alleged messages are, so the Court has no way of evaluating their relevance.  But even more importantly, evidence that the defendants purportedly used attorneys

while incarcerated to continue their alleged misconduct could very easily suggest to the jury that the defendants are using trial counsel for similar purposes.  Undercutting trial counsel's credibility through introduction of such evidence would be highly prejudicial to Mr. Kwok's ability to defend himself.  *Cf. United States v. Drummond*, 481 F.2d 62, 62 (2d Cir. 1973) (inappropriate for prosecutor to inject his own credibility into trial).

### E.    The Court Should Exclude Evidence About the Pax Contempt Order and Mr. Kwok's Bankruptcy Cases

Mr. Kwok has moved in *limine* to preclude the government from introducing evidence concerning the PAX Contempt Order and Mr. Kwok's bankruptcy filings.  (*See* Mr. Kwok's Mot. *in Limine* (Dkt. No. 271) ("Kwok Mot.") at 25.)  Mr. Kwok will not burden the Court with rehashing his arguments here, and incorporates them by reference in opposition to the government's motion to admit such evidence.  The government's motion does, however, confirm Mr. Kwok's arguments in three significant ways.

*First*, the government's brief confirms that the PAX Contempt Order and bankruptcy case cannot serve as motive for the alleged fraudulent misrepresentations concerning GTV, the Farm Loans, GCLUBS, and the Himalaya Exchange, because the contempt order and bankruptcy filing occurred *after* those alleged misrepresentations were made.  Specifically, according to the government's recounting of the events surrounding the PAX Contempt Order and the bankruptcy filing, prior to the entry of the contempt order, Mr. Kwok had secreted away significant assets in the names of family members and trusted confidants upon arriving in the United States.  (Govt. Mot. at 28.)  Mr. Kwok, however, had the use of those assets at critical times in the period of the charged conduct—for example, according to the government, Mr. Kwok "filmed many of the broadcasts where he promoted the fraudulent investment opportunities from the deck or interior of

20

the Lady May." (Govt. Mot. at 30.) Thus, in other words, when Mr. Kwok was allegedly making these misrepresentations, he had access to significant wealth.

According to the government, that all changed in February 2022, when the New York state court (the "State Court") issued its final contempt order, *i.e.*, the PAX Contempt Order. In that order, the State Court ordered Mr. Kwok to pay $134 million to PAX within five days. When Mr. Kwok was unable to do so, he declared bankruptcy, reporting that he had substantial debts and only limited assets. *In re Ho Wan Kwok, et al.,* Case No. 22-50073 (JAM) (Bankr. D. Conn.), Dkt. No. 1. This was almost two years after the Mr. Kwok's allegedly fraudulent statements in connection with the GTV Private Placement; approximately a year and a half after his alleged misrepresentations in connection with the Farm Loans and G|CLUBS; and approximately four months after his alleged misrepresentations in connection with the Himalaya Exchange. (*See* Ind., ¶ 16(a) (alleging misstatement regarding GTV in April 2020), ¶ 17 (alleging misstatements regarding the Farm Loans in July and August 2020), ¶ 18 (alleging misstatements regarding G|CLUBS in October 2021).) In other words, according even to the government's theory, the event that drove Mr. Kwok into insolvency, *i.e.*, created his need for money quickly, only occurred in 2022. Given that, there is no way that this evidence could form a motive or serve as background for Mr. Kwok's actions in 2020 and 2021—the fact that Mr. Kwok was driven into bankruptcy after facing an edict to pay more than $100 million in less than a week speaks little to his financial affairs months or years before.

*Second*, the government's brief confirms that, in light of the non-existent probative value, this evidence should be excluded under Rule 403 as highly inflammatory and unfairly prejudicial. For example, the government recites that the State Court wrote in the PAX Contempt Order that it was finding Mr. Kwok in contempt based on his "efforts to avoid and deceive his creditors by

parking his substantial personal assets with a series of corporations, trusted confidants, and family members." (Govt. Mot. at 28.) The State Court further stated that Mr. Kwok was engaged in a "shell game." (*Id*.). As Mr. Kwok argued in his motions in *limine*, the use of such pejorative terms creates a substantial risk of improperly prejudicing the jury against Mr. Kwok. (Kwok Mot. at 34.) But that is particularly the case when those phrases emanate from the State Court—in effect, the jury will be that another judge has concluded that Mr. Kwok has improperly "parked" assets with those close to him to engage in a "shell game." As evidenced in the governments' brief, that dovetails with its money laundering theory, namely that Mr. Kwok was hiding his assets in his family's name. (*See*, *e.g.*, *id*. at 29-30). Thus, in essence, if permitted, the government will be introducing evidence that a judge essentially endorsed the government's theory of the case. That would create an impermissibly high risk that the jury would simply defer to the State Court's view rather than weigh the evidence for itself. *See United States v. Thaler*, 229 F. App'x 7, 9 (2d Cir. 2007) (questioning district court's determination that probative value of order barring defendant defendant from practice of law "was not substantially outweighed by the danger of unfair prejudice." (internal quotation omitted)); (Zenith *Radio Corp. v. Matsushita Elec. Indus. Co*., 505 F. Supp. 1125, 1186 (E.D. Pa. 1980), *aff'd in part, rev'd on other grounds in part, In re Japanese Elec. Prod. Antitrust Litig*., 723 F.2d 238 (3d Cir. 1983) (excluding under FRE 403 judicial findings of fact because it "present[s] a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.); *see also Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir.1987) *cert. denied*, 484 U.S. 1043 (1988) ("A practical reason for denying [judgments] evidentiary effect is ... the difficulty of weighing a judgment, considered as evidence, against whatever contrary evidence a party to the

current suit might want to present. The difficulty must be especially great for a jury, which is apt to give exaggerated weight to a judgment.").

Furthermore, the government's 403 mischief does not end with the PAX Contempt Order. Specifically, the government has now also confirmed in its brief that it intends to introduce evidence of Mr. Kwok allegedly defying court orders in the bankruptcy proceedings and purportedly encouraging protests to harass the Trustee, his family, and his employees. (Govt. Mot. at 30.)  For the reasons set forth in Mr. Kwok's motion in *limine*, including that this would impermissibly inject Mr. Kwok's invocation of his Fifth Amendment rights, this evidence should be excluded as irrelevant and unfairly prejudicial. (Kwok Mot. at 16-22, 26.)

Moreover, the government also reprises its claim that NFSC members attempted to bolster Mr. Kwok's "cover story" by decorating the Mahwah Facility to appear like a clubhouse. (Govt. Mot. at 30.)  The government's brief, however, fails to describe any foundation for the introduction of such evidence—it does not state who created this purported "cover story," or when it was created.  And, if the government's theory is that it was Mr. Kwok who created this purported "cover story" after he was arrested, then the government has not shown how Mr. Kwok communicated this "cover story" to the other members of the NFSC.  Absent such evidence, the government cannot show that Mr. Kwok was part of any plot to "cover up" anything simply because, according to the government, he was engaged in an earlier fraud conspiracy.  *See Grunewald v. United States*, 353 U.S. 391, 401–02 (1957) ("[a]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that conspiracy was kept a secret and that conspirators took care to cover up their crime in order to escape detection and punishment").  Similarly, if the government seeks to introduce this purported "cover story" as 404(b) evidence that is relevant to

Mr. Kwok's motive or intent, for example, then it has to tie that conduct to him somehow—the government cannot prove Mr. Kwok's state of mind through the actions of others without some evidence that Mr. Kwok participated in or caused the actions.

*Third*, the government's brief should also doom its effort to introduce evidence concerning the $37 million bond loan from the Himalaya Exchange. Specifically, the government's own recitation of the facts demonstrate that the loan was requested and initiated only in response to the PAX Contempt Order. This means that this alleged transaction was not tied to any of the alleged misrepresentations made by the government—rather, at best under the government's theory, it was an alleged isolated theft of funds that does not constitute a fraud. *See United States v. Finnerty*, 533 F.3d 143, 148-49 (2d Cir. 2008) (no securities fraud where government did not show that defendant had communicated anything misleading to his alleged victims and government merely "undertook to prove no more than garden variety conversion").

The only option that leaves the government is that this bond is admissible as background or 404(b) evidence, or as evidence demonstrating the existence of the alleged enterprise. (Kwok Mot. at 26-28.) With respect to background evidence, the bond cannot be background for the charged offenses, because it occurred after they did. Similarly, the need for the bond cannot serve as, for example, motive or proof of intent with respect to the charged offenses because the need for the bond was not in existence at the time Mr. Kwok allegedly made the relevant misrepresentations. Finally, with respect to the existence of the alleged enterprise, even if one assumed that this evidence showed some affinity between Mr. Kwok and the Himalaya Exchange, the government has described substantial amounts of evidence connecting the two. Allowing the government to also use the bond for this payment would, however, run afoul of Rule 403, because the only way to explain why the bond was necessary is to introduce the PAX Contempt Order,

which, as described above, would be unfairly prejudicial.  Accordingly, evidence concerning the
bond should be excluded for these same reasons.















## IV.    AUTHENTICATION UNDER 902(11) SHOULD NOT BE PERMITTED

The government asks the Court to rule that a long list of categories of documents[14]—without identifying or proffering any specific documents—to be admitted as self-authenticating business records under Federal Rules of Evidence 803(6) and 902(11) and 18 U.S.C. § 3505.11. (Govt. Mot. at 34-36.)   The government asserts, with no further explanation or description, that each document in these categories will qualify as a business record under Rule 803(6) and therefore be self-authenticating under Rule 902(11) for domestic records and 18 U.S.C. § 3505 for foreign records.  Under Fed. R. Evid. 902(11), proponent must "make the record and certification available for inspection—so that the party has a fair opportunity to challenge them."  Until the government identifies the specific documents that it seeks to introduce and supplies the relevant supporting certification, the Court should deny the government's motion as premature.

## V.    THE ABU DHABI BANK DOCUMENTS SHOULD BE EXCLUDED UNDER EVIDENTIARY AND CONSTITUTIONAL STANDARDS

To help prove its (false) theory that the defendants misappropriated funds from the Farm Loans Program, the government seeks to introduce account opening documents (Govt. Mot., Ex. F), including a standard Excel spreadsheet (Govt. Mot., Ex. G) purportedly obtained from the First Abu Dhabi Bank (collectively the "FAB Documents").   According to the government, this evidence is of critical importance to its charges premised on the Farm Loans Program.  As much as the government may wish otherwise with respect to the records from the First Abu Dhabi Bank, however, there is no "important evidence" exception to the Federal Rules of Evidence concerning authentication and hearsay.

---

[14] The government seeks permission to admit: bank records, bank transaction information, IP logs, call detail records, subscriber information, emails from search warrant returns. (Govt. Mot. at 34-36).

But while the government's desperate attempt to admit this evidence pursuant to the rarely used "residual exception" fails, a more fundamental threshold issue dooms the government's effort: the government cannot offer any basis to authenticate the FAB Documents. It has long been held that a defendant's right to present a defense is governed by the "rules of procedure and evidence"—and these rules should apply with even more force to the only party in this proceeding that has a burden of proof—the government. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence"). Those rules require the government to authenticate the evidence it seeks to introduce. Those rules also prohibit the introduction of out-of-court statements admitted for the truth of the matter asserted, unless the proffered evidence satisfies one of the exceptions to the hearsay rules. The government, however, cannot authenticate these documents or satisfy any of the hearsay exceptions—indeed, it does not even try to authenticate these documents through traditional exceptions, but relies solely on the so-called "residual" exception.

