UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"
    a/k/a "Boss," and

YANPING WANG
    a/k/a "Yvette,"
    a/k/a "Y,"

            Defendants.

**S2 23 Cr. 118 (AT)**

# THE GOVERNMENT'S OPPOSITION
# TO THE DEFENDANTS' MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
    *- Of Counsel -*

# **TABLE OF CONTENTS**

ARGUMENT ................................................................................................................. 1

I.   Evidence That GTV Investor Funds Sent to Fund-1 Lost $30 Million Is Admissible ............ 1

   A. Background................................................................................................... 1

   B. Discussion.................................................................................................... 3

II.  Evidence That the GTV Private Placement Constituted an Unregistered Offering of
Securities is Admissible ............................................................................................. 6

   A. Evidence of the Unregistered Nature of the GTV Stock Offerings is Admissible........... 7

   B. The Defendants Have Abundant Notice of the Relevance of the Unregistered-
Offering Evidence ....................................................................................... 9

III. Evidence That Those Who Threatened the Kwok Enterprise Were Disparaged and
Harassed Is Admissible ............................................................................................. 13

IV.  Additional Evidence Relating to the PAX Case and Kwok's Bankruptcy Is Admissible ...... 17

   A. The Context for the $37 Million Transfer Is Admissible ................................................ 18

   B. Certain Bankruptcy Evidence Is Admissible ................................................................ 19

      1.   Kwok's Declaration of Bankruptcy ........................................................ 19

      2.   Efforts to Obstruct the Bankruptcy ........................................................ 22

      3.   The Trustee's Mahwah Mansion Walkthrough ...................................... 23

      4.   Rule 403 Does Not Bar This Highly Probative Evidence......................... 24

V.   Evidence of Wang's Compensation Is Admissible........................................................ 25

VI.  Evidence of Wang and Kwok's Personal Relationship Is Admissible ............................. 26

VII. Accurate References to the "Mahwah Mansion" and to the Kwok Enterprise's "Shell
Companies" and "Figurehead Executives" Are Permissible............................................... 29

   A. Accurate References to Shell Companies and Related Terms Should Be Permitted ...... 30

   B. Accurate References to the Mahwah Mansion Should Be Permitted............................. 33

VIII.       Hypothetical Questions To Show Materiality Are Proper .................................... 35

IX.  Kwok's Motion Regarding Metadata Evidence Is Premature ............................................ 38

X.   Kwok's Motion To Exclude Evidence Regarding             Is Moot...................... 39

XI.  Professor Shams's Testimony Is Admissible................................................................ 39

   A. Professor Shams's Disclosure .................................................................. 40

   B. Applicable Law .................................................................................. 46

   C. Argument ............................................................................................ 47

      1.   Professor Shams's Testimony Is Admissible Expert Opinion................................ 47

2.    Professor Shams's Testimony Is Reliable..................................................... 53

3.    Professor Shams's Testimony About HDO's Reserves Is Admissible.................. 55

XII. The Government Is in Compliance with Its *Brady* Obligations ............................................. 56

CONCLUSION................................................................................................................................ 57

The Government respectfully submits its consolidated oppositions to the defendants' motions *in limine*.  *See* Dkt. 267 ("Wang MIL"), 271 ("Kwok MIL").  For the reasons stated below, the Court should deny the defendants' motions *in limine* and grant the Government's motions *in limine*.  *See* Dkt. 273 ("Gov't MIL").

## ARGUMENT

## I.   Evidence That GTV Investor Funds Sent to Fund-1 Lost $30 Million Is Admissible

The Court should admit evidence that the GTV investor funds sent to Fund-1 lost $30 million in value.  Wang contends that such evidence is "irrelevant" or, alternatively, should be excluded under Rule 403 due to "unfair prejudice and confusion of the issues, such as the investment strategy employed by Fund-1 and the market or other conditions that ultimately caused the alleged loss."  Wang MIL at 3.  Wang is wrong.  While a loss to victims is not an element of the charged fraud offenses, the $30 million loss is inextricably intertwined with misstatements by Kwok and necessary to complete the story of the charged crimes.

### A.  Background

The evidence at trial will show that, almost immediately after raising $452 million in GTV investor funds, the defendants misappropriated $100 million of those funds (approximately 22%) and made an extremely high-risk investment in Fund-1 that, if successful, would have benefited Kwok's son.  Wang herself signed the investment paperwork and personally transferred the $100 million in GTV investor funds—via an account held in the name of GTV's parent company, Saraca—to Fund-1.  The Government expects that employees of Fund-1 will explain that the investment was, in essence, a bet that the Hong Kong dollar's price, which is pegged to the U.S. dollar, would become decoupled from the U.S. dollar and collapse.  If that occurred, the value of investments in Fund-1 would dramatically increase.  Such an investment typically serves as a

hedge utilized by investors with significant exposure to an economic downturn in Asia. For strategic reasons, Fund-1 takes time to make all its options trades; as a result, only $30 million of the $100 million of Saraca's investment was deployed by Fund-1 into options trades prior to the SEC's intervention. Nearly the entirety of that $30 million investment was lost. Following the SEC's September 13, 2021 settlement with the GTV entities, the remaining $70 million was transferred by Fund-1 to the SEC's Fair Fund, for distribution to GTV investors. These GTV investors will not be made entirely whole, in substantial part because of the $30 million loss.

Moreover, and inextricably intertwined with the evidence in this case, Kwok himself made misstatements relating to the investment of GTV investor funds in Fund-1 and the losses suffered. For example, on November 11, 2020, Kwok stated the following in an online video (as translated from Mandarin):

> At the beginning, my comrades wanted to follow [the Chief Investment Officer of Fund-1], to do the 200 times leverage. Many comrades said that, this, Brother Seven, sent me a lot of messages, Brother Seven, I wanted to invest money. I wanted to invest money in shorting the Hong Kong dollar at 200 times the leverage. They all wrote authorization letters to me, but I refused them all. Everyone remembers this matter, right?

> The US media announced that Biden was elected, the Hong Kong dollar, do you know how much you lost by shorting the Hong Kong dollar? Brothers and sisters? All [the Chief Investment Officer of Fund-1] funds lost 50%, lost 50%. You did not lose, fellow comrades, SARACA, you did not invest, SARACA invested, SARACA invested 100 million, 100 million US dollars, and now it has lost 50 million, it has lost 50 million. The day before yesterday, received a notification from the fund, telling everyone that half of your account balance has been lost in the market, which is 50 million. Brothers and sisters, if you said that Wen Gui had a bad conscience at that time, I would ask my comrades to invest, then today, half of your money would have been lost. I would like to ask everyone, is there any reason why GTV investment will be reduced by half? Never, [please, you can take everything]. It will never be. This is Wengui's feelings for his comrades. You can never lose half of your investment in GTV, because every penny you invest must be audited by American legal accountants. I can't use the money you invested to buy a Japanese meal today, so I will be arrested directly. The United States will really arrest you. Then you want to…the money invested by the comrades will all

2

> be in the comrades' companies, and GTV will never be able to, but if you heard today that you will lose 50% of your money because of Biden's false election, how painful would it be for you? Can Wengui sit here and have a Japanese meal with you? Impossible. Brothers and sisters, this is Wengui, measured by facts.

That is, Kwok lied to his followers about the loss, telling investors, falsely, among other things, that "[y]ou did not lose" any money.  In reality, the loss of the $30 million was shouldered by GTV's investors, whose money was used to make the failed investment.  More generally, Kwok repeatedly told GTV investors that they could not lose money, only make money, and that he would personally guarantee their losses—all of which were false.

### B. Discussion

The above facts are admissible at trial.  To start, the Government has alleged and intends to prove beyond a reasonable doubt that the investment in Fund-1 was inconsistent with the GTV offering memorandum, and inconsistent with Kwok's statements to GTV investors.  The Government expects the defendants to argue that the investment was an appropriate expenditure of GTV funds, consistent with the terms of the offering.  That makes the particulars of the Fund-1 investment, including, for example, "the investment strategy employed by Fund-1," Wang MIL at 3, directly relevant to the charged offenses.  The Government expects that the principal of Fund-1 will testify on that topic, including as to the acute risks of any investments in Fund-1.  That witness, who was also a GTV board member, will testify that the defendants did not tell him that Saraca's investment was made with GTV investor funds, and that Fund-1 would never have accepted that money if that fact had been disclosed, in part due to the high-risk nature of Fund-1.  That this risk "materialized tended to show that [the defendants] intended to subject the [raised funds] to a risky investment in order to enrich [themselves]." *United States v. Seabrook*, 814 F. App'x 661, 662 (2d Cir. 2020) (summary order) (affirming admission of evidence showing that an investment

procured with a kickback had lost almost all its value due to a subsequent bankruptcy, including because "[t]he loss evidence was also relevant to the element of materiality because it demonstrated the riskiness of the investments.").

Moreover, Kwok's own video-recorded false statements regarding the losses are clearly admissible. Kwok made false and misleading representations to investors about the losses to con them into continuing to make investments in GTV—evidence of those misrepresentations is at the very heart of the proof of the charged crimes on trial. Because the introduction of this evidence goes to the core of what this trial is about—the defendants' fraud on investors—it does not pose any risk of unfair prejudice or confusion of the issues. Further, the $30 million loss is relevant because it occurred while the charged schemes were ongoing and the defendants were still actively defrauding victims. That is, this is not a case where investors were tricked into making a single discrete investment through lies, and then that investment later suffered losses. This is a case where investors were misled through a cascade of deceit that spanned years, with the defendants tricking victims to invest, repeatedly, in sequential investment "projects" over an extended period. The defendants even tricked victims to "reinvest" their distributions from the SEC's Fair Fund. It is clearly proper to admit evidence that Kwok continued to trick victims by telling them they would suffer no losses and effectively bore no risk, despite Kwok's knowing, at least as of the time of the SEC's September 2021 settlement, that investors had already lost at least $30 million.[1]

Finally, evidence regarding what happened with the investment into Fund-1 is necessary to complete the story of the charged crimes. It is settled law that evidence is admissible "if it is

---

[1] *See* https://www.sec.gov/files/litigation/admin/2021/33-10979.pdf ("By late July 2020, Hedge Fund A had invested $30 million of Saraca's $100 million transfer and, to date, that $30 million investment in Hedge Fund A has lost approximately $29.2 million in value.").

necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quotation marks omitted).  Here, without the evidence of the $30 million loss, the jury will be left wondering what happened to the $100 million investment of GTV investor funds in Fund-1. The Government should be entitled to present evidence to "satisfy the jurors' expectations about what proper proof should be." *Old Chief v. United States*, 519 U.S. 172, 188 (1997); *see also United States v. Gotti*, No. 02 Cr. 743 (RCC), 2004 WL 2389755, at *5 (S.D.N.Y. Oct. 26, 2004) (ruling that the amount of loss created by a construction industry extortion conspiracy was admissible because "a jury may well be left wondering why the Government did not establish the exact dollar amount, perhaps inferring that it could not do so").

The cases that Wang cites in seeking to exclude this evidence are inapposite.  *See* Wang MIL at 3.  In *SEC v. Jensen*, evidence of a $9 million profit was excluded because there was no dispute that the profit "does not reflect the effect of the Defendant's alleged misrepresentations." No. 11 Civ. 5316 (MLR), 2013 WL 12129377, at *6 (C.D. Cal. Mar. 13, 2013).  Here, by contrast, the $30 million loss is inextricably intertwined with the defendant's misrepresentations; to continue the scheme, Kwok lied about that the Fund-1 investment loss.  *United States v. Butler* involved false promises to invest victims' funds in student-loan-related assets.  No. 08 Cr. 370 (JBW) (RER), 2010 WL 1692882, at *1 (E.D.N.Y. Apr. 27, 2010).  Instead of investing in those assets, the defendant invested in "non-student-loan assets, such as mortgages and corporate debt," which "differed materially" from the promised investment.  *Id.* at *1, *4.  The trial judge "precluded as irrelevant" evidence establishing that the student-loan-related investments—*i.e.*, the promised and intended use of the victims' funds—had liquidity problems five months "*after* the [victims] uncovered [the defendant's] fraud."  *Id.* at *3 (emphasis added).  In upholding that decision in a subsequent opinion, the court reasoned that such evidence "does not tend to make the

allegations of Butler's fraud and conspiracy more or less probable." *Id.* at *4. Here, of course, the loss of value in Fund-1 goes directly to the charged frauds, in that Kwok was making misrepresentations to investors about that specific loss and more generally about the risks of their preexisting and ongoing investments.

Accordingly, the Court should admit evidence relating to the losses suffered by the investment of GTV investor funds into Fund-1.

## II.    <u>Evidence That the GTV Private Placement Constituted an Unregistered Offering of Securities is Admissible</u>

Evidence that the GTV Private Placement was conducted by the defendants knowingly in contravention of securities regulations designed to protect unsophisticated investors is admissible. Moreover, this type of evidence is not limited to the GTV Private Placement; it applies equally to the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, as explained below.

