

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 1, 2024

**VIA ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *United States v. Guo, et al.*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

      The Government writes in response to defendant Yvette Wang's April 28, 2024 letter motion, which seeks to reconsider the Court's pretrial scheduling order. Wang's motion should be denied.

      A.   <u>The Government's Trial Exhibits</u>

      Pursuant to the Court's pretrial scheduling order, on April 22, 2024, the Government produced trial exhibits. In total, the Government produced approximately 14,800 exhibits, which represents a small portion of the materials that the Government produced in Rule 16 discovery. Wang's assertion that the Government's exhibit production was a "document dump" is a mischaracterization that ignores the realities of this matter. The Government's trial exhibit production is appropriate for a case of this scale. Guo and Wang perpetrated a complicated fraud, which spanned more than five years, and has given rise to a thirteen-count indictment that charges the defendants with participating in a vast RICO conspiracy comprised of various interlocking frauds, which collectively defrauded more than 1,000 victims out of more than $1 billion. To execute their crimes, Guo and Wang established, or used, at least 43 separate entities and relied upon dozens upon dozens, if not hundreds, of individuals. (Ind. ¶ 1 ("[GUO], JE, WANG, and their co-conspirators operated the G Enterprise through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds").) Naturally, for the Government to meet its burden of proof on a crime of this scope, a voluminous number of exhibits is to be expected.

      To facilitate the defendants' review, the Government's exhibits were produced in an organized fashion. The exhibits are separated into folders, and each folder clearly identifies for the defense the provenance of the materials in that folder. For example, exhibits from cellphones are named with the FBI evidence ID number that has been used to identify devices since the beginning of this case. Many of the exhibits have other identifiers in their file names, including, often, the Bates number assigned by the Government, or the Bates number assigned by the party that produced the materials to the Government. Finally, the Government will provide the defense

an exhibit list later this week, and the Government is, as always, available to answer questions for the defense about its exhibits.

1. *The Volume of the Government's Trial Exhibits*

Despite Wang's complaints, there is nothing remarkable about the number of exhibits the Government produced—the overwhelming majority of which have been in the defendants' possession for many months.[1] And while the Government did produce approximately 14,800 exhibits, Wang's motion omits additional context crucial to understanding the appropriateness of the Government's production. To begin, approximately 4,200 exhibits—approximately 30% of the overall exhibits—are bank records from the "more than approximately 500 [bank] accounts held in the names of at least 80 different entities or individuals, including entities that are part of the G Enterprise." (Ind. ¶ 4.) This includes bank statements, opening bank documentation, and wire transfer information. These exhibits are necessary to demonstrate the defendants' use of victim funds—specifically how money was sent from the victims then through an intricate, and intentionally complex, series of transfers into the defendants' and their co-conspirators' pockets. It was not the Government that decided to use more than 500 bank accounts and dozens of entities to carry out this fraud. That decision was made by the defendants and their co-conspirators. Proving this flow of victim funds—the use of fraud proceeds to purchase luxury items—is an important component of the Government's evidence at trial. Moreover, the Government intends to introduce these voluminous bank records in an efficient manner at trial: through summary exhibits that succinctly explain these records for the jury. However, to do so, the Government necessarily must mark the underlying bank records as trial exhibits.

Another approximately 2,400 of the marked exhibits are invoices, emails, and records documenting the exorbitant furnishings Guo selected for his family's Mahwah Mansion. The defendants have suggested that the Mahwah Mansion was a secret "facility" purchased to fight the Chinese communist party. The Government intends to show that the millions of dollars' worth of gratuitous furnishings, most of which Guo personally selected—including, for example, $300,000 worth of fine rugs—are plainly inconsistent with that purpose and, instead, show that the defendant misappropriated victim funds for his personal benefit. (*See* GXSB616.) The Government does not expect to separately display or discuss each of these invoices at trial and may introduce them through a summary witness, but doing so requires each of the underlying records to be introduced. The foregoing categories of bank records and records related to Mahwah, constitute nearly half of the Government's exhibit production.

