UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

MILES GUO,
    a/k/a "Ho Wan Kwok,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"
    a/k/a "Boss," and

                Defendant.

**S3 23 Cr. 118 (AT)**

# THE GOVERNMENT'S SUPPLEMENTAL MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF THE DEFENDANT'S EXPERT WITNESSES

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
    *- Of Counsel -*

## **TABLE OF CONTENTS**

PROCEDURAL BACKGROUND ........................................................................................ 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT .................................................................................................................. 5

I.   The Court Should Exclude the Testimony of Raymond Dragon ......................... 5

II.  The Court Should Exclude the Testimony of Maggie Sklar or, Alternatively, Limit Its Scope ...................................................................................................... 11

    A.   Ms. Sklar's Supplemental Notice ........................................................ 11

    B.   Ms. Sklar's Supplemental Disclosure Still Fails to Comply with the Notice Requirements of Rule 16 ........................................................ 12

    C.   Even If Ms. Sklar's Disclosure is Adequate, Her Testimony Should be Narrowed ............................................................................................ 14

        1.   Sklar's Third Opinion Impermissibly Relies on Hearsay ................... 14

        2.   Sklar's Third, Fourth, and Sixth Opinions Are Not Reliable ............. 16

        3.   Ms. Sklar's Remaining Opinions May Require a Limiting Instruction ............... 18

III. The Court Should Limit the Testimony of Paul Doran .................................... 20

    A.   Procedural History ............................................................................... 20

    B.   Few Parts of Mr. Doran's Proposed Testimony Are Consistent with the May 2 MIL Order ................................................................................. 21

    C.   Most of Mr. Doran's Proposed Testimony Should Be Excluded Under Rules 403 and 702 ............................................................................... 22

        1.   Applicable Law ................................................................................. 22

        2.   Most of Mr. Doran's Proposed Testimony is Irrelevant and Cannot "Help the Trier of Fact" as Required by Rule 702 ............... 23

        3.   Much of Mr. Doran's Proposed Testimony Creates the Dangers Contemplated by Rule 403 ............................................................... 24

        4.   Much of Mr. Doran's Proposed Testimony Impermissibly Transmits Inadmissible Hearsay to the Jury ..................................... 25

IV.  The Court Should Exclude the Testimony of Thomas Bishop or Hold a *Daubert* Hearing ................................................................................................ 26

CONCLUSION ............................................................................................................... 34

Having reviewed the supplemental expert disclosures of defendant Miles Guo, the Government respectfully renews and supplements its motion to exclude the testimony of the defendant's proposed experts.

## PROCEDURAL BACKGROUND

On April 1, 2024, the parties provided mutual expert disclosures pursuant to Rule 16. Guo noticed his intention to call four experts: Raymond Dragon, who seeks to provide testimony concerning the valuation of GTV; Maggie Sklar, who seeks to provide testimony regarding various cryptocurrency topics; Thomas Bishop, who seeks to offer opinions on fund flows; and Paul Doran, who seeks to provide testimony about the Chinese government. *See* Dkt. 272 ("Gov't Daubert Mot."), Exs. 1-4.

On April 8, 2024, the Government moved to exclude the testimony of Guo's proposed experts, arguing, among other things, that Guo's expert disclosures were insufficient under Rule 16. *See* Gov't Daubert Mot. Guo opposed. *See* Dkt. 290.

On April 24, 2024, the Court issued an order finding that Guo's "Rule 16 notices are insufficient." Dkt. 305 ("*Daubert* Order") at 3. The Court noted that "[f]or the most part, [Guo's] notices merely identify the general topics about which the expert will testify, rather than the expert's actual opinions—a level of detail insufficient even before the recent amendment to Rule 16." *Id.* (cleaned up). Moreover, "[t]he few opinions that are offered lack 'the bases and reasons' for those opinions." *Id.* at 4 (quoting Fed. R. Crim. P. 16(b)(1)(C)(iii)). The Court concluded that this failure "not only dooms Kwok's notices under Rule 16, but also fails to provide the Court with enough information to conduct a 'rigorous examination' of the experts' methodology, as required by its gatekeeping function under *Daubert*. *Id.* at 5 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). Nevertheless, the Court exercised its discretion to permit

Guo to supplement his disclosures, given that trial was "more than three weeks" away. *Id.* at 5. The Court ordered that Guo provide his supplemental disclosures—to contain a "complete statement of all opinions" and "the bases and reasons for them"—by April 29, 2024.

On April 29, 2024, Guo provided his supplemental expert disclosures to the Government and to the Court, which are attached hereto as Exhibits A ("Dragon Supp. Notice"), B ("Sklar Supp. Notice"), C ("Doran Supp. Notice"), and D ("Bishop Supp. Notice").

Guo's supplemental disclosures have not cured the problems posed by the defendant's proposed expert witness testimony. As explained further below, the Government seeks to preclude or otherwise limit the testimony of these experts because notice remains insufficient or because the proposed testimony is improper and inadmissible.

## LEGAL STANDARD

"An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliably applied" to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual

purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that

are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was recently amended to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). While this "does not require a verbatim recitation of the testimony the expert will give at trial," it requires more than the "written summary" previously required under the Rules. Fed. R. Crim. P. 16 Adv. Comm. Notes, 2022 Amendment. Even before Rule 16(b)(1)(C) was amended in 2022, the advisory notes to the Rule recognized that the purpose of this requirement is "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation," Rule 16 Adv. Comm. Notes, 1993 Amendment, and this Court observed that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions." *Kaufman*, 2021 WL 4084523, at *19 (collecting cases); *see also United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (same). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see also*

*United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same); *United States v. Bankman-Fried*, No. 22 Cr. 0673 (LAK), 2023 WL 6162865, at *3 (S.D.N.Y. Sept. 21, 2023) (precluding the testimony of the defendant's proposed expert witnesses).

## ARGUMENT

### I.    The Court Should Exclude the Testimony of Raymond Dragon

The Government renews its motion to exclude the testimony of Raymond Dragon under Federal Rule of Evidence 403 and for failure to comply with Federal Rule of Criminal Procedure 16(b)(1)(C)(iii).

At the outset, the Government recognizes that in a case where the Government has alleged the defendant falsely represented the value of a company when fraudulently soliciting investments in that company, expert testimony on the actual value of the company may be appropriate, as it is, indeed, the province of an expert.  As the Court recognized, however, the defendant's expert disclosures were plainly insufficient.  *See Daubert* Order at 3 (concluding Guo's notices provided "a level of detail insufficient even before the recent amendment to Rule 16").  Having been granted an opportunity to make a curative supplemental disclosure, Mr. Dragon's disclosure is still materially inadequate.  The need to provide a disclosure sufficiently fulsome to comply with Rule 16 is not a mere formality.  Indeed, in this case, the defendant's insufficient disclosure has effectively hamstrung the Government in its ability to assess and respond to Mr. Dragon's proposed expert testimony.  Less than three weeks before trial, the Government still does not have sufficient information about Mr. Dragon's assessment and opinions to, for example, retain its own expert to rebut Mr. Dragon's conclusions and methodologies.  Because the defendant's disclosure is still insufficient, as detailed below, and for the reasons set forth in the Government's initial *Daubert* motion, the Court should exclude Mr. Dragon's testimony.

