

**Sidhardha Kamaraju**

Direct Tel: 212-326-0895
Direct Fax: 212-326-0806
skamaraju@pryorcashman.com

April 29, 2024

**VIA EMAIL**

Ryan Finkel, Esq.
Juliana Murray, Esq.
Micah Ferguson, Esq.
Justin Horton, Esq.
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
26 Federal Plaza
New York, NY 10007

          **Re:**    <u>*United States v. Kwok et al.*, **Case No. 1:23-cr-00118 (AT)**</u>

Counsel:

    Pursuant to the Court's April 24, 2024 order, Defendant Ho Wan Kwok provides this supplemental disclosure regarding the expected testimony of Maggie Sklar, Esq.

    **I.**    <u>**The Bases and Reasons for Ms. Sklar's Conclusions**</u>

    Ms. Sklar's expert opinions about the cryptocurrency industry are described further below. In reaching her conclusions she is relying on her ten years in public service, including time spent in senior counsel and policy advisor roles, at the U.S. Commodity Futures Trading Commission ("CFTC") and Federal Reserve Bank of Chicago (the "Federal Reserve"), both of which regulate cryptocurrencies and cryptocurrency exchanges. While at the CFTC and Federal Reserve, Ms. Sklar advised regulators and policy makers about cryptocurrency, blockchain, and cryptocurrency exchange issues. After leaving the CFTC, Ms. Sklar worked as an attorney at the law firm of Davis Wright Tremaine, where she advised clients about issues related to cryptocurrencies and cryptocurrency exchanges. Ms. Sklar is also regularly invited to speak about cryptocurrency issues on panels and at conferences. A list of such topics can be found on her LinkedIn page, a copy of which is attached as Exhibit A.

    Ms. Sklar applied her industry expertise and analyzed numerous documents disclosed to the defense in this case, including the whitepapers (the "White Papers") for H-Dollar ("HDO") and H-Coin ("HCN"), records related to the Himalaya Exchange's custodial arrangements and



April 29, 2024
Page 2

capabilities (including its arrangements with BitGo, Inc.), documents related to work performed on behalf of the Himalaya Exchange, including work by common crypto currency vendors, such as Armanino LLP ("Armanino") and CertiK, the Superseding Indictment, and other publicly available materials.

## II. Ms. Sklar's Expert Opinions

Ms. Sklar will offer the following expert opinions as part of her anticipated testimony:

1. Ms. Sklar will opine that one of the perceived benefits of cryptocurrency is that it can afford a level of anonymity to users in conducting financial transactions. As a result of this feature, cryptocurrencies are often favored by some individuals living under or trying to avoid monitoring by repressive regimes.

2. Ms. Sklar will also opine that, in the cryptocurrency industry, there is a common market understanding that a "cryptocurrency" is digital currency that uses blockchain technology to record transactions on a distributed ledger. Cryptocurrencies are frequently created pursuant to self-executing "smart contracts" and a are used as a store of value. She will further opine that given that HCN and HDO each were minted using smart contracts, which can be seen on the public Ethereum blockchain, and are purchased using fiat currency and traded, they meet the common market understanding of "cryptocurrencies." Finally, Ms. Sklar will opine that, based on the White Papers, HCN was designed to operate as a trading coin and HDO was designed to operate as a stable coin.

3. Ms. Sklar will further opine that the Himalaya Exchange was designed to function as a cryptocurrency exchange based on the descriptions of the Exchange's operations in the White Papers and reports prepared by Armanino (the "Armanino Report") concerning the Exchange, and the fact that the Exchange contracted with recognized vendors that typically provide services to cryptocurrency exchanges, such as BitGo, CertiK, and Armanino.

4. Ms. Sklar will also opine that the Himalaya Exchange operated as a centralized exchange, based on her review of publicly available materials, the Exchange's custodial arrangement with BitGo, the Armanino Report, and the expert disclosure of Professor Amin Shams, the government's proffered expert witness.

