

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 7, 2024

**VIA ECF AND EMAIL**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Guo*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

    The Government respectfully submits this letter brief in further support of its motion *in limine* to admit certain testimony from ▓▓▓▓▓▓▓▓▓▓ ("Witness-1"), and in response to the defendant's opposition. *See* Dkt. 273 ("Gov't MIL") at 31-34; Dkt. 287 ("Guo Opp'n") at 25-33; Dkt. 310 ("Witness-1 Order"). For the reasons explained below, the Court should admit Witness-1's testimony as described below.

**I.    Procedural Background**

    In its motions *in limine*, the Government moved to admit Witness-1's testimony about conversations he had with Guo and Guo's co-conspirators—Wang and Je—regarding the GTV Private Placement fraud. *See* Gov't MIL at 31-34. The Government argued that Witness-1 was not acting in a legal capacity, that the conversations were not in confidence, and that GTV's assertion of privilege over these conversations was no longer valid because GTV has ceased to be a going concern. *Id.*

    Guo opposed the Government's motion. Relying on Witness-1's lengthy interview by the Securities and Exchange Commission ("SEC") in the civil investigation that ran parallel to this criminal investigation—which the Government had produced in Rule 16 discovery—Guo submitted that Witness-1 had an attorney-client relationship with Guo and served as the *de facto* general counsel of GTV. As to Witness-1, Guo, Wang, and Je, the defendant argued that they were "all working towards the common purpose of the GTV Private Placement" and in fact all held various roles at GTV. Guo Opp'n at 27-28 (explaining Witness-1 was the Secretary of GTV, Wang was a director of GTV, Kwok was the sponsor of GTV, and Je was the advisor to GTV). Guo thus argued that the conversation was subject to Guo's attorney-client privilege under the common interest doctrine. Guo Opp'n at 27-30.

    On April 24, 2024, Guo sent a letter to the Government requesting, in essence, early production of Witness-1's 3500 material. Given the proximity to the deadline for production of material under 18 U.S.C. § 3500, the Government accommodated Guo's request for early production of Witness-1's 3500 material, which it produced to defense counsel on April 29, 2024.

In response to an April 29, 2024 order by the Court, *see* Witness-1 Order, Guo confirmed that he was not relying on any advice-of-counsel defense as to Witness-1. *See* Dkt. 317.

## II.     Legal Standards

The attorney-client privilege does not broadly cover all communications between an individual and an attorney, even if an attorney has, at times, been engaged by that individual to work on certain legal matters. Rather, "[t]o invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). As the Second Circuit has explained, moreover, "since the attorney-client privilege stands in derogation of the public's right to every man's evidence, it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) (internal quotations omitted); *accord United States* v. *Goldberger & Dubin*, 935 F.2d 501, 504 (2d Cir. 1991) ("The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose.").

In-house attorneys regularly provide both legal advice and business or other advice, and only legal advice is subject to a claim of privilege. *See Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962) ("Attorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from essentially professional legal services, give rise to no privilege whatsoever."). The Second Circuit has consistently stated that in assessing whether business or legal advice was provided, courts should examine whether the predominate purpose of the communication with an attorney was to procure legal advice. *In re County of Erie*, 473 F.3d 413, 420, n.7 (2d Cir. 2007). "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged." *Id.* at 421-22 (citing *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998)). If a business decision can be viewed as both business and legal evaluations, "the business aspects of the decision are not protected simply because legal considerations are also involved." *Hardy v. New York News, Inc.*, 114 F.R.D. 633, 643-44 (S.D.N.Y. 1987); *see also Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 444 (S.D.N.Y. 1990) (privilege not extended to management advice).

## III.    Witness-1's Expected Testimony

Almost none of Witness-1's expected testimony, which is described in greater detail below, raises even any potential issue with regard to attorney-client privilege, as it largely falls outside the ken of "legal advice." Indeed, as in-house counsel for an entity within the G Enterprise, Witness-1's work entailed not just providing legal advice, but also serving in various business and administrative functions. Witness-1's expected testimony will relate almost entirely to those business and administrative matters on which he worked. Importantly, the Government will not elicit any testimony from Witness-1 regarding any legal advice he rendered to or privileged conversations he had with Guo in connection with the private litigation Witness-1 was hired by Golden Spring to help manage. *See* SEC Tr. 56 (Witness-1 explaining there were about 20-30 lawsuits in the U.S. and three lawsuits in Hong Kong when he started in 2018). Instead, the

Government expects that Witness-1 will testify almost entirely about business and administrative matters on which he worked for the Guo family, including the organizational structure of various Guo family and G Enterprise entities, bank accounts, financial transactions, and relevant personnel—all matters that Witness-1 testified about extensively in his 72-page SEC interview, to which Guo cites approvingly in his opposition and does not appear to make any objection. Accordingly, the vast majority of Witness-1's testimony is not subject to even any potential claim of privilege.

