E6qdtag1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4               v.                            13 Cr. 0115(RA)

5   JAMES TAGLIAFERRI,

6               Defendant.

7   ------------------------------x
                                             June 26, 2014
8                                            9:44 a.m.

9   Before:

10                    HON. RONNIE ABRAMS,

11                                           District Judge

12
                          APPEARANCES
13
    PREET BHARARA
14       United States Attorney for the
         Southern District of New York
15  BY:  JASON HARRIS COWLEY
         PARVIN DAPHNE MOYNE
16            Assistant United States Attorneys
              – and –
17  SECURITIES AND EXCHANGE COMMISSION
    BY:  SAIMA S. AHMED
18
    LAW OFFICES OF SCOTT B. TULMAN
19       Attorneys for Defendant
    BY:  SCOTT B.  TULMAN
20       SUSAN PAPANO
         ROBERT MARTINEZ
21
            – also present –
22
    Rebecca Baskin, Government Paralegal
23
    Shiyu Pan, Defense Paralegal
24

25

E6qdtag1
                              Trial

1              (Trial resumed; jury not present)

2              (Case called; all sides ready)

3              THE COURT:  So first I just want to advise you that

4    Juror No. 2, Mr. Bonuomo, advised my deputy that he has a

5    medical procedure scheduled for July 22nd, and he wants to know

6    if he should reschedule it, and he said the sooner the better.

7    She indicated that we should be done by then, but that she

8    wanted to check with me to verify.

9              So I don't know if you want me to tell him to

10   reschedule it or tell him we expect to be done by then.

11             MR. COWLEY:  The government still expects to be done I

12   think well before then, your Honor.

13             THE COURT:  OK.  Mr. Tulman.

14             MR. TULMAN:  Yes, I have no reason to --

15             THE COURT:  All right.  We are going to tell him we

16   expect to be done by then and that he doesn't need to

17   reschedule if it is not pressing.  He is welcome to, but we

18   don't think he needs to do that.  OK?

19             So now I am ready to rule on the motion in limine.

20             After carefully considering all of the parties'

21   submissions and arguments, I'm prepared to rule on the

22   remaining government motion in limine.  I'll just note at the

23   outset that this issue is a close question because it requires

24   the Court to balance the defendant's constitutional right to

25   present a defense against the concern about confusion to the

E6qdtag1
Trial

jury and prejudice the government may suffer from defendant's
last-minute waiver of the attorney-client privilege.

First, I'm not going to give an advice-of-counsel
instruction -- and, just to be clear, no one has asked me to --
or permit defendant to argue specifically that he relied on any
lawyer's advice.  In determining whether a defendant is
entitled to an advice-of-counsel instruction, the Second
Circuit has held that he must show that he "made complete
disclosure to counsel, sought advice as to the legality of his
conduct, received advice that his conduct was legal, and relied
on that advice."  Markowski v. SEC, 34 F.3d at 105; see also
United States v. Colasuonno, 697 F.3d at 181.  Defendant
explained on Tuesday that he was not seeking this instruction
because he does not expect the evidence to show that
Mr. Tagliaferri sought specific legal advice on any particular
legal issue.  See pages 14 and 15 of Tuesday's transcript.  So
I don't want any testimony or argument that Mr. Tagliaferri
relied on his attorney's advice -- because, according to
Mr. Tulman, Mr. Tagliaferri did not receive any advice about
what was required to be disclosed.

I am, however, going to permit the defendant to elicit
testimony that attorneys were involved in the transactions
(which will in any way event come out on the government's
case), and I will permit him to argue that this involvement
affected his state of mind, thus bearing on whether he acted

Trial

```
 1   with fraudulent intent.   In United States v. King, the Second
 2   Circuit concluded that the defendant was not entitled to an
 3   advice-of-counsel instruction, but noted in a footnote that he
 4   had "suggested the defense in his summation."   The Eastern
 5   District of Virginia addressed the issue even more directly in
 6   United States v. Okun, 2009 WL 414009, at *6-*7 (2009) and held
 7   that, quote, "If [the defendant] is not able to furnish
 8   sufficient evidence to warrant an instruction on the good faith
 9   reliance on counsel defense, any evidence of attorney advice
10   presented might be relevant to the issue of specific intent."
11   Additionally, the D.C. Circuit has explained that "reliance on
12   the advice of counsel need not be a formal defense; it is
13   simply evidence of good faith, a relevant consideration in
14   evaluating a defendant's scienter."   See Howard v. SEC, 376
15   F.3d at 1147 (2004).   Put more concretely, if he has an
16   evidentiary basis for doing so, the defendant may argue that
17   attorneys who drafted or reviewed documents related to the
18   charged transactions did not inform him of the illegality of
19   his receiving fees or that formal disclosure of them was
20   required, and that the defendant took comfort in the attorney
21   silence.   The government is, of course, free to cross-examine
22   Mr. Tagliaferri if he testifies so as to establish that he
23   never sought legal advice on this issue and that he was not in
24   fact acting in good faith.
25              The government points out that a defendant waives
```

E6qdtag1
Trial

1    attorney-client privilege by raising the advice-of-counsel

2    defense, and argues that it is prejudiced because

3    Mr. Tagliaferri or his company previously claimed that certain

4    documents were privileged and did not produce them.  The

5    defendant first announced that he was waiving the privilege on

6    Tuesday, the first day of jury selection in this trial; that

7    delay inevitably has caused government prejudice in its

8    investigation and preparation for trial.  In an attempt to

9    remedy the prejudice caused by this untimely waiver, I'm going

10   to require the defendant to make a reasonable, good faith

11   effort to produce to the government any documents that it was

12   otherwise obligated to produce that were previously withheld on

13   grounds of attorney-client privilege.  Although I recognize

14   that counsel is on trial and that the volume of documents in

15   this case is high, I'm going to ask Mr. Tulman to make a

16   diligent search for these documents and report to the Court and

17   the government on his progress by the end of the day on Monday.

18   Depending on what his search uncovers, I may permit the

19   government to recall witnesses, if necessary, and will consider

20   any other requests on this point that the government wishes to

21   make.

22         So to summarize:  The defendant may not argue that he

23   relied on explicit advice of counsel, but he may note the

24   involvement of attorneys and how their involvement bore on his

25   intent or lack of intent.  In so doing, I intend to ensure that

E6qdtag1
                              Trial

1    the evidence is not cumulative in nature and will consider a

2    limiting instruction if the government believes that it may

3    assist in preventing juror confusion.  Given the last-minute

4    nature the defendant's waiver, I will expect him to act with

5    good faith in attempting to locate any documents that were

6    previously withheld as privileged but otherwise producible.

7            OK?  Do you have other issues you would like to raise?

8    All right.

9            MR. TULMAN:  No, your Honor.

10           THE COURT:  I think we are waiting for two jurors.  We

11   are going to check on them right now.

12           (Pause)

13           THE COURT:  Is everyone ready for the jury?

14           All right.  We will bring them out.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

E6qdtag1                         Opening - Ms. Moyne

1          (Jury present)

2          THE CLERK:  All rise.

3          THE COURT:  Good morning, everyone.

4          JURORS:  Good morning.

5          THE COURT:  You may all be seated.

6          We are going to begin with the government's opening

7     statement.  Remember, this is not evidence but just a preview

8     of what the parties expect to come.

9          Ms. Moyne.

10          MS. MOYNE:  Thank you.

11          Good morning.

12          This is a case about lies, greed, and betrayal.  It is

13     about how the defendant, James Tagliaferri, lied to clients who

14     trusted him with their own money.  It is about the defendant's

15     scheme to make himself rich with other people's money, to keep

16     the scheme going, and to cover up his fraud before he was found

17     out.  All told, the defendant earned millions of dollars from

18     his scheme, while his clients lost tens of millions of dollars.

19          You will learn that for many years, the defendant was

20     paid to invest other people's money for them and to make money

21     for these people, who were his clients.  He was known as an

22     investment advisor.  When the defendant's clients made money,

23     the defendant made money, because he was entitled to take a

24     small percentage of his clients' money as a fee for himself.

25     And for many years the defendant and his clients did well:  He

1   by investing their money in safe, solid, investments and

2   watching -- and earning his fees, and his clients' by watching

3   their money grow.  But in 2007, the defendant made a decision.

4   His legitimate fees weren't enough.  The defendant began

5   investing his clients in companies because the people behind

6   those companies promised to pay the defendant money.  Instead

7   of putting his clients' money in safe investments that would

8   benefit them, he put his clients in risky investments that

9   would benefit him.  And the defendant made this choice because

10  the people behind these risky investments promised to pay him.

11  And they did -- they paid him lots of money.  Payments that the

12  defendant kept secret from his clients.  Over the course of

13  about three years, the defendant earned $3 million in these

14  secret payments, or kickbacks.

15          And the defendant didn't just lie to his clients about

16  the secret payments he received.  He lied to them about how his

17  investments were performing.  When some clients wanted out of

18  the risky investments, the defendant used other clients' money

19  to pay them back.  In other words, he robbed Peter to pay Paul

20  so the scheme could continue and he wouldn't get caught.

21          But the defendant did get caught, and that is why we

22  are here today.  Because when the defendant knowingly lied to

23  his clients, when he betrayed them and stole from them, he

24  violated the federal laws that protect people who invest their

25  money with others, and he has been charged with those crimes.

E6qdtag1                          Opening - Ms. Moyne

1          In this opening statement, I am going to do two

2    things.  First, I am going to give you a preview of what I

3    expect the evidence will show, and, second, I am going to

4    describe some of the ways we will prove our case to you.

5          So, what will the evidence show?

6          The defendant was an investment advisor, which means

7    that he was in the business of investing money for people.  He

8    was hired by people, his clients, to make decisions for them

9    about how they should invest their money, in stocks and bonds

10   and other assets, to try to make more money.

11         You will learn in this trial that an investment

12   advisor has a special relationship of trust with his clients,

13   kind of like doctors have with patients.  As an investment

14   advisor, the defendant was required to be honest with his

15   clients and to make investments for them that was in their best

16   interests.  You will learn that, because the defendant's

17   clients trusted him to do just that, they gave him complete

18   control, which meant that the defendant could decide what to

19   buy and sell without asking anyone's permission first.

20         The defendant had a partner and they ran their

21   business from a office in Connecticut, and at any given time he

22   had dozens of clients whose money he was managing.  As I

23   mentioned earlier, the defendant made money by earning fees

24   from his clients based on how much money they had.  The fees

25   were well known to his clients, and they didn't change over

1    time.  Each year, because the defendant had so many clients, he

2    earned several hundred thousand dollars in salary.

3         The defendant and his business partner ran a

4    legitimate business for decades, managing money and earning

5    fees from clients.  But at a certain point everything changed.

6    The defendant moved the business to the U.S. Virgin Islands, he

7    changed the name of the business, and he began to lie and to

8    cheat and to steal to make more money.

9         The defendant's fraud had three parts or phases -- the

10   kickback scheme, the shell game, and the fake IOU notes.  Each

11   was related to the other.  I am going to describe each of them

12   briefly for you now, and then I will describe each of them in a

13   little bit more detail and explain how they fit together.  At

14   the end, you will see how, as a result of his fraud, the

15   defendant was secretly paid millions of dollars, while his

16   clients lost tens of millions of dollars.

17        First, the kickback scheme.

18        Starting in 2007, the defendant began investing his

19   clients in risky investments that paid him money.  These were

20   companies that needed money so desperately that they agreed to

21   give the defendant a portion of every dollar he invested with

22   them.  So, for example, for $1 million of his clients' money

23   that the defendant invested in one of these companies, he was

24   paid $100,000 on the side.  These payments are called kickbacks

25   because the company is kicking back, or giving money back to

E6qdtag1                        Opening - Ms. Moyne

1    the defendant for investing money with them in the first place.

2    And they were secret because the defendant told his clients

3    exactly the opposite -- the defendant told his clients that he

4    did not get paid by the companies for making investments.  In

5    this part of the scheme, the defendant lied to his clients and

6    he stole a portion of their money.

7           The second part of the defendant's fraud is the shell

8    game.

9           Not surprisingly, at a certain point the companies

10   paying the kickbacks could not pay back the money they owed to

11   the defendant's clients.  So, to cover up the losses and hide

12   his fraud, the defendant began moving money around so that some

13   clients paid back other clients.  In this part of the scheme,

14   the defendant lied to his clients about how their investments

15   were doing, and he used money from some clients to pay other

16   clients, all to keep the scheme alive.

17          Finally, the fake IOU notes.

18          As the defendant struggled to keep his lies from being

19   exposed, he created phony paperwork to cover his tracks and to

20   make his clients look safe, the clients' investments look safe,

21   when in fact they were not.  More lies, and more stealing.

22          Now, I'm going to talk to you about each phase of the

23   fraud in more detail, and let's start with the kickbacks.

24          As I mentioned a moment ago, this phase of the fraud

25   began in 2007, when the defendant began entering into

1  agreements with people running companies that desperately

2  needed money.  In these agreements, which the defendant kept

3  secret from his clients, the defendant agreed to invest his

4  clients' money in the company, and, in return, the company

5  agreed to pay the defendant some money -- usually 10 percent.

6          Let me give you an example.  If you turn to your

7  screen, the defendant made it appear that 100 percent of his

8  clients' money went to the company, but he actually took a

9  kickback of 10 percent and his clients were not told about that

10  kickback.

11          Let me tell you about the companies that the defendant

12  decided to invest his clients in during the kickback scheme.

13  Some of these companies were real companies but they had fallen

14  on hard times.  They were losing money and needed help even to

15  stay in business.  It was not Apple or Coca-Cola or Exxon that

16  was paying kickbacks to the defendant.  For example, one of the

17  companies paying kickbacks to the defendant was a horseracing

18  company on Long Island.  This company owned some famous horses

19  that had raced in the Kentucky Derby and Belmont, but in 2007

20  the company had problems.  It couldn't pay its bills and it

21  desperately needed cash.  So the horse racing company and the

22  defendant made a deal -- the defendant loaned his clients'

23  money to the horse racing company for a fee -- a kickback --

24  without telling his clients that he was being paid kickbacks in

25  exchange for the loans.

1        You will hear that at the same time -- at about the
2   same time as he received kickbacks from the horseracing
3   company, the defendant also began investing his clients into a
4   group of companies run by two brothers who lived in California.
5   The brothers' companies also had problems.  You will learn that
6   some of these companies were not even real companies.  They did
7   not provide products or services, and they simply existed on
8   paper.  In fact, one of the companies was basically just a bank
9   account that had been set up for the purpose of paying the
10  mortgage on the multimillion dollar mansion of one of the
11  brothers.
12       Like the horseracing companies, the brothers also
13  agreed to pay the defendant kickbacks in exchange for making
14  loans to their companies.  And so from 2007 through 2010, the
15  defendant poured tens of millions of dollars of his clients'
16  money into the brothers' companies -- even the mansion and the
17  other companies -- and reaped the benefits of these investments
18  in the form of the secret side payments.
19       Now, you will learn that although the people at the
20  companies knew about the payments, the defendant's clients did
21  not know about them when the defendant made the investments.
22  Getting paid to do business is one thing.  Lying to clients
23  about getting paid is another.  You will learn that the
24  defendant lied to his clients about the fact that he put their
25  money in companies that paid him kickbacks.  And of course he

E6qdtag1                        Opening – Ms. Moyne

1    didn't tell them, because, as you will learn, they never would

2    have agreed to make the investments in the first place.

3          And you will learn that the defendant knew full well

4    that he was supposed to tell his clients about the kickbacks.

5    You'll see paperwork that he sent to clients in which the

6    defendant represented he was not receiving money from companies

7    in connection with his investment decisions, when in fact he

8    was.

9          And you'll also learn that the defendant told the same

10   lie to the SEC, the government agency that regulates investment

11   advisors.  So there will be no question that the defendant knew

12   that he was lying to his clients when he took millions of

13   dollars in kickbacks and he failed to tell them about it.

14         So what happened to the clients' money?  Not

15   surprisingly, many of the investments failed -- the horseracing

16   company and the mansion company and many of the brothers' other

17   companies could not pay back the defendant's clients.  And, as

18   you would expect, as time went on, the defendant's clients

19   became upset -- they repeatedly asked the defendant where their

20   money was and they demanded to be paid back.

21         What did the defendant do?  Did he tell his clients

22   that he lost millions of dollars of their money?  Did he tell

23   them that he put them in investments that were so undesirable

24   that he himself would later describe them as the equivalent of

25   garbage?  No.

1          To cover up his lies about the kickbacks, the

2     defendant began another phase of the fraud -- the shell game.

3          In this part of the scheme, the defendant sold an

4     unprofitable investment from one client to another, not because

5     it was good for the second client, but only to keep the first

6     client from complaining to the defendant or, even worse, going

7     to the government.

8          Let me give you an example and you can see it visually

9     on your screen.  The defendant had invested Client 2 -- on the

10     right -- in a company and Client 2 wanted to sell the

11     investment but the investment wasn't doing well.  Instead of

12     telling Client 2 the truth, the defendant caused another

13     Client, Client 1, to buy the investment from Client 2.  So

14     Client 1's money went to Client 2, and Client 1 got the failing

15     investment in return.  It was a swap.  And when he did that,

16     the defendant never told Client 1, the one buying the failing

17     investment, that it was only being sold so that Client 2 would

18     not complain.

19          From this example, and others like it, you will learn

20     that the defendant used the shell game -- moving losing

21     investments from one client to another -- to keep the scheme

22     going and to make sure he did not get caught.  And in many

23     cases you will learn that the defendant frequently dumped risky

24     investments on the clients who were least likely to question

25     him.

1          Not surprisingly, you will learn that the shell game

2     became more and more complicated as time went on because the

3     defendant had to cover up losses for more and more clients.  In

4     particular, the defendant schemed with the brothers I talked

5     about earlier to hide the clients' losses in the brothers'

6     companies, like the mansion company.

7          In many cases, the defendant and the brothers covered

8     up losses by using one client's money to buy stock of a company

9     controlled by one of the brothers, and then used the money that

10    was used to pay the stock to pay back another client.  What the

11    client buying the stock did not know was that the stock

12    investment was failing.

13         This is how it worked.

14         In this slide, Client 2 (on the bottom) is owed money

15    for an investment in one of the brothers' companies and is

16    asking for her money back.  The defendant used Client 1's money

17    to pay Client 2, just as we saw in the other example.  In this

18    example, the defendant sent Client 1's money to an account that

19    he controlled, and in exchange Client 1 received shares of

20    stock from the account.  Then the defendant sent Client 1's

21    money to Client 2 to pay back Client 2 and to keep her quiet.

22    In this example, as in real life, Client 1 was being cheated

23    because the defendant never told Client 1 that the investment

24    in stock had been made only to make sure there was enough money

25    to pay back Client 2.  And Client 1 was cheated in a second

1    way, because this Client was stuck with shares of stock which

2    was almost impossible to sell because nobody else wanted it.

3    So in this example Client 1 ends up losing money, which is

4    exactly what happened to many clients in real life who were

5    lied to and cheated by the defendant in the part of the scheme

6    that involved the shell game.

7          Throughout this trial you are going to see many

8    examples of these kinds of shell games, and as I mentioned a

9    moment ago, the lies and the schemes became more and more

10   complicated as the defendant had to cover up more and more

11   losses for his clients.

12         At the end of the trial, there will be no question

13   that the defendant knew that the shell game was a fraud.  Among

14   other things, you will hear that the defendant promised each of

15   his clients that he would tell them if he involved one client

16   in a trade with another client -- and you will learn that he

17   never did.

18         Which brings us to the final phase of the defendant's

19   fraud -- the fake IOU notes.

20         This part of the scheme began with another shell game.

21         Looking at the screen, you will see that there are two

22   companies involved, Company 1 and Company 2.  The defendant had

23   invested clients in Company 2.  Company 2 owed those clients

24   money, but Company 2 couldn't pay.  Company 1 owed Company 2

25   money, but Company 1 also didn't have money to pay.  So the

1    defendant invested clients in Company 1 and directed Company 1

2    to pay it to Company 2, and then Company 2 paid back the

3    defendant's other clients.

4             Just another way of robbing Peter to pay Paul.

5             But this wasn't a shell game like the others.  This

6    time, the defendant didn't paper over his fraud.  In other

7    schemes, the defendant tried to make sure that he generated

8    paperwork that made it appear as if he had made a secure

9    investment on behalf of his clients.  For example, clients

10   received something called a note, which is a piece of paper

11   that functions as an IOU for a loan.  But in this shell game,

12   the defendant didn't get any paperwork for the money going out

13   of clients' accounts.  He had been so desperate to keep the

14   fraud going and from unraveling that he never completed the

15   deal with Company 1, and he had no paperwork to give his

16   clients.  In other words, he put his clients' money -- over $5

17   million in total -- in Company 1 and he got nothing for them in

18   return.

19            The defendant could not tell his clients that he

20   received nothing in return for their investments.  After all,

21   the whole purpose of the shell game was to keep the fraud

22   hidden.

23            So what did the defendant do?  Again, the defendant

24   lied.  He told his clients that their money was secure, when it

25   was anything but.  And this time the lie went further -- this

1    time, the defendant created phony paperwork to put in his

2    clients' accounts.  The defendant, with the help of his

3    business partner, created dozens of fake IOU notes, and he told

4    his clients that these fake IOUs were real.  In this trial, you

5    will see the fake IOU notes, and you will hear how the

6    defendant used them to betray and to cheat his clients.  And

7    you will have no doubt that the defendant knowingly lied to his

8    clients when he took their money and gave them nothing but

9    phony paperwork in return.

10           So that, ladies and gentlemen, is an overview of what

11   we expect the evidence will show.

12           As a result of his crimes -- and because of the lies

13   he told his clients and the information he hid from them -- the

14   defendant has been charged in an Indictment with various

15   federal crimes, including securities fraud and investment

16   advisor fraud.  At the end of the trial, Judge Abrams will give

17   you detailed instructions on the law and each of these

18   offenses.

19           Now, let me take a few minutes and describe how the

20   government will prove these charges during trial.  In short,

21   the evidence will consist primarily of different kinds of

22   witnesses and documents -- witnesses and documents that will

23   establish the defendant's guilt beyond a reasonable doubt.

24           First, you will hear from a number of victim investors

25   who were clients of the defendant.  Victims who will tell you

E6qdtag1                          Opening - Ms. Moyne

1    about the lies that the defendant told them and the critical

2    information he hid from them about the kickbacks, the shell

3    game, and the fake IOU notes.

4          Second, you will hear from two employees of the

5    defendant.  They will describe the defendant's business, and

6    how -- after 2007 -- he moved money around as he pleased among

7    client accounts.

8          Third, you will hear from employees of the horseracing

9    company in which the defendant invested his clients.  These

10   witnesses will describe the payments that the horseracing

11   company made to the defendant in exchange for his steering

12   investment money to them -- payments which the defendant kept

13   secret from his clients.

14         Fourth, you will hear from an expert witness -- a law

15   professor who teaches at Rutgers University.  He will describe

16   the different obligations that investment advisors, like the

17   defendant, are required to satisfy for their clients --

18   obligations that the defendant violated over and over again.

19         You are going to see a lot of documents and emails,

20   many of which were sent by or to the defendant.  These

21   documents will make clear what the defendant was really

22   doing -- lying to his clients and enriching himself, instead of

23   protecting their investments, as he promised to do.  You'll

24   also see charts that summarize some of the financial records,

25   including the evidence that the defendant received over $3

1   million in kickbacks, while his clients lost tens of millions

2   of dollars.

3           At the end of the case, we will have an opportunity to

4   speak with you again about all of the evidence you are about to

5   see and hear.  For now, we ask that you do three things.

6   First, pay close attention to the evidence.  This may seem

7   complicated at first, but at the end of the day this is a case

8   about the defendant's lies and his attempts to cover up his

9   lies.  Second, follow the Judge's instructions on the law.

10  Finally, remember to use your common sense -- the same common

11  sense you use in your everyday lives that tells you when

12  somebody is lying and when somebody has been honest.  If you do

13  these things, you will come to the only conclusion that is

14  consistent with the evidence in this case -- that the defendant

15  is guilty as charged.

16          Thank you.

17          THE COURT:  Thank you, Ms. Moyne.

18          Mr. Tulman, would you like to make an opening

19  statement?

20          MR. TULMAN:  Yes, your Honor.

21          Good morning, ladies and gentlemen.  You will note

22  that her Honor just indicated to me and asked me a question.

23  And the question that she asked was, "Do you want to make an

24  opening statement?"  That question was not put to the

25  prosecutor.  And the reason why that is so is because it is the

1   prosecutor who is required to open, because it is the

2   government that has brought these charges.  It is a very

3   significant way of communicating to you from the very outset

4   that Jim Tagliaferri has no burden of proving anything in this

5   case.  Right now if the Judge were to tell you to go back in

6   the room, in the jury room, and deliberate and return a

7   verdict, there would be only one verdict that you could return,

8   and that verdict would be "not guilty."

9           And you would have to return that verdict because you

10  have not heard a single shred of evidence in this case.  What

11  you have heard is an advocate, a very capable advocate, a

12  person who has done a tremendous amount of work on this case,

13  and a person who may well believe in the cause in which she is

14  a partisan.

15          She has got it wrong.  She has got it wrong.

16          Step back for a moment.  Think of what you just heard

17  in the opening statement.  What Ms. Moyne said to you was that

18  after running a legitimate business for decades --

19  Mr. Tagliaferri is 74 years old.  His birthday is on July 13th,

20  1949.  The allegation in this case is that Mr. Tagliaferri,

21  after decades of service to his clients, suddenly went to this

22  dark side.  And so now I want you to ask a question that you

23  keep in mind throughout this trial.  What was the motivation

24  for a 67/68-year-old man, moving towards the end of his

25  career -- not the beginning but the end of his career -- to

1    suddenly become the Darth Vader of investment advisors and to

2    turn to this dark side?  What the prosecutor suggests as a

3    motive is money, greed.  He wanted money.  He decided now --

4    now, at this age -- he wants the money.  It makes no sense.

5         I am going to talk to you about the evidence in this

6    case, and I am going to use the same charts that the prosecutor

7    used.  When the prosecutor opened and put those charts on,

8    there are inflammatory words that are used.  "Shell game."

9    "Kickbacks."  And so when you listen to it and you see it on

10   the screen there, you would say, well, if the question is was

11   it OK for him to get kickbacks, the answer is, of course, no.

12        It's loaded.  It's inflammatory.  Part of me wanted to

13   stand up and object and say this is inflammatory.  But I don't.

14   Because the purpose of an opening statement is to afford the

15   parties an opportunity to present their case and lay out for

16   you what they think they can prove.  And so I don't object.  If

17   you have the evidence, if you really think that you've got it,

18   then go ahead.  Take a shot.  You tell them.  You do whatever

19   you want.  I'm not scared of those charts, because there is a

20   truth in this case.

21        And the truth in this case, ladies and gentlemen, is

22   the defense in this case.  And let me tell you what the defense

23   is in this case.  And this is what I want you to keep in mind

24   throughout this entire trial with every witness, with everybody

25   that you hear in this case.  The defense in the case is this:

E6qdtag1                    Opening - Mr. Tulman

1    Jim Tagliaferri never -- never, never -- intentionally did

2    anything to hurt a single Client.  Never did he act in bad

3    faith.  And these allegations of shell games and kickbacks and

4    schemes just simply doesn't hold water in the least bit.

5          They don't know this man.  Do they know about his

6    lifestyle?  Do they know?  No.  What they said was -- just hung

7    out there -- for decades he ran a legitimate business.  For

8    decades he had the same clients that he did fine work for, and

9    there were returns for these people and they were very, very

10   happy with him.  But something happened in 2007.  The

11   prosecutor really kind of suggests something but doesn't really

12   go there.  The prosecutor says he moved to the Virgin Islands.

13   He moved to the Virgin Islands.  To suggest that there was

14   something untoward, that maybe that was the start of the whole

15   thing.  It's just wrong.  It's just wrong.

16         He moved to the Virgin Islands because there were

17   great tax advantages.

18         You don't know this man.  I'm going to tell you

19   something about him.  Probably one of the brightest people that

20   you're going to meet, as the evidence will show.  A very, very

21   sophisticated, intelligent man.  And what he lived for, and

22   lives for, were his clients.  The money wasn't important to

23   him.  What was important to him was to make money for his

24   clients.  But he is sophisticated and he knows tax laws and he

25   knows tax rules and he follows these things, and so there were

1    tax advantages to being in the Virgin Islands, as opposed to

2    being in Connecticut, where he had been located for decades.

3    And that's why he moved, the evidence will show, to the Virgin

4    Islands.  It is as simple as that.

5            The prosecutor said he moved to the Virgin Islands,

6    but didn't explain how, if at all, that related to anything in

7    this case.  The reason:  It doesn't.

8            What was happening in 2007 was that this man saw

9    something that a lot of other people did not see.  He saw a

10   financial crisis on the horizon.  He saw something wrong, as

11   the evidence is going to show and as we all do know.  He saw a

12   problem in the world markets and the problem in the United

13   States markets.  He saw a problem in the securities and the

14   investments in which he had his clients invested in 2007.

15           We all know what happened in 2008.  Not many people

16   saw it coming.  Not many people saw major financial houses

17   collapsing, as they did.  But he did.  And you know why he did?

18   Let me tell you something about who Jim Tagliaferri is.

19   Because I think it's very important for you to know something

20   about the man who you will have the solemn duty of judging.

21           He grew up here in Queens.  Went to CCNY, from which

22   he graduated.  He took jobs in trading houses, having studied

23   business.  Ultimately -- you'll hear a lot more about this --

24   because of his business acumen, he ended up being the head of

25   research equities in a major firm -- bear with me one moment --

E6qdtag1                         Opening - Mr. Tulman

1    Lionel Edie.  Lionel Edie is, I think, the second or the third

2    largest house in the country.  He was the head of the

3    department there.  15 senior research analysts in 15 different

4    sectors -- housing, whatever.  He was the head of it all.  All

5    the people under him, with everyone bringing reports, and he

6    making decisions.

7              He is a certified financial analyst.  Perhaps you will

8    hear testimony about what that is.  A JD is easy.  Anybody can

9    be a lawyer.  You can't be a certified financial analyst.  It's

10   a very difficult process.  It requires a great deal of ability.

11   Detailed examinations on portfolio analysis, balance sheets,

12   stuff that, frankly, I don't understand despite my client's

13   efforts to try and explain it to me so many times.

14             That's who he is, and that's who he was.

15             So in the year 1983, decades ago, he decided to leave

16   his employer and he went out into his own business, to become

17   an investment advisor on his own.  That's what he did.

18             And as the prosecutor has told you, for decades, with

19   his partner -- her name is Pat Cornell, who he worked with for

20   years -- they went into business to become a boutique -- a

21   boutique, small, little firm, literally a mom-and-pop show

22   because they were married, Pat and Jim for many years.

23             (Continued on next page)

24

25

E6QBTAG2                    Opening - Mr. Tulman

 1   BY MR. TULMAN:

 2        MR. TULMAN:  And they opened up this company with an

 3   idea of catering to a very special clientele:  High-wealth

 4   people.  That he would take his skills and his knowledge and

 5   his ability and market himself to high-wealth people.

