L4fnhil1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 Cr. 602 (RA)

5   MICHAEL HILD,

6              Defendant.

7   ------------------------------x

8                                         New York, N.Y.
                                          April 15, 2021
9                                         10:00 a.m.

10
    Before:
11
                        HON. RONNIE ABRAMS,
12
                                          District Judge
13

14                      APPEARANCES

15  AUDREY STRAUSS
         United States Attorney for the
16       Southern District of New York
    JORDAN ESTES
17  SCOTT HARTMAN
         Assistant United States Attorneys
18
    BEN DUSING
19  KATY LAWRENCE
         Attorneys for Defendant
20
    Also present:
21
    Brandon Racz, S.A.,  F.B.I.
22  Adam Basinger, Defense Paralegal

23

24

25

L4fnhil1

|  |  |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  I did want to briefly address an |
| 3 | outstanding issue on Government Exhibit 412.  I agree that the |
| 4 | portion preceding the line the government wanted to admit |
| 5 | should be admitted and will allow the government to do so.  I |
| 6 | do though think it is a little unfair to just cut it off right |
| 7 | after that because it does make it look like that was the end |
| 8 | of the call. |
| 9 | What I am going ask you to do, I am going to let some |
| 10 | more of it in, but I really think it would be more productive |
| 11 | to you could get back together and see, look, if my decision is |
| 12 | I am going to allow in a little bit more context, what context |
| 13 | really makes sense, and I am going ask you to all to have a |
| 14 | little more conversation about it. |
| 15 | All right.  Thank you. |
| 16 | Are there any other issues that we need to raise. |
| 17 | MS. ESTES:  Yes, your Honor. |
| 18 | One issue, it actually relates to the public call-in |
| 19 | line.  We learned yesterday that one of our witnesses, |
| 20 | actually, our next witness was listening to the dial-in |
| 21 | yesterday.  And we also learned this morning when we contacted |
| 22 | our other witnesses to see if they listened and to instruct |
| 23 | them not to listen, we learned this morning that I second |
| 24 | witness had listened to it. |
| 25 | Haden Novikoff has also listened to the dial-in.  We |

L4fnhil1

 1    have instructed him not to do it anymore, but I understand that

 2    defense counsel may have some issues with that.

 3              MR. DUSING:  We do, your Honor.  Those two witnesses,

 4    as I understand it, this issue is in play for, the first is a

 5    Mr. Misiano, who is perhaps the next witness to be called by

 6    the government.  He is with one of the victims here, and the

 7    defense preliminarily does not have an issue with Mr. Misiano

 8    testifying given that the subject matter of his testimony

 9    really doesn't relate to Mr. Stumberger's.

10              Mr. Novikoff, however, is a different story.  We would

11    have an issue with Mr. Novikoff testifying in light of this

12    development.  Full disclosure, we did not formally move for the

13    separation of witnesses.  I felt like we had that

14    understanding, but I want to be clear with the Court that was

15    not formally maid.  Mr. Novikoff reported to Mr. Stumberger.

16    The subject matter of their testimony overlaps directly, and it

17    is hard to imagine that this didn't affect things.

18              THE COURT:  I think this is super unfortunate.  But

19    you're right, you didn't formally move for sequestration, so

20    nothing has been formally violated.  That said, I think it's

21    fair game for cross.  I am not going to preclude the witness

22    from testifying, but I am not going to preclude you from asking

23    questions about it.

24              MR. DUSING:  Fair, your Honor.

25              Could I so move under 615 for separation at this time?

L4fnhil1

1          THE COURT:  Absolutely.  And the government should

2     instruct all of its witnesses that they are not permitted to

3     listen to the call-in number, just like they wouldn't be

4     permitted to come into the courtroom and listen to the

5     testimony.

6          MS. ESTES:  Yes, your Honor.  We did so.

7          THE COURT:  The same is true for defense witnesses to

8     the extent there are any witnesses you intend to call.

9          MR. DUSING:  Very good, your Honor.

10          THE COURT:  Anything else would you like to raise?

11          MS. ESTES:  No, your Honor.  Thank you.

12          THE COURT:  Can we bring the jury in?

13          We can bring the witness in.

14          Now let's turn on the dial-in number.  Do you all have

15     paralegals or agents who can reach out to the other witnesses

16     to make sure no one is calling in?

17          MR. HARTMAN:  Yes, your Honor.  We actually talked to

18     all the counsel for all the witnesses this morning.  That is

19     how we learned about the other witnesses.

20          (Pause)

21          THE COURT:  We are now just testing the public call-in

22     number and we are getting the jurors ready to come in.

23          (Witness resumed)

24     DARREN STUMBERGER, resumed.

25          THE COURT:  Good morning, folks.  You can all be

1    seated.  Thank you all for getting here so promptly this

2    morning.  It is much appreciated.

3            You may proceed whenever you are ready.

4            I am just going remind you that you are still under

5    oath.

6            THE WITNESS:  Thank you, Judge.

7    DIRECT EXAMINATION (Continued)

8    BY MR. HARTMAN:

9    Q.  Mr. Stumberger, when we left off, we were talking about the

10   issues with respect to Scott Skyrm and Wedbush.

11           I want to start today by just talking about what

12   happened after that request.  We heard a call about a request

13   for a broker to value a CUSIP.  Can you tell us what happened

14   with respect to that after the call occurred?

15   A.  Yes.  My recollection is Live Well provided a dealer name

16   to Wedbush.  At that point Wedbush had tried to have a

17   conversation with that dealer.  That conversation didn't go

18   anywhere.  Scott at Wedbush came back to Live Well asking for

19   another dealer.  Live Well provided that dealer to Wedbush.

20           MR. DUSING:  Objection, your Honor.

21           Foundation for what Wedbush did or said.

22           THE COURT:  All right.

23           MR. HARTMAN:  I can ask a clarifying question.

24           THE COURT:  Thank you.

25   BY MR. HARTMAN:

1    Q.  Mr. Stumberger, is your testimony based on the information

2    that Scott at Wedbush provided to your team.

3    A.  Yes.

4    Q.  So you said you learned that Wedbush had gone to the

5    dealer, that the dealer -- what happened with respect to that

6    dealer?

7    A.  I was told Wedbush tried to get information from --

8             MR. DUSING:  Objection, your Honor.  Hearsay.

9             THE COURT:  Yes.  Is it being admitted for the truth?

10            MR. HARTMAN:  No, your Honor, just for the effect on

11   the listener and the team.  That's the only relevance.

12            THE COURT:  I am going overrule the objection.

13            You may answer.

14   A.  What was the question?

15   Q.  Sorry.  What was your understanding of what happened when

16   Wedbush went to this dealer?

17   A.  My recollection was Wedbush went to the dealer and the

18   dealer was either nonresponsive or the conversation didn't go

19   anywhere, leading to Wedbush requesting another dealer from

20   Live Well.

21   Q.  OK.  Did you learn through conversations with Wedbush or

22   conversations that your team had with Wedbush about what

23   happened as a result of that?

24   A.  Yes.  My recollection is that Wedbush had a conversation

25   with the second dealer name we provided, and the CUSIPs or the

L4fnhil1                    Stumberger - Direct

1    bonds that Wedbush was asking about were in fact not the HECM

2    IOs.  They were CUSIPs from another sector.

3    Q.  OK.  Now, Mr. Stumberger, I want to move on to a call that

4    took place the day after the call that we listened to the end

5    of yesterday.

6              MR. HARTMAN:  Ms. Troy could you please put up for the

7    parties Government Exhibit 401-4T.

8              THE COURT:  OK.  The government offers Government

9    Exhibit 401-4T and the corresponding recording.

10             MR. DUSING:  No objection, your Honor.

11             THE COURT:  It will be admitted.

12             Thank you.

13             (Government Exhibit 401-4T received in evidence)

14             MR. HARTMAN:  Ms. Troy, could you publish for jury --

15   we are in January of 2017.  This is January 13, 2017.  Is this

16   the call we looked at, at the end of yesterday?

17   A.  Yes.

18             MR. HARTMAN:  Ms. Troy, could I ask you to move

19   forward to line 220.

20             OK.  If we could play the recording beginning at line

21   220.

22             (Audio played)

23             MR. HARTMAN:  Ms. Troy, could you stop right there.

24   BY MR. HARTMAN:

25   Q.  Mr. Stumberger, Mr. Hild refers to a problem.  What did you

L4fnhil1                          Stumberger - Direct

1  understand the problem to be that he's referring to there?

2  This is on line 233.  He says, "I don't know how to solve this

3  problem without, without doing some form of securitization."

4  A.  It's my understanding the problem generally is the bonds

5  are marked above market with the repo lenders.  And now this

6  was the day before you had one of the repo lenders asking

7  basically to validate the prices.

8  Q.  Why was that a problem?

9  A.  It was a problem because the lenders were

10  under-collateralized.

11         JUROR:  OK.  Ms. Troy, you can go ahead and play.

12         (Audio played)

13         MR. HARTMAN:  Ms. Troy, can you stop right there.

14  BY MR. HARTMAN:

15  Q.  Mr. Stumberger, when you say at the end of that portion we

16  just listened to, "If you find another bank with a 3 percent

17  haircut that would be able to take in big parts of the

18  portfolio, the 3 percent haircut, because the drop in haircut

19  could offset the market price moves," what were you envisioning

20  there?

21  A.  Being able to move the portfolio from an existing repo

22  lender at a specified haircut of 10, 20, 25 percent to another

23  lender at 3 percent.  That would allow for the prices, you

24  could normalize in some magnitude the prices because of the

25  lower haircut.

L4fnhil1                    Stumberger - Direct

1    Q.  OK.  And is the idea that because of the smaller haircut
2    Live Well wouldn't have to put in as much cash?
3    A.  Yes.  Also that the prices could be normalized.
4    Q.  OK.  And when you say normalized, what do you mean by that?
5    A.  Just brought back into market context.
6            MR. HARTMAN:  Ms. Troy, you can go ahead and play.
7            (Audio played)
8            MR. HARTMAN:  You can stop right there.
9    BY MR. HARTMAN:
10   Q.  Mr. Stumberger, when Mr. Rohr said, "Well, then you have
11   regulators asking you, well, how do you know you can, you can
12   carry it at this," did you understand what he meant by that?
13   A.  My understanding is that that would be in the context of
14   buying a bank and having the portfolio financed by that bank,
15   there would be regulators asking questions about the valuation
16   and why.
17           MR. HARTMAN:  OK.  And then let's just play the last
18   part.
19           (Audio played)
20   BY MR. HARTMAN:
21   Q.  OK.  Mr. Stumberger, you say in response to Mr. Rohr, well,
22   at least the prices would be right, and then it's just a
23   haircut thing.
24           What are you referring to there?
25   A.  What I'm saying is, in this example of moving to a low

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    haircut, 3 percent, for example, that would allow for the

2    prices I say to be right, which I mean market context.

3              MR. HARTMAN:  OK.  Ms. Troy, you can take that down.

4              Mr. Stumberger, after this incident with Wedbush in

5    January of 2017, was there a change in the lending relationship

6    between Live Well and Wedbush?

7    A.  Yes.

8    Q.  OK.  And what happened?

9    A.  My recollection was immediately thereafter this set of

10   discussions, Wedbush requested that Live Well remove certain of

11   its bonds from its line.

12   Q.  OK.  And then were there further discussions about whether

13   Live Well could continue to finance through Wedbush?

14   A.  Yes.

15   Q.  Do you know about these discussions because of your

16   participation in these events and your conversation with your

17   team and Mr. Hild?

18   A.  Yes.

19   Q.  Did you discuss with Mr. Hild these changes with respect to

20   Wedbush?

21   A.  Yes.

22   Q.  OK.  So you said initially Wedbush asked Live Well to

23   remove certain bonds from the line.  Just to be clear, so we

24   are all following, what does that mean, remover the bonds from

25   the line?

1  A.  What that means is Wedbush requested that some of the bonds

2  they were financing they didn't want to finance anymore.

3  Q.  OK.  And what did that mean for Live Well in terms of its

4  cash position from your understanding?

5  A.  My recollection and understanding is that Live Well needed

6  to move those bonds to another lender, and the only lender at

7  that time available was one of another dealer, and that, that

8  created a situation where Live Well had to come up with a lot

9  of cash to supplement that move.

10 Q.  Which dealer are you referring to?

11         MR. DUSING:  Objection, your Honor, foundation for the

12 availability of the dealers.

13         MR. HARTMAN:  Well --

14         THE COURT:  Can you rephrase.

15         MR. HARTMAN:  I can address that.

16 BY MR. HARTMAN:

17 Q.  Mr. Stumberger, were you part of discussions about how to

18 deal with the fact that Wedbush was requesting that these bonds

19 be moved to a different line --

20 A.  Yes.

21 Q.  -- or off their line?

22         Were you part of discussions about what other dealers

23 or what other financiers were available for these bonds?

24 A.  Yes.

25 Q.  Was Mr. Hild part of those discussions?

1   A.  Yes.

2   Q.  So, in the context of those discussions, did you learn or

3   did you develop an understanding about where else Live Well

4   might have been able to finance these bonds?

5   A.  Yes.

6   Q.  OK.  You referred to another dealer.  Who are you referring

7   to there?  What entity?

8   A.  Nomura.

9   Q.  OK.  We heard testimony earlier about this, but just to

10  remind us, did Nomura accept IDC pricing for its lending

11  limits?

12  A.  No.

13  Q.  How did Nomura determine how much to lend against these

14  bonds?

15  A.  They determined it themselves.  They had a trading desk

16  that was very active in the sector.

17  Q.  And for a given bond, how did the amount that Nomura would

18  be willing to lend to Live Well compare to the amount that the

19  lenders who relied on IDC would be willing to lend at this

20  time?

21  A.  Apples to apples, lower.

22  Q.  And why is that?

23  A.  Because Nomura marked bonds or lent against bonds based on

24  the market.

25          MR. DUSING:  Objection, your Honor, to foundation for

1   Nomura's knowledge as well as his understanding of the market.

2          THE COURT:  Why don't you ask a few more questions.

3          MR. HARTMAN:  Sure.

4   BY MR. HARTMAN:

5   Q.  So, did you have an understanding about why it would be

6   that Nomura would finance the bonds at a lower rate?  Did you

7   have conversations with Nomura about how they looked at the

8   bonds?

9   A.  Yes.

10  Q.  OK.  And based on those conversations, what was your

11  understanding about why Nomura's valuations for these bonds

12  were lower than IDC's valuations?

13  A.  My understanding is they marked bonds where they were

14  trading the bonds in the context of the market.

15  Q.  OK.  You made a distinction, you mentioned that Nomura is a

16  dealer, and we talked a little bit about this distinction

17  earlier.  What does that mean that they were a dealer?

18  A.  They were a securities dealer broker/dealer, registered

19  broker/dealer, large investment bank at -- active in many

20  different sectors within fixed income, and they had a major

21  presence in this specific sector, reverse mortgage trading.

22  Q.  OK.  So were they more like Jeffries than the other repo

23  lenders that we've talked about so far?

24  A.  Yes.

25  Q.  And we talked about Jeffries yesterday.  Were they also

1  active in this space?

2  A.  Yes.

3  Q.  Did you share with Mr. Hild the fact or did you and your

4  team share with Mr. Hild the fact that Nomura would not lend

5  against these bonds using the Scenario 14 prices?

6  A.  Yes.

7  Q.  OK.  Now, you said that the disappearance of the Wedbush

8  line would cause a problem for Live Well.

9       Can you just tell us, give us that again.  How did

10  that affect things?

11  A.  Sure.  So, moving the bonds from Wedbush to Nomura in this

12  example created a cash need for Live Well, and what I mean by

13  that is moving -- so the valuations being lent against at

14  Wedbush would be very different at Nomura.  So the valuations

15  being lent against would drop, and I forget exactly at the time

16  the difference in haircut -- I don't -- I'm not going to opine

17  on that without seeing it, but the valuation drop caused the

18  need for Live Well to come up with a meaningful amount of cash

19  to pay off the loan at Wedbush.

20  Q.  OK.  So is that because Nomura would not lend enough to pay

21  off the loan at Wedbush?

22  A.  Yes.

23  Q.  Now you talked about the fact that initially Wedbush asked

24  Live Well to remove specific bonds from the line.  At some

25  point did Wedbush notify Live Well that it was going to end the

L4fnhil1                          Stumberger - Direct

1    lending relationship entirely?

2    A.  Yes.

3    Q.  OK.  And what would be the consequences of that based on

4    your conversations with Mr. Hild and others in terms of the

5    cash requirements for Live Well?

6    A.  My recollection was the amount of cash or money needed was

7    very large in magnitude.

8    Q.  OK.  And did Mr. Hild express a view about this problem?

9    A.  Yes.  My recollection was it was he was very upset.

10   Q.  OK.  What was the tenor of your conversations with him and

11   others about this problem?

12   A.  My recollection was during this period of time it was we

13   were in scramble mode.  It was very tense and trying to move

14   quickly to figure out how to move the bonds from the, you know,

15   Wedbush to the other line.

16   Q.  Why not just sell the bonds and use the cash to pay off

17   Wedbush?

18   A.  It wasn't discussed.  The prices obtained by selling the

19   securities wouldn't have been enough to pay off the loan.

20   Q.  Now, in addition to the issues with respect to Wedbush, was

21   Live Well facing other liquidity problems or cash problems in

22   early 2017 based on your conversations with Mr. Hild and

23   others?

24          MR. DUSING:  Objection, your Honor, foundation for

25   what Live Well knew.  The witness can speak to his personal

1   understanding.

2          THE COURT:  Can you lay that foundation please.

3          MR. HARTMAN:  Sure.

4   BY MS. ESTES:

5   Q.  Mr. Stumberger, did you have conversations during this time

6   period with Mr. Hild, Mr. Rohr, and others at the company about

7   other liquidity concerns or cash concerns that Live Well was

8   facing in early 2017?

9   A.  Yes.

10  Q.  OK.  And can you tell us what some of those were based on

11  your conversations?

12  A.  Yes.  So during this time immediately after the situation

13  with Wedbush, my recollection was another repo lender requested

14  the bonds to be removed.

15  Q.  Do you remember which one that was?

16  A.  Mizuho.

17  Q.  OK.

18  A.  After that there was a margin call from Nomura sent to Live

19  Well, and there was another issue with one of the bonds being

20  sold and taking a loss, but that -- that's different.

21  Q.  OK.  Now, what was the solution to these cash needs on the

22  part of the company?  Did you discuss with Mr. Hild what the

23  solution would be?

24  A.  I was a part of those discussions.

25  Q.  OK.  Did he propose a solution?

L4fnhil1                    Stumberger - Direct

1    A.  Yes.

2    Q.  What was the solution that he proposed?

3    A.  The initial solution was to submit marks to IDC in early --

4    late January, early February to raise cash -- potentially to

5    raise cash, to extract cash from the lenders to use to

6    supplement the move between the lines.

7    Q.  Was that the only time in early 2017 that Live Well

8    increased marks at IDC?

9    A.  No.

10   Q.  When else did Live Well increase marks at IDC?

11   A.  My recollection was there was a mark submission in

12   mid-March and another submission at the end of March.

13   Q.  And from your understanding and your conversations with

14   Mr. Hild and others, what was the reason for these submissions?

15   A.  The reason for the submissions in my understanding was to

16   generate cash for these liquidity needs.

17   Q.  Were there any market events to your knowledge or

18   understanding that dictated these increases in price in the

19   February and March 2017 time period?

20   A.  I don't recall there being any kind of market or

21   macroeconomic events in early 2017.

22   Q.  OK.  And at that time, before the mark submission, was

23   there any discussion of macroeconomic events that would justify

24   these price increases by Mr. Hild?

25             MR. DUSING:  Objection, your Honor, in his opinion.

1    The objection would be foundation.

2              MR. HARTMAN:  I was just asking whether he had

3    discussions of these issues with Mr. Hild.

4              THE COURT:  I will allow that question.  You can

5    answer that.

6    A.  Related to macroeconomic events in --

7    Q.  To support the price increases in February and March.

8    A.  My recollection was there weren't discussions related to

9    market events in January or February.  That's just my

10   recollection.  There were discussions towards the end of March

11   is what I remember.

12   Q.  OK.  Was that after these price increases had occurred?

13   A.  My recollection was, yes, there were other discussions

14   related to some other things, but, yes.

15   Q.  OK.  We'll come back to that at some point.

16             Now, you spoke about the initial set of price

17   increases, and I think you said it was in early February of

18   2017, is that right?

19   A.  Yes.

20   Q.  Was there a set of assumptions that was used to support

21   those February price increases?

22   A.  Yes.

23   Q.  And did that have a name?

24   A.  My recollection was it was a scenario, Scenario 4 from a

25   prior set of analytics.

1  Q.  What was the effect of the implementation of Scenario 4 on

2  the IDC indicated value of the bond portfolio?

3  A.  The effect was a very large increase in valuation.

4  Q.  Do you remember about how much it was?

5  A.  My recollection was on the order of 20 million.

6  Q.  OK.

7  A.  Maybe higher.

8          MR. HARTMAN:  OK.  Let's look at a call that relates

9  to this.

10          Ms. Troy, could we please show for the parties and for

11  the Court what's been marked for identification as Government

12  Exhibit 409T.

13          The government offers Government Exhibit 409T as well

14  as Government Exhibits 409-1 and 409-2?

15          MR. DUSING:  No objection, your Honor.

16          THE COURT:  All right.  They will be admitted.

17          Thank you.

18          (Government Exhibits 409-1, 409-2 and 409T received in

19  evidence)

20          MR. HARTMAN:  Ms. Troy, could we show that for the

21  jury.

22  BY MR. HARTMAN:

23  Q.  Mr. Stumberger, this is a call from February 3, 2017, is

24  that right?

25  A.  Yes.

L4fnhil1                    Stumberger - Direct

1   Q.  Is this around the time of the Scenario 4 price submission

2   that you described?

3   A.  Yes.

4       MR. HARTMAN:  Ms. Troy, can we move forward to line

5   157, please.

6       OK.  And let's play the call, beginning at line 157.

7       (Audio played)

8       MR. HARTMAN:  OK.  Ms. Troy.  Thank you.

9   BY MR. HARTMAN:

10  Q.  Mr. Stumberger, on line 165, Mr. Hild talks about -- well,

11  actually a little earlier he talks with making a gradual move

12  where he says, making a move towards Scenario 4 gradually here

13  toward the first half of the month.  Did you have an

14  understanding of what he meant by making a move gradually?

15  A.  Yes.

16  Q.  What was your understanding of that?

17  A.  My understanding is Scenario 4, the outcome of Scenario 4

18  led to a large valuation increase and that led to submissions

19  to IDC.  And this was similar to what I said prior.  It would

20  be a series of submissions or a gradual increase in the

21  valuations to get to the full amount.

22  Q.  OK.  And he says he wants to do it in preparation for, you

23  know, all this stuff.  Do you have an understanding of what

24  he's referring to when he says "all this stuff"?  He also talks

25  about "bad things."  Do you know what that is?

1   A.  My understanding of all this stuff is there were different

2   dates in which bonds had to be removed from Wedbush and sent to

3   the other lender.  It wasn't all in one day.  It was staggered

4   over the month, over the next few months.  So that's -- that's

5   my understanding of this stuff.

6           Bad things, my understanding is what was happening in

7   lenders calling up and requesting bonds to be removed off the

8   line.

9   Q.  He says, "The train's run off the tracks here with

10  Wedbush."

11          What did you understand him to be talking about there?

12  A.  My understanding is exactly that, getting a call from

13  Wedbush requesting the bonds be removed.

14  Q.  On line 172 he says, "It doesn't mean we can't claw that

15  back and reduce it if we don't need it, you know."

16          What did you understand him to mean when he said, "We

17  could claw that back and reduce it if we don't need it"?

18  A.  My understanding is the submission or the ultimate -- the

19  total amount of Scenario 4, the valuation increase was large in

20  magnitude.  My understanding of what he means by here is if it

21  was ultimately -- that was a large increase to extract cash via

22  margin call to use to supplement these moves.  If some of these

23  moves didn't come to fruition for whatever reason, then the

24  price increase via Scenario 4 could be reversed or prices

25  lowered and reduced back if it's not needed.

1    Q.  OK.  Mr. Stumberger, you testified yesterday about your

2    experience at other institutions marketing bonds and coming up

3    with bond prices.

