```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 05/16/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MILES GUO,

                 Defendant.

23 Cr. 118 (AT)

**ORDER**

ANALISA TORRES, District Judge:

The Court has reviewed the motions *in limine* filed by the Government and Defendant, Miles Guo,[1] each seeking to exclude and limit the testimony of the opposing party's experts. Guo Mot., ECF No. 269; Guo Mem. at 38–57, ECF No. 271; Gov. Mem., ECF No. 322.[2] For the reasons stated below:

1. Guo's motion to exclude Amin Shams, the Government's cryptocurrency expert, is **DENIED**;
2. The Government's motion to exclude Maggie Sklar, Guo's cryptocurrency expert, is **DENIED**;
3. The Government's motion to limit the testimony of Paul Doran, Guo's expert regarding the Chinese Communist Party, is **GRANTED IN PART and DENIED IN PART**;
4. The Government's motion to exclude Thomas Bishop, Guo's accounting expert, is **GRANTED**; and
5. The Government's motion to exclude Raymond Dragon, Guo's valuation expert, is **GRANTED IN PART and DENIED IN PART**.

**LEGAL STANDARD**

I.    <u>Rule 702</u>

Federal Rule of Evidence 702 "governs the admissibility of expert and other scientific or technical expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d

---

[1] A grand jury returned a third superseding indictment ("S3") in this matter on April 24, 2024. S3, ECF No. 307. S3 identifies Defendant as "Miles Guo," the name by which he is primarily known, instead of "Ho Wan Kwok." *Id.*; *see* ECF No. 308. This order refers to Defendant by that name.

[2] By order dated April 24, 2024, the Court found that Guo had failed to provide the expert notices required by Federal Rule of Criminal Procedure 16 and required him to supplement his expert notices by April 29, 2024. ECF No. 305. Following Guo's supplemental disclosures, the Government renewed its motion to exclude his experts.

Cir. 2002). It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the [C]ourt that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are met. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The Court, however, has the ultimate "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Courts first address "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York,* 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702).

After considering the expert's qualifications, courts then determine whether the expert's testimony is reliable. The reliability inquiry is "fluid," *Amorgianos*, 303 F.3d at 266, and depends on the "nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 150 (1999). In some cases, the reliability inquiry will turn on the "scientific foundations" of the testimony, and in other cases, the "relevant reliability concerns may focus on personal knowledge or experience." *Id*. Ultimately, the Court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266.

Expert testimony should be excluded if "it is speculative or conjectural, [] if it is based on

assumptions that are so unrealistic and contradictory as to suggest bad faith," if it seeks to "merely construct a factual narrative based upon record evidence," or if it opines upon issues of law. *United States v. Chastain*, No. 22 Cr. 305, 2023 WL 2966643, at *5 (S.D.N.Y. Apr. 17, 2023) (cleaned up). On the other hand, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Even after qualifying a witness as an expert and determining that the opinion is reliable, the Court must ask "whether the expert's testimony as to a particular matter will assist the trier of fact." *Nimely*, 414 F.3d at 397 (cleaned up). The testimony must be relevant, and it should not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) (quoting *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001)).

Exclusion of expert testimony is "the exception rather than the rule." *Media Glow Digit., LLC v. Panasonic Corp. of N. Am.*, No. 16 Civ. 7907, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) (quoting advisory committee's notes to 2000 amendments to Fed. R. Evid. 702).

II.     Rule 703

An expert may rely on hearsay "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. However, the expert can disclose the hearsay only if its "probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.*; *see In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 638 F. Supp. 3d 227, 254 (E.D.N.Y. 2022) (quotation marks and citations omitted). A party cannot call an expert "simply as a conduit for introducing hearsay." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted).

3

Rather, the expert must apply his or her "extensive experience" to the hearsay materials. *In re Payment Card*, 638 F. Supp. 3d at 254 (cleaned up).

