

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 21, 2024

<u>VIA ECF</u>
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

     **Re:**    ***United States v. Guo*, S3 23 Cr. 118 (AT)**

Dear Judge Torres:

     The Government respectfully submits this letter to (i) provide additional information regarding co-conspirator statements that the Government may elicit at trial, including as early as this week; (ii) to preclude the defense from introducing irrelevant evidence and argument; and (iii) to preclude improper argument during the defendant's opening statement (and throughout the trial) about the immigration consequences of a conviction.

## I.    Co-Conspirator and Agent Statements

     The Court granted, in part, the Government's motion *in limine* to admit statements of the defendant's co-conspirators. *See* Dkt. 319 ("May 2 Order"). The May 2 Order indicated that the Government could offer such statements "subject to the later submission of the necessary evidence" that the statements were made during and in furtherance of a conspiracy. *See id.* at 4 (quoting *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993)). The Court granted the Government's motion with respect to particular statements by co-conspirators William Je, Mileson Guo, and Haoran He, and requested additional information about other statements made by the defendant's co-conspirators in furtherance of his several conspiracies. *See id.* Accordingly, the Government writes to apprise the Court in advance of co-conspirator statements it anticipates eliciting from this week's expected trial witnesses. Specifically, during the first week of trial, the Government expects to call two victims who will testify about, among other things, statements made by the defendant's co-conspirators Qidong Xia, a/k/a "Long Island David," and David Dai, during and in furtherance of the defendant's conspiracies. Those statements are described in further detail below.

### A.    Applicable Law

     Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a *preponderance* of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the

course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

For purposes of Rule 801(d)(2)(D), an agency relationship can exist between two employees at the same company. "[W]hen a statement made by one corporate employee" is sought to be introduced against a defendant "employee, instead of the corporation," admissibility "depends on the relationship between the declarant and the defendant." *Zaken v. Boerer*, 964 F.2d 1319 (2d Cir. 1992). Applying that standard, the Second Circuit has held that, if the defendant runs the company or organization, statements made by employees who are responsible to that defendant may be admitted under the Rule. For example, in *United States v. Rioux*, the Second Circuit considered whether statements made by supervisors in a sheriff's office were admissible against the defendant sheriff. 97 F.3d 648, 660 (2d Cir. 1996). The Court found that the statements were properly admitted, even though the defendant did not "control[] the daily tasks" of the supervisors and some of the supervisors operated under a "Supervisory Special Deputy Sheriff," rather than the defendant. *Id.* It was sufficient, the Court explained, that the supervisors "were answerable and directly responsible to [the defendant], who directed the sheriff's office operations." *Id.*; *see also Zaken*, 964 F.2d at 1323 (admitting statements of vice president against president because declarant was "directly responsible" to the president, who directed the company's operations).

## B.    Victims' Testimony

### a.    Victim-1's Anticipated Testimony

Victim-1 is a victim of Guo's fraudulent schemes. Victim-1 is expected to testify to the following, in sum and substance. Victim-1 donated to the Rule of Law Foundation and thereafter invested in GTV stock by purchasing a purported G|CLUBS membership. She communicated directly with co-conspirator Xia Qidong, a/k/a "Long Island David." Victim-1 understood that Xia spoke on behalf of Guo, and was working with Guo, after watching the two of them appear side-by-side in Guo's broadcasts and hearing Guo tell his followers to obey Xia's instructions. With that understanding, Victim-1 communicated directly with Xia in Xia's capacity as the leader of the New York Farm—one branch of a web-based collective of Guo's followers and victims—and Victim-1 received instructions from Xia about where and how to wire funds to Guo-controlled bank accounts to make purported investments in GTV stock. Xia personally communicated with Victim-1 about Victim-1's post-investment complaints and denied Victim-1's request for a refund while making additional false promises about Victim-1's purported investment.[1]

---

[1] Following his arrest, Guo called into an online broadcast for his supporters and identified Xia as the new leader of the Himalaya Alliance. In other recorded jail calls, Xia updated Guo on the G Enterprise's business and received instructions from Guo in return. *See* Dkt. 273 at 23; *see also* May 2 Order at 8-9 (finding that "these recorded calls appear relevant to proving Guo's degree of control over the alleged criminal enterprise").) Consistent with the Court's prior decision, the Government will not introduce at trial the fact that Guo is currently detained.

