**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MILES GUO,

        *Defendant*.

Case No. 1:23-CR-118-1 (AT)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MILES GUO'S MOTION FOR RECONSIDERATION OF COURT'S ORDER PRECLUDING CERTAIN TESTIMONY FROM EXPERT WITNESSES**

Sidhardha Kamaraju
Matthew S. Barkan
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
mbarkan@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490
sabrinashroff@gmail.com

E. Scott Schirick
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
scott.schirick@alston.com

*Attorneys for Defendant Miles Guo*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

LEGAL STANDARD.................................................................................................................3

ARGUMENT ..............................................................................................................................3

    I.    THE COURT OVERLOOKED MR. DRAGON'S INDEPENDENT ANALYSIS .....3

        A.  Mr. Dragon Conducted an Independent Analysis of GTV's Growth Projections ...5

        B.  Mr. Dragon Conducted an Independent Analysis To Confirm the Reasonableness
            of the Discount Rate Applied in the A&M Report ...................................................7

            1.  Mr. Dragon Independently Calculated GTV's Beta ..........................................8

            2.  Mr. Dragon Independently Calculated GTV's Weighted Average Cost of
               Capital (WACC) .................................................................................................9

            3.  Mr. Dragon Independently Calculated GTV's Discount Rate........................10

        C.  Mr. Dragon's Independent Market Multiple Analysis Further Confirms the
            Reasonableness of a $2 Billion Valuation for GTV ...............................................12

    II.  THE COURT SHOULD ALLOW MR. DORAN TO TESTIFY TO THE
        EXCLUDED TOPICS ................................................................................................14

CONCLUSION.........................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Corines v. Am. Physicians Ins. Tr.*,
  769 F. Supp. 2d 584 (S.D.N.Y. 2011)........................................................................3

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016)....................................................................................11

*Schoolcraft v. City of New York*,
  298 F.R.D. 134 (S.D.N.Y. 2014) ..............................................................................3

*United States v. Onumonu*,
  967 F.2d 782 (2d Cir. 1992)....................................................................................17

**Statutes**

Fed. R. Evid. 402 ............................................................................................................15

Fed. R. Evid. 403 ............................................................................................................16

**Other Authorities**

https://www.fidelity.com/insights/investing-ideas/glossary-betaCite .............................8

https://www.investopedia.com/terms/w/wacc.asp ...........................................................9

Defendant Miles Guo respectfully submits this memorandum of law in support of his motion, pursuant to Local Criminal Rule 49.1, for reconsideration of this Court's May 17, 2024 order (Dkt. No. 338) (the "Order") granting in part the government's motions *in limine* (Dkt. No. 322) ("Gov. Mot.") to limit the testimony of Mr. Guo's experts Paul Doran and Raymond Dragon.[1]

## PRELIMINARY STATEMENT

Mr. Guo respectfully requests that the Court reconsider its May 17, 2024 Order which, in relevant part: (i) precluded defense expert Raymond Dragon from testifying, based on the Income and Market approaches to valuation, that the December 2020 A&M Report reasonably concluded that $2 billion was a reasonable valuation for GTV in August 2020, and (ii) precluded defense expert Paul Doran from testifying about certain aspects of the Chinese Communist Party's ("CCP") efforts to surveil and suppress political speech.

As to Mr. Dragon, the Order stated that "[Mr.] Dragon proposes to testify that the A&M Report was accurate and to put its valuation before the jury, without conducting his own analysis." (Order at 17.) But as demonstrated by the materials submitted to the Court, the conclusion that Mr. Dragon did not conduct "his own analysis" is error. As noted in Mr. Dragon's Supplemental Disclosure, dated April 29, 2024, and as explained in Mr. Guo's Opposition (Dkt. No. 328), Mr. Dragon conducted multiple independent analyses related to the valuation of GTV that were not in the A&M Report. The data underlying these independent analyses were provided both to

---

[1] The Order also excluded certain testimony from one of Mr. Guo's other proffered experts, Thomas Bishop. The government did not seek to preclude Mr. Bishop's expert testimony concerning redemption activity at the Himalaya Exchange, and thus Mr. Guo still intends to call him in an expert capacity to testify as to that activity. In addition, in light of the Court's reasoning in excluding part of Mr. Bishop's testimony, Mr. Guo may still call him in part as a summary witness to summarize certain bank records that are already in evidence.

the government and to the Court. These independent analyses are, in fact, the cornerstone of his proposed testimony.

Further, the independent analyses conducted by Mr. Dragon each were described in detail—albeit, in some cases, in numerical and mathematical detail. Specifically, his analyses included: (1) an independent assessment of the growth rate projected by GTV's own financial model. (2) Mr. Dragon's independent assessment of the operating profit margin projected by GTV's financial model, (3) an independent calculation of an appropriate discount rate, which is one of the key factors in the Income Approach to valuation, and (4) the application of the market multiple approach to valuation as to GTV's projected revenue and earnings. Consequently, the Court's conclusion that the Government "cannot properly cross-examine Dragon regarding his assumptions, conclusions, or even his arithmetic" respectfully was ill-founded. (Order at 17.)

