```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  06/24/2024

-against-

MILES GUO,

                          Defendant.

23 Cr. 118 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant, Miles Guo, moves for reconsideration of the Court's May 16, 2024 order (the "Order") granting in part the Government's motion to exclude and limit the testimony of Guo's expert witnesses. Def. Mot., ECF No. 364; Def. Mem., ECF No. 365; see Order, ECF No. 338. For the reasons stated below:

1. Guo's motion to permit the testimony of Raymond Dragon, his valuation expert, about two additional methods of valuation is **DENIED**;

2. Guo's motion to permit the testimony of Paul Doran, his expert on the Chinese Communist Party ("CCP"), is **GRANTED** only as to Doran's testimony on (1) the CCP's opposition to specific political causes for which Guo has publicly advocated; and (2) the "secret, extra-legal Chinese police station" identified in New York City, and is otherwise **DENIED**; and

3. Thomas Bishop, Guo's accounting expert, may testify about the Himalaya Exchange redemptions only as a summary witness.

**LEGAL STANDARD**[1]

Local Criminal Rule 49.1(d) provides that a party may file "[a] motion for reconsideration . . . within fourteen (14) days after the Court's determination of the original motion. A memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked shall accompany the motion."

---

[1] The Order describes the substantive legal standards for the admissibility of expert testimony, see Order at 1–3, and the Court does not repeat them here.

"Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *United States v. Baldeo*, No. 13 Cr. 125, 2015 WL 252414, at *1 (S.D.N.Y. Jan. 20, 2015), *aff'd*, 615 F. App'x 26 (2d Cir. 2015) (internal quotation marks and citation omitted). "[A] motion for reconsideration 'is not a vehicle for relitigating old issues, presenting the case under new theories or otherwise taking a second bite at the apple.'" *United States v. Lisi*, No. 15 Cr. 457, 2020 WL 1331955, at *2 (S.D.N.Y. Mar. 23, 2020) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)) (cleaned up). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *United States v. Goldberg*, No. 12 Cr. 864, 2021 WL 2444548, at *1 (S.D.N.Y. June 15, 2021) (citation omitted).

A motion for reconsideration is "properly granted only if there is a showing of: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citation omitted).

## DISCUSSION

I. <u>Raymond Dragon</u>

Guo seeks to call Dragon as a valuation expert to opine that "a $2 billion valuation of GTV was reasonable based on information available in August 2020." Dragon Supp. Notice at 3 ¶ 3, ECF No. 322-1. Dragon arrived at this conclusion by analyzing a valuation report prepared by the Alvarez & Marsal firm ("A&M") in December 2020 (the "A&M Report"), and by using three different valuation methods: (1) analyzing GTV's discounted cash flow projections (the "Income Method"), (2) comparing twelve companies (the "Comparator Companies") to GTV

(the "Market Method"), and (3) considering the amount of capital that was actually raised during the GTV Private Placement (the "Backsolve Method"). *Id.* at 2–3. In the Order, the Court permitted Dragon to opine as to the Backsolve Method, but precluded him from testifying about the A&M Report, the Income Method, and the Market Method. Order at 16–17. Guo now moves for reconsideration, describing the Income and Market Methods—and Dragon's analysis—in greater detail.[2] *Compare* Def. Mem. at 3 *with* Order at 17.

A. The Income Method

The Income Method—also known as the discounted cash flow ("DCF") method—values a company based on the present value of all future monetary benefits. *See, e.g.*, *In re Young Broad. Co.*, 430 B.R. 99, 126 (Bankr. S.D.N.Y. 2010). To apply the Income Method, an expert multiplies a discount rate by the projected future cash flows of a company in order to arrive at a valuation. *See* Def. Mem. at 7; *accord In re Chemtura Corp.*, 439 B.R. 561, 574 (Bankr. S.D.N.Y. 2010).[3] "Critical to the reliability of the results obtained from a DCF analysis is the determination and calculation of: (1) the future economic benefit to be measured, and (2) the rate at which that future benefit should be discounted to reflect its present value." *In re Med Diversified, Inc.*, 346 B.R. 621, 632 (Bankr. E.D.N.Y. 2006).

