

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 28, 2024

**VIA ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

     Re:    *United States v. Guo*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

     The Government respectfully writes to provide the Court with a list of out-of-court statements elicited at trial that are admissible for their truth as co-conspirator or agent statements. *See* Exhibit A (appendix of applicable statements). The out-of-court declarants for the statements set forth in Exhibit A are discussed in turn below, with citations to the trial record establishing, by a preponderance of the evidence, that the declarants were co-conspirators or otherwise agents of the defendant.[1]

    **I.  The Court Should Admit Certain Co-Conspirator and Agent Statements for Their Truth**

      A.  <u>Applicable Law</u>

     Statements by a criminal defendant—speaking for himself or through his agents—are not hearsay and are admissible for their truth. *See* Fed. R. Evid. 801(d)(2); *see also, e.g.*, *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943) (noting that the co-conspirator statements are based on "the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal").

     To be admissible for their truth, a co-conspirator's statement must be made "during and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E), and a general agent's statement must be "on a matter within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D). To admit co-conspirator statements for their truth, the Government must show by a preponderance of the evidence that "a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)); *see also, e.g.*, *United States v. Vilar*, 729 F.3d 62, 86-87 (2d Cir. 2013) (same standard for agent's statements). When corroborated by some other

---

[1] This application does not address statements in exhibits that were admitted into evidence without objection.

evidence, the defendant's and his co-conspirators' and other agents' statements may themselves be used to support a *Geaney* finding. *See generally Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (affirming a *Geaney* finding as "amply supported by the recorded statements of both defendants").

Because these rules are "grounded in agency theory," *United States v. Saneaux*, 365 F. Supp. 2d 493, 500 (S.D.N.Y. 2005), the court should also admit "statements by an agent of a co-conspirator," *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1054 (S.D.N.Y. 1992) (Motley, J.), or by "an agent of the conspiracy," *United States v. Rogers*, 118 F.3d 466, 478 (6th Cir. 1997). Corporations can be conspirators, *see, e.g.*, *United States v. Weintraub*, 27 F. App'x 54, 55-56 (2d Cir. 2001) (summary order) (affirming convictions of individual and corporate co-conspirators), and corporations commit crimes through the acts of their human agents, *see United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989). Moreover, an agent's statement is admissible under Rule 801(d)(2)(D) even if "it is questionable whether the conversation was held during the course of and in furtherance of a conspiracy as required by Rule 801(d)(2)(E)." *United States v. Pilarinos*, 864 F.2d 253, 256-57 (2d Cir. 1988).

B. <u>Out-of-Court Declarants</u>

Six weeks of witness testimony and admitted exhibits (many without objection) collectively provide more than sufficient evidence to demonstrate that "a conspiracy existed, that the defendant and the declarant[s] were members, and that the [co-conspirators'] statements were made during the course of and in furtherance of the conspiracy." *Tracy*, 12 F.3d at 1199 (citing *Geaney*, 417 F.2d at 1120); Fed. R. Evid. 104. The trial record also amply supports a finding that Miles Guo and his co-conspirators acted through agents who spoke on the conspiracy's behalf. *See Pilarinos*, 864 F.2d at 256-57 (affirming admissibility of statements by agent who did not join conspiracy).

Most of Guo's and his co-conspirators' statements that have come in at trial were offered for purposes other than establishing their truth: as evidence of lies to Guo's victims, as commands to his agents, or as words that had a particular effect on listeners.[2] But other statements by the G

---

[2] *See, e.g.*, GX 3401 and Tr. 3677-79 (Jesse Brown, acting as CEO of the Himalaya Exchange and reporting to co-conspirator William Je, lying about the Exchange and its products in an interview broadcast on GTV); *United States v. Pedroza*, 750 F.2d 187, 203 (2d Cir. 1984) (noting that "[t]he testimony was not hearsay since it plainly was not offered to prove the truth of the matter asserted" but "[r]ather, the statement was offered for its patent falsity"). Other statements were questions or commands—categorically not hearsay—by Guo through his agents. *E.g.*, Tr. 1213:23-1214:9 (testimony that Guo's agent, Guobin, ordered an investor removed from a Discord group—"kick it out"—after the investor asked Guo for a refund on a live broadcast); Tr. 479:18-22 (testimony that a paralegal at the Rule of Law Society—an organization controlled by Guo, *see* Tr. 475:13-19—asked a director if her vote against a Guo directive had been a typo). *See United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) ("[A]s a matter of law, questions are not 'assertions' within the meaning of Rule 801"); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . rather than for the truth of the matter asserted therein, are not hearsay."). Still other statements—for example, words from "media websites created and controlled by the defendant"—were "admissible as nonhearsay to show their effect on the viewer." Tr. 349-50 (citing Dkt. 361 (Government's motion) and *SEC v. AT&T, Inc.*, 626 F.

