

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 30, 2024

**VIA ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

  Re: *United States v. Guo*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

  The Government writes in reply to Miles Guo's opposition to the Government's motion to admit out-of-court statements elicited at trial that are admissible for their truth as co-conspirator or agent statements.

  The defendant's opposition boils down to an attempt to ask this Court to sanction Guo's "shell game" of hiding his actions behind corporate entities, co-conspirators, and agents over which he claims no official association.[1] On top of ignoring and misstating undeniable trial evidence about Guo's control of the G Enterprise and its constituent members, the defendant repeatedly misrepresents the governing law. Simply put—and notwithstanding the defendant's repeated invocation of the specter of "reversible error"—the Court's evidentiary rulings during trial admitting statements of co-conspirators and agents have not been in error at all (much less "clear error" or an "abuse of discretion").[2] The Court should reject the defendant's arguments out

---

[1] At least three courts have already concluded that the defendant utilized shell companies in precisely this way. *See Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *1 (finding by Judge Liman that "Eastern Profit Corporation," nominally held by Guo's daughter, was "in essence, a shell corporation" for Guo); February 9, 2022 Decision and Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181 (finding Guo used shell companies to shield his assets); *In re: Ho Wan Kwok, et al.,* Chapter 11 Case No. 22-50073 (JAM), at 10 (Bankr. D. Conn. Jan. 11, 2023) (Filed at Dkt. 7, Exhibit C) (identifying five organizations and movements which "serve as business vehicles for [Guo], and their members are personally loyal to the [Guo]").

[2] Guo incorrectly invokes the Confrontation Clause. *See* Dkt. 383 at 1 (citing *United States v. Bruno*, 383 F.3d 65 (2d Cir. 2005), which concerned the admission of testimonial statements from a plea allocution and grand jury testimony), 5 (alluding to "Confrontation Clause concerns"). But the Confrontation Clause bars only the admission of out-of-court *testimonial* statements—that is, "*ex parte* in-court testimony or its functional equivalent." *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004). And statements in furtherance of a conspiracy "are *non-testimonial* for purposes of

of hand and make the *Geaney* findings with respect to the statements identified in the Government's motion, which are amply supported by the extensive trial record, the law, and a trial judge's extensive discretion regarding evidentiary matters. *See, e.g.*, *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 87–88 (2d Cir. 1999) (evidentiary rulings reversed only if "manifestly erroneous" because district "judge acted arbitrarily or irrationally").

### A. The Defendant Misstates The Law Regarding Corporate Co-Conspirators and Agents

The defendant's opposition elides the fact that this is a racketeering case in which the corporate entities have been proven to be members of the racketeering conspiracy. As an initial matter, it is well established that corporate entities may join a criminal conspiracy that a corporate co-conspirator can "only act through its agents, for example, its officers and employees." *United States v. Jacques Dessange, Inc.*, 103 F. Supp. 2d 701, 705–06 (S.D.N.Y. 2000) (Cote, J.) (citing several Second Circuit cases). And as the Second Circuit has explained in the context of sprawling racketeering cases:

> A conspiracy may involve only two or three individuals. In the context of a RICO prosecution of organized criminals, however, the relevant conspiracy may grow quite large. For example, the Windows conspiracy, of which Gigante was a part, was a sprawling criminal enterprise involving both the Genovese and Colombo crime families and enveloping an entire industry. *See United States v. Gigante,* 39 F.3d 42, 44 (2d Cir.1994) (describing Windows scheme). The conspiratorial ingenuity of La Cosa Nostra expands the normal boundaries of a criminal enterprise, and Rule 801(d)(2)(E) must expand accordingly to encompass the full extent of the conspiracy.

*United States v. Gigante*, 166 F.3d 75, 82–83 (2d Cir. 1999). With respect to conspiracy more generally, the exacting standards that the defendant suggests are not required, as the Second Circuit has explained:

> The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the "general nature and extent" of the conspiracy. [*United States v. Huezo,* 546 F.3d [174, 180 (2d Cir. 2008)]. It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; "it is enough," rather, to show that "the parties ha[d] a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks omitted).

> Indeed, a defendant may be a conspirator even if he knew only one other member of the group, and "a single act may be sufficient for an inference of [his] involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy." *Huezo,* 546 F.3d at 180 (internal quotation marks omitted).

---

the Confrontation Clause . . . and are therefore not covered by its protections." *United States v. Shyne*, 617 F.3d 103, 108 (2d Cir. 2010) (citing *Crawford*, 541 U.S. at 56)).

*United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014).

