M75CgilC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                 v.                        11 Cr. 409 (PAE)

 5    STEFAN GILLIER,

 6                   Defendant.

 7    ------------------------------x

 8                                          New York, N.Y.
                                            July 5, 2022
 9                                          9:35 a.m.

10

      Before:
11
                         HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13
                             APPEARANCES
14
      DAMIAN WILLIAMS,
15         United States Attorney for the
           Southern District of New York
16    BY:  DINA McLEOD
           MICHAEL McGINNIS
17         Assistant United States Attorneys

18    LEE GINSBERG
      NADJIA LIMANI
19         Attorneys for Defendant

20    ALSO PRESENT:
      JANICE OVADIAH, French Interpreter
21    ERIC HEUBERGER, French Interpreter

22

23

24

25
```

M75CgilC

1        (Case called)

2        MS. McLEOD:  Good morning, your Honor.  Dina McLeod

3   and Michael McGinnis for the government.

4        THE COURT:  Good morning, Ms. McLeod.  Good morning,

5   Mr. McGinnis.  You may be seated.

6        MR. GINSBERG:  Good morning, your Honor.  Lee Ginsberg

7   and Nadjia Limani.

8        THE COURT:  Good morning, Mr. Ginsberg.  Good morning,

9   Ms. Limani.

10       MS. LIMANI:  Good morning.

11       THE COURT:  Good morning to you, Mr. Gillier.  Good

12  morning, as well, to everyone else here.  That includes two

13  court certified French translators that I'm grateful to you for

14  your assistance.  Indeed, are there three?

15       THE INTERPRETER:  Your Honor, Spanish interpreter

16  assisting with the equipment.

17       THE COURT:  Very good.  Thank you.

18       Let me begin with the COVID rules of the road.

19       The current protocol is that I am at liberty to have

20  my mask off as is anybody who is then speaking, provided that

21  they are fully vaccinated.  So, for the purposes of today, to

22  the extent that counsel is speaking or to the extent I have a

23  colloquy, which I expect I will have at the later point with

24  Mr. Gillier, if that person is fully vaccinated, you may for

25  that period of time of your speech take the mask off.  When the

M75CgilC

1    time comes to trial, that same principle will apply to the

2    witness on the witness stand.

3            With that, I want to thank counsel for the really

4    thoughtful submissions you've made to me on a variety of

5    subjects, most of all, the motions in limine.  Here is what I

6    intend to accomplish today, and it's a full agenda.  It's my

7    hope we can get all this accomplished in an hour and a half,

8    but we'll see how things go.

9            First off, I have a lengthy bench ruling that should

10   solve all of the motions *in limine*, save that there are several

11   points of which I have follow-on questions for you.  Then, in

12   no particular order, I have a series of items to take up that

13   concern *voir dire*, where it's going to be, how it's going to

14   work, who's going to be there.  I have a summary of the case

15   that I want to workshop with you to make sure that it is

16   neutral and comprehensive and so forth.  I want to take up our

17   trial schedule, what days we'll be sitting.  I want to take up

18   issues of plea offers, if any, that have been made to

19   Mr. Gillier and allocute him on that subject.  So government,

20   you need to be prepared, because I'll turn to you first when

21   the time comes, to set out what the offers were, if any, and

22   what became of them.

23           I will have some requests as to materials I need for

24   each side.  Counsel, why don't you listen first and you can

25   confer in a moment.  I'll have some requests for counsel as to

M75CgilC

1    materials I'll need, exhibits, 3500 and the like.  I have some

2    pointers as to prior testimony to the extent it's going to be a

3    thing at this trial.

4            I want to remind counsel, I know Ms. McLeod and

5    Mr. Ginsberg have had trials before me just as to my

6    preferences with respect to the raising of issues outside the

7    trial day, and I want to take up just a couple other

8    housekeeping matters.

9            More or less, that is my agenda for today.  Obviously,

10   there will be an opportunity at the end if I haven't covered

11   something for counsel to raise issues, as well.

12           Without further ado, I propose to turn first to the

13   motions *in limine*.

14           I understand the court reporter has a copy of the

15   draft.

16           I am now going to resolve, in a bench decision, the

17   motions *in limine* filed by the government and by the defense.

18           And I should say to Mr. Gillier, before I go any

19   further, if at any point you do not understand what the

20   translator is saying, please raise your hand so that I can

21   intervene.  And please pull the mask up to cover your nose.

22   Thank you.

23           I will not be issuing a written decision.  Instead, I

24   will simply issue an order reflecting the fact that the motions

25   were resolved for the reasons set forth on the record today.

M75CgilC

So, if the content of what I say is important to you, as I expect in some respects it will be, you will need to order the transcript of today's conference.

By of way of very brief background, defendant, Stefan Gillier, has been charged in eight counts.  One charges conspiracy to commit mail and wire fraud, to transport stolen property across state lines, and to engage in monetary transactions in property derived from unlawful activity. Gillier is also charged with one count each of mail fraud, wire fraud, and interstate transportation of stolen property, and three counts of engaging in monetary transactions in property derived from specified unlawful activity.  Trial is set to begin a week from today on July 12th.

Broadly speaking, Gillier is alleged to have conspired to defraud, first, Honeywell and, later, other victims of millions of dollars in aircraft parts through a stopped-check scheme.  Although the substantive fraud counts cover only the first part of the scheme, the conspiracy is alleged to have spanned the period of 2004 through 2010.  The scheme is alleged to have occurred in two phases.

The first spanned 2004 through 2006.  The government alleges that in 2004, Gillier, as president of RTF International Inc., which I will call "RTF," and using the alias "Roland Van Gorp," began placing airplane part orders with Honeywell.  Between 2004 and 2006, RTF ordered and

M75CgilC

received more than $6 million in airplane parts from Honeywell.
Gillier, the sole signatory of the accounts from which payment
was sent to Honeywell, is alleged to have stopped payment on
more than 400 of the nearly 1,000 checks sent, enabling him, in
effect, to steal more than $6 million in airplane parts.
Because RTF obtained Honeywell parts without paying for them,
the government alleges, it was able to sell the products for
below-market value while still recording a profit.  RTF then
transferred the profits from parts sold to accounts controlled
by Gillier and his coconspirator, Rafii Tari, who is, today,
deceased.

        According to the government, Honeywell did not detect
the stop-payment scheme until in or around March 2006, when it
began investigating RTF and a man using the name "Roland Van
Gorp."  After Honeywell placed a credit hold on RTF's account,
Gillier attempted to set up a credit line using another entity
he controlled, Alberta Aerospace Services, "AAS," which Gillier
allegedly falsely represented had done more than $11 million in
sales.  But Honeywell identified an apparent connection between
AAS and RTF and did not ship any parts to AAS.

        On June 14, 2006, Honeywell executed a civil
attachment order at a warehouse and Gillier's residence in
Kansas.  The next day, June 15, 2006, Gillier left the United
States for Canada.  He did not return to the United States
willingly.  He was extradited from Italy in 2020.

M75CgilC

1          Honeywell commenced civil litigation against Gillier

2    soon after executing its civil attachment order in 2006.

3    Gillier failed to appear in connection with that litigation —

4    in his individual and corporate capacities — for noticed

5    depositions on four occasions.

6          The second phase of the alleged scheme occurred

7    between in our about May 2006 through 2010.  On or about

8    July 7, 2006, Gillier's coconspirator, Tari, is alleged to have

9    incorporated a company called UN Air Service, Inc., or "UAS,"

10   in Delaware.  The government alleges that UAS perpetrated, in

11   substance, the same aircraft part stop-payment scheme as RTF.

12   UAS used Tari's address at Trump Tower as a shipping and

13   billing address through at least May 2008.

14         The government proffers that Gillier took part in the

15   second phase in at least the following ways:  Gillier and his

16   alias "Roland Van Gorp" had both been listed as personal

17   references in support of Tari's lease application for the Trump

18   Tower address; checks drawn from RTF's account had been

19   remitted for the first and last month's rent; and in 2007 and

20   2008, UAS shipped seven different packages to Gillier at his

21   address in Montreal.

22         With that, I will turn to the motions *in limine*.  I'll

23   address the government's first, and indicate where Gillier has

24   filed a similar motion, and resolve those together.  I'll then

25   address Gillier's remaining motions *in limine*.

M75CgilC

1          I'll first address the government's motion relating to

2    statements made by Gillier's counsel during the Kansas

3    litigation.  The government seeks to admit statements Gillier's

4    lawyers made on his behalf in answers to Honeywell's requests

5    for admission and in an answer to Honeywell's amended petition.

6    Gillier does not object to the receipt of the specific

7    statements identified by the government.  However, he objects

8    to the "wholesale offering by the government of exhibits 301-A

9    through 302-F2, 699 pages of court filings, the majority of

10   which do not contain 'admissions.'"

11         The Court rules for the government and grants this

12   motion, with the important caveat that I understand the

13   government to be offering only the specific statements it has

14   enumerated and not any unspecified others.  Because Gillier

15   does not object to the admission of the particular statements

16   the government has identified, the government's motion, as thus

17   construed, is effectively unopposed.  Those statements are

18   properly admitted under Federal Rule of Evidence 801(d)(2)(D).

19   It provides that statements "made by the defendant's agent or

20   employee on a matter within the scope of that relationship and

21   while it existed" are not hearsay.  It is well established that

22   statements of an attorney made on behalf of a client are not

23   hearsay, under that rule, when admitted in a later criminal

24   trial against that client.  *See United States v. Amato*, 356

25   F.3d 216, 220 (2d Cir. 2004), which affirmed the admission of a

M75CgilC

letter from the defendant's prior counsel.  *United States v.*
*Arrington*, 867 F.2d 122, 128 (2d Cir. 1989), which held that
there are no "special procedures to be followed, or balancings
to be formed as a prerequisite to the evidentiary use of a
defendant's counsel's out-of-court statements." *United States*
*v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984), which recognized
that "the general admissibility of an attorney's
statements... is well established."); and *United States v.*
*Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981), which held that
"statements made by an attorney concerning a matter within his
employment may be admissible against the party retaining the
attorney.")

My ruling — by necessity — reaches only the admission
the government has identified on pages 11 through 13 of its
motion *in limine*.  These include statements such as "the
Honeywell product identified in the inventory [of airplane
parts recovered in the civil search and seizure of Gillier's
Kansas warehouse] was received and accepted by RTF" and "Roland
Gillier is employed by RTF" and "Roland Van Gorp and Roland
Gillier are one in the same person."  The defense, rightly,
does not object to these statements under Rule 801(d)(2)(D),
and the Court does not understand the defense to dispute
admissibility on any other ground, such as authentication or
Rules 401, 402, and 403.  Nor, on the Court's review, would
there be any apparent basis for such an objection.  To the

M75CgilC

1    extent the defense objects, it is to the spectre that the

2    government would make a "wholesale offering" of 699 pages of

3    court filings.  Such would be obviously problematic without a

4    tailored examination of specific statements therein, not just

5    to confirm compliance with Rule 801(d)(2)(D), but Rules 401

6    through 403.  But the government, I understand, is not seeking

7    that.  If I am wrong about that, the government is to alert me

8    following this conference, but the remedy will be to identify

9    additional counseled statements that the government seeks to

10   admit.

11        I'll turn next to evidence of conduct by Gillier's

12   that constitutes what the government terms his "flight" after

13   execution of Honeywell's attachment order, and his later

14   refusal to attend depositions in the United States.  The

15   government seeks to introduce such evidence as probative of

16   Gillier's consciousness of guilt.  Gillier argues that the

17   government has not met its burden with respect to such

18   evidence.

19        At the outset, I'll distinguish between the categories

20   of evidence that are contested here.  The first is paradigmatic

21   "flight" evidence:  That Gillier left the United States the day

22   after he was served with a civil attachment order that, in

23   substance, accused him of stealing from Honeywell.  The second

24   is Gillier's later failure to return to this country for four

25   noticed depositions in civil litigation that related to the

M75CgilC

Honeywell scheme.  I'll take each in turn after briefly
recounting the legal standards governing the admissibility of
flight evidence.

As the Second Circuit, per then Judge and future
Justice Thurgood Marshall recognized back in 1962, "evidence of
flight generally is admissible as is other circumstantial
evidence.  It is not conclusive, but is subject to varying
interpretations.  The accepted technique is for the judge to
receive the evidence and permit the defendant to bring in
evidence in denial or explanation." *United States v. Ayala,*
307 F.2d 574, 576 (2d Cir. 1962).  The circuit has since held
that "probative value [of flight] as circumstantial evidence of
guilt depends upon the degree of confidence with which four
inferences can be drawn:  (1) from the defendant's behavior to
flight; (2) from flight to consciousness of guilt; (3) from
consciousness of guilt to consciousness of guilt concerning the
crime charged; and (4) from consciousness of guilt concerning
the crime charged to actual guilt of the crime charged."
*United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005)
(internal quotations removed).  These requirements, the circuit
has stated, "ensure that the evidence is probative in a legal
sense and protects the defendant against the possibility of the
jury drawing unsupported inferences from otherwise innocuous
behavior."  *United States v. Torres,* 435 F.Supp.3d 526, 537-38
(S.D.N.Y. 2020) (internal quotations removed).

M75CgilC

1          Turning to the matters at issue, the four inferences

2     identified by the circuit can easily be drawn from the evidence

3     the government proffers of Gillier's flight from the United

4     States in June 2006.  The government proffers that it will show

5     that Gillier flew to Canada on June 15 — literally one day

6     after he witnessed the execution of the civil attachment order

7     at his Kansas warehouse and personal residence — and that he

8     did not return to the U.S. until he was extradited here in

9     2020.  *See Al-Sadawi*, 432 F.3d at 425, holding that "evidence

10    that a defendant fled immediately after a crime was committed

11    supports an inference that the flight was motivated by a

12    consciousness of guilt of that crime.  As the time between the

13    commission of the offense and the flight grows longer, the

14    inference grows weaker."  Critically, too, the civil attachment

15    order here and ensuing civil litigation — on the government's

16    theory — targeted Gillier's two-year long scam of Honeywell.  A

17    jury could easily find that Gillier would have understood this

18    dramatic action as a likely prelude to a criminal action

19    against him based on the same alleged scam.  In other words, a

20    jury could easily find that, based on Honeywell's attachment of

21    this property, Gillier knew the jig was up.

