O5O1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                         23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                      Defendant.            Trial
 6   ------------------------------x
                                            New York, N.Y.
 7                                          May 24, 2024
                                            10:15 a.m.
 8
     Before:
 9

10                       HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O5O1GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Michael Gartland, Paralegal Specialist, USAO
Geoffrey Mearns, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)

O5O1GUO1

```
 1            (A jury of 12 and six alternates was duly impaneled
 2   and sworn)
 3            THE COURT:  Counsel, would you approach, please.
 4            (At the sidebar)
 5            THE COURT:  Who's opening for the government?
 6            MR. FERGENSON:  I am, your Honor.
 7            THE COURT:  And for the defense.
 8            MS. SHROFF:  I am.
 9            THE COURT:  All right.  You may step back.
10            MS. SHROFF:  Thank you.
11            (In open court)
12            THE COURT:  Good morning.
13            THE JURORS:  Good morning.
14            THE COURT:  Members of the jury, the case is
15   officially on trial, and you are the jurors in the case.  As
16   you can see, the jury is composed of 12 members.  In addition,
17   there are six alternates.  If you are an alternate, you need to
18   pay as close attention to the evidence as the jury.  If for any
19   reason any one of the members of the jury is unable to serve,
20   an alternate will be required to step into the place of that
21   juror.
22            I now will give you some preliminary instructions to
23   guide you in your participation in the trial.
24            The second part of the trial is about to start.  This
25   part is the opening statement by the prosecution.  In the
```

O5O1GUO1

opening statement by the government, he's required to indicate

to you what the prosecution intends to prove by way of evidence

to support the charges against the defendant.  Once the

government's opening statement has been completed, defense

counsel has the option to make an opening statement.

Now what attorneys say in an opening statement is not

evidence.  An opening statement is, in a sense, a preview of

what the attorney expects that the evidence will show.

Next, the government will present a witness and will

ask the witness questions.  This is called direct examination.

Once the government completes those questions, the defense will

then be given an opportunity to question the witness.  This is

called cross-examination.  This process will continue for each

witness the prosecution will present to give testimony.

When the government finishes calling all of its

witnesses, the defense will be given the opportunity to present

witnesses also.  Remember, the defense need not prove anything.

Therefore, they do not have to cross-examine the government's

witnesses or offer their own witnesses.

Once both sides have finished presenting witnesses,

the defense and the prosecution will be given the opportunity

to make closing remarks to you.  These closing arguments will

not be evidence.  They are just arguments made by the attorneys

to discuss the facts and circumstances in the case, and they

should be confined to the evidence and to reasonable inferences

O5O1GUO1

    to be drawn from the evidence.  So again, neither opening

    statements nor closing remarks are evidence, and you should

    disregard any statement or argument made by the attorney that

    is not based on the evidence.

        After closing arguments, I will give you detailed

    instructions on the law that relates to this particular case.

    When I finish my instructions, you will then retire to

    deliberate to reach a verdict.

        Now I'm going to instruct you on evidence.  First let

    me tell you what evidence is.

        Basically, evidence consists of oral testimony under

    oath, any stipulations of the parties, and physical exhibits

    during the trial that are introduced by either the prosecution

    or the defense and allowed into evidence.  If an exhibit is

    given to you to examine, you should examine it carefully,

    individually, and without comment.

        There are two types of evidence——direct and

    circumstantial.  Direct evidence is direct proof of a fact such

    as testimony of an eyewitness.  Circumstantial evidence is

    proof of facts from which you may infer or conclude that other

    facts exist.  There's a simple example of circumstantial

    evidence that is often used in this courthouse.  Assume that

    when you came into the courthouse this morning, the sun was

    shining and it was a nice day.  Assume that the courtroom

    shades were down and you could not look outside.  As you were

O5O1GUO1

| 1 | sitting here, someone walked in with an umbrella that was

| 2 | dripping wet.  Then a few minutes later, another person also

| 3 | entered with a wet umbrella.  Now you cannot look outside the

| 4 | courtroom and you cannot see whether or not it is raining, so

| 5 | you have no direct evidence of that fact, but on the

| 6 | combination of facts that I have asked you to assume, it would

| 7 | be reasonable and logical for you to conclude that it had been

| 8 | raining.  That is all there is to circumstantial evidence.  You

| 9 | infer, on the basis of reason and experience and common sense,

| 10 | from one established fact the existence or nonexistence of some

| 11 | other fact.

| 12 |         Not all circumstantial evidence presents clear,

| 13 | compelling inference.  The strength of the inferences arising

| 14 | from circumstantial evidence is for you to decide.  I will give

| 15 | you further instructions on these as well as other matters at

| 16 | the end of the case, but have in mind that you may consider

| 17 | both kinds of evidence.

| 18 |         If you're instructed that some evidence is received

| 19 | for a limited purpose only, you must follow that instruction.

| 20 |         Questions asked by either attorney or even myself are

| 21 | not in and of themselves evidence.  Only questions coupled with

| 22 | answers are evidence.  Therefore, you may not infer any fact

| 23 | from the mere asking of a question.  The reason that I point

| 24 | this out to you is simple.  During the course of questioning,

| 25 | the prosecution and the defense may exercise their right to

O5O1GUO1

1   object to the other's question, to an answer given to a

2   question, or to introduction of an exhibit on the ground that

3   the attorney believes it is somehow legally improper or

4   inadmissible.  At that point I will sustain or overrule the

5   objection.  If I sustain an objection to a question, you must

6   disregard the question and any answer, if one has been given.

7   You must also draw no inference from the question or from any

8   answer.  Nor are you to speculate as to what the witness would

9   have said if permitted to answer.

10          Evidence stricken from the record must likewise be

11  disregarded.

12          Conversely, if I overrule the objection, the question

13  will be allowed and the answer will stand, and it remains as

14  evidence.  When I overrule an objection to any evidence, you

15  must not give such evidence any more weight than if the

16  objection had not been made.

17          Please bear in mind that my rulings on the law are

18  simply that, and under no circumstance are such rulings to be

19  considered by you as indicating that I have any opinion as to

20  the guilt or innocence of the defendant.  Under our law, the

21  judge may not and will not entertain any opinion as to the

22  guilt or innocence of the accused.  Members of the jury, you

23  and you alone are the sole and exclusive judges of the facts.

24          Now I want you to understand that objections may come

25  rather quickly, and at times either party may seem worried.

O5O1GUO1

1   Please do not resent this or penalize either party for this.

2   Understand that they are just doing their job and this is part

3   of it.

4           As I stated at the beginning, you are the triers of

5   fact.  Therefore, it is up to you to decide which witness to

6   believe and which witness not to believe.  Furthermore, you

7   will decide how much of every witness's testimony to accept and

8   how much to reject.

9           How do you decide what to believe and what not to

10  believe?  Listen to the witnesses, watch them, and observe

11  them, then decide whether you believe or disbelieve them in the

12  same way that you decide such questions in your everyday life.

13  Did they know what they were talking about?  Were they candid,

14  honest, open, and truthful?  Do they have a reason to falsify,

15  exaggerate, or distort their testimony?  Just use your common

16  sense in evaluating all testimony.  All that is asked of you is

17  that you apply the same common sense you would apply in your

18  everyday lives to determine who is telling you the truth, who

19  is not, and who is telling you something less than the full

20  truth.

21          Please remember that it is the quality of the evidence

22  that controls, not the quantity of the evidence, or the number

23  of witnesses called by either side.

24          You must decide the case solely on the evidence and

25  law before you, and must not be influenced by any personal

O5O1GUO1

1    likes or dislikes, opinions, prejudices, sympathy, or biases,

2    including unconscious bias.  Unconscious or implicit biases are

3    stereotypes, attitudes, or preferences that people may

4    consciously reject but which may be expressed without conscious

5    awareness, control, or intention.  Like conscious bias,

6    unconscious bias too can affect how we evaluate information to

7    make decisions.  All of us, no matter how hard we try, tend to

8    look at others and tend to weigh what they have to say through

9    the lens of our own experience and background.  We each have a

10   tendency to stereotype others and to make assumptions about

11   them.  Often we see lights and evaluate evidence through a

12   clouded filter that tends to favor those like ourselves.  You

13   must do your best to put aside such stereotypes, for all

14   litigants and witnesses are entitled to a level playing field

15   in which we do the best that we can to put aside stereotypes

16   and prejudices.  You are to be guided solely by the evidence in

17   the case and my instructions on the law.

18           Although you are the sole judges of the facts, my job

19   is to be the sole judge of the law.  You must accept the law as

20   I give it to you, without any hesitation or reservation.  You

21   must accept the law as I give it even if you privately disagree

22   with me or the law.

23           There are three basic principles of law that apply to

24   this and all criminal cases—the presumption of innocence, the

25   prosecution's burden, and the standard of proof.

O5O1GUO1

First, the presumption of innocence.  A defendant is presumed innocent, and that presumption remains with the defendant throughout the trial and is not removed unless and until the defendant's guilt is proven beyond a reasonable doubt.  The indictment containing the charges against the defendant is only an accusation, nothing more.  It is not proof of guilt or anything else.  Therefore, because no evidence has been presented to you as of yet, if you were to deliberate right now, you would have to find the defendant not guilty.

Second is the prosecution's burden.  The burden of proof is on the government.  The defense has no burden and is not required to do anything to prove his innocence.  The defense has the option of just sitting back and doing nothing. Why?  Because the defense has no burden of proof, and the defendant is presumed innocent.  The defendant is not required to put on a defense or call any witnesses because of the presumption of innocence.  If the defendant chooses not to take the stand, to testify on his behalf, you may not draw any negative inference from that; in other words, you cannot hold that against the defendant.

Third is the standard of proof.  The prosecution is required to prove the defendant's guilt beyond a reasonable doubt.  This standard does not require the prosecution to prove the defendant's guilt beyond all doubt or to a mathematical certainty.  The prosecution does, however, have to prove the

O5O1GUO1

defendant's guilt beyond a reasonable doubt.  The doubt is not

reasonable if, instead of being based on the nature and quality

of the evidence or the insufficiency of the evidence, it is

based on some guess or whim or speculation unrelated to the

evidence.

In my final instructions to you at the end of the

trial, I will give you detailed instructions on the law as to

the specific charges against the defendant.  Those instructions

are intended to guide you through your deliberations and to

enable you to reach your decision.

Finally, I'm now going to instruct you on how you must

conduct yourselves during the trial.

You must keep an open mind during the trial.

You must keep your eyes open during the trial.

You may not ask the witnesses questions.

Do not converse, either amongst yourselves or with

anyone else, about anything related to the case.  You may tell

the people with whom you live and your employer that you are a

juror and give them information about when you'll be required

to be in court, but you may not talk with them or anyone else

about anything related to the case.  Do not at any time during

the trial request, accept, agree to accept, or discuss with any

person the receipt or acceptance of any payment or benefit in

return for supplying information about the trial.  You must

promptly report directly to me any incident within your

O5O1GUO1

1    knowledge involving an attempt by any person to improperly

2    influence you or any other member of the jury.

3           Do not visit or view the premises or place where the

4    charged crimes were allegedly committed or any other premises

5    or place involved in the case.  And you may not use internet

6    maps or Google Earth or any other program or device to search

7    for and view any location stated in the testimony.

8           Do not read, view, or listen to any accounts or

9    discussions of the case reported by newspapers, television,

10   radio, the internet, social media, or any other form of news

11   media.  Do not attempt to research any fact, issue, or law

12   related to this case, whether by discussion with others, by

13   research in a library, or on the internet, or by any other

14   means or source.

15          In this age of instant electronic communication and

16   research, I want to emphasize that in addition to not

17   conversing face to face with anyone about the case, you must

18   not communicate with anyone about the case by any other means,

19   including by telephone, text messages, email, internet chat or

20   chat rooms, blogs, or social websites, such as Facebook and X.

21   You must not provide any information about the case to anyone

22   by any means whatsoever, and that includes the posting of

23   information about the case or what you are doing in the case,

24   on any device or internet site, including blogs, chat rooms,

25   social websites, or any other means.

1          You must also not Google or otherwise search for any

2     information about the case or the law that applies to the case

3     or the people involved in the case, including the defendant,

4     the witnesses, the lawyers, and myself.

5          Now, ladies and gentlemen, I want you to understand

6     why these rules are so important.  Our law does not permit

7     jurors to converse with anyone else about the case or for

8     anyone to talk to them about the case because only jurors are

9     authorized to render a verdict, only you have been found to be

10    fair, and only you have promised to be fair.  No one else has

11    been so qualified.

12         Our law also does not permit jurors to converse among

13    themselves about the case until the judge tells them to begin

14    deliberations, because premature discussion can lead to a

15    premature final decision.

16         Our law also does not permit you to visit a place

17    discussed in the testimony.  First, you cannot always be sure

18    that the place is in the same condition as it was on the day in

19    question; second, even if it were in the same condition, once

20    you go to a place discussed in the testimony to evaluate the

21    evidence in light of what you see, you become a witness, not a

22    juror.  As a witness, you may now have an erroneous view of the

23    scene that may not be subject to correction by either party.

24    That is not fair.

25         Finally, our law requires that you not read or listen

O5O1GUO1

1    to any news accounts of the case and that you not attempt to

2    research any fact, issue, or law related to the case.  Your

3    decision must be based solely on the testimony and other

4    evidence presented in the courtroom.  It would not be fair to

5    the parties for you to base your decision on some reporter's

6    view or opinion or upon information you acquire outside of the

7    courtroom.

8         These rules are designed to help guarantee a fair

9    trial, and our law accordingly sets forth serious consequences

10   if the rules are not followed.  I trust you understand and

11   appreciate the importance of following the rules, and in accord

12   with your oath and promise, I know you will do so.

13        During the trial, it may be necessary for me to confer

14   with the lawyers out of your hearing with regard to questions

15   of law or procedure.  On some occasions you may be excused from

16   the courtroom for that reason.  I will try to limit these

17   interruptions as much as possible, but you should remember the

18   importance of the matter you are here to determine, and should

19   be patient even though the case may seem to go slowly.

20        Finally, I permit jurors to take notes, but you do not

21   have to take notes.  Notes are just an aid in your own

22   recollection.  The court reporters in this case record

23   everything that is said in the courtroom, and any portion of

24   the testimony can be read back to you here in open court during

25   your deliberations.

O5O1GUO1                    Opening - Mr. Fergenson

1          If you do take notes, be aware that note-taking might

2    distract you from something important that is happening on the

3    witness stand.  Whether or not you take notes, rely on your own

4    recollection, and don't be influenced by the fact that another

5    juror has taken notes.

6          I just told you that you are to report any attempt by

7    anyone to improperly influence you.  Lawyers are not permitted

8    to have any contact with you other than what takes place on the

9    record in this courtroom.  If you see an attorney, for an

10   example, in the hallway or outside and the attorney does not

11   say hello or acknowledge your presence, please don't think that

12   the attorney is being rude.  The attorneys simply are not

13   permitted to have that type of contact with you.

14         Now Assistant United States Attorney Micah Fergenson

15   will make his opening statement.

16         MR. FERGENSON:  This case is about how the defendant,

17   Miles Guo, conned thousands of investors out of $1 billion, and

18   it's about how he spent millions of dollars of victim money on

19   himself.

20         In online videos, the defendant pitched investments in

21   a series of companies.  In these videos, the defendant said

22   many false and misleading things.  But at its core, the

23   defendant's fraud was simple.  He promised his victims they'd

24   get rich, that their investments were safe, and they would not

25   lose any money.  He told them that, as an ultra-rich

O5O1GUO1                    Opening - Mr. Fergenson

1     billionaire, he would personally guarantee and pay back any

2     losses.  He assured them he would never, ever let their

3     investments be stolen.  These were lies.  The truth is that the

4     defendant took investor money and spent it on

5     himself——million-dollar cars, yachts, a mansion.  Miles Guo ran

6     a simple con, on a grand scale.  He lived a billionaire's

7     lifestyle using money he stole from people he tricked and

8     cheated.

9            Now the defendant couldn't run a con this size alone.

10    You'll learn that the defendant and his partners in crime built

11    a criminal enterprise of different companies to carry out this

12    fraud.  Some of the companies had offices right here in New

13    York City.  The employees called the defendant the boss, and

14    the principal.  And the defendant and his inner circle used

15    these businesses to steal money from their victims and to spend

16    it on themselves.  And that's why we're here today, because

17    when the defendant conned people out of their money, he

18    committed several crimes involving fraud.  When he and his

19    partners moved around investor money to hide that they were

20    spending it on themselves, they committed money laundering

21    crimes.  And because the defendant committed these crimes,

22    using a criminal enterprise, a group of people and companies he

23    controlled, he committed a racketeering offense, a RICO

24    conspiracy.

25           Ladies and gentlemen, in this opening statement, I'm

O5O1GUO1                    Opening - Mr. Fergenson

going to tell you what the evidence at this trial will show and
how the government is going to prove it——prove beyond a
reasonable doubt that the defendant is guilty.

So first, what will the evidence show?  For years the
defendant deceived thousands of people and stole their money to
pay for a lifestyle he could no longer afford.  You see, the
defendant used to be a wealthy real estate developer in China.
But he left China and came to the United States.  Eventually
the defendant spoke out against China's government, the Chinese
Communist Party, or the CCP for short.  He began giving
interviews and broadcasting his own videos.

And he didn't talk just about the CCP.  The defendant
also talked about how rich he was.  He showed off his
$70 million apartment on Central Park, or his $30 million
yacht.

And the defendant's mix of showing off wealth and
criticizing the CCP was popular.  He became an internet
celebrity in the Chinese community.  He had thousands of
followers.  And you're going to learn that the CCP didn't like
this, that the CCP tried to silence the defendant, even tried
to have him brought back to China.  And you'll learn that the
governments of China and Hong Kong seized the defendant's
assets shortly before the schemes began.  So the defendant
needed money.

Now you're going to learn that the defendant pitched

O5O1GUO1                          Opening - Mr. Fergenson

1    many different investment schemes to his victims, but each one

2    was just a new spin on the same simple fraud.  The defendant

3    told his followers that their money would be used for an

4    investment, and they could not lose any money.  And instead,

5    the defendant stole the victims' money and spent it on himself.

6    He did that through four main schemes——GTV; the farm loans;

7    G/CLUBS; and the Himalaya Exchange.  I'm going to talk about

8    each of those schemes in turn.

9         So the first business that the defendant raised money

10   for was GTV.  What was GTV?  It was an online media company

11   with a website and an app that had the defendant's videos, his

12   broadcasts on it.  What did the defendant tell his followers

13   about GTV?  He told them it was their special opportunity to

14   get rich without any risk.  In 2020, the defendant announced,

15   in his online broadcast, that he would let his followers buy

16   GTV stock.  The defendant told his followers that investing in

17   GTV had no risk.  He told them he would personally pay back any

18   losses.  He told them that investing in GTV could only make

19   them money.  These were lies.  And the defendant even lied

20   about the most basic part of the GTV investment——that the money

21   raised from GTV investors would be used for GTV, to grow the

22   business of GTV.  Even that basic promise was a lie.

23        But the defendant's followers trusted him, and money

24   poured in.  In months, victims invested over $400 million in

25   GTV.

1          What did the defendant actually do with that money?

2     Almost immediately, just days after the fundraising for GTV

3     closed, the defendant took $100 million of GTV investor money

4     and used it for a high-risk investment on behalf of his son.

5     He essentially made a bet using $100 million of GTV investor

6     money, sent it to a hedge fund for an extremely risky

7     investment.  This bet wasn't even made on behalf of GTV; it was

8     made in the name of a company owned by the defendant's son.

9     And guess what?  The hedge fund bet didn't pay out.  This hedge

10    fund bet lost $30 million.  The defendant told GTV investors

11    that he would personally guarantee their money and pay back any

12    losses.  Did he pay back the $30 million loss?  No.  That was

13    just a lie.

14         What was GTV?  It was one way that Miles Guo lied to

15    take other people's money.  But it wasn't the only way.

16    There's GTV and then the farm loan scheme.

17         Now farms, these farms didn't have anything to do with

18    farming or agriculture.  The defendant used the word "farms" to

19    refer to online groups of his followers in different cities or

20    countries.  And the farm loan scheme was just a way to continue

21    the GTV scheme.  You see, almost right away, US regulators

22    began investigating what GTV was doing.  Funds were frozen, and

23    GTV's bank accounts were shut down.  But the defendant, he

24    didn't stop.  Instead, in his broadcasts, the defendant blamed

25    these problems on the Chinese government.  He claimed that

O5O1GUO1                    Opening - Mr. Fergenson

victims who were complaining about their money being stolen
were traitors and CCP spies.

          And the defendant told his followers they could still
buy GTV stock; they just couldn't call it stock.  Instead,
investors could use "loans" that would be organized through the
farms.  You see, each farm opened bank accounts that were used
to collect and pool money from farm members, the investors.
The defendant told his followers that to get GTV stock, they
could enter a "loan agreement" with a farm and send their money
to that farm.  He said the farm would then enter a loan
agreement with GTV, and after a few years, the defendant's
followers, the farm members, could choose whether to get GTV
stock or cash.  But that was another lie.  The defendant and
his money launderer stole the farm loan money for themselves,
and the victims got nothing.

          GTV, then the farm loan scheme.  What were the farm
loans?  They were another way that Miles Guo lied to take other
people's money.

          The next scam was G/CLUBS.  Now G/CLUBS was supposedly
a high-end lifestyle membership club, but really, it was
another way for the defendant to sell stock without calling it
stock.  The defendant told his followers that by paying
G/CLUBS' initial membership fee, they would get stock in GTV or
G Fashion, the defendant's clothing company.  How much was the
initial membership fee?  The initial fee started at $10,000 and

O5O1GUO1                          Opening - Mr. Fergenson

1    went up to $50,000 on the high end.  Thousands of the

2    defendant's followers paid this fee, sending G/CLUBS hundreds

3    of millions of dollars and expecting to receive stock in

4    return.  But G/CLUBS members did not get stock.  That was

5    another lie.

6             Did members get anything for their membership costing

7    tens of thousands of dollars?  The main thing they got was a

8    discount at G Fashion, which sold expensive clothing to the

9    defendant's followers, like an $800 pair of sweatpants.  You

10   could get 10 percent off that price if you paid $10,000 for a

11   G/CLUBS membership.  And while G/CLUBS members did not get

12   stock or any benefit worth tens of thousands of dollars, the

13   defendant spent the G/CLUBS membership money on himself and his

14   family.

