O5S1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                     Defendant.            Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         May 28, 2024
                                           9:10 a.m.
 8
     Before:
 9

10                       HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                             APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN
          CLARE TILTON
22
     ALSTON & BIRD LLP
23        Attorneys for Defendant
     BY:  E. SCOTT SCHIRICK
24

25
```

O5S1GUO1

1    ALSO PRESENT:
     Isabel Loftus, Paralegal Specialist, USAO
2    Michael Gartland, Paralegal Specialist, USAO
     Geoffrey Mearns, Paralegal Specialist, USAO
3    Robert Stout, Special Agent, FBI
     Ruben Montilla, Defense Paralegal
4    Tuo Huang, Interpreter (Mandarin)
     Shi Feng, Interpreter (Mandarin)
5    Yu Mark Tang, Interpreter (Mandarin)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5S1GUO1

1          (In the robing room)

2          THE COURT:  I called you in this morning because

3   during jury selection and the first day of trial, I have

4   observed a troubling pattern of discord between the attorneys

5   in this case.  In your interactions with each other, there have

6   been a number of instances of discourteous behavior, including

7   snippiness, bickering, sarcasm, eye rolling, and heavy sighs.

8   The tenor of the proceedings has been diminished by this

9   negative emotionalism.

10          As officers of the court, I expect that you will

11   observe courtroom decorum and abide by standards of

12   professionalism.  If you deal with each other in an

13   unprofessional manner in the presence of the jury, I will stop

14   the proceedings and direct that you only address the Court and

15   not each other, which will slow down the trial considerably.

16          You have an ethical obligation to advocate zealously,

17   but that zealousness must never cross the line into disrespect

18   of your adversaries.  Such conduct is an affront to the court's

19   dignity and may potentially disrupt and frustrate the trial.

20          I urge you to review the Supreme Court's decision in

21   *Pounders v. Watson*, 521 U.S. 982, 988 (1997), as well as 18,

22   United States Code, Section 401.  In other words, you need to

23   nip it in the bud.  Don't test me.

24          I received a letter from the prosecution this morning.

25   They seek to admit certain exhibits that are preserved copies

O5S1GUO1

1  of online posts on G News and Gettr.  When do you want to use

2  those exhibits?

3       MR. FERGENSON:  Your Honor, we expect those will be

4  offered tomorrow.

5       THE COURT:  All righty.  So I will need a response

6  from the defense today.  When do you think you can get that to

7  me?

8       MR. SCHIRICK:  By 3:00, your Honor?

9       THE COURT:  All right then.  So I will address that

10  after I receive your response.  You're excused.

11       MS. SHROFF:  Your Honor, may we raise a matter that I

12  wish to raise prior to the start of the witness testimony?

13       THE COURT:  Go ahead.

14       MS. SHROFF:  Thank you, your Honor.

15       Your Honor, in the cross-examination last week, the

16  Court might recall I had difficulty with the exhibit numbering;

17  when I tried to pull up an exhibit from the defense side for

18  cross-examination purposes, it did not match up to the

19  numbering on the government's side.  I have reviewed 3500

20  materials in this case that is being given to the defense with

21  constantly changing 3500 numbers, so what used to be 3519-57

22  three days ago is a different document than what it is today.

23  I raise this as a seasoned lawyer to inform the Court that I'm

24  having trouble keeping up with the constant—I've never had a

25  case where the 3500 numbers change.  So that's one matter.  And

O5S1GUO1

1    I hope that we can have a set of documents——and I think

2    Ms. Tilton can speak to this more if need be.  But we are

3    having trouble reconciling the 3500 material being produced

4    with new Bates stamp numbers——with new 3500 numbers.  That's

5    one issue.

6         The second issue is, we're getting 3500 material, and

7    I know this is normal, but for example, I just walked in this

8    morning and there is a two-page, single-spaced 3500 production

9    of the witness that's about to take the stand.  So

10   respectfully, I know you don't take a break before lunch, but

11   either I need 20 minutes now to review it or I will need 20

12   minutes after the witness testifies to review it.  I did not

13   even have a second copy to go over it with Mr. Guo.  I imposed

14   upon your court to either run to the fifth floor to make a

15   copy, but I see that your law clerk helped me out and made an

16   extra copy.  But I need at least 20 minutes to just go over

17   that.  I'm sorry to raise this now, but it's——

18        MR. FINKEL:  Your Honor, over the weekend our

19   paralegal Ms. Loftus sent the defense, in response to questions

20   from the defense, updated exhibits and exhibit list that we

21   audited, which should resolve the issues that Ms. Shroff just

22   mentioned.  The 3500 that Ms. Shroff is mentioning just now is

23   3500 material that was generated this morning, so we gave it to

24   the defense as soon as it was completed.  But to help

25   Ms. Shroff out, we will call that witness later on and we'll

O5S1GUO1

1    call Le Zhou first so Ms. Shroff will have plenty of time to

2    review that 3500 material in advance of that witness testimony.

3         THE COURT:  So this is precisely the type of issue

4    that I should not be hearing about.  In 24 years I've never had

5    lawyers come to me and tell me that they can't agree on the

6    numbering of exhibits.  For goodness sakes, you have got to

7    cooperate on these purely ministerial matters.

8         So you'll have the break to review that document.

9         MS. SHROFF:  Yes, your Honor, but there's nothing we

10    can do about the numbering system.  We're happy to cooperate.

11    I believe Ms. Tilton is in constant contact with them.  This is

12    really her bailiwick.  She has, and I have, I think Ms. Loftus

13    has done the same.  But I don't think that this is a lack of

14    cooperation problem.  I don't know what the problem is.

15    Honestly, I've never had a case——I agree with you——where 3500

16    numbering is changed.  I've never had that.  A document that's

17    marked number 19 remains 19.

18         THE COURT:  Ms. Shroff, I've heard enough.  You know

19    how to fix this.  Fix it.

20         You're excused.

21         ALL COUNSEL:  Thank you, your Honor.

22         (Recess)

23         (In open court; jury not present)

24         THE COURT:  Good morning.  Would you make your

25    appearances, please.

O5S1GUO1                         Le Zhou - Direct

 1              (Appearances noted)

 2              THE COURT:  Please be seated.

 3              Please have the jurors brought in.

 4              (Jury present)

 5              THE COURT:  Please be seated.

 6              Good morning, jurors.

 7              THE JURORS:  Good morning.

 8              THE COURT:  Welcome back.  Thank you for arriving on

 9    time.  This way, you can walk into the courtroom at 9:30 and we

10    can get going and proceed in an efficient manner.  Thank you.

11              Would the prosecution call its next witness.

12              MS. MURRAY:  Thank you, your Honor.  We call Le Zhou.

13              THE LAW CLERK:  Please raise your right hand.

14              (Witness sworn)

15              THE COURT:  Please state your name and spell it.

16              THE WITNESS:  My name is Le Zhou, L-E, Z-H-O-U.

17              THE COURT:  You may inquire.

18              MS. MURRAY:  Thank you, your Honor.

19     LE ZHOU,

20         called as a witness by the Government,

21         having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MS. MURRAY:

24    Q.  Good morning, Mr. Zhou.

25    A.  Good morning.

1  Q.  In what state do you live?

2  A.  Florida.

3  Q.  What do you do for work?

4  A.  I'm a licensed realtor.

5  Q.  Have you ever been a follower of Miles Guo?

6  A.  Yes.

7  Q.  Do you see anyone in the courtroom today that you recognize

8  from your time following Miles Guo?

9  A.  Yes.

10  Q.  Who?

11  A.  I see Miles Guo.

12  Q.  Can you describe him by where he's seated and an item of

13  clothing he's wearing.

14       MR. KAMARAJU:  We'll stipulate to identity, your

15  Honor.

16       THE COURT:  He has indicated the defendant.  Go ahead.

17       MS. MURRAY:  Thank you, your Honor.

18  Q.  Do you see anyone else that you recognize from your time

19  following Miles Guo in the courtroom here today?

20  A.  Yes.  A few.

21  Q.  Can you identify them by their names or the names you know

22  them by?

23  A.  There's a few followers sitting in the court on the

24  audience side, left side.  The name?  Yes.  Rachel Eva, Miles

25  7, Yongbing Zhang.  There's a nickname, "Heaven Spare No One."

O5S1GUO1                     Le Zhou - Direct

1   That's all I see.

2   Q.  Thank you.  Mr. Zhou, where were you born?

3   A.  China.

4   Q.  When did you come to the United States?

5   A.  1998.

6   Q.  Why did you come to the United States?

7   A.  I came here to study, in——for college.

8   Q.  After you moved to the US, where did you go to school?

9   A.  I went to Miami-Dade College.

10  Q.  And what did you study there?

11  A.  I was a major in music education, and I played piano and

12  the trombone.

13  Q.  Mr. Zhou, are you a supporter of the Chinese Communist

14  Party, or the CCP?

15  A.  No.

16  Q.  What experience, if any, has your family had in the past

17  with the CCP?

18  A.  Our family suffered tremendously from the Chinese

19  government, both family on my mother and my father's side.

20       My——my maternal grandparents, they went abroad to

21  study.  My grandfather was soil engineer.  He worked building

22  roads, and at the time he worked for the Chinese government.

23  After he finished building road, he become a professor at a

24  university.  During cultural revolution and the Red Guards,

25  some of his students came to their houses, physically and

1    verbally abused my both parents—grandparents.  So my maternal

2    grandmother couldn't take the shame of it, so she committed

3    suicide.  Before she did that, and she took my great

4    grandmother's life, because she thought no one would take care

5    her.  And so that, my maternal parents just—the families fall

6    apart.  My mother was only 16 at the time.

7            My father's, my grandparents' side—we used to own

8    business as regular grocery store.  We have a small plaza.  The

9    government, during Second Sino-Japanese War, they came to ask,

10   they would take our assets to help the country.  They said

11   they're going to borrow it, but it took majority of the assets,

12   left little bit for the family to survive.  My father has nine

13   sisters and brothers, but that is not enough to feed all the

14   family.  So two of the children, was forced to give away.

15           That's—that's my both parents, how they suffered from

16   this government.

17           And there's also one big impact, almost not to have me

18   to live, was one child, one—one child, one policy in China.

19   It was implemented in 1980.  At the time, my mother was already

20   seven months' pregnant, and my parents wanted to have me

21   and—but the government wanted to do a forced abortion.  So my

22   parents—my mom went hiding while my dad was reasoning with the

23   government.  In the end, he made a deal that by lowering my

24   both father's salaries and also to give up the newborn baby's

25   welfare, which is food, milk, I don't get that, so they would

O5S1GUO1                          Le Zhou - Direct

1    spare my life.

2           So—and also one experience I personally witnessed,

3    when I was 9 years old—that's 1989—the student protests

4    happened Beijing, also happening in my hometown as well.  At

5    the time we lived in apartment, very close to our hometown, the

6    government square, where the student protests happened.  So we

7    were quarantined at the house, not allowed to leave the

8    community, and we were—at a time we heard outside shouting,

9    very loud.  So I used to live on the first floor.  That day,

10   when we heard outside a lot of protests, shouting, and I went

11   up to the eighth floor to my parents' friends' house.  Their

12   balconies are facing directly to the streets.  When I walked,

13   walk up to there, at a balcony, I saw, right near a bus stop, a

14   female student was covered, someone—riot police used a sandbag

15   cover her, just yank her away, and two other just jump up and

16   beat her up.  Then later, I move my—aside to nearby, very

17   close, just looked down; there's a mall, one-story mall.  There

18   were some protestors climb up the first floor of the roof.  And

19   they were throwing some objects into the crowd.  Then we hear

20   loud bangs, then I saw the tip of the concrete wall, with the

21   rooftop, the dust just smashing, shooting the air.  We heard

22   people shouting, "Shots fired, shots fired."  We were all

23   scared.  We just quickly got inside our house.

24          So that's—that's the fear we felt for—and we know

25   the regime is cruel.

O5S1GUO1                              Le Zhou - Direct

1   Q.  And how, if at all, did those experiences affect your view
2   of the Chinese government?
3   A.  The government is not——is untrustworthy.  Their cruelty and
4   brutality, it's unimaginable.
5   Q.  Mr. Zhou, you mentioned that you had been a follower of
6   Miles Guo.  When did you first learn about Miles Guo?
7   A.  Back in 2017, earlier, February.
8   Q.  And how did you learn about him?
9   A.  I watched YouTube, while he's broadcast.
10  Q.  What did you see on YouTube about Miles Guo in 2017?
11  A.  At the beginning, Miles Guo was doing a broadcast called
12  Safety Announcement.  So I was just curious who this person
13  was.  Then I——that's how I first watched the videos.
14  Q.  And before watching that video had you heard of Miles Guo?
15  A.  No.
16  Q.  Did you continue to watch his videos after that first time
17  that you saw him in 2017?
18  A.  Yes.
19  Q.  What, if anything, caught your attention about his
20  broadcast?
21  A.  Miles Guo introduced himself, then we learned he's a
22  self-made billionaire.  But he escaped the Chinese government's
23  persecutions, and he escaped to the United States, looking for
24  protection.  And he also started talking about corruption, the
25  Chinese high official corruptions.  He has classified

1    information; he will expose their corruptions.

2                And I also learned that he living New York, Manhattan.

3    He has——he bought his luxury hotel in New York called

4    Sherry-Netherland Hotel.  And also he introduced his family

5    back home.  He has a big family, near a hundred people in his

6    family; and his wealth, the family owns $20 billion networks

7    and he owns private jets, luxury yachts, over hundred race

8    car——luxury cars.  Also, at the time, he's well dressed in his

9    broadcast, seemed very knowledgeable, well spoken, and he talk

10   about a lot, his knowledge on cultural.  And even sometimes a

11   lot of time impressed me was he mentioned he has bodyguards,

12   24/7, and he has a legal team.  Sometimes he mentioned

13   he's——the information he holds, or he has, he will bear the

14   legal responsible for what he talk about.

15   Q.  The information that you just provided, was the source of

16   that information Miles Guo himself during those broadcasts?

17   A.  Yes.

18   Q.  Did there come a time when Miles Guo launched a

19   whistleblower movement?

20   A.  Yes.

21   Q.  How did you learn about that movement?

22   A.  Because I started watching his videos, and I know the

23   movement 'cause he called himself a whistleblower.

24   Q.  What, if anything, was the purpose of Guo's whistleblower

25   movement?

O5S1GUO1                    Le Zhou - Direct

1   A.  Whistleblower movement was to expose Chinese officials'

2   corruptions.

3   Q.  What actions, if any, did Guo encourage whistleblower

4   followers to take to combat the CCP corruption?

5   A.  At the time he used——using social media, we become

6   followers of his social accounts.  Of course I learned some of

7   the corruption he mentioned in his broadcasts.  He encouraged

8   us to spread words.  Beginning, my action was just following

9   everyone else, retweets, or sometimes repost while he talk

10  about it, just spread into other——I had created a Twitter

11  account to help to spread the words.

12  Q.  What, if anything, did Guo say about how people could join

13  the whistleblower movement and become followers?

14  A.  Beginning, he has——had his Twitter accounts, people can

15  follow him, and also, at the time, there were few very activist

16  followers appear on the social media.  There would also reveal

17  their identity, face, and join Miles's broadcasts.  At the time

18  there were one follower named Sara Wei.  She created a group

19  called Voice of Guo.  Then there was a——people can also join

20  there, also that means join the movement.  So I joined that

21  group.

22  Q.  Was Voice of Guo also called VOG at times?

23  A.  Yes.

24  Q.  How, if at all, did the followers communicate with one

25  another?

O5S1GUO1                          Le Zhou - Direct

1    A.  At the time we have software we used for everyone to

2    communicate.  It's called Discord.

3    Q.  Can you describe for the jury what Discord is.

4    A.  Discord is a free software, allow user to create channels,

5    which is like chat rooms.  The chat room then also you can

6    create subchannels for any other categorized purposes.  The

7    software, you're able to let users to join using link, and you

8    can send messages, share messages, pictures, videos, files.

9    And you can also start voice meetings in the——in the group.  So

10   when I joined, it was categorized, and the part I remember was,

11   there's subchannels as a——so they create a subchannel as a

12   working group, as a task——task force, for certain things we

13   want to do.

14   Q.  Did you and the other followers use your real names in

15   those Discord chats?

16   A.  No.

17   Q.  How, if at all, did you identify yourselves?

18   A.  I had created my user name as Coffee Cantata, then use

19   Chinese two words, Wen Lu (ph).  That was my hashtag.

20   Q.  And did other followers similarly use aliases or handles

21   when they communicated with one another?

22   A.  Yes, mostly at the time everyone has their own nickname.

23   Q.  By the way, what other names, if any, do you know Miles Guo

24   by?

25   A.  Seven Brothers, and also Ho Wan Guo; that's the Cantonese

O5S1GUO1                    Le Zhou - Direct

1    pronunciation.

2    Q.  Mr. Zhou, are you familiar with the Rule of Law

3    organizations?

4    A.  Yes.

5    Q.  What are those?

6    A.  Rule of Law was created by Miles for——it was a charitable

7    organization.

8    Q.  Around when were those Rule of Law organizations launched?

9    A.  In 2018.

10   Q.  And how did you hear about them?

11   A.  It was publicly announced during press conference.

12        MS. MURRAY:  Your Honor, at this time I would like to

13   offer a stipulation between the parties.  This is Government

14   Exhibit Stip 2.

15        THE COURT:  So I just want to remind the jurors what a

16   stipulation is.  A stipulation is an agreement between both

17   sides to present evidence to the jury without calling a witness

18   to testify about the subject matter.

19        You may read the stipulation.

20        MS. MURRAY:  Thank you, your Honor.  This is a

21   stipulation regarding web pages and videos.

22        The parties stipulate that in the chart that is

23   contained within this exhibit, which is Government Exhibit Stip

24   2, columns A, B, and C accurately list the following

25   information:

1          The government exhibits listed in column A are

2     authentic copies of web pages that were preserved from the

3     internet.  If a web page contained a video that was also

4     preserved, the associated video is designated with a V in the

5     government exhibit name.  For example, GX C20 is a preservation

6     of a web page, and GX C20-V is a preservation of the video that

7     was on that web page.

8          Column B in the stipulation lists the web address or

9     url of the web page that was preserved.

10         And column C lists the date on which the web page was

11    preserved.

12         And at this time, your Honor, there is a chart

13    contained within this exhibit which is now admitted.  I would

14    like to just note two of the exhibits noted within this chart.

15    One is GX C26 and corresponding GX C26-V.  Those are YouTube

16    videos that were preserved, and they are dated July 15, 2020.

17    And then GX C63 and GX C63-V; again, YouTube video from a web

18    page, and that's dated November 25, 2020.

19         THE COURT:  And you're moving to admit that.

20         MS. MURRAY:  Moving to admit those two exhibits from

21    within this chart and moving to admit the stipulation at this

22    time.

23         THE COURT:  They're all admitted.

24         MS. MURRAY:  Thank you.

25         (Government's Exhibits Stip 2, C26, C26-V, C63, C63-V

O5S1GUO1                          Le Zhou - Direct

1    received in evidence)

2    BY MS. MURRAY:

3    Q.  Mr. Zhou, directing your attention to November of 2018, did

4    there come a time when you watched a livestream of an

5    announcement relating to the Rule of Law?

6    A.  Yes.

7    Q.  Do you recall on what website you watched that

8    announcement?

9    A.  It was on a livestream.

10   Q.  The website is named Livestream?

11   A.  That was a link.  It's a—livestream will push out the

12   channel, the broadcast, but the channel was under Rule of Law

13   Foundation.  The livestream, I believe the website associated

14   was Vimeo.

15           MS. MURRAY:  Your Honor, we would move to admit one

16   more exhibit from GX Stip 2.  That's GX W1005 and GX W1005-V,

17   and that's YouTube, and it was preserved on February 9, 2024.

18           THE COURT:  They're admitted.

19           (Government's Exhibits W1005, W1005-V received in

20   evidence)

21           MS. MURRAY:  Thank you.

22           Ms. Loftus, could we now publish what's admitted in

23   evidence GX W1005-V.

24   BY MS. MURRAY:

25   Q.  Mr. Zhou, do you recognize this video?

O5S1GUO1                          Le Zhou - Direct

1    A.  Yes.

2    Q.  Have you viewed it before?

3    A.  I watched it earlier and live.

4    Q.  And there's an insignia on the top left here.

5              MR. KAMARAJU:  Your Honor, I apologize.  Could we have

6    a brief sidebar on this.

7              THE COURT:  All right.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2                    MR. SCHIRICK:  Your Honor, the defense just wanted to

3        be clear that the stipulation was just to the online

4        preservation.  We hadn't stipped to moving it into evidence.

5        So we have an objection to hearsay.  It's going to——they're

6        going to play a video of Mr. Bannon speaking at this press

7        conference.

8                    THE COURT:  So I don't understand what you're saying

9        was not admitted through the stipulation.

10                   MR. SCHIRICK:  The stipulation, your Honor, was just

11       to authenticity.  It was to the video having been pulled down

12       from the source.  The stip did not go to the admissibility.

13                   THE COURT:  Go ahead.

14                   MR. FERGENSON:  That's correct, your Honor.  It's just

15       authenticity in the stip.  I understand the objection is to

16       hearsay.  We're not offering this video clip for the truth of

17       what Mr. Bannon is saying in it; we're offering it for the

18       falsity of what he's saying.  And it's a clip from the joint

19       announcement of the Rule of Law Fund, where both Mr. Guo and

20       then Mr. Bannon speak, and this is a clip from Mr. Bannon's

21       speech.

22                   THE COURT:  So are you seeking to admit it because

23       it's an admission?

24                   MR. FERGENSON:  No, because it's not offered for its

25       truth.  We're offering it for the fact that it was said.

O5S1GUO1                          Le Zhou - Direct

1         MR. SCHIRICK:  Your Honor——

2         THE COURT:  For the effect on the listener?

3         MR. FERGENSON:  Correct, your Honor.  These are launch

4    videos that victims watched and believed.

5         MR. SCHIRICK:  And your Honor, what Mr. Bannon is

6    going to say in that video that the government is going to show

7    the witness and the jury is a statement by Mr. Bannon that

8    Mr. Guo was going to start the Rule of Law Foundation with a

9    hundred million dollars.  They contend that that was a

10   representation that it was his own money.  So it is in fact

11   offered for the truth of that statement, that that's in fact

12   what Mr. Bannon said and that that was, in effect, a

13   misrepresentation.  So I'm not sure that there is not——there

14   are nonhearsay issues here.  And——

15        THE COURT:  Are you suggesting a curative instruction?

16        MR. SCHIRICK:  I think we do need a limiting

17   instruction, your Honor.  But I think there is a risk of 403

18   with the jury here as well.

19        THE COURT:  I would expect that numbers of these types

20   of statements, video or otherwise, are going to be propounded

21   by the prosecution; am I correct?

22        MR. FERGENSON:  Yes, your Honor.

23        THE COURT:  So I'm looking for an application for a

24   limiting instruction.

25        MR. SCHIRICK:  We would ask, your Honor, that the jury

O5S1GUO1                       Le Zhou - Direct

1    be given a limiting instruction that this is not a

2    statement——that Mr. Bannon's statement is not a statement

3    attributable to Mr. Guo.

4             MR. FERGENSON:  We would object to that.  That's not

5    necessary for the admission of the statement.  We would be fine

6    with a limiting instruction that said these statements are not

7    being offered to prove the truth of the matter asserted.

8    That's the definition——

9             MR. KAMARAJU:  Your Honor, since this is just an

10   authenticity stip, I think the prosecution has to lay the

11   foundation in order to introduce this through the witness.  I

12   know this one has already come in, but I think as these videos

13   are coming in, I think the proper format is to do that first.

14            THE COURT:  Absolutely.

15            MR. KAMARAJU:  Thank you, your Honor.

16            THE COURT:  Okay.

17            (Continued on next page)

18

19

20

21

22

23

24

25

O5S1GUO1                          Le Zhou - Direct

1              (In open court)

2     BY MS. MURRAY:

3     Q.  Mr. Zhou, there's a logo on the top left of this

4     screenshot.  Do you see that?

5     A.  Yes.

6     Q.  What does that read?

7     A.  Guo Media.

8     Q.  What is Guo Media, or what was Guo Media at the time?

9     A.  It was earliest symbol that was created for this movement.

10    There was a media channel.  That's the name for it.

11    Q.  And what type of content, if any, was posted on Guo Media

12    at this time?

13    A.  At this time, this was that press conference happening in

14    New York.

15             MS. MURRAY:  Ms. Loftus, if we could please play this

16    video.  This is Government Exhibit W1005-V1.

17             THE COURT:  Is it now that you're looking for me to

18    give the limiting instruction?

19             MR. KAMARAJU:  Yes, your Honor.

20             THE COURT:  Members of the jury, this video is not

21    being offered by the government for the truth of what is stated

22    in the video.  Keep that in mind as you watch it.

23             MS. MURRAY:  Thank you, your Honor.

24             (Video played)

25    BY MS. MURRAY:

O5S1GUO1                        Le Zhou - Direct

1   Q.  Mr. Zhou, do you recognize the individual depicted in this

2   video?

3   A.  Yes, I do.

4   Q.  Who is it?

5   A.  Steve Bannon.

6   Q.  What role, if any, did Steve Bannon have with the Rule of

7   Law?

8   A.  He was the co-founder of the Rule of Law Foundation.

9   Q.  What, if anything, did you learn from the Rule of Law

10  livestream that you saw in 2018 about whether Miles Guo was

11  donating money to the Rule of Law?

12  A.  The video I learned from was the conference that talk about

13  this announcement and also talk about this fund will use to

14  help Chinese dissidents and to have them to financially help,

15  and also help them with legal support, and to also use the fund

16  to investigate mysterious business deaths.

17          THE COURT:  I'm sorry.  Investigate mysterious what?

18          THE WITNESS:  Business——persons' deaths.

19          THE COURT:  Deaths.  All right.  Go ahead.

20  Q.  Did you have an understanding of whether the Rule of Law

21  Fund would be funded with a certain amount of money at its

22  inception?

23  A.  Yes.  There was hundred million dollars.

24  Q.  Now you said from your viewing of Miles Guo's broadcast

25  that at that time you had the impression that Miles Guo was

1    wealthy; is that correct?

2    A.  Yes.

3    Q.  At the time that you viewed this launch video in 2018, did

4    you believe that Miles Guo could donate a hundred million

5    dollars to the Rule of Law charity?

6    A.  Yes.

7            MS. MURRAY:  We can take that down, Ms. Loftus.  Thank

8    you.

9    Q.  Did there come a time when you donated to the Rule of Law?

10   A.  Yes, I did.

11           MS. MURRAY:  Your Honor, may I approach the witness?

12           THE COURT:  You may.

13           MS. MURRAY:  Thank you.

14           I've handed the witness a binder that contains

15   exhibits that are marked for identification as GX C26,

16   GX C63-V1 and V4, GX CT209 and 211, GX VI150-160 and their

17   corresponding translations, GX VI180 through 190 and their

18   corresponding translations, GX V02, 13, 15-16, 18-19, 22-23,

19   25-29, 31, 59, 67-69, 77-78, 81-82, and 84, as well as

20   GX W1005, GX W56-57 and GX W59.

21   BY MS. MURRAY:

22   Q.  And Mr. Zhou, I'd ask if you would briefly flip through

23   that binder and let me know if you recognize the exhibits that

24   are in that binder.

25   A.  Yes.

1    Q.  Are those documents——are some of those documents, documents

2    that you provided to the government in connection with your

3    time when you were a follower of Miles Guo?

4    A.  Correct, yes.

5    Q.  Have you reviewed all of the exhibits that are contained

6    within that binder?

7    A.  Sorry.  At this moment?

8    Q.  Previously, before today.

9    A.  Before, yes, all.

10             MS. MURRAY:  Your Honor, at this time the government

11   would move to admit Government Exhibits GX V2, 13, 15-16,

12   18-19, 22-23, 25-29, 31, 59, 67-69, 77-78, 81-82, and 84.

13             THE COURT:  They are admitted.

14             MR. KAMARAJU:  No objection.

15             MS. MURRAY:  Thank you.

16             (Government's Exhibits V2, 13, 15-16, 18-19, 22-23,

17   25-29, 31, 59, 67-69, 77-78, 81-82, and 84 received in

18   evidence)

19             MS. MURRAY:  Ms. Loftus, can you please publish what's

20   now in evidence as Government Exhibit VO27.

21             If we could zoom in on the top portion.

22   BY MS. MURRAY:

23   Q.  Mr. Zhou, what is this?

24   A.  That's my receipt, donation receipt.

25   Q.  And what date is this document?

1    A.  May 18, 2019.

2    Q.  What donation does this reflect?

3    A.  This is donation to Rule of Law Foundations in $500, my

4    first donation.

5    Q.  Why did you donate to the Rule of Law in 2019?

6    A.  Yes, because I'm part of the follower, I want to help any

7    of the dissidents, as many as I can, not just follow Miles Guo

8    to help them, so that's the same goal I wanted to help.

9    Q.  If Miles Guo had not donated a hundred million dollars to

10   the Rule of Law, if you had known that at the time, would that

11   have been important to you?

12            MR. KAMARAJU:  Objection to form.

13            THE COURT:  Overruled.  You may answer.

14   A.  Yes.

15   Q.  Why would it have been important to you at that time if you

16   had known that Miles Guo had not donated a hundred million

17   dollars to the Rule of Law?

18   A.  Because there's a lot of people that need help, Chinese

19   people, there's a lot of dissidents.  Me alone, 500—I can do

20   as much as I can, but a hundred million dollars, that can help

21   a lot of people.

22            MS. MURRAY:  We can take that down, Ms. Loftus.  Thank

23   you.

24   Q.  Mr. Zhou, did there come a time when you volunteered for

25   Miles Guo and his whistleblower movement?

O5S1GUO1                    Le Zhou - Direct

1    A.  Yes, I did.

2    Q.  Around when did you begin to volunteer?

