O5V1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                     Defendant.            Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         May 30, 2024
                                           9:00 a.m.
 8
     Before:
 9

10                    HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                            APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O5V1GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O5V1GUO1

```
1              (Trial resumed; jury not present)
2              THE COURT:  Good morning.  Would you make your
3    appearances, please.
4              MR. HORTON:  Good morning, your Honor.  Justin Horton,
5    Ryan Finkel, Juliana Murray, Micah Fergenson for the
6    government.  We're joined by paralegal Isabel Loftus and Robert
7    Stout from the FBI.
8              MR. KAMARAJU:  Good morning, your Honor.  Sid Kamaraju
9    and Scott Schirick on behalf of Mr. Guo.  My understanding is
10   Mr. Guo is just in the bathroom.
11             THE COURT:  All right.  So we'll wait till he comes
12   out.  Please be seated.
13             (Defendant present)
14             THE COURT:  So last night the defense submitted a
15   letter with respect to hearsay exceptions, which deserves a lot
16   of attention, and I'd like to discuss the three hearsay
17   exceptions which they mention.  I know that the prosecution has
18   not yet responded to the letter.
19             So the first exception mentioned is statements that
20   are offered for their impact on the defendant, and as an
21   example, defense counsel mentions a conversation concerning
22   misuse of funds.  So we had one witness, Mr. Zhou, who spoke
23   about a videoconference where the misuse of funds was raised.
24   How is it that Mr. Guo's statements about the misuse of funds
25   would have an impact on him?
```

O5V1GUO1

1          MR. KAMARAJU:  Your Honor, just for the record,

2    Mr. Guo is now here at counsel's table.

3          The——I think you have to take those two in tandem,

4    your Honor, the first example we gave and the second example we

5    gave.

6          THE COURT:  But I want you to stick with the first

7    example.

8          MR. KAMARAJU:  Okay.

9          THE COURT:  Impact on the defendant.

10          MR. KAMARAJU:  Sure.  So an example of that, your

11    Honor, would be, if the defendant said, "Oh, my gosh, I can't

12    believe the funds were stolen," then that is evidence of the

13    impact that other people's statements had on him.

14          THE COURT:  Yes.  But we're talking about the witness

15    speaking about Mr. Guo's statements about misuse of funds.

16    That's what I thought you were getting at.

17          MR. KAMARAJU:  Well, my point, your Honor, is, in the

18    example I just gave, Mr. Guo's statement was made in response

19    to another party's statement, right, and so it's——his statement

20    is evidence of the impact that the speaker's statement had on

21    him.  It caused, in that specific example——and again, as we

22    said in our letter, we're not trying to revisit any of those

23    rulings, but if it caused Mr. Guo to take an action, right, if

24    it caused him to make a phone call, right, if it caused him

25    to——if it caused him to say something or send a direction, that

O5V1GUO1

1    is evidence of impact that it had on Mr. Guo.

2             THE COURT:  So I'd like to hear from the government

3    about that.

4             MR. FERGENSON:  Yes, your Honor.

5             So the way this typically works, this kind of state of

6    mind exception, would be——

7             THE COURT:  This is impact on the defendant.

8             MR. FERGENSON:  Correct.

9             THE COURT:  Yes.

10            MR. FERGENSON:  Which would be someone, an

11   out-of-court declarant, saying something to the defendant, not

12   the defendant saying something to other people.

13            THE COURT:  Yes.

14            MR. FERGENSON:  That's the framework.

15            THE COURT:  The word "impact," it necessarily means

16   that an individual is the object of something.  You are being

17   impacted by, you are receiving the action.

18            MR. KAMARAJU:  Yes.  Yes, your Honor.  But where I'm

19   going is that the statement, the defendant's statement can

20   still be evidence of the impact that someone else's statement

21   has on him, right?  I'm not quibbling with the fact that impact

22   suggested a third party's acting in a way that is influencing

23   Mr. Guo.  I'm just saying that Mr. Guo's statement can be

24   evidence of that influence.

25            MR. FERGENSON:  Just briefly, your Honor.

O5V1GUO1

1        THE COURT:  Yes.

2        MR. FERGENSON:  If that were the rule, or if that were

3  the exception, it would swallow the rule, because it's hard to

4  imagine a situation where an actor, the defendant, is not

5  speaking in response to something.  And so if any time he

6  speaks, it's evidence of his state of mind, then you're

7  basically disregarding the hearsay rules for anything the

8  defendant said, because you could always say, well, anything he

9  said is reflective of his state of mind.  That's not the way

10  the rules of evidence work.  It's not how the hearsay rules

11  work.  There are cases like the ones they cited where something

12  is said to the defendant and that had an effect on the

13  defendant, or at least the defense is entitled to argue that it

14  did, and that out-of-court statement comes in.  And it's not

15  the case that any time the defendant spoke, it's a reflection

16  of his state of mind and it can disregard the hearsay rules to

17  have the defendant essentially testify without taking the stand

18  throughout the trial.  It's not—it's not an opposing party

19  statement, like when the government elicits the defendant's

20  statements, and the hearsay rules preclude them from doing

21  that.  That's—it's kind of Trial 101, your Honor.

22        MR. KAMARAJU:  Well, so, first of all, I think *DiMaria*

23  addressed that argument that Mr. Fergenson just made, but the

24  state of mind exception—which is not the one that your Honor

25  was asking about—but the state of mind exception has a

O5V1GUO1

1    carveout built into it, so that's what Mr. Fergenson is talking

2    about.  Your Honor is focused on impact, the impact part of our

3    letter.  My point is simply that if there is a statement made

4    by the defendant that is being offered for a reason other than

5    its truth, and so in that case we were using it as an example

6    of impact, but a statement that evinces his desire to do

7    something in response to a statement.

8          THE COURT:  No.  But we're talking about a witness who

9    is quoting your client.  The witness says, "Mr. Guo said we

10   should investigate the misuse of funds."

11         MR. KAMARAJU:  Right.

12         THE COURT:  So the question is:  How does Mr. Guo's

13   statement impact himself?

14         MR. KAMARAJU:  But that, I don't think—respectfully,

15   your Honor, I don't think our formulation is that Mr. Guo's

16   statement impacts himself.  I think our formulation is that

17   Mr. Guo's statement is evidence of the impact that another

18   statement had on him.  That's not being offered for the truth;

19   that's being offered for solely the reaction that it caused in

20   Mr. Guo.

21         THE COURT:  But in this case, your position is that

22   Mr. Guo indeed wanted to have an investigation carried out

23   against Sara Wei, and so isn't it being offered for the truth

24   of the matter asserted, that he's directing that an

25   investigation be undertaken, and that's part of your defense?

O5V1GUO1

MR. KAMARAJU:  No, your Honor, because that would
fall, in our view, into the second example we gave, which is an
order or direction, and an order or direction is not hearsay.

THE COURT:  Well, so we're in the command exception
now.  I was in the impact exception.  So——

MR. KAMARAJU:  Well——I'm sorry, your Honor.  My
apologies.  I didn't mean to interrupt.

THE COURT:  Go ahead.

MR. KAMARAJU:  No, I was only——I only brought up the
command because your Honor brought up the concept of
investigation of Sara Wei, so that was just the example that we
used in connection with the second prong.  So that's why I went
to the command angle of it.

THE COURT:  Right.  The statement, "I understand that
there may be a misuse of funds and that should be
investigated," that in and of itself is not a command.  If he
states, "You should investigate it, you must undertake an
investigation," that is a command.

MR. KAMARAJU:  Well, that's what we were trying to
elicit was that he did say this should be looked into.

THE COURT:  I understand the command exception.  I
just don't comprehend the impact exception that you're making
out, and I invite you to submit authority that discusses a
defendant's own statement's impact on himself.

MR. KAMARAJU:  I don't think I'll have that authority,

O5V1GUO1

1    your Honor, because that's not our——as I think your Honor

2    knows, because that's not our argument.

3             THE COURT:  Well, your argument is that the

4    defendant's statement reflects the impact another person's

5    statement had on him.

6             MR. KAMARAJU:  So maybe I can try to do a clearer

7    example.  And I recognize that is not this case, but I'm just

8    trying to use what might be a familiar example.

9             In a——in support of a duress defense, right, a

10   defendant may be able to say, or you may be able to elicit

11   testimony from a third-party witness that another party

12   threatened the defendant unless they took the action that the

13   government charged them with, right?  That could come in as a

14   state of mind, but it could also come in as an example of

15   impact.  Now the way the defendant's statement in that scenario

16   might come in is, if the defendant says, "Oh, no, I'm terrified

17   of that."  If they expressed fear, right, that would be

18   evidence of the impact that the threatener's statement is

19   having on the defendant.  And that's——I mean, that's how you

20   make out a duress defense, right, in the absence of the

21   defendant's testimony.  So that's an example of a defendant's

22   statement being an example of the impact that it had on him,

23   which is our formulation.  We're not trying to say that

24   Mr. Guo's statements impacted himself in some way.  I recognize

25   that that would be circular.

O5V1GUO1

1          THE COURT:  Okay.  So I'll hear from the government

2     with respect to the defense contention that commands are

3     exceptions to the hearsay rule.  And I will permit you, of

4     course, to do your own research.  I know that you may not have

5     completed that yet.

6          MR. FERGENSON:  Yes, your Honor.  Just as a general

7     matter, that's correct.  I think as everyone recognizes, the

8     devil is in the details at times.  And just to take an example,

9     the one that we were discussing just a moment ago, your Honor,

10     a statement like, "This should be investigated," that is close

11     to a command but not exactly.  The command would be,

12     "Investigate this."  But some kind of general pontificating on

13     "This should be investigated" is not——I don't think that, you

14     know——we're kind of dealing with these examples on the fly.  I

15     don't think that would fall under the command exception.  But

16     as a general principle, it is correct, you know, Mr. Kamaraju

17     is correct that commands are not hearsay.

18          THE COURT:  All righty.  So I don't recall how, during

19     Mr. Zhou's testimony, any command was dealt with by myself.  I

20     just don't recall it in the transcript.  And so we can go back

21     and we certainly can alter my ruling to reflect the command

22     exception to the hearsay rule, but I of course invite you to

23     review the transcript and identify where that took place.

24          MR. KAMARAJU:  Well, that's fine, your Honor.  We're

25     happy to do it.  We're happy to identify the places for the

O5V1GUO1

1   Court.  We truly——we truly intended this to be a prospective

2   issue simply because we——given the government's hearsay

3   objections, we expect that this is going to come up over and

4   over again.  So it's not that we're requesting the Court go

5   back and revise any of its rulings.  That witness has been

6   excused.  We're not asking to call him back or anything like

7   that.  Just given what we've seen in the 3500 material, what we

8   anticipate our cross-examination being, and given the

9   government's perspective on hearsay, we just wanted to be clear

10  so that the Court had our position for the record.

11          THE COURT:  All right.  So now we go to the state of

12  mind exception.  If you could explain your position on that.

13          MR. KAMARAJU:  Yes, your Honor.

14          So the state of mind, so obviously, the case we cited,

15  *United States v. DiMaria*, the state of mind exception is

16  triggered when the defendant's statement is offered to prove

17  their then-existing state of mind.  It cannot, just by rule, as

18  everyone knows, be used to introduce a statement about a

19  past-remembered belief.  So from our perspective, if Mr. Guo

20  made a statement like——I'll use the *DiMaria* example again.  So

21  in *DiMaria*, when the agents came to arrest him, the defendant,

22  the defendant said, "Why are you guys here?  I'm just here to

23  get some cheap cigarettes."  So the Court in that case said

24  that is indicative of his state of mind for why he thought he

25  was there.

1          THE COURT:  For?

2          MR. KAMARAJU:  Why the defendant believes he was

3     there.  That was his state of mind, his present, existing state

4     of mind for why he was there.  So from our perspective, there

5     could be similar testimony where we could cross-examine a

6     witness who might make a statement, for example, about Mahwah,

7     right, and Mr. Guo's belief at the time, during the period of

8     the conspiracy, about Mahwah and its use.  That——and again,

9     we'd have to see what the testimony is, but that would be an

10    example of a state of mind exception.

11         THE COURT:  So you're saying that if a witness were on

12    the stand and the witness states Mr. Guo said the premises is

13    used for these given purposes, that that statement should come

14    in to show his state of mind?

15         MR. KAMARAJU:  At the time, your Honor, yes.  It

16    cannot come in——if he tried to say——if we tried to elicit

17    testimony that said, you know, in 2023 he's reflecting back on

18    a purchase from 2021, we're not saying that is a state of mind

19    exception.  But for his present, then-existing state of mind,

20    yes.

21         THE COURT:  I'll hear from the government on that.

22         MR. FERGENSON:  Again, very difficult to deal in the

23    abstract with this, but we are concerned, as we said at the

24    outset, that the defense's interpretation of this exception

25    would swallow the rule such that pretty much anything the

O5V1GUO1

1  defendant said ever, they could elicit through, you know——offer

2  through our witnesses.  That's not the way the hearsay

3  exception works, your Honor.  It's very difficult to address it

4  in the abstract, and we haven't had much time to digest their

5  letter, but I think there's a real concern that it would——the

6  exception would swallow the rule.

7       THE COURT:  So I want to understand when a hearsay

8  statement, an out-of-court statement by Mr. Guo would not be

9  showing his state of mind.  Give me an example of that.

10       MR. KAMARAJU:  Well, I mean, first of all, the rule

11  defines an example of that, right?  Which is past

12  recollections.  That's one example, right?  But let me put it

13  this way.  What the government's argument basically collapses

14  to is that the Court should read out the state of mind

15  exception because they think it's too broad.  That's not the

16  way that works.

17       THE COURT:  Well, the Court is trying to figure out

18  when the Court should read in the exception.

19       MR. KAMARAJU:  Well, I agree, and as I said, your

20  Honor, it certainly turns on the particular statement.  So my

21  example was one of, during the period of the conspiracy, when

22  they say renovations are happening, right, if Mr. Guo says, oh,

23  you know, I like this for the G/CLUBS members or whatever,

24  first of all, that's relevant, right?  And secondly, it shows

25  his then existing state of mind during a relevant time period,

O5V1GUO1

1    not in the past.  We're not talking about future action, which

2    is a separate hearsay exception; we're talking about at that

3    moment in time, that's what Mr. Guo believes, right?  So to me,

4    trying to determine what is read in——and your Honor is right,

5    you can't do that in the abstract, but I think the example I

6    just gave, then it is very clearly then-existing state of mind.

7            THE COURT:  We'll revisit this.  We'll revisit this.

8    And of course the government will have an opportunity to submit

9    authority on this, and of course I invite you, Mr. Kamaraju, to

10   submit any further authority to guide the Court.

11           MR. KAMARAJU:  I appreciate that, your Honor, and I'll

12   certainly try.

13           THE COURT:  Is there anything else before we have the

14   jurors come in?

15           MR. KAMARAJU:  Not from the defense, your Honor.

16           MR. FERGENSON:  It's not——I don't believe it's

17   pressing before the jury comes in, your Honor, but the defense

18   did submit a motion for reconsideration of your Honor's expert

19   rulings.  You know, I think we would ask to have at least until

20   Monday to file a response to that, your Honor.

21           THE COURT:  That's fine.

22           MR. FERGENSON:  And secondly, just one housekeeping

23   matter that I will keep short.  I don't——I think given the

24   schedule, we probably won't get to the testimony of Mr. Shamel

25   Medrano.  He's a summary witness of the government, introducing

O5V1GUO1

1    a large volume of videos and G News posts.  That was the

2    subject of our letter that your Honor ruled on yesterday.  He's

3    introducing a summary chart that's a little over 200 pages.

4    And we prepared hard-copy binders for the Court, for the jury,

5    for defense, and also for the court reporters, that we would—I

6    don't think we'll get to his testimony today, but wanted to

7    just alert the Court to that, that, you know, prior to his

8    testimony, we might want to put those binders underneath the

9    jurors' chairs or hand them out at the beginning, if that was

10    all right with your Honor.

11            THE COURT:  That's fine.

12            MR. FERGENSON:  The one other thing with that

13    testimony is there's—I will also—there's so many exhibits

14    that we'll be offering pursuant to stipulations, that we're

15    grateful for the defense in helping us reach agreement on, that

16    we were hoping to hand out just a page listing out all the

17    government exhibits so the court reporter and the Court can

18    follow along while I read them out, if that is also all right

19    with your Honor.

20            THE COURT:  Very handy.  Thank you.

21            MR. FERGENSON:  Thank you, your Honor.

22            THE COURT:  We are going to have our sidebars on this

23    side of the bench going forward.

24            MR. KAMARAJU:  That makes sense to us, your Honor.

25    It's a little close to the witness and the jury otherwise.

O5V1GUO1

1          THE COURT:  All right.  So we will return at 9:30.

2          ALL COUNSEL:  Thank you, your Honor.

3          (Recess)

4          MR. HORTON:  Your Honor, if I may just raise something

5   briefly before the jury comes in.

6          THE COURT:  Go ahead.

7          MR. HORTON:  We were handed a document a moment ago

8   that we understand the defense intends to offer through

9   Ms. Maistrello.  It is a document that postdates her

10  employment.  We don't think there's any way that she can

11  authenticate it.  It postdates her employment.  There's no

12  author indicated on the document except Golden Spring Ltd.  It

13  appears to be a corporate document.

14         So setting aside the authentication issue, although

15  that's, of course, a threshold issue, this is a two-page

16  statement of the defendant's agent.  It's exactly the kind of

17  hearsay that we've been talking about, and it's clearly offered

18  for its truth.  It's a two-page explanation of the purpose of

19  the security team at Golden Spring.  So we want to bring that

20  to the Court's attention and object to it.

21         THE COURT:  So is the defense planning to use it to

22  refresh her recollection?

23         MR. HORTON:  Well, it postdates her employment, and—

24         THE COURT:  Yes, but anything can be used to refresh a

25  recollection.

O5V1GUO1                    Maistrello - Cross

1          MR. HORTON:  Of course.  I understand.

2          THE COURT:  That would, of course, be the only reason

3    that document could be put before the witness, and I know that

4    Ms. Shroff knows that.

5          MS. SHROFF:  I do know that, your Honor.  That is

6    exactly what I would use the document for.  Thank you.

7          THE COURT:  Okay.  All righty.  Please have the jurors

8    brought in.

9          (Continued on next page)

1           (Jury present)

2           MS. SHROFF:  Your Honor, I believe we're missing one

3    person.

4           THE COURT:  The witness?  Yes, yes, the witness will

5    also come in.

6           Good morning, jurors.

7           THE JURORS:  Good morning.

8           THE COURT:  Welcome back.  Please be seated.

9           Good morning.  And remember that you're still under

10   oath.

11          You may continue with the cross-examination.

12          MS. SHROFF:  Thank you, your Honor.

13    KARIN MAISTRELLO, resumed.

14   CROSS EXAMINATION CONTINUED

15   BY MS. SHROFF:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  You testified on direct, right, that you were going to

19   refer to Mr. Guo as Boss through these proceedings, correct?

20          MR. HORTON:  Objection.

21          THE COURT:  Sustained.

22   Q.  And Mr. Guo also went by the name Ho Wan Kwok, correct?

23   A.  Yes.

24   Q.  Would you keep your voice up for me, please.

25   A.  I'll do my best.

O5V1GUO1                            Maistrello - Cross

1    Q.  Thank you.

2              And the name Ho Wan Kwok is his Hong Kong name,

3    correct?

4    A.  Cantonese name.

5    Q.  Right.  It's his Cantonese name, right?

6    A.  Yes.

7    Q.  You can just pull that towards you if you want, the

8    microphone.

9    A.  No, I'm good.

10   Q.  And that's the name that appears on his Hong Kong passport,

11   correct?

12   A.  I do not remember.

13   Q.  Well, you made travel arrangements for him, right?

14   A.  I did.

15   Q.  You made hotel bookings for him, correct?

16   A.  Not with his name.

17   Q.  I cannot hear you.

18              THE COURT:  All righty.  So shall we try the handheld

19   microphone instead then.

20   A.  Not using his name.

21   Q.  Not using the name Ho Wan Kwok?

22   A.  I never used his name to make reservations.

23   Q.  Okay.  And you knew that he had a political asylum in the

24   name of Ho Wan Kwok, correct?

25              MR. HORTON:  Objection.

1          THE COURT:  Overruled.  You may answer.

2   A.  I do not remember the name used.

3   Q.  You knew he had a political asylum application pending,

4   correct?

5          MR. HORTON:  Objection, relevance.

6          THE COURT:  Overruled.  You may answer.

7   A.  Yes.

8   Q.  Now it's fair to say, right, that your employee contract

9   was with Golden Springs, correct?

10  A.  Golden Spring.

11  Q.  And you testified on direct that when you took the job,

12  your understanding was that Golden Spring was a managed——asset

13  management company, correct?

14  A.  Yes.

15  Q.  And at the time that you took the job, nobody told you

16  where those assets came from, correct?

17  A.  That's correct.

18  Q.  And you did not know whether the assets came from the

19  Middle East, correct?

20         MR. HORTON:  Objection.

21         THE COURT:  Overruled.  You may answer.

22  A.  I did not know.

23  Q.  And you knew at some point that the assets came from Golden

24  Spring Hong Kong, correct?

25         MR. HORTON:  Objection, your Honor.  We covered this

O5V1GUO1                          Maistrello - Cross

```
 1   yesterday.
 2              THE COURT:  Sustained.
 3   Q.  You told the FBI that you had knowledge that the assets
 4   flowing into Golden Spring New York came from both the Middle
 5   East——
 6              MR. HORTON:  Same objection, your Honor.
 7              MS. SHROFF:  I hadn't finished question.
 8              THE COURT:  Please continue.
 9   Q.  ——and from Golden Spring Hong Kong, correct?
10              MR. HORTON:  Same objection, your Honor.  This was
11   covered yesterday.
12              THE COURT:  Overruled.
13   A.  Can you repeat the question, please.
14   Q.  Sure.  You told the FBI that you were aware that the assets
15   in Golden Spring New York came from both the Middle East and
16   Hong Kong, correct?
17   A.  I knew there were transfers from Golden Spring Hong Kong to
18   Golden Spring New York, yes.
19   Q.  And you also knew that there were transfers from the Middle
20   East to Golden Spring New York and you told the FBI that,
21   correct?  You remember that?
22   A.  I knew that there were transfers to various companies.
23   Q.  Right.  And by transfer, you mean money coming in, correct?
24   A.  Correct.
25   Q.  Okay.  And you recall telling the FBI that you were
```

1    perfectly aware that those transfers paid for Mr. Go's personal

2    and political expenses, correct?

3    A.  I don't remember that.

4    Q.  Okay.  Well, let me see if I can help you refresh your

5    recollection.

6              THE COURT:  One moment, please.

7              Go ahead.

8    Q.  Does that document refresh your recollection?

9    A.  I've never seen this document before.

10   Q.  Let me try it this way.

11             THE COURT:  We're getting a little bit of feedback

12   here and so——

13             MS. SHROFF:  I know.

14             THE COURT:  Go ahead.

15   Q.  Ma'am, you recall your meetings with——

16             THE COURT:  All right.  We're still getting the

17   feedback.

18             All right.  Let's try again.

19   Q.  Does this document refresh your recollection?

20   A.  Are you referring to a specific paragraph?

21   Q.  Sure.  The paragraph I hope that is now highlighted for

22   you.

23             THE COURT:  So you're not to read anything out loud.

24   The question is whether or not the document refreshes your

25   recollection.

O5V1GUO1                           Maistrello - Cross

1   A.  Yes.

2           MS. SHROFF:  Okay.  You can take that down.

3   Q.  And when you started at Golden Spring, Mr. Guo asked you to

4   research something called DDS attacks; do you remember that?

5   A.  I do.

6   Q.  And what are DDS attacks?  Could you tell the jury, please.

7   A.  Those were cyber attacks that, according to Boss, were done

8   by the CCP to——to his platforms.

9   Q.  And there were also attacks to Golden Spring platforms,

10  correct?

11  A.  What do you mean by Golden Spring platforms?

12  Q.  I mean emails to Golden Spring.

13  A.  What I was asked to investigate was specifically about Guo

14  Media, not Golden Spring.

15  Q.  Okay.  So you were asked to look into or investigate the

16  distributed denial of service attacks on Guo Media platforms,

17  correct?

18  A.  Yes.

19  Q.  Okay.  And you did that along with the help of a gentleman

20  named Raj Benraj (ph), correct?  Or is it Benraja?  I'm not

21  sure.

22  A.  Raj is his name.

23  Q.  Right.  That's his first name, right, and Benraj is his

24  last name?  Do you recall that?

25  A.  No, that is not his last name.

1    Q.  And there was also an ongoing concern about the email

2    addresses used by Golden Spring, correct?

3    A.  I don't know about that.

4    Q.  You don't recall William Gertz being on the board and

5    asking for Proton Mail to be used?

6              MR. HORTON:  Objection.

7              THE COURT:  Sustained.

8    Q.  Do you know who William Gertz is?

9    A.  I do.

10   Q.  Who is that?

11   A.  He is a journalist and he was a member of Rule of Law

12   Society board.

13   Q.  Right.  And that's the board that you served on, correct,

14   Rule of Law Society board, right?

15   A.  That's correct.

16   Q.  You had nothing to do with Rule of Law Foundation, correct?

17   A.  I was not on that board, no.

18   Q.  Right.  You had no job on that——in that nonprofit, correct?

19   A.  That's correct.

20   Q.  Okay.  So let's just go back to the email system used while

21   communicating with you as a Golden Spring employee, okay?

22   A.  Okay.

23   Q.  Okay.  And do you recall Mr. Gertz, as a board member,

24   talking to you about which email system to use?

25   A.  I don't remember.

O5V1GUO1                          Maistrello - Cross

1    Q.  Do you remember getting an email from Mr. Gertz saying that

2    he felt that Proton Mail was more secure because of the cyber

3    attacks experienced by both Golden Spring and by Rule of Law

4    Society?

5              MR. HORTON:  Objection, your Honor.  Hearsay.

6              THE COURT:  Ms. Shroff, do not elicit hearsay

7    testimony.

8              MS. SHROFF:  Your Honor, it's not going for the truth,

9    it's simply going to show——

10             THE COURT:  If you're going to make an objection, or

11   respond to an objection, you need to do it at the sidebar.

12             MS. SHROFF:  Okay.  I apologize, your Honor.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O5V1GUO1                        Maistrello - Cross

1           (At the sidebar)

2           THE COURT:  So what is the purpose of the question?

3           MS. SHROFF:  Well, your Honor, the government elicited

4    that Proton Mail was used.  I think—I can't remember whose

5    direct this was on, but Proton Mail was somehow used because

6    people wanted to maintain secrets.  I'm entitled to show that

7    there were, one, concerns about the cybersecurity at both

8    Golden Spring and the cybersecurity issues at Rule of Law

9    Society, that she was aware of the cyber issues, one of the

10   board members had specifically asked to use Proton Mail to have

11   secure engagement.  The document is not being offered for the

12   truth.  The documents are also email exchanges between her and

13   the board, maintained in the regular course of business, which

14   would also be an exception to the hearsay rule.  So for those

15   reasons, I asked her whether or not she had an awareness that

16   one of her board members wanted to use Proton Mail.  And I

17   asked her if she could recall it, and if she can't recall it,

18   I'm entitled to refresh her recollection.  That's what I was

19   trying to ask.

20           MR. HORTON:  So we did not elicit testimony about the

21   purpose, if any, of using Proton Mail.  It came in through

22   Louie Bonsukan, who was a salesperson or a customer

23   representative at a car dealership in Texas, who testified the

24   fact of a Proton email address in a document that we discussed

25   with him.  The car dealership certainly doesn't know the

O5V1GUO1                    Maistrello - Cross

1   purpose for which anybody outside of the dealership was using

2   that Proton email.  So that testimony did not come in the way

3   it was described.  Ms. Shroff did elicit that, like,

4   Ms. Maistrello had heard from Bill Gertz that he wanted to use

5   Proton Mail.  That's in.  This further long statement about

6   Bill Gertz talking at length about the reason he wanted to use

7   it and Bill Gertz's thoughts and Bill Gertz's statements,

8   that's hearsay, and that's why it's coming in.  It's coming in

9   to prove the truth of what Bill Gertz, who is not here, was

10  saying.

11           MS. SHROFF:  It's coming in to show that the

12  government, when it elicited the fact that purchase of the car

13  was made through a Proton Mail address, therefore asking the

14  jury to infer that use of a Proton Mail——and I didn't bring up

15  Proton Mail questions, I'm almost a hundred percent sure it

16  came out on this direct somehow——that the jury should infer

17  that that was a sign of a nefarious transaction.  I am not

18  seeking to introduce what Bill Gertz said because, frankly, the

19  only thing the man did say is, let's use Proton Mail, which is

20  the only fact I wanted to bring out and show that one of the

21  board of directors, who is outside of any influence of Miles

22  Guo, used Proton Mail.  That's the most basic fact I was

23  seeking to elicit.  And again, the email exchanges are all——

24           THE COURT:  I want to go back to your question about

25  whether she received an email from this individual in which he

1    said X.   My recollection is that I sustained the objection, and

2    so that it is not in.

