O5VVGUO1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    UNITED STATES OF AMERICA,
 3
              v.                        23 Cr. 118 (AT)
 4
    MILES GUO,
 5
                   Defendant.           Trial
 6  ------------------------------x
                                        New York, N.Y.
 7                                      May 31, 2024
                                        9:00 a.m.
 8
    Before:
 9
10                  HON. ANALISA TORRES,

11                                      District Judge
                                         -and a Jury-
12
                         APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MICAH F. FERGENSON
         RYAN B. FINKEL
16       JUSTIN HORTON
         JULIANA N. MURRAY
17       Assistant United States Attorneys

18  SABRINA P. SHROFF
         Attorney for Defendant
19
    PRYOR CASHMAN LLP
20       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
21       MATTHEW BARKAN

22  ALSTON & BIRD LLP
         Attorneys for Defendant
23  BY:  E. SCOTT SCHIRICK

24

25
```

O5VVGUO1

1    ALSO PRESENT:
     Isabel Loftus, Paralegal Specialist, USAO
2    Robert Stout, Special Agent, FBI
     Ruben Montilla, Defense Paralegal
3    Tuo Huang, Interpreter (Mandarin)
     Shi Feng, Interpreter (Mandarin)
4    Yu Mark Tang, Interpreter (Mandarin)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5VVGUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          Please make your appearances.

4          MR. FINKEL:  Good morning, your Honor.

5          Ryan Finkel, Juliana Murray, Micah Fergenson, Justin

6     Horton, who is on his way up — and feedback, sorry — for the

7     government.  We're joined by Isabel Loftus, who is a paralegal

8     in the U.S. Attorney's Office, and Special Agent Robert Stout

9     of the FBI.

10         MR. KAMARAJU:  Good morning, your Honor.  Sid Kamaraju

11    and Sabrina Shroff, on behalf of Mr. Guo.  And Mr. Guo is here

12    with us at counsel table.

13         MS. SHROFF:  Good morning, your Honor.

14         THE COURT:  Please be seated.

15         Yesterday the Court heard testimony from Steele

16    Schottenheimer, the managing director for investor relations at

17    Hayman Capital Management.  The government seeks to elicit from

18    Ms. Schottenheimer testimony as to whether an investment in

19    Hayman Capital's Hong Kong Opportunities Fund could "have a

20    negative impact on the Chinese Communist Party," and be a means

21    to "fight the CCP," or whether such an investment is merely "a

22    bet on how the macroeconomic environment will perform."  That

23    was from the government's letter at ECF No. 369.

24         Under Rule 701, a lay witness may offer opinion

25    testimony only to the extent that it is rationally based on the

O5VVGUO1

1    witness's perception, helpful to clearly understand the

2    witness's testimony or to determine a fact in issue, and not

3    based on scientific, technical, or other specialized knowledge

4    within the scope of Rule 702.

5         The parties have found some common ground in their

6    letters.

7         The government argues that based on her personal

8    experience as a Hayman Capital managing director,

9    Ms. Schottenheimer "should be permitted to testify that Hayman

10   does not represent that investing in something like the Hayman

11   Hong Kong Opportunity Fund would help bring about the event

12   that is being bid on."  Government letter at 4.

13        The defense agrees that Ms. Schottenheimer "can

14   testify about whether she marketed the fund as a tool to take

15   down the CCP."  Defendant's letter at 4, ECF No. 370.

16        Testimony about how Hayman marketed the Hong Kong

17   Opportunity Fund to Guo does not require Ms. Schottenheimer to

18   offer an opinion.  Accordingly, Ms. Schottenheimer may testify

19   as to how she marketed the fund in promotional material, such

20   as the slide deck which was admitted into evidence, and in

21   conversations with the defendant and other relevant

22   individuals.  The government may elicit, for example, that

23   Hayman advertised the fund merely as a bet on the performance

24   of the Hong Kong dollar.  These representations would be

25   relevant to the defendant's state of mind in deciding whether

O5VVGUO1

1    to invest in the fund.

2          However, I will not permit the government to ask

3    Ms. Schottenheimer to speculate about whether an investment in

4    the fund would have a negative impact on the Chinese Communist

5    Party.  That question asks for an opinion that goes beyond her

6    work at Hayman Capital; it asks her to opine on whether a short

7    position on a foreign currency could have an impact on a

8    foreign government.  This is beyond the ken of a person with

9    industry experience like Ms. Schottenheimer.  It is also far

10   less relevant than marketing-related evidence because it does

11   not directly bear on the defendant's state of mind.

12         Accordingly, the government shall not elicit general

13   testimony about the impact of the fund on the broader economy.

14         I'm told that we're still waiting for one of the

15   jurors because the Lexington Avenue subway line apparently is

16   stuck.  There may be some sort of a crisis related to someone

17   on the tracks.

18         Is there anything else that you'd like to raise?

19         MR. KAMARAJU:  Not from the defense, your Honor.

20         MR. FINKEL:  Your Honor, I just want to make sure I

21   don't run afoul of the Court's ruling.  I plan to ask

22   Ms. Schottenheimer, consistent with what I understand the

23   ruling to be, about marketing and how the HHKOF was represented

24   to investors.  I believe I can also ask her what the HHKOF is a

25   bet on, which is to say what it is.  And that, in large part,

O5VVGUO1

1      has come in.

2              I think she can also testify about her personal

3      observations about whether, after the HHKOF was made available

4      to the public in 2017, the CCP has fallen.  She has personal

5      observations of that; that is not expert testimony.  I just

6      want to make sure all that is in accord with your Honor's

7      ruling.

8              And with respect to the sort of -- whether the opinion

9      about -- if it even is an opinion, about the impact of the bet

10     on the CCP, your Honor, in some sense I think -- this is what

11     I'm trying to figure out if there's a way to get this with

12     Ms. Schottenheimer is if you bet on the Met game, right, and

13     the Mets win — which I hope they do, but they don't a lot — you

14     make money.  But betting on the Met game doesn't make the Mets

15     win or lose, right; it's just a bet on an outcome.  And I think

16     that concept, which she knows based on her personal knowledge —

17     not based on any studies she's done, not based on any work

18     she's done as an expert or anything like that, she's not an

19     expert, she's just an employee of the company — those sorts of

20     questions about investing and betting, frankly, because that's

21     what the investment is, I don't think that runs afoul of your

22     Honor's ruling and I just want to ensure that I don't do that.

23             MR. KAMARAJU:  Thank you, your Honor.

24             So I think the testimony that Mr. Finkel is trying to

25     elicit or that he refers to at the end is actually precisely

O5VVGUO1

1    expert testimony.  And we submitted an example of that from a

2    trial that was held here in this courthouse, *United States v.*

3    *Phillips*, which was about a market manipulation theory related

4    to the South African rand.  And the government submitted an

5    expert disclosure concerning an expert witness that they

6    intended to call talking about the influence of trading

7    patterns on the underlying currency, how it would impact it,

8    and how ultimately that would affect the economy in South

9    Africa.  So the idea that Ms. Schottenheimer can sort of

10   facilely say, Well, if you're just making a bet on the

11   currency, it's not going to affect anything underlying, it's

12   nothing more than a way to backdoor in the prior testimony that

13   your Honor has just excluded.

14         With respect to whether she can testify as to whether

15   the CCP has fallen, first of all, I'm not sure what her

16   personal observations about that fact are relevant to, but I'm

17   also not sure that she has the knowledge base to say one way or

18   the other whether the CCP has been damaged or harmed or hurt in

19   any way.  The fund is still working.

20         So to me, what Mr. Finkel has sort of advocated for is

21   just another way to backdoor into the same opinions that your

22   Honor has now just precluded.

23         MR. FINKEL:  So, your Honor, the difference between

24   Ms. Schottenheimer and the *Phillips* case is Ms. Schottenheimer

25   has personal experience, personal knowledge.  She's a

O5VVGUO1

1    percipient witness.  She works at Hayman Capital.

2            The expert the government sought to introduce at

3    *Phillips* is none of those things.  He looked at the evidence

4    and made an assessment about the evidence.

5            Ms. Schottenheimer would be testifying not about her

6    opinion, but about her personal observations, her percipient

7    knowledge of events, how the trade works.  She tells people

8    about that.  That's her job.  And so I think that's an

9    important distinction between what defense counsel is

10   discussing and what Ms. Schottenheimer would testify about.

11           THE COURT:  So I understand the questions that you'd

12   like to elicit.  Would this investment have an impact on the

13   government and did it have an impact or did the government fall

14   as a result of this investment.  Am I correct?

15           MR. FINKEL:  That is one question, your Honor.

16           I think another question, which I can't envision how

17   it's in any way 701 or 702, is what is the size of the HHKOF,

18   right, which is the total position that the HHKOF has taken

19   over time.  She knows that from her work.  That's not an expert

20   analysis; that's her knowledge.

21           THE COURT:  That's a matter of fact.

22           MR. FINKEL:  Exactly.

23           And so that's all I'm saying, your Honor.  Just to be

24   clear, I'm not trying to relitigate your Honor's ruling, the

25   Court's ruling.  I just want to be -- I just don't want to have

O5VVGUO1

1    sidebars and make sure I stay within the lanes that your Honor

2    established.  And that's what I intend to do, is elicit facts

3    about what she knows, what she's seen, what she's experienced,

4    and then she'll be free to be crossed on it.

5        THE COURT:  So asking about the size of the position

6    is fine.  But asking whether this investment would have an

7    impact on the Chinese economy, that is prohibited.  And asking

8    whether it did cause an impact or cause the Chinese Communist

9    Party to fall, that is also prohibited.

10        MR. FINKEL:  Understood, your Honor.

11        Okay.  Understood.

12        THE COURT:  Anything further?

13        MR. KAMARAJU:  Not from us, your Honor.

14        MR. FINKEL:  Just two things.

15        Defense counsel and the government have discussed I'm

16    going to provide Ms. Schottenheimer a binder; it has a number

17    of documents in it.  We've identified the documents for defense

18    counsel.  As at least to one of those documents, the defense is

19    going to ask for a limiting instruction because it's an email

20    that Kyle Bass sent to William Je; and it's being offered for

21    the effect on William Je, not for its truth.  The Government

22    has no objection to such an instruction.  And I guess we can

23    ask for it when that document comes up.

24        MR. KAMARAJU:  That's fine with us, your Honor.

25        MR. FINKEL:  And then last piece, your Honor, and just

O5VVGUO1

1    in an abundance of caution, I know the Court instructed the

2    jury about this during preliminary instructions.  The

3    government would just request that in the sort of daily

4    admonishment to the jurors not to discuss the case, your Honor

5    also tell them not to do research on the case or follow any

6    news about it.  I know that's sort of already out there, but

7    the government would appreciate if your Honor would do that

8    from time to time.

9              THE COURT:  Okay.

10             MR. FINKEL:  Thank you.

11             THE COURT:  I'd like the government to provide me with

12    hard copies of the stipulations, please.

13             MR. FINKEL:  Absolutely.  They are being printed now,

14    your Honor, and we'll have them shortly.

15             (Recess)

16             THE COURT:  I'm told that all the jurors are now here.

17             Is there something, Mr. Kamaraju, that you wanted to

18    put on the record?

19             MR. KAMARAJU:  Yes, it's very minor.  I've already

20    spoken with the government about it.

21             I just wanted the Court to be aware that when one of

22    the jurors arrived, they accidentally wandered into the room

23    that the defense team is using.  They saw us, expressed

24    surprised, turned around, and walked away.  Nobody said

25    anything to the juror, but I just wanted the Court to know.

1    I've spoken with the government; I don't think there's anything

2    to be done about it.

3              THE COURT:  All righty, then.

4              Please have the jurors come in.

5              MR. FINKEL:  Should the witness take the stand?

6              THE COURT:  And the witness should take the stand,

7    yes.

8              (Jury present)

9              THE COURT:  Please be seated.  Good morning, jurors.

10             THE JURY:  Good morning.

11             THE COURT:  We're going to continue with the direct

12   examination of Ms. Schottenheimer.

13             And I remind you that you're still under oath.

14             You may inquire.

15             MR. FINKEL:  Thank you, your Honor.

16    STEELE SCHOTTENHEIMER,

17        called as a witness by the Government,

18        having been previously duly sworn, testified as follows:

19   DIRECT EXAMINATION (continued)

20   BY MR. FINKEL:

21   Q.  Good morning.

22   A.  Good morning.

23   Q.  Ms. Schottenheimer, you were speaking yesterday a bit about

24   the Hayman Hong Kong Opportunities Fund.  Is there a shorthand

25   name that Hayman uses for the Hayman Hong Kong Opportunities

1    Fund?

2    A.  HHKOF.

3    Q.  And how do you spell that?

4    A.  H-H-K-O-F.

5    Q.  So if I refer to it as the HHKOF, you'll understand I'm

6    referring to the Hayman Hong Kong Opportunities Fund?

7    A.  Yes.

8            THE COURT:  Mr. Finkel, I'm going to need you to come

9    closer to the microphone.

10            MR. FINKEL:  Yes, your Honor.

11   Q.  When an investor invests in the HHKOF Share Class A, what

12   event needs to happen for that investment to pay off, for the

13   bet to win?

14   A.  There would need to be a devaluation or a stress to the

15   Hong Kong dollar.

16   Q.  And how significant of a devaluation or stress to the Hong

17   Kong dollar would be required for a bet on the HHKOF to pay

18   off?

19   A.  Even one cent outside of the band, the fund would be

20   technically in the money.  But the more drastic the devaluation

21   or stress, the more money the fund would make.

22   Q.  So if the peg breaks, the Hong Kong dollar/U.S. dollar peg

23   breaks, would the HHKOF pay off?

24   A.  Yes.

25            THE COURT:  One moment.

1          Can you explain in very simple terms how this works?

2          THE WITNESS:  Yes.  So the Hayman Hong Kong

3   Opportunities Fund is short the Hong Kong dollar.  And so the

4   Hong Kong dollar is pegged to the U.S. dollar.  And so if the

5   Hong Kong dollar were to devalue against the U.S. dollar, then

6   our fund would make money.

7          THE COURT:  But what do you mean by "short"?

8          THE WITNESS:  You can be long a currency and you can

9   be short a currency; meaning you can be positioned to make

10   money on the long side if the currency were to strengthen, and

11   you could make money on the short side, being short the

12   currency, if the currency were to go down in value.

13          THE COURT:  Can you give an example using numbers.

14          THE WITNESS:  Absolutely.

15          So the Hayman Hong Kong -- sorry the Hong Kong dollar,

16   for example, the weak side of the band is seven spot 85, $7.85

17   per Hong Kong dollar to the U.S. dollar.

18          If the Hong Kong dollar were to devalue to 10 Hong

19   Kong dollars to U.S. dollars, even though it's increasing, it's

20   actually devaluing because it takes more Hong Kong dollars to

21   make a U.S. dollar.  So if you were to be short the Hong Kong

22   dollar and it were to trade outside the band $7.85 Hong Kong

23   dollars per U.S. dollars, then you would make the delta or the

24   difference between 7 spot 85 and $10.

25   Q.  Thank you.

O5VVGUO1                        Schottenheimer - Direct

1          So if someone is shorting a currency, the bet they're

2    making is anticipating the currency will drop in value?

3    A.   Drop in value versus another currency.  In the case of the

4    Hong Kong dollar, because it is pegged to the U.S. dollar, that

5    is the metric.

6    Q.   So if the Hong Kong dollar drops outside of the band, if

7    the peg breaks, the value of the Hong Kong dollar would drop

8    and the HHKOF would pay off; correct?

9    A.   Correct.

10   Q.   Now, that was Share Class A.  Let's talk about Share Class

11   B, the Prodigious Series.

12          What event, if any, needs to occur for Share Class B,

13   the Prodigious Series, for that bet to pay off?

14   A.   It's the outcome -- the input, meaning the devaluation of

15   the Hong Kong dollar, it's the same.  It was just more -- the

16   exposure in Share Class B is more significant, so the outcome

17   is more severe.

18   Q.   So, again, if the band or peg breaks, then Share Class B

19   would pay off?

20   A.   Correct.

21   Q.   Since the --

22   A.   Breaks to the weak side.

23   Q.   Since the HHKOF has been offered for sale, has the peg

24   broken?

25   A.   No, it has not.

1    Q.  And when Hayman markets this HHKOF investment to investors,

2    what you just explained, how the bet will pay off, is that

3    consistent with Hayman's marketing materials?

4    A.  Yes.

5            MR. FINKEL:  Your Honor, may I approach the witness?

6            THE COURT:  You may.

7            MR. FINKEL:  Handing Ms. Schottenheimer a binder with

8    a variety of documents, including the following:  GX HN-26, 29,

9    35, 41, 57, 59, 69, 70, 71, 79, 80, 82, 86, 98, 124, 168, 193,

10   208, 220, 221, 222, 223.

11   Q.  Ms. Schottenheimer, can you flip through the binder and let

12   me know if you recognize the documents inside of it.

13           MR. FINKEL:  For the record, those numbers are all "GX

14   HN" prefixes.

15   A.  I have flipped through the binder.

16   Q.  Ms. Schottenheimer, have you seen that binder before?

17   A.  Yes.

18   Q.  And how do you recognize that you've seen it before?

19   A.  I reviewed this binder a couple days ago when I was with

20   the assistant U.S. Attorney office.

21   Q.  And who asked you to review the contents of that binder?

22   A.  You did.

23   Q.  And who picked the contents of that binder?

24   A.  I believe you did.

25   Q.  And what, just at a very high level, is in that binder?

1    A.   It's email correspondence between myself and William Je,

2    email correspondence between William Je and Kyle, email

3    correspondence between Steve Bannon and Kyle.

4           There's different versions of the Saraca subscription

5    booklet subscribing to the Hayman Hong Kong Opportunities Fund.

6    There's a Hamilton subscription booklet in here as well.

7           There's also some wire details, evidence of wires that

8    have occurred; as well as the side letter between Saraca,

9    Hamilton, and the Hayman Hong Kong Opportunities Fund.

10   Q.   And Ms. Schottenheimer, the emails that you sent or

11   received, are those fair and accurate copies of emails you sent

12   or received?

13   A.   Yes.

14   Q.   And what is Global Relay?

15   A.   Global Relay is a third-party service that Hayman Capital

16   Management uses to capture required emails and store them for

17   up to five years.

18   Q.   And why does Hayman store its emails for up to five years?

19   A.   We are required to by the Securities and Exchange

20   Commission.

21   Q.   And with respect to the emails that you mentioned that

22   you're not on, what steps, if any, did you take concerning

23   those documents in the Global Relay system?

24   A.   I connected with Hayman's chief compliance officer, Stu

25   Smith.  We set up a Teams call so I could view his screen.  I

do not have access as investor relations to the Global Relay;

however, he does as the chief compliance officer.  And so he

logged into Global Relay and searched for these specific

emails, and I was able to verify that they were sent to

Hayman's server and captured by Global Relay.

MR. FINKEL:  Your Honor, at this time the government

offers GX HN-26, 29, 35, 41, 57, 59, 69, 70, 71, 79, 80, 82,

86, 98, 124, 168, 193, 208, 220, 221, 222, and 223.

THE COURT:  No objection?

MR. KAMARAJU:  No objection to their admission, your

Honor, subject to the Court giving a limiting instruction with

respect to G HN-208 at the appropriate time.

THE COURT:  All right.  So you'll indicate when that

happens.

MR. KAMARAJU:  Yes, your Honor.

THE COURT:  Okay.  Go ahead.

MR. FINKEL:  Thank you, your Honor.

(Government's Exhibits HN-26, HN-29, HN-35, HN-41,

HN-57, HN-59, HN-69, HN-70, HN-71, HN-79, HN-80, HN-82, HN-86,

HN-98, HN-124, HN-168, HN-193, HN-208, HN-220, HN-221, HN-222,

HN-223 received in evidence)

BY MR. FINKEL:

Q.  Ms. Schottenheimer, how long has the HHKOF been offered to

the marketplace for?

A.  January of 2017.

1    Q.  And since that time, has the Hong Kong dollar peg broken?

2    A.  It has not.

3    Q.  Is the peg still in place today?

4    A.  The band is still in place today, yes.

5           MR. FINKEL:  Okay.  If we can pull up, please, what's

6    in evidence as Government Exhibit HN-29.

7    Q.  Ms. Schottenheimer, what is this document?

8    A.  This is an email that I sent to all prospective investors

9    that had indicated an interest in participating in the Hayman

10   Hong Kong Opportunities onshore fund for Share Class B, the

11   Prodigious Series.  I sent it on Sunday, May 24th.  We had just

12   received the offering documents from outside counsel, and I was

13   distributing it to all interested parties.

14   Q.  Ms. Schottenheimer, you said onshore.  Can you explain to

15   the jury what you mean by "onshore"?

16   A.  So the Hayman Hong Kong Opportunities Fund has two feeder

17   funds:  An onshore feeder fund for taxable U.S. investors, and

18   an offshore feeder fund for U.S. tax-exempt investors and

19   offshore investors.  These are, I guess, kind of tax -- it's so

20   investors, you know, get the appropriate tax documentation when

21   they invest in our fund.

22          MR. FINKEL:  Ms. Loftus, can you zoom out of that and

23   zoom in on the top of the document, please.

24   Q.  Ms. Schottenheimer, do you recognize this email address?

25   A.  Yes.

O5VVGUO1                    Schottenheimer - Direct

1    Q.  And whose email address is that?

2    A.  William Je.

3    Q.  Could you read the email address, please.

4    A.  William.je@acacap.com.

5    Q.  Ms. Schottenheimer, why did you send this documentation

6    about the Hong Kong Opportunities Fund Share Class B, the

7    Prodigious Series, to Mr. Je?

8    A.  At that point I was under the impression that William was

9    interested in reviewing both the onshore and the offshore

10   offering documents for the fund.

11          MR. FINKEL:  You can zoom out of that, please,

12   Ms. Loftus, and go to page 3 of this document.

13   Q.  Ms. Schottenheimer, what is this, page 3 of HN-29?

14   A.  This is our AML or anti-money laundering information grid.

15   Q.  And the second row says:  Private corporation/limited

16   liability companies.  Can you explain to the jury the purpose

17   of that row on this document?

18   A.  Yes.  We have all different types of limited partners that

19   come and invest in our fund in all different types of

20   structures.  Sometimes it's as an individual, sometimes it's as

21   a limited partnership, sometimes it's as an LLC.  And the row

22   that you're inquiring about is -- you said the LLC?

23   Q.  Private corporation/limited liability companies, is that --

24   A.  Yes, yes, private corporation and limited liabilities, yes.

25   Q.  In the second checkmark it says:  Beneficial owners, 25

O5VVGUO1                          Schottenheimer - Direct

1   percent or more interest, see CIP requirements.

2          What does that mean?

3   A.  So we are required to do a look-through of the entity to

4   understand who the beneficial owner of the entity is.

5          MR. FINKEL:  Go to page 5 of this document, please,

6   Ms. Loftus.

7   Q.  And Ms. Schottenheimer, do you see where it says "ultimate

8   beneficial owner" above that chart?

9   A.  Yes.

10  Q.  Can you read what that says?

11  A.  "Where no beneficial ownership information is provided, it

12  will be assumed no beneficial owner holds 25 percent or more of

13  the assets of the entity.  In cases where the investing entity

14  is performing AML due diligence on the underlying beneficial

15  owner, an eligible introducer letter or equivalent

16  certification letter can be provided in lieu of providing the

17  details above."

18         MR. FINKEL:  Can we zoom out of that, please,

19  Ms. Loftus.

20  Q.  The chart below that, what is that for?

21  A.  Those are four of the five -- that's outlining four of the

22  five items that we are required to collect on any beneficial

23  owner owning more than 25 percent of any entity.

24  Q.  And what is an ultimate beneficial owner?

25  A.  It's the person who owns the entity.

1              MR. FINKEL:  If we can go, please, to page 9 of this

2   document.  Can you zoom in at number 10, Ms. Loftus, please.

3   Right there is fine.

4   Q.  Here, underneath where it says payment and a Citibank bank

5   account, what's that?

6   A.  That is the account -- that is the banking account for

7   Hayman Hong Kong Opportunities Onshore Fund.  This is where

8   investors send their capital, that they're subscribing to the

9   entity.

10  Q.  And so if an investor wants to invest in the onshore fund,

11  they send their money to a Citibank account which ends in 9681;

12  is that right?

13  A.  That is correct.

14             MR. FINKEL:  We can go, please, to page 44.

15  Q.  Ms. Schottenheimer, what is this part of the documents for?

16  A.  This is the accredited investor status.  So we are required

17  for anyone who is subscribing to the fund to get verification

18  that they are, in fact, an accredited investor.

19             MR. FINKEL:  And if we can please go to the next

20  page -- or, sorry, page 46.

21  Q.  At the bottom it says "qualified purchaser status."  What's

22  that?

23  A.  This section of the document?

24  Q.  Yes.

25  A.  This section of the document is where we're collecting the

O5VVGUO1                      Schottenheimer - Direct

1    qualified purchaser representation from the investor.  As

2    discussed yesterday, all of our investors are required to be

3    qualified purchasers.

4    Q.  Ms. Schottenheimer, what is a sub doc?

5    A.  A subscription document is the legal paperwork that an

6    investor completes in order to subscribe to our vehicle.

7    Q.  And this document that we're looking at with the jury, is

8    that a sub doc?

9    A.  Yes.

10   Q.  For what?

11   A.  The Hayman Hong Kong Opportunities Onshore Fund.

12            MR. FINKEL:  Ms. Loftus, we can take that down.  And

13   if we can display for the witness, please, HN-33, just the

14   witness.

15   Q.  Ms. Schottenheimer, what is this document?

16   A.  This is a text message from Kyle Bass to myself.

17   Q.  And the top text message, who is that text message from?

18   A.  The top text message is, I believe, a cut-and-paste from

19   William to Kyle that he is then cut and paste to myself,

20   explaining what entities are investing in the Hong Kong fund.

21            MR. FINKEL:  Government offers HN-33.

22            MR. KAMARAJU:  No objection.

23            THE COURT:  It is admitted.

24            (Government's Exhibit HN-33 received in evidence)

25            MR. FINKEL:  Publish that, please.

1    Q.  Ms. Schottenheimer, now that the jury can see it, can you

2    read that first text message, which was the cut-and-paste from

3    William Je?

4    A.  Correct.

5              "Because of tight timing, the entities to invest into

6    your fund onshore U.S., Saraca Media Group Incorporated.

7    Number two, offshore:  Hamilton Investment Management Limited.

8    We can fill in all the details later.  Thanks."

9    Q.  And what do you say in response to that?

10   A.  I'm asking Kyle if the text message is from William.

11   Q.  And what is Kyle's response to you after you ask if it's

12   from William?

13   A.  "Steele, these are the two entities that William and Miles

14   will be investing through."

15   Q.  And what is your understanding of who "Miles" refers to?

16   A.  Miles Kwok.

17   Q.  At this time, on May 26, 2020, when you received this text

18   message, what was your understanding of what Saraca Media

19   Group, Inc. was?

20   A.  I had no understanding.  It was just the name of an entity.

21   Q.  In your work at Hayman, is it unusual for an individual to

22   invest in a Hayman financial product through an entity as

23   opposed to their own individual self?

24   A.  Not unusual.

25   Q.  And why is that?

O5VVGUO1                    Schottenheimer - Direct

1  A.  Because a lot of wealthy individuals use entities for their

2  family limited partnerships, for their business purposes.  It's

3  just their preference.

4  Q.  So here it says Saraca Media Group, Inc.  Did you have an

5  understanding at this time, May 2020, whether Saraca Media

6  Group, Inc. was a media company?

7  A.  No, I did not.

8  Q.  What was your understanding about what Saraca Media Group

9  did at this time?

10 A.  Just at this pinpoint with the text message?  I hadn't

11 considered it.  I was looking to collect the names to get

12 checks with our external counsel to see if they could help

13 enlist the side letter.

14        MR. FINKEL:  We can go, please, to HN-35, which is in

15 evidence.  35, please, Ms. Loftus.  You can scroll down,

16 please, to page 2.  And if you can zoom in on that email on

17 Tuesday, May 26.

18 Q.  Ms. Schottenheimer, this email that you sent to William Je,

19 copying Mr. Bass, what is the purpose of this email?

20 A.  Now that I had the names of the entities investing, I was

21 formally requesting to William the AML and FATCA compliance

22 requirements for them to invest in the fund.

23 Q.  And what was your understanding of why there was an onshore

24 investment entity and an offshore investment entity at this

25 time in May of 2020?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5VVGUO1                        Schottenheimer - Direct

1    A.  At this time I was unclear of that.

2    Q.  Go ahead.

3    A.  Outside of one being a taxable entity and the other one

4    being a nontaxable entity.

5    Q.  And which was the nontaxable entity?

6    A.  Hamilton Investment Management Limited.

7            MR. FINKEL:  We can zoom out of that, please.  We can

8    go to the first page.

9    Q.  Can you read the top email that you sent, please, on May

10   28th, 2020.

11   A.  Sorry, could you repeat the question please.

12   Q.  Sure.  Can you read this email that you sent to William Je

13   on May 28, 2020?

14   A.  "Hi, William.  We are looking to have all wires and

15   documents in by Friday, June 5th.  Thank you for the below

16   confirmation -- sorry.  Thank you for the confirmation below.

17   I will have the side letter to you shortly."

18   Q.  What does "side letter" mean?

19   A.  A side letter is a legal document that a lot of large

20   investors require.  They are terms outside of the offering

21   materials.

22   Q.  And was there a side letter for the Saraca/Miles Kwok

23   investment?

24   A.  Yes.

25   Q.  And what was the nature of the side letter for the

1  Saraca/Miles Kwok investment?

2  A.  From a high level, they were requesting three terms outside

3  of the offering documents for the fund.  The first was they

4  wanted a reduced management fee, from two percent to one

5  percent; they wanted a hurdle on the performance fee, meaning I

6  believe it was something in the magnitude of they were going to

7  make 25 times their money before we would start charging a

8  performance fee; and then the third is they had requested a

9  transparency clause, meaning they were going to require

10  additional reporting outside of our typical reporting to

11  investors.

12  Q.  All right.  Let's walk through that.

13          You said there is a reduction in the, is it,

14  management fee?

15  A.  Yes.

16  Q.  Can you explain to the jury what that means.

17  A.  So for the Hayman Hong Kong Opportunities Fund Share Class

18  B, there's a onetime two percent management fee taken upon --

19  at closing.  And so if you were to invest $100 in this share

20  class, the management fee for Hayman to manage this capital

21  would be $2 at the time of closing.  So in the case of Saraca

22  and Hamilton's investment, it would only be one dollar.

23  Q.  So the reduction in the fee, is that beneficial to Saraca

24  and Miles Kwok or to Hayman?

25  A.  A reduction in the management fee would be beneficial to

1  the investor requesting it, because they are only paying a

2  dollar instead of $2.

3  Q.  And can you describe to the jury, please, what the

4  reduction in the performance fee means?

5  A.  So Hayman collects a performance fee.  The performance fee

6  for the Hayman Hong Kong Opportunities Fund is first you get

7  your initial capital back.  So if you invest $100, you get $100

8  back.

9        Then, on the next $100 that is made — let's say the

10  trade works out in our favor — we collect 15 cents of every

11  dollar, and you get 85 cents of every dollar, up until 100

12  percent net return to you as the investor.  So you've made, you

13  know, $200 and we've -- or sorry, you've made $2 and we've

14  collected 15 cents at this point.

15        Then anything above 100 percent net return to you, we

16  split those dollars 80 to you, 20 to us.

17  Q.  What did the Miles Kwok/Saraca investment seek instead?

18  A.  They were looking for -- to make 25 times their money.  So

19  if they were to invest a dollar, they would get that dollar

20  back plus $25.  And then anything above that we would split the

21  20/80; 80 to them, 20 to us.

22  Q.  And so the terms that Miles Kwok and Saraca requested, are

23  they beneficial to Miles Kwok and Saraca or to Hayman?

24  A.  Beneficial to Miles Kwok and Saraca.

25  Q.  At this time, Ms. Schottenheimer, May 2020, what was your

1  understanding of the amounts of money that Miles Kwok and

2  Saraca sought to invest in the Prodigious Series?

3  A.   Originally, it was flagged to me 50, 51 million, including

4  Hamilton.  And then at some point when we received the sub

5  docs, it was 100 million from Saraca.

6  Q.   The last point with respect to the side letter,

7  Ms. Schottenheimer, you mentioned was transparency.  Can you

8  explain to the members of the jury, please, what that means.

9  A.   So we have typical exposure reporting to investors on a

10  monthly basis.  We kind of quantify for them, you know, that

11  you are 200 times short the Hong Kong dollar or you're 196

12  times short the Hong Kong dollar.  In Share Class B, it doesn't

13  vary month-to-month until the options expire.

14        But in the case of Saraca, they actually wanted

15  position-level detail, which we gave them, because there was no

16  withdrawal rights in this fund.  And so once we were fully

17  positioned, we were comfortable giving them position-level

18  detail, which is what the side letter said.

