O67BGUO1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
                v.                        23 Cr. 118 (AT)
4
   MILES GUO,
5
                Defendant.               Trial
6  ------------------------------x
                                         New York, N.Y.
7                                        June 7, 2024
                                         8:45 a.m.
8
   Before:
9
10                   HON. ANALISA TORRES,

11                                       District Judge
                                          -and a Jury-
12
                           APPEARANCES
13
   DAMIAN WILLIAMS
14      United States Attorney for the
        Southern District of New York
15 BY:  MICAH F. FERGENSON
        RYAN B. FINKEL
16      JUSTIN HORTON
        JULIANA N. MURRAY
17      Assistant United States Attorneys

18 SABRINA P. SHROFF
        Attorney for Defendant
19
   PRYOR CASHMAN LLP
20      Attorneys for Defendant
   BY:  SIDHARDHA KAMARAJU
21      JOHN M. KILGARD
        CLARE P. TILTON
22
   ALSTON & BIRD LLP
23      Attorneys for Defendant
   BY:  E. SCOTT SCHIRICK
24

25

O67BGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O67BGUO1

1        (Trial resumed; jury not present)

2        THE COURT:  Note your appearances, please.

3        MR. FINKEL:  Good morning, your Honor.  Ryan Finkel,

4    Justin Horton, Juliana Murray and Micah Fergenson who will be

5    joining us shortly for the government.  We're joined at counsel

6    table by Special Agent Robert this morning.

7        MR. SCHIRICK:  Good morning, your Honor.

8        Scott Schirick for the defendant, and I will be joined

9    shortly by Mr. Kamaraju, Ms. Shroff and Mr. Barkan, and we're

10   at counsel's table with Mr. Guo.

11       THE COURT:  Please be seated.  Is there anything

12   before we start today?

13       MR. FINKEL:  Not from the government.

14       MS. SHROFF:  No, your Honor, not from us.

15       THE COURT:  So if you'll have the witness ready to

16   take the stand by 8:59.

17       MR. FINKEL:  We'll do that, your Honor.

18       THE COURT:  Thank you.

19       (Recess)

20

21

22

23

24

25

O67BGUO1                    Ya Li- Cross

 1              THE COURT:  Please get the jury.

 2              (Jury present)

 3              THE COURT:  Please be seated.  Good morning, jurors.

 4   Thank you again for coming back exactly on time.  We're going

 5   to continue with the cross examination of the witness.

 6              Ms. Li, remember that you're still under oath.

 7              MS. SHROFF:  May I proceed, your Honor?

 8              THE COURT:  You may.

 9   YA LI,

10   CROSS-EXAMINATION CONTINUED

11   BY MS. SHROFF:

12   Q.  Ms. Li, let me direct your attention to Defense Exhibit

13   60497.  Could you publish it, please.

14              This is Lei Ann Li, correct?

15   A.  Yes.

16   Q.  And she goes by the name of Cornfield sister, correct?

17   A.  Yes.

18   Q.  You did not approve of her work product, correct?

19   A.  Sorry.

20   Q.  Who did she work for?

21   A.  I work for Miles Guo.

22   Q.  Who did she work for?

23   A.  She work for Miles Guo.

24   Q.  Which company did she work for?

25   A.  G Fashion.

O67BGUO1                    Ya Li- Cross

1   Q.  And you were not a fan of her design at G Fashion, correct?

2   A.  Sorry.

3   Q.  You were not a fan of her designs at G Fashion, correct?

4   A.  Not her design.

5   Q.  Now, you testified also that you were the leader of -- you

6   may take that down.  Thank you.

7          You were the leader of G translators, correct?

8   A.  Yes.

9   Q.  And you supervised somebody name Xin Sheng, correct?

10  A.  Do you mean Xin Sheng?

11  Q.  I didn't hear her.

12  A.  Do you mean Xin Sheng?

13  Q.  X-I-N, S-H-E-N-G.

14  A.  Yes.

15  Q.  And he complained about the way you treated him in the

16  group, correct?

17  A.  Once.

18  Q.  He left the group, correct?

19  A.  Yes.

20  Q.  And he left because you mistreated him he said, correct?

21  A.  No.

22  Q.  He left with 17 other people who complained about the way

23  you treated them, correct?

24  A.  No.

25  Q.  Seventeen people left from your group, correct?

O67BGUO1                              Ya Li- Cross

1   A.  Yes.

2   Q.  All at once, correct?

3   A.  Some come back.

4   Q.  I could not hear you.

5   A.  Some come back.

6   Q.  I did not ask you if some came back.

7           MR. FERGENSON:  Objection, your Honor.

8           THE COURT:  Overruled.  Did 17 leave?

9           THE WITNESS:  Yes.

10  Q.  And there was a long discussion about all of these issues,

11  right, during a meeting, correct?

12  A.  Yes.

13  Q.  And Mr. Guo was part of that meeting, correct?

14  A.  Yes.

15  Q.  And they were part of the meeting, correct?

16  A.  Yes.

17  Q.  And you were part of that meeting, correct?

18  A.  Yes.

19  Q.  And during the meeting they complained, correct?

20  A.  Yes.

21  Q.  And Mr. Guo told everyone, look at yourself first before

22  complaining about others, correct?

23  A.  Yes.

24  Q.  Okay.  Now, after this meeting that Mr. Guo had with these

25  individuals, some of them came back, correct?

O67BGUO1                          Ya Li- Cross

1   A.  Yes.

2   Q.  And even after they came back, other people still

3   complained about how you treated them, correct?

4   A.  I don't know.

5   Q.  Let me show you what is marked as a defense exhibit, and it

6   will get pulled up just momentarily.  This is Exhibit 60499.

7   Do you recognize this person?

8   A.  Yes.

9   Q.  Who is that?

10  A.  Sara Wei.

11  Q.  And Sara Wei worked with whom?

12  A.  With Miles Guo.

13  Q.  Sure.  Which group did she work for?

14  A.  VOG.

15  Q.  And that is Voice of Guo, correct?

16  A.  Yes.

17  Q.  And she was also somebody who started as a volunteer

18  translator, correct?

19  A.  Yes.

20  Q.  And you did not get along with her either, correct?

21  A.  No.

22  Q.  And then you were part of the Iron Blood Group, correct?

23  A.  Sorry, who?

24  Q.  Was she part of the Iron Blood Group?

25  A.  No, she left.

O67BGUO1                        Ya Li- Cross

1   Q.  She left the Iron Blood Group?  I didn't ask you if she

2   left, ma'am.

3   A.  She left before Iron Blood Group.

4   Q.  Before she left, she was part --

5   A.  No.  Iron Blood Group establish after she left.

6   Q.  So she was never part of the Iron Blood Group?

7   A.  No, never.

8   Q.  And you did not like her, correct?

9   A.  No.

10  Q.  Okay.  Now, let's move to the videos that you were shown.

11  Let's talk about the videos that you were shown during your

12  direct, right.  You remember those?

13  A.  Sorry.

14  Q.  You testified on direct with Mr. Fergenson, correct?

15  A.  Yes.

16  Q.  And you were shown I believe eight videos, correct?

17  A.  Which video?

18  Q.  You were shown videos on the screen, and you testified

19  about them, the broadcast?

20  A.  Yes.

21  Q.  You remember that?

22  A.  Yes.  Which one?

23  Q.  Let's start with GXVI-191.

24  A.  Yes.

25  Q.  You remember testifying about this one?

1  A.  Yes.

2  Q.  And this video is how long?

3  A.  Nearly two hours.

4  Q.  Nearly two hours, correct?

5  A.  Yes.

6  Q.  And you translated this video as part of your translation

7  duties, correct?

8  A.  Yes.

9  Q.  And you did that, you said, as part of request from Miles

10 Guo, correct?

11 A.  We translated all his broadcast videos, yes.

12 Q.  So let's pull up 192-T, please.  And if we could just make

13 it larger.  Do you recall being shown this document?

14 A.  Yes.

15 Q.  And let's see if we can start with this paragraph that

16 says, This is a verbal agreement, correct?

17 A.  Yes.

18 Q.  You translated, not this document, but you translated the

19 video that has this language in it, correct?

20 A.  I don't remember.

21 Q.  Okay.  Could you read that for the jury what it says?

22 A.  This is a verbal agreement I want to reach with the Rule of

23 Law Fund.  And according to the basic requirements of New York

24 State for C3 and C4 public welfare nonprofit organizations, now

25 as long 70 percent of all the money in it was donated by

1    Wengui, it shouldn't be called Guo Wengui.  It was donated by

2    Guo Wengui's family foundation and related companies.

3    Q.  Thank you.  And even though you didn't watch the complete

4    video, you translated this as well, right?

5              MR. FERGENSON:  Objection.

6              THE COURT:  Overruled.  Which translation are you

7    referring to?

8              MS. SHROFF:  I'll rephrase.

9    Q.  You watched the complete video, correct?

10   A.  Yes.

11   Q.  And you translated the complete video, correct?

12   A.  I don't remember.

13   Q.  But you remember testifying that Mr. Guo trusted your group

14   to do the translations, correct?

15   A.  Yes.

16   Q.  And you translated every broadcast, you said that, right?

17   A.  Not full.  We not translated the full video.  We translated

18   the clips, but I don't remember this clips.

19   Q.  So you don't remember if this clip is even part of the

20   video; is that your testimony?

21   A.  No, this is part of the video.

22   Q.  I'll move forward.  Thank you very much.  You may take that

23   down.

24              Now, you testified minutes ago that you listened to

25   all of Mr. Guo's broadcast; is that correct?

O67BGUO1                         Ya Li- Cross

1    A.  Yes.

2    Q.  And during his broadcast he discussed, did he not, the

3    seizure of his assets, correct?

4    A.  Yes.

5    Q.  He discussed the seizure of his assets in Hong Kong,

6    correct?

7    A.  Yes.

8    Q.  He discussed the Pax litigation, correct?

9    A.  Yes.

10   Q.  He talked about somebody named Shan Wenjian, correct?

11   A.  Yes.

12   Q.  He said he was a CCP spy, correct?

13   A.  Yes.

14   Q.  Mr. Guo stated his belief that it was CCP who had

15   instigated the Pax litigation, correct?

16   A.  Yes.

17   Q.  And he had also broadcasted that he felt he was forced into

18   declaring bankruptcy, correct?

19              MR. FERGENSON:  Objection, hearsay.

20              THE COURT:  Overruled.  You may answer.

21   A.  He said his bankruptcy is CCP persecuted.

22   Q.  Exactly.  He said he was forced into it, correct?

23   A.  Yes.

24   Q.  And he said that he felt forced into it because an

25   unreasonable time had been imposed for him to pay back the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO1                        Ya Li- Cross

1    money, correct?

2    A.   I don't remember.

3    Q.   And you testified, did you not, about the unfairness of the

4    bankruptcy trustee, correct?

5              MR. FERGENSON:   Objection to hearsay.   He said.

6              MS. SHROFF:   It's not introduced for the truth of the

7    matter.

8              MR. FERGENSON:   Your Honor, it's clearly hearsay.

9              THE COURT:   Step up, please.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At the sidebar)

2          THE COURT:  What is the purpose of these statements

3  that you're eliciting now?

4          MS. SHROFF:  Your Honor, the purpose of it is to show

5  that the government's theory of Mr. Miles Guo lying in his

6  broadcast is not true.  In fact, he said all kinds of things on

7  his broadcast, including his financial situation.  So when they

8  put in that he was rich; he had a ton of money, it's equally

9  responsive under the rule of completeness, number one, to show

10 that he was candid to all of the people watching his broadcast.

11 But, number two, it is irrelevant to anyone of us eliciting

12 this information whether or not Mr. Miles Guo's statement in

13 itself is true or false.

14          The fact is that he made the statement.  It reflects

15 his state of mind, which is an exception to the hearsay rule,

16 and it is not being offered for the truth of the matter

17 asserted.  They elicited that it was the Pax litigation that

18 drove him here.  They elicited information about the Pax

19 litigation, and they elicit only clips from the broadcast.  To

20 complete that picture is the reason those questions are being

21 posed.  And it's two questions, this one and the next one, and

22 then I'm done.

23          MR. FERGENSON:  If it's not being offered for the

24 truth, we're okay with it coming in.  Your Honor can make clear

25 to the jury that those statements are not being offered by his

O67BGUO1                         Ya Li- Cross

1    defense lawyers for its truth.

2              MS. SHROFF:  We have no objection.  If the Court deems

3    it appropriate to instruct the jury that this is being offered

4    to show Mr. Guo's state of mind at that time, and it's all it

5    should be considered for.

6              MR. FERGENSON:  Just offered not for its truth because

7    she's referencing it wasn't just that he said it, the last

8    question was he testified.

9              MS. SHROFF:  I never said testified.

10             MR. FERGENSON:  He can't testify through the lawyers,

11   so I think it would be appropriate to tell the jury the

12   references in what he said out of court are not being offered

13   for its truth.

14             MS. SHROFF:  We have no objection.

15             THE COURT:  That is what I will do.

16             MS. SHROFF:  And I said "you" testified, meaning she

17   testified.  It's right here.  It's realtime read back.  You

18   should read it.

19             MR. FERGENSON:  If I misheard, I heard he.

20             THE COURT:  All right.  Let's go back.

21             (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO1                        Ya Li- Cross

1           (In open court)

2           THE COURT:  Members of the jury, the statement that

3    the witness said came from Mr. Guo and the statements that are,

4    I expect, to be forthcoming from Mr. Guo are not offered for

5    the truth of the matter asserted.  You may continue.

6           MS. SHROFF:  I think I have to re-approach.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O67BGUO1                        Ya Li- Cross

1              (At the sidebar)

2              MS. SHROFF:  Your Honor, respectfully I ask the Court

3    to say they're being introduced to show Mr. Guo's state of mind

4    at that time.

5              THE COURT:  I don't think it's an appropriate

6    instruction.

7              MS. SHROFF:  Okay.  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O67BGUO1                          Ya Li- Cross

1              (In open court)

2              THE COURT:  You may continue.

3   BY MS. SHROFF:

4   Q.  He also stated, did he not, that he felt that the

5   bankruptcy trustee was acting improperly, correct?

6   A.  Sorry, acting what?

7   Q.  Improperly, not properly.

8   A.  He said the trustee is CCP spy.

9   Q.  And he also said, did he not, that the trustee had made

10  $385 million in legal fees, correct?

11  A.  I don't remember.

12  Q.  You received a subpoena from the bankruptcy trustee,

13  correct?

14  A.  Yes.

15  Q.  When you received the subpoena, you were in Australia; is

16  that right?

17  A.  Yes.

18  Q.  And you are familiar with the fact that a subpoena is a

19  legal document, correct?

20  A.  No, I don't know.

21  Q.  Did you look at the subpoena?

22  A.  No, Miles Guo ask us to throw away.

23  Q.  I understand Miles Guo ask you to do all of these things.

24  I understand that.  My question to you was, did you read the

25  subpoena?

O67BGUO1                    Ya Li- Cross

1    A.  No.

2    Q.  So you got a subpoena.  You did not read it, but somehow or

3    the other you knew it was a subpoena?

4    A.  Yes, because from Paul Hastings.

5    Q.  From who?

6    A.  From Paul Hastings.

7    Q.  From Paul Hastings?

8    A.  Yeah, the trustee legal firm.

9    Q.  So you knew it came from a legal firm, correct?

10   A.  Yes.

11   Q.  A legal firm has lawyers, correct?

12   A.  Legal firm of trustee.

13   Q.  But they have lawyers, right?

14   A.  Yes.

15   Q.  The lawyers sent you a legal document, correct?

16   A.  Yes.

17   Q.  You told Miles Guo that you got a legal document, correct?

18   A.  Yes.

19   Q.  And to tell him that you got a legal document, you have to

20   know what the legal document is, correct?

21   A.  I don't know, just legal document.  Any legal document

22   Miles Guo said throw away.

23   Q.  Any legal document?

24   A.  Yes.

25   Q.  So if you got a legal document about your daughter, you

O67BGUO1                        Ya Li- Cross

1    would just throw away?

2                THE COURT:  Sustained.

3                MR. FERGENSON:  Thank you.

4    Q.  Is it your testimony, ma'am, that you did not open the

5    legal document?

6    A.  Yes, not open.

7    Q.  You did not open it?

8    A.  No.

9    Q.  How did you get the document by the way?

10   A.  By the mail.

11   Q.  Which mail?

12   A.  FedEx.

13   Q.  Excuse me.

14   A.  FedEx.

15   Q.  FedEx?

16   A.  Yeah.

17   Q.  Federal Express?

18   A.  Yeah.

19   Q.  You got a Federal Express envelope from a law firm name

20   Paul Hastings.  You took the envelope and you threw it in the

21   garbage.  You did not even open the Federal Express envelope?

22   A.  Yes.

23   Q.  You never opened the envelope itself?

24   A.  Yes.

25   Q.  Federal Express ask you to sign for receipt, correct?

 1   A.  Yes.

 2   Q.  Did you sign the receipt?

 3   A.  Yes.

 4   Q.  So you knew that you got the document -- I'll take that

 5   back.

 6           Paul Hastings you testified is a law firm, right?

 7   A.  Yeah.

 8   Q.  And you did not at all -- you were not at all curious why a

 9   law firm was reaching out to you?

10   A.  Sorry.

11   Q.  I'll take that back.  Now, there came a time, did you not,

12   that you knew you were subpoenaed by the trustee, correct?

13   A.  Yes.

14   Q.  And you knew the name of the trustee, correct?

15   A.  Yes.

16   Q.  And you knew how to get in touch with the trustee, correct?

17   A.  Yes.

18   Q.  How did you find out the name of the trustee?

19   A.  Miles Guo broadcast.

20   Q.  So --

21   A.  On broadcast Miles Guo says the trustee is a Luc Despins,

22   and his program explain the bankruptcy case in the broadcast.

23   Q.  So in the broadcast Miles Guo told you that there was a

24   trustee at Paul Hastings, correct?

25   A.  Yes, and he also ask the translation task to translate this

O67BGUO1                        Ya Li- Cross

1   legal document for him.

2   Q.  And so you knew what the legal document was, correct?

3   A.  Yes.

4   Q.  So you knew it was a subpoena, correct?

5   A.  Yes.

6   Q.  And you knew that's a legal document, correct?

7   A.  Yes.

8   Q.  And you know that if a legal document is issued by someone

9   who is from the CCP, it still remains a legal document,

10  correct?

11          MR. FERGENSON:  Objection, your Honor.  She's

12  testifying.

13  A.  Miles Guo told us.

14          THE COURT:  Overruled.

15  A.  Miles Guo told us to throw away.

16          THE COURT:  Very compound question there, so if you'll

17  just take it in bites.

18  Q.  You testified on direct yesterday, right --

19  A.  Yes.

20  Q.  -- that even if you're targeted by the CCP, you cannot

21  scam.  That was your testimony, right?

22  A.  Yes.

23  Q.  So even if you're sent a subpoena by CCP, you cannot avoid

24  it, correct?

25  A.  That time Miles Guo said throw it away.  That time I

O67BGUO1                    Ya Li- Cross

1  totally trust him so I throw it away.

2  Q.  Okay.  So you totally trusted him and you threw it away,

3  correct?

4  A.  Yes.

5  Q.  So there was a time when you thought you could just ignore

6  all legal documents because Mr. Guo told you?

7  A.  Yes.

8  Q.  Anything he told you, you would do, correct?

9  A.  Yes.

10  Q.  Anything?

11  A.  Yes.

12  Q.  When Mr. Guo told you not to pay the person in your farm

13  for the G/Club membership, you didn't listen to him, correct?

14  You paid them that $10,000 back anyway, right?

15  A.  Yes.

16  Q.  So when you didn't want to listen to Miles Guo, you were

17  able to not listen to Miles Guo, correct?

18  A.  That's different.

19  Q.  No.  My question is, you didn't listen to Miles Guo,

20  correct?

21          MR. FERGENSON:  Your Honor, she can't just say no.

22  She has to ask a question.

23          MS. SHROFF:  I didn't ask if it was different.

24          MR. FERGENSON:  She can't argue with the witness.

25          THE COURT:  So you need to -- if a question calls for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO1                        Ya Li- Cross

1    a yes or no answer, you'll answer yes or no or I don't remember

2    or I don't understand.  You understand?  You don't add

3    additional information.

4                THE WITNESS:  Okay.

5                MR. FERGENSON:  Your Honor, some may be difficult to

6    answer yes or no.  It doesn't mean she can argue with the

7    witness.

8                THE COURT:  Yes, that's right.  There is some questions

9    that are difficult to answer yes or no.  And the witness is a

10   very intelligent individual who will be able to discern whether

11   she can answer yes or no.  Go ahead.

12   BY MS. SHROFF:

13   Q.  He also asked you to move to Abu Dhabi, correct?

14   A.  Sorry.

15   Q.  Miles Guo asked you to move to Abu Dhabi, correct?

16   A.  Yes.

17   Q.  And you said no, correct?

18   A.  Wrong.

19   Q.  Did you move to Abu Dhabi?

20   A.  Because later he send someone else, not me.

21   Q.  Let's try the question again.  He asked you to move to Abu

22   Dhabi, correct?

23   A.  Yes.

24   Q.  You didn't go, correct?

25   A.  No.

O67BGUO1                         Ya Li- Cross

1    Q.  You said no, correct?

2    A.  Wrong.

3    Q.  And after you said no, he sent someone else, correct?

4    A.  I didn't say no.  I said I prepare to go, but finally he

5    send someone else instead of me.

6    Q.  You recall meeting with these prosecutors and discussing

7    this very topic.  You discussed this topic with the

8    prosecutors, correct?

9    A.  Yes.

10   Q.  And you told these prosecutors while you were meeting with

11   them, correct, that you never said yes or no to Mr. Guo about

12   going to Abu Dhabi, correct?

13   A.  No, I didn't say.

14   Q.  You then told these prosecutors that you didn't want to go

15   for family reasons, correct?

16   A.  No, I didn't say.

17   Q.  And that's why you didn't go, correct?

18   A.  No.

19           MS. SHROFF:  Just one second, your Honor, please.

20   Q.  Do you recall telling these prosecutors that in reality you

21   could not go to Abu Dhabi because you had family in Australia?

22           MR. FERGENSON:  Asked and answered, your Honor.

23           THE COURT:  Sustained.

24   Q.  You then told them, did you not, that you were asked to go

25   there permanently, and you said no?

O67BGUO1                        Ya Li- Cross

1                  THE COURT:  Sustained.

2    Q.  Now, according to you, Miles Guo's broadcast took you to

3    Paul Hastings, correct?

4                  MR. FERGENSON:  Objection to form.

5                  THE COURT:  What do you mean took you to?

6                  MS. SHROFF:  I'm happy to rephrase.  I was trying to

7    move along.

8    Q.  You found the trustee at Paul Hastings, correct?

9    A.  Not me, Miles Guo said.

10   Q.  Without Miles Guo, you would not know where that trustee

11   was, correct?

12   A.  Yes.

13   Q.  And so Miles Guo told you where the trustee was, correct?

14   A.  Yes.

15   Q.  And then you contacted the trustee all on your own,

16   correct?

17   A.  That's after I wake up.

18   Q.  Oh, yes.  You woke up, and then you went to the trustee,

19   right?

20   A.  Yes.

21   Q.  Right.  But the only reason you found the trustee is

22   because he told you where the trustee was, correct?

23                 MR. FERGENSON:  Asked and answered.

24                 THE COURT:  Sustained.

25                 MS. SHROFF:  I don't think there was ever an answer.

O67BGUO1                        Ya Li- Cross

1    Q.  You then contacted the trustee all on your own, correct?

2    A.  Yes.

3    Q.  You didn't tell Mr. Guo I'm going to contact the trustee,

4    right?

5    A.  Yes.

6    Q.  And then you talked to that trustee without anyone else

7    ever finding out, correct?

8              THE COURT:  How could she possibly testify as to what

9    others knew.  She can only testify as to what she knows.

10   Q.  Nobody from the Himalaya Alliance broadcasted that you were

11   talking to the trustee when you reached out to him, correct?

12   A.  I don't understand.  Sorry.

13   Q.  In August of 2023, you reached out to the trustee, correct?

14   A.  Yes.

15   Q.  You did not tell Miles Guo, correct?

16             MR. FERGENSON:  Your Honor, we've covered this.

17   A.  Yes.

18   Q.  You didn't tell Long Island David you were reaching out to

19   the trustee, right?

20   A.  Yes.

21   Q.  You told Long Island David?

22   A.  I couldn't tell anyone Alliance.

23   Q.  Exactly.  You told no one, right?

24   A.  Yeah.

25   Q.  And you started talking to the trustee in August of 2023,

O67BGUO1                        Ya Li- Cross

```
 1    correct?
 2    A.   I don't remember.
 3    Q.   Now, you testified yesterday about social media, correct?
 4    A.   Which social media?
 5    Q.   You testified about Mr. Guo's YouTube account, correct?
 6    A.   Yes.
 7    Q.   You testified specifically that YouTube had suspended his
 8    broadcast ability, correct?
 9    A.   Yes.
10    Q.   And because they had suspended his broadcast ability, he
11    couldn't broadcast, correct?
12    A.   He started broadcast other platform.
13    Q.   Right.  That was correct was GTV, right?
14    A.   No.
15    Q.   Which other platform?
16    A.   Twitter, Instagram, Live Stream and then Go Media.
17    Q.   And because of the issues he was having with broadcast, he
18    thought of creating GTV; is that correct?
19              MR. FERGENSON:  Objection.
20              THE COURT:  She can't testify as to what another
21    person was thinking.
22    Q.   He told you what he was thinking, right, on the broadcast?
23              MR. FERGENSON:  He told her something.  I don't know
24    if she can get inside of his head, your Honor.
25              THE COURT:  Overruled.  You can answer.  Did he say
```

O67BGUO1                      Ya Li- Cross

1   what he was thinking on the broadcast.

2   A.  He said he want to establish a media platform.

3   Q.  If you use that mic we will all be able to hear you,

4   please.

5   A.  He said he's going to establish a media platform like

6   YouTube, Twitter.

7   Q.  He said he wanted to establish a media platform?

8   A.  He will.

9   Q.  Okay.  And he told everyone in the broadcast that it would

10  take time to build this platform, correct?

11  A.  I don't remember.

12  Q.  And he told you that the platform would have to be, not

13  you, told people in the broadcast that the platform would have

14  to be such that it would not be vulnerable to disruption

15  attempts by the CCP, correct?

16          MR. FERGENSON:  I just object on hearsay grounds, your

17  Honor.

18          THE COURT:  Overruled.  You may answer.

19  A.  Can you repeat again.  Sorry.

20  Q.  In April of 2020 is when you first heard of GTV, correct?

21  A.  Yes.

22  Q.  Mr. Guo announced it in a broadcast, correct?

23  A.  Yes.

24  Q.  He announced he wanted to make or setup a platform to

25  broadcast, correct?

O67BGUO1                        Ya Li- Cross

1   A.   No, April he said it's going to a private placement for

2   GTV.   That time GTV already existing.

3   Q.   And he said he wanted it to be just like Twitter or

4   Facebook, correct?

5   A.   Yeah.

6   Q.   And he told everyone on the broadcast that that was because

7   YouTube had suspended his abilities, correct?

8   A.   I don't remember.

9   Q.   And he said, did he not, that he was going to have a

10  platform that had no censorship, correct?

11              MR. FERGENSON:   Objection, your Honor.   We're getting

12  into offered for its truth.

13              THE COURT:   If you'll step up, please.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O67BGUO1                        Ya Li- Cross

```
 1                 (At the sidebar)
 2                 MS. SHROFF:  Your Honor, I'm pretty sure this
 3      transcript is in evidence.  They put it in.
 4                 THE COURT:  So you're objecting on hearsay grounds?
 5                 MR. FERGENSON:  Yes.
 6                 MS. SHROFF:  Off a transcript that's in evidence.
 7                 MR. FERGENSON:  You want to go through the transcript,
 8      that's fine.
 9                 MS. SHROFF:  We'll be here all day.
10                 MR. FERGENSON:  And we certainly don't want that.  We
11      are just concern about expanding the state of mind purpose for
12      these sorts of questions into, He said this.  He said that.
13      They're testifying on cross.  There's some discretion.
14                 MR. KAMARAJU:  Your Honor, they introduced the
15      transcript without requesting any limine instruction.
16                 MR. FERGENSON:  That's because we're allowed to do
17      that.
18                 MR. KAMARAJU:  Once you put it in, we're allowed to
19      reference it.
20                 MR. FINKEL:  Which transcript is it?
21                 MR. KAMARAJU:  Transcript of April 2020.
22                 MS. SHROFF:  You want us to go through the whole
23      transcript?  We're happy to read it out loud, the whole thing.
24                 MR. FERGENSON:  We're interested in an efficient
25      examination.  I don't want to keep this sidebar longer.
```

O67BGUO1                        Ya Li- Cross

1    There's a line at some point about things Guo said continuing

2    to come in this way.

3            MR. KAMARAJU:  I'm trying to understand the objection.

4    We are not allowed to refer to a part of the transcript that

5    you already put into evidence?

6            MR. FINKEL:  Not unless you use your client's

7    statements to testify as though he were speaking.  If you want

8    to offer statements for his state of mind.  The state of mind

9    exception is I feel scared.  I feel this.

10           MS. SHROFF:  It's in evidence.  I can have her read

11   the entire transcript.

12           MR. FINKEL:  Please don't yell at me.

13           MS. SHROFF:  That's the federal rule of evidence.

14           THE COURT:  Here's my ruling.  Mr. Guo needs the

15   opportunity to assert a defense, and these statements will come

16   in, in the words of a brilliant jurist, for what they're worth.

17           (Continued on next page)

18

19

20

21

22

23

24

25

O67BGUO1                          Ya Li- Cross

 1                  (In open court)

 2                  THE COURT:  You may continue.

 3     BY MS. SHROFF:

 4     Q.  You testified, correct, Ms. Li, on direct examination that

 5     Mr. Guo, according to you, talked about Israeli technology to

 6     create this platform, remember that?

 7     A.  Yes.

 8     Q.  And when you were, as you say, working for Miles Guo, you

 9     helped him find such IT experts, correct?

10     A.  Not this Israel technology.  That's all from supporters.

11     Q.  But you helped place advertisements for IT experience

12     people, correct?

13     A.  Yes.

14     Q.  And you knew that he was looking to find engineers to build

15     this platform, correct?

16     A.  Yes.

17     Q.  You knew he was interviewing people to build this platform,

18     correct?

19     A.  Yes.

20     Q.  And you knew he wanted to find the most qualified people to

21     build this platform, correct?

22     A.  I don't know.

23     Q.  You placed the advertisements, correct?

24     A.  Yes.

25     Q.  And you were hoping that good candidates would apply to the

O67BGUO1                       Ya Li- Cross

1    job description, correct?

2    A.  Yes.  The jobs, all the resume, I send it to --

3    Q.  I'm sorry. There's no question.

4    A.  All the resume --

5           THE COURT:  There's no question before you.

6    Q.  You wanted me to know all the resumes you got you sent to

7    Miles Guo?

8    A.  Yeah.

9    Q.  Okay.  How many resumes did you get?

10   A.  Many.

11   Q.  Many, right, because it was a real job posting, right?

12   A.  Yes.

13   Q.  And he reviewed all those resumes, right?

14   A.  I don't know.

15   Q.  Now, you also testified on direct that you wanted to invest

16   in GTV, correct?

17   A.  Yes.

18   Q.  And you wanted to invest, but your investment was part of

19   the pool, correct?

20   A.  Yes.

21   Q.  And your investment was with other people.  How many other

22   people, do you recall?

23   A.  About five.

24   Q.  Five of them, right?

25   A.  Mm hm.

O67BGUO1                         Ya Li- Cross

1   Q.  Was that five plus you, or four plus one that made five
2   including you?
3   A.  Five plus me.
4   Q.  And you put the investment in your name; is that right?
5   A.  Yes.
6   Q.  Your name, your personal name, right?
7   A.  Yes.
8   Q.  Even though it was pooled, you decided to put it in your
9   name?
10  A.  Everyone decide.
11  Q.  Oh, everyone decided to put it in your name?
12  A.  Yes.
13  Q.  Okay.  And you did that because you've testified several
14  times yesterday because you trusted Miles Guo, correct?
15          MR. FERGENSON:  Objection to characterizing what she
16  said.
17          THE COURT:  Overruled.  You may answer.
18  A.  Yes.
19  Q.  When you met with these prosecutors, you told them you were
20  a cautious investor, correct?
21  A.  Yes.
22  Q.  And you told them that you thought that this platform would
23  really work when they took down the CCP, correct?
24  A.  That Miles Guo said so, I believed.
25  Q.  So you believed that the platform would be most successful

1    after the CCP was taken down, correct?

