O6A1GUO1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                          23 Cr. 118 (AT)
4
    MILES GUO,
5
                    Defendant.              Trial
6   ------------------------------x
                                            New York, N.Y.
7                                           June 10, 2024
                                            9:02 a.m.
8
    Before:
9
10                      HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                            APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MICAH F. FERGENSON
         RYAN B. FINKEL
16       JUSTIN HORTON
         JULIANA N. MURRAY
17       Assistant United States Attorneys

18  SABRINA P. SHROFF
         Attorney for Defendant
19
    PRYOR CASHMAN LLP
20       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
21       MATTHEW BARKAN

22  ALSTON & BIRD LLP
         Attorneys for Defendant
23  BY:  E. SCOTT SCHIRICK

24

25
```

O6A1GUO1

```
1    ALSO PRESENT:
     Isabel Loftus, Paralegal Specialist, USAO
2    Michael Gartland, Paralegal Specialist, USAO
     Geoffrey Mearns, Paralegal Specialist, USAO
3    Robert Stout, Special Agent, FBI
     Ruben Montilla, Defense Paralegal
4    Tuo Huang, Interpreter (Mandarin)
     Shi Feng, Interpreter (Mandarin)
5    Yu Mark Tang, Interpreter (Mandarin)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

O6A1GUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          ALL COUNSEL:  Good morning, your Honor.

4          THE COURT:  Would you make your appearances, please.

5          MR. FINKEL:  Good morning, your Honor.  Ryan Finkel,

6    Juliana Murray, Micah Fergenson, and Justin Horton will be

7    joining us momentarily for the government, and we're joined by

8    Isabel Loftus, who is a paralegal in our office.

9          MR. KAMARAJU:  Good morning, your Honor.  Sidhardha

10   Kamaraju and Sabrina Shroff, along with Mr. Guo, who is with us

11   at counsel's table.

12         THE COURT:  Please be seated.

13         Is there anything before we continue with the witness?

14         MR. KAMARAJU:  Not from the defense, your Honor.

15         MR. FINKEL:  There's one logistical item; we're just

16   waiting to hear if the defense believes it to be an issue.

17   Aside from that—so we don't want to bother your Honor with it

18   if it's not.  Aside from that, nothing from the government.

19         THE COURT:  All righty.  So if you'll have the witness

20   on the witness stand at 9:29.  Thank you.

21         ALL COUNSEL:  Thank you.

22         (Recess)

23         THE COURT:  Please be seated and please get the

24   jurors.

25         (Jury present)

1          THE COURT:  Please be seated.

2          Good morning, jurors.

3          THE JURORS:  Good morning.

4          THE COURT:  Welcome back.

5          We're going to continue with the cross-examination of

6    the witness.

7          Please remember that you're still under oath.

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  You may inquire.

10         MR. KAMARAJU:  Thank you, your Honor.

11    MARGARET MURPHY, resumed.

12    CROSS EXAMINATION CONTINUED

13    BY MR. KAMARAJU:

14    Q.  Good morning, Special Agent Murphy.

15    A.  Good morning.

16    Q.  Now we were talking about the Sherry-Netherland on Friday,

17    correct?

18    A.  Correct.

19    Q.  Now the Sherry-Netherland, it's a luxury hotel, right?

20    A.  Yes.

21    Q.  It's pretty opulent, right?

22    A.  Yes.

23    Q.  And the 18th floor was the premises that you were going to

24    search that day, right?

25    A.  Correct.

O6A1GUO1                           Murphy - Cross

1    Q.  And the 18th floor is one apartment that takes up the whole

2    floor, right?

3    A.  Correct.

4    Q.  And that's the——that's where Mr. Guo and his family lived,

5    right?

6    A.  I don't know that to be true.

7    Q.  Okay.  That's where Mr. Guo was located that day, right?

8    A.  Yes.

9         MR. KAMARAJU:  All right.  Now could we pull up

10   Government Exhibit SH207, please.

11        And I think it's in evidence so we can put it up for

12   everybody.

13   Q.  Now this is the diagram of the apartment, correct?

14   A.  Correct.

15   Q.  Now there's numbering——or lettering, I guess——on each of

16   the rooms, right?

17   A.  Yes.

18   Q.  So each room was assigned a particular letter combination?

19   A.  Yes.

20   Q.  Okay.  And correct me if I'm wrong, but the highest one

21   that I see is BB, which is up by the den at the north side.  Do

22   you see that?

23   A.  Yes.

24   Q.  Okay.  So whether I missed one or not, safe to say that

25   there were nearly 30 rooms in this apartment, right?

O6A1GUO1                        Murphy - Cross

1   A.  Nearly, yes.

2   Q.  And they were all furnished, correct?

3   A.  Some of those rooms were closets that I wouldn't classify

4   as furnished, but in general the place was furnished, yes.

5   Q.  Okay.  Fair enough.  The rooms that could be furnished were

6   furnished, right?

7   A.  Yes.

8   Q.  Got it.  Now I believe you testified on direct that you

9   entered the apartment from an elevator bay, right?

10  A.  Yes.

11  Q.  Okay.  On the diagram, can you tell us where that elevator

12  bay would have been.

13  A.  So the elevator bay is in the center of the apartment,

14  where it says Service Elevator Lobby.

15  Q.  Okay.  That's the one that you came up on?

16  A.  I don't recall exactly which elevator that I came up on.

17  Q.  Okay.  Are there multiple elevators that let out into the

18  apartment?

19  A.  I don't recall.

20  Q.  Okay.  I think you testified on direct on Friday that it

21  would take several minutes to walk from one end of the

22  apartment to the other, right?

23  A.  Yes.

24          MR. KAMARAJU:  Can we pull up Government Exhibit SH28,

25  which is also in evidence.  Please publish it.

O6A1GUO1                              Murphy - Cross

1    Q.  You recall testifying about this photograph on direct?

2    A.  Yes.

3    Q.  And this is the photograph of the cellphone under the

4    mattress, right?

5    A.  Correct.

6    Q.  Now you have no idea when the cellphone was placed under

7    the mattress, right?

8    A.  Sorry.  I didn't hear that.

9    Q.  You have no idea when the cellphone was placed under the

10   mattress, right?

11   A.  No, I don't know.

12   Q.  Okay.  You have no idea how it came to be under the

13   mattress, right?

14   A.  Well, I know that it was found during the arrest and clear

15   of the residence.

16   Q.  Sure.  You know when it was found, right?

17   A.  Right.

18   Q.  You don't know who put it there, for example, right?

19   A.  I——I don't know how it got there, no.

20          MR. KAMARAJU:  Okay.  And can we look back at

21   Government Exhibit SH207 again.

22   Q.  Now I think you testified on direct that this cellphone

23   that we were just looking at was found in Room P, right?

24   A.  Correct.

25   Q.  Okay.  And that's the master bedroom?

O6A1GUO1                        Murphy - Cross

1   A.  Correct.

2   Q.  Got it.  Now I think on direct you also testified about

3   something called a knock and announce search, right?

4   A.  Yes.

5   Q.  Okay.  Can you just remind us what that is.

6   A.  A knock and announce is something the FBI would typically

7   do to announce our presence prior to entering a premises that

8   we're executing an arrest or a search warrant on.

9   Q.  Got it.  So there's a period of time when you let the

10  person come to the door; is that right?

11  A.  During a knock and announce, yes.

12  Q.  Okay.  Typically how long is that period?

13  A.  It depends, but could be 15 to 20 seconds.

14  Q.  Okay.  15 to 20 seconds before the FBI enters, is that—

15  A.  Correct, yeah.

16  Q.  Okay.  Now you didn't enter the apartment until after

17  Mr. Guo was arrested and the apartment was cleared, right?

18  A.  Correct.

19  Q.  So if there were a knock and announce, it happened before

20  you got there, right?

21  A.  Correct.

22         MR. KAMARAJU:  All right.  Now can we pull up

23  Government Exhibit SH135, please.

24         All right.  And I think this is in evidence as well,

25  so we can publish it.

O6A1GUO1                          Murphy - Cross

1   Q.  This is another one of the photographs you took during the
2   search?
3   A.  Yes.
4           MR. KAMARAJU:  Okay.  And maybe we can just blow it up
5   at the top, the Post-it.
6   Q.  Okay.  Can you just read that.
7   A.  Sure.  It says, "Room Y.  Multiple phones.  Under bed."
8   And then there's two names I can't make out.
9   Q.  Don't worry about the names.
10          Okay.  All right.  And it says Room Y at the top
11  there, right?
12  A.  Yes.
13          MR. KAMARAJU:  Okay.  So let's go back to 207.
14  Q.  Now can you find Room Y on the diagram?
15  A.  Yes.  It's the dressing room.
16  Q.  Okay.  Now when it refers to dressing room, is that
17  basically like a walk-in closet?
18  A.  From what I recall, yeah, it was similar to what a walk-in
19  closet would look like.
20          MR. KAMARAJU:  All right.  Now let's pull up
21  Government Exhibit SH156, please.
22  Q.  All right.  This is another photograph that you took,
23  right?
24  A.  Yes.
25  Q.  And you see the document at the top there?

1    A.  Yes.

2    Q.  That's a Hong Kong International Driving Permit, right?

3    A.  Yes.

4    Q.  And it's from 2015, correct?

5    A.  Yes.

6            MR. KAMARAJU:  All right.  Now could we pull up

7    Government Exhibit SH157, please.

8    Q.  All right.  Do you see that?

9    A.  Yes.

10           MR. KAMARAJU:  Okay.  And everybody's got that on

11   their screen?

12           Okay, good.

13   Q.  Now on the top of this photograph, that's the permit we saw

14   in GX SH156, right?

15   A.  The photo we just looked at?

16   Q.  Yeah.

17   A.  Yes.

18           MR. KAMARAJU:  Okay.  Can we——on the top right portion

19   of the permit, maybe we can just blow that up, above the

20   photograph.

21   Q.  Okay.  Could you read that, please.

22   A.  Sure.  It says, "Kwok.  Ho Wan.  China.  10/05/1968.

23   Majestic View Manor 20 South Bay Road HK, Hong Kong."

24           MR. KAMARAJU:  All right.  We can zoom out of that.

25           Could we put that back up, please, 157.

1              All right.  If we can just zoom out on this document,

2    please.

3    Q.  Now you see there's another document below it, right?

4    A.  Yes.

5    Q.  Okay.  And these two documents were found in roughly the

6    same place?

7    A.  Yes.

8    Q.  All right.  And the document that's below, that's the Hong

9    Kong exit and entry permit; is that right?

10   A.  Correct.

11             MR. KAMARAJU:  All right.  Now could we blow up the

12   bottom right corner of that document, please.

13   Q.  All right.  Do you see the Date of Issue?

14   A.  Yes.

15   Q.  What's that date?

16   A.  April 12, 2010.

17   Q.  And do you see the Date of Expiry?

18   A.  Yes.

19   Q.  What's that date?

20   A.  October 11, 2010.

21   Q.  Now there was no US driver's license for Mr. Guo recovered

22   during the search, right?

23   A.  I don't recall there being one, no.

24   Q.  Okay.

25             THE COURT:  Get closer to the microphone.  Thank you.

O6A1GUO1                    Mattioli - Direct

1       MR. KAMARAJU:  Oh, sorry, your Honor.

2   Q.  And you certainly didn't take any photographs of US

3   driver's licenses for Mr. Guo, right?

4   A.  I don't recall, but, yeah.

5   Q.  Okay.  And there's no US driver's permit found for Mr. Guo

6   in the apartment, correct?

7   A.  I don't recall there being one.

8       MR. KAMARAJU:  Okay.  No further questions, your

9   Honor.

10      THE COURT:  Redirect?

11      MR. FINKEL:  Nothing further.  Thank you.

12      THE COURT:  You may step out.  Thank you.

13      THE WITNESS:  Thank you.  Thank you, your Honor.

14      (Witness excused)

15      THE COURT:  And the prosecution may call its next

16  witness.

17      MR. HORTON:  The government calls Giacomo Mattioli.

18      THE LAW CLERK:  Please pull the microphone very close

19  to your face and raise your right hand.

20      (Witness sworn)

21      THE LAW CLERK:  Thank you.

22      THE COURT:  Please be seated.  State your name and

23  spell it.  Also draw the microphone close to you.

24      THE WITNESS:  My name is Giacomo Mattioli, spelled G

25  as in George, I-A-C-O-M-O, and the last name is

O6A1GUO1                        Mattioli - Direct

1    M-A-T-T-I-O-L-I.

2              THE COURT:  You may inquire.

3              MR. HORTON:  Thank you, your Honor.

4     GIACOMO MATTIOLI,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. HORTON:

9    Q.  Good morning, Mr. Mattioli.

10   A.  Good morning.

11   Q.  What do you do for work?

12   A.  I have a Ferrari dealership.

13   Q.  And how many Ferrari dealerships do you have?

14   A.  Three.

15   Q.  Where are your Ferrari dealerships located?

16   A.  California.

17   Q.  Where in California?

18   A.  Los Angeles, Beverly Hills and Westlake.

19   Q.  And Mr. Mattioli, what is Passione Rossa, LLC?

20   A.  It is the legal entity that owns Ferrari Beverly Hills.

21   Q.  How long have you been selling Ferraris, Mr. Mattioli?

22   A.  25 years.

23   Q.  Where is Ferrari headquartered in Italy?

24   A.  Maranello.

25   Q.  What relationship, if any, do your Ferrari dealerships have

O6A1GUO1                     Mattioli - Direct

1    with Ferrari in Italy?

2    A.  I am Ferrari official franchise dealer.

3    Q.  And what does it mean to be an official franchise dealer

4    for Ferrari?

5    A.  Well, we have a franchise agreement in place, so we

6    represent the factory in the market, so we have the ability to

7    purchase a new car at the discount price and we retail them.

8    Q.  You said "we represent the factory in the market."  What's

9    the factory?

10   A.  Well, we represent, technically, Ferrari North America,

11   which is a wholly-owned subsidiary of the Ferrari S.p.A., which

12   is the factory in Italy, yeah.

13   Q.  And what does the factory refer to?

14   A.  The Ferrari S.p.A., yes, the Italian company.

15   Q.  And what sorts of dealings, if any, do you have with

16   Ferrari S.p.A. in Italy?

17   A.  Well, we have——I have some dealings with some special cars

18   that we purchase directly through them.

19   Q.  And what do you mean by special cars?

20   A.  Typically not street-legal car, purposely built for the

21   racetrack, so race cars.

22   Q.  What does it mean for a car not to be street legal?

23   A.  It means that it does not comply with the rules and

24   regulations and the homologations that are required to be

25   street-legal car.

1    Q.  And where can a car——where can a Ferrari that's not street

2    legal be driven?

3    A.  On the racetrack, typically.

4    Q.  Mr. Mattioli, at your Ferrari dealerships, what are

5    consignment services?

6    A.  Consignment, it's a form of an agreement that we enter with

7    the seller and that, you know, expressed a desire to sell his

8    car, and we work together, advising him on the best marketing

9    tactics to sell the car and the price point of selling the car.

10   Q.  And what's the purpose of selling a Ferrari through

11   consignment?

12   A.  Typically you maximize the return to the owner, to the

13   buy——to the seller, you know.

14   Q.  Mr. Mattioli, what is Ferrari Corse Clienti?

15   A.  It's a department within the Ferrari factory.

16   Q.  And could you spell that for the court reporter and the

17   jury, Corse Clienti.

18   A.  Sure.  C-O-R-S-E, and then separate word, Clienti,

19   C-L-I-E-N-T-I.

20   Q.  What does Corse Clienti mean?

21   A.  Racing client.

22   Q.  Racing client?  You said Corse Clienti is a department in

23   Ferrari.  What does Corse Clienti do?

24   A.  They are in charge to organize and promote this program,

25   several programs they have under their control, enhance the

O6A1GUO1                        Mattioli - Direct

1    Ferrari client experience.  They sell purposely racetrack-build

2    vehicles, and they organize events around the world for the

3    owners to enjoy their vehicles.

4    Q.  Can anybody participate in Ferrari Corse Clienti

5    programming?

6    A.  No.  They need to be selected by the factory, by Ferrari.

7    Q.  And how does somebody get selected by the factory?

8    A.  Well, I don't really know their—all the criteria.  I know

9    that as a practical, that you submit the name and then they

10   goes on the waiting list, typically there's a waiting list, and

11   then the factory decides who to pick from this list.

12   Q.  Now what is the XX program at Ferrari?

13   A.  The XX program is under the Corse Clienti department.  It's

14   a program to allow the clients to drive this specific vehicle

15   that was built for the racetrack, and it's called FXX?

16   Q.  And what is a Ferrari FXX?

17   A.  So a Ferrari FXX is a car that was developed based on a

18   street car, the LaFerrari.  Ferrari LaFerrari, that's the name

19   on the vehicle.  And it was, you know, developed, again, for

20   the racetrack so they add the roll cage and modify the car in

21   many different ways, and it's, again, built only for the

22   racetrack.

23   Q.  And how fast can a Ferrari FXXK go?

24   A.  Over 200 miles, yeah.

25   Q.  What training, if any, is required to drive a Ferrari FXXK?

1    A.  Well, yes, there is training required because it's——you're

2    driving on the racetracks and you need to get familiar with the

3    behavior of a race car, you know, and slick tires and etc., so

4    there are driving schools specifically, you know, designed for

5    that, and Ferrari has a driving school itself.

6    Q.  You referenced slick tires.  What do you mean by that?

7    A.  Oh, the tires developed just for the track, so there are no

8    groove, you know, they have particularly high grip in the

9    turns.  They just need to be properly warmed up.

10   Q.  And Mr. Mattioli, if I could just ask you to bring the

11   microphone a little closer to your mouth for the court reporter

12   and the jury.

13   A.  Okay.

14   Q.  How often, if ever, do the slick tires on a Ferrari FXXK

15   need to be changed out?

16   A.  Depends a lot from the kind of performance you're looking

17   for because, you know, obviously the newer tires gives you

18   higher performance, but typically you change it, you know——it

19   depends on the number of kilometers you're going to run in a

20   day, but, you know, typically once a day when you're on the

21   track.

22   Q.  And how much do those tires on the FXXK cost?

23   A.  20——I'm not sure 'cause I don't sell them directly, but I

24   think it's 2500.

25   Q.  Mr. Mattioli, about how many Ferrari FXXKs have been

1  manufactured?

2  A.  Ferrari never disclose a total number.  I speculate about

3  40.

4  Q.  And about how much does a Ferrari FXXK cost?

5  A.  When it's new or the current price?

6  Q.  Well, what's the range of what a Ferrari FXXK costs?

7  A.  Currently, right now?

8  Q.  Sure.

9  A.  I think it's between 6 million to 6½ million right now.

10  Q.  How are these Ferrari FXXKs bought and sold?

11  A.  When they're new or preowned?

12  Q.  Well, let's start with new.  How is a new Ferrari FXXK

13  bought or sold?

14  A.  Okay.  So new, again, Ferrari would launch the car, would

15  unveil the car, and dealers will submit prospects, submit names

16  to the factory, to the Ferrari factory, and they will pick and

17  choose who would get the car.

18  Q.  And how is a preowned Ferrari FXXK bought and sold?

19  A.  Preowned, it's a little different.  Some cars they come

20  available in the marketplace, they get advertised, but the

21  preferred way for the Ferrari is to sell them through them, and

22  so anybody that has a car that is available for sale should

23  notify the Ferrari factory, the special department, yeah.

24  Q.  And what's your understanding as to why Ferrari prefers to

25  sell preowned FXXKs through Ferrari?

O6A1GUO1                    Mattioli - Direct

1    A.  Well, they like to know who's gonna purchase the car, and

2    they——it's a sort of a club, so, you know, they——they support

3    the car, then they prepare the car, they store the car, so

4    it's——it's——they just want to know who they're dealing with,

5    yeah.

6    Q.  Mr. Mattioli, have you ever participated in the purchase or

7    sale of a Ferrari FXXK?

8    A.  Yes.

9             MR. HORTON:  Ms. Loftus, could you please pull up

10   what's in evidence as the stipulation that's marked GX Stip 8.

11   And if you could please publish it.

12             This is a stipulation regarding documents.  It's in

13   evidence.  In relevant part, it says that the parties have

14   agreed that the exhibits that are listed in column B of the

15   stipulation were lawfully obtained by the government and are

16   authentic records of the entity listed in column A, that were

17   made at or near the time by, or from information transmitted

18   by, a person with knowledge of the matters set forth in the

19   records; such records were kept in the course of a regularly

20   conducted activity; and it was the regular practice of that

21   entity to make the records.

22             Ms. Loftus, if you could go to the second page of this

23   stipulation.

24             That's fine.  Thanks.

25             And the entity column in A, the second line from the

1  top reads Ferrari S.p.A.  And the exhibits associated are

2  GX 801 and GX 802.

3          Ms. Loftus, we can go to the third page, third

4  numbered paragraph, please.

5          It says, the parties further agree that this

6  stipulation, as well as the Government Exhibits listed in

7  column B, may be received as Government Exhibits at trial.

8          And your Honor, at this time pursuant to this

9  stipulation, the government offers GX BR440 and GX 802.

10          THE COURT:  They are admitted.

11          (Government's Exhibits 802 and BR440 received in

12  evidence)

13          MR. HORTON:  Ms. Loftus, can you please publish

14  GX 802.

15          THE COURT:  Is the stipulation itself in evidence?

16          MR. HORTON:  It is, your Honor.

17          THE COURT:  Okay.

18          MR. HORTON:  And can you please publish this and show

19  the witness pages 1 and 2.

20  BY MR. HORTON:

21  Q.  Mr. Mattioli, what is this document?

22  A.  Purchase agreement.

23  Q.  And purchase agreement for what?

24  A.  For a FXXK EVO.

25  Q.  And what's the date of this purchase agreement?

O6A1GUO1                        Mattioli - Direct

1    A.  May 18, 2021.

2              MR. HORTON:  Can you go to the second page,

3    Ms. Loftus.

4    Q.  Mr. Mattioli, who has signed the signature line above the

5    seller?

6    A.  Me.

7    Q.  And what was your role in this transaction, Mr. Mattioli?

8    A.  I facilitate the transaction.  The owner at the time

9    desired to sell his car and I consequently informed the Ferrari

10   factory that——the Corse Clienti program, that I was——we had

11   this car for sale.

12   Q.  Below your signature line on the same page, it says the

13   purchaser and it says Stichting Administratiekantoor

14   StillWeRise.

15             What role did this entity have in the transaction,

16   Mr. Mattioli?

17   A.  I assume the buyer.

18   Q.  And what is Stichting Administratiekantoor StillWeRise?

19   A.  No idea.

20             MR. HORTON:  Ms. Loftus, if you could please go back

21   to page 1 of the purchase agreement.  And if you could blow up

22   the paragraph numbered 1.

23   Q.  Mr. Mattioli, could you please read this paragraph.

24   A.  Sure.  "This is to confirm our agreement pursuant to which

25   we agree to sell you, and you agree to purchase, our vehicle

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Ferrari FXXK EVO car chassis number 240860 (the 'car' or

2    'FXXK') as described on Schedule C."

