O6BBGUO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

       v.                          23 Cr. 118 (AT)

MILES GUO,

             Defendant.          Trial
------------------------------x
                                  New York, N.Y.
                                  June 11, 2024
                                  9:02 a.m.

Before:


                 HON. ANALISA TORRES,

                                 District Judge
                               -and a Jury-

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MICAH F. FERGENSON
     RYAN B. FINKEL
     JUSTIN HORTON
     JULIANA N. MURRAY
     Assistant United States Attorneys

SABRINA P. SHROFF
     Attorney for Defendant

PRYOR CASHMAN LLP
     Attorneys for Defendant
BY:  SIDHARDHA KAMARAJU
     MATTHEW BARKAN

ALSTON & BIRD LLP
     Attorneys for Defendant
BY:  E. SCOTT SCHIRICK

O6BBGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Michael Gartland, Paralegal Specialist, USAO
Geoffrey Mearns, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6BBGUO1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Good morning.  Please make your

3          appearances.

4                    MS. MURRAY:  Good morning, your Honor.  Juliana

5          Murray, Ryan Finkel and Justin Horton.  We'll also be joined by

6          Micah Fergenson on behalf of the United States. We're joined at

7          counsel's table by Paralegal Specialist Jeff Mearns.

8                    MR. KAMARAJU:  Good morning, your Honor.  Sidhardha

9          Kamaraju, Scott Schirick and Claire Tilden on behalf of

10         Mr. Guo, and Mr. Guo is with us at counsel's table.

11                   THE COURT:  Please be seated.  Have you resolved the

12         issue of the transcription?

13                   MS. MURRAY:  Not yet, your Honor.  We attempted to

14         discuss with defense counsel after the trial day yesterday.  We

15         don't have resolution yet, but we will speak with them again

16         before the jury comes in at 9:30 today.

17                   THE COURT:  I wanted to clarify something.  I may have

18         left you with the impression that the transcript as an aid

19         cannot go back into the jury room.  That's not the case.  It

20         can go back into the jury room as an aid.  It's just that

21         typically I have ruled that they're to rely on the actual

22         recording.  However, the parties could agree that they may

23         relay equally on the transcription.

24                   MS. MURRAY:  Yes, your Honor.  We will continue to

25         discuss with defense counsel.  This is a situation where we do

O6BBGUO1

1    have a stipulation, and our understanding was that the parties

2    stipulated that the transcripts, including the English were

3    admitted entirely as evidence.  We appreciate your Honor's

4    clarification.  We certainly would want the transcripts to go

5    back to the jury in any event, whether as evidence or as an aid

6    because otherwise the Mandarin translation, which is evidence,

7    could not be understood without context.  But again we'll

8    engage with defense counsel, and we'll come back to the Court

9    on this issue.

10          THE COURT:  All right.  Is there anything further?

11          MS. MURRAY:  With respect to scheduling, your Honor.

12   We've spoken with defense counsel.  If it's okay with the Court

13   and with the jury, we would propose that Wednesday through

14   Friday this week we sit an additional 15 minutes until 3:00.

15   We're still discussing potential schedule change for next week,

16   and we would propose to come to the Court hopefully tomorrow

17   morning with a joint proposal.

18          THE COURT:  All righty.  Is there anything else?

19          MR. KAMARAJU:  Not from us, your Honor.

20          MS. MURRAY:  No, your Honor.

21          THE COURT:  Thank you.

22          (Recess)

23          (Jury not present)

24          THE COURT:  Please have the jurors brought in.

25          THE LAW CLERK:  Jury entering.

O6BBGUO1

1          (Jury present)

2          THE COURT:  Good morning, jurors.  Please be seated.

3     And, counsel, could you approach.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO1

1                (At the sidebar)

2                THE COURT:  I just wanted to ask which Wednesday,

3    Thursday and Friday you want the extra 15?

4                MS. MURRAY:  This week.

5                THE COURT:  I'll ask them now.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Members of the jury, we are running a bit

3   behind.  And I wanted to ask if for tomorrow, Thursday and

4   Friday you could stay until 3 p.m.  Is that all right?  Anybody

5   who cannot stay until 3 p.m.?  All right.  So that's what we'll

6   do.  Now we're going to continue with the direct examination of

7   Mr. Khaled.  Remember, sir, that you're still under.

8   HAITHAM KHALED, resumed.

9   DIRECT EXAMINATION CONTINUED

10  BY MS. MURRAY:

11  Q.  Mr. Khaled, just to remind you, could you keep the

12  microphone in front of your mouth so the jurors can hear you.

13  A.  Sure.

14  Q.  When we left off yesterday, we were talking about certain

15  recordings that you had made.  Do you recall that?

16  A.  Yes.

17  Q.  And you testified yesterday that approximately $100 million

18  had came into Crane's account in March and April of 2021.

19          What, if anything, at the time was your reaction to

20  that volume of incoming wire activity?

21  A.  I was nervous because it was just a large sum amount that

22  was in my account without any clear instructions what to do

23  with it.

24  Q.  Why, if at all, were you nervous about that amount of

25  money?

O6BBGUO1                         Khaled- Direct

1    A.   It was a lot of liability.   It was over $100 million, just

2    concern of what's the status on what's going to happen,

3    especially there hasn't been I think accounts that are open for

4    G/Club or any other entities, so.

5    Q.   Did there come a time, if ever, when you were asked to

6    transfer that money that was in Crane's accounts to accounts

7    held in the name of another company?

8    A.   Yes.

9    Q.   What company?

10   A.   Himalaya Exchange.

11   Q.   And to your knowledge who, if anyone, controls the Himalaya

12   exchange?

13   A.   That was William Je.

14   Q.   Were the accounts you were asked to transfer the money to

15   held in the name of the Himalaya Exchange?

16   A.   There was talks to open an account for Crane with the

17   Himalaya Exchange which was a fund to invest in crypto.

18   Q.   When you say crypto, what are you referring to?

19        THE COURT:   One moment, please.   You said there was

20   talks to open an account for Crane with the Himalaya Exchange

21   which was a fund to invest in, if you could please explain what

22   you mean by that?

23        THE WITNESS:   I was requested to open an account for

24   Crane with the Himalaya Exchange as a fund, as an investment

25   fund.

O6BBGUO1                        Khaled- Direct

1              THE COURT:  I am not following what you mean.  Perhaps

2     you could ask some questions to clarify that.

3              MS. MURRAY:  Yes, your Honor.

4     Q.  Mr. Khaled, so we're talking about a hundred million or so

5     dollars that are in Crane's accounts in March and April of

6     2020, correct?

7     A.  Yes.

8     Q.  And what was your understanding, if anything, of the source

9     of those funds?

10    A.  It was a mix of members for G/Club, also investors.

11    Q.  What investors?

12    A.  There were two entities that were going to be invested in.

13    One was a private offering for tech company and one was

14    H Dollar.

15    Q.  Focusing on the first, what was the tech company relating

16    to the private offering?

17    A.  It was a tech company that was going to be created in the

18    Cayman Islands for a private offering to establish a tech

19    platform.

20    Q.  Do you know the name of that tech company?

21    A.  I don't remember it, no.

22    Q.  Who, if anyone, controlled that tech company?

23    A.  It wasn't a control, but the creation of that tech company

24    was being done with Yvette and an attorney in Cayman.

25    Q.  Who, if anyone, did you discuss the tech company with?

O6BBGUO1                          Khaled- Direct

1    A.  Just Yvette and the attorneys.

2    Q.  So that was the first category of investor money that you

3    mentioned.  What was the second category?

4    A.  It was an H Dollar.

5    Q.  What's H Dollar?

6    A.  It was a cryptocurrency that was being established.

7    Q.  Who told you that?

8    A.  Yvette.

9    Q.  So the request that you mention to transfer the funds from

10   Crane's account, who, if anyone, did you discuss that request

11   to transfer the funds with?

12   A.  William Je.

13   Q.  What were those discussions?

14   A.  Opening up an account for Crane to invest in H Dollar.

15   Q.  And to be clear, William Je asked Crane to invest in H

16   Dollar using what funds?

17   A.  The funds that were with Crane.

18   Q.  What, if anything, was your reaction to the request to

19   transfer the funds that Crane's held to the Himalaya Exchange?

20   A.  I told them I cannot do it because Crane cannot be an

21   investor if it's not instructed to.

22   Q.  What do you mean if it's not instructed to?

23   A.  If it's not instructed by the people that sent the money to

24   Crane.

25   Q.  Did there come a time when Crane entered into a legal

O6BBGUO1                          Khaled- Direct

1    agreement with G/Clubs?

2    A.  Yes.

3    Q.  What type of agreement?

4    A.  Payment facilitation agreement/escrow agreement.

5    Q.  Can you describe what that means?

6    A.  That means Crane will receive money for G/Club on behalf of

7    members, and it will conduct a compliance, a KYC check, and

8    then transfer the money to G/Club.

9    Q.  Ms. Loftus, if we could please publish what's in evidence

10   as Government Exhibit BR-1515.

11          Mr. Khaled, do you recall the effective date of the

12   payment facilitation agreement with G/Clubs?

13   A.  Effective date was November of 2020.

14   Q.  And when did you enter into the payment facilitation

15   agreement with G/Clubs?

16   A.  In May 2021 I think.

17          MS. SHROFF:  Did you say May 2021?

18          THE WITNESS:  Yes.

19   Q.  Why, if at all, was the effective date of the payment

20   facilitation agreement backdated from the date that it was

21   signed?

22   A.  To capture the entire amount that came into Crane.  And

23   until that time, that's when everyone agreed on how to properly

24   transfer this money.

25   Q.  What do you mean everyone agreed?  To whom are you

1    referring?

2    A.  I mean the discussion was done with Miles Guo, Mileson,

3    in-house attorney Ana, my attorneys.  There was discussion with

4    William about it as well and a gentleman named David Long

5    Island.

6    Q.  Looking at this, is this the payment facilitation agreement

7    you mention between Crane and G/Club?

8    A.  Yes.

9    Q.  Ms. Loftus, if we could zoom in on the top portion, please.

10             Looking at the first line, Mr. Khaled, can you read

11   the effective date of this agreement?

12   A.  November 23, 2020.

13   Q.  And then if we could go, Ms. Loftus, please, and look at

14   the date that this was signed.

15             Mr. Khaled, what date did you sign this agreement on

16   behalf of Crane?

17   A.  May 12, 2021.

18   Q.  What, if any, fee was Crane entitled to collect under the

19   payment facilitation agreement?

20   A.  Two percent fee.

21   Q.  Two percent of what?

22   A.  Of the cleared amount, which is a hundred -- it was 137

23   million at that point.

24   Q.  What do you mean by the cleared amount?  If you could just

25   break that down for us.

O6BBGUO1                        Khaled- Direct

1    A.  Any payments that went through the process and a

2    KYC/indemnity package was received from the sender with

3    instructions where the money should go, that amount, that

4    transfer was considered a cleared amount.  And everyday as many

5    packages we had received, there will be a total amount that

6    goes out to G/Club.

7    Q.  Ms. Loftus, we can take that down.

8            So, Mr. Khaled, once Crane cleared funds, what, if

9    anything, happened with that money that was then held in Crane

10   bank accounts?

11   A.  It went to G/Clubs Morgan Stanley account.

12   Q.  How, if at all, did you know what account to send the

13   cleared funds to?

14   A.  I was told that was the only Morgan Stanley account open

15   for G/Club.  G/Club had no other accounts.  And the account was

16   opened through me, so that's the account that we had and that

17   was in the agreement, that was in the instructions with Ana.

18   Q.  How, if at all, did the parties decide on a two percent fee

19   for Crane for any cleared funds?

20   A.  It was discussed with Mileson that there needs to be a

21   financial transaction and an arm's length setup where Crane

22   would receive a monetary compensation for the work that it's

23   doing for G/Club.  A research was done on the average escrow

24   fee, and the two percent was the determined and agreed on.

25   Q.  What do you mean by arm's length?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6BBGUO1                       Khaled- Direct

1    A.   Having a separate company where it's not considered just

2    one company, just separate, separate management where the role

3    of compliance is being performed properly.

4    Q.   And at the time that Crane entered into the payment

5    facilitation agreement with G/Clubs, at what office location

6    were you working?

7    A.   I was still at 162, 64th Street the townhouse.

8    Q.   At the time that Crane entered into the payment

9    facilitation agreement with G/Clubs, what entity was paying

10   your salary?

11   A.   Lexington.

12   Q.   And what entity formally employed you?

13   A.   Saraca.

14   Q.   Between May and June of 2021, approximately what volume of

15   G/Club member funds did Crane clear from its accounts?

16   A.   Approximately 97 million, something like that.

17   Q.   And what was the approximate amount of the two percent fee

18   that Crane was entitled to for clearing those funds?

19   A.   About two million.

20   Q.   Did there come a time when G/Club terminated the payment

21   facilitation agreement?

22   A.   Yes.

23   Q.   Approximately when was that?

24   A.   I think June or July of 2021.

25   Q.   What basis, if any, did G/Clubs provide for terminating

O6BBGUO1                          Khaled- Direct

1   that agreement?

2   A.   They said that I breached the contract and I was taking too

3   long to clear funds.

4   Q.   Who, if anyone, said that?

5   A.   There's a couple of calls where there was a complaint that

6   money needs to be transferred now, needs to be transferred now.

7   It was done by Miles Guo, David from Long Island, some

8   employees like Ming that worked with us in the townhouse.

9   Yvette got on a couple of calls.

10  Q.   And after G/Club terminated the payment facilitation

11  agreement, what, if anything, happened next with respect to

12  Crane?

13  A.   After the termination, G/Club sued Crane through an

14  arbitration process.

15  Q.   We'll turn to the arbitration in a moment.  After the

16  payment facilitation agreement was terminated, what, if

17  anything, happened with the two percent service fees that Crane

18  held?

19  A.   I transferred it to my personal account.

20  Q.   Why?

21  A.   I was entitled to it.

22  Q.   Was that approximately $2.7 million?

23  A.   Yes.

24  Q.   After you transferred that money to your personal account,

25  what, if anything, did you do with it?

O6BBGUO1                          Khaled- Direct

1   A.   I purchased properties, investment properties.

2   Q.   In whose name did you purchase those properties?

3   A.   My wife and entities that are owned by my wife.

4   Q.   Why, if at all, did you purchase those properties in your

5   wife's name or in the names of entities owned by your wife?

6   A.   Wanted to make sure that if anything, any lawsuits or

7   anything might happen to me, that the properties are in someone

8   else's name that I trust.

9   Q.   Why?

10  A.   I was fearing something might happen to me physically.  I

11  have a family, wanted to protect them and give them at least

12  financial security.

13  Q.   And what, if anything, did you agree to do under your

14  non-prosecution agreement with the government with respect to

15  that $2.7 million?

16  A.   I have to forfeit the entire thing.

17  Q.   Does that include forfeiting the properties that you

18  purchased with those funds?

19  A.   Yes, ma'am.

20  Q.   What is the current status of that forfeiture?

21  A.   One property was sold already.  One is pending, and the

22  rest are for sale.

23  Q.   And to your understanding under your non-prosecution

24  agreement, is that a continuing obligation until you forfeited

25  the full amount of 2.7 million?

O6BBGUO1                        Khaled- Direct

1   A.  Yes, ma'am.

2   Q.  Ms. Loftus, can we please pull up Government Exhibit 417.

3   It's a recording that we were listening to yesterday,

4   Mr. Khaled.

5          I'd like to start at the 15 minute -- excuse me,

6   Ms. Loftus.  Actually at the seven minute and 20 second

7   timestamp.  This is page eight in the transcript.  Ms. Loftus,

8   I think we left off a bit further along.  Can we start at the

9   nine minute and 30 second mark, and we can play that.  Thank

10  you.

11         (Media played)

12  Q.  Mr. Khaled, can you just remind us in this conversation

13  what is happening?

14  A.  Miles is trying to find out missing money that, that he was

15  told was transferred; but that missing money was in transit

16  stuck with Medici correspondent bank.

17  Q.  And this conversation was a meeting among several people

18  that you participated in remotely, correct?

19         MS. SHROFF:  Objection to the leading, your Honor.  We

20  covered all this yesterday.

21         MS. MURRAY:  Your Honor, I'm just trying to remind the

22  jury where we were yesterday.

23         THE COURT:  You mentioned a call; is that correct?

24         THE WITNESS:  Yes.

25         THE COURT:  And who was present on the call?

1          THE WITNESS:  Miles Guo, Yvette Wang, Alex

2    Hadjicharalambous which is an employee in the townhouse with

3    us, myself on the call.

4          THE COURT:  Is that a phone call or a video

5    conference?

6          THE WITNESS:  Alex and Yvette were in the townhouse.

7    I was in my house on a video and Miles Guo was also on a call.

8    I don't know if it was a video. I couldn't see.

9          THE COURT:  And the figure 18.2, is that the missing

10   money that you were referring to?

11         THE WITNESS:  Yeah, he wanted a reconciliation of a

12   total of 32 million, and 18.2 million was the missing part.

13         THE COURT:  You may continue.

14   BY MS. MURRAY:

15   Q.  What, if anything, was the source of that $18.2 million?

16         MS. SHROFF:  Objection, asked and answered yesterday.

17         THE COURT:  You may answer.

18   A.  So it's transferred by individuals to G/Club without any

19   reference to the beneficiary, so it did not say G/Club or did

20   not have any reference, just monies transferred to Medici.

21         MS. MURRAY:  Ms. Loftus, we can continue playing.

22         (Media played)

23         MS. MURRAY:  We can pause, Ms. Loftus.

24   Q.  Mr. Khaled, what, if anything, did you discuss with Miles

25   Guo about the amount of money beyond the 18 million that he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    believed was missing?

2    A.  I gave him a reconciliation of what -- how much G/Club had

3    at Medici for that amount.

4            MS. MURRAY:  Ms. Loftus, can we go to 15 minutes and

5    50 seconds, please.  This is on page 13 of the transcript.

6            (Media played)

7            MS. MURRAY:  Pause, Ms. Loftus, please.

8    Q.  Mr. Khaled, who is Limarie that you referred to there?

9    A.  She was hired as a CEO for G/Club operations in Puerto

10   Rico.

11   Q.  And you reference open tickets, what does that refer to?

12   A.  These are complaints similar to a customer service case.

13   Q.  Complaints by whom?

14   A.  People that sent the money.

15   Q.  People that sent what money?

16   A.  The 18.2 million, we're assuming that it's the 18.2 million

17   that was sent to G/Club, per Medici for G/Club.

18   Q.  And you mentioned Orbit --

19           MS. SHROFF:  Actually, your Honor.  I'm going to move

20   to strike anything with assuming.  If he knows, he knows.  And

21   if he doesn't know, he doesn't know.

22           THE COURT:  Yeah.  He shouldn't be called on to, to

23   make assumption.

24           MS. MURRAY:  Could we have a read back of Mr. Khaled's

25   last answer, please?

1          MS. SHROFF:  That's the one I objected to.

2          MS. MURRAY:  If we could read back until the point

3    that it was struck. I understand that you were striking after

4    assuming.

5          (Record was read)

6    Q.  Mr. Khaled, you said that it had to do with people

7    complaining, who were those people?

8    A.  People that wired monies.

9    Q.  Wire money for what purpose?

10         MS. SHROFF:  Objection.  He just testified he didn't

11   know.

12         THE COURT:  If you know the purpose that they wired

13   the money, you can state it.

14   A.  To G/Club.

15   Q.  Why, if at all, did those people wire money to G/Club?

16         MS. SHROFF:  Same objection.

17         THE COURT:  If you know, you may answer.

18   A.  I don't know why.

19   Q.  You mentioned Orbit with respect to complaints, what is

20   Orbit?

21   A.  Orbit was the customer service company servicing G/Club.

22         MS. MURRAY:  We can continue, Ms. Loftus.

23         (Media played)

24         MS. MURRAY:  Pause, please, Ms. Loftus.

25   Q.  Mr. Khaled, there was a reference in what Yvette just said

O6BBGUO1                    Khaled- Direct

1   to CCP.  What do you understand that to refer to?

2   A.  Chinese Communist Party.

3   Q.  And at the time of this meeting or call April 28, 2021,

4   what was your understanding, if anything, about whether the

5   banking issue related to the Chinese Communist Party?

6   A.  In many events I was told by Yvette, in-house attorneys and

7   Miles Guo that the CCP is trying to interrupt business flow for

8   any of the G entities.

9   Q.  Approximately when did Yvette, Miles Guo, and attorneys

10  tell you that?

11  A.  Since I started working with Yvette and Miles.

12  Q.  And that's in August of 2020?

13          MS. SHROFF:  Objection to the leading.  It's asked and

14  answered.

