O6C1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
               v.                          23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                    Defendant.             Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         June 12, 2024
                                           9:00 a.m.
 8
     Before:
 9

10                    HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6C1GUO1

1   ALSO PRESENT:
    Isabel Loftus, Paralegal Specialist, USAO
2   Ruben Montilla, Defense Paralegal
    Tuo Huang, Interpreter (Mandarin)
3   Shi Feng, Interpreter (Mandarin)
    Yu Mark Tang, Interpreter (Mandarin)
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6C1GUO1

 1          (Trial resumed; jury not present)

 2          THE COURT:  Good morning.  Please make your

 3   appearances.

 4          MS. MURRAY:  Good morning, your Honor.  Juliana

 5   Murray, Ryan Finkel, Micah Fergenson, and Justin Horton on

 6   behalf of the United States.  We're joined by paralegal

 7   specialist Isabel Loftus.

 8          MS. SHROFF:  Good morning, your Honor.  On behalf of

 9   Mr. Guo, Sabrina Shroff, Mr. Kamaraju, Mr. Schirick, and

10   Mr. Barkan.  And of course Mr. Guo is seated next to me.

11          THE COURT:  Please be seated.

12          Yesterday, defense counsel objected to the

13   government's questioning of Haitham Khaled about the

14   truthfulness of statements made by Ana Izquierdo and Limarie

15   Reyes Molinaris during a G/CLUBS arbitration proceeding.

16          The defense argues that Mr. Khaled's testimony would

17   violate Federal Rule of Evidence 608(b), which prohibits the

18   use of extrinsic evidence to "prove specific instances of a

19   witness's conduct in order to attack or support the witness's

20   character for truthfulness."  Specifically, the defense argues

21   that Mr. Khaled's testimony as to whether Izquierdo's and

22   Molinaris's statements were truthful would be inadmissible

23   extrinsic evidence of specific instances of dishonest acts.

24          Where "testimony [is] probative only of [a witness's]

25   general character for truthfulness" it is "inadmissible under

O6C1GUO1

Rule 608(b)."  *United States v. Atherton*, 936 F.2d 728, 734 (2d

Cir. 1991); United States v. Abel, 469 U.S. 45, 51 (1984).

Here, the government does not offer Mr. Khaled's

testimony solely for the purpose of attacking the character of

Ms. Izquierdo and Ms. Reyes Molinaris.

The government offers his testimony about the

truthfulness of their statements as evidence that G/CLUBS'

agents misrepresented facts in the arbitration in furtherance

of the RICO enterprise.

Accordingly, the objection is overruled.

Are there any other issues that you'd like to raise?

MR. FINKEL:  So, your Honor, I think there are a menu

of items for this morning.

THE COURT:  Okay.

MR. FINKEL:  If it suits your Honor, I think we could

start with schedule.

THE COURT:  All right.  If you could just hang on for

a moment.

(Pause)

THE COURT:  Go ahead.

MR. FINKEL:  Thank you, your Honor.

So the parties have conferred, and it's the

government's understanding that the defense does not object to

a 30- to 45-minute extension of trial day next week.  The

government has given careful thought to how many witnesses it

O6C1GUO1

1    has left in its case, including considering streamlining it

2    significantly——very significantly, actually——and also giving

3    thought to what the Court told the jury, which is that this

4    trial will be over effectively by July 12th, all

5    in——deliberations, the whole thing.  Given the pace of things

6    and sort of where we are, as we've mentioned, we're behind.

7    The lengths of crosses, the lengths of directs in some cases,

8    and just generally some logistical issues with technology,

9    etc., the government's view is that if it's acceptable to your

10   Honor, and of course the jury——and that, of course, is going to

11   carry the day at the end of the day——the government requests

12   that the Court sit a full day next week to whatever your

13   Honor's full day would be, whether that's 4 or 4:30.  This will

14   enable the parties and the Court, and most importantly the

15   jury, to catch up in the sense of filling the time that we're

16   going to lose on that Wednesday——plus there are additional days

17   off that are plugged into the schedule, which is what it

18   is——and allow us to sort of get back on track.

19          The defense has a defense case.  We know that.  They

20   have, as I understand it, at least three experts, a summary

21   witness——or, sorry——two experts, a summary witness, and

22   somewhere between three to five fact witnesses; and then, of

23   course, the defendant could choose to testify about the issues

24   in this case, and whether he does or doesn't is not a question

25   we have to resolve today, but we can think about the logistical

O6C1GUO1

```
 1    implications of his decision to testify if he so chooses, which

 2    will obviously extend matters.  Then there is the two days——I

 3    see your Honor is about to speak.

 4              THE COURT:  Yes.  So are you suggesting that next week

 5    one of the days be a full day or all of the days be a full day?

 6              MR. FINKEL:  The government's proposal, your Honor,

 7    is, in order to catch up and also account for the Wednesday off

 8    and future days off and the length of the defense case, is that

 9    we sit a full week next week during the four days, so we go to

10    4 or 4:30, or whatever your Honor normally does on a full-day

11    trial schedule.  This will enable the government to catch up

12    and get back on track and land the plane, as they say.

13              THE COURT:  Is there something else you wanted to add?

14              MR. FINKEL:  Not on schedule.  There are other issues.

15    I don't know if you want to——

16              THE COURT:  I'll hear from the defense regarding the

17    schedule.

18              MR. KAMARAJU:  Thank you, your Honor.

19              As Mr. Finkel mentioned, the defense did agree to

20    extend the schedule by 30 to 45 minutes because that's what we

21    understood the government, after its careful review and

22    considered analysis of its witnesses, had requested from the

23    Court initially.

24              THE COURT:  If you would speak louder or speak closer

25    to the microphone.
```

O6C1GUO1

1          MR. KAMARAJU:  Sorry.  So we——thank you, Ms. Shroff.

2          So we had agreed to that based on our understanding

3     that that was what would be required for the government to

4     catch up.  From our perspective, one of the difficulties that

5     comes from having a full trial day is that every week of this

6     trial now, the government's witness list has shifted

7     dramatically from day to day, midweek and sometimes the day

8     before witnesses are anticipated to testify.  And so for as

9     long as that continues, it's difficult to see how we can

10    address, and, frankly, even take into account your Honor's

11    suggestions about how we can shorten our crosses if we don't

12    have time to prepare for them and if the government extends it

13    to a full day every week.  So I would ask what has changed,

14    frankly, in the government's analysis, because it cannot all be

15    simply due to their anticipation of the estimated length of

16    cross, your Honor.  Their suggestion is that we're days behind.

17    We've looked at the cross-examinations.  They are frequently

18    around the same time as the direct or less.  We understand your

19    Honor's direction to us to cut out the repetitive questions,

20    and we will do that and work on our best on that.  But this

21    idea that we, the defense, should be prejudiced in terms of our

22    preparation given the government's continuous shifting of its

23    witnesses, when the government controls its schedule, the

24    government controls which witnesses it wants to call, and the

25    government, frankly, even controls the issues that need to be

O6C1GUO1

1    addressed——I'll just give your Honor one example of that.  I

2    anticipate later today we are going to have the same witness

3    testify again as a summary witness, Ms. Espinoza.  She

4    testified last week, I believe it was, or the week before.

5    We're then going to have another summary witness testify at the

6    end of trial.  I don't know about what, but it appears to be

7    about very similar topics.

8         Similarly——Mr. Schirick can address it in a little

9    more detail when it comes up——we raised the 701 issue with the

10   government on one of their witnesses, that very possibly could

11   testify today, on Monday.  We heard back at 10:30 last night

12   that the government intended to file a letter about the issue.

13   We still haven't seen the letter.  I believe they conferred

14   this morning.

15        These are all things that could be avoided and are

16   dragging into the schedule that have nothing to do with the

17   cross-examination.  And I understand we are where we are, your

18   Honor, but we do have to balance the two things.

19        And so from our perspective, the 30 to 45 minutes that

20   the government had asked for, that makes sense, and if they

21   have difficulty in terms of keeping their commitment, they can

22   streamline their case.  They don't need to call three summary

23   witnesses to talk about the same thing.  They don't need to

24   call 14 victims to talk about the same thing.  So they too can

25   control the schedule, your Honor.

O6C1GUO1

1          THE COURT:  Were you anticipating 14 victims?

2          MR. KAMARAJU:  That's what they noticed to us, your

3    Honor.  I believe it was 14.

4          MR. FINKEL:  No.  The direct answer to your Honor's

5    question is no.  And as I mentioned at the outset of my

6    remarks, the government is considering significant streamlining

7    of its case.  And if I can just respond to a few things that

8    defense counsel said.

9          First of all, yesterday we had a, I think, productive

10   conversation in which the government explained that 30 to 45

11   minutes is not going to be sufficient, and so defense counsel

12   knew that the government was contemplating a full week of trial

13   time for next week.  That's number one.

14         Number two, the summary witness who is going to

15   testify today and the summary witness who will testify

16   hopefully next week, depending on the schedule, are talking

17   about discrete monetary transactions, and the government is

18   going to show through those summary witnesses how fraud

19   proceeds were used to purchase Lamborghinis, Ferraris, the

20   Mahwah mansion, personal effects.  As your Honor knows from

21   prior briefing, there are something around 500 bank accounts

22   and probably a thousand some-odd transactions.  That takes time

23   to explain and get in.  But we are streamlining it.

24         In terms of victims, I think we have one that should

25   testify today, if we get there, and then there's probably one

O6C1GUO1

 1    more, maybe one after that, but probably just one more.

 2            To respond directly to some of the points that defense

 3    counsel raised, in every trial there are logistical issues that

 4    require some rejiggering of the witnesses for the week.  What

 5    has happened at this trial is, Mr. Khaled, for example, was

 6    noticed to testify during the first full week of trial.  That

 7    didn't happen because the cross went so long.  We then were in

 8    a problem where we had a witness who was flying in from a

 9    foreign country and was only going to be here for a week, and

10    we had other travel issues with respect to other witnesses.

11    Mr. Khaled, as it happens, is relatively local and we have

12    control over his schedule, so we had to move him, okay?  There

13    was another witness who was traveling from Europe over the

14    weekend, Saturday morning.  We were planning to call him first

15    thing on Monday.  After we met with him we decided, you know

16    what, we want to streamline our case, we don't really need him.

17    So we took him out, which we thought would help matters, but

18    had to replace him in the schedule to accommodate scheduling of

19    other witnesses, including a witness who will probably be

20    called on Friday but lives in Puerto Rico and won't be here

21    until today.  So we had to put a new witness in.  These are

22    things that happen all the time.

23            What has also happened, your Honor, is, with respect

24    to cross, I believe that the cross-examination of Ms. Li, at

25    the very end of the cross, there was an objection from the

O6C1GUO1

1    government about a series of questions that resulted in a

2    sidebar.  The sidebar lasted somewhere around 10, 15 minutes.

3    There was an argument of some kind.  Your Honor overruled our

4    objection.  We then resumed the testimony and defense counsel

5    said, "No further questions," and didn't even ask the question

6    that was the subject of the sidebar.  I'm not sure why that

7    needed——that sidebar needed to happen if our objection was for

8    a question——on a question that defense counsel didn't even

9    intend to ask.

10           Yesterday, during Mr. Khaled's cross-examination, we

11   spent 15 to 20 minutes on whether Victor Cerda was emailed an

12   opportunity to join Crane Advisory Group.  I don't know why

13   that's relevant to either his credibility or to Mr. Guo's

14   involvement in the RICO enterprise, but that's fine.  They're

15   allowed to cross-examine the witnesses.

16           The bottom line is this——and this is the way the

17   government is looking at this——your Honor told the jury this

18   trial will be done by July 12th.  I predicted wrongly——your

19   Honor was right——that we would be on track to finish by

20   July 4th.  I don't think that's going to be the case anymore,

21   and I'm glad your Honor had the wisdom that I did not.  But to

22   get us done by July 12th, we cannot do——we need additional

23   time, and what we propose is a full week of the four days.

24   With Wednesday off, it will enable the jury to catch up in

25   their lives, to the extent they need to.  This is not an

O6C1GUO1

1    imposition.  We're all on trial.  I think we all want to move

2    this trial efficiently forward.  We will certainly work with

3    the defense in any way we can to communicate with them, to

4    advise them of who our witnesses are going to be when changes

5    are necessary——sometimes things happen——when exhibits change.

6    We're doing all we can to be efficient.  But a 30- to 45-minute

7    extension, candidly, is not enough.

8            And we are considering, just so your Honor knows,

9    cutting witnesses.  The government is considering cutting

10   witnesses that I'm surprised that we're even thinking about it,

11   but we are thinking about it to streamline the case and, as I

12   said, to land the plane and meet the deadlines and the end date

13   that your Honor outlined to the jury.  But even with those

14   cuts, if we just sit an additional 30 to 45 minutes next week,

15   we're going to end up in late July, given the length of the

16   defense case, given some witnesses that we have to put on to

17   prove our case.  There are a lot of charges here.  It's a

18   complicated scheme.  We have a burden that we have to meet.

19   And so we'd ask your Honor to please ask the jury if it's okay

20   with them to sit a full day Monday, Tuesday, Thursday, Friday

21   next week.

22           THE COURT:  I'll think about it.

23           MR. KAMARAJU:  I just wanted to respond with one

24   clarification, your Honor.

25           I believe Mr. Finkel talked about a sidebar at the end

O6C1GUO1

1    of Ms. Li's testimony.  I think that was on the translation

2    issue, not on a government objection.

3            He also discussed the travel issues that prompted the

4    government's original request, I believe, to extend the time of

5    the trial.  We accommodated those travel issues, and not only

6    did both victims—or, sorry, excuse me—both witnesses complete

7    their testimony in time to take their preplanned travel but we

8    in fact fit in another witness essentially after that, and we

9    would have completed that witness if not for a government

10   objection at the end of the day that prompted a sidebar.  So

11   the defense is certainly cognizant, and has worked with the

12   government to move that part along.  And we simply don't

13   understand when Mr. Finkel says something like, it will allow

14   the jury to catch up on their lives, when what he's actually

15   talking about is taking away two hours from them and having

16   jurors who could be in Westchester having to leave the

17   courthouse at 4:30 or 5.

18           MR. FINKEL:  I think the question for the jury, your

19   Honor, is whether the jury wants the trial to end, as the Court

20   predicted it would, on July 12th, or whether they want to sit

21   through the end of the month.  And I don't know what's in their

22   minds, obviously, but that's really the question.  And so I

23   don't think there's a prejudice to sitting an additional hour

24   and a half each day at trial.  We're all here; we're all on

25   trial.  I am sure the defense team is working as hard as the

O6C1GUO1

1    government team, which is basically 24/7, seven days a week,

2    which is what we've been doing for months now.  I'm sure they

3    have been too.  That's the nature of trial practice——in this

4    district, especially.

5         The government's view is that in order to meet the

6    July 12th date, which the Court told the jury about, we need

7    more time.  There are a variety of reasons.  We can point

8    fingers at each other as to who is responsible, but we are

9    where we are.  And so we ask the Court to consider and ask the

10   jury to sit full days next week.

11        And we can turn to the other issues, if your Honor

12   would like.

13        THE COURT:  Yes, if you would, please.

14        MS. MURRAY:  Your Honor, with respect to Mr. Khaled's

15   cross-examination, just before we started today, Ms. Shroff

16   advised me that she would like to question Mr. Khaled about a

17   recording that the government produced in discovery.  It's not

18   one of the recordings that we introduced in our direct.  We

19   would——I've asked Ms. Shroff the basis for her trying to admit

20   it.  We don't dispute the authenticity, but we do dispute its

21   admissibility and relevance.  It's a Zoom or WebEx recording of

22   an interview that Mr. Khaled and two others did of a potential

23   candidate a few years ago.  Our understanding is, it's the way

24   that WebEx or Zoom automatically records sessions, and it

25   happened to be saved onto his computer.  In looking through all

O6C1GUO1

1    of his possessions and giving the government recordings, he

2    produced that.  So we don't see any reason for it to be

3    introduced.  We don't see its relevance.  To the extent

4    Ms. Shroff wants to establish that he recorded other

5    conversations, she can do so through questions.  But it's

6    hearsay, and there's no basis for it to be admitted into the

7    case.

8             THE COURT:  What is discussed during the recording?

9             MS. MURRAY:  It's an interview of a candidate for a

10   position at G/CLUBS.  So the interview is conducted by Limarie

11   Reyes, the CEO; by Alex Hadjicharalambous, the financial

12   controller; and by Mr. Khaled.  One is the interview of the

13   candidate and the second is the feedback session, internal

14   feedback session.

15            THE COURT:  So I assume that it concerns the

16   qualifications for the individual; is that the subject matter?

17            MS. SHROFF:  Thank you, your Honor.

18            The subject matter is not that limited, your Honor.

19   First, the only person who seems to have had this recording is

20   Mr. Khaled.  I would like to be able to tell the jury that

21   Mr. Khaled recorded not just quote-unquote random calls but he

22   recorded a lot of things just because maybe he's a serial

23   recorder.  I don't know.  But that's not important why he

24   recorded.

25            The second thing is, the conversation and the

1    interview itself is relevant.  Mr. Khaled lies during the

2    interview.  He tells the potential——the applicant that he has

3    been at Guo for four years, at GTV for four years, which is

4    false.  He also talks about the setting at Guo at that time,

5    and the other participants who are interviewing the candidate

6    are very candidly telling the candidate that the office is

7    chaotic, and they're looking for a person with experience who

8    can actually deal with chaos.  So even if those statements

9    aren't true, the point is that they were made.  It reflects

10   Mr. Khaled's state of mind.  It shows his awareness that this

11   was a growing company, that everybody was taking steps to make

12   sure that the holes in the personnel group were being

13   addressed.  Mr. Khaled said that that was not the case, that

14   all of this was just nonsensical and, you know, he was so

15   disillusioned.  So that makes this conversation relevant.  I do

16   not intend——and I just want to be very clear——in this cross,

17   unless the witness testifies a particular way, I have no desire

18   to replay the calls that were played yesterday or to play the

19   entirety of this call.  I asked the government to stipulate to

20   its authenticity so that we could save time, and I obviously

21   don't need to have him listen to the entire call, your Honor.

22            THE COURT:  So with respect to what you say is a lie

23   on the call, you're wanting to use the call to impeach

24   Mr. Khaled.

25            MS. SHROFF:  Not just to impeach him.  Also to show

O6C1GUO1

1    that he had a particular state of mind.  That's how he

2    perceived himself.  He sells himself as part of this group, as

3    having a long relationship with them.  He describes the

4    relationship with them, which is quite contrary to the

5    relationship he says on direct to the jury that he had

6    reformulated by that time.

7              THE COURT:  That he had reformulated?

8              MS. SHROFF:  Right.  So he says, you know, I started

9    out at GTV with such enthusiasm and then I became disillusioned

10   and I thought it was a big scam and it was all a fraud; and

11   he's participating in a job interview where he says, come on

12   board, join us, we're the greatest.  So I think that that's

13   part of the reason why the call itself is relevant, your Honor.

14             THE COURT:  And what about the issue of the chaos that

15   you're describing?  How is that pertinent?

16             MS. SHROFF:  Because Mr. Khaled said that, you know,

17   his first week there was so chaotic, nobody knew what they were

18   doing, people ignored the problems.  Here is an example of not

19   only was the problem not ignored, they had identified the

20   problem.  The place was new, it was a startup, there was a lot

21   of chaos, and they're looking for an applicant, they're looking

22   for a potential employee who can help them with chaos.  I

23   believe that there is an actual interview question put to the

24   applicant that says:  Give us an example of how you would deal

25   with the chaotic work environment.  That's what we are.  So

O6C1GUO1

1      there was no lying.  There was no hiding anything.  This was a

2      real entity, trying to build a real business, and we should be

3      allowed to show that.

4                  THE COURT:  And how long is it?

5                  MS. SHROFF:  I don't know how long it is, but I really

6      do not mean to——I don't need to play it even more than like a

7      clip.  Even if I don't play the clip at all, I would still seek

8      its——to be admitted, because part of the reason we admit

9      everything, your Honor, is not just to show to the jury; we

10     also admit it because we want to use it at summation.  And that

11     is also, candidly, why we'd like the recording admitted.  Not

12     only the government knows of the existence of this recording,

13     they've——I mean, I'm sorry that they found out late.  We'd

14     known about it before.  And it was always part of our cross.

15                 MS. MURRAY:  Your Honor, the defense is trying to

16     admit this as extrinsic evidence to impeach the witness.  It's

17     improper.  First of all, if they were to do that, they would

18     first need to confront him as to whether he lied, and that

19     hasn't been established.  I don't think that there would be any

20     basis for that.  From what I'm hearing from Ms. Shroff about

21     why she's seeking to admit it, the statements on the interview

22     are entirely consistent with his testimony.  There were people

23     who were working at G Club.  Ms. Reyes is a participant in the

24     interview.  She became the CEO in April, interim CEO in April

25     of 2021.  So this isn't the first week, when he said it was

O6C1GUO1

1    chaotic and there was no infrastructure.  This is further along

2    in his time when he was working at GTV and G/CLUBS.  Yes, it

3    was consistent with what he said, they were starting to build a

4    team, but later, his understanding was that it was all just a

5    money laundering operation, effectively.  It also doesn't go to

6    his state of mind.  And the government's view is there's no

7    basis——no basis——to introduce this audio.

8        The last point I would make is it's unquestionably

9    hearsay.  There is no question that it's hearsay, and the

10   government doesn't think that it should come in at all.

11       MS. SHROFF:  Your Honor, they've, throughout this

12   case, maintained that the companies are just a sham, whether

13   it's at point one, point six, or at the end.  All throughout,

14   their whole testimony is——they went through all of this.

15   Ms. Murray spent five questions asking just about how she

16   stopped the tape to say, and what do they call these people,

17   they call these people investors, not members; what did they

18   do, they did nothing; did they get any benefit, no, they

19   didn't.  Time after time, pause after pause, when that document

20   is in evidence, the tape is in evidence, and all she had to do

21   is skip over all of that and just sum up on it.  Like Judge

22   Kaplan says, the document speaks for itself.  So for those

23   reasons, we are allowed to show that this was not in fact a

24   scam, this was not just a shop front, this was not a money

25   laundering operation.  People were working throughout that time

O6C1GUO1

1    to make it a real entity.

2            And your Honor, they're the ones who charged the RICO.

3    They keep calling it a fraud case.  It's not a fraud case.

4    We're allowed to show——in fact, failure of the defense to raise

5    the issue that it is an actual real business is a 2255 in the

6    making.  I'm entitled to show it was a real business.

7            MS. MURRAY:  Your Honor, Ms. Shroff can question the

8    witness about all of these topics.  The question here is the

9    recording, and whether the recording is relevant and

10   admissible, and it's not.  It's an out-of-court statement that

11   she's proposing to offer for the truth.

12           I would also note, the government's position in its

13   case has not been that these companies didn't exist.  It's not

14   that they weren't real.  It's that they were put into place

15   effectively as instrumentalities of a RICO enterprise.  There

16   were real employees.  Ms. Reyes, we expect to testify——she was

17   the CEO——she believed she was operating a legitimate membership

18   company.  But at bottom, the people who were actually in

19   charge, Mr. Guo and his key co-conspirators, they were the ones

20   who knew that they had created this shell game in furtherance

21   of this massive multibillion-dollar fraud.

22           And another point I'd make, Ms. Shroff said she wants

23   to introduce it to show that the witness, I think she said,

24   "recorded all kinds of conversations."  Aside from the

25   recordings that the government has discussed with the witness

O6C1GUO1

1   and the additional recordings from that time period, which were

2   support to the stipulation, this is the only other recording

3   we're aware of.  As I said, it's our understanding that this is

4   automatically recorded during a Zoom or WebEx session.  You can

5   press a button and you can record a meeting, and that's how

6   this came to be.  It just happened to be saved onto his

7   computer.  So he provided it to the government.

8          And lastly, again, your Honor, it's just classic

9   hearsay.

10          MS. SHROFF:  The only person who pressed the button,

11   Mr. Khaled.  The other people did not press that button.

12          More importantly, if the government is going to

13   stipulate that in fact these were real businesses, and they

14   are, they'll agree that that element of the offense is not met

15   by the government, we're happy to just skip all of the

16   testimony as to whether or not this was a proper business and a

17   functioning business.

18          And I remind the Court, your Honor, over and over

19   again Ms. Murray asked him, did G/CLUBS provide any benefits,

20   did G/CLUBS provide any services.  She paused the tape and

21   said, is there any discussion here about services by G/CLUBS?

22   No.

23          THE COURT:  I'm going to permit the tape.

24          MS. SHROFF:  Thank you.

25          THE COURT:  Is there anything else?

O6C1GUO1

1          MS. SHROFF:  No, your Honor.

2          Your Honor, is the government——may I just have a

3    minute.

4          (Counsel conferring)

5          MS. MURRAY:  Your Honor, one more issue.

6          With respect to the matters that were raised yesterday

7    with Mr. Khaled and the Court advising him to speak with his

8    counsel, it's our understanding from his counsel that they had

9    the opportunity to speak.  It's also our understanding that he

10   intends to respond to any questions that are posed to him.  But

11   we would ask that the defense not be permitted to inquire in

12   any way into the Court's conversations with the witness

13   yesterday, including advising him of potential exposure he

14   might have in answering those questions.  That would be 403,

15   and we firmly believe that the defense cannot inquire into

16   that.

17         THE COURT:  So I'm sure they don't intend to inquire

18   about my discussion; isn't that correct?

19         MS. SHROFF:  Of course not, your Honor.

20         MR. FERGENSON:  And, your Honor, I have——apologies, I

21   think last on the menu——I have one other issue.  It relates to

22   a victim witness the government expects to testify today.  And

23   I just want to at least give some context for the Court.  It

24   may be that we can take it up at the lunch break.

25         But this is a victim witness who was a member of the

O6C1GUO1

1    Mountains of Spices farm.  She did translation volunteer work

2    for that farm.  She was in a chat group——it's either WhatsApp

3    or Discord chat——with other members, and with, you know, other

4    volunteers who did translation work.  Three or four exhibits

5    that the government intends to offer through this witness are

6    documents that were shared in that group.  They were shared by

7    Zhang Yongbing, who, if your Honor recalls, was the attorney

8    who tried to coerce Ms. Ya Li into signing a false affidavit.

9    He was a lawyer, and he shared these documents with the group.

10   She doesn't——she didn't really work on them, but she has copies

11   of them.

12         Just to give your Honor a sense of what they are,

13   they're not——they're not legal——I understand the defense has

14   said that Mountains of Spices, the New York Farm, intends to

15   claim privilege on these three exhibits.  Just to give your

16   Honor a sense of what these exhibits are, one is a screenshot

17   of a conversation between Mr. Guo, William Je, and Sara Wei,

18   about reconciling the farm loan program wire transfers.  It's a

19   screenshot of a WhatsApp conversation between them.  And it

20   just lists out, you know, sender, date, and dollar amount.

21   That's one.  The other two, I believe, are——two or three are

22   Excel sheets that show, you know, again, similar information,

23   just wire transfer information.  There's no legal advice at all

24   in any of these documents.  And the government does not think

25   there's any valid claim of privilege on any of these documents.

O6C1GUO1

1    Just wanted to raise that so that we possibly can avoid any

2    sidebar during the victim's testimony.  We're hoping to,

3    consistent with Mr. Finkel's statements earlier, streamline

4    this victim's testimony, you know, to keep things moving at a

5    good pace.

6            MR. SCHIRICK:  Your Honor, I think Mr. Fergenson is

7    leaving a few key facts out of his description that are

8    relevant here to the claim of privilege, and I will just say

9    that it's my understanding that outside counsel for Mountains

10   of Spices, who either may be here or will be here shortly——

11           THE INTERPRETER:  Counsel, you need to speak into the

12   mic.

13           MS. SHROFF:  Sure.  I'm sorry.  Apologies.

14           ——that counsel for Mountains of Spices, who is either

15   here or will be here shortly, will assert privilege formally.

