O6D1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                     Defendant.            Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         June 13, 2024
                                           9:00 a.m.
 8
     Before:
 9
10                      HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                             APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6D1GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6D1GUO1

```
1                (Trial resumed; jury not present)
2                THE COURT:  Good morning.
3                MR. FERGENSON:  Good morning.
4                THE COURT:  Please make your appearances.
5                MR. FERGENSON:  Good morning, your Honor.  Micah
6    Fergenson, Juliana Murray, Justin Horton for the government;
7    also joined by our paralegal Isabel Loftus.
8                MR. SCHIRICK:  Good morning, your Honor.  Scott
9    Schirick, Sabrina Shroff, and Matt Barkan on behalf of Mr. Guo,
10   who also joins us here at counsel's table.
11               THE COURT:  Please be seated.
12               By letter dated June 12, 2024, the government states
13   that it will call Samuel Roberts, the head of financial
14   intelligence at Bitgo, which "provided certain services to the
15   Himalaya Exchange."  The government expects that Mr. Roberts
16   will testify about "his participation in Bitgo's reviews of its
17   business relationship with the Himalaya Exchange."
18   Specifically, Bitgo conducted two reviews--a preliminary due
19   diligence inquiry upon beginning its business relationship with
20   the Exchange in 2021, and another "more searching" review after
21   receiving a subpoena related to the Exchange.  As part of this
22   second review, Mr. Roberts communicated with Exchange
23   representatives, "evaluated information provided by the
24   Himalaya Exchange and from public sources," and recommended
25   that Bitgo terminate the relationship with the Exchange.
```

O6D1GUO1

1          By letter dated June 12, 2024, the defense states that

2     "certain of Mr. Roberts's anticipated testimony about factual

3     information he gathered may be admissible."  However, the

4     defense seeks to preclude the government from eliciting

5     Mr. Roberts's opinions as to whether Himalaya Coin and Himalaya

6     Dollar are cryptocurrencies, whether the Himalaya Exchange is a

7     cryptocurrency exchange, and the design/functions of Himalaya

8     Coin, Himalaya Dollar, and the Himalaya Exchange.

9          Early this morning, the government filed a response

10    stating that it does not intend "to ask Roberts his opinion

11    whether Himalaya Coin and Himalaya Dollar are cryptocurrencies

12    or whether the Himalaya Exchange is a cryptocurrency exchange."

13    Rather, the government represents that "Roberts would be

14    testifying about what he observed, what he was told by the

15    Exchange, and how that information impacted the review he

16    conducted and informed his recommendation that Bitgo terminate

17    its relationship with the Exchange."

18         To the extent that there is still a dispute between

19    the parties, the Court agrees with defendant that whether H

20    Coin and H Dollar are cryptocurrencies and whether the Himalaya

21    Exchange is a cryptocurrency exchange are questions that

22    require "scientific, technical, or other specialized knowledge"

23    within the meaning of Rule 702.  Indeed, both parties have

24    noticed experts to opine about these two questions.

25    Mr. Roberts, by contrast, has not been noticed as an expert

O6D1GUO1

1    witness.  Accordingly, the government shall not elicit his

2    opinions as to these two topics.

3           The Court shall not broadly preclude Mr. Roberts's

4    testimony about the design and function of Himalaya Coin,

5    Himalaya Dollar, and the Himalaya Exchange.  He may state that

6    he recommended that Bitgo terminate its relationship based on

7    his findings, but he may not offer general information about

8    the characteristics of cryptocurrency, nor may he offer an

9    opinion as to whether H Coin, H Dollar were cryptocurrencies

10   and whether the Exchange was a cryptocurrency exchange.

11          Is there anything further?

12          MR. FERGENSON:  One matter from the government, your

13   Honor.

14          We just wanted——we wanted to alert the Court so it's

15   aware.  We're discussing this with the defense actively.  But

16   we wanted to let the Court know——

17          To back up, for context, the government's——one of the

18   government's witnesses noticed for this week is Beau Collins.

19   He was the CEO of Mercantile Bank.  And as a refresher for your

20   Honor, Mercantile Bank was the——I think you could call it the

21   digital bank.  It was a Puerto Rico financial institution that

22   Hamilton, the William Je entity, was going to acquire.  Shortly

23   before that acquisition, the government executed its seizure

24   warrants on Hamilton's bank accounts.  That was the seizure of

25   the ultimately around $600 million or so.  Mr. Collins was the

O6D1GUO1

1    CEO of Mercantile.  The government was going to call him to

2    testify sort of about the Himalaya Exchange was a client of

3    Mercantile Bank and had bank accounts there.  The government's

4    going to call him to testify about that relationship and the

5    proposed acquisition and then the ultimate seizure of the

6    funds, which stopped the acquisition.

7            After the acquisition, there was an arbitration

8    between Mercantile and Hamilton, like a private arbitration

9    based on, to my understanding, like a contract dispute in the

10   purchase of sale agreement.  That was litigated in the

11   arbitration.  I think Mercantile won the arbitration,

12   ultimately filed for a con——I don't know the correct term——a

13   confirmation of the arbitration award in the S.D.N.Y.  I'm not

14   sure the status of that case, but the arbitration was done.

15           We received in mid-April——we requested and then

16   received in mid-April a production from Mercantile——mid-April

17   of this year.  That was in response to our request for any

18   testimony that Mr. Collins gave in the arbitration.  We

19   understood he had testified.  We received from Mercantile

20   the——I think you would call it the arbitration file, your

21   Honor.  On quick review, it appears to be the filings by the

22   parties in the arbitration, perhaps some correspondence or

23   discovery back and forth between the parties in the

24   arbitration, the arbitration award, and the hearing transcript

25   of the arbitration.  I think it was a two-day hearing.  That

O6D1GUO1

1    production was mistakenly not produced to the defense, the

2    mid-April of this year production.  We learned that last night.

3    We produced it to the defense immediately.  While it was being

4    uploaded, the government clicked through this production as

5    fast as we could to get a sense of what is in there.  That's,

6    you know, what my understanding—from that, that's my

7    understanding what it is.  We flagged what we thought was the

8    most pertinent part of that for Mr. Collins, which is his—I

9    believe in the arbitration they did direct testimony via

10   affidavit and then got crossed at the hearing.  So we flagged

11   his affidavit, the other Mercantile employee affidavits we saw,

12   and we flagged the hearing transcript, like the Bates numbers

13   for those, your Honor.  Unfortunately, it is a large number of

14   pages.  It's around 16,000 pages.  My understanding is that is

15   about 754 documents.  I think, from my clicking through very

16   quickly, my sense is the reason the page numbers is so much

17   larger than the document count is, your Honor could think of

18   like a motion for summary judgment where a party is filing a

19   brief to the arbitrators and attaching as exhibits, you know,

20   long contracts about the arbitration and due diligence

21   documents on Mercantile, that sort of thing.  But there's very

22   long exhibits to these filings.  That's my sense, on very quick

23   review of this.  We have not determined yet—although we want

24   to further review this to be further helpful to the defense on

25   the contents of this production, but we had received from

O6D1GUO1

Mercantile prior to this very voluminous production already in
response to a grand jury subpoena that had requested any and
all documents related to Hamilton and specified, including any
proposed merger transaction.  That was our grand jury subpoena
request.  In response to that, they had given us previously and
we had previously produced around 16,000 documents, which was
around 79,000 pages.  Now we have not confirmed that the
exhibits to these arbitration filings are duplicative of the
prior grand jury subpoena productions.  Topically, they——they
should be, but that's one thing that we want to look at to see
if we can flag anything for the defense that may be new, or
anything else that, in our judgment, may be particularly
pertinent to Mr. Collins's testimony or that we want to flag
for them so they can take a closer look at that.  As I said,
we're also just generally discussing this with the defense.
We're open to moving Mr. Collins's testimony to allow them more
time to review this, and we don't have an agreement as to
what——how to proceed with Mr. Collins.  He is not testifying
today no matter what.  We're open to ideas on how best to
accommodate it.  We want to be efficient with the jury's time
and the Court's time.  We're open to any number of options,
including possibly, you know, if the defense were open to this,
maybe Mr. Collins could do his direct on Friday but not get
crossed until Monday, give them additional time to review this
production and his direct testimony transcript, or even if they

O6D1GUO1

1  want us to just not call him until next week, we're open to

2  this.  We're discussing it.  I just wanted to alert the Court

3  to the issue and, you know, just as an FYI for this issue.

4            THE COURT:  Is there a table of contents for the grand

5  jury documents and for the arbitration documents?

6            MR. FERGENSON:  There's not a table of contents, I

7  don't believe so, your Honor.

8            THE COURT:  Does the defense have anything to say?

9            MR. SCHIRICK:  Your Honor, I can only comment to this

10  briefly.  Mr. Kamaraju is actually right now in the process of

11  trying to assess these materials because as Mr. Fergenson

12  noted, we just got them late last night.  So we're not at this

13  point able to sort of give a substantive assessment of what we

14  have.  Obviously we need to spend a little bit of time with it

15  to be able to do that.  But I would just note for the Court,

16  you know, that Mr. Collins was on the government's witness list

17  that they sent us on Saturday morning, so he was noticed, you

18  know, over the weekend, and, you know, we're just receiving

19  this information last evening.  And, you know, as I said,

20  Mr. Kamaraju I think a little bit later today will, after he's

21  had a chance to look at it, come and address the issue in more

22  detail.

23         I would just flag, in addition to the logistical

24  issues that the government has already raised about

25  Mr. Collins's testimony, you know, the sort of parallel issue

O6D1GUO1                          Wu - Direct

1    that I think we may find ourselves, depending on how we handle

2    Mr. Collins's testimony, with additional time at the end of the

3    day tomorrow.  It remains to be seen, obviously.  We would all

4    love if that were the case, if things moved that quickly.  But

5    to the extent that we do, we don't have any notice from the

6    government as to who else they may call at this point to take

7    that time.  So again, this is happening in realtime.  We

8    haven't had that much of a chance to discuss it with the

9    government, but I just flag that for the Court.

10           MR. FERGENSON:  And we appreciate that, your Honor,

11   and that's something else we're happy to discuss with the

12   defense and do everything we can to try and accommodate them.

13   You know, we can't promise there won't be mistakes, but if we

14   learn of them, we'll try and do the right thing when we do, and

15   that's what we're hoping to do here.

16           THE COURT:  Don't you have a bevy of folks who can be

17   comparing the two documents while you're on trial?

18           MR. FERGENSON:  I'm not sure we have a bevy, but that

19   is our plan, your Honor.  We're going to try and do that

20   comparison and flag anything further for the defense.

21           THE COURT:  Is there anything further?

22           MR. FERGENSON:  Not from the government.

23           MR. SCHIRICK:  Not from the defense, your Honor.

24           THE COURT:  All righty.  We'll reconvene at 9:30.

25   Please have the witness on the stand at 9:29.

O6D1GUO1                          Wu - Direct

1            MR. FERGENSON:  Yes, your Honor.

2            (Recess)

3            THE COURT:  Please have the jurors brought in.

4            (Jury present)

5            THE COURT:  Please be seated.

6            Good morning, jurors.

7            THE JURORS:  Good morning.

8            THE COURT:  We're going to continue with the direct

9   examination of the witness.

10           Please remember that you're still under oath.

11           You may inquire.

12           MR. FERGENSON:  Thank you, your Honor.

13    MINRAN WU, resumed.

14   DIRECT EXAMINATION CONTINUED

15   BY MR. FERGENSON:

16   Q.  Good morning, Ms. Wu.

17   A.  Good morning.

18   Q.  And Ms. Wu, when we broke yesterday, we were discussing the

19   farm loan program.  Do you remember that?

20   A.  Yes.

21   Q.  Did you participate in the farm loan program?

22   A.  Yes.

23   Q.  And did you send money to your farm?

24   A.  Yes.

25   Q.  How much did you send?

O6D1GUO1                              Wu - Direct

1   A.  $20,000.

2   Q.  And approximately when did you send the $20,000?

3   A.  August 2020.

4   Q.  And where did you send the 20,000?

5   A.  Mountains of Spice, LLC, something like that.

6   Q.  And what was the name on the account that you used to send

7   the money to Mountains of Spices?

8   A.  Wonder Invest, LLC.

9   Q.  And in connection with that transfer, did you sign a loan

10  agreement?

11  A.  Yes, should be.

12          MR. FERGENSON:  Ms. Loftus, could we show the witness

13  what's marked as Government Exhibit VN39.

14  Q.  Ms. Wu, is this the loan agreement?

15  A.  Yes.  Yes.

16          MR. FERGENSON:  The government offers Government

17  Exhibit VN39.

18          MR. SCHIRICK:  No objection.

19          THE COURT:  It is admitted.

20          (Government's Exhibit VN39 received in evidence)

21          MR. FERGENSON:  Could we please publish that.

22          All right.  And Ms. Loftus, if we could zoom on the

23  top half just to make the text larger for everyone.  That's

24  great.

25  BY MR. FERGENSON:

O6D1GUO1                        Wu - Direct

1   Q.  All right.  Ms. Wu, do you see at the top here it says Loan

2   Agreement?

3   A.  Yes.

4   Q.  And who is the borrower on this loan agreement?

5   A.  MOS Farm, Mountains of Spice Farm.

6   Q.  And who's the lender?

7   A.  Me.

8   Q.  What's the date for this loan agreement?

9   A.  August 12, 2020.

10  Q.  And under loan amount, do you see it says $20,000?

11  A.  Yes.

12  Q.  So focusing you on the paragraph 1(a) there, Use of

13  Proceeds, I'll go ahead and read that paragraph.

14  A.  Okay.

15  Q.  So it says, "Use of Proceeds:  The loan proceeds advanced

16  under this Agreement is for the general working capital

17  purposes of the Borrower."  And the Borrower is the farm,

18  right, Ms. Wu?

19  A.  Yes.

20  Q.  Now, Ms. Wu, did you read that before or after you sent the

21  money?

22  A.  I cannot remember because at that time a lot of things just

23  pushed together.  We were so hurry and hectic because they gave

24  us 24 hours to 48 hours, anyway, just a very short time to wait

25  our bank account information, because they use several bank

O6D1GUO1                          Wu - Direct

1    accounts, but they send each person different bank account.  I

2    don't know what they were, just that we needed to wait for our

3    own bank account.  After that, we need to wire the money

4    immediately, because they said those bank accounts would be

5    stopped at any time because of the CCP.  And then we need to

6    write an email to the email address they gave us, provided a

7    lot of stuff they required, and then just after, just to

8    send——we sent the email to the farm, we need to join a Telegram

9    group.  In that group, we needed to wait the confirmation from

10   them about our money.  So, very busy.  May——maybe just a——a

11   little——a little thing about the contract before sign, before

12   send the money, but to——I don't think I had a lot of time to

13   read it little by little, turn by turn.

14   Q.  And Ms. Wu, you explained yesterday that you understood

15   this loan agreement was to get GTV stock.  Do you recall that?

16   A.  Yes.

17   Q.  And the Use of Proceeds does not mention GTV stock, right?

18   A.  Yes.

19   Q.  What, if anything, were you told about why that was?

20   A.  They said they couldn't write clearly about that in this

21   contract just because of the CCP; because CCP always eyeing

22   this group, they couldn't do that.

23   Q.  And who told you that?

24   A.  Miles Guo said this.  Xia Qidong also said this.

25   Q.  And remind us again what Xia Qidong's other name is.

O6D1GUO1                           Wu - Direct

1   A.  Changdao or Changdao Weida.

2   Q.  What does that mean again?

3   A.  Changdao means an island, Weida is great brother.

4   Q.  And Ms. Wu, focusing on paragraph (c) of this contract, do

5   you see the——it says "interest rate."  What was the interest

6   rate?

7   A.  They said we borrowed our money to the farm, right, the

8   farm should give us this interest, 3 percent each year.

9           MR. FERGENSON:  And Ms. Loftus, if we could now scroll

10  down to page 7.

11  Q.  And Ms. Wu, did you sign this contract?

12  A.  Yes.

13  Q.  And who else signed it?

14  A.  Xia Qidong.

15  Q.  And now what was the date you signed the contract, Ms. Wu?

16  A.  August the 12th, 2020.

17  Q.  And what was the date that Xia Qidong signed the contract?

18  A.  November 2, 2021.

19  Q.  Over a year later?

20  A.  Yes.

21          MR. FERGENSON:  Now, Ms. Loftus, if we could scroll

22  down to page 9.

23  Q.  Ms. Wu, do you see it says Name of Entity and it says

24  Wonder Invest, LLC?

25  A.  Yes.

O6D1GUO1                        Wu - Direct

Q.  Can you remind us, what is Wonder Invest, LLC?

A.  It's my own company.

        MR. FERGENSON:  And if we could go to the next page,
Ms. Loftus, please.

Q.  All right.  Now, Ms. Wu, do you see this says Addendum at
the top?

A.  Yes.

        MR. FERGENSON:  And Ms. Loftus, maybe just to make it
easier to read, could we blow up the top half.

Q.  Okay.  I'll just go ahead and read paragraph 1.

        So paragraph 1 says, "Provision 1(a) of loan agreement
shall be modified as to follows.  The loan proceeds advanced
under this agreement may be used by the borrower at its
discretion without limitation, including but not limited for
working capital, political activities, loaning out to other
parties, and/or investment purposes."

        Ms. Wu, what, if anything, did Changdao say about this
addendum?

A.  I don't remember.

        MR. FERGENSON:  And if we could zoom out, please,
Ms. Loftus, and go to page 12, just another couple pages down.

        Keep going, please.

Q.  Okay.  Just to focus on when the addendum was signed,
Ms. Wu?

A.  November 5, 2021.

O6D1GUO1                          Wu - Direct

1    Q.  And that's when you signed it, correct?

2    A.  Yes.

3    Q.  And what was the date that Xia Qidong signed this?

4    A.  November 2, 2021.

5    Q.  And is that the same date that Xia Qidong signed the——or

6    Changdao signed the original loan agreement?

7    A.  Yes.

8         MR. FERGENSON:  Okay.  Now let's go back up,

9    Ms. Loftus.  Let's go back to page 12 of the document.  And

10   I'll ask you to please zoom, if you would, on paragraph 6,

11   please.

12   Q.  Okay.  So I'll go ahead and read paragraph 6, Ms. Wu.

13   A.  Okay.

14   Q.  It says, "The borrower shall have the right to unilaterally

15   terminate the loan agreement if the lender has committed or

16   commits the following:

17        "(a) lender defames, libels, insults, humiliates,

18   abuses, curses verbally or in writing, in public or secrecy,

19   Mr. Wengui Guo aka Miles Guo;

20        "(b) lender makes any statements or engages any

21   conducts that are against the missions of the Whistleblower

22   Movement (WM).  For the purpose of this loan agreement, WM is

23   defined as a combination of campaigns, actions and platforms

24   (including GTV) designated to disclose the criminal activities

25   of Chinese Communist Party (CCP) and spread the truth about

O6D1GUO1                          Wu - Direct

1    CCP's atrocity for the purpose of achieving the total and

2    complete destruction of the CCP; or

3              "(c) lender makes any statements or engages any

4    activities that are against the missions of the New Federal

5    State of China (NFSC).  For the purpose of this note, NFSC is a

6    semi state sovereignty created and initiated by Mr. Miles Guo

7    and supported by anti-CCP communities on June 4th 2020 at New

8    York with the mission of establishing a new China without CCP

9    to promote the universal ideas of rule of law, freedom, and

10   democracy to Chinese people."

11             Ms. Wu, we discussed the original loan agreement.  At

12   the time you received the loan addendum in November 2021, did

13   you read the addendum before signing it?

14   A.  No.

15   Q.  Why didn't you read the addendum before you signed it?

16   A.  At that time actually, I already thought about ask to

17   refund.

18   Q.  And why did considering asking for a refund, why did that

19   affect whether you read the contract?  Or the addendum.  Excuse

20   me.

21   A.  This was in November, right?  Actually, I began to doubt

22   this organization from April or May 2021st, because at that

23   time SEC published the settlement, the settlement with the GTV,

24   so I went to the website, read that documentation, then I felt

25   something not right; also some other things together.

1   Q.  And we'll talk about those things in a few minutes, Ms. Wu.

2   A.  Okay.

3         MR. FERGENSON:  Ms. Loftus, if we could just zoom out

4   and go back to page 12, just——oh, I'm sorry.  Page 14.  Excuse

5   me.

6   Q.  So Ms. Wu, just, could you explain why, if at the time you

7   were considering asking for a refund, why you still signed this

8   addendum.

9   A.  If I didn't do this, I definitely would no chance to ask a

10   refund.

11   Q.  And why do you say that?

12   A.  First, I heard a lot of people said if they asked a refund,

13   then they maybe——just maybe I——I cannot guarantee, because I

14   heard people said a lot of people already was expelled from

15   their farms because of their——refund request.  Then——

16         MR. SCHIRICK:  Your Honor, objection to the hearsay.

17         THE COURT:  Sustained.

18         MR. FERGENSON:  It's being offered for the effect of

19   why she signed the addendum, your Honor, not for the truth of

20   the out-of-court statement.

21         THE COURT:  In that case then, the answer stands.

22   BY MR. FERGENSON:

23   Q.  I'm sorry, Ms. Wu.  You were explaining why you signed the

24   addendum even though you were thinking about asking for a

25   refund.

O6D1GUO1                      Wu - Direct

1   A.  And then I——I just thought I needed a safe way to do this.

2   I hadn't defined a way at that time.  Then I had to sign this

3   first, and later, I think I will——I will do something.

4   Q.  When you say "do something," what do you mean?

5   A.  Find a perfect opportunity to do this.

6   Q.  And when you say "do this," what are you referring to,

7   Ms. Wu?

8   A.  Ask for a refund.

9   Q.  And did you——we'll talk about it later, but did you

10  ultimately ask for a refund from the farm loan?

11  A.  Yes.

12  Q.  Okay.  We'll turn to that in a moment.

13         Ms. Wu, what, if any, volunteer work did you do

14  related to farm loan transfers?

15  A.  In the group, just the farm——the MOS Farm established the

16  group to do the translation job for documentations needed in a

17  lawsuit.

18  Q.  And who was the lawsuit between?

19  A.  Between MOS Farm and the Phoenix Farm.

20  Q.  And who was in charge of the Phoenix Farm?

21  A.  At that time should be Sara Wei.

22  Q.  Now could you explain what sorts of documents were shared

23  in the chat group that was created by MOS for this, at a high

24  level.  What sorts of documents were shared in that group?

25  A.  Just all kinds of loan project from all——from——I don't know

1    if all farms, but definitely from various farms of the world.

2    Q.  And who would send these documents to the chat group?

3    A.  Zhang Yongbing and Xia Qidong were in charge of this group.

4    Zhang Yongbing and his assistant distributed this documentation

5    to us to do the translation.

6              MR. FERGENSON:  Ms. Loftus, could we please publish

7    what's in evidence as Government Exhibit 121.

8              If we could publish it.

9    Q.  Ms. Wu, who is this?

10   A.  This is Zhang Yongbing.

11   Q.  And what was his role at the MOS Farm?

12   A.  He was the legal group leader in the MOS Farm at that time.

13   Q.  And what was his position in the farms after that?

14   A.  After that, he was ascended to the Himalaya Alliance and

15   then to the Iron Blood Group.

16   Q.  Was——

17             THE COURT:  Does he go by any other name?

18             THE WITNESS:  Zhang Yongbing is his real name.  His

19   called name is Tang Gong Qi Xia (ph).

20   Q.  And Ms. Wu, could you spell Zhang Yongbing for the court

21   reporter.

22   A.  Zhang Yongbing.  Z-H-A-N-G, Y-O-N-G-B-I-N-G.

23   Q.  You said, Ms. Wu, he ascended to the Himalaya Alliance and

24   the Iron Blood Group.  What's the Iron Blood Group?

25   A.  It should be the core, the core of this organization, and

O6D1GUO1                          Wu - Direct

1    all members are Miles Guo's helpers.

2              MR. FERGENSON:  All right.  Ms. Loftus, if we can now

3    show just the witness what's marked as Government Exhibit VN7.

4    Q.  And Ms. Wu, you said Zhang Yongbing or his assistant shared

5    the documents with this chat group, correct?

6    A.  Yes.

7    Q.  Were some of the documents sent to you screenshots of text

8    messages, Ms. Wu?

9    A.  Yes.

10   Q.  Sorry.  I didn't——is this document now on your screen?

11   A.  Yes.

12   Q.  Is this one of the documents that Zhang Yongbing or his

13   assistant shared with the chat group?

14   A.  Yes.

15             MR. FERGENSON:  The government offers Government

16   Exhibit VN7.

17             MR. SCHIRICK:  Your Honor, voir dire?

18             THE COURT:  You may.

19   VOIR DIRE EXAMINATION.

20   BY MR. SCHIRICK:

21   Q.  Ms. Wu, you didn't create this document, did you?

22   A.  No.

23   Q.  Do you know when the document was created?

24   A.  No.

25   Q.  Do you know who created it?  And to be clear, I'm asking

O6D1GUO1                          Wu - Direct

1  who created the document, not who were the—what are the names

2  of the people that show up in the document.

3  A.  I don't know.  Should be the Iron Blood Group people.

4  Q.  But you don't know.

5  A.  Because they do this, not—no others can do this.

6  Q.  I understand.  I'm asking you what you know, not to

7  speculate on what may have happened.

8  A.  Okay.  I don't know.

9        MR. FERGENSON:  Your Honor, she answered the question.

10        MR. SCHIRICK:  We object.

11        THE COURT:  Overruled.  It is admitted.

12        MR. FERGENSON:  Could we publish this, please,

13  Ms. Loftus.

14  BY MR. FERGENSON:

15  Q.  All right.  Now—

16        MR. SCHIRICK:  Your Honor, before Mr. Fergenson begins

17  questioning, could we just have a brief sidebar?

