O6EBGUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                      Defendant.            Trial
 6   ------------------------------x
                                            New York, N.Y.
 7                                          June 14, 2024
                                            9:00 a.m.
 8
     Before:
 9

10                       HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                             APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6EBGUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Make your appearances,

3     please.

4          MS. MURRAY:  Good morning, your Honor.  Juliana

5     Murray, Ryan Finkel and Justin Horton on behalf of the United

6     States.  We're joined by paralegal specialist Isabel Loftus.

7          MR. BARKAN:  Good morning, your Honor.  Matthew Barkan

8     with defendant Miles Guo and joining us shortly will be

9     Ms. Shroff and Mr. Schirick.

10          THE COURT:  Please be seated.  Is there anything that

11     anyone would like to raise at this time?

12          MR. FINKEL:  Not so much an issue, just want to note

13     for the Court in connection with what was discussed yesterday

14     morning.  At about 3:00 yesterday we sent the defense a table

15     of contents that we created for that production, as I

16     understand it, listing each of the documents and what they

17     purported to be.  We thought that would be helpful for them.

18          THE COURT:  I'd like you to speak into the microphone.

19     You say that you made a table of contents.

20          MR. FINKEL:  Yes, our team created a table of contents

21     for that production for Mercantile, which I understand listed

22     each of the documents that were in that production, and what

23     those documents purported to be.  Based on their title, for

24     example, that sort of thing.  We thought that would be helpful,

25     and also what the Court requested.  I just want to note that we

O6EBGUO1

1    did that.  That's all.

2            MS. SHROFF:  Nothing from the defense, your Honor.

3    Good morning.

4            THE COURT:  So you'll have the witness back on the

5    stand at 9:29.

6            (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6EBGUO1

1          (Jury not present)

2          THE COURT:  Just now after I left the bench, I

3    received a letter from the defense.  I'll hear you on that.

4          MS. SHROFF:  Your Honor, just as the letter said, we

5    understand the Court is ruled about the longer day.  We just

6    ask that the government be held to its order of witnesses as

7    that would help us given the other constraints that we have

8    detailed in the letter.

9          THE COURT:  I'll hear from the government.

10          MR. FINKEL:  So, your Honor, we have always endeavored

11    to provide a good faith estimate in order of our witnesses.

12    Our witnesses are people.  Many of whom are civilians.  Some of

13    who have counsel.  Some of whom are traveling.  There are

14    logistical issues that are sometimes difficult to work out.

15    What I can certainly tell the Court is the order that we

16    provide witnesses in is the order we intend to call them in,

17    but sometimes things happen.  So to the extent things have

18    changed, we deal with it.  That happens at trials, and I think

19    defense counsel knows that.  We can certainly provide the

20    defense, as we have been, our order for the upcoming, which we

21    will endeavor to meet.  And to the extent something happens,

22    we'll communicate that to the defense in realtime.

23          And what I can tell the Court is, I've had a number of

24    conversations with members of the defense team, none of whom

25    are here right now, but with other members of the defense team

O6EBGUO1

1    about these scheduling issues.  And we've had good

2    conversations about them.  So we'll continue to do that, and

3    we'll continue to provide exhibits in advance to help the

4    defense and to make this trial more efficient.  We're certainly

5    doing all that we can to be efficient and forthcoming with the

6    defense as possible.

7        MS. SHROFF:  Your Honor, that has not been our

8    experience.  It is because we've had trouble that one of the

9    members of the defense team spoke to a supervisor at the U.S.

10    Attorney's office.  We continue to have difficulty adjusting to

11    the schedule.  Whether it's in good faith or bad faith, the

12    problem is, we're still left in a position where we have to

13    adjust.  So, for example, yesterday's witnesses that are going

14    to spill over into today required two lawyers to not be in

15    court with the client so they could step out and prepare.  That

16    would not be optimal for anyone.  This is happened quite a bit

17    throughout the trial.  And, of course, it's a given that

18    witnesses are people, that's why they're witnesses.  But the

19    problem is, we're also people on the defense side.  We also

20    have to adjust.

21        And the biggest juggle we have to make with the

22    situation is schlepping back and forth from MDC, which by the

23    way has been in consistent lockdown.  The other night I went at

24    5:00 after the 3:00 trial day, it was a holy mess over there.

25    I'm told again that there was a delay.  They've changed the

O6EBGUO1

1    count time now, so there are new count times at MDC.  So

2    rejiggering of witnesses has like a complete domino effect on

3    the defense team.  That is -- I haven't finished speaking,

4    Mr. Finkel.  I can't see the judge.  Thank you.

5          So whether or not the government is endeavoring,

6    that's not what I'm worried about.  What I'm worried about is

7    our ability to move around, then pull all of the exhibits, the

8    exhibits are dripping in at the very last second.  Yesterday's

9    witnesses, the exhibits were being pulled I believe at 1:30 in

10   the morning.  So there is no issue of whether or not this is

11   good faith or bad faith.  This is where we are.  So to the

12   extent the government can give us their witness list earlier

13   than noon on Saturday, that would great.  If they could stick

14   to it, that would be even better.  And if we really can't cope,

15   your Honor, we'll come back to the Court.

16         MR. FINKEL:  Can I respond to just a few points, your
     Honor.

17         THE COURT:  Yes.

18         MR. FINKEL:  First -- and I hate to say this, but now

19   I have to because of what Ms. Shroff just raised.  But there

20   have been a number of occasions where members of the -- the

21   four of us -- have approach Ms. Shroff in particular to discuss

22   logistical issues, and have been told in no uncertain terms,

23   get away from me.  That's a direct quote.  Okay.  So the

24   government has tried to address these issues with Ms. Shroff in

25   particular, and that's what we've been told.  Thankfully other

O6EBGUO1

1    members of the defense team have not had that response.  And

2    we've had good communication with other members of the defense

3    team, but I want the Court to know that just in light of what

4    Ms. Shroff said.

5            Also, with respect to Ms. Wilson, I think we provided

6    her as a possible witness on May 26, including her exhibits

7    that we intended to introduce.  Because cross went long for

8    other witnesses, she got pushed to where she is now.  The

9    changes in the witness order that happened this week are as

10   follows:  On Sunday -- and we told the Court about this -- we

11   determined that we weren't going to call Paolo Sozy.  We wanted

12   to streamline our case, so we took him off the calendar.

13   That's what happened.  There was then some flip flopping

14   between whether it'd Kim Espinoza or Jamie Wilson.  We thought

15   it would be Kim Espinoza first.  Then we thought it would be

16   Jamie Wilson.  The reasons why had to do with a family member

17   who was sick of Ms. Wilson's, and then Ms. Espinoza's travel

18   schedule.  So those got flip flopped back and forth.

19           We communicated that as best we could with the

20   defense, and have always endeavored to do so.  What's going to

21   happen tonight, your Honor, and what we do every Friday after

22   the weekends is the four of us, more than the four of us, the

23   case agents and the paralegals, we all go back to 26 Fed.  We

24   discuss what happened this week.  We discuss who we can call

25   next week, and we try to think about the longer term plan with

O6EBGUO1

1    respect to the trial; who our witnesses will be, whether

2    they're available, who we've been in touch with recently, that

3    takes time.  We will then go back, look at a calendar, and plot

4    out the witnesses that we think and guess how long the cross

5    will be.  That's what we do.  We then reach out to counsel or

6    witnesses to make sure that the dates that we think would be

7    best for the jury frankly in hearing the evidence will work for

8    people's schedules.

9         Sometimes we don't learn about scheduling difficulties

10   until after Saturday, right, because we've been telling the

11   defense by Saturday at noon what our witness order will be; but

12   things happen because there are people involved.  So I have no

13   problem, your Honor, and the government has no problem

14   communicating to the defense.  If we can do it tonight, we'll

15   do it tonight, what we anticipate our order of the witnesses

16   will be, and doing everything we can to stick to that order.

17   And we will endeavor to do that.  To the extent there are any

18   issues that get raised because of scheduling issues or what

19   have you, we will tell the defense in realtime.  There's no

20   problem with that.

21        THE COURT:  So you expect that you will be able to get

22   them witness list tonight?

23        MR. FINKEL:  We can do that.  The only caveat I'd

24   raise is we might not be able to be in touch with all of the

25   witness and/or their counsel, and so that could create some

O6EBGUO1

 1    sort of change.  So, yes, we can get them tonight the witness
 2    list we anticipate, but I just want to be completely
 3    forthcoming with the Court, sometimes there are changes as a
 4    result of things outside of our control.
 5         THE COURT:  It is typical that the order of witnesses
 6    may change during a trial.  This is extremely common.  However,
 7    if it gets to the point where defense counsel cannot represent
 8    their client effectively, they may ask for an adjournment,
 9    which I would consider granting if I felt that there was a
10    basis for that.
11         MR. FINKEL:  I understand that, your Honor.  Just to
12    be completely clear, there's no gamesmanship here.  This is
13    about scheduling difficulties and trying to fill the days
14    appropriately given what we don't know, and it's sometimes been
15    a black box in terms of how long cross will be.  But we hear
16    your Honor, and we have been very mindful, your Honor, of what
17    your Honor told us in the robing room at the beginning of this
18    trial.  And we think about that all the time, and I can tell
19    this Court that the four of us talk about that a lot.  And so
20    what we'll do tonight -- we'll try to do it by nine.  It might
21    take a little longer -- is provide a list in order of what we
22    expect the order to be.  And what I'll tell your Honor is to
23    the extent there are changes, we will communicate that to the
24    defense in realtime, including the reason why we're changing
25    it, whether it's scheduling or what have you.

O6EBGUO1

1          THE COURT:  Ms. Shroff, is it true that you said get

2    away from me?

3          MS. SHROFF:  I did, your Honor.  My past experience

4    with Mr. Finkel on a prior trial before this one has led me to

5    tell him several times that I would not be the point person for

6    him, and that he should speak to some other member of the team.

7    With Mr. Finkel, I have had exactly this issue in a prior

8    trial, and I do not want to get into it before this Court.  But

9    here's the most important thing.  I offered Mr. Finkel three

10   other lawyers, and I offer Mr. Finkel email.  I stand by that

11   because I have repeatedly told Mr. Finkel that I am

12   uncomfortable proceeding to talk to him off the record.  Given

13   my past experience with him on another trial, that was my

14   position, your Honor.  I'm telling the Court candidly.

15         So I've had this difficulty before, but there are

16   three other members of the team who have bourne out these

17   conversations that are long, protracted, and which still have

18   led our team to go to the prosecutors' office's supervisor

19   because we're in the same conundrum as when we started this

20   trial.  Mulan is a perfect example, your Honor.  The government

21   said that we should come in earlier and a day longer because

22   they thought that we were playing a game with her schedule.

23   Mulan ended earlier, and then they called two other witnesses

24   to back it up.  When Mulan was called out of order, it was a

25   strain on us.  We still came early, and we still stayed late.

O6EBGUO1

1  So, yes, my historical experience with Mr. Finkel has led me to

2  ask him to talk to other members of the team.

3          THE COURT:  Well, you might make that request, but it

4  is not proper for you simply to say, I will not speak to a

5  member of the prosecution team, or that he cannot speak to you.

6  It's simply improper professionally, and so I'm directing that

7  you may ask that he not address you, but you cannot tell him

8  that you will not engage at all.

9          MS. SHROFF:  Your Honor, I do not engage with

10  Mr. Finkel off the record because it has been my historical

11  experience that it is not positive for my client.  That said, I

12  have offered him every other member of the defense team and

13  email correspondence.  That way nobody can say, Ms. Shroff said

14  X, and I said Y.  It's the best way to proceed because it shows

15  clear communication and transparency.  But I will take your

16  Court's order as every order this Court issues and proceed

17  accordingly.  But I do note again, my experience with Mulan,

18  and I note here again, that because the entire team had the

19  same difficulty, we escalated the matter to a supervisor.  The

20  problem remained as of yesterday.  I don't need to belabor

21  this.  I'm happy to take the Court's instruction and move

22  forward.

23          MR. FINKEL:  Your Honor, I'm sorry, but I have to

24  respond to some of that.  I have to.  And now this is before

25  your Honor, and I'm sorry that it is.  It's not just me.  It's

1    all four of us.  Every member of the prosecution team

2    Ms. Shroff has expressed this, get away from me attitude, which

3    has not been productive, and it's been contrary to what the

4    Court ordered us to do in the robing room two weeks ago.

5            And, your Honor, with respect to the Ya Li issue that

6    Ms. Shroff raised, the witness prior -- and now we have to get

7    into this -- the witness prior was Ms. Jenny Li.  There were

8    problems with the translation.  There was an issue in which

9    Ms. Shroff was reviewing the transcript to assess whether there

10   were translation issues.  I made some suggestions about how to

11   make that more efficient.  Ms. Shroff made it clear to me in

12   words and in her affect essentially that she was intentionally

13   delaying this because she said -- the quote was essentially, Is

14   the government worried because it has scheduling issues with

15   its witness, in sum and substance, which was delivered in a

16   sarcastic tone.  And that's why we had that reaction about what

17   was going on.

18           And all this, your Honor, should not before the Court.

19   It's contrary to what happened in the robing room.  So the

20   bottom line is this -- and I want to say this on behalf of this

21   table, and I think on behalf of the table behind us, is the

22   government is going to do whatever it can to litigate this case

23   in a professional, efficient manner, including by communicating

24   in realtime with the defense.  Indeed, when we realized the

25   issue with the production, one of the first things we did is

O6EBGUO1

1    call a member of the defense team to tell them about this, and

2    we did that.  So we're going to continue to do that, and we're

3    going to continue to work to make sure this trial is efficient

4    for your Honor and for the members of the jury.

5          MS. SHROFF:  Repeatedly the government has said things

6    to this Court implying that we're acting in bad faith.  An off

7    the cuff comment to opposing counsel does not mean there's any

8    gamesmanship on this part.  We did not delay a cross --

9          THE COURT:  Well, but saying, don't talk to me, that

10   is an improper way of dealing with your adversary.  It's simply

11   not acceptable.

12         MS. SHROFF:  Your Honor, there are three other people

13   on this team.  The reason I ended communication with Mr. Finkel

14   is it wasn't productive for my team or my client.

15         THE COURT:  Okay.  So I want you to understand that

16   you must engage.  You cannot simply turn your back.

17         MS. SHROFF:  Your Honor, repeatedly we have endeavored

18   to give the government a point person on our team.  So one

19   person talks to one person.  There is no back and forth

20   between, well, I told Mr. Barkan this, or I told Mr. Shroff

21   this.  It is an efficient way to proceed.

22         THE COURT:  Ms. Shroff, I've heard enough.  What I've

23   said is that you can make a request that you not be addressed,

24   but you cannot insist on it.  And if it is more efficient for

25   the prosecution team to speak with others, that's fine, but you

O6EBGUO1

1    simply cannot take the position that you're not going to engage

2    the prosecution team.  It's simply not acceptable.

3         MS. SHROFF:  That's fine, your Honor.  I will take the

4    Court's statement and move forward accordingly.  But the record

5    should be clear here, the reason this matter was escalated is

6    because not one of the people on the defense team was able to

7    fulfill their obligation to the client by talking to the

8    government's team on the table ahead of me.  It is for that

9    particular reason that we wrote to the supervisor, that we

10   spoke to the supervisor, and we sent a letter to the Court.  To

11   shift this onto me is fine.

12        THE COURT:  I've heard enough, Ms. Shroff.  I'm going

13   to take a moment, and then we'll start.  If you'll have the

14   witness, please, brought to the stand.

15        (Recess)

16

17

18

19

20

21

22

23

24

25

O6EBGUO1                        Wilson- Direct

1              (Jury not present)

2              THE COURT:  Please have the jurors brought in.

3              THE LAW CLERK:  Jury entering.

4              (Jury present)

5              THE COURT:  Please be seated.  Good morning, jurors.

6   We're starting five minutes late.  I'm sorry about that.  It's

7   nobody's fault.  I do try to stay on time.  As for next week,

8   we will start at 9:30.  We'll have a break between 11:30 and

9   12, and then another break between 2:30 and 3:00.  We'll stop

10  at five.  Remember, you're still under oath, and you may

11  continue the inquiry.

12             MS. MURRAY:  Thank you, your Honor.

13  JAMIE WILSON, resumed.

14  DIRECT EXAMINATION CONTINUED

15  BY MS. MURRAY:

16  Q.  Ms. Loftus, can we please publish Government Exhibit BOP-1.

17  Good morning, Ms. Wilson.

18  A.  Good morning.

19  Q.  When we left off yesterday we were speaking about the

20  G/Clubs account at Bank of Princeton.

21             If we could go, Ms. Loftus, to page 26.

22             Ms. Wilson, what is this document?

23  A.  This is a QualiFile or check systems report.

24  Q.  If we can go to the next page, please, Ms. Loftus.

25             Ms. Wilson, what person or entity did Bank of

O6EBGUO1                        Wilson- Direct

1   Princeton run a QualiFile check for, for the G/Clubs account?

2   A.  For G/Club and the signers on the account.  This one in

3   particular is for one of the signers Yvette Wang.

4   Q.  And, Ms. Loftus, if we could zoom in on the table on the

5   top, please.

6          Ms. Wilson, how many different QualiFile responses did

7   Bank of Princeton get back for Yanping Wang or Yvette Wang?

8   A.  Nine.

9   Q.  What are the various different financial institutions that

10  had QualiFile responses for Yvette Wang?

11  A.  Citibank, Capital One, First Republic Bank, Santander Bank,

12  NexBank, Signature Bank and the Bank of Princeton.

13  Q.  Of those nine inquiries, is it correct that seven of them

14  were between the period of June 2020 and October 2020?

15  A.  Yes.

16  Q.  And can you remind us what it means for a QualiFile

17  response to come back?

18          What action it reflects?

19  A.  This means that an account was opened at that financial

20  institution, so they ran the customer through tech systems.

21  Q.  And how, if at all, does the number of QualiFile responses

22  for this particular signer Yvette Wang factor into your BSA

23  analysis of the G/Club account?

24  A.  This would make it a little more risky for our institution

25  knowing that somebody opened multiple accounts within a short

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1                       Wilson- Direct

1    period of time at multiple different banks.

2    Q.   Why, if at all, would that make it a riskier customer?

3    A.   Because normally when you have an individual or entity,

4    they maintain banks at a few locations, maybe two or three

5    different banks, not seven or eight different banks.

6    Q.   Did there come a time when the G/Club account was in fact

7    opened at Bank of Princeton?

8    A.   Yes.

9    Q.   What, if anything, was your involvement with the G/Club

10   account after it was opened?

11   A.   When it was opened, just like any other account, we review

12   all of the opening documents, and we monitor the account.  Some

13   accounts are risk high, so we may monitor them a little more

14   frequently than the low risk account.

15   Q.   And focusing on the G/Club account, how, if at all, did you

16   monitor that account in the course of your work as a BSA

17   officer?

18   A.   We reviewed all the opening documents to include the

19   business documents, the personal documents.  We reviewed the

20   money that came into the account when it was opened.

21   Q.   What type of business was G/Club?

22   A.   It was an international luxury living company.

23   Q.   Ms. Loftus, if we could go to page 23 of this exhibit,

24   please.

25             Ms. Wilson, what type of document is this?

O6EBGUO1                        Wilson- Direct

1    A.   This is a certificate of formation.

2    Q.   Is this one of the documents that was submitted in

3    connection with the account opening?

4    A.   Yes.

5    Q.   If we could zoom in on article 3 in the middle of the page

6    please, Ms. Loftus.

7         Ms. Wilson, this section is entitled Article 3, Nature

8    of Business.  Can you please read the bolded text of what

9    G/Club purports to be in this corporate document?

10   A.   Membership concierge service with exclusive offers and

11   discounts for luxury hotels and retailers for high net worth

12   individuals from the Asian market.  The company may also engage

13   in any other activities authorized by the laws of the

14   government of Puerto Rico.

15   Q.   Thank you.  Ms. Wilson, in the course of your BSA analysis,

16   what open source, if any, did you do into G/Club?

17   A.   We did some background research just to Google the business

18   itself to see what type of business it was, what type of luxury

19   services that it offered.

20        THE COURT:  Would you remind the jurors what BSA

21   stands for?

22        THE WITNESS:  Yes.  BSA is the Bank Secrecy Act.  And

23   under the Bank Secrecy Act, we monitor accounts for money

24   laundering and terrorist financing.

25   Q.   What, if anything, were the results of your research, your

1  open source research into G/Clubs?

2  A.  It looked like a start-up company. The website really

3  hadn't been developed too much, but we found that it wasn't

4  just G/Club.  They where linked to other different types of

5  luxury like clothing, and they had their own Bitcoin or

6  cryptocurrency it look like they were generating, so other

7  different luxury companies within G/Club.  And that's only

8  found the link to the owner potentially being Miles Guo.

9  Q.  Who is Miles Guo?

10 A.  Miles Guo, when we did research, had a lot of negative news

11 search on that he had been exiled from China, just different

12 money laundering, different types of negative news searches

13 that kind of raised a lot of red flags in our opinion.

14 Q.  And what, if anything, did you find from your research

15 about Miles Guo's connection to G/Clubs, the company that was

16 seeking to open an account?

17 A.  He was the owner of that business or the creator for that

18 business.

19 Q.  How, if at all, did Miles Guo's association with G/Clubs

20 factor into your BSA analysis?

21 A.  At that time it was a risk that we didn't want to keep the

22 accounts at our institution, so we chose to close any accounts

23 linked to that entity.

24 Q.  What, if anything, do you recall about the activity in the

25 G/Clubs account before Bank of Princeton made the decision to

O6EBGUO1                      Wilson- Direct

1   close it?

2   A.  For G/Club they brought in -- I want to say it was 10 or

3   $15 million into the bank.  And before they could spend the

4   money, we closed the account out to send it out.

5   Q.  Ms. Loftus, can we publish Government Exhibit BOP-3.

6           Ms. Wilson, what type of document is this?

7   A.  That's a bank statement.

8   Q.  For what entity?

9   A.  For G/Club Operations, LLC.

10  Q.  And looking at the top left there, if we could zoom in on

11  that please, Ms. Loftus.

12          It indicates G/Club Operations LLC, what is listed

13  below that?

14  A.  Memberships 590 Madison Avenue, Floor 21, New York, New

15  York 10022-2545.

16  Q.  And this is a statement for the period ending November 30,

17  2020?

18          MR. BARKAN:  Objection.  She's testifying.

19  Q.  What is the statement date please, Ms. Wilson?

20  A.  The statement ending in 11/30/2020.

21  Q.  Ms. Loftus, if we could zoom in on the bottom portion which

22  is the account activity here.

23          Ms. Wilson, what was the beginning balance as

24  reflected on this statement for the G/Clubs memberships

25  account?

O6EBGUO1                      Wilson- Direct

1    A.  Negative five dollars.

2    Q.  And on what date?

3    A.  10/31/2020.

4    Q.  How many credits were there during this one-month period?

5    A.  Seven credits.

6    Q.  For what dollar amount?

7    A.  $13,500,005.

8    Q.  If can you just look through those.  There are three on the

9    bottom.  If you could read the date and the amount of those

10   credits on this account?

11   A.  On 11/2/2020, there was a miscellaneous credit for $5. On

12   11/3/2020, there's an incoming wire from G/Club Operations, LLC

13   for 2 million, and on 11/3/2020, there's an incoming wire from

14   G/Club Operations for 3 million.

15   Q.  Focusing on those bottom two incoming wires from G/Club

16   Operations, what, if anything, are you able to determine about

17   what accounts for G/Clubs those wires came from?

18   A.  From this statement you could just tell that they came --

19   the money came from themselves.  They're at another

20   institution.

21   Q.  And there are numbers associated with each of those

22   incoming wires after the words "incoming wire," are those the

23   same numbers for each wire?

24   A.  No, they're two separate wires.

25   Q.  If we can go to the next page, please, Ms. Loftus, the

O6EBGUO1                        Wilson- Direct

1    third page.  Thank you.  And focus in again here on the top

2    portion, the remainder of the incoming wires.

3            For these additional four, Ms. Wilson, if you could

4    please read us the date of the incoming wire and the amount?

5    A.  11/4/2020 for 2 million; 11/4/2020 for 2 million; 11/6/2020

6    for 2.5 million; 11/13/2020 for 2 million.

7    Q.  We can take out the zoom.  Thank you.

8            Ms. Wilson, what, if anything, were you able to

9    determine about the source of the $13.5 million that came into

10   the G/Clubs account over the course of a few days in November

11   2020?

12   A.  Just that they came from their accounts at other financial

13   institutions.

14   Q.  You mentioned that the Bank of Princeton decided to close

15   G/Clubs and additional associated accounts; is that right?

16   A.  Correct.

17   Q.  What were the additional accounts that were associated with

18   G/Clubs?

19   A.  The additional accounts were the Greenwich and Lamp

20   Capital.

21   Q.  At the time that G/Clubs was opening its account with Bank

22   of Princeton, what association, if any, had it disclosed to the

23   bank about an association with Lamp or Greenwich Land?

24   A.  The same advisor was -- the way all three accounts were

25   brought to us was from Haitham Khaled and Stephen Lawandy, the

O6EBGUO1                        Wilson- Direct

 1   same investment advisor for all three accounts for our

 2   institution.

 3   Q.  How, if at all, did the association among these accounts

 4   factor into your BSA analysis?

 5   A.  We found some red flags while.  We were reviewing these

 6   accounts and found the links with Miles Guo, when we looked

 7   into Daniel Podhaskie, our research had noted that he was also

 8   his lawyer.  So the fact that all three accounts were brought

 9   from the same investment advisor along with the links being

10   together from the same investment advisor and the ultimate

11   owner of G/Club versus the signer on the other two business

12   accounts, we chose to close all three accounts.

13   Q.  Just to be clear, Ms. Wilson, you said that Daniel

14   Podhaskie was his lawyer, whose lawyer did you learn Daniel

15   Podhaskie was?

16   A.  Miles Guo.

17   Q.  When the Bank of Princeton determined that it was going to

18   close the accounts, how, if at all, did it convey that to the

19   account holders?

20   A.  The head of our retail reached out to Haitham Khaled to let

21   him know that we were making a risk-base decision to close out

22   their accounts.

23   Q.  How, if at all, did Haitham Khaled respond?

24            MR. BARKAN:  Objection, hearsay.

25            THE COURT:  Sustained.

O6EBGUO1                      Wilson- Direct

1  Q.  What response, if any, did the Bank of Princeton receive

2  from the account holders?

3           MR. BARKAN:  Same objection, your Honor.

4           THE COURT:  Sustained.

5  Q.  When Bank of Princeton decided to close the accounts and

6  inform the account holders of that, were you involved in any

7  further communications regarding the account closures?

8  A.  I saw the emails and were forwarded the emails that were

9  discussed between the head of our retail and the individuals

10  Haitham Khaled.

11  Q.  And what, if anything, did you learn about the account

12  closure process from those emails?

13           MR. BARKAN:  Same objection, your Honor.

14           THE COURT:  Sustained.

15           MS. MURRAY:  May I have a moment, your Honor.

16           (Pause)

17  Q.  Ms. Loftus, can we go to Government Exhibit BOP-1 again,

18  please, the bottom of the page.

19           There's a stamp at the bottom account closed.

20  Ms. Wilson, on what date did the Bank of Princeton close the

21  G/Clubs account?

22  A.  November 25, 2020.

23  Q.  If we can go, Ms. Loftus, to the next page I believe, and

24  on the bottom right here.

25           On what date had Bank of Princeton opened the G/Clubs

O6EBGUO1                    Wilson

1    account?

2    A.  10/30/200.

3    Q.  So for approximately how long was that account opened at

4    the Bank of Princeton?

5    A.  Approximately a month.

6    Q.  And how much money had come into the account during that

7    one-month period?

8    A.  Approximately almost $15 million.

9            MS. MURRAY:  Nothing further, your Honor.  Thank you.

10           THE COURT:  Cross examination.

11           MR. BARKAN:  Yes, your Honor.

12   CROSS-EXAMINATION

13   BY MR. BARKAN:

14   Q.  Good morning, Ms. Wilson.

15   A.  Good morning.

16   Q.  You testified on direct about the G/Clubs account opening,

17   right?

18   A.  Yes.

19   Q.  Could we pull up GX-BOP-1, please.  We can publish that.

20           Ms. Murray showed this document to you on direct,

21   right?

22   A.  Correct.

23   Q.  These are the account opening documents for G/Clubs, right?

24   A.  Correct.

25   Q.  And Ms. Yvette Wang is the owner and signer; is that

O6EBGUO1                        Wilson

1   correct?

2   A.  Yes, she's a signer on the account.

3   Q.  Can we go to page two, please.

4           On the top left we see that the second signer is Alex

5   Hadjicharalambous, right?

6   A.  Yes.

7   Q.  Can we go to page 13, please.

8           And as asked by the Bank of Princeton, Ms. Wang

9   provided her passport information; isn't that correct?