That reliance, however, is unavailing—the records are not sufficiently trustworthy to satisfy the heightened standard required to apply this limited exception, and, as the government concedes, the source of the records declined to provide the underlying bank statements or even a certification statement for the records. (Govt. Mot. at 38-39 & n.16, 44.) Accordingly, admitting these records under the residual exception would violate Mr. Kwok's confrontation rights under the Sixth Amendment. The Court should reject the government's attempt to skirt these evidentiary protections and admit hearsay in violation of the defendants' constitutional rights. *See United States v. Bruno*, 383 F.3d 65, 72 (2d Cir. 2004), *as amended* (Oct. 6, 2016) ("The convictions for false-statement conspiracy (included in Count IV) must be vacated because the District Court

committed plain error in admitting the hearsay evidence supporting those convictions, in violation of the Confrontation Clause.").

### A.      The Government Cannot Properly Authenticate the FAB Documents

The government seeks to fast forward to the question about hearsay, but its application fails at a more elementary level: it cannot even authenticate the FAB Documents as First Abu Dhabi Bank records concerning a bank account in the name of ACA (the "ACA Account").  *See* Fed. R. Evid. 901(a)  ("[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is"); *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014) ("[t]he requirement of authentication is a condition precedent to admitting evidence").  Although "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be, there must nonetheless be at least sufficient proof so that a reasonable juror could find in favor of authenticity or identification."  *Id*. at 230.

In this case, the government cannot supply the Court with *any* appropriate evidence that the FAB Documents are what they purport to be.  The only evidence the government has even offered is an affidavit from Marlee B. Miller, an attorney with the SEC (the "Miller Affidavit"), and the appearance of the records themselves.  Neither satisfy Rule 901's requirements.

*First*, according to the government and the Miller Affidavit, the government obtained the FAB Documents through an apparent daisy chain: the government obtained them from the SEC, which obtained them from financial regulators in the United Arab Emirates (the "UAE Regulator"), which obtained them through unspecified "domestic procedures" from the First Abu Dhabi Bank, located in the United Arab Emirates (the "UAE").  As a result, the government, however, can, at best, offer competent evidence only of the last two steps in this chain—through the testimony of Ms. Miller, the government apparently will establish that the SEC received the FAB Documents

from the UAE Regulator and then provided them to the government.  But neither Ms. Miller nor the government can provide Mr. Kwok or the Court with any information—let alone evidence—as to how the FAB Documents were prepared or maintained by the First Abu Dhabi Bank or what procedures the UAE Regulator followed to gather the documents from the First Abu Dhabi Bank.

It is precisely because of this black box that the government cannot rely on the traditional method of authenticating such documents, either through the testimony of a witness with knowledge, *see* Fed. R. Evid. 901(b), or as self-authenticating under Federal Rule of Evidence 902(12), which requires the proponent of the evidence to supply the Court with a certification by a custodian of records that attests, under penalty of perjury, that the records qualify as business records under the traditional four-part test.  *See* Fed. R. Evid. 803(6) (describing the five elements required to introduce an out-of-court statement as "records of regularly conducted activity"); *see also United States v. Doyle*, 130 F.3d 523, 547 (2d Cir. 1997) ("[w]e find that the admission of privately-generated, business records without further foundation, even though the records were found in the possession of a foreign government agency, would in all probability be an abuse of the discretion by the trial court" and that court should not find new exceptions "to correct the Government's failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception").

*Second*, the government's own arguments undermine its ability to authenticate the FAB Documents through the "distinctive characteristics" prong of Rule 901.  The government's argument in support of admission of the FAB Documents is essentially that they look like bank records because they have the name of First Abu Dhabi Bank on them.  Taking each proffered exhibit in turn, that evidence is insufficient.

Exhibit F is a loose set of documents that the government describes as account opening documents, emails and signature pages related to the ACA Account at First Abu Dhabi Bank.  In support of these documents, the government points almost exclusively to the appearance of the documents and the fact that they purportedly bear the logo of the First Abu Dhabi Bank.  (*See* Govt. Mot. at 39.)  As an initial matter, it is no difficult feat to alter the face of a document.  *See, e.g.*, *United States v. Bryant*, No. 19 Cr. 29 (ADM/ECW), 2019 WL 3307393, at *2 (D. Minn. June 7, 2019), *report and recommendation adopted*, 2019 WL 3308220 (D. Minn. July 23, 2019) (denying motion to suppress based in part on agent's affidavit asserting that "computer and printing technology allowed for printed documents to be easily modified for malicious purposes").  Moreover, whatever force the government's argument may have if it were trying to introduce blank account opening forms, the government here is trying to say that Exhibit F contains the specific account opening documents for the ACA Account itself, complete with handwritten entries purportedly linking the account to Mr. Je.  The government's attempt to do so, however, is doomed by the Second Circuit's decision in *Vayner*.

In *Vayner*, the Second Circuit vacated the defendant's conviction and found the district court abused its discretion by admitting improperly authenticated evidence.  769 F.3d at 127.  In particular, the Second Circuit considered whether the government had properly authenticated printouts of a website that the government claimed was the defendant's profile page from a Russian social networking site.  *See* 769 F.3d at 127.  To authenticate the document, the government offered testimony from a law enforcement agent who testified, among other things, that the profile picture on the webpage was of the defendant and that the page referenced the defendant's social media handle and employment history.  *See id*. at 127-28.  On cross-examination, however, the agent admitted that they did not have any personal knowledge concerning whether "identity verification

was required in order for a user to create an account on the site." *Id*. at 129.  The district court admitted the printout as a copy of the defendant's profile page, and the prosecution used the similarity between the defendant's social media handle on the web page and the email address involved in the underlying offense to argue that the email address belonged to the defendant.  *Id*. at 128.

The Second Circuit found that the district court had erred in admitted the evidence and vacated the conviction.  *Id*. at 129-35.  First, the court found that the government had not introduced any evidence that the defendant himself had created the page or was responsible for the information on it.  *Id*. at 132. Thus, the government had no direct evidence that the defendant created the website.  Second, the court found that there was no circumstantial evidence that linked the defendant to the webpage.  The court acknowledged that a written document can be authenticated based on circumstantial evidence concerning the "distinctive characteristics" of the record, including the fact that "that the contents of the writing were not a matter of common knowledge." *Id*. at 132 (cleaned up).  But, the court found, the government could not rely on this avenue, because while there was information about the defendant on that page, that information was known to several others, including some with a reason to create such a page and "falsely attribute it to the defendant."  *Id*.  The court also found that the lack of any evidence that the website required identity verification to open an account further undercut the government's authentication theory.  *Id*. at 133.

The same issues pervade the government's inability to authenticate the FAB Documents here.  The government has no direct evidence that anyone from ACA created these account documents—the government has no evidence at all, in fact, about the circumstances of how these documents were actually prepared.  Nor does it have any kind of circumstantial evidence of the

authenticity of these records as ACA Account opening documents or emails.  The information contained on the ACA Account opening documents found in Exhibit F does not include anything about ACA that the government can claim was not common knowledge—it merely has ACA's address and the fact that it is owned by Mr. Je, facts that are known to many.  Nor does the government have any evidence concerning First Abu Dhabi Bank's account opening process and whether it requires the kind of "identity verification" that would lend credence to the government's claim that an authorized ACA representative retrieved these records.  Put simply, the government's proof is as deficient as it was in *Vayner*, and should be rejected for the same reasons.

Similarly, the government cannot properly authenticate Exhibit G, which is an Excel spreadsheet that purportedly details transactional information for the ACA Account.  The government's principal evidence in support of authenticity of this spreadsheet is presumably that certain transactions reflected in other bank records line up with entries in the spreadsheet.  But at most, that shows that Exhibit G is a spreadsheet reflecting certain financial transactions—it does not say anything about whether the spreadsheet accurately reflects transactions at the ACA Account at First Abu Dhabi Bank.  For example, the government has not purported to show that *all* of the transactions reflected on the spreadsheet are correlated through other bank records to the ACA Account, meaning that the spreadsheet could very well be a compilation of financial data from several bank accounts, a fact that is of critical importance when the government claims that the ACA Account was used to commingle funds.  (Govt. Mot. at 39-40.)

It is striking that instead of providing underlying bank statements, which the UAE regulator refused to do, the SEC was instead provided a spreadsheet that does not even bear *any* indicia that it emanates from the bank—the spreadsheet does not contain any notation that it was prepared by a employees of the bank or based on records of the bank.  The only connection between the

spreadsheet and the bank, in fact, are that certain .pdf files are embedded on a tab of the spreadsheet, which appear to be the same documents as those found in Exhibit F.  But, as addressed above, the government cannot even authenticate the documents that comprise Exhibit F as First Abu Dhabi Bank records concerning the ACA Account, so it cannot rely on these documents as evidence of the connection between Exhibit G and the bank.  That is particularly true given that the government cannot offer any evidence as to how these .pdf files became embedded in Exhibit G.  Ms. Miller does not address this issue in her affidavit, but even if she did, the most she could say is that such is the manner in which she received Exhibit G.  But the government cannot show whether it was the UAE Regulator or employees of the bank that linked those files—there is no testimony from any bank representative that its employees prepared Exhibit G in that manner, or testimony from a representative of the UAE Regulator that the regulator received Exhibit G in its current form. The complete lack of information about how the documents were prepared dooms the government's attempts to authenticate these documents.  *See Vayner*, 769 F.3d at 132-33.

The government's own characterization of the UAE regulator's response to the SEC's request drives the point home.  As the government is forced to concede twice in its motion, the UAE regulator declined the SEC's request to provide a certification statement for the records it provided, a refusal that raises red flags as to the reliability of the sources and methods used to procure them.  (*See* Govt. Mot. at 38-39, 44.)[15]  The government itself characterized the UAE regulator's response as "irregular, at best."  (*Id.* at 44.)[16]  And perhaps most damning, the government concedes that the regulator refused to provide even the basic underlying bank

---

[15] The Miller Affidavit is curiously silent on the request for such a certification, and its denial.

[16] The characterization of the UAE regulator's provision of records as "irregular, at best" conclusively undermines the government's description of that process, a few pages prior, as "reliable and routine" and "obtained in an ordinary manner that is indicative of trustworthiness." (Govt. Mot. at 38.)

statements themselves, leaving Mr. Kwok, the jury and the Court no way to confirm the accuracy or reliability of the numbers that have been spit out of a computer under dubious circumstances into the spreadsheet at Exhibit G.

*Third*, the government argues in a footnote that any assertion from the defense that the UAE Regulator tampered with the FAB Documents would be "speculation" that is undercut by the fact that Mr. Kwok and Mr. Je allegedly resided in or were citizens of that country. (Govt. Mot. at 39 n.15.) As an initial matter, the government's position is based on one logical fallacy after another. In particular, nefarious conduct is not required for there to be questions about the reliability of a document—even an innocent mistake can alter the nature of a document, such as a mistaken keystroke that transposes a file where it should not be or alters a line a spreadsheet. Moreover, even if illegal tampering was necessary (which it is not), the fact that an individual lives in or is a citizen of a country is by no means a bar to arguing that that nation has engaged in some misconduct—if it were, then American citizens would not be entitled to pursue claims against the government for compensation for injuries. That, of course, is ridiculous. *See, e.g., Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (holding that victim of unconstitutional search could pursue claim against federal agents).