The Government intends to offer such evidence to prove acts in furtherance of the charged fraud and racketeering conspiracies, as a component of the charged substantive frauds, and to complete the story of the crimes charged. Evidence that the defendants conducted ther investment offerings in contravention of, and to circumvent, U.S. securities laws is also admissible to prove intent, preparation, plan, knowledge, and absence of mistake pursuant to Federal Rule of Evidence 404(b). Any concerns that the jury could be confused as to whether the defendants are charged with violating the registration requirements for investment offerings are properly addressed by a straightforward limiting instruction reminding the jury that the defendants are not charged with any such violations.

Accordingly, the Court should deny Wang's motion to exclude such evidence. *See* Wang MIL at 6-8.

**A.  Evidence of the Unregistered Nature of the GTV Stock Offerings is Admissible**

The defendants repeatedly sought to circumvent the disclosure requirements of U.S. securities laws and the jurisdiction of the Securities and Exchange Commision ("SEC") in order to target thousands of unsophisticated investors.  Indeed, in many ways, the charges against the defendants boil down to conning inexperienced and unsophisticated investors out of their money.  To do that, the defendants had to avoid the oversight of the SEC and U.S. securities laws.

Thus, in connection with the GTV Private Placement, the defendants *ostensibly* complied with securities regulations about private offerings—*i.e.*, the investment contracts with GTV contained the correct language—but the defendants *also* sent investors who were legally ineligible to participate in the offering to a third party, Voice of Guo Media ("VOG"), who pooled the investments of these less-wealthy investors and invested in GTV on their behalf.  As discussed in the Government's motions *in limine*, the Government expects that a witness ("Witness-1") will testify about conversations he had with Wang, Kwok, and Je regarding this aspect of GTV Private Placement and, in particular, the legal risks associated with pooling non-accredited investors' funds.  *See* Gov't MIL at 31-32.

The defendants' deliberate circumvention of U.S securities laws meant to protect investors did not stop there, however.  The need to avoid the SEC and U.S. securities law was the driving purpose behind the Farm Loan Program and G|CLUBS, which were initiated almost immediately after the SEC intervened to stop the illegal GTV Private Placement.  The offering of these *ostensible* "loans" and "club memberships" were, in reality, nothing but continuations of the defendants' illegal private offerings of GTV stock to often inexperienced and unsophisticated

victims, dressed up in an effort to avoid the SEC and U.S. law.[2]  Similarly, the need to avoid U.S. regulatory scrutiny was also why the Himalaya Exchange *ostensibly* did not allow U.S. residents to purchase HDO or HCN—even though, all the while, victim investors in the United States were simply told to use intermediaries in other countries to send money to the Himalaya Exchange.

This circumvention of the securities laws and targeting of unsophisticated investors was a key part of the investment frauds.  Indeed, as described above, one of the notable misrepresentations made to victim investors in this case concerned the riskiness of their investments in GTV and the defendants' other investment projects.  Kwok repeatedly told investors that they could not lose money, and he would personally guarantee any losses if they did.  Nonaccredited investors—*i.e.*, investors who were ineligible under the U.S. securities laws to participate in private offerings like the GTV Private Placement—are exactly the type of investors who are most susceptible to the type of investment scams perpetrated by the defendants.

The foregoing evidence is admissible as direct evidence.  "In order to prove that [the defendants] sold securities 'through fraudulent means,' the prosecution must show the 'means' by which the fraud was perpetrated."  *United States v. Ramer*, No. 14 Cr. 10 (GFVT), 2015 WL 13839476, at *5 (E.D. Ky. Dec. 11, 2015).  That the Indictment does not charge counts specifically for the violation of investment offering registration requirements does not alter the admissibility of this evidence showing a key component of the crimes that are charged.  Where, as here, an

---

[2] Evidence showing that the GTV Private Placement was an unlawful unregistered stock offering is also admissible to provide the context for the the Farm Loan Program and G|CLUBS offerings that followed.  That is, to prove that the Farm Loan Program and G|CLUBS offerings were "in connection with a security"—as the Government must, beyond a reasonable doubt, for the substantive securities fraud counts—the rules around which types of investors can participate in private offerings, and the noncompliance of the GTV Private Placement with those rules, are directly relevant and provide important context.

indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, because the defendants' efforts to avoid the SEC and U.S. securities laws were so central to their schemes, this evidence is inextricably intertwined with the charged offenses. Thus, this evidence is also admissible to provide background to the conspiracy and complete the story of the charged crimes.

Alternatively, the evidence is admissible under Rule 404(b) to show the defendants' intent, knowledge, lack of accident, and absence of mistake. The elaborate and deliberate efforts that the defendants undertook to avoid complying with disclosure requirements and evading the jurisdiction of the SEC is evidence that the defendants were acting with criminal knowledge and intent, not negligently or accidentally.

In short, evidence about the unregistered nature of the GTV Private Placement—and the defendants' attempts to circumvent the requirements of U.S. securities laws and evade the SEC— is admissible. Indeed, such evidence is inextricably intertwined with even the most basic narrative of the defendants' course of conduct. It is also properly admitted to show the defendants' knowledge and fraudulent intent and lack of negligence or good faith. Accordingly, Wang's motion should be denied.

### B. The Defendants Have Abundant Notice of the Relevance of the Unregistered-Offering Evidence

Wang's motion seeks to bar argument about the unregistered nature of the GTV Private Placement, purportedly to avoid a constructive amendment to, or prejudicial variance from, the

Indictment.  *See* Wang MIL at 6-8.  This is a baseless concern.  The purpose of the constructive amendment doctrine is to ensure "that the defendant was given *notice* of the *core* of criminality to be proven at trial."  *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (cleaned up and emphases in original).  The "core of criminality" is defined broadly in connection with the indictment's allegations.  *See, e.g.*, *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) ("The core criminality pleaded in this indictment was a fraud scheme, operating between October 1995 and June 1996, whose ultimate purpose was the conspirators' realization of millions of dollars in illegal profits from their sales of [securities].").  It "involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."  *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).

In this case, the core of the defendants' charged conduct is several "conspir[acies] to defraud thousands of victims of more than approximately $1 billion . . . through a series of complex fraudulent and fictitious businesses and investment opportunities," Indictment ¶ 1, with the GTV Private Placement as the fulcrum around which the schemes pivoted.  Wang's motion references only "the substantive securities fraud count relating to GTV," Wang MIL at 7, but that is just one piece of the charged scheme.  The GTV Private Placement was at the core not only of "the substantive securities fraud count relating to GTV" charged in Count Six and the related substantive wire fraud charged in Count Five, but also of the later schemes that followed in the aftermath of the GTV Private Placement, when the defendants, in an effort to continue raising funds for the unregistered offering of GTV stock, fraudulently offered that stock for sale through the Farm Loan Program and G|CLUBS.  *See* Indictment ¶¶ 17(a) (alleging that Farm Loan Program followed closure of Kwok Enterprise bank accounts after large wires "referenced an unregistered stock offering"), 18(f) (alleging that "KWOK, JE, and WANG also used G|CLUBS as a

mechanism to continue fraudulent private placement stock offerings"). And indeed, the Indictment begins its detailed allegations about the Kwok Enterprise by *defining* the GTV Private Placement as "an illegal"—that is, improperly unregistered—"private stock offering." Indictment ¶ 16. The charging instrument then alleges that the unregistered GTV Private Placement was critical to Count One's racketeering conspiracy, *id.* ¶ 16(a)-(i), constituted an overt act in furtherance of Count Four's securities-fraud conspiracy, ¶ 40(a), was at the core of the substantive wire and securities frauds charged in Counts Five and Six, ¶¶ 41-44, and gave rise to the follow-on frauds through the Farm Loan Program and G|CLUBS in Counts Seven through Ten, ¶¶ 45-52.

This case is therefore nothing like *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005), on which Wang pins her motion. *See* Wang MIL at 8 (arguing that permitting argument about the GTV Private Placement's unregistered nature would effect a constructive amendment "[a]s in *Milstein*"). In *Milstein*, the District Court permitted the Government to present evidence of a wholly alternative theory of liability premised on entirely different facts that "the Government claim[ed] to have learned" "[f]ollowing Milstein's indictment." 401 F.3d at 64. Milstein's indictment charged that he misbranded drugs by repackaging them; the disputed trial evidence and argument was that Milstein in fact misbranded drugs by selling contaminated drugs. *Id.* at 65. While *Milstein*'s indictment never included any allegations about contaminated drugs, *id.* at 65-66, the Indictment in this case is replete with allegations about the unregistered nature of the GTV Private Placement and the role that design played in effecting the defendants' related fraud schemes.[3]

---

[3] *Milstein* also makes clear that, even if the unregistered-offering evidence were inadmissible in connection with the substantive securities fraud charge (and it is not), that evidence *would* be admissible in connection with the charges of racketeering conspiracy, wire fraud conspiracy, and

Even if the Indictment did *not* expressly allege the relationship between the GTV Private Placement's unregistered nature and the charged substantive and conspiracy offenses, evidence and argument about this feature of the scheme would be admissible without risking a constructive amendment or prejudicial variance.  That is because the Government may prove even "*unalleged* overt acts falling squarely within the charged scheme." *Salmonese*, 352 F.3d at 621.  And Wang's warning against arguments "that the defendants committed securities fraud *because* the offering was allegedly unregistered," Wang MIL at 8 (emphasis added), sounds a false alarm.  "The Government [will] not argue, and the Court [will] not charge, that the jury could find [the defendants] guilty of securities fraud," *Watts*, 2020 WL 6136211, at *8, *based only on* the unregistered nature of the GTV Private Placement.  Rather, its deliberately unregistered design is evidence of the defendants' guilty knowledge and fraudulent intent; a means by which the securities fraud and related conspiracies were effected; and a key part of the complete story that explains, among other things, why the jury will hear indisputably admissible evidence about the conspirators' efforts to pool victim-investors' funds, *see* Indictment ¶ 16(g), and how the Farm Loan Program arose when banks "began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering," *id.* ¶ 17(a).  Moreover, *excluding* argument about the unregistered nature of the GTV Private Placement "would risk confusing the

securities fraud conspiracy, as to which the stock's unregistered nature played a critical role.  In *Milstein*, the Second Circuit vacated a substantive drug-misbranding charge where the indictment alleged misbranding by repackaging and the evidence at trial established misbranding by selling contaminated drugs. 401 F.3d at 65-66.  But the Second Circuit rejected a constructive-amendment challenge to Milstein's conspiracy conviction, holding that Milstein "had notice of" the contamination evidence before trial and that it constituted permissible evidence of "an overt act not specified in the indictment" in support of a conspiracy conviction.  *See Milstein*, 401 F.3d at 66.

12

issues at trial," Wang MIL at 8, while such evidence and argument would properly enable the Government to "show the 'means' by which the fraud was perpetrated."  *Ramer*, 2015 WL 13839476, at *5 (rejecting Rule 403 challenge to evidence about "sale of unregistered securities" in securities fraud prosecution).

In short, there is no risk of constructive amendment or prejudicial variance.  The defendants have had ample notice that this case would include evidence they violated investment registration requirements.  Any concern that the jury could be confused as to whether the defendants are charged with violating the registration requirements of the securities laws is easily addressed with a simple limiting instruction.  Accordingly, the Court should admit this evidence and deny Wang's motion.

## III.   <u>Evidence That Those Who Threatened the Kwok Enterprise Were Disparaged and Harassed Is Admissible</u>

Evidence that Kwok disparaged and caused his followers to harass those who threatened his criminal enterprise—including complaining victim investors, Chinese dissidents who criticized Kwok, unpaid creditors, and the bankruptcy Trustee—is admissible.  *Cf.* Kwok MIL at 17-22.

The Government intends to offer evidence that Kwok labeled those who posed a threat to the continuation of his criminal enterprise as "traitors" and CCP "spies" or "agents" and directed his followers to harass those individuals.  These tactics are a means and method of the Kwok Enterprise—indeed, they are what allowed Kwok to continue manipulating and deceiving his followers—and are admissible at trial as proof of the existence and scope of the Kwok Enterprise, as a component of the charged fraud, and to complete the story of the crimes charged.  The evidence regarding the harassment of these various individuals, including complaining investors, includes the following:

- Kwok disparaged complaining investors as "traitors" and CCP "spies." This disparagement both discredited complaining victims and had a chilling effect on others who might have considered complaining or questioning Kwok, allowing the scheme to continue. The Government expects to call victims who will testify at trial to the effect of Kwok's harassment campaigns on them—including their onetime beliefs, as a result of Kwok's statements, that complaining investors and other critics were CCP spies, and then, their realizations that Kwok was running a scam, after which they became fearful of becoming targets themselves if they sought to recoup their investments or otherwise spoke out.