The Government has also marked hundreds of exhibits from the various businesses that make up the G Enterprise, including a total of approximately 1,900 exhibits from G|CLUBS, Saraca Media (the parent of GTV), Gettr (Guo's social media company), and various "Farms" (collectives run by Guo, which collected victim money). These exhibits include purported "loan" agreements, documentation evidencing transfers of fraudulent proceeds, and communications involving, or made at the direction of, Guo and Wang. Again, it was not the Government's decision to enact a fraud on a grand scale that relied on the operation of multiple businesses, with

---

[1] By contrast, and as further explained below, the defendants have not produced a single document pursuant to their Rule 16 obligations, even though the defendants predict a two-week defense case.

different employees and documentation. But, given that Guo and Wang decided to do so, the Government must prove the existence of the scheme, and the fraud carried out, at trial.

Approximately 1,000 exhibits comprise data extracted from cellphones, USB drives, and laptops. But that count overstates the volume of material in this category. For example, a single chat thread may contain dozens of exhibits, because the chat participants send each other photographs (each a separately marked exhibit) and voice messages (each separately marked). Further, may of the phone extractions are accompanied by language translations, which create a need for a further exhibit, essentially creating a double count. Hundreds of other exhibits are derived from various "businesses" that the G Enterprise interacted with when spending the fraud proceeds, including luxury car dealerships, a hedge fund, a recruiting agency, and a payroll provider. Finally, hundreds of other exhibits include, appropriately, videos and statements of Miles Guo lying to victims to induce them to provide money. Again, each time a recording or statement is in Mandarin, a second exhibit is needed for a translation.

While the Government will not seek to publish every marked exhibit at trial—as to several categories of exhibits, the Government intends to summarize and consolidate them in the form of summary charts, both to assist the jury in comprehending the information and for the sake of efficiency—the Government's exhibit production is a good faith assessment of the exhibits that it intends to introduce at trial. To the extent the Government narrows its exhibits, it will inform the defense. Given the complexities of the defendants' fraud enterprise, the Government's exhibit production is appropriate, and it cannot be arbitrarily limited simply because Wang requests as much. *See United States v. Menendez, et al.*, No. S4 23. Cr. 490 (SHS), Dkt. 366 (S.D.N.Y. April 30, 2024) (denying defense motion that sought to require the Government to narrow its 38,000 item exhibit list and characterizing that defense motion as "needless motion practice" in light of the work among the parties). The Government has the burden of proof, and it must meet that burden at trial. In any event, the defense teams have a month to review the Government's exhibits before this trial begins, the vast majority of which were previously produced in Rule 16 discovery and have been in the defendants' possession for many months.

2. *Wang's Complaints About Specific Exhibits*

Wang's other individual complaints should be rejected.

*First*, Wang complains that 20 exhibit stickers were included in the production. This was inadvertent and is hardly prejudicial to Wang.

*Second*, Wang complains the Government intends to introduce 357 photographs of the Mahwah Mansion. It is true that there are approximately 357 photographs of the Mahwah mansion that are marked as exhibits, but that is not surprising. The Mahwah Mansion is huge—nearly 50,000 square feet. Further, the Government intends to prove both what was recovered from the Mahwah Mansion at the time of the defendants' arrests and what was *not* in the Mahwah Mansion at the time of the FBI's search—namely, signs and materials suggesting it was a G|CLUBS/NFSC base. Rather, the Government contends that those G|CLUBS/NFSC materials appeared *after* Guo was arrested, so that he and his co-conspirators could reverse engineer a reason why G|CLUBS funds were used to purchase the Mansion. In order for the Government to prove a negative, many photographs are required.