*First*, while it is difficult to discern, as the Exhibits provided in connection with

Mr. Dragon's supplemental disclosure lack sufficient explanation and are generally opaque, it appears that those exhibits go beyond the opinion Mr. Dragon purports to offer—which is that "$2 billion was a reasonable valuation of GTV based on information available in August 2020." Dragon Supp. Notice at 1. Exhibit 7, for example, contains the following table:

| | 2021 Revenues | 2022 Revenues | 2022 EBITDA | 2023 Revenues | 2023 EBITDA |
|---|---|---|---|---|---|
| GTV | 179.9 | 1,115.4 | 98.6 | 3,147.4 | 513.1 |
| Median multiple | 4.2x | 4.32x | 12.66x | 4.32x | 12.66x |
| | | | | | |
| Total Enterprise Value | 755.6 | 4,818.5 | 1,248.3 | 13,596.8 | 6,495.8 |
| less debt | - | - | - | - | - |
| | | | | | |
| GTV Equity Value ($ millions) | 755.6 | 4,818.5 | 1,248.3 | 13,596.8 | 6,495.8 |

| Year | 2021 | 2022 | 2023 |
|---|---|---|---|
| GTV Average Equity Value ($ millions) | 755.6 | 3,033.4 | 10,046.3 |

The bottom, highlighted row calculates that the average equity value of GTV was $755.6 million in 2021, approximately $3 billion in 2022, and approximately $10 billion in 2023. There is no explanation of how these numbers lead to an opinion that a valuation of $2 billion in August 2020 was reasonable.[1] Indeed, the year 2020 is not even represented in this exhibit. Perhaps even more troublingly, the Exhibit suggests—again, it is difficult to say for certain, due to the inadequacy of the disclosure—that Mr. Dragon will put analysis before the jury intimating that a valuation of $10 billion was somehow reasonable, even though that is not one of the opinions described in the supplemental disclosure, nor is it clear how even that valuation was reached.

---

[1] Even the calculations being performed in this table are unclear. For example, for the years 2022 and 2023, there are columns for both "Revenues" and "EBITDA" (or earnings before interest, taxes, depreciation, and amortization). But for the year 2021, there is only a column for "Revenues" and no "EBITDA" column. As noted, there are no columns at all for the year 2020, the year for which Mr. Dragon is offering an opinion on the value—more specifically, as of August 2020—of GTV.

Compounding that wholly insufficient explanation of the reasons and bases for the opinion—as well as the potential for serious confusion by the jury—Exhibit 7 does not specify where the GTV revenue figures used in the Exhibit come from, and it takes several layers of impermissible hearsay to arrive at the source of these figures.  At the first layer, the figures appear to come from the A&M Report, which was prepared in December 2020 at the direction of GTV's counsel in the SEC investigation.  The A&M Report and related emails produced to the SEC by A&M in response to a subpoena, in turn, make clear that these figures are not based on *GTV's* data.  *See* Ex. E (Dec. 15, 2020 A&M email chain explaining that A&M was going to use "the GNews data" because "there isn't a forecast for GTV Media, just preliminary testing data"). Instead, they are based on a forecast that is deeply suspect as a basis for conducting this valuation analysis.  For one, the forecast was for a *different* company, G News.  For another, the forecast was not developed by A&M (or Mr. Dragon, for that matter), but by the individuals who may have conducted the GTV Private Placement fraud, and then was provided to A&M by counsel for GTV in the SEC investigation.  Relying on these confounding levels of hearsay, Mr. Dragon's analysis and proposed testimony risk confusing the jury into thinking that his analysis is based on actual data about GTV when, in fact, it is not.

Undoubtedly, the Government would be entitled to cross-examine Mr. Dragon on these matters, but the Court exercises a preliminary gatekeeping function precisely because expert testimony, even subject to rigorous cross examination, can be "both powerful and quite misleading."  *See Daubert*, 509 U.S. at 595 (explaining that "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses" because "[e]xpert evidence can be both powerful and quite misleading").  Here, moreover, these substantial Rule 403 problems dovetail with the inadequacy of Mr. Dragon's

disclosure.  The disclosure has no explanation whatsoever as to why this methodology—using a *different* company's *ipse dixit* forecasts, which were created by the individuals involved in the fraud at issue, and which for purposes of the analysis are simply assumed to be accurate—is a reasonable methodology.  The supplemental disclosure for Mr. Dragon simply asserts that "GTV's growth projection are based upon commonly used practices in the valuation industry" without engaging with any of these actual issues.  Dragon Supp. Notice at 2.  That frustrates the design of the Rule 16, which—even before the 2022 amendments requiring greater disclosure—was meant "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation."  Fed. R. Crim. P 16, Adv. Comm. Notes, 1993 Amendment.

Mr. Dragon also claims to have relied upon "publicly available information" about a set of "comparator companies" in reaching his opinions.  Dragon Supp. Notice at 2.  Critically, there is no explanation as to the methodology through which Mr. Dragon's comparator companies calculate "users," and whether, or how, each company's methodology corresponds with, or differs from, the definition and calculation of "users" in the GNews forecast.[2]  *See, e.g.*, Investopedia, *Monthly Active Users (MAU): Definition and How the Indicator Is Used* (July 20, 2022) ("The fact that there are no uniform standards for the individual components of MAU [monthly active users], and other metrics used to quantify trends in social media, makes for a slippery playing field.").[3]  These failures call not for further supplementation, but for exclusion of the testimony. *See National Railroad Passenger Corp.*, 303 at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert*

---

[2] It is not clear on what basis Mr. Dragon could say how the GNews forecast treated such matters.

[3] https://www.investopedia.com/terms/m/monthly-active-user-mau.asp

and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

Additionally, Mr. Dragon's disclosure comes nowhere close to adequately explaining his opinion about how "the censorship efforts of the CCP could create a niche market for GTV, which could further bolster the company's value." Dragon Supp. Notice at 3. How, exactly, would "censorship efforts of the CCP" directed at Guo somehow make GTV "the sole or dominant player in a market"? Would silencing Guo somehow eliminate all of GTV's competitors—which, according to Mr. Dragon's analysis, include well-established companies like Facebook (now Meta) and Twitter (now X)? Or perhaps the point is that, if the CCP ceased its censorship efforts, GTV could gain users in China? But, if so, why would that not be equally true of, say, Facebook and Twitter? Is this "further bolster[ing of] the company's value" incorporated into any of the opaque calculations set forth in the disclosure's exhibits, or not? The Government and the Court are simply left to guess at what Mr. Dragon's reasoning and methodology is, and whether it is permissible under *Daubert* and Rule 702.

The disclosure's reference to SPACs is similarly unexplained. In particular, Mr. Dragon is said to have "considered the funding activity in the Special Purpose Acquisition Company ('SPAC') sector." Dragon Supp. Notice at 2. And Exhibit 9 is a chart of certain statistics for SPACs between 2009 and 2021. *Id.*, Ex. 9. Yet neither the cover letter nor Exhibit 9 indicates that Mr. Dragon will offer any opinion related to SPACs, nor how SPACs might have affected any of the opinions or testimony he *will* offer. *See id.* at 2-3; *id.*, Ex. 9. The Government and the Court are again left to guess.