5. Ms. Sklar will opine about the manner in which cryptocurrencies and centralized cryptocurrency exchanges operate, in particular:

    a. Holders of cryptocurrencies typically store their tokens in "wallets." When an individual user transfers cryptocurrency to another user's wallet, that transaction may be reflected on a blockchain, or an automated cryptographic ledger.



April 29, 2024
Page 3

   b. Centralized cryptocurrency exchanges often maintain a single wallet or set of wallets in which they store all of a certain token traded on the exchange. For example, a centralized exchange may maintain a single wallet or set of wallets in which the exchange stores all of the Bitcoin traded on the exchange.

   c. When a user of a centralized cryptocurrency exchange wants to purchase or trade a particular cryptocurrency, the exchange does not necessarily transfer the relevant cryptocurrency to an individual wallet for the user. Instead of transferring the cryptocurrency directly to an individual wallet for the user, the tokens remain in the exchange's centralized wallet, and an entry is made on the internal ledger of the exchange. In particular, when a user buys a token, the exchange would record a "credit" in that user's account on the exchange's internal ledger.

   d. As a result of this structure, typically, when a user trades cryptocurrency through a centralized exchange, that trading activity would not be reflected on the blockchain because the cryptocurrency is not actually being transferred from one wallet to another.

   e. Furthermore, centralized cryptocurrency exchanges permit their users to "redeem" or convert their cryptocurrency tokens into the equivalent value in fiat currency, such as U.S. Dollars. For similar reasons, such redemptions would also not typically be reflected on the blockchain, because even though the user is trading his or her token for fiat, there is no transfer of cryptocurrency between wallets—rather, the cryptocurrency remains in the exchange's wallet and a corresponding "debit" is made in that user's account on the exchange's internal ledger.

   f. One result of this structure is that an individual user's trading activity will not be viewable on the public blockchain, but rather, will be privately recorded on the exchange's internal records only.

   g. Accordingly, evidence that there is not substantial on-chain trading or redemption activity of a token, such as is the case with HCN and HDO, does not demonstrate that the token is not a cryptocurrency.

  6. Finally, Ms. Sklar will also opine about common aspects of early adoption of cryptocurrency tokens like HCN and HDO. In particular, Ms. Sklar will opine that:

   a. The value and success of newly developed tokens depends, in part, on their adoption by users.

   b. As a result, issuers of tokens often make efforts to increase user adoption of those tokens, including through marketing.

   c. A common marketing technique with respect to early-stage tokens is to demonstrate that the tokens can be used to purchase products in the real world. The ability to use



April 29, 2024
Page 4

cryptocurrency to purchase real world products can provide a significant use case for a cryptocurrency. As a result, when a cryptocurrency token is first used to purchase real world products, that can be an important event for the market's acceptance of a token.

      d. Market participants in the cryptocurrency industry typically understand the concept of "using" a token to purchase a product to mean that the seller of the good has agreed to accept the token in exchange for the product, and that the buyer has agreed to accept the product in exchange for the token. That is even the case if the seller—*i.e.*, the recipient of the token—subsequently decides to redeem their token and receive fiat currency. In that case, market participants in the cryptocurrency industry would typically describe that scenario as involving two distinct transactions: (i) the first transaction between the buyer and seller of the products, in which the token is exchanged for the product; and (ii) a second transaction between the seller of the product and the exchange, in which the token is exchanged for fiat currency. Based on the norms and practices in the cryptocurrency industry, the fact that the seller decided to engage in the second transaction and ultimately received fiat does not mean that the first transaction did not involve a cryptocurrency.

### III.    Reservation of Right to Supplement

Ms. Sklar reserves her right to further supplement and/or amend these disclosures, including in response to the government's disclosures and the evidence presented in its case-in-chief.

                                                              Very truly yours,

                                                               PRYOR CASHMAN LLP
                                                               Sidhardha Kamaraju
                                                               E. Scott Schirick
                                                               Matthew S. Barkan
                                                               Daniel J. Pohlman
                                                               Clare P. Tilton

Reviewed, Approved, and Adopted by:

Maggie Sklar, Esq.