### A. Family Offices

For example, Witness-1 will provide background on the family office entities that were members of the G Enterprise, such as Golden Spring, Lamp Capital, Leading Shine, and Hudson Diamond, among others, and which were in existence prior to the start of the GTV Private Placement fraud. The Government expects that Witness-1 will testify about these entities' ownership structure, bank accounts, financial transactions, decisionmakers, and personnel. Additionally, as a signatory on bank accounts for these entities, Witness-1 will testify about certain representations that Witness-1 made to banks concerning these entities and the nature of certain financial transactions. Certain of those representations were in response to questions from banks regarding proceeds from the Farm Loan Program fraud that had been sent from the ACA Capital account in the United Arab Emirates (the "ACA UAE Account") to family-office bank accounts. None of this testimony relates to Witness-1's work rendering any legal advice, nor relies on information or communications that are privileged. Instead, this expected testimony relates entirely to Witness-1's business and administrative work, which is not protected by attorney-client privilege. *See In re County of Erie*, 473 F.3d at 421-22.

### B. GTV

The Government also expects Witness-1 to offer limited testimony regarding the GTV Private Placement fraud. As the Court is aware, one component of that fraud was raising funds from unsophisticated and inexperienced investors in contravention of SEC rules. *See* Dkt. 311 at 11-12 (ruling that this evidence was admissible because the "core of criminality" in this case "boils down to conning inexperienced and unsophisticated investors out of their money" (cleaned up)). The funds from unaccredited investors were sent to Voice of Guo ("VOG"), which was to pool the funds for investment in GTV. Co-conspirator William Je suggested this plan in a call among Je, Wang, and Witness-1. Witness-1 then spoke with a securities lawyer about pooling the funds of unaccredited investors. Witness-1 then had a conversation with Je and Wang ("GTV Conversation-1"), and then another conversation with Je, Wang, and Guo ("GTV Conversation-2"), in which Witness-1 communicated his understanding of what was permissible, and impermissible, in the course of the upcoming fundraising. The Government does not know the content of what Witness-1 said in either GTV Conversation-1 or GTV Conversation-2; indeed, Witness-1's counsel advised the Government during interviews with Witness-1 that GTV had, years ago, claimed privilege over the conversations. Nevertheless, soon after Witness-1 had those conversations with Guo and his co-conspirators, Wang informed Witness-1 that he was directed to resign from GTV.

For the reasons explained in Sections IV and V, *infra*, these conversations are not subject to any valid claim of privilege, and Witness-1 should be permitted to testify to their contents. For

the reasons explained in Section VI, *infra*, at a minimum, the foregoing narrative described in this paragraph, absent the content of GTV Conversation-1 and GTV Conversation-2, is admissible.

### C. ROL

The Government expects that Witness-1 will also testify regarding his work at the Rule of Law ("ROL") entities. Witness-1 will testify that he helped facilitate a ROL entity's purchase of a house in Connecticut as a new headquarters. Prior to the Rule of Law entity purchasing the house, a co-conspirator had entered a contract to purchase the house, which the ROL entity essentially took over. Witness-1 will also testify that, shortly before he was fired, he denied a proposal to pay for protestors to protest outside of the SEC. At the time, Witness-1 was no longer the general counsel of Golden Spring and had ceased acting in a legal capacity. Instead, Witness-1 was then the Director of Operations of the ROL entities, and this proposal, which came from ROL's Treasurer and a Farm member who at some point may have been employed by ROL, came to Witness-1 in his non-legal capacity.[1] While it is true that following Witness-1's denial of the proposal to pay SEC protestors, Yvette Wang and Witness-1 separately consulted ROL's outside counsel about this matter, the Government will not elicit any testimony about what advice Witness-1 received. Rather, the Government will elicit that Witness-1 received advice from outside counsel, that Witness-1 conveyed that advice to the Board of ROL, and the Board denied the request. Shortly thereafter, Guo stated in a broadcast that ROL was too bureaucratic and there would be changes. Witness-1 was then terminated by Guo's counsel without explanation.