 6        Well, why would high-wealth people go to Jim

 7   Tagliaferri?  Why not go to the major investment advisory firms

 8   who have teams of analysts and all of these staffs and as Jim

 9   had supervised for all the years?  You need a niche.  You need

10   to have something a little bit different, and that's what Jim

11   Tagliaferri offered.

12        What Jim Tagliaferri offered was his unique, special

13   business knowledge to go into sectors and to go into areas and

14   to find those stocks and to find those bonds and to find those

15   things where the large houses weren't investing.  Anybody can

16   buy IBM, I suppose.  Anybody can buy Apple.  Anybody can buy

17   the kinds of securities that, if anyone here has securities

18   invested, probably you would have them in.  Cisco, whatever

19   they may be.

20        But I think the evidence in this case is going to show

21   that there are some fundamental concepts or terms that are

22   going to be used that might be-- maybe we should become a

23   little more familiar with.  The evidence is going to show, I

24   believe, that there's going to be a notion of risk and risk

25   tolerance.  Liquidity.  How much can you risk?  You can risk a

E6QBTAG2                         Opening - Mr. Tulman

1   lot more if you've got a lot of money.  The return that you

2   seek, the amount of profit that you want to make, the

3   investments in which you can put yourself.  How much you can

4   gamble, if you will, depends upon how much money you have to

5   gamble.  Common sense.

6          And so what Jim was marketing himself to were

7   high-wealth accounts.  And so when we speak about millions of

8   dollars, millions of dollars, it's because the clients had

9   millions and millions of dollars.  That's what it was.

10          Now, the defense in this case is simply what I told

11   you.  And I would like to go now, if I may, and use the

12   prosecutor's opening charts, if I may.

13          Do you have them so I could use them?  I don't have

14   any.  Okay.

15          "Kickbacks," "shell game," and "fake IOU notes," these

16   are inflammatory terms.  And what I would like to do is to,

17   instead of using these terms, what I would like to do and what

18   I'm going to go to now is to put up something else.  Something

19   else which I think is a far more important resource.  That

20   resource is called an indictment.

21          I would like you folks not to look at inflammatory

22   words.  Quick things to say guilty.  I want you to look at what

23   the case is really about.  Because what the case is really

24   about is an indictment.  I'm not scared that-- the evidence

25   will give me-- it gives us no reason to be concerned.

1      So I think there's a machine here.  And so I think

2   that for you to really be educated about this case and to

3   understand the evidence that I'm going to establish-- when I

4   say "I," of course I mean with the witnesses.  I'm as much

5   partisan as the prosecutor.  But I think that we should look at

6   the indictment together because it provides kind of a table of

7   contents of where the evidence and -- what the evidence is

8   going to show in this case.  Okay?  So let's take a look.

9      May I, your Honor?

10     THE COURT:  You may.

11     MR. TULMAN:  Thank you.

12     Okay.  I would like to use this machine if possible.

13  Is there a way to do that?

14     We'll come back to the government's opening and I just

15  want to show it by contrast to the indictment, because it's the

16  indictment that controls, not this.  It's reason.  It's

17  evidence.  Not this.

18     Okay.  Now, now that it's on, is there a way to get

19  this off and the indictment on?

20     THE COURT:  We all still see the old slides.

21     MR. TULMAN:  There it is.  Perfect.  Thank you very

22  much.  Just stay right there and do your thing.  Okay.

23     The indictment begins, and the name of this case is,

24  *United States of America v. James Tagliaferri.*  And the first

25  count says "Investment advisor fraud."  And it says that a

1    grand jury-- and you'll remember from jury selection her Honor

2    telling you it's a completely different standard of proof in

3    that case.  It's just a means in order for a charge to be

4    brought, as her Honor told you.  Relevant individuals and

5    entities.

6        First-- let's see.  "At all times relevant to this

7    indictment, the defendant provided investment advisory services

8    to clients through various companies that he managed and

9    controlled."  Meaning that there was a company in Connecticut,

10   that was TAG, and then there was a company in the Virgin

11   Islands when he moved, for what the evidence will show are

12   completely legitimate reasons, that was TAG VI.  Guilty.

13   Guilty of that charge.  We did do that.

14       From at least 2007 to at least in or about 2011, Jim

15   Tagliaferri provided investment advisory services through TAG

16   Virgin Islands and its successor, the LLC.  Guilty.

17       At all times relevant to the indictment it had its

18   principal place of business in St. Thomas, U.S. Virgin Islands.

19   And TAG was a registered investment advisor with the SEC.

20   Guilty.  He was.  No question about it, no dispute.

21       From in or about -- or at least the 1980s, 1983 to be

22   precise, to about 2006, he provided these investment services

23   through an entity named Taurus, which was headquartered in

24   Connecticut.  That is correct.

25       At all times relevant to this indictment, a company

E6QBTAG2                          Opening - Mr. Tulman

1   based in Garden City, New York, was a privately held

2   corporation.  And the indictment refers to it as company number

3   one.  Company number one is a company that's called

4   International Equine Acquisitions Group, or, for short, IEAH.

5   And you're going to be-- the evidence is going to be coming in

6   fast and furious about IEAH and its history.

7          I'll tell you a little bit about IEAH and what the

8   evidence is going to show about IEAH.  IEAH was a company that

9   was formed in 2003, the evidence will show.  It was formed in

10  2003 by a fellow named Michael Iavarone.  A very important name

11  to remember in this case:  Michael Iavarone.  And Michael

12  Iavarone was a man who had a vision.  He knew horses and he

13  knew about horse racing.  And he grew up with horses and he

14  knew about all of these things.  And he had an idea of getting

15  a stable of horses and a way of picking winning horses.  And I

16  don't know what it is because I don't -- but perhaps the

17  evidence will show what that is, because it's not for me to

18  tell you.  It all comes from the witness stand.

19         And the company that Michael Iavarone and another

20  fellow who later joined him, whose name is Richard Schiavo --

21  and I believe in this case you will be hearing from Richard

22  Schiavo as a witness.  Richard Schiavo had horses.  And there

23  was also another idea that the two of them had.  They were

24  located, the company, IEAH, was located in Garden City, New

25  York.  Garden City, New York is located in Nassau County, right

1    by the Queens border, right near a racetrack that's called

2    Belmont.  And at Belmont there's a very famous horse race that

3    is run there that is part of a series of horse races which is

4    called the Triple Crown.  And that is the World Cup, I guess,

5    of horse racing, to win the Triple Crown.  And you may have

6    known recently that there was a horse, California Chrome, and

7    California Chrome almost won the Triple Crown.

8            There was a horse that ran even better than California

9    Chrome.  The name of that horse was Big Brown, and it was a

10   horse that his clients own.

11           The scheme, the scheme, the fraud, that was the fraud.

12   The investment that was being made by Jim Tagliaferri was in

13   this company, IEAH, to provide this company with the capital in

14   2007 and 2008 for Michael Iavarone to realize his dream of

15   being able to pick those horses with his system and his

16   formula.  And among the horses, because there were many, one of

17   those horses was Big Brown.

18           That was not a fake asset.  That was not a shell game.

19   It happened.  It was real.  His clients were at the winner's

20   circle at the Kentucky Derby holding trophies.  That's not a

21   scam.  That's not a Bernie Madoff.  That's real.

22           Michael Iavarone also had another idea.  And that idea

23   was to not only be involved in the purchase of these horses,

24   these Thoroughbred horses, with a formula that could pick-- you

25   don't get the horses as when they foals.  You wait until

E6QBTAG2                          Opening – Mr. Tulman

1    they've run a race.  And then, after they've run a certain

2    number of races and you can pick them, you pay top dollar for

3    them, but you know you've got a winner.  And the evidence is

4    going to show more about what that was, this whole idea that he

5    had.

6          But the idea that this man had was an idea that

7    intrigued Jim Tagliaferri, the evidence will show.  It

8    intrigued him.  Because he didn't like what he was seeing in

9    the economic storm clouds that seemed to be looming.  Problems

10   in liquidity, problems with mortgages, problems with too much

11   money in the economy.  There was too much free money.  He

12   didn't like it.  He didn't like it.  He wanted to find

13   something alternative and he seized upon this.

14         This man, Iavarone, had an idea.  He had another idea.

15   And the other idea he had was that over in Belmont, to not only

16   have an investment in winning horses, because that's just

17   gambling to a large extent, but to establish an equine

18   hospital.  A very specialized equine hospital that was geared

19   towards Thoroughbred horse racing.  To build that hospital, to

20   do that, required capital.  Michael Iavarone had -- well before

21   Jim Tagliaferri -- had investors.  Had obtained millions of

22   dollars.

23         But the evidence will show that Jim saw something in

24   that idea, and he spoke with Michael Iavarone and they came to

25   an agreement.  Michael Iavarone had the horse racing knowledge.

E6QBTAG2                         Opening - Mr. Tulman

1   Richard Schiavo was with him as his right hand.  But what Jim

2   Tagliaferri saw, as a certified financial analyst with his vast

3   knowledge of markets and accounting and balance sheets and

4   everything that goes with that, was that these guys didn't know

5   how to run a business.  They knew horses, they really had that,

6   but in terms of being able to get capital and get money and to

7   really run something and to really take it to its potential to

8   get that hospital built, they needed capital.  They needed

9   structure.  They needed organizational and not just Jim

10  Tagliaferri's clients' money, they needed really big money.

11  They needed $100 million, not $10 million or $20 million.

12          And the man who could make that happen, the man who

13  could figure that out, the man who could do the research, the

14  man who was the man who headed senior research analysts was a

15  man who could put something like that together.  And this is

16  the beginning of Jim Tagliaferri's undoing.  Because he entered

17  into an agreement, the evidence will show, with IEAH.  And the

18  agreement, reduced to essentials, was this:  You guys don't

19  have the money to pay me for what it is that I can do for you

20  with my expertise.  You need capital.  Here's what we'll do.

21  We'll have a consulting agreement.  I'll get you money.  I'll

22  get you my clients' money.  You can't pay me, so what we'll do

23  is when I get money invested in your company, I will be able to

24  get money from that and we'll agree upon some kind of

25  percentage that you'll pay to me as a consulting fee and I will

1    work for you.

2               Now, it sounds a little, Well, wait a minute now.

3    You're taking money from your clients.  What are your clients

4    getting?  The evidence will show in this case that his clients

5    got exactly what they deserved in this case.  He negotiated for

6    them and got them a very good deal.  Because what they obtained

7    was as follows, from this sophisticated investment advisor

8    whose life was spent protecting his clients and who never to

9    this day ever sought to do otherwise.

10              Can I remove the indictment for a moment and go back

11    to the opening?  Thank you.

12              We're talking about kickbacks.  The government has

13    called this kickbacks, this consulting agreement.  In writing.

14    In writing.  Criminals don't say, Hey, let's go into a criminal

15    contract and put it into an agreement in writing.  Was it a

16    mistake?  Yes.  Yes.  Was it a crime?  No.  It was a mistake.

17    It was a good-faith mistake.  Because a kickback, as I

18    understand it from how it's described by Ms. Moyne, is when you

19    go and you're getting a piece of the action and not doing

20    anything for it.  This wasn't a kickback.  This was a guy who

21    was working very, very hard to try to make something happen.

22              And when the prosecutor in her opening statement said

23    the evidence is going to show that what he did was, is he lied

24    and all this, he wasn't lying.  He wasn't lying.  He never lied

25    to his clients.  He was explaining to his clients what he was

1    trying to make happen with IEAH.  Ultimately it didn't happen.

2    It didn't happen.  But not for lack of effort and not for lack

3    of trying on Jim Tagliaferri's part.  And the evidence is going

4    to establish that.  You will see the work that he did to earn

5    the monies that he obtained.

6          Kickbacks.  Let's look at this chart together.  It's

7    very simple as the government explained it.  Tagliaferri

8    clients, with an arrow just to the right, put in 100 percent.

9    Goes to the company.  The company there is IEAH.  And then the

10   company gives back 10 percent to Jim Tagliaferri.  This is

11   accurate.  This is somewhat basically accurate so far as it

12   goes.

13         Here's what's missing.  Here's what's missing.  What

14   Jim Tagliaferri negotiated for his clients was that in exchange

15   for them making an investment in IEAH, what they received back

16   was this really complicated instrument called a convertible

17   note.  A convertible note.  And what a convertible note is, or

18   was, the evidence will show, is an instrument.  And that

19   instrument says that you're going to get back your money with

20   interest.  Right?  It's a note, like a promissory note.  You

21   put up 100 percent.  Let's make it $100,000.  You put up

22   $100,000; you're going to get a promissory note back for

23   $100,000 with interest.

24         But it is a convertible note.  What does that mean, a

25   convertible note?  What a convertible note means, the evidence

1    will show, is that if this takes off, this investment takes off

2    and this works out as Jim Tagliaferri, the evidence will show,

3    honestly in good faith believed, and that was the reason why he

4    made the investment, if it takes off, then we don't want our

5    money back. We want a piece of the action. We want shares in

6    the company. We can convert the note into shares of this

7    company. Because if the company-- because shares of stock in a

8    company -- the marketplace is a lot more volatile, right?

9    Shares of stock can go up; shares of stock can go down. That's

10   a lot riskier.

11          A note is something which is a secure thing. It's a

12   promissory note. It's a promise to pay back money. It's a

13   certain percentage. This is what you get and that's it. You

14   don't get more. You're not in the action. If it's taking off,

15   if it's profiting, if it's doing well, then we can go into the

16   company and get shares. That was the convertible note.

17          But Jim Tagliaferri was not content with that for his

18   clients because Jim Tagliaferri, the evidence will show, really

19   lived for his clients. The evidence will show he has no

20   children. This was what his life was. He spent decades with

21   these people. And that's why you may see older people come in,

22   because he knows them for 20 years. He was with them when he

23   was in his 40s and now he's here, sitting in this chair, when

24   maybe people are going to come in saying, You ripped me off.

25   For 25 years you didn't rip me off, but now you ripped me off.

E6QBTAG2                          Opening - Mr. Tulman

1    You made a lot of money for me for 25 years, but then you lost

2    my money and now I want you to pay for it.

3            And so Jim Tagliaferri makes this investment and does

4    the work.  And he says it's not enough to just give me a

5    convertible note.  I want more.  I want more.  I'm greedy, but

6    not greedy for myself.  I'm greedy for my clients.  What are

7    you using this money for? the evidence will show jim is asking

8    these people.  I want to know exactly what you're doing with

9    this money.  The evidence will show that Iavarone says, Well, I

10   think that this horse, this particular horse, its name is Benny

11   the Bull.  Its name is Kip Deville.  Its name is Big Brown.

12   I'm telling you, that is a horse that could make a lot of

13   money.

14           And understand what the evidence is going to show.

15   The money in horses is not just purses, not just that it runs a

16   race and wins the race.  The big money in horses is if it wins

17   races, there are breeding rights.  They go out and you can go

18   on and it can get paid again and again and again, like a slot

19   machine that just keeps winning every time.  That horse goes

20   and mates and then breeds and has another horse and it's a

21   whole industry.

22           Now, some people during voir dire, I remember, said,

23   Well, I don't like gambling and all that stuff.  You have to

24   suspend any prejudices and biases.  I'm telling you that there

25   is an industry.  There are people who do this.  There are

1    legitimate organizations in Kentucky, there are organizations

2    in Australia, in Europe.  Everywhere.  The Middle East.

3    There's big money in these horses.  It is an asset.  Like gold

4    is an asset or silver is an asset, horses can be an asset.

5            And so Jim Tagliaferri on behalf of his clients says,

6    What are you using it for?  A horse?  I want a piece of the

7    horse.  I want that.  Apart from giving me a note, I want --

8    not for me, I want for my clients that they get a piece of the

9    horse.  And the deal is struck.

10           To this day there are people who own these horses,

11   some of these horses, in a company that's called Pegasus.  And

12   you'll hear the evidence and you'll hear about this company

13   called Pegasus.  Some of these same people who may be

14   testifying in this case still have an interest as fractional

15   shareholders of a horse.  They don't like the investment, they

16   don't like what happened, but it's there.  A bad investment is

17   not a crime so long as you do it in good faith without any

18   intent to deceive anybody or any intent to defraud anybody.

19           You will see, I believe, in evidence these agreements.

20   What you will see on the face of the agreement is a notation.

21   And what the agreement says, right there on top, is Jim

22   Tagliaferri's receiving a consultant's fee.  It's right there

23   in writing.

24           Now, who engages in a scheme to defraud?  The evidence

25   will show that it's right there.  And these are high-wealth,

E6QBTAG2                          Opening - Mr. Tulman

 1  sophisticated people who take their statements, the evidence is
 2  going to show, and read them.  Because the government is right,
 3  you will see the e-mails.  These people are watching their
 4  money and they're looking at their investments and they're
 5  following and watching and saying, What's this?  What's that?
 6  Horses, Jim?  You sure?  But when the going was good and the
 7  Kentucky Derby was being run, the evidence will show, and
 8  everybody was there at the winner's circle, it was the good
 9  times and Jim was a genius.  Now he's a criminal.
10          Now, that's the kickbacks.  That's the IEAH story.
11  And I believe the evidence is going to show with respect to
12  that portion of this case, this IEAH portion of this case,
13  resoundingly he's just not guilty.  There was no intent to
14  deceive, no intent to do anything of the like.
15          Let's turn, now, back to the indictment.  I'm sorry.
16  And forgive me, folks.  This is obviously a very important
17  case.  There's a lot at stake here, so I just beg your
18  indulgence and bear with me.  It's a serious charge.  You all
19  know that.  The man came into a courtroom sometime ago.  The
20  indictment was there.  He was asked to enter a plea and he
21  resoundingly-- he said, I am not guilty of this.  I am not
22  guilty of ever doing anything to hurt my clients.  Not guilty.
23  I'm going to trial.  And he's presumed innocent.
24          Now, the next says-- oops, I'm sorry.  "At all times
25  relevant to this indictment"-- if you follow, you see where it

1    says "Garden City"?  That's IEAH was number four.  I'm going up

2    now.  Number five:  "At all times relevant to this indictment,

3    a company based in New York, New York was a publicly traded

4    company, company number two."  And company number two's shares

5    were quoted on the electronic interdealer quotation system

6    operated by the OTC markets known as the pink sheets.

7            Company number two in this case is a company that is

8    called Fund.com, F-U-N-D dot C-O-M.  And Fund.com -- I must

9    tell you the indictment is inaccurate, I think the evidence is

10   going to show.  I think the evidence is going to show that

11   there are different types of exchanges.  And the exchanges have

12   different kind of levels of respectability, if you will, or

13   requirements.  In other words, to be listed as a stock on an

14   exchange, you have to meet certain kinds of requirements.

15   Let's think like baseball:  Major leagues, minor leagues,

16   triple A, double A, right?  Different levels of ability.  If

17   you're a minor league ball player, you're still pretty good,

18   but you're not a major league ball player.  I think the major

19   leagues is New York Stock Exchange in terms of requirements,

20   listing requirements, things of that nature.

21           Right up there with that is something that's called

22   the NASDAQ.  And when you watch the television news, you'll see

23   they give those things.  And then right below that is a

24   NASDAQ-approved trading system that's called the bulletin

25   board.  And the evidence will show -- it can't be disputed,

1    just can't be -- Fund.com was a bulletin board stock.  Later

2    on, down the road, it went down to become-- went to the pink

3    sheets.  But when Jim Tagliaferri is first involved with

4    Fund.com, it's a bulletin board trading stock.

5           And what the evidence is going to show was that stock

6    was a stock that Jim believed in.  He honestly in good faith

7    believed that that stock had tremendous potential.  And that it

8    was part of an investment strategy on his part, as it has

9    always been for decades, to find the company that other people

10   weren't looking at.  To look at the stocks that he saw because

11   that's what he does.  He reads, he studies, he researches, and

12   he comes up with these things.  And this was a stock that met

13   with his approval.

14          You'll hear evidence in this case about another stock

15   that was far riskier than this stock.  That stock was an

16   Australian company, not even one that was on the New York

17   exchanges, a company that was called White Energy.  And you're

18   going to hear evidence about White Energy.  It's not in this

19   indictment.  You know why?  No one's complaining about that

20   one.

21          But everybody's complaining about this one.  And

22   you'll see the statements and you'll see the monies that people

23   earned on a stock that nobody would consider buying except

24   maybe for somebody like him.  Somebody who gets involved, the

25   evidence will show, and learns the people and does the

1    research.  And just doesn't do it, meets the people who are in

2    these small development companies.  Because that's his

3    strategy.  The investment strategy for Jim Tagliaferri, what he

4    focused on, was small, developmental-stage companies, companies

5    that were early on, that had a concept, an idea, something that

6    was good, but what they were missing was capital.  They needed

7    capital but had an idea.

8            To jump ahead-- oh, it's not on this page.  There'll

9    be on the next page a company three, the one that was the other

10   shell game-- no, the-- what was it?  The IOU.  The fake IOUs or

11   whatever it was.  We'll get to it and look at it.  That was

12   another company called NDMA, and we'll get to it.  But that was

13   a company that was another one that dealt with medical, a thing

14   to work with medical records, how to work with medical records,

15   get them sent.  Health care is a big thing in this country, you

16   know, and it's a big, big area.  And he saw that one, too.

17   We'll talk about what the evidence is going to show with regard

18   to that.

19           But he did make substantial investments of his clients

20   in this Fund.com.  Oh here it is, right next to it.  You see

21   this one:  "At all times relevant to this indictment, a company

22   based in Berwyn, Pennsylvania was a privately held corporation.

23   It wasn't publicly traded.  It's a private corporation.  That's

24   the company they were talking about with the fake IOU notes.

25   That company is called NDMA.  National Digital Media Analysts?

E6QBTAG2                    Opening - Mr. Tulman

1    I don't remember.  Something like that.  National Medical

2    something.  It deals with records and storage with computers

3    and all that and being able to get records so that a doctor can

4    go and pull up a record one way and you can get it sent another

5    way.  And it saves a lot of money and it's a whole

6    technology-based way of dealing with medical records.

7           And so that's those two companies.  There are two

8    companies that the evidence will show Jim Tagliaferri very,

9    very much believed in.  You will see what Jim saw about these

10   companies.  You will look at the kinds of information that Jim

11   Tagliaferri was provided with for these companies before he

12   made investments in these companies.  And with the benefit of

13   hindsight you may say that was a bad call, because people lost

14   money on it.  Well, it's very easy after the fact, in

15   hindsight, to say, Hey, that was a bad call.  Bad judgment.

16   Crime.  If it made money, he would have been a hero.  Bad call,

17   it's a crime.  It's a fraud.

18          Now, number seven:  "At all times relevant to this

19   indictment, an individual and his brother were involved in a

20   number of business entities that received funds."  And here

21   it's associate one and associate one's brother.  Those names

22   are Jason Galanis.  Jason Galanis is associate one.  Jared

23   Galanis is associate one's brother.  Jared Galanis is an

24   attorney.

25          Jason Galanis, the evidence will show, is a man who I

1    believe attended Oxford University studying business.  He's

2    much younger than Jim, but I think the evidence will show that

3    he was a very, very articulate, very, very bright, very

4    entrepreneurial guy.  A man who, I guess unlike many of us,

5    could speak the financial talk that Jim Tagliaferri speaks and

6    understands.

7              And this man had a lot to talk about.  Had a lot of

8    companies.  And you're going to hear in the evidence a lot

9    about those companies that he knew and the ideas.  One of those

10   companies was company number two.  And company number two,

11   Fund.com, was a parent, meaning that it had subsidiaries.

12   Companies that it owned.  And you'll hear evidence about the

13   companies that owned, something that was coming up called ETFs,

14   electronic trading.  You'll hear evidence about it.  I hear

15   it's big.

16             Okay.  That's what this was about.  The evidence is

17   going to show that a great deal of this case is about what

18   happened when Jim Tagliaferri became involved with Jason

19   Galanis and Jared Galanis and entered into business deals with

20   Jason Galanis and Jared Galanis and loans that were made for

21   capital, for businesses and ideas of what was going to be

22   happening and what was going to be going on.  And things that

23   were fed to Jim, reports and analysts, things of the like, that

24   Jim accepted and believed in good faith was there.

25             It turns out that Jim is far from perfect.  He may

E6QBTAG2                          Opening - Mr. Tulman

1    have a heart of gold, as the evidence I think is going to show,

2    when you hear about things that he's done in his life.  He may

3    not care all that much about money for himself, as the evidence

4    will show, but he can't say no.  It's very difficult for him to

5    say no to people.

6            And that's a fault, believe it or not.  Because when

7    you can't say no, okay, I'll help you out, I'll get something

8    to you, I'll do something for you.  But what are we going to do

9    here?  And it turns out, as the evidence is going to show, that

10   Jason was not the most honest guy in the world.  And a lot of

11   the losses and a lot of what took place here and a lot of the

12   losses that befelled Jim's clients was a result of the actions

13   of these two men.  But they're not here today and you're not

14   sitting in judgment of them.

15           Next.  The evidence-- I'm going to go up-- in the

16   indictment it says, in the page before, it said that-- okay.

17   "In or about April of 2007, Jason Galanis was judicially barred

18   from serving as an officer or director of a publicly traded

19   company for a period of five years."  And that's in there to

20   say, well, I suppose Jim Tagliaferri should have been on

21   notice.

22           The question, of course, is when did Jim Tagliaferri

23   learn about that?  When did he know about that?  And that's

24   going to be an issue in the case because the evidence is going

25   to show that he met Jason Galanis before this and didn't know

E6QBTAG2                          Opening - Mr. Tulman

1    about this at the time.

2              Now, look at number eight:  "In or about February of

3    2009," Jim Tagliaferri reported to the SEC that he had over 100

4    clients and approximately $252 million in client funds under

5    management.  It's a lot of money to be entrusted with.

6              Okay.  And the evidence will show, the evidence will

7    show, that in the next paragraph it talks about investment

8    management agreements and that Jim would enter into agreements

9    with his clients providing that they pay him a certain fund,

10   and it's something that the prosecutor referred to in her

11   opening and the evidence will show.  And you will see these

12   investment management agreements.  And when you see those

13   investment management agreements, I think what the evidence

14   will show is that Jim generally charged fees for the services

15   that he provided and it would generally be around 1 percent of

16   the amount of money that he was managing.

17             And so now, with that in mind, think about how much

18   money he would make if that was the amount of money that he had

19   under control, how much he would earn from investment

20   management fees.  The government's claim is that wasn't enough

21   for him so he needed to get more money.  I think the evidence

22   is going to show it didn't mean a thing to Jim.  Did not mean a

23   thing.

24             Now, these gave him-- these management agreements gave

25   Jim tremendous control over his clients.  They trusted him

E6QBTAG2                          Opening - Mr. Tulman

1   completely, and they trusted him completely because he had been

2   dealing with them, some for decades.  They were high-wealth

3   people who specifically went to him because of the investment

4   strategies that he had because the return that he could get for

5   them was better than they could otherwise get.  And that's what

6   he did.  Okay?

7           And so now I think what I might do is jump ahead for a

8   moment-- oh, here it is.  You see paragraph 11?  It says

9   "Between 2007 and 2010, Tagliaferri collected at least

10  approximately $4.3 million in investment advisory fees."  Now,

11  do the math based upon the prior.  If you did the math and if

12  you said he had 252 million under his control, and if he

13  generally would get a percentage of around 1 percent, as the

14  evidence will show, what would his fees be?  And the answer is

15  it would be a lot more than $4.3 million that he would really

16  have received over that four- or five-year period, right, if

17  you do the math.

18          What happened?  How come he didn't get more money than

19  4.3?  The answer?  Contrary to the government's claim in the

20  opening statement, the evidence is going to show he's not all

21  that concerned about the money.  Didn't send out, didn't

22  collect the fees a lot of time.  He made enough money.  Didn't

23  need the money, and so he didn't collect the fees.

24          When you add them up from the statements and you see

25  what's collected, you'll see that that's the correct number.

1    He just didn't collect everything that he could have collected
2    because the money wasn't important to him.  What was important
3    to him was finding the deal.  He wanted to be involved in the
4    business.  He wanted-- and you can do the math yourself.  It's
5    just in the indictment, which is why I go to the indictment and
6    not to just a simple chart.

7           What would he have been earning a year if he had 252
8    million?  It would have been 2.5, right?  Multiply it out, ten
9    million.  What happened?  Where's your-- how come you-- why
10   would you-- the evidence is going to show that it makes no
11   sense for him to be looking to get money from other people when
12   it was there the whole time.  Like Dorothy in the Wizard of Oz.
13   Click your heels three times, right?  The money was there.  Why
14   didn't he just collect the money that you could have collected?
15   Is he that stupid?  The evidence is going to show not at all.

16          And now I turn to the paragraph 12, which is really
17   the heart of the case, because it's the three things that the
18   government made the charts up about.  Because it says that he
19   engaged in a scheme to defraud, and the next sentence is what
20   this case is all about.  Because the government alleges that
21   "In general, rather than making investment decisions based upon
22   the best interests of his clients, as he was legally obligated
23   to do, Tagliaferri instead made investment decisions for his"--
24   next page.  They're right on top.  Instead of making investment
25   decisions based on his clients, he made-- based on his clients,

1    he made decisions based on his-- that's why she's here.  "He

2    instead made investment decisions for his clients based on his

3    own interests and those of his close associates, including

4    Jason Galanis."  And to this, ladies and gentlemen, we say,

5    most emphatically, not guilty.  Not guilty.  Jim never did

6    anything that he thought would hurt his clients.

7            Now, the government is accurate in one respect.  When

8    it turned out that these investments were not working out and

9    people were clamoring and asking, Jim, do something.  What's

10   going on?  What's going on?  He did have to do some explaining

11   and talking and try to figure out what he's going to do right

12   now, when it turns out that the people that he trusted had

13   betrayed him and the money that he had put there.

14           Jim is not a man who can say no, the evidence is going

15   to suggest, and he did not want to tell these people, that he

16   had known some for decades, We've got a problem.  I've got a

17   problem here.  But that's not what this case is all about.

18   They'll say he lied, he covered up, he did this, he did that.

19   He was in a jam not of his own making and he had to figure out

20   what he could do to try to make things right.  How could he

21   make things right?

22           The evidence is going to show that there were some

23   clients and certain investments called notes, that we spoke

24   about before, like the IEAH convertible notes.  Right?  There's

25   a note.  And you have a note and it pays a certain interest

1   rate.  And that's a more secure investment than a stock.  And

2   so he had many of his clients in these notes.  And these notes

3   that he had put his clients into, many of them, were notes

4   which he had obtained from the Galanises.  And it turned out

5   that the Galanises, with all their smooth talk and all their

6   legalese, or whatever else they did, were not honest.

7        When the time came to pay on these notes, Jim, can you

8   get us an extension?  Jim, this is what we're going to do.

9   We're going to do this, we're going to do that.  And you're

10  going to watch and read from the evidence the e-mails and the

11  exchanges as Jim comes to learn more and more that these guys

12  may not be above board.  What did he do?  Okay.  And what the

13  evidence is going to do, is going to show in this case, is that

14  he tried to do the right thing by all of his clients.

15        And so now let me show you the next government chart

16  which they claim is one of the crimes in this case, one of the

17  aspects, one of the parts of the scheme to defraud.