4            In that experience, had you ever considered whether or

5    not you would need liquidity at that institution in determining

6    what price to assign a bond?

7    A.  No.

8    Q.  OK.  Based on your experience, are there any circumstances

9    in which you would submit a price increase or increase the

10   price of a bond with the expectation that you might back that

11   price increase out if you didn't need it?

12   A.  I don't recall ever doing that.

13   Q.  OK.  The last portion of this excerpt that we listened to

14   talks about setting off alarm bells.  What did you understand

15   Mr. Hild to be talking about there?

16   A.  My understanding is the conversation here is about being

17   preemptive or being -- getting this done ahead of time, and the

18   rationale was that last sentence, you know, that's the

19   thinking, because a drastic move or, you know, one -- onetime

20   submission to IDC with the magnitude of the valuation increase

21   may have set off red flags, alarm bells, and triggered, you

22   know, scrutiny.

23           MR. HARTMAN:  OK.  Ms. Troy, why don't we go forward

24   to line 379 in this transcript.

25           Ms. Troy, can you play starting at line 379.

1        (Audio played)

2    BY MR. HARTMAN:

3    Q.   OK, Mr. Stumberger, at the end of that conversation,

4    Mr. Hild is asked about IDC, and you say, "I think the only

5    color we have is the maximum can be a point without them asking

6    a ton of questions."

7        What are you referring to there?

8    A.   What that means is, in the context of a price submission to

9    IDC, the only time IDC questioned, challenged the submission

10   was a submission where bonds were delivered over a point higher

11   in price?

12   Q.   Did you know that based on your experience in submitting

13   marks to IDC?

14   A.   Yes.

15   Q.   And then you say, at the end you say again, just the other

16   two lines, doesn't matter to do anything on the Wedbush line.

17   What are you talking about there?

18   A.   My understanding of what I said there is it would make

19   sense, in the context of generating cash for this liquidity

20   need, it would make sense for the price submissions to be

21   directed to bonds on other repo lines, not Wedbush, because

22   those bonds were coming off.

23        MR. HARTMAN:  Ms. Troy, you can take that down.

24   BY MR. HARTMAN:

25   Q.   Mr. Stumberger, ultimately were these Scenario 4 prices

L4fnhill1                    Stumberger - Direct

1    fully implemented?

2    A.  My recollection is yes.

3    Q.  OK.  And did Live Well borrow money as a result of

4    implementing the Scenario 4 prices to your understanding?

5    A.  My understanding is yes.

6    Q.  OK.  You mentioned there were also some price increases in

7    March.  Do you remember about how much they were?

8    A.  My recollection was mid-March was on the order of 2.5

9    million.  And the increase that occurred at the end of March,

10   my recollection or memory was about 20 million.

11          MR. HARTMAN:  Ms. Troy, could you please put up for

12   the parties and for counsel and the Court what's been marked

13   for identification as Government Exhibit 201.

14          The government offers government Exhibit 201.

15          MR. DUSING:  No objection.

16          THE COURT:  It will be admitted.

17          (Government Exhibit 201 received in evidence)

18          MR. HARTMAN:  Ms. troy, could you display that for the

19   jury.

20   BY MR. HARTMAN:

21   Q.  Mr. Stumberger, this is an e-mail from March 30, 2017.

22   It's from Mr. Foster to Mr. Hild and it cc's Mr. Rohr, who

23   you've testified is the CFO, and yourself.  And the subject

24   line is March ME materials.

25          What does ME mean?

1    A.   Month end.

2    Q.   All right.  And so this is happening at the end of March

3    2017.  Is this after the price submissions you have just

4    described?

5    A.   Yes.

6            MR. HARTMAN:  Can we see the attachment, please,

7    Ms. Troy.  If we could zoom in on just the blue box at the top

8    and -- yeah, that's fine.  That's great.

9    BY MR. HARTMAN:

10   Q.   OK.  Mr. Stumberger, I think we looked at one of these

11   yesterday, but can you just remind us what this format is.  Was

12   this a format that you saw and used regularly in the course of

13   your work at Live Well?

14   A.   Yes.

15   Q.   And just remind us the context for this month-end sheet.

16   What was it and how was it used at Live Well?

17   A.   Sure.  So it was generally customary to mark bonds once a

18   month at the end of the month, and this is a set of analytics

19   to discuss the bond valuations to be submitted.

20   Q.   OK.  Were these submitted -- similar types of sheets

21   submitted at the end of every month at Live Well?

22   A.   Yeah.  These types of sheets were generated and discussed

23   every month.

24   Q.   Who typically were these month-end sheets circulated to?

25   A.   These sheets were circulated to the team, so Dan, Ernie,

1    myself, Eric and Michael.

2    Q.  OK.  And then the scenarios that are outlined on the

3    left-hand side, just remind us as a general matter, how were

4    those used as part of these month-end discussions?

5    A.  Different scenarios were laid out and each scenario

6    contained a different set of assumptions and inputs for the

7    valuation scenario.

8    Q.  OK.  And then ultimately remind us who would choose which

9    scenario would be sent to IDC?

10   A.  Ultimately it was Michael sometimes Eric.

11   Q.  OK.  And column H, I think we looked this yesterday as

12   well, what's being shown in column H for each of these

13   scenarios?

14   A.  Column H is -- I will read it, net day-over-day realistic

15   margin call impact.  And what that means is, based on the

16   valuation generated by the scenarios, that would be the impact

17   in the context of potential margin calls.

18   Q.  So is the idea if you loaded that Scenario 14 to IDC, this

19   would be the nature of the margin call or the amount of margin

20   call?

21   A.  Correct.

22   Q.  If that is a negative number, what does that mean in terms

23   of the margin call?

24   A.  Negative means Live Well owes cash or money.

25   Q.  Scenarios 4 and 5 here are labeled alternate 1 and

1    alternate 2.  Do you remember, based on your conversations and

2    participation in these discussions, what alternate 1 and

3    alternate 2 were designed to show?

4    A.  Yes.

5    Q.  What were they showing?

6    A.  My recollection was those were two sets of scenarios or

7    inputs, set of inputs that were market contextual.

8    Q.  What do you mean by market contextual?

9    A.  Generic market inputs for prepayment speed and just rates

10   and yield.

11   Q.  And who decided to include alternate 1 and alternate 2 on

12   this sheet?

13   A.  My recollection was me.

14   Q.  Why did you do that?

15   A.  My recollection was I wanted there to be visible,

16   observable numbers in valuations based on the context of the

17   market versus where Live Well was at at the time in terms of

18   going through these events in the mark submissions and the

19   deviation from market contextual prices.

20   Q.  OK.  In column H, for alternate 1 the value there is

21   negative 143,811,849.

22            What does that mean?

23   A.  That means if that scenario, Scenario 4, the valuation

24   based on that scenario's inputs and assumptions were submitted

25   to IDC it would lead to a 143 million and change margin call to

L4fnhil1                    Stumberger – Direct

1   Live Well.

2   Q.  For the one below there, the negative 110 million number,

3   is it the same?

4   A.  Yes.  That's my understanding.

5        MR. HARTMAN:  Ms. Troy, you can take that down.

6   BY MR. HARTMAN:

7   Q.  Mr. Stumberger, at some point did you learn that Live Well

8   was under investigation by the Securities and Exchange

9   Commission?

10  A.  Yes.

11  Q.  What is the Securities and Exchange Commission?

12  A.  The SEC is the primary regulator of the securities

13  industry.

14       MR. DUSING:  Objection, your Honor.

15       THE COURT:  And the basis of the objection?  It's just

16  the definition?

17       MR. DUSING:  403 type of objection and foundation

18  before we get into this too much.

19       THE COURT:  I will allow it.  Overruled.

20       MR. HARTMAN:  There's only a couple of questions on

21  this, Judge.

22  BY MR. HARTMAN:

23  Q.  Mr. Stumberger, when did you learn that Live Well was under

24  investigation by the SEC?

25  A.  July 2017.

1  BY MR. HARTMAN:

2  Q.  What was your reaction to learning that?

3  A.  Very concerned.  Troubled.  Stressed.

4  Q.  Did Mr. Hild give you any direction -- actually do you know

5  when Mr. Hild learned about the SEC investigation or did you

6  have conversations with him about the SEC investigation?

7  A.  It was at the same time.  I don't know the a specific date

8  but the same time period.

9  Q.  Is that based on conversations that you had with him?

10  A.  Yes.

11  Q.  Did Mr. Hild give you any direction about what to do with

12  the bond prices after learning about the SEC investigation?

13  A.  Yes.

14  Q.  What did he tell you to do?

15  A.  My recollection was do nothing, keep the price as is.  And

16  I asked specifically:  Is this the time to start the

17  normalization process?  And the answer was no.

18  Q.  Did he ask you --

19        MR. DUSING:  Objection, your Honor, I'm very sorry,

20  could we have a sidebar.

21        THE COURT:  Sure.

22        If you want to stand and stretch while we have

23  sidebars, you're welcome to.

24        (Continued on next page)

25

1              (At sidebar)

2              MR. DUSING:  Your Honor, I want to alert the Court to

3     this issue.  This is where the issues come in with Mr. Hild,

4     the corporation, Mr. Rohr, who I expect we'll hear from, and

5     Mr. Stumberger had an oral ABA -- that was what was represented

6     to me -- who was engaged right at this time to deal initially

7     the SEC investigation.

8              So this kind of ties back to the conversation at the

9     pretrial conference.  And my concern is if we go down this

10    path, this is how it's relevant in that I have to call them to

11    talk about the advice of counsel that was given precisely on

12    this issue, which was to hold the prices the same.

13             So I want to make sure the Court aware of that tricky

14    issue and if you want to go down that path.

15             THE COURT:  Tell me where you're going.

16             MR. HARTMAN:  Judge, my understanding is there are

17    discussions without counsel, and what he is relating is he had

18    conversations where counsel present for.  And I was going to

19    ask this one question, and the next question was:  Did Mr. Hild

20    direct you to do anything else?  And he will say:  He directed

21    me to try and justify the prices that were in IDC.  That's the

22    only other question.

23             MR. DUSING:  If he asks that question, then the

24    defense position is I have to call to testify that the legal

25    advice given was to hold the prices the same and that advice

1    was taken.  So I think the impression being given, the

2    direction was from Mr. Hild to Mr. Stumberger to hold the

3    prices the same.  That decision was a legal counsel driven

4    decision.

5              MR. HARTMAN:  Could I respond to that, Judge?

6              THE COURT:  Yes.

7              MR. HARTMAN:  Because I don't -- and I want the record

8    to be clear, we have no issue with Mr. Dusing calling the

9    McGonigle firm, by but doing that waives the privilege.  So if

10   he wants to do that that and waive the privilege, we have no

11   problem with that, but my understanding is he is repeatedly

12   saying he doesn't waive the privilege.  So I don't want there

13   later to be an argument that the Court introduced testimony or

14   suggested that he wasn't allowed to use an advice of counsel

15   defense here.

16             THE COURT:  Give me the advice of counsel that he can

17   choose to waive versus the company, and are there other people

18   who would need to make that decision about waiver?

19             MR. HARTMAN:  I think there are people who would need

20   to make that decision.  We haven't had a conversation with them

21   about whether or not they would do that because -- and I looked

22   back at the transcript at the final pretrial conference because

23   I wanted to be sure that I was right about this, my

24   understanding is Mr. Hild doesn't want to waive.  If he wants

25   to waive, we could have a conversation about it, but the

L4FTHIL2                        Stumberger - Direct

1    company indicated they would consider waiving if that's

2    something -- if that was something that it was necessary.  And

3    we conveyed to this to Mr. Dusing.

4            So this relates to the Ben English issue that came up

5    at the final pretrial conference and also this issue.  Again, I

6    think we would want to be sure that Mr. Hild -- my

7    understanding with respect to Mr. English, the defense counsel

8    does not want to pursue that line of questioning about whether

9    Mr. English had concerns about the bond portfolio anymore.  So

10   it's kind of moot with respect to Mr. English.  That's what we

11   were told after we indicated that counsel might waive.

12           But with respect to this issue, if Mr. Hild wants to

13   waive with respect to the McGonigle firm, we're fine with that.

14   We would have conversations with the trustee about what their

15   position would be with and with Mr. Rohr about what his

16   position would be.  We haven't talked to Mr. Rohr at all about

17   his communications with McGonigle precisely because we

18   understood Mr. Hild had a personal relationship with counsel

19   that he was not going to waive.  If he wants to waive, we'll do

20   that.  I think we could clear the other issues.  It's really an

21   issue of his own privilege that I understand is not being

22   waived.

23           MR. DUSING:  So I don't think any of this implicates

24   privilege at all.  I think we're complicating this.  I do not

25   intend to solicit testimony about legal advice requested or

1    communications involved with the legal advice requested or

2    given.  Based on the pretrial conference, I understand there's

3    some sensitivity to the McGonigle firm testifying.  I would

4    like to avoid that in this testimony, but I'm not -- there's no

5    issue -- if we could down this path and the testimony from this

6    witness is going to be Mr. Hild directed me to keep the prices

7    constant, I will have to call the McGonigle firm to testify

8    that we gave legal advice to the firm who we represented, to

9    Mr. Hild who we represented, and frankly to Mr. Rohr, who they

10   represented at that time.  I don't have to -- there's some

11   issues about the representations.  I don't want to go down that

12   rabbit hole.  If we go down that rabbit hole, I want to do it

13   eyes wide open because we're doing it right now.

14           THE COURT:  Is there a way to avoid this?

15           MR. HARTMAN:  I could move on from this.  He's

16   answered the question already, so if you want to strike -- let

17   me talk to when Ms. Estes about that.

18           THE COURT:  I want to make sure we're all thinking

19   through the implications of this at every stage.

20           MR. HARTMAN:  I understand.

21           THE COURT:  So why don't you do that and let me know.

22   I'm happy to wait here.

23           MR. HARTMAN:  Counsel is saying that if we elicit this

24   testimony and he wants to call Tom McGonigle, I don't have a

25   problem with that.  I want to be clear on that.  I don't hear

1    Mr. Dusing to say he's willing to waive the privilege.  Our

2    issue has always been you can't have it both ways.  If you want

3    to say counsel told you to do this, that's absolutely fine, and

4    it's a valid legal defense.  I really want the record to be

5    clear on that.

6           THE COURT:  I understand.  That's different just from

7    my experience with the *Tagliaferri* case, so I get that, but I

8    do think it gets more complicated when the decision is not just

9    Mr. Hild's.  The question is if we need to take a break and

10   call people, how is that going to work.  I want to -- I'm not

11   making a decision without hearing you both out completely.  If

12   you want to think about it and talk about it, come back and let

13   me know.

14          MR. HARTMAN:  Let me talk to her, because if everyone

15   is on the same page that if we don't get into this with him

16   then the McGonigle issue is moot, we could strike this answer

17   and move on.

18          MR. DUSING:  To be clear, my way of avoiding all of

19   this would be if we could strike the last portion of the

20   testimony about the price guidance after the SEC investigation.

21   I simply want to call or stipulate to the four things that I

22   mentioned at the pretrial conference, because it is highly

23   relevant that counsel was involved, we now introduced the SEC

24   investigation and the fact that the company, Mr. Hild,

25   Mr. Rohr, were all represented, much less by the same counsel,

1   from that point until 2019 is relevant to issues in this case.

2              THE COURT:  I think that what you suggested would be

3   really misleading.  And again, if the company is willing to

4   waive the privilege and therefore there could be cross about

5   what were you told, but I think it would be really misleading

6   to leave the suggestion counsel was there for the entirety of

7   the time looking at the relevant issue, which suggests that

8   they gave their blessing without knowing what information they

9   were provided, and I think that would be misleading to the

10  jury.

11             MR. DUSING:  Understood, your Honor.  So it would then

12  require a waiver to that particular subject matter to put that

13  testimony on.

14             THE COURT:  I think that's right.

15             MR. HARTMAN:  I think that's right.  Again, if

16  Mr. Hild wants to do that, we don't have a problem.  I know I

17  keep saying that.

18             It may be that we would have additional questions we

19  would want to ask Mr. Stumberger or Mr. Rohr if that happened,

20  but I just want to be real clear, we don't have a problem with

21  that.  It would be helpful, and if Mr. Dusing wants to talk to

22  his client about this, it would be helpful to know -- if he

23  wants to do that it would be helpful to know about it now

24  because we would like to ask Mr. Stumberger about that if he

25  would like to waive.

1              MR. DUSING:  The issue just came up, but recognizing

2    the validity of the point, and the Court's point is it may not

3    be solely Mr. Hild's or the company's to waive, it may be other

4    people, and I would like to think through the implications of

5    that.

6              To be clear, Mr. Stumberger was not represented, but

7    the others were.  So I think preliminarily to discussions by

8    the client, the client personally would be willing to waive

9    privilege to that issue, but I don't think he could speak for

10   the company, certainly at this time.  Certainly can't speak for

11   Mr. Rohr.  We have a lot of issues.

12             THE COURT:  Are you comfortable -- what I'm hearing is

13   a limited waiver.  Are you comfortable with a limited waiver?

14             MR. HARTMAN:  I think what we want is a subject

15   matter, the problem -- this is how it's different than a

16   traditional -- I know this is a long sidebar, but this is

17   different from a traditional presence of counsel.  Counsel was

18   engaged on this specific issue.  So I don't see how a subject

19   matter waiver on the issue of the pricing -- it certainly -- we

20   wouldn't want to or expect to be and able to get into questions

21   about strategy of defense or what happened earlier, but I think

22   we would want to understand and ask counsel about what they

23   were told about how the prices were derived and the history of

24   how they got there.  So I think it would be more like a what

25   facts were conveyed to counsel waiver as opposed to what

L4FTHIL2                        Stumberger - Direct

1    conversations took place around strategy.

2            To the Court's point earlier, we can avoid this issue.

3            THE COURT:  If you're comfortable doing that,

4    obviously it makes it a lot easier, but I'm not ordering you to

5    do so without your consent, at least at this point.

6            MR. HARTMAN:  Mr. Rohr is going to testify later in

7    the trial.  And it may be that we wouldn't need to call

8    Mr. Stumberger to address these issues, we could elicit the

9    relevant information from Mr. Rohr.  Again, we haven't talked

10   to him about this at all, but I think that we really need to

11   know one way or the other whether Mr. Hild wants to waive.

12           THE COURT:  Because you have to recall people.

13           MR. HARTMAN:  Right.  Once we know that we could start

14   the conversation with the other parties.  And I think we could

15   do that quickly, but we need to know soon.  This was teed up in

16   the motions in limine and this is the first I'm hearing that

17   Mr. Hild may want to waive, but if we can set a date for that

18   so we know that, we could have those conversations.

19           MR. DUSING:  And I didn't know to what extent we were

20   going to get into this, but my decision on that with counsel

21   with Mr. Hild would turn on whether or not the government is

22   willing to strike the last portion of his testimony and whether

23   or not there's going to be any further testimony about

24   everything that sort of transpired thereafter, because in that

25   event, the entire issue is gone.  That would make things --

1        MR. HARTMAN:  What I suggest, if this is okay, we

2    could strike the question and answer about the direction that

3    he got from Mr. Hild and I can ask him what happened after the

4    SEC subpoena with respect to prices and he could say they were

5    kept constant.

6        MR. DUSING:  No objection to that, your Honor.

7        THE COURT:  Why don't we do that, and over the break,

8    over the lunch break, you all have to figure out the next steps

9    on this issue.  Then give me as much notice as you can so I can

10   look through and look at the law.  If there's anything

11   specifically on point, for example as to limited waiver, I need

12   to look more closely, and it will give me the time to do that.

13       MR. DUSING:  Sorry about interrupting your Honor.  If

14   you do that, we may moot the issue.

15       MR. HARTMAN:  Great.  Let me confer with Ms. Estes.

16       THE COURT:  I will wait here.

17       MR. HARTMAN:  Let me check with her.

18       (Pause)

19       MR. HARTMAN:  Okay, that's fine.  Can we get the read

20   back on what the question was?

21       (Pause)

22       MR. HARTMAN:  So the two questions I asked that I

23   think raise this are:

24   "Q.  Did Mr. Hild give you any direction about what to do with

25   the bond prices after learning about the SEC investigation?

1    "A.  Yes.

2    "Q.  What did he tell you to do?

3    "A.  My recollection was do nothing, keep the price as is."

4          Our proposal would be to strike the two questions, and

5    the question I will ask him is:  After the SEC investigation

6    came, what did Live Well do with respect to bond prices?

7          THE COURT:  Why don't you move to withdraw the

8    question and I'll strike the question and answers.

9          MR. HARTMAN:  Okay, I will do that.

10         MR. DUSING:  Very good.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court)

 2          MR. HARTMAN:  Your Honor, at this time we move to

 3   withdraw the last two questions, strike the answers to the

 4   questions about bond prices, and I will pose a new question.

 5          THE COURT:  The last two questions and answers will be

 6   stricken and you're not to consider them.

 7          Thank you, you may proceed.

 8   BY MR. HARTMAN:

 9   Q.  Mr. Stumberger, after you learned of the SEC investigation

10   and after Mr. Hild learned of the SEC investigation, what did

11   Live Well do with respect to bond prices or prices that were

12   set by IDC?

13   A.  My recollection was prices were kept static or the same.

14   Q.  Thank you.  Now Mr. Stumberger, did you believe that the

15   prices that were currently at IDC at that time were justifiable

16   based on market conditions?

17   A.  The prices at that time were above market.

18   Q.  Now at some point did you begin meeting with folks from the

19   SEC about the events at Live Well?

20   A.  Yes.

21   Q.  Do you remember when your first conversation was?

22   A.  My recollection was November 2017.

23   Q.  And at that point, were you still working at Live Well?

24   A.  Yes.

25   Q.  At some point did you leave Live Well?

1    A.  Yes.

2    Q.  When was that?

3    A.  March 2019.

4    Q.  Is Live Well still in operation?

5    A.  No.

6    Q.  At some point did you begin meeting with the U.S.

7    Attorney's Office about this?

8    A.  Yes.

9    Q.  Were you truthful in those meetings?

10   A.  Yes, other than to personal questions.

11   Q.  What were those personal questions as to which you weren't

12   truthful?

13   A.  Two personal questions related to relationships outside --

14   in any form outside the context of marriage, and other one was

15   related to prior drug use.  I admitted to the other

16   information.

17   Q.  Why did you lie about those things?

18   A.  To protect my family.  I am married and have three young

19   children at home.  It's embarrassing.

20   Q.  At some point did the government learn that you lied about

21   these things?

22   A.  Yes.

23   Q.  How did they learn you lied about that?

24   A.  I voluntarily corrected the answers.

25   Q.  Why do you do that?

1   A.  Because everything I say has to be the truth.  You can't

2   lie about anything.

3   Q.  Now you testified earlier that you're testifying pursuant

4   to a cooperation agreement with the government, is that right?

5   A.  Yes.

6   Q.  And you pled guilty to certain crimes pursuant to that

7   cooperation agreement?

8   A.  Yes.

9   Q.  Why did you plead guilty to those crimes?

10  A.  Because I'm guilty.

11  Q.  Have you been sentenced yet?

12  A.  No.

13  Q.  What is your understanding of the maximum possible sentence

14  you're facing?

15  A.  105 years.

16  Q.  Do you expect there may be a financial component to your

17  sentence?

18  A.  Yes.

19  Q.  What are you required to do under your cooperation

20  agreement with the government?

21  A.  Tell the truth and appear when asked.

22  Q.  What is your understanding of what the United States

23  Attorney's Office will do if you live up to those obligations?

24  A.  Receive a 5K1 letter.

25  Q.  Sorry, what would the U.S. Attorney's Office do?

1   A.  If I live up to my obligations?

2   Q.  Yes.

3   A.  Potentially receive a 5K1 letter.

4   Q.  Would the U.S. Attorney's Office receive the letter or

5   write the letter?

6   A.  Write the letter.

7   Q.  Do you have an understanding of what would be in that

8   letter if the U.S. Attorney's Office wrote it?

9   A.  Yes.

10  Q.  What is your understanding of what would be in it?

11  A.  Details of the crimes committed and details of the

12  cooperation and help I provided.

13  Q.  And to your understanding, who does that letter go to?

14  A.  It goes to the judge.

15  Q.  If the government submits that letter, what effect does it

16  have on the possible sentence you face?

17  A.  It potentially reduces the sentence.

18  Q.  If the government writes that letter, does it mean that the

19  judge will necessarily give you a lower sentence?