III. Rules 401 and 403

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. The Court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## DISCUSSION

I. The Government's Expert

In the indictment, the Government alleges that Guo misrepresented that Himalaya Dollar ("HDO") and Himalaya Coin ("HCN") were cryptocurrencies, when in fact they were not and instead were instruments of Guo's fraud. *See* S3 ¶ 19(e), ECF No. 307. The Government intends to call a cryptocurrency expert, Amin Shams, an assistant professor of finance at Ohio State University. Shams Notice at 2–3, ECF No. 270-3. Shams' proposed testimony covers three primary categories. First, Shams will provide background about blockchain and cryptocurrency. Shams Notice at 2–13. Next, he will opine that "HCN and HDO have many features that are not consistent with typical cryptocurrencies." *Id.* at 73. Shams bases this opinion on the following five factors, *see* Gov. Opp. at 54–55, ECF No. 290:

(1) The trading volume of HCN was abnormally low for its large market capitalization, compared to similarly capitalized exchange tokens. *Id.* at 15–24.
(2) HCN's price movements were largely uncorrelated with the broader cryptocurrency market. *Id.* at 25–36.
(3) HCN and HDO had far less "on-chain transaction" activity than Bitcoin, Ethereum, and other benchmark cryptocurrencies. *Id.* at 38, 55.
(4) HCN and HDO had much more concentrated ownership than Bitcoin, Ethereum, and other benchmark cryptocurrencies. *Id.* at 38, 55.

4

> (5) HCN and HDO's "smart contracts" were "mutable," which could allow "the terms of the contract [to] change after funds are invested"—in contrast to the contracts associated with other exchange tokens, which are "immutable." *Id.* at 57–65.

Finally, Shams seeks to testify that "HDO did not seem to carry the $1.5 billion in reserves which would appear to be necessary based on the 1.5 billion HDO created on the Ethereum blockchain." *Id.* at 72.

Guo moves to exclude or limit Shams' testimony on five grounds. First, Guo argues that Shams, when testifying about HCN and HDO's market capitalization, price correlation, on-chain transactions, and ownership concentration, offers "merely a series of fact statements," as opposed to expert opinions. Guo Mem. at 43. Guo is incorrect for two reasons. First, "[e]xpert witnesses provide laymen with crucial knowledge where the common experience of [] jurors is insufficient to comprehend particular facts of a case." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp. 2d 482, 504 (S.D.N.Y. 2009). At trial, the jury will be presented with a complicated set of facts as to two purported cryptocurrencies, and the average juror does not possess the specialized knowledge to analyze the market capitalization for cryptocurrencies or their level of ownership concentration. *Cf. United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."). Second, these fact statements are "the predicate for [Shams'] opinion testimony" that HCN and HDO have many features that are not consistent with typical cryptocurrencies. *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013). Therefore, the Court declines to exclude Shams' opinions as "factual narratives."

Second, Guo seeks to preclude Shams' testimony that HCN and HDO are atypical compared to other cryptocurrencies because, according to Guo, Shams does not explain why he

5

chose the aforementioned five factors. Guo Mem. at 52–53. Guo is incorrect. Shams identifies these factors as important features of blockchain and cryptocurrencies, explains why, and provides the materials that he reviewed in making this determination. Shams Notice at 1, 3–12, 26. Guo may challenge whether these criteria are comprehensive, but in light of Shams' proffered explanation and expertise in cryptocurrency,[3] "any such alleged failures in [Shams'] methodology go to the weight of his expert testimony, not its admissibility in the first instance." *Emig v. Electrolux Home Prods., Inc.*, No. 06 Civ. 4791, 2008 WL 4200988, at *9 (S.D.N.Y. Sept. 11, 2008). Guo may explore whether Shams should have considered other criteria through "vigorous cross-examination" or "presentation of contrary evidence." *Chastain*, 2023 WL 2966643, at *6 (quoting *Daubert*, 509 U.S. at 596) (cleaned up).[4]

Third, Guo argues that Shams lacks sufficient foundation for his opinion that HCN and HDO's concentrated ownership and "mutable" smart contracts are atypical. Guo Mem. at 48–49. Guo specifically contests Shams' statements that "*most* cryptocurrencies ensure that the token contracts are immutable," and that "[f]or *typical* cryptocurrency projects, the majority of tokens are not held by a single entity." *Id.* (citing Shams Notice at 63) (emphasis in brief). Shams details his methodology for concluding that HCN and HDO's concentrated ownership made them outliers, comparing the two to Bitcoin, Ether, and "other benchmark cryptocurrencies selected because they are tokens associated with cryptocurrency exchanges." Shams Notice at 38; *see id.* at 38–55. And,

---

[3] Guo does not contest Shams' qualifications, and the Court finds that, given his academic experience and formal training in finance and blockchain, Shams is qualified to offer expert testimony. *See* Gov. Opp. at 39–40.