### b. Victim-2's Anticipated Testimony

Victim-2 is also a victim of Guo's fraudulent schemes. Victim-2 is expected to testify to the following, in sum and substance. He donated to the Rule of Law Foundation; participated in the GTV private placement through Voice of Guo; and purchased a purported G|CLUBS membership. Victim-2 also volunteered for the Himalaya Farm Alliance, serving as a translator and, later, assisting in broadcasting Guo's and his followers' videos onto the internet. He was recruited to join the UK Farm by David Dai, the then-farm leader and a member of Guo's "Iron Blood" group of top-tier farm leaders who had frequent direction contact with Guo. Victim-2 was recruited due to his talents as a translator and broadcaster. Dai asked Victim-2 to register businesses in the U.S. and open bank accounts in the names of those businesses. Dai advised that the accounts would primarily get money from Guo supporters. After money came into those accounts, Dai directed Victim-2 where to send the funds. Victim-2 became aware that some of the money coming into the business accounts that he opened at Dai's direction was for pre-investment in the Himalaya Exchange. He participated in meetings with Dai and other members of the UK Farm, during which meetings Dai would explain where Victim-2 should wire the money from his business bank accounts Victim-2 opened and maintained at Dai's direction. Victim-2 also participated in a WhatsApp meeting with Xia—as described above, the co-conspirator whom Guo has identified from jail as the new leader of the Himalaya Alliance—and other Guo co-conspirators, during which meeting they designated a new CEO of the newly-named London Farm. In sum, Victim-2 communicated directly with Dai (in his capacity as the leader of the London Farm) and with Xia regarding the operations and banking of the G Enterprise—including by providing volunteer translation and one branch of a web-based collective of Guo's followers and victims—and Victim-1 received instructions from Xia about where and how to wire funds to Guo-controlled bank accounts to make purported investments.

### C. Discussion

Statements of Farm leaders to Farm members regarding the defendant's investment projects—here, the statements of Xia to Victim-1 and the statements of Xia and Dai to Victim-2—are not hearsay and are admissible for at least two reasons. First, Xia and Dai were members of an investment fraud and money laundering conspiracy, along with the defendant, and their statements were made in furtherance of that conspiracy. Second, Xia and Dai, like all the Farm leaders, acted as agents of the defendant, and their statements were made within the scope of that agency relationship.[2]

The evidence at trial will demonstrate that the defendant used the Farms to help organize and pool the investments of his victims, and to hide the nature of the funds that the Farms were collecting and transferring. Xia and Dai were longtime Farm leaders and high-level members of the Himalaya Farm Alliance. As Farm leaders, Xia and Dai communicated with Victim-1 and Victim-2 about their investments, including where and how to wire funds. These communications were directly in furtherance of the investment fraud and money laundering conspiracy. *See, e.g.*, *United States v. Adelekan*, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021) ("statements that co-conspirators made to victims . . . may be admitted on the basis that they prompted the victim 'to

---

[2] Moreover, many statements made to victims by the defendant's agents and co-conspirators are "not hearsay" because they will be "offered to show [their] effect[s] on the listener" rather than for their truth. *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013).

respond in a way that promotes or facilitates the carrying out of a criminal activity,' i.e., by wiring money or confirming the status of the money that was wired" (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990)).

Alternatively, Xia's and Dai's statements were made as Guo's agent. *See* Fed. R. Evid. 801(d)(2)(D) ("[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."); *United States v. Mercado*, No. S1 02 CR 675 WHP, 2003 WL 21756084, at *8 (S.D.N.Y. July 30, 2003) (statements made while declarant acting as agent admissible).  The proof at trial will demonstrate that Guo had a principal-agent relationship with the Farms covering Guo's investment frauds, the transferring of investment funds, and general the management of the Farms (including the expulsion of members who sought refunds or criticized Guo).  This proof will be in the form of Guo's own recorded statements, in which Guo explained that he has created the Farms and their governance structure, designated which Farms have authority to act on his behalf, and repeatedly directed his victims to the Farms to facilitate their investment and the transfer of funds.  There will also be direct testimony about Guo's control of the Farms.  For example, Victim-1 observed Guo tell his followers to obey Xia's instructions. David Dai's statements to Victim-2 also indicate that Dai acted as Guo's agent, including Dai's instructions regarding how to bring in, and then wire out, money from investors.

Accordingly, the record at trial will establish by a preponderance of the evidence that the statements of Farm leaders to Farm members regarding investments—here, the statements of Qidong Xia and David Dai—are not hearsay and admissible under Rule 801(d)(2)(D) and Rule 801(d)(2)(E)).

## II.    The Fire at the Sherry-Netherland Hotel

To avoid a confusing and time-consuming mini-trial that lacks probative value, the Court should preclude evidence and argument relating to the fire at the defendant's apartment following the defendant's arrest.

### A.  Background

On March 15, 2023, FBI agents announced their presence at Guo's Sherry-Netherland penthouse.  Approximately 15-20 minutes later, Guo answered the door and was placed under arrest.  Also, in the apartment was one of Guo's associates ("Individual-1").  During the search, Individual-1 requested, and the FBI permitted Individual-1, to remove a necklace from Individual-1's bedroom because it had sentimental value.  That bedroom was next to the origin of the fire.  Hours later, a fire burned half of Guo's apartment.  The FDNY responded and extinguished the blaze.  Subsequent investigation by the FDNY and ATF revealed that the blaze began in a closet next to the den, near Individual-1's bedroom, at the floor level, in combustible material which was

stored in that closet.  From there the fire extended into several rooms.  The ATF's conclusion is that the cause of the fire was not determined, based on materials observed and recovered.

Prior to his arrest, Miles Guo's account on GETTR (a social media platform that Guo controls) began posting about fires and a "Flame Movement" to fight Government repression.  For example:

- On December 2, 2022, Guo posted a video in which he discussed the "at least over 30 fire accidents (in China)" and stated: "So, this Flame Movement is something indeed!"