As to Mr. Doran, the Court excluded categories of his testimony relating to the "Five Poisons," which are political topics the CCP regards as existential threats to its monopoly on power, the CCP's use of extra-legal police stations, and the CCP's efforts to recruit local nationals to target political dissidents abroad, on the grounds that these topics are irrelevant or unduly prejudicial. (Order at 12.) The government, however, did not seek to exclude entirely much of this testimony, and even if it had, that argument would not have been well-founded. In light of the Court's prior orders holding that the CCP's targeting of Mr. Guo is relevant, the excluded testimony offers context to what Operation Fox Hunt is, which would help the jury assess the significance of the targeting of Mr. Guo. (*See* Dkt. No. 243 at 5-7; Dkt. No. 319 at 13-14.) Mr. Guo respectfully requests that the Court reconsider its Order and permit Mr. Doran to testify on these matters.

**LEGAL STANDARD**

A court should reconsider its conclusion where doing so is necessary, among other things, "to correct a clear error or prevent manifest injustice." *Schoolcraft v. City of New York*, 298 F.R.D. 134, 136 (S.D.N.Y. 2014) (cleaned up). "[T]he decision to grant . . . a motion for reconsideration is within the sound discretion of the district court." *Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 594 (S.D.N.Y. 2011). "Exclusion of expert testimony is 'the exception rather than the rule.'" (Order at 3 (citations omitted).)

**ARGUMENT**

## I.    THE COURT OVERLOOKED MR. DRAGON'S INDEPENDENT ANALYSIS

In its Order, the Court concluded that it would be hearsay for Mr. Dragon to opine that the A&M Report's valuation was reasonable because Mr. Dragon did not "conduct[] his own analysis" of the report's underlying data. (Order at 17.) The Court further found that Mr. Dragon failed to substantiate his opinion that it was reasonable to ascribe a $2 billion valuation to GTV. (*Id.* at 16–17.)

Respectfully, the Court overlooked that Mr. Dragon in fact did conduct "his own analysis" of the assumptions made in the A&M Report, and that it was this analysis that allowed him to conclude that a $2 billion valuation was supportable. Accordingly, the Court's preclusion of Mr. Dragon's testimony on the basis that he failed to conduct his own analysis constituted error.

As demonstrated by the exhibits to his supplemental disclosure, Mr. Dragon rigorously stress-tested the A&M Report's assumptions in multiple ways. *First*, Mr. Dragon conducted an independent analysis of the growth rate in GTV's financial projections. As disclosed in Exhibits 1, 2, and 3 to Mr. Dragon's supplemental disclosure,[2] Mr. Dragon gathered the performance data

---

[2] References to the "Schirick Declaration" or "Schirick Decl." are to the May 29, 2024 Declaration of E. Scott Schirick submitted together with this memorandum and the exhibits thereto.

of twelve comparator companies (the "Comparator Companies") and assessed the historical growth rate of each company's revenue and earnings. Mr. Dragon then compared the historical performance of the Comparator Companies against GTV's financial projections, confirming that GTV's projected growth rates were reasonable in light of those of the Comparator Companies.

*Second*, Mr. Dragon conducted an independent analysis of GTV's operating margins. As disclosed in Exhibit 6 to Mr. Dragon's supplemental disclosure, Mr. Dragon assessed the historical operating margin of each Comparator Company. Mr. Dragon compared the historical performance of the Comparator Companies against GTV's projected operating margin, confirming that GTV's projected operating margins were reasonable in light of those of the Comparator Companies.

*Third*, rather than merely relying on the A&M Report's calculation of a discount rate, Mr. Dragon calculated his own discount rate to be applied to GTV's projected future inflows. (Schirick Decl. Ex. A, at Exs. 4a, 4b, and 5.) As set forth below, the discount rate is a key variable in assessing value in what is known as a discounted cashflow analysis (the "Income Approach" to valuation). Mr. Dragon then compared his calculated discount rate to the one used by A&M in the A&M Report. Mr. Dragon calculated his discount rate from first principles and did not rely on the work of A&M, which itself merely assumed a 40% discount rate.

*Fourth*, as disclosed in Exhibits 6 and 7 to his Supplemental Disclosure, Mr. Dragon conducted an independent assessment of GTV's potential future value based upon the Comparator Company's (i) total equity value, (ii) historical earnings, and (iii) historical revenue (providing an assessment of value under the "Market Multiple Approach"). Armed with these data that Mr. Dragon independently sourced, Mr. Dragon then calculated the average future projected value of GTV if it met its financial projections. Mr. Dragon calculated the average of each value based on multiples of earnings and multiples of revenues, using projections for 2021, 2022, and 2023. On

the basis of these calculations for the Market Multiple Approach, as well as Mr. Dragon's assessment under the Income Approach, Mr. Dragon concluded based on his experience and training that a $2 billion valuation was supportable, based on information that was available in August 2020.

For these reasons, as explained in greater detail below, the Court's assessments that Mr. Guo "did not include any information about how Dragon used these inputs to arrive at a valuation of GTV" and that Mr. Dragon failed to "conduct[] his own analysis" were predicated on a misunderstanding of the work that Mr. Dragon performed.  (Order at 16-17.)