The Income Method is widely accepted in business literature and caselaw. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689, 697 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). But, an expert cannot simply "use[] DCF terminologies" and appeal to the accepted reliability of the Income Method if he makes "multiple novel assumptions that do not exist in the DCF

---

[2] Details of the Income and Market Methods were provided by Guo's counsel, not Dragon. However, because the Court has already permitted Dragon to testify about the Backsolve Method based on an explanation offered by Guo's counsel, Order at 17, it shall consider Guo's reconsideration brief in determining the reliability of Dragon's proposed testimony on the other two methods.

[3] *See also* Jason Fernando & Khadija Khartit, *Discounted Cash Flow (DCF) Explained with Formula and Examples*, Investopedia (Nov. 6, 2023), https://perma.cc/T66Y-9VJH.

3

analysis." *Young*, 430 B.R. at 127; *see Celebrity Cruises, Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 179 (S.D.N.Y. 2006) ("Any analysis will be only as good as the inputs to the model."). Whether Dragon's analysis is reliable can only be determined by examining in detail his three-step methodology.

1. Calculation of the Discount Rate

First, "[c]alculation of the appropriate discount rate is critical to obtaining reliable valuation results from the DCF method." *Med Diversified*, 346 B.R. at 635. Dragon calculated GTV's discount rate by first calculating GTV's weighted average cost of capital ("WACC"), which is the "after-tax cost of bringing in new money, either through taking on debt or through the sale of equity." Def. Mem. at 9; *see* Timothy A. Luehrman, *What's It Worth? A General Manager's Guide to Valuation*, Harv. Bus. Rev. (May/June 1997), https://perma.cc/J224-MZ5U ("According to [the DCF] method, the value of a business equals its expected future cash flows discounted to present value at the weighted-average cost of capital."). To determine GTV's WACC, Dragon calculated the cost of both equity and debt. To calculate the cost of equity, Dragon estimated GTV's beta—a "measure of stock price sensitivity" used to approximate risk—by taking the median of the unlevered betas of the five Comparator Companies that had publicly available data. Def. Mem. at 8–10. Dragon then calculated a weighted average of the equity and debt costs, assigning a weight of 100% to the cost of equity and a weight of 0% to the cost of debt because GTV's "[p]roposed capital structure was all equity," to arrive at a WACC of 9.3 percent. Dragon Supp. Notice at 9. Finally, he divided the WACC by the "success rate of early-stage companies" to "adjust[] for new venture risk." Def. Mem. at 7, 10. He ultimately arrived at a discount rate of 37.2 percent. *Id.* at 12.

4

Dragon's calculation of the discount rate has two major flaws. First, Dragon arrived at his GTV beta estimate by averaging the betas of the Comparator Companies. Def. Mem. at 8–9. Although averaging the betas of comparable public companies is an accepted method of estimating the beta of a private company, an expert must select appropriate comparable companies to ensure the reliability of the beta calculation.[4] But, Dragon does not explain why he chose the Comparator Companies. *See infra* Section I.B (describing the problems with the Comparator Companies in more detail). Moreover, he merely calculates the unlevered beta of five of the Comparator Companies—not all twelve listed—and he does not explain why those five companies are a reliable subset to estimate GTV's beta.

Second, Dragon erred in assigning a weight of zero to the cost of debt—omitting it from his determination of GTV's WACC—without providing an explanation. "The weighting is established by the ratio of debt to equity in the company's capital structure." *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1135 (D. Nev. 1998). Although Dragon states that he assigned a weight of 100% to the cost of equity because the "[p]roposed capital structure for GTV was all equity," he fails to cite any source for this assumption. Dragon Supp. Notice at 9. Moreover, "whether it is appropriate to use the company's *actual* debt to equity ratio, or one closer to the industry average, is generally open to discussion." *Steiner Corp.*, 5 F. Supp. 2d at 1135; *see Young*, 430 B.R. at 127 (finding that a purported DCF analysis that "account[ed] for the cost of equity instead of both the cost of debt and equity" employed a "novel assumption[]" that is not part of the generally accepted DCF method). Without an explanation of the assumptions underlying Dragon's equity-debt breakdown, his assignment of weights is unreliable.

---

[4] *See* Elvin Mirzayev and Charles Potters, *How to Calculate the Beta of a Private Company*, Investopedia (Dec. 31, 2021), https://perma.cc/S4YK-GS62 ("For instance, Apple Inc. [] has a diverse set of operations, including personal computers, smartphones, tablets, and other items. This company would likely be poorly comparable to a private company that has a single operation, such as smartphone production.").