Enterprise conspirators—incriminating admissions, public and private—are offered for their truth. For the reasons below, the Court should make *Geaney* findings and admit these statements into evidence.

### 1. Guo's Inner Circle Co-Conspirators

Miles Guo's RICO conspiracy was led by a core group of co-conspirators who directed the flow of funds, commanded agents of the various business entities, and enacted the long-term plans of the conspiracy:

- **Yvette Wang** pleaded guilty to conspiring with Guo. On May 28, the Court ruled that the Government "may ask questions that elicit statements from [Yvette] Wang" in light of her guilty plea. Tr. 436:2-437:22. Separate from her guilty plea, the trial record sufficiently demonstrates that Wang was Guo's co-conspirator and agent. Indeed, Wang even referred to Guo as "the Principal." *See, e.g.*, Tr. 425:25-426:4, 1918:3-7. Wang exercised control over nearly every entity in the Guo Enterprise and served as Guo's "right hand." Tr. 433:21-25; *see also* Tr. 42 ("Ms. Wang was the head of operations. She ran the day-to-day of each business." (defendant's opening statement)). Wang hired Guo's aides who also acted on her and Guo's behalf (and who referred to Guo as "Principal" or "Boss"). *See, e.g.*, Tr. 425:3-427:2. For example, Wang hired Haitham Khaled from Citibank to create the Crane entity to obscure and extend the G|CLUBS fraud, Tr. 1915:20-1916:9, and hired Jesse Brown to run a cryptocurrency project that evolved from G-Dollar and G-Coin to H-Dollar and H-Coin, Tr. 3638:3-3639:10. Wang also exercised control over the movement of funds and directed the misappropriation of investor funds. As an Executive Director of GTV and the signatory on Saraca's bank accounts, Wang executed the $100 million transfer to Hayman Capital of misappropriated GTV investor funds—a transfer used to benefit the Guo family. *See* GXZ1. Wang coordinated matters related to the Farms, including coordinating Farm "loan" payments with Ya Li, a Farm leader who testified at trial. *See, e.g.*, Tr. 1389. Wang exercised control over G Clubs and directed its personnel to transfer funds and buy assets. Tr. 2976:8 (G Clubs's CEO, Limarie Reyes, reported to Yvette). Wang exercised control over the family offices that used victim money to pay for the Guo family's extravagant lifestyle. Tr. 433-434.

- **William Je** was Guo's principal money launderer. Tr. 458:18-22 (describing Je as the "finance person" and "the person who would handle the investments and financing for Boss"); Tr. 42 ("William Je was the finance guy. He's a well-regarded investment banker who had managed the fortune not just of the Guo family fund" (defendant's opening statement)). Along with Yvette Wang, Je facilitated the misappropriation of $100 million of GTV investor funds. *See* Tr. 762-63.

---

Supp. 3d 703, 737 (S.D.N.Y. 2022)); *see also, e.g.*, Tr. 186-190 (admitting statements by Steve Bannon during Rule of Law launch with limiting instruction that they were "not being offered by the government for the truth of what is stated in the video"); Tr. 2656-2659 (admitting testimony by Sam Roberts about information given to him by Himalaya Exchange agents for its effect on Roberts).

Additionally, Je managed ACA Capital, which was used to launder and misappropriate victim funds, including Farm "loan" funds. Je also owned and exercised control over the Hamilton and Himalaya Exchange entities, which were also used to launder and misappropriate victim funds for Guo's benefit. For example, Je received over $46 million of G|CLUBS investor funds from Crane, and then laundered those funds for the purchase and renovation of a mansion in Mahwah, New Jersey for Guo and his family. Je was also instrumental in the Himalaya Exchange's transfer of $37 million in fraud proceeds to Guo through the subterfuge of a loan made in connection with Guo's yacht. *See* GXMER138, Tr. 2792:22-2793:19 (testimony about "the $37 million wire" being "a loan that William and Himalaya made to Miles Guo"). Je oversaw and executed large transfers of fraud proceeds on an ambitious scale, going so far as to attempt to purchase a bank for the benefit of the G Enterprise. In communications with that bank's former chief executive, Je stated that "Miles Guo was his best friend, that Miles Guo trusted him more than any individual in the world, and that they were very close." Tr. 2792:12-18.