Further, as the Second Circuit has repeatedly noted, all that is required to meet the *Geaney* threshold is "'a showing of a likelihood of an illicit association between the declarant and the defendant.'" *United States v. Cicale*, 691 F.2d 95, 103 (2d Cir. 1982). The statements admitted in *United States v. Lebedev* are instructive. *United States v. Lebedev*, 932 F.3d 40, 50-51 (2d Cir. 2019), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). *Lebedev*'s conspiracy centered around a cryptocurrency exchange called Coin.mx. *Id.* at 46. Coin.mx—acting through entities that "falsely purported to be a private members' association"—sought to purchase a credit union, HOPE FCU, and negotiated with coconspirator and codefendant Gross to that end. *Id.* In affirming Gross's conviction, the Second Circuit upheld the admission against him of "statements by Coin.mx agents" as coconspirator statements under Rule 801(d)(2)(E). *Id.* at 50-51. In other words, *Lebedev* stands for the proposition that the Government may offer the truth of statements made by agents of a corporation that conspired with the defendant.

The "full extent of the conspiracy" in this case includes several individuals as well several corporate entities, including two instrumentalities of the frauds that were corporate co-conspirators: G Clubs and the Himalaya Exchange. *Gigante*, 166 F.3d at 82–83. Perhaps the simplest reason the defendant's arguments to the contrary fail is that the defendant's discussion of G Clubs and the Himalaya Exchange misses the fact that *these entities themselves are co-conspirators*—they were owned and controlled by individual co-conspirators of the defendant, *see* Tr. 1982:24-1983:3 (testimony from Khaled, G|CLUBS's banker, identifying coconspirator Haoran He as "the ultimate beneficiary holder for G/club operation"); Tr. 2769:1-5 (testimony from Collins, Himalaya Exchange's banker, that coconspirator "William Je was in charge of the Himalaya Exchange")—and corporations can speak only through their officers and employees. *Jacques Dessange, Inc.*, 103 F. Supp. 2d at 705–06.

The defendant also offers a straw man, claiming the "absurdity of the government's position" is shown because "[u]nder the government's logic, any time a defendant allegedly conspires with an employee at a company, that defendant opens himself up to admission of statements by all of that company's employees, regardless of whether those employees have any knowledge or involvement in the conspiracy or connection to the defendant." Dkt. 383 at 6. That is not the Government's logic. The defendant did not conspire with "any employee" at G Clubs and the Himalaya Exchange. He installed his co-conspirators—who worked for the defendant (during the conspiracy and for years prior as well) and referred to him as "the Principal" and "Boss"—as the controlling members and owners of G Clubs and the Himalaya Exchange, and the defendant and his co-conspirators used those businesses as instrumentalities to effect their fraud. G Clubs and the Himalaya Exchange—and the individuals who owned and controlled them—were co-conspirators of the defendant, and statements of employees and officers of those entities are admissible for their truth.[3] The Court need not accept the defendant's invitation to turn the

---

[3] The defendant argues that the Government has conceded the inadmissibility of a statement by a Himalaya Exchange employee to trial witness and former Himalaya Exchange CEO Jesse Brown regarding the defendant's control over the timing of the Himalaya Exchange's launch. The Government makes no such concession. The Government inadvertently left off that statement from its Exhibit A (while describing it in its brief, at page 6) in its effort to review over 4,000

question before the Court into a broad evidentiary inquiry divorced from the specifics of the trial record. Here, the Government has identified particular statements by specific employees and officers that were made at the direction of the defendant's co-conspirators and/or in furtherance of the objectives of the conspiracy.

Finally, putting aside the formalities of who technically owned and controlled G Clubs (an entity named for Guo) and the Himalaya Exchange (an entity named for the Himalaya Farm Alliance, which Guo controls)—the "shell games" that multiple courts have already seen through—the trial record has amply demonstrated that the defendant was ultimately in control of the G Enterprise and its constituent parts. *See In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against the person who controls the entity). The Court need look no further than the defendant's own statements, which were admitted into evidence at trial in the form of recorded videos and posts that were publicly disseminated online (*i.e.*, affecting interstate commerce). For example, in a broadcast dated June 2, 2020, the defendant tied together numerous of the G Enterprise entities, stating: "All these GTV, GNEWS, GDOLLAR, GCOIN, Himalayan Farm, and our future operation *of this whole organization* . . . is created for" the defendant's followers. GXZ-9 at 7 (emphasis added). On June 28, 2020, the defendant highlighted the work he was doing to further the G Enterprise: "GClub will be on sale starting mid July" (GXZ-9 at 17); "We are also trying to see if we could issue some convertible bonds for our brothers-in-arms. This is like another way that our brothers-in-arms can purchase stock worth $1per share, through convertible bonds" (GXZ-9 at 21); "We are in the middle of acquiring at least 5 banks right now across the world" (*Id.*); and, "So everyone, look at how much *I* have done." (*Id.*) (emphasis added). The defendant identified Yvette Wang as his "assistant" (GXZ-9 at 93), and discussed her work relating to several of the G Enterprise businesses, including G Fashion and the Himalaya Exchange. (*See id.* at 76, 129.) The defendant himself took credit for creating the Himalaya Exchange's purported cryptocurrencies: "I am talking about your H coins, *Brother Seven designed it* at that time." (GXZ-9 at 121) (emphasis added). There is simply no question that the Government has proven the existence of the G Enterprise, and Guo's role in controlling it, by a preponderance of the evidence.