22         Gillier makes two arguments in response.  First, based

23    on a more benign explanation for his actions, he contends that

24    these did not bespeak consciousness of guilt.  As Gillier

25    explains, he had "no choice" but to leave the U.S. after his

car, warehouse, and possessions were seized.  But whether

Gillier truly had "no choice" but to leave the country, and

whether that as opposed to fear of apprehension and ensuing

conviction drove his departure is an issue for the jury.  And

the government has an available factual counterargument:  It

proffers that Gillier, far from having nowhere to go in the

U.S., maintained an address in New York.  As the Second Circuit

has held:  "Absent unusual circumstances, what inferences are

suggested, or conclusively established, by the evidence are

matters to be argued to the jury by counsel."  *United States v.*

*Mundy*, 539 F.3d 154, 157 (2d Cir. 2008); *see also United States*

*v. Steele*, 390 F.App'x 6, 11 (2d Cir. 2010).  The circuit held

there that it was not an abuse of discretion to receive

evidence of flight where defendant proffered an alternative

explanation for his conduct and was permitted to offer that

explanation to the jury.  Based on the government's proffer, a

reasonable jury could easily infer consciousness of guilt based

on the suggestive timing and circumstances of Gillier's

departure.  At trial, Gillier will be at liberty to argue a

different, and more benign, interpretation of these events.

     Gillier also notes that "there were no criminal

charges against Mr. Gillier on June 14, 2006."  That, however,

is not decisive.  The relevant timeframe, the circuit has held,

is the "time between the commission of the offense and the

flight."  *United States v. Al-Sadawi*, 432 F.3d 419, 424

M75CgilC

1   (2d Cir. 2005).  Given that Honeywell's civil litigation

2   targeted an allegedly unknowing fraud, a jury could reasonably

3   infer that its court-approved attachments would have signaled

4   to Gillier that a follow-on criminal action was forthcoming.

5           I'll briefly address two collateral issues implicated

6   by the government's flight evidence.  First, there is a

7   potential hearsay problem posed by receiving the content of the

8   civil attachment order in evidence, as such effectively accuses

9   Gillier of the crime for which he will stand trial in this

10  court.  To cure that problem, the government states that it

11  will not offer the content of Honeywell's attachment papers for

12  their truth.  That is the right solution.  On a request from

13  the defense, I stand at the ready to give the jury a limiting

14  instruction that the content of the civil attachment order and

15  associated papers is admissible to show only the effect of that

16  order on Gillier's knowledge and intent and to explain his

17  ensuing conduct.

18          Second, Gillier asserts that, after the execution of

19  the civil attachment order on June 14, 2006, he flew from

20  Kansas to New York to meet with attorneys to discuss matters

21  including "the civil cases brought against him by Honeywell."

22  On the facts proffered, that meeting is clearly inadmissible.

23  As the government notes, the bare fact that Gillier met with a

24  lawyer could only be offered in an attempt to imply that

25  Gillier's New York counsel authorized some aspect of his

M75CgilC

behavior, presumably his ensuing flight, and to pull the sting

of that flight as evidence of consciousness of guilt.  But

receiving the fact of such a meeting would allow the defense to

end-run the established obligations with respect to

advice-of-counsel evidence.  And Gillier, despite a proper

request from the government, has not disclosed an intent to

give an advice-of-counsel defense, either as to the schemes

alleged or the discrete act of flight.

         Courts in this district have been reluctant to permit

the defense to pursue a "presence-of-counsel" defense without

requiring the defendant to meet the criteria necessary to mount

an advice-of-counsel-defense.  *See, e.g.*, *SEC v. Tourre*, 950

F.Supp.2d 666, 683-84 (S.D.N.Y. 2013); *SEC v. Lek Securities

Corp.*, 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019).  Apart

from permitting a defendant to benefit from an incomplete

advice-of-counsel defense, a presence-of-counsel defense may

also be highly misleading to a jury.  That is because the mere

presence of counsel is not probative of anything.  It does not

establish what was said between client and counsel.  And, where

there is not evidence that all relevant information was

disclosed to counsel and that counsel's ensuing advice was

followed, it cannot establish the defendant's good-faith

reliance on the advice of counsel.  *See SEC v. Stoker*, 11 Civ.

7388 (JSR) (S.D.N.Y. 2012), Dkt. 100 at 895-96, where Judge

Rakoff recognized that "absent evidence that counsel knew

either the information that Mr. Stoker allegedly kept secret,
at least from outsiders, or knew the information that the SEC
claims were distorted misrepresentations, the role of counsel
in any of this was totally irrelevant."  As Judge Forrest
explained in *SEC v. Tourre*, the risk of prejudice in
introducing "presence-of-counsel" evidence is that "a lay jury
could easily believe that the fact that a lawyer is
present... means that he or she must have implicitly or
explicitly "blessed" the legality of [the act in question]."
950 F.Supp.2d at 683-84.

       That concern would be squarely implicated here were
Gillier permitted to offer the fact of his meeting with an
attorney.  Introducing evidence that Gillier met with an
attorney right after his business and personal property were
attached could — without more — suggest to the jury that his
counsel blessed his subsequent conduct, the flight, and/or
perhaps his prior conduct toward Honeywell.  But Gillier has
not proposed to offer admissible evidence of the foundation of
any such advice-of-counsel defense.  Such would require Gillier
to show "that he:  (1) honestly and in good faith sought the
advice of counsel; (2) fully and honestly laid all the facts
before his counsel; and (3) in good faith and honestly followed
counsel's advice, believing it to be correct and intending that
his acts be lawful."  *United States v. Colasuonno*, 697 F.3d
164, 181 (2d Cir. 2012).  There has been no defense proffer

whatsoever as to what Gillier informed his counsel, what

information was available to counsel, what advice counsel

thereupon gave Gillier, when these interactions occurred, or

even who the counsel were that purportedly gave Gillier

pertinent advice.  For all we know, the meeting Gillier had

with an attorney on the eve of his flight did not concern legal

matters at all, or if it concerned legal matters, ones relating

to this case at all.  For all we know, it involved estate

planning or flight insurance.  Accordingly, the Court excludes

evidence that Gillier met with his counsel before leaving the

United States.  I do so under the case authority above and

under Rules 401 through 403.  There is no non-speculative

probative value to Gillier's meeting with an attorney, and even

if there were, the meeting has clear and substantial potential

to confuse and mislead the jury, and to unfairly prejudice the

government.

I'll turn now to the government's motion as it relates

to evidence of Gillier's failure to appear for four noticed

depositions in the Honeywell civil litigation.  The government

seeks to introduce such evidence to show that Gillier's

"behavior went beyond merely choosing not to return, as he

repeatedly defied his legal obligation to return to the United

States and appear for depositions in the Kansas litigation on

four separate occasions."  Gillier's civil counsel, in legal

filings, described the depositions as functionally "an attempt

M75CgilC

1    to extradite him to the United States, and propounded

2    interrogatories to Honeywell seeking to ascertain whether, and

3    to what extent, Honeywell had made any criminal referrals to

4    U.S. law enforcement regarding Gillier and his scheme."  The

5    government seeks leave to introduce evidence relating to

6    Gillier's conduct and these representative admissions to

7    establish Gillier's consciousness of guilt.

8            I begin with the guidance of the Second Circuit.

9    "When there is an adequate factual predicate that a defendant

10   remained a fugitive because of a guilty conscience, his

11   continued absence is probative in much the same way as his

12   initial flight."  *Amuso*, 21 F.3d at 1260.  The government here

13   contends that Gillier's continued absence — particularly in the

14   context of noticed depositions and statements from his counsel

15   indicating his awareness of potential criminal proceedings —

16   supplies such a factual predicate.  I find that persuasive.  A

17   jury could easily infer, from Gillier's continued absence,

18   including his failure to return to the U.S. for four

19   depositions, that such behavior evinced consciousness of guilt.

20   See *United States v. Candelaria-Silva*, 162 F.3d 698, 705

21   (1st Cir. 1998), in which the First Circuit found that the

22   district court did not abuse its discretion in admitting

23   evidence of flight and continued absence because there was an

24   adequate factual predicate, including that defendant admitted

25   "after his arrest that he knew he was wanted in Puerto Rico."

M75CgilC

As with the evidence of Gillier's departure, Gillier's counsel
is at liberty to argue a different interpretation of the
evidence to the jury.

I also note that the receipt of evidence that Gillier
refused to appear for depositions does not infringe his Fifth
Amendment right against selfincrimination.  And that's not an
argument the defense has made, I'm merely spotting it.  In this
respect, it is different from allowing the jury to hear that a
defendant invoked his Fifth Amendment right against
selfincrimination during a civil deposition.  *See Universitas
Educ., LLC v. Nova Grp., Inc.*, 2016 WL 1178773, at *4 (S.D.N.Y.
Mar. 23, 2016), which held that "the general reasonableness of
a fear of potential selfincrimination does not justify a
refusal to answer any and all questions.  The appropriateness
of assertions of privilege must be determined on a
question-by-question basis."  *See also Auction Credit
Enterprises, LLC v. Lo Castro*, 2010 WL 3039180, at *2 (W.D. Pa
July 30, 2010), holding that "defendant's refusal to submit to
any examination by properly noticed or subpoenaed deposition is
not a valid exercise of the Fifth Amendment privilege against
selfincrimination."

The Court therefore will permit the jury to hear
evidence that Gillier, on multiple occasions, failed to appear
for noticed depositions.

Relatedly, Gillier seeks to preclude evidence

M75CgilC

regarding his use of an allegedly bogus claim of a medical
illness as a basis not to appear at a deposition in the
Honeywell litigation.  Gillier is concerned that the
government, on its direct case, will offer evidence that a
doctor retained by Honeywell, Dr. Michael Monaco, analyzed
Gillier's medical records and concluded that "there was a high
probability of suspicion for surreptitious use of a drug to
induce a low sugar condition that would preclude [Gillier's]
being able to travel out of the country at that time."  Had the
government pursued that route, it would have raised questions,
including the nonhearsay means by which it intended to prove up
Gillier's alleged manipulation of his blood sugar prior to the
scheduled deposition.  It also would have raised a question
about whether this Dr. Monaco had any medical foundation to
reach those conclusions.  In all events, the government has not
stated that it intends to offer such proof, as opposed to
offering the fact that Gillier did not attend the deposition.
I therefore assume that the government is not seeking to put
before the jury Gillier's ostensible manipulation of his
medical condition on his direct case.  If that is wrong, the
government is to notify the Court immediately after this bench
ruling.  That, of course, does not preclude the government from
seeking to elicit such evidence should Gillier open the door to
it at trial, for example, suggesting that he had a valid
medical reason not to enter the United States.  Nor does it

M75CgilC

preclude the government from taking up this issue on cross

examination should Gillier testify.  Before raising the issue

before the jury, however, the government is to notify the Court

outside the jury's presence.

The government next seeks to introduce certain

statements Gillier made when he was refused entry to the United

States on three occasions:  In December 2004, February 2005,

and December 2005.  These, of course, were prior to the

Honeywell attachment that the government contends occasioned

his flight in 2006.

During the December 2005 attempted entry, the border

agent determined that Gillier was required to possess a valid

visa to enter the United States because he determined that

there was strong evidence that Gillier lived and worked in the

United States.  As part of that inspection, the agent took a

sworn statement in which the government contends Gillier made

false representations, such as that the purpose of his entry

was to "relax for a couple of days" and that he had "no

position at RTF International."  The government seeks to

introduce these statements as direct evidence to show, in

particular, that Gillier acted to conceal the ongoing

conspiracy, and that Gillier's lies to gain reentry into the

United States were in furtherance of the conspiracy, i.e., to

allow him to enter the United States to continue fraudulent

activity at RTF.

M75CgilC

1          The defense does not object to the admission of these

2     statements.  Gillier objects only to the extent that either the

3     CBP's agent's questions, or Gillier's answers, involved an

4     investigation by any U.S. agency for transhipping to Iran.

5     Relatedly, Gillier has also filed a motion *in limine* requesting

6     that the Court order that the government redact any statements

7     that are not relevant to Gillier's charges.

8          On this issue, I am persuaded by Gillier, whose

9     motion, in pertinent part, is unopposed.  As the defense

10    rightly notes, evidence relating to any investigation of

11    Gillier relating to potential ITAR violations would have

12    considerable potential for unfair prejudice, and such evidence

13    would not be relevant to the fraud charges in this case.  As

14    such, such evidence is properly excluded under both Rules of

15    Evidence 401 and 403.  The government does not take a different

16    view.  In its opposition to Gillier's motions *in limine*, the

17    government states that it does not object to redacting the

18    question and answer relating to whether Gillier was under

19    investigation for transhipping to Iran.

20         Accordingly, the government will be permitted to

21    introduce statements Gillier made at the border, provided that

22    it redact any statements involving any investigation into

23    Gillier into ITAR violations or other infractions unrelated to

24    the crimes alleged here.

25         The next motion involves the seized Kansas computer.

M75CgilC

In its motion, the government states "absent a stipulation that a particular computer seized during the June 14th, 2006 civil search in Kansas was used by and belonged to Gillier alone, the government intends to introduce the fact that pornography was on that computer within a folder bearing Gillier's name."  Gov. Mot. at 20.  In his opposition, Gillier has agreed to so stipulate.  See Gillier Opp. at 5.  That moots the issue.  For avoidance of doubt, upon such a stipulation, there is to be no reference to the pornographic nature of any material on the Kansas computer.

I'll now consider together two motions *in limine*, one from the government and one from Gillier.  Each relates to post-2006 evidence.