15            GTV, farm loans, G/CLUBS.  What was G/CLUBS?  It was

16   another way that Miles Guo lied to take other people's money.

17            Now the defendant didn't just pitch stock to his

18   followers; he also pitched a pair of cryptocurrencies sold on

19   the Himalaya Exchange.  At first he called them G Coin and G

20   Dollar, then they became H Coin and H Dollar——H Coin for

21   Himalaya Coin, H Dollar for Himalaya Dollar.  These

22   cryptocurrencies were another scam.  In his broadcast, the

23   defendant told his typical lies about this cryptocurrency,

24   guaranteeing investors would not lose money.  He told his

25   followers that H Coin was backed 20 percent by gold.  Ladies

O5O1GUO1                    Opening - Mr. Fergenson

1     and gentlemen, H Coin was not backed by gold.

2             The defendant tricked his followers into buying H Coin

3     and H Dollar because he wanted more money.  You see, the only

4     place you could buy H Coin or H Dollar was a supposed

5     cryptocurrency exchange called the Himalaya Exchange.  But the

6     Himalaya Exchange was run by the defendant's money launderer;

7     same one who helped him steal the farm loan money.  You're

8     going to learn that when the defendant was in a bind and needed

9     money, the defendant's money launderer sent $37 million of

10    Himalaya Exchange money—-real dollars, not H dollars——to get

11    the defendant out of the bind he was in.  $37 million of money

12    that victims sent to the Himalaya Exchange used for his

13    benefit.

14            GTV, farm loans, G/CLUBS, the Himalaya Exchange.

15            What was the Himalaya Exchange?  It was one more way

16    that Miles Guo lied to take other people's money.

17            These four schemes were really just different versions

18    of the same con, where the defendant tricked people out of

19    their money so he could spend it on himself and his family.

20    And he did it for greed.  He used investor money to pay for a

21    luxury yacht, for private jets, to buy luxury cars, a

22    Lamborghini that cost nearly a million dollars, a Bugatti that

23    cost $4 million, a $4 million Ferrari for his son, a second

24    luxury yacht, a 50,000-square-foot mansion that he paid

25    millions more to renovate for himself and his family, and to

O5O1GUO1                    Opening - Mr. Fergenson

1    buy things like a $35,000 mattress, and a $60,000 TV.  And the

2    victims, the investors whose funds were stolen by the defendant

3    to fund these spending sprees?  They got nothing.  They just

4    lost money——money they had saved, money they had borrowed,

5    their family money, money they thought was safe.  And he just

6    stole it.

7            MS. SHROFF:  Your Honor, objection.

8            THE COURT:  Overruled.

9            MS. SHROFF:  This is opening statement.

10           THE COURT:  Overruled.

11           MR. FERGENSON:  That's what the evidence is going to

12   show.

13           Now how is the government going to prove it, prove to

14   you that the defendant is guilty?  You're going to see and hear

15   several different types of evidence.  You will hear the

16   defendant's own words.  You will see the defendant lie on video

17   over and over.  You'll see him lie and say that his victims

18   can't lose money, that he would pay back any losses, that he

19   would never spend investor money on himself.  And you'll hear

20   him lie about what he did with investor money, saying that he

21   has not touched even a penny of it, and admitting that if he

22   did, it would be a crime.

23           You'll also hear what the defendant and his

24   co-conspirators said on phone calls when they didn't know they

25   were being recorded by a concerned employee.  You will hear the

O5O1GUO1                         Opening - Mr. Fergenson

1  defendant order his co-conspirators to transfer $100 million of

2  investor money that he later used to buy his mansion.  And

3  you're going to see records related to each of the four main

4  frauds, about how the investor money was supposed to be used,

5  and then you'll see records showing how it was actually used,

6  bank records showing how the defendant and his co-conspirators

7  used dozens of shell companies and hundreds of bank accounts to

8  conceal the fact they were spending investor money on

9  themselves.

10         You'll see the GTV investment document that says GTV

11  investor money would be used to grow GTV's business, and then

12  you'll see the records showing $100 million of GTV investor

13  money going instead to a hedge fund bet for the defendant's

14  son.

15         You'll see the farm loan contracts given to victims,

16  pieces of paper that were ultimately worth nothing to them.

17  You'll see the bank records showing that farm loan money was

18  just stolen.

19         And you'll see photographs of the things the defendant

20  bought with G/CLUBS membership money, all while promising in

21  his recorded broadcast that G/CLUBS memberships were a way to

22  invest in GTV or G Fashion.  You'll see photographs of the

23  G/CLUBS Lamborghini that was parked in the defendant's garage,

24  at his Connecticut home; photographs of the defendant's mansion

25  in New Jersey, paid for with G/CLUBS money.  You'll see

O5O1GUO1                    Opening - Mr. Fergenson

1   photographs of the defendant's custom Italian suits hanging in

2   his bedroom closet at that mansion.

3        You'll see the bank records showing the $37 million

4   transfer of Himalaya Exchange money for the defendant's

5   personal benefit, all while the defendant told investors in

6   recorded broadcasts that he had no ownership in the Himalaya

7   Exchange and that H Coin and H Dollar money was secure.

8        Now you'll also hear the testimony of witnesses.  You

9   will hear from people who used to work for and used to trust

10  the defendant.  You'll hear from former employees of the

11  defendant's G businesses.  They will tell you that the

12  defendant and his co-conspirators ran and controlled those

13  businesses, and made the decisions about how money was spent

14  and where it was transferred.

15       Now some of these former employees are testifying

16  pursuant to what's called non-prosecution agreements, in which

17  the government has agreed not to prosecute them in exchange for

18  their testifying at this trial.  So you should listen carefully

19  to the testimony of these witnesses.  When you do, you'll see

20  it's consistent with all the other evidence in the case.

21       Ladies and gentlemen, you will also hear from victims

22  of the defendant's fraud, people who were drawn into Miles

23  Guo's online world, people who trusted Miles Guo, who believed

24  the lies he told them, and who lost money, sometimes their life

25  savings, as a result, people who eventually realized they were

O5O1GUO1                         Opening - Ms. Shroff

1    being scammed.

2              Now the evidence, it's not going to come in all at

3    once.  You'll see it witness by witness, document by document,

4    one piece at a time.  But at the end of this trial, after

5    you've heard the testimony and you've seen the evidence, you

6    will see the full picture.  This man conned thousands of

7    investors and stole $1 billion.

8              At the end of the trial, we'll have a chance to speak

9    with you again.  Between now and then, I'm going to ask you

10   just to do three things——first, pay close attention to the

11   evidence; second, follow Judge Torres's instructions on the

12   law; and third, use your common sense——the same common sense

13   and good judgment that you use every day in your lives as New

14   Yorkers.  If you do those three things, you will reach the only

15   verdict that is consistent with the evidence and the law——the

16   defendant is guilty.

17             THE COURT:  Now we will have the opening statement on

18   behalf of the defendant, Mr. Guo, by Ms. Sabrina Shroff.

19             MS. SHROFF:  Thank you, your Honor.

20             Good morning, ladies and gentlemen of the jury.  It

21   was not a bet.  It was not a scheme.  It was not a con.  It was

22   none of those things.  And the reason we are here today is not

23   because the government brought an indictment; the reason we are

24   here today is because Mr. Guo has pleaded not guilty to the

25   indictment, and the evidence in this case will show——all of the

1    evidence——the witnesses that they bring in, as government

2    counsel noted, one by one, the documents that come in one by

3    one, will lead you to only one conclusion, and the conclusion

4    is that Mr. Guo is not guilty of the 12 counts brought in this

5    indictment.

6          I am here to tell you why there is no conspiracy, RICO

7    or otherwise, and there is no enterprise.  Mr. Guo is not

8    guilty of the charges in this indictment.

9          Before I do that, and before I speak more to what the

10   evidence will show in this case, please allow me to introduce

11   myself.  My name is Sabrina Shroff.  And I, along with my

12   colleagues, represent Miles Guo.

13         Miles Guo is one of eight children who started life

14   with very little, born and raised in China, and that is in fact

15   where he and his brothers and his family made a fortune in real

16   estate.  The evidence in this case will show that the fortune

17   was humungous.  And yes, the government would like you to draw

18   many, many negative inferences from a person who, according to

19   them, spent thousands of dollars on a TV or on a mattress.  I

20   ask you please, when you consider the evidence, consider the

21   evidence within the context and not to be drawn in by the

22   government's invitation to make judgment calls about people who

23   have money and spend it in a way that you and I simply

24   wouldn't.

25         So let's talk about what the evidence in this case

1    will show.  The evidence in this case will show how Miles Guo,

2    filled with a determination to accomplish a goal, he had a

3    goal, and how he worked on that goal over a period of years,

4    and the goal was to establish, to set up, to form, and to move

5    forward a movement——a movement that would allow the people of

6    China, the Chinese people, to know that there was an

7    alternative, an alternative to the Chinese Communist Party, and

8    how the Chinese Communist Party could be removed so that

9    everybody could live in a way that they chose to live.

10         Mr. Guo, the evidence will show, did not have criminal

11   intent, and when the evidence in this case is complete, you

12   will see that what the government is trying to string together

13   is not just a group of people to try and prove to you an

14   existence of a conspiracy that really doesn't exist, but also

15   asking you to make value judgments about how money is made and

16   how money is spent.

17         So let me start where the government had started.  Let

18   me talk about what the government spent the majority of the

19   time today, and what the government will spend a majority of

20   the time throughout this case on, the one person they ask you

21   to convict——Miles Guo.

22         He was raised in China, one of eight boys, and each

23   one of them grew up from nothing and made a fortune in real

24   estate.  The real estate fortune of the eight brothers in China

25   was not just worth millions, it was worth hundreds and hundreds

O5O1GUO1                    Opening - Ms. Shroff

1    of millions of dollars.  And you will hear that despite this

2    incredible success, financial fortune that he had in China,

3    Mr. Guo left China and came eventually and settled down in New

4    York.  And you will ask yourself and the evidence will show why

5    Mr. Guo left China.  He left China because he'd taken on the

6    CCP, the Chinese Communist Party, and they were not pleased

7    with him at all.  The Chinese Communist Party also had a goal,

8    and they were very determined to make sure their goal was met.

9    Their goal was to make sure Miles Guo stopped speaking about

10   the CCP.

11           Now you've heard from government counsel earlier

12   today, and he has certainly invited you to make moral

13   judgments, value judgments, all sorts of judgments, but what he

14   has asked you to do at his core, he's asked you to receive from

15   him almost a fiat that Mr. Guo lied.  He wants you to accept

16   that Mr. Guo lied so that people would give him money and then

17   wants you to accept that the only thing he did with that money

18   is spent it on himself and his family.  That is not this case,

19   and that is not true.

20           You are going to hear that, like almost every one of

21   us, there's more than one aspect to Miles Guo, and some of the

22   aspects and some of the things you will hear during the

23   testimony in this case will be both surprising and eye opening.

24   So when you evaluate the evidence that comes in through the

25   witnesses, when you think about Miles Guo's story, when you

1    think about who Miles Guo is, I ask you, keep in mind and

2    conceptualize the world that he lived in because it is not our

3    world.  Our world is not filled with surveillance, constant

4    harassment, and constant oversight and disruption by the

5    Chinese Communist Party.

6         You will hear testimony in this case from government

7    witnesses that Mr. Guo was forced to leave China.  He was

8    forced to leave behind his wife and his daughter.  Both were

9    arrested and detained in prisons in China for almost two years.

10        You will learn and you will have evidence that shows

11   you that once Mr. Guo got to New York, instead of focusing on

12   all the negatives that were before him and all the hurdles he

13   had to face, what he did is, he started to and continued over

14   time to speak out against the Chinese Communist party, and that

15   is what he did all the time, all day long.  That was his goal,

16   to get that story out.  And repeatedly he said——and you will

17   hear it through the trial——that the people of China are not the

18   Communist party.  That is what he wanted to tell the people

19   that were here in the United States and the good-thinking

20   people that he had to leave behind in China.

21        What is it that he set out to do?  He set out to start

22   a movement and tell the truth about the CCP.  And with that, he

23   started to speak, he started to write, and he started to

24   broadcast, and soon that came to be known amongst those who

25   believed him and amongst those who followed him to be the

1   Whistleblower Movement.

2            And what did he talk about?  He talked about things

3   that he knew.  He knew of the corruption in the CCP, and that's

4   what he talked about.  He knew certain secrets of corrupt

5   government officials, and that's what he talked about,

6   specifically.  What else did he know?  He knew the many ways in

7   which the CCP worked, and he knew of the many, many ways that

8   the CCP could make one's life hell, and one's professional life

9   and one's business life and one's personal life.

10           Now once Mr. Guo started talking about the CCP, the

11   reaction to it was immediate and strong, and the reaction

12   wasn't just from the people who were enthralled by what he had

13   to say.  There was another reaction too.  There was a reaction

14   by the CCP, the Chinese Communist Party, and they too had a

15   goal.  Their goal was to make sure that he stopped.

16           So you see that most vividly when Mr. Guo, and the

17   evidence will show, had a broadcast on April of 2017,

18   April 19th of 2017, when he starts and gives a live interview

19   on Voice of America.  In face of relentless bullying by the CCP

20   to stop, to be quiet, Mr. Guo decided to have a live-feed

21   interview on April 19th.  The interview was, and his goal was,

22   to broadcast in an uncensored, live manner so that nobody could

23   doctor what he had to say.  And what happened to this live

24   interview?  While he's still speaking, in mid-speech, the feed

25   is cut off, the line is cut off, and the interview is stopped.

O5O1GUO1                    Opening - Ms. Shroff

1    There is no warning.  There is no notice.  All of a sudden, all

2    of the work he had put in to make sure this interview goes

3    through, it's cut off.  And what happens after that?  What

4    happens after that also gives you a context about the world in

5    which Mr. Guo has to live and do business.

6          Immediately after the April 19th interview, the

7    Chinese Communist Party issues what is called a red notice.

8    That is——a red notice is a warrant through the Interpol,

9    seeking Mr. Guo's immediate arrest and extradition back to

10   China.

11         After that interview with Voice of America, his wife

12   and his daughter are arrested in China by the Chinese police.

13   He loses all access to social media.  His YouTube account is

14   cut off.  His Twitter is cut off.  And he has no access

15   whatsoever to any methodology by which he can get his word out.

16         What else do they cut off access to?  They cut off

17   access to any method by which he could get himself or his

18   businesses any help.  The CCP hacked his phones.  Every

19   cellphone he has, they hacked.  They hacked his computers——his

20   home computers and his work computers.  They even hacked the

21   home and work computers of other people who are either

22   assisting him or doing business with him.  And this pattern of

23   harassment by the CCP——and the evidence will show all of this

24   pattern——escalates and becomes more and more sophisticated.

25         So let me give you an example of how sophisticated

1    this harassment can get.

2            At one point the CCP is so determined to shut down any

3    and every bank account that the CCP starts to send money into

4    these accounts in the names of people who are on the OFAC list.

5    The OFAC list is a list set by the United States government

6    that lists the names of people who have engaged in criminal

7    conduct and are not allowed to use our banking system.  The CCP

8    uses those names to send in money, triggers a reaction from the

9    compliance people in the bank, the bank shuts down all of his

10   accounts, because the monies being wired, they think, are in

11   the name of known criminals on the OFAC list.

12           You will hear all of this evidence from the government

13   witnesses, and you will know that the CCP has a thousand

14   different ways to mess with Miles Guo and to try and stop the

15   political movement that was really the essence of his entire

16   being.

17           The evidence will show why Mr. Guo continued,

18   continued in this movement, and why he endeavored to overcome

19   each and every one of these hurdles.  He was determined to make

20   sure the movement survived, and he wanted to make sure others

21   who wanted to join the movement were able to do so.

22           So what did Mr. Guo do?  He set up the Rule of Law

23   Foundation and he set up the Rule of Law Society.  He dedicated

24   both those entities to make sure that they provided people with

25   support to fight the propaganda given by the CCP.  To give

1    voice to the movement, he created a social media company.  The
2    government lawyer has spoken endlessly about it.  GTV.  What
3    was GTV?  GTV was a real company set up to spread the message
4    of the Whistleblower Movement.  The point of GTV was to get an
5    uncensored voice out, not to just the people of Chinese beliefs
6    and systems who lived in the United States, but also the many,
7    many people who were left behind in China, who also wanted to
8    be part of that movement.  And that is what GTV offered them.
9    Yes, GTV was the first of multiple business opportunities that
10   aimed to spread the voice of the Whistleblower Movement.
11   Mr. Guo participated in GTV, the farm loan program, G/CLUBS,
12   and the Himalaya Exchange, and its currencies, H Coin and H
13   Dollar.  These businesses were at the heart of the movement,
14   and the government is simply wrong when it argues that they
15   were not real businesses.  The evidence in this trial will show
16   that GTV was, unlike many, many others, a citizen-based
17   journalism website.  It allowed for people to speak openly and
18   talk to each other without repercussions from the CCP.
19          The farm loan program.  The farm loan program, the
20   evidence will show, not what this prosecutor has just told you,
21   but it will show that the farm loan program was a way for
22   people to give their money at an interest rate to support the
23   movement—the movement that they were interested in.  And it
24   was a way for people to earn money from these loans.  I remind
25   you, keep an eye on the time frame when all of this happened.

O5O1GUO1                         Opening - Ms. Shroff

1    United States and most of the world is in the midst of a

2    pandemic, and people are eager to interact with each other

3    online.

4            What was G/CLUBS?  G/CLUBS was what the government

5    lawyer here mocks whether or not one should spend X amount of

6    dollars on a sweatshirt or sweatpants——I think he said

7    sweatpants.  That is a person's choice, and that is exactly

8    what China didn't want people to have and what the movement did

9    want people to have——choice.  You want to spend your money that

10   way, that is entirely up to you.  And what did G/CLUBS

11   membership allow?  It allowed a person, if they wanted, to

12   support the movement, at whatever price they wanted to support

13   it.  If you wanted to support it at the $10,000 level, you

14   could, and if you wanted to support it at the $50,000 level,

15   you could.  The evidence will show——and I ask you, when the

16   evidence comes in, do not take that invitation to make a moral

17   or value judgment on what and how people should spend their

18   money.  The question is, does the evidence show the existence

19   of real companies, the existence of real employees, the

20   existence of people who did actual, real good work, the

21   existence of people who dealt with the same problems you and I

22   deal with at our jobs, trying to do the best job we can because

23   we're chosen by people and bosses, because we have talent,

24   expertise, and hard work, and those are the people that worked

25   in each one of these companies.

1          There is no denying at all that all of these entities

2    were built around Mr. Guo's celebrity.  Yes.  And he was the

3    one who started speaking as early as 2017 and continued

4    speaking against the CCP.

5          You know what else the evidence will show?  That not

6    just other people were the ones who invested.  Mr. Guo's

7    friends invested, Mr. Guo's family members invested.  Why?

8    Because they too—they too believed in the movement.  So they

9    invested.  They invested in GTV, they invested in the farm,

10   they invested in G/CLUBS, and they invested on the Himalaya

11   Exchange.  They believed.  The evidence will show that these

12   companies were built, were put together, just like any other

13   business; maybe not with the same level of infrastructure, but

14   people believed.  And Mr. Guo, like many, many of us, had a

15   vision, had an idea.  What he did not quite have is the

16   infrastructure that you and I bring to our daily lives.  When

17   he first started, he spoke very little or no English.  He was

18   new to this country.  He wasn't familiar with the way things

19   are done.  And yes, you will hear recordings in which he speaks

20   in a demanding voice, one instant, for work to get completed,

21   and at some times even appears to be extremely pigheaded in a

22   way that many a person is.  Does that mean he's a criminal?

23   No.  Does that mean he committed these crimes?  The evidence

24   will show it does not.  What the evidence, again, will show is

25   that the people who he hired were people who were able to

O5O1GUO1                    Opening - Ms. Shroff

1    contribute to each one of these businesses.

2            Now the government, I suppose, will spend some amount

3    of time introducing evidence about two individuals, Yvette Wang

4    and William Je, and I ask you, as you hear the evidence the

5    government puts in, to pay some and close attention to what

6    roles each one of these people played.  The testimony will show

7    that Ms. Wang was the head of operations.  She ran the

8    day-to-day of each business.  She was in charge of hiring.  She

9    did the best to hire people, and her hiring practices were the

10   same as yours or mine.  She hired people that she met along the

11   way in her business, she hired people through a headhunter when

12   she needed a person or a spot filled.  And she was no more or

13   no less committed and no more or no less demanding than any

14   other chief executive officer that works.

15           William Je is another name that the evidence will

16   show, and William Je was the finance guy.  He's a well-regarded

17   investment banker who had managed the fortune not just of the

18   Guo family fund but he had managed the fortunes of many another

19   companies.  He had expertise, he had skill, and that is why he

20   was the finance guy.

21           And I've already talked at length about Mr. Guo, who

22   was the ideas man.  He came up with the ideas and he put

23   together the thought and the vision of what the movement that

24   he believed in would look like.

25           So you see, he wasn't alone in the movement.  He

1    wasn't moving all on his own.  In fact, that's why it was

2    called the Whistleblower Movement.  The point of it was to have

3    others join and participate.

4            So what will the evidence show at the end of the day?

5    The evidence will show that each one of these companies hired

6    and had people working towards the existence of a real

7    business.  They believed and Mr. Guo believed.  Mr. Guo

8    believed in this movement.  So when the government lawyer asks

9    you and tells you to believe that Mr. Guo defrauded the members

10   of this movement, what the government is saying to you is that

11   he intentionally misled supporters to steal money, the same

12   money that they had given to the movement, the movement that he

13   had devoted almost his entire life to, the movement for which

14   he fled China, the movement for which he put up with being

15   followed every day, the movement for which his phones were

16   hacked, the movement for which his wife and his daughter sat in

17   prison for two years, and the movement for which he was not

18   allowed to leave and travel outside the United States, the

19   movement for which he risked his very existence.  That's what

20   they're saying he set out to harm.  They're saying that he set

21   out to harm the very thing that was almost an extension, a

22   symbiotic extension of who he was.  And he did all of that even

23   though he had a fortune from a family fund that allowed him to

24   live in luxury.  What the government is asking you to believe

25   is not just illogical; it defies common sense.

O5O1GUO1                        Opening - Ms. Shroff

1          I ask you to consider this.  All of the evidence that

2     the government lawyer talked about——the wealth, the millions of

3     dollars' worth of luxury hotel in Manhattan where he lived, the

4     yacht, the mattress, whatever it is that he talked about——you

5     know what the evidence is going to show?  The evidence is going

6     to show that no matter what else these witnesses say to you,

7     Mr. Guo had that lifestyle long before the government even

8     alleges that he committed this fraud.