3    A.  In 2017, couple months I followed, I start following, just

4    retweeting when Miles Guo started, and later I also volunteered

5    to transcribe Miles Guo's videos.  I also did translation and

6    video editing, and I also helped the streaming services for the

7    movement.

8    Q.  Who, if anyone, assigned that volunteer work to you?

9    A.  From beginning, from the VOG, there were some volunteer

10   groups, they give me the transcript work to do; then later, the

11   work assigned from farm management teams.

12            THE COURT:  What do you mean by transcript work?

13            THE WITNESS:  Yes, your Honor.  Transcript means, most

14   of Miles Guo's video, it's in Chinese speaking.  Now there's

15   not a subtitle.  So we would have to create the subtitles.

16   That's transcript.  I would listen the video, take down what

17   Miles Guo said in Chinese, then type it into a Chinese, become

18   a subtitle.

19   Q.  And when you say farm, you mentioned that some of the work

20   was assigned to you by farm leaders.  Can you explain to the

21   jury what you mean by farm.

22   A.  Farm is a adjective.  It's quotation for work, but the real

23   meaning is refer to offices, and Miles Guo mentioned, when the

24   whistleblower established, he wanted to have 50 farms, in

25   different regions in——throughout the world, become the

O5S1GUO1                    Le Zhou - Direct

1    subdivisions, offices.

2    Q.  In what way, if any, were the farms kind of organized under

3    one unit?

4    A.  The farm organized——there are person we call farm leader.

5    Most of the people were——beginning were very active as a

6    follower, follow the movement, follow movement.  Those people

7    are some——most of them are designated by Miles Guo to become

8    the farm leaders.  So there were farm, once it's created, in

9    different countries, regions, then also gather people locally

10   or online to have their own groups, but all under one of the

11   headquarter, which is farm called Himalaya Global Alliance to

12   managing those farms.

13   Q.  Who, if anyone, was in charge of the Himalaya Global

14   Alliance?

15   A.  At the time Global Alliance was only a few people and Miles

16   Guo was one.  There are two——few peoples.  Then they call

17   themself Iron Blood, a group.

18   Q.  Why, if at all, did the leaders of the Himalaya Global

19   Alliance, Miles Guo and the others, call themselves the Iron

20   Blood group?

21   A.  There were individuals selected by Miles, to give titles,

22   because Himalaya Global Alliance form with a designated

23   chairman, secretary general, and there's a few people that

24   Miles Guo designated those people.  Miles Guo said, those are

25   brothers because those brothers are willing to sacrifice for

O5S1GUO1                          Le Zhou - Direct

1    him and shed the blood with him and for this movement.  So that

2    name was formed from that.

3    Q.  Returning to your volunteer work that you did for the

4    movement, were you paid for that work?

5    A.  No.

6    Q.  You mentioned that you were involved in, among other

7    things, streaming.  On what website or websites did you stream

8    content?

9    A.  On streaming, I did YouTube, and also on Gettr and GTV.

10   Q.  What is Gettr?

11   A.  Gettr is a——a social platform created by Miles Guo.  It's

12   similar to Twitter.  It's just like Twitter features.  You

13   share your posts and people can follow, retweet.

14   Q.  What is GTV?

15   A.  GTV, it's a website that similar act as YouTube, allow you

16   to post and the livestreams, post videos.

17   Q.  And who, if anyone, was in charge of GTV?

18   A.  In charge of GTV, I don't know.

19   Q.  Whose company, if anyone's, was GTV?

20   A.  Oh, GTV was owned by Guo Media.

21   Q.  And who owned, in turn, Guo Media?

22   A.  That, I don't know who owned the company.

23   Q.  Focusing on GTV for a moment, what, if anything, at that

24   time, in 2018, 2019, did Miles Guo say about GTV?

25   A.  Miles——GTV here introduced, and he called out for

O5S1GUO1                        Le Zhou - Direct

1    investment that asked people who like to invest into GTV.

2    Q.   Around when did Miles Guo offer an investment opportunity

3    into GTV?

4    A.   Earlier 2020.

5    Q.   Directing your attention to March of 2020, did you

6    participate in a Guo broadcast regarding that GTV investment

7    opportunity?

8    A.   Yes, I did.

9    Q.   What, if anything, did Guo ask his followers about their

10   interest in investing in GTV during that broadcast?

11   A.   I remember I watched the video live when it was broadcast.

12   Miles Guo was calling people who like to invest in GTV.  He

13   mentioned if you like to invest in $10,000, raise your hand in

14   the chat group by posting of the emoji, icon, as your intent.

15   He also asked, let me see who wanted to invest hundred thousand

16   dollars using two of the emoji as your intent.

17   Q.   And during that broadcast what level of interest, if any,

18   was there from the followers in investing in GTV?

19   A.   I sent one emoji as for intent for $10,000.

20   Q.   From your viewing of that live broadcast did other

21   followers similarly indicate their interest in investing in

22   GTV?

23   A.   Yes, there were a lot of one emoji for 10,000 and also few

24   a hundred thousand dollars investment that people putting two

25   emojis.

O5SVGUO2                          Le Zhou - Direct

 1    BY MS. MURRAY:

 2    Q.  Now, directing your attention to April 21st of 2020, did

 3    you watch a pre-recorded broadcast that Guo streamed about the

 4    GTV investment opportunity?

 5             MR. KAMARAJU:  Objection to form, your Honor.  She's

 6    testifying.

 7             THE COURT:  You can restate the question.

 8    Q.  Directing your attention to April 21st of 2020, did you

 9    watch any broadcasts on that day that were relevant to GTV?

10    A.  Yes.

11    Q.  Did those include a broadcast of Miles Guo?

12    A.  Yes.

13    Q.  What, if anything, was the subject of what Miles Guo was

14    discussing during that broadcast?

15    A.  Yes.  I remember I got a share link for that.  Miles Guo

16    mentioned the GTV.  First he mention any investment has risk.

17    Then for any investor you will make your own judgment.  Then he

18    talk about the GTV.  We know that's the mention based on his

19    part to talk about GTV investment.  He mention about the GTV

20    how become today.  There's a breakthrough because GTV has been

21    targeted, he mentioned target by CCP, hacking, a lot of hackers

22    trying to take down.  The GTV was pulled us off, it's not easy.

23             But he mentioned that GTV future forecasts, this is a

24    platform that's intended for Chinese dissidents have a voice,

25    freedom of speech.  We're the only one; no other platform.

1          And he mentioned this, as we all see, GTV future

2    growths.  From the current six people online at the same time,

3    but eventually will grow to thousands people doing the

4    broadcast together, the skill of it.  And so I remember that

5    video also post contact information, his personal contact

6    information for the investment.  If anyone want to invest, can

7    direct contact.

8    Q.  When you say his personal contact information, to whom are

9    you referring?

10   A.  Miles Guo.

11   Q.  So in that video, Miles Guo provided his information for

12   people to contact regarding an investment?

13   A.  Yes.

14   Q.  What, if anything, did Miles Guo say in that video about

15   what you would get in exchange for investing in GTV?

16   A.  Will get stocks, GTV stocks.

17          MS. MURRAY:  Your Honor, at this time I would like to

18   offer a stipulation between the parties.  This is Government

19   Exhibit STIP-9.

20          The stipulation reads that the parties stipulate and

21   agree that in the below chart which is contained in this

22   exhibit, the exhibits listed under column A contain audio or

23   text in a foreign language; and in the chart that's contained

24   within this stipulation, the exhibits listed under column B are

25   true and accurate translations of the audio or text contained

O5SVGUO2                          Le Zhou - Direct

1    in the exhibits listed under column A.  The stipulation further

2    stipulates and agrees that the stipulation, as well as the

3    government exhibits listed under column B — those are the

4    translation and transcript stipulations — may be received into

5    evidence as government exhibits at trial.

6             THE COURT:  The stipulation is admitted.

7             (Government's Exhibit STIP-9 received in evidence)

8             MS. MURRAY:  And with respect to the particular items

9    contained within the chart, at this time the government would

10   move to admit GX C-26-V and its corresponding GX C-26-T, which

11   is the translation and transcription; as well as GX C-63-V, and

12   its corresponding GX C-63-T, which is the transcription and

13   translation.

14            THE COURT:  No objection?

15            MR. KAMARAJU:  No.  I would just ask the government to

16   go ahead and just admit all the exhibits that are in the stip

17   for efficiency.

18            MS. MURRAY:  Sure.  We would then move to admit all of

19   the exhibits contained within the chart that's in Government

20   Exhibit STIP-9.

21            THE COURT:  They are admitted.

22            MS. MURRAY:  Thank you.

23            Ms. Loftus, can you please pull up Government Exhibit

24   GX C-26.

25            Just a moment, your Honor.

O5SVGUO2                          Le Zhou - Direct

 1              (Counsel conferred)

 2              MS. MURRAY:  Your Honor, I would like to withdraw the

 3      request to admit all of the items contained within this

 4      stipulation.  The parties' agreement was to admit certain of

 5      the translations, but not the full videos listed in column A.

 6              So I would like to withdraw the request to admit

 7      everything that's noted within the chart.  At this time I would

 8      just move to admit the two particular exhibits that I had

 9      mentioned.

10              THE COURT:  All right, then.  So those items that were

11      admitted are not admitted, and what you're requesting to admit

12      now is admitted.

13              MS. MURRAY:  Thank you, your Honor.

14              So just for clarity for the record, what I'm seeking

15      to admit is Government Exhibit STIP-9, which is the

16      stipulation; Government Exhibit C-26-V and C-26-T, and

17      Government Exhibit C-63-V and C-63-T.

18              THE COURT:  They are admitted.

19              MS. MURRAY:  Thank you.

20              (Government's Exhibits C-26-V, C-26-T, C-63-V, C-63-T

21      received in evidence)

22              MS. MURRAY:  All right.  Ms. Loftus, if we could

23      please put up Government Exhibit C-26.

24      BY MS. MURRAY:

25      Q.  Mr. Zhou, looking at this, do you recognize this video?

O5SVGUO2                          Le Zhou - Direct

 1   A.  Yes.

 2   Q.  And up in the top left there is a logo and insignia.  Do

 3   you recognize that?

 4   A.  Yes, I do.

 5   Q.  What is it?

 6   A.  GTV logos.

 7   Q.  Did you watch this video when it was posted online in April

 8   2020?

 9   A.  No, it wasn't posted online when I watch it, so I share a

10   link.

11   Q.  And who, if anyone, shared the link with you to the video?

12   A.  One of the farm members.

13   Q.  When you say the link was shared, how was it shared with

14   you?

15   A.  I shared it on the telegram, our working -- the farm

16   working channels.

17   Q.  So that's over phone application; is that correct?

18   A.  Yes.

19           THE COURT:  What do you mean by "telegram"?

20           THE WITNESS:  Yes, your Honor.

21           Telegram is another social media software.  It's more

22   like you can allow you instant message, you can do it as

23   individual one-on-one or you can also have a group chat.  And

24   there you able -- also you can share your files, pictures,

25   links, videos, etc.

1          MS. MURRAY:  Ms. Loftus, can you please play this

2    video from the beginning up until 41 seconds.

3          (Video played)

4          MS. MURRAY:  Thank you.  We can take that down.

5    BY MS. MURRAY:

6    Q.  Mr. Zhou, what, if anything, did Guo say during that video

7    that was broadcast about the amount of stock that one would

8    receive in exchange for their GTV investment?

9    A.  I remember was the GTV stock in total was about to issue 20

10   million to 200 million stocks.

11   Q.  And what, if anything, did he say about how much stock

12   somebody would get for the money that they invested personally?

13   A.  One dollar per share.

14   Q.  Did there come a time when you invested in GTV?

15   A.  I'm sorry, would you -- could you please repeat the

16   question.

17   Q.  Sure.  Did there come a time when you invested in GTV?

18   A.  Yes, I did.

19   Q.  When was that?

20   A.  I invested end of the May 2020.

21   Q.  And how much did you invest?

22   A.  I send two payments total for $31,300.

23   Q.  Where did you send your money for that GTV investment?

24   A.  I send it through VOG, Voice of Guo, the channel which

25   control by Sara Wei.

1  Q.  Why did you send your GTV investment to VOG or Voice of

2  Guo?

3  A.  Because my investment is less than $100,000, and also Sara

4  was designated person also can take the GTV placement, private

5  placement.

6  Q.  Can you explain for the jury how, if at all, it was

7  relevant that your investment was below $100,000?

8  A.  Could you please be more specific.

9  Q.  Sure.  So I believe that you said because your investment

10  was below $100,000, you sent it to VOG; is that correct?

11  A.  Yes.

12  Q.  Who, if anyone, directed you to send your investment which

13  was below $100,000 to VOG?

14  A.  Because the first GTV Miles Guo mentioned about the GTV

15  placement, they were giving out only 2,000 seats.  There is a

16  head count, it's limitation on there.  The limitation then the

17  people can -- minimum you can invest $100,000 up to all the way

18  to millions, million dollar.  But it's limited seats.  And if a

19  lot of people, especially not qualified for the seats or less

20  $100,000, but we can have this other company to invest on our

21  behalf to acquire the GTV stocks.  So that was -- I was -- I

22  understand myself my investment is not qualified with the

23  seats.  And it's not exceeds over $100,000, so I just went

24  through the VOG, ask for the investment.

25  Q.  So at that time was it your understanding that VOG invested

O5SVGUO2                         Le Zhou - Direct

1   on your behalf and on behalf of others in GTV?

2   A.  No, they are --

3            MR. KAMARAJU:  Objection, your Honor, to form.

4            THE COURT:  Sustained.  Don't lead.

5   Q.  Did you have an understanding at the time in whose name

6   your money was being invested?

7   A.  GTV Media.

8   Q.  And for purposes of the shares, whose names, if anyone's,

9   would be on the shares that you spent your money to invest in?

10           MR. KAMARAJU:  Objection to form.

11           THE COURT:  If you'd rephrase, please.

12           MS. MURRAY:  Sure.

13  Q.  Mr. Zhou, you mentioned that you invested your money

14  through VOG; is that correct?

15  A.  Yes.

16  Q.  What arrangement or legal agreement, if any, did you enter

17  into with VOG?

18           MR. KAMARAJU:  Objection to form.

19           THE COURT:  Did you enter into a legal agreement?

20           MS. MURRAY:  Thank you.

21  Q.  Did you enter into a legal agreement with VOG?

22  A.  Yes.

23  Q.  Can you describe that legal agreement to the jury, please.

24  A.  It was agent agreement.  Sara Wei would act as my agent to

25  take my investment for the GTV investment.

O5SVGUO2                        Le Zhou - Direct

1            MS. MURRAY:  Ms. Loftus, can we please publish

2    Government Exhibit VO-81.

3    Q.  Mr. Zhou, what is this?

4    A.  This is wire instruction I received.

5    Q.  And who, if anyone, sent this to you?

6    A.  Sent by Sara Wei, the Voice of Guo channel leader.

7    Q.  I think you mentioned previously that Sara Wei had some

8    role within the Himalaya Global Alliance.  Can you just

9    describe that for the jury.

10   A.  Yes.  She was very active follower before.  She reveal

11   herself and joined the movement as well.  Then she had some

12   meeting with Miles Guo, even publicly, live broadcast together.

13           So at the time she was with another person that she

14   was very active and designated.  And because she also gather

15   some followers and fall through the whistleblower movement.

16   She form a group; she was the whistleblower movement.

17           So at the time Miles Guo was also designate her as the

18   followers, the group leaders.  And she can also have

19   authorization from Miles Guo to collect GTV investment for us.

20           MS. MURRAY:  Ms. Loftus, can we please publish

21   Government Exhibit VO-82.  Zoom in on the top.

22   Q.  Mr. Zhou, what is this?

23   A.  That's my wire confirmations.

24   Q.  And looking at this, what was the date of this wire

25   transfer?

O5SVGUO2                        Le Zhou - Direct

1   A.  May 28, 2020.

2   Q.  And it was a wire sent to where?

3   A.  It was sent to Voice of Guo Media.

4   Q.  And what was the amount of this particular wire?

5   A.  $20,000.

6           MS. MURRAY:  We can take that down.  Thank you.

7   Q.  Why did you want to invest in GTV at that time in May of

8   2020?

9   A.  Because first I want to get a GTV stock.  And the GTV, I

10  was also the user.  And this is a platform.  GTV website also

11  is for the freedom of voice for other Chinese people

12  dissidents.  And I was follower myself.  I really a believer

13  for this movement.  I want to just be part of it and also to

14  help grow this GTV.  The GTV was just like any other tech

15  companies started.

16          There's also about Miles Guo mention we also will grow

17  this to become the world number one social media platform,

18  surpass YouTube.  We have all the features, we'll combine Zoom,

19  combine YouTube, we'll have the best top technology implemented

20  into this GTV.  So for that I want to be part of it.  So I

21  invested.

22  Q.  When Miles Guo said at the time in 2020 that GTV would

23  surpass YouTube, did you believe him then?

24  A.  Yes.  Eventually.

25  Q.  Did you, in fact, receive stock or any shares in exchange

O5SVGUO2                         Le Zhou - Direct

1    for your GTV investment?

2    A.  No.

3    Q.  At that time in 2020, what, if anything, did Miles Guo say

4    about whether there was a risk of losing your principal

5    investment in GTV?

6    A.  He made a personal guarantee that for other people invested

7    in GTV would not lose their money; he made personal guarantee

8    on that.

9    Q.  Can you explain what you mean by "personal guarantee."

10   A.  During his broadcast, he mentioned all the money we

11   invested, that principal would never lose, lost even a cent.

12   He will pay -- personally pay back.

13   Q.  And at that time, in 2020, did you believe that Miles Guo

14   was capable of paying or guaranteeing your investment?

15   A.  Yes.

16   Q.  At that time, 2020, did you have an understanding from

17   Guo's broadcasts about the value of GTV stock?

18   A.  Yes.

19   Q.  What was your understanding?

20   A.  There is another broadcast lively on Miles Guo broadcast

21   that I watch live on that day, where successfully closeout the

22   placement, GTV private placement was announcement.  Miles Guo

23   mention have a receive -- GTV alone received $335 million; from

24   VOG received 117 million.  And combine, that's near -- he said

25   near $500 million investment.

O5SVGUO2                    Le Zhou - Direct

1          And the valuation at the time of GTV, he gave out the

2     statement about the value was $2 billion.  Then he added from

3     his legal team and from his financial experts the valuation

4     should be $10 billion.  So just that moment he explained the

5     investment we did, from 7 point time -- jumped to estimate made

6     about 30 times.

7     Q.  And at the time that you watched that broadcast in 2020,

8     did you believe Miles Guo regarding the valuation of GTV?

9     A.  Yes, I did.

10          MS. MURRAY:  Ms. Loftus, can we please pull up

11    Government Exhibit C-63-V, which is in evidence.  If we could

12    just publish it to the jury, please.

13    Q.  Mr. Zhou, do you recognize this video?

14    A.  Yes.

15    Q.  Is this a broadcast that you watched at the time that it

16    was posted on the internet in 2020?

17    A.  Yes.

18          MS. MURRAY:  Ms. Loftus, if we could go to the

19    12-minute-and-40-second mark, please, and start playing.

20          (Video played)

21          MS. MURRAY:  We can pause for a moment please.

22          Your Honor, we've also admitted Government Exhibit

23    C-63-T, which is the translation and transcript of this video.

24    I'm going to play this portion and then I'm going to ask

25    Mr. Zhou to read portions of that transcript.

O5SVGUO2                        Le Zhou - Direct

1            Thank you, Ms. Loftus.  We can continue.

2            (Video played)

3            MS. MURRAY:  You can stop there.  Thank you.

4            Ms. Loftus, if you could please now publish for the

5  jury what's in evidence as Government Exhibit C-63-T.  And if

6  we could go down to the time stamp of 12:40, please.  And zoom

7  in on the right.

8  Q.  Mr. Zhou, this is a translation and transcription of the

9  video clip that we just watched.  If you could just read in the

10  right column there the English for the jury.

11  A.  Sure.

12            We had an initial valuation of 200 million for GTV,

13  and the private placement required a minimum investment of 20

14  million.  The private placement exceeded the highest

15  expectations and raised 350 million.  This is up to now, this,

16  this figure, ah, is about 360 million, let's say 350 million.

17  350 million does not include the 117 million from VOG.  If 117

18  million plus 350 million, it's more than 400 million -- sorry,

19  480 million, which is almost, almost, almost, almost 500

20  million, almost 500 million.

21            But the figure we have now is the 350 million

22  received, which is just for the contracts with GTV.  This turn

23  out to be a conservative estimate and 17.5 times the valuation.

24  Given the tremendous demand for GTV shares and the good capital

25  position of GTV going forward, my lawyers and financial experts

O5SVGUO2                          Le Zhou - Direct

1   mutually agree that a $2 billion valuation is probably too low,

2   and that the actual value of the company is probably closer to

3   10 billion given the tremendous demand for GTV shares.

4              MS. MURRAY:  Thank you.  We can take that down.

5   Q.  Mr. Zhou, at the time that you watched this broadcast in

6   2020, did you believe Miles Guo that the value of GTV was

7   approximately $10 billion?

8   A.  Yes.

9   Q.  At the time that you invested in GTV in 2020, what, if

10  anything, did you understand that your investment would be used

11  for?

12  A.  Yes.  The money first will use to enhance the GTV's

13  features, purchasing top tiers companies and to expand GTV to

14  become -- to take over the YouTube, become world number one

15  social media.

16  Q.  At that time in May of 2020, if you'd believed that Guo

17  would use GTV investment money for his own personal expenses,

18  would you have invested in GTV?

19             MR. KAMARAJU:  Objection to form, your Honor.

20             THE COURT:  If you'll step up, please.

21             (Continued on next page)

22

23

24

25

O5SVGUO2                          Le Zhou - Direct

1              (At sidebar)

2              THE COURT:  I'll hear your objection.

3              MR. KAMARAJU:  Your Honor, Ms. Murray continues to

4    just embed facts that are not in evidence, asking questions,

5    then asking the jury to infer -- asking the witness to agree

6    with them.  That's, in essence, putting her own testimony in

7    front of the jury.  If she wants to elicit those questions, she

8    can ask open-ended questions.  That was our objection to the

9    form.

10             MS. MURRAY:  Your Honor, I believe that the Court

11   ruled that hypotheticals could come in in questioning of

12   witnesses and, in particular, victim witnesses.  And that is

13   what I'm posing to this witness.

14             THE COURT:  I don't see how she gets at it without

15   asking hypothetical questions.

16             MR. KAMARAJU:  She could still lay the foundation

17   prior to asking a hypothetical.

18             THE COURT:  So I think that he's asking you to state

19   whether it's his understanding — the witness's understanding —

20   that -- or whether he knows whether Mr. Guo invested the money

21   that he claimed that he had invested.

22             MR. FERGENSON:  Your Honor, you had ruled in pretrial

23   rulings that to prove materiality, we can ask the hypothetical

24   question such as, If you had known X, would you have invested?

25   And that's, you know, standard in fraud cases like this.

O5SVGUO2                           Le Zhou - Direct

 1                THE COURT:  Of course.  Of course.

 2                I don't think that it's improper though for her to ask

 3       whether --

 4                MR. FERGENSON:  To establish he doesn't, in fact, know

 5       how it was used -- I'm sorry.

 6                THE COURT:  The fact that she's assuming is that

 7       Mr. Guo did not invest the $100 million.  And so do you know

 8       whether the witness knows whether Mr. Guo invested the $100

 9       million?

10                MS. MURRAY:  So this is with respect in particular to

11       the witness's GTV investment and other GTV investment money.  I

12       don't believe the witness has any personal knowledge of how

13       that money was used, except to say that, sitting here today,

14       the witness has an understanding that it was not all used for

15       GTV's business and instead was used for personal expenses.

16                MR. KAMARAJU:  Understanding based on the government's

17       allegations, your Honor, not on any evidence --

18                MS. MURRAY:  And just to be clear, that's why I asked

19       the question in the manner that I did.

20                THE COURT:  I don't know that it is detrimental for

21       her to ask it this way as opposed to asking whether he knows if

22       the money was used by Mr. Guo to invest.

23                MR. KAMARAJU:  To me, your Honor, the problem is your

24       Honor definitely ruled that they can ask a hypothetical.  So

25       the question is is what, if any, foundation they have to lay

1   prior to asking a hypothetical.

2              THE COURT:  Exactly.

3              MR. KAMARAJU:  So to me, maybe it's just a form point

4   on this particular hypothetical.  I suspect they are going to

5   ask many more, so that's why I think it's appropriate to raise

6   it now.  To me, she can just establish the basic foundation for

7   it, and then she can say -- she can ask her hypothetical if she

8   wants.

9              THE COURT:  Okay.

10             MS. MURRAY:  I will do that.  I did ask if he had an

11  understanding of how the money was used; but I can ask that

12  question again if that would be sufficient foundation.

13             MR. KAMARAJU:  That's the distinction.

14             MS. SHROFF:  The question is whether he had knowledge,

15  not what his understanding is.  Because his understanding could

16  come from your prep of him during his preparation for his

17  testimony here.  The question is what knowledge he had at that

18  time, not the knowledge he has now.

19             MR. FINKEL:  At the time his understanding would

20  address all these concerns and be consistent with the Court's

21  ruling.

22             MS. SHROFF:  Not understanding knowledge.

23             THE COURT:  You can ask about knowledge and then ask

24  your hypothetical.

25             MS. MURRAY:  Thank you, your Honor.

O5SVGUO2                        Le Zhou - Direct

 1                MR. KAMARAJU:  Thank you, your Honor.

 2                (In open court)

 3                THE COURT:  You may continue.

 4                MS. MURRAY:  Thank you, your Honor.

 5     BY MS. MURRAY:

 6     Q.  Mr. Zhou, in May of 2020, when you invested in GTV, did you

 7     have any knowledge of how your investment was going to be used?

 8     A.  Yes.

 9     Q.  And what did you believe your investment would be used for,

10     again, in May of 2020.

11     A.  Yes, at the time I believe my investment will use to

12     enhance the GTV, to bring this GTV platform to number one

13     leading social media platform.

14     Q.  At that time, in May of 2020, if you had believed that

15     Miles Guo would use your GTV investment money for his personal

16     expenses, would you have invested in GTV?

17                MR. KAMARAJU:  Objection, your Honor.

18                We just addressed this at side bar.

19                THE COURT:  If you'll step up again.

20                (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5SVGUO2                          Le Zhou - Direct

1          (At sidebar)

2          THE COURT:  Are you asking for -- stating that she

3    needs to ask whether Mr. Guo used the money?  I mean, what is

4    the question that you're looking for?

5          MR. KAMARAJU:  No, I thought -- my understanding when

6    we left the sidebar was that she was going to ask questions do

7    you know how the money was used.  She has not asked it.

8          MS. MURRAY:  I believe I did ask that.

9          MR. KAMARAJU:  No, the question that I heard — if I

10   got it wrong, I apologize — was how did he believe he thought

11   the money was going to be used.  She never asked the follow-up

12   question of do you know how the money was used in May of 2020.

13         THE COURT:  So you're going to ask the "do you know"

14   question.

15         MS. MURRAY:  Your Honor, what's relevant is his

16   understanding and his knowledge; that goes to the reason that

17   he invested.  That's the materiality point.  I don't think that

18   it's necessary to establish whether he, as an investor, knew

19   what was happening with the money that was being invested into

20   this company in order for him to say what his motivation was

21   for investing.

22         MR. KAMARAJU:  If you don't ask, if you don't

23   establish that he doesn't know, then how do you ask a

24   hypothetical that says:  If you had known, then how would that

25   change your opinion?

O5SVGUO2                        Le Zhou - Direct

1              THE COURT:  Okay.

2              MR. KAMARAJU:  Thank you, your Honor.

3              (In open court)

4              THE COURT:  You may continue.

5    BY MS. MURRAY:

6    Q.  Mr. Zhou, in May of 2020, after you invested $31,300 in

7    GTV, at that time did you have personal knowledge of how your

8    investment was used?

9    A.  The money invested to GTV, my understanding was intended to

10   enhance the GTV, purchase top-tier company or software to make

11   it enhancement and to overcome -- become the world number one

12   platform, surpass YouTube.

13   Q.  And what is that understanding that you had in May 2020,

14   what is that understanding based on?

15   A.  Miles Guo mention his broadcast.

16   Q.  Aside from what Miles Guo mentioned, do you have personal

17   knowledge?  Do you know how your money was used or did you know

18   in May 2020 how your money was used?

19   A.  That I don't know.

20   Q.  If you had believed that Guo would use your GTV investment

21   money for his own personal expenses in May of 2020, would you

22   have invested in GTV at that time?

23   A.  No.

24   Q.  Have you heard the phrase "G Series"?

25   A.  Yes.

1   Q.  What is G Series?

2   A.  G Series is investments including GTV, G News, G Fashion, G

3   Mall, G Clubs, etc., which were all created by Miles Guo.  And

4   this is one of a financial system for the whistleblower

5   movement as their ecosystem.

6   Q.  Do you have an understanding of what, if anything, the "G"

7   in G Series stands for?

8   A.  Yes.

9   Q.  What's your understanding?

10  A.  G is the English letter reference Miles Guo's last name

11  initial, first initial.

12       MS. MURRAY:  Ms. Loftus, can we please pull up for the

13  witness only what's been marked for identification as

14  Government Exhibit VI-151.

15  Q.  Mr. Zhou, do you recognize this?

16  A.  Yes.

17  Q.  At a high level, what is it?

18  A.  Miles Guo's broadcast.

19  Q.  Do you see the date on the top left?

20  A.  Yes.

21  Q.  Did you watch this particular broadcast at the time that it

22  was posted on the internet on or about that date?

23  A.  Yes.

24       MS. MURRAY:  Your Honor, the government would move to

25  admit Government Exhibit VI-151.