3              MR. HORTON:   I think there was—I may be remembering

4    this incorrectly.   I thought there was a question unrelated to

5    the email about whether she knew if somebody had used Proton

6    Mail; just the simple knowledge of whether she knew person X

7    used Proton Mail.   I thought that had come in.   I think the

8    point is not—just to be clear—that the Proton Mail is not

9    relevant; it's that this is hearsay and it's about Bill Gertz's

10   purposes.

11             THE COURT:   Yes.   I'm excluding his statements.   But

12   also, I think that you're implying that the mere use of Proton

13   Mail implies something.

14             MS. SHROFF:   No.   They implied that to another

15   witness.   I was cleaning it up.

16             THE COURT:   No, they did not.   They merely stated that

17   the dealership received an email from Proton Mail, an

18   individual using Proton Mail.   They did not discuss any of the

19   qualities of Proton Mail.

20             MS. SHROFF:   Oh, they did not.   They just wanted the

21   jury to infer that something's wrong with using Proton Mail,

22   which is why with that witness, I had to clarify that he gets a

23   lot of emails from Proton Mail.   But you know what, I'll move

24   on, your Honor.

25             THE COURT:   Good.

O5V1GUO1                          Maistrello - Cross

1          MS. SHROFF:  I do want to note that these emails are

2    maintained in the regular course of business and they do fall

3    under the business exception rule to the hearsay.

4          THE COURT:  But you're not allowed to get in hearsay

5    statements merely because they're inside of a business

6    document.

7          MS. SHROFF:  That's true, your Honor, but I thought it

8    was relevant, and it's not hearsay.  We've been arguing about

9    hearsay throughout, and I just wanted to make sure the

10   government is clear on defense's position that there are other

11   exceptions to the hearsay rule.  But I shall move on.  It's not

12   worth it.

13         MR. HORTON:  If I can briefly respond to the last

14   thing Ms. Shroff said.  If she intends to lay a foundation to

15   get business records in, she can try to do that.  I don't think

16   that's been done yet.  Ms. Maistrello is not a document

17   custodian.  There's some work to be done I think if that's

18   coming next.

19         MS. SHROFF:  I don't think I need a document custodian

20   to get a hearsay business record in, but thank you for the

21   lecture.

22         THE COURT:  Ms. Shroff?

23         MS. SHROFF:  Yes, your Honor.  Your Honor——

24         THE COURT:  The way that you were just speaking was

25   huffy, and I ask you to please not do that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5V1GUO1                         Maistrello - Cross

 1          MS. SHROFF:  I was huffy, your Honor, but I'm tired,
 2   and I don't think this is a valid objection.  The government
 3   knows it falls clearly within the business record rule, and the
 4   government is doing as much as it can to prolong this
 5   testimony.  There's no reason for any of this.  There really
 6   isn't.  The government has done this with every objection here.
 7   They inject other issues that are really not relevant to the
 8   analysis.  This is a simple issue.  This is—
 9          THE COURT:  So I don't agree with your claiming that
10   this is an exception to the hearsay rule.  So let us go back.
11   And please, please, I want you to be even-tempered.
12          MS. SHROFF:  Thank you, your Honor.
13          (Continued on next page)

1              (In open court)

2              THE COURT:  The objection was sustained.

3    BY MS. SHROFF:

4    Q.  You were aware of the need to investigate the distributed

5    denial of services attack, correct?

6    A.  Can you repeat the question, please.

7    Q.  You were asked to investigate the distributed denial of

8    service attacks, correct?

9              MR. HORTON:  Objection.  Asked and answered.

10             THE COURT:  I'll allow the answer.  Go ahead.

11   A.  Yes.

12             THE COURT:  And Ms. Shroff, you used a term there that

13   I don't understand.  Distributed what?

14             MS. SHROFF:  Distributed denial of service attacks.

15             THE COURT:  Okay.  Go ahead.

16   Q.  And that's when a platform is cyber-attacked, correct?

17   A.  In my understanding, yes.

18   Q.  And you worked on that issue with a gentleman named Raj

19   Dhangra, D-H-A-N-G-R-A, correct?

20   A.  Initially, I was alone.  He was not hired yet.

21   Q.  Your testimony is that he was not hired when you were

22   assigned this task?

23   A.  That's correct.

24   Q.  Okay.  And that came up when he was hired, correct,

25   according to you?

O5V1GUO1                            Maistrello - Cross

1    A.  Can you repeat the question.

2    Q.  Sure.  There came a time when he was in fact hired,

3    correct?

4    A.  Yes.

5    Q.  Okay.  And he had a technology background that you did not

6    have, correct?

7    A.  That's correct.

8    Q.  And he was employed as a person in the IT department,

9    correct?

10   A.  Yes.

11   Q.  And he assisted with all IT-related issues, correct?  That

12   was his job, right?

13   A.  Yes.

14   Q.  And he's the one who assisted you in investigating that

15   matter, correct?

16   A.  Yes.

17   Q.  And you emailed with him while he worked there, correct?

18   A.  I mainly——we mainly spoke.  We shared the same office.

19   Q.  All right.  Well, let me see if I can refresh your

20   recollection about emailing with him, okay?

21          MR. HORTON:  Objection, your Honor.  There was no

22   failure of recollection.

23          THE COURT:  Sustained.

24   Q.  Do you recall emailing him about this specific task at

25   hand?

O5V1GUO1                          Maistrello - Cross

1   A.  I don't remember.

2          MS. SHROFF:  May I approach, your Honor?

3          THE COURT:  You may.

4   Q.  Is it fair to say, ma'am, that you interacted with him on

5   issues involving the security of cyber systems?

6   A.  We spoke about it.

7   Q.  Okay.  And you also spoke to him about the issues of

8   entrance and security for people entering the building,

9   correct?

10  A.  I sent an email to him as I did to other employees.

11  Q.  And you emailed about what topic, ma'am?

12  A.  Are you referring to the email I have in my hand right now?

13  Q.  I don't need to.  I just was testing your recollection of

14  the topics you covered with him.  You emailed him about

15  security in the building, correct?

16  A.  I don't remember.

17  Q.  Well, may I ask that you read that document and see if it

18  refreshes your recollection.

19  A.  I see the document, and I see that I——

20         THE COURT:  Well, don't say what the document says.

21  The only question is, does it refresh your recollection.

22  That's a yes or no question.

23         THE WITNESS:  Oh.

24  A.  It doesn't refresh my recollection, but I——I see what's

25  written in the email.

1   Q.   Okay.  And you were aware that there was a security issue

2   at the building in which Golden Spring was located, correct?

3   A.   We had——we were told that we had to keep the building

4   secure.

5   Q.   And you wanted to make sure only authorized people came to

6   the Golden Spring New York office, correct?

7   A.   That's correct.

8   Q.   You put in place verification procedures, correct?

9   A.   Yes.

10  Q.   You put in place the process whereby each vendor's name

11  would have to be on a list before they could enter the

12  building, correct?

13  A.   That's correct.

14  Q.   You put in place a process so that the vendor's name would

15  have to be told, the date of the visit would have to be told,

16  the time of the visit would have to be told, and the reason for

17  the visit would have to be told, correct?

18  A.   Yes.

19  Q.   You put in place the requirement that each vendor have

20  identification presented before they were allowed into the

21  building to come to the Golden Spring New York office, correct?

22  A.   Yes.

23  Q.   And you were the person who made yourself responsible for

24  making sure that the security team and any other party that was

25  involved was aware of this procedure, correct?

O5V1GUO1                          Maistrello - Cross

1    A.   Yes.

2    Q.   And you were the one who informed the entire team that you

3    would keep a record of each of these procedures being followed,

4    correct?

5            MR. HORTON:  Your Honor, the document is not in

6    evidence.

7            MS. SHROFF:  I'm not asking about the document, your

8    Honor, most respectfully.

9            THE COURT:  So first, the witness must answer "I don't

10   recall" before considering a document that may or may not

11   refresh her recollection.  So the procedure is, you're asked a

12   question; if you say that you don't recall, then she says, is

13   there something that might refresh your recollection; it is at

14   that time that you might refer to the document.

15           Go ahead.

16   BY MS. SHROFF:

17   Q.   Would you like me to repeat the question, ma'am?

18   A.   Yes, please.

19   Q.   Sure.  And do you remember that in the year 2018, while you

20   were working at Golden Spring, you took on the responsibility

21   of forwarding this protocol to the security team to make sure

22   that everyone was aware of the protocol itself?

23   A.   I don't remember doing that.

24   Q.   May I ask if the document that I have handed to you, and if

25   you look——refreshes your recollection.

O5V1GUO1                         Maistrello - Cross

1    A.  Yes.

2    Q.  Do you now remember that you said you would remain

3    responsible for forwarding that message of the protocol to the

4    security team, correct?

5    A.  As I read it on the document, yes.

6    Q.  Okay.  And you——

7              MR. HORTON:  Objection, your Honor.

8              THE COURT:  So you can't say what the document says.

9    You can only say if the document refreshes your recollection.

10   Does it help you to remember what she is asking about?  That's

11   the question.  Does the document refresh your recollection?

12             THE WITNESS:  It does not.

13   BY MS. SHROFF:

14   Q.  It does not refresh your recollection of what you did in

15   2018, correct?

16   A.  It does not.

17   Q.  In fact, there are a lot of things you've forgotten about

18   2018 now, correct?

19   A.  Yes.

20   Q.  You've forgotten your interactions with the security team,

21   correct?

22   A.  I forgot certain things, yes.

23   Q.  And you also forgot your involvement with the security team

24   vis-à-vis the cyber attack issues, correct?

25             I'll rephrase that.  You've forgotten how you

O5V1GUO1                         Maistrello - Cross

1    interacted with the security teams regarding the entering and

2    leaving of visitors to the Golden Spring's office, correct?

3             MR. HORTON:  Objection, your Honor.

4             THE COURT:  So that is a compound question.

5             MS. SHROFF:  You know what, your Honor, I'll move on.

6    Thank you.

7    Q.  Now on direct, you testified, did you not, about something

8    called Rule of Law, right?  Those were the questions asked of

9    you yesterday.  Do you remember that?

10   A.  I do.

11   Q.  Okay.  There's no such thing as Rule of Law, correct?

12   A.  I don't understand the question.

13   Q.  Sure.  I'll be happy to try again.  There is Rule of Law

14   Society, correct?

15   A.  There is.

16   Q.  Right.  And there is Rule of Law Foundation, correct?

17   A.  There is, correct.

18   Q.  There was no entity simply called Rule of Law, correct?

19   A.  No.  We referred to both entities as Rule of Law

20   collectively.

21   Q.  You referred to that?

22            MR. HORTON:  Objection.

23            THE COURT:  Overruled.

24   A.  We did.

25            THE COURT:  Was that a question?

1              MS. SHROFF:  I'm sorry?

2              THE COURT:  You've asked a question.  You referred to

3       them; is that the question?

4              MS. SHROFF:  Yes, your Honor.  Thank you.

5              THE COURT:  You may answer.

6       A.  We did.

7       Q.  Well, let's try that.  There was a board for the Rule of

8       Law Society, correct?

9       A.  Yes.

10      Q.  You were on that board, right?

11      A.  I was.

12      Q.  There was a Rule of Law Foundation board, correct?

13      A.  Yes.

14      Q.  You were not on that board, correct?

15      A.  I was not.

16      Q.  Right.  So if somebody asked you if you were on the board

17      of Rule of Law, you would have to say, I'm on the board of Rule

18      of Law Society, I am not on the board of Rule of Law

19      Foundation, correct?

20      A.  Yes.

21      Q.  Because that would be a truthful answer, right?

22      A.  Yes.

23      Q.  And it would be complete, correct?

24      A.  Yes.

25      Q.  Okay.  Now the board of Rule of Law Society, in 2018,

1    consisted of Steve Bannon, correct?

2    A.  Yes.

3    Q.  Sasha Gong, correct?

4    A.  Yes.

5    Q.  Bill Gertz, correct?

6    A.  Yes.

7    Q.  And Jennifer Mercurio, correct?

8    A.  That's correct.

9    Q.  And you, right?

10   A.  Right.

11   Q.  Okay.  And it was not Miles Guo who gave you any position

12   on that board; it was the board that voted to get you that

13   position, correct?

14   A.  He chose me.

15   Q.  Let's try that.  Who told you he chose you?

16   A.  He did.

17   Q.  He told you that he chose you to be on the board; that's

18   your testimony?

19   A.  It is.

20   Q.  Okay.  Did he make an announcement:  Welcome to the board

21   of directors Rule of Law Society, I have appointed you to be on

22   the board?

23   A.  I don't remember a public announcement.

24   Q.  Okay.  Did he send an email?

25   A.  No.

1   Q.  Did he put it on Twitter?

2   A.  He did not.

3   Q.  Did he put it on YouTube?

4   A.  I don't know.

5   Q.  He's a man, according to you, who likes publicity, right?

6   A.  What do you mean about——with publicity?

7   Q.  Okay.  According to you, he's the type of man who likes to

8   be the center of attention, right?

9   A.  He is.

10  Q.  He is.  So no grand announcement about him making you a

11  member of the board?  No, right?

12  A.  I don't remember.

13  Q.  Okay.  Each one of you five people had one vote, correct?

14  A.  In general, you mean?

15  Q.  No.  I mean as when you were on the board of the Rule of

16  Law Society.

17  A.  Oh.  Yes.

18  Q.  Okay.  I don't mean——that's what I meant.  For the Rule of

19  Law Society, you had one vote, right?

20  A.  Yes.

21  Q.  And there were five of you, right?

22  A.  Correct.

23  Q.  Okay.  What did it take to be a majority?

24  A.  I don't remember.

25  Q.  You don't remember what it took to be a majority for a

1  board that you sat on for less than two years?

2  A.  That's correct.

3  Q.  Okay.  You voted against certain requests, correct?

4  A.  Yes.

5  Q.  You voted no, correct?

6  A.  Once, yes.

7  Q.  You were never fired from the board, right?

8  A.  I was not.

9  Q.  You were not.  You remained on the board until you decided

10 to quit for medical reasons, correct?

11 A.  That's correct.

12 Q.  Mr. Guo never called you into his office and said, hey, why

13 did you vote that way, correct?

14 A.  Not that I remember.

15 Q.  Okay.  I just want to make sure.  You'd remember something

16 like that, right?

17 A.  I don't know if I would remember.

18 Q.  You wouldn't remember being fired from a board?

19 A.  I would remember being fired from a board; that, yes.

20 Q.  You'd remember him chastising you, correct, because,

21 according to you, he was Boss, right?

22 A.  Can you repeat the question.

23 Q.  Sure.  You would remember being chastised by him because,

24 according to you, he was Boss, right?

25 A.  I would remember.

O5V1GUO1                       Maistrello - Cross

1    Q.   And he never chastised you for the way you voted, right?

2    A.   No.

3    Q.   Okay.  You testified about a home that he bought in

4    Connecticut; is that right?

5    A.   Yes.

6    Q.   And that home was bought in February or March of 2020; is

7    that correct?

8    A.   I don't remember the exact date.

9    Q.   It was bought after you started working there, correct?

10   A.   Yes.

11   Q.   And before you quit, right?

12   A.   That's correct.

13   Q.   When did you quit?

14   A.   In April of 2020.

15   Q.   April of what?

16   A.   2020.

17   Q.   And we know from yesterday that your first day on the job

18   was February 19th, correct?

19   A.   My first day on the job was February 19 of 2018.

20   Q.   What?  2019, right?  2018.

21   A.   2018.

22   Q.   Right.  So that house had to be bought somewhere between

23   2018 and 2020, correct?

24   A.   Yes.

25   Q.   Okay.  And did you visit the house?

1    A.  Once.

2    Q.  You visited the house once?

3    A.  Yes.

4    Q.  It's huge, right?

5    A.  It's not small.

6    Q.  And there were people in and out of that house doing

7    broadcasting, correct?

8    A.  When I was there, I didn't see anyone.

9    Q.  When you were there, did you see the office that he had in

10   the house?

11   A.  I don't remember.

12   Q.  Do you remember seeing equipment in the house?

13   A.  I——no.

14   Q.  Do you remember seeing cameras in the house?

15   A.  No.

16   Q.  Do you remember seeing camera lighting in the house?

17   A.  No.

18   Q.  Do you remember seeing background screens in the house?

19   A.  No.

20   Q.  Sitting here today, do you know who paid for all of that

21   equipment that was in his house?

22           MR. HORTON:  Objection.

23   Q.  Did you know——

24           MS. SHROFF:  I apologize, your Honor.  I'll withdraw.

25   Q.  Did you know if there was——even if you didn't see it, you

O5V1GUO1                          Maistrello - Cross

1    knew there was equipment in his house in Connecticut, correct?

2    A.  Can you repeat the question.

3    Q.  Sure.  You testified right now on cross-examination that

4    you never saw this equipment at his Connecticut home, correct?

5    A.  Correct.

6    Q.  Did you know that he had equipment in his Connecticut home?

7    A.  I don't know.

8    Q.  Okay.  Did you know if he had broadcast equipment at the

9    Sherry-Netherland?

10   A.  Yes.

11   Q.  He did have it, correct?

12   A.  He did.

13   Q.  And he had the same equipment that I recited two minutes

14   ago, correct?

15   A.  Such as?

16   Q.  I can repeat it if you need me to.

17   A.  Yes, please.

18   Q.  Okay.  He had cameras, correct?

19   A.  Yes.

20   Q.  Background screens, correct?

21   A.  That I don't remember.

22   Q.  Lighting, correct?

23   A.  Yes.

24   Q.  Recording equipment, correct?

25   A.  Yes.

O5V1GUO1                          Maistrello - Cross

1   Q.  Broadcasting equipment, correct, most particularly this

2   one?

3   A.  Yes.

4   Q.  All of that was paid for by Golden Spring New York,

5   correct?

6   A.  No.

7   Q.  It wasn't paid for by Golden Spring, New York?

8           MR. HORTON:  Objection, your Honor.

9           THE COURT:  Asked and answered.

10  Q.  Who paid for it, according to you?

11  A.  Saraca.

12  Q.  And who's Saraca?

13  A.  Saraca was a company that paid for media and tech expenses.

14  Q.  And Saraca was the holding company for Golden Springs New

15  York, right?

16  A.  Can you repeat the question.

17  Q.  Saraca was the holding company for Golden Spring New York,

18  correct?

19  A.  I don't know about that.

20  Q.  You don't know William Je managed Saraca?

21  A.  I don't.

22  Q.  You don't know if Saraca had family fund money?

23  A.  I don't.

24  Q.  So you don't know anything about Saraca, but you're sure

25  Saraca paid the bill.

O5V1GUO1                         Maistrello - Cross

1      MR. HORTON:  Objection, your Honor.

2      THE COURT:  Compound question.

3  Q.  Do you know anything about Saraca?

4  A.  What I just told you.

5  Q.  Okay.  Where did the money into Saraca come from?

6  A.  I don't know.

7  Q.  Okay.  You testified about an office at 800 Fifth Avenue,

8  correct?

9  A.  Yes.

10  Q.  And is it fair to say that that was really an apartment

11  building, like a makeshift office that was put in place?

12  A.  Yes.

13  Q.  Okay.  It was a three-bedroom apartment, right?

14  A.  It was a two-bedroom apartment.

15  Q.  Okay.  And people were using it as an office, right?

16  A.  We were, yes.

17  Q.  Right.  And there came a time when it was just too crammed

18  and everybody agreed to move, correct?

19  A.  We moved in 2019.

20  Q.  Okay.  And you moved to the East 64th building, correct?

21  A.  Yes.

22  Q.  And Golden Spring relocated there, correct?

23  A.  Correct.

24  Q.  And the holding company named Saraca also relocated there,

25  correct?

O5V1GUO1                          Maistrello - Cross

1   A.  I don't know what the official location of Saraca was.

2   Q.  Okay.  So you don't know if Saraca relocated to 64th

3   Street; do I have it right?

4            THE COURT:  Asked and answered.

5   Q.  And you continued to work for Golden Spring at East 64th

6   Street, correct?

7   A.  Yes.

8   Q.  And you testified on direct you worked long hours, correct?

9   A.  Yes.

10  Q.  Was it Golden Spring's practice to have free lunch for

11  every one of its employees every day of the week?

12  A.  At 800 Fifth, yes.

13  Q.  Okay.  That practice continued at 64th, correct?

14  A.  No.

15  Q.  Okay.  When you worked long hours, you were given a hotel

16  room to sleep in the city, correct?

17  A.  When I was working consecutive days, yes.

18  Q.  Okay.  They put you up in a hotel, didn't make you drive

19  back and forth from work, right?

20  A.  I——I could choose.

21  Q.  You could choose, right?  And you chose, right?

22  A.  I did.

23  Q.  Okay.  Now you testified on direct about how bills were

24  paid, right?

25           I'll move on.

1    A.  How vendors were paid.

2    Q.  I'm sorry?

3    A.  How vendors were paid.

4    Q.  Okay.  Fair enough.  And do I have it right, the vendor

5    would need paying and you would go to Yvette, correct?

6    A.  It depended on the amount.

7    Q.  So if it was above a certain amount, you would go to

8    Yvette; is that right?

9    A.  That's right.

10   Q.  Okay.  And you referred to Yvette as Yanping Wang; is that

11   right?

12   A.  When I——when I talked about her to my colleagues, then I

13   would call her Yvette; when I talked to her, I would use her

14   Chinese name.

15   Q.  Okay.  And it was Yvette who decided whether to pay the

16   vendor or not, correct?

17   A.  Yes.

18   Q.  There were times when you had to get preauthorization from

19   Yvette before you would undertake an expense from a particular

20   vendor, correct?

21   A.  Yes.

22        MS. SHROFF:  Okay.  Could I just have the witness and

23   the jury see SM62, please.

24   Q.  You recall testifying about this document on direct?

25   A.  I remember.

1    Q.   Okay.  And this document is you seeking someone to sign off

2    on payment to a particular vendor; is that correct?

3    A.   It's a payment request form.

4    Q.   Right.  So if I could just highlight for you the name of

5    the payee, that would be Apple Inc., correct?

6    A.   Yes.

7    Q.   And Apple is at 767 Fifth Avenue, which is right next to

8    the Sherry-Netherland, right, the FAO Schwarz building,

9    correct?

10   A.   Yes.

11   Q.   Okay.  If you could scroll down to the payment amount, it's

12   $1,217.17.  Well, up top it says 17 cents, but here it says 95

13   cents, correct?

14   A.   1,117.95.

15   Q.   Small amount, right, relatively?

16   A.   What do you mean by small?

17   Q.   It's a small amount of money.  It's $1,117 for three pieces

18   of equipment from Apple, correct?

19   A.   That's the correct amount, yes.

20   Q.   Okay.  You did not have authority to sanction payment on

21   $1,117, right?

22   A.   Can you repeat the question, please.

23   Q.   Sure.  You did not have the authority to allow payment on

24   $1,117.95, correct?

25   A.   Not with Saraca.

O5V1GUO1                          Maistrello - Cross

1    Q.  You had no authority to sanction payment, correct?

2    A.  Not with Saraca.

3    Q.  Your testimony today is, if this bill were going to Golden

4    Spring, you could have paid the bill?

5            MR. HORTON:  Objection, your Honor.  Asked and

6    answered.

7            THE COURT:  Sustained.

8    Q.  Let's see the top of this document, okay?

9            You see that's where it says Golden Spring New York

10   Ltd.?

11   A.  I do.

12   Q.  Okay.  And let's go to the bottom of that document.

13   Requested by you, correct?

14   A.  Yes.

15   Q.  When you filled out the form——go back up, please——you

16   filled out the requisition to Golden Spring, correct?

17   A.  No.  It was crossed out.

18            (Continued on next page)

19

20

21

22

23

24

25

O5UVGUO2                        Maistrello - Cross

1    BY MS. SHROFF:

2    Q.  That cross-out is by Max Krasner, is it not?

3    A.  It is.

4    Q.  Right.

5           That is not your handwriting, right?

6    A.  It's not.

7    Q.  Right.

8           So when you sought requisition payment on this

9    particular bill, you filled it out as the payer being Golden

10   Spring; correct?

11   A.  The original form was a Golden Spring form.

12   Q.  Right.

13          So you filled out the form asking Golden Spring to pay

14   that bill because you're not the one who crossed that top part

15   out, right?

16   A.  I don't remember how it went.

17   Q.  Okay.

18          MS. SHROFF:  Could I scroll down again, please.

19   Q.  "Requested by Karin Maistrello."

20          Am I pronouncing your name right, ma'am?

21   A.  You are.

22   Q.  Okay.  So you requested it; correct?

23   A.  I did.

24   Q.  Okay.  And it was approved by Max Krasner; correct?

25   A.  Yes.

O5UVGUO2                    Maistrello - Cross

1    Q.   Okay.  When you filled out the form, you did not request it

2    yourself and approve it yourself with Golden Spring on top;

3    correct?

4              MR. HORTON:  Objection, your Honor.

5              THE COURT:  Sustained.

6              MS. SHROFF:  Okay.

7    Q.   When you submitted the form, there was no Saraca written on

8    top; correct?

9              MR. HORTON:  Objection.  It's been asked and answered.

10              THE COURT:  Sustained.  Asked and answered.

11    Q.   Sitting here today, do you remember who these devices were

12    for?

13    A.   I do not.

14    Q.   Okay.  And you testified about this gentleman named Max

15    Krasner; correct?

16    A.   Yes.

17    Q.   Okay.  And Max Krasner also handled payments and bank

18    accounts for Rule of Law Society; correct?

19    A.   Yes.

20    Q.   And you didn't handle any money as president or a board

21    member for Rule of Law Society; correct?

22    A.   I didn't handle, no.

23    Q.   Right.  You were never allowed to handle any finances at

24    Rule of Law Society, right?

25    A.   I would always sit with Max.

O5UVGUO2                          Maistrello - Cross

1    Q.  I'm sorry, what did you --

2            MS. SHROFF:  I could not hear her answer.  I

3    apologize, your Honor.

4    A.  I would always sit with Max to check the accounts.

5    Q.  That's not my question.

6            My question was you were never in charge of the

7    finances of the Rule of Law Society; correct?

8            MR. HORTON:  Objection.

9            THE COURT:  Asked and answered.

10   Q.  You can authorize payment on behalf of Rule of Law Society,

11   right?

12   A.  I don't know.

13   Q.  Okay.  You were a board member and president and you don't

14   know?

15           MR. HORTON:  Objection.

16           THE COURT:  Sustained.

17   Q.  You testified about somebody named Defeng Cao; correct?

18   A.  Yes.

19   Q.  You testified that he was may's -- his daughter's

20   boyfriend; correct?

21   A.  Yes.

22   Q.  Do you know, by the way, what work he did while he was

23   working in China?

24   A.  I don't remember.

25   Q.  Do you remember at all if he was trained in security while

O5UVGUO2                          Maistrello - Cross

1    he worked in China?

2            MR. HORTON:  Objection, your Honor.  Asked and

3    answered.

4            THE COURT:  Overruled.  You may answer.

5    A.  I don't remember.

6    Q.  Do you remember if he was employed in China in the security

7    industry?

8            MR. HORTON:  Objection, your Honor.  Asked and

9    answered again.  She said she didn't remember.

10           THE COURT:  Sustained.

11   Q.  Do you know how he got from China to the United States?

12   A.  By plane.

13   Q.  Under what circumstances, do you remember?

14           MR. HORTON:  Objection.

15           THE COURT:  You may answer.

16   A.  I don't know.

17   Q.  You testified about a man named William Je; correct?

18   A.  Correct.

19   Q.  And it was Mr. Je -- am I saying his name correctly?  Je,

20   right?

21   A.  Yes.

22   Q.  Okay.  He's the one who asked you to take on a position at

23   ACA Capital; correct?

24   A.  Yes.

25   Q.  And on direct you testified that it was Mr. Guo who

1    introduced you to Mr. Je; correct?

2    A.  Yes.

3    Q.  Isn't it true that Mr. Guo had nothing to do with that

4    introduction; in fact, it was Yvette Wang who introduced you to

5    Mr. Je?

6    A.  No, I'm pretty sure boss introduced me to William.

7    Q.  Okay.  Do you remember testifying in a deposition in a

8    case?

9    A.  Yes.

10   Q.  Do you remember testifying under oath?

11   A.  Yes.

12   Q.  Do you remember having a lawyer there?

13   A.  Yes.

14   Q.  And remember giving this testimony while you were under

15   oath, saying you were introduced to William by Mrs. Wang as a

16   person of trust and I met him several times.

17           Do you recall that testimony you gave?

18   A.  I don't.

19   Q.  Okay.  Well, let's see if we can show you 3525-001 at page

20   14.

21           MS. SHROFF:  Could you just go one page back.

22   Q.  Do you see the bottom of that page?

23   A.  I do.

24   Q.  Does that refresh the testimony you gave under oath at a

25   deposition?

O5UVGUO2                          Maistrello - Cross

1    A.  Yes.

2    Q.  And under oath at a deposition, you said:  "I was

3    introduced to William by Mrs. Wang as a person of trust, and I

4    met him several times."  Correct?

5            MR. HORTON:  Objection, your Honor.  This is not

6    evidence.  Not before the jury.