19  Q.   Can you break that down for us, please, what you mean by

20  position-level detail and because this was a fully invested

21  financial product.

22  A.   Right.  So typically, you know, again, we just tell you

23  your exposure, your short X amount to Hong Kong dollar.  They

24  were actually looking for position-level detail, meaning the

25  actual description of the option.  You know, you are short 200

O5VVGUO1                         Schottenheimer - Direct

1    million, you know, dollars worth of an option that expires on X

2    date.

3    Q.  So they wanted detail about the underlying financial

4    transactions that --

5    A.  Correct.  The actual positions that they hold, when they

6    expired, the notional value of each of them.  Because, again,

7    you don't just go out and buy a single option for a whole

8    tranche; you are trading with multiple dealers and getting the

9    best pricing possible every night that you're in the

10   marketplace.  So you could have dozens of line items or dozens

11   of very similar options, and they were wanting to see that

12   level of detail.

13   Q.  And this level of detail pertains to financial

14   transactions; correct?

15   A.  Correct.

16   Q.  And these are transactions -- these are trades that Hayman

17   makes to put in place a bet that if the peg breaks on the weak

18   side, the bet pays off; is that right?

19   A.  Correct.

20   Q.  And did Hayman ultimately agree to the reduction in

21   administrator fee, performance fee, and these transparency

22   rights for Miles Kwok and Saraca?

23   A.  Reduction in management fee, yes.  The reduction in the

24   incentive fee, yes.  And the transparency rights.

25   Q.  Who asked for those, by the way?

1    A.   This was something, to my knowledge, that William

2    negotiated with Kyle.

3    Q.   Ms. Schottenheimer, with respect to Saraca Media Group,

4    Inc., what, if any, due diligence did Hayman perform on that

5    entity?

6    A.   Regarding their subscription document?

7    Q.   Yes.

8    A.   So when Saraca subscribed to Hayman, there was a thorough

9    review of the subscription document by myself, another person

10   that works with me in investor relations, and our third-party

11   administrator.  And there was some time spent kind of

12   reconciling the answers and then inquiring back to William

13   regarding some things that did not align.

14   Q.   And Ms. Schottenheimer, through that process, what did

15   Hayman learn about who, if anyone, was the ultimate beneficial

16   owner of Saraca Media Group?

17   A.   So Saraca Media Group represented that there was only a

18   single person that owned the entire entity.  And they put forth

19   that that individual was Miles Kwok's son.

20          MR. FINKEL:  Can you please display what's in evidence

21   as GX HN-82.

22   Q.   Ms. Schottenheimer, what is this?

23   A.   This is a copy of a valid passport at the time of Miles

24   Kwok's son.

25   Q.   And what's his legal name?  If you could read it or spell

1    it for the jury, please.

2    A.  His last name is Guo, and his first name is spelled

3    Q-I-A-N-G.

4    Q.  And why does Hayman collect this passport copy?

5    A.  It is required as part of our AML practices on any and all

6    beneficial owners more than 25 percent.

7    Q.  And based on the representations made by Saraca, were there

8    any other owners of Saraca Media Group?

9    A.  Not based on their subscription booklet.

10   Q.  And Ms. Schottenheimer, if the Prodigious Series

11   investment, $100 million investment, that Saraca invested in

12   paid off, ultimately, who would collect the gain?

13            MR. KAMARAJU:  Objection to form.

14            THE COURT:  Overruled.  You may answer.

15   A.  Saraca Media Group would collect the wire, and the ultimate

16   beneficial owner of Saraca is Miles's son.

17   Q.  So he would collect the gain?

18   A.  Through the entity, yes.

19   Q.  Did Miles Kwok go through an AML check?

20   A.  He did not.

21   Q.  Why not?

22   A.  Because he was not listed on the subscription booklet as an

23   authorized signatory and ultimate beneficial owner or a

24   controlling interest person.

25   Q.  In your work, does the term "principal" and "agent" have a

1    particular meaning?

2    A.  Not in the context of a subscription booklet.

3    Q.  In the context of what?

4    A.  Can you please repeat the question?

5    Q.  What is a principal?

6    A.  What is a principal?  Someone that is the primary person

7    on -- in some capacity.

8    Q.  And, Ms. Schottenheimer, if your understanding that it was

9    Miles Kwok who was investing the Saraca -- making the Saraca

10   investment, but Miles Kwok's son was the ultimate beneficial

11   owner, can you explain to the jury whether that would be

12   unusual or why there was no work done on Miles Kwok AML?

13           MR. KAMARAJU:  Object to the form.

14           THE COURT:  If you would break that down, please.

15           MR. FINKEL:  Certainly.

16   Q.  You testified earlier that your understanding was Miles

17   Kwok was making the Saraca investment; correct?

18   A.  Yes.

19   Q.  Why then -- let me ask it this way:  The fact that his son

20   was the ultimate beneficial owner of Saraca, but you understood

21   it was Miles Kwok's money, can you explain what impact, if any,

22   that had on your thinking when doing due diligence?

23           MR. KAMARAJU:  Objection to form.

24           THE COURT:  So take it in small bites.

25           MR. FINKEL:  Sure.

1    Q.  The fact that Miles Kwok's son was the ultimate beneficial

2    owner of Saraca, as opposed to Miles Kwok, what impact, if any,

3    did that have on your thinking as you were working through the

4    due diligence of this particular investment?

5    A.  I didn't find it --

6                MR. KAMARAJU:  Same objection.

7                THE COURT:  You understood Miles Kwok to be making the

8    investment?

9                THE WITNESS:  I understood that it was Miles Kwok

10   family office that was interested in making the investment.

11               THE COURT:  You can ask the next question.

12               MR. FINKEL:  Thank you.

13   BY MR. FINKEL:

14   Q.  What do you mean by Miles Kwok's family office?

15   A.  Previously it had been represented to me that William Je

16   was the head or ran Miles Kwok's family office.  And so when

17   William Je was interested in reviewing our presentation, our

18   playback webcast in reviewing offering documents, I took that

19   to mean that Miles Kwok's family office, the capital that

20   William ran on his behalf, was interested in the Hayman Hong

21   Kong Opportunities Fund.

22   Q.  And that Miles Kwok's son was the ultimate beneficial owner

23   of Saraca, as opposed to Miles Kwok, what impact did that have

24   on your thinking about the investment?

25               MR. KAMARAJU:  Same objection.

1           THE COURT:  You may answer.

2     A.  It had very little impact on my thinking because it is

3     typical for family offices to have members of the family be the

4     beneficial owners of the entities that they invest in.

5           MR. FINKEL:  If we can look at what's in evidence as

6     GX HN-41.  If we can zoom in, please, Ms. Loftus, on the top

7     email.

8     Q.  Ms. Schottenheimer, can you read this email from William Je

9     to you on May 31st, 2020?

10    A.  Yes.

11          "Dear Steele, thanks.  Please see attached the revised

12    side letter.  Please ignore the previous one.  As discussed

13    with Kyle earlier, in the interest of time, the funds may be

14    transferred to your bank account from a different company from

15    that of the registered investor.  Thanks and regards, William."

16    Q.  What was your understanding of what Mr. Je meant "the funds

17    may be transferred to your bank account from a company

18    different from that of the registered investor"?

19    A.  So the registered investor was Saraca.  Saraca had filled

20    out the sub docs.  Saraca was subscribing to the Hayman Hong

21    Kong Opportunities Fund.  However, in this email, he's

22    highlighting that the funds might be wired from a different

23    account other than Saraca -- or different entity other than

24    Saraca.

25    Q.  And is that okay?

O5VVGUO1                    Schottenheimer - Direct

1  A.  No, it is not.

2  Q.  Why not?

3  A.  Because we wouldn't have had AML on the company that is

4  sending the wire.

5       MR. FINKEL:  We can zoom out of that, please,

6  Ms. Loftus.  And if we can zoom in on the third email, May

7  29th.

8  Q.  Can you read this email from William Je to you on May 29th,

9  2020?

10 A.  "Dear Steele, please see attached our comments of the side

11 letter.  We will have one onshore and one offshore vehicle.

12 The onshore one will invest 100 million, and the offshore will

13 invest one million.  The address of the onshore vehicle is 162

14 East 64th Street, New York, New York, 10065, United States.

15 Thanks and regards, William."

16 Q.  Ms. Schottenheimer, you testified that the 100 million was

17 from Saraca.  What was your understanding of what the $1

18 million was from at this time in May of 2020?

19 A.  At this time I believe that I recognized that the 100

20 million was coming from Miles Kwok's family office, and the

21 million dollars was coming from William Je personally.

22 Q.  What is AML?

23 A.  Anti-money laundering.

24      MR. FINKEL:  You can zoom out of that, please, and

25 display for the witness what's been marked for identification

O5VVGUO1                        Schottenheimer - Direct

1    as HN-43.  And if you can zoom in this so Ms. Schottenheimer

2    can just take a look at it.

3    Q.  Ms. Schottenheimer, just at a high level, what document is

4    this?  What kind of document is this?

5    A.  This is an email from me to William providing an update

6    kind of on our side, where we are with the side letter

7    negotiations, the timing of the closing.

8            MR. FINKEL:  Your Honor, the government offers HN-43.

9            MR. KAMARAJU:  No objection.

10           THE COURT:  It is admitted.

11           (Government's Exhibit HN-43 received in evidence)

12           MR. FINKEL:  And if we can publish that, please.

13           THE COURT:  Go ahead.

14           MR. FINKEL:  Ms. Loftus, can you highlight or zoom in

15   on the last paragraph, "Lastly."

16   BY MR. FINKEL:

17   Q.  Can you read that, please, Ms. Schottenheimer.

18   A.  "Lastly, the wire needs to come from an account in Saraca

19   Media Group's name.  We understand that due to tight timing,

20   this might not be possible.  As a solution, you can change the

21   entity making the initial investment to match the wire, and we

22   can transfer and assign the interest to Saraca Media Group as

23   of June 8th, the day of the closing.  We will need to do full

24   AML on both entities."

25   Q.  Ms. Schottenheimer, can you please explain to the members

O5VVGUO1                    Schottenheimer - Direct

1   of the jury what you were conveying to Mr. Je about his request

2   to send the money from a different account.

3   A.  So as I've previously described, we are under strict AML

4   guidance and requirements.  Thus, you cannot subscribe to one

5   of our funds in a, you know, investor A name and send a wire

6   from investor B's account.  They have to match.

7           So I am providing a solution to Mr. Je.  If he can't

8   send a wire from Saraca's account to match the subscription

9   books -- subscription booklet provided, I am suggesting that

10  whatever account has the capital to fund the investment,

11  actually make the investment.  So then we would do full AML on

12  that entity.  And then after we have closed on, you know,

13  investor B making this investment, if all of the checks are in

14  place, then we could do something called a transfer and

15  assignment, meaning we could transfer and assign the interest

16  of investor B to Saraca as of the date of the closing.  But

17  that would be post facto, after investor B, entity B, had gone

18  through all the AML checks.

19  Q.  And when you say investor B would have to go through all

20  the AML checks, you mean filling out the subscription

21  documents, providing ultimate beneficial owner information,

22  that sort of thing?

23  A.  Yes.

24  Q.  And what ultimately happened?  Did they change the name of

25  the entity or what happened?

1   A.   They kept the Saraca subscription booklets in place and

2   they sent a wire from a Saraca account.

3            MR. FINKEL:  We can take that down.

4            And if we can pull up, please, what's in evidence as

5   Government Exhibit GX HN-57.

6   Q.   By the way, Ms. Schottenheimer, this period at the end of

7   May into June 2020, when you were facilitating this

8   Saraca/Miles Kwok investment, can you describe to the members

9   of the jury the pace of that deal.

10  A.   There was a lot going on at that time.  There was a lot of

11  interest in this new Prodigious Series.  It was a reverse

12  inquiry from one of our largest investor from our flagship

13  fund.  And, you know, we introduced this new product to our

14  current investor base.

15           We closed the initial B1 tranche closing on June 1st;

16  and so coinciding with me closing that 172 interested investors

17  that subscribed on June 1st, I was then also coordinating this

18  between Kyle and William, the Saraca and Hamilton Investment.

19  Q.   And so as the managing director of investor relations, the

20  time you were interacting with William Je about the

21  Saraca/Miles Kwok investment, were you also handling other

22  potential investors and managing those investments?

23  A.   Correct, like close to 200.

24  Q.   Ms. Schottenheimer, this document is dated June 3rd, 2020,

25  and it's from William Je to you.  Could you please read to the

O5VVGUO1                         Schottenheimer - Direct

1    jury the first email from Mr. Je.

2    A.   "Saraca will subscribe USD 100 million, and Hamilton will

3    subscribe USD one million in this batch.  Please see the

4    attached signature pages of the onshore Saraca fund document

5    you sent earlier and the relevant KYC documents for your

6    review.  Please confirm all is in order and we will arrange

7    remittance.  The offshore Hamilton documents will follow."

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. FINKEL:

2    Q.  And Ms. Schottenheimer, at a high level, what is attached

3    to this email?

4    A.  These are the subscription documents for Saraca to invest

5    in Hayman Hong Kong Opportunity Onshore Fund Share Class B.

6            MR. FINKEL:  Ms. Loftus, could we go to page 4 of this

7    document, please.

8            Stop right there.

9    Q.  Ms. Schottenheimer, what is this page?

10   A.  This is the signature page to the subscription booklet.

11   Q.  And who signed for Saraca Media Group, Inc.?

12   A.  Yanping Wang.

13   Q.  With what title?

14   A.  President.

15   Q.  What does it say next to Total Requested Capital

16   Contributions?

17   A.  $100 million.

18   Q.  And what does that mean, total requested capital

19   contributions, layman's terms?

20   A.  The amount that they're subscribing or investing in the

21   fund.

22   Q.  At this time, June 3, 2020, did you know who Yanping Wang

23   is?

24   A.  I did not.

25           MR. FINKEL:  Could we go to page 6, Ms. Loftus.

1    Q.  Ms. Schottenheimer, what is this page, Investor Profile?

2    A.  This is a page of the subscription booklet that collects

3    information on the investor.

4    Q.  Ms. Schottenheimer, underneath the Capital Contribution,

5    100 million, or two lines below it, what does it say?

6    A.  Two lines below the Capital Contribution?

7    Q.  Yes, ma'am.

8    A.  "Briefly identify the subscriber's primary source of

9    wealth."

10   Q.  And why does Hayman collect that information?

11   A.  This is an AML requirement.

12   Q.  And what information is provided by Saraca about their

13   primary source of wealth?

14   A.  On their first pass of the subscription document, it was

15   left blank.

16   Q.  And is that acceptable for Hayman's purposes?

17   A.  No.

18   Q.  And below that, Entity Investors, it says there's a

19   registered office address in Delaware and a principal place of

20   business on 64th Street in Manhattan.  What's the difference

21   between a registered office address and a principal place of

22   business address?

23   A.  Principal place is of business is where——is the primary

24   place where the majority of the business of this entity takes

25   place.  The registered office is where the entity was formed

1    and registered.

2                    MR. FINKEL:  Could we go to page 8, please,

3    Ms. Loftus.

4                    Actually, page 7.  Sorry.

5    Q.  The bottom, or the second line of page 7,

6    Ms. Schottenheimer, it says, "Total number of equity/capital/or

7    beneficial owners of the investor."  What does that mean?

8    A.  So this is an entity, and we are trying to understand how

9    many individuals own this entity.

10   Q.  And what's the information provided?

11   A.  That there is one owner of this entity.

12   Q.  And which entity is this?

13   A.  Saraca Media Group, Incorporated.

14   Q.  And at this time what was your understanding of who the one

15   entity or owner of this Saraca Media Group was?

16   A.  Miles Kwok Sun.

17                   MR. FINKEL:  Ms. Loftus, we can go to page 8 now,

18   please.  Sorry about that.

19   Q.  Ms. Schottenheimer, what is the information that is being

20   provided on page 8 of HN57?

21   A.  We need authorized contacts to know who is authorized to

22   receive information regarding this investment, and there is a

23   primary contact and a secondary contact listed.

24   Q.  And who is the primary contact?

25   A.  Yanping Wang.

O5V1GUO2                    Schottenheimer - Direct

1   Q.  And who is the secondary contact?

2   A.  Max Krasner.

3   Q.  And at this time, Ms. Schottenheimer, did you know who Max

4   Krasner was?

5   A.  I did not.

6   Q.  In your work at Hayman, is it unusual to see contacts that

7   are different than your understanding of who is the family

8   office investing in a project?

9              MR. KAMARAJU:  Object to form.

10             THE COURT:  You may answer.

11  A.  There's an industry term called segregation of duties, and

12  this is a best in practice kind of governance over kind of

13  institutional practices, and so it is very common that the

14  person making the investment decisions is different than the

15  authorized signatory on the account, and that is, you

16  know—there's additional contacts receiving information of

17  the—of the investment.

18             MR. FINKEL:  We can go to page 11, please, Ms. Loftus.

19  Q.  It says here the authorized signatory is Yanping Wang.

20  Similar question:  Is it unusual to see an individual as an

21  authorized signatory who is different than the ultimate

22  beneficial owner in the family office?

23  A.  This is not unusual.

24  Q.  Why not?

25  A.  Like I previously said, this is segregation of duties.

1   This is kind of more eyes watching the investment, watching

2   over what's going on, and this is very typical for

3   institutional quality investments.

4           MR. FINKEL:  If we can go page 29, please, Ms. Loftus.

5           Sorry.  Page 46.  Excuse me.

6           If we can go to page 49.

7   Q.  Ms. Schottenheimer, what is this document, page 49 of HN57?

8   A.  This is a valid government-issued ID.  It's a passport of

9   Yanping Wang's passport.

10  Q.  And why is it something that Hayman collected?

11  A.  As the authorized signatory of Saraca Media Group, we were

12  required to collect this document as part of our AML check.

13          MR. FINKEL:  Could we go to the next page, please,

14  Ms. Loftus.

15          If we can go to page 53.

16          You can take that down.

17  Q.  Ms. Schottenheimer, given that the source of wealth

18  information was left blank, what, if anything, did you convey

19  to Mr. Je about that?

20  A.  There was a number of blanks within the subdoc that I

21  needed complete and so I requested to him to complete the

22  outstanding information.

23          MR. FINKEL:  If we can pull up, please, HN69.

24  Q.  Now separate from the Saraca investment, was Hayman also

25  collecting materials for the Hamilton investment?

1    A.  Yes.

2    Q.  And what is this document, HN69?

3    A.  This is the subscription packet that Hamilton is submitting

4    for processing for subscription to Hayman Hong Kong

5    Opportunities Offshore Fund.

6    Q.  And was Hamilton going to get the same side letter

7    agreement that Saraca got?

8    A.  Yes, it was negotiated simultaneously.

9            MR. FINKEL:  If we can pull up, please, Ms. Loftus

10   HN71.

11           If we can zoom in on the top email, please.

12   Q.  Ms. Schottenheimer, this document HN71 is dated June 4,

13   2020.  Can you review it and let the members of the jury know

14   the purpose of you sending this email to Mr. Je.

15   A.  Mr. Je had requested countersigned, or counterexecuted

16   subscription——subscription booklets for both Saraca and

17   Hamilton.  This is sometimes a practice that in order to——for a

18   bank to send a wire, they want to see that there's an actual

19   agreement or deal in place for the fund that they're

20   subscribing.  There was a handful of outstanding questions on

21   the Saraca document, but none that were AML related, and so we

22   were comfortable signing the subscription booklet with just

23   a——a handful of outstanding questions to be made.

24   Q.  But when Hayman had signed the subscription booklet, had

25   Saraca provided information about the source of funds?

O5V1GUO2                     Schottenheimer - Direct

1   A.  Yes, they had.

2           MR. FINKEL:  Could we go to page 31 of this document,

3   Ms. Loftus.

4   Q.  And can you read, Ms. Schottenheimer, what's below "Briefly

5   identify the subscriber's primary source of wealth."

6   A.  Selling shares of a subsidiary.

7   Q.  And at this time, do you have any idea what that meant?

8   A.  Not specifically.

9           MR. FINKEL:  You can take that down.

10          And if we can go to HN79, which is in evidence.

11          And can you zoom in on the bottom email, please,

12  Ms. Loftus.

13  Q.  Ms. Schottenheimer, can you read this email dated June 5,

14  2020, from you to William Je.

15  A.  Hi William.  I am pleased to report we have received the

16  $100 million wire from Saraca.  Please advise on Hamilton's

17  wire at your earliest convenience.  Thank you.

18  Q.  And did in fact Hayman receive a hundred million dollars

19  from Saraca?

20  A.  Yes.

21  Q.  And did Hayman later receive the million dollars from

22  Hamilton?

23  A.  Yes.

24  Q.  By the way, why were you interacting with William Je about

25  the Saraca investment instead of Miles Kwok?

1   A.  It was my understanding that he ran Mr. Kwok's investment

2   portfolio.

3   Q.  And is that unusual for you to interface with people who

4   work for someone who runs——who owns a family office?

5   A.  Not unusual at all.

6          MR. FINKEL:  Okay.  If we can please display what's in

7   evidence as HN80.

8          You can zoom in on the top, please.

9   Q.  And who is this email from?

10  A.  Steve Bannon.

11  Q.  And who is it addressed to?

12  A.  Kyle Bass.

13  Q.  And can you read what it says.

14  A.  "Congrats on miles deal.  He thinks u r biggest superstar

15  in finance."

16          MR. FINKEL:  Your Honor, at this time the government

17  would like to read a stipulation.

18          THE COURT:  Go ahead.

19          MR. FINKEL:  This is GX Stip 13.

20          It is hereby stipulated and agreed by the United

21  States of America and Miles Guo, the defendant, that,

22  GX SW101-GX SW150 are emails and their attachments, if any,

23  that were sent or received by the account steve@arc-ent.com on

24  the dates indicated on the face of the exhibit.

25          And that stipulation is signed by the parties.

O5V1GUO2                        Schottenheimer - Direct

1              And at this time, Ms. Loftus, if we could display for

2      the witness what's been marked as GX SW107.

3              THE COURT:  So you're looking to have that admitted.

4              MR. FINKEL:  Parts of it, yes.

5              THE COURT:  So is it going to be one by one that

6      you'll——

7              MR. FINKEL:  We're going seek to admit two of the

8      documents at this time.

9              THE COURT:  Okay.

10             MR. FINKEL:  As soon as I find them.

11             Your Honor, at this time the government offers GX

12     SW107.

13             THE COURT:  It is admitted without objection.

14             MR. KAMARAJU:  No objection, your Honor.

15             (Government's Exhibit SW107 received in evidence)

16     BY MR. FINKEL:

17     Q.  And Ms. Schottenheimer——

18             MR. FINKEL:  Actually, Ms. Loftus, can you publish

19     that, please.

20             And could you flip through that quickly.

21             We can go to the top.

22     Q.  Ms. Schottenheimer, who is this email from, or what email

23     address?

24     A.  Steve@arc-ent.com.

25     Q.  And who is it to?

O5V1GUO2                    Schottenheimer - Direct

1    A.   Jack Bannon and Sean Bannon.

2    Q.   And what's attached to it, the name of the attachment?

3    A.   Saraca-Bannon Consulting Agreement Version 4 Clean, Word

4    doc.

5    Q.   Ms. Schottenheimer, have you seen this document before?

6    A.   No.

7         MR. FINKEL:  Could we go to the next page.  Oh, sorry,

8    Ms. Loftus.

9    Q.   Ms. Schottenheimer, can you please read the text of this

10   email.

11   A.   "Jack print out 2 copies of this agreement for me."

12   Q.   Ms. Schottenheimer——

13        MR. FINKEL:  Can you go to the next page, please.

14   Q.   And Ms. Schottenheimer, can you read the top in bold.

15   A.   This Consulting Agreement is made effective as of

16   October 1, 2019 (the "Effective Date") by and between Saraca

17   Media Group, Inc., a company incorporated in the state of

18   Delaware ("Guo Media" or "the Company") and Bannon Strategic

19   Advisors, Inc. (the "Consultant") (individually, a "Party,"

20   collectively, "the Parties").  In consideration of the mutual

21   covenants set forth and upon other good and valuable

22   consideration, the parties agree as follows.

23        MR. FINKEL:  Ms. Loftus, can you scroll down to

24   paragraph 4.

25   Q.   And Ms. Schottenheimer, can you read paragraph 4.

O5V1GUO2                      Schottenheimer - Direct

A.  As full compensation for the services and rights granted to

the Company in this agreement, Company agrees to pay one——pay

consultant an annual fee of USD $1 million (the consulting

fee), paid quarterly (i.e., every three months) in the amount

of USD 250,000 and payable in advance, which consulting fee is

fully earned on the date hereof.  The first USD 250,000 shall

be due on signing of this agreement.  Consultant shall be

entitled to reimburse for any company prepaid costs and

expenses incurred in connection with the services rendered

under this agreement.

MR.  FINKEL:  And if we can pull up, please, for the

witness GX SW108.

And at this time the government offers GX SW108.

THE COURT:  Without objection?

MR. KAMARAJU:  I'm just waiting for it to come up on

the screen, your Honor.

No objection, your Honor.

THE COURT:  It is admitted.

(Government's Exhibit SW108 received in evidence)

MR. FINKEL:  Could we publish that, please,

Ms. Loftus.

BY MR. FINKEL:

Q.  Ms. Schottenheimer, have you seen this document before?

A.  No.

Q.  Can you read the bottom of it; it says on October 1, 2019?

1    A.  At 1:17 p.m.?

2    Q.  Yes.

3    A.  "Jack print out 2 copies of this agreement for me."

4    Q.  And who sent that?

5    A.  Steve Bannon.

6            MR. FINKEL:  Okay.  If we can scroll to the top,

7    please, Ms. Loftus.

8    Q.  And this email from Sean Bannon to Jack Bannon copying

9    Steve Bannon, Ms. Schottenheimer, can you read the text of it.

10   A.  "Two copies of Guo contract in envelope along with a

11   contract Grace needs your wet signature on."

12           MR. FINKEL:  We can take that down.

13   Q.  And Ms. Schottenheimer, for Saraca, ultimately did the AML

14   KYC checks go through?

15   A.  Yes.

16           MR. FINKEL:  If you can please display what's in

17   evidence as GX HN220.

18   Q.  Ms. Schottenheimer, do you recognize this sort of email?

19   A.  Yes.

20   Q.  What is it?

21   A.  It is an email from the Hayman Hong Kong Opportunities

22   Fund's third-party administrator SEI.  SEI sets up all

23   authorized contacts on their portal for access to the

24   investor-level documents available, such as tax documents like

25   a K1 or the monthly capital statements.

O5V1GUO2                      Schottenheimer - Direct

1    Q.  And who was this email sent to?

2    A.  The authorized signatory and contact on the Saraca account,

3    Yvette Wang.

4              MR. FINKEL:  Take that down, please.

5              And if we can please pull up what's in evidence as

6    HN124.

7    Q.  Do you recognize this document, Ms. Schottenheimer?

8    A.  Yes.

9    Q.  Can you explain to the jury what HN124 is.

10   A.  It's an email between William and I.  I had received a

11   strange email from a strange email address asking that, need to

12   verify that if "Karl" Bass was one of the directors of Saraca

13   Media Group.  So I cut and paste this strange email that I've

14   got, had received, to William, and I say, Hi William, I am

15   going to ignore the below unless otherwise directed by you.  In

16   which he responds, Please ignore the email as most of these are

17   scams.  Thanks.

18             MR. FINKEL:  We can take that down.

19   Q.  Ms. Schottenheimer, I want to direct your attention to

20   July 13, 2020.  What, if anything, happened with respect to the

21   Saraca investment on that date?

22   A.  Hayman received a call from outside counsel, our lawyer,

23   that they had received a letter from the SEC for a

24   documentation request regarding Saraca's investment in the

25   Hayman Hong Kong Opportunities Fund.

O5V1GUO2                          Schottenheimer - Direct

1   Q.  What was the name of that attorney?

2   A.  Kit Addleman.

3   Q.  And what firm does Ms. Addleman work at?

4   A.  Haynes and Boone.

5   Q.  And how is it that you remember that particular date,

6   July 13, 2020?

7   A.  It was my mom's 70th birthday and I was supposed to cook

8   dinner.

9   Q.  Did you cook her dinner?

10  A.  At like 9 p.m.

11  Q.  Why was it so delayed?

12  A.  There was a lot of calls, internally at Hayman and with

13  external counsel.

14  Q.  About what general topic matter?

15  A.  About Saraca's investment in the Hayman fund and this

16  document request that we had received.

17  Q.  And what sort of documents was the SEC requesting from

18  Hayman?

19          MR. KAMARAJU:  Objection to form, your Honor.

20          THE COURT:  Did they request any documents?

21  A.  They requested a number of documents.

22  Q.  What kind of documents did the SEC request?

23  A.  The ones that I had to run point on gathering was the

24  subscription documents.

25  Q.  Subscription documents for——of what?

O5V1GUO2                          Schottenheimer - Direct

1    A.  Of Saraca investing in the Hong Kong fund, AML that went

2    along with it.

3    Q.  And upon receiving this request for documents from the SEC,

4    after that, what, if any, steps did Hayman take as a result of

5    this notification?

6    A.  At this point we were being advised by external counsel and

7    they were running point on the process, but as a next step, my

8    recollection was that we segregated the Saraca investment in

9    its own tranche so it wasn't commingled with any other

10   investors, so Saraca stayed in B2 and the other investors we

11   moved out to different tranches, and then we, from there,

12   had——$30 million of the hundred million had been invested in

13   options shorting the Hong Kong dollar, and then we had roughly

14   7 million——$70 million that was still in cash, and we kind of

15   segregated these two buckets of the Saraca investment because

16   it had been brought to our attention that 70 million of the

17   hundred million was potentially not from Saraca.

18   Q.  Did Hayman's attorneys contact Saraca?

19   A.  Yes.

20           MR. KAMARAJU:  Objection to form.

21           THE COURT:  Overruled.  You may answer.

22   A.  Yes.

23           MR. FINKEL:  If we can display what's in evidence as

24   HN168.

25           If you can zoom in at the top through the Kit

O5V1GUO2                    Schottenheimer - Direct

1    Addleman.  Yup.

2    Q.  What is the date of this email, Ms. Schottenheimer?

3    A.  Wednesday, July 15th.

4    Q.  What is the text of it?

5    A.  Please see the attached letter requiring your prompt

6    attention.  Thank you, Kit Addleman.

7    Q.  And who, if anyone, did Ms. Addleman send this email to?

8    A.  William Je, Max K, Yvette Wang, aaron@lmesq.com.

9           MR. FINKEL:  Zoom out of that, and let's go to the

10   next page, please.

11   Q.  And Ms. Schottenheimer, what was your understanding of why

12   Ms. Addleman sent this letter to William Je, Max Krasner,

13   Yvette Wang, and Aaron Mitchell?

14   A.  We were under——we were trying to understand where the

15   source of funds came for for the Saraca investment, and we were

16   trying to understand what to do with the investment going

17   forward.

18   Q.  Can you read the first paragraph of this letter.

19   A.  Haynes and Boone, LLP represents Hayman Capital Management

20   and Hayman Hong Kong Opportunities Onshore Fund.  We have been

21   contacted by the US Securities and Exchange Commission related

22   to an investigation of a securities offering by GTV Media Group

23   entitled in the matter of G Coins (NY-10256).  As a result we

24   require your immediate attention and additional information.

25   Q.  And at this time, Ms. Schottenheimer, July 15, 2020, what

O5V1GUO2                        Schottenheimer - Direct

1   was your understanding of what GTV Media Group was?

2   A.  It was an entity run and operated by Miles Kwok.

3   Q.  And what was your understanding of what G Coins was?

4   A.  It was an offering that GTV was—it was a private placement

5   offering that GTV Media Group offered, presented.

6   Q.  What's a private placement?

7   A.  A private placement is a private fund that is not offered

8   on an exchange.

9   Q.  Can you read the next paragraph.

10  A.  As the general partner to the fund and in the performance

11  of its continuing due diligence and compliance with the

12  securities laws, Hayman requires your response to the

13  following:

14  Q.  Can you read the first question.

15  A.  What was the source of capital used by Saraca Media Group

16  to invest in the fund?

17  Q.  Can you read the next question.

18  A.  The fund's subscription agreement contemplated—sorry—the

19  fund's subscription agreement completed on behalf of Saraca

20  listed the company's primary source of wealth as selling shares

21  of subsidiary.  What subsidiary is this statement referring to,

22  when were the shares of the subsidiary acquired, and when were

23  the shares sold?

24  Q.  Could you read the next one.

25  A.  If the proceeds were derived from a securities offering,

1    did the offering documents disclose the use of proceeds to

2    include an investment in the fund or in any similar private

3    vehicle?  If yes, please provide a copy of the disclosure

4    document.

5    Q.  Can you read the next one.

6    A.  Was any of the money raised in GTV's primary offering of

7    shares used to fund Saraca's investment in the fund?

8    Q.  And the next one?

9    A.  For the primary offering funds raised by GTV, into what

10    banks were the proceeds deposited and what was the balance in

11    those accounts as of July 9, 2020?

12    Q.  Ms. Schottenheimer, did anyone from Saraca Media respond to

13    these questions?

14    A.  No.

15    Q.  The third question, it says:  "If the proceeds were derived

16    from a securities offering, did the offering documents disclose