2    A.  Yes.

3    Q.  And Miles Guo believed that too, correct?

4            MR. FERGENSON:  Objection.

5            THE COURT:  So she can't testify as to what he was

6    thinking or believing.  Sustained.

7    Q.  Let me show you what is marked in evidence, and maybe I'll

8    just pull up the transcript rather than the video, is GX26-T.

9    You remember this document, ma'am?

10   A.  Yes.

11   Q.  And not this translation, but you and your translator

12   volunteers translated the video underlying this exhibit,

13   correct?

14   A.  I don't remember.

15   Q.  Well, let's see at page two where it says, Please carefully

16   read.  You see that language?

17   A.  Yes.

18   Q.  And what does it say, ma'am?

19   A.  Please carefully read through all the documents to be

20   signed for investment.

21   Q.  That's what Miles Guo said in the broadcast, correct?

22   A.  No, in the private video.

23   Q.  In the private video?

24   A.  Yes.

25   Q.  But you did everything Miles Guo ever asked you to do,

O67BGUO1                         Ya Li- Cross

1    correct?

2    A.  Yes.

3    Q.  And he asked you to please carefully read through all the

4    documents, correct?

5    A.  Yes.

6    Q.  You can take that down. Now let's look at Government

7    Exhibit K5.  You recognize this document, Ms. Li?

8    A.  Yes.

9            MS. SHROFF:  May I have the jury see it, please.

10   Q.  If we could see the Use of Proceed Chart.

11           You were shown this particular page by Mr. Fergenson

12   here, correct?

13   A.  Yes.

14   Q.  And you were asked questions, were you not, if this chart

15   indicated that GTV money would go into a hedge fund, correct?

16   A.  Yes.

17   Q.  And you said it did not, correct?

18   A.  Yes.

19   Q.  You received this document, correct?

20   A.  Yes.

21   Q.  You never read it, correct?

22   A.  Yes.

23   Q.  So no matter what it said --

24   A.  At that time I didn't, yeah.

25   Q.  You never read it at that time, correct?

1    A.  Yeah.

2    Q.  You invested without reading it, correct?

3    A.  Yes.

4    Q.  And that's because Miles Guo said so, right?

5         THE COURT:  Are you asking whether Miles Guo said that

6    she should invest without reading it?

7         MS. SHROFF:  I take that back, your Honor.  I withdraw

8    the question.

9    Q.  You never read this document when you invested, right?

10   A.  Yes.

11   Q.  So if this document had said hundred percent of this money

12   is going to go to the hedge fund, you would not know, correct?

13   A.  Yes.

14   Q.  Because you never read it?

15   A.  Yes.

16   Q.  Let's show you Government Exhibit 165 -- 65 I think.

17   Sorry.  65. You testified about this document, right?

18   A.  Yes.

19   Q.  Is it your testimony, ma'am, that you never read this

20   document either?

21   A.  Before I sign I didn't.

22   Q.  I can't hear you.

23   A.  Before sign, I didn't.

24   Q.  Before signing it, you didn't read it?

25   A.  Yeah.

O67BGUO1                         Ya Li- Cross

1    Q.  Let's just look at the top.  This page that's before you.

2    A.  Yeah.

3    Q.  You see some of it is in red?

4    A.  Yes.

5    Q.  Do you know what that is?

6    A.  That's some update.

7    Q.  So it's a track change in this document, right?

8    A.  Sorry.

9    Q.  It shows you the changes, correct?

10   A.  Yes.

11   Q.  And if I could go to the next page.  You see on the top

12   there is again a thing over there?

13   A.  Yeah.

14   Q.  What does that mean to you?

15   A.  There's some changes.

16   Q.  So when you're looking at this document because there are

17   changes there, you know it's a draft, correct?

18   A.  It's not draft.

19   Q.  It's not a draft?

20   A.  No.

21   Q.  So these changes that are highlighted in track does not

22   tell you it's a draft?

23   A.  No.  This is the version I signed.

24   Q.  I didn't ask you if you signed it.  It's possible to sign a

25   draft version, right?

1  A.  No.

2  Q.  You said you never looked at anything, correct?

3          MR. FERGENSON:  Objection.  That's not what she said.

4  Q.  You never read anything, right?

5  A.  Yes.

6  Q.  So you wouldn't know if it's a draft?

7  A.  But this we been told to sign, to sign it.

8  Q.  I'm not following.  Somebody told you to sign a draft?

9          MR. FERGENSON:  Objection.

10  A.  I don't know if it's draft or not, but to me it's a final

11  because they ask me to sign it?

12  Q.  Who's they?

13  A.  The Alliance.

14  Q.  The Alliance asked you to sign it?

15  A.  Yes.

16  Q.  How many people are in the Alliance?

17  A.  I don't know.

18  Q.  So how many people called you to tell you to sign this?

19  A.  There's a customer service team for this new GTV platform.

20  Q.  But the customer service team is there to shoot down

21  customer related problems, right?

22  A.  No, they send contract to us, email to us.

23  Q.  Right. They sent you an email, correct?

24  A.  Yeah.

25  Q.  Just like Netflix sends you an email.  You can open it or

O67BGUO1                          Ya Li- Cross

 1   disregard it, right?

 2            MR. FERGENSON:  Objection.

 3   A.  No.

 4            THE COURT:  Overruled.

 5   Q.  No?  If they send you an email, you have to open it?

 6   A.  Yeah, because we been told that's the new GTV contract.  We

 7   need to sign.

 8   Q.  But there is no email that says you need to sign, correct?

 9            Ms. Li, let me try it this way.  You downloaded your

10   emails and gave them to the prosecutor, some of them, correct?

11   A.  Yes.

12   Q.  You gave them many, many documents, correct?

13   A.  Yeah.

14   Q.  And you never gave them any document from the Alliance

15   telling you that you must sign this document, correct?

16            Let's go to the bottom of the document shall we.  Did

17   they tell you that you must sign this electronically or that

18   you must sign it by printing it out and hand signing it?

19   A.  Both, you need signature and print your name.

20   Q.  That's not my question.

21   A.  So please repeat your question.

22   Q.  You said you had to sign it, correct?

23   A.  Yes.

24   Q.  The Alliance told you, you must sign it, correct?

25   A.  Yes.

O67BGUO1                        Ya Li- Cross

1  Q.  There's no email from the Alliance saying you must sign it,

2  correct?

3  A.  In Miles Guo broadcast he said there's new GTV to replace

4  the old GTV, so everyone need to sign if you invest the old

5  GTV.

6         MS. SHROFF:  Your Honor, that's non-responsive and

7  move to strike.

8         THE COURT:  Overruled.  You may continue.

9  Q.  So now it's no longer the Alliance.  It's Miles Guo's

10 broadcast?

11 A.  Alliance listen to Miles Guo's direction.

12 Q.  But before you told me that it was the Alliance who told

13 you, you must sign?

14 A.  Yes.

15 Q.  So who from the Alliance told you that?

16        MR. FERGENSON:  We've been over this, your Honor.

17        MS. SHROFF:  I'll move on.

18 Q.  Can I go back to the top of the document.  This is the

19 document where you testified on direct, correct, that Mr. He

20 was identified as a director, correct?

21 A.  Who?  Sorry.

22        MR. FERGENSON:  Misstating the testimony, your Honor.

23        THE COURT:  Sustained.

24 Q.  Was Mr. He identified as a director in this document?

25 A.  Sorry, who?

O67BGUO1                      Ya Li- Cross

1  Q.  He.

2  A.  He.?

3  Q.  H-O-A-R-A-N.  Was he identified as a director in this

4  document?

5  A.  Not in this document.

6  Q.  Right.  So let me show you what is also in evidence as

7  GXVI-34 and 35.  Let's put them up side-by-side if we can for

8  the jury.

9         Ms. Li, you testified about both these documents in

10  your direct testimony with Mr. Fergenson, correct?

11  A.  Yes.

12  Q.  Before you testified about these two documents, you and

13  Mr. Fergenson reviewed them with each other, correct?

14  A.  Yes.

15  Q.  When he was preparing you for testimony, correct?

16  A.  Yes.

17  Q.  And the document on the left, right, that says 34 at the

18  bottom, you see that is the email to which document 135 was

19  attached, correct?

20  A.  Which one?

21  Q.  I cannot hear you.

22  A.  Which part?  Which part are you talking about?

23  Q.  Which part am I talking about?  On the left is the email

24  that you received, right?

25  A.  Yes.

O67BGUO1                          Ya Li- Cross

1  Q.  And in that email chain the document on the right was

2  attached, correct, it was an attachment to the email, right?

3  A.  Yes.

4  Q.  And you received that email, right?

5  A.  Yes.

6  Q.  And we know that because the email address shows L-A-N,

7  M-U, which is the beginning of your online name Mulan, correct?

8  A.  Yes.

9  Q.  And this document is from a lawyer, correct?

10  A.  Yes.

11  Q.  And you can tell that because at the bottom it says it is

12  from a lawyer, right?

13  A.  Yes.

14  Q.  So if we can just scroll down and make sure that -- you got

15  this email from a lawyer, right?

16  A.  Yes.

17  Q.  And the document that was attached is to your right,

18  correct?

19       So if we could just take a look at the attachment that

20  you received is on your right, correct?

21  A.  Yes.

22  Q.  And you received it cause you opened this email, correct?

23  A.  Yes.

24  Q.  And the document that you looked at, right, which is 35 in

25  evidence, right --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO1                           Ya Li- Cross

1    A.  Yes.

2    Q.  -- is the resolution for FMV identifying Haoran as the sole

3    director, correct?

4    A.  Yes.

5    Q.  So let's see.  You got the email.  You opened the

6    attachment, correct?

7    A.  Yes.

8    Q.  And then let's scroll down on the right-hand side, all the

9    way down, just the whole document on 35.  See, it says right

10   there right, who's the sole director, Haoran He, Correct?

11   A.  Haoran.

12   Q.  It's there, right?

13   A.  Yes.

14   Q.  What's his title?

15   A.  Sole director.

16   Q.  And you got the attachment, right?

17   A.  Yes.

18   Q.  Now, are you saying that you never looked at this

19   attachment either because Miles Guo told you not to or did you

20   look at this attachment?

21   A.  I look at it because this lawyer ask me to sign.

22   Q.  So you read it, right?

23   A.  Yes.

24   Q.  When you read it, you knew who the sole director was,

25   right?

O67BGUO1                        Ya Li- Cross

1    A.  Yes.

2    Q.  Who's he the sole director of?  FMV, right?

3    A.  Yes.

4    Q.  This document is sent to you in September of 2022,

5    September 10, correct?

6    A.  Yes.

7    Q.  And that is seven months after the FMV confidential

8    offering memo the government showed you, correct?

9    A.  I don't remember.

10   Q.  You may take that down.  Thank you.  Could I have

11   Government Exhibit 135, please.

12          MR. FERGENSON:  Is this VI-135?  I'm not sure what

13   135.

14   Q.  You see this document, ma'am?

15   A.  Yes.

16   Q.  And you see the section where it says, Is hereby resolved

17   that?

18   A.  Yes.

19   Q.  Could we just highlight it for her.  This document resolved

20   one person being removed as the company's authorized

21   representative, correct?

22   A.  Yes.

23   Q.  And then another person is substituted in, correct?

24   A.  Yes.

25   Q.  Who is that?  Tian Hao, who is that?

O67BGUO1                          Ya Li- Cross

1   A.   Hao Tian is one of Miles Guo's supporter.

2   Q.   Is it a he or she?

3   A.   She.

4   Q.   Where does she work, do you know?

5   A.   In New York.

6   Q.   Did you work with her, ma'am?

7   A.   No.

8   Q.   Did you interact with her at all?

9   A.   Yes.

10  Q.   And you and she didn't get along either, correct?

11  A.   No, we get along.

12  Q.   You got along with her?  Let me show what is marked as

13  6051.

14  A.   Yes.

15  Q.   Who is that?

16  A.   Hao Tian.

17  Q.   And your testimony is you got along with her, correct?

18  A.   Yes.

19  Q.   And she was put in as the representative, correct?

20  A.   Sorry.

21  Q.   The document that I just showed you noticed her as the

22  representative, correct?

23  A.   Yes.

24  Q.   And did you read that document?

25  A.   I just try to find where I sign, where is my name I could

O67BGUO1                         Ya Li- Cross

1   sign.

2   Q.  Your name wasn't there, right?

3   A.  Yeah.

4   Q.  And you didn't sign that document, right?

5   A.  Yes.

6   Q.  But you read it, right?

7   A.  Yes.

8   Q.  We can take that down.  Let me move forward and talk to you

9   about G Fashion, okay?

10  A.  Okay.

11  Q.  G Fashion has a current website in 2024, correct?

12  A.  Yes.

13  Q.  And you've checked it, right, in 2024?

14  A.  Yes.

15  Q.  You still check the G Fashion website, right?

16  A.  Now I don't.

17  Q.  So sometime in 2024 you checked, but now you don't?

18  A.  Yeah.

19  Q.  And you knew that G Fashion at one point had an office in

20  Los Angeles, correct?

21  A.  Yes.

22  Q.  And from Los Angeles they moved to New York, correct?

23  A.  Yes.

24  Q.  And then from New York it moved to Milan, Italy, correct?

25  A.  Yes.

O67BGUO1                        Ya Li- Cross

1   Q.  And G Fashion is now run by Lei Ann Li who you testified

2   before, correct?

3   A.  Yes.

4   Q.  And it is still a functioning company now, correct?

5   A.  I don't know.

6   Q.  You don't know?

7   A.  I don't know.

8   Q.  When was the last time you looked at their website?

9        MR. FERGENSON:  Asked and answered.

10       THE COURT:  Sustained.

11  A.  I don't know.

12  Q.  Let me talk to you about NFSC okay?

13  A.  Yes.

14  Q.  You recall testifying on direct, did you not, that Mr. Guo

15  announced the NFSC, right?

16  A.  Yes.

17  Q.  And there were other people who were part of the

18  announcement, correct?

19  A.  Yes.

20  Q.  And you watched it, correct?

21  A.  Yes.

22  Q.  You were very excited about it, correct?

23  A.  Yes.

24  Q.  Because according to you back then you believed in Miles

25  Guo, correct?

O67BGUO1                      Ya Li- Cross

1    A.  Yes.

2    Q.  And you no longer do, right?

3    A.  Yeah.

4    Q.  And the announcement was made.  Mr. Bannon was there,

5    correct?

6    A.  Yes.

7    Q.  There was some gentleman named Dai Hong who was part of

8    announcement, correct?  Remember the soccer player from China?

9    A.  I don't know who you talking about.

10              I do apologize.  Apparently I bungled his name.  Let

11   me show you what is Defense Exhibit 6512.  You see that

12   photograph?

13   A.  Yes.

14   Q.  Who is that?

15   A.  Haidong.

16   Q.  And who is he?

17   A.  He's one of Miles Guo supporter and also use to be the

18   chairman of Rule of Law Foundation.

19   Q.  He was also a famous soccer player for China, correct?

20   A.  Yes.

21   Q.  Went to the olympics for China, correct?

22   A.  I don't know.

23              MS. SHROFF:  Your Honor, I move that into evidence,

24   please.

25              THE COURT:  No objection?

O67BGUO1                        Ya Li- Cross

1          MR. FERGENSON:  No objection.

2          THE COURT:  It is admitted.

3          (Defendant's Exhibit 6512 received in evidence)

4   BY MS. SHROFF:

5   Q.  He was apart of the announcement as well, right?

6   A.  No, he just read the statement.

7   Q.  Could I have it published to the jury, please.

8          He read a statement in support of NFSC, correct?

9   A.  Sorry.

10  Q.  He made a statement on June 4 in support of the NFSC,

11  correct?

12  A.  Not that he made.  He just read out the statement.

13  Q.  Tell me what is the difference?

14  A.  It's not he produce this statement.  He just read it.

15  Q.  How do you know he didn't produce it?

16  A.  Because I know we prepared, our group member prepared.

17  Q.  Your movement, your movement prepared his statement?

18  A.  Yeah.  So other supporter write up this statement, and we

19  prepare and send it to him copy.  On that day June 4th, he read

20  out.

21  Q.  Right.  And he made his changes, and then he read out the

22  statement?

23  A.  No changes.

24          MR. FERGENSON:  Objection to form.

25          THE COURT:  Overruled.

O67BGUO1                    Ya Li- Cross

1    Q.  And he now lives where, in Spain, correct?

2    A.  Yes.

3    Q.  And he's still a Miles Guo supporter, right?

4    A.  Yes.

5    Q.  And he spoke in support of the NFSC, correct?

6              THE COURT:  Sustained.

7              MS. SHROFF:  I'll move on, your Honor.  You can take

8    it down.  Thank you.

9    Q.  Now, the NFSC, Ms. Li, was the concept for a new type of

10   government in China; is that fair to say?

11   A.  Please say it again.

12   Q.  The NFSC was a concept for a new type of government in

13   China, correct?

14   A.  At that time I think it is.  At that time I think it is.

15   Q.  So according to you today the New Federal State of China is

16   not a concept anymore, correct?

17   A.  Yes.

18   Q.  It's not a concept?

19   A.  It's a scam.

20   Q.  It's a scam according to you, correct?

21   A.  Yeah.

22   Q.  So if anyone believes that there could be a New Federal

23   State of China is being scammed, correct?

24             MR. FERGENSON:  Objection.

25             THE COURT:  Sustained.

1    Q.  The New Federal State of China as a concept promoted

2    democracy in China, correct, that was the goal, right?

3    A.  We thought.

4    Q.  No.  You thought.  You can't speak for other people's

5    thinking, correct?

6    A.  I thought at that time.

7    Q.  You thought.  Right.  You don't know what any of these

8    people here are thinking, correct?

9          MR. FERGENSON:  Excuse me, your Honor.  Can she answer

10   the question.

11         THE COURT:  Counsel, we're directing the questions

12   toward her, not toward the gallery.

13   Q.  I'm asking her.  You don't know what anybody else thinks

14   about the New Federal State of China, only what you think,

15   correct?

16   A.  All his supporters think the same, think this way.

17   Q.  What way?  Your way or his way?

18   A.  What Miles Guo said about New Federal State of China.

19   Q.  Right.  But you can only testify to what you are thinking?

20   A.  At that time I believed him.

21   Q.  Ma'am, you've said that many, many times.

22         MR. FERGENSON:  Your Honor, objection to the

23   commentary.

24         THE COURT:  Don't testify.

25   Q.  Ms. Li, do you know what everybody else thinks of the New

O67BGUO1                        Ya Li- Cross

1    Federal State of China?

2              MR. FERGENSON:  Can we move on, your Honor.

3              THE COURT:  Everybody else.  Who are you referring to?

4    Q.  Ms. Li, you can only speak to your opinion of the New

5    Federal State of China and not the opinion of other people,

6    correct?

7              MR. FERGENSON:  Objection.  We've covered this.  Asked

8    and answered.

9              THE COURT:  Asked and answered.  Sustained.

10   Q.  You joined a farm, correct?

11   A.  I think miles Guo picked up as a farm leader.

12   Q.  I really cannot hear you, ma'am.

13   A.  Miles Guo pick me up to be a farm leader.

14   Q.  Right.  But before he picked you up to be a farm leader,

15   you were part of a farm, correct?

16   A.  No.

17   Q.  You were not part of the translator group farm?

18   A.  That's not a farm.

19   Q.  It's just a group?

20   A.  Yes.

21   Q.  So Miles Guo told you to go be a farm leader even if you

22   were not part of the farm.  That's your testimony?

23   A.  Yeah.

24   Q.  And which farm was that?

25   A.  Australian farm.

O67BGUO1                    Ya Li- Cross

1    Q.  Which Australia farm, the Himalaya Australia farm?

2    A.  Yeah.

3    Q.  And you joined that farm, correct, 2020, you recall?

4    A.  Yeah.

5    Q.  And that farm is based in Sydney; is that right?

6    A.  Yeah.

7    Q.  And you left that farm, correct?

8    A.  Yes.

9    Q.  You left that farm to form your own farm, correct?

10   A.  Yes.

11   Q.  You wanted to form your own farm, right?

12   A.  Sorry.

13   Q.  You wanted to form your own farm, correct?

14   A.  No, miles Guo ask me.

15   Q.  Miles Guo asked you to go open up a whole new farm in

16   Sydney, Australia?

17   A.  Yes.

18   Q.  And you did exactly what Miles Guo said.  You opened up a

19   farm, correct?

20   A.  Yes.

21   Q.  And that farm was called the Athena farm, correct?

22   A.  Yes.

23   Q.  And according to you, I'm sure it was Miles Guo who told

24   you to call it the Athena farm, correct?

25              MR. FERGENSON:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO1                          Ya Li- Cross

1                    THE COURT:  Sustained.  Just ask her questions.

2    Q.  Who picked the name?

3    A.  I picked the name and approved by Miles Guo.

4    Q.  So you picked the name.  He approved it, correct?

5    A.  Yes.

6    Q.  And according to you, am I correct, that if he had not

7    liked the name, you would have changed the name, correct?

8    A.  Yes.

9    Q.  And this was in February of 2021, right?

10   A.  I don't remember.

11   Q.  You don't remember when you formed your own farm?

12   A.  In 2021.

13   Q.  A follower could join your farm, correct, if he wanted?

14   A.  Yes.

15   Q.  They could leave your farm if they wanted, right?

16   A.  Yes.

17   Q.  They could go from your farm to a different farm, correct?

18   A.  Yes.

19   Q.  People were allowed to move around, correct?

20   A.  Yes.

21   Q.  You didn't stop them, right?

22   A.  Stop what?

23   Q.  You didn't stop followers from leaving your farm, correct?

24   A.  Yes.

25   Q.  Yes you stopped them or you allowed them to?

1    A.  I don't stop them.

2    Q.  You did not stop them, right?

3    A.  Yeah.

4    Q.  Now, you testified about the translator group.  You were

5    supervising about a hundred people at one point, correct?

6    A.  Yes.

7    Q.  And of these hundred people, when they wanted to leave you

8    or your group, they could also leave; is that correct?

9    A.  Yes.

10   Q.  And you didn't stop them either, right?

11   A.  Yes.

12   Q.  Because they were all volunteers?

13   A.  Yes.

14   Q.  And you testified at some point yesterday about something

15   called the black list, correct?

16   A.  Yes.

17   Q.  And you testified that you were on a black list if you

18   criticized Miles Guo, right?

19   A.  Sorry.

20   Q.  You testified on direct that if you dear to criticize Miles

21   Guo, you would be put on a black list, correct?

22   A.  Miles Guo will tell us who go to the black list.

23   Q.  Miles Guo authorized who was put on the black list?

24   A.  Yes.

25   Q.  And he circulated this black list to you, right?  How many

O67BGUO1                        Ya Li- Cross

1    people were on this black list?

2    A.  I don't know.

3    Q.  Ten people, 30 people, hundred people?

4    A.  More than ten.

5    Q.  Less than hundred?

6    A.  I don't remember.

7    Q.  There was no black list that was ever circulated, correct?

8    A.  It's on the Gettr.

9    Q.  It's on Gettr posted, right?

10   A.  Yes.

11   Q.  But that's not a black list, that's the name you are using,

12   right?

13   A.  No, that's black list account.

14   Q.  It's a black list account?

15   A.  Yeah, everyone can see it.  It's public.

16   Q.  That account, anyone can put in a name, correct?

17           Anyone can put a name onto that black list, correct?

18   A.  No.

19   Q.  No?

20   A.  Only approved by Miles Guo.

21   Q.  I didn't ask you if it was approved by Miles Guo, ma'am.  I

22   asked you if anyone could put in a name on that list?

23           MR. FERGENSON:  Objection to the commentary.

24           THE COURT:  Are you asking whether anyone could add a

25   name to the list?

O67BGUO1                        Ya Li- Cross

1              MS. SHROFF:  Yes.

2              THE COURT:  You can answer that question.

3    A.  No, not anyone.

4    Q.  Not anyone?

5    A.  Yeah.

6    Q.  Your testimony is only Miles Guo runs that Gettr account to

7    add the name?

8              MR. FERGENSON:  Asked and answered.

9              THE COURT:  Overruled.

10   A.  Can you say it again.

11   Q.  Your testimony is that only Miles Guo can add a name onto

12   the black list on the Gettr account; is that your testimony?

13   A.  Approved by Miles Guo.

14   Q.  Ma'am, you understand the difference between doing

15   something and someone approving something, two different

16   things, right?

17   A.  Alliance will add.

18   Q.  My question is, other people were allowed to and did put in

19   names on any list on Gettr, correct?

20   A.  Alliance has people in charge.  There's the people in

21   charge --

22   Q.  Right.

23   A.  -- this black list.

24   Q.  And it's not just Miles Guo, correct?

25             MR. FERGENSON:  She can't finish her answer, your

1    Honor.

2              MS. SHROFF:  I can't hear her, frankly.  I don't know

3    when she's finished.

4              THE COURT:  If you'll speak up, please.

5    A.  People in alliance who in charge of black list will post on

6    this Gettr account.

7    Q.  Gettr is like Twitter, correct?

8    A.  Yes.

9    Q.  People would post, correct, just like on Twitter, correct?

10   A.  Yes.

11   Q.  And people would respond, correct?

12   A.  Yes.

13   Q.  You did not get any actual list of a black list from Miles

14   Guo, correct?

15             In your Whatsapp messages group, Miles Guo never sent

16   you a list and said, this is my black list set of people,

17   correct?

18   A.  He would say --

19   Q.  Listen to the question.

20   A.  He would say put this person into that black list.

21   Q.  My question to you was -- and let me try again -- Mr. Guo

22   never sent you a list saying these are the names on my black

23   list, correct?

24             MR. FERGENSON:  She's answered the question, your

25   Honor.

O67BGUO1                         Ya Li- Cross

```
 1              THE COURT:  You may answer.
 2   A.  Please say it again.
 3   Q.  All right.  Let's try it again.  He sent you many documents
 4   on the Whatsapp group, correct?
 5   A.  Yes.
 6   Q.  He sent you document to translate, correct?
 7   A.  Yes.
 8   Q.  Documents to read, correct?
 9   A.  Yes.
10   Q.  He never sent you a document called the black list,
11   correct?
12   A.  He sent a name of this black list.
13   Q.  Just one name?
14   A.  Not just one.  Anyone he think should go to black list, he
15   sent their name.
16   Q.  Okay.  So on a given day he would say this person should be
17   on a black list because he criticized the Alliance; is that
18   what you're saying?
19   A.  Yeah.
20   Q.  But he never sent you a list, right?
21   A.  Yeah.
22   Q.  No, right?
23   A.  No.
24   Q.  Okay.  That's all I was asking.  You also testified on
25   direct about protests, correct?
```

O67BGUO1                         Ya Li- Cross

1   A.  Yes.

2   Q.  And you testified that you did not personally participate

3   in any protest yourself, correct?

4   A.  Yes.

5   Q.  You never went, right?

6   A.  Yes.

7   Q.  You never went because you never wanted anybody to know

8   your face, correct?

9              Yes or no?

10  A.  No.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O671GUO2                          Ya Li - Cross

1   BY MS. SHROFF:

2   Q.   The protests that you were asked about yesterday, they

3   occurred in the United States, correct?

4   A.   Sorry?  Which protest you refer to?

5   Q.   The protests you testified about, ma'am, just yesterday.

6   Do you remember that?

7   A.   There's many we mentioned.

8   Q.   There were many protests mentioned yesterday?

9   A.   Yeah.

10  Q.   Okay.  Let's start with the protest they showed you the

11  photo about, okay?  I will pull up the photo for you.

12          MS. SHROFF:  Can we show her the exhibit, please.

13          I'll start anyway.

14  Q.   You talked about two protests yesterday, correct?  You

15  remember that, or no?

16  A.   No, more than two.  Many.

17  Q.   I'm sorry?

18  A.   Many, not——more than two.

19  Q.   You said there were many protests, correct?

20  A.   Yeah.

21  Q.   And then you talked specifically about two of them.  Do you

22  recall that?

23  A.   Which one?

24  Q.   You discussed in your direct testimony yesterday a protest

25  where people were smashing or punching each other in the face,

O671GUO2                          Ya Li - Cross

 1  correct?  You remember that?

 2  A.  Yes.

 3  Q.  Do you remember, you said somebody was punched in the eye,

 4  correct?

 5  A.  Yes.

 6  Q.  And then you testified on direct that Miles Guo said, "Good

 7  job," correct?

 8  A.  Yes.

 9  Q.  About the punch, correct?

10  A.  Yeah.

11  Q.  Okay.  And you were not at these protests, correct, because

12  you were in Australia, right?

13  A.  Yes.

14  Q.  And you were there along with your husband and daughter,

15  correct?

16  A.  No.  We were watching the broadcast.

17  Q.  Okay.  But you were watching the broadcast of that protest,

18  correct?

19  A.  Yes.

20  Q.  Okay.  And you followed that broadcast, correct?

21  A.  Yes.

22  Q.  Okay.  And you watched the protest as it was happening

23  live, correct?

24  A.  Yes.

25  Q.  Because you were part of the protest at that time, correct?

O671GUO2                    Ya Li - Cross

1   A.  I'm not part of that protest.

2   Q.  But you were watching it, right?

3   A.  Yeah.

4   Q.  And by watching it, you're supporting it, correct?

5   A.  Yes.

6   Q.  So you were part of the protest?  Is it fair to say, ma'am,

7   if you don't support something, you don't watch it?

8   A.  I watch it because it's Alliance broadcast.

9   Q.  But the Alliance is not watching what you're doing in your

10  home in Australia, right?

11          MR. FERGENSON:  Objection to relevance.

12          THE COURT:  Sustained.

13  Q.  Nobody's forcing you to watch the broadcast, right?  You're

14  in your home in Australia?

15          MR. FERGENSON:  Objection to form.

16          THE COURT:  Sustained.

17  Q.  Where were you watching the broadcast from?

18  A.  From Australia.

19  Q.  Where in Australia?

20          MR. FERGENSON:  Objection to the line of questioning

21  about where she lives, your Honor.

22          THE COURT:  We don't need the specifics about that.

23  Q.  Nobody's asking for an address, ma'am, just where.

24  A.  In Australia.

25          MR. FERGENSON:  Why is it relevant where in Australia,

O671GUO2                         Ya Li - Cross

1   your Honor?

2              THE COURT:  Were you in your home?

3              THE WITNESS:  I don't remember.

4   Q.  Okay.  But you remember watching the protest, right?

5   A.  Yeah.

6   Q.  And you watched the violence in the protest, correct?

7   A.  Yes.

8   Q.  And you continued to watch more protests even after seeing

9   the violence, correct?

10  A.  Yes.

11  Q.  Okay.  So you kept following the protests even if they were

12  violent, correct?

13  A.  Yes.

14  Q.  Okay.  And those protests occurred in the United States,

15  right?

16  A.  Yes.

17  Q.  Okay.  And as a result of those protests, you remember that

18  the Rule of Law Foundation took certain steps, correct?  Let me

19  see—do you remember that or no?

20  A.  Can you say it again?  Rule of Law what?

21  Q.  Took certain steps, correct?  They did certain things to

22  make sure that that didn't happen again, right?  Do you

23  remember that?

24  A.  I don't remember.

25  Q.  Okay.  Well, let me show you something that might refresh

O671GUO2                         Ya Li - Cross

 1   your recollection.

 2            MS. SHROFF:  May I approach, your Honor?

 3            THE COURT:  You may.

 4            MS. SHROFF:  Can you just pull it up for her,

 5   actually.  It's DX 60511.

 6   Q.  Would you take a look at the document for me, please.

 7   A.  Yes.

 8            MS. SHROFF:  And if I could just have just——the jury

 9   doesn't have it, right?  Okay.

10   Q.  And if you could just look at the top, fourth and fifth

11   line.  It's from the words, "If you."

12   A.  Sorry.  I can't hear.  Which line?

13   Q.  They're going to highlight it for you, but it says, "If

14   you."  It's the second line of the second paragraph at the end,

15   on the right side.