3    Q.  And Mr. Mattioli, what is chassis No. 240860?

4    A.  It is a VIN.  It is a vehicle identification number.

5    Q.  And what is a vehicle identification number?

6    A.  So every car that's built has this individual number.

7    They're born with it.

8             MR. HORTON:  Ms. Loftus, if you could zoom back out

9    and then highlight paragraphs numbered 2 down just above the

10   No. 3.  And enlarge that, please.

11   Q.  Mr. Mattioli, this says the agreed purchase price is

12   4 million US dollars.  Do you see that?

13   A.  Yes.

14   Q.  Below that paragraph it says, "The agreed price shall be

15   paid as follows:  A nonrefundable deposit equal to $500,000."

16   Do you see that?

17   A.  Yes.

18   Q.  And after that it says that will be paid upon Ferrari Corse

19   Clienti XX Programme Team technical check of the car to forward

20   to the buyer for his approval.  What is the XX Programme Team

21   technical check of the car?

22   A.  It's a predelivery inspection to make sure the car is in

23   good condition.

24   Q.  Below that the line says the balance equal to 3.5 million

25   US dollars will be done not later than 15th of June 2021.  Do

O6A1GUO1                        Mattioli - Direct

```
1    you see that?

2    A.  Yes.

3    Q.  Mr. Mattioli, is this a typical payment structure for this

4    kind of deal?

5    A.  Yes.

6          MR. HORTON:  Could you please go to page 2 and zoom in

7    on paragraph 11.

8    Q.  Mr. Mattioli, could you please read this paragraph.

9    A.  "As requested by the Car' maker, Ferrari S.p.A., you are

10   requested to sign the Schedule B hereto which governs a certain

11   number of issues regarding, inter alia, warranties, use,

12   transfer concerning the car."

13         MR. HORTON:  Ms. Loftus, can you please take us to

14   page 4 of this same exhibit, GX 802, and briefly click through

15   pages 4-6.

16         Okay.  If you could take us back to page 4, please.

17   Q.  Mr. Mattioli, what is this document?

18   A.  This is a statement of Ferrari S.p.A. statement.

19   Q.  And what role did this document play in the transaction for

20   the FXXK?

21   A.  Oh, this is required by them.  It's a Schedule B they

22   require to be signed.

23   Q.  And how often in your 25 years dealing with Ferrari have

24   you seen a document like this?

25   A.  This is only when you deal with special cars like this with
```

O6A1GUO1                         Mattioli - Direct

1   Ferrari——the Ferrari statement, yeah.

2   Q.  Under the statement, it says, "The undersigned, being the

3   purchaser of the FXXK EVO car, chassis 240860 from the seller."

4           MR. HORTON:  Ms. Loftus, can you enlarge the

5   Homologation in paragraph 1, please.

6   Q.  While she's doing that, Mr. Mattioli, what is homologation?

7   A.  Homologation is the term that describe where a car——it's

8   street legal and complies with the rules and regulations of the

9   country where the car is homologated.

10  Q.  And can you please read the first sentence of paragraph 1.

11  A.  Yes.  "As stated above, the purchaser understands that the

12  FXXK EVO does not meet current safety and emissions standards

13  for street-legal vehicles in any country."

14          MR. HORTON:  Ms. Loftus, if you go to page 5 of this

15  same exhibit, GX 802, and please zoom in on the section that

16  says Transfer.

17  Q.  And Mr. Mattioli, if you could just read the first two

18  lines.  Start with No. 5.

19  A.  "In the event of transfer of the FXXK EVO, the purchaser

20  agrees to immediately inform Ferrari of the identity of the

21  transferee."

22  Q.  And Mr. Mattioli, what is the purpose of this provision?

23  A.  To inform the factory of any change of ownership, this

24  specific model.

25  Q.  And does Ferrari require that of every car it sells?

O6A1GUO1                    Mattioli - Direct

1    A.  No.  They——again, this is a statement only for the

2    specifically built Corse Clienti cars.

3    Q.  And why does Ferrari require that the Corse Clienti

4    cars——why do they require that the owner notifies them if

5    ownership changes?

6    A.  Well, I think they want to know, are they dealing with the

7    car most of the time, store at their facilities.

8    Q.  And why are these cars mostly stored at Ferrari's

9    facilities?

10   A.  Yes.

11   Q.  I'm sorry.  Why are they mostly stored at Ferrari

12   facilities?

13   A.  Because they are supported by them.  So the Ferrari

14   technician, they work on——on the cars are at the factory; the

15   cars gets managed and maintained by them.

16           MR. HORTON:  And Ms. Loftus, if you could please take

17   us to page 6 of the same exhibit, GX 802, and zoom in on the

18   signature line, the date and signature line.  Thank you.

19   Q.  Mr. Mattioli, whose name appears under the signature line?

20   A.  Mr. Guo.

21   Q.  And do you know who that is?

22   A.  No.

23           MR. HORTON:  Ms. Loftus, if you could take us to

24   page 20 of this same exhibit, please, GX 802.

25   Q.  By the way, Mr. Mattioli, the document we looked at earlier

O6A1GUO1                          Mattioli - Direct

1    referenced an FXXK EVO.  What's an FXXK EVO?

2    A.  It's a special built only for track purposes from the

3    Ferrari factory.

4    Q.  What difference, if any, is there between the FXXK and the

5    FXXK EVO?

6    A.  Yes.  The EVO was the second series of that model.  So

7    first they had the FXXK came out, and then the factory produced

8    few additional units and also made available a kit to upgrade

9    the series 1 cars into an EVO.

10   Q.  Looking at the screen in front of you on page 20 of GX 802,

11   Mr. Mattioli, the header says FXXK EVO Chassis Number 24860.

12   Do you see that?

13   A.  Yes.

14   Q.  And is that the same chassis number as the one involved in

15   the transaction you handled?

16   A.  Yes.

17   Q.  And what is depicted on this page of the document?

18   A.  The car.

19   Q.  And is this the car that was in the transaction you've been

20   testifying about?

21   A.  Yes.

22          MR. HORTON:  Ms. Loftus, could you please display

23   what's in evidence as GX BR440 at page 13.

24          Thank you.

25   Q.  Mr. Mattioli, what is this document?

O6A1GUO1                          Mattioli - Direct

1   A.  This is a receipt of funds.

2   Q.  And who received the funds?

3   A.  Ferrari Beverly Hills.

4   Q.  And who are the funds sent by?

5   A.  Fiesta Property Developments Ltd.

6   Q.  What was the date of this wire transfer?

7   A.  May 26, 2021.

8   Q.  And what were these funds paying for?

9   A.  This was the deposit for the FXXK EVO 24860.

10  Q.  Do you know if Fiesta Property Developments is?

11  A.  No.

12          MR. HORTON:  You can take that down, Ms. Loftus.

13          If you could please put back up what's in evidence as

14  GX 802 at page 28.

15          And if you could zoom in on the email that starts

16  about 10 percent down from the top on page 28.

17  Q.  Mr. Mattioli, what is this email?

18  A.  This is an email from me to an executive at Ferrari S.p.A.

19  Q.  And who is Adalberto Cattabriga?

20  A.  He's the gentlemen in charge of the special sales, within

21  the Corse Clienti.

22  Q.  What's the date of this email?

23  A.  June 15, 2021.

24  Q.  What's the subject line?

25  A.  FXXK EVO Chassis 24860.

1    Q.  The email starts:  "Dear Catta, Thank you for your email

2    and your time on the phone.  While we understand that the delay

3    in closing has been caused by factory's inspection, we are

4    currently facing a buyer's default as per agreement."

5         What's a buyer's default, Mr. Mattioli?

6    A.  When the buyer doesn't fulfill his obligation according to

7    an agreement.

8    Q.  And what was your purpose in sending this email on

9    June 15th?

10   A.  Well, soliciting the, you know, conclusion and the funding

11   and the successful completion of the transaction.

12   Q.  Can you please read the email addresses that you sent this

13   email to.

14   A.  Cattabriga, Adalberto, adalberto.cattabriga@ferrari.com.

15   Alex Soltani, asoltani@skyviewcapital.com—

16   Q.  And I'm sorry, Mr. Mattioli.  You can just read the name

17   next to the email address, unless there isn't one.

18   A.  Oh, okay.  Balli, Francesco; Gandini, Matteo.

19   Q.  And what is the last email address?

20   A.  There is no name.

21   Q.  Okay.  And it says ukistruehome@gmail.com?

22   A.  Yes, correct.

23        MR. HORTON:  Thank you, Ms. Loftus.  Can you please

24   put up just for the witness and the parties what's marked as

25   GX BR1604.

O6A1GUO1                    Mattioli - Direct

1   Q.  Mr. Mattioli, what is this document?

2   A.  This is an email that I received.

3   Q.  And what date did you receive this email?

4   A.  It says June 15, 2021.

5   Q.  What relationship, if any, does this email have to the one

6   we just looked at that you sent that day?

7   A.  It's a reply from this guy to my email.

8           MR. HORTON:  Your Honor, the government offers

9   GX BR1604.

10          MS. SHROFF:  No objection, your Honor.

11          THE COURT:  It is admitted.

12          (Government's Exhibit BR1604 received in evidence)

13          MR. HORTON:  Ms. Loftus, if you could zoom in to the

14  top of the email, please; the first email in the chain.

15  BY MR. HORTON:

16  Q.  Who is this email to you sent from, Mr. Mattioli?

17  A.  Can you repeat the question.

18  Q.  Who sent you this email on June 15th?

19  A.  It says Mileson ukistruehome@gmail.com.

20  Q.  And can you just read the email that he sent you that day.

21  A.  Sure.  "Dear All:  I don't understand this email, we are

22  trying our best to be patient and move the deal forward ASAP.

23  We've been waiting to pay the rest of the invoice for weeks.  I

24  understand the factory's delay and I am very supportive to

25  Ferrari.  However, seeing this email from Ferrari Beverly Hills

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6A1GUO1                          Mattioli - Direct

1   is very unpleasant, no one is trying to 'default' anything

2   here."

3   Q.  And Mr. Mattioli, what, if anything, was your reaction to

4   receiving this email?

5   A.  I don't really remember.

6   Q.  And what, if anything, did you understand was the sender's

7   role in the transaction?

8   A.  I didn't.  I was surprised I think to receive this.

9           MR. HORTON:  Ms. Loftus, can you please put up what's

10  marked as GX BR802.  It's in evidence.  And at page 27.

11          And if you could zoom in on the email from

12  Mr. Cattabriga to Mr. Mattioli and the others.

13  Q.  Mr. Mattioli, this is an email you received the same day,

14  Tuesday, June 15, 2021.  Do you see that?

15  A.  Yes.

16          MR. HORTON:  And Ms. Loftus, if you can

17  attach──sorry──if you can zoom in to the paragraphs "Having

18  said that" and "Please sign the statement here."

19  Q.  Mr. Mattioli, the paragraph in the middle says, "Having

20  said that, I am attaching a statement confirming the deadline

21  for the balance on Friday 18 June 2021; the operations for the

22  transfer of the FXXK car to Switzerland will begin as early as

23  tomorrow morning as per contract."

24          Mr. Mattioli, why was the FXXK car in this transaction

25  transferred to Switzerland?

O6A1GUO1                          Mattioli - Direct

1    A.   The car was under a bond.

2    Q.   And which party to the transaction decided the car would be

3    transferred to Switzerland?

4    A.   The factory, the Ferrari.

5    Q.   And which party, if any, was the factory representing in

6    this transaction?

7    A.   The buyer.

8             MR. HORTON:   Ms. Loftus, if you can please take that

9    down and put up what's in evidence as GX BR440 and go to

10   page 8.

11            And then just zoom in on the——thank you.

12   Q.   Mr. Mattioli, what is this document?

13   A.   It's a receipt of funds.

14   Q.   And who received the funds?

15   A.   Ferrari Beverly Hills.

16   Q.   What was the date of the funds transfer?

17   A.   June 16, 2021.

18   Q.   How much was sent to Ferrari Beverly Hills on June 16,

19   2021?

20   A.   3,500,000.

21   Q.   And who sent the $3.5 million to Ferrari Beverly Hills?

22   A.   Fiesta Property Developments.

23   Q.   And what transaction did this funds transfer relate to?

24   A.   This is——was the balance of the amount on the FXXK EVO.

25            MR. HORTON:   Ms. Loftus, if you can please take this

1    down and put up for the witness what's marked as GX BR1601.

2    Q.  Mr. Mattioli, what is this document?

3    A.  This is an email from my CFO to Adalberto Cattabriga.

4    Q.  And what, if anything, is attached to this email?

5    A.  It's called a bill of sale.

6    Q.  And what's a bill of sale?

7    A.  The bill of sale is the document that we provide because on

8    the race car, there is no title, so it's in lieu of a title.

9          MR. HORTON:  Ms. Loftus, can you please go to——oh,

10   actually——sorry, your Honor——the government offers GX BR1601.

11         MS. SHROFF:  No objection, your Honor.

12         THE COURT:  It is admitted.

13         (Government's Exhibit BR1601 received in evidence)

14         MR. HORTON:  Ms. Loftus, if you could please take us

15   to page 7 of the exhibit.

16   BY MR. HORTON:

17   Q.  Mr. Mattioli, is this the bill of sale for the FXXK

18   transaction you've been testifying about?

19   A.  Yes.

20   Q.  The buyer line is blank in this version of the document.

21   Did this transaction ultimately go through?

22   A.  Yes.

23         MR. HORTON:  Your Honor, if I could just have a

24   moment, please.

25         THE COURT:  Yes.

O6ABGUO2                          Mattioli - Direct

1    BY MR. HORTON:

2    Q.  Ms. Loftus, if you could just highlight the buyer field on

3    1601 at page seven.  I'm sorry.  The buyer field with text to

4    its right on top of that.

5            And on the final bill of sale, Mr. Mattioli, what was

6    the name of the buyer entity?

7    A.  Fiesta Property Development.

8    Q.  Mr. Mattioli, we looked at an email you received on June 15

9    from MilesonUKIsTrueHome@gmail.com.  Did you ever meet Mileson

10   in person?

11   A.  Not to my knowledge.

12   Q.  Did you ever speak with Mileson on the phone?

13   A.  No, I don't remember ever speaking to him.

14   Q.  And what, if any, due diligence did you do as the seller's

15   representative in this transaction?

16   A.  In this transaction we haven't done any due diligence

17   because the buyer came directly from the Ferrari factory.

18   Q.  Is that typical in a consignment sale?

19   A.  I wouldn't say it's typical in consignment sale.  I would

20   say that when you go through the factory and they choose the

21   buyer, then you just rely on the Ferrari factory.

22   Q.  Mr. Mattioli, did anything about this transaction stand out

23   to you?

24   A.  What sense?

25   Q.  Was anything about it unusual to you at the time?

O6ABGUO2                     Mattioli - Cross

1    A.  Not really, no.

2              MR. HORTON:  If I could just have one more moment,

3    your Honor.

4              (Pause)

5              MR. HORTON:  Thank you, your Honor.

6    Q.  Mr. Mattioli, when was the car delivered to the buyer, what

7    year?

8    A.  No, it was subsequent to the transaction the car was

9    transferred to Switzerland.  I don't recall the date.

10             MR. HORTON:  Thank you.  No further questions, your

11   Honor.

12             THE COURT:  Cross examination.

13             MS. SHROFF:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MS. SHROFF:

16   Q.  Good morning, Mr. Mattioli.

17   A.  Good morning.

18   Q.  The car brand that we're talking about is the Ferrari,

19   correct?

20   A.  Yes.

21   Q.  And this particular Ferrari FXXK, you would agree with me

22   that it is a very exclusive car, correct?

23   A.  Correct.

24   Q.  And even if I had the money to purchase it, I would still

25   have to be vetted by Ferrari before I could buy it, correct?

O6ABGUO2                          Mattioli - Cross

1    A.  Correct.

2    Q.  So there could be 50 people with the same amount of money

3    trying to buy this car, and Ferrari factory would pick which of

4    the 50 people would be allowed to buy it, right?

5    A.  Yes.  I mean, there's a waiting list.  I don't know if it's

6    50.

7    Q.  Well, of course.  Who doesn't want a Ferrari, right.

8          So the value of this car per year, does it tend to

9    increase or decrease?

10   A.  Tend to increase.

11   Q.  Now, you testified about this, what did you call it,

12   clienti?  What is it called?

13   A.  Corse Clienti maybe.

14   Q.  Yes. Is that like a program at Ferrari?

15   A.  Yes.

16   Q.  And what is that program about?

17   A.  The program is about enhancing the client experience

18   relating to the track activities, racetrack activities.

19   Q.  So I'm going to come back to the racetrack activities.  The

20   waiting list to get into this clienti program is also long,

21   correct?

22   A.  There is a waiting list.

23   Q.  And this person that the government kept asking you about

24   Mileson Guo, right, you remember many questions about

25   Mr. Mileson Guo on direct?

O6ABGUO2                          Mattioli - Cross

1    A.  Yes.

2    Q.  So do you sitting here today know how far back Mileson Guo

3    has been a customer of Ferrari?

4    A.  No idea.

5    Q.  If I told you he had been a customer since 2011, you would

6    not know?

7               MR. HORTON:  Objection, calls for speculation.

8               MS. SHROFF:  I'll rephrase.  I'll withdraw that and

9    try again.

10   Q.  Before you came to testify here, you reviewed all these

11   names with Mr. Horton, correct, this man right here?

12   A.  What names, sorry?

13   Q.  Miles Guo, Fiesta Properties, you reviewed those names with

14   him, right, when you prepped?

15   A.  Yeah, we went through those names.

16   Q.  Did you by any chance check to see how far back Miles Guo

17   had been a Ferrari customer?

18              MR. HORTON:  Objection, mischaracterizes the

19   testimony.

20              MS. SHROFF:  It's a question of whether or not he

21   checked how far back Mr. Guo, Mileson Guo is a customer.  It's

22   a question.

23              THE COURT:  You may answer.

24   Q.  Did you check?

25   A.  No.

1   Q.  Did the prosecutor ask you to check to see how far back

2   Mileson Guo had been a Ferrari customer?

3   A.  No.

4   Q.  Then you talked a little bit about something called the

5   Curso Pilota.  Is there such a thing?

6   A.  I'm not sure I spoke about Curso Pilota, but, yes, there is

7   such a thing.

8   Q.  Could you tell the jury what that is?

9   A.  Yes.  Curso Pilota is a program.  It's a driving school

10  that is run by Ferrari to further develop the driving skills of

11  the Ferrari clients.

12  Q.  And do they also participate in the track events?

13  A.  Who?

14  Q.  The Curso Pilota.

15  A.  I don't understand the question.

16  Q.  I will try again.  Now, let me ask you this:  There was a

17  purchase request made to the Ferrari factory, correct, for this

18  car on consignment, right?

19  A.  I would assume so.  I didn't see the request.

20  Q.  And your dealership happen to have a car that match what

21  the factory was looking for, correct?

22  A.  Yes.  We had a car in consignment, and I immediately

23  notified Ferrari factory department that we had this car

24  available for sale.

25  Q.  And you work closely with Ferrari factory, correct?

1    A.  Well, I work with Ferrari factory since many years.

2    Q.  Exactly.  And you trust them to do their job, correct?

3    A.  Yes.

4    Q.  And they trust you to do your job, correct?

5    A.  I would think so.  I don't know.  I hope.

6    Q.  Fair enough.  But Ferrari factory and you were trying to

7    make sure that the sale happened, correct?

8    A.  Yes.

9    Q.  And could I just have 802, Government Exhibit 802 back up.

10   You remember the prosecutor asked you questions about this

11   document, correct?

12   A.  Yes.

13   Q.  And this is a very standard document, right?

14   A.  Yes.

15   Q.  Could I have it made bigger, please.  And you see how there

16   is a date filled in.  That's what you filled in, correct?

17   A.  Yes.

18   Q.  And if I could just have page two.  You are listed as the

19   seller, correct?

20   A.  Yes.

21   Q.  And then below that there is a purchaser.  I can't read

22   that very long end, and then at the end it says Still We Rise,

23   correct?

24   A.  Yes.

25   Q.  And when you received this document, you saw nothing

1   unusual about it.  You just moved to the next step of the sale,

2   right?

3   A.  Correct.

4   Q.  You did not reply back and say, what is this purchaser

5   company or what is it or anything like that.  That was not part

6   of your inquiry, right?

7   A.  Correct.

8   Q.  Now, you testified on direct something about how the car is

9   stored at a Ferrari facility, right?  You remember that

10  testimony?

11  A.  Yes.

12  Q.  And it is very common, is it not, for the car to be stored

13  at a Ferrari facility because the car needs as much attention

14  as a one-year-old child, right?

15          MR. HORTON:  Object to form.

16          THE COURT:  You can answer.

17  A.  I don't know if it needs that much attention, but I have

18  three childs of my own so I know that subject.  Yes, the car,

19  it's common to be left at storage at the factory for this

20  specific model.

21  Q.  And when you testified that the car was transferred to

22  Switzerland, do you really know if it actually made it to

23  Switzerland?

24  A.  No, I wasn't there.

25  Q.  So you don't know where the car is now, correct?

O6ABGUO2                          Mattioli - Cross

1    A.  Right now, no, definitely no.

2    Q.  And you definitely don't know if it ever even left to go to

3    Switzerland, correct?

4    A.  Correct, yes.

5    Q.  Now, the prosecutor ask you questions about this "default

6    issue." If I could go back to page 802 at page eight.  And you

7    were asked about this email exchange, correct?

8    A.  Yes.

9    Q.  And you see that portion where it says, While we understand

10   that the delay in closing has been caused by factory's

11   inspection, right.  You see that?

12   A.  Yes.

13   Q.  So it's fair to say that it wasn't the buyer's fault that

14   things were delayed, right?  It's the inspection that caused

15   the delay.  Is that a correct reading by me?

16   A.  Well, it was a combination I think.

17   Q.  Where does it say it's a combination?

18        Does it say, While we understand that the delay in

19   closing has been caused by a combination of factors including

20   factory's inspection?

21   A.  No.

22   Q.  So then you get a reply to this email, right?  Could I show

23   him the reply and the jury also.

24        And you said that you were surprised by the response

25   because it is from somebody named Mileson, right, on the top?

1     A.  Yes.

2     Q.  And it says, I don't understand the email.  We are trying

3     our best to be patient.  And he's telling you, he is being

4     patient, right, Mileson is being patient?

5     A.  Yes, that's what he's saying.

6     Q.  And you read the email, right?

7     A.  Yes.

8     Q.  You're on the email chain, right?

9     A.  Yes.

10    Q.  You don't reply and say, hey, buddy you're the cause of the

11    hold up, right?

12    A.  I don't know who he was.

13    Q.  Right. So you don't say that.  You don't say it's a

14    combination of factors.  You are contributing to the delay.

15    You don't say any of those things to him?

16    A.  Is that a question?

17    Q.  Yes.

18    A.  So the question is -- sorry, if I reply to this email?  Is

19    that the question?

20    Q.  Yeah.

21    A.  I did not reply to this email.

22    Q.  And you did not reply to any of the other people and take

23    Mileson off the email chain and say, hey, who is this guy

24    replying, right?