15          THE COURT:  Overruled.  You may answer.

16  A.  Yes.

17  Q.  When you started working at Saraca, did you believe that

18  explanation regarding the communist party?

19  A.  I did.

20  Q.  Why?

21  A.  It was a good theory, good story.  There's a lot of news

22  about Chinese versus America, so it made sense then.

23  Q.  Did there come a time when you stopped believing that the

24  communist party was responsible for the G series banking

25  issues?

O6BBGUO1                          Khaled- Direct

1   A.  Yes.

2   Q.  Around when was that?

3   A.  April, May of 2021.

4   Q.  Why, if at all, did your view change?

5   A.  Because there wasn't really anything there to help and

6   support that mission that was happening between G/Club and the

7   other entities.

8   Q.  What do you mean by that?

9   A.  Initially it was a G/Club membership to help individuals

10  access U.S. services, resources.  By April, May, there was a

11  lot of money between G/Club accounts, Crane's accounts, but

12  none of the services that were going to -- that were told will

13  be provided was in place.

14          G/Club still had very few employees, zero to none

15  services, so it wasn't real anymore what we were doing.

16          MS. MURRAY:  Ms. Loftus, we can continue playing,

17  please.

18          (Media played)

19          MS. MURRAY:  Pause, please.

20          MS. SHROFF:  Your Honor, I apologize.  The English

21  portion needs to be translated from the recording for Mr. Guo.

22  I apologize.

23          THE COURT:  Of course.  The interpreters need to

24  translate whatever is stated in English including on the

25  recording.

1            THE INTERPRETER:  Of course.

2            MS. SHROFF:  Thank you, your Honor.

3    Q.  Mr. Khaled, in that portion of the recording that we just

4    listened to, who, if anyone, is giving instructions regarding

5    what G/Clubs should do?

6    A.  Miles Guo.

7    Q.  And who else?

8    A.  And Yvette.

9            MS. MURRAY:  Ms. Loftus, can we please go to the 19

10   minute and 45 second mark, start playing there.

11           (Media played)

12           MS. MURRAY:  Can you pause, Ms. Loftus.

13   Q.  Mr. Khaled, do you know what contract is being referred to

14   in this portion of the recording?

15   A.  The contract is a loan agreement in order to facilitate a

16   wire transfer for 20 or 50 million.

17   Q.  Do you know who the parties to that loan agreement were?

18   A.  I think it was Fiesta.

19   Q.  What is the full name of that entity?

20   A.  I don't recall the full name.  Fiesta Properties, something

21   like that.

22           MS. MURRAY:  Ms. Loftus, we can continue.

23           (Media played)

24           MS. MURRAY:  Can you pause, Ms. Loftus.

25   Q.  Mr. Khaled, in those discussions which were translated in

O6BBGUO1                        Khaled- Direct

1    the captions from Mandarin, was there any reference to the

2    communist party with respect to potential account closures?

3    A.  No.

4              MS. MURRAY:  We can keep playing.

5              (Media played)

6              MS. MURRAY:  Can you pause, Ms. Loftus, please.

7    Q.  Mr. Khaled, what foundation do you understand to be

8    referenced in these conversations?

9    A.  It's the Himalaya Fund.

10   Q.  And whose foundation is that, if anyone's?

11   A.  Himalaya Fund was for -- controlled by William Je.

12             MS. MURRAY:  We can continue, please, Ms. Loftus.

13             (Media played)

14             MS. MURRAY:  Pause, Ms. Loftus.

15   Q.  Mr. Khaled, do you recognize the voice of the person who is

16   added to this call indicated here as Yu?

17   A.  That's William Je.

18             MS. MURRAY:  Thank you, Ms. Loftus.  You can continue.

19             (Media played)

20             MS. MURRAY:  We can pause, Ms. Loftus, and if you can

21   go to 26 minutes and 17 seconds.  This is on page 21 of the

22   transcript.

23             (Media played)

24             MS. MURRAY:  Can you pause, please.  If we could go

25   back just a moment to the reference to Alex.

O6BBGUO1                          Khaled- Direct

1              (Media played).  You can pause.

2    Q.  Mr. Khaled, who, if anyone, do you understand that Alex

3    reference to be?

4    A.  Alex Hadjicharalambous.

5    Q.  Did you have an understanding of whether Alex was a formal

6    employee of G/Club?

7    A.  He was an employee of G Fashion, but worked on G/Club.

8    Q.  What were Alex's duties and responsibilities with respect

9    to G/Club?

10   A.  His title was controller, and he was in charge of

11   accounting, specifically the reconciliation of member IDs with

12   the money that comes in.

13   Q.  And earlier there was a reference to a Mr. He, did you hear

14   that or read that?

15   A.  Yes.

16   Q.  Who do you understand that to be?

17   A.  The ultimate beneficiary of G/Club and its parent companies

18   Jovial.

19   Q.  And what is his full name?

20   A.  Haoran He.

21   Q.  We can continue for a moment, Ms. Loftus.

22              (Media played)

23   Q.  Pause please.

24              Mr. Khaled, in that portion that we justly listened

25   to, who, if anyone, was Yvette referencing with respect to

O6BBGUO1                        Khaled- Direct

1  potential investigation into the transfers?

2  A.  I'm sorry.  Can you go back.

3  Q.  If we can go back just a moment, Ms. Loftus.

4          (Media played)

5  Q.  Pause there.

6  A.  The regulatory authorities investigate.

7  Q.  Was there any reference in this portion of the conversation

8  to the CCP?

9  A.  No, ma'am.

10 Q.  We can continue, Ms. Loftus.

11         (Media played)

12 Q.  Can you pause, Ms. Loftus.  Just go back one moment.

13         Mr. Khaled, can you read the second sentence here in

14 the portion that Yvette just spoke?

15 A.  Do you think a normal company would do this.

16 Q.  All right.  We can continue.

17         (Media played)

18 Q.  Can you pause, Ms. Loftus.

19         Mr. Khaled, in this discussion regarding the hundred

20 million dollars that's in Crane's accounts, is there any

21 discussion regarding the services that G/Club provides to its

22 members?

23 A.  No.

24         THE COURT:  Mr. Khaled, would you remind me who is

25 Mr. Yu?

O6BBGUO1                        Khaled- Direct

1              THE WITNESS:  William Je.

2    Q.  Ms. Loftus, we can continue.

3              (Media played)

4    Q.  Mr. Khaled, you joined this meeting by video; is that

5    correct?

6    A.  Yes.

7    Q.  What, if anything, happened after the portion of the

8    meeting that we just listened to?

9    A.  Yvette threw the remote control onto the TV where Guo was.

10   Q.  How do you know that?

11   A.  I saw it and heard the crack.  And then when I came to the

12   office the second day, I saw the TV cracked.

13   Q.  Ms. Loftus, if we could turn please to Government Exhibit

14   404 and 404-T.

15             MS. MURRAY:  Your Honor, if I may approach Mr. Khaled

16   with a physical binder of the transcripts as well.

17             THE COURT:  You may.

18   Q.  Mr. Khaled, 404-T is up on the screen.  You're welcome to

19   follow along in the binder.

20             What was the date of the conversation that was

21   recorded here?

22   A.  May 4, 2021.

23   Q.  And the time?

24   A.  6:13, sorry 5:13.

25   Q.  5:13 p.m.?

1   A.  Yes.

2   Q.  We can go to the next page.

3          Ms. Loftus, if we could start playing -- excuse me.

4   Go back up, please.  Who are the participants to this call?

5   A.  Myself and William Je.

6   Q.  We can go to the next page and start playing the recording,

7   please.

8          (Media played)

9   Q.  Can you pause, Ms. Loftus.

10          Mr. Khaled, this call was approximately one week after

11  the call we just listened to; is that correct?

12  A.  Yes.

13  Q.  And the funds that are being discussed during this call

14  between you and William Je, are those the same funds that were

15  discussed during the earlier call?

16  A.  No.

17  Q.  What is the difference?

18  A.  The other funds that were discussed was money that was at

19  G/Club Morgan Stanley account that was collected directly

20  through G/Club and was parked at Morgan Stanley's account.

21  These funds were the monies transferred from November to April,

22  May to Crane's account.

23  Q.  And in these discussions with Mr. Je, why, if at all, is

24  the purchase order number or the membership number relevant to

25  Crane's work?

O6BBGUO1                    Khaled- Direct

1  A.  Because in order to match that this money is actually for

2  G/Club, there had to be a membership number and a membership

3  agreement signed by the members.

4  Q.  Ms. Loftus, we can continue playing.

5            (Media played)

6  Q.  You can pause, Ms. Loftus.

7            Mr. Khaled, what, if anything, is your understanding

8  of what the reference to shares of the future GTV means?

9  A.  They would get a stake in GTV, like stock shares of the

10  private offering.

11            MS. MURRAY:  All right.  We can continue, Ms. Loftus.

12            (Media played)

13  Q.  Can you pause, Ms. Loftus.

14            Mr. Khaled, in that conversation that you just had,

15  the reference to a different explanation the prior week, with

16  whom, if anyone, had you been discussing these funds in advance

17  of this call we're listening to?

18  A.  Yvette, Miles and Mileson.

19            (Continued on next page)

20

21

22

23

24

25

1   BY MS. MURRAY:

2   Q.  And at the time of this call on May 4, 2021, what was your

3   understanding of what these funds represented?

4   A.  I was still confused.  I did not know.

5           MS. SHROFF:  I'm sorry.  I didn't catch that.

6           THE WITNESS:  I was still confused.  I did not know at

7   that time.

8           MS. MURRAY:  Ms. Loftus, if we could please go to

9   Government Exhibits 405 and 405-T.

10  Q.  And this is in your binder as well if you want to find it,

11  Mr. Khaled.

12          There we go.  What is the date of this call?

13  A.  May 4, 2021.

14  Q.  The same date as the call we just listened to?

15  A.  Yes.

16  Q.  And what is the time?

17  A.  5:42.

18  Q.  And who are the participants in this call?

19  A.  William Je, myself, and David from Long Island.

20          MS. MURRAY:  Ms. Loftus, if we could please go to the

21  6:53 mark, and that's page 10 of the transcript.

22          We could start playing the audio, Ms. Loftus.

23          (Audio played)

24          MS. MURRAY:  Sorry, Ms. Loftus.  It's page 5.

25          (Audio replayed)

| 1 | MS. MURRAY:  Can we pause, please, Ms. Loftus. |

1          MS. MURRAY:  Can we pause, please, Ms. Loftus.

2     BY MS. MURRAY:

3     Q.  Mr. Khaled, what role, if any, did Long Island David have

4     at G Club?

5     A.  No role.

6     Q.  Why, if at all, was he involved in these discussions

7     regarding the movement of G Club money?

8     A.  It was for facilitating the package, the payment

9     facilitation package that Crane requested from the farms.

10    Q.  From which farms in particular?

11    A.  Didn't specify exactly which one.

12    Q.  And who, if anyone, introduced Long Island David to these

13    conversations regarding the money held in Crane's account?

14    A.  Yvette Wang.

15         MS. MURRAY:  All right.  Ms. Loftus, if we could

16    please now go to Government Exhibits 406 and 406-T.

17    Q.  Mr. Khaled, what's the date of this recorded call?

18    A.  May 6, 2021.

19    Q.  And the time?

20    A.  9:43 a.m.

21    Q.  That's two days after the call we just listened to, right?

22    A.  Yes, ma'am.

23    Q.  Who are the participants?

24    A.  Mileson Guo and myself.

25         MS. MURRAY:  All right.  Ms. Loftus, if we could

O6B1GUO2                          Khaled - Direct

1    please start at the 8:35 mark.  This is page 8 of the

2    transcript, near the bottom of that page.

3              (Audio played)

4    Q.  What Ana is that referring to?

5    A.  Ana the attorney, in-house attorney for G Club Operation in

6    Puerto Rico.

7              MS. MURRAY:  All right.  We can continue, Ms. Loftus.

8              (Audio continued)

9              MS. MURRAY:  Can you pause, Ms. Loftus.

10   Q.  Mr. Khaled, what did you mean when you said "it keeps

11   changing"?

12   A.  The purpose of the money keeps changing.

13             MS. MURRAY:  We can continue, Ms. Loftus.

14             (Audio continued)

15             MS. MURRAY:  Can we pause, Ms. Loftus.

16   Q.  Mr. Khaled, there's a reference to you receiving 1300.

17   What does that mean?

18   A.  1300 wires.

19             MS. MURRAY:  All right.  We can continue.

20             (Audio continued)

21             MS. MURRAY:  Can you pause, Ms. Loftus.

22   Q.  Mr. Khaled, the reference to Hamilton checking its box,

23   what does that mean?

24   A.  So Hamilton, to receive money from Crane, they needed to

25   conduct KYC on Crane, so that is what the checking the boxes

O6B1GUO2                         Khaled - Direct

1    is.

2    Q.  With respect to the various stated purposes we've seen for

3    this fund, what role, if any, did Hamilton play?

4    A.  Hamilton was the entity that is receiving money for the H

5    Dollar.

6           MS. MURRAY:  All right.  We can continue, Ms. Loftus.

7           (Audio continued)

8           MS. MURRAY:  Can you pause, Ms. Loftus.

9    Q.  In that portion that Mileson just stated, how, if at all,

10   is he referring to the people who were sending money to Crane?

11   A.  That they don't give a damn about procedures?

12   Q.  How is he describing them, those people?

13   A.  Investors.

14   Q.  And Mr. Khaled, who ran Hamilton?

15   A.  William Je.

16           MS. SHROFF:  Objection.

17           THE COURT:  Overruled.  You may continue.

18   Q.  Who ran Hamilton?

19   A.  William Je.

20           MS. MURRAY:  We can continue, Ms. Loftus.

21           (Audio continued)

22           MS. MURRAY:  Can you pause, Ms. Loftus, and skip ahead

23   to 12:06.  Halfway through the next page.

24           (Audio played)

25           MS. MURRAY:  Can you pause there, Ms. Loftus.

O6B1GUO2                         Khaled - Direct

1   BY MS. MURRAY:

2   Q.  Mr. Khaled, what did you mean by the reference to jail?

3   A.  That I could go to jail.

4   Q.  Why, if at all, were you concerned about going to jail in

5   connection with the transfers of this money?

6   A.  'Cause there's risk of money laundering, fraud, etc., and

7   my name was——I was the only name on Crane, and everything

8   was——the transfer requests, the wires were going to be through

9   me.

10          MS. MURRAY:  Ms. Loftus, could we please go to

11  Government Exhibits 408 and 408-T.  And we'll just play this

12  whole clip.  We can start at page 2.

13  Q.  Mr. Khaled, looking at the transcript binder in front of

14  you, who are the participants of this call, 408?

15  A.  Just give me one second.

16          That's Mileson, myself.

17          MS. MURRAY:  All right.  And we can play this clip,

18  Ms. Loftus.

19          (Audio played)

20          MS. MURRAY:  Ms. Loftus, if you can pause it.

21  Q.  Mr. Khaled, just for clarity, when you're referencing 50,

22  what amount is that?

23  A.  $50 million.

24          MS. MURRAY:  All right.  Let's continue.

25          (Audio continued)

O6B1GUO2                          Khaled - Direct

1    Q.  Mr. Khaled, in the conversations that we've listened to and
2    looked at so far, what use, if any, is G Club contemplating for
3    this money?
4                MS. SHROFF:  Objection.
5                THE COURT:  Overruled.
6    A.  Investment.
7    Q.  In the calls that we've listened to, what discussion, if
8    any, is there of using the G Club money for services to the
9    members?
10   A.  None.
11               MS. MURRAY:  Ms. Loftus, can we go to Government
12   Exhibit 409, please, and 409-T.
13   Q.  Mr. Khaled, this call is still dated May 6, 2021.  What
14   time was it?
15   A.  1:14 p.m.
16   Q.  And who are the participants?
17   A.  Miles Guo, myself, and William Je.
18               MS. MURRAY:  Ms. Loftus, if we could start playing
19   from the beginning, please.
20               (Audio played)
21               MS. MURRAY:  Ms. Loftus, you can skip ahead to 4:36,
22   just slightly further down the transcript page.
23               (Audio played)
24               MS. MURRAY:  You can pause, Ms. Loftus.
25   BY MS. MURRAY:

```
 1   Q.  Mr. Khaled, there was a reference to Gladis.  Do you know

 2   who Gladis is?

 3   A.  Gladis was the assistant for Miles Guo.

 4           MS. MURRAY:  Ms. Loftus, if we could please go to the

 5   6:24 mark.

 6           THE COURT:  What page is that?

 7           MS. MURRAY:  It's the same page, your Honor.  It just

 8   cuts out a little bit of a blank interstitial conversation

 9   about Mr. Khaled's dog.

10           (Audio played)

11   BY MS. MURRAY:

12   Q.  Mr. Khaled, do you see references to the Alliance

13   Committee?

14   A.  Yes.

15   Q.  Do you have an understanding of what that is?

16   A.  No.

17           MS. MURRAY:  All right.  Let's continue.

18           (Audio continued)

19           MS. MURRAY:  We can pause, Ms. Loftus.

20   Q.  Mr. Khaled, the funds that are being discussed here as a

21   potential investment with David's company, what was your

22   understanding of the source of those funds when they came into

23   Crane's account?

24   A.  The source was, these are individuals, members; also

25   investors.
```

1    Q.  Members of what?

2              MS. SHROFF:  Objection.  Asked and answered.

3    A.  G Club.

4              THE COURT:  Overruled.

5    A.  Members for G Club.

6    Q.  And investors in what?

7    A.  Investors in the private offering in the BVI as well as the

8    H Dollar.

9              MS. MURRAY:  All right.  Ms. Loftus, can we please go

10   to Government Exhibits 411 and 411-T.

11   Q.  Mr. Khaled, again, looking at the dates, same day, May 6,

12   2021.  What time was this call?

13   A.  4:53 p.m.

14   Q.  And who were the participants?

15   A.  Ana Izquierdo, Mileson Guo, Miles Guo, myself, a third

16   person—another person.

17             MS. MURRAY:  And Ms. Loftus, if we could please start

18   at 5:30, that should be just the very bottom of page 5, into

19   page 6 of the transcript.

20             (Audio played)

21             MS. MURRAY:  Ms. Loftus, if you could pause.

22   Q.  Mr. Khaled, how did Ana Izquierdo characterize the

23   56 million in that comment?  Starts with "It's."

24   A.  "It's only."  "It's only."

25             MS. MURRAY:  All right.  Ms. Loftus, we can continue.

O6B1GUO2                        Khaled - Direct

 1              (Audio continued)

 2              MS. MURRAY:  Ms. Loftus, if you can pause.

 3   Q.  Mr. Khaled, in the translated portion of what Guo, Miles

 4   Guo is saying there, do you see the reference to a Swiss bank

 5   account?

 6   A.  Yes.

 7   Q.  Did Crane hold any bank accounts in Switzerland?

 8   A.  No.

 9   Q.  Were you aware of any G Club Swiss bank accounts to which

10   you were asked to transfer money from Crane?

11   A.  No.

12              MS. MURRAY:  All right.  We can continue.

13              (Audio continued)

14              MS. MURRAY:  Can you pause.

15   Q.  So Mr. Khaled, the beginning of that comment you just made,

16   "So, Crane for G Club has 132," first of all, what does 132

17   mean?

18   A.  132 million.

19   Q.  And what did you mean by "Crane for G Club"?

20   A.  Holding for G Club.

21   Q.  So in your comment there, what amount is Crane holding for

22   G Club of the amount of money that's in the Crane account?

23   A.  Yes, 132 million.

24              MS. MURRAY:  All right.  We can continue.

25              (Audio continued)

O6B1GUO2                          Khaled - Direct

1          MS. MURRAY:  Can you pause.

2     Q.  Mr. Khaled, do you see the reference to "people buy the

3     card"?

4     A.  Yes.

5     Q.  What does that refer to?

6     A.  Membership card.

7     Q.  Membership card for what?

8     A.  G Club.

9          MS. MURRAY:  All right.  Let's continue.

10          (Audio continued)

11          MS. MURRAY:  Can you pause.

12          Can we move ahead, please, to the 17:02 mark.  That's

13     at the bottom of page 13 of the transcript.

14          And we can play from 17:02.

15          (Audio played)

16          MS. MURRAY:  Sorry, Ms. Loftus.  It's page 13 of the

17     transcript.  If we could go back to that 17:02 mark.

18          (Audio replayed)

19          MS. MURRAY:  Can you pause.

20     BY MS. MURRAY:

21     Q.  Mr. Khaled, the reference that Miles Guo made to the CCP,

22     what do you understand him to be saying about why he wanted to

23     move this money overseas?