16   So that's number one.

17           Number two is that, what the defense just learned last

18   night for the first time, because——

19           THE COURT:  Wouldn't it be Mr. Guo's privilege to

20   assert?

21           MS. SHROFF:  No, your Honor.  This is——so the

22   communications are communications that take place on a chat, on

23   a Discord chat——and perhaps another chat, another, you know,

24   platform chat——that relate to a lawsuit that Mountains of

25   Spices, which is the New York Farm, brought against Sara Wei,

1    who your Honor may recall was at one point in charge of VOG,

2    who took in money from the private placement.  And Mountains of

3    Spices' claim was that she stole the funds.  And they sued her.

4    And so the communications that are at issue here, including the

5    spreadsheets and including the screen chat that Mr. Fergenson

6    referred to, are communications that are taking place in the

7    context of that lawsuit.

8           And even more specifically, your Honor, there is——this

9    alleged victim has a confidentiality agreement that the

10   government first produced to us last night.  That specifically

11   says that she is——at the top——and we can certainly show it to

12   the Court to give the Court more color, but it says at the top

13   that the translation services that this person is providing are

14   in connection with that lawsuit.  And then it goes on to, you

15   know——essentially it's a standard NDA that says you'll keep

16   everything confidential, because she's providing those services

17   in connection with the lawsuit by Mountains of Spices.

18          So those are just some additional facts that——to help

19   give the Court color.  Now——

20          THE COURT:  When is it that you expect this issue to

21   arise?

22          MR. SCHIRICK:  I think we anticipate——and

23   Mr. Fergenson can speak to this better than I, your Honor, it's

24   his witness, but I think we anticipate that it will be today,

25   assuming that we get to this witness.  I think she's following

O6C1GUO1

 1    Mr. Khaled.  She's number two up after Mr. Khaled, if I

 2    understand correctly.

 3            MR. FERGENSON:  That's right.  It's Khaled,

 4    Ms. Espinoza, and then this victim.

 5            MR. SCHIRICK:  So, your Honor, our view is that, look,

 6    Mountains of Spices has asserted privilege.  There's certainly

 7    a valid privilege claim here that would need to be dealt with

 8    with respect to these four or so documents.  I think we're in

 9    agreement as to what documents this applies to.  There are four

10    of them.  And that that issue needs to be resolved certainly

11    before the government intends to ask the witness about them.

12            THE COURT:  Your position is that these four documents

13    pertain to the lawsuit.

14            MR. SCHIRICK:  Correct.

15            THE COURT:  Go ahead.

16            MR. FERGENSON:  That doesn't mean they're privileged,

17    your Honor.  They're not legal documents.  They're

18    spreadsheets.  And there's a screenshot of a WhatsApp chat, not

19    with any lawyers.  They're not privileged, one, just there.

20    And the second is, your Honor, this is a victim of Mountains of

21    Spices.  Like she——she was——they had these victims, as your

22    Honor has heard over and over, sign various agreements.  And

23    that was part of the scheme to defraud.  This is not a valid

24    claim of privilege in any sense.  It's not privilege.  To the

25    extent there were any like——to the extent the Court has any

O6C1GUO1

1    concern about maybe there is some privilege here, it's clearly

2    crime fraud, your Honor.  There is no way that the farm loan

3    program is not subject to the crime fraud exception, and you

4    don't even need to get there because these are just not

5    privileged.  They're just screenshots of Excel sheets.

6            THE COURT:  What would make those screenshots and

7    Excel sheets privileged?

8            MR. SCHIRICK:  So the——one of the principal issues as

9    I understand it in the lawsuit, and certainly outside counsel

10   for Mountains of Spices knows better than I and may be able to

11   correct me, but my understanding, your Honor, is one of the

12   principal issues was, how much money had been stolen.  You

13   know, essentially what the damages were, what Mountains of

14   Spices damages were and what it proved.  And these spreadsheets

15   appear to be, have been circulated by lawyers in the Discord

16   chat to, as part of having, you know——and there are——there are

17   a number of portions of the documents that are in Mandarin, and

18   so they're circulated to this group as part of the——as part of

19   the effort on Mountains of Spices side to decide what quantum

20   of damages to assert and what they can prove.

21           THE COURT:  So this is Mountains of Spices saying what

22   about the defendant?

23           MR. SCHIRICK:  They're not saying anything about the

24   defendant, your Honor.

25           THE COURT:  In the action they are asserting claims

O6C1GUO1

1    against the defendant.  What are the claims?

2              MR. SCHIRICK:  Sorry.  When you——yes, Ms. Wei, yes.

3              THE COURT:  They're claiming that Ms. Wei

4    misappropriated the funds, correct?

5              MR. SCHIRICK:  Correct.

6              THE COURT:  All right.  This is all part of the RICO

7    enterprise and they come in.

8              Anything else?

9              MR. FERGENSON:  No, your Honor.  Thank you.

10             MR. SCHIRICK:  We have one other issue——I'm sorry,

11   your Honor——that also relates to a witness that may come up

12   later today and maybe even——are we confident of that?

13             Okay.  Well, just to preview for your Honor, there is

14   a——the witness who will follow the victim that we were just

15   speaking about, Mr. Roberts, who is a representative of a

16   company called Bitgo, which was an outside vendor of the

17   Himalaya Exchange, and Mr. Roberts——and the defense sent a

18   letter on Monday, after we received Mr. Roberts——or notice that

19   Mr. Roberts would testify this week, letting the prosecution

20   team know that we believe that what appears to be his

21   anticipated testimony is actually expert testimony that was not

22   noticed.  It appears that the government plans to have

23   Mr. Roberts testify about issues like whether or not the

24   cryptocurrencies at issue were real cryptocurrencies, which

25   your Honor will remember was the subject of extensive briefing

O6C1GUO1

1    with respect to the dueling experts that the parties have here.

2    And so we gave the government notice seeking——well, not so much

3    notice; we wrote them a letter seeking assurances that they

4    wouldn't elicit that kind of testimony, which is the proper

5    subject of expert testimony.  And we just heard back for the

6    first time this morning in the discussion before your Honor

7    came out that the government takes the position that

8    Mr. Roberts can speak to those issues.  And I don't mean to

9    mischaracterize——Mr. Horton can correct me if I got that

10   wrong——but my understanding is that the government's position

11   is that he can testify to those issues because essentially it

12   was part of his job when he was at Bitgo to review and do due

13   diligence and so to the extent that he came to conclusions

14   about the coins or about the exchange, that he can testify to

15   that.  And again, our view I think——and it's pretty clear——is

16   that that's actually expert testimony.

17            THE COURT:  Are we expecting Mr. Roberts?

18            MR. HORTON:  No, your Honor, we're not expecting him

19   today.  And in the interest of time, we have a short letter

20   prepared as to his testimony and why it's admissible.

21            THE COURT:  All right.  So we'll revisit that at a

22   later time.

23            If you'll have the jurors brought in.

24            (Jury present)

25            THE COURT:  Please be seated.

O6C1GUO1                        Khaled - Cross

1              Good morning, jurors.

2              THE JURORS:  Good morning.

3              THE COURT:  So I have some good news, and that is that

4    next Wednesday we will not be meeting.  You'll have next

5    Wednesday off.  But due to circumstances beyond my control and

6    beyond the control of the parties, we are running late.  And

7    what I do not want to do is to have to extend the trial beyond

8    the July 12th date that I gave you as the end date for the

9    trial, and so for next week only, I'm going to make a proposal.

10   You don't have to answer me now.  You can think about it over

11   the lunch break.  But in order to catch up and not have to

12   extend the trial, I am proposing that for four days next

13   week——Monday, Tuesday, Thursday, Friday——that we go from 9:30

14   to 1 p.m., that we have a one-hour break for lunch, and that we

15   then go from 2 to 5.  So think about that.  Think about that.

16   And you'll come back, and we will continue our discussion after

17   the lunch break.

18              Mr. Khaled, remember that you're still under oath.

19              We'll continue with the cross-examination.

20              MS. SHROFF:  Thank you, your Honor.

21    HAITHAM KHALED, resumed.

22   CROSS EXAMINATION

23   BY MS. SHROFF:

24   Q.  Good morning.

25   A.  Good morning.

O6C1GUO1                        Khaled - Cross

1    Q.  Mr. Khaled, let me show you what is marked as Defense

2    Exhibit 60538.

3            MS. SHROFF:  It's just for the witness.  Thank you.

4    Q.  Sir, if I could ask you, if you could take a look at the

5    document.

6            Do you recognize this, sir?

7    A.  Yes.

8    Q.  And what is it?

9    A.  It's a affidavit.

10   Q.  Whose affidavit?

11   A.  Pacific Alliance Asia Opportunity Fund.

12   Q.  Let me try it again.  Who signed the affidavit?

13   A.  Who signs the affidavit?

14   Q.  Yes.

15   A.  I signed it.

16           MS. SHROFF:  Your Honor, at this time the defense

17   moves Defense Exhibit 60538 into evidence.

18           THE COURT:  No objection?

19           MS. MURRAY:  Your Honor, objection for the moment.  We

20   don't understand the purpose of this exhibit.

21           THE COURT:  All right.  So if you'll step up, please.

22           (Continued on next page)

23

24

25

O6C1GUO1                    Khaled - Cross

1                (At the sidebar)

2                MS. SHROFF:  Your Honor, Mr. Khaled makes a statement

3    under oath in paragraph 5 of the affidavit——I don't think he's

4    going to find it there, but——essentially saying that he has no

5    relationship——Crane has no relationship with Mr. Kwok, and he

6    says that under oath.

7                THE COURT:  So you're going to confront him, you're

8    going to ask him:  Did you say on X date X thing?

9                MS. SHROFF:  No.  I'm just going to ask if the

10   affidavit is signed under oath, if he signed it, and if

11   paragraph 5 accurately reflects the fact he put down in the

12   affidavit.

13               THE COURT:  But the purpose is impeachment.

14               MS. SHROFF:  It's also to show his state of mind on

15   May 17th, when he signed the document.

16               THE COURT:  This is for impeachment.  And so you can

17   confront him, and you'll have to live with his answer if he

18   says yes.

19               MS. SHROFF:  Okay.

20               THE COURT:  All righty.

21               (Continued on next page)

22

23

24

25

O6C1GUO1                         Khaled - Cross

1           (In open court)
2    BY MS. SHROFF:
3    Q.  Mr. Khaled, you signed an affidavit, correct, in the Pax
4    litigation?
5    A.  Can you repeat that.
6    Q.  Sure.  You signed an affidavit, did you not, and submitted
7    it as part of the Pax litigation?
8    A.  Yes, I did.
9           MS. MURRAY:  Your Honor, I ask that the document be
10   taken down unless and until it's admitted.
11          THE COURT:  It's not being shown to the jurors.
12          MS. SHROFF:  No.
13          THE WITNESS:  But can I see the entire one?  There's a
14   page 1 to 3.
15          THE COURT:  You may look at that.  Go ahead.
16          MS. SHROFF:  May I approach, your Honor.
17          THE COURT:  You may.
18          MS. SHROFF:  I just——it might be easier for the
19   witness to have a hard copy.
20          THE COURT:  Oh, I see what you're saying.  That's all
21   right.
22   A.  Can you repeat your question.
23   Q.  My question was:  Do you remember signing an affidavit and
24   submitting it as part of the Pax litigation?
25   A.  This affidavit, yes.

O6C1GUO1                          Khaled - Cross

1    Q.  And when you submitted that affidavit, you knew that you
2    were submitting facts that you were swearing to as truthful,
3    correct?
4    A.  On actual facts?
5    Q.  Yes.
6    A.  And documents that I had, yes.
7    Q.  Okay.  And you had——you recall that the affidavit was
8    notarized by a notary, correct?
9    A.  Yes.
10   Q.  And as part of the affidavit, you made certain statements,
11   correct?
12   A.  Yes.
13   Q.  And one of the statements that you swore to under oath was
14   that you had no information demonstrating that the Citibank
15   account nor any Crane bank account has or has had any funds
16   belonging to Kwok or any entities that he has a financial
17   interest in, correct?
18   A.  On paper, yes.
19   Q.  You swore to that under oath, correct?
20   A.  That on paper, yes.
21   Q.  Okay.  Could you explain to me what you mean by "on paper."
22   A.  So none of the——the payments that came in that were on
23   Crane did not have Kwok as a name, as a beneficiary.  Kwok's
24   name was not on it.
25   Q.  Well, but you said that they had no funds belonging to

O6C1GUO1                          Khaled - Cross

1    Kwok, right?  Funds can belong to someone without their name
2    being on it, correct?
3              THE COURT:  Don't testify.
4    Q.  What did you mean when you said any funds belonging to
5    Kwok?
6    A.  That his name was on there.
7    Q.  So your affidavit, when you say something belongs to you,
8    you mean that your name has to be on there.
9    A.  When it comes to funds and the documents that I had, the
10   statements, correct.
11   Q.  And then you said, "or any entities that he has a financial
12   interest in," correct?
13   A.  Yes.
14   Q.  And by saying that, did you also mean to say on paper, if
15   his name appears, or did you actually mean to say what you
16   wrote and swore to under oath, any entities that he has a
17   financial interest in?
18   A.  My statement was based on the paper.
19             THE COURT:  What do you mean, based on paper?
20             THE WITNESS:  Based on the actual wires that were in
21   the account.
22             THE COURT:  Could you explain that more fully.
23             THE WITNESS:  Okay.  So there's 1300 wires, transfers
24   that came into the account, which was at Citibank's account.
25   So all these payments did not have specifically the name of

1    Kwok on them.

2              THE COURT:  Go ahead.

3    BY MS. SHROFF:

4    Q.  Okay.  And you said, "I have no information demonstrating

5    that Citibank account nor any Crane bank account has or had any

6    funds belonging to Kwok or any entities that he had a financial

7    interest in," correct?

8    A.  That's what it says, yeah.

9    Q.  And you testified on direct, did you not, Mr. Khaled, that

10   the wires that you received for G/CLUBS, Mr. Guo had control

11   over, correct?

12   A.  Correct.

13   Q.  And if he had control over them, he had a financial——did

14   you believe that he had a financial interest in those wires?

15   A.  Yes.

16   Q.  So when you said that he has no financial interest in it,

17   that was not a truthful statement, correct, according to you?

18   A.  In theory, no.

19   Q.  How about in practice.

20   A.  According to the documents of the account and the wires.

21   Q.  Did the affidavit say, "according to the documents and the

22   wires——"

23              MS. MURRAY:  Objection, your Honor.

24   Q.  "——no funds belong——"

25              THE COURT:  Overruled.

1  Q.  "——to Mr. Kwok, but I personally believe that he has a

2  financial interest in all the money coming into G/CLUBS"?  Did

3  you say that in the affidavit?

4  A.  No.

5  Q.  And could you tell the members of the jury the date of the

6  affidavit.

7  A.  May 17, 2021.

8  Q.  And by May 17, 2021, how many recordings had you made?

9  A.  I don't remember the exact number.

10  Q.  Okay.  Let me move on.

11        Mr. Khaled, between November 23rd of 2020 and May 13th

12  of 2021, did you move about $108 million?

13  A.  Can you repeat the dates.

14  Q.  November 23rd of 2020 and May 13th of 2021.

15  A.  I might have, yeah.

16  Q.  Let me show you what is marked as Government Exhibits MSS80

17  and MSS96.

18        Now while we're pulling those documents up,

19  Mr. Khaled, do you have any significance attached to the

20  May 12, 2021, date?

21  A.  Do I have a what?

22  Q.  Do you have any significance attached to May 12, 2021?

23  A.  I'm not sure.

24  Q.  Okay.  Now let me direct you to the bottom right of the

25  front first page, okay?  You see the account number?  And I

O6C1GUO1                         Khaled - Cross

1   apologize for the quality of the document.  You see the account

2   number, which is 552069134?

3   A.  I see the number, yeah.

4   Q.  Okay.  And if you look at page 7 of the same exhibit ending

5   in 80, do you see the January 26, 2021, transfer of $5,000 to

6   an account ending in 136, which will be Government Exhibit 96?

7   Do you see that?

8   A.  Yeah, but can you——can you show me the actual statement, or

9   no?  I can't see the statement.

10  Q.  Does that help you?

11  A.  Mm-hmm.

12  Q.  Do you see on the top column on the right?

13  A.  Yes.

14  Q.  So if I could highlight that for you just to make your life

15  easier.

16  A.  Thanks.

17  Q.  Active Asset Account, correct?  I can't tell if it's asset

18  or assets.  I apologize.  I don't mean to purposely mislead.

19          On the very top——if you could highlight it for

20  him——Crane Advisory Group LLC, care of Haitham Khaled, correct?

21  A.  Yes.

22  Q.  And that is the 136 account, correct?

23  A.  Correct.

24  Q.  And that's your personal Morgan Stanley account, correct?

25  A.  The one highlighted?

1   Q.  No.  The one into which this money is going is your

2   personal Morgan Stanley account, right, which is Exhibit 96,

3   the document ending in 96?  Do you see that transfer?

4   A.  Yeah.

5   Q.  Okay.  And you transferred $5,000 into that account,

6   correct?

7   A.  Yes.

8   Q.  Okay.  And that is dated January 26, 2021, right?

9   A.  Correct.

10  Q.  Okay.  Now if we go to page 7 of document ending 96, would

11  you tell the jury where that money came from.

12  A.  The 5,000?

13  Q.  Yes.

14  A.  From the other Morgan Stanley account.

15  Q.  And what is the name on the other Morgan Stanley account?

16  A.  Crane.

17  Q.  And then there is another transfer, if you look at page 30,

18  of $1 million, correct?  We're now back at 80, Government

19  Exhibit GX MSS80.  You see, on page 30, there's a $1 million

20  transfer, correct?

21  A.  Correct.

22  Q.  And then another $1 million transfer, correct?

23  A.  Correct.

24  Q.  That's exiting the Crane account, correct?

25  A.  Yes.

O6C1GUO1                    Khaled - Cross

1  Q.  And that money is going where, sir?

2  A.  Account ending 136.

3  Q.  And who is the owner of 136?

4  A.  I am.

5  Q.  It's your personal account, correct?

6  A.  Correct.

7  Q.  The first transfer is on April 5th of 2021, correct, and

8  the second transfer is on April 20th?

9  A.  Yes.

10 Q.  Thank you.  Now let's go back.

11        MS. SHROFF:  You can take that down, please.  Thank

12 you.

13 Q.  Is it fair to say you also transferred money from the Crane

14 account to your personal account at Capital One?

15 A.  I need to see it.

16 Q.  You don't remember it?

17 A.  No.  There was a lot of transfers.

18 Q.  Do you recall a transfer for $129,000?

19 A.  I need to see it, again.

20 Q.  Let me see if I can show you a document that might refresh

21 your recollection, okay?

22 A.  Sure.

23        MS. SHROFF:  This is just for the witness and not the

24 jury, please.

25 Q.  Do you see the third bullet point?

1    A.  Yes.

2    Q.  Does that refresh your recollection of that transfer?

3    A.  No.

4    Q.  Okay.  Did you have a Capital One account?

5    A.  I did.

6            MS. SHROFF:  And could we go to the very top of the

7    document that is in front of Mr. Khaled.

8    Q.  Does that refresh your recollection about the transfer?

9    A.  No, ma'am.

10           MS. SHROFF:  Okay.  You can take that down.

11   Q.  Mr. Khaled, you testified on direct about your fee,

12   correct?  You remember that?

13   A.  Correct.

14   Q.  And you testified on direct that you felt you were entitled

15   to a $2.7 million fee, correct?

16   A.  Correct.

17   Q.  Now to earn a 2-million-plus-dollar fee, you would have to

18   clear more than $100 million, correct?

19   A.  Correct.

20   Q.  And you had not cleared anywhere close to that amount when

21   you transferred $2 million to your personal account from the

22   Crane account in April of 2021, correct?

23   A.  Correct.

24   Q.  You were not entitled to that amount even under a simple

25   mathematical calculation, correct?

1  A.  What do you mean entitled?

2  Q.  You testified yesterday that you thought you were entitled

3  to this fee, 2 percent of all the money you cleared, correct?

4  A.  Correct.

5  Q.  Okay.  So mathematically, when you took the $2 million,

6  even just by math, you were not entitled to it, correct,

7  because you could only get 2 percent of what you had cleared

8  and you hadn't cleared that much, right?

9          MS. MURRAY:  Objection, your Honor.  Compound.

10          THE COURT:  Sustained.

11          MS. SHROFF:  I'm just trying to save time.  I'm happy

12  to go through it step by step.  Really, I am.

13          THE COURT:  All righty.  Just break the question up.

14  A.  Can you.

15  Q.  You want me to try again, Mr. Khaled?

16  A.  No, can you——

17  Q.  I'm sorry?

18  A.  Can you?

19  Q.  Sure.

20  A.  Repeat?

21  Q.  Sure.  You said yesterday that you were going to charge a

22  2 percent fee, right?

23  A.  It was agreed with Yvette and Mileson, Ana, so it's not me

24  charging them directly.  Go ahead.

25  Q.  Whoever agreed to it, you were charging the fee, right?

O6C1GUO1                          Khaled - Cross

1   Yvette's not charging the fee, right?

2   A.  Correct.

3           MS. MURRAY:  Objection, your Honor.

4   Q.  Mileson is not charging the fee, correct?

5           THE COURT:  He has answered yes.

6   Q.  Okay.  So I'll move on.

7           To charge a 2——for you to get $2.7 million as

8   2 percent of an amount, you would have had to clear more than

9   100 million; it's just simple math, correct?

10  A.  Correct.

11  Q.  Okay.  And by April 2021, you had not cleared more than

12  $100 million, correct?

13  A.  Correct.

14  Q.  So you just arbitrarily transferred $2.7 million from the

15  Crane account into your personal account, right?

16  A.  No.  I believe the 1 million was transferred back.  I think

17  there was a mistake.

18  Q.  I didn't ask if it was transferred back, sir.  I just asked

19  you, based on the documents I showed you, the $2 million were

20  transferred into your personal account.

21  A.  Yeah.

22  Q.  Okay.

23  A.  Again, my answer is, that 2 million, a million of it

24  was——or maybe both——transferred back.  I don't remember the

25  exact transactions back and forth.

O6C1GUO1                        Khaled - Cross

1   Q.  I'm sure Ms. Murray will clean that up on redirect.

2              MS. MURRAY:  Objection your Honor, objection.

3              THE COURT:  Sustained.  Don't testify.

4   Q.  Sitting here today, your testimony is that the 2 million of

5   the 2.7 was transferred back?  I just want to make sure I get

6   it right, or we can have the answer read back.

7   A.  I don't remember every transaction.

8   Q.  Okay.  So when you agreed with these four prosecutors,

9   three prosecutors over here to forfeit $2.7 million, you're

10  really forfeiting money that you never even got, or that you

11  got and transferred back?

12             MS. MURRAY:  Objection, your Honor.

13             THE COURT:  Sustained.  Too many concepts in the

14  question.  You need to break it down.

15  Q.  You agreed to forfeit $2.7 million, correct?

16  A.  Correct.

17  Q.  Now you're saying that the $2 million that was transferred

18  into your account was transferred back to G/CLUBS, correct?

19             MS. MURRAY:  Objection.  Mischaracterizes.

20             THE COURT:  Sustained.  He said that he could not

21  recall exact numbers.

22  Q.  Okay.  Tell me your approximate number that you think you

23  transferred back.

24  A.  I can't really answer.  I don't——I don't remember.

25  Q.  Was it 1 million?

O6C1GUO1                         Khaled - Cross

1              MS. MURRAY:  Objection, your Honor.

2              THE COURT:  Sustained.

3   Q.  So you transferred some amount back; that's your testimony,

4   right?

5   A.  Correct.

6   Q.  To G/CLUBS.

7   A.  No, back to the Crane account.

8   Q.  You transferred it back to your Crane account?

9   A.  Correct.

10  Q.  So you kept it, in your Crane account.

11  A.  Went back to the Crane account, and then when the clearing

12  happened, when we did the clearing, it either——it either went

13  to G Club or it stayed or became part of the fee.

14  Q.  So then why, if it went back to G Club, did you agree to

15  forfeit $2.7 million?

16  A.  Again, it went——it went back to Crane and then it was

17  cleared for G Club.

18  Q.  Okay.

19  A.  And then a fee was earned.

20  Q.  Right.  But why did you agree to give it back to the

21  government if it was lawfully earned?

22             MS. MURRAY:  Objection, your Honor.  Asked and

23  answered.

24             THE COURT:  You can answer.  Why did you agree to give

25  it back to the government, to return the money?

O6C1GUO1                          Khaled - Cross

1            Clarification:  Why did you agree to forfeit the

2    money?

3            MS. MURRAY:  Your Honor, I would just note, we would

4    ask—

5            MS. SHROFF:  Your Honor, she can't testify either.

6            MS. MURRAY:  Your Honor, I'm simply asking that the

7    Court note that Mr. Khaled is not obligated to get into any

8    discussions with his counsel about that topic.

9            THE COURT:  Yes.  It's not a question of revealing a

10   discussion with his counsel.  He's just being asked:  Why did

11   you agree to forfeit 2.7 million?

12           THE WITNESS:  It was part of the agreement.

13   BY MS. SHROFF:

14   Q.  You met with the government—Ms. Murray, Mr. Finkel,

15   Mr. Fergenson—on July 26th of 2021 with the FBI, correct?

16   Remember that?

17   A.  July?

18   Q.  How about on March 31st of 2022?

19   A.  Probably.

20   Q.  Did you tell them, I sent this money back into the Crane

21   account?

22   A.  I don't understand your question.

23   Q.  You just said you transferred the money back to the Crane

24   account and some of the money to G/CLUBS.  You just testified

25   to that, right, now?

O6C1GUO1                          Khaled - Cross

1          THE COURT:  That was not his testimony.  He did not

2    testify that the money transferred from his account went to

3    G/CLUBS.

4          MS. SHROFF:  Your Honor, I'm——

5          THE COURT:  He testified that it went from his account

6    to the Crane account.

7          MS. SHROFF:  He said some went to the Crane account,

8    some went back to G/CLUBS.

9          THE COURT:  That was not his testimony.

10   BY MS. SHROFF:

11   Q.  Could you clarify where that 2.7 million went back,

12   according to you?

13   A.  The 2 million?

14   Q.  Yes.

15   A.  Not the 2.7.

16   Q.  The $2.7 million.

17          THE COURT:  All right.  So I understood you to be

18   asking about the $2 million.  So now you're asking about the

19   2.7 million?

20          MS. SHROFF:  I'll break it up, your Honor.

21   Q.  The 2 million, you said you transferred it back, correct?

22   A.  I transferred——it was——it was transferred back to the Crane

23   account.

24   Q.  All 2 million.

25          MS. MURRAY:  Your Honor, objection.  It

O6C1GUO1                          Khaled - Cross

1    mischaracterizes.  He said he doesn't recall the specific

2    transaction.

3            MS. SHROFF:  It's a question.

4            THE COURT:  Where did you transfer the $2 million,

5    from your account to where?

6            THE WITNESS:  It either stayed in that account—I

7    don't remember if it—the entire amount stayed in that personal

8    account or transferred back—most of it transferred back to

9    Crane, as an error.

10   BY MS. SHROFF:

11   Q.  Did you tell Ms. Murray that when you met with her on

12   March 31st?

13   A.  I don't think I was asked.

14   Q.  Did you tell her that when you met with her on May 12th of

15   2022?

16   A.  No.

17   Q.  How about on June 27th of 2022, did you tell her that?

18   A.  Again, I don't remember.

19   Q.  July 7, 2022, you met with her again.  Did you tell her

20   then?

21   A.  Again, I don't remember.

22   Q.  November 2, 2022, you met with her then.  Did you tell her

23   then?

24   A.  Again, I don't remember.

25   Q.  January 10, 2023, did you tell her then?

O6C1GUO1                          Khaled - Cross

1    A.  I don't remember, no.

2    Q.  March 7, 2024, did you tell her then?

3    A.  No.

4    Q.  March 8, 2024, did you tell her then?

5    A.  I don't remember.

6    Q.  March 14, 2024, did you tell her then?

7              MS. MURRAY:  Objection, your Honor.  403.

8              THE COURT:  You may answer.

9    A.  Again, I don't remember.

10   Q.  March 25, 2024, when you met with her, did you tell her

11   then?