18        THE COURT:  Yes.

19        (Continued on next page)

20

21

22

23

24

25

O6D1GUO1                          Wu - Direct

1              (At the sidebar)

2              MR. SCHIRICK:  So your Honor, we have a continuing

3     objection to this on the basis of hearsay and that it has

4     Mandarin language in it.  That's our objection.

5              MR. FERGENSON:  It's not hearsay.  It was sent by an

6     agent of Miles Guo to the MOS Farm; clearly a statement of an

7     agent.  Second, it's a screenshot of a text that Miles Guo was

8     in.  I don't see how it could be hearsay.

9              On the Mandarin translation, I'm happy——the vast

10    majority of this is in English.  I'm happy to just ask her

11    about the English-language portions.  We don't have a lot of

12    questions on this.  And if we want, we can get the limited

13    Mandarin text translated and send it to the defense.  We can

14    put that in evidence——

15             THE COURT:  So this came up before.  Any Mandarin

16    needs to be translated.  So you'll hold off on this and my

17    ruling is pending, shall we say.

18             MR. FERGENSON:  Okay.  I'll just skip it.

19             MR. SCHIRICK:  Just one point, your Honor.  I believe

20    the witness testified, notwithstanding what Mr. Fergenson

21    described as the province of this document, this witness

22    testified she has no idea who created it or where it came from.

23             MR. FERGENSON:  That's not true.  She said it was

24    shared in a chat that was sent to her within the chat and she

25    downloaded it from that.

O6D1GUO1                        Wu - Direct

1          MS. SHROFF:  She never said she downloaded it and—

2          MR. FERGENSON:  Right.  If you want me to ask her—

3          MS. SHROFF:  If I could just finish.  She did not say

4     she downloaded it and she did not say she created the document.

5     We should just be clear about what the record is so far

6     because—and we can always go back, but I don't believe there

7     was any testimony whatsoever that she downloaded it.

8          MR. FERGENSON:  You're correct.  I'm sorry.

9          THE COURT:  But she recognizes it.

10         MS. SHROFF:  I think she did say that.  But she never

11    said how that document was created, right?  He asked her, who

12    created the exhibit that's before you, so just—it's inaccurate

13    to say she downloaded it.

14         MR. FERGENSON:  On the created, you don't have to

15    create a document to be able to create a document.  It was sent

16    to her.  I'm happy to ask her that.

17         THE COURT:  So we'll wait on the translation, but to

18    the extent you have other ones, if it was sent to her and she

19    recognizes it, it's going to come in.

20         MR. SCHIRICK:  We're making a hearsay objection, but

21    we understand, your Honor.

22         THE COURT:  This is the statement of conspirators, or

23    alleged conspirators.  Let's go.

24              (Continued on next page)

25

O6D1GUO1                          Wu - Direct

1                    (In open court)

2                    THE COURT:  You may continue.

3                    MR. FERGENSON:  Thank you, your Honor.

4                    Okay.  Ms. Loftus, could we show the witness now

5     what's marked as Government Exhibit VN13.

6     BY MR. FERGENSON:

7     Q.  And Ms. Wu, is this another document that was shared in

8     that chat group?

9     A.  Yes.

10                   MR. FERGENSON:  Government offers Government Exhibit

11    VN13.

12                   MR. SCHIRICK:  Your Honor, voir dire?

13                   THE COURT:  You may.

14    VOIR DIRE EXAMINATION.

15    BY MR. SCHIRICK:

16    Q.  Ms. Wu, again, you didn't create this document, correct?

17    A.  Several people created together.

18    Q.  So my question was:  Did you create the document?

19    A.  I did some.

20    Q.  You created some part of this document?

21    A.  Yes.

22    Q.  Okay.  Do you know if this was the final version of this

23    document?

24    A.  Can I move——move it?

25                   MR. FERGENSON:  Ms. Loftus, if you want to scroll down

O6D1GUO1                              Wu - Direct

1    slightly.

2              You can keep scrolling, Ms. Loftus.

3    A.  There is no grand total.

4    BY MR. SCHIRICK:

5    Q.  Okay.  Do you know what the source of this information is,

6    source of the information displayed in this document?

7    A.  You see the file number?  Those file numbers just different

8    screenshots that Zhang Yongbing distributed to us.

9    Q.  I'm sorry.  Could you explain that again.

10   A.  The file number, that column, the file number column, MLP,

11   all just—

12   Q.  Oh, file number.  I see.  Okay.  Go ahead.

13   A.  Each one stands for one screenshot.  We did the

14   translation.

15   Q.  Okay.  And my question was:  Do you know what the source is

16   of the financial information in this document?

17   A.  What do you mean source?  Source from the screenshots they

18   gave us, the screenshots they asked from different farms.

19             MR. FERGENSON:  And was the first exhibit we looked at

20   an example of those screenshots?

21             THE WITNESS:  Yes, yes.

22             MR. SCHIRICK:  Your Honor, same objection.

23             THE COURT:  You received this document in the chat,

24   correct?

25             THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6D1GUO1                         Wu - Direct

1                    THE COURT:  It is admitted.

2                    (Government's Exhibit VN13 received in evidence)

3                    MR. FERGENSON:  Thank you, your Honor.

4             We could publish it to the jury, just quickly.

5             We can scroll up to the top.

6    BY MR. FERGENSON:

7    Q.  So Ms. Wu, do you see in row 1 it says "Note" in red text?

8    A.  Yes.

9    Q.  I'll just read the note.  It says, "Note: the following

10   amounts have either been transferred or were confirmed by farm

11   owners to have been transferred to Maywind."

12             Ms. Wu, do you recall what──in Receiver column it says

13   Maywind Trading LLC.  Do you recall what that was?

14   A.  Should be one of the bank or bank accounts of the Phoenix

15   Farm.  It's just used to receive loan program funds from that

16   farm members.

17             MR. FERGENSON:  Ms. Loftus, if we could scroll down

18   towards the bottom, please.  Keep going.

19   Q.  And Ms. Wu, do you see on this Excel it says the total is

20   $39,872,527?

21   A.  Yes.

22             MR. FERGENSON:  All right.  And Ms. Loftus──I'm sorry.

23   If we could scroll back up quickly, just because we covered

24   this when the jury didn't see it.

25   Q.  Under the column File Number, the column B, Ms. Wu──

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6D1GUO1                           Wu - Direct

1    A.  Yes.

2    Q.  ——do you see how there's numbers with MLP in the entries

3    beneath that column?

4    A.  MLP.

5    Q.  Well, for example, in row 3 it says MLP 0011-7?

6    A.  Yes.

7    Q.  Could you just explain again, while the jury can see it,

8    what that is a reference to.

9    A.  M means Maywind.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6DBGUO2                          Minran Wu - Direct

1    BY MR. FERGENSON:

2    Q.  These file numbers, are these references to the sorts of

3    screenshots we looked at first?

4            MR. SCHIRICK:  Objection.

5            THE COURT:  Sustained.

6    A.  Yes.

7            THE COURT:  You can't answer. The answer is stricken.

8    Q.  Could you explain what these are references to, Ms. Wu?

9    A.  "M" means Maywind.  "L" means lawsuit.  "P" means Phoenix

10   Farm.  And that four numbers up these letters identify

11   different farm.  For example, 0011 just MOS farm, Himalaya New

12   York MOS.

13           And seven, before this, Zhang Yongbing ask his

14   assistant to send table to different farms to let the farm

15   owner or related person to fill that table.  That table

16   included ten questions; such as, when did your farm started

17   this loan program; when did your farm send the first amount to

18   Maywind; how much total about your loan program, etc., etc. I

19   cannot remember all of the ten questions.  So according to each

20   farm's answers about that table; one, just question one; two

21   just question two.  Here, seven, just for the question seven.

22   The screenshot about that question seven included some money

23   amount or bank information and just use those information to

24   fill this form.  Also, some farms also send some related bank

25   statement wire transfer details.

O6DBGUO2                        Minran Wu - Direct

1   Q.  Ms. Loftus, if we could show the witness what's marked as

2   Government Exhibit VN-12.

3           MR. SCHIRICK:  Your Honor, same objection.

4           MR. FERGENSON:  I'll offer it in a moment, your Honor.

5   Q.  Is this the document that was shared in the chat group,

6   Ms. Wu?

7   A.  Yes.

8   Q.  And by the way, Ms. Wu, the documents that were shared in

9   the chat group that we looked at, did you provide these

10  documents to the government?

11  A.  Yes.

12          MR. FERGENSON:  The government offers Government

13  Exhibit VN-12.

14          MR. SCHIRICK:  Same objection.

15          THE COURT:  It is admitted.

16          (Government's Exhibit VN-12 received in evidence)

17  BY MR. FERGENSON:

18  Q.  All right.  Ms. Loftus, maybe we can minimize the top bar

19  so we can see more of this excel, and we could scroll up, if we

20  could just scroll down slightly.

21          Now, Ms. Wu, I want to focus you on row 37, where it

22  says row zero to 35 and it gives a grand total.  What's the

23  grand total there listed in blue?

24  A.  Just added together the above transfer amount.

25  Q.  And does that say $106,489,540?

O6DBGUO2                         Minran Wu - Direct

1    A.  Yes.

2    Q.  Now I want to scroll back up slightly, Ms. Loftus.  We can

3    just look at one example.  You can go up to row 17.

4            So, Ms. Wu, this row says the amount is $30.8 million.

5    Do you see that?

6    A.  Mm hm.

7    Q.  And it says sender, and then there's a question mark, and

8    then it says receiver and there's a question mark, and the

9    receiver is Abu Dhabi.  Do you see that?

10   A.  Yes.

11   Q.  Do you know why there are question marks here?

12   A.  All this information from screenshot from Sara.  And in

13   that screenshot, Sara just list these three to Abu Dhabi LA and

14   G Service, but didn't mention where from, so question mark

15   here.

16           But we didn't have any details; for example, bank

17   statement, wire transfer statement to show Abu Dhabi LA

18   G Service, so question mark.

19   Q.  Do you know why money was sent to Abu Dhabi?

20   A.  I don't know.

21   Q.  You can take that down, Ms. Loftus.

22           Now, Ms. Wu, do you know how if at all your $20,000

23   was spent after you sent it to the MOS farm?

24   A.  I don't know.

25   Q.  Did you ever receive GTV stock for your loan?

O6DBGUO2                         Minran Wu - Direct

1   A.  No.

2   Q.  Did you ever receive interest payments for your loan?

3   A.  No.

4   Q.  What, if anything, Ms. Wu, did Miles Guo say in his

5   broadcast about using investor money for himself?

6   A.  No.

7   Q.  What did he say?

8   A.  He said nobody can touch our money, even a penny safe, all

9   safe.

10  Q.  If you had known Miles Guo used investor money for personal

11  expenses, would you have invested in the farm loan program?

12          MR. SCHIRICK:  Objection.

13          THE COURT:  You may answer.

14  A.  No.

15  Q.  Would you have invested in anything he promoted?

16          MR. SCHIRICK:  Objection.

17          THE COURT:  You may answer.

18  A.  No.

19  Q.  Ms. Wu, did there come a time as you mention before when

20  you asked for a refund of the farm loan program money you sent?

21  A.  September 2022.

22  Q.  And we'll talk about the timing, but did you get a refund?

23  A.  Yes.

24  Q.  Did the refund include any interest?

25  A.  No.

O6DBGUO2                          Minran Wu - Direct

1    Q.   Did the refund include any GTV stock?

2    A.   No.

3    Q.   When you requested your refund, who did you talk to about

4    that in September 2022?

5    A.   First I contact G Series volunteer in the MOS farm, and she

6    said she would contact Xia Qidong about this and then let me

7    wait.  I waited several weeks.  Nothing happened, so I contact

8    that volunteer again.  And the volunteer said maybe Xia Qidong

9    forgot about that, and she would ask him again.  And later Xia

10   Qidong contact me through email, and we talked several times.

11           He ask some question, also let me sign a refund

12   agreement about my bank account, and then he said he would give

13   me a paper check, so later I got a paper check.

14   Q.   We'll come back to the timing of when you requested it.

15   But let me ask, Ms. Wu, did there come a time when you sent

16   money to G/Clubs?

17   A.   October 2020.

18   Q.   How much did you send to G/Clubs?

19   A.   10,000.

20   Q.   Where did you send that money?

21   A.   G/Clubs Operating, LLC.

22   Q.   And what was the name on the account that you used to send

23   the money to G/Club?

24   A.   Joint account.

25   Q.   And, Ms. Wu, why did you send $10,000 to G/Club?

O6DBGUO2                        Minran Wu - Direct

1   A.   GTV stock.

2   Q.   Why would you think you would get GTV stock by sending

3   money to G/Clubs?

4   A.   Miles Guo said.

5   Q.   Where did Miles Guo say that?

6   A.   In his video, maybe several videos.

7   Q.   Did you get GTV shares?

8   A.   No.

9   Q.   What benefits, if any, did you get from your G/Clubs

10  membership?

11  A.   I didn't get anything.

12  Q.   What's G Fashion, Ms. Wu?

13  A.   Miles Guo created that website to sell fashion such as

14  clothes, jewelry.

15  Q.   And what connection, if any, was there between G Fashion

16  and G/Clubs?

17  A.   If you have G/Club membership, you can get some kind of

18  discount when you make purchase of G Fashion.

19  Q.   Did you ever buy G Fashion?

20  A.   No.

21  Q.   Why not?

22  A.   I don't like it, not my style, and ridiculously expensive.

23  Q.   So, Ms. Wu, why did you pay $10,000 for a G/Clubs

24  membership?

25  A.   GTV stock.

O6DBGUO2                        Minran Wu - Direct

1    　　　　MR. SCHIRICK:  Objection, asked and answered.

2    　　　　THE COURT:  Overruled.

3    Q.  Ms. Wu, did you ever request a refund of the money you sent

4    to G/Clubs?

5    A.  Yes.

6    Q.  Around when did you do that?

7    A.  December 2022.

8    Q.  You mentioned you requested a refund of the farm loan in

9    September 2022 earlier?

10   A.  Yes.

11   Q.  Why did you wait until December of 2022 to ask for G/Club

12   refund?

13   A.  Before the G/Club refund request, actually I ask for H Coin

14   refund.

15   Q.  And so what was the timing?  If you could walk us through

16   the timing of your refund request, and we'll talk about H Coin

17   in a moment?

18   A.  I felt loan program maybe the easiest one to ask for

19   refund, so I did it first.

20   Q.  And why did you think the farm loan program would be

21   easiest?

22   A.  Before I heard Xia Qidong was under government

23   investigation and more and more investigation put on him, and I

24   got a chance to translate some emails among Xia Qidong and some

25   other MOS members.  In those emails, they discuss about the

O6DBGUO2                              Minran Wu - Direct

1  loan program refund.  At that time in those emails Xia Qidong

2  behave a little reasonable, so I felt a good sign for me to go

3  ahead.

4  Q.  And why didn't you ask for refunds from all the investment

5  projects at the same time?

6  A.  I was afraid they just expel me from the farm, I would got

7  nothing.

8  Q.  And why were you concerned about being expelled from the

9  farm for asking for refunds?

10  A.  They do this.  They did this a lot.

11  Q.  What did Alliance members call people who were expelled

12  from the farms that way after asking for refunds?

13        MR. SCHIRICK:  Objection.

14        THE COURT:  Overruled.  You may answer.

15  A.  CCP spy.

16  Q.  Ms. Wu, to bring you back to the G/Clubs refund request,

17  how did you request your G/Clubs refund?

18  A.  I ask the farm first, but the farm said none of their

19  business.  I should go to G/Clubs to ask them.  So I log on

20  G/Club and ask the online agent.  Then G/Club send me email to

21  let me fill a refund request form.  I filled it and submitted

22  it, and nothing happen till now.

23  Q.  How often, if at all, were you emailing G/Clubs?

24  A.  In about a year, I wrote to them everyday.

25  Q.  Did you ever get an answer?

O6DBGUO2                          Minran Wu - Direct

1    A.  Machine answers.

2    Q.  Do you recall what the machine answer said?

3    A.  Our staff will review your request, something like that.

4    Q.  Ms. Wu, did you ever get your G/Clubs money, the $10,000

5    back?

6    A.  No.

7    Q.  Did you ever get, for this money transfer, did you ever get

8    any shares in GTV or any other company?

9    A.  No.

10   Q.  Ms. Wu, what was the H Coin quota?

11   A.  It is complicated formula to calculate the number of

12   H Coins you should get according to your previous investment,

13   including your Rule of Law Foundation donation.

14   Q.  What was the price of each H Coin in someone's H Coin

15   quota?

16   A.  10 cent each coin.

17   Q.  Ms. Loftus, if we could show the witness what's marked as

18   Government Exhibit VN-37.

19          What's this document, Ms. Wu?

20   A.  H Coin agreement.

21          MR. FERGENSON:  The government offers Government

22   Exhibit VN-37.

23          MR. SCHIRICK:  No objection.

24          THE COURT:  It is admitted.

25          (Government's Exhibit VN-37 received in evidence)

O6DBGUO2                          Minran Wu - Direct

1    Q.   Is this your H Coin agreement, Ms. Wu?

2    A.   Yes.

3    Q.   Which farm was it with?

4    A.   MOS farm.

5    Q.   And Ms. Loftus if we could zoom on the middle paragraph

6    there, the larger paragraph.

7              I'm not going to read the entirety of the paragraph,

8    Ms. Wu, but how many H Coins were you in your H Coin quota?

9    A.   44,500.

10   Q.   And what was the price of each of those H Coin?

11   A.   Ten cents each.

12   Q.   If we could zoom out and go to page six, Ms. Loftus,

13   please.

14             Did you sign this document, Ms. Wu?

15   A.   Yes.

16   Q.   What was the date you signed it?

17   A.   October 28, 2021.

18   Q.   Who else signed it?

19   A.   Xia Qidong.

20   Q.   Let's zoom out, Ms. Loftus.  And if we can go back up

21   slightly to page two.  And if we could zoom on paragraph five

22   through the bottom.  I'll just read a little bit of this,

23   Ms. Wu.

24             It says, a material term of this letter of agreement

25   is that you hereby irrevocably consent fully and indefinitely

O6DBGUO2                        Minran Wu - Direct

1    complying with the following warranties and undertakings.  You

2    warrant and confirm that you are a member of the HF, and

3    therefore subscribe to the rules and ideology of the HF.

4            And we can zoom out, go to page three, please.  If we

5    could zoom on the one through four Roman numerals.  I'll read

6    these, Ms. Wu.

7            You undertake to not taking any action, endorsing any

8    action or facilitating any action, whether directly or

9    indirectly anything which is intended to or goes against the

10   core values and ideals of HF.  I'll skip ahead a little bit and

11   reading II.  It says, you undertake to not take any action --

12   and skip ahead slightly -- which is intended to or could

13   potentially hurt or damage the mission and ideology of HF.

14           Number three says, You undertake to not demonstrate --

15   skip ahead a little bit -- any support or benefit in any form

16   to the Chinese Communist Party or CCP or any CCP officials.

17   Number four says, You undertake to not take any action --

18   skipping ahead -- which is intended to or could potentially

19   hurt or damage the reputation or operation of the exchange.

20           Ms. Wu, what's your understanding of what these means?

21   A.  Non-sense.

22   Q.  I'm sorry, Ms. Wu.

23   A.  I feel this is non-sense.  I don't understand why write

24   these terms.

25   Q.  What's your understanding of what happens if you criticize

O6DBGUO2                        Minran Wu - Direct

1    the movement?

2              MR. SCHIRICK:  Asked and answered.

3              THE COURT:  Sustained.

4    Q.  If we could zoom out.  If we could go back down to the

5    signature page, page six.

6              Now, Ms. Wu, you signed this October 28, 2021.  Did

7    you send money to pay for your H Coin quota?

8    A.  Actually, I paid for the H Coin in April 2021.  I don't

9    remember if I remember correctly, I don't remember at that time

10   I had this agreement.

11   Q.  And about how many did you pay in April 2021?

12   A.  Less than $5,000.

13   Q.  Did you send -- withdrawn.  We can go ahead and take this

14   down for now, Ms. Loftus.

15             Where did you send your a little less than $5,000 for

16   the H Coin quota?

17   A.  They gave me a personal account to send my money into.

18   Q.  When you say they gave you, who gave you the personal

19   account?

20   A.  Volunteer, G Series volunteer.

21   Q.  And what was the name on the account that you used to send

22   the H Coin quota money?

23   A.  I don't remember, joint account or my own account.

24   Q.  Ms. Wu, why didn't you send the H Coin quota money directly

25   to the Himalaya Exchange?

O6DBGUO2                              Minran Wu - Direct

1    A.   They didn't give us any account related to Himalaya

2    Exchange.

3    Q.   What was the Alliance Foundation?

4    A.   They said later, very later, just this is the foundation to

5    hold our H Coins and do the digital currency operation to get

6    better profit for us.

7    Q.   And did you, as a general matter, Ms. Wu, what's your

8    understanding of who could invest directly, buy H Coins

9    directly through the Himalaya exchange?

10   A.   Should be farm members who are not in America and Japan,

11   maybe Canada.  I don't remember, but definitely USA and Japan.

12   Q.   What, if any, commissions did you have to pay by not

13   sending money directly to Himalaya Exchange?

14   A.   Five percent.

15   Q.   Where would that five percent commission go?

16   A.   I don't know.

17   Q.   Ms. Wu, why did you send this money in April 2021 to buy

18   the H Coin quota?

19   A.   Miles Guo said that this digital currency would be the

20   leading digital currency in the world in the future.  At that

21   time already many countries including famous financial

22   institutions may interested in or may already bought those

23   H Coins for themselves.  So take your seats.  This your chance,

24   and then they used our previous investment to calculate the

25   quota, so why not.

O6DBGUO2                           Minran Wu - Direct

1   Q.   When you use the phrase "Take your seats," that's something
2   Miles Guo said.  What was your understanding of what take your
3   seats meant?  What are you referring to?
4   A.   Not everyone has this chance.  You are so lucky to have
5   this chance so you cannot lose it anyway because you will never
6   have this chance in your life anymore.
7   Q.   What, if anything, did Guo say about H Coins in gold?
8   A.   Excuse me.
9   Q.   What, if anything, did Guo say about H Coins and gold?
10  A.   He said Himalaya Exchange has 20 percent gold as the
11  reserve.
12  Q.   And was this 20 percent gold reserve important to you?
13  A.   Yes.
14  Q.   Could you explain to the jury why that was important to
15  you?
16  A.   First, if financial institution has this ability to buy 20
17  percent gold as the reserve, this institution's financial
18  ability should be very good.
19          And second I have the impression that many banks in
20  the world, including federal reserve, they all have gold as
21  their reserve, so this sounds so formal.
22  Q.   Ms. Wu, did you ever have an account at the Himalaya
23  Exchange?
24  A.   No.
25  Q.   To your knowledge were there ever H Coins held in your name

O6DBGUO2                          Minran Wu - Direct

1   or your account on the Himalaya Exchange?

2   A.  No.

3   Q.  Did you ever request that your H Coin quota money be

4   returned?

5   A.  Yes.

6   Q.  And around when did you do that?

7   A.  After the loan program refund, about October 2022.

8   Q.  Did you get that money back?

9   A.  Most part after almost half year.

10  Q.  And how much money did you receive back approximately?

11  A.  4,500, around that.

12  Q.  Did you get back the five percent commission?

13  A.  No.

14  Q.  Did Miles Guo pay back what you lost?

15  A.  No.

16  Q.  Ms. Wu, you said at the beginning of your testimony you're

17  no longer a follower of Miles Guo.  What caused you to have

18  doubts about the movement?

19  A.  First, the SEC, the settlement of GTV.  Before SEC declared

20  this, Miles Guo and his helpers never mention anything about

21  this.  Then the translation for that lawsuit.  I got so many

22  screenshots show so many things.

23          For example, Sara Wei open more than 170 bank

24  accounts.  I just felt so weird about this.  Is that normal?  I

25  don't know.  Because at this time, I still trusted Miles Guo

O6DBGUO2                         Minran Wu - Direct

1    and this organization, but I just felt some kind of a weird

2    things here.  Also before that I already felt not that free

3    speech inside this group.  People shouldn't criticize Miles Guo

4    and people around him, close to him, you should be careful

5    about what you said and what you wrote.  So then later, I just

6    heard government begin to investigate some people such as Xia

7    Qidong.  Also they were so reluctant to sign back this

8    contracts to us, although those contracts have a lot of flaws

9    inside.  I don't know why.

10        So little by little, I just -- also they send people

11   to protest in front of homes and workplaces of those people who

12   criticize Miles Guo with invoking pictures and language.

13   Sometimes it turn to violence.  Some people were sent to

14   hospital because of this.  Also, Miles Guo just use volunteers

15   to death.  I don't know why.  Just the moments after moments,

16   events by events, never stopped.  Just left you no time to

17   think others, no time to get touch with others.  I heard Miles

18   Guo said by himself in his video, one volunteer was send to

19   hospital because of the overstress of the volunteer work.  But

20   Miles Guo said we shouldn't like CCP, just the manner of

21   abusing people.  This kind of abusing.  I don't know why.  Just

22   volunteer, right.  Why so hard?

23        Also for H Coins.  They said this would be the most

24   secured digital currency in the world.  One day they said,

25   millions or tens of millions H Coins disappear, missing.  They

O6DBGUO2                         Minran Wu - Direct

1    couldn't locate them, okay.  Also for the H Coin lockup.

2    Before they promised for us who put those H Coins into famous

3    digital currency institution, we could redeem our H Coins at

4    any time as long as that institution already have our coins at

5    least six months. Never happened.

6          Actually, several months later, I don't remember exact

7    time Miles Guo said they needed to lock our H Coins at least

8    three years.  Nobody can touch it.  And before the arrest of

9    Miles Guo, one Iron Blood Group member said we needed to lockup

10   our H Coins maybe at least ten years.  A lot of other things,

11   just little by little.

12   Q.  Ms. Wu, to go back to a couple of things you said.  One

13   thing was the H Coin.  Just so we understand the last thing you

14   were discussing, what was the H Coin lockup?

15   A.  Just they didn't want people to get their money back from

16   H Coin.  This is my understanding.  So they don't want you

17   touch H Coin.  You cannot get any money from them.

18   Q.  You also mentioned free speech and protest.  What sorts of

19   protests did you watch?