10  A.  Correct.

11  Q.  Can we go to page 14, please.

12          And Ms. Wang provided a copy of her credit card from

13  Santander; isn't that right?

14  A.  Correct.

15  Q.  Santander is a global bank, right?

16  A.  Yes.

17  Q.  It's FDIC insured, right?

18  A.  To my understanding, yes.

19  Q.  If we go to page 15.

20          If we look at the top left, we see it says United

21  States of America employment authorization; isn't that right?

22  A.  Correct.

23  Q.  So Ms. Wang provided proof that she was authorized to work

24  in the United States, right?

25  A.  Correct.

O6EBGUO1                      Wilson

1    Q.  Go to page 18, please.

2          And Mr. Hadjicharalambous provided his passport

3    information; isn't that right?

4    A.  Yes.

5    Q.  And can we go to page 19, please.

6          And Mr. Hadjicharalambous provided his drivers license

7    as well; isn't that right?

8    A.  Correct.

9    Q.  Can we go to page 21, please.

10          Now at the top this says Bank of Princeton

11    certification of beneficial owner, right?

12    A.  Correct.

13    Q.  And if we can zoom in on the middle of the page, please.

14          Letter C says:  The following information for each

15    individual, if any, who directly or indirectly through any

16    contract arrangement, understanding, relationship or otherwise

17    owns 25 percent or more of the equity interest of the legal

18    entity listed above.  Did I read that correctly?

19    A.  Yes.

20    Q.  And below in the grid you see the name He Haoran, right?

21    A.  Correct.

22    Q.  And there's an address in the United Kingdom, right?

23    A.  Correct.

24    Q.  And that's his correct address, right?

25    A.  To the best of our knowledge, yes.

O6EBGUO1                    Wilson

1   Q.  Well, BOP confirmed that that was his correct address,

2   right?

3   A.  Yes.

4          MS. MURRAY:  Objection.

5          THE COURT:  One moment.  It appears that perhaps the

6   jurors are not able to see the screens.  Okay.  So we need to

7   fix that.  Is it possible for you to go to an area that doesn't

8   require the screen, or do you need the screen for every

9   question?

10          MR. BARKAN:  I do need the screen at this time, your

11  Honor.

12          THE COURT:  Are you able to lean over and look at the

13  screen.  We're working on getting your screens back up. But in

14  the mean time, if you'll just look over at the screen that is

15  in the second row.  Okay.  So you may continue.

16          MR. BARKAN:  Thank you, your Honor.

17  Q.  Could we go up to page 20, please.  Could we zoom in on the

18  top left there.

19          Mr. He provided his passport information; isn't that

20  right?

21  A.  Correct.

22  Q.  And so he disclosed himself as an owner of 25 percent or

23  more of the equity of G/Clubs; isn't that right?

24  A.  Yes.

25  Q.  Ms. Wilson, you testified on direct about QualiFile, right?

O6EBGUO1                    Wilson

1   A.  Correct.

2   Q.  It's part of the verification process for new customers;

3   isn't that right?

4   A.  Yes.

5   Q.  Is it fair to say that that's part of Bank of Princeton's

6   KYC process or Know Your Customer process?

7   A.  Yes.

8   Q.  Can we go to page 26, please, and can we zoom in a bit.

9           That says QualiFile response, correct?

10  A.  Yes.

11  Q.  And if we could zoom out.  If we look a little further down

12  the page it says, business information, right?

13  A.  Yes.

14  Q.  And it says G/Club Operations, LLC, right?

15  A.  Yes.

16  Q.  And towards the bottom do you see where it says, check

17  systems history?

18  A.  Yes.

19  Q.  And below that it says, no closures found, right?

20  A.  Correct.

21  Q.  It says no purchase debt found, right?

22  A.  Correct.

23  Q.  It says no previous inquiries found; isn't that right?

24  A.  Yes.

25  Q.  So QualiFile found nothing problematic with the G/Club

O6EBGUO1                          Wilson

1    Operations, LLC report; isn't that correct?

2    A.  Yes.

3    Q.  Can we go to page 27, please.

4            This is the QualiFile report for Ms. Wang; isn't that

5    right?

6    A.  Yes.

7    Q.  So if we zoom in on the bottom of the page, we see where it

8    says check systems history, right?

9    A.  Yes.

10   Q.  And again no closures found, right?

11   A.  No.

12   Q.  No purchase debt found, right?

13   A.  Correct.

14   Q.  Can we go to page E28, please.

15           So you testified on direct that part of the QualiFile

16   inquiry is an inquiry into other banks where the applicant had

17   opened other accounts; isn't that right?

18   A.  Yes.

19   Q.  And so when other banks asked Ms. Wang, she provided her

20   documentation to those banks, right?

21   A.  Yes.

22   Q.  So she provided it to Santander Bank?

23   A.  Yes.

24           MS. MURRAY:  Objection.  How would this witness know

25   if Ms. Wang provided her information to a different bank.

O6EBGUO1                        Wilson

```
 1              THE COURT:  So you can testify about what you know.
 2    If you happen to know whether she provided that information to
 3    Santander, you may answer.  If you don't know, then you'll say
 4    you don't know.
 5    A.  I don't know for a fact what she supplied them, but I know
 6    by this page that she went to the bank and inquired to open an
 7    account there.
 8    Q.  Fair enough.  And same with Citibank, right?
 9    A.  Correct.
10    Q.  And same with Capital One, right?
11    A.  Correct.
12    Q.  If we could go back to page 27 and zoom in on the middle of
13    the page.
14              So for Ms. Wang do you see where it says account
15    actions?
16    A.  Yes.
17    Q.  And it says action accept, right?
18    A.  Right.
19    Q.  And it says recommended actions, open account, right?
20    A.  Yes.
21    Q.  Could we go to page 30, please.
22              This is the QualiFile report for Alex
23    Hadjicharalambous, right?
24    A.  Right.
25    Q.  And the recommended action here is, open account, right?
```

O6EBGUO1                    Wilson

1   A.  Right.

2   Q.  And it says action, accept, right?

3   A.  Yes.

4   Q.  Ms. Wilson, what is an ORM inquiry?

5   A.  I'm not sure.

6   Q.  Could we go to page 31, zoom in on the top.

7   A.  That's an OFAC inquiry.

8   Q.  I couldn't hear you.

9   A.  The OFAC inquiry, the Office of Foreign Asset Control.

10  Q.  And is the inquiry run as part of the bank's KYC process

11  for new customers?

12  A.  Yes.

13  Q.  And so at the top here it says ORM inquiry Yanping Wang,

14  right?

15  A.  Yes.

16  Q.  And then in a box it says suspect matches, right?

17  A.  Correct.

18  Q.  What is a suspect match?

19  A.  A suspect match is, that's what they're running it against,

20  so Yanping Wang's name is there, and it's showing that no

21  matches were found.  If there were potential matches, they

22  would be listed below instead of no matches found.

23  Q.  So the bank's OFAC inquiry found no suspect matches for

24  Yanping Wang, right?

25  A.  Correct.

O6EBGUO1                    Wilson

1  Q.  Can we go to the top of the page E32, please.  And can we

2  zoom in on the top.

3           So this page shows the OFAC inquiry result for Alex

4  Hadjicharalambous?

5  A.  Correct.

6  Q.  And for Mr. Hadjicharalambous there's no suspect matches,

7  right?

8  A.  Correct.

9  Q.  And can we go to the page 33, please, and can we zoom in on

10  the top.

11           And this shows the ORM inquiry for G/Club Operation,

12  LLC, right?

13  A.  Correct.

14  Q.  And again no suspect matches found, right?

15  A.  Correct.

16  Q.  Thank you.  We can take that down.

17           Ms. Wilson, other than the QualiFile and the OFAC,

18  were there any other account opening KYC processes that Bank of

19  Princeton ran on these accounts?

20  A.  We ran QualiFile, OFAC, and other than that we just review

21  the documents that are provided by the signers opening the

22  account for the businesses and themselves.

23  Q.  So as we've reviewed, the signers for the G/Club Operations

24  accounts provided all the ID that the Bank of Princeton asked

25  for; isn't that right?

O6EBGUO1                        Wilson

1    A.  Correct.

2    Q.  And so Ms. Wang and Mr. Hadjicharalambous provided their

3    ID, right?

4    A.  Correct.

5    Q.  And they passed the banks's KYC process, right?

6    A.  Correct.

7    Q.  And G/Club Operation itself pass the bank's KYC process,

8    right?

9    A.  Yes.

10   Q.  And the beneficial owner was disclosed, right?

11   A.  One of them, yes.

12   Q.  The beneficial owner Mr. Haoran He was disclosed, right?

13   A.  Correct.

14   Q.  And the bank KYC system recommended that the account be

15   opened; isn't that right?

16   A.  Yes.

17   Q.  And the bank in fact opened the accounts, right?

18   A.  Correct.

19   Q.  And permitted them to be funded, right?

20   A.  Correct.

21   Q.  You also testified on direct that an entity called

22   Greenwich Land, LLC had accounts at the bank, right?

23   A.  Yes.

24   Q.  And that it was Mr. Podhaskie who signed the documents to

25   open that account, right?

O6EBGUO1                        Wilson

1   A.  Yes.

2   Q.  And you would agree that Mr. Podhaskie provided the

3   identification required by the Bank of Princeton to open that

4   account, right?

5   A.  Yes.

6   Q.  And Mr. Podhaskie gave his true profession when he

7   disclosed that he was a lawyer, right?

8   A.  Yes.

9   Q.  And it's simple to verify if a person is a lawyer in good

10  standing, right?

11          MS. MURRAY:  Objection.

12          THE COURT:  You may answer if you know.

13  A.  We can do research through the internet to find if they are

14  currently a lawyer based on website.  So whether we want to

15  trust the internet research that is provided, then there's a

16  potential we could verify that.

17  Q.  And you did that research with Mr. Podhaskie, right?

18  A.  I did research on Podhaskie.

19          MS. MURRAY:  Objection, per the Court's prior ruling

20  on this matter.

21          THE COURT:  If you'll step up, please.

22          (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1                    Wilson

1          (At the sidebar)

2          THE COURT:  So on direct Mr. Podhaskie was identified

3     as the attorney for G/Clubs, so it's not improper to inquire as

4     to whether he was in good standing.  Do you plan to ask any

5     more questions?

6          MR. BARKAN:  A couple, your Honor.  Just to identify

7     the fact that it was disclosed that he was a lawyer at the time

8     the opening of the account. It's not something they found out

9     later.

10         MS. MURRAY:  Your Honor, we understand, and we believe

11    that that has been established.  To the extent there are

12    additional questions into his good standing and any results

13    that the bank found about his good standing, which are

14    suggestive and imply that there was in some way giving some

15    legitimacy to what was happening, that's firmly within the

16    Court's prior ruling.

17         MR. BARKAN:  Your Honor, I have no intention of asking

18    questions about whether he was in good standing.

19         THE COURT:  You did ask a question as to whether she

20    did research.  One minute.  You did ask questions as to whether

21    she researched his status as a lawyer in good standing, which I

22    find to be acceptable to go that far because his status as a

23    lawyer was raised in the direct, but calling further attention

24    to his status as a lawyer is not proper.

25         MR. BARKAN:  Your Honor, I was going to -- one of the

O6EBGUO1                          Wilson

1   pieces of identification that he submitted was his attorney ID

2   card to the bank, and I was going to confirm that they had that

3   information at the time before the account was opened.  It was

4   submitted with the application.  So if they're going to

5   complain that they later discovered that he was an attorney, I

6   think it's important for the jury to hear.

7            THE COURT:  If it was part of the application process,

8   which Ms. Murray went through, then I think it's fine for you

9   to ask that one question.

10           MS. MURRAY:  Your Honor, with respect to that point,

11  again we think that that has been established.  There's been no

12  allegation by the witness that Mr. Podhaskie didn't disclose

13  the fact that he was an attorney in the course of the account

14  opening.  In fact, she said that that was one of the red flags

15  for her in reviewing the accounts.  But to continue to inquire

16  into this matter beyond just establishing it, we believe again

17  falls firmly within the Court's ruling and is attempting to

18  paint this with the approval of some kind of legal counsel.

19           THE COURT:  So you're going to ask the question about

20  the ID, which I find acceptable.  Did you want to ask any

21  further questions?

22           MR. BARKAN:  No, your Honor.

23           THE COURT:  All righty.  Thank you.

24           (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1                        Wilson

1                    (In open court; jury present)

2     BY MR. BARKAN:

3     Q.  Can we please pull up, GX-BOP-7.

4              Ms. Wilson, this is an identification that

5     Mr. Podhaskie provided with the bank application, right?

6     A.  Correct.

7     Q.  And in the lower left-hand corner it says, attorney secure

8     pass, correct?

9              MS. MURRAY:  Objection, your Honor.

10             THE COURT:  Overruled.

11    A.  Correct.

12    Q.  My only further question here is, this was submitted with

13    the account opening documents, correct?

14             MS. MURRAY:  Asked and answered.

15             THE COURT:  Sustained.

16    Q.  So Bank of Princeton knew that Mr. Podhaskie was an

17    attorney?

18             MS. MURRAY:  Asked and answered.

19             THE COURT:  Sustained.

20             MR. BARKAN:  I'll move on.

21    Q.  In addition to Mr. Podhaskie's ID, the beneficial owner of

22    Greenwich Land Hing Chi Ngok was disclosed; isn't that right?

23    A.  Yes.

24    Q.  And her identification was also provided, right?

25    A.  Yes.

O6EBGUO1                        Wilson

1   Q.  And Mr. Podhaskie and Greenwich Land and Ms. Ngok passed

2   the bank's KYC process; isn't that right?

3   A.  Yes.

4   Q.  And only then did the Bank of Princeton open the accounts

5   for Greenwich Land, right?

6   A.  Yes.

7   Q.  And permitted them to be funded, right?

8   A.  Yes.

9   Q.  You also testified on direct that an entity called Lamp

10  Capital, LLC had accounts at the bank, right?

11  A.  Yes.

12  Q.  Mr. Podhaskie signed those account opening documents as

13  well, right?

14  A.  Yes.

15  Q.  And he provided the identification that was required by

16  Bank of Princeton, right?

17  A.  Yes.

18  Q.  And the beneficial owner of Lamp Capital was also

19  disclosed, right?

20  A.  Yes.

21  Q.  And his document, his passport, was also provided; isn't

22  that right?

23  A.  Yes.

24  Q.  And so each of Mr. Podhaskie, Lamp Capital, and the

25  beneficial owner passed the bank's KYC process, right?

O6EBGUO1                         Wilson

1    A.  Yes.

2    Q.  And as a result of that, the bank opened accounts for Lamp

3    Capital; isn't that right?

4    A.  Yes.

5    Q.  And permitted them to be funded, right?

6              MS. MURRAY:  Asked and answered.

7              THE COURT:  Sustained.

8    Q.  You testified on direct that you found it concerning that

9    Mr. Podhaskie was a signer on the Greenwich and Lamp accounts

10   even though he wasn't the beneficial owner; isn't that right?

11   A.  That he wasn't the owners of the businesses, yes.

12             THE COURT:  If you would bring the mic closer to you,

13   and the same for you Mr. Barkan.

14   Q.  I didn't hear the answer to the question.

15   A.  That he was not the owner of the either of the businesses.

16   Q.  Right.  But the application for Greenwich Land disclosed

17   that Ms. Ngok was the beneficial owner, right?

18   A.  Right.

19   Q.  And for Lamp Capital, that application disclosed that Qiang

20   Guo was the beneficial owner, right?

21   A.  Yeah, I don't remember the exact names, but we were

22   disclosed the two different individuals for beneficial owners

23   for the businesses.

24   Q.  And so the fact that Mr. Podhaskie wasn't the beneficial

25   owner was not a problem for Bank of Princeton at the time the

O6EBGUO1                    Wilson

1    accounts were opened, right?

2    A.   Right.

3    Q.   You testified that it was concerning to you the amount of

4    money that was flowing through these accounts; isn't that

5    right?

6    A.   Correct.

7    Q.   G/Club we saw on direct about 13.5 million in its account

8    at one time?

9    A.   Yes.

10   Q.   Greenwich Land had about 10 million?

11   A.   Yes.

12   Q.   Lamp Capital had about 11 million?

13   A.   Yes.

14   Q.   And you testified that nobody had brought that kind of

15   money into Bank of Princeton, correct?

16        MS. MURRAY:   Objection, mischaracterizes her

17   testimony.

18        THE COURT:   Sustained.

19   Q.   Had you seen that kind of money flow through Bank of

20   Princeton before?

21   A.   Not without a loan relationship to my recollection.

22   Q.   I'm sorry.

23   A.   Not without a loan relationship to my recollection.

24   Q.   In fact, Bank of Princeton knew before the G/Club accounts

25   were open how much money was going to be brought into that

O6EBGUO1                         Wilson

1   account, right?

2                MS. MURRAY:  Objection.

3   A.  No.

4                THE COURT:  Overruled.  You may answer.

5   A.  No.

6   Q.  Could we call up GX-SW-2032 which is in evidence.  Thank

7   you.  Can we go to page five of the PDF, please, and can we

8   focus on that bottom email, please.

9                Ms. Wilson, do you see that this is an October 21,

10  email from Haitham Khaled to Debra Von Gonten and Miriam Colon

11  at the Bank of Princeton?

12  A.  Yes.

13  Q.  Do you know Ms. Von Gonten and Ms. Colon?

14  A.  I do.

15  Q.  So they're your colleagues at the bank, right?

16  A.  Yes.

17  Q.  Can you read the second paragraph down below, Hi Debra and

18  Miriam, it begins with, We have another client?

19  A.  We have another client that has a banking relationship with

20  Signature.  They are a start-up with international membership

21  service for luxury living with approximately 1600 members,

22  current balances are 15 million, and we want to help them setup

23  a bank account with Princeton as well.  Can you please email me

24  money market account rates available.  That's what MMA stands

25  for.

O6EBGUO1                         Wilson

1    Q.  You can take that down.  Thank you.

2            Ms. Wilson, do you now understand that the Bank of

3    Princeton was told ahead of time how much money G/Clubs would

4    be bringing into the account.

5            MS. MURRAY:  Objection, your Honor.

6            THE COURT:  Overruled.  You may answer.

7    A.  I was not on that email chain, so I was not aware when the

8    accounts were being open, but those individuals would have been

9    aware.

10   Q.  You were asked on direct about a loan agreement between ACA

11   Capital Group Limited and Greenwich Land.  Do you remember

12   that?

13   A.  Yes.

14   Q.  Can we call up GX-BOP-40 which is in evidence.

15           And that loan agreement was provided by Mr. Podhaskie,

16   right?

17   A.  Correct.

18   Q.  Can we scroll down to the bottom of page two, top of page

19   three.

20           So this is an email from Miriam Colon to Haitham

21   Khaled and Daniel Podhaskie, correct?

22   A.  Yes.

23   Q.  And you were shown this on direct yesterday, right?

24   A.  Yes.

25   Q.  And so your colleague Ms. Colon had emailed Mr. Khaled and

1   Mr. Podhaskie on, this is November 24, right?

2   A.  Yes.

3   Q.  And she asked for information that she had requested

4   earlier, right?

5   A.  Yes.

6   Q.  Can we scroll further up to page two, please.

7           So this is November 24 email later that day.

8   Mr. Podhaskie replies and he says, thank you for following up.

9   We will get back to you shortly.  I read that correctly, right?

10  A.  Yes.

11  Q.  And again it's Tuesday, November 24, right?

12  A.  Yes.

13  Q.  Can we scroll up to the top half.

14          On December 1, Ms. Colon reiterates her request for

15  information from Mr. Podhaskie and Mr. Khaled, right?

16  A.  Yes.

17  Q.  And if we scroll up to the bottom of page one, please.

18          So we see Mr. Podhaskie replies the next day on

19  December 2, right?

20  A.  Yes.

21  Q.  And he supplies the requested information in the loan

22  agreement, right?

23  A.  Yes.

24  Q.  Ms. Wilson, you're aware that Thanksgiving falls on the

25  fourth Thursday of every November, right?

O6EBGUO1                    Wilson

1    A.  Yes.

2    Q.  And in 2020, the fourth Thursday of November was November

3    26, right?

4    A.  I don't exactly know.

5    Q.  I will represent to you --

6    A.  I don't have a calendar.

7          THE COURT:  Don't testify.

8    Q.  Friday was November 27th; isn't that right?

9    A.  If Thursday was the 26, then, yeah.

10   Q.  And the 28th and 29th would have been the weekend, right?

11   A.  Yes.

12   Q.  And Monday would have been the 30th, right?

13   A.  Correct.

14   Q.  And so two days later on December 2nd, Mr. Podhaskie

15   replies with the requested information of the loan agreement;

16   isn't that right?

17   A.  Yes, he replied on December 2nd.

18   Q.  Could we go to page five of the pdf, please.  And can we

19   zoom in on the top half.

20          This is the loan agreement that Mr. Podhaskie

21   provided, right?

22   A.  Yes.

23   Q.  You were shown this yesterday on direct, right?

24   A.  Yes.

25   Q.  Mr. Podhaskie is a signatory on the Greenwich Land accounts

 1    at BOP, right?

 2    A.  Yes.

 3    Q.  And if you look at number one, ACA Capital is based in Hong

 4    Kong, right?

 5    A.  Yes.

 6    Q.  You can take that down.

 7            Ms. Wilson, you testified that there came a time when

 8    you made a recommendation to close the accounts, right?

 9    A.  Yes.

10    Q.  You had begun conducting some website research into

11    G/Clubs?

12    A.  Yes.

13    Q.  I think you testified you did some Googling?

14    A.  Yes.

15    Q.  And you did it personally, right?

16    A.  I did.

17    Q.  And you discovered what you called negative news, right?

18    A.  Correct.

19    Q.  And as the BSA officer, you consider negative news when you

20    evaluate risk to the bank, right?

21    A.  Yes.

22    Q.  So you found the names of other about businesses linked to

23    Mr. Guo; isn't that right?

24    A.  Yes.

25    Q.  You saw the name GTV, right?

O6EBGUO1                    Wilson

```
1    A.  Yes.

2    Q.  But the negative news was from abroad, right?

3    A.  It was on the internet, so.

4    Q.  Do you recall telling the government that the news you

5    found about Mr. Guo came from abroad, right?

6    A.  Some of it, yes.

7    Q.  You actually told the government that there was not a lot

8    of negative news about Mr. Guo from in the United States; isn't

9    that right?

10   A.  I didn't say those exact words, but I found a lot of

11   negative news on him.

12   Q.  From abroad, right?

13   A.  That he was exiled from China, yes.

14   Q.  So you learned that Mr. Guo was in trouble with the Chinese

15   authorities, right?

16   A.  Yes.

17   Q.  And you learned he had been exiled from China, right?

18   A.  Correct.

19   Q.  And you learned that the Chinese government had issued an

20   Interpol red notice for him, right?

21   A.  I don't know what that is.

22   Q.  You learned that the Chinese government had frozen his

23   assets, right?

24   A.  No, I did not.

25   Q.  Even just with the negative news stories you found about
```

O6EBGUO1                     Wilson - Redirect

1    what the Chinese government had done, that was enough for you
2    to close the accounts for Lamp, Greenwich and G/Clubs, right?
3             MS. MURRAY:  Objection, mischaracterizes.
4             THE COURT:  Sustained.
5             MR. BARKAN:  I have nothing further, your Honor.
6    Thank you, Ms. Wilson.
7    REDIRECT EXAMINATION
8    BY MS. MURRAY:
9    Q.  Ms. Wilson, you were asked a few questions on cross-examine
10   about the G/Club QualiFile response.  Do you recall those?
11   A.  Yes.
12   Q.  Ms. Loftus, if we could please pull that up.  It's
13   government Exhibit BOP-1, and we'll go to page 26.
14            While we're pulling that up, Ms. Wilson, how, if at
15   all, did the QualiFile results factor into your mosaic of
16   considerations in conducting a BSA analysis?
17   A.  If a QualiFile report says to decline an account, then we
18   do automatically decline the account at the bank.  But the
19   other factors that we look into is to make sure that sometimes
20   people put freezes on their social security number, so we want
21   to make sure there's no freezes.  And we do look at how many
22   accounts are opened within the time period on that QualiFile
23   that may be listed.
24            And if multiple accounts are opened at multiple
25   institutions within a short period of time, that can raise a

1   lot of red flags to us because that's what fraudsters will do.

2   They open multiple accounts at different banks.  It's just a

3   red flag to me as a BSA officer.  Usually as a human being or a

4   business, you only have accounts at very few banks.

5   Q.  And looking at this, Ms. Wilson, on what date was the

6   G/Club QualiFile report run?

7   A.  11/3/2020.

8   Q.  And, Ms. Loftus, if we can please go to page 25 of this

9   exhibit, the page before.

10          On what date was G/Club Operations established as a

11  business?

12  A.  October 7, 2020.

13  Q.  Approximately how many weeks before the QualiFile report

14  was run was G/Clubs brought into existence as a company?

15  A.  Less than a month.

16  Q.  We can take that down, Ms. Loftus.

17          You were also asked some questions about Haoran He's

18  address on cross-examination.  Do you recall those questions?

19  A.  Yes.

20  Q.  Have you ever been to Haoran He's house in the United

21  States?

22  A.  No.

23  Q.  Do you know whether the address provided to the Bank of

24  Princeton is where he in fact lives?

25  A.  No.

1  Q.  You were also asked questions about ACA Capital's address

2  listed in Hong Kong, correct?

3  A.  Correct.

4  Q.  Have you ever been to ACA Capital's offices at that address

5  in Hong Kong?

6  A.  No.

7  Q.  Do you know whether ACA Capital actually operates out of

8  the address it provided to the bank?

9  A.  No.

10  Q.  Have you ever met Qiang Guo who was listed as the ultimate

11  beneficial owner of the accounts?

12  A.  No.

13  Q.  Have you ever met Yvette Wang who was listed as the signer

14  on various of the accounts?

15  A.  No.

16  Q.  With respect to your BSA analysis of these three customers

17  Lamp Capital, Greenwich Land and G/Clubs, what, if anything,

18  was relevant to your BSA analysis about the status of the

19  ultimate beneficial owners?

20  A.  They were non-resident aliens, which means they're not U.S.

21  citizens.  So our bank protocol is any non-resident alien,

22  whether they're just a beneficial owner on the signer on the

23  account, we monitor them a little more frequently because those

24  types of individuals usually are sending a higher volume of

25  wires potentially in and out of the country, so we like to

O6EBGUO1                      Wilson - Recross

1    monitor that.

2    Q.  And what, if anything, did you find about the activity in

3    these accounts during the time period you were monitoring it

4    that was relevant to your BSA analysis of the risk of these

5    accounts?

6    A.  A high volume of funds came into the account and was

7    quickly being sent out, and the activity was not in line with

8    the types of businesses that we would normally associate with

9    the investment capitals or real estate businesses.

10   Q.  And what types of businesses were Lamp Capital and

11   Greenwich Land described as to the bank?

12              MR. BARKAN:  Objection, scope.

13              THE COURT:  Overruled.  You may answer.

14   A.  They were investment advisor or real estate.

15              MS. MURRAY:  May I have a moment, your Honor.

16              THE COURT:  Yes.

17              MS. MURRAY:  Nothing further.

18              THE COURT:  Recross.

19   RECROSS EXAMINATION

20   BY MR. BARKAN:

21   Q.  Ms. Wilson, the beneficial owners provided each and every

22   identification document that the Bank of Princeton required to

23   open these accounts, right?

24   A.  Correct.

25   Q.  Each of Greenwich, lamp and G/Club passed the bank's KYC

O6EBGUO1                         Roberts- Direct

1    process, right?

2    A.  At account opening, yes.

3    Q.  And the accounts were opened and funded, right?

4    A.  Correct.

5           MR. BARKAN:  Thank you.  Nothing further.

6           THE COURT:  Anything further?

7           MS. MURRAY:  No, your Honor.  Thank you.

8           THE COURT:  You may step out.

9           (The witness is excused)

10          THE COURT:  The government may call its next witness.

11          MR. HORTON:  Your Honor, the government calls Sam

12   Roberts.

13   SAMUEL ROBERTS,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16          THE COURT:  Would you say your name and spell it.

17          THE WITNESS:  Samuel David Roberts, S-A-M-U-E-L,

18   D-A-V-I-D, R-O-B-E-R-T-S.

19          THE COURT:  You may inquire.

20   DIRECT EXAMINATION

21   BY MR. HORTON:

22   Q.  Good morning, Mr. Roberts.

23   A.  Good morning.

24   Q.  Where do you work?

25   A.  I work at Bitgo.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1                    Roberts- Direct

1  Q.  Could you please tell that for the jury and court reporter.

2  A.  B-I-T-G-O.

3  Q.  Mr. Roberts, if you'd like to move the microphone closer it

4  maybe easier for us to hear you.