More importantly, however, is that the government's argument turns the burden of proof on its head. The government is the proponent of the FAB Documents, and as such, it is the government's burden to come forth with "sufficient proof so that a reasonable juror could find in favor of authenticity or identification." *Vayner,* 769 F.3d at 130. Thus, it is for the government to prove that these documents can be authenticated through a witness of personal knowledge of their reliability or through distinctive characteristics that make clear what they are. Mr. Kwok is entitled to point out the glaring holes in that evidence without having to introduce contradictory

evidence himself.  Indeed, that is precisely the approach taken by the Second Circuit in *Vayner*, when it noted that any number of people besides the defendant could have known the information on the social media page, even without any indication that the defendant had offered any proof of that fact.  *See id*. at 132-33.  The government has failed in satisfying its burden, and, thus, cannot admit this evidence, no matter how important the government feels it is to its case.  *See id*. at 129 ("[t]he requirement of authentication is a condition precedent to admitting evidence").[17]

### B.    The FAB Documents Do Not Satisfy the Residual Exception to the Rule Against Hearsay

Even assuming that the government could authenticate the FAB Documents, it still cannot introduce them to prove the matters that it wishes to—namely that certain transactions occurred from the ACA Account and that that account was under Mr. Je's control—because the documents are inadmissible hearsay.

Even though these are purported bank records, the government does not even attempt to authenticate them using the traditional hearsay exceptions pertaining to business records.  The government instead relies on Fed. R. Evid. 807, the so-called "residual" exception.  Notably, "Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances."  *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).  This is not one of the cases in which the residual exception should apply—while the government may

---

[17] The government takes great pains to plead the import of the FAB Records to its case.  (*See, e.g.*, Govt. Mot. at 36 ("These records are substantially important to the government's case[,]"); *id* at 44 ("Certain of the transfers of [alleged] fraud proceeds can only be established using the ACA Bank Account records."); *id.* ("[*O*]*nly* the ACA Bank Account records establish that William Je . . . opened this account[,]") (emphasis in original).)  But the Rules of Evidence that protect Mr. Kwok do not vary with the purported important of the evidence to the government.  *See Doyle*, 130 F.3d at 547 (rejecting notion that the courts should create new exceptions to the rules of evidence "to correct the Government's failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception.").

claim that this evidence is "very important," it cannot show that it is "very reliable" and thus should be excluded.  *See United States v. Kim*, 595 F.2d 755, 766 (D.C. Cir. 1979) ("Congress intended the exception to apply in a very few cases in which the evidence is very important *and* very reliable." (emphasis added)).  To satisfy the residual exception, the government must show that the FAB Documents are "particularly trustworthy."  *See United States v. Bryce*, 208 F.3d 346, 350 (2d Cir. 1999), *as amended on denial of reh'g* (Jan. 19, 2000) (describing required factors to apply Fed. R. Evid. 807).  The government cannot satisfy this burden.

*First*, the government spends a considerable part of its motion trying to draw connections between Exhibit G—the purported spreadsheet of transactional data—and other bank records to argue that the FAB Documents bear sufficient indicia of reliability.  The government's prolific screen-shotting aside, the comparison exercise in which the government engages is entirely irrelevant.  The Supreme Court has "squarely rejected the notion that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears particularized guarantees of trustworthiness."  *Lilly v. Virginia*, 527 U.S. 116, 137–38 (1999) (cleaned up); *Idaho v. Wright*, 497 U.S. 805, 826 (1990) (other evidence that corroborates hearsay statement are "irrelevant to a showing of the 'particularized guarantees of trustworthiness' necessary for admission of hearsay statements under the Confrontation Clause").  Thus, the Court cannot consider any of the other evidence that the government argues corroborates the information in the FAB Documents.  To be sure, Rule 807 speaks of considering "evidence, if any, corroborating the statement" in assessing its reliability.  Fed. R. Evid. 807(1).  *Lilly* and *Wright*, however, create a constitutional bar to doing so in criminal cases due to Confrontation Clause considerations.  Thus, in a criminal case at least, the Court may not look to extrinsic evidence, but rather, the Court must look solely at the characteristics of the proffered hearsay statement to assess its trustworthiness.

44

*See Wright*, 497 U.S. at 822 ("hearsay evidence . . . must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial").

Even if the Court could consider the government's Photoshop-style evidentiary presentation, that still would not permit introduction of the FAB Documents under Rule 807. As discussed above, while the government's proof may show that certain financial transactions appear on the spreadsheet, it cannot show that Exhibit G captures all of the activity in that account such that the Court could reliably conclude that the spreadsheet is an accurate depiction of the flow of funds in and out of that account. Indeed, Exhibit G does not even reference or bear the name or logo of First Abu Dhabi Bank, such that the Court could reasonably determine that the document even originated from that financial institution. Moreover, even if the Court could conclude that exhibit G was reliable, such would have no bearing on the reliability of Exhibit F, which the government cannot tie to any of the same evidence. And finally, the government can offer no testimony whatsoever about the circumstances of the preparation of either document. In such circumstances, Rule 807 is not an appropriate vehicle for admission. *See*, *e.g, United States v. Hill*, 658 F. App'x 600, 603 (2d Cir. 2016) ("The statement is recorded in a report prepared by law enforcement as an after-the-fact summary of Abreu's interview, and the exact circumstances by which the report was prepared are unclear."); *United States v. Rom*, 528 F. App'x 24, 28 (2d Cir. 2013) (admission of database evidence was not appropriate under Rule 807 where "[t]he database evidence contained no certification, and the person who conducted the database search . . . was neither affiliated with the Massachusetts Registry of Motor Vehicles nor available for cross-examination"); *United States v. Tin Yat Chin*, 371 F.3d 31, 36 (2d Cir. 2004) (district court properly refused to admit receipts under Rule 807 where defendant offered "no evidence by any witness or

any document that can establish that his signature was placed on them at the time and place he proffers").

*Second*, considering solely the FAB Documents, it is plain that their reliability is not "so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *Lilly*, 527 U.S. at 136.  The most the Miller Affidavit establishes is that the SEC received the documents from the UAE Regulator—thus, all she can really attest to is that these purported bank records were in the custody of a foreign regulator.  The government's claim that this is sufficient to overcome the hearsay issue runs squarely into the Second Circuit's decision in *Doyle*, which declined to "forge a new, hybrid exception to the hearsay rule by combining these two distinct varieties of admissible hearsay simply to correct the Government's failing to offer a witness who could present the foundation necessary for the admission of the documents under the business records exception," and found that it would likely be an abuse of discretion for a trial court to do so.  *See* 130 F.3d at 547.  The same is true here—whether clothed an invocation of the residual exception or some other hearsay exception—the fact that a foreign regulator merely possessed the records does little to demonstrate their reliability.

Moreover, the government cannot rely on *United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 468 (S.D.N.Y. 2017) to argue that the nature and appearance of the FAB Documents sufficiently assure their reliability.  As an initial matter, *Prevezon* involved a civil forfeiture action, and so the court did not have to consider the Confrontation Clause, which, as discussed below, prohibits the admission of this evidence under the residual exception.  But even if *Prevezon* did have some relevance here, the facts of that case actually demonstrate the weakness of the government's position, not the other way around.  For example, in *Prevezon*, the government sought to introduce (i) photographs of a case file from a Russian criminal money laundering

investigation (the "*Prevezon* Criminal Files"), which were taken by an attorney who was involved in an unrelated Russian litigation and (ii) files from Russian arbitration proceedings (the "*Prevezon* Arbitration Files") that were provided to the government by Russian attorneys. *See* 319 F.R.D. at 461-62.

The *Prevezon* court permitted the government to authenticate both sets of records, but the court's reasoning highlights precisely the types of necessary evidence that the government is missing in this case. With respect to the *Prevezon* Criminal Files, the court allowed them to be authenticated through the videotaped testimony of the attorney who actually photographed the files personally, *i.e.*, collected the files the government was trying to authenticate. *See id*. On the other hand, in this case, the government can offer no testimony from the individual who actually created or collected the FAB Documents. Similarly, with respect to the *Prevezon* Arbitration Files, the court found that the files had sufficient "distinctive characteristics" because they had pages of "non-public information" in them. *See id*. at 463. In this case, many of the FAB Documents—such as those in Exhibit F—contain routine information from the bank and publicly-available information about ACA like its address and owner, rather than any sort of "distinctive characteristics." Far from being helpful, *Prevezon* only highlights the deficiencies in the government's argument.

The *Prevezon* court also found that bank records from the *Prevezon* Criminal Case Files could be introduced for the truth of the matter asserted by the government under the residual exception. *See id*. at 468. Yet again, however, the government's reliance on *Prevezon* for support is a self-inflicted wound. Initially, in *Prevezon*, the court was presented with photographs of "bank records" that appeared to be "records of account activity created and maintained by financial institutions." *Id*. at 465. None of the documents contained in Exhibit F are "records of account

activity created and maintained by financial institutions"— as discussed above, *see supra* pp. 37-40, they are account opening documents that were completed by some unknown individual at some unspecified time.  The same is true of Exhibit G.  While it is a spreadsheet, **not a bank statement**, that supposedly records some account activity for the ACA Bank Account, as described above, *see supra* p. 40, the government cannot show that it is all activity from a single account or even properly tie it to the First Abu Dhabi Bank, much less a particular account.  Thus, even a superficial comparison of the appearance of the records in *Prevezon* and the FAB Documents shows how glaringly deficient the government's evidence is here.

Critically, however, the *Prevezon* court did not stop at the appearance of the records proffered by the government, but insisted on more.  *See id.* at 465 ("While these facts standing alone are not dispositive, they nevertheless bear favorably on trustworthiness.").  Rather, the *Prevezon* court went on to examine the circumstances under which the bank records had been collected as evidence of their reliability.  For example, the court noted how the records were either produced by the banks as part of a Russian criminal investigation or obtained by investigators who physically visited the banks to collect the records.  *See id.* at 466.  The government cannot, however, provide the Court any similar evidence in this case, because it has no testimony from the UAE Regulator about what process it engaged in to obtain these records.  Indeed, the UAE Regulator *declined* the SEC's request to provide a certification statement.  (Govt. Mot. at 38-39, 44.)  The government falls well short of the level of proof offered in *Prevezon*.

Finally, in *Prevezon*, the court adopted the government's reliance on extrinsic evidence to corroborate the bank records from the Criminal Files for purposes of determining that they were sufficiently trustworthy under Rule 807.  *See id.* at  466-67.  Whatever validity that approach has in a civil case, as discussed above, in a criminal case like this one, the Supreme Court has made

crystal clear that the government may not rely on extrinsic evidence to prove the reliability of a hearsay statement introduced under Rule 807.  *See Lilly*, 527 U.S. at 137–38; *Wright*, 497 U.S. at 826.  The fact that the *Prevezon* court's rationale is premised on a factor that would be impermissible in this case only underscores the fact that *Prevezon* is of no help to the government. Accordingly, Mr. Kwok respectfully submits that the government cannot satisfy the requirements of Rule 807, and thus, the FAB Documents should be excluded.

### C.  Admitting the FAB Documents Would Violate Mr. Kwok's Rights Under the Confrontation Clause of the Sixth Amendment

Even if the government could satisfy some of the requirements of Rule 807, its inability to demonstrate sufficient indicia of reliability would also make introducing the FAB Documents an error of constitutional dimension.  Specifically, allowing the government to introduce the FAB Documents would violate Mr. Kwok's Sixth Amendment rights under the Confrontation Clause.