- Kwok employed a similar tactic with a prominent one-time follower ("Follower-1"),[4] whom Kwok referred to regularly as the "nine-fingered demon," and whom Kwok sought to use as a scapegoat for the SEC's intervention in the GTV Private Placement. Kwok's statements about Follower-1 are particularly material to issues in this trial, as Kwok repeatedly stated that Follower-1 had committed crimes based on her conduct with respect to Voice of Guo Media ("VOG"). Kwok directed investors who were investing less than $100,000 to Follower-1 so they could invest in GTV via VOG. Follower-1 then facilitated those investors' transfers of funds to VOG. The evidence at trial will show that Kwok himself was directing Follower-1's conduct, which he later claimed was criminal.

- Similarly, when Chinese dissidents criticized Kwok, potentially calling into question Kwok's own bona fides as a dissident, Kwok launched the same sorts of attacks on them—including labeling them CCP spies and paying protestors to protest outside their homes. These sorts of attacks allowed Kwok to maintain his credibility as a dissident and to cement his position as leader of the Kwok Enterprise.

- When Kwok's assets, and the assets of the Kwok Enterprise, were threatened by the creditor claims of the investment fund Pacific Alliance Asia Opportunity Fund L.P. ("PAX")—and, later, by the bankruptcy Trustee's investigation—Kwok caused his followers to harass those affiliated with PAX, including PAX's lawyers. Similarly, like Kwok's other targets, the Trustee and his family members, including the Trustee's children, were harassed and threatened by Kwok's followers after Kwok claimed that the Trustee and those associated with him were CCP agents.

As an initial matter, Kwok's argument that admitting such evidence would violate the First Amendment is baseless. *See* Kwok MIL at 17-19. Even assuming that Kwok's attacks on complaining investors and others who posed a threat to his criminal enterprise constituted

---

[4] *See* Dkt. 255 at 9 (discussing Kwok-directed harassment of Follower-1).

protected speech,[5] evidence of those attacks is still admissible at this criminal trial. "The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell,* 508 U.S. 476, 489 (1993). The Second Circuit has repeatedly upheld the admission of evidence of "speech" in furtherance of establishing elements of criminal conduct, including the existence of and the defendant's participation in a RICO enterprise. *See United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998) (rejecting First Amendment argument regarding admission of evidence, and stating "[i]t is difficult to comprehend this argument since it is beyond cavil that the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent") (cleaned up); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (rejecting First Amendment argument regarding admission of rap lyrics, reasoning that the "challenge is meritless . . . because here the speech is not itself the proscribed conduct. The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise."); *United States v. Herron*, 762 F. App'x 25, 29–30 (2d Cir. 2019) (following

---

[5] As set forth above, while the Court need not decide the question of whether Kwok's harassment campaigns constitute protected speech, they do not. "[T]he First Amendment does not shield fraud" and "other forms of public deception." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 611-12 (2003). More generally, the First Amendment does not protect "speech integral to unlawful conduct." *United States v. Hansen*, 599 U.S. 762, 783 (2023). Here, Kwok's retaliation against those who threatened the continuation of the Kwok Enterprise was an "integral" part of Kwok's racketeering conspiracy. *Id.* Kwok's harassment campaigns and related conduct were also intended to obstruct multiple court proceedings, and there is no First Amendment right to obstruct justice. *See United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir. 1990) ("The First Amendment does not guarantee a right to make intimidating threats against government witnesses."); *United States v. Dahda*, No. 12 Cr. 20083 (DDC), 2023 WL 8113265, at *11 (D. Kan. Nov. 22, 2023) ("No component of the First Amendment shields a defendant from prosecution or a sentence enhancement for conduct that obstructs justice." (citing cases)).

*Pierce*).  Indeed, the Government is not aware of any case—and Kwok has not cited one—holding evidence inadmissible in a criminal trial because that evidence constituted speech protected under the First Amendment.[6]

Kwok also asserts that such evidence is inadmissible because it is not probative of elements of the charged offenses, including the relationships among member entities of the Kwok Enterprise.  *See* Kwok MIL at 20-21.  That argument fails for two reasons.  First, Kwok's premise is wrong.  These tactics were a means and method of the Kwok Enterprise, not because they illustrate the relationships between the entities within the Kwok Enterprise, but because these tactics were employed *in order to facilitate and perpetuate* the Kwok Enterprise and its investment frauds.  As such, these tactics are highly probative of the charged crimes; indeed, victim witnesses will testify to their effects, as noted above.  Moreover, and in any event, this evidence *does* show the relationship among members of the Kwok Enterprise.  Kwok instigated and promoted his harassment campaigns through posts on his own media websites such as G News, GTV, and GETTR,[7] organized protests through the Farms, and paid protestors using the Rule of Law

---

[6] *See also United States v. Walters*, 350 F. App'x 826, 829 (4th Cir. 2009) ("The First Amendment does not bar evidence of a person's associations when it provides a link to criminal activity."); *Dressler v. McCaughtry*, 238 F.3d 908, 915 (7th Cir. 2001) (rejecting defendant's First Amendment argument about admission of evidence); *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996) ("The government did not indict the Yahweh religion, but only named it as the racketeering enterprise. The First Amendment's protection of beliefs and associations does not preclude such evidence where relevant to a trial issue."); *United States v. Barnett*, 667 F.2d 835, 844 (9th Cir. 1982) ("[T]he [F]irst [A]mendment does not compel the exclusion of evidence simply because it consists of speech. If a defendant's words or his silence are relevant to prove some issue in the case, they are admissible subject to the rules of evidence . . . ."); *cf. Dembele v. Decker*, No. 18 Civ. 5070 (JPO), 2018 WL 4960234, at *2–3 (S.D.N.Y. Oct. 9, 2018) (holding that immigration judge's consideration of Facebook post did not violate First Amendment).

[7] G News, GTV, and GETTR were, in turn, owned or controlled by additional entities within the Kwok Enterprise: Saraca, Hamilton, and Freedom Media Ventures.

entities.[8]  To a one, these entities are alleged in the Indictment to be within the Kwok Enterprise. *See* Indictment ¶ 3(a).

The probative value of this evidence is not substantially outweighed by a risk of unfair prejudice. There is nothing unfair about introducing evidence about a critical means through which the defendants effectuated and continued their fraud.  That the defendants' tactics to perpetuate the scheme involved "intimidation" and "physical assault," Kwok MIL at 21, is no basis to exclude a critical means and method of the Kwok Enterprise.  And to the extent there is any risk of potential confusion as to whether the defendants are charged with assault or other uncharged offenses, the Court may issue a limiting instruction to eliminate any potential for confusion.  *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").  A limiting instruction would address the concerns raised by the defense, while permitting the jury to hear critical evidence of the operation of the Kwok Enterprise, about which victims themselves will testify while explaining their investment-related decisions.

## IV.    <u>Additional Evidence Relating to the PAX Case and Kwok's Bankruptcy Is Admissible</u>

The Court should admit certain additional evidence regarding the PAX case and Kwok's bankruptcy proceedings.  *Cf.* Kwok MIL at 23-30.  As set forth in the Government's motions *in limine*, *see* Gov't MIL at 27-31, the PAX case provides the background and context for important and plainly admissible evidence at this trial.  First, the PAX litigation led to Kwok filing for bankruptcy in February 2022.  *See* Indictment ¶ 20 (discussing bankruptcy).  Second, following

---

[8] That protestors regularly wore G|Fashion shows the connection to another entity in the Kwok Enterprise.

Kwok's claim of bankruptcy, the PAX litigation prompted the $37 million "loan" between an entity controlled by Kwok's daughter and one of the Himalaya Exchange entities controlled by defendant Kin Ming Je. *See* Indictment ¶ 19(g).   The relevance of these topics is discussed in turn.

### A.  The Context for the $37 Million Transfer Is Admissible

Turning first to the $37 million loan, evidence related to the PAX litigation is admissible, as it provides essential context for the charged crimes (the Himalaya Exchange wire fraud count and related conspiracies) and proves the defendants' control over, and misuse of, Himalaya Exchange funds.  This "loan" of Himalaya Exchange funds to Kwok's daughter was made for Kwok's benefit—a fact that can only be proved by providing the context surrounding the PAX litigation—and thus shows Kwok's ultimate control over funds held by the Himalaya Exchange. In arguing that this evidence proving a specific allegation and count charged in the Indictment is somehow not admissible, Kwok attacks a straw man, claiming the $37 million loan is inadmissible "motive" evidence.  *See* Kwok MIL at 28.  But the $37 million transfer from the Himalaya Exchange for Kwok's benefit will not be offered to show "motive."  It shows that that Kwok *could*—and, indeed, *did*—use the Himalaya Exchange funds for his benefit.  It is thus direct, and highly probative, evidence of (among other things) Kwok's fraudulent intent when making misrepresentations about the Himalaya Exchange.  And it also demonstrates that Kwok actied through intermediaries and agents, including entities and individuals that are members of the Kwok Enterprise.  Notably, despite the misdirection in Kwok's motion *in limine* relating to supposed "motive" evidence, Kwok has acknowledged in prior filings that the "$37 million loan from the Exchange to an entity controlled by one of Mr. Kwok's relatives . . . *is a basis of the count in the Indictment related to the Exchange*."  Dkt. 219 (Kwok's Renewed Motion to Stay the Bankruptcy)

at 2 (emphasis added). There is thus no question that evidence relating to this transfer is admissible as direct evidence at this trial; it is, in Kwok's words and any fair reading of the charges, "a basis" for one of the counts charged in the Indictment. *Id.* Finally, to the extent there is any risk of unfair prejudice stemming from the fact that the benefit to Kwok from this $37 million transfer related to fines and contempt orders against Kwok in the PAX litigation, the Court can eliminate any such prejudice by issuing a limiting instruction. *See Snype*, 441 F.3d at 129; *Tussa*, 816 F.2d at 68.

### B. Certain Bankruptcy Evidence Is Admissible

Bankruptcy-related evidence is likewise admissible as direct evidence of the charged offenses. While Kwok now asserts that his bankruptcy is "unrelated" to this case, *see* Kwok MIL at 3 and 10, he has previously represented to the Court "that there is not a shred of daylight between the subject matter of this case and the Bankruptcy Cases." Dkt. 219 (Kwok's Renewed Motion to Stay the Bankruptcy) at 4. As Kwok correctly noted in his earlier filings,

> the Indictment . . . alleges that Mr. Kwok's filing for bankruptcy protection itself was an act in furtherance of the government's purported schemes. Moreover, the alleged 'enterprise' upon which the government relies is a constellation of corporate entities that include twelve entities against which the Trustee has commenced adversary proceedings to date, and numerous other entities which the Trustee has contended are Mr. Kwok's alter egos.

*Id.* Simply put, there is no question that the bankruptcy proceedings are "relevant" to this case under Rule 401. The only question is what limits, if any, must be placed on bankruptcy-related evidence under Rule 403. Importantly, the Government does not intend to offer exhaustive evidence relating to the bankruptcy litigations or go entry by entry through the voluminous bankruptcy dockets. Rather, the Government intends to offer particularly probative evidence from the bankruptcy proceedings, as discussed below.

### 1. Kwok's Declaration of Bankruptcy

First, the basic fact that Kwok declared bankruptcy in February 2022 and Kwok's sworn

19

declaration claiming bankruptcy are clearly admissible as direct evidence because they show that Kwok was knowingly lying to investors about his wealth and ability to personally guarantee investors' losses.  Kwok's portrayal of himself as a billionaire in a position to personally guarantee his victims' investments was a critical part of the scheme to defraud investors, from the outset of the racketeering conspiracy through Kwok's arrest in March 2023.  In the April 2020 GTV offering memorandum, Kwok is described first and foremost as "a billionaire."[9]  Yet less than two years later, after the imposition of less than $300 million in fines in the PAX litigation, this "billionaire" who could supposedly personally guarantee over a billion dollars in investor money, declared bankruptcy, claiming $100,000 or less in assets and over $374 million in liabilities.  This evidence is, thus, directly relevant to establishing certain of Kwok's misrepresentations to investors.

Kwok's arguments against admitting bankruptcy evidence rely principally on the timing of the bankruptcy, which Kwok himself voluntarily initiated in the midst of carrying out the charged offenses in February 2022.[10]  *See* Kwok MIL at 27 ("The filing of the Bankruptcy Cases and the

---

[9] The first sentence describing the "Sponsor and Adviser of GTV Media" reads: "The sponsor and adviser of GTV Media, Mr. Wengui Guo (a/k/a Miles Guo, Ho Wan Kwok or Miles Kwok), is a billionaire, a successful businessman and a dissident in China."

[10] Kwok also reasons that because he is not charged with *bankruptcy fraud*, his bankruptcy filings and his own statements in connection therewith cannot be direct evidence in this case.  Kwok MIL at 25.  Of course, direct evidence need not be so tightly tethered to the charged offenses to be relevant and admissible.  If a defendant falsely tells investors that he is a billionaire and can reimburse any of the investors' losses, the fact that the defendant also declared bankruptcy at or around the same time is plainly evidence that the defendant was lying—an essential element of any fraud charge, and thus direct evidence in a trial on such charges.