*Third*, Wang complains that the Government marked 717 farm loan agreements and avers that was improper. It was not. The 717 farm loan agreements, which were produced in Rule 16 months ago and represent an exemplar of the volume of Farm Loan Program funds that flowed through a single Farm, demonstrate the magnitude of the RICO enterprise, explain how certain bank accounts were funded with fraud proceeds, and are evidence that the defendants used victim money for personal expenditures. Further, none of those loan agreements were ever countersigned, which is a fact relevant to intent, as it demonstrates that the defendants were interested in obtaining victim funds and not entering into a legitimate agreement to provide stock. Moreover, the Government expects to introduce the farm loan agreements in support of the introduction of a summary exhibit to promote trial efficiency.

*Fourth*, Wang points to an empty folder, which was named "Brioni." This folder is empty because, at the time the Government produced trial exhibits, it had not yet received documents from Brioni. The folder was included to give the defendants notice that the Government intends to introduce some exhibits produced by Brioni once it receives and reviews the company's production.

*Fifth*, Wang points to a letter from the Government to the court, claiming it is "plainly not admissible." However, that letter was not intended to be produced as an independent exhibit; rather it is attached to an email sent by an HCHK employee to the CFO of Gettr. That is, one G Enterprise entity sent an email to another G Enterprise entity attaching a letter that was about Wang, despite the fact that Wang has claimed to occupy no formal role in either entity. The content of the attachment, the letter, is not the focus of the exhibit.[2]

*Sixth*, GXAS 138 is an email from an entity engaged by the Himalaya Exchange to the Government, providing a particular cryptocurrency address, which that entity retained as a business record about the Himalaya Exchange. The Government's expert, Professor Shams, analyzed that cryptocurrency address.[3]

*Seventh*, GX243 is an email chain between the CEO of G|CLUBS and a Bugatti dealership. That email chain was forwarded to the Government and one of its paralegals—the portion of the email involving an AUSA and the paralegal will be redacted for trial, but the rest of the exhibit is plainly admissible—the email chain involves an agent of the defendants seeking to expend fraud proceeds to buy a Bugatti for Guo's son.

*Eighth*, GX237 is an FBI 302 containing co-conspirator statements—specifically, statements made by co-conspirator who spoke to an undercover FBI agent, as that co-conspirator sought to obtain a Bugatti purchased with fraud proceeds, after this case was unsealed. The Government will introduce those statements through a witness (the FBI undercover officer) and marked this 302 to provide the defendants notice of its intent to do so.

---

[2] The Government is, of course, available to discuss the admissibility of this attached letter with counsel and to further assess whether the Government will introduce the exhibit at trial before any evidentiary objection need be brought to the Court's attention.

[3] The Government does not object to redacting portions of this email, in particular the portions reflecting that it was sent to the Government.

*Ninth*, GX301-325, which Wang contends "raise potential hearsay issues," are text messages from the "GTV Investment Committee" directing victims how to send money so they can invest in the GTV Private Placement. That is, these are co-conspirator and agent statements directly relevant to the charged fraud. Their admissibility is plain.

Accordingly, Wang's complaints should be rejected.

B.  Recent Government Rule 16 Productions

The Government's Rule 16 obligations are ongoing, and when the Government obtains, or locates in its possession, Rule 16 materials, it is required to produce them. The Government has met its obligations in this case and continues to do so, including with respect to materials that the Government recently obtained in connection with its ongoing investigation, as well as a set of materials which were inadvertently not previously produced.[4]

In the course of preparing exhibits and re-reviewing its case file, the Government learned that photographs taken of Guo's Greenwich estate had not previously been produced. Upon learning this fact, the Government immediately produced those photographs to the defense, which included approximately 1,600 photographs—a volume of images that can be reviewed in a few hours. From that set of 1,600 photographs, the Government marked only approximately 80 photographs as trial exhibits. Those 80 trial exhibits include photographs of a Lamborghini that was found in Guo's garage, which Lamborghini was purchased with fraud proceeds. The Court should not exclude those 80 photographs from trial, especially where these 80 exhibits impose a *de minimis* burden on the defense: there are weeks until trial begins, and the defense has known about the Greenwich search and the seizure of the Lamborghini for approximately one year.