Lastly, the final valuation methodology listed in the disclosure is the "Backsolve Method of the Market Approach." Dragon Supp. Notice at 2. This methodology was not identified in the original disclosure, and is described only in a single sentence in the supplemental disclosure. *See*

9

*id.* ("Finally, Mr. Dragon considered the amount of capital raised as part of the 2020 GTV private stock offering . . . as evidence of the market's view of GTV's value (the 'Backsolve Method of the Market Approach').").  While it is true that the defendant has set forth more fully what this methodology may entail—albeit, in a legal brief signed by counsel, not the expert, *see* Dkt. 195 (Guo's Dec. 14, 2023 Motion to Dismiss) at 30-32—this methodology, and how Mr. Dragon utilized it to reach his opinions, is still insufficiently explained in the supplemental disclosure, as required by the amended Rule 16.

Individually, and certainly in combination, these failures in Mr. Dragon's disclosure deprive the Government of fair notice and an opportunity to adequately prepare a response by retaining its own expert.  The shortcomings of the disclosures similarly frustrate the ability of the Court to play a gatekeeping function, as it is required to do, particularly in the context of expert testimony.  *Daubert*, 509 U.S. at 595.  Now, less than three weeks before trial, after already providing the defendant an opportunity to make a curative supplemental disclosure, excluding Mr. Dragon's testimony is the appropriate outcome.  The defendant should not be permitted to supplement Mr. Dragon's disclosure once again, in a third attempt to fairly provide notice to the Government as required by the criminal rules.  Accordingly, Mr. Dragon's testimony should be excluded under Rule 403, and for failure to comply with Rule 16(b)(1)(C).

Nevertheless, to the extent that the Court is not inclined to exclude the testimony of Mr. Dragon in its entirety, the Government respectfully requests that the Court limit that testimony to the only topic for which the Mr. Dragon's reasoning is apparent, and which does not risk confusing the jury: Mr. Dragon's valuation opinion based on the "Backsolve Method of the Market Approach."  Dragon Supp. Notice at 2.  While the supplemental disclosure is inadequate under Rule 16, the methodology that Mr. Dragon is referencing appears to be one which the defendant

has, in fairness, previously described in legal briefing and, assuming that to be the case, the methodology is decipherable and presents a lessened risk of misleading or confusing the jury. *See* Dkt. 195 (Guo's Dec. 14, 2023 Motion to Dismiss) at 30-32 (setting forth the reasoning behind such a valuation process and citing an authority on valuing startups that describes this valuation process). Thus, to the extent the Court does not exclude Mr. Dragon's testimony entirely, the Government respectfully submits that the Court should limit it to valuation opinions based on that methodology.

## II. The Court Should Exclude the Testimony of Maggie Sklar or, Alternatively, Limit Its Scope

### A. Ms. Sklar's Supplemental Notice

Ms. Sklar's Supplemental Notice identifies six opinions that she seeks to offer at trial.

- Opinion No. 1: Ms. Sklar's opinion that cryptocurrency offers anonymity and favored by individuals living under repressive regimes.

- Opinion No. 2 has several parts: (a) There is a common understanding, cryptocurrency uses "blockchain technology;" (b) Smart contracts can be used to create cryptocurrencies; (c) HCN and HDO were "minted using smart contracts, which can be seen on the public Ethereum blockchain, and are purchased using fiat currency and traded, they meet the common market understanding of 'cryptocurrencies;'" and (d) "[B]ased on the White Papers" HCN is designed as a trading coin and HDO was designed as a stable coin.

- Opinion No. 3: Based on Armanino's audit report, and the Himalaya Exchange's relationship with vendors, "the Himalaya Exchange was designed to function as a cryptocurrency exchange."

- Opinion No. 4: Based on unspecified public materials, the Armanino Report, and the Government's Expert Report, "the Himalaya Exchange operated as a centralized exchange."

- Opinion No. 5 has several parts and generally describes the functioning of crypto currency exchanges, tokens, and wallets. Including that "evidence that there is not substantial on-chain trading or redemption activity of a token, such as is the case with HCN and HDO, does not demonstrate that the token is not a cryptocurrency."

- Opinion No. 6 has several parts: (a) Value and success of tokens depends on adoption by users; (b) Issuers of tokens engage in marketing efforts; (c) Marketing includes demonstrations of token use; (d) an explanation about what market participants "understand" and a hypothetical "scenario" about transacting with cryptocurrency.

**B.  Ms. Sklar's Supplemental Disclosure Still Fails to Comply with the Notice Requirements of Rule 16**

The defendant's supplemental expert notice for Maggie Sklar remains insufficient. Although the supplemental notice provides information about Ms. Sklar's purported opinions, the supplemental notice does not provide sufficient information as to how those opinions were formed. In its April 24, 2024 order, this Court required Guo to provide a disclosure that "provide[s] a 'complete statement of all opinions' and '*the bases and reasons for them*.'"  *Daubert* Order at 5 (quoting Fed. R. Crim. P. 16(b)(1)(C)(iii)).  Guo failed to meet the Court's direction, and has now twice failed the requirements of the criminal rules of procedure.  Exclusion is appropriate.

Critically, Ms. Sklar's supplemental notice does not disclose "the bases and reasons" for her opinion—*i.e.*, how she formed her opinions.  Ms. Sklar's supplemental disclosure merely states that she formed her opinions in part by reviewing "other publicly available materials."  *Id.*  There is no information as to what "publicly available materials" Ms. Sklar reviewed—or even a general category of public materials that she examined.  This deficiency means that the Government did not "receive adequate information about the content of the witness's testimony and potential impeachment."  *See* Rule 16, Notes of Advisory Committee on 2022 Amendment.  The Government and this Court can only hazard a guess at what "publicly available materials" Ms. Sklar used as "the bases and reasons for [her] opinions."  *See id*.

Ms. Sklar's supplemental notice is also vague as to other categories of materials she relied on as the bases for her opinions.  The supplemental notice states that Sklar reviewed "numerous documents disclosed to the defense in this case" but identifies those documents only by category.

(*See* Sklar Supp. Notice at 1 ("records related to the Himalaya Exchange's custodial arrangements and capabilities"); *id*. at 2 ("documents related to work performed on behalf of the Himalaya Exchange"). As to those general categories of documents, the supplemental notice provides illustrative examples of the materials reviewed (e.g. "arrangements with BitGo" and "CertiK") but does not identify the other materials in the aforementioned categories that Ms. Sklar considered. Thus, the bases for her opinions are missing.[4]

As this Court noted "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." Dkt. 305 (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)). The lack of information in the supplemental disclosure means the Government is unable to assess *how* Ms. Sklar reached her conclusion. This is important because the Government is unable to test the manner in which Ms. Sklar reached her opinions and determine whether it is sufficiently reliable or subject to challenge. Nor can the Government sufficiently meet the evidence at trial. *See United States v. Mrabet*, No. 23 Cr. 69 (JSR), 2023 WL 8179685, at *1 (S.D.N.Y. Nov. 27, 2023) ("The [2022 expert notice] amendment "is intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed.")