The foregoing testimony about ROL does not implicate the attorney-client privilege. Witness-1 was acting in a non-legal role as the Director of Operations of the ROL entities. Witness-1 was not even the general counsel of Golden Spring—for a time, the central Guo family office entity— at this point; a new general counsel had been hired.[2]

### IV. GTV Held Any Privilege, Which No Longer Exists

With respect to the conversations about pooling unaccredited investor funds, Guo takes the position that those conversations were privileged because Guo, Wang, and Je—like Witness-1—were all working on behalf of GTV. Guo Opp'n 32-33. Contrary to the arguments in Guo's opposition, however, there is no default "common interest" privilege between a corporation and its officers, employees, or volunteers. Rather, the default is that the privilege belongs to the corporation, and only the corporation may assert it, unless a five-part test is met. Specifically, where an *individual* seeks to assert a personal attorney-client privilege over a matter involving corporate legal advice, that person must meet a five-prong test:

---

[1] In the initial interview with the Government, Witness-1 described ████████████████████ ████████████████████. After describing that request, Witness-1 advised the Government that, actually, the question had come to him in his legal capacity, so it may be potentially privileged. The Government does not intend to elicit testimony about this request.

[2] Additionally, to the extent any person has a claim of privilege over these facts—which would necessarily fail—it would be the ROL entities. Guo, by contrast, was not even privy to any of the ROL discussions. Thus, not only are these facts not privileged at all, but it cannot be seriously disputed that *Guo* cannot assert a personal privilege over these facts.

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123-25 (3d Cir. 1986); *see Int'l Bhd. of Teamsters*, 119 F.3d at 215 (citing *Bevill* approvingly); *see also United States v. Graf*, 610 F.3d 1148, 1161 (9th Cir. 2010) (adopting *Bevill* approach); *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001) (following *Bevill*); *Intervenor v. United States (In re Grand Jury Subpoenas)*, 144 F.3d 653, 659 (10th Cir. 1998) (same).

Guo cannot meet that test. As an initial matter, Guo was not a participant in GTV Conversation-1; that exchange was only between Witness-1, Wang, and Je. Thus, Guo cannot claim a personal privilege over the communications that were part of that conversation; such a claim fails every part of the *Bevill* test because Guo was not even personally involved. Even as to GTV Conversation-2, though, in which Guo did participate, Guo's claim of privilege fails. Even if Guo had an individual attorney-client relationship with Witness-1, that at most goes to elements two and three of the *Bevill* test. And even with respect to those elements, it is by no means apparent that Guo "made it clear that [he was] seeking legal advice in [his] individual rather than in [his] representative capacities" or that Witness-1 was communicating with Guo in his "individual capacity[y], knowing that a possible conflict could arise." *Bevill*, 805 F.2d at 123-25. In any event, the discussion—about how GTV was going to raise money for *GTV's business*, not personal donations or money transfers to *Guo*, individually—clearly concerned "matters within [GTV] or the general affairs of [GTV]" and thus Guo cannot, at a minimum, meet the fifth prong of the test.

Because Guo cannot meet the five-part *Bevill* test, any privilege that may be asserted as to those conversations was held by GTV as a business, not by Guo personally. And as set forth in the Government's motion *in limine*, a corporate privilege does not survive the formal or practical dissolution of the corporation. *See Securities and Exchange Comm'n v. Carillo Huetell LLP*, No. 13 Civ. 1735(GBD) (JCF), 2015 WL 1610282, at *2-*3 (S.D.N.Y. April 8, 2015) (privilege does not survive dissolution of corporation); *TAS Distrib. Co. v. Cummins Inc.*, No. 07-1141, 2009 WL 3255297, at *2 (C.D. Ill. Oct. 7, 2009) ("Absent some compelling reason to the contrary, the attorney client privilege does not survive the death of the corporation."); *Lewis v. United States*, No. 02-2958 B/AN, 2004 WL 3203121, at *4 (W.D. Tenn. Dec. 7, 2004) (same); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. k (2000); 24 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5499 (1st ed. West 2019). *See also Lopes v. Vieira*, 688 F. Supp. 2d 1050, 1068-69 (E.D. Cal. 2010) (former attorney of corporate entity that, although formally still active and in good standing with Secretary of State, had effectively ceased to function did not have authority to assert entity's attorney-client privilege). *Cf. Official Comm. of Admin. Claimants v. Moran*, 802 F. Supp. 2d 947, 949-50 (N.D. Ill. 2011) (stating that courts should look to "practical business realities" rather than technical legal status in determining whether a corporation has "died" for purposes of asserting attorney-client privilege and concluding that plaintiff corporation could

assert privilege because it had continued to pursue claim against defendant after it had entered bankruptcy and thus was never entirely defunct).