18        Back to the opening statement, if I may.

19        THE COURT:  What would you like?

20        MR. TULMAN:  The opening statement.  It's going to

21  come back up.  And I apologize, folks, but this is a serious

22  responsibility for the government and for the defense, of

23  course.  And so we've been waiting a long time for this and so

24  I'm just doing what I have to do here.

25        Okay.  The government calls this another shell game.

E6QBTAG2                         Opening – Mr. Tulman

1   Another shell game.  Let me tell you what this is about.

2   You'll see, in looking at this, that there's stock that goes to

3   client one, money goes to a Tagliaferri-controlled account, and

4   then there appears to be money going to client number two.  You

5   see that?

6        There's a problem with the equation, really.  And you

7   may think it looks bad for me, or for Mr. Tagliaferri, but

8   let's just make this accurate.  There should be another arrow

9   here and there should be a lot more in this chart.  The arrow

10  that's missing is why is client two getting money?  On its

11  face, this chart doesn't make sense.  Okay?  Because it's not

12  going to be consistent with what the evidence is going to show

13  at trial.  Why is client two getting money?  What's this about?

14        Here's the answer.  What happened was as follows:

15  Client two in these situations would have purchased a note, a

16  promissory note or some kind of note that was supposed to pay

17  interest.  And because these were high-wealth people who didn't

18  want just a regular return like ordinary people with-- you

19  know, you go to the bank and you buy a CD or something like

20  that which returns, you know-- it's secure, but a lower

21  interest rate.  They wanted high interest.  They wanted 13

22  percent, 14 percent interest, right, because they could risk

23  the money because they had the money to risk.

24        And so these people, clients two, were purchasing

25  notes with a specific interest rate back.  And where they were

1    purchasing the notes from were entities that were, in fact,

2    Galanis-related entities.  These were notes that were related

3    to the Galanises.  Jim Tagliaferri, the evidence is going to

4    show, trusted them, did business with them, and thought that

5    because of the promise, because of that which they communicated

6    to him, because of the people that they seemed to be associated

7    with in the business world and over in Europe and in Australia

8    and the sheik down in the Middle East, who not only had-- and

9    Asia.  Because of all of these contacts, he said, these are

10   money people.  This could pay off.  This is going to do well.

11   Okay, I'll get money to you.  I'll get you into notes.

12         And so, really, there should be money-- there should

13   be money going the other way, but not to a Tagliaferri-

14   controlled account.  It's not Tagliaferri.  It's Galanis.  The

15   money went to notes for the Galanises, you see.  And then what

16   happened was the notes came due.  It's called mature.  A note

17   matures.  There's a date when the note is supposed to be paid,

18   and the notes weren't being paid.

19         And then the people who looked at their statements

20   would say to their investment advisor, Mr. Tagliaferri, Hey,

21   Jim, what's going on?  I have this note.  What happened?

22   Sometimes he would extend-- the notes would be extended, and

23   that means that you get more time to pay the note, the evidence

24   will show.  And in exchange for doing that, in exchange for

25   getting more time to pay back a note, you get what's called

1    forebearance, which means they'll give you something in return,

2    like money or something.  Capital, stocks, whatever.  But you

3    get something to forbear.  We'll pay you all the interest now

4    or things of that nature.

5          And these are complicated business transactions, as

6    the government indicated, and you'll get a lot more of this as

7    time goes on.  And I know, hearing my opening, you're saying

8    are you sure we're going to end this case by the middle of

9    July?  I don't know if Mr. Tulman is going to finish by the end

10   of July, but I will.

11         And so what happens is these people want their money

12   paid back on the notes.  Jim Tagliaferri, the evidence will

13   show, was a firm believer in this stock called Fund.com.

14   Remember the one before that we referred to, right?  That

15   stock, Fund.com?  The Galanises were linked to Fund.com, but it

16   wasn't just the Galanises.  Unlike a private company, this was

17   a publicly traded company.  The SEC is involved.  It's on an

18   exchange.  There are things that are being filed, as the

19   evidence will show, called 8-Ks and 10-Qs and reports and

20   things that are tangible.

21         Now, if those things are fraudulent, if those things

22   are not honest, well, then, Jim Tagliaferri's being defrauded

23   as is anybody else who is investing in Fund.com.  But what he

24   did was he believed, as the evidence will show, honestly and in

25   good faith that Fund.com was a good stock.  So what he did was

1    is he said to the Galanises, Listen, you've got to pay my

2    people on these notes.  You got me involved in these notes.  My

3    people are entitled to not only their payments, I want their

4    interest.  I want full payment on these notes.  I'll sue you.

5    I'll do something.

6           And so they would make deals.  And here's what

7    happened.  The Galanises had a substantial amount of this

8    Fund.com stock, which Jim Tagliaferri believed in.  And so they

9    said, Listen, we'll get you stock.  We'll give you the stock.

10   Take the stock.  We'll get money.  We can pay back notes.  You

11   follow it?

12          Jim believes that it's in the best interests of client

13   number one to get stock, and he certainly wants to see client

14   number two get their money back with interest.  With interest.

15   Because Jim Tagliaferri can't say no.  He's not going to tell

16   people, listen, there's a problem with these investments that I

17   made on your behalf.  These guys are not paying the note.

18   Instead, he's on the phone, he's working and doing and

19   e-mailing and all this, you guys, forebearance, this and that.

20   Because he's going to get them their money.  And that's what he

21   does.

22          Now, what's in it for Jim?  In the first chart that

23   you saw before, they talked about kickbacks.  Kickbacks.  He's

24   getting something.  What's here?  Absolutely nothing is the

25   answer.  Absolutely nothing except that client two -- it's not

E6QBTAG2                      Opening - Mr. Tulman

1    a shell game.  Client number one is getting stock.  Client

2    number two is getting their money in their account with

3    interest.  Exactly what it was that was the purpose of the

4    investment.  We say not guilty.

5           Go back one.

6           The government calls this a shell game.  On its face,

7    I don't see a shell game.  When I say "I," of course, I don't

8    think the evidence is going to show that there's any kind of

9    shell game.  I'm not important in this whole thing.  I'm just

10   commenting on a chart, right.  On its face, what does it look

11   like?  Money goes to client two; client number one gets an

12   investment, right.  Because sometimes some people may say I

13   need money.  I need to be liquid, right.  I need something for

14   whatever it is.  I'm taking a vacation.  I don't know.  I'm

15   paying for something.  I need money.  I'll get you money.  You

16   have a security, you have an investment.  This client will get

17   the investment; you can get the money.

18          It's not a shell game.  It's something, a concept,

19   that I think we'll learn about as the evidence develops in this

20   case.  The evidence is going to show you that there's a concept

21   in the trading world that's called cross-trading.  It's legal.

22   It's not a shell game.

23          Finally, there's this one, the fake IOU notes.  In the

24   first chart you saw, they said, okay, we can show that Jim

25   Tagliaferri received money.  They called it a kickback.  The

1    evidence will show quite the contrary.  That is, he made a

2    mistake.  I'll tell you what the mistake was, by the way.

3    There's no dispute in this case.  As an investment advisor, you

4    are a fiduciary.  You have an obligation.  That's just not the

5    ordinary obligation of someone who's selling a car.  You go to

6    buy a car -- I mean, I guess there are lemon laws.  I don't

7    know.  But that's just the marketplace.  When you're entrusted

8    with somebody's money, you have a very special obligation and

9    that's called a fiduciary relationship.  And you're entrusted

10   and you have a higher duty.

11         He was negligent.  He may even have been reckless.

12   But he never intended to deceive or defraud anybody, and that

13   is what this case is all about.  Because a fiduciary, the

14   evidence will show, has a special obligation to a client that

15   if you are receiving a fee, if you are receiving a fee, you

16   should say something.  You should report it.  Not just put it

17   on the face of the document.  I think you may have something

18   more that's required.

19         Well, Jim knows these people for 20 years.  He sits

20   their living room, sits in their kitchens, talks to them.  And

21   because he has no bad heart, no evil intent in his mind and he

22   doesn't intend to do anything wrong, he doesn't look to cover

23   his tracks.  He's not looking to put something in the small

24   print that you send out to your clients and things like that.

25         There'll be times when he does do that, and you'll see

1    evidence of that as well, when he even does make disclosures to

2    his clients of things, such as when it appears on the face of

3    documents and all.  But I think the evidence is going to show

4    that he's not perfect.  He made mistakes.  That's why we're

5    here.  That's why we're here.  Because he made these kinds of

6    mistakes.

7            This was a mistake.  This fake IOU notes was a

8    mistake.  What the evidence is going to show is as follows.

9    Company number -- oh, there it is.  NDMA.  UMS and NDMA.  That

10   was a company-- bear with me one second.  National Digital

11   Medical Archives.  That's its name, National Digital Medical

12   Archives.  That was the name of the company.  Health care is a

13   very big thing, as we all know.  That was a company that was

14   doing business with another company called CSI.  And I won't go

15   to ask my client again.  Whatever it is, it's computers.

16   Something with computers that developed the technology.  And

17   that was another company that Jim believed in and had invested

18   his clients in before NDMA.

19           And it turned out that NDMA, which had used CSI --

20   owed money, and a lot of money, to CSI because this is a small,

21   developmental company with what Jim Tagliaferri, the evidence

22   will show, believed to be a great idea.  And it was on the

23   verge, based upon the projections, based upon certain contracts

24   that were almost in place with major, major entities,

25   hospitals, whatever it may be, and you'll get the evidence as

E6QBTAG2                         Opening - Mr. Tulman

1   it comes in, right.  And once those things came in, NDMA was

2   going to take off.  But it needed capital.  And it also needed

3   capital to pay CSI.

4        And so what the evidence will show is that Jim

5   Tagliaferri puts money of his clients into NDMA, but says to

6   NDMA, I'm going to get you this money; I want notes.  And when

7   the money is sent over to NDMA, it will say, as the evidence

8   will show, for -- UMS is the parent of NDMA.  See "UMS" on the

9   top there?  UMS is a parent, which means it's like -- it owns

10  NDMA.  "For purchase of UMS notes," that's what it says.

11  That's what it was intended to be, the evidence will show.

12       And NDMA gets the money and Jim says, I'm sending you

13  the money so you can get by and meet your obligations.  And, by

14  the way, the major obligation I'm concerned about is CSI,

15  because my clients are in that, and I want to see you make sure

16  that my clients-- that this company is being taken care of.

17  And I'm going to give you the money that you need to survive so

18  that you can then take off yourself and we'll go from there.

19  And maybe we'll have a similar kind of a deal with a

20  convertible note similar to who?  IEAH, right?  A similar type

21  deal like that.

22       But this company, NDMA, the evidence is going to show,

23  there's going to be a fellow called Turnbull, who says, Jim,

24  great, great.  We'll get everything worked out.  Get us the--

25  we really need the money now.  We really need the money now, as

1    people will do when they want money from you.  And because, as

2    the evidence will show, Jim is a guy who it's hard to say no,

3    he starts wiring the money over to NDMA because it needs it.

4    Because it needs it.

5         Now, in this scheme to defraud, let me tell you how

6    much money Jim got for that, because you should know.  Zero.

7    Nothing.  Nothing at all.

8         Months pass.  NDMA has gotten its money and it ends up

9    being like $5 million that it gets.  You'll see the e-mails,

10   you'll see the evidence of these people:  You've got to do it.

11   Jim, we need this now.  We've got that obligation, we got that

12   obligation.  We need money for this.  We need money for that.

13        He's got no skin in that game.  He's not getting

14   anything out of it.  He's trying to do a deal to make this

15   company go.  Because if this company goes, he sees a great

16   potential for his clients.  Not for him, for his clients to get

17   into this whole thing.

18        What you'll learn is that they don't put-- they don't

19   get him the notes.  That which he relied upon when he sent the

20   money, there's a different story.  And you'll see the evidence

21   with Jim Tagliaferri communicating to these guys and saying,

22   You know what?  You're asking me for more money.  I wanted

23   projections.  I wanted more data from you.  You know, you're

24   talking and talking.  I need to see more right now.  I'm

25   getting nervous about this whole thing.  And you'll see the

E6QBTAG2                    Opening - Mr. Tulman

exchanges back and forth where they're trying to get

information.  I want to see your financials, because that's

what a CFA does.  They analyze balance sheets and look at all

the things to try to -- and they're not responding and they're

not getting to him.

          And now the year is coming to an end in 2009 and he

says I'm getting nervous.  I'm getting nervous.  What happened

to this money?  And so he wants to protect his clients.  He

hasn't gotten a note yet.  He knows they need more money.  He

says to them, the evidence will show, Listen, you want more

money; I need my notes.  I want my security before I'm going to

do anything.

          And now the people-- there's a fellow, his name is

Mark Brasso, B-r-a-s-s-o.  Brasso.  I always get it wrong.  And

this fellow meets with Jim Tagliaferri in December of 2009 and

they talk and discuss.  And at the end of that meeting, Jim

Tagliaferri, the evidence will show, is very confident that

things are now going to work out and that he's going to be

getting those notes from NDMA.  Why?  Because he needed the

money.  And he was not going to send them any more money unless

they were going to get him the notes that he was demanding that

he receive.

          And so what he does is he prepares these sub notes.  A

sub note.  What a sub note is, is let's say Jim sent over a

million dollars.  He has these assets that he controls and he

1    gives the company a million dollars.  From the million dollars

2    he doesn't take one client and take a million dollars.  He'll

3    take, let's say, ten different clients and take $100,000 from

4    ten different clients and say, okay, I'm taking from this

5    client, this client, this client, down the list, put that

6    together, and then sends NDMA a million dollars.  Right?

7            So there would be one note that would be prepared for

8    the million dollars, but that's one note that's just to Jim's

9    company, to TAG.  And so, in other words, to evidence for each

10   individual client that they had given $100,000, and he wanted

11   to document the fact that these clients had this $100,000

12   investment, he prepared these notes.  You have $100,000, you

13   have $100,000.  So it was a sub note predicated on the

14   existence of the million dollar note.  Got it?  So a million

15   dollars broken up into ten, so there were these sub notes.

16           And what he caused to be done, the evidence will show,

17   is that he had these sub notes put into the clients' files

18   fully intending and expecting that the master note was going to

19   be coming.  And the evidence will show, you will see -- you

20   will see that at the same time that that is taking place, that

21   all the e-mail correspondence and exchanges are here's the

22   final draft of the master note that's going because attorneys

23   are preparing these things and to get it over, to get this

24   done.

25           What happens?  In 2010 this company with Turnbull and

1    another fellow named Keller say to Jim Tagliaferri, By the way,

2    Jim, you're not getting any notes.  That's not our deal.  Our

3    deal is you're a shareholder.  You're a limited partner.  Your

4    clients are now limited partners in our company, to which

5    Tagliaferri is just shocked and says, That was never the deal.

6    If you're a limited partner, there has to be an agreement.

7    There has to be what's called a subscription agreement, where

8    you subscribe and you become a limited partner.  We have no

9    such agreement.  What are you talking about?  Where's the

10   notes?

11           By that time in 2010, what the evidence will show is

12   that the problems with the Galanises are developing, and all of

13   a sudden a lot of the Fund.com stock that he had his clients

14   invested in was starting to go down and people are starting to

15   clamor, to call for their money.  Where's my money, Jim?  You

16   made me a lot of money on this Fund.com last year.  You told me

17   I'm going to make more money.  Where's my money?  Where's my

18   money?  Where's my money?  I want my return, Jim.

19           IEAH, not because of Jim Tagliaferri but because of

20   what the evidence will show is complete utter mismanagement by

21   Mike Iavarone, who blows millions of dollars in the equine

22   hospital that then goes under, loses the money.  And so the

23   people and all of the money that had been invested so

24   promisingly in Kentucky Derby winners and the like all of a

25   sudden is not there.

E6QBTAG2                              Opening - Mr. Tulman

1          And so the people with IEAH are saying, Where's my

2    money, Jim?  Hey, I don't want to be in this IEAH anymore.

3    Sell it.  Get me my money.  I don't want to lose any money.

4    That's not what you are about.  You're an investment advisor.

5    We're not supposed to lose money with you.  We're only supposed

6    to make money with you.  All we've ever been doing with you is

7    making money.  Now you're losing money.  We're going to sue

8    you.  We're going-- and that's the clamoring that's now

9    beginning.

10         And then people say, What about these notes with NDMA?

11   They go to the bank and say, What's this sub note about?  They

12   contact the company.  The company says, oh, we have no note

13   with this.  There's no note.  You're a limited partner.

14         And we're indicted.  And we're indicted.  And we're

15   here.  And we're begging you to listen to the evidence in this

16   case.  We're begging you to stand -- as the government wants

17   you to do, so much more does Jim Tagliaferri want you to listen

18   to the evidence in that case-- in this case.  And when you

19   listen to the evidence in this case, when you listen to the

20   evidence and you hear from Richard Schiavo from IEAH-- and, you

21   see, I think we're hearing from him.  Because, again, I don't

22   know.  The burden of proof is on the government.  They can

23   prove the case any which way they want.  So I don't know for

24   sure who they're calling.  I'm surmising.  Somebody from NDMA

25   should be here.  Maybe there won't be.  I don't know.  I assume

1    that there will be.  You have to prove a case somehow.

2              When any witness takes this witness stand, whether

3    it's a disgruntled investor who says this man in 2010, I was

4    asking for my money and he was telling me a whole bunch of

5    stories, ask yourselves questions:  How did you do before?

6    When somebody from NDMA comes in, ask yourself, from the

7    evidence in this case, What happened to the notes, mister?

8    Whatever happened to the notes?

9              I don't think that Jason Galanis is showing up here.

10   I don't think that Jared Galanis is showing up here.  They

11   might.  I don't know.  It's not my call.  It's the government's

12   call.  They prove the case however they will prove their case.

13   So I don't know if you'll have an opportunity to listen to

14   them, to hear the evidence and testimony of what they did, what

15   they were telling Jim.  You'll see e-mails.  The government may

16   seek to do that, to look at all the e-mail exchanges and the

17   text messages.

18             Ask yourself, from the evidence in this case, whether

19   you can really find guilt beyond a reasonable doubt when

20   virtually every single critical witness who was involved in

21   these things doesn't show up in a courtroom.

22             MS. MOYNE:  Objection.

23             MR. TULMAN:  Because the evidence will show--

24             MS. MOYNE:  Objection.

25             THE COURT:  One second.

 1           MR. TULMAN:  I'm sorry.

 2           THE COURT:  Overruled.  I can instruct the jury at the

 3      end of the trial.  Go on.

 4           MR. TULMAN:  Because a case is based not only on

 5      evidence, but the lack of evidence.  And if at the end of the

 6      day, ladies and gentlemen, you entertain a reasonable doubt

 7      because the government has failed to adduce the evidence that

 8      you need to make a decision, you do your duty.

 9           Ask yourself at the end of this case, ladies and

10      gentlemen, has the government really proven or disproven beyond

11      a reasonable doubt that Jim was not acting in good faith?  The

12      evidence is going to show that this man never in his life

13      intended to hurt any of his clients.  Every step of the way,

14      could he have honestly believed in good faith that Jason

15      Galanis was a real reputable businessman who had access to the

16      funds and the deals that he was speaking of?  Ask yourself,

17      could Jim Tagliaferri have been honestly mistaken when he puts

18      money into a company that goes and wins the-- is a runner-up

19      for the highest honor in the Thoroughbred racing industry

20      called the Eclipse Award and they're nominated because of

21      their great work in the horses, and particularly Big Brown?

22      This horse, the equivalent of the Academy Award for

23      Thoroughbred racing industry, this is not made up.  This is not

24      a shell game.  This is not fake.  This happened.  This is real.

25      It's a real story.  Big Brown is alive today, I think in

E6QBTAG2                    Opening - Mr. Tulman

1    Australia, but I think Big Brown was being moved to New York or

2    something like that.

3            Could he have been mistaken honestly, as you'll hear

4    the evidence in this case, about what his obligations were as a

5    fiduciary with respect to his clients when you don't have the

6    bad heart and you don't have the evil intent and you know that

7    you're trying to do the right thing by your client, but you're

8    just not good with your administrative and all that?  That's

9    left to others.  Could he have honestly made mistakes, albeit

10   negligently, foolishly?  A one-man shop, essentially, without

11   big departments for compliance and all those things that the

12   SEC demands, with all the paperwork and all that stuff.  You're

13   just running around and on your phone and reading e-mails and

14   doing deals.  Could he have honestly made mistakes here?  The

15   evidence is going to show resoundingly he did.  He did.  That's

16   why we're here.

17           But at the end of the day, ladies and gentlemen, I

18   think what the evidence is going to show is that if you put

19   aside any bias and prejudice, you view this dispassionately,

20   you make a determination based upon the evidence and the lack

21   of evidence in this case, and if you hold the government

22   responsible for proving Jim Tagliaferri's guilt beyond a

23   reasonable doubt, if you do that, there is no question in this

24   case that you will return a verdict of not guilty.

25           Thank you.

 1              THE COURT:  Thank you.

 2              Ladies and gentlemen, what we're going to do now is

 3    take our morning break.  I'm going to ask you, just like I'm

 4    going to ask you at the beginning of all breaks, to keep an

 5    open mind and not to discuss the case.  Thank you.

 6              (Jury excused)

 7              THE COURT:  All right.  I'll see you back here at

 8    noon.