20  A.  No.

21  Q.  Who ultimately will decide your sentence?

22  A.  The judge.

23  Q.  And have you been made any promises are guarantees about

24  what your sentence will be?

25  A.  No.

L4FTHIL2

Q.  To your understanding, does anyone beside the judge decide

your sentence?

A.  No.

          MR. HARTMAN:  Your Honor, could I have one moment?

          THE COURT:  Yes.

          (Pause)

          MR. HARTMAN:  No further questions.

          THE COURT:  All right.  Thank you.  Would you like to

take a morning break now before you begin your

cross-examination?

          MR. DUSING:  It would be a good time.

          THE COURT:  Why don't we do that.  Please remember

keep an open mind, don't discuss the case.  Thank you.

          (Jury not present)

          (Continued on next page)

L4FTHIL2

1          THE COURT:  You can step down.

2          I want to discuss one issue with all of you.  I think

3    realistically we'll start at 11:30.  We would have shorter

4    breaks except with Covid we have to move jurors to different

5    places.

6          MR. HARTMAN:  Your Honor, while everyone is here,

7    could I note for Mr. Stumberger that he can't have any

8    communication with government counsel since he's now on cross,

9    or the agent?

10          THE COURT:  Okay, thank you, that's clear.

11          (Witness not present)

12          THE COURT:  I did want to tell you that a juror said

13    something to my deputy, she said that the terms were very hard

14    to follow and she wanted some type of diagram.  She didn't use

15    the word "demonstrative," but she was trying to understand all

16    the financial terms and customers and she said something about

17    a pie chart.

18          Number one, I'm telling you that to let you know that

19    statement was made.  I know you all tried to introduce a

20    demonstrative but there was an objection to it.  So my question

21    is:  Is there a way for the parties to get together maybe over

22    lunch and at least put the terms together that are not in

23    dispute?  And either that could be introduced by way of

24    stipulation -- I understand you had a dispute about some of the

25    terminology, but I suggest whatever you can do to constantly be

L4FTHIL2

1    reminding these jurors of the very basic terms at issue,

2    including, as she noted, "customers," I encourage you to work

3    together to see if you could create some kind of glossary, that

4    would be helpful.

5              MR. DUSING:  I plan to use the white board today for

6    this very reason, so hopefully I could clear up some confusion,

7    but we could have discussions as well.

8              THE COURT:  I will see you back shortly.  Thanks.

9              (Recess taken)

10             MR. DUSING:  Your Honor, may I raise one issue?

11             THE COURT:  Yes.

12             MR. DUSING:  It would be my intention to use the white

13   board, but when I do that, I recognize I would have to use my

14   mask, so I will put my mask on when using the white board.

15             THE COURT:  Sure.  Now there's no one in the front

16   row, but make sure you're not within six feet of anyone when

17   you're doing that.  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  As you can see, we have done a lot to

3    ensure the safety of the courthouse.  Normally the jury box is

4    over here, but we cleared off that section so you could be

5    safely distanced.

6          MR. DUSING:  May I proceed, your Honor?

7          THE COURT:  Yes, thank you.

8    CROSS-EXAMINATION

9    BY MR. DUSING:

10   Q.  Good morning, Mr. Stumberger.

11         Can you hear me, sir?

12   A.  Yes, sir.

13   Q.  My name is Ben Dusing, I'm representing Michael Hild.

14         The first thing I want to do is talk about some of

15   these terms that you used to clarify some things.

16         MR. DUSING:  Your Honor, may I step out?

17         THE COURT:  Yes, you may.

18   Q.  Mr. Stumberger, can you see the white board here, sir?

19   A.  Yes.

20   Q.  We mentioned some terms this morning, Mr. Stumberger, and I

21   want to make sure we know who we're talking about.

22         So you used the term IDC.  Do you recall that

23   testimony?

24   A.  Yes.

25   Q.  And do I understand correctly that this stands for

1   Interactive Data Company?

2   A.   Correct.

3   Q.   And it is the case, is it not, that they are a third party

4   independent valuation company, is that right?

5   A.   Yes.

6   Q.   And what they do, as far as you understand, is to

7   independently value hard to value securities, is that right?

8   A.   Can you repeat that?

9   Q.   Sure.  What IDC does is to independently value hard to

10  value securities?

11  A.   My understanding of IDC is they provide valuation services

12  for hard to value securities and not hard to value securities,

13  securities across the spectrum.

14  Q.   Fair enough.  Let me ask this way:  This is a subscription

15  service, is it not?

16  A.   Yes.

17  Q.   And they publish various prices and valuations of various

18  securities, is that right?

19  A.   Yes.

20  Q.   And some of those may be easier to value than others, but

21  among the securities that they value, at least during the

22  relevant time, were the CUSIPs, these bonds that we talked

23  about, is that right?

24  A.   Yes.

25  Q.   So that's IDC.

1          Now to be clear, at the beginning -- and we'll get to

2     have a timeline here.  At the beginning, IDC did not price or

3     value -- it did not publish a value of all of the CUSIPs

4     purchased by Live Well, is that right?

5     A.   Sorry, could you repeat that?

6     Q.   Sure.  At the time of the transaction whereby Live Well

7     purchased these CUSIPs -- we'll get to that in a second --

8     these bonds from Stifel, IDC was not publishing a value or a

9     price for all of those CUSIPs, isn't that right?

10    A.   That's correct.

11    Q.   Thank you, sir.

12          Now I want to talk about CUSIPs.  Do you happen to

13    know what that acronym stands for?

14    A.   CUSIP?

15    Q.   Yes, sir.

16    A.   I don't.

17    Q.   I don't either.  But for present purposes, when we say

18    CUSIP, can we think of that as one of these bonds?

19    A.   Yes.

20    Q.   Okay.  So if I wrote CUSIP equals bond on this white board,

21    would that be a fair thing?

22    A.   In my opinion, yes.

23    Q.   Then we talked about IDC, and that's -- if I called that a

24    pricing service or valuation service, would that be accurate in

25    your mind, sir?

```
 1   A.  Yes.

 2   Q.  Would it be fair to write "independent valuation service?"

 3   A.  Yes.

 4   Q.  So you mentioned some other names as well.  Now you

 5   mentioned in your testimony yesterday and today "repo lenders."

 6   Do you recall that testimony, sir?

 7   A.  Yes.

 8   Q.  And I believe over the course of your testimony yesterday

 9   and today you mentioned specific repo lenders, is that right,

10   sir?

11   A.  Yes.

12   Q.  So for example, you mentioned Wedbush.  Do you recall your

13   testimony about that, sir?

14   A.  Yes.

15   Q.  So if I just made a list of the repo lenders that you

16   mentioned, would that be fair, sir?

17   A.  Sure.

18   Q.  So you got Wedbush.  I believe you mentioned Mizuho?

19   A.  Yes.

20   Q.  I believe you mentioned -- is it Guggenheim?

21   A.  Guggenheim was one of the lenders at a period of time, yes.

22   Q.  Fair if I put them on the list here?

23   A.  Sure.

24   Q.  You mentioned Nomura.  Do I have this right?

25   A.  Yes.
```

1   Q.  Were they also a repo lender?

2   A.  Yes.

3   Q.  Others I might be forgetting, sir?

4   A.  ICBC.

5   Q.  Very good.  Which I believe stands for the Intercontinental

6   Bank of China, is that right, sir?

7   A.  Right.

8   Q.  Is it all right if I write ICBC?

9   A.  Yes.

10  Q.  I don't recall whether you used the term Mirae.

11  A.  Mirae, yes.

12  Q.  They're also a repo lender, sir?

13  A.  Yes.

14  Q.  Now if I sort of indicate like this that these are repo

15  lenders, would that fairly characterize things, Mr. Stumberger?

16  A.  Yes.

17  Q.  Now in your testimony I believe you indicated that all repo

18  lenders are not alike in this way, at least, not all of them

19  use IDC, the independent valuation service, to value the bond

20  collateral for their lending decisions.  Do I have that right,

21  sir?

22  A.  Yes.

23  Q.  And so from my list -- and I'm sorry but I'm not quite sure

24  where to stand -- can we agree Wedbush used IDC, is that right,

25  sir?

1   A.  Yes.

2   Q.  Mizuho uses IDC, is that right, sir?

3   A.  Yes.

4   Q.  Guggenheim, do they use IDC, sir?

5   A.  My recollection is yes.

6   Q.  Okay.  Nomura does not use IDC, is that right?

7   A.  Correct.

8   Q.  If I put a little star, a little asterisk to remind of us,

9   that would that be okay?

10  A.  Sure.

11  Q.  Hopefully we can all remember that that is not use IDC.

12          Now ICBC, they do use IDC, correct, sir?

13  A.  Yes.

14  Q.  Then this Mirae, do they use IDC?  They do, yes?

15  A.  Yes.

16  Q.  So I want to make sure I have this accurate,

17  Mr. Stumberger.  Can you see that, sir?

18  A.  I can.

19  Q.  So of all these repo lenders, we have got Wedbush, Mizuho,

20  Guggenheim, ICBC, Mirea, they are repo lenders that do not use

21  IDC, and we have Nomura that does.  Fair?

22  A.  I think you have it reversed.

23  Q.  I may have.  Nomura is the only one of these repo lenders

24  that does not use IDC?

25  A.  Correct.

1    Q.  Thank you.  So we used those terms yesterday and today.

2              Now we have also heard the term Stifel, yes?

3    A.  Yes.

4    Q.  And just to be clear, who is Stifel?

5    A.  Stifel Financial is an investment bank in the securities

6    dealing.

7    Q.  So if I write Stifel -- well, hopefully we can remember

8    this.  Stifel is your former employer prior to Live Well, is

9    that right, sir?

10   A.  Correct.

11   Q.  And the circumstances under which you came to Live Well

12   involved the transaction between Stifel and Live Well involving

13   the bonds, yes?

14   A.  Yes.

15   Q.  And remind us when that was, sir.

16   A.  That was August 2014.

17             MR. DUSING:  With the Court's permission, I would

18   erase the board here as we move on to something else.

19             THE COURT:  Okay.

20             MR. DUSING:  Your Honor, if I may endeavor to have

21   some assistance, I could probably make better use of my time.

22             THE COURT:  Sure.

23   Q.  So could we talk about how these bonds work for a second?

24   A.  Sure.

25   Q.  I am going to use bonds and CUSIPs interchangeably.  Is

1    that fair?

2    A.  Sure.

3    Q.  I am going to try to simplify this, but don't let me

4    simplify it too much.  Do I understand correctly these bonds or

5    CUSIPs are securities that basically it's an asset that

6    generates a stream of income -- an unknown stream of income

7    over an unknown period of time, is that fair, sir?

8    A.  Yes.

9    Q.  So just to illustrate that, these bonds -- this is the

10   bond, you know that it's going to generate income for some

11   period of time but you don't know how long, it could be a short

12   period of time, it could be much longer.  Fair?

13   A.  Yes.

14   Q.  And for however long that period is, it's indeterminate,

15   it's unknown how much revenue at any given time is going to be

16   generated.  Is that fair, sir?

17   A.  Yes.

18   Q.  Can we agree that at least at the intrinsic value, if you

19   will, of these bonds is a function of how much revenue is going

20   to be generated by the bonds over the life of the bonds?

21   A.  I would answer that as my definition of intrinsic value is

22   a depiction, an opinion of what the asset's true value is.

23   Q.  Well, your understanding -- help me out here, but the value

24   of this asset, this bond, is how much money I'm going to get

25   from it, if I'm the holder.  Do you agree?

L4FTHIL2                    Stumberger - Cross

1    A.  Yes.

2    Q.  And that is unknown, do you agree?

3    A.  Yes.

4    Q.  So Mr. Stumberger, can we agree that because we're talking

5    about an asset, the value of which is the right to an unknown

6    stream of income for an unknown period of time, these are very

7    hard to value.  Would you agree with me, sir?

8    A.  These bonds use inputs and assumptions to create a

9    valuation.

10   Q.  So again, my question is simply:  Do you agree these bonds

11   are very hard to value?

12   A.  I would say that these bonds are, in my opinion, among the

13   most complex in fixed income.

14   Q.  Did I hear that correctly, the bonds are --

15   A.  Among the most complex in fixed income.

16   Q.  Can I infer then that you agree that they are difficult to

17   value?

18   A.  My opinion is they are not hard to value, they're very

19   complex and it takes expertise.

20   Q.  So could we agree on this, these bonds -- the life of these

21   bonds could range anywhere from 10 years to 40 years?

22   A.  I believe it's 50.

23   Q.  Is that 50?

24   A.  50.

25   Q.  Okay.  And the value, the amount of cash generated during

1    that time can be a lot or a little, there's a big difference

2    between these two, right?

3    A.   Correct.

4    Q.   So we'll get to this, a market definition of these aside,

5    would you agree it is very difficult to predict how much

6    revenue the holder of one of these securities is going to

7    derive from the security over the life of the security?

8    A.   It's impossible to predict that times zero.

9    Q.   We'll take this down.  But before I do, you've testified

10   yesterday and today about these CUSIPs, these bonds.  To be

11   clear, we're talking about these securities, these all of these

12   assets, these are the bonds that we're talking about, yes, sir?

13   A.   Yes.

14   Q.   Now let's talk about how these bonds are bought and sold.

15   You testified yesterday about your background.  Do I understand

16   correctly that your background is as a trader, sir?

17   A.   Some of my experience is in trading, yes.

18   Q.   Is it fair to say that prior to you joining Live Well that

19   your experience was on the so-called sell side?

20   A.   Yes.

21   Q.   And that once you joined Live Well, it was a buy side kind

22   of situation, would you agree?

23   A.   Yes.

24   Q.   Would you agree that those two things are very different?

25   A.   They're different in certain respects.

1    Q.  Understood.  Well, what about this respect, as a seller of

2    these bonds you don't have to think about how much they are

3    worth over the life of the bond knowing that you're going to

4    sell them.  Fair?

5    A.  That's fair.

6    Q.  As compared to if you're a buyer who intends to hold these

7    bonds for the life of these bonds, that is something that is

8    absolutely very important.  Would you agree, sir?

9    A.  Sorry, could you repeat that?

10   Q.  Yes.  If you're a buyer of these bonds and you're going to

11   hold them for the life of the bonds, the ability to value them,

12   to analyze how much revenue they're going to generate for how

13   long is a very important thing.

14   A.  Yes.

15   Q.  Can we agree that -- withdrawn.

16        So I want to talk about the market for these bonds.

17   You mentioned the term "market" a number of times.  Can we

18   agree that the market for these bonds can separately be

19   described as a primary market and a secondary market?

20   A.  Yes.

21   Q.  Correct me if I get this wrong here, but these bonds are

22   comprised -- well, is it fair to characterize these bonds,

23   these CUSIPs, as a whole bunch of bonds kind of stapled

24   together?

25   A.  Yes.  The CUSIPs we're talking about are comprised of

1    underlying bonds pulled together.

2    Q.  And that's what we kind of mean when we talk about

3    securitizing them, is that right?

4    A.  Yes.

5    Q.  And so you have these securities which are comprised of a

6    whole bunch of underlying bonds, and these are produced, if you

7    will, by I guess mortgage originators, issuers?

8    A.  The underlying bonds?

9    Q.  Yes, sir.

10   A.  Yes.

11   Q.  And then they are stapled together by whom, sir?

12   A.  By the issuer, primary dealer.

13   Q.  At some point in time these bonds, they're initially

14   offered into the primary market by a broker-dealer, is that

15   right, sir?

16   A.  Yes.

17   Q.  So if I wrote B/D on this board, can we agree that will

18   stand for broker-dealer?

19   A.  Sure.

20   Q.  So this is where these bonds originate.

21          Now the sale from the broker-dealer, the first sale

22   into the market, can we call that the primary market?

23   A.  Yes.

24   Q.  And these bonds are sold by the broker-dealers to

25   investors, are they not, sir?

1  A.  Yes.

2  Q.  So if I write investor --

3         THE COURT:  I think you might by bumping the

4  microphone a little bit.

5         THE WITNESS:  Sorry.

6         THE COURT:  I know we're asking you to lean into it

7  but --

8         Please proceed.

9  Q.  So Mr. Stumberger, if I write "investor" here, would that

10  be a fair kind of depiction?

11  A.  Sure.

12  Q.  Okay.  I will write "investor one," if I can, to show that

13  this is the first -- this is the bond moving into the market.

14  Fair?

15  A.  Yes.

16  Q.  Now can we agree that in this primary market there are a

17  number of interested -- there are a number of investors, not

18  too much, but there are some in your experience, is that right?

19  A.  The number of investors has shifted over time, yes.

20  Q.  Notwithstanding that shift, in your experience, at any

21  given time there's at least some of these, fair?

22  A.  Yes.

23  Q.  In fact, Live Well would be an example of an investor,

24  would it not, sir?

25  A.  Yes.

1    Q.  So we'll get to this, but during the time that you were

2    there running the department, you would look for these new

3    issue bonds from broker-dealers to analyze them, and ultimately

4    Live Well bought, as investor one here, a number of these bonds

5    from broker-dealers.  Fair?

6    A.  Yes.

7    Q.  And that happened from the time period from September 2014

8    when you came aboard Live Well until at least until 2017,

9    correct?

10   A.  Acquisitions of new bonds I believe ceased at the end of

11   2016, but around that timeframe.

12   Q.  So at the end of '16.  Okay, fair.

13          Now in theory, an investor who has purchased one of

14   these bonds could sell it to another investor, in theory.  Do

15   you agree, sir?

16          Do I need to restate my question, Mr. Stumberger?

17   A.  No.  I don't know the answer technically if an investor can

18   sell bonds to another investor.  It's not the normal course of

19   business.  The normal course of business is where an investor,

20   when they want to sell, they sell back to the community of

21   broker-dealers.

22   Q.  So let's start with this:  Would you agree with me that

23   there really is not -- if there is any market at all, we call

24   this a secondary market, there is, if any market at all, not

25   much of a market for investors to sell to?

1    A.  I would answer that this way:  Again, investors when they

2    want to sell their securities, the normal customary business

3    practice is for them to sell them to the broker-dealers, not to

4    other investors.

5    Q.  But it is really hard to sell -- once an investor purchased

6    a bond from a broker-dealer, it's your experience, correct me

7    if I'm wrong, sir, most of these investors are holding these

8    securities for the life of the securities, isn't that right?

9    A.  Historically holders of these bonds have been long-term

10   holders.  The segment of investors that aren't are typically

11   hedge funds, but pension funds, insurance companies typically

12   are long-term holders.

13   Q.  Is that generally a yes then?

14   A.  Yes.

15   Q.  So when we talk about market, can we agree that it's very

16   important to distinguish between the primary market and the

17   secondary market?  Do you agree with me, sir?

18   A.  I'm sorry, could you repeat that question?

19   Q.  Sure.  When we talk about market, isn't it very important

20   to distinguish between the primary market and the secondary

21   market?

22   A.  It certainly should be.  In English, they're different.

23   Q.  And I know I'm painting with a broad brush, but the primary

24   market has some liquidity to it -- that's a term I should talk

25   about in a second -- not so much the secondary market.  Fair,

L4FTHIL2                          Stumberger - Cross

1    sir?

2    A.  It would help if I define my opinion of what those two

3    things mean.  Primary market is the new issuance of securities

4    from dealers to investors.  That's the primary market.  The

5    secondary market is after the fact.  So if there's trading of

6    bonds that want to be traded after the new issuance period,

7    that's secondary trading.

8    Q.  From here forward let's go with the definitions that you

9    just defined.  Using that definition, if you're an investor and

10   you bought one of these new issue bonds on the primary market,

11   you may not be able to later sell it even if you wanted to.

12   Would you agree, sir?

13   A.  I would disagree with that.  My opinion is an investor

14   would be able to sell the bond, but at any given point in time

15   the price is indeterminate.  You can't determine which price it

16   would be sold at, but it could be sold.

17   Q.  Fair enough.  Let me clarify.  I guess in a sense you could

18   sell anything.  There would be some price at which you could

19   sell it, but it would not necessarily reflect its full value.

20   Would you agree, sir?

21   A.  Reflect what?

22   Q.  It would not necessarily reflect its full value.  Would you

23   agree, sir?

24   A.  There's no way of telling where a bond could be sold at any

25   given point in time.

1    Q.  Or even if you could sell the bond, right?

2    A.  From my experience, there would always be a bid available.

3    I don't remember a specific point that wasn't the case.  But

4    the price which you could get, you can't know that up front.

5    Q.  Understood.  It's likely to be way less than the customary

6    pricing, right?

7    A.  The what pricing?

8    Q.  It's likely to be way less than the circumstances you

9    described than kind of a typical primary market transaction.

10              MR. HARTMAN:  Objection, vague, "typical."

11              THE COURT:  I'll allow the question.  Answer it as

12   best you can.  If you can't answer it, say that.

13   A.  Repeat the question?

14   Q.  Sure.  Let me try and do it this way:  Once you bought one

15   of these bonds as an investor, it's likely to be very difficult

16   to sell it if you ever want to.  Is that a fair statement?

17   A.  No.  I just said that if you want, you could sell it, you

18   just wouldn't know what the price would be.

19   Q.  Let me rephrase.  If you one day want to sell it, you're

20   likely to be able to sell it, if all, at a deep discount.  Is

21   that fair?

22   A.  That's one possibility.

23   Q.  So when we talk about the market concepts, it's a big -- we

24   need to be careful, I think we recognize, to distinguish

25   between the primary market and secondary market.  Can we agree

1   to do that moving forward in our conversation today?

2   A.  Yes.

3   Q.  Now let's try and get a sense of the timeline.  Can I ask

4   you:  You knew Mr. Hild prior to the time of the Stifel

5   transaction, isn't that right?

6   A.  Correct.

7   Q.  Do you recall when about you met Mr. Hild?

8   A.  My recollection of the first time was in 2006.

9   Q.  Okay.  And where were you in 2006?

10  A.  I worked at Goldman Sachs.

11  Q.  What was Mr. Hild doing at that time, if you recall?

12  A.  Mr. Hild had just launched Live Well Financial.

13  Q.  Your understanding of Live Well Financial at that time was

14  what?

15  A.  A mortgage lender.

16  Q.  Was it on the reverse side at least in part?

17  A.  Yes, reverse mortgages.

18  Q.  At Goldman Sachs was your work -- did that involve in some

19  way the reverse side of the mortgage business?

20  A.  Yes.  When I was at Goldman Sachs there was an effort to

21  understand the sector and to create business, develop business.

22  Q.  And in your interactions with Mr. Hild, was that in fact an

23  effort to create business for Goldman?

24  A.  Yes.

25  Q.  And can you just briefly explain how?

1   A.  My recollection was Goldman Sachs, like other -- their peer

2   group, they are in the business of acquiring mortgage loans,

3   mortgage loans, reverse mortgage loans.  Goldman was just

4   getting up to speed, and my recollection was there would be

5   business there, potentially, at some point.  And at some point

6   I have a recollection where Goldman was interested in

7   purchasing a reverse mortgage lender or a platform and Live

8   Well was one of the companies there were talks about doing

9   that.

10  Q.  So were those discussions separate and apart from your

11  discussions with Mr. Hild about acquiring his reverse mortgage

12  production?

13  A.  Those were separate discussions.

14  Q.  Nonetheless, can we agree that you had discussions with

15  Mr. Hild -- you met in 2006 and you had interaction with him

16  over a period of years, is that fair?

17  A.  Yes.

18  Q.  And did you continue to have interaction with Mr. Hild from

19  the point in time when you met him in 2006, under the

20  circumstances that you mentioned, all the way through until

21  2014 when the Stifel transaction occurred?

22  A.  I remember meeting Michael around the 2012 time period, I

23  don't know the exact date.  It was around there, meeting him.

24  Q.  I don't mean to imply it was constant or regular

25  communication, but over the years from 2006 through the time of

L4FTHIL2                          Stumberger – Cross

1    the Stifel transaction in 2014, from time to time did you have

2    interaction with Mr. Hild?

3    A.   That's fair.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  So am I correct, sir, in that when in July or August of

2    2014 you reached out to Mr. Hild about the business proposition

3    that you testified about, that wasn't out of the blue in a big

4    picture sense?  Yes?

5    A.  That's correct.

6    Q.  OK.  So, those discussions proceeded fairly quickly, did

7    they not?