[4] Guo also contends that testimony as to the individual factors is irrelevant; for example, he claims that it is irrelevant if the smart contracts were mutable because "the [i]ndictment does not allege that the HCN/HDO contracts were altered." *See* Guo Mem. at 50. But, Shams' testimony need not directly address the central issue in the case to be relevant, as long as it "will assist the trier of fact." *Nimely*, 414 F.3d at 397 (cleaned up). Shams' testimony is relevant because it "will likely prove helpful in allowing the trier of fact to understand the evidence better," to determine whether HCN and HDO were true cryptocurrencies, and "to make an ultimate determination about whether or not" Defendants' conduct with regard to HCN and HDO was fraudulent. *Fin. Guaranty Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372, 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020).

although Shams' testimony is broader than this particular analysis, "[e]xperts of all kinds tie observations to conclusions through the use of . . . general truths derived from specialized experience." *Kumho Tire*, 526 U.S. at 148 (cleaned up).  It is not inappropriate for Shams to base his testimony on his practical experience with various cryptocurrencies' contracts and ownership.  Guo may probe the bases for Shams' testimony through cross-examination.

Fourth, Guo contends that Shams should not be allowed to testify about the sufficiency of the HDO reserves.  Guo Mem. at 53–54.  Shams seeks to testify that (1) reserves are important for a "stablecoin"[5] like HDO because they "serve as collateral or backing," and that (2) HDO did not "seem to carry" the reserves that "would appear to be necessary."  Shams Notice at 67, 72.  The first line of testimony, which is based on Shams' experience with cryptocurrencies, expresses an expert opinion based on his practical experience and is, therefore, admissible.  *See* Guo Mem. at 53 (conceding that this is an expert opinion).

The second line of testimony is based on Shams' analysis of (1) an HDO whitepaper, which states that the Himalaya Reserve will hold a "value [of U.S. dollars] at a level equal to the value of all HDO in circulation"; (2) blockchain records showing that 1.5 billion HDO had been created by November 25, 2021; and (3) an audit by Armanino LLP (the "Armanino Audit"), which found that the Himalaya Reserve held only $400 million in reserves as of July 31, 2022.  Shams Notice at 68–69, 71.

Although Guo seeks to preclude this testimony as hearsay—given its reliance on out-of-court statements such as the HDO whitepaper and Armanino Audit—the Court finds the testimony admissible under Rule 703's hearsay exception.  As an initial matter, it is not improper for Shams

---

[5] A "stablecoin" is a type of cryptocurrency "whose value is 'pegged' (meaning tied) to another asset—often a traditional fiat currency like the US dollar."  *Sandoval v. Uphold HQ Inc.*, No. 21 Civ. 7579, 2024 WL 1313826, at *1 n.2 (S.D.N.Y. Mar. 27, 2024).