- Also on December 2, 2022, Guo posted a video in which he discussed the same topic, from the terrace of the apartment at the Sherry-Netherland. He stated: "One word the only escape from cabin is to burn it down. The Flame Revolution is unstoppable… The opposite side is armed with real weapons provided by the nation, weapons purchased with your money, to kill your entire family. Tell me what are you going to do.  Fire! Fire! Fire! Fire! Fire!"



- On December 4, 2022, Guo posted a video in which he again discussed fire, stating in part: "In this case, igniting it with fire is to save people, but not to harm people…. Isn't this an example of how fire should be used to save people?  The loophole is fire. . . . More importantly, anyone facing danger or life threatening situations for no reason, you have the right to defend yourself in any way. Use Fire!"

- On February 24, 2023, Guo posted a video about one of his closest NFSC supporters and Farm leaders, whose hotel had a fire.  Guo stated: "You know, almost 30-40% of the fire extinguishing systems in the world are made in China. Almost all the sensor chips in the fire extinguishing systems come from China. . . . So, any hotels you stay and any places with a fire extinguishing system are within the reach and control of the CCP."

- Most notably, on February 25, 2023—approximately three weeks before Guo's arrest—Guo posted about the same NFSC member "who has been talking about the Flame Revolution in her live streams, was caught in a fire accident herself. This will let more people in the world wonder what on earth had happened? Why are there so many reports that could not be further from the truth? Why are there so many coincidences lately? I will surely get to the bottom of it."  That post contained the

following hashtags "#fire #ParkLaneHotel #fireaccidents #DOJ #JhoLow." The intent of Guo's post appears to have been to suggest that a fire at another hotel was caused by the Department of Justice.

In addition, Individual-1's cellphone indicates that, on February 24, 2023, Individual-1 visited a website related to the fire described by Guo the next day. Individual-1's cellphone also ran searches for, or otherwise visited sites referencing, three other hotel fires on the same date.

Less than three weeks later, the FBI announced their presence outside Guo's penthouse apartment, but did not make entry for approximately 15 minutes. Then, while the FBI was conducting its search, a fire broke out.

## B. Discussion

Based on the foregoing, the defendant and Individual-1 had, at minimum, opportunity and motive to start the fire that threatened the lives of several FBI agents executing court-authorized arrest and search warrants—not to mention the numerous civilians who live and work in the Sherry Netherland and its vicinity, and the firefighters who had to risk their lives to stop the fire from spreading further. While these circumstances may be relevant to later proceedings in this case, they are not relevant to trial on the charged offenses and should be precluded. Even assuming these facts have some probative value as to the fraud and money laundering charges—and they do not— that probative value is substantially outweighed by the Rule 403 factors.

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

Evidence about the fire is not relevant to the charged offenses and poses a substantial risk of confusing the issues and misleading the jury. Despite good-faith discussion between the Government and the defense, the defense has not been willing to rule out that it will introduce evidence about the fire, or make arguments about the fire, during the trial. The defense has not proffered why or how the fire is relevant. If the defense introduces the fact of the fire, it will necessarily require the Government to respond to any such evidence and argument. That is particularly the case if the defense attempts to blame the fire on particular individuals or groups. Doing so would require the Government to respond with its assessment as to who is responsible for the fire. That could redirect this trial into a mini-trial regarding whether Guo committed arson, and necessitate calling a parade of FBI agents, NYFD personnel, and ATF agents—including arson experts—to testify to a matter wholly incidental to the defendant fleecing investors and using their money to fund his lavish lifestyle. Such an extended and potentially inflammatory sideshow, in

an already lengthy and complex trial, would do nothing but confuse the issues, mislead the jury about what is relevant, cause undue delay, and result in a waste of time.

Accordingly, evidence concerning the fire should be excluded from trial.

## III. The Defense Is Not Permitted to Make Arguments About the Immigration Consequences of a Conviction

The Court should preclude the defendant from introducing evidence concerning any potential immigration consequences of a conviction. Evidence that does not go towards the elements of the charged offense is properly excluded under Rules 401 and 402. *See, e.g.*, *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *6 (S.D.N.Y. Apr. 25, 2016). The only purpose for such evidence would be to curry sympathy from the jury or invite jury nullification. *See, e.g.*, *United States v. Edwards*, 101 F.3d 17, 20 (2d Cir. 1996) (approving district court's decision to prohibit any argument in support of jury nullification). Evidence and argument about potential immigration consequences is particularly problematic in this case where the defense is expected to argue that the Chinese Government is attacking him and seeks to punish him for his dissident activities. The defense should not be permitted to argue that a conviction in this trial would return him to China where he would be punished by the Chinese Government. Accordingly, any such argument and evidence about potential immigration consequences should be precluded. *See* Dkt. 319 at 19 ("A jury should reach its verdict "without regard to what sentence might be imposed," and information about sentencing "distracts [jurors] from their factfinding responsibilities." (citation omitted)

## IV. Conclusion

For the reasons outlined above, the Court should grant the requested relief.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314