A.    **Mr. Dragon Conducted an Independent Analysis of GTV's Growth Projections**

As a first step, Mr. Dragon independently assessed the accuracy of GTV's financial model. Where A&M simply applied the GTV financial model without further analysis, Mr. Dragon conducted a historical analysis of the financial performance of the Comparator Companies to confirm the reasonableness of GTV's growth projections.  The GTV financial projections used by A&M were built from a financial forecast for GNews prepared by Mr. Matt Smith, a disclosed government witness.  Other than the starting number of monthly users (which was raised to 1.3 million monthly users for GTV), the "assumptions for user grown and operating margins" for GNews were identical for GTV.  (Schirick Decl. Ex. C. at 2.)[3]  Mr. Dragon compared the growth rates for revenues and earnings contained in GTV's financial projections against the historical growth rates for the twelve Comparator Companies.  Because all of the Comparator Companies

---

[3] While the Order concluded that Mr. Dragon's proposed testimony regarding the A&M Report is hearsay, Mr. Dragon is not relying on the A&M Report for its truth.  Mr. Dragon can—and did—independently assess the GTV financial projections as opinions of potential future value.  There simply is no out-of-court statement being offered for the truth because projections—inherently—are not facts.

are publicly traded companies, their historical financial performance is available from public sources, which Mr. Dragon disclosed.

Mr. Dragon provided the historical reported revenues and earnings for the Comparator Companies as Exhibit 1 to his Supplemental Disclosure. Mr. Dragon's calculations of the "Annual Percentage Revenue Growth rates" for each of revenue and earnings for each of the Comparator Companies is provided as Exhibit 2 to his Supplemental Disclosure. Mr. Dragon also included the growth rate for the financial model as included in the A&M Report as a separate line item ("GTV forecast") in Exhibit 2.

In assessing the accuracy of GTV's revenue projections, Mr. Dragon also calculated the *standardized* revenue for each of the Comparator Companies. That is, he calculated the relative growth in revenue, year over year, for the Comparator Companies for the years where such data is available. Publicly reported data underpinned these calculations. (*i.e.*, Schirick Decl. Ex. C at Ex. 1.) Using these figures, Mr. Dragon calculated the three, six, and ten year Compound Annual Growth Rate ("CAGR") for the Comparator Companies based on both (i) the average standardized revenue and (ii) the median standardized revenue for the Comparator Companies. His calculations of these figures are included as Exhibit 3 to his Supplemental Disclosure.

Mr. Dragon used the Comparator Company and GTV CAGR figures to conduct an apples-to-apples comparison of the projected growth for each. Mr. Dragon thus tested whether the A&M Report's "valuation of GTV . . . was predicated on reasonable assumptions" as to its financial performance, as displayed below.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Compound Annual Growth Rate Based on Average | | 3 year | 224% | 6 year | 148% | 10 year | 96% |
| Compound Annual Growth Rate Based on Median | | 3 year | 179% | 6 year | 111% | 10 year | 72% |

| | A&M Forecast from A&M's Schedule 2 | | | | A&M H Model Decline Period | | | A&M Long-term Growth Rate | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GTV revenues growth rate | | 520% | 182% | 134% | 37% | 27% | 18% | 4% | 4% | 4% | 4% |
| GTV forecast revenues in millions | $180 | $1,115 | $3,147 | $7,351 | $10,038 | $12,759 | $15,013 | $15,614 | $16,239 | $16,888 | $17,564 |
| GTV revenues standardized | $100 | $620 | $1,750 | $4,086 | $5,580 | $7,092 | $8,345 | $8,679 | $9,026 | $9,387 | $9,763 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GTV's Compound Annual Growth Rate | | 3 year | 244% | 6 year | 109% | 10 year | 58% |

(Schirick Decl. Ex. A at Ex. 3.)  As shown by the cells highlighted in light blue, GTV's 3-year CAGR is not far from the average CAGR for the Comparator Companies (244% vs. 224%), and GTV's 6- and 9-year CAGR is lower than the 6 and 9 year median CAGR for the Comparator Companies (109% vs. 111% and 58% vs. 72%).  Mr. Dragon's calculations thus provide clear mathematical support for his opinion that the valuation of GTV was indeed "predicated on reasonable assumptions."

### B.    Mr. Dragon Conducted an Independent Analysis To Confirm the Reasonableness of the Discount Rate Applied in the A&M Report

Next, in continuing to assess whether the A&M's valuation was based on reasonable assumptions, Mr. Dragon tested the other primary variable used under the Income Approach—the discount rate.  Specifically, and as the Court appears to have overlooked in its analysis in the Order, Mr. Dragon independently calculated the appropriate discount rate to apply to GTV to assess whether the discount rate used by A&M was reasonable.  (*See* Schirick Decl. Ex. A at 2; *id.* at Exs. 4a, 4b, and 5.)