5

Dragon's calculation of the discount rate—a critical input to the Income Method—depends on conjured-up estimates of beta and WACC. His speculative assumptions, which go well beyond the kinds of minor flaws that can be probed on cross-examination, are grounds for exclusion. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) ("Admission of expert testimony based on speculative assumptions is an abuse of discretion.").

2. Revenue Projections

The accuracy and reliability of revenue projections are crucial to the reliability of the DCF model. *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 243 (Bankr. S.D.N.Y. 2014) ("DCF analysis may be problematic where management's projections are inaccurate or unreliable."); *In re Adelphia Commc'ns Corp.*, 512 B.R. 447, 471 (Bankr. S.D.N.Y. 2014) ("As a matter of common sense, DCF works best (and, arguably, only) when a company has accurate projections of future cash flows; when projections are not tainted by fraud; and when at least some of the cash flows are positive.").

Here, Dragon did not create his own revenue projections for GTV and instead relied on revenue projections generated by A&M. This is hearsay.[5] Guo argues that this is nonetheless acceptable because experts can consider hearsay materials "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see* ECF No. 328 at 11–12. But, this exception to the hearsay rule does not apply for at least two reasons.

---

[5] Guo contends that Dragon is not offering the projections for their truth because they are "opinions of potential future value" and because "projections—inherently—are not facts." Def. Mem. at 5 n.3. Guo is incorrect. At minimum, Dragon is offering A&M's projections "for the truth of [A&M's] opinion" as to GTV's cash flows. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). And, although the projections are estimates, Dragon is ultimately offering the projections as true estimates of GTV's future cash flows. *Cf. Smith v. Arizona*, No. 22-899, 602 U.S. __ (U.S. June 21, 2024), slip op. at 2 ("When an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth.").

First, under the "mouthpiece" rule, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted; *accord Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). An expert "cannot merely recite another expert's opinion" or "directly testify as to the conclusions of another expert." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015). "[T]he expert witness must in the end be giving his *own* opinion." *Malletier*, 525 F. Supp. 2d at 664; *see Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16 Civ. 1318, 2021 WL 4810266, at *21 (S.D.N.Y. Sept. 30, 2021) ("[A]n expert's job is to present (and support) his own views, not to marshal the views of others."). For example, when a noticed expert is unavailable at trial and courts authorize a replacement expert, the new expert can rely on the "facts and data" supplied by the original expert, but not on the "opinions of other experts not subject to cross-examination." *Jung v. Neschis*, No. 01 Civ. 6993, 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007) (emphases omitted); *see Palatkevich v. Choupak*, No. 12 Civ. 1681, 2014 WL 5463371, at *1 (S.D.N.Y. Oct. 22, 2014) (holding that the replacement expert cannot "simply parrot the analysis" of the noticed expert but must "offer his own opinions based on his experience and expertise in the subject matter").

Here, the financial predictions contained in the A&M Report are critical to Dragon's valuation opinion. It would not be proper for him to summarily adopt A&M Report's opinion as

7

to the soundness of its own projections. This is so because the authors of the A&M Report will not be subject to cross examination at trial.[6]

Second, neither Guo nor Dragon has provided evidence that A&M's revenue projections are reliable. "[E]xperts may rely on one another, but they may only do so if the requisite standards for reliability are met each step of the way. If one expert's opinions are built upon a foundation laid by another, reliability of the latter requires reliability of the former." *In re M/V MSC FLAMINIA*, No. 12 Civ. 8892, 2017 WL 3208598, at *5 (S.D.N.Y. July 28, 2017). A&M did not have revenue projections for GTV as of August 2020, so it used the model for a different company, GNews, adopting the same estimates for "user grow[th] and operating margins," while assuming that GTV would have a base number of users higher than that of GNews. Def. Mem. at 5. Further, the GNews projections were generated internally, potentially by persons involved in the alleged fraud scheme that is the subject of Guo's trial. *See* ECF No. 322 at 7; *Adelphia*, 512 B.R. at 463 (declining to apply the DCF model when the projections are unreliable or the product of fraud because the model's reliability depends heavily on the accuracy of future cash flows). The GNews projections, therefore, constitute an unreliable foundation for the valuation of GNews. For A&M to then transform the dubious GNews projections into GTV projections—with no alterations except an increase in the number of users—was a major analytical step taken without explanation or laying a proper foundation. A&M Report at 2, ECF No. 366-3; *see*

---

[6] A common example of where an expert can rely on another expert is where a physician, despite not being an expert in radiology, relies on a diagnosis in an X-ray to arrive at a conclusion about a course of treatment. *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002); *see* Advisory Committee Notes to Rule 703 (1972). But, if the soundness of the X-ray were the key issue in the case, the physician cannot simply "parrot[] the opinion" of the radiologist. *Dura*, 285 F.3d at 613. In that case, the expert who actually evaluated the X-ray is "the one who should have testified." *Id.* (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992)).