- **Mileson Guo**—also known as Qiang Guo, the defendant's son—enriched himself with G Enterprise fraud proceeds and participated in the conspiracy's operations. Mileson was the owner of multiple family office entities, including Saraca, the entity used to misappropriate $100 million of GTV investor funds for the Hayman Capital investment. Mileson was also the owner of family office entities, such as Lamp Capital, that received and spent Farm loan program fraud proceeds. Mileson used G|CLUBS investor money to buy himself a $4 million Ferrari. *See generally* GXZ 21. The Government offered Haitham Khaled's recordings in which Mileson, Guo, and other co-conspirators direct the movements of fraud proceeds through G|CLUBS, Crane, and other G Enterprise entities. *See* GX411-T at 14-15 (Guo tells Mileson, regarding Crane's money, "strictly speaking, it's not completely legal"); *id.* at 16 (Mileson: "Dad, by saying the same, what I meant is if we were challenged, they would have the jurisdiction"); GX412A at 4 (Mileson: "I am the settlor of the foundation" that owns G|CLUBS); GX413A-T at 4 (when asked by Crane and G|CLUBS agent Khaled "where is the money going?," Mileson responds, "anywhere out of the U.S.").

- **Haoran He** served as the paper owner of numerous entities at the heart of the G Enterprise, including G|CLUBS. *See* Tr. 1983; GXBR460. In that capacity, he directed G|CLUBS's figurehead CEO, Limarie Reyes Molinares, to receive and launder fraud proceeds using purported loan agreements. *See* Tr. 2990; GXGC515 (documents with He's name reflecting $15 million and $20 million transfers from G|CLUBS to the Himalaya Exchange). He was also the nominal owner of entities controlled in fact by Mileson Guo and Miles Guo. *See, e.g.*, Tr. 3379 (Fiesta Property Developments, used to receive G|CLUBS money to pay for Mileson's Ferrari); Tr. 1425 (Ya Li's testimony identifying He as the director of Freedom Media Ventures, "a new GTV company").

### 2. Agents of the Guo Family Office

Guo's so-called "family office" was made up of employees who acted as Guo's agents. As relevant to this application:

- **Max Krasner** "was an employee of Golden Spring and he worked in accounting," where he "handled lots of payments" for Guo and Wang. Tr. 448. Among other transactions, Krasner facilitated the use of G|CLUBS investor money to buy the Lamborghini that was found in Guo's Greenwich garage. *See* Tr. 136 (testimony that Krasner was "probably one of the agents – that helped in regards with negotiating with [a Dallas Lamborghini employee]" for the purchase of "the Aventador SVJ Roadster"); Tr. 3066-67 (Krasner email to G|CLUBS's figurehead CEO that "Looks like the team is staying with the red Lambo. We need to finalize all paperwork"). In addition to executing transactions for the G Enterprise, Krasner served as a paper owner or director of G Enterprise entities. *See, e.g.*, Tr. 3081 (Hudson Diamond); Tr. 4069 (Krasner executed paperwork in connection with Saraca's investment of $100 million in misappropriated GTV investor funds in a hedge fund). Indeed Krasner was the "president" of GTV and was paid by Saraca Media Group for this role.

### 3. G|CLUBS Employees

The operations of G|CLUBS were controlled by Guo's conspirators, principally Wang and He. The G|CLUBS entities themselves are also corporate co-conspirators; the entities themselves took actions and were used to further the goals of the criminal enterprise charged. G|CLUBS' employees are agents of the conspiracy that Guo led, and certain statements elicited at trial are admissible for their truth as a result.

- **Limarie Reyes** was the figurehead CEO of G|CLUBS. In that capacity she received directions from Wang and He primarily to sign and facilitate "loan" agreements. (E.g. Tr. 2975-76.) Such agreements directed the expenditure of G|CLUBS member payments (i.e. victim money) to purchase luxury items for Guo and his family as well as send cash to Mileson Guo and Je (who further distributed it to the Guo family).

- **Alex Hadjicharalambous** was G|CLUBS's controller, "and he was in charge of accounting, specifically the reconciliation of member IDs with the money that comes in." Tr. 2045. Hadjicharalambous communicated with banks on behalf of G|CLUBS, *see, e.g.*, Tr. 2602-04. His work extended to other G Enterprise entities: for example, a document found at Wang's apartment identified Hadjicharalambous as the operator of Freedom Media Ventures's account at the Himalaya Exchange. *See* GXWA96; Tr. 3323-24.