Testimony by the Government's witnesses and documentary evidence corroborates the defendant's control over the G Enterprise and reflects his agreement with others—including William Je, Yvette Wang, Mileson Guo, and Haoran He, among others—to further the goals of the Enterprise through fraudulent offerings that raised more than $1 billion from victims. The following are just a few examples of such evidence. Le Zhou testified that the defendant was the "ultimate highest leader" of the Farms and the Himalaya Global Alliance. (Trial Tr. 406:141 – 407:2). Khaled testified that he lied to banks in the course of his employment for the defendant,

---

pages of trial transcripts. The defendant's emphasis on the fact that the declarant's identity, beyond being a Himalaya Exchange employee, was not provided is likewise misplaced. As the Second Circuit has observed, a "statement may be non-hearsay within [the] meaning of Rule 801(d)(2)(E) even though [the] declarant is unidentified." *United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993) (citing United States v. Cruz, 910 F.2d 1072, 1081 n.10 (3d Cir. 1990)). "What matters is proof of the declarant's membership in the conspiracy rather than proof of the declarant's name and true identity." *United States v. Swinton*, No. 19 Cr. 65 (JAM), 2022 WL 3053767, at *4–5 (D. Conn. Aug. 3, 2022).

because opening and maintaining bank accounts was one of his primary responsibilities (Trial Tr. 1902:12-22), and that he had discussions with the defendant, Yvette Wang, and Victor Cerda about the G Enterprise's efforts to purchase a bank in Puerto Rico. (Trial Tr. 1960:4 – 1961:17.) The phone calls that Khaled covertly recorded clearly demonstrate the defendant's control over G|CLUBS, the movement of fraud proceeds, and the actions of co-conspirators and agents. For example, during the meeting held on April 28, 2021, the defendant directed Yvette Wang to instruct Ana Izquierdo (G|CLUBS general counsel), Khaled, Limarie Reyes Molinaris, and Alex Hadjicharalambous that "G Club can't answer any question" about GTV or any investments. (GX417-T at 13-14.) During that same meeting, the defendant directed the transfer of more than $50 million in G|CLUBS proceeds. (*See generally id.*) Additional evidence at trial, including bank records and flow of funds, confirmed that those transfers in fact happened, consistent with the defendant's instruction. (*See, e.g.*, GXZ-26 at 19 (reflecting $85 million in transfers from G Clubs Operations LLC accounts at Morgan Stanley to a Hamilton Digital Assets account at Deltec Bank in the Bahamas between May 6, 2021 and June 23, 2021); *see also* Trial Tr. 3384, 3388-3391).

### B. The Defendant Misstates the Import of Cases Involving Employees

Guo heavily relies on *United States v. Rioux*, which *affirmed* the admission of statements made by the defendant's agent. 97 F.3d 648, 660 (2d Cir. 1996). Guo misreads *Rioux* and overstates its holding. *Rioux* does not *require* that agents be "directly responsible" to the defendant; rather, "direct responsibility" is one way to demonstrate the principal-agent relationship. While "a party's employees" may "represent the easiest cases," agency is a broader concept—and courts "undertake a fact-based inquiry applying common law principles of agency." Wright & Miller § 6776. Moreover, *Rioux* simply *did not* hold that "the declarant must be 'directly responsible' to the defendant," Dkt. 383 at 3, and in fact held that the defendant *need not* "control[] the daily tasks of the declarant," 97 F.3d at 660. And *United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003) said nothing at all about any "require[ment]" of proof of agency relationships. Dkt. 383 at 4. Instead, the agency relationship in that case was taken for granted and unremarked upon by the court, which analyzed only whether the admitted statements were within the *scope* of agency, *see* 348 F.3d at 340. If anything, *Rioux* underscores that the Court should admit Guo's agents' statements. *See Rioux*, 97 F.3d at 660 (admitting statements by sheriff's subordinates because, among other reasons, "it is hard to imagine how Rioux could make informed decisions regarding over 300 Deputies and Special Deputies without the input of their supervisors"). That is, in *Rioux* the Second Circuit was satisfied that agents acted within the scope of their duties in carrying out a broad mandate from the principal. *Id*. ("it was well within the scope of the supervisor's power to enforce [Rioux's] policy."). Here—and again setting corporate formalities—the defendant was "the Princpal" and the "Boss" of the G Enterprise.