I'll consider Gillier's first, as it sweeps more broadly.  Gillier seeks to preclude evidence of any post-2006 activity by UAS and AAS.  He argues that such is not direct evidence and cannot be linked to him.  Consistent with that position, Gillier argues that any evidence regarding victims other than Honeywell, including *inter alia*, Pratt & Whitney, Dallas Airmotive, and Twin Aviation, cannot be considered direct evidence of a charged crime because such victims, as alleged, were targeted only after he left the country in 2006. Gillier is wrong.

At the outset, as the government notes, Gillier's argument that evidence post-dating 2006 cannot serve as direct

M75CgilC

evidence of a charged crime misreads the indictment.  Count

One, the conspiracy count, explicitly charges a conspiracy

spanning 2004 through 2010.  It alleges that Gillier and Tari

conspired to "defraud aircraft part manufacturers," plural,

paragraph 6., meaning manufacturers, plural.  And it alleges

that the scheme continued until 2010 — years after Honeywell

alerted to the alleged fraud, in 2006, and took the civil

actions that allegedly prompted Gillier's flight.  The

conspiracy count expressly covers the second phase of the

conspiracy when Tari and Gillier were operating under the

entity of UAS between 2006 and 2010, and pivoted to attempt to

defraud entities other than Honeywell.

        Now, Gillier posits that the government will not be

able to link him to the post-2006 conduct — involving victims

other than Honeywell, and through the UAS entity.  That will

await proof at trial.  For present purposes, what matters is

that the indictment charges Gillier with participation in a

conspiracy to defraud manufacturers that extends through 2010,

and as such, evidence of such a conspiracy is properly received

as direct evidence.  In any event, the government proffers that

it will adduce evidence that Gillier and Tari continued

effectively the same scheme after 2006, albeit with

modifications.  The corporate entity they used, UAS, was new;

and the aircraft parts were purchased from different

manufacturers, including Pratt & Whitney, among others; and the

M75CgilC

1    steps in furtherance taken by individual conspirators

2    presumably adapted given Gillier's domicil abroad.  The

3    government proffers that it will offer evidence directly

4    linking Gillier to the scheme as continued.  As proffered,

5    these include leasing documents and financial records showing

6    that Gillier assisted UAS in obtaining its office lease and

7    paying for its rent.  In addition, the government anticipates

8    introducing evidence that, in 2007 and 2008, UAS shipped

9    multiple packages to Gillier at his Montreal home.  Such

10    evidence is direct evidence of Gillier's involvement in the

11    second phase of the conspiracy.  Subject to the theoretical

12    possibility that this evidence will not be properly

13    authenticated, or that considerations will emerge that make

14    such proof inadmissible under Rule 403, and to date no proffer

15    along these lines has been admitted, such proof will be

16    received.

17          There is, however, a caveat, which I will take up

18    before moving to the government's motion to introduce

19    coconspirator statements.  The conspiracy charge that I have

20    just referenced alleges that the "scheme so defraud" spanned

21    between "at least in or about 2004, up through and including on

22    or about March 1, 2010."  See paragraph 6 of the indictment.

23    As such, the post-2006 evidence of a fraud conspiracy can and

24    will, as I've explained, be received as direct evidence for

25    that charged offense.  I note, however, that the substantive

M75CgilC

offenses do not extend that far in time.  The mail fraud, wire

fried, ITSP, and money laundering offenses, as alleged,

occurred between "in or about 2004 up to and including in or

about June 2006."  That's paragraphs 17 and 19 for the former

two, and May and June 2006 for the latter two, that's

paragraphs 21 and 23.  Were this case limited to substantive

charges, and were there no conspiracy charge, the defense would

have a strong argument that evidence of post-2006 conduct could

not be received as direct evidence, but only under Rule 404(b)

if it met the requirements of Rule 404(b).  The defense

therefore may be entitled, should it regard it as worthwhile,

to a limiting instruction identifying the discrete purposes for

which post-2006 or post mid-2006 evidence may be received as to

the substantive counts, Counts Two through Eight, even though

no such limiting instruction would be in order for the

conspiracy count, Count One.  It may be that the defense would

not at all welcome that articulation by the Court to the jury.

For now, I'll just flag the issue for defense counsel.

Mr. Ginsberg, if I don't receive an application from you along

these lines, I will not plan on give a limiting instruction as

to the evidence of post-2006 conduct.  The ball, in other

words, is in your court.

        I'll turn now to the government's motion *in limine* to

introduce coconspirator statements made by UAS and AAS

employees.

M75CgilC

1            The governing principles as to the admissibility of

2    coconspirator statements are familiar.  Rule 801(d)(2)(E)

3    provides in relevant part that a "statement is not hearsay

4    if... the statement is offered against an opposing party and

5    was made by the party's coconspirator during and in furtherance

6    of the conspiracy."  As the Second Circuit and Supreme Court

7    have held, to admit a statement under this rule, a district

8    court must find two facts by a preponderance of the evidence.

9    First, that a conspiracy that included the defendant and a

10   declarant existed; and second, that the statement was made

11   during the course of and in furtherance of that conspiracy.

12   Citing the famous case of *Bourjaily v. United States*, 483 U.S.

13   171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82

14   (2d Cir. 1999).  As the Second Circuit has explained, the

15   requirement that the challenged statement be in furtherance of

16   the conspiracy is satisfied if the statement's objective is

17   "designed to promote or facilitate achievement of the goals of

18   the conspiracy."  *United States v. Rivera*, 22 F.3d 430, 436

19   (2d Cir. 1994).  The circuit has summarized in the following

20   manner some of the ways in which a conspirator statement may

21   further a conspiracy:

22            A statement must be more than a merely narrative

23   description by one coconspirator of the acts of another.

24   Statements in furtherance of a conspiracy prompt the listener

25   to respond in a way that promotes or facilitates the carrying

M75CgilC

out of criminal activity.  The statements need not be commands,
but are admissible if they provide reassurance, or seek to
induce a coconspirator's assistance, or serve to foster trust
and cohesiveness, or inform each other as to the progress or
status of the conspiracy.  *United States v. Desena*, 260 F.3d
150, 158 (2d Cir. 2001).

Here, the government seeks to introduce, through
documents and records, various out-of-court statements made by
individuals allegedly connected with UAS and AAS.  The
government illustrates two such statements in its motion.

The government proffers that UAS employees made
numerous false statements to a Pratt & Whitney employee — I'll
call that P&W employee 1 — to conceal the fraud and to induce
Pratt & Whitney to continue to ship parts to UAS.  For example,
a UAS employee — whom I'll call UAS employee 1 — falsely told
P&W employee 1 that UAS had wired payments to Pratt & Whitney
to cover the invoices on which payment was stopped.  UAS
employee 1 asked whether Pratt & Whitney could now ship UAS
additional parts.  P&W employee 1 responded that no shipments
would occur until the payments cleared.  UAS employee 1 later
sent P&W employee 1 an email purportedly containing details of
the wire transfers, but which instead contained only Pratt &
Whitney's bank account information.  When P&W employee 1
pointed out the lack of an actual wire transfer confirmation,
UAS employee 1 falsely stated that she was working with the

bank to get the wire transfer information to Pratt & Whitney.
UAS employee 1 later falsely claimed that UAS's bank had
confirmed that it had sent the wire to the wrong bank account
and that the bank was in the process of recovering the funds.
No wire transfers were ever made to cover the unpaid invoices.

As another example, an employee of AAS — which had
submitted a credit application to Honeywell, signed by AAS
employee Harrison Mirtar, shortly after Honeywell ceased
shipments to RTF — called a Honeywell customer service
representative several times to inquire as to the status of
that credit application.  The AAS employee identified himself
as "Tristan Anderson."  But when asked for his complete name,
he stated, "I am Tristan, but the direct number is for
Harrison."

I will resolve these motions using these illustrative
examples.  I will rule, to the extent possible at this pretrial
juncture, based on the evidence that has been proffered.  In
ruling, I am assuming that the government's factual proffers
accurately reflect what the evidence will show.  If that
premise is wrong, of course, or if counsel believe that actual
evidence is afield from that previewed, my ruling today has no
bearing.  If counsel believe a coconspirator statement being
offered is outside the scope of what I'm now addressing,
counsel should, by all means, object so as to assure a timely
and informed ruling.  I'm also assuming that, as of the point

M75CgilC

1    any statement by an alleged coconspirator is offered at trial

2    as a statement in furtherance of the conspiracy, the Court will

3    have received, or the government will have proffered, evidence

4    supporting the first *Bourjaily* requirement, that is that a

5    conspiracy existed and that it included the defendant and the

6    declarant.

7        The issue then as to each statement would be twofold.

8    First, does it qualify as one in furtherance of the conspiracy?

9    And second, if so, as with all evidence, does the statement

10   meet the requirements of Rules 402 and 403?  Is it probative of

11   an element of the offense?  And if so, is its probative value

12   substantially outweighed by the risk of confusion, delay, or

13   unfair prejudice?

14       The government's first example, again, involves an

15   ostensible attempt to compel the shipment of aircraft parts

16   from Pratt & Whitney to UAS without having paid for them.  The

17   government expects to introduce this attempt through

18   documentary and record evidence containing the above-mentioned

19   statements.  The statement as described can reasonably be

20   inferred to have been by a coconspirator in furtherance of the

21   conspiracy's fraud object.  That's because the statement served

22   to induce Pratt & Whitney to continue shipping aircraft parts,

23   for which UAS had no intention to pay.  Viewed in terms of

24   Rules 402 and 403, this kind of statement is probative of the

25   allegations against Gillier for taking part in the alleged

M75CgilC

stop-payment conspiracy. And although it may be harmful to
Gillier's trial prospects, that is not unfair prejudice.
Rather, it is harmful because of its capacity to prove up an
element of the offense — the charged conspiracy and its
functional means of operating. Accordingly, statements such as
these have substantial probative value and there are not
consequential offsetting factors under Rule 403. Such
statements are admissible.

The government's second example concerns statements
made by an AAS employee when he called the Honeywell customer
service rep to inquire as to the status of that credit
application. In his opposition, Gillier states that he does
not contest that statements made by Harrison Mirtar or any
other AAS employees may be admissible as coconspirator
statements, but he reserves the right to make any objection to
the introduction of such evidence. This statement, too, could
reasonably be found to have been made by a coconspirator in
furtherance of the alleged conspiracy. The statements were
aimed at securing a new line of credit with Honeywell that
would permit the coconspirators to continue the scheme to
defraud. Again, as to Rule 403, this kind of statement is
probative of the conspiracy charge in Count One. And for the
same reason above, it may be damaging evidence, but it's not
unfairly prejudicial. Accordingly, this statement, too, is
admissible.

M75CgilC

1         The Court therefore grants the government's motion *in*

2    *limine* to admit these statements under Rule 801(d)(2)(E) and

3    any similar statements that would qualify under that hearsay

4    exclusion.

5         I will, however, caveat this ruling by noting that the

6    government has not identified in its motion *in limine* the

7    precise nature of the documentary and record evidence and the

8    method by which it seeks to introduce these coconspirator

9    statements.  They are described generally in the motion *in*

10   *limine*, but not with precision.  It is not as clear to me as I

11   would like the nature of proof that will be received to link

12   AAS and UAS to the conspiracy, although I understand the

13   government's proffer that there is such proof.  In the interest

14   of confirming that that aspect of the *Bourjaily* foundation has

15   been laid, counsel for the government should be prepared, at

16   the end of my ruling or, if not, prepared today in writing

17   thereafter to identify with more specificity what the documents

18   and records will be that prove up the existence of the

19   conspiracy and the participant of these corporate entities in

20   it.

21         The government seeks to preclude evidence or argument

22   that seeks to blame Honeywell and other victims for Gillier's

23   fraud scheme; evidence concerning Gillier's family background,

24   health condition, age, or any other personal factors; and

25   evidence or argument concerning Gillier's commission of "good

M75CgilC

1   acts" or non-commission of other bad acts.

2           I grant the government's motions for several reasons.

3   First, they are each unopposed.  That alone would justify

4   granting the motions.

5           As to evidence that Honeywell or any other victim was

6   negligent in failing to alert or to stop the alleged fraud,

7   that is properly precluded.  A defendant charged with a fraud

8   scheme may not assert as a defense the victim's negligent

9   failure to discover the fraud.  *United States v. Thomas*, 377

10  F.3d 232, 243-44 (2d Cir. 2004).  Whether Honeywell or the

11  other victims were negligent in extending RTF and UAS credit,

12  monitoring its finances, or failing to discover Gillier's

13  alleged misconduct is irrelevant to the charges at issue, and

14  to the jury's determination of Gillier's culpability of the

15  crimes charged pursuant to the legal standards, familiar ones,

16  on which I will instruct them.  Accordingly, the Court will

17  preclude any evidence or line of argument that Honeywell or the

18  other manufacturers were negligent.

19          The government has also moved to preclude evidence or

20  argument concerning the defendant's health, family background,

21  age, education, or other such personal information on the

22  grounds that such biographical details are irrelevant, that

23  they are apt to confuse or distract the jury, and that they

24  facilitate appeals to sympathy as opposed to assessments of the

25  evidence on the merits.  As I have noted, the defense has not

M75CgilC

opposed this motion.  It is not inconceivable, in theory, that

some data point within the categories described, for example

relating to Gillier's background or other personal

circumstances, could have some conceivable relevance at this

trial, but he has not proffered any relevant evidence along

these lines.  My ruling, though, is without prejudice.  In the

event Gillier wishes to elicit evidence of this nature, please

raise it with me outside the presence of the jury, either by

letter or prior to the jury's arrival in the morning or after

the jury is excused for the day in the evening.  I can then

take up with counsel in an orderly way whether the evidence in

question is properly admitted under the rules of evidence.