9          The suits, sweatpants, the house, the evidence will

10    clearly show, that has been his lifestyle for decades, well

11    before the government says he lost money and well, well before

12    any of this was even a thought in the government's mind.  And

13    it certainly continues today and continued for days after

14    because the family fund will always support Mr. Guo.

15         And I ask you to consider this, because the government

16    does invite you to make this value judgment.  It is easy for a

17    person to judge another as either shallow or rich, but shallow

18    or rich does not make for a criminal.  That does not mean that

19    the government's inference is a proper one.

20         The evidence will clearly show that Mr. Guo did not

21    need to steal money to buy the Brioni suits.  None of that

22    would be worth all of the hardship he went through to keep the

23    CCP at bay.  What the evidence will show here is that Mr. Guo

24    did not steal money from GTV, he did not steal money from the

25    farm loans program, he did not steal money from G/CLUBS, and he

O5O1GUO1                          Opening - Ms. Shroff

1    did not steal money from the Himalaya Exchange.

2              The government will also invite you to think, and

3    invite you to conclude, that the reason Mr. Guo did certain

4    things are because he was engaged in criminal activity.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5OVGUO2                          Opening - Ms. Shroff

1          MS. SHROFF:  So what else is the government going to

2    elicit in terms of evidence?  The government is going to seek

3    to elicit that Mr. Guo had constant telephones that he changed;

4    he had almost hundreds and hundreds of telephones.  And that he

5    had these telephones, and he changed his number constantly

6    because he didn't want people to know what he was doing.

7          I ask you to consider this:  If you have been the

8    target of constant hacking by the CCP, and if you have been the

9    target of people listening in on your phones, using your voice

10    recordings to impersonate you, wouldn't you also change your

11    phones that often?

12          If you were in constant fear of being threatened,

13    kidnapped, killed, moved, would you also not have a car that

14    does not tell people where and when you're going to be taken?

15    It's logical that that is what a person who is being surveilled

16    would live in that manner.  If you were Mr. Guo and you were

17    being constantly targeted, wouldn't you want a safe and secure

18    place to have business meetings?  Wouldn't you establish a base

19    where people you wanted to do business with could come and meet

20    with you without the interference and the distortion from the

21    CCP?

22          For every piece of evidence of wealth that they put

23    in, you will have an equally fair inference that he took those

24    steps not to cheat, not to indulge, but to make sure that the

25    movement survived despite the distortions of the CCP.

O5OVGUO2                       Opening - Ms. Shroff

 1              I ask you to keep in mind when they talk to you about

 2    bank accounts, Mahwah, homes, ask yourself, why would a person

 3    have to open a bank account, unless, of course, each time a

 4    bank account was owned, somebody from the OFAC list deposited

 5    money into your account and had compliance to them.  That's the

 6    reason why Mr. Guo's actions must be evaluated in the context

 7    and the lifestyle in which he was supposed to exist.

 8              So the government will introduce the evidence.  And I

 9    ask you to keep in mind that for each piece of evidence that

10    comes into them, the necessary inference from them is not the

11    accurate one.  They ask you to infer from the filing of a

12    bankruptcy that Mr. Guo simply did not have money.

13              Now, whether we think it's fair or whether we think it

14    unfair, the rich often declare bankruptcy.  Personal bankruptcy

15    does not mean poverty.  None of that inference is correct.  And

16    I ask you, when you hear evidence of that, to consider how it

17    is that Mr. Guo, who did not have any personal assets at that

18    time, because the CCP was the one that had seized his property.

19              There was a time — and you will hear evidence coming

20    in — that Mr. Guo was to pay a fine of almost $100 million

21    within a few days.  And that is what leads to a filing of

22    bankruptcy.  But the government's request that from that you

23    draw the conclusion of guilt, again, is a misplaced request.

24              The government will argue throughout this case that

25    what Mr. Guo did was simply unlawful.  They will ask you to say

1    you can be persecuted and you can still be a fraud.  And when

2    they ask you that, I ask you to think about how the evidence

3    shows them to be wrong.  The government isn't just saying that

4    there is a fraud.  What the government is asking you to do is

5    to conclude that Mr. Guo defrauded essentially himself because

6    he is the movement, and the movement him.

7        So when they ask you to take a look at the evidence

8    that comes in — the evidence of wealth, the evidence of

9    spending, the evidence of luxury — I ask you to evaluate all of

10   that evidence in the context which I have described.  And if

11   you do so, and if you evaluate the evidence, understanding how

12   difficult it was for these entities to survive, and how each

13   one of the people who worked for these entities worked hard to

14   maintain and forward a movement, you will reach the only

15   logical conclusion in this case:  That Mr. Guo is not guilty of

16   the 12 counts of the indictment.  Thank you.

17        THE COURT:  Members of the jury, I want to remind you

18   about our trial schedule.  Every day, every weekday, you'll be

19   entering the courtroom at 9:30 in the morning.  By 9 o'clock,

20   you'll have a light breakfast available to you, so you can come

21   early.  But you must be ready to enter the courtroom at 9:30.

22        So, in general, we'll take a half-hour break between

23   11:30 and 12; and I will also have a light lunch for you.  And

24   then we'll go until 2:45.  By condensing the schedule this way,

25   I don't take up your entire day until 5 p.m.  I'm very aware

O5OVGUO2

 1   that you have other important things to do during the day, and

 2   so that is why I've designed the schedule in this way.

 3             So at this time we will take our half-of-an-hour

 4   break.

 5             (Jury not present)

 6             THE COURT:  You may be seated.  Counsel, is there

 7   anything before we return in half of an hour?

 8             MR. FERGENSON:  No, your Honor.

 9             THE COURT:  You're ready with your first witness?

10             MR. FERGENSON:  Yes, your Honor.

11             MR. KAMARAJU:  Not from the defense, your Honor.

12             THE COURT:  All righty.

13             (Luncheon recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O5OVGUO2

```
 1                    A F T E R N O O N   S E S S I O N

 2                         12:10 P.M.

 3           (At sidebar)

 4           THE COURT:  I have a note from Juror No. 192.  I don't

 5   remember his number, his actual number on the jury.

 6           MR. KAMARAJU:  It makes sense that he's an alternate.

 7           MR. BARKAN:  192 is Alternate 5, your Honor.

 8           THE COURT:  Okay.  Alternate 5.

 9           To the Honorable A. Torres:

10           I am profoundly disappointed that my excuse for

11   dismissal wasn't granted.  My request began with I am a working

12   single father.  My child will have field trips, Father's Day,

13   tea ceremony, and graduation.  And I will now not be able to

14   attend.  When school ends on June 18th, I will not be able to

15   take her to camp.  My family is far away and not able to assist

16   regularly.  I am a widower.  My wife passed away in childbirth.

17   So being able to something my child is very important.

18           I've just learned about the need to gather at a

19   location at an agreed-upon time.  I dropped my child off at 8

20   a.m.  Any adjustments brought in will cost me, my family, and

21   job gravely, not to mention thousands of dollars.  I did not

22   detail my work position and how I am required to be at my job.

23   I thought my reasonable request based on my home and living

24   situation would have been sufficient.

25           To the attorneys, I appreciate the confidence you have
```

O5OVGUO2

1    in my selection.  You have royally screwed me over.

2              Juror No. 192.

3              MS. SHROFF:  He's the gentlemen who served on Judge

4    McMahon's jury.  I think he said that when he was being voir

5    dired.

6              THE COURT:  What would you like me to do?

7              MS. SHROFF:  I say we let him go.  We have six; we can

8    live with five.

9              MR. FINKEL:  So, your Honor, the government is fine

10   with five alternates.  However, we defer to the Court on the

11   appropriateness on how to deliver the message.  And the

12   government's concern would be sending a message to the rest of

13   the jury that merely sending a letter to the Court would allow

14   them to be excused from service.

15             The government has no objection to proceeding with

16   five alternates; and just ask the Court to use its discretion

17   and its experience on how to -- the timing of how to deliver

18   the message.

19             THE COURT:  So I am also told that the jurors are not

20   pleased with the arrangement that they meet at a pick-up point

21   and be taken by car to the courthouse.  XXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXwhich I think is acceptable.

24             MR. KAMARAJU:  Fine with us, your Honor.

25             THE COURT:  So this juror, Alternate No. 5, does not

O5OVGUO2

1    know about that offered alternative yet.  I could always bring

2    him in and ask him if that change would make it acceptable to

3    him, see what he says.

4            MS. SHROFF:  We leave it up to the Court, if the Court

5    wants to ask him.  But he seems royally, as he puts it, pissed

6    off.  So my inclination would be to let him go.  But perhaps

7    the Court could consider if we just let him sit through the day

8    and then we let him know just not to come on Monday, and then

9    assume that -- either tell the jury that, you know, this is the

10   new pool and provide no explanation, so that they don't think

11   somebody got away with something.

12           THE COURT:  I definitely will have him sit through the

13   day, and I will speak with him after we're finished for the

14   day.  Okay.

15           MR. FINKEL:  Your Honor, one application before we

16   leave.  Just that the location where the jurors are going to

17   meet be sealed in public record for the reasons that the

18   government stated in its motion, and that the location where

19   the jurors are going to meet not be shared with the defendant.

20           THE COURT:  I think that that is totally appropriate.

21           MS. SHROFF:  We don't even know where they were going

22   to meet, so we have nothing to share.

23           THE COURT:  Okay.  So those items will be sealed.

24           MR. FINKEL:  Thank you, your Honor.

25           (Continued on next page)

1              (In open court)

2              THE COURT:  Would you have the jurors return to the

3    courtroom please.

4              (Jury present)

5              THE COURT:  Please be seated.

6              Will the government call its first witness.

7              MR. FINKEL:  Yes, your Honor.

8              The government calls Erin McNamara.

9     ERIN McNAMARA,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12             THE COURT:  Please state your name and spell it.

13             THE WITNESS:  Erin, E-R-I-N; McNamara,

14    M-C-N-A-M-A-R-A.

15             THE COURT:  Please draw the microphone towards you.

16    You can bend it if you like.

17             You may inquire.

18             MR. FINKEL:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. FINKEL:

21    Q.  Good afternoon.

22    A.  Good afternoon.

23    Q.  Where do you work?

24    A.  I'm a special agent with the FBI in the New Haven field

25    office.

O5OVGUO2                          McNamara - Direct

1    Q.  How long have you been with the FBI?

2    A.  26 years.

3    Q.  What, if anything, did you do before you were an FBI agent?

4    A.  I was an auto underwriter with State Farm.

5    Q.  Special Agent McNamara, what is ERT?

6    A.  It's an evidence response team.

7    Q.  Can you please describe to the members of the jury what the

8    evidence response team does.

9    A.  Sure.  Evidence response teams, they are bureau-wide.  They

10   are people who are additionally trained in crime scene

11   management and forensic evidence collection.

12   Q.  Special Agent McNamara, what role, if any, do you have with

13   ERT?

14   A.  I'm the senior team leader for the New Haven team.

15   Q.  What is a search warrant?

16   A.  A search warrant is a document that's obtained from a

17   judge, usually an investigator gets it.  It explains what it is

18   that you are allowed to search and what it is that you are

19   allowed to search for and seize.

20   Q.  Special Agent McNamara, I want to direct your attention to

21   March 15th, 2023.  In connection with your role at ERT, what,

22   if anything, did you do that day?

23   A.  We executed a search warrant at 373 Taconic Road in

24   Greenwich, Connecticut.

25   Q.  What sort of neighborhood is Greenwich, Connecticut?

O5OVGUO2                          McNamara - Direct

1    A.   It's a very affluent neighborhood.

2    Q.   How would you describe 373 Taconic Road?

3    A.   It's beautiful, beautiful mansion.  Very large, beautiful

4    yard, pool, tennis courts.  And I believe it even bordered a

5    golf course.

6              MR. FINKEL:  Ms. Loftus, we can display for the

7    witness what's been marked for identification as GX 133.

8    Q.   Special Agent McNamara, what is GX 133?

9    A.   That's an aerial view of 373 Taconic Road in Greenwich.

10   Q.   Is that a fair and accurate photograph of 373 Taconic Road

11   in Greenwich?

12   A.   Yes.

13             MR. FINKEL:  Government offers 133.

14             THE COURT:  No objection?

15             MS. SHROFF:  No, your Honor.

16             THE COURT:  Admitted.

17             (Government's Exhibit 133 received in evidence)

18             MR. FINKEL:  If we could publish it, please,

19   Ms. Loftus.

20   Q.   Special Agent McNamara, was the weather the day that you

21   were at 373 Taconic the same as what we see on the screen?

22   A.   No, there was snow on the ground.

23   Q.   Approximately what time did you arrive at 373 Taconic on

24   March 15th?

25   A.   Around 7 a.m.

O5OVGUO2                          McNamara - Direct

1   Q.  And when you arrived, did the FBI have a search warrant?

2   A.  Yes.

3   Q.  For what?

4   A.  For 373 Taconic Road and its grounds.

5   Q.  Did the FBI have an arrest warrant that day?

6   A.  Yes.

7   Q.  For who?

8   A.  Miles Guo.

9   Q.  Was Miles Guo present at 373 Taconic?

10  A.  No.

11  Q.  Were there individuals besides FBI personnel present at 373

12  Taconic?

13  A.  Yes, there were three residents.  There were an older

14  female, a younger female, and a male.  And my understanding was

15  it was the wife, daughter, and the daughter's boyfriend.

16  Q.  Wife, daughter, and daughter's boyfriend of whom?

17  A.  Of Mr. Guo.

18  Q.  What were their names?

19          MS. SHROFF:  Objection.

20          THE COURT:  Overruled.  You may state that.  You may

21  answer.

22  A.  The daughter was Mei --

23          MS. SHROFF:  May we approach for a moment, please?

24          THE COURT:  All right.

25          MS. SHROFF:  Thank you.

O5OVGUO2                          McNamara - Direct

1              (At sidebar)

2              MS. SHROFF:  Your Honor, the daughter's name is

3      immaterial.  She has been the subject of a lot of online and

4      offline harassment.  She's not even in court today because she

5      does not want to be identified.  She has made no court

6      appearances, even though she's dedicated to her father, because

7      she is constantly harangued.

8              We have not once raised an objection to their

9      witnesses names not being disclosed.  And there is no relevance

10     to what her name is.  It's not pertinent at all to any

11     questioning here.  Her name could be Sonia Gandhi, for all I

12     care, but her real name does not need to be used.

13             MR. FINKEL:  It is pertinent because her name is on

14     documents, as is the name of the wife, as is the name of the

15     daughters, boyfriend or fiancé.

16             In addition, I should note it is relevant here.

17     Ms. Shroff opened on the fact of the wife and the daughter and

18     their relationship with him.  Her name is on documents.  We

19     need to explain who she is.  It's relevant.

20             THE COURT:  The harassers already know her name.

21             MS. SHROFF:  She's not here in court.  She didn't come

22     to court to support her father because she's being harassed,

23     your Honor.  And I did not refer to her by name in my opening

24     for a specific reason, which is obvious why I didn't use the

25     wife's name and the daughter's name.  And I think the record

O5OVGUO2                          McNamara - Direct

1   speaks for itself on that point.

2           THE COURT:  So the fact that these names are on

3   documents makes her name relevant.  But also, the Chinese

4   Communist Party jailed the wife and daughter.  I'm sure they

5   know the name, plus a lot of other information.

6           The objection is overruled.

7           MS. SHROFF:  Your Honor, it's not the Chinese

8   Communist Party, it's quote/unquote victims.

9           THE COURT:  Overruled, Ms. Shroff.

10          MS. SHROFF:  Thank you.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5OVGUO2                          McNamara - Direct

1            (In open court)

2            THE COURT:  You may answer.

3    A.   The daughter was Mei, M-E-I; Guo, G U O.  The mother, I

4    only recall her last name was Ngok, N-G-O-K.  And the male, it

5    was Cao, C-A-O.

6    Q.   Do you remember the male's first name?

7    A.   I do not.

8            MR. FINKEL:  Ms. Loftus, if we can display for the

9    witness 3514-48.  If you can please go to page 2 of that.

10           Actually, your Honor, may I approach?

11           THE COURT:  You may.

12   Q.   Special Agent McNamara, can you look at your screen towards

13   the bottom.  And the question is whether that refreshes your

14   recollection as to the daughter's boyfriend's first name?

15   A.   Yes.

16           MR. FINKEL:  Ms. Loftus, can you bring that down,

17   please.

18   Q.   Special Agent McNamara, what is the daughter's boyfriend's

19   first name?

20   A.   Defeng, D-E-F-E-N-G.

21   Q.   Special Agent McNamara, what was your role with respect to

22   the search at 373 Taconic?

23   A.   I was a coordinator.  I made sure we had the materials we

24   needed, assignments as to who would photograph, answer

25   questions; just sort of made sure that the search kept moving

1   and that everything was completed.

2   Q.  And what were the sort of items that the team was looking

3   for?

4   A.  Electronics like cell phones, computers, business records,

5   financial records, photographs, things of that nature.

6   Q.  By the way, Special Agent McNamara, aside from your

7   involvement in this search on March 15th, were you involved in

8   the investigation concerning Miles Guo?

9   A.  No.

10   Q.  If you were not involved in the Miles Guo investigation,

11   can you explain to the members of the jury why, if at all, you

12   were participating in a search that day?

13   A.  Sure.  It was a request by New York.  They had multiple

14   search warrants, so they needed assistance conducting this one.

15   And since it's in Greenwich, it's in our territory in

16   Connecticut, so they asked us for assistance.  They asked us to

17   provide people and supplies and things that were needed to

18   conduct the search.

19   Q.  Does that happen somewhat commonly within the FBI?

20   A.  Yes.

21        MR. FINKEL:  Your Honor, at this time I'd like to read

22   a stipulation to the parties.

23        THE COURT:  Go ahead.

24        Before you read the stipulation though, I'd like to

25   let the jurors know what a stipulation is.

O5OVGUO2                         McNamara - Direct

1           A stipulation is an agreement between both sides to

2   present evidence to the jury without calling a witness for the

3   purpose of discussing the subject matter.

4           Go ahead.

5           MR. FINKEL:  It is hereby stipulated and agreed by the

6   United States of America and Miles Guo, the defendant:

7           If called as a witness at trial, a special agent of

8   the Federal Bureau of Investigation, FBI, would testify as

9   follows:

10          On March 15, 2023, special agents and other FBI

11  employees executed a judicially authorized search of 373

12  Taconic Road, Greenwich, Connecticut.  During the course of

13  that search, FBI personnel took photographs of exterior and

14  interior spaces of 373 Taconic Road, Greenwich, Connecticut,

15  and also lawfully seized documents and electronic devices.

16          Government Exhibits GX CT-20 through GX CT-30, GX

17  CT-35 through GX CT-72, GX CT-74 through GX CT-105 are fair and

18  accurate photographs of interior and exterior spaces of 373

19  Taconic Road, Greenwich, Connecticut, that were lawfully

20  captured by an FBI photographer on March 15, 2023, when

21  conducting the search.

22          Following the March 15, 2023 search, FBI personnel

23  scanned and photographed documents that were lawfully seized

24  during the search.  GX CT-101 through GX CT-129, GX CT-157

25  through GX CT-187, GX CT-190 through GX CT-202, and GX CT-204

O5OVGUO2                          McNamara - Direct

1    through GX CT-207 are true and correct copies of documents that

2    were seized during the March 15, 2023 search of 373 Taconic

3    Road, Greenwich, Connecticut.

4              It is further stipulated and agreed that this

5    stipulation, which is GX STIP-1, may be received into evidence

6    as a government exhibit at trial.  And it's signed by the

7    parties.

8              With that, your Honor, the government offers GX

9    STIP-1.

10             THE COURT:  It is admitted.

11             (Government's Exhibit STIP-1 received in evidence)

12             MR. FINKEL:  And the government offers GX CT-20

13   through GX CT-30, GX CT-35 through 72, GX CT-74 through 105, GX

14   CT-101 through 129, GX CT-157 through 187, GX CT-190 through

15   202, and GX CT-204 through 207.

16             THE COURT:  They are admitted.

17             (Government's Exhibits CT-20 through CT-30, CT-35

18   through 72, CT-74 through 105, CT-101 through 129, CT-157

19   through 187, CT-190 through 202, CT-204 through 207 received in

20   evidence)

21             MR. FINKEL:  Thank you.

22   BY MR. FINKEL:

23   Q.  Special Agent McNamara, did you see every aspect of 373

24   Taconic on March 15, 2023?

25   A.  I did not.

O5OVGUO2                              McNamara - Direct

1   Q.  How long did the search take?

2   A.  Just under four hours.

3        MR. FINKEL:  We can please display what's in evidence

4   as Government Exhibit GX CT-87.

5   Q.  Special Agent McNamara, what is the jury looking at in GX

6   CT-87?

7   A.  That's an exterior photo of 373 Taconic Road.

8        MR. FINKEL:  If we can pull up, please, Ms. Loftus, GX

9   CT-25.  It's not on your screen?  If you can publish that,

10  please, Ms. Loftus.  It wasn't published.  Thank you.  Sorry

11  about that.

12  Q.  Special Agent McNamara, what is GX CT-25?

13  A.  That's another exterior photo of 373 Taconic Road, the rear

14  of the house.

15       MR. FINKEL:  Ms. Loftus, if we can please publish GX

16  CT-91.

17  Q.  Special Agent McNamara, what is GX CT-91?

18  A.  This is a side of the house, the side with the two garages.

19  Q.  Did there come a time during the search of 373 Taconic when

20  you entered the garages that we're looking at in GX CT-91?

21  A.  Yes.

22  Q.  Which garage?

23  A.  Both.

24  Q.  What, if anything, were in the garages?

25  A.  In the garage to the right in the photo as you're looking

1    at it was a red Lamborghini.

2                MR. FINKEL:  If you can please display GX CT-95.

3    Q.  Special Agent McNamara, is this the garage that you went

4    inside and saw the red Lamborghini?

5    A.  Yes.

6                MR. FINKEL:  If we can please display GX CT-38.

7                Sorry.  It looks like our computer froze.  Bear with

8    us.  Apologies.

9    Q.  While we're waiting for the computer to wake up, which

10   happens, sorry, Special Agent McNamara, what, if anything,

11   happened to the Lamborghini on March 15, 2023?