```
 1              MR. KAMARAJU:  No objection.

 2              THE COURT:  It is admitted.

 3              (Government's Exhibit VI-151 received in evidence)

 4              MS. MURRAY:  If we could play that, please,

 5    Ms. Loftus.  We can publish it to the jury first and then we'll

 6    play it.

 7              (Video played)

 8              MS. MURRAY:  We can stop there, please.

 9              We can take it down.

10    Q.  Mr. Zhou, there was a reference in the first video clip to

11    Sara's VOG.  What does that refer to?

12    A.  Sara Wei.

13    Q.  And "VOG," what does that reference?

14    A.  Voice of Guo.

15    Q.  There was also a reference to a Guo Wengui.  Did you see

16    and hear that?

17    A.  Yes.

18    Q.  Who is that?

19    A.  Miles Guo.

20    Q.  Generally speaking, what, if anything, did Miles Guo say

21    during those broadcasts we just viewed?

22    A.  Personally guarantee that investors' money will not lose,

23    only gain.  If any ten cents loss, he'll personally pay.

24    Q.  And did you view those videos at the time that they were

25    posted in 2021?
```

O5SVGUO2                          Le Zhou - Direct

1   A.  Yes.

2   Q.  And at that time, when you viewed those videos, did you

3   believe Miles Guo that he would personally guarantee any

4   investments in the G Series?

5   A.  Yes.

6   Q.  I want to turn your attention now to June of 2020.

7          Did there come a time when Miles Guo announced the

8   launch of a new organization?

9   A.  Yes.

10  Q.  What was the name of that organization?

11  A.  It's called New Federal State of China.

12  Q.  Was that also referred to as the NFSC?

13  A.  Yes.

14  Q.  What was the New Federal State of China?

15  A.  It's a supervisory organization for the whistleblower

16  movement.

17  Q.  Can you describe how Miles Guo announced the launch of the

18  NFSC?

19  A.  Yes.  That was June 4th, 2020.  He announced this

20  establishment of NFSC on his private yacht and was lively

21  broadcasted.

22  Q.  Did you watch that broadcast when it was broadcast on June

23  4th, 2020?

24  A.  Yes, I watched.

25  Q.  How, if at all, is the NFSC -- or at the time was the NFSC

O5SVGUO2                        Le Zhou - Direct

1    associated with the G Series?

2    A.   G Series were already launched before; then it was for the

3    other whistleblower movement.  And NFSC was established because

4    NFSC is a supervisory organization on top of all the movement,

5    that's the name that will be used in the future to as a

6    legitimate government.  So that's ultimately a name that -- for

7    this movement.

8    Q.   What do you mean when you say that the NFSC is going to be

9    a government?

10   A.   Because the movement is -- will take down the China

11   Communist Party.  Once Chinese CCP falls, then this

12   organization will try to replace the CCP; give the people one

13   person, one vote.

14   Q.   And how was it your understanding that the NFSC -- let me

15   put it in timing.  In June of 2020, how was it your

16   understanding that the NFSC was going to take over for the

17   Chinese Communist Party?

18   A.   At that time my understanding was just to expose the

19   Chinese corruptions.  Miles Guo has three tactics.  He

20   mentioned that by eliminate CCP using by law; by eliminate CCP,

21   using America power, American powers; by eliminate CCP by using

22   CCP itself, that's he mention it.

23   Q.   So at that time, in June 2020, was your understanding that

24   the NFSC was going to be a government, was that based on

25   statements by Miles Guo?

 1    A.  Correct.

 2            MS. MURRAY:  Ms. Loftus, can we please publish what's

 3    in evidence as Government Exhibit CT-209.

 4    Q.  Mr. Zhou, looking at the item?

 5            MS. MURRAY:  If we could zoom in, Ms. Loftus, in the

 6    middle of this.

 7    Q.  The figure that's depicted in those two posters or

 8    pictures, do you recognize that shape?

 9    A.  Yes, I do.

10    Q.  What is it?

11    A.  That's the star from the NFSC flag.

12    Q.  How many points does that star have?

13    A.  Total, 49 stars.

14    Q.  Can you explain for the jury how you get 49 points from

15    that star?

16    A.  It's a seven times seven equal 49.

17    Q.  And what is the significance, if any, of seven points on

18    that star?

19    A.  Seven, we all use call Miles Guo seven brothers.  There's a

20    lot of seven he's associated with.  So he was also was part of

21    the flag creations, participated.  And so I think that's -- I

22    believe that's a flag that represents seven is Miles, the

23    sevens.

24            MS. MURRAY:  We can take that down, Ms. Loftus.

25    Q.  Mr. Zhou, did there come a time after the GTV private

O5SVGUO2                          Le Zhou - Direct

1   placement closed in June 2020, when Miles Guo announced a

2   farm-related investment opportunity?

3   A.  Yes.

4   Q.  What was that opportunity?

5   A.  That's called a farm loan.

6   Q.  Can you describe for the jury what the nature of the farm

7   loan investment opportunity was.

8   A.  Farm loan was to have investors lend money to the -- call

9   it farms, which is the NFSC offices in different divisions

10  throughout the world.  Then there was a term lend the money to

11  the farm to use to operate for hirings, expand, and recruit.

12  Q.  And based on the farm loan opportunity, what, if anything,

13  would a lender get in exchange for the loan?

14  A.  There is a term for three-year term.  And there is also

15  interest rate for annual interest rate placed on that.

16  Q.  And at the end of that three-year term, what options, if

17  any, did lenders have to either get their principal and their

18  interest rate or something else?

19  A.  You have choice to get your money, interest plus your

20  principal, plus interest back, and also you can get stocks.

21  Q.  What type stocks?

22  A.  GTV stocks.

23  Q.  How was it your understanding at that time, in June 2020,

24  that the farm loan investment opportunity offered either return

25  on your money or stock?

1    A.  I'm sorry, could you just repeat it one more time.

2    Q.  Yeah.  In June of 2020 or thereabouts, how was it your

3    understanding that by giving a loan to the farm, three years

4    later you could either receive your money back with interest or

5    you could receive stock?

6    A.  We have agreements.

7    Q.  What type of agreements?

8    A.  Loan agreements signed with the farms.

9    Q.  And who, if anyone, announced the farm loan program?

10   A.  Miles Guo announced.

11   Q.  At that time, in 2020, were you a member of any farm?

12   A.  Yes, I am.

13   Q.  Which farm were you a member of at that time?

14   A.  The first farm on social is called UK London Club.

15   Q.  Did you participate in the farm loan program?

16   A.  Yes, I did.

17   Q.  With which farm did you participate in the farm loan

18   program?

19   A.  UK London Club.

20          MS. MURRAY:  Ms. Loftus, can you publish Government

21   Exhibit VO-22, which is in evidence.

22   Q.  Mr. Zhou, do you recognize this?

23   A.  Yes.

24   Q.  What is this?

25   A.  This a farm loan agreement.

1   Q.  What is the name of the borrower listed on this agreement?

2   A.  It's U.S. Himalaya Capital Inc.

3   Q.  What farm, if any, is U.S. Himalaya Capital, Inc.

4   associated with?

5   A.  This is a farm -- UK London Club farm.

6   Q.  And the lender listed there, whose name is that?

7   A.  That's my name.

8   Q.  What date did you enter into this loan agreement, the UK

9   farm?

10  A.  August 24, 2020.

11  Q.  And under the terms of this loan agreement, what was the

12  stated use of the loan that you provided to the UK London Club?

13  A.  It's for the general working capital purpose for the farm.

14  Q.  How much did you invest in the farm loan program?

15  A.  $21,000.

16          MS. MURRAY:  We could take this down, Ms. Loftus.

17  Q.  Mr. Zhou, at the time that you signed the loan agreement in

18  August of 2020, what was your understanding of how your money

19  would be used?

20  A.  For the farm to establish offices, hiring staffs, and other

21  corporated operation expenses.

22  Q.  And at that time in August 2020, what was your

23  understanding of what you would get, if anything, in exchange

24  for your loan to the UK farm?

25  A.  It was eight percent for three years' term.

1   Q.  At that time, in August 2020, why did you participate in

2   the farm loan program?

3   A.  Because I want to help the farm and I want to get the

4   stocks.

5   Q.  And what type of stock did you expect you would get in

6   exchange for your loan to the UK farm?

7   A.  The GTV common stocks.

8   Q.  Why did you believe that you would get GTV stock in

9   exchange for making a loan to the farm?

10  A.  Because that was part of what Miles Guo introduced this

11  project, as investment opportunities.

12  Q.  Did there come a time when Miles Guo announced another

13  investment opportunity that was called G Clubs?

14  A.  Yes.

15  Q.  When was that?

16  A.  It was same year, 2020 introduced.

17  Q.  At that time, in 2020, what did you understand G Clubs to

18  be?

19  A.  G Club is -- is to -- as other exclusive club for high net

20  worth people, individual to have, to show your status.  But as

21  we are already investing to GTV, our wealth in the future will

22  be tremendous big.  So this club is created to also to serve

23  additional as a financed project will have another features to

24  give to those members.  So that's a club was created.

25              THE COURT:  What do you mean by "exclusive club"?

1           THE WITNESS:  Yes, your Honor.

2           Exclusive -- this Miles Guo mention about other

3    society has those club, like Royal Family.  This particular

4    club, for example, Masons, there's other clubs.  So he want

5    create some similar clubs for particular individuals, which is

6    this is among the NFSC members.

7    BY MS. MURRAY:

8    Q.  At that time, in 2020, did you understand that G Club had

9    any physical locations, any actual club location?

10   A.  No.

11   Q.  At that time, in 2020, what, to your understanding, would

12   you get in exchange for investing in G Clubs?

13          MR. KAMARAJU:  Objection to form, your Honor.

14          THE COURT:  Rephrase, please.

15          MS. MURRAY:  Yes, your Honor.

16   Q.  In 2020, what did you understand the G Club investment

17   opportunity to be?

18          MR. KAMARAJU:  Your Honor, I'm going to continue to

19   object.  I can explain at sidebar.

20          MS. MURRAY:  If I may have a moment, your Honor.

21          (Counsel conferred)

22          MS. MURRAY:  May I try again, your Honor?

23          THE COURT:  Go ahead.

24          MS. MURRAY:  Thank you.

25   Q.  Mr. Zhou, in 2020, what did you understand that paying

1    money to G Clubs would give you?

2    A.  Yes.

3           There was offer the members we'll give stocks, the G

4    Club stocks.

5           Second, we'll get passports.

6           Third, we'll get another investments called exchange

7    of coins.

8           Fourth, we'll get discount rated deals from travel

9    agencies or even shoppings, like luxury air jets, Bombardier.

10          And the last one was for discount shopping on G

11   Fashion.

12   Q.  Taking those in turn, starting with the last, what was G

13   Fashion?

14   A.  G Fashion is part of the G Series.  It's clothing for

15   fashion where you can shop luxury clothes.

16   Q.  Where were G Fashion items sold, if anywhere?

17   A.  Was sold in the states, United States.

18   Q.  You mentioned that you had an understanding at that time in

19   2020 that you could get other benefits in exchange for paying

20   money to G Clubs; is that right?

21   A.  Yes.

22   Q.  What was that understanding based on at that time?

23   A.  That was introduced by Miles Guo.

24   Q.  What was the cost of a G Clubs membership in 2020?

25   A.  G Club membership has five tiers.  The first tier is

1    $10,000, with each 10,000 increasement to top five tiers.

2    Q.  So for the top tier, what was the cost of a top-tier

3    membership at that time?

4    A.  That would be $50,000.

5    Q.  Did there come a time when you purchased any G Clubs

6    memberships?

7    A.  Yes, I did.

8    Q.  When was that?

9    A.  That in September 2021.

10   Q.  And how many memberships did you purchase?

11   A.  I purchase two, Tier 2 and Tier 5.

12   Q.  What was the cost of the Tier 2 membership?

13   A.  That's $20,000.

14   Q.  And what was the cost of the Tier 5 membership?

15   A.  $50,000.

16           MS. MURRAY:  Ms. Loftus, can we please publish what's

17   in evidence as Government Exhibit VO-25.  Zoom in on the top

18   portion.  Actually, the body of this.

19   Q.  Mr. Zhou, what is this?

20   A.  That's my G Club membership notification after the

21   application was approved.

22   Q.  And looking at the initial line, it's addressed to someone,

23   can you read what that reads?

24   A.  I'm sorry, could you please --

25   Q.  Sure.  Starting with the word "my" at the beginning of this

O5SVGUO2                          Le Zhou - Direct

1    notification, what does that line say?

2    A.   "My dear fellow fighters."

3    Q.   And then looking down at the bottom of this, who signed --

4    or who is this notification from, according to body of this

5    email?

6    A.   The name signed, Guo Wengui.  That's Miles Guo.

7    Q.   And how is he described here?

8    A.   G Clubs' official spokesperson.

9    Q.   How did you pay for your G Clubs memberships?

10   A.   I paid by checks.

11            MS. MURRAY:  Ms. Loftus, can we please take this down

12   and publish Government Exhibit VO-26, which is in evidence.

13   Q.   Mr. Zhou, do you recognize these?

14   A.   Yes.

15   Q.   Are these the checks that you sent to become a G Clubs

16   member?

17   A.   Yes.

18   Q.   What is the date of each of these checks?

19   A.   The first check, August 24, 2021.

20   Q.   And the second?

21   A.   August 25th, 2021.

22   Q.   And looking at the memo line, there is some text in the

23   memo line of each of these checks.  What, if anything, does

24   that text indicate?

25   A.   That's indicate my application numbers.

1          THE COURT:  Sir, other than the payment of money, was

2     there any other requirement or criteria in order to join the

3     club?

4          THE WITNESS:  Yes, your Honor.  To join the club, you

5     have to be a follow members, which is the I have receive

6     members.  And to purchase at a beginning, it wasn't required

7     for the only members, and it has previously investing the GTVs,

8     and also donated to Rule of Law Foundation.

9     BY MS. MURRAY:

10    Q.  So in submitting an application for a G Clubs membership,

11    what information, if any, were you required to provide about

12    prior donations to Rule of Law or prior investment in GTV?

13    A.  We have to include input our assigned the investment IDs

14    and which farm we were associated with into applications.

15         MS. MURRAY:  And if we could go back, Ms. Loftus, to

16    Government Exhibit VO-25.  If we could zoom in on the first

17    paragraph, please, that starts with "Congratulations."

18    Q.  Mr. Zhou, can you just read the text here starting with

19    "Congratulations."

20    A.  Yes.

21         "Congratulations.  I am pleased to announce that your

22    Tier 5 membership to G Clubs has been approved.  As a spokesman

23    for G Clubs, I extend a warm welcome to your membership to the

24    future."

25         MS. MURRAY:  We can take that down.

1  Q.  Mr. Zhou, did you receive any stock shares in exchange for

2  your G Clubs membership payment?

3  A.  No.

4  Q.  You mentioned that there were discounts that you could use

5  as a G Clubs member.  Where could you use those discounts?

6  A.  Mean I use on GFashion.com.

7  Q.  Did you purchase any items from GFashion.com?

8  A.  Yes.

9  Q.  Did you purchase some of those items before you became a G

10 Clubs member?

11 A.  Yes.

12 Q.  Did you purchase some items after you became a G Clubs

13 member?

14 A.  Yes.

15 Q.  Can you describe the quality of the items that you

16 purchased from G Fashion?

17 A.  The quality itself is very ordinary, normal, compared to

18 what we -- I think the clothes we normally get.

19 Q.  I'd like to look at a few of the items that you purchased

20 from G Fashion.

21        MS. MURRAY:  Your Honor, may I approach?

22        THE COURT:  Yes.

23        MS. MURRAY:  Your Honor, I'm handing the witness

24 what's been marked for identification as Government Exhibits

25 32, 33, 34, and 35.

1  Q.  Mr. Zhou, do you recognize Government Exhibits 32, 33, 34,

2  and 35?

3  A.  Yes.

4  Q.  What are they?

5  A.  Those are my purchase item from GFashion.com.

6  Q.  Are those just some of the items that you purchased from G

7  Fashion?

8  A.  Yes.

9        MS. MURRAY:  Your Honor, the government would move to

10 admit Government Exhibits 32, 33, 34, and 35.

11       MR. KAMARAJU:  No objection.

12       THE COURT:  They are admitted.

13       (Government's Exhibits 32, 33, 34, 35 received in

14 evidence)

15 Q.  If you could start with Government Exhibit 32, please,

16 Mr. Zhou, and hold that up for the jury.

17 Q.  What is Government Exhibit 32?

18 A.  That's a baseball cap.

19 Q.  And where did you purchase that?

20 A.  GFashion.com.

21 Q.  What was the approximate cost of that baseball cap?

22 A.  This I remember cost close to $200.

23 Q.  If you could please hold up Government Exhibit 34.

24       What is that item?

25 A.  Just a regular shirt.

1    Q.  And is that one of the items that you purchased from G

2    Fashion?

3    A.  Yes.

4    Q.  What was the approximate cost of that T-shirt?

5    A.  This one was about $150.

6    Q.  And now if you can please pull up or hold up Government

7    Exhibit 33.

8    A.  Yes.

9    Q.  What is Government Exhibit 33?

10   A.  This is silk pants, ladies' wear.

11   Q.  What was the approximate price of those pants on G Fashion?

12   A.  It was listed about $800.

13            MS. MURRAY:  Your Honor, if we could show the witness

14   what's been marked for identification as Government Exhibit

15   W-58.

16            THE COURT:  All right.

17            MS. MURRAY:  While we're waiting, your Honor, may I

18   publish Government Exhibits 32, 33, and 34 to the jury?

19            THE COURT:  You may.

20            MS. MURRAY:  Thank you.

21   Q.  Mr. Zhou, do you recognize Government Exhibit W-58?

22   A.  Yes.

23            MS. MURRAY:  If we could scroll down a bit,

24   Ms. Loftus.

25   Q.  Have you visited the website that's depicted in Government

O5SVGUO2                        Le Zhou - Direct