7            THE COURT:  Overruled.

8            MR. HORTON:  It is before the jury, and it's not in

9    evidence.

10           THE COURT:  Oh, you're saying that this is being shown

11   to the jurors?  This should not be shown to the jurors.

12           It is not?  Do you have a document in front of you?

13           THE JURY:  It was.

14           THE COURT:  All right.  So that was an error.

15   BY MS. SHROFF:

16   Q.  Does that refresh your recollection?

17   A.  Yes.

18   Q.  So you did say that under oath, right?

19   A.  I did.

20   Q.  And that was years earlier than your testimony today;

21   correct?

22   A.  Yes.

23   Q.  And you already testified you have trouble remembering some

24   things; correct?

25   A.  Yes.

O5UVGUO2                     Maistrello - Cross

1    Q.  And your memory then was better than your memory now;
2    correct?
3    A.  I don't know about that.
4    Q.  You don't know about that.
5    A.  I don't know when my memory was better.
6    Q.  Okay.  So back then you said it was Yvette who introduced
7    you to William.  That we are clear on; correct?
8    A.  Yes.
9    Q.  Okay.
10        MS. SHROFF:  You can take that down.  Thank you.
11        I'm sorry about that.
12   Q.  You also testified about Mr. Je being at the East 64th
13   Street office; correct?
14   A.  Sometimes he came, yes.
15   Q.  And when he came, he worked off of his laptop and you were
16   there, right?
17   A.  Most times.
18   Q.  Did you guys share an office?
19   A.  We shared a floor.
20   Q.  My question was did you share an office?
21   A.  Yes.
22   Q.  Right.  So you and he sat in the same office; correct?
23   A.  Yes.
24   Q.  Okay.  Mr. Guo never sat in that office with you, right?
25   It was you and William Je; correct?

O5UVGUO2                          Maistrello - Cross

1    A.  And other people, yes.

2    Q.  Right.  But you shared -- Mr. Guo wasn't in that space at

3    all; correct?

4    A.  He was not.

5    Q.  Okay.  And it was William Je who asked you to join the

6    board of ACA, right?

7    A.  Yes.

8    Q.  And he told you why he wanted you to join the board; isn't

9    that right?

10   A.  Yes.

11   Q.  He told you he was looking for people to invest; correct?

12   A.  Yes, he was looking for investments in New York and the

13   states.

14   Q.  He was looking for investors as well, right?

15   A.  I don't recall that.

16   Q.  Okay.  So he wanted you to help him find people who would

17   invest; correct?

18   A.  I believe so.

19   Q.  And people who invest are called investors; correct?

20   A.  They are.

21   Q.  Okay.  And you sat on that board of ACA until you received

22   a subpoena; correct?

23   A.  Yes.

24   Q.  Okay.  When you got the subpoena, who did you go talk to

25   first about the subpoena, do you remember?

1    A.  Yes.

2    Q.  Who was that?

3    A.  Daniel Podhaskie.

4    Q.  Right.

5          You didn't go to Yvette, right?

6    A.  The first person I talked to was Daniel.

7    Q.  You didn't go to Mr. Guo, right?

8    A.  I did not.

9    Q.  Okay.  And know one else was present when you discussed

10   that subpoena with Mr. Podhaskie; correct?

11   A.  Can you repeat the question please?

12   Q.  Sure.  No one else was present when you discussed the

13   subpoena with Mr. Daniel Podhaskie; correct?

14   A.  That's correct.

15   Q.  Okay.  And Ms. Wang was not present for that conversation;

16   correct?

17   A.  She was not.

18   Q.  Okay.  And you were free to tell him whatever was on your

19   mind about that subpoena, right?

20   A.  Yes.

21   Q.  Okay.  You could have asked Mr. Podhaskie to get you a

22   lawyer from -- that had never been at the Golden Spring's

23   office; correct?

24   A.  I could have.

25   Q.  Okay.  So you then testified yesterday about being at a

O5UVGUO2                          Maistrello - Cross

1    deposition, you recall that testimony?

2    A.   Yes.

3    Q.   Okay.  And you were at a deposition; correct?

4    A.   I was.

5    Q.   Okay.  And you were deposed, right?

6    A.   I was.

7    Q.   You gave testimony; correct?

8    A.   I did.

9    Q.   You were put under oath; correct?

10   A.   I was.

11   Q.   You were sworn to tell the truth; correct?

12           MR. HORTON:  Objection, your Honor.

13           We've been through this.

14           THE COURT:  Asked and answered.

15   Q.   And you had a lawyer there, right?

16           MR. HORTON:  Objection.  Same objection.

17           THE COURT:  Sustained.

18   Q.   Ms. Wang was not seated next to you during the deposition,

19   right?

20           MR. HORTON:  Objection.  Same objection.

21           We've been through this.

22           THE COURT:  Sustained.

23           MS. SHROFF:  Your Honor, may I approach?

24           THE COURT:  Yes.

25           (Continued on next page)

1              (At sidebar)

2              THE COURT:  So my recollection is that you asked

3    yesterday whether Ms. Wang was there at the deposition.

4              MS. SHROFF:  Right.  But I don't think I ever covered

5    that there was a lawyer and Ms. Wang was three seats away.  I

6    never covered the scope of what she testified to during the

7    deposition.  I never questioned her on all the acts that

8    happened after the deposition was over.  I never covered any

9    part of the discussion about the deposition with Miles Guo

10   about all of this.

11             I don't think I covered any of that.  And I'm pretty

12   certain I checked last night; but if I'm wrong, I'm wrong, but

13   I don't think I covered that.

14             I think I'm entitled to show that Ms. Wang was not

15   seated next to her as they implied; that there was a lawyer

16   seated next to her; Ms. Wang was three seats down.  I think I'm

17   allowed to show all of that.

18             MR. HORTON:  Your Honor, this line of questioning,

19   which is not just the last several questions, but I think it's

20   about ten minutes of questions, is needlessly cumulative.  It's

21   going to significantly prolong the trial, particularly if it's

22   a pace that's continued with the witnesses who are to come.

23   And we've gone over it again and again and again, and your

24   Honor has sustained a number of the same kind of objection,

25   which is that the question is asked and answered, and it's

1    followed again by the same questions and the same topic.

2              THE COURT:  So the questioning has been repetitive.

3    You found every way to ask whether an individual gave sworn

4    testimony at a deposition, and so it is needless.  So if you

5    would just stick to what is necessary to be more efficient in

6    the questioning.

7              MS. SHROFF:  I'd be happy to try, your Honor.

8              THE COURT:  Okay.

9              MR. HORTON:  Can we ask how much is left of her

10   cross-examination?

11             MS. SHROFF:  I have no idea.  I don't know.  I think

12   30 minutes.

13             THE COURT:  Then take a moment to think about it.

14             MS. SHROFF:  Thirty minutes.

15             THE COURT:  Thirty minutes.

16             MS. SHROFF:  But I'm telling you honestly, I have a

17   lot of trouble hearing her.  It's also adding to my degree of

18   frustration, but I simply cannot hear her.  And I feel

19   ridiculous asking, I can't hear you, like ten times.  I

20   apologize, your Honor, but I'm having a lot of trouble hearing

21   her.

22             THE COURT:  Do you need a hearing aid?

23             MS. SHROFF:  I can't have a hearing aid.  My deafness

24   was due to some kind of weird injury.  I was seen at Mt. Sinai

25   Hospital in Brooklyn.  They gave me prednisone injections to

1    try and recover it.  I can't do anything about it.  I normally

2    don't have this struggle.  So I apologize, your Honor, I really

3    do, but I don't --

4            THE COURT:  Do you need a device to amplify what

5    you're hearing in the ear that works?

6            MS. SHROFF:  I'm only having trouble with this

7    witness.  I haven't had trouble with the other two before.  I

8    will try better, your Honor.

9            But I really am having trouble hearing her.  And I

10   don't want to keep asking you to repeat.  So you see when I'm

11   craning forward, I'm really trying to see if I can hear better.

12   So I apologize about that.  I am having trouble hearing.

13           THE COURT:  Are you making a request that I --

14           MS. SHROFF:  No, no, no, I'm not --

15           THE COURT:  -- install any additional equipment or

16   give you an opportunity to have a medical exam or somehow

17   address the deafness?

18           MS. SHROFF:  No, your Honor, not at all.  I'm not

19   seeking to make a record of any kind.  I do not plan to raise

20   this at any appeal.  I'm just telling you why I'm having

21   trouble hearing her, that's all.  It is nothing that I

22   intend -- I'm not laying the foundation for anything down the

23   road at all.  I'm just trying to explain what's going on,

24   that's all.

25           THE COURT:  I am going to ask her again to speak up.

O5UVGUO2                         Maistrello - Cross

1          MS. SHROFF:  Okay.  I just want to be very clear, your

2    Honor, I'm really not trying to lay a foundation about

3    anything.  I hope that's very clear.

4          MR. HORTON:  Your Honor, we just want to note that

5    cross has been longer than the direct.

6          And your Honor is interested in the July 4th target

7    that was set up in the case, and we have concerns about being

8    able to hit that at the pace this is going.

9          MS. SHROFF:  Your Honor, we join in that concern.

10          And we also ask the government that if they could stop

11    looping, that would also make the trial shorter.

12          THE COURT:  Actually, looping is a more efficient way

13    actually.

14          MS. SHROFF:  I don't think so.  I think it's leading

15    and I think it's very prejudicial to the defense.

16          And, you know, defense lawyers have long argued

17    against looping, your Honor.

18          THE COURT:  So there is a long way and a short way to

19    do a direct examination.  If we take the long way, it prolongs

20    the trial.

21          MS. SHROFF:  I apologize, your Honor.  I always

22    thought just saying what happened next is shorter than, you

23    know, When you went to the house and then saw the blue flag,

24    then tell me what happened next.  So I apologize.  I will do

25    better.  I will try to move it right along.

O5UVGUO2                         Maistrello - Cross

1                (In open court)

2    BY MS. SHROFF:

3    Q.   At the deposition, your lawyer was seated next to you;

4    correct?

5                MR. HORTON:   Objection, your Honor.

6                THE COURT:   You may answer.   Go ahead.

7    A.   Yes.

8    Q.   Ms. Wang was seated three seats down; correct?

9    A.   Two.

10   Q.   And she did not speak during the deposition; correct?

11   A.   She did not.

12   Q.   And you testified at the deposition that you were an

13   Italian citizen; correct?

14   A.   Yes.

15   Q.   You testified that you were on a visa in the United States;

16   correct?

17   A.   Yes.

18   Q.   And is it fair to say in 2023, you were still on a visa;

19   correct?

20   A.   Yes.

21   Q.   By that time you had stopped working for Golden Spring;

22   correct?

23   A.   Yes.

24   Q.   And by that time you had stopped working with Rule of Law

25   Society; correct?

O5UVGUO2                         Maistrello - Cross

1    A.  Yes.

2    Q.  In 2023, you reached out to a lawyer who still worked there

3    named Victor Cerda; correct?

4              MR. HORTON:  Objection, your Honor.  Relevance.

5              THE COURT:  You may answer.

6    A.  Yes.

7    Q.  You asked him to help you with your immigration status;

8    correct?

9    A.  I asked for advice, yes.

10   Q.  He declined; correct?

11   A.  That's correct.

12   Q.  You testified on direct that after the deposition, you went

13   to lunch; is that correct?

14   A.  That's correct.

15   Q.  You went to lunch with Yvette; correct?

16   A.  Yes.

17   Q.  And then you returned to the office, you testified, right?

18   A.  We did.

19   Q.  And you testified on direct that you, Yvette, went to

20   Mr. Guo's office; correct?

21   A.  Yes.

22   Q.  And your testimony was that Yvette told Mr. Guo that you

23   had done an excellent job; correct?

24   A.  Yes.

25   Q.  Is it fair to say, Ms. Maistrello, that at the deposition,

1   you testified that you did not even know why you were there?

2   You recall giving that testimony at the deposition?

3   A.  Yes.

4   Q.  And according to you, Ms. Wang praised you for testifying

5   that you had no idea why you were at a deposition; correct?

6   That's your testimony?

7   A.  She just said that I did well during the deposition.

8   Q.  Okay.  And according to you, she praised your -- that you

9   did well at the deposition, and then she proceeded to call you

10  a flute; correct?

11  A.  Yes.

12  Q.  And isn't it fair to say she has never ever referred to you

13  as flute; correct?

14          MR. HORTON:  Objection, your Honor.

15          THE COURT:  You may answer.

16  A.  She did before.

17  Q.  She did before the deposition, called you flute?

18  A.  She did.

19  Q.  Okay.  So long before the deposition she called you a flute

20  and, according to you, after the deposition she also called you

21  a flute?

22          MR. HORTON:  Objection, your Honor.  It's compound.

23          THE COURT:  You may answer.

24  A.  I don't remember when she did.

25  Q.  You don't remember if it was before the deposition?

1          MR. HORTON:  Objection.  Asked and answered.

2          THE COURT:  Sustained.

3    Q.  You do recall though testifying that you had no idea why

4    you were being deposed; correct?

5          MR. HORTON:  Objection.

6          THE COURT:  Asked and answered.

7    Q.  And you testified to that as a person who was sitting on a

8    particular board; correct?

9          MR. HORTON:  Same objection.

10         MS. SHROFF:  I'll move on, your Honor.

11   Q.  You testified on direct, did you not, about a press

12   conference on the launch of the Rule of Law Society; correct?

13   A.  Rule of Law Society and foundation.

14   Q.  Well, let's just talk about Rule of Law Society, okay?

15         Okay.  You coordinated the travel for people for that

16   event; correct?

17         MR. HORTON:  Objection.

18         THE COURT:  The battery is gone.  Do we have another

19   microphone?  And would you speak up, please.

20         MR. HORTON:  Objection.  Your Honor, we object to the

21   premise of the question limiting it to the Rule of Law Society.

22         THE COURT:  Well, the questioner has asked the witness

23   to limit her answers to the Rule of Law Society; and that your

24   concerns may be addressed on redirect.  Go ahead.

25   Q.  You coordinated travel; correct?

1   A.  Yes.

2   Q.  You were the one who actually made the bookings, right?

3   A.  I was not the only person, but yes.

4   Q.  But your job was to make bookings, right?  Travel bookings.

5   A.  That was not my job, but I did in that instance.

6   Q.  And you coordinate people's flights; correct?

7   A.  I don't remember that.

8   Q.  And do you remember booking hotel rooms for people?

9          MR. HORTON:  Objection, your Honor.  Cumulative.

10         MS. SHROFF:  I'll move on, your Honor.

11  Q.  Do you recall that part and parcel of your job throughout

12  the time you were there was to do these kinds of bookings,

13  right?

14         MR. HORTON:  Objection, your Honor.  We covered this.

15         THE COURT:  Sustained.

16  Q.  Was part and parcel of your job to actually visit the hotel

17  rooms prior to the guest taking -- starting their stay to

18  inspect the rooms themselves?

19  A.  Are you referring to a Rule of Law Society job?

20  Q.  Yes.

21  A.  Then the answer is no.

22  Q.  How about for Golden Spring?

23  A.  Yes, but only for boss, not for guests.

24  Q.  Okay.  So your testimony is you looked at the hotel rooms

25  ahead of time, correct, when it was for Mr. Guo; correct?

O5UVGUO2                        Maistrello - Cross

1          MR. HORTON:  Objection.

2          Asked and answered, your Honor.

3          THE COURT:  Overruled.  You may answer.

4   A.  Yes.

5   Q.  And when you went to inspect the rooms, you took a cyber

6   security team person with you, correct, and a security person

7   with you; correct?

8   A.  Yes.

9   Q.  Is it fair to say, ma'am, that you have never talked to

10  Mr. Guo about any finances surrounding the Rule of Law Society?

11  A.  I don't remember.

12  Q.  Mr. Guo never, ever told you he was going to donate a

13  million dollars as a sponsor of Rule of Law Society; correct?

14  A.  He did during meetings.

15  Q.  Your testimony is he told you that he was going to donate a

16  million dollars?

17          MR. HORTON:  Objection.  Asked and answered.

18          THE COURT:  Were you at the meetings?

19          You need to speak up.

20          THE WITNESS:  Yes.

21          THE COURT:  Go ahead.

22  BY MS. SHROFF:

23  Q.  Could you tell us who else, according to you, was at this

24  meeting?

25  A.  People varied, but I remember Steve Bannon being there,

1    sometimes William was there, Yvette was there.

2    Q.  So according to you, Mr. Bannon was there — I missed the

3    second name.

4    A.  William.

5    Q.  William Je, right?

6    A.  Correct.

7    Q.  And Yvette was there.  That's your testimony?

8    A.  Yes.

9    Q.  So there was no member of the public there; correct?

10   A.  No.

11   Q.  This meeting, according to you, was not broadcast to

12   anyone; correct?

13   A.  No.

14   Q.  You never heard him say that on Twitter, YouTube, or any

15   social media; correct?

16   A.  I don't remember that.

17   Q.  You don't remember ever hearing him say that out loud in

18   public ever; correct?

19   A.  I don't remember.

20   Q.  Now, you testified about an entity that the government in

21   its direct referred to as Rule of Law; correct?  All the

22   questions yesterday, do you remember they called it Rule of

23   Law, right?  Do you remember that?

24   A.  I remember discussing the Rule of Law organizations.

25   Q.  Okay.  So I just want to be very clear for

1    cross-examination that I'm only asking you about the entity you

2    were involved with, which is Rule of Law Society, okay?

3                MR. HORTON:  Objection, your Honor.

4                Mischaracterizes her testimony.

5                THE COURT:  Sustained.  She has stated that she held

6    offices within the Rule of Law Society.

7                MS. SHROFF:  Right.

8                THE COURT:  "Involved in" is a mischaracterization of

9    her testimony.

10   Q.  You're not involved with any operations of Rule of Law

11   Foundation; correct?

12   A.  I was not.

13   Q.  You were not on the board of Rule of Law Foundation;

14   correct?

15   A.  I was not.

16   Q.  You were not involved with anything having to do with Rule

17   of Law Foundation by the board; correct?

18   A.  I was not.

19   Q.  Okay.  Rule of Law Society had a following; correct?

20   A.  I think it's fair to say that boss had a following.

21   Q.  Okay.  So boss had a following from which Rule of Law

22   Society benefited.  Is that also a fair thing to say?

23   A.  It is.

24   Q.  On direct testimony you talked about the one-year broadcast

25   anniversary; correct?  You remember -- that was an awkward

O5UVGUO2                          Maistrello - Cross

1    question.  I apologize.

2              You remember the broadcast that was done on the

3    one-year anniversary?

4    A.  I do.

5    Q.  Okay.  And that was in November of 2019; correct?

6    A.  Yes.

7    Q.  And the broadcast was from the East 64th Street office,

8    right?

9    A.  It was.

10   Q.  That was done on Guo Media; correct?

11   A.  I think it was.

12   Q.  I didn't hear you, I'm sorry?

13   A.  I think it was.

14   Q.  Okay.  And you testified that you did nothing for that

15   fundraiser; correct?

16   A.  That's correct.

17   Q.  Okay.  Your testimony is you did not set up travel for

18   people who were flying into New York for this occasion?

19             MR. HORTON:  Objection.  Cumulative, your Honor.

20             THE COURT:  Asked and answered.

21   Q.  And according to you, at this fundraiser, Yvette asked you

22   to move money from Saraca and Golden Spring to show donations

23   to Rule of Law Society; correct?

24   A.  Yes.

25   Q.  Okay.  And you testified to that, that you were told that

1   you should do this so that people could see big amounts of

2   money shown on screen; correct?

3   A.  Yes.

4   Q.  And you were told this by Yvette, correct, according to

5   you?

6   A.  Yes.

7   Q.  And you were told by Yvette that she wanted you to do this

8   so that she could show large donations to Rule of Law Society;

9   correct?

10  A.  Correct.

11  Q.  And you said on direct that you did not want to do that

12  because the transfers were not real; correct?

13  A.  Yes.

14  Q.  And you testified that you considered them to be internal

15  transfers; correct?

16  A.  Yes.

17  Q.  And according to you, Golden Spring giving money to Rule of

18  Law Society, you would consider that to be an internal

19  transfer; correct?

20  A.  Yes.

21  Q.  Okay.  So if rule of -- if Golden Spring wanted to donate

22  to Rule of Law Society, you would object to that as an internal

23  transfer?

24  A.  No.  We were asked to transfer money and then send it back.

25  Q.  But you never sent it back, right?

1   A.  I never transferred it in the first place.

2   Q.  Right.  And when others transferred it, sitting here today,

3   you have no evidence that they ever transferred it back;

4   correct?

5   A.  I don't remember.

6   Q.  You never checked any books from Golden Springs about this

7   money transfer; correct?

8   A.  I never checked Golden Spring's books.

9   Q.  Right.  And you have no idea if that money was ever

10  transferred back to Golden Springs; correct?

11  A.  I don't remember.

12  Q.  You don't remember or you don't know?

13  A.  I don't remember.

14  Q.  Do you know how much money Golden Springs donated to Rule

15  of Law Society?

16  A.  I don't know.

17  Q.  Do you know how much money Golden Spring donated to Rule of

18  Law Foundation?

19  A.  I don't know.

20  Q.  You never checked the books for the Rule of Law Society;

21  correct?

22          MR. HORTON:  Objection.  Cumulative.

23          THE COURT:  Asked and answered.

24  Q.  You also testified on direct that you told Yvette you did

25  not want to do this, right?

O5UVGUO2                          Maistrello - Cross

1    A.  Yes.

2    Q.  Yvette didn't force you, right?

3    A.  No.

4    Q.  And then it was your testimony yesterday that after you

5    told her that, Yvette could sense that you were upset; correct?

6    A.  Yes.

7    Q.  And according to you, Yvette saw that you were upset and

8    then still told you that, Don't worry about it, someone else

9    will do it.  Is that what she told you, according to you?

10   A.  Yes.

11   Q.  Did anyone else come up to you and complain that they were

12   forced to do something like this?

13   A.  Yes.

14   Q.  Really.  Who?

15   A.  Three colleagues.

16   Q.  Three colleagues came up to you and said they complained to

17   you, is that your testimony?

18   A.  It is.

19   Q.  You didn't testify to that on direct yesterday; correct?

20        MR. HORTON:  Objection.

21        THE COURT:  Overruled.

22        You may answer whether you testified.

23   A.  I don't remember.

24   Q.  And when these three colleagues came up to you and

25   complained about this, you could have gone to William Je;

1  correct?

2  A.  Why would I have gone to William?

3  Q.  Well, isn't he one of the people that you had a good

4  relationship with?

5  A.  He was not even at the office.

6  Q.  Okay.  He has email though, right?

7  A.  He has an email, yes.

8  Q.  Okay.  You were on the board at that time; correct?

9  A.  Yes.

10  Q.  You could have brought it up at a board meeting; correct?

11  A.  I could have.

12  Q.  You could have emailed any number of people about this;

13  correct?

14  A.  I could.

15  Q.  You could have emailed Dan Podhaskie; correct?

16          MR. HORTON:  Objection.  It's cumulative, your Honor.

17          THE COURT:  Sustained.

18  Q.  Did you email anyone about these three colleagues asking --

19  complaining to you?

20          MR. HORTON:  Same objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  After that event you didn't resign from the board because

23  you were asked to do something wrong according to you; correct?

24  A.  I did not.

25  Q.  And the three colleagues didn't resign either; correct?

O5UVGUO2                          Maistrello - Cross

1    A.  Not all of them were part of the board.

2    Q.  They didn't resign from their job, right?

3    A.  They did not.

4    Q.  Okay.  Is it fair to say, ma'am, that you had no authority

5    to transfer any money out of Saraca; is that correct?

6    A.  That's correct.

7    Q.  You had no authority to pay any bills with the Saraca

8    account; correct?

9            MR. HORTON:  Objection, your Honor.  We covered this.

10           THE COURT:  Sustained.  You've gone over this.

11   Q.  The first meeting of the board for Rule of Law Society was

12   in May of 2019, do you remember that?

13   A.  I don't.

14   Q.  You don't remember the very first meeting in May of 2019?

15           MR. HORTON:  Objection, your Honor.

16           THE COURT:  Sustained.

17   Q.  The next meeting was on June 27, 2019.  Do you recall that

18   meeting?

19   A.  I don't.

20   Q.  Do you recall a meeting, a special meeting held to discuss

21   issues raised by the firing of Sasha Gong?

22   A.  I don't.

23   Q.  Do you remember Sasha Gong approaching the Rule of Law

24   Society's board because she'd been fired for doing the Voice of

25   America interview with Mr. Guo?

1    A.  Can you repeat the question, please.

2    Q.  Sure.  Do you remember a special meeting being convened to

3    discuss Ms. Gong getting fired by Voice of America for doing an

4    interview with Mr. Guo?  Do you recall that?

5    A.  I don't remember a special meeting.  I remember her sharing

6    this fact.

7    Q.  And you don't remember the board voting on her request to

8    get assistance to sue Voice of America for wrongful firing?

9    A.  I don't remember.

10   Q.  Okay.  Do you remember August 23rd, 2019, announcement

11   about a September 3rd, 2019, board meeting?  Do you recall

12   that?

13   A.  I do not.

14   Q.  Do you recall that there was an actual board meeting on

15   September 3rd of 2019?

16   A.  I don't.

17   Q.  Do you remember that one of the agendas was to review the

18   budget?  Does that help you refresh your recollection?

19            MR. HORTON:  Objection, your Honor.

20            THE COURT:  I think that you've already gone over this

21   territory, Ms. Shroff.

22   Q.  Do you recall the Rule of Law Society having a proposal —

23   and you testified to this yesterday — to ship PPE to China;

24   correct?

25   A.  Yes.

1   Q.  And you testified that made no sense to you, right?

2   A.  That's correct.

3   Q.  And you testified that it didn't make any sense to you that

4   PPE was being sent back to China because China was the one who

5   was making the N95 masks; correct?

6   A.  That's correct.

7   Q.  But the N95 masks are just one part of PPE; correct?

8   A.  I don't understand the question.

9   Q.  There are different kinds of masks, right, during COVID?

10  A.  In general?

11  Q.  Yes.

12  A.  Yes.

13  Q.  Okay.  And when you thought that, you had no knowledge

14  whether the ordinary person in China had access to an N95 mask;

15  correct?

16  A.  I don't remember.

17  Q.  And you had no knowledge if the family members of people

18  who were in the United States wanted masks sent to their family

19  members in China; correct?

20  A.  What people?

21  Q.  Dissidents, people who were supporters of Rule of Law

22  Society.

23          THE COURT:  She can't testify as to what was on the

24  mind of other people.

25  Q.  You were aware, were you not, that Rule of Law Society was

O5UVGUO2                          Maistrello - Cross

1    supporting dissidents; correct?

2    A.   That was the mission.

3    Q.   And dissidents had family in China; correct?

4    A.   Some may have.

5    Q.   And dissidents in the United States would want their family

6    members in China to have --

7              MR. HORTON:   Objection, your Honor.

8    Q.   -- N95 protection; correct?

9              THE COURT:   Sustained.

10   Q.   You testified on direct, did you not, that it was your

11   understanding that N95 masks were sent to Mr. Guo's home?

12   A.   Yes.

13   Q.   Which home?

14   A.   The one in Connecticut.

15   Q.   And sitting here today, do you know if Mr. Guo was in his

16   Connecticut home at any part of the pandemic?

17   A.   In March of 2020, yes.

18   Q.   Okay.  And in March of 2020, your testimony is that Mr. Guo

19   was not on a yacht, but at his home in Connecticut?

20             MR. HORTON:   Objection, your Honor.

21             THE COURT:   Overruled.  You may answer.

22   A.   Can you repeat the question, please.

23   Q.   Your testimony is that it is your recollection that in

24   March of 2020, Mr. Guo, during the pandemic, was at his home in

25   Connecticut and not on a yacht?

O5UVGUO2                          Maistrello - Cross

1    A.  At least for some part of March of 2020, yes.

2    Q.  What part?

3    A.  I don't remember the exact dates.

4    Q.  You don't know any dates at all; correct?

5    A.  I don't remember the dates.

6    Q.  Right.

7            Did you have any personal knowledge about who was

8    staying at the Connecticut home during the pandemic?

9    A.  I can only speak to the first month of the pandemic.

10   Q.  Okay.  Do you actually know who was living in that house?

11   A.  I know he was there and his wife was there.

12   Q.  You don't know who else was there; correct?

13   A.  If there were other people, I don't.

14   Q.  They will consult with you as to who was living in their

15   home, right?

16   A.  No, they would not.

17   Q.  It didn't involve your job, right?

18   A.  No.

19   Q.  During the pandemic, you did not go to the office; correct?

20   A.  We stopped going to the office on March 16.

21   Q.  I'm only asking about you, ma'am.  My question to you was

22   were you going to the office?

23   A.  I stopped going to the office on March 16.

24   Q.  Okay.  And, in fact, Yvette went to the office during the

25   pandemic every single day; correct?

1    A.  I don't know.  I wasn't there.

2    Q.  Okay.  So when you said "we stopped going," you really

3    meant you stopped going; correct?

4    A.  I meant me and my colleagues.

5    Q.  Well, you don't know if your colleagues stopped going,

6    right?  You don't know if Dan Podhaskie stopped going; correct?