17    the use of proceeds to include an investment in the fund or in

18    any similar private fund vehicle?"

19          What is your understanding of what offering documents

20    means?

21    A.  Well, a private placement is something that an investor

22    subscribes to, and you have to offer them the interest or the

23    option to invest in the fund, so there would be offering

24    documents just like we have offering documents for the Hayman

25    Hong Kong Opportunities Fund.

1              MR. FINKEL:  Can you zoom out, Ms. Loftus, and go to

2    the next page, please.

3    Q.  Can you read the second sentence of the first paragraph.

4    A.  Thank you for your prompt assistance in this matter.  If

5    you have questions regarding this request, please contact me at

6    this email address and phone number below.

7    Q.  And above that, it says, "However, to remain an investor in

8    the fund, we require responses to the above questions by 9 a.m.

9    Central Time on Friday, July 17"?

10   A.  Yes.

11   Q.  Were those responses provided?

12   A.  They were not.

13   Q.  Did Hayman receive any response after dispatching this

14   letter?

15              MR. KAMARAJU:  Objection, your Honor.

16              MR. FINKEL:  I can rephrase.

17   Q.  What, if any, response did Hayman receive after dispatching

18   this letter?

19   A.  No formal responses to this letter.

20   Q.  What about informal responses?

21   A.  It's my understanding that Kyle and William had connected

22   over the phone.

23   Q.  And what is your understanding of what that communication

24   was?

25              MR. KAMARAJU:  Objection.  Hearsay.

O5V1GUO2                        Schottenheimer - Direct

1              THE COURT:  If you'll step up, please.

2              (At the sidebar)

3              THE COURT:  So for what purpose are you eliciting

4    these out-of-court statements?

5              MR. FINKEL:  So there are two points to it.  One, your

6    Honor, it's a statement of William Je, which is a

7    co-conspirator statement; and second, it's being offered to

8    show the effect on the listener, which here is

9    Ms. Schottenheimer, because it informs what she and others at

10   Hayman subsequently did with respect to the Saraca investment.

11             THE COURT:  The objection is overruled.

12             (Continued on next page)

1          (In open court)

2          THE COURT:  Overruled.  You may answer.

3   A.  Can you please repeat the question.

4   Q.  What was your understanding of what was conveyed to

5   Mr. Bass by Mr. Je?

6   A.  That there was a misunderstanding, there might have been

7   some money borrowed but they were going to put it back, and to

8   keep investing the money, and they wanted to stay invested in

9   the Hayman Capital Hong Kong Fund.

10  Q.  I'm sorry?

11  A.  The Hayman Capital Hong Kong Fund.

12  Q.  Was that explanation sufficient for Hayman?

13  A.  No.

14          MR. FINKEL:  If we can please display what's in

15  evidence as HN193.

16          If you can zoom in on this.

17  Q.  This is a document from—this is an email from William Je

18  to Kyle Bass; is that correct?

19  A.  Yes.

20  Q.  July 24, 2020?

21  A.  Yes.

22  Q.  Can you read what William Je told Mr. Bass.

23  A.  Dear Kyle, How are you?  Saraca has asked me to inform you

24  that their investments into your fund is valid and approved by

25  your fund previously.  Saraca does not agree for any refund of

1  the money to Saraca or your fund may need to bear any

2  consequences of such refund including any economic

3  consequences.   Thanks and best regards, William.

4  Q.  Was Hayman contemplating ejecting Saraca from the HHKOF at

5  this time?

6  A.  Yes.

7  Q.  Why was that?

8  A.  Because it had been brought to our attention that the funds

9  for the investment might not have come from Saraca.

10         MR. FINKEL:  If we can please pull up what's in

11  evidence as HN221.

12  Q.  Ms. Schottenheimer, do you recognize this document?

13  A.  Yes.

14  Q.  Could you explain to the jury what this email is.

15  A.  This is our lawyer, Kit Addleman, sending notice to Saraca

16  and its counsel that Hayman, as the general partner of the

17  Hayman Hong Kong Opportunities Onshore Fund, is exercising its

18  right to make a mandatory withdrawal of $70 million of the

19  investment made by Saraca Media Group.

20  Q.  And what does that mean, if you can explain to the jury, of

21  a mandatory withdrawal of 70 million?

22  A.  The GP of the fund, the general partner of the fund,

23  reserves the right to exercise its ability to do a mandatory

24  withdrawal for—of an investor.

25  Q.  And what's mandatory withdrawal?

1    A.  Forcing them to——it's a forced redemption to return the

2    capital of an investor's money.

3              MR. FINKEL:  If we can please display what's in

4    evidence as HN208.

5              And your Honor, this is the document that requires the

6    instruction.

7              THE COURT:  All right.  So the document that you're

8    about to see——if you'll just enlarge it for me——is an email

9    from Kyle Bass to William Je.  It's not being offered for the

10   truth of what is being stated in the email, it's being offered

11   merely for its effect on the recipient.

12             You may proceed.

13             MR. FINKEL:  Thank you, your Honor.

14   BY MR. FINKEL:

15   Q.  Ms. Schottenheimer, is this an email that you reviewed

16   before it was sent?

17   A.  Yes.

18   Q.  And why did you do that?

19   A.  I think it was a team effort to review the accuracy of this

20   email before Kyle sent it to William.

21   Q.  And what's the date of this email?

22   A.  August 22nd of 2020.

23   Q.  And prior to this email being sent by Mr. Bass to Mr. Je,

24   aside from that phone conversation you mentioned, had Hayman or

25   its attorneys received any responses to the questions that

Ms. Addleman had posed about the source of the funds for the

hundred-million-dollar Saraca investment?

A.   No response.

Q.   Can you read this document, please.

A.   Me?

Q.   Yes.

A.   Sorry.  Yes.  William, given the unfortunate government

investigations that surround Saraca's investment with the

Hayman Hong Kong Fund, I am writing today to inquire about your

signature on the attached document, sent to you and the Saraca

team on July 31st.  Since we first received notice of the

investigations in mid-July, our lawyers have been in frequent

contact with federal authorities regarding this investment and

have spoken repeatedly with counsel to Saraca and GTV.  Based

on those discussions, through which Hayman learned information

regarding the source of funds for some of Saraca's investment

in the fund (and which had not been previously disclosed),

Hayman was compelled to act responsibly and redeem 70 million

of Saraca's initial $100 million investment.  Hayman will not

be collecting any management fees from the entire $100 million

investment.  As we stated in the letter, we will retain our

actual legal fees incurred in this matter.  In our last phone

conversation on August 3rd, you confirmed that you would have

the attached letter signed and returned to me promptly.  To

this day, I have not received your signature on the document.

1    Please have it executed and send it to me as soon as possible.

2    Q.  Pause right there.

3         And so in that piece of the letter to William Je, it

4    says that Hayman was compelled to act responsibly and redeem

5    70 million of Saraca's initial $100 million investment.  What

6    does that mean, redeem?

7    A.  So this is the mandatory withdrawal that Hayman exercised,

8    or the GP of the Hayman Hong Kong Opportunities Fund exercised.

9    And so in our——in speaking with federal authorities and counsel

10   for Saraca and GTV, it became evident that this $70 million was

11   not from in fact Saraca, as repped to us in the subscription

12   document, and so therefore, we were wanting to divest the

13   amount from the fund and put it in an escrow account, until

14   further instruction.

15   Q.  And if you can keep reading.

16   A.  The next item to be addressed relates to the remaining

17   30 million (part of the 100) initially invested into the Hayman

18   Hong Kong fund.  In order to allow Saraca to remain invested in

19   the fund, Hayman needs to receive a representation from you and

20   Saraca's lawyers regarding the specific source of this money

21   (beyond what was initially provided stated in the subscription

22   documents) and that this money is not tainted in any way,

23   including that it does not represent assets from the GTV

24   offering but that it is a bona fide investment made by Saraca

25   and Miles.

1    Q.   Pause right there.

2            Now where it says a bona fide investment made by

3    Saraca and Miles, what does Miles mean?

4    A.   Miles Kwok.

5    Q.   Keep going.

6    A.   Moreover, we expect you or your lawyers to confirm that the

7    source of this portion of Saraca's investment has been

8    discussed with the federal authorities and that they have no

9    objection to the continuation of that portion of the investment

10   being managed in the fund.  We have been asking for

11   clarification regarding this information since July 15th,

12   (letter from counsel also attached) and need the information

13   and representations from you or your lawyers by the end of next

14   week for us to continue managing this investment on Saraca's

15   behalf.

16   Q.   Keep going.

17   A.   Please discuss this with Miles and respond to me as soon as

18   possible.  We need resolution on the remaining 30 million

19   investment by August 28th.  I will be available to you at any

20   time you wish to speak about this and I would like to find a

21   resolution that everyone (including the US government

22   prosecutors) agrees upon.

23   Q.   Ms. Schottenheimer, did the federal authorities direct

24   Hayman to send this email?

25   A.   No.

O5V1GUO2                    Schottenheimer - Direct

1   Q.   Okay.  Did Hayman receive a response to this email?

2   A.   No.

3   Q.   Did Saraca provide a representation from itself or its

4   lawyers regarding the specific source of money?

5   A.   No.

6   Q.   Was there any representation made that the money invested

7   in the Hong Kong Opportunities Fund was not tainted in any way?

8   A.   No.

9   Q.   Was there any representation made that that money was not

10  from assets from a GTV offering?

11  A.   Not to my knowledge, no.

12  Q.   Was there any representation made by Saraca or its counsel

13  that the $100 million investment in the Hong Kong Opportunities

14  Fund Prodigious Series was a bona fide investment made by

15  Saraca and Miles Kwok?

16  A.   No.

17          MR. FINKEL:  You can zoom out of that and go to the

18  next page.

19  Q.   Ms. Schottenheimer, do you recall what documents were

20  attached to this email?

21  A.   The letter Kit Addleman sent on July 15th inquiring about

22  the source of funds of the Saraca Media Group investment and

23  also the withdrawal notice that she had sent on July 31st as

24  well.

25  Q.   And what's the withdrawal notice mean?

O5V1GUO2                        Schottenheimer - Direct

1    A.   That was the letter that we sent to Saraca notifying them

2    of the mandatory withdrawal of the $70 million.

3             MR. FINKEL:   Okay.   You can take that down,

4    Ms. Loftus.

5    Q.   Now, Ms. Schottenheimer, the 30 million that was left

6    because it was already invested in options, what happened to

7    that 30 million?

8    A.   To clarify, the 30 million——

9    Q.   Let me ask the question this way:   Saraca made a $100

10   million investment in the Prodigious Series.   What happened to

11   that $100 million?

12   A.   70 of that was segregated and we moved it into a feeder

13   fund account until an agreed-upon escrow account was put in

14   place.   The remaining 30 million, to our knowledge, was

15   not——was potentially a bona fide investment.   We had no

16   evidence otherwise.   And so we kept it invested in the fund

17   through September-October time frame of 2021.

18   Q.   And what happened to the value of that $30 million?

19   A.   Well, because it is a capital exhaustion fund, as marketed

20   in the presentation, and it is an options-based strategy, the

21   value of the options, as they became closer to the expiration

22   date, declined dramatically, so that $30 million investment,

23   when it was put to work back in kind of June of 2020, you know,

24   15 months later, when we liquidated it in the marketplace, it

25   was worth about $380,000.

O5V1GUO2                        Schottenheimer - Direct

1    Q.  So how much money was lost, approximately?

2    A.  Approximately $29.6 million.

3    Q.  And Ms. Schottenheimer, when an investor invested in the

4    Prodigious Series, if they want to pull their money out six

5    months after investing or 12 months after investing, are they

6    allowed to do that?

7    A.  No, they're not.  There's no withdrawal rights for the

8    Hayman Hong Kong Opportunities Fund's Share Class B.

9    Q.  And the 70 million that was segregated, what ultimately

10   happened to that money?

11   A.  It sat in our feeder account, the Onshore feeder account,

12   for about a year, and in July of 2021, all interested parties

13   did not object to it going to a escrow account in the name of

14   Saraca's lawyers.  It was an account in Saraca's lawyers' name.

15   Q.  When you say interested parties, who is that?

16   A.  The government authorities involved——DOJ, SEC——and then

17   Saraca's lawyers didn't object to it, so Saraca.

18            MR. FINKEL:  If we can please display what's in

19   evidence as Government Exhibits 222 and——sorry, excuse

20   me——HN222 and HN223.

21   Q.  Ms. Schottenheimer, do you recognize these documents, HN222

22   and 223?

23   A.  Yes.

24   Q.  What are they?

25   A.  These are wire confirmations.

O5V1GUO2                          Schottenheimer - Direct

1    Q.  For what?

2    A.  The one on the left is a wire confirmation from July 7th

3    from the Hayman Hong Kong Opportunities Onshore Fund wiring

4    money from its account to a JPMorgan account in the name of

5    Morvillo Abramowitz Grand Iason & Associates.

6    Q.  What's the amount of that wire?

7    A.  $69,331,019.48.

8    Q.  And what is your understanding of what Morvillo is?

9    A.  This is—it's my understanding that this is Saraca's

10   counsel at the time of the wire.

11   Q.  And Ms. Schottenheimer, do you know what happened, if

12   anything, to that $69.3 million after Hayman sent it to

13   Morvillo's escrow account?

14   A.  I do not.

15   Q.  And the right, the document on the right, HN223, what is

16   that?

17   A.  This is a second wire from Hayman Hong Kong Opportunities

18   Onshore Fund dated October 15th.  The wire is coming from our

19   Onshore feeder—is coming from our Onshore feeder account,

20   being sent to a JPMorgan account in the name of Morvillo

21   Abramowitz Grand Iason & Associates.  It's in the amount of

22   $382,558.58.

23   Q.  And do you know what happened to that $382,000 after Hayman

24   transferred it to the Morvillo account?

25   A.  I do not.

O5V1GUO2                    Schottenheimer - Cross

1    Q.   And this $382,000 and change, does that represent what was

2    remaining of the 30 million?

3    A.   That's, correct, the liquidation of the 30 million.

4    Q.   Ms. Schottenheimer, you mentioned a moment ago that once

5    money is invested in the Prodigious Series, it can't be

6    withdrawn by an investor.  Why is that?

7    A.   Because of the——it's an industry term.  It's called faded

8    decay of the option, meaning that this is an options-based

9    strategy and there is dramatic——or dramatic loss of the value

10   of the option immediately after investment, and so this is a

11   buy-and-hold strategy.  You invest an amount that you are

12   comfortable with losing, if the Hong Kong dollar does not trade

13   outside of the weak side of the band within the time horizon of

14   these options.  So for every tranche that closes, we have a

15   target date that all the options expire.

16   Q.   What do you mean by "comfortable with losing"?

17   A.   This is a very high-risk, potentially high-reward strategy,

18   and it is very plausible that all of the options could expire

19   worthless, and the Hong Kong dollar, this 40-year peg stays

20   within the band during the duration of your investment, and so

21   all investors need to be prepared to lose whatever amount they

22   are investing 'cause this is——this is to be used as a hedge to

23   their overall portfolio or a small kind of opportunistic

24   potentially repricing of these——this risk.

25          MR. FINKEL:  Thank you, Ms. Schottenheimer.  No

1    further questions at this time.

2                THE COURT:  Cross-examination.

3                MR. KAMARAJU:  Yes.  Thank you, your Honor.

4    CROSS EXAMINATION

5    BY MR. KAMARAJU:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  So you have now been with Hayman in one form or the other

9    for almost 20 years, right?

10   A.  Correct.

11   Q.  You started as an intern in 2005, correct?

12   A.  I started as an intern at Legg Mason but under Kyle in

13   2005.

14   Q.  Got it.  And then you started at Hayman the following year?

15   A.  April of 2006, yes.

16   Q.  Okay.  And you mentioned Kyle.  That's Kyle Bass, right?

17   A.  Yes, Kyle Bass.

18   Q.  Okay.  And Mr. Bass is Hayman's chief investment officer,

19   right?

20   A.  Founder and chief investment officer.

21   Q.  All right.  So fair to say he decides sort of the ultimate

22   investment strategies for the fund?

23   A.  Yes.

24   Q.  And you testified I think on direct that Hayman is

25   regulated by the SEC, correct?

1  A.  At the time in question, June of 2020, Hayman was a

2  registered investment advisor with the Securities and Exchange

3  Commission.

4  Q.  Okay.  And that's subsequently changed, right?

5  A.  Yes.

6  Q.  And I believe——let's just focus on the time in question for

7  right now.  You testified that at that time Hayman could only

8  take in money from certain kinds of investors, right?

9  A.  Correct.

10  Q.  Qualified purchasers, basically, right?

11  A.  Yes.  We only offered 3(c)(7) funds at the time.

12  Q.  And the definition of a qualified investor that you gave on

13  direct, it's fair to say it's basically about income level or

14  assets that the investor has?

15  A.  Specifically for qualified purchaser, it's $5 million in

16  marketable securities.

17  Q.  Okay.  And an accredited investor is a similar concept,

18  right?

19  A.  Correct, a similar threshold but lower.

20  Q.  Got it.  You just need more——less in assets, right?

21  A.  Correct.

22  Q.  Now Hayman also has, for some of its funds, at least, a

23  minimum investment amount, right?

24  A.  Yes, a stated minimum, yes.

25  Q.  So for the Prodigious fund I think that was around $25,000,

O5V1GUO2                     Schottenheimer - Cross

1    right?

2    A.   For the Onshore feeder fund, yes.

3    Q.   Okay.  Thank you.  You're going to have to explain onshore

4    and offshore to me in a little bit, but for right now, Onshore

5    fund, right?

6            And so is it fair to say that there's a distinction

7    between the accredited investor standard and the minimum

8    investment, investment standard, right?

9    A.   So we don't manage any (3)(c)(1) funds or accredited funds.

10   Q.   Okay.  Well, let's do it with the qualified purchaser, all

11   right?

12   A.   Correct.

13   Q.   There's a distinction between the qualified purchaser and

14   the minimum investment amount, right?

15   A.   Correct.  Those are two separate things.

16   Q.   Right.  The qualified purchaser is about the qualities of

17   the investor, right?

18   A.   Correct.

19   Q.   And the minimum investment amount is about the qualities of

20   the investment, right?  Amount, basically.

21           MR. FINKEL:  Object to form.

22           THE COURT:  You may answer.

23   A.   Can you repeat the question.

24   Q.   Sure.  So the minimum—the minimum amount threshold is

25   about the amount of the investment, right?

1    A.  Yes, it's set by the GP.

2    Q.  And the minimum investment amount can be in some

3    circumstances waived, right?

4    A.  Yes.

5    Q.  But the qualified purchaser threshold, that cannot be

6    waived, right?

7    A.  Unless you are a knowledgeable employee.

8    Q.  Right.

9    A.  That works for Hayman.  So it's one of the——it's one of the

10   things, but yes, for external investor, there is no exceptions

11   for being a qualified purchaser.

12   Q.  Got it.  And I think you testified on direct that the way

13   Hayman learned that somebody is a qualified purchaser is

14   through a representation by the potential investor, right?

15   A.  If it's someone that comes in as a reverse inquiry that we

16   don't know, that is the case, yes.  If it's the University of

17   Chicago, I can look up that they manage 9 billion under assets

18   under their website, then no.

19   Q.  Right.  But that verification that you mentioned, that's

20   not required of Hayman, right?

21   A.  Can you repeat the question.

22   Q.  Yeah, sure.  Hayman——I'll rephrase it.  Maybe it will be

23   better.

24           Hayman is not required to confirm the accuracy of a

25   qualified purchaser representation, correct?

1  A.  Once the representation is made, we do not look at——we're

2  not required to look at bank statements or any further

3  verification.

4  Q.  Okay.  And so that's the same with Saraca, just like any

5  other investor, right?

6  A.  Pertaining to the subdocs?

7  Q.  Yeah, at the time it was making the investment.

8  A.  Yeah, we take the reps on the subdocs as is.

9  Q.  So as part of your——I'm going to call it the qualification

10  process, is that all right, just to——

11  A.  Okay.

12  Q.  So as part of the qualification process for Saraca, Hayman

13  never had to ask for any bank account statements, right?

14  A.  Correct.

15  Q.  Never any sort of net worth statements, right?

16  A.  Correct.

17  Q.  No list of assets, right?

18  A.  Not required.

19  Q.  Okay.  And it's not required, so you didn't ask Mr. Je for

20  any of that stuff, right?

21  A.  Correct.

22  Q.  And that was true from the time that you first got the

23  qualified purchaser representation from Mr. Je all the way

24  through when the money came in, right?

25  A.  Can you please repeat the question.

1   Q.  Sure.  I'm just trying to get at that period of time

2   between when——

3   A.  Did you say a number of days?

4   Q.  Yeah, just a few days, whatever it was, right?

5   A.  Right.

6   Q.  But that period, whenever the qualified purchaser

7   representation was made and the wire came in, there was no

8   point in that period where you asked for the Saraca bank

9   statements or any confirmation, right?

10  A.  Correct.

11  Q.  And you're not required to, right?

12  A.  That is correct.

13  Q.  And now you testified earlier that you recognize Mr. Guo in

14  the courtroom, correct?

15  A.  I believe I was not able to answer that question, to my

16  recollection.

17  Q.  That's fine.  You met him first in Texas, right?

18  A.  I've met Mr. —— yes, I met Miles one time in Texas.

19  Q.  All right.  He was pleasant to you when you met him?

20  A.  Very pleasant.

21  Q.  Down to earth?

22  A.  Very.

23  Q.  And he was there to do an interview with Mr. Bass, right?

24  A.  Yes.

25  Q.  Do you know if that interview was preplanned?

O5V1GUO2                       Schottenheimer - Cross

1    A.   Yes.  The Reel Vision team was there recording, and it was

2    planned.

3    Q.   Okay.  And it happened in an airport hangar, right?

4    A.   Yes.

5    Q.   Now it happened in an airport hangar because there were

6    security concerns, right?

7    A.   Not to my knowledge.

8    Q.   Do you know why it happened in the hangar?

9    A.   Not specifically, no.

10   Q.   And that interview happened, right?  It was a Reel Vision

11   interview?

12   A.   It did.

13   Q.   And you were there for the whole interview?

14   A.   I was.

15   Q.   And you were asked on direct to interpret what——some things

16   that Mr. Bass and Mr. Guo were talking about, right?

17   A.   Yes.

18   Q.   Right.  The prosecutor played some clips and asked you what

19   you thought——

20   A.   Of the final interview, yes, that was aired.

21        Just for clarification, there was a full filming team

22   there and I was out of the frame and so I couldn't hear live

23   every single word that was said in the interview.  I watched

24   the interview *post facto* once it was actually published.

25   Q.   Oh, I got it.  So you were able to sort of see the complete

1    interview after it was released, is that—

2    A.  Yes, correct.

3    Q.  Okay.  Got it.  And those were the clips that Mr. Finkel

4    was asking you to interpret, right?

5    A.  Yes.

6    Q.  Okay.  Now it's fair to say that during that interview

7    Mr. Guo wasn't exactly fluent in English, right?

8    A.  Correct.  He brought an interpreter with him.

9    Q.  Right.  He even made a joke about trying to use something

10   he called "Chinglish," right?

11              MR. FINKEL:  Objection.

12              THE COURT:  You may answer if you know.

13   A.  I don't recall that joke.

14   Q.  You said he brought a translator.  That was Mr. Je, right?

15   A.  Correct.

16   Q.  And Mr. Je did step in to translate from time to time,

17   right?

18   A.  That is my recollection, yes.

19   Q.  And you testified on direct that despite the language

20   barrier, they were discussing certain aspects of the Chinese

21   economy, right?

22   A.  Yes.

23   Q.  And there was a graph that was displayed during the

24   interview; do you remember that?

25   A.  Yes.

1  Q.  And you testified that Mr. Guo's team supplied that graph,

2  right?

3  A.  Yes.

4  Q.  Who was it on Mr. Guo's team that supplied that graph?

5  A.  The graph was supplied to Kyle and so I——I don't know.

6  Q.  Okay.  So you don't have any personal knowledge that

7  Mr. Guo's team submitted it to Mr. Bass, right?

8  A.  Correct.

9  Q.  But you did testify that subsequent to that, Hayman

10  actually included that graph in one of its presentations,

11  right?

12  A.  Yes.

13  Q.  And that's an investor presentation, correct?

14  A.  Yes.

15  Q.  So Hayman was comfortable enough with the information in

16  the graph to disclose it to its potential investors, right?

17  A.  Yes, with the source of Guo Media.

18  Q.  So you listed the source was Guo Media, right?

19  A.  That's my recollection.

20  Q.  Okay.  But if you had thought the numbers were totally

21  bogus, you wouldn't have sent them out to your investors,

22  right?

23  A.  Correct.

24  Q.  Now you also testified that Hayman engages in——I think you

25  described it as an event-driven investment strategy, right?

1   A.  Global event-driven investing, yes.

2   Q.  Okay.  And I think in response to the Court's question, you

3   gave an example of devaluing currency, right?

4   A.  That would be a catalyst or an event, yes.

5   Q.  So is it fair to say that it's basically making an

6   investment around something the fund considers to be a

7   significant event?

8   A.  I don't know if the word "significant" is always

9   appropriate, but just an event.

10  Q.  Okay.  An event that the fund thinks is worth trading

11  around, right?

12  A.  When you say fund, what fund are you speaking of?

13  Q.  I'm talking about Hayman.

14  A.  Hayman, yeah.  So if we have a—could you please repeat the

15  question.

16          MR. KAMARAJU:  Could we have it read back, please, or

17  I'll get it wrong.

18          THE COURT:  Go ahead.

19          (Record read)

20  A.  So we would invest in securities that we tied to an

21  event-driven thesis, yes.

22  Q.  Okay.  So the underlying event, that could be in the US or

23  it could be abroad, right?  Hayman does both?

24  A.  It had a global focus.  We have a global focus.

25  Q.  But Hayman has made—has made investments based on events

O5V1GUO2                       Schottenheimer - Cross

1    in the United States, right?

2    A.  Yes.

3    Q.  So for example, in 2008, Hayman made an investment based on

4    the subprime mortgage market, correct?

5    A.  Correct.

6    Q.  And so in essence, you made an investment that the market

7    would go down, right?

8    A.  Yes.

9              MR. FINKEL:  Object to the relevance and scope.

10             THE COURT:  Could you step up, please.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5V1GUO2                    Schottenheimer - Cross

1              (At the sidebar)

2              THE COURT:  Why are you asking about subprime

3     mortgages in 2008?

4              MR. KAMARAJU:  Oh, I'm just trying to establish—I was

5     just trying to help explain what an event-driven investment

6     thesis is, which is they're playing against the Hong Kong

7     dollar.  I have no more questions about this.  I don't intend

8     to delve any further into the 2008 subprime mortgages.  That

9     was it.

10             THE COURT:  All right.  I'll allow the question.

11             MR. FINKEL:  Your Honor, if I may.

12             THE COURT:  Yes.

13             MR. FINKEL:  I think defense counsel has gone far

14    enough.  The 2008 investment was an investment that there would

15    be a housing crisis, which is to say that Hayman profited when

16    there was a housing crisis.  2008 is about 12 years before the

17    events that are relevant here, and it's already been elicited

18    that they made domestic investments.  That's relevant, and I

19    didn't object to that question.  To go any further into the

20    investment in the housing market, it appears, your Honor, it's

21    designed in part to portray Hayman in a negative light because

22    they invested in the housing crisis, which is irrelevant, so I

23    would ask the objection be sustained.  What needs to be

24    elicited has already been elicited, and we shouldn't go any

25    further because it has no proper purpose before the jury.

O5V1GUO2                         Schottenheimer - Cross

1          THE COURT:  I don't agree.  I think that it is

2   appropriate to give an example of a past investment.  So the

3   objection is overruled.

4          (Continued on next page)

1              (In open court)

2              THE COURT:  Overruled.  You may answer.

3              MR. KAMARAJU:  Would you mind just reading back the

4      question, please.

5              (Record read)

6      BY MR. KAMARAJU:

7      Q.  Now on direct you spent some time talking about something

8      called the Prodigious Fund, right?

9      A.  Yes.

10     Q.  Okay.  And without getting too granular at the moment, sort

11     of the event that was triggering for the Prodigious Fund was

12     some activity related to the Hong Kong dollar; fair enough?

13     A.  Yes.

14     Q.  And specifically, the idea is that the peg between the Hong

15     Kong dollar and the US dollar would break at some point, right?

16     A.  On the weak side, yes.

17     Q.  Right.  On the weak side, because if it breaks the other

18     way, the fund loses money, right?

19     A.  Correct.

20     Q.  So you testified on direct, I believe, that there's

21     something called the Hong Kong Monetary Authority, right?

22     A.  Yes.

23     Q.  Sometimes called——

24     A.  HKMA.

25     Q.  Yes.  Thank you.  And it has a role to play in maintaining

1    the peg, right?

2    A.  Yes.

3    Q.  So it maintains US dollars reserves, right?

4    A.  It holds US dollar——US dollars on its balance sheet, yes.

5    Q.  Okay.  And if I understood your testimony——please correct

6    me if I have it wrong, but——the HKMA can use those reserves to

7    step in to keep the peg in place, right?

8    A.  The excess reserves, yes.

9    Q.  Okay.  And the whole concept of the peg is to keep the Hong

10   Kong dollar tied to a band with the US dollar, right?

11   A.  Yes.

12   Q.  And I think you testified that if the HKMA ran out of its

13   excess reserves, then that could lead the peg to break, right?

14   A.  Likely.

15   Q.  It likely would lead it to break, right?

16   A.  Yes.

17   Q.  And do you remember testifying on direct that Mr. Bass

18   expressed the opinion in the Reel Vision interview that the

19   HKMA had already spent 78 percent of its excess reserves?

20   A.  Yes.

21   Q.  And I think you testified further that if the peg broke,

22   then——and I believe this is your phrase——the market would call

23   out Hong Kong, right?

24   A.  So the market could call out Hong Kong prior to the Hong

25   Kong Monetary Authority actually running out of reserves, in

1    anticipation that they would.

2    Q.  Right.  So basically the fear that they might could cause

3    the market to call out Hong Kong.

4    A.  Could cause the Hong Kong dollar to trade outside of the

5    band, even prior to the HKMA running out of——officially running

6    out of reserves.

7    Q.  Got it.  And just to try to put it in layman's terms,

8    right, the phrase "call out the market," that's another way of

9    saying there would be a loss of confidence in the Hong Kong

10   economy, right?

11   A.  In the Hong Kong dollar pegged to the US dollar is where

12   the loss of confidence would be.

13   Q.  Fair enough.  Fair enough.  So just to be clear for the

14   record, the loss of confidence would be specific to the Hong

15   Kong dollar in this instance.

16   A.  Hong Kong dollar's ability to maintain the peg.

17   Q.  And I think on direct you testified that Hayman's view was

18   that the peg no longer made sense when they——when——I think you

19   were using the phrase HHKOF, right?  When HHKOF was started,

20   Hayman's view was that the peg didn't make sense anymore,

21   right?

22   A.  Correct.

23   Q.  And that at some point in the future, it would break,

24   right?

25   A.  That it would likely break, yes.

1    Q.  Okay.  That's the investment thesis; fair enough?

2    A.  Correct.  Or more broadly, that the option—the optionality

3    is just mispriced; it's too cheap.

4    Q.  Right.  And I'm not an expert, so I'm going to try, but

5    basically that it makes financial or economic sense to buy the

6    option at that price, right?

7              MR. FINKEL:  Your Honor, I just object to the

8    commentary.  It should just be questions to the witness.

9              THE COURT:  Overruled.  You may answer.

10   A.  Can you please repeat the question.

11   Q.  Sure.  That at that point in time, it made economic sense

12   to buy the option at that price.

13   A.  It would depend on what your investment objectives are,

14   what kind of exposures you have in your portfolio, but as a

15   event-driven, a global event-driven investor, it made sense for

16   Kyle and the Hayman vehicles to invest in this strategy, in

17   this misprice strategy.

18             MR. KAMARAJU:  Your Honor, I don't know if you

19   intended to break for lunch now or you want me to keep going.

20   It's up to you.

21             THE COURT:  It's 11:29 and we will have our break.

22   Remember that you're not allowed to discuss the case amongst

23   yourself or with anyone else.  Don't permit anyone to discuss

24   the case in your presence.  Also remember that you're not

25   permitted to do any research about the case by any means, and

O5V1GUO2                          Schottenheimer - Cross

1    you're not permitted to read any news coverage of the case.  So

2    be ready to walk back into the courtroom at noon.

3                    THE LAW CLERK:  Jury exiting.

4                    THE COURT:  And you may step down.  Remember not to

5    discuss the case.

6                    THE WITNESS:  Yes, your Honor.

7                    (Jury not present)

8                    THE COURT:  Do the parties have anything before we

9    return at noon?

10                   Oh, the witness needs to step out.

11                   MR. FINKEL:  The government does not.

12                   MR. KAMARAJU:  Nor do we, your Honor.

13                   THE COURT:  All righty.

14                   MR. KAMARAJU:  Thank you.

15                   THE COURT:  Yes.

16                   (Luncheon recess)

17

18

19

20

21

22

23

24

25