16   A.  Yes.

17   Q.  Okay.  Now do you recognize this document, the logo on the

18   top of the document?

19   A.  I don't remember.

20   Q.  I didn't ask you if you remembered.  I asked you if you

21   recognized.  Do you recognize this document, the logo on the

22   top?

23   A.  Yes.

24            MS. SHROFF:  Okay.  And if you could just show her the

25   bottom of the document.

O671GUO2                          Ya Li - Cross

1              Okay.  And right up there before that.

2    A.  Yes.

3    Q.  Okay.  Do you see that signature block?

4    A.  Yes.

5    Q.  Do you recognize this document?

6    A.  I don't remember.

7    Q.  I know you don't remember.  My question is:  Do you

8    recognize it?

9    A.  I don't recognize.

10   Q.  Okay.  And does this document help refresh your

11   recollection that the Rule of Law put out a memo that said, "If

12   you demonstrate——"

13              MR. FERGENSON:  She can't read from a document not in

14   evidence, your Honor.

15              THE COURT:  Sustained.

16   Q.  Does this refresh your recollection that the Rule of Law

17   did something about the violence at the pro——

18              MR. FERGENSON:  Objection.

19              MS. SHROFF:  That was——

20              THE COURT:  I'll allow the question.

21   Q.  Does this document, the paragraph that is before you,

22   refresh your recollection that the Rule of Law Foundation took

23   steps to ensure that there was no more violence at protests?

24   Does that refresh your recollection?

25   A.  Yes.

1    Q.  Okay.  So there was violence and then the Rule of Law said,

2    you cannot do that anymore, correct?

3    A.  Yes.

4    Q.  And according to you, Miles Guo runs the Rule of Law

5    Foundation, correct?

6            MR. FERGENSON:  Your Honor, I think perhaps we can

7    take the document down.  She maybe thinks she's being asked

8    about the document.

9            THE COURT:  Are you finished with the document?

10           MS. SHROFF:  I'm happy to have it taken down.

11   Q.  According to you, Miles Guo ran Rule of Law, right?

12   A.  He told us what to do, some issues in Rule of Law.

13   Q.  Okay.  So he told you to make sure and stop the violence at

14   the protest, correct?

15   A.  I don't know what running means.

16   Q.  I'm sorry?

17   A.  I don't——I'm not sure, running the Rule of Law.  What do

18   you mean running it?

19   Q.  You said he was in charge of the Rule of Law Foundation,

20   right?

21   A.  I didn't say that.

22   Q.  You said he made you director, correct?

23   A.  Yes.

24   Q.  You said everybody listens to only Miles Guo, correct?

25   A.  Yes.

O671GUO2                        Ya Li - Cross

1  Q.  And people only do what Miles Guo tells them to do,

2  correct?

3  A.  Yes.

4  Q.  So when Miles Guo said stop the violence, everybody stopped

5  the violence, correct?

6            MR. FERGENSON:  Objection.

7            THE COURT:  Overruled.

8  Q.  Yes or no?

9  A.  This—this not Miles Guo said.

10  Q.  So this time it's not Miles Guo speaking.

11  A.  This document said.

12  Q.  I'm sorry?

13  A.  Document said.

14  Q.  But the document is from Rule of Law Foundation, correct?

15  A.  Yeah.

16  Q.  And he is able to do anything he wants under Rule of Law

17  Foundation, according to your testimony yesterday.

18  A.  But I don't know about this document.

19  Q.  Okay.  We'll move on.

20            Let me direct your attention to the protest from the

21  SEC that you testified to yesterday, okay?  Remember that?

22  A.  Yes.

23  Q.  That was also because of Miles Guo, according to you,

24  correct?

25  A.  Yes.

O671GUO2                          Ya Li - Cross

1    Q.  Okay.

2    A.  Yes.

3    Q.  And you believed, you said at that time, that the SEC was

4    infiltrated by the CCP, correct?

5    A.  Yeah, that's Miles Guo said.

6    Q.  Right.  And you only believed that because Miles Guo said

7    that, correct?

8    A.  Yes.

9    Q.  Okay.  And did you have an understanding whether Miles Guo

10   believed that the SEC had been infiltrated by the CCP?

11   A.  I'm sorry.  Please say it again?

12   Q.  Did you have an understanding that Miles Guo himself

13   believed that the SEC had been infiltrated by the CCP, correct?

14          MR. FERGENSON:  Objection.  It sounds like she's

15   testifying.

16          THE COURT:  Are you asking whether she believed that

17   Mr. Guo believed that the CCP had infiltrated the SEC?

18          MS. SHROFF:  I'm asking her understanding, yes, your

19   Honor, exactly.

20          THE COURT:  You can answer.

21   A.  I believe.

22   Q.  Okay.  And he had broadcasted that he had in fact been

23   targeted, correct?

24   A.  About——I'm not sure what——what's the issue you're talking

25   about.

O671GUO2                          Ya Li - Cross

1   Q.  He broadcasted that he was targeted by Broidy, correct?

2   A.  Yes.

3   Q.  He broadcasted that he had been targeted by George

4   Higginbotham, correct?

5   A.  Yes.

6   Q.  And he broadcasted that he had been targeted by the United

7   States government, correct?

8   A.  Yes.

9   Q.  And that that was only because people like Broidy and

10  Higginbotham were working for the CCP and trying to get him

11  hurt through the United States, correct?

12  A.  I don't know.

13  Q.  But you watched the broadcast where he said that, correct?

14  A.  Yeah.

15  Q.  And you knew that George Higginbotham had been convicted of

16  doing such things, correct?

17  A.  I don't know.

18  Q.  And you—you didn't know?

19  A.  I don't know.

20  Q.  Okay.  Did you know that he was convicted of acting as an

21  agent of China?

22  A.  That's Miles Guo said.

23  Q.  Okay.  And Miles Guo said that Higginbotham had tried to

24  get Trump to send him back to China, correct?

25  A.  Yes.

O671GUO2                      Ya Li - Cross

1   Q.  And he said that, you heard it, and you believed it,

2   correct?

3   A.  Yes.

4   Q.  Do you know who George Higginbotham is?

5   A.  I don't know.

6   Q.  Do you know who Broidy is?

7   A.  I don't know.

8   Q.  Okay.  Now you've talked many times about this concept

9   called the Alliance, correct?

10  A.  Yes.

11  Q.  And the Alliance had meetings, right?

12  A.  Yes.

13  Q.  And where were these meetings?

14  A.  Where?

15  Q.  Yeah.

16  A.  Online.

17  Q.  Online.  What format did they use?

18          I'll rephrase that.  That might be a difficult

19  question for you.

20          How were the meetings conducted, on WebEx, Zoom, which

21  one?

22  A.  WebEx.

23  Q.  On WebEx, correct?  And you participated in them from

24  Australia, correct?

25  A.  Yes.

O671GUO2                          Ya Li - Cross

1    Q.  And there was a concern that those meetings could be

2    hacked, correct?

3    A.  I don't remember.

4    Q.  Okay.  And when you participated in those meetings, did you

5    ever show your face or did you use an avatar of Mulan, like

6    from the movie?

7    A.  Yes, not show the face.

8    Q.  So you took the movie photo of Mulan, right?

9    A.  Yeah.

10   Q.  And when everybody was participating in that WebEx, your

11   square was the avatar of Mulan, correct?

12   A.  Everyone is like that.

13   Q.  No.  Not Mr. Guo, right?  Everyone——

14   A.  Except Miles Guo.

15   Q.  How about Long Island David?

16   A.  Sometimes.

17   Q.  Sometimes, right?  Not all the time, right?

18   A.  Yeah.

19   Q.  There were people who showed their face, right?

20   A.  Yeah.

21   Q.  Sara Wei showed her face, right?

22   A.  Yes.

23   Q.  Okay.  So it's not true that everybody used an avatar,

24   correct?

25            I'll move on.

O671GUO2                        Ya Li - Cross

1              The Himalaya Alliance had meetings, correct?

2   A.  Yes.

3   Q.  All the leaders came to the meetings, if they could,

4   correct?

5   A.  Yes.

6   Q.  These meetings, they had conversations about what to do

7   next as part of the Alliance, correct?

8   A.  Yes.

9   Q.  And people voted on those issues, right?

10  A.  No.

11  Q.  There was no vote?

12  A.  No.

13  Q.  So if five people wanted to do something and six people

14  didn't want to do it, what would happen?

15  A.  Miles Guo decide.

16  Q.  But Miles Guo wasn't at all the meetings.

17  A.  Final decision, Miles Guo decide.

18  Q.  So—

19  A.  We would report to Miles Guo.

20  Q.  I'm sorry?

21  A.  We would report to Miles Guo.

22  Q.  You would report to Miles Guo even if it was a unanimous

23  agreement that everybody should do something; that's your

24  testimony?

25  A.  Sorry?  Can you say it again?

O671GUO2                          Ya Li - Cross

1   Q.  If everybody agreed to do something, even if everybody

2   agreed, you would still go to Miles Guo; is that your

3   testimony?

4   A.  Yes.

5   Q.  Okay.

6   A.  Approved by final decision, approved by Miles Guo.

7   Q.  Okay.  I understand approved by Miles Guo.  You keep saying

8   that.  My question to you was:  Was there a decision-making

9   process within the Alliance?

10  A.  No.

11  Q.  Okay.  So there was no decision-making process, Miles Guo

12  decided everything, but the Alliance leaders would have long

13  meetings to do nothing but give the information to Miles Guo?

14          MR. FERGENSON:  Objection to form.  She's testifying.

15          THE COURT:  Sustained.

16  Q.  All the farm leaders went to these meetings, right?

17  A.  Yes.

18  Q.  During the meeting the farm loan program was discussed,

19  correct?

20  A.  Yes.

21  Q.  They talked about what the program consisted of, correct?

22  A.  Sorry?

23  Q.  They talked about—the farm leaders discussed the program,

24  correct?

25  A.  Yeah.

O671GUO2                          Ya Li - Cross

1    Q.  How many times did the farm leaders discuss the farm loans

2    program?

3    A.  I don't remember.

4    Q.  Five times?

5    A.  I don't remember.

6    Q.  And Miles Guo wasn't at all of those meetings, correct?

7    A.  I don't remember.

8    Q.  Okay.  Do you remember a single meeting when Miles Guo was

9    present?

10   A.  Yes.

11   Q.  Okay.  And when Miles Guo was present in the meeting—you

12   tell me if I'm wrong—all the farm leaders talked with each

13   other and with Mr. Guo, correct?

14   A.  Yes.

15   Q.  And you were part of that group, correct?

16   A.  Yes.

17   Q.  Sometimes you wanted him to do something or you wanted the

18   group to do something and others said no, correct?  You wanted

19   more money for your farm, other people said no, correct?

20   A.  No, never.

21   Q.  No, never?  Nobody ever said no to you, right?

22   A.  No, I never ask—

23   Q.  You never asked?

24   A.  To do something, yeah.

25               THE COURT:  You have to let her answer.  Go ahead.

O671GUO2                        Ya Li - Cross

1    A.  I never asked from me to do something, no, not from me.

2    Q.  As the farm leader, you never asked for anything at all in

3    the Alliance meetings; that's your testimony?

4    A.  Ask what?

5    Q.  Anything.  You had a group that you were responsible for,

6    your followers, right?

7    A.  Yes.

8    Q.  Each farm leader had people who were following that farm,

9    correct?

10   A.  Yeah.

11   Q.  The farm leader is the one who speaks for them at these

12   meetings, correct?

13   A.  Yes.

14   Q.  So is it your testimony that you never spoke up for any of

15   the followers in your farm?

16   A.  No.

17   Q.  No, that's not your testimony?

18   A.  I don't remember.

19   Q.  Okay.  Let's move on.

20        Let's talk about what you testified to yesterday, the

21   Iron Blood group, okay?

22   A.  Yeah.

23   Q.  And at one point the Iron Blood group was about 20 people,

24   correct?

25   A.  Yes.

O671GUO2                        Ya Li - Cross

1    Q.  And then it grew, correct?  Could you keep your voice up

2    for me, please.

3    A.  Yes.

4    Q.  Okay.  That's the only way the jury can hear you.

5    A.  Yes.

6    Q.  Thank you.

7            And starting in March of 2021, you were in that group,

8    correct?

9    A.  April 2021.

10   Q.  So you recall it wasn't March but it was April, correct?

11   A.  Yeah.

12   Q.  Okay.  Thank you.

13           And the Iron Blood group had meetings, correct?

14   A.  Yes.

15   Q.  And in the Iron Blood group itself, one person had one

16   vote; is that right?

17   A.  No.

18   Q.  So did one person have more than one vote or nobody had any

19   votes?

20   A.  No votes.

21   Q.  No votes.

22   A.  We just do what Miles Guo told us.

23   Q.  You just do what Miles Guo tells you, correct?

24   A.  Yeah.

25   Q.  And even though Miles Guo was going to do whatever he

O671GUO2                         Ya Li - Cross

1    wanted to do, everybody had these very long meetings, correct?

2              MR. FERGENSON:  Object to form.

3              THE COURT:  Sustained.

4    Q.  Did you have long meetings as part of the Iron Blood group?

5    A.  Yes.

6    Q.  People came, correct?

7    A.  Yes.

8    Q.  People talked in the Iron Blood group meetings, correct?

9    A.  Yes.

10   Q.  People raised issues in the meetings, correct?

11   A.  Yes.

12   Q.  People raised issues about personnel issues, right?

13   A.  What issue?

14   Q.  Personnel, personnel.  Human resources, personnel.

15   A.  Yes.

16   Q.  In fact, one of the issues that was raised was your

17   inability to get along with people in the Iron Blood group,

18   correct?

19   A.  No.

20   Q.  Well, you were thrown out of the Iron Blood group for a

21   while, right?

22   A.  Yes.

23   Q.  And then they let you back in, right?  They gave you a

24   timeout.

25   A.  Yes.

O671GUO2                        Ya Li - Cross

1    Q.   Okay.  And they gave you a timeout because other people in

2    the Iron Blood group complained about you, correct?

3    A.   No.  That's wrong.  Because Miles Guo said something

4    broadcast, I not agree.

5    Q.   So Miles Guo said something in the broadcast, you didn't

6    agree?

7    A.   Yeah.

8    Q.   So he threw you out of the Iron Blood group; is that your

9    testimony?

10   A.   No.  I left by myself.

11   Q.   Excuse me?

12   A.   I left by myself.

13   Q.   You resigned from the Iron Blood group.  You knew how to

14   resign from a group that he had complete control over, correct?

15   A.   Yeah.

16   Q.   You knew how to walk away, correct?

17   A.   Yeah.

18   Q.   And in fact, you did walk away, correct?

19   A.   Yeah.

20   Q.   So when you wanted to walk away, you could, correct?

21   A.   Yeah.

22   Q.   Nobody forced you to come back to the Iron Blood group,

23   right?

24   A.   No.

25   Q.   Okay.

O671GUO2                         Ya Li - Cross

1    A.  No, sorry.  They——

2    Q.  Okay.

3    A.  They add me back.

4    Q.  They asked you back?  You could have said no, right?

5           MR. FERGENSON:  Your Honor, the witness said "add,"

6    not "asked."

7           THE COURT:  I'm sorry.  What did you say?  Did you say

8    they asked?

9           THE WITNESS:  Add me back to that group.  They add me.

10   Miles Guo add me back to that group.

11   BY MS. SHROFF:

12   Q.  And you could have said no, right, just like you said no

13   the first time when you left?  You could have changed your

14   phone number, correct?

15   A.  Yes.

16   Q.  You could have left and not downloaded the WhatsApp

17   application on your iPhone, correct?

18   A.  Yes.

19   Q.  You could have just swiped and deleted WhatsApp from your

20   phone, correct?

21   A.  Yeah.

22   Q.  Okay.  Now let's talk about these refunds that you

23   testified about yesterday, right?  You remember that?

24   A.  Yes.

25   Q.  You testified about people on the farms wanting refunds,

O671GUO2                    Ya Li - Cross

1    correct?  On your farm, one of the people wanted a refund on

2    G/CLUBS, right?

3    A.  Yes.

4    Q.  And you decided, even though Miles Guo said no, to give him

5    the refund anyway, correct?

6    A.  Yes.

7    Q.  And you decided it was different because he was your

8    follower, correct?

9    A.  Not my follower, because he contributed a lot.

10   Q.  According to you, he contributed a lot, correct?

11   A.  Yes.

12   Q.  And you wanted to make sure he was okay, correct?

13   A.  Yes.

14   Q.  And you wanted to make sure he was okay even though Miles

15   Guo was telling you no, correct?

16   A.  Yes.

17   Q.  And you did it anyway, correct?

18   A.  Yes.

19   Q.  And so you're capable of doing things Miles Guo tells you

20   not to do, correct?

21   A.  It depends.

22   Q.  Depends, right?

23          Now let's talk about the money you got, okay?  You

24   testified that in July of 2021, the Alliance paid you ten grand

25   a month, correct?

O671GUO2                        Ya Li - Cross

1    A.   Yes.  Not Alliance.  The Rule of Law Foundation.

2    Q.   The Rule of Law Foundation paid you ten grand, right?

3    A.   Yes.

4    Q.   And the Rule of Law Foundation paid you ten grand because

5    you were part of the IBG group, right?

6    A.   Yes.

7    Q.   When you were out of the IBG group, you got five grand,

8    correct?

9    A.   Yes.

10   Q.   And beginning in August or September——you tell me, 'cause I

11   don't know the date——you were paid by the Alliance as well; is

12   that correct?

13   A.   Which, which time?  What time?

14   Q.   September or August of 2022.

15   A.   Yes.

16   Q.   You were paid in H Coin, correct?

17   A.   Yes.

18   Q.   1,500 H coins a month, correct?

19   A.   Yes.

20   Q.   And other farm leaders got less than that, correct?

21   A.   Yeah, farm leader and the Iron Blood group's different,

22   yeah.

23          MS. SHROFF:  I could not hear her, your Honor.  I

24   apologize.

25   A.   Iron Blood group is 1,000 H Coin, farm leader——

O671GUO2                        Ya Li - Cross

1   Q.  I can't——

2   A.  Iron Blood group is 1,000, receiving 1,000 H Coin; and the

3   other farm leaders received 500 H Coin; and the farm CEO

4   received from 300 H Coin.

5   Q.  You don't mean Iron Blood group received that H Coin; you

6   mean if you were a member of Iron Blood group, you received

7   that H Coin, right?

8   A.  Yes.

9   Q.  Okay.  So all totaled, because you were a farm leader,

10  because you were in the Iron Blood group, and because of

11  whatever else you did, you got a total of 1,500 H coins a

12  month, correct?

13  A.  Yes.

14  Q.  And that is in addition to the ten grand you also got,

15  correct?

16  A.  No.

17  Q.  You stopped getting the ten grand from the Rule of Law

18  Foundation?

19  A.  Yes, yes.  It's only for one year.

20  Q.  Right.  You got it for the whole year, and during that time

21  you got both, correct?

22  A.  No.  Only coin.

23  Q.  For one year, Rule of Law Foundation paid you, correct?

24  A.  Yeah.

25  Q.  Okay.  And then H Coin paid you, correct?

O671GUO2                        Ya Li - Cross

1   A.  Yes.

2   Q.  Okay.  And it is your testimony now, because I just want to

3   make sure it's clear, the two did not overlap, according to

4   you, is that——

5   A.  No, no overlap.

6   Q.  Okay.  So when you were paid the 1,500 H coins, you would

7   then immediately convert it into the H Dollar, correct?

8   A.  No.

9   Q.  You didn't convert it to the H Dollar?

10  A.  No.

11  Q.  What did you do with the coins?

12  A.  Just keep there, because that time Himalaya Exchange is not

13  working.  You can't redeem the money.

14  Q.  I could not hear you.  I'm sorry.

15  A.  Himalaya Exchange that time stop working; you can't redeem

16  the money from it.

17  Q.  Right.  But that was at some point.  Before that, you could

18  redeem it, correct?

19  A.  No.  That's after.  We got our H Coin already.

20  Q.  Right.

21  A.  The Himalaya Exchange can't redeem the money out.

22  Q.  Right.  And then after that, you could redeem it, correct?

23  A.  No.

24  Q.  You could never redeem your H Coin, is that——

25  A.  No.

1    Q.  You have to let me finish, ma'am.

2    A.  Until now, it can't.

3    Q.  Okay.  You could not redeem your H Coin, correct?

4    A.  Yes.

5            MR. FERGENSON:  Your Honor, we've covered this.  Asked

6    and answered.

7            THE COURT:  Sustained.

8    Q.  Ma'am, my question to you was whether you were able to

9    convert, not redeem—

10           MR. FERGENSON:  Same objection.

11           THE COURT:  You can use the new word, convert.  Go

12   ahead.

13   Q.  If you could convert your H Coin into HDO without

14   redeeming, you could do that, correct?

15   A.  Yes.

16   Q.  And you did that, right?

17   A.  I did some.

18   Q.  You did some, correct?

19   A.  Yeah.

20   Q.  And you decided how much to convert; that was your

21   decision, correct?

22   A.  Yes.

23   Q.  You didn't have to check that one with Miles Guo, correct?

24   A.  Yes.

25   Q.  Correct?  Yes, right?

O671GUO2                          Ya Li - Cross

1    A.  Yes.

2    Q.  Okay.

3    A.  This Miles Guo ask every farm leader and Iron Blood group

4    member have to create their job and working full time for

5    Alliance.  That's the reason I have to create my job to work

6    for the Alliance as Iron Blood group.

7              MS. SHROFF:  I move to strike.  There was no question.

8              But thank you for keeping your voice up.

9              MR. FERGENSON:  It's responsive to the line of

10   questioning, actually, your Honor.

11             MS. SHROFF:  There was no question pending.

12             THE COURT:  The answer is stricken.

13   BY MS. SHROFF:

14   Q.  There came a point when you took $30,000 out of the

15   Himalaya Exchange; is that correct?

16   A.  Yes.

17   Q.  Okay.  And you took that $30,000 and then you put that

18   $30,000 into your own bank account, correct?

19   A.  Yes.

20   Q.  And there was nothing wrong with that because that was

21   yours to take, correct?

22   A.  Yes.

23   Q.  And you made that decision without Miles Guo, correct?

24   A.  Yes.

25   Q.  Okay.  Now the H Coin itself was launched in November of

1    2021, correct?

2    A.  Yes.

3    Q.  And the prelaunch offering of that coin was at 10 cents a

4    coin; is that correct?

5    A.  Yes.

6    Q.  And the amount of coins you could get——you correct me if

7    I'm wrong, okay——depended on the contributions you had made to

8    the movement, correct?

9    A.  And your investment and donation, everything together.

10   Q.  I hadn't gotten there, ma'am.

11            So one factor was the work you did for the movement,

12   correct?

13   A.  Yes.

14   Q.  The second factor was how much you had invested, correct?

15   A.  Yes.

16   Q.  The third factor was what type of work and volunteering you

17   did, correct?

18   A.  Donation.

19   Q.  Okay.  There was also donations, correct?

20   A.  Yes.

21   Q.  Okay.  But somebody who volunteered 30 hours would be

22   getting less coins than somebody who volunteered a hundred

23   hours, correct?

24   A.  I don't know.

25   Q.  Okay.  And you were able to purchase $6,000 worth of H Coin

O671GUO2                        Ya Li - Cross

1    at 10 cents a coin, correct?

2    A.  Yes.

3    Q.  Okay.  And the farms themselves also received H Coin,

4    correct?

5    A.  No.

6    Q.  They never received any——farm leaders did not receive H

7    Coin to distribute to their farm people?

8    A.  No.

9    Q.  So there was no distribution to fellow fighters at all;

10   that's your testimony.

11   A.  That's from Rule of Law Foundation.

12   Q.  Okay.

13   A.  Farm get grant from Rule of Law Foundation.

14   Q.  Right.  The farm got the grant, and then they passed it on

15   to the people within their farm, correct?

16   A.  Yes.

17   Q.  That was up to the discretion of the farm leaders, such as

18   you, correct?

19   A.  Sorry?

20   Q.  That was up to the discretion of the farm leaders, such as

21   you, correct?

22   A.  No.  We were approved by Rule of Law.

23   Q.  I understand.  But you decided how to allocate it, correct?

24   A.  No.

25   Q.  Okay.  So Rule of Law decided what each fellow fighter

O671GUO2                          Ya Li - Cross

1    would get; that's your testimony?

2    A.  But in the farm, not I decide.  We have the rule in our

3    farm, not I decide.

4    Q.  But you were the farm leader, right?

5    A.  Not decided by myself.  They had to meet certain rules.

6    Q.  Okay.  Tell us the rules.  Who did you consult with about

7    these rules?

8    A.  My farm have group leaders.  We discussion all the—all the

9    rules.

10   Q.  Okay.  You picked the group leaders, right?

11   A.  Yeah.

12   Q.  Because you were the leader.

13   A.  Yeah.

14   Q.  Right.  So you discussed these issues with the people you

15   picked, correct?

16   A.  Not I picked.  Some—some is voluntarily want to be the

17   group leader.

18   Q.  Right.  But you picked which volunteer to pick.  If there

19   were ten volunteers and you could only have five, you chose the

20   five, right?

21   A.  Not I choose.  I accept.

22   Q.  So if everybody in the farm wanted to be your second in

23   command, you would let—accept everybody.

24   A.  Sorry?  Can you say it again?

25   Q.  Sure.  You were the farm leader?

O671GUO2                          Ya Li - Cross

1    A.  Yes.

2    Q.  You picked who would be your group assistant, correct?  You

3    could choose.

4    A.  Not I pick.

5    Q.  Okay.

6    A.  If someone waiting to that position, you accept.

7    Q.  Right.  But what if ten people wanted one position; who

8    would choose?

9    A.  Never happened.

10   Q.  Nobody volunteered; never more than one person volunteered

11   for any position in your group.

12   A.  No.

13            MR. FERGENSON:  Asked and answered.

14            THE COURT:  Overruled.

15   A.  No.

16   Q.  Okay.  You also testified yesterday about G/CLUBS and G

17   Fashion, correct?

18   A.  Yes.

19   Q.  And you testified about the G/CLUBS memberships, correct?

20   A.  Yes.

21   Q.  And you testified that it entitled you to a discount in G

22   Fashion, right?

23   A.  Yes.

24   Q.  Did you use that discount?

25   A.  Yes.

O671GUO2                    Ya Li - Cross

1   Q.  Did you appreciate G Fashion or you didn't like it?

2   A.  Before, I like it, but now, I don't like it.

3   Q.  Okay.  Well, we understand.  But did you like it back then?

4   A.  Yes.

5   Q.  Okay.  Did you use it?

6   A.  Yes.

7   Q.  And did you feel that that was a benefit conferred upon

8   you?

9   A.  Yes.

10  Q.  Okay.  Did there come a time, Ms. Li, when you became aware

11  that there were logistical issues with the G/CLUBS membership?

12  A.  I don't understand.  What do you mean logistic issue?

13  Q.  There were people who complained that they'd applied for

14  the G/CLUBS and they were still waiting for approval, correct?

15  A.  Yes.

16  Q.  That was mainly because of a problem with Crane, correct?

17  You testified about Crane also, correct?

18  A.  I don't know the reason.

19  Q.  I cannot hear you.

20  A.  I don't know the reason.

21  Q.  Okay.  So there were some things you just didn't know,

22  correct?

23  A.  Yeah.

24  Q.  Okay.  Now on direct testimony you also talked about

25  something called AIAI, correct?

1    A.  Yes.

2    Q.  What does AIAI stand for?

3    A.  I don't know.  That's Miles Guo said, the new plat——the new

4    platform's name.

5    Q.  You don't know?

6    A.  I don't know.

7    Q.  All you know is Miles Guo said it, correct?

8    A.  Yeah.

9    Q.  Okay.  And you testified on direct that——did you watch a

10   broadcast about AIAI?

11   A.  Yeah, he said in the broadcast.

12   Q.  No, no.  My question to you is:  Was there a broadcast——I

13   take that back.

14        Could you repeat your answer for me.  He said that in

15   a broadcast; is that what you said?

16   A.  Yes, yes.

17   Q.  Okay.  And that broadcast, you translated it?

18   A.  I don't remember.

19   Q.  You don't remember.  And do you have a copy of that

20   broadcast where he talks about AIAI?

21   A.  You mean I have a copy now or what?

22   Q.  Sure.  Do you have a copy?  Did you send it——

23   A.  No, no.

24   Q.  No, no, not now, but you have a copy, right?

25   A.  I don't remember.

O671GUO2                    Ya Li - Cross

1   Q.  Did you give a copy to the prosecutors?

2   A.  I don't remember.

3   Q.  Do you remember ever translating it?

4   A.  Translating which one?

5   Q.  Anything about AIAI.

6   A.  I don't remember.

7   Q.  And you don't even know if there is a video of this AIAI,

8   right?

9   A.  No, I watched the live broadcast.

10  Q.  You watched a live broadcast, correct?

11  A.  Yes.

12  Q.  But every live broadcast he ever made was saved, correct?

13  A.  Yes.

14  Q.  Okay.  So you have it, right?

15  A.  I don't have right now.  I can find it for you.

16  Q.  Did you find it for the prosecutors when you talked to them

17  about AIAI?

18  A.  I don't remember.

19  Q.  They asked you if you had that broadcast, correct, when you

20  prepared with them?

21  A.  No.

22  Q.  They did not ask you for a video of AIAI.

23  A.  No.

24          MR. FERGENSON:  Asked and answered.

25          THE COURT:  Sustained.

O671GUO2                        Ya Li - Cross

1   Q.  They asked you about all of the other broadcasts, correct?

2   A.  No.

3   Q.  They asked you about at least eight broadcasts because you

4   testified to them, right?

5   A.  Yes.

6   Q.  Right.  So the one broadcast they did not ask you if you

7   had a video of was AIAI, correct?

8   A.  I don't remember.

9   Q.  Okay.  You prepared for this testimony here, right?

10  A.  Yeah.  No.

11  Q.  Well, what did you meet with them 13 times for?

12  A.  I tell them the truth, give them everything.

13  Q.  13 times?

14  A.  Yes.  I don't——not sure.  I——I don't know.

15  Q.  So you met with them all these times just to make sure you

16  were telling the truth, nothing else, right?

17  A.  Yeah.  Yes.

18  Q.  And you were telling the truth about the things you were

19  going to talk about today, correct?  The same exact things.

20  A.  No, no, no.

21  Q.  No?

22  A.  No.

23  Q.  Okay.  Well, what else did you prepare for other than Miles

24  Guo?

25  A.  Sorry?  Can you say it again?

O671GUO2                    Ya Li - Cross

1  Q.  What other things did you prepare for other than testimony

2  surrounding Miles Guo?

3          Let me try it this way.

4  A.  I don't prepare anything.

5  Q.  You didn't prepare.  I didn't ask you if you prepared a

6  document, ma'am.  That's not my question.

7          But in any event, you did send the prosecutors a lot

8  of documents, right?

9  A.  Yes.

10  Q.  You sent them a lot of emails, correct?

11  A.  Yes.

12  Q.  You sent them a lot of links to many, many videos, correct?

13  A.  Yes.

14  Q.  You emailed Mr. Fergenson over here, correct, this man

15  right here?

16  A.  Yeah.

17  Q.  Okay.  And you sent them many links but not a link of this

18  AIAI video, correct?

19  A.  I don't remember.

20  Q.  All right.

21  A.  Too many videos.

22  Q.  Too many videos, correct?

23  A.  Yeah.

24  Q.  Okay.  But you—I'll move on.

25          By the way, did they show you a video of AIAI?

O671GUO2                          Ya Li - Cross

```
 1    A.  I don't remember.
 2             MS. SHROFF:  Okay.  Let's pull up, please, GX VI114.
 3    Q.  This document, you were shown this document, correct?
 4    A.  Yes.
 5             MS. SHROFF:  And is it published for the jury?
 6             If we could just show her, please, page 2.
 7             Page 3.
 8             Page 4.
 9    Q.  Do you recognize this document, ma'am?
10             You don't recognize it?
11    A.  I recognize this A15 contract.
12    Q.  You read it, right?
13    A.  Not everything.
14    Q.  But you read something.
15    A.  Just first page.
16    Q.  You only read the first page.
17    A.  Yeah.
18    Q.  Okay.  How about the last page?
19    A.  No.
20    Q.  Okay.  What is Ampleforth Capital?
21    A.  The supporters sent money to this company.
22    Q.  What is that company?
23    A.  I don't know.
24    Q.  You don't know?
25    A.  I don't know.
```

O671GUO2                     Ya Li - Cross

1   Q.  Okay.  You collected money from your farm—

2   A.  No.  They can direct send there.

3   Q.  They can direct send there, right?

4   A.  Yeah.

5   Q.  You had nothing to do with this, right?

6   A.  Yes.

7   Q.  Okay.  The only reason you were able to testify about it is

8   because you reviewed it with Mr. Fergenson, correct?  You can

9   take that—

10  A.  Can you say it again?

11  Q.  Sure.  Mr. Fergenson showed you this document when you two

12  met in his office, correct?