25    A.  No.

O6ABGUO2                          Mattioli - Cross

1    Q.  And could you tell me, sir, who is SkyViewCapital.com.  Who
2    is that?
3    A.  That in this transaction was the seller.
4    Q.  The seller, right?
5    A.  Yes, the consignor.
6    Q.  So the seller knows who Mileson is because the seller
7    doesn't reply either saying who is this Mileson person, right?
8             MR. HORTON:  Objection, your Honor.
9             THE COURT:  Overruled.  You may answer.
10   A.  So the question was again, sorry?
11   Q.  The question was, you said you were surprised by receiving
12   this email from this person.  My question is, nobody does
13   anything about this "surprise," correct?
14   A.  I don't know what people did.
15   Q.  Well, you were on the email chain.  You didn't get any
16   email from anyone else saying anything about this person name
17   MilesonUKIsTrueHome, right?
18   A.  I think I receive an email back from Cattabriga.
19   Q.  Saying what?
20   A.  Thanking us for being patient and giving us more
21   instruction for the completion of the deal.
22   Q.  Thank you.  We can take that down.
23        Now, you testified that according to you, you believed
24   that the Ferrari factory represented the seller in this case or
25   the buyer?

O6ABGUO2                        Mattioli - Cross

1              MR. HORTON:  Objection.

2              THE COURT:  You may answer.

3    A.   They represented at the time the buyer.

4    Q.   So Ferrari factory told you that they -- it had a buyer

5    that was interested, correct?

6    A.   Yes.

7    Q.   Who makes the commission on the sale, Ferrari factory or

8    you?

9    A.   I made the commission.

10   Q.   Ferrari factory has no financial incentive in the sale,

11   correct?

12   A.   Not that I know of.

13   Q.   Exactly.  So Ferrari factory's only job is to make sure

14   that the seller is Ferrari-appropriate, right?

15   A.   Correct, yeah.  I would describe that.

16   Q.   And Ferrari is extremely particular about who it sales its

17   cars to, right?

18   A.   Yes.

19   Q.   So Justin Bieber, for example, can no longer purchase a

20   Ferrari because he changed something on the Ferrari's car

21   model, correct?

22   A.   I'm not aware of such a thing.

23   Q.   Now, you are aware of this program where Ferrari encourages

24   track days so that the purchaser of these kind of cars can

25   enjoy the car in a setting, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO2                          Mattioli - Cross

1    A.  Yes.

2    Q.  And there are five track dates a year; is that right?

3    A.  I think it changes every year.  There's a schedule, could

4    be five, could be six, seven.

5    Q.  And on that day Ferrari organizes like a huge event,

6    correct?

7    A.  Ferrari promote the day at the track, yes.

8    Q.  And they invite people from the Clienti program, correct?

9    A.  Yes.

10   Q.  They have racecar trainers who teach the owners how to

11   drive these cars, correct?

12   A.  Correct, yes.

13   Q.  People bring their friends, family, colleagues, just for

14   that event, correct?

15   A.  I've seen that, yeah.

16   Q.  And there are many people who buy properties around these

17   tracks so that they can participate in these events and they

18   can be promoted for companies or for their colleagues, correct?

19            MR. HORTON:  Object to scope.

20            THE COURT:  You may answer.

21   A.  I'm not aware of that.

22   Q.  Now, on these track dates Ferrari brings the cars to the

23   tracks, correct?

24   A.  Yes.  I would say most of the time Ferrari takes care of

25   the transportations, but is not a hundred percent of the time,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO2                          Mattioli - Cross

1    most of the time, yeah.

2              THE COURT:  Where does an owner keep the car?

3              THE WITNESS:  Well, typically if you are active in the

4    program, meaning you like to drive the car, you would leave the

5    car at the factory so they can prep it, manage it, maintaining.

6    Other owners, the more collectors, they just take the car home

7    with them.

8              THE COURT:  So those persons who want to race the car

9    must always go to Italy?

10             THE WITNESS:  No, they actual have events all over the

11   world.

12             THE COURT:  Go ahead.

13   BY MS. SHROFF:

14   Q.  Is it fair to say, sir, that there are certain dealership

15   like yours or dealerships in Europe who also host events for

16   these cars?

17   A.  No, we don't host events for this specific cars.

18   Q.  Now, the Ferrari factory makes sure that they give services

19   such as storage for the car, correct?

20   A.  Yes.

21   Q.  They help you maintain the car, correct?

22   A.  Yes.

23   Q.  And if you want to be taken to or from the track, they make

24   sure that all of those arrangements are taken care of by

25   Ferrari, correct?

O6ABGUO2                          Mattioli - Cross

1   A.  Yeah, Ferrari provide the services.

2   Q.  And what is the telemetry program, do you know?

3   A.  Telemetry?

4   Q.  Yes.

5   A.  Yes.

6   Q.  Could you tell the jury what that is?

7   A.  Okay.  So typical in a race car, to improve the

8   performance, you analyze a lot of data and telemetry is a

9   program that allows you collect this data that will help you to

10  improve the performance, to go faster.

11  Q.  And when these track events are held, they're filmed, and

12  the film is given to the persons who attend; is that correct?

13  A.  I would say every car is pretty much equipped with camera,

14  say Gopro camera just to give an example, not to use the brand,

15  but to use an idea for it.  So, yes, every lap is filmed, and

16  together with the telemetry, you can then show the driver what

17  it can improve, where it can brake, where the line of the turn

18  is, give instructions.

19  Q.  And this particular car -- you know they showed you a photo

20  and everything.  I'm not going to pull that back up again.  But

21  I just want to make sure I understood your testimony clearly.

22  Sitting here today, you do not know if the car ever left the

23  Ferrari factory, correct?

24          MR. HORTON:  Objection, asked and answered.

25          THE COURT:  Sustained.

O6ABGUO2                         Mattioli - Cross

1  Q.  Sir, when you reviewed documents from Mr. Horton, you sent

2  him documents, correct?

3  A.  Yes.

4  Q.  You sent him emails, correct, such as the ones we saw now?

5  A.  Yes.

6  Q.  Is it fair to say that you did not send him any document

7  confirming any transportation of this car to Switzerland,

8  correct?

9  A.  I don't remember if there was a shipment slip that was bill

10 of lading.  There must be something.

11 Q.  Only if the car was actually transported, correct?

12         MR. HORTON:  Objection, asked and answered.

13         THE COURT:  Sustained.

14 Q.  You didn't give him any bill of ladings, correct?

15         MR. HORTON:  Objection asked and answered.

16         THE COURT:  You may answer.

17 A.  I don't remember.

18         MS. SHROFF:  Thank you, your Honor.  Nothing further.

19         THE COURT:  Any redirect?

20         MR. HORTON:  No further questions.  Thank you.

21         THE COURT:  So an individual who buys this particular

22 model, is that person usually the driver or no?

23         THE WITNESS:  I would say for the majority, yes, it's

24 the driver.

25         THE COURT:  Thank you.  You may step out.

O6ABGUO2                          Mattioli - Cross

1           (Witness excused)

2           THE COURT:  The prosecution may call its next witness.

3           MS. MURRAY:  Your Honor, the government's next witness

4    is Haitham Khaled. We would ask if we could take maybe a

5    five-minute break.  We have some materials to pass out for the

6    jurors for the next witness, and we would like a couple of

7    minutes to do that.

8           THE COURT:  All righty. Members of the jury, we will

9    take our five-minute-break.  You're not to discuss the case.

10   You're not allowed to read, watch, or listen to anything that

11   has to do with this case.

12          (Recess)

13          THE COURT:  Please have the jurors come in.

14          MS. MURRAY:  Your Honor, would you like the witness on

15   the stand?

16          THE COURT:  Yes, and please have the witness take the

17   stand.

18          (Jury present)

19          THE COURT:  Please be seated.

20   HAITHAM KHALED,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23          THE COURT:  Please be seated.  State your name and

24   spell it and draw the microphone close to you.

25          THE WITNESS:  Haitham Khaled, H-A-I-T-H-A-M,

1    K-H-A-L-E-D.

2              THE COURT:  You may inquire.

3              MS. MURRAY:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MS. MURRAY:

6    Q.  Good morning, Mr. Khaled.

7    A.  Good morning.

8    Q.  Where do you live?

9    A.  Long Island, New York.

10   Q.  What do you do for work?

11   A.  I am a mortgage banker as well as I have a consulting

12   company.

13   Q.  What did you do before your current job?

14   A.  I worked for GTV and Saraca.

15   Q.  Have you ever worked for Miles Guo?

16   A.  Yes.

17   Q.  Do you see Mr. Guo in the courtroom today?

18   A.  Yes.

19   Q.  Can you identify him by where he's seated and an item of

20   clothing he's wearing.

21             MS. SHROFF:  Your Honor, we'll stipulate Mr. Miles Guo

22   is at defense table.

23             THE COURT:  Okay.

24   A.  Right there in gray.

25   Q.  And, Mr. Khaled, have you ever worked for an individual

O6ABGUO2                        Khaled- Direct

1    named Yanping Wang or Yvette Wang?

2    A.  Yes.

3    Q.  At a high level, what did you do for Miles Guo and Yvette

4    Wang?

5    A.  I was in charge of banking relationships.

6    Q.  In that role, what communications, if any, did you have

7    with banks?

8    A.  I was in charge of opening up banking accounts for various

9    entities and individuals.  I communicated with them if there's

10   any issues that arise, whether it's during the transactions or

11   closure of the account.

12   Q.  And when you were working for Miles Guo and Yvette Wang,

13   were you always truthful with banks?

14   A.  No.

15   Q.  Why did you lie to banks?

16   A.  To make sure that accounts get opened and stay open.

17   Q.  And is that because that was part of your employment?

18            MS. SHROFF:  Objection to the leading.

19            THE COURT:  Don't lead.

20   Q.  Was that in the course of your employment that you had

21   those communications with the banks?

22   A.  Yes.

23   Q.  Mr. Khaled, did there come a time when you were approached

24   by the FBI?

25   A.  Yes.

O6ABGUO2                          Khaled- Direct

1     Q.  Approximately when was that?

2     A.  It was November 2021.

3     Q.  And when the FBI approached you, did they ask you

4     questions?

5     A.  Yes.

6     Q.  Did you answer their questions at that time?

7     A.  No, I referred them.

8     Q.  After the FBI approached you in November 2021, did you

9     consult with an attorney?

10    A.  Yes.

11    Q.  Did there come a time when you met with the U.S. Attorney's

12    office?

13    A.  Yes.

14    Q.  Around when did you first meet with the U.S. Attorney's

15    office?

16    A.  May 2022.

17    Q.  Approximately how many times have you met with the U.S.

18    Attorney's office?

19    A.  Eighteen.

20    Q.  During those meetings, did the U.S. Attorney's office, the

21    government, ask you questions?

22    A.  Yes.

23    Q.  Did you answer those questions?

24    A.  Yes.

25    Q.  Did you answer them truthfully?

O6ABGUO2                          Khaled- Direct

1    A.  Yes.

2    Q.  Did you provide the U.S. Attorney's office with information

3    about your personal background?

4    A.  Yes, I did.

5    Q.  Does that include that you filed for chapter 13 bankruptcy

6    in 2018?

7    A.  Yes.

8    Q.  During those meetings, did you also disclose crimes that

9    you've committed?

10   A.  Yes.

11   Q.  Did those include crimes that you committed while working

12   for Miles Guo and Yvette Wang?

13   A.  Yes.

14   Q.  Did they include other crimes that you'd committed in your

15   past?

16   A.  Yes.

17   Q.  Did you provide documents and other information and

18   materials to the government?

19   A.  I did.

20   Q.  Did those include certain recordings, audio recordings that

21   you made?

22   A.  Yes.

23   Q.  Mr. Khaled, after meeting with the government, were you

24   offered an agreement?

25   A.  Yes.

O6ABGUO2                          Khaled- Direct

1   Q.  What sort of agreement were you offered?

2   A.  A non-prosecution agreement, NPA.

3   Q.  What's your understanding of what a non-prosecution

4   agreement is?

5   A.  That I have to tell the truth and disclose crimes that I

6   have committed.  I have to attend meetings.  I have to testify

7   if I'm requested to.

8   Q.  If you do those things under your non-prosecution

9   agreement, what's your understanding, if any, of what the

10  government will do?

11  A.  Will not prosecute me.

12  Q.  And specifically what crimes has the government promised

13  they won't charge you for from your time working for Miles Guo

14  and Yvette Wang?

15  A.  Participating in a fraud scheme.

16  Q.  What is your understanding as to whether the

17  non-prosecution agreement protects you from prosecution for the

18  other crimes you committed?

19  A.  It does.

20  Q.  And those are crimes that you disclosed to the government,

21  correct?

22  A.  Yes, ma'am.

23  Q.  What is your understanding as to whether the

24  non-prosecution agreement protects you from prosecution from

25  perjury, obstruction of justice, or making false statements if

O6ABGUO2                        Khaled- Direct

1    you were to lie on the stand today?

2    A.   This agreement will be voided.

3    Q.   And is it your understanding the government could

4    separately prosecute you for perjury, obstruction of justice or

5    making false statements if you lie here?

6    A.   Yes.

7    Q.   If your non-prosecution agreement were voided, is it your

8    understanding you could be charged for all of the crimes you've

9    disclosed to the government?

10   A.   Yes, ma'am.

11   Q.   In that situation would the statements that you've made to

12   the government be used against you?

13   A.   They would.

14   Q.   Aside from the non-prosecution agreement, were you made any

15   other promises by the government?

16   A.   No.

17   Q.   During your meetings with the government, did you tell the

18   government about all of the crimes that you committed?

19   A.   Yes, I did.

20   Q.   Did that include inflating your personal expenses in

21   documents you submitted to modify your home loan in 2016?

22   A.   Yes.

23   Q.   Did it include falsifying bank statements that you

24   submitted in connection with a home loan modification in 2010?

25   A.   Yes.

O6ABGUO2                              Khaled- Direct

1    Q.  And did it include inflating reported work expenses in

2    filings you submitted to the IRS from about 2009 to 2011 to

3    lower your tax bill?

4    A.  Yes.

5    Q.  What protections, if any, does your non-prosecution

6    agreement provide you for those crimes?

7    A.  I will be not prosecuted for those crimes.

8    Q.  Mr. Khaled, if you tell the truth during your testimony in

9    this case, but no one gets convicted, do you still get to keep

10   your non-prosecution agreement?

11             MS. SHROFF:  Objection.

12             THE COURT:  Overruled.

13   A.  Yes, ma'am.

14   Q.  If you lie during your testimony but someone gets

15   convicted, do you get to keep your non-prosecution agreement?

16   A.  No.

17   Q.  Who decides if you tell the truth during your testimony?

18   A.  I do.

19   Q.  Mr. Khaled, I want to start by talking about how you first

20   met Yvette Wang.  If I call her Yvette will you understand that

21   I'm referring to Yvette Wang or Yanping Wang?

22   A.  Yes.

23   Q.  Approximately when did you meet Yvette Wang?

24   A.  April 2018.

25   Q.  What were you doing for work at that time?

1    A.   I worked at Citibank as a business relationship manager.

2    Q.   At that time in 2018, approximately how long had you been

3    working at Citibank?

4    A.   Four years.

5    Q.   What did you do as a business relationship banker at

6    Citibank?

7    A.   I use to open business accounts, process loans for

8    businesses.  That's it.

9    Q.   What did you do for work before you were at Citibank?

10   A.   I work for Santander.

11   Q.   In what role?

12   A.   Also a business banker.

13   Q.   For approximately how long were you a business banker at

14   Santander?

15   A.   Approximately four years also.

16   Q.   Did you have any other banking related jobs before your job

17   at Santander?

18   A.   Yeah, I worked for two international banks before that.

19   Q.   Which international banks?

20   A.   Arab Bank PLC and National Bank of Kuwait.

21   Q.   For approximately how long did you work for those two

22   international banks?

23   A.   Total of ten years.

24   Q.   And in what role or roles?

25   A.   Private banking, correspondent banking, different types of

1   banking.

2   Q.  Returning to 2018, can you explain how you met Yvette?

3   A.  I was introduced to her by a law firm, and they requested

4   me that she needed help in opening up a bank account for her

5   business.

6   Q.  Did there come a time when Yvette got in contact with you

7   regarding that bank account?

8   A.  Yes.

9   Q.  For what entity or company was Yvette looking to open a

10  bank account at Citibank?

11  A.  Golden Spring, LLC.

12  Q.  What, if anything, did Yvette say to you about what type of

13  business Golden Spring conducted?

14  A.  She said that they help worthy individuals that are in the

15  U.S. with security logistics and other factors that they need.

16  Q.  What, if anything, did Yvette tell you about the type of

17  bank account that she wanted you to open for Golden Spring?

18  A.  Just an operating account.

19  Q.  Did she tell you anything about the source of funds that

20  would be going into that account?

21  A.  She said it will be for those clients funding that account.

22  Q.  At that time during your first meeting with Yvette, did she

23  identify any of Golden Springs clients by name?

24  A.  No.

25  Q.  What happened after that meeting with Yvette that was

O6ABGUO2                        Khaled- Direct

1    relevant to your work with Golden Spring?

2    A.  We continued to open the account, collected documents,

3    collected signer information, and the account was open at that

4    time.

5    Q.  Mr. Khaled, are you familiar with the term "KYC?"

6    A.  Yes.

7    Q.  What does it stand for?

8    A.  Know your customer.

9    Q.  Can you describe what KYC entails?

10   A.  It's knowing who is the ultimate beneficiary of, if you're

11   opening up a business account, who they are; what type of

12   activities are going to be going through the account, source of

13   funds, a volume, information about the signers, date of birth,

14   residency, etc.

15   Q.  And at what stage in the account opening process does a

16   bank conduct KYC?

17   A.  It's done in the initial stage, but it's also done

18   throughout the process or the life of a bank account.

19   Q.  Were you involved with the KYC for the Golden Spring bank

20   account for City?

21   A.  For collecting the information, yes.

22   Q.  And with whom did you communicate at Golden Spring

23   regarding the KYC documentation that you collected?

24   A.  It was Yvette, and she had another employee at that time.

25   I can't recall her name.

O6ABGUO2                          Khaled- Direct

1    Q.  Did there come a time when Citibank opened bank accounts

2    for Golden Springs?

3    A.  Yes.

4    Q.  How many accounts?

5    A.  I believe one or two current accounts, checking accounts,

6    and then a few money market accounts to earn interest.

7    Q.  After the bank account for Golden Spring were open at

8    Citibank, what was your involvement or role for those accounts

9    if any?

10   A.  Just point of contact.  If there's any issues, Yvette would

11   give me a call or send me an email; or whoever is the signer if

12   they needed an additional debit card or needed any large wires

13   coming in, or if they needed checkbooks, a point of contact.

14   That's it.

15   Q.  And for approximately how long were you the point of

16   contact at Citibank for the Golden Spring accounts?

17   A.  It was until 2019, early 2019.

18   Q.  What, if anything, happened in early 2019 that changed your

19   involvement with the Golden Spring account?

20   A.  I changed position.  I became a healthcare banker, just in

21   charge of the healthcare clients of the bank; and therefore,

22   Golden Spring was not part of my clients anymore.

23   Q.  After you transitioned to that new role, how often, if at

24   all, were you in contact with Yvette?

25   A.  Not much.  I don't recall being in any contact with her.

O6ABGUO2                          Khaled- Direct

1    Q.  After your transition in 2019, did there come a time when

2    Yvette asked you to help open additional bank accounts at

3    Citibank?

4    A.  Yes.

5    Q.  Around when was that?

6    A.  May of 2020.

7    Q.  Were those business accounts or personal accounts?

8    A.  Business.

9    Q.  For what entity or entities?

10   A.  GTV and Saraca.

11   Q.  What, if anything, did Yvette tell you about GTV at the

12   time that she ask for your assistance in opening a bank

13   account?

14   A.  She said it's going to be a large account, and it will be

15   for a private offering of a media company.

16   Q.  What, if anything, did Yvette tell you about Saraca when

17   she asked for your assistance in opening a bank account?

18   A.  That Saraca is a parent company of GTV.

19   Q.  Did you have an understanding of Yvette's role at either

20   Saraca or GTV?

21   A.  Not exact role, but she was the person that referred the

22   clients.  It was part of her organization.

23   Q.  In connection with opening those accounts, what, if

24   anything, did Yvette say about any existing Saraca or GTV bank

25   accounts?

O6ABGUO2                       Khaled- Direct

1   A.  She said that they had an account with Chase.

2   Q.  Did she say anything about the amount of money that was

3   held in that Chase account?

4   A.  No, she just said large, but I had a different role at this

5   time.  I didn't dig into the details of the account.

6   Q.  After Yvette asked for your assistance in opening accounts

7   in the name of Saraca and GTV, what did you do next?

8   A.  I referred accounts to a business banker that had taken my

9   old role.

10  Q.  Do you know whether GTV or Saraca bank accounts were in

11  fact opened at Citibank?

12  A.  Yes, they were.

13  Q.  How do you know that?

14  A.  The banker informed me and kept in contact of updating me.

15  Q.  What credit, if any, were you given for referring those two

16  banks to Citibank?

17  A.  I was recognized after the account got funded that it was a

18  large referral that I made.

19  Q.  Do you recall the approximate amount of the funding of

20  those account?

21  A.  200 million.

22  Q.  Mr. Khaled, did there come a time when you became aware of

23  a Securities and Exchange Commission or SEC allegation relating

24  to GTV?

25  A.  Yes.

O6ABGUO2                          Khaled- Direct

1    Q.   Around when was that?

2    A.   June of 2020.

3    Q.   What did you learn?

4    A.   That there was an investigation for improper private

5    offering.

6    Q.   And when you say private offering, can you explain to the

7    jury what you mean?

8    A.   It's an investment.

9            MS. SHROFF:  Objection, your Honor.

10           THE COURT:  You may answer.

11   A.   It's an investment structure, but it's for certain

12   individuals, not a public opening like a stock.

13   Q.   Did there come a time when Citibank took adverse action

14   regarding the GTV and Saraca accounts?

15   A.   Yes.

16   Q.   Around when was that?

17   A.   End of June of 2020.

18   Q.   And what, if anything, did Citibank do with respect to

19   those accounts in June 2020?

20   A.   They blocked the account and then closed it.

21   Q.   Were you personally involved in the decision to either

22   block or close those accounts?

23   A.   No.

24   Q.   Do you know why City decided to close those accounts?

25   A.   It was a reputation risk.

1          MS. SHROFF:  Objection, your Honor, hearsay.

2          THE COURT:  Overruled.  The answer stands.

3   Q.  Mr. Khaled, did you ever speak with Yvette about those

4   account closures, the closure of the GTV and Saraca at City?

5   A.  Yes.

6   Q.  What, if anything, did she say about those account

7   closures?

8   A.  That she wants -- she doesn't care if the account gets

9   closed, but she wants the proceeds of that account, the checks.

10  Q.  Do you know what happened to the money that had been in the

11  Saraca and GTV accounts at City?

12  A.  It was given to Yvette in the form of multiple checks.

13  Q.  What role, if any, did you have with respect to those funds

14  that had been in the Saraca and GTV accounts at City?

15  A.  Nothing, just follow-up with James to make sure that it's

16  resolved.

17  Q.  And who is James?

18  A.  James is the banker that I referred the account to at

19  Citibank.

20  Q.  Mr. Khaled, did there come a time when Yvette tried to hire

21  you?