24     A.  That the CCP is going to try to block the money in America.

25     Q.  At the time of this call in May of 2021, did you believe

O6B1GUO2                     Khaled - Direct

1    that?

2    A.  No.

3            MS. MURRAY:  And Ms. Loftus, let's go to Government

4    Exhibit 412, please.  And 412-T.

5    Q.  Again, Mr. Khaled, same day.  What time is this call?

6    A.  5:25 p.m.

7    Q.  Who are the participants?

8    A.  Miles Guo, Ana Izquierdo, Mileson Guo, Aaron Mitchell,

9    myself, and Victor Cerda.

10   Q.  And at this time, in May of 2021, what entity did Ana

11   Izquierdo work for?

12   A.  G Club Puerto Rico.

13   Q.  What entity did Aaron Mitchell work for?

14   A.  Not specified, but in the townhouse, for the family.

15   Q.  Sorry.  If you could just—

16   A.  For the family, in the townhouse.

17   Q.  For whose family?

18   A.  Yes.

19   Q.  For whose family?

20   A.  Guo, Guo family.

21   Q.  And at this time what entity did you work for?

22   A.  Saraca, my contract.

23   Q.  And what entity did Victor Cerda work for?

24   A.  No specific one.

25           MS. MURRAY:  All right.  Ms. Loftus, if we could

O6B1GUO2                      Khaled - Direct

1  please go to the 2:22 mark.  That's at the bottom of page 3 of

2  the transcript.

3              (Audio played)

4              MS. MURRAY:  Can you pause there, Ms. Loftus.

5  Q.  Mr. Khaled, at this time what did you understand about the

6  purpose of these refunds that Miles Guo was referring to?

7  A.  That's the money that—can you—can you ask the question

8  again.

9  Q.  Sure.

10             MS. MURRAY:  Actually, Ms. Loftus, if we could go

11  back, please, to Government Exhibits 411 and 411-T.  This is a

12  prior call.  And if we could start at the 26:21 mark.  That's

13  on page 20 of the transcript.

14             (Audio played)

15             MS. MURRAY:  If we could scroll up to the portion that

16  starts with, "So, alright," Miles Guo's comment.

17  BY MS. MURRAY:

18  Q.  Mr. Khaled, in this portion of the call, what reference is

19  there, if any, to members requesting refunds?

20  A.  I don't—I don't see where you are.

21  Q.  In this paragraph that's up on your screen, there's a

22  reference to refunds.  Do you see that?

23  A.  Yes.  "The fellow fighters that hold the cards' power."

24  Q.  And a few lines above that, it says, "We return all the

25  cards."  Do you see that?

O6B1GUO2                          Khaled - Direct

1   A.  Yes.

2   Q.  With respect to the return of the cards or the refund

3   that's being discussed here, what reference is there, if any,

4   to members being the ones who were requesting the refund?

5   A.  There's none.

6   Q.  And what entity, if any, is proposing to buy all of the G

7   Club cards back after they are refunded?

8   A.  The Alliance Committee.

9            MS. MURRAY:  All right.  We can continue, Ms. Loftus.

10           (Audio continued)

11           MS. MURRAY:  Pause, Ms. Loftus.

12  Q.  Mr. Khaled, in that portion of the conversation regarding

13  potentially closing G Club—

14           MS. SHROFF:  Objection to the leading, your Honor.

15  There's no question pending.

16           MS. MURRAY:  No problem, your Honor.

17  Q.  That portion of the conversation, Mr. Khaled, what

18  discussion, if any, is there of services that are provided to G

19  Club's members?

20  A.  None.

21  Q.  What discussion, if any, is there of the potential

22  implication to member benefits of shuttering G Club Puerto

23  Rico?

24  A.  None.

25           MS. MURRAY:  All right.  Ms. Loftus, we can go to 412

O6B1GUO2                         Khaled - Direct

 1    again, please, and 412-T.  We're going to start at the 12:09

 2    mark, which is on the top of page 10 of the transcript.

 3            Actually, first, if you could just zoom in on the top

 4    portion again to remind us who the participants are to this

 5    call.

 6            Thank you.  And we can go to page 10 now of the

 7    transcript.

 8            The 12:09 mark.  Thank you.

 9            (Audio played)

10            MS. MURRAY:  All right.  We can pause, Ms. Loftus.

11    And if we could go to the 14:49 mark.  I guess that's right

12    where we are.  We'll continue here.

13            (Audio played)

14            MS. MURRAY:  Can you pause there, Ms. Loftus.

15    BY MS. MURRAY:

16    Q.  Mr. Khaled, why, if at all, were you advising that whomever

17    was opening a bank account should inform the bank of the

18    anticipated transfer activity?

19    A.  Because that's what happened with Morgan Stanley.  Money

20    came in, then goes out, and whoever was opening up that

21    account, the entire conversation at that time was to get the

22    money to the final destination, which is Hamilton, so they were

23    just moving it from one——one account to another, and that was

24    just going to sit there for maybe a week and go out.  So I was

25    kind of telling whoever, Ana——at that time Ana and Aaron were

O6B1GUO2                    Khaled - Direct

1    opening up the BVI.  I stopped communicating with those banks

2    or any banks.  So I just wanted to put it out there.

3    Q.  And returning to the earlier part of this call that we just

4    listened to, what understanding, or what did you understand

5    Mileson to be saying about being a settler of G Club?

6    A.   In control and really the ultimate beneficiary of it.

7    Q.  And in that conversation Mileson had identified the legal

8    ultimate beneficiary owner of G Club; is that right?

9              MS. MURRAY:  Please scroll up, Ms. Loftus.

10   A.  Yeah, the ultimate beneficiary owner on paper, Mr. He.

11             MS. MURRAY:  If we can just continue, Ms. Loftus.

12             Your Honor, we have about one minute left in this clip

13   and then I think it would be a good time to break, if we could.

14             THE COURT:  All right.  Go ahead.

15             MS. MURRAY:  Thank you.

16             (Audio played)

17             MS. MURRAY:  Pause there, Ms. Loftus.

18   BY MS. MURRAY:

19   Q.  Going back up, Mr. Khaled, how did you and Mileson describe

20   the intended use or purpose of those accounts that were going

21   to be opened up?

22   A.  As a pass-through.

23             MS. MURRAY:  All right.  We can break now, if it makes

24   sense, your Honor.

25             THE COURT:  All right, then.

O6B1GUO2

1              Members of the jury, it's 11:30, so we will have our

2       half-of-an-hour break.  Remember that you're not allowed to

3       discuss the case amongst yourselves.  Don't allow anyone to

4       discuss it in your presence.  Don't listen to, read, or watch

5       anything from any source having anything to do with the subject

6       matter of this trial.

7              (Jury not present)

8              THE COURT:  Sir, you may step out.  Don't discuss your

9       testimony.

10             (Witness not present)

11             THE COURT:  Is there anything before we resume at

12      noon?

13             MS. MURRAY:  Nothing from the government.

14             MS. SHROFF:  Your Honor, I actually did have one

15      matter to raise.  The witness was asked a question about how

16      did Mileson and he describe the purposes of the account.

17      Before the witness answered, highlighted for him, or at least

18      including for me, was the words, on page 13, the two words

19      "pass through."  I would have——had the government not said,

20      this is a good time to stop, and if the Court hadn't responded,

21      I would have objected to the highlighting.  And I can't see the

22      Court anymore, but——so I would object, your Honor.  Before a

23      witness answers, it would be wholly inappropriate to highlight

24      the response, or even direct the witness as to where it is that

25      the government wants him or her to focus on.  If the government

1    wants to repose the question, that's fine.  If the government

2    wants to state out loud a page number, that's fine.  But to

3    highlight something and that not be reflected in the record is

4    my objection.  Thank you.

5           THE COURT:  Was that inadvertent?

6           MS. MURRAY:  Yes, your Honor, and it was inadvertent,

7    and understood.  We're happy to pose the question again without

8    the highlighting.  I'm happy to just direct Mr. Khaled to the

9    portion of the call which has already been introduced into

10   evidence and ask him to cite that portion and explain what, if

11   anything, he meant by pass-through.

12          MS. SHROFF:  That would only be like the 10th time we

13   ask the same question.  I would just ask that the government

14   not do that again.

15          MS. MURRAY:  Your Honor, we respectfully disagree,

16   but——

17          THE COURT:  I do disagree.  I do not remember this

18   question being asked beforehand.

19          So we'll return at noon.

20          ALL COUNSEL:  Thank you, your Honor.

21          (Luncheon recess)

22

23

24

25

O6BBGUO3

1                          AFTERNOON SESSION

2                             12:00 p.m.

3          (Jury not present)

4          MS. SHROFF:  Your Honor, may I just put one matter on

5   the record.

6          THE COURT:  Go ahead.

7          MS. SHROFF:  I realize during the break obviously that

8   Ms. Murray couldn't have highlighted it, so I apologize.  I

9   don't think she did it on purpose, so I just wanted to note

10  that.  I realize that the highlighting couldn't have come from

11  this side, so sorry about that.

12         THE COURT:  Let's get the jurors.

13         THE LAW CLERK:  Jury entering.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO3

1           (Jury present)

2           THE COURT:  Please be seated.  Remember, sir, that

3     you're still under oath.  You may continue your inquiry.

4           MS. MURRAY:  Thank you, your Honor.

5     BY MS. MURRAY:

6     Q.  Ms. Loftus, if we could please pull up Government Exhibit

7     412-T.  We'll go where we left off which was page 13.

8           Mr. Khaled, what is a pass through?

9     A.  That's an entity or an account that money comes in or goes

10    out right away.  No activity other than that.

11    Q.  What are some of the reasons, if any, that an account would

12    be used as a pass through?

13          MS. SHROFF:  Objection.

14          THE COURT:  You may answer if you know.

15    A.  Just to prevent the two parties from being involved in the

16    transaction.

17    Q.  Mr. Khaled, you were talking about -- or, actually,

18    Ms. Loftus, if we could just go, please, to page 12 of this

19    transcript, and focusing on the portion you see on the screen

20    here, Mr. Khaled.  Can you read what Mileson stated in this

21    portion of the call?

22    A.  But I'm not actively, um, but I'm UBO, but UBO is Mr. He.

23    I am just the settler.  By Dutch Law, I do have some sort of

24    saying, but I'm not practicing it.

25    Q.  Mr. Khaled, what did you mean when you said that Mr. He was

O6BBGUO3

1    the UBO on paper?

2    A.   That he was just on the legal documents, but not actively

3    managing or dealing with any of the employees or the products.

4    Q.   Was Mr. He involved in any of these conversations that you

5    recorded in this time period from April to May of 2021

6    regarding the G/Clubs funds?

7    A.   No, he was not.

8    Q.   Ms. Loftus, if we could please go to Government Exhibit

9    413-A and 413A-T.

10          Mr. Khaled, what is the date of this call?

11    A.   May 12, 2021.

12    Q.   What time?

13    A.   7:58 a.m.

14    Q.   And who are the participants?

15    A.   Mileson Guo and myself.

16    Q.   Ms. Loftus, if we can please play Government Exhibit 413A.

17          (Media played)

18    Q.   Can we pause, Ms. Loftus.

19          Mr. Khaled, what is BVI refer to?

20    A.   British Virgin Islands.

21    Q.   What were you proposing with respect to Crane BVI?

22    A.   That we create like a private equity structure for Crane

23    and then move the money from Crane to that entity and then move

24    the money back to the media company when it's created.  It

25    wasn't created at that time, so they're working on creating the

O6BBGUO3

1    company, and the money was gonna get transferred there.

2    Q.  And why, if at all, move the money from Crane's U.S.

3    accounts to BVI accounts held in Crane's name?

4    A.  To satisfy what they were asking for, to move the money

5    out -- the reason they gave, Miles and Mileson, was the money

6    needs to go out of the U.S. So by creating a BVI entity, the

7    money will be outside a U.S. company.

8    Q.  What did you believe was the real reason that Miles Guo and

9    Mileson wanted to move the money outside of the U.S?

10           MS. SHROFF:  Objection.

11           THE COURT:  Sustained.

12   Q.  Mr. Khaled, you testified earlier when we listened to a

13   call regarding the CCP.  Do you recall that?

14   A.  Yes.

15   Q.  At the time of these conversations in May of 2021, did you

16   have an understanding of why Miles Guo instructed you to move

17   the money outside of the U.S.?

18           MS. SHROFF:  Objection.

19           THE COURT:  You may answer.

20   A.  Yes, to make the investment in H Dollar at that time.

21   Q.  At that time did you have an understanding of the reason

22   for the instruction to move the money outside of the U.S.

23           MS. SHROFF:  Same objection.

24           THE COURT:  You may answer.

25   A.  To invest it in H Dollar.

O6BBGUO3

1    Q.  Ms. Loftus, we can continue.

2              (Media played)

3    Q.  Mr. Khaled, what was the timing of these discussions

4    regarding the transfer of the money in Crane's accounts?

5    A.  That it need to be urgent, time is of the essence.

6    Q.  And with whom, if anyone, did you discuss the urgency of

7    these transfers?

8    A.  Everyone, Miles Guo, Mileson, David from Long Island,

9    Yvette.

10   Q.  Mr. Khaled, there was some discussion in the calls that we

11   listened to about Mercantile, what is Mercantile?

12   A.  Mercantile was also a bank, an international financial

13   institution licensed in Puerto Rico acting as a bank, and they

14   were the bank where Medici had an account.

15   Q.  And what type of account did Medici have at Mercantile?

16   A.  A correspondent bank account.

17   Q.  Ms. Loftus, can we go to the top of Government Exhibit

18   413A-T, please.

19              Mr. Khaled, what is the date of this call?

20   A.  May 12, 2021.

21   Q.  Ms. Loftus, we can take that down and put up what's in

22   evidence as Government Exhibit GC-502.  If we could go down the

23   chain, please, and focus in on the body of this.

24              Mr. Khaled, what kind of document is this?

25   A.  It's an email.

O6BBGUO3

1    Q.  From whom to whom?

2    A.  Alex Hadjicharalambous at G/Club.

3    Q.  And to whom did he send this email?

4    A.  Elizabeth Berstler at Morgan Stanley.

5    Q.  What's the date of this email?

6    A.  May 11, 2021.

7    Q.  Looking at the body of the email, can you read the amount

8    that's listed for the wire referenced?

9    A.  15 million.

10   Q.  And the account name?

11   A.  Deltec Bank and Trust Limited.

12   Q.  Looking at the next line, what is the geographical location

13   of the address associated with Deltec?

14   A.  Bahamas.

15   Q.  And then going down to reference memo, can you read what

16   that line reads?

17   A.  100179601 Hamilton Digital Assets Fund SP.

18   Q.  And two lines below the internal reference?

19   A.  Loan.

20   Q.  And, Ms. Loftus, if we could go up the chain, please.  One

21   more up, please.

22           Focusing on the top email, Mr. Khaled, what day was

23   this email sent?

24   A.  May 13, 2021.

25   Q.  From whom to whom?

O6BBGUO3

1    A.  From Alex Hadjicharalambous to Limarie Reyes Ana Izquierdo

2    and me.

3    Q.  What is the title of the attachment that was attached to

4    this email?

5    A.  15 million from Morgan Stanley 051321.

6    Q.  Finally looking at the body of the email, the second

7    sentence, what does that read?

8    A.  The first 15 million of the 30 has been authorized and will

9    be sent out today May 13, 2021.

10   Q.  Thanks, Ms. Loftus.  We can take that down.

11          Mr. Khaled, during your testimony yesterday and today,

12   did we listen to every recording that you made in April and May

13   of 2021?

14   A.  Yes.

15   Q.  The entirety of each recording that you made we've listened

16   to in this court today?

17          MS. SHROFF:  Objection.

18          THE COURT:  Overruled.  You may continue.

19   A.  No.

20          MS. SHROFF:  Objection.

21   A.  It was --

22          THE COURT:  You may answer.

23   A.  It was parts of each recording.

24   Q.  Approximately how many recordings if you recall did you

25   make during that time period?

O6BBGUO3

1    A.  I don't have the exact amount.

2    Q.  Did you record every conversation that you had with any of

3    these individuals in April and May of 2021?

4    A.  No, not every conversation.  There was conversations that

5    were not recorded.

6    Q.  Did you provide every recording that you had in your

7    possession from these conversations to the government?

8    A.  Yes.

9    Q.  Who, if anyone, chose what recordings to listen to during

10   your testimony here?

11   A.  The government, you.

12   Q.  Who, if anyone, chose what portion of the different

13   recordings to listen to during your testimony here?

14   A.  You did.

15   Q.  And who, if anyone, prepared the transcripts of the

16   conversations that you recorded and provided to the government?

17   A.  You guys did.

18   Q.  Mr. Khaled, I'd like to direct your attention now to July

19   of 2021.  Did there come a time when G/Club instituted

20   adversary proceedings against Crane?

21   A.  Yes.

22   Q.  What type of proceedings were those?

23   A.  An arbitration.

24   Q.  What was the subject matter of that arbitration?

25   A.  Money that was still with Crane.

O6BBGUO3

1    Q.  What money?

2    A.  The transfers that had came in from November and the

3    portion that was not already transferred to G/Club.

4    Q.  And what was the approximate volume of those funds that

5    were at issue in the arbitration?

6    A.  I think the total was about 50 million.

7            THE COURT:  Before you ask the next question, how did

8    you make the recordings?

9            THE WITNESS:  Through an app on my phone.

10           THE COURT:  Go ahead.

11   Q.  Did you make the recordings at the direction of anyone?

12   A.  No.

13   Q.  Returning to the arbitration in 2021, which party filed

14   that action?

15   A.  G/Club Operations Puerto Rico.

16   Q.  Against what entity or entities?

17   A.  Crane Advisory Group, LLC.

18   Q.  What was the outcome of that arbitration?

19   A.  There was immediate injunction and transfer of the monies

20   to the attorney of G/Club.

21   Q.  Can you explain what you mean by immediate injunction?

22   A.  So the money was blocked.

23   Q.  And the injunction was issued against whom or what entity?

24   A.  Crane Advisory Group.

25   Q.  After that injunction was issued, what, if anything, did

O6BBGUO3

1    you do with the money that was in Crane's account?

2    A.  Transferred out.

3    Q.  Where did you transfer it?

4    A.  I transferred it to the law firm of Aaron Mitchell.

5    Q.  Why did you transfer it to that particular law firm?

6    A.  Cause G/Club had no other accounts open.

7    Q.  Who, if anyone, provided you with the account information

8    for the Aaron Mitchell account to receive those funds?

9    A.  It was done through the attorneys.

10    Q.  Was Crane party to any other adversary proceedings with

11    G/Clubs?

12    A.  Yes.

13    Q.  What type of proceeding?

14    A.  It was similar second arbitration to take back fees and --

15    the fees of what Crane had received.

16    Q.  For that second arbitration, who were the parties to that

17    arbitration?

18    A.  G/Club Operation, LLC and Crane Advisory Group.

19    Q.  Who filed that arbitration?

20    A.  G/Club.

21    Q.  During the course of that second arbitration, what court

22    proceedings or legal proceedings, if any, were there?

23    A.  It was dismissed.

24    Q.  Prior to dismissal, were there any official proceedings

25    relating to the arbitration panel?

O6BBGUO3

1   A.  Yes, there was a full hearing.

2   Q.  Who, if anyone, testified at that hearing on behalf of

3   G/Club?

4   A.  Ana and Limarie and a forensic accountant.

5   Q.  Did you participate in that hearing?

6   A.  I did.

7   Q.  Did you hear the testimony that Ana Izquierdo gave to the

8   panel?

9   A.  Yes.

10  Q.  And did you hear the testimony that Limarie gave to the

11  panel?

12  A.  Yes.

13           MS. SHROFF:  Your Honor, may we approach, please?

14           THE COURT:  All right.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6BBGUO3

1          (At the sidebar)

2          MS. SHROFF:  Your Honor, I just wanted to flag for the

3    Court the question about participated by Mr. Khaled.  I'm

4    assuming the government knows he asserted his Fifth, so I'm not

5    sure what it is that they -- what the participated means.  But

6    to the extent the government is going to ask him his opinion

7    either Ana or Limarie lied during the arbitration, I would ask

8    the Court to not allow those questions.  They're improper as to

9    whether or not he believes they told the truth.

10         THE COURT:  I wanted to understand what happened at

11   the second arbitration.

12         MS. SHROFF:  The second arbitration is for the return

13   of the fees.  There was a full blown hearing, and three

14   individuals testified.  The lawyer testified.  Ana Izquierdo,

15   she testified.  Mr. Khaled's 3500 material demonstrates that

16   he's been asked to give his opinion, she lied, and he

17   repeatedly gives the suggestion that she lied.  Limarie Reyes

18   also testified, and I think they're trying to elicit in his

19   opinion she lied in the arbitration.