12   A.  Tell her that I made an error wiring money back and forth?

13   Q.  Anything to say or show that this money went back to where

14   you said it went back to.

15             Let me try it this way:  There is a digital record of

16   money going back and forth from accounts, correct?

17   A.  Correct.

18   Q.  Did you ever tell her there's a digital record, here it is?

19   A.  I believe statements were presented.

20             (Continued on next page)

21

22

23

24

25

O6CBGUO2                          Khaled - Cross

1    BY MS. SHROFF:

2    Q.  I asked you if you presented any statements to her showing

3    any transfer from your personal account into the Crane account

4    after April of 2021?

5    A.  My entire discovery was sent through the lawyers, so I

6    don't see --

7    Q.  Okay.  Is it fair to say up until all through these dates

8    you and Ms. Murray never discussed that topic, correct?

9    A.  The topic of transfers?

10   Q.  Yes.  Transfers back from your personal account to the

11   Crane account that you've testified to now under oath?

12            THE COURT:  What dates are you asking about?

13            MS. SHROFF:  All the dates that I just recited, your

14   Honor.  I didn't want to repeat them.

15   A.  The dates of the transfers, like exact transfers one by

16   one.

17   Q.  Yes, exact transfers one by one.

18   A.  One by one, I don't -- I really don't remember one by one.

19   Q.  How about as a group?

20   A.  What do you mean as a group?

21   Q.  I ask you if you remember them as a group?

22   A.  I don't remember specific transfers, no.

23   Q.  How about on March 31 of 2024, did you discuss this issue

24   with her then?

25   A.  I don't remember, no.

O6CBGUO2                           Khaled - Cross

1   Q.  You met with her on May 7th, correct, of 2024?

2   A.  I don't remember the exact dates.

3   Q.  May 20, 2024?

4   A.  Again, I don't remember exact dates.

5   Q.  May 27, 2024?  You met with Ms. Murray May 27, 2024,

6   correct?

7   A.  I don't remember exact dates.

8   Q.  May 29, 2024?

9   A.  Could have.  I don't know.

10  Q.  June 1, 2024?

11  A.  Might have been.

12  Q.  June 6 you sent her emails, correct?

13  A.  I might have, yeah.

14  Q.  June 6 you met with her again, correct?

15          Do you recall telling her I transferred these monies

16  back out of my personal account?

17  A.  Again, I want to clarify.  The money came to my account.

18  It transferred to --

19  Q.  Can you just use your mic for me because I have trouble.

20  A.  The money came into the account and then transferred back

21  to Crane.

22  Q.  Well, it didn't come into your account, right?  You had to

23  transfer it?

24  A.  It transferred from Crane to the personal account, and then

25  return to Crane.

O6CBGUO2                        Khaled - Cross

1    Q.  Did you ever tell her that?

2            In the 19 times you met with her, did you ever tell

3    her that?

4    A.  No.

5    Q.  And the money didn't just move from the Crane account into

6    your personal account, right, only you can release funds from

7    the Crane account, correct?

8            MS. MURRAY:  Objection, your Honor, compound.

9            THE COURT:  He testified that he made the transfer,

10   that it wasn't a spontaneous transfer.

11   Q.  Could you tell me, sir, what is a non-spontaneous transfer?

12           THE COURT:  I'm characterizing.

13           MS. SHROFF:  Oh, I apologize.

14           THE COURT:  He said that he made the transfer.

15   Q.  June 8, 2024, you met with Ms. Murray, correct?

16   A.  Could have, yeah.

17   Q.  Never told her about this transfer, correct?

18           MS. MURRAY:  Asked and answered.

19           MS. SHROFF:  I did not ask about June 8th.

20           THE COURT:  Why don't you just go through all the

21   dates, name the dates and ask him whether he stated that he

22   made the transfer on any of those dates.

23   Q.  June 6, June 8, June 9, June 10, and today is June 12.

24   That's just last week?

25   A.  No.

O6CBGUO2                          Khaled - Cross

1    Q.   What money did you use to buy your seven properties if you

2    sent this money back to Crane?

3    A.   From the two percent.

4    Q.   Excuse me.

5    A.   I bought those properties from the two percent fee.

6    Q.   The two percent fee which is included in the two million we

7    just talked about?

8    A.   No, that's what I was trying to clarify.

9    Q.   Okay.  Go ahead.

10   A.   So money went back.  And then when it was cleared, I took

11   the fee from the cleared amount.

12   Q.   Oh, so you sent it back.  Then you waited to clear the two

13   percent amount, and then you used that money to buy properties.

14   That's your testimony?

15   A.   Yes.

16   Q.   You've reviewed your bank records, correct, to prepare for

17   your testimony here?

18   A.   Yes.

19   Q.   There's no such document that you reviewed, correct, that

20   shows these transfers?

21   A.   What do you mean?

22   Q.   There's no bank account that shows any transfer from your

23   personal account into the Crane account, correct?

24        It only shows transfers from your Crane account into

25   your personal account?

O6CBGUO2                          Khaled - Cross

1           MS. MURRAY:  Objection to testifying.

2           MS. SHROFF:  It's a question.

3           THE COURT:  You may answer whether or not there are

4   documents showing a transfer from your account to the Crane

5   account.

6   A.  The ones that she showed me here?

7           THE COURT:  No, whether there exist any documents that

8   show that.

9   A.  Could be, yeah.  A statement, yeah.

10  Q.  It could be?

11  A.  No, no, there's a statement.

12  Q.  There is a statement that you -- did you show that

13  statement to Ms. Murray?

14  A.  Again, everything was produced.

15  Q.  You reviewed a lot of documents with Ms. Murray to prepare

16  for your testimony here, correct?

17  A.  Yes.

18  Q.  You never reviewed any documents with me, right?

19  A.  No.

20  Q.  Is it your testimony under oath that you reviewed such a

21  document with Ms. Murray?

22          MS. MURRAY:  Asked and answered.

23          THE COURT:  Sustained.

24  Q.  You worked out a payment facilitation agreement, correct?

25  A.  Can you be more specific.

O6CBGUO2                          Khaled - Cross

1    Q.  No.  Did you work out a payment facilitation agreement with

2    G/Club?

3    A.  Yes.

4    Q.  Have you worked out payment facilitation agreements with

5    anyone else?

6    A.  No.

7    Q.  You listened to several recordings yesterday, correct?

8    A.  Correct.

9    Q.  Each one of those recordings was made by you, correct?

10   A.  Correct.

11   Q.  And on those recordings -- and I'm hoping I don't -- I take

12   that back.

13          You testified that you heard and listened to different

14   people giving you different options for the way money could be

15   moved out of the Crane account, correct?

16   A.  Correct.

17   Q.  You testified you are on the recordings discussing the need

18   to do a Know Your Customer, correct?

19   A.  Correct.

20   Q.  And that's one of the reasons you gave on the recordings as

21   to why you could not move the money out of the Crane account

22   because according to you, you had not yet finished Know Your

23   Customer, correct?

24   A.  Correct.

25   Q.  And you've been a banker for how long, ten years, a decade;

O6CBGUO2                          Khaled - Cross

1    is that right?

2    A.   Approximately.

3    Q.   And you know, sir, that it is the bank that receives money

4    that does KYC, correct?

5    A.   They do KYC, correct.

6    Q.   Right.  In fact, if they hadn't done a KYC, there would be

7    no money in your Crane account, correct?

8         It would have been one big zero?

9    A.   Correct.

10   Q.   And, in fact, the only reason you were able to transfer

11   money out of your Crane account into your personal account was

12   because KYC had been done, correct?

13   A.   No, that's not accurate.

14   Q.   Really.  How did you open your Crane personal account?

15        Was KYC done when you opened the personal account?

16   A.   At Morgan Stanley?

17   Q.   Morgan Stanley, Citibank, anywhere.  Each time you open an

18   account, the bank does a KYC, correct?

19   A.   Correct.

20   Q.   Banks --

21   A.   But the money that was in Morgan Stanley came into Citibank

22   and Capital One to Crane's account.  And then when it went to

23   Morgan Stanley, it went from Crane's account, so not the 1300

24   people.

25   Q.   You finished?

O6CBGUO2                    Khaled - Cross

1    A.  Yeah.

2    Q.  The money that came into the Crane account, the banking

3    institution did the KYC, correct?

4    A.  Yes.

5    Q.  Not you?

6    A.  No.

7    Q.  Not Crane?

8    A.  For the money that came in, Crane did not do it.

9    Q.  By that you mean KYC, correct?

10   A.  Correct.

11   Q.  Let me go back to the recordings.

12          On the recordings people suggested to you the

13   different ways you could get the money out of the Crane

14   account, correct?

15   A.  Correct.

16   Q.  One option presented to you was to simply send the money

17   back to the original sender, correct?

18   A.  Correct.

19   Q.  You did not do that?

20   A.  I did for a few wires.

21   Q.  How many?

22   A.  Don't remember.  There was a number of returns.

23   Q.  I'll come back to a specific recording later, but your

24   testimony is you don't remember how much, correct?

25   A.  Returned?

O6CBGUO2                    Khaled - Cross

1   Q.  Right.

2   A.  I don't remember exactly, no.

3   Q.  A second option presented to you, correct, was for you to

4   simply close down the Crane account, right?

5   A.  I don't remember that.

6   Q.  You don't remember Ms. Wang telling you that you should

7   just simply close the Crane account?

8          If you close the Crane account, she informed you, you

9   would just stop receiving funds, correct?

10  A.  I don't remember that, no.

11  Q.  In fact, she told you that in a call that you recorded on

12  April 30th, correct?

13  A.  Again, I don't remember that.

14  Q.  All right.

15         MS. SHROFF:  May I have a moment, your Honor?

16         THE COURT:  Go ahead.

17  Q.  Does that refresh your recollection, sir, that on April 30

18  of 2021, Ms. Wang told you Crane should just like close down

19  the account instead of receiving further funds, correct?

20  A.  I don't know this word she's talking, if she's talking to

21  me.

22  Q.  Well, you're on the call, right?  You have the whole

23  transcript in front of you.

24  A.  No, you only have the -- can I see?

25  Q.  There you go.  Let us know when you want to shift the page,

O6CBGUO2                              Khaled - Cross

1   page two, page three.  Take your time?

2   A.  Okay.  What page was that message?

3   Q.  Nine.

4   A.  Can you go to page nine.

5   Q.  Could somebody highlight it for him?

6            THE COURT:  Sir, the question was whether you remember

7   her having said something to you.  You said that you did not.

8   And now the question is, do the documents in front of you

9   refresh your recollection as to whether or not she said that.

10  It's not a question of whether or not something is stated in

11  the document.  It's a question of whether looking at the

12  document causes you to recollect that she made the statement.

13  A.  No, not to me.

14  Q.  You were on the call?

15  A.  Yes.

16  Q.  You recorded the call?

17  A.  Correct.

18  Q.  You reviewed transcription of those calls and gave

19  corrections to Ms. Murray?

20  A.  I reviewed the transcripts, yeah.

21  Q.  Made corrections and gave them to Ms. Murray?

22  A.  What do you mean?

23  Q.  You read the transcription?

24  A.  Okay.

25  Q.  You made some corrections and you emailed the corrections

O6CBGUO2                        Khaled - Cross

1   to Ms. Julie Murray who is sitting here with the ponytail,

2   correct?

3            MS. MURRAY:  Your Honor --

4            MS. SHROFF:  I'm trying to identify.

5            MS. MURRAY:  -- I will stipulate I'm wearing a

6   ponytail.

7            THE COURT:  The ponytail.  Go ahead.

8   Q.  You told her, right, the corrections?

9   A.  No, these transcripts were not prepared by me.

10  Q.  I never said they were prepared by you, sir.  I asked you

11  --

12  A.  Did I review them, yes.

13  Q.  You made corrections, and you sent them to Ms. Murray,

14  correct?  You're on this call, right?

15           THE COURT:  Allow him to answer the question.  Did you

16  make corrections?

17           THE WITNESS:  Corrections on these?  Like words or

18  something?

19           THE COURT:  Did you read it and decide that something

20  was correct or incorrect?

21           THE WITNESS:  Yes.

22           THE COURT:  Did you send corrections to Ms. Murray?

23           THE WITNESS:  I don't remember.

24  Q.  Can someone pull up the 3500 material June 6, 2024.

25           Sir, there's a document on the screen for you?

O6CBGUO2                          Khaled - Cross

1    A.  Yes.

2    Q.  Does that refresh your recollection that you in fact sent

3    Ms. Murray changes that you thought were appropriate on the

4    transcription?

5    A.  Yes.

6    Q.  And you sent them on June 6 of 2024, correct?

7    A.  Correct.

8    Q.  Going back to the document I was showing you before which

9    is the April 30th call.  Does that refresh your recollection or

10   not?

11              MS. MURRAY:  Your Honor, asked and answered.

12              THE COURT:  Sustained.

13   Q.  You can take that down.

14              In more than one call Ms. Wang suggested to you to

15   stop receiving funds and close down the Crane account, correct?

16   A.  Again, it wasn't addressed to me.

17   Q.  Who owned Crane?

18   A.  On paper, I owned it, yeah.  I owned it.

19   Q.  So who else could close down the Crane account?

20   A.  The messages that she's saying, it's not addressed to me.

21   It's addressed to the other people on the call, Mileson.  She's

22   talking to him directly.

23   Q.  But Mileson can't close the Crane account, correct?

24   A.  He can't.

25   Q.  Miles Guo can't close that Crane account, correct?

O6CBGUO2                        Khaled - Cross

1    A.  No.

2    Q.  Only you can close the Crane account, correct?

3    A.  Correct.

4    Q.  In fact, only you could transfer the money out of the Crane

5    account, correct?

6    A.  Correct.

7    Q.  All these recordings are because you won't transfer the

8    money, correct?

9    A.  Not just for that purpose, no.

10   Q.  But one of the purposes is because you won't transfer the

11   money, correct?

12   A.  One of the purposes, yeah.

13   Q.  Right.  And Mileson couldn't force you to move the money,

14   correct?

15   A.  Definitely was putting pressure, yeah.

16   Q.  I didn't hear that.

17   A.  Definitely was putting pressure.

18   Q.  Oh, definitely.  We heard about the pressure.  My question

19   is --

20             MS. MURRAY:  Objection, your Honor.

21             THE COURT:  Don't testify, Ms. Shroff.  Don't testify.

22   Q.  Did he get you to move the money?

23             I'm asking about Mileson now.  Yes or no, did he get

24   you to move the money?

25   A.  Yes.

O6CBGUO2                          Khaled - Cross

1    Q.  You moved the money out of Crane into G/Club as Mileson

2    wanted you to?

3    A.  Without KYC, I did not, no.  Without a package, I did not.

4    Q.  You never moved that money when Mileson asked you to,

5    correct?

6    A.  Correct.

7    Q.  He pressured you according to you and you still never moved

8    the money, correct?

9    A.  Correct.

10   Q.  According to you, Mr. Guo pressured you, correct, Miles Guo

11   sitting right there?

12   A.  Yes.

13   Q.  You never moved the money, correct?

14   A.  Correct.

15   Q.  Ms. Wang pressured you, correct?

16   A.  Correct.

17   Q.  You never moved the money, correct?

18   A.  Correct.

19   Q.  William Je pressured you, correct?

20   A.  Yes.

21   Q.  You never moved the money?

22   A.  The large sum, no.

23   Q.  Any sum.  You never moved the money that they were asking

24   you to move, correct?

25   A.  The hundred million, no.

O6CBGUO2                          Khaled - Cross

1   Q.  Haoran He asked you to move the money, correct?

2   A.  No, that's not correct.  Haoran He never reached out.

3   Q.  Ana Izquierdo asked you to move the money.  You didn't move

4   the money, correct?

5   A.  Correct.

6   Q.  Now, regardless of whether Ms. Wang made the suggestion or

7   not, you could have always closed the bank account, correct?

8   A.  Correct.

9   Q.  Best way not to get money into an account is to close an

10  account, correct?

11  A.  Correct.

12  Q.  Had you closed the Crane account, there would have been no

13  more wire transfers into that account, correct?

14  A.  Yes, but it had balances.

15  Q.  I didn't ask you about the balances.

16          My question to you was, sir, had you closed the

17  account, you would have received no more wire transfers,

18  correct?

19  A.  I would have never received wires.

20  Q.  The larger the balance in the Crane account, the larger

21  your two percent fee, correct?

22  A.  Correct.

23  Q.  Another option presented to you was for you to simply

24  return the money to G/Clubs, correct?

25  A.  Return the money to G/Club?

O6CBGUO2                          Khaled - Cross

1    Q.  Right.

2    A.  To send it to -- yeah, to send it.

3    Q.  Right.  That was an option for you.  I'm not sure if you're

4    done.  I'm confused, sir.  I'm asking you?

5    A.  I'm done.

6    Q.  You didn't do that, correct?

7            THE COURT:  By "that" what are you referring to?

8    Q.  Sending the money to G/Club?

9    A.  Money was sent to G/Club.

10   Q.  All the money?

11   A.  Less expenses which is a two percent.

12   Q.  You never sent that to G/Clubs, correct?

13   A.  Less money transferred, less money returned.  Money was

14   returned to some senders that sent the money.  They requested

15   the money to be returned back, so not all the money that came

16   in went to G/Club.

17   Q.  How much did you get sued for by the G/Clubs?

18            What was the dollar amount?

19   A.  I think it was like four something.

20   Q.  Four something?

21   A.  Yeah, or three something.  I'm not sure.

22   Q.  Three what?

23   A.  Three million.  I don't have the exact amount.

24   Q.  In the arbitration how much money were you sued for to

25   return to G/Clubs?

O6CBGUO2                        Khaled - Cross

1    A.  I don't remember.

2    Q.  56 million?

3    A.  The initial arbitration, yes.

4    Q.  You had 56 million that you didn't transfer, correct?

5    A.  Correct.

6    Q.  You were told one option would be to transfer that 56

7    million to Hamilton.  You didn't take that option either,

8    correct?

9    A.  I don't recall that, no.

10   Q.  You were given the option to transfer the 56 million to

11   Himalaya Exchange.  You didn't do that either, correct?

12   A.  Again, I don't remember that.

13   Q.  One of the other options was not to return the money to the

14   original sender, but to return the money to the person in the

15   middle who had sent the money, and you didn't like that option

16   either, correct?

17   A.  No, that was not suggested.

18   Q.  And in each one of these recorded calls that you heard

19   yesterday, you kept talking about an escrow agreement, correct?

20   A.  It was mentioned, yeah, escrow agreement.

21   Q.  You mentioned the escrow agreement, correct?

22   A.  Could have been mentioned, yeah.

23   Q.  You're not licensed to act as an escrow agent in the state

24   of New York, correct?

25   A.  We did get a license.

O6CBGUO2                          Khaled - Cross

1    Q.  I did not ask you that.  I'm asking you if you are

2    registered, sir, on the website at the department of finance as

3    an escrow agent?

4    A.  Yeah, my attorneys did register Crane as an escrow agent,

5    as a money servicing business.

6    Q.  I didn't ask you about a money servicing business, sir.  I

7    asked you if you were registered as an escrow agent?

8            MS. MURRAY:  Objection, your Honor.  Ms. Shroff is

9    arguing with the witness.

10           THE COURT:  Sustained.  He answered.

11   Q.  Sir, do you think that an escrow agent is the same thing as

12   a money transmitter?

13   A.  I relied on the attorneys, and they set up a money

14   servicing business license in order to act as an escrow.

15   Q.  Sir, my question to you was, your understanding as a banker

16   of ten years, is it your understanding that an escrow agent is

17   the same thing as a money transmitter?

18   A.  I don't know that.

19   Q.  During the time that you were recording these calls, right,

20   you were at the same time concomitantly trying to work out a

21   PFA with G/Clubs, right?

22   A.  That was one of the solutions, yeah.

23   Q.  I could not hear you.

24   A.  That was one of the solutions that the lawyers and myself

25   came up with.

O6CBGUO2                         Khaled - Cross

1          THE COURT:  What is PFA?

2          MS. SHROFF:  It's the agreement that he entered into,

3    the payment facilitation agreement.

4          THE COURT:  Go ahead.

5    Q.  You hired lawyers so that you could get the agreement,

6    correct?

7    A.  Correct.

8    Q.  You wanted the agreement, correct?

9    A.  All parties wanted the agreement.

10   Q.  My question to you, sir, did you want the agreement?

11   A.  All parties wanted the agreement.

12   Q.  You signed that agreement on May 12 of 2021, correct?

13   A.  Correct.

14   Q.  And even after you signed that agreement, you refused to

15   transfer the money, correct?

16   A.  Not before a KYC plus indemnity package was received.

17   Q.  Right. According to you Crane was going to do KYC even

18   though the bank had already done it?

19   A.  They were going to verify the indemnity form.  It was

20   multiple pages that needed to be completed.

21   Q.  Okay.  So it was not KYC, it was the indemnity form?

22   A.  It was a package.

23   Q.  It was a package.  Okay.

24          And at that time you were told, right that the people

25   who had applied for G/Club membership were getting annoyed that

O6CBGUO2                          Khaled - Cross

1    they didn't have their membership?

2    A.  I don't remember that.

3    Q.  You were told by Ana Izquierdo, were you not, that

4    membership could not issue until payment had cleared, correct?

5    A.  Unless they finish consolidation, yeah.  Until Ana and the

6    team of G/Club does consolidation.

7    Q.  Well, actually until you release the money.  I'll move on.

8            Let me show you what is marked as Defense Exhibit

9    60539.  You recognize this document?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's an email.

13   Q.  About what?

14   A.  Subject line is notice of termination.

15   Q.  Termination of what?

16   A.  Payment facilitation agreement.

17   Q.  The same one we've been talking about all this time, right?

18   A.  The payment facilitation agreement.

19   Q.  The one we've been talking about, correct?

20   A.  The payment facilitation agreement.

21   Q.  The payment facilitation is between you and G/Clubs, right,

22   Crane and G/Clubs, correct?

23   A.  Correct.

24   Q.  And who is Todd Kulkin?

25   A.  Attorney.

O6CBGUO2                      Khaled - Cross

1    Q.  For whom?

2    A.  Crane.

3    Q.  That's you, right?

4    A.  Yes.

5         MS. SHROFF:  Your Honor, we ask that the Court allow

6    us to introduce into evidence DX-60539.

7         MS. MURRAY:  Just one question to voir dire?

8         THE COURT:  Go ahead.

9         MS. MURRAY:  Mr. Khaled, do you know who ask Limarie

10   Reyes to send this notice of termination to you?

11        THE WITNESS:  It's being sent to Alex at G/Club.

12        MS. MURRAY:  No objection, your Honor.

13        THE COURT:  It is admitted.

14        (Defendant's Exhibit 60539 received in evidence)

15   BY MS. SHROFF:

16   Q.  Whoever it's sent to, it's telling you Crane's terminated,

17   correct.

18        MS. SHROFF:  Oh, I'm sorry.  May I have the jury also

19   take a look, please.

20        THE COURT:  Go ahead.

21   BY MS. SHROFF:

22   Q.  May I pose my question, sir?  Are you done reading?

23   A.  Go ahead.

24   Q.  They're terminating the contract with Crane, correct?

25   A.  Are you talking about the email that's going to Alex?

O6CBGUO2                          Khaled - Cross

1  Q.  I cannot hear you.

2  A.  Are you talking about the email going to Alex?

3  Q.  I'm talking about the notice of termination addressed to

4  the Mr. Todd Kulkin at Warren Law Group at 112 West 34th

5  Street, 17th Floor, New York, New York, 10120, your lawyers?

6  A.  Yes, they're asking to terminate the escrow agreement.

7  Q.  Terminate what?

8  A.  The escrow agreement.

9  Q.  Well, it's a payment facilitation agreement.

10  A.  The payment facilitation agreement.

11  Q.  Your lawyers are on the email chain, correct?

12  A.  From Limarie, yes.

13  Q.  And it's addressed to your attorney, correct?

14  A.  Correct.

15  Q.  And it is dated June 30, correct?

16  A.  Yes.

17  Q.  And you read this before, right?

18  A.  Yes.

19  Q.  They were terminating Crane's agreement with G/Club?

20  A.  Correct.

21  Q.  You can take that down, please.  Thank you.

22         Let me show you DX-60540.  Let me ask you, sir, while

23  we're waiting for the document to be brought up.

24         Did you want the contract with Crane to be terminated?

25  A.  I'm sorry.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6CBGUO2                              Khaled - Cross

1  Q.  Did you want the contract with Crane to be terminated?

2  A.  Yes.

3  Q.  You did?

4  A.  Yeah.  At this time, yeah.

5  Q.  Which time?

6  A.  July, yes.

7  Q.  You wanted it terminated?

8          MS. MURRAY:  Objection, asked and answered.

9          MS. SHROFF:  I'm simply trying to understand what he's

10 saying, your Honor.  You could instruct him to keep his voice

11 up.

12         THE COURT:  Speak into the microphone, please.

13 A.  Yes.

14 Q.  Let me ask you to take a look at 60540.  If you could just

15 show him page two, page three, page four, and you see there the

16 document is signed?

17 A.  Yes.

18 Q.  By whom?

19 A.  Chris Warren.

20 Q.  Who is that?

21 A.  My attorney.

22 Q.  Your attorney, correct?

23 A.  Yes.

24         MS. SHROFF:  Your Honor, at this time I move 60540

25 into evidence.

O6CBGUO2                        Khaled - Cross

1              MS. MURRAY:  Objection, your Honor, hearsay,

2    relevance.

3              THE COURT:  Sustained.

4              MS. SHROFF:  Your Honor, I'll move forward now.  May

5    we be heard later at a sidebar?

6              THE COURT:  Yes.

7    Q.  Now, your lawyers reached out to the lawyers for G/Club and

8    asked them not to terminate the agreement, correct?

9    A.  They were working with each other.

10   Q.  I didn't ask you if they were working with each other.  My

11   question to you sir, was, did your lawyer Chris Warren, did you

12   call him Chris or Christopher so I get it right?

13   A.  Chris.

14   Q.  Did Chris Warren reach out to G/Club and say, please, don't

15   terminate the payment facilitation agreement, correct?

16   A.  I don't know.

17   Q.  You don't know?

18   A.  I don't know.  They were discussing working with each

19   other.

20   Q.  He's your lawyer, correct?

21   A.  Yes.

22   Q.  He's working at your say, correct?

23   A.  Correct.

24   Q.  He's doing what you're asking him to do, correct?

25             MS. MURRAY:  Objection, your Honor.

O6CBGUO2                            Khaled - Cross

1            THE COURT:  Don't repeat the question.

2            MS. SHROFF:  I'm waiting for a response, your Honor.

3            THE COURT:  He answered yes to the question of whether

4    the lawyer was acting at the witness's say.

5            MS. SHROFF:  Okay.

6    Q.  And you through your lawyer asked G/Clubs to withdraw their

7    June 30, 2021 notice of termination, correct?

8    A.  Correct.

9    Q.  You asked them to work with you so that you could find a

10   way to refund any remuneration, correct?

11   A.  Again, they were working with each other.  The back and

12   forth was a negotiation.

13   Q.  Did the negotiations result in G/Clubs not terminating

14   Crane?

15   A.  No.

16   Q.  G/Clubs terminated Crane period, right?

17   A.  Correct.

18   Q.  You offered to work with them, correct?  Do you recall

19   that?

20   A.  No.

21   Q.  Well, let's show you 60540 so that will refresh your

22   recollection, defense exhibit.  Let's go to page three.

23           Does this refresh your recollection that you offered

24   to return the money that was in the Crane account to the G/Club

25   account without doing KYC?

O6CBGUO2                        Khaled - Cross

1          MS. MURRAY:  Objection, your Honor.  The question that

2     Ms. Shroff was trying to refresh a recollection on was, You

3     offered to work with them, correct?

4          THE COURT:  That is correct.  The objection is

5     sustained.