20   A.  I didn't like watch it, just listen to what they said about

21   this protest.  For example, SEC protest.  One person who

22   criticize Miles Guo a lot who is in Canada, they protest three

23   times.  Each time 10 days, 20 days.  I don't remember exactly.

24   And they using a lot of invoking pictures, also including

25   neighbors, friends, family.

O6DBGUO2                        Minran Wu - Direct

1   Q.  And what, if anything, did the Alliance say about people or
2   call people who were being protested?
3           MR. SCHIRICK:  Asked and answered.
4           THE COURT:  Overruled.  You can answer.
5   A.  You mean Miles Guo call them?
6   Q.  Yeah, what did Miles Guo call them?
7   A.  CCP spy.
8   Q.  And what effect did these sorts of -- this about CCP spies,
9   what effect did that and the protest have on your doubts?
10          MR. SCHIRICK:  Objection, asked and answered.
11          THE COURT:  Overruled.  You may answer.
12  A.  Why so many CCP spies around us, I don't know.  I feel
13  that's ridiculous.
14  Q.  Now, Ms. Wu, did Miles Guo ever talk about being targeted
15  by the CCP?
16  A.  Yes.
17  Q.  What sorts of things did he say?
18  A.  He said he was -- okay.  He said the CCP wanted to kill
19  him.  He said CCP arrest his family and almost to him, but he
20  escape it.  He said CCP seized his property, his assets,
21  something like that.
22  Q.  Ms. Wu, if it were true that Miles Guo was targeted by the
23  CCP, does that change your view of the investment projects?
24  A.  No.
25  Q.  Does it change your view of the movement?

O6DBGUO2                        Minran Wu - Direct

1   A.  No.

2   Q.  Why doesn't it change your view?

3   A.  This movement just a scam.  I don't think it's related

4   anything to the CCP.  Also if somebody is anti-CCP, it doesn't

5   mean this guy could scam somebody else.  That's different

6   things.  You cannot use this anti-CCP to do something illegal.

7   Q.  What do you mean by that?

8   A.  Just, for example, you scam money, now you said you scam

9   money for anti-CCP.  I just cannot understand.  If you anti-CCP

10  and you scam money, you think you better than the CCP?

11  Q.  Ms. Wu, overall did you make money or lose money from your

12  investment?

13  A.  I lost some.

14  Q.  How much did you lose approximately?

15  A.  Around $15,000.

16  Q.  Did Miles Guo personally pay back the $15,000?

17          MR. SCHIRICK:  Objection.

18          THE COURT:  Overruled.  You may answer.

19  A.  No.

20  Q.  Did you ever ask him one-on-one to do that?

21  A.  No.

22  Q.  Were you ever in one-on-one communication with him?

23  A.  No.

24  Q.  Ms. Wu, sitting here today are you still anti-CCP?

25  A.  Yes.

O6DBGUO2                          Minran Wu

1   Q.  Do you still trust Miles Guo?

2   A.  No.

3   Q.  Why not?

4            MR. SCHIRICK:  Asked and answered, your Honor.

5            THE COURT:  Overruled.  You may answer.

6   A.  He just a liar.  He's very good at acting and cheating, but

7   I feel he's not honest, reliable, credible, not a decent guy to

8   be trusted in any way.

9            MR. FERGENSON:  No further questions.

10           THE COURT:  Cross examination.

11  CROSS-EXAMINATION

12  BY MR. SCHIRICK:

13  Q.  Ms. Wu, you were born in China; is that right?

14  A.  Yes.

15  Q.  You came to the US in 2001?

16  A.  Yes.

17  Q.  And you have a postgraduate degree in computer science,

18  right?

19  A.  Yes, master.

20  Q.  A master's in computer science.  So you worked as a

21  computer programmer?

22  A.  Yes.

23  Q.  And are you retired now?

24  A.  I retired myself.

25  Q.  Fair enough.  And when did you retire?

O6DBGUO2                    Minran Wu

1  A.  2010.

2  Q.  And your husband, he still works?

3  A.  Yes.

4  Q.  And he works as a computer programmer?

5  A.  Yes.

6  Q.  And where does he work?

7  A.  A medicine company.

8  Q.  That's okay.  I'll move on.

9       You said you first heard of Miles Guo in 2018, right?

10  A.  Yes.

11  Q.  Because you saw some of his videos online?

12  A.  Yes.

13  Q.  And that was on YouTube?

14  A.  Yes.

15  Q.  And I believe you testified that in 2020 you started

16  watching Mr. Guo's videos just about everyday?

17  A.  From one, two times a week to everyday, not from the

18  beginning everyday.

19  Q.  Okay.  But up to a point everyday?

20  A.  Yes.

21  Q.  And is it fair to say that his videos were anti-CCP in

22  2020?

23  A.  He said something about CCP badness, that's it, and some

24  kind of a gossip inside the CCP.

25  Q.  Right.  The gossip you refer to is, he was exposing what he

O6DBGUO2                          Minran Wu

1    believed were some of the secrets of the CCP, right?

2    A.  Yes.

3    Q.  And now you were already anti-CCP before you were

4    introduced to Mr. Guo's videos, right?

5    A.  At that time actually I maybe inside was, but I didn't

6    realize that clearly.

7    Q.  And you had done some of your own research on the Chinese

8    Communist Party around this time, right?

9              THE COURT:  Around what time.

10             MR. SCHIRICK:  Around 2020, your Honor.

11   A.  Actually before that from my family's history and

12   experience, I already notice a lot about that.  That is why

13   when I watched Miles Guo video, I thought he said something

14   true.

15   Q.  And your family experience was partially based on the fact

16   that your parents were ill, right?

17   A.  My parents illness you mean?

18   Q.  Yes.

19   A.  Not only about that.

20   Q.  Well, in part is my question.

21   A.  Yes.

22   Q.  And you felt that they were not treated well in China when

23   they were ill, right?

24   A.  Yes.

25   Q.  And that was part of why you became anti-CCP even in your

```
 1   mind, if not in action, right?
 2   A.  Yeah, part.
 3   Q.  What was the other part?
 4   A.  My family's history.
 5   Q.  And when you say your family history, do you mean something
 6   different than your parents' illness?
 7   A.  Yes.
 8   Q.  Can you tell us what you mean by that?
 9   A.  My father was sacrificed in fighting of the CCP when he was
10   young.
11   Q.  Okay.  Now, when you began participating in the movement,
12   do you understand what I mean by the movement?
13   A.  Rules of law movement?
14   Q.  Yes.
15   A.  Okay.
16   Q.  When you began participating in the movement, you didn't
17   expect that your participation would lead to the overthrow of
18   the CCP, right?
19   A.  Miles Guo said.
20   Q.  I'm asking, ma'am, what you thought, what you believed.
21   A.  If can do that, good.  If cannot, at least do something.
22   Q.  Did you believe that your participation would overthrow the
23   CCP?
24   A.  Maybe.
25   Q.  Did you believe that the Rules of Law movement could
```

O6DBGUO2                        Minran Wu

1   overthrow the CCP?

2   A.  Maybe.

3   Q.  Okay.  Fair enough.  But you didn't necessarily expect that

4   it would overthrow the CCP, right?

5   A.  Anything possible, so who knows.

6   Q.  My question is, you didn't necessarily expect that to be

7   the case?

8             THE COURT:  Asked and answered.  Move on.

9   Q.  In fact, you recall telling the government that you

10  participated because you thought it would help wake people up,

11  correct?

12  A.  At this time, yes.

13  Q.  Help them to wake up to how the CCP operates?

14  A.  At least to let people know more.

15  Q.  Sure.  And help them understand the truth, right?

16  A.  Yes.

17  Q.  Now do you still have family in China?

18  A.  You mean close family, not relatives?

19  Q.  Any family.

20  A.  Cousin, uncle, something like that.

21  Q.  And how about your husband, does he have family in China as

22  well?

23  A.  Yes.

24  Q.  Do you speak with them?  Are you in touch with them?

25  A.  My husband's family, actually they have dialect I could not

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6DBGUO2                          Minran Wu

1  understand.  They're language, I could not understand.  They

2  have some dialects.

3  Q.  Have you visited anyone in China since you left in 2001?

4  A.  2001, yes.

5  Q.  And when did you return to China?

6  A.  I went there a lot of times.

7  Q.  You visited a lot of times?

8  A.  Yes.

9  Q.  I just want to go through them.  Tell me when you visited?

10  A.  Almost every year.

11  Q.  About once a year since 2001?

12  A.  Yes.  Maybe not the first two years, but after that.

13  Q.  And so in the year 2000, you visited at least one?

14  A.  2000?

15  Q.  I'm sorry, 2020.

16  A.  Not COVID-19.  I mean before COVID-19.

17  Q.  Before Covid 19.  Okay.  Fair enough.  In 2019, you visited

18  at least once?

19  A.  Yes.

20  Q.  Was it more than once?

21  A.  Sometime more than once.

22  Q.  And how about since Covid, have you been back?

23  A.  Since?

24  Q.  Mm hm.

25  A.  My father dead.  I don't want to go back.

O6DBGUO2                          Minran Wu

1    Q.   So you haven't been back since Covid?

2    A.   Yes.

3    Q.   In preparation for your testimony here today, you met with

4    the government lawyers and agents on a number of occasions,

5    right?

6    A.   Several times.

7    Q.   Several times?

8    A.   Yes.

9    Q.   Do you remember how many times?

10   A.   I didn't count it.

11   Q.   Well, let's see if we can bill out a list.

12              Do you recall having a telephone interview with the

13   FBI at the end of November of 2022?

14   A.   2022, maybe.  I can not remember the time.

15   Q.   Do you remember when the first time was that you spoke to

16   members of the FBI or the department of justice?

17   A.   I don't remember, but, yes.

18   Q.   Approximately 2022?

19   A.   Yeah, 2022, I don't remember the time.

20   Q.   End of 2022?

21   A.   You mean twice?

22   Q.   Meaning toward the end of 2022.

23   A.   Maybe.

24   Q.   How about in January of 2024?

25   A.   What happened?

O6DBGUO2                           Minran Wu

1    Q.  I'm asking you, did you meet with representative of the
2    U.S. government?
3    A.  Maybe.
4    Q.  Mr. Fergenson here who questioned you earlier today by
5    Webex?
6    A.  I don't remember, January or February.  I'm not sure.
7    Q.  What about in April of 2024, did you have an in-person
8    interview with Mr. Fergenson?
9    A.  You mean online?
10   Q.  No, an interview with him in person.
11   A.  Face-to-face?
12   Q.  Either way.
13   A.  Yes.
14   Q.  And then again in mid-May, May 17?
15   A.  Mid-May 17?
16   Q.  Mm hm.
17   A.  Face-to-face, in-person?
18   Q.  Either way, ma'am.  We'll just say any kind of meeting,
19   whether it was virtual --
20   A.  I just remember --
21   Q.  Just let me finish.  Whether it's an in-person meeting or
22   virtual meeting or phone call.  That's what I mean by meeting
23   with the government.
24   A.  I don't remember May 17, no.
25   Q.  You don't remember meeting with them in May?

O6DBGUO2                         Minran Wu

1    A.  I met Mr. Fergenson in May, I can't remember that time

2    because we met May 26.  That's just around Memorial Day so I

3    can remember that.

4    Q.  That was my next fix question.  So, fine, you met with him

5    then.  And then again on June 11, right, two days ago?

6    A.  Today 13?  Yes.

7    Q.  And then again yesterday in preparation for testimony?

8    A.  Yesterday?

9    Q.  Did you meet with him yesterday?

10   A.  Said hello, is that kind of a meeting?

11   Q.  That I think would qualify as a meeting.  You said hello?

12   A.  Yes.  When you just meet somebody say hello, that's still

13   normal.

14   Q.  Great. That's a total of seven meeting, right?

15   A.  I don't know.  If you say seven, okay seven.  I did not

16   count it.

17   Q.  Either way you met with him on numerous occasions, right?

18   A.  Numerous, no, several times.

19   Q.  Okay.  And in addition during the time that you met with

20   him, and even before, you forwarded the government numerous

21   emails, right?

22   A.  Several, should not be numerous.

23   Q.  About how many would you say?

24   A.  I don't remember.

25   Q.  You don't remember, but it was several, not numerous?

O6DBGUO2                         Minran Wu

1   A.  You see, you cannot submit as many.  You can't because they

2   limit the size and the number you can submit, so definitely not

3   numerous.

4   Q.  Okay.  So you forwarded this information to try to help

5   them, right?

6   A.  Help everybody.

7   Q.  You forwarded the information to try to help the U.S.

8   government, right?

9           MR. FERGENSON:  Asked and answered.

10          THE COURT:  Well, you've gone from him to the U.S.

11  government, so you may answer.

12  A.  I think help everybody.

13  Q.  Are you helping Miles Guo?

14  A.  Yeah.

15  Q.  You are?

16  A.  Just make him stop to do something bad.

17  Q.  Okay.  Noted.

18          Now, you testified on direct about making an

19  investment in GTV, right?

20  A.  Through VOG.

21  Q.  And you invested $14,000, right?

22  A.  Yes.

23  Q.  And that was an investment with Sara Wei, right?

24  A.  Yes.

25  Q.  And this wasn't the first time that you had purchased

O6DBGUO2                          Minran Wu

1   stock, right?

2   A.  Can I just understand, Sara Wei kind of brokerage, stock

3   brokerage.  If this way, this is the first time.

4   Q.  My question was different.  This wasn't the first time that

5   you purchased stock, right?

6          You have other investments?  You have other stock

7   investments, right?

8   A.  Purchase online, yeah.

9   Q.  Now, you knew that there was some risk associated with

10  purchasing a stock, right?

11  A.  Yes.

12  Q.  Every investment has some risk, right?

13  A.  Yes.

14  Q.  And, in fact, even Mr. Guo you recall him saying that

15  investing is always a little risky, right?

16  A.  But he also said he guarantee every penny.

17  Q.  I would like you to listen to my question.

18          MR. FERGENSON:  Your Honor, she's answering the

19  question.

20          MR. SCHIRICK:  It's non-responsive, your Honor.

21          THE COURT:  Just stick to the question and don't offer

22  additional question.

23          MR. SCHIRICK:  Could we please have the court reporter

24  read back the question.

25          (Record was read)

O6DBGUO2                    Minran Wu

1           THE COURT:  You may answer.

2   A.  As far as I can remember, he said this very late, not at

3   the very beginning.

4   Q.  But he said it, right, you remember him saying it?

5   A.  He ask about our investment.  At that time he didn't say

6   this.

7   Q.  Okay.  Now, you never spoke with Mr. Guo directly about

8   your investment before you made it, right?

9   A.  Yes.

10  Q.  You only communicated with Sara Wei, right?

11  A.  Yes.

12  Q.  Or people who worked for her, right?

13  A.  Yes.

14  Q.  And, in fact, you sent your $14,000 to Ms. Wei, right?

15  A.  Yes.

16  Q.  And as you testified to on direct, I believe you sent it in

17  a few different transactions?

18  A.  Yes.

19  Q.  And those transactions were between approximately May 21

20  and 29, 2020, right?

21  A.  Yes.

22  Q.  And some of those transfers were in fact to Ms. Wei's

23  personal bank account, correct?

24  A.  She gave that account to me.

25  Q.  She gave you that account and you sent it to her?

O6DBGUO2                          Minran Wu

1    A.  Yes.

2    Q.  And some were to a VOG bank account, right?

3    A.  Yes.

4    Q.  And the ones that went to the VOG bank account, again to be

5    clear, Ms. Wei told you to send those there, right?

6    A.  Yes.

7    Q.  Now Mr. Guo didn't provide any specifics about where to

8    send that money, right?

9    A.  Yes.

10   Q.  All the specific instructions came from Ms. Wei?

11   A.  But Ms. Wei and a lot of other guys, they made a lot of

12   videos in which they said, it was Miles Guo who give us this

13   opportunities, so we should show our gratitude to Miles Guo

14   forever.  And Miles Guo will create more similar opportunities

15   for us to invest in later.

16          MR. SCHIRICK:  Your Honor, move to strike as

17   non-responsive.

18          THE COURT:  So once again, if you listen carefully to

19   the question and only answer what is being asked.  So if he

20   asks you, what is your favorite color.  Then you can answer

21   whatever it is, blue, red, yellow.  But you wouldn't say, and

22   my favorite flower is the rose.  Don't add additional

23   information.  So the prior answer is stricken.

24   Q.  All the specific instructions about where to send money

25   came from Sara Wei, right?

O6DBGUO2                          Minran Wu

1   A.   Yes.

2   Q.   Now, do you recall when the GTV private placement closed?

3   A.   June.

4   Q.   June.   June 2nd?

5   A.   I don't remember.

6   Q.   Can we just please pull up what's in evidence as Government

7   Exhibit Z9 and go to the June 2, 2020 entry.  I believe it's

8   page six.

9           Now, Ms. Wu, do you see what's displayed in the screen

10  in front of you?

11  A.   You mean the picture?

12  Q.   Correct.

13  A.   Yes.

14  Q.   Do you recognize that as a screen capture from a video?

15  A.   Miles Guo.

16  Q.   Do you recognize that as a screen capture from a video?

17  A.   Maybe, yes.

18  Q.   Do you recognize this as a video that Mr. Guo posted when

19  the GTV private placement ended in June of 2020?

20  A.   I don't remember that date, but he did that.

21  Q.   But you do recall this video?

22  A.   Yes.

23  Q.   You recall seeing a video?

24  A.   Maybe the same, maybe the same.  I'm not sure, but yes.

25  Q.   Now, you testified earlier that during this period you were

O6DBGUO2                          Minran Wu

1    watching Mr. Guo's videos pretty regularly, right?

2    A.  Yes.

3    Q.  So you recall seeing this video.  Do you believe you saw it

4    around the time that it was posted?

5    A.  You said June 2nd, but I don't remember.  I just remember

6    in June.

7    Q.  So, ma'am, I'm not asking you about the specific date.

8        My question is, do you remember seeing it around the

9    time that it was posted?

10   A.  Yes.

11   Q.  Thank you.  We can take that down.

12       Now, you testified that you were refunded 92 percent

13   of the $14,000 that you sent to Sara Wei; is that right?

14   A.  From SEC, yes.

15   Q.  I want to go back to Sara Wei for a second.

16       Can you tell us who is Sara Wei?

17   A.  She is the earliest, maybe earliest, maybe, I'm not sure,

18   but from my understanding she is the earliest person who

19   cooperated with Miles Guo.

20   Q.  And did a time come when Sara Wei had a falling out with

21   Mr. Guo?

22   A.  2021 I guess.  I cannot remember exactly.  That is why

23   there was that lawsuit MOS farm to Phoenix.

24   Q.  Thank you.  We'll get there in a second.  So you do recall

25   a time when they had a falling out?

O6DBGUO2                         Minran Wu

1    A.  Approximately, not exactly.

2    Q.  Again, ma'am, I'm not asking you the exact time.  I'm just

3    asking you if you recall that they had a falling out?

4    A.  Yes.

5    Q.  Now, I believe you just started to talk about a lawsuit

6    that resulted from that falling out, correct?

7    A.  The lawsuit you mean result from a fallen breakup?

8    Q.  From the breakup, yes, that followed the breakup?

9    A.  Yes, follow.

10   Q.  And that was a lawsuit that the farms brought against Sara

11   Wei and her farm, right?

12   A.  Sara Wei at that time already broke up with Miles Guo, so

13   I'm not sure if Miles Guo at that time still keep her at that

14   farm leader.

15          MR. SCHIRICK:  Your Honor, move to strike as

16   non-responsive.

17          MR. FERGENSON:  Your Honor, I think she's trying to

18   answer it very carefully but answering the question.

19          MR. SCHIRICK:  Your Honor, the answer is totally not

20   responsive to the question.

21          THE COURT:  The answer is stricken.

22   Q.  The lawsuit was brought by the farms against Sara Wei's

23   farm and Sara Wei?

24   A.  Yes.

25   Q.  Now, you're aware that the Mountain of Spices farm, MOS

O6DBGUO2                          Minran Wu

1    farm I believe you referred to it on direct, sued Sara Wei for

2    stealing funds that supporters had put into the farm loans

3    program, right?

4    A.   Should be.

5    Q.   Yes?

6    A.   Yes.

7    Q.   And that lawsuit was in 2021, right?

8    A.   Yes.

9    Q.   And where was that lawsuit if you remember?

10   A.   I think Texas.

11   Q.   And you provided translation services to the MOS farm in

12   support of that lawsuit, right?

13   A.   Yes.

14   Q.   And the result of that lawsuit -- withdrawn.

15        You're aware of the result of that lawsuit?

16   A.   No.

17   Q.   So you're not aware that the result of that lawsuit was a

18   default judgment against Ms. Wei?

19   A.   No, but I --

20        MR. FERGENSON:  Objection, your Honor.  She said she

21   doesn't know.

22        THE COURT:  Asked and answered.

23        MR. SCHIRICK:  Your Honor, I believe she was still in

24   the process of answering it.  It may have jogged her

25   recollection.

O6DBGUO2                          Minran Wu

 1                MR. FERGENSON:  That's not correct.  She said no.

 2                THE COURT:  The answer was no.

 3   Q.  Now, you were asked some questions about some government

 4   exhibits by Mr. Fergenson earlier today, right?

 5   A.  Today, no.

 6   Q.  You don't recall testifying on direct and being shown those

 7   spreadsheets?

 8   A.  Oh, you mean here, yes.

 9   Q.  Yes, here, today just a few minutes ago.  Okay.

10                Now, did you have an agreement with the MOS farm to

11   provide translation services in connection with that lawsuit

12   against Ms. Wei?

13   A.  Yes.

14                MR. FERGENSON:  Your Honor, may we have a sidebar?

15                THE COURT:  All righty.  Step up.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

O6DBGUO2                         Minran Wu

1                    (At sidebar)

2                    MR. FERGENSON:  I'm not sure where this line of

3          questioning is going, but the reason for my request, your

4          Honor, is the witness signed an NDA with the MOS farm.  And I

5          assume, but I just wanted to confirm, we're not going anywhere

6          where Mr. Schirick is going to suggest she's going to get sued

7          or retaliated against for breaching the NDA.  I assume that's

8          not the case.  I don't know where we're going with it.

9                    MR. SCHIRICK:  You assume correct. That's not where

10         I'm going with this.

11                   THE COURT:  Okay.

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6DBGUO2                        Minran Wu

 1                  (In open court; jury present)

 2                  THE COURT:  You may continue.

 3       BY MR. SCHIRICK:

 4       Q.  So that agreement that you had with the MOS farm was to

 5       provide translation services, right?

 6       A.  Yes.

 7       Q.  And it was to provide translation services in support of

 8       the MOS farm's lawsuit against Ms. Wei?

 9       A.  Yes.

10       Q.  And that's why you had access to the spreadsheets that you

11       testified about earlier today, right?

12       A.  Yes.

13       Q.  Now, if we could please bring up Government Exhibit

14       GXVN-12.  If we could scroll up a little, please, or down.

15       That's fine.  Thank you.

16                  Now, Ms. Wu, you recognize this as the document that

17       you looked at a few minutes ago when Mr. Fergenson was asking

18       you questions?

19       A.  Yes.

20       Q.  And I'd like to just focus you on the line 17 that

21       Mr. Fergenson focused you on where there's a reference to Abu

22       Dhabi?

23       A.  Yes.

24       Q.  You see that?

25       A.  Yes.

O6DBGUO2                          Minran Wu

1    Q.   Now, you don't know that any money was actually sent to Abu

2    Dhabi, right?

3    A.   From that screenshot, the money amount on that screenshot.

4    Q.   My question is, you don't know yourself that money was

5    actually sent to Abu Dhabi, right?

6    A.   We just do the calculation, so I don't know.

7    Q.   Right.  You just did the translation, right?

8    A.   Calculation here, calculation for the number.

9    Q.   Sure.  Now, there's also a question mark next to Abu Dhabi,

10   right?

11   A.   Yes.

12   Q.   Do you know why that's there?

13   A.   Because Sara didn't provide us the detail, just that

14   screenshot for the amount and the destination.

15   Q.   So you didn't have the details, and we don't know if money

16   was actually sent to Abu Dhabi, right?

17            MR. FERGENSON:  Objection to form.

18            THE COURT:  Compound question.  If you want to break

19   it up.

20   Q.   So you didn't have the details, right?

21   A.   At least I haven't.  I don't know others.

22   Q.   Right.  You didn't have the details, right?

23   A.   Yes.

24            THE COURT:  Asked and answered.

25   Q.   And the whole point of putting together this information

O6DBGUO2                        Minran Wu

1    that's in this spreadsheet was to support the lawsuit against

2    Ms. Wei, right?

3    A.  Yes.

4    Q.  And the other spreadsheets that we looked at were also for

5    the purpose of supporting the lawsuit against Ms. Wei, right?

6    A.  Yes.

7    Q.  Because she had been accused of taking the money, right?

8    A.  Yes.

9            MR. SCHIRICK:  Your Honor, I was going to move to

10   another topic.  This maybe a good stopping point if we're doing

11   11:30.

12           THE COURT:  We're going to go to noon.

13           MR. SCHIRICK:  I'm sorry.  I didn't realize that.

14   BY MR. SCHIRICK:

15   Q.  We can take that down.

16           Now, you testified earlier today that you were a

17   member of the MOS farm, right?

18   A.  Yes.

19   Q.  And approximately when did you join the MOS farm?

20   A.  Maybe May or June 2020.

21   Q.  And that farm was located here in New York, right?

22   A.  Yes.

23   Q.  And at the time you joined in May or June of 2020, you

24   began doing volunteer work, right?

25   A.  Yes.

O6DBGUO2                     Minran Wu

Q.  And you did the translation work that we just talked about?

A.  Not this one at the beginning.

Q.  What kind of work did you do at the beginning?

A.  There was a translation group in the farm, so I joined that group to do some news translation they ask it.

Q.  Any other kinds of volunteer work?

A.  Modify some other people's articles.

Q.  And were there other people doing volunteer work?

A.  You mean what other --

Q.  Other members of the farm doing volunteer work?

A.  A lot of, yeah.

Q.  A lot of people.  What kinds of volunteer work were other people doing?

A.  Video.

Q.  Video recording?

A.  Just like media.  They also had workout group.  I don't know what they do, just workout, some exercises, workout group, religion group, patrol group, just to do patrol to see if somebody said something not good just delayed or maybe expel from other farm.