5         What industry is Bitgo in?

6  A.  Bitgo is in the block chain and cryptocurrency industry.

7  Q.  And how long have you worked there?

8  A.  Three years and three months.

9  Q.  What kind of work do you do at Bitgo?

10 A.  I work in Bitgo's compliance team and I do transaction

11 monitoring and investigations.

12 Q.  As a member of Bitgo's compliance team, Mr. Roberts, did

13 there come a time that you conducted an account review of the

14 Himalaya Exchange?

15 A.  Yes.

16 Q.  We'll come back to that.

17        Generally speaking, Mr. Roberts, what services does

18 Bitgo provide to its customers in the cryptocurrency industry?

19 A.  Bitgo provides wallet services and custodial services.

20 Q.  Can you explain what you mean by wallet services?

21 A.  Yes.  It's the idea of providing a wallet to our users or

22 customers so they can interact with the block chain.

23 Q.  And in this context, what is a wallet used for?

24 A.  A wallet can be used to receive, hold, and send

25 cryptocurrency.

O6EBGUO1                        Roberts- Direct

1   Q.  What exactly is your title at Bitgo, Mr. Roberts?

2   A.  My title is head of financial intelligence unit.

3   Q.  And as the head of the financial intelligence unit at

4   Bitgo, what information, if any, do you review to perform your

5   job?

6   A.  I review various pieces of information including a

7   customer's account profile information, transactions, and other

8   information.

9   Q.  And as part of your work on the financial intelligence unit

10  at Bitgo, do you learn about the nature of Bitgo's customers'

11  businesses?

12  A.  Yes.

13  Q.  And what's your purpose in learning about Bitgo customers'

14  businesses?

15  A.  In order to understand the activity they are doing on the

16  Bitgo platform.

17  Q.  What kind of things do you learn about Bitgo as customers?

18          MR. SCHIRICK:  Objection.

19          THE COURT:  What kinds of things do you look into

20  about your customers.

21  Q.  Mr. Roberts, what kinds of things do you look into about

22  Bitgo's customers?

23  A.  We will review information about their business and people

24  associated with their business.

25  Q.  Mr. Roberts, in your work at Bitgo, what year did you first

O6EBGUO1                        Roberts- Direct

1   hear about the Himalaya Exchange?

2   A.  2021.

3   Q.  And when you first heard about the Himalaya Exchange, what

4   did you understand it was?

5   A.  I understood the Himalaya Exchange to be a cryptocurrency

6   exchange.

7   Q.  And what was your basis for that understanding?

8   A.  Information supplied to Bitgo when Himalaya Exchange was

9   on-boarding to Bitgo to an account.

10  Q.  Who supplied that information to Bitgo about the Himalaya

11  Exchange?

12  A.  I don't recall or I'm aware of the exact person, but

13  Himalaya Exchange employees.  I recall it was someone.

14  Q.  And what role, if any, did you have in connection with the

15  Himalaya Exchange on-boarding at Bitgo?

16  A.  I was not involved in the on-boarding of their account to

17  Bitgo.

18  Q.  What work were, if any, were you doing in connection with

19  the Exchange at that time?

20  A.  At that time Himalaya Exchange had requested that Bitgo

21  provide support for two cryptocurrencies of theirs.

22  Q.  And what were those cryptocurrencies?

23  A.  The first one was call being called Himalaya Coin and the

24  second one was called Himalaya Dollar.

25  Q.  And what did you understand Himalaya Coin to be?

1    A.   I understood Himalaya Coin to be a cryptocurrency with a

2    fluctuating value.

3    Q.   What did you understand Himalaya Dollar to be?

4    A.   I understood Himalaya Dollar to be a stable coin.

5    Q.   And what did that mean to you at the time, a stable coin?

6    A.   To me a stable coin is a cryptocurrency that derives its

7    value from a different currency or asset.

8    Q.   And how does that work?

9    A.   The way that works is that you will have the base currency

10   or asset, and you will set aside a number of those, and there

11   will be a corresponding number of cryptocurrency tokens of that

12   asset or currency.

13              THE COURT:  What you do mean by set aside?

14              THE WITNESS:  What I mean by that is, if I can use a

15   U.S. dollar stable coin as an example.  So if there are 100

16   cryptocurrency tokens of the U.S. dollar stable coin, there

17   will be 100 U.S. dollars set aside to give value to those

18   cryptocurrency tokens.

19              THE COURT:  But set aside in what way?

20              THE WITNESS:  It could vary, but I typically

21   understand that you would set it aside in a bank account, in a

22   bank vault, somewhere where that value cannot be accessed.

23              THE COURT:  You may continue.

24   BY MR. HORTON:

25   Q.   What were the products that the Himalaya Exchange was

1    signing for up at Bitgo at this time in 2021?

2    A.  I recall Himalaya Exchange signing up for our hot wallet

3    services and our custodial services.

4    Q.  And what, if any, wallets are associated with your

5    custodial services?

6    A.  These wallets are cold wallets.

7    Q.  Mr. Roberts, what's the difference --

8            THE INTERPRETER:  Can you say that again, Mr. Roberts?

9     What was the services.

10           THE WITNESS:  Hot wallet services and custodial

11   services.

12   Q.  Mr. Roberts, you mentioned that the Himalaya Exchange

13   you're signing up for hot wallets and cold wallets, what's the

14   difference at Bitgo between a hot wallet and a cold wallet?

15           MR. SCHIRICK:  Objection.

16           THE COURT:  Overruled.  You may answer.

17   A.  A hot wallet at Bitgo is non-custodial, which means that

18   the user of the wallet maintains the ultimate control of it;

19   where as a cold wallet is typically custodial and Bitgo

20   controls that cold wallet.

21   Q.  Is a cold wallet connected to --

22           THE COURT:  One moment.  When you say holder of the

23   wallet, what are you referring to, an entity?  Are you

24   referring to a customer?  What do you mean by holder?

25           THE WITNESS:  So a cryptocurrency wallet is secured by

O6EBGUO1                          Roberts- Direct

1   private keys, and those private keys should only be known to
2   the holder of the wallet.
3           THE COURT:  But what do you mean by the holder?
4           THE WITNESS:  So the holder of the wallet would be the
5   person or entity that is holding those private keys and they
6   secure the wallet.  I think a good example is if you have $100
7   in your wallet, your physical wallet in your pocket right now,
8   you are holding your wallet.  You are securing it.  But if you
9   had a $100 in your bank account, it's your bank that is
10  securing it, not yourself.
11          THE COURT:  Go ahead.
12  Q.  Mr. Roberts, are these wallets connected to the internet?
13  A.  Can you clarify which type of wallet you're talking about.
14  Q.  Which, if any, of these wallets are connected to the
15  internet?
16  A.  Typically hot wallets are by definition connected to
17  internet.
18  Q.  And what's the implication, if any, of a cold wallet not
19  being connected to the internet?
20  A.  Typically they are regarded as being more secure than hot
21  wallets because if a wallet is disconnected from the internet,
22  it makes it more difficult for a malicious or bad actor to
23  compromise it.
24  Q.  And at this time in 2021, Mr. Roberts, what, if anything,
25  did you understand the Himalaya Exchange would be storing in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   their Bitgo wallets?

2   A.  I recall they were looking at storing Himalaya Coin and

3   Himalaya Dollar.

4   Q.  And where did you get that information from?

5   A.  I recall that during the account on-boarding process that

6   we collect information about what our customer is looking to

7   do, and there was some reference to that in that form.

8   Q.  You said that you conducted a due diligence review when the

9   Himalaya Exchange signed up for these services from Bitgo in

10  2021, how did you conduct that due diligence review in 2021?

11  A.  This due diligence review is focused on the Himalaya Dollar

12  and the Himalaya Coin, and it was an anti-money laundering due

13  diligence review.

14  Q.  What does that mean, an anti-money laundering due diligence

15  review?

16  A.  It's the process of performing a review on something to

17  look for red flags connected to financial crime or money

18  laundering.

19  Q.  What do you mean by red flags?

20  A.  In the industry I work in, our big focus is to detect

21  suspicious activity and indicators of financial crime.  So red

22  flags is something that we look for to try and inform us if

23  certain activity, certain customers may have suspicious

24  activity or potential touch points to financial crime.

25  Q.  With respect to Himalaya Coin and Himalaya Dollar,

1    Mr. Roberts, what analysis, if any, were you performing in

2    2021?

3    A.   We performed a few different things.  The first one was

4    open source research, including something that we called a

5    negative news search in my industry to see if there's

6    information available on the public domain that may present red

7    flags.  We were assessing the design of these cryptocurrencies

8    to see if there were any features such as privacy enhancing

9    features which may present red flags and looking to understand

10   if our block chain analytics vendor were able to surveil these

11   cryptocurrencies.

12   Q.   What do you mean by block chain analytics?

13   A.   Yes.  Block chain analytics is the process of interpreting

14   transactions, cryptocurrency transactions that occur on a block

15   chain.  And specific to my role, it's the process of trying to

16   understand if these transactions have financial crime red

17   flags.

18   Q.   And what, if anything, were the results of the block chain

19   analytics for Himalaya Coin and Himalaya Dollar in 2021?

20   A.   At that time I recall that there was no support for

21   surveilling Himalaya Coin or Himalaya Dollar through our block

22   chain analytics vendor.

23   Q.   What, if anything, did you take away from that?

24   A.   I recall concluding that these two cryptocurrencies were in

25   kind of a prelaunch state, so it was probably not likely that

O6EBGUO1                          Roberts- Direct

1    our vendor was going to have turned on support for their

2    surveillance yet.

3    Q.  And what does prelaunch state mean?

4    A.  I understand a prelaunch state to be cryptocurrency that is

5    yet to be available publicly, but is in development, business

6    development.

7    Q.  And, Mr. Roberts, when you talk about block chain activity,

8    what do you mean by block chain?

9    A.  By block chain -- sorry, can you repeat that question.

10   Q.  Sure.  You mentioned block chain activity was something you

11   looked at for Himalaya Coin and Himalaya Dollar in 2021, what

12   do you mean by block chain?

13   A.  A block chain is a distributed ledger that facilitates

14   cryptocurrency transactions.

15   Q.  And what is distributed ledger mean?

16   A.  It's the idea that a block chain can exist on various

17   different say computers is a good example that may be in

18   distributed geographic locations and accessible by different

19   people.

20          So it's the idea that when transactions are processed

21   on a block chain that lots of different parties can verify the

22   transactions, and that no single entity or group of people can

23   have control over that process.

24   Q.  Is this something you looked at in your analysis of

25   Himalaya Coin and Himalaya Dollar, the block chain?

O6EBGUO1                          Roberts- Direct

1   A.  I recall contemplating whether there was block chain

2   activity of Himalaya Coin and Himalaya Dollar during that

3   review.

4   Q.  And did you find that out?

5   A.  Yes.  My general conclusion that the coins were in a

6   prelaunch state so that there would have been no block chain

7   activity at that time.

8   Q.  And generally speaking in your work at Bitgo, how do you

9   look at the block chain?  How do you do that?

10  A.  We have several methods.  We have our block chain analytics

11  vendors that provide us tools to help us interpret the block

12  chain.  We have internal -- an internal database of block chain

13  transactions, and we also can go on publicly available

14  websites, generally known as block explorers, that allow the

15  public to go and search activity on a block chain.

16  Q.  When you talk about the block chain, is this a publicly

17  accessible thing?

18  A.  Block chains typically -- the activity occurring on a block

19  chain such as the transactions are typically publicly

20  accessible.

21  Q.  Who controls the block chain?

22  A.  It would depend on the specific block chain.  But typically

23  block chains are not controlled by any single individual or

24  group.

25  Q.  Was there a particular block chain you looked at in

O6EBGUO1                        Roberts- Direct

1  connection with the Himalaya Coin and the Himalaya Dollar?

2  A.  Yes.

3  Q.  Which one was that?

4  A.  I recall going to look at the ethereum block chain because

5  I was of the understanding that these two digital assets were

6  to have interoperability or the basis on that block chain.

7  Q.  When you say the ethereum block chain, is that a publicly

8  accessible thing?

9  A.  Yes.

10         THE COURT:  Did you intractability?

11         THE WITNESS:  No.

12         THE COURT:  What did you say?

13         THE WITNESS:  Can I be refreshed on what I said.

14         (Record was read)

15         THE WITNESS:  I think I was trying to say

16  interoperability.  The idea that the ethereum block chain is

17  what people call a layer one block chain, and then you can

18  build things on top it of such as cryptocurrencies.

19  Q.  Mr. Robert, who controls the ethereum block chain?

20         MR. SCHIRICK:  Objection, asked and answered.

21         THE COURT:  You may answer.

22  A.  I am not aware of any single group or party or entity that

23  controls the ethereum block chain, so no one.

24  Q.  How does that work?

25         Are they centralized or decentralized?

O6EBGUO1                         Roberts- Direct

1         MR. SCHIRICK:  Objection.

2         THE COURT:  You may answer.

3    A.  I am of the understanding that the ethereum block chain is

4    decentralized.

5    Q.  What does that mean that it's decentralized?

6    A.  That no single person, party, group of people controls the

7    transactions that can be -- that can occur on that block chain.

8    Q.  Is that true for the cryptocurrencies that are on that

9    ethereum block chain?

10        MR. SCHIRICK:  Objection.

11        THE COURT:  Well, if you know you can answer.

12   A.  I think it would depend on the specific cryptocurrency.

13   Q.  Were there any red flags in your prelaunch review of the

14   Himalaya Exchange in 2021?

15        MR. SCHIRICK:  Objection, asked and answered.

16        THE COURT:  Overruled.  You may answer.

17   A.  I do not recall identifying any red flags when I concluded

18   my review in 2021.

19   Q.  And what happened with the Himalaya Exchange and Bitgo

20   after you finish your review?

21   A.  The Himalaya Exchange was on-boarded to Bitgo as a

22   customer, and the two digital -- the two cryptocurrencies,

23   Himalaya Dollar, Himalaya Coin were approved for our wallet

24   support.

25   Q.  Mr. Roberts, after the on-boarding in 2021, did there come

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   a time when you conducted an account review of the Himalaya
2   Exchange?
3   A.  Yes.
4   Q.  What year was that account review that you conducted?
5   A.  It began in 2022.
6   Q.  And under what circumstances does Bitgo conduct account
7   reviews of customers?
8   A.  There can be various circumstances.  Specific to my team,
9   we may initiate an account review when we receive an alert or
10  notification for one of our detection scenarios.
11  Q.  And what, if anything, triggered the 2022 account review
12  you conducted?
13  A.  Bitgo received a subpoena that identified Himalaya
14  International Clearing Limited and individuals and other
15  entities that I believed to be associated with that entity.
16  Q.  And what, if anything, was -- what did you understand
17  Himalaya International Clearing was?
18  A.  I understood that they were an entity.  I recall they were
19  incorporated in the British Virgin Islands and that they were
20  the entity behind or operating the Himalaya Exchange.
21  Q.  Mr. Roberts, did this subpoena require Bitgo to conduct the
22  account review?
23  A.  No.
24  Q.  And what direction, if any, did you get from the U.S.
25  government when you began the account review?

O6EBGUO1                        Roberts- Direct

1   A.  I do not recall receiving any direction from the U.S.

2   government.

3   Q.  Was this 2022 account review different from the review you

4   conducted the year before?

5   A.  Yes.

6   Q.  And in what ways was it different?

7   A.  The way it came about was different, the purpose of the

8   review is different, and the parties and entities we were

9   looking into were different.

10  Q.  What was the first step of your 2022 account review of the

11  Himalaya Exchange?

12  A.  Our first step was to go and try and learn a little bit

13  more about the names and entities listed in the subpoena, so

14  that the first step is typically go and do an open source

15  review on a publicly available database such as Google.

16  Q.  And what material from the Himalaya Exchange, if any, were

17  part of this review?

18  A.  An account review such as this one will encompass review of

19  account profile information that Bitgo has collected about

20  Himalaya Exchange.

21  Q.  Did the Himalaya Exchange have a website at this time?

22  A.  Yes, I recall that they had a website.

23  Q.  And was reviewing that website part of your review?

24  A.  Yes.

25  Q.  What materials, if any, from that website did you consult?

O6EBGUO1                          Roberts- Direct

1    A.  I recall consulting white papers that were prepared about

2    the Himalaya Dollar and Himalaya Coin and clicking through the

3    several web pages on their website.

4    Q.  You said you looked at white papers for the Himalaya Coin

5    and the Himalaya Dollar, what is a white paper?

6    A.  In the block chain industry, a person seeking to develop a

7    new block chain or a cryptocurrency often chooses to publish a

8    white paper which will outline the kind of purpose of a

9    cryptocurrency, a block chain, how it operates, and various

10   other pieces of information.

11   Q.  In this first phase of your 2022 account review,

12   Mr. Robert, what, if anything, did you learn about the price of

13   H Coin?

14   A.  I recall learning that H Coin had a price and that it

15   seemed -- it was something that we were interested in and

16   reviewed further.

17   Q.  And when you reviewed the H Coin's price further, what did

18   you find?

19   A.  I recall finding that it appeared to have a very large

20   apparent market capitalization based on the number of H Coin I

21   understood to be in circulation, and the price of the H Coin

22   that I recall reviewing on Himalaya Exchange's website.

23   Q.  Mr. Roberts, when you say that H Coin had a large market

24   capitalization, can you explain to the jury what that means?

25            MR. SCHIRICK:  Objection, your Honor.  Can we have a

O6EBGUO1                          Roberts- Direct

1    brief sidebar?

2              THE COURT:  Yes.

3              (Continued on next page)

O6EBGUO1                    Roberts- Direct

1          (At the sidebar)

2          MR. SCHIRICK:  Your Honor, thank you.  I just wanted

3    to flag because I'm anticipating that the questioning may go

4    here that we're going to get into an area where this witness is

5    asked whether he found the large market capital H Coin relative

6    to what was in circulation to be something that struck him as

7    strange or odd or unusual.  I could be wrong, Mr. Horton can

8    clarify.  I believe if the question goes that far that that

9    would be over the line that we understood Your Honor to rule

10   yesterday in terms of expert witness testimony.

11         THE COURT:  I anticipate that he's going to testify

12   that they decided to terminate the relationship because of

13   certain factors.  And if that's one of the factors, then it's

14   appropriate for him to testify about it.

15         MR. SCHIRICK:  Understood, your Honor.  And I think

16   what we're just trying to understand is where the line is on

17   what this witness's opinion is with respect to those issues

18   versus the factual observations, which is what we understood

19   the line that the Court draw yesterday.

20         THE COURT:  So far he has only spoken about market

21   capitalizations.

22         MR. SCHIRICK:  We could have this question read back,

23   but I just wanted to register the objection now because, either

24   in this question or the next question, I anticipate us getting

25   there. It may be fine.  I think we're getting close to that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6EBGUO1                        Roberts- Direct

1    area.

2            THE COURT:  So I would anticipate that he would state

3    that his company does not want to do business with companies

4    that have these characteristics, am I correct?

5            MR. HORTON:  Generally right.  He's conducting an

6    analysis of these products in the market.  He's taking in the

7    information.  And as your Honor noted, he's testifying to what

8    recommendation he should make with that information.  So there

9    are questions about what his realtime historical analysis was.

10   The Court's order was about general ties and general topics

11   uncovered.  I have no intention in going anywhere near that.

12   He said that the one thing that he saw was market

13   capitalization, and that was relevant to his investigation.  I

14   want to ask him what does that mean and how does that relate to

15   the investigation.

16           MR. SCHIRICK:  Look, just a final point, your Honor.

17   As the Court may recall, in the government's expert's

18   disclosure, Professor Sean spends quite a bit of time talking

19   about this precise issue, how he believes in his observation as

20   the expert, that the large market cap relative to trading

21   volume are indicative of certain things.  So from that

22   perspective, I think there's a significant overlap of what this

23   witness's anticipated testimony will be based on what

24   Mr. Horton just said.

25           THE COURT:  So the expert is going to testify about

O6EBGUO1                           Roberts- Direct

1    his opinion about the significance.  He's testifying about a

2    fact and then a decision to terminate the relationship.  So

3    you're not going to ask him what does it mean that there's a

4    large capitalization?

5            MR. HORTON:  Certainly not going to ask him that.

6    Generally what I will ask is he identified it as a fact that is

7    relevant, that he saw a market cap that was relevant, how is it

8    relevant.  That's the bridge between learning the fact and

9    making the recommendation.

10           THE COURT:  It's only logical that he has to give some

11   explanation for why they disapproved of this characteristic.

12   And your witness will say that that he disagrees with that,

13   which is what expert witnesses do.

14           MR. SCHIRICK:  Thank you, your Honor.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6EBGUO1                          Roberts- Direct

 1              (In open court)

 2              THE COURT:  You may continue.

 3    BY MR. HORTON:

 4    Q.  Mr. Roberts, in this first phase of this 2022 account

 5    review, what, if anything, did you learn about the price of

 6    H Coin?

 7    A.  I recall learning that it had a value, and that in light --

 8    I recall finding open source information about the price of

 9    Himalaya Coin.

10    Q.  And you said a moment ago that you observed the market

11    capitalization of H Coin, can you explain to the jury what

12    market capitalization means?

13    A.  I understand market capitalization to be the aggregate

14    amount of -- sorry. could I start that again.

15              The aggregate amount of a type of asset.

16    Q.  And what did you observe about H Coin's aggregate amount?

17    A.  I recall observing that it had a price somewhere in the

18    range of 15 to 20 dollars in that ballpark range, and that it

19    also appeared to have a maximum supply of somewhere in the

20    ballpark range of one to 1.5 billion H Coins.

21              So by multiplying the price of a single H Coin against

22    what the apparent amount of H Coin circulation, that appeared

23    to give H Coin a market capitalization in the multibillion

24    dollar range.

25    Q.  And what impact, if any, did seeing that H Coin had a

O6EBGUO1                        Roberts- Direct

multibillion dollar market capitalization have on your review?

A.  I recall that prompting us to go and understand what other information is out there about H Coin, such as going to cryptocurrency market data websites to see if we could verify that information or learn more about it.

Q.  And in that process what, if anything, did you learn about the historical price of H Coin?

A.  I recall learning that we found some open source news articles about a rapid price spike of the Himalaya Coin in around late 2021 where it had shot up from a very, very small price, less than a dollar, to a very significant price, above 20 dollars in a short period of time around a few weeks.

Q.  And what impact, if any, did seeing H Coin's price go from under a dollar to over 20 dollars have on your review of H Coin?

A.  I recall being interested in trying to understand why that happened.

Q.  And what did you do to try understand why that happened?

A.  I recall trying to learn -- as I mentioned earlier about going to try and find more information on cryptocurrency market data websites.  I recall I was not able to find any information about H Coin on these websites.  So the next thing was to go and try and understand how their exchange was working and other associated things.

Q.  And, Mr. Roberts, why did seeing the historical price of

O6EBGUO1                          Roberts- Direct

1    H Coin prompt you to take those next steps?

2    A.  It was because I found that price spike to be an anomalous

3    price spike compared to how I understand financial markets with

4    cryptocurrency and --

5              MR. SCHIRICK:  Objection, your Honor.

6              THE COURT:  So you're nearly speaking from your point

7    of view as an employee of your company; is that correct?

8              THE WITNESS:  Yes.

9              THE COURT:  You may continue.

10   Q.  Mr. Roberts, why did seeing H Coin's price spike cause you

11   to take these additional investigative steps?

12   A.  Because I found that price spike to be anomalous compared

13   to what I understand about cryptocurrency financial markets.

14   And when we find something anomalous, that is starting a

15   process of assessing whether it might present a red flag to us.

16             THE COURT:  So what do you mean by anomalous?

17             THE WITNESS:  What I mean by that is comparing market

18   activity like I observe with H Coin or what I recall observing

19   about Himalaya Coin compared to other cryptocurrency such as

20   Bitcoin, for example, and what I understand about the price

21   fluctuation of those other cryptocurrencies.

22   Q.  And what did you see when you compared it to other coins?

23   When you compared H Coin to other coins as part of your review

24   what did you see?

25             MR. SCHIRICK:  Objection.

O6EBGUO1                          Roberts- Direct

1           THE COURT:  You may answer.

2    A.  I recall concluding that at a general level, it appeared to

3    be a very significant price spike compared to the well-known

4    cryptocurrencies that I have familiarity with.

5    Q.  As part of this review, did you conduct a block chain

6    analysis?

7    A.  I went to review information available in the block chain

8    about Himalaya Coin and Himalaya Dollar.

9    Q.  And what did you see when you went to look at the block

10   chain for Himalaya Coin and Himalaya Dollar?

11          What did you see when you went to look at the block

12   chain?

13   A.  I found that Himalaya Coin was a cryptocurrency that had

14   been created and published to the ethereum block chain, and I

15   identified a wallet where I understood a significant amount of

16   the H Coin in circulation to be sitting in.

17   Q.  And who owned the wallet where you saw significant amount

18   of H Coin in circulation?

19   A.  I recall finding that this wallet was generated through the

20   Bitgo platform and that it was held by -- that it was a hot

21   wallet held by Himalaya International Clearing Limited.

22   Q.  And when you say a significant amount, about how much of

23   the H Coin in circulation was in the Himalaya Exchange's own

24   wallet?

25   A.  I recall it being nearly 100 percent.

O6EBGUO1                    Roberts- Direct

Q.  What impact, if any, did that finding, that almost a

hundred percent of H Coin was in the Exchange's own wallet have

on your review?

A.  I recall finding that it indicated that there is a

significant concentration of ownership of the Himalaya Coin.

Q.  And what impact, if any, did finding that the Himalaya Coin

was stored in a hot wallet have on your review?

A.  That prompted me to go and look at assets that were

cryptocurrencies that may have been held in their cold wallets.

Q.  What was the purpose of determining whether the assets were

held in cold wallets or hot wallets?

A.  The purpose was to get a complete picture of their activity

in the Bitgo platform.

Q.  What did it mean to you, if anything, that H Coin was

stored in a hot wallet and not a cold wallet?

A.  I remember finding that due to the apparent multibillion

dollar market cap of H Coin that I would think that a business

would seek to hold those assets in a cold wallet.

Q.  And why was your understanding at the time that assets like

that would be stored in a cold wallet, not a hot wallet?

            MR. SCHIRICK:  Objection.

            THE COURT:  You may answer.

A.  Well, I recall that there was not a significant amount of

block chain transaction activity with H Coin.  So if you have

multiple billion dollars worth of a cryptocurrency, I would

O6EBGUO1                          Roberts- Direct

1    think it would be preferable to store those in a cold wallet

2    due to the enhanced security features that they offer.

3             MR. SCHIRICK:  Objection.

4             THE COURT:  Overruled.

5    Q.  Mr. Roberts, you said that part of your review is comparing

6    H Coin and H Dollar to other cryptocurrencies.

7             How did that comparison play out when you looked at

8    the block chain?

9    A.  I found that nearly 100 percent of H Coin and H Dollar was

10   stored in a single wallet which I found to be anomalous for

11   other cryptocurrency that are available.

12            MR. SCHIRICK:  Same objection.

13            THE COURT:  Overruled.

14   Q.  And, Mr. Roberts, when you anomalous, what do you mean by

15   anomalous?

16   A.  A lot of cryptocurrencies typically have --

17            THE COURT:  I think what he's asking you to do is

18   define the word.

19            THE WITNESS:  Can you clarify which word?

20            THE COURT:  Anomalous.

21            THE WITNESS:  A finding that is not normal.

22   Q.  Mr. Robert, does Bitcoin trade on the block chain?

23            MR. SCHIRICK:  Objection.

24            THE COURT:  You may answer.

25   A.  Bitcoin can be transacted on a block chain.

O6EBGUO1                    Roberts- Direct

1  Q.  And in your account review what, if anything, did you find

2  that whether H Coin was transacting on the block chain?

3  A.  I found that there was not much block chain transaction

4  activity in connection with H Coin.

5  Q.  And what, if anything, did you find about whether H Dollar

6  was transacting on the block chain?

7  A.  I recall making a similar finding.

8  Q.  Mr. Roberts, what impact did the comparisons you've

9  testified about between H Coin and H Dollar and other

10 cryptocurrencies, what impact did those comparisons have on

11 your review?

12 A.  I recall finding that the block chain activity with these

13 two cryptocurrencies was not what I would expect or anticipate

14 for cryptocurrency activity generally.

15 Q.  And what impact, if any, did seeing relatively little block

16 chain activity for H Coin or H Dollar have on your review?

17 A.  I recall finding that this was a red flag for us that we

18 wanted to investigate further.

19 Q.  And what impact, if any, did seeing that almost all of

20 H Coin was held in the Himalaya Exchange's own wallet have on

21 your review?

22 A.  I recall that being a potential red flag that we wanted to

23 understand more about.

24 Q.  And what impact, if any, Mr. Roberts, did seeing that the

25 H Coin was in a hot wallet, not a cold wallet, have on your

O6EBGUO1                    Roberts- Direct

1  review?