The Sixth Amendment guarantees a criminal defendant the right to confront the witnesses against him.  *See generally Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994) ("The Sixth Amendment guarantees criminal defendants the right to a trial by jury, including the right to confront one's accusers").  The Supreme Court has stated that introducing out-of-court statements for their truth would violate this right unless the statements either "falls within a firmly rooted hearsay exception, or where it is supported by a showing of particularized guarantees of trustworthiness."  *Wright*, 497 U.S. at 816 (cleaned up).  The residual exception upon which the government relies does not fit into any "recognized hearsay objection" and thus, admission of a statement under that exception requires a heightened showing of reliability.  *See id.* at 817 ("Hearsay statements admitted under the residual exception, almost by definition, therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception.").  In other words, statements admitted under the residual exception

must come with sufficient "guarantees of trustworthiness" or constitute a Sixth Amendment violation.

For the reasons stated above, the FAB Documents do not have sufficient indicia of reliability to be admitted under the residual exception. *See supra* pp. 37-40. As a result, admitting them would not only violate the requirements of Rule 807, but also the Sixth Amendment. Particularly in light of the importance the government has placed on these records, admitting them in violation of Mr. Kwok's Sixth Amendment rights would surely constitute reversible error, and that risk far outweighs the government's repeated pleas that this evidence is important to it. *See Bruno*, 383 F.3d at 72 (vacating conviction because "admitting the hearsay evidence . . . [violated] the Confrontation Clause"). Indeed, if, as the government says, this evidence is so critical to demonstrating Mr. Kwok's guilt of crimes bearing decades in prison, the Court should well demand that the government should support its admissibility with more than the slender reed the government has presented.

The government's only response is to claim that the FAB Documents are not "testimonial" because the Supreme Court has said that "business records" are not "testimonial." (Govt. Mot. at 45). If the government could show that these are traditional "business records," then maybe this authority would be helpful for the government, but the government cannot do so. The conclusion that "business records" are not "testimonial" is because business records are prepared in the ordinary course of business, and not in anticipation of trial. *See United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006). On the other hand, documents prepared for purposes of litigation are not "business records" and thus are testimonial. *See id.* ("records created in anticipation of litigation do not fall within its definition"). In this case, the government cannot demonstrate that these records were kept in the ordinary course of business or specifically in preparation for this trial,

because the government has *no* evidence whatsoever concerning the preparation or collection of these records.

For example, Exhibit G is a spreadsheet of financial data, but the government cannot show that the UAE Regulator did not direct First Abu Dhabi Bank to prepare the spreadsheet specifically for use in this trial, or that the bank did not take it upon itself to do so. All the government can say is that it has a spreadsheet that has numbers on it that match other bank records—that does not speak at all to *why* the documents were created, which is the critical inquiry in determining whether a hearsay statement is testimonial. Accordingly, the government cannot sustain its burden to demonstrate that the FAB Documents are not "testimonial," and thus subject to the Confrontation Clause. *See Mendlowitz*, 2019 WL 6977120, at *9 ("[t]he proponent of a hearsay statement bears the burden of demonstrating its admissibility"). And because the FAB Documents are subject to the Confrontation Clause, and because, as described above, it does not bear sufficient indicia of reliability, the Court should reject the government's attempt to introduce blatant hearsay into the trial in violation of his constitutional rights, and exclude the FAB Documents.[18]

## VI. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO PRECLUDE CERTAIN EVIDENCE AND ARGUMENT REGARDING THE CCP'S TARGETING OF MR. KWOK

### A. The Court Should Deny the Government's Improper Attempt to Restrict Mr. Kwok from Attacking the Credibility and Motivations of the Government's Witnesses

The government moves to preclude Mr. Kwok from arguing "that the government has improper motives or is somehow advancing a CPP [sic] backed effort" because "the Government is not on trial." (Govt. Mot. at 47.) The government misunderstands the point and its motion

---

[18] If the Court elects to admit the FAB Documents for their truth, then Mr. Kwok respectfully submits that the entirety of the documents have to be admitted for their truth. In other words, for example, the government should not be permitted to assert that some of the information on Exhibit G is admissible for its truth, while other data is not.

should be denied.

"Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury." *United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010); *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (same).  A juror is free to believe all, some, or none of a particular witness' testimony.  *United States v. Beqiraj*, 788 F. App'x 73, 74 (2d Cir. 2019).  And a court must "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *Id.* (citing *Payne*, 591 F.3d at 60).

At trial, Mr. Kwok may properly attack the credibility of the government witnesses and their motivations for testifying, including that their testimony is motivated by CCP pressure or ideology.  *See, e.g., United States ex rel. Santiago v. Vincent*, No. 75 Civ. 3225, 1977 U.S. Dist. LEXIS 14046, *10-11 (S.D.N.Y. Sept. 13, 1977) (observing that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination" and ordering hearing reopened because "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness" had been improperly restricted).  Indeed, the government expressly concedes this point elsewhere in its motion.  (*See* Govt. Mot. at 57 (admitting "it could be appropriate cross-examination to challenge any *particular* Government witness about whether their testimony was the result of coercion by the CCP") (emphasis in original).)  For these reasons, the government's attempt to preclude the jury from considering whether the CCP has influenced the testimony and evidence before it should be denied.

**B.   The Government's Requests to Preclude Defendants from Offering Evidence Regarding the CCP's Targeting of Mr. Kwok, His Family and the NFSC Are Improper and Should Be Denied**

The government's motion to essentially exclude Mr. Kwok from introducing evidence concerning the CCP's targeting of Mr. Kwok, his family, and the relevant entities is a thinly-veiled attempt at convincing the Court to reconsider its February 21, 2024 order (Dkt. No. 243) (the "Fox

Hunt Order"). The government's motion is wrong as a matter of procedure and, more importantly, substance. The Court has already determined that the CCP's targeting of Mr. Kwok supports several aspects of his defense; indeed, the Court specifically noted that whether "Kwok's explanations ultimately hold water is, of course, a question for the jury." (Fox Hunt Order at 7.) Thus, the government's motion is nothing more than attempt to deny Mr. Kwok his "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

Moreover, the government's attempt to cabin the evidence that Mr. Kwok may rely on to his own testimony and material of which he is aware is wrong as a matter of law. As the government was fond of intoning—before superseding—"this is a fraud case," and as a result, a central question at trial is Mr. Kwok's intent when he made the alleged misstatements. To defend against those charges, as a matter of settled law in this Circuit, Mr. Kwok is entitled to argue that he acted in good faith, and to introduce extrinsic evidence to show the reasonableness of that belief. The government asks the Court to simply ignore that body of law and impose artificial and unlawful limits on Mr. Kwok's ability to present evidence in support of his defense. It is clear that the government is scared of what will happen if the jury is permitted to fully consider the CCP's targeting, but that is not a basis to hamstring Mr. Kwok's trial defense. The government's motion should be denied.

### 1.    Mr. Kwok Is Entitled to Introduce Extrinsic Evidence of the CCP's Targeting Efforts

The government claims that the only probative value of the CCP's targeting of Mr. Kwok goes to the Defendants' "state of mind," and that the Court should preclude extrinsic evidence regarding CCP activities "beyond the defendants' own testimony as to their state of mind" and perhaps information that the defendants personally received that may form the basis of that belief.

(Govt. Mot. at 47-49.)   The government is wrong as a matter of law that a defendant is not permitted to introduce extrinsic evidence that bolsters his arguments with respect to state of mind—indeed, the Court essentially found as much in the Fox Hunt Order.  (*See*, *e.g.*, Fox Hunt Order at 7 ("Evidence that the Chinese government has taken measures to suppress Kwok's access to online platforms could support his argument that such a market niche existed, justifying his valuation.").)   That conclusion is further supported by binding Second Circuit precedent, which the government ignores in its motion.

A defendant is permitted to admit evidence showing that his beliefs are objectively reasonable because such evidence can support that he holds those beliefs in good faith.  *See, e.g.*, *United States v. Weber*, 843 F. App'x 364, 367 (2d Cir. 2021) ("While a defendant's good-faith reason need not be objectively reasonable, the objective reasonableness of a claimed belief may be probative of whether the defendant held the belief in good faith.").   Contrary to the government's repeated contention, that includes extrinsic evidence about which the defendant is not aware.[19]   For example, in *United States v. Rittweger*, the Second Circuit found that certain witness statements—about which the defendant had no knowledge—that the government had withheld constituted *Brady* material because the withheld statements "lend credence to [the defendant's] defense that he did not know he was not the sole signatory on the CBL accounts." 524 F.3d 171, 181 (2d Cir. 2008).   Similarly, in *United States v. Onumonu,* the Second Circuit found that the defendant was entitled to introduce expert testimony about methods of smuggling

---

[19] The government generously suggests that Mr. Kwok could show that his fears were "objectively legitimate" by offering "public reports that [he] read at that time regarding efforts to target [him]." (Govt. Mot. at 50.)  At the risk of stating the obvious, the PRC's Ministry of State Security is not in the habit of releasing public reports regarding their efforts to silence and harass prominent U.S.-based critics of the CCP.  On the other hand, the Department of Justice, including the government, have been quite vocal about the CCP's efforts, at least when it suits it to bring criminal charges against others.

diamonds from Africa to support the defendant's asserted belief that he was smuggling diamonds rather than narcotics.  *See* 967 F.2d 782, 787 (2d Cir. 1992).  Obviously, the defendant could not have known at the time of the smuggling incident about the expert testimony—nevertheless, the court found that it should have been admitted.  *See also United States v. Philips*, No. 22 Cr. 138 (LJL), 2023 WL 6620146, *4 (S.D.N.Y. Oct. 10, 2023) ("And while the Government is correct that Defendant could not have known with absolute certainty what the USD/ZAR exchange rate would be in advance, evidence that corroborates the reasonableness of the legitimate investment thesis Defendant has proffered for his trades makes it more probable that he traded on that basis.") (cleaned up).

Thus, when viewed through the proper legal lens, the government's objections are entirely meritless, as extrinsic evidence of the CCP's targeting of Mr. Kwok squarely bolsters Mr. Kwok's claimed state of mind in, at least, the following ways:

**GTV Valuation**: In response to the government's contention that Mr. Kwok misstated GTV's value by allegedly stating that it had "a market value of 2 billion US dollars," (Ind., ¶ 17(d)), Mr. Kwok is entitled to argue that he rendered that opinion in good faith.  And, as the Court held in the Fox Hunt Order, "[e]vidence that the Chinese government has taken measures to suppress Kwok's access to online platforms could support his argument that such a market niche existed, justifying his valuation."  (Fox Hunt Order at 7.)  Such evidence (which the government still refuses to produce fully to the defense, (*see* Def.'s Apr. 14, 2024 Letter to Court (Dkt. No. 282)), would thus squarely undercut one of the government's core allegations, and Mr. Kwok must be permitted to raise it with the jury.

The government concedes that Mr. Kwok should be able to argue that GTV investors "would be particularly enthusiastic in supporting GTV's business because they were [] committed

to GTV's mission to combat the CCP and believed their support of GTV would help that mission," and "GTV would be successful and that there was a large market for GTV, including because he understood at the time that the CCP was taking steps to proscribe Kwok's efforts." (Govt. Mot. at 54.)  The government asks the Court, however, to preclude evidence about and argument that "the CCP's activities and targeting 'creat[ed] both the necessity for, and the potential monopoly position of, GTV'—particularly in the absence of evidence that GTV had any potential (much less proven) success in breaking through the great firewall and delivering content to individuals in China."  The government's argument misses the point, however—the question is not whether GTV actually enjoyed such a market position due to CCP targeting, but rather whether Mr. Kwok believed that the CCP targeting would give GTV such a preferred perch.  To show that he honestly held that belief, Mr. Kwok is entitled to demonstrate that this belief is reasonable through extrinsic evidence, such as evidence that is described in the *Bai* complaint (and contained in the *Bai* case file), and through expert testimony, such as the testimony of Messrs. Dragon (Mr. Kwok's valuation expert) and Doran (Mr. Kwok's CCP targeting expert), *see* Opp. to Govt. Mot. to Preclude Experts at XX.