Additionally, Kwok argues that the bankruptcy proceedings were "personal to him" and do not relate to the Kwok Enterprise.  Kwok MIL at 25-26.  Kwok is wrong.  The bankruptcy did not relate merely to Kwok personally, because Kwok used the Kwok Enterprise to obscure and conceal the assets, including fraud proceeds, he controlled and used to pay for personal expenses.  Kwok's assertion is also belied by Kwok's previous filing acknowledging that "the 'enterprise' upon which the government relies is a constellation of corporate entities that include twelve entities against

ensuing proceedings post-dated the alleged criminal activity"); *id.* ("Kwok's supposed need for money in February 2022 does not show that he similarly needed money at the time of" certain earlier illustrative misrepresentations described in the Indictment); *id.* ("Kwok's ability to pay his debts in November 2021 and February 2022 was dramatically different"); *id.* at 28 ("the Bankruptcy Cases cannot be evidence of the 'background' of any of the charged offenses because it occurred after the start of the charged offenses").  The primary problem with Kwok's temporal argument is that Kwok's deception of investors—and the fraud offenses charged in the Indictment—continued "up to and including at least in or about March 2023," over a year *after* Kwok had declared bankruptcy.[11]  Indeed, the Government's evidence at trial will include video-recorded broadcasts by Kwok which post-date his bankruptcy, in which he continued to personally guarantee any investor losses.  Similarly, the Government's evidence at trial will show that Kwok was misappropriating investor funds after declaring bankruptcy, including by using G|Fashion funds to purchase luxury custom clothing for himself.  The defendants actively concealed the fact that Kwok was the beneficiary of these misappropriations by describing the payments for Kwok's custom luxury clothing on internal G|Fashion paperwork using euphemisms like "Research and Development: Special."

---

which the Trustee has commenced adversary proceedings to date, and numerous other entities which the Trustee has contended are Mr. Kwok's alter egos."  Dkt. 219 (Kwok's Renewed Motion to Stay the Bankruptcy) at 4.

[11] At one point, Kwok acknowledges the time period charged in the Indictment.  *See* Kwok MIL at 28.  Yet Kwok then asserts, puzzlingly, that because the bankruptcy filing and subsequent proceedings occurred *during* the charged fraud, the "Bankruptcy Cases are neither the start or the end of the charged offenses, and thus cannot properly be admitted to 'complete the story of the crime on trial,'" *id.* at 28-29.  That reasoning is nonsensical.  That the filing of the Bankruptcy came in the midst of the charged crimes and not at the beginning nor the end makes it no less relevant.

In addition to being direct evidence of the charged crimes, Kwok's voluntary declaration of bankruptcy is clearly admissible as to the defendants' motive, knowledge, intent, absence of mistake, and lack of accident under Rule 404(b).  As to motive, in its motions *in limine*, the Government explained how, when declaring bankruptcy, Kwok admitted that his assets had been seized beginning in 2017, including through a Hong Kong court order put into effect one month before Kwok began raising money from his followers.  *See* Gov't MIL at 21-23 (admissibility of asset seizures immediately prior to Kwok starting to raise funds from his followers).  That Kwok's assets were seized before he began soliciting money from his followers shows Kwok's motive for committing his investment frauds.  With respect to Kwok's knowledge and intent, Kwok declaring bankruptcy while representing to investors, at the same time, that he would personally guarantee their losses, shows that Kwok knew his representations were false and misleading.

### 2. Efforts to Obstruct the Bankruptcy

Next, the Government intends to offer evidence that, through agents of the Kwok Enterprise, the defendants sought to obstruct the bankruptcy proceeding, because the Trustee's investigation threatened to expose Kwok's fraud and placed the fraud proceeds in jeopardy of confiscation.  As explained above, *supra* at 13-17, evidence that Kwok disparaged and harassed the Trustee and those associated with him is admissible.  That harassment was just one dimension of the defendants' efforts to obstruct the bankruptcy proceedings.  For example, Wang's coaching of Kwok's daughter, Mei Guo ("Mei"), in connection with Mei's false claim of ownership over the Lady May, and Mei's perjurious testimony to the same effect when deposed by the Trustee on that topic and that of the $37 million "loan" of Himalaya Exchange funds, is also admissible.  Wang and Kwok also sought to transfer ownership of entities in the Kwok Enterprise so that they

would be beyond the reach of the Trustee.[12]  Such evidence shows the efforts of the defendants to conceal their crimes, through obstruction and false testimony, and Kwok's ultimate control over assets like the Lady May and the funds held by the Himalaya Exchange, as well as other entities in the Kwok Enterprise.  As evidence of a means and method of the Kwok Enterprise, these facts are direct evidence of the charged racketeering conspiracy.  Alternatively, this evidence is admissible under Rule 404(b) as highly probative of the defendants' intent, knowledge, absence of mistake, and lack of accident.  That the defendants sought to obstruct court proceedings that might unveil their crimes or lead to the confiscation of fraud proceeds demonstrates consciousness of guilt—and that the defendants ran the Kwok Enterprise with the requisite *mens rea*, and not negligently or in good faith.

### 3.  The Trustee's Mahwah Mansion Walkthrough

As a final example, the Government intends to offer evidence arising from the Trustee's September 2023 walkthrough of Mahwah Mansion.  As the Court is aware, following the defendants' arrests and the unsealing of the Government's charges related to the misappropriation of G|CLUBS funds to purchase a personal home for Kwok and his family, Kwok's followers accessed the Mahwah Mansion and modified the premises in a blatant attempt to obstruct justice.

---

[12] To the extent the jury needs, in order to undrestand this evidence, context regarding what was happening in the bankruptcy, the Government intends to offer evidence regarding the bankruptcy litigations sufficient to provide that context.  To be clear, however, the Government does not intend to offer any orders or any judicial factual findings from the bankruptcy proceedings for their truth. Wang's motion to preclude the introduction of "findings in other judicial proceedings" as hearsay thus proceeds from a mistaken premise.  *See* Wang MIL at 14.  The Government does not intend to offer "findings" or any other evidence from "other judicial proceedings" for their truth, but rather to explain and provide essential context, where necessary, for the actions the defendants and their co-conspirators took in furtherance of the charged crimes.  *See, e.g.*, *supra* at 17-19 (admissibility of the PAX litigation and contempt order as essential context for the $37 million transfer of Himalaya Exchange funds for Kwok's benefit).  When admitting such evidence, the Court can cure any risk of prejudice or confusion by issuing a limiting instruction.

Specifically, Kwok's followers placed placards stating "NFSC / G|CLUBS"—in an effort to bolster Kwok's argument at trial that the Mahwah Mansion was a secret "base."[13]  This obstructive conduct was discovered through, and documented with photographs and videos taken during, the Trustee's walkthrough.  When introducing this evidence, the Government is entitled to provide at least some basic context for the Trustee's walkthrough.

> ### 4.  Rule 403 Does Not Bar This Highly Probative Evidence

Because the foregoing bankruptcy-related evidence is highly probative of the central issues on trial, it is admissible.  Kwok's Rule 403 arguments to the contrary, claiming unfair prejudice, are unpersuasive.  *See* Kwok MIL at 29.  In *HTC Corp. v. Tech. Properties Ltd.*, No. 08 Civ.  00882 (PSG), 2013 WL 4782598, at *2 (N.D. Cal. Sept. 6, 2013), the magistrate judge excluded evidence of a party's bankruptcy because the opposing party had "fail[ed] to tie TPL's bankruptcy to" the relevant issue at trial, namely, "a lack of success in licensing the MMP portfolio."  *Id.* at *2.  That failure "le[ft] the court guessing on the cause of TPL's bankruptcy," which may have been unconnected to the relevant issue.  *Id.* at *2 & n.2.  Not so here, where Kwok's voluntary bankruptcy is directly probative of several relevant issues, such as Kwok's representations to victim investors about his wealth and ability to repay their losses.  The other case Kwok relies on is similarly inapposite.  *Pedroza v. Lomas Auto Mall, Inc.*, Civ. No. 07 Civ. 0591 (JB) (RHS), 2009 WL 1325440 (D.N.M. Apr. 6, 2009) concerned a dispute about a used car, and the court excluded evidence of "negligible relevance" regarding a plaintiff's prior and unrelated bankruptcy.  *Id.* at *7.  Unlike the *Pedroza* plaintiff's bankruptcy, Kwok's bankruptcy occurred in the midst of this case's investment frauds, is inextricably intertwined with the Kwok Enterprise, and is highly

---

[13] In recorded jail calls following their arrests, the defendants appear to be discussing with followers this supposed "base."

probative of essential elements of the charges in this case, such as the making of fraudulent representations to investors.

If anything, the Court can address any risk of unfair prejudice from the bankruptcy-related evidence by issuing a limiting instruction to the jury. That is plainly the proper outcome, as opposed to excluding outright such highly probative evidence, connected to voluntarily initiated bankruptcy proceedings contemporaneous with the charged offenses, particularly when "there is not a shred of daylight between the subject matter of this case and the Bankruptcy Cases." Dkt. 219 (Kwok's Renewed Motion to Stay the Bankruptcy) at 4.[14]

## V.    **Evidence of Wang's Compensation Is Admissible**

Evidence of Wang's compensation is probative of her intent to commit the charged crimes. It shows she received financial rewards for her role in the Kwok Enterprise. Wang seeks to preclude this evidence, arguing only that her financial compensation was not linked to or derived from the proceeds of the fraud. Wang MIL at 10. Not so. To start, Wang's salary was paid to compensate her *for her role in the Kwok Enterprise*. The Government intends to introduce W2s and payroll information reflecting as much. That makes it relevant—it shows Wang had a financial motive to participate in the Enterprise, and shows that Wang did, in fact, participate in the Enterprise. Evidence of compensation is also relevant to Wang's knowledge and intent—it shows that Wang was on the payroll for some entities in the Kwok Enterprise but not for others, such as G|CLUBS, even though she was its *de facto* CEO. This evidence indicates that Wang tried to conceal her involvement in G|CLUBS, which demonstrates her intent. Any prejudice is minimal

---

[14] Kwok also raises Rule 403 concerns regarding the bankruptcy court's contempt order related to Kwok's invocation of the Fifth Amendment. Kwok MIL at 29-30. The Government will not offer any evidence regarding that contempt order or related litigation.

and does not outweigh this significant probative value.

Wang is, of course, free to argue that this compensation was not connected to the criminal conduct. But those arguments go to the weight of this evidence, and not its admissibility. The cases upon which Wang relies are not the contrary. In *United States v. Ferguson*, a court in the District of Connecticut partially granted the defendant's motion to exclude evidence of bonuses paid to him because those bonuses were "irrelevant" to the charged conduct. But the court determined that evidence of the defendant's "deferred compensation plan [was] relevant to proving motive" because it showed a reason why he sought to manipulate stock. 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007). The circumstances are no different here—evidence that Wang was paid for her role(s) in the Kwok Enterprise is plainly relevant and not unduly prejudicial. [15] Accordingly, the evidence is admissible. [16]

## VI.    **Evidence of Wang and Kwok's Personal Relationship Is Admissible**

Wang seeks to preclude, pursuant to Rule 403, evidence that Wang and Kwok ███████ ███████████████████████████████████. *See* Wang MIL at 16-17. Wang's motion

---

[15] Wang's reliance on *United States v. Stahl* is also misplaced. Evidence of Wang's compensation is not offered to make an "appeal to class prejudice"—it simply reflects that Wang was paid for her criminal acts. 616 F.2d 30, 31-33 (2d Cir. 1980). As for *United States v. Shapiro*, No. 15 Cr. 155 (RNC) (D. Conn. Apr. 24, 2017), ECF No. 372, it appears (though is not clear from the copy Wang provided the Court) that the compensation at issue was significant (the amount is redacted). To the extent that was the reason for that court's exclusion of compensation, there is no similar concern here. Wang was not paid excessive sums. But that she earned a comfortable salary through the Kwok Enterprise is highly probative of her motive to involve herself in it.

[16] Wang also seeks to preclude evidence relating to the purchase of a condominium apartment on her behalf. Wang MIL at 10-11. The Government does not presently intend to offer evidence regarding Wang's condominium purchase at trial. In the event that changes, the Government will alert Wang's counsel, and if necessary the Court, before introducing any such evidence at trial.

should be denied.

Wang does not appear to dispute that evidence of ███████ is relevant. Rather, Wang's objection turns solely on Rule 403. That is whether ██████████ and the associated personal relationship between Wang and Kwok is "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. It is not.

"Unfair" prejudice is that which "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). Typically, unfair prejudice is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Comm. Note; *see also* Weinstein, § 403.04(1)(c) at 403-42-403-47 (traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror and evidence that provokes a jury's instinct to punish).