It is common in every case, and particularly before trial, for the Government to run several checks (and re-checks) of its case file to confirm all materials requiring production have been provided to the defense. In connection with that work, the Government expects to produce to the defense a small production of approximately 30 files today, which includes some photographs and chain of custody documents, among other things. If any additional materials that have not yet been produced are located, the Government will produce them expeditiously, as it is required to do so.

C.  Wang's Request to Reconsider the Pretrial Schedule Should be Rejected

In her letter, Wang seeks to adjourn disclosure of defense Rule 16 material to just seven days before trial, and defense exhibits to just three days before trial. Wang's request that the Court reconsider its pretrial scheduling order should be rejected. *See* Dkt. 250 ("Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." (quoting *United States v. Baldeo*, No. 13

---

[4] Wang also complains that the Government provided "300 non-searchable pdf pages" in response to the Court's order requiring the Government to produce materials involving targeting of Guo. These pdf pages are FBI reports from a separate investigation, and the Government has no intention of introducing those materials—which were obtained from the FBI shortly before they were produced—at trial. Additionally, as defense counsel is no doubt aware, the 300 pages can be readily made text-searchable using common document processing tools; indeed, as a courtesy, the Government already re-produced those materials in a text searchable format on Monday morning.

Cr. 125, 2015 WL 252414, at *1 (S.D.N.Y. Jan. 20, 2015), *aff'd*, 615 F. App'x 26 (2d Cir. 2015) (internal quotation marks and citation omitted)).)

Given that Wang's complaints about the Government's exhibits are without merit, her request for an adjournment should not be granted. But, more to the point, permitting the defendants to further delay disclosure of Rule 16 materials and defense exhibits would only serve to delay the orderly proceedings of trial. Upon receipt of reciprocal discovery, the Government will need to review the materials and may choose to take investigative steps of its own to, among other things, evaluate the authenticity or completeness of those materials and locate relevant rebuttal evidence. The Government also must review those materials to make determinations as to whether to make any objections on admissibility grounds, and the Court will, in turn, need time to resolve such objections.

Disclosure in accord with the schedule previously entered by the Court is particularly appropriate because, unlike the Government, the defense has not produced a single document in Rule 16 discovery—the Government has no idea what discovery the defendants possess. *See United States v. Rajaratnam*, No. S2 09 Cr. 1184 (RJH), 2011 WL 723530, at *5 (S.D.N.Y. Feb. 25, 2011) ("A defendant would always like more information about the government's case before revealing anything about his or her own, but Rule 16 conditions a defendant's disclosure obligations on the government's having made certain specified disclosures, not on the government's laying open its entire case or the defendant's satisfaction.") Given that the defendants have predicted a two-week defense case, the volume of defense discovery may be considerable.

In any event, the Government's trial exhibits are not a surprise—they are consistent with the Government's charging theories that were spelled out in a lengthy speaking indictment, briefing, and other documents. Because the defendants have known the Government's theory of the case for more than a year, and have been in possession of Rule 16 materials for nearly as long, what exhibits, or witnesses, the defense intends to introduce is unlikely to be significantly impacted by the Government's exhibit production. Even if it were so impacted, for the reasons described above, the defense is equipped to review the Government's exhibits and, given the specific complaints in Wang's letter, has ably done so.

Wang's request for an adjournment of the defendants' disclosure dates appears tethered less to any real need for an additional period to review the Government's exhibits than to a desire to continue to withhold defense Rule 16 and to provide the Government just three days to review

defense exhibits before trial.  This request would serve only to delay the orderly and efficient presentation of evidence at trial and should be denied.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

By: /s/
    Micah F. Fergenson
    Ryan B. Finkel
    Justin Horton
    Juliana N. Murray
    Assistant United States Attorneys
    (212) 637-2190 / 6612 / 2276 / 2314