The failure of the supplemental notice to disclose the bases for Ms. Sklar's opinions requires exclusion of her testimony at trial. Alternatively, the Court should require Sklar to

---

[4] By contrast, in connection with the Government's proposed cryptocurrency expert disclosure, the Government provided the defense a copy of all the materials that that expert reviewed or otherwise specifically identified the material and exactly where it was available for review by the defense.

disclose with specificity all of the materials, public or otherwise, she reviewed to form her opinions.

### C. Even If Ms. Sklar's Disclosure is Adequate, Her Testimony Should be Narrowed

Even if the basis for Ms. Sklar's opinions were properly disclosed, certain of Ms. Sklar's opinions are improper, as set forth below.

#### 1. Sklar's Third Opinion Impermissibly Relies on Hearsay

Ms. Sklar's third opinion is an impermissible argument based on hearsay because it relies upon an audit of the Himalaya Exchange and materials collected by that auditor, as well as on documents issued by the Himalaya Exchange.

By way of background, Armanino is an accounting firm that, at one time, had a practice focusing on audits of various cryptocurrency-linked businesses.[5]  Armanino performed an "audit" of the Himalaya Exchange which included examination of documents provided by the Himalaya Exchange and interviews with employees of the Himalaya Exchange.  The Government obtained the Armanino audit and underlying audit materials from Armanino in connection with its investigation and long ago provided them to the defense.  The Government expects to introduce as trial exhibits just a few of documents Armanino provided, such as: a list of Himalaya Exchange personnel that the Exchange provided to Armanino; and a two-page document Armanino issued, and the Exchange sent to a court, as purported proof of its stable-coin reserves.  The Government does not expect to introduce into evidence the other voluminous materials acquired from Armanino including, for example, interviews with Armanino personnel, Armanino work product, and various

---

[5] Based on public reporting, Armanino has since wound down its cryptocurrency audit practice. *See* Forbes, *FTX.US Accounting Firm Armanino Ends Crypto Audit Practice*, dated Dec. 15, 2022, available at https://www.forbes.com/sites/emilymason/2022/12/15/ftx-accounting-firm-armanino-ends-crypto-audit-practice/?sh=325a1aa7362f (last accessed May 3, 2024).

other documents Himalaya appears to have provided Armanino.  By way of further background, the Himalaya Exchange White Papers are documents written and issued by the Himalaya Exchange describing what they purport are the features of HCN an HDO.  The Government intends to offer the White Papers as evidence at trial.

Ms. Sklar's third opinion is clearly based on the Armanino report and White Papers issued by the Himalaya Exchange ("the Himalaya Exchange was designed to function as a cryptocurrency exchange based on the descriptions of the Exchange's operations in the White Papers and reports prepared by Armanino").  While the White Papers will be evidence, Armanino's audit will not be, nor will many of the documents the Exchange provided Armanino in the course of its preparation of that audit.[6]  Indeed, the defendant could not introduce the audit report or those supporting materials for their truth, as they constitute impermissible hearsay.  However, and impermissibly, Ms. Sklar's third opinion is designed to put the contents of the Armanino audit materials that are otherwise inadmissible before the jury.  Serving as a mouthpiece of hearsay material not a proper use of expert testimony.  *See United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (an expert witness may not "circumvent rules prohibiting hearsay" by "relying on … conversations with non-testifying witnesses" (citing Fed. R. Evid. 801(c) and 703)); *United States v. Mejia*, 545 F.3d 179, 197 (2d. Cir. 2008) ("The expert may not, however, simply transmit hearsay to the jury….

---

[6] Because Ms. Sklar only categorically identified documents upon which she relied, it remains possible that her analysis included reliance on communications among Himalaya Exchange employees, for example, emails between Himalaya Exchange personnel, which is impermissible hearsay.  *See* Fed. R. Evid. 801(d)(2)(E) (co-conspirators' statements only admissible when "offered against an opposing party").

Otherwise, the expert is 'simply repeating hearsay evidence without applying any expertise whatsoever.'").

While it is correct that in certain circumstances (which are not present here) experts may rely upon hearsay to form an opinion, that is only proper if "if experts in the field reasonably rely on such [hearsay] evidence in forming their opinions." *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001). That test is not satisfied here. For example, as to Ms. Sklar's third opinion, the Armanino documents that provide the bases for Sklar's third opinion refer to an audit performed by Armanino on the Himalaya Exchange. There is no industry standard, and Ms. Sklar's notice does not suggest otherwise, indicating that experts in the field of cryptocurrency field rely upon non-public components of private audits to assess whether an entity "was designed to function as a cryptocurrency exchange." Sklar Supp. Notice at 2. Armanino's audit was based on an investigation that included a review of documents that the Himalaya Exchange provided Armanino and conversations Armanino had with Himalaya exchange employees. Armanino then formed an opinion about the Himalaya Exchange. Ms. Sklar should not be permitted to regurgitate Armanino's opinion as her own, nor should she be permitted to base her opinion on the hearsay within Armanino's materials. Accordingly, Ms. Sklar's third opinion should be excluded.

## 2. Sklar's Third, Fourth, and Sixth Opinions Are Not Reliable

In order for expert testimony to be admissible, the trial court must find that "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Sklar's third, fourth, and sixth opinions fail this test.

Sklar's third and fourth opinions characterize the Himalaya Exchange as a cryptocurrency exchange and, more specifically, as a centralized cryptocurrency exchange. Sklar's third opinion is that the "Himalaya Exchange was designed to function as a cryptocurrency exchange"—an

opinion she reached based on descriptions in certain documents and the fact that the Exchange contracted with certain vendors. Sklar's fourth opinion—"that the Himalaya Exchange operated as a centralized exchange"—is similarly based on a review of materials including a mysterious set of "publicly available materials." But Ms. Sklar points to no studies, research, or even industry standards which demonstrate that individuals in the cryptocurrency field review descriptions in the aforementioned categories of documents, nor lists of "recognized vendors" with which an exchange might contract, as a basis to ascertain that an entity was "designed to function as a cryptocurrency exchange" or a "centralized exchange." The result is that Ms. Sklar proposes to offer expert opinion that appears not to be based on sufficiently reliable and accepted methodology. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nat'l Railroad Passenger Corp.*, 303 F.3d at 266 (2d Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert.").

Ms. Sklar's sixth opinion fares no better. That opinion is about the early adoption of cryptocurrencies and the "understand[ing]" of market participants. Indeed, this sixth opinion is not based on anything. It is simply Ms. Sklar pontificating about "early adoption" of cryptocurrency tokens. Opinion 6.d. deserves particular scrutiny. The supplemental disclosure indicates that Ms. Sklar seeks to offer opinions about "market participants . . . understand[ings]" about token use. Sklar Supp. Notice at 4. Opinion 6.d. is particularly troubling because Ms. Sklar offers no basis for her knowledge about the *understanding of market participants*—Ms. Sklar does not cite, for example, industry studies, polling data, or even any documents upon which to base

such an opinion. Ms. Sklar's sixth opinion—and in particular 6.d.—is the quintessential "ipse dixit" expert opinion for which gatekeeping is appropriate.