Accordingly, Witness-1's conversations regarding pooling funds in connection with the GTV Private Placement are not subject to any valid claim of privilege.

## V. The Crime Fraud Exception Applies

As set forth above, Guo cannot assert a claim of attorney-client privilege over the communications about which Witness-1 will testify. Even if Guo could assert such a privilege, however, the crime-fraud exception applies, as set forth below.

### A. Applicable Law

"The [attorney-client] privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933) (Cardozo, J.).

It is "well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984). "The crime-fraud exception thus insures that the secrecy protecting the attorney-client relationship does not extend to communications or work product 'made for the purpose of getting advice for the commission of a fraud' or crime." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (*quoting United States* v. *Zolin*, 491 U.S. 554, 563 (1989)); *see also In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038 ("Whereas confidentiality . . . facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or unlawful goal cannot be considered 'sound' . . . and the client's communications seeking such advice are not worthy of protection."). Such communications or work product are not protected "even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038.

For the crime-fraud exception to apply, the Government must show that "there is probable cause to believe that a crime or fraud has been attempted or committed" and that "the communications were in furtherance thereof." *In re Richard Roe, Inc.*, 68 F.3d at 40. The probable cause standard in this context is "not an overly demanding" one. *A.I.A. Holdings, S.A.* v. *Lehman Brothers, Inc.*, No. 97 Cir. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999); *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (*quoting In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039). The Court must find that the communication in question was itself in furtherance of the crime or fraud and intended in some way to facilitate or conceal the criminal activity. *In re Richard Roe, Inc.*, 68 F.3d at 40. Thus, to find that the crime-fraud exception applies, the Court need only conclude that "a prudent person [would] have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Id*. at 71.

"[T]he crime-fraud exception embraces common-law fraud," *Specialty Minerals, Inc.* v. *Pleuss-Stauffer AG*, No. 98 Civ. 7775, 2004 WL 42280, at *9 (S.D.N.Y. Jan. 7, 2004), and has

been interpreted to encompass "'misconduct fundamentally inconsistent with the basis premises of the adversary system,'" *Madanes* v. *Madanes*, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001) (quoting *Coleman* v. *American Broadcasting Cos.*, 106 F.R.D. 201, 208 (D.D.C. 1985)). The crime or fraud need not have actually occurred for the exception to be applicable; it need only have been the objective of the client's communication. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039. And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent. *Id*.

Once the Government establishes the factual basis for applicability of the crime fraud exception, the Court may conduct *in camera* review of the relevant communications or, presumably, of the relevant testimony. *See In re John Doe, Inc.*, 13 F.3d at 636 ("*in camera* proceedings may be used to determine whether the [crime-fraud] exception applies to particular communications"). There is no requirement to do so, however, and "the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court." *United States* v. *Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997).

**B. Discussion**

Even assuming that Guo has a claim of privilege over Witness-1's conversations with Guo and his co-conspirators regarding the pooling of investors in the GTV Private Placement fraud, the crime-fraud exception applies.

As an initial matter, there is no question that there is probable cause that a crime has been committed. A grand jury in this District has, on several occasions, found there is probable cause supporting criminal charges against Guo, Wang, and Je—the very same participants in Witness-1's conversations—related to the GTV Private Placement fraud. Indictment ¶¶ 16, 40-43. In addition to the lengthy speaking Indictment in this case, the record includes a sworn affidavit from Special Agent Nicholas DiMarino of the Federal Bureau of Investigation setting forth the basis for fraud and money laundering charges related to the GTV Private Placement fraud against Yvette Wang, one of participants in Witness-1's conversations. *See* Dkt. 1 (Wang Complaint). More generally, as the Government has previously explained, *see* Dkt. 290 (Gov't MIL Opp'n) at 7, an important component of Guo's investment frauds—in the GTV Private Placement fraud and more generally—was evading the SEC's rules meant to protect unsophisticated investors.