 9              (Recess)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury not present)
 2              MS. MOYNE:  Your Honor, we wanted to raise two issues.
 3              THE COURT:  Okay.
 4              MS. MOYNE:  Sorry.  First, the government request that
 5    the Court give an instruction now about witnesses being
 6    equally-- uncalled witnesses being equally available to both
 7    sides.  Defense counsel in his opening said he doesn't know if
 8    Jason Galanis is coming here or if Jared Galanis is coming
 9    here.  It's not his call, it's the government's call.  And
10    obviously the law is that both parties can call witnesses.
11              What we would propose is that the Court instruct the
12    jury now that while the defendant doesn't have a burden to call
13    witnesses or present any evidences, that the uncalled witnesses
14    are equally available to both sides and either side could
15    choose to call a witness.
16              THE COURT:  Mr. Tulman, do you have any objection to
17    that?  I mean, I'm going to give the instruction at the end in
18    any event.
19              MR. TULMAN:  No.  If your Honor believes that I
20    overstepped in my opening the boundary by making that comment,
21    then I have no objection to the instruction.
22              THE COURT:  Okay.  All right.  Why don't you hand up
23    the language.  I'm sure it's the standard language.
24              MS. MOYNE:  All right.  I might write it so you can
25    read it more thoroughly.
```

E6QBTAG2                        Opening – Mr. Tulman

1         MR. TULMAN:  In English.

2         THE COURT:  It can't be worse than my handwriting.

3         MS. MOYNE:  And the second issue is Mr. Tulman

4    referred to in his opening that there were drafts of notes

5    being exchanged, referring to the NDMA notes that were

6    allegedly going to be drafted.  And we've never -- as far as we

7    know, we have no such documents of any drafts of notes being

8    created or exchanged of NDMA notes.  And so we're obviously

9    going to move to preclude that evidence.  I just wanted to

10   front it with the Court.

11        I don't know if this was something that was previously

12   withheld on privilege grounds, but I suspect not because

13   Mr. Tulman said that he hasn't seen the documents that had

14   previously been withheld on privilege grounds.  And unless he

15   can point me to the production of these notes existing, we're

16   going to move to preclude that evidence.

17        THE COURT:  Do you anticipate that such evidence will

18   be introduced?

19        MR. TULMAN:  I believe in Carol Cureton -- who is a

20   witness in this case.  I believe in Carol Cureton's documents

21   there would be drafts of a master note.  I believe it was in

22   Carol Cureton's --

23        THE COURT:  I don't think we need to keep the jury

24   waiting.  Why don't you look and see if it's something that's

25   going to come out in the government's case with the

E6QBTAG2                         Opening - Mr. Tulman

 1    government's witnesses.  I think I can take this up later.

 2             Bring in the jury.

 3             Do you want to hand up that language, Ms. Moyne?

 4             MR. TULMAN:  So long as the instruction also indicates

 5    that the burden of proof is on the government.  That

 6    instruction is acceptable to the defense.

 7             (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6QBTAG2                         Opening - Mr. Tulman

1              (In open court; jury present)

2              THE COURT:  You may be seated.  Thank you.

3              That concludes opening statements.  I do just want to

4    give you one brief instruction on the law.  Although the burden

5    of proof remains at all times with the government and the

6    defendant is under no obligation whatsoever to call any

7    witnesses or present any evidence, you should also know that

8    uncalled witnesses are equally available to both sides and

9    either side can call an uncalled witness.  But I'll give you

10   more instructions on the law at the end of the case after

11   you've heard the evidence.

12             Now we're going to move on to the portion of the trial

13   where the government is permitted to call witnesses and

14   introduce evidence.

15             MR. COWLEY:  Thank you, your Honor.  We begin by

16   reading a stipulation relating to records into evidence.  Your

17   Honor, what I'm about to read is marked for identification as

18   Government's Exhibit 3010.  It's entitled "Trial Stipulation"

19   and it reads as follows:

20             "It is hereby stipulated and agreed by and among the

21   United States of America, by Preet Bharara, United States

22   Attorney for the Southern District of New York, Jason Cowley,

23   Parvin Moyne, Assistant United States Attorneys, and Saima

24   Ahmed, Special Assistant United States Attorney, of counsel,

25   and James Tagliaferri, the defendant, by and with the consent

1    of his attorney, Scott Tulman."

2              The stipulation reads as follows:

3              "1.  The documents set forth on Appendix A, which

4    contain Bates stamps beginning with the prefix 'SS' or 'SSB,'

5    were produced by State Street Bank and constitute true and

6    accurate documents kept and maintained by State Street Bank in

7    the normal course of business.

8              "2.  That the documents set forth in Appendix B and

9    Appendix F, which contain Bates stamps beginning with the

10   prefix 'TAG,' were produced by TAG Virgin Islands, LLC and

11   constitute true and accurate copies of documents kept and

12   maintained by TAG in the normal course of business.

13             "3.  That the documents set forth in Appendix C, which

14   contain Bates stamps beginning with the prefix 'IEAH,' were

15   produced by International Equine Acquisitions Holdings,

16   Incorporated, referred to as 'IEAH,' and constitute true and

17   accurate copies of documents kept and maintained by IEAH in the

18   normal course of business.

19             "4.  That the documents set forth in Appendix D, which

20   contain Bates stamps beginning with the prefix 'Sentinel,' were

21   produced by the Sentinel Law Firm and constitute true and

22   accurate copies of documents kept and maintained by the

23   Sentinel Law Firm in the normal course of business.

24             "5.  That the documents set forth in Appendix E, which

25   contain Bates stamps beginning with the prefix 'PCL,' were

1   produced by Patricia Cornell and constitute true and accurate

2   copies of documents kempt and maintained by her."

3          And, finally, the stipulation reads:  "It is further

4   stipulated and agreed by and among the parties that this

5   stipulation and the Government exhibits set forth in Appendices

6   A through F are admissible as exhibits at trial.  The

7   Government exhibits set forth in Appendix F, however, are not

8   admissible for the truth of the matters asserted therein, but

9   instead are admissible only for the effect, if any, that the

10  communications reflected in those exhibits had on the intended

11  recipient of those communications."

12         It is dated June 25th, 2014.  It is signed by

13  representatives from the U.S. Attorney's Office and by

14  Mr. Tulman.

15         And, your Honor, we would respectfully move for the

16  admission of Government's Exhibit 3010 and all exhibits set

17  forth on the attached appendices as stipulated in Government's

18  Exhibit's 3010.

19         THE COURT:  All right.  It will be admitted.

20         MR. COWLEY:  Thank you.

21         (Government's Exhibit 3010 received)

22         THE COURT:  And just to be clear, the numbers

23  referenced in the appendices correspond to the numbers of

24  Government exhibits, is that correct?

25         MR. COWLEY:  That is correct, your Honor.

 1          THE COURT:  All right.  Thank you.

 2          MR. COWLEY:  With that out of the way, your Honor, the

 3  United States calls Susan Temkin to the stand.

 4          THE COURT:  Good morning.

 5   SUSAN TEMKIN,

 6      called as a witness by the Government,

 7      having been duly sworn, testified as follows:

 8          THE DEPUTY CLERK:  Can you please state and spell your

 9  name for the record?  And speak very clearly and loudly.

10          THE WITNESS:  My name is Susan Temkin, T-E-M-K-I-N.

11          THE DEPUTY CLERK:  Thank you.

12          MR. COWLEY:  May I proceed, your Honor?

13          THE COURT:  You may.

14          MR. COWLEY:  Thank you.

15  DIRECT EXAMINATION

16  BY MR. COWLEY:

17  Q.  Good morning, Ms. Temkin.

18  A.  Good morning.

19  Q.  Could you please state and spell your name for the record,

20  please?

21  A.  Susan Temkin, T-E-M-K-I-N.

22  Q.  And could you tell the jury where you live?

23  A.  Los Angeles, California.

24  Q.  And are you married, Ms. Temkin?

25  A.  Yes, I am.

1    Q.  What's your husband's name?

2    A.  Victor.

3    Q.  Do you all work or are you retired?

4    A.  We're retired.

5    Q.  And if you'll pardon me for asking, how old are you and

6    Mr. Temkin?

7    A.  Mr. Temkin is 80 and I'm 73.

8    Q.  And how long have you all been retired?

9    A.  My husband retired in '89 and then he did consulting work

10   and fully retired in about 2012.

11   Q.  And prior to you all retiring, can you give us a brief

12   background of the sort of work you and your husband did?  I

13   think you just mentioned he did some consulting.  How about

14   before that, what sort of work --

15   A.  Before that he was an attorney.  And then, when we moved to

16   California, he was the head of a division at MCA for licensing

17   and consumer products.

18   Q.  Okay.  What kind of company is that?

19   A.  Music Corporation of America.  It was Universal Pictures.

20   Q.  And how about you?  What sort of job background did you

21   have?

22   A.  I had a catering business in New York and I had a cooking

23   school for children.  And I did benefit coordinating and

24   interior design, as well.

25   Q.  So prior to living in Los Angeles, you all lived in the New

1    York area for some time?

2    A.  Yes, we did.

3    Q.  Ms. Temkin, did there come a time when you met a man named

4    Jim Tagliaferri?

5    A.  Yes.

6    Q.  Do you see him in the courtroom here today?

7    A.  Yes.

8    Q.  And there's a table on the left and a table on the right.

9    Could you indicate which table that he's sitting on?  I guess

10   my left and my right.

11   A.  He is on my right and he's wearing a white shirt and a

12   plaid or colored tie.

13            MR. COWLEY:  Your Honor, if the record could reflect

14   that the witness has identified the defendant, Mr. Tagliaferri.

15            THE COURT:  It shall so reflect.

16   Q.  When's the first time that you met Mr. Tagliaferri,

17   Ms. Temkin?

18   A.  The first time I met Mr. Tagliaferri was about '99.  '98 or

19   '99.

20   Q.  And explain to the jury, what was the context of that

21   meeting?  How did you come to meet him?

22   A.  Mr. Tagliaferri was handling the-- he was the financial

23   advisor for my parents' finances.

24   Q.  And did there come a time where he became your investment

25   advisor?

1   A.  He became our investment advisor when my parents died.  And

2   my inheritance that I received I turned over or continued

3   having Mr. Tagliaferri handle it.

4   Q.  And when was that, approximately?

5   A.  I would say 2000/2001.

6   Q.  And when Mr. Tagliaferri became your investment manager for

7   those funds, what's the amount of funds we're talking about,

8   approximately?  How much money did you entrust in

9   Mr. Tagliaferri's --

10  A.  About a million dollars.

11  Q.  Now, do you recall executing an agreement with

12  Mr. Tagliaferri regarding the investment management services

13  his company was going to provide?

14  A.  Yes.

15  Q.  Do you see the Redweld in front of you that has some

16  documents in it, Ms. Temkin?

17  A.  Yes.

18  Q.  If I could ask you to take a look at Government's Exhibit

19  1470, which I believe is in evidence.

20  A.  Okay.

21  Q.  Ms. Temkin, you have a paper copy.  I think we'll also be

22  able to have it on your screen shortly.  So whichever one

23  you're more comfortable with, you can read from.  Okay?

24  A.  Okay.

25  Q.  So what's the title of this agreement?

1   A.  "Investment Management Agreement."

2   Q.  And do you recognize it?

3   A.  Yes.

4   Q.  And could you explain to the jury, briefly, what it is?

5   A.  Yeah.  It's just the agreement between Taurus Advisory

6   Group and us stating what services would be provided.

7   Q.  And what's the date of this agreement?

8   A.  The date of this agreement was August 3rd, 2000.

9   Q.  And I think you referenced Taurus Advisory Group.  Whose

10  company was Taurus Advisory Group?

11  A.  Mr. Tagliaferri's.

12  Q.  And who did you understand made investment decisions at

13  Taurus Advisory Group on behalf of clients?

14  A.  Mr. Tagliaferri.

15  Q.  And the parties to this agreement are, on one hand, Taurus

16  Advisory Group, is that correct?

17  A.  Yes.

18  Q.  And then I see a reference, underlined, to "Trust Fbo Susan

19  L. Temkin, uwo Charlotte D. Lamm Revocable Trust."  It goes on

20  and it says "Susan L. Temkin Trustee."

21          Do you see that?

22  A.  Yes.

23  Q.  Could you tell the jury who Charlotte Lamm was?

24  A.  She was my mom.

25  Q.  So this is the trust or the funds that you inherited from

E6qbtag2                        Temkin - direct

1   your mother.  Is that right?

2   A.   That's right.

3               (Continued on next page)

E6qdtag3                           Temkin - direct

1    Q.  Let's go down, please.  Do you see that first numbered

2    paragraph?

3    A.  Yes.

4    Q.  And what is it titled?

5    A.  "Investment Management Service."

6    Q.  And go, if you could, please read that first sentence under

7    that paragraph to the jury.

8    A.  "The client hereby retains the company to manage the

9    investment of all cash, securities and other assets comprising

10   the investment portfolio placed under the supervision of the

11   company by the undersigned, which portfolio, together with all

12   additions, substitutions and alterations occurring during the

13   term of this agreement, is referred to herein as 'the

14   portfolio.'"

15   Q.  So the reference to portfolio, is that a simple -- is that

16   a reference to the money that's in that revocable trust that is

17   referenced above?

18   A.  Yes.

19   Q.  And if you could read the second sentence, please, under

20   this paragraph?

21   A.  "The company is authorized, without further approval by or

22   notice to the undersigned, to make all investment decisions

23   concerning the portfolio and to make purchases, sales and

24   otherwise effect transactions in stocks, bonds, and other

25   securities in the portfolio on behalf of the client."

1    Q.  So, Ms. Temkin, what level of authority was it your

2    understanding that this agreement gave Mr. Tagliaferri's

3    company in terms of investment making decisions on your behalf?

4    A.  All authority, total authority.

5    Q.  Now, explain to the jury, please, why you were comfortable

6    giving Mr. Tagliaferri that level of control over the

7    portfolio.

8    A.  Well, he had been my parents' advisor for years and it had

9    worked really well for them.  And we wanted kind of the same

10   thing that they had, which was very conservative, sort of blue

11   chip, liquid stocks.

12   Q.  Now, in providing Taurus Advisory Group with this level of

13   control, did you have certain expectations as to how they were

14   going to carry out their investment advisory services?

15   A.  Yeah.  Yeah.  That they would do well with our money and

16   our investments and make it increase.

17   Q.  In regards to honesty, what expectations, if any, did you

18   have regarding whether or not Mr. Tagliaferri had to be open

19   and honest with you about the investment decisions he was

20   making?

21   A.  I had -- I mean, I had complete faith that he would be open

22   and honest with us and transparent in any decisions that he was

23   making.

24   Q.  What expectations did you have regarding whether or not

25   Mr. Tagliaferri needed to disclose things that could affect his

1    decision making in terms of what investments he was going to

2    put you in?

3    A.  Well, I thought that if there was anything that was

4    questionable, he would raise it with us, certainly, before he

5    would make an investment.

6    Q.  And why were these sort of expectations important to you in

7    terms of trust, honesty, disclosure, those sort of things?

8    A.  Well, I trusted him then, and that was how I expected to do

9    business with him.

10   Q.  Let me have you go down, please, to the last sentence in

11   this paragraph that starts "In order that."  Could you read

12   that sentence to the jury, please?

13   A.  Certainly.

14        "In order that the company may render efficient

15   services to the client under this agreement, the client shall

16   notify the company of any and all changes in the general

17   financial circumstances and investment objectives of the client

18   during the term of this agreement."

19   Q.  Do you see the reference to "investment objectives"?

20   A.  Yes, I do.

21   Q.  Did you and Mr. Tagliaferri have a discussion when he

22   became your investment advisor regarding what investment

23   objectives you had?

24   A.  Yes.

25   Q.  And what sort of objectives did you lay out for

1   Mr. Tagliaferri?

2   A.   That we wanted things in non-risky, safe securities,

3   because we were old and we didn't want chancy stuff.

4   Q.   Now, besides this account that we are talking about,

5   Ms. Temkin, did any other family members also use

6   Mr. Tagliaferri as an investment advisor?

7   A.   My brother did.

8   Q.   What is your brother's name?

9   A.   Douglas Lamm, L-a-m-m.

10  Q.   And also in addition to this one, was there another trust

11  that Mr. Tagliaferri started to manage relating to you?

12  A.   Yes.

13  Q.   And which one was that?

14        (Pause)

15  A.   It was a generation-skipping trust for my children.  Sorry.

16  Q.   That's OK.  If you need a moment?

17  A.   No.

18  Q.   Let's turn to page 2, please.

19        Do you see that, Ms. Temkin?

20  A.   Page 2, yes.

21  Q.   Do you see the numbered paragraph 2?

22  A.   "Delivery of funds and securities."

23  Q.   Correct.

24  A.   Yes.

25  Q.   Do you see the first sentence underneath there says, "All

1    transactions in the portfolio shall be carried out through such

2    custodians as the client shall designate in writing, and the

3    company is authorized to issue instructions to such custodians

4    with respect to all deliveries of funds or securities in

5    connection with transactions by the company pursuant to this

6    agreement."

7            Do you see that?

8    A.  I do.

9    Q.  Do you see the reference to "custodians"?

10   A.  I do.

11   Q.  What do you understand that reference to custodian to mean?

12   A.  Well, the custodian was First Investors Bank & Trust, which

13   then changed to State Street Bank.

14   Q.  OK.  And even -- you know, I guess taking a step back,

15   let's just talk about the concept of a custodian.

16           Were your assets, your money, your securities, were

17   they going to be physically held by Mr. Tagliaferri's company,

18   or were they going to be physically held at like a bank?

19   A.  I'm not sure, but I think they would be physically held at

20   the bank.

21   Q.  OK.  So this custodian -- do you understand IBT, I think

22   you mentioned, and later State Street, that's where your

23   account was physically located, is that correct?

24   A.  Yes, that's right.

25   Q.  All right.  Then pursuant to the language that we talked

1    about on the first page, who was delegated authority by you to

2    make investment decisions and decisions regarding what

3    securities were going to move in and out of those accounts?

4    A.  Mr. Tagliaferri.

5    Q.  All right.  So -- and the reference we see here about the

6    company is authorized to issue instructions to such custodians

7    with respect to all deliveries of funds or securities, the

8    reference to the company being authorized, that's a reference

9    to Taurus Advisory Group, as you understand it?

10   A.  Yes.

11   Q.  And let's go down to the next numbered paragraph, which

12   says "fee schedule."  Do you see that?

13   A.  I do.

14   Q.  And could you read that sentence to the jury under "Fee

15   Schedule," please.

16   A.  "Fee schedule.  For services hereunder, the company shall

17   be entitled to a fee in accordance with the fee schedule

18   annexed as Exhibit A."

19   Q.  If I could ask you to go to the last page of this exhibit,

20   which is I think where Exhibit A is, please.

21   A.  Yes.  Exhibit A.

22   Q.  And what's the title of this exhibit to this agreement?

23   A.  "Fees for Investment Management Services Are as Follows."

24   Q.  And underneath that, does it say, I think, .5 percent on

25   tax exempt securities and cash equivalent?

E6qdtag3                    Temkin - direct

1   A.  Yes.

2   Q.  And then 1 percent on all other assets?

3   A.  Yes.

4   Q.  So basically what was your understanding as to how

5   Mr. Tagliaferri was going to get compensated by you in exchange

6   for the investment advisory services he was providing?

7   A.  He was going to get a percentage of what he did -- I mean,

8   what we made, and they were payable quarterly.

9   Q.  So the reference to securities, cash equivalent and other

10  assets, did you understand that to be references to the stuff

11  sitting in your account?

12  A.  Yeah, exactly.

13  Q.  All right.  If we could go back to page 2, please.

14  A.  Mm-hmm.

15  Q.  Actually, let's go to the signature block, please.

16          All right.  Do you recognize your signature there?

17  A.  I do.

18  Q.  And who signs on behalf of Taurus Advisory Group?

19  A.  That criminal.

20  Q.  Again, who did you understand to be making the decisions at

21  Taurus regarding what investments you were going to be placed

22  in?

23  A.  Jim Tagliaferri.

24  Q.  All right.  I think we spoke a few minutes ago about the

25  investment objective conversation that you had with

E6qdtag3                          Temkin - direct

1    Mr. Tagliaferri at the beginning of this relationship.  Do you

2    recall that?

3    A.  Yes.

4    Q.  I now want to talk about the period of 2000 to

5    approximately 2007, so the first seven years or so where

6    Mr. Tagliaferri is serving as your investment advisor.  OK?

7    A.  Mm-hmm.

8    Q.  And during that time, were your instructions generally

9    complied with?

10   A.  Yes.

11   Q.  And how often would you speak with someone from Taurus

12   Advisory Group -- actually, I will be more specific.  How often

13   did you speak with Mr. Tagliaferri regarding how your

14   investments were doing?

15   A.  I don't know, but whenever -- I mean, we were always

16   available for each other whenever we needed to have any

17   questions.

18   Q.  And, generally, I think you referenced at first your

19   account was custodied or held at Investors Bank & Trust, is

20   that right?

21   A.  That is right.

22   Q.  What sort of information would you get about your account

23   from Investors -- Investment Bankers Trust?

24   A.  We would get statements.

25   Q.  And what sort of things would be reflected on those

1    statements?

2    A.  The trades, what was going in, what was going out, what

3    money was being spent.

4    Q.  And would you also get statements from Taurus Advisory

5    Group?

6    A.  Yeah, we did.

7    Q.  And how often would you get statements first from IBT and

8    then also from Taurus Advisory Group, how often would they

9    come?

10   A.  They both came once a month.

11   Q.  And which set of statements was more I guess detailed in

12   terms of the line level of different securities and things like

13   that that you were holding in your account?

14   A.  Investors Bank & Trust.

15   Q.  Now, so he continues as your advisor from 2000 to around

16   2007, correct?

17   A.  Correct.

18   Q.  All right.  I now want to talk about the period of

19   approximately 2007 going forward.  OK?

20   A.  OK.

21   Q.  Around that time, do you recall if Mr. Tagliaferri

22   physically moved the location of his company and changed its

23   name?

24   A.  Yes, he did.

25   Q.  And does the name TAG VI sound familiar to you?

E6qdtag3                          Temkin - direct

1   A.  Yes, it does.

2   Q.  What is that?

3   A.  Taurus Advisory Group moved from Connecticut to St. Thomas,

4   Virgin Islands, and changed its name to TAG VI.

5   Q.  So Taurus Advisory Group becomes TAG Virgin Islands around

6   that time?

7   A.  That's right.

8   Q.  And it goes from -- where was Taurus Advisory Group?

9   A.  Stamford, Connecticut.

10  Q.  So it moves from Connecticut to St. Thomas?

11  A.  Correct.

12  Q.  Now, let's take a look at -- well, around 2007, and moving

13  forward, did you notice any sort of changes in the types of

14  investments he was placing you in?

15  A.  Yes.  I started seeing things I didn't recognize.

16  Q.  Let's go and take a look at some of those statements.

17          First let's look at government's Exhibit 1000, and --

18  A.  OK.

19          MR. COWLEY:  And, Ms. Baskin, before we publish this,

20  if -- with the Court's consent.  I see that Ms. Temkin's

21  address is referenced on this, your Honor.  We would like, with

22  the Court's consent, for Ms. Baskin to be able to just redact

23  out during the publication phase that sort of information.

24          THE COURT:  That is fine.

25          MR. COWLEY:  Great.

E6qdtag3                      Temkin - direct

 1  BY MR. COWLEY:
 2  Q.  OK.  So let's look at the top left of this statement.  What
 3  is the name of the company that's referenced on the top left
 4  here?
 5  A.  Investors Bank & Trust.
 6  Q.  All right.  Where are they located?
 7  A.  Maiden Lane, New York.
 8  Q.  Is that -- that is your New York, New York?
 9  A.  New York, New York.
10  Q.  And then do we see the name of your account that we saw
11  referenced on the investment advisory statement -- investment
12  advisory agreement?
13  A.  Yes.
14  Q.  Then looking at the top right, underneath "Account
15  Statement," what date range does this account statement cover?
16  A.  January 1st through the 31st, 2007.
17  Q.  So this is the kind of information you would be getting
18  monthly about what was going on in your account, is that
19  correct?
20  A.  That's correct.
21  Q.  All right.  Let's take a look at the next page, please.
22          Ms. Temkin, I'm not sure if you have all of these
23  pages in a paper copy up there so it might be easier to look on
24  the computer screen for right now.
25  A.  Thank you.

E6qdtag3                          Temkin - direct

1  Q.  OK.  So this has -- do you see the section that says "Asset

2  Summary?"

3  A.  Yes.

4  Q.  All right.  Does that just lay out the different types of

5  securities that you are put in?

6  A.  Yes.

7  Q.  Later underneath that do you see "Income Summary?"

8  A.  I do.

9  Q.  And does that also talk about -- reference different

10  securities that you are put in?

11  A.  Yes.

12  Q.  Do you see a reference to things like corporate bonds?

13  A.  I do.

14  Q.  Do you see a reference to things like equities?

15  A.  Yes.

16  Q.  And a reference to things like other assets?

17  A.  Mm-hmm.  Yes.

18  Q.  And then let's -- if we go forward to the next page,

19  please.

20          All right.  Do you see how it is titled "Account

21  Holdings?"

22  A.  I do.

23  Q.  OK.  And do you see references to -- what are these

24  references to, these sort of individual things?

25  A.  They are references to different companies in which we

E6qdtag3                        Temkin - direct

1    invested.

2    Q.  And let's go down to "Equities," for example.

3    A.  OK.

4    Q.  Do you see -- what are the first two companies referenced

5    under Equities?

6    A.  Bowing and General Electric.

7    Q.  You heard of those companies before?

8    A.  I have.

9    Q.  All right.  Now let's move forward, if we could, to the

10   March 2007 statement.  And, Ms. Baskin, I think this is page 16

11   of the PDF.

12            OK.  So looking at this page, up on the top right,

13   what is the month that this statement covers?

14   A.  This is March 1st through 31st, 2007.

15   Q.  And what is the heading of the information that's conveyed

16   here sort of up at the top left?

17   A.  "Account Activity."

18   Q.  So basically is it your understanding that this shows sort

19   of what's moving in and out of your account for that relevant

20   month?

21   A.  Yes.

22   Q.  Let me draw your attention to a few different transactions.

23            Let's look at March 7, 2007.  Do you see something

24   under that date referred to as a disbursement?

25   A.  Yes.  Yes.

E6qdtag3                          Temkin - direct

1    Q.  And there, what institution does it say that that

2    disbursement is going to?

3    A.  Valley National Bank.

4    Q.  And at the sort of very bottom of the information for that

5    disbursement, what is the security being referenced there?

6           Do you see where it says "Mortgage Note?"

7    A.  Oh, yeah.  Mine is not that -- yes, "Mortgage Note."

8    Q.  And what is the amount of money leaving your account?

9    A.  $200,000.

10   Q.  And let's go down a little lower, if we could, to

11   March 14th, 2007.

12          Do you see that disbursement?

13   A.  I do.

14   Q.  And what is the amount of money that's leaving your account

15   for that disbursement?

16   A.  $1,375.61.

17   Q.  And going down a little further, to March 22nd, 2007, do

18   you see another disbursement?

19   A.  Yes.

20   Q.  And what is that amount?

21   A.  It is $100,000.

22   Q.  Going back up to the March 14th one, who does that indicate

23   that it's going to?

24   A.  Taurus Advisory Group.

25   Q.  And what's the basis for ha disbursement?

E6qdtag3                          Temkin - direct

1   A.  It was an investment management fee.

2   Q.  So that's the type of fee that we saw referenced in Exhibit

3   A of your Investment Advisory Agreement, is that correct?

4   A.  That's right.

5   Q.  Going down to March 22, 2007, that disbursement, what does

6   that indicate that it is going to?

7   A.  It's going for an IEAH note.

8   Q.  And what is the specific account that it says that it is

9   going to?

10  A.  Valley National Bank.

11  Q.  And do you see a reference to an AC and then a series of

12  numbers followed by a name?

13  A.  Yes, I do.

14  Q.  And what is the -- what is the name behind that account

15  number?

16  A.  The name is Barry Feiner, Esq.

17  Q.  Now, let's move forward and take a look, please, at page 22

18  of this PDF, please.

19          So this account statement is for the following month,

20  is that correct?

21  A.  Yes.  April.

22  Q.  And if we could go down to page -- do you see the 4/19/07

23  disbursement?

24  A.  I do.

25  Q.  How much money is leaving your account on that date?

1   A.  $100,000.

2   Q.  And what is that for the purchase of?

3   A.  Purchase of IEAH convertible note.

4   Q.  Now, Ms. Temkin, at the time that we are talking about,

5   early to mid-2007, how much focus are you paying on sort of the

6   line-by-line securities like these in your account statements?

7   A.  Not a lot.

8   Q.  What are you focusing on when you get these account

9   statements in?

10  A.  I was focusing on the bottom line.

11  Q.  And why didn't you feel a need to look at sort of

12  particular securities in your account at that time, sort of in

13  early 2007?

14  A.  Because I thought that whatever Jim was doing, he was doing

15  for me.

16  Q.  To what extent was your trust in Mr. Tagliaferri a factor

17  in your feeling like you didn't need to do a line-by-line at

18  the time?

19  A.  It was total.  It was complete.

20  Q.  If we can move forward, please, to page 27.  OK.

21          So what is the account statement time period for this

22  account statement?

23  A.  This is May.  May 1st through 31st.

24  Q.  And what is the title of the section that is referenced on

25  this account statement?

1   A.  "Account Holdings."

2   Q.  And do you see the subtopic there called "Other Assets?"

3   A.  Yes, I do.

4   Q.  Do you see the first other asset, do you see it being with

5   a tax cost of $200,000?

6   A.  I do.

7   Q.  And do you recall seeing in a statement that we looked at

8   earlier about $200,000 going -- actually exactly $200,000 going

9   out relating to a mortgage note?

10  A.  Yes.

11  Q.  And at the time did you have any idea what 1920 Bel Air LLC

12  was?

13  A.  None at all.

14  Q.  And under the next asset, do you see -- what do you

15  understand that next asset to be?

16  A.  Conversion Services International.

17  Q.  And the next asset, what did you understand that to be an

18  investment in?

19  A.  International Equine Acquisitions.

20  Q.  And is that -- do you recall seeing transfers out of your

21  account relating to International Equine Acquisitions?

22  A.  Yes.

23  Q.  Now, when you got your monthly account statements, were you

24  also sent copies of these securities that were being held in

25  your account?

1    A.  From?

2    Q.  From IBT or from anyone.  Did you just get the account

3    statements, or did you also get things like if there was a Sub

4    Note in your account or things like that, were you sent a copy

5    of those at the time?

6    A.  The notes that we got from TAG's office didn't spell out

7    everything the same way it did from Investors Bank & Trust.

8    Q.  I asked that question a little awkwardly.  Let me try and

9    rephrase it in another way.

10          I am not talking about statements.  We understand that

11   you got account statements from IBT and also TAG.  What I'm

12   asking is, in addition to those statements, did you also get

13   physical copies of these securities, like a stock certificate

14   and things like that, sent to you?

15   A.  No.  No.

16   Q.  Did you feel any need to ask to get copies of those things,

17   as well?

18   A.  I assumed they were being held securely.

19   Q.  And at the time did you have any idea what kind of company

20   IEAH was?

21   A.  No, I didn't.

22   Q.  How about 1920 Bel Air LLC, any idea about that?

23   A.  I still don't know what that is.

24   Q.  Now, if you had known -- if we could go back, please, to

25   what is I think page 22 of this PDF, please, Ms. Baskin.

1   So this is the April statement.  Do you recall that we

2   just looked at that?

3   A.  Mm-hmm.

4   Q.  And, again, near the bottom, do you see that reference of

5   $100,000 going out of your account?

6   A.  Yes, I do.

7   Q.  And if you had known at the time, Ms. Temkin, that

8   Mr. Tagliaferri had made an arrangement with IEAH where his

9   company, TAG VI, would actually receive as a fee a percentage

10  of the TAG client funds he caused to be transferred for

11  investments in IEAH, would that have been important to you at

12  the time?

13  A.  It certainly would have been important to me at the time.

14  Q.  Can you explain to the jury why that would have been

15  important information to you?

16  A.  Because I was paying him a fee, and he's getting money from

17  people he's using my money to invest in.  It's like -- it was

18  like a shell game.

19  Q.  Well, let me ask you this.  Where did you expect all of

20  that money to be going to?

21  A.  To the company that was listed.

22  Q.  If you had known that a portion of that money was actually

23  going to be routed down to Mr. Tagliaferri's corporate account

24  in the Virgin Islands, would that have been important

25  information to you?

E6qdtag3                          Temkin - direct

1    A.  Very important information to me.

2    Q.  And explain to the jury why that would have been important.

3    A.  Because we were being duped.

4    Q.  What concerns -- let's be specific.  What sort of concerns

5    would that have raised in your mind about Mr. Tagliaferri's

6    motivations?

7    A.  Well, I call it double-dipping.

8    Q.  And why is that?  Explain what you mean by that.

9    A.  You can't take from both sides.  If you're getting paid by

10   somebody, that's it; you don't then take it from the other end

11   of the agreement as well, which was what was happening,

12   clearly.

13   Q.  What concerns would you have had regarding

14   Mr. Tagliaferri's motivations to invest in a particular

15   security?

16   A.  Well, his motivations were clearly for him, not for us.

17   Q.  If you had known that at the time, if you had found out