8    A.  That's my memory, yes.

9    Q.  I want to talk about the Stifel transaction and make sure I

10   understand it in a moment.  But can we agree that generally the

11   Stifel transaction, which saw the bonds managed by you at

12   Stifel acquired by Live Well and you being employed with

13   Stifel, newly at Live Well, that transaction was introduced and

14   completed within less than two months, sir?

15   A.  It was less than two months, yes.

16   Q.  And can we talk about that transaction for a second?

17   A.  Sure.

18   Q.  So, I want to simplify this as much as possible, but the

19   Stifel transaction can be viewed as such, Live Well and

20   Mr. Hild as its CEO acquired certain things and effectively

21   certain people from Stifel.  Is that a fair way to put it?

22   A.  Yes.

23   Q.  So if I put "Stifel" over here and I put "LWF" over here,

24   which stands for Live Well Financial -- I am a very poor artist

25   here, so forgive me, but I am just going to write "People" and

L4fnhil3                    Stumberger - Cross

1   "Things."  Fair?

2   A.  Yes.

3   Q.  Let's talk about these things first.  Can we agree that the

4   things that Stifel had that were acquired by Live Well were --

5   I forget the exact number but maybe 15 CUSIPs, 15 bonds?

6   A.  Roughly.  I don't remember the exact number, but roughly.

7   Q.  Understood.  My numbers are intended to be rough.

8   A.  OK.

9   Q.  Less than 20?  Can we agree on less than 20?

10  A.  Yes.

11  Q.  OK.  So if I write "CUSIPs" right here, does that sort of

12  accurately -- however many the number is, we'll go with that?

13  A.  Yes.

14  Q.  Now, in terms of people when you originally reached out to

15  Mr. Hild, do you remember when that was in 2014?

16  A.  It was summer of 2014.  I don't remember the exact date,

17  whether it was June, July or early August.

18  Q.  OK.  Very good.  So, if it was July, let me ask you this:

19  Do you remember when about the transaction was completed?

20          MR. HARTMAN:  Objection to the "if it was July."  I

21  think he testified he didn't remember exactly.

22          THE COURT:  Why don't you rephrase it.

23          MR. DUSING:  Sure.  I can move on if it's easier.

24          THE COURT:  All right.

25  BY MR. DUSING:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L4fnhil3                         Stumberger - Cross

1  Q.  Do you recall by when the transaction was completed, when

2  it was consummated?

3  A.  My recollection was the end of August of 2014.

4  Q.  OK.  If I use September 1 as a date, is that fair?

5  A.  Sure.

6  Q.  Now, when you originally reached out to Mr. Hild to propose

7  this deal, who were the people that were contemplated as being

8  part of the acquisition?

9  A.  The team at Stifel contemplated on moving to Live Well were

10 myself, Richard Boyd, Dan Foster, Ernie Calabrese.

11 Q.  OK.  So we've got -- can I use "DS" for you, sir, as Darren

12 Stumberger?

13 A.  Sure.

14 Q.  Just to be clear, were you in charge?

15 A.  Of the team at Stifel, yes.

16 Q.  And then your team was, you said Ernie Calabrese?

17 A.  Yes.

18 Q.  And did you say Dan Foster, sir?

19 A.  Yes.

20 Q.  And you mentioned another name there.  What was that name,

21 sir?

22 A.  Richard Boyd.

23 Q.  OK.  Now, it is the case, is it not, that Mr. Boyd was sort

24 of your top assistant, chief lieutenant?  Fair to describe him

25 as such?

L4fnhil3                    Stumberger - Cross

1    A.  Rich Boyd worked for me on managing our position and

2    trading.

3    Q.  OK.  He was an important part of this team.  Would you

4    agree?

5    A.  He was.

6         THE COURT:  Do you want to move the mic closer to you.

7    Some people are going to have trouble hearing you, Mr. Dusing.

8    Thank you.

9         MR. DUSING:  I will try and speak up as well, your

10   Honor.

11        THE DEPUTY CLERK:  People listening in can't hear any

12   of your questions.

13        MR. DUSING:  I understand.  I was trying to speak

14   louder this way.

15        THE COURT:  Maybe walk there and then walk to the

16   board.  I leave it to you.

17        MR. DUSING:  Very good.  Thank you.

18   BY MR. DUSING:

19   Q.  Mr. Boyd, was there a hierarchy in this team?

20   A.  There was a loose one.  I ran the desk.  Rich was kind of

21   my right-hand man.  Dan reported or worked for Rich and me, and

22   Ernie reported to me, but Ernie focused on more of the finance

23   and relationship aspects of the business.

24   Q.  OK.  So we've got people, we've got things.  Is it fair to

25   characterize a proposal that you reached out to Mr. Hild about

L4fnhil3                     Stumberger - Cross

1   as Live Well acquiring these people and those things?  Yes?

2   A.  Is it fair that's what the transaction was?

3   Q.  No.  The business prop -- the idea.  Your idea.

4   A.  Yes, yes.

5   Q.  OK.  And, generally, was it contemplated that the same

6   people would continue managing the same things as Live Well

7   more or less just as they had at Stifel?

8           Is that fair to say?

9   A.  Yes.

10  Q.  All right.  Now let's talk about how they were managed at

11  Stifel.  You mentioned Stifel was a broker/dealer.  Do I

12  understand that correctly?

13  A.  Can I clarify my last statement?

14  Q.  Of course, yes, sir.

15  A.  The same people managing the same things, yes.  What's

16  important to understand is the financing used for the position,

17  that was primarily different.

18  Q.  Understood, sir.  You are talking now about how the

19  position was financed at Stifel relative to how it was financed

20  at Live Well, sir?

21  A.  Yes.

22  Q.  And at Stifel it was -- let me ask you.  Repo financing was

23  at times part of the financing of the position, is that right,

24  sir?

25  A.  At Stifel from time to time, and I don't recall when, repo

1   financing was used.

2   Q.  OK.  But do I gather that it was not necessarily the norm

3   in the Stifel days?

4   A.  That's correct.

5   Q.  Whereas can we agree, fast forwarding, it became sort of

6   the primary mechanism of financing the position once you and

7   the CUSIPs ended up at Stifel -- at Live Well?

8   A.  Yes.  There was repo financing and bank facility financing,

9   but repo was the dominant financing.

10  Q.  At the time you approached Mr. Hild about this transaction,

11  can we agree that wasn't necessarily the plan?

12  A.  The plan for Live Well and the type of financing?

13  Q.  Yes.

14  A.  My recollection was that repo financing was contemplated.

15  Q.  OK.  It certainly got -- there was a point in time when

16  repo financing became a necessity, isn't that right, in

17  connection with the transaction itself?  Isn't that right, sir?

18  A.  I don't have a recollection of discussions for the

19  financing of the portfolio other than repo financing.  I don't

20  have any recollection of that.

21  Q.  OK.  Do you happen to recall as you sit here today how the

22  purchase price of the bonds acquired by Live Well in the

23  transaction were financed?

24  A.  How the trade was financed?

25  Q.  How the purchase by Live Well of the bonds from Stifel was

1  financed?

2  A.  Yes.

3  Q.  What's your understanding of that?

4  A.  It was financed by Mizuho, was one of the repo lenders, and

5  a bank, Zenith Bank.

6  Q.  Understood.  Is Zenith Bank a repo lender?

7  A.  No.

8  Q.  OK.  And Zenith Bank, is it not, is a so-called warehouse

9  lender?  Is that a fair term?

10  A.  I don't -- it's a bank lending facility.  It was called a

11  warehouse lender with differences.

12  Q.  Very good.  How about I do it this way.  We'll agree zenith

13  is a nonrepo lender.  Can we agree on that?

14  A.  Correct.

15  Q.  Zenith was sort of the historical banking relationship for

16  Live Well at the time of the transaction, would you agree, sir?

17  A.  That's my memory, recollection, yes.

18  Q.  OK.  And so one thing we haven't mentioned here is -- we

19  talked about the people, we talked about the things.  How much,

20  what was the purchase price that Live Well paid to Stifel for

21  these bonds?

22  A.  My recollection was it was in the context of 45 million --

23  45 or 50 million dollars.

24  Q.  If I write "50 million" on here, are you confident it's

25  sort of in that ballpark?

1    A.  Yes.

2    Q.  So, Stifel gets 55 million, Live Well gets the CUSIPs or

3    bonds; is that right, sir?

4    A.  Yes.

5    Q.  OK.  Now, that's how the things got to Live Well, yes?

6    A.  Yes.

7    Q.  Now, the people, you know, Live Well did not technically

8    purchase you and your team, but can we say that you stopped

9    working for Stifel at the time of the transaction and you

10   started working for Live Well?

11   A.  Yes.

12   Q.  OK.  And so these guys, including yourself, minus Mr. Boyd,

13   ended up at Live Well.  Do we agree, sir?

14   A.  Yes.

15   Q.  Now, over the course of the execution of this transaction,

16   can we agree that certain things changed?

17   A.  Pre-Live Well or during the transition period?

18   Q.  Over the course of the transaction -- so let me ask it this

19   way:  When you originally reached out to Mr. Hild and proposed

20   this idea, it was contemplated that Mr. Boyd would be joining

21   you and your other team members at Live Well, correct?

22   A.  Yes.

23   Q.  OK.  Fast forward to the end of the transaction.  Mr. Boyd

24   did not in fact join you at Live Well, correct?

25   A.  That's correct.

L4fnhil3                    Stumberger - Cross

1   Q.  So, can we agree that at some point between those two

2   points in time at least that's one thing that changed?  Yes?

3   A.  Yes.

4   Q.  OK.  And it is the case that Mr. Boyd would ultimately end

5   up at a competitor of Live Well; is that right, sir?

6   A.  That's correct.

7   Q.  OK.  Everybody else came with you, though, yes?

8   A.  Yes.

9   Q.  All right.  Another thing that changed over the course of

10  the transaction is how Live Well was going to pay this 55

11  million for the bonds, isn't that right, sir?

12  A.  I don't have a recollection on what changed.  I remember

13  how it was ultimately financed and how it happened.  I don't

14  have a recollection of how anything changed.

15  Q.  Fair, fair, fair.  You recollect, though, that part of the

16  ultimate -- however it was financed in the end, part of that

17  financing was repo financing, correct?

18  A.  Yes.

19  Q.  And specifically, if I recall, was it not Mizuho?

20  A.  That's correct.

21  Q.  All right.  Now, it is the case, is it not, that prior to

22  this transaction that Live Well had never used repo financing

23  before?

24          MR. HARTMAN:  Objection.  Foundation.

25          MR. DUSING:  I can rephrase, your Honor.

1              THE COURT:  Why don't you.  Thank you.

2              MR. DUSING:  I'm sorry?

3              THE COURT:  Why don't you.  Thanks.

4              MR. DUSING:  OK.

5    BY MR. DUSING:

6    Q.  Mr. Stumberger, based on your conversations with Mr. Hild

7    over the course of the transaction, did you have an

8    understanding about their financial relationships, their

9    financing relationships?

10             MR. HARTMAN:  Objection.  Hearsay.

11             THE COURT:  I will allow it, as it goes to his state

12   of mind.

13   Q.  Mr. Stumberger?

14             THE COURT:  You can answer.

15   A.  Yes.

16   Q.  Based on those conversations, did you have an understanding

17   about whether Live Well had ever used, had ever financed things

18   in the past through so-called repo lenders?

19   A.  I don't recall thinking about or having conversations about

20   who Live Well used as financing partners.  My general

21   recollection is they used warehouse lines for the origination

22   of mortgages.  I don't remember which ones or names of them.

23   Q.  OK.  Very good.  Now, you, however, had some relationships

24   with repo lenders based upon your time at Stifel, isn't that

25   right, sir?

L4fnhil3                    Stumberger - Cross

1    A.  Yes.

2    Q.  And one of the relationships that you had was with Mizuho,

3    isn't that right, sir?

4    A.  That's correct.

5    Q.  So, over the course of this transaction, so that Live Well

6    could finance the full amount of this purchase price you

7    introduced, you facilitated an introduction of Mizuho to Live

8    Well?  Is that correct, sir?

9    A.  Yes.  My team and I.

10   Q.  OK.  Fair enough.  Fair enough.

11          And it is the case that ultimately that facilitation

12   was successful in that Mizuho financed part of the purchase

13   price for the portfolio; is that right?

14   A.  Yes.

15   Q.  OK.  I should talk about that term as well.  We've heard

16   the term portfolio.  By portfolio, is that a fair way to

17   characterize the total amount of bonds or CUSIPs held by Stifel

18   at first and then Live Well?

19   A.  Yes.

20   Q.  Fair enough.  All right.  So that's the transaction.

21          Now I want to talk about repo financing for a moment.

22          MR. DUSING:  Can I have a moment to wipe my whiteboard

23   here?

24          THE COURT:  Yes.

25   BY MR. DUSING:

L4fnhil3                        Stumberger - Cross

1    Q.  Maybe in the interest of time I can ask you some questions

2    as I wipe my board, Mr. Stumberger, but let me ask you, I want

3    to return to this company called IDC, this interactive data

4    company we talked about previously.  As we previously

5    discussed, they become relevant generally when repo financing

6    gets involved.  Would you agree, sir?

7    A.  In the case of Live Well that's -- yes.

8    Q.  Well, that is the case in the case of any repo lender,

9    including those that we had on our list, that uses IDC to

10   independently value these bonds, yes?

11   A.  Yes.  The repo lender, certain repo lenders require that

12   they get their values from an independent source and IDC is the

13   market leader.

14   Q.  I'm sorry, sir, IDC is what?

15   A.  Is the market leader.

16   Q.  In fact, isn't their tag line, "Global leader in hard to

17   value securities," or something like that.  Do you know?

18   A.  I don't know.

19   Q.  But if you don't use repo financing as a general rule, IDC

20   really doesn't matter.  Is that fair?

21           MR. HARTMAN:  Objection.

22           THE COURT:  What's the basis?

23           MR. HARTMAN:  Context.

24           THE COURT:  All right.  If you can answer that

25   question without context, do so; but if you feel like you need

1    more context for the question, say that.

2                THE WITNESS:  OK.  Repeat the question, please.

3                MR. DUSING:  Yes.  Thank you.

4                I'll try and do it differently.

5                THE COURT:  OK.

6    BY MR. DUSING:

7    Q.  Now, once we have a repo -- the repo lenders -- let me do

8    it this way.  The idea, is it not, Mr. Stumberger, is that the

9    repo lenders would require that the bonds that they're going to

10   finance be independently valued by IDC and they would lend to

11   the borrower against those values?

12   A.  Yes.  That's how it worked.

13   Q.  OK.  I want to draw this so we understand this.

14               So, you have -- if I put lender, "repo lender" up

15   here, OK, and I have "IDC" down here and I have "Live Well

16   Financial" over here -- can you see that, Mr. Stumberger?

17   A.  Yes.

18   Q.  And I am trying to stay out of the way of everybody at

19   once.  The idea is for the repo lender to lend money to Live

20   Well Financial so that Live Well Financial can hold these bonds

21   so that Live Well can get the stream of income, indeterminate

22   as it may be, from these bonds and in part to pay back the

23   loans to the lender with interest, whatever's left over is the

24   value to Live Well?

25               MR. HARTMAN:  OK.  The idea of whom?

1        MR. DUSING:  I can rephrase, your Honor.

2        THE COURT:  All right.

3   BY MR. DUSING:

4   Q.  Mr. Stumberger, the relationship between these various

5   things that we've talked about, namely, the repo lenders, IDC

6   and Live Well, is one where -- let's start with this:  The repo

7   lender is going lend money to Live Well Financial, yes?

8   A.  Yes.

9   Q.  And those funds would be used to purchase, at least in

10  overwhelming part, certain CUSIPs, bonds?

11  A.  Yes.

12  Q.  And those bonds would, as we've talked about, they would

13  generate revenue for an uncertain period of time in an

14  uncertain amount, yes?

15  A.  Yes.

16  Q.  And with that revenue, or some other way, the lender would

17  be repaid ultimately the amount borrowed, yes?

18  A.  That's how it works.

19  Q.  They would also get interest on the amount lent, yes?

20  A.  Yes.  They charge interest typically monthly.

21  Q.  Very good.  All right.

22        So that's kind of how this works, fair?

23  A.  Yes.

24  Q.  All right.  Now, isn't it the case that one critical

25  feature of repo financing is that these are extremely

1    short-term loans, yes?

2    A.  I would define the general terms of repo lending as

3    anywhere from overnight to what's mostly typical 30 days, and

4    sometimes 60, 90 days.

5    Q.  OK.  Did you say overnight?

6    A.  Yeah.

7    Q.  Can we agree that's a short-term loan?

8    A.  Yes.

9    Q.  OK.  So anywhere from one day -- did you say 90 days, sir?

10   A.  That's been my history in the market, yeah.

11   Q.  OK.  So let's use that.  Relative to sort of what I'll call

12   traditional financing, can we agree that repo lenders, that

13   means short-term financing, anywhere from 1 to 90 days?

14   A.  As a relation to -- you said traditional financing?  What

15   is -- define that.

16   Q.  Non-repo lending for terms of years.

17   A.  Right.  So, in relation to a term loan in some type of

18   facility, whether it is a bank or other, that's typically for a

19   minimum one year up to several years could, five, ten.  So this

20   would be much shorter.

21   Q.  Fair enough.  Thank you.

22           So, when we talk about the stability of financing, can

23   we agree that when repo lenders are involved it is far less

24   stable relative to traditional kind of lending?

25   A.  If you can, define what you mean by stable, stability.

1    Q.  The length of the borrowing relationship.  So, not to use

2    an analogy, but if I can, this is like buying a house and

3    getting a loan for 90 days and having to get a home loan every

4    90 days.  Is that a fair characterization?

5    A.  That's fair.  The operational aspects of it are very

6    routine, whether it's overnight, 30 days, 60 or 90, yeah.

7    Q.  Very good.  It's better, you would agree, to get a 30-year

8    home loan than a nine-month home loan for that reason.  Yes,

9    sir?

10   A.  That would make sense, yeah.

11   Q.  If you get a 90-day home loan, you better make sure that

12   bank is, you know, still there after 90 days or you might not

13   have a home.  Do you agree?

14   A.  Yes.

15   Q.  And that's kind of the inherent risk of repo financing,

16   would you agree?

17   A.  What are you inferring?  The stability of it?

18   Q.  If you come back in 90 days -- when I say "you," I mean

19   Live Well or Stifel or whoever the borrower is -- and whoever

20   the repo lender is decides that they don't want to lend you the

21   money anymore, you've got to find other financing, right?

22   A.  That's correct.

23   Q.  Whereas if you arrange financing through a traditional

24   lender for say a term of years, that's not something you have

25   to worry about, fair?

1    A.  That's correct.

2    Q.  OK.  All right.  So that, that's part of the repo financing

3    story.  But IDC, will you agree with me that IDC comes into

4    play because I think, as you've said, the repo lender,

5    certainly the ones that we put on the list, require that the

6    bonds be priced or valued on IDC if they're going to lend money

7    to Live Well?

8    A.  That's correct.

9    Q.  OK.  Do I understand correctly then that, but for the

10   involvement of repo financing, IDC has no relevance?

11           MR. HARTMAN:  Objection.  Relevance to what?

12           THE COURT:  Why don't you rephrase, please.

13           MR. DUSING:  I will rephrase.

14   BY MR. DUSING:

15   Q.  If Live Well is financing these bonds through a lender

16   other than the repo lenders that use IDC, IDC has no bearing

17   upon the financing transaction at all, would you agree?

18   A.  My recollection was the bank lenders were also reliant on

19   IDC, but I don't have perfect recollection.

20   Q.  Fair enough.  And I'm trying to get to the point here, and

21   I appreciate the precision.  Let me try and do it this way.  If

22   Live Well is financing these bonds through a lender, repo or

23   other, that does not rely on IDC, IDC has no bearing upon the

24   financing transaction?  Would you agree?

25   A.  Yes.

1    Q.  OK.  But -- and I'm fast forwarding here a little bit -- in

2    relation to our story, insofar as Live Well financed these

3    bonds with the names that we had on the list, Wedbush, Mizuho,

4    Guggenheim, the other ones we mentioned, IDC did bear upon the

5    financing relationship, yes?

6    A.  Yes.

7    Q.  And, in fact, IDC was a critical component of the financing

8    relationship because, but for IDC pricing these bonds, the repo

9    lenders I just mentioned would not lend the money to Live Well,

10   is that right?

11   A.  Generally, yes.  It doesn't specify IDC in every purchase

12   agreement.  It's an independent third-party pricing service,

13   but IDC was the dominant market leader.

14   Q.  OK.  IDC was one such --

15   A.  Yes.

16   Q.  All right.  Can we also agree as a functional matter it was

17   IDC?

18   A.  Yes.

19   Q.  OK.  All right.  So, if Live Well wanted to finance a bond

20   through a lender such as one of these repo lenders, that

21   required the bond be listed on IDC, and to lend against that

22   value, that would be a problem if IDC did not value or price

23   that bond.  Would you agree?

24   A.  Yes.

25   Q.  OK.  Can we agree as well that it is precisely that problem

1   that came into the picture in connection with the acquisition

2   by Live Well of the Stifel purchase of bonds?

3   A.  You're calling that aspect a problem.

4   Q.  Let me rephrase.  We mentioned -- I think you said there

5   was something less than 20, I think we agreed less than 20

6   bonds that were purchased by Live Well from Stifel.  Would you

7   agree with me that some of, but not all of those bonds, those

8   CUSIPs, were at that time -- there was values published by IDC

9   for them?  Do you agree?

10  A.  It's possible.  I don't have recollection of any of them or

11  some of them.  I remember what happened during those

12  discussions with IDC, but I don't remember what was on IDC at

13  that time.

14  Q.  Fair enough.  In any event, when the dust settled here, and

15  for example, Mizuho had agreed to finance some of these, their

16  financing required that all of the bonds be priced or valued by

17  IDC.  Yes?

18  A.  Yes.

19  Q.  OK.  Not only that, because these repo loans were only for

20  up to 90 days, very short term, there had to be some sort of

21  understanding that IDC would not only price and publish prices

22  about these bonds then, but into the future; isn't that right,

23  sir?

24          MR. HARTMAN:  Objection to "understanding."  Among

25  whom?

1      THE COURT:  Look, as I said before, if you can answer

2  questions yes or no, do it.  But if you feel like there's

3  something in the question that makes it hard for you to answer

4  it yes or no, that it wouldn't be accurate in some way or that

5  you're confused in some way, just let me know that as well.

6  OK.  Do you feel like you can answer this question as stated?

7      THE WITNESS:  Can you repeat the question?

8      MR. DUSING:  Yes, I think.

9  BY MR. DUSING:

10  Q.  If Live Well was going to continue to finance the bonds

11  through a lender, such as one of these repo lenders, that

12  required publication of a price on IDC, it was important that

13  IDC continue pricing or valuing those CUSIPs for the

14  foreseeable future.  Do you agree?

15  A.  Yes.

16  Q.  OK.  And the reason that was important, right, was that if

17  that could not be guaranteed, it couldn't be guaranteed that

18  there would be financing for Live Well to finance these assets?

19  Do you agree, sir?

20  A.  With the repo lenders that required IDC.

21  Q.  Fair.  With that -- my question so amended, do you agree

22  with that, sir?

23  A.  I'm sorry.  Repeat the full question, and I will answer.

24  Q.  Let's do it this way.  In connection with the Stifel

25  purchase, at some point in time you facilitated the

1    introduction of Live Well and Mr. Hild kind of generally to

2    Mizuho, the repo lender, is that right?

3    A.  Yes.

4    Q.  It is your understanding that Live Well did not have a

5    preexisting relationship with Mizuho?

6    A.  Correct.

7    Q.  It's your understanding that they did not have a

8    pre-existing relationship with any repo lender; is that right?

9    A.  That's fair.

10   Q.  OK.  All right.  Because repo lending was part of the

11   equation at that point in time in terms of financing the bonds,

12   and because Mizuho was a lender that required that a value be

13   published by IDC, that meant that IDC was part of this

14   transaction calculus.  Do you agree?

15   A.  Yes.

16   Q.  OK.  And, in fact, there were discussions at that time

17   initiated with IDC.  Do you agree?

18   A.  Yes.

19   Q.  And you were in fact part of those conversations, at least

20   at a high level.  Would you agree?

21   A.  Yes.

22   Q.  And those conversations happened in connection with the

23   discussions with Mizuho regarding acquiring financing.  Do you

24   agree?