to rely on these facts and data in forming his opinion. The Government will seek to admit the HDO whitepaper into evidence, and the blockchain records and Armanino Audit are the type of data used by experts in the field. *See* Gov. Mem. at 14 (Armanino "had a practice focusing on audits of cryptocurrency-linked businesses"). Moreover, Shams may disclose the numbers that underpin his opinion to the jury because when an expert's opinion is based on "comparing a set of figures, . . . the figures must be expressed to the jury for the comparison to be meaningful." *In re Payment Card*, 638 F. Supp. 3d at 254. Further, Shams is not a mere conduit for hearsay materials. Although his testimony about the sufficiency of the HDO reserves arises from a mere comparison of two numbers—the amount of HDO created and the amount of dollars in reserves—he arrives at these figures after examining blockchain records and analyzing an audit of cryptocurrency records, which require expertise as they are not "simple" or "easy to understand." *Chastain*, 2023 WL 2966643, at *6 (quotation marks omitted). Accordingly, the Court shall not preclude his testimony as to the HDO reserves.

Fifth, Guo argues that portions of Shams' testimony are unfairly prejudicial pursuant to Rule 403. Specifically, he seeks to preclude Shams from (1) referring to "infamous crypto frauds" like FTX, Squid Game Token, CP3R, and Tether; (2) referencing price manipulation in other cryptocurrencies; (3) testifying that "several tokens in the crypto market . . . lack genuine innovation"; and (4) stating that certain features of HCN and HDO have been used in other cryptocurrency frauds or thefts. Guo Mem. at 55–57. The Government states that it "will not elicit testimony from [] Shams comparing HCN/HDO to [] fraudulent cryptocurrencies, unless the defense opens the door to such testimony." Gov. Opp. at 53 n.33. The Court agrees with Guo that references to cryptocurrency frauds are prejudicial, and directs the Government not to elicit such testimony on direct examination. However, in explaining why Shams considers certain features of

cryptocurrencies to be important, the Court shall not bar him from mentioning the potential for misuse, theft, or fraud. The Court shall consider specific relevance and prejudice objections at trial.

Accordingly, Guo's motion to exclude Shams' testimony is DENIED.

II. Guo's Experts

A. Maggie Sklar

Guo intends to call a cryptocurrency expert, Maggie Sklar, who was previously senior counsel at the Commodity Futures Trading Commission, a senior policy advisor at the Federal Reserve Bank of Chicago, and a partner at a large law firm. *See* Sklar Notice, ECF No. 272-1. The Government moves to exclude or limit Sklar's testimony on three grounds.

First, the Government argues that Sklar has not provided the "bases" for her opinions pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C)(iii), specifically claiming that she has not identified the "publicly available materials" and "documents related to work performed on behalf of the Himalaya Exchange" that she reviewed. Gov. Mem. at 12–14. The Court disagrees that this is a basis for exclusion. Sklar has described her industry expertise, which forms the bases for her opinions, and identified "illustrative examples of the materials reviewed." *Id.* at 13. In addition, Guo clarifies that "publicly available" information is a "reference to the publicly available blockchain on which HCN and HDO were minted, which is available to view using a website called Etherscan." Guo Opp. at 19, ECF No. 328. The purpose of Rule 16 notice is "to facilitate trial preparation." Rule 16, Notes of Advisory Committee on 2022 Amendment. The information provided by Guo has given the Government "a fair opportunity to prepare to cross-examine [the] expert witness[] and secure opposing expert testimony if needed." *United States v. Mrabet*, No. 23 Cr. 69, 2023 WL 8179685, at *1 (S.D.N.Y. Nov. 27, 2023).

Second, the Government contends that Sklar seeks to introduce impermissible hearsay by relying on the Armanino Audit to form her opinions. Gov. Mem. at 14– 16; *see* Sklar Supp. Notice at 2. Sklar reviewed the Armanino Audit—as well as Himalaya Exchange white papers and vendor agreements—in arriving at her opinion that "the Himalaya Exchange was designed to function as a cryptocurrency exchange." Sklar Supp. Notice at 2. Guo states that, although Sklar considered the Armanino Audit, she does not "intend[] to testify about [its] findings for the truth of a matter asserted there," and did not "review[] or rel[y] on communications between Himalaya Exchange employees." Guo Opp. at 20 & n.7. Guo does imply that Sklar will testify as to the "auditor's description of [the] company's business." Guo Opp. at 21.