As set forth in more detail below, Mr. Dragon used an industry-accepted three-step process to arrive at his own discount rate for GTV.  *First*, Mr. Dragon calculated the value of "beta" (β), which is a measure of the sensitivity of a security's price relative to the stock market as a whole. *Second*, Mr. Dragon used his independently calculated beta value to determine the Comparator Companies' weighted average cost of capital, or "WACC."  (*See* Dragon Supp. Discl., Ex. 4a.) *Third*, using the Comparator Companies' WACC, Mr. Dragon then calculated his own discount rate for GTV by adjusting for new venture risk.  (*See* Schirick Decl. Ex. A at Ex. 4b.)  Because Mr. Dragon's independently calculated discount rate was similar—albeit not identical to—the discount rate used in the A&M Report, Mr. Dragon concluded, based upon his experience and training, that the discount rate used in the A&M Report was reasonable. Moreover, each step of

Mr. Dragon's analysis is detailed in his supplemental disclosure, and, accordingly, there is no question that the government could cross-examine Mr. Dragon as to his methods, inputs, and conclusions.

### 1.    Mr. Dragon Independently Calculated GTV's Beta

As noted above, in independently developing an appropriate discount rate, Mr. Dragon first calculated beta, which is a measure of the sensitivity of a stock's price relative to the stock market as a whole.  Beta is thus a measure of stock price sensitivity:  a higher beta signifies that a stock is more sensitive than average to changes in the stock market overall (and thus has higher implied risk), while a lower beta signifies less sensitivity to such changes.[4]  In the context of a company valuation analysis, beta is used as a proxy for the expected rate of return, with higher risk assets having the potential to generate greater returns (or losses).[5]

Mr. Dragon's independent calculation of GTV's beta is clearly set forth in Exhibit 5 to his supplemental disclosure.  As disclosed, Mr. Dragon used publicly available data to assess the beta of the Comparator Companies.  (Schirick Decl. Ex. A at Ex. 5.)

| Name of security | 2 year Beta $B_L$ | Equity/ Inv. Capital E | Debt / Inv. Capital D | Effective Tax Rate T | Unlevered beta [b] $B_u$ |
|---|---|---|---|---|---|
| SINA Corporation | 0.80 | 87.37% | 12.63% | 43.14% | 0.74 |
| Sohu.com Limited (NasdaqGS:SOHU) | 1.30 | -112.53% | 212.53% | - | na |
| Baidu, Inc. (NasdaqGS:BIDU) | 0.90 | 134.32% | -34.32% | - | na |
| Fang Holdings Limited (OTCPK:SFUN.Y) | 0.70 | 21.66% | 78.34% | - | na |
| Tencent Holdings Limited (SEHK:700) | 0.70 | 97.15% | 2.85% | 13.03% | 0.68 |
| Meta Platforms, Inc. (NasdaqGS:META) | 0.90 | 109.43% | -9.43% | 22.92% | 0.96 |
| Twitter, Inc. | 1.20 | 118.82% | -18.82% | - | na |
| Pinterest, Inc. (NYSE:PINS) | 1.40 | 117.27% | -17.27% | - | na |
| Hello Group Inc. (NasdaqGS:MOMO) | 1.10 | 140.68% | -40.68% | 21.56% | 1.42 |
| JOYY Inc. (NasdaqGS:YY) | 1.10 | 176.14% | -76.14% | - | na |
| Snap Inc. (NYSE:SNAP) | 1.60 | 105.01% | -5.01% | - | na |
| Weibo Corporation (NasdaqGS:WB) | 1.00 | 109.58% | -9.58% | 20.93% | 1.07 |
| | | | | | |
| Low | 0.70 | -113% | -76% | 13.0% | 0.68 |
| High | 1.60 | 176% | 213% | 43.1% | 1.42 |
| Average | 1.06 | 92% | 8% | 24.3% | 0.98 |
| Median | 1.05 | 110% | -10% | 21.6% | 0.96 |

---

[4] https://www.fidelity.com/insights/investing-ideas/glossary-betaCite

[5] *Id.*

Where sufficient data was available, Mr. Dragon calculated the unlevered (debt-free) beta for the Comparator Companies. (*Id.*) Using the formula identified in note [d] to Exhibit 5, Mr. Dragon then independently calculated GTV's re-levered (i.e., debt-adjusted) beta, which here was the same as the unlevered beta because GTV had no debt:

| | | |
|---|---|---|
| Selected unlevered equity beta | 0.96 | |
| Company debt / capital | 0% | [c] |
| Company equity / capital | 100% | |
| Assumed tax rate | 24.3% | |
| **Relevered Company Beta** | **0.96** | [d] |

[a] Market data are from CapitalIQ database.
[b] Unlevering of beta was based on the following formula: $B_u = B_L / [1+(1-T)*(D/E)]$
[c] Based on guideline companies' capital structures.
[d] Relevering of beta was based on the following formula: $B_L = B_u*[(1 + (1-T)*(D/E)]$

### 2.    Mr. Dragon Independently Calculated GTV's Weighted Average Cost of Capital (WACC)

Having independently calculated GTVs re-levered beta as .96, Mr. Dragon next calculated GTV's weighted average cost of capital ("WACC"). WACC is a measure of a company's after-tax cost of bringing in new money, either through taking on debt or through the sale of equity.[6] Beta is a variable necessary to calculate WACC because, as a measure of risk, beta impacts an investor's expected return on investment in a company's equity.[7]

Using his independently-derived beta, Mr. Dragon calculated GTV's WACC as 9.3%. Mr. Dragon's calculations showing how he arrived at that WACC, including the formula he used and the sources for each of the variables, are set forth in Exhibit 4a to Mr. Dragon's Supplemental Disclosure:

---

[6] https://www.investopedia.com/terms/w/wacc.asp
[7] *Id.* (discussing required rate of return).