*Boucher*, 73 F.3d at 21 (noting that an expert's testimony should be excluded when it is "based on assumptions that are [] unrealistic and contradictory" (cleaned up)).

In response to both the mouthpiece and reliability problems with Dragon's testimony, Guo contends that Dragon validated the reliability of the GTV projections by comparing the projections to the historical financial performance of the Comparator Companies. Def. Mem. at 5–6. The Court finds Guo's validation theory unconvincing. On the mouthpiece point, Dragon's validation does not change the fact that he would still be putting A&M's methods and calculations before the jury, not his own.[7] His validation is little more than "merely vouch[ing] for [A&M's] opinions," which is impermissible. *U.S. Bank*, 112 F. Supp. 3d at 131. As to reliability, using the Comparator Companies as a benchmark set is suspect.[8] *See supra* Section I.A.1; *infra* Section I.B. Accordingly, the financial projections that support Dragon's conclusion are unreliable.

        3.   Valuation Calculation

Guo admits that Dragon did not do the "arithmetic to apply [his] discount rate to GTV's revenue projections" and arrive at a valuation range for GTV. Def. Mem. at 11. The Court rejects Guo's argument that the valuation calculation is "rote" and need not be divulged. Although an arithmetical error would be a "minor flaw" properly attacked on cross-examination, the Government can probe Dragon's ultimate valuation only if it is disclosed. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see* Order at 17.

---

[7] Dragon did not independently calculate GTV's financial projections.

[8] Moreover, Guo says that Dragon's calculated compound annual growth rate ("CAGR") for GTV is "not far from the average CAGR for the Comparator Companies (244% vs. 224%)." Def. Mem. at 5. This unscientific conclusion is not supported by any tests for statistical significance.

Guo contends that this step is unnecessary because Dragon's discount rate of 37.2 percent is lower than the 40 percent discount rate used by the A&M Report. Def. Mem. at 11. Therefore, he asserts, Dragon's valuation must necessarily be higher than the $1.7 billion valuation that the A&M Report reached. *Id*. Guo's logic has two flaws. First, it presumes that the A&M Report is reliable, which the Court cannot conclude. *See supra* Section I.A.2. Second, it assumes that Dragon can put the A&M Report's valuation before the jury. But, pursuant to Rule 703, Dragon cannot rely on—much less disclose to the jury—the A&M Report's opinion as to GTV's valuation. *Jung*, 2007 WL 5256966, at *16. The testifying expert must testify as to his own valuation opinion, not—as Dragon proposes to do—launder the opinion of another expert that is not subject to cross-examination.[9] Without doing the calculation, Dragon has no valuation opinion to offer.

4. Conclusion

Guo's fraud charges turn, in part, on his August 2020 statement that GTV was worth $2 billion. The testimony of a valuation expert is relevant to the determination of whether this statement was a misrepresentation. The Court is also mindful that "[v]aluation is not an exact science." *Genco*, 513 B.R. at 242.

But, the liberal approach that the Federal Rules of Evidence adopt toward expert testimony should not be confused with a "let it all in" philosophy. *United States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993) (quoting *Eymard v. Pan Am. World Airways*, 795 F.2d 1230, 1234 (5th Cir. 1986)). Expert testimony can be "powerful and quite misleading" to the jury, and the Court has an obligation, through its "gatekeeping role," to "ensur[e] that an expert's

---

[9] Dragon's proposed testimony could be admissible if the validity of the A&M Report was a fact at issue in trial. But, the A&M Report's validity is irrelevant to the charges: Guo did not see the A&M Report, which was created in December 2020, before stating in August 2020 that GTV was valued at $2 billion.

testimony . . . rests on a reliable foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "To warrant admissibility, [] it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Although "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible," *id.*, the significant flaws, unexplained assumptions, and hearsay in each of Dragon's three steps "go far beyond weight" and cannot effectively be probed on cross-examination. *Lippe*, 288 B.R. at 701. Accordingly, the Court shall not reconsider its decision to exclude Dragon's proposed Income Method testimony.