- **Ana Izquierdo** was an in-house lawyer for G|CLUBS. Izquierdo took instruction from Wang, *see* Tr. 3020, and helped facilitate transfers of fraud proceeds from G|CLUBS to other G Enterprise entities, *see, e.g.*, Tr. 3067 (email to Krasner about documents needed before G|CLUBS's figurehead CEO "can send them and the wire can go out"). Izquierdo also worked, at Wang's direction, to facilitate the

purchase of "assets" including the red Lamborghini found in Guo's garage and the Liberty Yacht that Guo used.  *E.g.*, GXGC317; GXGC318.

### 4. The Himalaya Exchange and Hamilton Employees

As explained above, the operations of the Himalaya Exchange were controlled by Guo and William Je.  Former Himalaya Exchange CEO Jesse Brown testified that Guo drove the timing of the Himalaya Exchange launch and that Guo selected the new CEO of the Himalaya Exchange. Tr. 3674:4-9 (Guo drove timing of launch); 3705:3-14 (Brown's replacement as CEO told him that "Miles Guo placed him there"). The Himalaya Exchange entities—including the Hamilton entities that were also owned and managed by Je and shared overlapping personnel with the Exchange, *see, e.g.*, GXHN-33 (establishing that Hamilton Investment Management was entity controlled by Je); 1962:13-15 (Khaled describing Je worked for Hamilton).  Himalaya Exchange and Hamilton are themselves corporate co-conspirators, having taken actions in furtherance of the crimes charged.  Their employees are agents of the conspiracy that Guo led, and certain statements elicited at trial are admissible for their truth as a result.

- **Marios Mamzeris** was the COO of the Himalaya Exchange and an employee of Hamilton. *See* GXBR 212 (email from Mamzeris to BitGo about the Exchange's lack of "crypto capabilities" in March 2023).  *See* Tr. 2675, 2679, 3733; GXBR 212 (email from Mamzeris to BitGo about the Exchange's lack of "crypto capabilities" in March 2023).

- **Priya Patel** was the primary point of contact at the Exchange for BitGo, *see* Tr. 2661-63, a vendor hired to provide wallet services that the Exchange never used, *see* Tr. 2680.  In that capacity, Patel lied to BitGo—*see, e.g.*, Tr. 2662 (Patel told BitGo that Guo had "no financial connection" to the Exchange)—and the Exchange's former CEO testified he believed she lied to a meeting of its employees by claiming ignorance of GTV's cryptocurrency-related settlement with the SEC, *see* Tr. 3691-93.

- **David Fallon** was a senior executive of Hamilton.  *See, e.g.*, Tr. 2523:17-19 (recounting that Fallon and Je are authorized users of Hamilton Opportunity Fund Bank Account); 2859:1-2 (Collins describing Fallon as "head trader" of Hamilton); 3060:8-11 (Reyes testimony describing Fallon as "part of the Himalaya Exchange team").

### 5. Agents of Taurus Fund

The Mahwah Mansion was purchased using investor funds originally received by Crane, a shell company created by trial witness Haitham Khaled.  Title to the Mahwah Mansion was held by Taurus Fund LLC, a shell company, and corporate co-conspirator.  Real estate attorney, Amy Buck, testified that Taurus Fund was her client as a formal matter, and that the property was owned as a practical matter by a family (namely, the Guo family).  Buck represented Taurus Fund in the purchase of the property and then paid $18 million of expenses on behalf of Taurus Fund.  Buck interacted with several agents of Taurus Fund and the Guo family: Aaron Mitchell and his wife and law partner, Dara Lawall; Scott Barnett; Gladys Chow; Sean Jing; and Ilona Musial.  *See* Tr.

3897. The Court overruled a defense objection and permitted Buck to testify to her communications with these individuals. *See* Tr. 3878-79.

- **Dara Lawall** and her husband Mitchell were attorneys representing the Guo family as a client. Lawall referred the family to Buck for the Mahwah Mansion purchase, and thereafter Buck interacted primarily with Mitchell. Tr. 3875-76 ("[Lawall] told [Buck] the clients [*i.e.* the Guo family] were like family to her and they were very important to them. And she also wanted to inquire about my ability to do a accelerated transaction. It was a quick cash transaction"), 3880-81.