### C. Max Krasner

In addition to being an agent and employee of the defendant, Max Krasner is also a co-conspirator himself. Krasner worked in the New York offices in which the G Enterprise was headquartered, and where Guo himself worked. Moreover, Krasner had a hand in, and insight into, the vast G Enterprise as he worked to further its goal. To start, Krasner was named as the president of GTV (GXVK5). And, for obtaining that role was paid tens of thousands of dollars. (GXSM178 (Krasner receiving approximately $30,000 payment); GXSM17-19 ($5,000 payments to Krasner)). Krasner was a signatory on Saraca and Golden Spring payments (*see generally* GXSM

series), and in that capacity was named in paperwork necessary to facilitate Guo's investment (with investor funds) into Hayman capital. (GXSM11.) As for G Clubs, it was Krasner, with Yvette Wang, who directed G Clubs Puerto Rico employees to purchase the red Lamborghini (with investor funds) that was later found in Guo's garage, as well as the Liberty yacht vessel (which Guo used). (GXGC276, at 2 (Email from Krasner "Looks like the team is staying with the Red Lambo. We need to finalize all paperwork")); GX1B125F (text message from Guo's assistant Chow to Guo "Boss, this is the information about the new boat Max sent to you: The first shipping company is Seven Star, and their price is $90,000 . . . ."). These examples only touch upon the pervasiveness of Kranser's involvement and are more than sufficient to demonstrate that he was a co-conspirator furthering the G Enterprise's goals—specifically spending victim funds on lavish items for the Guo family, in exchange for which he received tens of thousands of dollars. (*See e.g.,* GX1B272B (Krasner and Mileson chars regarding loans and expenditures among various G entities).)

      **D. Taurus Fund**

The defendant attempts to distance himself from the Taurus Fund by suggesting it was connected to the Mahwah property and controlled by Je, and not the defendant himself. These attempts are futile, however, in the face of the trial record. The Taurus Fund was a shell company set up to conceal the use of investor funds to purchase the defendant's mansion in Mahwah, New Jersey (the "Mahwah Mansion"); its very existence, then, was in furtherance of the defendant's fraud and to use investor funds for the defendant's benefit. Shell games aside, the agents of Taurus Fund were co-conspirators and employees of the defendant. Indeed, they included the defendant's money launderer (William Je), the defendant's attorneys (Aaron Mitchell and Dara Lawall), the defendant's bodyguard (Scott Barnett), and the defendant's translator (Gladys Chow). That Taurus was nominally controlled by the defendant's coconspirator does not change the realities of the relationships between those associated with Taurus Fund and the defendant.

      **E. The Defendant Misstates the Law Regarding Attorneys**

The defendant repeatedly misstates the law regarding statements by agents who are attorneys. Dkt. 383 at 4, 9, 10. As the Government already set out its in motions in limine (Dkt. 273 at 10 n.4), and as the Second Circuit has expressly held, there are no "special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements." *United States v. Arrington*, 867 F.2d 122, 128 (2d Cir. 1989); *see also United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) ("The general admissibility of an attorney's statements . . . [is] well established."); *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981) ("Statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney."); *United States v. Dolleris*, 408 F.2d 918, 921 (6th Cir. 1969) (affirming admission of statements made by an attorney at conferences, even though the client was not present at the conferences); *see also United States v. Gillier*, No. 11 Cr. 409 (PAE) (S.D.N.Y.), July 5, 2022 Tr. at 8-10 (following these authorities).[4] To be sure, the Second Circuit has developed a five-part test concerning the admission of *jury argument* by a criminal defendant's counsel in a *prior criminal trial*. *McKeon*, 738 F.2d 26; *see United States v. Amato*, 356 F.3d 216 (2d Cir. 2004); *Arrington*, 867 F.2d 122 (2d Cir. 1989) (limiting the *McKeon*

---

[4] This transcript is attached as Exhibit A.

five-part test to prior counsel's jury argument). That test has no relevance here, as the Government has not introduced any prior jury argument. Accordingly, the defendant's repeated suggestion that this five-part test concerning the admission of *jury argument* by a criminal defendant's counsel in a *prior criminal trial* is generally applicable to statements by attorneys is simply wrong. The Court can—and should—admit evidence of statements by the defendant's coconspirators and agents of his coconspirators, regardless of the fact that certain of them were also attorneys.

\* \* \*

For the reasons set forth above in its initial application, the Court properly admitted the identified statements for their truth.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ _____
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314