        Finally, as to evidence of prior good acts, it is

black letter law that "a defendant may not seek to establish

his innocence... through proof of the absence of criminal acts

on specific occasions." *United States v. Scarpa*, 897 F.2d 63,

70 (2d Cir. 1990); see also *United States v. Chambers*, 800

F.App'x 43, 46 (2d Cir. 2020); and *United States v. Walker*, 191

F.3d 336 (2d Cir. 1999*).  Similarly, while the defense is

permitted to offer general testimony from a character witness

regarding Gillier's reputation for a "pertinent trait,"

including that witness's opinion of the defendant's capacity

for that trait, the defendant is not permitted to testify or

offer proof to establish specific acts in conformity with that

trait that are not an element of the offense. *See, e.g.,*

M75CgilC

1    *United States v. Fazio*, 2012 WL 1203943, at *5 (S.D.N.Y. Apr.

2    11, 2012), *affd*, 770 F.3d 160 (2d Cir. 2014).

3          Consistent with these principles, evidence that

4    Gillier previously engaged in non-fraudulent business ventures

5    or that RTF or UAS engaged in legitimate business is irrelevant

6    to whether Gillier committed the crimes alleged.  Any argument

7    or evidence that Gillier did not commit fraud on those other

8    occasions or that he committed prior good acts would be

9    excluded as irrelevant to the issues in the case and to

10   demonstrate his good character.  Introduction of such evidence

11   would also be excluded under Rule 403, as it could lead the

12   jury to be confused about the actual conduct at issue in the

13   case and unnecessarily lengthen the trial.

14          I'm now going to turn to Gillier's motions *in limine*.

15   To some extent, I have already resolved these alongside the

16   government's motions.  I'm going to address only the remaining

17   motions or portions thereof that I've left unaddressed.

18          I've addressed, in resolving the government's motions,

19   Gillier's motion that the Court direct the government to redact

20   certain portions of Gillier's encounters in 2004 and 2005 with

21   agents at the border.  The government has agreed to make such

22   redactions.

23          Gillier further seeks to preclude such statements to

24   the extent that the government sought to introduce them in

25   summary form.  The government, in its opposition, has

represented that it does not intend to offer any summaries, and
that it will offer Gillier's statements only in the
question-and-answer format.  Gillier does not object to that
approach.

Gillier objects to the inclusion of evidence that he
was denied entry into the United States as being irrelevant and
highly prejudicial.  I agree, based on the present record, such
evidence should be excluded under Rule 403.  In its opposition,
the government has not indicated why such evidence is probative
of the crimes charged, at all.  And being turned away at the
border for having an improper visa, although hardly
inflammatory, could be viewed as an infraction that perhaps
might make a jury look askance at Gillier, or wonder about
whether he was otherwise a violator of the law, to some degree,
anyway.  As such, unless the government can better explain the
probative value of such events, Gillier's being turned away at
the border is excluded under Rule 403.  To be clear — this
ruling is limited only to evidence of the denial of entry.  My
ruling that any misrepresentations Gillier may have made —
including any representation made imminently before being
turned away — stands.

I next consider complaints by customers of RTF or
other entities associated with Gillier.  Gillier reserves the
right to object to evidence of such complaints until the
government presents it in concrete form.  He acknowledges that

M75CgilC

such complaints may be relevant to the charged conspiracy if
made by customers who purchased airplane parts sold by
Honeywell to RTF.

Without any particular examples before me, any ruling
on this point would be premature.  To the extent Gillier seeks
to object to narrow the indictment to exclude any evidence
post-2006, however, I caution that I have already ruled that
post-2006 evidence is admissible as direct evidence of the
conspiracy charge.

I therefore deny this motion as premature, but grant
Gillier leave to renew his objection in advance of any
testimony or evidence relating to customer complaints.

Gillier next seeks to preclude any references to
violations of the ITAR, I-T-A-R, regulations, export
violations, or the United States Munitions list from the
government's exhibits, and requests that the Court preclude
government witnesses from making such references.  Gillier
appears to be making this motion under Rules 401 and 403.  In
its opposition, the government agrees not to offer evidence
that Gillier was investigated for the improper export of
aircraft parts or other violations of ITAR.  It requests only
that it be excused from redacting any reference, including
generic ones, to ITAR, export violations, or the United States
Munitions list.

On June 30th, 2022, the Court directed the government

1      to provide examples of such generic reference it sought to be

2      excused from redacting.  See Dkt. 92.  On July 1, the

3      government provided illustrative examples, including one which

4      I'll briefly describe now:  A credit application submitted to

5      Honeywell by UAS.  The document contains a statement of

6      certification that must be submitted to Honeywell as part of

7      its credit application and which states, *inter alia*, on page 8,

8      that the customer complies "with applicable United States

9      export control laws and regulations."  In its letter, the

10     government reiterated that it will not offer any testimony or

11     argument that Gillier or any entity involved in the case failed

12     to comply with U.S. export law.

13            I find the government's line is a reasonable one.  Any

14     reference to laws or regulations that govern the industry that

15     are boilerplate or generic do not require redaction.

16     Similarly, to the extent the government's witnesses mention

17     export compliance in passing — without making any particular

18     reference to compliance by Gillier or the entities in the case

19     — need not be redacted.  The mere fact of such regulations — in

20     a highly regulated industry — is not unfairly prejudicial to

21     Gillier.

22            However, I quite agree with the defense that any

23     specific reference to Gillier in connection with such

24     regulations must be redacted.  By that I mean, non-exclusively,

25     any evidence suggesting that Gillier was in or out of

M75CgilC

1    compliance with such regulations, or that his compliance with

2    such regulations was a subject of investigation, or the same as

3    to the companies with which he was allegedly affiliated, such

4    as RTF and UAS, or the same as to his alleged coconspirator.

5    And the government, rightly, has made clear that it will make

6    such redactions.

7         Gillier next seeks to preclude numerous documents that

8    purportedly record transactions at issue between RTF and

9    Honeywell and that tend to show that such transactions went

10    unpaid.  Gillier seeks to preclude this on several grounds.

11    Gillier argues that the documents should be precluded because

12    (1) they are not complete records of the transactions, and

13    therefore "lack indicia of reliability and trustworthiness,"

14    (2) the records are improper duplicates under Rule 1003; and

15    (3) admission of the documents would preclude meaningful cross

16    examination as to whether additional documents existed and

17    whether any such documents would have revealed delivery or

18    non-delivery of airplane parts to RTF.

19         The government counters that the records it intends to

20    offer satisfy the "low bar" for authentication and admission of

21    business records.  *See United States v. Gagliardi*, 506 F.3d

22    140, 151 (2d Cir. 2007), holding that "the bar for

23    authentication of evidence is not particularly high."  The

24    government proffers that the records include hundreds of final

25    invoices to RTF, checks from RTF, and debit notifications

M75CgilC

1    pertaining to those checks from Honeywell's bank.  The

2    government anticipates authenticating such evidence through the

3    testimony of a current Honeywell employee who was an employee

4    at the time of the alleged fraud, and evidently played a role

5    in its discovery.  The government proffers that this employee

6    also testified at the damages phase of the Honeywell litigation

7    in 2007.

8            The motion before the Court is not specific as to any

9    particular record.  It is therefore premature to rule as to the

10   admissibility of any exhibit.  That will await the testimony at

11   trial, including voir dire by the defense of the authenticating

12   witness if it so elects.

13           As to the completeness of the documents, however, I

14   can say this.  The fact that the government does not intend to

15   offer documentation of each of Gillier's and Honeywell's 1,000

16   or so transactions — or even every document bearing on a single

17   transaction — is not a basis for excluding the documents that

18   the government seek to offer.  As a condition of admissibility

19   of business records such as invoices, the government is under

20   no obligation to structure its case in that way.  Gillier, of

21   course, on cross examination or the defense case, is at liberty

22   to seek to authenticate and offer additional documents, but the

23   government's offer of subsets of the universe of conceivably

24   relevant business records, provided that they are properly

25   authenticated, is not a basis for denying admission.

M75CgilC

1          I understand that Gillier posits that because the

2     events occurred long ago, it took more than a decade to bring

3     him to justice in this country, certain records of the long-ago

4     transactions at issue may no longer survive.  That is a proper

5     basis for cross examination and I will give defense counsel

6     latitude to probe in this area.  However, again, provided that

7     the records that are offered by the government are properly

8     authenticated, the existence or inability to locate other old

9     business records goes to the weight of the evidence, it does

10    not go to their admissibility.  As authority, I would cite you

11    to *Fagiola v. Nat'l Gypsum Co. AC &* S., 906 F.2d 53, 58

12    (2d Cir. 1990), which held that where incomplete sales records

13    were offered, objections that such records were incomplete went

14    to the weight of evidence, not its admissibility, and *United*

15    *States v. Hathaway*, 798 F.2d 902, 907 (6th Cir. 1986), holding

16    that "the fact that records were missing or unavailable does

17    not evidence a clear abuse of discretion in the district

18    court's finding that the records were trustworthy.  Instead, it

19    is an argument which best goes to the weight to be given that

20    evidence."

21         Gillier separately posits that as to certain Honeywell

22    records, it is or may prove to be a problem that the government

23    will be offering photocopies, not originals, and that the

24    witness who will authenticate some of these records is not a

25    currently employed records custodian, but a former employee.

M75CgilC

1        As to the issue of copies, the Rules of Evidence

2   permit copies to be received.  Rule 1003 provides that "a

3   duplicate is admissible to the same extent as the original,

4   unless a genuine question is raised about the original's

5   authenticity or the circumstances make it unfair to admit the

6   duplicate."  The defendant bears "the burden of demonstrating a

7   genuine issue as to the authenticity of the unintroduced

8   original, or as to the trustworthiness of the duplicate, or as

9   to the fairness of substituting the duplicate for the

10  original."  *United States v. Chang An-Lo*, 851 F.2d 547, 557

11  (2d Cir. 1988).  As I have explained, the fact that the

12  government does not intend to offer all records of Honeywell's

13  and Gillier's transactions, or even all documents associated

14  with a single transaction, does not compel the conclusion that

15  such records are inauthentic or untrustworthy.  *Cf. United*

16  *States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967), holding,

17  under the best evidence rule that "the fact that part of a tape

18  recording is missing or inaudible does not render it

19  inadmissible."  And Gillier has not cast doubt on these

20  records' admissibility for any other reason, for example, that

21  records were altered in any way.

22       As to the issue of the record custodian, I am unaware

23  of any rule of evidence that requires current employment as a

24  precondition for a business records custodian to properly

25  authenticate such records.  In order to admit a business

M75CgilC

record, a foundation must be established by the "testimony of the custodian or other qualified witness of the record." *United States v. Friedin*, 849 F.2d 716, 719-20 (2d Cir. 1988) (quoting Rule 803 (6)).  "This circuit has recognized that a custodian who testifies as to the authenticity of a record need not have a firsthand knowledge of the creation of the record." *United States v. Reyes*, 157 F.3d 949, 952 (2d Cir. 1998).  "The custodian or other qualified witness who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the record-keeping entity, so as long as the witness understands the system used to prepare the records."  *In re: Enron Creditors Recovery Corp.* 376 B.R. 442, 456 (Bankr. S.D.N.Y. 2007).

          The issue in all events is and will be at this trial whether the witness on the stand is capable of laying the foundation required by Rule 803(6).  There is no law or precedent precluding a former employee from doing so.  Beyond that, I simply cannot rule at this time as to admissibility. That turns on the details.  I must await the specific evidence that the government elicits as to the particular Honeywell business record at hand, that will permit me to determine whether a proper foundation to authenticate these records has been laid.

          Finally, Gillier seeks to preclude the government's

M75CgilC

1    proposed summary witness, Scott Holt, from testifying on the

2    ground that Mr. Holt's categorization as a summary witness

3    instead of an expert witness is a "subterfuge."  Mr. Holt is a

4    forensic accountant.  Gillier argues that Mr. Holt will

5    necessarily provide an expert opinion as to Gillier's alleged

6    fraud.

7         The government has committed that Mr. Holt will not

8    testify as an expert witness.  The government represents that,

9    notwithstanding his professional training, he will serve solely

10   as a summary witness.  It advertises that he will distill reams

11   of financial documents into summary charts, which, of course,

12   is a familiar role played by lay summary witnesses.  His

13   testimony, the government represents, will include only

14   summaries of the purchase orders, checks, stop payments, and

15   other such records admitted in the case.  The government

16   assures that Mr. Holt's testimony will not address such matters

17   as "trends" in the area of fraud, and such, indeed, would be

18   impermissible.

19        I deny Gillier's motion to preclude Mr. Holt from

20   testifying as a summary witness.  On the proffer before me,

21   there is no aspect of his anticipated testimony that qualifies

22   as expert testimony.  The mere fact of Mr. Holt's occupation as

23   a forensic accountant does not disqualify him — or over-qualify

24   him, if such was even a thing — from serving in a summary

25   witness capacity.  *See United States v. Blakstad*, 2021 WL

M75CgilC

5233417, at *4 (S.D.N.Y. Nov. 9, 2021), in which Judge Ramos

concluded that an accountant properly testified as a summary

witness by summarizing voluminous financial records in a

financial fraud case.  I am relying here, of course, on the

government's representations as to the nature of and boundaries

upon Mr. Holt's testimony.  Should his testimony stray into the

realm of expert opinion, this ruling does not apply, and the

defense will be at liberty to object.  But I will not preclude

Mr. Holt from testifying outright.  His testimony, as proffered

by the government, is admissible.

          That concludes my ruling.

          Let's take a 10-minute recess.

          (Recess)

          THE COURT:  Counsel, before I turn to the other

matters that I indicated, I wanted to take up with you, let me

just close the loop on a couple of the items that I covered in

the bench rulings.

          Government, I couldn't tell whether there are

additional counseled statements by Mr. Gillier that you

intended to put before the jury.  Are there?

          MS. McLEOD:  Your Honor, yes, I believe there will be

and we will put in a letter specifying that.

          THE COURT:  Just raise it with Mr. Ginsberg first

because it may well be that they're unopposed and it may be

that the objection was really the where's Waldo quality of the

M75CgilC

earlier offer.  My guess is if you specify what the statements

are, you may not get any opposition, and it will be useful for

me to know that when your letter comes in.

MS. McLEOD:  Will do that, your Honor.