12   A.  It was seized.

13   Q.  And was that pursuant to a warrant?

14   A.  A seizure warrant, yes.

15   Q.  And was the FBI able to locate the keys to the Lamborghini?

16   A.  Yes.

17   Q.  And where were they?

18   A.  Inside the house.

19   Q.  Did you see the keys that day?

20   A.  I did.

21   Q.  Special Agent McNamara, what is a VIN number?

22   A.  It's a vehicle identification number.  It's a number that's

23   unique to each vehicle.

24               MR. FINKEL:  If we can please display GX CT-42.

25   Q.  Special Agent McNamara, approximately how many FBI

O5OVGUO2                         McNamara - Direct

1   personnel participated in the search?

2   A.  Around 40.

3   Q.  And did you walk from one side of the home to the other?

4   A.  I did not -- no, not on every floor no, I did not.

5   Q.  On any of the floors did you?

6   A.  The first floor.

7   Q.  How long did it take to get from one side to the other?

8   A.  I don't know.  I was stopped multiple times from one end to

9   the other.

10           MR. FINKEL:  If we can please display, Ms. Loftus, GX

11  CT-41.

12  Q.  Special Agent McNamara, did the 373 Taconic appear to be a

13  home that was lived in?

14  A.  Yes.

15  Q.  Why was that?

16  A.  There were clothes, shoes, food, toiletries, dogs.  They

17  had two dogs.  Dog beds.

18           MR. FINKEL:  Just going to wait for our computer to

19  cooperate so we can continue.

20  Q.  All right.  Special Agent McNamara, what are we looking at

21  in GX CT-41?

22  A.  That's the VIN number on the Lamborghini in the garage.

23  Q.  Does ERT have any practices or procedures with respect to

24  VIN numbers on cars?

25  A.  Yes, we always photo the VIN number because it's a unique

O5OVGUO2                          McNamara - Direct

1   identifier, like a serial number on a computer.

2           MR. FINKEL:  Your Honor, may I approach?

3           THE COURT:  You may.

4           MR. FINKEL:  I've handed the witness what's been

5   marked for identification as Government Exhibit 36.

6   Q.  Special Agent McNamara, can you look at Government Exhibit

7   36, please.

8   A.  It's keys to a Lamborghini.

9   Q.  And do those keys have any uniquely identifying marks?

10  A.  There's a partial VIN number on the tag.

11  Q.  And what is the end of the partial VIN number?

12  A.  10393.

13  Q.  Does that match the VIN number in GX CT-41?

14  A.  It does.

15          MR. FINKEL:  Government offers 36.

16          THE COURT:  It is admitted.

17          (Government's Exhibit 36 received in evidence)

18          MR. FINKEL:  Your Honor, may I publish it to the jury?

19          THE COURT:  You may.

20          MR. FINKEL:  If we can display for the witness,

21  please, Government Exhibit GX CT-209.  Just for the witness.

22  Q.  Special Agent McNamara, from where were the keys recovered?

23  A.  There was a -- it was a room, I would call it like an

24  office/security room.  There were monitors for the security

25  cameras in there.  And a desk.

O5OVGUO2                          McNamara - Direct

1          MR. FINKEL:  One moment, please.

2          MR. FINKEL:  GX CT-209, please, for the witness.

3   Q.  Special Agent McNamara what is GX CT-209?

4   A.  That's another photograph from the search.

5   Q.  Is that a fair and accurate photograph of what you saw on

6   March 15, 2023?

7   A.  Yes.

8          MR. FINKEL:  Government offers CT-209.

9          THE COURT:  It is admitted.

10          (Government's Exhibit CT-209 received in evidence)

11          MR. FINKEL:  Can you please publish that.

12          The jury can see it?  No?  Now you can.  Okay.  Great.

13   Q.  Special Agent McNamara, do you know what those flags are?

14   A.  No.

15          MR. FINKEL:  We can now please display what's in

16   evidence as Government Exhibit CT-58.

17   Q.  Special Agent McNamara, what are we looking at in GX CT-58?

18   A.  A photograph of one of the rooms in the house at 373

19   Taconic Road.

20   Q.  And what, if anything, was in that room besides what we're

21   looking at?

22   A.  Oh, cameras.  Like a video cameras.

23   Q.  Do you know why there are video cameras in there?

24   A.  No.

25          MR. FINKEL:  Please look at, Ms. Loftus, GX CT-59.

O5OVGUO2                        McNamara - Direct

1    Q.  What is GX CT-59?

2    A.  That's another photo of that room, that same room.

3         MR. FINKEL:  If we can please, Ms. Loftus, show just

4    the witness GX CT-208.  This is just for the witness, please.

5    Q.  Special Agent McNamara, what are we looking at in GX

6    CT-208?

7    A.  That's another photograph from the search.  That's what I

8    would call the living room.

9         MR. FINKEL:  Government offers GX CT-208.

10         THE COURT:  It is admitted.

11         (Government's Exhibit CT-208 received in evidence)

12         MR. FINKEL:  Publish that please, Ms. Loftus.

13         If we can please display Government Exhibit GX CT-83,

14    which is in evidence.

15    Q.  Do you know what those insignias on the clothing are?

16    A.  No.

17         MR. FINKEL:  Ms. Loftus, if we can display GX CT-80.

18    80, please.  Eight zero.  This is in evidence.

19         Jury able to see that?  No?

20         Can we publish that to the jury, please.

21    Q.  Are these some of the closets that you mentioned before?

22    A.  Yes.

23    Q.  Special Agent McNamara, you said some documents were

24    recovered that day; is that correct?

25    A.  Yes.

O5OVGUO2                              McNamara - Direct

1   Q.  Did you review the documents?

2   A.  No.

3   Q.  Did other members of the team?

4   A.  No.

5   Q.  What happened to the documents after they were collected on

6   March 15, 2023, do you know?

7   A.  They were collected, they were packaged, and they were

8   handed over to New York.

9   Q.  And the New York field office was running this

10  investigation; is that correct?

11  A.  Yes.

12          MS. SHROFF:  Objection to the leading.

13          THE COURT:  You can ask who was leading the

14  investigation.

15  BY MR. FINKEL:

16  Q.  Special Agent McNamara, which field office, if any, was

17  leading the investigation in this matter to your understanding?

18  A.  New York.

19          MR. FINKEL:  We can please display what's in evidence

20  and for the witness and the jury GX CT-201.  If you can go to

21  the second page, please.

22  Q.  Special Agent McNamara, can you read what it says at the

23  top?

24  A.  Brioni, 688 Madison Ave., New York, New York, 10065.

25  Telephone number:  212-376-5777.

O5OVGUO2                          McNamara - Direct

1    Q.   What does it say in that green cell at the top of the

2    chart?

3    A.   Invoice from Mr. Miles Kwok bespoke order.

4    Q.   Do you know what Brioni is?

5    A.   No.

6         MR. FINKEL:  If we can go to the next page please,

7    Ms. Loftus.  Page 4, rather.  Can you zoom in on that.  We can

8    go to page 5, please.  And if you can please pull up what's in

9    evidence as GX CT-205.  I'm sorry, 207.  Excuse me.

10        This should be published so the jury can see it.  If

11   we can go to the next page, please.  And can you zoom in at the

12   top please, Ms. Loftus.

13   Q.   Special Agent McNamara, can you read up to "background"?

14   A.   Execution version.  Loan agreement.  This agreement (this

15   agreement) is made on the 3rd day of June 2020, between GTV

16   Media Group, Inc. (the lender), a Delaware corporation with

17   office address at 162 East 64th Street, New York, New York,

18   10065, and Saraca Media Group Incorporated (the borrower), a

19   Delaware corporation with office address at 162 East 64th

20   Street, New York, New York, 10065.  Each a "party together"

21   parties.

22        MR. FINKEL:  Ms. Loftus, if you can go to the last

23   page of this document, please.  Can you zoom in on that.

24   Q.   And who is the authorized signatory according to this

25   document, Special Agent McNamara, for Saraca Media Group Inc.?

O5OVGUO2                            McNamara - Direct

1   A.  I'm going to mispronounce this.  Qiang, Q-I-A-N-G, Guo.

2            MR. FINKEL:  Thank you, Ms. Loftus.

3            If we can bring up, please, GX CT-198 for the parties

4   and the jury.  And if you can go to the next page of that

5   please.

6   Q.  Special Agent McNamara, can you read this document, please.

7   A.  Dear Mr. Harry Eccles-Williams, I am writing this letter to

8   request and to put into consent for the release of all my files

9   from your firm to Qiang Guo as soon as possible.  Most

10  importantly, the relationship between me and Appleby, the

11  relationship between Well Origin and Appleby.  Thank you.

12  Yours sincere, Ho Wan Kwok.

13           MR. FINKEL:  Ms. Loftus, if we can bring up, please,

14  GX CT-157 for the jury and the parties.

15           That's fine.  Right there as you have it.

16  Q.  Special Agent McNamara, can you read the top of that,

17  please.

18  A.  G talks-program.

19  Q.  Can you read down where it says 7:48 a.m.?

20  A.  Welcome by host, Limarie Reyes.

21  Q.  Who's Limarie Reyes?

22  A.  I have no idea.

23           MR. FINKEL:  We can display, please, GX CT-172.

24           That's fine, Ms. Loftus.

25  Q.  Special Agent McNamara, can you read the top of GX CT-172.

O5OVGUO2                         McNamara - Direct

1    A.  List of do-not words dash -- slash, I'm sorry, ideas.

2          MR. FINKEL:  Ms. Loftus, can you scroll down a little

3    bit.

4    Q.  Special Agent McNamara, do you see where it says "loans"?

5    A.  Yes.

6    Q.  Can you read the words that follow "loans."

7    A.  Partner or partners, growth, growth projections, venture,

8    partnership, future investment benefits, future opportunities,

9    participate/participation in business or profits, GTV, Saraca,

10   voice of Guo/voice of good (VOG), Rule of Law Foundation, Rule

11   of Law Society, Canada Himalaya, Jang Yun Fu, lewd, Yvette Wang

12   Yvette, Sarah, Mulan, SEC, investigation, litigations, golden

13   spring, regulators, DOJ.

14   Q.  What is DOJ?

15   A.  Department of Justice.

16   Q.  What is SEC?

17   A.  Securities Exchange Commission.

18          MR. FINKEL:  Ms. Loftus, if we can bring up, please,

19   GX CT-174.

20   Q.  Can you read where it says 8:20 a.m.

21   A.  Live Q&A by Mr. Miles Guo, preselected questions.

22          MR. FINKEL:  Ms. Loftus, if you can display for the

23   witness only GX CT-210.

24   Q.  Special Agent McNamara, what is GX CT-210?

25   A.  It's one of the photographs from the search.

O5OVGUO2                        McNamara - Direct

1          MR. FINKEL:  Government offers GX CT-210.

2          MS. SHROFF:  Objection, your Honor.

3          THE COURT:  If you'll step up, please.

4          MR. FINKEL:  I can lay an additional foundation.

5   Q.  How do you recognize this photograph as one of the

6   photographs from the search?

7   A.  I reviewed the photographs.

8   Q.  Okay.  Did you see this particular area of 373 Taconic on

9   the day that the search was conducted?

10  A.  I don't recollect.

11  Q.  Okay.  Does the FBI maintain photographs that are taken

12  during a search in the regular course of FBI's business?

13         MS. SHROFF:  Objection.  What the FBI generally does

14  is not relevant.

15         THE COURT:  Overruled.  You may answer.

16  A.  Yes.

17  Q.  And you said that you reviewed the photographs from the

18  search.  Can you explain what you mean by that?

19         MS. SHROFF:  Objection to the leading.

20         THE COURT:  Overruled.  You may continue.

21  A.  So we had -- we maintained a copy of photographs from the

22  search.  When I was asked to come here, I reviewed this to

23  refresh my memory of the search.

24  Q.  And the photographs that were part of the search, are they

25  maintained in FBI's records and kept that way?

O5OVGUO2                          McNamara - Direct

1    A.   Yes.

2              MS. SHROFF:   Objection.   She has no personal

3    knowledge.

4              THE COURT:   Step up.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5OVGUO2                         McNamara - Direct

1          (At sidebar)

2          THE COURT:  So she is familiar with the photographs

3     from the search.

4          MR. FINKEL:  So, your Honor, she was the team lead and

5     she's familiar with the ERT, including its recordkeeping

6     practices.  For one, I think she recognizes parts of the

7     photograph, but that's neither here nor there.  She can lay an

8     803(6) foundation as a photograph that was taken at the search.

9     She knows it was stored with the other photographs of the

10    search.

11         I'll lay that foundation that it was taken by someone

12    with knowledge of the matter at the time it occurred and kept

13    in the course of the FBI's business.

14         It's one photograph.  We can lay the foundation.

15         MS. SHROFF:  The government knows full well it has a

16    problem here.  They asked me this morning to stipulate to it

17    coming into evidence and I declined because they are unable to

18    lay a foundation.  The fact that --

19         THE COURT:  What is wanting in the foundation?

20         MS. SHROFF:  Your Honor, number one, she didn't take

21    the photograph; number two, she didn't view the evidence;

22    number three, she didn't view that particular scene; number

23    four, the only reason she's table to testify this way is

24    because of the government giving her the photos that they took

25    from other members of the FBI team and showed it to her.

1          She has zero personal knowledge of this particular

2     photograph.  And nothing about a photograph being in an FBI

3     file falls under the exception of a business record.  Either

4     she has personal knowledge of this or she doesn't, and clearly

5     she doesn't, your Honor.

6          Additionally --

7          THE COURT:  Isn't this kept in the regular course of

8     business?

9          MS. SHROFF:  It doesn't fall within that exception,

10    because the exception is supposed to capture something that is,

11    one, a business record, which this is not; this is evidence

12    gathering.  And documents gathered by the FBI are by definition

13    self-serving because they are prepared in the course of a

14    litigation.  But they do not technically fall within the

15    business records exception.

16          Number two, the way this photograph is taken, it is

17    not a photograph of a scene that is in the home.  So what

18    they've done is they've gone through the entire house, pulled

19    out all the sunglasses, laid them on a table, and then taken a

20    photograph.  You can see that clearly from the photograph and

21    from the cases that are stacked up next to them.

22          So this particular person did not do the underlying

23    search for the sunglasses, did not place the sunglasses there,

24    and she has zero personal knowledge of any of this.

25          THE COURT:  But the photograph was taken during the

O5OVGUO2                          McNamara - Direct

1    course of the search.

2              MS. SHROFF:  She wouldn't know that.  It could have

3    been this search, it could have been another search, it could

4    have been a search before that.  She doesn't know when this

5    photograph was taken.

6              MR. FINKEL:  If I may just make a few points.

7              First of all, if necessary, we can bring another

8    person to simply authenticate one photograph.  The parties have

9    worked quite well in good faith on stipulating authenticity,

10   suddenly that changed this morning.

11             Number one, I believe if I ask the witness, Do you

12   recognize any components of this photograph, she will say:  I

13   know the door and that was from the room.

14             A witness does not have to be the one to take a

15   photograph to get it into evidence.  The witness does not have

16   to be the one to move things around if that's, in fact, what

17   happened to get it into evidence.  If Ms. Shroff wants to cross

18   her on how the sunglasses were arranged, if that is, in fact,

19   correct, I don't know, she can do that.  It's just an

20   admissibility question.

21             THE COURT:  So she may be able to testify as to the

22   door, but she certainly can't testify as to the rest of the

23   room and how these sunglasses were positioned.

24             MS. SHROFF:  We would have no objection --

25             MR. FINKEL:  Excuse me.

O5OVGUO2                          McNamara - Direct

1           MS. SHROFF:  -- to the photo of the door.

2           MR. FINKEL:  Excuse me.

3           That would be appropriate cross.

4           This goes to the weight of the document.  Excuse me.

5    This goes to the weight of the document, not to admissibility.

6    In either case, I can lay an 803(6) foundation.  She's familiar

7    with the case file and she's familiar with how the records are

8    stored.  That's one photograph.  I'll just leave it at that.

9           THE COURT:  So she can identify the room, but she

10   cannot identify these objects.

11          MR. FINKEL:  Okay.  So I'll lay an 803(6) foundation.

12          THE COURT:  Okay.

13          MS. SHROFF:  Your Honor?

14          THE COURT:  We're done.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. FINKEL:

3    Q.  Special Agent McNamara, when a search is conducted by the

4    FBI, what happens to the photographer's photos?

5    A.  The photographer brings the -- takes the SD card out of the

6    camera, places it into a tower.  It's not a computer, it's a

7    tower where you just burn -- you can do like four copies at a

8    time.  So that they place that in there.  We burn the copies.

9              The first copy is the original, and that goes into

10   original envelope of -- original evidence envelope, a 1A

11   envelope we call it.  It gets attached to the file.

12             The second is the backup copy; that also gets put into

13   the file.

14             The third copy is one we would send to the case agent

15   for a working copy so they wouldn't have to go and remove those

16   physically from the file to review it.

17             And if there were items that were being sent to the

18   lab, we would also burn a copy to send with those items to the

19   lab for review.

20             THE COURT:  I'd like you to get closer to the

21   microphone.  You can bring it closer, you can sit closer.  And

22   speak up.

23   Q.  And the copies of photographs, which field office, if any,

24   were they sent to?

25   A.  New York.

O5OVGUO2                          McNamara - Direct

1              MR. FINKEL:  We can please display, Ms. Loftus,

2       Government Exhibit GX CT-129.  This is in evidence.  And if we

3       can please go to page 17.  I just want to make sure it's

4       published for the jury.  If you can zoom in just for the top

5       half, please, Ms. Loftus.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5O1GUO3                           McNamara - Direct

1    BY MR. FINKEL:

2    Q.  Can you read that, please, Special Agent McNamara.

3    A.  "Declaration of Trust and Agreement.  The Declaration of

4    Trust and Agreement (this Trust and Agreement) is made on

5    December blank 2020, between Qiang Guo, the beneficiary, an

6    individual holding Cyprus passport number blank, residing at

7    blank, London, United Kingdom, and Kin Min Je, the Trustee, an

8    individual holding Hong Kong passport No. KJ0168411, residing

9    at 87 Balmoral House, Earls Way, London, United Kingdom, each a

10   party, together parties."

11   Q.  And you can continue reading, please.

12   A.  "Background.  The Trustee agrees to hold the shares of the

13   following companies (each, the company, together, the

14   companies) registered in the name of the Trustee for and on

15   behalf of the Beneficiary:  (1) Himalaya Currency Clearing Pty.

16   Ltd., a company registered in Australia with the company number

17   642418684; (2) Himalaya Reserves Pty. Ltd., a company

18   registered in Australia with company number 642487232,

19   Himalaya——sorry; (3) Himalaya Currency——I think it's Party——I'm

20   sorry——Ltd., a company registered in Australia, with company

21   number 643817449; (4) Major Lead International, Ltd., a company

22   registered in British Virgin Islands with company number

23   1976621."

24         MR. FINKEL:  Can you zoom in, please, Ms. Loftus.

25   Q.  Can you read No. 3, please, Special Agent McNamara.

O5O1GUO3                       McNamara - Direct

1           MR. FINKEL:  Ms. Loftus, if you can zoom in on No. 3.

2    A.  "The Trustee further covenants with the beneficiary: (3.1)

3    to keep the company at all times solvent unless instructed

4    otherwise by the beneficiary, and to comply with all applicable

5    rules and regulations that the company requires; (3.2) to keep

6    the company active on the——on the relevant registry at all

7    times, and pay on time all applicable fees which will be

8    reimbursed by the beneficiary; (3.3) not to assign or part with

9    possession of the company to any third party without the prior

10   written approval of the beneficiary."

11          MR. FINKEL:  Ms. Loftus, you can zoom out of that,

12   please, and go to the next page.

13          And the next page, please.

14   Q.  And can you read the sign names, next to where it says

15   Signed.

16   A.  Signed by Qiang Guo.  Signed by Kin Min Je.  Witnessed by

17   blank.

18          MR. FINKEL:  Thank you.  Ms. Loftus, you can take that

19   down.

20          Just one moment, your Honor.

21          Can you please display, Ms. Loftus, Government Exhibit

22   GX CT176.

23   Q.  And Special Agent McNamara, can you read starting where it

24   says "Draw."

25   A.  "Draw G——I'm sorry——G Fashion items, Designer 1 Whistle,

O5O1GUO3                          McNamara - Cross

1   pants, 100, hat, 200."

2           MR. FINKEL:  If you can please go, Ms. Loftus,

3   GX CT184.

4           Next page, please.

5           Keep going.  Stop right there.

6   Q.  What sort of document is it?

7   A.  It's a vehicle title.

8   Q.  What's a vehicle title?

9   A.  It's—it's something that you have to—it's—shows your

10  ownership and it's registered with the state.

11  Q.  What's the name of the owner listed on this?

12  A.  It's Cao, C-A-O, Defeng, D-E-F-E-N-G.

13  Q.  Did you see Cao Defeng or Defeng Cao on March 15, 2023?

14  A.  Yes.

15  Q.  And what type of car is this?

16  A.  Lamborghini.

17  Q.  What's the model?

18  A.  Aventador.

19  Q.  And what is the last four digits of the VIN, or vehicle

20  identification number?

21  A.  0393.

22          MR. FINKEL:  Ms. Loftus, if you can please display

23  GX CT41.

24  Q.  What are the last four digits of this vehicle

25  identification number on the Lamborghini?

O5O1GUO3                      McNamara - Cross

1    A.  0393.

2              MR. FINKEL:  Nothing further at this time.  Thank you.

3              THE COURT:  Cross-examination?

4              MS. SHROFF:  Thank you, your Honor.

5    CROSS EXAMINATION

6    BY MS. SHROFF:

7    Q.  Good afternoon, Special Agent.

8    A.  Good afternoon.

9    Q.  Ms. McNamara, before March 15th, did you know anything

10   about Mr. Miles Guo?

11   A.  No.

12   Q.  And you prepared, I take it, right, to execute the search

13   on March 15th?

14   A.  Prepared the search supplies and things of that nature,

15   yes.

16   Q.  Right.  And you had a plan in place, correct?

17   A.  Yes.

18   Q.  And prior to executing the search, you met with or emailed

19   with the members of the team that were going to accompany you,

20   correct?

21   A.  Yes.

22   Q.  You discussed where Mr. Guo might be on March 15th,

23   correct?

24   A.  I don't believe so.

25   Q.  You did not discuss where——which one of the three homes you

O5O1GUO3                         McNamara - Cross

1   thought he might be in?