```
 1   Exhibit 58 before?
 2   A.  Yes, I did.
 3            MS. MURRAY:  We would move to admit Government Exhibit
 4   W-58.
 5            MR. KAMARAJU:  No objection.
 6            THE COURT:  It is admitted.
 7            (Government's Exhibit W-58 received in evidence)
 8            MS. MURRAY:  If we'd please publish that, Ms. Loftus.
 9            We could start up at the top.
10   Q.  Mr. Zhou, what website is shown in Government Exhibit 58?
11   A.  This is a G Fashion website.
12            MS. MURRAY:  Ms. Loftus, if we could scroll down a
13   bit, please.
14   Q.  Looking at the right there, do you see "G Fashion silk
15   pant"?
16   A.  Yes.
17   Q.  What is the listed price of that item?
18   A.  $880.
19   Q.  And is that the same item that is in Government Exhibit 33?
20   A.  Correct.
21            MS. MURRAY:  We can take that down, Ms. Loftus.
22   Q.  One more physical exhibit that you have, Mr. Zhou,
23   Government Exhibit 35.  If you could take that out.
24            What is Government Exhibit 35?
25   A.  Yes.  This is a gold limited edition whistles.
```

1  Q.  How was that item advertised on the G Fashion website?

2  A.  Advertise as only was 77 made and it's 24K.

3  Q.  What was the cost of that whistle?

4  A.  I paid about $3200 for it.

5       MS. MURRAY:  Ms. Loftus, if we could please publish

6  what's in evidence as Government Exhibit VO-67.

7  Q.  Mr. Zhou, what is Government Exhibit VO-67?

8  A.  That's paid receipt confirmation email.

9  Q.  And that's for the whistle that is Government Exhibit 35?

10 A.  Correct.

11 Q.  What material did you say that the whistle was advertised

12 as?

13 A.  24K gold.

14 Q.  Do you have an understanding or an impression of whether

15 that whistle was, in fact, gold?

16      MR. KAMARAJU:  Objection, your Honor.

17      THE COURT:  Sustained.

18 Q.  Mr. Zhou, have you weighed that whistle?

19 A.  I did.

20 Q.  How much did it weigh approximately?

21      MR. KAMARAJU:  Objection, your Honor.

22      THE COURT:  Overruled.  You may answer.

23 A.  0.7 ounce.

24      MS. MURRAY:  Your Honor, permission to publish

25 Government Exhibit 35 to the jury.

O5SVGUO2                          Le Zhou - Direct

 1              THE COURT:  You may.
 2   Q.  Mr. Zhou, why, if at all, did you weigh the whistle after
 3   you purchased it?
 4   A.  I was just curious about if -- if real or not.
 5   Q.  What do you mean if it was real or not?
 6              MR. KAMARAJU:  Objection.
 7              THE COURT:  Overruled.  You may answer.
 8   A.  When I first received, the packaging, when I first opened,
 9   was -- I saw little bit dust go on it.  The gold itself was --
10   the craftsmanship was little bit rough.  My knowledge, this is
11   a limited edition as collectible items, that made me little bit
12   concern.
13   Q.  Mr. Zhou, returning to --
14              MS. MURRAY:  Ms. Loftus, we can take that down.
15              Thank you.
16   Q.  Returning to what you expected or understood that you would
17   receive in exchange for paying money to G Clubs, I think you
18   mentioned a currency; is that correct?
19   A.  Yes.
20   Q.  What was that?  Can you explain that to the jury?
21   A.  It is currency introduced called G dollar and the G coins.
22   It was digital currency and also digital cryptocurrencies that
23   also will be launched from exchange.
24   Q.  And when you say "exchange," what are you referring to?
25   A.  At the time we have a change is called Himalaya Exchange.

1    Q.  At that time in 2021, when you invested in -- or, excuse

2    me, when you paid for a G Clubs memberships, what was your

3    understanding of what the Himalaya Exchange was?

4    A.  Himalaya Exchange was another part of G Series for

5    financial freedom created by Miles Guo.  And it gave people

6    much better opportunity to transfer monies instantly.  Also no

7    boundaries.  And also for the most securities you will get.

8    Q.  And at that time, in 2021, what was your understanding

9    about the Himalaya Exchange based on?

10   A.  The G dollar was equal to one U.S. dollar values, and will

11   have gold standards for the H coins.  The full name, it's

12   Himalaya coins, it's backed by 20 percent gold.  So that adds

13   all the value to it.

14   Q.  Why, if at all, did you believe in the time, in 2021, that

15   the Himalaya currencies were backed 20 percent by gold?

16   A.  Miles Guo personally announced that.

17   Q.  To your knowledge, at that time, in 2021, who was in charge

18   of the Himalaya Exchange?

19   A.  The person, I don't know.

20   Q.  At that time, in 2021, who, if anyone, promoted the

21   Himalaya Exchange?

22   A.  Miles Guo promoted Himalaya Exchange.

23   Q.  Did there come a time when you purchased any of the digital

24   currencies that were available on the Himalaya Exchange?

25   A.  No.

1    Q.  Why not?

2    A.  Because there's a policy, it's not a -- it's restricted to

3    sell to the residents in the states.

4    Q.  And how was it your understanding at that time, in 2021,

5    that it was restricted?

6    A.  Also Miles Guo mention that.

7    Q.  Did there come a time when you sent money to purchase

8    Himalaya coin or Himalaya dollars?

9    A.  I didn't send money to get Himalaya dollars, but I was

10   given opportunity to purchase H coins.

11   Q.  And what was that opportunity?

12   A.  That opportunity is based on my previous G Series

13   investments and donations for the previous investment.  Also,

14   I'm a follower of this movement; the opportunity was given to

15   me.

16   Q.  Who, if anyone, gave you the opportunity to purchase H

17   coins?

18   A.  Miles Guo gave us the opportunity.

19           MS. MURRAY:  Ms. Loftus, if we could please pull up

20   for the witness what's marked for identification as Government

21   Exhibits VO-107 and VO-108.

22   Q.  Mr. Zhou, do you recognize these?

23   A.  Yes.

24   Q.  Generally speaking, what are they?

25   A.  On the right side --

O5SVGUO2                          Le Zhou - Direct

```
 1   Q.  Sorry.  Just a moment, sir.  If you could, just at a
 2   general level, what type of document or item is this?
 3   A.  That's my personal investment summary.
 4   Q.  And are these -- are these contents that were taken from
 5   your phone?
 6   A.  From my computers.
 7   Q.  Did you provide these to the government?
 8   A.  Yes, I did.
 9             MS. MURRAY:  Your Honor, the government moves to admit
10   Government Exhibits VO-107 and VO-108.
11             MR. KAMARAJU:  No objection to their admission, your
12   Honor.
13             THE COURT:  They are admitted.
14             (Government's Exhibits VO-107, VO-108 received in
15   evidence)
16             THE COURT:  It's now 11:30, members of the jury, so
17   we're going to take our half-hour break.
18             Remember that I need for you to be ready to walk
19   through that door at noon.  Remember also that you're not
20   allowed to discuss this case amongst yourselves or with anyone
21   else.  Don't permit anyone to discuss the case in your
22   presence.
23             Sir, you are not to discuss your testimony.
24             (Jury not present)
25             THE COURT:  You may be seated.
```

O5SVGUO2                        Le Zhou - Direct

1          Counsel, anything before we come back for our break?

2          MR. KAMARAJU:  Not from the defense, your Honor.

3          MS. MURRAY:  Not from the government, your Honor.

4          THE COURT:  All right, then.  You may step down.

5          THE WITNESS:  Thank you, your Honor.

6          (Luncheon recess)

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                            12:00 p.m.

 3            THE COURT:  Please be seated.

 4            Please have the jurors brought in.  And please have

 5   the witness resume the stand.

 6            MS. MURRAY:  Yes, your Honor.

 7            (Jury present)

 8            THE COURT:  Please be seated.

 9            Remember, sir, that you are still under oath.

10            THE WITNESS:  Yes, your Honor.

11            THE COURT:  You may proceed with the direct

12   examination.

13            MS. MURRAY:  Thank you, your Honor.

14            Mr. Gartland, if you could please publish for the

15   jury, alongside one another, Government Exhibits V0107 and

16   V0108.

17   BY MS. MURRAY:

18   Q.  Mr. Zhou, before we took a break, I believe we were talking

19   about the Himalaya Exchange.  We're going to pull up Government

20   Exhibits V0107 and V0108.

21            MS. MURRAY:  Mr. Gartland, if you could just unpublish

22   while you're pulling those up.  Thank you.

23   Q.  I guess, Mr. Zhou, while we're waiting, you had mentioned

24   that there were certain restrictions on purchasing Himalaya

25   Coin.  Can you explain those to the jury, please, your
```

O5S1GUO3                      Le Zhou - Direct

1    understanding in 2021 on what those restrictions were.

2    A.  Yes.  To allow to purchase H Coin, you have to have—first

3    you got to be a member of the farms, which you have to join the

4    movement.  Then based on that, it's all based on your previous

5    investment, including donations.  So once all that been

6    counted, then you were able to get a prelaunch of the coins and

7    at a discounted rate.

8    Q.  What do you mean by prelaunch?

9    A.  Because this coin was launched on November 1, 2021, all the

10   investments was previously invested was counted towards to how

11   much coin you could get.

12   Q.  And who, if anyone, calculated the amount of investment

13   that you had prelaunch of the Himalaya Coins?

14   A.  The rule of guidance was set by Himalaya Alliance.  For

15   previous GTV there was deadline also, made that draw line.  For

16   September 31st [sic], anything donate investment, you place it

17   before, you will get a dollar investment for 0.5 coins.  Any

18   investments after that deadline, it's counted as 1 dollar

19   investment for 0.2 coins.

20   Q.  And who, if anyone, set those deadlines?

21   A.  The deadline was announced by Miles Guo.

22   Q.  Where was that announced?

23   A.  During his broadcast.

24   Q.  At the time of the Himalaya Coin launch in November of

25   2021, were you a member of any farms?

1   A.  Yes.

2   Q.  Which farms?

3   A.  UK London Club.

4   Q.  Did you communicate with anybody from the UK London Club

5   regarding the Himalaya Coin?

6   A.  Yes.

7   Q.  With whom did you communicate about Himalaya Coin?

8   A.  I contacted the farm leaders.

9   Q.  Who was the farm leader of the UK farm at that time?

10  A.  His name is David Dai.

11  Q.  How do you spell that last name?

12  A.  D-A-I.

13  Q.  Can you describe what communications or conversations you

14  had with David Dai at that time about Himalaya Coin?

15  A.  There were one for the resident in the States and other

16  prohibited country couldn't purchase the Himalaya Coin

17  directly.  That Global Alliance, Himalaya Alliance, established

18  a business as nominee shareholdings to held those people's

19  coins.  Besides that, the farm also established business act as

20  a nominee shareholdings to held those people's coins, which was

21  I was included.

22  Q.  What business are you referring to that the farm

23  established——or the Alliance?  Excuse me.

24  A.  From the Alliance, the company created called Freedom Media

25  Venture Ltd.

1   Q.  And can you explain for the jury what you mean when you

2   describe Freedom Media Venture as a nominee.

3   A.  Nominees act as——on your behalf to hold your——your coins,

4   for example.

5   Q.  And at that time, in the fall of 2021, how was it your

6   understanding that Freedom Media Venture was a nominee?

7   A.  It was public announced by Miles Guo.

8   Q.  And what role, if any, did Freedom Media Venture have with

9   respect to money that you paid for Himalaya Coins?

10  A.  The Freedom Media Venture, that company was a new company

11  created for the GTV, so was announced that for those people who

12  are in the restricted countries, then they will able to sign a

13  contract and also offer——there was also fee will be charged was

14  announced to us.  He explained it to us.

15  Q.  Who explained that to you?

16  A.  Miles Guo mentioned it and also the other farm leader

17  mentioned it.

18  Q.  What was the nature of the fee?

19  A.  The fee I got was a 5 percent.

20          THE COURT:  What do you mean by restricted country?

21          THE WITNESS:  Yes, your Honor.  The Himalaya Exchange

22  has a policy, and the policy laid out, there were countries not

23  on their list, a permitted list to purchase or do any business

24  or even become a user.  The country were United States, Canada,

25  Japan, North Korea, and other essential countries.

O5S1GUO3                        Le Zhou - Direct

1           THE COURT:  You may continue.

2           MS. MURRAY:  Thank you, your Honor.

3   BY MS. MURRAY:

4   Q.  Mr. Zhou, for those restricted countries that you just

5   mentioned, did you have an understanding of whether people who

6   were located in those countries could invest in Himalaya Coin?

7   A.  Yes.

8   Q.  What was that understanding at that time, in 2021?

9   A.  So that this create a nominee shareholding companies that

10  were able to have them as our shareholders, to—to obtain the

11  coins.

12  Q.  And did you in fact send money to purchase Himalaya Coins

13  through that nominee shareholder?

14  A.  I didn't send the money direct to the shareholder.  I send

15  money to the farm.

16  Q.  Which farm?

17  A.  UK London Club.

18  Q.  Did you enter into any kind—was there any understanding

19  between you and the UK London Farm of what the purpose of the

20  money that you sent was for?

21  A.  Yes.

22  Q.  What was that understanding?

23  A.  There were agreement, I signed it, with the farm leader,

24  David Dai.  He created a company act as the nominee

25  shareholding company.

O5S1GUO3                      Le Zhou - Direct

1    Q.  And generally speaking, what were the terms of that

2    agreement that you entered into with the UK Farm leader?

3    A.   The term were just, they will hold my coins and also I have

4    to pay the fee, annual fee to it.  But in the future, once the

5    Himalaya Exchange acquired legal license, was able to expand

6    the territory, which the restriction related to those

7    countries, especially to the United States, then I would be

8    able to use my own user name accounts that would transfer the

9    coins back to me.

10   Q.  And how was it your understanding at that time in 2021 that

11   that's how the nominee shareholder kind of investment would

12   work?

13   A.  I'm sorry.  Just one more time repeat the question.

14   Q.  Yeah, of course.  So in 2021, how was it your understanding

15   that at some point in the future you would be able to register

16   your own account on the Himalaya Exchange?

17   A.  Yes, mentioned by Miles Guo, yes.

18   Q.  So at the time that you sent money to the UK Farm for the

19   purchase of Himalaya Coins, what assets, if any, did you have

20   to the Himalaya Exchange?

21   A.  I don't.

22   Q.  At that time in 2021, how, if at all, were you able to

23   check the number of Himalaya Coins that you held, that you had

24   paid for?

25   A.  Because the farm has my investment summaries and the

1  summary document, all the investment I have previously

2  invested; and also, there were ratios for the coins was

3  calculated.  It was—the information was provided to me.

4  Q.  Provided to you by whom?

5  A.  By one of the members, from UK London Club.

6  Q.  After you purchased Himalaya Coin in 2021 through the UK

7  Farm, how, if at all, were you able to use that digital

8  currency to purchase things?

9  A.  I—'cause I don't have access, so I don't know how you

10  spend that.

11  Q.  Between your investment in 2021 and today, the present,

12  have you had access to the Himalaya Exchange?

13  A.  No.

14         MR. KAMARAJU:  Objection to form.

15         THE COURT:  Overruled.

16  Q.  Between your investment in 2021 and today, did there come a

17  time when you were able to spend your Himalaya Coin to purchase

18  anything?

19  A.  No.

20  Q.  I want to turn back for a moment, Mr. Zhou, to the

21  volunteer work that you did for the whistleblower movement.

22  Can you just remind the jury generally what types of services

23  you provided.

24  A.  Yes.  I did video transcript, also translations, videos

25  editing, and also streaming services, for the Himalaya

O5S1GUO3                         Le Zhou - Direct

1    Alliance, and the farm members.

2    Q.  In connection with your volunteer work, did there come

3    times when you participated in meetings with other volunteers?

4    A.  Yes.

5    Q.  What types of meetings?

6    A.  Those are private meeting with Miles Guo, with the farm

7    members.

8    Q.  What was the nature of the meeting?  Where did you all

9    meet?

10   A.  We used the social platform called Webex.

11   Q.  And what, if anything, was discussed during meetings among

12   the volunteers over Webex?

13   A.  These meeting include briefing of the farm movements,

14   activities, also the followers' investments, and also some

15   other issues, among just farm and the Global Alliance, and

16   also, there were—at the time, the Global Alliance, one wanted

17   to create a central data center to centralize all the

18   investors' investment informations, and those meeting was

19   conducted, and also Global Alliance asked each farm, come to

20   the farm meetings.  Give them guidelines, have them to turn

21   over all their bookkeepings, and also the balance to the

22   designated accounts by the Himalaya Global Alliance.

23   Q.  Mr. Zhou, in the course of your volunteer work, you said

24   you were involved with streaming broadcasts.  Did that include

25   broadcasts relating to activities by the NFSC?

1    A.  Yes.

2    Q.  Did that include broadcasts relating to protests?

3    A.  Yes.

4    Q.  What types of protests did you stream broadcasts of, in

5    your volunteer work?

6    A.  In late 2022, there were protests, a name called 90 Days

7    Protest was protesting one of Miles Guo attorneys, and their

8    attorney firms.

9    Q.  What, generally, was the subject matter of the 90 Days

10   Protest?

11   A.  There was involved with Miles Guo's bankruptcy cases, and

12   so the protest was because Miles Guo announced he was being

13   extorted by one of the attorneys for the amount of

14   $250 million.

15   Q.  Taking a step back for a moment, did there come a time when

16   you learned that Miles Guo had filed for bankruptcy?

17   A.  Yes.

18   Q.  Around when did you learn that?

19   A.  Miles Guo personally did on his broadcast, on February 15,

20   2022.

21   Q.  What, if anything, did Miles Guo say during his broadcast

22   about having filed for bankruptcy?

23   A.  He just mentioned, I'm signing today my bankruptcy, and

24   because I'm being persecuted.

25   Q.  By whom, if anyone, did Miles Guo claim that he was being

O5S1GUO3                     Le Zhou - Direct

1   persecuted?

2   A.   He mentioned the persecution from CCP and also he mentioned

3   some of the CCP penetrated US justice.

4   Q.   At the time that Miles Guo said that in February of 2022,

5   did you believe that he was filing bankruptcy in part because

6   he was being persecuted by the CCP?

7   A.   At that time I believed it.

8   Q.   Returning to the 90 Days Protest, around when did the 90

9   Days Protests begin?

10   A.   The 90 days started towards to end of October 2022, and

11   last——

12   Q.   Sorry.  Go ahead.

13   A.   And last until end of January.

14   Q.   And why, if at all, were NFSC members protesting during

15   that time period?

16   A.   Because Miles Guo announced that extortion from the

17   bankruptcy cases, and the——so there were protests started at

18   multiple locations.

19   Q.   Can you explain what you mean when you say that Miles Guo

20   announced extortion.

21   A.   During his broadcast he mentioned he was being extorted by

22   this attorney, and also he mentioned the amount, $250 million.

23   Q.   And which attorney?

24   A.   The attorney name is Luc Despins.

25   Q.   Based on Miles Guo's broadcast, what was your understanding

O5S1GUO3                          Le Zhou - Direct

1    of Luc Despins' role, if any, in the bankruptcy?

2    A.  He was court-appointed trustee for Miles Guo.

3    Q.  And at that time in 2022 what, if anything, did Miles Guo

4    say about the $250 million that you mentioned?

5    A.  He said, that's unbelievable, outrageous; he was mad about

6    that.

7            THE COURT:  When you say court-appointed trustee, what

8    court are you referring to?

9            THE WITNESS:  Yes, your Honor.  I believe that's New

10   York Southern District bankruptcy court.

11   Q.  Mr. Zhou, against whom were the protests directed, the 90

12   Days Protests in 2022?

13   A.  There were protests at the attorney Luc, attorney's home,

14   his daughters' universities, his ex-wife's home, his law firm

15   office, and one of his associates attorneys' home, and one of

16   Luc second daughter's workplace.

17   Q.  Who, if anyone, directed the protests?

18   A.  Right after Miles mentioned about this extortion, then the

19   Himalaya Global Alliance initiate, launch all the protests.

20   Q.  Can you describe how the Himalaya Global Alliance launched

21   the protests.

22   A.  It was organized so the recording of sending out the form

23   to the farms, asking who willing to come to the protests, and

24   we also received information that this protest will last 90

25   days, so the farm leader started gathering the information,

1   putting people in place, and was also printing materials for

2   the protests.

3   Q.  Which farm leader are you referring to?

4   A.  At the time I'm associated with the new farm, it's called

5   the Washington, DC Farm.

6   Q.  And what types of materials did the farm leader print in

7   connection with the 90 Days Protests?

8   A.  There were posters, banners, and flyers.

9   Q.  Can you describe for the jury some of the posters that were

10  created for the protests.