7    A.  I know.

8    Q.  Your testimony is Dan Podhaskie stopped going to the office

9    during the COVID pandemic?

10              MR. HORTON:  Objection.  Cumulative.

11              THE COURT:  Sustained.

12              MS. SHROFF:  I'll move on, your Honor.

13   Q.  You recall discussing with the FBI, did you not, that --

14   about the shipments of rice and PPE, do you recall testimony

15   about that -- I mean talking to them about that topic?

16   A.  I do.

17   Q.  And you recall that you told them that you were no longer

18   at the office, were working from home, and you had no idea what

19   was being moved; correct?

20   A.  Can you repeat the question, please?

21   Q.  You told the FBI that you were not at the office, you did

22   not know what was being moved, but that is what you had heard;

23   correct?

24   A.  What do you mean about something that was being moved?

25   Q.  You didn't see any PPE being moved from the office to

O5UVGUO2                         Maistrello - Cross

1   Connecticut; correct?  You weren't there, right?

2   A.  I wasn't there physically, no.

3   Q.  Right.  You had no personal knowledge.  You were simply

4   repeating what somebody else had told you; correct?

5   A.  That's not correct.

6   Q.  Okay.  Well, did you tell the FBI that you were not at the

7   office and you did not see these moves?

8   A.  I did not see the moves with my eyes as I was not there.

9   Q.  Okay.  So you have no personal knowledge.  You only know

10  what somebody told you.

11  A.  I was asked to arrange some of the moves.

12  Q.  You were asked to arrange the moves of PPE?

13  A.  Yes.

14  Q.  Okay.  And how many moves did you arrange?

15  A.  I don't remember.

16  Q.  From where to where?

17  A.  From the office to the home in Connecticut.

18  Q.  What amount?

19  A.  I don't remember.

20  Q.  Okay.  Sitting here today, do you recall being told to send

21  PPE to the homes of employees of Golden Spring?

22  A.  I don't remember.

23  Q.  Do you remember being asked to send PPE to the homes of

24  Rule of Law Society people?

25  A.  No, I don't remember.

O5UVGUO2                          Maistrello - Cross

1    Q.  Do you remember being asked to ship PPE to anyone else?

2    A.  To NYPD.

3    Q.  You sent them to NYPD; correct?

4    A.  I remember boxes being sent to NYPD.

5    Q.  I didn't hear that.  Boss is what?

6    A.  I remember boxes of PPE.

7    Q.  Boxes?

8    A.  Of masks being sent to NYPD precincts.

9    Q.  Okay.  And you remember boxes being sent to hospitals?

10   A.  I don't.

11   Q.  Okay.  And when you testified on direct about these boxes

12   being sent to the NYPD, you testified that Yvette wanted you to

13   put Mr. Guo's name on them and you declined; correct?

14   A.  That's correct.

15   Q.  Okay.  The important thing was for the PPE to get to the

16   NYPD; correct?

17   A.  The important thing for who?

18   Q.  For anybody who needed PPE.

19   A.  I don't understand the question.

20   Q.  Okay.  I will move on.

21       Nobody drafted a letter for you to sign from Mr. Guo

22   to the NYPD; correct?

23   A.  No.

24   Q.  Nobody forced you to draft such a letter; correct?

25   A.  I was asked to draft it.

O5UVGUO2                          Maistrello - Cross

1    Q.  My question was nobody forced you to draft such a letter;
2    correct?
3    A.  That's correct.
4    Q.  Okay.  And you, in fact, never drafted such a letter;
5    correct?
6    A.  I did not.
7    Q.  Okay.  Mr. Guo didn't say, If my name is not on the letter,
8    don't send the PPE to the NYPD, right?
9    A.  He never said that.
10   Q.  Right.
11          And NYPD got the PPE, right?
12   A.  I believe they did.
13   Q.  Right.
14          You sent it, right?
15   A.  I did not.
16   Q.  Exactly.  Somebody else sent it because you weren't
17   physically there, right?
18   A.  That's correct.
19   Q.  Okay.  Now, you testified a great deal about the security
20   and how you thought it was nonsensical; correct?
21   A.  I testified that it was not needed.
22   Q.  Okay.  And when you decided it was not needed, were you
23   aware that Mr. Guo was visited by ministers from China and
24   agents of the CCP, were you aware of that?
25   A.  I was aware of a visit in 2017.

O5UVGUO2                        Maistrello - Cross

1   Q.  You were aware of a visit in 2017; correct?

2   A.  Yes.

3   Q.  And you were aware that he was visited by agents of the

4   CCP's ministry of state security; correct?

5   A.  That's correct.

6   Q.  And they visited him at his home; correct?

7   A.  That's correct.

8   Q.  And at that time his wife and daughter were still in China;

9   correct?

10  A.  I don't know.

11  Q.  And at that time, you were aware, were you not, that he was

12  the main target of CCP's Fox Hunt campaign; correct?

13  A.  I was not working for him at that time yet.

14  Q.  My question was were you aware?

15          MR. HORTON:  Objection.  Asked and answered.

16          THE COURT:  You may answer.

17  A.  I was not aware.

18  Q.  Were you aware that there was a campaign to coerce Mr. Guo

19  to return to China?

20  A.  Are you referring to a specific period, a specific year

21  and --

22  Q.  Were you ever aware of that fact?

23  A.  I was told.

24  Q.  What year was that?

25  A.  2018.

O5UVGUO2                    Maistrello - Cross

1    Q.  And that is when you were working there; correct?

2    A.  Yes.

3    Q.  And that is when he had security; correct?

4    A.  Yes.

5    Q.  You were aware, were you not, that when he was visited by

6    the CCP ministries, he was threatened?

7              MR. HORTON:  Objection.

8              THE COURT:  You may answer.

9    A.  I don't remember being told that.

10   Q.  Do you recall being told that he was at risk of being

11   kidnapped?

12             MR. HORTON:  Objection.  This is hearsay, your Honor.

13             THE COURT:  Please step up.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  So I thought the lengthy stipulation

3     covered this.

4              MR. HORTON:  Yes, your Honor.  It's clearly being

5     elicited to repeat that truth.

6              The first problem with that I think is that the

7     witness has established that she doesn't have personal

8     knowledge of this.  So the questions are all, Were you told X

9     about Y, the goal of getting in the truth of X and Y.

10             THE COURT:  So she at some point learns that he was

11    being targeted by the CCP, she said that.

12             MR. HORTON:  Right.  She said that she was told

13    certain things.  And it seems that they are trying to get the

14    truth of those things in right here, and doing that by asking,

15    And what did this other person who's not here tell you, what

16    was that statement, to say that that statement is true.

17             THE COURT:  So you're objecting on a hearsay ground.

18             MR. HORTON:  I agree it's cumulative with the

19    stipulation, as your Honor said.  But it's also --

20             THE COURT:  No, I didn't say that.

21             MR. HORTON:  Sorry.  I wasn't trying to be cute.  I

22    must have misheard you.

23             THE COURT:  No, no, no.  That long statement is

24    something that I'm sure the jury has not completely

25    assimilated.

1          MR. HORTON:  Fair enough.  I really didn't mean to

2     suggest anything.

3          It is eliciting hearsay for the truth of that hearsay.

4     They are asking, And who did this person — who's not identified

5     — tell you and what did they say and what were those

6     statements.

7          MS. SHROFF:  I really do not care at all if it's true

8     or not.  All I want to show is she knew all of this and then

9     decided that the only reason he had security is because it

10    sounded better to call them security than to call them

11    handymen.  That is my only point here.

12         MR. HORTON:  So there's testimony in the record

13    sufficient to allow Ms. Shroff to make a point that she just

14    said she wants to make.  The point of this barrage in these

15    questions is for the truth of the statements.

16         THE COURT:  Well, you took pands to try to make it

17    appear that there wasn't a legitimate authentic security

18    apparatus in place.  And so now she's trying to establish that

19    there was.

20         MR. HORTON:  It is still hearsay.  And if she goes and

21    does the next thing, correct, like we may or may not object to

22    the way that comes in; but right now we're on this series of

23    hearsay statements that are coming in for their truth.

24         MS. SHROFF:  It's really not -- go ahead.

25         MR. KAMARAJU:  I was just going to say, the witness

O5UVGUO2                          Maistrello - Cross

1  testified she thought the security was bogus.  We're allowed to

2  elicit that she was told all these facts; that this undercuts

3  her testimony the security is bogus.  That's it.

4          THE COURT:  It is a form of impeachment, so I'm going

5  to permit it.

6          MR. KAMARAJU:  Thank you, your Honor.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Go ahead.

3           (Pending question read)

4           THE WITNESS:  I don't remember.

5     BY MS. SHROFF:

6     Q.  And were you aware that ministers had come to his home from

7     China and brought with them his wife and daughter?

8     A.  No.

9     Q.  And were you aware that all of these instances were while

10    Mr. Guo was living at the Sherry-Netherlands?

11    A.  I only know of one instance.

12    Q.  And you've already testified to that; correct?

13    A.  I did.

14    Q.  Okay.  Now, let me just go back to my last set of

15    questions.

16          Do you recall if Mr. Bannon gave a talk in April of --

17    April 25th of 2019, at the Regis Hotel?  Do you remember that

18    talk?

19    A.  I -- I don't.

20    Q.  Okay.  And do you recall being asked to order a book after

21    that talk?

22    A.  I don't.

23    Q.  And do you recall when you worked for Golden Spring, you

24    were part and parcel of the people that Yvette would assign

25    tasks to regarding purchases; correct?

O5UVGUO2                        Maistrello - Cross

1   A.  Can you repeat the question, please.

2   Q.  You know, I'll do better.

3        Do you recall Yvette asking you to purchase or put

4   into place something called the Snack National Proposal?  Do

5   you remember that?

6   A.  Can you repeat the name of the proposal?

7   Q.  Do you remember Yvette asking you to buy snack boxes for

8   Golden Spring employees to make sure they were healthy?

9   A.  Yes.

10  Q.  Okay.  And you remember somebody -- working with somebody

11  named Tamara Flores; correct?

12  A.  I don't remember.

13  Q.  Yvette chose the snack box and told you to order them;

14  correct?

15  A.  Yes.

16  Q.  And you ordered them, right?

17  A.  I did.

18  Q.  That was your job, right?

19  A.  I ordered the boxes.

20  Q.  May 29, 2018 is when Max Krasner was onboarded to Golden

21  Spring; correct?  Do you remember that?

22  A.  I don't remember the date.

23  Q.  But you remember when he joined, right?

24  A.  I remember it was 2018.

25  Q.  Right.

1          And to onboard him, there were certain steps that you

2     needed to take; correct?

3     A.  I don't remember that.

4     Q.  Okay.  Do you recall Yvette asking you to make sure that

5     you had set up stationery with his name on it?

6     A.  I don't.

7     Q.  Do you remember her asking you to make sure that the floor

8     lights were moved and his desk was cleaned?

9     A.  I don't remember.

10    Q.  Do you remember somebody named Rich Wojcicki,

11    W-O-J-C-I-C-K-I?

12    A.  Yes.

13    Q.  And you remember booking his travel in 2018?

14    A.  I -- I do, vaguely.

15    Q.  Right.

16          You remember booking his flights and his hotel;

17    correct?

18    A.  I believe I booked his flight.

19    Q.  That was part of your job, right?

20    A.  I was asked to do that.

21    Q.  I'm sorry?

22    A.  I was asked to do that.

23    Q.  That was part of your job description; correct?

24    A.  It was not part of my job description, but I did it.

25    Q.  There was a deposition in South Carolina; correct?

O5UVGUO2                          Maistrello - Cross

1    Remember that?

2    A.  I don't.

3    Q.  *Guo v. Lin*.  Mr. Guo brought an action, a civil action, do

4    you remember that?

5    A.  I don't.

6    Q.  Do you remember that you made travel arrangements for that

7    trip?

8    A.  I don't.

9    Q.  Do you remember that a translator was needed at that trip

10   and you were not the translator taken?

11              MR. HORTON:  Objection, your Honor.

12              THE COURT:  You may answer.

13   A.  I don't remember.

14   Q.  Do you remember Una Wilkinson being the translator that was

15   taken because your Mandarin was not good enough?

16              THE COURT:  Sustained.

17   Q.  Do you remember attending meetings with Jennifer Mercurio?

18   A.  I don't remember attending meetings with her.  We were

19   colleagues.

20   Q.  And Ms. Mercurio was on the board; correct?  Actually, I

21   take that back.  She was general counsel and corporate

22   secretary to Rule of Law Society; correct?

23   A.  Yes.

24   Q.  And do you recall Ms. Mercurio saying that there would be a

25   telephonic meeting on September 3rd of 2019; correct?  Do you

O5UVGUO2                    Maistrello - Cross

1    remember getting an email about that?

2    A.  I don't.

3    Q.  Do you remember getting an email about Guo Media's

4    fundraising drive and the budget?

5    A.  I don't.

6    Q.  And do you remember that there came a point when

7    Ms. Mercurio stated that your role in Rule of Law Society was

8    limited?

9    A.  I didn't hear the last part.

10   Q.  Was limited.  Your role was limited.

11   A.  I don't know that she said that.

12   Q.  Do you recall getting an email saying that you would not be

13   involved in the operation of Rule of Law Society?

14   A.  I do not.

15   Q.  Do you remember being told that while you were on the

16   board, you were not involved in the day-to-day operations of

17   the entity?  Do you not recall that?

18   A.  I don't recall that.

19   Q.  All right.  Well, let me show you something that might help

20   you refresh your recollection.

21            MS. SHROFF:  Your Honor, may I approach?

22            THE COURT:  You may.

23            MS. SHROFF:  Thank you.

24   Q.  Please don't read it out loud, but I can direct you to the

25   bottom of the first page.

O5UVGUO2                          Maistrello - Cross

1          MR. HORTON:  Is there a question pending?

2          THE COURT:  Go ahead.

3          MS. SHROFF:  I was waiting for the witness to finish

4    reading, your Honor.

5    A.  I'm done.

6    Q.  Okay.  And does that refresh your recollection that you

7    were informed that you would not be involved in the operation

8    of Rule of Law?

9    A.  It does not.

10   Q.  It does not refresh your recollection?

11   A.  It doesn't.

12   Q.  Was it your practice to read emails that you were sent?

13   A.  Yes.

14   Q.  And it was your practice to respond to emails that were

15   sent to you; correct?

16   A.  That's correct.

17   Q.  And if you got an email that said you were going to be left

18   off an email chain here on forward, is it likely that you would

19   remember that?

20         MR. HORTON:  Objection, your Honor.

21         THE COURT:  Sustained.

22   Q.  Is it fair to say, ma'am, that you have two master's

23   degrees?

24   A.  Yes.

25   Q.  You have one master's in Chinese literature; correct?

1    A.   Yes.

2    Q.   One in linguistics; correct?

3    A.   Applied linguistics, right.

4    Q.   Right.

5         And before you took the job at Golden Spring, where

6    did you work?

7    A.   In China.

8    Q.   And after your job at Golden Spring you set up what is

9    something called Kai Enterprise; is that correct?

10   A.   That's correct.

11   Q.   Okay.  And after that -- you testified yesterday that you

12   work at Google Search; correct?

13   A.   Google.

14   Q.   Google, right?

15        Are you a full-time employee at Google?

16   A.   No.

17   Q.   You don't have a desk at Google; correct?

18   A.   No, I work from home.

19   Q.   You do not have full-time employment with them; correct?

20   A.   That's correct.

21   Q.   Okay.  You've done work for the FBI, have you?

22   A.   Through a company; correct.

23   Q.   I'm sorry?

24   A.   Through a company.

25   Q.   Okay.  So through a company you did freelance work for the

1  Federal Bureau of Investigations; correct?

2  A.  That's correct.

3  Q.  Okay.  And that's the same Federal Bureau of Investigations

4  that was present during your prep; correct?

5          MR. HORTON:  Objection, your Honor.  Relevance.

6          THE COURT:  Overruled.

7  A.  No.

8  Q.  Is there a different Federal Bureau of Investigations that

9  you did freelance work for?

10  A.  It was a different unit.

11  Q.  Was a different unit, but it's still the same company, the

12  FBI; correct?

13  A.  Yes.

14  Q.  Okay.  And if the FBI were to give you a freelance job now,

15  you would do it; correct?

16  A.  I don't know.

17  Q.  Okay.  Fair enough.

18          Is it fair to say that you told these prosecutors that

19  Mr. Guo's ego was the most important thing to Mr. Guo?

20  A.  Yes.

21  Q.  And you said, did you not, to these people, that Mr. Guo

22  was all about Mr. Guo; correct?

23  A.  Yes.

24  Q.  You told them you saw no good in Mr. Guo; correct?

25  A.  That is not correct.

O5UVGUO2                          Maistrello - Cross

1    Q.  Really.  Okay.

2              And you said that you could be a character witness

3    about Mr. Guo, that's what you told this team; correct?

4    A.  No.

5    Q.  You did not tell them that you could be a character witness

6    about Mr. Guo?

7              MR. HORTON:  Asked and answered.

8              THE COURT:  Sustained.

9              MS. SHROFF:  Your Honor --

10   Q.  Do you remember saying that?

11             MR. HORTON:  Asked and answered.

12             THE COURT:  Sustained.

13             MS. SHROFF:  Okay.  May I just have 3525 to refresh

14   her recollection.

15             THE COURT:  She did not say that she did not recall.

16   She said no.

17             MS. SHROFF:  Your Honor, the government objected to

18   that question as asked and answered.

19             THE COURT:  The answer she gave was no.

20   Q.  You told this team that you felt that they were more on

21   your side than anything else; correct?

22   A.  No, that's not correct.

23   Q.  You did not say that to them when you met with them --

24             THE COURT:  Sustained.

25             She's already answered the question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  During your meetings with the United States Attorney's

2    Office — and I mean Mr. Horton, Mr. Finkel, Ms. Murray,

3    Mr. Fergenson — you made it clear that you did not think well

4    of Mr. Guo; correct?

5    A.  That's not correct.

6    Q.  You called him a man with an ego; correct?

7    A.  I did.

8    Q.  And a man all about himself; correct?

9    A.  That's correct.

10   Q.  And you think well of people like that, is that your

11   testimony?

12            MR. HORTON:  Objection, your Honor.

13            THE COURT:  Sustained.

14            MS. SHROFF:  Nothing further.

15            THE COURT:  All righty, members of the jury.  Even

16   though it is only 11:23, we'll take our break now and you'll

17   come back at noon.

18            Remember that you're not permitted to discuss the case

19   amongst yourselves.  Don't permit anyone to discuss it in your

20   presence.

21            (Jury not present)

22            THE COURT:  You may step down.  And don't discuss your

23   testimony.

24            (Witness not present)

25            THE COURT:  You may be seated.

1            Is there anything that either party would like to

2    raise before we break?

3            MR. FINKEL:  Just very briefly, your Honor.

4            Just for the record, Ms. Maistrello's direct

5    examination was approximately an hour and 40 minutes, give or

6    take.  The cross-examination has been about three hours and 15

7    minutes, give or take.

8            Obviously we've been objecting, and your Honor has

9    largely sustained sort of questions that just repeat the

10   answers with some exasperation or "oh, really," which are kind

11   of argumentative and are delaying the proceedings.  We'll

12   continue to object to those of course.

13           Just generally, your Honor, the government's estimate

14   with respect to this trial was based on what we understood to

15   be reasonable crosses.  I think generally the rule of thumb is

16   about -- it depends on the witness, obviously, but if direct is

17   an hour, usually cross is around half an hour, sometimes more

18   sometimes less, sometimes witnesses require a one-to-one.  But

19   from one hour and 42 minutes to three hours and 20 minutes,

20   it's a lot and I think it's a lot of repeating.  So we just

21   want to make our record on that.

22           THE COURT:  I'm waiting for a response.

23           MS. SHROFF:  Your Honor, I apologize, but I don't

24   think Mr. Finkel's comments were inviting a response and I

25   don't have one.

O5UVGUO2                          Maistrello - Cross

1          The cross was the cross.  And, you know, Mr. Finkel,

2     if he thinks my cross was bad, can certainly bring it up at the

3     2255 proceeding.  But I will do my best and I did do my best to

4     do the cross I wanted to do.

5          THE COURT:  So the only criticism that I heard was

6     that it was too lengthy because there were repetitive

7     questions.  And there were repetitive questions.  And so I'd

8     like you to eliminate repetitive questions.

9          MS. SHROFF:  I will do my best, your Honor.

10          THE COURT:  All righty.  We'll break.

11          (Luncheon recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

                        AFTERNOON SESSION

                           12:00 p.m.

 3          (Jury present)

 4          THE COURT:  You may be seated.

 5          Redirect.

 6   REDIRECT EXAMINATION

 7   BY MR. HORTON:

 8   Q.  Good afternoon, Ms. Maistrello.

 9   A.  Good afternoon.

10   Q.  At the end of cross-examination, you were asked some

11   questions about past work you've done for the FBI, right?

12   A.  Correct.

13   Q.  Did you do any work for the FBI on this case?

14   A.  No.

15   Q.  Did you do any work for anybody on this case?

16   A.  No.

17   Q.  At a high level, could you describe the past work you've

18   done for the FBI.

19   A.  It was mainly interpretation, transcription, and

20   translation.

21   Q.  You were also asked questions about meeting with the

22   government.  Do you remember that?

23   A.  Yes.

24   Q.  Did the government tell you what to say in your testimony,

25   Ms. Maistrello?

1    A.  No.

2    Q.  What, if anything, did the government tell you to do when

3    you testified?

4    A.  The only thing I was told is to be truthful.

5    Q.  And have you done that?

6    A.  I have.

7    Q.  Ms. Maistrello, you testified yesterday that Yvette Wang

8    asked you in your job interview whether you had any connections

9    to the CCP.  Do you remember that?

10   A.  I do.

11          THE COURT:  Mr. Horton, if you would please bring the

12   microphone up closer to you.

13          MR. HORTON:  Yes, your Honor.

14   Q.  After Yvette asked you if you had any connections to the

15   CCP, what was her response when you told her that you knew CCP

16   members when you were in China?

17   A.  She said, oh, don't worry, I'm a party member too.

18   Q.  And what did you understand Yvette to mean when she said

19   she was a party member?

20   A.  I understood that she was a member of the party.

21   Q.  And what, if anything, did Miles Guo say about Yvette being

22   a member of the CCP?

23   A.  We didn't talk about that much, but sometimes he would joke

24   about it.

25   Q.  And how would he joke about it?

O5V1GUO3                          Maistrello - Redirect

1    A.  Well, considering the fact that he was fighting against the

2    CCP, miles would bring up the joke and say, oh, you know,

3    Yvette, she's also a party member.

4    Q.  You were asked questions today about whether you remembered

5    being chastised by Miles Guo.  Do you remember those questions?

6    A.  I do.

7    Q.  When, if ever, Ms. Maistrello, did Miles Guo chastise you?

8    A.  I don't remember.

9    Q.  And when, if ever, did Miles Guo chastise your colleagues?

10            MS. SHROFF:  Objection as to which colleagues.

11            THE COURT:  You may answer.

12   A.  I——I don't remember.

13   Q.  Generally speaking, how did Miles Guo treat the people who

14   worked for him?

15   A.  It highly depended on his mood, so when he was in a good

16   mood, he treated people kindly, when he was in a bad mood, then

17   less kindly.

18   Q.  And what kinds of things would make him in a bad mood?

19   A.  Things that were not being done like he wanted to.

20   Q.  And what would happen when things weren't being done the

21   way Miles Guo wanted them to be done?

22   A.  When things were done properly, then he was——he was happy.

23   Q.  And what would happen when he was unhappy?

24   A.  He would——he would usually yell.

25   Q.  What kind of things would he say when he yelled?

1  A.  That we're stupid, we don't know, we're incompetent.

2  Q.  And how often did that happen?

3  A.  Quite often.

4  Q.  How often, if ever, were people fired by Miles Guo?

5  A.  Very often.

6  Q.  And for what kinds of reasons?

7  A.  Various reasons.  Sometimes he didn't like them, sometimes

8  he didn't like what they looked like or what they were wearing,

9  what they were doing.

10 Q.  You testified, Ms. Maistrello, that you were involved with

11 Miles Guo's move to Connecticut in 2020.  Do you recall that?

12 A.  I recall that.

13 Q.  And you also testified that there were times you were told

14 to pay for things when you worked for Miles Guo; is that right?

15         MS. SHROFF:  Objection.  She was told.  That's not the

16 testimony.

17         THE COURT:  Overruled.  You may answer.

18 A.  Yes.

19 Q.  When, if ever, Ms. Maistrello, were you directed not to pay

20 for something?

21 A.  It happened several times.  Yvette would tell me, we're not

22 satisfied with this, don't pay this vendor.

23 Q.  How much did that move that you were involved in planning

24 to Miles Guo's home in Connecticut, how much did it cost?

25 A.  Approximately 100,000.

1    Q.  And what, if anything, were you told to do with that

2    $100,000 bill for the movers?

3    A.   Initially I was——I was told not to pay it, then I was——I

4    was told to ask for discount.

5    Q.  And why were you told not to pay the $100,000 bill?

6            MS. SHROFF:  I have a hearsay objection, your Honor.

7            THE COURT:  Sustained.

8    Q.  What was your reaction when you were told not to pay the

9    bill?

10            MS. SHROFF:  Objection as to relevance.

11            THE COURT:  You may answer.

12    A.   I wanted to understand the reasons why I was asked that.

13    Q.  Who told you not to pay that bill?

14    A.   Yvette did.

15    Q.  And what was the reason Yvette gave you for not paying the

16    hundred-thousand-dollar bill?

17            MS. SHROFF:  Objection to the hearsay.

18            THE COURT:  You may answer.

19    A.   I was told that they did not a good job——they did not do a

20    good job, that some items were damaged during the move.

21    Q.  And how did you react to being told to not pay that bill?

22    A.   I knew that nothing was damaged because we had a team on

23    site supervising the movers, so I didn't really understand why

24    I was asked to——to do that.

25    Q.  You testified that there were other times you were told not

1    to pay for things?

2    A.  Yes.

3    Q.  What was the reason, as you understood it, you were told

4    not to pay for things?

5    A.  Reasons varied.  In general, I was told that we're not

6    satisfied with this vendor.

7              MR. HORTON:  May I have one moment, your Honor.

8              THE COURT:  Yes.

9              MR. HORTON:  Thank you, your Honor.

10   Q.  Ms. Maistrello, you were asked questions on

11   cross-examination about whether you knew the source of the

12   funds for Saraca and Golden Spring.  Do you remember that?

13   A.  I do.

14   Q.  What was the source of the funds that paid for N95 masks to

15   be sent to Miles Guo's home at the beginning of COVID?

16   A.  That was Rule of Law organizations.

17   Q.  And where did Rule of Law get its money from?

18   A.  From donors.

19             MR. HORTON:  Nothing further.

20             THE COURT:  Recross, within the scope?

21   RECROSS EXAMINATION

22   BY MS. SHROFF:

23   Q.  Tell us, would you, how does one become a member of the

24   Chinese Communist Party?

25   A.  You are chosen by the party, so you're being contacted

1    directly by the party.  It usually happens when you're in
2    college or university.
3    Q.  Right.  And it is the party that chooses the person to
4    become a member of the CCP, correct?
5    A.  That's correct.
6    Q.  To become a member of the CCP, you have to be a Chinese
7    national, correct?
8    A.  That's correct.
9    Q.  You have to be chosen by the CCP, and you're normally
10   chosen at a young age, correct?
11              MR. HORTON:  Objection to scope, your Honor.
12              THE COURT:  You may answer.
13   A.  Correct.
14   Q.  And Yvette was chosen as a young child——actually, not
15   child——as a teenager when she was then chosen to be a student
16   in a foreign country, correct?
17   A.  I don't know at what age she was chosen.
18   Q.  But you do know that she was chosen to be part of the CCP
19   and then allowed to study in the Sorbonne, in France, correct?
20   A.  Those two things don't necessarily have a connection.  I
21   know that she studied in France, and I know that she is a party
22   member.
23   Q.  Right.  And according to you, a person could not——actually,
24   I take that back.
25              There is no person that is able to say to the CCP, I

O5V1GUO3                        Maistrello - Recross

1    won't join your party, correct?

2              MR. HORTON:  Objection.  Beyond the scope.

3              THE COURT:  Sustained.

4    Q.  Isn't it fair to say that one would be at risk of harm if

5    one did not remain in the CCP party?

6              MR. HORTON:  Same objection, your Honor.

7              THE COURT:  Sustained.

8              MS. SHROFF:  Your Honor, may we approach?

9              THE COURT:  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5V1GUO3                          Maistrello - Recross

1          (At the sidebar)

2          MS. SHROFF:  They opened this door, your Honor, by

3     asking if Yvette is a member of the CCP.  There is clear

4     testimony, and this expert——this person would know that once

5     you are made a party member of the CCP, there's no withdrawing

6     from the CCP.  It's not a free organization where you say

7     bye-bye, I'm out.  Yvette would have had no choice in remaining

8     a member of the CCP.  I'm allowed to explore the misimpression

9     they have left that she had any connection to the CCP now,

10    meaning 2018, 2019, 2020, all throughout the indictment.  They

11    decided to do this on recross.  I am not being cumulative, I

12    hope, and it is——sorry.