```
 1                 A F T E R N O O N   S E S S I O N

 2                        12:00 P.M.

 3            THE COURT:  Please have the witness brought back and

 4   the jury brought in.

 5            (Jury present)

 6            THE COURT:  Please be seated.

 7            And please remember that you're under oath.

 8            THE WITNESS:  Yes.

 9            THE COURT:  You may continue the cross-examination.

10            MR. KAMARAJU:  Thank you, your Honor.

11   BY MR. KAMARAJU:

12   Q.  Now, Ms. Schottenheimer, I think when we broke off, we were

13   talking about the peg, right?

14   A.  Yes.

15   Q.  By the way, do you know why it's called a peg?

16   A.  So technically, the Hong Kong dollar is banded to the

17   United States dollar.  I don't know where the term --

18            THE COURT:  One moment, please.

19            MR. KAMARAJU:  Sorry, your Honor.

20            THE COURT:  If you would ask the question again,

21   please.

22            MR. KAMARAJU:  Absolutely.

23   Q.  So I think the question you were responding to is do you

24   know why it's called a peg?

25   A.  My response was the Hong Kong dollar is banded to the U.S.
```

1  dollar, which means it trades within a band, not a peg.  And I

2  don't know the origination of the term "peg."

3  Q.  Okay.  But it's commonly referred to — and you on direct

4  were talking about it — as a peg, right?  That's the phrase

5  that we're using?

6  A.  Yes.

7  Q.  Okay.  And before we broke, we were talking about the peg

8  potentially breaking, right?

9  A.  Yes.

10  Q.  Now, Hayman had a view that the peg would break at some

11  point in the future, right?  Or could break at some point in

12  the future?

13  A.  Break to the weak side, yes.

14  Q.  Okay.  But Hayman's view wasn't that that break would

15  happen immediately, right?

16  A.  The timing of the decoupling of a 40-year peg is tough.

17  Q.  Right.  So, for example, in June 2020, the prodigious fund

18  closed, right?

19  A.  It had its first closing June of 2020.

20  Q.  Okay.  So that was the first closing?

21  A.  The first closing was June 1.

22  Q.  Hayman wasn't anticipating that the peg was going to break

23  by July 4th of 2020, right?

24  A.  It's hard for me to recall that many years ago, but I do

25  know that tranche one and tranche two, the initial closings of

1  June 1 and June 8th, were buying options that expired at the

2  end of 2021.  So we were kind of giving ourselves roughly like

3  a year and a half runway.

4  Q.  Okay.  And do you mind just -- you used a term there,

5  "options" and "runway."  Would you mind just explaining how

6  those two concepts go together?

7  A.  Yes.  In the Prodigious Series, we were purchasing options

8  on the Hong Kong dollar outside of the band.  So basically,

9  it's a call option on the U.S. dollar and a put option on the

10  Hong Kong dollar, meaning we were long the U.S. dollar and

11  short the Hong Kong dollar.  They were struck at seven spot --

12  the option price was struck at $7.85, so meaning the option

13  would be in the money or triggered once the Hong Kong dollar

14  traded outside of the band on the weak side.  So seven spot 86,

15  seven spot 87, all of a sudden, that option is in the money.

16          And the term "runway" is me -- in my words is that we

17  were giving ourselves 18 months, roughly, or 17 -- I guess,

18  sorry, 19 months of time for this thesis to play out with the

19  options that we were buying for tranches B1 and B2.

20  Q.  And in very, sort of, general terms, the thesis envisioned

21  this being sort of a gradual process, right?

22          How about this -- let me withdraw that question and

23  try a different one.

24  A.  Okay.

25  Q.  The thesis envisioned that this could be a process that

1    would play out over some time?

2    A.  I recall how the trade was set up with this 19-month

3    duration.  And I recall us wanting to get the money invested in

4    the options in a careful and timely manner.  I can't exactly

5    recall the specific question that you're asking.  We wanted to

6    be set up and positioned sooner rather than later so we could

7    be fully invested to capture any potential move in the Hong

8    Kong dollar.

9    Q.  Got it.

10          All right.  Let me try it a different way.  Let me ask

11   a better question.

12          MR. KAMARAJU:  Can we bring up what I believe is in

13   evidence GX HN-27, please.  And can we just go to page 2.

14   Q.  All right.  So I believe you testified about it on direct,

15   right?

16   A.  Yes.

17   Q.  This is the prodigious fund deck, is that fair to say?

18   A.  Yes.

19   Q.  All right.  So and by "deck" we just mean presentation,

20   right?

21   A.  This is the initial investor presentation from May of 2020;

22   correct.

23   Q.  This is what would be sent out to investors to give them

24   some sense of what the fund was about?

25   A.  In May of 2020, there was iterations and updates along the

1    way.

2    Q.   Sure.  And just sticking to May of 2020, to this version

3    for the moment.

4              MR. KAMARAJU:  Can we go to page 35, please.

5    Q.   All right.  Do you see the second bullet there that says

6    "targeting effective average duration of portfolio of roughly

7    12 to 14 months"?

8    A.   Yes.

9    Q.   What does that mean?

10   A.   This is referencing the average option expiry of this

11   initial kind of portfolio or closing.  So when you're buying

12   options at different periods of time, it wasn't that we could

13   just overnight put all the money to work in a single option.

14             So as you're buying options over the course of June,

15   July, and maybe August, I think that this is kind of

16   under-promising, in hopes that we can over deliver an effective

17   duration of 12 to 14 months.  I'm trying to recall if we were

18   buying all one-year options.  I think that's right.

19             Okay.  If I could just --

20   Q.   Take your time.

21   A.   -- start over.

22   Q.   Take your time.  Go ahead.

23   A.   We were focused on buying one-year options for the Share

24   Class B.  And so when we purchased options in June, they would

25   expire June of the following year; and we would purchase

1  options in July, they would expire July the following year; and

2  August and so on.

3          And I think that we would hold back some of the cash

4  in order to purchase some options in December of 2020 for the

5  last expiration to be December of 2021.  So the goal was to put

6  the exposure on with all of the options expiring by December of

7  2021.  And the effective duration of the portfolio, meaning the

8  average duration of the length of the options at any given

9  time, would be between 12 and 14 months of coverage or exposure

10 to the trade.

11 Q.  Got it.

12         So is it fair to say then that Hayman wouldn't know if

13 it was right about this particular tranche until December 2021?

14 A.  Correct.  Because with a goal of purchasing options that

15 didn't expire through the end of December of 2021, we wouldn't

16 have been completely wrong until we knew if all of the options

17 expired worthless or not.

18 Q.  So even if you lost money during that time period, the

19 investment thesis wouldn't have been proven wrong at that

20 point, right?

21 A.  Correct.

22 Q.  And I think you testified on direct that the strategy was a

23 12-to-24-month window or something in that range, right?

24 A.  So, yeah.  It depends on the timing that we have these

25 tranche closings; but, yes, it's between kind of --

1    historically, it's been 12 to 24 months as the duration of

2    these tranches.

3    Q.   And, in fact, the HHKOF is still in existence, right?

4    A.   Both Share Class A and Share Class B has -- Share Class B

5    still has tranches.

6    Q.   So Hayman is still using the same investment thesis or a

7    similar one at least today?

8    A.   Yes.

9    Q.   Okay.  Let's flip back to page 2 of this, if you don't

10   mind, please.

11            All right.  So who's depicted here again?

12   A.   This is the leader of the communist party of China.  His

13   name is Xi Jinping.

14   Q.   Thank you.  Sorry.  I didn't mean to cut you off.

15            What is he doing?

16   A.   He is blowing the flowers -- the pedals of the flower

17   that's on the Hong Kong flag.

18   Q.   Okay.  And this is in the material that's being marketed to

19   potential investors, right?

20   A.   Yes.

21            MR. KAMARAJU:  Can we go to page 29, please.

22   Q.   What's the title of this slide?

23   A.   "When investors last worried about Chinese law in Hong

24   Kong."

25   Q.   And what does this slide depict?

1    A.  This slide depicts a fairly substantial devaluation in the

2    Hong Kong dollar primarily from 1981 to 1983.

3    Q.  Got it.

4         And what is the title intended to convey?

5    A.  I believe around 1983, Britain announced that they were

6    going to -- Britain had -- Hong Kong was a territory of

7    Britain, for lack of a better term.  And Britain was announcing

8    that they were going to hand back Hong Kong to China, I think

9    it was in like 19 -- in -- Britain was no longer under UK law

10   effective 1997.  And I think there was an announcement to that

11   effect sometime in the early '80s, that at some point it was

12   going to go back to China.

13        So when investors last worried about Chinese law in

14   Hong Kong is around the time of this announcement, and that's

15   around the time that the peg was put in place, to stabilize the

16   currency, to the best of my recollection.

17   Q.  Fair enough.

18        MR. KAMARAJU:  Could we go to page 26, please.

19   Q.  Can you just read the title of that slide?

20   A.  "Beijing liaison office draws line in sand in Hong Kong on

21   5/2/20."

22   Q.  And then could you read that first bullet point.

23   A.  "Saturday, Beijing's liaison office in Hong Kong warned

24   that the city would have no future if radical anti-government

25   protests return to chaos and violence at the time requiring

O5VVGUO3                        Schottenheimer - Cross

1    unity to fight the coronavirus crisis."

2    Q.  And what is this bullet intended to convey to investors?

3    A.  Given that this presentation is three years old and we no

4    longer have this in our deck, it's unclear to me.

5    Q.  Okay.

6            MR. KAMARAJU:  Can we go to page 31, please.

7    Q.  Do you see the title "Pegs are meant to be

8    broken-Argentina," right?

9    A.  Yes.

10   Q.  So what's the purpose of including this slide in the deck?

11   A.  I can't recall.

12   Q.  Okay.  The purpose of the deck was to give some flavor of

13   the investment to potential investors, right?

14   A.  It was our body of work, our research in conveying our

15   thesis to investors.

16   Q.  Right.

17           And you wanted to show the investors there was some

18   evidence for why the thesis might work, right?

19   A.  Yes.

20   Q.  Right.

21           You wanted to substantiate the idea in investors'

22   minds, right?

23   A.  I would describe it as we wanted to present our

24   well-researched thesis.

25   Q.  Right.  You wanted to make sure they understood it wasn't

1    like a half-baked investment thesis, right?

2    A.  That it was a thoughtful thesis.

3    Q.  And this slide depicts a time when another country's peg

4    was broken, right?

5    A.  Sitting up here today, I can't recall what Argentina is

6    pegged to; and so it's hard for me to discuss this slide.

7              MR. KAMARAJU:  Okay.  Let's go to page 34, please.

8    Q.  So what's depicted here?

9    A.  This is a Dragon crunching down on Hong Kong, and an

10   umbrella that says "democracy" across it.  This is China

11   clamping down on Hong Kong's system of democracy.

12   Q.  And is there any significance to the fact that the umbrella

13   is yellow?

14   A.  Not to me, no.

15   Q.  Now, in addition to this presentation, investors would also

16   receive something called a prospectus, right?

17   A.  Generally, yes.  We call it a confidential -- we call it a

18   private placement agreement.

19   Q.  Okay.  We can call it that.  Like a PPM?

20   A.  PPM.

21   Q.  PPM?  Okay.  We'll use that.

22             MR. KAMARAJU:  Could we bring up Government Exhibit

23   29, please.  Thank you.

24   Q.  All right.  So let's just start on page 1.  And I think you

25   testified about this on direct.

1    A.  Yes.

2    Q.  So this is the email -- you sent this email; correct?

3    A.  I did.

4    Q.  You were sending it to potential investors, right?

5    A.  That it indicated interest in the Share Class B closing.

6    Q.  And one of the documents that you sent was the PPM for the

7    HHKOF, right?

8    A.  Yes, confidential offering memorandum.

9    Q.  Got it.

10         MR. KAMARAJU:  Can we go to page 197 of the PDF,

11   please.

12   Q.  All right.  So this is what we're referring to as the PPM;

13   correct?

14   A.  Yes.

15   Q.  Or if the proper term is confidential offering, I'm

16   happy --

17   A.  Some funds call it a PPM.  This one is obviously a

18   confidential offering memorandum.

19   Q.  Okay.  So this memorandum is intended to convey more

20   detailed information about the potential investment to

21   investors, right?

22   A.  Yes.

23   Q.  So it's got a number of different sections to it, right?

24   A.  It does.

25   Q.  And there's a lot of work that goes into putting together

1    one of these documents, right?

2    A.  Yes.

3    Q.  So you get -- Mr. Bass contributes input to it, right?

4    A.  This particular offering memorandum, I can't say that he

5    had input in it, no.

6    Q.  Okay.  Let's divorce it from this particular one for a

7    second.  Just the process at Hayman.

8    A.  Yup.

9    Q.  Can you tell me -- you're putting together a new tranche.

10   What's the process for preparing a confidential memorandum

11   offering?

12   A.  So it's at the fund level.  So this was in existence prior

13   to the Prodigious Series closing for the -- initially on

14   June 1.  So the initial Hong Kong Opportunities Onshore Fund

15   confidential memorandum was put in place January of 2017; it

16   was amended for the kind of additional Share Class B, and

17   that's why it's from May of 2020.

18           We had a previous fund called the -- we had a previous

19   fund that was a currency-specific fund that we kind of used the

20   basis of that fund for the Hong Kong strategy.  And there was a

21   number of people that provided input and helped the lawyers

22   pull the draft together.  I can't attest to whether Kyle was

23   involved in that process or not.

24   Q.  Okay.  That's fair enough.

25           There are a number of Hayman people involved?

```
1    A.  Correct.

2    Q.  There were lawyers involved?

3    A.  Investment professionals.

4    Q.  Got it.  Okay.

5            So all of them worked together to put together a

6    confidential offering memorandum, right?

7    A.  Yes.

8    Q.  And there's a lot of different topics covered in one of

9    these; correct?

10   A.  Yes.

11           MR. KAMARAJU:  So, for example, can we go to page 198.

12   Q.  So this is titled "Partnership Directory," right.

13           What's the partnership directory?

14   A.  I think it's naming all of the different kind of parties

15   involved and third-party representation on behalf of the

16   partnership.

17   Q.  Got it.

18           And I think on direct you testified about having an

19   administrator named SEI; is that right?