13  A.  I showed him.

14  Q.  Right.  And then you two looked at it together, correct?

15  A.  Yes.

16  Q.  And then you reviewed it, right?

17  A.  Not page by page.

18  Q.  Page by page, every other page, you reviewed it with him,

19  right?

20  A.  Just first page.

21  Q.  Just the first page.  Even with Mr. Fergenson, you only

22  looked at the first page.

23  A.  I don't remember.

24  Q.  You don't remember?

25  A.  I don't remember.

1  Q.  Do you know if the prosecutor picked or chose which page to

2  show you?

3  A.  I don't know.

4  Q.  You don't know.

5  A.  No.

6          MS. SHROFF:  And if I could just show her the second

7  page, please.

8  Q.  You never looked at the second page, right?

9  A.  I don't remember.

10          MS. SHROFF:  Okay.  All right.  We can take that down.

11  Q.  Now you recall that on direct testimony you were shown

12  documents showing money sent to Abu Dhabi, correct?  Do you

13  recall that?

14          You know what, I'll come back to that topic.

15          Let me show you what is in evidence as GX VI190-T.

16  That's the transcript of a video.

17          MS. SHROFF:  190, 1-9-0.

18  Q.  Do you remember testifying about this document?

19  A.  Yes.

20          MS. SHROFF:  Okay.  And if I could just have the first

21  top part made bigger.

22  Q.  All right.  And on the top left corner, you see how it says

23  U.S. Attorney's Office?

24  A.  Yes.

25  Q.  That's Mr. Fergenson's office, correct?

O671GUO2                        Ya Li - Cross

1   A.  I don't know.

2   Q.  Okay.  And you don't know if he works for the U.S.

3   Attorney's Office?

4   A.  I don't know.

5   Q.  Who do you think he is?  What is your understanding about

6   Mr. Fergenson?

7   A.  Prosecutor.

8   Q.  Okay.  So you know he's a prosecutor on this case, right?

9   A.  Yeah.

10  Q.  Okay.  And he showed you this document, right?

11  A.  Yes.

12  Q.  Okay.  And he pointed you to this issue of the incentive

13  mechanism, correct?  You see that language?

14  A.  Yes.

15  Q.  Okay.  And then below that, it explains what the incentive

16  is, correct?

17  A.  Yes.

18  Q.  And it says, "For anyone who bring——" it should say brings,

19  but, "For anyone who bring new fellow fighters in, there will

20  be incentive for them."  Correct?

21  A.  Yes.

22  Q.  There are awards of 3.5 percent, 5.5, and 7.5 percent.

23  Correct?

24  A.  Yes.

25  Q.  This is like refer a friend, get a reward, correct?

O671GUO2                         Ya Li - Cross

1    A.  Yes.

2    Q.  Many companies do that, correct?  If you refer a friend,

3    you get a discount, right?

4    A.  But this not really happen.

5    Q.  I didn't ask you that question, but if you'd like to

6    volunteer it, that's okay.

7            But my question was:  This incentive program is no

8    different than any other incentive program, correct?

9    A.  I don't know.

10   Q.  Are you familiar with incentive programs in general?

11   A.  No.

12   Q.  There are no incentive programs in Australia.

13           MR. FERGENSON:  Asked and answered.

14   A.  I don't know.

15           THE COURT:  Sustained.

16           MS. SHROFF:  You can take that down.

17   Q.  Now let me show you what is marked as Government Exhibit

18   VI101.

19           Ms. Li, on direct testimony, you were——

20           MS. SHROFF:  It's okay.  You can take that down.  I'll

21   come back to it.

22   Q.  Ms. Li, on direct testimony you were asked about a place

23   called Mahwah, correct?

24   A.  Yes.

25   Q.  Okay.  And you testified to the effect of——

1          MS. SHROFF:  Actually, let me see if I can pull up

2   that document for you.  It's GX 29, VI29.

3   Q.  You recall being shown this document and testifying about

4   it, correct?

5   A.  Yes.

6   Q.  I haven't shown you the document yet.  Hold on.

7          MS. SHROFF:  Your Honor, apparently we're having some

8   kind of system problem.  I apologize.

9          The jurors don't have it, your Honor.

10          THE COURT:  It's not on the jurors' screens?

11          Now is it there?

12          THE JURORS:  No.

13          THE COURT:  All right.  So can you move to a different

14   question.

15          MS. SHROFF:  I'll come back to this.

16   BY MS. SHROFF:

17   Q.  And I'm going to try and ask you some questions without the

18   document in front of you.

19          THE JURORS:  It's there.

20          MS. SHROFF:  Oh, now it is?  Okay.

21          All right.  Here it is.

22   Q.  Could you take a look at this document.  You testified

23   about this particular document, correct?

24   A.  Yes.

25   Q.  Okay.  And it says, "Dear Anron," correct?

O671GUO2                          Ya Li - Cross

1    A.   Yes.

2    Q.   And Anron, as you testified, is Aaron Mitchell, correct?

3    A.   Yes.

4    Q.   And who's Aaron Mitchell?  Could you keep your voice up.

5    A.   Okay.  Miles Guo's lawyer.

6            MS. SHROFF:  Okay.  Is the document—it's not back on?

7    It's off again?  Okay.  I'll do it without.

8            Your Honor, may I just continue without the document?

9            THE COURT:  You may attempt to do that.  Go ahead.

10           MS. SHROFF:  Okay.

11   BY MS. SHROFF:

12   Q.   You remember testifying about this document, right?

13           MS. SHROFF:  Can somebody give her a hard copy.

14           THE COURT:  Is there a question?

15           MS. SHROFF:  Okay.

16   Q.   And Aaron Mitchell was also the lawyer for G/CLUBS,

17   correct?

18   A.   I don't know.

19   Q.   So you only know that he was the lawyer for Miles Guo but

20   you don't know if he was the lawyer for G/CLUBS.

21   A.   Yes.

22   Q.   Okay.  And have you met Aaron Mitchell?

23   A.   No.

24   Q.   Have you been in meetings with Aaron Mitchell?

25   A.   No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O671GUO2                         Ya Li - Cross

1    Q.  Okay.  And so how do you know that he is Miles Guo's

2    lawyer?

3    A.  He called me once.

4    Q.  So he called you once, and from that—

5    A.  And he also gave me translation task.

6    Q.  Okay.  He gave you translation tasks that included G/CLUBS,

7    correct?

8    A.  I don't remember.

9    Q.  You don't remember.

10   A.  No.

11   Q.  Okay.  So let's just stay with this document because you

12   remember the document, correct?

13   A.  Yes.

14   Q.  Okay.  And the document before you is GX VI29, right?

15   A.  Sorry?  What's the number?

16   Q.  It's okay.  29 at the bottom.  Do you see that?

17   A.  Yes.

18   Q.  Okay.  And the document talks about a property, correct?

19   It says "about the property today," right?

20   A.  Yes.

21   Q.  Okay.  And it talks about "where we can host our family to

22   live there," comma, correct?

23   A.  Yes.

24   Q.  "Or sometimes we may also convert it to host our club

25   members," correct?

O671GUO2                         Ya Li - Cross

1    A.  Yes.

2    Q.  Okay.  And according to you, when Miles Guo is talking in

3    this document and referring to family, he only means his own

4    personal family, right?

5    A.  Yes.

6    Q.  Not the big family of the movement that you testified to,

7    correct?

8    A.  Yes.

9    Q.  Because you testified on direct that the reason he kept

10   calling you Sister Mulan is because he wanted you to feel part

11   of the family, correct?

12   A.  Yes.

13   Q.  And that was a way you said of him controlling you,

14   correct?

15   A.  Yes.

16   Q.  That was your testimony, right?

17   A.  Yes.

18   Q.  But this time when he's saying family, he's excluding you,

19   in your mind, correct?

20   A.  Yes, that's his own family.

21   Q.  Okay.  Right.  That's what you believe is his own family

22   he's talking about, right?

23   A.  Yes.

24   Q.  Okay.  Even though he says "our family," right?

25   A.  Yes.

1    Q.  It doesn't say "I can host my family," correct?  Do you see

2    that right there, "where we can host our family"?  He doesn't

3    say "my family," right?  "Our family."

4    A.  That's still his family.

5    Q.  That's according to you, right?  But the word is "our."

6    A.  Yes.

7    Q.  Okay.  So let's move to the next line, correct?

8            And then he says, "I want to reiterate the following

9    key points about this Offer," right?

10   A.  Yes.

11   Q.  Okay.  And then if you——it says, "please contact William,"

12   correct?

13   A.  Yes.

14   Q.  Okay.  Who is William?

15   A.  William Je.

16   Q.  And what is William Je in charge of?

17   A.  I don't know.

18   Q.  Okay.  So let's go to the next page.

19           He says the house is more than a hundred years,

20   correct?

21           And if we could go to the next page, please.

22           Do you see No. 5?

23   A.  Yeah.

24   Q.  It talks about renovation projects "subject to our budget

25   approval," correct?

O671GUO2                          Ya Li - Cross

```
 1    A.  Yes.
 2    Q.  Okay.  It doesn't say "my budget approval," right?
 3            I'll move on.
 4            MS. SHROFF:  So let's just keep going down.
 5            And——I'm sorry.  Too far.  Okay.
 6    Q.  And you see here, it says a——it talks about getting permits
 7    from the government, correct?
 8    A.  Yes.
 9    Q.  Okay.  And then he talks about it being important to
10    coordinate with the government for permits, correct, under
11    paragraph b, right?
12    A.  Yes.
13            MS. SHROFF:  Okay.  Let's keep going down.
14    Q.  Now he's complaining about the light fixtures in the old
15    home, right?
16    A.  Yes.
17    Q.  He said they're too old, right?
18    A.  Yes.
19    Q.  Okay.  And this has to assume that somebody has done a home
20    inspection, right, 'cause he's talking particularly about
21    lamps?
22            MR. FERGENSON:  Objection.
23            THE COURT:  Sustained.
24    Q.  Okay.  Then it talks, in d——look at paragraph d.
25    A.  Yes.
```

O671GUO2                          Ya Li - Cross

1    Q.  Right?

2              MS. SHROFF:  Keep going down.

3              Keep going down.

4              And paragraph 6.  Hold on.  There we go.  Okay?

5    Q.  It says, "The last and most serious thing is that he and

6    the agent must sign to ensure that they must always keep a

7    legal commitment to this transaction, never disclose any

8    information to any second or third party," correct?

9    A.  Yes.

10   Q.  Okay.  "And keep it absolutely confidential, including the

11   right to judicial protection that they cannot disclose any

12   information about this deal even when testifying in court."

13   Correct?

14   A.  Yes.

15   Q.  Did you understand what he's talking about over there?

16   A.  I don't understand.

17   Q.  Okay.  And then he says, "since this house has a long

18   history," right?

19   A.  Yes.

20   Q.  He's talking about keeping the relationship intact,

21   correct?

22   A.  Yes.

23   Q.  Because there is a commitment to the history of the

24   building itself, right?

25   A.  Yes.

O671GUO2                          Ya Li - Cross

Q.  Okay.  And then you keep going down, right?  And that's——he

talks about this price and then says, "Thank you very much,"

right?

A.  Yes.

Q.  Okay.  And you——

            MS. SHROFF:  Is that the end of the document?  Thank

you.

Q.  And you translated that document for Miles Guo, correct?

A.  Yes.

Q.  And you got not a voice message with Miles Guo's voice with

these words, you actually got a document to translate, correct?

A.  No.  His voice message.

Q.  Okay.  So let's see the Chinese version of this document,

right?

A.  Yeah.

Q.  Okay.  Is it your testimony that you created the Chinese

version of this document?

A.  Sorry?

            MS. SHROFF:  Could somebody show it to her.

            Thank you, Ms. Loftus.  I appreciate it.

            I'm sorry.  The Mandarin version of it.

Q.  Okay.  And this is the document created by whom?

A.  Me.

Q.  So you took what he was saying, according to you, and you

made this document out in Mandarin, correct?

O671GUO2                        Ya Li - Cross

1    A.  Yes.

2    Q.  Okay.  And then from Mandarin, you translated it into

3    English, correct?

4    A.  Yes.

5    Q.  And who did you send the English version to?

6    A.  Miles Guo.

7    Q.  So you sent the English version back to Miles Guo and not

8    to Aaron Mitchell, even though it's addressed to Aaron

9    Mitchell.

10   A.  Yes, I sent back to Miles Guo.

11   Q.  And when you sent it back to Miles Guo, you testified that

12   you didn't know what property he's talking about, right?

13   A.  At that time, yes.

14   Q.  Correct.  You don't know what property he's talking about,

15   correct?

16   A.  Yes.

17   Q.  Okay.  And at that time you knew Miles Guo to be looking

18   for property all over the world, correct?

19   A.  I don't know.

20   Q.  You don't know?

21   A.  I don't know.

22   Q.  Okay.  So you didn't know if he was looking for property

23   any place else, correct?

24   A.  No.

25   Q.  Okay.  And you did not know if he was looking for a

O671GUO2                          Ya Li - Cross

1    property——

2              MR. FERGENSON:  Objection.  Asked and answered.

3              THE COURT:  We haven't heard the question yet.

4              MS. SHROFF:  It's all right, your Honor.

5    Q.  You testified that as far as you were concerned, you were

6    part of his inner circle, correct?

7    A.  I don't know.  What do you mean, inner circle?

8    Q.  Well, you said that everything Miles Guo told you was

9    secret, right?

10   A.  Yes.

11   Q.  Anything at all that he told you was secret, correct?

12   A.  Yes.

13   Q.  So if he wanted to tell you about this, this home, there

14   would be no issue, right?  He would just share the secret with

15   you, right, according to you?

16   A.  He wanted me to translate this.

17   Q.  Right.  All he wanted you to do was translate it, right?

18   A.  Yes.

19   Q.  He never discussed the document with you, right?

20   A.  No.

21   Q.  He never talked about the property with you, correct?

22   A.  No, no.

23   Q.  He didn't tell you whether or not it was for or not a

24   secret base, right?  He didn't tell you anything?

25   A.  No, right.

O671GUO2                          Ya Li - Cross

1   Q.  So everything that you testified to yesterday was only

2   about what is on this document, correct?

3   A.  Yes.

4   Q.  And of course you reviewed this document with Mr. Fergenson

5   in his office, correct?

6   A.  Yes.

7   Q.  Okay.  How many times?

8   A.  I don't remember.

9   Q.  Did Mr. Fergenson ask you about this phrase where it says

10  "to host club members"?  Did you discuss that phrase with him?

11  A.  I don't remember.

12  Q.  Did you discuss the phrase "Family Fund" with him?

13  A.  Yes.

14  Q.  Okay.  So you remember discussing that with him, right?

15  A.  Yes.

16  Q.  And did you discuss with him the need for permits on this

17  place?

18  A.  I don't remember.

19  Q.  Okay.  So Mr. Fergenson focused on the Family Fund part of

20  this document, correct?

21  A.  I don't know.

22  Q.  Okay.

23          MS. SHROFF:  Your Honor, may I just have one second.

24          THE COURT:  Yes.

25          MS. SHROFF:  Thank you, your Honor.

O671GUO2                         Ya Li - Cross

1            I'm sorry, your Honor.  We're obliged to Ms. Loftus

2    for helping us out.  May I work with her for just one moment.

3            101.  Sorry.  VI.

4    BY MS. SHROFF:

5    Q.  You recall testifying about this email yesterday, right?

6    A.  Yes.

7    Q.  Okay.  And you are one of the people on this email chain,

8    correct?

9    A.  Yes.

10   Q.  And the email chain is from a person named Alex Lipman,

11   correct?

12   A.  Yes.

13   Q.  And could you tell us, who is Alex Lipman?

14   A.  Yvette Wang's lawyer.

15   Q.  Okay.  And you know he is Yvette Wang's lawyer how?  How do

16   you know that?

17   A.  Brother Island Chang Dao told me.

18   Q.  Who?

19   A.  Brother Island Chang Dao told me.

20   Q.  Okay.  And is he also known as Long Island David?

21   A.  Yes.

22   Q.  Okay.

23           MS. SHROFF:  I guess we can't pull up the defense

24   exhibit, but that's okay.  I'll keep going.

25   Q.  And the second person on the email chain, right?

O671GUO2                          Ya Li - Cross

1   A.  Yeah.

2   Q.  It says To, correct?  It's just——

3          MS. SHROFF:  If the email addresses could be enlarged

4   and——no, the top part, please.

5   Q.  Okay.  And the email is to Sari B. Placona, correct?

6   A.  Yes.

7   Q.  And as far as you know, that's also a lawyer, correct?

8   A.  Yes.

9   Q.  And Anthony Sodono, correct?

10  A.  Yes.

11  Q.  Also a lawyer, right?

12  A.  I don't know.

13  Q.  Well, let's scroll down, and let's look at the name of the

14  law firm.

15         MS. SHROFF:  Right here, at the bottom, under Sari B.

16  Placona, if we could make that larger.

17  Q.  Right?  It's at MSBNJ.com.  Correct?

18  A.  Yes.

19  Q.  And MSB is McManimon, Scotland & Baumann.com, right?

20  A.  I don't know.

21  Q.  Well, look at it right there.  MSB.  MSB.

22  A.  I don't know what's that stand for.

23  Q.  Okay.  Let's just go back to the email addresses.

24         So you have Jeremy Temkin, right?  That one, it's

25  clear, right, just from the reading, maglaw, that's law, right,

O671GUO2                          Ya Li - Cross

1  .com?

2  A.  Yeah.

3  Q.  Okay.  Raymond Moss, correct?

4  A.  Yeah.

5  Q.  Maglaw.com, correct?

6  A.  Yeah.

7  Q.  So from those two addresses, you can conclude it's a law

8  firm, correct?

9        MR. FERGENSON:  Your Honor, we just object to the

10 relevance and the Court's prior ruling.

11       THE COURT:  You may answer.

12       MS. SHROFF:  I'll move on.

13 Q.  The next one is PriyaChaudhryLaw.com, correct?

14 A.  Yeah.

15 Q.  The next email address is virtlawus.com, correct?

16 A.  Yes.

17 Q.  The next one is weddlelaw.com, correct?

18 A.  Yeah.

19 Q.  And the final one is also weddlelaw.com, correct?

20 A.  Yeah.

21 Q.  So Mr. Lipman, a lawyer, is emailing you and several other

22 lawyers with a document attached, correct?

23       MR. FERGENSON:  May we have a brief sidebar, your

24 Honor.

25       THE COURT:  Yes.

O671GUO2                          Ya Li - Cross

1                    (At the sidebar)

2              MR. FERGENSON:  The objection to relevance is that the

3    defendant has not put forward any advice of counsel defense, as

4    your Honor knows.  He was required to notice it.  He's not

5    putting forward that defense, meaning the presence of attorneys

6    is not relevant in this case, and that's exactly the argument

7    they seem to be teeing up with this line of questioning.  If we

8    continue down this road, I think it's appropriate that your

9    Honor instruct the jury that the defendant has not and indeed

10   cannot raise any defense on the advice of counsel, make it

11   clear that presence of counsel, there's no, like, suggestion

12   that the defendant did what he did because lawyers were around.

13   That's exactly the, you know——we raised this in pretrial

14   filings, your Honor.

15             THE COURT:  What's the reason for bringing up these

16   lawyers?

17             MR. KAMARAJU:  Just that it's not hidden from anyone,

18   your Honor.

19             MS. SHROFF:  It's not hidden from anyone.  If the *Wall*

20   *Street Journal*——

21             MR. FERGENSON:  On the email chain, what does it

22   matter if they're lawyers?

23             MS. SHROFF:  Before you cut me off, I was going to

24   say, if the email had been sent to the *Wall Street Journal*, I

25   would bring that out also.

O671GUO2                        Ya Li - Cross

1          MR. FERGENSON:  That makes no sense.

2          THE COURT:  What is the purpose for calling her

3    attention to the fact that these are lawyers?

4          MS. SHROFF:  Because there's nothing—we're basically

5    saying that this email was openly sent.  Just exactly the way

6    they called out each document, each line.  We're not invoking

7    an advice of counsel defense.  Our client's not even involved

8    in this email.

9          MR. FERGENSON:  I know they're not, but they're

10   misleading the jury that there's something proper here because

11   there's lawyers involved.

12         MS. SHROFF:  But—

13         MR. FERGENSON:  Excuse me, Ms. Shroff.  Excuse me,

14   Ms. Shroff.  If they want to ask questions like, you're one of

15   eight people on this email chain, that's fine, but going

16   through one by one, oh, that's a lawyer, that's a lawyer,

17   that's clearly contradictory to the Court's ruling about the

18   presence of counsel and being allowed to elicit this sort of

19   thing.  The Court should instruct the jury that there is no

20   advice of counsel defense, and they cannot make an advice of

21   counsel defense.

22         MR. KAMARAJU:  My understanding from the Court's

23   ruling is that we were able to point out the existence of

24   lawyers but we were not allowed to argue that the lawyer did

25   anything, or highlight Mr. Guo's involvement with lawyers, but

O671GUO2                        Ya Li - Cross

 1    I didn't think we were precluded from referencing lawyers.

 2              THE COURT:  So I want to go back to my decision, just

 3    to refresh my recollection, and we'll discuss it when we

 4    return.  We'll take our break now.

 5              MR. KAMARAJU:  Okay, your Honor.

 6              MS. SHROFF:  Thank you.

 7              (In open court)

 8              THE COURT:  Members of the jury, it's 11:29.  I'm

 9    going to break.  Remember not to discuss this case amongst

10    yourselves or with anyone else.  Don't permit anyone to discuss

11    it in your presence.  Don't watch, listen to, or read anything

12    about anything that has to do with this case.

13              (Jury not present)

14              THE COURT:  Ms. Li, you may step down.  You may step

15    out.  Remember not to discuss your testimony.

16              (Witness not present)

17              THE COURT:  We'll return at noon.

18              (Luncheon recess)

19

20

21

22

23

24

25

                          AFTERNOON SESSION

                            12:01 p.m.

          (Jury not present)

          MS. SHROFF:  Your Honor, the witness is in the box.

          THE COURT:  Ma'am, if you would step out, please.  In
my normal courtroom, the witness is to my right so I'm not use
to looking this way, if you could step out, please.

          So I'm going to read into the record the decision that
I made with respect to the issue that we discussed at the
sidebar on May 14th at our final pretrial conference.  I stated
I have received a letter from the government dated yesterday
seeking to preclude Mr. Guo from invoking a presence of counsel
defense.  Mr. Guo has stated that he does not intend to
formally assert an advice of counsel defense, but reserves the
right to present evidence of testimony regarding his awareness
that legal counsel was involved in certain transactions.

          I agree with the government that this evidence may be
irrelevant and risks confusing the jury.  If Mr. Guo had
asserted the advice of counsel defense, he would have been
required to disclose his communications with his attorney to
determine if he fully and honestly laid out all the facts, and
if he followed his attorney's advice.  *United States v. Scully*
877 F.3d, 464, 476, Second Circuit 2017.

          Having chosen not to assert such a defense, Mr. Guo
cannot now use the presence of attorneys as both a shield and a

 1    sword.  Accordingly, I will follow the approach utilized by

 2    Judge Katherine Forrest in *SEC v. Tourre*, 950 F.Supp 2d, 666,

 3    684 to 85, (S.D.N.Y 2013).  That is counsel for the defense

 4    "will not be precluded altogether from saying the words

 5    "counsel, lawyer or attorney" but will not be "permitted to

 6    zero in on the presence or involvement of lawyers for the sake

 7    of highlighting their presence or involvement." Id at 685.

 8            The Court will preclude evidence that solely shows

 9    that lawyers attended or set up meetings, which is irrelevant.

10    And the Court will give a limiting instruction if Mr. Guo

11    references the presence or involvement of lawyers.  And so I

12    think that this is exactly, Ms. Shroff, what you were doing,

13    highlighting the presence of attorneys.  And that it was

14    irrelevant, and I am going to give a limiting instruction.

15            This is what I propose to state to the jury.  The fact

16    that lawyers were present on an email chain does not establish

17    the legality of any individual's actions.  Any comments,

18    questions?

19            MR. FERGENSON:  May we have one moment.

20            (Counsel conferred)

21            MS. SHROFF:  Your Honor, just, first, I misread the

22    Court's order, so I apologize, and obviously I just misread the

23    order because I read it to attempted meetings and set up, but

24    it's my error.  It's my error.  I just want to make sure that

25    was clear.  But could the Court please read the language again

O67BGUO3                          Ya Li - Cross

1    for me.

2              THE COURT:  The fact that lawyers were present on an

3    email chain does not establish the legality of any person's

4    actions.

5              MS. SHROFF:  The defense has no objection.

6              MR. FERGENSON:  Nor do we, your Honor.

7              THE COURT:  So have the jurors brought in, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O67BGUO3                         Ya Li - Cross

1            THE LAW CLERK:  Jury entering.

2            (Jury present)

3            THE COURT:  Please be seated.  And would you have the

4    witness brought back.

5            Members of the jury, I want to point something out to

6    you.  The fact that lawyers were present on an email chain does

7    not establish the legality of any person's actions.

8            Remember that you're still under oath, Ms. Li.  And

9    you may continue your inquiry.

10           MS. SHROFF:  Thank you, your Honor.

11   BY MS. SHROFF:

12   Q.  May I go back to GXVI-110.  Ms. Li, you recall testifying

13   about this document, correct?

14   A.  Yes.

15   Q.  And again, if you could just keep your voice up.  That

16   would be helpful.

17           This is a document, you would agree, right, between

18   Club ME limited and HAA, right?

19   A.  I'm not agree.

20   Q.  You don't agree with the title that says loan agreement

21   between G/Club ME Limited and HAA Group Party Limited?

22   A.  No.

23   Q.  That's not the document before you?

24   A.  It is, but it's not a real loan agreement.

25   Q.  My question was, is that the document before you?

O67BGUO3                          Ya Li - Cross

1   A.  Yes.

2   Q.  And you testified about this document on direct, correct?

3   A.  Yes.

4   Q.  And sitting here today, Ms. Li, do you have any knowledge

5   of who Mr. Guo's institutional investors were in Abu Dhabi?

6   A.  William Je.

7   Q.  Who other than William Je that you know were institutional

8   investors?

9   A.  Hamilton farm.

10  Q.  Okay.  That's still William Je, but who else?

11  A.  I don't know.

12  Q.  Is it fair to say that the only information you have is

13  about William Je, correct?

14  A.  Yes.

15  Q.  And you have no knowledge whether or not Mr. Guo applied

16  for a management consulting license to the H Reserve in Abu

17  Dhabi?

18  A.  Under Miles Guo direction.

19  Q.  What was under Miles Guo's direction?

20  A.  H Reserve and what you said, the license in Abu Dhabi.

21  Q.  So you know he applied for such a license in September 2?

22  A.  He send supporters to apply it.

23  Q.  Could you let me finish my question.  Would that be

24  possible?

25  A.  Yes.

1    Q.   So my question was, were you aware that Mr. Guo applied for

2    a management consulting license to H Reserve on September 2 of

3    2022?

4              MR. FERGENSON:   Your Honor, she answered this

5    question.

6              THE COURT:   Sustained.

7    Q.   And that license was granted, correct?

8    A.   I don't know.

9    Q.   Do you know if the H Reserve was negotiating with banks and

10   finance licenses with UAE at the same time?

11   A.   I don't know.

12   Q.   Do you know whether or not in September of 2022, they were

13   moving over the exchange to the United Arab Emirates, the

14   H Exchange?

15   A.   I know the move, but I don't know exact date.

16   Q.   You know the move, correct?

17   A.   Yes.

18   Q.   But you don't know whether it was in September of 2022?

19   A.   Yes.

20   Q.   So you don't know if it was September 2 of 2022?

21   A.   I don't know.

22   Q.   If I could show her, please, GXVI-110.  I'm sorry.  The

23   second page and then the last page.

24              You see your signature down there, correct?

25   A.   Yes.

O67BGUO3                          Ya Li - Cross

1    Q.  And you're assigned as the lender, right?

2    A.  Yes.

3    Q.  And you testified on direct that you did not read this

4    document at all, correct?

5    A.  Yes.

6    Q.  The prosecutor ask you questions about this document, and

7    you just answered them, right?

8    A.  Yes.

9    Q.  And under this document, no one was required to buy any new

10   cards, correct?

11   A.  Yes.

12   Q.  And you would agree with me, would you not, that there's

13   nothing illegal about opening up a company in Abu Dhabi?

14          MR. FERGENSON:  Objection.  She can't testify to

15   legal.

16          THE COURT:  Sustained.  She's not here to give

17   testimony about the law.

18   Q.  Do you think companies exist in Abu Dhabi?

19   A.  Sorry.

20   Q.  Do you think companies exist in Abu Dhabi?

21   A.  Yeah.

22   Q.  And people do business with companies in Abu Dhabi,

23   correct?

24   A.  Yes.

25   Q.  Okay.  And you knew Miles Guo to do business with Abu

O67BGUO3                          Ya Li - Cross

 1  Dhabi, correct?

 2  A.  Yes.

 3  Q.  And you knew that over a period of seven years, correct,

 4  cause you worked for him as you said for seven years, right?

 5          MR. FERGENSON:  Your Honor, she needs to be able to

 6  answer the question before another one is posed.

 7          THE COURT:  That's right.  Let her answer the

 8  question.

 9  A.  I don't know.

10  Q.  Okay.  Now, Mr. Fergenson over here asked you questions,

11  did he not, about the euros reference in this document,

12  correct?

13          Can we show her the reference to euros.  You see right

14  there, the loan amount?

15  A.  Yes.

16  Q.  And he zeroed in on that line, right, correct?

17  A.  Yes.

18  Q.  You remember that yesterday you testified to this line?

19  A.  Yes.

20  Q.  It will really help me out if you use the mic then I won't

21  speak while you're still thinking.

22  A.  Okay.

23  Q.  Thank you.  So you testified that you believed that

24  business was being done with euros because euros unlike dollars

25  could not be traced, right?  That was your testimony?

O67BGUO3                          Ya Li - Cross

1  A.  Yes.

2  Q.  So, Ms. Li, is it your understanding that the only currency

3  that can be traced are US dollars?

4  A.  Sorry.

5  Q.  Is it your understanding that the only currency that can be

6  traced are US dollars?

7  A.  I don't know.

8  Q.  Right.  Somebody sends money in euros from one bank to

9  another, there's still a digital transaction created, right?

10 A.  Yes.

11 Q.  And you can follow that transaction, correct?

12 A.  I don't know.

13 Q.  So isn't it possible that the reason the currency is a Euro

14 is because --

15         MR. FERGENSON:  Objection.

16 Q.  -- because that was the currency in which business was

17 being done?

18         THE COURT:  Sustained.  This is not the type of

19 hypothetical question that she should be asked.

20 Q.  You testified on direct, correct, Ms. Li, that you signed

21 documents, and I use your words here "The alliance ask me to

22 sign, so I sign with them," correct?

23 A.  Yes.

24 Q.  And you --

25 A.  Alliance also ask me to send Euro, but I couldn't send.  I

1    still send US dollar, but the contract is Euro.  It's not match

2    what the dollar I send.  I send US dollar.

3    Q.  Ms. Li, I ask you no such question.

4              MS. SHROFF:  I move to strike, your Honor.

5              THE COURT:  The answer is stricken.

6    Q.  Did you or did you not say on direct testimony that when

7    the Alliance ask me to sign, so I have to sign with them.

8    That's what you said, right?

9    A.  Yeah.

10   Q.  And then you stated, did you not, that you signed a loan

11   agreement because Lao Ban Zhang asked you to sign it?

12             MR. FERGENSON:  Objection to the slight

13   mischaracterization.  It wasn't a loan agreement.