22  A.  Yes.

23          MS. SHROFF:  Objection, your Honor, leading.  It

24  assumes facts not in evidence.

25          THE COURT:  Overruled.  You may answer.

O6ABGUO2                        Khaled- Direct

1   Q.   Approximately when was that?

2   A.   Just after July of 2020.

3   Q.   How did that come about?

4   A.   Just throughout the communication she said that, you know,

5   we're doing big things and she wants me to join their

6   organization and their company.

7   Q.   And after that conversation with Yvette, what happened

8   next?

9   A.   I went to meet Yvette at her office.

10  Q.   Where was that office located?

11  A.   It was on 64th Street, 162 East 64th Street in Manhattan.

12  Q.   Ms. Loftus, if you could please show the witness what's

13  been marked for identification as Government Exhibit 132.

14         Mr. Khaled, what is Government Exhibit 132?

15  A.   That's the office building, the one with the glass.

16  Q.   Is this a photograph of the office building where you met

17  Yvette?

18  A.   Yes.

19  Q.   Is it a fair and accurate representation of that office

20  building?

21  A.   Yes.

22         MS. MURRAY:  Your Honor, the government offers

23  Government Exhibit 132.

24         MS. SHROFF:  No objection.

25         THE COURT:  It is admitted.

 1              (Government's Exhibit 162 received in evidence)

 2              MS. MURRAY:  Can we please publish.

 3   Q.  Mr. Khaled, in this photo which is coming up for the jury,

 4   can you explain which of the buildings we're looking at is the

 5   office that you were referring to?

 6   A.  It's the one with the glass.

 7   Q.  Is it on the left or the right side of the two in the

 8   middle?

 9   A.  The right.

10   Q.  I'm going to refer to that building as the townhouse.

11              MS. SHROFF:  Objection, your Honor.

12              THE COURT:  Overruled.  You may go ahead.

13              MS. MURRAY:  Thank you, your Honor.

14   Q.  When I refer to the townhouse, will you understand that I'm

15   referring to that building?

16   A.  Yeah.

17   Q.  And looking at this, Mr. Khaled, what floor or floors of

18   the townhouse did the office that you visited occupy?

19   A.  It was the entire building.

20   Q.  We can take that down, Ms. Loftus.  Thank you.

21              When you went to meet with Yvette regarding the job,

22   Mr. Khaled, what, if anything, did she tell you about what role

23   she was offering you?

24   A.  I was offered a banking relations manager, as well as

25   strategic manager as well.

O6ABGUO2                        Khaled- Direct

1  Q.  And for what company or companies?

2  A.  At the time when we met, she didn't mention, but I was

3  eventually hired by GTV.

4  Q.  When you went to interview with Yvette what, if anything,

5  did she tell you about who she worked for?

6  A.  She said she works for the big boss principal.  She didn't

7  mention his name at that time.

8  Q.  When you went to the townhouse for the interview with

9  Yvette, did you meet anyone else?

10  A.  Yes.

11  Q.  Who?

12  A.  Aaron Mitchell was in the office, and the front desk there

13  was a security.

14  Q.  Who is Aaron Mitchell?

15  A.  He was in-house attorney.

16  Q.  Ms. Loftus, can you please show the witness what's been

17  marked for identification as Government Exhibit 128.

18       Mr. Khaled, do you recognize the individual depicted

19  in Government Exhibit 128?

20  A.  Yes.

21  Q.  Who is it?

22  A.  That's Aaron Mitchell.

23       MS. MURRAY:  Your Honor, the government offers

24  Government Exhibit 128.

25       MS. SHROFF:  We have no objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO2                        Khaled- Direct

1           THE COURT:  It is admitted.

2           (Government's Exhibit 128 received in evidence)

3           MS. MURRAY:  We can publish that.

4    Q.  Mr. Khaled, can you just remind us again what was Aaron

5    Mitchell's role to your understanding?

6    A.  In-house attorney.

7    Q.  For what entity or entities?

8    A.  Didn't specify, just a group.

9    Q.  Thank you.  Ms. Loftus, we can take that down.

10          Based on your interview with Yvette at the townhouse,

11   did you have an understanding of what type of duties and

12   responsibilities you would be doing?

13   A.  Just banking relationship for the group, a project that

14   involved financial institution and setting up of financial

15   institution.

16   Q.  And during that interview, did you and Yvette discuss what

17   compensation, if any, you would receive?

18   A.  Yes.

19   Q.  What was your compensation going to be?

20   A.  $350,000 a year.

21   Q.  How did that $350,000 a year compare with what you were

22   making at Citibank at the time?

23   A.  It's about 40 percent increase.

24   Q.  Approximately how much more in a dollar amount?

25   A.  About 150,000 more.

1    Q.   Per year?

2    A.   Yes.

3    Q.   In advance of the interview with Yvette, did you do any

4    independent research on GTV or Saraca?

5    A.   Just YouTube, Google, that kind of stuff.

6    Q.   What, if anything, did you find?

7    A.   I found some videos on YouTube about GTV, Saraca, and Miles

8    Guo.

9    Q.   What, if anything, did you learn about Miles Guo from your

10   research that you did?

11   A.   Someone from China seeking asylum in the U.S. against the

12   CCP.

13   Q.   Mr. Khaled, after the interview with Yvette at the

14   townhouse, did there come a time when you met with or

15   interviewed with someone else in connection with the potential

16   job?

17   A.   Yes, I did a video call.

18   Q.   A video call with whom?

19   A.   Miles Guo.

20   Q.   Prior to the video call with Miles Guo, what, if anything,

21   had Yvette told you about Miles Guo?

22   A.   That he's the boss.

23   Q.   Aside from the boss, did Yvette refer to Guo by any other

24   name?

25   A.   Yes.

O6ABGUO2                          Khaled- Direct

1             MS. SHROFF:  Asked and answered.

2             THE COURT:  Overruled.  You may answer.

3    A.  Principal.

4    Q.  In advance of your video call with Miles Guo, what, if

5    anything, did Yvette say about whether you would be working for

6    Miles Guo?

7    A.  Yeah, it depend on him liking me and approving that I would

8    work.

9    Q.  Who participated in your video meeting with Miles Guo?

10   A.  Just me and Yvette and Miles Guo.

11   Q.  During that meeting, what language was Guo speaking?

12   A.  Spoke a little bit of English and then that's it, wasn't

13   very clear back and forth.

14   Q.  What other languages does Miles Guo speak to your

15   understanding?

16   A.  Chinese, Mandarin.

17   Q.  Do you speak Mandarin?

18   A.  No.

19   Q.  Do you understand Mandarin?

20   A.  No.

21   Q.  During the video meeting what, if anything, did Guo ask

22   you?

23   A.  It's more of welcoming me to the family in terms of we're

24   going to do big things, excited.

25   Q.  What, if anything, did Guo say about the potential job

1    offer with respect to what your duties would be?

2    A.   The main project was opening up a bank.  We're going to

3    open up a bank.

4    Q.   Did there come a time after that video meeting with Miles

5    Guo and Yvette Wang when you were offered a formal position?

6    A.   Yes.

7    Q.   And what company offered you the position?

8    A.   I believe the contract was either Saraca or GTV.  I'm not

9    sure.

10   Q.   Ms. Loftus, if we could please show the witness what's been

11   marked for identification as Government Exhibit BR399.

12   Mr. Khaled, do you recognize this?

13   A.   Yes.

14   Q.   At a high level, what is it?

15   A.   That's my offer letter from Saraca Media.

16   Q.   Ms. Loftus, could we go to the next page, please.  Did you

17   sign this letter?

18   A.   Yes.

19            MS. MURRAY:  Your Honor, the government offers

20   Government Exhibit BR399.

21            MS. SHROFF:  No objection.

22            THE COURT:  It is admitted.

23            (Government's Exhibit BR399 received in evidence)

24   BY MS. MURRAY:

25   Q.   Can we please go to the first page and publish that.  If we

could zoom in on the top portion, please, through item number

five.

            Mr. Khaled, what is the date of this offer letter?

A.   July 6, 2020.

Q.   And if you could read the full name of the company that

sent this offer letter?

A.   Saraca Media Group, Inc.

Q.   In the first sentence starting with, It is, can you please

first read that sentence?

A.   It is my pleasure to formally extend our offer of

employment to you as VP of banking relations and strategy at

Saraca Media Group, Inc., and its subsidiary entities.

Q.   Thank you.  And looking at item number three, what was the

salary for this job?

A.   350,000.

Q.   And looking at item number five, what is the bolded title

of that paragraph?

A.   Equity.

Q.   Was it your understanding from this offer letter that there

would be an equity component to your compensation for your work

at Saraca?

A.   Yes.

Q.   During your time working for Saraca, did you ever receive

any equity in Saraca?

A.   No.

O6ABGUO2                        Khaled- Direct

1   Q.  Did you ever receive any shares or stock equity in any of
2   Saraca's subsidiary entities?
3   A.  No.
4   Q.  If we could zoom out, Ms. Loftus, and go to the last page
5   please.
6           And, Mr. Khaled, is it correct that that's your
7   signature?
8   A.  Yes, ma'am.
9   Q.  What date did you sign this offer of employment?
10  A.  July 10, 2020.
11  Q.  We can zoom out and take that down.
12          And when did you start working for Saraca?
13  A.  August 1, 2020.
14  Q.  When you accepted the employment with Saraca and started
15  working for Saraca in August of 2020, did you quit your job at
16  Citibank?
17  A.  No, I did not.
18  Q.  Why not?
19  A.  I wanted to make sure that this job is real.
20  Q.  What do you mean by that?
21  A.  It was a pandemic.  I wasn't sure if it's going to be
22  something real or not.  That's it.
23  Q.  How long did you work for both companies Saraca and
24  Citibank?
25  A.  Approximately two months.

O6ABGUO2                          Khaled- Direct

1    Q.  Did the terms of your employment contract with Citibank

2    permit you to take outside jobs?

3    A.  No.

4    Q.  Did you disclose your employment at Saraca to Citibank at

5    the time in July, August of 2020?

6    A.  No, I did not.

7    Q.  Did you disclose to Yvette or anyone at Saraca that you

8    were still employed by Citibank when you started working for

9    Saraca?

10   A.  No.

11   Q.  Why not?

12   A.  Again, I wanted to make sure that the job is real.  I was

13   worried that it's not and it's just something that I would not

14   like.  I wanted to keep my Citibank job if I could if something

15   happened.

16         MS. SHROFF:  I'm sorry, your Honor, I did not hear the

17   last part his response.

18         THE COURT:  if you'll read back the answer, please.

19         (Record was read)

20   Q.  Mr. Khaled, when did you stop working at Citibank?

21   A.  October 1, 2020.

22   Q.  During August and September of 2020, were you formally

23   employed by both entities?

24   A.  Yes.

25   Q.  Did you have an understanding of whether that employment by

O6ABGUO2                              Khaled- Direct

1   both entities was in violation of the terms of your employment

2   agreement?

3   A.   Yeah, for Citibank, yeah.

4   Q.   Turning now to August of 2020, what was your understanding

5   of who you worked for when you started at Saraca?

6   A.   My direct manager was Yvette.

7   Q.   What was the location of the office where you worked?

8   A.   162, 64th Street.

9   Q.   Was it the townhouse?

10  A.   The townhouse, yeah.

11  Q.   How many floors were in the townhouse?

12  A.   Five.

13  Q.   Was Saraca or its subsidiary GTV, were those the only

14  companies that operated out of the townhouse?

15  A.   No.

16  Q.   When you started working there in August of 2020, what

17  other companies operated out of the townhouse?

18         MS. SHROFF:   Objection, your Honor.  It assumes facts

19  not in evidence.  May we have a sidebar, please.

20         THE COURT:   All right.

21         (Continued on next page)

22

23

24

25

O6ABGUO2                        Khaled- Direct

```
 1                    (At the sidebar)
 2              MS. SHROFF:  Your Honor, I have two objections.  I
 3     know the Court overruled my objection about referring to the
 4     building as the townhouse.  There is no witness who has ever
 5     referred to it as the townhouse.  So the word comes from either
 6     the government or the government's prosecution team, but there
 7     is no 3500 that refers to this building as the townhouse.  It
 8     is noted as an office building, and I have a continuing
 9     objection, and I ask the Court most respectfully to reconsider
10     because it's not even this witness's testimony that he referred
11     to it as the townhouse.
12              THE COURT:  Are you saying it doesn't fit the
13     description of a townhouse?
14              MS. SHROFF:  It does not. It's an office building.
15     Whether it's a short office building or not, it's an office
16     building.  52 Duane, for example, is a short office building.
17     It's an office building.  It's not a townhouse.
18              THE COURT:  Even if it was built originally as a
19     townhouse?
20              MS. SHROFF:  We don't have any evidence that it was
21     built as a townhouse.  If they want to show evidence that it
22     was built as a townhouse, leased as a townhouse, then yeah.
23     But this is a word they made, townhouse. It's not a townhouse.
24     It's an office building.  It is licensed for office rental.  It
25     is not a home.  So, for example, the building where I live,
```

O6ABGUO2                        Khaled- Direct

1    which is similar in look maybe, I couldn't open an office there

2    because it's not -- what is the word?

3            MR. KAMARAJU:   Zoned.

4            MS. SHROFF:   It's not zoned for an office building.

5    More importantly, your Honor, whether it is or is not a

6    townhouse, it's not proper to refer to it just because the

7    government made up the word "the townhouse." They can call it

8    the office building, 64th Street, whatever.  So could I start

9    referring to it as the Buddhist temple on East 64th Street

10   because they worship in that building?  It's not a fair

11   description of the building, but that is my objection.  My main

12   objection is, there is no witness who has ever testified that

13   it is a townhouse.

14           The second objection I have, your Honor, is the

15   questioning is now about the work being done at the building.

16   I'm pretty certain that the 3500 makes clear, this gentleman

17   never went to the building during the pandemic, and especially

18   during the time where he was double-dipping.  And that's the

19   way he got away with it, right.  The way he got away with it is

20   to pick a job without either side finding out is because

21   everybody was working remotely during that time, and he didn't

22   go there or do any work in that building.  So those were the

23   reasons for my objection.

24           Finally, I do have a continuing objection to the

25   leading by the government.  I didn't interrupt again, but it's

1    looping and leading, so I have a continuing objection.

2              MS. MURRAY:  Happy to turn those in turn.  With

3    respect to the second point.  Ms. Shroff respectfully

4    misunderstood the 3500 material.  This witness did not go to

5    Citibank during the pandemic, which is how he was able to

6    leverage the dual jobs.  He did go to the townhouse, which is a

7    descriptor that various witnesses have used to describe the

8    building.  I'll get to that in a moment.  He did go in person,

9    including starting in August of 2020, once or twice a week, not

10   everyday at first until people came back to work.  He was

11   certainly present there and working out of that building from

12   the beginning of his employment.  He has personal knowledge of

13   what was going on in that building, and he also did banking

14   work for various of the entities aside from GTV and Saraca that

15   were in that building, which we're going to be laying a

16   foundation for and discussing at length during his testimony.

17             With respect to the description of the building as a

18   townhouse.  First of all, that is a factual description of the

19   structure.  It is a townhouse.  It was built as a townhouse.

20   It is an effort for the government to simplify when we refer to

21   that building.  Other things that it's been referred to by the

22   defendant, for example, is the Himalaya embassy.  If they would

23   prefer that we call it something like the Himalaya embassy also

24   known as the townhouse, we could certainly do that.  I think

25   again for streamlining purposes, it is much easier for us to

O6ABGUO2                         Khaled- Direct

refer to it as the townhouse.  Similarly, when we talk about

where the operations moved a couple of years later, which is

3 Columbus Circle, we intend to call that 3 Columbus Circle or

3CC because it is a shorthand description.

        With respect to Ms. Shroff's objection the leading

nature, I'm trying, your Honor.  I'll do a better job of

building in some foundation if there is any that's needed.  I

think on the last two questions there was an objection.  I

don't believe it was objectionable.  I first asked him whether

the company he worked for was the only company operating out of

the building, and he said no.  So I asked the follow-up

question about what other companies were working there.

        MS. SHROFF:  East 64th Street is just as short as

townhouse.  Office building is just as short as townhouse.  3

Columbus Circle, we have no objection to it being 3CC because

that's an actual physical address.  If you want to introduce

any evidence that this building was built as a home and a

townhouse, you should feel free to do so.  But until then, it

is an office building zoned for office use. It is misleading to

keep calling it the townhouse.  And it leaves the jury with the

impression that somehow or the other there's something

nefarious going on by using a home as a townhouse as an office.

If they want to use it and call it the Himalayan embassy, which

frankly is longer than East 64th -- and by the way, East 64th

is something every New Yorker would relate to, so it's really

O6ABGUO2                          Khaled- Direct

1    not that much of a stretch for the government to use the

2    phrase.  But the townhouse is being used for a very specific

3    purpose by the government.  That's my objection.

4            THE COURT:  So it happens that I took a course on the

5    history of New York City architecture at NYU, and that

6    structure does fit the description of a townhouse.  I think it

7    is entirely not misleading, and so you may refer to it as a

8    townhouse.  And you're correct that he did mention other

9    entities previously, so this last question was not leading.

10   We're done.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6ABGUO2                          Khaled- Direct

1                    (In open court)

2                    THE COURT:  So it is 11:29.  Time for our break.  When

3        you return at noon, we'll continue with the direct examination

4        of this witness.  Remember, do not discuss the case.  Don't

5        read, listen, or watch anything about anything having to do

6        with the subject matter of this case.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6ABGUO2                          Khaled- Direct

1           (Jury not present)

2           THE COURT:  Mr. Khaled, you may step out.  Do not

3    discuss your testimony.  We'll resume at noon, and if you'll

4    have the witness on the stand at 11:59.

5           MS. MURRAY:  Just a matter or two before we break once

6    the witness has left.

7           (Witness temporarily excused).

8           THE COURT:  Okay.

9           MS. MURRAY:  Just two housekeeping matters, your

10   Honor.  First, we place binders under the jury's chairs.  Those

11   contain certain transcripts that we will be introducing

12   pursuant to a stipulation.  Second, this witness had recordings

13   that he will be authenticating.  For the sake of efficiency, we

14   have put them on a hard drive that he has reviewed in its

15   entirety, and signed and dated and can identify.  We discussed

16   this with defense counsel.

17          So at the time when we ask him to authenticate those,

18   I will ask to approach.  He will confirm that he recognizes the

19   hard drive and the exhibits contained therein, and then we will

20   introduce and seek to admit into evidence certain of those

21   recordings.  But I just wanted to flag that the parties have

22   discussed this in advance.

23          THE COURT:  And you'll say that he had listened to it

24   at a certain time?

25          MS. MURRAY:  Yes, your Honor.  That's correct.

O6ABGUO2                          Khaled- Direct

1          THE COURT:  All righty.

2          MS. MURRAY:  Thank you.

3          (Recess)

O6A1GUO3                        Khaled - Direct

                          AFTERNOON SESSION

1                              12:20 p.m.

2         THE COURT:  Please have the jurors brought in.

3         (Jury present)

4         THE COURT:  Please be seated.

5         Remember, sir, you're still under oath.

6         You may continue.

7    BY MS. MURRAY:

8    Q.  Mr. Khaled, when we left off, we were talking about the

9    other companies that operated out of the townhouse when you

10   started at Saraca in August 2020.  Can you describe what some

11   of those companies were.

12   A.  Golden Spring was there, the Rule of Law Foundation, and of

13   course Saraca and GTV operated from there.

14   Q.  And what type of company was Golden Spring?

15   A.  Golden Spring was the——really the family office that made

16   payments.

17   Q.  And just to remind you, if you could just keep the

18   microphone pointed at your mouth, it will help us all out.

19   A.  Sorry.

20   Q.  At the time you started in August 2020, who, if anyone,

21   worked for Golden Spring?

22   A.  Max Karsenas [sic] I think is his last name.  He had a

23   couple of other junior accountants as well that worked under

24   him.

O6A1GUO3                          Khaled - Direct

1  Q.  And you mentioned Rule of Law Foundation.  Can you describe
2  your understanding of what Rule of Law Foundation was.
3  A.  Rule of Law was a not-for-profit organization helping the
4  whistleblower movement.
5  Q.  What is the whistleblower movement, to your understanding
6  at the time?
7  A.  Individuals that were talking against the CCP that needed
8  help after, you know, either they get incarcerated or they need
9  to travel, something like that.
10  Q.  When you started working for Saraca in August of 2020,
11  what, if anything, was the source of your information about the
12  whistleblower movement?
13  A.  Nothing.  Just employees that were there told me what it
14  is.
15  Q.  What, if anything, did you understand about who led the
16  whistleblower movement?
17  A.  It was Miles Guo.
18  Q.  Mr. Khaled, which company paid your salary?
19  A.  Initially it was GTV, but then Lexington Properties.
20  Lexington Properties.
21  Q.  And what is Lexington Properties?
22  A.  It was a company created so operations and employee and
23  salaries to be paid through.
24  Q.  A company created by whom?
25  A.  It was Yvette Wang.

O6A1GUO3                          Khaled - Direct

1  Q.  What role, if any, did you have with respect to Lexington

2  Properties?

3  A.  I think I helped with some of the foundation documents as

4  well as account opening for it.

5  Q.  Mr. Khaled, can you describe your first week working for

6  Saraca in August of 2020.

7  A.  It was very confusing of what I——what my job was going to

8  be; no structure, really.  It was also the pandemic at that

9  time so——it was weird, weird times, in terms of, like,

10  employees not being there.  That's it.

11  Q.  When you say "there," where are you referring to?

12  A.  The townhouse.

13  Q.  Did you go and work out of the townhouse during your first

14  week or so when you were employed by Saraca?

15  A.  Yeah, I went maybe once or twice; not every day.

16  Q.  Who else, if anyone, was working at the townhouse when you

17  started working at Saraca?

18  A.  Max was always there, most of the days that I went; again,

19  junior——junior accountants were there; in-house attorneys were

20  there; cleaning, there was cleaning staff; security; Yvette was

21  there when I was there.

22        MS. MURRAY:  Ms. Loftus, can you please publish what's

23  in evidence as Government Exhibit 110.

24  Q.  Mr. Khaled, do you recognize the individual depicted in

25  Government Exhibit 110?

O6A1GUO3                       Khaled - Direct

1   A.   That's Max Karsenas, I think it was.

2   Q.   And can you remind us, what was Max's role?

3   A.   He was in finance, handling multiple entities, mainly

4   Golden Spring, but others as well.

5        MS. MURRAY:   Thank you, Ms. Loftus.   We can take that

6   down.

7   Q.   At a high level, during your first few weeks working for

8   Saraca, what did you spend your time doing?

9   A.   We were tackling the issue with Citibank and trying to find

10   an account for Saraca and GTV and setting up Lexington.

11   Q.   And who did you work with, typically, on a daily basis when

12   you started at Saraca?

13   A.   It was Yvette, in-house lawyer Jessica, and then after that

14   they introduced new lawyers in the building; Yvette introduced

15   me to new lawyers.   Max, connected with Max as well.   There was

16   new hires happening every day, so——

17   Q.   Mr. Khaled, you mentioned that Yvette worked out of a

18   townhouse when you started at Saraca.   How often did you see

19   her there, if at all?