20         THE COURT:  What is it that they lied about?

21         MR. KAMARAJU:  I guess they'll say I believe it's

22   about Ms. Wang's role at G/Club, at least that's my

23   understanding from Ms. Molinaris' 3500.

24         THE COURT:  What is it that they said about Ms. Wang?

25         MR. KAMARAJU:  Ms. Molinaris testified that in essence

O6BBGUO3

1    Ms. Wang had a connection to G/Club, and admitted that there

2    was some control owner.  I'm sure the government will spell it

3    out.  So in the 3500 material for Ms. Molinaris, it seems clear

4    that they've suggested that that was a misrepresentation of

5    Ms. Wang's role.  I think the issue for this witness I think

6    under Rule 608(b), I don't think you're allowed to inquire of a

7    witness of a specific instance of untruthfulness in order to

8    impeach another witness's credibility through extrinsic

9    evidence, which would be what this is.

10            THE COURT:  Yes.  Go ahead.

11            MS. MURRAY:  Few things, your Honor.  With respect to

12    Mr. Khaled's impression of false testimony that Ana Izquierdo

13    Limarie Reyes gave during arbitration, it's broader than simply

14    Ms. Wang's role.  His view is at that point, well-after the

15    G/Club's money transfers and after at least Ana Izquierdo had

16    left G/Clubs, he did not believe they were truthful when they

17    testified about the services that G/Club offered, about the

18    member benefits that they testified that it provided to its

19    members.

20            His impression from his conversations with them,

21    including at the time period these calls we've listened to, is

22    they well-knew that there were no such benefits and services.

23    And, in addition, he would testify that he believed that both

24    of them lied about the fact that they told the arbitration

25    panel that Crane was an entirely independent company; that it

1    had no connection to G/Clubs.  And they were trying to

2    represent it as an arm's length consultant, even though again

3    they well knew that it was intricately intertwined with the

4    G/Club companies.

5              THE COURT:  How is it that you get him to impeach

6    those witnesses at the arbitration?

7              MS. MURRAY:  It's not impeachment of those particular

8    individuals.  It's simply introducing statements that were made

9    in the context of the Rico enterprise by agents of Guo, who

10   were operating in different entities within the enterprise.

11             THE COURT:  Go ahead.

12             MR. KAMARAJU:  One, I think his belief as to the truth

13   or falsity of another person's statement, particularly a person

14   statement who is not Mr. Guo is irrelevant.  I think that's

15   consistent with rulings your Honor has made before.  But

16   second, this is exactly what Rule 608 is talking about.  It's

17   inquiring about specific instances of other dishonest acts that

18   are outside of a criminal conviction, so I don't see how that

19   is outside of 608(b).

20             THE COURT:  Their theory is that Ms. Izquierdo and the

21   other person, they're both agents of Guo.

22             MR. KAMARAJU:  Right, which I still think they have to

23   establish that.  I think they have not.  We've heard no

24   testimony from Ms. Molinaris or about Ms. Molinaris' role other

25   than she is the CEO generally of G/Club.  They haven't tied

O6BBGUO3

1    those two things together.  But either way, the agency

2    proposition overcomes a hearsay issue.  It doesn't overcome

3    608(b) issue.  Frankly again, they're going to call

4    Ms. Molinaris. Ms. Molinaris can testify about whatever

5    misrepresentation they think she made.  I don't know why this

6    witness's belief as to the truth or falsity of those statements

7    is relevant to any question.

8         MS. SHROFF:  It only goes to bolster in a roundabout

9    way Ms. Reyes' testimony.  Ms. Reyes is going to testify.  They

10   tried to flip Ms. Izquierdo, and she didn't flip, so she's out.

11        MS. MURRAY:  We reject that characterization.  The

12   arbitration in question, the second arbitration related to the

13   release of fraud proceeds.  Fraud proceeds that Crane was

14   holding, and in furtherance of getting those fraud proceeds

15   released to G/Clubs in an effort to get them back within the

16   Rico enterprise.  Once Mr. Khaled was now separated from the

17   Rico enterprise, these two individuals lied to the arbitration

18   panel.

19        THE COURT:  Do you have authority for me?

20        MS. MURRAY:  Regarding the specific testimony?

21        THE COURT:  The admissibility of this testimony.

22        MR. FINKEL:  Your Honor, I think it's just a piece of

23   any other co-conspirator statement.  It's very consistent with

24   that.  His view is based on his personal observations at the

25   time.  He's not impeaching their credibility vis a ve their

O6BBGUO3

1    specific testimony.  I think that's really what 608(b) really

2    turns to. I could be wrong about that.  I'm not certain.

3                THE COURT:  Why wouldn't it be impeachment?

4                MR. FINKEL:  It's the same sense of how Ya Li

5    testified that the affidavit she received from Yongbing Zhang,

6    Guo's criminal attorney, emphasis on criminal, was false

7    because she had experiences that countered what the affidavit

8    represented.  Same thing with Mr. Khaled.  He's had experiences

9    that countered what was being represented.  I think it's

10   important for the jury to understand, particularly in light of

11   where the cross is going to go, as to why the arbitration

12   decisions came out in the way they did, which is that G/Clubs

13   misrepresented facts in furtherance of the Rico enterprise.

14   And G/Clubs is firmly part of the Rico enterprise.

15                I think, your Honor, Mr. Khaled can certainly -- I

16   don't think there'd be objection to this -- bring out the

17   statements that he observed Limarie and Ms. Izquierdo made in

18   further of G/Clubs trying to obtain money. Those are clearly

19   agent statements.  So the question then becomes whether he can,

20   his view or his understanding whether those statements were

21   true or false.  And any co-conspirator could do that because

22   he's experienced in the conspiracy and that's standard 701

23   standard.

24                MR. KAMARAJU:  I'm sorry, no.

25                MR. FINKEL:  It is, and it's consistent with how this

O6BBGUO3

1    trial is proceeding.

2            THE COURT:  I don't know what the answer is, and I'm

3    going to ask my clerks to look at this.  We need to jump to

4    another subject matter.

5            MR. FINKEL:  I just want to make sure everything is

6    clarified.  I assume the government can inquire about -- I

7    don't want to run afoul about what the Court just said -- what

8    he observed about Ms. Izquierdo and Ms. Reyes' statements.

9            THE COURT:  I want to skip over this whole subject

10   matter for now.

11           MS. MURRAY:  This is the tail-end of this witness'

12   direct examination.  I guess I would ask if we look into this

13   issue and it does come up that we can inquire into it, we will

14   be permitted to do that on redirect.

15           THE COURT:  Of course, definitely.  Absolutely.  Even

16   if I don't come up with an answer, you can recall him.  All

17   right.

18               (Continued on next page)

19

20

21

22

23

24

25

O6BBGUO3

```
1                    (In open court)

2                    THE COURT:  You may continue.

3     BY MS. MURRAY:

4     Q.  Mr. Khaled, focusing on the second arbitration, you mention

5     that there was a hearing, did you testify at that hearing?

6     A.  Yes, I did.

7     Q.  Were you asked questions at that hearing?

8     A.  Yes.

9     Q.  How, if at all, did you respond to those questions?

10    A.  I pleaded the Fifth.

11    Q.  I apologize.  I didn't hear that?

12    A.  I pleaded the Fifth.

13    Q.  And yes or no answer, did Ana Izquierdo testify at that

14    hearing?

15    A.  Yes.

16    Q.  Limarie Reyes, did she testify at that hearing?

17    A.  Yes.

18    Q.  What, if anything, was the outcome of that second

19    arbitration with respect to the fees that were in question?

20    A.  Dismissed.

21    Q.  What, if anything, happened to the money that was the

22    subject of that second arbitration?

23    A.  Can you elaborate?

24    Q.  After the second arbitration, what happened to the money?

25    A.  I think it stayed in the assets that I bought, but then
```

1    forfeited through the non-prosecution agreement.

2    Q.  And that's the 2.7 million we discussed earlier?

3    A.  Yes.

4    Q.  Focusing on the first arbitration, what was the approximate

5    total amount of money that Crane was directed to transfer to

6    Aaron Mitchell's bank account?

7    A.  I believe about 50 million.

8    Q.  And do you know what happened with that money after it was

9    transferred from Crane to Aaron Mitchell's law firm account?

10   A.  No, I don't.

11            MS. MURRAY:  May I have a moment, your Honor.  No

12   further questions.

13            THE COURT:  Cross examination.

14   CROSS-EXAMINATION

15   BY MS. SHROFF:

16   Q.  Mr. Khaled, you started at Citibank on October 14 of 2014;

17   is that correct?

18   A.  I don't remember the exact date, but it was October of

19   2014, yeah.

20   Q.  So I have trouble hearing, so I would really much

21   appreciate --

22   A.  I don't know the exact date, but it was October of 2014.

23   Q.  And you testified on direct that you worked for Citibank

24   for about four years, correct?

25   A.  Yes.

1  Q.  And you stopped working there on October 30 of 2020,

2  correct?

3  A.  Yes.

4  Q.  You got a job offer from Golden Spring on July 6 of 2020,

5  correct?

6  A.  No, it was from Saraca.

7  Q.  You got a job offer from Saraca; is that your testimony?

8  A.  Yes.

9  Q.  And that was also on July 6, 2020, correct?

10  A.  I believe so.

11  Q.  Do you want something to help refresh your recollection?

12  A.  Sure.

13          MS. MURRAY:  Objection, your Honor.  He didn't

14  indicate that he doesn't have a recollection.

15          THE COURT:  Sustained.

16  Q.  You remember what date it was?

17  A.  I don't remember the exact date.

18  Q.  You don't remember the exact date.

19          THE COURT:  He said he did not remember the date, so,

20  yes, you can attempt to refresh his recollection.

21          MS. SHROFF:  Thank you, your Honor.

22  Q.  So if I could have it made larger, please.

23          So on the top right corner does that help refresh your

24  recollection?

25  A.  Yes.

O6BBGUO3                          Khaled - Cross

1   Q.  And you got the job offer on July 6 of 2020, correct?

2   A.  Yes.

3   Q.  And the start date, according to -- you know what, do you

4   recall your start date on the job?

5   A.  It says here to be determined.

6   Q.  Right.  My question is, do you remember your own start

7   date?

8   A.  August 1st.

9   Q.  And you give notice to Citibank that you were leaving on

10  October 19 of 2020; is that correct?

11  A.  October, I don't remember the exact date.

12  Q.  How about your last day at Citibank, what was your last day

13  at Citibank?  Do you remember that?

14  A.  No, I don't remember the exact date, just October.  I don't

15  know.

16  Q.  Do you remember if it was October 30 of 2020?

17  A.  No, beginning of October, maybe October 1st.

18  Q.  Sitting here today your testimony is you don't remember if

19  it was October 1st or October 30?

20          MS. MURRAY:  Objection, your Honor.  Asked and

21  answered.

22          THE COURT:  Sustained.

23  Q.  When you started your job at Citibank, you went through an

24  on-boarding process, correct?

25  A.  Yes.

O6BBGUO3                          Khaled - Cross

1   Q.  And part of the on-boarding process involved you getting
2   trained by Citibank, correct?
3   A.  Yes.
4   Q.  They gave you internal training on issues that would come
5   up while you were an employee of Citibank?
6   A.  Yes.
7   Q.  They trained you on how to open bank accounts for Citibank,
8   correct?
9   A.  Yes.
10  Q.  They gave you a training manual, correct?
11  A.  Yeah.
12  Q.  They gave you a set of rules and they asked you to read
13  them, correct?
14  A.  Yes.
15  Q.  They asked you to read the rules, and then asked you to
16  acknowledge that you had read the rules, correct?
17  A.  Yes.
18  Q.  They asked you to acknowledge by signing a document that
19  you had both read and knew the rules, correct?
20  A.  Yes.
21  Q.  And you did that, did you not, sir?
22  A.  I did.
23  Q.  You were given a code of conduct to read by Citibank,
24  correct?
25  A.  Yes.

1    Q.  And you read that code of conduct, correct?

2    A.  Yes.

3    Q.  You were asked to affirm that code of conduct, correct?

4    A.  Correct.

5    Q.  And you agreed to abide by Citibank's code of conduct,

6    correct?

7    A.  Correct.

8    Q.  You agreed and you affirmed to follow all of the rules that

9    Citibank imposed upon its employees, correct?

10   A.  Yes.

11   Q.  Citibank also had an employee manual that they gave you a

12   copy of, correct?

13   A.  Yes.

14   Q.  And that employee manual clearly stated that you were not

15   to accept outside employment while an employee of Citibank; is

16   that correct?

17   A.  I don't remember the exact terminology.

18   Q.  Was the gist basically what I said that you could not work

19   for somebody else while you were collecting a paycheck as an

20   employee of Citibank?

21   A.  Needed proper prior approval.

22   Q.  I didn't ask you that question.

23          My question was, were you aware that Citibank would

24   not permit you to work for another person while you were

25   employed by Citibank?

O6BBGUO3                          Khaled - Cross

1   A.  Yes.

2   Q.  You knew that if you worked for another entity while

3   employed by Citibank, you could create conflict of interest

4   situations, correct?

5   A.  Correct.

6   Q.  You could jeopardize the bank, correct?

7   A.  Can you explain.

8   Q.  You could jeopardize the insurance policy of a bank if you

9   did business with somebody who was a customer of theirs,

10  correct?

11  A.  I don't know that.

12  Q.  You could jeopardize the welfare of the other entity that

13  you were working for secretly while working for Citibank,

14  correct?

15  A.  I don't know that either.

16  Q.  Citibank has a compliance department, correct?

17  A.  They do.

18  Q.  And this would raise compliance issues for them, correct?

19  A.  It could.

20  Q.  And you knew all of that when you continued working for

21  Citibank after having accepted a job at Saraca and after you

22  started a job at Saraca, correct?

23  A.  I knew that I couldn't get that job, no.

24  Q.  And you did it anyway, correct?

25  A.  Yes.

O6BBGUO3                          Khaled - Cross

1   Q.   Now, let me show you what is marked as Defense Exhibit

2   60524.  Do you recognize this document, sir, and feel free if

3   you would like us to help you scroll through.

4          MS. MURRAY:  Your Honor, I would just note it is not

5   before the jury.  There is personal identifiable information

6   that is not redacted on this document.  So we would just ask

7   that before it's published to the jury or the gallery it be

8   redacted.

9          MS. SHROFF:  I do not intend to publish anything that

10  has any personal information on it.

11         THE COURT:  Good.

12  Q.   Do you recognize that document, sir?

13  A.   Yes.

14  Q.   Could you tell us what it is?

15  A.   City employment application.

16  Q.   And whose City employment application is it?

17  A.   Mine.

18         MS. SHROFF:  Your Honor, most respectfully I ask that

19  DX-60524 be admitted into evidence at this time.

20         MS. MURRAY:  Your Honor, the objection relative to the

21  issue that I just stated stands.

22         THE COURT:  She just said she does not seek to publish

23  it at this time.

24         MS. SHROFF:  I do not seek to publish any page that

25  would disclose any such information.  If I could just go to

 1    page 12 of the exhibit.

 2              MS. MURRAY:  Briefly, your Honor.  We understand it

 3    would be admitted.  We would just ask the admitted version

 4    that's in evidence have the redactions apply, so that the

 5    version that is in evidence is redacted.

 6              MS. SHROFF:  Sure.  No problem.  May I go to page 12

 7    of the document, and if I could have it made more convenient

 8    for reading by the witness.

 9              Your Honor, I'm assuming the Court has granted my

10    application to admit it into evidence.

11              THE COURT:  It is admitted.

12              (Defendant's Exhibit DX-60524 received in evidence)

13    BY MS. SHROFF:

14    Q.  If you could read under the section A.  Do you see the

15    title is regulatory information, correct?

16    A.  Yes.

17    Q.  And you answered each one of these questions, correct, A

18    through all the way down to G, correct?

19    A.  Yes.

20    Q.  Now, if you can take a look at question number one.  And

21    you see the question has any domestic or foreign court.  You

22    see that question?

23    A.  Yes.

24    Q.  And you have subheadings under that, correct?

25    A.  I have what?

O6BBGUO3                        Khaled - Cross

1   Q.  There are sub-questions under that question, right?

2   A.  Yes.

3   Q.  If you look at F, you see F?

4   A.  Yes.

5   Q.  And that question is, Have you been or have you ever -- has

6   anyone ever enjoined you or entered an order or taken any other

7   action against you in connection with any financial services

8   related activity, correct?

9   A.  Yep.

10  Q.  And you answered no, right?

11  A.  Yes.

12  Q.  Is it fair to say, sir, that at that time or before you had

13  owned a company called Auto Box?

14  A.  Yes.

15  Q.  And you had in fact defaulted on a business loan with Auto

16  Box, correct?

17  A.  Correct.

18  Q.  Auto Box had sued you, correct?

19  A.  No.

20  Q.  I'm sorry.  The customer had sued you, correct?

21  A.  No.

22  Q.  The customer hadn't sued you on November 21 of 2013?

23  A.  The customer?

24  Q.  Yes.

25  A.  I don't recall.

O6BBGUO3                           Khaled - Cross

 1  Q.  How about the lender, had the lender sued you?

 2  A.  Yes.

 3  Q.  And a court in California entered judgment against you,

 4  correct?

 5  A.  Correct.

 6  Q.  The judgment was entered on April 22nd of 2014, correct?

 7  A.  Don't know the exact date.

 8  Q.  And you did not indicate that on this application form to

 9  Citibank, correct?

10  A.  Correct.

11  Q.  Now let's go to paragraph 10 if we could, please.  You see

12  that paragraph?

13  A.  Yep.

14  Q.  And that is the acknowledgment section; is that correct?

15  A.  Yes.

16  Q.  And in the acknowledgment section there are certain

17  numbers.  You see that paragraph where it says employment and

18  code of conduct?

19  A.  Can you zoom to it.

20  Q.  Sure.  We can try and highlight that for you.  Right above

21  I understand, right?

22  A.  Mm hm.

23  Q.  And Citibank is telling you all of the things that it will

24  do, correct?

25  A.  Yes.

O6BBGUO3                          Khaled - Cross

1   Q.   And then it ask you to represent certain things to

2   Citibank, correct?

3   A.   Yep.

4   Q.   The first thing that you're representing to Citibank under

5   oath because you have to acknowledge it -- I don't know what

6   the acknowledgment was -- that you were legally free to enter

7   into an employment relationship with City, correct?

8   A.   Yes.

9   Q.   What does that mean to you, sir?

10  A.   Don't know the legal term of it.

11  Q.   I cannot hear you.

12  A.   I don't know the legal term of it, legally free.

13  Q.   You tell me.  You acknowledged it.

14            So what did you understand it tell you to do or be?

15  A.   That I can become an employee of Citibank.

16  Q.   That you could what?

17  A.   I am free to become an employee of Citibank.

18  Q.   But you're representing that, right?  It says I represent

19  that.

20  A.   Okay.

21  Q.   So you're telling City that you are free to be their

22  employee, correct?

23  A.   Correct.

24  Q.   And what does number two tell you?  That you have no

25  obligation to any other person or entity that would affect or

O6BBGUO3                        Khaled - Cross

1   conflict with your employment with City, correct?

2   A.  Yes.

3   Q.  And then if I could just skip down to I further represent.

4   Could you read that for the jurors, please?

5   A.  I further represent that if I am hired I will disclose to

6   City any current or future outside business interests for the

7   purpose of determining compliance with regulatory standards and

8   City policy.

9   Q.  Keep going.

10  A.  And I understand that certain affiliations or activities

11  may be impermissible under such standards and/or policy.  You

12  want me to continue?

13  Q.  No.  That's fine.  You did not live up to those two

14  obligations, correct?

15  A.  No.

16  Q.  You can take that down.

17          There came a time, sir, that you resigned from

18  Citibank, correct?

19  A.  Yes.

20  Q.  And when you resigned from Citibank, Citibank terminated

21  your employment pending investigation, correct?

22  A.  I don't know that.

23  Q.  You testified on direct testimony that -- I take that back.

24  Let me move to another topic now.

25          I'm going to talk to you about Ms. Wang.  You

O6BBGUO3                         Khaled - Cross

1   testified about her at great length during the direct, correct?

2   A.  Yes.

3   Q.  And you testified that you were introduced to Ms. Wang

4   through a law firm; is that right?

5   A.  Correct.

6   Q.  Which law firm?

7   A.  Rutkin Ross, LLC.

8   Q.  Who at that law firm introduced you to Ms. Wang?

9   A.  Valerie Stevens, Hutchinson & Ross.  That's what it was.

10  Q.  And it is true that introduction you spoke to Ms. Wang

11  about opening bank accounts for Golden Spring.  Was that your

12  testimony, sir?