6     Q.  Did you offer to work with them by suggesting to them that

7     you would no longer do KYC?

8          THE COURT:  All right.  That question was answered.

9     He said he didn't remember.  So the question now is whether or

10    not the document before the witness refreshes his recollection

11    as to whether or not he said that or did that.

12         MS. SHROFF:  That's where I thought I was, your Honor.

13    I apologize, but I'm happy to highlight the fourth paragraph on

14    the document.  That's not the correct paragraph.  It's the

15    benefits paragraph.

16    Q.  In an effort to work with them, you suggested certain

17    benefits that would flow from Crane to G/Clubs if they kept the

18    contract, correct?

19         MS. MURRAY:  Your Honor, is Ms. Shroff seeking to

20    refresh his recollection on this point?  It's not clear.

21         THE COURT:  Is this a refreshing question or a new

22    question?

23         MS. SHROFF:  It's the same question.  I was just

24    trying to highlight it for him.

25    Q.  Does that refresh your recollection?

O6CBGUO2                          Khaled - Cross

1           THE COURT:   The question is does this document help

2   you to remember.

3   A.   From this document, I remember they wanted the money to be

4   transferred to G/Club without anything, without any KYC,

5   without any information.

6   Q.   They meaning Crane, correct?

7   A.   No, G/Club.

8   Q.   And you also recall, do you not, that your lawyers offered

9   to return all the money to the original senders, correct, from

10  this document?

11          THE COURT:   The question is do you recall that, not

12  whether the document says that.

13  A.   I do recall.

14  Q.   And that was one of the compromises Crane offered to

15  G/Club, correct?

16  A.   To return funds?

17  Q.   Yes.

18  A.   To the original, yes.

19  Q.   And that was something you had firmly rejected during the

20  recordings, correct?

21  A.   That's not true.

22  Q.   Okay.   In the recordings that option was suggested to you,

23  and you had never taken it, correct, to return the 56 million

24  back to the owners, correct?

25  A.   No.   There was discussion to return the full amount of

O6CBGUO2                    Khaled - Cross

1    G/Club money to the owners and close G/Club Puerto Rico.  That

2    money was for G/Club that was at G/Club.

3    Q.  But you had not taken that option to return it to the

4    sender, correct?

5    A.  I didn't have charge of the G/Club account.

6    Q.  You had charge of the Crane account?

7    A.  I had charge of the Crane account, correct.

8    Q.  And the option presented to you was to return the money in

9    the Crane account to the people who had sent it to the Crane

10   account, correct?

11   A.  Again, that option was for G/Clubs money.

12   Q.  So you now had through your lawyer suggested that keep the

13   payment facilitation agreement with Crane, and we will return

14   the money as you ask before, correct?

15   A.  As another option, yeah.

16   Q.  They turned you down, correct?

17   A.  They said they don't want to return the money, no.

18   Q.  They said they didn't want to do business with Crane,

19   correct?

20   A.  No. This termination is to ask, again, to transfer money to

21   G/Club, whatever is left not cleared to G/Club's account.  So

22   it wasn't just termination.

23   Q.  It was G/Club's telling Crane, we are done.  We are not

24   doing business with you, period, correct?

25   A.  And requesting the money to be transferred to G/Club's

O6CBGUO2                         Khaled - Cross

 1   account.

 2   Q.  Exactly.

 3   A.  Without any information.

 4   Q.  Exactly.  And they were done with you, correct?

 5   A.  Again, they wanted to transfer the money.

 6   Q.  Could you hear the question?

 7   A.  Yes, I did.

 8   Q.  They were done with you, correct?

 9           MS. MURRAY:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.  Why did you go to arbitration by the way?

12   A.  Why did I go?

13   Q.  Yeah.

14   A.  I had to.

15   Q.  You had to because G/Club wouldn't do business with you

16   anymore, correct?

17   A.  I had to because G/Club was requesting the money, 50

18   million.

19   Q.  G/Club said we're not working with you anymore, period?

20   A.  Cause I wasn't transferring the money.

21   Q.  Whatever the reason, sir, they refused to work with you,

22   correct?

23           MS. MURRAY:  Asked and answered.

24           THE COURT:  Asked and answered.  Move on.

25   Q.  You went to arbitration, correct?

O6CBGUO2                        Khaled - Cross

1    A.  Correct.

2    Q.  You were ordered to return that 56 million back to G/Clubs,

3    correct?

4    A.  Correct.

5    Q.  You gave all the recordings that you had here to the three

6    arbitrators, and they told you to return the 56 million back to

7    G/Club?

8              MS. MURRAY:  Objection, compound.

9              THE COURT:  Did you give the recordings to the

10   arbitrator?

11             THE WITNESS:  My lawyers might have, yeah.

12             THE COURT:  Well, answer what you know, not what

13   possibly happened.

14             THE WITNESS:  I don't know.

15   Q.  You went to the arbitration, right?

16   A.  I did not, no.

17   Q.  You didn't go to the arbitration hearings?

18   A.  Which one?

19   Q.  Any arbitration hearing.

20   A.  The first one, no.

21   Q.  You didn't go to the first one at all; is that your

22   testimony?

23   A.  The first one?

24   Q.  Yes.

25   A.  I don't recall, no.

O6CBGUO2                    Khaled - Cross

1    Q.  You don't recall or no?

2    A.  It was a video or a meeting.  No, I wasn't.

3    Q.  You didn't go?

4    A.  I don't think so.

5    Q.  So your company's account was being terminated.  You did

6    not go to the arbitration?

7    A.  My attorneys went.

8    Q.  Right.  But you didn't go?

9            MS. MURRAY:  Asked and answered.

10            THE COURT:  Sustained.

11            MS. SHROFF:  I just want to be clear.

12            THE COURT:  You asked him whether he went.  He

13    answered.  Move on.

14    Q.  You went to the second proceeding; is that your testimony?

15    A.  Yes, I attended that.

16    Q.  And at that proceeding, there was still the same

17    recordings, correct?

18    A.  Again, I don't remember what recordings they gave them.

19    Q.  Okay.  Do you remember any recordings?

20    A.  Do I remember any recordings?

21    Q.  Yes.  Any of the recordings that were here in this trial,

22    do you recall them being part of the arbitration?

23    A.  Any?

24    Q.  Yes, any.

25    A.  Maybe one or two, yeah.

O6CBGUO2                          Khaled - Cross

1    Q.  Maybe one or two?

2              THE COURT:  So I don't want you to guess at it.  I

3    want you to state what you know.

4    A.  At least one, yeah.

5    Q.  You had $56 million plus a two percent fee at stake in the

6    arbitration.  Is that fair to say?

7    A.  Can you repeat your question.

8    Q.  Sure.  You had $56 million and a two percent fee at stake

9    in the arbitration, correct?

10   A.  Correct.

11   Q.  The arbitration could go your way or the arbitration could

12   go G/Club's way, correct?

13   A.  Correct.

14   Q.  Fair to say you were an interested party in the

15   arbitration?

16   A.  Not for the 56 million, no.

17   Q.  You were not interested in the 56 million?

18   A.  Not at all.

19   Q.  Because that's not the amount that would generate the two

20   percent fee.  You were not at all interested in that, that's

21   your testimony?

22   A.  I was not interested in keeping the 56 million, no.

23   Q.  On what money were you earning that two percent fee?

24   A.  At that point?

25   Q.  I didn't ask you about that point, sir.

O6CBGUO2                          Khaled - Cross

1    A.  Still, I'm talking.  At that point --

2              THE COURT:  Please allow him to answer.

3              MS. SHROFF:  I think he's mis-answering the question.

4    That's my problem.  I just want to make sure the question is

5    clear.

6              THE COURT:  Repeat your question.

7              MS. SHROFF:  Thank you, your Honor.

8    Q.  On what dollar amount is the two percent fee imposed by

9    Crane calculated?

10   A.  On the cleared amount.

11   Q.  And how much had you cleared?

12   A.  At that time it was about 97 million.

13   Q.  And that 97 million was cleared from the Crane account,

14   correct?

15   A.  Correct.

16   Q.  The larger the amount in the Crane account, the larger the

17   amount you clear, correct?

18   A.  Yeah.

19   Q.  And the larger the amount you clear, the larger your fee,

20   correct?

21   A.  Correct.

22   Q.  As part of the negotiations that your lawyers, as you put

23   it, discussed with G/Clubs to keep the payment facilitation

24   account, Crane suggested that if the account did not remain in

25   place, you would send the funds to the state of New York's

O6CBGUO2                              Khaled - Cross

1    unclaimed fund office, correct?

2    A.  Might have been mentioned, yeah.

3    Q.  And they still did not keep the payment facilitation

4    agreement with you, correct?

5    A.  Correct.

6    Q.  Now, it was G/Club that filed the notice of arbitration,

7    correct?

8    A.  Correct.

9    Q.  There were three arbitrators, correct?

10   A.  I don't recall the exact number.

11   Q.  The arbitrators found no risk of money laundering, correct?

12           MS. MURRAY:  Objection, your Honor.  Can we discuss

13   this either at sidebar or perhaps when there's a break for the

14   jury.

15           THE COURT:  Sustained.  If you'll approach, please.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

O6CBGUO2                        Khaled - Cross

1           (At the sidebar)

2           MS. MURRAY:  Your Honor, the arbitrators' decision is

3    considering information that is not the same as the information

4    at this trial.  The severe risk of prejudice in confusing the

5    jury to suggest that any of the findings of the arbitration

6    panel and any of the evidence considered by them in an entirely

7    separate manner would go to in some way the question that I

8    think Ms. Shroff is seeking to introduce it for, which is to

9    imply that G/Club is a legitimate business, and that in fact a

10   judicial panel found that.  It's different evidence than this

11   jury is considering.  It's extremely prejudicial.  It should

12   not come in.

13          MS. SHROFF:  Your Honor, isn't that the exact same

14   thing that the government is seeking to do by asking this

15   witness whether or not it was his impression that Ana Izquierdo

16   or Limarie Reyes lied during the arbitration proceeding, and

17   that is why the arbitrator found for G/Clubs.  That is

18   literally exactly what they're seeking to do.  And I'm simply

19   asking what he understood the arbitrators to find.  It is

20   literally exactly the same thing.  She's trying to show that

21   the arbitration only resulted in this result because G/Club's

22   people lied.  I'm trying to show that the arbitrators had more

23   information than just a lie.

24          THE COURT:  She's not brought up the arbitration.  She

25   has not said that the arbitrators made a finding based upon

O6CBGUO2                        Khaled - Cross

1    lies stated by those two women.  That's not her argument.  It's

2    entirely inappropriate for you to try to get out of this

3    witness the legal conclusions of the arbitrators, and so I will

4    not allow that.

5            MS. SHROFF:  I understand that, your Honor.  It's not

6    a legal conclusion.  It's the arbitration award that he as the

7    owner of Crane was told of.

8            THE COURT:  That he was told to pay over a certain

9    amount of money, that's one thing.  It's another thing to say

10   that the arbitrators concluded that there was no money

11   laundering. That's completely different.

12           MS. SHROFF:  It was a finding.

13           THE COURT:  No.  No findings.

14           MS. SHROFF:  Your Honor, again to go back to what

15   Ms. Murray is going to seek to elicit on redirect is exactly

16   that.  She's trying to show that the only -- otherwise, what is

17   the relevance of his impression that Ana lied or Limarie lied?

18   It is only to show that the lie led the arbitrator to a certain

19   decision.  That's the logical conclusion.  Otherwise, why is it

20   even relevant?

21           THE COURT:  The arbitrators considered much more

22   evidence than the testimony of these two witnesses.

23           MS. MURRAY:  Your Honor, in any event, I don't intend

24   to elicit that testimony from Mr. Khaled with respect to those

25   two witnesses, so it's a moot point.  And we completely agree

O6CBGUO2                          Khaled - Cross

1    that the arbitrator's judicial finding, the decision should not

2    come in.  And depending how the questioning goes, we may at the

3    end of the trial ask for a jury instruction to that effect so

4    that they know what weight to give it, if any, but we agree

5    with your Honor that it should not come in.

6            THE COURT:  And you're not seeking to elicit testimony

7    about the findings from any other witness, correct?

8            MS. MURRAY:  Correct.

9            THE COURT:  All right.  You're not going to go there.

10   We're going to go until noon.

11           MS. SHROFF:  That's fine.  I still have one more

12   question, one more issue. I'm not really clear what the hearsay

13   objection is to the letter sent by Crane to G/Club.

14           THE COURT:  How is it that he can authenticate a

15   letter that he is not the author of?

16           MS. SHROFF:  He can say I can't authenticate it, but

17   he helped his lawyer prepare it.  Their objection was hearsay,

18   your Honor.

19           MS. MURRAY:  It was several bases.

20           MR. KAMARAJU:  Hearsay and relevance to not

21   authenticate.

22           MS. SHROFF:  This is a document kept in the regular

23   course of business.  It is a document sent by a law firm to an

24   entity G/Clubs.  G/Clubs maintains documents in the regular

25   course of business.

O6CBGUO2                         Khaled - Cross

1          THE COURT:  He's not a G/Club maintainer of documents.

2          MS. SHROFF:  Sure.  But he knows -- and of course his

3     lawyer is his agent that what's good for the goose is good for

4     the gander.  The lawyer is his agent, and therefore that

5     document comes in.

6          MS. MURRAY:  Agent applies a party-opponent ruling.

7     This is an out-of-court statement.  And your Honor's already

8     ruled on the objection.  She sustained it.

9          MS. SHROFF:  I actually did say, Ms. Murray, and the

10    record will show, that I wasn't going to pursue it then, that I

11    would wait until a break cause I didn't want to hold up the

12    proceedings.

13         MS. MURRAY:  I believe you said you wanted to take up

14    the issue again at sidebar, but the judge did sustain the

15    objection on the basis that we raised.

16         MS. SHROFF:  Judge, I did not want --

17         THE COURT:  She did reserve argument on the letter, so

18    I just permitted her to do that.

19         MS. MURRAY:  I guess our question would be what the

20    relevance is, and then again we emphasize that it's hearsay.

21         MR. KAMARAJU:  It's not being offered for the truth,

22    your Honor.  There's no argument that's coming from that letter

23    that says, because this chart describes the way the PFA is

24    structured; therefore, that is the way the PFA is structured.

25    The entire purpose of offering the letter is to complete the

O6CBGUO2                    Khaled - Cross

story in response to what happened to the termination notice.

This witness just said that he intends that he didn't care about having the contract terminated.  His lawyer sent a letter saying, actually, please don't terminate it.  In fact in the letter he says, we intend to keep taking our fee.  So there's nothing about it that's being offered to say the facts within it are offered for the truth.  And if your Honor wants to instruct the jury about that, we don't have any objection, but that is the relevance of it.  The relevance of it is, they brought up the arbitration in the first place.  These are the events leading up to the arbitration.  Frankly, I'm hard pressed to see how it's not relevance if the arbitration is relevant in the first place.

MS. SHROFF:  We didn't raise the arbitration.  The government did.

MS. MURRAY:  Just a couple of responses.  First of all, it is not his statements.  Mr. Kamaraju said it's his statements about what Crane intended to do or not.  He did not offer the letter.  It's an out-of-court statement of a different declarant.

THE COURT:  Are you not challenging authentication?

MS. MURRAY:  Of the letter?

THE COURT:  Yes.

MS. MURRAY:  There's no foundation for authentication right now.

O6CBGUO2                        Khaled - Cross

1          THE COURT:  So that is my first question.  How does he

2    authenticate a letter from someone else?

3          MR. KAMARAJU:  If he recognizes it, your Honor, at the

4    time it was sent, he could authenticate it.  That happens all

5    the time, right.  Just like you can authenticate a document that

6    you are not the author of if you reviewed it prior to it being

7    sent.  We didn't get to that -- and maybe if your Honor wants,

8    we can ask those questions, but we didn't get to that because

9    their objection was hearsay and relevance, neither one of which

10   are relevant.  We can try to lay the foundation on

11   authentication, but we didn't understand that was the

12   objection.

13         MS. SHROFF:  It is also kind of surprising that the

14   government would object to the authenticity of a document sent

15   by the Warren Law Group to G/Clubs in a document which they

16   received as part of their discovery, not just from G/Clubs, but

17   also from the Warren Law Group.

18         THE COURT:  But they're not offering it.

19         MS. MURRAY:  We're saying this witness cannot

20   authenticate it. He's not copied anywhere on the document or on

21   the forwarding chain above.

22         MR. KAMARAJU:  We don't know until we ask the

23   question.

24         THE COURT:  Then we have the issue of hearsay.

25         MS. SHROFF:  It's not hearsay.  We're not offering it

O6CBGUO2                        Khaled - Cross

1   for -- I don't want to repeat what Mr. Kamaraju said, but I'm

2   happy to have him repeat it.

3           THE COURT:  What does the letter say?

4           MS. SHROFF:  The letter says, please don't terminate

5   us.  Can I go grab it?

6           THE COURT:  Yeah.

7           MS. SHROFF:  Thank you.

8           THE COURT:  So what does the letter say?

9           MR. KAMARAJU:  The letter, I have a copy.  The letter

10  basically outlines reasons why G/Club should not terminate the

11  PFA, and explains Crane's position; for example, why the PFA

12  does not grant them the ability to terminate.  To borrow one of

13  the government's phrases, we're not offering it for the truth.

14  We're in fact offering it for its falsity, which is a position

15  the government has taken regularly with respect to why

16  something is not hearsay.  None of this is something that we're

17  going to say is true.

18           We're not going to say, for example, that this diagram

19  shows the way that the money is going to go.  We don't agree

20  that these are benefits to G/Clubs.  That's a false statement.

21  In our minds this document has nothing to do with a hearsay

22  purpose.  All it is doing is for a non-hearsay purpose of

23  completing the story, which is something the Second Circuit has

24  repeated over and over again.  It's not a hearsay issue.  And

25  noting that contrary to what this witness said, he was actually

O6CBGUO2                        Khaled - Cross

1    trying to hang onto the PFA so that he could continue to earn

2    millions of dollars in fees.  That's the purpose of the

3    introduction of the letter.  There's now a single line in here

4    that's being offered for the truth.

5              MS. MURRAY:  Your Honor, there are exceptions to the

6    hearsay rule.  This is a lengthy letter.  They're saying both

7    that it's to complete the story and then to impeach him.

8    There's nothing to impeach.  He said that his lawyers were

9    engaged with G/Clubs on these very issues.  He said that if

10   more money came into or maintained in the Crane account, his

11   fee would be larger.  He said all of that.  There's no

12   impeachment from this letter. It's entirely improper to bring

13   this in. Of course they want to argue and bring it in for its

14   truth.  Otherwise there is no reason to try to introduce it.  I

15   heard no basis for it.

16             MR. KAMARAJU:  He testified that he wanted to hang

17   onto the agreement.  I'm sorry.  He testified that he did not

18   care about retaining the PFA at this time, specifically in July

19   of 2021.

20             MS. SHROFF:  He actually said I wanted to terminate it

21   at this time.  And I asked him at what time, and he said he

22   didn't care.  He wanted it terminated.

23             THE COURT:  I just don't recall that testimony.  I

24   have to go back to look at the transcript.  In the meantime,

25   we'll not deal with the letter.  I want a copy of the letter

O6CBGUO2                        Khaled - Cross

1    and we'll continue with other questions.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6CBGUO2                          Khaled - Cross

1              (In open court)

2              THE COURT:  Go ahead.

3              MS. SHROFF:  Your Honor, I'm requesting to skip ahead.

4    Q.  Mr. Khaled, you testified on direct, did you not, that the

5    recordings that were played here were a random selection by

6    you, correct?

7              MS. MURRAY:  Objection, mischaracterizes his

8    testimony.

9              THE COURT:  Sustained.

10   Q.  Your testimony was, there wasn't really a science behind

11   it.  It was just random calls that are related to the transfer

12   and request of transfer and what we were doing with this money,

13   just management calls that I can record.  That was your

14   testimony, correct?

15   A.  Can you repeat the last part.

16   Q.  It was just random calls?

17             THE COURT:  It's a confusing question because it's not

18   clear whether you're asking whether the recordings played here

19   were randomly selected or whether when he made recordings, he

20   did it randomly.  If could you clarify that.

21   Q.  Do you remember testifying yesterday, sir?

22   A.  Yes.

23   Q.  Do you recall being asked this question and giving this

24   answer.  This is yesterday's transcript at 2003, lines nine to

25   13.  How, if at all, did you select which calls to record.

O6CBGUO2                              Khaled - Cross

1   Answer, there wasn't really a science behind it.  It was just

2   random calls that are related to the transfer and request of

3   transfer and what we were doing with this money, just

4   management calls that I can record.

5           Do you recall being asked that question and giving

6   that answer?

7   A.  Yes.

8   Q.  And the statement above that these were just random calls

9   is not entirely true, correct?

10  A.  What do you mean?

11  Q.  You decided which calls to record, correct?

12  A.  Correct, I decided.

13  Q.  And you decided what calls not to record, correct?

14  A.  Correct.

15  Q.  You decided when to start the recordings, correct?

16  A.  Correct.

17  Q.  And you decided when to stop the recording, correct?

18  A.  Most of the calls stopped when the conversation ended and

19  everybody said good-bye.

20  Q.  Let's look at Government Exhibit 411, and I'm not going to

21  play the whole thing, just the last 20 seconds or so.

22          (Media played)

23  Q.  She's mid-sentence, correct, Ana is?

24  A.  Yeah.

25  Q.  The recording stops, correct?

O6CBGUO2                        Khaled - Cross

1   A.  It's a glitch.

2   Q.  I'm sorry.

3   A.  It did not stop.  It continued.  Is there a pause?  I don't

4   know.

5   Q.  Could we play it again for him.

6          THE COURT:  Is there a question as to whether or not

7   the recording ends there?

8          MS. SHROFF:  Yes.  That was my question.

9          THE COURT:  Does the government concede that the

10  recording ended there?

11         MS. MURRAY:  Yes, your Honor.  That's the end of the

12  audio recording.

13  Q.  So Ana is mid-sentence, correct?

14  A.  Correct.

15  Q.  Recording stops, correct?

16  A.  I guess, yeah.

17  Q.  You're the only one doing the recording, correct?

18  A.  Correct.

19  Q.  Let's go to Government Exhibit 417.  I'm not going to play

20  it, but you recall that conversation.  This is the one that you

21  testified to yesterday where you testified that Yvette threw

22  the remote at the TV?

23  A.  You could play it.

24  Q.  Okay.  Do you recall the part of that conversation, I think

25  it's at --

O6CBGUO2                          Khaled - Cross

1              (Media played)

2    Q.  You recall this recording?

3    A.  Yes.

4    Q.  And you recall during this recording, while they're finding

5    the correct portion, you recall Ms. Wang saying that before any

6    money is moved, the issue should be sent to the board, correct?

7    You recall that?

8    A.  Yeah, in the transcript.

9    Q.  I'm sorry.

10   A.  In the transcript, yes.

11   Q.  And the transcript is of the recording, correct?

12   A.  Correct.

13   Q.  And you reviewed that transcript for accuracy because

14   Ms. Murray made sure to ask you to review it, correct?

15             MS. MURRAY:  Objection, your honor.  The portion I

16   believe Ms. Shroff is talking about is in Mandarin, and we

17   established that Mr. Khaled doesn't speak Mandarin.

18             MS. SHROFF:  That's not the portion I was asking

19   about.

20             THE COURT:  You had been referring to Ms. Wang's

21   statements.  Now what are you referring to?

22             MS. SHROFF:  I'm still referring to Ms. Wang's

23   statements.  That is why I don't understand the objection.

24             THE COURT:  So statements that were made in English?

25             MS. SHROFF:  Yes.  I'm just trying to point him to

O6CBGUO2                         Khaled - Cross

1   where rather than go through the entire recording being

2   replayed.

3           THE COURT:  So which statements do you claim were made

4   in English?

5   Q.  Ms. Wang speaks in English to you, correct, in this call?

6   A.  In this call, yeah.

7   Q.  And she says, does she not, that the issue should be

8   presented to the board, correct?

9           MS. MURRAY:  Objection.  Can we go to the actual part

10  of the document or the part of the recording that Ms. Shroff is

11  talking about.

12          THE COURT:  Would you direct us to that portion where

13  she allegedly said that.

14          MS. SHROFF:  Yes, your Honor.  If I could just have a

15  minute.  Your Honor, it will take us a minute to find it.

16          THE COURT:  Perhaps you could ask other questions.

17  Q.  Do you recall a discussion of Mr. He in this call?

18  A.  Who are you referring to Mr. He?

19  Q.  You know a person name Mr. He?

20  A.  Haoran He?

21  Q.  Yes.

22  A.  I don't believe that he was on this call, no.

23          MS. MURRAY:  We would object.  That portion is in

24  Mandarin.

25          MS. SHROFF:  I have the transcript.  It's 417.

O6CBGUO2                      Khaled - Cross

1    Q.  Do you have the transcript in front of you, sir, your

2    transcript binder from yesterday, page 22?

3            THE COURT:  Of which call?

4            MS. SHROFF:  417-T, page 22.

5    A.  I'm sorry.  I don't have 417 here.

6            THE COURT:  At the beginning.

7    Q.  There you go.  It's on the screen for you, sir.

8            THE COURT:  So you're on page 22?

9    Q.  You see Ms. Wang suggesting that you definitely need to

10   inform board of directors about this.  Mr. He saying, you

11   definitely need to inform the board of directors about this,

12   correct?

13           MS. MURRAY:  Objection, your Honor.

14           THE COURT:  So where is Mr. He on page 22?

15           MS. SHROFF:  Y-U.

16           MS. MURRAY:  That's Mr. William Je, J-E.

17   BY MS. SHROFF:

18   Q.  William Je is speaking.

19   A.  Totally different people.

20   Q.  That's fine.  Sorry.  By bad.  It's William Je, correct?

21           MS. MURRAY:  If I may just note for the record, your

22   Honor, our objection.  Italics indicate Mandarin.  That's noted

23   on the first page.  We listened to this yesterday.  That's

24   consistent.  All of the questions that Ms. Shroff is asking

25   about right now are portions that were in Mandarin.

O6CBGUO2                        Khaled - Cross

 1          MS. SHROFF:  That's correct.  That's why I'm asking

 2   them through the translation which is now in evidence at page

 3   22.

 4          THE COURT:  And the part that you're referring to is

 5   Mr. Yu, who is also Mr. Je.  Is that correct?

 6   BY MS. SHROFF:

 7   Q.  William Je, right.  You see that?

 8   A.  I see it.

 9   Q.  You were shown exactly this translation and this

10   transcription yesterday, correct?

11   A.  Correct.

12   Q.  And you have Yvette saying, correct, I have sent you all

13   the G/Club company documents.  You can find them.  It should

14   still -- Mr. Je himself, it should be himself?

15          MS. MURRAY:  Objection to the characterization that

16   the witness has that saying anything.

17          THE COURT:  So you're saying that Yvette made the

18   statement.  Is that right?

19          MS. SHROFF:  I'm saying what's on the document.

20          THE COURT:  So next to the word "Yvette" we have a

21   statement.  That's not the witness's statement.  It's Yvette's

22   statement, correct?

23          MS. SHROFF:  Yes, it's Yvette's statement to

24   Mr. Khaled who is on the call.

25          MS. MURRAY:  It's in Mandarin, your Honor.

O6CBGUO2                        Khaled - Cross

1           THE COURT:  There are a number of people on the call.

2           MS. SHROFF:  Yes, absolutely.  And the document is in

3     evidence stating all the people that are on the call, so if I

4     could go back.

5     A.  She's talking to me in Mandarin?

6     Q.  Could you go back to page 21.

7           And according to that transcript, because it's in

8     italics, Yvette is speaking in Mandarin according to you,

9     correct?

10          MS. MURRAY:  Objection to "according to you."

11          THE COURT:  So the transcript says that words in

12    italics are in Mandarin, so it's according to the transcript.

13    Q.  Okay.  It's in Mandarin, correct?

14    A.  Correct.

15    Q.  And if you keep scrolling to the document, correct.  This

16    is the translation of what Yvette is saying on the call,

17    correct?