            THE COURT:  What was the name of that group?

            THE WITNESS:  Patrol.

            THE COURT:  How do you spell that?

            THE WITNESS:  P-A-T-R-O-L.

            THE COURT:  Patrol.

1            THE WITNESS:  Patrol.

2   A.  And financial group, legal group, education group.

3   Q.  And what did the education group do?

4   A.  Educate people.

5   Q.  Can you explain that any further?

6   A.  I don't know.  I don't know that group, what they were

7   doing.  I don't know.

8   Q.  Anything else?

9   A.  Writing, but the writing is not like any other group, just

10  a lot of groups had writing group inside.

11  Q.  Make sense.  Now, a time came as you testified on direct

12  that you made a loan to the farm, right?

13  A.  Yes.

14  Q.  And that was in August of 2020?

15  A.  Yes.

16  Q.  For $20,000 right?

17  A.  Yes.

18  Q.  And Mr. Fergenson showed you the loan agreement, right?

19  A.  Yes.

20  Q.  So if we could just pull up that loan agreement GXVN-39.

21          Now, you testified that you can't recall if you read

22  the loan agreement before you signed it, right?

23  A.  I really don't remember because it so hurry at that time.

24  I read it long time ago.

25  Q.  Sure.  But you can't recall whether it was before or after

1    that you read it, right?

2    A.  Yeah.

3    Q.  So it's possible that you read it before, right?

4          THE COURT:  Don't ask her to speculate.

5          MR. SCHIRICK:  It's a logical conclusion.

6          THE COURT:  Don't testify.

7    Q.  You also testified that you recall Mr. Guo saying at some

8    point that the proceeds from these loans would go to purchase

9    GTV stock, right?

10   A.  Yes.

11   Q.  Now, don't you recall that he said that after you signed

12   this agreement?

13   A.  I don't remember, that long time ago.

14   Q.  Now, isn't it true you recall Mr. Guo saying that the money

15   loan through the loan program was for the farm?

16   A.  He said interest to the farm.  I don't know what does that

17   mean, just I remember it like this.

18         MR. SCHIRICK:  Your Honor, move to strike as

19   non-responsive.

20         THE COURT:  Well, I think the first sentence is

21   responsive with respect to interest, and so the second part

22   will be stricken.

23   Q.  Now, you recall telling the government that you understood

24   that the farm could use the money in any project it wanted,

25   right?

O6DBGUO2                      Minran Wu

1    A.  Xia Qidong said that.

2    Q.  My question is, do you recall telling the government that

3    that was your understanding?

4    A.  I don't remember.

5    Q.  Okay.  Let's see if we can refresh your recollection.  Can

6    we put up for the parties and the witness 3620-10, page three.

7           Now, Ms. Wu, if you could just read what's in front of

8    you or should be in front of you momentarily to yourself, not

9    out loud, and let me know when you're done?

10   A.  Yes.

11   Q.  Does that remind you that that is in fact what you told the

12   government?

13   A.  Yes.

14   Q.  So it is true that you told the government that it was your

15   understanding that the farm could use the money to invest in

16   any project that it wanted, right?

17   A.  Yes, but not the contract time.

18   Q.  Speaking of the contract, why don't we go back to the

19   contract.  If we could just zoom in on 1A in the contract, Use

20   of proceeds.

21          Now, this sentence says, Use of proceeds.  The loan

22   proceeds advanced under this agreement is for the general

23   working capital purposes of the borrower.  Do you see that?

24   A.  Yes.

25   Q.  Who is the borrower under this agreement?

O6DBGUO2                          Minran Wu

1    A.  MOS farm.

2    Q.  We can take that down or just zoom back out.  Keep the

3    exhibit up, but zoom back out.  If we could go to the interest

4    rate section, and this says that the interest rate would be

5    three percent per annum on the loan amount payable in full on

6    the final maturity date.  Do you see that?

7    A.  Yes.

8    Q.  And then if we can zoom in on final maturity date.  It

9    says, final maturity date 36 months from the effective date.

10   Do you see that?

11   A.  Yes.

12   Q.  Do you understand that maturity date means when the loan

13   payment becomes due?

14   A.  Yes.

15   Q.  And so the loan payment isn't due before the maturity date,

16   right?

17   A.  Yes.

18   Q.  Now, you expected to get interest on the loan, right?

19   A.  Because at that time somebody already got the three percent

20   when I ask for the refund.

21          MR. SCHIRICK:  Move to strike as non-responsive.

22   Q.  You can't tell me what other people told you.  I'm asking

23   what your understanding was at the time.

24          THE COURT:  Sustained.

25   A.  I understand it, so I just feel unfair why someone else.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6DBGUO2                          Minran Wu

```
 1   Q.  I'm sorry.  Can you speak up.

 2   A.  I understand it.

 3   Q.  You understood that it was for interest, right, the farm

 4   loan was for interest?

 5   A.  So why not me?

 6   Q.  That's may question.  So you expected interest?

 7   A.  So, I don't want it.

 8           MR. SCHIRICK:  Move to strike, your Honor.

 9   Q.  I'm asking you if at the time you signed this agreement you

10   expected to earn interest?

11   A.  Actually, at that time just the three percent surprise me,

12   because before Miles Guo said six percent.

13           MR. SCHIRICK:  Again, your Honor.  Move to strike.

14           THE COURT:  Both answers are stricken.  I want you to

15   listen carefully to the question, and you may read back the

16   question, and answer just what's being asked.

17           (Record was read)

18   A.  Not really.

19   Q.  Ma'am, when you met with the government, do you recall

20   telling them that you were upset that you didn't get interest?

21   A.  No.

22   Q.  Let's see if we can help with that.  Can we please pull up

23   --

24           MR. FERGENSON:  Objection to the commentary, your

25   Honor.
```

O6DBGUO2                         Minran Wu

1           THE COURT:  Don't testify.  Ask her if there is

2    anything that would refresh her recollection.

3    Q.  Would it be possible if we could show you a document to

4    help refresh your memory?

5    A.  I'm not sure.

6           MR. SCHIRICK:  May we, your Honor?

7           THE COURT:  You may.

8    Q.  Please pull up 3620-10 at three.  While we're waiting for

9    that, it was your impression that others had been paid

10   interest, right?

11   A.  I knew some, yes.

12   Q.  And based on that you expected to be paid interest?

13   A.  No.

14   Q.  You didn't expect to be paid interest?  Others got it, but

15   you didn't expect to get interest?

16          THE COURT:  Asked and answered.

17   Q.  Now, isn't it true that under the loan agreement the loan

18   amount and any accrued interest is paid on that maturity date,

19   right?

20          MR. FERGENSON:  Asked and answered.

21          THE COURT:  You may answer that question.  Actually,

22   no.  I do recall your asking the question, so the objection is

23   sustained.

24   Q.  Now, Ms. Wu, you sought to terminate the loan agreement

25   before the maturity date, right?

O6DBGUO2                          Minran Wu

1   A.  Yes, I sought it.  Somebody did it, so I sought it.

2   Q.  In fact, you did terminate the loan agreement before the

3   maturity date, right?

4   A.  Yes, follow examples.

5   Q.  And based on that, you're not entitled to any interest,

6   right?  We just read the contract, right?

7   A.  Yeah.

8   Q.  Is it your understanding that based on your early

9   termination you are not entitled to interest?

10         MR. FERGENSON:  To the extent it doesn't call for a

11  legal conclusion, no objection.

12         THE COURT:  Her understanding, but obviously not a

13  legal conclusion.  You may answer what your understanding is.

14  A.  My understanding for that at that time when I ask for the

15  refund, I just feel this is illegal so I don't want the three

16  percent interest anymore that illegal money.

17  Q.  You testified on direct that you didn't get your three

18  percent interest, right?

19  A.  I said that because they didn't show any intention to give

20  me, so I didn't get and I also don't want that.

21         (Continued on next page)

22

23

24

25

O6D1GUO3                        Wu - Cross

1          MR. SCHIRICK:  Move to strike, your Honor.

2          MR. FERGENSON:  I mean, your Honor, we've covered it

3   as well, so maybe we can move——

4          THE COURT:  The answer is stricken.

5   BY MR. SCHIRICK:

6   Q.  Now you entered into a release of the loan agreement,

7   right?

8   A.  Yes.

9   Q.  And the farm in fact refunded your loan; you received all

10  $20,000 back, right?

11  A.  Yes.

12  Q.  Okay.  Now nowhere in the agreement that we looked at, that

13  we just reviewed, does it say that you would get GTV stock for

14  your $20,000 loan to the farm, right?

15  A.  They use the GTV stock to allure me to buy, to go with this

16  loan program, so yes, I understand no GTV on the contract,

17  but——

18  Q.  It doesn't say GTV stock anywhere in the contract, right?

19  A.  So that is a scam.

20  Q.  Right.  And then in fact, you recall telling the government

21  during one of your meetings with them that Mr. Guo said that

22  the farm money is for the farm, not just TV, just——pardon me.

23  Withdrawn.

24          You recall telling the government during one of your

25  meetings with them that Mr. Guo said that the farm loan money

O6D1GUO3                          Wu - Cross

1   is for the farm—

2              MR. FERGENSON:  I believe asked and answered.

3   Q.  —not for GTV.

4              MR. FERGENSON:  I believe asked and answered.

5              THE COURT:  I'll allow her to answer the question.

6   A.  Not on the contract time; later they said that.

7   Q.  My question is:  Do you recall telling the government that

8   that's your understanding at the time?

9   A.  I told the government, but I didn't at the time, at that

10  time.  I mean, I should tell the government they just said this

11  later, the contract, so—

12  Q.  That's not what you told the government, right?

13             THE COURT:  She's testified as to what she told the

14  government.

15  A.  Because the government didn't ask that.

16             MR. SCHIRICK:  There's no question pending, your

17  Honor.

18             MR. FERGENSON:  Well, then he's just arguing with the

19  witness, so—

20             THE COURT:  Move on.

21  Q.  Now you testified earlier that you invested through a

22  company called Wonder Invest; is that right?

23  A.  Yes.

24  Q.  And that company was set up by your husband, right?

25  A.  Yes.

1   Q.   Now did you talk to your husband about the farm loan before

2   you made it?

3   A.   Yes.

4   Q.   Did your husband review the contract?

5   A.   The con——the Wonder Invest is mine at that time.

6   Q.   Ma'am, my question is:  Did your husband review the

7   contract?

8   A.   This is my contract.  Why I need my husband to review the

9   contract?  I don't understand this question.

10  Q.   It's a simple question.  He either did or didn't review it.

11  So my question is:  Did he review it at the time?

12  A.   I told him by myself.  He didn't review, but I told him.

13  Q.   Okay.  But you told him about it.

14  A.   Yeah.

15  Q.   Okay.  Now you testified that——withdrawn.

16          Now you actually received your refund of the farm loan

17  money before you made your first complaint to the government;

18  is that right?

19  A.   Yes.  I don't remember the time I complained to the

20  government.  It may be, yes.

21          MR. SCHIRICK:  Okay.  Now I'd just like to go back

22  briefly to GX VN39.  And if we could go to page——to the

23  addendum that's at the end of this document.

24          And scroll to the bottom but not——but excluding the

25  last page.  One more down, please.

O6D1GUO3                         Wu - Cross

1            There we go.

2    BY MR. SCHIRICK:

3    Q.  Now you recall being shown this document by Mr. Fergenson?

4    A.  Yes.

5    Q.  Okay.  And Mr. Fergenson pointed out that the loan

6    agreement was signed in November of 2021 by a representative of

7    the farm, right?

8    A.  Yes.

9    Q.  And this is signed, this addendum is signed by you around

10   the same time, right?

11   A.  Yes.

12   Q.  Like three days later.

13   A.  Yes.

14   Q.  Right.

15           MR. SCHIRICK:  And if we go back to the first page of

16   the addendum, please.

17   Q.  And this addendum that you signed more than a year later,

18   after signing the first loan contract, you testified you didn't

19   review this one either?

20   A.  Almost not.

21   Q.  So you did review it to some extent.

22   A.  I just reviewed it where I should fill in——for example, my

23   name, the time.

24   Q.  Okay.  And you reviewed it and you actually included a——and

25   we're not going to display this, but you included a copy of

O6D1GUO3                          Wu - Cross

1   your driver's license, as well, right?

2   A.  They ask it.

3   Q.  Sure.  That's what was asked for, right?

4   A.  Yes.

5   Q.  Okay.  So you had the time to fill it in and make a copy of

6   your driver's license.  And now did you send this back by

7   email?

8           MR. FERGENSON:  Your Honor, objection to testifying.

9   If he has a question about that, he can ask it.

10          THE COURT:  I'm waiting for the question.

11  Q.  The question is:  Did you return this by email?

12  A.  I don't remember.  Maybe to G service volunteer.

13          THE COURT:  What is that, G service volunteer?

14          THE WITNESS:  Oh, sorry.  G series, G series.  A lot

15  of G, GTV, G Fashion, G Club, it's all together, G series.

16          THE COURT:  Please continue.

17  Q.  And so it's possible that you handed this in hard copy to

18  another person?

19  A.  No.

20          THE COURT:  So don't ask her what might be possible.

21  Ask her what happened.

22  Q.  Do you recall whether you did that?  Did you hand it in

23  hard copy to another person?

24  A.  Not hand, not by hand.  Not by hand.

25  Q.  Then how did you convey it, ma'am?

O6D1GUO3                          Wu - Cross

1              MR. FERGENSON:  Asked and answered.

2              MR. SCHIRICK:  Just trying to understand how it was

3   sent back.

4              THE COURT:  You've already asked the question.

5   Q.  So is it your testimony that at no point after signing this

6   addendum you reviewed it more carefully?

7   A.  No.

8   Q.  You never reviewed it.

9   A.  I reviewed some.

10  Q.  Okay.

11  A.  Just the 3 percent, like that.

12  Q.  Now you testified that there was some time pressure on you

13  with respect to the original loan agreement.  There wasn't any

14  time pressure on you with respect to this addendum, was there?

15  A.  Yeah.

16  Q.  There was?

17  A.  My family issue.  My family issue.

18  Q.  So there wasn't any time pressure put on you by Mr. Guo.

19  Right?

20  A.  Yes.

21  Q.  Right?  No time pressure put on you by anybody at the

22  farms, right?

23  A.  They asked several days to return it.

24  Q.  Sure.  Do you think several days is enough time to review a

25  four-page contract?

O6D1GUO3                         Wu - Cross

1    A.  If carefully, one by one, word by word, not enough.

2    Q.  Four days isn't enough to review a four-page contract?

3             MR. FERGENSON:  Asked and answered.

4             THE COURT:  Asked and answered, and don't testify.

5             MR. SCHIRICK:  Okay.  Okay.

6    Q.  Now when did you, according to you, first review either the

7    loan agreement or the addendum, in detail?

8    A.  Can you repeat that again.

9    Q.  Sure.

10            THE COURT:  Are you asking when did she make a

11   thorough review of the contract?

12            MR. SCHIRICK:  Yes, your Honor.

13            THE COURT:  And the addendum?

14            MR. SCHIRICK:  Correct, your Honor.

15            THE COURT:  Okay.  Go ahead.

16   A.  You mean carefully review of this?

17   Q.  That's right.  That's the question.

18   A.  Not one by one.  Maybe just some.

19            MR. SCHIRICK:  Move to strike, your Honor.

20            THE COURT:  The answer is stricken.  The question is

21   when.

22            THE WITNESS:  When.  I cannot remember when.

23   Q.  Okay.  Did you ever review it carefully, before you met

24   with the prosecutors?

25   A.  Yes.

O6D1GUO3                          Wu - Cross

1    Q.   When was that, approximately?

2    A.   Around the time I asked a refund.

3    Q.   Around the time you asked──you planned to ask for a refund,

4    right?

5    A.   Yeah.

6    Q.   Okay.  And were you surprised by what was in there?

7    A.   Not exactly that surprised.

8    Q.   Yeah, not that surprised, right?

9    A.   Because I──

10              MR. FERGENSON:  Your Honor──

11   A.   ──a lot of people said something already about this

12   contract.

13              MR. SCHIRICK:  Okay.  I'll move on.

14              Now again, I'm change──I'm going to change topics,

15   your Honor.  Is now a good time or should we continue?

16              THE COURT:  All right, yes.  This is a fine time.

17   It's 11:55.

18              So you'll have your break.  We'll return at 12:30.

19   Remember not to discuss the case amongst yourselves or with

20   anyone else.  Don't permit anyone to discuss the case in your

21   presence.  And don't read, watch, or listen to anything from

22   any source that has anything to do with the subject matter of

23   this trial.

24              You may step out.  Don't discuss your testimony.

25              (Jury not present; witness not present)

O6D1GUO3                          Wu - Cross

1              THE COURT:  You may be seated.

2              Do the parties want to raise anything before we return

3    at 12:30?

4              MR. FERGENSON:  Not from the government.

5              MR. SCHIRICK:  Not from the defense, your Honor.

6              THE COURT:  All right.

7              (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6D1GUO3                         Wu - Cross

 1                        AFTERNOON SESSION

 2                           12:30 p.m.

 3              THE COURT:  Please get the jurors.

 4              (Jury present)

 5              THE COURT:  Please be seated.

 6              And you may continue the cross-examination.

 7              Remember, ma'am, that you are still under oath.

 8              THE WITNESS:  Yes.

 9              MR. SCHIRICK:  Thank you, your Honor.

10    BY MR. SCHIRICK:

11    Q.  I'd like to just talk briefly about H Coin.

12              So I believe you testified that you purchased H Coin

13    in April of 2021, right?

14    A.  Yes.

15    Q.  And you purchased $4,500 worth of H Coin; is that right?

16    A.  You mean total?

17    Q.  Yeah.

18    A.  More than that.

19    Q.  Okay.  How much, in total?

20    A.  Plus 5 percent commission, plus 35 other fees.

21    Q.  I'm sorry.  Can you just speak up a little.  Plus what?

22    A.  The H Coin fee, plus 5 percent commission, plus 35 other

23    fees.

24    Q.  Right.  And my question was just how much you spent on the

25    H Coin.  Was it more than 4500 or 4500?

1    A.  I have four——44,500, right?  Then should be 4,450 for H

2    Coin only.

3    Q.  Right.  Okay.  So you spent——am I correct in understanding

4    you that you spent $4,500 on H Coin?

5    A.  Yeah, for H Coin only.

6    Q.  Yeah.  Okay.  That's all my question was.

7              MR. SCHIRICK:  All right.  Now if we could please pull

8    up Government Exhibit VN37.

9    Q.  And Ms. Wu, this is——I believe this is the exhibit that

10   Mr. Fergenson showed you on direct.

11             Okay.  Now do you remember Mr. Fergenson asking you

12   some questions about this document earlier?

13   A.  Yes.

14   Q.  Okay.  And this reflects here on page 1 that you purchased

15   44,500 coins, right?

16   A.  Yes.

17             THE COURT:  If you would bring the microphone close to

18   your mouth.

19             THE WITNESS:  Okay.

20             THE COURT:  You can pull it, you can move it around.

21             THE WITNESS:  Yes.

22   Q.  Okay.  And then Mr. Fergenson asked you some questions

23   about your understanding of this document, right?

24   A.  Understanding this contract?

25   Q.  Yes.

O6D1GUO3                          Wu - Cross

1    A.  Yes.

2    Q.  Okay.  And was it your understanding at the time that you

3    signed this that the H Coin were being offered to you in part

4    because of your volunteer work for the farms?

5    A.  They already added into this number for 44,500.

6    Q.  Right.  And my question is a little different.  My question

7    is:  Did you understand that the reason that you were being

8    offered the opportunity to buy this number of H Coin was partly

9    based on your volunteer work for the farm?

10   A.  No, I don't understand that.  I never——I never heard of

11   that.

12   Q.  You didn't understand that?  Am I right that there was a

13   formula that you testified to on direct that determined the

14   number of coins that you would be allocated?

15   A.  Yes.

16   Q.  And didn't that formula include in part how much volunteer

17   work you had done for the farms, or for the Alliance?

18   A.  For the farms, that formula does not include this——this

19   volunteer work, H Coin.  I don't know how to call it.

20   Q.  Okay.  What did it include, as far as you understand?

21   A.  That formula calculation number, at that time, and then

22   when I needed to pay for this H Coin, the G series volunteer

23   told me I should pay how much and told me something like how

24   many H coins I should have.

25   Q.  Okay.  And did you——in that conversation with the volunteer

O6D1GUO3                          Wu - Cross

1   did they ask you about your volunteer work?

2   A.  Ask my volunteer work?  For what?  I mean——

3   Q.  So you'll correct me if I get it wrong, but my

4   understanding was that you had a conversation with a volunteer

5   about the allocation of H coins.  Do I have that right so far?

6   A.  Not discussion; just send me a message, just let me know.

7   Q.  Okay.  So it was by Discord?

8   A.  Yes.

9   Q.  Okay.  And I'm just going to refer to that as a discussion,

10  if that's okay.

11  A.  Okay.

12  Q.  Okay.  So in that Discord discussion, did the volunteer

13  mention your volunteer work for the farm?

14  A.  No.

15  Q.  Okay.  Now do you recall telling the government that it was

16  your understanding that your volunteer work figured into the

17  coin allocation formula?

18  A.  No.

19  Q.  You don't recall that?

20  A.  You mean I tell the government about I volunteer work for

21  the H Coin?

22  Q.  Yeah.  You don't recall telling the government that.

23  A.  I——I——don't remember.

24  Q.  Okay.  Maybe it will help if I show you a document?

25          MR. SCHIRICK:  Could we please pull up 3620-17.  And

O6D1GUO3                          Wu - Cross

1    if we could just highlight that relevant portion there, Jorge.

2                 THE WITNESS:  Oh, I remember this.

3    Q.  Does that refresh your memory that your volunteer work was

4    part of the formula for determining your H Coin allocation?

5    A.  Yes.

6    Q.  Okay.  Great.  We can put that down.

7                 Okay.  So being given this H Coin allocation was at

8    the time, you understood, an opportunity or a reward for your

9    volunteer work, right?

10   A.  I know this after that the G series volunteer gave me the

11   number.  At that time I felt very strange about this number,

12   and later, somebody told me about this.

13   Q.  So it's your testimony you didn't understand at the time

14   that you were being given this opportunity to buy H Coin

15   because you did volunteer work, you only learned that after?

16   Just looking to clarify.

17                 MR. FERGENSON:  I think it misstates the testimony.

18   But——

19                 THE COURT:  You may answer.

20   A.  I think when I got the Discord message, I was kind of

21   confused, and I just to confirm the number with that volunteer

22   worker, they said everything was correct, and then I just paid

23   the money, but later, I asked somebody else, they just said,

24   that was your reward.

25   Q.  So they used the word "reward," right?

O6D1GUO3                          Wu - Cross

1    A.   Yeah.  After the payment, I——I understood that.

2    Q.   Okay.  But that's what you understood, that it was a

3    benefit you were being given as a reward for part of your work,

4    right?

5         MR. FERGENSON:  Just objection to form.

6         THE COURT:  You may answer.

7    A.   Yes.

8    Q.   Okay.  Now at the time that you signed——I'm sorry.

9         MR. SCHIRICK:  Jorge, could we pull that back up, the

10   37.  Sorry.

11   Q.   At the time that you signed this document, did you read

12   this, did you read this one?

13   A.   Already said at that time I already wanted a refund so I

14   didn't pay attention, but I need to sign; I needed to sign this

15   first.

16   Q.   Okay.  So you didn't read this one either.

17   A.   Not really.

18   Q.   Okay.  And your testimony is that at the time you signed

19   this, you had already decided that you were going to leave the

20   movement, right?  You were uncomfortable.

21   A.   I have not——I had not decided at that time to leave this

22   movement because I think even if I got all my money back, I

23   could still in this group, right?  So at that time I hadn't

24   decided if leave or not.  That's year 2021.

25   Q.   So you may have——if you got all of your money back, you may

O6D1GUO3                          Wu - Cross

1    have stayed in the movement; is that right?

2              MR. FERGENSON:  Calls for speculation.

3              MR. SCHIRICK:  I believe that's what she just said,

4    your Honor.

5              THE COURT:  I think you may answer.  Go ahead.

6    A.  I haven't——I hadn't have the final decision at that time.

7    The final decision made just 2022.

8    Q.  Right.  But that's what you were considering.  You were

9    considering staying in the movement even if you got your money

10   back, right?

11   A.  Yeah.  Some people, they didn't pay anything but still in

12   the group.

13   Q.  Right.  Okay.  Now did you——did a time come when you did

14   read this document, before you met with the prosecutors?

15   A.  You mean——can you just repeat.

16   Q.  Sure.  Did a time come when you read this document, the one

17   that's on your screen, before you met with the prosecutors?

18   A.  Yes.

19   Q.  So you did read this one at some point.

20   A.  Yes, some point, not all.

21   Q.  And when was that?

22   A.  When I asked the refund.

23   Q.  Okay.  So I believe you testified that you read your farm

24   loan agreements when you——when it came time to ask for a

25   refund, right?

O6D1GUO3                              Wu - Cross

1    A.  Not all, some, yes.

2    Q.  How many farm loan agreements are there?

3    A.  I mean, this contract, there are several pages, right?

4    That's long.  So——

5    Q.  Well, let's count them.  How many pages are there?  If we

6    could just flip.  Two.  Three.  Four.  Five.  Six.

7    A.  Yeah.

8    Q.  Five and a signature page.

9    A.  Yes.

10   Q.  Did I count that correctly?

11   A.  Yes.

12   Q.  Yes?  Okay.  Now you, as part of your work for the farm,

13   you were a translator, right?

14   A.  Yes.

15   Q.  You translated documents from Mandarin to English?

16   A.  English-Mandarin, Mandarin-English.

17   Q.  Yeah, sure.  Both ways?

18   A.  Yeah.

19   Q.  Yeah.  Makes sense.  And for a five-page document, how long

20   would it take you to translate that?