2  A.  I recall finding that that was a red flag that we wanted to

3  learn more about and investigate.

4  Q.  And why were these red flags?

5  A.  Because the activity on all of those topics appeared not

6  normal for a cryptocurrency exchange.

7           MR. SCHIRICK:  Objection.

8           THE COURT:  Overruled.  You may continue.

9  Q.  Mr. Roberts, you said you read the white papers for H Coin

10  and H Dollar, what did you learn H Dollar was from reading its

11  white paper?

12  A.  I understood H Dollar to be a stable coin.

13  Q.  And in your role as a head of financial intelligence at

14  Bitgo, what do you understand a stable coin to be?

15           THE INTERPRETER:  Your Honor, the interpreter is

16  requesting all parties to slow down.

17           THE COURT:  All righty.

18  A.  Can you please repeat that.

19  Q.  As the head of the intelligence unit at Bitgo, what do you

20  understand a stable coin to be?

21  A.  My understanding is a stable coin derives its value from

22  another currency or asset.

23  Q.  And how does that work?

24           MR. SCHIRICK:  Objection.

25           THE COURT:  What is your understanding as an employee

O6EBGUO1                         Roberts- Direct

1    of this company that you work for.

2    A.   That a stable coin will have its value derived from a

3    different currency or asset that is not on -- that's not

4    necessarily true.  Just the different currency or asset.

5    Q.   And what is the connection then, if any, between the stable

6    coin and that different asset?

7    A.   The intention of a stable coin as I understand it is for

8    the stable coin to maintain a stable price against that base

9    asset or currency.

10   Q.   When you looked at the Himalaya Dollar, how many units, if

11   any, did you see were minted?

12   A.   When I reviewed the block chain information for Himalaya

13   Dollar, I recall there being something like in the ballpark of

14   one to 1.5 billion, one to 1.5 billion H Dollars that had been

15   minted.

16   Q.   And what, if anything, did you expect that to mean about

17   its reserves?

18            MR. SCHIRICK:  Objection.  Your Honor, we just have a

19   standing objection to this line of questioning.

20            THE COURT:  Is there a different question?

21   A.   Sorry.  Can you repeat that.

22   Q.   You said you observed there to be 1.0 to 1.5 billion units

23   of Himalaya Dollars, first I want to ask you, what do you mean

24   units of Himalaya Dollar?

25   A.   Individual tokens.  With cryptocurrencies, there's

O6EBGUO1                      Roberts- Direct

1    typically a concept of maximum supply.  It doesn't necessarily

2    have to be maximum, but take Bitcoin, for example.  Bitcoin is

3    regarded to have a maximum supply of 21 million Bitcoin, so

4    that is the limit of the amount of Bitcoin that can exist.

5              MR. SCHIRICK:  Objection, your Honor, to typical

6    Bitcoin example.

7              THE COURT:  So you are testifying based on your own

8    company's priorities and policies; is that correct?

9              THE WITNESS:  I'm testifying because I was called to

10   come here today to testify.

11             THE COURT:  What I'm saying is that you're speaking

12   about the approach that your company uses in analyzing an

13   issue?

14             THE WITNESS:  Yes.

15             THE COURT:  Go ahead.

16   Q.  Mr. Roberts, you said a moment ago that there were between

17   a billion and a billion and a half units of H Dollar minted.

18   You observed that in your investigation.

19             What does that mean "minted?"

20   A.  I understand that to mean the number of units of a token,

21   of a cryptocurrency token that have been created.

22   Q.  When you saw that there were between one and 1.5 billion

23   units of Himalaya Dollar, what, if anything, did that cause you

24   to look for?

25   A.  That cause me to seek to understand where the corresponding

O6EBGUO1                        Roberts- Direct

1   U.S. dollar value was being held or stored.

2   Q.  And so in this context with one to 1.5 billion of Himalaya

3   Dollar, what do you mean by corresponding U.S. dollar value?

4   What does that mean?

5   A.  So if one Himalaya Dollar equals one U.S. dollar, I would

6   expect that there's a corresponding -- if there are in the

7   ballpark of one to 1.5 billion Himalaya Dollars in circulation,

8   I would expect that there be the equivalent amount of U.S.

9   dollars or U.S. dollar value stored somewhere else.

10  Q.  And what, if anything, did you ultimately find out about

11  that?

12  A.  Can you confirm that you're asking about the initial review

13  in 2022?

14  Q.  I'll ask a different question.

15          During your account review of the Himalaya Exchange,

16  what did you learn about the U.S. dollar value that was

17  connected to the one to 1.5 billion units of Himalaya Dollar

18  that you found?

19  A.  After looking at this information, I was not able to find

20  information available in the public domain or in the account

21  profile information that explains Himalaya's -- how they go

22  about storing that value.

23  Q.  And during this account review, Mr. Roberts, what, if

24  anything, did you learn about whether Himalaya Dollar or

25  Himalaya Coin was backed by gold?

O6EBGUO1                          Roberts- Direct

1    A.   I do not recall making a finding about gold backing either

2    of these cryptocurrencies.

3    Q.   When you reviewed the design and functions of the Himalaya

4    Exchange, Mr. Roberts, what, if anything, did you learn about

5    whether customers could withdraw their H Coin and H Dollar from

6    the Exchange?

7    A.   I recall doing a review of the mechanics of their exchange

8    and having questions about the specifics.

9    Q.   And what, if anything, did you come to understand about

10   whether customers could withdraw their coins from the Exchange?

11   A.   I recall wanting to know more information so I could

12   understand how they could -- if a customer and how they could

13   withdraw those coins from the exchange.

14   Q.   Did you ultimately learn if a customer could withdraw those

15   coins from the Exchange?

16   A.   I recall getting more information about the mechanics of

17   the Exchange.  I recall learning that being told by a Himalaya

18   Exchange employee that it was not possible at that time to

19   withdraw H Coin.

20   Q.   And what impact, if any, did that finding that it wasn't

21   possible to withdraw H Coin from the Exchange have on your

22   investigation?

23   A.   I found it to be abnormal compared to how other

24   cryptocurrency exchanges operate.

25            MR. SCHIRICK:  Objection.

O6EBGUO1                          Roberts- Direct

1          THE COURT:  Overruled.  You may continue.

2   Q.  Why did you find it to be abnormal?

3   A.  Because a typical cryptocurrency exchange in my experience

4   would allow their users to withdraw their assets.

5          MR. SCHIRICK:  Same objection.

6          THE COURT:  Overruled.

7   Q.  Mr. Roberts, let me ask you, what was the implication for

8   your review of the Exchange of the fact that customers couldn't

9   withdraw their coins?

10  A.  It was something we wanted to learn more about.

11  Q.  Did there come a time that you spoke directly with the

12  Himalaya Exchange?

13  A.  Yes.  There was a time where I spoke to people who I took

14  to be employees of Himalaya Exchange.

15  Q.  And when did that first happen?

16  A.  I recall that first occurring in early 2023.

17  Q.  What was the purpose of that call in early 2023?

18  A.  The purpose of that call was for Bitgo's compliance team,

19  including myself to ask questions about the Himalaya Exchange

20  and findings we had made from our investigations thus far.

21  Q.  What were the questions that you wanted to ask them in

22  January of 2023?

23         MR. SCHIRICK:  Objection.

24         THE COURT:  You may answer.

25  A.  I recall there being various questions, including questions

O6EBGUO1                        Roberts- Direct

1    about the mechanics and how their exchange works, about more

2    details about the Himalaya Dollar stable coin and other

3    questions about where they're physically operating from and

4    other things.

5    Q.  Did you receive sufficient answers to these questions on

6    this call in January of 2023?

7    A.  Bitgo received responses to these questions.  I recall

8    thinking or finding that we wanted to dive further into some of

9    the responses we received.

10   Q.  By the way, what kind of call was this in January of 2023?

11   A.  This was a video call over the internet.

12   Q.  On this call what, if anything, did the Exchange tell you

13   about H Coin's price?

14   A.  I recall asking a question about H Coin's price and getting

15   a response along the lines of --

16           MR. SCHIRICK:  Objection, hearsay.

17           THE COURT:  You may answer.

18   A.  I recall getting a response that the price fluctuated on a

19   daily basis.

20           MR. SCHIRICK:  Your Honor, may we have a brief

21   sidebar?

22           THE COURT:  Yes.

23           (Continued on next page)

24

25

O6EBGUO1                        Roberts- Direct

1                    (At the sidebar)

2              MR. SCHIRICK:  Your Honor, our understanding is that

3     this line of questioning is about a conversation, about

4     multiple conversations that this witness had with the general

5     counsel of the Himalaya Exchange.  And there's been -- our

6     understanding of the Court's second ruling with respect to

7     co-conspirator statement and with respect to agent statements

8     is that the government first has to proffer that the general

9     counsel is either an agent or a co-conspirator.  The government

10    has not done so.  And so this witness testifying about what the

11    general counsel in the Exchange told him in January of 2023,

12    according to the Court's ruling is inappropriate and its

13    hearsay.

14             MR. HORTON:  Your Honor, the purpose of all these

15    questions and the purpose of this testimony now is really at

16    the time of the statement, what was the impact, the effect of

17    these statements on him.  Whether or not they're true, of

18    course the nature of these statements is that most all of them

19    are false.  So there's a few reasons that they're not hearsay.

20    When a witness like this whose job is to obtain and analyze

21    information about its customers, getting statements for the

22    purpose of their effect, that's what I'm trying to elicit.

23             THE COURT:  He's basing his ultimate conclusion on

24    information gathering from different sources, one of which was

25    conversation with someone at --

1          MR. HORTON:  It's supposed to be people from the

2    Exchange.

3          THE COURT:  I think it's justifiable.  He's got to be

4    able to explain why it is that they made their decision.

5          MR. SCHIRICK:  He can certainly do that without

6    eliciting from the witness statements that this person made.

7          MR. HORTON:  That was the source of the information.

8    He analyzes the customers by calling them up and saying answer

9    our questions, please.

10          MR. SCHIRICK:  Your Honor, we maintain the objection.

11    At the end of the day, we understood the Court's ruling back in

12    May to be that the government can't take the position that

13    every employee of every one of the companies at issue here over

14    the entire period of time at issue is effectively an agent of

15    the defendant, such that their words are the words of the

16    defendant.

17          THE COURT:  Well, they're not necessarily the words of

18    the defendant.  He said he needed to do research.  He made

19    inquiries.  Based on those inquiries, they decided, the answers

20    to those inquiries they decided to terminate the relationship.

21    How else is he going to explain why they made their decision?

22          MR. SCHIRICK:  I get it.  I'm not saying he can't.

23    I'm just saying that there has to be some showing that the

24    person who is a declarant, a witness who is going to testify

25    about those conversations, there first needs to be some proof

O6EBGUO1                        Roberts- Direct

1    that that person was a co-conspirator or an agent.  Otherwise,

2    I don't understand why those conversations are ones that can

3    come into the jury.

4            MR. HORTON:  Setting aside the evidence that has come

5    in and will come in about the Himalaya Exchange agency and

6    their relationship with the defendant, setting that aside,

7    they're not coming in under the co-conspirator or agency

8    exception.  They're coming in as the effect on the listener.

9            THE COURT:  That's my understanding.  All righty.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6EBGUO1                          Roberts- Direct

 1                (In open court; jury present)

 2                THE COURT:  I understand that we need to take a break

 3     at this time, so we will do so.  Remember that you're not

 4     allowed to discuss the case amongst yourselves or with anyone

 5     else.  Don't permit anyone to discuss the case in your

 6     presence.  Don't read, watch or listen to anything having to do

 7     with this matter.  We'll resume at noon.

 8                THE LAW CLERK:  Jury exiting.

 9                (Jury not present)

10                THE COURT:  Sir, you may step out.  Don't discuss your

11     testimony.

12                (Witness temporarily excused)

13                THE COURT:  You may be seated.  Is there anything

14     further before we break?

15                MR. FINKEL:  Not from the government.

16                MR. SCHIRICK:  Not from the defense, your Honor.

17     Thank you.

18                THE COURT:  All righty.

19                (Recess)

20

21

22

23

24

25

O6E1GUO2                          Roberts - Direct

AFTERNOON SESSION

12:00 p.m.

1

2

3    (Jury not present)

4    THE COURT:  So the interpreters are telling me that

5  they cannot follow the very quick language because it's

6  technical and so I'd like you both to slow down.

7    MR. HORTON:  Understood, your Honor.

8    THE COURT:  Please get the jurors.

9    (Jury present)

10    THE COURT:  Please be seated.

11    You may continue the inquiry.

12    MR. HORTON:  Thank you, your Honor.

13  BY MR. HORTON:

14  Q.  Mr. Roberts, before the break, you were describing a video

15  call you participated on in January 2023 with some people from

16  the Himalaya Exchange.  Who from the Himalaya Exchange was on

17  that video call?

18  A.  I recall that an individual I knew as Priya Patel attended

19  that video call.

20  Q.  And were you able to see Ms. Patel on this call?

21  A.  I do not recall being able to see Ms. Patel.

22  Q.  And what, if anything, did you see?

23  A.  A black screen.

24  Q.  Were you able to see what, if anything, Ms. Patel was doing

25  during this video call?

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

O6E1GUO2                          Roberts - Direct

A.   No.

Q.   On this call with the exchange in January 2023, what, if
anything, did the exchange tell you about their blockchain
activity?

A.   I don't recall a specific response about blockchain
activity other than the general discussion about the Himalaya
Dollar and the Himalaya Coin.

Q.   And what, if anything, did the exchange tell you about
whether the Himalaya Dollar and the Himalaya Coin was backed by
gold?

A.   I do not recall a response or any discussion about gold.

Q.   And on this January 2023 video call, what, if anything, did
the exchange tell you about Miles Guo?

A.   I recall that Bitgo had a question about Miles Guo and we
had a——received a response and had some discussion about Miles
Guo.

Q.   And why at this stage in your account review did Bitgo have
a question about Miles Guo?

A.   We had a question about Miles Guo because in the public
domain, through Google searches, we identified some news
articles and other information speculating about a connection
between Miles Guo and Himalaya Exchange.

Q.   And what, if anything, did Ms. Patel or anyone else from
the Himalaya Exchange tell you on this call about employing
Miles Guo?

1    A.  I recall hearing from Ms. Patel that Himalaya Exchange had

2    no financial connection to Miles Guo.

3    Q.  And what impact, if any, did that statement, that the

4    Himalaya Exchange had no financial connection with Miles Guo,

5    have on your review?

6    A.  We—we noted it, and it was—it formed part of our analysis

7    as we continued the investigation.

8    Q.  Mr. Roberts, on this call what information, if any, did you

9    ask for from the Himalaya Exchange about the Himalaya Dollar?

10   A.  I recall we had some questions and a discussion on the—the

11   reserves and the backing of the Himalaya Dollar and that we

12   requested some documentation in connection to that.

13          MR. HORTON:  Ms. Loftus, can you please pull up for

14   the witness what's been marked as Government Exhibit BR208A.

15          And if you could just go to its second page and then

16   back to its first.

17   Q.  Mr. Roberts, what is this document?

18   A.  I understand this document to be an independent

19   accountant's report issued by a company that I know as

20   Armanino.

21   Q.  Have you seen it before?

22   A.  Yes.

23   Q.  And where did you see it?

24   A.  I recall first seeing this when we received an email from

25   Ms. Patel containing attachments and documents that Bitgo had

O6E1GUO2                     Roberts - Direct

1    requested from her.

2              MR. HORTON:  Your Honor, the government offers

3    Government Exhibit BR208A.

4              MR. SCHIRICK:  No objection.

5              THE COURT:  It is admitted.

6              (Government's Exhibit BR208A received in evidence)

7              MR. HORTON:  If you could please publish it,

8    Ms. Loftus.

9    BY MR. HORTON:

10   Q.  Now, Mr. Roberts, directing your attention to the top right

11   of the first page where it says Armanino, and you just

12   mentioned them.  What was Armanino?

13   A.  I am of the understanding that Armanino is an accounting

14   and auditing firm.

15   Q.  And what's the title of this document?

16   A.  The title is Independent Accountant's Report.

17             MR. HORTON:  Ms. Loftus, if you could take us to the

18   second page, please.  And if you could zoom in at the top of

19   the document above the word Notes.

20   Q.  Now at the top left of this page, Mr. Roberts, it says

21   Himalaya International Reserve.  At this point in your review

22   what, if anything, did you understand that Himalaya

23   International Reserve was?

24   A.  I don't recall having an immediate finding about that piece

25   of information.

O6E1GUO2                     Roberts - Direct

Q.  And the top middle of the page says Himalaya Dollar Bank &
Fund Holdings Report, and there's a date of July 31, 2022.
What did you understand this information to represent?
A.  I understood that this information pertains to the reserves
and currency behind the Himalaya Dollar.
Q.  And the top line with the number next to it says "U.S.
dollars held in Himalaya-owned bank accounts."  What's the
value next to that line item, Mr. Roberts?
A.  $401,163,865.60.
Q.  And Mr. Roberts, what, if anything, did this Armanino
report that the Himalaya Exchange gave you say about gold
reserves for the Himalaya Dollar?
A.  I do not recall making a finding about gold reserves on
this document.
Q.  The line below this says, "HDO-denominated liabilities
issued," total.  What did you understand that line to be?
A.  I understood that this line was referring to the amount of
value that was giving Himalaya Dollar its stablecoin value.
Q.  And how, if at all, did that compare to the amount of
Himalaya Dollar you had observed in your blockchain analysis?
A.  I recall finding this number to not correspond to the
number of Himalaya Dollar cryptocurrency tokens that I believed
to be minted and in circulation.
Q.  Remind us what you understood the number of Himalaya Dollar
to be minted and in circulation.

O6E1GUO2                          Roberts - Direct

1   A.  I recall it being in the ballpark of 1 to 1.5 billion

2   units.

3   Q.  And so what impact, if any, did that comparison between the

4   amount of Himalaya Dollar you'd observed minted and the amount

5   reflected in this report, what impact, if any, did that have on

6   your review of the Himalaya Exchange?

7   A.  I recall finding that it posed questions as to whether the

8   Himalaya Dollar had a stable value to the U.S. dollar.

9   Q.  And what do you mean that it posed questions about that?

10  A.  What I mean about that is because this particular amount

11  and the amount of Himalaya dollars that I took to be in

12  circulation, those two amounts are different, and therefore how

13  can it——how can——if there are 1 to 1.5 billion Himalaya Dollar

14  cryptocurrency tokens in circulation, how can they be worth,

15  you know, individually 1 dollar when there isn't 1 dollar in

16  reserves backing that value.

17  Q.  And that view, the question that you just described, how,

18  if at all, did that impact your analysis of Himalaya Dollar?

19  A.  I recall making findings questioning the——whether it is

20  truly a stablecoin or not.

21       MR. HORTON:  And the line that starts "Collateralized

22  HDO tokens on the Ethereum blockchain," if you can highlight

23  that, Ms. Loftus.

24  Q.  What does that mean, "Collateralized HDO tokens on the

25  Ethereum blockchain"?

O6E1GUO2                          Roberts - Direct

1    A.  I recall this appearing to refer to the Himalaya Dollar

2    cryptocurrency units that are viewable on the Ethereum

3    blockchain.

4    Q.  What's the number next to that?

5    A.  That number is 0.

6    Q.  The line below that says "Collateralized HDO credits on

7    Himalaya ecosystem platforms."  What do you understand that to

8    mean, Mr. Roberts?

9    A.  I understood Himalaya Dollar credits to be a—a way that

10   the Himalaya Exchange exchange expressed Himalaya Dollar on

11   their—on their platform.

12   Q.  And Himalaya ecosystem platforms, what understanding, if

13   any, did you have about what that was?

14   A.  I recall taking this to be a reference to the Himalaya

15   Exchange.

16   Q.  And what, if anything, was your understanding from this

17   document that the exchange provided you about whether HDO was

18   on the blockchain?

19   A.  Sorry.  Can you repeat that question.

20   Q.  Yeah.  What understanding, if any, did you have from this

21   document that the exchange gave you about whether HDO was on

22   the blockchain?

23   A.  Well, I—I went back to my initial finding about the

24   Himalaya Dollar cryptocurrency that I could view on the

25   blockchain and—and I—I recall making a finding that there is

1   a cryptocurrency called Himalaya Dollar on the blockchain.

2   Q.  And so the value of 0 on the line item here for tokens

3   on——HDO tokens on the Ethereum blockchain, seeing that value of

4   0 reported to you by the exchange, what impact, if any, did

5   that have on your analysis of Himalaya Dollar?

6   A.  It was——I recall it being another piece of information that

7   made me question whether the Himalaya Dollar that I could go

8   and view on the Ethereum blockchain is——meets the definition or

9   understanding of a stablecoin.

10  Q.  And why does——

11          MR. SCHIRICK:  Objection.

12  Q.  Mr. Roberts, why did seeing, in this document that the

13  exchange gave you, that the number of HDO tokens on the

14  blockchain was 0 make you question whether it accorded with

15  your understanding of a stablecoin?

16  A.  Because as I——I understood the total amount of Himalaya

17  Dollar in circulation to be in the range of 1 to 1.5 billion,

18  seeing this number 0 made me question whether that there

19  were——that——whether the Himalaya Dollar on the blockchain had

20  any value at all.

21  Q.  And if it was reported to you by the exchange that the HDO

22  tokens were not on the blockchain, what understanding, if any,

23  did you have about where the HDO tokens actually were?

24  A.  Well, I——I understood the HDO tokens that I could see in

25  the blockchain to still be on the blockchain.

O6E1GUO2                        Roberts - Direct

1   Q.  And the HDO credits that are on the Himalaya ecosystem

2   platforms, what did you understand that to mean?

3   A.  I recall taking the view that this was a reference, an

4   internal Himalaya Exchange reference to the Himalaya Dollar on

5   their platform.

6   Q.  How does an internal platform, in your understanding,

7   compare to the blockchain?

8   A.  An internal platform may choose to operate on a——a private

9   ledger that is not available to the public.

10  Q.  And what do you mean by private ledger?

11  A.  What I mean by that is——is maintaining customer account

12  balances, customer transactions on a document or a database

13  that is only, you know, viewable to——to that platform.

14  Q.  And what understanding, if any, did you have about whether

15  the Himalaya Exchange operated an internal private ledger?

16  A.  I recall taking the view that this information and other

17  information we learned about the Himalaya Dollar suggested that

18  that——that they were operating some type of private ledger to

19  track transactions, customer balances, and so forth.

20  Q.  And what impact, if any, did your understanding that a

21  private ledger was being used have on your analysis of the

22  Himalaya Exchange?

23  A.  I felt——I——I had the——I recall having the view that they

24  are operating a cryptocurrency exchange which has activity that

25  is tracked on a private ledger.

O6E1GUO2                           Roberts - Direct

1   Q.  And what impact, if any, did that fact have on your view of

2   the exchange?

3          MR. SCHIRICK:  Objection, your Honor.

4          THE COURT:  The question is what impact did it have on

5   his recommendation to his company.

6          MR. HORTON:  Yes, your Honor.

7   Q.  Mr. Roberts, what impact, if any, did your understanding

8   that the Himalaya Exchange operated as an internal ledger have

9   on your recommendation to the company about its relationship

10  with the Himalaya Exchange?

11  A.  I recall that being part of our analysis and findings when

12  we got together to discuss the findings from our investigation.

13  Q.  And you say it was part of your analysis.  What did it

14  contribute to your analysis?

15         MR. SCHIRICK:  Objection, your Honor.

16         THE COURT:  You may answer.

17  A.  I recall that it——that it assisted in our understanding of

18  how we thought that the Himalaya Exchange operated.

19  Q.  And what is it about that fact, Mr. Roberts, the internal

20  ledger, that contributed to your analysis of the exchange?  How

21  exactly was it relevant?

22  A.  Well, it——to me, I took the understanding that transactions

23  were occurring on a private ledger, not in——available for

24  public viewing, so that the exchange, in combination with other

25  findings, may have been operating a sort of closed-loop system.

O6E1GUO2                    Roberts - Direct

1    Q.  And what does it mean for purposes of——

2              MR. SCHIRICK:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  Mr. Roberts, you said closed-loop system.  What was the

5    effect on your analysis?  Why was it relevant to you, the

6    finding that the exchange might be a closed-loop system?

7    A.  I recall learning about transaction flows on the Himalaya

8    Exchange; I recall learning that customers of the Himalaya

9    Exchange were not able to withdraw H Coin or H Dollar; I also——

10             MR. SCHIRICK:  Objection to the hearsay.

11             THE COURT:  Overruled.  You may continue.

12   A.  And I recall learning that Himalaya Exchange customers

13   typically funded their account with some type of U.S. dollar

14   transfer, such as——such as a wire transfer.  These——these

15   aspects led me to the belief that any type of H Coin, H Dollar

16   activity on their exchange was all internal to their platform

17   and there was no H Coin or——or H Dollar transactions going

18   from, for example, the exchange to another platform on the

19   blockchain.

20   Q.  And why did all that matter to your analysis?

21   A.  That mattered to my analysis so I could understand

22   Himalaya's business model.

23   Q.  Mr. Roberts, the observations you noted about Himalaya

24   Exchange appearing to be internal to you, what, if anything,

25   did that suggest to you for purposes of your analysis?

O6E1GUO2                        Roberts - Direct

1              MR. SCHIRICK:  Objection.

2              MR. HORTON:  I can try it a different way, your Honor.

3              THE COURT:  Okay.

4    Q.  The findings you've just listed, that customers were unable

5    to withdraw their coins from the exchange and that it appeared

6    to you that the exchange operated as an internal ledger, what,

7    if anything——

8              MR. SCHIRICK:  Objection.

9    Q.  ——was the implication?  Why did you include that

10   information in the report?

11             MR. SCHIRICK:  Objection, your Honor.

12             THE COURT:  What was the purpose of preparing your

13   report?

14             THE WITNESS:  The purpose of our preparing the report

15   was because we were conducting an account review into Himalaya

16   Exchange.

17             THE COURT:  And your account review would have an

18   impact on what?

19             THE WITNESS:  It would have an impact on whether we

20   felt that we had identified any financial crime red flags that

21   would be escalated to more senior compliance management.

22   BY MR. HORTON:

23   Q.  Mr. Roberts, what, if anything, was the relationship

24   between your finding that the Himalaya Exchange appeared to be

25   an internal ledger and the financial red flags that was the

O6E1GUO2                          Roberts - Direct

1    subject of your reporting?

2    A.  I recall that this understanding that we had developed

3    played a part in——in the financial crime red flags we

4    identified and the subsequent escalation.

5    Q.  And when you say it played a part, what part did it play?

6            MR. SCHIRICK:  Objection.

7            THE COURT:  Overruled.  You may answer.

8    A.  I recall finding that the exchange appeared to operate in a

9    way that I find abnormal.

10           MR. SCHIRICK:  Objection, your Honor.

11           THE COURT:  Overruled.  You may continue.

12           THE WITNESS:  Sorry.  Can I start just like a step

13   back.

14           THE COURT:  Yes.

15   A.  In a way that I find abnormal for cryptocurrency exchanges

16   to operate.

17   Q.  And what is it about an internal ledger that you found

18   abnormal?

19           MR. SCHIRICK:  Continuing objection.

20           THE COURT:  Overruled.

21   A.  It's——it's not——to me, it's not the mere fact that it's an

22   internal ledger, it was that there was no corresponding

23   blockchain, very, very little corresponding blockchain

24   activity, but there was——still appeared to be a very high

25   market capitalization of H Coin, and it——it raised questions as

O6E1GUO2                        Roberts - Direct

1   to, you know, why it had such a large market capitalization.

2   Q.  And what were the questions it raised about why H Coin's

3   market capitalization appeared so large?

4           MR. SCHIRICK:  Same objection.

5           THE COURT:  Overruled.  Please continue.

6   A.  Going to what I talked about earlier, the math that we had

7   performed to roughly calculate the price of an H Coin that we

8   could see on the Himalaya Exchange versus the number of H Coin

9   we understood to be in circulation, we had ongoing questions as

10  to how H Coin could have such a significant market

11  capitalization.

12  Q.  And Mr. Roberts, did you ever receive satisfactory answers

13  to those questions about H Coin and H Dollar?

14  A.  I recall receiving responses and that some of them were not

15  satisfactory to Bitgo.

16          THE COURT:  Could you explain what you mean by market

17  capitalization.

18          THE WITNESS:  So I am referring to the aggregate value

19  of a cryptocurrency.

20  Q.  Mr. Roberts, turning your focus to March of 2023, what, if

21  anything, happened that month that was relevant to your

22  investigation?

23  A.  I recall becoming aware of an indictment that identified

24  Miles Guo, the Himalaya Exchange, and other parties that I was

25  familiar with.

1    Q.  And after you became aware of that indictment, when, if

2    ever, did you communicate again with the Himalaya Exchange?