**Purchase of the Mahwah Facility**: In response to the government's contention that Mr. Kwok misappropriated GCLUBS funds to purchase the Mahwah Facility for his own personal benefit, Mr. Kwok is entitled to argue that he believed that purchasing the building was for the benefit of GCLUBS members because it provided them as secure place to meet and conduct their business.  "Evidence showing that Kwok's fears of CCP targeting are objectively legitimate could be used to counter the [G]overnment's case or to bolster [his] defense[,]" because this evidence "provides an alternative, nonculpable explanation for the heightened 'Secrecy and security' around the New Jersey property" and "could support Kwok's argument that he believed in good faith that

purchasing the property was an appropriate and nonfraudulent use of G|CLUBS dues—a defense to the fraud charges."  (Fox Hunt Order at 6-7.)

The government argues that Mr. Kwok cannot "introduce extrinsic evidence regarding CCP targeting (including Operation Fox Hunt) in an effort to justify the alleged need for the purchase of the Mahwah Mansion as a 'secure location' for the NFSC 'to conduct its business.'" That argument runs squarely into the Court's Fox Hunt Order and the Second Circuit's holdings in *Rittweger* and *Onumonu*, and thus is easily rejected.  Mr. Kwok is entitled to introduce extrinsic evidence of the CCP's efforts to kidnap, surveil, or otherwise force his return to China, such as Mr. Doran's testimony or testimony from other lay witnesses (such as witnesses who actually participated in or observed the targeting), to show that his belief that he and his fellow movement members needed to act covertly and to have a safe space to meet was objectively reasonable.

The government's other objection with respect to the Mahwah Facility is particularly perplexing.  The government claims that it would not matter if Mr. Kwok believed that the purchase of the Mahwah Facility was for the benefit of GCLUBS members because his purported misrepresentations did not concern the purchase of the property.  (*See* Govt. Mot. at 53).  The government cannot have it both ways—it cannot on the one hand argue that Mr. Kwok's alleged misappropriation of GCLUBS funds is evidence of Mr. Kwok's purported fraud, but then on the other hand contend that Mr. Kwok cannot offer argument or evidence to rebut the government's allegation.  While such an attempt to hold a one-sided trial is of apiece with the government's overall strategy in its motions in *limine*, it is not consistent with Mr. Kwok's "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies," *Washington*, 388 U.S. at 19, or the Court's "primary obligation is to ensure that [the defendants] receives a fair trial," *United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004).

**Use of Multiple Cellphones or Bank Accounts**: In response to the government's allegations that Mr. Kwok's use of multiple cell phones or bank accounts demonstrates consciousness of guilt and financial structuring, Mr. Kwok is entitled to introduce evidence to "prove that he took these measures not for the purposes of evading U.S. authorities, but [as] a necessary by-product of [O]peration Fox Hunt"—to avoid the Chinese government's efforts to interfere with his accounts or hack his phones."  (Fox Hunt Order at 7) (cleaned up).   The government claims that the Court should limit Mr. Kwok's proof on these matters to his own testimony because, according to the government, "allowing such general evidence about the CCP's targeting of banking relationships of other (non-Kwok) dissidents could suggest that the CCP was also targeting Kwok's bank accounts in the U.S., which would invite the jury to draw unsupported inferences." (Govt. Mot. at 55.)  Again, the government's argument misses the mark.

The relevant inquiry is not whether the CCP was actually interfering with Mr. Kwok's banking relationships (which it was), but whether Mr. Kwok *believed* that the CCP was engaged in such activity.  Under *Rittweger* and *Onumonu*, Mr. Kwok is entitled, as a matter of law, to introduce extrinsic evidence demonstrating the reasonableness of that belief.  *See supra* pp.  54-55.  That would include, for example, Mr. Doran's expert testimony concerning the CCP's intent to and tactics in furtherance of disrupting Chinese dissidents' banking relationship.  It would also include, as another example, testimony elicited from the government's own witnesses, some of whom have themselves expressed a view that the CCP was monitoring and seeking to cut off the movement's access to U.S. banking.  To hold otherwise would be, in essence, to undo the Court's Fox Hunt Order.

**Mr. Kwok's Purported Fraudulent Intent**: The government further claims that evidence concerning the CCP's targeting is irrelevant because Mr. Kwok could truly be a political dissident,

but also have committed fraud.  The government's theory in this case, however, is that Mr. Kwok intended to victimize his fellow movement members by tricking them into spending money to support ventures in furtherance of his political movement, but then diverting those funds for his own use.  In other words, the government is alleging that Mr. Kwok intended to harm the very movement that he helped to found.  Mr. Kwok is entitled to rebut that allegation by proving that he would not intentionally have done anything to damage his political movement, including by proving how much he sacrificed for it.  Evidence that Mr. Kwok suffered through immense retaliation—including efforts to kidnap or harm him, to detain his family, and to cut of access to his wealth—but nevertheless persisted in his movement supports his argument that he would not willingly sabotage his movement by stealing the very funds that were intended to support it.  Thus, Mr. Kwok should be able to introduce evidence—including expert and lay witness testimony—of the scale and severity of the CCP's efforts to silence him, and to make such arguments.[20]

**The Alleged Racketeering Enterprise**:  Furthermore, although the parties briefed Mr. Kwok's motion to compel prior to the government's filing of the Superseding Indictment to include a RICO conspiracy, evidence of the CCP's targeting of him is also admissible as background evidence.  "Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  *United States v. Coonan*, 938 F.2d 1554, 1561 (2d Cir. 1991).  In this case, evidence of the CCP's targeting of Mr. Kwok helps explain why he would have helped to found the movement in the first place, or why he participated in ventures such as GTV to break through the CCP's efforts to silence him.  Moreover, the government seeks to

---

[20] Mr. Kwok should similarly be able to introduce evidence concerning the vast amount of money that his family spent to support the movement, such as the expert testimony of Mr. Bishop, as further proof that he would not intentionally harm his movement.

introduce evidence of and argue to the jury that one of the "means and methods" of the purported racketeering enterprise was to try to silence or harass Mr. Kwok's critics. As Mr. Kwok has argued in his motions *in limine*, the government should not be allowed to do so. (Kwok Mot. at 16-30.) But if the government is permitted to do so, then Mr. Kwok is entitled to rebut that claim by showing his good faith belief that these critics were part of the CCP's operation to destroy his movement, and that was why he was purportedly seeking to discredit those critics. As with the value of GTV or the legitimate need for the Mahwah Facility, Mr. Kwok is entitled to show that this belief is objectively reasonable, and to introduce extrinsic evidence to support that claim. That would include, for example, evidence from lay witnesses who will testify that they were coerced by the CCP to file false complaints against Mr. Kwok with regulators and courts, and expert testimony from Mr. Doran that the tactics of the CCP include filing such false complaints.

In the end, the government's motion is a transparent attempt to limit Mr. Kwok's proof of the CCP's targeting of him to his own testimony so that the jury may be misled into believing that Mr. Kwok is espousing some fringe conspiracy theory that the jury will find incredible. The government knows better however—it knows that the CCP's targeting of political dissidents generally and Mr. Kwok specifically is such a significant matter that the Department of Justice (including this U.S. Attorney's Office) have brought criminal charges against many of those who participated in this criminal conduct. Moreover, Mr. Kwok has not sought to simply inject Operation Fox Hunt in some generalized manner to confuse the jury, but rather to rebut specific allegations that the government has made against Mr. Kwok. Failing to permit Mr. Kwok to introduce evidence that meets those allegations would be reversible error, and thus the Court should reject the government's motion. *See, e.g., United States v. Murray*, 736 F.3d 652, 659 (2d Cir. 2013) (reversing conviction where defendant was not allowed to "offer evidence rebutting the

government's new contention" which "denied him a fair opportunity to present a defense and a fair trial").

### 2.      The Government's Motion Effectively Tries to Erase the Court's Fox Hunt Oder

The government's motion is an invitation to narrow the Court's Fox Hunt Order to the point of vanishing.  The Court should reject the government's belated reconsideration motion.

The government's contention that the Fox Hunt Order should not govern because it deals with relevance "for the purposes of *Rule 16* discovery, which is a 'low bar,'" (Govt. Mot. at 50 (emphasis in original)), is incorrect.  The government's position relies on a self-serving and selective editing of the Court's order.  What the Court found in its Order is that the government had to produce certain discovery because evidence that may be found in that discovery would be relevant to defenses Mr. Kwok is permitted to advance at trial.  (Fox Hunt Order at 7.)  To the extent evidence is relevant, then, provided that it satisfies the other criteria for admissibility, it is admissible at trial.  *See generally* Fed. R. Evid. 402 (subject to certain exceptions, "relevant evidence is admissible").

The government's argument that extrinsic evidence and expert testimony regarding the CCP's targeting of Mr. Kwok should be precluded as overly confusing or unfairly prejudicial, (Govt. Mot. at 50-51), is also incorrect.  To be barred by Rule 403, the probative value of the evidence must be "substantially outweighed" by the danger of confusing the issues or unfair prejudice.  Fed. R. Evid. 403.  Here, the probative value of evidence of CCP targeting carries great weight because it relates to several aspects of the charged offenses, as described above.  *See supra* pp. 55-61.  On the other side of the scale is the government's claim that Mr. Kwok may engender sympathy from the jury by introducing evidence that he was targeted.  The Court, however, will instruct the jury that they are not allowed to let sympathy sway their weighing of the evidence, and

"[i]t is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." *See United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987). Thus, any risk that evidence about the CCP's targeting of Mr. Kwok would lead to the jury acquitting him based on sympathy can be extinguished by the Court's instruction. Given the many ways that this evidence is relevant to the charged offenses, several of which the Court has *already* ruled on, the government does not come close to meeting its burden to show that this evidence is "substantially outweighed" by the risk of unfair prejudice or confusing the issues.

### 3. The Government's Request that the Court "Closely Police" Defendants' Testimony Improperly Subverts the Trial Process, and Should Be Rejected

The government asks the Court to "closely police" Mr. Kwok's potential testimony regarding the CCP's targeting "to avoid confusing the jury and/or suggesting they render a verdict on bases impermissible under the law." (Govt. Mot. at 52-56.) Through this argument, the government improperly employs its motion in *limine* as a "preemptive weapon[]" to strike testimony "out of context and before any specific objection against its proper backdrop is raised." *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344-45 (S.D.N.Y. 2003). Of course, the Court can and should make evidentiary rulings *during* Mr. Kwok's testimony (should he choose to testify), but the government's request that the Court do so now, before that testimony has occurred, "would effectively serve as a form of advance trial of substantive portions of the case, or indeed as a substitute for the trial itself," and should be denied. *See id.* But Mr. Kwok should certainly be able to testify—if he chooses to—about topics that the Court has already found to be relevant.