Evidence of ██████ is nothing of the sort. ██████ is not a crime. ████████ ██████████████████████ is neither unusual nor inflammatory. Indeed, ████████ is common and mainstream. ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

██████ Wang's suggestion that ████████████████████████ Wang MIL at 17, does not establish prejudice sufficient to exclude this evidence. Even if that is the case for some jurors, the jury will be instructed to place any such feelings to the side when deliberating. And any possible prejudice can be eliminated through a proper limiting instruction or a targeted

27

questioning posed during *voir dire*.  Moreover, Wang's argument ignores that courts frequently admit prior *criminal acts* between two co-defendants because it is probative of the level of trust between co-defendants.   The Second Circuit has stated repeatedly that Rule 403 favors the admission of evidence where uncharged *crimes* "did not involve conduct more serious that the charged crime[s]." *Williams*, 205 F.3d at 33-34.  The proposed evidence here, ███████████ ████████████ is not a *bad* act—it is not unfairly prejudicial to the defendants because it is not "any more sensational or disturbing" than the charged conduct.  *See, e.g.*, *United States v. Sanpedro*, 352 Fed. App'x 482, 485 (2d Cir. 2009) (summary order) (noting that "prejudice is informed by the crimes with which the defendant has been charged"); *United States v. Taylor*, 767 F. Supp. 2d 428, 441 (S.D.N.Y. 2010) (holding that evidence of other robberies in a Hobbs Act robbery case was admissible and not prejudicial).

Wang argues this evidence is unduly prejudicial because "there is *unlikely* to be any serious dispute" that Wang and Kwok had a close relationship. Wang MIL at 16 (emphasis added).  It is, of course, the Government's burden to prove the charged offenses and, as relevant here, to establish the closeness of Kwok and Wang's relationship.  That Wang may not contest that closeness does not provide an evidentiary basis for establishing it, as the Government must do.   The nature of Kwok and Wang's relationship is relevant to the jury's consideration of the charged offenses. Kwok placed Wang in charge of his vast criminal apparatus.  The jury will likely question why Kwok trusted her—and why Wang agreed to take on that role.  That Kwok and Wang ████ ██████████████████████████████ is evidence from which the jury can drawn inferences that may answer those questions.[17]  This is particularly the case given that Wang has

---

[17] To the extent Wang and Kwok wish to stipulate to their close and personal relationship, the

28

argued that she was not financially rewarded for her participation in the criminal conduct. Wang MIL at 9 ("The original indictment filed by the government against Ms. Wang contained no allegation that investor money went to Ms. Wang, or that she personally benefitted from the alleged scheme in any way."). Indeed, Wang's financial rewards were different in degree than Kwok, Je, or some Kwok family members; the Government is permitted to argue that some of her incentive to participate in the schemes was not just financial, but personal, an argument supported by evidence of Kwok and Wang's personal relationship, ███████████████████.

Wang contends that if this evidence is admitted the only way for her to "meet the Government's allegations" is for her to testify about ████████ Wang MIL at 17. If Wang wishes to present admissible evidence to cut against the Government's allegation that the two co-defendants had a ██████████████, she may do so, whether through witness testimony or the introduction of exhibits; indeed, the discovery in this case includes, for example, a recording of Kwok yelling at Wang that might suggest a breakdown in their relationship. Regardless of how Wang chooses to advance this argument, the Government must be able to prove the two co-defendants had a level of trust significant enough to operate a vast RICO enterprise with each other, including through the introduction of the ████████ evidence.

Accordingly, the evidence is admissible.

## VII.  Accurate References to the "Mahwah Mansion" and to the Kwok Enterprise's "Shell Companies" and "Figurehead Executives" Are Permissible

The Court should permit accurate references to the Kwok Enterprise's use of shell companies and figurehead executives, and to Kwok's New Jersey residence as a mansion in

---

Government would welcome a dialogue about the scope and language of such a stipulation. However, to date, neither defendant has broached the Government about such a stipulation.

Mahwah. *See* Kwok MIL at 33-36; Wang MIL at 4-6. Kwok and Wang's motions to preemptively preclude references to "shell companies" and related terms, and Kwok's motion to preclude references to his New Jersey home as the "Mahwah Mansion," are premised on the assertion that these terms are inherently and unfairly prejudicial. But a term's permissibility must be evaluated in context. *Cf., e.g.*, *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (appropriateness of arguments must be evaluated "within the context of the entire trial"). For this reason, courts typically do not preclude the use of purportedly prejudicial terms if they have some basis in the evidence. *See, e.g.*, *United States v. Runner*, No. 18 Cr. 578 (JS), 2023 WL 3727532, at *5 (E.D.N.Y. May 30, 2023) (denying motion to preclude references to "shell companies" in fraud and money laundering case). Neither the Government nor its witnesses should be precluded from referencing terms that accurately describe certain of the Kwok Enterprise's entities and Kwok's New Jersey residence.

### A. Accurate References to Shell Companies and Related Terms Should Be Permitted

Kwok's and Wang's motions to preclude references to "shell companies" and related terms[18] relies on a single criminal case involving meaningfully different allegations. Kwok MIL at 33-35 (citing *United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013); Wang MIL at 4-5 (citing same case). But a full view of the case law points to a different standard: these terms are presumptively "neutral" and should be permitted where "a factual predicate . . . shows the subject entities are shell companies prior to usage of the descriptive term." *Runner*, 2023 WL 3727532,

---

[18] Kwok's motion also seeks preclusion of the related terms "shell corporation" and "alter ego," Kwok MIL at 33-35, and Wang's motion also seeks preclusion of the related terms "figurehead executives" and "straw owners," Wang MIL at 4-5.

at \*5 (denying similar motion where indictment alleged defendant used various entities to commit fraud and money laundering conspiracies).

Despite Kwok's comparison of these terms to more colloquial slights like "vulture funds," Kwok MIL at 35, "shell corporation" is a common descriptor of a corporate entity that exists solely or primarily to serve the purposes of another person or entity. *See, e.g.*, SHELL CORPORATION, Black's Law Dictionary (11th ed. 2019) (defining the term neutrally as "[a] corporation that has no active business and usu[ally] exists only in name as a vehicle for another company's business operations").  For that reason, "shell corporation" and similar terms often serve a useful explanatory function in cases involving allegations of the transfer and concealment of funds. *See, e.g.*, *United States v. Abdullaev*, 761 F. App'x 78, 83 (2d Cir. 2019) (summary order) (describing trial evidence that witness "served as Director of [a relevant entity's] corporate shell" and observed "how [a relevant entity's] Russian clients used shell companies to pay their invoices"); U.S.S.G. § 2S1.1(b)(3), cmt. n.5 (suggesting consideration of use of "shell corporations" in determining whether to apply "sophisticated laundering" enhancement).  Wang's additional argument—that the terms are "clearly prejudicial as [they] communicate a conclusion to the jury," Wang MIL at 5—misstates the law.  The Federal Rules of Evidence prohibit only *unfairly* prejudicial evidence— and "communicat[ing] a conclusion to the jury" is the very purpose of advocates' arguments and the testimony and evidence they seek to elicit.  *See Old Chief v. United States*, 519 U.S. 172, 180 ("'Unfair prejudice' within its context means an undue tendency to suggest decision *on an improper basis* . . ." (quoting Fed. R. Evid. 403, advisory committee's notes) (emphasis added)); *see also* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

31

Moreover, in *Watts*—Kwok's and Wang's sole cited authority—both the movant's arguments and the Court's ruling suggested that it *would* be appropriate to refer to entities—like Kwok's—that were used "to evade bankruptcy rules and to commit mail and wire fraud" as "shell corporations." *Watts*, 934 F. Supp. 2d at 482 (citing *United States v. Ross*, 77 F.3d 1525, 1535-36 (7th Cir. 1996)); *Watts*, No. 10 Cr. 627 (KAM), Dkt. 610-1 at 19-20 (same). *Watts* involved a comparatively straightforward scheme to obtain loans for companies by falsifying their financial statements. *See United States v. Dupree (Watts)*, 781 F.Supp.2d 115, 121-22 (E.D.N.Y. 2011) (providing background). The structure of the holding company that owned the various debtor companies was irrelevant to the case, and there were no allegations of concealing or promoting the offenses by taking advantage of any features of corporate structure. *Id.* In other words, *Watts*'s decision to preclude references to a "shell company" came in a context where those features of the company were irrelevant to the charges. In stark contrast, the Indictment in this case charges that the defendants "operated the Kwok Enterprise through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities." Indictment ¶ 1. It further alleges that the means and methods of the crimes involved "years-long efforts to obscure the funds used and controlled by KWOK," "mov[ing] funds within the Kwok Enterprise and for the benefit of KWOK, his family, and his associates, by disguising the money movements as 'loans' or 'investments,'" and "install[ing] figurehead executives and/or straw owners at the entities within the Kwok Enterprise, while the entities within the Kwok Enterprise were, in reality, owned and/or controlled by" the defendants." *Id.* ¶ 20. All of this conduct involved taking advantage of the design of entities described accurately as "shell companies," giving the term a factual predicate that was lacking in *Watts*, where those features were irrelevant.

Consistent with the weight of authority, the Court should deny Kwok's and Wang's motions and find that "shell company," "figurehead executives," and similar terms are presumptively neutral and can appropriately be referenced at trial if they are consistent with other evidence in the case. *See, e.g.*, *Wherevertv, Inc. v. Comcast Cable Commc'ns, LLC*, No. 18 Civ. 0529 (WJF) (NPM), 2023 WL 2664200, at *5 (M.D. Fla. Mar. 28, 2023) (denying without prejudice motion to exclude reference to "shell company"); *H&L Farms LLC v. Silicon Ranch Corp.*, No. 21 Cv. 0134 (CDL), 2023 WL 1795705, at *6 (M.D. Ga. Feb. 7, 2023) ("If there is evidence that any of the defendants is a shell corporation . . . then Plaintiffs shall not be precluded from using the term 'shell company.'"); *DNT, LLC v. Sprint Spectrum, LP*, No. 09 Cv. 0021 (JRS), 2010 WL 582164, at *4-5 (E.D. Va. Feb. 12, 2010) (finding "shell company" to be a "neutral term[ ]" and permitting references should the term be "accurate").

### B.  Accurate References to the Mahwah Mansion Should Be Permitted

Kwok's motion to preclude references to the "Mahwah Mansion"—and to require the use of two impracticably lengthy and specific alternatives—should also be denied.  *See* Kwok MIL at 35 (requesting that Court mandate use of "675 Ramapo Valley Road" or "675 Ramapo").  As set forth in greater detail below, the use of the term "mansion" is not unfairly prejudicial.  It has, in fact, been used to describe the residence that Kwok bought for himself and his family in 2021 by Kwok's own media outlet, G News.  That is because the property is, indisputably, a mansion.  Accordingly, there is no basis to preclude the use of an accurate and entirely proper term or to mandate an unwieldy alternative.

Kwok cites no authority for the proposition that "mansion" is an unfairly prejudicial term.  Indeed, courts routinely refer to unusually large residences as "mansions," even in criminal cases proceeding before juries.  *See, e.g.*, *United States v. Al Kasser*, 660 F.3d 108, 115 (2d Cir. 2011)

(referring to trial evidence of the defendant extending an invitation "to his mansion in Spain to further discuss the Nicaraguan arms deal"); *United States v. Trupin*, 119 F. App'x 323, 326 (2d Cir. 2005) (summary order) (referring to trial evidence of the defendant's evasion of taxes owed on "proceeds from the sale of his 63-room, beachfront mansion"); *United States v. Monaco*, 194 F.3d 381, 384-85 (2d Cir. 1999) (referring to trial evidence that defendant "used [his parents'] mansion to meet with his fellow drug traffickers and to store cash, equipment, cars, and his yacht"). And at least one District Court in the Second Circuit has rejected the related argument that "referring to the defendants' home as a 'mansion'" improperly "invoked class bias" and caused "prejudicial and inflammatory" pretrial publicity. *United States v. Sabhnani*, No. 07 Cr. 429 (TCP), 2007 WL 2769487, at *3 (E.D.N.Y. Sept. 21, 2007).

Precluding references to Kwok's Mahwah residence as a "mansion" makes particularly little sense in view of the indisputable fact that the home continues to be referred to by its historical names, which include the "Crocker Mansion" and the "Darlington Mansion." *See, e.g.*, Crocker-McMillin Mansion, Wikipedia, https://en.wikipedia.org/wiki/Crocker-McMillin_Mansion (last accessed April 17, 2024). Even Kwok's own media outlets refer to the residence as a "mansion." After Kwok's arrest on the charges giving rise to this trial, G News[19] referred to the Mahwah property as the former "Darlington Mansion." *See* 乱世天堂：新中国联邦基地, GNEWS, April 11, 2023, available at https://gnews.org/m/1085804 (last accessed April 16, 2024) (reference in English in original).[20] And business records relating to the renovations of the Mahwah Mansion using

---

[19] In an April 2020 G News post by Kwok (under the verified handle "Miles"), summarizing one of Kwok's broadcasts, Kwok states: "Comrades, I'm creating G-TV and G-News for you, is that right?" Kwok also goes on to say, "Everyone sees that we are so busy G-TV, G-News, Wang Yanping and all the employees of our rule of law fund." *See* https://gnews.org/m/1096424.