Indeed, this Court previously excluded expert testimony, in the cryptocurrency context, where there was too great an analytical gap between a proposed expert's data and their opinion. *See Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 5670711, at *13 (S.D.N.Y. Mar. 6, 2023) ("event study demonstrates, at best, correlation between the news announcements and XRP's price changes. His statement of causation is supported only by his *ipse dixit*"). The circumstances here are more deserving of exclusion because Ms. Sklar's sixth opinion about early adoption tokens—and particularly opinion 6.d. about the mental impressions of market participants—is not based on any information, data, or methodology at all. It is an opinion whose only basis is Ms. Sklar's "say so." Such an opinion is not proper and should be excluded. *United States v. Ray*, 583 F. Supp. 3d 518, 542 (S.D.N.Y. 2022) (excluding defense expert that sought to offer "ipse dixit" opinion based on a method that had "no criteria to follow, no peer-reviewed study to consult, and no score on the only test that was provided that could guide another [expert] in reaching the same opinion").

### 3. Ms. Sklar's Remaining Opinions May Require a Limiting Instruction

Ms. Sklar's purported expertise derives from her training as an attorney. She worked for a civil law firm and held advisory roles at the U.S. Commodity Futures Trading Commission ("CFTC") and Federal Reserve Bank of Chicago. Supp. Sklar Notice at 1. Assuming that the Court finds Ms. Sklar's notice sufficient (or offers Ms. Sklar a third opportunity to provide legally sufficient notice), Ms. Sklar's testimony may not be used by Guo to suggest that the Himalaya Exchange satisfied applicable regulatory requirements or otherwise operated "legally." It is improper to offer an expert to testify about the legal framework that applies to cryptocurrencies. *See Bilzerian*, 926 F.2d at 1294 ("[A]n expert's testimony on issues of law is inadmissible").

Further, Guo may not seek to use Ms. Sklar's prior experience to convey that the Himalaya Exchange met industry standards or otherwise complied with regulations. That would confuse the jury. The focus of this case is how the defendant's conduct measured up against the law that applies to the charged offenses. Comparing the Himalaya Exchange to general industry practices is irrelevant and confuse the jury as to what it is they are required to decide. *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019), *aff'd*, No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023) (precluding defense expert because "the jury did not need to understand general industry practices in the payment processing industry in order to reach a verdict in this case. The issue the jury was tasked with deciding was whether or not Defendant's actions and/or statements during the relevant time period violated the wire fraud statute."). Moreover, in a criminal case, Rule 704(b) precludes expert opinions "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). The defendant cannot use Ms. Sklar's proposed testimony to convey to the jury an improper opinion that the defendant lacked criminal intent, even if the Himalaya Exchange generally acted consistently with broader industry practices. *See Rezulin Prods.*, 309 F. Supp. 2d at 541 n.23 (improper for expert to substitute her "judgment for the jury's").

Thus, if Ms. Sklar testifies,[7] depending on her testimony, it may be necessary for the Court to instruct the jury that compliance or consistency with industry standards or regulations does not mean the defendants lacked criminal intent and/or that Ms. Sklar's position as a regulator does not

---

[7] Putting aside the deficiency of her expert notice, and in effort to narrow the issues before the Court, the Government does not otherwise object to Sklar providing limited testimony concerning the benefits of cryptocurrencies (opinion No. 1), use of blockchain technology (opinion No. 2), and the operation of cryptocurrency exchanges (opinion No. 5). The Government's effort to narrow the issues in dispute in no way renders Ms. Sklar's other opinions admissible.

mean that the Himalaya Exchange complied with required regulations.  Such an issue need not be reached now, but the Government merely requests the opportunity to be heard on such an instruction at the conclusion of Ms. Sklar's testimony, if any.

### III.    The Court Should Limit the Testimony of Paul Doran

Guo offers Paul Doran, a former British government employee and "corporate risk professional," Doran Supp. Notice at 1, to testify on a vast range of topics that span from Chinese policy on Tibetan independence to Canadian counterintelligence laws.  *See id.* at 2, 6.  The Court has conditionally permitted evidence limited to corroborating Guo's assertion that he has been targeted by the Chinese Communist Party ("CCP"), while recognizing that "presentation of the CCP-related evidence might risk 'confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Id.* (quoting Fed. R. Evid. 403).  To keep CCP-related evidence within appropriate bounds in this fraud trial, "[t]he Court . . . will closely police [Guo's] testimony" and that of his witnesses.  Dkt. 319 ("May 2 MIL Order") at 14. Consistent with this guidance, the Court should narrowly limit any testimony from Mr. Doran to ensure it is tightly focused on establishing that Guo's "fears of CCP targeting" were "beyond mere paranoia."  *Id.*  Doing so requires excluding the large swaths of Mr. Doran's proposed testimony that stray far afield from the purposes for which the Court has indicated it will permit CCP-related evidence and that do little more than transmit impermissible hearsay into the trial record.

#### A.    Procedural History

Guo first noticed his intention to call Paul Doran on April 1, 2024. Dkt. 272-2 (the "Doran Notice").  The Court found the Doran Notice deficient (along with three other expert notices filed that day) for "[m]erely identifying the general topics about which the expert will testify," rather than "the expert's actual opinions."  Dkt. 305 ("April 24 *Daubert* Order") at 3; *see also id.* at 4

(identifying as example of particular deficiency Mr. Doran's proposed testimony about "the nature of corruption in the PRC government").

On April 29, 2024, Guo filed the Doran Supplemental Notice.  This supplement was substantively similar to the First Doran Notice, consolidating the former's 28 categories of summary topics (*e.g.*, First Doran Notice Topic 24 ("[H]ow other countries have addressed the targeting of dissidents by the CCP")) into the latter's 10 sets of opinions (*e.g.*, Doran Supp. Notice Opinion 10 ("Countries allied to the United States have also taken measures to combat illegal Chinese intelligence operations in their countries through new national security legislation . . .").

On May 2, 2024, the Court ruled that Guo could offer limited evidence to establish that his concerns about being targeted by the CCP were "beyond mere paranoia," while recognizing that "presentation of the CCP-related evidence" could "[c]ertainly" create the dangers protected against by Rule 403 and stating that it would "closely police" Guo's witnesses to safeguard against improper presentations to the jury.  May 2 MIL Order at 14.  The May 2 MIL Order, in conjunction with the Court's February 21, 2024 order on Guo's second motion to compel (Dkt. 243, the "February 21 Discovery Order"), limit the scope of CCP-related evidence to that which is necessary to establish that "[Guo]'s fears of CCP targeting are objectively legitimate."  *See* February 21 Discovery Order at 6; *see also id.* at 9 (denying motion to compel discovery concerning CCP targeting of any individuals other than "[Guo], his family, and his co-defendants").