There is probable cause to believe that Witness-1's conversations were related to and intended by Guo and his co-conspirators efforts to further the conspirators' efforts to commit these crimes. Indeed, Witness-1's conversations were about what Guo and his co-conspirators could, and could not, do under the SEC's rules. Importantly, Witness-1's conversations were about contemplated future actions, not past conduct. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) ("The exception does not apply if the assistance is sought only to disclose past wrongdoing."). Rather, Witness-1's conversations were about how Guo and his co-conspirators could conduct this forthcoming investment offering—*i.e.*, the GTV Private Placement fraud. Thus there is probable cause that Guo and his co-conspirators' discussion with Witness-1 regarding the GTV Private Placement was "intended in some way to facilitate . . . the criminal activity," that is, the defrauding of investors in GTV. *In re Richard Roe, Inc.*, 68 F.3d at 40. Indeed, the facts here present a paradigmatic case for application of the crime-fraud exception. The defendants contemplated a plan of action that was illegal and suggested that plan to a lawyer, Witness-1. The

defendants then had discussions with that lawyer regarding the legality of their plan. And then the defendants *proceeded* with their illegal plan, defrauding thousands of investors out of over a billion dollars. The defendant's consultation with counsel about their illegal actions in furtherance of the fraud is not privileged, because the crime-fraud exception plainly applies. *See, e.g.*, *S.E.C. v. Herman*, No. 00 Civ. 5575 (PKC) (MHD), 2004 WL 964104 (S.D.N.Y. May 5, 2004) (in securities fraud case about misrepresentations regarding use of investor funds, finding crime-fraud exception applied to communications with lawyers about "carrying out or concealing this planned fraud"); *United States v. Reeder*, 170 F.3d 93, 106 (1st Cir. 1999) (crime-fraud exception applied where client sought advice on potential conduct and attorney advised that the contemplated conduct was "a crime" and the attorney did not "want anything to do with it").

Accordingly, even assuming that Guo has a claim of personal privilege over the conversations with Witness-1 about the GTV Private Placement fraud (which, as explained above, he does not), the Court should hold that the crime-fraud exception applies to those conversations.[3] *See Clark*, 289 U.S. at 15 ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told.")

## VI. Even If The Court Rules that the Conversations About the GTV Private Placement and the ROL Are Privileged, Witness-1 May Testify to the Facts

It is well settled that "[t]he protection of the privilege extends only to communications and not to facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981). Even if the Court holds that the substantive communication between Witness-1 and Guo regarding the pooling of unaccredited investor funds in the GTV Private Placement fraud and protected by a valid claim of privilege by Guo, Witness-1 may still testify to the factual narrative of what occurred, leaving out the substance of his conversation with Guo. In particular, Witness-1 can testify that:

- In a conversation with Je and Wang, Je suggested pooling unaccredited investor funds.
- Witness-1 sought and received outside legal advice on that question, without disclosing to the jury what the advice was.
- Without disclosing what the advice was, Witness-1 then had a conversation with Je and Wang, and then Je, Wang, and Guo.
- Thereafter, Wang directed Witness-1 to resign from GTV.

*See* Section II(B), *supra*. None of these facts are *communications* over which Guo holds any privilege. This sort of sanitized factual narrative is what is routinely conveyed by parties claiming privilege—through redactions of legal advice and descriptions on privilege logs—in litigations across the country every day. *See, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 04394 (AJN) (BCM), 2018 WL 10038859, at *1 (S.D.N.Y. Sept. 28, 2018) (privilege log must provide "sufficient detail . . . to permit a judgment as to whether the document is at least

---

[3] To the extent the Court finds that the Government has not established the probable cause standards set forth in *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039, the Government certainly has established the lower threshold of "'a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review may reveal evidence to establish the claim that the crime-fraud exception applies.'" *In re John Doe*, 13 F.3d at 636 (*quoting* Zolin, 491 U.S. at 572).

potentially protected from disclosure," including the general subject matter of the document) (quoting *United States v. Constr. Prod. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)).

The same is true of the facts regarding the ROL entities. As noted, the Government is not seeking a ruling from the Court to elicit in Witness-1's testimony the advice that was received from outside counsel about the propriety of payments to SEC protestors. Instead, the Government seeks to elicit the following facts, none of which are privileged communications:

- In his operational role, Witenss-1 received and denied a proposal to pay SEC protestors.
- Yvette Wang and Witness-1 separately consulted ROL's outside counsel about this matter.
- Without disclosing what the advice was, Witness-1 conveyed the advice he received to the Board of ROL, and the Board denied the request.
- Shortly thereafter, Guo stated in a broadcast that ROL was too bureaucratic and there would be changes.
- Witness-1 was then terminated by Guo's counsel without explanation.

*See* Section II(B), *supra*.

Guo cannot claim privilege over these facts, and Witness-1's testimony at trial to these facts is consistent with "the public's right to every man's evidence." *Int'l Bhd. of Teamsters*, 119 F.3d at 214.

## VII. Conclusion

For the reasons set forth above, the Court grant the Government's motion *in limine* and permit Witness-1 to testify regarding his conversations about the GTV Private Placement fraud.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: __/s/_____
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314