18   information like that, that he was getting a fee like that,

19   would you have continued to have Mr. Tagliaferri as your

20   investment advisor?

21   A.  No.

22   Q.  Would you have strongly indicated to him that you wouldn't

23   be put in securities where that sort of arrangement was being

24   made?

25   A.  I certainly would have.

E6qdtag3                          Temkin - direct

1   Q.  Now, when did you come to learn that you were invested in

2   IEAH, approximately?

3   A.  Well, it was about the time that Big Brown was running.

4   And I got a call from my sister-in-law, who said, Do you

5   realize you are -- you own part of Big Brown?  I said, What are

6   you talking about?  She said, Look at your statement.  IEAH,

7   that's the horse.

8         That's when I realized that -- I don't know if that

9   was 2008, I don't know what -- I guess when he started to run.

10  But that was when I realized what IEAH was.

11  Q.  What sort of concerns did you have when you learned that

12  you were invested in a company relating to owning racehorses?

13  A.  My concern was that we didn't have enough money to invest

14  in racehorses.

15  Q.  Was an investment in a company like IEAH consistent or

16  inconsistent with the guidance and directions you had given

17  Mr. Tagliaferri?

18  A.  Well, it certainly wasn't blue chip and it certainly wasn't

19  safe and it certainly wasn't liquid.

20  Q.  And did you ask Mr. Tagliaferri, did you express this

21  concern -- these concerns to Mr. Tagliaferri?

22  A.  Yes.

23  Q.  And what assurances did he give you?

24  A.  He assured me that it was safe and that, you know, not to

25  worry, that everything was going to be OK.

1    Q.  And based on those assurances, did you develop a comfort

2    level with being in that security for a time?

3    A.  For a little while I did.  But it nagged because it was

4    always wrong.

5    Q.  I mean, Big Brown is a pretty exciting things to watch,

6    fair to say?

7    A.  Absolutely.

8    Q.  Get swept up in it a little?

9    A.  Absolutely.

10   Q.  Do you recall if you ever attended any horseraces relating

11   to IEAH?

12   A.  We went to a race once.  I can't remember if it was -- I

13   think it was maybe Belmont.  I can't remember.  And it was

14   exciting.  And his assurances -- you know, helped me think this

15   was OK.

16   Q.  Now, we've talked about IEAH.  I want to now talk about

17   another security that you were invested in.

18          Ms. Baskin, if we could please go to page 102 of the

19   PDF.

20          All right.  Now, so we're skipping ahead a bit.  Some

21   of the account statements that we looked at before were sort of

22   March/April 2007.  What is the date of this account statement?

23   A.  June 1st through 30th, 2008.

24   Q.  And let's go down and take a look at some of the things

25   that you are invested in at this time.

E6qdtag3                    Temkin - direct

1          Do you see a reference to "Fund.com" under "Equities?"

2     A.  Yes, I do.

3     Q.  Do you have any understanding of what Fund.com was at the

4     time?

5     A.  No.

6     Q.  And if we could go down to just I guess the next page,

7     please, Ms. Baskin.  Page 103.

8          OK.  Do you see that under "Other Assets," that Bel

9     Air -- that 1920 Bel Air note that we looked at previously is

10    no longer there; is that correct?

11    A.  That's correct.

12    Q.  Do you see assets relating to IEAH that are still there?

13    A.  Yes, I do.

14    Q.  Let's look at the account activity for this month, please.

15    If we could go to page 105.

16         OK.  Now I now want to drill down on a few particular

17    transactions that we see happening in your account.

18         First, do you see -- let's look at June 20th, 2008,

19    please.

20         Do you see that, Ms. Temkin?

21    A.  I do, yes.

22    Q.  All right.  So on June 20, 2008, how much money is going

23    out of your account?

24    A.  $49,910.

25    Q.  And what does it say it is for purchase of?

1    A.  It says it is for purchase of Fund.com shares.

2    Q.  And, again, where did you think your 49-nine was going when

3    that money was leaving your account?

4    A.  To a company called Fund.com.

5    Q.  If you had come to learn that a portion of this money was

6    just -- or this money was just pooled with another set of

7    investor money and a portion of that was sent down to

8    Mr. Tagliaferri's corporate account in the Virgin Islands,

9    would that have been important for you to know?

10   A.  It would be important.

11   Q.  Would that have been a material thing for you to know in

12   deciding whether or not to continue to trust Mr. Tagliaferri

13   with your money?

14   A.  Yes.  Of course.

15   Q.  Let's go down to June 25th, 2008.  Do you see that?

16   A.  Yes.

17   Q.  Do you see a little -- I'm sorry.  Do you see the reference

18   to the $200,000 coming in?

19   A.  One second.

20         (Pause)

21         Yes there it is, yes.

22   Q.  OK.  So this is money that's actually coming into your

23   account, is that correct?

24   A.  That's right.

25   Q.  There is no little minus signed behind it?

E6qdtag3                        Temkin - direct

1    A.  No.

2    Q.  So how much money is coming into your account on June 25,

3    2008?

4    A.  $200,000.

5    Q.  What does it say it relates to, what security?

6    A.  Bel Air, 1920 Bel Air.

7    Q.  Ms. Temkin, had you known that that $200,000 that was

8    coming back into your account was simply coming from the same

9    pool of money that your $49,900 was sent to, would that have

10   been important for you to know?

11   A.  Yes.

12   Q.  Put differently, if you knew that the disbursement of money

13   out of your account in June 20th was part of the funds being

14   used to make the payment into your account on June 25th, would

15   that have been important information for you to know?

16   A.  It is important information.

17   Q.  Would you have been comfortable continuing to invest with

18   Mr. Tagliaferri had you known that?

19   A.  Of course not.

20   Q.  And can you explain -- you say "of course not."  Can you

21   explain to the jury why that would have made you so

22   uncomfortable?

23   A.  It just was wrong.  I mean, you don't take other people's

24   money to -- it is like robbing Peter to pay Paul.  You don't

25   take money from other investors to give back to an investor so

E6qdtag3                          Temkin - direct

1    it looks like investor number 2 is getting something.  It is

2    just -- it just stinks.

3    Q.  In this case, if you had known that it was your own money

4    that was being used to pay you back in regard to another

5    investment?

6    A.  Even worse.

7    Q.  And would you have continued to trust Mr. Tagliaferri with

8    your money had you known that that sort of thing was going on?

9    A.  No.

10   Q.  If you had known -- do you see the reference to 1920 Bel

11   Air LLC?

12   A.  Yes.

13   Q.  That cash received coming in?

14   A.  Yes, I do.

15   Q.  Again, did you have any idea what Bel Air LLC was?

16   A.  No.

17   Q.  If you had known that that was an entity that was helping

18   to pay for a house in Los Angeles for someone affiliated with

19   Fund.com, would that have been important information for you to

20   know?

21   A.  What did you say?

22   Q.  Sure.  Let me ask the --

23              MR. TULMAN:  Objection, your Honor.

24              THE COURT:  I am going to sustain the objection.

25              You don't have to answer that.  He will ask you

E6qdtag3                    Temkin - direct

1    another question.

2              THE WITNESS:  OK.  Thanks.

3              MR. COWLEY:  Just briefly for the record.

4    Materiality, your Honor.

5              THE COURT:  And it is subject to connection?

6              MR. COWLEY:  Absolutely.

7              THE COURT:  All right.  Then I will allow it.

8    BY MR. COWLEY:

9    Q.  So, Ms. Temkin, if you had known that this 1920 Bel Air LLC

10   was an entity that was used to pay for a home that someone

11   affiliated with Fund.com was living in, would that have been

12   important information for you to know?  Would you have felt

13   comfortable with that investment knowing that?

14   A.  Of course not.

15   Q.  I'm so sorry --

16   A.  Of course not.

17   Q.  Thank you.  All right.  So it's June 2008, I think we've

18   looked at the statement from there.  Let's look briefly at

19   July 2008.

20             If we could go to page 110 of Government's Exhibit

21   1000.

22             All right.  Do you see a reference under "Other

23   Assets" to "Geomas?"

24   A.  I do.

25   Q.  And do you see a reference to again International Equine

E6qdtag3                        Temkin - direct

1   Acquisition Holdings?

2   A.  Yes.

3   Q.  And do you see a reference to a mortgage Sub Note?

4   A.  Yes.

5   Q.  Did you have any idea at the time what the reference to

6   mortgage Sub Note was?

7   A.  No.

8   Q.  Any idea what these were about?

9   A.  No.  I just know they were continued investments.

10  Q.  If we could look at page 111, please.

11          And do you see some money going out of your account on

12  July 1st, '08 for the purchase of Geomas and Fund.com shares?

13  A.  Yes.

14  Q.  And where did you expect -- when that money went out of

15  your account, where did you expect it was going to?

16  A.  Geomas and Fund.com shares.

17  Q.  If you had known that that money was just being pooled with

18  other investor money and a portion of it was being sent down to

19  a TAG Virgin Islands' corporate account, would that have been

20  important?

21          MR. TULMAN:  Objection.

22  A.  Yes, it would have been important.

23          THE COURT:  Overruled.

24          MR. COWLEY:  Your Honor, subject to connection, of

25  course.

E6qdtag3                    Temkin - direct

1              THE COURT:  Sorry to interrupt.

2              Did you finish your answer?

3              THE WITNESS:  Yes.

4              THE COURT:  Thank you.

5    BY MR. COWLEY:

6    Q.  So we've talked about Geomas, we've talked about Fund.com

7    and a few other securities.  I am now going to talk about IEAH

8    again.  And let's move forward in time to September 2008.

9              Do you recall if you received correspondence around

10   that time from Mr. Tagliaferri relating to IEAH?

11   A.  September did you say?

12   Q.  Yes.  We can show it to you.

13   A.  OK.

14   Q.  If you give me a moment.

15   A.  That would be better.

16   Q.  Do you see a document in your Redweld that's marked as

17   Government's Exhibit 1451, please, Ms. Temkin?

18   A.  Yes.  I have it.

19   Q.  Do you recognize that as correspondence that

20   Mr. Tagliaferri sent to you?

21   A.  Yes.

22   Q.  Around September 2nd, 2008?

23   A.  Yes.

24              MR. COWLEY:  Your Honor, I move to admit Government's

25   Exhibit 1451.

E6qdtag3                    Temkin - direct

1           THE COURT:  Any objection?

2           MR. TULMAN:  I didn't see it.

3           THE COURT:  Mr. Tulman needs a copy.

4           (Pause)

5           MR. TULMAN:  No objection.

6           THE COURT:  All right.  It will be admitted.

7           (Government's Exhibit 1451 received in evidence)

8    BY MR. COWLEY:

9    Q.  All right, Ms. Temkin.

10          MR. COWLEY:  So if we could ask, please, Ms. Baskin,

11   for that same redaction of an address?

12          THE COURT:  That's fine.

13          MR. COWLEY:  Thank you.

14   Q.  OK.  So what is the date of this correspondence?

15   A.  September 2, 2008.

16   Q.  And does this letter have to do with IEAH?

17   A.  Yes, it does.

18   Q.  OK.  So let's just briefly walk through it.

19          For the first paragraph, do you see a reference to

20   documents being enclosed relating to IEAH holdings and your

21   fractional interest in racehorses?

22   A.  Yes.

23   Q.  Do you see a reference to you having received interest in

24   particular horses?

25   A.  Yes.

E6qdtag3                         Temkin - direct

1    Q.  And what are some of the horses that are named there?

2    A.  Big Brown, Kip Deville, and Shaggy Mane.

3    Q.  And what does the next sentence read?

4    A.  "We formed an LLC, Pegasus Holdings Group Stables, LLC, to

5    take title to the horses."

6    Q.  And if you go down a little further, do you see a reference

7    to "I became the managing member"?

8    A.  "I became the managing member, and each owner client will

9    become a nonmanaging member."

10   Q.  OK.  Again, who is this letter from?

11   A.  Jim Tagliaferri.

12   Q.  So he's forming an LLC, Pegasus Holdings, and it is going

13   to hold the interest that different clients have in these

14   different horses, is that right?

15   A.  That's right.

16   Q.  And he's enclosing documents relating to that?

17   A.  Yes.

18   Q.  All right.  If we could go down a little further.  Do you

19   see a reference to a Pegasus operating agreement?

20   A.  I do.

21   Q.  And do you see a reference to a statement of your net

22   personal earnings?

23   A.  Yes.

24   Q.  And what's the amount reflected there?

25   A.  $5,825.11.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6qdtag3                          Temkin - direct

1    Q.  OK.  So this was money relating to your IEAH investment

2    that you got some money back, correct?

3    A.  Right.

4              MR. TULMAN:  Objection.

5              THE COURT:  No.  Overruled.

6    BY MR. COWLEY:

7    Q.  OK.  And if you can read -- let's go down to the last

8    paragraph, please.

9              Actually, let's go to the second-to-last, for

10   completeness.  Can you just read that paragraph to the jury?

11   A.  "The success IEAH has enjoyed on the track has triggered

12   interest among several suitors who are interested in acquiring

13   a significant stake in the company.  While we cannot predict if

14   the deal will occur, we believe it is in your best interest to

15   convert your notes into IEAH common stock."

16   Q.  So in reference to that paragraph, is there a reference to

17   being able to convert the note into stock?

18   A.  Yeah.  That's what he's suggesting.

19   Q.  Mm-hmm.  And let's go down to the bottom paragraph, please.

20   And if you could read that to the jury.

21   A.  "For the record, we've provided financial advice to IEAH

22   and are representing the company in its discussions with

23   prospective buyers.  For these services we have received

24   consulting fees.  This raises the potential for a conflict of

25   interest among TAG VI, its clients, and IEAH.  I would be happy

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    to discuss these arrangements at your convenience."

2    Q.  Ms. Temkin, would it have been important for you to know

3    about a potential conflict before your money was invested in

4    IEAH?

5    A.  Of course it would have been important.

6            MR. COWLEY:  If we could please have a split screen,

7    Ms. Baskin, between Government's Exhibit 1451 and page 16 of

8    Government's Exhibit 1000.

9    Q.  All right.  So what's the date of the account statement

10   that we see on the right of your screen?

11   A.  March 1, 2007.

12   Q.  Do you see the transfer out of $100,000 relating to IEAH?

13   A.  Yes.

14   Q.  And so that's March of '07.  What's the date of this letter

15   from Mr. Tagliaferri on the left?

16   A.  September 2008.

17   Q.  Are you aware of approximately how much money he had caused

18   you to invest in IEAH by that point?

19   A.  Hundreds of thousands of dollars.

20   Q.  Did you have a choice as to whether or not you would be

21   invested in IEAH at this point?

22   A.  I was invested in IEAH at this point.

23   Q.  And in looking at this paragraph and focusing on your

24   understanding at the time, where, if anywhere, in this

25   paragraph does it make a disclosure that Mr. Tagliaferri had

E6qdtag3                              Temkin - direct

1    made arrangements with IEAH to receive a portion of client

2    money that was sent to IEAH?

3    A.   Nowhere.

4    Q.   So based on this letter, did you feel the need to give

5    Mr. Tagliaferri a call and ask if such an arrangement existed?

6    A.   I did not.  My money was gone.

7    Q.   Did you understand, was this -- were there any prior

8    mentions, to your recollection, of any conflicts of interest or

9    anything like that?

10   A.   No.

11             MR. COWLEY:  And then -- if I could approach, your

12   Honor?

13             THE COURT:  Yes.

14             MR. COWLEY:  Thank you.

15   Q.   I'm going to hand you what's been marked for

16   identification, it is a copy -- it is Government's Exhibit

17   1451A.

18             Is this something that you recognize?

19   A.   Yes.

20   Q.   And is this some of the Pegasus-related paperwork

21   affiliated with that September 2nd, 2008 email?

22   A.   Yes.

23   Q.   Excuse me.  Letter.

24   A.   Letter, yes.

25             MR. COWLEY:  Your Honor, I move to admit Government's

E6qdtag3                          Temkin - direct

1   Exhibit 1451.

2              THE COURT:  Any objection?

3              MR. TULMAN:  No objection.

4              THE COURT:  It would be admitted.

5              (Government's Exhibit 1451 received in evidence)

6   BY MR. COWLEY:

7   Q.  We don't have that electronically, but just looking through

8   it, does it relate to your holdings and horses relating to

9   Pegasus?

10  A.  Yes, it does.

11  Q.  OK.  So we've talked about -- we've gone up to

12  September 2008.  We've talked about a number of different

13  securities, and we have just looked at this letter on

14  September 2, 2008.

15             Going forward after that, did you have concerns about

16  how much money of yours was being placed in IEAH?

17  A.  Yes, I did.

18  Q.  And did you relay those concerns to Mr. Tagliaferri?

19  A.  Yes, I did.

20  Q.  Let's now take a look at what I believe is in evidence as

21  Government's Exhibit 1452, as evidence limited to the effect on

22  the listener.

23             OK.  So this is an email that is that is sent from

24  whom to whom?

25  A.  From me to Jim Tagliaferri.

E6qdtag3                         Temkin - direct

1   Q.  And what is the date of this?

2   A.  This was November 14, 2008.

3   Q.  And let's just -- if you could for the jury, please, just

4   read that first paragraph.

5   A.  "Jim, Victor and I are really worried about the liquidity

6   in our portfolio.  Both of us are uncomfortable and we would

7   really feel better in a mostly cash position.  We should have a

8   phone conversation soon at your earliest convenience."

9   Q.  And going down, do you see a reference specifically to

10  IEAH?

11  A.  "I notice that the IEAH convertible Sub Note of 9/17/08 has

12  not been paid nor has the 6 percent of 17/12/08.  It seems that

13  we have over $600,000 tied up in IEAH.  Also, there is a

14  $150 mortgage Sub Note which I have no idea what it is."

15  Q.  So what is the concern that you are relaying to

16  Mr. Tagliaferri in this email in November 2008?

17  A.  That we are really concerned, that we are really nervous,

18  and we really need to understand what's going on.

19  Q.  And did you see a reference -- in that paragraph about

20  IEAH, is there a reference to payments that were due that had

21  not been made yet?

22  A.  Yeah.

23  Q.  So this is November of 2008.  Did your concerns continue

24  into 2009?

25  A.  Yes, they did.

E6qdtag3                          Temkin - direct

1   Q.  If I could now ask you to take a look at what's been marked

2   for identification as Government's Exhibit 1453, which should

3   be in your Redweld.

4   A.  I have it.

5   Q.  Do you recognize this as a letter that you sent to

6   Mr. Tagliaferri?

7   A.  Yes, I do.

8   Q.  And what is the date of the letter?

9   A.  May 18, 2009.

10          MR. COWLEY:  Your Honor, I move to admit Government's

11  Exhibit 1453.

12          THE COURT:  Any objection?

13          MR. TULMAN:  No objection.

14          THE COURT:  It will be admitted.

15          (Government's Exhibit 1453 received in evidence)

16  BY MR. COWLEY:

17  Q.  OK.  So what is the date of this letter to Mr. Tagliaferri?

18  A.  May 18, 2009.

19  Q.  And go ahead and just read the first paragraph, please.

20  A.  "Dear Jim, both Victor and I are very concerned about the

21  present state of our portfolio.  We've lost on paper

22  approximately $600,000 in the last six months and roughly

23  42 percent of the remainder is invested in IEAH."

24  Q.  So this is additional concerns being relayed, is that

25  right?

E6qdtag3                          Temkin - direct

1    A.  That's right.

2    Q.  And do those concerns continue into 2010?

3    A.  Yes.

4    Q.  Let's take a look, if we could, through Government's

5    Exhibit 1456.

6              Actually, before you go there, let me ask you, if you

7    could -- put that aside for a moment and let's just stay

8    chronologically.  So we are in 2009 now, is that correct?

9    A.  Correct.

10   Q.  OK.  Now, IEAH is only one of many securities that you are

11   holding, correct?

12   A.  Correct.

13   Q.  And did you ultimately lose money on all the securities

14   that you held in your portfolio?

15   A.  Everything.

16   Q.  Now, were there some securities that you may have held that

17   you may have made a profit on?

18              (Pause)

19              For example, White Energy?  Have you heard the

20   investment White Energy?

21   A.  I was about going to say White Energy.  Yes, we make a

22   profit on White Energy, yes.

23   Q.  In terms of the profits that you made, how did those

24   compare ultimately to the losses that you sustained?

25   A.  The losses were -- far outweighed the profits.

1    Q.  Let's talk about Fund.com, again.

2                If we could go to Government's Exhibit 1000, page 189,

3    please.

4                THE COURT:  Mr. Cowley, I think we should take a break

5    in the next five or so minutes.  OK?

6                MR. COWLEY:  Sure.  Would now be a convenient time,

7    your Honor?  If you wanted me to proceed, I am happy to, but

8    this is sort of a subject matter break.

9                THE COURT:  That is fine.

10               Since we are starting a new subject matter, why don't

11   we take our lunch break now.  We will take a little bit over an

12   hour.  So we will meet back here at 2:15.

13               Please remember, don't discuss the case and keep an

14   open mind.  Thank you.

15               (Jury not present)

16               THE COURT:  Come back at 2:15, please, and we will

17   resume with the testimony.  Thank you.

18               (Luncheon recess)

19

20

21

22

23

24

25

E6qbtag4                    Trial

1              A F T E R N O O N   S E S S I O N

2              (In open court; jury not present)

3              THE COURT:  One of the jurors notified my deputy that

4       she has to be out by five because she has her grandchild's

5       graduation, so let's try and stop a minute or two before five.

6       Thank you.

7              You may be seated back up here.  Thank you.

8              Can I get an updated exhibit list tomorrow including

9       what's been admitted today?

10             MS. BASKIN:  Yes.

11             THE COURT:  Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E6qbtag4                    Trial

1          (In open court; jury present)

2          THE COURT:  You may be seated.  You may proceed,

3    Mr. Cowley.

4    DIRECT-EXAMINATION (Continued)

5    BY MR. COWLEY:

6    Q.  Good afternoon, Ms. Temkin.

7    A.  Good afternoon.

8    Q.  So I think where we left off, we were around the 2009 time

9    period.  If you'll recall, we had looked at some correspondence

10   between you and Mr. Tagliaferri in 2009.

11          Do you recall that?

12   A.  Yes.

13   Q.  Let me go back and ask just sort of broad questions.

14          We had saw your investment advisory agreement that you

15   executed in 2000 with Mr. Tagliaferri, correct?

16   A.  Correct.

17   Q.  I think you testified earlier that you had had a

18   conversation with Mr. Tagliaferri about your investment

19   objectives.

20          Do you recall that?

21   A.  Yes.

22   Q.  So going forward up to 2009 and on, did you ever have a

23   conversation with Mr. Tagliaferri where you changed your

24   investment objectives or did they stay the same?

25   A.  No, they stayed the same.

E6qbtag4                     Temkin - direct

1          MR. COWLEY:  And if we could please have Government

2     Exhibit 1000 back up?  Just the front page will be fine for

3     now.  Thank you.

4          (Pause)

5          MR. COWLEY:  There we go.  Okay.

6     Q.  Again, in looking at this, the custodian is originally

7     Investors Bank & Trust, is that correct?

8     A.  Correct.

9     Q.  And who chose the custodian?  Was this your selection or

10    was it Mr. Tagliaferri's?

11    A.  Mr. Tagliaferri's.

12    Q.  So now, like I said, where we left off we were in the 2009

13    period.  So let's look at some transactions in 2009.

14         MR. COWLEY:  Ms. Baskin, if you could go to page 189

15    of this exhibit, please.  Okay.

16    Q.  So, again, let's talk about custodians for a moment.

17    What's the custodian name that you see referenced on the

18    account?

19    A.  State Street.

20    Q.  And do you have an understanding as to whether IBT merged

21    into State Street?

22    A.  Yes.

23    Q.  And what's the relevant month of account activity that

24    we're looking at here?

25    A.  I'm sorry.

1   Q.   Sure.  It's at the top right.

2   A.   Where it says "cash amount"?

3   Q.   Under just the date range, the month that we're --

4   A.   I'm sorry.  I'm sorry.  October 1st through October 31st.

5   Q.   Great.  Of what year?

6   A.   2009.

7   Q.   All right.  So going down and looking at some of the

8   account activities here, do you see reference of sales of

9   Fund.com shares out of your account?  It will be the second and

10  third entries on the page, I believe.

11  A.   There's a sale on 9/28 of 30,000 shares and a sale on 10/1

12  of 30,000 shares.

13  Q.   So on the right side where we see "cash amount," is that

14  cash coming into your account?

15  A.   I would assume so.

16  Q.   So what we have going on here is sales of Fund.com shares

17  out of your account and cash coming in, is that correct?

18  A.   That's correct.

19  Q.   If you had learned that Mr. Tagliaferri executed this

20  transaction by causing another client to simultaneously

21  purchase Fund.com stock, would that have been important

22  information for you to know?

23            THE COURT:  I'm going to overrule --

24            MR. COWLEY:  Objection.

25            THE COURT:  I'm going to overrule the objection.

E6qbtag4                              Temkin - direct

1               You may answer that.

2     A.  Yes.  Yes.

3     Q.  And explain to the jury why that would have been important

4     information for you to know.

5     A.  Because it would make me feel like he had other interests

6     at heart other than mine; that he had some arrangement where he

7     was getting money from one company and getting money from me.

8     And it would be wrong for the other client.

9     Q.  So, again, let's drill down on that issue in terms of why

10    it would be important to you in regard to there being another

11    client involved.

12              What sort of comfort level would you have knowing that

13    it was another client on the other side of this transaction

14    involving the same security?

15    A.  Well, I had no confidence because he might be doing the

16    same thing to me and it would just be horrendous.

17    Q.  Do you recall if there was any-- did you have any

18    conversations with Mr. Tagliaferri where he discussed any

19    specific cross-trades with you, trades between client accounts?

20    A.  No, never.  Of course not.  No.

21    Q.  Did your concerns continue going into 2010, Ms. Temkin?

22    A.  Yes.  Yes, it did.

23    Q.  Let's take a look, if we could, at Government Exhibit 1456,

24    which you should have a paper copy in front of you in the

25    Redweld.  Just let me know when you found it.

1    A.  Just a second, please.  Okay.  I have it.

2    Q.  You see it, Government Exhibit 1456?

3    A.  Wait.  I have 1453.  Sorry.  Yes, I have 1456.

4    Q.  Great.  And is that a document that you recognize,

5    Ms. Temkin?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  It's a fact from me.

9    Q.  And who are you sending it to?

10   A.  To Jim Tagliaferri.

11           MR. COWLEY:  Your Honor, move to admit Government

12   Exhibit 1456.

13           THE COURT:  Any objection?

14           MR. TULMAN:  No objection.

15           THE COURT:  It will be admitted.

16           (Government's Exhibit 1456 received)

17   Q.  Great.  And it will also be available on your screen now,

18   if you'd like.

19   A.  Okay.

20   Q.  So is this a fax cover page?

21   A.  Yes.

22   Q.  And who were you sending this to?

23   A.  It's to Jim.

24   Q.  And what's the date of this?

25   A.  February 5th, 2010.

E6qbtag4                          Temkin - direct

1    Q.  And let's turn the page and see what we have.  Okay.  So is

2    this the body of the letter that you were sending to

3    Mr. Tagliaferri?

4    A.  Yes, it is.

5    Q.  If you could read the first paragraph, please.

6    A.  "Dear Jim, it is very difficult for me to write this note.

7    You have managed my money eight or nine years.  I told you two

8    or three years ago that Victor and I were worried about the

9    safety of our investments.  Your response was to change our

10   portfolio and invest heavily in companies we never heard of and

11   IEAH.  I am even less comfortable today, and I feel that there

12   has been no meaningful move towards a less-risky portfolio

13   except at our specific urging.  That's unsatisfactory and

14   troubling."

15   Q.  Let me just stop you there.

16           Describe to the jury your sort of state of mind right

17   at this point, February of 2010, about your investments.

18   A.  We were worried all the time.  We weren't sleeping.  I

19   mean, it was just horrible.  We couldn't get away from it and

20   we couldn't make it better.

21   Q.  And in terms of this account, to what extent did you rely

22   on money from this account for expenses?

23   A.  I was relying on this account for a monthly check.

24   Q.  How much money per month, approximately, would you

25   withdraw?

E6qbtag4                          Temkin - direct

1   A.  Ten thousand dollars a month.

2   Q.  And this is after you were retired, is that correct?

3   A.  Yeah.

4   Q.  Let's look at the second paragraph, please.  If you could

5   read that to the jury.

6   A.  "Jim, Victor and I are very worried.  The losses which

7   showed up on the December statements of $24,000 and $10,000,

8   along with the still missing $42,000 greatly perturb me."

9   Q.  I see a reference there to "the still missing $42,000."  Do

10  you recall what that's a reference to?

11  A.  Yeah, that was the Geomas note that we kept trying to find

12  out-- I mean, it was past due and it never came back.

13  Q.  And if you could read the next paragraph, please.

14  A.  "This money represents a significant portion of our assets,

15  which I have mentioned several times before.  We are not

16  sophisticated investors and we have trusted you, but I'm sure

17  that having 75 percent of our monies in IEAH is not

18  conservative investing.  I have repeatedly asked that any money

19  coming due is put in Treasury bills and other less vulnerable

20  situations.  Surely you can see from these requests how anxious

21  I am for more secure positions."

22  Q.  Ms. Temkin, I think we talked earlier around the 2007 time

23  period you weren't really looking at the line items in your

24  portfolio very closely.

25            How about in 2010?  Have you increased the amount of

1   sort of review that you do to account statements?

2   A.  Yes.

3   Q.  And why is that?

4   A.  Because now we were really, like, terrified and had to see

5   what was going in and what was coming out.

6   Q.  All right.  In regard to the rest of this letter, is this

7   essentially instructions that you lay out to Mr. Tagliaferri

8   --

9   A.  Yes.

10  Q.  -- regarding your account?

11  A.  Yes, sir.

12  Q.  If we could, on numbered paragraph 1, if you could just

13  read that last sentence to the jury about "We have gone

14  back..."

15  A.  "We have gone back and forth for over two months on the

16  missing $42,000 and I still do not have an answer.  Please

17  resolve this at this time."

18  Q.  Now let's take a look at what I believe is in evidence as

19  Government Exhibit 1457.  You have both the paper copy and it's

20  on the screen, too.

21  A.  Yes.

22  Q.  Okay.  So who's this from?

23  A.  This is from James Tagliaferri to me.

24  Q.  And what's the date of this e-mail exchange?

25  A.  February 8, 2010.

E6qbtag4                           Temkin - direct

1   Q.  Okay.  So this is a few days after that fax that we looked

2   at?

3   A.  Yes.

4   Q.  All right.  And so what does he say-- what does he say at

5   the beginning?  What's the first line?

6   A.  "Susan, I am in receipt of your fax of February 5th."

7   Q.  And go ahead and read the second line.

8   A.  "First, let's clarify a few things.  We've been managing

9   your money since 2001.  I will send you the performance of the

10  accounts within a day or two.  It's been quite good."

11  Q.  All right.  And read the next sentence, please.

12  A.  "Second, we didn't begin to invest in IEAH until late

13  2007."

14  Q.  Let me stop you there for a moment.

15          MR. COWLEY:  Ms. Baskin, if I could have a split

16  screen, please, between this exhibit and page 16 of Government

17  Exhibit 1000.

18  Q.  Again, do you recognize Government Exhibit 1000 being your

19  March 2007 statement?

20  A.  Yes.

21  Q.  And going down to the bottom, "Disbursement," do you see

22  $100,000 out for the purchase of an IEAH note?

23  A.  Yes.

24  Q.  And that's in March 2007?

25  A.  Yeah.

1        MR. COWLEY:  If we can go back to just 1457, please.

2    Q.  And let's go on.  If you can read the rest of that

3    paragraph that Mr. Tagliaferri writes to you.

4    A.  He says, "We didn't begin to invest in IEAH until late

5    2007.  Most of IEAH's investments were in the second half of

6    2008.  We have not bought another since.  The total amount

7    invested in IEAH was 485,000.  Based upon the current value of

8    your two portfolios combined, the percent in IEAH is 36

9    percent, not 75 percent.  This does not include any

10   distributions you received from Pegasus on the horses or the

11   values of Big Brown, Kip Deville and Shaggy Mane in which you

12   hold minor fractional interests.  We estimate the net value of

13   your Pegasus holdings at about 50,000."

14   Q.  And let's skip down.  Do you see a paragraph that says --

15   it starts out with "There is not a 'missing' $42,000..."?

16   A.  Yeah.

17   Q.  Could you read that paragraph to the jury, please?

18   A.  "There is not a 'missing' $42,000.  Originally, you held a

19   $92,000 note.  You informed us on April 14th you needed $30,000

20   to pay taxes.  We were able to sell $50,000 of the $92,000.  We

21   wired $35,000 to US Bank; $15,000 was deposited in the account.

22   $42,000 remains in escrow.  We described this transaction

23   several times.  We will ask for the $42,000 to be redelivered.

24   Q.  Okay.  So there's sort of a lot of description of

25   transactions in this paragraph.  The bottom line, where does he

E6qbtag4                          Temkin - direct

1   say your $42,000 is?

2   A.  In escrow.

3   Q.  Did that strike you as odd?

4   A.  I don't know what it means now.  Yes, odd.

5   Q.  And what instructions does he make-- what does he say about

6   what he's going to do with regard to your $42,000?

7   A.  Ask for it to be redelivered.

8   Q.  Do you know one way or another if your $42,000 was sitting

9   in escrow at the time?

10  A.  I did not know it was sitting in escrow at the time.

11  Q.  Sitting here today, do you know one way or another whether

12  it actually was?

13  A.  No.

14  Q.  And just to clean one thing up real quickly.  Going back up

15  to the second paragraph, the reference to "485M," and I think

16  we see "50M," did you understand that to be his notation for a

17  thousand?

18  A.  Yes.

19  Q.  So he wasn't saying $485 million?

20  A.  No.

21  Q.  All right.  Now let's take a look, if we could-- so this is

22  February 8th, 2010, is that correct?

23  A.  That's correct.

24  Q.  Let's take a look now at Government Exhibit 1458, please.

25  All right.  And do you see this as an e-mail exchange involving