25   A.  Yes.

1    Q.  Mr. Hild was also part of those conversations, would you

2    agree?

3    A.  Possible.  I don't remember who was -- who was on any one

4    of the calls.  It could have been Eric, you know.

5    Q.  OK.

6    A.  Generally, yes.

7    Q.  Generally, fair.  Let me -- at a high level at least,

8    Mr. Hild was involved in those discussions.  Is that fair?

9    A.  That's my recollection.

10   Q.  OK.  And the purpose of this, at least in major part here,

11   was to make sure that IDC would price the CUSIPs that were to

12   be acquired by Live Well and would continue to price those

13   CUSIPs; is that right?

14   A.  Yes.

15   Q.  OK.  Isn't it the case, sir, that they in fact agreed to do

16   that?

17   A.  Yes.

18   Q.  And is it the case that this sort of discussion took place

19   as part of this general discussion with Mizuho at that time?

20   A.  Yes.

21   Q.  OK.  Very good.  Now, as such, that allowed the financing

22   arrangement to proceed, yes?

23   A.  Yes.

24   Q.  All right.  Not to get into the details here, but we talk

25   about this as a single transaction.  It is the case more

1    precisely that the Stifel transaction proceeded in two stages?

2    Isn't that right, sir?

3    A.  Yes.

4    Q.  In other words, there was an initial purchase of part of

5    the -- a certain number of CUSIPs, and then a little bit later

6    a purchase of the rest of the CUSIPs; is that right?

7    A.  Yes.

8    Q.  OK.  Isn't it the case, Mr. Stumberger, that after the

9    first stage of the purchase was completed, there was some

10   uncertainty about whether Live Well would be able to acquire

11   the necessary financing to acquire the remaining CUSIPs?

12   A.  My recollection was it was done in two stages.  I don't

13   remember -- I have no memory of problems per se with the second

14   stage, as you're saying.  I don't have any recollection.

15   Q.  Fair.  If you don't recollect, you don't recollect.

16           Let's do it this way.

17           The idea -- well, let me ask you this.  One problem

18   with this situation was that IDC at that point in time did not

19   necessarily have its own model.  It didn't independently price

20   this class of security, is that right?

21   A.  Yes.

22   Q.  And one of the reasons for that is because, frankly, it's,

23   as you said, extremely complicated.  Is that fair?

24           MR. HARTMAN:  Objection.  Foundation.

25           THE COURT:  Overruled.

```
 1              MR. DUSING:  I'm sorry.

 2              THE WITNESS:  Could you repeat the question.

 3              MR. DUSING:  Sure.

 4    BY MR. DUSING:

 5    Q.  Was it your understanding that one of the reasons that IDC

 6    at that time did not model these securities was because of

 7    their complexity?

 8    A.  I don't have recollection on the exact reason they were not

 9    modeling these.  It's -- I said before it's a complex bond and

10    I don't remember the exact reason why they weren't.

11    Q.  OK.  Very good.  In any event, do I understand correctly

12    that they were not at this point in time?

13    A.  That's correct.

14    Q.  All right.  But do I understand correctly that the

15    understanding that was reached in these discussions with Mizuho

16    with IDC, with Live Well, was that IDC would ultimately do

17    that?  Is that your understanding?

18    A.  Yes.

19    Q.  OK.  But until that time IDC would continue to accept

20    something called broker quotes from Live Well; isn't that

21    correct?

22    A.  Yes.

23    Q.  OK.  Now, I want to try and do this the best I can.  Can we

24    agree that a broker quote is basically a -- well, it's a data

25    point?  It's what somebody thinks a security is worth?  Is that
```

1   a fair definition?

2   A.  I don't know the exact definition of broker quote.  It's a

3   quote delivered by a broker to IDC.

4   Q.  Well, I'm not sure -- a broker quote is a creation of IDC;

5   that's an IDC thing.  Fair enough?

6   A.  Yes.

7   Q.  I'm not sure we need to talk -- I mean, IDC knows what that

8   is.  But for our purposes IDC, as it turns out, has not only an

9   evaluated price, but it has this other thing called a broker

10  quote, is that fair?

11  A.  Yes.

12  Q.  And whereas an evaluated price is an independent

13  third-party assessment of what a security is worth, a broker

14  quote is not that; is that right?

15  A.  Right.  That is a valuation developed or created by a

16  broker delivered to IDC.

17  Q.  Right.  And IDC with a broker quote is not expressing --

18  they're just kind of passing along the information as opposed

19  to, you know, that's not exactly what they would say -- that's

20  what they would say it was worth.  Is that fair?

21          MR. HARTMAN:  Objection to the foundation for that.

22          THE COURT:  Sustained.

23          MR. DUSING:  I'm sorry, your Honor?

24          THE COURT:  Sustained as to what they would say.

25          MR. DUSING:  Fair enough.

1    BY MR. DUSING:

2    Q.  If IDC did not value or did not issue an independent, you

3    know, an evaluation of a particular securities price, it

4    nonetheless often issued a so-called broker quote price, fair?

5    A.  Yes.

6    Q.  OK.  And, in fact, during your time at Stifel, you would

7    often, oftentimes submit so-called broker quotes, broker quote

8    values to IDC, and IDC would publish these values; isn't that

9    right?

10             MR. HARTMAN:  Objection.  Foundation with respect to

11   the latter part.

12             THE COURT:  If you can answer that as a general

13   matter, answer it, based on your experience.  But, again, if

14   you feel like you can't answer it, say that.  And let us know

15   if you want the question read back.

16             THE WITNESS:  No, it's OK.

17   A.  I don't have recollection of Stifel sending prices to IDC.

18   I know Stifel used repo lending during periods of time.  I

19   don't remember myself sending prices.  It could have been

20   someone on my team.  It would have been someone in the

21   operations group, but --

22   Q.  Fair enough.  Let me clarify.  When I say -- that's my

23   fault.  I don't mean you personally.  I mean your team or

24   Stifel generally was supplying broker quotes to IDC with

25   respect to those bonds, some of those bonds, is that right?

L4fnhil3                    Stumberger - Cross

1   A.  My recollection was when Stifel used repo financing for

2   periods of time -- my recollection was the prices on the books

3   at Stifel were used for the lending amounts.  That's not

4   perfect recollection.

5   Q.  OK.  But I'm asking about -- here's what I'm asking.  When

6   you were at Stifel, did you, any member of your team, or

7   anybody at Stifel, to your knowledge, provide values to IDC as

8   broker quotes?

9   A.  I don't remember.  It's possible.  I don't remember.

10  Q.  OK.  All right.  Nonetheless -- we'll come back to that.

11  It is the case, is it not, that there is generally an

12  understanding here that for a period of time Live Well would

13  provide to IDC its valuation of these bonds, its internal

14  valuation, and that IDC would use these for a period of time

15  until it built its own model and independently evaluated them?

16  A.  That's correct.

17  Q.  I'm sorry?

18  A.  That's correct.

19  Q.  OK.  And so what that would look like then is this:  Live

20  Well would provide its internal valuations to IDC, IDC would

21  publish its values pursuant to its subscription service, which

22  presumably would be the value supplied by Live Well Financial,

23  and the repo lender would lend to Live Well an amount based in

24  part on that value.

25           Is that a fair depiction, sir?

L4fnhil3                    Stumberger - Cross

1   A.  Yes.

2   Q.  OK.  Let me stand out of the way to make sure everybody can

3   see this.  So with all of this that we are talking about, the

4   testimony of the past couple of days, when we have these

5   entities, we have Live Well, we have IDC, we have the repo

6   lender, it's this relationship that we are talking about that

7   is at the heart of it.  Would you agree?

8   A.  Yes.

9   Q.  OK.  And I just want to make sure that we understand that

10  the intent the plan, if you will, at the time of the Stifel

11  transaction -- let me step out of the way here -- was for these

12  values -- I'm going to put "BQ" here for broker quotes, really

13  just Live Well's internal valuations, for this to happen only

14  until IDC developed its own model.  Do you agree, sir?

15  A.  Yes.

16  Q.  And the plan, the intent at the time was, once IDC

17  developed its own model, that IDC would independently evaluate

18  these securities, and those would be the values published to

19  the repo lender?

20  A.  That's correct.

21  Q.  OK.  But that is not what happened, is it, sir?

22  A.  My recollection was Live Well delivered broker quotes for a

23  period of time in 2014, even perhaps through early 2015.  IDC

24  developed a model at that point.

25  Q.  And we'll get there.  But here's the point I want to make

1   right now.  Do you agree that the original plan, the original

2   intent of the transaction in that respect was changed?

3   A.  It was changed from what?

4   Q.  Let me rephrase it.  Insofar as I think we've established

5   the original plan or intent of the parties here was that Live

6   Well would provide value, so-called broker quotes to IDC only

7   until IDC developed its own model and thereafter not, that that

8   changed insofar as -- cutting to the chase -- IDC was never

9   able to develop an effective model.

10          Do you agree, sir?

11  A.  I agree that it changed.  There were issues, there were

12  issues in our opinion of what was happening with the IDC

13  valuation when they announced they were modeling the bonds.

14  Q.  Very good.  And we'll get there.  I just want to make sure

15  that we understand.

16          So let's do it this way.  So, having talked about the

17  original plan, the original intent, after the transaction,

18  things proceeded accordingly for a period of time.  Would you

19  agree?

20  A.  Yes.

21  Q.  Meaning that, following the transaction in say September of

22  2014 through the end of 2014, and we'll get to a timeline in a

23  second, as everybody had agreed, Live Well gave its internal

24  valuations as broker quotes to IDC, IDC published those values,

25  and the repo lenders or lender lent against those values.  Do

L4fnhil3                    Stumberger - Cross

1    you agree, sir?

2    A.  Yes, generally.  And I say that because there were blips of

3    time during that time period, there were -- my recollection is

4    ITC was making certain adjustments to the prices, but that's

5    the general -- that's generally what happened.

6    Q.  Fair enough.  And I am trying to cover this generally in

7    the interest of time.

8    A.  OK.  I got to be --

9    Q.  Understood.  That's fair.  So let -- can I just do it this

10   way.  Everything I just said generally --

11   A.  Yes.

12   Q.  -- would you agree?

13   A.  Yes.

14   Q.  OK.  But you make a good point I think.  IDC didn't

15   necessarily accept precisely the value that was given to it by

16   Live Well, correct?

17   A.  That's my recollection.

18   Q.  Yeah.  Just to be clear, IDC had nothing to do -- well, let

19   me rephrase that.  IDC was a separate standalone entity, yes?

20   A.  Yes.

21   Q.  Live Well Financial could not control what value was

22   published by IDC.  Do you agree?

23   A.  That's correct.

24   Q.  In fact, at no point in time could Live Well Financial

25   dictate what price was published by IDC.  Do you agree, sir?

1   A.  Yes.  Live Well could not dictate what IDC has to do.

2   Q.  Well, it could not, right?

3   A.  Right.

4   Q.  After all, the entire purpose of this, sir, is it not --

5           MR. HARTMAN:  Objection.  Argumentative.

6           THE COURT:  The objection is to?

7           MR. HARTMAN:  Argument.

8           MR. DUSING:  I can rephrase, your Honor.

9           THE COURT:  All right.  Why don't you do that.

10          MR. DUSING:  Sure.

11  BY MR. DUSING:

12  Q.  The entire purpose of IDC's existence is to be an

13  independent valuation service, isn't that correct, sir?

14  A.  Yes.

15  Q.  OK.  So thank you for the clarification.  Generally, the

16  values were used for a period of time.  There was some

17  deviation.  At some point in time -- and why don't woo do this.

18  I would like to did a little timeline here, so if I can erase

19  this portion.  Can I do that, Mr. Stumberger?

20  A.  Sure.

21  Q.  Very good.  Before we do that, before we do that, one final

22  thing.  Just to make sure we understand what's going on here,

23  these lenders generally, you referred to this thing called a

24  haircut, right?

25  A.  Yes.

1   Q.  And again, can I -- in the interest of time, is this

2   roughly comparable to sort of how a home loan works?  You know,

3   you have to put 20 percent down; the haircut's like the down

4   payment kind of thing?

5   A.  Yes.  It's the amount between the purchase price and the

6   amount of lending you could receive from a lender.

7   Q.  OK.  In other words, these lenders weren't going lend the

8   full amount of the purchase price for the bonds.  Live Well

9   would have to, you know, put a down payment down, if you will?

10  A.  Correct.

11  Q.  OK.  And the amount of the down payment varied by lender.

12  Do I understand correctly?

13  A.  Yes.

14  Q.  In other words, the haircuts were different for different

15  lenders?

16  A.  Yes.

17  Q.  Fair enough.  OK.  So, you know, the higher the value

18  published by IDC, whatever the haircut was for a particular

19  lender, the more money could be borrowed by Live Well.  Do you

20  agree, sir?

21  A.  All else being equal, two prices that -- in the same

22  notional amount or face amount, the higher the price means more

23  borrowing.

24  Q.  OK.  Let me --

25  A.  Can I clarify that?

1    Q.  I am not trying to be complicated here.

2         The understanding between Live Well and the repo

3    lenders the arrangement, the contractual arrangement is that

4    the repo lender's going to lend to Live Well based on the value

5    of the bonds which are collateral, fair?

6    A.  Yes.

7    Q.  OK.  But the value of that bond collateral is determined,

8    at least with respect to repo lenders that use IDC, by what IDC

9    publishes as its price, yes?

10   A.  Yes.

11   Q.  So, the higher the value of the price or value published by

12   IDC, the more money necessarily that Live Well can borrow,

13   right?

14   A.  Yes.

15   Q.  OK.  With that, I'll take it.

16        Now, Mr. Stumberger, at the time of the Stifel

17   transaction, you had no intention of defrauding anybody.  Would

18   you agree?

19   A.  I agree.

20   Q.  I'm sorry, sir?

21   A.  Yes, yes, I agree.

22   Q.  OK.  And based on your interactions and conversations with

23   the others involved in this transaction, it was not your

24   perception that Mr. Hild had any intent to defraud anybody.

25   Would you agree?

L4fnhil3                    Stumberger - Cross

1          MR. HARTMAN:  Objection to --

2          THE COURT:  Sustained.

3          MR. DUSING:  I will move on, your Honor.

4   BY MR. DUSING:

5   Q.  All right.  The Stifel transaction, if we use September 1

6   as date generally, Mr. Stumberger, are you comfortable with

7   that?

8   A.  Sure.

9   Q.  OK.  So September 2014?

10  A.  Yes.

11  Q.  All right.  We have the Stifel transaction.  All right.  At

12  that point in time there's sort of this temporary understanding

13  that we just discussed worked out, namely, that for a period of

14  time Live Well would supply its internal valuations of the

15  bonds to IDC, IDC would use those, although it didn't have to,

16  and, as you said, didn't always use them precisely, and the

17  lender, Mizuho, would lend based off of those values; is that

18  correct?

19  A.  Yes.

20  Q.  OK.  But, as we talked about, that understanding was sort

21  of a temporary understanding, and the idea was that at some

22  point IDC would develop its own independent valuation.  Fair?

23  A.  Yes.

24  Q.  OK.  And, in fact, there came a point in time when IDC

25  endeavored to do that.  Isn't that the case, sir?

1   A.  Yes.

2   Q.  And, kind of cutting to the chase here, can we agree that

3   the results of that were -- went quite poorly?

4           MR. HARTMAN:  Objection.  Vague.

5           MR. DUSING:  I can rephrase, your Honor.

6           THE COURT:  OK.

7   BY MR. DUSING:

8   Q.  We can we agree, Mr. Stumberger, that there were some

9   problems with the IDC independent valuations with its model, if

10  you will?

11  A.  Yes.

12  Q.  And I believe you testified about this a little bit in your

13  testimony yesterday on direct.  This is what you were referring

14  to?  Yes, sir?

15  A.  Yes.

16  Q.  OK.  And there is when -- and don't let me put words in

17  your mouth here.  I am just trying to characterize things in

18  the interest of time.  Sort of, you know, you had to get

19  involved with IDC and say, Hey, what are we doing here.

20  There's problems.  Is that fair?

21  A.  Yes.

22  Q.  And the purpose of that was to, can we agree, to solve the

23  problem of their model which they had, they had built.  Yes?

24  A.  Yes.

25  Q.  OK.  Let's understand the problem with their model.  Well,

1    can we agree there were multiple problems with the value

2    generated by their model?

3    A.  My recollection, there were two separate issues.

4    Q.  OK.  What are the -- can you remind us of the two that you

5    recall?

6    A.  My recollection was there was an inability to match a Live

7    Well valuation and an IDC valuation.  It's a tie-out process,

8    trying to model one bond to come up with the same answer.  My

9    recollection is that was -- it was -- it couldn't be done.

10   That's one.

11          Number two, I remember the daily degradation of bond

12   value as they were modeling the portfolio and that was the

13   other issue.  So, two issues.

14   Q.  OK.  So you mentioned the daily degradation.  We should

15   clarify I think.  IDC was issuing daily values at this time.

16   Do you agree?

17   A.  That's my recollection.

18   Q.  OK.  And wasn't one of the issues that the volatility of

19   the values being generated by the IDC model were all over the

20   place and otherwise one day real high, one day very low?

21   Wasn't the volatility here a big issue as well?

22   A.  My recollection was there was a -- a daily amount the bond

23   portfolio was dropping, the valuation was dropping.  I don't

24   recollect -- I have no recollection of it spiking up, spiking

25   down in that manner.  I remember just a kind of a steady amount

1   each day it was going down.

2   Q.  OK.  And we can maybe look at some documents later on that

3   can help for this period.  But, in any event, am I correct in

4   understanding that you agree that there were, you know, serious

5   analytical deficiencies in the IDC model?

6   A.  Yes.

7   Q.  And because -- let me withdraw that.  Did you have

8   face-to-face meetings with IDC about fixing their model?

9   A.  I recall having a meeting face to face with IDC.  I don't

10  remember when.  And it wasn't about these deficiencies.  We had

11  discussions over the phone and e-mail.

12  Q.  OK.  So I'm speaking now just about the problems, the

13  deficiencies with the IDC model.  Can we agree that you

14  communicated with them through whatever form or fashion?

15  A.  Yes.

16  Q.  It sounds like one of those ways was not in person, but

17  there were calls and e-mails if I understand correctly; is that

18  right?

19  A.  Correct.

20  Q.  Is it fair to characterize the communication about this

21  issue as sort of, you know, it wasn't once or twice; it was

22  kind of an ongoing discussion for a period of time?  Is that

23  fair?

24  A.  That's fair, yeah.

25  Q.  OK.  And can we agree as well that there were other members

L4fnhil3                    Stumberger - Cross

1   of your team that were involved in these discussions with IDC?

2   A.  Correct.

3   Q.  And can we agree that one of those people was Dan Foster?

4   A.  Yes.

5   Q.  OK.  And can we agree that one of those people was Ernie

6   Calabrese?

7   A.  Yes.

8   Q.  OK.  And can we agree that one of those people was Eric

9   Rohr?

10  A.  Yes.

11  Q.  OK.  And just to be clear, Eric Rohr was not a member of

12  your team historically?  He was the CFO and chief compliance

13  officer of Live Well Financial; is that right?

14  A.  My recollection he was the chief financial officer.  I

15  didn't know about compliance officer.

16  Q.  OK.  So you understood -- you knew him to be the CFO?

17  A.  That's correct.

18  Q.  The chief financial officer?

19  A.  Yes.

20  Q.  OK.  All right.  And just to give us an idea of physical

21  proximity, your offices, sir, and those of your team were here

22  in New York City; isn't that right, sir?

23  A.  There was an office in New Jersey and an office in

24  Manhattan.

25  Q.  Very good.  So, in the interest of brevity, putting New

L4fnhil3                         Stumberger - Cross

1    York and New Jersey together, they were up here in that way,

2    yes?

3    A.  Yes.

4    Q.  OK.  And Mr. Rohr and Mr. Hild were physically located on a

5    day-to-day basis down in Richmond, Virginia, where Live Well

6    was headquartered, if you will.  Yes, sir?

7    A.  Yes.

8    Q.  OK.  Nonetheless, would you agree that you had, well, far

9    more frequent interaction with Mr. Rohr on a day-to-day basis

10   managing the portfolio than you did Mr. Hild?

11   A.  On a day-to-day basis there was a standing call at 9:30

12   where my members of my team and Eric and Michael were on, so

13   that was the routine call.

14            I wouldn't know how to quantify the amount of

15   discussions with Michael or Eric.  Like, I -- that was the

16   question?  Did I work with Eric more than Michael?

17   Q.  No.  The question was simply on the whole over time you had

18   more interaction with Mr. Rohr than you did with Mr. Hild.  Do

19   you agree with that premise?

20   A.  On the bond -- on everything or just the bond portfolio?

21   Q.  Just in general.

22   A.  I would say that's accurate.

23   Q.  In addition.  We saw something in these e-mails called a

24   HECM trading Listserv.  Do you recall that, sir?

25   A.  The e-mail address?

L4fnhil3                    Stumberger - Cross

1    Q.  Yes, sir.

2    A.  Yes.

3    Q.  I should have put that up on there on the list of terms,

4    and that's my bad.  But, sir, it is the case that the

5    recipients or the group members, if you will, of that HECM

6    trading Listserv included you and your team and Eric Rohr, but

7    not Mr. Hild?

8    A.  That's correct.

9    Q.  OK.  Very good.  So, unless Mr. Hild was specifically

10   separately copied, for example, on an e-mail that went to the

11   HECM trading Listserv, he would not then see that e-mail.  Do

12   you agree, sir?

13   A.  Yes.

14   Q.  OK.  All right.  OK.  So, getting back to our timeline

15   here, I think we've established that from say the Stifel

16   transaction, September 2014, through some period of time -- can

17   we use January of 2015 as when generally IDC tried to model

18   this themselves?

19   A.  Yes.

20            (Continued on next page)

21

22

23

24

25

1    BY MR. DUSING:

2    Q.  I want to be fair.

3    A.  Yes.

4    Q.  So 2015, January, if I say IDC attempts to model, and this

5    is kind of when those problems that you referenced arose.  Is

6    that fair, Mr. Stumberger?

7    A.  Yes.

8    Q.  At this point in time would you agree with me that the

9    parties' intention with respect to the Stifel transactions,

10   namely the repo lenders Mizuho, IDC and Live Well, all of that

11   changes at this point, do you agree, sir?

12          MR. HARTMAN:  Objection, foundation, with respect to

13   another entity.

14          MR. DUSING:  I think we covered that, your Honor.

15          THE COURT:  I'll allow it.

16   Q.  Mr. Stumberger?

17   A.  Could you repeat?

18   Q.  It's at this point in time that everything changes.  Do you

19   agree?

20   A.  In January 2015?

21   Q.  Yes.

22   A.  Yeah, that was what we were waiting for, for the IDC

23   developer model and be able to price, and that was the moment

24   from the beginning we were waiting for.

25   Q.  And if IDC -- the idea was IDC would have a model, it would

1    work, they would price it, and that would be the end of Live

2    Well providing its internal values to IDC.  Agreed?

3    A.  Yes.

4    Q.  There would be no purpose in that anymore, do you agree?

5    A.  Yes.

6    Q.  But IDC couldn't model this stuff, right?

7         Let me rephrase that.  The problem is that IDC could

8    not develop a model that worked, that didn't have problems.  Do

9    you agree, sir?

10   A.  That was our opinion, yes.

11   Q.  Ultimately did IDC agree, to your understanding?

12   A.  Ultimately IDC requested that Live Well restart delivering

13   broker quotes.

14   Q.  To clarify, Mr. Stumberger, IDC said generally -- well, let

15   me rephrase that.

16        In response to the issues about the problems with

17   IDC's model in connection with these conversations which you've

18   testified about, do I understand correctly that the outcome of

19   them was that IDC requested that the broker quotes continue?

20   A.  Yes.

21   Q.  And did they in fact continue?

22   A.  Yes.

23   Q.  And did they in fact continue, as it turned out -- we have

24   got more to talk about -- from that point in time all the way

25   through to the very end?

1  A.  Yes.

2  Q.  And jumping to the end, isn't it the case that in or about

3  April of 2019, IDC announced that they just weren't going to --

4          MR. HARTMAN:  Objection.

5          THE COURT:  Sustained.

6          MR. DUSING:  I withdraw the question, your Honor, at

7  this point in time.