It was not error for Sklar to rely in part on the Armanino Audit in forming her opinion on whether the Himalaya Exchange is a cryptocurrency exchange: the Government itself states that Armanino "had a practice focusing on audits of various cryptocurrency-linked businesses." Gov. Mem. at 14. Sklar may not, however, disclose to the jury the contents of the Armanino Audit, including its description of the Himalaya Exchange. Experts can disclose inadmissible facts only "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *In re Payment Card*, 638 F. Supp. 3d at 254. Testimony about the "auditor's description of" the Himalaya Exchange would be nothing more than a "conduit for introducing hearsay." *Marvel Characters, Inc.*, 726 F.3d at 136.[6]

Third, the Government contends that Sklar's fourth and sixth opinions are unreliable. The Court disagrees. Sklar's fourth opinion is that "the Himalaya Exchange operated as a centralized exchange." Sklar Supp. Notice at 2 ¶ 4. The Government claims that "Sklar points to no studies,

---

[6] This does not prevent Sklar from testifying that the Himalaya Exchange hired certain vendors—including Armanino—that were associated with cryptocurrency companies.

research, or even industry standards" to support this conclusion. Gov. Mem. at 17. But, in testimony that the Government does not seek to preclude, *id.* at 19 n.7, Sklar describes in detail her opinions as to "the manner in which cryptocurrencies and centralized cryptocurrency exchanges operate"—a framework that she then applies to ground her opinion about the Himalaya Exchange. Sklar Supp. Notice at 2 ¶ 5. On cross-examination, the Government can probe its concerns about Sklar's framework for analyzing cryptocurrency exchanges.

Sklar's sixth opinion is a series of statements about the "common aspects of early adoption of cryptocurrency tokens," including that "[t]he value and success of newly developed tokens depends, in part, on their adoption by users," and that a "common marketing technique . . . is to demonstrate that the tokens can be used to purchase products in the real world." Sklar Supp. Notice at 3 ¶ 6. The Government claims that Sklar is "pontificating" about the beliefs of "market participants" without citing "industry studies, polling data, or even any documents upon which to base such an opinion." Gov. Mem. at 17–18. The Government, however, does not challenge Sklar's qualifications, and it is clear that she is testifying based on her experience in financial regulation. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995). Again, the Government can contest Sklar's conclusions on cross-examination.

Accordingly, the Government's motion to exclude Sklar's testimony is DENIED.[7]

  B.  Paul Doran

Guo intends to call Paul Doran as an expert on the People's Republic of China (the "PRC") and the Chinese Communist Party (the "CCP"). Doran Notice, ECF No. 272-2. Doran was an

---

[7] The Government "requests the opportunity to be heard" on a limiting instruction at the conclusion of Sklar's testimony to clarify to the jury that "compliance or consistency with industry standards or regulations does not mean the defendant[] lacked criminal intent." Gov. Mem. at 19–20. "As a general rule an expert's testimony on issues of law is inadmissible." *Bilzerian*, 926 F.2d at 1294. If necessary, the Government may request a limiting instruction at the conclusion of Sklar's testimony.

11

employee of the British government's Foreign and Commonwealth Office for approximately three-and-a-half years and has been a private security consultant for more than twenty years, advising on "the tactics and methods used by the CCP to target its perceived political enemies, and the security measures that clients might take to mitigate those risks." Doran Supp. Notice at 1–2, ECF No. 322-3. The Government seeks to limit his testimony on two grounds.

First, the Government argues that portions of Doran's proposed testimony are irrelevant under Rule 402 or insufficiently probative under Rule 403. The Court agrees. Although the Court has refused to "broadly exclude" CCP-related evidence from the trial, acknowledging that it could bear on whether Guo's "fears of CCP targeting were objectively legitimate," even relevant evidence presents a risk of "confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence." ECF No. 319 at 13–14. Portions of Doran's testimony stray too far afield and risk miring the jury in issues that do not bear on this case. Specifically:

- Doran's "Five Poisons" testimony is irrelevant. *See* Doran Supp. Notice at 2 ¶¶ 1, 2.