**Cost of Equity**                                     $Ke = Rf + Beta \times Erp + Sp + Csrp$

|  |  |  | CRSP Deciles |
|---|---|---|---|
| **Modified Capital Asset Pricing Model** |  |  |  |
|  | Risk-free rate | Rf | 1.04% (a) |
|  | Beta | B | 0.96  (b) |
| x | Equity market risk premium | Erp | 6.17% (c) |
| + | Adjusted equity risk premium |  | 5.95% |
| + | Size premium | Sp | 1.34% (d) |
| + | Company specific risk premium | Csrp | 1.00% (e) |
|  | Cost of equity | Ke | 9.33% |
|  | **Selected cost of equity** | **Ke** | **9.33%** |

**Weighted Average Cost of Capital**             $WACC = We \times Ke + Wd \times Kd$

|  | Cost | Weights | Wtd. Cost |
|---|---|---|---|
| Equity | 9.33% | 100.00% | 9.33% (g) |
| Debt | 2.96% | 0.00% | 0.00% (g) |
| Weighted Average Cost of Capital |  | 100.00% | 9.33% |
|  | **WACC (rounded)** |  | **9.3%** |

Source:
| | |
|---|---|
| (a) | 20 year treasury bond yield |
| (b) | See Exhibit 5 for Beta calculation. |
| (c) | CRSP data as provided by the Kroll Cost of Capital Navigator. |
| (d) | CRSP data as provided by the Kroll Cost of Capital Navigator (6th decile premium). |
| (e) | Nonsystematic risk. |
| (f) | Moody's Seasoned Baa Corporate Bond Yield. |
| (g) | Proposed capital structure was all equity. |

3.    <u>Mr. Dragon Independently Calculated GTV's Discount Rate</u>

After calculating GTV's WACC, Mr. Dragon next determined GTV's discount rate.   As set forth in Exhibit 4b, the discount rate is WACC[8] divided by the success rate for early-stage companies.  As noted in Exhibit 4b, Mr. Dragon's selection of a 25% success rate is supported by

---

[8] As noted above, WACC is a measurement of return on investment, and is referred to as such in Exhibit 4b to Mr. Dragon's supplemental disclosure.

academic literature on valuations.  (Schirick Decl., Ex. A at Ex. 4b nn. a & b.)  Mr. Dragon divided WACC (9.3%) by the success rate (25%) to arrive at a discount rate for GTV investors at entry of 37.2%:

| | Probability Of Success | Return on Investment |
|---|---|---|
| Probability of venture not succeeding [a],[b] | 75% | 0% |
| Probability of venture succeeding [a],[b] | 25% | 37.2% |
| Guideline Companies Industry Return [c] | 100% | 9.3% |
| **Discount rate for GTV investors at entry** | | **37.2%** |

Mr. Dragon's calculation of GTV's discount rate—on its own—can be used as an independent "stress test" of the A&M Report's conclusion that a $2 billion valuation for GTV was reasonable.  A&M applied a discount rate of 40% (a slightly more conservative assumption than the figure arrived at by Mr. Dragon) but did not itself provide _any_ supporting analysis or calculation, unlike Mr. Dragon.  Mr. Dragon's independent analysis of this figure thus provides further support for his conclusion that the "valuation of GTV . . . was predicated on reasonable assumptions."  Once Mr. Dragon arrived at a discount rate similar to that used in the A&M Report, it is rote arithmetic to apply Mr. Dragon's discount rate to GTV's revenue projections to arrive at a valuation.  That Mr. Dragon did not expressly show this final step in the calculation is hardly a basis to preclude his testimony as to the reasonableness of A&M's $2 billion valuation of GTV. _See In re Pfizer Inc. Sec. Litig._, 819 F.3d 642, 665 (2d Cir. 2016) (finding district court committed error by rejecting all testimony regarding an analysis performed, rather than specific portions which were inadequately supported).  In sum, because Mr. Dragon confirmed the reasonableness

of (i) GTV's future growth rate and (ii) the discount rate, both as used in the A&M Report, he therefore had more than adequate independent foundation to opine that a $2 billion valuation of GTV was reasonable.

| | | |
|---|---|---|
| Risk-adjusted Discount Rate (r) | | 40.0% |
| Current Period Growth Rate ($g_1$) | | 50.0% |
| Long-term Sustainable Growth Rate ($g_{lt}$) | | 4.0% |
| Period (H) | | 3.00 Yrs |
| FV of Terminal Cash Flows (1) | $ | 3,967 |
| Present Value Factor | | 0.3080 |
| **PV of Terminal Cash Flows** | **$** | **1,222** |

| | | |
|---|---|---|
| Net PV of Discrete Cash Flows | $ | 470 |
| PV of Terminal Cash Flows | | 1,222 |
| **Indicated Enterprise Value from Operations** | **$** | **1,692** |

(Schirick Decl. Ex. C, at Schedule 3 (red boxes added).)  Indeed, while the A&M report used a 40% discount rate and arrived at a valuation of $1.7 billion, Mr. Dragon's *lower* discount rate of 37.2% would have led to an even higher valuation number for GTV.  Again, the government is, as a result, well-equipped to cross Mr. Dragon on these calculations or have its own expert attempt to refute them.