      B. The Market Method

The Market Method—also known as the comparable companies method of valuation—is also an accepted method of valuation. *See Celebrity Cruises v. Essef Corp.*, 434 F. Supp. 2d 169, 179 (S.D.N.Y. 2006) (citing *Steiner Corp.*, 5 F. Supp. 2d at 1124). The Market Method "determines the value of a company by comparing it with other, public companies with similar assets, as well as similar operating and financial characteristics." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 330 (Bankr. S.D.N.Y. 2018). "Values are standardized using one or more common variables such as revenue, earnings, or cash flow, with the expert then applying a multiple of the financial metric or metrics that yields the market's valuation of these comparable companies." *Chemtura*, 439 B.R. at 575.

"The key to this analysis is the choice of appropriate comparable companies relative to the company in question." *Genco*, 513 B.R. at 243. Here, the Comparator Companies include Meta, Snap, Twitter, and Tencent—in other words, some of the most valuable and recognizable social media and technology companies in the world. *See* Dragon Supp. Notice at 2. Dragon examined the publicly available data for the Comparator Companies, but he does not explain

11

how and why he chose this subset, and Guo's briefs offer no insight. *See* Def. Mem. at 3–4; *see* ECF No. 328 at 5–6; Dragon Supp. Notice. This failure to explain the Comparator Companies is itself grounds for exclusion. *See Lippe*, 288 B.R. at 697 ("In making a comparable companies analysis, of course, a valuation expert must consider earnings data from comparable companies. The more comparable a company, the more relevant its data. If there are differences between the comparables and the company being valued, adjustments should be made."); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 936 (Bankr. S.D.N.Y. 1994) (disregarding expert's Market Method analysis because the comparable companies he identified were "not only much larger" but also "more mature" than the subject company); *see also Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20 Civ. 3773, 2022 WL 4225543, at *9 (S.D.N.Y. Sept. 13, 2022) (permitting an expert to testify as to the Market Method only because "she explained why she identified these companies as comparable").

The only explanation that the Court can discern from the record is that the Comparator Companies are the exact ones that were used in the A&M Report. *Compare* A&M Report at 8–19 *with* Dragon Supp. Notice at 2. This parroting of A&M's subset is a fatal flaw in Dragon's proposed testimony. *See Lippe v. Bairnco Corp.*, 99 F. App'x 274, 279 (2d Cir. 2004) (holding that relying on another party to provide comparable companies "without verifying whether those companies were indeed comparable and without adjusting [their] analyses to account for variances" was "considerably more than [a] 'minor flaw'").[10]

Dragon's Market Method opinion is also flawed because he again failed to calculate GTV's value based on the Market Method. Instead, he arrived at GTV equity values for 2021,

---

[10] A&M justifies its selection by saying that the companies "include both US-based and Chinese companies that focus on social media, content distribution, communication, and entertainment services." A&M Report at 3. This broad statement provides none of the detail required to allow the Government to offer contrary evidence or to properly probe either Dragon or A&M's selection of the Comparator Companies on cross-examination.

12

2022, and 2023 assuming that the company hit its financial projections each year. Def. Mem. at 13. He concluded that because the equity value that he calculated for each year exceeded A&M's calculation of each year's equity value, his valuation range must exceed the A&M Report's valuation range of $1.4 billion to $2.6 billion. *Id.* at 13–14. Again, the A&M Report cannot be offered to the jury, so Dragon's comparison is meaningless.[11] His failure to conduct any valuation calculations himself, while attempting to hide behind the A&M Report's purported reasonableness, dooms his proposed expert testimony. *See Delshah 60 Ninth, LLC v. Free People of PA LLC*, No. 20 Civ. 5905, 2024 WL 1120388, at *10 (S.D.N.Y. Mar. 13, 2024) (the Court "must disregard [the] parroting of the opinion of another expert." (cleaned up)). Accordingly, the Court concludes that Dragon's proposed testimony about the Market Method is unreliable and must be excluded.[12]

II. <u>Paul Doran</u>

Next, Guo asks that the Court reconsider its exclusion of portions of Paul Doran's anticipated expert testimony about the CCP. Def. Mem. at 15–19. The Court previously held that several of Doran's proposed topics "stray[ed] too far afield and risk[ed] miring the jury in issues that do not bear on this case." Order at 12. On reconsideration, Guo argues that the Court should permit three such areas of testimony: (1) "testimony regarding the 'Five Poisons' on which the CCP focuses its repression and surveillance activities," (2) "testimony regarding the

---

[11] Even if the A&M Report could be offered to the jury, Dragon's logical proposition—that his calculated equity value exceeded A&M's calculated equity value in 2021, 2022, and 2023, therefore resulting in a higher valuation range—does not hold water. Dragon's calculated equity value is dependent on GTV's financial projections, which are unreliable. *See supra* Section I.A.2. Moreover, A&M arrived at its valuation range by calculating the equity value for 2021, 2022, 2023, and 2024, and using a weighted average of the four years, where 2021 was weighted at 10% and 2024 was weighted at 40%. *See* A&M Report at 21. Dragon does not calculate an equity value for 2024 and does not indicate what weights should be given to each year in light of this omission. And, he does not state whether the weights assigned by A&M are correct.