- **Aaron Mitchell** was Guo's attorney. *E.g.*, Tr. 1505. Mitchell was the attorney for Taurus Fund and gave Buck directions on who was authorized to approve payment of expenses. Tr. 3881. Mitchell was also a GTV director, served as counsel to G|CLUBS and affiliated the transfer of victim proceeds to purchase the Mahwah Mansion.

- **Scott Barnett** was Guo's head of security, Tr. 3562; GX 233, and a manager of Taurus Fund, Tr. 3890.

- **Gladys Chow** was Guo's personal assistant, *see* GXPRO466, and an agent of Taurus Fund, Tr. 3899.

- **Sean Jing** was another agent of Taurus Fund authorized to approve expenses. Tr. 3898-99.

   6. Farms

The trial record makes clear that Guo controlled the Farms—the "supporters group around the world" that "Miles Guo established around April/May 2020." Tr. 1373:5-9. Guo's own words establish his control over the Farms. For example, in a July 22, 2020 video, Guo listed out the leaders of the various Farms and gave them instructions. *See* GXC40-V ("The leaders of all farms need to do all they can to protect those who contact them. Anybody who does not respond or not fulfill their responsibilities will be dismissed. The contact information of all Himalayan farms will be posted on Getter. Mulan will post shortly."). In addition to "Mulan," Guo referenced other farm leaders in that video, including: "Brother Changdao" (i.e., Xia Qidong), "Sara" (i.e., Sara Wei), and "David in U.K." (i.e., David Dai). The individual "Mulan" that Guo referenced was Ya Li, a trial witness. Li testified that "controlled the Alliance" of Farms around the world. *See* Tr. 1317:9-10, 1475:9-18 (Ya Li's testimony that Guo "controlled the [Himalaya Farm] Alliance" and "controlled investments related to the Farms"); Tr. 2378:20-2379:7 (Minran Wu's testimony that Guo said "in his video" that he chose all Farm leaders and gave them instructions). Indeed, Guo's control over his so-called "movement" was emphasized in the defense's opening statement: "What the government is asking you to do is to conclude that Mr. Guo defrauded essentially himself because he is the movement, and the movement him." Tr. 48:4-6.

Because Guo directly controlled the Farms, the Farm leaders were agents of Guo, and certain statements by Farm leaders included in Exhibit A are admissible for their truth.

- **Xia Qidong**, also known as Long Island David, Long Island Brother, Changdao, and Changdao Brother, was "the leader of the MOS Farm" and "Miles Guo chose him." Tr. 2378:20-24. Xia ultimately ascended to "Himalaya Alliance secretary," Tr. 1373:19-25, a position from which he has carried out Guo's conspiracy by attempting to obstruct justice after Guo's arrest and detention. *See, e.g.*, Tr. 1501:14-24 (Ya Li's testimony that, "after Guo's arrest," "Chang Dao said: Next week, FBI is going to arrest us; you need to delete all the information.").

- **Sara Wei** led the Phoenix Farm, Tr. 2500:18-21, and solicited and facilitated GTV investments through Voice of Guo as Guo's agent, Tr. 204:6-205:5.

- **David Dai** was the leader of the UK Farm, Tr. 245:9-12, in which capacity he directed Le Zhou to create a shell company and open bank accounts to collect purported H-Coin investments from Guo's followers, Tr. 247:8-249:13.

- **Zhang Yongbing** "was the legal group leader in the MOS Farm" before he "ascended to the Himalaya Alliance and then to the Iron Blood Group." Tr. 2403:10-15. Among other acts that Zhang committed as Guo's agent and in furtherance of Guo's conspiracy, Zhang instructed Ya Li to sue Guo's bankruptcy trustee, Tr. 1522:11-12, directed her to sign a false affidavit to obstruct Guo's bankruptcy proceedings, Tr. 1523:8-11, and threatened her on Guo's behalf when Ya Li refused, Tr. 1523:17-19 (testimony that Zhang took directions from Guo), 1529:24-1530:5 (Zhang's threat to Li). Zhang was also awarded a Lamborghini by G|CLUBS. Tr. 3033. Zhang further used his assistant as his agent in furtherance of the conspiracy. Tr. 2404-2413.

## II. Conclusion

The evidence adduced in the Government's case-in-chief showed that the defendant operated a global racketeering and fraud conspiracy through his own words—broadcast to his followers, investors, and victims—and through the words and acts of his many co-conspirators and other agents. The defendant's own words, and those of his agents, are not hearsay. Fed. R. Evid. 801(d)(2). Accordingly, the Court should make a *Geaney* finding admitting certain of the defendant's and his agents' statements for their truth.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ _____
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314