THE COURT:  Next issue involves the doctor.  I

understood you not to be seeking to prove up through the

doctor's secondhand testimony his medical conclusion that there

had been some medical manipulation.  Did I read that right?

MS. McLEOD:  That's correct.  We don't intend to offer

that in our case and chief.  As your Honor noted, it could come

in in another phase of the trial.

THE COURT:  Mr. Ginsberg, the next question involves

the substantive counts in whether you might be seeking a

limiting instruction with respect to the post mid-2006 conduct.

There is absolutely no reason for to you decide that, but I'm

just flagging that as something for you.

MR. GINSBERG:  I decline.

THE COURT:  I thought you would, but I'm offering.

Okay.

The next issue involves the *Bourjaily* predicate.

Government, you came fairly close in the letter, but I must

say, I just need to be able to make the predicate finding that

these organizations were, in fact, participants, if you will,

in the conspiracy.  I suppose it is a nice question about what

one does about the individual functionary employee, but I think

M75CgilC

1    if the employee is serving in his capacity as a party, he's a

2    representative of an organization that is in furtherance of the

3    employee's own guilt as opposed to the corporation's is what

4    matters.  Either way, though, I'm going to need a little more

5    of a proffer.  I'm happy to receive that at a later point.

6              MS. McLEOD:  Yes, your Honor.

7              THE COURT:  And finally, Gillier's having been turned

8    away at the border, it did not appear to me the government was

9    seeking to offer that, but let me clarify.

10             MS. McLEOD:  We were proposing not to redact that part

11   of the question and answer.

12             THE COURT:  No, the outcome, which is you may not

13   enter.  This is pre-2006, and I understood you not to be

14   offering the bottom line that he was being forbidden entry.

15             MS. McLEOD:  We were proposing to offer that.  It is

16   part of, sort of, the witness's narrative and it is actually in

17   the Q&A, and he says this is why I am not allowing you into the

18   country.  But we can certainly --

19             THE COURT:  The important thing is I don't want an

20   adverse inference to arise about the mysterious reasons he was

21   excluded.  If you need to establish that he didn't enter the

22   country because that explains the way the scheme then proceeded

23   or stalled, that's another story, that's a perfectly good

24   probative reason.  There is probative value if his nonadmission

25   is necessary to explain subsequent operational issues with

M75CgilC

1    respect to the scheme — his nonpresence at a meeting, why

2    somebody else took on some responsibility.  But, without that,

3    you have no explainable probative value, at least as it's been

4    proffered to me, to his being excluded, and you have some

5    degree of negative inference, even if it's not deeply

6    inflammatory, it's a little bit of a mystery — people usually

7    don't get excluded, what happened here?

8              MS. McLEOD:  We can redact the Q&A portion at the end

9    where he essentially explains to the defendant, here's why you

10   are being refused admission.  I can also tell the witness we

11   are not planning on getting into what eventually happened.

12             THE COURT:  At the border.

13             MS. McLEOD:  I do expect, as Mr. Ginsberg has

14   proffered, that the defendant will testify and it may become

15   relevant on cross the fact that he then later entered the

16   country again.

17             THE COURT:  I'm not touching cross here.  I understood

18   the motions to be directed to the government's case.

19             What I'm not hearing you say is that Mr. Gillier's

20   failure to secure entry on those dates is probative of anything

21   in your direct case.

22             MS. McLEOD:  I think that's right, your Honor.

23             THE COURT:  Very good.  Let's then turn to other

24   issues.  Let's, first of all, just talk about what days we are

25   sitting.

M75CgilC

1          Jury selection will begin on Tuesday the 12th.  Per
2     our prior discussion, Mr. Ginsberg, I understand it's important
3     that we sit only four days a week, but you're comfortable next
4     week sitting Tuesday through Friday, and I had intended the
5     following week, and to the extent the trial might extend into a
6     third week, to sit Monday through Thursday.
7          Mr. Ginsberg, most important, does that work for you?
8          MR. GINSBERG:  It does, your Honor.
9          THE COURT:  Any other limitations I need to be aware
10    of?
11         MR. GINSBERG:  This is not a limitation, but it's an
12    emergent issue.
13         THE COURT:  It's a?
14         MR. GINSBERG:  An emergent issue.
15         THE COURT:  Closer to the mic.
16         MR. GINSBERG:  An emergent issue.  Unfortunately, my
17    partner who's not present today tested positive for COVID on
18    Thursday.  I started feeling unwell on Friday and I tested
19    three times since then, first a home test and two PCR tests,
20    and I've tested negative, but I'm still feeling unwell.  So I'm
21    going to continue to test because I don't want to come into the
22    court --
23         THE COURT:  Why don't you put your mask on for now
24    then.
25         MR. GINSBERG:  That's why I had it on.

M75CgilC

1          THE COURT:  You're not obliged to under the rules, but

2     that just seems prudent.

3          Look, obviously, I'm not going to make a judgment

4     about what to do based on unknown circumstances.  In the event

5     you test positive, let your adversary and the Court know as

6     soon as possible and be as concrete as you can about what you

7     believe the ramifications to be.

8          MR. GINSBERG:  I will.

9          THE COURT:  Right now, as to your law partner's

10    testing positive, as one who a few weeks ago tested positive on

11    a Thursday, I was allowed back in here a week from the

12    following Monday.  So applying *in re: Engelmayer* to your law

13    partner, if things follow that familiar form, he would likely

14    be able to be here the day before trial, but you'll let me

15    know.

16          In any event, that's our schedule.

17          Government, I'll need two copies of 3500 binders and

18    two of Government Exhibits, one for me and one for my law

19    clerk.  Any time this week is fine.

20          MR. McGINNIS:  Your Honor, a quick question on that.

21          THE COURT:  You may take your mask off.

22          MR. McGINNIS:  Thank you, your Honor.  For purposes of

23    3500, the government has started producing 3500 material of

24    witnesses we do not expect to testify.  That can create quite a

25    few witnesses and substantially increase the size of the 3500

M75CgilC

1    binder.  Would the Court prefer if we limited the production to

2    the Court only to 3500 of witnesses we expect to testify?

3            THE COURT:  Yes, that's fine.  If you're producing

4    binders anyway, give me one binder, consolidate the testifying

5    versus the non.  But yes, what's important is I have the

6    testifying witnesses, and if somebody gets added to that list,

7    I'll promptly get the 3500.  Thank you.  Thoughtful question.

8            Let me ask the government in particular, do you intend

9    to be introducing any prior testimony?  I note that there is

10   civil litigation in the background of this case.

11           MS. McLEOD:  We do not, your Honor.

12           THE COURT:  That's fine.

13           Mr. Ginsberg, you presumably are privy to deposition

14   or other testimony from the civil case.  Have you any

15   expectation to use any prior testimony to examine --

16           MR. GINSBERG:  No, your Honor.

17           THE COURT:  The only reason I ask is, this happens in

18   civil litigation all the time where there are depositions that

19   have been taken and you wouldn't believe how often it is that

20   the prior testimony is bungled, misused, tried to be put before

21   the jury, or there is really no acceptable prompt for it.  So I

22   developed a system where I ask counsel to get me the prior

23   testimony in advance, and if they believe there has been an

24   inconsistency from the witness stand with prior testimony, to

25   say, Judge, pages 76, lines 1 through 6, I will quickly eyeball

M75CgilC

1    it, confirm that it is proper, then authorize you to confront

2    in the way that is proper under the rules of evidence.  If

3    we're not going there, there is no reason to go into all that,

4    but if it looks like there may be, I just want to take a moment

5    with you to make sure we have that choreography down.

6         MR. GINSBERG:  Does that apply to refreshing

7    recollection from statements that may be in documents --

8         THE COURT:  No, because if you're refreshing, you're

9    putting it in front of the witness.

10        MR. GINSBERG:  I understand.

11        THE COURT:  The concern for me, Mr. Ginsberg, is the

12   situation in which a lawyer's question effectively smuggles

13   before the jury the content of prior testimony that really

14   isn't properly called for, and that's why I assist on taking a

15   look at it, to make sure that it actually is within bounds and

16   isn't a bunch of rambles or areas that are not appropriate.

17   But for refreshing, I was taught in trial advocacy you can

18   refresh a witness's recollection with a pizza box, so I don't

19   have a problem with your doing that.

20        MR. GINSBERG:  Okay.

21        MS. McLEOD:  Sorry, your Honor.  This may not actually

22   implicate the concerns that you are raising, but I just wanted

23   to flag this in case you wanted to do something with it.

24        Due to the age of the case and the fact that there

25   were some parallel investigations in litigation, there may be

M75CgilC

some offering through testimony of things as a recorded

recollection.  We are obviously going to lay the foundation for

that and it should be clear what we are directing --

THE COURT:  As long as I've got it in front of me and

it's clear what you're doing, that gives the opportunity to

stop you if there is an issue.  And obviously, Mr. Ginsberg,

given what you're proposing to do, we'll be in a position to

object.

The challenge becomes, in the course of an

examination, say in a civil case, where the witness says the

light was red and the examiner then says, well, did you testify

under oath like you did today, were you asked the following

questions and did you give the following answers, and the

questions and answers involve the witness's complicity in a

triple homicide, and suddenly that's all read aloud and

nobody's given notice.  That's the worry.

MS. McLEOD:  Yes.

THE COURT:  Very good.  Next, let's talk about *voir*

*dire*.

The good news is that Mr. Smallman has secured

courtroom 318 in this building for *voir dire*.  The trial will

be held here, but the *voir dire* will be done there, and the

reason is simply because of the sheer number of people.

There's more space there.

I expect and I'm just going to go through a few of the

M75CgilC

1    mechanics of *voir dire*, although I know two of the lawyers, one

2    for each side, have had trials before me.

3         I expect to seek four alternates, and that means using

4    the struck-panel method that we will have to preclear, before

5    the exercise of peremptory challenges, 36 people.  In other

6    words, you'll each have an extra strike directed to the

7    alternates.  You don't waive any strike by taking people out of

8    order.  You know all this.  This is familiar stuff.

9         I will need from the government, but also as

10   supplemented by the defense, a list of any people that may be

11   mentioned, including corporate entities at trial, and any

12   places that truly matter.  I don't think Kansas matters here,

13   unless there's something memorable about a location in Kansas.

14   So since it's not going to prompt, I think, any prejudice, I

15   don't need to know that sort of thing, but if there is a venue

16   or for some reason it matters, I would like to know that, too,

17   but please kindly get that to me by late this week.

18        I need to know who's going to be at the table for each

19   side both during the *voir dire* and during the trial.

20        For the government, am I correct that it's the two

21   counsel who are here and Geoffrey Mearns?

22        MS. McLEOD:  Who will be at counsel table, your Honor?

23        THE COURT:  Yes.  Is he your legal assistant?

24        MS. McLEOD:  Yes, he is our paralegal.

25        THE COURT:  Very good.  Welcome.

M75CgilC

1          MS. McLEOD:  We have a third AUSA partner who is

2     traveling back to New York right now, that's why he is not

3     here, Micah Fergenson.  I think we will probably have three

4     AUSAs at the table and possibly Jeff at the back, but it will

5     be three, I think, because of the limit.

6          THE COURT:  I think you're allowed four, Mr. Smallman

7     will let us know offline, but the important thing is in *voir*

8     *dire*, I need to identify all four.

9          MS. McLEOD:  Yes.

10          THE COURT:  Will you expect anyone else from the

11     government to be at your table at any point?

12          MS. McLEOD:  Our trial agent may be in and out as a

13     trial agent.

14          THE COURT:  At the table or in the back?

15          MS. McLEOD:  Probably in the back.  So I think at our

16     table, it will be the three AUSAs, that includes Mr. Fergenson,

17     plus Geoffrey Mearns.

18          THE COURT:  Why don't you include the trial agent on

19     the list of names that may be mentioned.

20          Mr. Smallman tells me that there is no limit, provided

21     everybody is vaccinated, but four is the ideal cap.

22          Mr. Ginsberg, is it you, Ms. Limani, and hopefully

23     Mr. Freeman joining your client at the table?

24          MR. GINSBERG:  Yes, your Honor.

25          THE COURT:  Anybody else?

M75CgilC

1          MR. GINSBERG:  No.

2          THE COURT:  Let me read to you a short summary that I

3    propose to give of the case to the venire, again, just to spot

4    whether there is any issue here that we need to be sensitive

5    to.

6          As you're going to see, the paragraph or two that I

7    list here, includes a number of corporate entities who I

8    understood the government claim to be victims.  If I'm

9    overdoing it here, I'm happy to have those cut out.  These may

10    be the entities that were listed to me when I wanted to

11    ascertain that there wasn't any conflict that precluded my

12    service to the case because I think that's what happened to my

13    predecessor on the case, but you'll let me know.  Again, this

14    is me speaking to the venire.

15          So you can understand the reason for the questions I

16    will be asking you shortly.  I will now tell you briefly about

17    this case.  I want you to understand that nothing I say today

18    regarding the description of the case is evidence.  The

19    evidence you will consider, if selected as a juror, will come

20    from the trial testimony of witnesses and from exhibits that

21    are admitted into evidence.

22          As I explained, this is a criminal case.  It is

23    entitled United States of America v. Stefan Gillier.

24          The defendant, Mr. Gillier, has been charged with the

25    commission of federal crimes in an indictment filed by a grand

M75CgilC

1    jury sitting in this district.

2           The indictment charges that Mr. Gillier participated

3    in a conspiracy to defraud aircraft part manufacturers.  It

4    charges that the conspirators placed orders for aircraft parts,

5    promising to pay for these parts, but once the parts had been

6    shipped, they stopped payment on the checks to pay for the

7    parts.  It charges that the conspirators were able to re-sell

8    the parts they received but had not paid for, and thereby made

9    millions of dollars.  The indictment alleges that this

10   conspiracy occurred between 2004 and 2010.  It alleges that the

11   companies whom the conspirators sought to defraud included

12   Honeywell, Pratt & Whitney, Dallas Airmotive, Twin Aviation,

13   Stair Cargo, Alpha Sentinel, and Aerospace Logistics.  Overall,

14   the indictment brings eight counts, or charges against

15   Mr. Gillier.  These are for conspiracy, mail fraud, wire fraud,

16   and money laundering.