2   A.  I don't recall that.

3   Q.  Do you recall, sitting here today, on what date you started

4   preparing to execute the search?

5   A.  It was either earlier that week or late the prior week.  I

6   believe.

7   Q.  And you emailed, did you not, with other members, including

8   somebody named Robin, correct?

9   A.  I don't know who Robin is.

10  Q.  Robin Cartwright?

11  A.  Rachel Cartwright.

12  Q.  I'm sorry?

13  A.  Rachel.

14  Q.  Rachel, Robin, you emailed with her, right?

15  A.  Yes.  She's the one that requested our assistance.

16  Q.  And in emailing with her, the plan was for her to exchange

17  information with you and you to exchange information with her,

18  correct?

19  A.  Information about how we were going to conduct the search,

20  yes.

21  Q.  Right.  And you knew you were going to search a home,

22  correct?

23  A.  Yes.

24  Q.  And you knew it was a large home, correct?

25  A.  Yes.

O5O1GUO3                        McNamara - Cross

1    Q.  And you knew the home could have Mr. Guo in it, correct?

2    A.  Yes.

3    Q.  And you were planning to arrest Mr. Guo, correct?

4    A.  I was not.

5    Q.  Well, somebody on your team was going to arrest Mr. Guo,

6    correct?

7    A.  No one on my team does arrests.  We simply do searches.

8    Q.  Okay.  And you testified earlier that you didn't recall

9    whether or not you anticipated where Mr. Guo would be, so let

10   me approach with something that might refresh your

11   recollection.  That would be 3514-24.

12          Does that refresh your recollection, ma'am, that you

13   were anticipating Mr. Guo not being in the Connecticut home?

14   A.  No.

15   Q.  And it is fair to say that you interacted via email with

16   several individuals, all coordinating the search of this place,

17   right?

18   A.  Yes.

19   Q.  And that's 373——I have trouble pronouncing the

20   street——Taconic Road; is that correct?

21   A.  Yes.

22   Q.  And you wanted to go there early in the morning, correct?

23   A.  Yeah.  I did not choose the time.

24   Q.  Okay.  But in any event, you were there before 7:00; is

25   that fair to say?

O5O1GUO3                     McNamara - Cross

1   A.  No.  We arrived around 7:00.

2   Q.  And it's fair to say that the home itself is not one that

3   you had access to, correct?

4              MR. FINKEL:  Objection.

5   A.  I don't understand.

6              THE COURT:  Overruled.

7              MS. SHROFF:  I'll rephrase, your Honor.

8   Q.  You couldn't get in through the gate, right?  Your team

9   couldn't get in through the gate, correct?

10  A.  Yes, we could.  The gate was open when we arrived.

11  Q.  The gate to the home was open.

12  A.  Yes.  When my team arrived, the gate was open.

13  Q.  And how many teams preceded you?

14  A.  The——the team that was doing the entry.

15  Q.  The team that was doing the entry, correct?

16  A.  Yes.

17  Q.  And the team that was doing the entry was coordinating with

18  the team that was following, which is your team, correct?

19  A.  When——when they finished their entry and it was secured,

20  they let us know that we can then proceed to the location.

21  Q.  Right.  And did the team that was doing the entry tell you

22  that it was Mr. Guo's daughter who let them in?

23             MR. FINKEL:  Objection.

24             THE COURT:  Sustained.

25  Q.  When you——

O5O1GUO3                       McNamara - Cross

1              THE COURT:  You don't need to answer.

2   Q.  When you entered the home, did you see Mr. Guo's daughter

3   and wife seated outside on a bench?

4   A.  No.

5   Q.  When was the first time you saw Mr. Guo's daughter and wife

6   in that home?

7   A.  Inside the house.

8   Q.  Where were they seated inside the house?

9   A.  I would call it like a family room.

10  Q.  And they were put there by the——by the team that entered

11  before you, correct?

12  A.  I don't know.  I was not there.

13  Q.  You don't know because you weren't there.  And when you

14  entered the house, did you go from room to room in the home?

15  A.  When I first entered the house?

16  Q.  Yes.

17  A.  When I first entered the house, I went towards where the

18  residents were to find Supervisory Special Agent Cartwright to

19  let her know that we were there.

20  Q.  Because she was the first entry team, right?

21  A.  I don't know.

22  Q.  You don't know who the first entry team was?

23  A.  I don't know who was on the entry team.  I followed the

24  entry team.  That was not part of the search.

25  Q.  So you followed the entry team, correct, and the entry team

O5O1GUO3                        McNamara - Cross

1   told you that the location was secure, correct?

2   A.  We were at a staging location.  When the entry team told us

3   it was secure, then we drove to the residence.

4   Q.  And how many of you drove together?

5   A.  I can only speak for my team.  There were probably a dozen

6   of us or so.

7   Q.  You just said you can only speak for your team, correct?

8   A.  Right.  You asked who drove together; that's who I drove

9   with, my team.

10  Q.  Okay.  Did any members of your team take any of the

11  photographs you testified to?

12  A.  Yes.

13  Q.  Okay.  So we'll get to the photographs in a minute.  But

14  let's just stay with your entry into the home, okay?  When you

15  entered the home, it looked, as you said, like a home that was

16  lived in, correct?

17  A.  Yes.

18  Q.  There was food on the kitchen table, correct?

19  A.  There was food, yes.

20  Q.  Yes.  And there were three people in the home, correct?

21  A.  Yes.

22  Q.  And the three people were Mr. Guo's wife, correct?

23  A.  Yes.

24  Q.  His daughter, correct?

25  A.  Yes.

1  Q.  And his daughter's fiancé, correct?

2  A.  I was told boyfriend, but yes.

3  Q.  Okay.  And did you see the boyfriend who was in crutches in

4  the bedroom or did somebody tell you about that?

5  A.  I'm sorry.  Can you repeat that.

6  Q.  Sure.  During your search did you see his daughter's

7  boyfriend?

8  A.  Yes.  They were all in that room together.

9  Q.  Okay.  And he was on crutches, correct?

10 A.  Oh, crutches, yes.  I'm sorry.  I misunderstood you.

11 Q.  That's okay.  A lot of people misunderstand me.

12         But he was on crutches, right?

13 A.  Yes, he had crutches with him.

14 Q.  Right.  And there were two dogs, two small poodle-like dogs

15 in the home, correct?

16 A.  Yes.

17 Q.  And they had all been placed in that one room, correct?

18 A.  No.  I took the daughter upstairs to go get the dogs.

19 Q.  Okay.  So you took the daughter upstairs so that she could

20 retrieve the dogs, and you brought his daughter back down and

21 put her back in that room, correct?

22 A.  Correct.

23 Q.  Okay.  And you had them stay there while the rest of your

24 team searched the whole home, correct?

25 A.  Yes.

1  Q.  Okay.  You gave her a copy of the search warrant, I'm

2  assuming?

3  A.  I did not.

4  Q.  Okay.  But she didn't stand in the way of you searching the

5  home, right?

6  A.  No, she did not.

7  Q.  Neither did the boyfriend who was on crutches, correct?

8  A.  Correct.

9  Q.  And certainly the wife didn't stand in the way, correct?

10  A.  Correct.

11  Q.  His wife is about 60 years old; is that right?

12  A.  I have no idea.

13  Q.  Wasn't she nervous when you watched her?

14  A.  I didn't watch her.  I—I saw her for—briefly.  I spoke

15  with the daughter, I took her to get the dogs, brought them

16  back down, I let her know that, you know, if she needed to

17  bring them out, to feed them, it's not a problem, just let us

18  know, and then we proceeded.

19  Q.  And then you started to search the house.  You said there

20  were at least about 20 other people, correct?

21  A.  Yeah.  Oh, at least.

22  Q.  Okay.  And when you say at least, were there more than 20?

23  A.  I think we had approximately 40 people searching.

24  Q.  Okay.  So you had 40 people searching, three residents in

25  the home, right?

O5O1GUO3                         McNamara - Cross

1   A.  Yes.

2   Q.  And nobody interfered with your search.

3   A.  No.

4   Q.  Okay.  At the time that you executed the search at

5   373——that's what I'm going to call it, okay——did you know how

6   many other homes Mr. Guo had?

7   A.  No.

8   Q.  Did you know he had a home in New York City?

9   A.  I know that they were doing other warrants at the same

10  time.  I'm not sure which homes he owned or where he lived.

11  Q.  Okay.  At the time that you executed the search did you

12  know Mr. Guo to have a lawyer?

13  A.  I have no idea.

14          MR. FINKEL:  Objection.

15          THE COURT:  Overruled.

16  Q.  At the time that you went to search Mr. Guo's home, did you

17  know anything about his status in the United States?

18          MR. FINKEL:  Objection.

19          THE COURT:  If you'll step up, please.

20          (Continued on next page)

21

22

23

24

25

O5O1GUO3                        McNamara - Cross

1          (At the sidebar)

2          THE COURT:  So this is beyond the direct.

3          MS. SHROFF:  I'm happy to call her as my own witness

4     then, your Honor.  But I'm allowed to have some latitude about

5     what she knew when she executed the search warrant.  I'd be

6     happy to be more constrained, your Honor, but——

7          THE COURT:  So whether he had a lawyer, I allowed

8     that, but now going into his immigration status, I think that's

9     just going beyond.

10         MS. SHROFF:  Well, she took——she took hundreds of

11    documents from his home.  I'm entitled to ask what other

12    documents she took and what other documents he elicited

13    testimony about.

14         THE COURT:  Are there documents that relate to his

15    immigration status?

16         MR. FINKEL:  I don't know, but I understood from their

17    response to our letter the other night that his immigration

18    status is not at issue and it isn't——it's irrelevant.  And I

19    also understood from your Honor's ruling the presence of

20    lawyers is not something that the defense was going to dwell

21    on, nor should they suggest, by implying to the jury that

22    Mr. Guo had a lawyer, somehow the search was improper.  The

23    search was proper.  It was judicially authorized.

24         MS. SHROFF:  Your Honor, asking if somebody has a

25    lawyer does not imply that a search is improper, number one.

1        Number two, she recovered documents.  If they want to

2   cherry pick as to what they put in, I'm allowed to explore what

3   else was out there.  We have no interest, and, you know, the

4   immigration issue——

5        THE COURT:  You can ask whether or not there were

6   documents related to immigration status.

7        MS. SHROFF:  Right.  And that shows that a person

8   lived in their home; personal documents were in his home.

9   My——the point of my cross is to show that's his residential

10  home.  I'm not seeking to present a defense that he has an

11  immigration consequence through this conviction, which is what

12  the brief was about, so I don't know why that's being brought

13  up here.  Totally irrelevant.

14       THE COURT:  So there's no dispute as to whether or not

15  it was used as a home, is there?

16       MS. SHROFF:  Oh, yes.  Their argument is that Mahwah

17  was also a home, and I'm trying to show this was his home

18  alone, nothing that is recovered here is anywhere comparable to

19  anything recovered in Mahwah.  I am entitled to show that.

20       THE COURT:  So you're saying this is his principal

21  home?

22       MS. SHROFF:  His only residential home.

23       THE COURT:  Okay.  Well, she can bring out some

24  evidence on that issue.

25       MR. FINKEL:  Certainly.  It shouldn't suggest

O5O1GUO3                        McNamara - Cross

 1   immigration status.  Immigration status is not something that's
 2   relevant.
 3        MS. SHROFF:  We're not talking about a status.  I have
 4   a status, you have a status.  I'm an American passport holder.
 5   That's my status.  If my passport is in my home, it's more
 6   likely it's my home, it's less likely it's your home, right?
 7        MR. FINKEL:  I completely agree the passport is—
 8        THE COURT:  Sure.  But you were asking about his
 9   immigration status.
10        MS. SHROFF:  I'll move from there and ask him if she
11   found some immigration-related document or his immigration
12   paperwork, his identity card, his wallet.  I'm entitled to ask
13   all of that.
14        MR. FINKEL:  Your Honor, no objection to identity
15   card, no objection to wallet.  My objection is for 402, 403
16   reasons to immigration documents and immigration status.
17   That's not appropriate.  It's not relevant.  I have no issue
18   with them exploring personal effects that were there.  That's
19   fine.  But—
20        MS. SHROFF:  We're not arguing he's going to be
21   deported or anything like that.  We're just trying to show that
22   he had immigration paperwork at his home.
23        THE COURT:  But ask for a passport as opposed to, do
24   you know what his immigration status was.
25        MS. SHROFF:  Sure.  I'd be happy to rephrase.

O5O1GUO3                        McNamara - Cross

1           THE COURT:  Thank you.

2           (In open court)

3           THE COURT:  Objection is overruled.

4    BY MS. SHROFF:

5    Q.  Agent McNamara, how many hours did you spend searching the

6    home?

7    A.  None.  I didn't search.

8    Q.  Okay.  You simply supervised the search, correct?

9    A.  Correct, mm-hmm.

10   Q.  And you were directly supervising how many people?

11   A.  Approximately 40.

12   Q.  40 people, correct?

13   A.  Mm-hmm.

14   Q.  And 40 people were given the task of searching different

15   parts of the home, correct?

16   A.  Yes.

17   Q.  Every bedroom was searched, correct?

18   A.  Yes.

19   Q.  Every living room was searched, correct?

20   A.  Yes.

21   Q.  Closets were searched, correct?

22   A.  Yes.

23   Q.  Bathrooms were searched, correct?

24   A.  Yes.

25   Q.  Okay.  So in the closets, and it's—if I could please

O5O1GUO3                         McNamara - Cross

 1   have—actually, I rephrase that.

 2            You were shown pictures of the closet, correct?

 3   A.  Yes.

 4   Q.  And in the closet there were white shirts hanging, correct?

 5   A.  Yes.

 6   Q.  Shoes?

 7   A.  Yes.

 8   Q.  Other men's clothing, correct?

 9   A.  Yes.

10   Q.  And did you know who those clothing belonged to?

11   A.  No.

12   Q.  Did you make any effort to find out whose clothing they

13   were?

14   A.  No, that's not part of the search.

15   Q.  Okay.  And then you searched the kitchen, correct?

16   A.  Yes.

17   Q.  The kitchen was an average kitchen with kitchen-related

18   things in it, correct?

19   A.  It was a very nice kitchen with kitchen-related things in

20   it, yes.

21   Q.  Okay.  But there was food there on the counter, correct?

22   A.  There was food.  I don't recall specifically what the food

23   was.

24   Q.  Okay.  And after you searched the kitchen, you searched the

25   other rooms, correct?

O5O1GUO3                              McNamara - Cross

1    A.  I did not search.

2    Q.  Well, you testified to a lot of photographs during the

3    search, so I apologize.

4         You supervised the search where those rooms were

5    searched, correct?

6    A.  Yes, ma'am, yes.

7    Q.  Okay.  Let's take a look at the photographs of the garage,

8    shall we, so that we can talk about that red Lamborghini.

9         Did you enter the garage to look for the red

10   Lamborghini?

11   A.  I entered through the garage but not to look for the

12   Lamborghini.

13   Q.  And is it fair to say that you had emailed with your team

14   about a search warrant for that particular Lamborghini,

15   correct?

16   A.  The seizure warrant for the Lamborghini was included, yes.

17   Q.  You emailed about the seizure warrant, correct?

18   A.  I emailed the entire team, the search warrant and the

19   seizure warrant.

20   Q.  Okay.  And you had the seizure warrant for the car

21   separately discussed, right?  It was an important issue for

22   you, correct?

23            MR. FINKEL:  Objection.  Vagueness.

24            THE COURT:  What is the question?

25   Q.  Sure.  You were specifically told to look for a red

1    Lamborghini, correct?

2    A.   No.  It was——we had a seizure warrant for the Lamborghini,

3    but nobody said:  Make sure you find the Lamborghini.

4    Q.   Okay.  So there was a specific seizure warrant for the car,

5    the Lamborghini, right?

6    A.   Yes.

7    Q.   You were told it was red, correct?

8    A.   I don't recall.

9    Q.   Okay.

10   A.   I know it had the VIN number on the seizure warrant.  I

11   don't recall if it had the color.

12            MS. SHROFF:  Okay.  If I could just have 95 pulled up,

13   please.

14   Q.   And that's the car.  Did you actually view the car in this

15   state?

16   A.   I'm sorry.  I don't understand.  The state?  In

17   Connecticut, is it?

18   Q.   No.  I mean covered.

19   A.   Oh, no.

20   Q.   You didn't see it when it was covered, correct?

21   A.   No, I did not.  That's one of the entry photos.

22   Q.   Okay.  And the person who took this photo, this is how they

23   found the car, correct?

24   A.   Yes.

25   Q.   The car was covered with this black thing on the top,

O5O1GUO3                          McNamara - Cross

1   correct?

2   A.  Yes.

3   Q.  And it's plugged into——there's a wire going into the car,

4   correct?

5   A.  Yes.

6   Q.  And then the wire is plugged in, correct?

7   A.  Yeah, it looks plugged in.

8   Q.  Right.  I don't drive so I don't know, but does that mean

9   the car is charging?

10  A.  I would——I believe that's to keep the battery charged.

11  Q.  To keep the battery charged, correct?

12  A.  Yes.

13  Q.  Okay.  And this was one of many garages that was there,

14  correct?

15  A.  There were two garages.

16  Q.  Right.  And in this garage then there's somebody who's

17  obviously working out so there's some kind of workout equipment

18  on the right, correct?

19  A.  Yes.

20  Q.  And then this is usual stuff you would find in somebody's

21  home, right?

22          MR. FINKEL:  Objection as to the form.

23          THE COURT:  Overruled.  You may answer.

24  A.  Yes, it's typical items from a garage.

25  Q.  The garage wasn't locked, correct?

O5O1GUO3                         McNamara - Cross

1    A.  I don't know that.

2         MS. SHROFF:  Okay.  And then if I could have the

3    uncovered version of the car, please.

4    Q.  And that's what the car looked like, correct?

5    A.  Yes.

6    Q.  Okay.  And you see that little white thing on the hoodie

7    part?

8    A.  Yes.

9    Q.  What's that for?

10   A.  I don't know.

11   Q.  Okay.  Did you search the car at all?

12   A.  I did not.

13   Q.  Did you talk to or──talk to the person who you were

14   supervising that was searching the car?

15   A.  Yes.

16   Q.  Okay.  And did they tell you if they found a driver's

17   license in the car?

18   A.  They did not.

19   Q.  Did they tell you if they found anything related to Miles

20   Guo in the car?

21   A.  No.

22   Q.  Did they tell you they found his clothing in the car?

23   A.  No.

24   Q.  Did they tell you they found anything in the car?

25   A.  No.

O5O1GUO3                        McNamara - Cross

1             MS. SHROFF:  And let me see if I could just get those

2     keys, please.

3     Q.  This is Government Exhibit 36, correct?  You testified

4     about these keys?

5     A.  Yes.

6     Q.  Okay.  You didn't recover the keys, right?

7     A.  I did not.

8     Q.  You don't know who recovered the keys, correct?

9     A.  I——there were two searchers in that room.  I don't recall

10    which one recovered the keys.

11    Q.  Okay.  So somebody gave you the keys and here they are in

12    the courtroom, correct?

13    A.  Yes.

14    Q.  Okay.  And you testified to these keys, right?

15    A.  Yes.

16    Q.  Okay.  And you testified to them because the government

17    showed them to you when you were preparing for your testimony

18    here today, correct?

19    A.  I don't understand the question.  I'm sorry.

20    Q.  Sure.  They showed you these keys when they prepped you,

21    right?

22    A.  They showed me these keys, yes.

23    Q.  And they prepped you, right, for your testimony here today?

24    A.  Sure, yes.

25    Q.  You met with them several times, right?

1    A.  Yes.

2    Q.  You met with them this morning, correct?

3    A.  Yes.

4    Q.  Twice this morning, or once?  How many times?

5    A.  Once, I believe.

6    Q.  You believe once?

7    A.  I believe once, yes.

8    Q.  Okay.  And then they told you to come in early so that they

9    could prep you, right?

10   A.  I believe so.

11   Q.  They sent you a text?

12   A.  Text or an email.  I'm not sure.

13   Q.  All right.  Well, here, let me help you out.

14   A.  Okay.

15   Q.  Did you keep a note of how many times it is you met with

16   these prosecutors to prepare for your testimony here today?

17   A.  No.

18   Q.  Do you know if it was more than five times?

19   A.  I don't know.

20   Q.  How many times in the last two days did you meet with them;

21   do you remember?

22   A.  I don't know if I met with them yesterday.

23   Q.  Let me talk to you a little bit about these keys.

24   A.  Mm-hmm.

25   Q.  I'm going to leave them right here.

1          There's an evidence tag on those keys, correct?

2   A.   There's a tag.  I'm not sure what——what kind of tag this

3   is.

4   Q.   Okay.  But it's a tag put on by your people, right?  That

5   tag wasn't on the keys when you first——when you got the keys,

6   right?

7   A.   I have no idea who put this tag on.  They were not on the

8   keys at the time.

9   Q.   Okay.  And the keys were just exactly like the way you see

10  them in their envelope, right?

11  A.   I——I don't know.

12  Q.   You don't know if it had a keychain on it, correct?

13  A.   I don't know.

14  Q.   You don't know if it had a nametag on it, correct?

15  A.   I don't know.

16  Q.   When was the first time the prosecutor showed you those

17  keys?

18  A.   Today.

19  Q.   This morning.

20  A.   Yes.

21  Q.   Okay.  And he showed you those keys and he told you you

22  were going to testify to them, correct?

23  A.   He asked me about the keys.

24          MS. SHROFF:  Okay.  See if this refreshes your

25  recollection.

O5O1GUO3                        McNamara - Cross

1              MR. FINKEL:  Your Honor, there's no failure of

2      recollection.  Objection.

3              MS. SHROFF:  I believe she couldn't remember——

4              THE COURT:  No, she did not say she could not recall.

5      Sustained.

6      BY MS. SHROFF:

7      Q.  You testified earlier that you couldn't recall, right,

8      whether it was by email or by text that they asked you to come

9      in this morning?

10     A.  Yes.

11     Q.  Okay.  Does that refresh your recollection, ma'am?

12     A.  Yes, it looks like a text.

13     Q.  Okay.  And they texted you to come in early so they could

14     prepare you, correct?

15     A.  Yes.

16     Q.  Okay.  And you came in early 'cause you wanted to be

17     prepared for testimony here today, right?

18     A.  That, and it's two——it's two and a half hours to get here

19     from Connecticut, so I had to be here before the traffic.