11  A.  Yes.  Some poster have the attorney's Luc's image, his

12  photos on it, but was altered, was also added with titles,

13  especially some offensive, some kind of meaningful——very mean

14  labels on that posters.

15  Q.  What are some examples of the language that was added to

16  those posters that were used in connection with the protests?

17  A.  Mostly they called him CCP running dog, evil.

18  Q.  At the time of the 90 Days Protests in 2022, did you

19  believe that Luc Despins was——and I'm quoting the language——a

20  CCP running dog?

21  A.  At that time I believed it.

22  Q.  Why did you believe it?

23  A.  Because Miles Guo mentioned the extortion and Miles Guo

24  mentioned Luc Despins' firms was bribed by the CCP.

25  Q.  At the time in 2022, did you have any personal knowledge of

O5S1GUO3                        Le Zhou - Direct

1    whether Luc Despins had extorted or attempted to extort Miles

2    Guo?

3    A.  No.

4    Q.  At the time in 2022 did you have any personal knowledge of

5    whether Luc Despins' firm had been influenced by the CCP?

6    A.  No.

7    Q.  Sitting here today, do you believe that Luc Despins was

8    operating on behalf of the CCP?

9           MR. KAMARAJU:  Objection, your Honor.

10          THE COURT:  If you'll step up, please.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5S1GUO3                        Le Zhou - Direct

1          (At the sidebar)

2          THE COURT:  Why would his belief today be relevant?

3          MS. MURRAY:  Your Honor, because it goes to the fact

4    that at the time he was operating on——his intent to behave and

5    participate in the protest was what he was told by Mr. Guo.

6          THE COURT:  So you've established that.

7          MS. MURRAY:  Yes.

8          THE COURT:  But then you've asked what he believes

9    now, and I'm trying to understand why that would be relevant.

10         MS. MURRAY:  I think it goes, your Honor, to the——what

11   I'm going to be getting to at the end, which is when he came to

12   the realization that this was all fraudulent.  He was a

13   believer in Miles Guo up until basically after the arrest, and

14   then at some point he came to realize that what Miles Guo was

15   telling him about the CCP's influence, about, you know, the

16   closing bank accounts because of the CCP, about all these

17   activities was not in fact true, and that was the moment when

18   he kind of came to the realization, and I expect that

19   Mr. Kamaraju is going to be cross-examining him on what his

20   belief was at the time and what, you know——why he is now

21   testifying for the government.  And I'm just trying to

22   establish that.

23         MR. KAMARAJU:  Well, I don't think his belief sitting

24   here today on the stand as to whether Mr. Despins is an agent

25   of the CCP has any relevance to the line of inquiry that

O5S1GUO3                        Le Zhou - Direct

1    Ms. Murray is talking about.  If she wants to ask him questions

2    like, you know, when did you become suspicious, that's still at

3    a point back in time, has nothing to do with what he's saying

4    now, what he's getting at now.

5              THE COURT:  So stick to that sort of question.

6              MS. MURRAY:  Okay.

7              MR. KAMARAJU:  Thank you, your Honor.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may continue.

3          MS. MURRAY:  Thank you, your Honor.

4  BY MS. MURRAY:

5  Q.  Mr. Zhou, what, if anything, was your role with respect to

6  the 90 Days Protest?

7  A.  My role was streaming technician.  I used software to push

8  out the broadcast.  I connect the farm and the guests.  Also, I

9  make schedule for the technician parts, who do that daily

10 streamings.

11 Q.  And who, if anyone, gave you instructions regarding how to

12 stream the 90 Days Protests?

13 A.  There were guidelines provided by the Himalaya Global

14 Alliance, some guidelines specific, during the protests, if we

15 hear any the guests, or the farm guests, that mention Miles Guo

16 or if they say something that was organized, we'll cut the

17 streaming.

18 Q.  Can you just explain that guideline a little bit more so

19 that the jury understands.  What was the instruction that was

20 given regarding streaming if someone mentioned Miles Guo?

21 A.  Yes.  Because all the streaming was conduct lively, there

22 were people at the protest locations linked to remote guests.

23 As technician on the back end, so we would receive these

24 instructions:  If either one inside the streaming, the image,

25 or guests spoke that, I'm here protest today, it's because

O5S1GUO3                        Le Zhou - Direct

1    Miles told me, or the organization told me come, if that words

2    said, we'll automatic cut the streamings.

3    Q.  And did there come a time when you were streaming the 90

4    Days Protests that you had to cut the transmission because of a

5    reference to Miles Guo?

6    A.  I personally did once.

7    Q.  I'd like to return for a moment to the Himalaya Coin

8    investment.

9         MS. MURRAY:  Ms. Loftus, if you could please publish

10   what's in evidence as Government Exhibit V0107 and V0108.

11        All right.  Actually, we'll move along for a moment.

12        Ms. Loftus, if you could please publish Government

13   Exhibit V0105.

14   A.  Sorry.  My—oh, got it.

15   Q.  Mr. Zhou, do you recognize Government Exhibit V0105?

16   A.  Yes.

17   Q.  What is it?

18   A.  This is a meeting attended on Webex with Miles Guo and the

19   UK London Club members.

20   Q.  Starting at the top left, who is that in the screen that's

21   shown on the top left?

22   A.  That's me.

23   Q.  And just to the right of you, who is that?

24   A.  Miles Guo.

25   Q.  In the image next to Miles Guo, on the other side of you,

O5S1GUO3                         Le Zhou - Direct

1    it appears that there's a poster.  Can you read what that

2    poster says.

3    A.  Yes, thank you.  Speaking Himalaya London Club UK.  Host.

4    Q.  Sorry.  Just to the left of that, there's a screen with

5    just a white wall and a poster.  What does that poster say?

6    A.  Oh, on the——I'm sorry.  Okay.  Got it.

7                New Federal State of China.

8    Q.  And now going one further to the right, which you just

9    read, what is it indicating about the person who's depicted in

10   that screen?

11   A.  That's UK London Club leader David Dai, and he hosts the

12   Webex software.  The meeting was launched by his account.

13   Q.  And do you recognize the flag behind David Dai?

14   A.  Yes.

15   Q.  What is it?

16   A.  That's NFSC flag.

17             MS. MURRAY:  Ms. Loftus, if we could take that down

18   and put up for the witness what's marked as Government Exhibit

19   V0106.

20             Your Honor, just in an abundance of caution, the

21   government moves to admit the prior exhibit, which is

22   Government Exhibit V0105.

23             MR. KAMARAJU:  No objection, your Honor.

24             THE COURT:  It is admitted.

25             (Government's Exhibit V0105 received in evidence)

1      MS. MURRAY:  And this is Government Exhibit V0106.

2  This is shown just to the witness right now.

3  BY MS. MURRAY:

4  Q.  Mr. Zhou, do you recognize Government Exhibit V0106?

5  A.  Yes.

6  Q.  Generally speaking, what is it?

7  A.  It's another meeting I participated.  This meeting was with

8  Miles Guo and——and it was Iron Blood members with other farm

9  members.

10      MS. MURRAY:  Your Honor, the government moves to admit

11  Government Exhibit V0106.

12      MR. KAMARAJU:  No objection.

13      THE COURT:  It is admitted.

14      (Government's Exhibit V0106 received in evidence)

15      MS. MURRAY:  Could we please publish.

16  BY MS. MURRAY:

17  Q.  Mr. Zhou, starting at the top left here, who is depicted

18  there on the top left of this screenshot?

19  A.  It's another farm leader.

20  Q.  The leader of which farm?

21  A.  Japan, Tokyo Stellar IS Farm.

22  Q.  On the top right, who is depicted in the screen that's

23  shown there?

24  A.  He's NFSC chairman.

25  Q.  And then looking at the bottom left, who is the person

O5S1GUO3                              Le Zhou - Direct

1    standing in what's depicted there?

2    A.  Miles Guo was standing.

3         MS. MURRAY:  Ms. Loftus, if we could zoom in on that

4    bottom left screen, please.

5    Q.  Mr. Zhou, do you recognize anyone else who is depicted in

6    that particular screenshot?

7    A.  Yes.

8    Q.  Who?

9    A.  All of them.

10   Q.  All of them?

11   A.  Yes.

12   Q.  Can you describe, generally speaking, who these people are

13   and what their roles were.

14   A.  Right next to the Miles Guo, this lady, her name is called

15   Justice Sara.

16   Q.  And then the male depicted seated kind of in the back on

17   the left side?

18   A.  Yeah.  His name Long Island David.

19   Q.  What farm, if any, is Long Island David associated with?

20   A.  He was associated with Mountain Spice New York.

21   Q.  And then to the right, the individual who is second from

22   the right in the back of the table here?

23   A.  Her name was Fay Fay.

24   Q.  And then finally, the person who's farthest right in this

25   photo?

O5S1GUO3                        Le Zhou - Direct

1   A.   Her name was Ruth Ray.

2   Q.   Generally speaking, what was discussed during this meeting

3   that you participated in?

4   A.   This meeting was gathered a lot of other farms management

5   team, farm leaders, and some even invited members, discuss

6   about some issues reported to the Himalaya Global Alliance.

7           MS. MURRAY:  You can take that down, Ms. Loftus.

8   Thank you.

9   Q.   Mr. Zhou, did there come a time when the UK Farm asked for

10  your assistance with certain banking activities?

11  A.   Yes.

12  Q.   Around when was that?

13  A.   That's February 2022.

14  Q.   And who was the leader of the UK Farm at the time?

15  A.   David Dai.

16  Q.   Can you describe for the jury what, if anything, David Dai

17  asked you to do.

18  A.   Yes.  He called me personally, asked me if I could help

19  this farm and help all the followers to receive money and to

20  help them to invest into the G series.

21  Q.   And what, if anything, did David Dai say about why he

22  wanted your assistance?

23  A.   Because he had few other people established business and

24  open banking accounts, but they were shut down, and they needed

25  still people to open more accounts to help the followers.

O5S1GUO3                          Le Zhou - Direct

1  Q.  What, if anything, did David Dai say about why those

2  accounts had been shut down?

3  A.  Some accounts, they were just mentioned because of CCP

4  don't want those people to invest, and all CCP is doing, those

5  accounts were being shut down.

6  Q.  At that time in February of 2022, did you believe that bank

7  accounts had been closed because of the CCP?

8  A.  Yes, at that time I believed.

9  Q.  What, if anything, did David Dai direct you to do with

10  respect to opening bank accounts?

11  A.  Yes.  We talked about how to open an account, what to tell

12  the bank, and also gave me instruction with open business, will

13  have him as hundred percent owner.

14  Q.  And what, if anything, did David Dai tell you to tell the

15  bank as the purpose of those accounts?

16  A.  Because of course David Dai also knows about my personal

17  life as also my occupancy [sic] as a realtor, so he instructed

18  that he mentioned it will be easier if I mention this account

19  when we establish it's for real estate development.  They're

20  also matching my current occupancy so that will not trigger

21  much of the flak, that will be more susceptible to open the

22  account.

23  Q.  Did you follow David Dai's instructions and in fact open

24  bank accounts?

25  A.  Yes, I did.

O5S1GUO3                        Le Zhou - Direct

1    Q.   After you opened those bank accounts did money come into

2    the accounts?

3    A.   Yes.

4    Q.   Approximately how much money, in total?

5    A.   Estimate about $2 million.

6    Q.   Were you able to determine the source of the money that

7    came into your bank accounts that you opened?

8    A.   I only able to see the wire, if it's from individual, or

9    some of the wires, it's from business accounts.

10   Q.   Do you know how those individuals knew to send money to

11   your bank accounts?

12              MR. KAMARAJU:   Objection, your Honor.

13              THE COURT:   Sustained.

14   Q.   Mr. Zhou, you mentioned that you saw incoming wires into

15   the accounts; is that correct?

16   A.   Yes.

17   Q.   Did you provide the account information to any of the

18   individuals who wired money into your accounts?

19   A.   No.

20   Q.   Do you know who, if anyone, provided your bank account

21   information to those individuals?

22   A.   Yes.

23   Q.   Who?

24   A.   One of the member from UK London Club.

25   Q.   What, if anything, did you do with the money that came into

1   your bank accounts that you had set up?

2   A.   When I see the money, I will bookkeep, document it with a

3   spreadsheet created by the UK leader.   Once reached certain

4   amount, I would receive instruction to where to send the money

5   to.

6   Q.   From whom, if anyone, did you receive instructions

7   regarding where to send the money?

8   A.   The farm, the UK leader, and also other few the UK members.

9   Q.   Were you paid for opening those accounts?

10  A.   No.

11  Q.   Did you keep any of the money that came through those

12  accounts?

13  A.   No.

14  Q.   I want to return for a moment to the Himalaya Exchange.

15          MS. MURRAY:   I'm going to try to do this old school.

16          Your Honor, these are, again, V0107 and 108.   I

17  believe just before the break these were admitted, but again,

18  in an abundance of caution, if they weren't formally admitted,

19  we would move to admit.

20          THE COURT:   No objection?

21          MR. KAMARAJU:   No, your Honor.

22          THE COURT:   They are admitted.

23          (Government's Exhibits V0107 and V0108 received in

24  evidence)

25          MS. MURRAY:   So this is Government Exhibit V0107.   If

O5S1GUO3                        Le Zhou - Direct

1   we could publish to the jury.

2            Can we publish that, please.  Thank you.

3   BY MS. MURRAY:

4   Q.  Mr. Zhou, before we took the break, we were looking at

5   this.  This was something that was sent, I believe you said it

6   was in your computer; is that correct?

7   A.  Yes.

8   Q.  Did you prepare this spreadsheet?

9   A.  No.

10  Q.  Do you know who prepared this spreadsheet?

11  A.  I don't know.

12  Q.  Who sent this to you?

13  A.  One of the UK member.

14  Q.  I want to just talk through a couple of the different

15  columns here and what's reflected.

16            First of all, there is a column—the second column

17  says Discord Discord.  Do you see that?

18  A.  Yes.

19  Q.  What information is shown there?

20  A.  Coffee Cantata, then two Chinese words.

21  Q.  Do you know who, if anyone, uses the Discord user name

22  Coffee Cantata?

23  A.  I used it.

24  Q.  Looking across the rows here, can you explain for the jury

25  what information is reflected in the top portion of this

O5S1GUO3                          Le Zhou - Direct

1    spreadsheet.

2    A.   Sure.  Under the Member ID Number, Member, UK2020H170, it's

3    unique ID assigned to me for investment.

4                Move to the right, after the Discord Discord, on top

5    account called A005, that's the investment account calls

6    created by the Himalaya Global Alliance.

7                Right next to it, Coin Rates.  That's reflects to

8    Himalaya Coins, as 0.5.

9                Then right after, it's the Chinese translate to

10   investment a month.

11               Then right after, next column, it's Chinese reflect to

12   translate to welfare coins numbers, which reflect to H Coins

13   numbers.

14   Q.   So focusing on the different rows, and is it correct that

15   the second-to-the-most-right column, the one with the little

16   emoji or the icon, that column reflects investment amounts; is

17   that correct?

18   A.   Yes.

19   Q.   So taking the first row, what investment, if any, is

20   reflected there at 59.93?

21   A.   That reflected to an investment called Apple Coins.

22   Q.   And was that an investment that you made in connection with

23   the G series offerings?

24   A.   Yes.

25   Q.   Looking at the next row, 31,300, what investment, if any,

1  does that reflect?

2  A.  That reflect to VOG investments.

3  Q.  And that was in connection with which company's private

4  placement?

5  A.  Guo Media's, GTV placement.

6  Q.  Looking at the next two rows, both of them have account

7  code 8142.  50,000 and 20,000.  What investment, if any, does

8  that relate to?

9  A.  The $50,000 reflect to my G club tier 5 investments;

10  $20,000 reflect to G club tier 2 investments.

11  Q.  And then the next row, the 21,000, what investment, if any,

12  does that reflect?

13  A.  That reflect to my UK Farm loan agreement investments.

14  Q.  And finally, the row that's 1500, what, if anything, does

15  that reflect?

16  A.  That reflected to my donations.

17  Q.  And so looking at the rightmost column, what information is

18  in the rightmost column that was relevant to your Himalaya Coin

19  purchase?

20  A.  So that's using the coin rates calculation, 0.5, multiplied

21  by my investment, how much coin I will receive.

22  Q.  And how much coin did you receive based on your prior

23  investments?

24  A.  40,935 coins.

25        MS. MURRAY:  We can take this down.

O5S1GUO3                          Le Zhou - Direct

1    Q.  Mr. Zhou, did there come a time when you requested a refund

2    of any of the money that you had invested in the G series?

3    A.  Yes, I did.

4    Q.  Approximately when was that?

5    A.  July 15, 2023.

6    Q.  And which money, if any, did you request to have refunded?

7    A.  I request my G Club investment refund.

8    Q.  How did you request a refund of your G Club investment?

9    A.  As instructed, for all the matters, I shall contact the

10   farm leader first, so I contact Washington, DC farm leader to

11   request the refund.

12   Q.  And what, if anything, was the response to your refund

13   request?

14   A.  It wasn't a pleasant—first they just provide a request

15   form, asked me to fill it out.

16   Q.  Did you complete that form?

17   A.  Yes, I did.

18   Q.  What happened next?

19   A.  Then for a very long period of time I didn't get any

20   response, so I have to contact them back and do a follow-up,

21   multiple follow-ups.  But they were trying to verify my

22   investments.

23          Then later, they asked me to fill out my request form.

24   They asked me they only will return HDO to me, not as fiat

25   currency to me.

O5S1GUO3                       Le Zhou - Direct

1    Q.  And just to be clear, when you say HDO, what are you

2    referring to?

3    A.  Himalaya dollars.

4            THE COURT:  And what do you mean by fiat currency?

5            THE WITNESS:  Because all my investment originally

6    send it to investment——G series investment using wires, paid in

7    the dollar.

8            THE COURT:  So you're saying dollars are fiat

9    currency?

10           THE WITNESS:  Correct.

11   BY MS. MURRAY:

12   Q.  And Mr. Zhou, at the time that the farm offered to refund

13   your G/CLUBS money in HDO, did you have access to a Himalaya

14   Exchange account?

15   A.  I don't.

16   Q.  Did you have access to any of the Himalaya Coins that you

17   had sent money to the farm to purchase?

18   A.  I don't.

19   Q.  At that time that you requested the refund and it was

20   offered in HDO, did you have personal knowledge whether you in

21   fact owned Himalaya Coins or Himalaya dollars?

22   A.  I addressed that.  I——

23   Q.  What do you mean by that?

24   A.  I told them that this request to return my investment in

25   HDO is not acceptable because I don't have HDO accounts,

O5S1GUO3                          Le Zhou - Direct

1    Himalaya Exchange accounts, so I said I will only receive in
2    the currency which is fiat currency.
3    Q.  And what, if anything, was the response to your saying that
4    you wouldn't accept HDO for your refund?
5    A.  So there's another long period of waiting time.  They just
6    asked me to wait.
7    Q.  Did there come a time when you received a refund of your
8    G/CLUBS money?
9    A.  Yes, I did.
10   Q.  Around when was that?
11   A.  December 1, 2023.
12   Q.  And what were the circumstances of your receiving that
13   refund?
14   A.  I have to sign a forfeit H Coin agreement and I also have
15   to return some equipments to them, so that's all the terms I
16   have to agree to.
17   Q.  Taking the equipment, what type of equipment were you
18   required to return?
19   A.  Just because I was—as a streaming technician, Washington,
20   DC Farm sent over certain equipment for the broadcast
21   equipments I at the time was holding.  So in a month, once I
22   request my refund, they would ask me to also return the
23   equipment as well.
24   Q.  You also mentioned you had to sign something forfeiting
25   your Himalaya Coin for the refund.  Can you explain that to the

1    jury, please.

2    A.  Yes.  Since I made a refund request, then they also send me

3    agreement that I have to forfeit all the H Coin was previously

4    acquired from investments.

5    Q.  And how much had you paid for that H Coin that you had to

6    forfeit?

7    A.  Total, I paid 5500 for the coins.

8    Q.  Did you in fact sign that agreement to forfeit the $5,500

9    worth of H Coin?

10   A.  I have no choice.  I was forced to sign that.

11   Q.  At some point after you requested a refund of your G Club

12   money, how, if at all, did the whistleblower movement respond?

13   A.  From——

14              MR. KAMARAJU:  Objection, your Honor.

15              THE COURT:  As to form, sustained.

16   Q.  Mr. Zhou, did anyone within the whistleblower movement, to

17   your knowledge, become aware that you'd requested a refund?

18              MR. KAMARAJU:  Objection, your Honor.  Same.

19              THE COURT:  Sustained.

20   Q.  Mr. Zhou, did there come a time when you were removed from

21   the UK Farm?

22   A.  Yes.

23   Q.  Can you describe what happened.

24   A.  Right after I returned equipment, the farm leader just

25   remove me out of the Discord server, cut all the

1   communications, and also they removed me out of all the working

2   channels, either the farm, Discord, WhatsApp, I was completely

3   removed.

4   Q.  Around when did that happen that you were removed from the

5   farm Discord channel?

6   A.  That was in September 2023.

7   Q.  Directing your attention to January of 2024, did there come

8   a time when your information was posted on Gettr?

9           MR. KAMARAJU:  Objection to form, your Honor.  What

10  information?

11          THE COURT:  Sustained.

12          MS. MURRAY:  Why don't we just pull up Government

13  Exhibit V02, which is in evidence.

14  Q.  Mr. Zhou, do you recognize this?

15  A.  Yes.

16  Q.  What is it?

17  A.  This is a post on gettrsocialmedia.com.

18  Q.  And can you just remind the jury what Gettr is.

19  A.  Yes, Gettr was of the G series.  It's a social platform

20  created by Miles Guo and it's similar as the Twitter's.

21  Q.  Looking at the English translation that was associated with

22  this post, can you read the title of this announcement.

23  A.  Global Himalayan Farm Alliance Blacklist Announcement.

24  Q.  What, if anything, do you understand a blacklist to be with

25  respect to the Himalaya Farm Alliance?

1  A.  For anyone accused who are against this movement, or Miles

2  Guo personally, would be put on the blacklist.

3  Q.  Looking at item 2 that's listed here, can you please read

4  that.

5  A.  I'm sorry.  One more time, please.

6  Q.  Yes.  Can you read item 2 that's listed here.

7  A.  Yes.  On January 21, 2024, Washington, DC Farm and the

8  collations made the following blacklist decision:  Blacklisted,

9  Coffee Cantata, Wen Lu, in Chinese.  No. 5082-Coffee Cantata.

10  Reason for exclusion, malicious attack on whistleblower

11  revolution and the G series.  Blacklist persons have the right

12  to submit an appeal within five days of the day of

13  announcement, and appeal will be ignored.

14  Q.  Mr. Zhou, Coffee Cantata, is that—that's the user name

15  that you used?

16  A.  Yes.

17  Q.  Were you given any notice in advance of this blacklist

18  announcement being posted on Gettr?

19  A.  No.

20  Q.  What was your reaction, if any, to being posted publicly on

21  the blacklist?

22  A.  First, I saw this afterwards.  That just not the truth.  I

23  never attacked the whistleblower movement, or the G series.

24  Q.  Did you appeal this blacklist decision?

25  A.  Because what I saw was already after the appeal dates,

1   allowance dates.

2               MS. MURRAY:  We can take this down, Ms. Loftus.  Thank

3   you.

4               THE COURT:  What is your answer, sir?  She asked

5   whether you appealed.

6               THE WITNESS:  I couldn't because I saw this post was

7   after this appealing allowance dates.

8               THE COURT:  You may continue.

9               MS. MURRAY:  Thank you.

10  BY MS. MURRAY:

11  Q.  Did there come a time when you stopped supporting Miles

12  Guo?

13  A.  Yes.

14  Q.  Around when was that?

15  A.  That's around June 2023.

16  Q.  Why did you stop supporting Miles Guo around June of 2023?

17  A.  Because there's a lot of the movement, the actions, I

18  personally seen is wrong, I——I don't want to be part of it, so

19  that's why I made the decision to stop.

20  Q.  Can you describe some of the actions that you're referring

21  to.

22  A.  Because there's also province within the farms and the

23  Global Alliance.  Especially the UK London Club, the leader was

24  accused of misproper use the Rule of Law Foundation monies.

25  There's a lot of problems never get really solved.  And we——I

O5S1GUO3                        Le Zhou - Direct

1  have personally reported a lot, a lot of the problems, never

2  got answer or solved.

3  Q.  Mr. Zhou, in total, how much money did you spend on the G

4  series offering we've been discussing?

5  A.  Total about $120,000.

6  Q.  And how did you pay for those investments or those costs of

7  the G series?