13         THE COURT:  Why are you bringing out her CCP

14    membership?

15         MR. HORTON:  It completes the——it was a short

16    interview.  It was a fact that was——that Yvette provided her in

17    this limited information exchange.  That was one of the items.

18    And there was extensive cross examination about what

19    Ms. Maistrello did or didn't know about the organization.

20         MS. SHROFF:  I specifically did not touch her being a

21    member of the CCP.  It's all over the 3500 material.  I did not

22    touch it.  I did not touch it on cross.  There was no reason

23    for them to bring it up on redirect.  They have left this jury

24    with the impression that this woman now, and while being a

25    co-conspirator of Miles Guo, was with the CCP, because they

1    want to show that Miles Guo kept her employed and was close to

2    a member of the CCP party person and therefore, he could not be

3    anti-CCP, okay?  They opened this door.

4                THE COURT:  So then I'll let you ask a leading

5    question or two that gets us to the point where I would expect

6    her to say, no, you cannot be with the CCP.

7                MS. SHROFF:  I should be able to explore that Yvette

8    said to her what Yvette's position is, she is no longer

9    supportive of the CCP, because that's the impression they want

10   to leave them with.

11               THE COURT:  So then that makes two questions.

12               MS. SHROFF:  Well, it's a little bit longer, your

13   Honor, because I have to flesh out that—what it takes to get

14   out of the CCP.  Okay.  So you can't just say no to the CCP.

15   Once you're chosen, you have to remain.  There's no withdrawal

16   steps.  If you wanted to disavow the CCP, there are no steps to

17   disavow the CCP.

18               THE COURT:  Okay.  That's one question.

19               MS. SHROFF:  And that Yvette made very clear that she

20   was no longer now a member of the CCP.

21               THE COURT:  Two questions.

22               MS. SHROFF:  Well, that's three, but okay, I will try.

23               THE COURT:  Good.

24               (Continued on next page)

25

1              (In open court)

2              MS. SHROFF:  May I continue, your Honor.

3              THE COURT:  You may.

4              MS. SHROFF:  Thank you.

5    BY MS. SHROFF:

6    Q.  Once you're chosen to be a member of the CCP, you are not

7    allowed to withdraw from the CCP, correct?

8    A.  I don't know whether you're allowed to withdraw.  I don't

9    know the law.  I don't know how that works.

10   Q.  When Ms. Wang worked with Mr. Guo, she worked for causes

11   that were anti-CCP, correct?

12   A.  Not entirely.

13   Q.  Ms. Wang took steps that were supportive of the CCP,

14   according to you?

15   A.  Can you repeat the question, please.

16   Q.  Sure.  Is it your testimony that Yanping Wang took steps

17   that were supportive of the dictatorship of the Chinese

18   Communist Party?

19   A.  No.

20   Q.  Okay.  So when she worked with Miles Guo, she worked on

21   causes that were anti-CCP, correct?

22              MR. HORTON:  Objection.  Asked and answered.

23              THE COURT:  You may answer.

24   A.  Not necessarily.

25   Q.  Well, tell me, what do you mean by "not necessarily"?

O5V1GUO3                          Maistrello - Recross

1  A.  The job that she was doing was not necessarily anti-CCP.

2  She was doing her job, but she was not always a political

3  activist.

4  Q.  Right.  She was not a political activist, but she was never

5  pro-CCP, correct?

6  A.  She was never pro-CCP.

7  Q.  Now you testified on redirect that you and your colleagues

8  were chastised by Mr. Guo, correct?

9  A.  I said he could be tough.

10 Q.  He yelled, you said, right?

11 A.  He did.

12 Q.  Called you stupid, correct?

13 A.  Yes.

14 Q.  Called you incompetent, correct?

15 A.  He did.

16 Q.  He did that often, correct?

17 A.  When he was mad.

18 Q.  Right.  And when he walked around, he would just simply

19 yell, "Disaster, disaster," wherever he went, right?

20 A.  I did not say that.

21 Q.  Okay.  I didn't ask you if you said that.  I asked you if

22 you knew if he did that.

23 A.  He did that sometimes.

24 Q.  Right.  And when he did that, you were part and parcel of

25 the people that he was speaking toward, correct?

1    A.  Sometimes I was, sometimes I wasn't.

2    Q.  Okay.  And as a result of that, is that what led you to

3    quit, or was it your health, or was it both?

4    A.  I quit for health reasons.

5    Q.  Okay.  You testified about people he fired, right?

6    A.  Yes.

7    Q.  He never personally fired a single person, correct?

8    A.  He gave directions to fire.

9    Q.  You are aware of a single direction he gave to someone to

10   get another person fired?  You have personal knowledge of that?

11   A.  Yes.

12   Q.  Really.  Who?

13   A.  You want to know who he asked to fire, who was fired?

14   What's your question?

15   Q.  No, I'm asking you who you are aware he told to get fired.

16   I'm asking about your personal knowledge, not what you heard

17   from others.

18   A.  He told me to fire some people.

19   Q.  Did you fire them?

20   A.  I did.

21   Q.  You had the authority to fire people.

22   A.  If Boss asked me to, yes.

23   Q.  Okay.  Who did you fire?

24   A.  Several people.

25   Q.  Who?

O5V1GUO3                          Maistrello - Recross

1    A.   Do you want the names?

2    Q.   Sure.

3    A.   I don't remember the names.  I remember the roles.

4    Q.   You don't remember the names of people you fired from a

5    job?

6    A.   I don't.

7    Q.   Okay.  You talked about the move to Connecticut costing a

8    hundred thousand dollars, correct?

9    A.   Approximately.

10   Q.   Right.  You didn't pay that bill, right?

11   A.   I did not.

12   Q.   You had no authority ever to allow any payment, correct?

13   A.   When I was asked to pay, I would pay.

14   Q.   No.  When you were asked to pay, you would go to Yvette,

15   correct?

16            MR. HORTON:  Objection.  Argumentative.

17            THE COURT:  Would you clarify your question, please.

18   Q.   When you were asked to pay a bill, you would have to send

19   the bill to either Max Krasner or Yvette, correct?

20            THE COURT:  Are you referring to all bills?

21            MS. SHROFF:  Yes, all bills.

22   A.   It depended on the amount.

23   Q.   Right.  And an amount of a hundred thousand dollars, you

24   could not pay, correct?

25   A.   That's correct.

1    Q.  You testified that you were told not to pay a bill because

2    somebody was unhappy with a vendor, correct?

3    A.  Yes.

4    Q.  Okay.  And you do not know sitting here today who that

5    vendor was, right?

6    A.  I do.

7    Q.  Really?  Who was the vendor?

8            MR. HORTON:  Objection to the "really" in the

9    questions, your Honor.

10           THE COURT:  Yes.  If you'd leave out the "really."

11   Q.  Who was the vendor?

12   A.  The movers.

13   Q.  What's the name?

14   A.  Moving company.  Broadway.

15   Q.  Broadway Movers.  Your testimony is Broadway Movers were

16   not paid; is that your testimony?

17   A.  My testimony is that Broadway Movers were the movers.

18   Q.  Okay.  Were they paid?

19   A.  Ultimately, I don't know.

20   Q.  So you don't know if they were ultimately paid.  So I'm

21   assuming you don't know how much it is that they were quibbling

22   about in terms of destruction of the property that was being

23   moved, correct?

24           MR. HORTON:  Object to the form of that question, your

25   Honor.

1          THE COURT:  Are you asking whether she knows what

2    discount amount was requested?

3          MS. SHROFF:  Yes.

4    A.  I don't remember.

5    Q.  Wasn't your furniture, right?

6    A.  Can you repeat the question, please.

7    Q.  Sure.  The furniture that was being moved was not your

8    furniture, right?

9    A.  No.

10   Q.  Well, you don't know if the furniture had sentimental

11   value, correct?

12   A.  I know it did.

13   Q.  So the furniture that was damaged had sentimental value and

14   that's why there was a conversation about not paying the

15   vendor; is that your testimony?

16   A.  I know that no furniture was damaged.

17   Q.  Did you inspect it?

18   A.  Personally, I didn't.

19   Q.  Did you see it?

20   A.  I was not there.

21   Q.  In fact, you don't even know what furniture they're talking

22   about, correct?

23   A.  I do know that.

24   Q.  What furniture was it?

25   A.  I had a pdf document with hundreds of pages of furniture.

1   Q.  And which of those hundreds of pages of furniture was

2   damaged; do you recall?

3   A.  I do not.

4   Q.  Okay.  Fair to say you didn't examine a single piece of

5   furniture on that hundreds of pages of document, correct?

6   A.  I was not present during the move.

7   Q.  Right.  And you just made a value judgment and decided the

8   vendors should have in fact paid, correct?

9           MR. HORTON:  Objection.  Objection, your Honor.

10          THE COURT:  Overruled.  You may answer.

11  A.  My colleagues who were present at the moves told me that

12  nothing was damaged.

13  Q.  My question to you was—and let me repeat it—you made a

14  value judgment without ever inspecting the damaged furniture,

15  correct?

16          MR. HORTON:  Objection.  Asked and answered.

17          THE COURT:  Sustained.  Sustained.

18  Q.  You testified that Rule of Law Society paid for the N95

19  masks, correct?

20  A.  One of the Rule of Law organizations.

21  Q.  Which one?

22  A.  I don't remember.

23  Q.  You don't remember at all which organization, correct?

24          MR. HORTON:  Objection.  Asked and answered.

25          THE COURT:  All right.  So ask the question only once.

1    Don't repeat the question.

2    Q.  You don't even remember how much the dollar amount was,

3    right?

4    A.  I do not.

5    Q.  You met with these prosecutors several times, correct?

6    A.  I did.

7    Q.  And not once did you look up that dollar amount, right?

8    A.  No.

9                MS. SHROFF:  I have nothing further.

10               THE COURT:  All righty.  I assume there's no

11   re-redirect?

12               MR. HORTON:  Nothing further.

13               THE COURT:  Good.  Okay.  So you may step out.  Thank

14   you.

15               (Witness excused)

16               THE COURT:  And the prosecution can call its next

17   witness.

18               MR. FERGENSON:  The government calls Patrick Chin,

19   your Honor.

20               THE LAW CLERK:  Please raise your right hand and bring

21   the mic close to you.

22               (Witness sworn)

23               THE LAW CLERK:  Please be seated and bring the mic

24   close to your mouth.

25               THE COURT:  Sir, if you would state your name and

O5V1GUO3                         Chin - Direct

 1    spell it, and make sure that you speak up.

 2                THE WITNESS:  My name is Patrick Chin.  Last name is

 3    C-H-I-N.

 4                THE COURT:  And your first name.

 5                THE WITNESS:  Oh, I'm sorry.  P-A-T-R-I-C-K, Patrick.

 6                THE COURT:  So I need you to bring the microphone

 7    closer and I need you to speak louder.

 8                THE WITNESS:  Okay.

 9                THE COURT:  You may inquire.

10                MR. FERGENSON:  Thank you, your Honor.

11     PATRICK CHIN,

12          called as a witness by the Government,

13          having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. FERGENSON:

16    Q.  Good afternoon, Mr. Chin.

17    A.  Good afternoon.

18    Q.  What state do you live in?

19    A.  I live in Texas.

20    Q.  What do you do for work?

21    A.  I work on semiconductor material.

22    Q.  What kind of work do you do with semiconductor material?

23    A.  We make specialized semiconductor research for various

24    customers.

25    Q.  Mr. Chin, do you know who Miles Guo is?

O5V1GUO3                              Chin - Direct

1  A.  Yes, I do.

2  Q.  How do you know who he is?

3  A.  I ran into his——one of his YouTube videos, I think back in

4  2017.

5  Q.  Were you ever a follower of Miles Guo?

6  A.  Yes, I was.

7  Q.  Did you ever invest in things Miles Guo promoted?

8  A.  Yes, I did.

9  Q.  Are you still a follower of Miles Guo today?

10  A.  I am not.

11  Q.  We'll come back to that, Mr. Chin.

12        Mr. Chin, where were you born?

13  A.  I was born in Taiwan.

14  Q.  And for how long did you live in Taiwan?

15  A.  24 years, between 1964 to 1988.

16  Q.  And why was your family in Taiwan when you were growing up?

17  A.  Both my parents' families originally were in mainland

18  China, and they moved to Taiwan after the Communist revolution.

19  Q.  What was the Communist revolution, Mr. Chin?

20  A.  I think after the second war, world war, there was a——a

21  civil war between Communist party, Chinese Communist Party and

22  the ruling government, and eventually the Communist party

23  pushed the previous Republic of China government to Taiwan.

24  Q.  Mr. Chin, why did your parents' families leave mainland

25  China at the time of the rise of the Communist party, or the

O5V1GUO3                          Chin - Direct

1    CCP?

2    A.  Yes.  During the revolution, on my father's side, my

3    grandfather and several uncles were brutally murdered during

4    the Communism——Communist rise-up, so my father was able to

5    escape and eventually move to Taiwan.

6          And on my mother's side, that's a different part of

7    China.  They were also farmers, landowners, and teachers, so

8    they were also terrorized by the Communist uprising, so they

9    also moved to Taiwan.

10   Q.  Mr. Chin, are you yourself pro- or anti-CCP?

11   A.  I am anti-CCP.

12   Q.  Why are you anti-CCP?

13   A.  First of all, based on my parents' families' experience and

14   also growing up in Taiwan in the '60s and '70s, the whole

15   climate is strongly anti-CCP.

16   Q.  Now where did you move to after growing up in Taiwan,

17   Mr. Chin?

18   A.  I moved to California to attend grad school in 1988.

19            THE COURT:  Where did you go?

20            THE WITNESS:  School?

21            THE COURT:  Yes.

22            THE WITNESS:  University of California San Diego.

23   Q.  What were you studying at UC San Diego, Mr. Chin?

24   A.  It's electrical engineering department.

25   Q.  And what, if any, degree did you receive from UC San Diego?

O5V1GUO3                          Chin - Direct

1    A.  I completed my PhD degree.

2    Q.  Mr. Chin, since coming to the United States in your early

3    20s, have you lived in this country since then?

4    A.  I've been living and working in the US from 1988 till 2008.

5    Q.  And in 2008, where did you go then?

6    A.  I took a job opportunity in Taiwan and moved to Taiwan.

7    Q.  And how long did you stay in Taiwan then?

8    A.  I spent ten years there.

9    Q.  And after those ten years, where did you move next,

10   Mr. Chin?

11   A.  I took another job opportunity in 2018——2018, and relocated

12   back to the US, in Texas.

13   Q.  And have you been here since?

14   A.  Yes.

15   Q.  Mr. Chin, you mentioned this earlier, but remind us, when

16   did you first learn about Miles Guo?

17   A.  I ran into his——one of the YouTube videos, and he discussed

18   an incidence of his interview being cut off by Voice of

19   America.

20   Q.  You said Voice of America.  For the jury, what is Voice of

21   America, Mr. Chin?

22   A.  My understanding is the Voice of America is a broadcast or

23   media company.  Even growing up in Taiwan, we heard Voice of

24   America's broadcast in both English and Chinese.  We used——I

25   learned some English listening to Voice of America.

O5V1GUO3                          Chin - Direct

1    Q.  And you said the video you watched where you learned about

2    Miles Guo related to Voice of America; is that right?

3    A.  Correct.

4    Q.  And what did Miles Guo say in that video about what had

5    happened with Voice of America?

6    A.  Apparently he had an interview with Voice of America but

7    that interview was cut short on air abruptly, so he——he claims,

8    in his later video, that it's because Voice of America was

9    pressurized, pressured, or——by——by the CCP, so he cannot

10   continue his interview.

11   Q.  And I apologize if you said this already, Mr. Chin, but

12   approximately what year was it that you watched this video?

13   A.  It's 2017 or 2018, thereabouts.

14   Q.  And what effect, if any, did watching this video and

15   hearing Miles Guo's claim have on you?

16   A.  To have a live interview cut short like that is——I think

17   it's a very significant event, and so that seemed to add some

18   credibility to his claim that Voice of America——Voice of

19   America may have been influenced.

20   Q.  After watching that initial video, Mr. Chin, how often, if

21   at all, did you start watching Miles Guo's videos?

22   A.  I started following his YouTube video posts, just tried to

23   listen more and more what he has to say, and also later

24   followed his Twitter account.

25   Q.  Did you read G News?

Chin - Direct

1   A.  G News was later platform he——he formed, I think.

2   Q.  And did you read G News ever?

3   A.  I have.

4   Q.  Mr. Chin, did there come a time when you began volunteering

5   as a Miles Guo supporter?

6   A.  Yeah.  There are many followers and——of his videos, and I

7   think it's at the beginning of the COVID, because there is——it

8   was really chaotic all over the world, and we——many

9   followers——he talked about COVID a lot too, and many followers

10  felt that the information coming out of China and going into

11  China are very——are not transparent, so many of us, the

12  followers, basically volunteered that, yes, we can do some

13  translation of the news from the credible US sources, outside

14  of China, and send those information back into China.

15  Q.  And Mr. Chin, what kind of volunteer work did you yourself

16  do?

17  A.  Just translate news articles and the information from, say,

18  John Hopkins Hospital, related COVID information.

19  Q.  And Mr. Chin, I'll just ask you, just for everyone's

20  benefit, if you could raise your voice, if you can.

21  A.  Yes.

22  Q.  Thank you.

23          So Mr. Chin, when you were doing this volunteer

24  translation work, who, if anyone, were you working with?

25  A.  I have worked with several loosely organized small groups,

1  but the later——eventually the bigger group, I spend most of

2  time with is a person named David.

3  Q.  What was David's last name?

4  A.  At that time we didn't know, but later, we learned that his

5  last name was Dai, D-A-I.

6  Q.  Where was David located?

7  A.  He apparently was located in UK.

8  Q.  What was David's role in this group?

9  A.  He is presumed the leader of this group.

10  Q.  And the group you were working with, did it have a name?

11  A.  There was a name roughly translate to Fighting Hawk or

12  Fighting Eagle.

13  Q.  Why was it called Fighting Hawk or Fighting Eagle?

14  A.  I assume because Miles Guo always have an eagle as his logo

15  on his T-shirt or cap.

16  Q.  Was this group, Mr. Chin, a farm?

17  A.  In the beginning, it was not.

18  Q.  Were you ever a farm member yourself?

19  A.  No, I was not.

20  Q.  Now, Mr. Chin, you testified you began following Miles Guo

21  on social media and you watched his videos, right?

22  A.  Correct.

23  Q.  What was your impression, if any, of Miles Guo's wealth?

24  A.  He portrayed himself as a very wealthy person.

25  Q.  And why did you have that impression?

O5V1GUO3                          Chin - Direct

1   A.  Just by all the setup, his luxury——luxury apartment, yacht,

2   and the cars, so on, so forth.

3   Q.  What sorts of things, if any, would he say about his

4   wealth?

5   A.  He claimed that he made his wealth in China doing either

6   construction or land development and made his money.

7   Q.  And you mentioned his apartment.  What, if anything, did he

8   say about how much his apartment cost?

9   A.  He has mentioned the purchasing process of that apartment

10  in New York.  I——I recall a number like $80 million.

11  Q.  You also mentioned his yacht.  What, if anything, did he

12  say about the quality of his yacht?

13  A.  His yacht is——was shown in his video constantly.  It's a

14  very big yacht, and he has been bragging about the build, the

15  interior, the exterior of that yacht constantly.

16  Q.  When you would watch him in his broadcasts, what sorts of

17  clothes would he be wearing, typically?

18  A.  He usually wears very nicely tailored suit, and sometimes

19  he would be doing exercising, but, yeah, he usually wears nice

20  suits.

21  Q.  And what, if anything, did Guo say about his clothing?

22  A.  He would also brag that his suits were made by famous

23  tailor.  I don't recall the name.

24  Q.  Mr. Chin, at the time you were following Miles Guo and

25  watching these videos, did you believe he was very wealthy?

1    A.  At the time, yes, I did.

2    Q.  Mr. Chin, are you familiar with the Rule of Law

3    organizations?

4    A.  Yes.

5    Q.  What were the Rule of Law organizations?

6    A.  At a certain time, Miles——

7            MR. KAMARAJU:  Objection.

8            THE COURT:  Overruled.  You may answer.

9    Q.  Mr. Chin, what were the Rule of Law organizations?  You can

10   answer that question.

11   A.  At certain time, Miles declared the establishment of

12   the——establishment of Rule of Law Foundation.  His claim was

13   that he would be using this money to help the

14   pro——pro-democracy group or people from China, or in China.

15   Q.  What, if anything, did Guo say about donating his own money

16   to Rule of Law Foundation?

17   A.  I recall he mentioned that his family will donate a large

18   sum of money to this foundation.

19   Q.  Do you recall how much?

20   A.  I recall a number like 100 million.

21   Q.  Now, Mr. Chin, you said you had the impression he was very

22   wealthy at this time, right?

23   A.  Yes.

24   Q.  At that time, did you believe Guo could donate a hundred

25   million dollars to the Rule of Law Foundation?

O5V1GUO3                          Chin - Direct

1    A.  At the time, based on his claims, I did believe that.

2    Q.  Did you donate to the Rule of Law Foundation, Mr. Chin?

3    A.  This foundation, over time I made several small donations.

4    Q.  And about how much in total did you donate to the Rule of

5    Law Foundation?

6    A.  Several hundred dollars, 200-some dollars.

7    Q.  Now in addition to those donations, Mr. Chin, did there

8    come a time when you invested in certain opportunities promoted

9    by Miles Guo?

10   A.  Yes.  Later, there were two——two claimed investment

11   opportunities, I did donate.

12   Q.  And approximately when did you donate?

13   A.  When.  20——early 2020.

14   Q.  And do you recall around what month?

15   A.  It's——it should be May; April or May.

16   Q.  Now, Mr. Chin, what opportunities did you invest in?

17   A.  These are two.  He claims that he will form a——a platform,

18   social platform, media platform to——to further broadcast news

19   to——that is uninfluenced by outside power, to send those news

20   to China.

21   Q.  What was the name of that platform?

22   A.  It's——it's GTV.

23   Q.  And did you try to invest in GTV?

24   A.  At the time he claimed that GTV is for large investors

25   only, more than hundred thousand-ish as a minimum.  So for

O5V1GUO3                          Chin - Direct

1    small—small investors, he created different route to—to

2    invest.

3    Q.  And Mr. Chin, how much did you invest in GTV?

4    A.  That's $10,000.

5    Q.  And you said that there was a $100,000 limit; is that

6    right?

7    A.  Yes, he claimed that those are for invited special

8    investors.

9    Q.  So where did you send your $10,000 investment in GTV?

10   A.  That 10,000, together with other followers, or investors,

11   were sent to—to an entity called Voice of Guo, Voice of Guo

12   Media or Voice of Guo.  It's a bank account in Arizona.

13             MR. FERGENSON:  Ms. Loftus, could we please show the

14   witness what's marked for identification as Government Exhibit

15   VC11.

16   Q.  Mr. Chin, is this the bank information where you sent your

17   money?

18   A.  Correct.

19             MR. FERGENSON:  Government offers Government Exhibit

20   VC11.

21             MR. KAMARAJU:  No objection.

22             THE COURT:  It is admitted.

23             (Government's Exhibit VC11 received in evidence)

24             MR. FERGENSON:  Ms. Loftus, could we please publish.

25   BY MR. FERGENSON:

O5V1GUO3                      Chin - Direct

1   Q.  All right.  Now, Mr. Chin, you said this is the bank

2   account where you sent your $10,000 investment in GTV; is that

3   right?

4   A.  Correct.

5   Q.  Why did you send your GTV investment to Voice of Guo?

6   A.  It was—well, we were told that small investors cannot

7   invest directly to GTV, we need to pool our money together

8   through the VOG, Voice of Guo account.

9   Q.  And who told you to pool money and send it to Voice of Guo?

10  A.  From Miles Guo himself on his videos and also from a lady

11  named Sara Wei.

12  Q.  Who is Sara Wei?

13  A.  She is one of the early avid supporters of Miles Guo.

14  Q.  And what connection, if any, did she have to Voice of Guo

15  media?

16           MR. KAMARAJU:  Objection.

17           THE COURT:  If you know, you may answer.

18  A.  I received this instruction from Sara's email.

19           MR. FERGENSON:  Ms. Loftus, if we could show just the

20  witness what's marked as Government Exhibit VC9.

21  Q.  Mr. Chin, is this another document you received from Sara

22  Wei?

23  A.  Correct.

24           MR. FERGENSON:  The government offers Government

25  Exhibit VC9.

1    MR. KAMARAJU:  No objection.

2    THE COURT:  It is admitted.

3    (Government's Exhibit VC9 received in evidence)

4  Q.  Mr. Chin, could you please read what's stated at the top of

5  this document.

6  A.  "Know all men by these——"

7  Q.  Oh, I'm sorry.  The bold text at the very top.

8  A.  Okay.  Limited Purpose Agency Agreement.

9  Q.  And what was your understanding of what this document was,

10  Mr. Chin?

11  A.  At the time it is a contract of this investment.

12  Q.  Between you and who?

13  A.  And VOG, Voice of Guo, Sara's account.

14  Q.  And did you sign this document?

15  A.  Yes, I did.

16  Q.  Did you ever receive a countersigned copy of this document?

17  A.  I have not.

18    MR. FERGENSON:  Ms. Loftus, we can take that down.

19  Thank you.

20  Q.  Mr. Chin, what was your understanding of what was supposed

21  to happen with the $10,000 you sent to VOG?

22  A.  The understanding was this money will be pooled together to

23  meet the threshold, a hundred thousand, to be able to invest in

24  GTV.

25  Q.  And why did you want to invest in GTV, Mr. Chin?

A.  At the time, while busy working on translating documents,
and it was claimed that GTV will become a——a new social
platform, social media platform or media platform, to transfer
information.

Q.  And what reasons did you want to invest with your own money
into what you understood GTV would be, Mr. Chin?

            MR. KAMARAJU:  Objection.  Asked and answered.

            THE COURT:  You may answer.

A.  It's being repeatedly claimed that this new social or media
platform will also do well through——through advertisement to
make——make profit.

Q.  What, if anything, did Miles Guo say about the return on
your investment in GTV, Mr. Chin?

A.  He threw out very large numbers, many, many volumes of
return.

Q.  And at the time when you invested in GTV, did you believe
Miles Guo?

A.  At that time I did believe there's a chance of return.

Q.  What, if anything, did Miles Guo say about the risk of the
GTV investment?

A.  The risk has been really downplayed, minimal.

Q.  And what, if anything, did he say about why that was?

A.  Just——just that his claim that this will be a——a——one of
the only media that is not affected by CCP so it will be——the
voice of most Chinese people will be used.

O5V1GUO3                              Chin - Direct

1    Q.  And at the time did you believe Miles Guo that there was

2    not a lot of risk in this investment?

3    A.  At the time I did believe that.

4    Q.  Mr. Chin, before 2020, had you participated in stock

5    investments?

6    A.  Stock, yes.

7    Q.  And in 2020 did you have a financial advisor?

8    A.  I had a financial advisor to my retirement account but not

9    brokerage account.

10   Q.  Would you describe yourself as a sophisticated investor?

11   A.  No.

12   Q.  Had you ever participated in a private placement?

13   A.  No.

14   Q.  What, if anything, did Guo say about who could participate

15   in private placements?

16   A.  Private placement.  It appeared to be a selective group.

17   You have to be invited, and you need to make a large sum of

18   investment.  There is a large minimum.

19   Q.  Was it your impression that normally unsophisticated

20   investors could participate in something like a private

21   placement?

22            MR. KAMARAJU:  Objection, your Honor.

23            THE COURT:  Sustained.

24   Q.  What, if anything, did Miles Guo say about who could

25   typically participate in a private placement?

1          MR. KAMARAJU:  Objection.  Asked and answered.

2          THE COURT:  Sustained.

3  Q.  Mr. Chin, what time limit, if any, was there on your

4  participating in this private placement?

5  A.  At the time it was——we were told that this opportunity

6  window was closing up soon so people who wants to participate

7  need to act quickly, within that month-ish time period,

8  March——April, May-ish time.

9  Q.  Mr. Chin, had you ever invested in a hedge fund?

10 A.  I have not.

11 Q.  In his broadcasts, what, if anything, did Miles Guo say

12 about sending GTV investor funds to a hedge fund?

13         MR. KAMARAJU:  Objection.  Which broadcasts?

14         MR. FERGENSON:  Any broadcasts.

15         THE COURT:  You may answer.

16 A.  He has never mentioned reinvesting to hedge fund.

17 Q.  If you had known that Miles Guo was sending GTV investor

18 funds to a hedge fund, would you have invested in GTV?

19         MR. KAMARAJU:  Objection.  Lack of foundation.  We

20 dealt with this yesterday, your Honor.

21         THE COURT:  Overruled.  You may answer.

22 Q.  Mr. Chin, if you had known that Miles Guo was sending GTV

23 investor funds to a hedge fund, would you have invested in GTV?

24 A.  Most likely, no, because I was pretty simple mind that this

25 money will be used to build the platform, not reinvest.