20   A.  That's correct.

21   Q.  Okay.  So that's the entity that's reflected here?

22   A.  That's our third-party administrator reflected as the

23   administrator.

24   Q.  Got it.

25           And you see two headings down there's something called
```

1   auditor?

2   A.   Yes.

3   Q.   And there's a company listed there?

4   A.   Deloitte & Touche.

5   Q.   Okay.  What's an auditor?

6   A.   An auditor is a third-party service that comes in and

7   audits the fund on a yearly basis.  They provide audited

8   financials on behalf of the partnership to its underlying

9   investors.

10          MR. KAMARAJU:  Could we go to page 224, please.

11  Q.   All right.  So this section is titled "Investment Program,"

12  right?

13  A.   Yes.

14  Q.   And then there's something entitled "Investment Objective

15  and Strategy"?

16  A.   Yes.

17  Q.   What's this section -- just generally, what's this section

18  intended to convey?

19  A.   This is describing the thesis of the fund.

20  Q.   Okay.  So the investment strategy basically?

21  A.   Yes.

22  Q.   All right.

23          And the purpose here is to give a more detailed

24  explanation to the investors and what's happening, right?

25  A.   As part of the offering, yes.

1    MR. KAMARAJU:  Could we go to page 235, please.

2  Q.  And you see the title "Certain Risk Factors"?

3  A.  Yes.

4  Q.  What's this section intended to convey?

5  A.  Outlining the risk factors of investing in the fund.

6  Q.  And the first risk factor, it looks like it says market and

7  risk investment risks, right?

8  A.  Yes.

9  Q.  Is that a particular type of risk?

10    Let me withdraw and ask it this way:  This is one

11  bucket of risk that the PPM would convey?

12  A.  Is outlining, yes.

13  Q.  And there are specific risks of investing in securities in

14  east Asian countries outlined here, right?  That's the second

15  bolded.

16  A.  Yes, that is in there.

17  Q.  Okay.  Don't worry, I'm not going to ask you to read

18  through the whole thing.  But this is just, generally speaking,

19  targeting risks of investing in securities in east Asia?

20  A.  This is highlighting that Asia is potentially riskier than

21  U.S. or other developed countries.

22    MR. KAMARAJU:  Could we show just the witness, the

23  parties, and the Court GX SM-08.

24  Q.  Ms. Schottenheimer, do you recognize that document?

25    MR. KAMARAJU:  Sorry.  Could we go back to the first

1    page.

2    A.  Yes.

3    Q.  What is it?

4    A.  This is a supplement to the confidential offering

5    memorandum specific to the Prodigious Series or Class B.

6    Q.  Okay.  So it's fair to say this is an addendum to sort of

7    the document we were looking at just before?

8    A.  Yes.

9            MR. KAMARAJU:  Let me get it right this time.  The

10   defense offers Government Exhibit SM-08.

11           MR. FINKEL:  Could I ask defense counsel a question?

12           THE COURT:  Okay.

13           (Counsel conferred)

14           MR. FINKEL:  Objection.

15           THE COURT:  If you'll step up, please.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1                    (At sidebar)

2                    THE COURT:  Does this addendum concern the defendant's

3      investment?

4                    MR. KAMARAJU:  It's the same fund, your Honor.  It's

5      just a supplement covering it.

6                    My only intention in showing it is showing that there

7      is a supplement and it's basically the same as the one that

8      came before it.

9                    THE COURT:  So what's the problem?

10                   MR. FINKEL:  The question I asked defense counsel was,

11     Who saw it?  And his answer was, I don't know.  And therefore,

12     I don't see its relevance.  Because if the point of introducing

13     this document is to show the effect on Mr. Guo or Mr. Je, then

14     there is no effect if it wasn't seen by anybody.

15                   He's certainly free to ask the questions they are a

16     supplement, that's fine.  But introducing a document in

17     evidence that may or may not have been seen by the defendant

18     has no relevant purpose.

19                   THE COURT:  It was made available to them, I assume,

20     based upon her testimony, that she hands out these documents

21     before an investor invests.

22                   MR. FINKEL:  That may be.  But I asked counsel whether

23     anyone of relevance had seen it, he said no.  That was the

24     reason for my objection.

25                   MR. KAMARAJU:  No, I said I don't know, because I

1    haven't asked the witness the question.  But it's just

2    simply -- it's just completing the record.  It's a document

3    that they make available.  I'm not going to make an argument

4    that Mr. Guo specifically saw this document.  Just completing

5    the --

6            THE COURT:  That's fine.  The objection is overruled.

7            MR. KAMARAJU:  Thank you, your Honor.

8            MR. FINKEL:  There's not even a -- understood.

9            THE COURT:  Are you challenging the authenticity of

10    it?

11            MR. FINKEL:  I'm not challenging authenticity, your

12    Honor.  I was going to add an additional argument my colleague

13    said.  And as I started speaking, I heard your Honor rule, and

14    so I'm not saying anything further.  I apologize.

15            THE COURT:  Okay.

16            (Continued on next page)

1           (In open court)

2           THE COURT:  Overruled.

3           (Government's Exhibit SM-08 received in evidence)

4           MR. KAMARAJU:  So could we publish this for the jury,

5     please.

6     BY MR. KAMARAJU:

7     Q.  So this document -- you've testified about supplements

8     before, right?  Sorry, let me be more specific.  Supplements to

9     PPMs; correct?

10    A.  I don't recall that.  I mean, this document right here is a

11    supplement to the PPM.

12    Q.  Okay.  Fair enough.

13          This one is a supplement to the prodigious fund PPM?

14    A.  The PPM that you showed me earlier was for the whole Hong

15    Kong fund.

16    Q.  Okay.

17    A.  I mean for the whole Hong Kong -- I believe what you showed

18    me was an onshore confidential memorandum.

19    Q.  Okay.

20    A.  What you're showing me right now is the supplement to the

21    offshore Hayman Hong Kong memorandum.

22    Q.  Okay.

23    A.  So this is not technically the supplement to what you --

24    Q.  No, I got that.

25    A.  Okay.

1    Q.  I understand.  Because Hayman has got two different ways in

2    which you can invest, right?

3    A.  There's an onshore feeder fund and an offshore feeder fund.

4    Q.  Got it.

5         And they both have -- they may have different

6    requirements, right?

7    A.  Different representations.  If you're a non -- if you're a

8    non -- if you're a tax-exempt U.S. or an offshore individual in

9    the offshore fund.

10   Q.  Right.  Because if you invest through the onshore, you have

11   to pay U.S. taxes?

12   A.  Yeah, you receive a K-1.

13   Q.  And that K-1 goes not just to the investor, but also to the

14   IRS, right?

15   A.  I don't know.

16        MR. KAMARAJU:  We can take that down.

17   Q.  So you first met Mr. Je in Dallas in 2018; correct?

18   A.  William Je?

19   Q.  Yes.

20   A.  I met him in Dallas in October of 2018.

21   Q.  Okay.  And you had no further communications with him until

22   May of 2020, right?

23   A.  He came through the office and met with Kyle.  I was not

24   part of the meeting, but he was reintroduced to me on his way

25   out.

```
1    Q.  When was that?

2    A.  Sometime between October 2018 and May of 2020.  I can't

3    exactly recall.

4    Q.  Okay.  Fair enough.

5           Was it closer to when you initially met him or closer

6    to May 2020?

7    A.  I honestly can't recall.

8    Q.  Okay.  You weren't part of the meeting though, right?

9    A.  I wasn't part of the meeting.

10   Q.  So you don't know what was discussed.  Other than that time

11   that he came to the office, you didn't have any other contact

12   with him, right?

13   A.  Not to my recollection.

14   Q.  Okay.  So during that period you didn't send him any

15   information about the Hong Kong fund, right?

16   A.  Not to my recollection.

17   Q.  And the first time you heard that Mr. Je had any interest

18   in investing was from Mr. Bass, right?