14             THE COURT:  Overruled.  You may answer.

15   A.  No, Wang Kan.  Wang Kan ask me to sign this document.  Wang

16   Kan is in charge of Alliance finance.

17   Q.  What was Mr. Zhang's role?

18   A.  Who?

19   Q.  Lao Ban Zhang.?

20   A.  He send the document, ask me to sign off this line,

21   writeoff this loan.

22   Q.  So he asked you to write-off the loan, correct?

23   A.  Yeah.

24   Q.  Did you write-off the loan by the way?

25   A.  Yes.

O67BGUO3                     Ya Li - Cross

1   Q.  And did you do that because you wanted to write-off the

2   loan or because the Alliance --

3   A.  Because Alliance ask me to sign.

4   Q.  So he was the Alliance in your mind, correct?

5   A.  Yes.

6   Q.  And he was at one point the head of the New Zealand farm,

7   correct?

8   A.  Yes.

9   Q.  And he's actually a good friend of yours, right?

10  A.  No.

11  Q.  He wasn't a good friend of yours when he sent you this

12  document?

13  A.  No, it's just supporters.

14  Q.  I'm sorry.?

15  A.  We just all supporters.

16  Q.  Well, yes, he was a supporter, correct?

17  A.  Yes.

18  Q.  And you were more friendly with some supporters than

19  others, right?

20  A.  No.

21  Q.  You were the same friends with all the supporters

22  everywhere?

23  A.  No.

24  Q.  I'm sorry.

25  A.  No.

O67BGUO3                        Ya Li - Cross

1    Q.  But you testified on direct also that you thought these

2    supporters were all family, correct?

3    A.  Yes.

4    Q.  So you were friendly with him, correct?

5    A.  I friendly with everyone.

6    Q.  Everyone the same amount?

7    A.  Yeah.

8    Q.  No better friend, no worse friend?

9    A.  No.

10   Q.  And he was with you in the Iron Blood Group, correct?

11   A.  Yes.

12   Q.  And he's the person to whom you sold one of your companies,

13   correct?

14   A.  Sorry.

15   Q.  He is the person to whom you sold one of your companies,

16   correct?

17   A.  I don't know what you talking about.

18   Q.  Did you transfer one of your companies to him?

19   A.  The fund, yes.

20   Q.  Which one?

21   A.  Ashwood fund.

22   Q.  Whose fund was that?

23   A.  Sorry.

24   Q.  Whose fund was Ashwood?

25   A.  It's set up under Miles Guo's direction.

O67BGUO3                        Ya Li - Cross

1    Q.  I didn't ask you that.

2              MS. SHROFF:  So move to strike.

3              THE COURT:  Sustained.

4    Q.  My question to you was, Ms. Li, whose fund was that?

5    A.  Alliance fund.

6    Q.  It was Alliance's fund.  Was there a management fee on that

7    fund?

8    A.  I don't know.

9    Q.  You got the management fee cause it was your fund, right?

10   A.  No, this Alliance fund.

11   Q.  It's your name on the corporate documents for Ashwood,

12   correct?

13   A.  Yes.

14   Q.  It's your signature, correct?

15   A.  Yes.

16   Q.  You're the ultimate beneficial owner, correct?

17   A.  No.

18   Q.  Really?

19   A.  Yes.

20   Q.  Who else's signature is on the certificate of

21   incorporation?

22   A.  I don't remember.

23   Q.  You don't remember.  Is there a name such as the Alliance

24   on the documents?

25   A.  I don't remember.

O67BGUO3                    Ya Li - Cross

1   Q.  How long did you manage the Ashwood fund?

2   A.  I don't remember.

3   Q.  One year?

4   A.  I don't remember.

5   Q.  Two years?

6   A.  I don't remember.

7   Q.  How much management fee did you get?

8   A.  I don't remember.

9   Q.  Did you get a management fee?

10  A.  I don't remember.  I don't get --

11  Q.  There is no question pending, ma'am.

12          You testified, did you not, Ms. Li, right that Mr. Guo

13  over there asked you to delete and change phone numbers,

14  correct?

15  A.  Delete messages and change phone numbers, yes.

16  Q.  So he asked you to delete information from your phone,

17  correct; that was your testimony?

18  A.  Yes.

19  Q.  And he asked you to change phone numbers, correct?

20  A.  Yes.

21  Q.  And he did that with almost everyone, right?

22  A.  Sorry.

23  Q.  And he did that with almost everyone, correct?

24  A.  I don't know.

25  Q.  He would put that message in the Whatsapp group, correct?

O67BGUO3                          Ya Li - Cross

1   A.   What message?

2   Q.   That his phone was hacked.  Everybody change their number?

3   A.   I don't know.

4   Q.   And he explained to you why his phone was being hacked,

5   right?

6   A.   Yes.

7   Q.   And what was the explanation he gave you?

8   A.   The CCP hacked his phone.

9   Q.   And he would then change his number, correct?

10  A.   Yes.

11  Q.   And you sometimes changed your number or you didn't change

12  your number, right?

13  A.   What do you mean?

14  Q.   When Mr. Guo would tell you to change your number, did you

15  always change your number?

16  A.   Yeah, I get a new number.

17  Q.   You'd get a new number, right?

18  A.   Yeah.

19  Q.   And you kept one phone for Mr. Guo and another phone for

20  everyone else; is that true?

21  A.   No.

22  Q.   So you just changed the phone number that you had all the

23  time, right?

24  A.   Yeah.

25  Q.   And you testified that he told you to delete messages and

1  you deleted them, correct?

2  A.  Yeah.

3  Q.  And then you testified but you kept some direct messages

4  with Miles Guo, correct?

5  A.  I kept all direct message with Miles Guo.

6  Q.  So even though he asked you, according to you, to delete

7  everything, you kept the messages directly with Miles Guo,

8  correct?

9  A.  Yes.

10  Q.  You saved all of them, but you deleted everything else,

11  that's your testimony, right?

12  A.  No, I didn't delete everything else, just group messages.

13  Q.  Group messages.  So what did you do if you was in the

14  group?  Did you keep that message or did you delete it?

15  A.  I keep the direct messages.

16  Q.  Do you remember testifying yesterday where you said I

17  delete most of them.  I keep some direct messages with Miles

18  Guo?

19  A.  Yes.

20  Q.  So that was yesterday.  Today you're saying you kept all of

21  his direct messages, so which one is correct?

22  A.  Both.  Yesterday I mean the most means including the group

23  messages, but I keep his direct messages.  That's what I mean.

24  Q.  But you said, and I quote "And I keep some direct message

25  with Miles Guo."

O67BGUO3                          Ya Li - Cross

 1                MR. FERGENSON:  Objection, asked and answered.

 2                THE COURT:  Asked and answered.  Sustained.

 3                MS. SHROFF:  Your Honor, just for the record, that's

 4       from trial testimony 1502.

 5                THE COURT:  I did not hear you.

 6                MS. SHROFF:  Just for the record that was yesterday's

 7       trial testimony 1502.

 8       Q.  Now, you were in a Whatsapp group, right?

 9       A.  Yes.

10       Q.  And you are familiar with the application Whatsapp, right?

11                You use the application, right?

12       A.  Yes.

13       Q.  You have to download it from the Apple store and use it,

14       right?

15       A.  Yes.

16       Q.  You can set up your account, correct?

17       A.  Yes.

18       Q.  You can choose your photo, correct?

19       A.  Yes.

20       Q.  And you can use delete disappearing messages, right?

21       A.  I don't know.  I don't use.

22       Q.  You don't use Whatsapp or you don't use the function?

23       A.  I don't use that function.

24       Q.  But the function is there, right?

25       A.  Yeah.

O67BGUO3                          Ya Li - Cross

1   Q.  Now, you testified about Mr. Guo's arrest, correct?

2   A.  Yes.

3   Q.  And then you testified about reading the indictment, right?

4   A.  Sorry.

5   Q.  You testified, did you not, that you read the indictment

6   against Mr. Guo, right?

7   A.  I read or I don't read?  What do you mean?

8   Q.  You tell me if you read it or you didn't read it?

9   A.  When?

10  Q.  The indictment.

11  A.  When I read it?

12  Q.  I'm asking you.  Did you read it?

13  A.  What's your question?

14  Q.  Did you read the indictment against Miles Guo?

15  A.  Yes.

16  Q.  Do you remember what the date of the indictment was?

17  A.  15th of March.

18  Q.  What year?

19  A.  2023.

20  Q.  And after the 15th of March 2023, you remained a farm

21  leader, correct?

22  A.  Yes.

23  Q.  You remained in the Iron Blood Group, correct?

24  A.  Yes.

25  Q.  You continued working for the Alliance, correct?

O67BGUO3                          Ya Li - Cross

1   A.  Yes.

2   Q.  And throughout that time, you never went to any authorities

3   to alert them to a potential fraud, right?

4            MR. FERGENSON:  Objection to form on the throughout

5   that time.

6            THE COURT:  What time are you referring to?

7   Q.  In March of 2023, you didn't go, right, to any authority

8   saying there's a fraud?

9   A.  Sorry, which day?

10  Q.  In March of 2023, after the indictment against Mr. Guo, you

11  did not go to any authority and say, Mr. Guo there is a scam,

12  correct?

13  A.  Yeah.

14  Q.  Right.  Not in March, April, May, June, July, correct?

15  A.  Yeah.

16  Q.  Not in August, correct?

17  A.  Yes.

18  Q.  When was the first time you went to the authorities?

19  A.  I don't remember.

20  Q.  You don't even remember, right?

21  A.  Around August, September, October.

22  Q.  August or September of 2023, correct?

23  A.  Yeah.

24  Q.  I'm sorry.

25  A.  Yes.

 1    Q.  Between March 15 and August, right, you continued to set up

 2    entities, correct?

 3    A.  No.

 4    Q.  Really.  You didn't set up any entities between that time

 5    from March 15 onward?

 6    A.  No.

 7    Q.  How about for G Fashion?

 8    A.  G Fashion?

 9    Q.  Yes.

10    A.  No.

11    Q.  Did you continue to run your fund the Ashwood fund?  You

12    continued to manage it, correct?

13    A.  No, we have manager.

14    Q.  You had a manager for your fund?

15    A.  Yes.

16    Q.  What's the manager's name?

17    A.  Richard.

18    Q.  And he continued to run the fund for you, right?

19    A.  Yeah, not for me, for the Alliance.

20    Q.  Well, the fund is in your name, right?

21    A.  Yeah.

22    Q.  Where does Richard live by the way?

23            MR. FERGENSON:  Your Honor --

24            MS. SHROFF:  It shows the relationship.

25            MR. FERGENSON:  -- can we say at a high level where he

```
 1   lives.
 2              MS. SHROFF:  It is at a high level.
 3              THE COURT:  Generally, yes.
 4   Q.  Which country does he live in?
 5   A.  Australia.
 6   Q.  You have his phone number in your phone?
 7   A.  Sorry.
 8   Q.  You have his phone number in your phone, correct?
 9   A.  Yeah.
10   Q.  The Alliance doesn't have his phone number?
11   A.  Alliance of course have.  He's one of the members.
12   Q.  But the Alliance in general doesn't have his phone number
13   as the manager of your fund, right?
14              MR. FERGENSON:  Objection to form, and asked and
15   answered.
16              THE COURT:  Sustained.
17   Q.  Who got the management fee from the Ashwood fund?
18              MR. FERGENSON:  Asked and answered.
19              THE COURT:  Sustained.
20   Q.  How about the HAA fund?
21   A.  What do you mean, how about what?
22   Q.  How about the HAA fund?
23   A.  For what?
24   Q.  Were you talking?  Go ahead.
25   A.  About HAA fund what?
```

O67BGUO3                         Ya Li - Cross

1   Q.  I was getting there.  So between March 15 of 2023 and

2   August when you went to the authorities, you continued to

3   manage the HAA fund, correct?

4   A.  On behalf of Alliance.

5   Q.  You've said that.  My question to you was whether you

6   continued to manage it?

7           MR. FERGENSON:  Your Honor, she can't argue with the

8   witness.  She can ask the questions.

9           THE COURT:  Sustained.

10  Q.  Did you manage the fund?

11          MR. FERGENSON:  Asked and answered.

12          THE COURT:  Sustained.

13  Q.  You continued to pay expenses, correct -- and I'm still

14  talking about the period between March 15 and August.  You paid

15  expenses, right?

16          MR. FERGENSON:  Objection to form.

17          THE COURT:  In connection with what specifically?

18  Q.  HAA?

19  A.  I don't remember.

20  Q.  How about expenses pertaining to Ashwood?

21  A.  Yes.

22  Q.  You paid the expenses, right?

23  A.  Yeah.

24  Q.  You paid people salaries, correct?

25  A.  No.

O67BGUO3                          Ya Li - Cross

1    Q.  And at the time that you were managing these two entities,

2    you did not believe them to be fraudulent, correct?  I'm still

3    only talking from the 15th to August.

4    A.  Yes.

5    Q.  And you continued to pay expenses for IT engineers,

6    correct?

7    A.  No, I stopped.

8    Q.  You stopped paying them even though they was still working,

9    you stopped paying them?

10   A.  Yes, I stopped early 2023.

11   Q.  Early 2023?

12   A.  Yeah.

13   Q.  And you continued to vote on the Rule of Law Foundation's

14   board, correct?

15   A.  No.

16   Q.  When did you stop Rule of Law Foundation board?

17   A.  July 2023.

18   Q.  So you continued in March, right, April, May, June, July?

19   A.  But between this time period, no vote.

20   Q.  I didn't ask you if you voted, ma'am.  I asked you if you

21   remained a member of the Rule of Law Foundation's board?

22        MR. FERGENSON:  Your Honor, if she's giving responsive

23   answers, Ms. Shroff should not be arguing with her.

24        MS. SHROFF:  I'll rephrase the question, your Honor.

25   I think Mr. Fergenson overstates his point.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      THE COURT:  Is there a question?

2  Q.  I believe my last question was to her was, she remained on

3  the board of the Rule of Law Foundation until July of 2023?

4      THE COURT:  You may answer that.

5  A.  Yes.

6  Q.  And you continued to manage investments in H Coin from

7  March 15 of 2023 until August, correct?

8  A.  What do you mean manage H Coin?

9  Q.  Well, you were managing an investment to buy a bank for the

10 movement, correct?

11 A.  You mean D2 bank project?

12 Q.  Right.?

13 A.  It stopped.

14 Q.  I understand that.  My question was it continued from March

15 15 until August, correct?

16 A.  No, it finish.

17 Q.  In what year?

18 A.  2022.

19 Q.  2022?

20 A.  April 2022.

21 Q.  April of 2022?

22 A.  Yeah, we already send them all the D2 Bank money to

23 Hamilton farm.  Then after that nothing happened.

24 Q.  My question wasn't whether anything happened.  My question

25 was, you did not take any steps to withdraw from any of these

1    transactions, correct?

2    A.  What do you mean withdraw from these transactions?

3    Q.  I'll move on.

4            You remember giving testimony about HCHK?

5    A.  Yes.

6    Q.  And you read about HCHK in the indictment, correct?

7    A.  Yes.

8    Q.  And when you read about HCHK in the indictment, that is

9    when you got worried, correct?

10   A.  Got what?

11   Q.  Is that when you started to get worried, concerned, scared?

12   A.  Concern, not scared.

13   Q.  You were concerned because you were a director of HCHK,

14   correct?

15   A.  No, because I thought that's a Rule of Law Foundation is a

16   charity, but now coming out is a company.  That's totally

17   different.

18   Q.  And you were on as the director, right?

19   A.  Yes, I been mislead by Miles Guo.

20   Q.  I understand.  You were misled by Miles Guo.

21           My question to you was, ma'am, you were worried

22   because your name was on the document, correct?

23   A.  That's no my name, just company's name.

24   Q.  Which company?

25   A.  HCHKBVI.

O67BGUO3                          Ya Li - Cross

1    Q.  And whose name was associated with HCHK?

2    A.  Yvette Wang.

3    Q.  And not yours?

4    A.  No.

5    Q.  So your name was not there at all?

6    A.  Not on the document, but I know I'm another director.

7    Q.  Now, you testified on direct, Ms. Li, that you were

8    approached to sign a document in connection with Mr. Guo's

9    bankruptcy, correct?

10   A.  Yes.

11   Q.  And you were approached you testified by a lawyer for

12   Ms. Wang, correct?

13   A.  Yes.

14   Q.  And what was the lawyer's name by the way?

15   A.  Alex Lipman.

16   Q.  After Mr. Lipman had approached you, you were approached by

17   another lawyer, correct?

18   A.  I don't remember.

19   Q.  You don't remember.  You testified about it yesterday?

20   A.  There were many lawyers, but I remember Alex Lipman send

21   the email to ask me to sign that document.

22   Q.  And then after that you were approached by another lawyer,

23   correct?

24   A.  Yeah.

25   Q.  And could I have GX-121 pulled up.  You remember the other

1    lawyer's name is Yongbing Zhang.  Maybe we could show her a

2    photo.

3                  MR. FERGENSON:  Your Honor, may I have just a moment

4    to talk to defense counsel very briefly.

5                  THE COURT:  Yes.

6                  (Counsel conferred)

7    Q.  I've shown you what is DX6053, correct?

8    A.  Yes.

9    Q.  Who's that?

10   A.  Yongbing.

11   Q.  Is this the lawyer that also approached you on behalf of

12   Ms. Wang?

13   A.  Yes.

14   Q.  And he brought you a document that he wanted you to sign,

15   correct?

16   A.  Not him, it's Alex Lipman send me.  He send me the false

17   affidavit.  That's a different document.

18   Q.  That's the document I'm talking about, the false affidavit

19   according to you, right?

20   A.  Yes.

21                  MS. SHROFF:  And, by the way, could I move this into

22   evidence.

23                  MR. FERGENSON:  No objection.

24                  THE COURT:  It is admitted.

25   Q.  And he asked you to sign this?

O67BGUO3                          Ya Li - Cross

```
 1                 THE COURT:  What is the number of the exhibit again?

 2                 MS. SHROFF:  60503.

 3                 (Defendant's Exhibit 60503 received in evidence)

 4     BY MS. SHROFF:

 5     Q.  We're no longer talking about the Alex Lipman document

 6     which was sent to you via email, okay?

 7     A.  Okay.

 8     Q.  We're talking about the document that he brought for you,

 9     correct?

10     A.  Yeah.

11     Q.  And you testified yesterday, right, that he threatened you

12     when you refused to sign it, correct?

13     A.  Yes.

14     Q.  And I just want to be clear.  He did not threaten you with

15     any violence, correct?

16     A.  Not physically.

17     Q.  He did not threaten you with any physical violence,

18     correct?

19     A.  Yeah.

20     Q.  He did not threaten to brand you a CCP spy, correct?

21     A.  Yeah.

22     Q.  I'm correct, right?

23     A.  Yeah.

24     Q.  He did not threaten to brand you a CCP spy?

25     A.  Yeah.
```

1    Q.  By "yeah" you mean I'm correct?

2    A.  Yes.

3    Q.  He did not threaten to kick you out of the movement,

4    correct?

5    A.  Sorry.  Can you say it again.

6    Q.  He did not threaten to kick you out of the movement,

7    correct?

8    A.  But I feel like that.

9    Q.  My question to you was, did he threaten you that you're

10   going to get kicked out of the movement if you don't sign the

11   affidavit?

12   A.  Make me feel like that.

13   Q.  That's how you felt.  My question is, did he use any words

14   and threaten you?

15   A.  Yes.

16   Q.  He used words to threaten you and said if you don't sign

17   this you'll be kicked out of the movement?

18   A.  Make me feel like that.

19   Q.  I didn't ask you if he made you feel like that, ma'am.  My

20   question to was, which you still haven't answered, is whether

21   or not he used words to threaten you?

22   A.  He used.

23   Q.  Now you're saying he used the words?

24   A.  Yes.

25   Q.  So this man threatened you and said, if you don't sign this

O67BGUO3                        Ya Li - Cross

1    affidavit, we're going to throw you out of the movement?

2    A.  The message make me feel like that.

3    Q.  Okay.  But the message did not have those words, correct?

4    A.  It's a threatening message.

5    Q.  Tell me what was the message?  Tell me what was threatening

6    about the message?

7    A.  He said as Alliance legal team, this is my full responsible

8    for this Alliance if this case we lose.  We lose $38 million,

9    I'm fully responsible for that.

10   Q.  Right.  But he never threatened to throw you out of the

11   movement, right?

12   A.  That make me feel like that.

13   Q.  That's what it made you feel like, but he never said those

14   words to you?

15            MR. FERGENSON:  Asked and answered.

16            MS. SHROFF:  It's never been answered.

17            THE COURT:  Did you say something?

18            MR. FERGENSON:  I think that was Ms. Shroff.

19            THE COURT:  Sustained.  Let's move on.

20   Q.  Can you show her Long Island David's photo, please.  Who's

21   that?

22   A.  Brother Long Island Changdao.

23   Q.  Also known as Brother Long Island David, correct?

24   A.  Yes.

25            MS. SHROFF:  I move this document into evidence,

O67BGUO3                          Ya Li - Cross

1   DX6498.

2              MR. FERGENSON:  No objection.

3              THE COURT:  It is admitted.

4              (Defendant's Exhibit 6498 received in evidence)

5   BY MS. SHROFF:

6   Q.  He's part of the movement, right?

7   A.  Yes.

8   Q.  He's the leader of some farm, correct?

9   A.  Use to be Mountain Spices farm leader.

10  Q.  And you interacted with him, right?

11  A.  Yes.

12  Q.  Frequently in fact, right?

13  A.  Yes, because we are in Iron Blood Group.

14  Q.  You interacted with him even outside of Iron Blood Group,

15  right?

16  A.  No.

17  Q.  No?

18  A.  No.

19  Q.  When was the last time you spoke to Long Island David, this

20  man?

21  A.  I don't remember.

22  Q.  Was it last month?

23  A.  No.

24  Q.  Was it the month before?

25  A.  No.

O67BGUO3                        Ya Li - Cross

```
 1   Q.  Do you remember if it was the month before?
 2   A.  No.
 3   Q.  In fact, you don't know if you spoke to him in 2024 because
 4   you don't remember now, correct?
 5   A.  I left in November 2023.
 6   Q.  My question wasn't when you left.
 7           My question was, ma'am, whether or not you continued
 8   to talk to Long Island David in 2024?
 9   A.  No.
10   Q.  Since Mr. Guo's arrest, did you continue to do business
11   with him?
12   A.  What do you mean business?
13   Q.  Did you continue to interact with him?
14   A.  Yes.
15   Q.  Did you continue to talk about entities with him?
16   A.  Yes.
17   Q.  And that was after Mr. Guo's arrest, right?
18   A.  Yes.
19   Q.  And sitting here today, you don't know if that went into
20   2024, correct?
21           MR. FERGENSON:  Objection.
22   A.  Yes.
23           THE COURT:  Asked and answered.  Sustained.
24   Q.  Turning back now to your communication with Mr. Zhang
25   right?
```

O67BGUO3                          Ya Li - Cross

1   A.  Who?

2   Q.  Yong, the photo right before.  Let's pull him back up.

3           He's the one who asked you to sign the false

4   affidavit, correct?

5   A.  Yes.

6   Q.  And he told you, according to you, that if you did not sign

7   it, the alliance would lose $35 million, correct?

8   A.  Yes.

9   Q.  And you didn't sign that document, right?

10  A.  Yes.

11  Q.  And you didn't sign that document because you wanted the

12  money to go back to the HCHK creditors, correct?

13  A.  No, I didn't sign because it's false.

14  Q.  You didn't sign it because it's false, correct?

15  A.  Yes.

16  Q.  And if you had signed it, the money would have gone back,

17  not to the bankruptcy trustee, correct?

18          MR. FERGENSON:  Objection, calls for a legal

19  conclusion.

20          THE COURT:  Sustained.

21  Q.  You read the affidavit, right?

22  A.  Yes.

23  Q.  You believed it was false, correct?

24  A.  Yes.

25  Q.  You also believed that he believed it was true, correct?

1          MR. FERGENSON:  Objection to form.

2          THE COURT:  Sustained.

3   Q.  You wanted the 38 million to go to the bankruptcy trustee,

4   correct?

5          MR. FERGENSON:  Objection.

6          THE COURT:  You can answer.

7   A.  Sorry.  Can you repeat.

8   Q.  You wanted the $38 million to go to the bankruptcy trustee,

9   correct?

10  A.  Not I wanted, but because there's already a TRO there.

11  Q.  So you thought it right for the money to go to the

12  bankruptcy trustee, right?

13         MR. FERGENSON:  Asked and answered.

14         MS. SHROFF:  Actually, she hasn't answered it.

15         THE COURT:  You can answer.

16  A.  Can you say it again.

17         MS. SHROFF:  I'm sorry to impose on you, but can you

18  read her the question.

19         (Record was read)?

20  A.  Yeah, it's right.

21  Q.  And HAA is one of HCHK's creditors, correct?

22  A.  No.

23  Q.  HAA had loaned money to HCHK, correct?

24  A.  I sent money to HCHK Technologies, but the contract sign

25  with New Zealand company.

O67BGUO3                         Ya Li - Cross

1    Q.  Ma'am, my question was whether the money had been sent to

2    HCHK, not who the contract was signed with?

3              THE COURT:  Is there an objection?

4              MR. FERGENSON:  She answered the question, your Honor.

5    Ms. Shroff can't characterize the evidence.

6              THE COURT:  Sustained.

7    Q.  Did HCHK owe HAA money?

8    A.  No, that's for buy GTV share, not a real loan.

9    Q.  I could not hear her.?

10   A.  That's for buy GTV shares, not for the loan.

11   Q.  For whatever the reason was, HCHK -- the question really

12   was.  You answered a different question, so I just want to make

13   clear.

14             MS. SHROFF:  Your Honor, may we approach.

15             THE COURT:  You asked the question, and part of her

16   answer was no, so move on.

17   Q.  The Mountain of Spice fund/farm had loaned money, correct?

18   A.  No.  I don't know.  It's another farm.  I don't know.

19   Q.  You don't know?

20   A.  I don't know.

21   Q.  So as a member of the Iron Blood Group, you do not know

22   what other monies was sent to HCHK?

23   A.  I don't know.

24   Q.  You do know this much that the farms got their money from

25   members, correct?

O67BGUO3                          Ya Li - Cross

1    A.  Yes.

2    Q.  And they were US members, correct?

3    A.  Which farm?

4    Q.  The Mountain of Spice farm got money from US members,

5    correct?

6    A.  Each farm have members all over the world, not only from

7    US.

8    Q.  And all of those proceeds went into the loans, correct?

9    A.  It's not a loan.  It's for buy GTV shares.

10   Q.  Okay.  Whatever you decided it is.?

11   A.  Not I decided.  Miles Guo said.

12            THE COURT:  The witness has said it was not a loan.

13   Q.  Was there a loan agreement executed?

14   A.  What do you mean executed?

15   Q.  Signed.?

16   A.  Signed only by farm.  No one sign back.

17   Q.  But it was still signed, correct, by one entity, correct?

18   A.  By farm.

19   Q.  The farm signed the document, correct?

20   A.  Yeah.

21   Q.  As a result of that signature, money left an account,

22   correct?

23   A.  Sorry.

24   Q.  Money left an account and went into HCHK, correct?

25   A.  You talking about which farm, which transaction?

O67BGUO3                         Ya Li - Cross

1   Q.  Let me try it this way.  The trustee, the bankruptcy
2   trustee was to recover money and return it to creditors, that
3   was your understanding, correct?
4   A.  Yes.
5   Q.  And one of the creditors was HAA, correct?
6   A.  No.
7            MR. FERGENSON:  Asked and answered.
8            THE COURT:  Sustained.
9   Q.  The trustee sued HAA in February of 2024, correct?
10  A.  I don't remember.
11  Q.  In February of 2024 you controlled HAA, correct?
12  A.  What's the date?
13  Q.  February of 2024.  We're in June now.?
14  A.  Yeah.
15  Q.  February, March, April, May, June.?
16  A.  Yeah.
17  Q.  So February of 2024, the trustee sued HAA, correct?
18  A.  I don't know what do you mean by "sue." Which case?
19  Q.  Brought a lawsuit, a civil lawsuit to collect money from
20  HAA?
21  A.  Yes.
22  Q.  Right.  And even though they brought the lawsuit, you never
23  turned over any money from HAA to the trustee, correct?
24  A.  Sorry.  I never what?
25           MS. SHROFF:  I'm sorry to do this, but can you just

O67BGUO3                        Ya Li - Cross

```
 1   read her the question back.
 2              (Record was read)
 3   A.  No.
 4   Q.  Right.  And instead, you turned over the -- you transferred
 5   the assets of HAA to someone else, correct, and that was -- let
 6   me just refresh your recollection -- in May of 2024?
 7   A.  Yes.
 8   Q.  Okay.  So May of 2024, you transferred it over to someone
 9   else, correct, who was that?
10   A.  I don't know.  Alliance decide.
11   Q.  I didn't ask you who decided.  I just asked you who you
12   transferred the fund to?
13   A.  I don't know.
14   Q.  You don't know?
15   A.  I just ask them to take over from me.  I don't want
16   involved anymore.
17   Q.  But they hadn't take over from you, correct?
18              MR. FERGENSON:  Your Honor, we've covered it I think.
19              MS. SHROFF:  We have not.
20              THE COURT:  You may answer.
21   A.  What's your question?  I told everything to Luc.  He knows.
22   Q.  Who's Duke?
23   A.  Luc Despins.
24   Q.  I didn't ask you if you done anything like that, so I move
25   to strike.
```

O67BGUO3                          Ya Li - Cross

1        My question to you, ma'am, was whether or not you

2   transferred HAA over entirely to someone else?

3   A.  Yes.

4   Q.  Okay.  And that was not Luc Despins, correct, that's

5   someone else?  It was not Luc, right?

6   A.  Yes.

7   Q.  It was not the bankruptcy trustee, right?

8   A.  Yes.

9   Q.  Okay.  And you told these prosecutors that you had done

10  that, correct?

11  A.  Done what?

12  Q.  The transfer.?

13  A.  Yeah.

14  Q.  In May of 2024, you told that to Mr. Fergenson, correct?

15  A.  Yes.

16  Q.  And that is why he included HAA in your non-prosecution

17  agreement, correct?

18  A.  Yes.

19  Q.  And he included that not in the first draft, but in the

20  final version because you're the one who pointed it out that it

21  wasn't in the first version, correct?

22              MR. FERGENSON:  Objection on getting into her

23  discussions with her counsel, your Honor.

24              MS. SHROFF:  I'm talking about her discussion --

25              THE COURT:  Overruled.  You may answer.

O67BGUO3                          Ya Li - Cross

1   A.  Can you say it again.

2   Q.  They gave you a draft non-prosecution agreement, correct?

3   A.  Yes.

4   Q.  HAA is not mentioned, right?

5   A.  Yes.

6   Q.  Then they gave you a final version, correct?

7   A.  Yes.

8   Q.  They added in HAA, correct?

9        You got coverage for HAA, correct?

10  A.  Yes.

11  Q.  Now, you've testified on direct that you resigned from your

12  position after meeting with the FBI, correct?

13  A.  Yes.

14  Q.  And it is also your testimony that after you resigned, the

15  police showed up, correct, the Chinese police showed up you

16  said?

17  A.  Yes.

18  Q.  And you testified that they showed up and they said they

19  were acting on the orders of the Ministry of State Security,

20  correct?

21  A.  Yes.

22  Q.  And the Ministry of State Security is the same people that

23  were hounding Mr. Guo, correct?

24  A.  I don't know.

25  Q.  Didn't he tell you that many, many times in the broadcast

O67BGUO3                          Ya Li - Cross

1   that you listen to at that time?

2   A.  At that time I don't know is that true or not.

3   Q.  I didn't ask you if it was true or not.  I asked you if

4   Mr. Guo said that?

5   A.  He said before.

6   Q.  So you understand the difference between my asking you

7   something --

8            MR. FERGENSON:  Your Honor --

9            MS. SHROFF:  I withdraw it.

10  Q.  You think, according to your testimony yesterday, that it

11  was Mr. Guo who sent the MSS to visit your relatives; is that

12  your testimony?

13           MR. FERGENSON:  That's mischaracterizing the

14  testimony.