20   A.   I would say every time I was there, she was——she would come

21   in.   There's days that she would come in later.   So pretty

22   often.

23   Q.   Do you have an understanding of what company Yvette worked

24   for?

25   A.   It wasn't a specific——she was involved with a lot of——a lot

O6A1GUO3                          Khaled - Direct

1  of the companies.

2  Q.  When you started working for Saraca in August of 2020, did

3  there come a time, if ever, when you saw Miles Guo at the

4  townhouse?

5  A.  Yes.

6  Q.  What were the circumstances of Miles Guo being at the

7  townhouse?

8  A.  He used to come and visit.  Again, there was——it was COVID

9  so it wasn't every day, but he would come and visit once in a

10  while.

11  Q.  When Miles Guo was at the townhouse, did he work out of a

12  certain space or location within the townhouse?

13  A.  Yes.

14  Q.  Where?

15  A.  It was the top floor.  I believe it's the fifth, the fifth

16  floor of the building——of the townhouse.

17  Q.  Can you describe the hierarchy of the offices within the

18  townhouse, if any.

19  A.  Sure.  So the front was the security check-in; there was a

20  studio there on the——on the ground floor; some HR individuals

21  would work on those desks.

22        And then you go one——one floor down, there's a big

23  conference room and a kitchen.  That's where people had lunch,

24  and it was just a big, nice conference room.

25        On the first floor, there was Golden Spring and

O6A1GUO3                          Khaled - Direct

accounting.  That's where Max worked.

         The floor above that, I believe there was a few desks
and a kitchen——private kitchen, though; it wasn't for——for all
the employees.  It was a private kitchen.

         The top floor had Rule of Law desks and area for
the——for Rule of Law.  And then before Miles and Yvette's
office, there was a secretary, and there was some offices for
attorneys, in-house attorneys.  These were like management
level.  And then above that there is——there's Miles's office,
and there's a conference room that Yvette used to sit in.

Q.  And again, focusing on the first couple of weeks that you
were working at Saraca, can you describe what your interactions
with Miles Guo were like.

A.  Wasn't much, just, you know, focus, give him some
briefings, through Yvette, in a meeting.  That's really it.

Q.  What type of information, if any, would you brief Miles Guo
on?

A.  I was working on setting up a bank in the US, so we were
talking about the different firms that are helping us identify
a bank, so just those type of briefings on where are we in the
process.  He would encourage——encourage us.  That's really it.

Q.  In the fall of 2020, when you were working at Saraca, can
you describe what a typical day at the office was like.

A.  So the first couple of weeks really the struggle was to
find a way to pay the staff and to pay rent.  So——and to do so,

O6A1GUO3                        Khaled - Direct

1    we needed bank accounts, so——and we needed an entity that does
2    not have a lot of news on it, negative news, so it really
3    was——I was working on identifying banks that are willing to
4    entertain account opening and set up those accounts, the first
5    couple weeks.
6    Q.   Can you describe what you mean by negative news.
7    A.   Negative press.  You know, the SEC was a big negative press
8    out there.  Banks typically don't want to set up an account for
9    a company or an entity that might have negative news or
10   investigation on it, subpoenas, etc., so——
11   Q.   What about Golden Spring?  Why, if at all, couldn't you
12   open bank accounts with Golden Spring to pay the payroll?
13   A.   I believe some articles had Golden Spring on there
14   connecting them to GTV and Saraca.
15   Q.   What was the relationship during that time, fall of 2020,
16   between Yvette and the other employees?
17             MS. SHROFF:  Objection as to form.
18             THE COURT:  Overruled.  You may answer.
19   A.   It was normal.  She was caring.  She smiled with everybody.
20   But she definitely was the person we reported to.
21   Q.   What about Miles Guo, what was the relationship, if any,
22   between Miles Guo and the employees of the townhouse?
23   A.   Same.  He would say hello to a lot of the——the workers from
24   top to bottom.  There was definitely fear that, you know, he is
25   the top boss, so everybody needed to be either working or busy

O6A1GUO3                          Khaled - Direct

1    with something.

2    Q.  Mr. Khaled, are you familiar with an entity called Crane?

3    A.  Yes.

4    Q.  What is it?

5    A.  Crane was an entity I created with——with discussion with

6    Yvette and an in-house attorney named Victor, but it was all

7    hundred percent under my name.

8    Q.  What was the full name of that entity?

9    A.  Crane Advisory Group LLC.

10   Q.  Whose idea was it to establish Crane?

11   A.  It was a combination between Yvette, Victor, and myself.

12   Q.  What, if anything, was the purpose of establishing Crane?

13   A.  That was going to be the entity that was either going to

14   apply for a license for a bank, acquire a bank, or set up

15   online digital bank.

16   Q.  Approximately when did you establish Crane?

17   A.  I would say within the first month that I started working

18   there.

19   Q.  And when you say started working there, are you referring

20   to working at Saraca?

21   A.  Yes, ma'am.

22   Q.  Who worked for Crane?

23   A.  I was really the only employee of Crane, and I had an

24   assistant that had a Crane email but was getting paid by

25   Lexington.

O6A1GUO3                    Khaled - Direct

1   Q.  And were you formally employed by Crane?

2   A.  It was my company, just a single-member LLC.

3   Q.  Were you paid by Crane as an entity?

4   A.  No.

5   Q.  What entity paid you after you established Crane?

6   A.  Still Lexington Properties.

7   Q.  And with what entity did you have an employment contract

8   after you established Crane?

9   A.  Still with Saraca.

10  Q.  What is Victor's full name?

11  A.  Victor Cerda.

12          MS. MURRAY:  Ms. Loftus, can you please show the

13  witness what's marked for identification as Government

14  Exhibit 109.

15  Q.  Mr. Khaled, do you recognize the individual depicted in

16  Government Exhibit 109?

17  A.  Yes.

18  Q.  Who is it?

19  A.  That's Victor Cerda.

20          MS. MURRAY:  Your Honor, the government offers

21  Government Exhibit 109.

22          MS. SHROFF:  No objection, your Honor.

23          THE COURT:  It is admitted.

24          (Government's Exhibit 109 received in evidence)

25          MS. MURRAY:  Can we please publish that, Ms. Loftus.

1  BY MS. MURRAY:

2  Q.  Now that the jury can see it, Mr. Khaled, can you remind

3  us, what entity or entities did Victor Cerda work for?

4        MS. SHROFF:  Objection, your Honor, to the form of the

5  question.  There is no indication anybody's forgotten any of

6  the answers.

7        THE COURT:  Overruled.  You may answer.

8  A.  Not a specific company.  He works for the family.

9  Q.  When you say the family, what family are you referring to?

10  A.  Personal for Guo family.

11        MS. MURRAY:  Thank you, Ms. Loftus.  We can take that

12  down.

13  Q.  Mr. Khaled, what was Crane's office address?

14  A.  One World Trade Center.

15  Q.  And is that where you actually went to work every day when

16  you worked for Crane?

17  A.  No.

18  Q.  What type of office space, if any, was One World Trade

19  Center?

20  A.  It was a—like a virtual office, through a Servcorp.

21  Q.  And what type of services does Servcorp provide, if any?

22  A.  They have shared offices similar to like Regus, and they

23  offer a virtual office.  They give you an address, a phone

24  number, mailing service.  That's about it.

25  Q.  Why, if at all, did you establish a virtual office for

O6A1GUO3                          Khaled - Direct

1    Crane?

2    A.   'Cause I want——I wanted to detach Crane from Golden Spring

3    and the address of GTV and Saraca.

4            MS. MURRAY:  Your Honor, if I may approach the

5    witness, I'm going to hand up a binder.

6            THE COURT:  Okay.

7            MS. MURRAY:  This is a binder that contains documents

8    that have been marked with the following exhibit numbers:

9    Government Exhibits BR363-364, 367-375, 380, 382, 384, 387,

10   392, 396-398, 1506-1509, 1511-1519; Government Exhibits GC131,

11   498, 500-502, 507-508; and Government Exhibits SW2002, 2005,

12   2008, 2009, 2021, 2027, 2030, 2032, 2035, 2038, 2040, 2042,

13   2045, 2046, 2050-2055, 2057, 2061, 2068, 2070, 2076, 2077,

14   2083.

15   Q.   Mr. Khaled, can you flip through that binder and let me

16   know if you recognize those documents.

17   A.   Yes.

18           MS. MURRAY:  Just a moment, please, your Honor.

19           (Counsel conferring)

20           MS. MURRAY:  Your Honor, I'm just going to show

21   defense a binder.  I apologize.  I thought we had a copy for

22   them as well.

23   Q.   Mr. Khaled, you said you recognized the documents in the

24   binder; is that correct?

25   A.   Yes.

O6A1GUO3                      Khaled - Direct

1    Q.  Have you seen them before?

2    A.  Yes.

3    Q.  Do those documents relate to the work that you did with and

4    for Guo, Yvette, and others during your time employed at Saraca

5    or Crane?

6    A.  Yes.

7            MS. MURRAY:  Your Honor, at this time the government

8    offers the exhibits that are contained within that binder.  I'm

9    happy to read the exhibit numbers into the record again if the

10   court reporter would like.

11           THE COURT:  It's not necessary for me that you read

12   them in.  Is there any objection?

13           MS. SHROFF:  No, your Honor.  And all things being

14   equal, I don't think we need to tax the court reporter.

15           THE COURT:  So they are admitted.

16           (Government's Exhibits BR363-364, 367-375, 380, 382,

17   384, 387, 392, 396-398, 1506-1509, 1511-1519; GC131, 498,

18   500-502, 507-508; SW2002, 2005, 2008, 2009, 2021, 2027, 2030,

19   2032, 2035, 2038, 2040, 2042, 2045, 2046, 2050-2055, 2057,

20   2061, 2068, 2070, 2076, 2077, 2083 received in evidence)

21           MS. MURRAY:  Thank you.

22   BY MS. MURRAY:

23   Q.  Mr. Khaled, returning to the virtual office that we were

24   just speaking about, what other companies, if any, did you set

25   up a virtual office for?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6A1GUO3                    Khaled - Direct

1    A.  Lexington Properties had a virtual office, G Club had a

2    virtual office; G Music also had a virtual office; G News also

3    had a virtual office; and G Fashion also had a virtual office.

4         MS. MURRAY:  Ms. Loftus, if we could please publish

5    what's now in evidence as Government Exhibit SW2008.  We can

6    zoom in on the top portion, please.

7    Q.  Mr. Khaled, what type of document is this?

8    A.  It's an email.

9    Q.  Who is it sent to?

10   A.  My name.

11   Q.  And is that your Crane business email address?

12   A.  Yes, ma'am.

13   Q.  What date was this sent?

14   A.  October 14, 2020.

15   Q.  And from what company?

16   A.  Regus.

17   Q.  What type of company is Regus?

18   A.  That's——Regus is the company that rents the virtual office

19   space as well as shared space.

20   Q.  So this is sent to your email address, but to whom is the

21   actual body of the email addressed?

22   A.  Yvette Wang.

23        MS. MURRAY:  Ms. Loftus, if we could zoom out and go

24   to the second page, please, which is the attachment.  And focus

25   on the top portion.

1   Q.  Mr. Khaled, what is the account name for this virtual

2   office space?

3   A.  G Fashion LLC.

4   Q.  And the contact listed for G Fashion LLC?

5   A.  Yvette Wang.

6   Q.  And what is the physical address of the virtual office

7   space for G Fashion?

8   A.  750 Lexington Avenue, New York, New York 10065.

9           MS. MURRAY:  Ms. Loftus, we can take that down.  And

10  please publish what's in evidence as Government Exhibit SW2009,

11  zooming in on the top portion with the text.

12  Q.  Mr. Khaled, what is the date of this email?

13  A.  October 14, 2020.

14  Q.  And again, who is it sent from and to whom?

15  A.  From Regus to me, at Crane Advisory Group.

16  Q.  And in the body of the email, to whom it is addressed?

17  A.  Yvette Wang.

18  Q.  What is the virtual office address for this Regus office

19  that's reflected in this document?

20  A.  590 Madison Avenue, New York City.

21          MS. MURRAY:  We can take that down, Ms. Loftus.

22  Q.  And Mr. Khaled, the various companies you mentioned for

23  which you set up virtual offices, did all of those companies

24  operate in practice out of the townhouse?

25  A.  A few.  The only one that did not I think is G Fashion, but

1    there was a—some activities for G Fashion once in a while.

2    Q.  So Crane, for example, did Crane ever operate any business

3    out of the One World Trade Center address?

4    A.  No, ma'am.

5    Q.  And did G Fashion operate business out of the virtual

6    office address at 750 Lexington?

7    A.  No.

8    Q.  You mentioned a couple of other entities for which you set

9    up virtual offices.  I believe G News?  Where did G News

10   operate out of?

11   A.  There was one—one or two employees that did IT that was

12   related to G News.  They operated out of the townhouse on

13   Lexington.

14   Q.  And what was the reason, if any, for setting up different

15   virtual offices for these different entities?

16   A.  That this was the dissociation between Saraca, GTV, and the

17   news of Golden Spring.

18   Q.  Mr. Khaled, when you were working at Crane, focusing on the

19   beginning of your time at Crane, what type of work were you

20   doing?

21   A.  Working towards setting up a bank and getting a license,

22   and then after that we started looking at different financial

23   institutions as well.

24   Q.  How, if at all, was that work at Crane different than the

25   work you had been doing when you were employed by Saraca, or

1    working for Saraca the first few weeks?

2    A.  It was really the same thing.

3    Q.  Apart from the salary that you received from Lexington

4    Properties for your Saraca employment, did you receive any

5    other compensation during your time working at Crane?

6    A.  No, ma'am.

7    Q.  Aside from a salary, did you receive any fees or any other

8    monetary amount related to your work at Crane?

9    A.  No.

10   Q.  When you started working for Guo and Yvette in August of

11   2020, what was your role, if any, with respect to banking

12   relationships?

13   A.  Can you repeat the question.

14   Q.  Yes.  When you started working for Guo and Yvette in August

15   of 2020, what was your role, if any, with respect to banking

16   relationships?

17   A.  I was the liaison between the entities, the signers, and

18   the bank relationship managers and the banks.

19   Q.  And when you say entities, what entities are you referring

20   to?

21   A.  Lexington.  There was a few other holding companies held by

22   the family that also had their accounts closed.  There was a

23   trust that they wanted to open an account for.  Just a number

24   of accounts, and I had to connect with the banks and the

25   bankers to facilitate that.

1    Q.  Did you discuss the bank account closures with anyone that

2    you worked with at the townhouse?

3    A.  Yeah.  Usually the signers know and Yvette knows.

4    Q.  What, if anything, did you and Yvette discuss about the

5    bank account closures?

6    A.  Usually they'll send us an email or they have a

7    conversation with me that they have decided to close the

8    account.  I would have to let Yvette know, the attorneys, the

9    in-house attorneys that are familiar with those entities know,

10   and that's it.

11   Q.  What, if anything, were you directed to do to address the

12   banking issues that the entities were having?

13              MS. SHROFF:  Directed by whom?

14              THE COURT:  You may answer both questions.  Go ahead.

15   A.  Directed by Yvette, Victor, the in-house attorneys, that we

16   need another account ASAP.

17   Q.  Can you describe this conversation in a bit more detail

18   with respect to what you were asked to do, if anything.

19   A.  To find another bank, as soon as possible.

20   Q.  And what did you do in reaction to that instruction?

21   A.  So two things: find another bank; and it got to a point

22   where I had to hedge and open two accounts for each entity at

23   two different financial institutions so that when an account

24   gets closed, there's always a backup.

25   Q.  Can you describe the process of how you would open a new

1    bank account when you were working at Crane.

2    A.  It evolved a little bit.  Before it was basic information

3    that I would send——formation documents of the companies,

4    information about the beneficial owner on these entities,

5    information about the signer, IDs about the signer.  Usually

6    there's a bank-specific application that needs to be completed.

7    That's really it.  And then we started——when we saw there was a

8    lot of account closures, association with Google searches and

9    articles about companies' websites, we started attaching a memo

10   to each, each account opening process that described, you know,

11   what is that entity, what does it do, who their clients are,

12   their relationship, if any, with——with, you know, Guo, Miles

13   Guo, and some of the——some of the missions or services these

14   companies offer.

15   Q.  You mentioned that you needed to collect documents and

16   information to submit with account openings.  From whom, if

17   anyone, did you gather that information and those documents?

18   A.  Usually the in-house attorneys, Yvette would direct them to

19   give me information about the entity; Max had some formation

20   documents for companies that were established before; and

21   that's it.

22   Q.  What are some of the banks at which you opened accounts

23   when you were working for Crane?

24   A.  Signature Bank, the Bank of Princeton, First Bank in Puerto

25   Rico, First Republic Bank, Israel Discount Bank, I think City

National, and Medici in Puerto Rico.

Q.  How, if at all, did you choose which bank to contact to open accounts?

A.  Either I knew the relationship managers, the business relationship managers and I would contact them, or I'd have a warm introduction by someone that knew a relationship manager. That's really it.

Q.  Can you describe what you mean by "warm introduction."

A.  So someone that would—someone, let's say, for example, works at Israel Discount Bank that knows someone at another bank; they would tell them, you know—they'll introduce me to them and I'll start conversation, letting them know that I have an opportunity to open an account for a business, send them the formation documents, tell them what kind of account it's going to be, and then that's a warm introduction.

Q.  And why, if at all, did you open accounts at various different banks?

A.  'Cause accounts were getting closed, and then I wanted to also hedge that account closure.  And usually if, let's say, there's one signer that is on one entity and multiple entities on one bank, they'll close all the accounts; so by opening in different banks, hedging basically one account to be active at a certain point.

Q.  And who, if anyone, decided who would be the authorized signers on each of the bank accounts that you assisted in

O6A1GUO3                    Khaled - Direct

1    opening?

2    A.  Yvette was telling me who was gonna be the signer on some

3    companies.  Some——some companies had a UBO or an owner listed

4    on the formation documents, and if they're still available and

5    there, they would be a signer.

6    Q.  Did you also open bank accounts under the name of Crane,

7    your company?

8    A.  Yes, I did.

9    Q.  At what banks?

10   A.  Citibank only.

11          MS. MURRAY:  Ms. Loftus, if we could please pull up

12   what's in evidence as Government Exhibit BR1511.  And we can

13   zoom in on the top portion.

14   Q.  Mr. Khaled, what kind of document is this?

15   A.  It's a business deposit account application for Citibank.

16   Q.  And what is the business name, looking on the top left

17   here?

18   A.  Crane Advisory Group LLC.

19   Q.  And in the middle, what is listed as the annual gross

20   revenue for Crane Advisory Group on this application?

21   A.  500,000.

22   Q.  And next to that, the annual net profits?

23   A.  250,000.

24   Q.  Just up and to the right slightly, what is the business

25   start date for Crane Advisory Group?

O6A1GUO3                    Khaled - Direct

1    A.  September 24, 2020.

2    Q.  And then looking down, there's a primary contact name

3    listed.  Whose name is there?

4    A.  That's my name, Haitham Khaled.

5    Q.  And the physical address that's associated with Crane in

6    this bank application?

7    A.  That's One World Trade Center, 85th floor, New York, New

8    York.

9            MS. MURRAY:  Thank you, Ms. Loftus.  We can take that

10   down.

11   Q.  I want to look through a couple of the other applications

12   for bank accounts that you assisted in opening.

13           MS. MURRAY:  If we could please publish what's in

14   evidence as Government Exhibit BR371.

15           Zoom in on the top portion, please.

16   Q.  Mr. Khaled, what is the institution name associated with

17   this account agreement?

18   A.  Golden Spring New York Ltd.

19   Q.  And what is the address listed for Golden Spring?

20   A.  162 East 64th Street, New York, New York.

21   Q.  Is that the address of the townhouse?

22   A.  Yes, ma'am.

23   Q.  Looking down at the owner/signer information listed here,

24   what name is listed on this account?

25   A.  Yanping Wang (Yvette).

O6A1GUO3                          Khaled - Direct

1  Q.  And what mailing address is associated with Yvette on this

2  account opening document?

3  A.  188 East 64th Street, New York, New York 10065.

4            MS. MURRAY:  Ms. Loftus, can we take that down and put

5  up Government Exhibit BR374, which is in evidence.

6            Again, zoom in on the top portion, please.

7  Q.  What is the institution name for this document, Mr. Khaled?

8  A.  Hudson Diamond NY, LLC.

9  Q.  Are you familiar with that entity?

10  A.  Yes.

11  Q.  What is it, or what was it at the time?

12  A.  I believe a holding company for an asset.

13  Q.  What is the address listed for Hudson Diamond on this

14  account agreement?

15  A.  162 East 64th Street, New York.

16  Q.  And again, that's the townhouse?

17  A.  Yes, ma'am.

18  Q.  The owner/signer name here?

19  A.  Yanping (Yvette) Wang.

20  Q.  And the mailing address, is it the same mailing address we

21  saw on the prior document?

22  A.  Yes, ma'am.

23  Q.  Who was listed as Yvette's employer?

24  A.  Golden Spring New York LLT——Ltd.

25            MS. MURRAY:  And Ms. Loftus, can we please pull up

O6A1GUO3                       Khaled - Direct

1  BR375.  Zoom in on the top, including the date on the right, if

2  we could, please.

3          Thank you.

4  Q.  Same questions, Mr. Khaled.  What is the institution name

5  listed here?

6  A.  Lamp Capital LLC.

7  Q.  What is the address listed for Lamp Capital?

8  A.  667 Madison Avenue, Fourth Floor, New York, New York.

9  Q.  From your time working at Crane, are you familiar with that

10  address?

11  A.  No.  This address is a——is a virtual address.

12  Q.  And who is listed as the owner/signer for Lamp Capital on

13  this account agreement?

14  A.  Daniel Podhaskie.

15  Q.  What is the description of Lamp Capital a couple of lines

16  down in the owner/signer information?

17          MS. MURRAY:  Ms. Loftus, if we could highlight that,

18  please.

19  A.  No, that's——

20  Q.  Do you see the highlighted portion, Mr. Khaled?

21  A.  Yeah.  That's previous financial institution.

22  Q.  And then what is the description that is included in the

23  account agreement?

24  A.  Newly established company.

25  Q.  And what's the date of this account agreement?

O6A1GUO3                          Khaled - Direct

1    A.  September 10, 2020.

2              MS. MURRAY:  Ms. Loftus, can we please pull up BR372,

3    which is in evidence.  Focusing on the top half again, please.

4    Q.  Let's start with the date this time.  What's the date of

5    this account agreement?

6    A.  September 22, 2020.

7    Q.  What is the institution listed here?

8    A.  Greenwich Land LLC.

9    Q.  And the address listed for Greenwich Land?

10   A.  6067 Madison Avenue, Fourth Floor, New York, New York.

11   Q.  Is that the same virtual office address that we saw

12   associated with Lamp Capital?

13   A.  Yes.

14   Q.  And the owner/signer here, same individual who was on the

15   Lamp Capital account agreement?

16   A.  Yes, Daniel Podhaskie.

17   Q.  Looking down at the employer listed for Daniel Podhaskie,

18   what employer is listed here?