13  A.  Yes.

14  Q.  And when you asked Ms. Wang about Golden Spring, she told

15  you that it was a family fund, correct?

16  A.  Family office.

17  Q.  She told you Golden Spring was a family office?

18  A.  Yes.

19  Q.  And she told you what that office consisted of, correct?

20  A.  Can you elaborate.

21  Q.  She told you what Golden Spring was, right?

22  A.  Yes.

23  Q.  She described what the company was all about, right?

24  A.  She described it, yeah.

25  Q.  There was a conversation, a back and forth between you and

O6BBGUO3                        Khaled - Cross

1    her, right?

2    A.  Correct.

3    Q.  And you're a Citibank employee at that point, right?

4    A.  Yes.

5    Q.  And you wanted to build a rapport with her, right?

6    A.  Not build a rapport.

7    Q.  You don't want to build a rapport with a potential

8    customer?

9    A.  I asked her information about what the business does.  It's

10   part of the account opening.

11   Q.  It was a friendly conversation, right?  You want to build a

12   rapport with your customer, right?

13           MS. MURRAY:  Objection, your Honor, asked and

14   answered.

15           THE COURT:  Sustained.

16   Q.  You wanted to cultivate a business relationship, correct?

17   A.  Correct.

18   Q.  And Ms. Wang answered your questions, correct?

19   A.  She did.

20   Q.  At no point did she tell you a question was not to be

21   answered, right?

22   A.  No, I don't think so, no.

23   Q.  And after you had the initial conversation, you continued

24   conversating with Ms. Wang, correct?

25   A.  Can you be more specific.

1    Q.   Sure.  You had follow-up questions to pose to her, correct?

2    A.   Can you be more specific.

3    Q.   No.

4            THE COURT:  Were there ongoing discussions with her?

5            THE WITNESS:  Regarding the account, yes.

6    Q.   And she gave you her phone number, correct?

7    A.   She did.

8    Q.   She gave you both her landline and her cell phone number,

9    correct?

10   A.   I don't believe there was a landline.

11   Q.   Did she give you an email address?

12   A.   Yes.

13   Q.   She had a Proton email address.  Do you remember that?

14   A.   Yes.

15   Q.   And Citibank had no rule against people having a Proton

16   email address, correct?

17   A.   Don't believe so, no.

18   Q.   You iPhone messaged with Ms. Wang, correct?

19   A.   I could have.

20   Q.   You texted her questions?  She texted the responses back,

21   correct?

22   A.   Probably, yeah.

23   Q.   You asked for paperwork from Ms. Wang, right?

24   A.   Yes.

25   Q.   You needed information to open the account, correct?

1   A.  Correct.

2   Q.  She sent you documents.  You made a copy of the documents

3   and you sent it to the back office, correct?

4            MS. MURRAY:  Objection to compound.

5            MS. SHROFF:  I'm happy to break it up, your Honor.

6   Q.  You asked for document from Ms. Wang, correct?

7   A.  Correct.

8   Q.  And you asked for information from Ms. Wang, correct?

9   A.  Yes, I did.

10  Q.  One piece of information you asked for was an EIN number,

11  correct?

12  A.  Part of the account opening is an EIN number.  I don't know

13  if I asked her directly or she provided me documents that had

14  it.

15  Q.  Could you tell the jury what an EIN number is?

16  A.  Employee identification number.

17  Q.  Did you ask her for articles of incorporation for Golden

18  Spring?

19  A.  Yes.

20  Q.  And she provided them to you, correct?

21  A.  Yes.

22  Q.  You asked her for an operating agreement, correct?

23  A.  Correct.

24  Q.  And she provided that document to you, correct?

25  A.  Yes.

O6BBGUO3                            Khaled - Cross

1   Q.  You asked her for identification, correct?

2   A.  Correct.

3   Q.  And she provided identification to you, correct?

4   A.  Yes.

5   Q.  Citibank has an accounting department, correct?

6   A.  A what?

7   Q.  Accounting department.

8   A.  I'm sure, yeah.

9   Q.  And a compliance department, correct?

10  A.  Correct.

11  Q.  You sent all of this information to the relevant

12  departments, correct?

13  A.  Yes.

14  Q.  Waited for verification from those departments to be sent

15  back to you, correct?

16  A.  Can you be more specific.

17  Q.  You had to wait until those departments approved the

18  application, correct?

19  A.  I'm not sure if it was the policy like that where you

20  needed an approval.

21  Q.  Well, you approved the application after receiving all of

22  the information, correct?

23  A.  There wasn't an approval process that way.

24  Q.  Well, how did the bank account open unless it was approved?

25  A.  We open it and then the documents get tested by compliance

1   and they give us approval.

2   Q.  And you got full approval, right?

3   A.  Yeah.

4   Q.  After you got full approval, the account was completely

5   opened, correct?

6   A.  Correct.

7   Q.  And Ms. Wang had told you that there was going to be an

8   initial deposit, correct?

9   A.  Yes.

10  Q.  And, in fact, she told you the deposit was going to be one

11  million, but it turned out to be about $600,000, correct?

12  A.  I don't know the exact amount.

13  Q.  Was it not one of the documents that you reviewed with

14  Ms. Murray when you met with her 19 times?

15  A.  Don't recall, no.

16  Q.  When you opened accounts for Ms. Wang or for Golden Spring,

17  you made sure to comport with Citibank's policy, correct?

18  A.  Yes.

19  Q.  And you opened more than one account for her, correct?

20  A.  Correct.

21  Q.  And that was in no way an obligation of Citibank's policy,

22  right?

23  A.  That's what?

24  Q.  That was not contrary to Citibank's policies, correct?

25  A.  No.

1    Q.  In fact, Citibank encouraged you to open multiple accounts

2    for business entities, correct?

3    A.  Correct.

4    Q.  Golden Spring had at least two signers on each account; is

5    that correct?

6    A.  I don't remember the exact number of signers.

7    Q.  Do you remember Ms. Wang was a signer?

8    A.  Yes.

9    Q.  Do you remember Melissa Menendez being a signer?

10   A.  Yes.

11   Q.  Do you, sitting here today, do you know what Ms. Menendez's

12   job was at Golden Spring?

13   A.  She was an accountant, an office manager as well.

14   Q.  And sitting here today, do you know she still works at

15   Golden Spring?

16   A.  No.

17   Q.  As a banker at Citibank, you had a view and transparency

18   into the accounts, correct?

19   A.  I had what they gave me in terms of information.

20   Q.  You could look at what transactions were going on in a bank

21   account, correct?

22   A.  Okay, yeah, correct.

23   Q.  And that's because you worked at Citibank, correct?

24   A.  Yes.

25   Q.  And you saw that the Golden Spring account received money

1    from Golden Spring Hong Kong, correct?

2    A.  Might have been.

3              MS. MURRAY:  Objection, hearsay.

4              THE COURT:  If you have direct knowledge, you may

5    answer the question.

6    A.  I don't remember all the transactions that came in.

7              MS. SHROFF:  Well, let me show you DX-10339, and it's

8    just for the witness, please.  This is pursuant to the Citibank

9    stipulation.  Your Honor, at this point pursuant to the

10   stipulation I ask that DX-10339 be admitted into evidence.

11             THE COURT:  No objection?

12             MS. MURRAY:  No objection, your Honor.  Thank you.  We

13   were just confirming.

14             THE COURT:  It is admitted.

15             (Defendant's Exhibit DX-10339 received in evidence)

16             MS. SHROFF:  If I may publish it to the jury.

17             THE COURT:  You may.

18   Q.  Tell us, Mr. Khaled, what is this document?

19   A.  That's a bank statement.

20   Q.  For which bank?

21   A.  Citibank.

22   Q.  For whose account?

23   A.  Golden Spring New York LTD.

24   Q.  For what time period?

25   A.  March 30 to April 25.

O6BBGUO3                          Khaled - Cross

1    Q.  Let's go to page three of the PDF, please.

2          Could you take a look at those three transactions for

3    me?

4    A.  Yes.

5    Q.  Is that money coming into the account?

6    A.  Yes.

7    Q.  Who's it coming in from?

8    A.  ACA Capital Group Limited.

9    Q.  What's the date?

10   A.  May 2.

11   Q.  And what's the amount for each deposit?

12   A.  100,000.

13   Q.  So all totaled, and this is easy math, so it's 300,000?

14   A.  Correct.

15   Q.  Let's look at page 51 of the PDF.  It's Bates ending 58122,

16   if you could look at the February 12, 2019 wire.

17          Could you tell us what transaction that is, sir?

18   A.  That's a debit transaction.

19   Q.  What is a debit transaction?

20   A.  Money going out.

21   Q.  Money going out from which account?

22   A.  Golden Spring.

23   Q.  And where is the money going to?

24   A.  Rule of Law Foundation.

25   Q.  And what is the Rule of Law Foundation, sir?

1    A.  You're asking me at this time?

2    Q.  No, sir.  I'm asking you.

3    A.  At that time?

4    Q.  At that time.

5    A.  At that time, I did not know.

6    Q.  I'm sorry.

7    A.  At that time, I did not know.

8    Q.  You did not know?

9    A.  On February 12 of 2019, I did not.

10   Q.  And after that as the person who got to know more, did you

11   come to have an understanding of what the Rule of Law

12   Foundation, Mr. Khaled?

13   A.  This is a different bank statement.

14   Q.  I'm not asking you about the bank statement, sir.  I'm just

15   asking you about the Rule of Law Foundation.

16   A.  Okay.  What's your question?

17   Q.  My question, sir, is what is your understanding of the Rule

18   of Law Foundation?

19   A.  It's a non-for-profit foundation.

20   Q.  Thank you.  If I could go to page 52.  And if I could focus

21   you on, February 15th, if I may.  What is that transaction if

22   you could explain it to the jury?

23   A.  That's an ACH debit.

24   Q.  And what is an ACH debit?

25   A.  It's an ACH, money going out.

O6BBGUO3                         Khaled - Cross

1    Q.  And what does it say underneath that?

2    A.  ADP wage pay.

3    Q.  And what would that tell you as a banker?

4    A.  Payroll.

5    Q.  It would tell you that this bank account is making payroll;

6    is that correct?

7    A.  Correct.

8    Q.  Do you see a deposit there of $500,000 from something noted

9    as IMMA?

10   A.  Yes.

11   Q.  And what is IMMA, sir?

12   A.  A money market account.

13   Q.  And the money market account is putting into Golden Spring

14   $500,000; is that correct.  Am I reading that right?

15   A.  Can you repeat the question.

16   Q.  Sure.  I'll make it easy for you.  You tell me what is this

17   showing?

18   A.  It says transfer, credit transfer from IMMA.

19   Q.  So it's money coming in?

20   A.  Correct.

21   Q.  $500,000?

22   A.  Yes.

23   Q.  Now, let's look at page 122, a January 31 transaction,

24   $24,236.41.  Somebody's getting paid?

25   A.  Yes.

O6BBGUO3                          Khaled - Cross

1    Q.   ADP wage pay, correct?

2    A.   Correct.

3    Q.   Page 123, there's a $10,000 payment, correct?

4    A.   Correct.

5    Q.   Payments being made to a law firm, correct?

6             MS. MURRAY:   Objection, your Honor.

7    Q.   What is that payment going to?

8             MS. MURRAY:   Objection based on the Court's prior

9    ruling.

10            THE COURT:   If you'll step up, please.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO3                          Khaled - Cross

1              (At the sidebar)

2              THE COURT:  So in my ruling I said you could not call

3       attention to attorneys.

4              MS. SHROFF:  This is 2018.  There's no advice of

5       counsel defense here.  I'll move on, but that is not how I read

6       it. I'm simply trying to show the money coming in and going

7       out.  I'm happy to move on, but there's no reliance on this law

8       firm for anything.

9              MS. MURRAY:  Your Honor, a few points.  One, I would

10      note the face of this document doesn't indicate Wachtel Missry

11      as a law firm.  Ms. Shroff testified to that and put that in

12      front of the jury.  Second, your Honor is correct.  We believe

13      this is squarely within the prior ruling which we clarified a

14      day or two ago where we had a similar issue come up where

15      defense called out a presence of a law firm before we could

16      submit proper argument.  I would also submit that 2018 is

17      within the charged conspiracy.

18             MS. SHROFF:  Right.  But there is no advice of counsel

19      issue in 2018, number one.  Number two, questions by a lawyer,

20      this is basic criminal law.  Questions by a lawyer are not

21      evidence.  The only evidence is the response.  And the response

22      was, he didn't know.  So my question doesn't do anything

23      because it's not evidence.

24             THE COURT:  You're calling attention to the

25      relationship with an attorney.

O6BBGUO3                          Khaled - Cross

1              MS. SHROFF:  No, I'm showing that bills were paid out

2      of the account including to an attorney.  That is not calling

3      attention to it.  It's just a bill being paid.

4              THE COURT:  That's exactly what you're doing.  Did you

5      want to say something, Mr. Kamaraju?

6              MR. KAMARAJU:  I believe there's going to be another

7      witness named Daniel Podhaskie who is going to testify at some

8      point. My understanding from his 3500 material and his prior

9      SEC testimony is that he testified that a lot of the bills

10     going out of Golden Springs were to pay for litigation,

11     litigation that led to protest the government's highlighting.

12     I'm just trying to understand how those two things interact if

13     we're not allowed to, when they put Mr. Podhaskie on the stand

14     with bank records to say, you were paying in connection with

15     all this litigation, but --

16             THE COURT:  Well, it's one thing if he's on the stand,

17     but you're picking out bills paid from an account specifically

18     calling attention to certain bills, one of which is this law

19     firm.

20             MR. KAMARAJU:  I understand your Honor's ruling here.

21     I'm just trying to make sure looking down the road I don't want

22     to come back and have this issue again.

23             THE COURT:  I'm glad.  Okay.  We're done.

24             (Continued on next page)

25

O6BBGUO3                          Khaled - Cross

 1                    (In open court)

 2                    THE COURT:  You may continue.

 3    BY MS. SHROFF:

 4    Q.  And this was an account maintained at Citibank, correct?

 5    A.  Can you repeat that question.

 6    Q.  The document that I showed you was for an account

 7    maintained at Citibank, correct?

 8    A.  Yes.

 9    Q.  Now, by 2020, Golden Springs' account had been opened,

10    correct, by January of 2020?

11    A.  Yes.

12    Q.  And you had moved out of opening bank accounts, correct?

13    You had moved to another department within Citibank; is that

14    fair to say?

15    A.  Correct.

16    Q.  You had moved onto healthcare; is that right?

17    A.  Yes.

18    Q.  And that was also sort of the beginning of the pandemic,

19    correct?

20    A.  I believe so, yeah.

21    Q.  Did Citibank have a policy of remote working during the

22    pandemic?

23    A.  Yes.

24    Q.  And what was the policy?

25    A.  Work from home.

1   Q.  And you were asked these questions on your direct, but you

2   heard again from Ms. Wang in January of 2020, correct?

3   A.  No, it wasn't January.

4   Q.  Okay.  In what month of 2020?

5   A.  I believe it was May.

6   Q.  In May of 2020.  How did she reach out to you by the way?

7   A.  Whatsapp or text message.  I'm not sure.

8   Q.  You're not sure?

9   A.  Text message.

10  Q.  And she texted you and asked you what?

11  A.  She needed my help to open a bank account.

12  Q.  She wanted to open a bank account, correct?

13  A.  Yes.

14  Q.  And did you reply to her text and answer her question?

15  A.  I'm sure I replied, yeah.

16  Q.  Do you recall letting her know that you had moved on from

17  opening bank accounts to healthcare?

18  A.  Yes.

19  Q.  You were not going to be able to open an account for her,

20  right?

21  A.  Me personally, no.

22  Q.  Right.  So did you just continue talking to her about what

23  kind of account she wanted to open any way?

24  A.  I might have, yeah.

25  Q.  Excuse me.

1  A.  I might have, yeah, continue.

2  Q.  You didn't right off the bat tell her, I'm in healthcare,

3  right?

4        You continued to talk to her about what kind of

5  account she wanted to open?

6  A.  Yeah.

7  Q.  Right.  You asked her what account is it, what is the

8  account for, correct?

9  A.  Correct.

10  Q.  You asked her the name of the company, correct?

11  A.  I might have, yeah.

12  Q.  Excuse me.

13  A.  I might have, yes.

14  Q.  She told you the name of the company, correct?

15  A.  Yeah.

16  Q.  She told you it was a media company, correct?

17  A.  Correct.

18  Q.  And she told you the name of the company, correct?

19  A.  Yes.

20  Q.  She told you it was GTV, correct?

21  A.  Yes.

22  Q.  And all of this time you knew that you couldn't open an

23  account for her, but you kept talking to her, correct?

24  A.  Correct.

25  Q.  You looked up the media company, correct?

O6BBGUO3                         Khaled - Cross

1   A.  Yes.

2   Q.  You went on that website to check it out, correct?

3   A.  Correct.

4   Q.  You knew you couldn't open an account, but still you went

5   to investigate the company, correct?

6   A.  Yeah.

7   Q.  Okay.  And you knew that the account, that the company had

8   a bigger account with another bank, correct?

9   A.  She told me, yeah.

10  Q.  And you continued talking to her about that account even

11  though you were not going to be -- you were not in that

12  department anymore, right?

13  A.  I had made the referral already.

14  Q.  You already made the referral, but you continued talking to

15  her?

16  A.  Yeah.

17  Q.  So you made the referral to somebody else at Citibank,

18  correct?

19  A.  Correct.

20  Q.  So some other person at Citibank is working on this account

21  with Ms. Wang, correct?

22  A.  Yes.

23  Q.  He's trying to establish his own rapport with her, correct?

24          MS. MURRAY:  Objection, your Honor.

25          THE COURT:  How could he know what the other person

```
 1   was trying to do.
 2   Q.  Isn't that what you're trained to do as a Citibank
 3   employee, develop a rapport with your customer?
 4   A.  Yeah, but I don't know what he did.
 5             MS. MURRAY:  Objection, your Honor.
 6             THE COURT:  As to relevance.  Please move on.
 7   Q.  You knew from talking to Ms. Wang that it was a large
 8   account, correct?
 9   A.  Yes.
10   Q.  You asked her how large an account was it, correct?
11   A.  No, she told me.
12   Q.  She told you how large the account was going to be with the
13   understanding that you were still going to open the account,
14   right?
15             MS. MURRAY:  Objection, your Honor.
16             THE COURT:  He could not possibly know what she had on
17   her mind.
18   Q.  You were talking to Ms. Wang throughout this time, correct?
19   A.  Yes.
20   Q.  And you were in healthcare?
21   A.  Yeah.
22   Q.  To open this account, did you have her send the documents
23   to you or to the other person at Citibank?
24   A.  The other person.
25   Q.  Your testimony is that Ms. Wang sent the documents to the
```

1    other person at Citibank, correct?

2    A.  Could have been copied, but definitely the other person was

3    working with her.

4    Q.  You were copied, right, Mr. Khaled?

5    A.  I might have.  I don't remember.

6    Q.  Do you remember the name of the other person?

7    A.  James Song.

8    Q.  Right.  And Mr. Song and you were on the same email chain

9    getting documents from Ms. Wang, correct?

10             THE COURT:  You can answer.

11   A.  I don't remember.

12   Q.  I'll come back to that.  The account was opened on June 3rd

13   of 2020, correct?

14   A.  I don't remember the exact date, but in June.

15   Q.  You kept in touch with Mr. Song and asked him how the

16   account was going, correct?

17   A.  Yes.

18   Q.  You asked Mr. Song how much the balance was in that

19   account, correct?

20   A.  Yeah.

21   Q.  And Mr. Song is the one who told you that there was $200

22   million in that account, correct?

23   A.  Yes.

24   Q.  And you wanted to know that because you wanted to get

25   credit for that account, correct?

1   A.  Yep.

2   Q.  There's something called a 30-day-balance for a referred

3   account, correct?

4   A.  Correct.

5   Q.  And there is something called a score card at Citibank,

6   correct?

7   A.  Correct.

8   Q.  Each employee has a score card?

9   A.  I don't know that for certain.

10  Q.  You had a score card, correct?

11  A.  I did.

12  Q.  And this account you wanted to make sure showed up on your

13  score card, correct?

14  A.  Yes.

15  Q.  You wanted it to show up because it was a large account,

16  correct?

17  A.  Correct.

18  Q.  You wanted to make sure you kept your relationship with

19  Ms. Wang, correct?

20  A.  Yeah.

21  Q.  And then you took that account and you referred that

22  account to an outside financial advisor, correct?