18    A.  Correct.

19    Q.  And Yvette is speaking in Chinese, correct, I mean in

20    Mandarin, correct?

21    A.  Correct.

22    Q.  And she and Mr. Miles Guo are speaking, correct?

23    A.  Yes.

24    Q.  And you're on the call, correct?

25    A.  Yes.

O6CBGUO2                          Khaled - Cross

1   Q.  And according to you, I just want to be clear, you don't

2   understand anything of what is going on during this call that

3   you record?

4            MS. MURRAY:  That's a mischaracterization.

5            THE COURT:  So do you understand Mandarin?

6            THE WITNESS:  No, your Honor.

7            THE COURT:  Did you understand when they were speaking

8   Mandarin during the phone call?

9            THE WITNESS:  No, your Honor.

10           THE COURT:  Please continue.

11  Q.  And after the phone call was over, did you discuss this

12  interaction with anyone?

13  A.  With Alex.

14  Q.  And other than with Alex, did you discuss it with anyone

15  else?

16  A.  No.

17  Q.  How about with Ms. Wang?

18  A.  No.

19  Q.  And you've now reviewed in preparation for your testimony

20  here the translation of this recording, correct?

21  A.  Correct.

22  Q.  And in the translation there's no indication that Miles Guo

23  says during this call there is no reason to go to the board,

24  correct?

25           MS. MURRAY:  Objection, speaks for itself.

O6CBGUO2                        Khaled - Cross

1            THE COURT:  Sustained as to what it does not say.  Are
2      you asking the witness to review the entire transcript to
3      search whether Mr. Guo made a certain statement or did not?
4            MS. SHROFF:  Yes, I believe I am, actually.  And I
5      think he's reviewed this transcript several times.
6            THE COURT:  Well, we'd have to give him an opportunity
7      now to review unless he has a recollection.  Do you have a
8      recollection of whether Mr. Guo made that statement?
9            THE WITNESS:  No.
10            MS. SHROFF:  I'm happy to come back to that question
11      after the lunch break, and perhaps the witness can review it
12      through his lunch break.
13            THE COURT:  No.  The witness is not required to review
14      documents during the lunch break.
15            MS. SHROFF:  I said perhaps.  I'm happy to wait here.
16      It's up to the Court.
17            THE COURT:  So is it your testimony that you do not
18      recall whether Mr. Guo made the statement?
19            THE WITNESS:  I don't.
20            THE COURT:  You do not.  Go ahead.
21      BY MS. SHROFF:
22      Q.  After this call, do you know if William Je's suggestion was
23      in fact followed?
24      A.  No.
25      Q.  Do you know if Yvette Wang's solution to go to the board

O6CBGUO2                          Khaled - Cross

1    was in fact followed?

2    A.   Again, no.

3    Q.   You'd agree with me, would you not, that this was quite a

4    tumultuous conversation, correct?

5    A.   What do you mean by that?

6    Q.   It was a heated conversation, correct?

7    A.   At the end, yeah.

8    Q.   And there were parts of it that you didn't understand,

9    correct?

10   A.   Correct.

11   Q.   It involved you as well?  The conversation involved you,

12   correct?

13   A.   Not pertaining to G/Club, no.

14   Q.   Were you a disinterested party in the conversation?

15   A.   Yeah, they were discussing G/Clubs, transfers on G/Clubs

16   accounts.

17   Q.   Did that involve you?

18   A.   No.

19   Q.   So then why did you remain on the call?

20   A.   They ask me to get on the call.

21   Q.   And why did you record it if it didn't involve you?

22   A.   I was in it.  I didn't know what's going to be discussed.

23   Q.   Okay.  You didn't know what was going to be discussed, but

24   you nevertheless recorded it?

25   A.   Yes.

O6CBGUO2                           Khaled - Cross

 1  Q.  And after you recorded it, you had no curiosity to find out
 2  what was said?
 3  A.  No.
 4  Q.  Now, yesterday you testified, right, about your first week
 5  at Saraca, remember that?
 6  A.  Yes.
 7  Q.  And you testified that was during the pandemic?  You
 8  started during the pandemic, correct?
 9  A.  Correct.
10  Q.  And you also testified that there were very few people at
11  the East 64th Street office, correct?
12  A.  Correct.
13  Q.  And at that same time you were still working for Citibank,
14  correct?
15  A.  Correct.
16  Q.  And you had an online presence for both jobs, correct?
17  A.  I had what?
18  Q.  You had an online presence for both jobs, correct?
19  A.  What do you mean by that?
20  Q.  Well, you had to go to work at Citibank through zoom,
21  correct?
22  A.  No, my job description was not like that.
23  Q.  Well, I'm only asking because it was the pandemic, sir.
24  A.  I understand, but that wasn't -- online presence, that
25  wasn't required, no.

O6CBGUO2                              Khaled - Cross

1    Q.  What was Citibank expecting you to do for the seven hours

2    you worked for them?

3    A.  During that time we were dealing with the PPP.

4    Q.  For Citibank?

5    A.  For Citibank, yeah.  We were trying to help small

6    businesses get their money for the pandemic, so all hands on

7    deck was for that.

8    Q.  Okay.  But that was your job, correct?

9    A.  Yes.

10   Q.  And that was until October 30 when you resigned, correct?

11   A.  October 1st I think I resigned.

12   Q.  Well, are you sure it's October 1st?

13   A.  I'm not really sure it's October 1st.  I think it's in the

14   beginning of October.

15   Q.  Did you review that fact with Ms. Murray when you met with

16   her?

17   A.  I don't remember.

18   Q.  You don't remember the day you resigned of your job of four

19   years?

20              MS. MURRAY:  Asked and answered, your Honor.

21              THE COURT:  Sustained.

22   Q.  To work at Citibank, you have to log in, correct?

23   A.  Not necessarily.

24   Q.  How do you access an account without logging in?

25   A.  Again, I was on the relationship side, so my job required

O6CBGUO2                        Khaled - Cross

1   me to speak to customers.

2   Q.  Send emails?

3   A.  Yes.

4   Q.  To send an email, do you have to log into the Citibank

5   network?

6   A.  Correct.

7   Q.  You can't use your Gmail to do Citibank work, right?

8   A.  You could send an email from the phone.

9   Q.  You could send an email through the phone, that is true,

10  but only through your Citibank email account, correct?

11  A.  Correct.

12  Q.  So you had to log into your Citibank accounts, correct?

13  A.  Yes.

14  Q.  And it's fair to say, right, for the time you were

15  double-billing so to speak, you didn't want to Citibank to find

16  out you were working at Saraca, correct?

17  A.  No.

18  Q.  That's not fair to say?

19  A.  I didn't want them to find out.

20  Q.  So you had to juggle two employers at the same time,

21  correct?

22  A.  Correct.

23  Q.  So on the days that you went to East 64th Street, how did

24  you do Citibank work?

25  A.  On the phone and on the laptop.

O6CBGUO2                              Khaled - Cross

1    Q.  On whose phone?

2    A.  My phone.

3    Q.  Which phone?

4    A.  My phone.

5    Q.  Was that your personal phone?  Was that the phone given by

6    Citibank, or was that the phone given to you by Saraca?

7    A.  No, there's an app that is for the Citibank email on my

8    personal phone.

9    Q.  So you used the Citibank app to take Citibank calls?

10   A.  Emails, like emails.  What specific is your question?

11   Q.  My question is what happened when a Citibank client called

12   you?  How did you handle that?

13   A.  I would answer.

14   Q.  What happens if you were in a meeting with Mr. Guo or with

15   Ms. Wang or with Alex H?

16   A.  I would call back.

17   Q.  You would call back?

18   A.  Yeah.

19   Q.  So you made judgment calls as to which was more important,

20   the Citibank question or the Saraca question?

21   A.  Can you repeat the question.

22   Q.  Sure.  If a Citibank client called you while you were in

23   the middle of a Saraca meeting, how did you prioritize?

24   A.  If I'm in a meeting, I would call back the client.

25   Q.  And if you were on a call with a Citibank client and Yvette

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6CBGUO2                        Khaled - Cross

1   Wang called you or Miles Guo called you, you would prioritize
2   Citibank, finish the call, and then go to Miles Guo?
3   A.  Might have, yeah.
4   Q.  You just don't know, correct?
5   A.  It depends.
6   Q.  And you kept no time sheets, right, for Citibank?
7   A.  I wasn't required to.
8   Q.  I understand.  But you were doing two jobs all at the same
9   time, right?
10  A.  Correct, but there was no time sheets.  There's no
11  requirements of certain time I have to report and leave in
12  either work.
13  Q.  Right.  There were no requirements on you at all, right,
14  that's why you were able to do this, charge two people at the
15  same time?
16          MS. MURRAY:  Objection.
17          THE COURT:  Overruled.  You can answer.
18  A.  So, again, I didn't have a time sheet for both.  So there
19  wasn't a requirement of 40 hours at a certain job and 40 hours
20  at a certain job from nine to five or that schedule.  So there
21  was no time sheet if that's what you're asking.
22          MS. SHROFF:  Your Honor, that wasn't my question.
23          THE COURT:  There was a two part question about
24  whether there were any requirements, and then there was a
25  question about whether he could double-bill.

O6CBGUO2                              Khaled - Cross

1           MS. SHROFF:  Right.

2           THE COURT:  So he's answered whether there were

3    requirements, so now you can answer whether you could

4    double-bill.

5    BY MS. SHROFF:

6    Q.  Because there were no time requirements?

7    A.  I wasn't billing.  It's not a bill.  It's wage.

8    Q.  You're cashing a check, right?

9    A.  Yes.

10   Q.  For what?

11   A.  For work.

12   Q.  Right.  So I'm asking you, how you did 14 hours of work in

13   a seven day, day?

14   A.  Like I said, it wasn't hourly, so I fulfilled both jobs

15   requirements.  I attended all my meetings that needed to be

16   attended when I was requested.

17   Q.  You attended all of your meetings.  So if Citibank had a

18   meeting at the same time Saraca had a meeting, you attended

19   both meetings?

20          MS. MURRAY:  Objection.  That's not his testimony.

21          THE COURT:  You can answer.

22   A.  It never happened where there's two meetings at the same

23   time.

24   Q.  Now, when you resigned from Citibank.  You were terminated

25   pending an investigation, correct?

O6CBGUO2                          Khaled - Cross

1   A.  I resigned.  Resigning is before -- you can't be terminated

2   after resigning.  I don't understand you.

3   Q.  Well, you resigned, correct?

4   A.  Okay.

5   Q.  Citibank had to accept your resignation, correct?

6   A.  Correct.

7   Q.  Citibank had to decide whether if you were resigning in

8   good standing, correct?

9   A.  I don't know that.

10  Q.  Well, they had to decide whether to give you your pension

11  at Citibank, correct?

12          Let me ask you this way.  If Citibank found out that

13  you had been working on the side for a company that Citibank

14  had closed its accounts, do you think Citibank would have given

15  you your pension?

16          MS. MURRAY:  Objection, your Honor.  Calls for

17  speculation, no personal knowledge.

18          THE COURT:  Sustained.

19  Q.  Citibank has a policy, right, after a person resigns to

20  either accept or not accept a resignation?

21  A.  I wouldn't know that.

22  Q.  You wouldn't know that?

23  A.  No, I don't.

24  Q.  How did you resign?

25  A.  I sent an email to my manager giving him -- sent an email

O6CBGUO2                      Khaled - Cross

1    to my manager.

2    Q.  You sent an email to your manager, and did Citibank

3    respond?

4    A.  Yeah.

5    Q.  Do you recall if they told you that you were terminated

6    pending an investigation?

7    A.  No.

8    Q.  You don't recall?

9    A.  No.

10   Q.  Sir, did you have an exit interview with Citibank?

11   A.  I don't recall.

12   Q.  Do you recall ever disclosing to Citibank that while you

13   were working at Citibank you were also working at Saraca?

14   A.  No.

15            THE COURT:  One moment, please.

16            (Pause)

17            THE COURT:  Go ahead.

18   Q.  Now, you testified on direct, right, that in your first

19   week at Saraca, you were tackling the issue with Citibank and

20   trying to find an account for Saraca and GTV, correct?

21   A.  Correct.

22   Q.  And what do you mean when you say tackling the issue with

23   Citibank?

24   A.  I was still trying to find out what's the status of the

25   account and how Yvette is going to receive the checks of the

O6CBGUO2                              Khaled - Cross

1   balance that was stuck at Citibank.

2   Q.  At City, correct?

3   A.  Correct.

4   Q.  And who at City were you dealing with then?

5   A.  James Song.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO1                    Khaled - Cross

1   BY MS. SHROFF:

2   Q.  James Song, correct?  So James Song was a colleague of

3   yours, correct?

4   A.  Yes.

5   Q.  And did James Song understand that you were calling him as

6   an employee of Saraca or did he think you were trying to

7   resolve the issue of these bank accounts as an employee of

8   Citibank?

9   A.  So——

10              MS. MURRAY:  Objection, your Honor.

11              THE COURT:  You can answer.

12  A.  So when I started in August——

13  Q.  Started where?

14  A.  At Saraca, the accounts were already closed.

15  Q.  Okay.

16  A.  So what I meant tackling the issue of Citibank is receiving

17  the checks and opening up a new account for them.

18  Q.  Okay.  So you were now no longer talking to James Song, as

19  you said a minute ago.

20  A.  Not in regards to the account, no.

21  Q.  Okay.  So let me just go back to your testimony from

22  yesterday, okay?  You said you were tackling the issue with

23  Citibank.  Could you tell me with whom at Citibank you were

24  tackling this issue.

25  A.  So I was dealing with Aaron to make sure that we received

O6BBGUO1                          Khaled - Cross

1     smaller checks or——

2     Q.  Who's Aaron?

3     A.  Aaron Mitchell, the——

4     Q.  Aaron Mitchell is not at Citibank.

5     A.  Yeah, correct.

6     Q.  Right.  My question to you is——

7          MS. MURRAY:  Objection.  It mischaracterizes his

8     testimony.

9          THE COURT:  So allow him to finish.

10         You were saying.

11    A.  So I was getting checks from Aaron, and these are the

12    Citibank proceeds of the checks that was blocked.  That's what

13    I meant.

14    Q.  You said tackling the issue with Citibank, correct?

15         THE COURT:  What did you mean by that, when you said

16    tackling the issue with Citibank?

17         THE WITNESS:  The money that was now blocked at

18    Citibank and closed, and they have checks in place.  I believe

19    the checks were issued before August 1st.

20    Q.  The checks were still with Citibank?

21    A.  I don't remember.

22    Q.  The money was still with Citibank?

23    A.  I——I really don't remember.  I don't remember, no.

24    Q.  You don't remember.

25    A.  No.

1            MS. MURRAY:  Objection, your Honor.  Asked and

2    answered.

3            THE COURT:  Sustained.

4    Q.  And were you attending meetings with people at Citibank to

5    get those checks cleared?

6    A.  No.

7    Q.  Did you have phone calls with Citibank about getting those

8    checks cleared?

9    A.  No.

10   Q.  Didn't Ms. Wang tell you, call your old bank and ask them

11   why these checks aren't cleared, you used to work there,

12   correct?

13   A.  That's——again, that's before August 1st.

14   Q.  Before August 1st or not, when Ms. Wang told you that——

15   A.  No, it's a big——

16   Q.  ——she was under the assumption that you had left Citibank,

17   correct?

18   A.  No.

19   Q.  She thought you were still working at Citibank?

20   A.  She knew I was still working at Citibank, yeah.  Can I see

21   the text dates?  Do you have dates?

22   Q.  What was your first week at Saraca?  What was your first

23   week?  What was the date?

24   A.  I believe August 1st.

25   Q.  So August 1st, you had told Ms. Wang that you were doing

O6BBGUO1                          Khaled - Cross

1    two jobs; that's your testimony today?

2    A.  So she asked me if, when—if I—if I had resigned in July,

3    when I accepted the offer, and when I could start.  She asked

4    me to start as soon as possible.

5               MS. SHROFF:  I move to strike.

6               THE COURT:  Sustained.

7    A.  Okay.  So what's your question again?

8               MS. SHROFF:  Could you read him the question back,

9    please.

10              (Record read)

11   A.  No.  August 1st, she—I didn't tell her, no.

12   Q.  Okay.  So in your first week, Ms. Wang is talking to you

13   about the blocked checks at Citibank, correct?

14   A.  She was asking me to find another bank, yeah.

15   Q.  She was asking you about the blocked checks, correct?

16   A.  I don't recall.

17   Q.  How much money was in those checks blocked by Citibank?

18   A.  200 million.

19   Q.  She wanted that 200 million unblocked; is that fair to say?

20              MS. MURRAY:  Objection, your Honor.

21              THE COURT:  You can answer that question.

22   A.  I'm sure she did, yeah.

23   Q.  And isn't the whole point of hiring an ex-Citibank employee

24   so that they can help figure out how to block the 2 million

25   being kept by Citibank?

1          MS. MURRAY:  Objection, your Honor.

2          THE COURT:  Sustained.

3    Q.  You were hired for your experience at Citibank, right?

4          MS. MURRAY:  Objection, your Honor.  He doesn't know.

5          THE COURT:  Sustained.

6    Q.  Did you make any effort to get those $2 million back from

7    Citibank?

8    A.  I wasn't——I wasn't in charge of that.  All I did was get

9    updates from John——from James.

10   Q.  You got updates.  And when you got those updates, did you

11   tell him, hey, buddy, I'm working at Saraca now, let's have a

12   drink?

13   A.  I don't remember.

14   Q.  I'm sorry.  I misspoke.  It wasn't 2 million, it was

15   200 million that was with Citibank, right?

16   A.  I believe so, yeah, it was 200 million.

17   Q.  Now you just testified that you were trying to find other

18   banks.  Is that what you testified to?  I don't want to get it

19   wrong.  You tell me.  What else were you doing during your

20   first week?

21   A.  Getting situated, email, figuring out the phone, payroll;

22   and one of the things was, they needed a new bank account.

23   Q.  Well, you weren't doing payroll, right?

24   A.  I'm sorry?

25   Q.  You weren't doing payroll there, right?

O6BBGUO1                          Khaled - Cross

1   A.  No, no, setting up my payroll, so I could get paid.

2   Q.  Okay.  So that took the whole week, or is that part of the

3   week?

4   A.  I don't remember exactly.  No.

5   Q.  Okay.  And you were trying to look for other banks now,

6   correct?

7   A.  Correct.

8   Q.  Okay.  And G/CLUBS, you remember it had launched in October

9   of 2020, correct?

10  A.  Correct.

11  Q.  And you wanted to find different banks for G/CLUBS to do

12  business; is that fair?

13  A.  No.

14  Q.  And you contacted——you tell me.  Which banks did you

15  contact?

16  A.  So I was trying to open an account for Saraca and GTV.

17  Q.  Right.  But where?

18  A.  I believe the Bank of Princeton and Signature.

19  Q.  Well, how did you identify the Bank of Princeton and

20  Signature?

21  A.  What do you mean?

22  Q.  I'm sorry?

23  A.  What do you mean?

24  Q.  Well, there are many banks, right?  How did you land on

25  Bank of Princeton and Signature Bank?

O6BBGUO1                          Khaled - Cross

1   A.  I had contacts.

2   Q.  Okay.

3   A.  In both banks.

4   Q.  Okay.  So you reached out to your contacts, correct?

5   A.  Correct.

6   Q.  And you reached out to your contacts through your GTV or

7   Saraca email address, correct?

8   A.  Or personal.  I'm not sure.

9   Q.  Okay.  And then you talked to people at Bank of Princeton

10  and at Signature Bank, correct?

11  A.  Correct.

12  Q.  And this was in August, correct?

13  A.  I believe so, yeah.

14  Q.  Well, that's your first week there, right?

15  A.  August, yeah, was my first week.

16  Q.  Right.  So when you were talking to Bank of Princeton and

17  telling them you wanted to open these bank accounts, you put

18  yourself out there as a Saraca employee, correct?

19  A.  I might have, yeah.

20  Q.  You might have?

21  A.  Yeah, I don't—I don't remember how I started the email, or

22  message or whatever.

23  Q.  So sitting here today, you don't know if you told Bank of

24  Princeton, hey, I'm working at Citibank, I'm trying to have

25  this client Saraca open a bank account at Bank of Princeton, or

O6BBGUO1

1   whether you told Bank of Princeton, I now work for Saraca, I

2   want to open a bank account with you?

3           MS. MURRAY:  Objection.  Asked and answered.

4           MS. SHROFF:  I don't think I asked any question about

5   Bank of Princeton.

6           THE COURT:  Did you hold yourself out as being

7   employed by one entity or another?

8           THE WITNESS:  I don't recall, like, in that——in that——

9           THE COURT:  All righty.  We're going to stop at this

10  time for our lunch.  You'll return at 12:30.  Remember not to

11  discuss the case amongst yourselves or with anyone else.  Don't

12  permit anyone to discuss the case in your presence.  But I also

13  want you to consider the proposal that I made for the four days

14  of next week.  Wednesday you're off, and I'm asking whether you

15  can come in at 9:30 and go until 1:00, with a full hour break

16  until 2, and then to go from 2 to 5.  And don't watch, listen,

17  or read anything about anything having to do with this case.

18          (Continued on next page)

19

20

21

22

23

24

25

O6BBGUO1

1          (Jury not present)

2          THE COURT:  Sir, you may step out.  Don't discuss your

3     testimony.

4          (Witness not present)

5          THE COURT:  I'd like to get a copy of the letter in

6     question.

7          MR. KAMARAJU:  I have it here, your Honor.  I'm just

8     going to hand it up.

9          THE COURT:  Please be seated.

10          It is the contention of the defense that this letter

11     dated July 11, 2021, from Warren Law Group to Limarie Reyes

12     Molinaris is not being offered for the truth of the matter

13     asserted; is that your position?

14          MS. SHROFF:  Yes, your Honor.

15          THE COURT:  And your position is that it's being

16     offered for what purpose?

17          MS. SHROFF:  Your Honor, I'm going to let Mr. Kamaraju

18     handle this because I stepped out from the sidebar so I don't

19     want to repeat, if that's okay with the Court.

20          MR. KAMARAJU:  The letter is being offered for two

21     purposes, your Honor.  One is to complete the narrative with

22     respect to the events that lead up to the arbitration, which

23     the government elicited; and second, to impeach the witness's

24     testimony that he claimed that he did not want to remain in the

25     PFA as of this time.

O6BBGUO1

1          THE COURT:  Does the government wish to add anything?

2          MS. MURRAY:  Yes, your Honor.  On the point of

3    completing the narrative, you can't just say that something

4    completes the narrative to get it in.  And to establish that

5    this completes the narrative is offering it for its truth, it

6    simply is, which is not permissible.

7          And separately, with respect to the alleged

8    impeachment, the witness did not deny that the letter says what

9    it says.  He also didn't deny that his counsel was engaged in

10   discussions regarding a PFA.  There's simply nothing in this

11   letter—which the witness did not write and which he was not

12   copied on, did not receive—that goes to anything that he said

13   on the stand, and certainly doesn't impeach anything he said.

14         THE COURT:  So I understand the defense to be saying

15   that he said during testimony—I don't recall this—that he was

16   not interested in the PFA continuing at the time that this

17   letter was written; am I correct?

18         MR. KAMARAJU:  That is my recollection of the

19   testimony, Judge, yes.

20         MS. SHROFF:  Your Honor—

21         MS. MURRAY:  This is—

22         MR. KAMARAJU:  Also—sorry.

23         MS. MURRAY:  This is about issues that his counsel had

24   about what was going on with effectively a contract dispute.

25   It's not the question that they posed to the witness, which was

O6BBGUO1

1    what he wanted or didn't want.  He answered that question.

2    This is an entirely separate thing that relates to legal

3    negotiations between two parties.

4        MS. SHROFF:  Your Honor, Ms. Sharonda has agreed to

5    look at her transcript and give me the page number during the

6    lunch break.  I'd be happy to send an email to the Court and

7    copy the government on it.

8        THE COURT:  And you're claiming that this statement

9    was made by the witness when?

10        MS. SHROFF:  I think he testified to it this morning.

11        THE COURT:  This morning?

12        MR. KAMARAJU:  It was this morning, your Honor.  This

13   is the first time the letter came up was this morning, through

14   Ms. Shroff's cross.  He said that he was—at that point he

15   wanted to get out of the PFA, which is the legal contract that

16   is being discussed in this letter, not some distinct contract.

17   Ms. Shroff asked him specifically at this time—I'm

18   paraphrasing the question, we'll have the transcript, but—at

19   this time, and he said July 2021, which is the period of the

20   letter.  He also testified that the lawyers were acting at his

21   direction.  In fact, he testified to that I believe in response

22   to Ms. Shroff's question and I believe the Court's question.

23        THE COURT:  So it's your position that the letter

24   contradicts his statement because it indicates a desire on his

25   part to continue with the PFA.

O6BBGUO1

1          MR. KAMARAJU:  Yes, your Honor.

2          MS. MURRAY:  And your Honor, it's not his statement.

3     He made a statement under——when he was testifying.  That's his

4     statement about what he wanted or didn't want.  This is a legal

5     negotiation as reflected in a document between two parties.

6     He's not a party to it.  If it were proper impeachment, they

7     wouldn't have to say that it's being offered to complete the

8     narrative.  The fact that they're saying it's offered to

9     complete the narrative of the timeline of what's happening in

10    the negotiations regarding the PFA is offering it for its

11    truth.  It is not permissible.

12         THE COURT:  And why do you think they're offering it

13    for its truth?

14         MS. MURRAY:  Because they're trying to back this

15    document into the case, your Honor, so they can use it for

16    other purposes.

17         THE COURT:  What other purposes do you think they want

18    to use it for?

19         MS. MURRAY:  I don't know.  I anticipate that they

20    want to use it in their argument at closing.  I think they're

21    going to point to different aspects of this document, including

22    different statements that it makes about G/CLUBS and G/CLUBS

23    operations, the benefits to G/CLUBS of the PFA, either

24    continuing the PFA or canceling it.

25         MR. KAMARAJU:  No, your Honor.

O6BBGUO1

1          THE COURT:  So exactly what portions of the letter do

2     you want to come out and for what specific purpose?

3          MR. KAMARAJU:  We want the letter to come out to say

4     your lawyers responded to the termination notice with this

5     letter, and the letter indicated that you, Crane, his company,

6     wanted to remain in the PFA at the time of July 2021.  We don't

7     agree that any of the contentions in that letter are true.

8          THE COURT:  So is there a portion of the letter which

9     expresses the desire of Crane to remain in the PFA?

10         MR. KAMARAJU:  Well, yeah.  For example, your Honor, I

11    think even the benefits to G/CLUBS from remaining in the PFA,

12    we don't think that those are true, but we think that's an

13    attempt to convince G/CLUBS to remain in the PFA.

14         MS. MURRAY:  That's a matter of interpretation.

15         MR. KAMARAJU:  Which the jury can do.

16         MS. MURRAY:  They're not answering the Court's

17    question.

18         THE COURT:  These lawyers are very capable of stating

19    whether or not they're urging the other side to cancel the

20    agreement.

21         MR. KAMARAJU:  Yes, your Honor, and I think if your

22    Honor looks at the letter, it is very apparent that these

23    skilled lawyers directly were trying to entice G/CLUBS not to

24    terminate the agreement.  That's the entire purpose of the

25    letter is a response to the termination notice.  It is not a

O6BBGUO1

1    response that says, yes, we agree to be terminated.  It is a

2    response that says, do not terminate this for X, Y, and Z

3    reasons.  We are not going to argue to the jury that X, Y, and

4    Z reasons were accurate; in fact, that's the opposite of our

5    argument.  It's for the same reason——when the government says,

6    we're putting in this document for the falsity of it, that's

7    not hearsay, it's the same concept.