21   A.  This is a lot of terminology, financial or law, law

22   terminology.  I don't want to.  At that time I already thought

23   about leaving, so why I spend a lot of time on this?

24   Q.  So when you did translation work for Mountains of Spices as

25   part of the Sara Wei lawsuit——do you remember we talked about

1    that earlier today?

2    A.  Yes.

3    Q.  Okay.  Now is it fair to say that there was plenty of law

4    and legal terminology in those materials?

5    A.  Actually, the assistant did a lot of this part.

6    Q.  Okay.

7    A.  I just——just the plain translation and some calculation for

8    the number.

9    Q.  Okay.  So you had, it sounds like——is it fair to say you

10   had limited translation skills?

11   A.  Not limited.  I don't have that time.  I didn't have that

12   time, a lot of time.  That assistant always stayed night to do

13   this, and after that, after that——

14   Q.  I'm sorry.  Go ahead.

15   A.  After that, she just felt so tired, and she just asked me

16   to help her some, something, so——

17   Q.  Okay.  And you were——I believe you testified you were not

18   employed at this time, right?  At the time that you signed this

19   agreement, you'd been retired?

20   A.  Important, retire?  You mean retire myself?

21   Q.  Yes.

22   A.  Yeah.

23   Q.  Okay.  And so your testimony is that you were retired but

24   you didn't have the time to read a five-page document?

25   A.  At that time I said my family issues.

O6D1GUO3                           Wu - Cross

1    Q.  Okay.  Now did anyone——withdrawn.

2            No one put pressure on you to sign this document

3    quickly, right?

4    A.  Yes.

5    Q.  I believe you testified that you signed this document weeks

6    if not months later, right?

7    A.  Months, because the months later, they gave us this, the

8    contract.

9    Q.  But you had already sent the money, right?

10   A.  At that time, nothing; no contract, no agreement, nothing.

11   Q.  Right.

12   A.  Yeah.

13   Q.  So you had the opportunity to review the agreement; there

14   was no rush to get the money in, right, because it was already

15   in?

16   A.  Money already paid.

17   Q.  Right.

18   A.  Yeah.

19   Q.  So you had time to review the agreement, no?

20   A.  If I didn't sign, can I get my money back?

21   Q.  Ma'am, can you try answering my question?

22   A.  Okay, yeah.  Review?  Yes?

23   Q.  You had time, right?

24   A.  Yes.

25   Q.  Okay.  That's all I'm asking.

1    Now as you testified before, you had—a time
2    came—excuse me—when you asked for a refund, right, for the H
3    Coin purchase?
4    A.  Yes.
5    Q.  Right.  And you followed up a few times with a volunteer to
6    get the refund, right?
7    A.  Yes.
8    Q.  And that was in January of 2023, approximately, right?
9    A.  January?  You mean I got the refund?
10   Q.  No.  That you followed up with a volunteer.  The timing
11   was, when you followed up with the volunteer, in approximately
12   January of 2023.
13   A.  I still don't understand.  January 2023.
14   Q.  Do you remember when you got the refund?
15   A.  I remember should be March.
16   Q.  That you received the refund, right, received the money
17   back?
18   A.  Some.
19   Q.  Okay.  And what you're referring to is you didn't receive
20   back $200 or so in what you view as fees, right?
21   A.  5 percent commission fee and—
22   Q.  Right.  But you got everything else back besides the
23   5 percent commission, right?
24   A.  Just for the H Coin only.  You asked me to calculate at the
25   beginning.

1   Q.  Right.  Okay.

2           Now you mentioned that you invested through Wonder

3   Invest, right?  You testified about that?

4   A.  Not for H Coin.

5   Q.  Okay.  But you did invest through it for farms and GTV?

6   You made the farm loan through——

7   A.  VOG, right?  You mean VOG?  One transfer, yes, was Wonder

8   Invest.

9   Q.  Okay.  And the farm loans?

10  A.  Yes.

11  Q.  Okay.  Now does Wonder Invest——withdrawn.

12          Did you——did Wonder Invest invest in anything else

13  apart from the——I think what you called the G series

14  investments?

15  A.  You asked into my own company; is that okay?

16  Q.  Yeah.  That's fine with me.

17  A.  Okay.  Yes.

18  Q.  My question is:  Did it invest in anything else?

19  A.  My own company?

20  Q.  Yes.

21  A.  Yeah.

22  Q.  Okay.  What?

23  A.  Stock.

24  Q.  What kinds of stock?

25  A.  Just some kind of——

O6D1GUO3                          Wu - Cross

1    Q.  Like stock on the stock exchange?

2    A.  Yeah, yeah, just stock on the market.

3    Q.  What kind of investments, what kind of stock?

4    A.  What kind of stock?  You mean the field, what field?

5    Q.  Yeah.  Why don't we try this:  How much are those other

6    investments worth?

7    A.  All together?

8    Q.  Yeah.

9    A.  Including already sold?

10   Q.  Why don't——

11          MR. FERGENSON:  Your Honor, just a relevance

12   objection.

13          THE COURT:  Are you asking what her current portfolio

14   is worth?

15          MR. SCHIRICK:  Your Honor, she testified that she

16   invested through this company, so I'm just trying to figure out

17   what else the company invested in.

18          MR. FERGENSON:  Just a relevance objection.

19          THE COURT:  You may ask that question.

20   A.  I cannot remember.  I——just——

21   Q.  Okay.

22   A.  You want a statement?  I can't——

23   Q.  Ma'am, I'm just asking you for your memory of what else

24   you've invested in.

25          MR. FERGENSON:  She said she can't remember.

O6D1GUO3                          Wu - Cross

1           THE COURT:  She doesn't remember.  Let's go.

2   Q.  Now you testified that it was your company, but didn't you

3   also testify on direct that your husband gave it to you just to

4   play with?

5   A.  Yeah.

6   Q.  Okay.  So how much, approximately, is in there for you to

7   play with?

8   A.  The same questions you asked, just like how many stock,

9   right?

10  Q.  No.

11          MR. FERGENSON:  Object on relevance, your Honor.

12          THE COURT:  Are you asking how much money her husband

13  gave her to play with?

14          MR. SCHIRICK:  Well, what is the value of the assets

15  and cash that are in this entity that she has to play with;

16  that's my question.

17          THE COURT:  You may answer.

18  A.  Just the company, the account itself.

19  Q.  Okay.  You can't give me a dollar figure, right?

20  A.  Give you a dollar?

21  Q.  Figure.  A dollar amount.  Do you understand me okay?

22  A.  I understand.  It's just the company bank account.  Just

23  this account.  Just like you open account, then you have that

24  account.

25  Q.  Sure.  But you won't tell me the dollar amount, but the

O6D1GUO3                              Wu - Cross

```
 1   account——
 2                MR. FERGENSON:  Objection.
 3                THE COURT:  So don't testify.  Only ask questions.
 4                MR. SCHIRICK:  Sure.  Okay.  All right.  We'll move
 5   on.
 6   Q.  Now you were asked some questions by Mr. Fergenson about if
 7   you knew you had H Coin on the Himalaya Exchange.  Do you
 8   remember that?
 9   A.  I——I cannot hear you, the whole sentence.  Can you repeat
10   again.  Just, I——
11   Q.  Yes.  So, no problem.  So you testified earlier when you
12   were on direct examination with Mr. Fergenson——
13   A.  Mm-hmm.
14   Q.  ——and he asked you if you knew if your H Coin was ever on
15   the Himalaya Exchange.  Do you remember that?
16   A.  Yes.
17   Q.  Okay.  And you said no, right?
18   A.  Yes.  I don't have account.
19   Q.  Okay.  And you checked, right?
20   A.  Checked what?
21   Q.  Ma'am, you checked whether your H Coin was on the Himalaya
22   Exchange is the question I just asked.
23                MR. FERGENSON:  Asked and answered.
24                MR. SCHIRICK:  She did not answer.
25                THE COURT:  You may answer.
```

1  A.  You mean a check?

2          THE COURT:  No.  He's asking whether you checked; did

3  you inquire, did you check.

4          THE WITNESS:  I don't have account.  Where I to check?

5  Q.  So the answer is you didn't check, right?

6  A.  I have no place to check.  I don't know how to—to—which

7  one to ask.

8  Q.  Did you call anybody?

9  A.  I asked the volunteer work there, they said they don't

10 know.

11 Q.  Okay.  Did you ever sell any of your H Coin?

12 A.  I don't have H Coin in my hand.  How could I sell?  I don't

13 have in my hand.  I cannot control it.  How could I sell

14 anything?

15 Q.  Well, that's the question.  So the answer would be no.

16 A.  Okay.

17         THE COURT:  All right.  So don't tell her what the

18 answer should be.  You ask questions, she gives answers; you

19 don't testify, and she doesn't ask questions.

20         MR. SCHIRICK:  Sure.

21 Q.  Let's talk about your G/CLUBS membership.

22         Now did you first learn about G/CLUBS from the G/CLUBS

23 launch video?

24 A.  I know G Club from Miles Guo's video.

25 Q.  From his—now do you recall launching—excuse me.

O6D1GUO3                          Wu - Cross

1    Withdrawn.

2              Do you recall watching the launch video for G/CLUBS?

3    A.  Miles Guo smoking, that one?

4    Q.  Do you know what I mean by launch video?

5    A.  Yeah.

6    Q.  Okay.  What do you think I mean?

7    A.  I just remember he's just smoking in that video.  That one?

8              MR. SCHIRICK:  Move to strike as nonresponsive.

9              THE COURT:  No.  She's asking you are you referring to

10   a video in which Mr. Guo is smoking.

11             MR. SCHIRICK:  Why don't we make this easy and pull up

12   the video.  GX C148-V1.  And let's please go to time stamp

13   3:28.  And we'll just play it for a few seconds.

14             MR. FERGENSON:  I think, your Honor, Mr. Schirick may

15   be pulling up GX C9.  I may have misheard, but I think that's

16   the exhibit.

17             THE COURT:  Well, you can confer with him.

18             (Counsel conferring)

19             MR. SCHIRICK:  Your Honor, may we approach?

20             THE COURT:  Sure.

21             (Continued on next page)

22

23

24

25

1            (At the sidebar)

2            MR. SCHIRICK:  So, your Honor, we just want to note

3    for the record that the 3500 material shows that the witness

4    met with the government on at least one occasion, perhaps more,

5    with an interpreter, and that she continues to seem to have

6    trouble in understanding questions, asking questions directly.

7    So we'd like to ask for an interpreter.

8            MR. FERGENSON:  I've never used an interpreter with

9    her.  I had a standby interpreter on the calls, because we

10   don't know, when we're first talking to someone, their facility

11   with English.

12           THE COURT:  So was there ever an agent, whether you or

13   someone else, who used an interpreter?

14           MR. FERGENSON:  Not that I'm aware of.

15           THE COURT:  She seems to me as being exceptionally

16   smart and fluent in English.  It may be a bit broken, but I

17   have the sense that she understands every single word that

18   you're saying.  And she's great at the volleys.

19           MR. SCHIRICK:  Well, I have to say I respectfully

20   disagree.  I think we've had to rephrase questions any number

21   of times to try to get it across.  Your Honor struck numerous

22   answers from her testimony as being nonresponsive.  It either

23   shows that she's not willfully responding to the question or

24   she doesn't understand.

25           THE COURT:  She's against your client and she wants to

O6D1GUO3                          Wu - Cross

1    let the world know what she thinks.  So yeah, she might be

2    resisting you, but it's not about the language.

3              MR. SCHIRICK:  Your Honor, I think, you know——

4              MS. SHROFF:  So I think at one point, your Honor, she

5    was asked a question about when she had seen a document or

6    something to that effect and her answer was indicative of she

7    thought when the document was in fact created as opposed to

8    when she saw it.  We're just suggesting that because the direct

9    flows more easily because she's prepped, so on the cross, it

10   seems that she doesn't quite understand either the lingo or the

11   question.  And, look, she can volley all she wants.  She's very

12   funny.  I'll give you that.

13             THE COURT:  She is as clever as she can be, and you

14   can't be clever if you don't understand the question.

15             MS. SHROFF:  Well——

16             MR. SCHIRICK:  Or be clever by pretending not to

17   understand the question.

18             THE COURT:  That's very possible, but I do not have

19   the sense she has a language problem.  I think she has a

20   problem with your client and she's letting you know.  And

21   you've got to be deft and you've got to be agile.  That's how

22   it works.

23             (Continued on next page)

24

25

O6D1GUO3                          Wu - Cross

1            (In open court)

2       BY MR. SCHIRICK:

3       Q.   Okay.  So we're going to play you a video and you just let

4       me know if you recognize it, okay?

5       A.   Okay.

6       Q.   And if you don't——Ms. Wu, if you don't understand a word

7       that I'm using or a phrase that I'm using, just feel free to

8       let me know and I'm happy to rephrase, okay?

9       A.   Okay.

10           (Video played, for witness only)

11      Q.   Okay.  Do you recognize that as the launch video for

12      G/CLUBS?

13      A.   I don't remember.

14      Q.   Okay.  Now at the time you were watching Mr. Guo's

15      broadcasts fairly regularly, right?

16      A.   Too many.  I cannot remember every one.

17      Q.   Yeah.  I'm sure.

18           So a time came when you purchased the G/CLUBS

19      membership, right?

20      A.   Yeah.

21      Q.   Now did you purchase the G Club membership after watching

22      this video?

23      A.   I don't remember.

24      Q.   Would you have made the purchase if you hadn't watched the

25      video?

O6D1GUO3                          Wu - Cross

1          MR. FERGENSON:  Objection.

2          THE COURT:  Sustained.  If she can't remember, then

3   how she can answer this follow-up question?

4   Q.  How did you first learn about G/CLUBS?

5   A.  Miles Guo said that.

6   Q.  When?

7   A.  I don't remember.

8   Q.  Do you remember approximately when?

9   A.  On a yacht.

10  Q.  No, in time, ma'am.

11  A.  I don't remember.

12  Q.  Do you think you sent $10,000 to G/CLUBS?

13  A.  Yes.

14  Q.  Withdrawn.  How did you learn where to send the $10,000 for

15  G/CLUBS purchase?

16  A.  How do you learn?

17  Q.  Yeah.  How did you know where to send the $10,000 for the

18  G/CLUBS purchase?

19  A.  GClub.com?

20  Q.  So you went to the website?

21  A.  Yeah, the farm told us to do so.

22  Q.  Okay.  And you registered on the website?

23  A.  Yes.

24  Q.  Okay.  And you received a membership number, right?

25  A.  You mean the online number, right?

O6D1GUO3                          Wu - Cross

1   Q.  A membership number, right.

2   A.  Okay, yes, online, yeah.

3   Q.  And do you recall whether you received that before or after

4   you watched the G/CLUBS video?

5   A.  I don't remember.

6   Q.  Okay.  Now you testified that G/CLUBS didn't give you any

7   benefits, right?

8   A.  Yes.

9   Q.  You did have a potential discount on G Fashion, right?

10  A.  Yes.

11  Q.  But you didn't like their stuff.

12  A.  Yes.

13  Q.  Now did you ever ask or inquire of G/CLUBS whether they

14  were adding additional benefits?

15  A.  Yes.

16  Q.  Okay.  Tell me about that.

17  A.  I wrote email to them.

18  Q.  Did you produce that email to the government?

19  A.  No.  I deleted it, because one time my computer, some

20  problem.  I don't know what happened.  Some——something just,

21  gone.

22  Q.  Sure.  It got deleted.

23  A.  Yeah.

24  Q.  Did you ever——besides the email that you just referenced,

25  did you ever inquire in any other way about whether they were

O6D1GUO3                              Wu - Cross

1   adding additional benefits?

2   A.  I talked with members of the farm about this.

3   Q.  Okay.  But my question was:  Did you talk to anyone at

4   G/CLUBS, or attempt to get in touch with anyone at G/CLUBS?

5   A.  No.

6   Q.  Okay.  Now wasn't one of the benefits of G/CLUBS the G

7   Talks sweepstakes?

8   A.  The benefits not that useful.

9   Q.  Didn't you enter the G Talks sweepstakes?

10  A.  Once.

11  Q.  Only once?

12  A.  Yeah.

13          Because somebody told me something——

14  Q.  Sure.  There's no question pending.

15  A.  Okay.

16          MR. SCHIRICK:  All right.  Now if we could just please

17  pull up GX C148-TX, which is also in evidence.

18          And if we can go to page 5, please.

19  Q.  Can you see that displayed, that document displayed on the

20  screen in front of you?

21  A.  Yes.

22  Q.  Okay.  Now I'm going to read there.  You let me know if I

23  get it correct, okay?  And this comes from the G/CLUBS launch

24  video.

25          Under the reviewed——

O6D1GUO3                          Wu - Cross

1          MR. FERGENSON:  He's testifying.  He just said this is

2    the G/CLUBS launch video.  She never said that.

3          THE COURT:  So the witness has not stated that she

4    remembers the G Club launch video.

5          MR. SCHIRICK:  And I'm only showing this to her and

6    reading it to her to see if it refreshes her recollection.

7          THE COURT:  So let's step up, please.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6D1GUO3                          Wu - Cross

1              (At the sidebar)

2              THE COURT:  So she doesn't recall whether she saw the

3     launch video.  If you want to refresh her recollection, first

4     you would say, is there something that might refresh your

5     recollection, then you would show that to her, but you can't

6     read from it; you'd ask her to read from it and ask, does this

7     refresh your recollection.

8              MR. SCHIRICK:  This document is in evidence, your

9     Honor.

10             THE COURT:  Absolutely, but when you're refreshing

11    somebody's recollection, you can't read from the document.  You

12    have to first show the person the document and ask them, does

13    it refresh your recollection.

14             MR. FERGENSON:  And I would just——my objection was

15    just him stating this is from the launch video when she's never

16    testified to that.  She doesn't remember watching the video.

17             MR. SCHIRICK:  Mr. Fergenson is stating——

18             THE COURT:  The launch video is in evidence.  And so

19    you're trying to get at whether or not she saw it and whether

20    she heard these warnings.  That's what you're trying to get at,

21    right?

22             MR. SCHIRICK:  Sure.

23             THE COURT:  So first you've got to establish that she

24    has some recollection of seeing the video.  She said she

25    doesn't recollect.  So maybe you can jog her memory.  And the

1   way that you jog the memory is by showing her something,

2   whatever that thing might be, just showing it to her alone and

3   asking her.

4            MR. SCHIRICK:  Happy to do that.  Happy to do that.

5            THE COURT:  You could, for example, show her the video

6   without the sound, and ask her does she recollect seeing that.

7            MR. SCHIRICK:  And that's what that video actually

8   was, your Honor, was the beginning of it, beginning of the

9   launch video.

10           THE COURT:  That was a document that we're reading

11  from and what I'm suggesting is not right.

12           MR. SCHIRICK:  I was referring to the previous

13  exhibit, your Honor, that had the Mandarin on the one side and

14  the English on the other, and the audio recording.  That's

15  actually the launch video.  But I'm happy to take the Court's

16  point.  I'm happy to refresh her recollection.

17           THE COURT:  Okay.

18           (Continued on next page)

19

20

21

22

23

24

25

```
 1                    (In open court)
 2      BY MR. SCHIRICK:
 3      Q.  Now, Ms. Wu, you testified earlier, correct, that you don't
 4      recall whether you watched the G/CLUBS launch video?
 5      A.  I don't remember.  I don't remember.
 6      Q.  Okay.  Would it help if I showed you the document, help
 7      refresh your memory?
 8      A.  No.
 9      Q.  So nothing I can show you would help refresh your memory;
10      you know that for sure without ever having seen it?
11                    MR. FERGENSON:  Objection.
12                    THE COURT:  Sustained.
13                    Is there something that might refresh your
14      recollection?  That's the question.
15                    THE WITNESS:  For that video, no.
16                    THE COURT:  Move on.
17      BY MR. SCHIRICK:
18      Q.  Do you have any problems with your memory, ma'am?
19      A.  I don't think so.
20      Q.  Okay.  Now you were asked some questions by Mr. Fergenson
21      about Miles Guo being targeted by the CCP.  Do you remember
22      that?
23      A.  Yes.
24      Q.  Okay.  And you said you don't think that the projects that
25      Miles Guo worked on had anything to do with the CCP.  Do you
```

O6D1GUO3                          Wu - Cross

1  remember that?

2  A.  Yes.

3       MR. SCHIRICK:  Okay.  Can we pull up DX Stip 1.

4  Q.  Now I'm going to read you this document, and you let me

5  know if it changes your mind——

6  A.  Okay.

7  Q.  ——about the question you just answered.

8       "It is hereby stipulated and agreed by the United

9  States of America and Miles Guo, the defendant, through their

10  attorneys of record that:

11       "1.  The FBI has investigated individuals who, working

12  at the direction of the government of the People's Republic of

13  China ('the PRC government') have engaged in an international

14  campaign, known as 'Operation Fox Hunt,' to coerce individuals

15  located in the United States and elsewhere to return to China

16  to face charges brought by the PRC government or to otherwise

17  reach financial settlements with the PRC government.

18       "2.  In 2017, a U.S. law enforcement agency assessed

19  that Mr. Miles Guo was the highest priority of China's

20  repatriation efforts.

21       "3.  In 2017, a U.S. law enforcement agency received

22  information that Chinese officials were paying and providing

23  food and signs to protestors of Mr. Guo.

24       "4.  In 2018, a U.S. law enforcement agency received

25  information that the PRC government had established a special

1    investigative group in China to manage China's investigation

2    of, and actions against, Mr. Guo."

3                Now if we could scroll down to the next page.

4                "5.  To carry out some of the objectives of Fox Hunt,

5    in 2017, the PRC government tasked a specially-designated group

6    of operatives ('the Group') with discrediting and harassing

7    individuals including Mr. Guo by using interactive computer

8    services and electronic communication systems."

9                Now if we could just scroll down to paragraph 6,

10   please.

11               "6.  Since Mr. Guo fled the PRC, the PRC government

12   has sought his return for prosecution in the PRC and has

13   employed numerous methods to effect Mr. Guo's capture or

14   arrest.  In May 2017, the PRC government sent four undeclared

15   agents from the PRC's Ministry of State Security ('MSS') to the

16   United States to attempt to cause Mr. Guo's coerced

17   repatriation to the PRC as part of the Fox Hunt initiative.

18   The U.S. government disrupted the PRC government's efforts to

19   forcefully repatriate Mr. Guo, and Mr. Guo continued to reside

20   in the United States."

21               Do you see that, ma'am?

22   A.  Yes.  Yes.

23   Q.  Do you still believe that Mr. Guo's projects had nothing to

24   do with being anti-CCP?

25   A.  Not exactly.  I think this shows nothing to prove Miles Guo

O6D1GUO3                        Wu - Redirect

1   anti the CCP.  I don't think so.

2              MR. SCHIRICK:  No further questions at this time, your

3   Honor.

4              THE COURT:  Redirect?

5              MR. FERGENSON:  Thank you, your Honor.

6              Ms. Loftus, do you want to pull up DX Stip 1, if you

7   have it.

8   REDIRECT EXAMINATION

9   BY MR. FERGENSON:

10  Q.  While we're waiting, Ms. Wu, about the stipulation, the

11  agreement between the parties you were just read, can you

12  explain to the jury what you mean when you say that doesn't

13  have anything to do with Miles Guo being anti-CCP?

14             MR. SCHIRICK:  Objection.  She just explained it.

15             THE COURT:  I don't know if that was her exact answer.

16  You could ask her to further explain the answer, but I don't

17  know, the way you characterize it, if that's correct.

18             MR. FERGENSON:  Understood, your Honor.

19  Q.  Ms. Wu, could you explain your answer to the jury, please.

20  A.  Fox Hunt, this operation, chased many——chased after many

21  people.  Actually, not all people on this list are good people.

22  I——as far as I know, Fox Hunt operation wanted a lot of people

23  who colluded with CCP officer or officers to make huge fortune

24  and then these people escaped abroad with the money, so this

25  operation included some kind of these people, and as far as I

O6D1GUO3                         Wu - Redirect

1    can searched online——

2              MR. SCHIRICK:  Your Honor, objection.

3              THE COURT:  Overruled.  You may continue.

4    A.  ——I just find that Miles Guo belongs to this category, so

5    he committed economic crimes in China.  I didn't find things

6    about Miles Guo's political reason in China.  So I——I think

7    that's paragraphs prove nothing that Miles Guo anti-CCP.

8    Q.  And Ms. Wu, you testified that you first learned about

9    Miles Guo in 2018, right?

10   A.  Yes.

11   Q.  And had you heard of him before that?

12   A.  No.

13   Q.  Had you heard of him being a CCP dissident before that?

14   A.  No.

15   Q.  All right.  Ms. Wu, you were asked some questions about

16   Sara Wei.

17   A.  Yes.

18   Q.  Which farm did Sara Wei lead?

19   A.  At that time Phoenix Farm.

20   Q.  Who picked the farm leaders?

21   A.  Miles Guo.

22   Q.  Who gave the farm leaders instructions?

23   A.  Miles Guo.

24             MR. FERGENSON:  And Ms. Loftus, if we could pull up

25   GX Z9.  Could we go to page 192.

1    Q.  Ms. Wu, you were also asked questions about a falling-out

2    between Miles Guo and Sara Wei.  Do you remember that?

3    A.  Yes.

4    Q.  All right.  Now just focusing you on the bottom of page 192

5    here, this date in this chart is February 13th, 2023, and the

6    image there says Full Text of Miles Guo's Gettr Video.

7            MR. FERGENSON:  If we could scroll down slightly.

8            And we'll go to the bottom of 193.

9    Q.  If we could, Ms. Wu, I'll just read the two paragraphs

10   here.

11           It says, "Don't make excuses for yourself under any

12   circumstances——"

13           MR. SCHIRICK:  Objection.

14           THE COURT:  Is this document in evidence?

15           MR. FERGENSON:  It is, your Honor.

16           MR. SCHIRICK:  Is there a question?

17           THE COURT:  Perhaps you could ask the question first.

18           MR. FERGENSON:  Yes, your Honor.  Is it okay if I ask

19   Mr. Schirick if she can let me know if I read it correctly.

20           THE COURT:  No.  You certainly could whisper in his

21   ear the anticipated question.