3    A.  I recall having further communication with Himalaya

4    Exchange personnel, a few days to a few weeks after that, the

5    date of that indictment.

6    Q.  Who requested that communication; was it Bitgo or the

7    exchange?

8    A.  I recall it being Himalaya Exchange who requested that

9    meeting.

10   Q.  And who was on that call for the Himalaya Exchange?

11   A.  I recall several people, including Priya Patel, an

12   individual Marios Mamzeris and some other Himalaya Exchange

13   people.

14   Q.  And was this a video call?

15   A.  Yes.

16   Q.  Were you able to see the Himalaya Exchange participants?

17   A.  I——I recall——I——I don't recall if I could see any or not.

18   Q.  You said that Marios Mamzeris was on the call for the

19   Himalaya Exchange.  What role did he have with the exchange, as

20   you understood it?

21   A.  I understood that Mr. Mamzeris was in a senior corporate

22   position, such as chief operating officer.

23   Q.  And what, if anything, did the exchange personnel say on

24   this call about H Coin?

25            MR. SCHIRICK:  Same objection.

1            THE COURT:  Overruled.  You may continue.  These
2     statements are not being offered for their truth; they're being
3     offered for the impact on the listener.  Go ahead.
4     A.  I——I don't recall a substantive discussion about H Coin on
5     this particular call.
6     Q.  On this call what, if anything, did the exchange personnel
7     say about H Dollar?
8     A.  I don't recall any specific discussion about H Dollar.
9     Q.  Mr. Roberts, what did the exchange people talk about on
10    this call?
11    A.  I recall Himalaya Exchange personnel wanting to flag to us
12    that there was an indictment against Miles Guo and the Himalaya
13    Exchange.
14    Q.  And what, if anything, did they say to you on that call
15    about Miles Guo?
16    A.  I recall a discussion, an explanation along the lines of
17    Miles Guo is innocent, nothing to hide, and things of that
18    nature.
19    Q.  And who from the Himalaya Exchange was talking to you about
20    Miles Guo on this call?
21    A.  I recall the call mostly being participated in by Priya
22    Patel.
23    Q.  And you said that on the January call Ms. Patel told you
24    that Miles Guo had no financial connection to the exchange.
25    What understanding, if anything, did you have about why she was

O6E1GUO2                          Roberts - Direct

1   telling you he was innocent?

2   A.  I recall thinking that the indictment, as I understood it,

3   allegedly tied Miles Guo to the Himalaya Exchange and that she

4   was looking to address this information.

5   Q.  Mr. Roberts, did there come a time during your account

6   review that you spoke with the FBI?

7   A.  Yes.

8   Q.  And who initiated contact with the FBI?

9   A.  I did.

10  Q.  And why did you reach out to the FBI?

11  A.  Bitgo decided to reach out to the FBI to notify them that

12  we had an account on our platform for the Himalaya Exchange and

13  whether closing that account would impede their investigation.

14  Q.  And what, if anything, did the FBI direct you to do?

15  A.  Nothing.

16  Q.  And before you testified today, did you meet with the

17  government's lawyers?

18  A.  Yes.

19  Q.  About how many times?

20  A.  Approximately five.

21          MR. HORTON:  Ms. Loftus, can you please show the

22  witness what's been marked as Government Exhibit BR212.

23          And if you could scroll through it just towards the

24  bottom.  You could just drag it down to the bottom and then

25  come up to the top, please.  Thanks.

O6E1GUO2                      Roberts - Direct

1   BY MR. HORTON:

2   Q.  Mr. Roberts, is this an email between Bitgo and personnel

3   at the Himalaya Exchange?

4   A.  Yes.

5   Q.  Are you a participant on this email exchange?

6   A.  I am not.

7   Q.  And when you were conducting your account review of the

8   Himalaya Exchange in 2023, did you review the contents of this

9   email exchange?

10  A.  I recall reviewing aspects of this, this exchange.

11         MR. HORTON:  And your Honor, the government offers

12  Government Exhibit BR212.

13         MR. SCHIRICK:  No objection.

14         THE COURT:  It is admitted.

15         (Government's Exhibit BR212 received in evidence)

16         MR. HORTON:  Now, Ms. Loftus, if you could publish it,

17  and please navigate down to the email that's dated Friday,

18  March 10, 2023, 12:22 p.m.  It's a little bit more than halfway

19  down the page.

20         Sorry.  There it is.

21  BY MR. HORTON:

22  Q.  Mr. Roberts, this email says that——on Friday, March 10,

23  2023, Marios Mamzeris wrote, "Thanks for your quick reply.

24  Please find the answers below."  Just remind us, Mr. Roberts,

25  who Marios Mamzeris is.

O6E1GUO2                    Roberts - Direct

1   A.  I understood Marios Mamzeris to be the COO of Himalaya

2   Exchange.

3           MR. HORTON:  Ms. Loftus, if you can scroll down to the

4   email immediately below that, please, and if you can get the

5   content to the answer to question 4 on the screen, please.

6   Q.  Mr. Roberts——

7           MR. HORTON:  Oh, I'm sorry, Ms. Loftus.  You can

8   scroll up so that the to/from date is visible.

9   Q.  Mr. Roberts, who sent this email?

10  A.  This was from a person called Can Unsal.

11  Q.  And what role did Can Unsal have at Bitgo?

12  A.  Can was a customer success manager.

13          MR. HORTON:  And Ms. Loftus, if you could look at the

14  third line of text here.

15  Q.  It says, "I'm getting some questions internally which are

16  blocking our overall progress and need to ask your team's help

17  to settling these inquiries."  Do you know what it means,

18  "questions internally"?

19  A.  I would take this as a reference to questions that Bitgo

20  personnel have about the Himalaya Exchange.

21  Q.  There are four questions in the email below.  And what

22  role, if any, Mr. Roberts, did you have in developing these

23  questions?

24  A.  I recall contributing to the composition of these

25  questions.

1    Q.  Taking a look at the first question, Mr. Roberts, "Himalaya

2    claims to keep 95 percent of their funds in cold storage."  Was

3    that claim true?

4    A.  I recall, based on the information available to me about

5    the Himalaya Coin and Himalaya Dollar, I questioned whether

6    this was accurate or not.

7    Q.  And of the Himalaya Exchange coins that were kept in Bitgo

8    wallets, how many were in cold storage?

9    A.  Himalaya's cold storage account was——was never funded.  It

10   had 0 balance.

11   Q.  Looking at the second question, "Why is it that only

12   'collateralized HDO credits' are backed and audited?  Why does

13   HDO need to exist if it cannot be withdrawn off-platform?"  Why

14   was Bitgo asking that question?

15   A.  Around this time Himalaya Exchange had submitted a request

16   to Bitgo that——for support of a cryptocurrency that I knew as

17   Himalaya Euro.

18   Q.  And the second question in line 2, "Why does HDO need to

19   exist if it cannot be withdrawn off-platform?" can you explain

20   that to the jury.  Why did the inability to withdraw it off the

21   platform prompt Bitgo to ask why does it need to exist?

22   A.  Because we had questions about the nature of Himalaya

23   Dollar and Himalaya Coin, when it came to reviewing this third

24   cryptocurrency, Himalaya Euro, we were attempting to do some

25   due diligence to assess whether it was, you know, eligible for

O6E1GUO2                        Roberts - Direct

1    us to support on that platform.

2    Q.  And Mr. Roberts, the fact that HDO cannot be withdrawn

3    off-platform, what's the connection between that part of the

4    question and why does HDO need to exist?

5    A.  Because of the reference to collateralized HDO credits.  I

6    take this to be something that likely exists on a private

7    ledger that could be tracked on something that Himalaya

8    Exchange controls and is privy to.  My findings I recall at

9    this time were if these collateralized HDO credits exist, you

10   know, what is the purpose of Himalaya Dollar, if it——if you've

11   already got those——credit system in place.

12   Q.  And did you ever develop a satisfactory understanding of

13   what the purpose was of Himalaya Dollar?

14            MR. SCHIRICK:  Objection.

15            THE COURT:  Whether he obtained an explanation to his

16   satisfaction; is that what you're asking?

17            MR. HORTON:  I can ask a different question, your

18   Honor.

19   Q.  Was it relevant to your ultimate recommendation, the

20   question you just mentioned, whether HDO had a purpose?

21   A.  I recall it being relevant.

22   Q.  And by the time you made your final recommendation, what

23   understanding did you have about HDO's purpose?

24   A.  I recall maintaining ongoing concerns as to the purpose and

25   existence of HDO.

O6E1GUO2                      Roberts - Direct

1   Q.  Looking at the first sentence of the answer to question 2

2   from the Himalaya Exchange, and it says, "We are launching

3   crypto capabilities soon for our coins."  What understanding do

4   you have about that answer?

5           MR. SCHIRICK:  Objection.

6   A.  I recall that we had some questions and a discussion with

7   Priya Patel on our first video call in January 2023 when we

8   were trying to learn about the mechanics of their platform

9   so—and that there was no ability for their customers to fund

10  their accounts for the cryptocurrency transaction or withdraw

11  cryptocurrency from their platform.  I took this reference to

12  suggest that they were looking to develop that capability but

13  it did not exist at—at that time.

14  Q.  And how did your understanding that the Himalaya Exchange

15  did not have crypto capabilities in March of 2023 inform your

16  ultimate recommendation?

17          MR. SCHIRICK:  Objection.

18          THE COURT:  Overruled.

19  Q.  Mr. Roberts, the question was:  How did your understanding

20  that as of March 2023 the Himalaya Exchange did not have crypto

21  capabilities, how did that inform your recommendation?

22  A.  I recall that it was part of the—the contribution to

23  our—our finding that their exchange seemed to be closed-loop,

24  operating kind of on a private ledger.

25          MR. SCHIRICK:  Objection to findings.

O6E1GUO2                          Roberts - Direct

1    THE COURT:  Overruled.  You may continue.

2    A.  Sorry.  Can I——can you ask that again, please.

3    Q.  Yeah.  Mr. Roberts, the question was:  How did your

4    understanding that as of March 2023 the Himalaya Exchange did

5    not have crypto capabilities——how did your understanding of

6    that inform your ultimate recommendation?

7    A.  Due to the private ledger/closed-loop system that I had

8    developed an understanding of, this fed into one of the ongoing

9    red flags that we had when we concluded our——our account

10   review.

11   Q.  And Mr. Roberts, now just looking at question 4 briefly, it

12   says, "If only HDO credits can be used to purchase HCN, then

13   what else is causing HCN's multibillion market cap?"  Part of

14   the answer is, "We have thousands of supporters globally, thus

15   the success of HCN."

16        MR. SCHIRICK:  Is there a question?

17        THE COURT:  The question is coming.

18   Q.  The question is:  "We have thousands of supporters

19   globally, thus the success of HCN," what understanding, if any,

20   does that give you about what's causing HCN's multibillion

21   market cap, the question that Bitgo asked?

22   A.  I recall not finding this sentence to be particularly

23   relevant to that question.

24        MR. HORTON:  You can take this one down, Ms. Loftus.

25   Q.  Mr. Roberts, after you concluded your review of Himalaya

O6E1GUO2                          Roberts - Cross

1    Exchange, what recommendation did you ultimately make?

2    A.  I recall recommending that the Himalaya Exchange's account

3    and relationship with Bitgo be escalated and considered for

4    termination.

5    Q.  And was the Himalaya Exchange ultimately terminated by

6    Bitgo?

7    A.  Yes.

8    Q.  Mr. Roberts, was there one reason or multiple reasons for

9    your recommendation to terminate the relationship with the

10   Himalaya Exchange?

11   A.  For me, the primary reason is that we identified financial

12   crime red flags and we did not receive or identify satisfactory

13   information in order to mitigate those financial crime red

14   flags.

15           MR. HORTON:  Your Honor, could I just have one moment.

16           THE COURT:  Yes.

17           MR. HORTON:  Thank you, your Honor.

18   Q.  Mr. Roberts, based on your review of the exchange, was H

19   Coin or H Dollar, as you saw it, available anywhere else other

20   than the Himalaya Exchange?

21   A.  I recall after performing research that I did not identify

22   another cryptocurrency exchange or platform that offered H Coin

23   or H Dollar for——for trading.

24           MR. HORTON:  No further questions, your Honor.

25           THE COURT:  Cross-examination?

O6E1GUO2                      Roberts - Cross

1              MR. SCHIRICK:  Thank you.

2    CROSS EXAMINATION

3    BY MR. SCHIRICK:

4    Q.  Good afternoon, Mr. Roberts.

5              I just wanted to go back to an earlier part of your

6    testimony.  I believe you testified on direct a bit about your

7    preparation for today.  Do you recall that?

8    A.  I did.

9    Q.  And in the process of preparing for today, did you review

10   documents that were provided to you by the government?

11   A.  The government did not provide me with any documents.

12   Q.  Okay.  Did you——did you review documents that your employer

13   assembled for you?

14   A.  Yes.

15   Q.  Okay.  And just describe to me, how were those documents

16   kept, if you would?  Is there a system or systems that Bitgo

17   uses to archive materials?

18   A.  Yes.

19   Q.  Okay.  Can you just describe that for me for a second.

20   A.  I——I——we use industry-standard databases and file storage

21   systems.

22   Q.  Okay.  Did you use Salesforce?

23   A.  Yes.

24   Q.  To log client communications or preserve client

25   communications?

O6E1GUO2                          Roberts - Cross

1   A.   That is one way to log and preserve client communications.

2   Q.   Okay.  And how about G Suite, was that another one?

3   A.   Can you clarify that a little bit.

4   Q.   Sure.  Did Bitgo use G Suite in order to preserve documents

5   and records that ultimately you ended up reviewing in

6   connection with your testimony?

7   A.   Is G Suite a reference to Google?

8   Q.   I believe so.  Yes.

9   A.   Bitgo uses systems and software provided by Google to

10  maintain records.

11  Q.   Okay.  Okay.  All right.  Now I just want to ask you some

12  general questions, if that's okay.

13           You testified on direct about certain transactions

14  that happened on the blockchain, right?

15  A.   I——I testified about blockchain transactions.

16  Q.   Right.  And then there's some transactions that can happen

17  off the blockchain, right, which you testified about?

18  A.   Yes.

19  Q.   Okay.  And transactions that occur on the blockchain are

20  called on-chain transactions, right?

21  A.   I understand them to be referred to that.

22  Q.   Okay.  And those transactions are publicly visible on the

23  blockchain.

24  A.   Yes.

25  Q.   Okay.  And when it comes to off-chain transactions, those

O6E1GUO2                          Roberts - Cross

1  transactions are not publicly visible, right?

2  A.  That is my understanding.

3  Q.  Okay.  And in Bitgo's work, and line of work, it only

4  really deals with on-chain transactions, right?

5  A.  Bitgo has some products and services that may interface

6  with off-chain transactions.

7  Q.  Okay.  Well, as relevant here, for the Himalaya Exchange,

8  Bitgo only provided on-chain transaction services, right?

9  A.  Yes.  The wallet services Himalaya was utilizing pertains

10 to on-chain transactions only.

11 Q.  Okay.  And are there some——when it comes to cryptocurrency

12 exchanges, is it possible to have off-chain transactions, in

13 your experience at Bitgo?

14 A.  I am of the understanding that it is possible for

15 cryptocurrency exchanges to have off-chain transactions.

16 Q.  Okay.  And you're familiar with the cryptocurrency exchange

17 Coinbase?

18 A.  Yes.

19 Q.  Okay.  And Coinbase, would you consider that a centralized

20 exchange?

21 A.  Yes.

22 Q.  Okay.  And based on your experience at Bitgo, does a

23 centralized exchange conduct cryptocurrency transactions

24 off-chain?

25 A.  Yes, that is my understanding.

O6E1GUO2                      Roberts - Cross

1    Q.  Okay.  That's because they occur within a wallet, if I

2    understand it correctly——and you'll tell me if I get it wrong,

3    but——they occur within a wallet that belongs to the

4    cryptocurrency exchange, right?

5    A.  Yes.

6    Q.  And so viewed from the outside on the blockchain, one can't

7    see what's happening inside that wallet, right?

8    A.  If the transaction is off-chain, yes.

9    Q.  Right.  And that's the——thank you for that clarification.

10   That's what I mean.  A transaction that's off-chain, that's

11   happening within the cryptocurrency exchange's wallet, that's

12   not visible from the outside; that's all.

13   A.  Yes, that is my understanding.

14   Q.  Okay.  And in fact, Coinbase, as a centralized exchange,

15   operates largely in that fashion, right?

16          MR. HORTON:  Objection.

17          MR. SCHIRICK:  Based on his experience.

18          MR. HORTON:  Objection.  He doesn't work for Coinbase.

19   There's no foundation.

20          THE COURT:  Do you want to step up.

21          (Continued on next page)

22

23

24

25

O6E1GUO2                    Roberts - Cross

1                    (At the sidebar)

2            MR. HORTON:  I objected because the questions are

3      about Coinbase.  Coinbase is a separate operation that has

4      nothing to do with where Mr. Roberts works.

5            THE COURT:  So the witness was asked about the subject

6      matter of the trial, not about Coinbase.

7            MR. SCHIRICK:  Well, I believe the witness was asked

8      questions on direct about on-chain and off-chain transactions,

9      and asked extensively about what——what he couldn't see

10     happening inside the Himalaya Exchange wallet, and so I'm

11     drawing that parallel, your Honor, to his understanding based

12     on his experience at this company, which is the foundation for

13     his testimony, about what happens at Coinbase as a point of

14     comparison.

15           MR. HORTON:  The objection was just that there is no

16     foundation for his knowledge about Coinbase.

17           THE COURT:  All right.  So you'll ask him whether he

18     knows how Coinbase operates.

19           MR. SCHIRICK:  Okay.  I believe I asked a question

20     close to that, but I'll firm it up, your Honor.  Thank you.

21           THE INTERPRETER:  Your Honor, the interpreter team is

22     asking your Honor, requesting your Honor to inform all parties

23     to slow down the pace, and pause, if possible.  Thank you.

24           THE COURT:  Please, yes, everyone, slow down.

25           MR. SCHIRICK:  Understood.  Thank you.

O6E1GUO2                      Roberts - Cross

1                  (In open court)

2                  THE COURT:  All righty.  So the questions and the

3      answers, please speak more slowly.

4                  MR. SCHIRICK:  Understood, your Honor.

5      BY MR. SCHIRICK:

6      Q.  So Mr. Roberts, I believe I asked you before about whether

7      you have a general understanding of the way that Coinbase

8      operates.

9      A.  I do.

10     Q.  Okay.  And you're familiar with the fact——and you'll

11     correct me if I'm wrong——that Coinbase is a centralized

12     exchange, right?

13     A.  I——I understand them to have centralized exchange service

14     offerings.

15     Q.  Okay.  And so when Coinbase conducts a transaction on its

16     centralized exchange, that transaction happens inside of a

17     wallet that is on the blockchain, correct?

18     A.  It——it could.  I——it could.

19     Q.  Okay.  And certainly there could be other transactions, to

20     the point I think you're trying to make, that could happen off,

21     you know——on the blockchain where Coinbase is sending something

22     out of its wallet, to be clear.

23     A.  Yes, that is my understanding.

24     Q.  Okay.  But in the main, when it conducts a——or executes a

25     trade for clients, that itself, that transaction itself,

O6E1GUO2                          Roberts - Cross

1    happens inside its wallet.

2    A.  Assuming it's through the centralized exchange service

3    offering, I'm not entirely aware of every type of product they

4    have.

5    Q.  But you're aware that it does have centralized exchange

6    offerings.

7    A.  Yes.

8    Q.  Okay.  And again, really my principal question here is, in

9    that case, viewed from the outside, viewed from the perspective

10   of the blockchain, one cannot see the transaction that's

11   happening inside Coinbase's wallet, right?

12              MR. HORTON:  Objection.  Asked and answered.

13              THE COURT:  Overruled.  You may answer.

14   A.  On the basis it's an off-chain transaction, a viewer of the

15   blockchain would not be, would not be aware that that

16   transaction took place.

17   Q.  Okay.  And so based on your review and understanding of the

18   Himalaya Exchange, would you agree that the Himalaya Exchange

19   was a centralized operation?

20   A.  Yes, I would agree with that.

21   Q.  Okay.  And therefore, one would not necessarily expect to

22   be able to see from the blockchain all the transactions that

23   were happening inside the Himalaya Exchange's wallet.

24              MR. HORTON:  Objection.  Calls for speculation.

25              THE COURT:  You may answer.

O6E1GUO2                          Roberts - Cross

1    A.  Sorry.  Can you please repeat that again.

2    Q.  Yeah.

3            MR. SCHIRICK:  I'm sorry.  I'm sorry to burden the

4    court reporter, but could we have that read back.

5            (Record read)

6    A.  I would clarify that the transactions were not necessarily

7    occurring in the wallet, but the transactions could be

8    off-chain.

9    Q.  Okay.  So, fair enough.  If—they may be in the wallet or

10   they may be off-chain, but in either case, there wouldn't

11   be—that wouldn't be something you could see from outside.

12   A.  Yes.

13   Q.  Right.  You would need the records of the exchange itself

14   to be able to tell what transactions were happening inside that

15   wallet, right?

16   A.  Yes.

17   Q.  Okay.  And that wasn't something that you had access to,

18   obviously, given limitations on information available to you.

19   A.  Bitgo did not have internal Himalaya transactions available

20   to us.

21   Q.  Okay.

22           THE COURT:  So your question was, that would be

23   something you could not see; is that correct?

24           MR. SCHIRICK:  I believe that was my question, your

25   Honor.

O6E1GUO2                        Roberts - Cross

1          THE COURT:  Okay.

2          MR. SCHIRICK:  Yes.

3          THE COURT:  I just wanted to clarify that, because the

4    transcription did not include a not.

5          MR. SCHIRICK:  Okay.  Thank you.

6          THE COURT:  You may continue.

7    BY MR. SCHIRICK:

8    Q.  Okay.  Now you testified on direct that Bitgo offers a

9    couple of different products by way of wallets, right?

10   A.  Yes.

11   Q.  Okay.  It offers I think what you called a hot wallet,

12   right?

13   A.  Yes.

14   Q.  Okay.  And can you just describe a hot wallet for the jury,

15   please.

16   A.  I understand a hot wallet is a cryptocurrency wallet that

17   is connected to the internet.

18   Q.  And another one of the offerings from Bitgo is a custodial

19   wallet, right?

20   A.  Yes.

21   Q.  Okay.  And what's the difference between a custodial wallet

22   and a hot wallet?

23   A.  On the Bitgo platform, our hot wallet offerings are

24   noncustodial, so the user of the hot wallet maintains control.

25   Q.  Okay.  And is it fair to say that there are a number of

O6E1GUO2                      Roberts - Cross

1   Bitgo's clients who use only one kind of wallet or the other?

2   A.   I——I've seen Bitgo customers use one or the other

3   previously, yes.

4   Q.   Okay.  So there's——there's nothing sort of on its face

5   unusual about a client using only hot wallet services, for

6   example.

7   A.   That could be typical.

8   Q.   Okay.  Now let's just talk for a second about——again, this

9   is based on your experience at Bitgo——when you have a

10  cryptocurrency token that is on the blockchain, can anyone look

11  that up to confirm that it's on the blockchain?

12  A.   Sorry.  Can you repeat that, please.

13  Q.   Sure.  When you have a cryptocurrency token on a public

14  blockchain, can anyone look it up to confirm that it's on the

15  public blockchain?

16          MR. HORTON:  Objection, your Honor.  Is this about

17  what was in the scope of Mr. Roberts's review?

18          MR. SCHIRICK:  Your Honor, I believe Mr. Roberts

19  testified that he looked up both of the cryptocurrencies at

20  issue to see that they were on the blockchain.  That's what I'm

21  getting at.

22          THE COURT:  You may answer.

23  A.   Yes.  If a——if a cryptocurrency is on the blockchain, on a

24  public blockchain, my understanding is that a viewer of that

25  blockchain should be able to see that cryptocurrency.

O6E1GUO2                        Roberts - Cross

1    Q.  Okay.  And for those of us who aren't fully initiated in
2    the crypto world, how do you go about doing that?
3    A.  We can use a block explorer, which is publicly accessible
4    through the internet; and at Bitgo we can use internal systems
5    or software provided by vendors.
6    Q.  Okay.  And is there something called Etherscan that you're
7    familiar with?
8    A.  Yes.
9    Q.  Okay.  And could someone use Etherscan to do the lookup we
10   were just talking about?
11   A.  Yes.
12   Q.  Okay.  And are you——is one able to see the code that is
13   associated with the individual wallet on using the tools that
14   you just described?
15   A.  You can obtain information about individual wallets on——on
16   a——on the Etherscan.
17   Q.  Okay.  And can you do the same thing with respect to
18   cryptocurrency tokens?
19   A.  Yes.
20   Q.  Okay.  And is that in fact part of what Bitgo does when it
21   conducts due diligence on prospective customers or current
22   customers?
23   A.  It is a step we may take.
24   Q.  Okay.  And is it in fact, if you know, a step that was
25   taken when it comes to HCN?

O6E1GUO2                          Roberts - Cross

1    A.  Can you clarify if you're referring to the 2021 review or

2    2022 review.

3    Q.  Sure.  Well, let's take them piece by piece.

4           Do you know whether that was part of the diligence

5    that was conducted in 2021?

6    A.  I recall performing searches to understand its—its state,

7    and I—I understood that it was yet to be launched or

8    available.

9    Q.  Okay.  And then because we have a couple of

10   cryptocurrencies at issue, I'm just going to go one by one.

11          So when it comes to HCN, for the later period of time,

12   was there a check conducted at that point?

13   A.  On Etherscan?

14   Q.  Or equivalent.

15   A.  Yes.  I recall referring to—to block explorers and

16   performing searches.

17   Q.  Okay.  And at that point—withdrawn.

18          Approximately when was that review that you just

19   referred to?

20   A.  It was initiated in the fall of 2022.

21   Q.  Okay.  So in the fall of 2022 when you looked up HCN on the

22   blockchain, did you find it?

23   A.  I—I recall finding information I was looking for.

24   Q.  Okay.  And when you say the information you were looking

25   for, you found the token on the blockchain.

O6E1GUO2                         Roberts - Cross

1    A.  Yes.

2    Q.  Okay.  And now let's do the same set of questions with

3    respect to HDO.

4           So in 2021 did you look up HDO on the blockchain using

5    any of the tools that you described?

6    A.  Yes, I——I recall performing the similar review to what I

7    did with HCN with respect to HDO.

8    Q.  Okay.  And what did you find?

9    A.  I also found that it appeared to be in a, you know,

10   prelaunch or yet-to-be-active state.

11   Q.  Okay.  Thanks.

12          And then with respect to the fall of 2022, did you

13   conduct the same review when it comes to HDO?

14   A.  Yes.

15   Q.  Okay.  And what did you find?

16   A.  That when I went on Etherscan or its equivalent, that——that

17   I found information about that cryptocurrency token.

18   Q.  And that it was on the blockchain, it existed on the

19   blockchain.

20   A.  Yes.

21   Q.  Okay.  Now the first time that you conducted diligence

22   concerning the Himalaya Exchange——I'm sorry.  Withdrawn.

23          I believe you testified on direct that the first time

24   you conducted diligence with respect to the Himalaya Exchange

25   was in April of 2021, or thereabouts?

O6E1GUO2                          Roberts - Cross

A.   The diligence was focused on the cryptocurrencies Himalaya

Dollar and Himalaya Coin.  However, I recall considering

Himalaya Exchange because of their connection.

Q.   Okay.  And that was part of an onboarding process with

Bitgo; is that fair to say?

A.   This review was specific to the request to onboard Himalaya

Dollar and Himalaya Coin.

Q.   Okay.  And in addition to onboarding Himalaya Dollar and

Himalaya Coin——withdrawn.

          When you say onboarding Himalaya Dollar and Himalaya

Coin, you mean that Bitgo is going to provide the wallet

services for Himalaya Dollar and Himalaya Coin, right?  Am I

correct in that understanding?

A.   Yes.  It's——it's the ability for Bitgo wallets to receive,

hold, and send those cryptocurrencies in Bitgo wallets.

Q.   Okay.  And if you could just briefly describe for us what

the steps are in terms of the diligence that's conducted as

part of that onboarding process.

A.   Can you clarify if it's specific to my review or the wider

diligence process?

Q.   Why don't we just talk about the wider diligence process,

and then I may ask you more specifically about your review.

A.   Sure.  The wider diligence process is——my understanding is

that it is seeking to understand the background, the

composition, the purpose of a cryptocurrency.

O6E1GUO2                          Roberts - Cross

1   Q.  Okay.  And then when it comes to your review, could you

2   also please explain that process.

3   A.  Yes.  My review is specific to performing an anti-money

4   laundering due diligence review.  I understand this process to

5   refer to researching the cryptocurrencies to see if there are

6   any financial crime red flags.