### 4.   The Court Should Reject the Government's Straw Man Argument to Preclude Argument and Evidence Regarding Duress and Justification

The government's motion to preclude argument or evidence "tending to suggest[] that [Defendants'] actions were justified or necessary as a result of targeting by the CCP," "or that they operated under duress," (Govt. Mot. at 56-57), is a straw man argument offered only to preclude evidence unfavorable to the government on an improper basis.  The Court should reject it.

In his motion to compel evidence of CCP targeting, Mr. Kwok explained that evidence of the CCP's targeting of him, his family and the NFSC is relevant to several issues in this case, including the value of GTV, the purchase of the Mahwah Facility, the use of multiple cell phones and bank accounts, and to rebut the government's theory of motive.  (*See* Reply in Supp. of Mot. to Compel, Dkt. No. 213 at 2.)  In the Fox Hunt Order, the Court agreed with these arguments and granted Mr. Kwok's motion.  To date, Mr. Kwok has not argued in any pleading or paper that this evidence supports a defense of duress or justification.  Mr. Kwok's argument is not that the CCP coerced him into acting in certain ways, or that the CCP's conduct justified his own acts.  Rather, Mr. Kwok's argument is that the CCP targeting provides innocent explanations for conduct that the government alleges is criminal.  The Court has already found that that is a permissible use of this evidence, and the government has offered no credible reason why the Court should revisit that conclusion.

### 5.   The Court Should Deny the Government's Request to Preclude "General Evidence" of Contact Between the Chinese Police and Victims

As with its request to preclude argument related to duress or justification, the government's motion to preclude Mr. Kwok from offering "general evidence" that investors were coerced into filing false reports by the CCP to suggest that the government's case "is tainted by the CCP" is a red herring.  (*See* Govt. Mot. at 57-58.)  The government does not define what it means by "general

evidence."   But it concedes, as it must, that Mr. Kwok is entitled to cross-examine the government's purported victim-witnesses on this basis.   Moreover, as discussed above, the government claims that as part of the affairs of the alleged RICO enterprise, Mr. Kwok directed his fellow movement members to harass and silence his critics.   Mr. Kwok is permitted to rebut that by showing his belief that those critics were working at the behest of the CCP to bring down his movement,  and evidence showing that the CCP coerced certain people to file false complaints and reports against Mr. Kwok could show that his fears were "objectively legitimate," and is thus relevant and admissible.   (*See supra* pp. 53-55; Fox Hunt Order at 7.)   The Court should deny the government's request.

### C.   The Court Should Reject the Government's Effort to Keep Evidence Regarding Legitimate Movement Activities Away from the Jury

Consistent with the theme throughout its motions in *limine* to secure a one-sided trial, the government moves to exclude "evidence and claims of the Defendants' good acts."  (Govt. Mot. at 58-61.)  In particular, it seeks to exclude evidence that Mr. Kwok is a genuine CCP opponent, by asking the Court to prohibit Mr. Kwok from submitting any evidence of Mr. Kwok's acts that would tend to prove as much.   The government's motion should be rejected because it improperly curtails Mr. Kwok's "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."  *Washington*, 388 U.S. at 18.

As an initial matter, Mr. Kwok does not seek to introduce any such evidence to argue that because he acted innocently with respect to those acts, he is similarly innocent of these charges (even though he is).  Mr. Kwok's work and the work of the relevant entities to combat the CCP is admissible, however, for other permissible reasons.

*First*, the government has chosen to prosecute the defendants for a racketeering conspiracy that focuses on many of the entities involved in Mr. Kwok's movement, including the NFSC and

the Rule of Law Foundation.  To prevail on its RICO conspiracy, the government must prove that the alleged enterprise "pose[s] a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239 (1989) (citation omitted).  When an alleged enterprise "primarily conducts a legitimate business, no presumption of a continued threat arises." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008).  In such cases, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.*   As a result, Mr. Kwok is entitled to undercut the government's continuity theory by introducing evidence that these entities engaged in legitimate business, such as organizing protests, broadcasting pro-democracy messaging, or helping other Chinese dissidents.  Precluding Mr. Kwok from offering such evidence would essentially require him to concede the government's continuity theory, which is impermissible.  *See*, *e.g.*, *Murray*, 736 F.3d at 659 (reversing conviction where defendant was not allowed to "offer evidence rebutting the government's new contention" which "denied him a fair opportunity to present a defense and a fair trial").

*Second*, the government is prosecuting Mr. Kwok for fraud-based offenses, which necessarily requires that the government show that he acted with the intent to victimize his fellow movement members by diverting funds from the movement.  Mr. Kwok is entitled to attack the government's contention that he intended to harm his fellow movement members and the movement itself by arguing that by virtue of his commitment to the movement, he would have never intended to damage his movement, but was instead acting in good faith.  As discussed in connection with the government's motion with respect to the CCP targeting evidence, Mr. Kwok is also permitted to introduce extrinsic evidence that demonstrates the reasonableness of his belief.  *See supra* pp. 53-55.  Evidence that Mr. Kwok and the constituent parts of the alleged Kwok

Enterprise engaged in genuine pro-democracy activities is such evidence—it shows, so to speak, that Mr. Kwok was not all talk when it came to seeking to rid China of the CCP.  The jury should consider such evidence.[21]

*Third*, it was the government, not Mr. Kwok, that first put his *bona fides* as a pro-democracy dissident at issue.  In this regard, the Indictment speaks for itself:

- "In truth and in fact, and as KWOK, JE, and WANG well knew, the entities [that allegedly form the Kwok Enterprise] were instrumentalities that KWOK, JE, and WANG **created** and used to perpetrate their fraud, strengthen the Kwok Enterprise, and exploit KWOK's followers."  (Ind. ¶2.)(emphasis added).

- "KWOK granted numerous media interviews and posted on social media, ***claiming*** to advance a movement against the Chinese Communist Party" (*Id.* ¶9(a))(emphasis added).

- "Kwok used [the Rule of Law Society and the Rule of Law Foundation] to amass followers who were aligned with his ***purported*** campaign against the Chinese Communist Party" (*Id.* ¶9(b))(emphasis added).

These allegations appear in the Indictment because the government must believe that proving them would support its case, and Mr. Kwok must be allowed to offer evidence rebutting them.  Accordingly, the government's motion should be denied.

### D. The Court Should Deny the Government's Request to Exclude Evidence of Risk Disclosures and Disclaimers

The government moves in *limine* to preclude Mr. Kwok from "making arguments, offering evidence, or cross-examining witnesses, which in any manner suggests that disclaimers in transactional documents render the defendants innocen[t]."  (Govt. Mot. at 62.)  The government

---

[21] This is not tantamount, as the government would have the Court believe, that the defense is contending that "if the Defendants were bona fide dissidents, then they are innocent" (Govt. Mot. at 60-61.)  Mr. Kwok's pro-democracy efforts certainly bear on the question of his innocence in that they go to his state of mind, but that is distinct from the *ipse dixit* construction of the argument that the government tilts at, namely, that if Mr. Kwok is a political dissident, then he *must* be innocent.

appears to sweep into its motion, and thus also seeks to exclude, risk disclosures such as those in the GTV Private Placement memorandum.  (*Id.* at 63.)

The government asserts that contractual disclaimers (and by implication, risk disclosures) are irrelevant because (i) reliance is not an element of wire fraud or criminal securities fraud and (ii) such disclaimers purportedly "do . . . [not] go to materiality of the misrepresentation."  (*Id.* at 64.)  The government also contends that such disclaimers are not probative of the defendants' good faith.  (*Id.* at 65 n.19.)   The government's application is wrong as a matter of law, and should be rejected.

### 1.    The Government Improperly Conflates Risk Warnings With "Disclaimers"

The government points to four documents it intends to introduce at trial:  (i) the GTV Private Placement memorandum, (ii) loan agreements between lenders and Farms, (iii) G|CLUBS membership agreements, and (iv) Himalaya Exchange White Papers.  (*Id.* at 62-64.)   Thus, what the government is arguing is that it can rely on certain parts of these documents as evidence against Mr. Kwok, but that he is not entitled in turn to rely on other parts of the documents as part of his defense.  The trial is not a one-side affair, however, and if the government is entitled to put these documents in front of the jury, then Mr. Kwok should be permitted to ask the jury to read and consider the entirety of them.  *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part — or any other statement — that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection.").

The GTV Private Placement memorandum contains no fewer than ten pages of risk disclosures, several of which directly address the purported misstatement regarding the use of funds from the private placement.  (*See, e.g.*, Govt. Mot., Ex. B at 20 ("The Company's

management has broad discretion in how the Company uses the net proceeds of the sale of common stock," and that "use of the proceeds in this memorandum is illustrative, and the Company's management will have considerable discretion over the use of proceeds from any offering.  You may not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately."); *id.* at 25-26 ("Saraca owns a controlling interest in the Company, and can exercise significant control over the Company," including "complete control over all corporate actions requiring stockholder approval.").)  Outside of the "risk disclosures" section, other language in the GTV Private Placement memorandum served similar purposes and must also be considered part of the "total mix" of information provided and that the jury may consider.  (*E.g.*, *id.* at 10 (referring to the "*contemplated* use of proceeds").

With respect to the Himalaya Exchange white paper, the government again mischaracterizes "risk disclosures" as a "disclaimer." (Govt. Mot. at 63; *id.*, Ex. E at 35.)  Nowhere in the document referenced by the government are any representations or warranties disclaimed.  Instead, potential purchasers are warned that purchasing HDO is risky, that they should conduct due diligence and consult financial professionals, and are warned of particular risks, including, for example, that "Credits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem and once purchased, you have no automatic right to receive fiat currency or crypto-assets in respect of such credits."  (Govt. Mot., Ex. E at 35.)  The white paper also warns prospective purchasers of "certain key risk[s] [which] are set out at Schedule 7 "Risk Factor Disclosure" of the Terms and Conditions (which can be found on the website of the Himalaya Exchange) which any prospective purchaser and/or investor should read and understand before making any purchase or investment decision or otherwise, accessing, using or purchasing any products or services available through the Himalaya Exchange or the Himalaya Ecosystem."  (*Id.*).

Nor is the language from the Farm loan document cited by the government any kind of "disclaimer."  The government cites to language in which the lender represented that "Lender is sufficiently experienced in financial and business matters to be capable of utilizing such information to evaluate such information to evaluate the merits and risks of this loan and make an informed decision relating thereto."  (Govt. Mot. at 63; *id.*, Ex. C at § 2(a).)

The specific language cited by the government in the G|CLUBS membership document annexed as Exhibit D to the government's motion does appear to contain a disclaimer that the reader should not "rely on any descriptions by [Mr. Kwok] or any other persons of (i) the benefits that could or would be available to G|CLUBS' members."  (Govt. Mot. at 63, *id.*, Ex. D at 1.)[22] However, that document also contains other risk disclosures and cautionary language that directly addresses the charged conduct.  For example, the document states that "the scope of benefits available to members has developed over time and may differ from promotional statements G|CLUBS or others may have made in the past before you sought to become a member."  (*Id.*)[23] The document also contains other important and informative cautionary language, such as that "[m]embership is not an investment in G|CLUBS, nor does it provide an equity or ownership interest in G|CLUBS or any other entity."  (*Id.*)  Where the Indictment alleges, for example, that

---

[22]  The government's version of the document omits the concluding lines of the final paragraph, which should read ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████  (*See* Barkan Decl. Ex. I (USAO_00109964) at -9969).)