[20] Moreover, Kwok's agents purchased the Mahwah Mansion in 2021 from its previous owner,

investor funds—which the Government intends to offer as exhibits at trial—similarly refer to the property as the "Crocker Mansion" or a "mansion."

There is no basis to preclude references at trial to one of the Mahwah residence's most commonly used names.  Kwok's motion should be denied.

## VIII.    <u>Hypothetical Questions To Show Materiality Are Proper</u>

The Court should permit the Government to ask hypothetical questions of fact witnesses— such as victim investors or bank representatives—in order to prove the materiality of false and misleading representations and omissions.  *Cf.* Wang MIL at 12-14 (relating to hypothetical questions).

The propriety of such questions is well established.  In *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), the Second Circuit affirmed the use of "what-if-you-had-known" questions in the securities fraud prosecution of two defendants who had schemed to inflate their company's reported earnings. *See id.* at 455-57.  In that case, two accountants testified at trial about "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements."  *Id.* at 456.  The Court held that such testimony "was properly admitted as factual testimony," and "alternatively h[e]ld that it [was] admissible as lay opinion."  *Id.* at 459.  The Court reasoned, where "the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness so testifying is engaged in 'a process of reasoning familiar in everyday life'" and is properly understood as

Crocker Mansion Estate LLC.  *See* Deed, *Despins v. Taurus Fund LLC et al.*, Adv. P. No. 23-05017 (JAM), Dkt. 23-2 at 2 (Bankr. D. Conn. Aug. 23, 2023).

offering lay opinion testimony. *Id.* (quoting Fed. R. Evid. 701, advisory committee's note, 2000

amend.).  At bottom, the Second Circuit concluded that

> a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior. As this case illustrates, 'what-if-you-had-known' questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud.

*Id.*[21]

Accordingly, provided the framework set forth in *Cuti* is followed, this Court should permit

the Government to ask "what-if-you-had-known" questions in order to prove materiality.  *See, e.g.*,

*United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 17076747, at *1, *4 (S.D.N.Y. Nov.

18, 2022) (explaining "well-established legal principles," including that "[w]hen a fact witness is

---

[21] As the Second Circuit noted in *Cuti*, its holding accords with that of other Circuits to have considered the issue.  *See United States v. Musselwhite*, 709 F. App'x 958, 972 (11th Cir. 2017) (not error to "allow[] the bank representatives to testify as to their respective banks' mortgage-approval procedures and to answer hypothetical questions about whether their respective banks would have approved the loans had the banks known that the buyer's income, employment history, assets, earnest money deposit, and cash-to-close were misrepresented"); *United States v. Hill*, 643 F.3d 807, 841-42 (11th Cir. 2011) (rejecting argument that "lender representatives should not have been allowed to testify about what their institutions would have done had they known that several representations in various loan applications were falsified"); *United States v. Orr*, 692 F.3d 1079, 1095-97 (10th Cir. 2012) (affirming propriety of hypothetical question—"Q. What affect, [sic] if any, would it have had upon you if you had been told that all tests done on Mr. Orr's own fuel did not show the advantages disclosed in those documents?"—because the "prosecutor's question went to the material nature of Orr's statements"); *United States v. Laurienti*, 611 F.3d 530, 549-50 (9th Cir. 2010) (affirming propriety of hypothetical question—"If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?"—in order to establish materiality); *United States v. Jennings*, 487 F.3d 564, 581–82 (8th Cir. 2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality, and noting that "[t]he government would be hard pressed to prove this element [*i.e.*, materiality] without asking whether the undisclosed information would have affected the decision maker's analysis."); *United States v. Dukes*, 242 F. App'x 37, 45 (4th Cir. 2007) (affirming propriety of the hypothetical question, "And if he had told you that [fact which was omitted], would that have affected your decision to invest in Financial Warfare Club?").

asked a hypothetical question about facts for which a foundation is laid in the record, and asked as well in answering the question to apply a reasoning process similar to that in which the witness normally engages, such testimony is admissible as testimony from a fact witness or, depending on the question, as lay opinion testimony." (citing *Cuti*)); *see also United States v. Patel*, No. 21 Cr. 220 (VAB), 2023 WL 2643815, at *44 (D. Conn. Mar. 27, 2023) (following *Cuti* and concluding that "the Government may solicit answers to hypothetical questions that fall within this framework and have the proper foundation").

The Government's evidence at trial will lay the factual foundation that the defendants spent investor funds improperly on Kwok's and his family's personal expenses, as described in the Indictment, and that these payments were facilitated and approved by Wang.  Kwok, moreover, made numerous representations to investors that falsely represented how he would use investors' money and misleadingly omitted that he intended to use investor funds for his and his family's personal benefit.  *See, e.g.*, *supra* at 2-3 (Kwok representing to investors: "You can never lose half of your investment in GTV, because every penny you invest must be audited by American legal accountants. *I can't use the money you invested to buy a Japanese meal today*, so I will be arrested directly. The United States will really arrest you. Then you want to . . . *the money invested by the comrades will all be in the comrades' companies . . .*" (emphases added)).  Accordingly, pursuant to *Cuti*, the Government is entitled to ask investors whether, if they had known that Kwok would use investor funds to pay for personal items, they would have invested in GTV and the other investment projects.[22]

---

[22] Just as courts allow co-conspirator statements to be admitted subject to connection with subsequent trial evidence establishing the declarant as a co-conspirator, *see, e.g.*, *United States v. Vidal*, No. 22 Cr. 2857, 2024 WL 397630, at *4 (2d Cir. Feb. 2, 2024) (affirming Judge Cote's

To the extent that Wang's motion is concerned about hypothetical questions that are unconnected to Kwok's false or misleading statements, or that suggest a limitless "open-ended duty to disclose," *see* Wang MIL at 14, the Government does not intend to ask such questions. Accordingly, the Court should permit the Government to ask proper hypothetical questions, and Wang's motion should be denied as moot.

## IX.    Kwok's Motion Regarding Metadata Evidence Is Premature

Kwok's motions include a statement that he "reserves his right to oppose" the introduction of "metadata as evidence." Kwok MIL at 58. He outlines several potential features of metadata, including that it "is not necessarily accurate" and "may also be altered." *Id.* These are, of course, features of virtually all documentary evidence—and the Government similarly reserves its right to oppose the introduction of unauthenticated or altered evidence. But as Kwok's motion also makes clear, metadata can provide relevant and probative information about "who authored [a] document, who accessed [a] document, when the document was first created, when the document was last edited and by whom"—all of which are potentially critical to establishing matters of knowledge and intent that are at the core of a fraud case. Kwok MIL at 58. Indeed, the same Sedona Principles that Kwok cites counsel the production and admission of metadata where it sheds relevant light. *See The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 212 (2018) (metadata often

---

employing such a procedure, over the objections of the defense); *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those . . . prerequisites."); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969) ("[T]he practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection[]' . . . when all the evidence is in."), the Court should permit the Government to pose these hypothetical questions to victims who testify early in this lengthy trial, subject to connection with the evidence establishing that Kwok used investor funds for himself and his family.

necessary to ensure "a fair representation of the file as kept and used in the ordinary course of business"); *id.* at 211 ("Sometimes metadata is needed to authenticate a disputed document or to establish facts material to a dispute . . ."). For this reason, the Court should reject any attempt to classify metadata as categorically suspect evidence and instead should apply the Federal Rules of Evidence to any metadata offered into evidence in the ordinary course at trial. *See, e.g.*, *Sexton v. Lecavalier*, 11 F. Supp. 3d 439, 442 (S.D.N.Y. 2014) ("As the Honorable Shira A. Scheindlin recently observed, e-mails may contain metadata with a significant amount of evidentiary value") (Torres, J.) (citing *Sekisui Am. Corp. v. Hart,* 945 F. Supp. 2d 494, 506 n.71 (S.D.N.Y.2013)); *United States v. Shea*, No. 20 Cr. 412 (AT), 2022 WL 1598189, at *2 (S.D.N.Y. May 20, 2022) (approving parties' agreement to present testimony "on the metadata associated with certain documents"); *see also, e.g.*, *Swearngin v. Rowell*, 846 S.E.2d 263, 266-67 (Ga. Ct. App. 2020) (arguments about metadata's potential for manipulation "went to the weight to be given the evidence rather than its admissibility").

Kwok's metadata motion *in limine* should accordingly be denied as premature.

## X.    **Kwok's Motion To Exclude Evidence Regarding ████████████ Is Moot**

The Government does not intend to offer evidence regarding ████████████

████. Accordingly, Kwok's motion to preclude this evidence should be denied as moot. *See* Kwok MIL at 30-33.

## XI.    **Professor Shams's Testimony Is Admissible**

For the reasons explained below, Kwok's motion to exclude the testimony of Professor Amin Shams should be denied. *See* Kwok MIL at 38-57.

Professor Amin Shams holds a Ph.D. from the University of Texas and is currently an Assistant Professor at The Ohio State University, Fisher College of Business. At Ohio State, Prof.

Shams teaches courses in Financial Technology (commonly known as "FinTech") including Blockchain and Machine Learning in Finance Research. Through his vast experience, Prof. Shams has acquired specialized knowledge regarding cryptocurrencies. Prof. Shams performed a series of analyses on the Himalaya Dollar ("HDO") and Himalaya Coin ("HCN"). Based on those analyses, Prof. Shams seeks to offer at trial opinions that "will assist the jury" in determining facts at issue—namely, whether HCN and HDO are actual cryptocurrencies. *United States v. Mostafa*, No. 04 Cr. 356 (KBF), 2014 WL 1744717, at *2 (S.D.N.Y. Apr. 23, 2014) (quoting *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir.1993)).

A fundamental issue at this trial will be whether HCN (a purportedly variably priced cryptocurrency), HDO (a purported stablecoin), and the Himalaya Exchange are fraudulent. The Government is permitted to meet that issue with expert analysis and opinions that assist the jury in understanding evidence that requires specialized knowledge. Prof. Shams used his specialized knowledge in the field of cryptocurrencies to analyze, through rigorous objective analyses, HCN and HDO, and will offer the jury a series of opinions about whether HCN and HDO behaved like cryptocurrencies or have features common among true cryptocurrencies.

Kwok's quibbles with Prof. Shams mostly go to the weight of his testimony and not its admissibility. To the extent that Kwok disagrees with Prof. Shams, his counsel will be able to test Prof. Shams's conclusions, and analyses, through rigorous cross-examination. Ultimately, it will be for the jury to determine what, if any, weight to assign to Prof. Shams's opinions and analyses. As relevant here, Kwok offers no legal basis to exclude his testimony.

### A. Professor Shams's Disclosure

Prof. Shams's detailed disclosure, the sufficiency of which Kwok does not challenge, outlines the topics of his testimony, explains the analyses he performed and the methodology he

applied, and details his opinions.  At a high level, Prof. Shams analyzed HCN and HDO.  Kwok MIL, Ex. D ("Shams Disclosure") at 1.  Specifically, Prof. Shams tested whether HCN and HDO behave like cryptocurrencies, have features consistent with cryptocurrencies, and, with respect to HDO, are collateralized in a manner consistent with other stablecoins.  Prof. Shams's disclosure separates his proposed testimony into six parts, as well as an overall conclusion, which are discussed in turn.  Shams Disclosure at 2.

First, Shams intends to provide the jury a brief background about cryptocurrencies generally.  This information is based on Prof. Shams experience and research, and constitutes information that is outside the knowledge base of an average juror.  For example, while some jurors may have heard about Bitcoin and cryptocurrencies in general, few will have an understanding about what a cryptocurrency is—how blockchain technology works, how cryptocurrencies are managed in a decentralized fashion, what "smart contracts" are, and what stablecoins are.  Shams Disclosure at 4-9.  This background information provides the jury information necessary to understand Prof. Shams's analyses, as well as to understand cryptocurrency generally.

Second, Prof. Shams performed a rigorous, and objective, analysis on HCN's market capitalization and trading volume, and compared HCN's behavior to the cryptocurrency market to determine if HCN acts like other cryptocurrencies.  Shams Disclosure at 14-16; *id.* at 15 (describing "Methodology").  Next, Prof. Shams relied on public data related to other tokens[23]— the sort of data commonly used in this field—to  compare HCN's pricing, volume, and market capitalization to those other similar tokens.  Shams Disclosure at 21-22.  Prof. Shams explained

_____

[23] As relevant here, exchange tokens are a type of cryptocurrency issued by a cryptocurrency exchange.

he chose certain tokens as benchmarks to compare against HCN because those tokens where the "top centralized exchange tokens"—that is, they were tokens similarly situated to what HCN purports to be. Shams Disclosure at 15. Prof. Shams then analyzed HCN's market capitalization over time, and concluded its average market capitalization was $32 billion, with an average daily trading volume of $4.1 million. Shams Disclosure at 23. Prof. Shams then compared those averages to other benchmarks. Based on that benchmark comparison, Prof. Shams opined that HCN's price, daily trading volume and market capitalization were highly dissimilar to the benchmarks. Shams Disclosure at 24 ("The trading volume of HCN does not appear to align with the size of its market cap."). Prof. Shams further offers that HCN's large market capitalization ($32 billion) is "unproportional" to its trading volume. *Id.*

Third, Prof. Shams examined HCN's price movements compared to the broader cryptocurrency market. Shams Disclosure at 25. Prof. Shams explained that research in the field has concluded that cryptocurrency prices are correlated with the price of Bitcoin. Shams Disclosure at 26 ("Academic literature on cryptocurrencies show that the returns of cryptocurrencies are positively correlated . . . . Cryptocurrency prices typically moves in the same direction as Bitcoin" (citing published studies)). Prof. Shams then tested that hypothesis on HCN. As he explains in his "Methodology" section, Prof. Shams analyzed the "correlation coefficient and coefficient of determination (adjusted R2, or $R^2$) between HCN and various market indices[, which] are [then] compared with 100 similarly-sized tokens."[24] Shams Disclosure at 27-28.