## B.    Few Parts of Mr. Doran's Proposed Testimony Are Consistent with the May 2 MIL Order

Only small portions of Mr. Doran's supplemental proposed testimony would be consistent with the Court's mandate that "CCP-related evidence" be elicited for the singular purpose of corroborating Guo's fear that he was being targeted by the Chinese authorities.   To the extent the

Court is inclined to permit expert testimony on this subject, it should limit Mr. Doran's testimony to the following portions of the Doran Supplemental Notice:

- Opinion 1:  The CCP's repressive nature, and its use of the Chinese state apparatus to monitor and suppress opponents' expression.  (As discussed below, Opinion 1's proposed additional discussion of "The Five Poisons"—that is, the CCP's policies on, among other things, various national independence movements—should be precluded under Rule 403.)
- Opinions 2, 4, and 5:  If limited to a focused explanation that Operation Fox Hunt is a "campaign directed . . . to target Chinese nationals living outside China whom the CCP sees as a political threat," Op. 2, and that it is executed by certain Chinese state agencies, Op. 4, including some known to conduct activities in the United States, Op. 5.
- Opinions 6 and 7:  If limited to a focused explanation of techniques the CCP and its proxies use to conduct Operation Fox Hunt.

So cabined, and subject to the strictures of Rules 403 and 702, these portions of Mr. Doran's testimony may be consistent with the May 2 MIL Order.  But, as explained below, the bulk of Mr. Doran's proposed testimony ventures far afield from the Court's limited scope of CCP-related evidence and should be excluded.

### C.    Most of Mr. Doran's Proposed Testimony Should Be Excluded Under Rules 403 and 702

#### 1.    Applicable Law

The May 2 MIL Order explained that CCP-related evidence is relevant only insofar as "showing that Defendants' fears of CCP targeting were objectively legitimate . . . gives credence to certain nonculpable explanations for their actions."  *Id.*  For this reason, expert testimony on the CCP will not "help the trier of fact . . . to determine a fact in issue"—the threshold set by Rule 702—if it goes beyond what the Court has ruled is relevant about evidence of CCP targeting of "[Guo], his family, his co-defendants, or the corporate entities relevant to the indictment," May 2 MIL Order at 13.  *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 134 (2d Cir. 1999) (affirming exclusion where "vast majority" of expert testimony that was "not relevant to the issues before the

jury"); *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6162865, at *3 (S.D.N.Y. Sept. 21, 2023) (excluding expert "background testimony" that would be "mere narration" and "irrelevant to the issues on trial").

The May 2 MIL Order also anticipated that "CCP-related evidence might risk 'confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Id.* at 14 (quoting Fed. R. Evid. 403). Under Rule 403, the Court "may exclude relevant evidence if its probative value is substantially outweighed by" one or more of the dangers identified in the May 2 MIL Order.

Experts may not "simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (finding that district court should have excluded expert testimony that consisted largely of "some of the articles that [he] had researched," "[r]eports from law enforcement personnel," and "research on the internet").

      2.   <u>Most of Mr. Doran's Proposed Testimony is Irrelevant and Cannot "Help the Trier of Fact" as Required by Rule 702</u>

Most of Mr. Doran's proposed testimony ventures far beyond the scope of the Court's orders on CCP-related evidence. The Doran Supplemental Notice promises the following irrelevant, yet detailed, digressions:

- "The CCP describes 'Five Poisons,' or beliefs, which it cannot tolerate at home or abroad. These "Five Poisons" are: (i) pro-democracy beliefs; (ii) religious groups or figures such as Falun Gong or the Dalai Lama; (iii) Taiwanese independence, (iv) Tibetan independence and (v) Xinjiang (or Uyghur) independence." Opinion 1.

- The content of hearsay public statements from spokespeople for "United States law enforcement agencies. *See* Opinion 2.

- The number and location of "secret, extra-legal Chinese police stations," including in dozens of countries with no relevance to this case. *See* Opinion 5.

- CCP activities *other* than targeting individuals, such as "recruit[ing] or attempt[ing] to recruit local nationals and then direct[ing] them to apply for jobs at local, state, and

federal agencies," "as part of [the CCP's] broader efforts to influence opinion in foreign countries."  Opinion 7(j).

- The content of hearsay documents from unrelated U.S. law enforcement actions.  *See* Opinion 9 (describing testimony about "DOJ charging documents" and reciting language from the FBI's public website).

- Actions taken by *other* countries' governments in response to CCP activities in their jurisdictions.  *See* Opinion 10 (describing proposed testimony on, among other things, Canada's Security of Information Act 1985 and Australian legislation "to combat the growing challenge of foreign interference" in that country).

None of these topics is sufficiently connected to the CCP's alleged targeting of Guo to be relevant at trial, nor to fall within the bounds of the Court's orders on this topic.  For that reason, these parts of Mr. Doran's proposed testimony should be precluded as inconsistent with Rule 702. *See Rahman*, 189 F.3d at 135-36 (affirming exclusion of expert testimony's "details . . . irrelevant to the issues before the jury" that "would neither explain nor excuse" the defendant's charged criminal conduct).

> 3.  Much of Mr. Doran's Proposed Testimony Creates the Dangers Contemplated by Rule 403

In addition to the fact that much of Mr. Doran's proposed testimony is well outside the bounds of relevance set forth in this Court's orders, a substantial portions must also  be excluded on the ground that it would create a prejudicial distraction.  *See* Fed. R. Evid. 403.

As set forth above, the only legitimate purpose for testimony about the CCP's activities in this fraud case is to corroborate—*without* "needlessly presenting cumulative evidence," Fed. R. Evid. 403—Guo's belief that he was targeted by the CCP, so that he may present alternative explanations for certain allegedly criminal conduct.  *See* Dkt. 319 at 14.  This trial is not a referendum on the actions of the CCP.  A lengthy diversion during this trial into a courtroom documentary about geopolitical intrigue—*see, e.g.*, Doran Supp. Notice, Op. 7(j) (proposing testimony about the CCP's planting of its nationals in positions with "local, state, and federal

agencies")—would risk "confusing the issues" and "misleading the jury" about the core issues for their consideration and decision: whether Guo presided over a racketeering conspiracy that defrauded thousands of people out of more than a billion dollars. The very length and depth of Mr. Doran's proposed testimony—*see, e.g.*, Doran Supp. Notice, Op. 8 (proposing testimony about "the DOJ and FBI's remit to counter 'transnational repression'" by foreign governments generally)—makes self-evident its tendency to cause "confusion of issues" and to potentially "mislead[] the jury" at the forthcoming trial. *See* Fed. R. Evid. 403.

Accordingly, Rule 403 requires strictly limiting the breadth and depth of Mr. Doran's proposed testimony.

### 4. Much of Mr. Doran's Proposed Testimony Impermissibly Transmits Inadmissible Hearsay to the Jury

Much of Mr. Doran's proposed testimony consists entirely of the repetition of inadmissible hearsay and thus he proposes to "simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). In *Mejia*, the Second Circuit found it was an abuse of discretion to admit the testimony of an expert who, among other things, testified on the basis of "some of the articles that [he] had researched," "[r]eports from law enforcement personnel," and "research on the internet." 545 F.3d at 197. Much of Mr. Doran's proposed testimony has the same fundamental flaw. His testimony would apparently include restating public remarks by U.S. law enforcement officials, Doran Supp. Notice at 1 (statements of FBI Director Wray), describing the "remit" of U.S. law enforcement agencies by restating language from their public websites, *id.* at 5, and testifying about the contents of "DOJ charging instruments" in other cases, *id.* This kind of testimony "do[es] not bring [his] expertise to bear in any way" and should be precluded. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming preclusion of expert testimony that "adduce[d] factual details of specific past events" previewed in "reports [that] are

by and large undergirded by hearsay statements"); *see also, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.").