E6qbtag4                              Temkin - direct

1   you and Mr. Tagliaferri?

2   A.  Yes, I do.

3   Q.  All right.  Let's start off with the bottom e-mail, which I

4   think is sent on March 9th, 2010, at 11:47 p.m.  Who sends that

5   e-mail?

6   A.  It is from me.

7   Q.  And who are you writing to?

8   A.  To Jim.

9   Q.  And could you read your e-mail to him, please?

10  A.  "The State Street statements for February arrived, and

11  still no sign of the $42,000 and the Geomas note remains

12  outstanding.

13       "Also, there remains a subordinated note for $150,000

14  and I can't discern whose note it is (this note has appeared

15  for quite some time).

16       "I trust that the IEAH deal will close on the 12th.

17  Please advise."

18  Q.  Are you asking about the same $42,000 that we saw you

19  asking about in previous correspondence?

20  A.  Yes.

21  Q.  And in regard to that reference to a subordinate note for

22  $150,000, what information are you trying to get from

23  Mr. Tagliaferri regarding this?

24  A.  Why it hadn't been repaid.

25  Q.  Well, is that right?  Okay.  Are you asking -- you can't

E6qbtag4                              Temkin - direct

1    discern what the note-- what note it is?

2    A.   That, and I was waiting for it to be repaid.

3    Q.   And does he respond to your e-mail?

4    A.   Well, his response is that tomorrow Geomas-- or the next

5    day, the 10th-- that would be the 11th, that Geomas proceeds

6    are to be credited and that IEAH was still on track.

7    Q.   And do you respond to him?

8    A.   Yes.  "Thank you.  Please let me hear from you on Friday."

9    Q.   Okay.  So this is on March 10, 2010, is that correct?

10   A.   Correct.

11   Q.   All right.  Now let's go to Government Exhibit 1459, which

12   I believe is in evidence.  Okay.  So let's start down at the

13   bottom.  I think we see-- I'm sorry, this appears to be the

14   same document.  If you'd give me a moment.

15           Here we go.  Yeah, 1459.  There we go.  Great.  All

16   right.

17           So if you look at the bottom e-mail, who is it from

18   and who is it to?

19   A.   It's to me from Jim Tagliaferri.

20   Q.   Okay.  And then there's references to the Temkin Living

21   Trust and the trust for the benefit of S. Temkin.  Do you see

22   that?

23   A.   Uh-huh.

24   Q.   And what is he saying with regard to-- what does he say

25   happened with regard to the notes?

1   A.   That the Geomas notes were paid off yesterday.   Temkin

2   Living Trust $42,857.14 principal and $18,214.34 interest.

3           MR. COWLEY:   If we could go now to Government Exhibit

4   1000, page 211, please.   All right.   And if we could highlight

5   the second and third.   That's fine.

6   Q.   Okay.   So these are your account statements for what month?

7   A.   March 12, 2010.

8   Q.   And you, in fact, see that receipt of cash that's

9   referenced in Mr. Tagliaferri's e-mail?

10  A.   I do.

11  Q.   All right.   So how much money comes in in two different

12  transactions on the 12th?

13  A.   $42,857 and change and $18,214 and change.

14  Q.   Ms. Temkin, if you learned that the money used to make

15  these payments to you had come from other TAG client accounts,

16  what would have been your reaction?

17  A.   I would have been outraged really.

18  Q.   Would you have continued to give Mr. Tagliaferri control

19  over your portfolio?

20  A.   No, I wouldn't have because he clearly wasn't-- wasn't

21  doing what we asked.

22  Q.   Why would you have been outraged?   Explain to the jury what

23  you would find troubling about that.

24  A.   I find troubling that clearly there was some arrangement

25  that Mr. Tagliaferri had with some of his other companies.

E6qbtag4                              Temkin - direct

1    Q.  Let me focus you, if I could, just on the issue of the

2    money being used to make these payments to you having come from

3    other clients' accounts.  If that is something that had

4    happened and if you had learned that at the time, explain to

5    the jury why you would find that issue troubling.

6    A.  Because I would have lost total trust in him.  I mean, I--

7    and I would have been worried about what he was doing with my

8    money if he's taking it from someone else to rob Peter to pay

9    Paul.  So unethical.

10   Q.  Let's shift now and talk some more about Fund.com.  So I

11   think this statement that we're looking at is from March 2010.

12   So let's continue to move forward chronologically and go to May

13   2010.  If we could have you take a look at Government Exhibit

14   1460, which I believe should be in evidence.  Okay.

15           Is this another e-mail exchange that you recognize

16   between yourself and Mr. Tagliaferri?

17   A.  Yes, I do.

18   Q.  And what's the date of this e-mail exchange?

19   A.  May 2, 2010.

20   Q.  All right.  Let's start with the bottom and the first

21   e-mail you write to Mr. Tagliaferri.  What do you ask of him?

22   A.  I'm sorry, do you mean the first section?

23   Q.  Yes.  If you go down to the bottom, do you see an e-mail on

24   May 2nd, 2010, at 12:07 p.m.?

25   A.  Yeah.  "I know this is a hypothetical question but I'm

E6qbtag4                              Temkin - direct

1    crazed.  If I traded out IEAH stock/notes for Fund.com, and

2    sold Fund.com immediately, can you tell me what my overall

3    gain/loss picture would be?"

4    Q.  Now, explain why you're interested in talking about somehow

5    trading out IEAH stock for Fund.com.  Why is that something

6    you're interested in speaking about?

7    A.  Because Mr. Tagliaferri suggested to me that if the

8    Fund.com-- that there would have been worth-- that Fund.com had

9    some value.  And that if I traded out IEAH for Fund.com, I

10   would have been able to regain some money.

11   Q.  Were you interested in getting out of IEAH at this time?

12   A.  Yes.

13   Q.  And what does Mr. Tagliaferri write back to you?

14   A.  He said "If we exchange IEAH for Fund.com, your profit

15   would be about $110,000."

16   Q.  I guess the e-mail says FNDM.  Did you understand that just

17   to be a short acronym for Fund.com or an abbreviation for

18   Fund.com?

19   A.  Yes, I did.

20   Q.  And then what else does he tell you about Fund.com?

21   A.  That it "Gives us a good backstop.  However, to alleviate

22   your concern, we must begin to sell Fund.com and then make the

23   exchange for IEAH.  Keep in mind Fund.com is a thin stock and

24   must be sold very carefully."

25   Q.  And what do you advise him at the top?  Just that top

1    e-mail, if you could read it to the jury.

2    A.  Oh.  "Please don't do anything until we speak.  I have some

3    more questions."

4    Q.  And this sort of notion of substituting or subbing in

5    Fund.com for IEAH, do you recall if it was your idea or

6    Mr. Tagliaferri's idea?

7    A.  No, Mr. Tagliaferri's.

8    Q.  Did this possible transaction ever take place, to your

9    knowledge?

10   A.  No, it didn't take place.

11   Q.  And do you recall if Mr. Tagliaferri gave you an

12   explanation why he was not able to execute that transfer?

13   A.  Yeah.

14   Q.  What did he say to you?

15   A.  Well, you see here where it says it's "a thin stock"?  I

16   didn't know what that meant.  But he said that there had been a

17   large position of Fund.com sold previously, a few days before,

18   and that I'd have to wait until the stock price came back up

19   again to make this happen.

20   Q.  So in regard to that large sale of Fund.com that he

21   mentioned, did he explain to you what impact that large sale of

22   Fund.com had had on the market price of Fund.com?

23   A.  No, but I assume that Fund.com was very low because of this

24   big sale that had happened, this change in position.

25   Q.  Let me ask that again.

1           Was there a discussion that you had with

2   Mr. Tagliaferri where he advised you whether or not the market

3   price of Fund.com had dropped because of this large sale?

4   A.  I don't remember.

5   Q.  Okay.  But, nevertheless, he advised you that because there

6   was recently a large sale of Fund.com, he couldn't make that

7   switch for you, is that correct?

8   A.  We had to wait.

9   Q.  Now, as 2010 progressed, did things get better or worse

10  generally in terms of how your portfolio was doing?

11  A.  Well, it got worse.  I mean, it's just...

12  Q.  Let's go to some correspondence a little later in 2010.

13  Take a look at Government Exhibit 1467.  Okay.  This is

14  actually the beginning of 2011, is that correct?

15  A.  Yes, January.

16  Q.  Okay.  And so let's look at the bottom e-mail.

17          Can you read that e-mail that you sent to

18  Mr. Tagliaferri?

19  A.  On January 4?  "We've asked many times, but would you

20  please explain what the mortgage sub note is for $150,000 which

21  appears on our November statement?"

22  Q.  And what does he respond?

23  A.  "It's part of a $50,000 (sic) mortgage on a property in

24  Long Island.  Please take the time to point out to me where you

25  inquired about this asset."

E6qbtag4                        Temkin - direct

1   Q.  Have we looked at previous correspondence today where you

2   inquired about that?

3   A.  Yes.

4   Q.  And what do you write back to him?

5   A.  "On numerous phone conversations we have questioned this

6   asset.  How much for this asset today?  Is it in default?  What

7   about all other assets?  How much are you going to give us

8   today?"

9   Q.  Did you come to learn whose mortgage that note that you had

10  been invested in was related to?

11  A.  Yes, we did.

12  Q.  Whose was it?

13  A.  It was for a house on Long Island that belonged to Mike

14  Iavarone, who was a partner of Mr. Tagliaferri's.

15  Q.  Do you recall that Mr. Iavarone was affiliated with IEAH?

16  A.  He was affiliated with IEAH.

17  Q.  And you understood his connection with Mr. Tagliaferri to

18  be through IEAH?

19  A.  Yes, I did.

20  Q.  What was your reaction upon eventually learning that that

21  note was related to an IEAH officer?

22  A.  I suppose the first reaction was disbelief and the second

23  reaction was why is he taking my money and giving it to a guy

24  he works with to buy a house on Long Island, or wherever?

25  Q.  From 2007 to 2010, I want to talk about sort of how your

1   account changed.  We'll start actually in 2000.  About how much

2   money did you start out with under Mr. Tagliaferri's control?

3   A.  About a million dollars.  A million plus.  A little.

4   Q.  And during that time period, I think you said there was

5   monthly withdrawals that you were making to live on, is that

6   correct?

7   A.  Yes.

8   Q.  All right.  And for some of the securities that you held,

9   you did make some money, like White Energy, for example?

10  A.  Yes.

11  Q.  And there were some payments relating to purse winnings and

12  things like that at IEAH, correct?

13  A.  Yes.

14  Q.  At the end of the day, 2011 time period, how much money

15  would you estimate approximately that you lost by virtue of the

16  investments that you had in that Tagliaferri-controlled

17  account?

18  A.  About $830,000.

19  Q.  Did you eventually transfer that account to another

20  institution and remove Mr. Tagliaferri as investment advisor?

21  A.  Well, I think there was a letter that we sent to State

22  Street saying that he was no longer allowed to trade or do

23  anything with any of our properties, what we had.  And

24  eventually we were able to take it to another firm.

25  Q.  And did you have occasion to reach out and ask that firm

E6qbtag4                          Temkin - direct

1    for the actual physical copies of the securities that had been

2    sitting in State Street?

3    A.  Actually, State Street sent them to this other firm and

4    they then sent them to me.

5    Q.  Let's take a look, if you could, at Government Exhibit

6    1471, which should be in your Redweld.  Do you have that paper

7    copy there, by any chance?

8    A.  Oh, sorry.  1471?  Yes.  Yes, I have it.

9    Q.  Is this a copy of the securities that were sitting in your

10   State Street account that had been transferred?

11   A.  Yes.  Yes, they were.

12   Q.  And this was a letter, a cover letter, where you were

13   receiving a copy of those securities?

14   A.  Yes.

15           MR. COWLEY:  Your Honor, I move to admit Government

16   Exhibit 1471.

17           THE COURT:  Any objection?  It will be admitted.

18           (Government's Exhibit 1471 received)

19           MR. COWLEY:  If we may publish to the jury.

20           THE COURT:  You may.

21           MR. COWLEY:  Thank you, your Honor.

22   Q.  And, again, back when Mr. Tagliaferri had been managing

23   your account, did you see any need to obtain the physical

24   copies of stock and stuff like that that were being held by the

25   custodian?

1    A.  No.

2    Q.  So let's take a look here.  What are the four securities

3    that are referenced?

4    A.  Two are Conversion Services International and two are

5    International Equine Acquisitions, which is IEAH.

6    Q.  And just going through, let's take a look at what some of

7    these physical securities look like.

8           MR. COWLEY:  If we could go to the next page.

9    Q.  So does this appear to be a stock certificate for

10   Conversion Services International?

11   A.  Yes.

12   Q.  And it was only January 14th.  This is the first time

13   you're physically seeing these, is that correct?

14   A.  Yes.

15   Q.  And then, to the next page, that's also Conversion Services

16   International, is that right, Ms. Temkin?

17   A.  That's right.

18   Q.  And then the next page.

19   A.  This is a mortgage sub note for the Iavarones' house.

20          MR. TULMAN:  If we could highlight the second

21   paragraph from the bottom.

22   Q.  Do you see the reference to Michael and Christine Iavarone?

23   Is that when you came to learn that this note was affiliated

24   with an IEAH officer?

25   A.  I may have known it a little bit before, perhaps through my

1   brother maybe, but this is the first time I ever saw it on

2   paper that it was theirs.

3           MR. COWLEY:  And then to the next security, please.

4   Q.  Is this an IEAH sub note?

5   A.  Yes.

6   Q.  All right.  And do you see a reference here to it being,

7   let's see, related to a note dated July 13th, 2007, issued by

8   Maker to TAG Virgin Islands?

9   A.  Yes.

10  Q.  Was that master note between TAG Virgin Islands and Maker

11  in your account or was the sub note in your account?

12  A.  It was a sub note in my account.

13  Q.  And who signs this sub note?

14  A.  Jim Tagliaferri.

15  Q.  All right.  And do we see another IEAH sub note, going to

16  the next page?

17  A.  Yes.

18  Q.  And another one, and another one.  Go to the last one.

19  Does this appear to be that $150,000 mortgage sub note?

20  A.  $150,000, yeah.

21          MR. COWLEY:  If I could have a moment, your Honor.

22          THE COURT:  Sorry?

23          MR. COWLEY:  If I could have a moment.

24          THE COURT:  Yes, of course.

25          (Pause)

E6qbtag4                          Temkin - direct

1          MR. COWLEY:  No further questions.

2          THE COURT:  Mr. Tulman, do you have any

3   cross-examination?

4          MR. TULMAN:  Yes, your Honor.

5          THE COURT:  Go ahead.

6   CROSS-EXAMINATION

7   BY MR. TULMAN:

8   Q.  Good afternoon, Mrs. Temkin.

9   A.  Good afternoon, sir.

10  Q.  Your husband's name is Victor?

11  A.  Yes.

12  Q.  Okay.  And your husband was an attorney?

13  A.  Yes.

14  Q.  Okay.  And your husband, in fact, was a former prosecutor?

15  A.  Yes.

16  Q.  When you were reviewing statements, were you reviewing

17  these statements with your husband?

18  A.  Sometimes.

19  Q.  Did you and your husband discuss things about these

20  statements?

21  A.  Yes.

22  Q.  Did you-- you have a son named Jeremy?

23  A.  Yes.

24  Q.  And your son Jeremy is also an attorney?

25  A.  Yes.

E6qbtag4                         Temkin - cross

1   Q.  And he is an attorney with a very good reputation?

2   A.  Yes.

3   Q.  And you have a son named Andrew?

4   A.  Yes.

5   Q.  And your son Andrew is an equestrian, is involved with

6   horses?

7   A.  Well, he's an attorney also.

8   Q.  Oh, okay.

9   A.  He's involved with horses just as a hobby.

10  Q.  Just as?

11  A.  A hobby.

12  Q.  As a hobby.  Okay.

13          Did there come a time that your husband wrote a letter

14  to Jim Tagliaferri telling Jim Tagliaferri that your son Andrew

15  wanted to be like him?

16  A.  Wanted to be like him?

17  Q.  That your son Andrew wanted to be like Jim Tagliaferri.

18          MR. COWLEY:  Objection.

19  A.  I don't know.  I don't know.

20          THE COURT:  I'll allow it.

21  A.  I'm sorry, I don't know.

22  Q.  If I showed you a letter, would that refresh your

23  recollection?

24  A.  Sure.

25  Q.  Okay.  Actually, I may not have it here.

E6qbtag4                        Temkin - cross

1              Now, as you sit here today --

2              THE COURT:  If you could just speak into the

3    microphone, please.  Thank you.

4              MR. TULMAN:  Am I-- thank you, your Honor.

5    Q.  Would it be fair to say, Mrs. Temkin, that as you're

6    sitting here today that you're very, very angry at

7    Mr. Tagliaferri?

8    A.  Yes.

9    Q.  Okay.  Do you hold him responsible for the losses in your

10   account?

11   A.  Yes.

12   Q.  When you testified earlier in response to Mr. Cowley's

13   questions, he asked you a series of questions starting with "If

14   you learned that," and then he would say something and then he

15   asked you how you would feel about it.

16              Do you remember all of those questions?

17   A.  I do.

18   Q.  Okay.  Do you know whether any of those things are true of

19   your own personal knowledge?

20   A.  I'm sorry, I don't understand the question.

21   Q.  Sure.  For example, Mr. Cowley said if you learned that

22   Mr. Tagliaferri had been taking money from one client in order

23   to pay you, would you be upset with that?  Do you remember that

24   question?

25   A.  Yes.

E6qbtag4                          Temkin - cross

1    Q.  Okay.  Do you know of your own personal knowledge whether
2    that ever happened?
3    A.  I'm not sure.
4    Q.  You're not sure.  You don't know whether that happened or
5    not?
6    A.  I'm not sure.
7    Q.  So if I understand your testimony correctly then, if that
8    were true, then you would be upset?
9    A.  That's right.
10   Q.  Okay.  Now, you mentioned in response to the questions from
11   the prosecutor, Ms. Temkin, that you received distributions on
12   a regular basis from the Tagliaferri accounts?
13   A.  Yes.
14   Q.  And you were receiving that from the time that you started
15   with the account, when you first opened your account with
16   Mr. Tagliaferri?
17   A.  I think so.
18   Q.  Okay.  And was it a fact that for a number of years you
19   received quarterly distributions of $10,000?
20   A.  I think I received the quarterly distributions in the
21   beginning.
22   Q.  And then there came a time that you changed that
23   instruction and told Mr. Tagliaferri that you didn't want
24   quarterly $10,000 distributions; every month you wanted
25   $10,000, correct?

E6qbtag4                    Temkin - cross

1   A.  We had retired, yeah.

2   Q.  And was there ever a time that Jim Tagliaferri told you

3   that you just don't have the $10,000 liquid in your account to

4   give to you?

5   A.  I don't remember.

6   Q.  Was there ever a time that you didn't receive your $10,000

7   monthly check?

8   A.  I think towards the end I didn't.

9   Q.  Were there times when you received more than $10,000 and

10  you told Jim, I don't want the $20,000, I just want the

11  $10,000?

12  A.  That was a bank mistake.

13  Q.  He gave you too much money?

14  A.  The bank gave us too much money.

15  Q.  I'm sorry.  The bank gave you too much money that month and

16  you asked Mr. Tagliaferri to correct that?

17  A.  And to put it back.

18  Q.  And to put it back into your account.

19  A.  That's right.

20  Q.  Okay.  And you said that you lost $830,000, correct?

21  A.  Correct.

22  Q.  You started with about a million dollars?

23  A.  Yes.

24  Q.  And you say you lost about $830,000, correct?

25  A.  Yes.

E6qbtag4                          Temkin - cross

1   Q.  But isn't it a fact that if you added up all the money that

2   had been given to you over the years, that you received

3   approximately $650,000 that you had received over the years

4   from the Tagliaferri accounts?

5   A.  I don't know if that number is right.

6   Q.  Okay.  Well, you received $10,000 a month, correct, and

7   that was for a period of years?

8   A.  Yes.

9   Q.  So that would be $120,000 a year that you were getting?

10  A.  Yeah.

11  Q.  And you received that for a period of years, correct?

12  A.  Yes.

13  Q.  So if you were to deduct the-- well, you don't know how

14  much money you actually had received over all of those years,

15  but it was a substantial amount, correct?

16  A.  Yes.

17  Q.  Okay.  Now, you started with a million dollars you said,

18  correct?

19  A.  A little more.

20  Q.  A little bit more.

21       And when you were shown statements by the government,

22  your account said it was $1.3 million.  Do you recall seeing

23  the statements?

24  A.  Yes, but I added money to that.

25  Q.  How much money did you add?

E6qbtag4                          Temkin - cross

1    A.  I added $175,000 to the original amount that I received.

2    Q.  Okay.  So it was more in terms of additional investments.

3    I take it that you had, apart from the monies that you had in

4    that account, that was not your life savings?  Withdrawn.

5         You had other monies -- separate and apart from what

6    you had entrusted to Mr. Tagliaferri, you had other monies

7    apart from those monies, correct?

8    A.  Correct.

9    Q.  Okay.  Now, you say that you learned about this company,

10   IEAH, only when you received a call from your sister-in-law?

11   A.  That's correct.

12   Q.  And your sister-in-law is your brother Doug Lamm's wife?

13   A.  Correct.

14   Q.  And she told you at that time that you were a partial owner

15   of Big Brown?

16   A.  Correct.

17   Q.  Prior to that time, had you had any interest in horse

18   racing?

19   A.  No.

20   Q.  Okay.  When you learned that Mr. Tagliaferri had invested

21   your monies in this company, were you angry?

22   A.  No, because his assurances were that they were good.

23   Q.  And what was it when you learned of this-- could you tell

24   me what you did when you learned that from your sister-in-law,

25   that Mr. Tagliaferri had actually invested you in this company

E6qbtag4                          Temkin - cross

1    which was now-- and that you were a fractional owner or partial

2    owner of Big Brown?  What did you do?

3    A.  It was exciting.

4    Q.  It was exciting?

5    A.  Yeah.

6    Q.  Why was it exciting?

7    A.  Because Big Brown was such a big name and there was so much

8    excitement about the horse in the press and in, I think, all of

9    the, I guess, Belmont and the Preakness and the races, that he

10   could have potentially been a Triple Crown winner.  That was

11   it.  There was excitement generated.  And because Jim had said

12   this was safe.

13   Q.  And when Jim said that this was safe, did he explain to you

14   why he thought it was safe?

15   A.  I don't remember.

16   Q.  If you remember.  If you remember.  If you don't --

17   A.  I don't remember.

18   Q.  Do you remember him talking about the value of Big Brown,

19   how many millions of dollars that horse could gain?

20   A.  I'm not sure.  I don't remember.

21   Q.  Okay.  Now, in fact, there came a time that you actually

22   went to the racetrack?

23   A.  I did.

24   Q.  You went to the racetrack in California?

25   A.  I did.

E6qbtag4                          Temkin - cross

1   Q.  There was another horse that was running there that was

2   named Pure Clan.  Do you remember that?

3   A.  I remember that.

4   Q.  It was an exciting time?

5   A.  Sure.

6   Q.  You were happy to be an owner of horses at that time?

7   A.  I was never happy to be an owner of horses.  From the time

8   that we began to be owners of horses, we were nervous.  And my

9   husband said to me "This isn't where we belong.  It's the sport

10  of kings because that's who can afford it.  We can't afford

11  this.  This isn't for us."

12  Q.  And you remember the government showing you a document from

13  September of 2008?

14          MR. TULMAN:  One moment, please.

15          (Pause)

16  Q.  All right.  Now, do you recall reading this letter in

17  September of 2008?

18  A.  Yes, I do.

19  Q.  Okay.  And at that time in September of 2008, when you

20  received this letter, you learned that the note that you had in

21  IEAH was now being converted into stock?

22  A.  Which paragraph are you looking at now, please?

23  Q.  Where it says-- you know what?  Withdrawn.  This is not the

24  right letter.  But let me ask you-- since this is up, let me

25  ask you some questions.  Okay.

E6qbtag4                    Temkin - cross

1        It says, at the bottom, where it says "For the
2    record," you see that Mrs. Temkin?
3    A.   Yes, sir.
4    Q.   And do you see where it says that "This raises the
5    potential for a conflict of interest"?
6    A.   I do.
7    Q.   And do you see where it says that "I" -- meaning
8    Mr. Tagliaferri -- "would be happy to discuss these
9    arrangements at your convenience"?
10   A.   Yes.
11   Q.   So did you ever call him to ask for the specific
12   information about this potential conflict of interest?
13   A.   My money was gone.
14   Q.   At this point --
15   A.   And IEAH was invested.  This was water over the bridge.
16   No, I didn't call to ask because it was done.  It was a done
17   deal.
18   Q.   And when you say "it was a done deal," meaning your money
19   had been invested?
20   A.   Right.
21   Q.   And there was nothing you could really do about these
22   monies anymore, right?
23   A.   Right.
24   Q.   Were you angry with Mr. Tagliaferri at this point in
25   September of 2008 for having received these monies?

E6qbtag4                          Temkin - cross

1    A.  I was locked in.  I felt locked in.  That's how I felt.

2    Q.  Did you ever consider at this point in time, in September

3    of 2008, discharging him?

4    A.  No, because we kept hoping it would get better.

5    Q.  You trusted him?

6    A.  Yeah.  We kept hoping, and he encouraged us.  He said

7    "Things are safe.  They're really okay.  Don't worry.  Please,

8    don't worry."  And so-- and then, you know, three months later

9    or five months later, we considered it again.  Maybe we should

10   get rid of him.  But it kept going down so we were locked in.

11   Q.  Now, when you say that you felt "locked in," in the months

12   prior to the time that you received this letter, were you, in

13   fact, really excited and happy with the fact that you had been

14   invested in this company, IEAH?

15   A.  The amount of time we were excited and happy was very

16   short-lived, because when we realized what was going on, I then

17   began to say I'm concerned.  You know, you've seen these notes.

18   I'm very concerned.  Please, we wanted to be in secure things.

19   We don't want to be in illiquid positions.

20           And so we were excited, yeah, in the beginning, but it

21   was soon thereafter that we began to not be excited.

22   Q.  Did you ever send a message-- you said earlier, you

23   testified that you had actually attended a race in California.

24   A.  Yeah.

25   Q.  And that was a race with Pure Clan.

E6qbtag4                         Temkin - cross

1   A.   Right.

2   Q.   And Pure Clan is a horse, right?

3   A.   Yes.

4   Q.   And Pure Clan actually won that race?

5   A.   Yes.

6   Q.   And you actually were in the winner's circle on that day?

7   A.   Yeah.

8   Q.   And did you ever write an e-mail to Mr. Tagliaferri telling

9   him what an extraordinary day that you had had?

10  A.   Yes.

11  Q.   And did you tell him that it was too bad that you had to be

12  at a wedding on August 16th because you would have wanted to

13  watch Pure Clan run again in Del Mar?

14  A.   Yes.

15  Q.   Did you ask him for a copy of the photo of you at the

16  winner's circle?

17  A.   Sure.

18  Q.   Okay.  And would that have been in around July of 2008 when

19  you were at that race?

20  A.   I don't know.  I have to-- you'd have to give me the, you

21  know...

22  Q.   Sure.  Let me --

23  A.   Is there some documentation?

24  Q.   Yes.

25  A.   Thank you.  This was July 2008.

E6qbtag4                              Temkin - cross

1    Q.  All right.

2    A.  Yes.

3    Q.  So that's correct, that it was in July of 2008?

4    A.  Yes.

5    Q.  Okay.  And in late July of 2008, do you recall

6    communicating with Mr. Tagliaferri to tell him that you on your

7    own were going to Del Mar and did you ask if we have any horses

8    running on that date?

9    A.  Probably.

10   Q.  Do you need to have-- would you like to have your

11   recollection-- is there anything that could refresh your

12   recollection?

13   A.  No.  I mean that sounds reasonable.

14   Q.  Okay.  So on that date in July of 2008, you were going to

15   the racetrack on your own without-- in other words, you were

16   going to be at Del Mar, right?

17   A.  Maybe I should see the paper.

18   Q.  All right.

19   A.  Thank you.

20   Q.  Sure.

21   A.  Okay.  That was July 31st, right?

22   Q.  Okay.

23   A.  Right.

24   Q.  So on July 31st, you were writing to Mr. Tagliaferri to ask

25   him if we have any horses running on that day?

E6qbtag4                        Temkin - cross

1    A.  Right, correct.

2    Q.  Because at that time, in July of 2008, when you say "we,"

3    you were part of the IEAH team at the time?

4    A.  Correct.

5    Q.  And when you testified earlier that you were very excited

6    about being-- for a time, for a short time, this was the time

7    period when you were very excited about being involved with

8    IEAH, correct?

9    A.  Correct.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6qdtag5                              Temkin - cross

1    Q.  Do you recall sending another email to Mr. Tagliaferri in

2    early August of 2008, telling him that you saw the race

3    yesterday and it was very exciting and heart-stopping?  Do you

4    remember that?

5    A.  Yes.

6    Q.  OK.  Did you say to him, "One more win for our team?"

7    A.  Perhaps I did.

8    Q.  Would you like to see anything that would refresh your

9    recollection specifically?

10   A.  No.  If you are looking at it reading it, then that's fine.

11   Q.  So does this refresh your recollection that that's what you

12   said, that it was another win for the team, for our team?

13   A.  Right.

14   Q.  And you asked about when Pure Clan was racing again, right?

15   A.  Right.

16   Q.  OK.  And this is in early August of 2008?

17   A.  Right.

18   Q.  And so now at this time -- at this time -- was this the

19   time that you also had reservations about being invested in

20   IEAH?

21   A.  Sure.

22   Q.  And so there came a time in early September of 2008 when

23   you had to make a decision whether or not to sign up as a

24   shareholder in IEAH.  Do you recall that?

25   A.  No, I don't recall that.

E6qdtag5                           Temkin - cross

1   Q.  OK.  Let me back up.

2              (Pause)

3              I would just like to get a document that we had

4   before, your Honor.

5              (Pause)

6              THE COURT:  Just while you're waiting, I will just let

7   you know that I have a transcript of the trial here.  So

8   sometimes you will see me look at my screen, and every once in

9   a while it is not working.  So we don't mean to distract you

10  here.

11             (Pause)

12  BY MR. TULMAN:

13  Q.  Do you recall becoming involved with a company that was

14  called Pegasus?

15  A.  Yes.

16  Q.  And Pegasus was a limited liability corporation that was

17  formed to own the various horses in which you had a fractional

18  interest?

19  A.  Yes.

20  Q.  And that company was a company that was managed by who, if

21  you know?

22  A.  I guess, Mr. Tagliaferri and Mr. Iavarone.

23  Q.  In order to become involved with this company Pegasus, did

24  you have to sign any paperwork, that you recall?

25  A.  I don't remember.

E6qdtag5                          Temkin - cross

1    Q.  Let me show you a document.

2              THE COURT:  Is this something that is in evidence?

3              MR. TULMAN:  Yes, it is, your Honor.  It's Government

4    Exhibit 1451A.

5    Q.  Now, I am going to show you this document.

6    A.  Mm-hmm.

7    Q.  And for everybody to read.

8              And this is a letter in which Mr. Tagliaferri is

9    asking you to confirm the accuracy of representations that were

10   made regarding your being an accredited investor.  Is that

11   correct?

12   A.  Correct.

13   Q.  OK.  And if I turn to the next page, it defines an

14   accredited investor as "any natural person whose individual net

15   worth or joint net worth with that person's spouse at the time

16   of his" -- or her, I suppose -- "purchase exceeds $1 million."

17   A.  I see that.

18   Q.  OK.  Would that be a fair statement, that that would have

19   described you and your husband at that time?

20   A.  Are you talking about the amount of money that we had with

21   Mr. Tagliaferri at that time?

22   Q.  No, not just with Mr. Tagliaferri.  Just your total monies.

23   A.  Yes.  The answer is yes.

24   Q.  OK.  And so, in fact, if I turn to the next page, then --

25   withdrawn.

E6qdtag5                          Temkin - cross

1          If I turn to the first page, is that your signature on

2    the bottom of that page?

3    A.  It is.

4    Q.  So what you did is you confirmed the accuracy of the

5    representation that you are an accredited investor?

6    A.  Correct.

7    Q.  OK.  And if I show you exhibits to this, what it indicates

8    is that you had made a capital contribution and that you had an

9    interest in this horse as an owner of Shaggy Mane, correct?

10   A.  Correct.

11   Q.  And you signed that on the bottom?

12   A.  I did.

13   Q.  As did your husband?

14   A.  He did.

15   Q.  And with respect to this Series E, you signed the document

16   that you are a fractional owner of a horse named Kip Deville,

17   correct?

18   A.  Correct.

19   Q.  And you signed another document, which was Exhibit A,

20   Series C, which indicated that you are a fractional owner of

21   Big Brown?

22   A.  Correct.

23   Q.  Big Brown at this point in time was a horse that had won

24   the Kentucky Derby, correct?

25   A.  I don't know the dates.  I mean, when was the Kentucky

E6qdtag5                         Temkin - cross

1   Derby?

2   Q.  Well, do you know when the -- do you know when Big Brown

3   won the Kentucky Derby?

4   A.  In 2008.  But this is as of July -- whatever the date is on

5   this document.  I don't know if the Kentucky Derby had run then

6   or if this was before or after.

7   Q.  OK.  You knew that Big Brown had won the Preakness --

8   A.  Yes.

9   Q.  -- by this time?

10  A.  OK.

11  Q.  If you didn't know --

12  A.  I honestly don't know the dates of the races on this.

13  Q.  OK.  It says on the document, do you see that your capital

14  contribution for Big Brown is based on "breeding contract as of

15  July 1st of 2008?"

16  A.  I do.

17  Q.  Did you understand the significance of having a breeding

18  contract?

19  A.  No.

20  Q.  Did you know anything at all at that time about the value

21  of what Big Brown would be?

22  A.  No.

23  Q.  Did you ever call Mr. Tagliaferri to ask him what the value

24  was before you decided to become --

25  A.  No.

E6qdtag5                        Temkin - cross

1        THE COURT:  We should probably take a break shortly,

2    but you tell me when it is a good time.  OK?

3        MR. TULMAN:  OK.

4    Q.  Now, with respect to the letter of September 2nd of 2008,

5    which talked about -- the potential conflict of interest

6    letter, do you recall in that letter it telling you that you

7    had received a distribution of $5,825?

8    A.  Yes.

9    Q.  OK.  Did there come a time on September 11th of 2008 that

10   you sent an email inquiring about the $5,825.99 that was

11   referred to in that letter?

12   A.  I'd have to --

13   Q.  Do you recall?

14   A.  I don't recall.  I'd have to see it.

15   Q.  Sure.

16        (Pause)

17   A.  Thank you.

18        Yes.

19   Q.  Now, on September 11th of 2008, you told Mr. Tagliaferri