8  Q.  So that being the case, Mr. Stumberger, do you agree that

9  it was still -- that IDC still -- the understanding was that

10 IDC was going to fix its model, at some point it still would

11 independently evaluate these securities.  Do you agree, sir?

12         MR. HARTMAN:  Objection to whose understanding.

13         THE COURT:  Let's focus on your understanding.

14         MR. DUSING:  If I could rephrase.

15         THE COURT:  Go ahead.

16 Q.  All the questions I'm about to ask are strictly based on

17 your understanding based on your involvement with the

18 conversations with the IDC personnel arising from the problems

19 with IDC's model.  Was it your understanding they were going to

20 try to fix these?

21 A.  My understanding was after the conversation in early

22 February where IDC requested Live Well commence sending broker

23 quotes again, I remember it being if Live Well wanted IDC to

24 begin the process again, they would be notified.  That's what

25 the email says.

1  Q.  Well, we'll look at the emails later, but let me make sure

2  I understand your understanding.  Your understanding is that --

3  first of all, are we clear that IDC requested that the broker

4  quotes continue.  This much we have correct?

5  A.  Yes.

6  Q.  And do I understand correctly that it was your

7  understanding that if Live Well wanted that to change, that

8  Live Well would let IDC know and IDC would try and come up with

9  a better model?

10 A.  That's my recollection.

11 Q.  Okay.  In any event, notwithstanding whatever your

12 recollection, there was nothing that would have prevented IDC

13 from pricing it however they wanted to price this at any point

14 in time.  Do you agree, sir?

15 A.  Sir, could you repeat that?

16 Q.  Yes.  IDC could price this stuff however it wanted at any

17 pint in time.  Do you agree, sir?

18 A.  Yes.

19 Q.  It could have decided not to price this at all, in other

20 words, not to use broker quotes at any point in time.  Do you

21 agree, sir?

22 A.  Yes.

23         THE COURT:  Let us know when it would be a good time

24 to break for lunch.  I don't want to cut you off, but when it's

25 any natural time.

1          MR. DUSING:  Your timing is perfect, your Honor, this

2     would be a good time.

3          THE COURT:  We're going to take lunch.  Please

4     remember don't discuss the case, keep an open mind and have a

5     nice lunch.

6          (Jury not present)

7          THE COURT:  Why don't we take 40 minutes.  Do you need

8     to talk to me about anything?

9          I'll see you in 40 minutes.

10          (Luncheon recess taken)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

                              (2:10 p.m.)

1

2

3          (Jury present)

4          THE COURT:  You may proceed.

5          MR. DUSING:  Thank you, your Honor.

6   BY MR. DUSING:

7   Q.  Mr. Stumberger, can you hear me, sir?

8   A.  Yes.

9   Q.  I would like to continue where we left off before the lunch

10  break.  Just to remind you, we talked about kind of how the

11  plan changed and the broker quotes continued forward.  I would

12  like to begin talking about the period that happened

13  thereafter.  Is that okay, sir?

14  A.  Yes.

15  Q.  Now it is the case, is it not, that, in connection with the

16  problems that arose from IDC's model, that there was internal

17  discussion involving Mr. Hild regarding those issues, isn't

18  that right?

19  A.  Yes.

20  Q.  And I don't want to cover ground we have gone over

21  previously, but you testified a little bit about that yesterday

22  and this morning, is that fair?

23  A.  Yes.

24  Q.  And isn't it the case that in connection with those

25  conversations, a bigger conversation grew out of that that

1   involved sort of you and Mr. Hild and others over time

2   reassessing how to value, on a held-to-maturity basis anyway,

3   these bonds?

4   A.   And the question is did I have discussions over time?

5   Q.   Yeah, I guess my question is it's my understanding in

6   connection with the IDC model problem there were discussions.

7   My question now is out of that, it is the case, is it not, that

8   kind of a larger conversation developed internally about how to

9   best value these bonds?

10  A.   My recollection was the dominant discussion related to that

11  happened in September 2015.

12  Q.   Understood.  And we'll get there.  I'm trying to take it

13  step by step.  But let's do that.  I believe you testified that

14  in September of 2015 there was a decision made to implement a,

15  fair to say, a different valuation methodology internally at

16  Live Well, is that right?

17  A.   Yes.

18  Q.   Can I go ahead and draw that box on the timeline here?

19  A.   Sure.

20  Q.   Is that generally, from your perspective, kind of the next

21  event?

22  A.   My recollection is yes, that was the event.

23  Q.   So I am just going to -- I know this isn't perfect here,

24  but I will put -- we agree that's in September of 2015, sir?

25  A.   Yes.

1    Q.  And I will say SC14 implementation IMP.  Do you think

2    that's fair?

3    A.  Sure.

4    Q.  And kind of what makes that a milestone sort of event is

5    that that's when the scenario 14 was sort of adopted

6    internally, if you will, is that right?

7    A.  Yes.

8    Q.  But scenario 14, though, wasn't created in September of

9    2015, correct?

10            Let me ask it a different way.  I will withdraw that

11   question.

12            While we marked the implementation of scenario 14

13   internally in September of 2015, it was many months in the

14   making, so to speak, the development of it, is that correct?

15   A.  My recollection is the major component of scenario 14 was

16   the yield adjustment.  My recollection is that happened in

17   September 2015.

18   Q.  I want to make sure we're connecting here.  I think we are

19   clear that the actual implementation of it was in

20   September 2015.  What I'm asking about now is that whatever was

21   implemented was the product of quite a few internal discussions

22   that had occurred over the months prior to September of 2015.

23   Do you agree, sir?

24   A.  I don't have recollection of having these discussions the

25   months prior.  There were adjustments and scenarios being run

1    months prior, but the major change in scenario 14 was the yield

2    assumption, and my recollection is that happened at that time.

3    Q.  Understood.  I will move on.  Let me do it this way:  After

4    the Stifel purchase, going back to September 2014, over time at

5    whatever time, it is the case, is it not, that there was --

6    there developed internal discussions between, among others,

7    Mr. Hild and yourself and your team about the best way to value

8    these bonds?

9    A.  In the time period again?

10   Q.  From the time of the Stifel transaction until up to and

11   including September of 2015, there was discussions about how to

12   value these bonds, yes?

13   A.  My recollection was the bonds were being marked using

14   market contextual assumptions up until the point of the IDC

15   issues of early 2015.  And then after that there were still

16   that context of using market contextual assumptions and inputs,

17   there were scenarios run in the months between February and

18   September, but the major change, in my opinion, was at that

19   time.

20   Q.  Understood.  There's no dispute there again, but the events

21   that gave rise to that change happened over a period of time

22   prior?

23           MR. HARTMAN:  Objection, asked and answered.

24           THE COURT:  Overruled.

25   A.  Repeat that?

1    Q.  Let me try it a different way.

2              Some of these phone calls that we have listened to,

3    these recorded calls that we listened to on your direct, these

4    are part of much larger conversations wherein there's a lot of

5    things discussed, one of which is how to best value these

6    bonds.  Do you agree?

7    A.  My opinion -- and you could play calls if you want -- my

8    recollection is the change in the valuation happened, the major

9    one happened during that time period in September.  There were

10   perhaps discussions about -- I would have a recollection of

11   being best way to value, if there were market gyrations where

12   the market was changing and speeds were slowing, making

13   adjustments to the assumptions would be a better way to value

14   these during that time.

15   Q.  So again you made reference to market.  So let me ask you

16   this:  Isn't it the case that the investment thesis or the plan

17   once you were at Live Well was to hold these bonds to maturity?

18   A.  Yes.

19   Q.  Can we agree that that is the opposite of trading them?

20   A.  Yes.

21   Q.  Can we further agree that the way that you had modeled them

22   in the past or valued them this the past, for example, when you

23   were at Stifel, was a way that contemplated future trade?

24   A.  Yes.

25   Q.  Would you agree then that this -- I think at Live Well, as

1  you said now on the buy side, in valuing them for purpose

2  holding it for a maturity situation, that required a new way of

3  valuing these potentially, do you agree?

4  A.  I agree.  My answer is depending on the financing of the

5  portfolio.

6  Q.  Well, I'm not asking in relation to the financing, I'm just

7  asking generally.  If in the past you valued them in a way that

8  contemplated they would be sold at one point, that was the

9  past.  Now you're looking at them with an eye towards holding

10  them to maturity, it was the case, was it not, we might need to

11  revisit how to value these.  Is that fair, sir?

12  A.  Discussions related to the valuation, my recollection, were

13  that month's -- the result of month end valuation.  You're

14  using repo financing, and that if it was buy and hold and you

15  had your own internal financing, that's one thing, but the

16  break is the fact that the repo lenders, they needed something

17  where they could trade, so the value on what they had to do,

18  potentially.

19  Q.  And we'll talk about that at some point in time, I promise,

20  but I'm not talking about it now.  Now I'm talking about the

21  fact that it is the case, is it not, that once you were at Live

22  Well, as you said the idea was these were going to be held to

23  maturity, there were discussions internally between your team,

24  Mr. Hild, Mr. Rohr, about how to value the bonds?

25  A.  There were discussions, yeah.

L4FTHIL4                          Stumberger - Cross

1    Q.  After all, if the plan is to hold these things forever,

2    would you agree it's fairly important to understand how much

3    they're valued, fair?

4    A.  Yes.

5    Q.  And this became -- these discussions became fairly regular

6    and intense over the course of 2015.  Do you agree, sir?

7    A.  Yes.

8    Q.  And they also increased in frequency over the course of

9    2015.  Do you agree, sir?

10   A.  My recollection is the frequency increased substantially

11   late summer, July, August, into September.

12   Q.  Fair enough.  In other words, right before the period where

13   scenario 14 was implemented in September, is that right, sir?

14   A.  Yes.

15   Q.  Because one of the reasons that the frequency increased

16   during that time was because isn't it the case that

17   collectively you guys felt like you saw that these bonds were

18   worth way more than the trading way of valuing them accounted

19   for, isn't that the case, sir?

20   A.  My recollection is there were discussions around the

21   intrinsic value of these bonds versus where they were trading

22   in the market.

23   Q.  And my question, though, is actually collectively, at some

24   point beginning with whenever these conversations began up

25   through prior to or including September of 2015, there was an

1    understanding, was there not, that these bonds were worth more

2    than people thought, there was hidden value, yes, sir?

3    A.  Yes, that's what I'm describing as the intrinsic value.

4    Q.  I want to make sure we're defining terms.  You used the

5    term "intrinsic value," correct?

6    A.  Yes.

7    Q.  Forgive me, I'm not a bond trader.  Moving forward we'll

8    use that term.  How would you define that term?

9    A.  I would define it as an asset or these bonds' true value.

10   It's an opinion, everyone would have a different one, but a

11   true value of the asset versus where it trades in the market

12   depending on other factors, supply and demand.  It's a true

13   value of the asset.

14   Q.  The intrinsic value?

15   A.  Yes.

16   Q.  The reason why that's such an important thing is the plan

17   at this point is not to trade them but to hold them forever,

18   right?

19   A.  Yes.

20   Q.  So a discussion of their true value ensues over time, and

21   step by step is it fair to say it was perceived that there was

22   more true value about these bonds than had otherwise been

23   thought, than had previously been thought, is that true, sir?

24   A.  It's personally something I have always known.  I don't

25   know when those discussions started in earnest, but there were

1    discussions around that.

2    Q.   Independent of whether you had always felt this way, as a

3    group, you, Mr. Hild, Mr. Rohr, the other members of your

4    team -- first of all, could we be clear these discussions

5    happened between all of those people, is that right?

6    A.   That's correct.

7    Q.   In fact, we heard these recorded calls.  Do I understand

8    correctly that these are dial-in conference calls, is that

9    right?

10   A.   That's correct.

11   Q.   And these would happen on kind of a regular basis, correct?

12   A.   Yes.

13   Q.   So independent of your personal view about whether people

14   were discovering the obvious, so to speak, would you agree that

15   by September of 2015, as a group, there was consensus that

16   these things were worth more than what people thought

17   intrinsically?

18   A.   Yes.

19   Q.   And the way that that was ascertained was over a period --

20   or the period from going back to whenever these conversations

21   began up through to include September of 2015, there were

22   discussions about how to more correctly project both the life

23   of these bonds and the amount of revenue generated over that

24   life.  Do you agree, sir?

25   A.   My recollection during that time was related to how the

Case 3:19-cr-00108-RAD Document 384 Filed 05/16/24 Page 121 of 178    301

1  bonds were seasoning, how yield discussions related to that and

2  how the bonds were modeled with those two main discussion

3  points.

4  Q.  While those may have been -- we'll talk about those two

5  main discussion points.  First, do you agree there were

6  discussions about those two main discussion points?

7  A.  Yes.

8  Q.  Do you agree that as an outgrowth or the outcome of those

9  discussions was those variables in the model, those

10  projections, were tweaked?  Do you agree, sir?

11  A.  My recollection was there was a new yield approach at that

12  time, yield input.

13  Q.  Is that a yes?

14  A.  Yes.

15  Q.  Okay.

16  A.  Sorry.

17  Q.  In addition to those two -- what was the other one, yield

18  and what else?

19  A.  The assumptions to my recollection during that time were

20  related to yield and how yield would be calculated.

21  Additionally, there was prepayment speed approach.

22  Q.  So just remind us, let me try and do this quickly, if you

23  agree with this.  When it comes to prepayment speeds, slow is

24  good and fast is bad, is that fair?

25  A.  For the valuation.

L4FTHIL4                    Stumberger - Cross

1    Q.  Sorry?

2    A.  For the valuation, yes, the prices.

3    Q.  Did I get it right?

4    A.  Yes.

5    Q.  In other words, just to say it again, a bond is going to be

6    worth more, meaning it's going to generate more revenue over

7    time if the prepayment speed is slower, yes?

8    A.  For these bonds, yes.

9    Q.  Sorry?

10   A.  For these bonds, yes.

11   Q.  So until I say otherwise, you can assume that we're going

12   to be talking about the bonds in question here and no other

13   bonds.

14   A.  Yes.

15   Q.  One more time.  Well, do you recall my -- with respect to

16   those bonds, prepayment speeds, if slower, one could expect

17   more revenue over time, yes or no?

18   A.  Yes.

19   Q.  And the flip side of that coin, if faster over time, one

20   could expect less revenue over time?

21   A.  Yes.

22   Q.  At some point in time during this period did Live Well,

23   your group there, run different scenarios that hypothesized

24   different prepayment speeds and/or different yield curves?

25   A.  Yes.

1    Q.  Okay.  Now we have heard about something called scenario

2    14.  I think you testified about that are previously.  Right?

3    A.  Yes.

4    Q.  Can I safely assume that since it's scenario 14 that there

5    were 13 other scenarios at least that were considered?

6    A.  Yes.

7    Q.  In that way, would you agree that part of these discussions

8    was trying to look at some of these assumptions more closely to

9    more accurately predict how much revenue would be generated by

10   the bonds, and more accurately for how long, as part of a way

11   to better understand their true value?

12   A.  I don't have perfect recollection of the different -- all

13   the 13 or 14 scenarios and the assumptions used in those.

14   There were varying prepayment speeds, yield assumptions that

15   created ultimate valuations.  Every scenario had a different

16   valuation.  I don't remember discussions related to what would

17   this do the average life, the maturity, to my recollection.

18   Q.  So your recollection is about what would it do to the value

19   of the bond?

20   A.  Yeah.

21   Q.  If I understand correctly, that's the ultimate sort of

22   inquiry, but the value of the bond is a function of the various

23   variable inputs, assumptions that go into the model, correct?

24   A.  Yes.

25   Q.  So changing these inputs would, in the end, change the

1    value of the bond so projected, fair?

2    A.  Yes.

3    Q.  Now when you were at Stifel, you used some kind of model,

4    is that right?

5    A.  Yes.

6    Q.  And after the Stifel purchase, you brought that model to

7    Live Well, so to speak, is that right?

8    A.  Live Well licensed the same software as Stifel did.  It's

9    call Intex.

10   Q.  Fair enough.  I don't mean to suggest you did anything

11   improperly.

12           Let me put it this way:  You used the same model after

13   the Stifel transaction once you were at Live Well as you did

14   when you at Stifel?

15   A.  Yes.

16   Q.  That model had certain assumptions kind of built into it,

17   yes?

18   A.  The model doesn't have assumptions built into it, you use

19   the assumptions you want to input to run.  The model is a

20   discount cash flow model so it discounts cash flows.  It

21   forecasts cash flows and discounts it back and gives you a

22   price.

23   Q.  It's a projection?

24   A.  Yes.

25   Q.  That projection is based on a whole bunch of assumptions,

L4FTHIL4                         Stumberger - Cross

1    right?

2    A.  Yes.

3    Q.  One of those assumptions is, for example, prepayment speed?

4    A.  Yes.

5    Q.  There are other main assumptions that you mentioned, yes?

6    A.  Yes.

7    Q.  There are also other assumptions that might not be major

8    but do affect things, yes?

9    A.  Yes.

10   Q.  So these are the things are, they not, that were discussed

11   by the group over roughly 2015 leading up to September of 2015,

12   yes?

13   A.  Yes.

14   Q.  At some point in time it is the case, is it not, that it

15   was decided to use different assumptions?

16   A.  Yes.

17   Q.  Relative to what was being used, kind of what would be

18   brought over from Stifel, yes?

19   A.  The assumptions used in valuation changed from what was

20   being done previously.

21   Q.  So in other words, after the transaction you have the

22   Stifel model, you're working off of that.  Over time, some of

23   the assumptions pursuant to conversations are kind of getting

24   swapped out, tweaked, fair?

25   A.  Yes.

1    Q.  Not all at once, kind of one by one, you would have

2    discussions about this input or that input.  Is that a fair

3    characterization?

4    A.  Yes.

5    Q.  And the outcome of those discussions over time would be

6    that those various inputs would be tweaked in some fashion,

7    yes?  Often, sometimes?

8    A.  Please repeat that again, sorry.

9    Q.  As a consequence of discussing these various inputs over

10   time, as a group, you would sort of tweak that assumption or

11   tweak the model on a whole, yes?

12   A.  That's what would be done, it wasn't -- that happened,

13   yeah.

14   Q.  So that's all I'm asking.  So is it fair to look at it this

15   way -- and again, I'm trying to get to the point here -- you

16   began tweaking the old model that kind of you brought over from

17   Stifel at some point in time, but at some point in time it was

18   tweaked so much it was a new model, really, is that a fair way

19   of looking at it?

20   A.  No, there's three primary assumptions, and at that time,

21   September 2015, two out of the three were changed materially.

22   Q.  Okay.  Could we agree on this scenario 14 is a methodology

23   to value these bonds?

24   A.  Generally, yes.  The methodology is discounting cash flows,

25   but the inputs are scenario 14.  So the valuation inputs

1   changed.

2   Q.  Maybe we're arguing over terms here.  I want to be clear.

3   The old model, when you changed the variables that you

4   mentioned in the way that you mentioned, that's scenario 14, is

5   that fair?

6   A.  Yes.

7   Q.  And that generated different projections or different

8   valuations for these bonds, isn't that right?

9   A.  Yes.

10  Q.  And so what happened in September of 2015, getting back to

11  bigger picture, is the decision was made internally at Live

12  Well to adopt this new methodology, yes?

13  A.  Yes.

14  Q.  In other words, to use scenario 14 values internally, yes?

15  A.  That's when it was adopted and implemented, yes.

16  Q.  Now can I discern here that you didn't necessarily agree

17  with that decision?

18  A.  That's correct.

19  Q.  As you said, from your perspective, you had kind of known

20  this all along, this was not rocket science, you did not

21  necessarily agree with the decision to start using scenario 14

22  methodology values internally at Live Well, yes?

23  A.  The fact -- so at that point in time it was a departure for

24  me.  In my opinion, my thought process, it was a departure from

25  what has been done.  And it was a pretty big departure from

1    that.

2    Q.  Well, let's talk about that for a second.  First of all, it

3    was a departure, yes?

4    A.  It was.

5    Q.  Scenario 14 was different than -- it was a way of valuing

6    these things or generating values that was different than the

7    way you had done it in the past, yes?

8    A.  Yes.

9    Q.  And the way you had done it in the past when you were at

10   Stifel was kind of a sell side analysis, as you would say, a

11   market analysis, fair?

12   A.  Yes.

13   Q.  And the scenario 14 methodology was a buy and hold kind of

14   methodology, yes?

15   A.  Yes.

16   Q.  And it was in fact Live Well's intention to buy and hold

17   these bonds to maturity, yes?

18   A.  Yes.

19   Q.  Okay.  Do I perceive correctly that your disagreement with

20   the adoption of scenario 14 internally was that you had

21   concerns about how this would implicate Live Well's lenders?

22   A.  Correct.

23   Q.  Could we agree that is a consideration, separate and apart

24   from a good faith analytical study of the value -- intrinsic

25   true value of these bonds?

1   A.  Yes.

2   Q.  So this made you nervous, correct?

3   A.  Yes.

4   Q.  And you understood the implications, perhaps, of

5   implementing the scenario 14 methodology in September of 2015

6   on Live Well's lenders, yes?

7   A.  Yes.

8   Q.  Now is it your testimony that you expressed those concerns

9   at that time to Mr. Hild?

10  A.  My recollection is in several of those discussions I made

11  the comment that if the lenders had to sell the bonds at those

12  prices they would take losses they wouldn't be able to.  That

13  is my recollection.

14  Q.  So is that a yes or a no?  The question is very simple:  Is

15  it your testimony at that point in time you expressed your

16  concerns to Mr. Hild?

17  A.  Yes.

18  Q.  Okay.  Did you do so on the phone?

19  A.  My recollection is it was during one of those phone calls

20  that were recorded.

21  Q.  Was it during one of the phone calls that was recorded that

22  we all heard in court here?

23  A.  I don't believe so.

24  Q.  So it was a different recorded call that was not played in

25  court here where you expressed these concerns to Mr. Hild, just

1   so we're clear?

2   A.  My recollection is it was on -- I was on a phone call

3   during that time where I made the comment, like I said, repo

4   lenders not being able to sell bonds if they had to, in his

5   presence.

6   Q.  We'll get to that.  But the point is moving forward, so

7   just so I understand these concerns, the concern is -- tell me

8   if I'm wrong here -- that at that point in time, because the

9   plan had changed, Live Well was submitting its internal values

10  to IDC, IDC didn't have to, but was publishing those values and

11  the lender was lending against those values.  The concern was

12  with that kind of construct, was it not, sir?

13  A.  Yes.

14  Q.  Now let me just point out, do you agree that that was sort

15  of a preliminary concern in that -- let's start with this, IDC

16  could choose to publish whatever value it wanted to, agreed?

17  A.  Yes.

18  Q.  I understand why you might be concerned about it, but your

19  concerns assumed what that situation would continue on.  Fair?

20  A.  Yes.

21  Q.  If IDC decided not to publish values for these CUSIPs, that

22  would eliminate the concern, yes?

23          It might have other and ramifications --

24  A.  Right.

25  Q.  -- but it would eliminate the concern.

1   A.  Yes.

2   Q.  And specifically the ramifications in the past was that

3   there would be serious financing issues in the circumstance,

4   yes?

5   A.  Yes.

6   Q.  Nevertheless, that's something that could have happened,

7   you agree?

8   A.  Yes.

9   Q.  Okay.  Very well.  Nonetheless, you had no issue with the

10  scenario 14 valuation as an intrinsic valuation.  Do I

11  understand that correct?

12  A.  Generally, yes.

13  Q.  I want to make sure I understand.

14  A.  I don't remember exactly was that perfectly the intrinsic

15  value or on or around that, but yes.

16  Q.  I want to make sure our question and answer connected.  You

17  understood scenario 14 to be a sincere good faith attempt to

18  value intrinsically the bonds?

19          MR. HARTMAN:  Objection with respect to whose intent.

20          THE COURT:  Sustained.  You can speak to what was in

21  your head but not as to what was in someone else's unless they

22  articulated something to you.

23          Do you want to rephrase that?

24          MR. DUSING:  Yes, your Honor.

25  Q.  As to your particular belief, you have understood scenario

1    14 to be a good faith exercise to intrinsically value the

2    bonds, yes?

3    A.   Yes.

4    Q.   The nature of your concerns were with the potential

5    implications that you foresaw of implementing it within Live

6    Well.  Do you agree?

7    A.   The issue in my mind was the facts that the lenders were

8    expecting or wanting a market value, not an intrinsic value.