- Doran's testimony about the Chinese Ministry of Public Security's "secret, extra-legal Chinese police stations" is irrelevant. *See id.* at 3 ¶ 5.
- Doran's testimony about the Chinese Ministry of State Security recruitment of "local nationals" as "so-called 'agents of influence'" is irrelevant, and even if it had probative value, such value is outweighed by its risk of confusing the jury. *See id.* at 5 ¶ 7(j).
- Doran's testimony about measures taken by "[c]ountries allied to the United States" is irrelevant. *See id.* at 6 ¶ 10.

Therefore, the above testimony is excluded.

Second, the Government contends that portions of Doran's testimony seek to transmit impermissible hearsay from the Federal Bureau of Investigation (the "FBI") and the Department of Justice (the "DOJ"). Specifically, Doran plans to testify as to (1) the FBI director's comments on Operation Fox Hunt, (2) the DOJ and FBI's operations "against Chinese police and intelligence agents conducting Fox Hunt operations in the U[nited] S[tates]," and (3) the DOJ's pursuit of

criminal charges against individuals targeting Guo.  Doran Supp. Notice ¶¶ 3, 8–9.  It is reasonable for a security professional to analyze statements and actions by United States government agencies to understand the legitimacy and scope of the potential threats posed by the CCP and Operation Fox Hunt.  The Court shall not bar Doran from testifying as to the first and second lines of testimony, as it permits the jury to assess the basis of Doran's expert opinion about these threats.  However, Doran's proposed testimony about the charges the DOJ has brought against people targeting Guo is prohibited.  Doran does not set forth any opinions as to Operation Fox Hunt's relationship to Guo and recites statements from the DOJ charging documents without applying expertise to them.  This amounts to hearsay and is precluded.  *See In re Payment Card*, 638 F. Supp. 3d at 254.

      Accordingly, the Government's motion to limit Doran's testimony is GRANTED IN PART and DENIED IN PART.

      C.  Thomas Bishop

      Guo intends to call Thomas Bishop as an expert related to an accounting analysis of Guo's use of funds.  Bishop Notice, ECF No. 272-3.  Bishop is a former special agent with the Internal Revenue Service's Criminal Investigation Division, where he worked for over twenty-five years as a field agent and a supervisory special agent.  Bishop Supp. Notice at 1, ECF No. 322-4.  Bishop reviewed the bank account records for seven companies that the Government alleges are part of Guo's criminal enterprise.  *Id.* at 2.  He then categorized inflows into these bank accounts into two types (Farm Loan Inflows and Other Inflows), and outflows from the accounts into four types of expenses (Personal, Political Movement, Corporate, and Undetermined).  *Id.* at 2.  Based on his analysis, Bishop seeks to opine that Guo's companies had the same pattern of expenditures before and during the alleged Farm Loan Program scheme.  *See id.* at 2 ¶ 1.  Guo contends this testimony

13

will rebut the Government's allegations that he commingled various sources of funds to launder money. Guo Opp. at 36. The Government moves to exclude Bishop's testimony as unreliable.