### C.    Mr. Dragon's Independent Market Multiple Analysis Further Confirms the Reasonableness of a $2 Billion Valuation for GTV

Mr. Dragon additionally used the "market multiple" approach to confirm that $2 billion was a reasonable valuation of GTV in 2020.  To conduct this analysis, Mr. Dragon compared GTV's projected revenues and earnings to the actual (a) market capitalizations and (b) revenues and earnings of the Comparator Companies.  (*See* Schirck Decl., Ex. A at Exs. 6 and 7.)    To conduct his analysis, Mr. Dragon gathered the total enterprise value ("TEV") for each Comparator Company as well as the last twelve months ("LTM") revenue, LTM earnings before interest, taxes, depreciation, and amortization ("EBITDA"), the LTM earnings before interest and taxes ("EBIT") as well as the next twelve months ("NTM") revenue and EBITDA. (Schirck Decl., Ex. A at Ex. 6.)  Mr. Dragon also gathered the "multiples" for these metrics, *i.e.*, the ratio of total enterprise value

compared to, for example, the LTM revenues, LTM EBITDA, or NTM EBITDA. (Schirck Decl., Ex. A at Ex. 7.) From these figures, Mr. Dragon calculated the median multiple for each of these financial metrics (*e.g.*, for historical revenue). Mr. Dragon applied these median multiples to GTV's financial projections to arrive at potential future values for GTV if it achieved the revenues and earnings projected in its financial model.

| | 2021 Revenues | 2022 Revenues | 2022 EBITDA | 2023 Revenues | 2023 EBITDA |
|---|---|---|---|---|---|
| GTV | 179.9 | 1,115.4 | 98.6 | 3,147.4 | 513.1 |
| Median multiple | 4.2x | 4.32x | 12.66x | 4.32x | 12.66x |
| Total Enterprise Value | 755.6 | 4,818.5 | 1,248.3 | 13,596.8 | 6,495.8 |
| less debt | - | - | - | - | - |
| GTV Equity Value ($ millions) | 755.6 | 4,818.5 | 1,248.3 | 13,596.8 | 6,495.8 |

| Year | 2021 | 2022 | 2023 |
|---|---|---|---|
| GTV Average Equity Value ($ millions | 755.6 | 3,033.4 | 10,046.3 |

(*Id.*, Ex. 8.) In the cells highlighted in light blue, Mr. Dragon provides the average equity value, in millions of dollars, based upon an assessment of a market multiple of revenues and EBITDA for the relevant periods.[9] These figures suggest projected average market multiple valuations of $755.6 million in 2021, $3 billion in 2022, and $10 billion in 2023. Critically, Mr. Dragon did not present these figures to suggest that GTV was worth $10 billion. Rather, these figures represent potential *future* valuations for GTV if it performed in-line with its projections. By comparison, the A&M Report projected valuation ranges of approximately $244 million to $422 million for 2021, $711 million to $1.3 billion for 2022, and $1.4 billion to $2.6 billion for 2023.

---

[9] Mr. Dragon's earliest figure is for 2021, looking back at 2020's projected revenues, using the LTM figure, as there would be no revenues to assess when considering the twelve months prior to 2020.

| Guideline Public Company Method | | | | | Summary |
|---|---|---|---|---|---|
| | FYE+1 | FYE+2 | FYE+3 | FYE+4 | |
| | Dec 31, 2021 | Dec 31, 2022 | Dec 31, 2023 | Dec 31, 2024 | Marketable |
| | MAU | MAU | MAU | MAU | |
| **Indicated Value Using Median** | | | | | |
| Financial Statistic | 2.8 | 8.3 | 16.4 | 24.6 | |
| Selected Multiple | 85.8 x | 85.8 x | 85.8 x | 85.8 x | |
| **Enterprise Value** | $        244 | $        711 | $     1,409 | $     2,113 | $     1,435 |
| Weight | 10.0% | 20.0% | 30.0% | 40.0% | 100.0% |
| | | | | | |
| **Indicated Value Using Straight Average** | | | | | |
| Financial Statistic | 2.8 | 8.3 | 16.4 | 24.6 | |
| Selected Multiple | 155.3 x | 155.3 x | 155.3 x | 155.3 x | |
| **Enterprise Value** | $        442 | $     1,286 | $     2,550 | $     3,826 | $     2,597 |
| Weight | 10.0% | 20.0% | 30.0% | 40.0% | 100.0% |

(Schirick Decl., Ex. C at Schedule 6.)  Notwithstanding the fact that the A&M Report's projected valuation based on projected users in 2021 is hundreds of millions of dollars less than Mr. Dragon's calculated value based on projected revenues in 2021, A&M still ultimately concluded that the appropriate valuation range for GTV, based on the totality of its figures, was $1.4 billion to $2.6 billion, because it placed greater weight on out-year value than near-year value.  (*Id.* at "Weight," weighing 2024 value 40% and 2021 value 10%.)  Given that Mr. Dragon's projected figures exceed those projected by A&M for each relevant year, his analysis plainly supports his conclusion that a $2 billion valuation was supportable.