[12] In an abundance of caution, the Court has reviewed Guo's arguments for the admission of Dragon's testimony without regard for the strict motion-for-reconsideration standard. Reviewed under that standard, the testimony falls even more plainly short.

13

CCP's use of secret police stations abroad," and (3) "testimony regarding the CCP's method of employing local nationals as 'agents of influence.'" Def. Mem. at 15.

First, Guo contends that Doran's proposed testimony about the "Five Poisons"—pro-democracy beliefs, religious figures, Taiwanese independence, Tibetan independence, and Uyghur independence—is "critical for an American jury to understand why someone like [] Guo would fear the CCP's influence, even while residing in the United States." *Id.* at 16. To the extent that Guo has advocated for democracy and Uyghur independence, *see id.* at 16–17, Doran may testify that the CCP opposes Guo's stated positions. Digressions about other causes that Guo has not publicly backed, however, are irrelevant under Federal Rule of Evidence 401.

Second, Guo argues that Doran should be allowed to testify about "secret, extra-legal Chinese police stations," which will "corroborate [Guo's] fears of surveillance and infiltration in the United States." *Id.* at 17. Doran may testify about the "one station identified in New York City," which may bear—however remotely—on Guo's state of mind. Doran Supp. Notice at 3 ¶ 5, ECF No. 322-3; *see also* ECF No. 322 at 22. Broader testimony about the "47 such stations in at least 38 countries," ECF No. 322-3 at 3 ¶ 5, remains irrelevant under Federal Rule of Evidence 401 and, in any case, is needlessly cumulative under Federal Rule of Evidence 403.[13]

Third, Guo contends that Doran should be permitted to testify "that the CCP actively recruits local nationals to surveil and infiltrate the CCP's stated enemies." Def. Mem. at 19. He argues that this testimony supports his "belief that such agents infiltrated his anti-CCP

---

[13] Doran is permitted to testify about the CCP's targeting of foreign-based Chinese nationals like Guo, which may provide support for Guo's nonculpable explanations for the alleged conduct. *See* ECF No. 243 at 6–7. And, the parties have negotiated and introduced a stipulation describing in detail the CCP's efforts to discredit, harass, and repatriate Guo. *E.g.*, Trial Tr. at 402:9–405:11 (quoting DX Stip. 0001). Rule 403 grants district courts "broad discretion to exclude even relevant evidence . . . if it would be needlessly cumulative," which the Court finds to be the case here. *United States v. Miller*, 626 F.3d 682, 689–90 (2d Cir. 2010) (quotation marks and citation omitted).

14

organizations."[14]  *Id.*  According to Doran's supplemental disclosure, however, he intends to testify specifically that the CCP directs its recruited "local nationals . . . to apply for jobs at local, state[,] and federal agencies."  ECF No. 322-3 at 5 ¶ 7(j).  This testimony is not relevant to whether the CCP directed "agents of influence" to infiltrate *Guo*'s organizations.  Further, the Court again finds that this testimony bears a significant risk of "confusing the issues" and "misleading the jury" by insinuating that government employees involved in this case may be compromised by the CCP.  Order at 12; Fed. R. Evid. 403.  It is also needlessly cumulative.  *See supra* n.13.

Accordingly, Guo's motion for an order permitting Doran's testimony is GRANTED to the extent that Doran may testify about (1) the CCP's opposition to specific political causes for which Guo has publicly advocated; and (2) the "secret, extra-legal Chinese police station" identified in New York City.  His motion is otherwise DENIED.