17          Mr. Gillier denies all these charges.

18          Now, let me stress again that an indictment is not

19   evidence.  It simply contains the charges against the

20   defendant, and no inference may be drawn against the defendant

21   from the existence of the indictment.  You must always keep in

22   mind that the defendant is presumed innocent, that he has

23   entered a plea of not guilty to all charges, and that the

24   government must prove the charges in the indictment beyond a

25   reasonable doubt.

M75CgilC

1              That would be what I proposed to read to the jury.

2              Government, any corrections?

3              MS. McLEOD:  Your Honor, we would propose changing

4    "made millions of dollars" to "stole millions of dollars in

5    parts."

6              THE COURT:  Okay.

7              MS. McLEOD:  And the key victims that will sort of be

8    referenced at trial would be Honeywell --

9              THE COURT:  Is there a full name for Honeywell?

10             MS. McLEOD:  It's just Honeywell.  Pratt & Whitney,

11   and Dallas Airmotive.

12             THE COURT:  The other four, could I leave out?

13             MS. McLEOD:  Yes.

14             THE COURT:  Is the jury going to hear about them?

15             MS. McLEOD:  There won't be any witnesses from those

16   companies.

17             THE COURT:  Okay.  Include them on your list of names

18   to be mentioned in the remote chance some juror has some

19   connection, that should be enough to raise them up.  For the

20   purposes of the narrative, I'll end after Dallas Airmotive?

21             MS. McLEOD:  Yes.

22             THE COURT:  Otherwise okay, Mr. Ginsberg, you're fine?

23             MR. GINSBERG:  Yes.

24             THE COURT:  Length of the trial.  Let's operate on the

25   assumption that jury selection takes all day and that your

M75CgilC

1    opening either at the end of the day or first thing the next

2    morning.  But let's also assume, as both Ms. McLeod and

3    Mr. Ginsberg know, that I move quickly and work a full 9:30 to

4    5:00 day with an hour break at lunch and a 15-minute break in

5    the morning and the afternoon, but I'm really working you hard

6    and making tracks.

7            Realistically, how long is this trial likely to last,

8    Ms. McLeod?

9            MS. McLEOD:  So some of this will depend a little bit

10   on the outcome of stipulations.  We are calling a fair number

11   of record custodians, but right now, our best estimate, and

12   this is also based on the fact that we understand Mr. Gillier

13   will be testifying through an interpreter and that could take a

14   full day for a defense case, we think the government may rest

15   on maybe July 19th, that's a Tuesday.

16           THE COURT:  Wait a minute.  We're starting on the

17   12th.

18           MS. McLEOD:  Yes.

19           THE COURT:  There are four days of trial which,

20   hypothetically, the first one is basically jury selection.

21           MS. McLEOD:  Yes.

22           THE COURT:  You're suggesting that there would then be

23   three days in which evidence would be received, the 13, 14th,

24   and 15th, a weekend, the 16th, and 17th, you'd receive

25   government evidence on the 18th and then sometime on the 19th,

M75CgilC

1    you're apt to rest; correct?

2            MS. McLEOD:  This is a guesstimate, but the way we

3    have sort of been attempting to plot it out and, as your Honor

4    knows, it's an art, not a science, we sort of had been aiming

5    for possibly having closings maybe Monday, July 25th, depending

6    on how long Gillier --

7            THE COURT:  Part of the issue involves what I tell the

8    jury.  I'm not going anywhere near how much time you have for

9    closing.

10           MS. McLEOD:  And that wasn't what I was --

11           THE COURT:  But the premise there is, let's suppose

12   you rest at the end of the day on the 19th, then the question

13   would be the length of the defense case, but in theory, if the

14   government rested on the 19th, I heard whatever Rule 29 motions

15   at the end of the day on the 19th, hypothetically, the defense

16   would then begin on the 20th, then the question would be

17   whether the defense case is apt to go one day or more than one

18   day.

19           Let me ask you, Mr. Ginsberg, obviously the trial

20   hasn't begun, I'm just trying to measure my language right for

21   the jury.  Have you a projection here?  Is the government's

22   estimate, to your knowledge, of its case realistic, first of

23   all?

24           MR. GINSBERG:  I think it is given what I believe to

25   be their strategy in terms of how they're going about trying

M75CgilC

1    this case.  I think, frankly, without making further comment,

2    that trying the case via heavy documents and fewer live

3    witnesses, which should make it go quickly because it's hard to

4    cross examine thousands of checks.

5        THE COURT:  You were wonderful in the 12-week trial

6    you and I had, you focused on what mattered and genuinely,

7    properly stipulated to things without forcing anybody to do

8    anything.  I hope you will do that.

9        MR. GINSBERG:  I heard what the government just said.

10   It's my intention to stipulate where we can stipulate.  There

11   are some real issues concerning certain banks.

12       THE COURT:  I appreciate that this is an ancient case,

13   no fault there, just the way it is, and that may open the door

14   to lines of questioning that might not have occurred.  I'm

15   asking you to be the professional I know you are and stipulate

16   when you can.  I know you will.

17       How long would you guess, based on what you know now,

18   the defense case is apt to last, a day, two days?

19       MR. GINSBERG:  I think a full day.  Sort of the wild

20   card is that Mr. Gillier is going to be testifying in French

21   and, as the Court knows, sometimes that just adds additional

22   time to the testimony for all kinds of reasons.

23       THE COURT:  Right.

24       MR. GINSBERG:  There's a lot to cover.

25       THE COURT:  Okay.

M75CgilC

1          MR. GINSBERG:  We've already sort of gone over what we

2    anticipate doing, but there will be more.  So I think a full

3    day I would be a good guess.

4          THE COURT:  At this point, without holding you to it,

5    is it reasonable to expect that will be all to the defense case

6    or will there be stipulated documents or are you apt to have

7    substantially more?  Not holding you to it, just trying to get

8    a ballpark.

9          MR. GINSBERG:  I don't think it will be substantially

10   more.  I can tell the Court, and I gave a heads up to the

11   government about a week ago, based on the Court's ruling today,

12   we may want to call a government agent.  If the government

13   tells me they're going to require a Touhy letter, but we may

14   need to call that witness, I don't think that testimony would

15   be long, assuming that the Court permits it.  I'm sure the

16   government is going to object, but I believe the Court will

17   permit the testimony.

18         THE COURT:  Why don't we do this, I don't need to hear

19   about that now if it hasn't been fully engaged with, but I've

20   had enough Touhy situations to know that sometimes they can get

21   tricky.  To the extent you're reserving the right to do that,

22   let's get in motions to make sure --

23         MR. COHEN:  We'll do it today.  I didn't want to do it

24   until I knew what the Court's ruling was on a certain issue now

25   that I know I have to proceed that way.

M75CgilC

1          THE COURT:  I take it whatever the ruling is in

2    question, it makes it more potentially necessary for you to

3    call that witness.

4          MR. GINSBERG:  That's correct.

5          THE COURT:  Very good.  So in any event, assuming that

6    Ms. McLeod's projection is right, that the government, let's

7    say, hypothetically, were to rest on Tuesday the 19th, under

8    any circumstances, you're going the entirety of the following

9    day, at least potentially into the next day, Thursday, the

10   21st; right?

11         MR. GINSBERG:  Sounds right.

12         THE COURT:  Correct?

13         MR. GINSBERG:  Yes, that sounds right, your Honor.

14         THE COURT:  So I think all I need to do now is tell

15   the jury what we are expecting, and I think it's therefore

16   reasonable for me to say that parties expect the trial to last

17   between two and two and a half weeks.  Is that a fair estimate?

18   It's a little bit blurry, it doesn't come down with specific

19   dates, and I will make it clear to them that, should the trial

20   extend into a third week, we would be sitting Monday through

21   Thursday of that week?

22         MS. McLEOD:  Yes.  I think that's the important part

23   that the jury understands that it could extend into the week of

24   the 25th.

25         THE COURT:  Okay.  Mr. Ginsberg, does that accord with

M75CgilC

1    your expectations?

2              MR. GINSBERG:  Yes, your Honor.

3              THE COURT:  Mr. Smallman asks me whether, if we were

4    to have sat the first four days of the week beginning the 18th,

5    we could sit on the 22nd.  Mr. Ginsberg, I understood that, for

6    personal reasons, that's out of bounds, right, you don't need

7    to say anymore, but is that correct?

8              MR. GINSBERG:  I need one day a week.

9              THE COURT:  Very good.  That's why I was asking.  Say

10   no more.

11             I expect, based on my limited knowledge of the case,

12   that the big issue in jury selection is going to be claims of

13   hardship because there's often, as you all know, a bit of a

14   bright line between the people, where people see two weeks and

15   a little bit more, and this case has a little bit more than

16   that.

17             What I'm expecting to do is to have a written

18   questionnaire, and I'll go through my questions with juror

19   No. 1 and then, for all future jurors, I'll ask them to just

20   give me the numbers of any questions as to which they had "yes"

21   answers.

22             One of them, of necessity, will be the hardship

23   question.  I expect to largely take that stuff up at the

24   sidebar as much as I possibly can.  And my practice has been to

25   not announce to the venire, which, in our case, the 36 are

M75CgilC

1   being struck, until I've gone through all 36 simply because it

2   becomes obvious to people that it's fruitful to play the

3   hardship card.  You get more people who play the hardship card.

4   So I expect what I'll do is bring the people to the sidebar,

5   have them step aside, I will either rule or seek your views,

6   but eventually rule on the hardship application, but the juror

7   will, in all likelihood, wind up taking their seat so that at

8   the end of the 36, I announce who the eight or ten or twelve

9   are who are being struck, but nobody has been able to cue their

10   responses based on how to roll the judge, to be very blunt.

11   I've seen it happen both ways and I think that's smart time

12   management.  So just FYI.

13           Government, I saw your list of additional questions

14   with respect to *voir dire*.  I just want to understand why some

15   of these are relevant.  Aerospace, connections to the three

16   victims, that's fine.  There will be, in my usual biographical

17   questions after for-cause questions, I ask if you've served in

18   the military, but is there any reason to think that that's apt

19   to yield a for-cause objection as opposed to being of interest?

20           MS. McLEOD:  We're fine with not having that specific

21   question in there.  I think it was partially because Honeywell

22   is a large defense contractor and Department of Defense was

23   originally one of the agencies on the case, but it's not so

24   tailored, I think, as to require a specific question.

25           THE COURT:  My practice, as you will recall, is that

1    after asking all the for-cause questions and clearing 36 people

2    here, as against for-cause challenges, to then have each of the

3    jurors read aloud from a one-page, in effect, questionnaire to

4    tell us 90 seconds, two minutes about themselves, and I act it

5    out myself just to give them a sense of tone.  One of those

6    questions is, have you ever served in the military.  I think

7    that should be enough for your purposes.

8         Shipping company, banking industry, credit card debt

9    collection.  I mean, the problem is those questions are apt,

10   everyone's had a problem with their credit card and the issue

11   is -- if it's important, I'll do it, but the more questions

12   like that that one asks, the more we wind up stirring up a lot

13   of irrelevance.

14        MS. McLEOD:  We have no objection to removing that

15   question.

16        THE COURT:  What about shipping company, banking

17   company?  Nowadays, Amazon is a shipping company.  We're all

18   having problems with shipping companies from time to time and

19   they're pretty ticky-tacky.  You tell me, is there really a

20   scenario here where some juror's life experience like that is

21   really going to be meaningful to you?

22        MS. McLEOD:  I think given the detailed nature of the

23   summary of the case, I would expect they would be able to

24   hopefully spot the issue of working logistics at a shipping

25   company versus, I occasionally don't get my amazon packages.  I

M75CgilC

1    think the other questions in *voir dire* should sufficiently

2    cover that concern.

3    THE COURT:  Mr. Ginsberg, you saw the government's

4    proposed *voir dire* at docket 83-1, including banking, credit

5    card debt collection, shipping.  Are any of those questions

6    important to you?

7    MR. GINSBERG:  No, your Honor.

8    THE COURT:  Is there anything special to this case

9    beyond hardship that I ought to be zeroing in on?  I understand

10    in general disputes with the government and stuff.  Are there

11    questions that matter to you in particular in *voir dire*?  You

12    know how I generally do it.  I'm just trying to spot things

13    that are tailored to this case.

14    MR. GINSBERG:  I thought about it.  I don't think they

15    really are, your Honor.

16    I did include in our *voir dire* request that you make a

17    comment to the jury about the fact that Mr. Gillier is using

18    the French interpreter.

19    THE COURT:  Right.  And the way I was going to do it

20    was not far off from the way the government's question 10 is,

21    in effect, as a factual matter, I will state that although he

22    speaks English, his native language is French, and for court

23    proceedings, it will be easier for him to have the proceedings

24    translated into French, which I have approved.  Will any juror

25    hold that against him?  Everyone is going to say no.  But I

M75CgilC

1    take it that's a useful way of introducing them to that concept

2    that is nonprejudicial.

3            MR. GINSBERG:  That's correct.  But you'd be surprised

4    about how many people have problems with the French.

5            THE COURT:  Well, I mean, look, the fact that he is a

6    French national.  Is he a French national?

7            MR. GINSBERG:  Belgium national.

8            THE COURT:  Well, is that going to come out?

9            MR. GINSBERG:  I think it probably will, given what I

10   understand to be the government's proof.