20     Q.  Okay.  But you met with them, right?

21     A.  Yes.

22     Q.  Okay.  And they asked you about those keys, correct?

23     A.  Yes.

24     Q.  They asked you who recovered them and you said, I don't

25     know, correct?

O5O1GUO3                         McNamara - Cross

1   A.  Correct.

2   Q.  And they asked you where they were recovered and you said,

3   I don't know, correct?

4   A.  I know which room they were in.  I said it was the room

5   that—where it had—it's like an office and it had cam—display

6   monitors with—for the security cameras.

7   Q.  And the security, that's where you were told that the keys

8   were put, correct?

9   A.  That's where the keys were found.

10  Q.  Okay.  So the keys were not found in the garage where the

11  car was, correct?

12  A.  Correct.

13  Q.  They were not found inside the car where one would leave

14  them if they used the car every day, correct?

15          MR. FINKEL:  Objection, as to form.

16          THE COURT:  Sustained.

17  Q.  Were they found inside the car?

18  A.  No.

19          MS. SHROFF:  If you could just show her, please, and

20  the jury, No. 95.

21  Q.  Did somebody actually drive the car out of the garage when

22  they seized it?

23  A.  I don't know.

24          MS. SHROFF:  If somebody could please put up 58.

25  Q.  You testified as to this photograph, correct?

O5O1GUO3                       McNamara - Cross

1   A.  Yes.

2   Q.  And could you tell me, please——on the right side you see a

3   flag, correct?

4   A.  Yes.

5   Q.  Did you know what that flag was for?

6   A.  No.  I have no idea.

7   Q.  Was there a nametag on the flag?

8   A.  I don't know.

9   Q.  Was there a notation New Federal State of China anywhere

10  telling you about that flag?

11  A.  I don't know anything about this flag.

12  Q.  Okay.  Look on the left side of that photograph, please.

13  Do you see that big yellow——the big white round thing?

14  A.  Yes.

15  Q.  What was that?

16  A.  I don't know.

17  Q.  That's something that was used to broadcast with; is that

18  correct?

19  A.  I don't know.

20          MS. SHROFF:  Okay.  Could you zoom out, please.

21  Q.  Did you conclude that this was an office space or a working

22  space?

23  A.  It looks to me like some type of studio-type setup.

24  Q.  It looked like a recording studio, correct?

25  A.  Something like that, yes.

O5O1GUO3                        McNamara - Cross

1    Q.  It looked like a place from where someone would broadcast,

2    correct?

3    A.  Yes.

4           MS. SHROFF:  May I please have No. 59.

5    Q.  Okay.  This is a better picture, perhaps.

6           So there's recording equipment right there, correct?

7    A.  Yes.

8    Q.  There's a computer monitor, correct?

9    A.  Yes.

10   Q.  A chair?

11   A.  Yes.

12   Q.  And during your search did you try to find out if these

13   were working equipment?

14   A.  No.

15   Q.  Okay.  Thank you very much.

16          MS. SHROFF:  May I have 83, please.

17   Q.  Now you testified about certain documents that the

18   government had you read, right?

19   A.  I read them.

20   Q.  Right.  You read them out loud, the loan agreements,

21   correct?

22   A.  Yes.

23   Q.  Okay.  How much paperwork did your team recover from that

24   home?

25   A.  Printed paper?

O5O1GUO3                          McNamara - Cross

1    Q.  Yes.

2    A.  Not a lot.

3    Q.  Not a lot?

4    A.  No.

5    Q.  Okay.  There was a loan agreement that you read out loud

6    for him, correct?

7    A.  Yes.

8    Q.  Okay.  Did you know what the loan agreement was about?

9    A.  No.

10   Q.  Do you know where the loan agreement was kept?

11   A.  No.

12   Q.  Do you know who kept the loan agreement in which room?

13   A.  No.

14   Q.  Do you know if it was Mr. Guo's room?

15   A.  No.

16   Q.  Do you know if it was even in the kitchen or the toilet,

17   you have no idea where it was, right?

18   A.  We could——you could go back to the——the evidence log.

19   Q.  Do you know?

20   A.  Do I know?  No.  I did not search.

21   Q.  Okay.  And you testified and read documents that the

22   government asked you to read, correct?

23   A.  Yes.

24   Q.  You'd never read them before, correct?

25   A.  Correct.

O5O1GUO3                          McNamara - Cross

1   Q.  You didn't choose which documents to read to the jury,

2   correct?

3   A.  I did not.

4   Q.  You don't know what other documents were recovered in the

5   home 'cause you didn't do the search, correct?

6   A.  That's correct.

7   Q.  Okay.  You didn't recover Mr. Guo's wallet in there,

8   correct?

9   A.  I don't recall a wallet being found.

10  Q.  Passport?

11  A.  No.

12  Q.  Sitting here today, do you recall if there was even a

13  driver's license in his name?

14  A.  I don't know.

15  Q.  How about a learner's permit?

16  A.  No, I did not see any of that.

17  Q.  So your memory is basically limited to what the government

18  showed you to prepare you for the trial here today.

19          MR. FINKEL:  Object to form.

20          THE COURT:  You may answer.

21  A.  No.  I remember what I did when I was there.

22  Q.  Right.  But all you did was supervise, right?

23  A.  That's correct.

24  Q.  You're not the one who searched for anything at all,

25  correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5O1GUO3                        McNamara - Cross

1    A.  That's correct.

2    Q.  You recovered none of the things that you've testified to

3    today, including the keys, correct?

4    A.  That's correct.

5    Q.  You testified about a suit with the name Brioni on it,

6    correct?

7    A.  I think it was a paper, piece of paper.

8    Q.  Do you remember testifying about a hanger with the name

9    Brioni on it?

10   A.  I saw the picture.  I don't think I was asked about that.

11   Q.  Okay.  Do you know what Brioni is?

12   A.  I have no idea.

13   Q.  Do you know if there were suits recovered in that home,

14   men's suits?

15   A.  Suits were not on the list of items to be seized.  We

16   didn't take any clothing.

17   Q.  My question was in——okay.  Did you see any of the suits?

18   A.  Yes.

19   Q.  Okay.  Did you know how old they were?

20   A.  No.

21   Q.  Do you know if they were from 2010, versus 2020?

22   A.  No.

23   Q.  Do you know if they were his suits or somebody else's

24   suits?

25   A.  No.

O5O1GUO3                          McNamara - Cross

1    Q.   Now you remember reading a document from which they made

2    you read names and then you read something called Voice of Guo,

3    Voice of Good, correct?

4    A.   Yes.

5    Q.   Okay.  Do you know what that meant?

6    A.   No.

7    Q.   Do you know what Voice of Guo is?

8    A.   No.

9    Q.   Do you know what Voice of Good is?

10   A.   No.

11   Q.   Do you know what Saraca is?

12   A.   No.

13   Q.   This is the hanger I'm talking about.  You testified as to

14   this hanger, right, this photograph?

15   A.   I saw the photograph.  I——yes.

16   Q.   Right.  You never saw the hanger, though, right?

17   A.   I did not.

18   Q.   Okay.  So you're only testifying here about the photographs

19   that somebody else took and gave to you, correct?

20   A.   Yes.

21        MS. SHROFF:  Okay.  May I have, please, No. 176.

22   Q.   Okay.  You testified about this document, correct?

23   A.   Yes.

24   Q.   Mr. Finkel asked you to read it out loud and you read it

25   out loud to the jury, correct?

O5O1GUO3                          McNamara - Cross

1  A.  Correct.

2  Q.  Okay.  What does it mean Designer No. 1 Whistle?

3  A.  I have no idea.

4  Q.  Pants 100, do you know what it means?

5  A.  I do not.

6  Q.  Hat 200, do you know what it means?

7  A.  I do not.

8  Q.  Sitting here today, do you know if these pants and hats

9  were supposed to be part of a swag bag?

10 A.  No.

11 Q.  You don't know anything about what you read to the jury,

12 correct?

13 A.  That's correct.

14 Q.  All you can tell them is that there was this piece of paper

15 found by somebody in your team and they took a photograph, and

16 you recited that to the jury.

17         MR. FINKEL:  Objection as to form.

18         THE COURT:  Overruled.  You may answer.

19 A.  I apologize.  I've already forgotten the question.

20 Q.  All you know is that somebody took a photograph, they took

21 that photograph that you then looked at, the government had you

22 read out loud to this jury and you did that, correct?

23 A.  Yes.

24 Q.  Okay.  Could I have 184, please.

25         You see that yellow sticky on this exhibit that you

O5O1GUO3                          McNamara - Cross

1    testified about?

2    A.  Yes.

3    Q.  "For Matthew, new insurance cards for all four vehicles

4    effective," or "effect 4/1/20," correct?

5    A.  Yes.

6    Q.  Do you know who wrote that Post-it?

7    A.  No.

8              MS. SHROFF:  And if you scroll down, please.

9    Q.  That's the entire document, right?

10   A.  I don't know.

11   Q.  You don't know if these documents were recovered together,

12   correct?

13   A.  I don't know.

14   Q.  You don't know if they were in one place together, correct?

15   A.  I don't know.

16   Q.  You don't know who filled out the documents, correct?

17   A.  Who filled out—I don't understand, who filled out.

18   Q.  You don't know whose handwriting is anywhere on these

19   documents.

20   A.  Oh, no.

21   Q.  Somebody showed you a photograph, you're testifying about

22   the photograph, right?

23   A.  Yes.

24             MS. SHROFF:  Okay.  You can take that down.

25             If I could just have 393.

O5O1GUO3                        McNamara - Cross

1          MR. FINKEL:  I don't believe 393 is in evidence.

2          MS. SHROFF:  Okay.  174.

3     Q.  You see this document?  You also testified to this,

4     correct?

5     A.  Yes.

6     Q.  Lies told by Miles Guo.  You have no idea what date they're

7     talking about, correct?

8     A.  Correct.

9     Q.  You don't know what questions and answers this is about,

10    right?

11    A.  Right.

12    Q.  You don't know who has preselected questions or what they

13    are, right?

14    A.  Correct.

15    Q.  You just got up there and read it to the jury because he

16    told you to, right?

17    A.  That's what I was asked to do, read it.

18         MS. SHROFF:  Okay.  And could we scroll down.

19    Q.  This is the full page, right?  Do you know where it was

20    recovered from?

21    A.  No.

22         MS. SHROFF:  Okay.  You may take that down.

23         If I could have 129.

24    Q.  You testified to this document?

25    A.  I don't recall.

```
 1  Q.  Okay.  Then we can take it down.

 2          Is it fair to say, Agent McNamara, that your job was

 3  limited to receiving whatever other people in that house were

 4  looking for and giving to you?

 5          MR. FINKEL:  Object as to form.

 6          THE COURT:  I did not hear that.

 7          MR. FINKEL:  Objection as to form.

 8          THE COURT:  Overruled.  You may answer.

 9  A.  Nobody gave me anything.  I managed the search.  The

10  searchers searched, the photographers took the photographs,

11  they entered the items into our evidence list so we had a list

12  of what was taken, and they packaged it.  They didn't hand them

13  to me to do that.

14  Q.  Okay.  Fair enough.  And the search you said took four

15  hours, right?

16  A.  Approximately four hours, yes.

17  Q.  Nobody bothered you during your search, correct?

18  A.  No.

19  Q.  And then the search was complete, you left?

20  A.  Completely?

21  Q.  When the search was complete, you left, right?

22  A.  Yes.

23          MS. SHROFF:  Okay.  Thank you very much.

24          THE COURT:  Redirect?

25          MR. FINKEL:  Very briefly.
```

O5O1GUO3                        McNamara - Redirect

1    REDIRECT EXAMINATION

2    BY MR. FINKEL:

3    Q.  Special Agent McNamara, what was the role of you and your

4    team on March 15, 2023?

5    A.  To help execute the search warrant.

6    Q.  And when documents or physical items are recovered from a

7    search, what, if anything, does the FBI do to keep track of

8    where those materials come from?

9    A.  So they're seized by the seizing agent, and then it starts

10   a chain of custody.

11   Q.  And can you explain a little bit about how it's tracked

12   where particular materials are recovered from.

13              Like which room, for example.

14   A.  Oh, sure.  So when someone finds an item in a room, we send

15   the photographer, they take a photo in place.  When we do our

16   photos, we give each room a letter, so when that item is

17   recovered, we'll say, give a description of the item, say, you

18   know, cellphone serial number so and so was located in room B

19   on desk.  And then we put the people who—the two people who

20   actually found and witnessed that item.

21   Q.  And was that procedure followed on March 15, 2023?

22   A.  Yes.

23   Q.  And Special Agent McNamara, when the FBI leaves, what

24   precautions or what's the policy and procedures right before

25   leaving?  What does the FBI do?

O5O1GUO3                          McNamara - Redirect

1   A.  With the evidence?

2   Q.  The evidence and the photographs.

3   A.  Oh.  So there is a seizing agent, so there's one person

4   that takes custody of the evidence, and they start the chain of

5   custody, and they bring that evidence to the evidence room,

6   where it gets logged in and put into the case file.  The

7   photographs, like I——I believe I said earlier, the photographer

8   takes the SD card and burns it directly to disks, so we don't

9   put it in a computer first, and then we make an original copy

10  that goes into the case file, a backup of the original copy

11  into the case file, a copy for the case agent, and then, should

12  we need another copy for the lab, or for sending stuff to

13  forensics, for forensics, then we make a fourth copy.

14  Q.  Special Agent McNamara, do you know what stats FBI, the New

15  York FBI investigative team, took prior to the search on

16  March 15, 2023, with respect to this case?

17  A.  No.

18  Q.  Do you know what steps FBI——what investigative steps they

19  took after March 15th of 2023?

20  A.  No.

21  Q.  Do you know if the case agent——what's a case agent?

22  A.  It's usually——there's usually one, sometimes more, assigned

23  as the——the responsible person for that case.

24  Q.  And do you know if the case agents——are you a case agent on

25  this case?

1  A.  No.

2  Q.  Do you know if the case agents know what Saraca means?

3  A.  I have no idea.

4  Q.  Do you know if the case agents have reviewed those

5  documents?

6  A.  I don't know.

7  Q.  And discussed them with the U.S. Attorney's Office?

8  A.  I don't know.

9  Q.  Whether the case agents have gotten other search warrants?

10         MS. SHROFF:  Your Honor, the case agent isn't

11  testifying here today.

12         THE COURT:  He's asked whether she knows what the case

13  agent has done or not done.  She may answer.

14  A.  I do not know.

15  Q.  And Special Agent McNamara, aside from the search March 15,

16  2023, do you have any other involvement in this matter?

17  A.  No.

18         MR. FINKEL:  Thank you, Special Agent McNamara.

19         THE COURT:  Recross?

20         MS. SHROFF:  Very briefly.

21  RECROSS EXAMINATION

22  BY MS. SHROFF:

23  Q.  You took every precaution to make sure that the evidence

24  was properly documented, correct?

25  A.  Yes.

O5O1GUO3                         McNamara - Recross

1   Q.  And you made sure to take photographs of the evidence,

2   correct?

3   A.  Yes.

4   Q.  Or had the photographs taken, correct?

5   A.  Yes.

6   Q.  And then you made sure those photographs were properly kept

7   in a file, correct?

8   A.  Yes.

9   Q.  And after taking all of those steps, when you reviewed the

10  evidence, there was nothing with a singular name tied to that

11  Lamborghini that involved Miles Guo, correct?

12          MR. FINKEL:  Objection.

13          THE COURT:  If you know the answer, you may answer.

14  A.  I do not know.

15  Q.  There was not a single title to the Lamborghini in Miles

16  Guo's name, correct?

17  A.  I don't know.

18  Q.  You read the title, didn't you?

19  A.  I read that title.  I don't know if there were other

20  titles.  I don't know.

21  Q.  So you are only──your knowledge for this jury is only

22  limited to what he told you to testify about.

23  A.  No.

24  Q.  Well, you tell me.  If you know more and you took all these

25  detailed steps, could you tell this jury if you recovered any

O5O1GUO3                        McNamara - Redirect

1   singular document linking the Lamborghini to Miles Guo?

2   A.  I do not know.

3   Q.  You didn't find anything linking the cars to the

4   Lamborghini to Miles Guo.

5   A.  The cars to the Lambor——

6   Q.  The keys.

7   A.  Oh, the keys.  I thought you said cars.  No.

8   Q.  And nothing in the car, not a single piece of clothing, not

9   a driver's license, linked that car to Miles Guo, correct?

10  A.  Not that I'm aware of.

11  Q.  Well, you can only testify to what you're aware of, ma'am.

12  A.  Right.

13  Q.  That's a no.  The answer is no?  Is the answer no?

14  A.  I've forgotten the question now.

15  Q.  There is nothing that you found linking that Lamborghini to

16  Miles Guo, correct?

17  A.  Nothing of the search of 373, correct.

18  Q.  That's where the car was, correct?

19  A.  Yes.

20  Q.  Thank you.

21          MR. FINKEL:  One question.

22          THE COURT:  Re-redirect?

23  REDIRECT EXAMINATION

24  BY MR. FINKEL:

25  Q.  Special Agent McNamara, do you know if the FBI New York

1    team has a video, or recovered a video of Miles Guo driving the

2    Lamborghini that was found at 373 Taconic on March 15, 2023?

3    A.  I do not know.

4            MR. FINKEL:  Nothing further.

5            THE COURT:  Re-recross?

6    RECROSS EXAMINATION

7    BY MS. SHROFF:

8    Q.  Driving a car doesn't mean you own a car, correct?  As a

9    Special Agent you'd be able to testify to that, right?

10   A.  Yes.

11           MS. SHROFF:  Thank you.

12           THE COURT:  Thank you.  You may step out.  And the

13   government may call its next witness.

14           (Witness excused)

15           MS. MURRAY:  Thank you, your Honor.  The government

16   calls Louie Bonsukan.

17           THE LAW CLERK:  Please raise your right hand.

18           (Witness sworn)

19           THE COURT:  Please state your name and spell it.

20           THE WITNESS:  My name is Louie Bonsukan.  It's

21   L-O-U-I-E, last name, Bonsukan, B-O-N-S-U-K-A-N.

22           THE COURT:  You may inquire.

23           MS. MURRAY:  Thank you, your Honor.

24

25

1    LOUIE BONSUKAN,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. MURRAY:

6    Q.  Good afternoon, Mr. Bonsukan.

7    A.  Hello.

8    Q.  What kind of work do you do?

9    A.  I'm the finance director for Lamborghini Dallas.

10   Q.  And what are your duties and responsibilities as the

11   finance director at Lamborghini Dallas?

12   A.  I help facilitate the paperwork on a sale of a vehicle.

13   Q.  How long have you worked at Lamborghini Dallas?

14   A.  A little over 13 years.

15   Q.  Approximately how many Lamborghinis does Lamborghini Dallas

16   sell in a given month, on average?

17   A.  Probably an average of 35 cars a month.

18   Q.  I'd like to direct your attention to September of 2021.

19   Were you involved with the sale of a Lamborghini in that month

20   to a customer known as G/CLUBS?

21   A.  Yes.

22   Q.  What was your role in that sale?

23   A.  I helped facilitate the paperwork on that sale with the

24   customer.

25        MS. MURRAY:  Ms. Loftus, if you could please show the

O5O1GUO3                          Bonsukan - Direct

1    witness what's been marked as Government Exhibit BR460.  And

2    scroll through page 2 and beyond.

3    Q.  Mr. Bonsukan, do you recognize Government Exhibit BR460?

4    A.  Yes.

5    Q.  Have you reviewed this exhibit before?

6    A.  Yes.

7    Q.  Generally speaking, what is in Government Exhibit BR460?

8    A.  It's a motor vehicle buyer's order.  It basically shows the

9    sale of the vehicle and who sold it.

10          MS. MURRAY:  And just scrolling through a couple of

11   the other pages of this exhibit, Ms. Loftus.

12   Q.  At a high level, Mr. Bonsukan, are these business records

13   of Lamborghini Dallas?

14   A.  Yes.

15   Q.  Are you familiar with these types of documents?

16   A.  Yes.

17   Q.  Fair to say it's a regular part of your business to receive

18   and maintain these documents?

19   A.  Yes.

20          MS. MURRAY:  Your Honor, the government offers

21   Government Exhibit BR460.

22          MS. SHROFF:  We have no objection, your Honor.

23          THE COURT:  It is admitted.

24          (Government's Exhibit BR460 received in evidence)

25          MS. MURRAY:  Ms. Loftus, can you please publish

O5O1GUO3                        Bonsukan - Direct

1    page 2.

2                THE COURT:  And Mr. Bonsukan, if you would raise your

3    voice and speak into the microphone.

4                THE WITNESS:  Yes, ma'am.  Yes, your Honor.

5                MS. MURRAY:  And if we could zoom in on the top

6    portion, please, Ms. Loftus.

7    BY MS. MURRAY:

8    Q.  All right.  Mr. Bonsukan, this is one of the business

9    records of Lamborghini Dallas.  What is this particular

10   document?

11   A.  The motor vehicle buyer's order.

12   Q.  And looking on the left, who was the seller for this

13   particular car?

14   A.  Lamborghini Dallas.

15   Q.  And the buyer?

16   A.  The buyer is G Club International Ltd.

17   Q.  What is the date of this buyer's order?

18   A.  September 13, 2021.

19   Q.  I want to look now on the left, the Description of Sale

20   Unit.  Can you describe for the jury what type of Lamborghini

21   this was.

22   A.  It's a Lamborghini Aventador SVJ Roadster.

23   Q.  Looking to the right, what color was that Lamborghini

24   Aventador?

25   A.  It's red.

O5O1GUO3                     Bonsukan - Direct

1  Q.  And there's a field call Stock No., or stock number.  What

2  information is reflected there?

3  A.  The stock number is a number that we give a——as a

4  dealership to a particular vehicle that we're selling rather

5  than using a VIN number.

6  Q.  So you mentioned VIN number.  What's a VIN number?

7  A.  The vehicle identification number, which identifies the

8  vehicle.

9  Q.  Looking a bit further down on Description of Sale Unit, is

10  there a VIN number listed here for this particular Lamborghini?

11  A.  Yes.

12  Q.  And what are the last three digits of that VIN number?

13  A.  Last three is 393.

14  Q.  What year was this Lamborghini?

15  A.  2021.

16       MS. MURRAY:  Ms. Loftus, if we could zoom out and then

17  zoom in on the box on the right, Price of Unit, down to the

18  bottom, please.