8            MR. KAMARAJU:  Objection, your Honor.

9            THE COURT:  Sustained as to form.

10 Q.  Mr. Zhou, what was the source of the money that you spent

11 on the G series offering?

12           MR. KAMARAJU:  Same objection.

13           THE COURT:  Step up, please.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O5S1GUO3                         Le Zhou - Direct

 1                    (At the sidebar)

 2                    THE COURT:  So are you objecting on the basis that it

 3      isn't established that there was an offering?

 4                    MR. KAMARAJU:  No, I'm objecting on the basis that the

 5      source of the money to pay for the offering is irrelevant.

 6                    THE COURT:  Overruled.

 7                    (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Overruled.  You may answer.

3              THE WITNESS:  Yes, your Honor.

4    A.  The source of the money was from my personal earnings, and

5    also I sold my properties, condominium I sold, and I also took

6    out my wife's life insurance.

7    Q.  Why did you sell your condos, your personal real estate

8    property?

9    A.  Because I——at the time I need to cash the Himalaya Exchange

10   coin launch, but I invest into G Club, so at the time I don't

11   have enough capital, but I——only thing I had was my

12   condominium.  I have to——and I sold it.

13   Q.  What about your wife's life insurance?  Why, if at all, did

14   you cash out the life insurance policy?

15   A.  That money, she agreed to put it into the farm loan.

16   Q.  Mr. Zhou, how much profit, if any, did you make from the

17   120,000 or so that you spent on the G series offerings?

18   A.  Zero profit.

19   Q.  How much money in total did you lose, if any, through those

20   offerings?

21   A.  I lost about $30,000.

22   Q.  $30,000?

23   A.  Or more.

24   Q.  At the time that you invested in the G series offerings,

25   did you believe that they would be profitable?

1    A.  Yes.

2    Q.  At the time that you invested in the G series offerings,

3    did you believe that Miles Guo would personally pay for any

4    losses that you sustained from those investments?

5    A.  At that time I believed it.

6    Q.  Did Guo in fact repay you for the approximately $30,000

7    that you lost through the G series investments?

8    A.  No.

9            MS. MURRAY:  May I have a moment, your Honor.

10            Nothing further.

11            THE COURT:  Cross-examination.

12            MR. KAMARAJU:  Yes.  Thank you, your Honor.

13   CROSS EXAMINATION

14   BY MR. KAMARAJU:

15   Q.  Good afternoon.

16   A.  Good afternoon, sir.

17   Q.  I just want to make sure I'm pronouncing your last name

18   correctly.  Mr. Zhou?

19   A.  Correct.

20   Q.  Okay.  Thank you.

21            Now you just testified that Mr. Guo has never repaid

22   you the amount that you say that you lost, correct?

23   A.  Correct.

24   Q.  You've never spoken with Mr. Guo, right?

25   A.  I spoke to him.

O5S1GUO3                    Le Zhou - Cross

1   Q.  You spoke to him about getting the money back?

2   A.  No.

3   Q.  You've never asked him to get any money back, correct?

4   A.  I mailed it to him.

5   Q.  You mailed it to Mr. Guo?

6   A.  Yes.

7   Q.  Mr. Guo doesn't use email, correct?

8   A.  I mailed it to——

9        MS. MURRAY:  Objection.

10        THE COURT:  Sustained.

11  Q.  You've never emailed Mr. Guo before, have you?

12  A.  I didn't email to him.

13  Q.  Okay.  So he's never responded to an email that you've

14  sent, correct?

15  A.  Never responded.

16  Q.  And he's never sent you personally an email, correct?

17  A.  Correct.

18  Q.  Okay.  Now I want to start with the Rule of Law Foundation.

19  Do you remember testifying about that?

20  A.  Yes.

21  Q.  And you testified that you first heard about it at a press

22  conference in November 2018, correct?

23  A.  Correct.

24  Q.  And your testimony was that you left that press conference

25  with the impression that Mr. Guo was going to fund the Rule of

```
 1   Law Foundation to a hundred million dollars, correct?
 2   A.  Correct.
 3   Q.  And that's what the prosecutors asked you here today,
 4   right?
 5   A.  Yes.
 6           MR. KAMARAJU:  Could we have Government Exhibit
 7   W1005V, please.  It's in evidence, so we can publish it.
 8           If we can just play it a little bit.
 9           (Video played)
10           MR. KAMARAJU:  Okay.  We can pause right there.
11   Q.  Now they asked you about this clip earlier, correct?
12   A.  Yes.
13   Q.  They asked you whether you had an understanding that
14   Mr. Guo had made a representation about funding a hundred
15   million dollars to the Rule of Law Foundation, correct?
16   A.  Correct.
17   Q.  Okay.  That's not Mr. Guo, right?
18   A.  That's not.
19   Q.  That's Steve Bannon, right?
20   A.  Correct.
21   Q.  Steve Bannon looks nothing like Mr. Guo, right?
22   A.  No.
23           MS. MURRAY:  Objection, your Honor.
24           THE COURT:  Overruled.  Go ahead.
25   Q.  This is Steve Bannon talking, correct?
```

1    A.  Correct.

2    Q.  So they asked you a question about representations Mr. Guo

3    made, but they showed you a clip of Mr. Bannon, correct?

4    A.  Correct.

5    Q.  But then you answered that your expectation was Mr. Guo was

6    going to fund the payment, right?

7    A.  Correct.

8    Q.  Now this isn't the first time that you've seen this video

9    clip, right?

10   A.  Correct.

11   Q.  You've seen it when you prepared with them before, right?

12   A.  I saw it at the live——when this press conference live.

13   Q.  Okay.  We'll come back to that.  But you've also seen it

14   with the prosecutors, right?

15   A.  Yes.

16   Q.  They've showed it to you before today, right?

17   A.  Yes.

18   Q.  They showed it to you when you prepared your testimony with

19   them, right?

20   A.  Not prepared the testimony, but they showed it to me.

21   Q.  Okay.  Well, you've met with the prosecutors multiple

22   times, right?

23   A.  Yes.

24   Q.  These prosecutors sitting at the table here, right?

25   A.  Not all.

O5S1GUO3                          Le Zhou - Cross

1    Q.  Some of them, right?

2    A.  Yes.

3    Q.  Which ones?

4    A.  Four of them.

5    Q.  Okay.  So the four people sitting here at the front of the

6    table?

7    A.  Not the left four but——

8    Q.  Okay.  Some set of those people, correct?

9    A.  Correct.

10   Q.  And there was an FBI agent there, right?

11   A.  No.  I don't know.

12   Q.  There wasn't an FBI agent there the first time you met with

13   the prosecutors?

14   A.  I don't know if the FBI.  I don't know.

15   Q.  Was there a translator there the first time you met with

16   the prosecutors?

17   A.  No.

18   Q.  There was no translator when you first met with them?

19   A.  No translator.

20   Q.  So you've never used a translator to speak with the

21   prosecutors; is that right?

22   A.  I didn't use translators.

23   Q.  Okay.  Now you testified that they showed you this clip

24   during one of those meetings, right?

25   A.  Correct.

1    Q.  How many meetings would you say you had with the

2    prosecutors?

3    A.  About seven.

4    Q.  About seven, right?

5    A.  Yes.

6    Q.  So that's seven times where you've met with the prosecutors

7    to discuss the testimony that you gave today, right?

8    A.  Not discuss.

9    Q.  Okay.  What did you talk about for seven meetings then?

10   A.  So I was being just asked the answer.

11   Q.  Okay.  Well, what were they asking you about?

12   A.  Asked related to the cases.

13   Q.  Right.  They asked you the same questions they asked today,

14   right?

15   A.  Correct.

16   Q.  And you gave the answers, right?

17   A.  Yes, I did.

18   Q.  Okay.  And sometimes if they didn't like one of your

19   answers, they asked a different question, right?

20   A.  No.

21   Q.  So you're telling me during seven meetings there was no

22   point where they asked you a follow-up question; is that your

23   testimony?

24   A.  They asked follow-up—

25              MS. MURRAY:  Objection.

1          THE COURT:  Sustained.  Sustained as to what they were

2    thinking.

3          MR. KAMARAJU:  Oh.  My apologies, your Honor.

4          THE COURT:  You may ask whether they asked follow-up

5    questions.

6          MR. KAMARAJU:  Oh, sorry.  I thought that's what I

7    asked.

8    BY MR. KAMARAJU:

9    Q.  So over the course of seven meetings, it's your testimony

10   that the prosecutors never asked you a follow-up question?

11         MS. MURRAY:  Objection.  Mischaracterizing the

12   witness's testimony.

13         THE COURT:  Sustained.

14   Q.  Okay.  Now you testified that you have seen this clip both

15   during a meeting with the prosecutors but you also saw it live,

16   correct?

17   A.  Correct.

18   Q.  Okay.  Now this clip is not everything that even Mr. Bannon

19   has to say at that press conference, right?

20   A.  That's correct.

21   Q.  He gives much longer remarks, right?

22   A.  Yes.

23   Q.  He takes questions from the press, right?

24   A.  Yes.

25   Q.  Okay.  He talks about efforts that Mr. Guo has made in

O5S1GUO3                    Le Zhou - Cross

1    support of the anti-CCP movement, right?

2    A.   Yes.

3    Q.   He talks about Guo Media, correct?

4    A.   Yes.

5    Q.   In fact, Mr. Bannon was even asked a question about whether

6    the Trump administration was involved, right?

7              MS. MURRAY:   Objection, your Honor.

8              THE COURT:   Overruled.   You may answer.

9    A.   No.

10   Q.   You don't recall that?

11   A.   Never asked.

12   Q.   Okay.   So your testimony was Mr. Bannon was never asked

13   that question, right?

14   A.   Could you repeat that one more time, please.

15   Q.   Yeah.   Was Mr. Bannon asked by a reporter whether the Trump

16   administration would be involved with the Rule of Law

17   Foundation?

18   A.   No.   Mr. Bannon never mentioned about Trump.

19   Q.   Okay.   And he was never asked, right?

20   A.   In that conference, no.

21   Q.   Okay.   Now Mr. Guo did speak at that conference, correct?

22   A.   Yes.

23   Q.   Okay.   And I think you talked about a few of the topics

24   that he discussed during your direct testimony.   Do you

25   remember that?

O5S1GUO3                          Le Zhou - Cross

```
 1   A.  Which topics?
 2   Q.  Well, and forgive me if I get it wrong, but I believe one
 3   of the things you said was that he discussed investigating
 4   business deaths.  Do you remember testifying about that?
 5   A.  I'm sorry.  Not invest——business stats,
 6   investigate——Mr. Bannon said investigate mysterious Chinese
 7   businessmen's deaths.
 8   Q.  Okay.  What is that a reference to?
 9   A.  That reference to how this Rule of Law Foundation fund will
10   be used.
11   Q.  Okay.  Well, Mr. Bannon also talks about the fact that
12   there had been an investigation into the death of a Chinese
13   businessman, correct?
14   A.  Correct.
15   Q.  It was a chairman of a company called HNA, correct?
16           MS. MURRAY:  Objection.
17           THE COURT:  Overruled.  You may answer.
18   A.  Yes.
19   Q.  And Mr. Guo had previously predicted the death of the
20   chairman of HNA, correct?
21           MS. MURRAY:  Objection, your Honor.  Hearsay and
22   relevance.
23           THE COURT:  Sustained.
24           MR. KAMARAJU:  I'm not offering it for the truth, your
25   Honor.
```

1          THE COURT:  If you'll step up.

2          (At the sidebar)

3          THE COURT:  The question was:  And Mr. Guo had

4     previously predicted the death of—

5          MR. KAMARAJU:  Yes.  I'm not offering it for the truth

6     of the man's death, just simply that he predicted it, that he

7     heard him say it.

8          THE COURT:  During the conference?

9          MR. KAMARAJU:  No.  Prior to the conference, your

10    Honor.

11         THE COURT:  Well, how is it relevant?

12         MR. KAMARAJU:  Because the witness testified that

13    Mr. Guo had revealed what he referred to as classified

14    information and that's one of the things that attracted the

15    witness.  I don't mean classified in the setting that American

16    government uses it.  I mean confidential information about the

17    Chinese government, and that was what attracted him.  I'm just

18    following up.  I don't intend to spend a long time on it.  I

19    have two more questions.

20         MS. MURRAY:  I don't see how it's not hearsay.  I

21    don't see how it's relevant.

22         THE COURT:  I just don't recall this testimony that

23    you're referring to, that you're saying this witness said that

24    one of the reasons he was attracted to Mr. Guo was because he

25    mentioned the death of a businessman?

1              MR. KAMARAJU:  No.  He said that he knew that Mr. Guo

2     had unknown details.  He referred to it as classified

3     information.  I'm not calling it that.  But he referred to

4     secret information about Chinese government officials, and

5     that's what Mr. Guo was revealing; that's one of the things

6     that attracted him.

7              THE COURT:  I have to say I don't recall that

8     particular testimony.  Is that what he said?

9              MS. MURRAY:  He indicated that it was one of the

10    topics that Miles Guo had covered in his broadcast.  But first

11    of all, I think that the statement that Mr. Kamaraju is

12    referring to is not even covered in this broadcast.  It's an

13    out-of-court statement by Miles Guo.  I also don't think that

14    the alleged prediction of the death of a Chinese businessman

15    falls within this broad category of potentially classified

16    information about Chinese government officials.  I just don't

17    see the connection.

18             THE COURT:  So this prediction does not occur at the

19    conference.

20             MR. KAMARAJU:  No.  Before the conference Mr. Guo

21    predicts that it will happen.  The death happens prior to the

22    conference.  Mr. Bannon then notes at the conference that one

23    of the things that Mr. Guo has done is an investigation into

24    the death of the businessman.

25             THE COURT:  Okay.  I'm going to allow the question.

1          MR. KAMARAJU:  Thank you, your Honor.

2          (In open court)

3          THE COURT:  Overruled.

4  BY MR. KAMARAJU:

5  Q.  Sir, do you remember the question?

6  A.  Could you please repeat it, please.

7  Q.  Yes.

8          MR. KAMARAJU:  I'm sorry to do this, but would the

9  court reporter mind reading back the question, please.

10          (Record read)

11          THE COURT:  You may answer.

12          THE WITNESS:  Yes, your Honor.

13  A.  Yes.

14  Q.  And Mr. Bannon discussed that at the press conference,

15  correct?

16  A.  Yes.

17  Q.  He talked about that Mr. Guo will send people to

18  investigate the death, correct?

19          MS. MURRAY:  Objection.

20          THE COURT:  Overruled.  You may answer.

21  A.  That part I don't remember.

22  Q.  Okay.  What do you——you don't remember Mr. Bannon talking

23  about Mr. Guo sending investigators——

24          MS. MURRAY:  Objection.  Asked and answered, your

25  Honor.

1          THE COURT:  Sustained.  Go ahead.

2   Q.  Now you testified on direct about your understanding of

3   what the NFSC is, correct?

4   A.  Correct.

5   Q.  And just remind us, what does NFSC stand for?

6   A.  New Federal State of China.

7   Q.  All right.  And it's comprised of individuals who would

8   like to take down the Chinese Communist Party, fair?

9   A.  Yes.

10  Q.  And you were one of those people, right?

11  A.  Yes.

12  Q.  And so you shared that goal, right?

13  A.  Yes.

14  Q.  And now the NFSC, that's the New Federal State of China,

15  right?  We're talking about the same thing?

16  A.  Yes.

17  Q.  The NFSC was founded on June 4, 2020, correct?

18  A.  Correct.

19  Q.  You watched the video about that founding, right?

20  A.  Yes.

21  Q.  Mr. Guo was there, correct?

22  A.  Correct.

23  Q.  He was in front of the Statue of Liberty, right?

24  A.  Not in front of it.  He was on his boat.

25  Q.  Okay.  So the boat was in front of the Statue of Liberty,

1    right?

2    A.   Close to it.

3    Q.   And there were other people who appeared in the video,

4    correct?

5    A.   Yes.

6    Q.   One was a famous Chinese soccer star, right?

7    A.   He appeared on stream, online.

8    Q.   Okay.  So you could see him during the broadcast, right?

9    A.   Yes.

10   Q.   Mr. Bannon was there also, right?

11   A.   Correct.

12   Q.   And they were talking about the founding of this

13   alternative government, right?

14   A.   Yes.

15   Q.   Okay.  And this is during the COVID pandemic, correct?

16   A.   Yes.

17   Q.   Okay.  Now you talked a little bit about this on direct,

18   but the idea is that the NFSC would be an alternative

19   government to the Chinese Communist Party, right?

20   A.   Yes.

21   Q.   And so you used the word on direct "ecosystem," there were

22   various businesses that comprised the ecosystem of the NFSC,

23   correct?

24   A.   Yes.

25   Q.   So you talked about GTV, right?  You testified about GTV.

1    That was one of the companies that would be in the ecosystem?

2    A.  Yes.

3    Q.  And G/CLUBS, that was another company that would be in the

4    ecosystem, right?

5    A.  Yes.

6    Q.  And the Himalaya Exchange, that was another company that

7    would be in there, right?

8    A.  Yes.

9    Q.  And each of these different components had a role to play

10   as part of that ecosystem, correct?

11   A.  The goal was the same.

12   Q.  They had a different purpose is what I'm trying to get at,

13   right?

14   A.  Purpose is all the same.

15   Q.  Okay.  Well, let me try it this way.  So GTV was a social

16   media company, right?

17   A.  Yes.

18   Q.  Himalaya Exchange was a cryptocurrency exchange, right?

19   A.  Yes.

20   Q.  And they both do different things, right?

21   A.  Correct.

22   Q.  But they're both——they were both intended to be part of the

23   larger NFSC goal, right?

24            MS. MURRAY:  Objection.

25            THE COURT:  Overruled.  You may answer.

1   A.  Yes.

2   Q.  So in terms of purpose, GTV was intended to be sort of a

3   social media platform that was devoid of CCP censorship,

4   correct?

5   A.  Yes.

6   Q.  And G/CLUBS was a way for NFSC members to associate with

7   each other, correct?

8   A.  No.  It's for investments.

9   Q.  It's for investments.

10  A.  Yes.

11  Q.  Didn't you testify on direct that you were going to get a

12  passport as part of G/CLUBS, right?

13  A.  Yes.

14  Q.  And that passport was going to be an NFSC passport, right?

15  A.  Yes.

16  Q.  Okay.  So G/CLUBS was for NFSC members, among other

17  reasons, to associate with each other, correct?

18          MS. MURRAY:  Objection, your Honor.  Asked and

19  answered.

20          THE COURT:  I'm going to allow the question.

21  A.  Not to socialize with other members, because each investor

22  is individually.  We don't know their informations.

23  Q.  So you joined G/CLUBS, right?

24  A.  Yes.

25  Q.  Okay.  When you joined G/CLUBS, were you proud of joining

O5S1GUO3                          Le Zhou - Cross

1    G/CLUBS?

2    A.  Yes.

3    Q.  Okay.  You were showing your commitment to the NFSC; that

4    was one of the reasons why you bought a G/CLUBS membership,

5    right?

6    A.  I want to get stock and also get a passport, which was

7    promised.

8    Q.  Okay.  I didn't ask you what was promised.  I just asked

9    why you did it, right?

10            MS. MURRAY:  Objection, your Honor.

11            THE COURT:  So don't testify.

12   Q.  Okay.  You mentioned that you wanted to get a passport,

13   right?

14   A.  Yes.

15   Q.  And that was the NFSC passport, right?

16   A.  Yes.

17   Q.  All right.  You also testified about the farm loans, right?

18   A.  Yes.

19   Q.  And the farm loans were intended to provide funding for the

20   farms' work, right?

21   A.  That was the fund, what will be used for.

22   Q.  Right.  And you testified on direct, you said it would be

23   used for the working capital of the farms, right?

24   A.  Correct.

25   Q.  So that's the farms' business, right?

O5S1GUO3                        Le Zhou - Cross

1   A.  Farm can use it as operation capitals.

2   Q.  Okay.  So the farm has discretion to use it on its

3   operations, right?

4   A.  Yes.

5   Q.  So if the farm decides they want to spend it on this, they

6   can spend it on this; if they want to spend it on that, they

7   can spend it on that, right?

8   A.  There's also restriction.

9   Q.  Okay.  And that restriction was found in the loan

10  agreement; is that right?

11  A.  I don't remember that.

12  Q.  Okay.  So you don't remember where this restriction is

13  located, right?

14  A.  Where located, I don't remember.

15  Q.  Okay.  Now I believe you lived in China until 1998,

16  correct?

17  A.  Correct.

18  Q.  And the political goals of the NFSC, is it fair to say

19  they're easier to support in the United States than in China?

20  A.  Yes.

21  Q.  Here you had the choice to spend your money on those

22  products, right?

23  A.  On which products?

24  Q.  Well, just take G/CLUBS, right?  That was your choice; you

25  could spend on it, right?

O5S1GUO3                        Le Zhou - Cross

1    A.   Yes.

2    Q.   Like there was no government agency that stopped you from

3    spending on it, right?

4    A.   Correct.

5    Q.   And like this hat that you testified about, this was your

6    choice, right?  You could buy this hat if you wanted to, right?

7    A.   Yes.

8    Q.   And the whistle that you talked about, your choice, right?

9    A.   But all the purchases was also towards to grow the G

10   Fashions as one of the investments.  I treated it as not just

11   purely purchase items but to support the growth together.

12   Q.   Okay.  To support the growth of the company, right?

13   A.   As the shareholders.

14   Q.   Okay.  But you weren't actually a shareholder in G Fashion,

15   right?

16   A.   No.  Miles Guo mentioned our investment will including G

17   Fashion stocks.

18              (Continued on next page)

19

20

21

22

23

24

25

1   BY MR. KAMARAJU:

2   Q.  You never had a share of G Fashion shares; correct, sir?

3   A.  I don't have the shares.

4   Q.  Okay.  You have no idea -- you have no idea how many shares

5   you even think you were promised, right?

6   A.  Promised a dollar per shares.

7   Q.  Okay.  So a dollar for everything you spent on G Fashion?

8   A.  Not spend.  It was -- G Fashion was in the future, the G

9   Fashion's gross was towards to the G Series investments.

10  Q.  Okay.  So going back to my original question though, that

11  was your choice to spend on that, right?

12          MS. MURRAY:  Objection.

13          THE COURT:  Overruled.  You may answer.

14  A.  Yes.

15  Q.  Now, sir, you testified on direct you're in the real estate

16  business; is that right?

17  A.  Yes.

18  Q.  And you've been in the real estate business for more than

19  ten years, right?

20  A.  Correct.

21  Q.  So you're pretty experienced in the business, right?

22  A.  Yes.

23  Q.  Your company is called East West Luxury Group; is that

24  right?

25  A.  No, that's my small group.

1    Q.  I'm sorry?

2    A.  That's my inner group.

3    Q.  That's your inner group.  Okay.

4            What's the name of your company, I'm sorry?

5    A.  United Realty Group.

6    Q.  And do you specialize in any particular kind of property?

7    A.  Yes.

8    Q.  What's that?

9    A.  Residential.

10   Q.  Okay.  Do you have a particular type of clientele?

11   A.  What you mean by --

12           MS. MURRAY:  Objection, your Honor.

13           THE COURT:  Overruled.  You may answer.

14   A.  I'm sorry, what do you mean by "particular"?

15   Q.  Well, for example, do you specialize in high-end

16   residential properties?

17           MS. MURRAY:  Objection, your Honor.  402.  403.

18           THE COURT:  Overruled.  You may answer.

19   A.  I just the residential.  I don't consider particular, if

20   it's a high-end or it's low-income or it's affordable housing.

21   Q.  Okay.  So you run the gamut, basically?

22   A.  Yes.

23   Q.  Okay.  Now, you advise your clients in connection with

24   those transactions, right?

25   A.  I'm sorry, which transactions?

O5SVGUO4                    Le Zhou - Cross

1   Q.  Just your real estate business, right?

2   A.  I'm only show the houses, provide informations on the

3   houses, but I don't control monies or receive the monies.

4   Q.  No.  Sir, I'm not trying to trick you.  I'm not asking you

5   if you receive the money or don't receive the money.  All I'm

6   asking is, is you advise your clients in connection with the

7   purchase of their homes, right?

8   A.  Yes.

9   Q.  Okay.  And part of that advice is to tell them to pay

10  attention to the deal they're entering into, right?

11  A.  Correct.

12          MS. MURRAY:  Your Honor, objection.  Sidebar.

13          (Continued on next page)

O5SVGUO4                          Le Zhou - Cross

1              (At sidebar)

2              MS. MURRAY:  Your Honor, the Court previously ruled

3      that you can't get into the details of the decisions that

4      people made in the investments.  It's veering into negligence,

5      it's prejudicial, it's not relevant, this line of questioning.