1    Q.   Now, Mr. Chin, what ended up happening to your money sent
2    to VOG?
3    A.   Because I did not receive any return reply or receipt from
4    VOG, after asking them couple times through email, I had my
5    suspicion, and also some other followers who will have left the
6    group also alarmed me that this may be a scam.  So I contacted
7    my bank, which wired the money to Wells Fargo, and the bank
8    investor contacted Wells Fargo, and within a couple weeks,
9    Wells Fargo was able to intercept that wire and return that
10   $10,000 to me.
11   Q.   So ultimately you received the $10,000 you sent back from
12   the bank.
13   A.   Yes.
14   Q.   Mr. Chin, about how soon after you had sent the money to
15   VOG did you contact the bank about fraud?
16   A.   Maybe two weeks-ish.  No more than a month.  Two weeks.
17   Yes.
18   Q.   Mr. Chin, was this $10,000 transfer to VOG your only Miles
19   Guo-related investment?
20            MR. KAMARAJU:  Objection to form.
21            THE COURT:  Overruled.
22   Q.   Did you invest in other Miles Guo opportunities, Mr. Chin?
23   A.   Yes, there was another one called a G dollar.
24   Q.   How much did you invest in G dollar?
25   A.   It's also $10,000.

O5V1GUO3                              Chin - Direct

1    Q.  And around what time did you invest in G dollar?

2    A.  About the same day or the next day of the——these two

3    investments were wired——were wired.

4    Q.  At that time, Mr. Chin, what did you understand G dollar to

5    be?

6    A.  At the time there are——I heard some claims also by Miles

7    that this money will be used to——to build a cryptocurrency or

8    purchase precious metals as a foundation of the movement.

9    Q.  When you say precious metals, what sorts of things?

10   A.  Gold.  He mentioned that quite often.

11   Q.  Mr. Chin, where did you send your G dollar money?

12   A.  This was sent to a Capital One bank account located in New

13   York.

14          MR. FERGENSON:  Ms. Loftus, could we please show

15   marked exhibits to the witness——just the witness——Government

16   Exhibits VC7 and VC8, please.

17   Q.  Mr. Chin, what are these exhibits?

18   A.  This is wiring instruction the followers get from a web

19   link.

20          MR. FERGENSON:  Government offers Government Exhibits

21   VC7 and 8.

22          MR. KAMARAJU:  No objection.

23          THE COURT:  They are admitted.

24          (Government's Exhibits VC7 and VC8 received in

25   evidence)

O5V1GUO3                          Chin - Direct

1          MR. FERGENSON:  And could we publish, please,

2     Ms. Loftus.

3     BY MR. FERGENSON:

4     Q.  Now, Mr. Chin, you said these were wire instructions sent

5     to followers on a web link; is that right?

6     A.  Correct.

7          MR. FERGENSON:  Ms. Loftus——

8     Q.  I want to focus you first on the one on the left, Mr. Chin.

9          MR. FERGENSON:  Could we blow that one up, Ms. Loftus.

10    Q.  All right.  Now, Mr. Chin, at the very top it says G Dollar

11    Preorder.  Do you see that?

12    A.  Yes.

13    Q.  What is the bank account name listed beneath that?

14    A.  Bank account name.  That's GTV Media Group.

15    Q.  And do you know, Mr. Chin, why G dollar money was sent to

16    GTV?

17    A.  At the time this was——I don't think this was clearly

18    defined because everything was promoted by——both entities were

19    promoted by——by Miles himself, so it's all related to GTV.

20         MR. FERGENSON:  And you can zoom out, Ms. Loftus.

21         And if we could zoom on the one on the right.

22    Q.  All right.  Now this one says mail the check.  Who is the

23    payee, Mr. Chin?

24    A.  Payee will be GTV Media Group, Inc.

25    Q.  All right.  And then do you see the text about halfway or a

O5V1GUO3                          Chin - Direct

1   little lower that says tip, how much G dollar will receive?  Do

2   you see that?

3   A.  Yes.

4   Q.  And then there's a chart beneath that.  Do you see the

5   chart, Mr. Chin?

6   A.  Yes, I do.

7   Q.  Can you please explain what's shown in the chart.

8   A.  It appears that you buy more, you get more.  You buy—you

9   pay more than a hundred, you get 120.

10          MR. FERGENSON:  Thank you, Ms. Loftus.  We can take

11  this down for now.

12  Q.  Mr. Chin, at the time you sent your $10,000 for G dollars,

13  what was happening in the news with respect to cryptocurrency

14  at that time?

15          MR. KAMARAJU:  Objection to form.

16          THE COURT:  If you'll step up.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O5V1GUO3                          Chin - Direct

1                (At the sidebar)

2                THE COURT:  What was happening in the news?

3                MR. FERGENSON:  Yes, your Honor.  It's relevant to the

4     promotion of cryptocurrencies at the time.  The witness is

5     going to testify that at that time, cryptocurrency was booming

6     in the news, it was sort of the hot new fad.  He's not going to

7     say those exact words.  I'm sort of editorializing a little

8     bit.  I believe the only objection was to form, your Honor, not

9     relevance.

10               MR. KAMARAJU:  Because it is an improper question to

11    ask the witness what was happening generally in the news about

12    any topic, let alone cryptocurrency.  If you're asking

13    particular questions of this witness, maybe——

14               MR. FERGENSON:  I can ask him, what information were

15    you reading about cryptocurrency.

16               MR. KAMARAJU:  Even that, I don't know what relevance

17    the promotions of other cryptocurrencies has to this particular

18    case.

19               MR. FERGENSON:  He's just going to say there was a lot

20    of information about cryptocurrency and the coin was like, you

21    know, booming, it was part of why he invested.

22               MR. KAMARAJU:  I'm still not sure——

23               THE COURT:  You can ask him what motivated him to buy

24    this investment.

25               MR. FERGENSON:  Okay.

1              THE COURT:  Okay.

2              (In open court)

3              THE COURT:  Sustained.

4    BY MR. FERGENSON:

5    Q.  Mr. Chin, in addition to Miles Guo's statements, what, if

6    anything, motivated you to buy G dollars at that time?

7    A.  Generally to still support this movement and also the claim

8    of potential return.

9    Q.  Had you ever invested in a cryptocurrency before?

10   A.  I have not.

11   Q.  What, if anything, did Guo say about the risk of investing

12   in G dollars?

13   A.  Also very much downplayed, basically just referred to

14   the——to the success of other cryptocurrency, that this will not

15   fail.

16   Q.  And Mr. Chin, what happened to the money you sent to GTV

17   for G dollars?

18   A.  Same as the other wire.  I didn't receive any receipt.  So

19   when I contacted my bank, I reported both——both wiring, so they

20   also contacted Capital One Bank, but Capital One Bank said the

21   money has been deposited or withdrawn so that money was not

22   returned, at that time.

23   Q.  Did you get any cryptocurrencies for that $10,000?

24   A.  I didn't receive anything.

25   Q.  Did you get a receipt?

1   A.  No.

2   Q.  Ultimately, Mr. Chin, did you get any refund of that money?

3   A.  Couple years later, through security exchange fair fund,

4   they eventually returned all the investors some of this money.

5   Q.  You said Securities & Exchange.  What are you referring to

6   there?

7   A.  The SEC.

8   Q.  The SEC?

9   A.  Yes.

10  Q.  The money that was returned to you through the SEC, did you

11  get a 100 percent refund or less than 100 percent?

12  A.  Everyone received 92 some percent.

13  Q.  Did Miles Guo pay back the missing 8 percent?

14  A.  No.

15  Q.  Mr. Chin, you've discussed reporting to your banks and

16  trying to reverse your investments.  What caused you to have

17  doubts about your investments?

18  A.  First of all, you don't——I didn't receive any even receipt,

19  so that's——that's the biggest alarm; and then meanwhile, there

20  are more and more people who have left the team before I did.

21  We also talked to each other, and they start to give me warning

22  that this is probably becoming a scam.

23  Q.  What effect did that have on you?

24  A.  I was——I——I feel all the good intention, not myself, many

25  people were abused, that we tried to support a pro-democracy

O5V1GUO3                        Chin - Direct

1   movement or transparency of information to Chinese people, but

2   we were scammed.

3   Q.  You said other people warned you.  Can you please describe

4   why you think other people's warnings played a role in your

5   doubts.

6           MR. KAMARAJU:  Objection to form and hearsay.

7           MR. FERGENSON:  It's for its effect, your Honor.

8           THE COURT:  You may answer.

9   A.  My feeling right now is, it's like other cult, right?  When

10  you were——when you believe that, you believe the leader and you

11  cannot ask questions, but then some people who, quote-unquote,

12  wake up were able to have that effect on me, yeah.

13  Q.  You used the phrase "wake up."  Why do you use that phrase,

14  "wake up"?

15  A.  That's how I feel because after I left the group, I feel

16  very relieved.

17  Q.  Who was the leader of——who is the ultimate leader of this

18  group, Mr. Chin?

19  A.  Miles Guo.

20  Q.  Mr. Chin, for people who were still in the group, what, if

21  anything, did those people say about people who left the group?

22          MR. KAMARAJU:  Objection, your Honor.

23          THE COURT:  Overruled.  You may answer.

24          THE WITNESS:  May I?

25          THE COURT:  Go ahead.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5V1GUO3                          Chin - Cross

1    A.   Okay.  When, in the beginning, there were few people who

2    left, and they were very quickly labeled as traitor or CCP

3    spies.  At the time it's very shocking, but it seems

4    believable.  But as more and more people left and more and more

5    people were labeled as CCP, CCP spies, that became not very

6    reasonable.  Yeah.  And it is almost against his original

7    intent of a democracy movement, pro-democracy movement, because

8    people seems to—people cannot have different voice in the

9    team, in the group.

10   Q.   Mr. Chin, at the time when you were a believer, what did

11   you think you were a part of?

12   A.   I tried to focus myself just on the translation job,

13   collecting news, medical information, and try to translate

14   that, and I think on a small part, at the small part of a

15   bigger movement of pro-democracy movement.

16   Q.   Looking back now, what do you think you were actually a

17   part of?

18             MR. KAMARAJU:  Objection, your Honor.

19             THE COURT:  Overruled.  You may answer.

20   A.   Right now I believe that was very elaborate scam.

21             MR. FERGENSON:  Could I have a moment, your Honor.

22             No further questions.

23             THE COURT:  Cross-examination.

24             MR. KAMARAJU:  Yes.  Thank you, your Honor.

25

O5V1GUO3                         Chin - Cross

1   CROSS EXAMINATION

2   BY MR. KAMARAJU:

3   Q.  Mr. Chin, since we've been having some problems with the

4   mic, can you hear me?

5   A.  Yes, I can hear you.

6   Q.  Okay.  Thank you.

7            Good afternoon.

8   A.  Yes.

9   Q.  So I'd like to start where you started with the

10  prosecutors, I believe.

11           You talked about your family moving to Taiwan,

12  correct?

13  A.  Yes.

14  Q.  And that was the result of atrocities committed as part of

15  the Communist revolution in China, correct?

16  A.  Yes.

17  Q.  And I believe you said that was because there was

18  infighting among the Communist party, right?

19  A.  It has been called a civil war.

20  Q.  Okay.  A civil war.  So a dispute, an internal conflict,

21  right?

22  A.  Within China, yeah.

23  Q.  And one set of members of the Communist party did not want

24  to release the other set from their group, right?

25  A.  Can you say that again.

O5V1GUO3                          Chin - Cross

1   Q.  Sure.  Let me try it this way.  Very difficult to leave the

2   Chinese Communist Party, correct?

3            MR. FERGENSON:  Objection, your Honor.

4            THE COURT:  You may answer.  Go ahead.

5   A.  From what I've learned, it seems that way.

6   Q.  Okay.  And you said that──and I apologize if I got this

7   wrong, so please correct me, but you mentioned that there was a

8   government that moved to Taiwan, correct?

9   A.  The government before 1949 was Republic of China, and that

10  government right now is in Taiwan.

11  Q.  Okay.  So the government that existed in China before 1949

12  now exists in Taiwan.

13  A.  Correct.

14  Q.  All right.  So it's an alternate government to the Chinese

15  Communist Party that runs mainland China, correct?

16  A.  That becomes the politics.

17  Q.  I'm just asking your understanding, sir.

18  A.  It's current government ruling──controlling or ruling

19  Taiwan.

20  Q.  Okay.  But that government that resides in Taiwan believes

21  it's the legitimate government of China, right?

22            MR. FERGENSON:  Objection, your Honor.  He can't

23  testify to what that government believes.

24            THE COURT:  Sustained.

25  Q.  Okay.  Let me ask, is that your understanding, sir?

O5V1GUO3                        Chin - Cross

1   A.  No.  Not right now.  In the past, probably.

2   Q.  Okay.  That's fine.

3           THE COURT:  Who is the leader of the enemy of the

4   Communist party in the 1940s?  What was the name of the leader?

5           THE WITNESS:  That would be Chiang Kai-shek.

6           THE COURT:  And did he go to Taiwan?

7           THE WITNESS:  He went to Taiwan.

8           THE COURT:  Go ahead.

9           MR. KAMARAJU:  Thank you, your Honor.

10  BY MR. KAMARAJU:

11  Q.  Now you mentioned, I believe, that you first came across

12  Mr. Guo on YouTube; is that right?

13  A.  Correct.

14  Q.  That was in 2017, correct?

15  A.  Roughly, yes.

16  Q.  Okay.  And the first thing you saw about Mr. Guo was about

17  a Voice of America interview he had done, right?

18  A.  Not the interview itself.  He mentioned, discussing that

19  interview.

20  Q.  Right.  It was a video discussing the Voice of America

21  interview, correct, just to be clear?

22  A.  Correct.

23  Q.  And you said that he claimed that the Chinese Communist

24  Party had cut off the interview, right?

25  A.  He claimed that the Voice of America cut it off due to the

Chin - Cross

1   influence of CCP.

2   Q.  Okay.  And are you using the word "claimed" because you're

3   skeptical of that?

4   A.  I couldn't verify that, right?

5   Q.  Okay.  Because you have no evidence one way or the other

6   about that, right?

7   A.  Yes.

8   Q.  Okay.  And you have no way of knowing, correct?

9   A.  No.

10  Q.  Not then and not now, right?

11  A.  Right now there actually are more information out, but

12  again, I cannot verify myself.

13  Q.  Right.  So you have no idea if there is an effort by the

14  Chinese Communist Party to silence Mr. Guo, correct?

15          MR. FERGENSON:  Asked and answered, your Honor.

16          THE COURT:  Sustained.

17  Q.  Now I think you mentioned that——I'm not referring to the

18  Mr. Guo interview, but previously——you had been able to see

19  Voice of America in Taiwan, correct?

20  A.  Not see; only listening to shortwave radio.

21  Q.  Okay.  Was it difficult to access Voice of America in

22  Taiwan?

23  A.  Not in Taiwan.

24  Q.  Okay.  How about mainland China?

25  A.  Difficult.

1    Q.   Why is that?

2    A.   I've heard that it's illegal to listen to outside

3    broadcasts in mainland China.

4    Q.   And when you say outside broadcasts, does that apply to

5    social media as well?

6    A.   When I grew up, there was no social media.  These are just

7    words, just radio broadcasts.

8    Q.   Okay.  So the censorship has been going on for a long time

9    then, right?

10   A.   Yes.

11   Q.   Okay.  And that was one of the ideas behind G——apologies.

12        That was one of the ideas behind GTV, according to

13   your understanding, correct?

14   A.   At the time that it was the claim, yes, and I believed

15   that.

16   Q.   And that was based on the idea of breaking through

17   something called "the great firewall of China," correct?

18   A.   I've heard that claim, yes.

19   Q.   What does the phrase "the great firewall of China" mean?

20   A.   My——my——I have limited understanding in that part of the

21   technology, but generally it's censorship.

22   Q.   Okay.  Censorship by who?

23   A.   By CCP.

24   Q.   Okay.  And so GTV was intended to break through that?

25   A.   That was the claim.

O5V1GUO3                          Chin - Cross

1    Q.   Okay.  And that claim seemed reasonable to you?

2    A.   At the time I——I believed that.

3    Q.   Okay.  Did you have any idea how GTV was going to

4    accomplish that goal?

5    A.   No.  That was never clearly explained.

6    Q.   Okay.  So right now I'm not asking what was explained; I'm

7    just asking whether you had any belief as to how that was going

8    to happen.

9    A.   No.  I wouldn't know, no.

10   Q.   You've met with the prosecutors before, correct?

11   A.   Yes.

12   Q.   Okay.  On several occasions, right?

13   A.   Remote meeting, yes.

14   Q.   Yeah.  Whether remote or in person, you've met with them on

15   a number of occasions, correct?

16   A.   Correct.

17   Q.   And there were FBI agents there, right?

18   A.   Correct.

19   Q.   And there was somebody taking notes, right?

20   A.   In remote meeting, I couldn't tell.

21   Q.   How about the in-person meetings?

22   A.   I did not see them taking notes.

23   Q.   Okay.  So you didn't observe anybody taking notes.  But

24   isn't it true that you told the prosecutors that you thought

25   that GTV could break through the great firewall of China using

1    satellite technology?

2    A.  No, I have not said that.

3    Q.  So you never mentioned Starlink to them?

4    A.  No.

5    Q.  And so if there were notes reflecting that, those notes

6    would be wrong, sir; is that your testimony?

7    A.  Satellite and Starlink, no.

8    Q.  Now when you were talking about the money that you sent to

9    Ms. Wei, you referred to it as Voice of Guo or Voice of Guo

10   Media, correct?

11   A.  Yes.

12   Q.  Okay.  Guo Media is a social media company, correct?

13   A.  Guo Media claimed to want to do social media.  Social media

14   platform was never built.  It's just a name, Guo Media.  That's

15   my understanding.

16   Q.  So it's your testimony that Guo Media never actually

17   broadcast anything?

18   A.  No.  Guo——

19        MR. FERGENSON:  Objection, your Honor.  That wasn't

20   the testimony.

21        THE COURT:  Overruled.  You may answer.

22   A.  Guo Media never broadcast anything.  All the broadcast by

23   Miles or by Sara, I'm not sure Guo Media label was put up there

24   as Guo Media, but everyone know it came from the same person.

25   Q.  Well, the reason why I asked you is because you testified,

1   I believe, that he claimed that Guo Media was a social media
2   company, correct?
3   A.   Guo——Guo Media is a social company?  My recollection, he
4   claimed that Guo Media will build a social platform, but that's
5   that.
6   Q.   Okay.  And that's the same claim you say that he made with
7   respect to GTV, correct?
8   A.   Those names have been used interchangeably by him and
9   others, was not clearly defined what Guo Media, what GTV.  It
10  was not clearly strictly defined.  That's my recollection.
11  Q.   Okay.  I'm sorry.  I didn't mean to interrupt.  So when you
12  invested money in 2020, in May of 2020, did you think you were
13  investing in Guo Media?
14  A.   At the time the money was sent to Voice of Guo account and
15  supposedly this will be pooled together to meet the hundred-K
16  threshold to be able to invest in the——however that is that's
17  going to be Guo Media, yes.
18               (Continued on next page)
19
20
21
22
23
24
25

1    BY MR. KAMARAJU:

2    Q.  Okay.  So the $10,000 that you sent to Ms. Wei, you

3    intended for that to be invested in Guo Media, that's your

4    testimony?

5    A.  That's what we were told, that this money will go where

6    this money will go.

7    Q.  Okay.  Now, we've talked about Ms. Wei for a little bit.

8    You don't have a very high opinion of her; correct?

9    A.  She was a early strong supporter, seems to be, and later I

10   stopped listen to her.

11   Q.  You don't think she's very bright, right?

12   A.  That's all personal opinion.

13           THE WITNESS:  Do I have to answer?

14           THE COURT:  Yeah, you can answer whether you think

15   she's bright or not.

16   A.  I don't think she's highly educated.

17   Q.  In fact, you've told the prosecutors that she is

18   incompetent; correct?

19   A.  I don't think I told the prosecutors she's incompetent.

20   She's not -- I cannot recall if I used that word, but --

21   Q.  Okay.  Let's put to the side whether you used that specific

22   word.  Did you express to them any word that suggested to them

23   that you thought she was incompetent?

24   A.  Any word.  I don't think I can recall exactly.

25   Q.  Now, sir, during your testimony on direct you repeatedly

1    referred to things that you believe Mr. Guo said; correct?

2    A.  Correct.

3    Q.  You have never spoken personally with Mr. Guo, right?

4    A.  No, I have not.

5    Q.  Okay.  So he didn't say those things to you, right?

6    A.  Not to me personally.

7    Q.  So where did you hear them?

8    A.  Where do I hear?

9    Q.  Where did you hear them?

10   A.  Mostly Twitter and YouTube.

11   Q.  Like Twitter posts or what?

12   A.  Twitter posts.

13   Q.  So like typed-out Twitter posts?

14   A.  Video, mostly video post.

15   Q.  Okay.  Which videos?

16   A.  He has post many, many videos.

17   Q.  Okay.  Tell me the video where he downplayed the risk of

18   the GTV investment?

19           MR. FERGENSON:  Objection, your Honor.

20           THE COURT:  Overruled.  You may answer, if you know.

21   A.  I have them in my record.  I cannot name the date right

22   now, but there are -- there was a video he said that the money

23   will grow quickly.

24   Q.  What did he say specifically, sir?

25   A.  In one of the video that I can recall, he said the money

O5UVGUO4                          Chin - Cross

has grown so much in the past few days.  And once it's open up

to more investor.  This will grow tremendously, very large

numbers.

Q.  Okay.  In which video did he promise really high returns?

A.  In his video, he would be promising hundreds or even more,

higher number for the return.

Q.  Which video?

A.  Again, the video that have translated for the -- for the

team.

Q.  Okay.  But the prosecutors didn't ask you about that

specific video, right?

A.  While the early email communication I have forwarded a few

links to the investigator.

Q.  Okay.  But during your testimony in this courtroom, the

prosecutor didn't show you any of those statements, right?

A.  During this court, in this --

        THE COURT:  When the prosecutor was asking you

questions, did he show you videos, just now?

        THE WITNESS:  Show video, no, no video.

Q.  Now, you testified on direct that you believed that -- you

believed Mr. Guo's statements about getting higher returns;

correct?

A.  At the time, yes.

Q.  Okay.  Isn't it true that during your very first meeting

with the prosecutors, you told them that you thought that his

1   predictions of returns were ridiculous?

2   A.  He claimed that everyone will be able to own a yacht like

3   that.  That's obviously ridiculous.  I didn't believe that.

4   Q.  Okay.  So you didn't believe that everybody would be able

5   to buy a yacht; you thought that was a ridiculous claim, right?

6   A.  At the time that number was ridiculous even to me.

7   Q.  Right.  The returns he was predicting in your mind were

8   ridiculous, right?

9   A.  Those large number were not reasonable.

10  Q.  Okay.  And, in fact, you also told the prosecutors that you

11  didn't have an anticipation of getting a return at all from

12  your GTV investment, right?

13  A.  At the time my mindset is if there's some return, great; if

14  there's no return, I donated to a cause.

15  Q.  Right.  Because ultimately, the goal of you sending the

16  money to GTV was to support GTV's mission to break through the

17  great firewall of China; correct?

18  A.  There was definitely some expectation of some return too.

19  Q.  But didn't you just testify that if you didn't get a

20  return, okay, you donated to a cause?

21          MR. FERGENSON:  Asked and answered.

22          THE COURT:  Sustained.

23  Q.  Now, one of the reasons why it was important -- GTV's

24  mission was important to you personally is because you still

25  have family in China; correct?

1    A.   There are remote family, yeah.

2    Q.   Okay.  Now, did you watch a video by Mr. Guo when he

3    announced the GTV private placement?

4    A.   Announced the private placement.  There were many videos at

5    the time.  I don't know exactly which one is announcement.  But

6    at the time I watched many.

7    Q.   How about one on April 20th, 2020, did you watch that?

8    A.   I cannot recall the date exactly.

9    Q.   Do you remember watching any video of his in April of 2020?

10   A.   I don't memorize the date.  I may have, but I --

11   Q.   Okay.  So when did you first hear about the potential GTV

12   investment?

13   A.   It's also in that time frame he has been mentioning a

14   investment opportunity.

15   Q.   When you say "in that time frame," are you talking about

16   the April time frame?

17   A.   April, even late March, there were -- I recall there were

18   mentioning of the opportunity.

19   Q.   Okay.  And he was mentioning those, you said, in videos

20   posted online, right?

21   A.   YouTube.  Correct.

22   Q.   YouTube.

23        Is it your testimony that you never saw him discuss a

24   GTV private placement on a Guo Media platform?

25   A.   I do not know the exact distinction between these two.

O5UVGUO4                        Chin - Cross

1    These two names or two entities were not clearly defined.  It
2    was separated in my mind.
3    Q.  Okay.  Now, when you were evaluating the GTV investment
4    that you were going to make, you thought it was a risky
5    investment; correct?
6    A.  At the time I thought, yes, it's risky.
7    Q.  And you were unsure about making the investment; correct?
8    A.  I had my doubt too, yes.
9    Q.  You didn't contact Mr. Guo and try to address those doubts
10   with him, right?
11   A.  I have not.
12   Q.  But you did contact somebody to address those doubts,
13   right?
14   A.  The email I send the money to, yes.
15   Q.  Well, didn't you speak about your concerns with the GTV
16   investment with somebody who goes by the name Bird?
17   A.  There's a lady with name called JamesBird, not just Bird,
18   JamesBird.
19   Q.  Okay.  Thank you.
20        So you spoke with JamesBird about your concerns prior
21   to investing?
22   A.  There were discussions.
23   Q.  I'm just trying to get clear, was that with JamesBird, this
24   discussion?
25   A.  My understanding is that she also invested.  And before the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    investment, there were discussion whether to make the

2    investment or not.

3    Q.  Okay.  Discussions between you and JamesBird, right?

4             THE COURT:  Are you saying Jane Bird?

5             THE WITNESS:  James.

6             THE COURT:  James.

7             THE WITNESS:  Last name Bird, but it's a she.

8             THE COURT:  So is the last name JamesBird?

9             THE WITNESS:  That's her online name.

10            THE COURT:  I see.

11            THE WITNESS:  JamesBird, the one word.

12            THE COURT:  Go ahead.

13            MR. KAMARAJU:  Thank you, your Honor.

14   BY MR. KAMARAJU:

15   Q.  So I just want to be clear so the record is clear.  When

16   you're referring to discussions, you're talking about

17   discussions between you and the person who goes by the name

18   JamesBird?

19   A.  Correct.

20   Q.  And based on those discussions, you then proceeded with

21   your investment; correct?

22   A.  There are also discussions with a few more people, now I

23   don't recall the name; but, yes, there was at least one

24   discussion with JamesBird.

25   Q.  Okay.  So you vetted your investment decision with

1   JamesBird and a few other people, right?

2          MR. FERGENSON:  Objection.  Mischaracterizing.

3          THE COURT:  Sustained.

4   Q.  Okay.  You discussed your investment decision with

5   JamesBird and a few other people; correct?

6   A.  There was, yes.

7   Q.  But none of those people were Miles Guo, right?

8   A.  No.

9          MR. KAMARAJU:  May I have just one moment, your Honor?

10  I'll try to organize a little bit.

11  Q.  Now, around the time that you were making your GTV

12  investment, you also said that you were doing some translation

13  work on behalf of the movement; correct?

14  A.  Correct.

15  Q.  And so what were you translating exactly?

16  A.  For example, at the time was -- that was COVID, and that a

17  number of death or infection inside China, outside China.  I

18  mean inside China looks -- from statistic point of view looks

19  not reasonable.

20          So one of the job I did was collect the trend of

21  infection from several different country and make a comparison.

22  And said that -- explain that for infectious disease,

23  statistically it unlikely to have a zero or very low flat

24  infection number, right.  Because most other countries have a

25  certain trend.  But the statistics, people can see from China

1  was -- looks odd from mathematic point of view, a mathematical
2  point of view.
3  Q.  So the material that you were translating was health
4  information that you were trying to help people in China; is
5  that right?
6  A.  Just to show that be careful what information they are
7  receiving, to have a second opinion, I guess.
8  Q.  Okay.  Because there's only one opinion allowed typically
9  in China; correct?
10  A.  China is controlled by CCP.
11  Q.  Right.  And so it's the CCP's opinion that's allowed,
12  right?
13  A.  It's a specific for health information or --
14  Q.  Sure, let's stick with that.
15  A.  There seems to be only one published data.
16  Q.  Okay.  And you testified on direct that Mr. Guo was also
17  talking about COVID; correct?
18  A.  He -- he discuss about -- he discuss COVID too, yeah.
19  Q.  And it was -- you translated some of his information about
20  COVID, right?
21  A.  Most of the information I translated is public information
22  from the U.S. I collected.  Some of his talks I translated to
23  English may also contain his opinion on COVID.
24  Q.  Okay.  So you translated, I think you used the word
25  "talks."  So you translated talks that Mr. Guo gave about COVID

1  and about other things, right?

2  A.  About other things.  There are COVID and other things;

3  correct.

4  Q.  Like what other things?

5  A.  The same thing.  The corruption in mainland China, how bad

6  that was, things like that.

7  Q.  Okay.  And you thought that was important to get that

8  information to the people in China, right?