19   A.  Correct.

20   Q.  And that was in May 2020, right?

21   A.  Yes.

22           MR. KAMARAJU:  Can we bring up what's in evidence as

23   Government Exhibit HN-27, please.

24   Q.  All right.  And you sent this email after Mr. Bass told you

25   about his conversation with Mr. Je; correct?
```

1  A.  Yes.

2  Q.  Do you see the sent time there?

3  A.  Yes.

4  Q.  Okay.  It says it was sent at almost 1 a.m. on Saturday,

5  right?

6  A.  Yes.

7  Q.  Do you believe that's when it was actually sent?

8  A.  It was my understanding that William was in London, so

9  potentially it could have been 1 a.m. London time.  I don't

10 think I sent it U.S. time 1 a.m., but potentially I work some

11 strange hours sometimes, but I don't recall.

12 Q.  Well, you did testify that there was some urgency to this

13 investment, right?

14 A.  Yes, that's probably why I sent it on a Saturday.

15 Q.  Right.  And can you explain why there was urgency?

16 A.  The genesis of Share Class B of the Hong Kong fund came

17 from a reverse inquiry from an existing investor, actually the

18 largest investor in our flagship fund.  And they wanted

19 expedited closing of June 1.

20 Q.  So fair to say that the window for the money coming in was

21 closing pretty quickly at this point, right?

22 A.  To participate in the first closing, yes.  The timing had

23 been previously set by a separate investor.

24 Q.  Now, Mr. Bass was pretty eager to get this investment done

25 as well, right?

1    A.   I would say that Kyle was sensitive to the timing because

2    the current pricing in the marketplace was -- had a good risk

3    return to it.

4              THE COURT:  Could you explain what you mean by

5    "reverse inquiry"?

6              THE WITNESS:  Yes.  One of our current investors had

7    asked us if they could do a capital exhaustion vehicle.  So it

8    was at a request by one of our investors to create a separate

9    share class that was capital exhaustion or put 100 percent of

10   the capital into the options-based strategy.

11             THE COURT:  Go ahead.

12   BY MR. KAMARAJU:

13   Q.   So there was a market reason for Mr. Bass to be eager to

14   get this done, right?

15   A.   Yes.

16   Q.   Okay.  And then also one of the fund's large investors

17   wanted to get this done quickly, right?

18   A.   It's a separate fund, our flagship fund; but, yes, it was

19   at their request.

20   Q.   Okay.  And then Mr. Je comes along and says Saraca would

21   like to invest $100 million, right?

22   A.   I think the initial conversation was that it wasn't

23   necessarily Saraca, but that Miles would have interest in this

24   new structure of the Hong Kong thesis.

25   Q.   Okay.  But the investment was really large, right?

1    A.  The Saraca investment?

2    Q.  Yeah, the proposed investment, it was big?

3    A.  $100 million investment is a large investment.

4    Q.  Right.

5           MR. KAMARAJU:  Bless you.

6           THE COURT:  Thank you.

7    Q.  It would generate significant fees for the fund, right?

8    A.  If the Hong Kong dollar had a substantial devaluation, it

9    would create substantial fees to the firm.

10          MR. KAMARAJU:  Can we go to Government Exhibit HN-27,

11   which I think is this one.  Can we go to page 37, please.

12   Q.  All right.  I think you walked through this on direct a

13   little bit.  But you see the place where it says "management

14   fee"?

15   A.  Yes.

16   Q.  Okay.  So the management fee gets paid to Hayman regardless

17   of whether the investment thesis works out or not, right?

18   A.  That is correct.

19   Q.  It's basically once the investment comes in, the management

20   fee is owed, right?

21   A.  Yes.

22   Q.  And it's not -- it's the investor paying Hayman, right?

23   A.  To manage the capital.

24   Q.  Right.  And that's standard practice in the hedge fund

25   industry, right?

1   A.  Yes.

2   Q.  That's not unusual for Hayman or anyone else; a management

3   fee is standard, right?

4   A.  Standard hedge fund fees, yes.

5   Q.  And so $100 million investment at two percent would have

6   been $2 million right up front, right?

7   A.  Yes.

8   Q.  And then I think what you're referring to is if the bet

9   paid off, the fund might stand to make substantially more than

10  that, right?

11  A.  Correct.

12  Q.  And that's the performance allocation that's referred to

13  here, right?

14  A.  Yes.

15  Q.  Now, at that time in 2020, I believe you testified on

16  direct that Hayman had approximately $400 million under

17  management, right?

18  A.  Yes.

19  Q.  That's its AUM, right?

20  A.  Correct.

21  Q.  And, in fact, specifically going into the closing of the

22  prodigious fund, that April/May period, it was approximately

23  $400 million, right?

24  A.  It might have been a little less, like 300 and some.

25          MR. KAMARAJU:  Could we go to Government Exhibit

1   HN-29, please.

2           THE COURT:  Are you speaking of total assets under

3   management?

4           THE WITNESS:  Across the entire firm, going into 2020,

5   it was 400; midway through the year, like May time frame, I

6   believe it was 300 and change.

7           MR. KAMARAJU:  Could we go to Government Exhibit 29,

8   please.  Can we just go to -- first, let's just stay here for a

9   second.

10  BY MR. KAMARAJU:

11  Q.  All right.  Do you see the attachments there,

12  Ms. Schottenheimer?  And I'm specifically looking at the one

13  that's the second from the last.

14  A.  Form ADV?

15  Q.  Yeah.  Do you see that one?

16  A.  Yup.

17  Q.  Do you know what a form ADV is?

18  A.  Yes.  It's a filing required by firms that are registered

19  with the SEC as a registered investment adviser.

20          MR. KAMARAJU:  And could we go to page 315 of this

21  document.

22  Q.  All right.  Is this the form ADV brochure?

23  A.  Yes, as of March 30.

24  Q.  So this is the last one filed before the prodigious fund --

25  before that June 1 prodigious fund closing, right?

1   A.  I understand this to be an annual filing.

2   Q.  Okay.

3            MR. KAMARAJU:  Can we go to page 318, please.

4   Q.  All right.  And so at the top there you see it says item 4,

5   advisory business?  Can you just read the last sentence of that

6   paragraph, please.

7   A.  "As of December 31, 2019, Hayman managed approximately 432

8   million in assets under management on a discretionary basis on

9   behalf of its clients."

10  Q.  Okay.  So by the time we get to like spring of 2020, that

11  number has gone down a little bit, right?

12  A.  To the best of my recollection, yes.

13  Q.  Okay.  So $100 million could be anywhere -- could be north

14  of 25 percent of the assets that the fund had under management

15  at that time, right?

16  A.  We had had a closing on June 1 of close to $40 million.

17  But, yes, somewhere around 20 percent of assets under

18  management.

19  Q.  A big chunk.

20  A.  A minority.

21  Q.  Sure.  Sure.  But the next biggest investor had put in, I

22  think, 30 or $40 million, right?

23  A.  Specifically to the Hong Kong fund?

24  Q.  Yeah.

25  A.  I think it was around 50 at the time.

1   Q.   Okay.  So this would be almost twice that investment,

2   right?

3   A.   Yes.

4   Q.   And it's fair to say that when the checks got larger,

5   Mr. Bass's involvement got more significant?

6   A.   In what regard?

7   Q.   Well, for example, if there were particularly

8   high-net-worth individuals who were planning to invest,

9   Mr. Bass might have more face-to-face -- withdrawn.  Mr. Bass

10  might have more contact with them, right?

11  A.   Not necessarily.

12  Q.   But it happened from time to time, right?

13          MR. FINKEL:  Objection.  Asked and answered.

14          THE COURT:  Sustained.

15  Q.   So in this case, Mr. Bass is the one who told you about

16  Mr. Je; correct?

17  A.   Yes.

18  Q.   And Mr. Bass had direct communications with Mr. Je, to your

19  knowledge, right?

20  A.   That is my understanding.

21  Q.   And he spoke to him on the phone, right?

22  A.   That was my understanding.

23  Q.   You didn't speak to Mr. Je on the phone, right?

24  A.   I did not.

25  Q.   And there were times when Mr. Je may be slow to respond to

1    some of your inquiries, right?

2    A.   My specific inquiries?

3    Q.   Or the fund's inquiries.

4           Well, let's say your inquiries.  Let's stick to yours,

5    your inquiries.

6    A.   I specifically remember after Mr. Je had requested the side

7    letter, I had reached out to him a couple of times asking for

8    the names of the entities that were investing so I could clear

9    it for conflict with my third-party counsel.  That is the only

10   time that I recall Mr. Je -- me having to follow up multiple

11   times to get a response.

12   Q.   Oh, sorry, I didn't mean to interrupt.

13   A.   But it was within a matter of days.

14   Q.   Okay.  Did Mr. Bass also try to follow up with Mr. Je then?

15   A.   Yes.  I had enlisted Kyle, The next time you talk to

16   William, we need these names to clear them for conflict.

17   Q.   Because Mr. Bass had a clearer pipeline to Mr. Je, right?

18   A.   It was just whoever talked to him first was hopefully going

19   to collect the names so we could clear them for conflict.

20   Q.   Now, it was Mr. Bass who originally gave you the names of

21   the companies that were going to invest, right?

22   A.   Via text.

23   Q.   Right.  And we looked at that text on direct, right?

24   A.   Yes.

25           MR. KAMARAJU:  Can we pull up Government Exhibit

1    HN-33.

2    Q.  This is that text message, right?

3    A.  Yes.

4    Q.  And you see at the top it says "because of the tight

5    timing"?

6    A.  Yes.

7    Q.  What do you understand that to be a reference to?

8    A.  At one point they were trying to invest as of June 1, along

9    with the other reverse inquiry investor from our flagship fund.

10   Q.  And this text was sent on May 26th, right?

11   A.  Ahead of the June 1 closing.  At some point it became

12   evident that they weren't going to make that cutoff, and so we

13   set a date around their preferred timing.

14           MR. KAMARAJU:  Okay.  And can we scroll down a little

15   bit.

16   Q.  So then you tell Mr. Bass that you're going to send William

17   the AML requirements, right?

18   A.  Yes.

19   Q.  And how does he respond?

20   A.  "Okay.  Let's fast-track everything.  Thank you.  Remember,

21   he's asleep now.  He won't get back -- so you won't get it back

22   until tomorrow."

23   Q.  What did you understand Mr. Bass to mean when he said

24   "let's fast-track everything"?

25   A.  In response to me requesting the AML requirements, that we

1    wanted to get the AML in to have that approved ahead of time so

2    that wouldn't slow down their ability to invest.

3    Q.   It's true, right, that sometimes the AML process can take

4    some time, right?

5    A.   Depending the complexity of the entity investing, yes.

6    Q.   Right.  I think on direct you described a process of

7    drilling down, right?

8    A.   Yes.

9    Q.   So drilling down can be simple sometimes, right?

10   A.   Can be very simple.

11   Q.   And sometimes can be very complicated, right?

12   A.   Can be very complicated.

13   Q.   So what makes drilling down particularly complicated?

14   A.   When an entity is owned by entities.

15   Q.   I'm sorry, could you explain what you mean by that?

16   A.   When an entity is not owned by a person, it's owned by

17   additional entities, separate entities.  So you could have

18   entity A that's owned by entity B, C, D, and you have to keep

19   drilling into the different entities until you find an actual

20   person to do AML on.

21   Q.   Got it.

22        Because you need the specific person in order to run

23   them through AML, right?

24   A.   Correct.  Anyone who owns more than 20 percent of an entity

25   is considered a beneficial owner and needs to have an AML

1    check.

2            MR. KAMARAJU:  Could we go back to Government Exhibit

3    HN-37 for a second.

4            All right.  It's not in?  Take it down for the jury.

5    I'm sorry, I thought you put it in.  Can I just show it to the

6    witness, the Court, and the parties.

7    Q.  Ms. Schottenheimer, do you recognize this document?

8    A.  One second.

9    Q.  Oh, yeah, please.  Take your time.

10   A.  Yes.  I'm familiar with this email.

11   Q.  Okay.  So it's an email chain, right?

12   A.  Yes.

13   Q.  And it starts with emails between you and Mr. Je, right?

14   A.  Yes.

15   Q.  And Mr. Bass is copied on those underlying emails, right?

16   A.  Yes.

17   Q.  And the time period of these emails is around May 29, 2020,

18   right?

19   A.  Yes, sir.

20   Q.  And it concerns a side letter that Mr. Je was seeking;

21   correct?

22   A.  Correct.

23           MR. KAMARAJU:  Okay.  The defense would offer

24   Government Exhibit HN-37.

25           MR. FINKEL:  Objection.  Hearsay.

1          THE COURT:  Step up please.

2          (At sidebar)

3          THE COURT:  So the first email from Mr. Je to

4   Ms. Schottenheimer concerns the terms they were negotiating;

5   correct?

6          MR. KAMARAJU:  Yeah.  My only purpose in introducing

7   the email is to show that Mr. Bass asked Ms. Schottenheimer to

8   call him about the side letter.  I'm not introducing it for the

9   truth of any of the underlying materials, just to say that

10  Mr. Bass asked Ms. Schottenheimer to call, which is basically

11  one of the exceptions that we had talked about yesterday, I

12  believe, an instruction or a direction.

13         MR. FINKEL:  He's certainly free to ask the question,

14  Did Mr. Bass contact you via phone to discuss whatever, or in

15  response to an inquiry from Mr. Je.  But defense can't put in

16  documents for declarants for Mr. Bass and Ms. Schottenheimer

17  and Mr. Je.  We object on that basis.

18         It's not being offered -- every time there's a hearsay

19  objection, I understand.  Obviously, as Mr. Fergenson mentioned

20  yesterday, the devil is in the details on all these things.

21  There's an explanation that it's for the state of mind or to

22  show, in fact, that all these things.

23         We disagree with that in this particular case.  I

24  don't object to the question, Did you speak with Mr. Bass on

25  the phone in response to an inquiry from Mr. Je?  That's fine.

1    But the document is hearsay and the government objects.

2              MR. KAMARAJU:  On what basis is the document hearsay?

3              MR. FINKEL:  It's a third-party declarant who's not

4    testifying.  And it's also a statement by a co-conspirator

5    which they can't offer under the rules.  That's the basis.

6              THE COURT:  So you have William Je to

7    Ms. Schottenheimer, then Ms. Schottenheimer to Kyle Bass.

8    Certainly she can authenticate her email.

9              MR. KAMARAJU:  And I'm only intending to ask her about

10   the top email.  And I think they've already introduced emails

11   about this very topic between Ms. Schottenheimer and Mr. Je.

12   So we're not --

13             THE COURT:  You're not seeking to introduce the first

14   email from Mr. Je?

15             MR. KAMARAJU:  I think you need that just to explain

16   what the phone call was about.  You know, I mean, I can

17   certainly confuse the witness, offer an active version of it,

18   and just have her not know what the substance of the phone call

19   is.  But we're not offering it for the terms that are being

20   negotiated.  I'm going to ask her that question.

21             But all I'm really asking for is that setting up that

22   Mr. Bass asked Ms. Schottenheimer to call him about the subject

23   of the terms that Mr. Je wanted to negotiate.  That's not

24   offered for the truth, your Honor.  And until the government

25   can articulate an actual basis -- hearsay basis for it, there's

1   no hearsay objection.

2           MR. FINKEL:  So there is a hearsay objection.

3           THE COURT:  Wait a minute.  I thought it went from Je

4   to Schottenheimer, Schottenheimer to Bass.

5           MR. KAMARAJU:  So it goes Je to Schottenheimer, then

6   Schottenheimer forwards the email to Bass and says Je wants

7   this.  And Kyle Bass responds, Call me.

8           So I'm not introducing it for the truth of what Je

9   wants.  I'll ask her that question, right.  All I'm introducing

10  it for is the idea that Kyle Bass says to her -- she goes to

11  Kyle Bass and says, you know, This is what he wants.  And Kyle

12  Bass says, Call me and I'll explain it, which is a nonhearsay

13  use.

14          MR. FINKEL:  Your Honor, if I may, what they want this

15  in for clearly is for what Je is saying.  Because otherwise the

16  question would be very appropriately put:  Did you speak with

17  Mr. Bass about what Je wanted?  That's a -- if I can please

18  finish.

19          MR. KAMARAJU:  I haven't said anything.

20          MR. FINKEL:  That's an appropriate question.

21          They are trying to introduce a document to get into

22  the record Je's statements which the defense can't do.  That is

23  hearsay.  I understand they have a view that it's not being

24  offered for the truth; but merely saying so does not make it

25  so.

1          The government believes -- it's an authentic document.

2     There's no dispute of authenticity.  I'm not disputing

3     authenticity.  I'm disputing hearsay.  On that basis, the

4     objection, respectfully, should be sustained and we should move

5     on and pose the question.

6          THE COURT:  You're saying that it comes in as a

7     command from Mr. Bass?

8          MR. KAMARAJU:  I'm saying it comes in as a request

9     from Mr. Bass to call me.  It's just that simple.

10         If your Honor wants to put a limiting instruction with

11    it to say they can't consider the underlying things, whatever

12    motivation Mr. Finkel is ascribing to, I am telling you that my

13    only purpose, my only set of questions is to say:  Mr. Bass

14    asked you to call him when you contacted him about this, right?

15         MR. FINKEL:  So why not just ask that question?

16         MR. KAMARAJU:  Because I'm allowed to set it up, Ryan.

17    I'm not limited to asking questions.

18         THE COURT:  So the elimination of the Je to

19    Schottenheimer email is acceptable to you?

20         MR. KAMARAJU:  If you want.  I mean, I think she

21    needs -- I think she needs the subject line because otherwise

22    she's not going to know what the email is about; she's not

23    going to know what the subject is.

24         But if you want to redact -- first of all, this is a

25    government exhibit that was produced to us in this way.  So we

1    didn't -- this is not a defense exhibit.

2          But second, if that is the concern, I just want to

3    make sure that it is recognizable for the witness so that she

4    understands what it is.  But I don't -- the fact that the

5    government is unable to articulate a reason why our hearsay

6    objection -- our hearsay argument isn't valid other than saying

7    that's not really what they want to do, your Honor, it's not

8    enough that you should reject the objection.

9          THE COURT:  I think we established yesterday that

10   commands don't constitute hearsay.

11         MS. SHROFF:  Exactly.

12         THE COURT:  But the Je portion of it is hearsay.

13         MR. KAMARAJU:  Sure.  Which your Honor can easily

14   solve by just saying don't consider the bottom part of the

15   email for the truth.

16         MR. FINKEL:  I think it should be redacted.  They can

17   zoom in on the portion of the email that your Honor is going to

18   admit.  They can prepare a redacted version of the document.

19         MR. KAMARAJU:  But why do we need to redact it?

20         MR. FINKEL:  Because it's hearsay.

21         THE COURT:  What does the subject matter say?

22         MR. KAMARAJU:  It just says -- it says side letter is

23   the subject line.  And then he's talking about the terms of the

24   side letter.

25         THE COURT:  Okay.  So if she can testify that Mr. Bass

1    wanted her to call, I have no problem with admitting that

2    portion of the email without the William Je portion.

3              MR. KAMARAJU:  Okay.  So how would your Honor like me

4    to handle it right now?  Should I just focus on the top

5    portion?

6              MR. FINKEL:  If I may.

7              THE COURT:  Yes.

8              MR. FINKEL:  Part of the reason the defense has said

9    that they need the letter is because she doesn't know the

10   subject matter and she doesn't know this.  Let's see what she

11   knows; maybe she remembers.  That's number one.

12             So if there's a failure of recollection, this can be

13   used to refresh.  That's number two.

14             The third is based on your Honor's ruling, they should

15   just blow up — they certainly have the technology; if not, we

16   can do it — the top portion of the email and introduce that

17   piece of the exhibit and then they'll redact the rest.

18             MR. KAMARAJU:  I should get both pieces.  I should get

19   Ms. Schottenheimer's email to Mr. Bass --

20             THE COURT:  Yes, I agree.

21             MR. KAMARAJU:  -- and I should get Mr. Bass's

22   response.

23             THE COURT:  That's fine.

24             Okay.  That's how we'll go forward.

25             MR. KAMARAJU:  Thank you, your Honor.

1          (In open court)

2          (Government's Exhibit HN-37 received in evidence)

3          MR. KAMARAJU:  Your Honor, may I publish this portion

4     that's on the screen?

5          THE COURT:  Yes, you may.

6          MR. KAMARAJU:  Okay.  Thank you.

7          Could we publish it for the jury, please.

8     BY MR. KAMARAJU:

9     Q.  Okay.  Ms. Schottenheimer, do you see your email to

10    Mr. Bass there at the bottom?

11    A.  Yes.

12    Q.  And do you see the subject is "Side Letter," right?

13    A.  Correct.

14    Q.  What is that a reference to?

15    A.  That's in reference to the side letter that William Je had

16    requested on behalf of the entities he was directing to invest

17    in the Hong Kong fund.

18    Q.  And where you refer to terms with a minimum of a one

19    million investment, what does that mean?

20    A.  To my recollection, there was a version of the side letter

21    that they were requesting the terms subject to a million

22    dollars minimum investment.

23    Q.  So they were asking for favorable terms on the $1 million

24    portion of the investment?

25    A.  It's hard for me to perfectly recall without the draft of

1    the side letter, but it was my understanding that they were

2    asking for these terms in connection with a million-dollar

3    investment.

4    Q.  Okay.  And it would be unusual normally for a

5    million-dollar investment to be able to get any kind of side

6    letter, right?

7    A.  Correct.

8    Q.  Why did you reach out to Mr. Bass about this?

9    A.  He was negotiating the side letter directly with William.

10   Q.  And was it your view that it was pretty aggressive to ask

11   for a side letter in connection with a million-dollar

12   investment?

13   A.  I think I understood that there was some sort of

14   miscommunication.  At this point, I don't know, May 29th, if it

15   had been represented to me that there was also a $50 million

16   investment in the mix as well; and that the wording, I think,

17   was just improperly outlined on the initial draft of the side

18   letter.

19   Q.  Okay.  And then how does Mr. Bass respond?

20   A.  "Call me on this.  I will explain."

21   Q.  Did you speak with Mr. Bass about it?

22   A.  Yes.

23   Q.  And what was the outcome of that conversation?

24   A.  He explained that William Je wanted to invest a million

25   dollars personally in addition to the capital that was coming

1    from Miles Kwok's family office, but it would be a separate

2    entity.

3    Q.  And so --

4    A.  The resolution --

5    Q.  Yeah, sorry.  I didn't mean to interrupt.

6    A.  The resolution was because they were affiliated entities,

7    our external counsel was comfortable drafting the side letter

8    with a $51 million minimum.  And I think, to the best of my

9    recollection, that is what went into the final version of the

10   side letter.

11   Q.  Was it 51 million or was it a 101 million that went into

12   the side letter?

13   A.  At one point I thought it was $51 million -- at some point

14   it went from 50 million from Saraca to 100.  But I believe in

15   the final side letter I thought it was 51.

16   Q.  Okay.  Now, when we looked at the text message you

17   mentioned starting -- sorry.  You mentioned starting anti-money

18   laundering checks with Mr. Je, right?

19   A.  Yes.

20   Q.  Okay.  And you testified on direct about what anti-money

21   laundering checks are.  They are part of the KYC process,

22   right?

23   A.  Yes.

24   Q.  And "KYC" stands for know your customer, right?

25   A.  Yes.

1    Q.  And you testified on direct that the SEC requires you to do

2    those kinds of checks, right?

3    A.  Yes, it's all -- yeah, yes.

4    Q.  And there are other government agencies that also have

5    checks that are part of the KYC process, right?

6    A.  It's, yeah, broadly, I think, financial institutions have

7    to engage in KYC with any of their customers.

8    Q.  And they have to check the entities against various U.S.

9    government lists, for example, right?

10   A.  Yes.  I'm really only familiar with our process.

11   Q.  Okay.  Well, tell me your process.

12   A.  We collect the required documentation outlined on the AML

13   grid.  We use SCI as our third-party administrator.  And we

14   have outsourced the AML function to our third-party

15   administrator.  They have a team that runs AML for our funds.

16   Q.  Got it.

17        And are you aware what checks they run?

18   A.  Generally, they check the names and details of all of the

19   required persons to have AML, beneficial owners, authorized

20   signatories, and controlling persons against a world check

21   database that checks against OFAC and a number of other broadly

22   kind of terrorist list or kind of *persona non grata* list.  And

23   they do this at the time of investment and on a monthly basis.

24   And they provide a report to us saying that there's no hit.

25   We've never had a hit, so no hits on a monthly basis for each

1    of our funds.

2    Q.  And, sorry, you mentioned OFAC.  What is that?

3    A.  I can't -- I don't know the acronym.

4    Q.  That's okay.  Just generally --

5    A.  It's a list of terrorists.  Not just terrorists, but people

6    that you cannot do business with.

7    Q.  And so that's -- checking against the OFAC list is one of

8    the parts of the AML, right?

9    A.  That is outsourced, yes, yeah.

10   Q.  Thank you.

11            Now, you testified on direct about something you

12   called an AML grid, right?

13   A.  Yes.

14   Q.  And part of the AML grid is a list of questions for the

15   investor to answer, right?

16   A.  It depends on -- a lot of the AML is baked into the

17   questionnaire within the sub doc.  The AML grid shows a list of

18   the documents that you need to provide and the information that

19   you need to provide on the ultimate beneficial owner,

20   controlling persons, and I think that's it.

21            MR. KAMARAJU:  Just one second.

22   Q.  Now, you testified on direct that there was a time when

23   Mr. Je told you that money would need to come from a different

24   entity, right?

25   A.  Yes.

1   Q.  And that was -- from your perspective, that might have been

2   an AML problem, right?

3   A.  It was.

4   Q.  And Mr. Je ultimately resolved that problem, right?

5   A.  The money came in from an account from Saraca.

6   Q.  Right.  And so that fixed the AML concern that you had,

7   right?

8   A.  Yes.

9   Q.  And, sorry, I forgot to ask the question before, but just

10  going back to the side letter quickly, it's not unusual for

11  larger investors to get side letters, right?

12  A.  Not unusual.

13  Q.  And the terms of those side letters and what -- withdrawn.

14          What Hayman is willing to agree to in a side letter is

15  based in part on the economics of the investment, right?

16  A.  I don't understand the question.  Can you please repeat it?

17  Q.  Sure.

18          If an investor is asking for particular terms, right?

19  A.  Mm-hmm.

20  Q.  One of the factors that would go into Hayman's decision as

21  to whether to accept those terms is the size of the investment,

22  right?

23  A.  Yes.

24  Q.  Now, in the subscription packet, right, one of the

25  questions is source of wealth, right?

1    A.  Yes.

2    Q.  Now, the subscription packet did not always have a source

3    of wealth question in it, right?

4    A.  That's correct.

5    Q.  That was added over the last few years, right?

6    A.  Few years from 2020, yes.

7    Q.  I'm sorry, you said yes?

8    A.  Yes.

9    Q.  Okay.  And you testified that at first, the Saraca form was

10   missing the source of wealth information, right?

11   A.  Yes.

12   Q.  That's also not unusual, right?

13   A.  It is typical for there to be corrections in a sub doc.

14   For that question to be skipped, it's been skipped before, but

15   I don't think it's a regular occurrence.

16   Q.  Right.  You had other investors who have been -- who have

17   failed to fill that in, right?

18   A.  Yes.

19   Q.  And you've had investors who were confused about what that

20   question was seeking, right?

21             MR. FINKEL:  Objection.  Calls for speculation.

22             THE COURT:  Sustained.

23   Q.  Well, you personally have dealt with investors who have

24   been confused about that, right?

25             MR. FINKEL:  Same objection.

1                    THE COURT:  Sustained.

2                    Can't speak to what other people are thinking.

3    Q.  You personally have had other investors express confusion

4    to you about that question?

5                    MR. FINKEL:  Same objection.

6                    THE COURT:  Sustained.

7                    MR. KAMARAJU:  Okay.  Can we go to Government Exhibit

8    HN-51.

9                    (Counsel conferred)

10   Q.  Do you recognize this?

11   A.  Yes.

12   Q.  Okay.  The defense offers Government Exhibit HN-51.

13                   MR. FINKEL:  No objection.

14                   THE COURT:  It is admitted.

15                   (Government's Exhibit HN-51 received in evidence)

16                   MR. KAMARAJU:  Can we publish that, please.

17   Q.  All right.  So this is the -- you see where it says

18   "briefly identify subscribers," right?

19   A.  Yes.

20   Q.  Okay.  So this is the specific source of wealth question

21   for the Saraca subscription package; correct?

22   A.  Yes.

23   Q.  And what's listed there is selling shares of subsidiary,

24   right?

25   A.  Yes.

1    Q.  Now, nothing in that description raised a red flag for you,

2    right?

3    A.  Correct.  It looks like a liquidation event to me.

4    Q.  And you didn't ask for any additional information about it

5    at the time, right?

6    A.  Nor did SCI.

7    Q.  Well, that was going to be my next question.  You passed it

8    along to SCI for them to review it, right?

9    A.  I did.

10   Q.  They didn't come back with any follow-up questions about

11   it, right?

12   A.  Correct.

13   Q.  And they are the AML experts, right?

14   A.  We rely on their expertise.

15   Q.  That's what you pay them for, right?

16   A.  Correct.

17           MR. KAMARAJU:  Now, can we pull up Government Exhibit

18   HN-57, please.  And we can publish this to jury.

19   Q.  All right.  Now, this is an email from Mr. Je to you,

20   right?

21   A.  At the top?

22   Q.  Yeah, at the top.

23   A.  Yes.

24   Q.  Okay.  And it's cc'ing Mr. Bass, right?

25   A.  Yes.

1   Q.  And there are a number of attachments to it, right?

2   A.  Yes.

3   Q.  And these are documents that you required or Hayman

4   required for the Saraca investment to go through, right?

5   A.  Yes.

6           MR. KAMARAJU:  So can we go to page 7.  Maybe let's go

7   to the page before that.  Thank you.

8   Q.  So you testified on direct about this, right?

9   A.  Yes.

10  Q.  And you see the primary contact there?

11  A.  Yes.

12  Q.  What's the email address listed for the primary contact?

13  A.  Yvettew@gtv.org.

14  Q.  Now, while this subscription agreement documentation was

15  being collected, Kyle Bass was discussing being a director of

16  GTV; correct?

17          MR. FINKEL:  Objection.

18          THE COURT:  Sustained.

19  Q.  Were you aware that during this period when the

20  subscription documentation was being collected, Kyle Bass was

21  having discussions about being a director at GTV?

22  A.  No.

23  Q.  GTV is a subsidiary of Saraca, right?

24  A.  I don't know.

25          MR. KAMARAJU:  Pull that down for a second.

1              And can we go to page 39.

2    Q.  Do you see an email address listed there, right?

3    A.  Yes.

4    Q.  Same email address, right?

5    A.  Yes.

6              MR. KAMARAJU:  May I just have one moment, your Honor.

7              (Counsel conferred)

8    Q.  Did you ever become aware that Mr. Bass was trying to

9    become a GTV director?

10             MR. FINKEL:  Objection.  Asked and answered.

11             THE COURT:  Sustained.

12             MR. KAMARAJU:  Could we pull up Government Exhibit

13   HN-168.  168.  Not in?  Okay.  Can we go to the attachment,

14   please.

15   Q.  Now, you remember you testified about this on direct,

16   right?

17   A.  Yes.

18   Q.  Okay.  And there's a list of questions that you testified

19   to, right, in this letter?

20   A.  The bullets, yes.

21   Q.  Now, Hayman never asked any of these questions prior to

22   accepting the Saraca investment; correct?

23   A.  Correct.

24   Q.  This only was prompted by the SEC's inquiry, right?

25   A.  Yes.

1    Q.  And Hayman at the time relied on the SEC's approval to do

2    business, right?

3    A.  In what context?

4    Q.  Well, you testified that they are a registered investment

5    adviser, right?

6    A.  Hayman at the time was a registered investment adviser with

7    the SEC, so they are our governing body.

8    Q.  Right.  So they could -- I don't know if it's the right

9    term, but they could deregister you, right?

10   A.  Yes, potentially.  I'm not really clear on that, but yeah.

11   Q.  But you didn't think there was anything wrong with Saraca's

12   original response; correct?

13          MR. FINKEL:  Objection to the form.  Vague.

14          THE COURT:  Overruled.

15   A.  Can you please repeat the question.

16   Q.  Sure.

17          MR. KAMARAJU:  Can we read it back, please.

18          (Record read)

19   A.  Saraca's initial -- Saraca's response in the subscription

20   document regarding the source of wealth was sufficient to --

21   for the AML requirement to subscribe to the Hayman Hong Kong

22   Opportunities Fund.

23   Q.  Okay.  And you testified on direct that you had discussions

24   with Mr. Bass about the SEC's inquiry, right?

25   A.  Yes.

1  Q.  Do you recall Mr. Bass ever criticizing the SEC's inquiry?

2  A.  I can't recall any comments at this time.

3  Q.  Was he happy about the SEC's inquiry?

4          MR. FINKEL:  Objection.  Asked and answered.

5          THE COURT:  You may answer.

6  A.  He was not happy.

7  Q.  He was upset about it, right?

8  A.  About the inquiry?

9  Q.  Yeah.

10 A.  I think he was upset about being lied to by where the funds

11 were coming from.

12 Q.  Sure.  And he wouldn't be happy about the SEC investigating

13 either, right?

14 A.  Correct.

15 Q.  And did you hear him express his unhappiness about it?

16 A.  I just can't recall a specific conversation about it.

17 Q.  Now, on direct, Mr. Finkel asked you whether HHKOF

18 involved, his phrase was a bet against the Hong Kong dollar,

19 right?

20 A.  Yes.

21 Q.  Hayman isn't a casino, right?

22 A.  No.

23 Q.  Not a sports book, right?

24 A.  Correct.

25 Q.  Hayman doesn't make bets; it makes investments, right?

1   A.  Correct.

2   Q.  And he asked you about Mr. Kwok making an investment in

3   Hayman, right?

4   A.  Yes.

5   Q.  He asked you about Mr. Kwok sending $100 million to Hayman,

6   right?

7   A.  I can't recall if it was Mr. Kwok specifically or

8   Mr. Kwok's family office or -- but, yes, generally, Mr. Kwok.

9   Q.  Okay.  And today he asked you questions about the

10  Saraca/Kwok investment, right?

11  A.  I believe so.

12  Q.  Okay.  Mr. Kwok never made an investment in Hayman, right?

13  A.  Personally, no.

14  Q.  His name doesn't show up in a single investment at Hayman,

15  right?

16  A.  Correct.

17  Q.  Not as Ho Wan Kwok, right?

18  A.  What are you asking?  I apologize.

19  Q.  I'm saying there's no Hayman investment in the name of Ho

20  Wan Kwok, right?

21  A.  Sorry.  Can you spell it?

22  Q.  Sure.  H-O, space, W-A-N, space K-W-O-K.

23  A.  Correct.

24  Q.  There's no investment in the names of Miles Kwok, right?

25  A.  Correct.

O5VVGUO3                        Schottenheimer - Cross

1    Q.  There's no investment in the name of Miles Guo, right?

2    A.  Yes.

3    Q.  And you know that because if there was an investment in

4    Mr. Guo's name, you'd have done an AML on him, right?

5    A.  Yes.

6    Q.  And that's true if the investment was in his own name,

7    right?

8    A.  Yes.

9    Q.  And that's true if he even owned just 20 percent of the

10   company that made the investment, right?

11   A.  Yes.

12   Q.  But based on the documentation, you did not think it was

13   necessary to do any AML on Mr. Guo, right?

14   A.  Correct.

15   Q.  And in either circumstance, you would have to do the

16   drill-down process that you were talking about, right?

17   A.  If he'd invested in an entity that he owned or invested in

18   his name?

19   Q.  Yes.

20   A.  Would there have been AML checks either way.

21   Q.  Now, the investment was in the name of a company owned by

22   Mr. Guo's son, right?

23   A.  Yes.

24   Q.  And you did a -- I think you testified on direct you did a

25   thorough review of that file, right?

O5VVGUO3                          Schottenheimer - Cross

1    A.  Of the subscription agreement?

2    Q.  Yeah.

3    A.  Yes.

4    Q.  And you thought that this investment was coming in through

5    Mr. Kwok's family office, right?

6    A.  Yes.

7    Q.  It's not unusual for a family office to involve multiple

8    members of the family, right?

9    A.  Not unusual.

10   Q.  Right?  The investments can be on behalf of different

11   family members, right?

12   A.  Yes.

13   Q.  Doesn't always have to be the father, right?

14   A.  Correct.

15   Q.  And it's not unusual for people to involve their children

16   in their family office, right?

17   A.  Very common.

18   Q.  But the fact that an investment is made by one of Mr. Guo's

19   relatives does not make it Mr. Guo's investment, right?

20   A.  It was my understanding that the wealth amassed was, in

21   fact, Mr. Miles Kwok's.

22              (Continued on next page)

23

24

25

1    BY MR. KAMARAJU:

2    Q.  But you didn't do any AML check on him, right?

3    A.  We weren't required to.

4    Q.  You didn't do any due diligence on him, right?

5    A.  Meaning?

6    Q.  Well, you testified on direct about the phrase "due

7    diligence," so whatever meaning you gave it, same one.

8    A.  There was no formal AML done on Mr. Kwok, Mr. Miles Kwok.

9    Q.  Which you would have had to do if you thought that this

10   investment was his, right?

11   A.  If he was listed as a beneficial owner and authorized

12   signatory or controlling persons, but given the reps provided

13   by Saraca Media, that was not the case.

14   Q.  I'm sorry.  Your testimony is that you thought that the

15   money was his but you didn't need to figure out whether the

16   entities were; is that right?

17           MR. FINKEL:  Asked and answered.

18           THE COURT:  Sustained.

19   Q.  Now Saraca came through the Onshore fund, right?

20   A.  Yes.

21   Q.  Which means that they would get a K1, right?

22   A.  They had a tax ID with the United States and they would get

23   a K1.

24   Q.  Now you testified that you only met Mr. Guo once, right?

25   A.  Correct.

1  Q.  And in this courtroom is the first time you've seen him

2  since 2018, right?

3  A.  Yes.

4  Q.  But you met with the prosecutors several times, right?

5  A.  Yes.

6  Q.  More than five times?

7  A.  Yes.

8  Q.  In fact, you met with them just a couple hours before your

9  testimony started yesterday, right?

10 A.  Briefly.

11 Q.  Over the lunch break?

12 A.  Yes.

13 Q.  Just downstairs in this building, right?

14 A.  Yes.

15 Q.  And at all of those meetings, you discussed your testimony

16 with them, right?

17 A.  In meetings, I answered questions truthfully.

18 Q.  Right.  They asked you questions, you gave them answers,

19 right?

20 A.  Yes.

21 Q.  And in anticipation of your testimony, they told you what

22 questions they anticipated asking you here today, right?

23 A.  Not necessarily.

24 Q.  They showed you the documents that they were going to show

25 you, right?

1    A.  They showed me documents, yes.

2    Q.  They asked you questions about those documents, right?

3    A.  They asked questions.

4    Q.  They showed you those emails that we looked at, right?

5    A.  Yes.

6    Q.  Now in none of those emails do you refer to it as the Kwok

7    investment, right?

8    A.  I don't believe so.

9    Q.  Right.  That was Mr. Finkel's choice of words, right?

10   A.  Yes.

11   Q.  That's his description, not yours, right?

12   A.  I've described the investment and spoke to the investment

13   however——whatever word choice I've——I've used.  Miles family

14   office, primarily called it Saraca, by the actual name of the

15   entity that invested.

16   Q.  So you don't recall him asking you questions about the Kwok

17   investment and you describing it that way?

18          MR. FINKEL:  Asked and answered.

19          THE COURT:  Sustained.

20   Q.  Ms. Schottenheimer, you would agree with me, right, it's

21   not accurate to call it the Kwok investment, right?

22   A.  At the time of May of 2020 and June of 2020, I thought of

23   it as Miles Kwok's investment from his family office.

24   Q.  So you just didn't follow the procedures that you would

25   need to if you did that, right?

1    A.  Not correct.

2              MR. KAMARAJU:  No further questions, your Honor.

3              THE COURT:  Redirect?

4    REDIRECT EXAMINATION

5    BY MR. FINKEL:

6    Q.  Ms. Schottenheimer, did you follow the procedures that

7    you're required to follow when conducting the facilitation of

8    the Saraca $100 million investment?

9    A.  Yes.

10   Q.  Ms. Schottenheimer, during the meetings you had with the

11   government, what did the government tell you to do when you

12   testified?

13   A.  Tell the truth.

14   Q.  Is the Prodigious Series offered to the general public?

15   A.  No.

16   Q.  Is it offered to qualified purchasers?

17   A.  Select qualified purchasers.

18   Q.  And why is the Prodigious Series only offered to qualified

19   purchasers, select qualified purchasers?

20   A.  Because we rely on a 3(c)(7) exemption, and in order to

21   maintain that exemption, we have to make sure that we are only

22   marketing to sophisticated investors with a net worth of—or

23   investable assets of $5 million or more.

24   Q.  And why is the Prodigious Series only marketed to

25   sophisticated investors?

1    A.  Because of how we have the fund structured; it's a 3(c)(7)

2    fund.

3    Q.  You mentioned something on cross-examination about multiple

4    closing dates.  Can you explain to the jury what that means.

5    A.  So for the share Class B or Prodigious Series, that the

6    Hayman Hong Kong Opportunities Fund, because it is 100 percent

7    options based and a capital exhaustion strategy, there's no

8    money in or no money out, once we have a closing, we have to

9    have a series of closings in order to take in new capital, so

10   to date we've closed B1 through B12.

11   Q.  So the Saraca investment, the 100 million investment, what

12   was the closing date of that?

13   A.  June 8th.