15           THE COURT:  Sustained.  That was not her testimony.

16  Q.  Who do you think sent the MSS to your relatives?

17  A.  CCP.

18  Q.  You think CCP sent them?

19           You think the CCP sent the MSS to your relatives

20  because you were talking with the FBI to testify against Miles

21  Guo?

22           MR. FERGENSON:  Again, object to form.  She answered

23  the question and now it's a compound question.

24           THE COURT:  Sustained.

25  Q.  The MSS visited your family, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O67BGUO3                        Ya Li - Cross

1   A.  Yes.

2   Q.  You believed that it was the CCP who sent them?

3   A.  Yes.

4   Q.  The CCP who is the enemy of Miles Guo?

5   A.  I don't know.

6   Q.  So now you think Miles Guo is a spy for the CCP?

7   A.  What?  Sorry.

8   Q.  So now you think Miles Guo is an agent of the CCP?

9   A.  I don't know.

10  Q.  Ms. Li, part of your testimony yesterday is that you

11  received H Coin from the Alliance, correct?

12  A.  Yes.

13  Q.  And that is not the only currency that you received from

14  farm members, correct?

15  A.  I don't understand.  What do you mean?

16  Q.  You received money from the United States and Japan

17  members, right, who sent their money to HAA, correct?

18  A.  The Japan farm and the US farm, yes.

19  Q.  They sent money, correct?

20  A.  Yes.

21  Q.  And that was in dollars, correct?

22  A.  Yes.

23  Q.  Not in H Coin, correct?

24  A.  Yes.

25  Q.  And you received that money to buy H Coin for members who

1  are otherwise not allowed to purchase it, correct?

2  A.  Yes.

3  Q.  And after doing that, you took a fee, correct?

4  A.  I took what?

5  Q.  A fee, a fee, F-E-E, like a charge?

6  A.  No.

7  Q.  Your testimony is that you did not charge a three percent

8  fee that went to HAA?

9  A.  No, zero.

10 Q.  You did not charge a three percent fee, that's your

11 testimony?

12 A.  No, Hamilton charge, not me.

13 Q.  No.  No.

14        MR. FERGENSON:  Your Honor, she can't argue. She can

15 ask questions and the witness answered.

16        THE COURT:  Don't testify.

17 Q.  HAA got a fee of three percent, correct?

18 A.  No.

19        MR. FERGENSON:  Asked and answered.

20        THE COURT:  Sustained.

21 Q.  The money came to HAA, right?

22 A.  Yes.

23 Q.  Is it your testimony that the entire amount without a fee

24 was transferred?

25 A.  Yes.

O67BGUO3                          Ya Li - Cross

1   Q.  And you received --

2   A.  I transfer under Brother Island Changdao's direction.

3   Q.  So it was not under Miles Guo's direction now.  It's under

4   Long Island David's direction?

5   A.  Miles Guo give Island Changdao direction, and Island

6   Changdao give me direction.

7   Q.  Okay.  And none of these questions are questions I asked

8   you, right?  You just volunteered that information now?

9           MR. FERGENSON:  Objection.

10          THE COURT:  Counsel.

11  Q.  You received money from farm members into your Ashwood

12  fund, correct?

13  A.  Sorry.

14  Q.  You remember Ashwood the fund that you had?

15  A.  Yes.

16  Q.  Right, you remember it?

17  A.  Yes.

18  Q.  It got money, correct?

19  A.  Yes.

20  Q.  In US dollars, correct?

21  A.  Yes.

22  Q.  In other currency, correct?

23  A.  No.

24  Q.  Just in US dollars, right?

25  A.  Yes.

1  Q.  And your testimony is that you did not charge a fee there

2  either, even though you were managing the fund?

3  A.  That fund charge money.

4  Q.  The fund charge --

5  A.  Charge management fee, yes.

6  Q.  Ashwood?

7  A.  Yes.

8  Q.  Charged a management fee?

9  A.  Yes.

10  Q.  Three percent?

11  A.  I don't remember exactly.

12  Q.  You don't remember?

13  A.  Yeah, but there's a fee, but I don't remember if it's three

14  percent or not.

15  Q.  I'm not going to ask you again, but you are the person

16  incorporating Ashwood fund, right?

17  A.  On behalf of Miles Guo.

18  Q.  Of course, but you're the one who ran the fund, right?

19  A.  Yes.

20  Q.  The money came to you, right?

21  A.  Not me, to Alliance.

22  Q.  No, no.?

23  A.  Not me, not myself.

24          THE COURT:  Don't testify.

25  Q.  The money came to the HAA fund, right?

O67BGUO3                          Ya Li - Cross

 1              MR. FERGENSON:  Asked and answered.

 2              THE COURT:  Sustained.

 3    Q.  You used the money in both funds to purchase H Coin,

 4    correct?

 5              MR. FERGENSON:  We're repeating now, your Honor.

 6              THE COURT:  Sustained.

 7    Q.  By the way, did you use the money at Ashwood to invest in a

 8    bank?

 9    A.  D2 Bank.

10    Q.  I'm sorry.

11    A.  D2 Bank.

12    Q.  So the answer is yes, you used the money in the Ashwood

13    fund to invest in a digital bank, correct?

14    A.  Yes.

15    Q.  The investment in this digital bank was in the name of

16    Ashwood, correct?

17    A.  Yes.

18    Q.  It was not in the name of the farm members who put in the

19    money, correct?

20    A.  Yes.

21    Q.  And the amount of money that you managed or controlled only

22    on behalf of Miles Guo or the Alliance I'm sure was in the

23    millions of dollars, correct?

24              MR. FERGENSON:  Your Honor, the commentary is uncalled

25    for.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

1   Q.  It was it in the millions of dollars, correct?

2   A.  Eight million.

3   Q.  And your testimony is under eight million you charge no

4   fee, correct?

5           MR. FERGENSON:  We've covered this.

6   A.  This we charge fee.

7           THE COURT:  Sustained.  So we've established that she

8   personally has not charged a fee, according to her.

9   Q.  According to you, the fund charged the fee, right?

10  A.  Yes.

11  Q.  Now, as a result of this non-prosecution agreement that you

12  have with Mr. Fergenson and his office, they are not going to

13  prosecute you here, correct?

14  A.  If I'm telling the truth provide the evidence.

15  Q.  Right.  As long as you do what they asked you to do, they

16  will give you coverage, correct?

17  A.  No.

18  Q.  Ma'am, they've agreed to give you coverage through the

19  non-prosecution agreement, correct?

20  A.  Yes.

21  Q.  And as a result of that non-prosecution agreement, they did

22  not ask you to turn over any money, correct?

23  A.  Sorry.

24  Q.  They haven't asked you to turn over any money, right?

25  A.  What do you mean turn over what money?

O67BGUO3                      Ya Li - Cross

1   Q.  Any money from Ashwood, HAA, they have not asked you to

2   turn over any money, correct?

3   A.  No.

4   Q.  And they never asked you to turn over any H Coin, correct?

5   A.  Yes.

6   Q.  And now they have given you coverage, the United States

7   government has given you coverage, correct?

8   A.  Yes.

9   Q.  And you testified at one point you were worried about the

10  US government, right?

11          You were worried that they would arrest you; is that

12  right?

13  A.  Because Island Changdao said at that time I believe that

14  FBI is CCP.

15  Q.  All right.  But now you're no longer worried about that,

16  right?

17  A.  Yes.

18  Q.  And now you are worried about the CCP, correct?

19  A.  Yes.

20  Q.  And the best way to get rid of the CCP is to testify

21  against Miles Guo, correct?

22          MR. FERGENSON:  Objection.

23          THE COURT:  Sustained.

24  Q.  The only way you can safely go back to China is if you

25  disavow your relationship with Mr. Miles Guo, correct?

1          MR. FERGENSON:  Objection.

2          THE COURT:  I'll allow her to answer that question.

3     A.  No.

4          THE COURT:  Next question.

5     Q.  Could I show her, let's call it DX-7000.  Do you recognize

6     it, ma'am?

7     A.  Yes.

8     Q.  What is it?

9     A.  It's Miles Guo's broadcast.

10    Q.  And you've seen it before, right?

11    A.  Yes.

12         MS. SHROFF:  I move Defense Exhibit 7000 into

13    evidence.

14         MR. FERGENSON:  No objection.

15         THE COURT:  It is admitted.

16         (Defendant's Exhibit 7000 received in evidence)

17         MS. SHROFF:  May I publish it to the jury, your Honor?

18         THE COURT:  Yes.

19    Q.  Tell us please, starting on the left hand corner, who's the

20    first man over there.?

21    A.  Left, Lao Ban Zhang.

22    Q.  Who's that?

23    A.  Lao Ban Zhang use to be the Iron Blood Group member and the

24    New Zealand farm leader.

25    Q.  Who's below him?

1   A.  Ru Shui.

2   Q.  Who is Ru Shui?

3   A.  Ru Shui also one of the Iron Blood Group member and the one

4   farm leader.

5   Q.  But let's stay with you Ru Shui now.

6          Below that, tell the jury who those two are?

7   A.  Hao Tian and Dao Haidong.

8   Q.  Let's start with the male.  Who's he?

9          In the photo on the left, there are two people in

10  there, right?

11  A.  Hao Haidong and Hao Tian.

12  Q.  He is the soccer player, correct?

13  A.  Yes.

14  Q.  That's his wife, correct?

15  A.  Yes.

16  Q.  Olympic Badminton player, correct?

17  A.  Yes.

18  Q.  For China, correct?

19  A.  Yes.

20  Q.  And you know sitting here today that both of them now live

21  in Spain, correct?

22  A.  Yes.

23  Q.  And in the middle are two individuals, correct?

24  A.  Yes.

25  Q.  I certainly don't need you to identify Miles Guo, but tell

O67BGUO3                          Ya Li - Cross

1   the jury who's next to him?

2   A.  Brother Long Island Changdao.

3   Q.  And who's on the right corner over there?

4   A.  Tao Ying Chago grassroot brother.

5   Q.  And he's the leader of the Japan Fund?

6   A.  Japan fund and Iron Blood Group member.

7   Q.  So one, two, three, four, five, six, seven people so far,

8   correct?

9   A.  Yeah.

10  Q.  This is from the VOA anniversary, right, Anniversary of

11  4/19/2017 interview, right?

12  A.  Yes.

13  Q.  And the only person in this meeting that has not shown her

14  face because of worry for the CCP is you?

15  A.  I just don't want to show my face.

16  Q.  Exactly, because you're worried about the CCP, correct?

17  A.  Yes.

18  Q.  And you're worried that the CCP will associate you with his

19  movement, correct?

20  A.  They already associate.

21  Q.  Right.  And the best way for you to disassociate with him

22  is to testify against him here?

23  A.  No.

24  Q.  Isn't that a way to disassociate with him?

25  A.  That's because he did something wrong.  He steal people's

O67BGUO3                          Ya Li - Cross

```
 1    money.  That's different.
 2    Q.  But that's your opinion, right, that he stole money?
 3    A.  This a fact.
 4    Q.  You believe that to be a fact, ma'am?
 5    A.  Yes.
 6    Q.  A fact according to you, right?
 7    A.  According to my personal experience.
 8    Q.  Exactly.  Just you?
 9            MR. FERGENSON:  Asked and answered.
10            THE COURT:  Sustained.
11    Q.  You're the only one who's not showing her face, correct?
12            MR. FERGENSON:  Asked and answered.
13            THE COURT:  Sustained.
14    Q.  And that is the avatar of Mulan, correct?
15    A.  Yes.
16    Q.  The woman who wants to fight like a man, right?
17    A.  Yes.
18    Q.  And the safest way for you to go back to China is to say, I
19    do not associate with him?
20            MR. FERGENSON:  Asked and answered.
21    A.  No.
22            THE COURT:  Sustained.
23    A.  I come here and I show my face.
24            THE COURT:  Let's move on.
25    Q.  You came here.  You showed your face and testified against
```

O67BGUO3                          Ya Li - Redirect

1   Miles Guo, correct?

2   A.  I just tell the truth.

3            MR. FERGENSON:  She should be allowed to answer the

4   question that's posed, your Honor.

5            MS. SHROFF:  I have just one last question, your

6   Honor.

7            THE COURT:  Okay.

8   Q.  When you were associated with his movement, you never once

9   showed your face, correct?

10  A.  Yes.

11           MS. SHROFF:  No further questions.

12           THE COURT:  Redirect.

13           MR. FERGENSON:  Thank you, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. FERGENSON:

16  Q.  Good afternoon, Ms. Li?

17  A.  Good afternoon, Fergenson.

18  Q.  You were asked some questions about monthly payments of

19  $10,000 from Rule of Law Foundation.  Do you recall those

20  questions?

21  A.  Yes.

22  Q.  So just to start, when did those monthly payments, the

23  $10,000 monthly payments, around when did those begin?

24  A.  From July 2021.

25  Q.  And we'll come back to those payments.  But before that

1    time, how long had you been volunteering for Miles Guo

2    approximately?

3    A.  About four years.

4    Q.  What sort of hours did you work volunteering for Guo?

5    A.  Many hours.

6    Q.  Did you work on weekends?

7    A.  Everyday.

8    Q.  Did you work at night?

9    A.  Yes.

10   Q.  And in July 2021, did you request to start getting paid?

11   A.  No.

12   Q.  What happened that led to these $10,000 monthly payments?

13   A.  From that time Miles Guo ask every farm leader and Iron

14   Blood Group member need to work full-time for the Alliance.

15   Q.  And before July 2021, did you have a paying job as an

16   accountant?

17   A.  Yes.

18   Q.  What was your response when Miles Guo said you had to work

19   full-time for the Alliance?

20   A.  I said I still can work voluntarily, but he insist you

21   should quit your job and work for me full-time.

22   Q.  What did you do after he told you that?

23   A.  So the next day I ask my company, I quit, I resign.

24   Q.  How long were you paid the $10,000 each month?

25   A.  About one year.

O67BGUO3                        Ya Li - Redirect

1    Q.  And was this $10,000 payment, was it just to you or was it

2    to all the Iron Blood Group members?

3    A.  All the Iron Blood Group members.

4    Q.  You also testified that after about a year or so the

5    payments changed to H Coin?

6    A.  Yes.

7    Q.  When Guo began paying farm leaders with H Coin, what, if

8    anything, did he say about Himalaya Exchange's bank account

9    being seized by the US government?

10   A.  Yes, that's a similar time.  So Himalaya Exchange is not

11   function.

12   Q.  And when he started paying people in H Coin, did he tell

13   them that the bank account had been seized?

14          MS. SHROFF:  Objection, your Honor.  It misstates

15   facts in evidence.  There's no evidence that Mr. Guo didn't

16   pay.

17          THE COURT:  Overruled.

18   Q.  When Guo started paying farm leaders with H Coin later in

19   2022, did he disclose that the bank account for Himalaya

20   Exchange had been seized?

21   A.  No.

22   Q.  By the way, Ms. Li, what do you do for work now?

23   A.  Accountant.

24   Q.  Ms. Loftus, can we please publish Government Exhibit

25   VI-114.  Ms. Li, this is the Ampleforth Capital LTD

O67BGUO3                    Ya Li - Redirect

1    subscription document.  Do you remember being asked questions

2    about this on cross examination?

3    A.  Yes.

4    Q.  And you were asked about whether the government showed you

5    this document in meetings.  Do you recall that?

6    A.  Yes.

7    Q.  Did you give this document to the government in the first

8    instance?

9    A.  Yes, I sent it to the government.

10   Q.  And the other documents you were asked about whether you

11   looked at them with the government, did you give those to the

12   government in the first instance too?

13   A.  Yes.

14          MS. SHROFF:  Which ones, your Honor?

15          MR. FERGENSON:  The ones she was asked about on cross.

16   A.  Yes, I give the US government.

17   Q.  Ms. Loftus, if we could go to, if we could please publish

18   Government Exhibit VI-29.

19          Now, Ms. Li, this is the voice message you transcribed

20   and translated for Miles Guo.  Do you recall being asked about

21   this on cross?

22   A.  Yes.

23   Q.  You were asked questions about related to G/Clubs in this,

24   do you recall that?

25   A.  Yes.

O67BGUO3                          Ya Li - Redirect

1   Q.  Whether Aaron Mitchell was the lawyer for G/Clubs.  Do you

2   remember those questions?

3   A.  Yes.

4   Q.  Ms. Li, let me just read paragraph A:  The family fund

5   offering the final price is $26 million.  Does that say G/Club

6   is offering the final price or the family fund?

7   A.  Family fund.

8   Q.  When you got this, did you think G/Clubs was playing for

9   this $26 million mansion?

10  A.  No.

11  Q.  We can take it down, Ms. Loftus.

12          Ms. Li, you were also asked questions about the black

13  list.  Do you remember being asked questions about that?

14  A.  Yes.

15  Q.  Can you just explain to the jury the way the black list

16  worked?

17  A.  If someone publicly criticize Miles Guo or Alliance or New

18  Federal State of China, and then we would put them on the black

19  list and approved by Miles Guo.  And there's a Gettr account to

20  publicly show the black list.

21  Q.  Ms. Li, you were also asked about protest.  Do you remember

22  being asked about protest?

23  A.  Yes.

24  Q.  Who picked the targets of the protest?

25  A.  Miles Guo.

1    Q.  Who said well done about the violence?

2    A.  Miles Guo.

3    Q.  You were also asked about being threatened by Zhang

4    Yongbing.  Do you remember those questions?

5    A.  Yes.

6    Q.  Why did you feel like you were being threatened to be

7    kicked out of the movement?

8         Could you explain to the jury why it felt that way?

9    A.  Because he ask me to fully responsible for that $38

10   million.  I can't repay.  If we lose the case, I can't pay back

11   that much money.  I don't have that money.  I only have one

12   life they can take.

13   Q.  I won't ask you more about that.  You were also asked about

14   being sued by the US bankruptcy trustee.

15   A.  Yes.

16   Q.  Ms. Li, are you cooperating with the US bankruptcy trustee?

17   A.  Yes.

18   Q.  Do you have any formal agreement, or are you just being

19   helpful where asked?

20        MS. SHROFF:  Objection, compound.

21        THE COURT:  Break it down, please.

22   Q.  Could you please describe what you mean how are you helping

23   the bankruptcy trustee?

24   A.  I voluntarily contact bankruptcy trustee Luc Despins and

25   explained to him what happened and every document I provided to

O67BGUO3                        Ya Li - Redirect

1    him.

2    Q.  Ms. Li, do you remember being asked about the Ashwood fund?

3    A.  Yes.

4    Q.  Who asked you to set up the Ashwood fund?

5    A.  Miles Guo.

6    Q.  What was the Ashwood fund used to do?

7    A.  To do GTV bank investment.

8    Q.  Was that a Miles Guo investment project?

9    A.  Yes.

10   Q.  Ms. Li, you were asked questions yesterday on cross

11   examination about meetings or emails or phone calls with the

12   government.  Do you remember being asked those questions?

13   A.  Yes.

14   Q.  Do you recall having meetings with the government?

15   A.  Yes.

16   Q.  Do you recall sending emails to the government?

17   A.  Yes.

18   Q.  Do you recall having phone calls with the FBI?

19   A.  Yes.

20   Q.  Do you recall all the exact dates of the meetings with the

21   government?

22   A.  No.

23   Q.  Do you recall all the exact dates of every email you sent

24   to the government?

25   A.  No.

O67BGUO3                          Ya Li - Redirect

1   Q.  Do you recall all the exact dates of every phone call you

2   had with the FBI?

3   A.  No.

4   Q.  Ms. Li, when you met with the government, what, if

5   anything, did the government tell you to do in your testimony?

6   A.  I have to tell the truth.

7   Q.  What are you required to do when you testify under your

8   non-prosecution agreement?

9   A.  I have to tell the truth.

10  Q.  And before you had a non-prosecution agreement, why did you

11  refuse to sign the false affidavit?

12  A.  Because that's false.  That's lie to the court.  That's I

13  don't want to do.

14  Q.  And before you had a non-prosecution agreement, why did you

15  voluntarily travel to the United States to testify?

16  A.  Because I want to tell the court Miles Guo misleading me,

17  cheated me and lied to me.

18  Q.  You still believe in democracy in China, Ms. Li?

19  A.  Yes.

20  Q.  Are you testifying today because the CCP forced you to

21  testify?

22  A.  No.  Even now after testify because I show my face, I'm

23  even in greater risk to the CCP.

24  Q.  Did you testify yesterday and today in your real name?

25  A.  Yes.

O67BGUO3                          Ya Li  - Recross

1    Q.  Did you show your real face to these jurors?

2    A.  Yes.

3    Q.  To this whole public courtroom?

4    A.  Yes.

5    Q.  Did you tell the truth in your testimony, Ms. Li?

6    A.  Yes.

7                MR. FERGENSON:  No further questions.

8                THE COURT:  Recross.

9    RECROSS EXAMINATION

10   BY MS. SHROFF:

11   Q.  You gave documents to the prosecutors, correct?

12   A.  Yes.

13   Q.  You kept all those documents, correct?

14   A.  Yes.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O671GUO4                        Ya Li - Cross

1   BY MS. SHROFF:

2   Q.  You sent them to him, right?

3   A.  Yes.

4   Q.  Did you read them before you sent them to him?

5   A.  Yes.

6   Q.  You read them before you sent them to him and then you

7   discussed them with him, correct?

8   A.  Yes.

9   Q.  And you decided which documents to save, correct?

10  A.  I decide.

11  Q.  Right.  And you decided which documents you wanted to

12  delete, correct?

13  A.  I don't delete.

14  Q.  You didn't give him documents about the HAA management

15  fees, correct?

16  A.  Sorry?

17  Q.  Did you give him any documents about the internal workings

18  of HAA?

19  A.  Yeah.

20  Q.  Really?  You gave them to him.

21        MR. FERGENSON:  Objection to the commentary on

22  "really."

23  Q.  You gave this prosecutor documents pertaining to the

24  internal workings of the HAA fund; that's your testimony?

25        MR. FERGENSON:  Asked and answered.

O671GUO4                          Ya Li - Cross

1           THE COURT:  Asked and answered.

2    A.  What document are you refer to?

3           THE COURT:  You don't need to answer.

4    Q.  How about for Archwood, did you give them any contracts

5    that you had with Archwood?

6    A.  Yes.

7    Q.  You gave them to him.

8    A.  Yes.

9    Q.  You gave him email exchanges pertaining to your running of

10   Archwood; this prosecutor.

11   A.  Can you say it again?

12   Q.  This prosecutor asked you questions again about a place

13   called Mahwah.

14          MS. SHROFF:  Can we pull it up for her again.

15   Q.  This document, right?

16   A.  Yes.

17   Q.  How many times did you discuss this document with

18   Mr. Fergenson when you prepared?

19   A.  I don't remember.

20          MS. SHROFF:  Could I show her page 2.

21   Q.  Do you see No. 1, point No. 1 up there?  "This house cannot

22   have any more restrictions on how to living or using."

23   Correct?

24   A.  Yes.

25   Q.  This point is saying that the person who wants to buy the

O671GUO4                    Ya Li - Cross

1  house does not want to be restricted to using it simply as a
2  home, correct?
3          MR. FERGENSON:  Objection.
4  A.  I don't know.
5          THE COURT:  Sustained.
6  Q.  What is your understanding of point 1?
7  A.  I don't know.  I just translate.
8  Q.  So you have no understanding of point 1, sitting here
9  today.
10 A.  Yeah.
11         MR. FERGENSON:  Asked and answered.
12         THE COURT:  Sustained.
13 Q.  You testified about a Digital Bank Project, correct, right
14 now on redirect?
15 A.  Yes.
16 Q.  Do you know if the project is still alive?
17 A.  No, because the——
18 Q.  You don't——I'm sorry.
19 A.  It's already seized by DOJ.
20 Q.  I didn't ask you if the money was seized; I'm asking you if
21 the project to get a digital bank is still alive.
22         MR. FERGENSON:  She answered the question, your Honor.
23 A.  No.
24         THE COURT:  You may answer.
25 A.  No.

O671GUO4                          Ya Li - Cross

1   Q.  You don't know because you're no longer involved, correct?

2   A.  It's stopped, finished.

3   Q.  You're no longer part of this movement, correct?

4   A.  Yes.

5   Q.  You don't know what is going on in this movement now,

6   correct?

7   A.  Yes.

8   Q.  You don't know, right?

9   A.  Yeah.

10  Q.  Okay.  Now——

11  A.  This project, I know, stopped.  We send it to the Hamilton

12  Fund——

13          MS. SHROFF:  Move to strike.

14          THE COURT:  There was not any question pending.  These

15  comments are stricken.

16  Q.  You testified now that you were given a false affidavit,

17  correct, and you refused to sign it, right?

18  A.  Yes.

19  Q.  And then you further testified that you wanted to come and

20  testify here, correct?

21  A.  Yes.

22  Q.  And the prosecutor asked you questions whether you were

23  using your real face, correct?

24  A.  Yes.

25  Q.  And he asked you if you were using your real voice,

O671GUO4                         Ya Li - Cross

1   correct?

2   A.  Yes.

3   Q.  And that is what you did——

4              MR. FERGENSON:  I didn't ask that.

5              THE COURT:  Sustained.

6              MS. SHROFF:  What did he say?

7   Q.  Real name.  You're testifying under your real name, right?

8   A.  Yes.

9   Q.  Real name and real face, correct?

10  A.  Yes.

11  Q.  And you——I just want to be very clear——are testifying

12  against Miles Guo, correct?

13  A.  No.

14  Q.  Are you testifying for him?

15  A.  I testify to tell the truth.

16  Q.  You've said that.  My question was——

17             MR. FERGENSON:  Your Honor, asked and answered.  She

18  answered the question.

19             MS. SHROFF:  No, she didn't, actually.

20             THE COURT:  You can answer.

21  A.  Please repeat your question.

22  Q.  You are testifying for the government against Miles Guo.

23  A.  No.

24             MS. SHROFF:  Okay.  I have nothing further.  Thank

25  you, your Honor.

O671GUO4                          Soza - Direct

1              MR. FERGENSON:  No further questions.

2              THE COURT:  Thank you.  You may step out.

3              (Witness excused)

4              THE COURT:  And the prosecution may call its next

5    witness.

6              MS. SHROFF:  Your Honor, could we just have one

7    minute.

8              THE COURT:  Yes.

9              MS. SHROFF:  Thank you.

10             MR. FINKEL:  Your Honor, the government calls Lonny

11   Soza.

12             THE LAW CLERK:  Would you please pull the microphone

13   close to you, raise your right hand.

14             (Witness sworn)

15             THE LAW CLERK:  Thank you.

16             THE COURT:  Please state your name and spell it.

17             THE WITNESS:  Lonny, L-O-N-N-Y, Soza, S-O-Z-A.

18             THE COURT:  I need you to speak into the microphone

19   and speak up so everyone can hear you.

20             THE WITNESS:  Lonny, L-O-N-N-Y, Soza, S-O-Z-A.

21             THE COURT:  You may inquire.

22             MR. FINKEL:  Thank you, your Honor.

23    LONNY SOZA,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

O671GUO4                         Soza - Direct

1    DIRECT EXAMINATION

2    BY MR. FINKEL:

3    Q.  Good afternoon, Mr. Soza.  I'd just ask if you can point

4    the mic directly at your mouth.  You can feel free to move the

5    mic and move your chair, and with the mic at your mouth, it

6    will be easier for everybody to hear you, okay?

7    A.  Okay.

8    Q.  Where do you work?

9    A.  Post Oak Motor Cars.

10   Q.  And where is Post Oak Motor Cars?

11   A.  In Houston, Texas.

12   Q.  What is Post Oak Motor Cars?

13   A.  It's a luxury automobile dealership.

14   Q.  What's your position at Post Oak Motor Cars?

15   A.  I'm the president and general manager.

16   Q.  What sort of cars, if any, does Post Oak sell?

17   A.  New cars.  We sell Bugatti, Rolls Royce, Bentley, and

18   Karma.

19   Q.  What's a Karma?

20   A.  It's a fully electric car.

21   Q.  What's a Bugatti?

22   A.  Bugatti is a——what we would consider a hypercar or a super

23   car, pretty exotic and very low-volume-built vehicle.

24   Q.  I'm just going to ask you to point the microphone directly

25   at your mouth, okay?

O671GUO4                          Soza - Direct

1   A.  Is that better?

2   Q.  Yeah, that's better.

3           Did you call it a hypercar?

4   A.  Hypercar or super car is how we refer to them.

5   Q.  And can you explain to the members of the jury what a

6   hypercar is.

7   A.  Hypercar is typically an exotic type of vehicle, like a

8   Lamborghini or a Ferrari, McLaren.  They're higher-end

9   vehicles.  Bugatti's a little bit different in that the volume

10  of the vehicle built is a lot less.

11          THE COURT:  How many are produced in a year?

12          THE WITNESS:  I don't know in a year, but what they do

13  is there's 500 Bugattis built.  They started building them in

14  2018, and they would only build 500 worldwide, and so from '18

15  to 2025 is how that was split up.

16  Q.  How much does a Bugatti cost?

17  A.  To—typically between—they started when they first

18  launched at base price of 2.9 million but up to over 5 million

19  pretty easily.

20  Q.  And that's for one car?

21  A.  One car.

22  Q.  Can you describe to the—well, withdrawn.

23          Did there come a time, if ever, where G/CLUBS

24  purchased a Bugatti from Post Oak Motors?

25  A.  Yes.

1    Q.  Can you describe to the members of the jury the process of

2    purchasing a Bugatti, how that works.

3    A.  It's a little unique and not your typical car purchase.

4    The vehicles are made, they're what they call bespoke built,

5    for each client that buys one, so they initially require a

6    deposit, which holds your spot for the vehicle, for one of the

7    500.  And then there's a point where——where their client's

8    vehicle would go, would begin to be built, and you have to

9    configure the vehicle, which means you have to say how you want

10   it to be built, which then requires a second deposit.

11        From the time that the vehicle starts, the process of

12   building the vehicle starts, is about ten months, and then at

13   that final ten months, the vehicle is done, it gets paid for in

14   full, and then delivered to the client.

15   Q.  And when you say delivered to the client, where——what does

16   that mean?

17   A.  Well, it gets delivered to the store, and then we would in

18   turn sell the vehicle to the client.

19   Q.  You also mentioned that a Bugatti is bespoke.  Can you just

20   explain what that means in the context of Bugattis.

21   A.  Bespoke is just——it's pure custom built.  So if you wanted

22   to create your own color, create your own theme, your own

23   leathers or leather kind of, you know, configuration, you could

24   do it.  There's very few limitations——other than changing the

25   body of the car, there's very few limitations in how you can

1    style the vehicle.

2    Q.  Approximately how many dealerships in the United States, if

3    any, sell Bugattis?

4    A.  I believe there's 14.

5    Q.  And Post Oak is one of them.

6    A.  And we're one of them.

7    Q.  Are there any in the tristate area?

8    A.  I think the closest one to this area is in Connecticut.

9    Q.  What is H.R. Owen?

10   A.  H.R. Owen is a luxury dealership based out of London that

11   sells Bugattis as well and I believe Bentley and Rolls Royce.

12   Q.  What business, if any, did H.R. Owen refer to Post Oak in

13   the fall of 2021?

14   A.  So H.R. Owen had a client that they——that they say wanted

15   to have a US-spec'd Bugatti, and they——they could not sell,

16   obviously, overseas, they couldn't sell an export, so they

17   asked us, if we would, to sell the vehicle on their behalf and

18   split the profit with them.

19   Q.  And why could H.R. Owen not sell a US vehicle?

20   A.  Those vehicles have to be homologated to be able to drive

21   on US words.

22   Q.  And what's homologated mean?

23   A.  It's——basically makes the vehicle roadworthy and meets all

24   the National Highway & Safety Transportation requirements.

25   Q.  And did you agree to take on this client from H.R. Owen?

1    A.   I did.

2    Q.   What's the name of the client?

3    A.   Mileson Guo.

4    Q.   How do you spell Guo?

5    A.   G-U-O.

6    Q.   What was your understanding of what Mileson sought?

7    A.   Just to have a US-spec'd car.

8    Q.   And why is that?

9    A.   To—for—for his home or one of his homes in the US.

10   Q.   And where was that home located?

11   A.   Initially I was understanding it to be Connecticut.

12   Q.   Did you ever meet Mileson Guo?

13   A.   No, sir.

14   Q.   And in the fall of 2021, what was your understanding of who

15   Mileson Guo was?

16   A.   Back then, we just—he was just a billionaire that was

17   looking to buy another super car.