19   A.  Lamp Capital LLC.

20             MS. MURRAY:  You can take that down, Ms. Loftus.

21   Thank you.

22   Q.  What type of company was Lamp Capital?

23   A.  It was a company that pays payments on behalf of all other

24   holding companies.

25   Q.  And when you say all the other holding companies, what are

O6A1GUO3                         Khaled - Direct

1   you referring to?

2   A.  Greenwich also paid expenses for real estate properties,

3   also paid expenses for a yacht, I believe; I don't know if

4   there was a plane or something.

5   Q.  I'm sorry.  I didn't hear you.

6   A.  I don't know if there was a plane, like a private plane,

7   or——it was just paying expenses.

8   Q.  And whose expenses, if any, were paid for by these holding

9   companies you're discussing?

10  A.  Guo family.

11  Q.  What type of company was Greenwich Land?

12  A.  A holding company.

13  Q.  What assets, if any, did Greenwich Land hold?

14  A.  I think it was the——it was a home in Greenwich,

15  Connecticut.

16  Q.  Who, if anyone, lived at that home?

17  A.  Miles Guo.

18  Q.  Mr. Khaled, you've mentioned a company called G/CLUBS.

19  What is G/CLUBS?

20  A.  G/CLUBS was a membership company that was going to offer

21  member benefits.

22  Q.  When was G/CLUBS established?

23  A.  It was——I think it was September 2020 as well.  That's G

24  Club Puerto Rico was established at that time.

25  Q.  How did you become aware of G Club?

1    A.   In my trip in Puerto Rico.

2    Q.   When did you go to Puerto Rico?

3    A.   September 2020.

4    Q.   What was the purpose, if any, of that trip to Puerto Rico

5    in September 2020?

6    A.   So Crane was looking at, like I said, establishing a

7    financial institution in the US, and we realized, after talking

8    to several law firms, consultants, that that mission is going

9    to be very lengthy and just a lengthy process to get approved

10   in the US, on US soil.  There was a concept called

11   international financial institutions, and that is a concept of

12   financial structure in Puerto Rico only, which is a bank

13   license in Puerto Rico, so we went, myself and Victor, to

14   explore getting a license there.  We were told by attorneys

15   that it's a shorter, more lenient process.  So we went to

16   Puerto Rico to meet with our——the attorneys that are going to

17   apply for that license and help us set it up.

18   Q.   In advance of your trip to Puerto Rico with Victor, what

19   conversations, if any, did you have, just about attempting to

20   buy a bank license?

21             MS. SHROFF:  Objection, your Honor.  It assumes facts

22   not in evidence or facts elicited from this witness, and it's

23   leading.

24             THE COURT:  You can ask whether he had any

25   conversations.

O6A1GUO3                              Khaled - Direct

1    A.  Yes, I did.

2    Q.  In advance of your trip to Puerto Rico, did you have any

3    conversations with anyone about the purpose of that trip?

4    A.  Yes.

5    Q.  With whom did you speak about the purpose of that trip?

6    A.  Spoke to Yvette about the purpose; also spoke to Victor

7    Cerda, and Miles Guo.

8    Q.  Can you describe what conversations you had with Yvette in

9    advance of that trip about going down to look into a bank

10   license?

11   A.  Victor suggested that——brought up that idea with me to

12   Yvette and she welcomed it.  She was like, you guys go and see

13   what you can accomplish.

14   Q.  What about Miles Guo?  What conversations, if any, did you

15   have with Miles Guo in advance of that trip to Puerto Rico?

16   A.  We're working towards a solution and we're advancing

17   towards setting up a bank.

18   Q.  Who is William Je?

19   A.  William Je was a banker that was introduced to me by

20   the——by Yvette.

21        MS. MURRAY:  Ms. Loftus, can you please publish what's

22   in evidence as Government Exhibit 103.

23   Q.  Mr. Khaled, do you recognize this individual?

24   A.  Yes.

25   Q.  Who is it?

O6A1GUO3                        Khaled - Direct

1   A.  William Je.

2            MS. MURRAY:  We can take that down.

3   Q.  What, if anything, did Yvette tell you about William Je

4   when she introduced you to him?

5   A.  That he's——he's a banker, has an investment company in UK,

6   has a large team, successful, and he's a close associate to the

7   family and the mission.

8   Q.  And when you say that William Je is a close associate to

9   the family, what family referring to?

10  A.  The Guo family.

11  Q.  And what mission are you referring to?

12  A.  The anti-CCP mission.

13  Q.  What company or companies does William Je——did William Je

14  work for at that time?

15  A.  I believe it was Hamilton.

16  Q.  Did there come a time when William became involved with

17  your bank purchasing efforts?

18  A.  Yes.

19  Q.  Around when was that?

20  A.  I think it was April, May of 2021.

21  Q.  And what role, if any, did he have with respect to your

22  efforts to purchase a bank?

23  A.  Here, we identified a bank and he was doing due diligence

24  on them.  We were——we presented, Miles——William and I presented

25  a term sheet, and we were negotiating a purchase of Medici.

O6A1GUO3                          Khaled - Direct

Q.  Mr. Khaled, during or after your trip to Puerto Rico in
September 2020, did you get involved in establishing any
businesses in Puerto Rico?

A.  Yes.

Q.  Which businesses?

A.  G Club operation, G Fashion, G Music, and G News.

Q.  How, if at all, would you refer to that group of
businesses?

A.  Referred to them as G series.

Q.  And what does the G stand for in each of the G series
entities?

A.  I believe Guo.

        MS. MURRAY:  Ms. Loftus, can you please pull up what's
in evidence as Government Exhibit SW2032.

        And if we can go down and start at the beginning of
this.

Q.  First of all, Mr. Khaled, what type of document is this?

A.  It's an email thread.

        MS. MURRAY:  So focusing there, Ms. Loftus, from high
down to the bottom.  If we could get the header information as
well, though, please, from Original Message.  Thank you.

Q.  Who is this email from?

A.  Debra Von Gonten.

Q.  Looking at the From line, if you could, who is it sent
from?

O6A1GUO3                        Khaled - Direct

1    A.  Oh, from——from me at Crane.

2    Q.  And it was sent to whom?

3    A.  It was sent to Debra Von Gonten, Bank of Princeton.

4    Q.  What is the subject line of this email?

5    A.  Crane Advisory Group - Referral.

6    Q.  Looking at the first paragraph of this email, it reads,

7    "The accounts for Lamp Capital and Greenwich should have a

8    total of $11 million and we should be receiving a large payment

9    to Greenwich for purchase a portfolio of properties in the

10   amount of $28 million."

11           Did you have a role in establishing the accounts at

12   Bank of Princeton for Lamp Capital and Greenwich?

13   A.  Yeah, as an introduction.

14   Q.  Do you know what portfolio properties, if any, this email

15   is referring to?

16   A.  Not really, no.

17           MS. MURRAY:  If we could look at the next paragraph,

18   please, Ms. Loftus.

19   Q.  If you could read that for us, Mr. Khaled.

20   A.  "We have another client that has a banking relationship

21   with Signature.  They are a start-UP with international

22   membership service for luxury living with approximately 1600

23   members.  Current balances are 15 million and we want to help

24   them set up a bank account with Princeton as well.  Can you

25   please email me MMA rates available."

O6A1GUO3                    Khaled - Direct

1   Q.  What is the date of this email?

2   A.  October 21, 2020.

3   Q.  The paragraph that you just read referencing a startup with

4   international membership service, what company does that refer

5   to?

6   A.  G Club operations.

7   Q.  At this time, October 21, 2020, who, if anyone, worked for

8   G/CLUBS?

9   A.  I think we had either one or two employees.

10  Q.  And at this time, October 21, 2020, approximately how much

11  money did G Club have in its bank account?

12  A.  I'm not sure exactly, but definitely over 15 million.

13  Q.  And Mr. Khaled, who, if anyone, told you that this is a

14  description of what G/CLUBS offered, international membership

15  services for luxury living?

16  A.  It was Jessica, and it also was listed on the website of

17  G/CLUBS.

18  Q.  And the 1600 members reflected here, where, if anywhere,

19  did you get that figure?

20  A.  From Jessica.

21  Q.  Did you work at G/CLUBS?

22  A.  No.

23          MS. MURRAY:  If we could go up, Ms. Loftus, to page 2,

24  please.  Further up in the chain.

25          And if we could focus on the email that starts with

O6A1GUO3                    Khaled - Direct

1    Original Message kind of in the middle of the page.

2    Q.  What's the date of this email, Mr. Khaled?

3    A.  October 30, 2020.

4    Q.  And who sent it?

5    A.  It's from me.

6    Q.  And is this to two individuals at Bank of Princeton?

7    A.  Yes, ma'am.

8    Q.  Looking at the body of the email here, it says, "Kindly see

9    attached the completed application for a new account for G Club

10   Operation LLC.  Client needs three accounts for the company two

11   DDA (subscription and operations) and one MMA at a rate of

12   .40 percent as agreed total deposit will be north of

13   $10 million."  What is a DDA account?

14   A.  Demand deposit account.

15   Q.  And can you just explain what that means.

16   A.  Oh, checking account.

17   Q.  And what is an MMA account?

18   A.  Money market account, which is like a liquid savings

19   account.

20   Q.  In the sentence that begins with "Please" here, "Please do

21   let me know if anything is missing as we need to establish the

22   accounts soon," what, if anything, do you recall about urgency

23   in establishing a G Club bank account at this time, October 30,

24   2020?

25   A.  I think the account at Signature was getting terminated, or

O6A1GUO3                          Khaled - Direct

1    closed.

2    Q.  And then you reference an individual in the next line or

3    paragraph.  It says comptroller of the company and signer Alex.

4    To whom does that refer?

5    A.  Alex Hadjicharalambous.

6    Q.  And what was his role?

7    A.  Comptroller, but I believe for G Fashion.

8    Q.  And looking at the cc line of the email that you sent, can

9    you read the email address as that was sent to you.

10   A.  Alex Hadjicharalambous.

11   Q.  And in brackets, the email address?

12   A.  Alexh@gclubs.com.

13           MS. MURRAY:  And Ms. Loftus, if we could just go up a

14   little bit further to the top of this email, please.

15           Actually, nearly the top.  The reference, "Our call

16   this morning," from Mr. Khaled.

17   Q.  What is the date of this email, Mr. Khaled?

18   A.  October 30, 2020.

19   Q.  The email reads, "Reference our call this morning, please

20   see attached the second ID Yvette you can use either one."

21   What Yvette does this refer to?

22   A.  Yvette Wang.

23   Q.  And why, if at all, were you providing Yvette Wang

24   identification to Bank of Princeton in connection with the

25   opening of a G/CLUBS account?

O6A1GUO3                         Khaled - Direct

1    A.  She was going to be a signer because Alex was new.

2              MS. MURRAY:  Ms. Loftus, we can take that down.  And

3    can we please pull up GX SW2005, which is in evidence.  Focus

4    on the top through to the signature block here.

5    Q.  Mr. Khaled, what type of document is this?

6    A.  It's an email.

7    Q.  From whom?

8    A.  From Dominick Chechile.

9    Q.  Where did Dominick Chechile work?

10   A.  Signature Bank.

11   Q.  What's the subject of this email?

12   A.  Follow-up on G Club.

13   Q.  And what day was it sent?

14   A.  October 13, 2020.

15   Q.  Is that approximately several weeks before the Bank of

16   Princeton email chain we just looked at?

17   A.  Yes, ma'am.

18   Q.  And generally speaking, what did this email from Dominick

19   Chechile to you refer to?

20   A.  It's an account opening email for G Club.

21             MS. MURRAY:  Ms. Loftus, we can take that down and put

22   up Government Exhibit SW2021, please, in evidence.  And let's

23   focus on the top part again.

24   Q.  What's the date of this email, Mr. Khaled?

25   A.  October 20, 2020.

O6A1GUO3                         Khaled - Direct

1   Q.  And this is from an individual at Signature Bank to you; is
2   that correct?
3   A.  Yes, ma'am.
4   Q.  There's an attachment.
5           MS. MURRAY:  If we could go to the next page, please,
6   Ms. Loftus.
7           And focus in on the actual text.
8   Q.  To what entity is this letter addressed?
9   A.  To G Club Operations LLC.
10  Q.  And what is the physical address listed for G Club
11  Operations LLC?
12  A.  590 Madison Avenue, 21st Floor, New York, New York.
13  Q.  Is that the same virtual office address that we saw in
14  Government Exhibit SW2009?
15  A.  I believe so.
16  Q.  And can you read the body of this letter, please, starting
17  with, "This letter."
18  A.  "This letter is to confirm that an account has been opened
19  for G Club Operations LLC.  Currently they have $39,208,081.06
20  [sic] on deposit as of today."
21  Q.  And if you could just read that dollar amount again.  I
22  think you might have inverted two of the numbers.
23  A.  $39,208,018.06.
24          MS. MURRAY:  And Ms. Loftus, could we please take this
25  down and put up Government Exhibit SW2030.

1           If we could zoom in on the top portion of this.

2   Q.  What is the date of this?  First of all, Mr. Khaled, what

3   type of document is this?

4   A.  It's an email from Dominick to—Chechile, to me.

5   Q.  What's the date?

6   A.  October 28, 2020.

7   Q.  Approximately two weeks after the account opening email

8   from Mr. Chechile to you?

9   A.  Yes, ma'am.

10  Q.  What is the subject line of this email?

11  A.  G/CLUBS Membership Request for Documentation.

12  Q.  And can you read the body of this email, please.

13  A.  "This breaks my heart to have to send.  As discussed,

14  attached is the letter for G Club and G Fashion.  I'm sending

15  it to you to give to Yvette as you see fit because I know this

16  is a very sensitive subject.  Please let me know if you would

17  like to me to call Yvette to discuss or if you think it's

18  better I do not.  Also, we have two wires requested to be

19  returned.  I will have them returned now and will send you the

20  wire info in a separate email."

21          MS. MURRAY:  We can that take that down, Ms. Loftus.

22  Q.  Mr. Khaled, did you also assist in forming businesses in

23  New York in the fall of 2020?

24  A.  I believe just Lexington Properties.

25          MS. MURRAY:  Ms. Loftus, can we please pull up

O6A1GUO3                    Khaled - Direct

1   Government Exhibit SW2002.  And if we could zoom in from the
2   top portion down to the item No. 2 in the middle of the page.
3   Q.  Mr. Khaled, what type of document is this?
4   A.  It's an email.
5   Q.  And looking starting in the middle here, from Scanlon,
6   Courtney, who is that email sent to?
7   A.  It's sent to Daniel Podhaskie.
8   Q.  What was Podhaskie's role?
9   A.  He was an in-house attorney.
10  Q.  Do you recognize the email domain for Daniel Podhaskie?
11  A.  Yes.
12  Q.  What is it?
13  A.  Golden Spring New York US, which is for Golden Spring.
14  Q.  And in this email, if you look at the message to Daniel
15  Podhaskie, it reflects 20 entities.  Looking at the first, the
16  Delaware corporation, what is the name of that entity and who
17  is the sole stockholder listed?
18  A.  Infinity Treasury Management Inc.  Sole stockholder is
19  Mileson Guo.
20  Q.  And then the second entity that's listed?
21  A.  Lamp Capital LLC.  (Sole member is Infinity Treasury
22  Management Inc.)
23  Q.  And on what date does Mr. Podhaskie send this to you?
24  A.  September 9, 2020.
25  Q.  What is the email domain associated with your email address

O6A1GUO3                        Khaled - Direct

1    on this email?

2    A.  Gtv.org.

3         MS. MURRAY:  All right, Ms. Loftus, we can take that

4    down.

5    Q.  Mr. Khaled, I believe that you mentioned that you prepared

6    certain summaries of the different entities for use in, among

7    other things, submitting to banks?

8         MS. SHROFF:  Objection.  Objection to the testifying.

9         THE COURT:  Sustained.

10   Q.  Mr. Khaled, what documents, if any, did you submit to banks

11   in connection with your work for Crane?

12   A.  At account opening, we submitted summaries of what the

13   company does for the G series, and then we created one for each

14   entity, basically telling them what the company is all about,

15   address, ownership structure, any association with promoters,

16   some of the services that each company offers, and the mission.

17   Q.  And what was the source of the information that you

18   included in those summary documents?

19   A.  Some were provided by in-house attorneys, about the

20   companies; some were from Wikipedia; and some information was

21   from Yvette; just discussions as well.

22        MS. MURRAY:  Ms. Loftus, can you please publish

23   Government Exhibit SW2040.  Focus on the top.

24   Q.  Mr. Khaled, this is an email from you to an email address

25   roman@fundingvictory.com.  Do you know who uses that email

O6A1GUO3                      Khaled - Direct

1   address?

2   A.  Yes.

3   Q.  Who is that?

4   A.  It's Roman Yagudaev.

5   Q.  And who is Roman Yagudaev as was relevant to your work at

6   Crane during this time period, December 2020?

7   A.  He was just a contact that I——and a friend that I knew.

8   Q.  There's a subject of this email.  What is the subject?

9   A.  MG.

10  Q.  And the title of the attachment?

11  A.  MG.docx.

12         MS. MURRAY:  Ms. Loftus, if we could go down now to

13  the attachment, please.

14  Q.  Mr. Khaled, what does MG refer to in that subject line and

15  in that attachment title?

16  A.  Miles Guo.

17         MS. MURRAY:  If we could focus, Ms. Loftus, just on

18  the top portion for a moment, the quote, and then the first

19  paragraph.

20  Q.  Mr. Khaled, what is this?

21  A.  It's an intro.

22  Q.  Who wrote this?

23  A.  My assistant Maya.

24  Q.  What was the purpose of this document?

25  A.  To give a preview of the mission.

O6A1GUO3                    Khaled - Direct

Q.   The mission of what?

A.   Anti-CCP.

          MS. MURRAY:  Ms. Loftus, if we could zoom out of that.
And focus on the bottom portion, from G/CLUBS down to the
bottom.

Q.   Mr. Khaled, there's a description here of G/CLUBS.  Who, if
anyone, provided that description?

A.   Jessica, in-house attorney.  She was in charge of all G
Club, and this information was also I believe on the website.

Q.   And looking at the portion that starts with the underlying
services being offered, what services does it indicate were
offered at the time of this email, December 2020?

A.   Multilingual concierge and translation services, booking
and discount on luxury consumer products in the US; sourcing
professional services in the US for Chinese decedents; hosting
an annual summit for Chinese professionals and entrepreneurs
with keynote speakers and empowering events; education services
and representation of Chinese students attending higher
education in the US; medical care services for high-net-worth
Chinese individuals in the US; temporary housing and travel
arrangements domestically in the US.

          MS. MURRAY:  Ms. Loftus, could we take that down and
put up Government Exhibit SW2042.  Focus on the top portion.

Q.   Mr. Khaled, what's the date of this email?

A.   December 8, 2020.

O6A1GUO3                          Khaled - Direct

1  Q.  And the subject?

2  A.  G series.

3  Q.  Who is it addressed to?

4  A.  Miguel Santin.

5  Q.  And who are some of the people who are copied on the CC

6  line here?

7  A.  Ross Heinemeyer, Alex Hadjicharalambous, Zee Liu.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6ABGUO4                    Khaled - Direct

Q.  To your understanding at this time December 2020, did Ross

Heinemeyer work for G/Clubs?

A.  No.

Q.  What entity, if any, did he work for?

A.  The rule of Law Foundation.

Q.  And in this email it starts with, As a promise, please find

attached a detail description of what the G companies offer and

inception.  We also describe the information about the

promotors of the brand.  As mentioned to you, they are hired

only to promote and bring in subscribers.  They're not owners,

nor are they in management position, solely as promotors

because of their following.

        Who, if anyone, were you referring to as promotors of

the G companies brand?

A.  Miles Guo.

Q.  Why, if at all, did you indicate that the promotors are not

owners nor in management positions?

A.  Cause that will -- that will create an issue with opening

up the account if the name is Googled and they have a direct

management or position in the company or ownership.

Q.  And can you just clarify a bit what you mean by that, if

what name is Googled it would create what kind of an issue?

A.  Say if Miles Guo's name is directly associated with the

ownership of the G entities, and if the name is Googled or put

on OFAC, that will jeopardize the possibility of opening up the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO4                          Khaled - Direct

1    account at the bank.

2    Q.  At this time period December of 2020, generally speaking

3    what were your duties and responsibilities with respect to

4    banking relationships?

5    A.  In December I was really -- my focus was supposed to be

6    opening up a real financial institution or a virtual bank, that

7    was the two projects I was working on.

8    Q.  And in this description regarding the promotor Miles Guo

9    not being in a management position, based on your experience at

10   this time working for Crane, was that a true statement?

11               MS. SHROFF:  Objection to the form of the question.

12               THE COURT:  Overruled.  You may answer.

13   A.  No, it was not.

14   Q.  What was inaccurate about that statement?

15   A.  Miles Guo was involved with the creation of the companies

16   and the day-to-day operation.

17   Q.  Why did you lie to First Bank PR in this email?

18   A.  To increase the chances of them approving the account to be

19   opened and the name not being associated with any OFAC or

20   Google or public searches that will not -- that will have

21   either the compliance or account opening team refuse the

22   account, to increase their chance of opening it.

23   Q.  There's an attachment to this particular email.  Ms.

24   Loftus, if we could scroll down, please.

25               What's the date at the bottom of this G series

O6ABGUO4                          Khaled - Direct

1    summary, Mr. Khaled?

2    A.  October 2020.

3    Q.  Zoom in a little bit more actually.

4            Read that date again for us, please, sir?

5    A.  I'm sorry, December 2020.

6    Q.  If we could go down a couple of pages.  I think it's page

7    six, if we could pause there.  Focus in, Ms. Loftus, on who is

8    Miles Guo.

9            Mr. Khaled, who wrote this description of Miles Guo?

10   A.  That was probably from the Wikipedia page.

11           MS. SHROFF:  Objection to the probably and move to

12   strike.

13           THE COURT:  So don't say what's probable or what

14   you're guessing at.  Only say what you absolutely know.

15   A.  Can you repeat the question.

16   Q.  Sure.  Who wrote this description of Miles Guo?

17   A.  Maya Fawas.

18   Q.  Did you personally verify any of this information in this

19   description about Miles Guo?

20   A.  No.

21   Q.  If we can zoom out of that, please, Ms. Loftus.  If we

22   could focus on the top portion behind the movement, that

23   paragraph.

24           Looking at the second sentence here, Mr. Khaled.  It

25   says, Miles Guo/Guo Wengui, was sought out as the brand

O6ABGUO4                      Khaled - Direct

 1   ambassador, major promoter, as his powerful voice for hope and

 2   freedom resonates with the people.

 3           Based on your experience working at Crane, is this an

 4   accurate statement of Miles Guo's relationship with the

 5   G series?

 6           MS. SHROFF:  Objection.  Objection to the form of the

 7   question itself.

 8           THE COURT:  I'm going to sustain the objection.

 9   Q.  Mr. Khaled, based on your work at Crane, do you have an

10   understanding of what relationship, if any, Miles Guo had with

11   the G series brand?

12           MS. SHROFF:  Same objection, your Honor.

13           THE COURT:  This is a question that you may answer.

14   A.  He was definitely part of the setup.

15   Q.  Can you explain what you mean by the setup?

16   A.  He was not sought out for.  He was the person that the

17   G series and the G entities were created with him, with his

18   involvement.