23  A.  Can you specify.

24  Q.  Sure.  Who is Eric Mark?

25  A.  Eric Mark is a financial advisor at the same branch I

O6BBGUO3                         Khaled - Cross

1    worked at.

2    Q.  And what did you do with Mr. Mark and Ms. Wang, the Golden

3    Spring account, I mean the GTV account?

4    A.  I asked him to connect with James for a large account

5    opportunity.

6    Q.  You asked him to connect with James as oppose to Ms. Wang;

7    is that your testimony?

8    A.  Yes.

9    Q.  And once you connected them, you learned from him, did you

10   not, that there was some kind of investigation, correct?

11   A.  Yes.

12   Q.  And you knew of that investigation from someone at Citibank

13   that you trusted, correct?

14   A.  From Eric Mark, yeah.

15   Q.  You trusted Mr. Mark, right?

16   A.  In terms of what?

17   Q.  He's your colleague, right?

18   A.  Yeah.

19   Q.  You trusted the information he was giving you, correct?

20   A.  What do you mean?

21   Q.  He gave you a piece of information that these companies

22   could be under investigation, and you trusted that information,

23   right?

24   A.  He gave me the information.

25   Q.  Right.  Excuse me.

O6BBGUO3                         Khaled - Cross

1   A.  He gave me the information, but what do you mean trust?

2   Q.  You thought the information was correct, right?

3   A.  I just got the information.

4   Q.  So somebody's telling you that the person you are engaging

5   with is under investigation, those companies, and you just kept

6   that information as a banker and did nothing more?

7            MS. MURRAY:  Objection, your Honor, misstates

8   testimony.

9            THE COURT:  Sustained.

10  Q.  What did you do with that?

11  A.  Just reviewed it, saw the article.

12  Q.  You reviewed it and saw the article?

13  A.  Yeah.

14  Q.  And then you continued dealing with Ms. Wang?

15  A.  Yeah, it was an investigation.

16  Q.  You did not report it to Citibank compliance, correct?

17  A.  No.

18  Q.  And you continued to talk to Ms. Wang even though you moved

19  onto healthcare, right?

20           MS. MURRAY:  Asked and answered.

21           THE COURT:  Sustained.

22  Q.  Mr. Khaled, in 2020, would it be fair to say that you

23  yourself were having some financial issues?

24  A.  Yeah.

25  Q.  Can you speak up.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  It's fair to say you were having financial issues?

3   A.  Yes.

4   Q.  And you had declared bankruptcy in 2018, correct?

5   A.  Correct.

6   Q.  And that was in Eastern District of New York, Brooklyn

7   right here, correct?

8   A.  No.

9   Q.  Where was it then?

10  A.  Islip, Long Island.

11  Q.  Still under the Eastern District purview, correct?

12  A.  I believe so.

13  Q.  And that bankruptcy, the trustee in that bankruptcy moved

14  to dismiss that bankruptcy on February 16 of 2018, correct?

15  A.  Yeah.

16  Q.  And they dismissed it because you didn't keep up with the

17  bankruptcy related payments, correct?

18  A.  That was improper documents, that's why they dismissed it.

19  Q.  I'm sorry.

20  A.  Improper documents that were filed.

21  Q.  You filed improper documents or somebody else?

22  A.  My attorney.

23  Q.  Your attorney filed improper documents, so the bankruptcy

24  was dismissed.  That's your testimony?

25  A.  I believe so, yeah.

1   Q.  You believe so or you know?

2   A.  I think that was dismissed because of that, yeah, because

3   of improper documents.

4   Q.  Okay.  The court dismissed another bankruptcy on November

5   21, 2018, correct?

6   A.  Correct.

7   Q.  And that was also because you failed to make the agreed

8   upon payments to people you owed money to, correct?

9           MS. MURRAY:  Objection, your Honor, mischaracterizing

10  the reason for the prior dismissal.

11          THE COURT:  Sustained.

12  Q.  Why was that bankruptcy dismissed, sir?

13  A.  For the same reason.

14  Q.  Oh, your lawyer again made a mistake?

15  A.  Yeah, it was right after a month in between them, correct.

16  Q.  So the lawyer made a mistake the first time.  Was it a

17  different lawyer now or you kept the same lawyer that had made

18  the mistake?

19  A.  I think I kept him.

20  Q.  So you made the mistake now the second time?

21  A.  I believe so, yeah.

22  Q.  And did you keep him after the second time?

23  A.  Yes.

24  Q.  So you kept him after the second time, and then the

25  bankruptcy was dismissed again in February of 2019, correct?

1    A.  It was all under one bankruptcy, so it wasn't separate

2    three.  There's one bankruptcy that stayed active.

3    Q.  Right.  And it stayed active because you didn't make

4    payments to people you owed money to under the bankruptcy plan,

5    correct?

6    A.  No, it stayed active until now.  Like, it stayed active.

7    Those three is one.  Those three that you just --

8    Q.  Did you owe money to people?

9    A.  Yeah.

10   Q.  You didn't pay it, right?

11   A.  Now I did, yeah.

12   Q.  You paid it when?

13   A.  Through the bankruptcy.

14   Q.  2024?

15   A.  There's two payments left.

16   Q.  Okay.  So you haven't paid it yet, right?

17   A.  There's two payments left.

18   Q.  So two payments are left, that means you haven't paid it

19   yet, right?  Help me out here.

20   A.  Yes, there's two payments left out of the 100 percent owed,

21   correct.

22   Q.  So you haven't paid it off yet, right?

23            MS. MURRAY:  Objection.

24            THE COURT:  Sustained.

25            MS. SHROFF:  I haven't gotten an answer to that

O6BBGUO3                         Khaled - Cross

1   question.

2            THE COURT:  Sustained.  He has answered the question.

3   Q.  Sitting here today is it your testimony that the bankruptcy

4   trustee did not move to dismiss these bankruptcies on December

5   21 of 2023?

6   A.  December 2023, yeah, the last two payments have not been

7   paid.

8   Q.  How about on March 25 of 2024, do you remember the

9   bankruptcy trustee dismissing the bankruptcy as recently as

10  March 25 of 2024 for failure to pay?

11  A.  Yeah, I didn't pay those last two payments.

12  Q.  And throughout the time you were employed, at least from

13  2018 until 2020, you were employed by Citibank, correct?

14  A.  Correct.

15  Q.  You did not tell Citibank that you were in bankruptcy,

16  correct?

17  A.  No.

18  Q.  And did you tell the bankruptcy trustee about this $2.7

19  million judgment?

20  A.  The what?

21  Q.  The $2.7 million judgment now, have you told the bankruptcy

22  trustee about that?

23            MS. MURRAY:  Objection, your Honor, mischaracterizes

24  what the 2.7 million is.

25            THE COURT:  You can ask whether he's told the

1    bankruptcy trustee about the $2.7 million obligation.

2              MS. SHROFF:  Thank you, your Honor.

3    Q.  You can answer that question.  Thank you.

4    A.  No.

5    Q.  Aren't you required to do that?

6    A.  I don't know.

7    Q.  You don't know?

8    A.  No.

9    Q.  Still have the same lawyer as before?

10   A.  Yes.

11   Q.  Have you checked with him if you have this obligation?

12             MS. MURRAY:  Objection, your Honor.

13             MS. SHROFF:  I'll move on.

14   Q.  In June of 2020, Citibank itself had taken adverse action

15   on the GTV and Saraca accounts, correct?

16   A.  Yes.

17   Q.  And you yourself in 2020 were looking to get out of

18   Citibank, correct?

19   A.  Yes.

20             (Continued on next page)

21

22

23

24

25

O6B1GUO4                     Khaled - Cross

1    BY MS. SHROFF:

2    Q.  You were the one who asked Ms. Wang for a job opportunity;

3    isn't that correct?

4    A.  No.

5    Q.  You asked her about the possibility of opening up a

6    consulting firm?

7    A.  It was discussed, not me asking.

8    Q.  How would she know about your desire to open a consulting

9    firm if you didn't tell her about it?

10            MS. MURRAY:  Objection, your Honor.

11            THE COURT:  Sustained.

12   Q.  You told her about your desire to open a consulting firm,

13   correct?

14   A.  It was discussed.

15   Q.  You'd run your own business before, right?

16   A.  Yes.

17   Q.  It had not been successful, correct?

18   A.  Correct.

19   Q.  You wanted to try again, correct?

20   A.  Yeah.

21   Q.  You wanted an international client base, correct?

22   A.  Yes.

23   Q.  And Ms. Wang and her companies provided that, correct?

24   A.  Yes.

25   Q.  You made the pitch, she turned you down, correct?

O6B1GUO4                    Khaled - Cross

1   A.  I don't know what you mean.

2   Q.  I'm sorry?

3   A.  I don't know what you mean.

4   Q.  You said, can you and I form an international consulting

5   firm, she said no, correct?

6   A.  No.

7   Q.  Okay.  You then asked her if there was a need for a person

8   like you at GTV, correct?

9   A.  I don't recall.

10  Q.  You said to her, I can help you open bank accounts,

11  correct?

12  A.  I don't recall these exact words.

13  Q.  Well, you texted with her, right?

14  A.  Yeah.

15  Q.  You texted with her on iPhone, correct?

16  A.  Correct.

17  Q.  You texted with her on Signal, correct?

18  A.  Correct.

19  Q.  And you testified on direct that you perceived Ms. Wang to

20  be a caring person towards her employees, correct?

21  A.  She acted caring, yeah.

22  Q.  You testified to what you testified to, sir.  I'm just

23  asking you, that was your impression, at least back then,

24  correct?

25          MS. MURRAY:  Objection, your Honor.  Argumentative.

```
 1                MS. SHROFF:  I'll move on, your Honor.
 2    Q.   That was your impression back then, sir?
 3    A.   Impression of what?
 4    Q.   Of her being a caring person.
 5    A.   Back then, yeah.
 6    Q.   Okay.  You asked her if she could set up a job interview
 7    for you at GTV, correct?
 8    A.   It wasn't asked, it was discussed, and she asked me.
 9    Q.   It was discussed, but she asked you; that's your testimony.
10    A.   Yeah, it was——it was a discussion, back and forth.
11    Q.   Okay.  In any event, you had an interview, right?
12    A.   Very informal, yeah.
13    Q.   Very informal interview, with whom?
14    A.   With Yvette.
15    Q.   With Ms. Wang?
16    A.   Yes.
17    Q.   Where was the interview, sir?
18    A.   At the townhouse, 162 East 64th Street.
19    Q.   And now let me ask you this question, here.  In the 19
20    times that you met with Ms. Murray, did you ever call the East
21    64th Street building a townhouse?
22    A.   Yes.
23    Q.   Really.
24                MS. MURRAY:  Objection, your Honor.
25    Q.   In all the times that you——
```

1      MS. MURRAY:  Objection, your Honor.

2      MS. SHROFF:  I'll move on.

3      THE COURT:  Please don't say "really."  Go ahead.

4      MS. SHROFF:  I apologize, your Honor.

5  Q.  In all the time that you talked to Ms. Wang about meeting

6  with her, did she ever refer to the East 64th Street structure

7  as the townhouse?

8  A.  I believe so, yeah.

9  Q.  You believe so?

10 A.  Yeah.

11 Q.  Okay.  When you entered the building, what is the big sign

12 you see over there?

13      MS. SHROFF:  Can you show it to him, please.

14 A.  Big sign?  What do you mean?  Where?

15 Q.  I'm going to——let me show you a photograph, if I may, okay?

16 A.  Sure.

17      MS. SHROFF:  Your Honor, I don't have an exhibit

18 number, but I'm going to go with 7001, Defense Exhibit 7001.

19      THE COURT:  Okay.

20 Q.  You see that?

21 A.  Yes.

22 Q.  Recognize it?

23 A.  Yeah.

24 Q.  What is it, sir?

25 A.  It's a very small sign called The Himalaya Embassy.

1  Q.  Where do you see that sign?

2  A.  It's right here.

3  Q.  No, no.  In real life, where do you see that sign?

4  A.  What do you mean?

5  Q.  Where else have you seen this sign?

6  A.  On that building.

7  Q.  On that building, right?

8  A.  Yeah, next to the door.

9          MS. SHROFF:  Okay.  I move 7001 into evidence, please.

10          MS. MURRAY:  No objection.

11          THE COURT:  It is admitted.

12          (Defendant's Exhibit 7001 received in evidence)

13  Q.  That's what they called this building, right?

14          MS. SHROFF:  If I could show it to the jury.

15  A.  Are you asking me?

16  Q.  Excuse me?

17  A.  Are you asking me?

18  Q.  Yes.

19  A.  That's what they called the building?

20  Q.  Yes.

21  A.  No.

22  Q.  So on the building when you enter, you see this sign,

23  right?

24  A.  Who "they"?

25  Q.  East 64th Street is a building, right?

1    A.  Yes.

2    Q.  Ms. Murray showed you the photographs, correct, of the

3    building?

4    A.  Correct.

5    Q.  She had shown you those photographs when you prepared with

6    her 19 times, correct?

7    A.  Correct.

8    Q.  She's never shown you this photograph, correct?

9    A.  No, I didn't see it.

10   Q.  Right.  And this, The Himalaya Embassy, appears on that

11   building, correct?

12   A.  Next to the door.

13   Q.  Of that building.

14   A.  Next to the door of that building.

15   Q.  Right.  East 64th, correct?

16   A.  162 East 64th Street.

17   Q.  Right.  And when anybody wants to meet there, they say,

18   let's meet at the embassy, correct?

19          THE COURT:  Sustained.

20   Q.  Isn't that building known as the embassy and not a person

21   calls it the townhouse?

22   A.  No.

23          MS. SHROFF:  Okay.  You can take that down.

24   Q.  Is this the building where you had your interview, East

25   64th?

O6B1GUO4                    Khaled - Cross

1   A.  Yes.

2   Q.  And Yvette was there, correct, Ms. Wang?

3   A.  Correct.

4   Q.  She was formally dressed for the interview, correct?

5   A.  She was dressed normal.

6   Q.  Well, you wore a suit, right?

7   A.  Yeah.

8   Q.  It was a job interview, right?

9   A.  No.  It was like a——a meeting, like I said, an informal

10  meeting.

11  Q.  It was an informal meeting for which you sent her a résumé,

12  correct?

13  A.  She asked for it, yeah.

14  Q.  So you sent it, right?

15  A.  I did send it.

16  Q.  Before you sent it, you updated it, correct?

17  A.  Yeah.

18  Q.  Okay.  She reviewed your résumé with you during the

19  interview, correct?

20  A.  Don't recall.

21  Q.  Asked you questions about your experience, correct?

22  A.  No.

23  Q.  No.

24          MS. MURRAY:  Is there a question pending, your Honor?

25          THE COURT:  What is the question?

O6B1GUO4                          Khaled - Cross

1   Q.  What month was this interview in, sir; do you recall?

2   A.  I think it was in June.

3   Q.  June of 2020, right?

4   A.  Yes.

5   Q.  Pandemic is still surging, correct?

6   A.  Yes.

7   Q.  And you went for an in-person interview, right?

8   A.  Again, it's a meeting.  I went for a meeting.

9   Q.  You went for an in-person meeting, correct?

10  A.  Yeah.

11  Q.  There was a follow-up?  You'd call it a meeting, I'd call

12  it an interview, but there was a follow-up, correct?

13  A.  Follow-up for what?

14  Q.  To that interview.

15  A.  In what sense?

16  Q.  Well, did you get the job at the first informal discussion,

17  as you call it?

18  A.  Yes, I got a job offer.

19  Q.  You got a job offer right there on the spot.

20  A.  No.

21  Q.  Yes or no?

22  A.  No, no.

23  Q.  No.

24  A.  No.

25  Q.  Okay.  So they—first you said yes, then you said no, so I

O6B1GUO4                    Khaled - Cross

1    want to make sure which one.

2                MS. MURRAY:  Your Honor, objection.  That

3    mischaracterizes the witness's answer.

4                THE COURT:  So did you get a job offer at the first

5    meeting?

6                THE WITNESS:  No.

7    Q.  Okay.  So they brought you back, correct?

8    A.  No.

9    Q.  Did they set up a second meeting?

10   A.  Yes.

11   Q.  Where was the second meeting?

12   A.  It was a Zoom, a Zoom or WhatsApp or—a Zoom, a video call.

13   Q.  A video meeting?

14   A.  A video call, correct.

15   Q.  Okay.  And whether they brought you back in person or on

16   WhatsApp, they brought you back for a second interview,

17   correct?

18                MS. MURRAY:  Objection, your Honor.  It's

19   mischaracterizing—

20                THE COURT:  Sustained.

21   Q.  Okay.  What was the Zoom meeting for?

22   A.  Yvette wanted me to meet Miles Guo.

23   Q.  Who else was at the meeting?

24   A.  On the call, it was just Yvette and Miles Guo and myself.

25   Q.  Okay.  And did you meet Mr. Guo?

1   A.  On the call, yes.

2   Q.  Could you see his face?

3   A.  Yes.

4   Q.  So it wasn't a call, it was a video, correct?

5   A.  That's what I meant, a video call.

6   Q.  So on this video call Mr. Guo asked you questions; is that

7   right?

8   A.  I can't recall if he asked questions.

9   Q.  And how many days after that, according to you, did you get

10  a job offer?

11  A.  I don't know the——I don't remember the exact days.

12  Q.  Okay.  Do you remember negotiating with Ms. Wang what your

13  salary would be?

14  A.  A little bit, yeah.

15  Q.  Well, it was a lot of back-and-forth, correct?

16  A.  I don't know about a lot.  I don't know the exact number of

17  back-and-forth.

18  Q.  You texted with her, right?

19  A.  I did.

20  Q.  And you texted with her about the dollar amount of your

21  salary, correct?

22  A.  Yeah.

23  Q.  You wanted a certain number and she right off the bat

24  wouldn't give it to you, correct?

25  A.  I believe so, yeah.

1  Q.  Right.  In fact, you texted her and you told her that you

2  were considered one of the top bankers at Citibank and she

3  should give you the salary you were asking for; remember that?

4  A.  Not in these exact words.  I don't remember.

5  Q.  I'm sorry?

6  A.  I don't remember the exact words, no.

7  Q.  But the gist of it is the fair one, right?

8  A.  What's the gist?  What do you mean?

9  Q.  That you told her that you were considered one of the top

10  bankers at Citibank, correct?

11  A.  Again, I don't remember the exact words.

12        MS. SHROFF:  May I, your Honor?

13        THE COURT:  You may.

14  Q.  Does that help refresh your recollection, Mr. Khaled?

15  A.  Yes.

16  Q.  May I.

17        And you pitched to her why you should get the salary

18  you wanted, correct?

19  A.  Again, I wouldn't call it pitch.

20  Q.  Okay.  What would you call it?

21  A.  I was simply asking if I have security in the job that

22  they're going to be offering me.

23  Q.  Okay.  Well, let's talk about that.  You asked her that

24  question, correct?

25  A.  Correct.

1   Q.  And what is it that she told you?  Do you remember?

2   A.  She said, if you want security, stay at Citibank.

3   Q.  Exactly.  She told you if you wanted security, you should

4   stay at Citibank, correct?

5   A.  Yes.

6   Q.  And then you continued to negotiate with her, correct?

7   A.  I continued talking to her, yeah.

8   Q.  I could not hear that.

9   A.  I continued talking to her.

10  Q.  But you didn't just talk to her, you talked to her about

11  the salary amount, correct?

12  A.  The amount was discussed.

13  Q.  Right.  You told her that you were going to forfeit your

14  bonus at Citibank so she should give you $70,000 to make up for

15  the lost bonus, and she said no, right?

16  A.  I told her about a bonus, yeah.

17  Q.  You told her you had—you wanted a two-month signing bonus;

18  you said that to Ms. Wang, correct?

19  A.  Could have, yeah.  Yeah.

20  Q.  And she said no, right?

21  A.  I don't remember what was exact reply, but I didn't get

22  that, no.

23  Q.  You did not get that, correct?

24  A.  No.

25  Q.  She told you if you wanted job security, you should stay at

1   Citibank, correct?

2           MS. MURRAY:  Objection, your Honor.

3           THE COURT:  Sustained.  Asked and answered.

4   Q.  She answered all of your questions honestly, correct?

5           THE COURT:  Sustained.

6   Q.  Did you think that question was honestly answered by

7   Ms. Wang, stay at Citibank?

8   A.  I wouldn't know if it was honest or not.

9   Q.  Okay.  And despite her admonition, you decided to take the

10  job, right?

11  A.  Despite what?

12  Q.  The admonition from her, you decided to take the job,

13  right?

14  A.  Can you explain what "admonition" is.

15  Q.  It's okay.  I'll move on.

16          You told Ms. Wang at some point that you were going to

17  accept the job, right?