8            MS. MURRAY:  It's simply not impeachment, your Honor.

9    You asked Mr. Kamaraju which portion of the letter he was going

10   to point to to impeach the witness and he responded with two

11   statements that——or two facts that he was seeking to elicit as

12   supposed impeachment.  And first of all, he can ask those

13   questions without reference to this letter, without seeking to

14   introduce this four-page letter.  And in any event, the

15   sections that he's pointing to or the paragraph he's pointing

16   to is not proper impeachment.  There's no basis for

17   impeachment.  This witness has not denied anything that's

18   reflected in the letter, and even if he did, this is not the

19   way to impeach him.

20           THE COURT:  All righty.  I'm going to look at the

21   letter.  We'll come back at 12:30.

22           MS. MURRAY:  And your Honor, just for timing purposes,

23   it's been two and a half hours so far on cross this morning.  I

24   would just ask how much longer Ms. Shroff has.

25           THE COURT:  Ms. Shroff?

O6BBGUO1

1          MR. HORTON:  Well, your Honor, I'm going to play the

2     video that he——one of the calls, because they want the call

3     played.  I don't know.  Honestly, I'm a little discombobulated.

4     I don't know.  Maybe an hour?

5          THE COURT:  So I want you to be efficient in your

6     asking of the questions.

7          We'll meet again at 12:30.

8          (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO1                        Khaled - Cross

                          AFTERNOON SESSION

                            12:50 p.m.

1              (Jury not present)

2              THE COURT:  Please be seated.

3              I'm going to have the witness step out.

4              (Witness not present)

5              THE COURT:  So first of all, the government raised the

6       issue that there was an arbitration, and what was established

7       on direct was that G/CLUBS made a claim against Crane for

8       certain monies and ultimately there was a decision in favor of

9       G/CLUBS after the testimony of Reyes Molinaris and Izquierdo.

10             I've reviewed the testimony of the witness from

11      yesterday, and I'm calling your attention to Ms. Shroff's

12      questions that start, "Did you want the contract with Crane to

13      be terminated?" to exactly, "They never were done with you,

14      correct?" and his answers to those two questions, as well as

15      everything that came in between.  And I believe that the jury

16      is left with the impression that the witness and Crane were

17      trying to distance themselves from their relationship with

18      G/CLUBS, but the letter contradicts that.  It shows that Crane

19      was trying to keep this relationship alive.  And I'm going to

20      allow it to come in to the extent that it can be authenticated.

21             So let's bring the witness back.

22             (Witness present)

23             THE COURT:  And if you'll have the jurors brought in,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6BBGUO1                          Khaled - Cross

 1    please.

 2                (Jury present)

 3                THE COURT:  Please be seated.

 4                Members of the jury, I had intended on calling you

 5    back in at 12:30, but something arose that is not the fault of

 6    the parties or myself, and so I apologize for the delay.

 7                You may continue with your questioning.

 8                MS. SHROFF:  Thank you, your Honor.

 9    BY MS. SHROFF:

10    Q.  Sir, you're familiar with G/CLUBS, correct?

11    A.  Yes.

12    Q.  And you were never asked, as part of your job description,

13    to design any website for G/CLUBS, correct?

14    A.  Me personally design?

15    Q.  Yes.

16    A.  I had different tasks, so might have been to review the G

17    Club website, yeah.

18    Q.  You were not on the designing team of the website, correct?

19    A.  Designing team?

20    Q.  Yes.

21    A.  No.

22    Q.  You were not on the marketing team for G/CLUBS, correct?

23    A.  No, not officially.

24    Q.  You were not unofficially any part of the marketing for

25    G/CLUBS, correct?

1  A.  I was involved with a few items, a few tasks.

2  Q.  What items?  Name an item that you marketed for G Club.

3  A.  Like, for example, the G Summit.

4  Q.  Okay.  You marketed the G Summit?

5  A.  Not marketed, but looked at it, looked at the location.

6  Q.  Which location?

7  A.  Where they were going to have the G Summit.

8  Q.  Which location did you look at?

9  A.  A hotel in Puerto Rico.

10 Q.  So you went to visit a hotel in Puerto Rico as a possible

11 site for the G Summit?

12 A.  Yes.

13 Q.  Okay.  What other things did you do for G/CLUBS marketing?

14 A.  Just, like I said, minor tasks.  That was part of the job,

15 minor tasks to help——that Yvette used to ask me for, for help,

16 on the G/CLUBS side.

17 Q.  And were you involved at all in G Fashion?

18 A.  Just on the finance side.

19 Q.  You did not play any role in designing the G Fashion

20 website, correct?

21 A.  Maybe the checkout, the checkout process online.

22 Q.  You helped——

23 A.  They needed——yeah, they needed——they needed somebody to

24 help them create a merchant.

25 Q.  So you helped them create a merchant for G Fashion?

O6BBGUO1                          Khaled - Cross

1   A.  I was trying to find them a merchant processor.

2   Q.  And did you find them one?

3   A.  It was very difficult.  I don't——I don't recall if they

4   were approved by someone.

5          MS. SHROFF:  I move to strike.

6   Q.  My question was:  Sir, did you find them one?

7          THE COURT:  Sustained.  It's stricken.  Just answer

8   the question.

9   A.  Can you repeat the question.

10  Q.  Did you find them one?

11  A.  I found, yeah.

12  Q.  Excuse me?

13  A.  I did.

14  Q.  And who was that?

15  A.  I don't recall the name.

16  Q.  Okay.  Did you help organize events for G/CLUBS?

17  A.  Like I said, just location.

18  Q.  Did you help organize a raffle for a car?

19  A.  Not directly, no.

20  Q.  Did you play any role in the actual provision of services

21  to G/CLUBS?

22  A.  No.

23  Q.  Now you testified on direct about G/CLUBS's banking issues,

24  correct?

25  A.  Correct.

O6BBGUO1                          Khaled - Cross

1   Q.  Accounts were being closed down, you testified, correct?

2   A.  Correct.

3   Q.  And some of the accounts were closed down because there

4   were hits from OFAC, correct?

5   A.  Some accounts, yeah.

6   Q.  And what does OFAC stand for?

7   A.  Office of Foreign Asset Control.

8   Q.  And is it fair to say that OFAC has a list of people that

9   are subject to sanctions?

10  A.  Can you repeat the question.

11  Q.  Is it fair to say that OFAC maintains a list of people that

12  are subject to sanctions, correct?

13  A.  Yes.

14  Q.  And banks do not want to do business with people who are on

15  the OFAC list, correct?

16  A.  Correct.

17  Q.  And there were wires that came in that were flagged as

18  coming from people who were on the OFAC list but they really

19  weren't, correct?

20  A.  Correct.

21  Q.  And in those instances what you and Alex H did is you

22  substantiated that the people who had sent the money were not

23  on the OFAC list, correct?

24  A.  We asked for ID, a date of birth, correct.

25  Q.  So that you could tell the bank that these people were not

O6BBGUO1                        Khaled - Cross

1   in fact on OFAC, correct?

2   A.  So we could provide it to the bank and then make a

3   determination.

4   Q.  And you did that, right?  You collected IDs, passport

5   photos, or other IDs and you sent them to the bank, correct?

6   A.  Alex did.  He was in charge of G/CLUBS.

7   Q.  He copied you on the emails, correct?

8   A.  He might have.

9   Q.  And he forwarded you emails, too, correct, about this

10  matter?

11  A.  Again, he might have.

12  Q.  Let me show you what is marked as Defense Exhibit 31189.

13          Do you recognize that document?

14  A.  Yes.

15  Q.  Is it an email sent to you?

16  A.  Yes.

17          MS. SHROFF:  Your Honor, at this time the defense

18  moves Defense Exhibit into evidence.  I'm sorry.  I lost my

19  number there.  But 31189.

20          THE COURT:  Any objection?

21          MS. MURRAY:  Yes, objection, hearsay.

22          THE COURT:  Step up.

23          (Continued on next page)

24

25

O6BBGUO1                        Khaled - Cross

1                    (At the sidebar)

2              THE COURT:  So this is an email from the witness to

3    Alex H in which the witness states that there's some personal

4    identifying information for several individuals.  You're

5    objecting on the basis of hearsay?

6              MS. MURRAY:  Yes, your Honor.  It's being offered for

7    the truth that the people are on an OFAC list and that that's

8    the relevance of why the defendant, or the witness——excuse

9    me——is sending it to other people.  It clearly doesn't fall

10   under any exception.  It doesn't go to his state of mind.

11   Completing the narrative is not a hearsay exception, to the

12   extent the defense intends to argue that that's the basis for

13   introducing it.  There's no proper basis to introduce it.

14             MS. SHROFF:  We're simply showing that this was a

15   topic that was discussed.  We do not have any——

16             THE COURT:  He's testified that it's a topic

17   discussed.  And so——

18             MS. SHROFF:  And that the information flowed from Alex

19   H, who was in charge of G/CLUBS, to Mr. Khaled, who was in

20   charge of banking, and it flowed from him to the bank.  We have

21   no interest in saying whether these people were or were not on

22   the OFAC list, and we don't intend to argue whether or not each

23   one of these individuals were on the OFAC list.  The only thing

24   we're trying to show is that there were people that——that were

25   alleged to have been on the OFAC list, they sent the

O6BBGUO1                        Khaled - Cross

information along to show that they weren't with their bona
fides.

THE COURT:  I thought it was an email from the witness
to Alex H.  Am I wrong?  Is it Alex H to the witness?

MS. SHROFF:  There's two.  It's from Alex H to this
gentleman.  He received it because he's been in charge of
banking.  And then he sends the email forward.

MS. MURRAY:  All of the facts that Ms. Shroff said
have already been established through testimony.  It's hearsay
within hearsay, the witness is responding to Alex H.  And
clearly, contrary to the representations, they are trying to
use this for its truth, or at least it will confuse the jury,
whether it's being introduced for its truth, and the Court has
an obligation to keep it out, particularly where there's no
hearsay exception to offer it.

MR. KAMARAJU:  First of all, the Court doesn't have an
obligation to keep out evidence that's admissible.

Two, to the extent they continue to say that we are
making representations that aren't true, there's a transcript.
They are free to object during summation and your Honor can
rule.

But the third thing I will say is, is that there is no
rule of evidence that says because a witness has testified to
something, that the party is not allowed to offer additional
evidence corroborating it.  That's why the government——

O6BBGUO1                        Khaled - Cross

1          THE COURT:  How about cumulative evidence?

2          MR. KAMARAJU:  It's one email, your Honor.  I can't

3   see how one email is—

4          THE COURT:  I'm not going to let it in.

5          MR. KAMARAJU:  Okay.

6          (Continued on next page)

1              (In open court)

2    BY MS. SHROFF:

3    Q.  Alex H provided you with biographical data for people,

4    correct, that were allegedly on the OFAC list?

5    A.  What do you mean by that, biographical?

6    Q.  Passport, ID.

7    A.  Passport.

8    Q.  And you would forward that to the bank, correct?

9    A.  Either me or Alex, yeah.

10   Q.  And that was part of your normal job duties there, correct?

11   A.  Correct.

12   Q.  By the way, do you know if Miles Guo was on the OFAC list?

13   A.  Not for sure, no.

14   Q.  You worked for Miles Guo, you said, right?

15   A.  Yes.

16   Q.  And you didn't learn whether or not Miles Guo was on the

17   OFAC list?

18             MS. MURRAY:  Asked and answered, your Honor.

19             THE COURT:  Sustained.

20   Q.  Did you know there was an Interpol Red Notice for Miles

21   Guo?

22   A.  Again, no.

23   Q.  Now as part of your job duties, you participated in job

24   interviews to hire people, correct?

25   A.  Some, yeah.

O6BBGUO1                          Khaled - Cross

1   Q.  You interviewed a person named Miguel Rivera, correct?

2   A.  Correct.

3   Q.  And you were part of an interview team, correct?

4   A.  Correct.

5   Q.  You recorded that interview, correct?

6   A.  Correct.

7   Q.  And that was a Zoom interview, correct?

8   A.  Yes.

9           MS. SHROFF:  Your Honor, at this time I move DX 60535

10  into evidence.

11          THE COURT:  It is admitted.

12          (Defendant's Exhibit 60535 received in evidence)

13  Q.  So if I could just play for you, I think it's 18.

14          While they're setting up, you remember this job

15  interview, correct?

16  A.  Yeah.

17  Q.  And who are the participants in the Zoom meeting?

18  A.  It was me, Miguel who was being interviewed, I believe

19  Ross, Alex, and Maya.

20  Q.  And who's Maya?

21  A.  Maya was my assistant and worked for the group as well.

22  Q.  And who paid for her work?  Who paid her checks?

23  A.  I believe Lexington.

24  Q.  You believe Lexington?

25  A.  Yeah.  Everybody got paid—I don't know how she got paid.

O6BBGUO1                          Khaled - Cross

1   Q.  My question was not how much she got paid, sir.

2   A.  I don't know how she got paid.  I didn't do payroll.  Go

3   ahead.

4   Q.  You go.

5   A.  No, you go.

6   Q.  You don't know who paid her, correct?

7   A.  No.

8   Q.  Okay.

9           (Audio played)

10          MS. SHROFF:  We can stop there.

11  Q.  Do you recognize that voice?

12  A.  That's me.

13  Q.  And you remember the statement that was just played,

14  correct?

15  A.  Yeah.

16  Q.  Did you in fact know the people behind G/CLUBS for four

17  years at that time?

18  A.  I was referring to Yvette.

19  Q.  You were referring to one individual?

20  A.  I was referring to Yvette.

21  Q.  Okay.  So your testimony is when you said that you knew

22  people behind G/CLUBS for four years, you were only referring

23  to Yvette Wang.

24  A.  Yes.

25          MS. SHROFF:  Okay.  Could we go to the next clip,

1    please.

2             (Audio played)

3             MS. SHROFF:  You can stop there.

4    Q.  Do you recognize the voice, sir?

5    A.  Yes.

6    Q.  Whose voice is that?

7    A.  Ross.

8    Q.  Where did Ross work?

9    A.  When I first met him, the Rule of Law.

10   Q.  My question was:  During this recording, where does Ross

11   work?

12   A.  I couldn't tell you.  It was the Rule of Law.

13   Q.  Your testimony is that Ross worked for Rule of Law during

14   this time?

15            MS. MURRAY:  Objection, your Honor.

16   Q.  I'll withdraw that.  And he is participate——I withdraw it.

17   Sorry.

18            And he was participating in this interview with you,

19   correct?

20   A.  Correct.

21   Q.  He's talking about this person Miguel Rivera's experience

22   bringing order to chaos, correct?

23   A.  That's what he said.

24   Q.  And he's interviewing somebody to come join G/CLUBS so that

25   there can be order to chaos, correct?

O6BBGUO1                          Khaled - Cross

1   A.  I don't know what he meant in that.

2   Q.  Did you talk to him before you started the interview to

3   prepare for the interview of Mr. Rivera?

4   A.  I don't remember if there was an official preparation for

5   an interview.

6   Q.  How about an unofficial preparation?

7   A.  Again, I don't remember.

8   Q.  How about an ad hoc preparation?

9           MS. MURRAY:  Objection, your Honor.

10          THE COURT:  Sustained.  Let's go.

11  Q.  For what position was Mr. Rivera being interviewed?

12  A.  I believe finance.

13  Q.  In what company?

14  A.  G Club Puerto Rico.

15  Q.  Thank you.

16          MS. SHROFF:  May I have the next clip, please.

17          (Audio played)

18          MS. SHROFF:  We can stop there.

19  Q.  Whose voice is that, sir?

20  A.  That's mine.

21  Q.  And is it fair to say that Mr. Miles Guo had no awareness

22  that you were interviewing Miguel Rivera?

23          MS. MURRAY:  Objection.

24          THE COURT:  Sustained.  He cannot speak about what

25  Mr. Guo was or was not aware of.

O6BBGUO1                          Khaled - Cross

1    Q.  Did you tell Mr. Guo that you were participating in an

2    interview for Miguel Rivera?

3    A.  No, not directly.

4    Q.  How did you tell him indirectly?

5    A.  Maybe through Yvette.

6    Q.  Maybe?

7    A.  Maybe Yvette told him.  I don't know.

8    Q.  You don't know, correct?

9    A.  I don't.

10   Q.  You're just speculating when you say maybe Yvette told him.

11   A.  Maybe, yeah, maybe Yvette told him.

12   Q.  It's a speculation on your part, correct?

13   A.  I don't know if Yvette told him.

14   Q.  Okay.

15           THE COURT:  Would you step up, please.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

O6BBGUO1                          Khaled - Cross

1                (At the sidebar)

2                THE COURT:  This witness has trouble with big words,

3     words like "admonition" and "speculation," and so I ask that

4     you speak in a simpler way so that he can answer the questions

5     efficiently.

6                MS. SHROFF:  Okay.  I'm sorry.  I did not——okay.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6BBGUO1                          Khaled - Cross

1                    (In open court)

2                    THE COURT:  You may continue.

3    BY MS. SHROFF:

4    Q.  Sir, you're just guessing that Yvette told Mr. Guo,

5    correct?

6    A.  Again, I'm not sure if she told him.

7    Q.  Okay.  And when you were speaking on the clip that we just

8    played to you, you were participating in an interview for this

9    person to have a job at G/CLUBS, right?

10   A.  Correct.

11   Q.  Now on direct you testified, did you not, that there came a

12   point when you used the money to—money taken from Crane to buy

13   certain properties for yourself and your wife, correct?

14   A.  I used the money to invest in properties.

15   Q.  Okay.  And how did you invest in these properties?  Did you

16   purchase them?

17   A.  I purchased them, yeah.

18   Q.  Okay.  And how many properties did you purchase?

19   A.  Total of seven.

20   Q.  And a total of seven properties.  Were they all in Florida?

21   A.  Yes.

22   Q.  Were they all multidwelling homes with swimming pools?

23   A.  No.

24   Q.  Okay.  And how many of them were multidwelling homes with

25   swimming pools?

O6BBGUO1                          Khaled - Cross

1    A.  What do you mean, multidwelling?  Single-family, what do

2    you mean exactly?

3    Q.  I withdraw the question.

4            These were homes that had more than one bedroom,

5    correct?

6    A.  Correct.

7    Q.  And they had other amenities in the apartment, correct?

8    A.  Correct.

9    Q.  You were trying to run these properties as Airbnbs,

10   correct?

11   A.  Three of them.

12   Q.  Okay.  And you testified on direct that you put these

13   properties in your wife's name, correct?

14   A.  Correct.

15   Q.  And you remember saying on your direct that you did that

16   "because of any lawsuit or anything might happen to me, the

17   properties are in someone else's name that I trust," correct?

18   A.  I think that's my testimony, but can I——

19   Q.  And you then testified that you thought some harm could

20   come to you, some physical harm, correct?

21   A.  Correct.

22   Q.  And what year were these properties bought, sir; do you

23   remember?

24   A.  '21 and '22.

25   Q.  In 2021 you were still working at East 64th Street,

O6BBGUO1                        Khaled - Cross

1    correct?

2    A.  Not the entire year.

3    Q.  Okay.  But for part of 2021 you were still working there,

4    correct?

5    A.  Yeah, until July.

6    Q.  Okay.  So you went in and out of East 64th Street, so at

7    that time you weren't scared that anything could happen to you,

8    correct?

9    A.  Not until the dispute happened, no.

10   Q.  Okay.  So before the dispute happened and you bought these

11   properties, you still put them in your wife's name, right?

12   A.  Yeah.

13   Q.  In fact, you put these properties in your wife's name

14   because you were in bankruptcy, and if you put them in your

15   name, the trustee would seize them; isn't that the truth?

16   A.  No.

17   Q.  So what would happen if you put the properties in your

18   name?  What do you think the trustee would do with that?

19          MS. MURRAY:  Objection.  Calls for speculation.

20          THE COURT:  Sustained.

21   Q.  Did you have an obligation to report purchase of property

22   to the trustee in bankruptcy?

23   A.  I don't know.

24   Q.  You don't know?

25   A.  No.

O6BBGUO1                          Khaled - Cross

1    Q.  You don't know your obligations to your bankruptcy trustee?

2    A.  Well, at that time it's a Chapter 13 reconstruction of

3    debt, so the entire debt was scheduled to be paid through that

4    Chapter 13.

5    Q.  Right.  And you had to give the——

6    A.  I don't——

7    Q.  I'm sorry.  Go ahead.

8    A.  I don't believe——I don't know if I needed to let them know.

9    Q.  You didn't need to give them a list of your assets?

10   A.  That's before.

11   Q.  That's——

12   A.  That's when you apply.

13   Q.  That's when you apply.

14   A.  Mm-hmm.

15   Q.  Not when you have a payment obligation.

16   A.  Again, I don't know.

17   Q.  You're still under an obligation, sitting here right now,

18   right, to the bankruptcy trustee to pay?

19   A.  Yeah, I have two payments for $8,000, I think.

20   Q.  Right.  And you still have to make those payments, correct?

21   A.  Correct.

22   Q.  And isn't it true that you're supposed to give them a list

23   of your assets so they can make sure that the payment schedule

24   is set properly?