22           (Counsel conferring)

23   BY MR. FERGENSON:

24   Q.  Ms. Wu, can you read the two paragraphs starting with,

25   "Don't make excuses."

O6D1GUO3                        Wu - Redirect

1   A.  "Don't make excuses for yourself under any circumstances,

2   whether it comes to earning money, striving for a goal, or

3   pursuing what you believe in.  Don't justify your failures and

4   greed.

5           "In particular, Chinese people always like to pass the

6   buck and blame someone in the family or their life for their

7   own mistakes.  They always make someone else the scapegoat and

8   say it is this person's fault or that it was not because of him

9   . . . our Chinese like to point fingers at others.  Please,

10  take responsibility for what you do."

11          MR. SCHIRICK:  Your Honor, objection.  There's no

12  question.

13          THE COURT:  I'm waiting for the question.

14  Q.  Are you familiar with what a scapegoat is?

15  A.  This word, yes.

16  Q.  What is a scapegoat?

17  A.  Just put your fault on others and let others be responsible

18  for your fault.

19          MR. FERGENSON:  Ms. Loftus, if we could go to page 6.

20  Q.  Ms. Wu, you were asked about this entry on the chart.  Do

21  you remember that?

22  A.  Yes.

23          MR. FERGENSON:  If we could scroll down.

24          I'm sorry.  Could we scroll up slightly, Ms. Loftus.

25  Q.  And Ms. Wu, in this video, just focusing you on the last

O6D1GUO3                          Wu - Redirect

1    sentence of that first paragraph.

2    A.   Okay.

3    Q.   Could you read that sentence.

4    A.   This turned out to be a conservative estimate and 17.5

5    times the valuation.

6    Q.   And what sorts of things did Miles Guo say about the value

7    of GTV?

8            MR. SCHIRICK:   Objection.   Asked and answered.

9            THE COURT:   Overruled.   You may answer.

10   A.   He said, I remember 20 billion; maybe he said later was

11   higher value.

12           MR. FERGENSON:   And Ms. Loftus, if we could go to

13   page 28.

14   Q.   Ms. Wu, you were also asked about whether you sent your

15   farm loan money before seeing a Miles Guo video about the

16   farms.  Do you remember being asked about that?

17   A.   I remember he asked about the G/CLUBS video.

18   Q.   Okay.  We can do that too.

19           MR. FERGENSON:   If we can scroll down slightly.   And

20   we can keep scrolling down.

21   Q.   Now, Ms. Wu, do you see the date on the chart here is

22   July 22, 2020?

23   A.   Yes.

24   Q.   Is this before you sent your G/CLUBS money?

25   A.   Yes.

1   Q.  And do you see in the screenshot there, it says "You become

2   a shareholder of G Club immediately"?

3   A.  Yes.

4          MR. FERGENSON:  If we could just pull up quickly

5   GX V939.

6          Government Exhibit VN39.

7   Q.  While we're waiting, Ms. Wu, you were asked questions about

8   the H Coin quota formula.  Do you remember being asked about

9   that?

10  A.  Yes.

11  Q.  Can you explain how the volunteer work——well, withdrawn.

12         Was the volunteer work the only thing that went into

13  the formula, or just one thing?

14         MR. SCHIRICK:  Objection.

15         THE COURT:  Sustained.

16  Q.  Can you explain how the volunteer work factored into the

17  formula generally.

18  A.  I don't know.  They just——they did this.  I don't think

19  they had any rules for this.  They just, like, if they like you

20  and then give you more, if you——if they——just like according to

21  their own feeling.  I don't know.  I don't know there are any

22  rules for that.

23         MR. SCHIRICK:  Objection.  Speculation, as to what

24  other people thought or did.

25         THE COURT:  She said she doesn't know if there are any

O6D1GUO3                          Wu - Redirect

1    rules.  The answer stands.

2    Q.  And Ms. Wu, now that we have the loan agreement up, do you

3    remember being asked questions about, you know, paragraph 1(d)

4    here about the maturity date?  Do you remember those questions?

5    A.  Yes.

6            MR. FERGENSON:  If we could scroll down to the

7    signature page.

8    Q.  Ms. Wu, at the time you sent your money, did you even have

9    a countersigned contract?

10   A.  No.

11   Q.  How long after you sent your money and you signed the

12   contract did you get a signed copy back?

13   A.  Just this, 2021, November 2nd.

14   Q.  And did you get an addendum on that same date?

15   A.  I cannot remember.  Maybe together.  I don't remember.

16   Q.  Ms. Wu, you were also asked questions about your family in

17   China.  Do you remember being asked questions like that?

18   A.  Can you make it clearer.

19   Q.  On cross-examination you were asked questions about whether

20   you had family in China.  Do you remember that?

21   A.  Yes.

22   Q.  And you were asked questions about whether you visited

23   China.  Do you remember that?

24   A.  Yes.

25   Q.  Are you testifying today because the CCP forced you to?

1  A.  No.  You mean CCP force me to sit here to answer your

2  question?  No.

3  Q.  Are you a CCP spy?

4  A.  No.

5         MR. FERGENSON:  No further questions.

6         THE COURT:  Recross?

7  RECROSS EXAMINATION

8  BY MR. SCHIRICK:

9  Q.  Ms. Wu, you were just shown a video from July 22nd of 2020,

10  right?

11  A.  Yes, just now.

12  Q.  Okay.  Sure.  And Mr. Fergenson asked you whether you

13  recalled if you had seen that before you purchased your G/CLUBS

14  membership, right?

15  A.  Yes.

16  Q.  Okay.  And I showed you a video about the G/CLUBS launch,

17  right?

18  A.  You showed me the video?  No.

19  Q.  You don't recall me showing you a video?

20  A.  Just about the text, not a video.

21  Q.  It was a video that had text, right?

22  A.  Okay, yeah.

23  Q.  Okay.  And so you remember that I showed that to you

24  earlier.

25  A.  Yes.

O6D1GUO3                    Wu - Recross

1    Q.  Okay.  And you couldn't remember whether the video I showed
2    you was before or after your G/CLUBS purchase, right?  That was
3    your testimony.
4    A.  You didn't say the date, right?  I remember after that—
5    Q.  Would it help if I showed it to you to refresh your memory?
6    A.  Okay.
7                MR. SCHIRICK:  So if you pull up GX 148-TX, please.
8                This is a document that's in evidence and it's dated
9    October 13, 2020.
10               And go to page 5, please.
11   Q.  And let me know if I get this right.  Okay?
12               "Under the revised launch plan for G/CLUBS, however,
13   members will not receive special access to future offerings of
14   stock, will NOT receive GTV stock, and will NOT receive loans
15   to purchase memberships.  This is serious business, brothers
16   and sisters.  Even if you have bought G Club, it absolutely
17   will not come with the stocks; it does not mean that you can
18   buy stocks of G Fashion and GTV; and, it does not mean that you
19   will be able to receive loans in the future.  No!  No!  No!
20   I'll repeat, this is a very serious topic.  No!  No!  There is
21   no GTV's stock.  And there is no G Fashion's stock.  When I
22   hear all this, I got chills.  There is none of that."
23               Does that refresh your recollection?
24   A.  No.  And I asked the date for this.  The date.
25   Q.  As I said before, it's October 13th.  It's three days

O6D1GUO3                         Wu - Recross

1   before you purchased your G/CLUBS membership, right?

2              MR. FERGENSON:  I mean, he can't do that, your Honor.

3              THE COURT:  She asked for the date.

4              MR. SCHIRICK:  It's a fact in evidence.

5              THE COURT:  October 13th what year?

6              MR. SCHIRICK:  2020.  It's a fact in evidence, by

7   stipulation of the parties.

8              THE COURT:  Are you asking whether or not October 13th

9   comes two days before October 15th?  Is that the question?

10             MR. SCHIRICK:  Yes.  And it's the 16th.

11             THE COURT:  Whether October——

12             MR. SCHIRICK:  16th comes three days after

13  October 13th, the date of this video.

14             THE COURT:  It's a compound question.  So let's take

15  it in pieces.

16  BY MR. SCHIRICK:

17  Q.  Okay.  You purchased your G/CLUBS membership on

18  October 16th, right, you testified before?

19  A.  I said October.  I don't remember the date.

20  Q.  If I were to show you a document, would it refresh your

21  recollection?

22  A.  If you have the document, yes.  Yes.

23             MR. SCHIRICK:  Okay.  Not for the jury yet, just for

24  the witness and the parties.

25  Q.  Ma'am, do you recognize this document?

O6D1GUO3                          Wu - Recross

1   A.  Yes.

2   Q.  And what is it?

3   A.  My wire transfer statement.

4   Q.  And in fact, this is a statement that you sent to the

5   government lawyers, right?

6   A.  Yes.

7          MR. SCHIRICK:  Your Honor, we offer this into

8   evidence.

9          THE COURT:  Any objection?

10          MR. FERGENSON:  No, your Honor.

11          THE COURT:  It is admitted.  Do you have an identifier

12   for this?

13          MR. SCHIRICK:  Yes.  DX 7002, your Honor.  I'm sorry.

14   3.

15          (Defendant's Exhibit 7003 received in evidence)

16          MR. SCHIRICK:  May we publish it to the jury, your

17   Honor.

18          THE COURT:  Yes.

19          MR. SCHIRICK:  Can we please zoom in on the date under

20   the words Wire Transfer Information.

21   BY MR. SCHIRICK:

22   Q.  Can you see the document, Ms. Wu?

23   A.  Yes.

24   Q.  And does this refresh your recollection that you purchased

25   your G Club membership by sending $10,000 on October 16, 2020?

1    A.  I still cannot remember, but the paper like this, okay,

2    that is the time.

3    Q.  Okay.  But you don't have any reason to believe that this

4    document, which you gave to the government, is incorrect, do

5    you?

6    A.  This is right.  This is right.

7    Q.  It's right.

8    A.  Yeah.

9            MR. SCHIRICK:  Okay.  Now if we go back to the

10   previous exhibit, GX C148-TX.  Actually, I take that back.  Can

11   we go to GX Z9.

12           And if we can please go to the October 13, 2020,

13   entry.

14   Q.  Now do you see the document that's displayed on your

15   screen?

16   A.  Yes.

17   Q.  And you see that the date column is October 13, 2020?

18   A.  Yes.

19           MR. SCHIRICK:  Okay.  And now if we can scroll down.

20   Keep going.  Keep going, please.

21           Keep going.  We're looking for——here.  There we go.

22   Q.  Now do you see here with the sentence beginning, "Under the

23   reviewed launch plan for G/CLUBS, however, members will not

24   thereby have opportunity to subscribe for or purchase any

25   shares to be issued in the future and will NOT receive GTV club

O6D1GUO3                        Wu - Recross

1    stock"?  Do you see that?

2              MR. FERGENSON:  Your Honor, this is the third time

3    we're reading the same text in the examination.  Just trying to

4    speed things along.

5              MR. SCHIRICK:  Just trying to link it up.

6              THE COURT:  Okay.  Go ahead.

7    Q.  Do you see that?

8    A.  Yes.

9    Q.  And that was, as the chart tells you——the chart is in

10   evidence——that that is from October 13th, right?

11   A.  Yes.

12   Q.  And that's three days before you purchased your G/CLUBS

13   membership, right?

14   A.  I heard his previous or previous——or previous videos.

15   Q.  My question is, this is three days before you purchased

16   your G Club membership, right?

17   A.  Yes, this is correct.

18   Q.  Okay.  Thank you.

19             Now you also——you testified a moment ago that you

20   don't believe that Mr. Guo is truly anti-CCP, right?

21   A.  No, he's not.

22   Q.  Okay.  Well, if we can pull up one more time DX Stip 1.

23   Paragraph 5.

24             And I'm going to start reading about halfway through

25   this paragraph, a little bit more than halfway through,

1    beginning with the words "In or about December 2018."

2            "In or about December 2018, officers of the Group were

3    directed to post three videos or posts daily with YouTube and

4    Facebook accounts, with one of the posts required to be

5    anti-Mr. Guo.  On February 3, 2020, a PRC government official

6    issued a tasking requirement that every member of the Group

7    shall write an original article with content related to

8    targeting Mr. Guo, the COVID pandemic, or Hong Kong.  The FBI

9    investigated the Group's activities, including its activities

10   aimed at Mr. Guo, and the U.S. government has charged many of

11   the group's members with violations of U.S. law."

12           Can you tell me why the PRC government would be

13   targeting——

14           MR. FERGENSON:  Objection.

15   Q.  ——Mr. Guo in this way if he's not anti-CCP?

16           THE COURT:  Sustained.  She cannot speak for the

17   Chinese government.

18   Q.  Does this change your opinion as to whether Mr. Guo is

19   anti-CCP?

20   A.  No.

21   Q.  Even if the CCP is after him, it doesn't change your

22   opinion at all?

23           THE COURT:  Asked and answered.

24           MR. SCHIRICK:  No further questions, your Honor.

25           THE COURT:  Any redirect?

 1                MR. FERGENSON:  Very briefly.

 2   REDIRECT EXAMINATION

 3   BY MR. FERGENSON:

 4   Q.  Ms. Wu, when you sent money to G/CLUBS, what did you expect

 5   to receive?

 6   A.  GTV stock.

 7                MR. SCHIRICK:  Beyond the scope.

 8                THE COURT:  Overruled.  You may answer.

 9   Q.  Did you expect G/CLUBS money to be used to buy a mansion?

10                MR. SCHIRICK:  Objection.  Beyond the scope.

11                THE COURT:  Overruled.  You may answer.

12   Q.  Did you expect G/CLUBS money would be used to buy a

13   mansion?

14                MR. SCHIRICK:  Same objection.

15   A.  No.

16                MR. SCHIRICK:  No further questions.

17                THE COURT:  Any re-recross?

18                MR. SCHIRICK:  No, your Honor.

19                THE WITNESS:  Good.

20                THE COURT:  You may step out.

21                THE WITNESS:  Thank you.

22                (Witness excused)

23                THE COURT:  And the government may call its next

24   witness.

25                MR. FINKEL:  The government calls Kimberly Espinoza.

O6D1GUO3                          Espinoza - Direct

 1              THE LAW CLERK:  Would you raise your right hand,

 2    please.

 3              (Witness sworn)

 4              THE LAW CLERK:  Thank you.

 5              THE COURT:  Please state your name and spell it.

 6              THE WITNESS:  Kimberly Espinoza.  K-I-M-B-E-R-L-Y,

 7    E-S-P-I-N-O-Z-A.

 8              THE COURT:  You may inquire.

 9              MR. FINKEL:  Thank you, your Honor.  Just one moment,

10    please.

11     KIMBERLY ESPINOZA,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. FINKEL:

16    Q.  Ms. Espinoza, can you please remind the members of the jury

17    where you work and what your title is.

18    A.  I work at the FBI and my title is a forensic accountant.

19              THE COURT:  One moment, please.

20              You may continue.

21              MR. FINKEL:  Thank you, your Honor.

22    Q.  Ms. Espinoza, you've testified at this trial previously; is

23    that correct?

24    A.  Yes, that's correct.

25    Q.  And after you testified last time you testified at this

O6D1GUO3                    Espinoza - Direct

1   trial, were you contacted by the case team again?

2   A.  Yes, I was.

3   Q.  And what, if anything, did the case ask you to do?

4   A.  To review new financial information, and testify again.

5   Q.  And did you review that new financial information?

6   A.  Yes, I did.

7           MR. FINKEL:  Your Honor, at this time, pursuant to

8   GX Stip 14, the government offers GX VNB1-3, GX IDB1, 3, 4, 7,

9   GX SIG1, GX SIL4, GX SIL3, GX SIL40.

10          THE COURT:  The stipulation is already in evidence?

11          MR. FINKEL:  Yes, your Honor.

12          THE COURT:  Any objection?

13          MR. SCHIRICK:  No objection.

14          THE COURT:  They are admitted.

15          (Government's Exhibits VNB1-3, IDB1, IDB3, IDB4, IDB7,

16  SIG1, SIL4, SIL3, SIL40 received in evidence)

17          MR. FINKEL:  Pursuant to Stip 8, the government offers

18  BR451 and BR452.

19          MR. SCHIRICK:  No objection.

20          THE COURT:  They're admitted.

21          (Government's Exhibit BR451 and BR452 received in

22  evidence)

23          MR. FINKEL:  And the government also offers GX CAP623

24  and GX CAP624.

25          MR. SCHIRICK:  No objection.

O6D1GUO3                          Espinoza - Direct

1              THE COURT:  They're admitted.

2              (Government's Exhibits CAP623 and CAP624 received in

3    evidence)

4              MR. FINKEL:  Thank you, your Honor.

5              Ms. Loftus, if we could please display for the witness

6    what's been marked for identification as GX Z12.  And if you

7    can just flip through that so Ms. Espinoza can take a look at

8    it.

9              We can go back to page 1.

10   BY MR. FINKEL:

11   Q.  Ms. Espinoza, do you recognize this document?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It's an analysis of financial statements that was—that I

15   assisted with.

16   Q.  And did you review this analysis?

17   A.  Yes, I did.

18   Q.  Did you check it for accuracy based on the underlying

19   exhibits?

20   A.  Yes, I did.

21   Q.  Is it accurate?

22   A.  Yes, it is.

23   Q.  And are those underlying exhibits voluminous records?

24   A.  Yes, they are.

25   Q.  And what kind of records are the underlying exhibits?

1  A.  Bank accounts, like bank statements, checks, deposits,

2  withdrawals, and also some documentation relating to a

3  property.

4          MR. FINKEL:  The government offers Z12.

5          MR. SCHIRICK:  No objection.

6          THE COURT:  It is admitted.

7          (Government's Exhibit Z12 received in evidence)

8          MR. FINKEL:  If we could publish it, please.

9  Q.  Ms. Espinoza, at a high level, what was the money flow, if

10  any, that you analyzed in this chart?

11  A.  It was money that was transferred from Crane Advisory Group

12  LLC to Lawall & Mitchell, LLC, and then the ongoing of funds

13  from there.

14          THE COURT:  I didn't catch where you said it was

15  transferred.

16          THE WITNESS:  Lawall & Mitchell.

17  Q.  Do you know what Crane Advisory Group is?

18  A.  I do not.

19  Q.  Do you know who Haitham Khaled is?

20  A.  I do not.

21  Q.  Okay.  This is the first——we're looking at the first slide

22  of Z12, Ms. Espinoza.  And at the top left, it says Capital One

23  887 and 890.  What do those numbers refer to?

24  A.  Those are the last four digits of two bank accounts.

25  Q.  Bank accounts in the name of what entity?

1    A.  Crane Advisory Group, LLC.

2              MR. FINKEL:  If we could go to the next slide, please.

3    Q.  And what are we looking at here on slide 2?

4    A.  These are the signature cards for those two Crane Advisory

5    Group LLC bank accounts.

6    Q.  What's the signature card?

7    A.  It's a card provided by the bank listing all the account

8    information and then who's the authorized user or signer of the

9    account.

10   Q.  What's the business name at the top of each of these

11   accounts, the 887 and 890 accounts?

12   A.   It's Crane Advisory Group, LLC.

13   Q.  And what is the signature at the bottom of these signature

14   cards?

15   A.  Haitham Khaled.

16             MR. FINKEL:  We can go to the next slide, please,

17   Ms. Loftus.

18   Q.  And what does this slide represent, Ms. Espinoza?

19   A.  There were additional Crane Advisory Group LLC bank

20   accounts that were not at Capital One, so these are—there were

21   seven accounts at three other banks.

22   Q.  And they were all in the name of Crane Advisory Group?

23   A.  Yes, they were.

24             MR. FINKEL:  Could we go to the next slide, please.

25   Q.  And what are we looking at here?

1    A.    These are three signature cards for those bank accounts I

2    just referred to, so they're for IDB Bank and for Signature

3    Bank.

4    Q.    And these accounts are in the name of what entities?

5    A.    Crane Advisory Group, LLC.

6    Q.    And what is the contact information on these three

7    documents on the screen, or the name of the individual?

8    A.    The name of the signer?

9    Q.    Yes, please.  Thank you.

10    A.    Is Haitham Khaled.

11          MR. FINKEL:  Okay.  We can go to the next slide,

12    please, Ms. Loftus.

13    Q.    What is Lawall & Mitchell?

14    A.    I'm not sure.

15    Q.    Did you look at bank account information for Lawall &

16    Mitchell?

17    A.    Yes, I did.

18    Q.    And is that at Valley National Bank?

19    A.    Yes, it is.

20          MR. FINKEL:  Could we go to the next slide, please,

21    Ms. Loftus.

22    Q.    And can you explain to the members of the jury,

23    Ms. Espinoza, what this slide represents, slide 6.

24    A.    At the bottom is just like an example of one of the

25    statements, so it just shows it said Valley National Bank, it

1    says Lawall & Mitchell, LLC, the address is also listed there,

2    and the—the last four digits of the account, which is 1500.

3    Q.  Okay.  Do you know who Aaron Mitchell is?

4    A.  I do not.

5            MR. FINKEL:  Ms. Loftus, if you could bring up GX 128,

6    please, which is in evidence.

7    Q.  Do you know who this individual is?

8    A.  I do not.

9            MR. FINKEL:  Ms. Loftus, if we could go back to Z12 at

10   page 6, please.

11   Q.  And on the left side of—excuse me.  On the left of this

12   slide, Ms. Espinoza, it says balance as of September 26th.

13   What is the balance as of September 26, 2021?

14   A.  $73,672.

15           MR. FINKEL:  And if we could go to the next slide,

16   please, Ms. Loftus.

17   Q.  And so are these the three—excuse me—the groups of

18   accounts that you were analyzing, at least initially?

19   A.  Yes, that's correct.

20           MR. FINKEL:  Let's go to the next slide, please,

21   Ms. Loftus.

22   Q.  So we're on slide 8 now, Ms. Espinoza, and what does slide

23   8 depict?  Can you describe it please to the members of the

24   jury.

25   A.  So the two Crane Advisory Group, LLC Capital One accounts

1    ending in 0887 and 0890 transferred a total of $37,006,848 on

2    September 29, 2021, to Lawall & Mitchell LLC's bank account at

3    Valley National Bank.

4    Q.  Do you know why those two Crane accounts transferred

5    $37 million and change on September 29, 2021?

6    A.  I do not.

7         MR. FINKEL:  If we can go to the next page, please,

8    Ms. Loftus.

9    Q.  What does this page represent, slide 9?

10   A.  The total there at the bottom is the 37,006,848 that I just

11   said from the previous slide, so this is three separate

12   transfers which add up to that total.

13   Q.  And why is there an asterisk on the first transfer, the

14   date of the first transfer?

15   A.  Because the wire went through on September 29, 2021, but on

16   the Capital One statement, the date of the transaction was

17   listed as September 10, 2021.

18   Q.  Do you know the reason for that delay?

19   A.  I do not.

20        MR. FINKEL:  If we can go to slide 10, please,

21   Ms. Loftus.

22   Q.  Ms. Espinoza, can you describe what slide 10 represents.

23   A.  So for the other seven bank accounts at the other three

24   banks of Crane——for Crane Advisory Group, LLC bank accounts,

25   $9,542,511 was transferred to Lawall & Mitchell at Valley

1    National Bank between September 27, 2021, and October 27, 2021.

2    Q.  And prior to these transfers can you remind the jury

3    approximately how much money was in the Lawall & Mitchell

4    account.

5    A.  It was about 73,000.

6            MR. FINKEL:  If we can go to slide 11, please,

7    Ms. Loftus.

8    Q.  And what does this slide represent?

9    A.  The total at the bottom is the 9,542,511 from the prior

10   slide, so this is just showing each individual transfer which

11   makes up that amount.

12   Q.  And so there were some transfers of less than $10; is that

13   correct?

14   A.  Yes, that's correct.

15   Q.  That's what the records show?

16   A.  Yes.

17           MR. FINKEL:  If we could go to slide 12, please.

18   Q.  And so Ms. Espinoza, turning to slide 12, what was the

19   total amount transferred by these nine Crane Advisory Group

20   bank accounts into Lawall & Mitchell?

21   A.  $46,549,359.

22   Q.  Did you follow the money flow from the Lawall & Mitchell

23   account further?

24   A.  Yes, I did.

25           MR. FINKEL:  Go to slide 13, please, Ms. Loftus.

O6D1GUO3                          Espinoza - Direct

1    Q.  And can you tell the jury what we're looking at in slide
2    13.
3    A.  On November 8, 2021, Lawall & Mitchell, that same account
4    that we've been discussing at Valley National Bank, transferred
5    $46,549,275 to an account at Silvergate Bank called Hamilton
6    Opportunity Fund SPC.
7    Q.  What is Hamilton Opportunity Fund SPC?
8    A.  I do not know.
9         MR. FINKEL:  If we can go to slide 14, please.
10   Q.  And by the way, Ms. Espinoza, aside from your testimony
11   today on this chart and your testimony I guess a week or so ago
12   on that chart, did you have any other involvement in this case?
13   A.  I did not.
14   Q.  Ms. Espinoza, can you explain to the members of the jury
15   what we're looking at on slide 14.
16   A.  This is a signature card for the Silvergate Bank account.
17   They referred to it as a master agreement.  So it says the two
18   people who are authorized to use the account are Kin Ming Je
19   and David Fallon.
20   Q.  And Kin Ming Je is on the left side?
21   A.  Yes.
22   Q.  Do you know who that individual is?
23   A.  I do not.
24        MR. FINKEL:  Ms. Loftus, can we please pull up
25   Government Exhibit 103.

1          MR. SCHIRICK:  Objection.  Is there a question?

2          MR. FINKEL:  I'm just waiting for the document to

3    load.

4    Q.  My question is, Ms. Espinoza:  Do you know who this

5    individual is depicted in Government Exhibit 103?

6    A.  I do not.

7    Q.  Do you know if this is Kin Ming Je?

8    A.  I do not.

9          MR. FINKEL:  Can we go back please to Government

10   Exhibit Z12 at slide 14.

11   Q.  And what was the balance prior to these transfers,

12   approximately?