7   Q.  Okay.  And as part of that financial crime red flag

8   analysis, did someone at Bitgo, to your knowledge, analyze the

9   code for HCN and HDO?

10  A.  I do not recall performing a code analysis in connection

11  with the anti-money laundering due diligence review.

12  Q.  Okay.  Do you know whether some other part of Bitgo did

13  that, someone else at Bitgo did that?

14  A.  I do not specifically recall whether that took place or

15  not.

16  Q.  Okay.  Now is it——am I correct in assuming that as part

17  this April 2021 onboarding process that the Himalaya Exchange

18  provided a variety of information to Bitgo for its evaluation?

19  A.  Are you talking about the consideration of opening an

20  account for Himalaya Exchange on the Bitgo platform?

21  Q.  Yes.  Fair enough.  You've drawn a distinction between the

22  tokens and the exchange, and I dropped that.  So yes, my

23  question is:  When it comes to onboarding those tokens, did the

24  exchange representatives provide Bitgo with information for its

25  evaluation?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  I recall references to white paper, white papers for the

2   Himalaya Dollar——Himalaya Dollar and Himalaya Coin, so yes,

3   I——I recall them submitting information.

4   Q.  Okay.  I'm sorry.  I didn't mean to interrupt.

5           Okay.  And then you had——did you and your team have

6   access to those materials?

7   A.  I——I don't——I recall that I had access to it in some way,

8   whether it was going to the Himalaya website or——or internally.

9   Q.  Okay.  But either way, you recall having access to it,

10  including the white paper.

11  A.  Yes.

12  Q.  Okay.  So let me just show that to you briefly.

13          MR. SCHIRICK:  If we could please bring up Government

14  Exhibit BR190, just for the parties and the witness.

15  Q.  Are you able to see that on your screen?

16  A.  Yes.

17  Q.  Okay.  And do you recognize that document?

18  A.  Yes.

19  Q.  Okay.  And do you recognize it as the Himalaya Dollar White

20  Paper Version 1.0 dated April 2021?

21  A.  Yes.

22          MR. SCHIRICK:  Okay.  Defense moves——I'm sorry.  I

23  didn't give it a number.

24          Oh, no, I did give it a number.  Apologies.  So we

25  move Government Exhibit BR190 into evidence.

O6E1GUO2                          Roberts - Cross

```
 1              MR. HORTON:  Objection, hearsay.

 2              THE COURT:  Would you step up.

 3              (At the sidebar)

 4              THE COURT:  So this is a document prepared by Himalaya

 5    Exchange?

 6              MR. SCHIRICK:  Yes.

 7              THE COURT:  And how does it come in?

 8              MR. SCHIRICK:  So it's one of the materials, one of

 9    the many materials that he reviewed at the time and relied on

10    as part of his work at Bitgo, and he——and, you know, your

11    Honor, it's being——we're going to take him through it to ask

12    him if he saw certain things in it at the time and if he

13    remembers those things.

14              THE COURT:  So you're offering it for the truth?

15              MR. SCHIRICK:  It's not being offered for the truth.

16              MR. HORTON:  We disagree with that, your Honor.  We

17    think it's——

18              MR. KAMARAJU:  I'm sorry.  I couldn't hear you.

19              MR. HORTON:  We disagree with that.  We think the

20    purpose of walking through these Himalaya Exchange out-of-court

21    statements is to show the jury that Himalaya Exchange was

22    saying things and implying that it's true.

23              MR. KAMARAJU:  That's not the purpose of it, and also,

24    the government just did this exact same thing on direct, where

25    they introduced the auditor's report of Armanino on the basis
```

O6E1GUO2                    Roberts - Cross

1   it was a document this witness relied on.  So this is a

2   Himalaya Exchange marketing material.  We're not offering it

3   for the truth but merely offering it for the fact that this is

4   what Himalaya Exchange was saying about its product, which is,

5   frankly, a central issue in the case.  So I don't know——

6           THE COURT:  They're entitled to a defense.  I'm going

7   to let it in.

8           MR. FINKEL:  Your Honor, if we may, if your Honor lets

9   it in, the government requests a limiting instruction, to

10  instruct the jury that these documents are not offered for the

11  truth of those statements, it's offered for the effect on the

12  listener.

13          MS. SHROFF:  Then the limiting instruction should

14  include the prior document that the government introduced on

15  direct.

16          THE COURT:  You didn't ask for a limiting instruction.

17          MS. SHROFF:  We didn't, your Honor.

18          THE COURT:  So——

19          MR. FINKEL:  If you want to say that the Armanino

20  document is false, that's fine.

21          (Continued on next page)

22

23

24

25

O6E1GUO2                          Roberts - Cross

 1                    (In open court)

 2                    MR. SCHIRICK:  So we move the document.

 3                    THE COURT:  Members of the jury, this document is not

 4       being offered for the truth of what's being stated in that

 5       document, only for its effect on the witness.

 6                    Let's go.  It's admitted.

 7                    (Government's Exhibit BR190 received in evidence)

 8       BY MR. SCHIRICK:

 9       Q.  Okay.  So as we covered before, this is—you recognize this

10       as the Himalaya Dollar white paper from April of 2021, right?

11       A.  Yes.

12                    MR. SCHIRICK:  Okay.  And if we could please scroll

13       to, I believe it's page 10.

14                    I apologize.  It's page 9 of the pdf, 7 of the

15       document, if that helps.

16       Q.  Okay.  Now do you see in the middle of the page paragraph

17       beginning, "If the market for HDO Credits"?

18       A.  I do.

19       Q.  Okay.  You see, it says, "If the market for HDO Credits

20       experiences significant liquidity shortfall, the issuer will

21       have the ability to use funds in the Reserve to provide

22       liquidity support"?

23       A.  Yes.

24                    MR. SCHIRICK:  Okay.  And if we could now just go to

25       the next page, please.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O6E1GUO2                    Roberts - Cross

1          And if we could highlight that first arrow, so to

2   speak, that's marked 01.

3   Q.  And now before I ask you about this, Mr. Roberts, I believe

4   you testified earlier that at the point in time, April 2021,

5   your understanding was that the exchange and the tokens were at

6   a prelaunch stage, right?

7   A.  Yes.

8   Q.  And so that is, they were not operating yet, they were

9   still being built.

10  A.  Yes.

11  Q.  Okay.  And so if we can then just look at point 1 here, it

12  says, "The Himalaya Exchange Prelaunch & Launch of HDO.

13  Private Placement Participants may apply to open a Himalaya

14  Exchange account and complete KYC procedures.  Following

15  opening of an account, Private Placement Participants may top

16  up their account by purchasing Himalaya Dollar credits with USD

17  on a 1:1 ratio," right?

18  A.  Yes.

19  Q.  Now do you recall that at the time of your initial

20  evaluation of the tokens that the exchange informed Bitgo that

21  HDO was based on a credit system?

22  A.  I do not recall a notification that I was aware of.

23  Q.  Does looking at this document refresh your recollection

24  that Himalaya Exchange made that disclosure?

25  A.  Looking at this——I recognize broadly the content in the

O6E1GUO2                          Roberts - Cross

document.

Q.  Okay.  Does it refresh your memory that that was something
that was disclosed to Bitgo at the time?

A.  I——I don't recall it being disclosed to Bitgo, like, by a
person.

Q.  Well, it can be——disclosures can happen lots of different
ways, right?  You can have a disclosure that comes through a
document, right?

A.  It could.

Q.  And you testified earlier that this document was among the
documents that Bitgo reviewed in connection——reviewed in April
of 2021 in connection with onboarding the tokens, right?

A.  Yes.

Q.  Okay.  So is it fair to say that the credit system for HDO
was disclosed to Bitgo back in April of 2021?

A.  Yes.

        MR. SCHIRICK:  Okay.  If we could go back to the
previous page just for a moment.

        It's the third paragraph up from the bottom beginning,
"In addition."  If we could blow that up, please.

Q.  Okay.  The document says, "In addition to the trading
solution benefits, HDO Credits are also designed for use
through the Himalaya Pay App.  The Himalaya Pay App, which will
be launched during Phase 3, will allow members to use HDO
Credits to offer domestic and cross-border payments to

O6E1GUO2                        Roberts - Cross

1    merchants who accept payment for goods or services through

2    Himalaya Pay within the Himalaya Ecosystem ('the Himalaya

3    Ecosystem').  Members will also be able to make transfers of

4    HDO Credits from their Himalaya Pay account to the Himalaya Pay

5    accounts of other members."  Did I read that right?

6    A.  Yes.

7    Q.  Okay.  Does this——well, withdrawn.

8            Do you recall that in April of 2021, the Himalaya

9    Exchange disclosed to Bitgo that HDO Credits were part of an

10   overall plan to also have a payment app?

11   A.  I recall seeing this reference to Himalaya Pay App.

12   Q.  Okay.  And what do you understand the Himalaya Pay App to

13   be a reference to?

14   A.  I recall that Himalaya was looking at a better product

15   along the lines of payments.

16   Q.  And payments, to your understanding, would mean that

17   the——that either HD——that either HDO Credits or HDO would be

18   moving on the Himalaya platform, right?

19   A.  Yes.

20   Q.  It says "within the Himalaya Ecosystem," right?

21   A.  It does.

22   Q.  Right.  And just, again, to return to the earlier

23   conversation we had, that would be something that was not

24   visible to Bitgo from the outside, right?

25   A.  Yes, I——I would take that to be an off-chain movement.

O6E1GUO2                        Roberts - Cross

1   Q.   Okay.  And then the last sentence there, saying, "Members
2   will also be able to," you see that?
3   A.   Yes, I do.
4   Q.   Okay.  Do you understand that to mean that users will be
5   able to transfer HDO Credits between and among themselves,
6   separate and apart from using a payment system?
7   A.   I took this to mean that HDO Credits could move from one
8   Himalaya Pay account to——to the other.
9   Q.   And one——one user to another within a single wallet, right?
10  A.   Yes, within the——the platform or ecosystem of Himalaya.
11  Q.   Which was housed in that one wallet, to your understanding.
12  A.   I——I'm not sure if I would say it was necessarily housed in
13  the wallet, but——but an off-chain system.
14  Q.   Okay.  Fair enough.  That's a fair point.
15          So in an off-chain system in a way that would not be
16  visible from the outside, whether it was that wallet or some
17  other wallet.
18  A.   Yes.
19  Q.   Okay.
20          MR. SCHIRICK:  Okay.  Can we please go to page of the
21  document 11, 13 of the pdf.  And we're just going to highlight
22  Exchange of HDO Credits.
23  Q.   Okay.  So here it says, "Exchange of HDO Credits.  A member
24  may make a request to the Himalaya Exchange to exchange HDO
25  Credits for an equivalent amount in U.S. dollars.  Where the

O6E1GUO2                        Roberts - Cross

Himalaya Exchange accepts such a request, it will accept a

transfer of such HDO Credits in exchange for an equivalent

amount in U.S. dollars from the Reserve to be paid to the bank

account of the member.

        "The issuer is not oblig[at]ed to provide liquidity

support and the Himalaya Exchange is not oblig[at]ed to agree

to any request from a member to exchange HDO Credits for U.S.

dollars and such actions are at the sole discretion of the

issuer and the Himalaya Exchange respectively.  Members do not

have any direct or indirect claim on the issuer or the

Reserve."

        Now do you understand the second paragraph here to

mean that there was no—that the exchange was disclosing that

there was no guarantee that it would be able to provide HDO

holders with U.S. dollars at the time of redemption,

necessarily?

            MR. HORTON:  Objection, your Honor.

            MR. SCHIRICK:  Asking for his understanding.

            MR. HORTON:  It's testimony.

            THE COURT:  You need to break this down.

            MR. SCHIRICK:  Okay.

Q.  Let's actually start with the first paragraph.

        In the first paragraph, do you understand that the

exchange is disclosing here that it will exchange HDO Credits

for U.S. dollars from the reserve that it has?

O6E1GUO2                        Roberts - Cross

1   A.  Yes.

2   Q.  Okay.  And in the second paragraph, do you understand the

3   exchange to be saying that there is no guarantee that it will

4   be able to do that upon demand and that it will happen at its

5   discretion?

6   A.  Yes.

7   Q.  Okay.  Thank you.

8           MR. SCHIRICK:  Could we please just go back to,

9   briefly, page 10 of the pdf, page 8 of document.

10          I'm sorry.  The one that we were looking at before.  I

11  may have the wrong page number, but the one that we were

12  looking at before with the arrows entitled Rollout.  I think

13  it's——there it is.  Great.  Thank you.

14          And if we could just zoom in on the arrows a little

15  bit.  Great.  Thanks.

16  BY MR. SCHIRICK:

17  Q.  So do you see here the bit of a——a bit of a flow chart of

18  the various phases of the rollout of the Himalaya Exchange and

19  its proposed services?

20  A.  Yes.

21  Q.  Okay.  And we read before the first arrow there about

22  prelaunch and launch of HDO, right?

23  A.  We did.

24  Q.  Okay.  And that's just Phase 1, right?

25  A.  That is my understanding.

1    Q.  Okay.  And then Phase 2 is the launch of the Himalaya Coin,

2    right?

3    A.  Yes.

4    Q.  And that's HCN, as we've been referring to it.

5    A.  Yes, that is my understanding.

6    Q.  Okay.  And then Phase 3 is the launch of the Himalaya Pay

7    App, you see that?

8    A.  I do.

9    Q.  And what's called "the full Himalaya Exchange"?

10   A.  I do.

11   Q.  And underneath that it says, "Members may commence trading

12   HDO, HCN, and other crypto asset credits through their

13   account"?

14   A.  Yes, I can see that.

15   Q.  Okay.  And finally, the fourth arrow says Himalaya Exchange

16   App Launch.  Do you see that?

17   A.  Yes, I do.

18   Q.  Okay.  And so does this——is it fair to say that this lays

19   out several phases of the rollout of the Himalaya Exchange that

20   were——

21           MR. HORTON:  Objection to relevance.

22   Q.  ——that were planned over time?

23           THE COURT:  Sorry.  Are you asking him whether the

24   document states that?

25           MR. SCHIRICK:  It is his understanding that this

1    explains the rollout of various services that Himalaya Exchange

2    intended to provide over time.

3            THE COURT:  So the document speaks for itself.

4            MR. SCHIRICK:  I'm just looking for the witness's

5    understanding, your Honor, on this.

6            THE COURT:  If the question is what does it say,

7    that's one thing.  You're asking him whether he understands

8    that that is what it says?

9            MR. SCHIRICK:  I'm asking if that's his understanding

10   of the document, of what is disclosed here.

11           THE COURT:  Okay.  I don't understand the question.

12           MR. SCHIRICK:  Okay.

13   BY MR. SCHIRICK:

14   Q.  Did you understand, based on the materials we just looked

15   at, that there was going to be a phased rollout of different

16   services by the Himalaya Exchange?

17           MR. HORTON:  Objection, your Honor.

18           MR. SCHIRICK:  That's okay.  I'll move on, your Honor.

19   That's fine.

20   BY MR. SCHIRICK:

21   Q.  Okay.  Now none of what you reviewed in this document at

22   the time was a red flag for Bitgo, right?

23   A.  Yes.  We—we did not find any red flags at that time.

24   Q.  Okay.  All right.  Now you were asked some questions

25   earlier about Bitgo's investigation, internal investigation; is

O6E1GUO2                          Roberts - Cross

1    that right?  I'm sorry.  Withdrawn.

2             You were asked some questions earlier about an

3    investigation that Bitgo started after receiving a subpoena

4    from the government, right?

5    A.  Yes.

6    Q.  Okay.  And did Bitgo receive that request from the

7    prosecutors in this case?

8    A.  I recall that subpoena was received from—from one of them.

9    Q.  Okay.  And that prior to that, did Bitgo have any concerns

10   regarding the exchange?

11   A.  I do not recall having any concerns regarding the exchange.

12   Q.  Okay.  And the exchange—I'm sorry.  Bitgo hadn't received

13   any complaints about the exchange, to your knowledge?

14   A.  I do not recall becoming aware of any complaints about the

15   exchange prior to the receipt of the subpoena.

16   Q.  And that was about 18 months in between the April 2021

17   onboarding and when you received the subpoena, right?

18   A.  Yes, approximately.

19   Q.  Okay.  Now you were asked on direct whether the government

20   required Bitgo to conduct the account review.  Do you recall

21   that?

22   A.  I recall being asked that question.

23   Q.  Okay.  And you said—and your answer was no, right?

24   A.  Yes.

25   Q.  Okay.  And is it Bitgo's policy to conduct an account

O6E1GUO2                          Roberts - Cross

1    review if it receives a subpoena from the government?

2    A.  It is a typical procedure that we follow when we receive a

3    subpoena.

4    Q.  Okay.  And I believe you testified that when you started

5    that account review, you found some things, found additional

6    information that was not available to you at the time you

7    conducted the initial due diligence in April 2021, right?

8    A.  Yes.

9    Q.  Okay.  And among those things were the subsequent white

10   papers for HCN and HDO?

11   A.  I can't recall if they were different white papers.

12   Q.  Okay.  But you found whatever white papers existed at that

13   time and reviewed those as part of your account review, right?

14   A.  Yes.  We——we identified the white paper material and

15   reviewed it.

16   Q.  Okay.  And if there were a more recent white paper, you

17   would have reviewed that, right?  That would have been your

18   practice.

19   A.  On the basis that what was available to me, yes.

20   Q.  Okay.  Now I think you also testified that you believed

21   that you found that there were——it was publicly available

22   information that there were 1.5 billion HDO; is that right?

23   A.  In——in that ballpark.  I don't recall the specific number.

24   Q.  Okay.  Fair enough.  Approximately 1.5 billion HDO.

25   A.  Approximately.  Around, in that range.

O6E1GUO2                          Roberts - Cross

1   Q.  Okay.  And at the time that you were conducting this

2   account review was there any—there wasn't anything that you

3   found that indicated that the Himalaya Exchange wasn't still in

4   the early stage of development, right?

5   A.  I don't recall making a finding that they were still in

6   development.

7   Q.  Do you recall that the—that finding the existence of H

8   Pay, for example, at the time?

9   A.  I recall reviewing their website, and I don't recall a

10  specific reference to H Pay.

11  Q.  Okay.  Did you have any reason to believe that the exchange

12  wasn't still in its early stages of development in the fall of

13  2022?

14  A.  I—I—I did not.

15  Q.  Okay.  Now you testified earlier that there were a number

16  of things that you believe you found that were quote-unquote

17  red flags, right?

18  A.  Yes.

19  Q.  Okay.  And one of those I think you testified was that

20  there was a significant increase in the price of HCN?

21  A.  Yes.

22  Q.  Okay.  And you said that you observed reports about the

23  increase in the price of HCN.  Was that from the internet?

24  A.  Yes.

25  Q.  From Google searches, that kind of thing?

O6E1GUO2                          Roberts - Cross

1   A.  Yes.

2   Q.  Okay.  Now based on your experience at Bitgo is it

3   sometimes the case that there are bubbles in the prices of

4   digital assets?

5   A.  Can you clarify the term "bubble."

6           MR. HORTON:  Objection, your Honor.

7           THE COURT:  So what does "bubble" mean?

8           MR. SCHIRICK:  A sharp run-up in the prices of assets

9   that later deflate to some extent.

10          THE COURT:  You're asking whether he's observed that

11  as part of his job?

12          MR. SCHIRICK:  Correct.

13          THE COURT:  You may answer.

14  A.  I recall observing fluctuating prices of cryptocurrencies

15  over time.

16  Q.  And that's something of a feature of the cryptocurrency

17  space, right?

18          MR. HORTON:  Objection, your Honor.  Goes beyond the

19  scope of the investigation.

20          THE COURT:  You can answer.

21  A.  My understanding is that cryptocurrencies typically have a

22  fluctuating value.

23  Q.  Right.  And they can be volatile, right?

24  A.  Their price could——could go up and down, absolutely.

25  Q.  Okay.  And are you familiar with the term "irrational

1   exuberance"?

2           MR. HORTON:  Objection, your Honor.

3           THE COURT:  Sustained.  Sustained.  Now we're getting

4   far afield.

5   Q.  Okay.  You also testified that another of the red flags

6   that you believed you observed was that there was a

7   concentration of ownership of the digital assets, right?

8   A.  Yes.

9   Q.  Okay.  And as we talked about a little while ago with

10  respect to the centralized nature of the Himalaya

11  Exchange——withdrawn.

12          We talked earlier about the centralized nature of the

13  Himalaya Exchange, right?

14  A.  Yes.

15  Q.  Okay.  And because it was centralized, wouldn't you expect

16  to see all of the assets in a concentrated fashion with the

17  exchange?

18  A.  I would not necessarily expect to see nearly 100 percent of

19  a cryptocurrency in a single wallet.

20  Q.  But in fact, you would expect to see high concentrations,

21  right?

22          MR. HORTON:  Objection.  Asked and answered.

23          THE COURT:  Sustained.

24          MR. SCHIRICK:  I believe he testified he wouldn't

25  necessarily expect to see that, so my follow-up question is to

O6E1GUO2                         Roberts - Cross

1   understand the "necessarily" part of the answer.

2                MR. HORTON:  Same objection.

3                THE COURT:  His answer was "not necessarily."

4   BY MR. SCHIRICK:

5   Q.  Okay.  Regardless of concentration, you wouldn't

6   expect—with a centralized exchange like Himalaya, you wouldn't

7   expect to see a large number of on-chain transactions; is that

8   fair to say?

9   A.  Sorry.  Can you repeat that.

10  Q.  Sure.  With a centralized exchange like Himalaya, you

11  wouldn't necessarily expect to see a large number of on-chain

12  transactions, right?

13  A.  With centralized exchanges, I typically expect to see

14  inbound on-chain transactions and outbound on-chain

15  transactions, which would correspond to customers' deposits and

16  customers' withdrawals.

17  Q.  But we just reviewed, didn't we, that the only way to

18  purchase HDO Credits was by depositing fiat with the exchange,

19  right?  We saw that in the April 2021 white paper.

20               MR. HORTON:  Objection.  It was just reviewed, as the

21  question indicated.

22               THE COURT:  Are you asking him is that what was stated

23  in the document?  Is that your question?

24               MR. SCHIRICK:  I believe he answered that he would

25  expect to see inbound or outbound transactions, and I'm

1     referring back to the April 2021 white paper that we just

2     reviewed that indicates that the purchase of HDO Credits

3     happens by depositing U.S. dollars, fiat currency, with the

4     exchange.

5            MR. HORTON:  Your Honor, in view of that explanation,

6     we renew our objection from our discussion at the sidebar of

7     the purpose of that.

8            THE COURT:  Having reviewed that statement, what is

9     your question?

10           MR. SCHIRICK:  The question is, does he recall that

11    that is how funds get into the exchange, according to the white

12    paper, according to the——

13           THE COURT:  So you're asking whether the white paper

14    states that?

15           MR. SCHIRICK:  No.  I'm asking whether it explains the

16    lack of inbound cryptocurrency transactions because the white

17    paper said the only way you can get HDO Credits on the system

18    is to deposit cash.

19           THE COURT:  You can answer that question.

20    A.  Sorry.  Can you just restate that.  There was a bit of

21    back-and-forth.  Please.  Thank you.

22           MR. HORTON:  Your Honor, may we approach before the

23    question is asked again.

24           THE COURT:  Yes.

25

1              (At the sidebar)

2              THE COURT:  So I understand you to be asking him

3    whether his conclusion about inbound and outbound is consistent

4    with what's in the white paper; am I correct?

5              MR. SCHIRICK:  Broadly speaking, yes.  But I think,

6    your Honor, the point is, you know, on direct, he was shown a

7    variety of materials that were Himalaya Exchange materials, and

8    asked——and they were allowed to show him——the government was

9    allowed to show them for the effect on the listener because it

10   informed his ultimate conclusions, and I'm showing him the same

11   materials to challenge his judgment on that.

12             THE COURT:  So that's fine, but it seems like perhaps

13   you should phrase the question:  Isn't it true that if X, then

14   Y?

15             MR. SCHIRICK:  Okay.  I will try.

16             MR. HORTON:  Our objection to framing it the way he

17   should frame it is that "isn't it true that the substance of

18   the Himalaya Exchange white paper" is offering it for its

19   truth, and taking it for granted that it is true.  "Well, since

20   this is true, how do you react to that?"  And that's the

21   purpose that we objected to at the sidebar.

22             MR. SCHIRICK:  We are not offering it for its truth.

23   It's the same basis you offered it, for the effect on the

24   listener and it informs his judgment.  I'm asking him the same

25   thing, does this inform your judgment, does this make you think

1    differently about——

2            MR. KAMARAJU:  It's no different than saying, you read

3    this document, you reached a conclusion, does this part of the

4    document undermine the conclusion that you reached?

5            MR. FINKEL:  But that's not the question that was

6    posed.

7            MR. KAMARAJU:  That's the question that your Honor——

8            MR. FINKEL:  Excuse me.

9            MR. KAMARAJU:  I apologize.

10           MR. FINKEL:  The question that was posed was, the

11   white paper said this so you'd expect to see X, which is using

12   the white paper for its truth.  Mr. Schirick is right.  If he

13   wants to ask a question of what effect did the white paper

14   statement have on him, that's a fair question.  To the extent

15   he poses the question, Mr. Schirick poses the question that he

16   did, we ask that your Honor give a limiting instruction, just

17   because the white paper says this fact doesn't make it true,

18   and it is not being offered for its truth.  And to be clear,

19   the government's view is the white paper is false.  So that's

20   the issue that we're wrestling with.

21           MR. KAMARAJU:  Well, to the extent the government's

22   view is the white paper is false, they'll obviously have the

23   opportunity to put on evidence and argue that in summation.

24           MR. FINKEL:  We're still allowed to——

25           MR. KAMARAJU:  Sorry.  I interrupted you and I

1    apologized, and I'd ask for the same thing.

2              My point is, the way the document——the way it is posed

3    is, this is the material you reviewed, this part of the

4    material undermines the conclusion that you reached, correct?

5    That's all about what's in his mind.

6              MR. FINKEL:  That wasn't the question asked, and to

7    the extent that the question is——to the extent the question is

8    relying on the information in the white paper, we ask that your

9    Honor give a limiting instruction which I think is consistent

10   with what defense counsel says he's using the white paper for,

11   which is the effect on the listener and his interpretation of

12   that relating to his analysis of HDO.

13             THE COURT:  I think he can ask whether this statement

14   is consistent with his conclusion.

15             MR. SCHIRICK:  I'm happy to put it like that.

16             MR. FINKEL:  I think that's a fair question, your

17   Honor, and I would just ask that the limiting instruction

18   accompany it, because just so the jury isn't confused, because

19   what's being offered for its truth and not, to a lay juror

20   sometimes can be misunderstood, and so we just ask that the

21   limiting instruction be provided so that it is being viewed by

22   the jury and considered by the jury for the proper purpose that

23   the Court has allowed this information to come in for.  That's

24   the government's view.

25             MR. KAMARAJU:  I don't think the Court has to repeat

O6E1GUO2                          Roberts - Cross

1    the same limiting instruction at each reference to the

2    document.

3              THE COURT:  I agree with that.  Okay.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6E1GUO2                          Roberts - Cross

 1                   (In open court)

 2                   MR. SCHIRICK:  Okay.  Thank you.

 3   BY MR. SCHIRICK:

 4   Q.  So Mr. Roberts, returning to this discussion, you recall

 5   looking at the portion of the April 2021 white paper that

 6   described how the—how any stored value would get onto the

 7   Himalaya Exchange, right?

 8   A.  I recall reviewing sentences about the mechanics of funding

 9   accounts on the exchange.

10   Q.  Right.  The mechanics of funding an HDO, the purchase of

11   HDO.

12   A.  Yes.

13   Q.  Okay.  And according to the white paper, that is done by

14   sending fiat—or U.S. dollars, to use a less fancy phrase—to

15   the exchange and then the exchange in turn would issue an HDO

16   credit to the purchaser; is that fair?

17   A.  Yes, I recall reading that.

18   Q.  Okay.  And so my question is:  In light of that, does

19   that—is that inconsistent with the idea that it would be

20   strange not to see inbound cryptocurrency transactions?

21                   MR. HORTON:  Object to the form.

22                   THE COURT:  You can answer.

23   A.  Are you talking specifically about this cryptocurrency

24   exchange or cryptocurrency exchanges generally?

25   Q.  No, no, just this one, given its unique—

O6E1GUO2                        Roberts - Cross

1    A.  Well, that is how they described the mechanics of their

2    exchange.

3    Q.  Right.  And so that is how they described it, and that

4    would explain why one might not see inbound cryptocurrency

5    transfers to the exchange, right?

6             MR. HORTON:  Objection in view of the issues raised at

7    the sidebar, your Honor.

8             THE COURT:  You can ask whether or not this claim is

9    consistent with his conclusions about inbound and outbound

10   transactions.