[23]  The G|CLUBS Membership Agreement ████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████  (Barkan Decl. Ex. J § 1.)

the purchase of the secure meeting facility in Mahwah was a misappropriation of G|CLUBS members' funds, this statement shows that defendants put prospective G|CLUBS members on notice that they are not making an investment, but rather paying for a service, and that G|CLUBS's owners need not account to G|CLUBS members for the use of membership proceeds.

> ### 2. The Defense Is Entitled to Rely on Risk Disclosures and Other Cautionary Statements to Demonstrate the Absence of a Material Misstatement

To the extent the government's motion seeks to have the Court confirm that reliance is not an element of wire fraud or criminal securities fraud, the government need not have burdened the Court with a motion to make clear settled law. But if the government is asserting that risk disclosures and other cautionary language in these documents may not be used by the defense to demonstrate the absence of a material misstatement, the government's motion should be denied.

Initially, where cautionary language warns of the precise risk that came to pass, courts find there is no actionable misstatement at all. *See, e.g.*, *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359-60 (2d Cir. 2002) (affirming dismissal where "offering memoranda explicitly warned" that shares being sold in private placement were subject to restriction on transferability and resale). With respect to GTV, for example, the private placement memorandum directly cautioned that the stated use of proceeds was illustrative, that Saraca exercised significant control as GTV's parent, and that management will have "considerable discretion over the use of proceeds from any offering." (Govt. Mot., Ex. B. at 20.) Mr. Kwok is absolutely entitled to present this evidence to a jury because it goes directly to whether the "illustrative" statement on the "contemplated" use of funds from the private placement constituted a misstatement. *See Halperin*, 295 F.3d at 360 ("When read in their entirety, these documents not only bespeak caution, they shout it from the rooftops . . .").

In addition, cautionary language in these documents is also admissible by the defense to refute the notion that any alleged misstatement was material. *See Neder v. U.S.*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."); *United States v. Livtak*, 889 F.3d 56, 64 (2d Cir. 2018) (to prove securities fraud under Section 10(b), government must prove, among others, a "material misrepresentation"). In evaluating materiality, courts do not focus on whether "the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the [securities]." *Emerson v. Mutual Fund Series Trust*, 393 F. Supp. 3d 220, 242 (E.D.N.Y. 2019) (citation omitted); *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010) (registration statement must be viewed "holistically."); *Olkey v. Hyperion 1999 Term Trust, Inc.* 98 F.3d 2, 5 (2d Cir. 1996) ("It is undisputed that the prospectuses must be read 'as a whole'").

Accordingly, in determining the alleged materiality of misstatements, the jury must consider the totality of the documents referenced in the government's motion, including, for example, (i) cautionary and qualifying language in the GTV Private Placement memorandum about the "illustrative" and "contemplated" use of the proceeds as well as risk disclosures about management's ability to control that use; (ii) warnings in the Himalaya Exchange white paper regarding the limitations on the use of HDO; and (iii) warnings in the G|CLUBS document attached to the government's motion (as well as other G|CLUBS membership documents) that the "scope of benefits available to members has developed over time and may differ from promotional statements," that any particular services or benefits may not be available during a member's membership or "at any time in the near future"), and that those who purchased G|CLUBS memberships were not investing in the company itself. *See, e.g., SEC v. Am. Growth Funding II,*

*LLC*, No. 16 Civ. 828 (KMW), 2019 WL 1748186, at *5 (S.D.N.Y. Apr. 19, 2019) (denying

without prejudice SEC motion *in limine* to preclude "allegedly boilerplate cautionary disclosures"

where defendants asserted that "the risk disclosures contained in the PPMs are relevant to the

materiality of audit language contained in the PPMs because the risk disclosures factor into the

total mix of information available to reasonable investors.").[24]  Even the government's case law

holds as much.  *See United States v. Weaver*, 860 F.3d 90, 97 (2d Cir. 2017) (while contractual

disclaimers did not render alleged misstatements immaterial as a matter of law on motion for

acquittal, they were still "relevant to the jury's determination of Weaver's guilt[.]").

Moreover, the jury may also consider the risk disclosures and cautionary language in these

documents as evidence of Mr. Kwok's lack of fraudulent intent.  *See, e.g.*, *Kuriakose v. Fed. Home

Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("[T]he bevy of truthful

disclosures . . . also negates an inference of scienter."); *see also In re Worlds of Wonder Sec. Litig.*,

35 F.3d 1407, 1425 (9th Cir. 1994) ("The detailed risk disclosure in the Debenture Prospectus

negates an inference of scienter.").  Put simply, Mr. Kwok is entitled to argue to the jury that if, as

the government alleges, he controlled G|CLUBS, for example, then it would make no sense that

he would intentionally try to trick the purported victims through misrepresentations about

G|CLUBS' benefits, but then would also allow G|CLUBS to include a statement in its membership

agreement that completely undoes his purported misrepresentation.  The same is true with respect

to the GTV Private Placement—if Mr. Kwok was trying to lure victims into investing by falsely

promising that GTV would use the investor funds in certain ways, then why would he allow the

---

[24] Nor is the admission of cautionary language or risk disclosures overly prejudicial to the
government under Rule 403.  (Govt. Mot. at 65.)  Evidence is not overly prejudicial merely because
it might tend to support the defense's narrative.  The government's Rule 403 argument is based on
the same misreading of *Weaver* discussed above.

offering memorandum to contain so much language that could dissuade the purported victims from investing?  Mr. Kwok is entitled to make this argument.  Accordingly, the government's contention that a limiting instruction may be necessary because "the existence of disclaimers does not limit [defendants'] criminal liability and is not probative [of] any supposed good faith" should be rejected.  (Govt. Mot. at 65 n.19.)

### E.  The Government's Motion to Exclude Evidence that Victims Were Negligent Should Be Denied

The government also moves to preclude defendants from offering evidence that purported victims were "negligent, gullible, or insufficiently vigilant."  (Govt. Mot. at 66.)  In support, the government again asserts that reliance is not an element of the crimes charged and that any particular "victim's risk tolerance or willingness to lose money" is not "a relevant fact for the jury to consider."  (*Id.*)  Mr. Kwok does not intend to argue that the alleged victims were negligent or gullible.

Nevertheless, the Court should deny the government's motion because the level of sophistication of investors (including the due diligence they conducted) is relevant to the materiality of the alleged misstatements.  The Second Circuit has recognized that the "[reasonable investor] standard may vary . . . with the nature of the traders involved in the particular market." *Livtak*, 889 F.3d at 65.  Mr. Kwok is therefore permitted to argue, for example, that in the particular market for shares of GTV, purchases of HDO and HCN, G|CLUBS memberships and farm loans,[25] the purported victims had a sufficient level of sophistication that would render certain alleged misrepresentations as immaterial—for example, that they would not attach much significance to a generalized statements about "contemplated" uses of GTV investor funds.  This is particularly true

---

[25] Mr. Kwok does not concede that G|CLUBS memberships or Farm loans constitute "securities."

where GTV investors represented that they were sophisticated investors.  *See, e.g.*, *Am. Growth Funding II, LLC*, 2019 WL 1748186, at *4-5 (denying SEC motion *in limine* to preclude defendants from offering evidence of investor sophistication because proof of same is "relevant to materiality" where defendants asserted that "a reasonable investor in this market is sophisticated and thus would not have been misled by the representations in the PPMs.").

**F.   Government Actions Are Relevant to the Story of the Charged Offenses and Mr. Kwok's Defenses, and He Must Be Permitted to Submit Evidence and Argument About Them to the Jury**

The government moves to preclude "[a]rguments attempting to shift the blame for GTV's collapse, or, any failure of the Himalaya Exchange onto regulators." (Govt. Mot. at 67).  In arguing for preclusion, the government erects strawmen and ignores the allegations of its own Indictment, in an attempt to, yet again, tell a one-sided story at trial.

*First*, the SEC's investigation into GTV provides necessary context to explain why banks began freezing GTV's accounts, which the government alleges was one of the reasons why Mr. Kwok purportedly started the Farm Loans Program and promised shares in GTV (at some indeterminate time) to those who participated.  (*Id.*, ¶ 17(a)-(b)).  As a result, this evidence is admissible as background evidence to explain the events that followed.  *See Coonan*, 938 F.2d at 1561 (evidence may be admissible "to provide background for the events alleged in the indictment").  Moreover, it was the government, not Mr. Kwok, that injected the government's seizures of the Himalaya Exchange accounts into this case by *including allegations about them in the Indictment*.  (Ind., ¶¶ 21-23.)  To the extent this conduct undercuts the government's allegations by, for example, showing that funds were not misappropriated by the defendants, Mr. Kwok has a right to present it to the jury.  *See United States v. Rosemond*, 841 F.3d 95, 112 (2d Cir. 2016) (finding that district court's restrictions on the defendant's "ability to cross-examine his witnesses and mount an effective defense violated the Sixth Amendment," when "[a]t minimum, the

Government opened the door, and defense counsel should not have been foreclosed from following up in cross-examination, recross-examination, or summation").

The same is true with respect to the seizures at the Himalaya Exchange. The government alleges that it seized hundreds of millions of dollars from accounts holding that the Exchange's HDO reserves, but then goes on to allege that the price of HCN—a separate token—has not fallen sharply since March 2023. (Ind., ¶¶ 22-23.) If the government is allowed to inject its seizures into the trial, and argue some relevance to the fact that the HCN price did not decline despite those seizures, then Mr. Kwok should be able to respond that that, in fact, is evidence that demonstrates that the dollar-backing of HDO was not material to HCN traders. *See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("stock movement is a factor the jury may consider relevant" when determining materiality of purported misstatement). Again, that is not "blaming" the government, that is responding to an argument that the government intends to make using facts that the government placed at issue. *See id.*[26]

*Second*, the government's two arguments for precluding this evidence are red herrings. As an initial matter, the government cites the basic proposition that it is not required to prove actual harm to victims to sustain a wire fraud conviction. (Govt. Mot. at 67.) That is true, but Mr. Kwok is not relying on the SEC's and government's conduct to argue about whether the victims were harmed. Next, the government claims that allowing this argument would be "no more than an

---

[26] The government does not raise it in its motion, but there is a similar issue with respect to the $37 million loan made by the Himalaya Exchange in connection with the Lady May and the PAX Contempt Order. *See supra* pp. 20-25. For the reasons set forth above and Mr. Kwok's motion in *limine*, the government should be precluded from introducing evidence or making arguments about that loan. (Kwok Mot. at 23-24.) But if the government is allowed to rely on it, then it appears that the argument intends to argue that the loan was fictitious for some reason. If so, then Mr. Kwok should be allowed to introduce evidence in response showing that the $37 million was held in escrow and available to repay the loan, but that that repayment was frustrated by the bankruptcy trustee, who seized the funds as part of the Bankruptcy Cases.

attempt by the defendants to turn this case into one about policy concerns regarding the role of regulation in financial markets." (*Id.*) It is unclear what policy debate the government is concerned about, but regardless, Mr. Kwok's argument focuses on facts that undercut the government's case, not financial markets policy. In those situations, the government cannot insulate scrutiny of its own conduct to prevent Mr. Kwok from presenting a defense. *See United States v. White*, 692 F.3d 235, 245 (2d Cir. 2012), *as amended* (Sept. 28, 2012) (finding evidence of government charging decisions admissible, holding that the district court committed "manifest error" in excluding it and vacating the conviction of the district court).[27]

### G.   Evidence that Mr. Kwok Believed in the Value of Certain Entities and Intended to Repay Loans Is Admissible

The government seeks to exclude any evidence or argument that Mr. Kwok and his co-defendants intended to return or repay victims' funds and therefore did not act with intent to defraud because the intent to return money is not a defense to the federal fraud statutes. (Govt. Mot. at 68). In support of this exclusion, the government makes two arguments.