---

[24] Prof. Shams explained why those tokens were selected as a benchmark for his analysis: "The 100 similarly-sized tokens are selected based on having the closest market cap to HCN on November 2, 2021, not being a stablecoin, and having a non-zero market cap at the beginning and end of the sample period (November 2, 2021 – March 14, 2023)." Shams Disclosure at 27.

$R^2$ analysis is a common statistical test that examines the proportion of the variation of one variable compared to a baseline.  *See* Shams Disclosure at 27-29.  After performing these objective tests, *see* Shams Disclosure 29-35, Prof. Shams concluded that unlike the pricing of the overall cryptocurrency market, "HCN's price movements are relatively independent of the broader market trends."  Shams Disclosure at 29.  Indeed, Prof. Shams concluded that HCN's price has a very low correlation to Bitcoin's price as well as Ethereum's price (which is another highly popular cryptocurrency).  Shams Disclosure at 29-34.  Thus, Prof. Shams opines that HCN's price behavior does not behave like real cryptocurrencies.  *See* Shams Disclosure at 32 ("virtually none of HCN's price movement is explained by BTC price movements"); *id.* at 34 ("contrast to the returns of cryptocurrencies being largely explained by ETH returns, virtually none of HCN's price movement is explained by ETH price movements").  "This suggests that HCN's price was disconnected from the price of cryptocurrencies," which is contrary to how cryptocurrencies behave based on academic research Prof. Shams cited.  Shams Disclosure at 36.[25]

Fourth, Prof. Shams analyzed HCN and HDO's concertation of ownership.  By way of background, cryptocurrencies track their transaction history, and individual coin/token ownership, on a public blockchain.  In this way, true cryptocurrencies are "decentralized" and are not subject to the whims of a single governing body.  Prof. Shams explains in his "Methodology" that he reviewed the "'on-chain' transactions" of HCN and HDO based on public blockchain records.  Shams Disclosure at 38.  Prof. Shams then compared the HCN/HDO on-chain transactions to

---

[25] Prof. Shams also provided an example of the highly abnormal price behavior of HCN.  Prof. Shams examined the May 9, 2022 TerraUSD stable coin crash, which generally sent cryptocurrencies prices down market wide.  However, HCN's price during that time "was virtually unchanged," which Prof. Shams opined is further evidence that "HCN's price behavior differed from cryptocurrencies and appeared disconnected from market forces."  Shams Disclosure at 35.

Bitcoin, Ethereum, and "other benchmark cryptocurrencies selected because they are tokens associated with cryptocurrency exchanges."[26]  *Id.*

After reviewing the public blockchains of HCN and HDO, Prof. Shams opined that from November 2, 2021 through March 14, 2023,[27] HCN and HDO had 206 and 251 on-chain transactions, respectively.  Shams Disclosure at 39-40.  The top 5 (for HCN) and top 8 (for HDO) transactions account for more than 99.9999% of all tokens transferred.  *Id.*  Further, Prof. Shams opined that the top owner of HCN owns 99.9994% of all HCN, and there are only 12 total holders of the token.  Shams Disclosure at 46.  There are only 16 holders of HDO and 99.999997% of the supply is held by one owner.  Shams Disclosure at 47.  A comparison to the benchmark cryptocurrencies shows that these metrics are highly irregular.  *See* Shams Disclosure at 54.  Prof. Shams analyzed the results of this analysis and opined that these metrics are not typical of cryptocurrencies.  *See* Shams Disclosure at 55.

Fifth, Prof. Shams analyzed the software code in HCN and HDO's underlying "smart contracts."  That is, Prof. Shams used his specialized knowledge to review and analyze the software that governs how HCN and HDO operate on the internet.  Shams Disclosure at 57-58 ("HCN's implementation [smart] contract consists of 14 files, written in the solidity programming language.").  Based on his review of the coding language, Prof. Shams opined that HCN's and HDO's smart contract is "mutable, meaning someone could change the underlying code."  Shams Disclosure at 61.  This mutability is inconsistent with other cryptocurrency exchange-associated

---

[26] HCN and HDO, like the benchmarks, are associated with a cryptocurrency exchange—the Himalaya Exchange.

[27] This is the relevant time range for all analyses conducted by Prof. Shams and runs from the establishment of HCN/HDO and to the day before this criminal case was unsealed.

tokens.  *Id*.  Prof. Shams opined that these mutability features provide additional information that demonstrates HCN and HDO are not like cryptocurrencies because cryptocurrencies are "decentralized [to] ensure[ ] that no single entity can dominate or has control over the data or the network, making it resistant to censorship, collusion, and single points of failure."  Shams Disclosure at 4; *see id.* at 61.

Sixth, Prof. Shams objectively analyzed HDO's purported reserves.  By way of background, HDO purports to be a "stablecoin" which requires a reserve or some kind of asset backing.  As Prof. Shams explained, "[r]eserves are crucial for a stablecoin because they serve as collateral or backing, ensuring that [its] holders can redeem their stablecoins for the underlying asset at any time which maintains stability." [28]  Shams Disclosure at 67.[29]  Prof. Shams reviewed an audit by Armanino, which the Himalaya Exchange had previously trumpeted, and which alleged that the Himalaya Exchange held $401 million in reserves for HDO.  Prof. Shams opines that the $401 million reserves are insufficient.  Shams Disclosure at 69.  This is because at the time of the audit, there were $1.5 billion HDO that had been issued.  *Id*.  Further, Prof. Shams opines that based on his review he was unable to locate any evidence that HDO was backed by gold, which is

---

[28] Indeed, as the Indictment alleges, Kwok trumpeted that HDO was backed by gold.  *See* Indictment ¶ 19(a)(i) ("[I]t has the attribute of currency, why?  It has 20% gold.  Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."); ¶ 19(a)(ii) ("If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours.").

[29] Prof. Shams notes that in the cryptocurrency field, the co-mingling of reserves with operational assets has been an indicator of fraud, citing to the FTX case and the NYS Attorney General's investigation of USDT.  The Government does not intend to elicit testimony about FTX or the USDT investigation from Prof. Shams.  These examples were included in Prof. Shams's disclosure to provide a full accounting of information known to, and relied upon by, individuals in his field and by Prof. Shams in carrying out his analysis.

something Kwok claimed on several occasions.  *Id.*

Finally, Prof. Shams synthesizes these separate analyses to offer opinions about whether HCN and HDO behave like typical cryptocurrencies.  Prof. Shams concludes that they do not. Shams Disclosure at 73 ("Summary of Conclusions").  That is, Prof. Shams uses his specialized knowledge in the FinTech field to conduct several reliable and testable analyses on HCN and HDO.  Based on those analyses, Prof. Shams offers several opinions, including that HCN and HDO do not behave like, or have features consistent with, cryptocurrencies.  *Id.*  These analyses and opinions will assist lay jurors as they assess whether HCN and HDO were cryptocurrencies or merely a component of the defendants' fraud.

### B.  Applicable Law

Under Rule 702, where "specialized knowledge will help the trier of fact," an expert witness may give opinion testimony if "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party proffering expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the expert testimony is admissible. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); Fed. R. Evid. 702 advisory committee notes (2000). The trial court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*, 509 U.S. 579, 597 (1993); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597.  To determine whether the expert testimony is reliable, "the district court should consider the indicia of reliability identified in Rule 702." *Amorgianos*, 303 F.3d at 265. Specifically, the district court "must focus on the principles and methodology

46

employed by the expert, without regard to the conclusions the expert has reached." *Id.* at 266.

To assess whether expert testimony is relevant, the district court must consider whether the evidence has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 265.

### C. Argument

In seeking to preclude Prof. Shams' testimony, Kwok attacks its relevance, the methods Prof. Shams employed, and raises Rule 403 issues. All of Kwok's arguments should be rejected. Indeed, most are premised on a mistaken premise that Prof. Shams proposed testimony "fails to provide expert opinions," and offers only "factual statements or observations" that are "not relevant." Kwok MIL at 43. For the reasons that follow, Kwok is mistaken.

1. <u>Professor Shams's Testimony Is Admissible Expert Opinion</u>

Kwok's first attack against Prof. Shams is that his testimony is not an expert opinion at all. Kwok MIL at 43. In making this argument Kwok picks at certain components of Prof. Shams analyses to manufacture a concept that Prof. Shams "provides merely a series of fact statements." *Id.* At best, Kwok has missed the proverbial forest for the trees. As recounted above, and as detailed in the Shams Disclosure, Prof. Shams used his specialized knowledge to conduct, based on facts and data, reliable analyses about which Prof. Shams offered opinions.

a. <u>Prof. Shams's Opinions Regarding HCN's Market Capitalization and Price Movements Are Admissible</u>

To start, Kwok asserts that Prof. Shamss' analysis of HCN's market capitalization as a ratio to its trading volume is not an opinion. Kwok MIL at 43. Kwok ignores that analyzing market capitalization for cryptocurrencies, as an average over time, and as compared to its trading volume, requires specialized knowledge that average jurors do not possess, but assists their consideration

of the evidence.  *See Jacobs v. Verizon Commc'ns Inc.*, No. 16. Cv. 1082 (PGG) (RWL), 2023
WL 3027311, at *18 (S.D.N.Y. Apr. 20, 2023) (permitting expert testimony where "the underlying
facts concerning the [] Fund's performance will be before the factfinder, [the expert] summarizes
what the different metrics show when applied to the facts . . . and would thus be helpful to the
factfinder"); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp.
2d 482, 504 (S.D.N.Y. 2009) ("Expert witnesses provide laymen with crucial knowledge where
the common experience of such jurors is insufficient to comprehend particular facts of a case.").
The market capitalization analysis is itself admissible.  But, more to the point, and contrary to
Kwok's claim, Prof. Shams uses the results of the market capitalization analysis to offer an
opinion:  "The trading volume of HCN does not appear to align with the size of its market cap."
Shams Disclosure at 24 (listing opinions based on the market capitalization analysis).  That is
surely an opinion, and one that assists jurors in assessing whether HCN is a legitimate
cryptocurrency.[30]

The remainder of Kwok's arguments about Prof. Shams's market capitalization opinions
and his opinions regarding HCN's pricing do not make sense.  He complains Prof. Shams "does
not indicate that he will testify or explain why a supposedly low 'Market Cap Ratio' matters."
Kwok MIL at 44.  And that Prof. Shams does not explain what is "unusual" about HCN's lack of
correlation to an index of 100 similarly-sized tokens.  Kwok MIL at 45.  But Prof. Shams explains

---

[30] To the extent that Kwok is complaining that an expert cannot testify about the *facts* upon which
they relied to render their opinions, such an argument is nonsensical, and contrary to the law.  *See*
Fed. R. Evid. 703 (permitting experts  to base their opinions on any facts or data "of a type
reasonably relied upon by experts in the particular field"); *U.S. Bank Nat. Ass'n v. PHL Variable
Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (holding that an expert  "is permitted to
rely on facts, opinions, and data not of the expert's own making—including analyses performed
or findings made by another expert in the case—even if those facts, opinions, and data are
otherwise inadmissible").

both these things. His disclosure notes that there is a "strong positive relationship found in academic research between cryptocurrencies and Bitcoin [and the] aggregate crypto market." Shams Disclosure at 36; *id.* at 26 ("Academic literature on cryptocurrencies show that the returns of cryptocurrencies are positively correlated"). However, HCN's price movements, combined with other observations such as its trading volume, indicate that "the price and market cap of HCN do not seem realistic according to market forces." Shams Disclosure at 74. That is, HCN's low market capitalization ratio, in Prof. Shams's opinion, indicates HCN does not behave like a typical, legitimate cryptocurrency. Similarly, Prof. Shams conducts a rigorous $R^2$ analysis to assess the correlation between HCN and 100 similarly-sized tokens. Based on that testing, Prof. Shams concludes that HCN has a low correlation to Bitcoin and cryptocurrency prices, generally. Shams Disclosure at 29-35. He further opines that HCN's lack of correlation to Bitcoin pricing is "unusual" and "suggests that HCN's price was disconnected from the price of cryptocurrencies traded." Shams Disclosure at 36. That is, HCN's price behavior does not perform like typical cryptocurrencies do, which is relevant to the question whether HCN is a cryptocurrency.[31]

---

[31] Kwok also attacks the relevance of these analyses, in part, by arguing that Prof. Shams's testimony pertains to things that the Indictment did not allege, such as price manipulation. Kwok MIL at 55. The Government is not limited at trial to the allegations in the Indictment. *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) ("[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment" (quotation omitted)); *United States v. LaSpina*, 299 F.3d 165, 182 (2d Cir. 2002) ("the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." (quotation omitted)). But, even if the Government were so limited, that HCN's price is not subject to market forces surely is relevant to the question of whether it is a real cryptocurrency, because pricing of real cryptocurrencies are highly correlated to cryptocurrency market movements. As this Court has written, "the bar for relevance is 'low,' and [expert] testimony [that offers] 'specialized knowledge that will help the jury determine a fact at issue in the case'" is admissible. *Ripple Labs*, 2023 WL 5670711, at *18 (S.D.N.Y. Mar. 6, 2023) (quoting *United States v. Jones*, No. 16 Cr. 553, 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018)). Prof. Shams's reliable, objective, and testable analyses demonstrate that HCN's pricing is divorced from broader economic forces; those analyses

The market capitalization analysis and price analysis are not, as Kwok wishes, a "recit[itation] [of] a factual narrative[.]" Instead, they are rigorous, objective, analyses based on an accepted thesis (that cryptocurrencies prices are correlated to Bitcoin), and from which Prof. Shams offers opinions that are helpful to the triers of fact.[32]

      b.   Prof. Shams's Analyses and Opinions about the HCN and HDO Blockchains Are Admissible.