The Court has conditionally permitted limited evidence of CCP targeting for the singular purpose of establishing Guo's belief that he was being targeted by the CCP and refuting any notion that Guo's related concerns were "mere paranoia." May 2 MIL Order at 14. Most of Mr. Doran's testimony would go far beyond the contours set by the Court's order. With the limited exceptions discussed in Section III.B above, Mr. Doran's testimony should be excluded.

## IV. The Court Should Exclude the Testimony of Thomas Bishop or Hold a *Daubert* Hearing

The Government renews its motion to exclude the testimony of Mr. Bishop under Federal Rule of Evidence 403 and for failure to comply with Federal Rule of Criminal Procedure 16(b)(1)(C)(iii).

Even with the benefit of Mr. Bishop's supplemental disclosure, the Government is at a loss to understand (a) the basis for Mr. Bishop's categorization of transactions in the accounts in question, (b) the substance of Mr. Bishop's anticipated "opinions," and (c) how the Court could ensure that the anticipated testimony would not risk unduly confusing the jury.

*First*, the Government acknowledges that testimony about financial transactions and analysis of flow of funds is to be expected in a case where the Government has brought money laundering charges. As the Court recognized, however, the defendant's expert disclosure regarding Mr. Bishop was plainly insufficient. *See* Dkt. 305 at 4 (notice "does not explain Bishop's accounting methodology."). The Court ordered the defendant to supplement his disclosures "to provide a 'complete statement of all opinions' and 'the bases and reasons for them.'" Dkt. 305 at

5 (quoting Fed. R. Crim. P. 16(b)(1)(C)(iii)).  Despite having been granted that opportunity, Mr. Bishop's disclosure is still materially inadequate and fails to provide a complete statement of his opinions and the bases for those opinions.  *See* Bishop Discl. at 2; Bishop Supp. Discl. at 2-3.  The defendant's failure to provide a disclosure that complies with Rule 16 impedes the Government's ability to evaluate and respond to Mr. Bishop's proposed expert testimony.  The Government still does not have sufficient information about Mr. Bishop's methodology and assumptions to, for example, permit the Government to identify a rebuttal expert or otherwise evaluate the reliability of Mr. Bishop's stated methodology and opinions—particularly with less than three weeks until trial begins.

Even if there were sufficient time, however, the disclosure does not articulate Mr. Bishop's categorization of expenses with adequate specificity to enable the Government to evaluate whether the proposed testimony will be "the product of reliable principles and methods" and will reflect "a reliable application of [those] principles and methods." Fed. R. Evid. 702.  The description in the "Methodology" tab of Exhibit A of the types of transactions that were allocated among Mr. Bishop's four categories of expenses—Corporate Expenses, Political Movement Expenses, Personal Expenses, and Undetermined Expenses—is inadequate.  For example, the notice indicates that Mr. Bishop categorized counterparties to each transaction "based on name and/or online research of the individual/entity to determine the nature of the transactions."  *See* Ex. A.  This general description gives the Government no way to know (a) which counterparties were categorized by name; (b) what guidance or metrics Mr. Bishop used to determine which of his four categories to assign to specific names; (c) the source of any such guidance or metrics regarding those determinations; (d) which counterparties were, instead, categorized based on "online

research;" and (e) what websites Mr. Bishop relied on, much less whether Mr. Bishop's approach "is reliable and generally accepted in the field." *See* Fed. R. Evid. 702.

*Second*, Mr. Bishop's anticipated testimony—as articulated in the notices—is in the form of summary testimony and does not reflect reliable, testable methodology or analysis. The four anticipated opinions cited in Mr. Bishop's supplemental disclosure come nowhere near "expert" testimony, because they reflect no "'scientific, technical, or specialized' knowledge." Fed. R. Evid. 702. Distilled down to its essence, Mr. Bishop will opine that:

1) Money in the 94[8] accounts Mr. Bishop analyzed was used to pay for things, including: "payroll and vendor" expenses (defined as "Corporate Expenses"); "expenses related to activities of the political movement of which Mr. Kwok as a part . . . such as expenses to support protest[s]" (defined as "Whistleblower Movement" expenses); "personal expenses for Mr. Kwok and his family" (defined as "Personal Expenses"); and other expenses (defined as "Undetermined Expenses");

2) Guo's personal expenses included yacht and private aircraft maintenance, automobiles, and what appear to be other luxury lifestyle expenses, and his personal spending was relatively consistent from 2015 through 2023[9];

3) Guo had substantial personal expenses both before and after the Farm Loan Program;

4) The amount of incoming funds characterized as "other" exceeded the combined "personal" and "undetermined" outgoing expenses from 2015 through 2023.

As noted above, Mr. Bishop's opinions are more accurately characterized as summary testimony, not expert testimony. They appear to be based on review of various bank and other financial

---

[8] One of the accounts Mr. Bishop incorporated into his analysis was the ACA Capital account at First Abu Dhabi Bank. The Court held that records from that bank account are not admissible at trial. Dkt. 319. The Government understands that the defense intends to amend Mr. Bishop's analysis accordingly.

[9] "Personal" expenditures (which Mr. Bishop defines to include "payments to vendors and service providers for yachts, private aircraft, and automobile dealers") reflected a "consistent pattern" from 2015 through 2023.

records and to, in effect, merely set forth the information in those records in various different ways. The Government concedes that Mr. Bishop or another defense witness could testify and summarize transactions reflected in bank records.  But the proposed testimony does not rise to the level of "expert" opinions, and the Court should exercise its "gatekeeping role."  *Daubert*, 509 U.S. at 597.

Specifically, the notice also does not provide sufficient information to evaluate what methods Mr. Bishop has applied in defining the concept that would be critical to any relevance of his proposed testimony—specifically, which counterparties Mr. Bishop is associating with the Farm Loan program, and thus which transactions constitute Farm Loan Inflows for purposes of his "expert" opinions.  Instead, Mr. Bishop appears to define the Farm Loan Proceeds by applying the following entirely unscientific, unreliable, and untestable assumptions:

- Mr. Bishop automatically *excludes* any "[i]nflows to HCHK" (which presumably means any incoming transactions among the collective 36 bank accounts held in the names of either HCHK Technologies, Inc., or HCHK Property Management, though it is not clear from the face of the disclosure) from the Farm Loan Proceeds—with no indication that he analyzed all incoming HCHK transactions and determined, based on the counterparty information (or "internet research") that those inflows were, in fact, unrelated to the Farm Loan program.

- Mr. Bishop automatically excludes inflows "from entities *related to Kwok*" from the Farm Loan Proceeds—without either identifying those "related" entities or explaining why he has excluded those inflows, as a rule.

- Mr. Bishop splits a single $9 million wire transfer from Greenwich Land to Lamp Capital into two separate categories for purposes of his analysis, categorizing $4 million as Farm Loan Proceeds and $5 million as "Other Inflows"—with no explanation or justification whatsoever.