20   that you had just reread the letter of September 2nd, and you

21   saw that that amount of $5,825.99 was deposited in State Street

22   Bank, correct?

23   A.  Correct.

24   Q.  And you told him that there was, therefore, no need to

25   answer your earlier emails regarding the $5,800, correct?

1   A.  Correct.

2   Q.  You were concerned to make sure that the $5,825.99 made its

3   way wherever it was supposed to be, correct?

4   A.  Correct.

5   Q.  OK.  But your testimony was that you really weren't even

6   looking at your statements to see where all of your other

7   monies were at that time, correct?

8   A.  We were beginning to look at statements, sir.

9   Q.  So in 2008, you were beginning to look at statements.

10          MR. TULMAN:  OK.  This might be a good time for a

11  break, your Honor.

12          THE COURT:  All right.  Why don't we take about a

13  ten-minute break.  Thanks.

14          Please remember, don't discuss the case.  Keep an open

15  mind.  Thank you.

16          (Recess)

17          THE COURT:  Are we ready for the jury?

18          (Jury present)

19          THE COURT:  You may be seated.

20          You may proceed.

21          MR. TULMAN:  Thank you, your Honor.

22  BY MR. TULMAN:

23  Q.  Do you need a drink of water?  Are you OK?

24          (Pause)

25          I am going to show you again, Mrs. Temkin, very

E6qdtag5                              Temkin - cross

1    quickly what was the Government's Exhibit 1451A.  We looked at

2    it just before.  OK?  And I just wanted to show you one more

3    thing that I forgot.  All right?

4              Do you see the first paragraph of the -- do you see

5    the first paragraph of that letter?

6    A.  Yes, sir.

7    Q.  OK.  And it says there, does it not, that in connection

8    with the purchase of securities of IEAH, that Peg represented

9    to Pegasus, the company, that, one, you acquired the securities

10   for your own account for investment purposes only and not with

11   a view to resale or other distribution, and that, secondly,

12   that you are an accredited investor, right?

13   A.  Yes.

14   Q.  OK.  Now, you've already answered questions about the

15   second part, in that you signed that you are in fact an

16   accredited investor?

17   A.  Yes.

18   Q.  Do you recall reading the first part of that letter, that

19   you understood that it was just not -- that it was not with a

20   view towards resale?

21   A.  Well, I see it now more clearly than I saw it then,

22   probably.  But I see it.  I see it.

23   Q.  OK.  But when there came a time that you became concerned

24   with the investment, you decided that, notwithstanding the

25   letter, you really wanted to get your money out of IEAH,

E6qdtag5                          Temkin - cross

1   correct?

2   A.  Right.

3   Q.  OK.  Now, do you recall earlier I asked you about your son

4   Andrew being an equestrian and having as a hobby an interest in

5   horses?

6   A.  Yes.

7   Q.  And do you remember when I asked you earlier about -- do

8   you recall your husband writing a letter to Mr. Tagliaferri

9   saying that Andrew would really like to be in the horse

10  industry, meaning, i.e., he'd like to be like you?  Do you

11  remember sending that letter?

12  A.  I don't think my husband said that --

13  Q.  You husband sent him this letter?

14  A.  Yeah.  But I don't think my husband ever said that my son

15  wanted to be like Mr. Tagliaferri.

16  Q.  OK.

17          MR. TULMAN:  May I approach the witness?

18          THE COURT:  You may.

19          MR. TULMAN:  I am going to mark this just for

20  identification, Judge.

21          THE COURT:  OK.  Just note for the record what you

22  mark it as, please.

23          MR. TULMAN:  Yes.  I am marking this as DX1000, for

24  identification.

25  A.  Thank you.

E6qdtag5                            Temkin - cross

1    Q.  Sure.

2    A.  I see it.

3    Q.  OK.

4    A.  Mm-hmm.

5    Q.  OK.  Does this document, Mrs. Temkin, refresh your

6    recollection that your husband communicated to Mr. Tagliaferri

7    that your son Andrew would really like to be somewhere in the

8    horse industry, i.e., he'd like to be like you?

9    A.  Yes.

10   Q.  OK.  Now, on direct examination, you testified about --

11   initially you testified that everything with Mr. Tagliaferri

12   you lost money on, correct?

13   A.  Yes.

14   Q.  But then you said that there were some cases where you

15   actually did make money on exchanges, correct?

16   A.  Yes.

17   Q.  OK.  And one such example of that was a stock that was

18   called White Energy, correct?

19   A.  Yes.

20   Q.  OK.

21           MR. TULMAN:  I would ask -- wait.

22           (Pause)

23           Your Honor, I am going to offer in evidence, as

24   Defense Exhibit 657, a State Street statement from November of

25   2005.

1              MR. COWLEY:  No objection.

2              THE COURT:  No objection.  All right.  It will be

3     admitted.

4              (Defendant's Exhibit 657 received in evidence)

5              MR. COWLEY:  Could you state the number again?

6              MR. TULMAN:  Sure.  657.

7     BY MR. TULMAN:

8     Q.  And this is a statement from State Street, OK, that's in

9     evidence.  OK.

10             And I'm going to show you the second page for a

11    moment.

12             And you said before that you had two different

13    accounts with Mr. Tagliaferri?

14    A.  Yes, sir.

15    Q.  OK.  And in one account you had over a million dollars, and

16    that was a statement that was sent that the prosecutors showed

17    you?

18    A.  Yes.

19    Q.  OK.  And this is the second statement, because this is the

20    account under the will of your mother, Charlotte Lamm, correct?

21    A.  Correct.

22    Q.  And you were a trustee on this particular account?

23    A.  Correct.

24    Q.  OK.  And with this particular account, I'm going to turn

25    the page now from the front page to the next page, and ask you,

E6qdtag5                        Temkin - cross

1  do you know -- did you know in 2005 what Headwaters, Inc. was?

2  Do you know what that company was?  Just yes or no.

3  A.  No.

4  Q.  You don't know?

5  A.  No.  No.

6  Q.  Did you know what Mesabi Trust was?

7  A.  No.

8  Q.  Did you know what Southern Copper Corp. was?

9  A.  I can assume it was a copper company.

10 Q.  OK.  Were these the type of conservative investments that

11 you had asked Mr. Tagliaferri to put you into in 2005?

12 A.  Wait.  You've got to understand something.  We had asked in

13 our trust for the securities to be safe and blue chip and

14 secure and liquid.  This trust was for my children from my

15 parents.  They were young boys.

16 Q.  Mm-hmm.

17 A.  And we asked for, in this account, there to be more

18 equities and be more growth because they were younger kids.

19 Q.  I see.

20 A.  So has nothing to do with what was in our account.

21 Q.  I see.  OK.  So in this particular account your

22 instructions to Mr. Tagliaferri was he was to be more

23 aggressive?

24 A.  Yes.

25 Q.  So you gave him -- so apart from talking about a

E6qdtag5                              Temkin - cross

1   conservative approach, you really had a more detailed

2   conversation with him about it, about exactly what your

3   investment goals were; is that what you're saying?

4   A.  Yeah.

5   Q.  OK.  And so this account was going to be growth?

6   A.  Yes.

7   Q.  Your other account was going to be conservative?

8   A.  Yes, sir.

9   Q.  I see.  And in retaining Mr. Tagliaferri's services for

10  these purposes, would you look at the statements to see whether

11  he was carrying out your instructions with respect to the two?

12  A.  Could you -- I mean, generally.

13  Q.  OK.  Now, do you see down here there is something, "Foreign

14  Assets," and that's Amarok Resources?

15  A.  Yes.

16  Q.  Do you know what Amarok Resources was?

17  A.  No.

18  Q.  Do you know, did you learn that Amarok Resources later

19  changed its ownership or in acquisition it became the company

20  White Energy?

21          MR. COWLEY:  Objection.

22  A.  No.  I didn't know.

23          THE COURT:  Overruled.

24  A.  I didn't know that.

25          (Pause)

E6qdtag5                        Temkin - cross

1    Q.  Isn't it a fact, Mrs. Temkin, that Amarok Resources later

2    becomes White Energy?

3    A.  I didn't know that.

4    Q.  OK.  Now, did there come a time -- and now I suppose the

5    government could assist me -- the June 17th -- the June 2010

6    statement for this account that ends in 3880.

7             (Pause)

8             I think it is a State Street statement.

9             (Discussion off the record)

10            MS. MOYNE:  It is in evidence.

11            MR. TULMAN:  OK.  And could you go, please, to the

12   sales, if you would, June of 2010.  Like I guess the fourth

13   page, where there are sales.  Give me a second and we will find

14   it.  I think, there it is.

15   Q.  In June of 2010, is it a fact that Mr. Tagliaferri, on your

16   behalf, sold White Energy for $81,723.60?

17   A.  Yes.

18   Q.  And isn't it a fact that the purchase price for you of that

19   stock was $12,255?

20   A.  Where does it say that?

21   Q.  Well, I'm asking you if that is --

22   A.  I don't remember that.

23   Q.  OK.  I'm going to show you, then, the -- I have to go back

24   to the 2005 statement.  So I guess if we could turn this one

25   off and turn this one back on.

E6qdtag5                         Temkin - cross

1            (Pause)

2            OK.  Do you see on the bottom, Amarok Resources,

3    $12,255 at the very bottom there?

4    A.  Yes, I see it.

5    Q.  So I ask you again, isn't it a fact that you realized a

6    longterm capital gain from the sale of White Energy of

7    approximately -- not "approximately," of $69,468.60?

8    A.  Yes.

9            MR. COWLEY:  Objection.

10           THE COURT:  Overruled.

11   Q.  The answer is yes?

12   A.  Yes.

13   Q.  OK.  And this was in June of 2010, correct?

14   A.  If that's what it says.

15   Q.  OK.  And now I'd like to show you another document, which

16   is Defendant's Exhibit 671.

17           And on June 25th of 2010, is this an email that you

18   sent to Jim Tagliaferri -- I'm sorry.  I am offering into

19   evidence Defendant's Exhibit 671.

20           THE COURT:  It will be admitted.

21           (Defendant's Exhibit 671 received in evidence)

22           MR. TULMAN:  Thank you.  Sorry.

23           OK, now I will publish it.

24   Q.  Do you recall sending an email to Mr. Tagliaferri

25   June 25th of 2010, saying, "Dear Jim, just noticed the sale of

E6qdtag5                          Temkin - cross

1   25,000 shares of White Energy.  Good going.  Good going.  Keep

2   going."

3          Do you recall that?

4   A.  "Pretty soon we'll start sleeping at night."

5   Q.  Yes.  "Pretty soon we'll start sleeping at night."

6   Correct?

7   A.  Mm-hmm.

8   Q.  Because at that point in time you may have had the gain in

9   White Energy but in fact you had losses, and significant

10  losses, in other stocks at that time, correct?

11  A.  Correct.

12  Q.  And that was really upsetting you at the time, correct?

13         And because it appears at that time that

14  Mr. Tagliaferri wasn't able to get you out of that IEAH,

15  correct?

16  A.  Right.

17  Q.  And even though you had signed a statement back when you

18  got involved with IEAH that it can't be resold, you wanted to

19  sell it because it wasn't making money for you, isn't that

20  right?

21  A.  I don't understand.

22         THE COURT:  She doesn't understand the question.

23         MR. TULMAN:  OK.  I'll break it up.  I'll stop.  OK.

24  Q.  You were upset at how much money you were losing with IEAH?

25  A.  Correct.

E6qdtag5                         Temkin - cross

1    Q.  You wanted out?

2    A.  Correct.

3           MR. TULMAN:  OK.  Now, in response to this, I'm

4    offering into evidence Defendant's Exhibit 672.

5           And in response to what is in evidence as 671, which

6    is this email, I am offering in evidence --

7           THE COURT:  You are offering in evidence?

8           MR. TULMAN:  672, your Honor.

9           THE COURT:  All right.  It will be admitted.

10          (Defendant's Exhibit 672 received in evidence)

11          MR. TULMAN:  OK.

12   BY MR. TULMAN:

13   Q.  So in response to the email where you told Mr. Tagliaferri

14   to keep going, having just sold 25,000 shares of White Energy,

15   I'm going to show you now what's in evidence as 672.

16          Do you recall receiving this response from

17   Mr. Tagliaferri indicating that he had sold in fact not 27,000

18   shares but 52,000 shares?

19   A.  Yes.  I see that.

20   Q.  So when you earlier testified -- withdrawn.

21          You earlier testified about the gain of $62,000,

22   approximately, on the sale of 27,000 shares?

23   A.  Yes.

24   Q.  It was more like 120,000; is that your recollection?

25   A.  Between the two accounts --

E6qdtag5                      Temkin - cross

1          MR. COWLEY:  Objection.

2     A.   -- do you mean?

3     Q.   Yes, between the two accounts.

4          THE COURT:  Overruled.

5          Go on.  There was an objection.

6     Q.   OK.  So the $67,000 was in fact, to your best

7     recollection -- to your best recollection -- more like

8     $120,000?

9     A.   Are you talking about it being divided between my

10    children's account and our account?  Was that what you are

11    saying?  Because did they have White Energy in their account,

12    as well?

13    Q.   No, ma'am.  What I'm asking -- I'll direct your attention,

14    again, Mrs. Temkin, just to Defendant's Exhibit 672.

15         Do you recall Mr. Tagliaferri selling 25,000 shares of

16    White Energy from your mother's account and then also selling

17    25,000 shares from your account?

18    A.   I see that here, now.

19    Q.   So the profit that you made was not 67,000 but more like

20    134,000, if you recall?

21         MR. COWLEY:  The same objection.

22         THE COURT:  Overruled.

23    A.   I don't remember it.  Sorry.

24    Q.   No problem.  Now, finally, you've heard testimony -- you

25    recall testifying on direct examination a whole series of

1   questions about a stock, a security called Fund.com; do you

2   remember?

3   A.   Yes.

4   Q.   I'd like to direct your attention, and ask the government

5   to assist me once again, to the July 2008 statement.  Oh, for

6   the living trust.

7           (Pause)

8           OK.  And I would direct your attention, please, to

9   page 5.  Well, maybe the first page.

10          MR. TULMAN:  And this is evidence, your Honor.  I

11  believe it is a government exhibit, your Honor.

12          THE COURT:  OK.

13          MR. TULMAN:  OK.

14  Q.   So in this July statement, I'll direct your attention to

15  page 6 of that statement.  OK.

16          Did I say page 6?  Forgive me.  Page 5.

17          I'd ask you, Mrs. Temkin, if you would please look at

18  the date of July 2nd of 2008?

19  A.   OK.

20  Q.   OK.  And did there come a time on or about July 2nd of 2008

21  that Mr. Tagliaferri, on your behalf, purchased 42,857 shares

22  of Fund.com for $12,857.10?

23  A.   Yes, sir.

24  Q.   OK.  And now I would like to direct your attention -- and I

25  would ask the government's assistance one last time -- for the

E6qdtag5                          Temkin – cross

1    September 2009 statements for the same account.  And I would

2    ask you, please, to go to page 5.

3              Mrs. Temkin, I would ask you to please direct your

4    attention to on or about between September 25th and

5    September 30th of 2009, did Mr. Tagliaferri, on your behalf,

6    sell 40,000 shares of Fund.com?

7    A.  Yes.

8    Q.  For the price of $79,397.96?

9    A.  Yes.  I see that.

10   Q.  And, by the way, were you also getting another $10,000 at

11   that time, as indicated right below that, for a distribution?

12   A.  I see that.

13   Q.  Yes.  And would it be fair to say, then, if you do some

14   math, that in connection with that Fund.com, given the course,

15   that you received a significant gain in that case with respect

16   to the sale of your Fund.com stock on that occasion?

17   A.  It seems that way, yes.

18             MR. TULMAN:  I have no further questions.

19             THE COURT:  Thank you.

20             Any redirect?

21             MR. COWLEY:  Yes, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. COWLEY:

24   Q.  All right.  Ms. Temkin, good afternoon again.

25             I think you were asked some questions on

E6qdtag5                          Temkin - redirect

1    cross-examination about going to a horserace, I think, in July

2    of 2008.

3    A.  Yes.

4    Q.  Is that correct?

5         And you had testified earlier regarding having some

6    apprehension about being invested in IEAH, is that correct?

7    A.  Right?

8         MR. TULMAN:  Permission to approach, your Honor?

9         THE COURT:  You may.  You don't have to ask going

10   forward.

11        MR. COWLEY:  Oh.  Thank you, your Honor.

12   Q.  Let me show you what's been marked for identification as

13   Government's Exhibit 1452B.

14        Do you see that?

15   A.  Yes.

16   Q.  Does this appear to be an email exchange between you and

17   Mr. Tagliaferri?

18   A.  Yes.

19   Q.  And is the date of it in June of 2008?

20   A.  June 17th, yes.

21        MR. COWLEY:  Your Honor, I move to admit Government's

22   Exhibit 1452B.

23        THE COURT:  Any objection?

24        MR. TULMAN:  No objection.

25        THE COURT:  It will be admitted.

1              (Government's Exhibit 1452B received in evidence)

2              MR. COWLEY:  If I could have that back, if you don't

3     mind?  Thank you.

4              If you'll bear with me for a moment, your Honor?  I am

5     going to try to get this thing working.

6              Thank you, Ms. Moyne.

7              MR. COWLEY:  I see it on the monitor down here.

8              THE CLERK:  It is black on my screen.

9              MR. COWLEY:  Here we go.  All right.

10    Q.  So looking through here, this is an email exchange between

11    you and Mr. Tagliaferri.  This is in June 2008, is that

12    correct?

13    A.  Correct.

14    Q.  So this is before you attended that horserace that

15    Mr. Tulman is asking you about?

16    A.  Yes.

17    Q.  At the bottom Mr. Tagliaferri says the May portfolios are

18    attached, correct?

19    A.  Mm-hmm.

20    Q.  What do you write to him on June 10, 2008?

21    A.  "Portfolios have come through.  I still remain apprehensive

22    about having so much money, such a large investment in IEAH.

23    What can I look forward to in the near term and what are the

24    risks?"

25    Q.  OK.  So are you expressing apprehension about your

E6qdtag5                        Temkin - redirect

1   investment in IEAH prior to going to see a horserace?

2   A.  I am.

3   Q.  And let's go up.  What sort of assurances -- actually, what

4   do you write to him on June 16, 2008?

5   A.  June 16th, I write, "Kindly respond to June 10 email.  I

6   believe you mentioned answering questions several days ago.

7   Perhaps your email didn't come through."

8   Q.  And what assurances does Mr. Tagliaferri give you on

9   June 17th?

10  A.  It says, "Just returned to St. Thomas yesterday.  Am

11  planning to call to discuss these questions and Victor's.

12  These notes we hold are backed by the racing stable, so we

13  don't have any concern about the ability to repay.  However, if

14  we convert, as we have begun to do, then we are subject to

15  risks of the business model.  At this point the outlook is

16  quite promising, and with the company planning a London Stock

17  Exchange offering in the fall, we have a liquidity event to

18  reduce the position.

19          "I will call you later to discuss in more detail and

20  answer your questions.

21          "Regards, Jim."

22  Q.  OK.  So in June 2008, you expressed apprehension about

23  having such a large investment in IEAH, and Mr. Tagliaferri

24  gives you assurances, is that correct?

25  A.  Correct.

1   Q.  Mr. Tulman, I think, showed you some other correspondence

2   also in June 2008, not in evidence, where he directed you to I

3   think a letter your husband may have written about your son

4   being interested in getting in the horse industry.  Do you

5   recall that?

6   A.  Yes.

7   Q.  Does your son's interest in getting in the horse industry

8   have anything to do at all with your comfort level with being

9   invested in IEAH?

10  A.  No.

11  Q.  I think he spent a lot of time talking with you about this

12  September 2, 2008 agreement that you signed; do you recall

13  that?

14  A.  Yes.

15  Q.  All right.  Let's take a look at that.  If we could please,

16  first put up Government's Exhibit 1451.

17          Thank you.

18          All right.  I just want to try to unpack and clarify a

19  few things here.  OK?

20          So on September 2, 2008, he sent you this letter,

21  correct?

22  A.  Correct.

23  Q.  All right.  If you can just zoom in about the top

24  paragraph, please.

25  A.  "Dear Susan, enclosed please find documents and information

E6qdtag5                        Temkin - redirect

1    related to your IEAH holdings and your fractional interests in

2    racehorses.  As add-ons to your notes, you've received

3    interests in Big Brown, Kip Deville and Shaggy Mane.  We formed

4    an LLC, Pegasus Holding Group Stables, LLC, to take title to

5    the horses.  This was simply a cumbersome process that requires

6    owners to be licensed in each racing venue and to provide a set

7    of fingerprints.

8            "I became the managing member and each owner client

9    will become a nonmanaging member.  The process will be

10   completed when you execute the enclosed documents and return

11   them to us.  I have provided a stamped priority mail envelope

12   for your convenience."

13   Q.  So he's sending you paperwork to fill out?

14   A.  Right.

15   Q.  Is that right?

16           When he talks about interest that you received, is he

17   talking about investments from the past tense, or is he talking

18   about you making a new investment on September 2, 2008?

19   A.  New investment.

20   Q.  Well, now, let's just read a sentence with me if you could.

21           "As add-on to your notes, you received interests in

22   Big Brown, Kip Deville and Shaggy Mane," is that correct?

23   A.  Correct.  Yes.

24   Q.  In fact, what this letter is talking about is investments

25   that Mr. Tagliaferri already put you in in relation to IEAH?

E6qdtag5                          Temkin - redirect

1           MR. TULMAN:  Objection, your Honor.

2   A.  Correct.

3           THE COURT:  Yes.  Just going forward, please don't

4   lead.

5           MR. COWLEY:  Yes, your Honor.  Understood.

6   BY MR. COWLEY:

7   Q.  In fact, if we could please switch over to this again.

8   Hopefully, it should work.

9           Great.  OK.

10          So this is what's been admitted as Government's

11  Exhibit 1451A; do you see that?

12  A.  Yes.

13  Q.  OK.  What are the dates referenced in that first sentence

14  in regard to your acquisition of securities in IEAH?

15  A.  March 21, 2007; April 20, 2007; July 13, 2007; and

16  September 18, 2007.

17          MR. COWLEY:  And if we could switch back, please, and

18  Ms. Baskin, Government's Exhibit 1000, please, page 16.

19          One-six.  Thank you.

20  Q.  OK.  And looking down at your account statements, what do

21  we see happening on March 22, 2007?

22  A.  A disbursement, is that what you are talking about?

23  Q.  Correct.

24  A.  A cash disbursement paid to Valley National Bank for

25  $100,000, wired at the request of the client, paid for no one,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6qdtag5                        Temkin - redirect

1  for IEAH."

2  Q.  So this is -- to an extent, is this a reference to a March

3  '07 investment into IEAH?

4  A.  It is an investment of $100,000 into IEAH on 3/22/07.

5  Q.  Going back again forward to July 2008, when you were

6  expressing excitement about seeing Big Brown, going to this

7  horserace, etc.  Did you have any knowledge then as to whether

8  or not Mr. Tagliaferri had a relationship established with IEAH

9  where he would be receiving a portion of client funds that had

10  been sent to IEAH?

11  A.  No.

12           MR. TULMAN:  Objection.

13           THE COURT:  Overruled.

14  Q.  If you had known that that was the case, would that have

15  changed your excitement level and comfort level?

16  A.  Yes, it would have.

17  Q.  And explain to the jury why that would have changed.

18           MR. TULMAN:  Objection, your Honor.

19           THE COURT:  Overruled.

20  A.  Because, again, it gets back to that double-dipping

21  business.  If he was getting money from IEAH for putting

22  money -- for a fee and for putting our -- I mean, the

23  investors' money into IEAH, then that's just dirty dealing.

24  Sorry.

25  Q.  Now, you were asked a question, a series of questions

E6qdtag5                          Temkin - redirect

1     actually, about a totally unrelated investment, White Energy.

2     Do you recall those questions?

3     A.  Yes.

4     Q.  I think you looked at some account statements from 2005, is

5     that correct?

6     A.  Yes.

7     Q.  And you looked at a purchase then and a sale later, is that

8     right?

9     A.  Yes.  Correct.

10    Q.  If we could please go to page 76 of this exhibit.

11            JUROR NO. 2:  Excuse me.  This monitor doesn't work

12    anymore.

13            THE COURT:  Thank you for letting us know.  Can look

14    on with your neighbor?

15            (Pause)

16            THE CLERK:  For now, you can go ahead.

17            THE COURT:  Raise your hand if your monitor is not

18    working.

19            Yours is not working either?

20            ALTERNATE JUROR 4:  No, it is working, but this is

21    working here.

22            THE COURT:  OK.

23            THE CLERK:  Judge, do you mind if they switch seats to

24    that monitor?

25            THE COURT:  No.  Go ahead.  Thank you.

E6qdtag5                          Temkin - redirect

1            You may proceed.

2            MR. COWLEY:  Thank you, your Honor.

3   BY MR. COWLEY:

4   Q.  All right.  So in looking at your account statements for

5   January of 2008, do you see additional money leaving your

6   account on January 30, 2008?

7   A.  $18,468, yes.

8   Q.  That's money leaving your account, correct?

9   A.  Yes.

10  Q.  And what security is that in relation to?

11  A.  White Energy.

12  Q.  And if we could see page 57, please.

13           And if we could zoom in on the transaction on

14  October 5th, '07, relating to White Energy.

15           Is that money coming in or leaving your account in

16  respect to White Energy?

17  A.  Leaving.

18           (Continued on next page)

19

20

21

22

23

24

25

E6qbtag6                           Temkin - redirect

1    Q.  And most broadly, Ms. Temkin, did you understand White

2    Energy to have anything at all to do with IEAH?

3    A.  No.  No.

4    Q.  You were asked some questions--

5             MR. COWLEY:  We can take that down, please.

6    Q.  So you were asked some questions about your monthly

7    distributions.

8             Do you recall those questions?

9    A.  Yes.

10   Q.  And I think you were asked something to the effect of did

11   those-- did the activity in your account ever interfere with

12   your receiving those distributions, is that correct?

13   A.  Yes.

14   Q.  And what's your recollection as to whether or not it did?

15   A.  It didn't.

16   Q.  Did the decline in value in your account impact you in

17   other ways?

18   A.  Well, sure.

19   Q.  Can you explain to the jury how it impacted you?

20   A.  Well, it impacted us-- first of all, we're retired and on a

21   fixed income.  And it sort of scarred us for things that we

22   wanted to do for our children, our grandchildren, that we can't

23   do.  And there's a good chance that we'll probably have to move

24   within the next couple of years because we can't stay where we

25   are.

E6qbtag6                          Temkin - redirect

1           MR. COWLEY:  If I could have a moment, your Honor.

2           THE COURT:  Sure.

3           (Pause)

4           MR. COWLEY:  Nothing further.

5           THE COURT:  Any recross?

6           MR. TULMAN:  Nothing further, your Honor.

7           THE COURT:  All right.  Thank you very much,

8    Ms. Temkin.  You may step down.

9           (Witness excused)

10          THE COURT:  Call your next witness, please.

11          MS. MOYNE:  The government calls Professor Arthur

12   Laby.

13    ARTHUR LABY,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16          THE DEPUTY CLERK:  Can you please state and spell your

17   name for the record, sir.

18          THE WITNESS:  Arthur Laby, A-R-T-H-U-R L-A-B-Y.

19          MS. MOYNE:  May I proceed?

20          THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MS. MOYNE:

23   Q.  Good afternoon, Professor Laby.

24   A.  Good afternoon.

25   Q.  How are you employed?

E6qbtag6                    Laby - direct

1    A.  I am a professor of law at Rutgers University and a

2    consultant to the securities industry.  I also serve on the

3    board of directors of the Certified Financial Planner Board of

4    Standards.  It's an industry association.

5    Q.  So let's start with as a professor.  What do you do as a

6    professor?

7    A.  Well, I teach at Rutgers Law School.  So that means I have

8    three primary responsibilities:  I teach courses; I engage in

9    research and writing; and then I also engage in what we call

10   service, which is service to the law school and service to the

11   broader community.

12   Q.  And what sorts of courses do you teach?

13   A.  I teach business law courses for the most part.  So

14   business organizations or corporations.  I teach securities

15   regulation, and I also have taught classes in investment

16   management law and in fiduciary law.

17   Q.  And in terms of your research and writing, what is the

18   focus of that?

19   A.  It's primarily in the area of the fiduciary obligations of

20   members of the financial services industry, investment advisors

21   and broker-dealers.

22   Q.  And in terms of your community work, your outreach, what's

23   the focus of that?

24   A.  So some of that is what I already mentioned.  The service I

25   do on the Certified Financial Planner Board of Standards.

E6qbtag6                          Laby - direct

1    That's a voluntary position and it's an organization that is in

2    the public interest.  I also assist with students, students'

3    work at the law school, and a little bit of outreach to the

4    broader area in South Jersey and Philadelphia in the financial

5    services area.

6    Q.  And you mentioned you were a consultant.  What sort of

7    consulting do you do?

8    A.  So various projects assisting members of the financial

9    services industry with compliance, with the laws and

10   regulations.

11   Q.  Okay.  And does that include investment advisors?

12   A.  It is primarily investment advisors, yes.

13   Q.  And you mentioned that you sit on the Board of the

14   Certified Financial Planners.  What is a certified financial

15   planner?

16   A.  So the certified financial planners are CFPs.  That's a

17   designation that we offer to members of the industry.  So

18   broker-dealers, investment advisors, those who provide

19   investment advice.  And if they want to be a certified

20   financial planner, it's a particular qualification, they have

21   to go through a series of coursework and then they sit for an

22   examination.

23          Once they pass that examination, if they also have had

24   significant work experience, they can be considered a so-called

25   CFP and they can put those initials after their name.  I think

E6qbtag6                          Laby - direct

1    there are now close to 70,000 CFPs in the United States.

2    Q.  Okay.  Now, if we could step back for a moment.  Could you

3    provide the jury with your educational background?

4    A.  Oh, sure.  I went to college at the University of

5    Pittsburgh and then went to law school at Boston University

6    School of Law.

7    Q.  Okay.  And what did you study in law school?

8    A.  Law school's a broad-based legal background.  By the time I

9    was finish not guilty my third year, I was focused a bit more

10   on business-related classes because I had a sense that that's

11   how I would spend most of my career.

12   Q.  And then what did you do after law school?

13   A.  Well, I first clerked for a federal district court judge in

14   the District of Maryland, and then I practiced at a law firm in

15   Washington, D.C. doing primarily financial services regulation.

16   Q.  Okay.  And I don't know if you mentioned this.  What year

17   did you graduate law school?

18   A.  I graduated in 1989 from law school.

19   Q.  Okay.  And when you were at the law firm, you said that you

20   were in financial services.

21          What sorts of cases did you work on or clients did you

22   have?

23   A.  So when I started at the firm, I did a lot of banking work.

24   And then I slowly moved over into the securities area and spent

25   most of my time in my last couple of years at that firm doing

E6qbtag6                            Laby - direct

1    work on behalf of investment advisors and broker-dealers.

2    Q.   And what did you do after you were working at the firm?

3    A.   So after the firm I spent two years overseas on a Fulbright

4    grant teaching and researching at two German universities, also

5    focused on the business law areas.

6    Q.   And approximately when was that?

7    A.   Let's see.   That was from 1994 to 1996.

8    Q.   And after you returned from your Fulbright, what did you

9    do?

10   A.   When I returned from the Fulbright, I joined the staff of

11   the U.S. Securities and Exchange Commission in Washington, D.C.

12   And I spent, I would say, just under ten years at the SEC

13   working in three different offices.

14   Q.   Okay.   First, if you could explain what the SEC, the

15   Securities and Exchange Commission, is.

16   A.   Sure.   The SEC, the Securities and Exchange Commission, is

17   the primary federal regulatory agency that regulates the

18   issuance of securities in the United States and then also

19   regulates members of the financial services industry like

20   stockbrokers, investment advisors, and mutual funds.

21   Q.   And you mentioned that you were in three different areas in

22   the SEC.   So what were your roles at the SEC?

23   A.   Yes.

24   Q.   Approximately what date, time frame, are we talking about?

25   A.   So I came back from Germany in 1996, joined the SEC staff.

E6qbtag6                          Laby - direct

1    And I worked first in the office of international affairs.

2    That was particularly fit because I had spent some time

3    overseas.  And then I moved into the division of investment

4    management.  That's the division of the SEC that regulates

5    investment advisors and mutual funds.  Spent two to three years

6    in that division.  And then I moved to the office of general

7    counsel, which oversees all of the work of the agency and has

8    to essentially look at the work of the staff and advise both

9    the general counsel and the commissioners whether they should

10   proceed with a certain rule or a certain enforcement case,

11   whatever it might be.

12   Q.  Okay.  And in the office of general counsel, were you

13   involved at all with investment advisors?

14   A.  Yes.  So I was the assistant general counsel specifically

15   assigned to do work in the investment management area, which of

16   course includes both investment advisors and mutual funds.

17   Q.  And did you have any role in drafting any of the

18   regulations or requirements for investment advisors, including

19   any forms that they're required to fill out?

20   A.  Yes.  So part of the work of the division of investment

21   management-- I should back up and say part of the work at the

22   SEC is to implement all of the federal securities laws.  And so

23   by implement, that often means passing rules and regulations

24   under those statutes that then of course apply to members of

25   the financial services industry such as investment advisors.

1           So, yes, in the division of investment management,

2     part of my responsibility was to actually write those rules and

3     the long documents that accompany the rules that go out to the

4     public so they can understand what the SEC is doing.

5           And at the time that I was in the division, we were

6     also working on the Form ADV, which is a form that must be