9    That was the issue.

10   Q.   I didn't -- we'll talk about that when we -- we'll talk

11   about that later, what the expectations of the lenders were.

12   Now that you brought it up, let me ask you now, there were

13   contractual relationships in place between Live Well and these

14   lenders, yes?

15   A.   Yes.

16   Q.   You would agree with me that the expectations of lenders

17   were set forth in the contracts, yes?

18   A.   Yes.

19   Q.   You will agree with me those contracts defined, actually

20   defined market price, do you agree?

21             MR. HARTMAN:  Your Honor, could we have a sidebar on

22   this really quickly?

23             THE COURT:  Sure.

24             Again, if you all want to stand and stretch, you can.

25

1           (At sidebar)

2           MR. HARTMAN:  The reason I asked for a sidebar is I

3      want to be sure we're on the same page.  I got a sense to the

4      question there was teeing up to suggestion or implication that

5      the lenders should have negotiated around this issue or dealt

6      with this issue, and given there was an in limine ruling on

7      this, I wanted to get a sense for the relevance.

8           MR. DUSING:  If I could speak to that, your Honor.

9           THE COURT:  Yes.

10          MR. DUSING:  I do not intend to go through that in any

11     way at all.  I wanted to introduce this.  I wanted to make it

12     clear, as you know, there are contractual agreements between

13     the three victim lenders and Live Well, you marked it as an

14     exhibit, we marked them as an exhibit, we will talk about

15     those, but given the witness's answer, that's as far as --

16          THE COURT:  I didn't hear the last thing you said.

17          MR. DUSING:  The point was simply to establish that

18     there were definitions in the contracts between the alleged

19     victim lenders and Live Well of market value.

20          MR. HARTMAN:  Okay.

21          MR. DUSING:  Since the witness preemptively spoke to

22     lenders' expectations, that was the purpose.

23          I'm finished asking questions about it.

24          MR. HARTMAN:  Okay.

25          THE COURT:  Okay, thank you.

1              (In open court)

2    BY MR. DUSING:

3    Q.  I was asking if there were contractual arrangements between

4    the lenders and Live Well that governed the terms of the loans,

5    the repurchase transactions, yes?

6    A.  Yes.

7    Q.  And I believe you testified yesterday that you had some

8    familiarity with those, is that right?

9    A.  Yes.

10   Q.  So when these -- when scenario 14 was adopted in

11   September 2015, the scenario 14 values were -- it valued these

12   bonds higher than the old model, the model that you used when

13   you came over from Stifel, yes?

14   A.  The valuations were higher because the inputs were

15   different.

16   Q.  Well, the inputs were different because they were for two

17   separate purposes, really, right?

18   A.  Yes.

19   Q.  But whyever that is or however that is, my question simply

20   is the values were higher.  Do you agree?

21   A.  Yes.

22   Q.  Now consistent with our diagram before, that little

23   triangle we draw, the implications of the internal adoption of

24   that, at least at that point in time, are significant, you

25   would agree?

1    A.  Yes.

2    Q.  Specifically, one implication is that the values, since

3    Live Well is giving its internal valuations to IDC and IDC is

4    publishing them to the lenders and the lenders are lending off

5    of them, the effect of that is that Live Well would be able to

6    borrow more based on those valuations, do you agree?

7    A.  Yes.

8    Q.  That being said, again, those broker quotes, the internal

9    valuations that were being provided to IDC, that could change

10   at any time, do you agree?

11   A.  Yes.

12   Q.  Nonetheless, your concern was that what if it didn't,

13   right?

14   A.  Yes.

15   Q.  In other words, getting to the heart of the matter, do I

16   understand correctly that the essence of your concern, having

17   the experience that you have and the background, was that in

18   effect for that moment in time, if you looked hard enough, the

19   internal value being given to IDC by Live Well was sort of

20   setting indirectly the terms of the financing arrangement, yes?

21   A.  I don't understand that question.

22   Q.  It was probably a bad question and I withdraw it.  My

23   apologies.

24          Your concern was that at that moment in time it set up

25   the scenario where Live Well's values necessarily increased

1    because of its new way of valuing the stuff would have the

2    indirect consequence of increasing the borrowing base from its

3    lenders, yes?

4    A.   The increase in valuations caused the amount of the loan to

5    go up with the lenders, the debt amount.

6    Q.   Understood.  And that's the implication of the triangle we

7    drew previously, yes?

8    A.   Right.

9    Q.   But will you agree at the time of the Stifel transaction it

10   was not contemplated that this situation would be in play at

11   all.  Do you agree?

12          MR. HARTMAN:  Objection to relevance.

13          THE COURT:  Sustained.

14   Q.   Mr. Stumberger, if IDC was independently valuing the bonds

15   at this point in time, you don't have the concern that you had,

16   correct?

17   A.   Yes.

18   Q.   All right.  But they weren't, right?

19   A.   Correct.

20   Q.   So now do I understand correctly, you were so concerned

21   about this that you started recording phone calls, is that

22   right?

23          THE WITNESS:  I just want to clarify that last answer.

24          THE COURT:  Go ahead.

25   A.   The conversation, to be perfectly clear, in February 2015

1    was Live Well would deliver the broker quotes to IDC, and when

2    we -- this is what I wrote in the email -- when Live Well felt

3    it was necessary for them to start or commence doing it again,

4    we would notify them.

5              So I just wanted to clarify that last answer.

6    Q.  Okay.  Anyway, do I have this much right:  IDC asked for

7    broker quotes again in February 2015, and that's what happened

8    from that point forward?

9    A.  Yes.

10   Q.  Okay.  Now the implication we talked about of implementing

11   scenario 14 internally indirectly with the lenders is what it

12   was, do I understand that one of the things that you did having

13   the concerns that you did was start recording phone calls?

14   A.  Yes.

15   Q.  And we heard some of those phone calls in the courtroom

16   here yesterday and today, do you agree?

17   A.  Yes.

18   Q.  More precisely, we have heard portions of those phone

19   calls, right?

20   A.  Yes.

21   Q.  Because some of these phone calls, to be clear, were over

22   an hour long.  Do you agree?

23   A.  Yes.

24   Q.  And the recorded calls that we heard in the courtroom here

25   today and yesterday, we haven't even heard all of those

L4FTHIL4                         Stumberger - Cross

1    portions of those calls, isn't that right?

2    A.  Yes.

3    Q.  Okay.  And so who recorded these calls, was that you?

4    A.  It was myself and Ernie and Dan.

5    Q.  Okay.  Your other team members?

6    A.  Yeah.

7    Q.  All right.  And was that some kind of coordinated effort?

8    A.  My recollection is I was told by Dan, I don't remember the

9    date, that he was recording them, the calls.  And then Ernie

10   and I, I think, started at the same time we knew he was, we

11   did, too.

12   Q.  Can we agree that you discussed your concerns with the

13   other members of your team, is that right?

14   A.  Yes.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    Q.  OK.  And whether because of your concerns or whether those

2    arose themselves, there was discussion amongst your team about

3    the financing implications of this?

4    A.  Yes.

5    Q.  OK.  All right.  You did something besides record phone

6    calls, though, didn't you, on account of these concerns?

7    A.  Yes.

8    Q.  What was that, sir?

9    A.  My team and I met with external counsel.

10   Q.  OK.  I'm from Kentucky.  Does that mean you went and saw a

11   lawyer privately?

12   A.  Yes.

13   Q.  Of course you told the company that you did that, right?

14   A.  No.

15   Q.  Of course you told Mr. Hild that you did that, right?

16   A.  No.

17   Q.  Let me just try to understand this.  You have these

18   concerns.  You go and see a private lawyer.  Let me ask you

19   this.  Did you go by yourself?

20   A.  No.

21   Q.  Who did you go with?

22   A.  Ernie and Dan.

23   Q.  Let me make sure I understand this.  You go with your other

24   team members.  Do I have it right?

25   A.  Yes.

L4dnhil5                    Stumberger - Cross

1    Q.   Go and secretively meet with your own lawyer, never tell
2    your boss?
3    A.   We didn't --
4    Q.   That is just a yes or no.  Can I get a yes or no to that.
5    A.   Yes.
6    Q.   OK.  You were aware at the time that was in violation of
7    company policy, right?
8    A.   No.
9    Q.   You were not aware?
10   A.   Correct.
11   Q.   Are you aware of whether that violated company policy now?
12   A.   I haven't read my employment agreement.
13   Q.   OK.
14   A.   Since --
15   Q.   We'll get to that, but I guess we will just knock this out.
16   Isn't it the case that you had an employment agreement with
17   Live Well?
18   A.   Yes.
19   Q.   And there were certain terms and conditions and obligations
20   placed upon you by virtue of that agreement?
21   A.   Yes.
22   Q.   One of those was conduct yourself in compliance with all
23   state, federal, local laws and regulations, correct?
24   A.   Yes.
25   Q.   One of those was to report to the company any concerns that

L4dnhil5                    Stumberger - Cross

1   you had that involved its business, isn't that correct?

2   A.  You would have to show me.  I don't remember that.

3   Q.  I will do so later.

4   A.  All right.

5   Q.  If you don't remember now, we'll leave it at that.  In any

6   event, you agree that you did not do that?

7   A.  Correct.

8   Q.  OK.  So, in response to having these concerns, you

9   privately secretively visit a lawyer with your team members,

10  never tell the company or Mr. Hild, and you start recording

11  phone calls with Mr. Hild, the CEO of the company.  That's what

12  you did?

13  A.  Yes.

14  Q.  OK.  All right.  Can I ask, how frequently, how many phone

15  calls did you have on average, just on average, with Mr. Hild

16  during an average week over this period?

17  A.  The calls were typically Monday through Thursday, so four

18  times a week.

19  Q.  OK.  I am going to try and do some math.

20  A.  Sure.

21  Q.  Tell me if this works.  Four times a week, all right.  Can

22  we say 50 weeks a year to account for two weeks of vacation for

23  everybody?  Is that fair?

24  A.  Sure.

25  Q.  OK.  So, four times a week times 50 weeks in a year is, by

L4dnhil5                    Stumberger - Cross

1   my math, 200 phone calls roughly per year.  Do you agree,

2   Mr. Stumberger?

3   A.  Yes.

4   Q.  OK.  And let's just do easy math.  Let's forget about 2014,

5   since you came aboard in September; let's forget about 2019,

6   since you left in March.  But let's do -- 2015, 2016, 2017,

7   2018 is four years.  Do you agree, Mr. Stumberger?

8   A.  Yes.

9   Q.  OK.  So if we had 200, on average, phone calls per year

10  times four years, can we agree that's 800 phone calls with or

11  involving Mr. Hild.  Do you agree, Mr. Stumberger?

12  A.  That's -- yes.  That's what -- the number's right.

13  Q.  Loose terms.

14  A.  Yeah.

15  Q.  But generally you're OK with this math?

16  A.  It seems like --

17  Q.  In general terms?

18  A.  Yes.

19  Q.  OK.  Pray tell, how many phone calls did you record?

20  A.  My recollection was on the order of 30 to 40.  I don't know

21  how -- around there.

22  Q.  OK.  And do you recall the time period during which you

23  recorded the calls that you recorded, sir?

24  A.  It was during that time.  It was -- my recollection it

25  started in September 2015.  It was -- it was during -- like the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    next, I don't know, several weeks is the bulk of it.

2    Q.  OK.  So we'll try and weave this together here.  Do you

3    agree in September of 2015, when Scenario 14 was implemented,

4    there was a significant increase in the Live Well's internal

5    valuations of its bonds?

6    A.  Yes.

7    Q.  As a consequence of that, because of Live Well giving those

8    values in the form of broker quotes to IDC, there was a

9    significant increase in IDC prices being published at that

10   time?

11   A.  Yes.

12   Q.  OK.  So, for general purposes, can I call that price

13   increase No. 1?

14   A.  OK.

15   Q.  Well, I say that because there was another period of time

16   during which, for other reasons we'll get to it in a moment,

17   there was another increase in the prices being published, an

18   increase in Live Well's internal valuations, which impacted,

19   which translated to an increase in IDC's published prices at a

20   different point in time.  Yes?

21   A.  Are you describing the major events, like there was a major

22   event --

23   Q.  I'm talking about the first quarter of 2017.

24   A.  Yes, exactly.

25   Q.  I'm just trying to get to it.

1   A.  Yes.

2   Q.  Is that fair, to call it price increase No. 2?

3   A.  Yes.

4   Q.  So when I say price -- we'll do, you know, Live Well values

5   increase 1 -- I can't do all this here.  But that was in -- say

6   Live Well values increase 2.  And that was in -- is it fair to

7   say the first quarter, Mr. Stumberger, of 2017?

8   A.  Yes.

9   Q.  And, again, I am just trying to be summary and quick, but I

10  don't want to be inaccurate.  I believe your testimony

11  involved -- there was a series of price increases in the first

12  quarter of 2017.  Is that fair?

13  A.  Yes.

14  Q.  For present purposes, can we group those together and call

15  those the price increase No. 2?

16  A.  Sure.

17  Q.  OK.  All right.  Can I draw that on the board?  Is that,

18  from your perspective, the next significant event?

19  A.  I'm sorry.  Say that again.

20  Q.  The second price increase, which we will talk about in a

21  moment, in the first quarter of 2017, was that sort of the next

22  thing that happened from your perspective on this timeline?

23  A.  The next thing that happened?

24  Q.  That was a poor question.  Let me withdraw it.  Can I write

25  that on the box?

L4dnhil5                          Stumberger - Cross

1    A.  Write what?

2    Q.  Tell you what.  I am going to indicate first quarter, Q1,

3    2017 price increase.  Can I draw that on this timeline here,

4    and can we say that that happened over the course of January

5    through March of 2017?

6    A.  Yes.

7    Q.  OK.  I just want to make sure this is accurate.  That's

8    what I'm asking.  OK?

9    A.  OK.

10   Q.  All right.  So I am revising this.  That is in February.

11   We are now in 2017, yes?

12   A.  Yes.

13   Q.  January, February, March.  OK.  Why am I talking about

14   this?  Because you mentioned the time period of your recorded

15   calls.  Do we agree the time period during which you recorded

16   calls was between the first price increase in September of 2015

17   and the second price increase inclusive, January, February,

18   March of 2017?

19   A.  Personally recording calls?

20   Q.  Yes.

21   A.  I recorded calls not in 2017.  2015.

22   Q.  OK.  I misunderstood.  Do I understand correctly, then,

23   that you -- may I just ask it this way.  To the best of your

24   knowledge as you sit here today, from when till when did you

25   record phone calls?

L4dnhil5                     Stumberger - Cross

1   A.  My recollection is my recorded calls started on or around

2   September 2015, and it was mostly during that time period, over

3   the next several weeks.  I remember there being one call when

4   the SEC investigation happened.  I don't remember --

5   Q.  OK.

6   A.  -- other calls between them.

7   Q.  All right.  Fair enough.  Can we agree that you stopped

8   recording calls at some time prior to the first quarter of

9   2017?

10  A.  Yes.

11  Q.  OK.  Turning back to that number, then, of roughly 800, you

12  know, phone calls on average we might say, you recorded 30 to

13  40 phone calls total.  Do I have that right?

14  A.  It could be 45 -- 30 to 50.

15  Q.  I understand.  Ballpark-ish?

16  A.  Yeah.  30 to 50 I don't know.

17  Q.  You agree with that ballpark-ish math however?

18  A.  Yes.

19  Q.  Yes?

20  A.  Yes.

21  Q.  OK.  All right.  So, the effect of this -- the decision to

22  implement, to adopt Scenario 14 values internally at Live Well,

23  as we discussed, was to indirectly increase the amount of

24  financing that was available to it.  Do you agree?

25  A.  Are you saying --

```
 1              MR. HARTMAN:  Objection to the characterization.

 2              THE COURT:  I will allow the question.

 3              THE WITNESS:  Repeat, please.

 4              MR. DUSING:  OK.

 5              THE COURT:  If you can try and shorten your questions

 6    a little bit, that would be helpful too.

 7              MR. DUSING:  I will do my best, your Honor.

 8              THE COURT:  Thank you.

 9              MR. DUSING:  I will do my best.

10    BY MR. DUSING:

11    Q.  OK.  Let's do it this way.  Mr. Stumberger, at some point

12    in time was there significant growth of the bond portfolio?

13    A.  Yes.

14    Q.  And I'm talking numerically here now, very specifically.

15    Live Well acquired many bonds over a certain period of time.

16    Is that fair?

17    A.  Yes.

18    Q.  And did that period of time coincide with the adoption of

19    Scenario 14 in September of 2015 through I guess the end of

20    2016?

21    A.  Yes.

22    Q.  OK.  Just so that we can recall, I think we said something

23    like 15 bonds were purchased by Live Well from Stifel, is that

24    right?  Ish?

25    A.  Ish.
```

L4dnhil5                    Stumberger - Cross

1   Q.  The number of bonds held by Live Well in the portfolio by

2   the end of 2016 was approximately 50; is that right?

3   A.  Yes.

4   Q.  Let's say 50, five zero.  So we went from one five to five

5   zero, right?

6   A.  Yes.

7   Q.  My understanding is part of that was driven by the

8   increased availability of financing, a byproduct of the

9   implementation of Scenario 14.  Do I understand correctly?

10  A.  Can you just explain what you mean by increased financing

11  being available?

12  Q.  OK.

13  A.  What do you mean by that?

14  Q.  Well, so we talked about this triangle and how the -- the

15  correlation between, during this time, Live Well's internal

16  valuations, those being given in the form of broker quotes to

17  IDC, IDC relying on those broker quotes and publishing those

18  values and lenders for Live Well relying on those broker

19  quotes.  Yes?

20  A.  Yes.

21  Q.  With that explanation, if you will, can I ask the question.

22  That had the indirect effect of expanding the availability of

23  financing during that period.  Yes?

24  A.  More money was being lent because of that, yes.

25  Q.  OK.  That's a different way of asking my question.  And

1   Live Well used that money to buy more bonds.  Yes?

2   A.  Yes.

3   Q.  And that is why and how the portfolio grew from 15 bonds

4   roughly at the time of the transaction to roughly 50 by the end

5   of 2016.  Yes?

6   A.  Yes.

7   Q.  OK.  Now, your compensation was -- will you agree with me

8   that it was predominantly driven by incentive-based comp?

9   A.  Yes.

10  Q.  You did have a salary, do we agree?

11  A.  Yes.

12  Q.  But the bulk of it was a factor of performance payments,

13  yes?

14  A.  It wasn't performance.  It was -- my comp was based off of

15  the interest income being generated by the portfolio, less

16  expenses.

17  Q.  Very good.  So the expansion -- let me -- can we do it this

18  way:  Fair to say that your comp and your team members' comp

19  was in large measure determined by the revenue derived from the

20  bond portfolio.  Yes?

21  A.  Yes.

22  Q.  The more bonds in the bond portfolio, the more revenue

23  generated by the portfolio.  Yes?

24  A.  Yes.  That's how it was originally forecast and modeled

25  when we came over from Stifel.

L4dnhil5                         Stumberger - Cross

1    Q.  I understand.  The more revenue generated by the bond

2    portfolio, the more comp to yourself and your team members,

3    yes?

4    A.  Yes.

5    Q.  So, can we agree that this phenomenon or these phenomena

6    that we've discussed had the effect of benefiting you and your

7    team members, at least in terms of your compensation?

8    A.  Acquiring more bonds, yes.  But it didn't need to be that

9    way.  We had a business modeled out --

10   Q.  OK.

11   A.  -- where we joined from Stifel, and that was buying bonds

12   too.  So this wasn't, this wasn't something that all of a

13   sudden this was going to increase our comp.  It was supposed to

14   be that way differently from the beginning.

15   Q.  OK.  My question is rather simple:  You made a lot more

16   when Live Well had 50 bonds and 50 revenue streams than you did

17   when Live Well had 15 bonds and 15 revenue streams.  Yes?

18   A.  Yes.  However --

19   Q.  OK.

20   A.  Let me -- can I answer?

21   Q.  If you want to explain that answer, that's fine.

22   A.  Yeah.  The business model that we came over with was

23   assuming new bonds would be bought, during that time when we

24   came over, monthly using Live Well's organic mortgage

25   production securitizing it and creating IO.  That was the

1   business plan when we came over.

2   Q.  And we agree, no one foresaw this kind of circumstance that

3   developed with, you know, the broker quote situation continuing

4   forever.  Yes?

5   A.  Correct.

6   Q.  OK.  All right.  So, just while we're at it, your

7   compensation, can you give us to the best of your ability for

8   2015, all in, was what?

9   A.  I don't recall.  It was over --

10  Q.  OK.

11  A.  I don't want to say the wrong number.  I don't recall.

12  Q.  That's fine.  More than a million?

13  A.  2015?

14  Q.  Yes.

15  A.  Possibly.

16  Q.  OK.  Well, 2016?

17  A.  Yes.

18  Q.  It was more than a million?

19  A.  Yes.

20  Q.  '17?

21  A.  Yes.

22  Q.  '18?

23  A.  I don't recall.

24  Q.  Can we agree that it increased in proportion to the

25  expansion of the portfolio?

1    A.  Yes.

2    Q.  OK.  All right.  So that brings us to I think the second

3    price increase, or we'll call it that, in the first quarter of

4    2017.  And we've, I think, identified that as actually a series

5    of price increases that for ease in time we're going to refer

6    to as one.

7              Can we agree to that, Mr. Stumberger?

8    A.  I don't want to -- like I want to clarify that from my

9    perspective.  There weren't two price increases, September

10   2015, first quarter 2017.  Every time a bond was acquired, the

11   prices were increasing.

12   Q.  Fair enough.  Let's clarify our terms here.  Live Well's

13   internal valuations of its bond portfolio increased on two

14   occasions in an outstanding way.  The first is in September of

15   2015.  The second is over the first quarter of 2017.  Do you

16   agree?

17   A.  Yes.

18   Q.  OK.  That's all I mean to suggest by that.  OK.  So let's

19   talk now about the second time that this happened.  Now I

20   believe some of the recorded calls that we heard earlier today

21   were from that period.  Do you agree?

22   A.  Yes.

23   Q.  In fact, I thought we heard one or two that were recorded

24   in March of 2017.  Do you agree?  Well, it is whatever it is.

25   The record is whatever it is.

1    A.  Yeah.  Or February, yeah.

2    Q.  In any event, could I just ask -- so did you decide -- how

3    did you record these calls?  May I ask?

4    A.  Using my iPhone.

5    Q.  I'm sorry?

6    A.  Using my phone.

7    Q.  Could you tell me how that -- you just hit --

8    A.  Record it.

9    Q.  Is there an app on that or how does that work?

10   A.  I had a desk phone and I put on it speaker and I used my

11   phone just to record it.

12   Q.  OK.  So you didn't have to decide prior to the call whether

13   you were going to record the call, is that right?

14   A.  I didn't have to decide?

15   Q.  Let me ask it a different way.  You could start recording

16   the call midstream, is that right?

17   A.  Sure.

18   Q.  OK.  And, in fact, for some of the recordings that you made

19   that's what happened; is that right?

20   A.  I don't recall.  I don't have recollection of when I

21   started or stopped every single call.

22   Q.  OK.  Well -- and I'm not asking that.  But can we agree

23   that there were at least some instances where you didn't record

24   the call until the call was under way.  Is that fair?

25   A.  It's possible.

L4dnhil5                         Stumberger - Cross

1     Q.  OK.  And there were some instances where you stopped

2     recording prior to the call being completed, right?

3     A.  It's possible.

4     Q.  OK.  In any event, I take it you had no standard practice

5     to, before the call began, hit record, and when the call was

6     over hit over; is that right?

7     A.  I didn't have documented procedures in how I did it, no.

8     Q.  OK.  All right.  Did you decide which parts of which calls

9     to record based on their anticipated subject matter in your

10    mind?  Was that the criterion?

11    A.  My recollection is it was during the time of September

12    2015, in the weeks after that, it was the -- that was the

13    subject matter as a whole, not bits and pieces of the calls.  I

14    don't -- it wasn't -- I wasn't trying to figure out pieces of

15    the calls to record and not record.  It was the switch to

16    Scenario 14 time period is my recollection.

17    Q.  OK.  But you are not saying that you recorded all of the

18    calls that occurred after that period, are you?

19    A.  Not all.

20    Q.  OK.  So, I mean, you decided which calls to record and when

21    to record them based on some logic I would presume, yes?