A brief explanation of Bishop's categorization methodology is necessary. *See* ECF No. 327-5 (spreadsheet describing Bishop's methodology). First, Bishop identified the counterparty for each transaction. He then categorized each transaction based on the counterparty, relying on twenty-one assumptions that certain counterparties were associated with certain types of inflows or expenses. For example, if money went to the Rule of Law Foundation, Bishop categorized the transaction as a "Political Movement Expense," whereas if the money went to GTV Australia Pty Ltd., Bishop categorized it as a "Corporate Expense." In all other circumstances, Bishop associated the counterparty with a category "based on name and/or online research of the individual/entity to determine the nature of the transactions." *Id.* If it appeared that a counterparty could be associated with multiple categories of expenses, Bishop examined the transaction and attempted to categorize it. If he could not, it fell into "Undetermined Expenses." *Id.*

As stated above, Rule 702 requires an expert witness to use "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." "[E]xpert testimony regarding matters not beyond the ken of an average juror should generally be excluded." *United States v. Londono-Tabarez*, 121 F. App'x 882, 884 (2d Cir. 2005). A district court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Although Bishop may well be qualified as an expert in forensic accounting, the Court is not convinced that he used this expertise to categorize the transactions. *See id.* ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Bishop's categorization of expenses was based on assumptions and, at most, basic

online research into counterparties to determine their type of business. Because this categorization method is "not beyond the ken of an average juror," Bishop's testimony is precluded pursuant to Rule 702.[8]

Even if Bishop had used technical expertise, the Court would exclude his testimony under Rule 702. Rule 702 "requires a sufficiently rigorous analytical connection between the expert's methodology and conclusions." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016). Bishop does not explain the basis for his assumptions, which directly govern how he categorized each transaction and form the basis for his ultimate opinions. Guo contends that the Government can attack specific assumptions and categorizations on cross-examination. Guo Opp. at 44. But, where an expert's opinion is based on a methodology that is "simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *see Boucher*, 73 F.3d at 21 ("A district court has discretion . . . to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." (citation omitted)). Moreover, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and the Court, under Rule 403, "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted). A line-by-line refutation of Bishop's insufficiently explained analysis would not prevent his testimony from misleading and confusing the jury.

Accordingly, the Government's motion to exclude Bishop's testimony is GRANTED.

---

[8] Guo also argues that Bishop matched transactions, removed duplicate transactions, and verified the information within the bank accounts. The Court disagrees that basic methods of data cleaning constitute expert testimony. *Cf. United States v. Lebedev*, 932 F.3d 40, 50 (2d Cir. 2019) (permitting an accountant to testify about the results of a "first-in-first-out" accounting methodology without being qualified as an expert because the process did not require "specialized knowledge").

D.  Raymond Dragon

Finally, Guo seeks to call Raymond Dragon as a valuation expert.  *See* Dragon Notice, ECF No. 272-4.  Dragon is the director of business and intellectual property valuation at Anchin, an accounting and advisory firm.  Dragon Supp. Notice at 1, ECF No. 322-1.  Dragon intends to opine that "a $2 billion valuation of GTV was reasonable based on information available in August 2020."  *Id.* at 3 ¶ 3.  He reached this conclusion by "validat[ing] the assumptions and methodology of a valuation report prepared by the firm Alvarez & Marsal" in December 2020 (the "A&M Report," ECF No. 327-2), and by using three different valuation approaches: (1) analyzing GTV's discounted cash flow projections (the "Income Method"), (2) measuring GTV against comparable companies (the "Market Method"), and (3) considering the amount of capital that was actually raised during the GTV Private Placement (the "Backsolve Method").  Guo Opp. at 4; *see* Dragon Supp. Notice at 2–3.  The Government seeks to exclude his testimony as unreliable.  The Court agrees in large part.

First, although Dragon has provided a broad reference to three different valuation approaches, only the Backsolve Method has been described in any detail—albeit by Guo's counsel in a December 15, 2023 brief.  *Compare* Gov. Mem. at 10–11 (citing ECF No. 195 at 30–32) *with* Dragon Supp. Notice at 2 ¶ 1.  Guo simply states that the Income and Market Methods are "industry-standard valuation approaches," Guo Opp. at 5, but neither he nor Dragon provide any detail as to what those approaches entail and how Dragon actually applied them.  *See Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 332 (S.D.N.Y. 2022) (permitting reliance on standard valuation methodologies where it was clear that the expert "applied such industry-standard valuation methodologies"); *Redcell Corp. v. A.J. Trucco, Inc.*, No. 20 Civ. 18, 2022 WL 3700148, at *9 (S.D.N.Y. Aug. 26, 2022) (holding that once the expert set forth the sources of his

data and the methodology he employed, "whether his [] calculations using that data is correct is precisely the type of disagreement that the flexible thrust of *Daubert* entrusts the jury to decide" (quotation marks omitted)). Guo contends that Dragon provided the Government "with the underlying data" as exhibits attached to his Rule 16 notice. Guo Opp. at 6. But, these exhibits do not include any information about how Dragon used these inputs to arrive at a valuation of GTV using either the Income Method or the Market Method. Indeed, nowhere does Dragon actually calculate the valuation of GTV in August 2020 based on these methods.[9] *See Boucher*, 73 F.3d at 21 ("[E]xpert testimony should be excluded if it is speculative or conjectural."). Without any description of Dragon's methodology or conclusions, the Court cannot be certain of the reliability of Dragon's approach, and the Government cannot properly cross-examine Dragon regarding his assumptions, conclusions, or even his arithmetic. Accordingly, Dragon shall not testify as to the Income and Market Methods. The Government concedes that Guo has described the Backsolve Method in some detail, *see* Gov. Mem. at 10–11, and the Court shall not preclude this testimony.