## II.    THE COURT SHOULD ALLOW MR. DORAN TO TESTIFY TO THE EXCLUDED TOPICS

The Court has twice held that evidence concerning the Chinese Communist Party's ("CCP") transnational campaign to harass Mr. Guo is relevant to showing that his political movement was genuine, explaining his fears of CCP infiltration and offering non-fraudulent reasons for his use of multiple bank accounts and secretive communications.  (*See* Dkt. No. 243 at 5-7; Dkt. No. 319 at 13-14.)    This information also buttresses Mr. Guo's defense by offering nonfraudulent explanations for needing a secure base from which to conduct anti-CCP business and supporting Mr. Guo's good-faith belief in the value of GTV.  (Dkt. No. 243 at 6-7.)

To present this evidence, Mr. Guo noticed his intent to call expert witness Paul Doran to testify to the CCP's surveillance and harassment tactics, among other issues.  Expertise on these matters is critical to Mr. Guo's defense.  While residents of the United States enjoy robust freedom of expression (which they may take for granted), residents of the People's Republic of China ("PRC") decidedly do not.  The PRC is a police state that employs its vast security apparatus to surveil and suppress any speech regarded as a threat to the CCP's continued power.  For a jury comprising American citizens accustomed to ubiquitous political commentary and dissent, the true extent of the PRC's censorship of critical political speech and worldwide efforts to quell it is difficult to imagine.  Mr. Doran's expertise on these matters is necessary to assist an American juror to accurately gauge the reasonableness of Mr. Guo's fears of the CCP, which the Court has already held to be relevant: "[E]vidence showing that Defendants' fears of CCP targeting were objectively legitimate—even if they were not aware of the specific pieces of evidence—gives credence to certain nonculpable explanations of their actions.  Put simply, a jury could find that the targeting evidence elevates Defendants' alternative narrative beyond mere paranoia."  (Dkt. No. 319 at 14.)

In its Order limiting Mr. Doran's testimony, the Court excluded testimony that is relevant under the Court's earlier decisions and in some cases even imposed broader exclusions than what the government requested in its motion *in limine*.  Specifically, the Court excluded three key areas of Mr. Doran's proposed testimony: (i) testimony regarding the "Five Poisons" on which the CCP focuses its repression and surveillance activities as irrelevant under Rule 402; (ii) testimony regarding the CCP's use of secret police stations abroad as irrelevant under Rule 402; and (iii) testimony regarding the CCP's method of employing local nationals as "agents of influence"

as unduly prejudicial under Rule 403.[10]  As set forth below, to cure this clear error and prevent manifest injustice to Mr. Guo, the Court should reconsider its Order.

*First*, the Court excluded, as irrelevant, Mr. Doran's proposed testimony regarding the "Five Poisons" that the CCP seeks to monitor and suppress at home and abroad.  (Order at 12.)  The "Five Poisons" are: (i) pre-democracy beliefs; (ii) religious groups or figures such as Falun Gong or the Dalai Lama; (iii) Taiwanese independence; (iv) Tibetan independence and (v) Xinjiang (or Uyghur) independence.  (Schirick Decl., Ex. B ¶ 1.)  Mr. Doran will testify that the CCP regards these "Five Poisons" as existential threats to its power and directs its intelligence and security agencies to target and suppress activity related to these poisons.  This testimony is critical for an American jury to understand why someone like Mr. Guo would fear the CCP's influence, even while residing in the United States.

Mr. Guo was and is one of the most prominent dissidents of the CCP and has advocated for a new democratic government to replace the CCP, *i.e.*, the New Federal State of China ("NFSC").  All of the alleged "schemes" in the Indictment relate to the NFSC and Mr. Guo's pro-democracy, anti-CCP messaging: GTV is a platform designed to enable anti-CCP, pro-democracy messaging; the Himalaya Alliance and their constituent Farms are the global network supporting the NFSC whose stated mission is to bring down the CCP; G|CLUBS is a membership club for people aligned with the NFSC and Mr. Guo's anti-CCP messaging; and the Himalaya Exchange is a cryptocurrency platform intended to host the currency for the NFSC and shield the assets of pro-democracy advocates from the CCP.  In addition, Mr. Guo has also supported other of the

---

[10] In addition to these three topics, the Court excluded Mr. Doran's proposed testimony about measures taken by countries allied to the United States.  (Order at 12.)  Mr. Guo does not seek reconsideration of this portion of the Order nor, given his stipulation with the government, does Mr. Guo seek reconsideration of that portion of the Order barring Mr. Doran from testifying to documents in which the DOJ charged CCP agents who targeted Mr. Guo.