III.    Thomas Bishop

Finally, Guo states that he still intends to call Thomas Bishop—his proffered accounting expert—to testify as an expert "concerning redemption activity at the Himalaya Exchange."[15] Def. Mem. at 1 n.1.  Guo contends that the Government "did not seek to preclude" this testimony in its initial motion.  *Id.*  The Government argues that it moved to exclude all of Bishop's expert testimony, and "the Court granted that relief in full."  Gov. Mem. at 6 n.5, ECF No. 373.  The Government asks, therefore, that the Court "strictly limit Bishop to non-expert testimony"—for example, his anticipated summary testimony regarding bank records in evidence.  *Id.*

---

[14] Guo asserts that the Government "did not seek to exclude the entirety of [] Doran's testimony on this topic."  Def. Mem. at 18.  Not so: the Government specifically cites the topic in its list of "irrelevant, yet detailed, digressions."  ECF No. 322 at 23–24.

[15] A "redemption" is a financial transaction in which a person redeems a purchased security for a sum of money.  *See* James Chen, *Redemption: Definition in Finance and Business*, Investopedia (May 5, 2022), https://perma.cc/DH6H-7KKX.

According to his initial disclosure, Bishop intends to testify that "the Himalaya Exchange paid in excess of fifty million dollars of customer redemptions through the Himalaya Exchange's account at FV Bank." ECF No. 327-6 at 3. He arrived at this conclusion by "analyz[ing] certain payments characterized as 'redemptions' on FV Bank records" for a Himalaya Exchange-related account. *Id.* at 4. "To confirm that the records accurately reflected redemption activity," Bishop "analyzed additional bank data produced by FV [B]ank and compared them to the bank statements" for the Himalaya Exchange account. *Id.* "[M]embers of [] Bishop's team" then examined a "statistically significant sample of the redemption transactions" and "verified that those accurately tied out to customer accounts on the Himalaya Exchange database." *Id.*

Although the Order did not expressly address the topic,[16] the Court finds that Bishop's testimony on the Himalaya Exchange redemptions—like his other proffered expert testimony—is "not beyond the ken of an average juror." Order at 15. Carrying out the arithmetic addition of payments characterized as "redemptions" does not require specialized knowledge. *See Schwartz v. Fortune Mag.*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (holding that testimony involving "basic calculations" did not involve any specialized knowledge and was properly excluded under Rule 702). Nor do Bishop's efforts to confirm the accuracy of the bank records implicate any technical expertise: he (and "members of [his] team") merely cross-checked the records against bank statements and Himalaya Exchange customer accounts. The Court again finds that this basic method of matching transactions— which "result[s] from a process of reasoning familiar in

---

[16] By order dated April 24, 2024, the Court found that Guo's initial disclosures were insufficient and ordered him to "to provide a 'complete statement of all opinions' and 'the bases and reasons for them.'" ECF No. 305 at 5 (quoting Fed. R. Crim. P. 16(b)(1)(C)(iii)). Guo's subsequent supplemental disclosure did not reference any anticipated testimony about the Himalaya Exchange redemptions, ECF No. 322-4 at 2–3, and the parties did not address the topic in their second round of briefing, ECF Nos. 322, 328. Accordingly, the Court understood Bishop to have abridged his testimony to only the "four narrow opinions" discussed in his supplemental disclosure. ECF No. 328 at 36.

16

everyday life"—does not constitute expert testimony. *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (cleaned up); *see* Order at 15 n.8 (citing *United States v. Lebedev*, 932 F.3d 40, 50 (2d Cir. 2019)). Accordingly, Bishop shall not testify as an expert regarding the Himalaya Exchange redemptions.

The Government concedes, however, that Guo "may be able to call Bishop 'as a summary witness to summarize certain bank records that are already in evidence.'" Gov. Mem. at 6 n.5 (quoting Def. Mem. at 1 n.1). To the extent that the records underlying Bishop's redemptions-related testimony are admissible, Bishop may testify as a lay summary witness about the results of his analysis. *See United States v. Blakstad*, No. 19 Cr. 486, 2021 WL 5233417, at *5 (S.D.N.Y. Nov. 9, 2021) (permitting witness to testify as a summary witness about "the flow of money moving into and out of [the defendant's] accounts").

## CONCLUSION

For the reasons stated above, Guo's motion for reconsideration is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 364.

SO ORDERED.

Dated: June 24, 2024
New York, New York

_____
ANALISA TORRES
United States District Judge