11           THE COURT:  Do you want me to ask --

12           MR. GINSBERG:  Also, he's going to testify.

13           THE COURT:  Right.  I'm not aware of anyone, since

14   1945, who's had any problems with Belgium.  Do I need to ask

15   about that?

16           MR. GINSBERG:  No.

17           THE COURT:  All right.  Defense clothing, pivoting

18   completely now off of *voir dire*, have you put in a clothing

19   order?

20           MR. GINSBERG:  Your Honor --

21           THE COURT:  Or do you not want one?

22           MR. GINSBERG:  I'll tell you what's happening.  We've

23   been calling the MDC and emailing the MDC for the better part

24   of a week and a half.  We can't get a response from them about

25   what they're doing.  I know other lawyers have had clothes

M75CgilC

1    turned away from the jail.  I bought clothes the other day and

2    my intention was to bring the clothes to the courtroom and have

3    him change in the morning.  It is far easier than dealing with

4    the MDC on a regular basis.

5         THE COURT:  Well, look, I don't want to delay our

6    trial because --

7         MR. GINSBERG:  I don't think it will delay --

8         THE COURT:  But the problem is the jury is going to be

9    arriving and they'll be waiting in the jury room.  I don't want

10    a situation that, it's an old courthouse, there isn't a

11    dedicated defendant's elevator, if Mr. Gillier is traveling in

12    prison garb, there is too much of a risk of somebody bumping

13    into him and then having a whole hornet's nest of issues.  I

14    would much rather task the government with running interference

15    with the MDC and making sure that Mr. Gillier's clothing is

16    here, and I'll ask you, as well, to bring a set here so that if

17    there is some horrible snafu, we have an extra set.

18         MR. GINSBERG:  I don't have multiple sets of certain

19    things, but I'll deal with the MDC.

20         THE COURT:  Just get me the order so I can issue it.

21    Honestly, I've had this problem many times and it's not

22    ultimately been an issue when I issue the relevant order.  I

23    appreciate that we've all had, the last couple years, a higher

24    number of compliance issues with our local federal holding

25    facilities, but that's one that I've not had a problem with.

M75CgilC

1          MR. GINSBERG:  Well, as long as we're talking about

2     the MDC, we saw our client on Thursday, we communicated with

3     him over the weekend, we spoke to him today, he continues to

4     have enormous problems with the MDC abiding by the Court's

5     order.  We've called the government, we've called the MDC.

6          THE COURT:  The order in this case is about clothing.

7     I have not been asked to issue one yet.

8          MR. GINSBERG:  You issued an order previously to the

9     MDC for a laptop and for X amount of hours that he be able to

10    go and use it in the visiting room.  The guards on his floor

11    don't care about court orders.

12         THE COURT:  You need to intervene with me, then.  The

13    problem is, I'm very solicitous of this, you can ask the

14    lawyers in the last couple of criminal trials that I've had in

15    other cases that didn't approach trial, I have been very

16    activist about this set of issues and have generally tasked the

17    government, successfully, with running interference on them.

18         The problem, Mr. Ginsberg, is this is news to me.  If

19    there is something you need me to do and you have not been able

20    to get results through the government's intercession, you need

21    to let me know.  For now, the relevant issue involves the

22    clothing order.  Get me a clothing order, I will sign it, and

23    make sure that the government conveys to the MDC that it needs

24    to comply.

25         Ms. McLeod, I'm mindful that the chief of the criminal

M75CgilC

1    division and the deputy have both been very hands-on in dealing

2    with all issues at MDC.  Please make sure they know the issues

3    that Mr. Ginsberg has raised just now, but more than that, how

4    important it is that the clothing order be strictly complied

5    with every day at trial.

6         MS. McLEOD:  Yes, your Honor.

7         THE COURT:  French interpreter, Mr. Smallman tells me

8    that the interpreter has been lined up every day, we should be

9    fine on that.

10        Next issue involves plea offers.  We're almost done

11   with my list.

12        Mr. Gillier, it's important that you listen closely to

13   what I'm about to elicit from the government.  I'm going to ask

14   the government whether there have been any plea offers, what

15   they were, and what response the government got from the

16   defense.  I'm going to then confirm the same with Mr. Ginsberg,

17   and then I'm going to put to you to confirm that those plea

18   offers were communicated to you, and that if any were made and

19   turned away, you were the one who decided that.

20        Go ahead Ms. McLeod.

21        MS. McLEOD:  Yes, your Honor.  On April 7th, the

22   government extended a plea offer to the defendant to Count One,

23   which is the 371 count.  The guidelines range was 108 to 135,

24   but because it was to 371, it was capped at 60 months.  The

25   guidelines offense level in the plea offer was 31.  That offer,

M75CgilC

1    when we extended it, we told defense counsel it would expire on

2    April 21st.  We did not receive a positive response to the plea

3    offer.

4                THE COURT:  Did you receive any response?

5                MS. McLEOD:  From what I recall, we did not receive

6    any response.

7                MR. GINSBERG:  That's not true.

8                THE COURT:  We'll get there.

9                MR. GINSBERG:  Why would you even --

10               THE COURT:  Mr. Ginsberg, I'll get there in a moment.

11   Let me --

12               MS. McLEOD:  We're not trying to cast aspersions on

13   Mr. Ginsberg.  This was --

14               THE COURT:  Were you the AUSA responsible for the case

15   at the time?

16               MS. McLEOD:  I had just been added and Michael Neff

17   was corresponding with Mr. Ginsberg.  My understanding is we

18   had an open line of communication with Mr. Ginsberg, but in the

19   two weeks, I remember that we -- I think we had reached out to

20   him during those two weeks.  It's not a question of there was

21   no communication.  I just don't remember.

22               THE COURT:  Let me see if I've got this right because

23   I think it is unnecessary to have aspersions cast.  What I

24   think you are saying to me is you understood the offer to be

25   open for two weeks, that you were not the primary person

M75CgilC

1    communicating with Mr. Ginsberg, but you're left with a clear

2    understanding that the offer was not accepted as of the 21st,

3    but you don't personally remember whether a declarative no was

4    given.  Am I getting that right?

5           MS. McLEOD:  That's correct.

6           THE COURT:  Prior to April 7th of this year, was any

7    plea offer ever extended, any formal plea offer?

8           MR. GINSBERG:  Are you asking me, your Honor?

9           THE COURT:  No, I'm asking the government.

10          MS. McLEOD:  I don't believe so, your Honor.

11          THE COURT:  So Mr. Ginsberg, as clearly as you can,

12   what, if any, plea offers were extended to your client from the

13   government, formal plea offers, not just general discussion.

14          MR. GINSBERG:  The government and I discussed on many

15   occasions the contours of a plea offer.  Finally, I received a

16   written plea offer from the government.  It was a one-count

17   conspiracy offer with a maximum sentence of 60 months because

18   of the statutory cap, even though the guidelines were

19   significantly higher.  I spoke to my client about the plea

20   offer on numerous occasions.

21          I communicated with Michael Neff on numerous occasions

22   that my client did not wish to accept the offer.  We discussed

23   other things, as well, but I was clear as could be, because we

24   were getting to the point where we had worked on this case for

25   a long time and he needed some clarity as to what direction it

M75CgilC

1    was going.  The government was absolutely clear at that point,

2    my client wasn't taking the plea offer, and that's how we

3    proceeded.

4            THE COURT:  Just a couple of questions.  Just to be

5    clear, although discussions were underway, the one firm plea

6    offer that was made was the written plea offer.  Any reason to

7    dispute Ms. McLeod's statement that it was made on April 7th

8    and it was, by its terms, open until April 21st of this year?

9            MR. GINSBERG:  I don't have the document in front of

10   me, but it was within the document.  So if that's what the

11   document says, it sounds right to me.

12           THE COURT:  You made it clear to the client that the

13   decision was his, not yours, whether to accept that offer;

14   correct?

15           MR. GINSBERG:  So I don't often do this, but in

16   addition to speaking with him, I think I wrote him a three-page

17   letter outlining my view on the topic and made it very clear to

18   him whose decision it was --

19           THE COURT:  Meaning that it was his decision?

20           MR. GINSBERG:  -- to proceed to trial or not.  Yes.

21           THE COURT:  In other words, whether in writing or

22   orally or both, you were unambiguously clear that the decision

23   whether to accept the offer was Mr. Gillier's?

24           MR. GINSBERG:  Yes, your Honor.

25           THE COURT:  And he understood that?

1          MR. GINSBERG:  Yes, your Honor.

2          THE COURT:  All right.  Mr. Smallman, would you kindly

3    swear Mr. Gillier.

4          (Defendant sworn)

5          Mr. Gillier, you may be seated.

6          First of all, good morning.

7          THE DEFENDANT:  Likewise.

8          THE COURT:  You have heard the assistant U.S.

9    Attorney, Ms. McLeod, and you've heard Mr. Ginsberg describe a

10   plea offer that was made to you this April.

11         Did you hear what each of them just said in response

12   to my questions?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  And they both represented that the

15   government's plea offer involved your pleading guilty to one

16   count, Count One, the conspiracy count.  They have explained

17   that, although the sentencing guidelines otherwise would have

18   recommended a much higher sentence because the maximum sentence

19   on Count One, the conspiracy count, was 60 months, five years,

20   that was the maximum sentence you could have been sent to

21   prison for on that count and, as a result, the sentencing

22   guidelines would have recommended a sentence of 60 months'

23   imprisonment.

24         Did you understand that to be the plea offer?

25         THE DEFENDANT:  Yes, your Honor.

M75CgilC

1              THE COURT:  And did you understand, as well, that were

2       you to have pled guilty to Count One pursuant to the plea

3       offer, the government, at the time of sentencing, would have

4       agreed to drop all the other counts brought against you?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  And without telling me the content of your

7       conversations, did you speak at length with your lawyer,

8       Mr. Ginsberg, about whether or not to accept the government's

9       plea offer?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  And were you satisfied and are you

12      satisfied with his representation of you?

13             THE DEFENDANT:  Yes, your Honor, I was also satisfied

14      with that.

15             THE COURT:  Did you understand the decision whether to

16      accept the plea offer by the government was yours to make, not

17      your lawyer's, but yours?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  And did you communicate to your lawyer

20      that you wanted to say no to the plea offer, to turn down the

21      plea offer?

22             THE DEFENDANT:  150 percent, your Honor.

23             THE COURT:  Just to be clear, you told your lawyer you

24      were rejecting the plea offer?

25             THE DEFENDANT:  Yes, your Honor.

M75CgilC

1              THE COURT:  You authorized Mr. Ginsberg to communicate

2      that to the government?

3              THE DEFENDANT:  Yes, absolutely.

4              THE COURT:  The lawyers have indicated to me that that

5      was the only formal plea offer that was made, even though

6      discussions about a potential plea occurred at other times.

7              Is that consistent with your recollection?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Government, is there any further colloquy

10     I need to undertake with respect to the --

11             MS. McLEOD:  No, your Honor.

12             THE COURT:  Mr. Ginsberg?

13             MR. GINSBERG:  No, your Honor.

14             THE COURT:  All right.  With that, the final question

15     I have to take up with you, and then I'll open the floor if

16     there is anything else, involves courtroom technology.

17             Ms. McLeod, are there any exhibits in this case that

18     are other than good old-fashioned documents?

19             MS. McLEOD:  Yes.  We have phone recordings, these are

20     customer service recordings, and we also have video recording.

21             THE COURT:  What are the customer service recordings

22     of?

23             MS. McLEOD:  Some of them are with the defendant and

24     some of them are with Tristan Anderson.  There are also some

25     with Pratt & Whitney.  So there are some that are recorded as

M75CgilC

1    Honeywell customer service recordings and some that are Pratt &

2    Whitney consensual recordings.

3            THE COURT:  And what about the video, what's that?

4            MS. McLEOD:  There is video that was taken as

5    surveillance pre the attachment order by private investigators,

6    and then there was video taken --

7            THE COURT:  What's the gist of that video, what does

8    it show?

9            MS. McLEOD:  It shows the outside of the warehouse, it

10   shows employees coming in and out, and then the search itself

11   is about maybe 15 or 20 minutes long of sort of going through

12   the warehouse and showing what's in there while the team was

13   searching it, during for the attachment order.

14           THE COURT:  I don't know if you've had a tech walk

15   through.  The important thing is I expect you to be ready for

16   prime time with respect to the use of that technology.  You've

17   obviously used more complicated videos and audios before, but

18   it's an old courtroom, so I just want to make sure you and your

19   team are ready for that.  So reach out to Mr. Smallman.

20           MS. McLEOD:  We will do that.

21           THE COURT:  Mr. Ginsberg, anything else to the

22   technology or exhibits in this case?

23           MR. GINSBERG:  I don't think so.  If there is going to

24   be any technology, Ms. Limani is going to handle it since I'm

25   not yet capable of it after all these years.

M75CgilC

1        THE COURT:  There's always time.

2        MR. GINSBERG:  There is, not much, but there is always

3   time.

4        THE COURT:  The important thing is I want both sides

5   to have somebody at the table who is facile with technology.

6   Juries hate it when that stuff malfunctions and they wind up

7   spinning their wheels.

8        So Ms. Limani, if you've been handed the baton on this

9   one, please make sure to get a tech walk through.

10        MS. LIMANI:  Will do, your Honor.

11        THE COURT:  With that, that covers everything that I

12   came here to raise.

13        Before we adjourn, let me begin with the government,

14   anything further to raise today?

15        MS. McLEOD:  No, your Honor.

16        THE COURT:  Okay.  Defense?

17        MR. GINSBERG:  Two items.  It's hard for me to take

18   issue with your Honor's ruling because, as usual, it was

19   extremely thorough and particularized and on point.  However,

20   there is part of it that puts me in a particular bind based on

21   how your Honor ruled on the flight evidence.  And then the

22   evidence regarding Mr. Gillier leaving Kansas and going to New

23   York, meeting with his lawyer, and then proceeding on, I think

24   it was the next day, to Montreal.