19  Q.  Mr. Bonsukan, at the top, what is the price of this

20  particular Lamborghini?

21  A.  $829,999.

22  Q.  And then looking down toward the bottom, what is the total

23  price when you add in taxes and fees?

24  A.  $832,075.

25  Q.  Sorry.  Could you read that amount again, please, sir.

1    A.   $832,000.75.

2    Q.   Thank you.

3             MS. MURRAY:  And Ms. Loftus, if we could go to the

4    bottom of this page where there's a signature line, please.

5    Q.   Mr. Bonsukan, do you recognize the seller's signature here?

6    A.   Yes, that's mine.

7    Q.   And what was the date that you signed this particular

8    contract of sale?

9    A.   September 13, 2021.

10            MS. MURRAY:  We can take that down, Ms. Loftus.

11            And let's pull up what's in evidence as Government

12   Exhibits CT38, 37, and 40.

13   Q.   Mr. Bonsukan, starting here on the left, top left, with

14   Government Exhibit CT38, do you recognize the car depicted in

15   this photograph?

16   A.   Yes, that's a Lamborghini Aventador.

17   Q.   And what color is it?

18   A.   It's red.

19            MS. MURRAY:  Ms. Loftus, we can take those down, and

20   let's put up Government Exhibits CT42 and 43, please, which are

21   in evidence.

22   Q.   Starting here on the left, Mr. Bonsukan, Government Exhibit

23   CT42, can you describe for the jury, please, what it is we're

24   looking at in that photograph.

25   A.   This is the driver's side of the vehicle; the door, which

1    is the scissor door, which raises up, shows the VIN plate on

2    the vehicle.

3    Q.  Can you just describe a bit more about how the scissor door

4    operates, please.

5    A.  So it hinges, as—the scissor door normally hinges up and

6    raises the door in this particular manner, just like this one,

7    rather than a normal door on a vehicle, which swings out, like

8    if you're opening and closing a door.

9    Q.  And the VIN plate that you mentioned, where in the photo on

10   the left do we see that?

11   A.  It's the black plate that's right on the—the scissor door.

12          MS. MURRAY:  And Ms. Loftus, on the right where we

13   have a zoomed-in portion of that black plate, that VIN plate,

14   can we zoom in on that even further, please, the VIN number.

15   Q.  Mr. Bonsukan, what are the last three digits of the VIN

16   number of this Lamborghini?

17   A.  393.

18          MS. MURRAY:  Ms. Loftus, if we could now, on the left

19   side, pull up Government Exhibit BR460 at page 2, and zoom in

20   on the VIN field.

21          And then on the right photo, similarly, zoom in on the

22   VIN field.

23   Q.  All right.  Mr. Bonsukan, so on the top here is a zoomed-in

24   version of the VIN of the car we were just looking at

25   photographs of.  Could you please read that VIN number, the

O5O1GUO3                          Bonsukan - Direct

1    vehicle identification number, into the record.

2    A.  Z as in zebra, H as in Henry, W as in William, U as in

3    umbrella, N as in Nancy, Z as in zebra, D as in David, 2, M as

4    in Mary, L as in Lima, A as in alpha, 10393.

5    Q.  And then looking at the one on the bottom here,

6    Mr. Bonsukan, which is from the contract of sale from

7    Lamborghini Dallas to G Club International, is that the same

8    VIN number that was on the car depicted in the photograph?

9    A.  Yes.

10   Q.  And based on your work at Lamborghini Dallas for the past

11   13 years or so, do you have an understanding whether VIN

12   numbers are unique to a particular vehicle?

13   A.  They are.

14            MS. MURRAY:  Ms. Loftus, we can take those down.

15            And let's please show the witness what's been marked

16   as Government Exhibit GX GC295, at page 10.

17   Q.  Mr. Bonsukan, are you able to see what's in Government

18   Exhibit GC295 here, page 10?

19   A.  Yes.

20   Q.  Do you recognize it?

21   A.  I do.

22   Q.  How do you recognize it?

23   A.  It's a—it has my name on it.  It's a normal letter that I

24   send out to a client along with the documents that we send out

25   to them for signature.

1          MS. MURRAY:  Your Honor, the government offers

2     Government Exhibit GC295.

3          THE COURT:  Any objection?

4          MS. SHROFF:  No, your Honor.

5          THE COURT:  It is admitted.

6          (Government's Exhibit GC295 received in evidence)

7          MS. MURRAY:  Can we please publish that.

8     BY MS. MURRAY:

9     Q.  Mr. Bonsukan, what is the date of this particular letter?

10    A.  September 14, 2021.

11    Q.  And to whom is it addressed?

12    A.  Mr. Horan.

13    Q.  Looking at the signature block here, is that your signature

14    or your electronic signature on this letter?

15    A.  Yes.

16    Q.  And generally speaking, what was the purpose of this

17    letter?

18    A.  It basically explains, thanking the client for purchasing a

19    vehicle and then things that's needed to be done in order to

20    facilitate the paperwork and then to instruct them to FedEx the

21    documents back.

22    Q.  And does this particular letter relate to the contract of

23    sale dated September 13, 2021, that we just looked at for G

24    Club International?

25    A.  Yes.

O5O1GUO3                    Bonsukan - Direct

1          MS. MURRAY:  Ms. Loftus, let's take that down and put

2     up Government Exhibit BR460 again, at page 5, please.

3     Q.  What type of document is this, Mr. Bonsukan?

4     A.  This is internal record for our dealership when a──when

5     funds are received, from a client.

6     Q.  And what is the date listed on the top right of this

7     particular document?

8     A.  September 14, 2021.

9     Q.  Looking over on the left side, it indicates Cash Received

10    From, do you see that?

11    A.  Yes.

12    Q.  Who sent the money to Lamborghini Dallas, as reflected

13    here?

14    A.  It shows G Club Hold Co. 1, LLC.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O5OVGUO4                        Bonsukan - Direct

1    BY MS. MURRAY:

2    Q.  And then is that crossed out in part and there is something

3    written over it?

4    A.  Yes.

5    Q.  What is the corrected name listed here?

6    A.  G Club International LLC.

7    Q.  Looking at the payment amount here just below, what is the

8    total amount of the electronic transfer from G Club

9    International?

10   A.  $832,000.75.

11   Q.  And the wire detail that's in bold below, wire from, do you

12   see that?

13   A.  Yes.

14   Q.  Can you read what that reflects?

15   A.  Wire from Mercantile Bank for G Club International Ltd.

16           MS. MURRAY:  Let's go to the next page please,

17   Ms. Loftus.

18   Q.  What is this, Mr. Bonsukan?

19   A.  This is a wire confirmation that's emailed to me from

20   JPMorgan Chase Bank, which is our bank, that notifies when a

21   wire was received.

22   Q.  And what is the date of this wire notification?

23   A.  Monday, September 13th, 2021.

24   Q.  Looking down at the body of this email, what bank was this

25   wire received from?

O5OVGUO4                          Bonsukan - Direct

1   A.  Received from the Reserve Trust Co, Greenwood Village,

2   Colorado.

3   Q.  And then a few lines down, there's a beneficiary and then a

4   B/O customer.  What does that reflect?

5   A.  Mercantile Bank International, 644 Fernandez Juncos Avenue,

6   Third Flo, San Juan, Puerto Rico.

7           MS. MURRAY:  Ms. Loftus, let's go to page 8, please.

8   If we could zoom in on the text.  Thank you.

9   Q.  It's a little hard to read, Mr. Bonsukan, but what kind of

10  information is reflected on this business record?

11  A.  This is looks like wire instructions.

12  Q.  And can you read the bank name listed at the top here?

13  A.  Bank name is Reserve Trust Company.

14  Q.  What about the beneficiary account name?

15  A.  Mercantile Bank International.

16  Q.  And finally, for further credit down at the bottom, what's

17  listed under MBI client account?

18  A.  G Club International Limited.

19  Q.  And if you could read the last five digits of that MBI

20  client account number for G Club International Limited?

21  A.  10103.

22          MS. MURRAY:  All right.  Ms. Loftus, can we please go

23  to page -- starting on page 19 of BR-460.

24  Q.  Mr. Bonsukan, do you see this email that is reflected here?

25  A.  Yes.

1          MS. MURRAY:  If we could scroll down, Ms. Loftus.

2    This is part of a chain.  We're going to start with some of the

3    earlier messages in this chain.  Looking here -- thank you,

4    Ms. Loftus.

5    Q.  This is an email, September 9, 2021.  Can you tell us who

6    that's sent from?

7    A.  It's sent from Max.

8    Q.  And to whom was it sent?

9    A.  To Mike Durkey.

10   Q.  Who is Mike Durkey?

11   A.  Previous salesperson for Lamborghini Dallas.

12   Q.  After the bracket external, what is the subject line of

13   this email?

14   A.  G Club Hold Co. LC732-Lambo SVJ Roadster.

15   Q.  And LC 732, what does that indicate?

16   A.  That's the stock number in our inventory for this

17   particular vehicle.

18   Q.  Can you please read the body of this email from Max to Mike

19   Durkey at Dallas Lamborghini?

20   A.  "Hi, Mike.  How much is the delivery to Connecticut?"

21   Q.  And there's an indication of the type of email account that

22   Max sent the email from.  Can you please read that?

23   A.  Sent from ProtonMail Secure Email.

24          MS. MURRAY:  All right.  Ms. Loftus, let's scroll up a

25   bit, please, so we go later in time in this email chain.

O5OVGUO4                    Bonsukan - Direct

```
1    Q.  All right.  Starting with the email at the top there from

2    Max to Mike Durkey, can you read the content of this email,

3    please, Mr. Bonsukan?

4    A.  It says:  "Can you help arrange a delivery?  Also, I should

5    have the resolution and driver's license tomorrow.  Please hold

6    the vehicle.  Thank you."

7    Q.  Mr. Bonsukan, do you know what the reference to

8    "resolution" reflects?

9    A.  Yes.  It basically -- the resolution is it shows who the

10   directors or officers or members of a particular business.

11   Q.  And in the course of a sale to a corporate entity or a

12   company, is that the type of document that Lamborghini Dallas

13   typically collects in connection with a sale?

14   A.  Yes.

15   Q.  Why?

16   A.  We want to make sure whoever is buying the vehicle is the

17   one that's able to sign off for the vehicle.

18            MS. MURRAY:  All right.  Ms. Loftus, let's keep going

19   in this email chain, please.  So we'll focus in from exactly

20   that through to the bottom of that email.

21   Q.  So if you kind of start in the middle here, Mr. Bonsukan,

22   because this is forwarded.  Start with the email from Max

23   again.  This is September 10, 2021.  Can you read the content

24   of that email to Mike Durkey, please.

25   A.  "Hi, Mike.  Attached is the passport which I'll text you
```

1    the password separately.  Also, attached is the correct entity

2    name.  Please reissue the documents with the corrected name.

3    Thank you.  Kind regards, Max."

4    Q.  And that email is forwarded to you which we can see at the

5    top of this portion.  Do you see that, Mike Durkey to you?

6    A.  Yes.

7    Q.  And what does he -- what does Mike Durkey write to you?

8    A.  "Passport secured by top secret password:  123456."

9              MS. MURRAY:  Thank you, Ms. Loftus.  If we could keep

10   going up in the chain.  All right.  And now I'd like to focus

11   on this bottom half from Mr. Bonsukan to a Max Krasner account.

12   Q.  All right.  Mr. Bonsukan, this is about a month later

13   October 19, 2021?

14             MS. SHROFF:  Objection to the testifying.

15             THE COURT:  You can ask him what date he sees.

16   Q.  Mr. Bonsukan, can you please read the date of this email?

17   A.  The date is October 19, 2021.

18   Q.  Thank you.  And who sent this email?

19   A.  It was sent from me to Max Krasner.

20   Q.  And what is the email address to which it was sent?

21   A.  Max -- M-A-X-K-R-A-S-N-E-R at ProtonMail.com.

22   Q.  Who's Max Krasner?

23   A.  Probably one of the agents for -- that helped in regards to

24   negotiating with Mike Durkey.

25   Q.  And negotiating with respect to what sale, if any?

O5OVGUO4                          Bonsukan - Direct

1    A.  The Aventador SVJ Roadster.

2    Q.  And that was the sale to G Club; is that correct?

3    A.  To G Club.

4    Q.  Did you ever speak personally with Max Krasner?

5    A.  No.

6    Q.  Did there come a time when you communicated with Max

7    Krasner regarding the sale?

8    A.  Through email.

9    Q.  You could read this email that you sent to Max Krasner,

10   please.

11   A.  "Hi, Max.  Here are the signed copies of the buyer's order,

12   odometer, and dealer reassignment form I have received with the

13   Wilmington, Delaware address.  This was the address Mike gave

14   to me.  Once we have title in hand, then we will send it to you

15   at the 162 East 64th, New York, New York, 10065 address with

16   signature required on the FedEx.  We will be on the lookout

17   tomorrow for the title.  If we do not receive, then we will

18   apply for a duplicate.  Best regards," and my signature.

19   Q.  Mr. Bonsukan, what is a title as it's indicated here?

20   A.  A title is a form given for a particular vehicle; basically

21   it's the ownership papers of that particular vehicle.

22   Q.  And what, if anything, does Lamborghini Dallas do with a

23   title to a car when it sells a car?

24   A.  We reassign the title to the new owner.

25          MS. MURRAY:  Ms. Loftus, if we could take that down.

1          Let's go to page 9 actually of BR-460.  We can zoom in

2     on the top half so it's a bit larger.

3     Q.  Mr. Bonsukan, what is this document, which is part of the

4     Lamborghini Dallas records we've been looking at?

5     A.  Shows register of directors for G Club International

6     Limited.

7     Q.  And on this document, who is listed as the named director

8     of G Club International Limited?

9     A.  It shows Haoran He.

10    Q.  Looking to the right column, personal details, what was

11    Haoran He's place of birth?

12    A.  China.

13    Q.  And nationality?

14    A.  British.

15    Q.  And further right, on what date was Haoran He appointed

16    director of G Club International Limited?

17    A.  October 16, 2020.

18    Q.  Mr. Bonsukan, have you ever spoken with Haoran He?

19    A.  No.

20    Q.  Have you ever communicated with Haoran He?

21    A.  No.

22          MS. MURRAY:  Ms. Loftus, let's now go to page 12,

23    please.

24    Q.  What is this, Mr. Bonsukan?

25    A.  This looks like to be a British passport.

1  Q.  For what individual?

2  A.  For Haoran He.

3         MS. MURRAY:  And let's go to page 18, please,

4  Ms. Loftus.

5  Q.  Again, part of the business records relating to this sale,

6  what type of document is this, Mr. Bonsukan?

7  A.  This is a shipment received from FedEx.

8  Q.  And what information or what documents would have been

9  shipped using this shipping receipt in relation to the sale of

10 that Lamborghini?

11 A.  The title to the vehicle, the Lamborghini Aventador, as

12 well as odometer statement, some of the other title documents

13 that's required to transfer.

14 Q.  Now, the "shipping from" field here indicates a certain

15 company.  Can you read what company that indicates?

16 A.  Yes.  Boardwalk Auto Group.

17 Q.  What affiliation, if any, does Boardwalk Auto Group have

18 with Lamborghini Dallas?

19 A.  Boardwalk Auto Group is our parent company.  Under that

20 group we have a number of dealerships, Lamborghini Dallas is

21 one of them.

22 Q.  Looking on the left, can you please read the "ship to"

23 information reflected on this FedEx receipt.

24 A.  Ship to attention Max, G Club International.

25 Q.  And the address?

1  A.  162 East 64th, New York, New York, 10065.

2          MS. MURRAY:  And if we could zoom out a little bit,

3  Ms. Loftus, to see the ship date, please.  Actually, the whole

4  center portion of this.

5  Q.  What is the ship date of this FedEx package, Mr. Bonsukan?

6  A.  October 27, 2021.

7  Q.  And then looking at billing information here, can you read

8  what is reflected under "bill transportation to" on the bottom?

9  A.  Bill transportation to:  Lambo-340.  Your reference number,

10  LC 732.

11  Q.  And that reference number, have we seen that on other

12  documents we've been looking at today?

13  A.  Yes.

14  Q.  What information is reflected in that reference number as

15  it's relevant to the G Club Lamborghini?

16  A.  That's the stock number of the Lamborghini Aventador sold

17  to G Club International.

18          MS. MURRAY:  We can take that down, Ms. Loftus.  Thank

19  you.

20  Q.  Mr. Bonsukan, in your role at Lamborghini Dallas, after

21  you've confirmed a successful wire transfer or transfer of

22  money and receive requested documents, what, if anything, do

23  you do next?

24  A.  I package everything up and send it to my accounting office

25  for processing of the title.

1    Q.  And how, if at all, are the vehicles delivered to the

2    customers?

3    A.  Excuse me?

4    Q.  How, if at all, are the vehicles delivered to the

5    customers, the vehicles?

6    A.  They are normally transported via vehicle transport.

7    Q.  Does Lamborghini Dallas facilitate in the shipment of

8    vehicles to customers at times?

9    A.  Yes.

10             MS. MURRAY:  Ms. Loftus, if we could please show the

11   witness what's marked as Government Exhibit GC-504.

12   Q.  Mr. Bonsukan, at a high level, what type of document is

13   this?

14   A.  This is a dispatch sheet from -- for the carrier that

15   transported the Aventador.

16   Q.  Is this the type of record that is maintained in the

17   ordinary course of business for Lamborghini Dallas?

18   A.  Yes.

19             MS. MURRAY:  Your Honor, the government offers

20   Government Exhibit GC-504.

21             THE COURT:  It is admitted.

22             (Government's Exhibit GC-504 received in evidence)

23             MS. MURRAY:  Thank you.

24             Can we please publish, Ms. Loftus.  We could zoom in

25   on the top half, first going through order information.

1    Q.  All right, Mr. Bonsukan.  Looking on the right, what is the

2    business name that's listed there on the right?

3    A.  Boardwalk Motor Sports LLC.

4    Q.  And again, if you could just remind the jury the

5    affiliation between that company and your store, Lamborghini

6    Dallas?

7    A.  When they created this account for central dispatch, it's

8    the parent company of Lamborghini Dallas.

9    Q.  And looking on the left on carrier, what role, if any, does

10   the carrier have in the shipment of a vehicle?

11   A.  That's the company that actually transported the vehicle.

12   Q.  Under order information here, there's a dispatch date.

13   What is the dispatch date?

14   A.  September 22nd, 2021.

15   Q.  And the pickup estimate?

16   A.  Pickup estimated date is September 25th, 2021.

17   Q.  And what was the delivery estimate for this particular

18   shipment?

19   A.  Delivery estimated, September 30th, 2021.

20   Q.  Looking at the top there, order ID, can you read what the

21   order ID was for this shipment?

22   A.  LC 732.

23          MS. MURRAY:  Ms. Loftus, we can zoom out and then

24   focus on the next portion, please.

25   Q.  Now, the vehicle information for this particular vehicle,

O5OVGUO4                          Bonsukan - Cross

1   if you could read the year and the car type and model?

2   A.   2021 Lamborghini Aventador.

3   Q.   And then looking on the right, delivery information, what

4   is the name for the recipient of that Lamborghini?

5   A.   Max (G Club International).

6   Q.   And to what address was that Lamborghini for G Club

7   International shipped?

8   A.   373 Taconic Road, Greenwich, Connecticut, 06831.

9           MS. MURRAY:   May I have a minute, your Honor, please?

10          THE COURT:   Yes.

11          (Counsel conferred)

12  Q.   Mr. Bonsukan, do you know what G Club is?

13  A.   No.

14          MS. MURRAY:   Nothing further, your Honor.

15          THE COURT:   Cross-examination.

16  CROSS-EXAMINATION

17  BY MS. SHROFF:

18  Q.   How are you doing, Mr. Bonsukan?

19  A.   Good.

20  Q.   You work at Lamborghini Dallas; is that right?

21  A.   I do.

22  Q.   Okay.  Sorry about that.  I can't see you.

23          And you were the one in charge of this particular

24  sale; correct?

25  A.   I helped facilitate the paperwork on the particular sale.

1  Q.  Okay.  Is it fair to say that you don't remember anybody

2  coming to like view the car, like you buy an average car,

3  right?

4  A.  Yes.

5  Q.  Nobody came to see it, right?

6  A.  Not that I'm aware.

7  Q.  Okay.  And you said that, is it -- did I get it right that

8  Dallas Lamborghini sells about 35 of these cars a month?

9  A.  Yes.

10  Q.  Okay.  And is it like an everyday car or is it like a

11  sporting car or a racing car?

12  A.  It's, in the car world, called an exotic car.  So there's

13  not very many made.  Enthusiasts that love the brand buy the

14  car.

15  Q.  Okay.  And people generally buy the car because it could be

16  fun to ride in the car; is that right?

17  A.  Yes.

18          MS. MURRAY:  Objection.

19          THE COURT:  Sustained.

20  Q.  It's not an everyday-use car, right?

21  A.  Not normally.

22  Q.  Not normally.  Okay.

23          And you've been doing this for 13 years; correct?

24  A.  Yes.

25  Q.  And this was one of many sales you made during the course

1    of your employment in Dallas; correct?

2    A.  Yes.

3    Q.  Okay.  So let me just walk -- just ask you a couple of

4    questions about the documents that you were shown by Ms. Murray

5    over here, okay?

6            MS. SHROFF:  If I could just have first CT-39, please.

7    Q.  You recognize this car, right?

8    A.  Yes, this is a Lamborghini Aventador.

9    Q.  What does "Aventador" even mean, can you tell us?

10   A.  Aventador is the name of a model of a particular

11   Lamborghini that was built.  Normally they're named after a

12   bull or a famous bull or a bullfighter.

13   Q.  Okay.  And this is the car that you sold, right?

14   A.  It appears to be, yes.

15   Q.  Okay.  Could you tell us please what is this wire thing

16   that comes out of the car for?

17   A.  It's a battery tender.  Basically, maintaining the battery

18   as it sits in a garage, so it's fresh whenever the client wants

19   to drive it the next time.

20   Q.  So do you normally do this if you're using the car every

21   day or do you charge up a battery when the car is not used

22   frequently?

23   A.  It varies.  The car is -- even when it's off, the computer

24   systems are still working.  So a lot of owners always want to

25   keep a fresh battery, so they plug it up.

1  Q.  Okay.  And you wouldn't -- you can't tell how often the car

2  is used; correct?