6      And it's, I think, over the line of -- and the argument that

7      there was negligence associated with the investments that this

8      witness testified to.

9              MR. KAMARAJU:  I do not intend at all to argue

10     negligence.  The determination, one, it goes to materiality,

11     which the government has to prove.  Two, your Honor also said

12     that as part of materiality, we were allowed to inquire into

13     the sophistication of the potential investors' particular

14     trades that might make that a reasonable investor.

15             I'm not arguing that he should have done this or he

16     should have done that.  I'm just saying that part of

17     materiality turns on what representations you're focused on.

18     And sophistication is something that your Honor has already

19     explicitly said is fair game.

20             MS. MURRAY:  Your Honor, these questions aren't going

21     to sophistication of him as an investor; it's victim-blaming,

22     asking him whether he advised clients in the course of his real

23     estate transactions and whether those clients were high-end

24     individuals.  I don't see how that is remotely relevant to this

25     individual's understanding of what the investment opportunities

O5SVGUO4                     Le Zhou - Cross

1    were or his motivation for investing in them.

2              THE COURT:  So he's asked whether he advises the

3    client to --

4              MR. KAMARAJU:  Pay attention.

5              THE COURT:  -- pay attention to the details.

6              MS. SHROFF:  Read a contract of sale.

7              MR. FINKEL:  That's not appropriate.

8              This is a fraud case.  There's no reliance defense.

9    You can't say to a victim of fraud, You should have read all

10   these details, sir.  This is victim-blaming through another

11   word, they are using "materiality."  And the jury is going to

12   draw the wrong conclusion.  It's a 403 problem.

13             MR. KAMARAJU:  Your Honor is going to instruct the

14   jury as to the elements of the offense.  I'm sure the

15   government will ask as to that instruction.  Reliance is not

16   relevant.  I'm not sure I see --

17             THE COURT:  Well, I think that you're trying to get

18   him to say that I advise my clients to use good judgment, and

19   the implication is that he didn't follow his own advice.

20             MR. KAMARAJU:  No, your Honor.  What I'm eventually

21   going to set up is to the extent that he did not read documents

22   when entering into these investments, is because the

23   information in those documents was not material to him, which

24   is directly as a joinder to the government's allegations of

25   specific recommendations in those documents are material.  It

O5SVGUO4                          Le Zhou - Cross

1    didn't matter to him what's in the farm loan agreement, to

2    enter into the farm loan agreement.  Then how it can be

3    material?

4           THE COURT:  Did he actually discuss the specifics of

5    agreements?

6           MR. KAMARAJU:  He also told the FBI that he didn't

7    read them.

8           THE COURT:  But he testified today about the specific

9    agreements.  So I don't think you can argue that he said that

10   he did not rely on the agreements at all.

11          MR. KAMARAJU:  I'm allowed to impeach him on that,

12   your Honor.

13          THE COURT:  Well, I'm saying you can't say he didn't

14   testify about examining the agreements.

15          MR. KAMARAJU:  No, no, no.  You're right, your Honor.

16   What I'm saying is I'm allowed to impeach that testimony to

17   suggest that he didn't read those.

18          THE COURT:  You can challenge him on that.  What I'm

19   saying is you can't imply that he did not say today that he

20   read the agreements.

21          MR. KAMARAJU:  No, absolutely, your Honor.  I'm not

22   intending --

23          THE COURT:  So I am going to sustain the objection at

24   this point because I do think that you're going down that road

25   of the blaming of the victim.

1          MR. KAMARAJU:  Okay, your Honor.

2          MR. FINKEL:  Thank you.

3          (In open court)

4          THE COURT:  Sustained.

5   BY MR. KAMARAJU:

6   Q.  Now, you testified on direct that you were interested in

7   investing in GTV; correct?

8   A.  Yes.

9   Q.  And you understood that the purpose of GTV was to be a

10  social media platform, right?

11  A.  Yes.

12  Q.  And that it was to broadcast material that was critical of

13  the Chinese government, right?

14  A.  Yes.

15  Q.  So that was one of the goals that the movement had, was to

16  set up a social media network like that, right?

17  A.  For all people to use, yes.

18  Q.  Right.  And the NFSC was actually -- the public

19  announcement of the NFSC was actually just two days after the

20  GTV private placement closed; correct?

21  A.  Yes.

22  Q.  Now, you testified that you were hoping to earn a profit on

23  GTV, right?

24  A.  I'm sorry?

25  Q.  You testified that you were hoping to earn a profit on GTV;

1    correct?

2    A.   Yes.

3    Q.   But you understood it was a risky business, right?

4    A.   Yeah.  Miles more mentioned it, investment has risk.

5    Q.   Mr. Guo said investment has risk, right?

6    A.   Also he made a guarantee.

7    Q.   Well, I asked you if he said that it --

8              MS. MURRAY:  Objection, your Honor.

9              THE COURT:  Sustained.

10             Continue your questions.

11   Q.   Now, you testified that Mr. Guo told people who wanted to

12   make an investment less than $100,000, that they had to contact

13   Sara Wei, right?

14   A.   At the time, yes.

15   Q.   At the time.  What do you mean by that?

16   A.   Because the first announcement he mention who like to

17   invest, he didn't mention that.

18   Q.   Okay.  So there came a point at which Mr. Guo said, If you

19   want to invest less than $100,000, you should go to Ms. Wei,

20   right?

21   A.   He didn't mention 100,000, less 100,000.  He mention for

22   other people that don't have that much can contact other farm

23   leaders to invest.  He will not let the followers left behind.

24   Q.   He didn't want the followers to be left behind, right?

25   A.   Yeah.

Q.   Okay.  So your testimony is he didn't mention $100,000, he
just said smaller investments go to your farm leaders; is that
right?

A.   No.  He mention 100,000 is two tiers; 100,000 for a certain
limited head counts.  It was 2,000 head counts.

Q.   Okay.  So there were 2,000 head counts, to use your word,
for people who wanted to invest $100,000 or more, right?

A.   That's a minimum.

Q.   Right.  So $100,000 or more, right?

A.   Correct.

Q.   And then if you wanted to invest less than $100,000, he
told you to go talk to people in the farms; is that right?

A.   Yes.

Q.   Okay.  And that was the only dividing line, right, it was
more than $100,000 or less than 100,000, right?

A.   Yes.

Q.   And you personally decided that you wanted to invest less
than $100,000, right?

A.   Not decide, just I don't have $100,000 at the time.

Q.   Okay.  Fair enough.  You didn't have the $100,000, so you
ended up investing less, right?

A.   Correct.

Q.   All right.  Now, you testified on direct that you watched a
broadcast that Mr. Guo did on April 21st, 2020, right?

A.   April 20th.

1    Q.  This is the one that's announcing the GTV private

2    placement; is that right?

3    A.  Yes.

4    Q.  Okay.  And you watched that, right?

5    A.  Yes.

6    Q.  Okay.  You watched the whole thing?

7    A.  Yes.

8            MR. KAMARAJU:  Could we bring up Government Exhibit GX

9    C-26-T and go to page 1, please.

10   Q.  The prosecutors, when they asked you about this, they only

11   showed you one clip from the --

12           THE COURT:  One moment, please.  It seems that one of

13   our jurors, No. 12, does not have the image on the screen.

14           MR. KAMARAJU:  I think it may be a problem with that

15   one screen, your Honor.

16           THE COURT:  Can you look on to Juror No. 11's screen?

17           Juror No. 12, are you able to look at Juror No. 11's

18   screen?

19           Okay.  Go ahead, please.

20           MR. KAMARAJU:  Maybe we can blow up the paragraph

21   that's -- great.  Thank you.  Is that better?  Okay.

22   BY MR. KAMARAJU:

23   Q.  Now, on direct, the prosecutors asked you about one clip

24   from this broadcast; correct?

25   A.  Yes.

1    Q.  They didn't show you the whole broadcast to testify about,

2    right?

3    A.  Correct.

4    Q.  So you see here where it says:  "This video is just a brief

5    introduction."  Do you see that?

6    A.  I saw the English text, yes.

7    Q.  Could you read that, please, the highlighted portion?

8    A.  "This video is just a brief introduction to friends and

9    fellow fighters who have the intention to invest in GTV so that

10   you can understand the documents to be signed in the investment

11   and during investment, as well as some basic procedures."

12            MR. KAMARAJU:  Okay.  Can we go to page 5, please.

13   Q.  Do you see the highlighted portion here?

14   A.  Yes.

15   Q.  Could you read that, please.

16   A.  "Within 24 hours after you received this video, you will

17   receive the following documents from the law firm about the

18   so-called private equity of GTV."

19            MR. KAMARAJU:  Okay.  Could we go to page 2, please.

20   Q.  Do you see the highlighted section here?

21   A.  Yes.

22   Q.  Could you read that, please.

23   A.  "Please carefully read through all the documents to be

24   signed for investment."

25   Q.  Okay.

1          MR. KAMARAJU:  Could we go to page 16, please.

2     Q.  Could you read that highlighted portion, please.

3     A.  "I just would like to make a brief explanation, but I will

4     stress this one more time:  Please be sure to read the

5     prospectus, subscription letter, shareholder agreement, and

6     confidentiality agreement that are sent to you.  Those will

7     prevail."

8     Q.  Okay.  So on repeated instances during the April 20th

9     broadcast, Mr. Guo urged listeners to read the documents;

10    correct?

11         MS. MURRAY:  Your Honor, same objection that we raised

12    at sidebar.

13         THE COURT:  The objection is sustained.

14         Move on.

15    Q.  Do you know what he means when he says "prospectus"?

16    A.  He didn't speak that broadcast in English; his original

17    words were in Chinese.

18         MR. KAMARAJU:  I think we can take it down.  We have

19    the Chinese next to it.  That's helpful.

20         Your Honor, I'm sorry, could we have a 20-second

21    sidebar?

22         THE COURT:  Yes.

23              (Continued on next page)

24

25

1             (At sidebar)

2             MR. KAMARAJU:  Just before I continue, I just want to

3   make sure I understand.  Am I not permitted to ask him if he's

4   read the prospectus?

5             THE COURT:  I want to first hear the objection of the

6   prosecution.

7             MR. KAMARAJU:  Okay.

8             MS. MURRAY:  That question is not objectionable.  But

9   the questions that Mr. Kamaraju has been asking are going again

10  to kind of victim-blaming and picking apart very specific

11  details about what this victim did or didn't do in a way that

12  is prejudicial, is intended to kind of muddy the waters for

13  this victim.  If he wants to ask if he read the prospectus, he

14  can ask if he read the prospectus.

15            MR. KAMARAJU:  All I elicited was that Mr. Guo

16  directed investors to the prospectus where there is information

17  surrounding the representations that the government is relying

18  on.  I want to be able to ask him if he read the prospectus.

19  If he didn't, he didn't.  That's what the entire line of

20  questioning before was when I showed him the various parts, was

21  that Mr. Guo is directing them to the document.

22            THE COURT:  So it's not a "don't you think you should

23  have done that," you're not going to follow up with that.

24            MR. KAMARAJU:  I don't intend to ask him "shouldn't

25  you have read it," no.

1          THE COURT:  Just did you.  That's it.  And then you're

2     done with that line of questioning?

3          MR. KAMARAJU:  I mean, if he says yes, he read it,

4     then I'm going to show him the document, I'm going to ask about

5     specific representations about the document.

6          THE COURT:  See, that's the problem.  You can't go to

7     those representations.

8          MR. KAMARAJU:  Actually, your Honor, your Honor ruled

9     in the motion *in limine* under the *Weaver* case that we are

10    allowed to show different representations in the PPM to go to

11    materiality.

12         The government explicitly argued that it only went to

13    reliance.  They cited *Weaver*.  *Weaver*, in fact, says the

14    disclaimers are relevant to the idea of materiality.  So if you

15    read the disclaimers, then I'm allowed to elicit them.

16    Otherwise, I don't know how to elicit that other than through a

17    witness who read the document.

18         MS. MURRAY:  Your Honor, the representations that were

19    made weren't only contained within the document.  There is the

20    broadcasts, there are other statements that he made.  So to the

21    extent that they want to inquire and find out what caused the

22    witness to invest or what induced him to invest, they can ask

23    that question without tying it to the language of the

24    prospectus and going to this line of questioning.

25         Then with respect to the specific question did he read

1    the prospectus, we don't object to that question.  But it's the

2    20 questions that have led up to it and then the questions that

3    would follow.

4           THE COURT:  If he answers yes, then what questions do

5    you feel are appropriate?

6           MS. MURRAY:  I think it would be questions regarding

7    the materiality of -- I believe this is where Mr. Kamaraju is

8    going, the materiality of the guarantee that Guo made that he

9    would personally guarantee any losses.

10          If the line of questioning is, Here's what was stated

11   in the prospectus.  Were Guo's statements that he would

12   personally guarantee your money, were those immaterial to your

13   decision to invest because it's not listed in the prospectus

14   anywhere, I don't think that's --

15          MR. KAMARAJU:  Well, first of all, I will note that

16   the indictment alleges that the misrepresentation related to

17   the securities fraud count and the wire fraud count related to

18   GTV to be statements in the prospectus.  So the idea that he

19   made statements elsewhere that affected that, that's fine.

20   They can argue that.  But there's no universe in which the

21   prospectus statements are not relevant, and the information

22   surrounding those representations are not relevant unless

23   they're dropping the count, which I don't think they are.

24          MS. MURRAY:  Your Honor, this is not the only victim

25   who invested in the GTV offering.  It's very clear that what

1    they're trying to do is back into the sophistication.  And a

2    topic that your Honor already ruled doesn't come in through

3    this.  Again, if they want to ask --

4              THE COURT:  If you're relying on the representations

5    in the indictment, how is it that it would not be proper to ask

6    the witness about these representations mentioned in the

7    indictment?

8              MS. MURRAY:  Well, I think first we would establish

9    whether he read the prospectus.

10             MR. KAMARAJU:  Sure.  I'm going to do that.

11             THE COURT:  Yes.  But if he answers yes, that's where

12   I'm asking.

13             MS. MURRAY:  If he answers yes, it's fair game to ask

14   questions about certain of the language in the prospectus and

15   determine whether he had read it at the time.  But what we're

16   concerned about is kind of the slippery slope of then going

17   into the sophistication and victim-blaming.

18             THE COURT:  Well, did you read it?  Let's say he says

19   yes.  Then the next question is:  Did you consider the risk

20   that was set out in the prospectus?

21             MR. FINKEL:  One way that your Honor might want to

22   contend with this, and I know it's been done in other fraud

23   cases, is through a limiting instruction, which is simply

24   telling the jury that whether the witness or the victims were

25   sophisticated or not, were aware of risks that they avoided or

1   relied on various disclaimers or not is not what's at issue

2   here.  The questions are being asked only for the purpose of

3   assessing whether the representations that the witness

4   testified about, here, the representations about the guarantee

5   and the use of GT funds, whether those are material.  I have

6   seen that done in other fraud cases.

7           THE COURT:  Okay.  We're going to take a pause, and I

8   want you to draft this instruction.

9           MR. KAMARAJU:  I'll just note, your Honor, that

10  everything he just said is a proper subject of a jury

11  instruction, not a limiting instruction in the middle of

12  testimony.

13          THE COURT:  I don't know that I agree with that.

14          MR. KAMARAJU:  Well, your Honor, I'm not sure -- first

15  of all, your Honor did say that we can acquire the

16  sophistication of the investors because it goes into the

17  materiality analysis.  So I just want to make sure that we're

18  clear on that.

19          I get the idea that we can't argue that the victims

20  are negligent or they should have done more.  We're not

21  precluded from arguing or eliciting testimony that these are

22  sophisticated people.  That's black-letter Second Circuit law.

23  That's the *Litvak* case.  The *Litvak* case says sophistication of

24  the investors plays into it.

25          MR. FINKEL:  That's a civil case.

1            MR. KAMARAJU:  No, it's *U.S. v. Litvak.*

2            So I don't -- because you have to judge the reasonable

3      investor standard by the investors who are in the market.

4      That's what the law is.  So that's one point.

5            Two, I don't know how you get away from determining

6      the materiality of any individual statement taken outside of

7      the context of the larger document.  There's no principle of

8      law that supports that.  If a guy says he read -- not this

9      witness, but generally.  If a person says they read a document,

10     and document -- one section of the document says this is how we

11     might use the money, and the other section of the document says

12     those are just examples of how we use the money, it goes to the

13     materiality analysis, your Honor.

14            MR. FINKEL:  Your Honor, the *Weaver* case, which we

15     briefed and which your Honor ruled on directly addresses this.

16     And it prevents defense counsel from eliciting this sort of

17     testimony.

18            What happened in *Weaver*, if I recall correctly, was

19     essentially the defendant, the fraudster, was saying to

20     victims, You're going to make millions of dollars, all that

21     kind of stuff, right.  Then they would receive documents that

22     would say something to the effect of, Don't listen to anything

23     I just said.  A disclaimer.

24            And so the defense wanted to put in a disclaimer to

25     say, Look, you should have looked at that disclaimer, victim.

1  You should have known, victim, that you shouldn't have listened

2  to the guy, the defendant, as to what he said.

3          Second Circuit said you can't do that.  Why can't you

4  do that?  Because fraud in a criminal context, there's no

5  reliance on it.  There's an objective reasonable standard which

6  the jury will assess.  But you can't -- defense counsel is

7  asking questions about -- this all came about because they are

8  asking questions about, Are you a good real estate broker?  Do

9  you point your clients to specific details in the contracts?

10  Do you look over things?

11          That goes to whether or not they were assessing

12  disclaimers.  That's not the issue.  The issue is whether Guo's

13  statements made in these broadcasts were lies and whether,

14  based on those lies, they were material to the victims, and so

15  they sent money to Guo, and they did.

16          THE COURT:  What does the prospectus say?

17          MR. FINKEL:  The prospectus says a number of things.

18  One of the things that I think defense counsel is referring to

19  with respect to the indictment is how the money would be used.

20          For example, the prospectus doesn't say that the money

21  would be sent to a hedge fund in the name of Mr. Guo's son.  It

22  says that the money would be used to essentially invest in GTV.

23  There is no guarantee in the prospectus, and I think that's

24  kind of what defense counsel is getting at, which is exactly on

25  all fours with the *Weaver* case.  Because in the *Weaver* case,

O5SVGUO4                          Le Zhou - Cross

1    again, the defendant was saying things that victims relied on,

2    and were the reasons why the victim invested, and then later

3    got disclaimers.  And so the Second Circuit -- sorry, your

4    Honor.

5              THE COURT:  But do these documents contain

6    disclaimers?

7              MR. FINKEL:  The prospectus?

8              THE COURT:  Yes.

9              MR. FINKEL:  I believe there are some disclaimers in

10   that document, yes, your Honor.

11             THE COURT:  Like what?

12             MR. KAMARAJU:  Like I'll give you an example.  There's

13   a chart that they rely on that they put into the indictment

14   that said these are the contemplated use of proceeds.  And then

15   there's language that says this list is illustrative, right,

16   which means it's examples, right.  I'm allowed to elicit that

17   to materiality.

18             I'll just say one point on the *Weaver* case, your

19   Honor.  Respectfully, you've already addressed this and you've

20   already noted that the government's description of *Weaver* is

21   precisely wrong.  Because what they said in *Weaver* is that

22   while there is no reliance element and the defense cannot make

23   a reliance argument, they can point to those disclaimers for

24   purposes of the materiality analysis, which is what your Honor

25   has already found.  So I don't know why we're revisiting the

O5SVGUO4                        Le Zhou - Cross

1    context in *Weaver*.

2              MR. FINKEL:  And that's why too to obviate any

3    potential juror confusion, a limiting instruction would be

4    appropriate.  And we'll draft one for the Court's

5    consideration.

6              THE COURT:  All right.  So that's what you'll do.

7    You'll draft and we'll pause.

8              MR. FINKEL:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5SVGUO4                          Le Zhou - Cross

1                    (In open court)

2                    THE COURT:  Members of the jury, we're going to take a

3      brief pause.

4                    Remember that you're not allowed to discuss the case

5      amongst yourselves or with anyone else.  Don't permit anyone to

6      discuss the case in your presence.

7                    I'll call you back shortly.

8                    (Jury not present)

9                    THE COURT:  You can step down.

10                   Don't discuss the testimony.

11                   THE WITNESS:  Sure, your Honor.

12                   (Witness not present)

13                   THE COURT:  Please be seated.

14                   (Recess)

15                   THE COURT:  Please be seated.

16                   Are the documents in evidence?  The prospectus, the

17     other --

18                   MR. KAMARAJU:  I don't believe so, your Honor, no.

19                   THE COURT:  They are not in evidence.  Okay.

20                   So on the issue of materiality, it is certainly

21     material whether or not the witness read the documents.  But

22     where you cannot go is into a question like:  Shouldn't you

23     have heeded the warnings.

24                   MR. KAMARAJU:  Understood, your Honor.  I don't intend

25     to ask any question like that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5SVGUO4                          Le Zhou - Cross

1           THE COURT:  The proposed instruction is:  When

2   considering witness testimony, please note that negligence,

3   carelessness, or gullibility on the part of the victims is no

4   defense to a charge of fraud.

5           MR. KAMARAJU:  I'm sorry, your Honor.  I should have

6   noted this.  If you're going to use the word "victims," we

7   would at least ask you use the word "alleged victims."

8           THE COURT:  I have not even stated whether I'm going

9   to use the instruction.

10           MR. KAMARAJU:  No, I know, your Honor, and I apologize

11   for jumping in.  I just -- when I heard you read it again, it

12   occurred to me that I missed that.

13           THE COURT:  Clearly if I were to read the instruction,

14   I would use "witness" instead of "victims."

15           But why is it necessary to give this instruction now

16   as opposed to when I'm instructing the jury at the end of the

17   case?

18           MR. FINKEL:  Your Honor, it's a correct statement of

19   law, and it absolves the jury from any confusion.  And I think

20   the jury would reasonably be confused.  They might be thinking,

21   I wouldn't have invested in this.  I would have known that this

22   didn't make any sense.  I would have known to read the

23   disclaimer and look at all the language.  And that's what

24   laypeople who don't understand the fraud law that we all do

25   would expect.

1           So this instruction, which is a correct statement of

2   law, resolves that issue, and I think appropriately

3   contextualizes the line of questioning that defense counsel has

4   advanced.

5           MR. KAMARAJU:  Well, your Honor --

6           MR. FINKEL:  It's also a long trial.

7           MR. KAMARAJU:  Well, it is a long trial.

8           So your Honor is going to instruct the jury that they

9   should begin deliberations at the close of all evidence.

10  You're going to instruct them, I presume, as to the proper

11  elements of the law.

12          And so when they are considering this witness's

13  testimony, as long as anybody else, they will have the

14  appropriate law to guide them.  There's no need to preview

15  government arguments about the law to the jury now, when this

16  is not a question, for example, of like is evidence being

17  offered for this purpose or this purpose.  It ultimately goes

18  to the elements of the offense.  And your Honor can address it

19  at the time that you address all the other elements of the

20  offense, which is when you instruct the jury as to the law, at

21  the close of evidence.

22          MR. FINKEL:  It exactly is the kind of issue where the

23  evidence is being offered for a particular purpose.  It's being

24  offered for the purpose of materiality.  And a jury doesn't

25  know what all of this means.

1           So what your Honor is doing is delivering to them a

2     correct statement of law so they can understand the evidence as

3     they sit through the trial.  As I understand, looking back on

4     the briefing on this issue, defense counsel doesn't object

5     generally to the concept that negligence is not a defense.  And

6     so we think your Honor instructing the jury of that is

7     appropriate so they understand how to use the evidence that

8     defense counsel is seeking to educe.

9           THE COURT:  So I agree with Mr. Kamaraju that it is

10    not appropriate to give the instruction at this time.

11          But I want to talk about what you can and cannot ask.

12          You can ask whether he has read those documents.  If

13    you get a no, it stops there.  The inquiry stops there.

14    There's no "shouldn't you have."

15          MR. KAMARAJU:  100 percent, your Honor.  I do not

16    intend -- if he says no, I'm not going to ask him more

17    questions about the document or should he have read it or

18    shouldn't he have read it.

19          THE COURT:  Now, if he says yes, then you can ask:

20    Did you consider the statements made in those documents?  But

21    you can't go on and then say:  Well, shouldn't you have heeded

22    that warning.

23          MR. KAMARAJU:  I do not intend -- and the questions

24    that your Honor is formulating, like "shouldn't you have," I

25    have no intention -- that was not -- I don't think I've asked

1      one of those questions, but that was not my intention.

2                THE COURT:  "Wouldn't a reasonable person have,"

3      "wouldn't you advise your client to," nothing like that.