9  A.  Just to -- again to perhaps open up more the information

10 flow or news flow.

11 Q.  You testified on direct that you were no longer a follower,

12 right?

13 A.  Correct.

14 Q.  When did you stop becoming -- when did you stop being a

15 follower?

16 A.  Since I didn't receive any receipt on my -- on my

17 investment.

18 Q.  Okay.  So that was in summer of 2020?

19 A.  Correct.  Since I ask investigator to investigate.

20 Q.  I'm sorry, sir, are you finished with your answer?

21 A.  Finished.

22 Q.  Since you stopped being a follower of Mr. Guo, have you

23 still tracked the information that he puts out?

24 A.  I didn't track his information, no.

25 Q.  Have you been following what's been going on in Mr. Guo's

O5UVGUO4                              Chin - Cross

1    life since you stopped being a follower?

2    A.  No.

3    Q.  Okay.  So you have no idea if he is still wealthy or not,

4    right?

5              MR. FERGENSON:  Objection.

6              THE COURT:  Overruled.  You can answer.

7    A.  On YouTube sometimes those video pop up, but I have not

8    actively tracked or follow or search any of his whereabout.

9    Q.  So you don't know if he still has a yacht, right?

10             MR. FERGENSON:  Objection.  Asked and answered.

11             MR. KAMARAJU:  I know I've not asked that question

12   before.

13             THE COURT:  I know.  I know.  You may answer, sir.

14   A.  The question was?

15   Q.  You don't know if he still has a yacht?

16   A.  I wouldn't know either way.  I wasn't following his --

17   Q.  Okay.  So I'm not going to go through each thing; I'll just

18   sum it up.  All the luxury items that you talked about seeing

19   in the videos, remember you testified about that with the

20   prosecutor?

21   A.  I did not follow, so --

22   Q.  Okay.  So you have no idea if he still has any of those

23   things, right?

24   A.  There are -- there were video that pop up with him in that

25   apartment or on the yacht.  But whether he still own or

O5UVGUO4                          Chin - Cross

1    whatnot, I don't know more than -- any more than that.

2    Q.  You testified on direct, sir, that you thought that you

3    woke up, I think was your word, because you spoke to a couple

4    of friends who told you it was a scam; is that right?

5    A.  Basically, a few ex-followers who left the group before I

6    did.

7    Q.  Were any of those ex-followers based in China, sir?

8    A.  There was a friend who was a prior acquaintance.  She was

9    based in China, but she did travel.  She was also following

10   this -- all this Guo's video.  She also contacted me separately

11   and warned me that this doesn't look right to her.

12   Q.  All right.  And this friend lives in Beijing; is that

13   right?

14   A.  I said she travels around overseas as well.  I don't know

15   exactly.

16   Q.  One of the first claims that you said Mr. Guo made was that

17   he was -- VOA was pressured to take him off the air; correct?

18   A.  That's his claim.

19   Q.  And that happened in 2017, right?

20   A.  I don't know the exact date, but I think that event

21   happened in 2017.

22          MR. KAMARAJU:  Could we please have Exhibit DX

23   STIP-001, please.  Can we go to paragraph 5.

24   Q.  Can you read the first sentence, sir.

25          MR. KAMARAJU:  If you could maybe highlight that for

1    him.

2    A.  "To carry out some of the objectives of Fox Hunt, in 2017,

3    the PRC government tasked a specially designated group of

4    operatives ('the group') with discrediting and harassing

5    individuals, including Mr. Guo, by using interactive computer

6    services and electronic communication systems."

7            MR. KAMARAJU:  Okay.  And then can we highlight the

8    sentence that says "The group's tactics aimed at Mr. Guo."  And

9    go all the way through the end of that sentence.

10   Q.  Can you read that sentence, please.

11   A.  "The group's tactics aimed at Mr. Guo included using

12   anonymized social media accounts operated by the group and by

13   pressuring U.S. social media companies to remove Mr. Guo and

14   U.S.-based associates of Mr. Guo from social media platforms."

15   Q.  Can you read the next sentence, please.

16   A.  "These efforts were part of the PRC government's broader

17   effort to prevent, disrupt, and harass Mr. Guo's use of social

18   media and other online platforms to disseminate and discuss

19   disfavored content."

20           MR. KAMARAJU:  No further questions.

21           THE COURT:  Redirect.

22           MR. FERGENSON:  Yes, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. FERGENSON:

25   Q.  Mr. Chin, you were asked questions about the difference

1    between Guo Media and GTV, do you recall that?

2    A.  Yes, I was asked.

3    Q.  Is the difference between those two things clear to you?

4    A.  At the time it was not very clear; it just all directed by

5    Miles Guo.

6    Q.  And when you sent $10,000 to VOG, what did you understand

7    would happen with that money?

8    A.  My understanding based on the claim was that this money

9    will be pooled together to meet 100,000 threshold to be able to

10   invest in the -- in the Guo Media.

11   Q.  Was it Guo Media or GTV?

12             MR. KAMARAJU:  Objection, your Honor.  Asked and

13   answered.

14             THE COURT:  Sustained.

15   Q.  And Mr. Chin, just a moment ago you were asked about things

16   Miles Guo said about being targeted by the CCP.  Do you

17   remember those questions?

18   A.  Yes.

19   Q.  What did Miles Guo say about the return on your GTV

20   investment?

21             MR. KAMARAJU:  Objection.  Scope.

22             THE COURT:  You may answer.

23   A.  He claims again big numbers based on other -- other

24   existing social media or media companies return.

25   Q.  And what about your G dollar investment, what did he say

1    about the returns on that?

2    A.  He claimed that this -- first of all, this will absorb a

3    large amount of money.  And then based on the -- implying that

4    based on the other cryptocurrencies' success, this will also be

5    successful.

6    Q.  At the time when you were a follower, did you believe what

7    Miles Guo was saying?

8    A.  At the time I did.

9    Q.  And, in fact, Mr. Chin, did you make money or lose money on

10   these investments?

11   A.  I lost.

12   Q.  Did Miles Guo pay back your losses?

13   A.  He did not.

14   Q.  Are you still a follower of Miles Guo's today?

15   A.  I'm not.

16   Q.  Why not?

17   A.  I think he has scammed, abused, many, many people's good

18   intention and our energy and the time.  We try to do something

19   good, but we were cheated.

20          MR. FERGENSON:  No further questions.

21          THE COURT:  Recross.

22          MR. KAMARAJU:  Very briefly, your Honor.

23   RECROSS EXAMINATION

24   BY MR. KAMARAJU:

25   Q.  You testified that Miles Guo has not repaid your losses;

1    correct?

2    A.   Correct.

3    Q.   Have you ever asked him?

4    A.   I have not.

5           MR. KAMARAJU:  Nothing further, your Honor.

6           THE COURT:  All righty, sir.  You may step down.

7        Thank you.

8           (Witness excused)

9           THE COURT:  And the prosecution may call its next

10   witness.

11          MR. FINKEL:  Government calls Steele Schottenheimer.

12    STEELE SCHOTTENHEIMER,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15          THE COURT:  You may proceed.

16          MR. FINKEL:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MR. FINKEL:

19   Q.   Good afternoon.

20   A.   Hello.

21   Q.   Ms. Schottenheimer, what city do you reside in?

22   A.   Dallas, Texas.

23   Q.   Where do you work?

24   A.   I work at Hayman Capital Management and Conservation Equity

25   Management.

1  Q.  What's Conservation Equity Management?

2  A.  Conservation Equity Management is a natural capital and

3  impact private equity firm.

4  Q.  What does that mean?

5  A.  We invest in environmental strategies in the private

6  markets, primarily buying raw land.

7  Q.  What's Hayman Capital?

8  A.  Hayman Capital Management is an asset manager based in

9  Dallas, Texas; it's founded by Kyle Bass in 2005; and

10 historically it's primarily focused on event-driven hedge

11 funds.

12 Q.  Ms. Schottenheimer, how is it that you work at two

13 different entities, Conservation Equity Management and Hayman

14 Capital?

15 A.  Hayman Capital Management is wholly owned by Kyle Bass; and

16 Kyle is a primary partner at Conservation Equity Management.

17 Q.  You said that Hayman Capital is an event-driven -- sorry,

18 what was the term you used?

19 A.  It's a global event-driven hedge fund manager.

20 Q.  What is a hedge fund manager?

21 A.  A hedge fund manager is someone that manages hedge funds.

22 Hedge funds are pooled vehicles that typically have a

23 investment mandate or strategy.

24 Q.  And what does it mean that Hayman Capital is event-driven?

25 A.  Event-driven investing has to do with typically some sort

1    of catalyst that triggers the thesis or the investment focus.

2              THE COURT:  Can you give us an example or examples?

3              THE WITNESS:  Yes.  If you have two -- a company

4    buying another, that would be an event.  If you have two

5    companies merging, that would be an event.  If you have a

6    country that decides to devalue their currency, that would be

7    an event.

8    Q.  Ms. Schottenheimer, how long have you been at Hayman

9    Capital?

10   A.  I have worked at Hayman since April of 2006, so just over

11   18 years.

12   Q.  What's your title at Hayman Capital?

13   A.  I'm the managing director of investor relations.

14   Q.  How long have you held that role?

15   A.  I've always been in investor relations, but the title of

16   managing director, roughly the last 15 years.

17   Q.  Can you just briefly describe to the members of the jury

18   what your general duties and responsibilities are as the

19   managing director of investor relations?

20   A.  Yes.  I am the point person on all current investors, and I

21   am also the point person for our marketing efforts to potential

22   investors.  I also handle a lot of Kyle's scheduling, as well

23   as his media appearances.

24   Q.  You mentioned Kyle.  What is Kyle Bass's title at Hayman?

25   A.  Kyle Bass is the founder and chief investment officer at

1  Hayman Capital Management.

2  Q.  I want to focus on the time period of 2020.  Around that

3  time period, Ms. Schottenheimer, what were the types of clients

4  that Hayman engaged with?

5  A.  Hayman clients at that time were high net worth

6  individuals, family offices, endowments, and broadly

7  institutional investors.

8  Q.  What's a family office?

9  A.  A family office is -- it is an investment office that is

10 dedicated to managing the wealth of a family.

11 Q.  Approximately how many employees does Hayman have?

12 A.  Today?

13 Q.  Today and in 2020, if you could.

14 A.  In 2020, I think it was around eight.  Today it's six.

15 Q.  In 2020, what were the approximate amount of assets under

16 Hayman's management?

17 A.  Around 400 million.

18 Q.  And what does that mean, assets under management?

19 A.  Assets under management is the amount of capital that we

20 invest on behalf of our investors.  We have direct control over

21 the asset allocation and investment decisions.

22 Q.  As part of your duties, do you also occasionally manage

23 Kyle Bass's calendar?

24 A.  At times, yes.

25 Q.  Based on your involvement in his scheduling, does Kyle Bass

1    make media appearances?

2    A.  Yes.

3    Q.  Can you broadly describe to the members of the jury what

4    Mr. Bass's profile is, generally speaking, in the financial

5    industry?

6              MR. KAMARAJU:  Objection to form.

7              THE COURT:  Sustained.

8    A.  Do I answer the question.

9    Q.  No.

10             THE COURT:  When I sustain the objection, you don't.

11   Q.  Based on your involvement in Mr. Bass's calendar, does he

12   make media appearances?

13   A.  Yes.

14             MR. KAMARAJU:  Asked and answered.

15             THE COURT:  Sustained.

16   Q.  What sort of media appearances does he make?

17   A.  Kyle has done a number of media appearances that would

18   include CNN International, Bloomberg, CNBC, CNBC Asia.

19   Q.  In 2020, before then, how often was Mr. Bass making media

20   appearances?

21   A.  Say at least once a month, generally.

22   Q.  In 2020 and before then, did Mr. Bass have a public

23   position regarding the Chinese Communist Party?

24   A.  Yes.

25   Q.  What was it?

1    A.   Kyle had a negative view on the Chinese Communist Party.

2    And the -- broadly, the communist -- sorry, the Chinese

3    economy.

4    Q.   What is your view on the Chinese Communist Party?

5    A.   I also have a negative view.

6    Q.   Why?

7    A.   I have a negative view because I don't agree with not

8    allowing people to practice their religion and putting them in

9    concentration camps for doing so.

10   Q.   Ms. Schottenheimer, can any member of the public invest in

11   a Hayman Capital financial product?

12   A.   No.

13   Q.   Why not?

14   A.   Because Hayman Capital -- the funds that Hayman Capital

15   Management operates relies on a 3(c)(7) exemption, which means

16   that we could only market and accept capital from qualified

17   purchasers.

18   Q.   What is the 3(c)(7) exception?

19           MR. KAMARAJU:   Objection, your Honor.

20           Can we have a brief sidebar?

21           THE COURT:   Okay.

22           (Continued on next page)

23

24

25

1              (At sidebar)

2              MR. KAMARAJU:  So my objection is that

3   Ms. Schottenheimer has not been noticed or proffered as an

4   expert witness on securities regulations; and yet she's being

5   asked — and I anticipate will continue to be asked — about

6   interpretations of various aspects of the Investment Advisers

7   Act and various securities regulations.  And that is properly

8   the province of expert testimony before the Court.

9              THE COURT:  Are you merely asking her about

10  credentials or qualifications for investing at a certain level?

11             MR. FINKEL:  Yes.  And she's not being offered as an

12  expert; but she's a lay witness in which her job is to evaluate

13  whether someone can be an investor in Hayman.  That's very

14  relevant to all the conduct here.

15             THE COURT:  Any average financial adviser knows this

16  is not expert testimony.

17             MR. KAMARAJU:  Well, in *Bilzerian*, your Honor, *United

18  States v. Bilzerian*, the Second Circuit approved the use of

19  expert testimony to interpret SEC regulations.

20             THE COURT:  Sure.

21             MR. KAMARAJU:  I want to make sure that's not where

22  we're going.

23             THE COURT:  My sense is that we're not going there.

24             MR. FINKEL:  She's not interpreting regulations; she's

25  explaining her understanding of the requirements to invest in

1   Hayman Capital, which is very relevant because she evaluated

2   Mr. Kwok's investment in Hayman Capital GTV investor funds.

3   And that's her job.  So determining whether someone is a

4   qualified purchaser, an accredited investor speaks to what she

5   does on a day-to-day basis.  She'll be crossed on it and she's

6   not been certified as an expert by your Honor.

7            MR. KAMARAJU:  But I don't think there's any dispute

8   as to Mr. Guo's ability to invest in Hayman Capital.  The

9   dispute is whether there is -- whether there were unaccredited

10  investors allowed to invest in GTV.  This witness's

11  understanding of what an accredited investor, it doesn't

12  matter.

13           THE COURT:  It's not about GTV, am I correct?

14           MR. FINKEL:  Well, two points in response to that,

15  your Honor:

16           First, I believe your Honor ruled in the motions *in*

17  *limine* that we are allowed to introduce the fact of the

18  unaccredited investor offering with respect to GTV.

19           With respect to whether this witness is about the GTV

20  offering, in a part, yes, because the GTV money that was

21  collected by Mr. Kwok and his co-conspirators was funneled into

22  the hedge fund that Ms. Schottenheimer works for.  And so she's

23  not going to be interpreting SEC regulations and saying, I

24  believe this.  She's talking about what she does every day.

25  This is her job.

1           THE COURT:  But I don't consider this to be expert

2    testimony and I'm going to permit the questions.

3           MR. FINKEL:  Thank you.

4           MR. KAMARAJU:  Can I just have one clarification?

5           I'm allowed to then cross-examine her on her

6    understanding of the differences?

7           THE COURT:  Between what and what?

8           MR. KAMARAJU:  Between a qualified investor, which I

9    believe he's going to elicit, and a minimum investment

10   threshold.

11          THE COURT:  Sure.

12          MR. KAMARAJU:  Okay.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may continue.

3   BY MR. FINKEL:

4   Q.  Ms. Schottenheimer, what is a 3(c)(7) objection?  Excuse

5   me.  Objection was overruled.

6          What is a 3(c)(7) exception?

7   A.  A 3(c)(7) exception is something that comes from the '40

8   Act rule under SEC, Securities and Exchange Commission,

9   directive.  And basically a 3(c) fund -- a 3(c)(7) fund is how

10  Hayman sets up their hedge funds.

11  Q.  What is a qualified purchaser?

12  A.  For an individual, a qualified purchaser is someone that

13  has $5 million in marketable securities.

14  Q.  And what about for an entity?

15  A.  For an entity that is not a family limited partnership,

16  they have to have $25 million in pooled or in net assets.

17  Q.  How, if at all, is the qualified purchaser definition

18  relevant to your work at Hayman Capital?

19  A.  So because I am in charge of marketing to potential

20  clients, I have to verify that everyone that I'm speaking to or

21  providing information about our funds is, in fact, a qualified

22  purchaser.

23  Q.  What is the term "accredited investor"?

24  A.  An accredited investor is someone that has a million

25  dollars of net worth, or $300,000 of combined income with their

1  spouse, or $200,000 of income as an individual.

2  Q.  Can someone who's an accredited investor, but not a

3  qualified purchaser, invest in a Hayman product?

4  A.  No, they cannot.

5  Q.  In these thresholds, qualified purchaser, accredited

6  investor, what entity, if at all, establishes those thresholds?

7  A.  The Securities and Exchange Commission.

8  Q.  And what is your understanding of why those thresholds are

9  established by the SEC?

10         MR. KAMARAJU:  Objection.

11         THE COURT:  You may answer.

12  A.  Can you please repeat the question.

13  Q.  Ms. Schottenheimer, what is the SEC?

14  A.  The Securities and Exchange Commission.

15  Q.  What is your understanding, if any, about why the SEC

16  establishes these thresholds of accredited investor and

17  qualified purchaser?

18  A.  To protect individuals that don't have these thresholds

19  from investing in what's considered to be higher-risk

20  investment funds.

21  Q.  And the financial products that Hayman offers, are they

22  high-risk financial products?

23  A.  They are considered to be by the SEC, yes.  It's a hedge

24  fund.

25  Q.  Okay.  And in sort of layman's terms, what do you mean by

1    "higher risk"?

2    A.   Typically, a hedge fund can invest not just in the stock

3    market or the bond market, they can participate in lots of

4    different types of securities, over-the-counter options,

5    over-the-counter forwards, commodities.  It has a very large

6    bandwidth of the types of financial products that they can --

7    that a hedge fund can invest in.  And these types of products

8    are considered to be more high risk.

9    Q.   Ms. Schottenheimer, is part of your job evaluating whether

10   potential clients are, in fact, qualified purchasers?

11   A.   Yes.

12   Q.   And what does Hayman do, if anything, to validate whether a

13   potential investor is a qualified purchaser?

14   A.   If I had reverse inquiry that comes into investor relations

15   at Hayman, I send them what's called a new contact

16   questionnaire.  It is a section out of our subscription booklet

17   that, you know, asks a couple of background information like

18   their name, date of birth, phone number, email address, as well

19   as an accredited investor representation and a qualified

20   purchaser representation.

21          So once I have these on file, I know that they have

22   made the QP rep, and I am able to provide them information on

23   the funds that Hayman offers.

24   Q.   What's a QP rep, what's that mean?

25   A.   A qualified purchaser representation, meaning --

1    Q.  I'm sorry.  Go ahead.

2    A.  Meaning that they, in fact, are an individual that has $5

3    million in marketable securities.

4    Q.  And what's a reverse inquiry?

5    A.  A reverse inquiry is when someone reaches out to Hayman

6    inquiring about the different products that we offer.

7    Q.  Ms. Schottenheimer, what work, if any, does Hayman do to

8    validate or check the representations made by potential

9    investors claiming they are qualified purchasers?

10   A.  We take the representation as-is.  There's no further

11   checking.  It's not required.

12   Q.  What is KYC?

13   A.  Know your customer or know your client.

14   Q.  What does that mean in the context of the work you do at

15   Hayman?

16   A.  We have what's called anti-money laundering procedures in

17   place when an investor makes an investment into one of our

18   funds.  And it is basically a grid or a checklist of the

19   information that we're required to collect and keep on file.

20   Q.  And what sort of information does Hayman collect as part of

21   its KYC obligations?

22   A.  It's a long list.  A lot of it is included in the

23   subscription document that the investor completes in order to

24   subscribe to a fund.  But on a high level, the name, address,

25   Social Security number, date of birth, and a copy of a valid

1  state-issued driver's license, passport.  And we collect this

2  on behalf of if someone is investing in their name, the

3  investor.  And then if it's an entity, we collect this

4  information on behalf of the authorized signatory, as well as

5  the -- any beneficial owners over I think it's 20 percent.

6  Q.  What is AML?

7  A.  Anti-money laundering.

8  Q.  How is that term relevant, if at all, to the work you do at

9  Hayman?

10  A.  So anti-money laundering is -- we call them AML checks.

11  And so this falls kind of within the know-your-customer or

12  know-your-client process.  And this AML checklist is actually

13  what we use as part of the closing process to collect all the

14  data that we need.

15  Q.  These AML and KYC checks, why, if at all, does Hayman do

16  them?

17  A.  We are required to.

18  Q.  By whom?

19  A.  The SEC.

20  Q.  What is the term UBO?

21  A.  You said UBL?

22  Q.  UBO.  O.

23  A.  UBO.

24  Q.  Have you heard that term before?

25  A.  Ultimate beneficial owner.

O5UVGUO4                      Schottenheimer - Direct

1    Q.   What's an ultimate beneficial owner?

2    A.   An ultimate beneficial owner is who actually owns the

3    entity.

4    Q.   And how is the concept of an ultimate beneficial owner

5    relevant, if at all, to your work at Hayman?

6    A.   For AML purposes, we are required to drill down into an

7    entity, so we have XYZ entity invest.  And I need to collect

8    AML on any individual that owns more than 20 percent of the

9    entity.  And sometimes an entity is owned by an entity, and you

10   just keep going down until you actually get to an individual;

11   and so you can do an AML check on that individual.

12   Q.   And why does Hayman go through all those steps about

13   ultimate beneficial owners?

14   A.   Because we are required to under our AML practices that are

15   required to by the -- required by the SEC.

16            MR. FINKEL:  Can I have one moment, your Honor?

17            THE COURT:  Yes.

18            (Counsel conferred)

19   Q.   Ms. Schottenheimer I think you used the term "drill down"

20   on the various ultimate beneficial owners.  Can you just

21   explain to the members of the jury what that means in the

22   context of your work?

23   A.   Absolutely.

24            So if there's an entity, we say does anyone or any

25   entity own more than 20 percent of this entity.  And if the

1    answer is yes, then we collect.  If it's a person -- it's
2    basically just a grid that goes down.  If it's a person, then
3    we collect the five AML requirements on that person.  If it's
4    an entity, then we would have to go to the next layer.  Does
5    anyone own 20 percent of this entity; is it a person or is it
6    another entity?  And then you just continue to go until you
7    actually have what we consider an ultimate beneficial owner.
8    Q.  Are you familiar with the concept in your work at Hayman of
9    parent entities and subsidiaries?
10   A.  Broadly familiar, yes.
11   Q.  And what does that mean?
12   A.  A parent company is the company that owns -- is the -- a
13   parent company owns subsidiaries.
14   Q.  Does Hayman also inquire with clients who wish to invest in
15   a Hayman product what the source of the money is that they're
16   using for an investment?
17   A.  Source of money?  No.
18   Q.  What about source of funds?
19   A.  No.
20   Q.  Is a potential investor required to report where the money
21   came from that they are using to invest in a Hayman financial
22   product?
23   A.  The specific capital being allocated, no.
24   Q.  Ms. Schottenheimer, have you ever met an individual known
25   as Miles Kwok?

1    A.  Yes.

2    Q.  Do you know him by any other names?

3    A.  Miles Guo.

4    Q.  Do you see him in the courtroom here today?

5    A.  I do.

6    Q.  Can you point him out and identify --

7            MR. KAMARAJU:  We'll stipulate to identity, your

8    Honor.

9            THE COURT:  All righty.

10   Q.  When was the first time that you met Miles Kwok?

11   A.  I met Miles Kwok in October of 2018.

12   Q.  And what was the name that you were -- that you understand

13   Miles Kwok to use at that time?

14   A.  Miles Kwok.

15   Q.  Where did you meet him?

16   A.  I met him in Dallas, Texas, at an airplane hangar.

17   Q.  Who was Miles Kwok with?

18   A.  Miles Kwok was with Steve Bannon and William Je.

19   Q.  At that time, 2018, Ms. Schottenheimer, what was your

20   understanding of Miles Kwok's relationship with William Je?

21   A.  At that time William Je was introduced to me as Miles's

22   interpreter for the interview that they were there to conduct.

23   Q.  And what was your understanding of Miles Kwok's

24   relationship with Steve Bannon at that time?

25   A.  That they were friends.

1   Q.  Was Kyle Bass also present at that time?

2   A.  Yes.

3   Q.  You mentioned that there was an interview.  What do you

4   mean?

5   A.  So the reason why we were all at the hangar that day in

6   Dallas was because Kyle was going to interview both Steve

7   Bannon in a single interview and, in a separate interview,

8   interview Miles Kwok.

9   Q.  And at that time, Ms. Schottenheimer, in 2018, what was

10  your understanding of Kyle Bass's relationship with Miles Kwok?

11  A.  That they had been introduced through Steve Bannon and had

12  a lot of similar views of China, the financial -- China's

13  financial system, and the communist party of China.

14          MR. FINKEL:  If we can please display what I believe

15  is in evidence as Government Exhibit 103.

16  Q.  Ms. Schottenheimer, who is this individual?

17  A.  This is William Je.

18          MR. FINKEL:  And if we can please display for the

19  witness, witness only, what's been marked for identification as

20  Government Exhibit 123.

21  Q.  Who is this individual?

22  A.  Steve Bannon.

23          MR. FINKEL:  Government offers 123.

24          MR. KAMARAJU:  No objection.

25          THE COURT:  It is admitted.

1            (Government's Exhibit 123 received in evidence)

2            MR. FINKEL:  Publish that, please.

3   Q.  Ms. Schottenheimer, how did Miles Kwok arrive to the

4   airplane hangar where this interview took place?

5   A.  It was my understanding that he had flown into a separate

6   FBO.

7   Q.  What's an FBO?

8   A.  I don't know the acronym, but basically there are different

9   FBOs at the airport.  It's basically a different hangar as to

10  where the airport -- the airplane lands and is stored.

11           MR. FINKEL:  We can take that down, Ms. Loftus.

12  Q.  You mentioned that there is to be an interview that

13  Mr. Bass was going to conduct.  What sort of interview at that

14  time period did Mr. Bass conduct?

15  A.  So there is a show called -- sorry, there's a group called

16  Reel Vision.  And it is a series -- it's an interview series

17  that people can subscribe to.  And Kyle has a number of

18  different people that he's -- interviews with a number of

19  different people, as well as people interviewing him.

20  Q.  And did Mr. Bass, in fact, interview Miles Kwok in this

21  airplane hangar?

22  A.  He did.

23  Q.  Did you witness that?

24  A.  I did.

25           MR. FINKEL:  If we can display for the witness,

1    please, what's been marked for identification as GX 1007-V1.

2    Apologies.  This is Government Exhibit W1007-V1.  My fault.

3            Ms. Loftus, can you scroll through that so

4    Ms. Schottenheimer can take a look at that.

5    Q.  Ms. Schottenheimer, do you recognize this?

6    A.  Yes.  This is the Reel Vision interview that was conducted

7    between -- Kyle Bass interviewed Miles Kwok.

8            MR. FINKEL:  Government offers GX W1007-V1.

9            MR. KAMARAJU:  No objection.

10            THE COURT:  It is admitted.

11            (Government's Exhibit W1007-V1 received in evidence)

12            MR. FINKEL:  If we can publish that, please,

13    Ms. Loftus.  Bring it back to the beginning.  And if we can

14    please play this, Ms. Loftus.

15            (Video played)

16            MR. FINKEL:  Pause it there.

17    Q.  Ms. Schottenheimer, first, who is the individual on the

18    screen?

19    A.  That is Miles Kwok.

20    Q.  And who is the other individual?

21    A.  Kyle Bass.

22    Q.  There are some terms that Mr. Bass and Mr. Kwok use.  First

23    term they use is something called FX reserves.  What is your

24    understanding of what that means?

25    A.  Foreign exchange reserves is in context of -- just broadly

1   is -- foreign exchange reserves is something that a country

2   keeps on their balance sheet.

3   Q.  And Mr. Kwok uses a term called the M2.  What is that?

4   A.  M2 is money in circulation.

5   Q.  And this minute and 50-second clip that we watched,

6   Ms. Schottenheimer, just generally speaking, what is it that

7   Mr. Kwok and Mr. Bass are discussing?

8   A.  They are discussing the issues with the China economy.

9           MR. FINKEL:  Can you play from there, please,

10  Ms. Loftus.

11          (Video played)

12          MR. FINKEL:  Pause it there, please.

13  Q.  Ms. Schottenheimer, what is this chart that Mr. Bass

14  referred to that Mr. Kwok had provided him, Mr. Bass?

15  A.  It's a comparison of the U.S. and Chinese GDP versus

16  currency supply.