14   Q.  And was there a June 1 closing?

15   A.  There was.

16   Q.  And so why was there a second closing on June 8?

17   A.  It's my understanding that that timing was too tight for

18   them.

19   Q.  Too tight for whom?

20   A.  Too tight for Saraca to participate.

21        MR. FINKEL:  Would you bring up what's in evidence as

22   HN57 at page 7, I believe.

23   Q.  Ms. Schottenheimer, do you recall this document?

24   A.  Yes.

25   Q.  It says, "Total number of equity/capital/or beneficial

1    owners of the Investor"?

2    A.  Yes.

3    Q.  Why does Hayman request that information?

4    A.  So we can understand how many beneficial owners are and who

5    we need to collect AML on.

6    Q.  And so if this number was two, how would that impact, if at

7    all, the way you performed diligence on this particular

8    investment?

9    A.  Well, it would be dependent on what was provided to us.  If

10   each beneficial owner owned 50 percent, then we would do AML

11   checks on both, but if one owned 90 percent and the other owned

12   10 percent, we'd only be required to do AML checks on the

13   individual that owned the 90 percent, or more than 20 percent.

14   Q.  But this question isn't a question about who owns

15   20 percent or more, or is it a question about total number of

16   beneficial owners?

17   A.  This is about total number.

18            MR. KAMARAJU:  I object to the form.

19            THE COURT:  Overruled.

20   Q.  So this representation is that there's just one investor

21   for the Saraca investment, correct?

22   A.  Who owns a hundred percent of Saraca, correct.

23   Q.  And that's who, based on the documents?

24   A.  Miles Kwok's son.

25            MR. FINKEL:  If we can bring up, please, HN51.

O5V1GUO4                          Schottenheimer - Redirect

1              And if we can zoom in at the top.

2    Q.  You were asked some questions about this document on cross;

3    is that correct?

4    A.  Yes.

5    Q.  And so it says on there, "Briefly identify the subscriber's

6    primary source of wealth."  It says, "Selling shares of

7    subsidiary," correct?

8    A.  Yes.

9    Q.  If Hayman had known that Saraca's source of wealth were GTV

10   investors who were not told that they were investing in the

11   HHKOF, would you have accepted Saraca's investment?

12              MR. KAMARAJU:  Objection to form, your Honor.

13              THE COURT:  Sustained.

14   Q.  Ms. Schottenheimer, if you had known in early June of 2020

15   that this statement "Selling shares of subsidiary" was a lie,

16   would you have accepted Saraca's investment?

17              MR. KAMARAJU:  Same objection.

18              THE COURT:  Sustained.

19   Q.  If you had known that this statement "Selling shares of

20   subsidiary" was untrue, would you have accepted Saraca's

21   investment?

22              MR. KAMARAJU:  Same objection.

23              THE COURT:  Sustained.

24              MR. FINKEL:  Your Honor, I thought this was consistent

25   with——could we approach.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              THE COURT:  Yes.

2              (At the sidebar)

3              THE COURT:  So my recollection is that I permitted

4    hypotheticals to the victim, not to a company like this.

5              MR. KAMARAJU:  That's right, your Honor, because it

6    goes to materiality.

7              MR. FINKEL:  So, your Honor, the Second Circuit has

8    now adopted what I think is commonly referred to as the

9    conversions theory.  What that means is that, in a wire fraud

10   context, the crime can be completed based on any action in

11   furtherance of the scheme that is a misrepresentation.

12   Therefore, the government would argue, in part, that part of

13   the scheme was maintained by this lie.  In addition, your

14   Honor, government also charged the——the last count of the

15   indictment, which statute is escaping me right now——yeah, the

16   1957 charge, which is the illegal use of funds, which is use of

17   funds derived from a crime, the fact that they're lying to

18   Hayman about where the funds came from is evidence of relevance

19   to that particular charge in and of itself.  So my

20   understanding, your Honor——forgive me if I misinterpreted the

21   Court's prior ruling; that's why I asked the question because I

22   thought it was consistent——I think it is relevant because it

23   shows that had they told the truth, the entire way the scheme

24   would have unfolded would have unfolded differently; it would

25   have failed.

1                THE COURT:  So my recollection is that you were

2      speaking about the individual victim investors in your motion.

3      That's my recollection.  Am I wrong about that?

4                MR. FINKEL:  I think you're right.  But separate and

5      apart from that, I still think this is a permissible

6      hypothetical question for the reasons I just identified.

7                MR. KAMARAJU:  There is no authority to asking a

8      hypothetical question to a nonvictim.

9                THE COURT:  I'm sustaining the objection.

10               MR. FERGENSON:  Just a final point on the conversion

11     theory point, your Honor?  Materiality is an element if that

12     material misrep was made to a victim or to someone else, and

13     that's Second Circuit law.  You don't have to make the material

14     misrep to a victim.

15               THE COURT:  Why didn't you bring it up in your papers

16     then?

17               MS. SHROFF:  Exactly.

18               MR. FERGENSON:  We thought——

19               MR. KAMARAJU:  Seems like that's the answer to me.

20               MS. SHROFF:  That answers the question right there.

21               THE COURT:  I'm going to sustain the objection.

22               MR. KAMARAJU:  Thank you, your Honor.

23               (Continued on next page)

24

25

1              (In open court)

2              THE COURT:  Sustained.

3    BY MR. FINKEL:

4    Q.  Ms. Schottenheimer, you were asked some questions on

5    cross-examination──

6              MS. SHROFF:  Your Honor, I'm sorry.

7              MR. KAMARAJU:  My apologies, your Honor.

8              THE COURT:  Go ahead.

9              MR. FINKEL:  Thank you, your Honor.

10   Q.  Ms. Schottenheimer, you were asked some questions on

11   cross-examination about at the time that Hayman received this

12   representation, whether you asked any additional questions

13   about selling shares of subsidiaries; is that correct?

14   A.  No further questions were asked at the time of processing

15   the subdoc.

16   Q.  But after the subdoc was processed, did Hayman and its

17   lawyers ask questions about the source of wealth?

18   A.  About the source of wealth and the source of funds.

19             MR. FINKEL:  If we can please pull up what's

20   been──what's in evidence as HN168, and go to the second page.

21   Q.  And this document, these were some of the questions that

22   were asked to Saraca about the source of wealth, correct?

23   A.  Source of wealth and source of funds.

24   Q.  What's the difference between the two?

25   A.  Source of wealth is how you created your money to be a

1    qualified purchaser; the source of funds is what funded your

2    investment into the vehicle.

3    Q.  And the third bullet, it says:  If the proceeds were

4    derived from a securities offering, did the offering documents

5    disclose the use of funds to include an investment in the fund,

6    meaning Hayman, or in any similar private fund vehicle?  If

7    yes, please provide a copy of the disclosure statement.  Did I

8    read that right?

9    A.  Yes.

10   Q.  Did Saraca ever provide offering documents in response to

11   this question?

12   A.  No, they did not.

13   Q.  Did Saraca provide any additional information to suggest

14   that they disclosed that the use of proceeds from a securities

15   offering would be used in Hayman?

16   A.  No, they did not.

17            MR. FINKEL:  If we can pull up HN208.

18   Q.  This exhibit is another example of Hayman seeking

19   additional information about the investment?

20   A.  Yes.

21   Q.  And did Saraca ever respond to this?

22   A.  They did not.

23   Q.  And so in the second paragraph, the underlying text says:

24   In order to allow Saraca to remain invested in the fund, Hayman

25   needs to receive a representation from you and Saraca's lawyers

1    regarding the specific source of this money (beyond what was

2    initially provided stated in the subscription documents) and

3    that this money is not tainted in any way, including that it

4    does not represent assets from the GTV offering, but that it is

5    a bona fide investment made by Saraca and Miles.  Is that what

6    it says?

7    A.  Yes.

8    Q.  Did Hayman ever receive response to this?

9    A.  We did not.

10            MR. FINKEL:  Nothing further.

11            THE COURT:  Recross?

12            MR. KAMARAJU:  Just briefly, your Honor.

13            MR. KAMARAJU:  Could I have 168, please.

14    RECROSS EXAMINATION

15    BY MR. KAMARAJU:

16    Q.  So Ms. Schottenheimer, the date of this email is July 15,

17    2020, right?

18    A.  Yes.

19    Q.  And the SEC had already contacted Hayman by this point,

20    right?

21    A.  The 13th of July.

22    Q.  Right.  Right.  And Mr. Finkel just asked you a number of

23    questions about whether you ever received a response, whether

24    Hayman received a response, right?

25    A.  A formal response.

1  Q.  Right.  Now sitting here today, you don't know what Mr. Je

2  and Saraca were doing during this period, right?

3  A.  Correct.

4  Q.  You don't know if they were consulting with lawyers, right?

5          MR. FINKEL:  Objection.  The Court ruled on that.

6          THE COURT:  Sustained.

7  Q.  Okay.  You testified during direct that Saraca had lawyers,

8  right?

9  A.  Yes.

10  Q.  You don't know if they were discussing the matter with the

11  SEC directly, right?

12  A.  I would not have been privy to those conversations so I——I

13  don't know.

14  Q.  Right.  But you testified on direct that at some point you

15  wired the money back, right, some portion of it?

16  A.  We wired money to an escrow account.

17  Q.  Okay.  An escrow account that was held by who?

18  A.  It's my understanding they were Saraca's lawyers.

19  Q.  Okay.  And you did that with the blessing of the SEC,

20  right?

21  A.  With no objections from the SEC or the DOJ.

22  Q.  Or Saraca, for that matter, right?

23  A.  Correct.

24  Q.  And then you also testified that you liquidated the

25  $30 million position at some point, right?

1   A.   Yes.

2   Q.   And that was 15 months later, right?

3   A.   Would have been maybe late September, early October of

4   2021; 15 months, yup.

5   Q.   And the SEC knew that that $30 million was there, right?

6            MR. FINKEL:   Objection.

7            THE COURT:   She cannot testify as to what the SEC

8   knew.

9   Q.   The SEC had asked Hayman about that $30 million before,

10  right?

11  A.   I was not a part of any of the direct conversations with

12  the SEC.

13  Q.   But on direct you testified that when that $30 million was

14  ultimately liquidated, it was done with the consent of the SEC,

15  right?

16  A.   It was my understanding at the time that there was no

17  objection from any of the parties, from——from the SEC.

18  Q.   Okay.  And on direct you said——I don't remember the exact

19  term, but——any of the interested parties, right?

20  A.   Regarding the 70 million or the 30 million?

21  Q.   30 million.

22  A.   I don't recall saying that about the 30 million.

23  Q.   Okay.  Anyone object to you liquidating the $30 million

24  position?

25  A.   Not to my knowledge.

O5V1GUO4                          Espinoza - Direct

1    Q.  You never heard Saraca object to it?

2    A.  At the time?

3    Q.  At the time it was liquidated.

4    A.  I don't know.

5            MR. KAMARAJU:  No further questions, your Honor.

6            MR. FINKEL:  One question, your Honor.

7            THE COURT:  All right.  Redirect examination.

8    REDIRECT EXAMINATION

9    BY MR. FINKEL:

10   Q.  Months later, when the SEC became involved, as you were

11   just asked about, at that time did anyone from Saraca respond

12   to the questions that Kit Addleman had asked and provide

13   documentation about the source of funds and source of wealth?

14           MR. KAMARAJU:  Objection to form.

15           THE COURT:  Overruled.  You may answer.

16   A.  There were no responses that I'm aware of.

17           MR. FINKEL:  Nothing further.  Thank you.

18           THE COURT:  Any re-recross?

19           MR. KAMARAJU:  No, your Honor.

20           THE COURT:  You may step out.

21           (Witness excused)

22           THE COURT:  And the government may call its next

23   witness.

24           MR. FERGENSON:  The government calls Kimberly

25   Espinoza.

1              THE LAW CLERK:  Please raise your right hand.

2              (Witness sworn)

3              THE LAW CLERK:  Please speak directly into the

4     microphone and hold it close to you, and you may be seated.

5              THE COURT:  State your name and spell it.

6              THE WITNESS:  I'm sorry.  Name and what?

7              THE COURT:  State your name and spell it.

8              THE WITNESS:  Kimberly Espinoza.  K-I-M-B-E-R-L-Y,

9     E-S-P-I-N-O-Z-A.

10             THE COURT:  You may inquire.

11             MR. FERGENSON:  I'm sorry, your Honor.  May I just

12    have one moment to talk with defense counsel.

13             THE COURT:  Yes.

14             MR. FERGENSON:  Your Honor, with apologies, may we

15    have a very brief sidebar.

16             THE COURT:  Yes.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O5V1GUO4                        Espinoza - Direct

1              (At the sidebar)

2              MR. SCHIRICK:  Your Honor, we just noticed a few

3    minutes before Mr. Fergenson stood up to speak that the

4    stipulation that covers the bank records that this witness is

5    going to put in was—there was a scrivener's error and we're

6    short one document, so we just wanted to put on the record the

7    defense will just stip to that coming in on the record even

8    though it's not in the stip.  We just wanted to do that before

9    he started.

10             THE COURT:  That's fine.

11             MR. SCHIRICK:  So the defense stips to GX JPM121.

12             MR. FERGENSON:  Great.  Thank you.  Thank you, your

13   Honor.

14             THE COURT:  Okay.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    KIMBERLY ESPINOZA,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. FERGENSON:

7    Q.  Good afternoon, Ms. Espinoza.

8    A.  Good afternoon.

9    Q.  Where do you work?

10   A.  At the FBI.

11   Q.  What's your position at the FBI?

12   A.  I'm a forensic accountant.

13   Q.  And what are some of your duties or responsibilities as a

14   forensic accountant at the FBI?

15   A.  I review and analyze financial information, mostly bank

16   records.

17   Q.  And how long have you been doing that work?

18   A.  For 16 years.

19   Q.  Now, Ms. Espinoza, besides your testimony today and your

20   preparation for that testimony, did you have any involvement in

21   this case?

22   A.  I did not.

23   Q.  In advance of your testimony, were you asked to review

24   certain government exhibits and summarize the information in

25   them?

Espinoza - Direct

1    A.   Yes, I was.

2    Q.   Did you prepare or help prepare and review for accuracy

3    some summary charts?

4    A.   Yes, I did.

5    Q.   Are those charts based on voluminous records?

6    A.   Yes, they are.

7    Q.   What type or types of exhibits are the charts based on?

8    A.   Bank records.

9    Q.   Now who decided which exhibits you reviewed and what

10   information to include on the charts?

11   A.   The prosecutors did.

12   Q.   Am I one of those prosecutors?

13   A.   Yes.

14   Q.   Were you provided the opportunity to make revisions to the

15   charts to make sure they were accurate?

16   A.   Yes.

17   Q.   Did you make revisions to the charts?

18   A.   I did.

19   Q.   And after you revised the charts, are they now all

20   accurate?

21   A.   Yes, they are.

22   Q.   And Ms. Espinoza, just to be clear, did you review all the

23   evidence gathered in this case or just the charts and the

24   exhibits those charts are based on?

25   A.   Just the charts and exhibits that it's based on.

1           MR. FERGENSON:  Your Honor, at this time the

2    government offers a stipulation agreed to between the parties

3    that's marked as Government Exhibit Stip, S-T-I-P, 14.

4           THE COURT:  It is admitted.

5           (Government's Exhibit Stip 14 received in evidence)

6           MR. FERGENSON:  And I'll just read the stipulation, at

7    least part of it.

8           It is hereby agreed between the parties that the

9    below-listed exhibits were lawfully obtained by the government

10   and are authentic records of the entity listed in Column A that

11   were made at or near the time by, or from information

12   transmitted by, a person with knowledge of the matters set

13   forth in the records; such records were kept in the course of a

14   regularly conducted activity; and it was the regular practice

15   of that entity to make the records.

16          And the government will offer——actually, Ms. Loftus,

17   if you want to scroll to page 5.

18   BY MR. FERGENSON:

19   Q.  Ms. Espinoza, do you see under column A, there's an entry

20   towards the middle, it says JPMorgan Chase Bank?

21   A.  Yes.

22          MR. FERGENSON:  And Ms. Loftus, if you want to scroll

23   up to page 3.

24   Q.  And at the top, in column A, Ms. Espinoza, do you see

25   there's an entity named Citibank, N.A.?

1    A.  Yes.

2            MR. FERGENSON:  All right.  So the government will now

3    offer Government Exhibits CIT14 and CIT47.  The government also

4    offers Government Exhibits JPM118 through 121.

5            MR. SCHIRICK:  No objection.

6            THE COURT:  They are admitted.

7            (Government's Exhibits CIT14, CIT47, JPM118-JPM121

8    received in evidence)

9            MR. FERGENSON:  Now, Ms. Loftus, if we could show just

10   the witness now what's marked as Government Exhibit Z1.

11   BY MR. FERGENSON:

12   Q.  Ms. Espinoza, what is this?

13   A.  These are the exhibits that I reviewed and maintained.

14   Q.  These are the charts you helped review?

15   A.  Yes.

16   Q.  Did you review all the exhibits that this chart is based

17   on?

18   A.  Yes.

19   Q.  And is this—are these charts accurate?

20   A.  Yes.

21           MR. FERGENSON:  Government offers Government Exhibit

22   Z1.

23           MR. SCHIRICK:  No objection.

24           THE COURT:  It is admitted.

25           (Government's Exhibit Z1 received in evidence)

1          MR. FERGENSON:  Could we please publish, Ms. Loftus.

2     BY MR. FERGENSON:

3     Q.  Now, Ms. Espinoza, generally speaking, what do these charts

4     show?

5     A.  These charts show an analysis of mainly two bank accounts

6     for Saraca Media Group, so it's going to show all the incoming

7     money and all the outcoming money from those two accounts.

8     Q.  Now looking just at this first chart here, please explain

9     what we're looking at on this slide.

10    A.  This is one of the bank accounts that I reviewed.  The

11    account title is Saraca Media Group Inc. d/b/a Himalaya Dollar.

12    It's a Chase account ending in 5601.  And as of April 1, 2020,

13    the beginning balance in the account was $206,133.

14    Q.  Now Saraca Media Group Inc., do you know what that is?

15    A.  I do not.

16    Q.  It also has a name d/b/a Himalaya Dollar.  What's d/b/a?

17    A.  Doing business as.

18    Q.  Do you know what Himalaya Dollar is?

19    A.  I do not.

20         MR. FERGENSON:  All right.  Now let's go to the next

21    page, Ms. Loftus, please.

22    Q.  Ms. Espinoza, could you read the title of this slide,

23    please.

24    A.  Chase 5601:  Signature Cards.  And they're dated July 24,

25    2018, and May 21, 2020.

1  Q.  Chase 5601, is that the same account on the first slide we

2  looked at?

3  A.  Yes, it is.

4  Q.  What's a signature card?

5  A.  Signature card is a document provided by the bank.  It

6  gives all the account information, like the account title, the

7  number, when the account was opened, and then also the signer

8  on the account.

9  Q.  What's an account signer?

10  A.  It's the person who's authorized to use the bank account.

11          MR. FERGENSON:  Ms. Loftus, if we could zoom in on the

12  left signature card first.

13          All right.  Now, Ms. Espinoza, just focusing you first

14  on the top left here, what's the account title?

15  A.  Saraca Media Group Inc.

16  Q.  And beneath that, there's a business address, right?

17  A.  Yes.

18  Q.  Now focusing you on the top right, it lists an account

19  number.  What are the last four listed there?

20  A.  5601.

21  Q.  And beneath that, a couple lines, it says Date Opened.

22  What was the date this account was opened?

23  A.  July 24, 2018.

24  Q.  And focusing you towards the bottom of what's blown up

25  here, who is the signatory on this account?

1   A.  Yanping Wang.

2   Q.  Do you know who that is?

3   A.  I do not.

4   Q.  What was her title?

5   A.  Acting secretary.

6   Q.  And what's the date she signed this?

7   A.  July 24, 2018.

8           MR. FERGENSON:  All right.  Ms. Loftus, if we could

9   zoom in on the right signature page.

10  Q.  The one on the left was 2018, right?  What's the date of

11  the one on the right?

12  A.  May 21, 2020.

13  Q.  Okay.  Now focusing you again on the top left, what's the

14  account title?

15  A.  Saraca Media Group Inc. d/b/a Himalaya Dollar.

16  Q.  And focusing you on the right, what are the last four?

17  A.  5601.

18  Q.  So same account, there's now a d/b/a on the account title?

19  A.  Yes.

20  Q.  All right.  And again, on the signature page, who's the

21  signatory on this account?

22  A.  Yanping Wang.

23  Q.  What's her title?

24  A.  President.

25  Q.  And what was the date she signed this?

O5V1GUO4                         Espinoza - Direct

A.  May 21, 2020.

Q.  So Ms. Espinoza, throughout this account for the exhibits you looked at, the authorized person was Yanping Wang.

A.  Yes.

          MR. FERGENSON:  All right.  Let's go to the third page, Ms. Loftus.

Q.  All right.  Now are we just back at the first page that we had looked at originally?

A.  Yes.

Q.  And on April 1, 2020, what's the beginning balance in the Saraca 5601 account?

A.  $206,133.

          MR. FERGENSON:  All right.  Let's go to the next slide, Ms. Loftus, please.

Q.  Okay.  Now Ms. Espinoza, please explain what we're looking at on this slide.

A.  This is showing, for the same Saraca account, 5601, from April 1, 2020, through April 30, 2020, there are deposits totaling $32,543,535, and it consists of 291 deposit transactions.  And they have references such as "GTV," "Stock," "Investment," and "Capital."

Q.  There's some bracketed text at the bottom that says "including misspellings and similar text."  What does that mean?

A.  Some of the references or the memos had some misspellings,

1    and then additional words added to the front or the back.

2    Q.  And I should have asked, when it says with references to,

3    what do you mean by reference?

4    A.  A lot of the transactions were wire transfers, and so a

5    reference is similar to like a memo on a check, where you could

6    put—the sender could put a reason for why they are sending the

7    money.

8            MR. FERGENSON:  Let's go to the next slide, please,

9    Ms. Loftus.

10   Q.  Ms. Espinoza, please explain what we're looking at on this

11   slide.

12   A.  These are four examples of those wire transfer deposits

13   that I was just speaking about, so there's two of them that are

14   occurring on April 24th, one on May 1st, and one on May 12th,

15   and the amounts are to the right, 300,000, 200,000, etc.  And

16   then highlighted is the memos or references that I was just

17   referring to.  So the top one says GTV Investment, the next one

18   says Investment Share Capital, the next one says Attention to

19   Mr. Miles Guo, and the last one says For GTV Stock.

20   Q.  And are these all the reference lines or just some

21   examples?

22   A.  Just some examples.

23   Q.  Do you know what GTV is?

24   A.  I do not.

25           MR. FERGENSON:  Let's go to the next slide, please,

Ms. Loftus.

Q.  Okay.  Now what's shown on this slide now, Ms. Espinoza?

A.  So this is the same Saraca account ending in 5601, so after those deposits, for that one month, on April 30th, the ending balance in the account is $32,474,168.

          MR. FERGENSON:  And let's go to the next slide, Ms. Loftus.

Q.  All right.  Now what's shown here, Ms. Espinoza?

A.  This is showing, for the same account, the Chase 5601, from May 1, 2020, through May 29, 2020, there were deposits totaling $291,554,689, it consisted of 2,446 deposit transactions, and again, there were references to "GTV," "Stock," "Investment," "Private Placement," "Capital."

          MR. FERGENSON:  Let's go to the next slide, please, Ms. Loftus.

Q.  All right.  So Ms. Espinoza, after those additional incoming deposits referencing things like stock or private placement, how much money is in the 5601 account now?

A.  As of May 29, 2020, the ending balance is $313,213,772.

          MR. FERGENSON:  Ms. Loftus, please go to the next slide.

Q.  How much money was in this account as of June 3, 2020?

A.  $928,401.

Q.  And actually, I should ask, what was the balance on the account the day before that?

1   A.  324,778,316.

2   Q.  So approximately how much money left this account on

3   June 3rd?

4   A.  About 323 to $324 million.

5   Q.  Okay.  Let's look at those transactions.

6           MR. FERGENSON:  Ms. Loftus, if we could go to the next

7   slide, please.

8           You could scroll up.  Thank you.

9   Q.  All right.  Ms. Espinoza, what's shown on this slide?

10  A.  So this is that account, the Saraca Chase 5601 account.  On

11  the top left, it's showing the same ending balance of

12  324 million, approximately, on June 2nd; and then this is

13  showing the outgoing transactions on June 3rd.  So the three

14  red highlights are transfers to a checking account ending in

15  2038.  So there's one transaction for a hundred million

16  dollars, another for $20 million, and another for $5 million.

17          MR. FERGENSON:  And——thank you, Ms. Loftus.

18  Q.  So Ms. Espinoza, focusing you on the 2038 there, what does

19  the 2038 mean?

20  A.  Those are the last four digits of a bank account.

21  Q.  And are you able to tell whether that bank account was also

22  at Chase or at another bank?

23  A.  It's at Chase.

24  Q.  And approximately how much in total was transferred to that

25  account on June 3rd?

1    A.   $125 million.

2    Q.   Okay.  I want to focus on those transactions.

3              MR. FERGENSON:  And Ms. Loftus, if we could go to the

4    next slide, please.

5    Q.   All right.  So what new information is on this slide,

6    Ms. Espinoza?

7    A.   So this is adding that 2038 Chase Bank account.  Looking at

8    the bank records for that account, the account title is Saraca

9    Media Group Inc. d/b/a Himalaya Dollar, and the account was

10   opened on June 3, 2020, which is the date of the transfers.  So

11   as of that date, the beginning balance was $0.

12   Q.   So both of these accounts are in the name of Saraca Media

13   Group d/b/a Himalaya Dollar, right?

14   A.   Yes, they are.

15   Q.   All right.  Let's——and they're both at the same bank,

16   correct?

17   A.   Yes.

18             MR. FERGENSON:  Ms. Loftus, go to the next page,

19   please.

20   Q.   All right.  Now what's shown on this page, Ms. Espinoza?

21   A.   This is the Chase Saraca account ending in 2038.  This is

22   the signature card for that account.

23             MR. FERGENSON:  Ms. Loftus, if we could just blow up

24   the——I don't know——top 2/3, make it a little easier to read.

25   Q.   Now what was the date of the $125 million in transfers to

1    this account that we were looking at?

2    A.  June 3, 2020.

3    Q.  And what date was this account opened?

4    A.  June 3, 2020.

5    Q.  And who is the signatory on this account?

6    A.  Yanping Wang.

7    Q.  And what was her title?

8    A.  President.

9    Q.  What date did she sign this?

10   A.  June 3, 2020.

11   Q.  All the same date.

12   A.  Yes.

13            MR. FERGENSON:  All right.  Let's go to the next

14   slide, please.

15   Q.  Okay.  Now, Ms. Espinoza, you testified there were three

16   transfers on this date, correct?

17   A.  Yes.

18   Q.  What's shown on this slide?

19   A.  This is the first transfer, so it was a hundred million,

20   20 million, and 5 million, so this is the first transfer of a

21   hundred million dollars, which occurred at 3:17 p.m. on June 3,

22   2020.

23   Q.  And this is the first transfer.

24   A.  I'm sorry?

25   Q.  Chronologically, is this the first transfer?

1    A.  Yes.

2             MR. FERGENSON:  Okay.  Let's go to the next slide,

3    please.

4    Q.  What are we looking at here, Ms. Espinoza?

5    A.  These are the account details provided by the bank for that

6    $100 million transaction on June 3, 2020.

7    Q.  And let me focus you first on the top left, so the bold

8    text.  What's the date and time listed there?

9    A.  June 3, 2020, 3:17 p.m.

10   Q.  And to the right of, you know——to the right of that, it

11   says, Transferpmtadd.  What does it say to the right of that?

12   A.  Yvettewang2018.

13   Q.  Now there's text highlighted in red, correct?

14   A.  Yes.

15   Q.  And what is that text?

16   A.  That is a memo, similar to a reference, and it states "GTV

17   Private Placement Fund."

18   Q.  Do you know what the GTV private placement is,

19   Ms. Espinoza?

20   A.  I do not.

21             MR. FERGENSON:  All right.  Let's go to the next

22   slide, please, Ms. Loftus.

23   Q.  Okay.  Now what's shown on this slide, Ms. Espinoza?

24   A.  So this is what was shown previously.  The 100——towards the

25   top, Saraca transfer of $100 million to another Saraca account

1    on June 3, 2020, and then there's $100 million transfer two

2    days later, on June 5, 2020, to Hayman Hong Kong Opportunities

3    at Citibank.

4    Q.  And what are the last four digits of that Hayman Hong Kong

5    Opportunities bank account?

6    A.  9681.

7    Q.  And Ms. Espinoza, I should ask, in the bottom center here,

8    there's a yellow box that list things like GX JPM119.  What

9    does that show?

10   A.  Those are the government exhibits that I looked at in order

11   to obtain the information on the chart.

12   Q.  All right.  Now I should also ask, do you know what Hayman

13   Hong Kong Opportunities Fund is?

14   A.  I do not.

15           MR. FERGENSON:  All right.  Let's go the next slide,

16   please, Ms. Loftus.

17   Q.  Okay.  What's the new information in this slide,

18   Ms. Espinoza?

19   A.  It's showing the tree——sorry——the three transfers between

20   Saraca.  So there was one for $100 million at 3:17 p.m.,

21   another for $20 million at 3:18 p.m., and then another for

22   $5 million at 4:06 p.m., all on June 3, 2020.

23           MR. FERGENSON:  And then——and Ms. Loftus, if we could,

24   maybe we can blow up the top right box.

25   Q.  Okay.  So $125 million goes to this account on June 3rd

1    from the, you know, the box on the left, right?

2    A.  Right.  Correct.

3    Q.  Why is the balance $138,200,000?

4    A.  There is an additional amount that came from another

5    account.

6    Q.  And there's an asterisk here, right?

7    A.  Yes, and there's——

8              MR. FERGENSON:  Ms. Loftus, if we zoom out.  And maybe

9    we can blow up the yellow box down there.

10   Q.  And could you please read the asterisk.

11   A.  On June 3, 2020, Saraca Media Group JPMC account ending in

12   8656 transferred 13.2 million to Saraca Media Group JPMC

13   account ending in 2038.

14   Q.  So another Saraca account transferred money to the 2038

15   account?

16   A.  Yes.

17   Q.  And it was about $13 million?

18   A.  Yes.

19             MR. FERGENSON:  Let's go to the next slide, please.

20   Q.  All right.  Now what's new on this slide?

21   A.  This slide just totals those three transactions, so it

22   shows 125 million at the top between the two Saraca accounts.

23             MR. FERGENSON:  And Ms. Loftus, let's go to the next

24   page, please.

25   Q.  And what's new here, Ms. Espinoza?

1    A.  So on June 3, 2020, there's also a $200 million transfer

2    between Saraca Media Group, the Chase account ending in 5601,

3    $200 million that's transferred at 6:12 p.m. on June 3, 2020 to

4    GTV Media Group Inc. d/b/a 7-Coin at Citibank.

5    Q.  Now this d/b/a 7-Coin, do you know what 7-Coin is?

6    A.  I do not.

7            MR. FERGENSON:  All right.  So could we please go to

8    the next slide, Ms. Loftus.

9    Q.  What's new here, Ms. Espinoza?

10   A.  There's an additional transfer from the Saraca Media Group

11   Chase account ending in 2038 for $38 million on June 9, 2020,

12   to GTV Media Group Inc. d/b/a 7-Coin.

13   Q.  All right.  So of the money that went into these two Saraca

14   accounts, approximately how much went to GTV Media Group Inc.?

15   A.  $238 million.

16   Q.  Where did the remaining $100 million go?

17   A.  Hayman Hong Kong Opportunities.

18           MR. FERGENSON:  May I have a moment, your Honor.

19           THE COURT:  Yes.

20           MR. FERGENSON:  No further questions.  Thank you.

21           THE COURT:  Cross-examination?

22           MR. SCHIRICK:  Thanks, your Honor.

23   CROSS EXAMINATION

24   BY MR. SCHIRICK:

25   Q.  Good afternoon, Ms. Espinoza.

1   A.  Good afternoon.

2   Q.  When did the government lawyers first ask you to testify in

3   this case?

4   A.  About two to three weeks ago.

5   Q.  You didn't know anything about the case before the

6   prosecutors reached out to you?

7   A.  I heard of the name GTV Media, but I don't know any further

8   information other than that.

9   Q.  Okay.  But you didn't have any substantive information, you

10  just heard it from somewhere.

11  A.  Yes.

12  Q.  Okay.  Had you ever heard of the name Miles Guo before the

13  government reached out to you?

14  A.  I heard of that name as well.

15  Q.  But again, just because you had heard it from office talk,

16  right, you didn't know anything about him?

17  A.  Yeah, I don't know anything about him.

18  Q.  You weren't part of the FBI's investigative team in this

19  matter?

20  A.  Just for the testimony I gave today.

21  Q.  But the investigative team.

22  A.  No, I'm not.

23  Q.  And you weren't part of the prosecution team.

24  A.  No.

25  Q.  And you didn't investigate any of the money transfers that

1  you just testified to a moment ago.  Putting the emphasis on

2  investigation.  Did you investigate any of those transfers that

3  you testified to?

4  A.  No, I didn't investigate.

5  Q.  In fact, you haven't really had any involvement in this

6  case, I believe, as you testified to on direct, apart from

7  prepping for your testimony here today and then giving

8  testimony; is that right?

9  A.  That's correct.

10  Q.  So really the only thing that you know about this case is

11  what the government has told you, right?

12          MR. FERGENSON:  Objection.

13          THE COURT:  Overruled.  You may answer.

14  A.  It's not what was told to me.  I actually reviewed a lot of

15  bank records in order to perform the analysis.

16  Q.  Fair enough.  So the only thing that you know about this

17  case is what the government has told you or told you to read;

18  is that correct?

19  A.  Well, what the government has provided to me, but yes.

20  Q.  Fair enough.  So the only things that you know are what the

21  government has told you or provided to you.

22  A.  Yes.

23  Q.  Have you met with the prosecutors before today?

24  A.  I have.

25  Q.  How many times?

1    A.  It was two phone calls and one in-person meeting.

2    Q.  Okay.  And do you remember when the first time was?

3    A.  Approximately two to three weeks ago.

4    Q.  Okay.  So it's fair to say that you've been involved in

5    this case for no more than two to three weeks.

6    A.  Correct.

7    Q.  And you're trained as a forensic accountant, correct?

8    A.  Yes, I am.

9    Q.  Okay.  And where did you go to school?

10   A.  Queens College.

11   Q.  And then did you work somewhere before you joined the FBI?

12   A.  I did.

13   Q.  And where was that?

14   A.  I worked at the New York State Attorney General's Office

15   and I worked for a company called RGL Forensics.

16           MR. SCHIRICK:  Okay.  All right.  If we could please

17   pull up Government Exhibit Z1.

18   Q.  And you just testified to this chart a moment ago when you

19   were talking to Mr. Fergenson, right?

20   A.  Yes.

21   Q.  Okay.  And can you tell me who created the first draft of

22   this chart?

23   A.  So there were various versions of the exhibits.  I was

24   given version 5.  I know the FBI agents and other forensic

25   accountant, the prosecutors worked together in putting some of

1  these together.

2  Q.  Okay.  So the first——the first version of this document was

3  put together by someone other than you, correct?

4  A.  Correct.

5  Q.  And it sounds like perhaps the first five versions of this

6  document were put together by someone other than you, correct?

7  A.  Correct.

8  Q.  And it sounds like there were multiple members of the

9  government team, including lawyers, who helped put it together

10  before you reviewed this document; is that correct, to your

11  understanding?

12  A.  Before I reviewed it, yes.

13  Q.  And perhaps multiple other agents who contributed to the

14  first five drafts of this before you saw it, to your

15  understanding?

16  A.  Before I saw the original, I just want to make that clear,

17  and not the final version, yes.

18  Q.  Understood.  Before you saw any draft of this document,

19  multiple other people had input to it before it was presented

20  to you, correct?

21  A.  Correct.

22  Q.  And after you were presented with the first draft, you and

23  the government lawyers talked about this exhibit, right?

24  A.  I'm sorry.  Me and who?

25  Q.  The folks sitting here at counsel's table for the

1    government.

2    A.   No.   Actually, I spoke with the agents and another forensic

3    accountant about it.

4    Q.   Okay.   So you spoke to other agents and another forensic

5    accountant for the FBI before you spoke to government lawyers?

6    A.   Correct.

7    Q.   Okay.   Did a time come when you spoke to the government

8    lawyers about this chart?

9    A.   Yes.

10   Q.   Okay.   And when was that?

11   A.   Last Saturday.

12   Q.   Okay.   And did they make suggested revisions to the chart

13   when you spoke to them?

14   A.   No, I actually made suggested revisions to the charts.

15   Q.   Okay.   So, understood.   Is it fair to say that the chart

16   was created and mostly completed before you had an opportunity

17   to comment to it?

18   A.   It was mostly completed and then I made edits to it.

19   Q.   Right.   But your edits were relatively small in relation to

20   the work that had been done before it was presented to you,

21   right?

22          MR. FERGENSON:   Objection.

23          THE COURT:   Overruled.   You may answer.

24   A.   I don't know.   I feel like it's relative.   They were

25   important to me, the changes that I made.   I changed an account

1    number, changed some amounts, so—

2    Q.  Understood.  You didn't go into PowerPoint and create this

3    document, though, right?

4    A.  I went into PowerPoint and edited the document.

5    Q.  And edited it, right?

6    A.  Correct.

7    Q.  It was presented to you as mostly complete, as you said

8    before, by the time you got to it.

9    A.  Yes, a different version.

10   Q.  Fair enough.  I'd like to just talk briefly about the chart

11   and some of the information underlying the chart.  Is it fair

12   to say that the chart focuses on a period of time April through

13   June of 2020?

14   A.  April through June 3rd—well, June 9, 2020.

15   Q.  Fair enough.  I was going to just use the months for ease.

16   So April to June 2020.

17   A.  Sure.

18   Q.  Roughly.

19   A.  Mm-hmm.

20   Q.  Okay.  And you testified that you reviewed the underlying

21   bank records for your testimony here today?

22   A.  Yes.

23   Q.  And you reviewed the underlying bank records that are

24   cited, as Mr. Fergenson pointed out, in the summary chart?

25   A.  Yes.

1    Q.   Okay.  And did you review any Saraca bank records from

2    JPMorgan that predated April 2020?

3    A.   No.

4    Q.   And did you review any JPMorgan bank records for Saraca

5    that postdated June 2020?

6    A.   I don't believe so.  I think it ended at June.

7    Q.   Okay.  So you have no idea, right, whether the bank account

8    at JPMorgan held by Saraca held substantial funds either before

9    or after the time period that you focused on, right?

10   A.   Yeah, I just knew the beginning balance as of April.

11   Q.   Okay.  Apart from the Chase accounts that you looked at in

12   connection with helping to edit this chart, how many bank

13   accounts did Saraca have in the United States?

14   A.   I'm sorry.  Could you repeat the question.

15   Q.   Sure.  Apart from the bank accounts that you looked at in

16   connection with helping to edit this chart, do you know how

17   many other bank accounts Saraca had in the United States?

18   A.   No.  I only focused on the Chase accounts that I reviewed.

19   Q.   Okay.  And what about foreign bank accounts; didn't look at

20   any foreign bank accounts for Saraca, correct?

21   A.   I was not provided with that, no.

22   Q.   Okay.  So at bottom, no information other than the

23   information you were provided with by the government is

24   reflected in this chart, right?

25   A.   Correct.

1    Q.  All right.  Let's just go back to the chart briefly.  I'd
2    like to just take you through it and review a few of the
3    slides, if that's all right.
4            Overall, is it fair to say that we're talking
5    about——this chart, that is, is talking about money that came
6    into Saraca from the sale of GTV shares?
7    A.  I do not know.  This is money that came into Saraca.  I'm
8    just showing the incoming money and the outgoing money.
9    Q.  Okay.  So you don't know that Saraca sold shares that it
10   held in GTV and that after selling that a portion of——
11           MR. FERGENSON:  Objection.
12           THE COURT:  Sustained.
13   Q.  You testified on direct about a private placement; is that
14   right?
15   A.  That was——
16   Q.  About your knowledge of a private placement?
17   A.  That was one of the memos on the checks.
18   Q.  Okay.  Do you know when the private placement began?
19   A.  I don't know anything about a private placement.
20   Q.  All right.  Let's just walk through the chart.
21           I'm going to first just focus on the first nine pages
22   of Government Exhibit Z-1.  Which should be in front of
23   everyone.
24           If we look at page 1, is it fair to say that this just
25   shows the opening balance of this first JPMorgan account on

1    April 1, 2020?

2    A.  Yes.

3    Q.  Okay.  And then on page 2, this just shows who has

4    signature authority for that account?

5    A.  Yes.

6    Q.  And it looks like that signature authority was updated in

7    May of 2020?

8    A.  Yes.

9    Q.  And focusing on the——

10          MR. SCHIRICK:  Yeah, if you could just blow that back

11   up.  Thank you.

12          And also blow up the same line on the left-hand side

13   of the screen.  The left-hand signature card.  Thank you.

14   Q.  And can you see here that, as you covered on direct, it's

15   the same individual is listed as the signatory to this account,

16   right?

17   A.  Yes.

18   Q.  Yanping Wang?

19   A.  Yes.

20   Q.  And it looks here as though she's just changed positions at

21   the company, right?

22   A.  Yeah, it's a different title.

23   Q.  So does that sort of explain why she might have updated the

24   signature card?

25          MR. FERGENSON:  Objection.