18   Q.   Who handled the configuration, the bespoke specifications

19   for this Mileson Bugatti, H.R. Owen or Post Oak?

20   A.   H.R. Owen.

21   Q.   And who made the payments for this Mileson Guo Bugatti?

22   A.   G Club International.

23   Q.   And what was your understanding of—well, withdrawn.

24            At this time, in the fall of 2021, what was your

25   understanding of what G Club International was?

O671GUO4                        Soza - Direct

1   A.  It was just one of his companies.

2   Q.  Did you communicate with anyone from G Club?

3   A.  Yes, I did.  The CEO of G Club International.

4   Q.  What was their name?

5   A.  Limarie Reyes Molinaris.

6   Q.  Did you communicate with anyone else from G Club?

7   A.  No, from G Club, no.

8   Q.  Did you communicate with anyone else about this Bugatti?

9   A.  Towards the end of the transaction, the gentlemen named

10  Mr. He.

11  Q.  Mr. He?

12  A.  He.

13  Q.  What was Mr. He's first name?

14  A.  I don't know.

15  Q.  Okay.

16          MR. FINKEL:  Your Honor, may I approach?

17          THE COURT:  Yes.

18          MR. FINKEL:  Handing the witness a binder of several

19  documents.

20  Q.  I'll ask you to please flip through that binder.

21          MR. FINKEL:  For the record, that binder contains

22  Government Exhibits 226-233, 240, 243, and 244-249.

23  Q.  Mr. Soza, have you seen this binder before?

24  A.  Yes, I have.

25  Q.  And when have you seen it before?

1    A.  Earlier today.

2    Q.  Okay.  And what is in that binder?

3    A.  These are communications via email as well as the contract

4    to order the Bugatti and the——the actual configuration for the

5    vehicle.

6    Q.  Okay.  Any financial documents in there?

7    A.  Yes, there are.  There are transactions for wire transfers.

8    Q.  Okay.  And with respect to the communications, who are the

9    communications with?

10   A.  Myself, Ms. Limarie from G Club, and H.R. Owen.

11   Q.  And the financial documents, where are they from?

12   A.  Those are from my office.

13   Q.  And does your office maintain financial documents——

14   A.  Yes, we do.

15   Q.  ——in the regular course of business?

16   A.  We do.

17           MR. FINKEL:  All right.  Your Honor, the government

18   offers GX 226-233, 240, 243, and 244-249.

19           MR. BARKAN:  No objection, your Honor.

20           THE COURT:  It is admitted, or they are admitted.

21           (Government's Exhibits 226-233, 240, 243, and 244-249

22   received in evidence)

23           MR. FINKEL:  Thank you, your Honor.

24   BY MR. FINKEL:

25   Q.  Mr. Soza, by the way, where is H.R. Owen located?

1   A.  London, England.

2   Q.  And you mentioned that you understood in the fall of 2021

3   that G/CLUBS was his company, I think is what you said?

4   A.  Correct.

5   Q.  Whose company?

6   A.  Mr. Guo's.

7            MR. FINKEL:  Okay.  If we can please pull up,

8   Ms. Loftus——or, I'm sorry, Mr. Gartland——what's in evidence as

9   Government Exhibit 226.

10           And we can publish it, please.

11  Q.  Mr. Soza, do you recognize this document?

12  A.  I do.

13  Q.  What is it?

14  A.  This is the initial contract for ordering the Bugatti.

15           MR. FINKEL:  Okay.  And if we can zoom in at the top

16  half, please, Mr. Gartland.

17  Q.  And who's the buyer?

18  A.  G Club International Ltd.

19  Q.  And why does it say G Club International Ltd. instead of

20  Mileson Guo?

21  A.  Because we understood it to be purchased by his company.

22  Q.  And is that a common occurrence in your line of business?

23  A.  It's a very common occurrence.

24  Q.  Why is that?

25  A.  We see a lot of vehicles being purchased by companies,

1  churches, different——different entities.

2  Q.  Okay.

3  A.  Quite often.

4  Q.  And on the right side it says Ordered Vehicle Bugatti

5  Chiron Super Sport?

6  A.  Correct.

7  Q.  Can you explain to the members of the jury what a Chiron

8  Super Sport is.

9  A.  Chiron is——Chiron is the 500 Bugatti being built right now.

10  Super Sport is one of the iterations of those 500 cars.  They

11  make a——I don't know exactly how many they make, but let's say

12  it's a percentage of the 500 cars or Super Sports.

13  Q.  Where are Bugattis manufactured?

14  A.  In Molsheim, France.

15          MR. FINKEL:  Okay.  And we can zoom out of that.

16          And if we can go to the second page.

17          And if you can zoom in on the top 2a, please.

18  Q.  And so can you explain to the members of the jury, please,

19  Mr. Soza, what the base price for this vehicle was.

20  A.  The base price is $3.825 million.

21  Q.  And is that a negotiated price?

22  A.  It is not.

23  Q.  Who sets the price?

24  A.  Bugatti does.

25  Q.  And what does the price depend on?  You said before there

O671GUO4                      Soza - Direct

1    was a range.

2    A.   The——the earlier model Chiron started out as a base price

3    of 2.9 million; by the time they got to the Super Sport, the

4    base price had risen to 3.825 million.

5              MR. FINKEL:  You can zoom out of that, please.  And if

6    we can go to page 4.

7    Q.   In paragraph 4, Mr. Soza, there are sort of initial

8    payment, second payment, final payment.  Can you just explain

9    what that's about.

10   A.   So the initial payment is the deposit that says you're a

11   committed buyer, and you're waiting for your allocated slot.

12             When Bugatti allocates your position or slot for your

13   vehicle to be built, then a second payment, a second deposit is

14   required, along with a signed configuration saying that this is

15   the vehicle, this is how the vehicle is going to be specified.

16             And then again, when the vehicle is built and

17   undergoing its final testing phases, then full payment is

18   required prior to the vehicle being shipped from the

19   manufacturer to the store.

20             MR. FINKEL:  If we can go to page 7, please,

21   Mr. Gartland.

22             And if you can scroll down a little bit so we have

23   both 7 and 8.  Perfect.

24   Q.   Do you see paragraph 11, Mr. Soza?  It says

25   Compliance/Sanctions list?

1     A.  I do.

2     Q.  What is the purpose of that paragraph?

3     A.  If—if there are any clients on any sanctions list, in my

4     world we look at a—at a system called—sorry, I'm at a loss

5     for words right now—OFAC, that would tell us if—if basically

6     we're allowed to do business with any particular party,

7     and—yeah, that's basically it.  It's a no-go list for us.

8     Q.  Okay.  And this particular purchase, did Post Oak run its

9     due diligence and OFAC check?

10    A.  Yes.

11    Q.  Any problems?

12    A.  No, sir.

13             MR. FINKEL:  If we can go to page 10, please,

14    Mr. Gartland.

15    Q.  Who signed this contract?

16    A.  That's Limarie Reyes from G Club International and myself.

17    Q.  And what is your understanding, if any, why Ms. Reyes

18    signed this contract as opposed to Mileson Guo, as you say?

19    A.  Right.  She was the CEO of the company and it's, again,

20    pretty normal for us to—to do, to have these kind of

21    transactions where a representative of the company will buy the

22    car.

23    Q.  Representative of whose company?

24    A.  Of any company.

25    Q.  In this case, representative of whose company?

1   A.  Of this——of Mr. Guo's company.

2            MR. FINKEL:  Okay.  If we can go to Government

3   Exhibit 227, which is in evidence.

4   Q.  And this top document, is this an email from you to

5   Ms. Reyes?

6   A.  That's correct.

7   Q.  And what are you attaching to this email?

8   A.  This is the——we say specifications.  This is the

9   configuration for the vehicle as it's to be built.

10           MR. FINKEL:  You can scroll down, please,

11  Mr. Gartland.

12           Keep going.

13           Right there.

14  Q.  And what is this page that the jury is looking at?

15  A.  This is a summary page of the price of the Chiron Super

16  Sport, along with a digital image of what it should look like.

17  Q.  And that's the image of the car.

18  A.  Correct.

19  Q.  And so this is the——sort of a computerized spec of what the

20  car will look like after it was designed.

21  A.  Correct.

22  Q.  And for Customer Name, what's the customer name?

23  A.  Mileson Guo.

24           MR. FINKEL:  And then if you can zoom in back on that

25  again, please.

1  Q.  And then below, you said Mileson Guo; is that right?

2  A.  Correct.

3  Q.  There is base price options and total price.  What's going

4  on there?

5  A.  So the base price is just the car before you do

6  any——any——add any particular personal touches to it.  In this

7  case it was $599,800 of additional options added to the

8  vehicle.

9  Q.  And so the total price was?

10 A.  $4.4248 million.

11 Q.  And the additional options that cost just a shade under

12 600,000, what is your understanding of who selected those

13 additional options?

14 A.  Mr. Guo.

15         MR. FINKEL:  Scroll down, please, Mr. Gartland, to the

16 next page.

17         Keep going.

18         Keep going, please.  We're going to go to page 7.

19         And Mr. Gartland, I'll ask that you sort of slowly

20 scroll through the next couple pages.

21 Q.  And as he does that, Mr. Soza, can you explain to the

22 members of the jury what we're looking at.

23 A.  These are digital renditions of the——of the vehicle as it

24 should be built.

25         MR. FINKEL:  Stop right there.

O671GUO4                    Soza - Direct

1    Q.  What is that plaque?

2    A.  That's—all Bugattis have that plaque as 1 of 500.  It

3    doesn't tell you which number in the sequence that it falls in,

4    but it's one of 500 to be built.

5    Q.  This Mileson Guo Bugatti, what number Bugatti was it?

6    A.  This was actually No. 400, coincidentally.

7            MR. FINKEL:  If we could go now to Government

8    Exhibit 230.

9    Q.  And I want to direct your attention, Mr. Soza, to the

10   second email, dated November 12, 2021.  And what is Ms. Reyes

11   communicating—what is your understanding of what Ms. Reyes is

12   communicating to you in this email?

13   A.  She's confirming that the configuration chosen was accepted

14   and approved.

15   Q.  And what is the subject line of this email?

16   A.  The subject line is Configuration Form Chiron Super Sport

17   Mileson Guo Version 1.

18   Q.  Were there any changes made after that configuration was

19   sent along?

20   A.  I don't believe so.

21           MR. FINKEL:  If we can look at Government Exhibit 232.

22   Q.  And this first email from Ms. Reyes to you, I believe, on

23   November 30, 2021, what is your understanding of what Ms. Reyes

24   is communicating to you in this email?

25   A.  We had received a second deposit for the vehicle, or a

1    second—a wire, unsolicited, and it's hard for us to tell where

2    a wire came from sometimes or what car it's allocated to, so

3    because it was such a large amount, and internally we could

4    only really associate it with this vehicle, so I'm asking

5    Ms. Reyes if they had sent this amount of money to us to

6    confirm that it was received, or to confirm it was to go

7    towards the Bugatti purchase.

8    Q.  And she's confirming it?

9    A.  She's confirming it.

10   Q.  And what was the amount of that wire payment?

11   A.  1,150,000.

12   Q.  And what's the subject line of this email?

13   A.  Configuration Form Chiron Super Sport Mileson Guo Version

14   1.

15            MR. FINKEL:  If we can look at GX 233, please.

16            You can scroll down, please.

17   Q.  And what is this document?

18   A.  This is the final invoice for—for requesting final payment

19   for the Bugatti since it had completed its process of being

20   built.

21   Q.  And did Mileson Guo's company pay in full for this Bugatti?

22   A.  Eventually, yes.  Yes.

23   Q.  And was that cash or did they take out a loan?

24   A.  It was all wire transfers.

25   Q.  Did there come a time, if ever, when the Bugatti was

1  delivered to Post Oak?

2  A.  Yes, the vehicle was shipped from the manufacturer to Post

3  Oak.

4           MR. FINKEL:  Your Honor, may I approach again.

5           THE COURT:  Did you offer financing?

6           THE WITNESS:  There is——there is actually financing

7  available for those cars.  It's a unique program, but

8  it's——it's only on the final payment.

9  Q.  Mr. Soza, I'm handing you a bunch of documents, which I'll

10  identify in a moment.  If you could just look through those,

11  please.

12          MR. FINKEL:  Your Honor, for the record, these are

13  Government Exhibits 202-223.

14  Q.  Do you recognize those images, Mr. Soza?

15  A.  I do.

16  Q.  What are they?

17  A.  They're of the actual vehicle.

18  Q.  Images of the actual Bugatti?

19  A.  Bugatti Chiron Super Sport.

20          MR. FINKEL:  Government offers 202-223.

21          MR. BARKAN:  No objection, your Honor.

22          THE COURT:  They're admitted.

23          (Government's Exhibits 202-223 received in evidence)

24          MR. FINKEL:  Mr. Gartland, if we could please publish

25  Government Exhibit 218.

O671GUO4                         Soza - Direct

1    BY MR. FINKEL:

2    Q.  What is Government Exhibit 218?

3    A.  This is the Bugatti Chiron Super Sport.

4    Q.  This is the one that Mileson Guo ordered?

5    A.  Yes, sir.

6            MR. FINKEL:  And if we can look at both 216 and 205.

7    Q.  Where is this photograph taken?

8    A.  This was in our—the shop of our store.

9    Q.  What kind of tires does this car have?

10   A.  They're—they're specially made Michelin tires, built only

11   for this car.

12   Q.  How much do they cost?

13   A.  To replace, about $10,000.

14   Q.  And how often does the owner of this vehicle have to

15   replace the $10,000 tires?

16   A.  Typically every 500 or so miles.

17   Q.  500?

18   A.  500.

19   Q.  Why does the tire need to be replaced after only 500 miles?

20   A.  I'm sure it's built for the performance of the car.  The

21   rubber is typically softer so it's going to wear out a little

22   bit faster based on how the car drives.

23   Q.  What other upkeep is required for this sort of vehicle?

24   A.  There's annual maintenance that's required.

25   Q.  How much does that cost?

O671GUO4                        Soza - Direct

1    A.  About $80,000.

2    Q.  And what happens for the annual maintenance?

3    A.  The vehicle——basically the back half of the vehicle is

4    removed and a lot of the hoses and seals in the vehicle are all

5    replaced.  It's a——it's about a crate, a pallet's worth of

6    materials, mechanical materials that go back into the car.

7    Q.  Can any regular car service shop service a Bugatti?

8    A.  No, sir.

9    Q.  To your knowledge, what's the closest service shop for a

10   Bugatti of this sort to New York City?

11   A.  Greenwich, Connecticut.

12       MR. FINKEL:  If we can look at Government Exhibit 209,

13   please.

14   Q.  How many miles were on this car when it was delivered?

15   A.  245.

16   Q.  Why so many?

17   A.  Part of the process for——for doing the quality check for

18   the vehicle is road testing it on actual roads, so Bugatti will

19   put that amount of miles basically breaking in the car before

20   it's delivered to the client, so when it's delivered, it's

21   ready to drive.

22   Q.  And what advice, if any, do you give Bugatti customers

23   about how many miles they should put on it a year?

24   A.  There's two schools of thought.  One is, if you're a

25   collector, you put as low——as little miles as possible; and the

O671GUO4                          Soza - Direct

1   other is, the car is made to be driven, drive it for anywhere

2   in the world you want, so——yeah.

3   Q.  How fast does it go?

4   A.  This particular model, shy of 300 miles per hour, but they

5   do make one that goes over 300.

6   Q.  And you said if you're a collector, you want to put on as

7   few miles as possible.  What do you mean by that?  Like if

8   you're a collector, what do you mean by that?

9   A.  The cars, you know, are anticipated to appreciate in value,

10  so obviously the lower the miles, as the car ages, the higher

11  the value should go, theoretically.

12  Q.  Do you market this kind of car as an investment to some

13  customers?

14  A.  We don't market it as an investment, but we do have that

15  discussion with clients.

16  Q.  Did you have that discussion in this particular case with

17  Mileson Guo?

18  A.  I've never talked to Mileson Guo.

19  Q.  What about with Limarie Reyes?

20  A.  No.

21          MR. FINKEL:  If we can look at Government Exhibits 202

22  and 201.

23  Q.  Mr. Soza, what is this box in Government Exhibit 202 and

24  opened in 201?

25  A.  This is the——the key box.  It holds the——the kind of——the

1  fancier key for the vehicle and also the——what we call a super

2  key, which is used to unlock the higher performance of the

3  vehicle if you're going to take it on a track.

4  Q.  If one were to lose the super key, how much would it cost

5  to replace?

6  A.  The bigger key in there I believe is around $10,000.

7        MR. FINKEL:  Okay.  We can take that down.

8  Q.  You mentioned someone named Mr. He; is that correct?

9  A.  Correct.

10 Q.  Did you ever communicate with him in any way?

11 A.  We did; a couple of emails, and a couple of phone calls.

12 Q.  Okay.  And just at a high level, what was the nature of

13 your discussions with Mr. He?

14 A.  Determining where the vehicle would ultimately be

15 registered so that we could calculate taxes and registration

16 and do final delivery for the car.

17 Q.  And why did you start talking to Mr. He as opposed to

18 Ms. Reyes?

19 A.  I was directed——I——I was trying to finish out this

20 transaction, and at some point in time there were——Ms. Reyes

21 wasn't as responsive, and then Mr. He came into the picture to

22 discuss options of taking delivery of the vehicle.

23 Q.  And what did Mr. He say, if anything, about taxes?

24 A.  He was wanting to find out where he could register the

25 vehicle and basically pay as little to or no taxes for the car.

O671GUO4                          Soza - Direct

1    Q.  And what advice, if any, did you provide Mr. He about

2    taxes?

3    A.  Well, I told him I couldn't provide him a guidance on that

4    particular matter.

5    Q.  And did there come a time, if ever, where——well, you had

6    the car in your lot; is that correct?

7    A.  We did.

8    Q.  Did Mr. He want to come pick it up in your lot?

9    A.  No.  They were——well, I say "they."  He was asking if we

10   could have the vehicle shipped overseas for them.

11              MR. FINKEL:  If we can show what's in evidence I

12   believe as Government Exhibit——yup——240.

13              We can zoom in on that email, please, Mr. Gartland.

14   Q.  What's the date of this email?

15   A.  This is February 9, 2023.

16   Q.  And can you read the first sentence.  From——oh, sorry.  Who

17   is this email from?

18   A.  This is from Mr. He.

19   Q.  And what's his email address?

20   A.  It is coollhr@protonmail.com.

21   Q.  And can you read the first sentence he wrote to you.

22   A.  "We have the register company ready.  Please let me know

23   what informations do you need for the register?"

24   Q.  And then the second paragraph.

25   A.  "In regarding for delivery, we are planning for a tour with

O671GUO4                          Soza - Direct

1    this vehicle, could we have quotations for delivery this

2    vehicle to from US to UK, Swissland, Dubai, and Abu Dhabi for

3    temporary import less than 6 months on a single location if you

4    provide this service, please."

5    Q.  Have you ever been to Abu Dhabi?

6    A.  I have not been to Abu Dhabi.

7    Q.  Have you ever been to Dubai?

8    A.  I have been to Dubai.

9    Q.  What is your understanding why Mr. He wanted to ship this

10   car to Swissland, Dubai, or Abu Dhabi?

11   A.  I don't know that I had an understanding other than they

12   wanted to take delivery outside of the US.

13   Q.  If Post Oak wanted to, could it have shipped this Bugatti

14   Chiron Super Sport to a foreign country?

15   A.  No, we could not.

16   Q.  Why not?

17   A.  Because we don't export vehicles.

18   Q.  Why not?

19   A.  It's just our——typically the manufacturers restrict us, in

20   our dealer agreements, from doing so.

21   Q.  At this time, so by February 9, 2023, had Post Oak been

22   contacted by the FBI?

23   A.  Yes, sir.

24   Q.  And what did the FBI——initially, what did the FBI seek from

25   Post Oak, if anything?

O671GUO4                          Soza - Direct

 1   A.  They were──they subpoenaed all the documents, any

 2   communications and documentation regarding this transaction.

 3   Q.  And did Post Oak provide such documents?

 4   A.  We did.

 5   Q.  And at this time, in February of 2023, were you still in

 6   contact with the FBI?

 7   A.  Yes, we were.

 8   Q.  And U.S. Attorney's Office?

 9   A.  Yes, sir.

10   Q.  Did there come a time where the FBI returned to Post Oak

11   with the search warrant?

12   A.  Yes, they did.

13   Q.  And can you tell the jury what that search warrant was for.

14   A.  The search warrant was to install tracking devices in the

15   vehicle.

16   Q.  Which vehicle?

17   A.  The Bugatti Chiron Super Sport.

18   Q.  And did the FBI do that?

19   A.  They did.

20   Q.  After the FBI installed tracking devices in the Bugatti

21   Chiron Super Sport, did anyone from G/CLUBS or Mileson Guo or

22   Mr. He pick up the Super Sport?

23   A.  No, sir.

24           MR. FINKEL:  We can look at Government Exhibit 223.

25   Q.  Mr. Soza, what are we looking at here?

1    A.  This is the Bugatti Chiron being loaded into a transport

2    for——it was being seized at the time.

3    Q.  Who seized it?

4    A.  The U.S. Marshals.

5    Q.  And did they have a warrant for it?

6    A.  They did.

7    Q.  And around the time of the seizure, did the FBI ask you to

8    do anything else?

9    A.  Prior to the seizure they asked me to send communications

10   to Mr. He via email.

11   Q.  And did you do that?

12   A.  I did.

13   Q.  And after you sent those communications to Mr. He, did the

14   FBI ask you to do anything else?

15   A.  They had asked me to communicate with him via text.

16   Q.  Did you do that?

17   A.  I did not.

18   Q.  Why not?

19   A.  I just wasn't comfortable with it.

20   Q.  And what, if anything, did Post Oak do after you were asked

21   to talk to Mr. He via text?

22   A.  We provided the FBI with a phone from our——from our

23   account.

24   Q.  And do you know what, if anything, the FBI did with that

25   account?

O671GUO4                          Soza - Direct

1   A.  I do not.

2   Q.  Do you know if the FBI had conversations with Mr. He?

3   A.  I do not.

4   Q.  Do you know what Mr. He's relationship is, if any, with

5   Mileson Guo?

6   A.  I do not.

7   Q.  Or G/CLUBS?

8   A.  No, sir.

9   Q.  One moment.

10          MR. FINKEL:  If we can take that down and display

11  Government Exhibit GX VI35.  It's in evidence so we can publish

12  it, please.

13          If you can zoom in to the top of that, please,

14  Mr. Gartland.

15  Q.  Can you read that top sentence, please.

16  A.  "Written Resolution of the Sole Director."

17  Q.  And the next sentence?

18  A.  "Freedom Media Ventures Ltd."

19  Q.  Have you seen this document before?

20  A.  No, sir.

21  Q.  And can you read the sentence below where it says "Written

22  Resolution of the Sole Director, Freedom Media Ventures Ltd.,

23  the Company."

24  A.  "I, Haoran He," you want me to read that?

25  Q.  Yeah.

O671GUO4                    Soza - Cross

1    A.  "——being the sole director of the Company, a company

2    limited by shares organized under the laws of the British

3    Virgin Islands with its registered address at Second Floor

4    Water's Edge Building, Wickham's Cay II, Road Town Tortola,

5    British Virgin Islands, hereby certify that the following

6    resolutions were resolved:"

7    Q.  In total, how much did Post Oak collect as a result of the

8    sale of this Bugatti Super Sport?

9    A.  I believe 4.4 million and change.

10            MR. FINKEL:  Nothing further.  Thank you.

11            THE COURT:  Cross-examination?

12            MR. BARKAN:  Yes, your Honor.

13   CROSS EXAMINATION

14   BY MR. BARKAN:

15   Q.  Good afternoon, Mr. Soza.

16   A.  Good afternoon.

17   Q.  You're the president of Post Oak Motors?

18   A.  Right.

19   Q.  Yes, sir.  You've been in that role for about seven years?

20   A.  Correct.

21   Q.  Post Oak sells high-end cars, right?

22   A.  Correct.

23   Q.  Super high-end cards, right?

24            THE COURT:  If you would draw the microphone closer to

25   you, please.

1        MR. BARKAN:  Sorry, your Honor.

2   Q.  Post Oak sells high-end cars, right?

3   A.  Yes, sir.

4   Q.  Super high-end cars, right?

5   A.  Correct.

6   Q.  Including Bugattis, right?

7   A.  Including Bugattis.

8   Q.  Bugatti made the world's fastest car, right?

9   A.  To a certain point, yes.

10  Q.  Over a thousand kilometers an hour?

11  A.  I don't know──I don't know kilometers.  I know miles.

12  Q.  And Post Oak sells the Chiron, right?

13  A.  Correct.

14  Q.  Very limited supply?

15  A.  500.

16  Q.  Right.  You testified on direct only 500 are going to be

17  made ever?  These are incredibly sought-after cars, right?

18  A.  I would say so.

19  Q.  You sell one or two a year, right, at most?

20  A.  Correct.

21  Q.  Now the Bugatti ordered by G/CLUBS was No. 400 out of 500,

22  right?

23  A.  Yes.

24  Q.  Fair to say it's pretty difficult to secure an opportunity

25  to purchase that particular car?

1    A.  What do you mean, the number 400?

2    Q.  Yeah.

3    A.  I think that was a coincidence.

4    Q.  Is it fair to say that it's difficult to purchase any of

5    the 500 cars?

6    A.  Depends on the means of the person buying.

7    Q.  And you testified on direct that a Bugatti Chiron could

8    appreciate in value, right?

9    A.  We anticipate that that could be the case.

10   Q.  You testified on direct that the Chiron was going to

11   originally be configured for Mileson Guo, right?

12   A.  Yes.

13   Q.  By H.R. Owen, right?

14   A.  Yes.

15   Q.  You understood that Mileson Guo was a regular customer of

16   H.R. Owen, right?

17   A.  Yes.

18   Q.  And it was your understanding, I think you testified on

19   direct, that Mileson just wanted another super car, right?

20   A.  A US specification.

21   Q.  So your understanding is that Mileson owned other super

22   cars, right?

23   A.  I was—that was my understanding, but I don't know

24   directly.

25   Q.  Have you heard of a car called the Pagani Zonda?

O671GUO4                        Soza - Cross

1   A.  I don't know the Zonda, but I know Pagani as a brand.

2   Q.  Okay.  Do you understand that Mileson designed his own

3   Pagani Zonda?

4   A.  No.

5   Q.  It's not unusual for customers to be referred to you,

6   right?

7   A.  No, sir.

8   Q.  Including from other Bugatti dealerships, right?

9   A.  Not in the States.

10  Q.  Here, H.R. Owen referred the purchase of the Chiron to Post

11  Oak, right?

12  A.  Yes, sir.

13  Q.  Because you understood that the customer wanted it for use

14  in the United States, right?

15  A.  Correct.

16  Q.  And it was designed to be used in the United States, right?

17  A.  Yes, sir.

18          MR. BARKAN:  Can we pull up Government Exhibit 226,

19  which is in evidence.

20          And can we zoom in on the top half, please.

21  Q.  Now at the top of the page, it says, "Supplemental terms

22  for the purchase of the Bugatti Chiron Super Sport," right?

23  A.  Yes, sir.

24  Q.  And under the word Buyer, it says G Club International

25  Ltd., right?

O671GUO4                          Soza - Cross

1    A.  Correct.

2    Q.  And then a few lines down, next to email, it says

3    limarier@gclubs.com, right?

4    A.  Yes, sir.

5          MR. BARKAN:  If we go to page 10, please.

6    Q.  And you see the signature blocks here?

7    A.  Yes, sir.

8    Q.  Okay.  And Limarie Reyes signed for the buyer, right?

9    A.  Yes.

10   Q.  On October 28, 2021?

11   A.  Yes.

12   Q.  And you understood that Limarie Reyes was with G/CLUBS,

13   right?

14   A.  Correct.

15   Q.  In fact, you testified on direct she was their CEO, right?

16   A.  Yes.

17   Q.  And that's your signature by the retailer, right?

18   A.  It is.

19          MR. BARKAN:  We can take that down.

20          Could we go to GX 227, please.

21   Q.  Okay.  This is a November 1, 2021, email from you to

22   Limarie Reyes, right?

23   A.  Yes.

24   Q.  And it says, "Hi, Limarie.  Apologies for the delay in

25   getting back to you.  Attached you will find the specifications

O671GUO4                         Soza - Cross

1    for the build coordinated with Art Katallozi, our Bugatti

2    partner in London.  This configuration will need to be signed

3    as well.  Once we receive along with the deposit your

4    allocation slot will be locked in."  You see that, right?

5    A.  Yes, sir.

6    Q.  So on November 1st, you sent initial specifications to

7    Ms. Molinaris, right?

8    A.  Yes.

9            MR. BARKAN:  Can we scroll down to page 3.

10           And let's look at the top half, please.

11   Q.  So this is the first page of the specification you sent on

12   November 1st, right?

13   A.  Yes.

14   Q.  Okay.  And at the top it says, "Personal configuration for

15   Bugatti London," right?

16   A.  Yes.

17   Q.  Okay.  Next to customer name, it says Mileson Guo, right?

18   A.  Yes.

19           MR. BARKAN:  Okay.  Let's go down to page 6 of the

20   pdf, please.

21   Q.  So if you look here, and if you focus on the bottom half of

22   the page, you see the signature lines, right?

23   A.  Yes.

24   Q.  They're blank, right?

25   A.  Yes.

O671GUO4                          Soza - Cross

1    Q.  No one filled in signature lines, right?

2    A.  No.

3    Q.  No one filled in the date lines?

4    A.  No.

5    Q.  Mileson Guo didn't sign this document, right?

6    A.  I don't see any signatures.

7              MR. BARKAN:  Could we go to GX 230, please.

8    Q.  And if you look at the second email down, this is an email

9    from Limarie Molinaris to you dated November 12, right?

10   A.  Correct.

11   Q.  And she says, "Dear Mr. Soza, Attached Bugatti's personal

12   configuration accepted with approval signature."  You see that,

13   right?

14   A.  Correct.

15             MR. BARKAN:  So let's go to page 4 of the pdf, please.

16             And if we look at the top half.

17   Q.  This is a similar document.  It says "Personal

18   Configuration for Bugatti London," right?

19   A.  Yes.

20   Q.  But the customer name now says G Club International Ltd.,

21   right?

22   A.  It does.

23   Q.  No longer says Mileson Guo, right?

24   A.  It does not.

25             MR. BARKAN:  If we go down to page 7, please.

O671GUO4                        Soza - Cross

1   Q.  And here, do you see the line that says signature customer?

2   A.  Yes.

3   Q.  And you see a signature above that line, right?

4   A.  Yes.

5   Q.  And there's a date written in by hand?

6   A.  Yes.

7   Q.  And that date is November 12, 2021, right?

8   A.  Yes.

9   Q.  So the previous version of this document that we looked at

10  that you sent to Ms. Molinaris on November 1st had Mileson Guo

11  identified in the document, right?

12  A.  It did.

13  Q.  But that version was unsigned, right?

14  A.  The version that I——wait.  I'm sorry.  Say that again?

15  Which version, the one that you said before?

16  Q.  The previous version we looked at.

17  A.  Yes, that you showed us was unsigned, yes.

18  Q.  But 11 days later the customer was changed to G Club

19  International, right?

20  A.  It looks like it.

21  Q.  And that version was signed by the buyer, right?

22  A.  I don't know whose signature that is.

23  Q.  But it's signed, right?

24  A.  It's signed.

25  Q.  And Ms. Molinaris sent that to you and said it was signed,

O671GUO4                          Soza - Cross

1    right?

2    A.  I—I don't remember.  I don't remember seeing this document

3    with G Club International on it.  I'm not saying it's not

4    there, but—

5            MR. BARKAN:  Well, could we go back up to the first

6    page of the document, please.

7    Q.  So in the second email, this is Limarie Reyes sending this

8    signed document to you, right?

9    A.  Okay.

10   Q.  And she's the CEO of G/CLUBS; isn't that right?

11   A.  Yes.

12   Q.  Thank you.

13           MR. BARKAN:  Could we go to GX 244, please.

14           Thank you.

15   Q.  Now I just want to confirm that you testified on direct

16   that all of the payments for the Chiron came from G/CLUBS;

17   isn't that right?