19   Q.  Ms. Loftus, if we could take this down and put up

20   Government Exhibit SW-2050.

21           Mr. Khaled, what's the date of this email?

22   A.  January 6, 2021.

23   Q.  Who sent it?

24   A.  Maya Fawas.

25   Q.  And who was Maya at the time?

O6ABGUO4                          Khaled - Direct

1   A.  She was my assistant, but she also did some work for the

2   other entities in the building in the townhouse.

3   Q.  Ms. Loftus, if we could scroll down to the attachment

4   that's Saraca.PDF.

5          Looking at the bottom right here, Mr. Khaled, what's

6   the date of this document?

7   A.  January 20, 2021.

8   Q.  If we could go to the next page.  Focus in on the overview

9   here, please, Ms. Loftus.

10          Could you read the first sentence under the overview

11   for this Saraca summary, please.

12   A.  Hudson Diamond Holding Incorporated is a BVI, is a business

13   company and legal entity holding assets on behalf of Miles

14   Guo's family.

15   Q.  Ms. Loftus, if we could zoom out of this.  I'd like to put

16   up side-by-side this exhibit, which is SW-2050 at page three,

17   and SW-2051 at page three, please.

18          And looking on the right, SW-2051, if we could zoom in

19   on that same top paragraph, please, Ms. Loftus, on the right

20   side as well.

21          Mr. Khaled, this is from 2051, can you read what the

22   lead-in paragraph reads in this Saraca summary document?

23   A.  Saraca Media Group, Inc.  Saraca is a holding company

24   established to help manage cross-border activities, business

25   and financial affairs.  The main purpose of establishing this

O6ABGUO4                          Khaled - Direct

1    structure is to manage real estate, trust and succession

2    planning, cross-border investments, joint ventures, listings

3    and corporate group structuring.

4    Q.   Thank you.  Ms. Loftus, we can zoom out of both of those.

5    If we could focus on the organizational chart on the bottom of

6    each, please.

7              In the first document that we looked at, Mr. Khaled,

8    what is kind of the ultimate parent company that's listed?

9    A.   Hudson Diamond, Inc., BVI.

10   Q.   Just one at a time is fine, Ms. Loftus.  That's from 2050

11   that we're looking at.  Hudson Diamond Holding BVI, what

12   company is underneath it?

13   A.   Saraca Media Group.

14   Q.   And what companies are listed beneath that?

15   A.   GTV Media Group, Inc., G News Media Group, Inc., G Fashion

16   Media Group, Inc., G Live, LLC and G Posts LLC.

17   Q.   Looking on the farthest left side there's kind of a line up

18   from GTV Media Group.  Do you see that?

19   A.   Yes.

20   Q.   What information is reflected there in this organizational

21   chart?

22   A.   Less than 49 percent is outside shareholders.

23   Q.   And then looking at the other line that goes into GTV media

24   Group here, what percentage is indicated from Saraca Media

25   Group, Inc.?

O6ABGUO4                        Khaled - Direct

1    A.  51 percent.

2    Q.  Ms. Loftus, we can take down, 2050.  Let's focus on 2051.

3    Same thing, just the organizational chart through to the

4    bottom.

5            In this version of the Saraca summary, Mr. Khaled, who

6    is listed at the top of the organizational chart?

7    A.  Kwon Guo.

8    Q.  Do you know who that is?

9    A.  That's Mileson Guo.

10   Q.  What relation, if any, is Mileson Guo to Miles Guo?

11   A.  His son.

12   Q.  Looking at the organizational flow here moving left from

13   GTV Media Group, what's reflected there in the org chart?

14   A.  Outside shareholders 330 million USD raised in a private

15   placement with non-owning more than 10 percent.

16   Q.  Ms. Loftus, we can take that down now.  Are you familiar

17   with an entity called Fiesta Property Development?

18   A.  Yes.

19   Q.  What is it?

20   A.  To my knowledge it's a real estate holding company in the

21   UK.

22   Q.  And who, if anyone, do you know to be associated with

23   Fiesta Property development?

24   A.  Haoran He.

25   Q.  Who is Haoran He?

O6ABGUO4                          Khaled - Direct

1    A.  He was -- the name was introduced to me as the ultimate

2    beneficiary holder for G/Club operation.

3    Q.  Did you ever meet Haoran He?

4    A.  No.

5    Q.  Did you ever speak with Haoran He on the phone or by video

6    chat?

7    A.  No.

8    Q.  Did you ever communicate with Haoran He in the course of

9    your work with Crane?

10   A.  Maybe a few times by email.

11   Q.  Ms. Loftus, can you please pull up Government Exhibit

12   GC-500.  We can start down near the bottom.

13           For this first email, Mr. Khaled, you're copied on

14   this, correct?

15   A.  Yes.

16   Q.  What's the date of this email?

17   A.  January 18, 2201.

18   Q.  Who sent it?

19   A.  Christina Schatz.

20   Q.  Looking at the from line if you could, who is the sender?

21   A.  From Alex Hadjicharalambous.

22   Q.  And it goes to two individuals at what financial

23   institution?

24   A.  Christina Schatz at Morgan Stanley.  Elizabeth Berstler at

25   Morgan Stanley.

O6ABGUO4                         Khaled - Direct

1    Q.  What's the subject line of this email?

2    A.  Wire transfer G/Club Operations, LLC.

3    Q.  And the body of this email indicates the scheduling of a

4    transfer on January 19, 2021, from an account ending in 8564

5    which is described in the parenthetical as ADP and expenses.

6    What does ADP stand for?

7    A.  It's a payroll company.

8    Q.  And then in the description of the wire here, what is the

9    amount listed of the outgoing wire from the ADP payroll and

10   expense account?

11   A.  $1 million.

12   Q.  And the beneficiary account name?

13   A.  Fiesta Property Developments Limited.

14   Q.  Ms. Loftus, if we could scroll up this chain, please, and

15   stop there, please.

16        There's an email in the middle from Elizabeth

17   Berstler.  This is an email from Elizabeth Berstler to Alex H.

18   What is the body of this email?

19   A.  Can you give brief explanation/purpose of this wire.

20   Q.  And zooming out, Ms. Loftus, and continuing up, please.

21   The top email here into the second one.

22        So January 20, 2021, at 9:15 a.m. Alex forwards this

23   email to you.  What does he write to you?

24   A.  Can you please advise how to best respond?

25   Q.  And what is your response to him?

O6ABGUO4                        Khaled - Direct

1    A.  I got it.  I will prepare a response.  Just spoke to

2    Christina.  They just want to keep it in the file.

3    Q.  Mr. Khaled, why if at all, Alex H. the controller of G/Club

4    asking you to prepare a response regarding this G/Club wire?

5            MS. SHROFF:  Objection.  I think the question should

6    go to Alex H.

7            THE COURT:  Sustained.

8    Q.  Mr. Khaled, what understanding, if any, did you have of why

9    Alex H. forwarded this email to you?

10   A.  He wanted to run the response to be a proper response to

11   the bank in order not to jeopardize the relationship and

12   account status.

13   Q.  To your understanding how at all could a response to this

14   inquiry jeopardize the account status?

15   A.  Based on the KYC and the account opening approval, the

16   G/Club operations account at Morgan Stanley was going to be

17   used for payroll and anything directly associated with G/Club

18   expenses.

19   Q.  And at this time January 2021, did you have an

20   understanding of the purpose of the wire to Fiesta Property

21   Development?

22   A.  Not really, no.

23   Q.  Ms. Loftus, if we could pull up GC-508, please.

24           Mr. Khaled, focusing on the top email here.  This is

25   from you.  What's the subject line of this email?

O6ABGUO4                          Khaled - Direct

1    A.  Wire transfer G/Club Operations LLC.

2    Q.  Who is it sent to and who is copied?

3    A.  It was sent to Alex Hadjicharalambous, copied to Jessica

4    Mastrogiovanni.

5    Q.  What role, if any, did Jessica Mastrogiovanni have?

6    A.  She was the in-house attorney for G/Club entities.

7    Q.  Looking at the body of this email, the first paragraph it

8    reads, This transfer was initiated from G/Club Operations LLC

9    to Fiesta Property Developments Limited, a real estate holding

10   company owned by Mr. He in the UK.  Same owner of G/Clubs

11   Operations, LLC, for a possible down payment on a property they

12   plan to purchase for a total of $10 million.

13          Mr. Khaled, where, if anywhere, did you get the

14   information that's in that paragraph?

15   A.  Jessica.

16   Q.  Do you have an understanding of what property, if any,

17   Fiesta Property planned to purchase?

18   A.  No.

19   Q.  Do you have any personal knowledge whether that information

20   is accurate?

21   A.  No.

22   Q.  Looking at the second paragraph it reads, The transaction

23   is recorded with an internal loan agreement from the lender

24   G/Club Operation, LLC, to the borrower of Fiesta Property, LLC,

25   for the amount of $10 million with a repayment plan.  If they

O6ABGUO4                         Khaled - Direct

1    need the loan agreement, we can present it in the future.

2              Where, if anywhere, did you get the information in

3    that paragraph?

4    A.   Jessica.

5    Q.   At the time that you wrote this email, do you recall

6    whether you had seen the loan agreement that's referenced here?

7    A.   I don't recall, no.

8    Q.   Why, if at all, did you send this draft email to Alex H?

9    A.   In order to forward to the bank.

10   Q.   What is your understanding, if any, of why Jessica

11   Mastrogiovanni provided this information about Fiesta Property

12   Development?

13             MS. SHROFF:  Objection.

14             THE COURT:  Sustained.

15   Q.   Why, if at all, did you consult Jessica Mastrogiovanni for

16   information about this wire transfer?

17   A.   Because I wanted to reply to the bank with something that

18   she knew about.

19   Q.   Do you recall whether you contacted Mr. He about this wire

20   transfer?

21   A.   No.

22   Q.   Why not?

23   A.   Cause the protocol was Jessica was in-between us, me and

24   Haoran He, if we needed any information.

25   Q.   Ms. Loftus, can we take that down, please, and go to

O6ABGUO4                         Khaled - Direct

1   Government Exhibit GC-501.  If we could scroll down a bit,

2   please.  There on the email that starts at the bottom of the

3   page here from Alex H.

4          Mr. Khaled, do you see the last two paragraphs of this

5   email from Alex H?

6   A.  Yes.

7   Q.  And what is the date of this email?

8   A.  January 25, 2021.

9   Q.  Alex H. sent it to the two individuals at Morgan Stanley;

10  is that correct?

11  A.  Yes.

12  Q.  Who's copied here?

13  A.  Me.

14  Q.  What is the amount of this wire transfer from G/Club

15  Operations, LLC?

16  A.  Five million.

17  Q.  To what beneficiary account?

18  A.  Fiesta Property Developments, LTD.

19  Q.  Now looking at the last two paragraphs, do you recognize

20  the content of those paragraphs that Alex H. submitted to the

21  bank?

22  A.  Yes.

23  Q.  Is that the same text and description that you provided in

24  the email we just looked at in Government Exhibit GC-500?

25  A.  Yes.

O6ABGUO4                          Khaled - Direct

Q.  Ms. Loftus, can we please now look at Government Exhibit
BR-1506.  What's the date of this email, focus on the top for a
moment?

A.  March 24, 2021.

Q.  And the subject line?

A.  Wires to Fiesta Property Development, January-February
2021.

Q.  Looking at the three wires that are listed here, what are
the dates and the amounts of those wires to Fiesta Property
Developments?

A.  January 21, 2021, 734,000 sterling pounds; January 27,
2021, 3,660,000 sterling pounds; February 4, 2021, 2,932,000
sterling pounds.

Q.  We can take that down, Ms. Loftus.

         Mr. Khaled, after you assisted in opening bank
accounts for these G series entities, what role, if any, did
you have in maintaining those accounts?

A.  I was really the point of contact between them.

Q.  In communications with the banks about these accounts, how,
if at all, did you hold yourself out?

A.  Can you repeat that.

Q.  Sure.  In communications with the banks about these
accounts, how, if at all, did you hold yourself out?

         What association, if any, did you indicate you had
with the entities?

O6ABGUO4                         Khaled - Direct

A.  I introduced myself as a consultant to these entities.

Q.  In communications with the bank, what, if anything, did you disclose to the banks about Crane's relationship with the G entities?

A.  That they are my clients.

Q.  Was that entirely truthful?

A.  No.

Q.  What was dishonest about that?

A.  Crane was related to these entities, and I was working for these entities.

Q.  In bank communication and in documents that you filed, what address did you list as the business address for Crane?

        MS. SHROFF:  Objection, asked and answered several times.

        THE COURT:  You may answer.

A.  one World Trade Center, 85th floor, New York, New York.

Q.  At the time that you submitted that business address to the banks, where were you in fact working?

A.  At the townhouse at 162 East 64th Street.

Q.  Why, if at all, did you not list your actual office address on documents and communications you submitted to the banks?

        MS. SHROFF:  Objection to the form of the question.

        THE COURT:  You may answer.

A.  To distinguish my -- the Crane company from the negative information that Saraca and GTV and the SEC articles that

O6ABGUO4                         Khaled - Direct

 1    listed Golden Spring, and there's some indication to the 162

 2    East 64th Street address.

 3    Q.  In addition to banking relationships, Mr. Khaled, did you

 4    do additional work related to these entities related to your

 5    time at Crane?

 6    A.  Yes.

 7    Q.  Ms. Loftus, if you could pull up, please, SW-2083.  If we

 8    could focus first on the bottom email, please.

 9            Mr. Khaled, what's the date of this email?

10    A.  May 7, 2021.

11    Q.  Who sent it?

12    A.  Joe W. at Guo.Media.

13    Q.  Who is Joe W?

14    A.  One of the techs that worked in the building as well with

15    us.

16    Q.  When you say the building, what building are you referring

17    to?

18    A.  Townhouse at 162 East 64th Street.

19    Q.  What was Guo Media?

20    A.  Media company.

21    Q.  Whose media company?

22    A.  Guo.

23    Q.  And who is this email addressed to?

24    A.  To me and Anthony Dibatista.

25    Q.  Who is Anthony Dibatista?

O6ABGUO4                          Khaled - Direct

1   A.  He is also the head controller for Lexington Properties.

2   He was in charge of payroll expenses and other things,

3   financial.

4   Q.  Focusing on the first sentence of this email it reads, We

5   are about to launch Gettr project, similar as Twitter.  We want

6   to build a fundraising feature on this platform.

7           At this time May of 2021, had you heard of Gettr?

8   A.  Not really, no.

9   Q.  Ms. Loftus, if we can zoom out of that and look at the top

10  portion of this email chain.  There's a response from

11  Mr. Dibatista.

12          MS. SHROFF:  Objection to the testifying.  If there's

13  a question, she can ask it.

14          THE COURT:  If you would just refer him to which email

15  you want him to comment on.

16          MS. MURRAY:  Will do, your Honor.

17  Q.  If you can focus on the very top email, Mr. Khaled, sent

18  from Joe W.  What date was that sent?

19  A.  May 7, 2021.

20  Q.  And to whom was it sent?

21  A.  Anthony Dibatista and myself.

22  Q.  What's the domain of the email address associated with

23  Anthony Dibatista?

24  A.  GTV.org.

25  Q.  And which of your email addresses was this sent to?

O6ABGUO4                          Khaled - Direct

1   A.  Crane Advisory Group.

2   Q.  Can you read the text of the email?

3   A.  This is a Fintech related question.  Miles wants to know

4   whether we can do it.  I'm tagged.  What do you think from your

5   side.  Best Joe.

6   Q.  Who do you understand Miles to refer to in this email?

7   A.  Miles Guo.

8   Q.  Thanks you, Ms. Loftus.  Can you take this down.

9           THE COURT:  Could you explain -- if you would --

10          MS. MURRAY:  Put it back up again, Ms. Loftus.  That

11  was SW-2083.

12          THE COURT:  If you would highlight that upper-portion.

13  Can you explain what is meant there by @-Khaled?

14          THE WITNESS:  There's two people on the email.

15  They're specific.  He wants me to answer that.

16          THE COURT:  In other words, that reference that is

17  highlighted in blue is merely referring to you.  It's not

18  referring to some other site or method of communication?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Go ahead.

21  BY MS. MURRAY:

22  Q.  Just a clarifying question on that, Mr. Khaled.  Based on

23  looking at this email, do you have an understanding of whether

24  there's a hyperlink embedded within that @ that the judge was

25  asking about?

O6ABGUO4                        Khaled - Direct

1   A.  I don't believe so.  From my understanding, it's gonna be,

2   if you click it, it would go to an email to me.

3   Q.  So your understanding is that that hyperlinks to your

4   email; is that correct?

5   A.  Correct.

6   Q.  Ms. Loftus, can we just put up Government Exhibit SW-2061,

7   please.  If we could focus on the top two emails in this chain.

8          Looking at the second email, Mr. Khaled, who is this

9   from on February 1, 2021?

10  A.  Alex Hadjicharalambous.

11  Q.  Who did he send it to?

12  A.  Edward Boyle from Medici bank.

13  Q.  If we can zoom out of that and go further down the chain,

14  please, bottom of the first page.

15         In this email starting with the paragraph or reading

16  the paragraph one last question, can you read that, please,

17  Mr. Khaled.  This is from Ed Boyle to Alex H?

18  A.  One last question, can you please confirm if Miles/Wengui

19  Guo, Kwok, has any decisive control over G/Club BVI or its

20  parent, jovial or its parent stichting Duurzame?  A simple

21  reply statement to this email is sufficient.

22  Q.  Ms. Loftus, if we can zoom out and go to the very top of

23  this email chain.

24         What does this reflect of this email chain,

25  Mr. Khaled?

O6ABGUO4                          Khaled - Direct

1   A.  Same thing, Alex sending an email to me with the thread of

2   the question.

3   Q.  And then going to the attachment to this email, Ms. Loftus,

4   on page two, please, focusing on the text.

5           What is the first sentence here in this document that

6   was attached to the email chain?

7   A.  Miles Guo does not have any decisive control over G/Club

8   BVI or its parent, jovial or its parent stichting Duurzame.

9   Q.  And I'll just read the beginning of the second paragraph.

10  His presence on the website and social media only as G/Club

11  brand ambassador Miles Guo.  Do you see that?

12  A.  Yes.

13  Q.  Based on your experience working at Crane, do you believe

14  that to be an accurate statement of Miles Guo's involvement

15  with G/Clubs?

16          MS. SHROFF:  Your Honor, I have no objection to the

17  question without the built-in -- there's no relationship

18  between this employment at Crane and the remainder of the

19  question, so that's my objection to the form.

20          THE COURT:  Do you want to come step up?

21          (Continued on next page)

22

23

24

25

O6ABGUO4                          Khaled - Direct

1                (At the sidebar)

2                THE COURT:  So I understand you to be asking the

3     witness whether it is accurate that Mr. Guo does not have

4     decisive control?

5                MS. MURRAY:  Yes, your Honor.

6                MS. SHROFF:  I have no objection to that because she

7     keep saying, while you're working at Crane.

8                THE COURT:  Go ahead.

9                MS. SHROFF:  He's not working at Crane.  He's

10    testified many, many times that Crane is like an entity he set

11    up.  He draws no salary from Crane. He makes no money from

12    Crane, and it's not material to the question.  She has a

13    document.  She wants to ask about the document, she can ask.  I

14    do have a secondary objection --

15               THE COURT:  I just want to get to the first part, the

16    while working at Crane.

17               MS. MURRAY:  I was simply trying to place him in time,

18    your Honor, because I think it's relevant about time.  I can

19    just say at the time of this email.  All I was trying to do is

20    stage him on the time.

21               MS. SHROFF:  There were a slew of questions, while you

22    were working at Crane.  I objected. That was the reason for the

23    objection, because he's not really working at Crane.  And I

24    don't know why the government keeps going back to Crane, so

25    that was my objection.  I also have a follow-up.

O6ABGUO4                          Khaled - Direct

1        THE COURT:  He identified it as the corporation that

2   he founded.

3        MS. SHROFF:  Right, but he's never worked there.  I

4   have a corporation.  I'll call it xxxxxx and family.  I don't

5   work there.  I don't draw an income from there.  How is it

6   relevant to what I think of, let's say, these proceedings.

7        THE COURT:  Perhaps the better question is when you

8   were associated with Crane.

9        MS. MURRAY:  I'm happy to establish if Ms. Shroff

10  would like that Crane was a shell corporation.

11       MS. SHROFF:  I think you've done that many times.

12       MS. MURRAY:  He had an email address associated with

13  Crane.  He submitted documents.

14       MS. SHROFF:  And you went over all of that in great

15  detail as to why he had an email address, which email address

16  he used, over and over again.  Not just in your questions, but

17  also in the looping and the re-looping.  This question can be

18  asked without any reference to Crane to which I would have no

19  objection at all.

20       MS. MURRAY:  Happy to do that.

21       MS. SHROFF:  My second objection, your Honor, is, I

22  have no idea what it means when she's asking about control or

23  degree of control.  Those are technical terms.

24       THE COURT:  But there's a quote, that's not coming

25  from the witness.  There's a quote, and he's asked to give an

O6ABGUO4                          Khaled - Direct

1   opinion as to whether or not Mr. Guo had control and so --

2            MR. KAMARAJU:  The question is the quote itself, right

3   your Honor?

4            THE COURT:  Yes.

5            MR. KAMARAJU:  If that's the question, decisive

6   control.

7            THE COURT:  Okay.

8            MS. SHROFF:  We're going to stop at 2:45, right?  I

9   need a bathroom break, but I'm not going to ask you.  I'm just

10  going to go to 2:45.

11           THE COURT:  We have to stop at 2:45, yes.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6ABGUO4                              Khaled - Direct

1              (In open court; jury present)

2              THE COURT:  Please continue.

3    BY MS. MURRAY:

4    Q.  Ms. Loftus, if we can go to SW-2061 at page two.

5              Mr. Khaled, focusing on the first sentence, do you

6    believe that statement to be true?

7    A.  No.

8    Q.  We can take that down, Ms. Loftus.

9              Did there come a time when Crane accepted money on

10   behalf of other individuals or entities?

11   A.  Yes.

12   Q.  When did that first occur?

13   A.  November 23, 24, something like that, of 2021.

14   Q.  At that time, November 2020, what agreement, if any, did

15   Crane have to accept money from other entities?

16   A.  There was no agreement in place.

17             MS. SHROFF:  He said there was no agreement, your

18   Honor.

19             THE COURT:  He said there's no agreement in place.

20             MS. SHROFF:  Thank you.

21   Q.  How, if at all, did Crane come to accept money on behalf of

22   others in November of 2020?

23   A.  Yvette ask me that if I have an active account for Crane

24   that she can send money from VIP clients to Crane.

25   Q.  What reason, if any, did Yvette give for asking you to

O6ABGUO4                         Khaled - Direct

1   accept money from others in the Crane accounts?

2   A.  At that time it was just to have an active account, that

3   was the request, is there an active account for Crane to accept

4   money.

5   Q.  What information, if any, did you provide to Yvette in

6   response to her inquiry?