18  A.  Yes.

19  Q.  And she put you in touch with Ms. Grace Yong; is that

20  right?

21  A.  Correct.

22  Q.  And that's because you still had more questions, correct?

23  A.  No.  She just put me in touch with her.

24  Q.  You asked her questions about your role at GTV and she told

25  you, talk to Grace Yong, correct?  Do you recall that?

O6B1GUO4                    Khaled - Cross

1   A.  No.

2   Q.  Okay.  Ms. Yong worked in HR; is that correct?

3   A.  Yes.

4   Q.  She answered your questions, correct?

5   A.  She gave me a scope of work.

6   Q.  And you described your conversation with her as a great

7   conversation, correct?

8   A.  I told her that—that I had a great conversation with—with

9   her.

10  Q.  You accepted the job offer, correct?

11  A.  Correct.

12  Q.  You did not get the salary you asked for, correct?

13  A.  No.

14  Q.  And—no, you did not get it, right?  I just want to make

15  sure the syntax is correct.  You asked for more, you settled on

16  350,000, correct?

17  A.  I agreed on the 350,000, correct.

18  Q.  Right.  But you'd asked for more, right?  You'd asked for

19  $450,000, you got 350.

20  A.  I don't remember exactly, but definitely more than 350, for

21  the bonus, yeah.

22  Q.  And you accepted the job, correct?

23          MS. MURRAY:  Objection, your Honor.  Asked and

24  answered several times.

25          THE COURT:  Sustained.

1          MS. SHROFF:  I did not hear the answer, but I'm happy

2   to move on.

3   Q.  And on July 7——July 10th of 2020, Ms. Wang reached out to

4   you to ask you if you had resigned from Citibank, correct?

5   A.  She might have.  I don't remember.

6   Q.  Does that refresh your recollection, Mr. Khaled?

7   A.  Yes.

8   Q.  She asked you, did you submit your resignation, correct?

9   A.  Correct.

10  Q.  You say, not yet, correct?

11  A.  Correct.

12  Q.  You never say to her, I'm not going to resign right now,

13  I'm going to keep the job at Citibank and hedge my bets,

14  correct?

15  A.  No.

16  Q.  And in fact, you respond to her and say you have to

17  finalize some things, correct?

18  A.  Correct.

19  Q.  You hedge, correct?

20  A.  I'm what?

21  Q.  It's all right.  I'll move on.

22          You start working, right, at East 64th Street, you

23  said, yesterday?

24  A.  Yes.

25  Q.  And Ms. Murray asked you to describe your first few days

O6B1GUO4                         Khaled - Cross

1    there, correct?

2    A.  Correct.

3    Q.  And you described them as chaotic or weird; is that

4    correct?

5    A.  I said weird, not structured.

6    Q.  Okay.  So let's talk about that.

7            When you were working during those weeks before

8    October 30th at East 64th, you were working two jobs, correct?

9    A.  Correct.

10   Q.  Okay.  Did Citibank give you a work phone?

11   A.  I don't think so.  Not at that time.

12   Q.  In July of 2020, Citibank did not give you a work phone,

13   right?  I just want to make sure I understand correctly.

14   A.  I don't remember.

15   Q.  Okay.  So you had a 9-to-5 job at Citibank, correct, and a

16   9-to-5 job at East 64th, right?

17   A.  9-to-5, correct.  But it was pandemic time.

18   Q.  Okay.  But you still owed seven hours to one job and seven

19   hours to another, right?

20   A.  It wasn't an hourly job.

21   Q.  You wouldn't take a salary if you weren't working for a

22   company, correct?  Because that would be theft.

23   A.  I was working, but again, it's not an hourly job of seven

24   hours and seven hours.

25   Q.  So for about three months, you worked 14 hours a day;

O6B1GUO4                    Khaled - Cross

1    that's your testimony?

2    A.  No.  It was two months, yeah.

3    Q.  So for two months you worked 14 hours a day.

4         Let me try it this way:  If you were at East 64th one

5    day and a Citibank employee or client called you, how would you

6    prioritize?

7         THE COURT:  I'd like the lawyers to step up, please.

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6B1GUO4                    Khaled - Cross

1              (At the sidebar)

2              THE COURT:  So you're asking him about theft of wages,

3      and he has a right against self-incrimination, and so I'm going

4      to have to advise him of his rights.

5              MS. SHROFF:  You can.  I have no objection.  I mean,

6      but he did steal.

7              THE COURT:  Well, this is at the level of a state

8      charge.  I don't expect that the immunity of the——

9              MS. MURRAY:  Your Honor, we don't have any objection

10     to this line of questioning.  He disclosed it to us.  It came

11     out on his direct testimony.  We believe it's covered by his

12     nonprosecution agreement, which covers him for any conduct

13     relating to the entire time that he worked for Guo, for Yvette

14     Wang during that period.

15             THE COURT:  But not a state crime.

16             MS. SHROFF:  I think he should be advised because it

17     is a state offense.

18             MS. MURRAY:  So typically, your Honor, for purposes of

19     our nonprosecution agreements or any agreements we enter into,

20     state crimes, crimes that are out of statute, etc., are not at

21     issue.  He was advised by counsel in entering into the

22     non-prosecution agreement.  We don't know the substance, okay,

23     of those conversations, but he did have the benefit of

24     consulting with counsel before he entered into the

25     nonprosecution agreement, and again, he disclosed it to us, and

1    again, we brought it out on direct examination.

2              MR. KAMARAJU:  So I would just note that I think his

3    nonprosecution agreement, like everybody's nonprosecution

4    agreement, specifically says that they cannot give protection

5    for criminal prosecutions either by other federal offices or

6    state authorities, so I think it's pretty explicit that it

7    doesn't cover it, your Honor.

8              THE COURT:  All righty.  So I'm going to have to

9    advise him of his rights and offer him counsel.

10             MR. FINKEL:  Your Honor, if I may, he has counsel with

11   respect to his testimony here.

12             THE COURT:  But does he have counsel present?

13             MR. FINKEL:  I don't know about that.

14             MS. MURRAY:  I don't believe so.

15             MR. FINKEL:  As a general matter, this happens all the

16   time.  When our office provides a nonprosecution agreement,

17   they have exposure also for state crimes.  It happens all the

18   time, whether it's domestic violence or fighting or whatever it

19   may be.  He has decided to enter into the nonprosecution

20   agreement and understands that he needs to answer questions on

21   cross and direct and from your Honor, completely and honestly

22   with respect to all of his conduct, and we don't believe that

23   any such instruction should occur, and if it does occur—which

24   we would object to, for the record—it should occur outside the

25   presence of the jury.

O6B1GUO4                        Khaled - Cross

1              THE COURT:  That part I got.

2              MR. FINKEL:  I was just——candidly, your Honor, sort of

3      with less formality attached to it, this happens all the time

4      where people have exposure, and they enter into a nonpros.  And

5      while I appreciate defense counsel looking out for a witness, I

6      don't think it's necessary here and this is pretty standard

7      practice.

8              MR. FERGENSON:  If I can add just one point to

9      Mr. Kamaraju's point about what's in the agreement.  Like

10     Mr. Finkel said, sort of every agreement covers the federal

11     crimes, but it's hard to think of what would be a federal crime

12     that would not also be a state or local crime, right?  And so

13     the agreement says, we can't formally give you coverage for

14     that, but at your request, we will raise to the attention of

15     any other prosecuting office the fact that you have entered a

16     nonprosecution agreement with our office for this conduct.

17             MR. KAMARAJU:  Your Honor, I'm sorry.  I think this

18     whole issue has been addressed in *Kastigar*, which I think

19     *Kastigar*, like, categorically addresses this issue, which is

20     that he continues to have a Fifth Amendment right in connection

21     with state offenses, despite the entry of a nonprosecution

22     agreement.  So I think your Honor is well within your

23     discretion——and frankly, it makes sense——to advise him outside

24     of the presence of the jury.  But that's——they cannot immunize

25     him for state offenses, and this is apparently getting into——

O6B1GUO4                        Khaled - Cross

1              MR. FERGENSON:  Every single cooperator——

2              MR. KAMARAJU:  And that is true then for every single

3    cooperator.

4              MR. FERGENSON:  It never happens for every cooperator.

5              MR. KAMARAJU:  That is the law.

6              THE COURT:  Well, you're in front of somebody who used

7    to be a state judge sitting on the bench.  So my question is:

8    Other than this area of this theft of wages, is there any other

9    state crime that you intend to bring up?

10             MS. SHROFF:  No.  I don't think there is——actually,

11   wait.

12             MR. KAMARAJU:  I don't think, right at this moment,

13   your Honor.  If I can just take a look at her outline to make

14   sure nothing is there, but I think the answer is no.

15             MS. SHROFF:  I think there was a whole bunch of

16   bounced checks, but I don't think there's any other state

17   crimes.  I think it was all federal.  So I don't think so.  But

18   I'm happy to double-check.

19             MR. FINKEL:  I'm not even sure this is theft of wages,

20   but I understand.

21             MR. KAMARAJU:  I think your Honor is well versed on

22   that, so——

23             MR. FINKEL:  I'm obviously not going to——I'm not going

24   to enter that competition, so that should be clear on the

25   record.

O6B1GUO4                          Khaled - Cross

1         MS. SHROFF:  I don't know.  I kind of miss being in

2    state court.  I got to tell you, 100 Centre Street was a lot

3    more fun than this.

4         MR. KAMARAJU:  Does your Honor intend to excuse the

5    jury at this point or——

6         ALL COUNSEL:  Well, she was going to check her

7    outline.  That was my understanding of what she was going to

8    do.

9         MR. KAMARAJU:  Oh, I misunderstood what you were going

10   to do.  I'll take a quick look at it just to make sure.

11        THE COURT:  Yes.

12        (Pause)

13        MS. SHROFF:  I do not intend to cross him on his DUIs

14   or his pot smoking so I think this is it.

15        THE COURT:  Well, we can take a break.

16        MS. SHROFF:  Okay.  I could use it.

17        THE COURT:  I'm going to look into getting a CJA

18   person, and let's just continue, and you'll go to a different

19   subject matter.

20        MR. FINKEL:  He has counsel, retained counsel.  We can

21   certainly have him call his counsel, as opposed to a CJA.  I'm

22   sure he would be available.  He knows he's testifying.

23        MS. MURRAY:  My understanding he was aware he's

24   testifying.  He was just not in the state yesterday and today

25   to be present.

1           THE COURT:  Who's his lawyer?

2           MS. MURRAY:  James Pascarella.

3           MS. SHROFF:  He also has Ezra Spilke, right, as a

4     lawyer?

5           MS. MURRAY:  Formerly.

6           MS. SHROFF:  He's on the CJA panel.  Maybe he can call

7     both of them.  We have no objection to who he calls.

8           MS. MURRAY:  I think we would, in the first instance,

9     suggest he contact Mr. Pascarella, but we'd be happy to do

10    that.

11          THE COURT:  So you'll move on to a different subject

12    matter.  It looks like he's going to be back tomorrow.

13          MS. MURRAY:  How long do you have?

14          MS. SHROFF:  Oh, I have——

15          MR. KAMARAJU:  I think it's fair to say he's coming

16    back tomorrow.

17          MS. MURRAY:  We could take this up——

18          THE COURT:  I'm going to stop before 3:00 because I

19    have to finish completely by 3:00, so——

20          MS. SHROFF:  Well, I thought we were going to 3

21    tomorrow, not today.

22          THE COURT:  Sorry.  I'm talking before 2:45.

23          MR. FINKEL:  So we can release our other witness we're

24    holding here for today?

25          MS. SHROFF:  Sure.

1                    MR. KAMARAJU:  Yes.

2                    (In open court)

3                    MS. SHROFF:  May I continue, your Honor?

4                    THE COURT:  You may.

5                    MS. SHROFF:  Thank you.

6                    If I could just show what is marked as Government

7     Exhibit BR399.

8     BY MS. SHROFF:

9     Q.  Mr. Khaled, you recall testifying about this document

10    yesterday, correct?

11    A.  Yes.

12    Q.  And Ms. Murray asked you questions about this paragraph 5,

13    correct?

14    A.  Yes.

15    Q.  Okay.  And paragraph 5, could you read that line for me,

16    "The equity grant will."

17    A.  "The equity grant will be subject to a vesting

18    requirement."

19    Q.  Right.  And you remember on direct yesterday you testified

20    that you did not in fact get any of this equity or the shares

21    that this contract provided for you, correct?  That's what you

22    said?

23    A.  Yes.

24    Q.  And did you fulfill the vesting requirement of this

25    contract?

1   A.  It wasn't clear what the vesting requirement was.

2   Q.  How long did you work there?

3   A.  Almost a year.

4   Q.  Almost a year?  How many months?

5   A.  11 months, something like that.

6   Q.  That's less than one year.  And you say it under oath that

7   you don't know what the vesting requirements were, correct?

8   A.  No.

9   Q.  Do you know what the vesting requirements were?

10  A.  No.

11  Q.  Okay.  So when you told the jury yesterday that you didn't

12  get any shares, you weren't really entitled to any shares,

13  right?

14          MS. MURRAY:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Under this paragraph 5, were you entitled to any shares?

17          MS. MURRAY:  Objection, your Honor.  He said he

18  doesn't know.

19          THE COURT:  Sustained.

20  Q.  What is your understanding of the vesting requirement?

21  A.  Entitled.

22  Q.  Excuse me?

23  A.  Entitlement.

24  Q.  Entitlement to what?

25  A.  Entitlement requirements.  That's what I mean by vesting.

1    That's what I understand what vesting is, entitlement.

2    Q.  Right.  So until you vest, you don't get anything, correct?

3            MS. MURRAY:  Objection, your Honor.  Asked and

4    answered.

5            THE COURT:  Sustained.

6    Q.  Did you have an exit interview, by the way, when you left?

7            THE COURT:  Left where?

8    Q.  Your employment?

9            THE COURT:  Where?

10   Q.  With GTV.  Did you have an exit interview?

11   A.  I didn't leave.

12   Q.  You didn't leave?  What happened?

13   A.  They——they let me go.

14   Q.  They fired you?

15   A.  They said the company is closing, not really——not requiring

16   me.

17   Q.  Only you were told that, right?

18           MS. MURRAY:  Objection, your Honor.

19           THE COURT:  Sustained.

20   Q.  Gladis still worked there, right?

21   A.  I don't know where Gladis worked.

22   Q.  Ms. Yong still worked there, right?

23   A.  I don't know who still works there.

24   Q.  Alex——not now.  I'm talking to you when you were fired.

25   They still worked there, right?

O6B1GUO4                    Khaled - Cross

1          MS. MURRAY:  Objection, your Honor, to the

2    characterization.

3          THE COURT:  Sustained.

4    Q.  Okay.  When you were let go——that's the word you used,

5    right?  Let go, right?

6    A.  Correct.

7    Q.  Okay.  Ms. Yong still worked there in HR, correct?

8    A.  Maybe.

9    Q.  Maybe?  Okay.  How about Aaron Mitchell, did he still work

10   there?

11   A.  Work where exactly?

12   Q.  East 64th Street.

13   A.  At the building?

14   Q.  Yes.

15   A.  At the townhouse?

16   Q.  Well, that's what you call it, but I just asked you about

17   East 64th Street.

18          MS. MURRAY:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q.  Aaron Mitchell still worked there, correct?

21   A.  He still worked for the family as a family office.

22   Q.  Who's Dan Podhaskie, by the way?

23   A.  Dan Podhaskie?

24   Q.  Yes.

25   A.  He was an in-house lawyer when I joined Saraca.

O6B1GUO4                        Khaled - Cross

1    Q.   In-house where, for whom?

2    A.   He worked for the Rule of Law.

3    Q.   Worked, according to you, at East 64th Street, correct?

4    A.   Yeah.

5    Q.   He still worked there after you were let go, correct?

6    A.   No.

7    Q.   He didn't work there when you were let go?

8    A.   No.

9    Q.   Okay.  How about Alex H?

10   A.   Again, I lost——I lost touch with them, so I don't know if

11   they continued to work there or not.

12   Q.   Okay.  But on the day that you were let go, Alex H was

13   still there, correct?

14   A.   I don't know.

15   Q.   Now on direct testimony you were asked questions about many

16   entities including Lexington Properties, correct?

17   A.   Yes.

18   Q.   And then you were asked about Lamp, correct?

19   A.   Correct.

20   Q.   And you were asked about Jovial, correct?

21   A.   Correct.

22   Q.   Would it be fair to describe all three of these entities as

23   Family Fund entities?

24   A.   What do you mean by Family Fund entities?

25   Q.   What did you mean by Family Fund when you testified to the

1   Family Fund?

2   A.  What do you mean?  What do you mean?  What do you mean why

3   you testified to Family Fund?  Can you——

4   Q.  Yesterday on direct, when Ms. Murray asked you questions

5   about the Family Fund, you answered those questions, correct?

6   A.  Your question is not clear.

7   Q.  You testified yesterday in this courtroom?

8   A.  Yes.

9   Q.  You testified about the Family Fund, correct?

10          I'll try it again.  You testified about the family

11  office, correct?  You remember that, at least?

12  A.  Family office?

13  Q.  Yes.

14  A.  Yes.

15  Q.  Okay.  What did you understand to be the family office?

16  A.  An entity that took care of expenses, investments for the

17  family.

18  Q.  Which family?

19  A.  As——you're asking me again family office?  That's what

20  family office——in this, it's Guo family.

21  Q.  Guo family, correct?

22  A.  Correct.

23  Q.  And Lexington Properties was an entity that paid the

24  expenses of the Guo family, correct?

25  A.  No.

O6B1GUO4                     Khaled - Cross

1    Q.  It didn't pay the expenses?

2    A.  No.  Lexington Properties was to pay for employees and

3    rent.

4    Q.  Okay.  And whose rent was included in that?

5    A.  I don't know.  I didn't manage exactly—

6    Q.  So you don't know?

7    A.  —the transactions.

8    Q.  I'm sorry?

9    A.  The transactions.  I don't know.

10   Q.  Okay.  So you don't know what transactions, correct?

11   A.  The specific transactions, no.

12   Q.  You don't—do you know general transactions?  No, right?

13   A.  General, employees that worked in the townhouse.

14   Q.  Did you ever look at any paperwork for Lexington

15   Properties?

16   A.  Formation documents, yeah.

17   Q.  Did you look at any of their day-to-day payroll?

18   A.  No.

19   Q.  Did you look at any of their bank accounts?

20   A.  Not specifically, no.

21   Q.  You don't know what money came in, correct?  And you don't

22   know what money went out, correct?

23   A.  Correct.

24   Q.  Let's talk about Lamp.  What did Lamp do?

25   A.  Same thing.  It was—it was told to me that Lamp was paying

O6B1GUO4                              Khaled - Cross

1   expenses for separate——for separate entities as well.
2   Q.  For separate entities or for the Guo family?
3   A.  Entities owned by the Guo family.
4   Q.  What entities that were owned by the Guo family did Lamp
5   pay for?
6   A.  There was a bunch of entities.  I don't——
7   Q.  Name one.
8   A.  I don't remember.  You could show me.
9   Q.  Excuse me?
10  A.  I don't remember.
11  Q.  You don't remember, right?
12  A.  No.
13  Q.  Okay.  You testified about a company called Regus, right,
14  R-E-G-U-S?  Remember that?
15  A.  Regus, yeah.
16  Q.  And you testified that they're the company through which
17  you rented virtual office space; is that right?
18  A.  Correct.
19  Q.  There's nothing illegal about virtual office space, is
20  there?
21          MS. MURRAY:  Objection, your Honor.  He can't speak to
22  a legal conclusion.
23          THE COURT:  Sustained.
24  Q.  Did you rent a virtual office?
25  A.  Yes.

O6B1GUO4                         Khaled - Cross

1   Q.  Did you sign a lease?

2   A.  They don't call it a lease.  It's an agreement.

3   Q.  I'm sorry?

4   A.  It's not a lease, it's an agreement.

5   Q.  Okay.

6   A.  Like, you know—

7   Q.  Thank you.  So you signed the agreement, correct?

8   A.  Yeah.

9   Q.  Okay.  And you signed virtual—I don't know, if it's not a

10  lease—I guess agreements for virtual space for other entities

11  also, correct?

12  A.  For other entities, yeah.  Yeah.

13  Q.  Yes?

14  A.  Yes.

15  Q.  Okay.  And you testified on direct yesterday that you did

16  that to show disassociation between Saraca, GTV, and Golden

17  Spring, correct?

18  A.  Different address, yeah.

19  Q.  Right.  You chose the addresses, or did someone else?

20  A.  For Lexington, Anthony wanted it close so they could pick

21  up the mail.