25            MS. MURRAY:  Objection.  Asked and answered.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  Sustained.
 2   Q.  Who is Roman Yagudaev?
 3              MS. SHROFF:  Let me spell that for you, Madam court
 4   reporter.  R-O-M-A-N, Y-A-G-U-D-A-E-V.
 5   A.  He was a friend of mine and a partner.
 6   Q.  And when you described him to others while you were working
 7   at GTV, you called him just a contact, correct?
 8   A.  I don't——I don't know what I called him.
 9   Q.  How about when you testified on the 10th, and you testified
10   on direct that he was "just a contact"?
11              MS. SHROFF:  Can we pull up that transcript for him,
12   please.
13   Q.  Do you recall giving that testimony?
14   A.  Do you want me to read it?
15   Q.  I just want to make sure it comports with your
16   recollection.
17   A.  Yeah, it says "and a friend that I knew."
18   Q.  Right.  That's who he was, right?
19   A.  So——yeah.
20   Q.  Okay.  And you used——how do you pronounce his name so I
21   don't get it wrong?  Is it Yagudaev, Yagudaev?
22   A.  How would you——how do you say it?
23   Q.  Okay.  I'll refer to him as Roman, okay?
24   A.  Okay.  That's easier.
25   Q.  Okay.  And you introduced Roman to people at G/CLUBS so
```

O6BBGUO1                          Khaled - Cross

1    that he could help provide services, correct?

2    A.  Correct.

3    Q.  You introduced him because according to you, he had

4    immigration contacts and experience, correct?

5    A.  Correct.

6    Q.  And you wanted to employ him or have GTV——G/CLUBS employ

7    him so that he could help people get a passport in Antigua,

8    correct?

9    A.  Yeah, Yvette was interested in employing him, correct.

10   Q.  Right.  And Yvette, Ms. Wang, interviewed him, correct, or

11   talked to you about him, correct?

12   A.  She had spoken to him directly.

13   Q.  And she declined to utilize his services, correct?

14   A.  I don't know.

15   Q.  In fact, she told you that they already had people in

16   Antigua who could perform the same services, correct?

17   A.  No.  She never said that.

18   Q.  And she sent you a text telling you to contact them

19   directly in Antigua, correct?

20   A.  Again, I don't remember.

21   Q.  Okay.  Now with this gentleman Roman, you started another

22   company all of your own, correct?

23   A.  Can you be more specific.

24   Q.  Sure.  You and he formed a company called Royalton,

25   correct?

1    A.  Royal?

2    Q.  Royalton.

3    A.  No.

4    Q.  You didn't?

5    A.  Royal.

6    Q.  Royal?  Just Royal?

7    A.  I think Royal Asset Group, something like that.

8    Q.  I'm sorry?

9    A.  Royal Asset Group.  I'm not sure the exact name.

10   Q.  Okay.  But the two of you opened it together, correct?

11   A.  I think there was a third person, and a fourth.  There was

12   like I think four people.

13   Q.  Is it still in existence now?

14   A.  Yeah.  No activity.

15   Q.  I'm sorry?

16   A.  It was no activity whatsoever.

17   Q.  Okay.  You also started another company, right, called

18   Kanji Capital Group, correct?

19   A.  That was started when I was still working for the group.

20   Q.  Which group?

21   A.  For Guo and Yvette.

22   Q.  And you pitched Kanji Capital Group as a possible private

23   equity to Ms. Wang, correct?

24   A.  That's what she wanted me to create.

25   Q.  Could you——

1          MS. SHROFF:  I would just move to strike, your Honor,

2     and ask him to please answer the question.

3          THE COURT:  You can answer the question.  Your answer

4     is stricken.

5          Please read back the question.

6          (Record read)

7     A.  She asked me to create it.

8     Q.  Your testimony is Ms. Wang asked you to create a company

9     for her in June of 2021?

10    A.  It was before June '21.

11    Q.  When before June of 2021?

12    A.  We started talking about this in February.

13    Q.  Okay.  And when did you culminate it, according to you?

14    A.  You mean when it was created?

15    Q.  I'm sorry.  I take that back.

16         You created a brochure of the company, correct?

17    A.  Possible.

18    Q.  Do you recall it or no?

19         THE COURT:  So don't say what's possible.  Say whether

20    or not.

21    A.  I don't remember.

22         MS. SHROFF:  Okay.  May I approach, your Honor?

23         THE COURT:  You may.

24    A.  What's your question?

25    Q.  You created a pamphlet or a brochure promoting the Kanji

O6BBGUO1                       Khaled - Cross

1   Private Equity Capital, correct?

2             THE COURT:  The question is whether or not this

3   document refreshes your recollection as to whether you did so.

4   A.  I didn't physically create it, but I'm familiar definitely

5   with Kanji Capital Group.  I said I didn't physically create

6   this, but I am familiar with Kanji.

7   Q.  Well, how are you familiar with Kanji?

8   A.  It's a—I own it, with—I own it with a partner.

9   Q.  Who's the partner?

10  A.  Stephen Lawandy.

11  Q.  Who is Stephen Lawandy?

12  A.  He was initially hired by G/CLUBS and the G group.

13  Q.  But who is he to you?

14  A.  I worked with him before.  We—we belonged to the same

15  banking group.

16  Q.  You helped Stephen Lawandy get a job at G Club?

17  A.  I introduced him to Yvette.

18  Q.  You introduced him to Yvette, correct?

19  A.  Correct.

20  Q.  Okay.  And you and Stephen Lawandy together made this

21  company, correct?

22  A.  We were asked to, yeah.

23  Q.  Excuse me?

24  A.  We were asked to create this company.

25  Q.  Okay.  But you created it, right?

1    A.  I said we were asked to create it by Yvette, this company.

2    Q.  Okay.  But you created it, then, right?

3    A.  We asked――yes.

4    Q.  Okay.  And you sent it around, correct?

5    A.  What do you mean?

6    Q.  Who did you send that document to?

7    A.  I don't remember.

8            MS. SHROFF:  Okay.  May I take it back from him.

9    Q.  And you wanted this private equity company to be supported

10   by whom?

11           MS. MURRAY:  Objection to relevance.

12           THE COURT:  I'll allow the question.

13   A.  What do you mean supported?

14   Q.  Who was going to fund it?

15   A.  It was going to have investors.

16   Q.  And who were the investors to be?

17   A.  When the company was created, it was going to be promoted

18   and――it was going to be from the network of Yvette.

19   Q.  And this was in June of 2021, correct?

20   A.  No.  Like I said, we started working on this project in

21   February.

22   Q.  Right.  And when did the project come to like a final

23   conclusion?  You started in February.  When did it come to a

24   conclusion?

25   A.  It continued, but, again, we never had any success with it.

O6BBGUO1                      Khaled - Cross

1   Q.  Okay.  But my question is:  When did it come to a

2   conclusion and you sent it to Yvette?

3   A.  What do you mean conclusion, like created the company?

4   Q.  Yeah.

5   A.  So we started in February.  By the time it was created in

6   Cayman, it was like probably June——May, June, something like

7   that.

8   Q.  And in May or June, you sent it to Yvette, right?

9   A.  Again, I don't remember sending this exact document to

10  Yvette.

11  Q.  All right.  Well, let me see if I can refresh your

12  recollection.

13  A.  Just an attachment.  I don't know if that's——this is it.

14  Q.  My question was, does that refresh your recollection that

15  the Kanji pdf was sent to Yvette on June 21st of 2021?  Does

16  that document refresh your recollection?

17  A.  Again, it's a pdf.  I don't know if this is it.

18           THE COURT:  So the question is whether or not looking

19  at that document actually causes you to remember that this

20  happened.

21           THE WITNESS:  That I've sent the pdf?  Yes, I've sent

22  the pdf to Yvette regarding Kanji.

23  Q.  And you recall, sitting here today, that the pdf regarding

24  Kanji that you sent to Yvette was sent on June 27th of 2021,

25  correct?

O6BBGUO1                      Khaled - Cross

1   A.  Correct.

2   Q.  Shortly after that, on July 11th, you were told that Crane

3   wanted to terminate their contract with you, correct?

4   A.  Correct.

5           MS. SHROFF:  Could I show just the witness DX 60540.

6           THE COURT:  Yes.

7   Q.  Would you prefer a hard copy, sir, or should we just flip

8   it for you on the machine?

9   A.  No.  Can you get me one?

10  Q.  Hard copy?

11  A.  Please.

12  Q.  Sure.

13  A.  Okay.

14  Q.  That's the termination agreement; that's the notice of

15  termination, correct?

16  A.  Correct.

17  Q.  And you recognize it to be so, correct?

18  A.  That's the response.

19  Q.  It's the response to the notice of termination, correct?

20  A.  Yeah, a response to the notice of termination.

21  Q.  And you recognize it to be so, correct?

22  A.  Yes, and from Chris Warren.

23  Q.  Thank you.

24          MS. SHROFF:  I move DX 60540 into evidence.

25          MS. MURRAY:  May I have voir dire?

O6BBGUO1                        Khaled - Cross

1           THE COURT:  You may.

2   VOIR DIRE EXAMINATION

3   BY MS. MURRAY:

4   Q.  Mr. Khaled, did you write this document?

5   A.  No.

6   Q.  Did you see this document in or around the time that it was

7   sent in July of 2021?

8   A.  I don't remember if Warren Law Group sent it to me or not.

9   Q.  Do you know whether this is a fair and accurate copy of a

10  letter that Chris Warren sent to Limarie Reyes on July 9th of

11  2021?

12  A.  No, I would not know.

13          MS. MURRAY:  We object, your Honor.

14  BY MS. SHROFF:

15  Q.  Does the document have a letterhead on top, sir?

16  A.  It does.

17  Q.  What's the little painting, the photo over there?

18  A.  I have no idea.

19  Q.  Okay.  Who's Christopher Warren?

20          MS. MURRAY:  Asked and answered.

21          THE COURT:  Sustained.

22          MS. SHROFF:  Your Honor, I'm laying a foundation for

23  the document.

24          THE COURT:  You've already asked who Christopher

25  Warren was.

O6BBGUO1                        Khaled - Cross

1              MS. SHROFF:  I meant on the letterhead.  I don't mean

2       in general; I just meant on the letterhead.

3              THE COURT:  So he's not reading from the document

4       because the document has not yet been authenticated.

5       BY MS. SHROFF:

6       Q.  Who was Todd Kulkin?

7       A.  Who is Todd Kulkin?

8       Q.  Right.

9       A.  He was my attorney.

10      Q.  And did your attorney in fact send a response to the G Club

11      notice of termination?

12      A.  He might have, yeah.

13      Q.  And that's this document, right?

14      A.  This looks like it.

15      Q.  Thank you.

16             MS. SHROFF:  Your Honor, we renew our application to

17      have the document admitted into evidence.

18             MS. MURRAY:  Same objection, but nothing further on

19      that point.

20             THE COURT:  I'm going to admit the document.

21             (Defendant's Exhibit 60540 received in evidence)

22             MS. SHROFF:  Thank you, your Honor.

23      BY MS. SHROFF:

24      Q.  You can set that aside.

25             Now, Mr. Khaled, on March 8th of 2023, you signed a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1 nonprosecution agreement with these three lawyers, correct?

2 A.  Can you repeat the date?

3 Q.  March 8th.  Do you recall the date of your nonprosecution

4 agreement?  Maybe I have the wrong date.  Let me check.

5    I do have the right date.  March 8th of 2023.  Do you

6 recall that?

7 A.  Yeah.  I'm not sure what the exact date of the——the

8 signature.

9 Q.  Okay.  And you testified on direct that you were approached

10 by the FBI and you did not immediately speak to them, correct?

11 A.  Correct.

12 Q.  You were approached on July 26th of 2021, correct?

13 A.  No.

14 Q.  Okay.  You tell me when you were approached.

15 A.  November of 2021.

16 Q.  You were approached by the FBI on November——in November of

17 2021?

18 A.  Correct.

19 Q.  Okay.  And when was the first time you spoke to the

20 prosecution after that?

21 A.  April of 2022.

22 Q.  Are you sure it wasn't May of 2022?  I'm sorry.

23 A.  I'm not sure.  April or May.

24 Q.  Okay.  In November when the FBI approached you, you

25 declined to speak to them, correct?  You said you had a lawyer

1  and you did not want to talk to them; is that right?

2  A.  Correct.

3  Q.  And between then and the first time that you spoke to them

4  on May 12th of 2022, you took stock of the fact that you had

5  stolen $2.7 million, correct?

6  A.  I didn't steal 2.7 million.

7  Q.  I'm sorry?

8  A.  I didn't steal 2.7 million.

9  Q.  How much did you steal?

10 A.  I didn't steal.

11 Q.  You didn't steal anything at all?

12 A.  No.

13 Q.  And you're just returning the money because you didn't

14 steal it?

15 A.  What returning money?

16 Q.  The forfeiture.  If you didn't steal it, why are you

17 forfeiting it?

18 A.  I'm returning it based on the agreement that we have.

19 Q.  But the agreement is based on things you did, right?

20          Well, you know what, let's talk about the things you

21 did.

22          You told them that you did wrong by opening bank

23 accounts that were associated with Mr. Guo from July 2020 to

24 July 2021, correct?

25 A.  Correct.

O6BBGUO1                          Khaled - Cross

1    Q.  And they agreed to not prosecute you for that, correct?

2    A.  That's what the agreement says.

3    Q.  They agreed not to prosecute you because you told them that

4    you had engaged in financial transactions to hide funds and

5    that was between July 2020 and July 2021, right?

6    A.  Correct.

7    Q.  And then you told them that you had induced people to

8    invest money in entities, and they told you they wouldn't

9    prosecute you for that either, correct?

10   A.  Induced?  Can you repeat that.

11          THE COURT:  Ms. Shroff.

12          MS. SHROFF:  I'm reading the agreement itself, your

13   Honor.  That's why——I'm happy to rephrase.

14   A.  Can I——

15   Q.  You told them, correct, that you did wrong things to have

16   people invest and that was illegal, and they said, okay, we'll

17   not prosecute you for that, correct?

18   A.  That's not what the agreement says.  It's fraud, a fraud

19   scheme.

20   Q.  You tell me what the agreement says.

21   A.  It was regarding a fraud scheme.

22   Q.  Okay.  You told them you ran an unlicensed money service

23   from October 2020 to July 2021, and they agreed to not

24   prosecute you for that, correct?

25   A.  Again, the agreement has that in——in——regarding operating a

O6BBGUO1                          Khaled - Cross

1    nonlicensed money servicing company.

2    Q.  Right.  But you testified on cross today that you were a

3    licensed remitter, right?

4    A.  We had a license, yeah.

5    Q.  Say it again?

6    A.  Yes, we did have a license.

7    Q.  So why did you ask the government to give you coverage for

8    something that was perfectly legal?

9              MS. MURRAY:  Objection, your Honor.  Misstates his

10   testimony.

11             THE COURT:  Sustained.

12   Q.  What unlicensed money services are they giving you coverage

13   for?

14             MS. MURRAY:  Objection.

15             THE COURT:  Sustained.

16   Q.  Your nonprosecution agreement says that they won't

17   prosecute you for operating an unlicensed money services

18   business from October 2020 to July 2021, correct?

19   A.  If that's what it says, yeah.

20   Q.  What do you understand that to mean?

21   A.  In terms of what exactly?

22   Q.  In terms of your nonprosecution agreement.

23   A.  What's your question?

24   Q.  My question is:  What is your understanding of the

25   highlighted language, which is your nonprosecution agreement?

O6BBGUO1                          Khaled - Cross

1    A.   Operating an unlicensed money services business from in or

2    about October '20 through in or about July 2021.

3    Q.   Right.  And what's the unlicensed money services business

4    you ran?

5    A.   Crane.

6    Q.   That's the unlicensed money services business you ran?  I

7    withdraw that.

8           You testified, though, on direct that you had a

9    license, right, to be a money services/business services

10   remitter?

11   A.   Correct.

12   Q.   Okay.  So why do you need coverage?

13   A.   In case my lawyer did not have it a hundred percent.

14          MS. MURRAY:  Objection, your Honor, to the extent that

15   this goes into any——

16          MS. SHROFF:  I have not asked anything about his

17   lawyer.

18          THE COURT:  Sustained.

19   Q.   Could you take a look at page 1 of this document for me.

20          THE COURT:  I just want to remind all the attorneys to

21   speak into the microphone so that the interpreters can hear

22   you.

23   A.   Yes, I'm here.

24   Q.   Do you recognize this document?

25   A.   Yes.

O6BBGUO1                        Khaled - Cross

1    Q.  Okay.  This is your nonprosecution agreement?

2    A.  Correct.

3    Q.  It's addressed to your lawyer?

4    A.  Yes.

5    Q.  And it's signed by you?

6    A.  Yes.

7              MS. SHROFF:  Your Honor, at this time I move the

8    document into evidence.

9              MS. MURRAY:  No objection.

10             THE COURT:  It is admitted.

11             (Defendant's Exhibit 60529 received in evidence)

12             MS. SHROFF:  May I have the jury view it, if they

13   would wish.

14   BY MS. SHROFF:

15   Q.  Now as part of your coverage, right——and if I could just go

16   back to the same page as before——the government agreed to not

17   prosecute you for other crimes you'd committed, correct?

18             MS. SHROFF:  If I could just make that larger for the

19   jury and for the witness, please.  Thank you.

20   Q.  Correct?

21   A.  Yes.

22   Q.  And one of the things that they gave you coverage for is

23   (v).  Do you see that over there?

24             MS. SHROFF:  And if we could just highlight that for

25   him.

1    Q.  "The provision of materially false information concerning

2    his," meaning you, "personal expenses to a financial

3    institution in or about 2016," correct?

4    A.  Yes.

5    Q.  Okay.  You did not know Miles Guo in 2016?

6    A.  No.

7    Q.  And you didn't know Ms. Wang in 2016, correct?

8    A.  No.

9    Q.  What was the lie you told the bank?

10   A.  I wanted to get a home modification for my house.

11               MS. SHROFF:  I move to strike.

12   Q.  My question was, please:  What was the lie?

13               THE COURT:  Did you finish your answer?

14               THE WITNESS:  No, I did not.

15               THE COURT:  Okay.  So please allow him to answer.

16   A.  So I was doing a home modification for my house, and I

17   provided them with incorrect personal expenses.

18   Q.  You called them incorrect?

19   A.  Yes.  And——

20   Q.  So by incorrect, do you mean it was like by mistake?

21   A.  No, no.  Not accurate information, about my expenses.  I

22   inflated my expenses.

23   Q.  You inflated your expenses.

24   A.  Correct.

25   Q.  And you gave it to a financial institution.

O6BBGUO1                          Khaled - Cross

1   A.  Yes.

2   Q.  And in 2016 were you working for a financial institution?

3   A.  Yes.

4   Q.  Which one?

5   A.  Citibank.

6   Q.  Did you lie to Citibank and inflate it with Citibank or

7   with some other bank?

8   A.  No, for my home modification, my home loan.

9   Q.  Okay.  Who was the home loan with?

10  A.  I think it was Wells Fargo.

11  Q.  So you lied to one bank, Wells Fargo, while working for

12  another bank, Citibank?

13  A.  Yes.

14  Q.  Okay.  Let's look at No. (vi).  And that was in 2010 now,

15  right?  That's about 15 years ago.  Or 14.  I'm sorry.  My math

16  is bad.  Right?  You lied then also in 2010.

17  A.  Correct.

18  Q.  Okay.  Then you wrote bad checks all through 2014 and '15,

19  seven different times, correct?

20  A.  Yes.

21  Q.  And what was the dollar amount, by the way, on all these

22  bounced checks?

23  A.  I don't—I don't remember exactly.

24  Q.  Okay.  And (v), (vi), and (vii) happened long before you

25  met Yvette Wang and Miles Guo, correct?

O6BBGUO1                    Khaled - Cross

1   A.  Correct.

2   Q.  You said a minute ago that you did not recall the dollar

3   amount for the checks; is that your testimony?

4   A.  Yes.

5   Q.  Let me show you 3500-166 at page 3.

6           MS. SHROFF:  Just the witness, please.

7   Q.  Do you see what's on your screen, sir?

8   A.  Yes.

9   Q.  And does that help you in refreshing your recollection as

10  to the dollar amount of these six and seven checks that you

11  bounced?

12  A.  I don't remember exactly, but that's——that's what I——that's

13  what I said.

14  Q.  What did you say?

15  A.  10 to 20,000.

16          MS. MURRAY:  Your Honor, objection.  This is

17  refreshing his recollection.  If he's read it, we can take it

18  down and he can speak to whether the document refreshed.

19          THE COURT:  So if you don't recall something and then

20  a document is offered to you to see whether that helps you

21  remember, don't read from the document.  Just say whether or

22  not it helps you remember.

23          THE WITNESS:  Doesn't remember——doesn't help me

24  remember exactly that amount.

25  BY MS. SHROFF:

1    Q.  Does it help you remember approximately how much it was,

2    each check?

3    A.  No, ma'am.

4    Q.  You have no recollection of the dollar amounts?  I withdraw

5    it.

6              THE COURT:  Sustained.

7              MS. MURRAY:  Objection.

8              MS. SHROFF:  You can take that down.

9    BY MS. SHROFF:

10   Q.  Now let's go back to your nonprosecution agreement.

11             Under this agreement, do you have any criminal

12   liability for failure to file taxes?

13   A.  Yes, I do.

14   Q.  And the government, through this nonprosecution agreement,

15   gave you a way out from filing——from avoiding tax prosecution,

16   correct?

17             MS. MURRAY:  Objection.

18             THE COURT:  You have to step up.  I——

19             (Continued on next page)

20

21

22

23

24

25

1                (At the sidebar)

2                THE COURT:  So I don't know what the nonprosecution

3     agreement says.

4                MS. MURRAY:  The objection is to the form.  The

5     government gave a way out of having to do something?  It's an

6     improper form of the question.  She can ask what the document

7     says.  The document speaks for itself.

8                MS. SHROFF:  They did give him a way out.  They said

9     you can file your taxes in an amended form and you won't go to

10    jail for failure to file taxes.  That's the way out.

11               MS. MURRAY:  That is not reflected in the documents.

12    There was no "or you will go to jail if you don't file your

13    taxes."  It's impermissible and improper.

14               MS. SHROFF:  That's common knowledge, you'll go to

15    jail.

16               THE COURT:  Does the government agree that if X and

17    then Y; that's the way you frame the question.

18               MS. SHROFF:  Okay, sure.

19               (Continued on next page)

20

21

22

23

24

25