13   A.  29 million.

14         MR. FINKEL:  Go to slide 15, please, Ms. Loftus.

15   Q.  What happened to the 46½ million and change that was

16   transferred from Lawall & Mitchell into the Hamilton

17   Opportunity Fund, 7739 account?  What happened to it after

18   that?

19   A.  On December 2, 2021, the same amount, so 46,549,275, was

20   transferred to another Hamilton Opportunity Fund account at

21   Silvergate Bank.  The account's last four digits are 7713.

22   Q.  And was there any information in these wire transfers

23   that's not reflected on the chart about the reason for these

24   transfers?

25   A.  On the bank statement, there was—it did say investor

O6D1GUO3                         Espinoza - Direct

1    incorrect account, or something to that effect.

2    Q.  And do you know who put that information into the wire

3    transfer?

4    A.  I do not.

5               (Continued on next page)

O6DBGUO4                          Espinoza - Direct

1    BY MR. FINKEL:

2    Q.  Do you know why that information was included?

3    A.  It could have been the bank.  It could have been the

4    sender, but I don't know why.

5    Q.  Can we go to slide 16, please, Ms. Loftus, the next slide.

6           Ms. Espinoza, what are we looking at here?

7    A.  This is a mass agreement or signature card for Silvergate

8    Bank at 7713, and it's the same authorized users which are Kin

9    Ming Je and David Fallon.

10   Q.  Kin Ming Je and David Fallon are the authorized users for

11   both of these Hamilton Opportunity Fund accounts; is that

12   correct?

13   A.  Yes, that's correct.

14   Q.  What was the balance in this Hamilton Opportunity Fund 7713

15   account prior to the $46.5 million transfer?

16   A.  $4,779,188.

17   Q.  Ms. Espinoza, did you also track the money flow after this

18   46.5 million went from Crane Advisory Group to Lawall &

19   Mitchell to Hamilton Opportunity Fund to a second Hamilton

20   Opportunity Fund, did you find out what happened to it after

21   that?

22   A.  Yes, I did.

23   Q.  Go to the next slide, please, Ms. Loftus.

24           What happened on December 8, 2021?

25   A.  $2 million payment was made to McDonnell Whitaker attorney

O6DBGUO4                    Espinoza - Direct

1   trust.

2   Q.  If we can go to the next slide, please.

3          Ms. Espinoza, what happened on December 16, 2021?

4   A.  $24,500,000, a payment was made to Insight Title Services,

5   LLC trust.

6   Q.  And that payment was made from which account?

7   A.  The Hamilton Opportunity Fund 7713 account.

8   Q.  If we can go to the next slide, please.

9          What does this slide depict?

10  A.  An additional 13 million was sent to Buck Esquire, LLC

11  attorney trust account between December 1, 2021 and March 2,

12  2022.

13  Q.  So in total approximately how much money was transferred

14  from, bringing the money flow all the way down, but ultimately

15  from this Hamilton Opportunity Fund 7713 between December 8 and

16  March 2, 2022?

17  A.  $39,500,000.

18  Q.  Ms. Espinoza, did you also review documents from Insight

19  Title Services, LLC trust?

20  A.  Yes, I did.

21  Q.  Documents pertaining to this $24.5 million?

22  A.  Well, documents related to a property which is

23  approximately that amount, yes.

24  Q.  Can we go to the next slide, please.  Is this one of the

25  documents that you reviewed?

O6DBGUO4                        Espinoza - Direct

1    A.  Yes, it is.

2    Q.  It says at the top settlement statement HUD-1; is that

3    correct?

4    A.  Yes.

5    Q.  Do you know what an HUD-1 statement is?

6    A.  In looking at the statement, it just for like a property

7    purchase, so it list the borrower, the seller, the purchase

8    price, and borrower and seller transactions.

9    Q.  And if we can zoom in on the G box on the left side at the

10   top.  Are you able to read that, Ms. Espinoza?

11   A.  Yes.  Property Location, 675 Ramapo Valley Road, Mahwah,

12   New Jersey 07430.  Would you like the rest?

13   Q.  No.  That's okay.  Can you zoom out of that, please.

14          Can you zoom into the box above it where it says name

15   and address of borrower.

16          According to this document, Ms. Espinoza, what is the

17   name of the borrower?

18   A.  Taurus Fund, LLC.

19   Q.  Do you know what that is?

20   A.  I do not.

21   Q.  Ms. Loftus, can you zoom in on row 101 where it says

22   contract sales price.

23          What is the contract sales price of this home?

24   A.  $26 million.

25   Q.  And if we can zoom in, please, on row 201.

O6DBGUO4                        Espinoza - Direct

1          What is it say for the deposit or earnest money?

2    A.  $2 million.

3    Q.  Ms. Loftus, you can go back to slide 19.

4          How much was the transfer on December 8, 2021, to

5    McDonnell Whitaker attorney trust?

6    A.  $2 million dollars.

7    Q.  Go back to slide 20, the next slide, please, Ms. Loftus.

8    If we can go to the next slide.

9          Are these additional documents from Insight Title

10   Services?

11   A.  Yes.

12   Q.  If you can zoom in, Ms. Loftus, on the first row on the

13   left.  Go all the way over to the right.

14         Can you read across this row, please, the first row,

15   Ms. Espinoza?

16   A.  On December 17, 2021, Taurus Fund LLC, HUD line 303, cash

17   from borrower, and it's a deposit amount of $24,344,844.44.

18   Q.  Zoom out of that.  The bottom of the document it says

19   $155,155.56.  Can you explain the document on the right?

20   A.  The document on the right is a wire transfer for that same

21   amount.  It's made from Insight Title to Buck Esquire, LLC, and

22   there's a note at the bottom which says overfund.

23   Q.  Ms. Loftus, if you can zoom in on the last row of the last

24   document, the second to last row.

25         Can you read the last, next to December 17, 2021,

O6DBGUO4                    Espinoza - Cross

1   beginning with Crocker?

2   A.   Crocker Mansion Estate, LLC, a New Jersey Limited Liability

3   Company, HUD line 603, cash to seller, $10,852,425.02.

4   Q.   Have you ever been to 675 Ramapo, Valley Road?

5   A.   I have not.

6   Q.   You ever been to the Crocker mansion?

7   A.   No.

8           MR. FINKEL:  Thank you, Ms. Espinoza.  Nothing

9   further.

10          THE COURT:  Cross examination.

11  CROSS-EXAMINATION

12  BY MR. SCHIRICK:

13  Q.   Thank you, your Honor.  Just briefly.  Good to see you

14  again, Ms. Espinoza.  As we covered last time, you testified

15  the government's lawyers asked you for the first time to

16  testify in this case about three weeks ago, right, maybe a

17  little more?

18  A.   Maybe three to four weeks ago.

19  Q.   And again, you didn't know anything about this case before

20  the prosecutor asked you to testify?

21  A.   I did not.

22  Q.   And again as we covered, you weren't part of the FBI's

23  investigative team on this matter?

24  A.   Correct.

25  Q.   And you're not part of the prosecution team?

1   A.  Correct.

2   Q.  And, in fact, as you testified on direct, you haven't

3   really had any involvement in this case aside from your

4   testimony and then your prep for that testimony, right?

5   A.  Yes, that's correct.

6   Q.  Now, just turning to the chart briefly, can you just tell

7   me who created the first draft of the chart?

8   A.  I believe it was a forensic accountant, not myself, another

9   forensic accountant at the FBI.

10  Q.  And approximately when was that?

11  A.  It was maybe two weeks ago.

12  Q.  And after that first draft, you and the government lawyers

13  talked about the chart?

14  A.  I think I may have received it at like maybe version three

15  or four, so I wasn't involved in the initial conversations.

16  Q.  In the earlier version.  And after you received it in

17  version three or four, how many additional versions were there

18  after that?

19  A.  I believe this is version five, five or six, but I believe

20  it's five.

21  Q.  Fair enough.  Let's just take a quick look at the chart.

22  If we could pull it up, please, Government Exhibit C-12.  I'm

23  just going to ask you a couple of questions.  We can flip

24  through this quickly.  If we could please go to page four, the

25  title of this slide is Crane Advisory -- I'm sorry.  Withdrawn.

O6DBGUO4                        Espinoza -  Cross

1              Off to the right-hand side of this page in a box
2    that's outlined in green it says Crane Advisory seven accounts
3    at three banks, right?
4    A.  Correct.
5    Q.  And this slide displays two signature cards at IDB Bank,
6    right?
7    A.  Yes.
8    Q.  And then one signature card from Signature Bank?
9    A.  Yes.
10   Q.  Was there a third bank involved here?
11   A.  Yes, there was.
12   Q.  And was that bank Morgan Stanley?
13   A.  Yes, it was.
14   Q.  And how many accounts did Crane have at Morgan Stanley if
15   you recall?
16   A.  Four accounts.
17   Q.  And there aren't any signature cards from those accounts at
18   Morgan Stanley displayed here, right?
19   A.  Correct.
20   Q.  If we could please go to page eight.
21              Now I believe you were asked this on direct, but you
22   don't know what Lawall & Mitchell is, right?
23   A.  I do not.
24   Q.  Do you know why it's receiving funds?
25   A.  I do not.

1    Q.  So you don't know, for example, if Lawall & Mitchell is one
2    of G/Club's attorneys, right?
3    A.  I do not know.
4    Q.  If we could go to slide 13, please.
5            Now, this slide shows Lawall & Mitchell sending money
6    to Hamilton Opportunity Fund SPC, right?
7    A.  Yes, it does.
8    Q.  And you testified that you don't know what kind of fund
9    Hamilton is, right?
10   A.  I do not know what type of fund it is, no.
11   Q.  You don't know in whose name these funds are listed at
12   Hamilton, right?
13   A.  I believe we have signature cards on the next slide for
14   them and the names that are listed.
15   Q.  So let me just rephrase that because the question may have
16   been unclear.  Within Hamilton, the entity, you don't know what
17   account within Hamilton the funds are held, right, as opposed
18   to the bank?
19   A.  Yeah, I only know the bank account information.
20   Q.  Right.  Yes.  Thank you.  That was the distinction I was
21   trying to draw.  Thank you.  And if we could go to page 15,
22   please.
23           This slide shows an internal transfer within signature
24   bank, right, between one account for Hamilton to another
25   account for Hamilton?

O6DBGUO4                          Espinoza - Cross

1    A.  Yes, it's a transfer between the two accounts.

2    Q.  Right.  So this isn't actually money leaving Silvergate

3    Bank, right, in the last arrow between the two bottom boxes?

4    A.  The last transfer is between Silvergate Bank to a

5    Silvergate Bank account.

6    Q.  It's fair to call that an internal transfer, to not leaving

7    the bank?

8    A.  Yes, that's fair.

9    Q.  And this happens on December 2, 2021, right?

10   A.  Yes.

11   Q.  And you don't know why, right?

12   A.  Correct.

13   Q.  And you don't know, for example, the funds were initially

14   directed to the wrong account?

15   A.  I'm sorry.  Could you repeat that.

16   Q.  You don't know if, for example, the funds were initially

17   directed to the wrong account?

18   A.  I do not know that.

19   Q.  If we could please turn to slide 20.  And you testified on

20   direct a moment ago that this is a HUD-1 form, right?

21   A.  Yes.

22   Q.  Is this form a standard government form in the purchase and

23   sale of real estate to your knowledge?

24   A.  I'm not sure whether it's a standard form or not.

25   Q.  Let's zoom in on the upper left.  I believe it's D.  This

O6DBGUO4                          Espinoza - Cross

1    is a little bit of an eye test here, but I think it's the first

2    box on the upper left.  And it says Taurus Fund LLC.  You see

3    that?

4    A.  Yes.

5    Q.  And do you have experience with real estate transactions as

6    part of your work as a forensic accountant for the FBI?

7    A.  I do.

8    Q.  And it's common, isn't it, in the purchase of higher-end

9    real estate for the buyer to create an LLC to hold title?

10   A.  I don't know if it's common or not.

11   Q.  If we could zoom in on what is to the right of that E, and

12   it's a little blurry, can you see there that the name of the

13   seller appears to be Crocker Mansion Estate, LLC, a New Jersey

14   Limited Liability company?

15   A.  Yes.

16   Q.  And does that sort of indicate to you that the seller here

17   too was an LLC?

18   A.  Yes, the seller here is an LLC.

19          MR. SCHIRICK:  No further questions at this time, your

20   Honor.

21          THE COURT:  Redirect.

22          MR. FINKEL:  Nothing, your Honor.  Thank you,

23   Ms. Espinoza.

24          THE COURT:  You may step.

25          (Witness excused)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           THE COURT:  The government may call its next witness.

2           MS. MURRAY:  Thank you, your Honor.  The government

3    calls Jamie Wilson.

4    JAMIE WILSON,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7           THE COURT:  Please state your name and spell it.

8           THE WITNESS:  Jamie Wilson, J-A-M-I-E, Wilson is

9    W-I-L-S-O-N.

10          THE COURT:  You may inquire.

11          MS. MURRAY:  Thank you, your Honor.

12   DIRECT EXAMINATION

13   BY MS. MURRAY:

14   Q.  Good afternoon, Ms. Wilson.

15   A.  Good afternoon.

16   Q.  Where are you employed?

17   A.  I'm employed at the Bank of Princeton.

18   Q.  What is your title?

19   A.  I am the BSA officer for the bank.

20   Q.  And what does BSA stand for?

21   A.  BSA stands for the Bank Secrecy Act.

22   Q.  When did you become a BSA officer?

23   A.  Four years ago.

24   Q.  What are your duties and responsibilities as a BSA officer?

25   A.  My duties are to protect the financial institution and our

O6DBGUO4                          Wilson- Direct

1    financial industry from money laundering, terrorist financing,

2    tax evasion.

3    Q.  Can you describe for the jury how, if at all, you monitor

4    for your issues in the course of your BSA duties?

5    A.  Yes.  We have different ways of monitoring.  We have a

6    system that alerts us when people's activity goes outside of

7    what you would consider normal for a personal account or a

8    business account.  We have ways of contacting -- law

9    enforcement can contact us through 314As.  We have 314Bs which

10   allows us to talk to other financial Constitutions.  We have

11   different monthly and weekly reports where we monitor wires,

12   monetary instruments, any activity that comes in and out of a

13   bank we monitor it.

14   Q.  And you mentioned the 314B program, can you explain in a

15   bit more detail what that entails?

16   A.  So 314B program is -- not all financial institutions are

17   involved in it, but if you sign up, it allows you to talk to

18   another bank about customers that you both have the same

19   customer.

20          So if I was a customer of financial institution A, and

21   financial institution B also, I was a customer of that

22   institution, we could talk about the activity going through our

23   accounts in reference to money laundering and possible

24   terrorist financing.

25   Q.  And how, if at all, does the 314B information sharing

1    system assist you in doing your BSA monitoring?

2    A.   That helps us put the bigger picture together.  So if we're

3    unsure where activity is coming from or the original source or

4    it or where it is going to, it allows us the capability of

5    finding out where that money originated from, if it was coming

6    into ours or where it was going, and what it was used for if it

7    goes somewhere else.

8    Q.   Ms. Wilson, are you familiar with the term QualiFile?

9    A.   Yes.

10   Q.   What is QualiFile?

11   A.   QualiFile is a report run on every individual in business

12   that comes to a bank to open an account.  And it's a checks

13   systems report that every single bank runs, and it allows you

14   to see if somebody has a charge off at another institution.  So

15   if they went in the negative at another bank, it would show us

16   that they possibly owe that financial institution funds.

17   Q.   Are you familiar with the phrase OFAC?

18   A.   Yes.

19   Q.   What does that stand for?

20   A.   OFAC is the Office of Foreign Asset Control, and OFAC sends

21   out multiple different types of lists that some people may be

22   blocked or sanctioned, and you cannot transact with those

23   individuals or businesses.

24   Q.   How, if at all, are the OFAC list relevant to your duties

25   and responsibilities as a BSA officer?

O6DBGUO4                    Wilson- Direct

1   A.   If somebody hits the OFAC list, then we need to call OFAC

2   which is part of the U.S. treasury, and either deny a

3   transaction or potentially put it into a separate account and

4   hold those funds.

5   Q.   Can you describe the average bank of Princeton customer

6   profile?

7   A.   Yeah.  The average bank of Princeton can be anybody from

8   what I would consider a blue collar customer, so somebody

9   possibly a mechanic or a military person to real estate agents

10  or doctors offices.

11  Q.   And how many branches are there of Bank of Princeton?

12  A.   We have 26 branches.

13  Q.   Geographically speaking, where in the U.S. are those

14  branches located?

15  A.   They're located mostly in New Jersey and Pennsylvania, and

16  just recently a couple in the outskirts of the New York, not

17  within a city, but mostly New Jersey and Pennsylvania.

18  Q.   Ms. Wilson, did there come a time when you conducted a BSA

19  review of an account held in the name of Lamp Capital?

20  A.   Yes.

21  Q.   Approximately when was that?

22  A.   Around September of 2020.

23  Q.   What, if anything, do you recall about that customer?

24  A.   That customer came to us from a board member who met with a

25  advisor and a financial advisor and a lawyer, and they were

O6DBGUO4                         Wilson- Direct

1    introduced together to bring money to our financial institution

2    because they considered us more of a family bank still over the

3    larger institutions.

4    Q.  Do you recall the name of that advisor who referred the

5    account?

6    A.  I believe the advisor -- Stephen Lawandy was the lawyer,

7    and then Haitham Khaled was the advisor who brought the funds

8    to us.

9    Q.  Who, if anyone, did the advisor say that he was working

10   with in bringing the account to Bank of Princeton?

11              MR. BARKAN:  Objection, Hearsay.

12              THE COURT:  Sustained.

13   Q.  Do you recall whether there were any other individuals

14   referenced in Lamp Capital?

15   A.  When Lamp Capital was open, the signer on the account was

16   another lawyer.  Once we researched that name, Daniel

17   Podhaskie.

18   Q.  Ms. Wilson, when an account is open at Bank of Princeton,

19   what information, if any, does the bank request of the

20   potential customer?

21   A.  We request, when it's a business account, we need two forms

22   of business identification.  Usually it's an SS4 which is given

23   from the IRS that has their EIN number.  And a EIN number is

24   kind of like a person's social security number for a business.

25   And then the other document would be their certificate of

1    formation that's usually filed with the state, and all the IDs

2    for the signers on the account.

3    Q.  And what, if anything, do you do with that information once

4    you collect it?

5    A.  We review it to make sure that it is a legitimate document

6    so that they actually did file with the IRS.  They did file

7    with the different states.  We review that the signers match

8    the business documents that are being opened, and that even the

9    signers IDs are legitimate.

10   Q.  Did you conduct a BSA review of the Lamp Capital account?

11   A.  Yes.

12   Q.  What, if anything, do you recall about that review?

13   A.  The beneficial owners, which we also do, is the ultimate

14   owner of the business.  We reviewed those documents.  The

15   opening documents, which the signer on the account wasn't the

16   owner of the business, so that was a bit of a red flag to us.

17   And they happen to be a lawyer, not the actual signers.  And

18   the signers and owners of the business on the UBO form, which

19   is the Ultimate Beneficial Ownership form, they were an NRA,

20   which is a non-resident alien, so not a U.S. citizen.  Which

21   doesn't make it bad, it just makes it a little higher risk for

22   us as the bank.

23   Q.  I want to discus some of the characteristics of the Lamp

24   Capital account based on your review.  Do you recall the

25   approximate dollar amount of that account?

O6DBGUO4                        Wilson- Direct

1    A.  Yes. When they opened it, they brought in around 10

2    million.

3    Q.  How, if at all, did that compare to the dollar amount in

4    other Bank of Princeton customer accounts that you reviewed?

5             MR. BARKAN:  Objection, relevance.

6             MS. MURRAY:  It goes to the risk rating that

7    Ms. Wilson was just speaking about.

8             THE COURT:  I'll allow the answer.

9    A.  Without having a loan at the institution, I've never seen

10   that kind of money brought in to open an account before.  It

11   was higher than our average clientele.

12            MS. MURRAY:  Your Honor, there's a stipulation between

13   the parties that I believe is in evidence.  I'm going to

14   confirm that.  This is Government Exhibit Stip 14.  It's a

15   stipulation regarding bank records.  And pursuant to this

16   stipulation, at this time the government offers Government

17   Exhibits GX-BOP-16, BOP-7, BOP-1, BOP-2, BOP-3, and BOP-4.

18            THE COURT:  Any objection?

19            MR. BARKAN:  No objection, your Honor.

20            THE COURT:  They are admitted.

21            (Government's Exhibits BOP-16, BOP-7, BOP-1, BOP-2,

22   BOP-3 and BOP-4 received in evidence)

23   BY MS. MURRAY:

24   Q.  Ms. Loftus, if we could please publish Government Exhibit

25   BOP-16.  Ms. Wilson, Bank of Princeton, is that institution

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    insured by any governing body?

2    A.   The FDIC.

3    Q.   Can you explain what the FDIC is?

4    A.   FDIC is the Federal Depository Institution, so they back

5    our institution financially to cover the funds that are within

6    our institution, and they also examine our bank to make sure

7    we're in compliance at least every 18 months.

8    Q.   Ms. Loftus, we now have this up, if you could just flip

9    through a few of the pages.

10            Ms. Wilson, generally speaking do you recognize

11   government exhibit BOP-16?

12   A.   Yes, this is the account agreement, the opening documents.

13   Q.   If we could go to the first page, Ms. Loftus.

14            For what account?

15   A.   This is for Lamp Capital.

16   Q.   If we could zoom in all the way across the page, the top

17   portion, please.

18            Looking at the top right, Ms. Wilson, what is the date

19   of this account agreement for Lamp Capital?

20   A.   September 10, 2020.

21   Q.   And over on the left a little bit below, what's the name of

22   the signer?

23   A.   Daniel Podhaskie.

24   Q.   And under that there's the name Lamp Capital again, what is

25   the text that's listed in the box below Lamp Capital?

O6DBGUO4                        Wilson- Direct

1    A.  The newly established company.

2    Q.  Ms. Loftus, if we could go to page 10, please.

3            What is this document, Ms. Wilson?

4    A.  This is the beneficial ownership document that shows that

5    the ultimate beneficial owners of the business.

6    Q.  Who, if anyone, completes this document?

7            Who provides the information reflected in this

8    document?

9    A.  The person opening the account.

10   Q.  Ms. Loftus, if we could zoom in please on the top portion

11   through to the first table.

12           Ms. Wilson, what's the name of the person opening this

13   account?

14   A.  Daniel Podhaskie.

15   Q.  And in B, the legal entity for this account?

16   A.  Lamp Capital.

17   Q.  Looking at section C, what is the name listed as the

18   ultimate beneficial owner of Lamp Capital?

19   A.  Qiang Guo.

20   Q.  Can you spell that?

21   A.  Q-I-A-N-G, last name is, G-U-O.

22   Q.  Ms. Loftus, if we could zoom in.  What is the address

23   associated with Qiang Guo on this document?

24   A.  It's 781 or 761 5th Avenue, New York, New York 10002.

25   Q.  What type of passport does this individual hold according

O6DBGUO4                        Wilson- Direct

1    to this document?

2    A.  A Hong Kong passport.

3    Q.  Ms. Loftus, can we go to page 15, please.

4             Ms. Wilson, what type of document is this?

5    A.  This is their limited liability company agreement, so it's

6    a business document.

7    Q.  Why, if at all, does the Bank of Princeton collect business

8    documents in the course of account openings?

9    A.  To validate the business itself that it was formed, and

10   within the businesses usually it tells you what type of

11   business it is, who the signers of the business are.

12   Q.  What, if anything, do you look for in the course of your

13   BSA review in collecting corporate documents like this?

14   A.  When we collect corporate documents, we like to see when

15   they were actually incorporated, who the signers are, what type

16   of business they are, anyone related to the business, where

17   they're located, where they actually registered of the

18   business.

19   Q.  If we could focus on the top portion here, Ms. Loftus.

20            What is the date based on this limited liability

21   company agreement that Lamp Capital was created?

22   A.  The 8th day of September 2020.

23   Q.  And what entity is listed as the sole member of that

24   company?

25   A.  Infinity Treasury Management, Inc.

O6DBGUO4                        Wilson- Direct

Q.  Ms. Loftus, if we could just briefly go back to page one,
please.

          Ms. Wilson, what was the date that Daniel Podhaskie
applied to open this bank account in the name of Lamp Capital?
A.  September 10, 2020.
Q.  Ms. Loftus, let's go back to page 19, please, just the
bottom of that corporate document.

          Ms. Wilson, who signed the limited liability company
agreement on behalf of Infinity Treasury Management?
A.  Daniel Podhaskie.
Q.  Ms. Loftus, can we go to page 33 now, please.

          What is this, Ms. Wilson?
A.  That's the QualiFile report, the check systems report.
Q.  Can you describe what information is reflected on a
QualiFile response?
A.  So this is a report that's run on every business or
individual opening an account, and that's run by every single
bank.  So when we look at this it's telling us, kind of gives
you a suggestion whether to open or deny the account.  And if
somebody had recently opened accounts at other institutions or
had charge offs at other institutions, we would be able to see
it here.
Q.  Can we go to the next page, please, Ms. Loftus.  And if you
could focus in on inquiry details down to the end of details
two.

1          If you could just explain a little bit of what

2    information is on this report, Ms. Wilson?

3    A.  Yeah.  So that's where you can see where it says 8/30/2020,

4    Daniel Podhaskie had also gone to NexBank to inquire and open

5    an account.  So he got through the process of opening the

6    account with their institution, whether they actually opened it

7    or not, they probably did if they ran him.  And then again you

8    have Santander bank on 9/15/2020.  He also went to that

9    institution to inquire and open an account.

10   Q.  We can take that down, Ms. Loftus.  Thank you.

11          Were any Lamp Capital accounts opened at Bank of

12   Princeton?

13   A.  Yes.

14   Q.  Did there come a time when the Lamp Capital signer opened

15   another account at Bank of Princeton?