11            MR. SCHIRICK:  That was going to be the next question,

12   your Honor.

13   BY MR. SCHIRICK:

14   Q.  And is that method of funding somewhat inconsistent with

15   your conclusion that you would expect to see inbound

16   cryptocurrency transactions?

17   A.  I thought I said for inbound and outbound that I was—I

18   recall referring to cryptocurrency exchanges more generally,

19   not necessarily the Himalaya Exchange.

20   Q.  And I agree.  You did.  And what we're talking about, just

21   to be clear, is, with respect to the Himalaya Exchange

22   specifically, given the way that it was described to you,

23   right, and the way it was disclosed to Bitgo, does that—is

24   that, to a degree, inconsistent with the idea, which you

25   testified to earlier, that you would expect, with respect to

1   Himalaya, to see inbound cryptocurrency exchanges?

2            MR. HORTON:  Objection.  It's a compound question with

3   testimony.

4            THE COURT:  Overruled.  Overruled.  You may answer.

5   A.   I——I don't think that's inconsistent with——with my finding.

6   Q.   And it's not inconsistent with your finding?  You think

7   that there should still be——with respect to the Himalaya

8   Exchange, specifically, your expectation would still be to see

9   inbound cryptocurrency exchanges, given the way that it works?

10           MR. HORTON:  Objection.  Asked and answered.

11           THE COURT:  So he just answered the question.

12           MR. SCHIRICK:  Okay.

13  Q.   Now you also testified that one of the red flags that you

14  identified in your review related to HDO's reserves, right?

15  A.   Yes.

16  Q.   And I think you said that you expected that the amount of

17  HDO tokens in circulation should match the reserves that

18  are——let's call it in the bank, if that's fair, from your point

19  of view.

20  A.   Yes.

21  Q.   Okay.  And just what are reserves again, to remind

22  everyone?

23  A.   My understanding of reserves, it is the pot of money or

24  asset that gives value to the stablecoin.

25  Q.   Okay.  And you testified that you believe that the amount

O6E1GUO2                    Roberts - Cross

1    of HDO that was minted was 1.5 billion, approximately.

2    A.  In a ballpark range.  I don't recall the specific number.

3    Q.  Okay.  Fair.  And I think you also testified on direct that

4    "minted" essentially means "created"; is that fair?

5    A.  I'd agree with that, yes.

6    Q.  Okay.  Now isn't it possible, based on your experience,

7    that you could have tokens that are created, or minted, but

8    held out of circulation?

9              MR. HORTON:  Objection.  Calls for speculation.

10             MR. SCHIRICK:  Based on his experience.

11             THE COURT:  I'm going to permit the question.  You may

12   answer.

13   A.  I think that it is possible to mint tokens but withhold

14   them from circulation.

15   Q.  Okay.  And so that means that only a portion of what was

16   minted could be circulating out and in an ecosystem or on the

17   blockchain, fair?

18   A.  It's——it's possible.

19   Q.  Okay.  And so turning to the case of the Himalaya Exchange

20   specifically, if 1.5 billion were minted but some were withheld

21   from circulation, then you wouldn't expect to see reserves for

22   the full 1.5 billion, fair?

23   A.  I——for me, when I viewed this information, it was

24   impossible for me to determine what was in circulation and what

25   was not in circulation.

O6E1GUO2                        Roberts - Cross

Q.  And I, yes, agreed a hundred percent because you didn't

have access to the information as to what was going on inside

the Himalaya Exchange, right?

A.  I did not.

Q.  Right.  So you had no way of knowing whether 1.5 billion

had been minted but some were held back out of circulation.

A.  I——I did not have access to that internal information, to

the extent that it exists.

Q.  Fair enough.  Okay.  And again, you couldn't——you can't see

this because, viewed from the outside, looking at the

blockchain, all the HDO looks like it's in, you know, either

one or a set of wallets that belonged to the exchange, right?

A.  Yes.

Q.  Okay.  So based on this, it's difficult to know what the

right reserve level is or would have been, right?

        MR. HORTON:  Objection.

        THE COURT:  Based on what?

        MR. SCHIRICK:  Based on the discussion that the

witness and I just had, the question is, it's difficult to know

from the outside what the appropriate reserve level is.

        MR. HORTON:  Same objection.

        THE COURT:  The appropriate reserve level?  Is that a

term of art?

        MR. SCHIRICK:  I believe the witness testified that

only what——only tokens in circulation need to be——need to have

1   reserves, and because we can't tell from the outside what's in

2   circulation, there's no way to know what the appropriate

3   reserve is.

4              MR. HORTON:  Objection.  That mischaracterizes his

5   testimony.

6              THE COURT:  I don't recall the witness saying that.

7              MR. SCHIRICK:  Your Honor, may we have a brief

8   sidebar?

9              THE COURT:  Yes.

10             (Testimony reviewed at the sidebar)

11             THE COURT:  Go ahead.

12             MR. SCHIRICK:  Thank you, your Honor.

13  BY MR. SCHIRICK:

14  Q.  So just to go back briefly, I believe you testified

15  earlier, just to be clear, that the amount of reserves should

16  match the amount of a token that's in circulation, right?

17  A.  Yes.

18  Q.  Okay.  And so if you don't know what the amount of a token

19  is in circulation, then you don't—you can't determine what the

20  right reserve amount should be, right?

21  A.  Yes, but I can refer to information on the blockchain to

22  get an idea of what may be in circulation.

23  Q.  Right.  But if we're talking about tokens that are held

24  off-chain, then there's no way to know what the right reserve

25  figure should be, right?

1    A.  If it was held off-chain, then it's entirely possible that

2    a person in the public could not ascertain those details.

3    Q.  Right.  Because you just don't have the information.

4    A.  Yes.

5    Q.  That's fine, right?  Okay.

6              MR. SCHIRICK:  Now if we could please turn to

7    Government Exhibit in evidence 208A.

8    Q.  Now do you recall reviewing this document on direct

9    testimony with Mr. Horton?

10   A.  Yes.

11             MR. SCHIRICK:  And if we could go to page 2, please.

12   Q.  Okay.  And you recall that Mr. Horton asked you some

13   questions——

14             MR. SCHIRICK:  Yes, thanks.  Let's zoom in on the top

15   portion of the document.

16   Q.  Okay.  Now I believe you said on direct that reviewing this

17   information led you to believe that there was an internal

18   ledger system at Himalaya, right?

19   A.  I——I got the impression that one likely existed based on

20   this information.

21   Q.  Right.  And we covered that when you and I spoke a little

22   earlier today, that that——to the extent the system operated

23   off-chain, that it was an internal ledger system.

24             MR. HORTON:  Objection.  Asked and answered.

25             THE COURT:  You may answer.

O6E1GUO2                         Roberts - Cross

1   A.  Yes.

2   Q.  Okay.  Now if we look at the——do you see the heading "Total

3   HDO-denominated liabilities issued"?

4   A.  Yes, I do.

5   Q.  Okay.  And then right under that, it says, "Collateralized

6   HDO tokens on the Ethereum blockchain"?

7   A.  Yes, I can see that.

8   Q.  And there's the 0 there that you talked about with

9   Mr. Horton, right?

10  A.  Yes.

11  Q.  Okay.  And does that mean——am I——is my understanding

12  correct that that means that there are no backed HDO tokens on

13  the Ethereum blockchain?

14  A.  I——that is a finding that I——that I have made, yes.

15  Q.  Okay.  And then if we look at the next line,

16  "Collateralized HDO Credits on the Himalaya Ecosystem

17  platform."

18  A.  Yes.

19  Q.  Do you see that?

20  A.  I do.

21  Q.  And there, your understanding was that that's a reference

22  to the off-chain system that Himalaya has, right?

23  A.  That is the impression I obtained.

24  Q.  Okay.  And it shows there that the HDO Credits were backed

25  at that roughly $400 million figure; is that right?

1    A.  It shows that there are, yeah, roughly $400 million there.

2    Q.  Okay.  And that's the credits that are backed──when we say

3    credits, we're talking about the off-chain, tokens, right?

4    A.  Yes.

5    Q.  The representation of the off-chain tokens, right?

6    A.  Yes.

7    Q.  Okay.  And that $400 million number──now let's go up to the

8    top where it says "U.S. dollars held in Himalaya-owned bank

9    account."  Do you see that?

10   A.  Yes.

11   Q.  All right.  And does that number exceed the $4 million,

12   approximately $4 million number below it?

13   A.  It does.

14   Q.  Okay.  And does that suggest to you that for the HDO

15   Credits that are off-chain, that those HDO Credits are

16   adequately backed by cash reserves?

17   A.  It is certainly an attestation that that could be the case.

18   Q.  Okay.  Do you have any reason to believe otherwise?

19   A.  Not──not at this time.

20           MR. SCHIRICK:  Your Honor, if I could just have one

21   moment.

22           THE COURT:  Okay.

23           MR. SCHIRICK:  Thank you, your Honor.

24   Q.  Now I think you testified earlier that you were told by

25   someone at the exchange in 2023 that Mr. Guo wasn't financially

O6E1GUO2                        Roberts - Cross

1   involved in the platform, is that right?

2   A.  I——I recall receiving that type of response, yes.

3   Q.  Okay.  And did you develop any information in your

4   investigation that was inconsistent with that?

5   A.  Well, I recall identifying information in the public

6   domain, such as Google searches, that drew a potential

7   financial connection between Miles Guo and the Himalaya

8   Exchange.

9   Q.  Okay.  And you've never spoken to Miles Guo before, right?

10  A.  Not to my knowledge.

11  Q.  And to your knowledge has Miles Guo ever contacted Bitgo?

12  A.  I'm not aware of an attempt by Miles Guo to contact Bitgo.

13  Q.  Okay.  And as far as you know, all of the instructions that

14  were given to Bitgo on behalf of the exchange were given by

15  representatives of the exchange, fair to say?

16  A.  Yes.

17  Q.  Okay.  And——okay.  Fair enough.  Now you said that you

18  received the subpoena from the government in the fall of 2020,

19  right?

20  A.  Fall of 2022.

21  Q.  I'm missing two years.  Yes.  Thank you.  Fall of 2022.

22          And then Bitgo subsequently ended its relationship

23  with the exchange, right?

24  A.  Subsequently, yes.

25  Q.  And do you remember about when that was?

O6E1GUO2                        Roberts - Cross

1   A.  Approximately mid-2023.

2   Q.  Okay.  June 8th sound like about the right date?

3   A.  I can't recall the specific date right now, but in the

4   ballpark.

5   Q.  Okay.  So several months later.

6   A.  Yes.

7   Q.  More than six months later.

8   A.  Yes.

9   Q.  Okay.  And do you recall that during that time, as part of

10  your customer review process, you took into account media

11  coverage of the Himalaya Exchange?

12  A.  By media coverage, can you clarify that a little bit,

13  please.

14  Q.  Sure.  I mean, as part of deciding whether or not to end

15  your relationship with the exchange, Bitgo took into account

16  the media coverage that the exchange was receiving, right?

17  A.  We took into account information available in the public

18  domain such as media websites that identified the Himalaya

19  Exchange.

20  Q.  Right.  And you also took into account that Mr. Guo had

21  been arrested, right?

22  A.  Yes.

23  Q.  Okay.  And in fact, you told the representatives of the

24  exchange that Mr. Guo being arrested and receipt of the grand

25  jury subpoena were pretty much going to be the end of the

O6E1GUO2                       Roberts - Cross

1    relationship with Bitgo, right?

2    A.  I don't recall that specific information being shared.

3    Q.  Okay.  Well, is it fair to say that bad media—withdrawn.

4           Fair to say that adverse media coverage of a

5    client—or bad press, as we would say—is something that you

6    take into account?

7    A.  It is.

8    Q.  Right.  Because there's a reputational risk, right, for

9    Bitgo?

10   A.  There is.

11   Q.  Yeah.  In being associated with, providing services to a

12   customer that is getting bad press, right?

13   A.  Yes, we—we do take—we can take into account reputational

14   harm matters.

15   Q.  And sometimes if there's a lot of, you know, heat on a

16   customer, it may just not be worth it for Bitgo to continue

17   doing business with them, right?

18   A.  That could—that is a factor among others when assessing if

19   having a relationship with a customer exceeds our risk

20   tolerance.

21   Q.  Right.  And so do you recall approximately what the fees

22   were that Bitgo was receiving from Himalaya?

23   A.  I recall the fee was in the range of—for all services, in

24   the range of 10 to $15,000.  I can't recall the exact figure.

25   Q.  Okay.  So it may not be worth the 10 or $15,000 in revenue

O6E1GUO2                          Roberts - Cross

1    to have the reputational risk of being associated with someone

2    who's getting bad press, right?

3    A.   It's a totality of factors that we consider when making

4    that evaluation.  The fees paid could certainly be a factor.

5    Q.   Sure.  But it's an important factor, right?

6            MR. HORTON:  Objection.

7            THE COURT:  You may answer whether it's an important

8    factor.

9    A.   It's a factor as important as many others.

10   Q.   Okay.  But it's important, right?

11           MR. HORTON:  Objection.  Asked and answered.

12           THE COURT:  Sustained.

13   Q.   Was Himalaya——withdrawn.

14           Himalaya wasn't Bitgo's biggest client, was it?

15   A.   Define "biggest."

16   Q.   Well, I mean, it's all relative, so you tell me.  Were they

17   the biggest client of Bitgo relative to others?

18           MR. HORTON:  Objection.

19           THE COURT:  You can say whether it was big, medium, or

20   small.

21   A.   I wouldn't regard Himalaya as being a significant

22   relationship compared to some other of the clients that we

23   have.

24   Q.   Sure.  Okay.  And after Bitgo fired Himalaya, you guys are

25   still in business, right?

O6E1GUO2                        Roberts - Cross

1    A.  After we closed Himalaya's account, Bitgo was still in

2    business, yes.

3    Q.  Yeah.  You guys are still doing fine.

4    A.  Yes.

5    Q.  Okay.  Now you testified earlier that you proactively

6    reached out to the FBI at some point in 2023, right?

7    A.  Yes.

8    Q.  Okay.  Now isn't it true that when you did that, Bitgo had

9    been in touch with the government for some time?

10   A.  Which part of the government?

11   Q.  Any part of the government.

12   A.  In relation to this account review?

13   Q.  Well, let's put it this way:  You, Bitgo, had received a

14   subpoena from the government in the fall of 2022?  I'm going to

15   get it right this time.

16   A.  Yes, we did.

17   Q.  Okay.  And so you had—you have lawyers at Bitgo?

18   A.  Yes, we do.

19   Q.  Okay.  And they were talking to lawyers for the government

20   as part of responding to that subpoena?

21   A.  Well, Bitgo is obliged to respond so they would have to

22   have some type of communication.

23   Q.  Certainly.  I'm just confirming the fact they did.

24   A.  I—well, I—I wasn't necessarily privy to that

25   communication, but I presume that something like that occurred.

O6E1GUO2                    Roberts - Redirect

1    Q.  Okay.  So Bitgo's lawyers were in touch with the

2    government, so when you reached out to the FBI, you had already

3    been in touch with the government for some time, right?

4    A.  We would have been communicating with agents and government

5    personnel associated with the subpoena.

6    Q.  Right.  So you didn't reach out out of the blue.

7              MR. HORTON:  Objection.

8              THE COURT:  He can say whether it was out of the blue.

9    A.  For the outreach, a typical and standard step to take in

10   that situation is to reach out to law enforcement.

11   Q.  But it wasn't──it wasn't out of the blue.  You knew who to

12   call, right?

13   A.  Sorry.  Can you say that again?

14   Q.  You knew who to call, right?

15   A.  Yes, I believe the person I called, their details were on

16   the subpoena.

17             MR. SCHIRICK:  Okay.  Thank you.  No further questions

18   at this time.

19             THE COURT:  Redirect?

20   REDIRECT EXAMINATION

21   BY MR. HORTON:

22   Q.  Mr. Roberts, you were asked a number of questions on

23   cross-examination about Coinbase.  Do you recall that?

24   A.  I do.

25   Q.  From your review, did the Himalaya Exchange operate like

O6E1GUO2                         Roberts - Redirect

1    Coinbase?

2              MR. SCHIRICK:  Objection.

3              THE COURT:  Overruled.  You may answer.

4    A.  I——I recall in my review that the composition and nature of

5    the Himalaya Exchange did not align with an exchange like

6    Coinbase's profile.

7    Q.  And what do you mean that the composition of the Himalaya

8    Exchange did not align with Coinbase's profile?

9    A.  There could be various things there, but one big one for me

10   being I recall the ability to make deposits in cryptocurrency

11   and withdraw cryptocurrency off the exchange.

12   Q.  Can customers at Coinbase make deposits in cryptocurrency?

13             MR. SCHIRICK:  Asked and answered.

14             THE COURT:  Overruled.  You may answer.

15   A.  Assuming we're talking about their——like, that particular

16   product, I——I am of the impression that Coinbase customers can

17   fund their accounts with a cryptocurrency transaction.

18   Q.  And could Himalaya Exchange customers fund their accounts

19   with cryptocurrency?

20   A.  Based on my review, I did not find information that

21   suggested that Himalaya Exchange customers could fund their

22   accounts with a cryptocurrency transaction.

23   Q.  You were also asked questions on cross about the blockchain

24   activity of Coinbase.  Do you remember that?

25   A.  Yes.

O6E1GUO2                          Roberts - Redirect

1   Q.  How does the blockchain activity of Coinbase compare to the

2   blockchain activity you observed for the Himalaya Exchange?

3   A.  I would categorize it as significantly different.

4   Q.  What makes it significantly different, the blockchain

5   activity you saw at the Himalaya Exchange against the

6   blockchain activity of Coinbase?

7   A.  Coinbase has numerous customer deposits in cryptocurrency

8   every day, numerous customer withdrawals of cryptocurrency

9   every day; they offer numerous different cryptocurrencies for

10  trading, among other things.

11  Q.  You testified that 99 percent of the Himalaya Coin you

12  observed was in the wallet controlled by the Himalaya Exchange.

13  Do you recall that?

14  A.  I do.

15  Q.  Does Coinbase control 99 percent of any cryptocurrency?

16  A.  I don't think I——I——I don't know if they——

17          MR. SCHIRICK:  Objection.

18  A.  Sorry.

19          THE COURT:  You may answer.

20  A.  I would find it unlikely, but I'm not entirely aware of

21  every single cryptocurrency they support today, right now.

22  Q.  Mr. Roberts, you described the Himalaya Exchange as a

23  closed-loop.  Is Coinbase a closed-loop?

24  A.  Coinbase has off-chain aspects.

25  Q.  And how do you compare the off-chain aspects at Coinbase to

O6E1GUO2                    Roberts - Redirect

1    the off-chain aspects of the Himalaya Exchange?

2    A.  I would say that if we're taking Himalaya Exchange's

3    customer who has HDO Credits and wants to buy HCN, that trade

4    is successful, it gets settled, I think that can be compared to

5    a Coinbase customer that funds their account with U.S. dollars,

6    such as via a wire transfer, places an order for, say, Bitcoin,

7    for example, and that trade settles; in both circumstances I

8    would describe that as off-chain activity.

9    Q.  Relatively speaking, what was the——withdrawn, your Honor.

10              At Coinbase, can customers take crypto off of the

11   exchange?

12   A.  Yes, that is my understanding.

13   Q.  And can customers do that at the Himalaya Exchange?

14   A.  I did not find information that indicated it was possible

15   for Himalaya customers to do that.

16   Q.  At Coinbase can customers bring their own cryptocurrency

17   wallets to the exchange?

18   A.  They could bring their own cryptocurrency to the exchange.

19   Q.  And to do that, did they need to bring their own wallets?

20   A.  You don't need to bring your own wallets.  You could——once

21   you created your account, you could simply fund your account

22   with the cryptocurrency.  You don't necessarily need to have

23   a——or bring a wallet.

24   Q.  You testified about a number of questions you asked the

25   Himalaya Exchange and the answers they gave you.

O6E1GUO2                          Roberts - Redirect

1   A.   Yes.

2   Q.   What, if anything, did the Himalaya Exchange tell you about

3   the H Coin lockup?

4            MR. SCHIRICK:   Objection.   Beyond the scope.

5            THE COURT:   You can answer.

6   A.   I recall putting a question to Himalaya Exchange about a——a

7   potential lockup of tokens, and I recall receiving a response

8   along the lines of no such lockup existed.

9   Q.   What, if anything, did the Himalaya Exchange tell you about

10  Freedom Media Ventures?

11           MR. SCHIRICK:   Objection.   Scope.

12           THE COURT:   Sustained.

13  Q.   You were asked a number of questions on cross, Mr. Roberts,

14  about the Himalaya Dollar reserves.   Do you remember that?

15  A.   Yes, I do.

16  Q.   And you were asked questions about whether it's possible

17  for the actual number of stablecoins to be lower than the

18  number that is shown as minted on the blockchain.   Do you

19  remember that?

20           MR. SCHIRICK:   Objection.

21           THE COURT:   Sustained.

22  Q.   Mr. Roberts, you were asked questions on cross about

23  whether it's possible for the number of stablecoins in

24  circulation to be lower than the number reported as minted on

25  the blockchain.   Do you remember that?

O6E1GUO2                          Roberts - Redirect

1    A.  Yes.

2    Q.  And you testified that you asked the Himalaya Exchange

3    questions about Himalaya Dollar; is that right?

4    A.  Yes.

5    Q.  And when, if ever, did the Himalaya Exchange tell you that

6    the number of Himalaya dollars was lower than what you had seen

7    on the blockchain?

8              MR. SCHIRICK:  Objection.  Mischaracterizes.

9              THE COURT:  You may answer.

10   A.  Sorry.  Can you repeat that, please.

11   Q.  Was there ever a time that the Himalaya Exchange told you

12   that the number of Himalaya dollars actually in circulation was

13   lower than what you observed on the public blockchain?

14             MR. SCHIRICK:  Same objection.

15             THE COURT:  You may answer.

16   A.  I——I don't recall a response by Himalaya Exchange personnel

17   pertaining to that.

18             MR. HORTON:  Ms. Loftus, can you pull up what's in

19   evidence as BR208A.

20             Can you go to the second page, please.

21   Q.  The line at the top here says, "U.S. dollars held in

22   Himalaya-owned bank accounts," and there's a figure of

23   $400 million.  What month in 2023 did you get this from the

24   Himalaya Exchange?

25   A.  It was around January 2023.

O6E1GUO2                          Roberts - Redirect

1   Q.  And what, if anything, did the exchange tell you about

2   whether these funds were still in their bank accounts when they

3   gave you this document?

4   A.  I don't recall a specific response by them about if

5   they──if they were still in there, but I──I felt that it was

6   implied based on the questions we had asked and the

7   documentation we had received.

8          MR. SCHIRICK:  Objection to that answer.

9          THE COURT:  Overruled.  You may continue.

10  Q.  And what do you mean that you felt it was implied based on

11  the information you got from the exchange?

12  A.  I recall asking questions about how is the Himalaya Dollar

13  backed by U.S. dollars, and they gave us back this──this

14  documentation, so if──if it was no longer backed by U.S.

15  dollars, I would have thought they wouldn't have bothered to

16  submit this type of documentation to us.

17  Q.  Mr. Roberts, you were asked various questions about the

18  nature of stablecoin reserves on cross.  Do you remember that?

19  A.  I do.

20  Q.  Can stablecoins──are stablecoins meant to be commingled

21  with an exchange's operating funds?

22         MR. SCHIRICK:  Objection.

23         THE COURT:  You may answer.

24  A.  For cryptocurrencies generally, I would expect customer

25  funds or crypto customer and cryptocurrencies to be separate

1    from the cryptocurrency exchange's own assets.

2    Q.  And you were also asked questions on cross about the fees

3    that the exchange paid to Bitgo.  Do you remember that?

4    A.  Yes, I do.

5    Q.  And how much per month did the Himalaya Exchange pay

6    overall to Bitgo?

7    A.  Per month, it was in the ballpark of 10 to $15,000 a month.

8    Q.  And how much of that 10 to $15,000 a month was for cold

9    wallets?

10   A.  It was somewhere in the realm of $10,000.

11   Q.  And did the Himalaya Exchange use those cold wallets?

12   A.  I do not recall the Himalaya Exchange ever funding those

13   cold wallets.

14            MR. HORTON:  Could I have one moment, your Honor.

15            THE COURT:  Yes.

16   Q.  At the bottom of the document we're looking at, there's a

17   name, Jesse Brown, CEO, and a signature.  When, if ever, did

18   you speak to Jesse Brown when you were reviewing the Himalaya

19   Exchange?

20   A.  I do not recall ever speaking to a person called Jesse

21   Brown in connection with the Himalaya Exchange.

22   Q.  And did Mr. Brown join any of the calls that you had with

23   the Himalaya Exchange?

24   A.  I do not recall an individual named Jesse Brown on either

25   of the calls I had with the Himalaya Exchange.

O6E1GUO2                           Roberts - Redirect

1    Q.  And what information, if any, did you get in your review

2    from Jesse Brown?

3              MR. SCHIRICK:  Objection.

4              THE COURT:  You may answer.

5    A.  I don't recall receiving any documentation from a person

6    called Jesse Brown.

7              MR. HORTON:  You can take this document down,

8    Ms. Loftus.

9    Q.  Mr. Roberts, you were asked to look at the white paper of

10   the Himalaya Exchange.  Do you know if Minran Wu got the

11   Himalaya Exchange white paper?

12   A.  Sorry.  Can you repeat that?

13   Q.  Do you know if Minran Wu got the Himalaya Exchange white

14   paper?

15             MR. SCHIRICK:  Objection, your Honor.

16             THE COURT:  Sustained.

17   Q.  Do you know what the Himalaya Farm Alliance is,

18   Mr. Roberts?

19   A.  I recall coming across that term in our account review.  I

20   don't have specific recollection of exactly what it is.

21   Q.  You were also asked questions on cross about the grand jury

22   subpoena that you received?

23   A.  Yes.

24   Q.  Did the grand jury subpoena order you to conduct a review?

25   A.  It did not.

1    Q.  Did the grand jury subpoena order you to close your

2    relationship with the Himalaya Exchange?

3    A.  It did not.

4    Q.  And did the government ever direct you to close the

5    relationship with the Himalaya Exchange?

6    A.  No.

7           MR. HORTON:  If I could have just one more moment,

8    your Honor.

9    Q.  Mr. Roberts, in the course of your several-months review,

10   did you understand what steps, if any, the Himalaya Farm

11   Alliance took to distribute the Himalaya Exchange's white

12   papers?

13   A.  I——I do not recall an event or receiving information about

14   that.

15          MR. HORTON:  No further questions.

16          THE COURT:  Recross?

17          MR. SCHIRICK:  Briefly, your Honor.

18          If we could just please bring up Government Exhibit

19   BR212.

20          And if you can just scroll down, please.  Yeah, just

21   keep going.  I'll let you know when to stop.  Thank you.

22          Okay.  Great.  Right there.  Thank you.

23   RECROSS EXAMINATION

24   BY MR. SCHIRICK:

25   Q.  Okay.  Mr. Roberts, do you remember being asked questions

1   about this document, which is in evidence, earlier this

2   afternoon by Mr. Horton?

3   A.  Yes.

4   Q.  Okay.  And he asked you, just to back up——withdrawn.

5           To refresh everyone, this email is an exchange that

6   someone at Bitgo had with someone at the exchange, right?

7   A.  Yes, this is an email between a Bitgo employee and

8   personnel from Himalaya Exchange.

9   Q.  Okay.  And this is in March of 2023, right?

10  A.  Yes.

11  Q.  And is it your understanding that this email exchange takes

12  place as part of Himalaya's request to add new tokens to

13  the——to Bitgo's wallet capabilities?

14          MR. HORTON:  Objection, your Honor.  It's beyond the

15  scope of the redirect.

16          MR. SCHIRICK:  Your Honor, I'm——

17          THE COURT:  I'll allow the question.

18          MR. SCHIRICK:  Thank you.

19  A.  I believe that this string related to several things, one

20  of which was a request by Himalaya to add an additional

21  cryptocurrency.

22  Q.  Okay.  Now I just want to focus your attention on No. 2

23  here quickly.  And you were asked some questions about

24  paragraph 2 by Mr. Horton, right?

25  A.  Yes.

Roberts - Recross

1   Q.   Okay.  And the question that Bitgo posed to the exchange

2   was why is that only——"Why is it that only collateralized HDO

3   Credits are backed and audited?  Why does HDO need to exist if

4   it cannot be withdrawn off-platform?"  And the answer——which

5   you did not review with Mr. Horton, am I correct?

6        MR. HORTON:  Objection.  Mischaracterizes.

7   Q.   The answer is——

8        THE COURT:  Sustained.

9   Q.   ——"We are launching crypto capabilities soon for our coins.

10  This is partly why we are asking for your support on the HEU,

11  as we plan to launch HDO, HCN and HEU crypto deposits and

12  withdrawals soon."  Do you see that?