*First*, it argues that evidence related to a belief that GTV investors would ultimately not be harmed because the value of GTV would reach significant heights should be excluded because "belief, even if truly held, 'that in the long-term [their companies] would ultimately succeed,' is not a defense to securities fraud or wire fraud. (Govt. Mot. at 68 (citing *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016).) However, *Lange* does not support exclusion of such evidence on this basis alone, or at the pre-trial stage. 834 F.3d at 79. Rather, the court in *Lange* found that

---

[27] The cases on which the government relies bear little resemblance to the issues here. *See United States v. Cheung Kin Ping*, 555 F.2d 1069 (2d Cir. 1977) (defense told the jury "it had a right to say by its verdict that it did not want the Government to make deals with men like the prosecuting witness"); *United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (defense argued for acquittal because the IRS was "arrogant").

instructing the jury against using "the conscious avoidance doctrine" was proper because there was a **<u>factual foundation</u>** that co-conspirators "intended to immediately deprive investors of their capital through fraud, even if they truly believed that in the long-term the companies at issue would ultimately succeed, therefore, deriving profits for the defrauded investors." *Id*.  Mr. Kwok's argument is not that he intended to siphon assets from GTV in the short run, but that in the end everything would be fine due to the company's success, so this part of the government's argument is moot.

*Second*, the government seeks to exclude is "the amount of money and assets the Government seized that would suggest to the jury that victims will be made whole." (Gov't Mot. at 69). The government argues that this information is irrelevant and "is no different than improper evidence of a defendant's own efforts to repay misappropriated fund." (*Id*.) (citing *United States v. Sindona,* 636 F.2d 792, 800 (2d Cir. 1980)).  The government's contention is a strange one, given that it chose to include allegations about how much money it seized in the Indictment itself. (Ind., ¶¶ 21-23.)  Moreover, the Indictment also alleges that part of the reason for the Farm Loans program was that banks started freezing GTV's accounts.  (Ind., ¶ 17(a)-(b).)  In other words, it was the government that put its seizures at issue.

But regardless, Mr. Kwok does not seek to argue that the seized money shows that would be made whole as some kind of abstract argument, but rather in specific response to the government's allegations.  For example, Mr. Kwok has argued, and will argue at trial, that the *purported* loans at issue in this case, were in fact loans, which by their very nature are intended to be paid back. To exclude all evidence related to repayment or attempted repayment based on the general proposition that "intent to return money is not a defense to the federal fraud statutes", would destroy Mr. Kwok's right to a complete defense against the charges underlying the Farm

Loans Program.  The same is true with respect to the $37 million bond—evidence that there was

an intent to repay that loan would undercut the idea that it was some sort of misappropriation.  In

other words, Mr. Kwok is not seeking to argue a general principle that everything would be ok,

but rather to argue against the government's position that the loans were "fictitious."  (Ind., ¶ 1).

Depriving him of the chance to do that would rob him of a his right to present a defense.

### H.    Mr. Kwok Should Be Permitted to Present Evidence About His Family Background and Personal History

The government seeks to broadly ban Mr. Kwok from offering any evidence or argument

"concerning family background, health, age, pretrial detention, or any other similar factors."  (Govt.

Mot. at 70.)  Mr. Kwok does not intend to introduce any evidence at trial regarding his potential

sentence, or his pretrial detention.  *See, e.g., Shannon v. United States*, 512 U.S. 573, 579 (1994)

(instructing that a jury should "reach its verdict without regard to what sentence might be imposed")

(internal citation omitted).  The government's attempt, however, to go beyond this narrow

proscription, and ban every aspect of Mr. Kwok's "family background" from the jury, is legally

meritless.  Its improper effort to turn Mr. Kwok into a complete cipher should be denied by the

Court.

"The admissibility of character evidence rests in the sound discretion of the trial judge."

*United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991).  Thus, the Court does not abuse its

discretion when it "exclude[s] evidence that is [unduly] prejudicial, as well as 'evidence of specific

acts intended to demonstrate character traits not at issue.'"  *Id.* (quoting *United States v.* Wilson,

750 F.2d 7, 9 (2d Cir. 1984), *cert. denied*, 479 U.S. 839 (1986).  But there is no legal support for

imposing the sort of blanket ban the government urges here.  *Compare* Fed. R. Evid. 404(a)(2)(A)

("a defendant may offer evidence of the defendant's pertinent trait").  If anything, the three cases

cited by the government on this point – *Paccione*, *Battaglia*, and *Harris* (Govt. Mot. at 70) – all

show that the government's position is entirely misplaced.

In *Paccione*, the trial court excluded evidence that defendant McDonald's "then-teenage son had been born with cerebral palsy and that McDonald had devoted his life to caring for the son." 949 F.2d at 1201.   Before drawing that line, however, the court "properly allowed McDonald's four character witnesses to testify to their opinions that McDonald was a forthright man of honesty whose integrity was beyond reproach."  *Id.*  Thus, far from imposing the sort of blanket ban on all background evidence that the government champions here, the *Paccione* court carefully and narrowly excluded only certain specific evidence that was both of questionable relevance *and* "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case."  *Id.*

Similarly, in *United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007), the trial court precluded testimony from the defendant's mother and girlfriend that the court found was proffered purely to place the defendant in a sympathetic light.  *Id.* at 447-48.  The court, however, allowed similar but more pertinent character evidence related to truthfulness to come in from other witnesses.  *Id.*

In *United States v. Battaglia,* No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008), the trial court excluded testimony about the defendant's family that had no relevancy to the defendant's labor racketeering trial.  *Id.* at *3.  But far from excluding all background evidence, the court allowed other background evidence to be admitted, provided it was relevant.  *Id.*  For example, the trial court ruled that defendant was permitted to introduce evidence of his performance as President of Local 1181 – *i.e.*, that he was "a good and honest union president" – so far as it was relevant to defendant's theory that his performance as union president led others to incriminate and manufacture evidence of his wrongdoing. *Id.* at *3. Here, Mr. Kwok's "family

background" and "other similar factors" are relevant. For example, the story of Mr. Kwok's financial success and rise in China is relevant to understanding why he was first targeted by the CCP and became an influential Chinese dissident. Similarly, his family is one of the pressure points the CCP tried to exploit against him, and the concern for whom helped lead Mr. Kwok to take many of the actions the government now contends was fraudulent and/or consciousness of guilt.

For all these reasons, the Court should reject the blanket ban on "family background" evidence proposed by the government. It is settled that such evidence is readily admissible if it is relevant and, in determining relevancy, Rule 404 "applies a lower threshold of relevancy to character evidence than that applicable to other evidence." *United States v. Han*, 230 F.3d 560, 564 (2d Cir. 2000). That lower threshold is easily met here. Accordingly, the government's *in limine* motion should be denied.

## VII. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST TO PRECLUDE DEFENDANTS FROM OFFERING THEIR STATEMENTS FOR THEIR TRUTH

The Government's broad request to preclude "*any* of [the defendants'] own statements from *any* emails, mobile chat threads, text messages, voicemails, public statements, or videos" as "inadmissible hearsay," (Govt. Mot. at 70 (emphasis added)), can only be interpreted as an attempt at an end-run around due process. To preemptively bar Mr. Kwok from introducing *any* of his own statements from an expansive list of sources—without consideration for whether such statements are admissible under established hearsay exclusions or exceptions or whether such evidence is critical to his defense—would be arbitrary, disproportionate, and would amount to a denial of Mr. Kwok's constitutional right to put on a defense. *See Scrimo v. Lee*, 935 F.3d 103, 112 (2d Cir. 2019) ("The Supreme Court has clearly and repeatedly held that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense[.]")

(collecting cases); *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) ("The Constitution protects a criminal defendant from the arbitrary exclusion of material evidence[.]").

Despite the Government's contentions, Rule 801(d)(2)(D) is not the only avenue to admit a defendant's statements, even for their truth.  *See generally, e.g.*, Fed. R. Evid. 803.  For example—and as is especially relevant here—a "'statement of the declarant's then-existing state of mind (such as motive, intent, or plan)' is exempted from the hearsay rule." *United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) (quoting Fed. R. Evid. 803(3)).  "[A] declarant's statement of his intent 'may be introduced to prove that the declarant thereafter acted in accordance with the stated intent.'"  *United States v. Persico*, 645 F.3d 85, 100 (2d Cir. 2011) (quoting *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000)).[28]

Fraudulent intent is a necessary element of the government's charges against Mr. Kwok, and he has a right to defend against them, including by proving his lack of criminal intent. Indeed, where intent is a necessary element of the offense charged, improper exclusion of a statement that falls within Rule 803(3) may be grounds for reversal.  *See, e.g.*, *United States v. DiMaria*, 727 F.2d 265, 270-72 (2d Cir. 1984) (reversing conviction where defendant's statement offered to prove lack of criminal intent was improperly excluded).

Moreover, the Government has not identified any specific statements that it seeks to preclude. Courts routinely deny similar motions as premature.  *See, e.g.*, *United States v. Amato*, No. 03 Cr. 1382 (NGG), 2006 WL 1495497, at *7 (E.D.N.Y. May 26, 2006) (declining to address premature hearsay objections without knowing "the precise evidence sought to be admitted, or the theories of admissibility"); *S.E.C. v. Treadway*, 438 F. Supp. 2d 218, 226 (S.D.N.Y. 2006) ("[I]t

---

[28] A defendant's statement may also be offered for non-hearsay purposes, such as to show that the statement was made. *See, e.g.*, *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992).

is premature to bar the testimony on hearsay grounds, as it is unclear at this juncture how the statements will be offered into evidence. . . . If [declarant] does not testify, it may be admissible under [a] hearsay exception, such as Rule 803(3)[.]"); *Zinaman v. Kingston Reg'l Sr. Living Corp.*, No. 11 Civ. 388 (RFT), 2014 WL 282633, at *3 (N.D.N.Y. Jan. 23, 2014) ("The Court is not prescient . . .  and must await the parties' presentation before concluding that these Exhibits are rippling with hearsay. . . . A ruling on these emails is premature.").

A blanket determination that "any" of Mr. Kwok's statements are "inadmissible hearsay" would be improper, overbroad and premature. In order to defend himself against the government's accusations, Mr. Kwok must have the opportunity to introduce his own statements for non-hearsay purposes or under established exceptions to the hearsay rule. The Court should deny the government's motion.



██████████████████████████████

██████████████████████████████

### **CONCLUSION**

For the foregoing reasons, Mr. Kwok respectfully requests that the Court (1) deny the government's Motions *in Limine* in their entirety and (2) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 17, 2024

PRYOR CASHMAN LLP

By: _____
      Sidhardha Kamaraju
      E. Scott Schirick
      Matthew S. Barkan
      Daniel J. Pohlman
      John M. Kilgard
      Clare P. Tilton

      7 Times Square
      New York, NY 10036
      (212) 421-4100
      skamaraju@pryorcashman.com
      sschirick@pryorcashman.com
      mbarkan@pryorcashman.com
      dpohlman@pryorcashman.com
      jkilgard@pryorcashman.com
      ctilton@pryorcashman.com

      Sabrina P. Shroff
      80 Broad Street, 19th Floor
      New York, NY 10004
      (646) 763-1490
      sabrinashroff@gmail.com

      *Attorneys for Defendant Ho Wan Kwok*