Kwok next attacks Prof. Shams's analysis of the HCN and HDO blockchains claiming that they are just "technical observations" from a public record. Kwok MIL at 46-47. Here too, Kwok misses that Prof. Shams's analysis of the HDO and HCN blockchain data was used by Prof. Shams to form an opinion that "HCN and HDO demonstrate significantly lower on-chain activity" than

---

clear this low relevance bar. *See Amorgianos*, 303 F.3d at 266 (expert testimony relevant if it has "evidence has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable"); *see also Ripple Labs*, 2023 WL 5670711, at *17 (opinion may be relevant even if it is "not [] dispositive of the core legal issue in this case").

[32] Kwok also objects to the benchmarks Shams selected. "Experts often use benchmarks as a comparison for evidence under examination." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 84 (S.D.N.Y. 2017). That Prof. Shams did so here is not remarkable. Indeed, Prof. Shams explained in his disclosure how the benchmarks were selected. *See* Shams Disclosure at 15 ("top centralized exchange tokens based on market cap on 3/14/2023, according to Cornmarket"); *id. at* 27 ("100 similarly-sized tokens are selected based on having the closest market cap to HCN on November 2, 2021, not being a stablecoin, and having a non-zero market cap at the beginning and end of the sample period (November 2, 2021 – March 14, 2023); *id.* at 38 ("benchmark cryptocurrencies selected because they are tokens associated with cryptocurrency exchanges"). It is wrong for Kwok to claim Prof. Shams selection of benchmarks was "anecdotal." Kwok MIL at 43-44. Kwok is, of course, free to disagree with the benchmarks Prof. Shams chose, and can cross-examine Prof. Shams about those choices, but Kwok offers no reason to exclude Prof. Shams on this basis. *See Gem Fin. Serv., Inc. v. City of New York*, No. 13 Civ. 1686 (RPK) (RER), 2023 WL 4850523, at *12 (E.D.N.Y. July 28, 2023) ("disputes about the comparability of the yardsticks [expert] used go to weight, not admissibility"); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 117 Civ. 00598 (BKS) (CFH), 2021 WL 2403107, at *7 (N.D.N.Y. June 11, 2021) ("the usual rule [is] that comparability questions are issues of weight, rather than admissibility") (collecting cases).

applicable benchmarks.    Shams Disclosure at 55; *id*. (comparing HCN/HDO blockchain information to benchmarks).  Thus, the blockchain analysis reveals an opinion, but even if that were not the case, jurors do not have the specialized knowledge necessary for them to review the HCN/HDO blockchain and understand what it means, thus a technical analysis of the blockchains is admissible. Fed. R. Evid. 702(a) (permitting expert to offer "technical . . . knowledge"); *cf. United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (a "district court should not admit testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'").

c.  Prof. Shams's Analyses about the HCN and HDO Smart Contracts Are Admissible.

An expert is permitted to analyze the features of HCN and HDO, and particularly their underlying software code, to make assessments about those features and convey opinions about the same to the jury.  *See Ripple Labs*, 2023 WL 5670711, at *4 (permitting an expert to "opine on the design features of [digital assets and their components] XRP, the XRP Ledger, and ODL"). And, of course, a lay juror cannot be expected to read and understand the software code of HCN or HDO smart contracts, thus Prof. Shams's technical analysis of it is appropriately admissible. So too, is Prof. Shams's opinion that HCN and HDO differ from other similarly situated tokens in that their smart contracts are mutable.  *See* Shams Disclosure at 61 ("This is unlike typical exchange tokens, which are often immutable").   Again, at most, Kwok disagrees with the benchmark Prof. Shams used to compare HCN and HDO.  *United States v. Romano*, 859 F. Supp. 2d 445, 458 (E.D.N.Y. 2012), *aff'd*, 794 F.3d 317 (2d Cir. 2015) (permitting expert to testify where opinion relies on "well-established industry standards, publications and market trends" even if opinion has a "subjective component").   Kwok's disagreement is appropriate for cross-examination.  If there are similarly situated tokens that have mutable smart contracts, that can be

tested through cross-examination, not preclusion. *See Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) ("while the evidence underlying [expert's] Yardstick Analysis [a form of benchmarking and comparison] may, in defendant's view, be thin, questionable, or self-servingly selective, our role as gatekeeper is not to divest defendant of the task of challenging the weight of such evidence before the trier of fact.").

Kwok next asserts that Prof. Shams relied "simply [on] his word" that typical cryptocurrencies ownership is diversified—whereas HCN and HDO are held by a single entity. Kwok MIL at 49. This argument ignores analysis that Prof. Shams performed. *See* Shams Disclosure 39-54. Prof. Shams assessed HCN/HDO ownership concentrations as compared to other similar tokens to show, objectively, that HCN and HDO ownership concentrations are atypical. (Shams Disclosure 39-54.) Moreover, Prof. Shams is able to opine that HCN and HDO's ownership concentration (which he analyzed to be greater than 99.999%) is a stark outlier compared to the broad cryptocurrency about which Prof. Shams has significantly studied. This kind of assessment is appropriate and admissible expert testimony. *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (When an expert "bases his testimony on practical experience rather than scientific analysis, courts recognize that experts of all kinds tie observations to conclusions through the use of . . . general truths derived from specialized experience.") (alterations and internal quotation marks omitted). Kwok is also wrong to fault Prof. Shams for opining that such highly concentrated ownership "departs from the decentralized nature of blockchain." Kwok MIL at 50 (citing Shams Disclosure at 64). That HCN and HDO are more than 99.999% owned by a single entity is a unique factor unlike any of the benchmarks Prof. Shams analyzed, Prof. Shams is allowed under Rule 702 to offer an opinion about the import of the highly concentrated ownership. Thius is especially the case because that

opinion helps to inform Prof. Shams's overall conclusions about whether HCN and HDO are like real cryptocurrencies.  Shams Disclosure 73-74.  Once again, if Kwok wishes to question or undermine Prof. Shams's opinion that a 99.999% ownership concertation is atypical of other cryptocurrencies, that is appropriately a subject for cross-examination.  *United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020) (affirming trial court which concluded that questions about "underlying assumptions" regarding a DNA tool were "best heard by a jury, which may accordingly adjust the weight it gives such evidence").

Kwok's arguments that Prof. Shams cannot analyze the features, or lack of features, offered by HCN and HDO is also wrong.  Kwok MIL at 50.  There is nothing improper about such testimony.  *See In re Celsius Network LLC*, 655 B.R. 301, 310 (Bankr. S.D.N.Y. 2023) (admitting expert testimony on value of cryptocurrency which "had no intrinsic value").  Further, the lack of features and innovative technology of HCN and HDO informed Prof. Shams' opinions about the abnormal price behavior of HCN.  Prof. Shams will not offer testimony during trial that the mutability of the HCN/HDO smart contracts *will* lead to investor losses, *see* Kwok MIL at 51; rather, he is simply opining that this feature means HCN and HDO are ultimately controlled by a single entity—the Himalaya Exchange—and that should undermine its value rather than cause it to spike.[33]

    2.  <u>Professor Shams's Testimony Is Reliable</u>

Kwok next contends that Prof. Shams overall approach is not reliable.  Kwok is wrong.  In

---

[33] At trial, the Government will not elicit testimony from Prof. Shams comparing HCN/HDO to other fraudulent cryptocurrencies, unless the defense opens the door to such testimony. Comparisons to Squid Game and CP3R are included in the disclosure to demonstrate that Prof. Shams' view of smart contract mutability is not speculative and is, instead, based on documented occurrences.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court must determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93; *see also United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995). Courts should view challenged expert testimony consistent with the "with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. Even "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Id.* Indeed, a court "should not exclude evidence simply because [a district court] thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994).

Professor Shams' analyses are each reliable, objective, and testable.[34] The reliability of Prof. Shams's methodology is supported by the analyses themselves—his benchmarks offer sufficient support to demonstrate that HCN/HDO are very different than cryptocurrencies, and that information is helpful to a lay juror. Prof. Shams compared HCN's market capitalization and trade volume to other similar tokens—HCN was an outlier. Next, Prof. Shams compared HCN's price movements to the broader cryptocurrency market—HCN was an outlier. Then, Professor Shams analyzed transaction volume and ownership concentration on the HCN and HDO blockchains and compared it to other exchange tokens—HCN and HDO were outliers. Prof. Shams also analyzed

---

[34] Kwok is free to run the analyses himself, as the Government provided the defendants all of the underlying data Prof. Shams used to form his opinions.

the software code governing HCN and HDO, and compared their features to similarly situated tokens—again, HCN and HDO were outliers.   Thus, these analyses are several different comparisons between HCN and HDO, on the one hand, and other comparable digital assets, on the other.  Each time, HCN and HDO were unusual and not like real cryptocurrencies.

    3.  <u>Professor Shams's Testimony About HDO's Reserves Is Admissible</u>

 Kwok suggests that Prof. Shams should not be able to testify about HDO's reserves.  Kwok complains that Prof. Shams's opinion on this issue is improperly based on hearsay because Prof. Shams analyzed HDO's whitepaper.  But HDO's whitepaper is a statement of Kwok's agents and co-conspirators, and thus is not hearsay.  *See* Gov't MIL at 2-11; *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("Expert testimony . . . admissible where it 'synthesizes' or 'summarizes' data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion." (alterations and quotation omitted)).  Kwok also complains that Prof. Shams should not be able to offer an opinion about what the data does *not* show—specifically, that he observed no evidence of gold backing HDO.  *See* Kwok MIL at 54.  But Rule 702 does not preclude experts from offering opinions about theses the evidence does *not* support.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 247 (E.D.N.Y. 2022) (permitting expert to opinion about what the "evidence does not show" if within his expertise).  Again, if Kwok seeks to call into question Prof. Shams's opinion—for example if he believes there is evidence that gold backs HDO—then he is free to test Prof. Shams's opinion on this subject through vigorous cross-examination.

    Finally, Kwok argues, as a Rule 403 matter, that Prof. Shams's comparison of the features of HCN and HDO to other tokens, which lack technological advancements or marketability, should be excluded as unduly prejudicial.  Kwok MIL at 55-56.  These comparisons are not unduly

prejudicial.  They appropriately contextualize HCN and HDO and offer a further explanation as to why HCN's pricing and market capitalization do not suggest that HCN and HDO behave like a typical cryptocurrency.

## XII.    **The Government Is in Compliance with Its *Brady* Obligations**

Kwok seeks an order for the Government to disclose any "orally communicated" *Brady* material in its possession.  The Government recognizes, and takes seriously, its obligations under *Brady*.  To the extent that the Government has identified *Brady*, or otherwise disclosable material, the Government has disclosed it.  This includes statements that were orally communicated—which the Government has disclosed to defense counsel via letters or by producing notes of those statements.  As a result, Kwok's request for an order compelling production of *Brady* that was orally communicated should be denied as moot.  *See, e.g.*, *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *9 (S.D.N.Y. May 22, 2018) ("The Government's good faith representations of its continuing compliance with its *Brady* disclosure obligations is sufficient.").

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny the defendants' motions *in limine* and grant the Government's motions *in limine*.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/
    Micah F. Fergenson
    Ryan B. Finkel
    Justin Horton
    Juliana N. Murray
    Assistant United States Attorneys
    (212) 637-2190 / 6612 / 2276 / 2314


Dated: April 17, 2024
      New York, New York