Indeed, Mr. Bishop's disclosure misleadingly incorporates the word "relevant" to confuse the Court in the same way his testimony would impermissibly confuse the jury.  Specifically, the disclosure states that Mr. Bishop's "expert" opinions will include "the nature and quantum of *relevant* inflows, and the nature and quantum of *relevant* outflows" across the specified bank accounts that brought in and managed Farm Loan Program funds.  Guo's Opp'n to Mot. to Preclude

Experts, Dkt, 288, at 16 (emphases added).  To be clear, the Government does not contest that transactions and money movements are relevant to arguments either side is likely to advance at trial, either to support or refute the Government's allegations of the laundering and misappropriation of fraud proceeds.  That said, Mr. Bishop's expert notice has not established that the specific money transfers Mr. Bishop selected are of particular relevance to any defense against the fraud and money laundering charges Guo faces—especially since, as described herein, Mr. Bishop's categorization of the transactions suffers fatal factual defects.  Indeed, it is no defense against wire fraud or securities fraud charges for Guo to show that he spent the proceeds of the fraud on personal expenses (including yacht and private airplane expenditures).  Nor is it a defense for him to suggest that his spending approximately the same amount of money[10] on his luxurious lifestyle before the alleged fraud (i.e., before 2018) as he spent after he collected the fraud proceeds absolves him of culpability.  The defense should not be permitted to hold Mr. Bishop's unsupported and unreliable analysis out as an "expert" opinion in a manner that is certain to confuse the jury and unduly prejudice the Government.

*Third*, Mr. Bishop's stated methodology is unreliable and inconsistent with the particular circumstances of this case.  Despite the fact that the Himalaya Farm Alliance and the Farms that offered the loan program are central to any possible relevance of Mr. Bishop's anticipated

---

[10] Mr. Bishop draws the line for his analysis at May 2020, which is when the Government alleges the Farm Loan Program began.  But Mr. Bishop's analysis ignores the broader factual allegations, which charge Guo with executing a scheme to defraud starting in or around 2018 (through the Rule of Law entities, and later the GTV Private Placement).  The Government has not alleged that the sole fraud proceeds that flowed through the Family Office accounts Mr. Bishop included in his analysis were derived from the Farm Loan Program.  Accordingly, Mr. Bishop's methodology of segregating the Farm Loan Proceeds from the other categories (of other, uncategorized, personal, or political movement expenses) misleadingly implies that funds falling outside his category of Farm Loan Proceeds are not the proceeds of the charged fraud.  That is factually incorrect and poses a significant risk of confusing and misleading the jury—particularly if that view is presented as an "expert" opinion.

testimony, a cursory review of Exhibit A reveals that Mr. Bishop's assumptions and methodology are neither "reliable" nor "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. As noted above and in Exhibit A, Mr. Bishop categorically excluded *any* inflows to HCHK from his calculation of Farm Loan Proceeds, with no explanation for his methodology. To take just one example: Exhibit A reflects three incoming transactions into an HCHK Technologies, Inc. account and an HCHK Property Management, Inc. account at TD Bank during the Farm Loan time period (*i.e.*, post-May 2020). *See* Bishop Supp. Discl. Ex. A, "Data" tab, rows 9964, 9968, and 9973. Those three incoming transactions, or inflows, are wire transfers from Mountains of Spices LLC, totaling a combined $2,908,880. *See id.* Mountains of Spices LLC is the corporate entity that operated the New York Farm and was the purported "borrower" on Farm Loans for New York Farm members; it is also alleged to be a member of the charged RICO enterprise. *See* Indictment ¶ 3.a. Accordingly, funds held by Mountains of Spices are proceeds of the G Enterprise. Despite tagging the Inflow/Outflow Type as "Farm Entity" for the Mountains of Spices transactions, Mr. Bishop then categorized the funds as "Other Inflows from Kwok-Related Entity" and, based on the Assumptions highlighted above, appears not to consider these incoming funds as related to the Farm Loan Program. This simply makes no sense. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos,* 303 F.3d at 266; *see Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.") Given how difficult it is for the Government to make sense of Mr. Bishop's unexplained theory and his inconsistent application of his stated methodology to the facts of this case, the Court can have no

reassurance that Mr. Bishop's testimony would do anything but confuse the jury.

While the Government would be entitled to cross-examine Mr. Bishop on these matters, the Court's preliminary gatekeeping role regarding expert testimony acknowledges that such testimony can be "both powerful and quite misleading," even when subject to cross-examination. *See Daubert*, 509 U.S. at 595. Here, moreover, these substantial Rule 403 problems dovetail with the inadequacy of Mr. Bishop's disclosure. The disclosure does not sufficiently describe the methodology Mr. Bishop applied, nor does it establish that the methodology is a reasonable one. The supplemental disclosure for Mr. Bishop does not provide the Government "with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" or "permit more complete pretrial preparation." Fed. R. Crim. P 16, Adv. Comm. Notes, 1993 Amendment.

If the Court does not grant the Government's motion to preclude, or limit, the testimony of Mr. Bishop on the papers, the Government respectfully requests that the Court conduct a *Daubert* hearing to evaluate Mr. Bishop's methodology, and the relevance and reliability of the proposed expert testimony. This is particularly necessary because Mr. Bishop's disclosure remains opaque and is rifle with sweeping conclusions based on unclear methodology. Further, Mr. Bishop's testimony runs a substantial risk of confusing the jury. Permitting the expert testimony of Mr. Bishop, a former federal law enforcement official, necessarily carries with it a message to the jury that his analysis bears on whether the Government has met the elements of the charged offenses. That is, the risk of Mr. Bishop's testimony is that it could confuse the jury into believing that, if Guo's income and expenditures did not change during the fraud and/or some fraud proceeds were not used for inappropriate reasons, there has been a failure in the Government's proof—when that is simply not the case under blackletter law. *See United States v. Szur*, 289 F.3d 200, 214 (2d

Cir. 2002) (holding that wire fraud was completed and funds became fraud proceeds "at the moment they were in the control of the perpetrators"). At a minimum, therefore, the Court should understand more particularly what Mr. Bishop's proposed testimony would be through a *Daubert* hearing so it can properly weigh these risks against any probative value of the specific proposed testimony. Such a hearing would be appropriate before any of this confusing and prejudicial evidence is presented to the jury, especially in areas where courts have recognized that the potential for prejudice is particularly high. *See Daubert*, 509 U.S. at 595 (explaining that "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses" because "[e]xpert evidence can be both powerful and quite misleading").

Accordingly, if the Court does not grant the Government's motion to preclude Mr. Bishop's testimony, a *Daubert* hearing is appropriate so that the Court can adequately assess the admissibility of Mr. Bishop's testimony on a full record.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should exclude or, alternatively and as indicated above, limit the testimony of (1) Raymond Dragon, (2) Maggie Sklar; (3) Paul Doran; and (4) Thomas Bishop.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/
     Micah F. Fergenson
     Ryan B. Finkel
     Justin Horton
     Juliana N. Murray
     Assistant United States Attorneys
     (212) 637-2190 / 6612 / 2276 / 2314

Dated: May 3, 2024
     New York, New York