7     completed by investment advisors that are registered with the

8     SEC.

9     Q.  And I'll probably ask you more about that in a little

10    while.  For now I'm just going to ask you, what did you do

11    after working at the SEC?

12    A.  Well, after the SEC I decided to make the move into

13    academia and that's when I joined Rutgers Law School.

14    Q.  And you mentioned some of the subjects that you teach in

15    and publish on.

16          What do you do to keep current with the laws,

17    regulations and practices governing investment advisors?

18    A.  Yes.  The laws are changing and the regulations are always

19    changing.  So that's always a challenge.  I do several things.

20    First of all, my work on the CFP board that I mentioned earlier

21    actually helps me stay very current, because we're very

22    involved in the cutting-edge issues of the day that are

23    advising advisors and brokers.

24          I also attend, regularly attend, meetings of the group

25    in the Philadelphia area called Philadelphia Compliance

1  Council.  We meet several times a year.  It's mainly compliance

2  individuals and we join together and discuss what the big

3  issues are that are facing investment advisory firms and

4  broker-dealer firms with regard to compliance.

5           I also serve on the New York City Bar Association

6  Investment Management Committee.  It's a small group of very

7  experienced lawyers in the investment management world.  We

8  meet once a month, again to keep current on various issues of

9  the day.

10           I also speak fairly regularly at industry conferences,

11  typically in the New York area.  And of course if I speak at

12  the conference, I also attend the conference and I learn a lot

13  about what's happening in the industry based on my attendance

14  at those conferences.

15  Q.  And have you published anything specifically on investment

16  advisors?

17  A.  Yes.  So that's one of my main areas of interest and of

18  research.  And several of the book chapters and articles that

19  I've published over the years have been quite specific to the

20  investment advisory area.

21  Q.  Have you served as an expert witness before?

22  A.  Yes, I have.

23  Q.  And approximately how many times?

24  A.  I would say probably seven to ten times.  I don't know what

25  the exact number is.

E6qbtag6                         Laby - direct

1   Q.  And on what subjects have you been hired as an expert

2   before?

3   A.  Well, typically it's in this area that we're discussing,

4   the obligations of investment advisors, the obligations of

5   broker-dealers.  On rarer occasions it's in the general

6   corporate law area.

7          MS. MOYNE:  At this time the government offers

8   Professor Laby as an expert witness in investment advisors

9   including the regulations and standards applicable to

10  investment advisors and in fundamental concepts of securities

11  as they relate to the work of investment advisors.

12         THE COURT:  Any objection?

13         MR. TULMAN:  No objection, your Honor.

14         THE COURT:  All right.  He's so qualified.

15  Q.  Professor Laby, do you charge when you serve as an expert

16  witness?

17  A.  I do.

18  Q.  And how much do you charge?

19  A.  A rate of $600 per hour.

20  Q.  And I'm just going to ask you, there's a microphone, just

21  to speak into it because it's hard to hear you unless you're

22  actually into it even though it may, to you, sound like you're

23  shouting.

24         Are you being paid by the government today?

25  A.  I am being paid, yes.

E6qbtag6                          Laby - direct

1    Q.  And does your compensation depend on the outcome of this

2    case?

3    A.  Not at all.

4    Q.  Has the government asked you to change your opinions that

5    you've previously reached before you were retained to testify

6    in this case?

7    A.  No.

8    Q.  And have you been retained by the government to give your

9    expert opinion on industry practices?

10   A.  Yes, that's correct.

11   Q.  And have you been retained by the government to give your

12   opinion on any of the specific conduct that is charged in this

13   case?

14   A.  Not specific conduct in this case, no.

15   Q.  Professor Laby, in connection with your testimony today,

16   did you prepare some slides?  Did you and the government

17   prepare some slides?

18   A.  Yes.  Yes, we did.  Yes.

19        MS. MOYNE:  And at this time the government moves

20   Government Exhibit 4000 into evidence.

21        THE COURT:  Any objection?

22        MR. TULMAN:  No objection.

23        THE COURT:  It will be admitted.

24        (Government's Exhibit 4000 received)

25   Q.  So, Professor Laby, first we're going to start with general

1   concepts of investment.  What sort of investments are there?

2   A.  Well, there are many types of investments.  The most common

3   types that many people have heard of are stocks, bonds, and

4   mutual funds.  I would say those are the three most common.

5   Q.  Okay.  So what is a stock?

6   A.  So a stock is-- it's actually evidence of just a little bit

7   of ownership in a particular company.  So an investor actually

8   gives money over to a company by buying stock.  And as a result

9   that investor is entitled to dividends if the company decides

10  to pay a dividend, but more importantly they own a share of

11  stock.  So they own a share of company which the investor hopes

12  will increase in value over time in which case they could sell

13  it at a profit.

14  Q.  So the company gets the investor's money and the investor

15  gets the stock?

16  A.  That's right.

17  Q.  And is the company required to pay the stockholder back at

18  any specific time?

19  A.  No, that's not the deal with stock.  It's really just a

20  little bit of ownership that that individual has in the company

21  itself.  There's no requirement for the company to pay anything

22  back.

23  Q.  And what is a bond?

24  A.  A bond is actually a loan.  So it's when an investor

25  decides to actually lend money to a company and they give that

1    money over as a loan and then they are paid back that money at

2    a certain point in time, both interest and principal.

3    Q.  So for a loan, is the company required to pay back the

4    loan?

5    A.  Yes, that's a different kind of a bargain and the company

6    has to pay back the investor.

7    Q.  And, briefly, what is a mutual fund?

8    A.  A mutual fund is a type of investment company.  And when I

9    say "investment company," it's really a company that goes out

10   and invests in other companies.  So it's a way for investors to

11   pool their money together into one common pool, one fund, and

12   then that fund goes out and invests in a lot of other

13   companies, hopefully which do well over time.

14   Q.  All right.  Are you familiar with the term "promissory

15   note"?

16   A.  Yes.

17   Q.  And what is a promissory note?

18        MS. MOYNE:  And maybe if we could ask, Ms. Baskin, if

19   you could put on the first slide.  Thank you.

20   A.  Yes.  So a promissory note just refers to a contract.  It's

21   an actual document, a piece of paper, that the company hands

22   over to the investor when the investor decides to invest in

23   that company.

24        So you can see from this picture the investor loans

25   money to the company, the company has promised to pay interest

1  and principal back to the investor.  But the investor has in

2  his or her hand a piece of paper, a document, a promissory

3  note, which is essentially an IOU from the company to the

4  investor where the company promises to make payments over

5  time.

6  Q.  So does the company have an obligation to pay back the

7  money to the investor with a promissory note?

8  A.  Yes, the company does have that obligation and the

9  promissory note is evidence of that if needed.

10 Q.  Okay.  And when is the payback date?

11 A.  The payback date depends on the bargain struck between the

12 investor and the company.  It can be one to two years out; it

13 can be 10 to 15 years out.  It varies actually.

14         MS. MOYNE:  And if Ms. Baskin can put on the second

15 slide, please.

16 Q.  What is this?  What does this appear to be?

17 A.  So this appears to be just the first page of the promissory

18 note.  And as you can tell, these are often complex legal

19 documents, but here you can see just by looking at the top that

20 it's a promissory note.  The rate of interest on this appears

21 to be 6 percent.  You can see that it's due on June 10th, 2008.

22 The amount is there, highlighted on the lower left, $1,500,000.

23 And the date that it was issued appears to be June 11th, 2007.

24 Q.  And you mentioned 6 percent interest.  What is interest?

25 A.  So interest is essentially the extra money that the company

1    agrees to pay to the investor above and beyond the principal

2    amount.  So not only does the investor receive the principal

3    amount back, the amount they loaned, but they receive that

4    amount plus interest, plus 6 percent of that amount, per year.

5    Q.  And is all of that information typically laid out in a

6    promissory note:  The due date, the amounts, the interest?

7    A.  Absolutely.  The promissory note lays out all of the rights

8    and responsibilities of the parties, of both the investor and

9    the company.

10   Q.  Okay.  And if you look on the top part that's blown up, it

11   mentions a converted secured convertible note.

12   A.  Yes.

13   Q.  What is a convertible note?

14   A.  Yes.  So a convertible note means that-- earlier I

15   mentioned-- we talked about both stock and debt.  In the case

16   of a convertible note, this is a bond, this is a loan, but this

17   can be converted, essentially, into equity.  So it's a bit of a

18   more complicated transaction.  Although the transaction starts

19   as a loan, it's at least possible at some point down the road

20   where the parties can decide to change the terms so that

21   instead of this being a loan, this converts into stock or into

22   equity or into an actual ownership in the company.

23   Q.  And are you familiar with the terms -- I think you've

24   mentioned them -- "equity" and "debt"?  And if you could

25   explain what the difference is between equity and debt.

E6qbtag6                          Laby - direct

1    A.  Sure.  So "equity" is just another phrase for stock.  It

2    essentially means the same thing.  We might think of equity we

3    have in our home.  But in the context of a company, equity is

4    essentially some little bit of ownership which is akin to

5    stock.  So stock and equity are essentially the same.

6         And then debt is essentially the same as a loan.  So

7    debt is what the company owes to an investor when the investor

8    loans money to the company.

9         MS. MOYNE:  All right.  And if we could look at the

10   next slide, Ms. Baskin.

11   Q.  What does this depict?

12   A.  I think this is particularly helpful to explain the

13   relationship between equity and debt.  So here you see on this

14   triangle, the debt holders are on the top part of the triangle.

15   And what that means is they have to be paid first by the

16   company.  So the company has to make these payments.  And

17   you'll notice on the left-hand side there's an arrow "payment

18   priority" going down.

19        Once the company has paid back the debt holders and

20   has paid back all of the other individuals or companies they

21   have to pay, like their employees and their utility bills and

22   everything else a company has to pay, whatever is essentially

23   left over at the end of the day, that's what falls down to the

24   stockholders who are on the bottom.

25        So I often say to students that the stockholders are

E6qbtag6                          Laby - direct

1    the residual owners of the firm.  They essentially get

2    whatever's left over at the end of the day after the debt

3    holders and others have been paid.

4    Q.  So what is the advantage of buying an equity or a stock

5    over making a loan?

6    A.  Yes.  So the advantage of equity is that there can be a

7    very, very great upside.  So if the company is very profitable,

8    if it makes a lot of money, what does that mean?  That means it

9    can pay its debt holder, it can pay its employees, it can pay

10   its utility bills, and there's a lot of money left over at the

11   ends of the day for stockholders and we see the value of the

12   stock increasing.  That's the advantage.

13             Of course, by contrast, if the company doesn't do

14   well, the stock price might well go down.

15   Q.  And what is the advantage of making a loan?

16   A.  So the advantage of the loan is it's a sure thing.  With

17   the debt holders, there's a promise to pay a given rate of

18   interest over a given period of time and then they absolutely

19   will get their money back.  So there's not this chance that

20   they might do well or they might not do well.  It's a

21   guaranteed payment that the debt holders are meant to receive.

22   Q.  And are you familiar with the term "security," a security?

23   A.  Yes.

24   Q.  What is that?  What do people mean by the term "security"?

25   A.  So a security is really a financial instrument like the

E6qbtag6                        Laby - direct

1   kinds we've been talking about:  Stock, bonds, mutual funds.

2   These are all considered securities although there are many

3   others besides those three.

4   Q.  So a stock is a security?

5   A.  Yes, absolutely.

6   Q.  Is a promissory note a security?

7   A.  Yes, it is.

8           MS. MOYNE:  We can actually turn off the slides for

9   now.  Thank you.

10  Q.  I want to ask you some questions about selling assets.

11          First, can an investor sell stock that he or she

12  owns?

13  A.  Yes.  Typically an investor can sell stock that he or she

14  owns, and that happens on a fairly regular basis.  Sometimes

15  it's not so easy to sell that stock, depending on what it is,

16  but generally speaking, yes, a stock can be sold.

17  Q.  And where does an investor go to sell stock?

18  A.  So typically an investor will contact his or her financial

19  advisor and indicate that they want to sell their shares.  And

20  then that advisor goes out to a broker, stockbroker, to

21  actually execute the trade.

22  Q.  And what sorts of markets are there to sell the stocks on?

23  A.  Well, the most common types of markets that we think about

24  are the exchanges, the securities exchanges, like the New York

25  Stock Exchange and the NASDAQ.  So if somebody wants to sell

E6qbtag6                          Laby - direct

1    the security of a large company, like IBM or Apple, they would

2    sell those shares by having a broker go out to the exchange and

3    finding a buyer.

4    Q.  And are there any requirements to have stocks sold on one

5    of those exchanges?

6    A.  Oh, yes.  If a company wants to have its shares listed on

7    something like the New York Stock Exchange, which is very

8    famous, that company has to meet what are called listing

9    standards.  So the New York Stock Exchange will have a series

10   of standards that the company has to meet:  The company has to

11   be of a certain value; it has to have been in existence for a

12   certain period of time.  There are many requirements, many

13   listing requirements.

14        When a company meets those, it can then have its stock

15   listed on the New York Stock Exchange.

16   Q.  And are you familiar with the OTC bulletin board?

17   A.  Yes.

18   Q.  And what is the OTC bulletin board?

19   A.  So the OTC bulletin board is a market for certain stocks

20   that really are not able to meet the listing standards for

21   something like the New York Stock Exchange or the NASDAQ, but

22   those companies still might want to have their stocks traded or

23   have a market for them.  So they'll list them on this other

24   market called the OTC, over-the-counter, bulletin board.

25   Q.  And are you familiar with the pink sheets?

E6qbtag6                         Laby - direct

1    A.  Yes.

2    Q.  And what are the pink sheets?

3    A.  So the pink sheets, which is a funny name, but it goes back

4    to the days when certain stocks were actually listed on pink

5    sheets; is yet another place where companies that cannot, as I

6    say, have their stocks listed on one of the more well-known

7    exchanges.  They might have them listed on these so-called pink

8    sheets so that investors who are looking for lesser-known

9    companies have a place to go to find those securities and buy

10   and sell them.

11   Q.  And are you familiar with the term "penny stock"?

12   A.  Yes.

13   Q.  And what is a penny stock?

14   A.  A penny stock is a stock of a company that is typically

15   rather small, not very well known, and the shares of the stock

16   are quite low in value and have to stay at that low value -- I

17   believe it's less than $5 per share -- for a prolonged period

18   of time.  That stock is called a penny stock.

19   Q.  And where are penny stocks traded?

20   A.  So, again, those stocks typically would not qualify to

21   trade on the New York Stock Exchange or the NASDAQ so they

22   wouldn't be listed there.  They would typically be listed on

23   the others that you've mentioned:  The OTC bulletin board or

24   the pink sheets.

25   Q.  And, generally speaking, are stocks that are traded on the

E6qbtag6                          Laby - direct

1    major markets, the New York Stock Exchange or the NASDAQ, more

2    or less risky than stocks that are traded on the other markets,

3    the OTC and the pink sheets?

4    A.  Well, the stocks on the major exchanges are less risky

5    because there's more what people call transparency.  So part of

6    the listing requirements that I mentioned earlier is that those

7    companies have to make a lot of information available to the

8    public about their company in order to be listed on those

9    exchanges.  So because that information is available to the

10   public, those stocks tend to be less-- less risky.

11   Q.  And what sorts of information is that?

12   A.  Oh, it's all sorts of information about the company, its

13   operating history, how it's spending its time, who the chief

14   officers are, what their backgrounds are.  I mean, it's

15   detailed information about the companies.

16   Q.  And do the OTC and the pink sheets have fewer or more

17   requirements?

18   A.  They have far fewer requirements of transparency.

19   Q.  Okay.  And now turning to loans and promissory notes.

20   We've spoken about how stocks can be sold and bought.  Can

21   notes be bought and sold?

22   A.  They actually can be.  So when you think about it, if you

23   hold a promissory note, the company has essentially agreed to

24   pay you back at some point in the future a certain amount of

25   money with interest.  And so that right that the investor has,

E6qbtag6                      Laby - direct

1    that note, that right to receive payments, can essentially be

2    sold and typically is sold on a regular basis to some other

3    investor who's willing to pay money today and then receive that

4    note and that investor then is paid the money in the future.

5    Q.  Are there markets set up for notes to be bought and sold in

6    the way that there are for stocks?

7    A.  Yes.  Yes, there are.  There's also markets for debt

8    instruments.  Correct.

9    Q.  And, Professor Laby, are you familiar with the concept of

10   liquidity and liquid and illiquid stocks?

11   A.  Yes.

12   Q.  Or assets, I should say.

13           Can you tell the jury about liquidity and liquid and

14   illiquid assets?

15   A.  Sure.  So liquidity refers to the ease by which a security

16   could be bought and sold.  So if we think about large

17   companies -- earlier I mentioned, just for example, IBM and

18   Apple -- we all know those are stocks that can be sold really

19   any minute of the day.  At any time if one wants to sell their

20   shares of IBM or Apple, there's somebody out there who's

21   willing to buy it.  Those are considered very liquid stocks.

22   There's a ready market all of the time.  That's a liquid

23   security.

24           An illiquid security is exactly the opposite.  If a

25   company is not very well known, does not have a lot of owners,

E6qbtag6                           Laby - direct

1    is not listed on a major exchange, there might not be on a

2    given day any buyers for that particular company.  So if a

3    seller wants to sell, they can't do it right away.  Those

4    securities are considered illiquid or nonliquid securities.

5    Q.  Are you familiar with the concept of a hard-to-value asset?

6    A.  Yes.

7    Q.  And what does that mean, have a hard-to-value asset?

8    A.  So, again, for some securities, some stocks, like the ones

9    we've been talking about, the major stocks like IBM, Apple, the

10   big companies, there's a price every day listed in the

11   newspaper, listed online.  One always knows what the stock is

12   worth.

13          For companies that do not trade very often, there's

14   not going to be a price where you can open up the newspaper and

15   find out what the company is worth.  And very often it's

16   actually not so easy to figure out what that particular

17   security is worth.  Again, there's not a lot of transparency

18   about those companies in the marketplace.  They don't trade

19   very often.  So that would be a hard-to-value security.

20   Q.  And are you familiar with the expression "a thinly traded

21   asset"?

22   A.  Yes.

23   Q.  And what does it mean to be thinly traded?

24   A.  So to be thinly traded means to be not traded very much at

25   all.  So a small company that's maybe owned mainly by the

E6qbtag6                      Laby - direct

1    family members of the company or maybe some friends of those

2    individuals, if it's not traded very often in the marketplace,

3    then it's considered thinly traded.

4    Q.  And are you familiar with the concept of parking an asset?

5    A.  Yes.

6    Q.  And when we're talking about parking an asset, instead of

7    parking a car, could you explain what parking an asset means?

8    A.  Yes.  It's very different.  So parking in the context of

9    assets or stock is when sometimes an individual wants to

10   essentially mask who the true owner is of a given asset at any

11   point in time.  And there might be a lot of reasons for that.

12   So individuals can engage in really what are sham transactions

13   or phony transactions, where an asset might come off of the

14   books of one individual and then go right back on at another

15   time.  But for a given period it looks as if the individual

16   does not own the particular stocks because they've been

17   "parked" in somebody else's account only to be put back to

18   their true owner at some future time.

19   Q.  Okay.  And the person who receives the shares for that

20   brief period of time, where the shares are parked, does the

21   parking of an asset affect the appeared value in that person's

22   account?

23   A.  Yes, it very well might.  So the person who receives the

24   parked securities, it looks as if that person is the owner at a

25   given point in time.  But, again, these are typically sham

E6qbtag6                    Laby - direct

1    transactions.  So it looks like they're the owner, but they're

2    sort of a secret deal where the securities are going to go back

3    to the true owner at a short time later.

4    Q.  Okay.  We'll shift gears to your specialty.  What is an

5    investment advisor?

6    A.  Well, an investment advisor is a person or a company -- it

7    can be a company just as well as a human being -- who is in the

8    business of providing advice about securities, like stocks and

9    bonds, for compensation.  Typically they have to be paid for

10   it.

11   Q.  And so, first, what sorts of assets?  You said stocks and

12   bonds?

13   A.  Right.  So when I said about securities, that to be an

14   investment advisor under the federal investment advisor law,

15   one has to be advising about securities.  And, again, that's a

16   defined term and includes things like stocks, bonds, promissory

17   notes, mutual funds and other types of financial instruments

18   that are considered securities.

19   Q.  And are you familiar with the concept of registering a

20   security?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  Yes.  So sometimes when companies offer their securities to

24   the public, those securities have to be registered with the

25   Securities and Exchange Commission, which means they have to go

E6qbtag6                           Laby - direct

1    through a rather onerous registration process with the SEC.

2    They go through that process before the securities are sold to

3    the public.  And if they do go through the process, those are

4    considered registered securities.

5    Q.  In your definition of an investment advisor, does that only

6    apply to people who are providing advice about registered

7    securities or is it a more general category?

8    A.  It's more general.  As long as the investment advisor is

9    advising about securities, then that individual or firm is

10   considered an investment advisor.  It doesn't matter in that

11   context whether the securities are registered or not

12   registered.

13   Q.  And what sort of things does an investment advisor do for a

14   client?

15   A.  Well, typically an investment advisor does what the name

16   sounds like:  They actually provide advice and recommendations

17   to their client about how that client should invest.  So they

18   might make recommendations about an investment strategy or they

19   might make particular recommendations about particular stocks

20   and bonds or other investments in which the advisor-- I'm

21   sorry, in which the client should invest and about when that

22   client should buy and sell.

23         So all of those types of things are what an advisor

24   does.

25   Q.  Does the investor provide the money for their clients to

E6qbtag6                          Laby - direct

1   invest?

2   A.  Yes.  So the investor is the one investing their own funds.

3   So, yes, they provide-- they essentially provide the funds.

4   Q.  Does the investment advisor-- I misspoke.

5        Does the investment advisor provide any money for the

6   investment?

7   A.  No.  The advisor-- it's the investor's money that becomes

8   invested.  So the advisor doesn't provide any funds.  It's the

9   client that provides the funds and then the advisor decides how

10  to invest those funds.

11  Q.  And are you familiar with a concept of an investment

12  advisor having discretionary authority?

13  A.  Yes.

14  Q.  And what does that mean?

15  A.  Okay.  So an investment advisor can be described as either

16  having discretionary authority or nondiscretionary authority.

17  And discretionary authority means that the investment advisor

18  essentially has what is effectively a kind of power of

19  attorney.  They have the authority that the client has given

20  them to invest the client's money without checking in with the

21  client first.

22        So they can decide today I want to invest the client's

23  money in the ABC Company and tomorrow in the XYZ Company.  And

24  they can make those decisions and buy and sell securities on

25  the client's behalf without calling the client on the phone,

1   checking in with them and getting their permission.  They have

2   discretionary authority to do that.

3         A nondiscretionary advisor cannot do that.  Any time

4   the advisor wants to buy a mutual fund or stock or sell a

5   mutual fund or stock, they have to call the client on the

6   phone, explain what they want to do, make sure they have

7   permission from the client, and then they proceed.

    Q.  And who determines if the investment advisor is going to

9   have discretion or it will be a nondiscretionary advisor?

    A.  That's typically an agreement between the client and the

11  advisor.  That's decided beforehand.

12        MS. MOYNE:  Your Honor, this would be a good time to

13  break.

14        THE COURT:  You think it would be a good time to

15  break.

16        We are going to adjourn for the day now.  I'm going to

17  remind you not to talk about the case.  And by that I mean you

18  can tell your family members that you were chosen to sit on a

19  criminal case, but beyond that you can't talk about the case at

20  all.  Again, don't do any research whatsoever.  Don't talk

21  about jury service in any way on social media or otherwise.

22  And just remember to keep an open mind.

23        With that, have a nice evening.  We'll start again

24  promptly at ten, so once again I would urge you to come

25  earlier, closer to 9:30.  Thank you.

E6qbtag6                          Laby - direct

1              (Jury excused)

2              THE COURT:  You may step down.  See you in the

3    morning.

4              (Witness temporarily excused)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6qbtag6                        Laby - direct

1          THE COURT:  Does anyone have any issues they want to

2     raise?

3          All right.  So I'll be here at 9:30 in the morning if

4     you need me, but otherwise we'll start at ten unless the jury

5     is here earlier.  Then we'll start earlier.

6          Mr. Tulman.

7          MR. TULMAN:  The only thing is in the testimony of the

8     expert, there was some concepts that were being testified to,

9     such as the concept of parking.  And I wasn't going to object

10    at this point on relevance because I don't want to highlight

11    it, but I'm mindful of the theory set forth in the indictment.

12         And I just have a concern at this point as to how--

13    what the theories are, additional theories, apart from the

14    theories set forth in the indictment in the case.  I'm not

15    seeking any relief at this point right now, but I'm hearing

16    terms now that I'm-- I had made a motion *in limine* that I was

17    denied because I was concerned about going into areas in terms

18    of securities, market manipulation and the like, and the Court

19    held that to be within the purview.

20         I don't know that parking securities and these things

21    are really something that falls within the indictment.  And I'm

22    not seeking a ruling right now, but I'm just calling it to the

23    Court's attention that in the future I might start objecting,

24    depending upon where this starts going.

25         THE COURT:  Does the government want to be heard?

E6qbtag6                         Laby - direct

1          MR. COWLEY:  Sure, your Honor.  And I can confer with

2     defense counsel about this.  There's evidence that we

3     anticipate will be admitted where the defendant,

4     Mr. Tagliaferri, is having discussions with Jason Galanis

5     regarding parking assets in a particular TAG client account to

6     give the appearance that the account-- or to cover up

7     substantial losses in the account for that month.

8          I can show him the exhibit that I'm referring to and

9     if he wants to be further heard on it, he can.  But that's how

10    we plan on sort of-- why we think that definition was relevant.

11         THE COURT:  And in your view is that consistent with

12    the theories that are outlined in the indictment?

13         MR. COWLEY:  It is, your Honor.  One of the things

14    that we allege in the indictment that was shown to the jury

15    today by Mr. Tulman was deceptive means by which the defendant

16    tries to cover up sort of the true nature of how securities are

17    doing.  And we would say that's part and parcel.

18         This is a communication between him and Mr. Galanis

19    regarding trying to give the false impression to a particular

20    TAG client.  And we're going to hear a lot about how her assets

21    are performing for a particular month in a security that's

22    relating to the Galanises.

23         MR. TULMAN:  The indictment as your Honor described it

24    to the jury and as is stated in the indictment involved three

25    different allegations.  Those allegations were, one, receiving

E6qbtag6                          Laby - direct

1    fees, nondisclosed fees, and investing not in the best interest

2    of his client; two, trading to raise revenue to pay; and,

3    third, this sub notes issue in connection with NDMA.

4            There may have been e-mails and the like, but this is

5    the first that I'm hearing about this new theory about parking

6    securities.  I'm not prepared to really defend that.  I don't

7    have an expert.  I don't have anything in that area that I ever

8    consulted anybody on that.

9            So that's my concern.  I know in the indictment it

10   says "among other things," but then we really may be going into

11   areas which -- I'm not attributing any kind of bad faith at all

12   and I don't mean to suggest otherwise, but we may be going into

13   areas which could operate to just constructively amend the

14   indictment and what we're prepared to meet in this case.

15           MR. COWLEY:  Your Honor, our contention would be that

16   it falls within part two or method two of the scheme which is

17   deceptive inner trading involving accounts.  I mean, I concede

18   it's not the same as from, like, client one or client two, but

19   it's a transaction where he's talking with the Galanises about

20   moving securities into a particular client's account to give

21   the impression that is untrue.

22           I would suggest we'll show him the specific reference

23   of this conversation.  It's as short as, I think, three text

24   message snippets that we're going to introduce.  That's it.

25   That's the extent of our evidence on it.  We think it falls

E6qbtag6                          Laby - direct

1    within the contour of the indictment.  It deals with a victim

2    we're going to hear a lot about, and it deals with

3    communications between Mr. Tagliaferri and Mr. Galanis that

4    we're going to hear a lot about as well.

5            So We'll give him that and be happy to be heard on it

6    further.

7            MR. TULMAN:  It just may well be 404.  Even though it

8    involves the same people, it may be other crimes evidence that,

9    my understanding, was the government had indicated that there

10   was no such evidence.  And I think this may be falling within

11   that category.  We'll leave it at that and --

12           THE COURT:  We can leave it at that.  Just build in

13   some time if you can for us to deal with this.

14           So when do you anticipate this evidence coming in?

15   Aside from the testimony about the definition, and I don't

16   believe that's been harmful at all.

17           MR. COWLEY:  Not tomorrow, certainly.

18           THE COURT:  Okay.

19           MR. COWLEY:  We can push it off a few days if that's

20   something the Court requests.

21           THE COURT:  Well, not necessarily.  You're going to

22   look at the documents.  Why don't you let me know if you have

23   an objection and what it is and we'll just try and deal with it

24   before the witness is on.

25           MR. COWLEY:  And I'll certainly give the Court and

E6qbtag6                          Laby - direct

1    Mr. Tulman a heads up before we're going to seek to admit it so

2    everybody knows that it's coming up.

3              THE COURT:  All right.  Thanks.  Have a nice night.

4              (Trial adjourned to June 27, 2014, at 9:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    SUSAN TEMKIN

 4    Direct By Mr. Cowley . . . . . . . . . . . . 155

 5    Cross By Mr. Tulman  . . . . . . . . . . . . 224

 6    Redirect By Mr. Cowley . . . . . . . . . . . 257

 7    ARTHUR LABY

 8    Direct By Ms. Moyne  . . . . . . . . . . . . 268

 9                         GOVERNMENT EXHIBITS

10    Exhibit No.                             Received

11     3010    . . . . . . . . . . . . . . . . . 154

12     1451    . . . . . . . . . . . . . . . . . 190

13     1451    . . . . . . . . . . . . . . . . . 195

14     1453    . . . . . . . . . . . . . . . . . 197

15     1456    . . . . . . . . . . . . . . . . . 205

16     1471    . . . . . . . . . . . . . . . . . 221

17     1452B   . . . . . . . . . . . . . . . . . 259

18     4000    . . . . . . . . . . . . . . . . . 277

19                         DEFENDANT EXHIBITS

20    Exhibit No.                             Received

21     657   . . . . . . . . . . . . . . . . . . 248

22     671   . . . . . . . . . . . . . . . . . . 252

23     672   . . . . . . . . . . . . . . . . . . 254

24

25
```