22    A.  My vague recollection was if there were maybe hot topics,

23    you know, topics that were very important with regards to

24    valuation and other things was the general premise.

25    Q.  OK.  But you can only capture those portions of those

1    discussions once you understood they were happening?  Once they

2    had happened and you hadn't pressed record those were not

3    recorded obviously, right?

4    A.  I honestly don't remember much right now about the thought

5    process of what to record and what not to.  It was during that

6    general time period.

7    Q.  OK.  Can we at least agree that the recorded calls, not

8    just those that were played here in court, but as a whole,

9    those that you recorded, that is certainly not the universe of

10   calls that were had about that subject matter during the

11   period?  Do you agree?

12   A.  Yes.

13   Q.  All right.  You know, while we are at it, could I ask,

14   please, how many e-mails a week would you say over this period

15   you exchanged with Mr. Hild?

16   A.  During that time period?

17   Q.  Yeah.  Say from 2014 through 2018, sir?

18   A.  I don't even -- I couldn't even guess.

19   Q.  I don't want you to guess.

20   A.  OK.

21   Q.  But a good-faith estimate would be appreciated.  More than

22   one?

23   A.  More than one, yes.

24   Q.  More than five?

25   A.  Yes.

1   Q.  More than ten?

2   A.  An e-mail where we were both on it, or like me to him, him

3   to me?  Like I don't --

4   Q.  That's fair enough.  Let's say any e-mail where you're --

5   yes, we'll include copying people.

6   A.  Yeah.

7   Q.  OK.  More than ten a week?

8   A.  More than ten a week?  Probably ten to 15.

9   Q.  OK.  Let's go with a conservative number.  So let's give

10  you two weeks off for vacation again.  So, we agree ten a week

11  times 50 weeks a year -- again, understanding generally

12  ballpark-ish -- 500 e-mails to and from you and Mr. Hild

13  defined as you just did, would you agree with that,

14  ballpark-ish?

15  A.  Some e-mails had like a long chain, so I don't know how

16  that --

17  Q.  Well, let's --

18  A.  It's tough to like -- it's like back and forth back and

19  forth and then it stops.

20  Q.  OK.  Including every e-mail.  I'm just trying to get a

21  rough sense here of 10 sort of -- 10 e-mails to or from you or

22  Mr. Hild or e-mails to or from you and other people on which

23  Mr. Hild was copied per week from 2014 to 2018.  Ten a week?

24  A.  I don't even have a -- ten is fine.  It could be 20.  Like,

25  I don't have a basis to remember --

L4dnhil5                        Stumberger - Cross

 1    Q.  Understood.  I am not asking a precise number.  Would you

 2    agree that ten is a -- maybe at least ten.  Is that a fair

 3    estimate?

 4    A.  Yes.

 5    Q.  OK.  So, that number per week times 50 weeks is 500 e-mails

 6    defined as we just defined it per year, times four years, 2014,

 7    2015, 2016 -- excuse me, not 2014 -- 2015, '16, '17, '18, times

 8    four years is 2,000 e-mails.  Do you agree with my math?

 9    A.  500 times four is 2,000, yes.

10    Q.  Very good.  OK.  So, in your testimony earlier this morning

11    and yesterday, we looked at a lot of e-mails about the subject

12    matter.  I don't know how many there were.  But can we agree

13    that they're not the only e-mails about that subject matter,

14    sir?

15    A.  Yes.

16    Q.  OK.  All right.  I want to take that down.  So,

17    Mr. Stumberger, during this period from September of 2015 up

18    through the end of 2016, as the portfolio grew, there was a

19    belief generally internally at Live Well that you perceived

20    more value than the market, you know, your competitors with

21    respect to these bonds.  Do you agree?

22    A.  Yes.

23    Q.  OK.  And there was a decision, and I'm not saying that you

24    made it or that any particular person made it, but just a

25    decision at the corporate level, if you will, to pursue a

1   strategic path to acquire as many of these bonds as possible

2   because you thought they were valued more than others.  Do you

3   agree?

4   A.  I will answer that by saying that we had a firm sense of

5   what the intrinsic value was versus the market value.

6   Q.  OK.  So is that a yes or --

7   A.  I don't know.  Could you just repeat the question?

8   Q.  Yeah.  You guys thought you saw something other people

9   didn't, didn't you?

10  A.  That was kind of the justification, rationale discussed on

11  calls, but I know that all my peers at other dealers understand

12  the intrinsic value as well.  It wasn't some, you know, thing

13  that we decided at Live Well.  It was known by other market

14  players.

15  Q.  OK.  I am not sure if that's a yes or a no.  Let me ask you

16  the question.  As a group, you perceived that there was an

17  opportunity with these bonds.  Is that the case?

18  A.  Yes.

19  Q.  OK.  And because of this opportunity, the decision was made

20  to go buy as many of these bonds as possible.  Yes?

21  A.  It was driven -- it was driven in my opinion through the

22  increased financing available.

23  Q.  OK.  And so why it was we will get to when we get to it.

24  So, right now the question is simply it was, was it not?  There

25  was a decision made to take advantage of this opportunity?

L4dnhil5                    Stumberger - Cross

1   A.  Yes.

2   Q.  That drove the portfolio growth from 15 bonds to 50.  Yes?

3         Let me ask it again, consistent with the strategy to

4   take advantage of this opportunity, effort was made to buy more

5   of these types of bonds.  Yes?

6   A.  Yes.

7   Q.  And in fact, quite a few more of these types of bonds were

8   bought.  Yes?

9   A.  Yes.

10  Q.  OK.  Now, during this period -- well, let me ask you this:

11  Did either the old model or Scenario 14 sort of account for

12  regulatory policy changes and other generalized market

13  developments?

14  A.  No.  It's a forecasting tool.

15  Q.  Understood.  I mean, Scenario 14 in the old, you know,

16  projecting method, I mean, was more formulaic in the sense

17  that, you know, prepayments and this yield assumption or

18  whatever, stuff like that, right?

19  A.  In the old model?

20  Q.  Yes, and in the Scenario 14 model as adopted.

21  Understanding that the assumptions in each were different, the

22  nature of the assumptions was more, for lack of a better term,

23  microeconomic.  Fair?

24  A.  They were -- it was generic market inputs.

25  Q.  Can we agree on this:  They did not account for sort of

 1    macroeconomic regulatory policies and other high-level market
 2    developments that might impact the value of the bonds?
 3    A.   The model did not include regulatory inputs or any kind of
 4    things like macro events in the market.  They were the inputs.
 5    Q.   Right.  And you agree those things could affect the value
 6    of the bond portfolio, right?
 7    A.   The outcome of those events, yes.
 8    Q.   OK.  Well, the outcome of those events.  There could be
 9    regulatory policy changes that would have consequences.  Those
10    consequences would impact the value of the bond portfolio.  Do
11    you agree, sir?
12    A.   Yes.
13    Q.   OK.  And just by way of example and not exhaustive
14    representation here, one could be, for example, a regulatory
15    moratorium on, let's say refinancings.  That would potentially
16    affect prepayments fees, would it not, sir?
17    A.   Yes.
18    Q.   And it would affect prepayments fees in a way that would
19    slow them down, would it not, sir?
20    A.   A moratorium on refinancings would slow down prepayments.
21    Q.   OK.  And remind me, am I correct in remembering that the
22    slower a prepayment speed, the more valuable a bond is?
23    A.   Yes.
24    Q.   So in that way, those things could affect the bond
25    valuations.  You agree, sir?

1    A.  Yes.

2    Q.  And in fact there were several regulatory changes not just

3    of that particular kind but other kinds that either were

4    implemented or announced or reasonably foresaw through 2016.

5    Isn't that the case?

6    A.  I have recollection there were a series of regulatory

7    updates being implemented or announced or discussed during that

8    time.

9    Q.  OK.  And there was to whatever extent some internal

10   discussion with yourself, Mr. Hild, your team, about the effect

11   on Live Well's valuation of its bond portfolio of those

12   regulatory changes and their consequences.  Do you agree?

13   A.  I have recollection there were conversations related to

14   that.  I don't know how many or when, but --

15   Q.  I didn't ask you that.

16   A.  Right.

17   Q.  That's fine. OK.

18            During the first quarter of 2017 I believe you

19   testified to some -- there was discussion of Wedbush and some

20   repo lenders and some problems that were had.  Do you recall

21   that testimony?

22   A.  Yes.

23   Q.  Again, I want to being quick but accurate, so if I'm not

24   accurate, correct me.  But can we fairly say that -- well,

25   Wedbush decided -- well, for whatever reason, Live Well was

1    notified by Wedbush, we're not going to lend you half as much

2    money as we have been.  That happened, yes?

3    A.  My recollection is Wedbush contacted Live Well with

4    requests to move bonds off their line at different times, and

5    there were a lot of conversations related to getting that done

6    over a period of time.

7    Q.  OK.  Let me try it this way.  Isn't it the case that, say

8    the beginning of January of 2017, that the total credit line,

9    if you will, extended by Wedbush to Live Well at that time was

10   somewhere in the ballpark of $225 million?

11   A.  Correct.

12   Q.  OK.  And at some point thereafter, either at one time or as

13   a series of times, Wedbush said we're only going to lend you,

14   your credit limit is going to be $125 million?

15   A.  Yes.

16   Q.  That was a problem, was it not?

17   A.  Yes.

18   Q.  And the problem was, if you are buying stuff with your

19   credit card and suddenly your credit card limit is cut in half,

20   you better find, you know, another credit card or something to

21   take its place fairly quickly.  Yes?

22   A.  Sure.

23   Q.  And the problem was, given the nature of repo lending, as

24   we talked about, 90 days at max, holy cow, we better do this

25   quickly.  Fair enough?

L4dnhil5                    Stumberger - Cross

1    A.  Yes.

2    Q.  And as you mentioned I believe on your testimony on direct,

3    this logically created, you know, quite a stir.  This was a

4    challenge for the company.  Would you agree?

5    A.  Yes.

6    Q.  You were involved in figuring out a solution to this

7    challenge.  You would agree?

8    A.  Yes.

9    Q.  I mean, Mr. Hild was certainly involved in figuring out a

10   challenge to this company.  You would agree?

11   A.  Yes.

12   Q.  After all he founded the company back in 2005.  Yes?

13   A.  Yes.

14   Q.  He was the, you know, controlling shareholder; he ran the

15   company.  You agree?

16   A.  Yes.

17   Q.  Not only that, did you have an understanding of Mr. Hild's

18   personal economic relationship to the company in terms of

19   whether he guaranteed the company's debt?

20   A.  I didn't know much, if anything.  My recollection is I know

21   that Mr. Hild provided a financial guarantee or a backup

22   guarantee on one of the lines, warehouse lines, I don't

23   remember which one, something like that.

24   Q.  OK.  So do I gather you don't have full knowledge about

25   what was guaranteed by Mr. Hild or what -- some -- there were

1    guarantees provided by Mr. Hild, but you don't know to what

2    extent.  Is that fair?

3    A.  Yes.

4    Q.  OK.  Can we agree that if Live Well is unable to find

5    financing for some of its bonds, it would not have the revenue

6    stream it needed to repay the debts that it owed and that if it

7    defaulted on the debts that it owed, at least in part Mr. Hild

8    personally would be on the hook.  Do we agree, sir?

9    A.  Yes.

10   Q.  OK.  Now, it's my understanding that the internal

11   valuations for Live Well were increased over a series of -- at

12   various times to whatever extent during the first quarter of

13   2017.  Do I have that right, sir?

14   A.  Yes.

15   Q.  OK.  And it is the -- let me ask it this way:  It happened

16   during the time of this, this financing challenge, if you will.

17   You will agree?

18   A.  Yes.

19   Q.  OK.  But the fact that the bonds were worth more than they

20   had otherwise, than they had been marked at internally had

21   already been, on account of the regulatory issues, had already

22   been discussed internally at Live Well, yes?

23   A.  My recollection was the regulatory-related discussions were

24   before that time period, yes.

25   Q.  OK.  So it was your understanding that -- well, we'll leave

L4dnhil5                    Stumberger - Cross

1    it at that.  So, the bonds were, internally at Live Well the

2    valuations were increased during this time.  Do we agree?

3    A.  Yes.

4    Q.  And again, not to beat a dead horse here, but the effect of

5    that, indirectly assuming that IDC was still accepting Live

6    Well's internal valuations as broker quotes, would be to

7    indirectly increase the borrowing base of Live Well.  Do you

8    agree?

9    A.  You're saying the regulatory developments caused the prices

10   to go up and -- I'm sorry.  Could you repeat that.

11   Q.  I'm not saying anything.  I'm asking this question.  Much

12   like what happened with respect to the first price increase of

13   September of 2015, during the first quarter of 2017, the

14   increase in the internal values of the bonds at Live Well had

15   the indirect effect of increasing Live Well's borrowing base?

16   A.  My recollection is the price increases in the first quarter

17   of 2017 were driven by the liquidity events happening.  There

18   were --

19   Q.  Let me ask it this way.  In the first quarter of 2017, was

20   IDC still choosing to accept or requesting Live Well's internal

21   valuations?

22   A.  Yes.

23   Q.  And was it publishing, was it making the decision to

24   publish those values at that time?

25   A.  Yes.

L4dnhil5                         Stumberger - Cross

1    Q.  OK.  And part of the -- among others, who those would be

2    published to were Live Well's repo lenders.  Yes?

3    A.  Yes.

4    Q.  OK.  All right.  There was mention of -- well, let me ask.

5    It is the case, is it not, that, for whatever reason, the

6    decision was made subsequently in 2017, after the first quarter

7    but prior to the SEC investigation, to reduce the bond values

8    internally at Live Well?

9    A.  I don't remember a specific conversation, but it's

10   possible.

11   Q.  I'm not asking about questions or, you know, conversations

12   or anything like that.  If you don't remember, you don't

13   remember.

14   A.  I don't remember.

15   Q.  My question is you don't remember whether there was a

16   decrease prior to the SEC giving notice of their investigation?

17   A.  I don't remember.

18   Q.  OK.  Do you recall at some point in the summer of 2017 the

19   company getting notice that the SEC was conducting some kind of

20   inquiry?

21   A.  Yes.

22   Q.  OK.  And do I have that timing right?  Can I write summer

23   of 2017 on here?

24   A.  Sure.

25   Q.  OK.  And I'm sorry if it's not big enough.  I had to try to

1    fit it on the board there.  But do I understand correctly from

2    your testimony that from about that time until the end prices

3    were kind of steady?  Live Well's internal valuation of the

4    bonds was flatlined?

5    A.  Yes.  They didn't change.

6    Q.  OK.  OK.  OK.  Now, you reached out to the SEC towards the

7    end of the summer privately and asked to meet with them, did

8    you not?

9    A.  No.  They scheduled a meeting with me.

10   Q.  It's your testimony you didn't reach out to them?

11   A.  To schedule a meeting?

12   Q.  For any reason.

13   A.  I recall sending them an e-mail directly right when -- on

14   the heels of when the subpoenas came.

15   Q.  OK.  So, by "outreach" let's include that to mean sending

16   an e-mail to the SEC.  Defined as such, let me ask you again.

17   Did you reach out to the SEC towards the end of the summer

18   2017?

19   A.  Yes.

20   Q.  You remained employed at Live Well through March of 2019,

21   correct?

22   A.  Yes.

23   Q.  Did you tell the company or Mr. Hild that you had reached

24   out to the SEC?

25   A.  No.

1   Q.  At some point, as Mr. Hartman asked you, you began speaking

2   with the U.S. Attorney's Office or agents of that office.  When

3   did that begin, best of your memory?

4   A.  Summer 2019.

5   Q.  I'm sorry, when?

6   A.  The summer of 2019.

7   Q.  The summer of 2019?

8   A.  I'm sorry.  The question was?

9   Q.  I'm sorry.  I'm just trying to hear your answer.  The

10  question was, when did you start talking to the -- not the SEC,

11  but the U.S. Attorney's Office and/or the FBI?

12  A.  Summer of 2019.

13  Q.  OK.  Was that after you left Live Well?

14  A.  Yes.

15  Q.  OK.  But before you left Live Well, in March of 2019, you

16  had a series of meetings with the SEC towards the end of 2018,

17  maybe early 2019, is that right?

18  A.  Yes.

19  Q.  And, in fact, you signed a declaration with the SEC that

20  was executed in January of 2019.  Yes?

21  A.  Yes.

22  Q.  Now, up until that point, can we fairly say that you had

23  denied being a part of any kind of scheme to defraud?  Can we

24  agree?

25  A.  Up until what point?

1    Q.  Well, at least up until January of 2019, when you executed

2    your declaration with the SEC.

3    A.  You're asking me if I declined admitting I was part of

4    fraud?

5    Q.  No.  I'm saying you met with the SEC, you reached out to

6    them in August of 2017, whenever you said.  There were

7    conversations over whatever period of time, including through

8    when you signed a declaration with the SEC in January of 2019.

9    Do we agree?

10   A.  Yes.

11   Q.  When you met with the SEC initially, you declined or you

12   denied being involved in any kind of scheme to defraud.  Yes?

13   A.  In my meetings with the SEC, they asked questions, I

14   answered the questions.  I don't remember which questions they

15   asked at any given -- I met with them three times I think.

16   Q.  One of their questions was, Hey, were you perpetrating a

17   scheme to defraud.  Yes?

18   A.  I don't have any recollection of that question.

19   Q.  You don't recall that question being asked at any of these

20   meetings?  That's your testimony?

21   A.  I don't have any recollection of that.

22   Q.  OK.  Notwithstanding that, didn't you assert to the SEC, at

23   least up until January of 2019, that you weren't a part of any

24   wrongdoing?

25   A.  I would have to read the affidavit or declaration, but I

L4dnhil5                          Stumberger - Cross

1    don't -- I was -- I remember saying I was involved in conduct I

2    was concerned about and it was wrong.

3    Q.  OK.  I'm sorry.  I'm really just trying to get at when you

4    initially talked to the SEC you denied any wrongdoing; isn't

5    that right?

6    A.  I don't recall.

7    Q.  You don't recall?

8    A.  I don't recall saying that.

9    Q.  OK.  You, in fact, defended the, you know, the valuations

10   throughout the period and -- well, we'll start with that.  You

11   defended the valuations throughout the period.

12           MR. HARTMAN:  Your Honor, could we have a quick

13   sidebar on this issue?

14           THE COURT:  Sure.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

L4dnhil5                           Stumberger - Cross

1              (At sidebar).

2              MR. HARTMAN:  Is it OK if I put on the record what the

3      issue is?

4              MR. DUSING:  Absolutely.

5              MR. HARTMAN:  Your Honor, my objection was related to

6      the fact that some of the events happened in the context of the

7      consultations working with Alan Gold and counsel for the

8      company, and we tried to elicit some of that on direct and

9      Mr. Dusing objected, as was his right.  So, you know, our

10     objection was that this would open the door to that.

11             MR. DUSING:  The defense recognizes that it was an

12     improper question in light of our previous conversations, and

13     it was a mistake and I apologize.

14             THE COURT:  OK.  You will just withdraw it.

15             MR. DUSING:  Yes.

16             THE COURT:  All right.  Thank you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

L4dnhil5                          Stumberger - Cross

```
 1                (In open court)
 2                MR. DUSING:  May I continue, your Honor?
 3                THE COURT:  You may.
 4                MR. DUSING:  I would move to withdraw that question,
 5       your Honor.
 6                THE COURT:  Withdrawn.
 7       BY MR. DUSING:
 8       Q.  Mr. Stumberger, in any event, we do agree, do we not, that
 9       you executed a declaration with the SEC admitting some kind of
10       wrongdoing in or about January of 2019?
11       A.  Yes.
12       Q.  Nonetheless, can we also agree that you didn't tell the
13       company anything about that, right?
14       A.  Yes.
15       Q.  You didn't tell Mr. Hild anything about that, right?
16       A.  I wasn't allowed to.
17       Q.  I am sorry?
18       A.  I wasn't allowed.  I did not.
19       Q.  When you say you weren't allowed to, was that a request
20       made to you by they SEC?
21       A.  I don't recall if it was my lawyers or them, but --
22       Q.  Understood.  I don't want to get into anything you said to
23       your lawyers or anything like that, so understood.
24       Nonetheless, you continued to get a paycheck from Live Well
25       through March of 2019.  Do we agree?
```

1   A.  Yes.  And it's something I discussed at length with the

2   SEC.  When you are going through an investigation with the SEC,

3   you can't get a job, so they were sympathetic to that and it

4   was understood.

5   Q.  OK.  So is that a yes?

6   A.  Yes.

7   Q.  All right.  I mentioned earlier at some point in time, I

8   believe back in September of 2015 in connection with the

9   implementation of Scenario 14 you secretively met with lawyer

10  with your team.  Do you remember that testimony?

11          MR. HARTMAN:  Your Honor, this has been asked and

12  answered.

13          THE COURT:  I assume you're moving on from this.

14          MR. DUSING:  It is a predicate question.  I can

15  withdraw it and rephrase, your Honor.

16          THE COURT:  OK.

17  BY MR. DUSING:

18  Q.  Mr. Stumberger, did you also meet with the same attorney

19  again with your team in February of 2019?

20  A.  I have recollection that we met with the attorneys February

21  2017.  September 2015, February 2017.  I was told there was

22  another one.  I wasn't a part of it.

23  Q.  My question I want to -- let's be careful about

24  communications here.  Let me ask you this:  How many times did

25  you meet with the attorney secretly?

L4dnhil5                        Stumberger - Cross

1   A.  My recollection was two.

2   Q.  OK.  And do I understand that, to the best of your

3   recollection, they were roughly in September of 2015 and

4   February of 2017?

5   A.  That's my recollection.

6   Q.  OK.  Do I understand that you didn't tell Mr. Hild or the

7   company about the second meeting either?

8   A.  Yes.

9            MR. DUSING:  All right.  Your Honor, I would like to

10  transition to the bubble here.

11           THE COURT:  All right.

12           MR. DUSING:  I don't know if it's a good time for --

13           THE COURT:  You can just put that mic down anywhere.

14           MR. DUSING:  I am not sure what the Court's intentions

15  are with respect to an afternoon break.

16           THE COURT:  Raise your hand if you're kind of burnt

17  out for the day.  OK.  All right.  I mean, we can end for the

18  day.  We could take a short break and go until 4:15.  I'm

19  trying to end this trial as soon as we can, so it's a balance

20  of long days versus long weeks.  If you need to take a break,

21  I'm happy to do that.

22           MR. DUSING:  I'm happy to accommodate.  It's been a

23  long day.

24           THE COURT:  We will do that.  We will start again at

25  10 in the morning.  Please remember just keep an open mind,

L4dnhil5                              Stumberger - Cross

1    don't discuss the case, don't research the case, and have a

2    nice evening.

3              (Continued on next page)

1          (Jury not present)

2          THE COURT:  You can step down.  Thank you.  All right.

3          So maybe it was my fault for not taking an afternoon

4   break.  I kind of thought we could get through since we took a

5   late lunch, but we are doing the best we can.

6          Anything you need to talk to me about?

7          MR. HARTMAN:  Judge, the only issue is I expect

8   Mr. Dusing to be introducing some exhibits on cross with

9   Mr. Stumberger tomorrow.  We may have some objections to those.

10         So perhaps if we could meet 15 minutes before Court

11  tomorrow.  We will, as in the past, try to work that out.  We

12  can let you know, Judge, if there aren't going to be.  I just

13  wanted to flag that.

14         THE COURT:  That's fine.  I have a plea at 9, but I

15  should be done by 9:30, 9:45, so I'll come down as soon as

16  that's done.

17         Try your best to resolve it.  If there's anything I

18  should see in advance, feel free to e-mail it to chambers so I

19  can look at it.

20         MR. DUSING:  It would be my hope that we could resolve

21  those.  We will talk, Judge.

22         THE COURT:  You are going to work together with the

23  exhibit we already addressed this morning?

24         MR. HARTMAN:  Yes.  We will do that.

25         THE COURT:  All right.

1           I will see you in the morning then.

2           Thank you.

3           (Adjourned to April 16, 2021, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

DARREN STUMBERGER

Direct By Mr. Hartman  . . . . . . . . . . . 185

Cross By Mr. Dusing  . . . . . . . . . . . . 227

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 401-4T   . . . . . . . . . . . . . . . . . 187

 409-1, 409-2 and 409T   . . . . . . . . . . 199

 201  . . . . . . . . . . . . . . . . . 204