Second, Dragon seeks to opine that the A&M Report, which calculated GTV's valuation as between $1.4 and $2.5 billion, was reasonable. Dragon Supp. Notice at 3 ¶ 2. This is impermissible hearsay. *Marvel Characters, Inc.*, 726 F.3d at 136 (excluding expert testimony used as a "conduit for introducing hearsay"). Although Guo contends that it is proper for a valuation expert to use an earlier valuation report as a starting point for his own analysis, Dragon proposes to testify that the A&M Report was accurate and to put its valuation before the jury, without conducting his own analysis and without the A&M Report's drafters appearing at trial for cross-

---

[9] The only portion of these exhibits that indicates any conclusion on Dragon's part as to GTV's valuation is Exhibit 7, in which Dragon states an average equity value for GTV of $755 million in 2021, and $10 billion in 2023. Dragon Supp. Notice Ex. 7. Guo disclaims this valuation, stating that the Government's speculation that Dragon may opine that GTV was worth up to $10 billion is "outlandish." Guo Opp. at 4. But, Dragon does not express any independent opinion as to the value of GTV—particularly in August 2020, the relevant time period.

examination. Therefore, Dragon may not testify as to the validity of the A&M Report.

Third, the Government objects to Dragon's proposed testimony that "the censorship efforts of the CCP could create a niche market for GTV, which could further bolster the company's value." Doran Supp. Notice at 3 ¶ 4. The Government argues that Dragon does not explain how this affects the proposed $2 billion valuation. The Court shall not preclude Dragon's qualitative testimony that, broadly, CCP censorship could create a market niche that could bolster a company's value. But, as Dragon has not offered any data, he shall not be permitted to testify as to any quantitative "impact of the censorship on the company's value." Guo Opp. at 9.

Fourth, Guo states that Dragon intends to testify about the market for special purpose acquisition companies ("SPACs"), which "involves pre-revenue, and frequently pre-operation, companies," to show that—contrary to the allegations in the indictment—investment in such companies is common. Guo Opp. at 9–10. But, Dragon's supplemental notice does not set forth any opinion about SPACs; it simply includes an exhibit listing the number of SPAC initial price offerings. *See* Doran Supp. Notice. And, Guo's brief merely sets forth this topic of Doran's testimony, not his opinion. *See United States v. Kaufman*, No. 19 Cr. 504, 2021 WL 4084523, at *19 (S.D.N.Y. Sept. 8, 2021); Guo Opp. at 7 (noting that Exhibit 9 to Dragon's supplemental disclosure "provides historical information regarding the proliferation of SPACs in recent years"). Accordingly, Dragon's proposed testimony on SPACs fails to satisfy the requirements of Federal Rule of Criminal Procedure 16(b)(1)(C)(iii), and is precluded.

Accordingly, the Government's motion to exclude Dragon's testimony is GRANTED IN PART and DENIED IN PART.

**CONCLUSION**

For the foregoing reasons, Guo's motion is DENIED, and the Government's motion is GRANTED IN PART and DENIED IN PART. The Clerk of Court is directed to terminate the motions at ECF Nos. 269 and 272.

SO ORDERED.

Dated: May 16, 2024
New York, New York

_____
ANALISA TORRES
United States District Judge