"Five Poisons," including Uyghur rights.  Understanding that Mr. Guo's messaging and activities are not just subject to CCP censorship but bring him within the crosshairs of the CCP's vast security apparatus will help the jury understand why his fears of CCP harassment and infiltration were "objectively legitimate," evidence this Court has twice held to be relevant.  (*See* Dkt. No. 319 at 14; Dkt. No. 243 at 6.)  The Court's decision to the contrary now is clear error and should be reversed.

*Second*, the Court excluded all of Mr. Doran's proposed testimony about the Chinese Ministry of Public Security's ("MPS") "secret, extra-legal Chinese police stations" on the ground that it is "irrelevant."  This goes beyond what even the government asked for in its motion to preclude.   First, the government did not seek to preclude Mr. Doran from testifying entirely on this topic.  Specifically, the government only sought to preclude Mr. Doran from testifying as to the "number and location" of these extra-legal Chinese police stations, "including in dozens of countries with no relevance to this case." (Gov. Mot. at 23.)  It would be manifestly unjust for the Court to exclude testimony by Mr. Doran beyond that which even the government requested.

But even if the government had sought to preclude this testimony in its entirety, reconsideration should still be granted.  Mr. Doran's testimony on secret, extra-legal Chinese police stations is directly relevant to Mr. Guo's defense because it will corroborate his fears of surveillance and infiltration in the United States, which the Second Circuit has held to be permissible expert testimony.  *See United States v. Onumonu*, 967 F.2d 782, 787 (2d Cir. 1992) (expert testimony that "made the existence of [the defendants' s] belief . . . more probable than it would have been without the evidence" was admissible).  Mr. Doran's testimony on this point will further assist the American jury in this case with determining whether Mr. Guo's fears were "mere paranoia" or "objectively legitimate."  (*See* Dkt. No. 319 at 14 ("Put simply, a jury could find that

the targeting evidence elevate Defendants' alternative narrative beyond mere paranoia."); Dkt. No. 243 at 6 ("Evidence showing that Kwok's fears of CCP targeting are objectively legitimate could be used to counter the government's case or to bolster his defense." (cleaned up).)  The Court's exclusion of Mr. Doran's testimony on this point on relevance grounds amounts to clear error and is manifestly unjust to Mr. Guo.

*Third*, the Court excluded Mr. Doran's proposed testimony about the MPS's recruitment of "local nationals" as "so-called 'agents of influence'" on the ground that it is "irrelevant, and even if it had probative value, such value is outweighed by its risk of confusing the jury."  (Order at 12.)  First, the government did not seek to exclude the entirety of Mr. Doran's testimony on this topic.  It only sought to preclude Mr. Doran from testifying about "CCP activities *other* than targeting individuals, such as recruiting or attempting to recruit local national and then directing them to apply for jobs at local, state, and federal agencies as part of the CCP's broader efforts to influence opinion in foreign countries." (Gov. Mot. at 23-24 (emphasis in original) (cleaned up).)  However, Mr. Doran's disclosure clearly indicated that he would testify regarding how these "agents of influence" "promote the CCP's aims and objectives, including denigrating and de-legitimizing Chinese dissidents."  (Schirick Decl., Ex. B ¶ 7(j).)  It was thus clear error to preclude Mr. Doran's testimony entirely on this topic.

But even if the government had sought to preclude all of Mr. Doran's testimony on local "agents of influence," the Court should still reconsider its decision.  The government intends to argue that one of the "means and methods" of the purported G Enterprise was to "harass[], threaten[], and silence[e] critics of [Mr. Guo]," (Indictment ¶ 8(d)), including by presenting

evidence that Mr. Guo falsely labeled critics as CCP spies.[11]  Expert testimony showing that the CCP actively recruits local nationals to surveil and infiltrate the CCP's stated enemies directly supports Mr. Guo's belief that such agents infiltrated his anti-CCP organizations.  Rather than "confusing the jury," Mr. Doran's testimony on this topic will assist the jury in assessing the legitimacy of Mr. Guo's fears.  The Court should reconsider its decision precluding Mr. Doran from offering this highly relevant testimony corroborative of Mr. Guo's defenses.

*    *    *

---

[11] The government argued as much in its opening statement, telling the jury that "[Mr. Guo] claimed that victims who were complaining about their money being stolen were traitors and CCP spies."  (May 24, 2024 Trial Tr. at 24:25-25:2.)

## CONCLUSION

For the foregoing reasons, Mr. Guo respectfully requests that the Court reconsider its Order

and permit Mr. Dragon and Mr. Doran to testify on the excluded topics.

Dated: May 29, 2024
      New York, New York

E. Scott Schirick
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
scott.schirick@alston.com

Sidhardha Kamaraju
Matthew S. Barkan
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
mbarkan@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490
sabrinashroff@gmail.com

*Attorneys for Defendant Miles Guo*