25        In permitting the evidence about flight and in citing

M75CgilC

1    the case law, which generally allows it and says, well, the

2    defense can contest the factors that are being put forward by

3    the government to join the inference, by precluding me from

4    allowing him to say I went from Kansas to New York to me with

5    my lawyer, that's a fact that I'm now being prevented from

6    bringing out while the government is going to be allowed to

7    bring out the fact that he did leave Kansas and he did go to

8    New York and he did go to Montreal.

9              I would propose to the Court, although while this is

10   usually asked of defense counsel, I don't see why, since I

11   never intended to argue any kind of defense involving advice of

12   counsel or an incomplete advice-of-counsel defense, it was just

13   for the fact that that's what he did and where he went, the

14   jury can be instructed that they're not to consider that, the

15   fact that he went to in New York, met with his lawyer to

16   discuss the Kansas case --

17             THE COURT:  May I ask you a question?

18             MR. GINSBERG:  Yes.

19             THE COURT:  What difference does it make whether he

20   went from Kansas to Canada or Kansas to New York to Canada, and

21   what difference does it make that the person he met with in New

22   York held a legal degree as opposed to as a dentist or a

23   dermatologist?

24             MR. GINSBERG:  Because it gives legitimacy to his

25   testimony when he gets on the witness stand and he testifies as

1    to how he acted and what he did in response to having a

2    warrant, take all of his goods, seize his car, seize his

3    apartment, seize everything he had in the United States.  A

4    logical thing for somebody to do might be to consult with a

5    lawyer, even though I'm not arguing that as a defense, and to

6    deprive him of being able to explain exactly what he did

7    because there might be some --

8            THE COURT:  I'm sorry.  You're explicitly, as you've

9    just said less than a minute ago, not arguing an

10   advice-of-counsel or a presence-of-counsel defense.  You're not

11   arguing that he sought and followed a lawyer's advice.

12           MR. GINSBERG:  Yes.

13           THE COURT:  You're taking all that off the table --

14           MR. COHEN:  Because he did something legitimate.  In

15   the jury's eyes, leaving him, under the circumstances that he

16   left and going to New York, in the jury's eyes, by going to New

17   York to talk to a lawyer about the case is a legitimate act as

18   opposed possibly to an inference that they're going to

19   otherwise draw --

20           THE COURT:  Sorry.  Mr. Ginsberg, that assumes that

21   lawyers are good things.  Lawyers are neither good nor bad.  It

22   all depends on the circumstance and the idea that going to see

23   a lawyer is, somehow or another, a positive as opposed to a

24   neutral without more, doesn't naturally follow.

25           And the problem with introducing the fact that it was

M75CgilC

1    a lawyer he went to see as opposed to somebody else, that even

2    if you are silent on it, the natural implication is that the

3    lawyer blessed something.  The case law is clear that the mere

4    presence of a lawyer doesn't have that effect.  That is the

5    case even in cases like the one I cited where there was

6    testimony about what happened at the meeting and the lawyer was

7    there, but in a situation like this where it's a complete

8    mystery what happened and all you want to do is show that there

9    was a lawyer there creates even more insinuation and

10    problematic inference that the lawyer approved something.

11        I'm happy for you to figure out some workaround in

12    which the word "lawyer" is taken out of the equation here.  If

13    what you're trying to do is avoid the inference that he went to

14    see a bad guy in New York, perhaps there's some way you can

15    work around that, but the problem is introducing the notion

16    that it's a lawyer is improperly trying to leverage the legal

17    degree and legal qualifications of that person to your client's

18    advantage.  I won't have that.

19        MR. GINSBERG:  I respectfully disagree.  I want to

20    enjoin an analogy then to one of the last rulings your Honor

21    made in saying that, for example, the government can call Scott

22    Holt, a forensic accountant by trade, to testify as a summary

23    witness who will say that he's an accountant, and then somehow,

24    magically, the jury is supposed to not give any weight to the

25    fact that he's an accountant or a forensic accountant, that's

M75CgilC

1    before the jury, but I can't put before the jury that my client

2    did something totally legitimate by going to see his lawyer,

3    and the government is going to argue --

4         THE COURT:  Sorry.  Pause on that for just a moment.

5    Totally legitimate to see his lawyer.  That's great for you to

6    say that, but that requires evidence, and the opportunity was

7    there to develop that he was doing something totally

8    legitimate.  You could have developed what happened there.  But

9    you are asking everyone to assume that — and you know as well

10   as anybody because there are plenty of lawyer defendants in

11   this courthouse — seeing a lawyer, what do they say in Hamlet,

12   nothing is good or bad -- I forget the rest of the quote, but

13   the gist is how we all see it through our own prism.

14        MR. GINSBERG:  I'm not asking anybody to assume

15   anything.  Mr. Gillier is going to testify, the jury is not

16   going to have to assume a thing.  He can say what happened.

17        THE COURT:  He can say what happened, and had you

18   given notice, the government could have then subpoenaed the

19   records --

20        MR. GINSBERG:  I gave them notice --

21        THE COURT:  -- advice-of-counsel defense.

22        MR. GINSBERG:  I'm not putting in an advice-of-counsel

23   defense.  I'm not putting in any defense like that.  That's why

24   I'm saying, there can be a curative instruction if the

25   government is worried about that.  I never intended to put that

M75CgilC

| | |
|---|---|
| 1 | defense in.  I believed the defendant has a right to say, my |
| 2 | life was just taken over, everything I had in Kansas was just |
| 3 | taken away from me, I was served with all these papers, so what |
| 4 | did I do?  I went to New York, I spoke to a lawyer, I flew back |
| 5 | to Montreal where I lived. |

THE COURT:  Is that the lawyer who's representing him in Kansas?

MR. GINSBERG:  No, in New York there was a different set of lawyers than Kansas who wasn't on the case at the time. The only lawyer available to him in his business at the time was the lawyer in New York.

THE COURT:  What do you represent the purpose was of seeing the lawyer in New York?  What was the question being raised with the lawyer in New York?

MR. GINSBERG:  It was a Southern District case pending, as well, which eventually, I believe, got dismissed. Honeywell filed multiple actions, multiple civil actions.  They filed an action in Kansas, they filed an action in the Southern District, they filed an action in Montreal.

In doing what the government is trying to do and argue that he just disappeared and never dealt with anything, the government has to know through their own witnesses that after he went to New York, he went to Montreal, and he appeared in Montreal in court on the case where some of their own witnesses who are going to testify here at trial were present.

M75CgilC

1          THE COURT:  Here's what I want to do.  I think I have

2     not gotten as detailed a proffer as what you intended to do as

3     I'm now getting.  For the time being, my ruling stands.  I will

4     invite you to write me a detailed letter that explains to me

5     concretely by whom and with what evidence you intend to put in

6     whatever it is you intend to put in of what happened in New

7     York.  You've told me you are foregoing an advice-of-counsel

8     defense, but the problem is that the presence of counsel often

9     implies an advice-of-counsel defense lawyer, the defense

10    counsel just often doesn't say it and it's still a problem.

11         I think I will be better off ruling on this if you

12    choose to make a detailed proffer as to what it is you propose

13    to elicit from Mr. Gillier.  It doesn't sound like there is any

14    other witness you have in mind, it doesn't sound like you've

15    given notice of an intent to call the lawyer, and then I'll

16    give the government an opportunity to respond and I'll be in a

17    position to rule, in all likelihood, the first day of trial or

18    I will get you on the phone the day before trial next Monday.

19         But for avoidance of doubt, you should assume it is

20    out, unless it is greenlighted by me and therefore you

21    shouldn't be opening on it.  But I appreciate the context a

22    little better and I think I will rule on this more reliably

23    with a fuller factual predicate.  So lay it out for me and

24    explain to me why, under the case law, this is permissible.

25         Government, one of the things you'll need to respond

1    to is the fact that there is civil litigation afoot, to

2    Mr. Ginsberg's point, does create a scenario under which a

3    person could be speaking with a lawyer other than to inoculate

4    their later conduct.  So that may be a complicating factor and

5    there may or may not be a legitimate purpose to elicit evidence

6    about a lawyer's role on Mr. Gillier's behalf in a civil

7    litigation as well as it is bounded by rules that make sure

8    there's no improper implication of an advice-of-counsel

9    defense.  In other words, I'm completely with you that we can't

10   have a situation where the facts and circumstances give rise to

11   a potential advice-of-counsel defense.  It's not completely

12   clear to me that the word "lawyer" can't appear in this case.

13   Mr. Ginsberg will go first.

14          By the end of day tomorrow, Mr. Ginsberg, I want a

15   detailed letter that explains to me exactly what you have in

16   mind, through what witness or witnesses and based on what legal

17   authority and with what proposed limiting instruction.

18   Government I'll give you then to the end of Friday to respond.

19   I think the smarter course here is to slow this down and to get

20   a more detailed factual proffer than I've previously gotten.

21          Okay, Mr. Ginsberg?

22          MR. GINSBERG:  There's one other issue which the

23   Court's going to have to deal with.  I just want to flag to

24   your Honor, it's going to be an ongoing evidentiary issue,

25   which I discussed with the government already.  Within their

1    voluminous exhibits are contained, I would say, between 50 and

2    100 — it's my guess — internal emails of Honeywell and possibly

3    other companies who have been mentioned here today.  There are

4    emails that were sent from one employee to another employee in

5    which they're basically discussing what they're finding out

6    about payment and checks and things like that.  They contain

7    hearsay within hearsay.  They contain conclusions of what

8    they're determining.  I told the government a couple of times,

9    I intend to object to every one of the internal emails.  There

10   are some emails that are between Honeywell and my client and

11   maybe other companies and my client and a coconspirator, which

12   I really don't have a basis to object to, but as to the

13   internal emails, I wanted to alert the Court to it because

14   there are a lot of them.  I don't know how many they're going

15   to introduce.  I told them, generally, the basis for my

16   objection, the rules that I'm arguing under, that they're not

17   admissible, and I don't think --

18            THE COURT:  Or, I take it, admissible only in part or

19   subject to limiting instructions.

20            MR. GINSBERG:  I think they're not admissible at all.

21   In my view of reading these things, they do not meet -- they

22   don't have a hearsay exception, they do not need meet a

23   business record rule for multiple reasons.

24            THE COURT:  In other words, they might be business

25   records insofar as the intention or creation of them is a

1  business record, but that doesn't get you past the later levels

2  of hearsay as to the content.

3         MR. GINSBERG:  Correct.

4         THE COURT:  Let me suggest this, Mr. Ginsberg.  I'm

5  glad you raised this.  You and Ms. McLeod both know this from

6  prior cases before me.  I am very focused on trying to make

7  rulings as early and reliably as I can.  It avoids unforced

8  error, it avoids wasting the jury's time, it avoids needless

9  sidebars.  I do not want to be repeatedly bouncing up and down

10  if we can avoid it to sidebar to discuss embedded hearsay

11  issues.

12         Therefore, my preference is always to have counsel

13  raising issues in pretrial letters to me or in letters before

14  the trial day or if it truly has only arisen in a circumstance

15  where you can only raise it with me orally to do it that

16  morning, but everyone is now on notice that that is looming as

17  an issue in a case where we're picking a jury from a week from

18  now.  I would like to have an orderly way in which to resolve

19  this.

20         It seems to me, the government, you have at least as

21  great an interest here in knowing which of these things are in

22  or out.  In as much as these are records that I gather it's

23  clear to you what Mr. Ginsberg is objecting to, I think the

24  right course is for me to ask for a letter just explaining what

25  the exhibits are and why you believe they're all properly

M75CgilC

1   admissible for the truth of the matter asserted and

2   Mr. Ginsberg can respond and I'll be in a position to rule.

3          MS. McLEOD:  That's fine, your Honor.  We actually

4   also raised this with defense counsel as an issue.  We were

5   also trying to make sure that we were dealing with any issues

6   efficiently.  We're happy to do that.  I do think that,

7   probably, the concern will be lessened.  There are

8   substantially fewer numbers of those emails I think that we

9   will be offering.  We can go through those in the letter.

10          THE COURT:  Just address them in the letter.  If they

11  logically sort into different categories, such as birds of a

12  feather will resolve together all the better.  I'm trying to be

13  efficient here.  It's in everyone's interest that we not get

14  interrupted by objection after objection, but I know

15  Mr. Ginsberg not to be somebody who makes frivolous objections,

16  he may be wrong about his arguments here, but I can attest that

17  if he's making the argument, he's got a notion that I need to

18  deal with, and these things can take some time and they can

19  take some unpeeling.  I'll be better off if it's done in

20  writing.

21          Can we do it this way, on the mirror image schedule

22  that I just set for the defense's, quote-unquote, lawyer

23  evidence, can I have a letter from you at the end of the day

24  tomorrow with respect to the emails or other corporate

25  communications that are contended by the defense to contain

M75CgilC

embedded hearsay and be all or in part admissible, can I have

your show and tell in your letter, Mr. Ginsberg will respond by

the end of the day Friday.

             MS. McLEOD:  Yes, your Honor.

             THE COURT:  Once I get all that, I'll figure out the

most efficient way of resolving this.  Like I say, the answer

may be if I have the defense's permission to do this outside of

Mr. Gillier's presence, to have counsel both on the phone on

Monday to try to resolve things, and at least that way you go

into opening statements knowing what the ground rules are.

             Mr. Ginsberg, if it goes that way, do I have your

permission to proceed in that way?

             MR. GINSBERG:  It's acceptable, your Honor.

             THE COURT:  Very good.  Then I will look forward to

getting those submissions.  Anything further from the defense?

             MR. GINSBERG:  No, your Honor.

             THE COURT:  Have a good week.  Mr. Ginsberg,

obviously, I hope you continue to test negative and please wish

your trial partner a quick recovery.  Keep us posted on that

front.  Thank you.

                               *  *  *