3  A.  No.

4  Q.  Okay.

5       MS. SHROFF:  Could I have please -- I could have that

6  taken down.  And if I could please have put up BR-460.

7  Q.  And 460 is the document that you received from Ms. Murray

8  right here who did your direct testimony; correct?

9  A.  Yes.

10  Q.  Okay.  And she asked you for documents and you sent them to

11  her; correct?

12  A.  Correct.

13  Q.  You've never spoken to me, right?

14  A.  No.

15  Q.  And you've never spoken to anybody else on the defense

16  table?

17  A.  No.  No, ma'am.

18  Q.  Okay.  And I never asked you for any documents; correct?

19  A.  No.

20       MS. SHROFF:  Okay.  So let's look at the next

21  document.  Could we look at CT-38.

22  Q.  And all of the documents pertain to this car; correct?

23  A.  Yes.

24  Q.  And Ms. Murray asked you some questions about the type of

25  door that this car has, right?

1   A.  Yes.

2   Q.  And it's a scissor door; is that right?

3   A.  Yes.

4   Q.  Does that mean anything?  I mean, it's just a door, right,

5   a straight door, a scissor door?

6   A.  On a Lamborghini --

7           MS. MURRAY:  Objection, your Honor.

8   A.  On a Lamborghini, it is a particular characteristic of the

9   particular model, which would be the Aventador.

10  Q.  It's just like a gimmick, right?

11  A.  Not necessarily a gimmick.  It's just a particular type of

12  door that they have.

13  Q.  Okay.  And on this car there is what is called a VIN

14  number, right?

15  A.  Yes.

16  Q.  And the VIN number is the vehicle identification number;

17  correct?

18  A.  Yes, ma'am.

19  Q.  And it's fair to say, right, every car has a VIN number?

20  A.  Yes.

21  Q.  A Subaru has a VIN number?

22  A.  Yes.

23  Q.  And Ford has a VIN number?

24  A.  Yes.

25  Q.  So as opposed to this fancy car, if I just went and bought

1  myself a regular old car, it would have a VIN number, right?

2  A.  Yes, it would.

3  Q.  Okay.  So nothing special about the VIN number on this car?

4  A.  No, just the identifying mark of that particular car.

5  Q.  Okay.  Great.

6          MS. SHROFF:  So let's look at, please, 295, GC-295.

7  And if you could just scroll down.

8  Q.  These are email exchanges you had about the sale of this

9  car; correct?

10  A.  Are you still scrolling?  It looks like from Max to a

11  number of people.

12  Q.  Right.  And you never -- you've testified you never spoke

13  to Max Krasner, right?

14  A.  No, not -- not physically or -- it's just through email.

15  Q.  Okay.  And you just emailed back and forth because you

16  wanted the sale to go through; correct?

17  A.  Yes.

18  Q.  That's part of the reason you have a dealership, right, you

19  want to sell the car?

20  A.  Yes.

21  Q.  And there was nothing untoward about the sale of this car;

22  correct?

23  A.  No.

24  Q.  You had no red flags while you were selling this car;

25  correct?

1   A.  No.

2   Q.  Okay.  You testified on direct testimony about an email

3   that said Proton; correct?

4   A.  Yes.

5   Q.  Okay.  You get emails from gmail; correct?

6   A.  Yes.

7   Q.  Yahoo; correct?

8   A.  Yes.

9   Q.  Proton; correct?

10  A.  Yes, sometimes.

11  Q.  Okay.  So it's just like an any old email address, right?

12  A.  Yes.

13  Q.  Okay.  And you also testified, did you not, about a top

14  secret password; correct?

15  A.  Yes.

16  Q.  The top secret password was 123456; correct?

17  A.  Yes.

18          MS. SHROFF:  Okay.  And if I could have that taken

19  down and please show 295.  Would you scroll down.  I'm sorry.

20  Q.  And these emails go back and forth all through you -- all

21  through your dealership until September, right?

22          MS. MURRAY:  Your Honor, objection.  I think

23  Ms. Shroff is asking about a different document than the one

24  that's displayed for the jury right now.

25          MS. SHROFF:  460 is what I want, please.

O5OVGUO4                       Bonsukan - Cross

  1                THE COURT:  Is this the correct document?

  2                MS. MURRAY:  It is, your Honor, pages 19 to 22.

  3    BY MS. SHROFF:

  4    Q.  So let's start with page 19.  You see that email that's

  5    right there says:  "Hi Max, we have -- "

  6                MS. SHROFF:  There you go.  Thank you.

  7    Q.  "We have signed copies of the buyer's order."  Correct?

  8    A.  Yes.

  9    Q.  Odometer and dealer reassignment form, right?

 10    A.  Yes.

 11    Q.  By the way, sitting here today, do you recall if this was a

 12    used car that you were reselling?

 13    A.  It is a pre-owned vehicle.

 14    Q.  Right.  So it's -- by "pre-owned," you mean it was used

 15    before, right?

 16    A.  Yes.

 17    Q.  It's not a brand-new Lamborghini, right?

 18    A.  No.

 19    Q.  Okay.  So this is a used car that is being resold to

 20    somebody, right?

 21    A.  Yes.

 22    Q.  Okay.  Sitting here today, do you know how old that car

 23    was?

 24    A.  During that time?

 25    Q.  Yeah.

O5OVGUO4                        Bonsukan - Cross

1  A.  In 2021?  So it was a 2021 model for Lamborghini and we

2  sold it in 2021.

3  Q.  Okay.  So how many owners had there been before it, do you

4  know?

5  A.  I'm not sure.

6  Q.  Do you know if it was more than one?

7  A.  Possibly.

8  Q.  Okay.  You don't really know, right?  It could have been

9  one, two, three, you just don't know?

10 A.  Correct.

11 Q.  Okay.  And sorry about that.  And at this point in this

12 email chain, which is October 19 of 2021, right?  Somebody is

13 giving you an address of where the -- do you read this email as

14 telling you where to send the paperwork or where to send the

15 car?

16 A.  To send the title.

17 Q.  To send the title, right?

18 A.  Yes.

19 Q.  Okay.  And do you send the title to that address?

20 A.  I don't.  My title clerk does.

21 Q.  Okay.  And do you know what is located at 162 East 64th

22 Street?

23 A.  No.

24 Q.  Do you know what business is located there?

25 A.  No.

1   Q.  Do you know who works there?

2   A.  No.

3   Q.  Have you ever heard of a person named Miles Guo?  Have you

4   ever heard of a person named Miles Guo?

5   A.  No.

6   Q.  Okay.

7           MS. SHROFF:  If we could just scroll down, please.

8   Q.  And there is a conversation here about the passport;

9   correct?

10  A.  Yes.

11  Q.  And you get a copy of a passport, do you not?

12  A.  Yes.

13  Q.  And why do you need the passport, sir?

14  A.  Gives identification of who the person that would be

15  signing off for the company when they buy a particular vehicle.

16  Q.  Okay.  And you got -- you got a copy of the passport;

17  correct?

18  A.  Yes.

19  Q.  And, of course, you did whatever you needed to do to verify

20  that that was a correct passport, right?

21  A.  Yes.

22  Q.  Okay.  And then after that --

23          MS. SHROFF:  If you could close that, please.

24  Q.  You have an email that asks you if you can assist with

25  transport.  And then they said that assistance for transport

O5OVGUO4                    Bonsukan - Cross

1   can be provided; correct?

2   A.  Yes.

3   Q.  Okay.  And when you're transporting the car, you would only

4   transport the car out of your dealership after the things on

5   your checklist have been met; correct?

6   A.  Yes.

7   Q.  You want to make sure title passes correctly, right?

8   A.  Yes.

9   Q.  Registration, right?

10  A.  Yes.  We don't do the registration on a cash deal, but we

11  make sure that the title is signed over to the correct buyer.

12  Q.  Okay.  And you also want to make sure that the buyer has a

13  driver's license, right?

14  A.  Not necessarily a driver's license, just identification.

15  Q.  Okay.  So you want to make sure that the person is properly

16  identified, right?

17  A.  Yes.

18  Q.  And you did that; correct?

19  A.  Yes.

20  Q.  Okay.  And after you took all of those steps, you were

21  going to ship the car out to whatever address they told you,

22  right?

23  A.  Yes.

24  Q.  Sitting here today, do you recall if the car was originally

25  supposed to go to a different address?

1    A.  No.

2    Q.  You don't recall?

3    A.  I don't recall, no.

4    Q.  Okay.  And is it fair to say that where a car goes also

5    determines the cost of the insurance of a car?

6    A.  Well, the shipping carrier -- when we set up shipping for

7    our client, we want to make sure that the shipping carrier, A,

8    might be familiar with the vehicle in transporting a vehicle of

9    this amount; and making sure that we have ample insurance to

10   cover if something were to happen during transport for a

11   client.

12   Q.  Right.  But that is the insurance on the transport part of

13   the car, right?

14   A.  Correct.

15   Q.  Would you agree with me, as a person who's been in the car

16   business for 13 years, that each state has a certain cost for

17   maintaining insurance on the car?

18   A.  I'm vaguely familiar.

19   Q.  Some states are more expensive than others; correct?

20   A.  Probably, yeah.

21   Q.  Insurance depends on whether the car is placed in a garage

22   or parked on the street; correct?

23            MS. MURRAY:  Objection, your Honor.

24            THE COURT:  Sustained.

25            The witness has said that he is vaguely familiar.

O5OVGUO4                          Bonsukan - Cross

 1                MS. SHROFF:  He might know the answer, your Honor.

 2                THE COURT:  With that understanding, he can answer.

 3    Q.  Do you know if insurance rates differ state to state?

 4    A.  No.

 5    Q.  Do you know if insurance is higher if you park the car on a

 6    street versus if you park the car in the garage?

 7    A.  It depends on the insurance company.

 8    Q.  Okay.  Fair enough.

 9                MS. SHROFF:  Could I have number 504, please.  It's

10    okay, actually.

11    Q.  When you were getting ready to ship the car, you were given

12    an address; correct?

13    A.  I wasn't given the address.  I have a sales assistant that

14    actually does our transportation for us that works with the

15    dealership.

16    Q.  Okay.  So once you finish of the sale of the car, somebody

17    else takes over to make sure the car gets to where it's

18    supposed to get, right?

19    A.  Yes.  Normally, the salesperson and our sales assistant.

20    Q.  And would you know what is the markup on a used car?

21    A.  The markup on a used car?

22    Q.  Yes, sir.

23    A.  It could vary.

24    Q.  Do you know how much the markup on this car was?

25    A.  In that particular instance, a Lamborghini Aventador,

O5OVGUO4                      Bonsukan - Cross

 1  brand-new 2021 model would be, MSRP — manufacturer's suggested
 2  retail price — at $650,000.
 3  Q.  Okay.  And you don't know how long this car was sitting on
 4  the parking lot before it was brought out, right?
 5  A.  Not -- no, not in particular.  I could find out, but no.
 6  Not long.
 7  Q.  When you were interacting with this person named Max,
 8  correct, he was telling you or at least somebody in your office
 9  where the car was going to go; correct?
10  A.  Yes.
11  Q.  And Max you understood was part of G Clubs; correct?
12  A.  Yes.
13  Q.  And he represented G Clubs' interest to you when he was
14  emailing with you; correct?
15  A.  Yes.
16  Q.  And Max Krasner from the emails, you can conclude, knew
17  that the car was going to go to Connecticut; correct?
18  A.  Yes.
19        MS. SHROFF:  Okay.  Could I have one moment, your
20  Honor?
21        THE COURT:  Yes.
22        (Counsel conferred)
23  Q.  Who did you talk to when trying to figure out the final
24  price sale of the car?
25  A.  I didn't speak with anyone.

O5OVGUO4                        Bonsukan - Redirect

1    Q.   I'm sorry, I cut you off.

2    A.   Normally, the salesperson negotiates the price with the

3    particular client.

4    Q.   So you have no idea how many times Max Krasner talked to

5    the salesperson and went back and forth before arriving at the

6    final purchase price?

7    A.   No.

8    Q.   You do not know how long those negotiations lasted;

9    correct?

10   A.   No.

11   Q.   And do you know if Mr. Krasner or anyone else from G Clubs

12   did an inspection of the car before it was shipped?

13   A.   I don't recall.  It could be possible.

14            MS. SHROFF:  I have nothing further, your Honor.

15            Thank you.

16            THE COURT:  Redirect.

17            MS. MURRAY:  Yes, your Honor.  Briefly.

18   REDIRECT EXAMINATION

19   BY MS. MURRAY:

20   Q.   Mr. Bonsukan, you were just asked some questions about how

21   long that Lamborghini that we've been talking about was on the

22   lot.  Do you recall those?

23   A.   Yes.

24   Q.   And you indicated it was not long; is that correct?

25   A.   Yes.

1   Q.  What do you recall about the volume of sales that

2   Lamborghini Dallas was doing during this time period, fall of

3   2021?

4   A.  Fall of 2021, obviously in the COVID times, vehicle sales

5   were -- on a naturally aspirated engine, which would be this

6   Aventador, were going like crazy because Lamborghini announced

7   that they were going to start doing hybrid engines on their

8   vehicles.  So collectors and people that loved this car would

9   try buying it, even if they're buying it for more than what the

10  original MSRP is.

11  Q.  And you mentioned that the MSRP on this car was

12  approximately what?

13  A.  Approximately 650,000.

14          MS. MURRAY:  And Ms. Loftus, if we could pull up,

15  please, Government Exhibit BR-460 at page 2.

16  Q.  And focusing on the final sale price of this car here, what

17  was the final sale price of this particular car, this used car?

18  A.  The unpaid balance is $832,000.75.

19  Q.  That's nearly $200,000 more than the manufacturer's

20  suggested retail price; is that correct?

21  A.  Yes.

22  Q.  And this was a used car, but it was the same year as it was

23  ultimately sold to G Clubs, right?

24  A.  Yes.

25          MS. MURRAY:  Ms. Loftus, if we could zoom out on this

1   and go to the left and look at the mileage listed for this

2   particular car.  It's on the top left description of sale unit.

3   Q.  Mr. Bonsukan, how many miles were on this car when it was

4   sold to G Club International?

5   A.  317 Miles.

6          MS. MURRAY:  All right, Ms. Loftus.  We can zoom out

7   of that and go to the top again to the seller and the buyer

8   names listed.

9   Q.  Now, Mr. Bonsukan, you testified on cross-examination that

10  you didn't know a person named Miles Guo; is that right?

11  A.  Yes.

12  Q.  Do you know what the "G" in G Club International Limited

13  stands for?

14  A.  No.

15         MS. MURRAY:  Just a moment please, your Honor.

16         (Counsel conferred)

17         MS. MURRAY:  Nothing further.

18         THE COURT:  Recross.

19         MS. SHROFF:  Yes, your Honor.

20         Could you just leave that exhibit.  Thank you.

21  RECROSS EXAMINATION

22  BY MS. SHROFF:

23  Q.  The Lamborghini that was sold, the red Lamborghini, right?

24  A.  Yes.

25  Q.  That was almost a collector's car; correct?

1   A.  Yes, could be.

2   Q.  It was actually an investment; correct?

3           MS. MURRAY:  Objection, your Honor.

4           MS. SHROFF:  She brought it out.

5           THE COURT:  Sustained.

6   Q.  The price was higher than a brand-new car, right?  You

7   testified for Ms. Murray about that, right?

8   A.  Yes.

9   Q.  And why was that?

10  A.  Why is the price higher?  Because it's a popular vehicle in

11  terms of the Lamborghini world, when a lot of people were

12  trying to buy these cars.

13  Q.  And they were going to change the model; correct?  You

14  testified to it on direct, something about it going hybrid;

15  correct?

16  A.  Yes, eventually.

17  Q.  Right.  And the model G Clubs bought would only go up in

18  value because they were going to stop making those Lamborghinis

19  that way; correct?

20          MS. MURRAY:  Objection, your Honor.

21          THE COURT:  You may answer.

22  A.  Possibly.

23  Q.  Well, you testified on direct that if the price was going

24  to go up, people were going crazy, they wanted to keep that

25  model, right?

1    A.  It would be a risk, yeah, possibility where it could go up.

2    But it also could go down.

3    Q.  Right.  But that is why people were buying it, right?

4    A.  Yes.

5    Q.  You testified that they were literally hot off the parking

6    lot because everybody thought this would be a collector's

7    model, right?

8               MS. MURRAY:  Objection, your Honor.

9               THE COURT:  That's a mischaracterization of his

10   testimony.  Sustained.

11   Q.  People were buying it during the pandemic nonstop; correct?

12              MS. MURRAY:  Objection, your Honor.

13              THE COURT:  Sustained.

14   Q.  Did the sales go up during the pandemic?

15   A.  Sales did go up, yes.

16   Q.  Of that red model, right?

17   A.  Amongst a lot of other models as well.

18   Q.  Right.  But the red model was included in the one where the

19   sales are going up, right?

20   A.  That's correct.  It's a rare car of Lamborghini.

21   Q.  Exactly.  Thank you.

22              MS. SHROFF:  Could I just have this exhibit made

23   bigger.

24   Q.  And you see on the left-hand side where the description of

25   the sale unit is listed?

O5OVGUO4                     Bonsukan - Recross

1    A.  Yes.

2    Q.  And it says used; correct?

3    A.  Yes.

4    Q.  Okay.  And when you go down, if you read further down on

5    this document, right?

6    A.  Yes.

7    Q.  Okay.  The salesperson's name is Mr. Durkey.  And that's

8    the person on the email chain that Ms. Murray had you read

9    about; correct?

10   A.  Correct.  Yes.

11   Q.  And he's the person who finalized the sale, right?

12   A.  He would be the one point of contact of negotiating with

13   the customer.

14        MS. SHROFF:  Okay.  And if I could just have that

15   shrunk and the next page of the document shown, please.

16   Q.  And this page shows you just an average sale of a car no

17   different --

18        MS. MURRAY:  Objection, your Honor.  Scope.

19        THE COURT:  Sustained.

20   Q.  The car that was driven off the lot was insured, right?

21   A.  Probably, yeah.

22   Q.  Okay.  And it was dropped off in Connecticut; correct?

23        MS. MURRAY:  Objection.

24        THE COURT:  Sustained.

25        MS. SHROFF:  I'm done, your Honor.  Thank you.

O5OVGUO4

| | |
|---|---|
| 1 | THE COURT:  Thank you, sir.  You may step out. |
| 2 | THE WITNESS:  Thank you, your Honor. |
| 3 | (Witness excused) |
| 4 | THE COURT:  Is that the last witness for today? |
| 5 | MS. MURRAY:  We have another witness ready, your |
| 6 | Honor.  But given the time, we defer to the Court whether you'd |
| 7 | like us to start a few minutes or whether we should stop for |
| 8 | today. |
| 9 | THE COURT:  All right.  I think we should stop for |
| 10 | today.  You may step out. |
| 11 | One moment. |
| 12 | Members of the jury, we have finished our work for |
| 13 | today.  Monday is Memorial Day, and so you're going to be |
| 14 | returning to court according to the instructions that have been |
| 15 | given to you so that you'll be able to walk into the courtroom |
| 16 | at 9:30 sharp.  It's very, very important that you follow those |
| 17 | instructions closely and that you get here on time. |
| 18 | Remember that you're not allowed to discuss the case |
| 19 | amongst yourselves.  Don't permit anyone to discuss the case in |
| 20 | your presence.  It's always tempting, once you start to hear |
| 21 | witness testimony, to want to discuss the case, but that is |
| 22 | absolutely prohibited. |
| 23 | I wish you a wonderful long weekend, and I look |
| 24 | forward to seeing you on Tuesday. |
| 25 | (Jury not present) |

O5OVGUO4

1          THE COURT:  Please be seated.

2          I'm going to ask that Alternate No. 5 be brought in.

3          Is there anything that the parties wanted to raise?

4          MS. SHROFF:  No, your Honor.

5          MS. MURRAY:  No, your Honor.

6          (Juror present)

7          THE COURT:  Hi.  You're Alternate No. 5, right?

8          JUROR:  I am.  Yes.

9          THE COURT:  I received a note from you and you raised

10   certain concerns.  But now with the understanding of the

11   transportation arrangements, my sense is that your schedule can

12   work with the second option that was discussed; is that

13   correct?

14         JUROR:  Correct.  Up until the point of where my child

15   is finished school June 18th.

16         THE COURT:  And then?

17         JUROR:  The summer plans will now have to be changed

18   in order for me to continue to be a juror.

19         THE COURT:  And so that you can do that, you can make

20   those changes?

21         JUROR:  I haven't even begun to figure out what that

22   would entail.

23         THE COURT:  Well, I ask that you work on that and that

24   you return on Tuesday.  Thank you.

25         JUROR:  Thank you.

O5OVGUO4

1              (Juror not present)

2              THE COURT:  All right.  If there's nothing further,

3    then I wish everyone a good holiday weekend.

4              MS. MURRAY:  Thank you, your Honor.  You as well.

5              (Adjourned to May 28, 2024 at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3     ERIN McNAMARA

4    Direct By Mr. Finkel . . . . . . . . . . . . .53

5    Cross By Ms. Shroff  . . . . . . . . . . . . .84

6    Redirect By Mr. Finkel . . . . . . . . . . . 117

7    Recross By Ms. Shroff  . . . . . . . . . . . 119

8    Redirect By Mr. Finkel . . . . . . . . . . . 121

9    Recross By Ms. Shroff  . . . . . . . . . . . 122

10     LOUIE BONSUKAN

11   Direct By Ms. Murray . . . . . . . . . . . . 123

12   Cross By Ms. Shroff  . . . . . . . . . . . . 143

13   Redirect By Ms. Murray . . . . . . . . . . . 157

14   Recross By Ms. Shroff  . . . . . . . . . . . 159

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                              Received

 3    CT-20 through CT-30, CT-35 through 72,  . . . .62

 4            CT-74 through 105, CT-101

 5            through 129, CT-157 through

 6            187, CT-190 through 202,

 7            CT-204 through 207

 8   STIP-1    . . . . . . . . . . . . . . . .62

 9   36     . . . . . . . . . . . . . . . . . .66

10   133    . . . . . . . . . . . . . . . . . .55

11   CT-208    . . . . . . . . . . . . . . . .68

12   CT-209    . . . . . . . . . . . . . . . .67

13   GC295     . . . . . . . . . . . . . . . 130

14   BR460     . . . . . . . . . . . . . . . 124

15   GC-504    . . . . . . . . . . . . . . . 141

16

17

18

19

20

21

22

23

24

25
```