4                MR. KAMARAJU:  Okay, your Honor.

5                MR. FINKEL:  Your Honor, if I may.  And I understand

6      the Court's ruling.  The problem is, is a victim saying that

7      they didn't read the documents, the implication that's left for

8      the jury is potentially, Well, they should have.  And that's

9      not the correct statement of how -- that's not a correct

10     statement of law as to how this evidence should be considered.

11               THE COURT:  People don't even read the instructions on

12     their iPhones.

13               MR. FINKEL:  I know.

14               THE COURT:  And so I think that average jurors would

15     not necessarily have the expectation that someone would read a

16     prospectus.

17               MR. FINKEL:  So, your Honor, we don't know what the

18     jury is thinking obviously.  And so the government's request is

19     just that the jury be instructed as to the law so they know how

20     to contextualize this evidence, that's all.

21               THE COURT:  I think an instruction on this discrete

22     aspect of the law, this particular defense or lack of a

23     defense, is drawing attention to or supporting an argument of

24     the government instead of truly clarifying.

25               So let's bring the witness back and the jurors back.

O5SVGUO4                         Le Zhou - Cross

1            MR. KAMARAJU:  Your Honor, I'm sorry, can I just have

2    one last verification?

3            THE COURT:  Yes.

4            MR. KAMARAJU:  If he says yes and I ask him, Did you

5    consider statements in the prospectus, am I allowed to point

6    him to particular statements in the prospectus?

7            THE COURT:  Yes.

8            MR. KAMARAJU:  Okay.  Thank you, your Honor.

9            THE COURT:  To the extent that he said he read them,

10   you may point him to those particular statements.

11           MR. KAMARAJU:  Okay.  So I --

12           THE COURT:  And you may ask if you've considered them.

13           MR. KAMARAJU:  I can put up a statement and say, Did

14   you read this?

15           THE COURT:  Yes.

16           MR. KAMARAJU:  And if he says yes, I can say, Did you

17   consider it?  And if he says no, move on.

18           THE COURT:  Right.  But if he says, I did not read the

19   prospectus, then you cannot bring up those --

20           MR. KAMARAJU:  Understood.

21           THE COURT:  Yes.

22           Anything further, Mr. Finkel?

23           MR. FINKEL:  No, your Honor.  Rising because I think

24   the jury is about to enter.

25           THE COURT:  Okay.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1          (Jury present)

2          THE COURT:  Would you have the witness return to the

3     stand, please.

4          (Witness present)

5          THE COURT:  Remember, sir, that you're still under

6     oath.  And please be seated.

7          And you may continue the cross-examination.

8          MR. KAMARAJU:  Thank you, your Honor.

9     BY MR. KAMARAJU:

10    Q.  Sir, I think when we broke, we were discussing a document

11    called the prospectus.  Do you remember that?

12    A.  Which document?  Sorry.

13    Q.  I think we referred to it as the prospectus.  Do you

14    remember that?

15    A.  Yes.

16    Q.  Prior to sending money to VOG, did you read the prospectus?

17    A.  I never received that.

18    Q.  So you never received a copy of the prospectus.  Okay.

19    Thank you.

20          Now, you testified on direct -- well, I'm sorry.

21          MR. KAMARAJU:  Could we pull up Government Exhibit GX

22    C-63-T, please; June 2nd, 2020 video translation.

23          Could we go to page 9, please.

24    Q.  I believe you testified about some part of this.

25          MR. KAMARAJU:  But if we could blow up the box on the

1  right that starts "We had an initial valuation of 200 million."

2  A.  Yes, I see that.

3  Q.  See that?  All right.

4         And you see where it says:  "the private placement

5  exceeded the highest expectations and raised $350 million";

6  correct?

7  A.  Yes.

8  Q.  So the private placement, in fact, raised more money than

9  was originally being sought, right?

10 A.  That was part of VOG, yes.

11 Q.  Well, the VOG money you testified was separate, right?

12 A.  No, is part of this.  Private placement.

13 Q.  So the $350 million that's being referred to, that's part

14 of -- VOG is part of that?

15 A.  No.

16 Q.  Okay.  It's separate, right?

17 A.  Yes.

18        MR. KAMARAJU:  Okay.  And if we can go down on -- just

19 a little bit further down in that box.  No, I'm sorry.  If you

20 could just -- the sentence that starts:  This is up to now this

21 figure and through, yeah.  Thank you.  Thanks very much.

22 Q.  Okay.  So you see it says:  Let's say 350 million.  350

23 million does not include the 117 million from VOG, right?  See

24 that?

25 A.  The 350 doesn't include the 117, that's correct.

1   Q.  Right.  The 117 million, which is coming in through VOG, is

2   separate from the 350 million that was raised as part of the

3   private placement, right?

4   A.  No, it's not separate from the private placement; it was

5   included in the private placement.  It's just separate fund,

6   350.

7   Q.  Well, you testified on direct that there were a certain

8   number of seats, right?

9   A.  Yes.

10  Q.  There were 2,000 seats, right?

11  A.  That was previously Miles mentioned it, yes.

12  Q.  Well, I'm asking what your understanding was, sir.

13  A.  When was introduced it to us as including me, Miles Guo

14  mentioned it private placement and also public placement, the

15  differences, then he explained it.

16          Private placement, if there were limitations, there

17  seats, 2,000 seats.  Then if it exceeds that limitations, then

18  it will be kind of different placement.

19  Q.  Okay.  So the private placement could have had 2,000 seats.

20          Can I just ask you, when you say "seats," what do you

21  mean?

22  A.  His original words translate to English called long chair

23  owe chair (ph).

24  Q.  Well, sir, I'm sorry, I'm not asking for a translation.

25  I'm just asking what your understanding of the word "seat" is

1    when you use it.

2    A.   My understanding is called long position.

3    Q.   Your understanding is it's a long position?

4    A.   Yes.

5    Q.   I'm sorry, I'm not familiar with that.  What does that

6    mean?

7    A.   That's a financial term for investment.  People before the

8    private investments, those are people will invest and hold

9    their stocks for certain periods.

10   Q.   Okay.  So the seats are people who buy and hold their stock

11   for a certain period?

12   A.   Yeah.  And also they are considered as the first

13   investment, investors.

14   Q.   Okay.  So they are the first set of investors, right?

15   A.   Correct.

16   Q.   And that's -- there were 2,000 of seats available in the

17   private placement; correct?

18   A.   Correct.

19   Q.   And then there was a separate set of money that came in

20   related to VOG, right?

21   A.   The separate money, the VOG, was for the people's

22   investment that was under certain amounts.

23   Q.   I'm sorry, sir, but that wasn't my question, right.  My

24   question is, is the money that came in through VOG is separate

25   from the money that you're talking about that comes in through

1    the seats, right?

2    A.   That I don't know.

3    Q.   Okay.  But you invested through VOG, that was your

4    understanding, right?

5    A.   Correct.

6    Q.   And you testified that you got the wire information from

7    Sara Wei; is that right?

8    A.   That's correct.

9    Q.   But you never directly corresponded with Sara Wei, right?

10   A.   I messaged her; she replied.

11   Q.   With the wire information?

12   A.   Yes.  So the emails.

13   Q.   Now, we talked about how you had met with prosecutors

14   before, right?

15   A.   Yes.

16   Q.   Do you remember telling the prosecutors that you never had

17   direct communication with Ms. Wei?

18   A.   I told them I contacted Sara Wei, yes.

19   Q.   I'm sorry.

20   A.   I told them I contacted Sara Wei direct.

21   Q.   Okay.  So there was somebody taking notes during that

22   interview, right?

23   A.   I didn't take notes.

24   Q.   I said there was somebody taking notes, right?

25   A.   I didn't see who was taking notes.

O5SVGUO4                        Le Zhou - Cross

1  Q.  I'm not asking if you saw who, I'm asking did you see

2  somebody taking notes, sir?

3  A.  I don't know.

4        MR. KAMARAJU:  All right.  Can we bring up Government

5  Exhibit GX VO-80, please.  I believe this is in evidence.  So

6  we can publish it.  And can we just blow up that first

7  paragraph.

8  Q.  Okay.  And do you see there's a name there, Lihong Wei

9  Lafrenz?  It's in the fourth line down.

10        MR. KAMARAJU:  There you go.  Thank you, sir.

11  Q.  Do you see that?

12  A.  Yes.

13  Q.  That's Sara Wei, right?

14  A.  That's her legal name, right.

15  Q.  Do you recognize this?  This is the limited purpose agency

16  agreement that you signed with Ms. Wei; correct?

17  A.  Yes.

18  Q.  Okay.  And this is in connection with your GTV investment?

19  A.  Correct.

20        MR. KAMARAJU:  Okay.  The government offers GX -- I'm

21  sorry, the government.  Apologies, your Honor.

22        The defense -- long afternoon already.

23        The defense offers GX VO-80 into evidence.

24        THE COURT:  No objection?

25        MS. MURRAY:  No objection.

1                THE COURT:  It is admitted.

2                (Government's Exhibit VO-80 received in evidence)

3                MR. KAMARAJU:  Sorry about that.

4    BY MR. KAMARAJU:

5    Q.  So just to clear it up, the name that's highlighted, that's

6    Sara Wei; correct?

7    A.  Correct.

8    Q.  And through this agreement you're designating Ms. Wei to be

9    your agent for purposes of buying GTV shares; correct?

10   A.  Correct.

11   Q.  You don't designate Mr. Guo for those purposes, right?

12   A.  No.

13   Q.  You don't have any contract designating any authority to

14   Mr. Guo over your purchases, right?

15   A.  Not with him, no.

16   Q.  I was just asking about him.  Not with him, right?

17   A.  Not with him.

18   Q.  You don't have a farm loan agreement with Mr. Guo, right?

19   A.  No.

20   Q.  You don't have a G Clubs agreement with Mr. Guo, right?

21   A.  I never receive a G Club agreement.

22   Q.  Okay.  So then you don't have one with him, right?

23   A.  No.

24   Q.  You don't have an agreement to buy H coin with Mr. Guo,

25   right?

O5SVGUO4                        Le Zhou - Cross

1   A.  No.

2   Q.  Okay.  And you, in fact, never spoke directly with Mr. Guo

3   about buying H coin, right?

4   A.  No.

5   Q.  You never spoke directly with Mr. Guo about buying G Clubs,

6   right?

7   A.  No.

8   Q.  You never spoke directly with Mr. Guo about buying GTV

9   shares, right?

10  A.  No.

11  Q.  Now, there comes a point when there's a disagreement

12  between Mr. Guo and Ms. Wei; correct?

13  A.  I'm not sure if it's a disagreement, words would be

14  accurate.

15  Q.  You understood that they had a bit of a falling out, right?

16  A.  Yes.

17  Q.  And Mr. Guo made public statements about Ms. Wei; correct?

18  A.  Yes.

19  Q.  He encouraged supporters to contact law enforcement about

20  Ms. Wei, right?

21          MS. MURRAY:  Objection, your Honor.  Hearsay.

22          THE COURT:  If you'll step up.

23          (Continued on next page)

24

25

O5SVGUO4                          Le Zhou - Cross

1              (At sidebar)

2              THE COURT:  So why is it that these statements could

3     come in?

4              MR. KAMARAJU:  Well, I'm not offering them for their

5     truth at all, I'm offering them for the fact that he said them

6     and the fact that he's inviting scrutiny from law enforcement

7     and public law filings, which is inconsistent with the idea

8     that he had a guilty intent at the time.  If he was trying to

9     hide what he was doing, he wouldn't have told people to bring

10    the FBI in.  They are not being offered for their truth;

11    they're just being offered for the fact that he's inviting that

12    to happen.

13             THE COURT:  What was it that he said about Ms. Wei?

14             MR. KAMARAJU:  He said a number of things about

15    Ms. Wei.  But what I have in the 3500 material is that he asked

16    supporters to contact law enforcement, including the FBI, about

17    what Ms. Wei had done.

18             THE COURT:  What was it that he claims she did.

19             MR. KAMARAJU:  Stolen money from the farm loan

20    program.

21             MS. MURRAY:  Your Honor, the defendant is welcome to

22    testify about that.  We can't -- it's just not permissible to

23    back-door in the defendant's statements through this manner

24    about what he may or may not have said to people about Ms. Wei.

25             MR. KAMARAJU:  It has to be offered for the truth to

1   be hearsay.  That's foundational.  We're not offering it for

2   the truth.

3        THE COURT:  What is it that if Mr.  -- if the witness

4   is aware that the statement was made, how is it relevant to his

5   testimony?

6        MR. KAMARAJU:  Well, he testified about the fact that

7   the money went -- he gave his money to Sara Wei so that Sara

8   Wei would make a GTV investment on his behalf.  He just

9   testified he had an agency agreement with Ms. Wei to do that

10  for him.

11       Mr. Guo and many other people think that Sara Wei —

12  who, our understanding is, is going to be a witness at this

13  trial — stole the money.  And my point simply is, is that if a

14  person who's involved in a fraud or is alleged to be involved

15  in a fraud says, Hey, FBI, come look at what I'm doing, that

16  suggests that they don't have a guilty conscience, your Honor.

17  And much of their --

18       THE COURT:  I don't understand why it is this witness

19  has to testify about having heard that statement.

20       MR. KAMARAJU:  Because he told the prosecutors about

21  it, your Honor.  It's not as if I'm planning --

22       THE COURT:  But what is the purpose -- how is it

23  relevant?  Did he act upon the statement?

24       MR. KAMARAJU:  He did actually act upon the statement.

25       THE COURT:  How so?

1          MR. KAMARAJU:  He filed complaints with various local

2     law enforcement agencies.

3          THE COURT:  And how is it relevant to whether or not

4     your client is guilty?

5          MR. KAMARAJU:  Whether he filed them, I'm not arguing

6     that is relevant.  What I'm arguing is the fact that Mr. Guo is

7     asking people to look at what's happening here is the exact

8     opposite of consciousness of guilt.

9          THE COURT:  Right.  But you're just trying to get that

10    statement in through this witness.  The objection is sustained.

11         MR. KAMARAJU:  Can I ask for the basis, your Honor?

12    Is it relevance or is it hearsay?

13         THE COURT:  There's no question that it's hearsay.

14         MR. KAMARAJU:  I don't mean to argue with the Court.

15    I just want to understand how it's being offered for the truth.

16         THE COURT:  You want to get the statement in to show

17    that your client had an adverse relationship with Ms. Wei.

18         MR. KAMARAJU:  No.  I'm asking to get the statement in

19    to show that my client is not afraid of the FBI looking at what

20    he was doing.

21         MS. SHROFF:  It's a state of mind.

22         THE COURT:  Examining what she was doing.

23         MR. KAMARAJU:  No.  Because their allegation is that

24    Ms. Wei is a part and parcel of the GTV conspiracy.

25         THE COURT:  Okay.  So I don't know what the -- I don't

1    know what her role is.

2             MS. MURRAY:  So Ms. Wei operated a company; she was

3    one of the farm leaders.  And that particular farm was used to

4    aggregate nonaccredited investors' money.  So Miles Guo made it

5    available in violation of securities law to people who had less

6    than $100,000.  And he said, Why don't you go to Ms. Wei, and

7    she'll aggregate all of your money, and it will look like a

8    legitimate investment from Voice of Guo that's above the

9    threshold.  So another way to kind of evaded the securities

10   regulations.

11            We agree with your Honor this is not the witness to

12   bring in what Mr. Kamaraju is trying to bring in.

13            MR. KAMARAJU:  But I still don't understand.

14            If their allegation is that Ms. Wei was part of

15   conduct that they're alleging is criminal on behalf of Mr. Guo,

16   the statement is not being offered for the truth and the

17   defense argument is, is that he's asking from sunlight to be

18   put on the conduct, which is inconsistent --

19            THE COURT:  But why does it come in through this

20   witness?

21            MR. KAMARAJU:  I'm not sure why it can't come in

22   through this witness, your Honor.  I understand that there are

23   other witnesses that (indiscernible) may prefer that it comes

24   through the defendant.  But I'm not aware of an evidentiary

25   objection that says it can't come in through this witness as

O5SVGUO4                          Le Zhou - Cross

1    opposed to some other witness.

2              MS. SHROFF:  Or through multiple witnesses.  That's

3    not an evidentiary objection.

4              MS. MURRAY:  Your Honor, it's our view the Court has

5    ruled on this matter.  I understand Mr. Kamaraju is just

6    continuing to litigate it.  But we agree with your ruling on

7    this.  The objection should be sustained.  We should move on.

8              THE COURT:  I'm going to sustain the objection.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5SVGUO4                          Le Zhou - Cross

 1              (In open court)

 2              THE COURT:  Sustained.  Go ahead.

 3   BY MR. KAMARAJU:

 4   Q.  Now, sir, you testified before about the Himalaya Farms;

 5   correct?

 6   A.  Yes.

 7   Q.  And there's a structure to those farms, right?

 8   A.  Yes.

 9   Q.  There are different positions within the farms, right?

10   A.  Correct.

11   Q.  So there's a farm leader, right?

12   A.  Yes.

13   Q.  And then the farm leader may have others who sort of assist

14   them; correct?

15   A.  Correct.

16   Q.  Did you have a position in any farm, sir?

17   A.  My position was OBS streamer for the farm.

18   Q.  OBS streamer for the farm.

19   A.  Yes.

20   Q.  Okay.  What does "OBS" stand for?

21   A.  It's a software platform name.  It's used -- it's open

22   software, allow you to connect your computer and the cameras,

23   broadcast to designated location, like YouTube push it out to

24   it, or push it to other sources.

25   Q.  Okay.  And then above the farms comes the alliance, right?

O5SVGUO4                        Le Zhou - Cross

1   A.  Yes.

2   Q.  So all the farm leaders are part of the alliance, that's

3   your understanding, right?

4   A.  Yes.

5   Q.  And so they set policy for the farms, is that your

6   understanding?

7   A.  Yes.

8   Q.  And then above them is something called the Iron Blood

9   Group; is that right?

10  A.  No, not above.

11  Q.  Okay.  I'm sorry.  You explain it to me.  I may have it.

12  Wrong.

13  A.  Iron Blood Group was launched by Miles Guo.  There were

14  three members at the beginning.  Eventually expanded to a

15  larger group.  All the member was selected by Miles Guo.

16  Q.  Okay.  But the group had some authority, right?

17  A.  They have their roles.

18  Q.  Sir, I'm not trying to trick you, but didn't you tell the

19  prosecutors that the Iron Blood Group had full authority to run

20  the farms?

21  A.  Not run the farm.

22  Q.  Okay.  So what kind of authority did they have over the

23  farm, sir?

24  A.  Iron Blood member will act as higher management group to

25  managing the farm leaders, and also they have the designated

1   roles.

2   Q.  Okay.  So they each may have designated roles within the

3   Iron Blood Group, is that what you're saying?

4   A.  Yes.

5   Q.  So one of the members of the Iron Blood Group was called

6   Mulan, right?

7   A.  Yes.

8   Q.  Mulan is not her real name, right?

9   A.  No.

10  Q.  What's her real name?

11  A.  Liya.

12  Q.  And Ms. Wei was a member of the Iron Blood Group at one

13  point; correct?

14  A.  Excuse me.  You mean Sara Wei.

15  Q.  Yes.

16  A.  I don't recall that.

17  Q.  Okay.  How about the leader of the UK farm, he was a member

18  of the Iron Blood Group?

19  A.  Yes.

20  Q.  Okay.  Now, you did more for the UK farm than just do

21  streaming; correct?

22  A.  Correct.

23          MR. KAMARAJU:  Actually, your Honor, I am about to

24  turn to a different subject.  I just wanted to note the time

25  and see if your Honor wanted to continue.

O5SVGUO4                         Le Zhou - Cross

1           THE COURT:  Well, if you're going to another subject,

2     then this would be an appropriate time to stop, even though

3     it's only 2:40 p.m.

4           MR. KAMARAJU:  I will take credit for the five-minute

5     break, your Honor.

6           THE COURT:  All righty.

7           So, members of the jury, we will stop our work for

8     today.  You'll return tomorrow on time, as you did today, so

9     that you'll be able to walk through this door at 9:30 a.m.

10          Remember that you're not allowed to discuss the case

11    amongst yourselves or with anyone else.  Don't permit anyone to

12    have any discussions in your presence.  Have a good evening.

13          (Jury not present)

14          THE COURT:  Sir, you may step out.

15          Don't discuss the testimony.

16          THE WITNESS:  Yes, your Honor.

17          (Witness not present)

18          THE COURT:  And you may be seated.

19          Is there anything that the parties want to raise

20    before we continue tomorrow morning?

21          MS. MURRAY:  May we have a brief sidebar, your Honor?

22          THE COURT:  Yes.

23          MS. MURRAY:  Thank you.

24          (Continued on next page)

25

O5SVGUO4                         Le Zhou - Cross

1              (At sidebar)

2              THE COURT:  I forgot to mention that the note that I

3     received from Alternate No. --

4              MS. SHROFF:  Five.

5              THE COURT:  Five yesterday, I made Court Exhibit No.

6     1.  It came in at 12:10 p.m., and I dated the exhibit Friday,

7     May 23rd, 2024.

8              What's the issue?

9              MS. MURRAY:  Yes, your Honor.

10             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXXXXXXXXX

20             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O5SVGUO4                        Le Zhou - Cross

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2              THE COURT:  Fine with me.

3              MS. SHROFF:  We have no objection.

4              MR. KAMARAJU:  Yeah, that's fine, your Honor.

5              THE COURT:  Anything further?

6              MS. MURRAY:  We just ask to seal this part of sidebar.

7              THE COURT:  And it is sealed.

8              MS. MURRAY:  Thank you.

9              MS. SHROFF:  Your Honor, does the Court want to do

10   anything with Juror No. 5?  I know when we broke before the

11   weekend, the thought was to excuse him.

12             THE COURT:  Oh, you're talking about Alternate No. 5?

13             MS. SHROFF:  Yes, your Honor.

14             THE COURT:  Oh, I don't recall our decision to excuse

15   him.  Am I not recalling it correctly?

16             MR. KAMARAJU:  That was at least my understanding.  I

17   thought your Honor was -- because I thought we had a discussion

18   about how to excuse him without alerting the rest of the jury,

19   which is why we thought you had brought him back instead to not

20   tip off the jury.  We may have misunderstood.  That was our

21   understanding.

22             THE COURT:  So is he even still here?

23             MS. SHROFF:  He is here, your Honor.

24             THE COURT:  All right.  I'll excuse him.

25             MS. SHROFF:  Thank you, your Honor.

O5SVGUO4                          Le Zhou - Cross

```
 1                   (In open court)
 2                   THE COURT:  Just a reminder, counsel, I have
 3     proceedings after this matter, so you'll need to clear the
 4     tables.
 5                   (Juror present)
 6                   THE COURT:  You're Alternate No. 5.
 7                   You may be seated.
 8                   JUROR:  I am Alternate 5.
 9                   THE COURT:  In light of your scheduling issues, I am
10     excusing you from jury service.  Thank you for your willingness
11     to serve.
12                   JUROR:  Thank you, your Honor.
13                   (Juror not present)
14                   THE COURT:  Anything further?
15                   MR. FINKEL:  Not from the government.
16                   MR. KAMARAJU:  Not from us, your Honor.
17                   THE COURT:  Thank you.
18                   (Adjourned to May 29, 2024 at 9:00 a.m.)
19
20
21
22
23
24
25
```

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3     LE ZHOU
 4    Direct By Ms. Murray . . . . . . . . . . . . 174
 5    Cross By Mr. Kamaraju  . . . . . . . . . . . 280
 6                       GOVERNMENT EXHIBITS
 7    Exhibit No.                              Received
 8     Stip 2, C26, C26-V, C63, C63-V . . . . . . 184
 9     W1005, W1005-V . . . . . . . . . . . . . . 185
10     V2, 13, 15-16, 18-19, 22-23, 25-29, 31, . . . 193
11           59, 67-69, 77-78, 81-82, and
12           84
13     C-26-V, C-26-T, C-63-V, C-63-T . . . . . . 202
14     32, 33, 34, 35 . . . . . . . . . . . . . . 234
15     VO-107, VO-108 . . . . . . . . . . . . . . 241
16     V0107 and V0108  . . . . . . . . . . . . . 266
17     STIP-9  . . . . . . . . . . . . . . . . . . 201
18     W-58  . . . . . . . . . . . . . . . . . . . 236
19     VO-80  . . . . . . . . . . . . . . . . . . 332
20     V0105  . . . . . . . . . . . . . . . . . . 260
21     V0106  . . . . . . . . . . . . . . . . . . 261
22     VI-151  . . . . . . . . . . . . . . . . . . 220
23
24
25
```