17  Q.  How is that, if at all, relevant to what Mr. Kwok and

18  Mr. Bass are discussing?

19  A.  That China just grew its currency supply at a massive rate

20  in order to kind of grow its economy.

21  Q.  This chart, aside from this interview, have you seen it in

22  other places?

23  A.  Yes.  Kyle asked permission from Miles to put it in our --

24  one of our decks.

25  Q.  Can you explain what you mean by "decks"?

1    A.  Yes.  One of our presentations.

2            I can't recall exactly which one, but we have an

3    evolving Hayman Hong Kong Opportunities Fund presentation that

4    we put in updated charts from time to time.  And I recall

5    having a snapshot at the beginning of this graphic and a

6    snapshot at the end inserted into the presentation.

7    Q.  So this graphic came from Mr. Kwok, and Mr. Bass used it in

8    a presentation he made?

9    A.  Correct.  Yes.

10   Q.  If I can ask, Ms. Schottenheimer, to point the microphone

11   directly at your mouth, it's directional, and everyone can hear

12   you.  Thank you.

13           MR. FINKEL:  And Ms. Loftus, we can continue to play

14   this video.

15           (Video played)

16   BY MR. FINKEL:

17   Q.  Ms. Schottenheimer, Mr. Bass asked the question:  Why does

18   the Hong Kong dollar have a peg?

19           What is your understanding of what that means?  What

20   is the Hong Kong dollar peg?

21   A.  The Hong Kong dollar is pegged to the U.S. dollar.  It's

22   actually -- it's banded to the U.S. dollar, meaning there's ten

23   cents of kind of flexibility that it trades within.

24   Q.  What does it mean for a currency to be pegged to another

25   currency?

1    A.  Basically, one currency adopts the value of another

2    currency, and it pegs its currency to that second currency.

3    Q.  Based on your understanding, how does the Hong Kong economy

4    actually peg its dollar to the U.S. dollar?

5    A.  So there's something called the Hong Kong Monetary

6    Authority.  And the HKMA maintains U.S. dollars and U.S. dollar

7    assets on its balance sheet in order to maintain the peg to the

8    U.S. currency.

9    Q.  Approximately how long has this peg been in place?

10   A.  Since October of 1983.

11   Q.  And is this peg still in place today?

12   A.  It is.

13   Q.  And in 2018, when this interview took place,

14   Ms. Schottenheimer, what was Hayman Capital's view about

15   whether that peg would persist?

16   A.  Hayman had the view that the Hong Kong peg no longer made

17   sense and it would cease to exist in some period of time.

18   Q.  And did Hayman Capital offer any financial products around

19   this time, 2018, based on that thesis?

20   A.  Yes.

21   Q.  And what was that financial product called?

22   A.  Hayman Hong Kong Opportunities Fund.

23            MR. FINKEL:  We can continue playing from there,

24   Ms. Loftus.

25            (Video played)

1    BY MR. FINKEL:

2    Q.  Ms. Schottenheimer, what is your understanding of what

3    Mr. Kwok is saying is fake versus true?

4    A.  So as you saw from the graphic, China had

5    disproportionately grown their economy through just by printing

6    money, putting additional money supply into the economy, so

7    essentially propping it up.  Hong Kong has a real economy

8    that's essentially tied to the U.S. dollar is the difference, I

9    think, is what he is referring to.

10              MR. FINKEL:  If we can please display for the witness

11   what's been marked for identification as GX W1007-V3.  Can you

12   just scrub through that so Ms. Schottenheimer can take a look.

13   Q.  Ms. Schottenheimer, what is this?

14   A.  This is still the Reel Vision interview between Kyle Bass

15   and Miles Kwok.

16   Q.  Is it a clip of that interview?

17   A.  Yes.

18   Q.  Approximately how long was the whole interview?

19   A.  An hour.

20              MR. FINKEL:  The government offers GX W1007-V3.

21              MR. KAMARAJU:  No objection.

22              THE COURT:  It is admitted.

23              (Government's Exhibit W1007-V3 received in evidence)

24              MR. FINKEL:  Ms. Loftus, after you publish that, if I

25   could ask you to please roll to the beginning and play it for

O5UVGUO4                         Schottenheimer - Direct

1    the members of the jury.

2                (Video played)

3    Q.  Ms. Schottenheimer, towards the beginning of that clip,

4    Mr. Bass said something that this is a big problem; Mr. Kwok

5    disagrees and says it's not a big problem.  What is your

6    understanding of what they are referring to?

7    A.  I'd have to see the beginning of the clip again.

8                MR. FINKEL:  Can we play the beginning of the clip.

9                (Video played)

10   Q.  Ms. Schottenheimer, what is your understanding?

11   A.  So Kyle is talking about the dwindling excess reserves that

12   are supporting the Hong Kong dollar.

13          The way that it works is when the Hong Kong dollar

14   trades to $7.75, it is at the strong side of the band.  So the

15   HKMA needs to come in and intervene to keep the Hong Kong

16   dollar within the band.  And so it sells its U.S. dollars to

17   buy Hong Kong dollars.

18          Same thing when it trades to the weak side of the

19   band, just $7.85 Hong Kong dollar per U.S. dollar.  So then the

20   HKMA needs to come in and buy U.S. dollars and -- sorry, buy

21   Hong Kong dollars and sell U.S. dollars.

22          And what Kyle is referring to is they have spent 78

23   percent of their excess reserve; so their ability to maintain

24   this peg has dwindled from 100 percent down to 38 percent.  And

25   that is what Kyle is talking about.

1    Q.  And Mr. Kwok disagrees with that.  And what is his view?

2    A.  His view is that it's just two options.  He wants to take a

3    step back and talk about how Hong Kong has the ability to

4    become a fake economy just like China.  They can lie about

5    their numbers, they can print their way out of the problem; or

6    they can show the world that they don't have enough excess

7    dollars to maintain the peg, which to me kind of goes back to

8    Kyle's first point.

9    Q.  And if the second option comes to pass that there's not

10   enough dollars to maintain the peg, what would happen?

11   A.  Likely the market would call out Hong Kong and there would

12   be a stress to the peg; it would trade outside of the peg and

13   likely eventually break.

14   Q.  You used the term "band" when you were explaining.  Can you

15   just explain the band?

16   A.  The band.  Yes.

17          The Hong Kong dollar trades within a band to the U.S.

18   dollar.  $7.75 Hong Kong dollar per U.S. dollar, and then the

19   range goes -- on the other side of that is $7.85.  So 7.75 to

20   7.85 is the Hong Kong band to the U.S. dollar.

21   Q.  You mentioned before that Hayman offers something called

22   the Hong Kong Opportunities Fund?

23   A.  Yes.

24   Q.  Can you describe what the Hong Kong Opportunities Fund is.

25   A.  The Hayman Hong Kong Opportunities Fund is a hedge fund

1    product that has a specific strategy where it is bearish on the

2    Hong Kong dollar and it is dedicated to just shorting the Hong

3    Kong dollar.

4    Q.  So if the peg, the band, were to break, what impact would

5    that have on an investment in the Hong Kong Opportunity Fund?

6    A.  It would have a positive monetary impact on the Hong

7    Kong -- the Hayman Hong Kong Opportunities Fund.

8    Q.  And, Ms. Schottenheimer, broadly speaking, is the Hong Kong

9    Opportunity Fund a risky investment?

10   A.  Yes.

11   Q.  And why is that?

12   A.  Well, specifically, in Share Class B, which is a dedicated

13   share class to expressing this trade 100 percent in options,

14   meaning that if the options expire out of the money, you would

15   lose 100 percent of your investment.

16   Q.  You mentioned something called share Class B.  Does that

17   have another name?

18   A.  Yes, Share Class B is the Prodigious Series.

19   Q.  When did Hayman start offering as an investment the Hong

20   Kong Opportunity Fund?

21   A.  Share Class A?

22   Q.  Sure.

23   A.  Okay.  The original Hayman -- yes, January of 2017.

24   Q.  And when did Share Class B, the Prodigious Series, become

25   available?

O5UVGUO4                        Schottenheimer - Direct

1    A.  The first closing was June of 2020.

2           MR. FINKEL:  We can take that down, Ms. Loftus.

3    Q.  Ms. Schottenheimer, did there come a time, if ever, when

4    Miles Kwok sought to invest in a Hayman product?

5    A.  Yes.

6    Q.  When approximately was that?

7    A.  May of 2020.

8    Q.  And what was your role, if any, in Kwok's sought Hayman

9    investment?

10   A.  I'm responsible for coordinating and processing the

11   subscription booklet.

12   Q.  And what investment -- or excuse me.  Withdrawn.

13          What financial product did Kwok invest in?

14   A.  He invested in the Hayman Hong Kong Opportunities Fund

15   Share Class B/Prodigious Series.

16   Q.  And how large was Kwok's investment in the prodigious

17   series?

18   A.  $100 million.

19          MR. FINKEL:  We can display for the witness what's

20   been marked for identification as GX HN-26.  Just flip through

21   it so Ms. Schottenheimer can take a look at it.  Go back to the

22   first page, please.

23   Q.  Ms. Schottenheimer, what is HN-26?

24   A.  This is an email to William Je from myself on Saturday, May

25   23rd, 2020, of me sharing the Hayman Hong Kong Opportunities

1    Fund prodigious series presentation and a playback link to the

2    webcast that Kyle had hosted earlier that month.

3              MR. FINKEL:  Government offers HN-26.

4              MR. KAMARAJU:  No objection.

5              THE COURT:  It is admitted.

6              (Government's Exhibit HN-26 received in evidence)

7              MR. FINKEL:  If we can publish that, please,

8    Ms. Loftus.  And if you can zoom in at the top, please.  You

9    can see the text.  Perfect.

10   Q.  Ms. Schottenheimer, now that the jury can see it, to whom

11   did you send this email?

12   A.  William Je.

13   Q.  And why did you send this email to William Je?

14   A.  Because Kyle Bass asked me to.

15   Q.  And what's the date of this email?

16   A.  May 23rd, 2020.

17   Q.  And what's the subject?

18   A.  Confidential Playback Details Hayman Hong Kong

19   Opportunities Fund LP Prodigious Series.

20   Q.  And what is your understanding of why Kyle Bass asked you

21   to send this email to William Je?

22   A.  Because Miles was interested in potentially investing.

23   Q.  In what product?

24   A.  The Hayman Hong Kong Opportunities Fund Share Class B

25   Prodigious Series.

1  Q.  And, Ms. Schottenheimer, in this time, May of 2020, what

2  was your understanding of William Je's role with respect to

3  Miles Kwok?

4  A.  That he was the head or chief investment officer of Miles'

5  family office.

6  Q.  By "family office," you mean what?

7  A.  Family office is a dedicated investment office to managing

8  the wealth of an individual.  So this was an office -- this was

9  a group of people dedicated to managing the wealth of Miles

10  Kwok.

11        MR. FINKEL:  We can zoom out of that, Ms. Loftus, and

12  go to the next page of the document, please.  Zoom in on that.

13  Q.  What is this a picture of?

14  A.  This is a picture of the leader of the Chinese Communist

15  Party, Xi Jinping.

16  Q.  And is there a watermark on this Power Point?

17  A.  Yes.

18  Q.  Why is that?

19  A.  Because we track all of the presentations that we send to

20  potential investors.

21  Q.  And what is the watermark on this particular Power Point?

22  A.  William Je, it's his email address.

23        MR. FINKEL:  You can go, please, to page 34 of this,

24  Ms. Loftus.  Let's go back a page -- or forward a page, excuse

25  me.

1    Q.  Ms. Schottenheimer, can you read the first bullet on this

2    page?

3    A.  "Targeting notional exposure of approximately 200 times

4    each dollar invested given current pricing as of May 4th,

5    2020."

6    Q.  And what does that mean?

7    A.  So based on pricing in early May, we were targeting being

8    able to achieve 200 times exposure for every dollar invested

9    being short the Hong Kong dollar via the Hong Kong dollar

10   options that we were purchasing.

11   Q.  And 200 times the dollar investment, can you just explain

12   that?

13   A.  Correct.  If you invest one dollar, you'd be short $200 of

14   U.S. -- of Hong Kong dollars.

15   Q.  Generally speaking, Ms. Schottenheimer, in your role as

16   managing director of investor relations, how does Hayman market

17   this product, the Prodigious Series, to potential investors?

18   A.  We market this as a very high-risk/potential high-return

19   strategy.

20   Q.  And what is your understanding of why investors invest in

21   it?

22   A.  There's typically two buckets of investors that are

23   interested in investing in our Hong Kong product.  The first is

24   a defensive position, meaning they're using this as a hedge for

25   their broader portfolio.  They might have some sort of exposure

1    to emerging markets, direct exposure to China, Asia.  And this

2    is a defensive play, meaning they have -- they put a very small

3    allocation of their overall portfolio into this product to

4    protect them if the second largest economy were to have a

5    substantial dislocation.

6    Q.  And what's the offensive play?

7    A.  The offensive play is when an investor understands that

8    this risk in being priced in the marketplace is -- it's wrong,

9    that it's way too cheap and that it will be repriced over time.

10   Q.  The fourth bullet, Ms. Schottenheimer, starts "Capital

11   Exhaustion Strategy."

12   A.  Yes.

13   Q.  Read that and explain to the members of the jury what that

14   means.

15   A.  Capital exhaustion strategy employs maximum capital

16   efficiency.  So when we offer in this product is -- you can put

17   a $25,000 minimum to invest in this product and it's very

18   capital efficient, meaning that every dollar that you invest is

19   going to provide massive notional exposure.  You kind of refer

20   to that first bullet point of 200 times.

21          MR. FINKEL:  If we can go to the next page, please,

22   Ms. Loftus.  The page after that.  Thank you.

23   Q.  Ms. Schottenheimer, what is management fee, which I believe

24   is the fourth row of this line?

25   A.  Yes.  There's a onetime management fee when investing in

1    the Prodigious Series.  And essentially it's a fee to the asset

2    manager for managing the capital.

3    Q.  And the asset manager here would be who?

4    A.  Hayman Capital Management.

5    Q.  And then I think two rows below that it says lock, two-year

6    hard lock.  What does that mean?

7    A.  Well, the strategy was only -- it's an 18 to two-year --

8    sorry, it's a 12-month to 24-month strategy.  And so the

9    two-year lock implies that there is no ability to get your

10   capital out.  Once you invest, it's permanently invested in the

11   fund.  There's no -- there's no rights to withdraw your

12   capital.

13   Q.  Ms. Schottenheimer, can investment in the Prodigious Series

14   take down the CCP?

15   A.  No.

16   Q.  Can an investment in the Prodigious Series affect the

17   Chinese economy?

18              MR. KAMARAJU:  Objection.

19              THE COURT:  You'll have to step up.

20              (Continued on next page)

21

22

23

24

25

1          (At sidebar)

2          MR. FINKEL:  Your Honor, should we just send the jury

3     home?

4          THE COURT:  Yes, I think it's a good idea.

5          MR. FINKEL:  Okay.

6          (In open court)

7          THE COURT:  Members of the jury, it's 2:45, so it's

8     time to end for the day.

9          Remember that you are not permitted to discuss the

10    case amongst yourselves or with anyone else.  Don't permit

11    anybody to discuss the case with you.  Have a good evening and

12    get back here tomorrow on time.  Thank you.

13         (Jury not present)

14         THE COURT:  Please be seated.

15         MR. KAMARAJU:  Your Honor, do you want to excuse the

16    witness?

17         THE COURT:  Oh, yes.  If you'll step down.

18         Don't discuss your testimony.

19         (Witness not present)

20         THE COURT:  I'll hear the objection.

21         MR. KAMARAJU:  Yes, your Honor.

22         So I understand that she was not qualified as a

23    securities expert, she wasn't noticed.  She certainly has not

24    been noticed as an expert on macroeconomics and the impact that

25    any particular strategy may have on the broader Chinese

1    economy.  I don't know if she even has the expertise to opine

2    on that, given that she's in investor relations; as far as I

3    know, not an actual economist.  And her personal perspective

4    with respect to whether it would impact the Chinese economy has

5    no relevance in the case.

6            MR. FINKEL:  So, your Honor, if the defense wants to

7    stipulate that the defendant did not believe, excuse me, that

8    this investment would have any impact on the Chinese economy,

9    then, yeah, it wouldn't be relevant.  I'm not sure exactly what

10   their point is on that.

11           MR. KAMARAJU:  We're not stipulating to that at all.

12   But this particular witness's view as to whether that happens

13   or could happen has no bearing on Mr. Guo's perspective

14   certainly.  But also, again, she is not offered as an expert to

15   testify about the macroeconomic effects of a particular

16   strategy.  If she wants to talk about that was not Hayman's

17   intent or that was not her understanding about what Hayman was

18   trying to do, that's one thing.  But to talk about it broadly,

19   you for sure have a 403 issue at that point.  Because now we're

20   going to have to start talking about all the ways in which it

21   could, the various economic trends that might apply.

22           I don't know how we go from this witness testifying

23   about the process of qualifying Mr. Guo for this investment to

24   the broader question about what will or will not take down the

25   CCP or the Chinese economy.

1            MR. FINKEL:  So, your Honor, if the defense, as it

2    seems to be, is going to assert that Mr. Guo believed that this

3    investment would take down the CCP, it is certainly relevant

4    what Ms. Schottenheimer, who is the managing director of

5    investor relations for this particular financial products, what

6    her view and Hayman's view is of the impact of this financial

7    product in fact on whether it can take down the CCP or impact

8    the broader Chinese economy.

9            There are two reasons why this is the case:  The first

10   reason, your Honor, is Ms. Schottenheimer is the one who

11   interacted with William Je about this particular investment.

12   So certainly Hayman's view and Ms. Schottenheimer's view, her

13   interactions with Mr. Je are relevant to the jury's

14   consideration, which appears to be the defense that Mr. Guo

15   believed this financial product could take down the CCP.  If

16   that's their defense, we have an opportunity to essentially put

17   in evidence that goes against it.  If they want to back off

18   that and say that that's not their defense or they'll stipulate

19   it won't affect the Chinese economy, that's fine.  If they

20   don't, they're free to cross-examine her on these issues.

21           THE COURT:  So are you going to elicit testimony that

22   she discussed this opinion with Mr. Je?

23           MR. FINKEL:  So, your Honor, she -- I don't know if

24   that happened is the answer to the Court's question directly.

25           What I do know is that Ms. Schottenheimer, her job is

1  this deck which was sent to Mr. Je, which is a representation

2  of what Hayman believed this financial product does.  I also

3  know that Ms. Schottenheimer has a view which she explained in

4  part today about the purpose of this financial product and,

5  importantly, how Hayman markets it.

6          Now, Mr. Bass, as has been clear from

7  Ms. Schottenheimer's testimony and from the video we watched,

8  has a negative view of the CCP, so does Ms. Schottenheimer.

9  But they know — because, in fact, it is true — that this

10 financial investment doesn't impact the CCP.  It's a bet.  It's

11 a way to make money or hedge against losing money.

12         And so if the defense is going to argue that Mr. Guo

13 in his heart of hearts believed that this financial investment

14 could take down the CCP, the government, which has the burden,

15 has the ability to introduce evidence to the contrary.  And I

16 say again, your Honor, that to the extent the defense is not

17 seeking to make that defense, then yes, this wouldn't be

18 relevant.

19         MR. KAMARAJU:  So I'd like to make just a couple of

20 points on it, and I think there are a few distinctions that are

21 important.

22         First of all, Ms. Schottenheimer's job as investor

23 relations is not to design the investment products.  She's very

24 clear about that.  The witness who does that is Mr. Bass.  What

25 she does is she communicates with potential investors,

1    qualifies them whether they can purchase it, and then takes in

2    their subscription information.  She does not set the

3    investment policy at all.  She does not design it, she's not

4    the person who creates it, she's not the person who runs the

5    models for it, she doesn't do any of that.  And if Mr. Finkel

6    asked her if she did any of that on the stand, she would say

7    no.

8            Second, in her 3500 material, she makes clear that she

9    has never spoken with William Je on the phone.  So the only

10   communications that the government has produced to the defense

11   — and I don't know if they have any others — are ones -- are

12   email communications, none of which mention

13   Ms. Schottenheimer's opinion as to whether this could take down

14   the CCP or not, or Hayman's opinion more broadly.

15           THE COURT:  Is there anything in the deck concerning

16   their opinion about the impact of this product on the Chinese

17   economy?

18           MR. KAMARAJU:  He just showed her the deck, your

19   Honor.

20           THE COURT:  I'm asking him.

21           MR. KAMARAJU:  Oh, I'm sorry.  I thought you were

22   asking me still, your Honor.

23           MR. FINKEL:  So, your Honor, yes.  I mean, the deck is

24   about Hayman's view of that the Chinese economy -- this is in

25   2020, when they sent this deck, that the Chinese economy is

1    faltering, and that there's stress that's being put in

2    particular on the Hong Kong Central Bank.  And as a result of

3    that stress, the peg or the band, as Ms. Schottenheimer

4    explained it, is going to break.

5          And what this financial product is designed to do,

6    which Ms. Schottenheimer may not have designed, but knows how

7    it works because her job is to market it to investors and

8    explain it to people.  That's what she does.  She travels the

9    world doing that, in fact, so she has knowledge of it.  Even if

10   she wasn't the one in the Excel sheet deciding which swaps to

11   invest in, she certainly knows how it works.

12         And so the way that Hayman markets this product and

13   was marketed through email to William Je and in other ways, is

14   relevant to the consideration that the jury is going to make,

15   which apparently is their defense that they haven't disclaimed.

16   Their defense is apparently Mr. Guo believed that an investment

17   of $100 million of GTV investor money into Hayman's Hong Kong

18   Opportunities Fund was a way to fight the CCP, making the

19   broader point that everything is fine here, ladies and

20   gentlemen, because all these investors really cared about was

21   taking down the CCP and that's what this investment was going

22   to do.

23         In fact, your Honor, that's not true.  And

24   Ms. Schottenheimer knows it's not true.  And she's entitled to

25   explain that to the jury.  It will be for the jury, not for me,

1    not for defense counsel, but for the jury to decide whether

2    Ms. Schottenheimer's view or the defense's view is the correct

3    view.  But they are entitled to evidence on both sides of the

4    coin.

5            MR. KAMARAJU:  Your Honor, first of all, the question

6    that was asked was not about Hayman's intent or

7    Ms. Schottenheimer's intent in designing the fund.  It was:

8    Can an investment in this fund take down the CCP, and can it

9    take down the Chinese economy.  There's a distinction between

10   what the fund decided to do when it designed the products and

11   what the actual impact in the real world would be.

12           THE COURT:  One second.

13           Would you agree with me that there's a difference

14   between making a representation that cryptocurrency is a safe

15   investment, a legitimate investment, and giving an opinion

16   about cryptocurrency on the world economy?

17           MR. FINKEL:  Are you asking me, your Honor?

18           THE COURT:  Yes.

19           MR. FINKEL:  So, yes.  But I think there's a

20   distinction between that hypothetical — which I agree with your

21   Honor on — and what's happening here.

22           And there still hasn't been from the defense any

23   disclaiming of a defense about Mr. Guo's view.  And therefore,

24   I think Ms. Schottenheimer is entitled to at least — and I can

25   frame the question this way:  Based on her understanding, how

does this financial product work and what is its effect based
on her understanding.  And I am certain that the defense will
cross-examine her on that --

THE COURT:  I understand that you'd like to bring out
her opinion, but she's not an economist.

MR. FINKEL:  So, your Honor, it's not her opinion.
It's her understanding.  To the extent it's an opinion, it's a
701 opinion based on her perceptions as an employee of Hayman
Capital.  And we don't need to introduce, I don't think, your
Honor, because we have a percipient witness, a 702 expert on
the mechanics of this particular investment.

We have a witness who is familiar with how this
product is marketed, how this product works, and has an
understanding of how it works in the broader economy.  That
understanding is certainly relevant under Rule 401.  There's
not a 403 problem.

How the jury will weigh all this information is up to
the jury.  But it passes the threshold test to allow us to
elicit this information, particularly when — which is clear
now, your Honor — the defense is going to argue, probably at
closing, that everything was fine here because this investment
was a way to take down the CCP.  They can cross
Ms. Schottenheimer on her lack of credentials, and the jury
will assess what weight, if any, to assign to
Ms. Schottenheimer's understanding of this financial product.

1          But as an employee of Hayman, who markets this product

2     for a living and has worked there for 25 years, her

3     understanding of what this financial product does is relevant,

4     is admissible, and the jury should be allowed to consider it.

5          THE COURT:  So any individual who's hawking a

6     financial product you're saying can give an opinion about the

7     effect of the product on a given economy?

8          MR. FINKEL:  So, your Honor, maybe.  I'm not talking

9     about every financial expert or every financial product or

10    whatever.  But in this case, I think, yes, I think

11    Ms. Schottenheimer is entitled to do that.  Because she has

12    personal knowledge of the facts at issue.  Given what their

13    defense is, it's clearly relevant.  We don't need --

14         THE COURT:  I'm not asking about relevancy.  I'm

15    asking whether or not this witness is qualified to offer the

16    opinion.

17         MR. FINKEL:  So she is under Rule 701.  It's a 701

18    opinion, right, because it's based on her percipient

19    information, her percipient knowledge.

20         It would be no different, for example, than someone

21    who's a lay witness talking about, for example, slang terms

22    that they've experienced and used.  One could also put on a 702

23    expert to testify about their understanding of terms that they

24    don't use.  But if a witness has a perception that -- has an

25    opinion rationally based on their perception, which is what

1    Ms. Schottenheimer has, it qualifies under 701.  And the

2    financial products here, itself, Ms. Schottenheimer has

3    knowledge of.

4            THE COURT:  All right.  So I'm going to allow you to

5    brief this this evening.  And you'll come back -- what time is

6    it?  So I want the government's brief by 8 and the defense

7    brief by 10.

8            MR. FINKEL:  Your Honor, that's totally fine.  We'll

9    do that.

10            If I can just ask the Court to inquire whether part of

11    the defense is Mr. Guo believing that an investment in the Hong

12    Kong Opportunities Fund is a way to take down the CCP.

13            THE COURT:  I'm sorry.  I thought it was later than it

14    is.  I think I should make that earlier.  One second.

15            I'll have the government's papers due at 6 and then

16    the defense papers at 8.

17            MR. FINKEL:  Thank you, your Honor.

18            And just in the context of the Court's consideration

19    and part of the government's arguments, can the Court inquire

20    of the defense whether one argument they may make is that

21    Mr. Guo believed that an investment in the Hong Kong

22    Opportunities Prodigious Series of $100 million was a way to

23    fight the Chinese government or the Chinese economy or the CCP.

24            THE COURT:  So are you anticipating making that

25    argument?

O5UVGUO4                              Schottenheimer - Direct

1              MR. KAMARAJU:  I'm certainly reserving the right to

2      make that argument, your Honor.

3              THE COURT:  I can't compel them to divulge their

4      defense.

5              MR. FINKEL:  Understood.  As long as the government

6      knows so they can respond that it very well may be an argument

7      made at closing, and it will assimilate that into its briefing.

8              Thank you, your Honor.

9              MR. KAMARAJU:  Your Honor, I know we'll address this

10     in briefing, but just since 701 is brought up, just to complete

11     the citation of 701, 701 also says that the proffered lay

12     opinion needs to be helpful to the understanding --

13             THE COURT:  I'm sorry, I didn't hear what you said.

14             MR. KAMARAJU:  701, if you continue reading it past

15     the provision that Mr. Finkel read, says that the testimony

16     also has to be helpful to clearly understanding the witness's

17     testimony and not based on scientific, technical, or other

18     specialized knowledge within the scope of Rule 702.  There is

19     no universe in which a witness could testify that a particular

20     economic strategy would destroy a global economy without some

21     form of specialized knowledge.

22             THE COURT:  Well, I am eager to hear from you.

23             MR. FINKEL:  Thank you, your Honor.

24             MR. KAMARAJU:  Thank you, your Honor.

25             (Adjourned to May 31, 2024, at 9 o'clock a.m.)

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3      KARIN MAISTRELLO

4     Cross By Ms. Shroff . . . . . . . . . . . . 582

5     Redirect By Mr. Horton . . . . . . . . . . . 668

6     Recross By Ms. Shroff . . . . . . . . . . . 673

7      PATRICK CHIN

8     Direct By Mr. Fergenson . . . . . . . . . . 686

9     Cross By Mr. Kamaraju . . . . . . . . . . . 711

10    Redirect By Mr. Fergenson . . . . . . . . . 731

11    Recross By Mr. Kamaraju . . . . . . . . . . 733

12     STEELE SCHOTTENHEIMER

13    Direct By Mr. Finkel . . . . . . . . . . . . 734

14                          GOVERNMENT EXHIBITS

15    Exhibit No.                              Received

16     VC7 and VC8 . . . . . . . . . . . . . . . 703

17     VC9 . . . . . . . . . . . . . . . . . . . 698

18     VC11 . . . . . . . . . . . . . . . . . . . 696

19     HN-26 . . . . . . . . . . . . . . . . . . 762

20     123 . . . . . . . . . . . . . . . . . . . 752

21     W1007-V1 . . . . . . . . . . . . . . . . . 753

22     W1007-V3 . . . . . . . . . . . . . . . . . 757

23

24

25