```
1            THE COURT:  Sustained.
2   Q.  Do you have any understanding as to why one might update a
3   signature card on a bank account?
4            MR. FERGENSON:  Objection.
5            THE COURT:  Sustained.
6   Q.  Okay.  And if we turn to page 3, this is just the same as
7   page 1, right?  No difference?
8   A.  Correct.
9   Q.  So it's sort of a dupe, right?
10  A.  I'm sorry?
11  Q.  So it's a dupe, it's duplicative, correct?
12  A.  Yes.
13  Q.  Okay.  And then turning to pages 4, 5, and 6—first of all,
14  take page 4, on this slide, it just shows how much money came
15  into this bank account in April 2020.  That's it, really.
16           MR. FERGENSON:  Objection, your Honor.
17           THE COURT:  Overruled.  You may answer.
18  A.  Well, there's a lot of details here, but yeah, it shows the
19  32 approximate million that came in in April.
20  Q.  Right.  Overall, that's just—that's what it's here for;
21  it's intended to show how much came in in April, right?
22  A.  Yes.
23  Q.  Okay.  And then on page 5, this is just a little bit more
24  detail on the same thing, right?
25  A.  Yes.
```

Espinoza - Cross

1    Q.  Okay.  And then on page 6, this just shows the balance at

2    the end of April, right?

3    A.  It does.

4    Q.  Okay.  Now let's take pages 7, 8, and 9.

5            Pages 7, 8, and 9 are really just the same thing that

6    we've looked at for pages 4, 5, and 6, but this time it's for

7    May of 2020, right?

8    A.  Right.

9    Q.  Okay.  So is it fair to say that pages 1 through 9 of this

10   19-page chart just show money coming into Saraca's JPM

11   accounts?

12           MR. FERGENSON:  Object to form.

13           THE COURT:  It's overruled.  You can answer.

14   A.  Yeah, I mean, it shows all the deposits that came into the

15   account.  It's very simplified in that it's——yeah, it's showing

16   the incoming money into the account, but there's a lot of

17   detail behind it.

18   Q.  I understand there's more detail in the chart.  My question

19   is:  Don't pages 1-9 just show money coming into this account?

20           MR. FERGENSON:  Asked and answered.

21   Q.  For April——

22           THE COURT:  Sustained.

23   Q.  All right.  Now let's look at pages 10-14.

24           Page 10 here is something of a cover sheet that just

25   shows what's detailed in the following pages; is that correct?

1    A.  Well, it shows the three transactions which we are about to

2    go over.

3    Q.  Right.  And—

4    A.  And the following pages.

5    Q.  Sure.  And maybe it would be helpful—I'm sorry.  We should

6    have just scrolled forward for you so you could see what was

7    coming up next.

8            MR. SCHIRICK:  Maybe go one more.  And one more.

9    Q.  Did you have an opportunity to look at that?

10   A.  Yeah, I mean, there's some additional information there,

11   like the signature card, but yeah, it is showing there's

12   $100 million transfer, which is one of the three transfers.

13   Q.  Right.  Okay.

14           MR. SCHIRICK:  So if we go back up to page 10.  So

15   this—I'm sorry.  Let's move now to page 11.

16   Q.  So this shows the opening of a new account at Chase by

17   Saraca; is that right?

18   A.  Yes, the box to the right shows that.

19   Q.  And it's in the exact same name as the other account; is

20   that right?

21   A.  Yes.

22   Q.  Saraca Media Group Inc. d/b/a Himalaya Dollar, right?

23   A.  Yes.

24           MR. SCHIRICK:  Okay.  Let's flip to page 12.

25   Q.  Now page 12 just shows who has signature authority for this

1    new Chase account, right?

2    A.  Yes, it does.

3    Q.  And it's the same person who had signatory authority for

4    the first Chase accounts, right?

5    A.  Yes, it is.

6    Q.  And in fact, it's the—reflects the same title for Ms. Wang

7    as the most updated signature card for the first account,

8    right?

9    A.  Yes, it does.

10   Q.  Okay.  We can go back to page 2 if you want.  But do you

11   recall that?

12   A.  I believe so, yeah.

13   Q.  Okay.  All right.  Now let's just focus a little bit on

14   what happened on June 3rd.

15          MR. SCHIRICK:  If we can go back to page 10.

16   Q.  So I believe you testified on direct that these

17   transactions on June 3rd reflected outgoing transfers.  Do you

18   recall that?

19   A.  Yes.

20   Q.  Okay.  Aren't these just online transfers from one account

21   at JP Morgan to another account at JPMorgan?

22   A.  Yeah, those three that are highlighted are online transfers

23   to another checking.

24   Q.  Right.  So it's just moving money from one of Saraca's

25   accounts and working it into another one of Saraca's accounts

1    within JPMorgan, correct?

2    A.  That's correct.

3    Q.  And so there's nothing going out of the bank, right?

4    A.  Not at that point yet, but eventually, yes.

5    Q.  Fair enough.  This is the one we're focusing on now.  These

6    three transactions, nothing going out of the bank, right?

7    A.  I'm not sure what you mean by that, because they are coming

8    out of the 5601 to go to the 2038 account.

9    Q.  Understood.  My question is:  There are no transfers

10   leaving JPMorgan Chase, right?

11   A.  The overall bank?

12   Q.  Correct.

13   A.  No.

14   Q.  Okay.  These are purely internal transfers within JPMorgan,

15   correct?

16   A.  Yes.

17   Q.  Isn't this the same thing as when I go into my online

18   account to move funds from a savings account to a checking

19   account?

20           MR. FERGENSON:  Objection.

21           THE COURT:  Overruled.  You may answer.

22   A.  Yes.  It's a transfer.

23   Q.  Right.  It's the same thing, right?

24           MR. FERGENSON:  Objection.

25           THE COURT:  Overruled.

1    Q.   Okay.  So these are sister accounts within the same bank,

2    held by the same company.

3            MR. FERGENSON:  Objection to the characterization.

4            THE COURT:  Overruled.

5    A.   They are the same bank account names at the same bank with

6    different account numbers.

7    Q.   Okay.  So this──these don't──these three transactions we're

8    looking at on slide 10 don't reflect wire transfers, right?

9    A.   I mean, it's a transfer.

10   Q.   You're aware of the difference between a transfer and a

11   wire transfer, correct?

12   A.   Yeah.

13   Q.   A wire transfer, am I right, is an outbound transaction

14   from a bank outside of the bank?

15   A.   Yes, but these are still transfers in between the accounts.

16   Q.   So my question──so if I was unclear, my question is:  These

17   are not wire transfers, the three transactions we're looking on

18   on slide 10, that are highlighted.

19           MR. FERGENSON:  Asked and answered.

20           THE COURT:  Sustained.

21           MR. SCHIRICK:  I'm not sure I got an answer to that

22   question, your Honor.

23   Q.   Are these ACH transfers?

24   A.   These are online transfers.

25   Q.   So is that no, they're not ACH transfers?

1    A.   That is how JPMorgan Chase characterizes them, as online

2    transfers.

3                MR. SCHIRICK:   Okay.  Can we please pull up Government

4    Exhibit JPM119.

5                At 48.

6                And if we could please just zoom in on the top of the

7    document, the transfers that are—yup, there we go.  If you

8    just move it up a little bit, please, to highlight the—thank

9    you.

10   BY MR. SCHIRICK:

11   Q.   So can you see this document?

12   A.   Yes.

13   Q.   And doesn't this reflect—I'm sorry.  Withdrawn.

14               Are these—is this document among the documents that

15   are the source for the information that's in the chart?

16   A.   Yes, it is.

17   Q.   Okay.  And these are among the documents that you looked at

18   as part of editing the chart?

19   A.   Yes.

20   Q.   Okay.  And you can see here that all three transfers are

21   characterized as online transfer to checking?

22   A.   Yes.

23   Q.   Okay.  Does that make it clear to you that these are purely

24   internal transfers within JPMorgan?

25               MR. FERGENSON:   Asked and answered.

1           THE COURT:  Sustained.

2           MR. SCHIRICK:  Okay.  If we could go back to the

3   summary chart.  Page 14, please.

4   Q.  So this particular slide shows some additional detail on

5   that internal transfer at Chase, correct?

6   A.  Correct.

7   Q.  And you testified to that on direct, right?

8   A.  Yes.

9   Q.  And again, in this internal transfer, what's written in the

10  memo section when this money gets zapped from one account to

11  another?

12  A.  GTV Private Placement Fund.

13  Q.  Right.  Do you agree with me that that's an accurate

14  description of the funds, or you don't know?

15  A.  An accurate description?  That is the description provided

16  by the bank.  And the bank records are accurate, to my

17  knowledge.

18  Q.  Okay.  So you don't have any reason to believe that this

19  was an inaccurate description of the funds that were

20  transferred internally at JPMorgan?

21  A.  No.

22  Q.  Okay.  So the transfer is made from one account at JPMorgan

23  to another account; the source of the funds is totally

24  transparent as between those two accounts, right?

25  A.  I'm not sure what you mean by that.

1   Q.  Well, there can't be any question, when money is moved

2   purely from one account at a bank to another account at a bank,

3   where the money came from, right?

4   A.  Yeah, no, it says which account it came from and which

5   account it went to, if that's what you're stating.

6   Q.  So the source of the funds is transparent, right?

7   A.  It's—it's in the details, yes.

8   Q.  Okay.  Thank you.  And the nature of the funds is described

9   in this memo line that we're looking at on page 14 of this

10  document, right?

11  A.  I don't know about the nature of the funds.  That is the

12  memo that is inputted by the person that made the transfer.

13  Q.  So if we look at the balance of the chart beginning with

14  page 15, would you agree with me that the remaining pages of

15  the chart show what actual money flows out of Saraca's bank

16  account?

17  A.  Yes, the remaining charts show outgoing money.

18  Q.  Okay.

19  A.  From Saraca.

20  Q.  I'm sorry.

21  A.  From Saraca.

22  Q.  Thank you.  And would you agree with me that there are two

23  main flows of money out of Saraca's bank account?

24  A.  There are two entities that received the money, but there

25  are several—it consists of several transactions.

O5V1GUO4                         Espinoza - Cross

1    Q.  So my question is:  Are there two principal flows in, in

2    two directions of the money?

3    A.  Well, the flows would be the arrows to me, and so there is

4    one, two, three——there's like four arrows and the end chart.

5    Q.  Is it fair to say that between June 3rd and June 9th,

6    $238 million from Saraca are moved to GTV Media Group?

7    A.  Could you go through the last exhibit, the last slide.

8    Q.  Sure.

9    A.  And could you repeat the question.

10   Q.  Sure.  Is it fair to say that between June 3rd and

11   June 9th, $238 million go from Saraca to GTV Media Group?

12   A.  Yes, that's correct.

13   Q.  Okay.  And is it also true that on June 5th, there is a

14   flow of funds from Saraca to Hayman Hong Kong Opportunities

15   Fund, right?

16   A.  Yes.

17   Q.  And that's in the amount of $100 million, right?

18   A.  Yes.

19   Q.  Okay.  And when the money that leaves JPMorgan and goes to

20   Hayman, that money comes from an account at JPMorgan that is

21   titled identically to the first account at JPMorgan, right?

22   A.  Yes, they're both Saraca accounts.

23   Q.  Okay.  And the account signatory on this account, Ms. Wang,

24   is exactly the same as on the first account.

25   A.  Of the Saraca account, yes.

1  Q.  So no less information is available to Hayman in this

2  transfer than if the funds had simply come from the first

3  account, right?

4         MR. FERGENSON:  Objection, your Honor.

5         THE COURT:  Sustained.

6  Q.  Ms. Espinoza, nothing about the funds coming from this

7  second account at JPMorgan concealed anything; is that right?

8         MR. FERGENSON:  Objection, your Honor.

9         THE COURT:  Sustained.

10 Q.  Does this flow of funds obscure the source of funds in any

11 way?

12        MR. FERGENSON:  Objection, your Honor.

13        THE COURT:  Sustained.

14        MR. SCHIRICK:  Your Honor, if I could just have a

15 moment.

16        THE COURT:  Yes.

17        MR. SCHIRICK:  Your Honor, may I approach.

18        THE COURT:  Yes.

19        MR. SCHIRICK:  Oh, no, I meant just approach the

20 witness, your Honor, not a sidebar.

21        Your Honor, it turns out we need a sidebar.

22        THE COURT:  Okay.

23        (Continued on next page)

24

25

1          (At the sidebar)

2          MR. SCHIRICK:  Your Honor, I would like to mark this

3     as Defense Summary Exhibit 1, and we would show it to the

4     witness as our only summary chart of the flow of funds that

5     essentially summarizes what's in her summary chart.  And the

6     government objects.

7          THE COURT:  Objects?

8          MR. SCHIRICK:  Yes.

9          THE COURT:  How come?

10         MR. FERGENSON:  They didn't——this was the first we

11    heard they were marking it as an exhibit.  They wanted to show

12    it to her and ask her if it's accurate.  There's no failure of

13    recollection.  It's not being used to refresh.  If they're

14    trying to offer it as a summary exhibit, I guess they can ask

15    her if it's accurate, but we'll see what she says.  If she says

16    this is accurate, then they can seek to offer it, I guess.

17         MR. SCHIRICK:  That's my point, your Honor.

18         THE COURT:  All right.  So on that prior issue of

19    hypotheticals to Ms. Schottenheimer, if the prosecution plans

20    to ask, say, for example, Mr. Bass or some other witness in

21    this category this type of hypothetical, I'd like you to

22    provide me with the authority.

23         MR. FINKEL:  Understood.  Thank you, your Honor.

24         THE COURT:  Okay.

25

1              (In open court)

2              MR. SCHIRICK:  May I approach the witness, your Honor.

3              THE COURT:  You may.

4              MR. SCHIRICK:  I'm handing the witness a copy of

5    what's been marked as Defense Summary Exhibit 1.

6    BY MR. SCHIRICK:

7    Q.  Just take a moment to review that.

8              Ms. Espinoza, have you had an opportunity to review

9    what's been marked as Defense Summary Exhibit No. 1?

10   A.  Yes.

11   Q.  Does this describe the flow of funds that is also described

12   in the summary exhibit that the government asked you about on

13   direct?

14   A.  Well, it removes some of the flow of funds and some of the

15   transfers.

16   Q.  Well, it certainly removes some of the detail, correct?

17   A.  Yes, it does.

18   Q.  Would you agree for me that the net effect of the transfers

19   is the same in this exhibit as in the exhibit that the

20   government introduced?

21   A.  The outgoing totals——I don't know about net effect, but the

22   outgoing totals to GTV Media and to Hayman are the same

23   amounts.

24   Q.  Okay.  That's a better formulation, so I will adopt your

25   formulation.

1          Are the outgoing totals, the net amounts that go to

2     Hayman and GTV correct in this exhibit?

3     A.  Yes.  The outgoing amounts are the same amounts.

4          MR. SCHIRICK:  Okay.  Your Honor, the defense offers

5     this exhibit into evidence.

6          MR. FERGENSON:  Your Honor, may I have voir dire for a

7     moment.

8          THE COURT:  You may.

9     VOIR DIRE EXAMINATION

10    BY MR. FERGENSON:

11    Q.  Ms. Espinoza, is that summary chart an accurate summary of

12    the final summary of GX Z1, the summary chart you testified to?

13    A.  No, it's taking out a lot of the details and some of the

14    transfers.

15         MR. FERGENSON:  The government objects, your Honor.

16         THE COURT:  So are you seeking to admit it for the

17    limited purpose that the witness has stated?

18         MR. SCHIRICK:  Correct, your Honor.  We're not

19    offering it——clearly it doesn't have the detail that the

20    government's exhibit has, but the witness has testified that

21    the net amount of the flows in the exhibit that we've offered

22    is correct.

23         MR. FERGENSON:  We object, because the witness just

24    testified it's not an accurate summary of the summary that's in

25    evidence, your Honor.

1           MR. SCHIRICK:  Your Honor, my summary doesn't need to

2      be an accurate version of their summary.  I'm allowed to have

3      my own summary.  The defense can have its own summary.

4           THE COURT:  So is your question whether or not this

5      chart shows the net outflow; is that the question?

6           MR. SCHIRICK:  Correct.  The witness has testified

7      that the amount of outflows from the JPMorgan account to Hayman

8      on one hand and to GTV on the other hand are correct, are

9      accurate in that exhibit, and we offer it for that purpose.

10          THE COURT:  All righty.  It is admitted then.

11          MR. SCHIRICK:  Thank you, your Honor.

12          (Defendant's Exhibit Summary 1 received in evidence)

13          MR. SCHIRICK:  We have only——because we just handwrote

14     that, we have only one copy.  We will provide additional copies

15     to the Court.  Can we publish it.

16          THE COURT:  It's 2:44.

17          MR. SCHIRICK:  Thank you, your Honor.  We're finishing

18     up momentarily.

19     BY MR. SCHIRICK:

20     Q.  So Ms. Espinoza, does this chart——again, does this

21     accurately summarize the flow of funds at issue in the chart

22     that the government introduced?

23     A.  It shows the correct amounts that went to GTV Media and to

24     Hayman Hong Kong Opportunities, but again, it leaves out a lot

25     of the details about the transactions.

1   Q.  Understood.  But this is really pretty simple, isn't it, at

2   the end of the day?

3              MR. FERGENSON:  Objection.

4              THE COURT:  Sustained.  She's answered the question.

5              MR. SCHIRICK:  Thank you, your Honor.  No further

6   questions.

7              MR. FERGENSON:  I have two questions, your Honor.

8              THE COURT:  All righty.

9              MR. FERGENSON:  Ms. Loftus, can we put up GX Z1.

10             GX Z1, at 19, please.

11  REDIRECT EXAMINATION

12  BY MR. FERGENSON:

13  Q.  Ms. Espinoza, is there more information on this chart than

14  the handwritten one the defense just showed you?

15  A.  Yes.

16  Q.  Is this chart accurate?

17  A.  Yes.

18  Q.  Does it have all the relevant information?

19  A.  Yes, it does.

20  Q.  You were also asked a question about how the $100 million

21  transfer from Saraca to another Saraca account had the memo

22  line GTV Private Placement Fund.  Do you recall that?

23  A.  Yes.

24  Q.  Focusing you on the $100 million transfer from Saraca to

25  Hayman Hong Kong Opportunities, did you review any records that

O5V1GUO4

1  showed a memo line of GTV Private Placement Fund?

2          MR. SCHIRICK:  Objection.

3          THE COURT:  Overruled.  You may answer.

4  A.  I don't recall the wire details for that transaction.

5          MR. FERGENSON:  Nothing further, your Honor.

6          THE COURT:  All righty.  Let me——recross?

7          MR. SCHIRICK:  Briefly, your Honor.

8  RECROSS EXAMINATION

9  BY MR. SCHIRICK:

10  Q.  You just testified, Ms. Espinoza, that you didn't review

11  any wire details for that internal JPMorgan transfer, correct?

12          MR. FERGENSON:  Objection, your Honor,

13  mischaracterizing.

14          THE COURT:  Sustained.

15          MR. SCHIRICK:  I believe she used the word "wire,"

16  your Honor.

17          THE COURT:  Sustained.

18  Q.  Was the internal transfer at JPMorgan a wire?

19          MR. FERGENSON:  Asked and answered.

20          THE COURT:  Sustained.

21          MR. SCHIRICK:  No further questions, your Honor.

22          THE COURT:  All righty.  Nothing further.

23          MR. FERGENSON:  Correct.

24          (Witness excused)

25          THE COURT:  Members of the jury, it's 2:46.  Time to

O5V1GUO4

go.  I just want to remind you that you're not allowed to

discuss the case amongst yourselves or with anyone else.  You

can't permit anyone to discuss the case in your presence.  In

addition, you're not allowed to research anything about the

case.  It's very tempting, now that you've heard some witness

testimony, to want to go to Google or the library or any other

source to do some research.  You cannot research anything

related to the case, and you cannot listen to any media reports

about the case from any source.

        Have a good weekend.  I look forward to welcoming you

back on Monday, promptly at 9:30.

        THE LAW CLERK:  Jury exiting.

        (Jury not present)

        THE COURT:  You may be seated.

        Is there anything before we reconvene on Monday?

        MR. FERGENSON:  Not from the government, your Honor.

        MS. SHROFF:  No, your Honor, not for the defense.

Thank you.

        THE COURT:  Have a good weekend.

        (Adjourned to June 3, 2024, at 9:00 a.m.)

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     STEELE SCHOTTENHEIMER

4    Direct By Mr. Finkel . . . . . . . . . . . . . 789

5    Cross By Mr. Kamaraju  . . . . . . . . . . . . 849

6    Redirect By Mr. Finkel . . . . . . . . . . . . 924

7    Recross By Mr. Kamaraju  . . . . . . . . . . . 932

8    Redirect By Mr. Finkel . . . . . . . . . . . . 935

9     KIMBERLY ESPINOZA

10   Direct By Mr. Fergenson  . . . . . . . . . . . 938

11   Cross By Mr. Schirick  . . . . . . . . . . . . 954

12   Redirect By Mr. Fergenson  . . . . . . . . . . 979

13   Recross By Mr. Schirick  . . . . . . . . . . . 980

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3     HN-26, HN-29, HN-35, HN-41, HN-57,  . . . . . 795

 4              HN-59, HN-69, HN-70, HN-71,

 5              HN-79, HN-80, HN-82, HN-86,

 6              HN-98, HN-124, HN-168, HN-193,

 7              HN-208, HN-220, HN-221,

 8              HN-222, HN-223

 9    CIT14, CIT47, JPM118-JPM121  . . . . . . . . 941

10    Z1  . . . . . . . . . . . . . . . . . . . 941

11    SM-08  . . . . . . . . . . . . . . . . . . 885

12    Stip 14  . . . . . . . . . . . . . . . . . 940

13    HN-33  . . . . . . . . . . . . . . . . . . 800

14    HN-37  . . . . . . . . . . . . . . . . . . 905

15    HN-43  . . . . . . . . . . . . . . . . . . 814

16    HN-51  . . . . . . . . . . . . . . . . . . 912

17    SW107  . . . . . . . . . . . . . . . . . . 826

18    SW108  . . . . . . . . . . . . . . . . . . 828

19                     DEFENDANT EXHIBITS

20    Exhibit No.                              Received

21     Summary 1  . . . . . . . . . . . . . . . . 978

22

23

24

25
```