18   A.  I did not.  I said they all came via wire transfer.

19   Q.  Your testimony is that the payments did not come from

20   G/CLUBS?

21   A.  They all came for the vehicle being purchased through

22   G/CLUBS, but—

23   Q.  Okay.  Well, let's look in column F.

24   A.  All right.

25   Q.  The first and second deposit payments are indicated as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  coming from Limarie Molinaris; isn't that right?

2  A.  Right.

3  Q.  And the fourth, fifth, and sixth lines indicate that G Club

4  made these payments; isn't that correct?

5  A.  Correct.

6  Q.  Okay.  And the second payment——

7       MR. BARKAN:  Could we pull up GX 232 side by side with

8  this document, please.

9       So could we pull up GX 232.

10  Q.  Okay.  And this is a November 30, 2021, email from

11  Limarie——sorry——from Limarie Molinaris to you; isn't that

12  right?

13  A.  Yes.

14  Q.  And she says:

15       "Dear Mr. Soza, I hope you had a wonderful holiday

16  weekend.

17       "Apologies for the delayed response.  Yes, our finance

18  team submitted a payment for $1,150,000.  Please confirm the

19  above was the amount received, to be applied to our current

20  remaining balance."

21       You see that, right?

22  A.  Yes.

23       MR. BARKAN:  Okay.  Could we go back to GX 244,

24  please.

25  Q.  And so line 3, that payment for 1 point——excuse

1  me—1,150,000, that's the payment that Ms. Molinaris was

2  confirming in that email; isn't that right?

3  A.  Yes.

4  Q.  Thank you.

5        There were no payments from Mileson, right?

6  A.  Not that I'm aware of.

7  Q.  There were no payments from Miles Guo, right?

8  A.  Not that I'm aware of.

9  Q.  And there were no payments from Ho Wan Kwok, right?

10  A.  Not that I'm aware of.

11  Q.  And there were no payments from Miles Kwok, right?

12  A.  Not that I'm aware of.

13        MR. BARKAN:  Thank you.  You can take that down.

14  Q.  You mentioned on direct—you were asked about sanctions

15  lists, right?

16  A.  Yes, sir.

17  Q.  What's a sanctions list?

18  A.  To the best of my knowledge, it's like a—there's—like I

19  said, we use OFAC, and my understanding is it tracks people who

20  have illicitly moved money or terrorists—or funding terrorist

21  organizations, and those—if we were to pull that, if somebody

22  were to pop up on that list, obviously it's a red flag and we

23  wouldn't be doing business with that person.  I'm not sure what

24  the exact protocols are after that, but—

25  Q.  What's OFAC?

1    A.  I don't know.  It's a government agency.  It's a government

2    resource.  I don't remember.  Office of—I don't remember

3    exactly what the—what it means, but it's—it's pulled for

4    every transaction.

5    Q.  Mr. Soza, you testified on direct about an email in which

6    Mr. He asked about price quotes for shipping the Chiron out of

7    the United States, right?

8    A.  Correct.

9    Q.  That email was dated February of 2023; isn't that right?

10   A.  I guess so, yeah.  I'm not looking at it.

11   Q.  That was the first time Mr. He mentioned shipping the

12   Chiron abroad, right?

13   A.  As far as I can remember, yes.

14   Q.  Ms. Molinaris never mentioned shipping the Chiron abroad,

15   right?

16   A.  No.

17   Q.  And at the time the Chiron was ordered, your understanding

18   was that it was for use in the United States, right?

19   A.  Yes.

20   Q.  And that's why the car was being shipped from France to the

21   United States, right?

22   A.  Yes.

23   Q.  And in fact, it was shipped from France to the United

24   States, right?

25   A.  It was.

1        MR. BARKAN:  Thank you.  Nothing further.

2        THE COURT:  Any redirect?

3        MR. FINKEL:  No.  Thank you, Mr. Soza.

4        THE COURT:  Thank you.  You may step out.

5        (Witness excused)

6        THE COURT:  And the prosecution may call its next

7   witness.

8        MR. FINKEL:  The government calls Margaret Murphy.

9        THE LAW CLERK:  Would you please pull the mic really

10   close to you and raise your right hand.

11        (Witness sworn)

12        THE LAW CLERK:  Thank you.

13        THE COURT:  Please state your name and spell it.

14        THE WITNESS:  Sure.  It's Margaret Murphy.

15   M-A-R-G-A-R-E-T, last name Murphy, M-U-R-P-H-Y.

16        THE COURT:  You may inquire.

17        MR. FINKEL:  Thank you, your Honor.

18    MARGARET MURPHY,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. FINKEL:

23   Q.  Where do you work?

24   A.  For FBI New York.

25   Q.  And what is your title?

O671GUO4                        Murphy - Direct

1    A.  Special agent.

2    Q.  Special Agent Murphy, how long have you been with the FBI?

3    A.  Since March 2016.

4    Q.  And what office are you assigned to?

5    A.  New York.

6    Q.  What is ERT?

7    A.  ERT is the evidence response team.

8    Q.  And what does ERT do as a sort of general matter?

9    A.  ERT will collect forensic evidence or assist squads with

10   executing search warrants.

11   Q.  Do you have a particular role with ERT?

12   A.  I'm an assistant team leader for one of the teams and I'm a

13   photographer as well.

14   Q.  What sort of training, if any, is an ERT member required to

15   have?

16   A.  We're required to attend an ERT basic training where we're

17   trained in different forensic methods for collecting evidence.

18   Q.  I want to direct your attention to March 15, 2023.  What,

19   if anything, did you do in connection with your ERT assignment

20   on that day?

21   A.  I was the photographer for a search warrant.

22   Q.  And where was that search?

23   A.  It was at the Sherry-Netherland, which was 781 Fifth

24   Avenue.

25   Q.  Right here in Manhattan?

1    A.  Yes.

2    Q.  You mentioned there was a search warrant.  Did the FBI in

3    fact have a search warrant that day?

4    A.  Yes, we did.

5    Q.  And what did the search warrant permit the FBI to do, if

6    anything?

7    A.   It permitted us to conduct a search of the 18th floor

8    apartment and to collect evidence related to──to certain

9    crimes.

10   Q.  And Special Agent Murphy, I'm just going to ask, if you can

11   direct the mic, point it at your mouth so that it picks up your

12   voice and everyone can hear you.

13   A.  Sure.

14   Q.  Feel free to move it so it's comfortable for you, all

15   right?  Thank you.

16        Special Agent Murphy, did the FBI also have an arrest

17   warrant that day?

18   A.  Yes, we did.

19   Q.  And was anyone arrested on March 15, 2023, at the

20   Sherry-Netherland?

21   A.  Yes.

22   Q.  Who?

23   A.  Miles Guo.

24        MR. FINKEL:  Your Honor, at this time the government

25   offers a stipulation, GX STIP3.  I'm just going to offer it.

1    Government offers Stip 3.

2              THE COURT:  It is admitted.

3              (Government's Exhibit Stip 3 received in evidence)

4              MR. FINKEL:  And Mr. Gartland, or Ms. Loftus, if we

5    can please publish GX Stip 3.

6              Okay.  And if you can scroll down a little bit,

7    please, Ms. Loftus.

8              "If called as a witness at trial, a Special Agent of

9    the FBI would testify as follows:

10             "On March 15, 2023, special agents and other FBI

11   employees executed a lawful search of the Sherry-Netherland,

12   781 Fifth Avenue, 18th Floor, New York, New York.  During the

13   course of that search, FBI personnel took photographs of

14   interior spaces of the Sherry-Netherland——"

15             THE INTERPRETER:  Your Honor, the interpreter is

16   requesting the counsel to move at a pace so we can interpret.

17             THE COURT:  If you'll just slow down.

18             MR. FINKEL:  I'm sorry.

19             "During the course of that search, FBI personnel took

20   photographs of interior spaces of the Sherry-Netherland, 781

21   Fifth Avenue, 18th Floor, New York, New York, and also lawfully

22   seized items, documents, and electronic devices.

23             "GX SH1-GX SH206 are fair and accurate photographs of

24   interior spaces of the Sherry-Netherland, 781 Fifth Avenue,

25   18th Floor, New York, New York, that were lawfully captured by

1    an FBI photographer on March 15, 2023."

2            And your Honor, at this time the government offers

3    GX SH1 through GX SH206.

4            THE COURT:  They are admitted.

5            (Government's Exhibits SH1 through SH206 received in

6    evidence)

7            MR. FINKEL:  We can take that down, Ms. Loftus.

8    BY MR. FINKEL:

9    Q.  Special Agent Murphy, can you just briefly describe the

10   search on March 15, 2023, of the 18th floor of the

11   Sherry-Netherland Hotel.  What took place?  What did you do, as

12   a general matter?

13   A.  Sure.  So we entered the premises, once it was cleared, did

14   a walk-through of the apartment, and then took photographs of

15   the apartment as it was before we searched it, and then also

16   collected evidence to include electronic devices, some clothing

17   items, documentation, and some other items, and photographed

18   those as well, and then conducted exit photos and concluded the

19   search.

20           MR. FINKEL:  Ms. Loftus, if we can publish GX SH2 and

21   SH48.

22   Q.  Special Agent Murphy, what are we looking at in SH2 and

23   SH48?

24   A.  This is the elevator landing of the 18th floor that opens

25   to the apartment that we searched.

O671GUO4                          Murphy - Direct

1  Q.  How many apartments are on the 18th floor?

2  A.  Just one.

3  Q.  How large is it.

4  A.  Fairly large.

5  Q.  How long does it take to walk from sort of one side to the

6  other?

7  A.  It would take several minutes.

8  Q.  Are there any exterior spaces on the 18th floor?

9  A.  Yes, there are also two terraces.

10  Q.  Did you go out on the terraces?

11  A.  Yes, I did, to photograph them.

12  Q.  And what do they overlook?

13  A.  Central Park.

14  Q.  Are there any buildings obstructing the view of Central

15  Park?

16  A.  No.

17          MR. FINKEL:  If we can look at SH3, please.

18  Q.  And Special Agent Murphy, what are we looking at here?

19  A.  This is the dining room.  I believe it was room A for the

20  purposes of our search.

21          MR. FINKEL:  And Ms. Loftus, you can zoom in sort of

22  on the wallpaper.

23  Q.  Those images on the wall, can you describe for the jury how

24  they were present there, if at all.

25  A.  It appears to me that it was wallpaper.

1              MR. FINKEL:  If we can please look at SH6.

2              Ms. Loftus, if we can zoom in on the lower half from

3    the sort of top of the windowsill, a little further up.

4              No, a little further up.  Yup.  All the way to the

5    bottom.

6    Q.  Special Agent Murphy, what is that silver cube-like object

7    in the windowsill?

8    A.  I believe it's an espresso machine.

9    Q.  And what's below the espresso machine?

10   A.  There's a tote bag.

11   Q.  And what's it say on it?

12   A.  The New Federal State of China.

13   Q.  Special Agent Murphy, aside from your testimony here today

14   and your search on March 15, 2023, were you otherwise involved

15   in this case?

16   A.  No.

17   Q.  Why then were you involved in the search?

18   A.  It's very typical for ERT members and other agents and

19   support staff to assist in execution of search warrants for

20   other cases.

21   Q.  Do you know what the New Federal State of China is?

22   A.  I do not.

23   Q.  Or why that's imprinted on a tote bag?

24   A.  I do not.

25             MR. FINKEL:  If we can please look at GX SH207.

O671GUO4                           Murphy - Direct

 1              Could we rotate that.

 2              If we could display for the witness only GX SH207.

 3   Q.  Special Agent Murphy, what is GX SH207?

 4   A.  This is a layout of the 18th floor of the

 5   Sherry-Netherland.

 6   Q.  And is it a fair and accurate layout of the 18th floor of

 7   the Sherry-Netherland?

 8   A.  Yes.

 9              MR. FINKEL:  The government offers GX SH207.

10              MR. KAMARAJU:  No objection.

11              THE COURT:  It is admitted.

12              (Government's Exhibit SH207 received in evidence)

13              MR. FINKEL:  If we could publish that, please.

14   Q.  Special Agent Murphy, there appear to be letters in various

15   places on this map.  Can you explain to the jury why that is.

16   A.  Yes.  So we assign room labels to each room, in the area

17   that we're searching, so that we can trace back where we found

18   each piece of evidence.

19              MR. FINKEL:  And Ms. Loftus, if you can zoom in on the

20   right side of this, please.

21              Keep going.  And scroll down a little bit, please.

22   Q.  Okay.  What's the letter for the master bedroom?

23   A.  Room P.

24   Q.  And to the left of that, what room is letter Q?

25   A.  That's the dressing room.

O671GUO4                           Murphy - Direct

1   Q.  And what about letter N; what's that?

2   A.  That's a walk-in closet.

3   Q.  And did you enter the walk-in closet, master bedroom, and

4   dressing room?

5   A.  Yes, I did.

6   Q.  And can you describe to the members of the jury how, if at

7   all, those rooms are connected.

8   A.  Yeah, they're all connected to the master bedroom

9   through——through doorways, but——yeah, they're all connected.

10           MR. FINKEL:  All right.  If we can please look at

11  GX SH19.

12  Q.  Special Agent Murphy, what is this an image of?

13  A.  This is room N, the walk-in closet.

14  Q.  And this is the walk-in closet connected to the master

15  bedroom?

16  A.  Yes, it is.

17  Q.  And that piece of paper that says N on it, was that there

18  when FBI arrived?

19  A.  No.

20  Q.  Can you describe why it's there?

21  A.  Those are the room labels I was describing earlier.  We put

22  it up as we're taking entry photos.

23           MR. FINKEL:  If we can look at GX SH15 and 16.

24  Q.  Is this that same closet?

25  A.  Yes, it is.

1          MR. FINKEL:  If we can look at SH130.

2    Q.  Is SH130 a photograph from that same closet?

3    A.  Yes, it is.

4    Q.  By the way, who took these photographs?

5    A.  I did.

6          MR. FINKEL:  All right.  Ms. Loftus, if we can display

7    SH165 and 164.

8    Q.  Special Agent Murphy, are these photographs also taken in

9    that same closet, closet N?

10   A.  Yes, they were.

11         MR. FINKEL:  And Ms. Loftus, you can zoom in on the

12   right, the label, please.

13   Q.  Special Agent Murphy, what does the label inside the suit

14   pocket hanging in closet N say?

15   A.  It says "Brioni for Miles Kwok."

16   Q.  What's Brioni?

17   A.  It's a high-end men's clothing line.

18         MR. FINKEL:  And if we can look at SH167 and 166.

19         If we can zoom in, Ms. Loftus, on the right side.

20   Q.  Special Agent Murphy, are these images from that same

21   closet?

22   A.  Yes, they are.

23   Q.  Similar label for Miles Kwok?

24   A.  Yes.

25         MR. FINKEL:  And if we can now look at, please,

1   GX SH28 and GX SH29.

2   Q.  Special Agent Murphy, what are photographs SH28 and SH29?

3   A.  This is an item we seized during the search warrant.

4   Q.  And where are these photographs taken?

5   A.  This is the master bedroom, room P.

6   Q.  And that's the master bedroom connected to the closet?

7   A.  Yes.

8   Q.  And what is that on the bed?

9   A.  It's a cellphone.

10  Q.  And where was that cellphone found?

11  A.  It was found between the mattresses during the arrest and

12  clear of the——of the apartment.

13  Q.  It was found under the mattress.

14  A.  Yes.

15  Q.  What's a knock and announce?

16  A.  Knock and announce is typically what the FBI does before we

17  execute a search warrant to alert the people inside the

18  premises that the FBI is there and to——and announce their

19  presence.

20  Q.  What does the FBI do when it knocks and announces?

21  A.  Typically knocks and announce and say, "FBI, search

22  warrant, come to the door."

23          MR. FINKEL:  If we can look at GX SH152.

24          If we can zoom in on the right side, the top half.

25  The right side, please, Ms. Loftus.  Yeah.

1   Q.  And what's that Post-it note?

2   A.  That's a Post-it note with the names of the people who

3   found the item and the room where they found it.

4   Q.  So this is room S?

5   A.  Yes.

6   Q.  And what does it say on the document itself at the top?

7   A.  G Club.

8   Q.  Do you know what G Club is?

9   A.  I know it's an entity associated with—with Miles Guo, but

10  I don't know anything else.

11          MR. FINKEL:  Okay.  Can we look at please SH153.

12  Q.  What does that red card say?

13  A.  Mileson.

14          MR. FINKEL:  If we can look at, please, SH156 and 157.

15  Q.  What are we looking at in SH156 and SH157?

16  A.  It's an international driving permit from Hong Kong and

17  exit and entry permit for Taiwan.

18  Q.  And the right side, the 157, are those documents open?

19  A.  Yes.

20  Q.  And who are these documents for?

21          MR. FINKEL:  Ms. Loftus, you can zoom in on the right

22  side.

23  A.  So the name is Kwok Ho Wan for the driving permit.

24  Q.  And the post on the left in the zoomed-up part of the

25  screen, where were these documents found?

1   A.  These were found in room S, which was the study, in the top

2   left drawer of a black desk.

3            MR. FINKEL:  If we can look at SH149.

4            Can you zoom in, Ms. Loftus, so that we could see the

5   note, the Post-it.

6   Q.  Where were these two items found?

7   A.  They were also found in room S, which was a study, right

8   top drawer of black desk.

9            MR. FINKEL:  Okay.  Zoom out of that, please.

10           Can you zoom in, Ms. Loftus, on the two golden items.

11           Can you zoom in on the one all the way on the left.

12           We can look at SH58, please.

13  Q.  What is this?

14  A.  This was another room in the apartment.  I believe this was

15  room X.

16  Q.  Special Agent Murphy, did you also take a number of

17  photographs of other types of clothing?

18  A.  Yes, I did.

19           MR. FINKEL:  Could we look at SH81 and 82.

20  Q.  Are these the sorts of clothing that you took photographs

21  of?

22  A.  Yes.

23  Q.  Who selected which pieces of clothing to take photographs

24  of?

25  A.  We had a search team that was guided by the case agents who

O671GUO4                        Murphy - Cross

1    had knowledge of the case.

2    Q.  So did you select or did they select?

3    A.  They selected it.

4    Q.  Do you know what G Fashion is?

5    A.  I know it's an entity associated with Miles Guo,

6    but—that's all.

7    Q.  Special Agent Murphy, approximately how many photographs

8    did you take on March 15, 2023?

9    A.  It was over 700.

10   Q.  And the photographs that were admitted into evidence just

11   before and the photographs that were shown to you today, did

12   you have any role in selecting what photographs were shown?

13   A.  I did not.

14   Q.  How many times did we meet before you testified today?

15   A.  I think we met four or five times.

16   Q.  And aside from your testimony today and your search on

17   March 15, 2023, did you have any other involvement in this

18   case?

19   A.  I did not.

20              MR. FINKEL:  Nothing further.

21              THE COURT:  Cross-examination.

22              MR. KAMARAJU:  Thank you, your Honor.

23   CROSS EXAMINATION

24   BY MR. KAMARAJU:

25   Q.  Good afternoon, Special Agent Murphy.

1  A.  Hi.

2  Q.  It is Friday afternoon so I'm going to try to do this

3  quickly, okay?

4  A.  Okay.

5  Q.  I know you said you were with the evidence response team,

6  correct?

7  A.  Correct.

8  Q.  And part of the role of the evidence response team is to

9  collect evidence and transport it back to FBI, the FBI field

10  office, right?

11  A.  Well, it depends, but usually the person responsible for

12  transporting the evidence back to the field office, it could be

13  someone from the case team, not necessarily someone on the

14  evidence response team.  It all depends who the seizing agent

15  is.

16  Q.  Got it.  But there's somebody with the FBI who is

17  responsible for transporting the evidence back, right?

18  A.  Correct.

19  Q.  And in terms of the Sherry-Netherland search, there were

20  agents responsible for doing that there also, right?

21  A.  Yes.

22  Q.  Now how did you arrive at the Sherry-Netherland that day?

23  A.  Me personally?

24  Q.  Yes.

25  A.  I drove my——my bureau-issued vehicle.

1  Q.  Okay.  And where did you park?

2  A.  I think I parked somewhere near 59th Street, near Central

3  Park.

4  Q.  Do you know if the Sherry-Netherland has its own garage?

5  A.  I don't know.

6  Q.  Now you testified I believe that the search warrant that

7  was going to be executed was for the 18th floor apartment,

8  right?

9  A.  Correct.

10  Q.  Okay.  So——and the items to be seized, if any, were to be

11  seized from that apartment, right?

12  A.  Correct.

13  Q.  So the FBI was not permitted that day to seize a Bugatti,

14  correct?

15          MR. FINKEL:  Objection.

16          THE COURT:  Overruled.  You may answer.

17  A.  I was executing——part of a team executing one search

18  warrant that was issued that day.  I'm not sure if there were

19  any other warrants that the FBI was authorized, so I can only

20  speak to the search warrant for 781 Fifth Avenue.

21  Q.  Okay.  Prior to conducting this search and arrest

22  operation, the FBI held a briefing, right?

23  A.  Yes.

24  Q.  And you attended the briefing, right?

25  A.  Yes.

O671GUO4                    Murphy - Cross

1    Q.  And the purpose of the briefing was to go over the

2    operation, right?

3    A.  Correct.

4    Q.  And to talk about what the FBI could and cannot do during

5    the operation, right?

6    A.  Yes.

7    Q.  And that's all standard, right?

8    A.  Yes.

9    Q.  It's happened before every search warrant you've ever

10   executed, right?

11   A.  Yes.

12   Q.  Okay.  And during that meeting there was no search warrant

13   for a Bugatti discussed, right?

14           MR. FINKEL:  Objection, your Honor.

15           THE COURT:  You may answer.

16   A.  I don't——I don't recall anything about a Bugatti.

17   Q.  Okay.  Same answer with respect to any kind of Lamborghini,

18   right?

19           MR. FINKEL:  Your Honor, could we approach, actually.

20           THE COURT:  Yes.

21           (Continued on next page)

22

23

24

25

1            (At the sidebar)

2            MR. FINKEL:  So, your Honor, as this Court knows,

3    there is—every piece of evidence that's being offered at this

4    trial is lawful, the seizure of the Bugatti was lawful, the

5    seizure of the Lamborghini was lawful.  If the defense counsel

6    wants to ask was a Bugatti found or was a Lamborghini found at

7    the Sherry-Netherland, that's a fair question, but he should

8    not suggest that the seizure of the Bugatti and the seizure of

9    the Lamborghini were something outside a search warrant that

10   the government wasn't lawfully permitted to do.  That's number

11   one.

12           Number two, I don't understand the relevance of what

13   was seized at other locations on other dates and times.

14           THE COURT:  So were the cars seized?

15           MR. FINKEL:  The Lamborghini was seized on March 15,

16   2023, in Connecticut, which Special Agent McNamara testified

17   to.  The Bugatti was seized I think about a month or so later

18   from Post Oak.

19           THE COURT:  So he can ask:  Do you know anything about

20   search warrants for cars.

21           MR. FINKEL:  That's fine.  I just don't want them

22   implying that the seizures were unlawful or improper.

23           THE COURT:  I do not think that the average person

24   would get that impression at all.

25           MR. KAMARAJU:  First of all, your Honor, my question

1  didn't go anywhere near that.  Secondly, your Honor is going to

2  instruct the jury that there were lawful seizures.  This is

3  just, in my opinion, fairly routine, standard questions for an

4  agent who conducted a search.  I'm not trying to suggest that

5  any search was unlawful.  I don't have any reason to.  If I

6  would, I would have challenged the search warrant.  I'm just

7  trying to get through the search.

8          MR. FINKEL:  So, your Honor, I'd ask at the conclusion

9  of the cross that you instruct the jury, the government would

10 request, that all the seizures in this case were lawful.

11         MR. KAMARAJU:  That's part of your jury instructions

12 at the end of the trial.

13         MR. FINKEL:  But why are you asking the questions now?

14         MR. KAMARAJU:  If I wanted to argue that the searches

15 were unlawful, the time for it was before.  No question I have

16 asked suggests that the searches were unlawful.  They know

17 perfectly well that I'm allowed on cross or in summation to

18 talk about where the cars were found.  All I'm doing is

19 saying——

20         MR. FINKEL:  Your Honor——

21         MR. KAMARAJU:  Excuse me, Mr. Finkel.  All I'm doing

22 is saying that the FBI didn't go to that house to try to find a

23 Bugatti or a Lamborghini or anything else, and they weren't

24 found.  I'm not saying it was improper for the FBI to do that.

25 I'm not throwing any aspersions to it.  I'll be done with there

1    in two questions and then we'll be moving on.

2                    MR. FINKEL:  I have no objection to defense counsel

3    asking was a Bugatti——were you looking for a Bugatti, but not

4    whether you had a search warrant for a Bugatti, because in

5    fact, we did have one.  We got one later.

6                    MR. KAMARAJU:  Okay.  I can clarify the question and

7    say:  You didn't have a search warrant for a Bugatti at the

8    address of the Sherry-Netherland.

9                    MR. FINKEL:  What is the relevance of saying search

10   warrant?  Why not just say:  Were you looking for a Bugatti

11   there?

12                   MR. KAMARAJU:  Frankly, that implies that the search

13   might be unlawful.

14                   MR. FINKEL:  So that then you agree that the seizure

15   of the Bugatti and the Lamborghini were lawful.  Do you agree

16   with that?

17                   MR. KAMARAJU:  Yes, because I did not file a motion to

18   suppress.

19                   MR. FINKEL:  Then we should just have an instruction.

20                   MR. KAMARAJU:  No.

21                   THE COURT:  I don't think the instruction is

22   necessary.  You can ask the questions.

23                   MR. KAMARAJU:  Thank you, your Honor.  I appreciate

24   it.

25

                          SOUTHERN DISTRICT REPORTERS, P.C.
                                    (212) 805-0300

```
 1              (In open court)

 2              THE COURT:  You may continue.

 3  BY MR. KAMARAJU:

 4  Q.  All right.  So I think I left off, there was no search

 5  warrant to seize a Lamborghini at that address either, right?

 6  A.  Not on March 15th, to my knowledge.

 7  Q.  Okay.  And to your knowledge there was no search warrant to

 8  seize a Ferrari from that address, right?

 9  A.  Not for March 15, 2023, to my knowledge.

10              MR. KAMARAJU:  Okay.  Now could we pull up GX SH207,

11  which I believe is already in evidence.

12              Okay.  So this is the——could we make sure the jury has

13  it too, please.

14              Thank you.

15  Q.  All right.  So this is the layout, correct?

16  A.  Correct.

17  Q.  Okay.  Did you prepare this diagram?

18  A.  I did not.

19              THE COURT:  One moment, please.

20              MR. KAMARAJU:  Oh, I'm sorry, your Honor.

21              (Pause)

22              THE COURT:  Go ahead.

23              MR. KAMARAJU:  Thank you.

24  Q.  So you testified that you went out onto two different

25  terraces, correct?
```

1   A.  Correct.

2   Q.  Okay.  So on the diagram, I think there are three terraces

3   that are identified, so could you just tell us which ones you

4   want out and photographed.

5   A.  Right.  I recall the two longer ones.  I see there's also a

6   terrace in the master bedroom.  I think I forgot to——when I was

7   referencing the terraces, I forgot about that one.

8           THE COURT:  Mr. Kamaraju, if you would tell me the

9   number of this exhibit, the floor plan.

10          MR. KAMARAJU:  Yes, your Honor.  It is GX SH207.

11          THE COURT:  Thank you.

12          MR. KAMARAJU:  Sure.

13  Q.  Okay.  But do you recall whether you took photographs on

14  the third terrace as well?

15  A.  I can't recall offhand.  I'd have to reference my photo

16  log.

17  Q.  Okay.  Now before, you testified on direct about the

18  elevator bay to enter the Sherry-Netherland's apartment, right?

19  A.  Correct.

20  Q.  Now the elevator goes up from the lobby up to the 18th

21  floor; is that right?

22  A.  Yes.

23  Q.  Okay.  And when you're in the lobby, there's a——there's

24  security, right?

25  A.  I don't recall there being security that day 'cause I think

O671GUO4                          Murphy - Cross

1    we were accessing through multiple elevators.  There was a

2    service elevator as well.  So I'm not sure about the security

3    guard's presence there.

4    Q.  So just so we're clear, the elevator that you took, did

5    that lead out into that elevator bay that you photographed or

6    did you have to walk there?

7    A.  I don't recall.

8              MR. KAMARAJU:  Okay.  Could we have Government

9    Exhibits GX SH164, 166, and 167.

10             Those two are fine for right now.  Thanks.

11   Q.  So you remember testifying on direct about these?

12   A.  Yes.

13   Q.  Right?  And you identified them as Brioni suits, right?

14   A.  Yes.

15   Q.  And I think you said Brioni was a high-end men's suit

16   company, right?

17   A.  Yes.

18   Q.  Okay.  So you have no idea when these suits were bought,

19   right?

20   A.  Sorry.  I didn't hear.

21   Q.  You have no idea when these suits were bought, right?

22   A.  Correct.  I don't know.

23   Q.  You have no idea where any——when any article of clothing in

24   the apartment was purchased, right?

25   A.  Right.

O671GUO4

1    Q.  You just came and took photographs of what you saw in the

2    closet, right?

3    A.  Correct.

4    Q.  Now let's stick with clothing.

5         MR. KAMARAJU:  Can we go to GX SH81 and 82.

6    Q.  All right.  You testified about taking photographs of

7    these, right?

8    A.  Yes.

9    Q.  Now is this how the clothes appeared in the apartment?

10   A.  No.  These were put there for the purpose of taking

11   photographs.

12   Q.  And were they in any kind of like wrapping or plastic

13   before they were photographed?

14   A.  I don't know.

15   Q.  Okay.  Who would have put them here for you to take these

16   photographs?

17   A.  One of the members of the search team.

18   Q.  Okay.

19        THE COURT:  So it is now 3 p.m.

20        MR. KAMARAJU:  I thought I could do it, your Honor.

21   I'm sorry.

22        THE COURT:  So members of the jury, it's time for you

23   to have your weekend.  Remember that you're not allowed to

24   discuss this case amongst yourselves or with anyone else.

25   Don't permit anyone to discuss the case in your presence.

O671GUO4

1    Don't read, watch, or listen to anything from any source about

2    anything having to do with the subject matter of this case.

3            I wish you a good weekend.  We will start in the

4    morning on Monday at 9:30.  We're going back to the other

5    schedule.  9:00 you'll have your breakfast ready for you.  Have

6    a good weekend.

7            THE JURORS:  Thank you.

8            (Jury not present)

9            THE COURT:  Ma'am, you may step out.  Don't discuss

10   your testimony, and I'll need for you to be in the courtroom on

11   Monday at 9:29.

12           THE WITNESS:  Yes, your Honor.

13           (Witness not present)

14           THE COURT:  You may be seated.

15           Is there anything before we break for the weekend?

16           MR. KAMARAJU:  Not from the defense, your Honor.

17           MR. FINKEL:  Nor the government.  Have a nice weekend.

18           THE COURT:  Have a nice weekend.

19           MR. KAMARAJU:  Thank you, your Honor.

20           (Adjourned to June 10, 2024, at 9:00 a.m.)

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   YA LI

4   Cross By Ms. Shroff . . . . . . . . . . .1607

5   Redirect By Mr. Fergenson  . . . . . . . .1774

6   Recross By Ms. Shroff . . . . . . . . . .1782

7    LONNY SOZA

8   Direct By Mr. Finkel . . . . . . . . . . .1789

9   Cross By Mr. Barkan  . . . . . . . . . . .1814

10    MARGARET MURPHY

11  Direct By Mr. Finkel . . . . . . . . . . .1826

12  Cross By Mr. Kamaraju  . . . . . . . . . .1839

13                    DEFENDANT EXHIBITS

14  Exhibit No.                          Received

15   6512    . . . . . . . . . . . . . . . .1653

16   60503   . . . . . . . . . . . . . . . .1749

17   6498    . . . . . . . . . . . . . . . .1752

18   7000    . . . . . . . . . . . . . . . .1770

19                    GOVERNMENT EXHIBITS

20  Exhibit No.                          Received

21   226-233, 240, 243, and 244-249  . . . . . .1795

22   202-223   . . . . . . . . . . . . . . .1804

23   Stip 3   . . . . . . . . . . . . . . . 1829

24   SH1 through SH206   . . . . . . . . . .1830

25   SH207   . . . . . . . . . . . . . . . .1833