7   A.  I told her yes, I have an account established for Crane at

8   Citibank and I gave her the Citibank wiring instructions.

9   Q.  After that conversation, did there come a time when Crane's

10  Citibank account started receiving incoming money?

11  A.  Yes.  I received it in November and then back again in

12  December.

13  Q.  And approximately what volume of incoming money was coming

14  into Crane's Citibank account at that time?

15  A.  Initial transfer was couple of hundred thousand, I believe

16  a little over a million in December.

17  Q.  After December of 2020, did Crane's Citibank account

18  continue to receive incoming wires?

19  A.  Yes.

20  Q.  Of what volume approximately?

21  A.  I think we received about 30 or $40 million, not really

22  sure the exact amount, but it was in that ballpark.

23  Q.  And when the money was coming into Crane's accounts in

24  early 2021, what discussions, if any, did you have with Yvette

25  about the source of those funds?

O6ABGUO4                        Khaled - Direct

1   A.  She said that it's investors' money for a new media

2   company, and also she said that also G/Club members that are

3   VIP that are sending money.

4   Q.  Did there come a time when Yvette asked you to transfer the

5   money in Crane's accounts to a different bank account?

6   A.  What period of time?

7   Q.  Let's focus on March and April of 2201.

8           Generally speaking, what was the volume of incoming

9   funds into the Crane accounts during that period?

10  A.  We had almost a thousand wires that came in.

11  Q.  And approximately how much money was coming into Crane's

12  accounts through those approximately one thousand wires?

13  A.  We had about a hundred million dollars.

14  Q.  What, if anything, did you do with the hundred million

15  dollars that came into Crane's account?

16  A.  Just kept it, paid some expenses on what needed to be done

17  for Crane in terms of rent, other expenses for legal work.  We

18  also started creating a new entity as well.  We paid some

19  expense for that.

20  Q.  Approximately what proportion of the hundred million

21  dollars or so did you spend on the Crane expenses you

22  described?

23  A.  I don't have exact number.  It's a very small amount.

24  Q.  What, if anything, happened with the remainder of the

25  hundred million dollars?

O6ABGUO4                    Khaled - Direct

1    A.  It was transferred to G/Club account, and a portion was

2    transferred to an attorney that represented G/Club.

3    Q.  Mr. Khaled, focusing you on Spring of 2021, did there come

4    a time when you started recording phone calls?

5    A.  Yes.

6    Q.  Why did you start recording phone calls?

7    A.  I had concerns.  I had over a hundred million dollars in a

8    company that I owned individually.  I wasn't getting clear

9    information of where this money needs to go.  There was now

10   inconsistent people telling me what to do and giving me

11   instructions that I never met before, just concerns.

12   Q.  Can you describe what you mean when you say inconsistent

13   people telling you what to do?  To whom are you referring?

14   A.  For example, William Je I was working with on establishing

15   a bank all of a sudden knows about G/Club and asking me to

16   transfer money for G/Club.

17          Other individuals started getting on the phone with me

18   telling me that we need to transfer money ASAP, rushing, and

19   also the other concern was all this money that came in, a

20   hundred plus directly to G/Club, and a hundred million that was

21   at Crane's account without really much services or anything

22   about G/Club is being done, conflicting information.

23   Q.  And when did you start recording calls?

24   A.  I think end of April, end of March, April, March.

25   Q.  Of what year?

O6ABGUO4                          Khaled - Direct

1    A.   2021.

2    Q.   And what was your motivation for recording phone calls?

3    A.   I just wanted to protect myself down the line from any

4    accountability in terms of what this money is for, where is it

5    going, etc.

6    Q.   What do you mean by protect yourself?

7    A.   Legally, and document that this money is not, you know,

8    that I used or that other people know about it.

9    Q.   How, if at all, did you select which calls to record?

10   A.   There wasn't really a science behind it.  It was just

11   random calls that are related to the transfer and request of

12   transfer and what we were doing with this money, just

13   management calls that I can record.

14   Q.   Did you tell anyone else on the calls that you were

15   recording them?

16   A.   No.

17   Q.   Why not?

18   A.   Cause I didn't want to.  I didn't want to.  I wanted that

19   information for myself.

20           MS. MURRAY:  Your Honor, may I approach?

21           THE COURT:  You may.

22           MS. MURRAY:  Your Honor, I'm handing the witness

23   what's been marked for identification as Government Exhibit

24   HK-1.

25   Q.   Mr. Khaled, do you recognize the hard drive that's marked

O6ABGUO4                          Khaled - Direct

1    as Government Exhibit HK-1?

2    A.  Yes.

3    Q.  How do you recognize it?

4    A.  It's my signature on it.

5    Q.  Did you review the contents of that hard drive?

6    A.  Yes.

7           MS. MURRAY:  Your Honor, that hard drive contains

8    exhibits that have been marked for identification as Government

9    Exhibits 401 through 417 and their sub-exhibits.

10   Q.  Mr. Khaled, are Government Exhibits 401 through 417 and

11   their sub-exhibits audio files of the recordings that you made?

12   A.  Yes.

13   Q.  Are those the recordings we've been discussing that you

14   made of phone calls you had in 2021?

15   A.  Yes, ma'am.

16   Q.  Did you review the contents of Government Exhibits 401

17   through 417 and their subparts that's are contained on that

18   hard drive?

19   A.  Yes.

20          MS. MURRAY:  Your Honor, at this time I would like to

21   read a stipulation between the parties.  This is Government

22   Exhibit Stip 16.  The parties stipulate and agree that in the

23   below chart the exhibits listed under column A contain audio in

24   English and/or foreign language, and the exhibits listed under

25   column B are true and accurate transcriptions and translations

O6ABGUO4                        Khaled - Direct

1    of the audio contained in the exhibits listed column A.  We

2    would offer this exhibit which is Government Exhibit Stip 16.

3              THE COURT:  No objection, correct?

4              MS. SHROFF:  No, your Honor.  It's a stipulation.

5              THE COURT:  It is admitted.

6              (Government's Exhibit Stip 16 received in evidence)

7              MS. MURRAY:  We can publish that, Ms. Loftus.

8    BY MS. MURRAY:

9    Q.  Looking at this stipulation, column A list certain

10   government exhibits which are recordings and subparts of those

11   government exhibits which are excerpts of recordings. Column B

12   list certain transcriptions and translations of those

13   recordings.

14             Your Honor at this time pursuant to the stipulation

15   and pursuant to Mr. Khaled's authentication of the recordings,

16   the government moves to admit Government Exhibits 404, 404-T,

17   405, 405-T, 406, 406-T, 408, 408-T, 409, 409-T, 411, 411-T,

18   412, 412-T, 413-A, 413A-T and 417, 417-T.

19             THE COURT:  No objection.

20             MS. SHROFF:  Your Honor, we have no objection now, but

21   we may raise an issue at sidebar or at the end of the day.  I

22   don't want to disrupt with another sidebar right now.

23             THE COURT:  They're admitted.

24             (Government's Exhibits 404, 404-T, 405, 405-T, 406,

25   406-T, 408, 408-T, 409, 409-T, 411, 411-T, 412, 412-T, 413-A,

O6ABGUO4                          Khaled - Direct

 1    413A-T and 417, 417-T received in evidence)

 2              MS. MURRAY:  Thank you, your Honor.  Ms. Loftus, we

 3    can take this down.  Each juror has a copy of the transcripts

 4    binder under their chairs.  That contains the transcript of the

 5    recordings that were just admitted into evidence, so feel free

 6    to pick that up and follow along.

 7              MS. SHROFF:  Just so the record is clear, they're not

 8    transcripts, right?  It's just a transcription.  The call is in

 9    English.  It's a mix, right, of a translation and a

10    transcription.  I just wanted to be clear about that.

11              MS. MURRAY:  Yes, your Honor.  For clarity of the

12    record, that is right.  A majority of the calls are in English.

13    Those are transcriptions.  The portions of the calls are in

14    Mandarin, those are transcriptions and translations as

15    indicated in the stipulation.

16              THE COURT:  So the transcriptions that are purely in

17    English are just an aid to help you read along, but it is the

18    actual recording which is in evidence, and so you should rely

19    on what you're hearing.  But the translations, you must rely

20    on.  Go ahead.

21              MS. MURRAY:  Thank you, your Honor.

22    Q.  Ms. Loftus, if we could please pull up Government Exhibit

23    417-T.  That's the first half in binder.

24              Mr. Khaled, this is a transcription of one of the

25    recordings that you made.  Is that correct?

O6ABGUO4                          Khaled - Direct

1    A.  Yes.

2    Q.  What was the date of the phone call that is recorded at

3    Government Exhibit 417?

4    A.  April 28, 2021.

5    Q.  Who were the participants to that call?

6    A.  Miles Guo, myself, Yvette, William Je, Alex.

7    Q.  And focusing for a moment, Mr. Khaled, on the recording

8    itself, have you reviewed that recording of the call that took

9    place on April 28, 2021?

10   A.  Yes.

11   Q.  Do you have a recollection of that call or meeting?

12   A.  Yes.

13   Q.  Were you physically present during that call?

14   A.  No.

15   Q.  Can you describe for the jury how the various different

16   participants participated in that call?

17   A.  So Yvette and Alex were in the townhouse.  Miles I couldn't

18   see, but either voice or zoom.  William Je was a voice from the

19   UK.

20   Q.  And what about you, sir, how did you participate?

21   A.  I was at my house.  I called into the call through zoom.

22            MS. MURRAY:  Ms. Loftus, if we could please pull up

23   417.  That's the audio of this meeting.  We're going to start

24   at the 3 minute and 25 second mark which is page four of the

25   transcription.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO4                    Khaled - Direct

1          Ms. Loftus, before we start that, actually, just for

2    clarity of the record, this version of Government Exhibit 417

3    contains captions that are overlaid on the audio.  It's the

4    same content that is reflected in the transcription that is

5    417-T.  We can go ahead and play it.

6          (Media played)

7    Q.  Can you pause for a minute.

8          Mr. Khaled, do you recognize the voice that was

9    associated with Guo in this transcription?

10   A.  Yes.

11   Q.  Is that in fact Miles Guo?

12   A.  Yes.

13   Q.  And the voice that just spoke, is that Yvette Wang?

14   A.  Yes.

15   Q.  We can keep going, Ms. Loftus.  Thank you.

16         (Media played)

17   Q.  Mr. Khaled, the portion of this next audio, did you hear

18   that it didn't appear to be in English?

19         We can continue playing for just a moment.

20         (Media played)

21   Q.  Can you pause it, Ms. Loftus.

22   A.  Yeah, that's not English.

23         MS. MURRAY:  I just wanted to note for the record that

24   in the transcription and translation, and this is indicated on

25   the cover sheet, words that are italicized are translations

O6ABGUO4                        Khaled - Direct

1   from the source language into English, here from Mandarin into

2   English.  Ms. Loftus, if we can go back a couple of seconds and

3   just begin where Yvette starts speaking here.

4            (Media played)

5   Q.  Mr. Khaled, what 919 payments are you referring to in that

6   portion of this conversation?

7   A.  Incoming transfers to Medici account.

8   Q.  Which Medici account?

9   A.  G/Club account with Medici.

10  Q.  What role, if any, did Crane have with respect to those 919

11  payments?

12  A.  For those payments, nothing.

13  Q.  Why, if at all, are you discussing those payments with

14  Yvette and with Miles Guo?

15  A.  Because I was getting that information from management of

16  Medici, and I was helping Alex reconcile incoming funds.

17  Q.  What does it mean to reconcile the incoming funds?

18  A.  On my side just making sure that there's accountability on

19  each account, what is the balances, the number of payments that

20  came in, just really just balances and where the money is

21  missing or is.  Reconciling on the operation side was matching

22  each wire to a G/Club membership number.

23  Q.  And what is the purpose, if any, of doing that

24  reconciliation?

25  A.  To match a G/Club membership to the incoming wire that came

O6ABGUO4                    Khaled - Direct

1    in, to activate a membership versus not activate a membership.

2    Q.  Ms. Loftus, if we could go to 7 minutes and 20 seconds,

3    please.  Start playing from here.

4           (Media played)

5    Q.  Mr. Khaled, on that question, so when can move to our bank

6    account, did you have an understanding of what bank account

7    Miles Guo was referring to?

8    A.  Medici, G/Club account.

9           MS. MURRAY:  All right.  We can keep going.

10          (Media played)

11   Q.  Mr. Khaled, what did you understand to be the source of the

12   $18.2 million that is being discussed here?

13   A.  That's its members money, but some of them did not mention

14   G/Club on their memo.

15   Q.  And when you say members, can you just clarify what you're

16   referring to?

17   A.  The G/Club members.

18   Q.  What, if anything, is the problem with the members not

19   mentioning G/Club on their wire memos?

20          MS. SHROFF:  Objection.

21          THE COURT:  Is there an issue?

22   Q.  Mr. Khaled, based on what we've listened to so far, do you

23   recall discussing whether it was problematic that there were

24   some, I think they referred to as orphan wires?

25   A.  Yes.

O6ABGUO4                    Khaled - Direct

1   Q.  What did you understand orphan wires to refer to?

2   A.  That it had no information to where it should go, the

3   money.  There's no ultimate beneficiary listed on the wire when

4   going from one corresponding bank to another.

5   Q.  And why, if at all, would that be a problem in terms of

6   moving money?

7   A.  For operation wise if they have multiple accounts, they

8   don't know where to send the money to, so it gets blocked.  It

9   gets in the middle, unless and until either someone opens up an

10  investigation, and they send clarification to where the money

11  should go, to what ultimate beneficiary it should go, account.

12  The other problem is purpose.  They cannot match it with either

13  a reference number or anything, and that's a compliance issue

14  as well.

15          MS. MURRAY:  We can keep playing, Ms. Loftus.  Thank

16  you.

17          (Media played)

18  Q.  Mr. Khaled, what, if anything, do you understand the

19  reference to "farm" to mean there?

20  A.  Congregation or union of different members.

21  Q.  And with respect to this money in particular coming in for

22  G/Clubs memberships, what role, if any, did the farms have in

23  the G/Club member funds?

24  A.  There was some large wires that came in from farms which

25  were combination of multiple members pulled together for one

```
     O6ABGUO4                        Khaled - Direct
 1   transfer.
 2   Q.  Can you describe what you mean by multiple members?
 3   A.  More than one G/Club member or individual.
 4   Q.  If we can keep playing, please, Ms. Loftus.
 5          (Media played)
 6   Q.  Mr. Khaled, do you understand the reference to Long Island?
 7   A.  Yes.
 8   Q.  What is that a reference to?
 9   A.  David who lived in Long Island.
10   Q.  And the reference to Mountain of Spices farm, do you
11   recognize that reference?
12   A.  No, just the company, no details.
13   Q.  What interaction, if any, did you have with Long Island
14   David regarding these G/Club member funds?
15   A.  I had a few calls with Long Island David.  He also
16   supervised and helped gather KYC packages for the payment
17   facilitation that we had between Crane and G/Club.
18          MS. MURRAY:  We can keep going, Ms. Loftus.  Thank
19   you.
20          (Media played)
21   Q.  Mr. Khaled, putting you back into the time of this meeting
22   April 28, 2021, were you able to understand what Yvette and Guo
23   were talking about when they were speaking Mandarin?
24   A.  No.
25   Q.  Was there anyone translating for you?
```

O6ABGUO4                        Khaled - Direct

1    A.  No.

2    Q.  At any point during or after the meeting did Yvette or Guo

3    explain to you what they had been discussing during the

4    Mandarin portions of the meeting?

5    A.  No, just the pauses and the translation.

6    Q.  We can keep going, Ms. Loftus.  Thank you.

7              (Media played)

8    Q.  Mr. Khaled, the reference to the principal, who is that

9    referring to?

10   A.  Miles Guo.

11             MS. MURRAY:  Probably a good time to stop here, your

12   Honor.

13             THE COURT:  Yes, we do have to stop now.  It is 2:44.

14   Do not discuss the case amongst yourselves or with anyone else.

15   Don't permit anyone to discuss the case with you.  Do not read,

16   listen to or watch anything from any source concerning anything

17   touching on the subject matter of this trial.  Have a good

18   evening and I'll see you back ready to walk in the courtroom at

19   9:30 tomorrow morning.

20             (Continued on next page)

21

22

23

24

25

O6ABGUO4                          Khaled - Direct

1                (Jury not present)

2                THE COURT:  Sir, you may step out.  Don't discuss your

3      testimony.

4                (Witness temporarily excused)

5                THE COURT:   Is there anything before we reconvene

6      tomorrow morning?

7                MS. SHROFF:  Your Honor, I just wanted to make sure

8      for the record that the English transcriptions, we would not

9      agree that they would go back to the jury.  I didn't want to

10     raise that in the middle of the proceedings.  I just want to

11     make sure I preserve.  We can deal with it later.  We don't

12     need to do deal with it now.  I just want to make sure my

13     objection was preserved on that score.

14               THE COURT:  Your objection is that this aid should not

15     go back to the jury.  That's what your objection is?

16               MS. SHROFF:  Yes, your Honor.  I don't have any

17     objection to it being used as an aid.  That's all.

18               MS. MURRAY:  Your Honor, the stipulation between the

19     parties explicitly states that these are not aids, they are in

20     fact evidence.  It says that the exhibits listed under column B

21     which are the T-exhibits which are the ones we've introduced

22     into evidence are true and accurate transcriptions and

23     translations of the audio contained in the exhibit listed under

24     column A.  And the predecessor paragraph indicates that column

25     A contains audio in English and/or a foreign language.

O6ABGUO4                          Khaled - Direct

1          THE COURT:  So typically a transcription in English is

2     not considered evidence.  The actual recording is considered

3     evidence, and the transcription is considered an aid.  As far

4     as a translation, now that can constitute the evidence.  And so

5     if you want to revisit this tomorrow morning, we can do that.

6     Have a good evening.

7          MS. SHROFF:  Your Honor, I have one other issue to

8     raise.  At the sidebar I used a relative's name in a

9     hypothetical.  May I have that X'd out of the transcript?

10          THE COURT:  Yes.

11          MR. FINKEL:  Your Honor, one last thing just on

12     logistics.  Apologies.  Given next week we're off on Wednesday,

13     the government request that the Court consider, provided it's

14     okay with the jury and your Honor, that we extend the days of

15     Monday, Tuesday, Thursday and Friday by 30, 45 minutes.  I'm

16     sorry, Monday, Tuesday, Thursday, Friday.

17          THE COURT:  You're talking about this week or the

18     following week?

19          MR. FINKEL:  Next week, the week where we're off on

20     Wednesday.  Two reasons for that.  One, we're off on Wednesday,

21     so we're missing a day and we want to sort of catch up on some

22     time.  Two, as the government has indicated, we're running

23     behind just for a variety of reasons.  Some are in our control.

24     Some not in our control.  Some not in the parties' control.

25          And third, last week having the additional 45 minutes

O6ABGUO4                        Khaled - Direct

1   from the government's perspective, and I think from the Court's

2   perspective and the jury's perspective, the trial moved much

3   more efficiently.  Those 45 minutes are quite helpful.  So we

4   ask the Court consider, provided it's okay with your Honor and

5   the jury, to extend next week 30, 45 minutes each day.

6          MS. SHROFF:  Your Honor, actually, we would object to

7   that.  It was a colossal hardship for us.  The 9:00 time

8   absolutely does not -- the earlier start time does not work.

9   We're happy to revisit this down the road.  But the government

10  is -- I want to just remind the Court.  Originally, the

11  government had an estimate.  When this trial date was set, we

12  asked for two extra weeks.  The government objected, and we

13  didn't have that time.  This time has been set.  We have other

14  commitments.  I especially have other commitments.  And I don't

15  think that is properly fair to those of us who are solo

16  practitioners, it is a true hardship.  So at least on my own

17  behalf, and I have not consulted with anyone else, I would most

18  respectfully ask the Court not to do that.

19         THE COURT:  I assume though that you don't have

20  commitments, other cases --

21         MS. SHROFF:  I do.

22         THE COURT:  -- early in the morning?

23         MS. SHROFF:  I do.

24         THE COURT:  You have to appear in court before you

25  come to this courtroom?

O6ABGUO4                        Khaled - Direct

1          MS. SHROFF:  I have prison calls.  I have meetings

2     that I have set up, and I have a child who's only home for the

3     summer break.  And I already missed a vacation with him because

4     they wouldn't give me the two weeks extension.  So, yes, for

5     all those reasons, your Honor, I would most respectfully ask

6     you not to do that to us.

7          THE COURT:  I'd like the government to make a more

8     specific proposal and to discuss this with defense counsel.

9          MR. FINKEL:  Absolutely.  Of course, your Honor, the

10    government is fine extending the 30 to 45 minutes in the

11    afternoon.  We all have families.  We all have other

12    commitments. There are three law firms behind us.  I'm sure

13    they could figure it out.  The alternative unfortunately, your

14    Honor, is we're going to drag -- especially if the defense has

15    a two weeks' defense case, quite deep into July.  And so the

16    government believes that extending the day by 30, 45 minutes

17    would be quite helpful.  Candidly, it may make sense -- and we

18    could talk about this later -- but it may make sense for there

19    to be some full days, assuming it's okay with your Honor and

20    the jury, just again to keep us on track.

21          THE COURT:  It's something for me to consider, a

22    regular day with an hour break between one and two.  So I'd

23    like you all to discuss this because I do understand the need

24    to have some additional time because we are behind.  So please

25    discuss this amongst yourselves.  I would hope that you'd come

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6ABGUO4                        Khaled - Direct

1    back with a joint proposal.  Thank you.  Have a good evening.

2              (Adjourned to June 11, 2024 at 9:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                             Page

 3    MARGARET MURPHY

 4   Cross By Mr. Kamaraju  . . . . . . . . . . .1856

 5    GIACOMO MATTIOLI

 6   Direct By Mr. Horton . . . . . . . . . . . .1865

 7   Cross By Ms. Shroff  . . . . . . . . . . . .1886

 8   HAITHAM KHALED

 9   Direct By Ms. Murray . . . . . . . . . . . .1901

10                        GOVERNMENT EXHIBITS

11   Exhibit No.                                 Received

12    802 and BR440  . . . . . . . . . . . . . .1872

13    BR363-364, 367-375, 380, 382, 384, 387, . .1946

14             392, 396-398, 1506-1509,

15             1511-1519; GC131, 498,

16             500-502, 507-508; SW2002,

17             2005, 2008, 2009, 2021, 2027,

18             2030, 2032, 2035, 2038, 2040,

19             2042, 2045, 2046, 2050-2055,

20             2057, 2061, 2068, 2070, 2076,

21             2077, 2083

22    404, 404-T, 405, 405-T, 406, 406-T, . . . .2005

23             408, 408-T, 409, 409-T, 411,

24             411-T, 412, 412-T, 413-A,

25             413A-T and 417, 417-T
```

```
 1   Stip 16    . . . . . . . . . . . . . . . .2005

 2   109    . . . . . . . . . . . . . . . . . .1943

 3   128    . . . . . . . . . . . . . . . . . .1919

 4   162    . . . . . . . . . . . . . . . . . .1917

 5   BR399    . . . . . . . . . . . . . . . . .1922

 6   BR1601    . . . . . . . . . . . . . . . . .1884

 7   BR1604    . . . . . . . . . . . . . . . .1881

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```