22  Q.  My question to you was:  Did you choose the addresses or

23  did someone else?

24          MS. MURRAY:  Asked and answered, your Honor.  He

25  answered the question.

O6B1GUO4                    Khaled - Cross

1           THE COURT:  Sustained.

2           MS. SHROFF:  I'm sorry.  Could somebody read that

3   answer back for me, please.

4           (Record read)

5   BY MS. SHROFF:

6   Q.  So Anthony Dibatista was the one who wanted to be close so

7   he could pick up the mail; is that right?

8   A.  Yes.

9   Q.  So you and Anthony Dibatista talked about what address to

10  pick, correct?

11  A.  Correct.

12  Q.  And you picked the address with him, correct?

13  A.  He asked me to get an address that is close, and that

14  location was the closest to the townhouse.

15  Q.  And you complied, correct?

16          I'll move on.

17          Before you started working there, there were no

18  virtual offices, correct?

19          MS. MURRAY:  Just clarify where "there" is.

20          MS. SHROFF:  Oh.  At East 64th Street.

21          THE COURT:  But there were no virtual offices in the

22  United States or——

23          MS. SHROFF:  No, no.  There were no virtual offices

24  for any G entity before he got there.  I apologize, your Honor.

25  That was a bad question.  Sorry.

O6B1GUO4                    Khaled - Cross

1    A.  I wouldn't know that.

2    Q.  But you would know that because you wouldn't have had to

3    get virtual office space if they already had it, correct?

4              MS. MURRAY:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  Before you signed an agreement for virtual office space,

7    you checked, right, that there was no virtual office space for

8    these entities beforehand?

9    A.  Yes.  They were new entities, Lexington was a new one, so—

10   Q.  How about Lamp?

11   A.  Don't remember.

12   Q.  How about Jovial?

13   A.  What do you mean?

14   Q.  An entity for which you got virtual office space.

15   A.  I don't think we got an entity—a virtual office for

16   Jovial.

17   Q.  Okay.  So your testimony was you only got virtual office

18   space for Lamp and Lexington.

19             MS. MURRAY:  Objection.  That's not his testimony.

20             THE COURT:  Sustained.

21   Q.  Which other companies did you get a virtual office for?

22   A.  G Music.

23   Q.  And where was G Music before you got it a virtual office?

24   A.  I don't know.

25   Q.  It was at East 64th, right?

1    A.  No.

2    Q.  You just said you don't know, but you know it wasn't at

3    East 64th.

4    A.  I know it wasn't at 64th, but I don't know what other

5    addresses they had.

6    Q.  How about G Fashion?

7    A.  Which G Fashion?  There was multiple.

8    Q.  Did you open multiple virtual offices for G Fashion?

9    A.  I know, but which G Fashion are you asking about?

10   Q.  I'm only asking about the G Fashion for which you opened a

11   virtual office.

12   A.  The G Fashion that was in the US had an office in

13   California, but I don't know if it was a virtual or not.

14   Q.  G Fashion moved from California to New York, correct?

15   A.  Again, which G Fashion?

16   Q.  And then it moved from New York to Italy, correct?

17   A.  I don't know that.

18   Q.  Who signed the agreements for the virtual offices?

19   A.  I don't remember.  Either me or Yvette.  I'm not sure.

20   Q.  Now you testified about an entity called Crane, correct?

21   A.  Yes.

22   Q.  And on direct you testified that you created this entity

23   after a discussion with Ms. Wang and an in-house attorney,

24   correct?  That's your testimony?

25   A.  Correct.

1  Q.  Is it fair to say, Mr. Khaled, that you're the one who

2  chose the name Crane, correct?

3  A.  It was suggested to Yvette, and she approved it.

4  Q.  Isn't it true, Mr. Khaled, that you chose the name because

5  you thought it was a lucky bird to name your company after?

6  A.  Yeah, Chinese one.

7  Q.  Right.  Ms. Wang had nothing to do with picking that name,

8  correct?

9  A.  It had a relationship to China.

10  Q.  That's not what I asked you.  What I asked you was:

11  Ms. Wang had nothing to do with you choosing that name; isn't

12  that correct?

13          MS. MURRAY:  Objection, your Honor.  Mischaracterizes

14  the testimony.

15          THE COURT:  You can answer this.

16  A.  Can you repeat the question.

17          MS. SHROFF:  Could you read it back to him, please.

18          THE COURT:  Go ahead.

19          (Record read)

20  A.  She had approved the name.

21  Q.  Do you see a difference between choosing and approving?

22          MS. MURRAY:  Objection, your Honor.

23          THE COURT:  So you selected the name and then she

24  approved it; is that the way it happened?

25          THE WITNESS:  Yeah, I suggested it and she approved

O6B1GUO4                        Khaled - Cross

1    it.

2    Q.  Did you email her about the name?  No, right?

3    A.  I don't remember.

4    Q.  You never texted her about the name, correct?

5    A.  Again, I don't remember.

6    Q.  She never went with you when you went to incorporate the

7    company, correct?

8    A.  We did it——I did it online.

9    Q.  She wasn't there with you, right, when you did it online?

10   A.  No.

11   Q.  And she had nothing to do with you paying the fee for that

12   company, correct?

13   A.  What do you mean had nothing?

14   Q.  In fact, isn't it fair to say, Mr. Khaled, that she

15   couldn't care one way or another whether you opened or didn't

16   open Crane?

17           MS. MURRAY:  Objection, your Honor.

18           THE COURT:  Sustained.  He can't testify as to how she

19   felt.

20   Q.  Who controlled Crane?

21   A.  In what instance?

22   Q.  In what instance?

23   A.  Yeah.  Like, what do you mean?

24   Q.  Who had ownership of Crane?

25   A.  I had ownership on paper.

O6B1GUO4                      Khaled - Cross

1    Q.  Is there any other way to have ownership of Crane?

2    A.  On paper, no.

3    Q.  Is there any other way to have ownership of Crane other

4    than on paper?

5    A.  No.

6    Q.  And you testified yesterday on direct that it was through

7    this entity Crane that you were going to apply for a license

8    for a bank, correct?

9    A.  Correct.

10   Q.  Your thought was that you were going to get a license for

11   an actual bank, correct?

12   A.  Correct.

13   Q.  And you also had the thought that you might want to get a

14   license for an online digital bank, correct?

15   A.  Can you repeat that.

16   Q.  Sure.  And was it also your hope or your intention to set

17   up an online digital bank?

18   A.  Correct.

19   Q.  And as a banker of at least a decade, did you know that a

20   person who has declared bankruptcy is disqualified from getting

21   such a license?

22   A.  Don't believe so.

23   Q.  You don't believe──you believe that a person who is in

24   personal bankruptcy, while they're applying for the license to

25   run a bank, is not automatically disqualified.

O6B1GUO4                      Khaled - Cross

1    A.  No.  I did not know that.

2    Q.  You did not know that.

3    A.  I don't know that for sure.

4    Q.  You don't know that for sure.

5          MS. MURRAY:  Objection, your Honor.

6    A.  No.

7          THE COURT:  Sustained.

8    Q.  Did you research whether or not your personal bankruptcy,

9    which you are in even now, would disqualify you from owning a

10   bank?

11   A.  The attorneys we were talking to didn't see that would be

12   an issue.

13   Q.  Did you tell the attorneys that you were in bankruptcy?

14   A.  Yes.

15   Q.  Which attorneys did you tell?  Did you tell Victor Cerda

16   that you were in bankruptcy?

17   A.  Yes.

18   Q.  You told Victor Cerda that you were in bankruptcy at the

19   time that you were applying for a banking license?

20   A.  Yes, he knew that.

21   Q.  You told Ms. Wang, Yvette Wang, that you were in bankruptcy

22   while you were applying for a banking license.

23   A.  Yes.

24   Q.  And your testimony—did you also share that information

25   with Miles Guo?

O6B1GUO4                      Khaled - Cross

1    A.  Yes.

2    Q.  And when did you share that information with Yvette Wang,

3    before or after you accepted that job?

4    A.  After.

5    Q.  So you took a job, you didn't tell her you were in

6    bankruptcy, and then you disclosed it to her after.

7    A.  Yes.

8    Q.  When?

9    A.  October of 2020.

10   Q.  When in 2020?

11   A.  October.

12   Q.  October of 2020?

13   A.  Yeah.

14   Q.  You told Ms. Wang in October of 2020 that you had declared

15   personal bankruptcy.

16          MS. MURRAY:  Objection, your Honor.  Asked and

17   answered.

18          THE COURT:  Sustained.

19   Q.  Did she ask you for paperwork about the bankruptcy?

20   A.  No.

21   Q.  Did she ask you how long you declared bankruptcy for?

22   A.  No.

23   Q.  Did she ask you how much you owed the trustee in

24   bankruptcy?

25   A.  No.

O6B1GUO4                        Khaled - Cross

1   Q.  So you told Yvette Wang, your employer, that you were in

2   bankruptcy and she asked you no follow-up questions.

3   A.  No.  She said that she'll add somebody else to the company.

4   Q.  She'll add somebody else to whose company?

5   A.  Crane.

6   Q.  But Crane was your company, right?

7   A.  Correct.

8   Q.  She couldn't add anybody to your company at all, correct?

9   A.  If she asked me to, I would have.

10  Q.  But she didn't ask you to, correct?

11  A.  In the beginning, she did.

12  Q.  Oh, she asked you.  And you said if she'd asked you, you

13  would have, so why didn't you?

14  A.  I was supposed to create it with Victor Cerda.

15  Q.  Your testimony is Victor Cerda was going to create a

16  company with you?

17  A.  Yes, ma'am.

18  Q.  Sir, isn't it true that you and Mr. Cerda absolutely did

19  not get along?  In fact, didn't you——

20  A.  We were——

21  Q.  I'm sorry?

22          THE COURT:  Let him answer.

23  A.  We went to Puerto Rico together.

24  Q.  You think because you went to Puerto Rico with Mr. Victor

25  Cerda, you got along?

O6B1GUO4                        Khaled - Cross

1              MS. MURRAY:  Objection, your Honor.  That's not his

2     testimony.

3              MS. SHROFF:  I believe that was——

4              THE COURT:  Did you get along with Mr. Cerda?

5              THE WITNESS:  Yeah, we were fine.

6     Q.  Didn't Mr. Cerda, in the middle of a meeting, call you a

7     moron?

8     A.  I don't recall that, no.

9     Q.  Didn't he mock you openly for trying to buy a bank without

10    knowing that you'd need a license?

11    A.  What do you mean?  What?  Can you repeat the question?

12    Q.  Sure.  Didn't Mr. Cerda openly mock you for thinking you

13    could buy a bank in the United States?

14    A.  I don't recall that, no.

15    Q.  Is it fair to say, Mr. Khaled, that other than that one

16    trip on which you went with Mr. Cerda, you've never traveled

17    with him ever, correct?

18    A.  Correct.

19    Q.  You've never been to Mr. Cerda's home, correct?

20    A.  No.

21    Q.  You've never been invited to socialize with him by him,

22    correct?

23              MS. MURRAY:  Objection, relevance.

24              MS. SHROFF:  He said they were friends.

25              THE COURT:  No.  He said that they got along.

O6B1GUO4                      Khaled - Cross

1           MS. SHROFF:  Okay.

2           THE COURT:  So——

3   Q.  Mr. Cerda never invited you to a single social event,

4   correct?

5           MS. MURRAY:  Same objection, your Honor.

6           THE COURT:  Sustained.

7   Q.  Mr. Cerda never asked to join Crane, correct?

8   A.  He was going to.

9   Q.  He was going to ask you?

10  A.  That was the plan.  No, the plan was he was going to join.

11  Q.  He was going to join——

12  A.  And be part of the Crane, correct.

13  Q.  I'm sorry?

14  A.  He was going to be part owner in Crane.

15  Q.  Mr. Cerda was going to be part owner of Crane.

16  A.  Yes.

17  Q.  You emailed with Mr. Cerda, correct?

18  A.  Correct.

19  Q.  You spoke to him by telephone?

20  A.  Yes.

21  Q.  You spoke to him by text?

22  A.  Yes.

23  Q.  And you gave all of those documents to the government,

24  correct?

25  A.  It was in the discovery, whatever I had.

1   Q.  There's not a single email, text, or exchange that

2   corroborates what you're saying orally here today, correct?

3          MS. MURRAY:  Objection, your Honor.

4          THE COURT:  Sustained.

5   Q.  You never sent Mr. Cerda a proposal to join Crane, correct?

6   A.  A proposal?

7   Q.  Yes.  It's a business venture, right?  Somebody's joining

8   Crane.

9   A.  No, but I have asked him for documents to join.

10  Q.  You never——listen, please.  Could you listen to my

11  question.

12  A.  Yes, go on.

13  Q.  My question was:  Did you send any proposal to Mr. Cerda

14  inviting him to join you at Crane?

15  A.  When you put it this way, no.

16  Q.  Did you ever send any proposal to Yvette Wang to invite her

17  to join you at Crane?

18  A.  When you put it this way, no.

19  Q.  You had all those recorded calls, correct?

20  A.  I have, yeah.

21  Q.  And not in one of those calls do you say, you know what,

22  Yvette, you can just join Crane, correct?

23  A.  What do you mean?

24  Q.  On these calls that you recorded, you never once say,

25  Ms. Wang, come join me, be my partner in Crane, correct?

O6B1GUO4

1    A.  No.

2    Q.  You never once said that to Mr. Cerda, who's on the calls

3    with you that you decided to record, correct?

4    A.  Never told him what?

5    Q.  Come join me at Crane.

6    A.  Not on those calls.

7    Q.  Not on any calls did you record ever inviting either of

8    those two individuals to join you at Crane.

9             MS. MURRAY:  Objection.  Asked and answered.

10            THE COURT:  Sustained.  Asked and answered.

11            MS. SHROFF:  Your Honor, is this a good time to stop

12   or should I continue?

13            THE COURT:  Yes, this is a perfectly fine time to

14   stop.  It's 2:36.

15            Members of the jury, we are going to finish our work

16   for today a little bit early.  Tomorrow you'll return to court

17   to be ready to come into the courtroom at 9:30.  Remember that

18   you're not allowed to discuss the case amongst yourselves or

19   with anyone else.  Don't permit anyone to discuss the case in

20   your presence.  Don't read, watch, or listen to anything from

21   any source that concerns any topic that touches on the subject

22   of this trial.

23            (Jury not present)

24            THE COURT:  Please be seated.

25            MR. KAMARAJU:  Your Honor, I apologize.  Before you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6B1GUO4

1    address the witness, could I just have a very brief sidebar.  I

2    just want to share one thing.

3         THE COURT:  Okay.

4         MR. KAMARAJU:  Thank you.

5         (At the sidebar)

6         MR. KAMARAJU:  Your Honor had asked previously whether

7    it's possible any other state law crimes would come up.  A

8    lawyer on our team flagged for me that he did submit an

9    affidavit in the Pax litigation, which we may ask him about.  I

10   suppose if he disclaims that one of the statements in here is

11   untrue, it's theoretically possible that that could raise it,

12   but I just didn't want your Honor to not have that with you

13   when you were issuing your instructions.  That's all.

14        THE COURT:  Okay.

15        MS. MURRAY:  And I confirm that Mr. Pascarella is

16   available to consult with Mr. Khaled.

17        THE COURT:  Okay.  Good.

18        (In open court)

19        THE COURT:  Mr. Khaled, I want to tell you about a

20   concern that I have.

21        You were asked questions about the period of time when

22   you were working both for Citibank and being paid by Lexington.

23   Do you remember that?

24        THE WITNESS:  Yes.

25        THE COURT:  And Ms. Shroff started to ask you about

O6B1GUO4

1    whether you spent seven hours working for each, for a total of

2    14 hours.  And the agreement that you have with the

3    prosecution, the nonprosecution agreement, that covers federal

4    crimes, but it doesn't cover state crimes.  If a person accepts

5    compensation for work that they don't do, let us say they

6    accept a salary but they work zero hours in a day, it could be

7    considered a type of theft.

8            The reason that I bring this up is that you have an

9    important constitutional right against self-incrimination,

10    which means that you cannot be compelled to admit to a crime.

11    So what I'm instructing you to do is to speak with

12    Mr. Pascarella, your lawyer, and to raise this question with

13    him as to whether or not you should be answering these

14    questions about working both for Citibank and for Lexington at

15    the same time.

16            In addition, you may be asked about an affidavit that

17    you signed in which there's a question as to whether or not you

18    were truthful.  Once again, making false statements can be a

19    state crime, and you're not protected against state crimes.  So

20    I also want you to ask him about that.  Do you understand?

21            It's a yes or no question.

22            THE WITNESS:  No.  I don't understand.

23            THE COURT:  So you may recall seeing on television or

24    on televised trials or hearing about people taking the Fifth.

25    So when you take the Fifth, you're saying that, I'm asserting

O6B1GUO4

```
1    my right against self-incrimination.  I am saying that I will
2    not admit to a crime.  That's what that amounts to.  Because
3    you don't have to.  You have a right to remain silent about
4    that.  And so because of this question of whether or not you
5    were accepting payment for work that you didn't do for a period
6    of time and this other question of whether you may have not
7    been truthful on an affidavit, because those things may
8    constitute state crimes, I want you to speak with
9    Mr. Pascarella and ask him for his advice as to how to answer
10   questions that might come up about those two subjects.
11                THE WITNESS:  Sure.
12                THE COURT:  You understand?
13                THE WITNESS:  Yes.
14                THE COURT:  All right.  So you'll speak with him
15   before you recommence your testimony tomorrow.
16                THE WITNESS:  Okay.
17                THE COURT:  All righty.  Thank you.  And you may step
18   out.  Don't discuss your testimony.
19                MS. MURRAY:  Just to be clear, your Honor, except as
20   directed by the Court with respect to discussing with
21   Mr. Pascarella tonight.
22                THE COURT:  Oh, of course.  I am instructing you to
23   discuss your testimony with Mr. Pascarella.
24                THE WITNESS:  Right.  Thank you.
25                THE COURT:  Yes.
```

O6B1GUO4

```
 1              (Witness not present)

 2              THE COURT:  Anything further?

 3              MR. KAMARAJU:  Not from the defense, your Honor.

 4              MS. MURRAY:  Yes, your Honor.  Just briefly.

 5              The government also would like to speak with

 6   Mr. Pascarella.  We won't discuss the substance of Mr. Khaled's

 7   testimony.  We just want to make sure that he understands what

 8   the issues are——that is, Mr. Pascarella——so he can properly

 9   advise Mr. Khaled.

10              MR. KAMARAJU:  I think that can be accomplished by

11   providing the transcript to Mr. Pascarella.  He can just get

12   the transcript, right?  They can send the transcript to him.

13              THE COURT:  If it's available.  I just don't know how

14   soon it's going to be available.

15              MR. FINKEL:  Your Honor, we just raise this because we

16   don't want to run afoul.  We're not going to talk to the

17   witness, obviously, but certainly we're entitled to talk with

18   his attorney about the agreement he has with us, his lawyer.

19              THE COURT:  Yes.

20              MR. FINKEL:  Briefly, just so we know how many

21   witnesses to tee up tomorrow and also relevant to the parties'

22   ongoing discussions about next week's schedule, can Ms. Shroff

23   provide us an estimate of how much longer is left on cross.

24              THE COURT:  Ms. Shroff.

25              MS. SHROFF:  Two and a half hours.
```

O6B1GUO4

1          THE COURT:  Did you say two and a half?

2          MS. SHROFF:  Yeah.  He was on there for a whole day

3    and a half.  I mean——and he also pauses for long.  He takes

4    such a long pause that I interrupt, and then she objects and

5    she says I'm interrupting.

6          THE COURT:  Well, there's also a lot of repeated

7    questions, and so you could be more efficient in the

8    cross-examination.

9          MS. SHROFF:  I will try, your Honor, but I do think

10   that the asked and answered——I really don't think I got an

11   answer, but I will try and not repeat myself.

12         THE COURT:  All righty.

13         MS. SHROFF:  Thank you.

14         THE COURT:  Have a good evening.

15         ALL COUNSEL:  Thank you, your Honor.

16         (Adjourned to June 12, 2024, at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION
 2   Examination of:                              Page
 3   HAITHAM KHALED
 4   Direct By Ms. Murray . . . . . . . . . . . .2027
 5   Cross By Ms. Shroff  . . . . . . . . . . . .2085
 6                        DEFENDANT EXHIBITS
 7   Exhibit No.                              Received
 8    7001    . . . . . . . . . . . . . . . . .2129
 9    DX-10339    . . . . . . . . . . . . . . .2104
10    DX-60524    . . . . . . . . . . . . . . .2092
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```