```
 1                (In open court)
 2                MS. SHROFF:  Could we put the nonprosecution back up.
 3    And if I could go to page 1.
 4                And page 1, if I could just have the first full
 5    paragraph.
 6    BY MS. SHROFF:
 7    Q.  And these are the——No. (i) to No. (viii) is all the
 8    coverage the United States government gave you, right?
 9    A.  Correct.
10    Q.  And by the United States government, I mean Ms. Murray,
11    Mr. Finkel, and Mr. Fergenson here, and of course Mr. Horton,
12    who's not here, correct?
13    A.  Who?
14    Q.  The four prosecutors, correct?
15    A.  The three prosecutors that I see.  I don't know——I don't
16    know the other person.
17    Q.  Okay.
18    A.  I don't remember.
19    Q.  Okay.
20    A.  I don't remember him.
21    Q.  Okay.  And who is it signed by on the bottom?
22                No, no, on the top.  The United States Attorney's
23    Office.  Three signed there, right?
24    A.  Damian Williams?
25    Q.  No.  And underneath is the signature, correct?
```

O6BBGUO1                         Khaled - Cross

1    A.  Yes, the three.

2             MS. SHROFF:  Okay.  And let's go to page 2.

3             Actually, let's go back to page 1 at the bottom.

4    Q.  You see the paragraph that says, "Moreover, if Khaled"?

5    You see that paragraph?

6    A.  Yes.

7    Q.  Okay.  And that tells you, does it not, that any testimony

8    or information that you give, right, will be used against him

9    in any criminal tax prosecution, correct?  It says no testimony

10   or other information given by you will be used against you in

11   any criminal tax prosecution.  Do you see that?

12   A.  It says "will be used against" you, "against him."

13            (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6CBGUO4                          Khaled - Cross

1   BY MS. SHROFF:

2   Q.  Say it again.

3   A.  It says, Will be used.

4   Q.  No testimony or other information given by him.  So nothing

5   you say to them will be used against you in a criminal tax

6   prosecution.  Is that your understanding?

7   A.  It says, Will be used against him.

8   Q.  It says, No testimony or other evidence given by you will

9   be -- none of it will be used against you?

10  A.  Okay.

11  Q.  Let's look at the next page.  They give you a solution to

12  your tax problems in the first paragraph?

13          MS. MURRAY:  There's personal identifying information

14  on this page.  We would just ask that it not be displayed.

15          THE INTERPRETER:  I'm sorry, counsel.  Can you repeat.

16          MS. MURRAY:  There's personal identifiable information

17  on this page.  We ask that it not be displayed to the gallery.

18          MS. SHROFF:  It's public information in the

19  bankruptcy.  It's not personal.

20          THE COURT:  Not the personal identifying information.

21  That should not be displayed.

22          MS. SHROFF:  There's no personal identifying

23  information.

24          MS. MURRAY:  There are addresses in the second

25  paragraph, your Honor.  That's what we're referring to.

O6CBGUO4                         Khaled - Cross

1              MS. SHROFF:  Your Honor, may we approach again?

2              THE COURT:  I see a reference to an individual and I

3    see addresses.

4              MS. SHROFF:  Those addresses are the Airbnb properties

5    that were turned over in the forfeiture.  It's not his personal

6    home.

7              THE COURT:  Is it the addresses that you are seeking

8    to have redacted?

9              MS. MURRAY:  Yes, your Honor.  It's not relevant that

10   they're not the place that he lives.  They're places that he is

11   associated with and owns, and it's identifiable information.

12   It just shouldn't be in the public record in front of the jury

13   and the gallery.

14             MR. KAMARAJU:  Your Honor, they're going to appear in

15   a forfeiture order at some point.

16             THE COURT:  These are the properties that were bought

17   by the witness with the $2.7 million?

18             MS. SHROFF:  Exactly.

19             THE COURT:  That can remain in there.  Go ahead.

20   Q.  Could the jury see page two of four, and could you make it

21   larger for them.

22             So this agreement also allows you to file amended tax

23   returns from 2009 to 2011, correct?

24   A.  Correct?

25   Q.  And the next paragraph, if I could have that blown up, are

O6CBGUO4                        Khaled - Cross

1    all the properties you bought with that $2.7 million, and that

2    you were going to use for Airbnb and other investments,

3    correct?

4    A.  Correct.

5    Q.  And you had to forfeit all of these properties to the

6    prosecution, correct?

7    A.  Correct.

8    Q.  How many properties do you count by the way?

9    A.  Seven.

10   Q.  Thank you.  And the agreement also requires for you to

11   return to the government the net equity value of your interest

12   in the properties or the full sum of $2.7 million, correct?

13   A.  Correct.

14   Q.  We can take it down, please.

15          What it does not make you return is the salary you

16   earned while working at Citibank, correct, when you were also

17   working at G/Clubs, right, or Saraca, correct?

18   A.  Correct.

19   Q.  It does not require you to return to them the wages you

20   were paid while you worked for Saraca, correct?

21   A.  No.

22   Q.  I'm correct, right?  You didn't have to give your wages

23   back?

24   A.  I did not have to give my wages back, no.

25   Q.  And in return for this non-prosecution agreement, you

1    testified yesterday your obligation is to tell the truth,

2    correct?

3    A.  My obligation is to tell the truth, yes.

4    Q.  And yesterday you testified on direct that it is you who

5    decides whether or not you're being truthful, correct?

6    A.  Correct.

7    Q.  So it is your understanding that if you decided that the

8    statements you've made to the prosecutors when you met with

9    them 19 times and the statements that you made in court are

10   truthful, all of the charges against you will never come to a

11   criminal charge, correct?

12   A.  Correct, that's what the agreement says.

13   Q.  And only you get to decide if you're being truthful, right?

14   A.  Correct.

15            MS. SHROFF:  Okay.  I have nothing further.

16            THE COURT:  Redirect.

17            MS. MURRAY:  Thank you, your Honor.

18   REDIRECT EXAMINATION

19   BY MS. MURRAY:

20   Q.  Good afternoon, Mr. Khaled.

21   A.  Good afternoon.

22   Q.  We can start with the non-prosecution agreement if we could

23   put that up again.  That's Defense Exhibit 60529.

24            You were asked some questions about your

25   non-prosecution agreement on cross examination just now.  Do

1    you recall that?

2    A.  Yes.

3    Q.  Did your attorney sign your non-prosecution agreement?

4    A.  Yes.

5    Q.  Who spoke to the government on your behalf regarding the

6    terms of the non-prosecution agreement?

7    A.  My attorney James.

8    Q.  I want to focus on the first paragraph, the first three

9    Roman numerals of what we just looked at, and this is with

10   respect to coverage under this agreement.

11          Under this agreement if you comply with the

12   obligations under the agreement, the government agrees not to

13   prosecute you for Roman Numeral One, Your participation in a

14   scheme from in or about July 2020 through in or about July

15   2021, whereby, you Khaled, agrees with others to make, and

16   yourself made, material misrepresentations to financial

17   institutions for the purpose of opening and maintaining bank

18   accounts for entities associated with Miles Guo into which

19   fraudulent proceeds were deposited.  Do you see that?

20   A.  Yes.

21   Q.  And the second Roman numeral which provides you coverage,

22   provides you coverage for the following conduct:  Your

23   participation in a scheme from in or about July 2020 through in

24   or about July 2021, whereby you agreed with others to engage

25   in, and yourself engaged in, financial transactions designed to

1    conceal that certain funds were the proceeds of fraud.  Do you

2    see that?

3    A.  Yes.

4    Q.  And then the third Roman numeral regarding coverage here

5    provides coverage for your participation in a scheme from in or

6    about July 2020, through in or about July 2021, whereby others

7    made material misrepresentations to induce individuals to

8    invest money in Miles Guo related entities, some of which money

9    you received.  Do you see that?

10   A.  Correct, yes, I do.

11   Q.  And, Mr. Khaled, that reflects conduct that you actually

12   engaged in during that time period, July 2020 through July

13   2021, correct?

14   A.  Yes.

15   Q.  That includes the lies to banks that you've testified about

16   in the last few days?

17   A.  Yes.

18   Q.  And those lies were made in part in order to maintain bank

19   accounts; is that right?

20   A.  Correct.

21   Q.  After the government offered you a non-prosecution

22   agreement, did you discuss it with your attorney?

23   A.  Yes.

24   Q.  And this is a yes or no question, Mr. Khaled.  Did your

25   attorney provide you advice about the terms of the

1   non-prosecution agreement?

2   A.  Yes.

3   Q.  After receiving that advice from your attorney, did you

4   accept the non-prosecution agreement?

5   A.  Yes.

6   Q.  Now, on cross examination you were asked some questions

7   about our meetings.  Do you recall those?

8   A.  About what, our meetings?

9   Q.  Our meetings.

10  A.  Yes.

11  Q.  Do you recall the exact dates that we met on approximately

12  19 prior occasions?

13  A.  Not the exact dates.

14  Q.  Do you recall every detail of those meetings that we had?

15  A.  Not every detail.

16  Q.  Do you recall, for example, whether I was wearing a

17  ponytail at each of those 19 meetings?

18          MS. SHROFF:  Objection.  I don't think that is a

19  relevant thing to remember.  You might want to remember some

20  other thing, but I don't think a ponytail would count.

21          THE COURT:  You opened the door to the ponytail.

22          MS. SHROFF:  I did, but it's not a memorable one, your

23  Honor.

24          THE COURT:  You may answer.

25  A.  No, I don't.

O6CBGUO4                        Khaled - Redirect

1   Q.  During those meetings, did the government ask you questions

2   about the transfers of money into and out of Crane's bank

3   accounts?

4   A.  Specifically, I don't remember.

5           MS. SHROFF:  I'm sorry.  I did not hear that.

6   A.  I said specifically I don't remember.

7   Q.  Generally speaking did the government ask you questions

8   during those meetings?

9   A.  General questions, yes.

10  Q.  Did those questions relate to, among other things, your

11  work at Crane?

12  A.  Yes.

13  Q.  Did you answer the government's questions truthfully?

14  A.  Yes.

15  Q.  By the end of May of 2021, had Crane cleared at least

16  approximately a hundred million dollars of G/Club's funds?

17  A.  Yes.

18  Q.  And had you transferred more than approximately two million

19  of those Crane funds to yourself to bank accounts that you

20  held?

21  A.  Yes.

22  Q.  And did that two million or more dollars represent the two

23  percent fee that you were entitled to under the PFA for the

24  cleared funds?

25  A.  Yes.

1          THE COURT:  One moment.  What do you mean by cleared,

2     when you say the funds are cleared?

3          THE WITNESS:  That means we had a package reviewed,

4     the KYC package and an indemnity package from the sender, and

5     the names have been cleared, the payment has been seen,

6     confirmed, and that's considered a cleared payment.

7          THE COURT:  Go ahead.

8          MS. MURRAY:  Thank you, your Honor.

9     Q.  And did you agree to forfeit the two million or more that

10    you had taken of those funds to the government as proceeds of

11    the crimes that you had committed?

12    A.  Yes.

13    Q.  Now, you were asked questions about an affidavit that you

14    submitted in a specific Alliance case.  Do you recall those

15    questions?

16    A.  Yes.

17    Q.  And the date of that affidavit was May 17 of 2021.  Do you

18    recall that?

19    A.  Can I see it again?

20         MS. MURRAY:  Ms. Shroff, do you have a copy of that?

21    May I approach, your Honor?

22         THE COURT:  Yes.

23    A.  The date is May 17.

24    Q.  And in that affidavit you were asked questions about -- I

25    believe it's paragraph five -- regarding Miles Guo's financial

O6CBGUO4                          Khaled - Redirect

1    interest in certain monies or entities.  Do you recall those

2    questions?

3    A.  Yes.

4    Q.  And you said that Miles Guo did not have a financial

5    interest on paper.  Do you recall that?

6    A.  Correct.

7    Q.  What did you mean by on paper?

8    A.  On the formation documents and on the wires that came in,

9    his name was not a sender.  And when we were going to send the

10   money to the entities, his name was not on the paper for

11   G/Club.

12          MS. MURRAY:  Your Honor, I'd like to move to admit

13   Government Exhibit 411 and 411-T.  Sorry.  Those are in so I

14   might have the wrong number.  Just a moment, 413 and 413-T

15   pursuant to the stipulation, and the audio was authenticated by

16   Mr. Khaled on Monday.

17          THE COURT:  They are admitted.

18          (Government's Exhibits 413 and 413-T received in

19   evidence)

20   BY MS. MURRAY:

21   Q.  Ms. Loftus, if we could pull up 413 and 413-T at page

22   seven, please.  If we could play 413 from approximately three

23   minutes and 15 seconds and zoom in on the transcript.  The jury

24   doesn't have this transcript in their binders.

25          (Media played)

O6CBGUO4                        Khaled - Redirect

 1   Q.  Can you pause, Ms. Loftus.

 2           Mr. Khaled, in that portion of this call which was

 3   dated May 12, 2021, you referenced a Pacific subpoena.  What

 4   was that a reference to?

 5   A.  I believe this one.

 6   Q.  In the recording that we just listened to?

 7   A.  The same subpoena.

 8   Q.  And the affidavit that you testified about on cross

 9   examination, was that an affidavit that you submitted in

10   response to a subpoena you received in the Pacific Alliance

11   litigation?

12   A.  Yes.

13   Q.  And looking down in this transcript a bit, what did you

14   mean in the last paragraph here, you could read the first

15   sentence and explain what you meant by that?

16   A.  We definitely have to paper out.  That we have to put it in

17   writing that the money is not -- don't belong to you or

18   Mileson.

19   Q.  Is it correct that the money in fact belonged to an entity

20   and not to Miles Guo or Mileson personally?

21   A.  Correct.

22   Q.  And is that consistent with the sworn statement of

23   paragraph five of your Pacific Alliance affidavit?

24   A.  Correct.

25   Q.  We can take that down, Ms. Loftus.

1          On cross examination you were played portions of a

2     recording of an interview of a potential candidate for G/Clubs.

3     Do you recall that?

4     A.  Yes.

5     Q.  When you made the statements about potential candidate

6     about the types of work that G/Clubs was doing or the nature of

7     the position, who were you working for at that time?

8     A.  At that time I had already established Crane, so I was

9     working on Crane and Saraca.

10    Q.  And who, if anyone, was an individual you reported to in

11    the course of that employment?

12    A.  Yvette.

13    Q.  You were also asked questions about the time period when

14    you worked at both Saraca and Citibank, do you recall those

15    questions?

16    A.  Yes.

17    Q.  Did you mislead each of your employers during that time as

18    to the status of your employment with the other company?

19    A.  No, they never -- like they didn't ask me.

20    Q.  But when you were working at Saraca and still working at

21    Citibank, did you deliberately not tell Saraca that you had

22    Citibank employment?

23    A.  I wasn't worried about Saraca.

24    Q.  How about Citibank. When you were still employed at

25    Citibank, did you deliberately omit from Citibank the fact that

O6CBGUO4                    Khaled - Redirect

1   you had accepted employment at Saraca?

2   A.  Yes.

3   Q.  Did you tell the government about that fact that you had

4   dual employment in violation of your employment contracts when

5   you met with the government?

6   A.  Yes.

7   Q.  And that was before you were offered a non-prosecution

8   agreement, correct?

9   A.  Correct.

10  Q.  You were asked questions about your bankruptcy on cross

11  examination.  Do you recall those?

12  A.  Yes.

13  Q.  Did you organize protests of any of the bankruptcy

14  administrators in your case?

15  A.  Protest?

16  Q.  Correct.

17  A.  No.

18  Q.  Did you direct protest of any of the bankruptcy

19  administrators' children or ex-spouses?

20  A.  No.

21          MS. SHROFF:  Objection, your Honor.  It's beyond the

22  scope.

23          THE COURT:  Overruled.  You may continue.

24  Q.  You were asked questions about the ownership of Crane.  Do

25  you recall those?

1    A.   Yes.

2    Q.   Who had ownership of Crane on paper or on the documents?

3    A.   I did.

4    Q.   Who did you report to regarding Crane-related business

5    decisions?

6    A.   Yvette.

7    Q.   Who, if anyone, was involved in establishing Crane?

8    A.   Yvette, and I believe Victor wanted to join it.

9    Q.   And if Yvette had instructed you to add someone to Crane as

10   an employee, how would you have responded, if at all?

11            MS. SHROFF:   Objection.

12            THE COURT:   You may answer.

13   A.   I would have done it.

14   Q.   Now, you were asked questions about various of the

15   recordings that we had listened to on your direct testimony in

16   this case.  Do you recall those questions?

17   A.   Yes.

18   Q.   You were asked about how one of those call recording ended

19   in the middle of a sentence.  Do you recall that?

20   A.   I recall that, yeah.

21   Q.   Ms. Loftus, can we please pull up Government Exhibit 417

22   and 417-T.  And these are in the jury's binders if they would

23   like to follow along.

24            We're going to start around page 24 of the transcript,

25   please.  I don't have the exact timestamp.  It will be two

1    minutes before the end of the recording.  Perfect.

2              (Media played)

3    Q.  You can pause, Ms. Loftus.  Mr. Khaled, the person who's

4    indicated in this recording transcript as Yu, who do you

5    understand that person to be based on your participation in

6    this call?

7    A.  William Je.

8    Q.  Thank you.  We can continue.

9              (Media played)

10   Q.  Mr. Khaled, does this recording end in the middle of a

11   sentence?

12   A.  No.

13   Q.  Does it end at the end of the call or meeting?

14   A.  Yes.

15   Q.  And who was yelling at the end of this meeting?

16   A.  Miles Guo.

17   Q.  You were asked on cross examination about the portions of

18   that recording excerpt we just listened to and read relating to

19   a reference to a board of directors.  Do you recall those

20   questions?

21   A.  Yes, I do.

22   Q.  At the time of this meeting in 2021, you didn't speak

23   Mandarin; is that correct?

24   A.  No.

25   Q.  Or understand Mandarin?

1    A.  No.

2    Q.  And Alex Hadjicharalambous, did he speak Mandarin at the

3    time?

4    A.  No.

5    Q.  Or understand it?

6    A.  I don't believe so.

7    Q.  And in listening to those portions of this recording, the

8    Mandarin language that was spoken, were you able to determine

9    what topics the speakers were discussing, setting aside the

10   translations, just the actual --

11           MS. SHROFF:  Objection to the testifying.

12           THE COURT:  Overruled.  Continue.

13   Q.  Just focusing on the audio, were you able to understand

14   what the topics were at the time?

15   A.  No.

16   Q.  And sitting here today having now reviewed translations of

17   portions of the various calls and meetings that had been

18   conducted in Mandarin, and knowing what was said at that time,

19   how do you feel sitting here today about what was discussed in

20   Mandarin during those meetings?

21           MS. SHROFF:  Objection.  What is the relevance of

22   these meetings?

23           THE COURT:  Overruled.  You may answer.

24   A.  Can you repeat the question one more time, please.

25   Q.  Sure.  And I'll break it down just a bit.  At the time of

O6CBGUO4                         Khaled - Redirect

1    these calls and meetings that you recorded, certain portions of

2    the conversations took place in Mandarin, right?

3    A.   Yes.

4    Q.   And at that time you didn't understand what was being

5    discussed during the Mandarin portions, correct?

6    A.   Correct.

7    Q.   And no one translated them for you at the time or told you

8    what was discussed?

9    A.   No.

10   Q.   Now having had the benefit of the translations of the

11   portions of the calls and meetings and having reviewed them,

12   how do you feel about what was being discussed in Mandarin

13   during those calls and meetings?

14            MS. SHROFF:   Same objection.

15            THE COURT:   Overruled.

16   A.   Secret planning of movement of money and putting us all in

17   front of it.

18   Q.   And what do you mean by that, putting us all in front of

19   it?

20   A.   Alex was signer on that account, a signer on loan

21   documents.   I was a signer on a bank account, and they just

22   used the names, use the accounts, and there was definitely a

23   plan and a structure behind all that that we were not privy to.

24            MS. MURRAY:   If I may have a moment, your Honor.

25   Nothing further.

1           THE COURT:  Recross.

2    RECROSS EXAMINATION

3    BY MS. SHROFF:

4    Q.  You were played this call again now call, 417, correct?  If

5    I could just pull the transcript for him.  It will be on your

6    screen over there and also for the jury.  You recorded this

7    call in April of 2021, correct?

8    A.  Correct.

9    Q.  Where did you keep the call?

10   A.  On my phone.

11   Q.  You recorded it for a purpose, right?

12   A.  It wasn't a plan purpose, no.

13   Q.  You recorded it for no reason?

14   A.  Again, I was trying to keep records.

15   Q.  And you wanted to know what you were keeping a record of,

16   correct?

17   A.  Correct.

18   Q.  This is in a foreign language, the recording, correct?

19   A.  It's a what?

20   Q.  It's in a foreign language, correct?

21   A.  Yes.

22   Q.  You never used Google translate to figure out what they

23   were talking about?

24   A.  I was interested in the last one, last piece.

25   Q.  Whatever piece you were interested in, sir.  My only

1    question is whether you used a simple app called Google

2    Translate to figure out what they're talking about to determine

3    if it in fact would even help you?

4    A.  Help me with what, no.

5    Q.  Whatever the reason was that you recorded it?

6    A.  No.

7    Q.  You didn't listen to at all?  That's your testimony, right?

8    A.  What do you mean listen to it?

9    Q.  You made the recording, correct?

10   A.  Yes.

11   Q.  You discussed it with Ms. Murray, whether she had a

12   ponytail that day or not, you discussed this recording with

13   her, right?

14   A.  After the fact, yeah.  When we started meeting, yes.

15   Q.  When you discussed it with her, she had this translation

16   for you, right?

17   A.  Correct.

18   Q.  You discussed this with her almost more than a year after

19   you recorded it, correct?

20   A.  Correct.

21   Q.  You saved this recording for all that time, correct?

22   A.  Yes.

23   Q.  You gave this very recording to your lawyers so that they

24   could give it to the arbitrator, correct?

25   A.  Correct.

O6CBGUO4                          Khaled - Recross

1   Q.  This recording was played in the arbitration, correct?

2          MS. MURRAY:  Objection.

3          THE COURT:  Overruled.  If you know.

4   A.  I don't remember.

5   Q.  The English version of this document was introduced into

6   evidence at the arbitration where you were physically present,

7   correct, and I remind you you're under oath?

8          MS. MURRAY:  Objection, per our discussion at sidebar,

9   your Honor.

10         THE COURT:  Overruled.  You may answer.

11  A.  I don't remember.

12  Q.  This was one of the main pieces of evidence in the

13  arbitration?

14         MS. MURRAY:  Same objection.

15  Q.  Let me try it a different way.  You gave this recording to

16  your lawyer, right?

17         MS. MURRAY:  Asked and answered.

18         THE COURT:  Sustained.

19  Q.  Does your lawyer speak Mandarin?

20  A.  I don't know.

21  Q.  You don't know if your lawyer speaks Mandarin?

22         MS. MURRAY:  Asked and answered.

23         THE COURT:  Sustained.

24  Q.  Sitting here today your testimony is that you had no idea

25  what this recording said in English before you met with

1    Ms. Murray?

2              MS. MURRAY:  Objection, mischaracterizes his

3    testimony.

4              THE COURT:  I'm going to allow the question.

5    A.  Again, I don't remember.

6    Q.  You testified that this call ended, and that's what ended

7    the recording, correct?

8    A.  Yes.

9    Q.  With every recording you made, you and only you had the

10   option of letting the recording continue or ending the

11   recording, correct?

12   A.  Correct.

13   Q.  You testified now that you thought during this conversation

14   that there was secret planning, correct?

15   A.  Sitting now here, yes.

16   Q.  Sitting here now, correct?

17   A.  Yeah.

18   Q.  And sitting here now your interest are completely aligned

19   with the U.S. Attorney's office, correct?

20   A.  I don't know what their interest are.

21   Q.  You don't know what their interest are?

22   A.  No.

23   Q.  You don't know what a prosecutor's interest is?

24   A.  I don't know.

25   Q.  Did you meet with me?

1    A.  No.

2    Q.  Did you sit down with me 19 times and review any

3    recordings?

4            MS. MURRAY:  Objection, your Honor.  We've covered all

5    this.

6            MS. SHROFF:  I don't think so.

7            THE COURT:  We don't know yet whether the witness met

8    with Ms. Shroff.

9    A.  No.

10   Q.  How about Mr. Kamaraju over here, met with him?

11   A.  Who?  No.

12   Q.  How about that young man over here Mr. Kilguard, met with

13   him?

14   A.  No.

15   Q.  The only person you ever talked to is Ms. Murray, correct?

16   A.  That's not correct.

17   Q.  Her team?

18   A.  Plus others.

19   Q.  Nineteen times?

20   A.  Correct.

21   Q.  Hours at a time?

22   A.  Correct.

23           MS. SHROFF:  I have nothing further.

24           MS. MURRAY:  Just one question on re-redirect your,

25   Honor.

O6CBGUO4                          Khaled - Recross

1   REDIRECT EXAMINATION

2   BY MS. MURRAY:

3   Q.  Mr. Khaled, do you know what happened to the $46 million or

4   so that Crane transferred to Lawall & Mitchell, Aaron Mitchell,

5   do you know what happened to that money after you transferred

6   it to Lawall & Mitchell?

7   A.  No.

8   RECROSS EXAMINATION

9   BY MS. SHROFF:

10  Q.  It wasn't your money to know anything about, correct?

11  A.  Excuse me.

12  Q.  It was none of your business what happened with that 46

13  million, correct?  It wasn't your money?

14  A.  No, it wasn't.

15  Q.  Right.  And no matter what Yvette told you, or no matter

16  what Miles Guo told you, or no matter what William Je told you,

17  or no matter what Haoran He told you, until the arbitrator

18  ruled, you would not let go of that money, correct?

19          MS. MURRAY:  Objection, scope, form.

20          THE COURT:  Sustained on the scope issue.

21          MS. SHROFF:  I have nothing further.

22          THE COURT:  Thank you, sir.  You may step out.

23          (Witness excused)

24          THE COURT:  You may call your next witness.

25          MR. FERGENSON:  The government calls Minin Wu.

O6CBGUO4                        Minin Wu- Direct

```
 1    MININ WU,
 2          called as a witness by the Government,
 3          having been duly sworn, testified as follows:
 4              THE COURT:  Please be seated, and state your name and
 5    spell it, and put the microphone close to your mouth.
 6              THE WITNESS:  My first name is M-I-N-I-N.  My last
 7    name is W-U.
 8              THE COURT:  And if you would say your name.
 9              THE WITNESS:  My name is Minin Wu.
10              THE COURT:  You may inquire.
11    DIRECT EXAMINATION
12    BY MR. FERGENSON:
13    Q.  Good afternoon, Ms. Wu.
14    A.  Good afternoon.
15    Q.  I'll ask you just if you can try to speak directly into the
16    mic and keep your voice up, and for the court reporter just try
17    and talk slowly.  Okay?
18    A.  Okay.
19    Q.  What state do you live in?
20    A.  New Jersey.
21    Q.  What do you do for work?
22    A.  Right now just at home.
23    Q.  And what was your last job outside of the home?
24    A.  Macy's.
25    Q.  Were you ever a follower of Miles Guo?
```

1   A.  Yes.

2   Q.  Are you still a follower of Miles Guo?

3   A.  No.

4   Q.  Looking around the courtroom, do you see Miles Guo here

5   today?

6   A.  Yes.

7          MR. SCHIRICK:  We'll stipulate, your Honor.

8          THE COURT:  Very well.

9   Q.  Ms. Wu, you said you live in New Jersey now, where were you

10  born?

11  A.  China.

12  Q.  When did you come to the United States?

13  A.  2001.

14  Q.  Why did you come to the United States?

15  A.  Follow my husband.

16  Q.  Did there come a time when you became interested in Chinese

17  politics?

18  A.  Yes.

19  Q.  Could you explain to the jury what caused you to become

20  interested in Chinese politics?

21  A.  My family history and my mother and father's illness and

22  death.

23  Q.  When your parents were ill and passed away, where were

24  they?

25  A.  China.

1    Q.  And what about their experience being ill in China caused

2    you to become interested in Chinese politics?

3    A.  They died from over treatment.  They all died from over

4    treatment, and the journey just full of cheating, money and

5    power, so miserable.

6    Q.  Ms. Wu, when did you first learn about Miles Guo?

7    A.  Around 2018.

8    Q.  And how did you learn about him?

9    A.  I watch his YouTube video.

10   Q.  And what did you see in that video?

11   A.  He just stood on the terrace of that 18th floor of the

12   hotel and said something about the CCP, CCP did a lot of bad

13   things.  CCP just kind of evil.

14   Q.  Before watching that video, had you heard of Miles Guo?

15   A.  No.

16   Q.  You said this video was 2018, right?

17   A.  I think so.

18   Q.  In that year and 2019, how often, if at all, were you

19   watching Guo's videos?

20   A.  Not that lot about Miles Guo's video.  Actually, a lot

21   about Yading Gao's Luna press.  In that program Luna introduce

22   a lot of things about Miles Guo and people around him also

23   their activities.

24   Q.  By 2020, how often, if at all, were you watching Guo's

25   videos?

O6CBGUO4                         Minin Wu- Direct

1   A.  2020, around 2020 I think I watched from two times a week

2   to everyday.

3   Q.  Ms. Wu, what, if anything, did Miles Guo says about his

4   wealth?

5   A.  He said he was rich, very rich, billionaire.

6   Q.  What, if anything, did he say about his apartment, the one

7   you saw the video in?

8   A.  He said apartment so expensive, but you couldn't get into

9   that hotel, that apartment, just because if you are rich.  You

10  also need great social network to introduce you into.

11  Q.  What, if anything, did he say about his clothes?

12  A.  Clothes?  Browny.

13  Q.  I'm sorry.

14  A.  The brand is browny, a lot of suits from his brand.  Also

15  he said just couture type, not retail type.

16  Q.  What, if anything, did he say about the things he ate?

17  A.  Some thing like strawberry.  Once he said strawberry $5 or

18  $10 each.  Also some seafood from public sea, and he said some

19  of them almost it's extinct.

20  Q.  Ms. Wu, are you familiar with the Rule of Law Foundation?

21  A.  I heard about that.  I know it.

22  Q.  What was that?

23  A.  It should be a foundation established for the new China.

24  Q.  And around when was it established?

25  A.  I think should be 2029, sorry 2019.

O6CBGUO4                          Minin Wu- Direct

1    Q.  And who established it to your understanding?

2    A.  Miles Guo and Steve Bannon.

3    Q.  What, if anything, did Miles Guo say about donating his

4    money or his family's money to the Rule of Law?

5    A.  He said hundred millions.

6    Q.  Now, Ms. Wu, you said he had talked about how rich he was?

7    A.  Yes.

8    Q.  Did you believe Miles Guo could donate a hundred million

9    dollars to the Rule of Law?

10   A.  Yes, at that time, yes.

11   Q.  Did you donate to the Rule of Law?

12   A.  Yes.

13   Q.  About how many times and how much in total?

14   A.  I think should be six times, total should be $1200.

15   Q.  If Miles Guo had not donated a hundred million dollars to

16   the Rule of Law, would that have been important to you?

17              MR. SCHIRICK:  Objection.

18              THE COURT:  Overruled.  You may answer.

19   A.  Yes.

20   Q.  Why?

21   A.  He lied.

22   Q.  Ms. Wu, did there come a time when you tried to purchase

23   GTV shares?

24   A.  I invested in VOG.

25   Q.  And approximately when was that?

O6CBGUO4                      Minin Wu- Direct

1   A.   May 2020.

2   Q.   Approximately how much did you invest through VOG?

3   A.   14,000.

4   Q.   And where did you send your $14,000?

5   A.   VOG, Sara's account.

6   Q.   Did you send it in one transfer or more than one?

7   A.   More than one.

8   Q.   Why did you send it in more than one?

9   A.   I tried to send just in one transfer, but the bank just

10  denied it.

11  Q.   Were you told why the bank was rejecting your transfer?

12  A.   I did it online, so I didn't get any information about the

13  deny.

14  Q.   Ms. Wu, do you recall what the name on the account was that

15  you used to the send the $14,000 to VOG?

16        MR. SCHIRICK:   Objection, her account or the

17  destination account.

18  Q.   Your account, the account you used?

19  A.   I used several ones, my own name, joint account, and one of

20  my company's account.

21  Q.   What was the name of that company?

22  A.   Wonder Invest, LLC.

23  Q.   What is Wonder Invest, LLC, Ms. Wu?

24  A.   Actually this, I have this bank account a long time.   My

25  husband created it very long time ago.   Later he just gave this

O6CBGUO4                        Minin Wu- Direct

1    to me to play.

2    Q.  Ms. Wu, why did you send the money to VOG bank accounts?

3    A.  For GTV stock.

4    Q.  And why did you think you would get GTV stock by sending

5    this money to VOG?

6    A.  Miles Guo said so.  He said if you have money over hundred

7    thousand dollars, then just go to him.  If you have less money,

8    just go to Sara.

9    Q.  Why did you want to get shares of GTV?

10   A.  Miles Guo said that GTV should be the foundation of the new

11   China later.  You cannot imagine how great it will be, how

12   profitable it will be.

13   Q.  What, if anything, did Miles Guo say about GTV investor

14   profits?

15   A.  He said that many times, every time the number would be

16   higher than the previous one.  I just remember first maybe 17

17   times, and then I remember 100 times, then I didn't pay

18   attention.

19   Q.  At the time did you believe your investment would be very

20   profitable?

21   A.  I think maybe 10 times possible.  I think maybe 100 times a

22   little not that feasible.

23   Q.  What, if anything, did Miles Guo say about the value of

24   GTV?

25   A.  I remember 20 billion.

O6CBGUO4                          Minin Wu- Direct

1   Q.  Ms. Wu, what, if anything, did Miles Guo say about private

2   placements?

3   A.  He said this private placement would be the only chance for

4   us common people to have in our life.  He did a lot to get this

5   chance for us.

6   Q.  Had you participated in private placements before?

7   A.  No.

8   Q.  And, Ms. Wu, what, if any, personal guarantee did Guo make

9   about the GTV investment?

10  A.  Can you repeat.

11  Q.  What, if any, guarantees did Miles Guo make about the GTV

12  investment?

13  A.  He said he guarantee all our principals.

14  Q.  And you said he talked about how rich he was, did you

15  believe him when he said that?

16  A.  At that time, yes.

17  Q.  Ms. Wu, what, if anything, did Miles Guo say about sending

18  GTV investor funds to a hedge fund?

19  A.  I never heard about that.

20  Q.  Have you ever invested in a hedge fund yourself?

21  A.  No.

22  Q.  If you had known that Miles Guo was sending GTV investor

23  funds to a hedge fund, would you have invested?

24          MR. SCHIRICK:  Objection.

25          THE COURT:  Overruled.  You may answer.

```
1    A.  No.
2    Q.  Ms. Wu, did you ultimately get a refund of your GTV
3    investment?
4    A.  I got some refund from SEC.
5    Q.  Did you get a hundred percent or less than a hundred
6    percent refund?
7    A.  Around 92 percent.
8    Q.  Did Miles Guo pay back the missing eight percent?
9    A.  No.
10   Q.  Ms. Wu, were you a member of a farm?
11   A.  Once, yes.
12   Q.  And actually, Ms. Wu, just one moment first.
13          To go back to the SEC refund, what's your
14   understanding of why you got money back from the SEC?
15   A.  This investment is illegal, so it was under the supervision
16   of the SEC.  The SEC just refund it all investors.
17   Q.  And when did you receive your refund back?
18   A.  2023, I don't remember the month.
19   Q.  Ms. Wu, in order to get that refund from the SEC, what, if
20   anything, did you have to do?
21   A.  The SEC send email to me and just said something about the
22   refund and fair fund they set up for this refund process.  I
23   needed to fill the form, to give them my wire transfer
24   statements also agreement about the VOG, then submit the form.
25   I think just this.  I don't remember others.
```

O6CBGUO4                          Minin Wu- Direct

1   Q.  Ms. Wu, now you said you were a member of a farm, right?

2   A.  Was.

3   Q.  You were.  Which farm were you a member of?

4   A.  MOS.

5   Q.  MOS. What does MOS stand for?

6   A.  Mountain of Spice.

7   Q.  And when did you join Mountains of Spice or MOS?

8   A.  June or July 2020.

9   Q.  Where was MOS based?

10  A.  NYC.

11  Q.  Who led the MOS farm?

12  A.  At that time Xia Qidong.

13  Q.  And for the court reporter's benefit, could you spell that,

14  Ms. Wu?

15  A.  X-I-A, Q-I-D-O-N-G.

16  Q.  What other names, if any, did Xia Qidong go by?

17  A.  Changdao or Chang Dao Wengui.

18  Q.  Who did that mean?

19  A.  Changdao means Long Island.  Wengui means great brother.

20  Q.  Ms. Wu, what's your understanding of how Changdao became

21  the leader of the MOS farm?

22  A.  Miles Guo chose him.

23  Q.  And how do you know that?

24  A.  He said so.

25  Q.  When you say he, who said that?

1    A.  Miles Guo.

2    Q.  And where did he say that?

3    A.  In his video.

4    Q.  To your understanding who chose all the farm leaders?

5    A.  Miles Guo.

6    Q.  Who did you understand to give them instructions?

7    A.  Miles Guo.

8    Q.  Now, Ms. Wu, what, if any, volunteer work did you do for

9    the MOS farm?

10   A.  Translation.

11   Q.  What was the farm loan program?

12   A.  We members lend money to the farm to get the GTV stock.

13   Q.  Why did you understand that lending money to the farm would

14   get you GTV stock?

15   A.  He said so.

16   Q.  When you say he said so, who are you talking about?

17   A.  Miles Guo.

18   Q.  What, if anything, did Miles Guo say about why you had to

19   use loans instead of just investing in GTV?

20   A.  He said for that GTV private placement already finish,

21   already ended, so he created another chance for us to invest in

22   this GTV stock.  He call this step to equity.

23            THE COURT:  One moment.

24            (Pause)

25            THE COURT:  We're going to have to stop at this point.

1    You can step out, but do not discuss your testimony.  You'll

2    return tomorrow.  9:29 you'll be in the chair.

3              (Witness temporarily excused)

4              THE COURT:  Members of the jury, earlier I asked you

5    whether next week on Monday, Tuesday, Thursday and Friday you

6    could come between 9:30 and five, with an understanding that

7    there's a lunch break between one and two in order that we not

8    have to prolong the trial.  Is there anybody who cannot do

9    that?

10             JUROR:  We have a request if that's okay.

11             THE COURT:  Yes. Okay.

12             JUROR:  Instead of having one, one-hour-lunch for a

13   number of reasons, we're asking if we can break it up until two

14   half hour, one at 11:30 and one at 2:00.

15             THE COURT:  We can have two breaks.  I'm not sure if

16   I'm going to do it exactly when you're mentioned it, but I will

17   space it out.

18             JUROR:  Some of us can't be here seated for that long.

19             THE COURT:  Understood.  All righty then.  That brings

20   our work to a close.  Remember that you're not allowed to

21   discuss the case amongst yourselves or with anyone else.  Don't

22   permit anyone to discuss the case in your presence.  Don't

23   listen to, watch, or read anything from any source about

24   anything having to do with the subject matter of this trial.

25   Have a good evening.

O6CBGUO4                         Minin Wu- Direct

1            THE LAW CLERK:  Jury exiting.

2            (Jury not present)

3            THE COURT:  Is there anything before we close?

4            MS. MURRAY:  Nothing from the government.  Thank you.

5            MR. SCHIRICK:  Not from the defense, your Honor.

6            THE COURT:  Have a good evening.  Thank you.

7            (Adjourned to June 13, 2024, at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    HAITHAM KHALED

 4   Cross By Ms. Shroff  . . . . . . . . . . . .2205

 5   Redirect By Ms. Murray . . . . . . . . . . .2349

 6   Recross By Ms. Shroff  . . . . . . . . . . .2363

 7   Redirect By Ms. Murray . . . . . . . . . . .2368

 8   Recross By Ms. Shroff  . . . . . . . . . . .2368

 9   MININ WU

10   Direct By Mr. Fergenson  . . . . . . . . . .2369

11                  GOVERNMENT EXHIBITS

12   Exhibit No.                         Received

13    413 and 413-T  . . . . . . . . . . . . . .2355

14                  DEFENDANT EXHIBITS

15   Exhibit No.                         Received

16   60529  . . . . . . . . . . . . . . . . . .2338

17   60535  . . . . . . . . . . . . . . . . . .2313

18   60539  . . . . . . . . . . . . . . . . . .2245

19   60540  . . . . . . . . . . . . . . . . . .2332

20

21

22

23

24

25
```