16   A.  Yes.

17   Q.  What was the name on that account?

18   A.  Greenwich Land.

19   Q.  Approximately when was that Greenwich Land account opened?

20   A.  That was also September of 2020.

21   Q.  Ms. Loftus, if we could please publish what's in evidence

22   as Government Exhibit BOP-7.

23          Ms. Wilson, what is this document?

24   A.  That's the opening documents, the account agreement.

25   Q.  If we could focus on the top portion all the way across the

1    top please, Ms. Loftus.

2            What is the date of this account opening document?

3    A.  9/23/2020.

4    Q.  And looking at the right, the account title and the

5    individual associated with this account?

6    A.  Greenwich Land, LLC and Daniel Podhaskie.

7    Q.  And then looking over on the left under owner/signer

8    information, what is listed as the occupation for Daniel

9    Podhaskie?

10   A.  Attorney.

11   Q.  If we could go to page three, please, Ms. Loftus.

12           Ms. Wilson, again, what is this type of document?

13   A.  That's the Ultimate Beneficial Ownership document.

14   Q.  If we could focus on the top portion, Ms. Loftus.

15           In the table in item C, Ms. Wilson, who is listed here

16   as the beneficial owner of the Greenwich Land?

17   A.  Hing Chi Ngok.

18   Q.  All right.  Ms. Loftus, if we could go to page eight,

19   please.

20           What type of record is this, Ms. Wilson?

21   A.  That's the resolution for the business, and anybody opening

22   the account are going to have authority over the account signs

23   this.

24   Q.  Zoom out of that, Ms. Loftus, and go to the next page, the

25   next page, and the next page.  If we could focus on the top

1  portion.  On what date was this limited liability company

2  established?

3  A.  This was signed September 22, 2020.

4  Q.  And who signed on behalf of the company?

5  A.  Daniel Podhaskie.

6  Q.  So that's September 22, 2020.

7         Ms. Loftus, can we go back to page one, please.

8         What was the date that Daniel Podhaskie applied for

9  the Greenwich Land bank account at Bank of Princeton?

10 A.  September 23, 2020.

11 Q.  Let's go to page 17, please, Ms. Loftus.

12        Ms. Wilson, is this the QualiFile response for the

13 Greenwich Land account?

14 A.  Yes.

15 Q.  And going to the next page, page 18, if we could zoom in on

16 the text here.

17        How many inquiries were there that were relevant to

18 the Greenwich Land bank account?

19 A.  Four.

20 Q.  And can you read the dates and the banks that were

21 associated with those inquiries?

22 A.  NexBank, Santander Bank, Signature Bank and the Bank of

23 Princeton.

24 Q.  Can you explain why, if at all, Bank of Princeton would

25 appear on its own QualiFile response?

1  A.  They ran his name through QualiFile on 9/16 also, and then

2  was running it again on 9/23.

3  Q.  Ms. Loftus, can we go to page 23, please.

4         What is this, Ms. Wilson?

5  A.  That's a new account check list that the branches fill out

6  for the businesses to make sure that we have everything, as far

7  as BSA goes and legal wise goes so we have the proper documents

8  for businesses and individuals.

9  Q.  If we can go to the next page, please, Ms. Loftus.  Looking

10 about halfway down the page in bold, there's an, If other

11 field, if we could zoom in on that.

12        Ms. Wilson, what information does this form reflect

13 about the type of business that Greenwich Land was?

14 A.  Capitol management.

15 Q.  All right.  Ms. Loftus, we can take that down.

16        Ms. Wilson, in the course of your duties as a BSA

17 officer, did you monitor the Lamp Capital and the Greenwich

18 Land accounts after they were opened?

19 A.  Yes.

20 Q.  What, if anything, did you observe about the activity in

21 those accounts?

22 A.  The activity coming in both accounts were funded with a

23 higher than normal amount of money than I've seen at the Bank

24 of Princeton in my 11 years there.  And then the money that

25 started going out of the accounts were not really in line with

1    what we thought a capital management or a real estate business

2    should, or wasn't in line of what I've seen or would be typical

3    for that type of business.

4    Q.  What type of activity did you observe that in your opinion

5    wasn't in line with typical activity?

6    A.  The funds going out, there were two large checks to the

7    beneficial owners, one from each of the businesses to the

8    beneficial owners of those businesses.  They went to car

9    dealerships, wineries, a yacht, not in line with just that

10   business.

11          MS. MURRAY:  Your Honor, pursuant to the stipulation

12   GX-Stip 14, I also offer Government Exhibit GX-BOP-12 and

13   GX-BOP-10.

14          THE COURT:  No objection.

15          MR. BARKAN:  No objection your Honor.

16          THE COURT:  They are admitted.

17          (Government's Exhibits BOP-12 and BOP-10 received in

18   evidence)

19   BY MS. MURRAY:

20   Q.  Ms. Loftus, if we can please publish GX-BOP-12.

21          Ms. Wilson, while we're pulling that up, did you

22   observe any OFAC hits in the Greenwich Land or the Lamp Capital

23   accounts?

24   A.  No OFAC matches.

25   Q.  Ms. Wilson, what is this?

O6DBGUO4                        Wilson- Direct

1    A.   That's a bank statement.

2    Q.   Looking at the top, for what account is the bank statement?

3    A.   For Lamp Capital, LLC.

4    Q.   And the statement ending date on the top right?

5    A.   10/30/020.

6    Q.   If we could focus on the summary of accounts down to the

7    bottom of the page, please, Ms. Loftus.

8            Looking at the summary of accounts, Ms. Wilson, what

9    was the ending balance for this pay period for this Lamp

10   Capital statement?

11   A.   $4,230,400.

12   Q.   And I want to look at a view of the different transactions

13   that are reflected here.  Under other credits the second entry

14   there, what is the date of that incoming wire?

15   A.   10/15/2020.

16   Q.   From a bank account held in the name of what entity?

17   A.   Savio Law, LLC.

18   Q.   And the amount of that incoming wire into the Lamp Capital

19   account?

20   A.   Five million.

21   Q.   And if we could go to page three please, Ms. Loftus.

22           Focus in on the content on the top.  Looking at the

23   third item here, Ms. Loftus, what is the date of that outgoing

24   wire?

25   A.   10/29/2020.

O6DBGUO4                        Wilson- Direct

1    Q.  Where does it go?

2    A.  Moran Yacht Management, Inc.

3    Q.  What is the dollar amount of that outgoing wire from the

4    Lamp Capital account?

5    A.  $272,525.

6    Q.  Ms. Loftus, we can take that down, and let's put up

7    Government Exhibit BOP-10, please.

8              What is this, Ms. Wilson?

9    A.  It's another bank statement.

10   Q.  For what account?

11   A.  Greenwich Land.

12   Q.  And what is the statement sending date?

13   A.  10/30/2020.

14   Q.  Again, if we could focus in here on the top portion from

15   summary of accounts through to the bottom.

16             What was the ending balance in the Greenwich Land

17   account on October 30, 2020?

18   A.  Almost 10 million.

19   Q.  And looking at the incoming wires listed here, if we could

20   just take them one at a time, the three of those incoming

21   wires, the date, where it came from, and the dollar amount?

22   A.  Yep, 10/15/2020, there's an incoming wire from Savio Law,

23   LLC for five million.

24             On 10/21/2020, there's an incoming wire from ACA

25   Capital Group, LTD for $999,893.22, and on 10/23/2020, another

O6DBGUO4                          Wilson- Direct

1   incoming wire from ACA Capital Group for almost four million.

2   Q.  And then if we could look at the bottom of this portion

3   other debits, the second to the last debit reflected there, if

4   you could read that for, that's October 26?

5   A.  An outgoing wire to Sherry-Lehman, Inc. for 32,220.

6   Q.  Do you know what type of company or business Sherry-Lehman,

7   Inc. is?

8   A.  I don't remember exactly what their business was.

9   Q.  If we could take that down, Ms. Loftus, and show the

10  witness what's marked as Government Exhibit BOP-40.

11          Ms. Wilson, do you recognize this?

12  A.  That's an email.

13  Q.  If we could scroll through the pages, Ms. Loftus.

14          Have you seen this email before, Ms. Wilson?

15  A.  Yes.

16  Q.  Did you receive this email?

17  A.  Yes.

18          MS. MURRAY:  Your Honor, the government offers

19  Government Exhibit BOP-40.

20          MR. BARKAN:  No objection, your Honor.

21          THE COURT:  It is admitted.

22          (Government's Exhibit BOP-40 received in evidence)

23          MS. MURRAY:  And we can publish that.

24  Q.  Starting at the top, and then we'll kind of work our way

25  through the chain, Ms. Wilson.  What is the date of the top

O6DBGUO4                          Wilson- Direct

1    portion of this email chain?

2    A.   December 18, 2020.

3    Q.   And this is an email from you to whom?

4    A.   From me to my assistant BSA officer.

5    Q.   What is the subject of the full email chain here?

6    A.   Incoming wires for Greenwich Land.

7    Q.   And there's an attachment to this email, what is the title

8    of that attachment?

9    A.   Loan agreement ACA verse Greenwich need to sign PDF.

10   Q.   Let's go to page three, Ms. Loftus.

11              Focusing on the email that begins about a third of the

12   way down of the page, who is Miriam Colon?

13   A.   She was the branch manager for our New Brunswick office.

14   Q.   What is the date of this outgoing email from Miriam Colon?

15   A.   November 19, 2020.

16   Q.   Who is it sent to?

17   A.   Haitham Khaled and Daniel Podhaskie.

18   Q.   What's the domain name of the email address for Haitham

19   Khaled?

20   A.   Crane Advisory Group.

21   Q.   Do you know what Crane Advisory Group is?

22   A.   That was the investment advisory firm that he worked for.

23   Q.   And what about the email domain for Daniel Podhaskie?

24   A.   It was Lamp Capital.

25   Q.   So if you could read just the first two lines of this email

O6DBGUO4                     Wilson- Direct

1    from Miriam Colon, actually the first three lines of the email?

2    A.  Good morning, gentlemen.  Hope your day is going well.  My

3    compliance department is conducting a retrospective review of

4    this payment.

5    Q.  Now there's text that's in black and there's text that's in

6    red.  Do you see that?

7    A.  Yes.

8    Q.  If we could zoom out, Ms. Loftus, and go up just a few

9    pages, and look at the bottom of this first page.  If we could

10   zoom in, Ms. Loftus.

11           Who is this email from?

12   A.  That's from Daniel Podhaskie.

13   Q.  On what date?

14   A.  On December 2, 2020.

15   Q.  Who does he send it to?

16   A.  To Miriam Colon the branch manager and copied Haitham

17   Khaled.

18   Q.  And the content of this email reads, Hi, Miriam.  I have

19   put the requested information below in red, and the requested

20   supporting documentation is attached.  Do you see that?

21   A.  Yes.

22   Q.  Let's go back to page three, please, Ms. Loftus.  I'd to

23   zoom in on that email.

24           Ms. Wilson, what information was Bank of Princeton

25   requesting from Lamp Capital in item one here?

O6DBGUO4                          Wilson- Direct

1    A.  We were trying to find out ACA Capital Group's business

2    activities, their contact information, their physical address,

3    phone number, so who ACA Capital was and more information about

4    that business.

5    Q.  Why, if at all, were you requesting additional information

6    about that business?

7    A.  Because they had sent a high amount of funds into the Bank

8    of Princeton to a new client of ours.

9    Q.  And looking at item two here, the request from Miriam Colon

10   is, Please provide organization structure chart for ACA Capital

11   Group Limited, and indicate beneficial owners.

12            What was the response from Lamp Capital to that

13   request?

14   A.  They were not in possession of that information.

15   Q.  Looking at item three where the Bank of Princeton request

16   the industry that Greenwich Land is operating, and additional

17   identifying details.  Can you read the text in red which is the

18   response from Greenwich Land?

19   A.  Greenwich Land is a real estate holding company

20   incorporated for the purpose of owning and managing real estate

21   assets.  The physical address is 667 Madison Avenue, 5th floor,

22   New York, New York 10065.  It's a privately owned entity that

23   is not marketing to the public, and therefore does not current

24   have a website.  The phone number is 917-225-8178.  The email

25   address is DanielP@LampCapital.org. Greenwich Land's beneficial

O6DBGUO4                    Wilson- Direct

1   owner is Hing Chi Ngok.

2   Q.  And then in item four which request the relationship

3   between ACA Capital Group and the beneficiary Greenwich Land,

4   LLC, what is the response from the customer there?

5   A.  ACA is a lender and Greenwich Land is the borrower.

6   Q.  If we can zoom out, Ms. Loftus, and focus on the response

7   for five into the next page.  So detail purpose down through

8   the end.

9          Ms. Wilson, Miriam Colon's requests the purpose of the

10  following payments.  On 10/20/2020, a payment in the amount of

11  $999,913.22.  Is that the payment we just looked at that was

12  reflected in the account statement?

13  A.  Yes.

14  Q.  And the second payment that Miriam colon is requesting

15  information for, what payment is that?

16  A.  On 10/22/2020 in the amount of $3,999,935. That was another

17  payment from ACA that we just saw on the statement.

18  Q.  And looking then further down the email, the bank request

19  documentation, what response does Greenwich Land give in

20  response to that request?

21  A.  Both transactions are part of a loan agreement.  Please see

22  attached loan agreement.

23  Q.  Now, the bank request the information within 14 days.  Do

24  you see that?

25  A.  Yes.

1    Q.  Ms. Loftus, let's look again at what the date was of the

2    request was of Ms. Colon?

3    A.  November 19, 2020.

4    Q.  And we can zoom out and just scroll up the chain.  Stop

5    there for a moment so we can see this email.

6            On November 24, 2020, there's an outgoing email from

7    Miriam Colon, what does that email say?

8    A.  Following up.  Hope your day is going well.  Please see

9    email sent on November 18.  I need to respond to my compliance

10   department on this.  Can you please provide information

11   requested.

12   Q.  And we can zoom out, Ms. Loftus, and go up again.

13           On what date does Daniel Podhaskie respond to Miriam

14   Colon?

15   A.  On the 24th he said, Thanks for following up.  We'll get

16   back shortly.

17   Q.  And then what happens on December 1, 2020?

18   A.  She requested a follow-up again.

19   Q.  And scroll up please, Ms. Loftus.

20           And then looking here at the bottom of page one, on

21   what date does Daniel Podhaskie provide the requested

22   information?

23   A.  December 2nd.

24   Q.  If we could look at the top of this page please, Ms.

25   Loftus.  In particular the email that you write Ms. Wilson.

O6DBGUO4                    Wilson- Direct

1    What do you write in your email here?

2    A.   This is for Greenwich Land and the relationship between ACA

3    Capital.   These are the answers we received from the customer.

4    I wanted to follow-up on the information.   We could go over it

5    on Monday when I got back with my assistant.

6    Q.   We can zoom out, and let's look at the attachment to this

7    email, Ms. Loftus.   It's a few pages down.   If we could zoom in

8    on the top portion here.

9            Ms. Wilson, is this a document that Daniel Podhaskie

10   provided to the bank in response to its inquiry?

11   A.   Yes.

12   Q.   What is the title of this document?

13   A.   Loan agreement.

14   Q.   What is the date of the agreement?

15   A.   October 16, 2020.

16   Q.   And who are the parties, looking first at party one?

17   A.   ACA Capital Group and Greenwich Land, LLC.

18   Q.   Let's zoom out, please, Ms. Loftus.   And focus on the loan

19   which is item two here.

20           Ms. Wilson, in the first sentence of this paragraph,

21   what is the loan amount for this loan agreement?

22   A.   Five million.

23   Q.   We can zoom out again, Ms. Loftus.   Can we scroll down,

24   please.   Is there one more page or is that the end?   We can

25   zoom in on the signature lines, please.

1              What entity is listed as signing on behalf of ACA

2    Capital Group Limited?

3    A.  Celestial Tide Limited.

4    Q.  And how is Celestial Tide Limited described?

5    A.  The director of ACA Capital Group Limited.

6    Q.  All right.  Ms. Loftus, we can take that down.

7              Ms. Wilson, did there come a time when a company

8    called G/Club Operations applied to open an account at Bank of

9    Princeton?

10   A.  Yes.

11   Q.  Approximately when was that?

12   A.  That was at the end of September beginning of October.

13   Q.  Of what year?

14   A.  2020.

15   Q.  How, if at all, did you become aware of that account

16   application?

17   A.  They were also brought to us from the same investment

18   advisor.

19   Q.  Did you conduct a BSA review of that account?

20   A.  Yes.

21   Q.  What, if anything, do you recall about the G/Club account

22   opening materials?

23   A.  The opening documents they had formed them in Puerto Rico,

24   the business formation was in Puerto Rico, and they had an

25   address listed in Puerto Rico and in New York.  They had their

1  SS4, but none of the signers that were going to be on the

2  business account were on the business formation documents, and

3  the beneficial open was a non-resident alien.

4  Q.  You said SS4, what does that refer to?

5  A.  SS4 is their EIN number.  So it's a letter from the IRS

6  assigning an EIN number to the business, such as you get your

7  social security number.  That's their sole identifier.

8  Q.  Ms. Loftus, can we please publish Government Exhibit BOP-1.

9          Ms. Wilson, is this the account agreement for that

10 account you just mentioned G/Club Operations?

11 A.  Yes.

12 Q.  Can we focus on the top portion, Ms. Loftus, on the left

13 side.  What is the full name of the institution for this

14 account?

15 A.  G/Club Operations, LLC.

16 Q.  And what is the address listed for G/Club Operations, LLC?

17 A.  590 Madison Avenue, 21st floor, New York, New York 10022.

18 Q.  Now there's a handwritten annotation under that address.

19 Do you see that?

20 A.  Yes.

21 Q.  What does it say?

22 A.  Correct address.

23 Q.  Ms. Loftus, if we can please pull up alongside this what's

24 in evidence as Government Exhibit SW-2009.  If we could zoom in

25 on the top portion from through to the address that's listed

O6DBGUO4                          Wilson- Direct

1    there as center.

2              Ms. Wilson, do you see to whom this email on the right

3    side was sent?

4    A.  HaithamK@CraneAdvisoryGroup.com.

5    Q.  To whom is it address?

6    A.  To Yvette Wang.

7    Q.  And looking on the right there, there's a field called

8    center.  Do you see that?

9    A.  I'm sorry.  Say that again.

10   Q.  Sure.  There's transaction for the value.  There are a few

11   fields under transaction details.  What is listed under center?

12   A.  New York, New York, City, 590 Madison Ave, 590 Madison Ave,

13   New York City 10022.

14   Q.  And two lines down, what is the authorization date

15   associated with that transaction?

16   A.  October 14, 2020.

17   Q.  Keeping that up, Ms. Loftus, looking on the left at the

18   Bank of Princeton account agreement for G/Club Operations, if

19   we could focus on the owner/signer information there.

20             Who is listed as the owner/signer of this account?

21   A.  Yvette Wang.

22   Q.  And the address that we just went over on the top here

23   that's listed, is that the same address that's listed on the

24   document on the right?

25   A.  Yes.

O6DBGUO4                          Wilson- Direct

1   Q.  If we could zoom out of that, Ms. Loftus, and we'll just

2   focus again on BOP-1.  We can take down SW-2009.  Let's go to

3   page three, please, focus on the top portion.  Actually, all

4   the way down to the bottom of the text here. This is on the

5   bottom right.

6           Ms. Wilson, what is the date the account was opened?

7   A.  10/30/2020.

8   Q.  On the top left, what is the name of the second signer on

9   this account?

10  A.  Alex Hadjicharalambous.

11  Q.  And what is Alex Hadjicharalambous' occupation listed as

12  here?

13  A.  Comptroller.

14  Q.  Let's go to page eight, please, Ms. Loftus.

15          Again, Ms. Wilson, what type of document is this?

16  A.  That's the limited liability company authorization

17  resolution.

18  Q.  And looking here, for what company?

19  A.  For G/Club Operations.

20  Q.  And what is the address listed for G/Club Operations on

21  this corporate document?

22  A.  590 Madison Avenue, 21st Floor New York, New York 10022.

23  Q.  And do you see the two signers here on the account?

24  A.  Yvette Wang and Alex H.

25  Q.  Are those the same signers who were listed above in the

1  account opening documentation?

2  A.  Yes.

3  Q.  Let's go to page 13, please.  If we could focus, Ms.

4  Loftus, on that portion down to the bottom.

5          What is the name of this scanned passport?

6  A.  Yanping Wang.

7  Q.  And what is the issuing country of this passport?

8  A.  China.

9  Q.  And then if we could focus on the handwritten information

10  on the bottom here, Ms. Loftus.

11          What does that say, Ms. Wilson?

12  A.  Second form of ID, occupation manager.

13  Q.  Let's go to the next page, page 14.

14          What is this an image of, Ms. Wilson?

15  A.  A credit card.

16  Q.  Why, if at all, would Bank of Princeton collect a scan of a

17  credit card in connection with an account opening?

18  A.  That can be used as a second form of ID for an individual.

19  Q.  And what is the individual's name listed on this credit

20  card?

21  A.  Golden Spring, New York.  And it's Yanping Wang.

22  Q.  Let's go to page 21, please.

23          Again, Ms. Wilson, is this the beneficial owner

24  certification for the G/Club Operation's account?

25  A.  Yes.

O6DBGUO4                          Wilson- Direct

1   Q.  And looking through to the table, the person opening the

2   account listed as Alex H, correct?

3   A.  Correct.

4   Q.  And then the name and address of the legal entity is the

5   same as we've been looking at in the account opening

6   documentation?

7   A.  Yes.

8   Q.  What is the name of the ultimate beneficial owner of

9   G/Clubs according to this document?

10  A.  He, Haoran.

11  Q.  Can you spell that?

12  A.  H-E, last name is, H-A-O-R-A-N.

13  Q.  And looking at the address field, can you read that

14  address?

15  A.  79 East Works Drive Cofton, Hackett, UK.

16  Q.  At the bottom if we could focus on the portion through --

17  to the date.

18          What date was this form submitted?

19  A.  October 29, 2020.

20  Q.  And this is a corporate document for G/Clubs that was

21  provided to Bank of Princeton; is that correct?

22  A.  Yes, this is a form the bank gives them to fill out to

23  explain who their beneficial owners are.

24  Q.  And, Ms. Loftus, if we can go to page 25.

25          Ms. Wilson, what type of document is this?

O6DBGUO4                        Wilson- Direct

1    A.   This is a certificate of organization for the business for

2    G/Club.

3    Q.   Looking at this, where was G/Club organized?

4    A.   Puerto Rico.

5    Q.   And on what date?

6    A.   October 7, 2020.

7              THE COURT:  All righty.  It's now 3 p.m., so our work

8    has come to an end for the day.  Members of the jury, remember

9    that you're not allowed to discuss the case amongst yourselves

10   or with anyone else.  Don't permit anyone to discuss the case

11   in your presence.  Don't read, watch, or listen to anything

12   from any source about anything having to do with the subject

13   matter of this trial.  Have a good evening.  I'll see you ready

14   to come into the courtroom tomorrow at 9:30.  Thank you.

15             THE LAW CLERK:  Jury exiting.

16             (Jury not present)

17             THE COURT:  You may step out.  Don't discuss your

18   testimony.

19             (Witness temporarily excused)

20             (Continued on next page)

21

22

23

24

25

1                (Jury not present)

2                THE COURT:  Please be seated.  Who do we expect to

3       testify tomorrow?

4                MS. MURRAY:  So we'll be continuing with Ms. Wilson

5       and then we will have Sam Roberts who is a Bitgo employee that

6       we discussed earlier, and then Bo Collins.  And with respect to

7       Mr. Collins, we don't anticipate that we will get past his

8       direct examination tomorrow.  But with respect to the issue we

9       had flagged this morning on the documents, we've spoken with

10      defense counsel.  And our proposal, if it's acceptable to the

11      Court, in the very unlikely event that we did complete his

12      direct examination tomorrow, we would request to then adjourn

13      for the day to give the defense the benefit of the weekend to

14      prepare his cross.  Again, I think it's extremely unlikely that

15      will be the timeline.  I suspect he will still be on direct

16      when the day ends.

17               THE COURT:  Anything else?

18               MS. MURRAY:  Nothing from the government.

19               THE COURT:  All righty.  Thank you.  Please have the

20      witness on the stand at 9:29 tomorrow.  Have a good evening.

21               (Adjourned to June 14, 2024 at 9:00 a.m.)

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     MINRAN WU

4    Direct By Mr. Fergenson . . . . . . . . . .2393

5    Cross By Mr. Schirick . . . . . . . . . . .2431

6    Redirect By Mr. Fergenson . . . . . . . . .2499

7    Recross By Mr. Schirick . . . . . . . . . .2506

8    Redirect By Mr. Fergenson . . . . . . . . .2513

9     KIMBERLY ESPINOZA

10   Direct By Mr. Finkel . . . . . . . . . . . .2514

11   Cross By Mr. Schirick . . . . . . . . . . .2530

12   JAMIE WILSON

13   Direct By Ms. Murray . . . . . . . . . . . .2536

14                      GOVERNMENT EXHIBITS

15   Exhibit No.                            Received

16    VNB1-3, IDB1, IDB3, IDB4, IDB7, SIG1, . . .2515

17            SIL4, SIL3, SIL40

18    CAP623 and CAP624  . . . . . . . . . . . .2516

19    BOP-16, BOP-7, BOP-1, BOP-2, BOP-3 and  . .2542

20            BOP-4

21    BOP-12 and BOP-10  . . . . . . . . . . . .2551

22    VN-12  . . . . . . . . . . . . . . . . . .2413

23    Z12  . . . . . . . . . . . . . . . . . . .2517

24    VN13  . . . . . . . . . . . . . . . . . . .2410

25    VN-37  . . . . . . . . . . . . . . . . . .2420

```
1   VN39    . . . . . . . . . . . . . . . .2394

2   BOP-40    . . . . . . . . . . . . . . .2554

3   BR451 and BR452    . . . . . . . . . . . .2515

4                     DEFENDANT EXHIBITS

5   Exhibit No.                           Received

6    7003    . . . . . . . . . . . . . . . .2509

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```