13  A.   I do.

14  Q.   Okay.  Is it your understanding that this is a member of

15  the exchange or representative of the exchange telling Bitgo

16  that they plan to launch crypto deposits and withdrawals?

17  A.   Yes, that's what it appears to be saying.

18  Q.   Those would be on-chain crypto deposits and withdrawals,

19  right?

20  A.   It doesn't actually specify on-chain, but I think I could

21  reasonably say that may be what they're referring to.

22  Q.   Right.  There's no other way to deposit cryptocurrency with

23  an exchange off-chain, is there?

24  A.   Well, you could do it off-chain.

25  Q.   But it wouldn't make any sense to do it that way, right?

O6E1GUO2                          Roberts - Recross

1    A.  Well, that—that would just be taking place on a private

2    ledger.

3    Q.  Right.  So it's fair to say, just to make sure we're on the

4    same page, that this reflects a statement from the exchange

5    that they plan to have the ability to do crypto deposits and

6    withdrawals from the Himalaya Exchange, right?

7              MR. HORTON:  Objection.  Asked and answered.

8              THE COURT:  Sustained.

9              MR. SCHIRICK:  Okay.  If we could go up to 1 and just

10   blow that up, please.

11   Q.  You were asked some questions on redirect by Mr. Horton

12   about whether Himalaya ever used the cold wallet solution that

13   Bitgo offered, right?

14   A.  Yes, I was.

15   Q.  And I think you said that they didn't, right?

16   A.  I said that they had—I do not recall that they ever funded

17   their account.

18   Q.  Okay.  Fair enough.  You don't recall that they funded it.

19   Let's just take a look at 1 here.

20             The question that your folks from Bitgo posed to the

21   exchange was that "Himalaya claims to keep 95 percent of their

22   funds in cold storage.  Why are you keeping the entirety of

23   HDO, HCN in hot wallets at Bitgo right now?  Is there an

24   alternative custody solution you are currently using?  Or are

25   you simply waiting for the cold wallet setup to be finalized

O6E1GUO2                          Roberts - Recross

1    with us?"  And the answer is, "It is the latter."  Do you see

2    that?

3    A.  Yes.

4    Q.  He says, "We are waiting for finalize our cold wallet

5    setup, and we will soon complete the creation of cold wallets."

6    Do you see that?

7    A.  Yes.

8    Q.  So your understanding is that this is a representative of

9    the exchange telling Bitgo that in fact they plan to start

10   using cold wallets soon?

11   A.  Yes.

12   Q.  Okay.  Now you were also asked some questions by Mr. Horton

13   about the comparison between Himalaya Exchange and Coinbase.

14   Do you recall those?

15   A.  Sorry.  Can you repeat that, please.

16   Q.  Yeah, I'm sorry.  So I should slow down.

17          You were asked some questions by Mr. Horton a moment

18   ago about a comparison between Coinbase and the Himalaya

19   Exchange, right?

20   A.  Yes.

21   Q.  Okay.  Now there are any number of different cryptocurrency

22   exchanges, right?

23   A.  Yes, I——I am of the impression there are——there are

24   numerous.

25   Q.  Sure.  Based on your experience at Bitgo and in the

O6E1GUO2                              Roberts - Redirect

1    industry, what would you say, there are dozens, hundreds?

2    A.   Hundreds, yeah, or more.

3    Q.   Do they all operate the same way?

4    A.   They could have internal mechanics that are specific to

5    themselves.

6    Q.   Sure.

7            MR. SCHIRICK:  No further questions.

8            MR. HORTON:  Just briefly, your Honor?

9            THE COURT:  All right.  Re-redirect.

10   REDIRECT EXAMINATION

11   BY MR. HORTON:

12   Q.   Mr. Roberts, you testified that the Himalaya Exchange was a

13   Bitgo customer for nearly two years; is that right?

14   A.   Approximately that much time, yes.

15   Q.   And Himalaya Exchange paid for cold wallet storage every

16   month they were a Bitgo customer; is that right?

17   A.   I don't recall if they——they paid every single month, but

18   I——that was——I believe that's what the agreement they signed

19   was stipulated.

20   Q.   And when, if ever, did they fund their cold wallets?

21           MR. SCHIRICK:  Asked and answered.

22           THE COURT:  Overruled.  You may answer.

23   A.   I do not recall that Himalaya Exchange ever funded their

24   cold wallet with Bitgo.

25   Q.   And when the exchange said in March 2023, in the email that

O6E1GUO2                          Collins - Direct

1    you were just shown on cross, that, "We are launching crypto

2    capabilities soon for our coins," what was your understanding

3    about the exchange's crypto capabilities at the time of that

4    statement in March 2023?

5    A.  I recall thinking that they had not really built out an

6    infrastructure for their crypto exchange to support

7    cryptocurrency transactions.

8    Q.  What were the factors that led you to recommend termination

9    with the Himalaya Exchange that year?

10            MR. SCHIRICK:  Objection.  Asked and answered several

11   times.

12            THE COURT:  Sustained.

13            MR. HORTON:  No further questions.

14            THE COURT:  Any re-recross?

15            MR. SCHIRICK:  No, your Honor.

16            THE COURT:  All righty.  So you may step out.

17            (Witness excused)

18            THE COURT:  And the government may call its next

19   witness.

20            MR. FINKEL:  The government calls James Collins.

21            THE LAW CLERK:  Please raise your right hand.

22            (Witness sworn)

23            THE COURT:  Please state your name and spell it, and

24   draw the microphone close to you.

25            THE WITNESS:  James Robert Collins, Jr.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6E1GUO2                        Collins - Direct

1             THE COURT:  Speak up.

2             THE WITNESS:  James Robert Collins, Jr.  J-A-M-E-S,

3    R-O-B-E-R-T, C-O-L-L-I-N-S, and I use the apostrophe J-R.

4             THE COURT:  So if you'll just speak into the mic, and

5    hold it very close.

6             You may inquire.

7             MR. FINKEL:  Thank you, your Honor.

8     JAMES ROBERT COLLINS, JR.,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. FINKEL:

13   Q.  Mr. Collins, feel free to move the mic to suit you so

14   you're comfortable, and if you could direct the mic directly

15   toward your mouth so everybody can hear you.

16   A.  How's this?

17   Q.  That's better.  Thank you.

18             Mr. Collins, are you known by any nicknames?

19   A.  I——my parents called me Beau when I was born, and I've gone

20   by that nickname since then.

21   Q.  Okay.  And could you just point the mic directly at your

22   mouth.  Just turn it a little bit.  Yeah, thank you.

23             Mr. Collins, where do you work?

24   A.  Mercantile Global Holdings.

25   Q.  What is Mercantile Global Holdings?

1    A.  It is a holding company that wholly owns Mercantile Bank

2    International.

3    Q.  What is Mercantile Bank International?

4    A.  Mercantile Bank International is an international financial

5    entity which is deemed a bank by FinCEN and operates under a

6    license issued in Puerto Rico.

7    Q.  What is your position at Mercantile Bank?

8    A.  I'm the chairman and CEO.

9    Q.  And CEO means what?

10   A.  The most senior executive officer.

11   Q.  And how many——how many years have you been with Mercantile

12   Bank?

13   A.  Approximately five.

14   Q.  What's the current status of Mercantile Bank?

15   A.  Mercantile Bank is unfortunately winding down its

16   operations.

17   Q.  And when did that begin?

18   A.  Yesterday.

19   Q.  Prior to that, Mr. Collins, approximately how many

20   employees reported to you as the CEO?

21   A.  All together, the total number of employees in the company

22   were about 25.

23   Q.  And Mr. Collins, as part of your role as CEO, did you learn

24   information about the revenues of Mercantile Bank?

25   A.  Yes.

O6E1GUO2                          Collins - Direct

1   Q.  Did you have influence on how to market Mercantile Bank in

2   the marketplace?

3   A.  Yes.

4   Q.  And did you have communications with the bank's customers

5   as the CEO?

6   A.  Yes.

7   Q.  Who had the final decision-making authority for Mercantile

8   Bank?

9   A.  I did.

10  Q.  That's because you're the CEO.

11  A.  That is because I am the senior executive officer.

12  Q.  What's an IFE?

13  A.  An IFE is a license granted by the sovereign of Puerto

14  Rico.  It stands for international financial entity, and it is

15  a unique bank charter.

16  Q.  And how is that different from a bank that is not an IFE

17  but located in the Continental U.S.?

18  A.  Generally speaking, you——when you apply for an IFE charter,

19  you designate which capabilities you want to use, and only

20  those capabilities are approved.  In a normal bank charter, you

21  have the ability to do all the things that a bank could do

22  under that charter whether you want to or not.

23  Q.  Mr. Collins, during your time as CEO of Mercantile Bank,

24  did the bank focus on a particular client base?

25  A.  Yes.  When we first began operations, we——we began with the

1    vision that we would be a settlement bank to the digital asset

2    industry.  We were the first bank in the United States licensed

3    to hold and transmit digital assets, and we had a fairly narrow

4    focus.

5    Q.  Did there come a time, if ever, where an entity known as

6    G/CLUBS became a client of Mercantile Bank?

7    A.  Yes.

8    Q.  What about an entity known as G Fashion, did that become a

9    client of Mercantile Bank at one time?

10    A.  Yes.

11    Q.  And what about the Himalaya Exchange, was the Himalaya

12    Exchange, that entity, ever a client of Mercantile Bank?

13    A.  Yes.

14    Q.  Are any of those entities clients of Mercantile Bank today?

15    A.  No.

16    Q.  Okay.  Mr. Collins, I want to first talk about G/CLUBS.

17    When did you first learn——approximately when did you first

18    learn about G/CLUBS?

19    A.  It would have been the spring of '21.

20    Q.  And how did you become aware of G/CLUBS?

21    A.  We were processing transactions for another IFE, and

22    G/CLUBS was a client of that IFE, and there was a time where

23    these trans——they processed or submitted a large volume of

24    transactions through the other IFE for us to process.

25    Q.  What was that time period, approximately?

O6E1GUO2                        Collins - Direct

1    A.  Also the spring of '21.

2    Q.  And what was the name of that other IFE?

3    A.  Medici Bank.

4    Q.  And can you explain to the jury, please, Mr. Collins, why

5    Mercantile Bank was helping process transactions for Medici.

6    A.  It's not uncommon for banks to process transactions for

7    each other.  We had a good technology stack.  We owned our own

8    technology stack.  We were in a position to do so for Medici.

9    That's typically referred to as a corresponding bank

10   relationship.

11   Q.  And so what is that term, a corresponding bank?

12   A.  Corresponding bank means that one bank will bank the other

13   bank and vice versa.

14   Q.  Now what issues, if any, was Medici having with its

15   relationship with G Club at that time in the spring of 2021?

16   A.  I'm not sure I understand the question in terms of what

17   issues they have.

18   Q.  What were the nature of the transactions that Mercantile

19   was processing for Medici in around that time, spring of 2021?

20   A.  So there was a high volume of transactions that came

21   through all at once, which was unexpected.  They were mostly

22   domestic wires.  And they——to give you an example, their

23   typical volume in a day might have been four or five

24   transactions, and these turned into 200 or so transactions a

25   day, which is a lot for us to process, without advance notice.

O6E1GUO2                          Collins - Direct

1    Q.  And what was the approximate dollar volume at that time?

2    A.  I don't remember daily dollar volumes, but the total

3    aggregate dollar volumes from that first period of time was

4    about $30 million.

5    Q.  Subsequent to those transaction volume issues, did you meet

6    with anyone from G/CLUBS?

7    A.  Yes.

8    Q.  Who did you meet with?

9    A.  We met with Ana Izquierdo and Limarie Reyes.

10             MR. FINKEL:  Could you please display for the witness

11   what's been marked for identification as Government

12   Exhibit 124.

13   Q.  While that's coming up, Mr. Collins——well, withdrawn.

14             Do you see the image on your screen, sir?

15   A.  No.

16   Q.  Who is depicted in Government Exhibit 124?

17   A.  That's Limarie Reyes.

18             MR. FINKEL:  The government offers Government

19   Exhibit 124.

20             MR. KAMARAJU:  No objection, your Honor.

21             THE COURT:  It is admitted.

22             (Government's Exhibit 124 received in evidence)

23   Q.  Where did this meeting with Ms. Reyes and Ms. Izquierdo

24   take place?

25   A.  My home in San Juan, Puerto Rico.

O6E1GUO2                          Collins - Direct

1    Q.  And what was your understanding of Ms. Reyes's title with

2    G/CLUBS?

3    A.  She was—presented herself as president.

4    Q.  And what was Ms. Izquierdo's role at G/CLUBS, based on your

5    understanding?

6    A.  She presented herself as the general counsel.

7    Q.  And who did most of the talking for G/CLUBS during that

8    meeting with you in your home?

9    A.  Ana Izquierdo.

10   Q.  How did Ms. Izquierdo describe G/CLUBS to you?

11   A.  She described it as a club of like-minded individuals, kind

12   of an affinity club that could have access to exclusive

13   merchandise; generally in that nature.

14   Q.  Did Ms. Izquierdo or Ms. Reyes, in that meeting with you in

15   your home, describe to you anything about trying to take down

16   the Chinese Communist Party?

17   A.  We didn't talk about the Chinese Communist Party.

18   Q.  Did Ms. Izquierdo describe what G/CLUBS' target market was?

19   A.  We did discuss—we discussed that there was a Chinese

20   diaspora of like-minded people that were interested in these

21   types of offerings.

22   Q.  Did Ms. Izquierdo or Ms. Reyes say whether G/CLUBS offered

23   its members stock?

24   A.  I don't recall us speaking about that.

25            MR. FINKEL:  We can take that down, Ms. Loftus.

O6E1GUO2                    Collins - Direct

1    Q.  Have you ever spoken with any G/CLUBS members?

2    A.  I don't believe I have.

3    Q.  After that meeting with Ms. Izquierdo and Ms. Reyes, did

4    Mercantile take G/CLUBS on as a client?

5    A.  Yes.

6    Q.  And before G/CLUBS was taken on as a client, what, if any,

7    review did G/CLUBS go through by Mercantile Bank?

8    A.  Mercantile Bank has an extensive Bank Secrecy Act

9    compliance process that is led by our compliance department,

10   and we went through the normal process of that.

11   Q.  And could you just describe, at a high level for the

12   members of the jury, what that process entails.

13   A.  As a rule of thumb, you want to identify the controlling

14   parties and the parties that are benefiting from the activity

15   of the bank above a certain percentage level.  Those are

16   referred to as UBOs, is the acronym we use—ultimate beneficial

17   owner.  You want to identify source of funds; you want to

18   identify the use of funds; and have some general understanding

19   of their business purpose and expectations.

20   Q.  I'm just going to ask you, Mr. Collins—you can move the

21   top part of the microphone, just the top part, it's like an

22   accordion, and point it at your mouth so that it can pick up

23   the sound.  Thank you.

24   A.  Is that better?

25   Q.  Yes.

1    A.  Okay.  Sorry.

2    Q.  Who was represented by G/CLUBS as their ultimate beneficial

3    owner?

4    A.  I don't actually recall.

5    Q.  Did G/CLUBS pass the due diligence process of Mercantile

6    Bank?

7    A.  Yes.

8    Q.  During the due diligence process did Mercantile Bank have

9    any concerns about G/CLUBS?

10   A.  Yes.

11   Q.  And what was that concern?

12   A.  There was clearly a relationship with a gentlemen named

13   Miles Guo.  We had concerns about Miles Guo, given his risk

14   profile and his history with the Chinese government.

15   Q.  Have you ever met Miles Guo?

16   A.  I don't believe so.

17   Q.  Did Mercantile seek representation from G/CLUBS about its

18   relationship with Miles Guo?

19   A.  I'm sorry.  Can you say the question again.

20   Q.  Sure.  Did Mercantile request information from G/CLUBS

21   about whether and to what extent G/CLUBS had a relationship

22   with Miles Guo?

23   A.  Yes.

24   Q.  And what was G/CLUBS' response, at a high level, to those

25   inquiries?

1   A.  G/CLUBS ensured us that Miles Guo would not qualify as a

2   UBO, that none of the money in G/CLUBS was his own, that he

3   only had a relationship that would be described as a influencer

4   or marketing relationship, that they paid him for.

5   Q.  And who made those representations to the Mercantile Bank;

6   do you know?

7   A.  Well, corporately, G/CLUBS did; but they were also made

8   verbally by Ana and Limarie.

9   Q.  And if Mercantile Bank had known at the time that Miles Guo

10  had operating control over G/CLUBS funds, would Mercantile have

11  opened an account for G/CLUBS?

12  A.  No.

13  Q.  After G/CLUBS became a client of Mercantile, at a high

14  level, what was their banking activity like?

15  A.  At a high level, their banking activity was what I would

16  call transactional, but we didn't——they had started planning

17  for another membership drive, but I don't believe they ever

18  conducted that, and so we were processing a handful of

19  transactions a day.

20  Q.  What do you mean by membership drive?

21  A.  The initial flurry of transactions that we processed while

22  they were at Medici Bank were affiliated or associated with a

23  membership drive where they were selling memberships in

24  G/CLUBS.

25  Q.  And who told you that it was associated with a membership

1    drive?

2    A.  I can't recall precisely who told that, but it came up in

3    our compliance process.

4           MR. FINKEL:  If we could please display for the

5    witness what's been marked for identification as Government

6    Exhibit 106.

7    Q.  As that's coming up, Mr. Collins, as your relationship

8    between Mercantile and G/CLUBS unfolded, who did you primarily

9    interact with at G/CLUBS?

10   A.  A gentleman I'll call Alex H because I can't pronounce his

11   last name.  It's difficult.

12   Q.  Okay.  Did you interact with Ana Izquierdo?

13   A.  A little bit.

14   Q.  What about Limarie Reyes?

15   A.  Not as much.

16   Q.  Who is depicted in Government Exhibit 106?

17   A.  That's Alex H.

18          MR. FINKEL:  Government offers 106.

19          MR. KAMARAJU:  No objection, your Honor.

20          THE COURT:  It is admitted.

21          (Government's Exhibit 106 received in evidence)

22   Q.  What does the H stand for?

23   A.  His last name.

24   Q.  Can you pronounce it, to the best of your ability?

25   A.  I really can't.  He's a——I mean, even when I was looking at

O6E1GUO2                        Collins - Direct

1    it to read it, it was difficult to phonetically pronounce.

2    Q.  Okay.  What was your understanding of Alex H's role at

3    G/CLUBS?

4    A.  Alex was I believe operating in what you would describe as

5    the capacity of a CFO.  I don't——he——he never represented his

6    title.

7    Q.  And CFO means what?

8    A.  Chief financial officer.

9    Q.  Do you know what entity paid Alex H's salary?

10   A.  I can't say that I had knowledge of that.

11           MR. FINKEL:  You can take that down, Ms. Loftus.

12   Q.  What is Yieldesta?

13   A.  Yieldesta was an investment vehicle that we launched that

14   was based on algorithmic trading.

15   Q.  And by "we," who's the "we" in that sentence?

16   A.  Mercantile Bank International.

17   Q.  What sort of investing did Yieldesta do?

18   A.  It was predominantly futures trading.

19   Q.  Did there come a time, if ever, when G/CLUBS invested in

20   Yieldesta?

21   A.  Yes.

22   Q.  How much, approximately, did G/CLUBS invest in Yieldesta?

23   A.  $3 million.

24   Q.  You were speaking before about interacting with Alex H, Ana

25   Izquierdo.  Did there come a time, if ever, that you

O6E1GUO2                          Collins - Direct

1    communicated regarding G/CLUBS with Yvette Wang?

2    A.   I don't have a recollection of it, but there were a number

3    of calls that she may have been on.

4    Q.   Did Alex H——well, withdrawn.

5              What about an individual named Haoran He?

6    A.   Also someone that may have been on a call, but I don't have

7    a memory of specific conversations.

8    Q.   What were the types of communications you had with Alex H?

9    A.   Generally talking about——we talked about the potential for

10   a membership drive again, we talked about the strategy of

11   Yieldesta.  It was pretty limited to just that.

12   Q.   When you pitched Yieldesta to Alex H, what, if anything,

13   was his reaction?

14   A.   He was interested in investing.

15   Q.   Was it your understanding that Alex H had the ability to

16   make that decision?

17   A.   Not exclusively.

18   Q.   What did Alex H say, if anything, about who needed to make

19   that decision?

20   A.   He referenced a group that he called the management, needed

21   to come to a decision on it and that he would represent.

22   Q.   Who——did Alex H indicate who the management was?

23   A.   No.

24   Q.   You mentioned before that G Fashion became a customer or

25   client of Mercantile; is that right?

O6E1GUO2                        Collins - Direct

1    A.  I'm sorry.  Can you say that again.

2    Q.  Sure.  Did there come a time, if ever, when an entity known

3    as G Fashion became a client of Mercantile?

4    A.  Yes.

5    Q.  Did G Fashion also go through a due diligence review?

6    A.  Yes.

7    Q.  And did it pass the due diligence review?

8    A.  Yes.

9    Q.  Did Mercantile have any concerns about G Fashion's

10   association, if any, with an individual named Miles Guo?

11   A.  Yes.

12   Q.  And what representations, if any, did G Fashion make about

13   its association with Miles Guo?

14   A.  They also represented that Miles was not a UBO, that he had

15   no money in the business, he'd received no financial benefit of

16   the business except for being paid as a spokesperson.

17   Q.  And was Mercantile satisfied with those representations?

18   A.  Yes.

19   Q.  And had Mercantile known that Miles Guo in fact had

20   operational control over G Fashion, would Mercantile have

21   opened G Fashion as a client?

22   A.  No.

23   Q.  You mentioned before that you didn't recall the UBO of

24   G/CLUBS as it was reported to Mercantile Bank; is that correct?

25   A.  I'm sorry.  Can you ask the question again.

O6E1GUO2                          Collins - Direct

1    Q.  I think you mentioned a moment ago that you didn't recall

2    the name of the UBO, the ultimate beneficial owner, of G/CLUBS

3    as it was reported to Mercantile Bank; is that right?

4    A.  Correct.

5            MR. FINKEL:  All right.  Ms. Loftus, if we can show

6    the witness what's been marked for identification as

7    GX MER1209.

8            Go to the next page.

9            Sorry.  It's MER1210.  Apologies.

10           If we can go to the next page, please.

11           Next page.

12           Next page.

13           Keep going.  Yeah.  Up, please.  Can you zoom in on

14   the bottom.

15   BY MR. FINKEL:

16   Q.  Mr. Collins, could you please take a look at the image on

17   your screen, sir.

18           Could you please take a look at the image on your

19   screen and let me know if that refreshes your recollection as

20   to the name of the UBO that G/CLUBS reported to Mercantile

21   Bank.

22   A.  It really doesn't.  I don't recall having seen this

23   document.

24           MR. FINKEL:  Okay.  We can take that down.

25   Q.  When, if ever, did you first learn about a company called

O6E1GUO2                          Collins - Direct

1    the Himalaya Exchange?

2    A.  I learned about the Himalaya Exchange when Alex H suggested

3    that he would introduce me to another company he was familiar

4    with that was a crypto exchange, digital asset exchange, who

5    might be a large depositor who might be interested in opening

6    up a bank account with us.

7    Q.  When, approximately, was this?

8    A.  Late summer, early fall of 2021.

9    Q.  Did the Himalaya Exchange ultimately become a client of

10   Mercantile Bank?

11   A.  Yes.

12   Q.  And did it go through a due diligence review?

13   A.  Yes.

14   Q.  Did it pass the due diligence review?

15   A.  Yes.

16   Q.  And did Mercantile Bank have any concerns about Himalaya

17   Exchange's association, if any, with an individual known by the

18   name of Miles Guo?

19   A.  Yes.

20   Q.  And what did the Himalaya Exchange tell Mercantile Bank

21   about its association with Miles Guo?

22   A.  They told us that he was not a UBO, that none of the money

23   that they'd be depositing with us was owned or affiliated with

24   Miles Guo, and that they had no association with him whatsoever

25   other than as a paid spokesperson.

1    Q.  Mr. Collins, what was your—excuse me—what was your

2    understanding at the time of who was in charge of the Himalaya

3    Exchange?

4    A.  My understanding at the time is that William Je was in

5    charge of the Himalaya Exchange.

6              MR. FINKEL:  If we can please display what's in

7    evidence as Government Exhibit 103.

8    Q.  Who is this individual?

9    A.  That's William Je.

10    Q.  Do you know him by any other names?

11    A.  I believe his Chinese name is Kin Ming Je.

12              MR. FINKEL:  We can take that down.

13              Could you please display for the witness what's been

14    marked for identification as Government Exhibit 113.

15    Q.  Do you recognize this individual?

16    A.  That is a gentleman that lived in the BVI who had an

17    executive title with the Himalaya Exchange, and I don't recall

18    his name.

19              MR. FINKEL:  Okay.  Government offers GX 113.

20              MR. KAMARAJU:  Objection since he doesn't know the

21    man's name.

22              THE COURT:  Sustained.

23    Q.  What is your understanding of this individual's association

24    with the Himalaya Exchange?

25    A.  He was designated as I believe president of the Himalaya

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6E1GUO2                        Collins - Direct

1    Exchange in the BVI, which was I believe a requirement of BVI
2    to have a local senior executive that represented the company.
3    Q.  And what did William Je tell you, if anything, about this
4    individual, Government Exhibit 113?
5    A.  Just what I said.
6    Q.  Did you ever interact with this individual about Himalaya
7    Exchange management?
8    A.  He was on one or two of the conference calls we had
9    initially, but it became clear that he wasn't really making any
10   decisions about the business.
11            MR. FINKEL:  If we can please display what's in
12   evidence as Government Exhibit BR208A.
13            You can scroll down to the next page, please.
14            Can you zoom in on that signature line, please,
15   Ms. Loftus.
16   Q.  Can you read that name, please, Mr. Collins?
17   A.  Jesse Brown.
18   Q.  Does that refresh your recollection about——
19   A.  Yes.
20            MR. FINKEL:  Okay.  If we can zoom out of that,
21   please, Ms. Loftus.
22   Q.  Did Jesse Brown purport to sign this document that's on
23   your screen?
24   A.  I never discussed this document with Jesse Brown.
25   Q.  Have you seen this document before?

O6E1GUO2

```
1    A.  I don't believe so.

2    Q.  Who signed this document, based on your review of it right

3    now?

4    A.  It appears that Jesse Brown signed the document.

5              MR. FINKEL:  Okay.  Could we please display for the

6    witness only GX 113.

7              THE COURT:  It's now 3:00, so we'll stop here.

8              Members of the jury, we're going to return on Monday

9    with our new schedule, 9:30 to 11:30, with a half-an-hour

10   break, and then 12 to 2:30, with another half-hour break,

11   returning at 3 and then going until 5.  On Wednesday there will

12   be no court.

13             Remember that you're not allowed to discuss the case

14   amongst yourselves or with anyone else.  Don't permit anyone to

15   discuss it in your presence, and don't read, watch, or listen

16   to anything from any source having to do with anything

17   concerning this matter.

18             Have a good weekend.

19             (Jury not present)

20             THE COURT:  You may step out.  Don't discuss your

21   testimony.

22             (Witness not present)

23             THE COURT:  You may be seated.

24             Is there anything before we break for the weekend?

25             MR. KAMARAJU:  Nothing from the defense, your Honor.
```

O6E1GUO2

1          MR. FINKEL:  Nor the government.  Have a nice weekend,

2     your Honor.

3          THE COURT:  Have a good weekend.

4          MR. KAMARAJU:  Thank you, your Honor.

5          (Adjourned to June 17, 2024, at 9:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   JAMIE WILSON

 4   Direct By Ms. Murray . . . . . . . . . . . .2586

 5   Cross By Mr. Barkan  . . . . . . . . . . . .2596

 6   Redirect By Ms. Murray . . . . . . . . . . .2619

 7   Recross By Mr. Barkan  . . . . . . . . . . .2622

 8   SAMUEL ROBERTS

 9   Direct By Mr. Horton . . . . . . . . . . . .2623

10   Cross By Mr. Schirick  . . . . . . . . . . .2685

11   Redirect By Mr. Horton . . . . . . . . . . .2737

12   Recross By Mr. Schirick  . . . . . . . . . .2746

13   Redirect By Mr. Horton . . . . . . . . . . .2751

14    JAMES ROBERT COLLINS

15   Direct By Mr. Finkel . . . . . . . . . . . .2753

16                    GOVERNMENT EXHIBITS

17   Exhibit No.                          Received

18    106   . . . . . . . . . . . . . . . . . .2763

19    124   . . . . . . . . . . . . . . . . . .2758

20    BR190   . . . . . . . . . . . . . . . . .2703

21    BR208A  . . . . . . . . . . . . . . . . .2664

22    BR212   . . . . . . . . . . . . . . . . .2678

23

24

25
```