O6H1GUO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                 v.                          23 Cr. 118 (AT)
4
    MILES GUO,
5
                     Defendant.             Trial
6   ------------------------------x
                                            New York, N.Y.
7                                           June 17, 2024
                                            9:30 a.m.
8
    Before:
9

10                       HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                            APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  RYAN B. FINKEL
         JULIANA N. MURRAY
16       Assistant United States Attorneys

17  SABRINA P. SHROFF
         Attorney for Defendant
18
    PRYOR CASHMAN LLP
19       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
20       MATTHEW BARKAN
         CLARE P. TILTON
21
    ALSO PRESENT:
22  Isabel Loftus, Paralegal Specialist, USAO
    Robert Stout, Special Agent, FBI
23  Ruben Montilla, Defense Paralegal
    Tuo Huang, Interpreter (Mandarin)
24  Shi Feng, Interpreter (Mandarin)
    Yu Mark Tang, Interpreter (Mandarin)
25

O6H1GUO1                          Collins - Direct

1                   (Trial resumed; jury not present)

2                   THE COURT:  Good morning.  Please make your

3       appearances.

4                   MR. FINKEL:  Good morning, your Honor, Ryan Finkel and

5       Juliana Murray for the government.  We're joined at counsel

6       table by Isabel Loftus and Special Agent Robert Stout.

7                   MR. KAMARAJU:  Good morning, your Honor, Sidhardha

8       Kamaraju, Sabrina Shroff, Matthew Barkan, and Clare Tilton on

9       behalf of Mr. Guo, who is seated at counsel's table with us.

10                  THE COURT:  Please have the jurors brought in.

11                  (Jury present)

12                  THE COURT:  Please be seated.

13                  Good morning, jurors, and welcome back.

14                  THE JURORS:  Good morning.

15                  THE COURT:  We will now continue with the direct

16      examination of Mr. Collins.

17                  You may inquire.

18                  MR. FINKEL:  Thank you, your Honor.

19       JAMES ROBERT COLLINS JR., resumed.

20      DIRECT EXAMINATION

21      BY MR. FINKEL:

22      Q.  Good morning, sir.

23      A.  Good morning.

24      Q.  So I remind you, you're still under oath, okay?

25      A.  Yes.

O6H1GUO1                          Collins - Direct

1              MR. FINKEL:  If we can please display for the witness

2         what's been marked for identification as Government

3         Exhibit 113.

4         Q.  Mr. Collins, who is depicted in Government Exhibit 113?

5         A.  I don't remember his name, but he was held out as the

6         president of the Himalaya Exchange.

7              MR. FINKEL:  If we can please display what's in

8         evidence as Government Exhibit BR208A.

9              Can you scroll down, please, Ms. Loftus.

10             Can you zoom in on the bottom.

11        Q.  Mr. Collins, please take a look at that and let me know if

12        it refreshes your recollection.

13        A.  It does.

14             MR. FINKEL:  And if we could please go back,

15        Ms. Loftus, to Government Exhibit 113.

16        Q.  Who is the individual depicted in Government Exhibit 113?

17        A.  Jesse Brown.

18             MR. FINKEL:  Government offers 113.

19             MR. KAMARAJU:  No objection.

20             THE COURT:  It is admitted.

21             (Government's Exhibit 113 received in evidence)

22             MR. FINKEL:  If you could publish that, please.

23        Q.  Mr. Collins, you said that this individual, Jesse Brown,

24        was held out as the president of the Himalaya Exchange.  Can

25        you explain to the jury what you mean by that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6H1GUO1                    Collins - Direct

1    A.  He represented that that was his title.  Other team members

2    in the Himalaya Exchange referenced him that way also.

3    Q.  Who?

4    A.  Jesse Brown.

5    Q.  What did William Je, if anything, say about Jesse Brown's

6    role at the Himalaya Exchange?

7    A.  Other than—other than handing, you know, discussing his

8    title, we didn't have a lot of discussion about Jesse.

9    Q.  Where was Jesse Brown located, to your knowledge?

10   A.  The British Virgin Islands.

11   Q.  Did you have an understanding about why Mr. Brown was

12   located in the British Virgin Islands?

13   A.  I believe the type of license they had in the BVI required

14   an officer, if not the main officer, to be located there.

15   Q.  Approximately how many interactions did you have personally

16   with Mr. Brown concerning the Himalaya Exchange?

17   A.  In a group or just one on one?

18   Q.  Either.

19   A.  All combined, probably three or four.

20   Q.  Who did you primarily interact with regarding the Himalaya

21   Exchange?

22   A.  William Je, Georgette Adonis-Roberts, and Priya Patel.

23              THE COURT:  Mr. Finkel, if you would get closer to the

24   microphone, please.

25              MR. FINKEL:  Yes, your Honor.

O6H1GUO1                        Collins - Direct

1    Q.  And Mr. Collins, what was your understanding of who ran the
2    Himalaya Exchange?
3    A.  It is clear to me that William Je was running the business.
4    Q.  And why was it clear to you that William Je was running the
5    Himalaya Exchange?
6    A.  People deferred to him ultimately on pretty much any
7    decision that was made around Himalaya Exchange.
8         MR. FINKEL:  If we can please display Government
9    Exhibit 103.
10   Q.  Mr. Collins, did there come a time, if ever, where you met
11   Mr. Je in person?
12   A.  Yes.
13   Q.  And where did you meet him?
14   A.  I met him in their offices just outside of London.
15   Q.  Whose offices just outside of London?
16   A.  Himalaya Exchange.
17   Q.  And when, approximately, was that?
18   A.  Approximately the fall of '21.
19   Q.  And can you describe, please, to the jury the nature of
20   your conversation with Mr. Je about the Himalaya Exchange in
21   his London offices.
22   A.  He was excited to tell us about their offering; they were
23   just in the midst of launching the Himalaya Coin, and the
24   Himalaya Dollar, which was both listed on the exchange.  He was
25   very much engaged in taking advantage of the market interest in

O6H1GUO1                          Collins - Direct

1    digital assets, and they held out this exchange as being the

2    next big thing.

3    Q.  What do you mean he was interested in taking advantage of

4    the market in digital assets, at that time?

5    A.  There was a lot of interest generically, publicly,

6    globally, in investing in digital assets.

7    Q.  And when you say "digital assets," based on your

8    understanding in the fall of 2021, can you give some examples.

9    A.  Well, the biggest digital asset and perhaps the most

10   notable is Bitcoin.  It's often referred——the market is often

11   referred to as crypto.  Ethereum is another coin.  There's I

12   think currently 20,000 different coins listed.

13   Q.  At the time that you had this meeting with Mr. Je in

14   London, had you heard of the Himalaya Coin?

15   A.  No.

16   Q.  Had you heard of the Himalaya Dollar?

17   A.  No.

18   Q.  And to your knowledge at that time was the Himalaya Coin or

19   Himalaya Dollar available on any other cryptocurrency exchange?

20   A.  Not that I'm aware of.

21   Q.  Did you have any conversations with Mr. Je at that time

22   about Miles Guo?

23   A.  I believe I mentioned that we had informed their staff that

24   we had concerns about Miles's profile, and I asked him to

25   confirm that Miles's money wasn't involved in the accounts that

O6H1GUO1                        Collins - Direct

1    we would be onboarding, and that Miles was not in any way a

2    control person of the enterprises.

3    Q.  And what did Mr. Je say in response to your request for

4    confirmation that Miles Guo was not in any way a control person

5    of the enterprise?

6    A.  He confirmed that Miles was not a UBO or that his money was

7    being used in the exchange.

8              THE COURT:  What does UBO mean?

9              THE WITNESS:  Ultimate beneficial owner.  It's sort of

10   a Bank Secrecy Act term of art.

11   Q.  Did Mr. Je explain anything about whether the Himalaya

12   Dollar was backed by gold?

13   A.  He did not mention that.

14   Q.  Did you meet with an individual named Priya Patel when you

15   were in London?

16   A.  Yes.

17   Q.  Who is Priya Patel?

18   A.  Priya Patel was held out as the most senior legal officer

19   of the company.

20   Q.  Which company?

21   A.  The ones I know about are Hamilton, the various funds run

22   by Hamilton, and the Himalaya Exchange.

23   Q.  What is your understanding of what Hamilton was?

24   A.  There were several different entities that utilized the

25   name Hamilton.  So for example, Hamilton special Opportunities

O6H1GUO1                        Collins - Direct

1    Fund, that collection of Hamilton entities generally was, from
2    my understanding, investment vehicles that were investing
3    William and his investors' money.
4    Q.  And what was your understanding of who ran the Hamilton
5    entities?
6    A.  William.
7    Q.  William, what's the last name?
8    A.  William Je.
9    Q.  Did you review—well, withdrawn.
10           MR. FINKEL:  Ms. Loftus, if we can play for the
11   witness and the jury what's in evidence—but outside of Trial
12   Director, please—GX C370-V.
13           Play just a few seconds of that, please.
14           (Video displayed)
15           MR. FINKEL:  Can you pause that, please.
16   BY MR. FINKEL:
17   Q.  Mr. Collins, around the time that Mercantile Bank was
18   considering onboarding the Himalaya Exchange as a client, did
19   you watch this video?
20   A.  I watched a few videos.  This seems familiar.
21           MR. FINKEL:  You could play it, please, Ms. Loftus.
22           (Video displayed)
23           MR. FINKEL:  You can stop there.
24   Q.  Mr. Collins, at the time you watched this video what was
25   your reaction to it, if any?

O6H1GUO1                    Collins - Direct

1   A.  I saw it as pure marketing.  I didn't really have a strong

2   reaction one way or the other.

3   Q.  In making a decision to onboard a client, does Mercantile

4   Bank consider marketing of a client?

5   A.  Sometimes.

6   Q.  Did you in this case?

7   A.  I believe we did holistically, in conjunction with my Bank

8   Secrecy Act team.

9   Q.  Mr. Collins, there is a phrase in this video that we just

10  watched that says "to the moon."  Did you see that and hear

11  that?

12  A.  Yes.

13  Q.  Are you familiar with that phrase, "to the moon"?

14  A.  I mean, it's from an old black-and-white TV series, but

15  yes.

16  Q.  What about in the context of cryptocurrency, are you

17  familiar with the phrase "to the moon"?

18  A.  Somewhat.

19  Q.  What does it mean?

20  A.  It means that the price will go infinitely high.

21  Q.  And is that a phrase that people in the cryptocurrency

22  community use, "to the moon"?

23  A.  I've heard it before.

24          MR. FINKEL:  We can take that down, Ms. Loftus.

25  Q.  Mr. Collins, did ultimately Mercantile Bank take on the

O6H1GUO1                         Collins - Direct

1    Himalaya Exchange as a client?

2    A.  Yes.

3    Q.  And approximately how many bank accounts did the Himalaya

4    Exchange open with your bank?

5    A.  I don't recall the specific number, but somewhere between

6    four and six.

7    Q.  And when you took on the Himalaya Exchange as a client, did

8    you believe the Himalaya Exchange was a legitimate business?

9    A.  Yes.

10   Q.  Did Mercantile Bank store gold for the Himalaya Exchange?

11   A.  No.

12   Q.  Did there come a time, if ever, when G/CLUBS transferred

13   money into a Himalaya Exchange bank account?

14   A.  I believe so.

15         MR. FINKEL:  If we can please display for the witness

16   what's been marked for identification as Government Exhibit

17   MER1203.

18   Q.  Do you see it on your monitor, Mr. Collins?

19   A.  Yes.

20   Q.  Please take a look at that and let me know what Government

21   Exhibit MER1203 is.

22   A.  Can you—can I read it from the bottom up.

23   Q.  Sure.

24   A.  There we go.  That's good.

25         Okay.

O6H1GUO1                          Collins - Direct

1    Q.  What is MER1203?

2    A.  This is me facilitating a movement from G Club to the

3    Himalaya Exchange.

4    Q.  And who was making that request, for the movement?

5    A.  Alex H.

6    Q.  And he works for what company, based on your understanding?

7    A.  G Club.

8           MR. FINKEL:  Government offers MER1203.

9           MR. KAMARAJU:  No objection.

10          THE COURT:  It is admitted.

11          (Government's Exhibit MER1203 received in evidence)

12          MR. FINKEL:  Could we publish that, please,

13   Ms. Loftus.  You can scroll to the bottom while that's coming

14   up.

15          THE COURT:  Sir, when you say a movement, what do you

16   mean?

17          THE WITNESS:  A wire transfer.

18          THE COURT:  If you would speak up, please.

19          THE WITNESS:  A wire transfer.

20   BY MR. FINKEL:

21   Q.  Mr. Collins, can you read the email at the, well, now the

22   top of your screen, December 1, 2021, from Alex H to Georgette

23   and you, beginning with, "I was told."

24   A.  Okay.

25   Q.  Can you read that, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6H1GUO1                        Collins - Direct

1    A.  You want me to read the email?

2    Q.  Yeah, from "I was told."

3    A.  Out loud?

4    Q.  Yes, please.

5    A.  Okay.  "I was told the account is open and ready to accept

6    funds.

7          "Can you please share the wire information for

8    Himalaya International Clearing Ltd account at Mercantile so I

9    may schedule transfer of 50mm USD."

10         MR. FINKEL:  If we can scroll up, please.

11   Q.  And what do you say in response to that email?

12   A.  "Would you like me to facilitate this.

13         "I don't want to share your account numbers/details

14   with him without your approval."

15         That was my comment to Georgette.

16         MR. FINKEL:  If we can scroll up again, please,

17   Ms. Loftus.

18   Q.  And after Georgette responds, "This will need to be

19   facilitated through the CFO," Mr. Collins, can you read what

20   you wrote back.

21   A.  "Sounds good.  John, can you work with Mahsud for this

22   authorization (communicating to directly G Club the wiring

23   instructions with Himalaya's account number) so that G Club can

24   move money from the G Club account to the Himalaya account that

25   is already open for their purchase of coins."

O6H1GUO1                          Collins - Direct

1              MR. FINKEL:  If we can please display for the witness
2    what's been marked for identification as Government Exhibit
3    MER1204.
4    Q.  Did there come a time, if ever, Mr. Collins——while that's
5    coming up——that Mr. Je asked for help with what he called VIP
6    clients?
7    A.  Yes.
8    Q.  Can you see that document on your screen, sir?
9    A.  It's just a header, yes.
10             MR. FINKEL:  Can you scroll down, please, Ms. Loftus.
11   Q.  Mr. Collins, what is this document, MER1204?
12   A.  It looks like a series of messages between me and William.
13             MR. FINKEL:  Government offers MER1204.
14             MR. KAMARAJU:  No objection.
15             THE COURT:  It is admitted.
16             (Government's Exhibit MER1204 received in evidence)
17             MR. FINKEL:  If we could publish that, please.
18   Q.  Mr. Collins, what's the month and year of these messages
19   between you and Mr. Je?
20   A.  March of 2022.
21   Q.  And can you read your third message at 5:45 p.m. on
22   March 17, 2022.
23   A.  "There is NO universe that I will be carrying 100 mill of
24   BTC on a thumb drive to Dubai."
25   Q.  What is BTC?

O6H1GUO1                           Collins - Direct

1    A.   That's the acronym for Bitcoin.

2    Q.   Why did you write "There is NO universe that I will be

3    carrying 100 mill of BTC Bitcoin on a thumb drive to Dubai"?

4    Why did you send that to William Je?

5    A.   In a discussion about—when we were having these messages,

6    William asked me the question, if I'd be open to that.

7    Q.   Open to what?

8    A.   Carrying a hundred million dollars of BTC on a thumb drive.

9    Q.   Did he provide any information, did William Je provide any

10   information why he wanted you to do that?

11   A.   No.

12   Q.   Why did you decline?

13   A.   There's many reasons.  Perhaps first and foremost is my

14   personal safety; second is, that would sidestep every single

15   BSI—BSA requirement; and I'm pretty sure—I don't remember

16   when laws were exactly passed, but it may have been a felony to

17   transmit or to carry more than $10,000 of value across the

18   border without disclosing it.

19   Q.   So you declined.

20   A.   Yes.

21        MR. FINKEL:  Okay.  We can scroll down, please,

22   Ms. Loftus.

23        Right there.

24   Q.   So on March 17, 2022, at 11:38 p.m., can you read what

25   William Je messaged you.

O6H1GUO1                          Collins - Direct

1    A.  I'm sorry.  At what time?

2    Q.  11:38 p.m.

3    A.  You want me to read it?

4    Q.  Yes, please.

5    A.  "Hi, could you help to check if the below account has been

6    opened?  If not, any outstanding issue?

7              "-UK Himalaya Ltd.

8              "-Director:  Jianfeng Dai."

9              His email, and then he says "Thanks."

10   Q.  Do you know who David Dai is?

11   A.  I don't recall that person.

12   Q.  What was your understanding of why William Je was asking

13   you about this individual, Mr. Dai?

14   A.  I don't recall that we really spoke about him.  I think he

15   is the signatory for UK Himalaya Ltd., and that would have──I'm

16   not sure we ever discussed the purpose of that operating

17   entity's account.

18             MR. FINKEL:  We can take that down.

19   Q.  Mr. Collins, did there come a time, if ever, when William

20   Je asked for your help in making a money transfer related to a

21   loan?

22   A.  Yes.

23   Q.  And when approximately was that?

24   A.  I remember it around Easter of '22.

25   Q.  And what did Mr. Je tell you about this loan?

O6H1GUO1                            Collins - Direct

1    A.   The loan was being made to an escrow account related to the

2    bankruptcy of Mr. Guo as security for a substantial piece of

3    collateral that they had moved from the United States to the

4    Mediterranean, being a large yacht, and the loan was to satisfy

5    the court's demand in time because they didn't have time to

6    steam the yacht back to America, and it was a short-term loan

7    to facilitate Mr. Guo's freedom.

8    Q.   What do you mean by that?

9    A.   I was told that if the loan wasn't facilitated right away,

10   that he would be imprisoned.

11   Q.   Mr. Guo?

12   A.   Yes.

13   Q.   And Mr. Je told you that?

14   A.   Yes.

15   Q.   And what was the collateral?  Can you explain how that

16   works, in your understanding of it, based on this conversation

17   with Mr. Je.

18   A.   So in the normal lending arrangement, the lender will take

19   collateral as security for the loan, so if the loan doesn't get

20   repaid, they can foreclose on that collateral and sell it to

21   pay the loan.

22   Q.   And so what was the issue with collateral being moved out

23   of the country?  Can you explain that.

24   A.   My understanding—I'm not an attorney, but—the bankruptcy

25   trustee was upset that some significant assets of the estate

1    had been moved outside of USA jurisdictional reach.

2    Q.  Whose estate?

3    A.  Mr. Guo's.

4    Q.  Bankruptcy attorney for what bankruptcy?

5    A.  Mr. Guo's.

6    Q.  What kind of asset was moved out of the jurisdiction, based

7    on your understanding from the conversation?

8    A.  The yacht.

9    Q.  What yacht?

10   A.  I don't remember the name of it.

11   Q.  And so how would this loan sort of solve Mr. Je and

12   Mr. Guo's problem?

13            MR. KAMARAJU:  Objection.

14            THE COURT:  Sustained.

15   Q.  How would this loan facilitate this issue, based on what

16   Mr. Je told you?

17            MR. KAMARAJU:  Same objection.

18            THE COURT:  Sustained.

19            Was there a request for a loan?

20            THE WITNESS:  The request was not a loan from me.  The

21   loan that was being made was by William Je and his——one of his

22   companies to a relative of Miles Guo, who I think was listed as

23   the owner at the bank, but the trustee had identified this

24   yacht as a substantial asset of the estate.

25   BY MR. FINKEL:

O6H1GUO1                         Collins - Direct

1    Q.  So what was Mercantile's role with respect to this
2    potential loan, if it wasn't a loan from you?
3    A.  We were just wiring money under the control of William Je
4    to the escrow account of an attorney involved in the case.
5    Q.  And the William Je account, do you know what business it
6    was associated with?
7    A.  I vaguely remember it was one of the Himalaya entities, but
8    I don't recall specifically.
9    Q.  And when you say Himalaya entities, entities of what?
10   A.  One of the Himalaya companies that had an account with us.
11   Q.  Meaning the Himalaya Exchange?
12   A.  Yes.
13   Q.  At the time did this seem like a reasonable business
14   transaction?
15   A.  It was unusual, but it seemed reasonable.
16   Q.  And you said that there was a woman involved in the
17   process?
18   A.  Yes, the——I don't recall——I didn't see the actual title
19   work to the yacht, but my understanding was the loan was made
20   to the bankruptcy at——well, I don't remember who the signatory
21   of the loan was, but it was somebody I'd never met before.  It
22   was held out as a relative of Miles Guo, whose name I think was
23   actually on the yacht title.
24   Q.  And did Mercantile Bank facilitate this wire payment from
25   the Himalaya entity to an escrow account for this loan?

O6H1GUO1                          Collins - Direct

1    A.  Yes.  Yes.

2    Q.  Okay.

3           MR. FINKEL:  Government offers, pursuant to the——may I

4    have a second.

5           (Counsel conferring)

6           MR. FINKEL:  Pursuant to a stipulation regarding bank

7    record documents, the government offers GX MER138.

8           MR. KAMARAJU:  No objection, your Honor.

9           THE COURT:  It is admitted.

10          (Government's Exhibit MER138 received in evidence)

11   BY MR. FINKEL:

12   Q.  By the way, Mr. Collins, what did William Je tell you, if

13   anything, about the nature of his relationship with Miles Guo?

14   A.  Do you have a specific point in time in mind or——

15   Q.  In general.

16   A.  He mentioned that Miles Guo was his best friend, that Miles

17   trusted him more than any individual in the world, and that

18   they were very close.

19   Q.  Can you see on your screen Government Exhibit MER138?  I

20   think it's published, but——

21   A.  Yeah.

22   Q.  What type of document is this?  You recognize the

23   formatting?

24   A.  Looks like a monthly statement from Mercantile Bank.

25   Q.  And what's the name of the entity whose monthly statement

O6H1GUO1                          Collins - Direct

1   this is?

2   A.  Himalaya International Financial Group Ltd.

3   Q.  And is that one of the Himalaya/William Je accounts?

4   A.  Yes.

5   Q.  And do you see where in the amount it says minus

6   37 million?

7   A.  Yes.

8   Q.  What is that?

9   A.  I believe that's the amount that we wired related to the

10  yacht and the loan in the escrow account.

11  Q.  And it also says Zeisler & Zeisler, PC IOLTA account.  Do

12  you see that?

13  A.  Yes.

14  Q.  What is your understanding of what that means, Zeisler &

15  Zeisler, PC IOLTA account?

16  A.  That's the escrow account I've been referencing.

17  Q.  And so the $37 million wire was the loan that you spoke

18  about prior?

19  A.  That was a loan William and Himalaya made to Miles Guo.

20  Q.  After the loan was processed, what reaction, if any, did

21  Mr. Je have?

22  A.  I just want to correct what I just said.  I don't know the

23  loan was made to Miles Guo.  It was related to Miles Guo's

24  bankruptcy estate, but technically I think the loan was made to

25  another person.

O6H1GUO1                       Collins - Direct

1    Q.   Okay.  What was Mr. Je's reaction after this wire was

2    processed, if any?

3    A.   His reaction after it was processed?  I think he was

4    grateful that we were able to process this so quickly.

5         MR. FINKEL:  You can take that down, Ms. Loftus.

6    Q.  Aside from the business that the Himalaya Exchange had with

7    Mercantile Bank, what other business discussions, if any, did

8    you have with William Je?

9    A.   Maybe you can narrow that question down for me.

10    Q.   Did you contemplate entering into a business transaction

11    with Mr. Je aside from opening accounts at Mercantile Bank?

12    A.   Yes.

13    Q.   What was the nature of that transaction?

14    A.   We discussed, early in the relationship, investing in the

15    exchange——I'm sorry——in our bank——technically our holding

16    company——which he did, initial investment.  And then that

17    conversation grew to much larger conversation about essentially

18    buying a controlling interest in the bank.

19    Q.   I'm sorry.  Who was that who was contemplating buying a

20    controlling interest in the bank?

21    A.   William Je, through one of his entities called I think

22    Hamilton Special Opportunities Fund.

23    Q.   And when you say the bank, you mean Mercantile?

24    A.   Yes.

25    Q.   How far advanced did those negotiations get about selling a

1  controlling interest in Mercantile Bank to William Je's

2  company?

3  A.  They resulted in an actual closing on September 16th,

4  according to what we had agreed to, the terms.

5  Q.  And what was the approximate price that Mr. Je was willing

6  to pay for a controlling interest in Mercantile?

7  A.  Ultimately he would be investing almost a hundred million

8  dollars.  The first tranche was 49½ million.

9  Q.  Is there a regulator who regulates Mercantile Bank?

10  A.  Yes.

11  Q.  And what's the name of that regulator?

12  A.  Our prudential regulator, if you will, is a firm who's most

13  easily referenced as their acronym, called OCIF, O-C-I-F.  It's

14  the agency, the banking agency of Puerto Rico.

15  Q.  In connection with the potential purchase of Mercantile

16  Bank by William Je, was Mr. Je required to make any

17  representations to OCIF?

18  A.  Yes.

19  Q.  About Miles Guo?

20  A.  About many things, but——

21  Q.  Were some of those representations that Mr. Je was required

22  to make to OCIF about Miles Guo?

23  A.  Yes.

24  Q.  And what did Mr. Je represent to OCIF about Miles Guo, if

25  anything?

O6H1GUO1                         Collins - Direct

1    A.   That Miles was not a UBO, that none of the money involved

2    in the fund that was actually making the investment was part of

3    Miles Guo's money or estate.

4    Q.   To your knowledge did he make those representations?

5    A.   Yes.

6    Q.   When was this transaction supposed to close, the sale of

7    Mercantile to Hamilton Special Opportunities?

8    A.   The original closing date was set for August 24th, and we

9    had to extend that to September 16th.

10             THE COURT:  Of what year?

11             THE WITNESS:  Of 2022.

12   Q.   Did the transaction close on September 16th of 2022?

13   A.   Yes.

14   Q.   Did Mercantile receive final payment on September 16, 2022?

15   A.   No.

16   Q.   How much was Mercantile expecting to receive on

17   September 16, 2022?

18   A.   $49½ million.

19   Q.   Why did Mercantile not obtain $49½ million on September 16,

20   2022?

21   A.   Why didn't we receive it?

22   Q.   Yeah.

23   A.   The money was seized in transit by the U.S. Marshals.

24   Q.   And how did you learn about that?

25   A.   Well——

O6H1GUO1                          Collins - Direct

1   Q.  At first.

2   A.  The wire was initiated on a Friday afternoon in the United

3   States, and we weren't surprised that it hadn't cleared that

4   day, just because it was late in the day.  So Monday, we were

5   looking for the wire.  We were in London at the time.  And the

6   wire wasn't showing up.  It didn't show up on Tuesday.  I think

7   by Wednesday, we realized that there was some sort of problem.

8   Q.  Did you speak with Mr. Je about the potential problem?

9   A.  Yes.

10  Q.  And what did he say?

11  A.  He said they hadn't had any communications from their

12  banks, that they didn't have any knowledge about why the wire

13  had not cleared, and I asked them to look into it, and I also

14  asked them if I could look into it.

15  Q.  Did you?

16  A.  I did.

17  Q.  What did you learn?

18  A.  I happened to know the CEO of Silvergate Bank, which is

19  where the wire initiated from, so I called him, and we had a

20  brief conversation, wondering where the wire was, and he didn't

21  know anything about it, so he said he would look into it.  And

22  the next day I got an email from him saying that he was not in

23  a position to discuss the account any further and that he——that

24  I should ask the account owners to contact them immediately.

25  Q.  Did you do that?

O6H1GUO1                        Collins - Direct

1    A.  I did.

2    Q.  What happened next?

3    A.  William and Priya reached out to them, I think they had a

4    phone call, and it was then that it was revealed that the wire

5    had been seized.

6    Q.  After the seizure, did Mr. Je make any requests concerning

7    the Himalaya Exchange?

8    A.  I don't──I mean, there were many conversations and several

9    requests, so maybe you could narrow it down for me.

10   Q.  Sure.

11           MR. FINKEL:  If we can display for the witness what's

12   been marked for identification as Government Exhibit MER1205.

13           If you can scroll down so Mr. Collins can take a look

14   at this, please.

15   Q.  What is MER1205, this document, Mr. Collins?

16   A.  This is a series of WhatsApp communications between me and

17   William Je.

18   Q.  What's the date?

19   A.  September 23, 2022.

20           MR. FINKEL:  Government offers MER1205.

21           MR. KAMARAJU:  No objection.

22           THE COURT:  It is admitted.

23           (Government's Exhibit MER1205 received in evidence)

24           MR. FINKEL:  Could we publish that, please.

25           And we can zoom in at the top, please, Ms. Loftus.

O6H1GUO1                          Collins - Direct

1              That's fine.

2    BY MR. FINKEL:

3    Q.  So the first message says, "I will speak to Mahsud at 11."

4    Is that correct?  That's from you?

5    A.  Yes.

6    Q.  Who is Mahsud?

7    A.  Ehsan Mahsud is the——was held out as the CFO of Himalaya

8    Exchange.

9    Q.  And why did you ask is he aware of what is happening?

10   A.  These are——for me, these are incredibly unusual

11   circumstances, and I didn't want to be in a position of saying

12   something out of——out of place with the wrong person at the

13   wrong time, partly because of commercial liability, and so I

14   just wanted to understand what Ehsan understood about what was

15   happening around them, because it was——it was a very confusing

16   time, there was——there was a lot of information flowing around

17   that was extreme, and I just wanted to be careful.

18              (Continued on the next page)

19

20

21

22

23

24

25

O6HBGUO2                     Collins, Jr. - Direct

1   BY MR. FINKEL:

2   Q.  I'm just going to ask you to move the mic somewhat down a

3   bit so everyone can hear you.

4          Mr. Collins, when you said aware of what is happening,

5   what does the "what" refer to?

6   A.  Several things.  That Silvergate funds were frozen or

7   seized.  We had learned that FV bank, another bank that we were

8   familiar with had also had a major seizure related to the

9   Himalaya universe, and we didn't know what else was out there.

10  Generically I would just say, my question was, is he aware of

11  what's happening related to the seizures, because even the most

12  senior executives were not necessarily aware in realtime.

13  Q.  And then a couple of messages below William Je at 9:03 a.m.

14  says, We are just doing normal redemption of a client.  Thanks.

15  Did I read that right?

16  A.  Yes.

17  Q.  What was your understanding of what that meant?

18  A.  A redemption typically means that they were substituting

19  HDO for cash or HCN for cash.

20  Q.  Why, based on your understanding, was Mr. Je talking about

21  a normal redemption of a client at this time?

22          MR. KAMARAJU:  Objection.

23          THE COURT:  You may state what your understanding of

24  the statement was.

25  A.  Well, my understanding is that he wanted to redeem, at this

O6HBGUO2                    Collins, Jr. - Direct

 1    point in time, that he wanted to redeem one of the coins on the

 2    Himalaya Exchange for U.S. dollars related to a normal client.

 3    Q.  At that time after the seizure first, did Mr. Je identify

 4    who that client was?

 5    A.  Not at first.

 6    Q.  How did he describe that client at first, Mr. Je?

 7    A.  He described him as -- well, he just said a normal

 8    redemption of a client, and I believe later he mentioned it was

 9    a VIP client.

10    Q.  And what was the amount of the redemption that Mr. Je

11    sought for this client shortly after the seizure from the banks

12    that you mentioned?

13    A.  Somewhere between 42 and 50 thousand -- $50 million.

14    Q.  Did Mr. Je provide documents to facilitate this redemption

15    to Mercantile bank?

16    A.  Yes.

17          THE COURT:  In a redemption, the money goes from where

18    to where?

19          THE WITNESS:  I would say there's a nomenclature

20    problem here in the sense that, what he's calling a redemption

21    here, we would think of as a trade, so he is selling his HCN

22    for U.S. dollars.  He's calling it a redemption because they

23    happen to control the platform, and so they can redeem it by

24    picking a value.  But later I believe they sent us what we

25    would call trade confirmations that actually show that it's

O6HBGUO2                        Collins, Jr. - Direct

1    more similar to a trade than a redemption.

2    Q.  To redeem, if a redemption or trade is going to be

3    processed, what sort of the real world event that Mercantile

4    would facilitate?

5    A.  Well, our role in what he's referring to as redemption is

6    simply the wiring of the money.  We're not involved in the

7    transaction.  We're not involved in the mechanics of the

8    redemption.  We just respond to the request.  We ask for

9    supporting documentation because that fulfills our bank's

10   Secrecy Act requirements.

11   Q.  If we can take that down, Ms. Loftus, and display for the

12   witness what's been marked as Government Exhibit MER-5 and

13   MER-6 for the witness.

14           Mr. Collins, who signed these documents?

15   A.  William Je.

16   Q.  What are these documents?

17   A.  These are what I would call a trade confirmation.

18   Q.  And does this pertain to the trade we were just discussing?

19   A.  Yes.

20           MR. FINKEL:  Government offers MER-5 and 6.

21           MR. KAMARAJU:  No objection.

22           THE COURT:  They are admitted.

23           (Government's Exhibits MER-5 and MER-6 received in

24   evidence)

25   BY MR. FINKEL:

O6HBGUO2                         Collins, Jr. - Direct

1    Q.  Can we publish please, Ms. Loftus.

2              Mr. Collins, what is your understanding about why

3    Mercantile was provided these two documents that you said were

4    trade confirmations?

5    A.  I presume this was part of our document collection related

6    to our compliance function.

7    Q.  And on the left side of the screen it says seller sales

8    1,308,000 and some more HCN at 24.46 per HCN, seller receives

9    32 million HDO.  Do you see that?

10   A.  Yes.

11   Q.  What was your understanding of what that meant?

12   A.  That meant the seller, which is listed just below, it says

13   the name of the seller account William K.  Je@ACap.com was

14   selling HDO -- I'm sorry.  He was selling HCN in exchange for

15   HDO.

16   Q.  And what was HDO described to you as?

17   A.  A stable dollar.  I'm sorry, a stable coin.

18   Q.  What was the price of HDO described to you as?

19   A.  The price was always equal to one, because it was backed

20   one to one by the stable -- I'm sorry, by the U.S. dollar.

21   Q.  And HCN was described to you as what?

22   A.  HCN is a digital asset that is more akin to a true crypto

23   coin like Bitcoin.

24   Q.  And that's how it was described to you?

25   A.  Yes.

O6HBGUO2                        Collins, Jr. - Direct

1    Q.  So by selling this HCN, it says seller receives 32 million

2    HDO, what's the U.S. dollar value of that?

3    A.  $32 million.

4    Q.  And then seeing the name of the seller account, did that

5    provide any information to Mercantile about who this VIP client

6    was?

7    A.  I believe our compliance department would have picked up on

8    it at the time.

9    Q.  And so who was this VIP client that Mr. Je said he was

10   helping redeem?

11   A.  It's William K -- well, it's either William Je or a firm

12   called ACA Capital.

13   Q.  And the document on the right side of the screen where it

14   says seller sells 572,000 and change at HCN, seller receives 14

15   million HDO, what is your understanding of the U.S. dollar

16   value of that 14 million HDO?

17   A.  14 million.

18   Q.  So 32 million plus 14 million is how much?

19   A.  46 million.

20   Q.  Is that the amount of money William Je was requesting to be

21   transferred shortly after the bank seizure?

22   A.  Yes.

23   Q.  Upon learning that the client -- excuse me.  Upon learning

24   that the client for this transfer, this redemption, was William

25   Je or ACA Cap, what reaction did you have to that, if any?

O6HBGUO2                        Collins, Jr. - Direct

1   A.  I don't recall a specific reaction other than being annoyed
2   that it wasn't forthcoming from the beginning.
3   Q.  That what wasn't forthcoming?
4   A.  That this was an account controlled by him.
5   Q.  That who just said this was an account --
6   A.  I'm sorry, William Je.
7   Q.  Ms. Loftus, if we can please put back up MER-1205.  Can we
8   go to the next page, please.  Can you zoom in from the 9:03
9   a.m. line.
10          At 9:03 a.m. Mr. Je says, We are just doing normal
11  redemption of a client, correct?
12  A.  Yes.
13  Q.  What was your understanding of that redemption referred to
14  what transaction, if any?
15  A.  The transaction we just reviewed.
16  Q.  And a few lines down at 12:31 p.m. Mr. Je says, What
17  documents you need for ACA?  I can send you all.  Do you see
18  that, sir?
19  A.  Yes.
20  Q.  What's your understanding of why Mr. Je was asking what
21  documents you needed for ACA?
22          MR. KAMARAJU:  Objection.
23          THE COURT:  I'll allow the question.
24  A.  Can you ask the question again.
25  Q.  What was your understanding why Mr. Je was asking you what

O6HBGUO2                    Collins, Jr. - Direct

1   documents you, Mr. Collins, needed for ACA?

2   A.  William knew that we ran a rigorous compliance function.

3   And in order for us to send a transaction of that size, we

4   would have to do what we would call KYC on the receiver as well

5   as the sender which we had already done.

6            THE COURT:  What do you mean by KYC?

7            THE WITNESS:  I'm sorry.  A Know Your Customer.  It's

8   a reference to being sure that you understand the bona fides of

9   who's receiving $50 million, well, 46.

10  Q.  At this time, what was your understanding of what ACA was?

11  A.  I had come across ACA in some news articles early on in the

12  relationship and didn't know much about it other than it was an

13  entity facilitated with William Je, so that's all.

14  Q.  At the time you were having this conversation, September

15  23, 2022, shortly after the bank seizure, the wire seizure,

16  were you contemplating processing this transaction that Mr. Je

17  was requesting?

18  A.  No.

19  Q.  Why not?

20  A.  It was clear that something was amiss.  At that point in

21  time we counted approximately $1.2 billion that had been seized

22  by the U.S. government between two other banks.

23  Q.  Mr. Collins, why then were you requesting documentation

24  from Mr. Je if you weren't going to process this transfer?

25  A.  Well, we have a commercial responsibility to consider

1  request, and we were doing that.

2  Q.  If we can scroll down a little bit please, Ms. Loftus.

3       At 1:37 p.m., can you read what Mr. Je wrote?

4  A.  1:37 p.m.?

5  Q.  Yes, sir.

6  A.  Okay.  I could send you all the documents to show that I

7  own ACA.  Do you still need to go through your portal?  We need

8  the execution today or it is meaningless.

9  Q.  At the time what was your understanding of why it had to be

10  executed today or it was meaningless?

11  A.  I had no understanding of that.  I was confused by the

12  term.

13  Q.  Why were you confused by the term "meaningless?"

14  A.  Because it didn't -- from my perspective it didn't appear

15  meaningless.

16  Q.  Can we scroll down some more, Ms. Loftus.

17       Can you read what Mr. Je wrote at 4:03 p.m. on

18  9/23/2022?

19  A.  Send you all the ACA stuff.  I have some updated

20  information in Hong Kong, but I think the information is more

21  than enough.  We are just redeeming.

22  Q.  What did you understand the term to mean "just redeeming?"

23  A.  They were liquidating their holdings for dollars.

24  Q.  And then at 4:50 p.m., can you read what Mr. Je wrote?

25  A.  Masud does not know about ACA. If any questions, call me.

1    Thanks.

2    Q.  Can you read what Mr. Je wrote at 8:12 p.m. on that same

3    day, September 23?

4    A.  Please let me know if you need further information.  We are

5    redeeming and need to be done today.  Other, it is meaningless.

6    Q.  After the wire was seized, did Mr. Je explain to you what

7    the urgency was with respect to this redemption?

8    A.  No.

9    Q.  You can take that down.  If we can display please what's

10   been marked as Government Exhibit MER-8.

11           By the way, in any of those messages that we just

12   looked at, did Mr. Je blame the Chinese Communist Party for the

13   troubles he was having with banking?

14   A.  I don't recall.

15   Q.  Can you see on your screen MER-8?

16   A.  Yes.

17   Q.  Take a look at that document.  Who signed it?

18   A.  William Je.

19   Q.  What is this document?

20   A.  This looks like it's called a redemption request form, but

21   it's really a request to wire funds.

22           MR. FINKEL:  Government offers MER-8.

23           MR. KAMARAJU:  No objection.

24           THE COURT:  It is admitted.

25           (Government's Exhibit MER-8 received in evidence)

O6HBGUO2                          Collins, Jr. - Direct

1    BY MR. FINKEL:

2    Q.   You said it's a redemption request form, but it's really

3    what?

4    A.   It's a request to transfer funds to a bank called First Abu

5    Dhabi Bank.

6    Q.   And what is the account holder of the First Abu Dhabi bank

7    account?

8    A.   ACA Capital Group Limited.

9    Q.   Where is First Abu Dhabi bank located?

10   A.   Abu Dhabi in the UAE.

11   Q.   You can zoom out of that.  It says at the bottom HDO

12   redemption amount.  You see that?

13   A.   Yes.

14   Q.   That amount 46 million HDO, what is your understanding at

15   that time of how much in U.S. dollars that was worth?

16   A.   $46 million.

17   Q.   And this 46 million, does it pertain to the transaction

18   documents that we've looked at in the chats you were having

19   with Mr. Je at the time?

20   A.   Yes.

21   Q.   What effect, if any, did the fact that Mr. Je's request to

22   send this $46 million to the Middle East have on you as a

23   banker?

24   A.   I'm sorry.  Could you ask the question again.

25   Q.   The fact that Mr. Je was requesting the $46 million be sent

O6HBGUO2                        Collins, Jr. - Direct

1    to Abu Dhabi after this wire seizure related to this redemption

2    for a client he didn't identify at first, what effect did that

3    have on you in your consideration whether to process this wire?

4              MR. KAMARAJU:  Objection, form and compound.

5              THE COURT:  Sustained.  It's compound.

6    Q.  What effect did the fact that Mr. Je was requesting you

7    send this wire to Abu Dhabi have on consideration whether to

8    process it as a banker?

9    A.  It felt uncomfortable.  It appeared to be an attempt to

10   move money outside of the jurisdiction of the United States.

11   We're not clear on the various agreements between UAE and the

12   United States, but it's known to be a jurisdiction that doesn't

13   always cooperate with seizures.

14   Q.  Did you process the wire?

15   A.  No.

16   Q.  We can display what's been marked for identification as

17   MER-1206.  Go to the next page, please, Ms. Loftus.  Can you

18   zoom in so, Mr. Collins can see it.  Thank you.

19             What is this document?

20   A.  This is more messages between me and William.

21             MR. FINKEL:  Government offers MER-1206.

22             MR. KAMARAJU:  No objection, your Honor.

23             THE COURT:  It is admitted.

24             MR. FINKEL:  If we could publish that please.

25             (Government's Exhibit MER-1206 received)

O6HBGUO2                          Collins, Jr. - Direct

 1    BY MR. FINKEL:
 2    Q.  If we could publish that please.  What's the date of these
 3    messages?
 4    A.  September 24, 2022.
 5    Q.  Can you read Mr. Je's message to you at 11:14 p.m.?
 6    A.  Yes.  Hi, Bo, Rene, Priya and our lawyer spoke today.  Our
 7    lawyer's negotiating with the DOJ and releasing the funds money
 8    to complete the transaction.  We need a simple letter from your
 9    bank to show that you will suffer if the deal did not go
10    through.  If you want to inform the PMA on the matter, we are
11    okay.  I can assure you that none of the money comes from Miles
12    and our independent fund administrator.  Our internal
13    compliance and the banking regulator have verified this
14    already.  Rene seems to doubt about this and even asked our
15    lawyers on this.  This will jeopardize our relationship with
16    our lawyer.
17    Q.  Who is Rene?
18    A.  Rene Carson is the general counsel of MGH and MBI.
19    Q.  Meaning Mercantile?
20    A.  Yes.
21    Q.  What's the nature of your relationship with Rene Carson
22    aside from her being the general counsel?
23    A.  She's my wife.
24    Q.  And then here it says, Want to inform PMA, what's PMA?
25    A.  PMA is a law firm based in Puerto Rico that represented

O6HBGUO2                          Collins, Jr. - Direct

1   Hamilton Opportunity Fund.

2   Q.  What was your understanding of what Mr. Je meant when he

3   messaged you, Rene seems to doubt about this and even asked our

4   lawyers on this.  This will jeopardize our relationship with

5   our lawyer?

6   A.  He was responding to my message above that says, I'm

7   shocked at what I just heard, which was that he didn't want us

8   giving notice, which we were required to give in our commercial

9   agreement, of the closing of any sort of default.  So he did

10  not want us communicating with PMA about the circumstances of

11  this event.

12  Q.  Who is he, whose the "he?"

13  A.  William and Priya did not want us communicating with their

14  attorneys about the circumstances of this event.

15  Q.  When you say this event, what do you mean?

16  A.  The seizures.

17  Q.  Did Mr. Je explain to you why he didn't want Mercantile

18  communicating with Je's lawyers about the seizure?

19  A.  He wrote in the bottom that it would jeopardize our

20  relationship with our lawyer.

21  Q.  Did Je explain why the seizure would jeopardize their

22  relationship with their lawyer?

23  A.  He didn't offer me details.

24  Q.  In this message Mr. Je also request a simple letter from

25  your bank Mercantile to show that you will suffer if the deal

1   did not go through.  What was your understanding of what that

2   meant?

3   A.  They were representing to us that they were in daily

4   communication with the DOJ at that point, that they were

5   requesting at a minimum the 49.5 million be released because it

6   was injuring a third party and they wanted us to validate that.

7   Q.  Did Mercantile provide a letter?

8   A.  I believe so.

9   Q.  And below that it says, I can assure you that none of the

10  money comes from Miles and our independent fund administrator.

11  What is your understanding of who Miles refers to?

12  A.  Miles Guo.

13  Q.  Did Mercantile receive a warrant, a seizure warrant from

14  the U.S. government?

15  A.  Initially we received a freeze and then later a seizure.

16  Q.  What's a freeze?

17  A.  A freeze means we can't move the money anywhere.

18  Q.  And what accounts did the freeze pertain to?

19  A.  I believe all the accounts related to William Je.

20  Q.  And then you said you received a seizure, what's the

21  difference between a seizure and a freeze?

22  A.  A seizure means that we actually wire the money to the U.S.

23  marshal office, and it becomes under the custody of the United

24  States.

25  Q.  Did Mercantile do that, did Mercantile transfer the

O6HBGUO2                        Collins, Jr. - Direct

1   Himalaya money to the United States government?

2   A.  Yes.

3   Q.  Did Mercantile retain any of the money that was in the

4   Himalaya and G/Club accounts?

5   A.  Yes.

6   Q.  Why?

7   A.  We have commercial provisions in our contracts that allow

8   us to offset for compliance and legal fees related to an

9   account.

10  Q.  As a result of that, did you have a legal dispute with

11  Hamilton?

12  A.  I don't recall a legal dispute on that issue, but I'm fuzzy

13  on that.

14  Q.  Did you have any legal dispute with Hamilton, you meaning

15  Mercantile?

16  A.  Yeah.  Actually, I don't think we have any, other than we

17  filed for an arbitration.

18  Q.  What do you mean by you, Mercantile?

19  A.  Mercantile Global Holdings.

20  Q.  Why did Mercantile file for an arbitration?

21  A.  Because they defaulted on the closing requirements?

22  Q.  Who is they?

23  A.  Hamilton Special Opportunity Fund.

24  Q.  Is there also an arbitration with G/Club?

25  A.  I believe there is one pending that's been stayed.

O6HBGUO2                          Collins, Jr. - Cross

1           MR. FINKEL:  One moment.  Nothing further at this

2      time.  Thank you, Mr. Collins.

3           THE COURT:  Cross-examination.

4           MR. KAMARAJU:  Thank you, your Honor.  Just for

5      planning purpose, are we taking the morning break at 11 or

6      11:30?

7           THE COURT:  11:30 will be our half an hour break, and

8      then we'll take another break at 2:30.

9           MR. KAMARAJU:  Thank you, your Honor.

10     CROSS-EXAMINATION

11     BY MR. KAMARAJU:

12     Q.  Good morning, Mr. Collins.

13     A.  Good morning.

14     Q.  Now, could we bring up Government Exhibit MER-1205, please,

15     which is in evidence.

16          Now, Mr. Finkel asked you some questions about this on

17     direct, correct?

18     A.  I presume so.  I only see a header.

19     Q.  We could scroll through real quick so you can take a look.

20     A.  Yes, this is what we discussed.

21     Q.  And this was the exchange of Whatsapp messages about the

22     redemption request, correct?

23     A.  Yes.

24     Q.  And you testified on direct that that redemption request

25     never happened, right?  Withdrawn.

1           You testified on direct that you never wired any money

2   pursuant to this redemption request, correct?

3   A.  We did not.

4   Q.  In fact, you were never intending to wire any money

5   pursuant to this redemption request, correct?

6   A.  That's correct.

7   Q.  Could we go to page three of the document, please.

8           Do you see a message there from Mr. Je at 9:03 p.m.,

9   the second from the bottom?

10  A.  Hi, please hold until Monday.

11  Q.  He's referring to this redemption request, right?

12  A.  Yes.

13  Q.  And you had never told him that you didn't intend to honor

14  this redemption request, right?

15  A.  I never told him that.

16  Q.  So, in fact, Mr. Je called it off on his own accord,

17  correct?

18  A.  Yes.

19  Q.  And that was before you processed it, correct?

20  A.  Yes.

21  Q.  We can take that down for a second.

22          Now, the transaction that you described between

23  Hamilton and Mercantile Bank, that was for Hamilton to acquire

24  a stake in the bank, right?

25  A.  Technically the holding company that wholly owns the bank,

1    but yes.

2    Q.  So indirectly buying the bank by buying an interest in the

3    holding company, right?

4    A.  Right.

5    Q.  You testified on direct I believe that that transaction

6    closed September 16 of 2022, right?

7    A.  Yes.

8    Q.  And prior to the transaction closing, you had to receive

9    authorization for something you called OCIF?

10   A.  Correct.

11   Q.  You made an application to OCIF, correct?

12   A.  I think technically the application was made by William Je

13   and Hamilton Special Opportunity Fund.

14   Q.  Did Mercantile not have any submission to the OCIF as part

15   of it.

16   A.  I don't recall what was required.  We had attorneys

17   handling it, both inside and outside counsel.

18   Q.  You understood that in connection with that application, it

19   was going to the entity that regulated your bank, right?

20   A.  Correct.

21   Q.  And so it was important to you to honor your commitments to

22   that regulator, correct?

23   A.  Correct.

24   Q.  And in fact you said that to Mr. Je on several occasions,

25   right?

O6HBGUO2                         Collins, Jr. - Cross

1    A.  Yes.

2    Q.  And you didn't want to be associated -- withdrawn.

3         You didn't want your regulator to associate you with

4    any kind of misconduct, right?

5    A.  Correct.

6    Q.  That would have a negative impact on your bank, right?

7    A.  Correct.

8    Q.  And that application that went in, whether it was for

9    Hamilton or Mercantile, that went in, in April of 2022, right?

10   A.  That sounds about right.

11   Q.  And that's right around Easter of that year, right?

12   A.  Yeah, I don't recall the specific dates.

13   Q.  But that is around the time that the loan went in, right?

14   A.  Correct.

15   Q.  Now, could we pull up Government Exhibit MER-1204, please.

16   And this is in evidence so we can put it up for the jury.

17   A.  It's just a header for me.

18   Q.  I'm going to have it scrolled through once the jury can see

19   it.  Okay.  So could we just scroll through that so the witness

20   can take a look at it.

21        Do you recall testifying about this exchange of

22   messages on direct?

23   A.  Yes.

24   Q.  And you remember Mr. Finkel asking you questions about this

25   line, There is no universe that I will be carrying 100 million

O6HBGUO2                    Collins, Jr. - Cross

1   of BTC on a thumb drive to Dubai, right?

2   A.  Yes.

3   Q.  You sent that message on March 17, 2022, correct?

4   A.  Yes.

5   Q.  So that's before you submitted the OCIF application,

6   correct?

7   A.  I don't -- could you tell me the date of the OCIF

8   submission?  I don't recall it.

9   Q.  Sure.  Maybe we can put up side-by-side with this

10  defense -- actually, let's take this down and just for the

11  witness put up DX-60554.

12         Do you see that?

13  A.  Yes.

14  Q.  Is this the application?

15  A.  It appears to be a letter to OCIF.  If you could reduce it

16  back.  That describes the transaction.  Can we go down the

17  letter so I can see the whole thing?

18  Q.  Sure.

19  A.  Okay.  That's signed by Hamilton's counsel.

20  Q.  Before we do that.  Is this the application?

21  A.  I believe this is the application that Hamilton submitted.

22  Q.  And this was the application submitted to OCIF?

23  A.  Yes.

24  Q.  And it's in connection with the Mercantile/Hamilton

25  transaction?

O6HBGUO2                        Collins, Jr. - Cross

1    A.  Yes.

2               MR. KAMARAJU:  The defense offers DX-60554, your

3    Honor.

4               MR. FINKEL:  I have a question for clarification.

5    This is Hamilton's application?

6               THE WITNESS:  I'm unclear.  We can look at the last

7    page.  We went through it very fast.

8    BY MR. KAMARAJU:

9    Q.  How about you just blow up the first paragraph just for the

10   witness.

11   A.  So that is a request for the approval.

12   Q.  I'm sorry.  I meant the very first paragraph.

13   A.  That paragraph, I'm not trying to be pedantic, but it

14   describes that we are requesting approval for this transaction,

15   but that is not necessarily the application.  I think there's a

16   distinction.

17   Q.  Understood.  Is this a letter submitted to OCIF in

18   connection with the application related to the

19   Mercantile/Hamilton transaction?

20   A.  Yes.

21   Q.  Is it a letter submitted on behalf of your bank?

22   A.  I believe so.

23               MR. KAMARAJU:  The defense offers DX-60554.

24   A.  Can I look at the signatories again.  I'm a little confused

25   on that.

O6HBGUO2                         Collins, Jr. - Cross

1   Q.   Feel free.

2   A.   Yeah, so, it's signed by our counsel and Hamilton's

3   counsel, so that may be perhaps why I don't recall the letter,

4   but okay.

5              THE COURT:   Is there any objection?

6              MR. FINKEL:   Yes.  Objection, hearsay, authenticity,

7   couple of things.

8              MR. KAMARAJU:   I'm not offering it for the contents of

9   the letter.  I'm simply offering it for the fact that it was

10  submitted.

11             THE COURT:   You're not offering it for the contents,

12  but merely for the fact that the letter was submitted?

13             MR. KAMARAJU:   Yes.

14             THE COURT:   It is admitted.

15             (Defendant's Exhibit 60554 received in evidence)

16             MR. KAMARAJU:   Could we publish that.

17             MR. FINKEL:   Can I ask one question.  Have you seen

18  this letter before?

19             THE WITNESS:   I don't recall seeing it by memory.

20             MR. FINKEL:   I renew the objection.

21             THE COURT:   I'm going to permit the letter.

22  Q.   Can we publish it, please.  So you see the date of this,

23  it's April 18, 2022?

24  A.   Yes.

25  Q.   So it's fair to say that at this time as of this date you

O6HBGUO2                    Collins, Jr. - Cross

1  were still pursuing the transaction with Hamilton, correct?

2  A.  Yes.

3  Q.  So now if we could go back and put up Government Exhibit

4  MER-1204, please.  If we could go to the second page, and if we

5  could blow up the message that starts, There's no universe.

6  You see that?

7  A.  Yes, sir.

8  Q.  So you sent that message on March 17, 2022?

9  A.  Yes, sir.

10  Q.  You sent this message before the letter we just looked at

11  was submitted to OCIF?

12  A.  Yes, sir.

13  Q.  Nothing about your conversation with Mr. Je about carrying

14  $100 million of Bitgo on a thumb drive to Dubai caused you to

15  cancel that transaction with Hamilton, correct?

16  A.  No.

17  Q.  And you didn't report this request to OCIF, right?

18  A.  Well, I'm not sure we have an obligation to report it to

19  OCIF, but we have an obligation to report it on SARS.

20  Q.  I'm not asking about your legal understanding of anything,

21  I'm just asking the fact of it is that you did not submit it

22  OCIF?

23  A.  Yes.

24  Q.  Let's pull up Government Exhibit GX-MER-138.  We can

25  publish that as well.

1      This is the bank statement that shows the loan going

2   out, right?

3   A.  I believe so.

4   Q.  So it's fair to say that your conversation with Mr. Je

5   about the loan going out occurred before this transaction,

6   right?

7   A.  Yes.

8   Q.  And the wire goes out April 15 of 2022, correct?  If you go

9   down to where it says withdrawal 37 million.

10  A.  Looks like April 15.

11  Q.  So the loan also went out before the OCIF letter that we

12  just looked at was submitted, correct?

13  A.  Correct.

14  Q.  And nothing about this loan request made you cancel the

15  transaction with Hamilton, correct?

16  A.  Correct.

17  Q.  You didn't report the loan to OCIF either, did you?

18  A.  I don't recall what we did or didn't report, but it doesn't

19  come to mind.

20  Q.  We can take that down.

21      Now, you were asked a question on direct about a

22  phrase, "To the moon," right?

23  A.  Yes.

24  Q.  And you saw a video with Mr. Guo when which that phrase was

25  used, correct?

1   A.  Yes.

2   Q.  And you described it as marketing material basically,

3   right?

4   A.  Yes.

5   Q.  And I think you said that the phrase "To the moon"

6   originally came from an old black and white TV show, right?

7   A.  Yeah, I think it was the Honeymooners.

8   Q.  That's what I was going to ask.  It was the Honeymooners,

9   right?

10  A.  Yes.

11  Q.  It's a common phrase in the cryptocurrency industry, right?

12  A.  Yes.

13  Q.  Mr. Guo is not the only person who's ever used that phrase,

14  right?

15  A.  No.

16  Q.  Elon Musk used that phrase about Dogecoin, correct?

17          MR. FINKEL:  Objection.

18  A.  I don't know.

19          THE COURT:  Sustained.

20  Q.  You heard that phrase in the course of your following the

21  cryptocurrency industry, correct?

22  A.  Yes.

23  Q.  And Mercantile Bank, I understand it's winding down --

24  withdrawn.

25          Mercantile Bank was a bank based in Puerto Rico,

O6HBGUO2                          Collins, Jr. - Cross

1    right?

2    A.  Yes.

3    Q.  When was it founded?

4    A.  I believe we received our license to organize around

5    December of '16 -- I'm sorry, December of '18, and we began

6    operating in the Spring of '19.

7    Q.  Now, prior to founding Mercantile Bank, you were also

8    looking at starting a cryptocurrency exchange, right?

9    A.  That was part of our original plan.

10   Q.  And you were going to call it the San Juan Mercantile

11   Exchange, right?

12   A.  Correct.

13   Q.  What is your understanding of what a cryptocurrency is?

14          MR. FINKEL:  Objection.

15          THE COURT:  Overruled. When you say that it was

16   contemplated that you may start such an entity, are you

17   speaking of yourself personally or the bank?

18          THE WITNESS:  The holding company.  So Mercantile

19   Global Holdings owned two -- at that time we owned two assets,

20   one was a bank, and the other was what we called San Juan

21   Mercantile Exchange, and the two were meant to operate

22   together.

23          THE COURT:  You may answer the question as to what

24   your understanding of a cryptocurrency exchange is.

25   A.  A cryptocurrency exchange matches buyers and sellers of a

O6HBGUO2                         Collins, Jr. - Cross

1  given crypto asset, usually for some fiat currency.  Sometimes

2  for a different crypto asset.

3  Q.  Now, the San Juan Mercantile Exchange never actually

4  launched, correct?

5  A.  Correct.

6  Q.  But Mercantile the bank did have a cryptocurrency focus,

7  correct?

8  A.  Correct.

9  Q.  And I think you testified on direct that your vision for

10 the bank was that it would be a settlement bank to the digital

11 asset industry.  You remember that?

12 A.  Yes.

13 Q.  What's a settlement bank?

14 A.  A settlement bank means that we are facilitating a clearing

15 of funds related to transactions on an exchange.

16 Q.  So that, if I understand you correctly, the clearing of

17 those funds occurs after there's a transaction on the exchange;

18 is that right?

19 A.  It depends on how the transactions being handled, but it

20 could be described as contemporaneous, but either instantly or

21 soon thereafter.

22 Q.  And that's what you mean by settlement, right?

23 A.  Correct.

24 Q.  You also testified that Mercantile was the first bank in

25 the U.S. to have a license to hold and transmit digital assets,

O6HBGUO2                         Collins, Jr. - Cross

1   correct?

2   A.  Correct.

3   Q.  What do you mean by hold and transmit digital assets?

4   A.  We could custody your digital assets.  So let's just use

5   Bitcoin as an example.  If you wanted to deposit Bitcoin with

6   our bank, we could hold that asset in custody for you.  We

7   could also transmit it.

8   Q.  And that's one of the offerings that your bank marketed,

9   right?

10  A.  Yes.

11  Q.  And I think you testified on direct that there are 20,000

12  cryptocurrencies to your knowledge?

13  A.  I've lost track of the number.

14  Q.  Fair to say thousands?

15  A.  At least.

16  Q.  And so would your bank provide custody services for all of

17  those?

18  A.  No.

19  Q.  Why might your bank not provide custody services for a

20  cryptocurrency asset?

21  A.  That industry is rife with projects that won't succeed.

22  There are some projects that are not cognizant of laws that we

23  have to follow.  And quite frankly from a commercial

24  perspective, there's just not enough business in 99 percent of

25  the coins --

1          THE INTERPRETER:  Your Honor, interpreter is

2     requesting all parties to slow down a little bit.

3          THE COURT:  Please slow down both the questioner and

4     the witness.

5          MR. KAMARAJU:  Understood, your Honor.

6     A.  I'll start over.  There are dubious projects in crypto that

7     are problematic that don't necessarily respect the laws of our

8     jurisdiction, and then there are commercial concerns about the

9     effort to onboard a specific coin as it relates to just

10    economic activity.

11    Q.  And so your bank picks and chooses between which

12    cryptocurrencies it will service for lack of a better word

13    after evaluating those factors, correct?

14    A.  Correct.

15    Q.  You also testified that Mercantile was a corresponding

16    bank.  Do you remember that?

17    A.  We had one corresponding relationship.

18    Q.  What does that mean?  What is a corresponding bank?

19    A.  Typically that just means that two banks have accounts with

20    each other.

21    Q.  And correspondent banking is often used when you have

22    transactions in different currencies, right?

23    A.  That's one purpose, yeah.

24    Q.  Can you explain how that would work to the jury?

25    A.  So I'll try to create a simple example.  I think that's the

O6HBGUO2                          Collins, Jr. - Cross

1   easiest way to consider it.  If JPMorgan has a client that owns

2   dollars and needs to purchase industrial equipment in Germany

3   that has to be transacted in euros, then often they will use a

4   bank account that they have with a bank in Germany where they

5   keep money in both dollars and euros and they'll simply accept

6   money from their client in the United States in dollars and

7   then they will make the payment to the German manufacturer out

8   of the German corresponding account that JPMorgan has in euros.

9   So there's a simultaneous transmission of value and an exchange

10  between one currency and the other.  So it's the most efficient

11  way to manage international multicurrency transactions.

12  Q.  Right.  And that's because a bank user, example JPMorgan

13  and the United States, may not just be able to send euros from

14  New York to Berlin, right?

15  A.  Yes, fair enough.

16  Q.  And for an international banking institution like

17  Mercantile, having corresponding relationships that allowed

18  U.S. dollar transactions was pretty significant, right?

19  A.  Yes.  We did not have a direct account with a federal

20  reserve, so we depended on our own bank accounts with other

21  banks to facilitate transactions on behalf of our clients.

22  Q.  I'm going to come back to the federal reserve.

23        At the time that G/Clubs became a client, you had a

24  correspondent banking relationship with Medici Bank, correct?

25  A.  Yes.

O6HBGUO2                          Collins, Jr. - Cross

1    Q.  But Medici wasn't the first correspondent banking

2    relationship that Mercantile had entered into, right?

3    A.  We had other accounts at other banks that I guess you could

4    describe as corresponding banks.

5    Q.  Well, you had a corresponding banking relationship with

6    Signature Bank, right?

7    A.  Correct.

8    Q.  And when you did that, Mercantile was processing

9    transactions for --

10   A.  No.  No.  I'm sorry.  I misstated that.  I don't believe we

11   had an account.  Our account with Signature Bank I believe was

12   purely an operating account which is different from a

13   corresponding account.

14   Q.  Are you familiar with a company called Bittrex?

15   A.  Yes.

16   Q.  Was Bittrex ever a client at Mercantile Bank?

17   A.  Briefly.

18   Q.  Did you use Signature Bank to process transactions on

19   behalf of Bittrex?

20            MR. FINKEL:  Objection, 401, 403.

21            THE COURT:  You'll step up, please.

22            (Continued on next page)

23

24

25

O6HBGUO2                        Collins, Jr. - Cross

1          (At the sidebar)

2          THE COURT:  How is all of this relevant?

3          MR. KAMARAJU:  I don't have a lot of questions.  I'm

4    just trying to clarify the kind of account.  My understanding

5    from his 3500 material was that this client Bittrex was using

6    Mercantile to do corresponding banking transactions through

7    Signature, so I'm just trying to clarify that.  I don't intend

8    to dwell on this topic at all.

9          THE COURT:  Why is it relevant?

10         MR. KAMARAJU:  Well, corresponding banking

11   relationships are relevant, that's all.  Because he goes from

12   here to -- he loses this banking relationship.  He then

13   struggles to find another corresponding banking relationship.

14   It's his belief that that has, one, to do with the fact that

15   the bank is in Puerto Rico.  And two, it has to do with

16   cryptocurrency.  I' just establishing that in fact it can be

17   difficult to establish banking relationships. The issue of that

18   is going to be relevant throughout the trial.

19         MR. FINKEL:  I don't see how Mercantile's

20   relationships with other customers is relevant, in particular a

21   customer like Bittrex.  The defense moved to make sure that

22   Mr. Collins was not used as a pseudo-cryptocurrency expert,

23   that's why I objected to the question about the cryptocurrency

24   exchanges initially.  That question in and of itself was fine.

25   I was worried about the line had been drawn.  I think if the

O6HBGUO2                    Collins, Jr. - Cross

defense is trying to use Mercantile's relationships with other

clients, particularly crypto clients like Bittrex to try to

draw comparisons and parallels to the Himalaya Exchange, that's

inappropriate.  That's a 403 problem.  It's a 702 problem, but

the relevance question I think predominates.  While there has

been evidence at this trial about the difficulty of G/Clubs,

for example, or Guo's enterprise to obtain banking

relationships, Bittrex ability to obtain banking relationships

is not relevant at all to this trial.  And it wouldn't be

appropriate to draw a comparison between entities in the Guo

enterprise and Bittrex, and that's the only possible relevance

to that question.  To the extent it is relevant, it would be

confusing to the jury.

        THE COURT:  What is Bittrex?

        MR. KAMARAJU:  It's a cryptocurrency exchange.

        THE COURT:  Is this one of those widely considered

legitimate exchanges?

        MR. FINKEL:  Yes.

        MR. KAMARAJU:  It is.  But, first of all, it's not

Bittrex that has the difficulty with maintaining banking

relationships.  It's Mercantile.  I have no intention of

suggesting anything about Bittrex's banking relationships or

comparing the exchange to Bittrex.  I just understood that it

was a corresponding banking relationship that he had with

Signature.  He told me it wasn't.  I was trying to clarify that

O6HBGUO2                    Collins, Jr. - Cross

1    through at least what was in the 3500.  I don't intend to

2    either here or during summation to say anything about the fact

3    that Bittrex, the fact that Bittrex was a client of Mercantile

4    has anything to do with the exchange.  I'm literally just

5    trying to get to point of Mercantile's own banking

6    relationships, not Bittrex.

7             MR. FINKEL:  Then the question should be, did

8    Mercantile have problems obtaining corresponding banking

9    relationships.  By that description itself, I think basically

10   concedes that Bittrex's point has no relevance, because the

11   point can be made without Bittrex.  The only reason I objected

12   is because of the Bittrex reference.

13            MR. KAMARAJU:  I only responded to the fact that the

14   witness said there was a corresponding banking relationship.  I

15   was just trying to get back to that.  If you want, I'll ask

16   that question if that's the only reason for asking about

17   Bittrex.

18            THE COURT:  I think that's a better question.

19            MR. KAMARAJU:  That's fine, your Honor.  I would just

20   note that the witnesses sometime have difficulty with longer

21   questions or more generalized questions, which is why I was

22   trying to more specific in the first instance.

23            THE COURT:  All righty.

24            (Continued on next page)

25

O6HBGUO2                         Collins, Jr. - Cross

1                    (In open court; jury present)

2                    THE COURT:  Sustained.

3    BY MR. KAMARAJU:

4    Q.  Did there come a point where Mercantile Bank had

5    difficulties obtaining corresponding banking relationships?

6    A.  Yes, we always tried to maintain more than one, and

7    corresponding banking is difficult at best.

8    Q.  And it's particularly difficult for banks based in Puerto

9    Rico, correct?

10   A.  I believe so.

11   Q.  And it's particularly difficulty for -- withdrawn.

12                   What is your understanding as to why it's difficult

13   for banks based in Puerto Rico to obtain corresponding banking

14   relationships?

15   A.  There's a perception bias.  I can't say I'm an expert on

16   what drives the bias, but at the end of the day it's human

17   beings making a decision.  That would be mostly the issue I

18   think.

19   Q.  And banks that primarily service cryptocurrency clients, do

20   they similarly have problems obtaining corresponding banking

21   relationship?

22                   MR. FINKEL:  Objection.

23                   THE COURT:  I'll allow the question.

24   A.  Yes.

25   Q.  And what's your understanding of why that is?

O6HBGUO2                        Collins, Jr. - Cross

1          MR. FINKEL:  Same objection as to other banks.

2          THE COURT:  So you're asking about banks based in

3   Puerto Rico.  What is the question?

4          MR. KAMARAJU:  I asked about banks based in Puerto

5   Rico.  Now I'm asking about banks that predominantly facilitate

6   cryptocurrency customers.

7          THE COURT:  If you'll just stick to his bank.

8          MR. KAMARAJU:  Sure.

9   Q.  Mercantile is a bank that had a focus on cryptocurrency,

10  correct?

11  A.  Correct.

12  Q.  And that was one of the factors that you believed made it

13  difficult for Mercantile to obtain corresponding banking

14  relationships, correct?

15  A.  Correct.

16  Q.  Why did you believe that?

17  A.  Because it was shared with us by corresponding banks that

18  we had made applications to.

19  Q.  By the way, do you know what Sharps Pixley?

20  A.  Sharps Pixley.  Can you spell Sharps?

21  Q.  Common spelling, S-H-A-R-P-S.

22  A.  And Pixley?

23  Q.  P-I-X-L-E-Y.

24  A.  I'm not sure I'm familiar with that term.

25  Q.  You do know what FV Bank is, right?

O6HBGUO2                          Collins, Jr. - Cross

1    A.  Yes.

2    Q.  FV Bank is another bank in Puerto Rico, right?

3    A.  Yes.

4    Q.  And its offices are close to Mercantile offices, right?

5    A.  I don't actually know where their offices are.

6    Q.  Fair enough.  Now, you testified on direct that you were

7    first introduced to G/Club through an individual called Alex H,

8    right?

9    A.  No.

10   Q.  Who introduced you first to G/Club?

11   A.  Our introduction came through essentially Medici because we

12   were processing transactions for Medici who was processing

13   transactions for G/Club.

14   Q.  After Medici made that introduction, you had a meeting at

15   your home with Ana Izquierdo and Limarie Reyes, right?

16   A.  Yes.

17   Q.  And you understand they were executives at G/Club?

18   A.  Yes.

19   Q.  Why was that meeting at your home?

20   A.  It was convenient for me at the time.  My office -- I

21   believe this was not -- we were still in a strange environment

22   related to Covid, and it was just more convenient for me to

23   meet there.

24   Q.  And I think you testified on direct that the Chinese

25   Communist Party did not come up during that meeting, right?

O6HBGUO2                           Collins, Jr. - Cross

1    A.   Yeah, I don't recall it.

2    Q.   But you also testified on direct that you had a discussion

3    with Ms. Reyes and Ms. Izquierdo that there was a Chinese

4    diaspora of like-minded people that were interested in these

5    types of offerings, do you remember that?

6    A.   Yes.

7    Q.   What do you mean Chinese diaspora?

8    A.   Generally I mean by that Chinese either current or former

9    citizens who left China that reside somewhere else.

10   Q.   And when you use the phrase "like-minded people," what do

11   you mean by that?

12   A.   People that wanted to leave China because of the political

13   system.

14   Q.   When you talk about these types of offerings, you refer to

15   G/Club offerings, right?

16   A.   Can you state that question again.

17   Q.   Sure.  The types of offerings that members of the Chinese

18   diaspora that you were describing, those were the offerings

19   that G/Clubs was marketing, correct?

20   A.   Yes.

21   Q.   Now, at the time that you met with Ms. Reyes, they were

22   looking to switch banks, fair enough?

23   A.   Yes.

24   Q.   They were no longer satisfied with Medici services,

25   correct?

1   A.  Yes.

2   Q.  And they ultimately did make that switch, right?

3   A.  Yes.

4   Q.  Did they explain to you why they were not satisfied with

5   Medici?

6   A.  They didn't like the amount of communication and they felt

7   the technology was not sufficient.

8   Q.  Now, once Mercantile opened the G/Club bank accounts, there

9   were millions of dollars that flowed into those accounts,

10  right?

11  A.  I can't recall the timeline of transactions.  I believe the

12  bulk of those transactions happen before we had a direct

13  relationship with G/Clubs.

14  Q.  Fair enough.  Regardless of before or after Medici, there

15  was millions of dollars flowing into G/Clubs accounts held at

16  Mercantile, correct?

17  A.  Yes.

18  Q.  How does Mercantile earn revenue from its banking business?

19  A.  Usually we earn money through transaction fees and through

20  an interest rate spread, because for digital assets, typically

21  banks don't pay any interest on the funds.

22  Q.  So if there are U.S. dollars sitting in a bank account at

23  Mercantile, can you explain to us how Mercantile might make

24  money off of that?

25  A.  We deposit that in short-term overnight funds with double A

O6HBGUO2                          Collins, Jr. - Cross

1    rated banks, and we receive essentially the fed funds rate.

2    And -- that I don't remember the exact rate at the time, but

3    since we started the bank, that's range from one percent to as

4    high as five and a quarter percent.

5    Q.   And so the more money that's in an account, the more money

6    the bank earns, right?

7    A.   Correct.

8    Q.   So the bank earned those same payments off the G/Clubs

9    inflows, right?

10   A.   Yes.

11   Q.   And on direct you were asked questions about the due

12   diligence process that Mercantile engaged in with new clients.

13   Remember that?

14   A.   Mm hm.

15   Q.   You testified that you understood that that kind of due

16   diligence was required under the Bank Secrecy Act, correct?

17   A.   Yes.

18   Q.   And part of that process is determining who the UBO is,

19   right?

20   A.   Yes.

21   Q.   Tell us again what UBO stands for?

22   A.   Ultimate beneficial owner.

23   Q.   How does Mercantile determine typically who the UBO is?

24   A.   So we have a compliance team that collects data.  They

25   evaluate the data.  They ask people to make certain

O6HBGUO2                        Collins, Jr. - Cross

1   attestations about what percentage they own of a company, what

2   control they have.  And based on those answers, they make an

3   evaluation.

4   Q.  And you testified on direct that another part of the due

5   diligence process was determining the source of funds, right?

6   A.  Yes.

7   Q.  So same question, how does Mercantile determine the source

8   of funds coming in from a potential client typically?

9   A.  That's a more complicated process that involves a lot of

10  research that my team takes care of.  I'm not an expert in

11  that.

12  Q.  You have a team at the bank who's responsible for doing

13  that?

14  A.  Right.

15  Q.  Now, you are aware at the time G/Club was seeking to open

16  bank accounts that there was a relationship or a connection

17  between G/Clubs and Miles Guo, right?

18  A.  Yes.

19  Q.  And you testified on direct that you had concerns about

20  that connection, and in particular Mr. Guo based on risk

21  profile and his history with the Chinese government, right?

22  A.  Yes.

23  Q.  What did you mean by his history with the Chinese

24  government?

25  A.  My understanding was he had been accused of criminal

O6HBGUO2                          Collins, Jr. - Cross

1   activity, that he had fled the country and was seeking asylum

2   or was granted asylum in the U.S., and that is quite frankly

3   too much information for us to unpack.

4   Q.  I didn't hear the last part.

5   A.  Too much information for us to unpack.

6   Q.  And by "unpack" you mean that was enough for the bank

7   basically?

8   A.  To make a determination if it was true, what crimes had

9   been committed or not committed, like it's a very complicated

10  situation.  And we took the more conservative position that

11  that was a risk profile we could not tolerate.

12  Q.  And that risk profile would be problematic for the bank if

13  Mr. Guo was the UBO of G/Club, right?

14  A.  Yes.

15  Q.  And it would be problematic for the bank if the source of

16  G/Club's money was Mr. Guo, correct?

17  A.  Correct.

18  Q.  And so the bank did in fact run its due diligence process

19  on G/Clubs, correct?

20  A.  Correct.

21  Q.  And you have no reason to believe that that process was any

22  different than what it runs on any of its other customers,

23  right?

24  A.  Correct.

25  Q.  You don't believe the bank took it easy on G/Club, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6HBGUO2                          Collins, Jr. - Cross

1    A.  Correct.

2    Q.  And as a result that due diligence process revealed that

3    Mr. Guo was not the UBO, correct?

4    A.  As far as our research concluded, that's the case.

5    Q.  And same with respect to the source of funds, it concluded

6    that they did not come from him, correct?

7    A.  That is true.

8    Q.  You also testified about the same thing with respect to

9    G Fashion, right?

10   A.  I believe so.

11   Q.  So you open accounts for G Fashion, correct?

12   A.  Yes.

13   Q.  You had the same concerns with respect to G Fashion and its

14   connection to Mr. Guo, right?

15   A.  Correct.

16   Q.  The bank ran due diligence on G Fashion, correct?

17   A.  Correct.

18   Q.  And as a result of its due diligence, it opened accounts

19   for G Fashion, right?

20   A.  Yes.

21   Q.  And Mr. Finkel asked you a number of questions about if the

22   bank had known that Mr. Guo had operational control of G/Club,

23   would the bank had opened the account, correct?  You remember

24   those questions?

25   A.  Yes.

O6HBGUO2                          Collins, Jr. - Cross

1    Q.  So at the time that the bank opened the G/Club account, the

2    bank concluded that Mr. Guo did not have operational control of

3    G/Club, correct?

4    A.  Correct.

5    Q.  And it determined that he did not have operational control

6    of G Fashion, correct?

7    A.  Correct.

8    Q.  And sitting here today, you have never seen any evidence

9    that he has operational control of G/Club, correct?

10   A.  Correct.

11   Q.  And you have never seen any evidence sitting here today

12   that he has operational control of G Fashion, correct?

13   A.  Correct.

14   Q.  And you have never seen any evidence sitting here today

15   that he has operational control of Himalaya Exchange, correct?

16   A.  Correct.

17   Q.  And, in fact, during all of your negotiations with Mr. Je,

18   whether it was about the acquisition, the loans, the redemption

19   request, you never communicated with this man Mr. Guo, correct?

20   A.  Correct.

21   Q.  In fact, you have never spoken to Mr. Guo, right?

22   A.  Not to my knowledge.

23   Q.  Sitting here in this courtroom is the first time you've

24   ever seen him in person, right?

25   A.  Correct.

O6HBGUO2                         Collins, Jr. - Cross

1    Q.  Now, I like to talk about Yield Esta.  Can you remind us
2    what Yield Esta is.  Am I saying that right first.
3    A.  Yield Esta, yes.
4    Q.  Can you remind us what it is?
5    A.  It was an investment vehicle for futures trading based on
6    algorithmic programs.
7    Q.  When you say investment vehicle, is that another word for
8    hedge fund?
9    A.  I wouldn't describe this as a hedge fund, but it's similar.
10            THE COURT:  Mr. Kamaraju, if you would spell out what
11   it is you're describing.
12   Q.  So it's Yield Esta.  correct me if I'm wrong,
13   Y-E-L-D-E-S-T-A.  Is that right, sir?
14   A.  It's the word "Yield" with Esta.
15            THE COURT:  If you'll speak into the microphone,
16   please.
17   A.  It's the word "yield" with Esta on it.
18            THE COURT:  Go ahead.
19   Q.  And you just mentioned it was focused on algorithmic
20   trading?
21   A.  Yes.
22   Q.  I'm not going to dive into the details of it.  I want to
23   say, is it fair to say that algorithmic trading is an
24   investment strategy of some sort?
25   A.  Yes.

O6HBGUO2                          Collins, Jr. - Cross

1  Q.  And it's the investment strategy that Yield Esta employs,

2  right?

3  A.  Yes.

4  Q.  A when you say it's focused on futures trading, a future is

5  just a particular kind of asset class, right?

6  A.  Correct.

7  Q.  So Yield Esta employs a particular investment strategy tied

8  to a particular asset class, right?

9  A.  Correct.

10  Q.  And who sets the strategy, for that investment strategy for

11  Yield Esta?

12  A.  I did.

13  Q.  It wasn't the folks at G/Clubs who invested that set the

14  strategy, right?

15  A.  No.

16  Q.  Are you a registered investment advisor, sir?

17  A.  No, I don't have to be.

18  Q.  I wasn't asking about the obligation.

19        When G/Clubs invested in Yield Esta, you provided them

20  certain information about the, I'll use investment your term

21  "investment vehicle," right?

22  A.  Correct.

23  Q.  They decided if they wanted to invest, right?

24  A.  Correct.

25  Q.  They sent you subscription documents, right?

O6HBGUO2                         Collins, Jr. - Cross

1   A.  Yes.

2   Q.  They sent you money, right?

3   A.  Yes.

4   Q.  And, in fact, they sent you money before they were even

5   allowed to open accounts at the bank, right?

6   A.  I don't remember that.

7   Q.  Withdrawn.  Once G/Club sent the money to you, it was your

8   decision how to invest it though, right?

9   A.  Yes.

10  Q.  And you do have experience advising clients on investments,

11  right?

12  A.  Yes.

13  Q.  You worked at a fund before, right?

14  A.  Yes.

15  Q.  Before you got into the banking space?

16  A.  Yes.

17  Q.  What was the name of that fund?

18  A.  Mother Rock.

19  Q.  Now, after G/Clubs had opened its accounts, we'll stick

20  with Alex H, Alex H suggested that you should meet another

21  potential client, right?

22  A.  Yes.

23  Q.  And that was the cryptocurrency exchange Himalaya Exchange,

24  right?

25  A.  Yes.

O6HBGUO2                          Collins, Jr. - Cross

1   Q.  And I think you testified that was in late summer or early
2   fall of 2021, right?
3   A.  Yes.
4   Q.  So the exchange had not -- was not up and running yet at
5   this time, right?
6   A.  No.
7   Q.  It was still in developmental phases, right?
8   A.  We had not pursued plans to launch the exchange very early
9   in our process.
10  Q.  I'm sorry.  I think I may have confused you with my
11  question.
12          I was referring to the Himalaya Exchange was not up
13  and running by the late summer of 2021?
14  A.  I don't think so.
15  Q.  How many -- again, I'm not asking for names, was it unusual
16  for you to have a cryptocurrency exchange as a client?
17  A.  No.
18  Q.  So you had others, right?
19  A.  Over time.  Timeline is important in all these questions.
20  Q.  Fair enough.  And I'm not trying to pin you down to
21  anything.
22          Prior to beginning to engage with the Exchange,
23  Mercantile had had other exchanges as clients in the past,
24  that's my question?
25  A.  Yes.

1  Q.  Now, at the time you first learned of the Himalaya

2  Exchange, Mercantile was experiencing a bit of a cash crunch,

3  right?

4  A.  Yes.

5  Q.  And you had been trying to raise money to keep the bank's

6  operations going, right?

7  A.  Correct.

8  Q.  And you were telling potential investors that you needed

9  cash to keep the bank going, right?

10  A.  Yes.

11  Q.  And one of the investors that you, let's say recorded for

12  lack of a better phrase, was a company called Tingo, right?

13  A.  Yes.

14  Q.  What is Tingo?

15  A.  At the time I understood Tingo to be a company doing

16  commodity transactions in Europe and Africa who had ambitions

17  to go public.

18  Q.  Based on what you knew at the time, so I'm just asking for

19  what you knew, sir.  Did you know if Tingo had any

20  cryptocurrency operations?

21         MR. FINKEL:  Objection, pertains to what we talked

22  about at the sidebar.

23         THE COURT:  Sustained.

24         MR. KAMARAJU:  Could I have a very brief sidebar on

25  this, your Honor?

O6HBGUO2                          Collins, Jr. - Cross

1              THE COURT:  Okay.

2                  (Continued on next page)

O6HBGUO2                          Collins, Jr. - Cross

1               (At the sidebar)

2               MR. KAMARAJU:  So the only reason I asked that is

3     because the timeline, as I understand it is, he is discussing a

4     transaction with Tingo.  He then meets William Je, and William

5     Je proposes a transaction, and he opts to go with William Je's

6     transaction over Tingo, including in part because his bank and

7     the Exchange had synergies, on the cryptocurrency front.  The

8     only reason I was asking about Tingo was to point out that he

9     switched courses so to speak mid-race to go with the company

10    that better fit his business.  That's the entire point.

11              THE COURT:  I think it's understood that a bank may be

12    courting a number of clients or a number of clients may be

13    looking to open accounts with the bank.  I don't see why you

14    need to specifically go into Tingo.

15              MR. KAMARAJU:  I'm not going into Tingo -- the only

16    reason -- my point is not that there's a bunch of different

17    suitors for the bank.  My point is actually that he picked the

18    suitor.  He had the choice and he picked the suitor that best

19    suited his interest.

20              THE COURT:  You don't need to make that point by

21    comparing it to an entity that's not relevant to this case.

22    You can ask him why did he pick.

23              MR. KAMARAJU:  Okay.  But if his answer is why did you

24    pick and he sells, well, Tingo, didn't have cryptocurrency

25    capability and the Exchange does, then are we in the same

O6HBGUO2                           Collins, Jr. - Cross

1    place?

2              THE COURT:  Then you can go into Tingo.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6HBGUO2                         Collins, Jr. - Cross

1                   (In open court; jury present)

2     BY MR. KAMARAJU:

3     Q.  So, Mr. Collins, we were talking about the fact that you

4     were discussing a potential transaction with Tingo, right?

5     A.  Yes.

6     Q.  And in November of 2021, you traveled to London to meet

7     with them?

8     A.  Yes.

9     Q.  At the same time you also met with Mr. Je, right?

10                  MR. FINKEL:  Objection.

11                  THE COURT:  Sustained.

12    Q.  In November of 2021 you traveled to London, right?

13    A.  Yes.

14    Q.  You met Mr. Je there, right?

15    A.  Yes.

16    Q.  You decided to engage in a commercial transaction with

17    Mr. Je's companies, right?

18    A.  Yes.

19    Q.  Why did you pick Mr. Je's companies as opposed to any other

20    potential suitors the bank might have had?

21    A.  In part my memory was they improved the price.  I believed

22    them to be liquid.  I was unclear of Tingo's liquid.  Tingo is

23    still evolving relative to their public ambition, which was

24    interest but pose some risk.  I would say those are the major

25    factors.

O6HBGUO2                          Collins, Jr. - Cross

1    Q.  Now, just stick with your meeting with Mr. Je for a second

2    please.

3           So you testified on direct that he ran the Himalaya

4    Exchange, right?

5    A.  Yes.

6    Q.  And you visited his office in London during this trip?

7    A.  It's a suburb of London, but yes.

8    Q.  Those offices occupied several floors of a building, right?

9    A.  I don't recall being on more than one floor.

10   Q.  You testified that there was an arbitration, correct?

11   A.  Where are we in the timeline?

12   Q.  Well, you testified on direct that the bank filed an

13   arbitration against Hamilton, correct?

14   A.  Correct.

15   Q.  And you submitted a declaration in that arbitration,

16   correct?

17   A.  I don't recall the documents that were part of it.

18   Q.  How many sworn statements do you recall submitting in

19   connection with that arbitration?

20   A.  I have no idea.

21   Q.  Was it more than one?

22   A.  I don't know.

23   Q.  Did you testify in the arbitration?

24   A.  I believe I did.

25   Q.  Prior to testifying in the arbitration, did you submit any

O6HBGUO2                         Collins, Jr. - Cross

1   sworn statements?

2   A.  I don't recall.

3   Q.  Just for the witness could we show him DX60551, please.

4   Could we just scroll through it, please.  If we could go to

5   page 19, please.

6              Do you recognize this?

7   A.  Yes.

8   Q.  Is this the declaration you submitted in connection with

9   the arbitration?

10  A.  I believe so.

11  Q.  Could we turn to page eight and highlight paragraph, just

12  the last sentence of paragraph 46 and please just read it to

13  yourself, sir.

14             THE COURT:  So it's now 11:30, so we will take our

15  break.  Members of the jury, remember that you're not allowed

16  to discuss the case amongst yourselves or with anyone else.

17  Don't permit anyone to discuss the case in your presence.

18  Don't read, watch or listen to anything from any source about

19  anything that touches upon the subject matter of this trial.

20  Sir, you may step out.  Don't discuss your testimony.

21             THE LAW CLERK:  Jury exiting.

22             THE COURT:  You may be seated.  You may step out, sir.

23             (Witness temporarily excused)

24             (Continued on next page)

25

O6HBGUO2                    Collins, Jr. - Cross

1           (Jury not present)

2           THE COURT:  Is there anything before we resume at

3    noon?

4           MR. KAMARAJU:  Nothing from the defense.

5           MR. FINKEL:  Just to avoid a sidebar when we resume.

6    I think defense counsel is going to a proper place with the

7    declaration, which is either to refresh his recollection or

8    impeach.  But to the extent the defense is seeking to introduce

9    the 20-page declaration, we would object to that.  And we can

10   settle that not at a sidebar.  It seems like we're going to a

11   proper place. But to efficient, I just wanted to put that on

12   the record.

13          MR. KAMARAJU:  I don't plan to try to admit the

14   declaration.  I was going to try to use it for, refresh his

15   recollection.  I guess possibly impeach him.  To the extent it

16   is used for impeachment, I think what I will do if it makes

17   sense to your Honor is, simply ask to admit the specific

18   statement that is reflected in the declaration and only publish

19   that statement to the jury.  And then we can have a redacted

20   version down the road before it goes to the jury.  That's what

21   I would propose.

22          THE COURT:  That seems appropriate.

23          MR. FINKEL:  Thank you.

24          MR. KAMARAJU:  Thank you, your Honor.

25          (Recess)

O6H1GUO3                    Collins - Cross

1           (Jury not present)

2           THE COURT:  Please have the witness resume the stand

3    and please bring the jurors in.

4           (Jury present)

5           THE COURT:  Please be seated.

6           Remember that you're still under oath.

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  You may continue your cross-examination.

9           MR. KAMARAJU:  Thank you, your Honor.

10   BY MR. KAMARAJU:

11   Q.  So I think when we left off, you were reviewing a document

12   on your screen.  I'm just going to direct you—to help to

13   orient you, I'm happy to show you the first page again, but

14   otherwise, I'm going to direct you to the last sentence of this

15   paragraph.

16   A.  My memory is this is a document produced out of the

17   arbitration.

18   Q.  Okay.  And does this document help refresh your

19   recollection as to whether Mr. Je's offices in London occupied

20   several floors of an office building?

21   A.  Yes.  I'm not sure I went to any other floors than the one

22   I was on.

23   Q.  Okay.  That wasn't my question; just simply that there were

24   multiple floors of the business, right?

25   A.  According to this statement, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6H1GUO3                        Collins - Cross

1    Q.  And it was your impression that the businesses employed a

2    lot of people, right?

3    A.  Mm-hmm.

4    Q.  More than a hundred?

5    A.  My memory is it was approximately 200.

6              MR. KAMARAJU:  We could take that down for now.  Thank

7    you.

8    Q.  Now I think before we looked at that, you were explaining

9    some of the reasons why you chose to go with Hamilton and the

10   Himalaya Exchange companies for the acquisition, right?

11             THE COURT:  Mr. Kamaraju, speak into the microphone.

12             MR. KAMARAJU:  Sorry, your Honor.

13   Q.  And one of those reasons was that you perceived a synergy

14   between the bank and the exchange, right?

15   A.  Yes.

16   Q.  And you were telling your shareholders that, right?

17   A.  Yes.

18   Q.  Okay.  Can you explain what you thought the synergy would

19   be between the bank and the exchange.

20   A.  Well, we had always planned on having a crypto exchange, a

21   digital asset exchange, as part of our offering, and had not

22   launched it yet, so there was the potential for us to work

23   closely with a digital asset exchange that happened to own a

24   large portion of us.

25   Q.  And given your prior interest in starting an exchange, you

1  had some ideas as to how to improve the Himalaya Exchange,
2  right?
3  A.  Yeah.  We didn't get very far along that path.
4  Q.  Sure.  But you made some initial suggestions, right?
5  A.  I don't remember what they were.
6  Q.  Okay.  Well, let me ask you this:  You previously invested
7  in Bitcoin, right?
8  A.  Yes.
9  Q.  Okay.  One of the ideas that you suggested to the exchange
10 was that they should list Bitcoin too, right?
11            MR. FINKEL:  Objection.  401, 403.
12            THE COURT:  You may answer.
13 A.  I don't remember that specific suggestion, but it seems
14 reasonable.
15 Q.  Okay.  You were aware at the time that the Himalaya
16 Exchange started that it only listed two tokens, right?
17 A.  Yes.
18 Q.  Okay.  And that was H Coin and H Dollar, right?
19 A.  Yes.
20 Q.  And so it made sense to you that it should list more
21 tokens.
22 A.  That's reasonable.
23 Q.  Now you discussed some of those suggestions with David
24 Fallon, right?
25 A.  That's who I would have discussed it with, probably.

1   Q.  Who is Mr. Fallon?

2   A.  I would best describe Dave as the head trader of the firm.

3   Q.  Okay.  And just so we're clear, when you say "the firm,"

4   which firm are you referring to?

5   A.  Well, he was like many of their employees, who worked for

6   many of the firms.

7   Q.  Okay.  Did he work for Hamilton as one of those?

8   A.  Yes.

9   Q.  Okay.  Did he work for the exchange as one of those?

10  A.  The Himalaya Exchange?

11  Q.  Yes, sir.

12  A.  Yes.

13  Q.  Okay.  So he played a role at several of Mr. Je's

14  companies, correct?

15  A.  Yes.

16  Q.  And I believe you testified to this, but Hamilton was a

17  hedge fund owned by Mr. Je, correct?

18  A.  Owned is a difficult word, but controlled by Mr. Je would

19  be better.

20  Q.  Okay.  Fair enough.  He controlled it, right?

21  A.  Yeah.

22  Q.  All right.  And prior to reaching your deal with the

23  exchange, you did due diligence on the exchange, right?

24  A.  Yes.

25  Q.  And the exchange did due diligence on the bank, right?

O6H1GUO3                          Collins - Cross

1   A.  I believe so.

2   Q.  And as part of that mutual due diligence process, you

3   traveled to London, right?

4   A.  Yes.

5   Q.  You spent a few weeks there at Mr. Je's offices, correct?

6   A.  Yes.

7   Q.  On the bank side, were you the only person involved in that

8   due diligence?

9   A.  No.

10  Q.  Okay.  Who else was involved?

11  A.  My compliance team, my legal team, my CFO.

12  Q.  Okay.  And on the exchange's side, who did you interact

13  with when it came to that due diligence?

14  A.  Priya Patel, Georgette, David, there was a young gentleman

15  that was sort of an analyst, whose name I can't recall.  Oh,

16  Harrison was his name.

17  Q.  Okay.  So as part of that due diligence process, you didn't

18  speak to Mr. Guo, right?

19  A.  No.

20  Q.  Okay.  You didn't speak to Yvette Wang, right?

21  A.  No.

22  Q.  Now as part of that due diligence process, there was an

23  independent valuation done, right?

24  A.  Yes.

25  Q.  And that was of what the bank would be worth with the

O6H1GUO3                        Collins - Cross

1   investment, correct?

2   A.  Correct.

3   Q.  Okay.  I'm not going to ask you to get into particulars,

4   but you provided the information for that valuation, right?

5   About the bank, I mean.

6   A.  We provided the information that related to the bank for

7   that valuation.

8   Q.  Yes.  Sorry.  My question was unclear.  Specifically, just

9   so the record is clear, the information that went into the

10  independent valuation about the bank came from you, not

11  Mr. Je's companies, correct?

12  A.  I believe so.

13  Q.  Okay.  And you believed that this transaction could

14  generate significant value for the bank, right?

15  A.  I did.

16  Q.  Okay.  Both in the short term because of your cash flow

17  crunch, right?

18  A.  Correct.

19  Q.  But then also on longer term, right?

20  A.  I'd like to go back to timelines, because you're conflating

21  a bunch of information as though it all happened at once.

22          The first investment that Mr. Je made occurred long

23  before we were working on any analysis of the valuation.  The

24  valuation, as I recall, occurred, or began, around February or

25  March, and I don't remember exactly when we received a report;

O6H1GUO3                        Collins - Cross

1    and the larger-investment dollar amounts, those discussions

2    didn't happen until after he had made his first investment.  So

3    that's the answer to your question.

4    Q.  Okay.  So just so we're clear, you had long-term plans for

5    the bank, right?

6    A.  Define long-term.

7    Q.  Okay.  You had plans to help try to grow the bank, right?

8    A.  Yes.

9    Q.  And they weren't going to happen the day after you signed

10   the deal, right?

11   A.  No.

12   Q.  Okay.  How long did you think it was going to take to grow

13   the bank to the scale that you envisioned?

14   A.  Several years.

15   Q.  Okay.  That's what I mean by long-term then, okay?

16   A.  Okay.

17   Q.  So over the course of a—withdrawn.

18          So some of the money that Mr. Je was going to invest

19   was intended to fuel long-term growth, right?

20   A.  Yes.

21   Q.  And you believed that that could greatly increase the value

22   of the bank, correct?

23   A.  Yes.

24   Q.  In fact, you told Mr. Je at one point that you thought the

25   bank could be worth a billion dollars, right?

O6H1GUO3                          Collins - Cross

1           MR. FINKEL:  Objection.

2           THE COURT:  Overruled.  You may answer.

3    A.  I don't recall having that specific conversation, but there

4    is a scenario where it could be worth that.

5    Q.  Okay.  Now I think in the answer you gave a second ago, you

6    alluded to this, but the total money that was going to be sent

7    from Mr. Je's companies to your companies was broken up into

8    chunks, right?

9    A.  Three parts.

10   Q.  Okay.  So can you explain to us just what the three parts

11   are.

12   A.  There was the initial investment, which required very

13   little approval and no approval by the regulator.  I believe

14   that amount was roughly 2.7 to $3 million.

15           There was what we would call the September 16th close,

16   which was 49½ million additional, and it was contemplated that

17   in or about six months later, we would fund another 50 million

18   into the bank.

19           THE COURT:  What do you mean by "we would fund"?

20           THE WITNESS:  I'm sorry.  Well, post September 16th,

21   our executives of the bank would be working for William Je and

22   the Hamilton enterprises, so that's what I meant by "we"

23   collectively, but it would have been Hamilton's money.

24           THE COURT:  Go ahead.

25   BY MR. KAMARAJU:

O6H1GUO3                          Collins - Cross

1   Q.  And the latter of the two chunks that you talked about——so

2   not the initial investment that didn't require OCIF approval

3   but the two chunks after that——are we clear?

4   A.  Yeah.

5   Q.  Those were each to be made pursuant to separate agreements,

6   right?

7   A.  Yes.

8   Q.  But both sets of agreements were signed on September 16,

9   2022, right?

10  A.  Which agreements specifically were signed?

11  Q.  Sorry.  I mean the agreement related to the second chunk

12  and the third chunk, right?

13  A.  I don't——I don't recall if we documented the third chunk on

14  the September 16th closing.

15  Q.  Okay.  So what agreements were signed?  What agreements

16  were signed as part of the September 16th closing?

17  A.  A number of agreements.  Quite a few, actually.

18  Q.  Do you remember any?

19  A.  I couldn't enumerate them for you.

20  Q.  Okay.  Those agreements were agreements that upon——well,

21  withdrawn.

22          Pursuant to the agreements signed on September 16,

23  2022, you were expecting that Hamilton was going to wire you

24  money, right?

25  A.  Yes.

O6H1GUO3                          Collins - Cross

1  Q.  So at least there was one agreement signed on September 16,

2  2022, that obligated, in your mind, Hamilton to send you money,

3  right?

4  A.  Yes.

5  Q.  Okay.  And how much money did you believe Hamilton was

6  supposed to send you?

7  A.  $49½ million.

8  Q.  Okay.  So there was one agreement signed on September 16th

9  of 2022 that you believed obligated Hamilton to send you

10 approximately $49 million, correct?

11 A.  Yes.

12         THE COURT:  And when was the money due?

13         THE WITNESS:  It was actually due on the 16th.

14 Q.  Okay.  And you testified on direct that you actually didn't

15 get the money on the 16th, right?

16 A.  Correct.

17 Q.  And you weren't expecting it because it was late in the day

18 on a Friday, right?

19 A.  It's reasonable to assume that the wire process might have

20 been slower than hoped, but it could have—it could have

21 cleared.  It wasn't that late in the day.

22 Q.  Got it.  But it didn't shock you.

23 A.  It did not shock us.

24 Q.  But you had received notification that Hamilton had

25 actually tried to send the wire, right?

O6H1GUO3                          Collins - Cross

 1          THE INTERPRETER:  Counsel, please slow down.

 2   Q.  Sorry.  You had received notification that Hamilton had

 3   tried to send the wire by that time, right?

 4   A.  We received a copy of the wire instructions and receipt

 5   that was sent to Hamilton.

 6   Q.  All right.  So you testified on direct that the reason why

 7   the money never made it to Mercantile was because I think you

 8   said the U.S. Marshals seized it, right?

 9   A.  Yes, sir.

10   Q.  Now after the money didn't show up on the 16th, you

11   continued to communicate with Hamilton about the wire, right?

12   A.  Yes.

13   Q.  Because you still thought there was a chance for the deal

14   to go through, right?

15   A.  We didn't know what was happening until almost Thursday of

16   the following week, so about the 22nd or 23rd.

17   Q.  Okay.  And you were following up with Hamilton because you

18   wanted to see if there was a way for the deal to keep going,

19   right?

20   A.  We wanted to receive the $49½ million.

21   Q.  Yeah.  Pursuant to the investments that Hamilton was going

22   to make, right?

23   A.  Correct.

24   Q.  And you testified that wire was supposed to come from the

25   Silvergate Bank account, right?

1    A.  Yes.

2    Q.  And you thought that——well, let me ask you this.

3    Withdrawn.

4            There was a OCIF approval in place for the

5    transaction, correct?

6    A.  Correct.

7    Q.  And did the OCIF approval set a deadline for when the

8    transaction would have to happen?

9    A.  Yes.

10   Q.  When was that deadline?

11   A.  September 16th.

12   Q.  Okay.  So did you believe that the deal was dead pursuant

13   to the OCIF approval——

14   A.  No.

15   Q.  ——when the——okay.  Just to be clear, so I can ask the

16   question——

17   A.  Sorry.

18   Q.  That's okay.

19           When the money didn't arrive on the 16th, in your

20   view, did that kill the deal under the OCIF approval?

21   A.  No.

22   Q.  Okay.  So the deal could have still gone through even

23   though the OCIF deadline had been missed, right?

24   A.  Our initial view was, if it were nothing more than clerical

25   error, that OCIF would have viewed money received on Monday or

1    Tuesday as sufficient, but that wasn't ultimately the cause of

2    the delay.

3    Q.  Right.  But in essence, if you missed the deadline by a few

4    days due to an explainable error, you thought OCIF would let it

5    slip, right?

6    A.  I wouldn't use that terminology, but——

7    Q.  Let it go through.

8    A.  They would understand.

9    Q.  Fair enough.  But there was some urgency there then to get

10   that situation resolved, right?

11   A.  Yeah.

12   Q.  That's why you reached out to the CEO of Silvergate, right?

13   A.  Correct.

14   Q.  You wanted to push this along, right?

15   A.  Yes.

16   Q.  Because the faster it got resolved, the better, right?

17   A.  Yes.

18   Q.  Because at some point——you never know——OCIF's patience may

19   run out, right?

20   A.  I think that's a fair assessment.

21   Q.  Now Hamilton advised you that the Marshals had seized the

22   funds, right?

23   A.  Yes.

24   Q.  Silvergate Bank wouldn't give you that information, right?

25   A.  Correct.

O6H1GUO3                          Collins - Cross

1   Q.   And you then had another discussion with Mr. Je about

2   potential options to fund the transaction, right?

3   A.   I don't recall that.

4   Q.   You don't recall speaking to him on the phone about other

5   options?

6   A.   No.

7   Q.   Okay.  So the Silvergate reachout was the last option you

8   thought they had; is that right?

9   A.   Once we learned that the funds had been seized by the U.S.

10  government, we did not believe——we wanted to be in a position

11  with our regulator to close the transaction because there has

12  to be good reason for funds to be seized.

13  Q.   I'm sorry, sir.  I don't understand the connection between

14  we wanted to complete the transaction and there had to be a

15  good reason for funds being seized.  Can you explain that to

16  us.

17  A.   Until——until we learned what had happened to the money,

18  which was about I believe Thursday the 22nd, we did not know

19  what had happened to the money.  If it was simply a clerical

20  issue, then I believe OCIF would have accepted the transaction

21  and we would be moving on.  But that's not what happened.  It

22  was seized by the U.S. government, and there's

23  requirements——I'm not a lawyer, I can't describe what those

24  requirements are, but there are requirements of having some

25  legitimacy to seizing the money, and I believe it has to be

1    approved by a court.  So from the perspective of BSA and our

2    relationship with the regulator, it did not——it did not make

3    sense to expect that the transaction would eventually close

4    with him or anybody else involved in his side of the

5    organizations——him being William Je.

6    Q.  Did you tell Mr. Je that?

7    A.  I'm not sure if I did.

8    Q.  Now you have personally spoken with the commissioner of

9    OCIF before, right?

10   A.  Yes.

11   Q.  Did you call the commissioner up and say, hey, this money

12   has been seized, we're calling the transaction off?

13   A.  That would be very unlike me to do that so I don't believe

14   I did.

15   Q.  Okay.  Did you direct your counsel to write a letter to

16   OCIF saying, hey, the money's been seized, let's call the deal

17   off?

18   A.  That is most likely how we communicated, or our counsel

19   called on our behalf.

20   Q.  Okay.  But you don't know one way or the other, right?

21   A.  I don't recall.

22   Q.  Now you testified during the arbitration proceeding,

23   correct?

24   A.  Yes.

25   Q.  And that testimony was under oath, right?

O6H1GUO3                          Collins - Cross

1    A.  Yes.

2    Q.  Just like you're under oath today, right?

3    A.  Yes.

4    Q.  And you remember being asked during your testimony, "Now,

5    do you recall a WhatsApp conversation with William where he was

6    trying to redeem his own cash, his own HDO into cash, to try to

7    complete this transaction?" and responding, "I recall a

8    conversation about that, yes"?

9            MR. FINKEL:  Object.  This mischaracterizes what

10   defense counsel is trying to impeach on.  That's not what the

11   witness testified about at all.

12           THE COURT:  Sustained.

13   Q.  Okay.  Did you have a WhatsApp conversation with William to

14   try to discuss him redeeming his HDO to fund the transaction?

15   A.  We had many WhatsApp conversations during that period.  It

16   would not have been unreasonable for me to have one about that.

17   I don't recall the specific details.

18   Q.  Okay.  You don't recall.

19   A.  The details.

20           MR. KAMARAJU:  Okay.  Then I'd like to pull up just

21   for the witness——I only want you to read it to yourself, okay?

22   And just for the record, I'm showing just the witness and the

23   parties and the Court what's been marked with the Bates number

24   Mercantile DOJ0078835.

25   Q.  Okay.  Sir, could you just read lines 13 to 17, to

1    yourself, please.

2    A.  Can you take the blowup down.  I'm sorry.  Yeah.  Thank

3    you.

4          Okay.

5    Q.  Does this refresh your recollection about whether you had a

6    WhatsApp conversation with Mr. Je about his trying to redeem

7    his HDO into cash to fund the transaction?

8    A.  It does.

9          MR. KAMARAJU:  Okay.  Now could we take that down and

10    could we show just the witness and the parties what's been

11    marked for identification as DX 60556, please.

12    Q.  Take a look at that on your screen, sir.  Do you have it

13    there?

14    A.  Yeah, I do.

15    Q.  Okay.  These are WhatsApp messages that you received from

16    Mr. Je, correct?

17    A.  Yes.

18    Q.  And you received them on September 23, 2022, at 2:01 a.m.,

19    correct?

20    A.  Yeah, the time stamps are unclear if they're U.S. times or

21    Ireland times, which is where I was at the time.

22    Q.  Okay.  But at least what's reflected on the document is

23    2:01 a.m.?

24    A.  Yeah, that's what it says.

25    Q.  Correct.  And the subject matter of Mr. Je's messages

O6H1GUO3                          Collins - Cross

 1    involve redeeming money, right?

 2    A.  Yes.

 3              MR. KAMARAJU:  Okay.  The defense will offer DX 60556,

 4    your Honor.

 5              THE COURT:  Any objection?

 6              MR. FINKEL:  No objection.

 7              THE COURT:  It is admitted.

 8              (Defendant's Exhibit 60556 received in evidence)

 9              MR. KAMARAJU:  Okay.  Could we publish that, please.

10              And could we actually bring up alongside it

11    GX MER1205, which is in evidence.

12    BY MR. KAMARAJU:

13    Q.  Okay.  Do you have both documents on your screen?

14    A.  Yes.  The one ending in 1205 is just a header.

15    Q.  I'll flip through it in a second, but——

16              MR. KAMARAJU:  Okay.  So let's turn the page on 1205

17    to the first page, please.

18    Q.  Okay.  Do you see, at the very top of both documents, where

19    it says, "Messages in chronological order"?

20    A.  Yes.

21    Q.  Okay.  And on the left document, do you see what's in the

22    parentheses there?

23    A.  "Times are shown in GMT + 00."

24    Q.  Okay.  And then on the right document, do you see the same

25    message?

O6H1GUO3                          Collins - Cross

1   A.  Yes.

2   Q.  Okay.  So you would agree with me, sir, that both these

3   messages reflect the same time zone, correct?

4   A.  I just agree that's what the document says.

5   Q.  Okay.  Fair enough.  These two exhibits both reflect that,

6   right?

7   A.  That's what the document says.

8   Q.  Okay.  And so the document on the left, DX 60556, says that

9   those messages were sent before the messages on the document on

10  the right, right?

11  A.  Yes.  Yes.

12  Q.  Okay.  Now you testified on direct that Mr. Je did not tell

13  you who this redemption was going to be for initially, correct?

14  A.  Yes.

15  Q.  Now on the left, in the message from 2:01 a.m., could you

16  please read that to the jury.

17  A.  They're both from 2:01 a.m.

18  Q.  Let's start with the one at the top.

19  A.  Okay.  "Hi, as discussed, my company would like to redeem

20  some money so that we could continue to support the operation

21  of your bank and other entities."

22  Q.  And then what does he go on to say?

23  A.  "Will send you the instruction in the morning."

24  Q.  Okay.  And then in Government Exhibit 1205, he sends you

25  the instruction, right?

O6H1GUO3                         Collins - Cross

1    A.  I can't see.  Oh.

2              MR. KAMARAJU:  You can just put 1205 up on the screen.

3    You can take the other one down.

4    A.  We talk about my meeting with Mahsud, we talk about FV

5    Bank, he mentions he's doing a normal redemption of a client.

6    Scroll down some more, please.

7              I mention I'm on a call with my attorney.  He

8    mentioned documents for ACA.

9              Do I need to go further?

10   Q.  Government Exhibit MER1205 reflects the only redemption

11   request that Mr. Je sent you on September 23, 2022, correct?

12   A.  Correct.

13   Q.  Okay.  And in the exhibit we were looking at, DX 60556,

14   which had the WhatsApp chats from earlier this morning, he said

15   he was going to send you instructions for a redemption,

16   correct?

17   A.  Yes.

18   Q.  So the instructions were for this redemption that's

19   referred to in Government Exhibit 1205, correct?

20   A.  I don't believe the two things are connected.

21   Q.  Okay.  So did he send you instructions for any other

22   redemption later that morning?

23   A.  To be clear, William and I never talked about him using

24   funds to invest in our bank after this moment.  He sent a

25   message at 2:01 in the morning that I didn't respond to, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6H1GUO3                        Collins - Cross

1    then later, he sent in separately a redemption request via ACA

2    Capital.

3    Q.   Okay.  So my question was:  Did he send you any other

4    redemption requests on the morning of September 23, 2022?

5                MR. FINKEL:  Asked and answered.

6                THE COURT:  Sustained.

7                MR. KAMARAJU:  Then I'm going to move to strike his

8    last answer as nonresponsive.

9                THE COURT:  Answer is stricken.

10   Q.   So let me try that question again.  Did you——

11               THE COURT:  So I sustained the asked and answered

12   objection.

13               MR. KAMARAJU:  I'm sorry, your Honor.  I thought once

14   it was stricken, I had the chance to go back.  Fine.

15   Q.   How many redemption requests did Mr. Je send you on the

16   morning of September 23, 2022?

17   A.   I believe one.

18   Q.   If we can scroll down to page 3 of this exhibit. do you see

19   there's a message from Mr. Je at 8:29 p.m.?

20               Sorry.  Go back.  It's the second message from him at

21   8:29 p.m.  Do you see that?

22   A.   "Will call you on how to complete your banking deal as

23   well."

24   Q.   Right.  You only had one banking deal going on with Mr. Je

25   at that time, right?

1   A.  Yes.

2   Q.  And that was the acquisition of Mercantile, right?

3   A.  Correct.

4   Q.  Now you didn't say to Mr. Je, during this Government

5   Exhibit MER1205, hey, William, we can't do a redemption request

6   because the money's been frozen, right?

7   A.  I don't recall making that statement.

8   Q.  You didn't make any similar statement either, right?

9   A.  I don't recall.

10  Q.  You at no point communicated to him that you had a concern

11  about the seizure impacting this redemption request, correct?

12  A.  Once I learned of the seizure, I was in listening mode.

13  Q.  Okay.  So you didn't convey it to him, right?

14  A.  I don't recall making a statement like that.

15  Q.  Now you said you were in listening mode.  You were in

16  listening mode because you anticipated commencing an

17  arbitration, correct?

18  A.  We were just simply trying to sort out what was happening.

19  Q.  Okay.  But you did commence an arbitration, correct?

20  A.  We did.

21  Q.  And you commenced that arbitration after learning that the

22  Department of Justice had seized the money, right?

23  A.  Yes.

24  Q.  And in fact, you commenced that arbitration pretty quickly

25  after learning that fact, right?

O6H1GUO3                          Collins - Cross

1    A.  Yes.

2    Q.  Within days.  Right?

3    A.  I don't know the specific number, but it was quickly.

4    Q.  And how about September 30, 2022, is that when you started

5    the arbitration?

6    A.  That sounds about right.

7    Q.  Now the DOJ had seized the money, right?

8    A.  The wire.

9    Q.  Had seized the wire.  You were suing for those funds,

10   right?

11   A.  Correct.

12   Q.  That's what you were claiming as damages, right?

13   A.  Correct.

14   Q.  How was Hamilton going to pay you that money if the DOJ had

15   seized it?

16            MR. FINKEL:  Objection.

17            THE COURT:  Sustained.

18   Q.  Okay.  What was your understanding of how Hamilton was

19   going to do it?

20            MR. FINKEL:  Objection.

21            THE COURT:  Sustained.

22   Q.  Okay.  Why did you file an arbitration seeking the wire

23   money knowing that DOJ had seized it?

24            MR. FINKEL:  Objection.

25            THE COURT:  Sustained.  He did not testify that he was

1    seeking the wire money.

2              MR. KAMARAJU:  He did, your Honor.

3              THE COURT:  No.

4    Q.  Okay.  Let me try it this way:  Why did you file an

5    arbitration asserting damages based on Hamilton's failure to

6    send the wire to you?

7    A.  Why did we do that?

8    Q.  Mm-hmm.

9    A.  Because I have a responsibility to my shareholders to

10   protect the asset of the bank.

11   Q.  Did you believe that Hamilton had other money that it could

12   use to pay you?

13             MR. FINKEL:  Objection.

14             THE COURT:  You may answer.

15   A.  I don't think that's important to the analysis, given the

16   fact that we had an obligation to protect our legal interest.

17   Q.  So you spent money on the arbitration, correct?

18   A.  I think that's confidential and privileged.

19   Q.  You paid lawyers, right, sir?

20   A.  Yes, so that's privileged, I believe.

21   Q.  Well, the judge is right there.  I'm not asking you for any

22   communications that you've had.  I'm simply saying you paid

23   lawyers.

24             THE COURT:  So what you and your lawyer talked about,

25   that's what's privileged, but the fact of making a payment is

O6H1GUO3                        Collins - Cross

1    not privileged.

2            THE WITNESS:  I did not make a payment.

3    Q.  I'm sorry.  I just want to make sure.  You did not pay?

4    A.  We did not.  We took a contingency arrangement.  There

5    might be some minor out-of-pocket fees that we paid for.

6    Q.  Okay.  Now prior to filing the arbitration, you had

7    visibility into the bank accounts that Hamilton had at

8    Mercantile, right?

9    A.  Yes.

10   Q.  Okay.  There was money in those accounts, right?

11   A.  Yes.

12   Q.  Millions of dollars, right?

13   A.  Yes.

14   Q.  And there were Himalaya Exchange accounts there too, right?

15   A.  Yes.

16   Q.  And there were millions of dollars in those?

17   A.  Yes.

18   Q.  Okay.  Did you ever ask Mr. Je to use any of that money

19   that was at Mercantile Bank to fund the transaction?

20   A.  It became clear to us at that point in time, once we

21   learned of the government seizure, that the regulator would not

22   support a closing transaction, nor do I think we could suggest

23   that it would pass BSA standards.

24   Q.  What about before you learned about the seizure?

25   A.  What about——what's the question about "before you learned"?

O6H1GUO3                          Collins - Cross

1   Q.  Before you learned about the seizure, did you go to Mr. Je

2   and say, why don't you just use the money that's already at the

3   bank?

4   A.  No.

5   Q.  Now as of September 16, 2022, it's fair to say that

6   Mercantile had more than $300 million on deposit, right?

7   A.  We had a lot.  I don't remember the exact number.

8   Q.  Okay.  Hundreds of millions?

9   A.  Yes.

10  Q.  Okay.  And most of that money came from either the Himalaya

11  Exchange or Hamilton, right?

12  A.  I believe so.

13  Q.  North of 80 percent, right?

14  A.  I——it was substantial.

15  Q.  Okay.  Also hundreds of millions of dollars, right?

16  A.  Yes.

17  Q.  And of those hundreds of millions of dollars, a significant

18  portion was meant for Himalaya Exchange customer redemptions,

19  right?

20          MR. FINKEL:  Objection, foundation.

21          THE COURT:  You may answer.

22  A.  They communicated with our compliance department about the

23  nature of the funds.  I don't believe they communicated to us

24  about what their future purpose would be.

25  Q.  Okay.  When we looked at the redemption request from

O6H1GUO3                          Collins - Cross

1   Mr. Je——

2   A.  Yes.

3   Q.  ——that was to redeem money from Mercantile——

4   A.  No.

5   Q.  Well, Mercantile was being asked to send a wire, correct?

6   A.  Yes, but the redemption was between ACA Capital and

7   Hamilton Exchange *[sic]*.

8   Q.  Understood.  But the end product of that redemption, from

9   Mercantile's perspective, was to wire out money, right?

10  A.  We received instructions to wire money that was related to

11  the redemption between ACA Capital and the Hamilton

12  Exchange——I'm sorry——the Himalaya Exchange.

13  Q.  Okay.  And you didn't honor that redemption request, right?

14  A.  We did not.

15  Q.  But if you had honored it——

16  A.  Well, I object to calling it a redemption.  From our

17  perspective, it's not a redemption request, it's simply a wire

18  request.  I did not honor the wire request.

19  Q.  Okay.  So let's use that term.

20  A.  Okay.

21  Q.  Wire request.  So let's just make sure we're clear.  There

22  was a redemption event that happened, in your mind, within the

23  exchange, right?

24  A.  Mm-hmm.  Yes.

25  Q.  Okay.  And then as a product of that request, then your

1    bank would have wired money out of a specific account at the

2    bank, right?

3    A.   Correct.

4    Q.   And there was an account designated at the bank for that

5    purpose, right?

6    A.   Correct.

7    Q.   And that bank was not——withdrawn.

8             That account was not limited to only redemption

9    requests related to Mr. Je or his companies, right?

10   A.   I don't know what you mean by limited.  The account was in

11   the name of the Himalaya Exchange, the funds redeemed owned by

12   the Himalaya Exchange.  They had exclusive authority over the

13   funds, so I don't know what you mean by designation or——it's

14   pretty simple.

15   Q.   I just mean if somebody other than——if another Himalaya

16   Exchange customer other than Mr. Je had wanted to do a

17   redemption and then receive a wire, they would have come from

18   that same account.

19             MR. FINKEL:  Calls for speculation.

20             THE COURT:  Sustained.

21   Q.   Okay.  Prior to Mr. Je making that request, had Mercantile

22   Bank wired out any money based on a Himalaya Exchange

23   redemption request?

24   A.   I don't recall.

25   Q.   Okay.  Was that the first one you had ever come in contact

O6H1GUO3                        Collins - Cross

1    with?

2    A.  Me personally?  Yes.

3    Q.  Okay.  Now you testified that FV Bank is another bank in

4    Puerto Rico, right?

5    A.  Yes.

6    Q.  And you learned that the Department of Justice had also

7    seized exchange money that was held at FV Bank, correct?

8    A.  That was our understanding, based on rumor.

9    Q.  I'm sorry.  That was based on rumor?

10   A.  Yes.

11   Q.  Okay.  Well, Mr. Je also told you that, right?

12   A.  Later, yes.

13   Q.  Well, as of September 23, 2022, you guys both knew about

14   that fact, right?

15   A.  I don't recall the exact day he told us, but they did

16   communicate that.

17          MR. KAMARAJU:  Okay.  Could we pull up GX MER1205,

18   please.

19          THE INTERPRETER:  Your Honor, can you please ask both

20   parties to slow down.  Thank you.

21          THE COURT:  All right.  Please slow down.

22          MR. KAMARAJU:  I will slow down, your Honor.  I

23   apologize.

24   BY MR. KAMARAJU:

25   Q.  Okay.  Could you read the third message down.

O6H1GUO3                         Collins - Cross

1   A.  "He only knows FV Bank is frozen.  He did not know the fund

2   nor the transaction issues."

3   Q.  Okay.  So that's Mr. Je talking to you, right?

4   A.  Yes, on September 23rd.

5   Q.  Okay.  And you understood what he meant when he said "He

6   only knows FV Bank is frozen," right?

7   A.  Yes.

8   Q.  That's the seizure, the DOJ seizure at FV Bank, right?

9   A.  Well, it says frozen, so it might have been a freeze.  It

10  was unclear.

11              THE COURT:  Who is "he" referring to?

12              THE WITNESS:  Mahsud, who's the CFO.  If you look up

13  earlier, I'm saying I'm speaking to Mahsud at 11, and I asked

14  if he was aware of what's happening, and he said, "He only

15  knows FV Bank is frozen."

16  Q.  Now at the time of this message, the Department of Justice

17  had not seized any money yet at Mercantile Bank, right?

18  A.  No.

19  Q.  That wouldn't happen until much later, right?

20  A.  Correct.

21  Q.  But based on the FV Bank seizure, you had concerns that the

22  DOJ would come and seize money at Mercantile, right?

23  A.  I'm sorry.  Can you ask the question again.

24  Q.  Sure.

25              MR. KAMARAJU:  I'm sorry, but would you mind reading

O6H1GUO3                        Collins - Cross

1    it back, please.

2                THE COURT:  Go ahead.

3                (Record read)

4    A.  We just didn't know.  If you say I have concerns, we had

5    concerns about many things.

6    Q.  That was one of them.

7    A.  Yes.

8    Q.  And so you approached the exchange about taking a

9    compliance fee, right?

10   A.  We didn't approach them.  We notified them.

11   Q.  Okay.  You told them——

12   A.  Yes.

13   Q.  ——we're going to take a compliance fee?

14   A.  Legal and compliance.

15   Q.  Okay.  And the legal and compliance fee was going to be

16   10 percent of what was in the Himalaya and Hamilton accounts at

17   your bank, right?

18   A.  That sounds about right.

19   Q.  Okay.  And the exchange objected, right?

20   A.  Yes.

21   Q.  You took the money anyway, right?

22   A.  Yes.

23   Q.  And it was about roughly $28 million, correct?

24   A.  That sounds about right.

25   Q.  And you pulled that money out of the customer bank

1  accounts, right?

2  A.  No.

3  Q.  You put it into its own restricted account, right?

4  A.  I didn't pull the money out of the customer bank accounts.

5  Q.  Okay.  So the $28 million that we've been talking about, it

6  stayed in the same Hamilton accounts?

7  A.  Oh, I'm sorry.  I misunderstood what you were saying.

8  Q.  Okay.  Sorry.  It might have been a confusing question.  Go

9  ahead.

10  A.  We took the money out of the Himalaya- and Hamilton-related

11  accounts, and put it aside.

12  Q.  Okay.  Into its own account, right?

13  A.  I don't recall the specific structure, but that sounds

14  right.

15  Q.  But an account that wasn't in Hamilton or Himalaya

16  Exchange's name, right?

17  A.  Correct.  Correct.

18  Q.  And as a result——withdrawn.

19         And you did that because you were worried that the

20  Department of Justice was going to seize the Hamilton and

21  exchange accounts at Mercantile and thus you wouldn't be able

22  to take that $28 million, correct?

23  A.  I have legal opinions from my internal and external counsel

24  that——

25  Q.  No, no.  I just want to——

O6H1GUO3                        Collins - Cross

1    A.  Let me answer the question.

2    Q.  No, no.  I just want to make sure you didn't disclose any

3    of the actual——

4    A.  That's why I'm flagging it.  Much of that was handled by

5    them, so it's hard for me to agree with the characterization of

6    your words, but that is not unreasonable.

7    Q.  Okay.  And like I said, not asking for your communications

8    with counsel, just for what's in your head.  That made sense to

9    you, right?

10   A.  That's a reasonable approach.

11   Q.  And that's the approach you took.

12   A.  I believe that's the approach we——we took.

13   Q.  Now the Department of Justice came and asked for that money

14   back, right?

15   A.  Yes.

16   Q.  And you gave them some of that money back, right?

17   A.  Yes.

18   Q.  But not all of it, right, sir?

19   A.  No.

20   Q.  Mercantile kept around $5 million, right?

21   A.  I don't remember the precise number, but that's

22   approximately right.

23   Q.  Okay.  And I'm not holding you to a precise dollar figure,

24   but it's in that area, right?

25   A.  Yup.

O6H1GUO3                      Collins - Cross

1    Q.  And Mercantile spent that money, right?

2    A.  We posted it with attorneys to——

3    Q.  I'm sorry.  I didn't understand.

4    A.  We posted it with attorneys, that we felt like we needed

5    representation because of all the noise that's going around.

6    Q.  Okay.  So you used it to hire lawyers, right?

7    A.  Yes.

8    Q.  And you were using it to pay the bank's legal fees, right?

9    A.  Yes.

10   Q.  And that was money that had come from Himalaya Exchange

11   customers, right?

12   A.  No.

13   Q.  So it was not your understanding that the ultimate source

14   of that money was Himalaya Exchange customers, sir; that's your

15   testimony?

16            MR. FINKEL:  Asked and answered.

17            THE COURT:  Sustained.

18   Q.  Now you originally took your legal and compliance fee

19   because you thought you had certain obligations to the

20   government, right?

21   A.  And we needed to defend ourselves because we didn't know

22   what was happening.

23   Q.  Right.  And both your defense obligations and your

24   obligations to the government required you to respond to

25   requests for information, right?

O6H1GUO3                      Collins - Cross

1    A.  Yes.

2    Q.  And you wanted to be able to pay lawyers to do that, right?

3    A.  Yes.

4    Q.  But you didn't want to spend your own money on that, right?

5    A.  I'm not following you.

6    Q.  Well, you didn't want to spend money that the bank already

7    had, right?

8    A.  We didn't believe we contractually needed to.  We could

9    spend the deduction that we took out of the account because

10   that's what the contract says.

11   Q.  Okay.  And that contract that you're referring to says that

12   you can take money out for compliance and legal costs, right?

13   A.  Yes.

14   Q.  But that's not all you used the money for, is it, sir?

15   A.  I'm not sure.

16   Q.  Well, didn't you use some of the money to buy an F1

17   sponsorship?

18   A.  No.

19   Q.  You don't recall testifying to that during arbitration?

20   A.  I don't believe we used the money for legal and compliance

21   to buy an F1 sponsorship.  We did buy an F1 Academy

22   sponsorship, which was much cheaper than an F1 sponsorship.

23   That was the first women's league for F1 drivers.

24   Q.  Okay.  Did the bank have its own money that it could spend

25   on that academy sponsorship?

O6H1GUO3                          Collins - Cross

1   A.  Yes.

2   Q.  So the bank had the money to spend on the academy

3   sponsorship, but not on its own legal bills, right?

4          MR. FINKEL:  Objection.

5          THE COURT:  Overruled.  You may answer.

6   A.  We were just operating according to our contractual rights.

7   Q.  Did your contractual rights allow you to exercise control

8   over fraud proceeds?

9   A.  That's a question that really an attorney needs to answer.

10  Q.  I'm just asking your understanding, sir.

11  A.  I don't have an understanding of it.

12  Q.  So that never occurred to you.

13  A.  I think we had it reviewed by counsel and they responded.

14  Q.  Okay.  So even though you moved money out of those accounts

15  and then spent it on corporate expenses, the Department of

16  Justice has never suggested that they were going to charge you

17  or anybody at Mercantile with a crime, right?

18  A.  They have never said that they would not charge me with a

19  crime.

20  Q.  I asked the other question, sir.

21  A.  What was the other question?

22  Q.  Have they ever said that they're going to?

23  A.  No.

24  Q.  These folks here have never said that to you, right?

25  A.  No.

1   Q.  And you're here, you don't have any kind of agreement with

2   them with respect to that, right?

3   A.  Be more specific.  I don't know what you mean.

4   Q.  Have you ever heard of a nonprosecution agreement?

5   A.  Not really.  This is my first criminal trial.

6   Q.  Okay.  So it's fair to say you don't have one with them,

7   right?

8   A.  I do not have a nonprosecution agreement.

9          MR. KAMARAJU:  No further questions at this time, your

10  Honor.

11         THE COURT:  Redirect?

12  REDIRECT EXAMINATION

13  BY MR. FINKEL:

14  Q.  Mr. Collins, do you know what representations Miles Guo

15  made to customers of the Himalaya Exchange concerning

16  whether——well, do you know what representations Miles Guo made

17  to the customers of the Himalaya Exchange?

18  A.  Other than some of the marketing material I've seen, which

19  I'm not sure I'd style as representations, I don't really have

20  knowledge.

21  Q.  Do you speak Mandarin?

22  A.  No.

23  Q.  Do you know what the H Coin lockup is?

24  A.  No.

25  Q.  Do you know what AIAI is?

O6H1GUO3                         Collins - Redirect

```
 1   A.  No.
 2   Q.  What about A10; do you know what that is?
 3   A.  A10.  I feel like that came across in something I looked
 4   at, but I really don't know what it is.
 5            MR. FINKEL:  If we can pull up MER8, please.
 6   Q.  You were asked some questions during cross-examination
 7   about the redemption or wire transfer that William Je sought to
 8   get out of Mercantile Bank; is that correct, sir?
 9   A.  Yes.
10   Q.  Now can you tell us, please, where William Je wanted to
11   send that redemption, that wire.
12   A.  To a bank called First Abu Dhabi Bank based in the UAE.
13   Q.  Did he suggest sending it to Silvergate Bank?
14   A.  No.
15   Q.  Did he suggest sending it to Mercantile Bank?
16   A.  No.
17   Q.  You were asked on cross about whether you thought there was
18   a difference between the messages that you received at 2 a.m.
19   and the sort of rest of the messages with respect to a
20   different transaction.  Do you believe there's a difference
21   between the two?
22   A.  Very much so.
23   Q.  Can you explain why.
24   A.  As I mentioned, I didn't respond to the prior messages.  We
25   never had a conversation about how they could continue the
```

1    transaction with the bank because we made it—it was clear to

2    us that the regulator wouldn't approve the transaction, nor did

3    I feel comfortable proceeding with a partner that appeared to

4    be the target of serious criminal prosecutions.

5    Q.  You were asked some questions about Mercantile's due

6    diligence—is that correct—on cross-examination?

7    A.  Yes.

8    Q.  And I believe you said that part of the due diligence

9    process is relying on attestations by the client?

10   A.  Yes.

11   Q.  What do you mean by that?

12   A.  We—we ask all clients to make certain attestations for

13   some—some of it's simple, like who are the UBOs of the

14   business, and we rely on their statements in part to understand

15   the reality.

16   Q.  So the passing of due diligence by Himalaya Exchange relied

17   on statements made by employees of the Himalaya Exchange; is

18   that fair to say?

19   A.  Very much so.

20   Q.  And the passing of due diligence by G/CLUBS relied on

21   statements made by employees of G/CLUBS; is that fair to say?

22   A.  Very much so.

23   Q.  And same for G Fashion; is that true as well?

24   A.  Yes.

25   Q.  And you were asked some questions about what evidence you

O6H1GUO3                         Collins - Redirect

1    may have seen regarding the Himalaya Exchange and the UBO of

2    that.  Do you remember those questions?

3    A.  Vaguely.

4    Q.  Have you attended this trial?

5    A.  No.

6    Q.  Do you know who the other witnesses are at this trial?

7    A.  No.

8    Q.  Do you know what the testimony has been or the exhibits

9    that have been introduced?

10   A.  No.

11   Q.  Is part of the due diligence process at Mercantile Bank

12   obtaining recordings of meetings between Miles Guo, Yvette

13   Wang, and William Je about use of funds?

14        MR. KAMARAJU:  Object to the form.

15   A.  No.

16        THE COURT:  Overruled.  You may answer.

17   A.  No.

18   Q.  Have you heard recordings of William Je, Miles Guo, and

19   Yvette Wang discussing use of G/CLUBS funds?

20   A.  No.

21        MR. KAMARAJU:  Same objection.

22        THE COURT:  Overruled.

23   Q.  Fair to say those recordings are not part of your due

24   diligence process at Mercantile?

25   A.  I'm not sure we knew they existed.

O6H1GUO3                          Frosini - Direct

1   Q.  Do you know who Haitham Khaled is?

2   A.  No.

3   Q.  The term "like-minded individuals," was that your term or

4   Ana Izquierdo's term?

5   A.  Honestly, I don't have a strong recollection of who uttered

6   that into existence.

7           MR. FINKEL:  One moment, please.

8   Q.  Did you ever buy HCN?

9   A.  No.

10  Q.  Did you ever buy HDO?

11  A.  No.

12          MR. FINKEL:  Nothing further.

13          THE COURT:  Recross?

14          MR. KAMARAJU:  No, thank you, your Honor.

15          THE COURT:  You may step out.

16          (Witness excused)

17          THE COURT:  And the prosecution may call its next

18  witness.

19          MS. MURRAY:  Thank you, your Honor.  The government

20  calls Christine Frosini.

21          THE LAW CLERK:  Please raise your right hand.

22          (Witness sworn)

23          THE LAW CLERK:  Please be seated.

24          THE COURT:  Please state your name and spell it.

25          THE WITNESS:  Christine Frosini.  C-H-R-I-S-T-I-N-E,

1    Frosini, F-R-O-S-I-N-I.

2              THE COURT:  You may inquire.

3     CHRISTINE FROSINI,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. MURRAY:

8    Q.  Good afternoon, Ms. Frosini.

9    A.  Good afternoon.

10   Q.  What kind of work do you do?

11   A.  I'm a broker associate.

12   Q.  If I could ask you to speak into the microphone.  If you

13   could just pull it towards you.

14   A.  I'm a broker associate for Prominent Properties Sotheby's.

15   Q.  And what is Prominent Properties Sotheby's?

16   A.  Real estate firm.

17   Q.  How long have you been a realtor?

18   A.  For 22 years.

19   Q.  What sort of properties do you buy or sell?

20   A.  Mostly residential.

21   Q.  What types of clients do you have?

22   A.  All sorts.  I have first-time buyers, repeat buyers, all

23   different levels.

24   Q.  What geographic area do you work in?

25   A.  Bergen County.

O6H1GUO3                          Frosini - Direct

 1  Q.  And in what state is that?

 2  A.  New Jersey.

 3  Q.  Were you involved with the purchase of the property located

 4  at 675 Ramapo Valley Drive in Mahwah, New Jersey?

 5  A.  Yes.

 6  Q.  What is the name by which you know that property?

 7  A.  Crocker Mansion.

 8          MS. MURRAY:  Ms. Loftus, if we could please pull up

 9  for the witness Government Exhibit 134.

10  Q.  Ms. Frosini, do you recognize Government Exhibit 134?

11  A.  Yes.

12  Q.  What is it?

13  A.  Crocker Mansion in Mahwah, New Jersey.

14          MS. MURRAY:  Your Honor, the government offers

15  Government Exhibit 134.

16          MS. SHROFF:  Your Honor, may I just ask one question.

17          THE COURT:  Yes.

18          MS. SHROFF:  Thank you.

19  VOIR DIRE EXAMINATION

20  BY MS. SHROFF:

21  Q.  You didn't take the photograph, right, Ms. Frosini?

22          THE WITNESS:  No.

23          MS. SHROFF:  Thank you very much.  No objection, your

24  Honor.

25          THE COURT:  It is admitted.

O6H1GUO3                          Frosini - Direct

 1                (Government's Exhibit 134 received in evidence)

 2                MS. MURRAY:  If we could publish that, please.

 3    BY MS. MURRAY:

 4    Q.  And if you could describe for the jury, please,

 5    Ms. Frosini, what part of the Crocker Mansion are we looking at

 6    at the front of this picture?

 7    A.  This is the front of the estate.

 8    Q.  And so if you could describe where, if at all, one would

 9    approach the mansion, based on this photo.

10    A.  This is the front of the estate where you have a circular

11    drive.

12                MS. MURRAY:  And Ms. Loftus, we can take that down.

13                If we could now put up, for the witness only, please,

14    Government Exhibits 145 and 146.

15    Q.  Starting on the left with 145, Ms. Frosini, do you

16    recognize what's depicted in Government Exhibit 145?

17    A.  Yes, that's the——that's the entryway from Ramapo Valley

18    Road to the estate.

19    Q.  And looking on the right at Government Exhibit 146, do you

20    recognize what's depicted in that exhibit?

21    A.  You know, the house is kind of small there, but it looks

22    like the property.

23    Q.  Which property?

24    A.  The property of Crocker Mansion.

25                MS. MURRAY:  Your Honor, the government offers

1    Government Exhibits 145 and 146.

2            MS. SHROFF:  May I just, your Honor?

3            THE COURT:  You may.

4    VOIR DIRE EXAMINATION

5    BY MS. SHROFF:

6    Q.  Ms. Frosini, you didn't take these photographs either,

7    correct?

8    A.  No.

9            MS. SHROFF:  I have no objection.

10           THE COURT:  They are admitted.

11           (Government's Exhibits 145 and 146 received in

12   evidence)

13           MS. MURRAY:  If we could please publish, Ms. Loftus.

14           And now that the jury can see it, Ms. Loftus, on the

15   left, on Government Exhibit 145, could you please zoom in on

16   the plaque that is shown.

17   Q.  And Ms. Frosini, could you please read what's on that

18   plaque.

19   A.  Crocker Mansion, 675 Ramapo Valley Road.

20           MS. MURRAY:  Thank you, Ms. Loftus.  We can take that

21   down.

22   Q.  Ms. Frosini, what was your role, if any, in the purchase of

23   the Crocker Mansion?

24   A.  I represented the buyer.

25   Q.  And again, if you could just pull the microphone straight

O6H1GUO3                          Frosini - Direct

1    in front of you.

2    A.  I'm sorry.

3    Q.  Acoustics are tricky here.  Thank you.

4          Who was the buyer that you represented?

5    A.  The buyer was Taurus Fund.

6    Q.  Approximately when did your involvement with this real

7    estate purchase begin?

8    A.  November 27, 28 of 2021.

9    Q.  And who was your primary contact for the buyer, the Taurus

10   Fund?

11   A.  An attorney called Aaron Mitchell.

12   Q.  Did you know Aaron Mitchell before this real estate deal

13   had started?

14   A.  No.  Actually, the call came in from Sotheby's

15   International, and they had answered that incorrectly.

16   Q.  And when you say the call came in, can you describe what

17   you mean by that.

18   A.  Yes, the——Aaron Mitchell contacted Philip White, who's the

19   CEO of Sotheby's International Real Estate, and Philip White

20   contacted the co-owner of Prominent Properties Sotheby's to

21   tell him that he had a client that wanted to see a couple of

22   homes, and then I was called in on it to help the buyer.

23   Q.  Did there come a time when you had a discussion with Aaron

24   Mitchell regarding his interest in purchasing a property?

25   A.  He contacted——yes, they contacted me to tell me the

O6H1GUO3                          Frosini - Direct

1    properties they were interested in seeing.

2    Q.  And what properties, if any, did you discuss with Mitchell

3    during that initial conversation?

4    A.  The two properties that they wanted to see, which was

5    Crocker Mansion and another property in Hyde Park, New York.

6             MS. MURRAY:  Ms. Loftus, if we could please put up and

7    publish Government Exhibit 128.

8    Q.  Ms. Frosini, do you recognize the individual depicted in

9    Government Exhibit 128?

10   A.  It looks like Aaron Mitchell.

11            MS. MURRAY:  Thank you, Ms. Loftus.  We can take that

12   down.

13   Q.  Ms. Frosini, in order to show those two properties you

14   mentioned, what, if anything, did you need from Aaron Mitchell?

15   A.  I needed proof of funds.  When you show properties at that

16   level, the sellers require proof of funds from the buyer.

17   Q.  And what do you mean by proof of funds?

18   A.  Proof of funds basically is that the buyer can afford the

19   property and you either——it either comes in the format of a

20   letter from the buyer's attorney or some people provide bank

21   accounts and they blank out the bank numbers.

22   Q.  And did Aaron Mitchell provide you with proof of funds?

23   A.  Yes.

24            MS. MURRAY:  Ms. Loftus, if we could please show the

25   witness what's marked as Government Exhibit 1100.

1            If we could just flip through a few of the pages,

2    please.

3    Q.  Ms. Frosini, what is this Government Exhibit, Government

4    Exhibit 1100?

5    A.  What——

6    Q.  What information is contained in this exhibit?

7    A.  Right here is a copy of the listing for Crocker Mansion.

8    Q.  And flipping through the remaining pages of this Government

9    Exhibit, is it fair to say that this is your file from the deal

10   for the Crocker Mansion?

11   A.  Yes, the executed contract.  That's the executed contract

12   where both parties signed.

13            THE COURT:  Ms. Frosini, if you would draw the

14   microphone close to your mouth so that we can hear you.

15            THE WITNESS:  I'm sorry.  Mm-hmm.

16            THE COURT:  You can move closer and move the chair

17   closer.

18            MS. MURRAY:  Your Honor, the government offers

19   Government Exhibit 1100.

20            THE COURT:  Any objection?

21            MS. SHROFF:  No, your Honor.

22            THE COURT:  It is admitted.

23            (Government's Exhibit 1100 received in evidence)

24            MS. MURRAY:  Ms. Loftus, if we could please publish

25   Government Exhibit 1100 at page 63.

O6H1GUO3                        Frosini - Direct

1                     And we can zoom in on the top portion.

2       BY MS. MURRAY:

3       Q.   Ms. Frosini, what is this?

4       A.   Yes.  That's the proof of funds.

5       Q.   And what is the date on this letter?

6       A.   November 25, 2021.

7       Q.   Who sent this letter?

8       A.   Aaron Mitchell.

9       Q.   Looking at the top left, what is the name that's associated

10      with the letterhead on this letter that Aaron Mitchell sent?

11      A.   Lawall & Mitchell, LLC.

12      Q.   And what does the subject line or the regarding line read

13      for this letter?

14      A.   Family Trust Real Estate Purchase.

15      Q.   If I could ask you now to read the main paragraph of this

16      letter, starting with "This firm."

17      A.   This firm represents Mei Guo and her Family Trust and has

18      done so for many years.  I am aware of Ms. Guo's financial

19      wherewithal and can confirm that she is in funds to purchase

20      real estate in cash in an amount she determines, up to the full

21      asking price of the property she currently wishes to view and,

22      further, that such funds shall be held in escrow by this firm

23      to complete any transaction entered into by Ms. Guo or her

24      designated entity.  I trust this is sufficient, but should you

25      have any questions, do not hesitate to contact me."

1    Q.  Ms. Frosini, at this time did you know who Mei Guo was?

2    A.  No.

3    Q.  Today, do you know who Mei Guo is?

4    A.  I've met her.

5    Q.  Who is she?

6    A.  The daughter.

7    Q.  The daughter of whom?

8    A.  Of Mr. and Mrs. Guo.

9    Q.  What, if anything, did you understand Mei Guo's involvement

10   to be with this real estate purchase?

11   A.  To purchase the home.

12   Q.  How, if at all, was Mei Guo involved in the purchase?

13   A.  Excuse me?

14   Q.  How, if at all, was Mei Guo, the daughter, involved in the

15   purchase?

16           MS. SHROFF:  Asked and answered, your Honor.

17           THE WITNESS:  I met her.

18           THE COURT:  Overruled.  You may answer.

19           THE WITNESS:  I'm sorry?

20           THE COURT:  Go ahead.

21   A.  I met Ms. Guo once or twice at the house, Crocker Mansion.

22   Q.  And this letter refers to the property she currently wishes

23   to view.  What property, if any, is that referring to?

24   A.  So this was used to view Hyde Park and Crocker Mansion.

25   Q.  And did there come a time when you showed those two

O6H1GUO3                        Frosini - Direct

1    properties to members of the Guo family?

2    A.  Yes.

3    Q.  Which property did you show first?

4    A.  Hyde Park.

5           MS. MURRAY:  We can take that down, Ms. Loftus, for

6    the moment.

7    Q.  Can you please describe the Hyde Park property for the

8    jury.

9    A.  Hyde Park was a unique property that was located on the

10   Hudson River, very modern style.

11   Q.  What was the approximate size of that property?

12   A.  You know what, I don't recall the square footage of that

13   home.

14   Q.  Would you describe it as a large home?

15   A.  Not really.  I mean, to some it may be large, but, you

16   know, it wasn't like——it wasn't huge.

17   Q.  And who, if anyone, went to the showing at the Hyde Park

18   property?

19   A.  Mr. and Mrs. Guo and then there were the driver——I drove

20   myself and met them there, but they had a driver and a couple

21   of security personnel.

22   Q.  Do you know Mr. Guo's first name?

23   A.  Miles.

24   Q.  And his wife, do you know her name?

25   A.  No.

O6H1GUO3                         Frosini - Direct

1   Q.  Did Mei Guo attend that showing of the Hyde Park property?
2   A.  She couldn't, and Aaron Mitchell said she couldn't go—
3           MS. SHROFF:  Objection to the hearsay, your Honor.
4           THE COURT:  Don't say what someone else said.  Just
5   answer, did she or did she not attend.
6           THE WITNESS:  I'm sorry.
7   A.  No.
8   Q.  Did Aaron Mitchell attend that showing?
9   A.  No.
10  Q.  Can you describe how long the showing took at the Hyde Park
11  property.
12  A.  Maybe an hour.
13  Q.  During that showing did you communicate with Mr. Guo?
14  A.  A little.
15  Q.  How did you communicate with him?
16  A.  I introduced myself.  We walked through the house with the
17  other brokers.  You know, there was always a little bit of a
18  communication—I couldn't understand with the English that
19  well.
20  Q.  In what language did you communicate with Mr. Guo?
21  A.  Me?  English.
22  Q.  Do you know whether he speaks any other languages?
23  A.  Chinese.  I don't know what dialect.
24  Q.  And Ms. Frosini, do you speak any dialect of Chinese?
25  A.  No.

1    Q.  Do you understand any dialect of Chinese?

2    A.  No.

3    Q.  So during the Hyde Park showing what, if anything, did Guo

4    say about that property?

5              MS. SHROFF:  Objection.  It's hearsay.

6              THE COURT:  Overruled.  You may answer.

7    A.  They just really walked through the rooms.

8    Q.  And when you say "they," to whom are you referring?

9    A.  Mr. and Mrs. Guo.

10   Q.  When was the second showing of the Crocker Mansion?

11   A.  After.  So from that estate, we went to Mahwah, to Crocker

12   Mansion.

13   Q.  Was that the same day?

14   A.  Yes.

15   Q.  Before we talk about the showing, can you describe the

16   Crocker Mansion for the jury.

17   A.  Crocker Mansion is an estate, a replica of an estate in

18   England, big estate, on 12 acres.

19             MS. MURRAY:  Ms. Loftus, if we could please publish

20   Government Exhibit 1100 at page 1.

21   Q.  Ms. Frosini, what type of document is this?

22   A.  This is called a listing.

23   Q.  And for which property?

24   A.  This is for Crocker Mansion.

25             MS. MURRAY:  Ms. Loftus, if we could zoom in on the

O6H1GUO3                        Frosini - Direct

1    top portion, please.

2    Q.   Looking at the photo here, Ms. Frosini, is that a photo of

3    the Crocker Mansion?

4    A.   Yes, it is.

5    Q.   And to the right, kind of the first line of text, "Last

6    LP," do you see that?

7             MS. MURRAY:   We could highlight it, Ms. Loftus.

8    A.   Yes.

9    Q.   What does that refer to?

10   A.   That means the last listing price, which means, you know,

11   that was the current listing price at that time.

12   Q.   And then looking down several lines, there's Original LP.

13            MS. MURRAY:   If we could highlight that, Ms. Loftus.

14   Q.   Ms. Frosini, what does that refer to?

15   A.   The original listing price.

16   Q.   And so for the Crocker Mansion, actually, on what date was

17   this report run, looking at the top right?

18   A.   So looking at the top, this was listed February 16, 2021.

19   Q.   And for that listing, the last listing price was what?

20   A.   The last listing price was 33 million.

21            MS. MURRAY:   If we could zoom out on that portion,

22   please, Ms. Loftus, and zoom in on the paragraph that begins

23   down the page.

24   Q.   Ms. Frosini, can you please read this paragraph from the

25   listing description for Crocker Mansion.

O6H1GUO3                          Frosini - Direct

1    A.   "One of the world's magnificent and rare estates,

2    Darlington is an architectural masterpiece located within 25

3    miles of New York City.  Originally constructed in 1907——"

4            MS. SHROFF:  Your Honor, may we just have her slow

5    down because of the translation, please.  Thank you.

6            THE COURT:  So just speak more slowly, please.

7    A.   Okay.  "Originally constructed in 1907, this estate has

8    been meticulously restored, offering approximately 50,000

9    square feet of spectacular living space, and more than 12 acres

10   of marvelous grounds framed by the Ramapo Mountains.  21

11   bedrooms, 19+ bathrooms, rare woods, stonework and

12   craftsmanship throughout.  Reception rooms of grand proportions

13   include great hall, library, tea room, and formal dining room.

14   Restaurant-style kitchen, movie theater, billiard room, indoor

15   lap pool with spa, massage room, wine room, game room, gym,

16   outdoor pool with cabana, majestic gardens with two fountains,

17   tennis court, 8-car garage, interior design and furnishings by

18   the world's top designers and artisans.  For detailed property

19   information, see link on Amenity Report (added to documents)."

20   Q.   And in the first sentence there's a reference to

21   Darlington.  What does that refer to?

22   A.   I'm not the listing agent.  So——

23   Q.   Do you have an understanding whether this paragraph refers

24   to what you know as the Crocker Mansion?

25   A.   Yes.

O6H1GUO3                        Frosini - Direct

1                MS. MURRAY:  Ms. Loftus, can we please go to page 64

2    of Government Exhibit 1100.

3    Q.  Ms. Frosini, what is this document?

4    A.   This is what's called an amenity sheet, which highlights

5    home features of the home.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6HBGUO4                        Frosini - Direct

1    BY MS. MURRAY:
2    Q.  And focusing at the top of this document, can you read what
3    the bolded text reads?
4    A.  Welcome to Darlington, 675 Ramapo Valley Road, Mahwah.
5    Q.  And that address, 675 Ramapo Valley Road, that's the
6    address of the Crocker mansion, correct?
7    A.  Correct.
8    Q.  If we could zoom in on the top third, please, Ms. Loftus.
9         Are these photos of the Crocker mansion?
10   A.  Yes.
11   Q.  Let's go to the next page, please, Ms. Loftus.  If we could
12   zoom in a bit so it's easier to see.
13        Ms. Frosini, generally speaking, what is this?
14   A.  This is a list of the renovations that the seller did from
15   2008 to 2018.
16   Q.  I'm not going to go through bullet by bullet.  Ms. Loftus
17   if we could go to the next page, please, and then the next
18   page.
19        Ms. Frosini, generally speaking, what was the extent
20   of the renovations that had been done as of the time of the
21   showing?
22   A.  Enormous extent.
23   Q.  And what areas of the Crocker mansion had been renovated at
24   the time of the showing?
25   A.  The entire home.

O6HBGUO4                          Frosini - Direct

1   Q.  So that's 1100 at page 67, can we put that back up.  If you

2   could just focus on the very last line of text there.

3           Ms. Frosini, can you read that last line here?

4   A.  Approximate cost of material and labor performed between

5   2008/2018 is $19 million.

6   Q.  Thank you, Ms. Loftus.  We can take that down now.

7           So turning to your showing of the Crocker mansion, who

8   attended that showing?

9   A.  Mrs. and Mr. Guo, myself, the seller, the driver, the

10  Guo's driver and a couple security men.

11  Q.  What type of car did the Guos arrive in for that showing?

12  A.  I don't remember.

13  Q.  Did you ride with the Guos to that showing?

14  A.  No.

15  Q.  Approximately how long did the showing take?

16  A.  It was longer than Hyde Park.  I'm guessing to say over an

17  hour.

18  Q.  What, if anything, did Mr. Guo say about the Crocker

19  mansion during that showing?

20          MS. SHROFF:  Same objection, your Honor.

21          THE COURT:  Overruled.  You may answer.

22  Q.  What, if anything, did Miles Guo, Mr. Guo, say about the

23  Crocker mansion during the showing?

24  A.  Comments about the detail of the home basically.

25  Q.  What are some examples of those comments?

O6HBGUO4                         Frosini - Direct

1   A.   The detail of the millwork of the home and the quality of

2   the home.

3   Q.   Based on your observations during that showing, what

4   impression, if any, did you have of how Mr. Guo intended to use

5   the Crocker mansion?

6               MS. SHROFF:  Objection.

7               THE COURT:  If you'd step up, please.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6HBGUO4                         Frosini - Direct

1                  (At the sidebar)

2              THE COURT:  You said based on your observations how

3       did he intend to use the home.  I don't know that she can state

4       his intention other than by what he may have said.

5              MS. MURRAY:  Right.  So it is based on her

6       observations.  It's 701 opinion.  She's a real estate broker

7       for 22 years.  She taken people on showings.  The question is

8       whether she formed an understanding during the showing from, as

9       your Honor said, from what she overheard or what she observed

10      or conversations she had; for example, whether it was to be a

11      family home, a residence.

12             THE COURT:  I would like you to be more specific about

13      observation.

14             MS. MURRAY:  I can draw that out a little more.

15             MS. SHROFF:  Your Honor, we have a relevance

16      objection.

17             THE COURT:  This is very relevant.  Ms. Shroff, this

18      is highly relevant as to the purpose of the home.

19             MS. SHROFF:  I know you're ruling against me, but I

20      just want to make my record for a minute.  It's fine. Of course

21      the Court's ruling is always fine.  I do believe that a real

22      estate agent's impression or observation of why a person is

23      buying a property is actually not relevant.  The only relevance

24      here would be nobody's impression.  Whether or not the

25      government can prove why he did or did not buy Mahwah is

O6HBGUO4                        Frosini - Direct

1    something they can prove elsewhere, but not by a real estate

2    agent's impression of what she thinks.

3              THE COURT:  What he stated, what he communicated.

4              MS. SHROFF:  But he never stated anything.

5              THE COURT:  That has not been established that he

6    stated nothing.  He talked about comments about the millwork.

7              MS. SHROFF:  As to the purpose.  The purpose of the --

8    I don't feel well today so you're going to have to excuse me.

9    The purpose of the mansion is not impacted at all by the

10   millwork.  And also it's again her impression of why he was

11   buying the property is irrelevant.  And most importantly here,

12   they've projected that it is May Guo who is the buyer of the

13   property, so it's May Guo's letter they have introduced as the

14   potential buyer of the property.

15             THE COURT:  She can comment about statements made to

16   her, statements she may have overheard that may indicate the

17   intended use of the property.  That's my ruling.

18             (Continued on next page)

O6HBGUO4                          Frosini - Direct

1                  (In open court)

2      BY MS. MURRAY:

3      Q.  Ms. Frosini, directing your attention again to the showing

4      of the Crocker mansion, what, if anything, do you recall about

5      what Miles Guo said about the property during that showing.

6      A.  Not really any comments, that I love the home or anything

7      like that.  Thank you very much.  We'll talk it over and get

8      back to you.

9      Q.  What, if anything, did Miles Guo say during that showing

10     about potential alteration or renovation to the property?

11                 MS. SHROFF:  Objection.  She's answered to what Miles

12     Guo said.

13                 THE COURT:  You may answer.

14     A.  Can you repeat that.  I'm sorry.

15     Q.  What, if anything, did Miles Guo say during the showing

16     about potential alterations or renovations to the property?

17     A.  Nothing.  That was the first time that they saw the house.

18     Q.  Now, after the showing of the Crocker mansion, what

19     happened next?

20     A.  Next was -- and again, you know, this was 2021, but I

21     got -- I don't remember the time, the exact day, but I got a

22     call from Aaron Mitchell that they wanted to proceed with an

23     offer.

24     Q.  The "they" you're referring to, Aaron Mitchell said they

25     want to proceed with an offer, whom did you understand him to

O6HBGUO4                        Frosini - Direct

1   be referring to?

2   A.  He said his client.

3          MS. SHROFF:  Objection to the hearsay.  Objection.

4          THE COURT:  Overruled.  You may answer.

5   A.  His client.

6   Q.  And, Ms. Frosini, generally speaking how did you

7   communicate with Aaron Mitchell involving the Crocker mansion

8   deal?

9   A.  We text and phone calls.

10  Q.  Ms. Loftus, if we can display for the witness what's been

11  marked as Government Exhibit 1101, and if we could scroll

12  through this.

13         Ms. Frosini, what type of document is in Government

14  Exhibit 1101?

15  A.  These are text that I received from Aaron Mitchell and my

16  responses, so it's both of our text back and forth.

17         MS. MURRAY:  Your Honor, the government offers

18  Government Exhibit 1101.

19         MS. SHROFF:  Objection.  Your Honor.  It's hearsay.

20         THE COURT:  Overruled.  It is admitted.

21         (Government's Exhibit 1101 received in evidence)

22  BY MS. MURRAY:

23  Q.  Ms. Loftus, if we could please publish this, and we can

24  zoom in on this top portion that's the full screen.  Thank you.

25         Ms. Frosini, the name of the contact here at the top

O6HBGUO4                          Frosini - Direct

1   of this chat message, can you read that?

2   A.  Aaron.

3   Q.  And the first message we see here, what is the date of

4   that?

5   A.  November 27, 2021.

6   Q.  Now, in these messages are the messages that you sent in

7   blue or in gray?

8   A.  Blue.

9   Q.  And then the gray messages are from Aaron Mitchell; is that

10  right?

11  A.  Correct.

12  Q.  If we could go, please, Ms. Loftus to page three.

13          So looking at the date here --

14  A.  November 28, 2021.

15  Q.  And looking at the bottom message in blue, can you read

16  what that message says, that's from you to Aaron Mitchell?

17  A.  Wanted to keep conversation going.  They can have estate

18  for 28 million furnished.  FYI, original asking price was 39

19  million, adjusted price to 33 million in June.  You can call me

20  later.  Thanks.

21  Q.  And the reference in that letter to estate, what is that

22  estate?

23  A.  Crocker mansion.

24  Q.  If we could go to the next page, please.  Looking in the

25  middle in the gray message from Aaron Mitchell.  What does that

O6HBGUO4                          Frosini - Direct

1    message read?

2    A.  The nothing crazy one?

3    Q.  Correct.

4    A.  Nothing crazy about the property, right?  Violent history,

5    stories of haunting, etc.

6    Q.  What was your response to that message from Aaron Mitchell?

7    A.  Mr. Guo ask me that about ghost, no violence that I know

8    of.  Call me when you're done with dinner.

9    Q.  What were you referring to here with respect to some

10   conversation you had with Mr. Guo about ghost?

11   A.  Sometimes buyers will ask if there's been any violence in

12   the homes or oddities in the homes.

13   Q.  With respect to Mr. Guo in particular, what was your

14   conversation with him?

15   A.  About that question?

16   Q.  Correct.

17   A.  That I would find out.

18   Q.  What, if anything, did he ask you?

19   A.  I'm sorry.

20   Q.  What, if anything, had he asked you that's referenced here?

21         MS. SHROFF:  Objection, your Honor.  That's hearsay

22   and it's asked and answered about this exact conversation twice

23   before.

24         THE COURT:  Overruled.  You may answer.

25   A.  He asked, you know, if there were any ghost in the house.

O6HBGUO4                          Frosini - Direct

1  Q.  When had he asked you that?

2  A.  When we were at the property, when he saw the property.

3  Q.  And the next message, Ms. Frosini, what is the date of

4  that?  It's at the bottom of this page.

5  A.  November 29, 2021.

6  Q.  Ms. Loftus, if we can zoom on that message from

7  Ms. Frosini.

8          Ms. Frosini, there's a reference in this message to

9  the foundation.  Can you read that sentence.  It starts with

10  please let?

11  A.  Please let the foundation know that the owner is putting a

12  detail package of information together for them to review.  I

13  will forward to you tomorrow.  It's a lot of detail.  I can

14  also go to the town and request to look at the file as well.

15  As far as known cemetery, fires, etc., the answer is no.

16  Chris.

17  Q.  Now, Ms. Frosini, what's the foundation that you're

18  referring to here?

19  A.  The buyer.

20  Q.  And what was the name of that buyer?

21  A.  Well, again, the name on the proof of funds was May Guo

22  Family Trust, but the name of the buyer when we're in contract

23  is Taurus Foundation.

24  Q.  And, Ms. Loftus, if we could go to the next page, please.

25  Actually, the following page, excuse me.

O6HBGUO4                    Frosini - Direct

1          Ms. Frosini, focusing on your message here, the second

2    message on the page, what date and time was that sent?

3    A.  December 1, 2021.

4    Q.  And can you read just the first sentence of that message

5    after "Hi Aaron."

6    A.  Owner ask me to put in writing so I will put together a

7    contract of sale.  Please email me the title of who's

8    purchasing the property along with their address.

9          Can we put 10 percent right after attorney review

10   concludes, which is usually a three-day deal?  Let me know

11   about closing date.  Let me know about closing date owners are

12   fine with now December or January, and who is going to be

13   signing this, you?

14   Q.  Now, Ms. Frosini, what were you asking for with the

15   language about the title of who's purchasing the property?

16   A.  Because I needed to know who the title of the buyer would

17   be on the contract when I write it up.

18   Q.  And what were you asking about in the last sentence when

19   you said, Who's going to be signing this, you?

20   A.  Because we do contracts electronically now, so I needed to

21   know whose name or LLC or whatever it was going to be, I needed

22   to know who that was in order for me to finalize the contract.

23   Q.  And if we could go to the next page, please, Ms. Loftus.

24         Looking at the top, same date you texted Aaron

25   Mitchell again, and what was his response at 5:47 p.m. on

O6HBGUO4                          Frosini - Direct

1   December 1?

2   A.  Need to speak to someone in UK repurchasing entity.  Will

3   get back to you tomorrow a.m.

4   Q.  Ms. Frosini, do you know whom Aaron Mitchell was going to

5   speak with?

6   A.  No.

7   Q.  By this point in the sale had you heard of Taurus Fund SP?

8   A.  No.

9   Q.  It continues here, if we could look at the next message

10  from Aaron Mitchell.  It says, Would it be possible for the

11  father to come back to the house tomorrow (10 a.m.) and meet

12  Vinny as well.  Who did you understand the father to be?

13  A.  Mr. Guo.

14  Q.  And who did you understand Vinny to be?

15  A.  He managed the property for the seller.

16  Q.  The next message from Aaron Mitchell begins with, one

17  concern the mother had was the AC was loud.  Do you see that?

18  A.  Yes.

19  Q.  Who did you understand the mother to be?

20  A.  Mrs. Guo.

21  Q.  And that's Miles Guo's wife; is that right?

22  A.  Correct.

23  Q.  If we can go to the next page please, Ms. Loftus.

24          Looking at the second message on this page from Aaron

25  Mitchell, the second gray message on this page.

O6HBGUO4                      Frosini - Direct

1    A.  December 2, 2021.

2    Q.  And Aaron Mitchell text, They are five minutes out.  Who

3    did you understand that to refer to?

4    A.  The buyers.

5    Q.  And then at 2:59 p.m. that same day, what did you text to

6    Aaron Mitchell?

7    A.  What did I text?

8    Q.  Mm hm.  In the blue if we could highlight that, Ms. Loftus.

9    A.  FYI, they just left.

10   Q.  Ms. Frosini, do you recall a visit to the Crocker mansion

11   by the Guos on December 2, 2021?

12   A.  Yes, we had a visit.  I just, you know, the date, again it

13   was two years ago; but, yes, we were there.

14   Q.  What happened during that visit?

15   A.  They looked at the house in more detail.

16   Q.  Can you walk us through what you recall about that visit on

17   December 2nd?

18   A.  That they went through the house in more detail, every

19   room, and I wasn't with them all the time because I just let

20   the buyers go off, especially when they're there a second time.

21   They want to talk amongst themselves.

22   Q.  And for this visit who attended?  Who were the buyers that

23   came to that visit?

24   A.  You know what, I don't really remember.

25   Q.  Do you remember whether Mr. Guo, Miles Guo, attended that

O6HBGUO4                          Frosini - Direct

1  visit?

2              MS. SHROFF:  Objection, asked and answered.

3              THE COURT:  You may answer.

4  A.  Yes, and the daughter may have been there that day.  I

5  don't remember the days; but, yeah, I don't remember exactly

6  who was there.  I mean, Mr. Guo was there, and I believe maybe

7  the daughter that day.  But again, I can't promise it was that

8  day.

9  Q.  Focusing on Mr. Guo in particular, did you have any

10 discussions with Mr. Guo that day during that visit?

11 A.  Casual conversation possibly.  Again, there was a language

12 little difficulty, but casual conversation here and there.

13 Again, I didn't walk through the whole entire house with them.

14 Q.  If we could go, Ms. Loftus, to the next page, please.

15 Looking at the top text here from you to Aaron Mitchell, what

16 is the date?

17 A.  December 3, 2021.

18 Q.  Can you read that message.

19 A.  Aaron, if I were to get seller to agree to 26 closing

20 December 20, do you think that would work?

21 Q.  What is the "26" here a reference to?

22 A.  You know what, I'm looking at this myself here.  You know

23 what, I don't know.

24 Q.  Looking down a bit further there's a text from Aaron

25 Mitchell middle of the page.  What information is he requesting

O6HBGUO4                        Frosini - Direct

1   about the seller?

2   A.  Do you have seller's full name so I can put in a letter.

3   Q.  And then a few messages down he sent another text that

4   begins with email.  Do you see that?

5   A.  Emailed you letter.  Let me know if you need anything else.

6   Q.  If we could go to the next page, please, Ms. Loftus.  This

7   is again the same day, December 3rd.  The message from Aaron

8   Mitchell that begins, Hi, can you read that, please?

9   A.  Hi, Chris, do you have the floor plans for Crocker.

10  Q.  And what was your response?

11  A.  I'll get it.  Were they happy with sellers accepting their

12  offer?  Seller may want to wait for me to send it until we have

13  the signed contract.  I'll let you know.

14  Q.  And what was Aaron's Mitchell's response to that text?

15  A.  They were more focused on getting it ready for their taste,

16  so if I can get them quickly, great.

17  Q.  Ms. Frosini, did you have an understanding of who the

18  "they" was that Aaron Mitchell was referring to?

19  A.  Yes.

20  Q.  Who?

21  A.  Again, the buyers.

22  Q.  And who were the buyers?

23         MS. SHROFF:  Objection, asked and answered.

24         THE COURT:  Overruled.  You may answer.

25  A.  The buyers were the Guo family.

O6HBGUO4                              Frosini - Direct

1    Q.  Ms. Loftus, we can take that down.  If we could pull up for

2    the witness, please, Government Exhibit 1102.  If we could

3    scroll through.

4             Ms. Frosini, do you recognize the document in

5    Government Exhibit 1102?

6    A.  These were the floor plans that were given to me by the

7    seller.

8    Q.  Have you reviewed this exhibit previously?

9    A.  When I received it.

10   Q.  Are these various documents relating to the Crocker mansion

11   deal?

12   A.  Correct.

13            MS. MURRAY:  Your Honor, the government offers

14   Government Exhibit 1102.

15            MS. SHROFF:  Objection, your Honor.  May we have a

16   sidebar?

17            THE COURT:  Okay.

18            (Continued on next page)

19

20

21

22

23

24

25

O6HBGUO4                          Frosini - Direct

1                    (At the sidebar)

2              MS. SHROFF:  Your Honor, the document is an email

3    exchange between a person named Gladys Chow and the realtor.

4    There is no relationship or co-conspirator argument that would

5    make these exchanges admissible, and they are written hearsay.

6    So for those reasons, the email exchanges between Ms. Chow and

7    the real estate agent we would object to.

8              THE COURT:  What do they say?

9              MS. SHROFF:  She asks a lot of questions and the real

10   estate agent replies.  She ask about furnishings.  She ask for

11   recommendation for decorators.  She asks for how and who she

12   should use to refurbish the place.  There's no hearsay

13   exception to Ms. Chow's interaction with the real estate agent.

14             THE COURT:  Who is Ms. Chow?

15             MS. SHROFF:  Ms. Chow is an employee.

16             THE COURT:  Of?

17             MS. SHROFF:  I believe she's an employee -- I'm not

18   sure technically who she is an employee for.  I really think

19   you should not laugh or scoff at me, Mr. Finkel.

20             MR. FINKEL:  I'm not laughing at you.  I was laughing

21   at your response.

22             MS. SHROFF:  That's the same thing, my response.

23             MR. FINKEL:  I apologize, Ms. Shroff.

24             MS. SHROFF:  Ms. Chow's communication with the real

25   estate agent are hearsay, and for those reasons we would

O6HBGUO4                    Frosini - Direct

1    object.

2        MS. MURRAY:  Your Honor, Ms. Chow is an agent of Miles

3    Guo.  She is communicating with the real estate agent as she's

4    communicated with various other people on behalf of Mr. Guo,

5    asking questions for Mr. Guo, taking responses back to Mr. Guo.

6    Indeed, Gladys Chow was on the list of potential

7    attorney/client privilege that defense counsel provided to the

8    government a year ago.  Because they said that she was an

9    interpreter in an assistant relationship with Mr. Guo.  She was

10   so close that she might be privy to privileged communication.

11   She is frequently communicating, not only with Mrs. Frosini,

12   but with various other people, including; for example, Paolo

13   Sozzi, one of the government's anticipated witnesses about

14   additional renovations.  And she is conveying information from

15   Mr. Guo and providing it back to Mr. Guo.  She's clearly an

16   agent and there's an exception.

17       THE COURT:  These emails come in.  Let's move on.

18       MS. SHROFF:  There's no evidence in the record about

19   the facts that Ms. Murray has recited at sidebar.  There's been

20   no testimony to this effect.  There's been no testimony about

21   Ms. Chow.  There's been no testimony about a potential witness

22   to come obviously because the witness has not yet testified.

23   There's no establishment of an agency relationship between

24   Ms. Chow and Mr. Guo.  And the fact that she would be on a

25   privilege could also reflect the fact that she translated for

O6HBGUO4                          Frosini - Direct

1   him after his arrest in the jail.  So for those reasons,

2   there's been no establishment of an agency relationship between

3   Gladys Chow and Mr. Guo.  Additionally, your Honor, the

4   government knows this full well because they approached

5   Ms. Chow and sought to speak to her, and she declined.  None of

6   this is in evidence, therefore, I continue to object on

7   hearsay.

8            MS. MURRAY:  Your Honor, I certainly intend to ask

9   Ms. Frosini the next question who Ms. Chow was and what the

10  nature was of her interaction with Ms. Chow.

11           THE COURT:  The email comes in.

12           (Government's Exhibit 1102 received in evidence)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6HBGUO4                          Frosini - Direct

1          (In open court; jury present)

2          THE COURT:  Go ahead.

3    BY MR. FINKEL:

4    Q.  Ms. Loftus if you can publish what's now in evidence as

5    Government Exhibit 1102.  Let's go to page 63. If we could zoom

6    in on this email at the bottom, please.

7          Ms. Frosini, what is the date of this email?

8    A.  December 3, 2021.

9    Q.  And who sent this email?

10   A.  Aaron Mitchell.

11   Q.  If you could read the email that you received from Aaron

12   Mitchell?

13   A.  Does this work to show interest intent?  Let me know if he

14   wants deposit, etc. or if he is good with the number.  His

15   attorney can speak to our attorney handling the closing.

16   Q.  And if we could go to the next page, please, Ms. Loftus,

17   and zoom in on the content portion here.

18          Ms. Frosini, what is this?

19   A.  This is a letter of intent.

20   Q.  For what property?

21   A.  For 675 Ramapo Valley Road, Crocker mansion in Mahwah.

22   Q.  What is the date of this letter of intent?

23   A.  December 3, 2021.

24   Q.  I'm going to read the letter.  Thank you for taking the

25   time to show representatives of my client your property at 675

O6HBGUO4                         Frosini - Direct

1    Ramapo Valley Road in Mahwah, New Jersey.  My client has

2    authorized me to formally offer 26 million to purchase the

3    property.  This would be a cash deal.  Per you request closing

4    would occur on or before December 20, 2021.

5            First of all, who did you understand the

6    representatives of my client to be in this letter?

7    A.  I don't know why he wrote it that way.

8    Q.  This refers to --

9            MS. SHROFF:  Objection.  Move to strike as

10   non-responsive.

11           THE COURT:  Sustained.  If you'll read back the

12   question, please, and listen to the question and answer that

13   question.

14   A.  You said thank you for taking the time to show

15   representatives of my client.  I don't know what he means,

16   Aaron Rogers means by show representatives instead of saying my

17   client or the buyers.  Maybe that's his term to say

18   representatives.

19           MS. SHROFF:  Your Honor, I move to strike everything

20   after "I don't know what he means."

21           THE COURT:  From "maybe" I'm striking.  Go ahead.

22   Q.  Ms. Frosini, the reference here to showing certain people

23   the property, whom did you show the property to who was

24   associated with Aaron Mitchell?

25           MS. SHROFF:  Objection to the leading.

O6HBGUO4                        Frosini - Direct

1    A.  The Guo family.

2          THE COURT:  Sustained.  Who did you show the property

3    to.

4          THE WITNESS:  The Guo family.

5    Q.  If we could go to Government Exhibit 1102 at page 19,

6    please.  Looking at this email at the top, what is the date of

7    this email?

8    A.  December 6, 2021.

9    Q.  And what property is this regarding according to the

10   subject line?

11   A.  675 Ramapo Valley Road.

12   Q.  At the top of the content of the email starting with sent,

13   there's some text in bold and italics.  Do you see that?

14   A.  Yes.

15   Q.  What does that read?

16   A.  Sent on behalf of Bruce E. Whitaker.

17   Q.  Who is Bruce E. Whitaker?

18   A.  The seller's attorney.

19   Q.  And looking at the first sentence here, start with attach,

20   what does that read?

21   A.  Attach is a fully executed contract.  Please note that I

22   have made one modification to paragraph 3C which is to have the

23   deposit held in our trust account.  Please have buyer initial

24   this modification.

25   Q.  And if we could go, Ms. Loftus, to page 21.  That's the

O6HBGUO4                      Frosini - Direct

1    attached contract.

2         Ms. Frosini, if we could focus on item seven down to

3    the bottom, Ms. Frosini.  Ms. Frosini, who's listed as the

4    seller on this signed contract?

5    A.  Crocker Mansion Estate, LLC.

6    Q.  And who was the buyer?

7    A.  Taurus Fund SP.

8    Q.  What did you understand Taurus Fund SP to be?

9    A.  I don't know.  I didn't ask.

10   Q.  In your real estate practice, how often, if at all, are

11   entities the buyers of properties?

12        MS. SHROFF:  Objection.

13        THE COURT:  Overruled.  You may answer.

14   A.  For significant properties, people will put -- they won't

15   put their personal name.  It will be either LLCs or trusts.

16   Q.  Do you see the Taurus Fund's signature --

17   A.  Yes.

18   Q.  -- on this contract.  How did you get a signed copy of this

19   contract?

20   A.  Electronically.

21   Q.  Do you know the corporate structure of Taurus Fund SP?

22   A.  No.

23   Q.  Looking at the bottom right here, is that your electronic

24   signature on this contract?

25   A.  Yes.

O6HBGUO4                          Frosini - Direct

1   Q.  If we could go to page 18 of this exhibit, Ms. Loftus, and

2   focus on the email from Ms. Frosini.

3          What is the date of this email, Ms. Frosini?

4   A.  December 6, 2201.

5   Q.  And to whom did you send this?

6   A.  To Aaron Mitchell.

7   Q.  If you could read the body of this email?

8   A.  Congrats to the foundation.  Attached is a fully executed

9   contract.  Please see attorneys note below.

10  Q.  Why did you say, Congrats to the foundation?

11  A.  Cause I always congratulate the buyer.

12  Q.  Ms. Loftus, we can take this down.  If we could please go

13  to Government Exhibit 1101, page 12.

14         Starting at the top message, what is the date of this

15  message, this text message from Aaron Mitchell?

16  A.  Any luck with the plans?  They have called me three times

17  today.  My or May and the mother really want to see them.  I

18  want to keep them happy.

19  Q.  And looking first at the date of this message which is just

20  at the top of this screenshot, what was the date that Aaron

21  Mitchell sent you that text message?

22  A.  December 4, 2021.

23  Q.  Who did you understand May to refer to?

24  A.  The daughter.

25  Q.  Whose daughter?

O6HBGUO4                        Frosini - Direct

1    A.  Mr. and Mrs. Guo's daughter.

2    Q.  Who did you understand the mother to refer to?

3    A.  Mr. Guo's wife.

4    Q.  And at the bottom here there's a message from you, the last

5    text from you on this page.  It indicates, Just emailed you

6    floor plans.  Please confirm receipt.

7         And on what date had you emailed Aaron Mitchell the

8    floor plans?

9    A.  December 4, 2021.

10   Q.  Ms. Loftus, if we could go now to Government Exhibit 1102

11   page one, focus on the email.

12        Ms. Frosini, who sent this email?

13   A.  Gladys Chow.

14   Q.  Who is Gladys Chow?

15   A.  Gladys Chow worked with the family.  I don't know her exact

16   tight.

17   Q.  Just to be clear, which family did Gladys Chow work with?

18   A.  The Guo family.

19   Q.  What is the email domain used to send you this message?

20   A.  HCHKTECH.com.

21   Q.  Do you know what HCHKTECH is?

22   A.  No.

23   Q.  And what's the date of this email from Gladys Chow?

24   A.  December 6, 2021.

25   Q.  That's about two days after the text message of the floor

O6HBGUO4                         Frosini - Direct

1    plan?

2              MS. SHROFF:  Objection to the testifying.

3              THE COURT:  Sustained.

4    Q.  Ms. Loftus, if we could pull up page 12 of Government

5    Exhibit 1101, focusing on the middle here.

6              The blue message from you, on what date did you send

7    these two messages to Aaron Mitchell regarding the floor plans

8    to the Crocker mansion?

9    A.  December 4.

10   Q.  And, Ms. Loftus, let's go back to 1102, page one, please.

11             How many days later did you receive this email from

12   Gladys Chow?

13   A.  December 6.

14   Q.  Who is copied on this email?

15   A.  Aaron Mitchell.

16   Q.  Ms. Frosini, can you read this email?

17   A.  Hope you had nice weekend.  We met the other day in the

18   Darlington tour, and I just have a few more questions.  One,

19   would you know any interior kitchen designers, shades and rugs

20   company both New Jersey and New York that can recommend to us.

21             Number two, other than the attached floor plans, do

22   you have any other drawings that can be provided to us.

23             Number three, I have circled three areas on page three

24   of the floor plan.  If we want to empty each one out and

25   convert each of them into one single room, around how long

06HBGUO4                          Frosini - Direct

1    would that take.  Thank you for your help.

2    Q.  Ms. Loftus, we can zoom out of that, and if we could go

3    through the next few pages of Government Exhibit 1102.  Stop

4    there for a moment.

5            Ms. Frosini, what is this?

6    A.  This is a floor plan.

7    Q.  For what property?

8    A.  675 Ramapo Road.

9    Q.  If you could let us know what part of that property does

10   this floor plan represent?

11   A.  I don't have my glasses, first floor.

12   Q.  Thank you.  We can zoom out of that.  Let's go to the next

13   page.  What part of the property is this?

14   A.  Second floor.

15   Q.  And the next page, please?

16   A.  Third floor.

17   Q.  Now, do you see red boxes on this floor plan?

18   A.  Yes.

19   Q.  Is it your understanding that those are the red boxes that

20   Ms. Chow was referring to in her email to you?  We could go

21   back to the first page, Ms. Loftus.

22           Looking again at item three here in Ms. Chow's email,

23   do you see that, Ms. Frosini?

24   A.  Yes.

25   Q.  Let's go back to page four, please, Ms. Loftus.  Based on

O6HBGUO4                         Frosini - Direct

1   that email, is it your understanding that these red boxes

2   indicate a portion?

3              MS. SHROFF:  Objection to the leading.

4   Q.  What is your understanding of what is indicated by the red

5   box?

6   A.  I never answered this question because I wasn't involved in

7   any of that.

8   Q.  Understood.  Setting aside any response, if any, you might

9   have given to the question, what was your understanding of what

10  the question was?

11             MS. SHROFF:  Objection, form.

12             THE COURT:  Are you asking her whether she sees any

13  relationship between the question and what is on the screen?

14             MS. MURRAY:  Yes, your Honor.

15             THE COURT:  You may answer.

16  A.  I really never commented on this at all.

17  Q.  If we can go to the next page, please, Ms. Loftus.

18             Which part of the house does this reflect, Ms.

19  Frosini?

20  A.  Basement.

21  Q.  And then the next page, if we could focus on this.

22             Ms. Frosini, this is an email from you, correct?

23  A.  Correct.

24  Q.  Who did you send this to?

25  A.  Gladys Chow.

O6HBGUO4                        Frosini - Direct

1   Q.  Copying who?

2   A.  Aaron Mitchell.

3   Q.  What was your reply?

4   A.  Thanks for your email.  I will get names designers to you

5   tomorrow and will call the home manager regarding number two

6   and number three below.

7   Q.  Who was the home manager?

8   A.  The home manager was Vinny Labarberi.

9   Q.  Let's go to the next page, please, Ms. Loftus.

10          Ms. Frosini, what is Gladys' response to that email

11  that you had sent?

12  A.  Thank you.  It would be nice if you get us some -- she said

13  DWG.  I'm thinking drawing -- files of the home both 2D and 3D.

14  Thank you.

15  Q.  Ms. Loftus, we can go two pages down to page 10, please.

16          Ms. Frosini, what's the subject of this email that you

17  sent?

18  A.  Floor plans.

19  Q.  What did you provide with this email?

20  A.  Additional floor plans that I had gotten from the seller.

21  Q.  Ms. Loftus, let's go back down another two pages.  Looking

22  at this on the kind of top right of our screen, Ms. Loftus, if

23  you could zoom in on what portion of the home this reflects.

24  Zoom out of that.

25          On the top right along the side, what level are these

O6HBGUO4                          Frosini - Direct

1    additional floor plans relating to?

2    A.  Basement level flooring finish plan.

3    Q.  And, Ms. Loftus, if we could go to the next page and

4    similar exercise.  This is on the left, bottom left.

5    A.  Crocker residence first level furniture floor plan.

6    Q.  And the next page, Ms. Loftus, please.  This one is on the

7    bottom left, which portion of the home are these additional

8    plans relating to?

9    A.  Crocker residence, second level furniture floor plan.

10   Q.  And the next page, please.

11   A.  Crocker residence second level furniture floor plan.

12   Q.  And finally the next page, please, Ms. Loftus.

13   A.  Crocker residence third level furniture floor plan.

14   Q.  If we could zoom out of that.

15          Ms. Frosini, how many levels were in the Crocker

16   mansion?

17   A.  I don't know if I'm mixing.  I believe there was above the

18   finish lower level there are three.

19   Q.  If we could go to the next page, please, Ms. Loftus.

20          Ms. Frosini, what is the subject of this email?

21   A.  Designers.

22   Q.  And the date?

23   A.  December 15, 2021.

24   Q.  Who did you send this to?

25   A.  Gladys.

O6HBGUO4                         Frosini - Direct

1   Q.  At a high level, what did these designs you sent to Gladys
2   do?
3   A.  I just submitted the list to her.
4   Q.  What type of designers are these?
5   A.  Interior designers.
6   Q.  All right.  Ms. Loftus, let's go down to two pages down.
7   Let's zoom out.  I think we're looking to go another page down.
8   Let's go back, Ms. Loftus, to Government Exhibit 1101, page 19.
9              These are again from the text messages with Aaron
10  Mitchell.  The message at the top with Aaron Mitchell reads,
11  Yes, Yvette will be arriving with everyone at noon.  Who is
12  Yvette?
13  A.  Yvette worked with Mr. Guo.
14  Q.  And then at the bottom here, what is the date of that
15  message if we look at the bottom half of these text?
16  A.  December 13, 2021.
17  Q.  What did you write to Aaron Mitchell on that date?
18  A.  FYI, everyone is here.
19  Q.  What was Aaron's response?
20  A.  On my way.  Thought we were meeting at noon.
21  Q.  And then your next two responses, understanding one is a
22  bit cuff off?
23  A.  So did I.  They changed.
24  Q.  And then you write, just spoke to Yvette.  Do you see that?
25  A.  Right.  I think it finishes on just spoke to Yvette.

O6HBGUO4                          Frosini - Direct

1   They --

2   Q.  Can we go to the next page, Ms. Loftus.  Actually, let's go

3   back up one page.

4           Ms. Frosini, do you recall a meeting on December 13,

5   2021?

6   A.  We were doing -- I'm just thinking of when the inspection

7   was.  I don't have my notes.  I don't know when the inspections

8   were.  We had inspections of the home, and then we have

9   structural inspection on another day, and that may have been

10  that day.

11  Q.  And who, if anyone, attended those inspections?

12  A.  The home inspection -- and I may be wrong, the family

13  wasn't there.  I was the whole time.  Then again, I'm sorry,

14  but I'm just guessing.  And then another day we had a

15  structural inspection, and I believe that's when they were

16  there.

17          MS. SHROFF:  Objection, your Honor, to the guessing.

18          THE COURT:  So don't guess.  Just state what you know.

19  Q.  Ms. Loftus, let's go to page 25 of this exhibit.  Ms.

20          Frosini, in the first message from Aaron Mitchell, the

21  first gray message, can you read that message?

22  A.  My message in the gray?

23  Q.  Sorry, the gray from Aaron Mitchell.

24  A.  Thanks, is any time going to be there Thursday or can

25  someone be there to let Scott in with contractor.

O6HBGUO4                          Frosini - Direct

1    Q.   Who is Scott?

2    A.   Scott was a security position.  Don't know his title.

3    Q.   Can we go to the next page, please, Ms. Loftus, focusing on

4    the top portion of this message.

5             Do you see the text message that you sent to Aaron

6    Mitchell there?

7    A.   Yes.

8    Q.   It reads in part, I sent Gladys per her request a bunch of

9    high-end designers.  Let me know if you guys need anything from

10   me.  What type of designers had you sent Gladys the names of?

11   A.   Interior designers.

12   Q.   And let's go to the next page, please.  If you could read

13   your first text message on this page to Aaron Mitchell?

14   A.   I'll meet seller tomorrow morning.  In fact, he wanted me

15   to schedule time between architect and principle, when or

16   tonight.  Let me know.

17   Q.   Who is principle?

18   A.   The client, the buyer.

19   Q.   And which individual in particular were you referring to

20   when you wrote principle?

21   A.   The buyers, the family.

22   Q.   Which family, Ms. Frosini?

23   A.   The Guo family.

24   Q.   And then looking down about two thirds of the way down the

25   page.  There's a message from Aaron Mitchell starts with Scott.

O6HBGUO4                          Frosini - Direct

1    Can you read that in your response?

2    A.   Scott will be there at 11.

3    Q.   And what was your response?

4    A.   Yes, I'm meeting him.

5    Q.   If we could go to the next page, please, and read the top

6    two text messages, the first from Aaron Mitchell?

7    A.   Can the architect and Vinny come to New York to discuss

8    plans.

9    Q.   And then what was your response?

10   A.   I'll ask when.  Just a thought, don't you think it would be

11   best to meet at the home in case they need to walk the rooms.

12   Q.   And then looking down a bit in this chain on December 17,

13   2021, the second message from Aaron Mitchell.  So the last

14   message from him on this page, what does that read?

15   A.   Can you send Amy the structural inspection invoice.

16   Q.   Who's Amy?

17   A.   Amy Buck is the real estate attorney.

18   Q.   What real estate attorney?

19   A.   She's the one that handled the closing for the buyer.

20   Q.   And let's go to the next page, please, Ms. Loftus.

21           We could zoom in on that.  Looking here at the last

22   message on this page from Aaron Mitchell, what does he write to

23   you, starting with Did you?

24   A.   Did you get a receipt for the $1500.

25   Q.   Can you read that message again.  I think you might have

O6HBGUO4                        Frosini - Direct

1   missed one of the words.

2   A.  Did you get Y, the letter Y, a receipt for the $1500.

3   Q.  Who did you understand "Y" to refer to?

4   A.  Did you get Yvette a receipt for the $1500.

5   Q.  Let's go to the next page, please, Ms. Loftus.

6           Ms. Frosini, you wrote, Sent revised you and Amy.

7   Aaron Mitchell responded.  Then your next message that starts

8   with Aaron.  Can you please read that text message?

9   A.  Aaron, please congratulate the buyers for me.  They are so

10  nice and so is there staff.  I need to talk to you about what I

11  can do for them to thank them as well.  Thanks again, Aaron.

12  Q.  In this message, Ms. Frosini, what individuals were you

13  referring to when you said the buyers?

14  A.  The Guo family.

15  Q.  And when you indicated their staff, what staff were you

16  referring to?

17  A.  The security guys, Yvette.

18  Q.  And those are staff of whom?

19  A.  You know, I use the word "staff." Maybe that was

20  inappropriate, but these are the people that I met through the

21  Guo family.

22  Q.  And let's look at the next message that you sent.  What

23  date did you send, Hi Aaron?

24  A.  December 22, 2021.

25  Q.  Can you read that message?

O6HBGUO4                     Frosini - Direct

1   A.  Hi, Aaron.  Tomorrow, do you have a minute to talk.  I'd

2   like to get the buyers something.  In the meantime, is it corny

3   to send them a nice holiday beautiful floral arrangement?

4   Being the privacy factor, I don't know if they would want me to

5   send something to their Connecticut home.  We can talk

6   tomorrow.  Thanks.

7   Q.  Ms. Frosini, did Aaron Mitchell ever respond to that text

8   message?

9   A.  No.

10  Q.  We can take that down, Ms. Loftus.

11          Ms. Frosini, after the purchase of the Crocker

12  mansion, do you have any knowledge of any renovations, if any,

13  that were done to the property?

14  A.  No, I was never there.

15  Q.  Do you know if at all that property was furnished?

16  A.  No.

17  Q.  Did you have any additional or further contact with Aaron

18  Mitchell?

19  A.  No.

20  Q.  Did you have any further contact with the Guo family

21  directly?

22  A.  After the closing of the house?

23  Q.  Correct.

24  A.  Maybe about like two months after.

25  Q.  What was the nature of that contact?

O6HBGUO4                          Frosini - Direct

1   A.  To potentially look at commercial space.

2   Q.  Where was that commercial space?

3   A.  In Bergen County.

4   Q.  Who, if anyone, contacted you about looking at commercial

5   space?

6   A.  Aaron Mitchell was the contact, initial contact.

7   Q.  And what happened?

8   A.  And then I talked to the security, mostly the security

9   guys.

10  Q.  Talk to them about what?

11  A.  About potential commercial space.

12  Q.  Did there come a time, if ever, when you did a showing of

13  potential commercial space in Bergen County?

14  A.  Yes, there were a couple of buildings.

15  Q.  Who, if anyone, did you show those buildings to?

16  A.  Two security and Mr. Guo, just a couple of occasions, but

17  mostly security.

18  Q.  What types of commercial space did you show to security in

19  Bergen County?

20  A.  Office space.

21  Q.  Did you have an understanding of who was going to use the

22  office space that you were showing?

23  A.  Whatever business that the family --

24          MS. SHROFF:  Objection.

25          THE COURT:  You may answer.

O6HBGUO4                          Frosini - Direct

1   A.  Whatever business, you know, the family needed the office

2   space for.  I shouldn't say the family, Mr. Guo.

3   Q.  Did there come a time when you learned the name of any

4   business that was going to be looking into that space?

5   A.  No, never did a contract together.

6   Q.  Was there any offer made on any of the commercial space

7   that you showed?

8   A.  We never put a contract together.

9   Q.  After those interactions, Ms. Frosini, relating to the

10  commercial space, did you have any other contact with the Guo

11  family?

12  A.  No.

13  Q.  And after the commercial space, did you have any contact

14  with the Guo family staff?

15  A.  The staff.

16          MS. SHROFF:  Objection to the phrase, Guo family

17  staff.

18          THE COURT:  Overruled.  You may answer.

19  A.  No, just on the commercial.

20  Q.  But after the commercial showings that you had?

21  A.  No.

22  Q.  What contact did you have with the --

23  A.  The family, no.

24          MS. MURRAY:  May I have a moment, your Honor.

25          THE COURT:  You may.

O6HBGUO4                         Frosini - Direct

1   Q.  Ms. Frosini, based on your interactions representing the

2   buyer of the Crocker mansion, what was your understanding of

3   why the buyer was purchasing the Crocker mansion?

4              MS. SHROFF:  Objection.

5              THE COURT:  Overruled.  You may answer.

6   A.  For their home.

7   Q.  Ms. Loftus, if we could please pull up Government Exhibit

8   Z12 and go to page 19.  This is in evidence.

9              Ms. Frosini, looking at the top of this document, top

10  left, what is the name of the company that's in the top left

11  corner in the box of this document?

12             MS. SHROFF:  Objection.  There's no question other

13  than to read the document.  That's improper.  She can ask a

14  question about the document.

15             THE COURT:  Is the document in evidence?

16             MS. MURRAY:  It is, your Honor.

17             THE COURT:  And the question is again.

18  Q.  The name of the entity listed on the top left here?

19             MS. SHROFF:  Objection.

20             THE COURT:  Overruled.  You may answer.

21  A.  Crane Advisory Group, LLC.

22  Q.  And then the name on the top right in the box?

23  A.  Top right.

24  Q.  Yes?

25  A.  Crane Advisory Group, LLC.

O6HBGUO4                         Frosini - Direct

1   Q.  And, Ms. Frosini, have you seen this document before?

2   A.  Never.

3   Q.  Looking at the first box in the middle of the page with the

4   yellow outline, do you recognize the name of the entity listed

5   there?

6   A.  Lawall & Mitchell, LLC.

7   Q.  Do you recognize that company?

8   A.  Yeah, that's Aaron Mitchell.

9   Q.  And then looking at the bottom here, the three different

10  companies that are listed along the bottom starting at the

11  bottom left, what is that?

12  A.  McDonnell Whitaker Attorney Trust.

13  Q.  And the middle?

14  A.  Insight Title Services LLC Trust.

15  Q.  And the top middle right?

16  A.  Buck Esquire LLC Attorney Trust account.

17  Q.  Are you familiar with the Buck Esquire LLC?

18  A.  That's Amy Buck, the attorney.

19          THE COURT:  Attorney for whom?

20          THE WITNESS:  The buyer, the real estate attorney.

21  The one that did the real estate transaction.

22          THE COURT:  Go ahead.

23  Q.  Let's go to the next page, please, and focus in on the top

24  portion.

25          Ms. Frosini, do you see the property location listed

O6HBGUO4                        Frosini - Cross

1   here, it's under item G?

2   A.  Property location 675 Ramapo Valley Road Mahwah, New

3   Jersey.

4   Q.  That's the Crocker mansion, correct?

5   A.  Correct.

6   Q.  Looking to the right of that in item H, the settlement

7   agent, who is listed as the settlement agency?

8   A.  Insight Title Services, LLC.

9   Q.  And looking back over to the left a bit, item D here, name

10  and address of borrower, what's the name and address of the

11  borrower?

12  A.  Borrower is Taurus Fund, LLC.

13  Q.  And then finally item 101 on the left near the bottom of

14  the screen we're looking at here, what is listed as the

15  contract sales price of the Crocker mansion?

16  A.  26 million.

17          MS. MURRAY:  Just a moment again, your Honor, please.

18  No further questions.

19          THE COURT:  Cross-examination.

20          MS. SHROFF:  Thank you, your Honor.  Could I actually

21  have that exhibit back up.  Thank you.

22  CROSS-EXAMINATION

23  BY MS. SHROFF:

24  Q.  Could I have the first page of that document.

25          Good afternoon, Ms. Frosini, how are you?

1   A.  Fine.  Thank you.

2   Q.  Ms. Frosini, you were just shown this document by

3   government counsel, correct?

4   A.  Correct.

5   Q.  And you met with government counsel before today, correct?

6   A.  Via zoom.

7   Q.  Zoom or otherwise, you met with her, right?

8   A.  I met with Micah Fergenson, and the first time I met her on

9   a Friday via zoom.

10  Q.  Last Friday?

11  A.  With Micah Fergenson, yes.

12  Q.  And she showed you this document; is that correct?

13  A.  No.

14  Q.  I'm saying on direct right now she showed you this

15  document?

16  A.  Yes.

17  Q.  Right?

18  A.  Yes.

19  Q.  Asked you to read it, correct?

20  A.  Correct.

21  Q.  Could you take a look at the document for me please, again.

22  You've never seen it before you said, correct?

23  A.  Correct.

24  Q.  You have no idea whether it's accurate or not, correct?

25  A.  Correct.

O6HBGUO4                       Frosini  -  Cross

1   Q.  Could you tell me where in the document you see the name

2   Miles Guo?

3   A.  I see the name who?

4   Q.  Miles Guo.

5   A.  No.

6   Q.  How about May Guo?

7   A.  No.

8   Q.  How about wife of Miles Guo?

9   A.  No.

10  Q.  How about daughter of Miles Guo?

11  A.  No.

12  Q.  How about staff of Miles Guo?

13  A.  No.

14          MS. MURRAY:  Your Honor, we stipulate Miles Guo is not

15  on this document.

16          THE COURT:  All righty.

17  Q.  So she also asked you about this group called Crane

18  Advisory, correct?

19  A.  Correct.

20  Q.  When you met with the prosecutors on Friday, did she ask

21  you about Crane Advisory?

22  A.  No.

23  Q.  Because you don't know anything about Crane, right?

24  A.  Correct.

25  Q.  And obviously you don't know anything about Hamilton

O6HBGUO4                        Frosini - Cross

1    Opportunity Fund, correct?

2    A.  Correct.

3    Q.  And the only thing you know on here are the people that you

4    worked with, correct?

5    A.  The two attorneys.

6    Q.  Right?

7    A.  Correct.

8    Q.  And that's Lawall & Mitchell, right?

9    A.  Yes, McDonnell Whitaker and Buck Esquire.  I don't know

10   Buck Esquire personally, but I know the name.

11   Q.  So we can take that down, please.

12          Now, if I could just go to Government Exhibit 1100,

13   and if I could just have you look -- could I have it made

14   bigger, please.  Thank you so much.  Could you tell the jury

15   who generated this document?

16   A.  The listing agent, the sellers agent.

17   Q.  And what's a listing agent?

18   A.  The listing agent represents the seller.

19   Q.  And where is this document made public, who sees it?

20   A.  This was made public via New Jersey multiple listing

21   service.

22   Q.  Like if somebody wants to buy a house, they see it?

23   A.  Correct.

24   Q.  And is it like advertisement come by my house kind of

25   thing?

O6HBGUO4                          Frosini - Cross

1   A.  Sure.  It notifies the public that the home is on the

2   market.

3   Q.  And it tries to sell the home, right?

4   A.  Correct.

5   Q.  It highlights the plus points of the property, correct?

6   A.  Correct.

7   Q.  And if you can avoid it, and if it's not required by law,

8   you don't necessarily publish the minus parts of the property,

9   correct?

10           MS. MURRAY:  Objection, calls for speculation.

11           THE COURT:  Overruled.  You may answer.

12   A.  Can you repeat that.

13   Q.  Sure.  And if it's not called for by the law, the

14   disclosure is not called for by the law, you don't necessarily

15   highlight the negative aspect of a property, correct?

16   A.  I mean if there's something negative, I mean, you need to

17   disclose what's on the property.  I really don't understand

18   what you're asking.

19   Q.  So say if the third bedroom didn't get any sunlight, you

20   wouldn't put it on this report, right?

21           MS. MURRAY:  Objection, your Honor, same basis.

22           THE COURT:  Overruled.

23   Q.  You wouldn't put that on --

24   A.  It's not a highlight of the house, so you wouldn't put that

25   on there.

O6HBGUO4                     Frosini - Cross

1    Q.  So you put the highlights of the house on that listing,

2    right?

3    A.  Correct.

4    Q.  So let's just scroll down for a minute, and could we keep

5    going down, please.  And here is the description of the

6    property, correct?

7    A.  Correct.

8    Q.  And you did not prepare this, right?

9    A.  No, I did not prepare it.

10   Q.  And in talking to you about this property, the government

11   counsel also ask you about a second property, correct?

12   A.  Correct.

13   Q.  And that was at Hyde Park?

14   A.  Correct, Hyde Park, New York.

15   Q.  Was that the name of the property or the place?

16   A.  That's the town.

17   Q.  And do you know the name of that property sitting here

18   today?  Do you remember it?

19   A.  Ledge something, and I can't remember.

20   Q.  Do you know which of the two properties was more expensive?

21   A.  Ledge.

22   Q.  Ledge was more expensive.  The Hyde Park property was more

23   expensive than this one?

24   A.  Correct.

25   Q.  Can you please keep scrolling down and keep going.  If I

O6HBGUO4                        Frosini - Cross

1    could just have that made larger.  Could I ask you, is this
2    like a standard contract?
3    A.  The National Association of Realtors, this is the contract
4    that realtors put together when you start negotiating a
5    transaction.
6    Q.  And you use the standard format, right?
7    A.  Yes.
8    Q.  And if we could scroll down to the signature line, and it's
9    signed here, right?
10   A.  Yes.
11   Q.  And it's signed on the left side by the seller of Crocker
12   Mansion Estate LLC, right?
13   A.  Yes.
14   Q.  And who's that?
15   A.  The seller.
16   Q.  Yeah, but who is Crocker Mansion Estate, LLC?
17   A.  That's the seller's LLC.
18   Q.  You don't know who it is, right?
19           Is there a Mr. and Mrs. Crocker Mansion Estate LLC?
20   A.  No.
21   Q.  And the buyer is whom here?
22   A.  Taurus Fund SP.
23   Q.  And you received this document obviously cause you E-signed
24   it below, right?
25   A.  Correct.

O6HBGUO4                          Frosini - Cross

Q.   And for all your purposes, the buyer is Taurus Fund SP,
correct?

A.   Correct.

Q.   It's not Miles Guo, right?

A.   It's Taurus Fund SP.

Q.   And it's not Miles Guo, correct?

A.   I don't know who it is.  I didn't ask.  I just prepare the
contract and it goes to the attorneys.

Q.   Right.  But it doesn't say Taurus, Miles Guo, right?

        MS. MURRAY:  Asked and answered.

        THE COURT:  Sustained.

A.   It says Taurus Fund SP.  I don't know who's included in the
fund.

Q.   You knew a fund was purchasing it, correct?

A.   When I asked the attorney who to write the contract, I was
told to put Taurus Fund SP.

Q.   If somebody wants to sell this property now, the only
seller could be Taurus Fund SP, right?

A.   I'm not an attorney.  I don't know.  If they changed the
name, I don't know.

Q.   I'm telling you if that document remained in place?

A.   Right.

Q.   The only person that could sell it, entity that could sell
it, is the Taurus Fund SP, right?

A.   Right.

O6HBGUO4                          Frosini - Cross

1    Q.  And you reviewed this document and sent it back to whom?

2    A.  I sent this document to -- once the buyer sells this

3    document, then it goes to the seller to sign, and then it goes

4    directly to the attorney.

5    Q.  Whose attorney?

6    A.  It goes to both attorneys, the sellers' attorney and the

7    buyers' attorney.

8    Q.  And is it you who sent it to both the buyers and the

9    sellers attorney?

10   A.  I distribute to the seller's attorney and buyer's, yes.

11   Q.  You sent it to both the seller's attorney and buyer's

12   attorney?

13   A.  No, I think I just sent it to the buyer.  Sometimes what we

14   do if we're representing the buyer, we send it to the buyer's

15   attorney, the listing agent who is representing the seller who

16   then sends it to the seller's attorney, but they both get this

17   contract.

18   Q.  And once they both get the contract, are you essentially

19   done with your part of the job?

20   A.  Yes, the only thing -- yes, they disapprove of the contract

21   and they put the riders together.  And my only part after that

22   is to schedule the inspections.

23   Q.  Who files the title of the property?

24          THE COURT:  All right.  It is now 2:30.  We're now

25   going to take half an hour break.  You may step out.  Don't

O6HBGUO4                      Frosini - Cross

 1    discuss your testimony. we'll resume at 3:00 p.m. Remember,

 2    don't discuss the case amongst yourselves.  Don't permit others

 3    to discuss it in your presence.  Don't read, listen or watch

 4    anything from any source that touches on the subject of this

 5    trial.

 6              THE LAW CLERK:  Jury exiting.

 7              (Jury not present)

 8              THE COURT:  You may be seated.  Is there anything

 9    before we resume?

10              MS. MURRAY:  Not from the government, your Honor.

11              MS. SHROFF:  No, your Honor.  Thank you.

12              (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6H1GUO5                        Frosini - Cross

1                    (Jury not present)

2                    THE COURT:  Please have the jurors brought in.

3                    (Jury present)

4                    THE COURT:  Please be seated.

5                    Remember, Ms. Frosini, you're still under oath.

6                    THE WITNESS:  Yes.

7                    THE COURT:  You may continue the cross-examination.

8                    MS. SHROFF:  Thank you, your Honor.

9    BY MS. SHROFF:

10   Q.  Ms. Frosini, you had deep experience in the real estate

11   market in Mahwah, correct?

12   A.  Correct.

13   Q.  And did you live yourself——I don't need an address or

14   anything——but did you live in that vicinity?

15   A.  Yes.

16   Q.  And had you sold property there before?

17   A.  In Mahwah?

18   Q.  Yes.

19   A.  Yes.

20   Q.  And would it be fair to say in fact that you were chosen to

21   make this sale when they identified this particular property

22   that was of interest to them?

23   A.  Yes.

24   Q.  Is that correct?

25   A.  Yes.

1       MS. SHROFF:  Okay.  If I could just pull up just for

2    the witness and me Defense Exhibit 60612.

3    Q.  Now do you know what the National Register of Historical

4    Places is?

5    A.  The——again, I'm not the listing agent, but the home,

6    because of its historic being, was registered, but I don't know

7    into what registries.

8    Q.  And could you explain a little bit further about the

9    historic significance of this property.

10      MS. SHROFF:  You can take that down.  I'm sorry.

11   A.  Again, I'm not the listing agent so I don't have that

12   detail.

13   Q.  Well, you familiarized yourself with the property before

14   you marketed it, right?

15   A.  I didn't market the property.  I'm not the listing agent.

16   Q.  I'm sorry.  I apologize.  Before you were going to sell it,

17   correct?

18   A.  Yes, I know about——I know about Crocker Mansion, but I'm

19   not sure, you know, which——where it's registered as far as

20   historic value.

21   Q.  Did you know that it was registered as an historic——

22   A.  Yes, it's on the documentation that we received.

23      MS. SHROFF:  Okay.  And so if I could just bring 60612

24   back up just for the witness.

25   Q.  And if you could just peruse the document, if you will.  If

1    I could have you look at page 1, maybe 2, 3.

2              Do you recognize this form?

3    A.  No, I've never seen this form.

4    Q.  I know you may not have seen it, but do you know what a

5    National Register of Historical Places registration form is?

6    A.  I've never registered a home, historically.

7    Q.  Okay.  But do you know what it means to be on the National

8    Register of Historic Places?

9    A.  Again, I'm familiar with registered homes as far as what

10   you can do and what you can't do when a home is registered.

11   But I don't—I can't answer to that.

12   Q.  Okay.  And do you, sitting here today, recall the many ways

13   that this home could be used as it was registered?

14   A.  No.  They had it listed as a residential home.

15   Q.  So do you remember if it was listed for more than one use?

16   A.  No.  Residential.

17             MS. SHROFF:  You can take that document down.

18   Q.  So according to you, this home was only registered as a

19   residential home; that's your——

20             MS. MURRAY:  Objection.  Asked and answered.

21             THE COURT:  Sustained.

22   Q.  Do you—oh, I'm sorry.

23   A.  This was listed——

24   Q.  I think the judge sustained the objection so you don't——

25             THE COURT:  Don't answer.

O6H1GUO5                          Frosini - Cross

1              THE WITNESS:  I'm sorry.

2   Q.  And sitting here today, Ms. Frosini, do you know if that

3   house was in fact registered to be used as a social clubhouse?

4   A.  No.  It's residential.

5   Q.  I didn't ask you if it was residential or not.  My question

6   was:  Sitting here today, do you know if that house could be

7   used as a social clubhouse?

8              MS. MURRAY:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10  Q.  Did you familiarize yourself with the different uses this

11  house could be put to before you sold it?

12  A.  No.

13  Q.  Had you been trying to sell that house before being

14  approached by the Taurus SB Fund?

15  A.  No, before this time, no.

16  Q.  And when you started to sell——is it fair to say you wanted

17  the house to sell?

18             MS. MURRAY:  Objection, your Honor.  Mischaracterizes.

19  Ms. Frosini is the buyer, not the seller.

20             THE COURT:  So she's not representing the seller in

21  the transaction, she's representing the buyer.  Sustained.

22  Q.  You wanted somebody to buy the home, right?

23  A.  I'm not the listing agent, so the seller wants the house to

24  sell.  I represented the buyer, not the listing——not the

25  seller.  I didn't represent the seller.

1    Q.  Okay.  You represented the buyer, right?

2    A.  Correct.

3    Q.  Do you make any money if the house is bought?

4    A.  Yes.  The broker gets a commission.

5    Q.  Right.  So if you're representing the buyer, you still want

6    the house to be bought, right?

7    A.  That's our business.

8    Q.  Exactly.  How else are you going to make money, right?

9    A.  Correct.

10   Q.  Okay.  And you wanted to make sure that the buyer went

11   ahead and bought, right?

12   A.  I want the buyer to buy a house, if not from me, if it's

13   right for the buyer.

14   Q.  And also it's good for you, right?

15   A.  I can't answer the——my focus is on my clients, on my

16   sellers and my buyers and what's best for them.  I'm not

17   looking at my pocket.  This is my work, but I don't look at my

18   pocket.  I do the best for my sellers and buyers.

19   Q.  Okay.  And when you want to make sure that you want to do

20   the best for your buyer, you want to make sure you have all the

21   information about the property, correct?

22   A.  Correct.

23   Q.  You want to be accurate about what the buyer can put the

24   property to use for, correct?

25   A.  Correct, but I'm showing it as a residential home.

O6H1GUO5                        Frosini - Cross

1   Q.  You think you're selling it as a residential home, correct?

2            MS. MURRAY:  Your Honor, objection.  Again,

3   mischaracterizes as the seller.

4            THE COURT:  So——

5            MS. SHROFF:  I'll rephrase, your Honor.

6            THE COURT:  Yes.

7   Q.  The buyer did not ask to see a residential home, correct;

8   the buyer asked to see a specific property?

9            THE COURT:  You may answer.

10  A.  The home is listed on——as a residential.  It says it on the

11  MLS, home.  The buyer asked to see the two homes, yes.

12  Q.  The buyer asked to see the two properties.

13  A.  The two properties, yes.

14  Q.  Correct?  Never said homes, said properties, correct?

15           MS. MURRAY:  Objection, your Honor.  The witness is

16  testifying, not Ms. Shroff.

17           THE COURT:  So you can ask her whether the buyer used

18  the word "home" or "property."

19  Q.  The buyer used the word "properties," correct?

20  A.  I don't remember.

21  Q.  Okay.  And let me show you again what is marked as Defense

22  Exhibit 60612 just for identification.

23           MS. SHROFF:  And if I could go to page 3 of 4.

24           Your Honor, actually, could I just have one moment,

25  please.

O6H1GUO5                    Frosini - Cross

1          THE COURT:  Yes, go ahead.

2   Q.  And do you recall if this property was called Crocker

3   McMillin Mansion/Immaculate Conception Seminary?

4          MS. SHROFF:  You can take that down, please.

5   A.  I personally never saw that.

6   Q.  And sitting here today, do you know if various people have

7   visited that property and that it was part of the marketing,

8   that it was visited by certain people?

9   A.  I don't——I didn't represent it for the seller so I don't

10  know who they showed the house to.

11  Q.  Okay.  So because you're representing the buyer, you

12  weren't really trying to sell, quote-unquote, the property,

13  correct?

14  A.  I wasn't marketing it.  I was working for the buyer, and if

15  the buyer wanted the property, then absolutely, I, you know,

16  helped the buyer purchase the property.

17  Q.  Fair enough.  And do you know if the seller had ever

18  marketed it as a place that made it clear it could be used as a

19  social clubhouse?

20         MS. MURRAY:  Objection, your Honor.  How would

21  Ms. Frosini know that?

22         MS. SHROFF:  Because she would interact with the

23  seller, and the seller's agent.

24         THE COURT:  You may answer the question.

25  A.  The seller, you know, I don't know what he did with the

O6H1GUO5                    Frosini - Direct

 1    house.
 2    Q.  Fair enough.
 3              MS. SHROFF:  Thank you.  I have nothing further.
 4              THE COURT:  Redirect?
 5              MS. MURRAY:  Thank you, your Honor.
 6    REDIRECT EXAMINATION
 7    BY MS. MURRAY:
 8    Q.  Ms. Frosini, you were asked some questions on
 9    cross-examination about the Taurus Fund.  Do you recall those?
10    A.  Yes.
11    Q.  Who told you that the purchasing entity of the Crocker
12    Mansion was the Taurus Fund SB?
13    A.  Aaron Mitchell.
14    Q.  And what individuals did Aaron Mitchell introduce you to in
15    connection with the purchase of the Crocker Mansion?
16    A.  The Guo family.
17              MS. MURRAY:  Ms. Loftus, if we could please pull up
18    Government Exhibit 1101 at page 8.
19    Q.  Focusing on the first Aaron Mitchell text, Ms. Frosini,
20    this is a question regarding the purchasing entity for the
21    Crocker Mansion; is that correct?
22              MS. SHROFF:  Objection, your Honor.  Beyond the scope.
23              THE COURT:  Overruled.  You may answer.
24    A.  What——Aaron said he needed to check to see who was going to
25    be, yes, the purchasing entity.

O6H1GUO5                        FROSINI - RECROSS

1    Q.  And do you know with whom, if anyone, in the UK Aaron

2    Mitchell checked to find out the name of the purchasing entity?

3    A.  No.

4              MS. MURRAY:  Thank you, your Honor.  Nothing further.

5              MS. SHROFF:  May I, your Honor?

6              THE COURT:  You may.

7              MS. SHROFF:  Could you put that back up, please.

8    Thank you.

9              Can we make it larger.

10   RECROSS EXAMINATION

11   BY MS. SHROFF:

12   Q.  You're texting back and forth with Aaron Mitchell, correct?

13   A.  Correct.

14   Q.  "Aaron, please call me.  Thx."  That's you texting?

15   A.  Yes.

16   Q.  And then he texts you back, correct?

17   A.  Correct.

18   Q.  December 1, 2021?

19   A.  Correct.

20   Q.  At 5:47 p.m.?

21   A.  Correct.

22   Q.  "Need to speak to someone in UK re: purchasing entity."

23   A.  That's what Aaron said.

24   Q.  What's an entity?

25   A.  Because I had asked——

O6H1GUO5                    Frosini - Redirect

1  Q.  What's an entity?

2  A.  Entity who's purchasing the property, the home.

3  Q.  It's not a person, correct?

4  A.  The——correct.

5  Q.  It's not an individual, correct?

6  A.  Correct.

7  Q.  And he says, "Will get back to you tomorrow am," and he's

8  going to talk to someone in the UK?

9  A.  Yes, correct.

10  Q.  And you say, "Thanks Aaron," correct?

11  A.  Correct.

12  Q.  Nothing further from you on that topic, correct?

13  A.  Correct.

14  Q.  No question who's the entity, correct?

15  A.  Correct.

16  Q.  Nothing at all about the purchasing entity, correct?

17  A.  Correct.

18         MS. SHROFF:  Nothing further.

19         MS. MURRAY:  Just briefly, your Honor.

20  REDIRECT EXAMINATION

21  BY MS. MURRAY:

22  Q.  Ms. Frosini, do you know where William Je lives?

23  A.  William Je?

24         MS. SHROFF:  Objection.  Beyond the scope.

25         THE COURT:  Overruled.  You may answer it.

O6H1GUO5                          Reyes - Direct

```
 1   A.  Excuse me.  Who?

 2   Q.  William Je.

 3   A.  No.

 4              MS. MURRAY:  Thank you.  Nothing further.

 5              MS. SHROFF:  I have one more question, your Honor.

 6   RECROSS EXAMINATION

 7   BY MS. SHROFF:

 8   Q.  Do you even know who William Je is?

 9   A.  No.

10              MS. SHROFF:  All right.  Thank you.

11              THE COURT:  All righty.  So you may step out.  Thank

12   you.

13              THE WITNESS:  Thank you.

14              THE COURT:  And the government may call its next

15   witness.

16              (Witness excused)

17              MR. FINKEL:  The government calls Limarie Reyes.

18              THE LAW CLERK:  Would you please raise your right

19   hand.

20              (Witness sworn)

21              THE LAW CLERK:  Thank you.

22              THE COURT:  All righty.  Please be seated.  And bring

23   the microphone very close to your mouth so that we can hear

24   you.  Speak up.  Say your name and spell it.

25              THE WITNESS:  My name is Limarie Reyes, spelled
```

1    L-I-M-A-R-I-E, R-E——

2              THE COURT:  So I'm having trouble hearing you, so you

3    really have to bring the microphone all the way to your mouth

4    and speak loud, into the microphone.

5              THE WITNESS:  My name is Limarie Reyes, spelled

6    L-I-M-A-R-I-E, R-E-Y-E-S.

7              THE COURT:  You may inquire.

8              MR. FINKEL:  Thank you, your Honor.

9     LIMARIE REYES,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. FINKEL:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16   Q.  What area of the country do you live in?

17   A.  Puerto Rico.

18   Q.  Where do you currently work?

19   A.  I've been unemployed.  I'm working right now in my business

20   for events.

21   Q.  For what?

22   A.  Event planning.

23   Q.  What's the name of that business?

24   A.  Sprinkle Events.

25   Q.  What kind of events does Sprinkle Events plan?

O6H1GUO5                          Reyes - Direct

1    A.  We do kids' parties, birthday parties, small corporate

2    events as well.

3    Q.  How many employees does Sprinkle Events have?

4    A.  Just me.

5    Q.  How many events has Sprinkle Events planned?

6    A.  Roughly around five.

7    Q.  And you said kids' parties.  How old are the children for

8    the parties?

9    A.  One year, mainly, and 10.

10   Q.  How long have you worked at──or had Sprinkle Events?

11   A.  Since November.

12   Q.  What's the approximate budget of the events at Sprinkle

13   Events, for those five events?

14   A.  Roughly around 2500.

15   Q.  Now you said before Sprinkle Events that you were

16   unemployed for a bit?

17   A.  Yes.

18   Q.  Before that, where did you work?

19   A.  I worked at G/CLUBS.

20   Q.  And what was your role at G/CLUBS?

21   A.  Changed over time.  I started as VP of marketing and

22   events; later on I became the interim CEO and later the CEO.

23          THE COURT:  So I'll need you to just get very close to

24   the microphone so that everyone in the courtroom can hear you.

25   Q.  When did you start at G/CLUBS, approximately?

O6H1GUO5                          Reyes - Direct

1    A.  December 2020.

2    Q.  And what was your title when you started?

3    A.  VP of marketing and events.

4    Q.  And when did you become, you said, the interim CEO?

5    A.  Around February 2021.

6    Q.  And when did you become the CEO?

7    A.  Around summer 2021.

8    Q.  Ms. Reyes, as the CEO of G/CLUBS, did you have final

9    decision-making authority on all matters concerning G/CLUBS?

10   A.  No, I did not.

11   Q.  Were you in charge of G Club?

12   A.  No, I was not.

13   Q.  As part of your role as CEO, did you get updated on the

14   revenues, the monthly revenues of G/CLUBS?

15   A.  Not on a regular basis, no.

16   Q.  Did you set the budget at G/CLUBS?

17   A.  No.

18   Q.  As the CEO of G/CLUBS, who did you report to?

19   A.  I reported to the ultimate beneficial owner, UBO, Mr. He.

20           THE COURT:  Okay.  So your voice is very low, and I

21   need for you to speak up because the reporter here is writing

22   down what you say, and also all the people in the back row,

23   they need to hear you, so speak loudly.

24           THE WITNESS:  Sorry.

25   Q.  Who did you report to?  When you were the CEO of G/CLUBS,

1    who did you report to?

2    A.  Mr. He.

3    Q.  What was his first name?

4    A.  Haoran He.

5    Q.  How do you spell He?

6    A.  H-E.

7    Q.  Did you report to anybody else?

8    A.  Yes, I reported to Yvette as well.

9    Q.  What's her last name?

10   A.  Wang.

11   Q.  When did you leave G/CLUBS?

12   A.  March 2023.

13   Q.  So in total, Ms. Reyes, how long were you the interim and

14   CEO of G/CLUBS?

15   A.  I was with G/CLUBS around two and a half years.

16   Q.  And what was your understanding of what G/CLUBS was

17   supposed to be?

18   A.  It was a membership club that provided benefits to its

19   members.

20   Q.  Was G/CLUBS a political organization?

21   A.  No.

22   Q.  How much did it cost to become a G/CLUBS member?

23   A.  It depended on the different tiers.  It would range from

24   $10,000 to $50,000, depending on the tier.

25   Q.  And how many tiers were there?

O6H1GUO5                          Reyes - Direct

1    A.  Five.

2    Q.  How much did each tier cost?

3    A.  Tier 1 was 10,000; tier 2, 20,000; tier 3, 30,000; tier 4,

4    40,000; tier 5, 50,000.

5    Q.  Was there a yearly fee for membership?

6    A.  Yes.  So after the initial fee, the yearly fee was

7    5 percent of their tier.

8    Q.  And if a member didn't pay their yearly fee, what happened

9    to their membership?

10   A.  It would get inactivated.

11   Q.  And if it was inactivated, could the member use the

12   benefits that G/CLUBS provided?

13   A.  No.

14   Q.  Ms. Reyes, did G/CLUBS provide its members stock in

15   G/CLUBS?

16   A.  No, it did not.

17   Q.  Did G/CLUBS provide its members stock in G Fashion?

18   A.  No.

19   Q.  Did G/CLUBS provide its members stock in any company?

20   A.  No.

21   Q.  Was G/CLUBS an investment club?

22   A.  No.

23        MR. FINKEL:  Ms. Loftus, if we can please display

24   what's in evidence as GX C160-V.  Go to 11:35.

25   Q.  Ms. Reyes, do you recognize the individual on your screen?

1    A.  Yes.

2    Q.  Who is it?

3    A.  Mr. Guo.

4    Q.  What's his first name?

5    A.  Miles Guo.

6    Q.  Do you know him by any other names?

7    A.  Kwok.

8    Q.  How do you spell that?

9    A.  K-W-O-K?  I'm not sure.

10   Q.  Did people that you worked with at G/CLUBS and yourself

11   call Miles Guo by any other titles?

12   A.  I've heard Boss, principal.

13            MR. FINKEL:  Ms. Loftus, you can play that, please.

14            (Video played)

15            MR. FINKEL:  Pause right there.

16   Q.  Ms. Reyes, is what Mr. Guo just said, that if you get a

17   $50,000 membership with G Club you get G Fashion stocks, true?

18   A.  No.

19   Q.  Do you see Mr. Guo in the courtroom here today?

20   A.  Yes.

21   Q.  Can you point him out——

22            MR. KAMARAJU:  We'll stipulate to identity, your

23   Honor.

24            THE COURT:  All righty.  Go ahead.

25   Q.  Is it true that memberships at G Club were limited, that

1    there was only certain space available?

2    A.  No.

3              MR. FINKEL:  You can take that down.

4    Q.  At the time that you were working at G/CLUBS, had you seen

5    that video that we just watched here in court?

6    A.  Not that I recall, no.

7    Q.  When you were the CEO of G/CLUBS, Ms. Reyes, did there come

8    a time when you became aware that G/CLUBS members expected to

9    receive stock?

10   A.  Yes, there was a time.

11             THE COURT:  All right.  I have to remind you to keep

12   your voice up so that the jury and the rest of us can hear your

13   testimony.

14   Q.  You can move the microphone as close to you as you like.

15   Feel free to move it to make yourself comfortable.  Try to

16   speak directly into the mic, okay?

17             Ms. Reyes, what was your understanding as to why

18   G/CLUBS members expected, or some of them expected to receive

19   stock when they purchased a G/CLUBS membership?

20             MR. KAMARAJU:  Objection.

21             THE COURT:  Overruled.

22   Q.  You can answer.

23   A.  Could you repeat the question.  Sorry.

24   Q.  What was your understanding as to why some G/CLUBS members

25   expected to receive stock when they purchased a G/CLUBS

1    membership?

2    A.   There had been a video where Mr. Guo had mentioned that

3    they would get stock.

4    Q.   Ms. Reyes, when you were the CEO of G/CLUBS, when did you

5    tell Mr. Guo that he shouldn't say that G/CLUBS members receive

6    stock?

7              MR. KAMARAJU:  Objection.  Lack of foundation.

8              THE COURT:  All righty.  So let's take it a little

9    slower.

10             MR. FINKEL:  Sure.

11   Q.   Ms. Reyes, did there come a time, if ever, when you were

12   the CEO of G/CLUBS where you told Mr. Guo to not say in videos

13   that G/CLUBS members receive stock?

14   A.   No, I did not.

15   Q.   Why didn't you say that to him?

16   A.   I didn't feel I had the authority to say that to him.

17   Q.   What do you mean you didn't feel like you had the authority

18   to say that to Mr. Guo?

19   A.   I didn't view myself as a person to say that.  I would rely

20   on the owner, not me.

21   Q.   Who's that?

22   A.   Mr. He.

23   Q.   We'll go back to G/CLUBS in a moment.

24             Ms. Reyes, are you testifying here pursuant to an

25   agreement with the government?

O6H1GUO5                          Reyes - Direct

1   A.  Yes.

2   Q.  And what type of agreement, or what is that agreement

3   called?

4   A.  Nonprosecution agreement.

5   Q.  And what is your understanding of what your obligations are

6   under that nonprosecution agreement?

7   A.  I have to tell the truth, provide information when asked,

8   attend meetings, testify if requested, and not commit crimes.

9   Q.  And if you meet your obligations under the nonprosecution

10  agreement, what has the government promised to do for you?

11  A.  Not charge with any crimes during my time in G/CLUBS.

12  Q.  I didn't hear the last part.

13  A.  During my time in G/CLUBS.

14         THE COURT:  So maybe if you just get so close to the

15  microphone that you're almost touching it.  Get very close.

16         MR. FINKEL:  You can move the microphone.  It's okay.

17  All right?  You can move it.

18  Q.  Aside from the nonprosecution agreement covering you for

19  your conduct at G/CLUBS, does it cover you for anything else?

20  A.  Sorry.  Could you repeat that.

21  Q.  Sure.  You said the nonprosecution agreement, if you meet

22  what you have to do under it, the government won't charge you

23  for your work when you worked at G/CLUBS.  Aside from that, is

24  there anything else that the government won't charge you for?

25  A.  No.

1   Q.  If you lie here today, what would happen to your

2   nonprosecution agreement?

3   A.  It would get canceled, null.

4   Q.  And if you lie here today, could you be charged for

5   perjury?

6   A.  Yes.

7   Q.  And the statements that you provided to the government in

8   the past, could those be used against you if your

9   nonprosecution agreement is torn up?

10  A.  I believe so.

11  Q.  How many times have you met with the government in advance

12  of your testimony today, approximately?

13  A.  I would say more than ten.

14  Q.  Ms. Reyes, does the outcome of this trial or any trial have

15  any impact on whether your nonprosecution agreement gets torn

16  up or not?

17           MR. KAMARAJU:  Objection to form.

18  Q.  I'll rephrase it.  Withdrawn.

19           Does the outcome of this trial have any impact on your

20  nonprosecution agreement?

21  A.  No.

22  Q.  Who's Steve Weber?

23  A.  Steve Weber is the recruiting person that interviewed me

24  for my role in G/CLUBS.

25  Q.  And after you interviewed with Steve Weber who, if anyone,

O6H1GUO5                        Reyes - Direct

1   did you interview with?

2   A.  I interviewed with Jessica and Yvette.

3          MR. FINKEL:  Can we please display what's in evidence

4   as Government Exhibit 102.

5   Q.  Ms. Reyes, who is depicted in Government Exhibit 102?

6   A.  Yvette.

7   Q.  What questions did Yvette ask you during your interview for

8   G/CLUBS?

9   A.  She asked me about my history and my past jobs, my event

10  experiences, what I——what I had done prior.

11  Q.  Ms. Reyes, what languages do you speak?

12  A.  Spanish and English.

13  Q.  Do you speak Mandarin?

14  A.  No.

15  Q.  Did Ms. Wang ask you if you spoke Mandarin?

16  A.  Not that I recall.

17  Q.  Did Yvette ask you about your political beliefs?

18  A.  Not that I recall.

19  Q.  Did she ask you about the Chinese Communist Party?

20  A.  Not that I recall.

21  Q.  Did she ask you your position, if any, on democracy in

22  China?

23  A.  Not that I recall.

24  Q.  What is your position, if any, on the Chinese Communist

25  Party?

1    A.  I don't have a position.

2    Q.  Do you follow Chinese politics?

3    A.  No.

4    Q.  Would you say you're familiar with Chinese culture?

5    A.  No.

6    Q.  Did Yvette mention anything during your interview about the

7    New Federal State of China?

8    A.  Not that I recall.

9    Q.  Are you a member of the New Federal State of China?

10   A.  No.

11   Q.  Did Yvette mention that G/CLUBS had anything to do with the

12   whistleblower movement during your interview?

13   A.  Not that I recall.

14           MR. FINKEL:  If we can display what's been marked for

15   identification as GX BR470, just for the witness, please.

16           Go to the next page, please.

17           Next page.

18           Take that down for a second.

19           One moment, please.

20   BY MR. FINKEL:

21   Q.  Ms. Reyes, in connection with your interview with Yvette,

22   did Yvette mention someone named Victor?

23   A.  Sorry.  During my—

24   Q.  In connection with your interview for G/CLUBS, before you

25   were hired with Yvette, did Yvette mention someone named

 1    Victor?

 2    A.  Not during the interview, but through the——the different

 3    communications, yes.

 4    Q.  And who was Victor?

 5    A.  At the time I didn't know, but later on I learned that he's

 6    an attorney.

 7    Q.  What's his last name?

 8    A.  Cerda.

 9            MR. FINKEL:  Can you please display what's in evidence

10    as GX 109.

11    Q.  Who is this individual in GX 109?

12    A.  Victor.

13    Q.  Why did Yvette mention Victor during your interview process

14    with G/CLUBS; do you know?

15    A.  I don't know.

16            MR. KAMARAJU:  Objection to form.

17            THE COURT:  Sustained.  How can she possibly know

18    what's in the mind of Yvette?

19    Q.  Did Yvette say anything about why she mentioned Victor in

20    the context of your interview for G/CLUBS?

21    A.  That he might be reaching out.

22    Q.  For what?

23    A.  Interview.

24    Q.  After interviewing with Yvette, were you hired?

25    A.  Yes, I was hired.

O6H1GUO5                          Reyes - Direct

1   Q.   In what role?

2   A.   VP of marketing and events.

3   Q.   And what was your salary when you started at G/CLUBS?

4   A.   Roughly around 100,000.

5   Q.   And the job you were working at before G/CLUBS, what were

6   you doing at that job?

7   A.   Events manager.

8   Q.   What was your salary at that prior job?

9   A.   Around 60,000.

10  Q.   When you started, Ms. Reyes, where were G/CLUBS' offices

11  located?

12  A.   When I started, it was a co-working space, and later then

13  we got our office space in San Juan.

14  Q.   And the co-working space was where?

15  A.   San Juan.

16  Q.   Puerto Rico?

17  A.   Correct.

18  Q.   How many employees were there when you started at the

19  co-working space in San Juan, Puerto Rico?

20  A.   Just me.

21  Q.   What was your understanding, if any, about why G/CLUBS was

22  based in Puerto Rico?

23  A.   To my understanding was to benefit from the tax incentives.

24  Q.   When you were working at G/CLUBS, Ms. Reyes, how were you

25  paid?

O6H1GUO5                          Reyes - Direct

1    A.  Via direct deposit.

2    Q.  And did G/CLUBS provide health insurance?

3    A.  Yes.

4    Q.  Was there a payroll system?

5    A.  Yes.

6    Q.  And when you were at G/CLUBS, did you believe it was a

7    legitimate business?

8    A.  Yes.

9    Q.  Did you believe you were committing any crimes?

10   A.  No.

11   Q.  Were there other employees hired after you?

12   A.  Yes.

13   Q.  During your time at G/CLUBS, approximately how many

14   employees were there?  What was the range?

15   A.  14.

16   Q.  And you said that you moved from the co-working space to

17   another office; is that correct?

18   A.  Yes.

19   Q.  And where was that other office located?

20   A.  San Juan as well.

21   Q.  And where?  Was it an office building?  Can you describe

22   what the office was like.

23   A.  Yes, it was an office building in San Juan area.  It was a

24   floor.  It had views to the ocean.

25   Q.  Did there come times while you were employed at G/CLUBS

O6H1GUO5                                Reyes - Direct

1    where the cable or internet would go out?

2    A.  Yes.

3    Q.  And what would the employees say, if anything, when that

4    would happen?

5    A.  They would joke about it was the CCP.

6    Q.  It was what?

7    A.  The CCP.

8    Q.  Why would employees joke that it was the CCP when the

9    internet went out?

10   A.  Because we had heard that many things were due to the CCP.

11   Q.  Do you believe the CCP put the cable out at G/CLUBS?

12             MR. KAMARAJU:  Objection.

13             THE COURT:  Overruled.  You may say what you believe.

14   Q.  You can answer.

15   A.  I don't know.

16   Q.  As far as you know, when did G/CLUBS start?  Do you know a

17   date?

18   A.  2020.

19   Q.  And you mentioned Haoran He; is that correct?

20   A.  Yes.

21   Q.  What was your understanding of his role at G/CLUBS?

22   A.  The ultimate beneficial owner.

23             MR. FINKEL:  If we can please display what's been

24   marked for identification as GX 112.

25   Q.  Do you recognize the individual depicted in GX 112?

O6H1GUO5                    Reyes - Direct

```
1    A.  Yes.

2    Q.  Who is it?

3    A.  Mr. He.

4               MR. FINKEL:  Government offers 112.

5               MR. KAMARAJU:  No objection.

6               THE COURT:  It is admitted.

7               (Government's Exhibit 112 received in evidence)

8    Q.  Ms. Reyes, in what manner did you communicate with Mr. He?

9    A.  I communicated with him via email, WhatsApp, and voice

10   calls.

11   Q.  What was his email address, Mr. He's email address?

12   A.  Coolhhr@protonmail.com.

13   Q.  What is Proton Mail?

14   A.  The email base that he used.

15   Q.  What was your email address at G/CLUBS?

16   A.  Lreyes@gclubs.com.

17   Q.  Why did your email address end at gclubs.com but Mr. He had

18   a Proton Mail address?

19              MR. KAMARAJU:  Objection to form.

20              THE COURT:  I'll permit the question.

21   Q.  You can answer.

22   A.  I don't know.

23   Q.  The other employees you worked with in Puerto Rico, did

24   they have Proton email addresses or G/CLUBS email addresses?

25   A.  G/CLUBS.
```

O6H1GUO5                        Reyes - Direct

1   Q.  What was your understanding of where Mr. He was located?

2   A.  Where did he live?

3   Q.  Yeah.

4   A.  In the UK.

5   Q.  Did Mr. He ever visit the office in Puerto Rico?

6   A.  No.

7   Q.  How many times had you met Mr. He in person?

8   A.  Twice.

9   Q.  How frequently would you speak with Mr. He when you were

10  the interim and CEO of G/CLUBS?

11  A.  It would depend on the task.  Not frequently, just——as per

12  his request.

13  Q.  What sort of tasks did Mr. He assign you?

14  A.  Different tasks.  It would vary from requesting to do

15  loan——loan agreements, or reaching out to potential partners,

16  supporting documents for banking.

17  Q.  What do you mean by loan agreements?

18  A.  A request would come to do a——a loan for some specifics,

19  and we would create the——the package of the different

20  documents.

21  Q.  Who would the requests for a loan come from?

22  A.  Depending.  It could come from Mr. He, sometimes Yvette.

23  Q.  Did you ever decide to make loans?

24  A.  No, I did not.

25  Q.  What entities, if any, did G/CLUBS send loans to?

1   A.   It would be G Club Operations to G Club International BVI.

2   Q.   Did G/CLUBS make any loans to any people?

3   A.   There was one that was to an individual, yes.

4   Q.   What was the name of that individual that G/CLUBS sent a

5   loan to?

6   A.   Mileson.

7   Q.   Who is Mileson?

8   A.   Mr. Guo's son.

9   Q.   Approximately how many loans did Mr. He request that you

10  help facilitate?

11  A.   Not exactly sure, but more than five.

12  Q.   What was the total dollar amount of loans that Mr. He

13  requested you help facilitate?

14  A.   I don't remember specifically.

15  Q.   Approximately how much?

16  A.   I would say in the millions.

17  Q.   How many millions?

18  A.   Maybe more than a hundred.

19  Q.   More than a hundred million?

20  A.   Yes.

21  Q.   How did Mr. He treat you when you were an employee of

22  G/CLUBS?

23  A.   It would depend, but there were——there were instances where

24  he would raise his voice.  There were some times that I felt

25  not valued.  He would say that "you Puerto Ricans are slow."

O6H1GUO5                          Reyes - Direct

1   Q.  What did Mr. He complain that you were being slow about?

2   A.  Different tasks, but it was a—it was slow.

3   Q.  You mentioned that there was a loan made to Mileson from

4   G/CLUBS.  What was your understanding, if any, about the nature

5   of the relationship between Mr. He and Mileson?

6   A.  I knew they were college friends.

7          MR. FINKEL:  Could we put up GX 102, please,

8   Ms. Loftus.

9   Q.  Ms. Reyes, to your knowledge was Yvette on the payroll at

10  G/CLUBS?

11  A.  No.

12  Q.  Did she have an official title at G/CLUBS?

13  A.  No.

14  Q.  What did you refer to her as and other people refer to her

15  as at G/CLUBS?

16          MR. KAMARAJU:  Objection to form.

17          THE COURT:  So break it up, please.

18          MR. FINKEL:  I apologize.

19  Q.  What was Yvette referred to as at G/CLUBS?

20  A.  Her—her name.

21  Q.  Was she referred to by anything other than her name?

22  A.  As a representative.

23  Q.  Representative of what, or who?

24  A.  Just representative, but I viewed as representative of

25  Mr. He.

1  Q.  What sort of things did Yvette work on for G/CLUBS?

2  A.  She would provide instructions in different matters from

3  loans to finance, but just for——for events, at some point

4  reviewing PRF forms, different aspects, legal.

5  Q.  You mentioned loans.  Same sort of loans that you talked

6  about a moment ago with Mr. He?

7  A.  Yes.

8  Q.  In what ways did you communicate with Yvette?

9  A.  It changed through time.  Very early, it was email, then

10 WhatsApp, then Signal, and voice calls as well.

11 Q.  How did Yvette treat you as an employee of G/CLUBS?

12 A.  She treated me well.  It was when things were not

13 necessarily——we had recommendations different that it could

14 become a little bit tense.

15 Q.  What is an issue that became tense with Yvette?

16 A.  I do recall there was a time that there had been a request

17 to transfer some funds and the recommendation was not to do so,

18 and it was tense in that way.  There was a time where——

19         THE COURT:  One moment.  Whose recommendation was not

20 to do so and who made the request?

21         THE WITNESS:  So legal recommendation was not to do

22 so.

23         THE COURT:  When you say legal, do you mean an

24 attorney?

25         THE WITNESS:  Counsel, yes.

1          THE COURT:  Okay.  Go ahead.  And who made the

2     request?

3          THE WITNESS:  Yvette in this case.

4     BY MR. FINKEL:

5     Q.  And the attorney who recommended not to do the transfer,

6     that attorney was in-house counsel at G/CLUBS?

7     A.  Yes.

8     Q.  And when you relayed that recommendation to Yvette, what

9     was her response?

10    A.  That we would have to do it and——not the exact words, but

11    like if we didn't do it, it was like——it was on me, like it was

12    my fault if something went wrong.

13    Q.  How much money was that transfer?

14    A.  To the best of my recollection, around 5 million.

15    Q.  Where was that transfer to?

16    A.  To a bank.  I'm not sure which one.

17    Q.  How did that make you feel when Yvette said that if you

18    don't do the transfer, it would be on you?

19    A.  I felt that it was unfair.

20    Q.  Why?

21    A.  Because I was relaying the suggestion from——from counsel,

22    and I understood that to be——I'd rely on their advice.

23    Q.  Did you ask Yvette any questions about why this transfer

24    would be on you if it didn't go through?

25    A.  No, I don't recall that.

O6H1GUO5                        Reyes - Direct

1    Q.  Did you ask Yvette any questions about why this transfer

2    should happen even though counsel said it shouldn't?

3    A.  I do not recall.

4    Q.  Did you ask any questions about whether we could wait,

5    G/CLUBS could wait to do the transfer another time?

6    A.  No, I——I do recall that was the instruction.

7    Q.  When you got instructions from Yvette, did you generally

8    ask her many questions?

9    A.  No.

10   Q.  When you got instructions from Mr. He, did you generally

11   ask him any questions?

12   A.  No.

13   Q.  The transfer you were just speaking about a moment ago with

14   Yvette, did you go through with it?  Did you process it?

15   A.  Ultimately, yes.

16   Q.  Did Yvette express to you——well, withdrawn.

17          MR. FINKEL:  We can take that down, Ms. Loftus.  And

18   if we could display for the witness what's been marked for

19   identification as GX 101.

20   Q.  Who's that?

21   A.  Mr. Guo.

22          MR. FINKEL:  Government offers 101.

23          MR. KAMARAJU:  No objection.

24          THE COURT:  It is admitted.

25          (Government's Exhibit 101 received in evidence)

1   Q.  What was Miles Guo's title at G/CLUBS?

2   A.  He was a spokesperson for G/CLUBS.

3   Q.  And what did you understand that to mean, to be a

4   spokesperson?

5   A.  To speak on behalf of the company.

6   Q.  On behalf of who?

7   A.  Of the company.

8   Q.  Company being?

9   A.  G/CLUBS.

10  Q.  As far as you know, how much was Miles Guo paid for his

11  role as spokesperson of G/CLUBS?

12  A.  He was not paid.

13          MR. FINKEL:  May I approach, your Honor.

14          THE COURT:  You may.

15          MR. FINKEL:  Handing the witness a binder.

16  Q.  And Ms. Reyes, if you could take a look at that binder and

17  flip through it.

18          MR. FINKEL:  And your Honor, I'll represent that that

19  binder contains the following Government Exhibits, which have

20  been marked for identification:  GX 1850, GX 1850A; and then

21  the following exhibits in the GX GC series:  GX GC3, 27, 28,

22  33, 37, 38, 40, 43, 54, 59, 60, 93, 95; 121, 122, 197, 126,

23  136, 150A, 150, 157, 158, 160, 168, 175, 178, 184, 187, 189,

24  198; 209, 213, 218, 220, 221, 222, 227, 228, 233, 242, 254,

25  276, 286, 292, 293, 299; 300, 307, 309, 317, 318, 332, 334,

O6H1GUO5                          Reyes - Direct

1   340, 341, 346, 363, 365, 372, 376, 377, 379, 380, 382, 387,

2   389, 392, 393; 483, 484, 485, 486, 487, 422, 423, 424, 405,

3   406, 409, 415, 416, 418, 419, 422, 427, 428, 431, 432, 433,

4   436, 438, 441, 443, 444, 450, 452, 453, 454, 455, 467, 470,

5   476, 480, 484, 486, 487, 494, 495, 497; 504, 541, 517, 518,

6   520, 521, 522, 525, 526, 527, 528, 530-534, 536-538, 540, 544,

7   547, 549, 553, 553A, and 550.

8   BY MR. FINKEL:

9   Q.  Ms. Reyes, would you flip through that binder.

10  A.  Yes.

11  Q.  Have you previously reviewed the contents of that binder?

12  A.  Yes.

13  Q.  Is there a signature on the front of the binder?

14  A.  Yes.

15  Q.  Whose signature is it?

16  A.  Mine.

17  Q.  At a high level, what are the kinds of documents in that

18  binder?

19  A.  Emails, sent by me or received by me, loan documents.

20  Q.  From what entity?

21  A.  G/CLUBS.

22          MR. FINKEL:  The government offers those exhibits that

23  I mentioned previously and hopefully don't have to read again,

24  unless you'd like me to.

25          (Counsel conferring)

 1           MR. KAMARAJU:  No objection, and we don't require it

 2   to be read again.

 3           THE COURT:  I didn't hear.  You said no objection and?

 4           MR. KAMARAJU:  And we don't request that all the

 5   exhibits be read again.

 6           THE COURT:  Okay.  All right.  So they're all

 7   admitted.

 8           MR. FINKEL:  Thank you, your Honor.

 9           (Government's Exhibits 1850, 1850A received in

10   evidence)

11           (Government's Exhibits GC3, GC27, GC28, GC33, GC37,

12   GC38, GC40, GC43, GC54, GC59, GC60, GC93, GC95 received in

13   evidence)

14           (Government's Exhibits GC121, GC122, GC197, GC126,

15   GC136, GC150A, GC150, GC157, GC158, GC160, GC168, GC175, GC178,

16   GC184, GC187, GC189, GC198 received in evidence)

17           (Government's Exhibits GC209, GC213, GC218, GC220,

18   GC221, GC222, GC227, GC228, GC233, GC242, GC254, GC276, GC286,

19   GC292, GC293, GC299 received in evidence)

20           (Government's Exhibits GC300, GC307, GC309, GC317,

21   GC318, GC332, GC334, GC340, GC341, GC346, GC363, GC365, GC372,

22   GC376, GC377, GC379, GC380, GC382, GC387, GC389, GC392, GC393

23   received in evidence)

24           (Government's Exhibits GC483, GC484, GC485, GC486,

25   GC487, GC422, GC423, GC424, GC405, GC406, GC409, GC415, GC416,

O6H1GUO5                    Reyes - Direct

1    GC418, GC419, GC422, GC427, GC428, GC431, GC432, GC433, GC436,

2    GC438, GC441, GC443, GC444, GC450, GC452, GC453, GC454, GC455,

3    GC467, GC470, GC476, GC480, GC484, GC486, GC487, GC494, GC495,

4    GC497 received in evidence)

5              (Government's Exhibits GC504, GC541, GC517, GC518,

6    GC520, GC521, GC522, GC525, GC526, GC527, GC528, GC530-534,

7    GC536-538, GC540, GC544, GC547, GC549, GC553, GC553A, and GC550

8    received in evidence)

9    BY MR. FINKEL:

10   Q.  Did Mr. Guo have a contract with G/CLUBS?

11   A.  Yes.

12             MR. FINKEL:  Okay.  If we can display what's in

13   evidence as Government Exhibit 541.  GX GC541.

14   Q.  What is this document, Ms. Reyes?

15   A.  It's an agreement between G/CLUBS and Mr. Guo.

16   Q.  Okay.  And it says, "By and between Guo Wengui."  Who do

17   you understand that to be?

18   A.  Mr. Guo.

19             MR. FINKEL:  You can zoom out of that, please.

20   Q.  And do you see under (b) at the bottom, where it says

21   termination by the company for cause?

22   A.  Yes.

23             MR. FINKEL:  Zoom in on that, please, Ms. Loftus.

24   Q.  Ms. Reyes, when you were the CEO of G/CLUBS, did you

25   believe that you could fire Guo as the spokesperson for

1    G/CLUBS?

2                MR. KAMARAJU:  Objection.  Calls for a legal

3    conclusion.

4                THE COURT:  Overruled.  You can say whether you

5    believed you could fire him or not.

6    A.  I didn't feel like I could fire him.

7                MR. FINKEL:  You can zoom out of that.  Go to the next

8    page, please.

9                And can you zoom in on paragraph 3, Ms. Loftus.

10   Q.  So here it says Consideration - Level 5 Membership.  What,

11   if anything, do you understand Guo was provided for his role as

12   spokesperson for G/CLUBS?

13   A.  He was entitled to a membership.

14   Q.  To your knowledge did he receive anything else aside from

15   the Level 5 membership?

16   A.  Not that I was aware.

17   Q.  Who negotiated this contract?

18   A.  I wouldn't know.

19   Q.  Who decided to make Guo the spokesperson?

20   A.  I don't know.

21   Q.  Did you ask any questions about why Guo was the

22   spokesperson?

23   A.  No.  He was already there when I started.

24   Q.  And when you started, did you ask any questions about why

25   Guo was the spokesperson?

1   A.  No.

2   Q.  Did you ask any questions about this consulting agreement?

3   A.  No.

4           MR. FINKEL:  Ms. Loftus, can you zoom out of that and

5   go to page 7.

6           Okay.  Take that down.

7   Q.  At the time that you were at G/CLUBS, Ms. Reyes, in what

8   ways, if any, did G/CLUBS promote itself?

9   A.  The spokesperson was Mr. Guo, and through word of mouth,

10  the——the farms, they would reach out to like-minded people.

11  Q.  And how did Guo as the spokesperson promote G/CLUBS, to

12  your knowledge, at the time?

13  A.  Through his videos.

14  Q.  Did you watch his videos?

15  A.  No.

16  Q.  How many members did G/CLUBS have?

17  A.  Depending.  It would increase, but by the time that I

18  resigned, around 8,000.

19  Q.  You mentioned that another way G/CLUBS was promoted was

20  word of mouth.  Did you say through the farms?

21  A.  Yes.

22  Q.  What are the farms?

23  A.  I don't know exactly how to describe it, but it's a group

24  of like-minded people that are located in different parts.

25  Q.  Who explained the farms to you?

1    A.  It wasn't an explanation of what they were.  It was just

2    that they——that they referenced the farms.

3    Q.  Did you ask Yvette how the farms got involved in promotion

4    of G/CLUBS?

5    A.  Not that I recall.

6    Q.  Did you ask Mr. He how the farms got involved in the

7    promotion of G/CLUBS?

8    A.  Not that I recall.

9    Q.  How were the farms, to your knowledge, if you know,

10   involved in promoting G/CLUBS?

11   A.  I do not know.

12   Q.  Were you a member of a farm?

13   A.  No.

14   Q.  What is your understanding of where the 8,000 or so G/CLUBS

15   members were located?

16   A.  They're located throughout the world.

17   Q.  And what was your understanding of what language they

18   spoke?

19            MR. KAMARAJU:  All of them?

20            MR. FINKEL:  Yes.

21   Q.  What was your understanding, generally speaking, of the

22   languages that the 8,000 G/CLUBS members spoke?

23   A.  Most of them Mandarin.

24   Q.  Do you believe, when you were the CEO of G/CLUBS, that you

25   were familiar with the like-minded ideology that you mentioned

O6H1GUO5                              Reyes - Direct

1    before of the G/CLUBS members?

2    A.   If I was familiar?

3    Q.   Yeah.

4    A.   No.

5    Q.   Of the 8,000 or so G/CLUBS members, approximately how many

6    have you spoken with?

7    A.   Maybe around seven, roughly.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6HBGUO6                         Reyes - Direct

1   BY MR. FINKEL:

2   Q.  You mention that Guo was the spokesperson for G/Club, was

3   there a disclaimer on G/Club's website about Guo?

4   A.  Yes, there was.

5   Q.  And what, at a high level, did that disclaimer say?

6   A.  Not exactly sure of the exact words, but that G/Club is not

7   linked to the things that are said by Mr. Guo.

8   Q.  Did that disclaimer change over time?

9   A.  Yes.

10  Q.  When did it change?

11  A.  It changed after we received a subpoena.

12  Q.  Who's the "we" received the subpoena, who is the "we?"

13  A.  G/Clubs.

14  Q.  And who was the subpoena received from?

15  A.  The government.

16  Q.  If Mr. Guo is the spokesperson of G/Club, why was there a

17  disclaimer on the website saying not to associate his

18  statements with G/Club?

19  A.  I'm not sure.  It was there.  It was to my recollection

20  when I started.

21  Q.  I'm going to ask you, Ms. Reyes, to speak loudly and

22  clearly so everyone can hear you.

23         Ms. Reyes, did you ask questions about the disclaimer

24  to Yvette?

25  A.  Not that I recall.

O6HBGUO6                              Reyes - Direct

1   Q.  Did you ask questions about the disclaimer to Mr. He?

2   A.  Not that I recall.

3   Q.  Did G/Club members receive a membership card?

4   A.  Physical card, no.

5   Q.  What would they receive, if anything, to signify their

6   membership in G/Club?

7   A.  I recall there was an email that was sent with an image of

8   a card.

9   Q.  You mentioned the prices for G/Clubs, there was an

10  initiation fee that ranged from 10,000 to 50,000; is that

11  correct?

12  A.  Yes.

13  Q.  Why did you decide those prices?

14  A.  I did not decide the prices.

15  Q.  Who did?

16  A.  I don't know.

17  Q.  Did you ask any questions to Yvette about why the prices

18  are what they are?

19  A.  No, I did not.

20  Q.  What about Mr. He?

21  A.  No, I did not.

22  Q.  You mentioned before that G/Clubs members didn't receive

23  stock, correct?

24  A.  Yes.

25  Q.  What benefits, if any, were G/Club members, were they

O6HBGUO6                         Reyes - Direct

1    entitled to?

2    A.   They were entitled to different benefits throughout time.

3    Can I list them?

4    Q.   You can list them, please.

5    A.   They had discounts in G Fashion depending on their tier.

6    There was a time where they were able to upload two hours of

7    content to GTV.  They had access to songs sung or written by

8    Mr. Guo.  They had access to a 24-7 customer service.  They had

9    access to the G talks events and sweepstakes.

10   Q.   Anything else?

11   A.   Yes.  We had hotels, discounts in hotels, gyms.  There was

12   a boarding charter.  We had done a private tour of FAO Schwarz.

13   They receive Christmas gifts.  We had a specialty dinner in a

14   Michelin star restaurant.  We had two hotel stays, one in Fiji

15   and one in Australia.  We had a discount at Formula One.  Those

16   are the ones that I recall.

17   Q.   How did the G Fashion discount work?

18   A.   Depending on their tier, they would receive a set discount.

19   If it was tier one, it was 10 percent discount on their fashion

20   item.

21   Q.   I ask you again to speak directly into the mic so everyone

22   can hear you.

23        If a member wanted to take advantage of the G Fashion

24   discount, how would they do that?  What was the process?

25   A.   It was done through the G Fashion platform.

O6HBGUO6                        Reyes - Direct

1    Q.  Can you explain how?

2    A.  I'm not exactly sure how.

3          THE COURT:  You said that they had access to songs

4    that were sung or written by Mr. Guo, how would they get access

5    to that?

6          THE WITNESS:  On the website.  On the website there

7    was a link that said G music, and they were able to see them

8    there.

9          THE COURT:  Go ahead.

10   Q.  Who decided that G/Club members should get a F fashion

11   discount in connection with their membership?

12   A.  I do not know.

13   Q.  Did you ask anyone why that was a membership benefit?

14   A.  No, I did not.

15   Q.  You mentioned that members could have -- did you say a

16   stream on GTV; is that correct?

17   A.  Yes.

18   Q.  Who decided that would be a benefit for members?

19   A.  I do not know.

20   Q.  Did you ask anyone why?

21   A.  No.

22   Q.  You mentioned that there was a Christmas gift, what was the

23   Christmas gift?

24   A.  It was a box that included a branded coffee mug, Puerto

25   Rican coffee and cookies.

O6HBGUO6                              Reyes - Direct

1   Q.  Was that shipped?

2   A.  Yes.

3   Q.  Was it shipped to every member?

4   A.  The ones that had registered.

5   Q.  You mention hotel discount; is that right?

6   A.  Yes.

7   Q.  Where were the hotels that G/Clubs members were entitled to

8   a discount for?

9   A.  The hotels were in Puerto Rico.

10  Q.  How many hotels in Puerto Rico were they entitled to a

11  discount for?

12  A.  Three.

13  Q.  And what was the discount that G/Clubs members were

14  entitled to at those three hotels in Puerto Rico?

15  A.  If I'm not mistaken 10 percent discount.

16  Q.  How would that work?

17          What was the process in which a G/Clubs member would

18  attain those 10 percent discount at those three hotels in

19  Puerto Rico?

20  A.  They would receive a link or a code, depending, and they

21  would be able to book their stay.

22  Q.  Would it be booked through G/Clubs?

23  A.  No.

24  Q.  Who would it be booked through?

25  A.  The member.

O6HBGUO6                          Reyes - Direct

1    Q.   The member would book it where?

2    A.   Through the website of the hotel.

3    Q.   How much did it cost G/Club to obtain that benefits from

4    those three hotels for its members?

5    A.   It did not cost us.

6    Q.   How many members took advantage of the 10 percent discount

7    at the three hotels in Puerto Rico?

8    A.   I do not know.

9    Q.   You mention that there was a dinner at a Michelin star

10   restaurant; is that correct?

11   A.   Yes.

12   Q.   Can you describe to the members of the jury, Ms. Reyes, the

13   nature of that benefit?

14   A.   It was a dinner at a Michelin restaurant. I don't remember

15   the name in the UK.  It was on Chinese New Year.

16   Q.   And was it just one night dinner or multiple dinners?

17   A.   Just that one night dinner.

18   Q.   Was the dinner free for G/Club members?

19   A.   No, they had to pay.  It was a discount.

20   Q.   How much was the discount?

21   A.   I don't recall.

22   Q.   How many members took advantage of that benefit?

23   A.   I do not know.

24   Q.   How much did the dinner cost?

25   A.   I don't recall.

O6HBGUO6                              Reyes - Direct

1   Q.  You mentioned, did you say a charter?

2   A.  There was a boat charter.

3   Q.  What do you mean by boat charter?

4   A.  It was a boat service that they could book a boating trip.

5   Q.  And where was that boat service located?

6   A.  In Puerto Rico.

7   Q.  What was the nature of the benefit or discount that G/Clubs

8   members could obtain?

9   A.  If I'm not mistaken, it was a percent, a discount, and I

10  believe it included something like champagne.  I don't remember

11  exactly the percentage.

12  Q.  How much did it cost G/Club to obtain that benefit for its

13  members?

14  A.  It didn't cost us.

15  Q.  How many G/Club members took advantage of that benefit?

16  A.  I do not know.

17  Q.  Did any G/Club members live in Puerto Rico to your

18  knowledge?

19  A.  Not that I was aware of.

20  Q.  Did you mention something about Fiji and Australia?

21  A.  Yes.

22  Q.  Can you describe that, the nature of that benefit to the

23  members of the jury?

24  A.  They were a block of dates for a hotel stay, one in Fiji

25  and one in Australia, and they would get a discount and some

O6HBGUO6                          Reyes - Direct

1   other benefits as well.

2   Q.  What do you mean by block of dates?

3   A.  It was a set number of dates.  It was a set date that they

4   would be able to book.

5   Q.  And how many dates were available for the G/Club discount

6   at the hotel in Fiji and Australia?

7   A.  I don't recall specifically.

8   Q.  Approximately how many, months, weeks?

9   A.  Maybe a couple of weeks.

10  Q.  And how much money did it cost G/Club to obtain that

11  benefit for its members?

12  A.  It did not cost us.

13  Q.  And how many G/Club members, if any, to your knowledge took

14  advantage of that benefit, the blocks?

15  A.  I do not know.

16  Q.  You mention Formula One race?

17  A.  Yes.

18  Q.  What was the nature of that benefit?

19  A.  It was a discount that the members were able to select

20  where they would like to view the race at the Monaco race and

21  then throughout the year.

22  Q.  And how many events were there associated with that

23  benefit?

24  A.  Sorry.  What do you mean?

25  Q.  Was it one race or more than one race?

```
O6HBGUO6                          Reyes - Direct
```

1   A.  The first one was Monaco, and then it was extended

2   throughout the whole year.

3   Q.  How many races, do you know?

4   A.  I do not know.

5   Q.  How many G/Club members to your knowledge took advantage of

6   that the Formula One race?

7   A.  I do not know.

8   Q.  I believe you mentioned, did you mention FAO Schwarz?

9   A.  Yes.

10  Q.  What was the nature of that benefit?

11  A.  We had close off the toy store FAO Schwarz for our members.

12  They would be able to tour the toy store.  We had breakfast for

13  them.  They had discount on their merchandise and that was two

14  days.

15  Q.  How long was -- FAO Schwarz located where?

16  A.  New York.

17  Q.  Where in New York?

18  A.  I'm not exactly sure the address.

19  Q.  Manhattan?

20  A.  Yes.

21  Q.  Were you present for that event?

22  A.  Yes.

23  Q.  How long was FAO Schwarz closed for?

24  A.  Like a couple of hours, like an hour.

25  Q.  How much did it cost for G/Clubs to obtain that benefit for

O6HBGUO6                          Reyes - Direct

1    its members?

2    A.  Around, the booking of the space was around $13,000.

3    Q.  How many G/Club members attended the FAO Schwarz event that

4    you were present at?

5    A.  Maybe four or five.

6    Q.  Were there any other events scheduled in New York around

7    the FAO Schwarz event?

8    A.  The original idea for the FAO Schwarz was to have a tour of

9    the toy store and later on have a gingerbread activity for the

10   kids.  That didn't happen.

11   Q.  Who canceled the gingerbread activity for the kids?

12   A.  Yvette requested to cancel it.

13   Q.  Those benefits that we went through, were those available

14   to every membership tier?

15   A.  Yes, except G Fashion, that was pertaining to their tier.

16   Q.  Every other benefit, every tier got whether they were

17   50,000 tier or 10,000 tier?

18   A.  Yes.

19   Q.  Is there a G/Club news letter?

20   A.  We promoted the different benefits through their emails.

21   Q.  What is Orbit?

22   A.  Orbit is the customer service company that we used for our

23   members.

24   Q.  And what did Orbit do?

25   A.  They would receive members' questions through them and then

O6HBGUO6                          Reyes - Direct

1    they would, depending on the question or the concern, they
2    would assign them to different departments.
3    Q.   Where was Orbit located?
4    A.   The agents were located in different parts of the world.
5    Q.   Did Orbit book travel for members?
6    A.   No, they did not.
7    Q.   Did Orbit book hotel stays for members?
8    A.   No, they did not.
9    Q.   Did Orbit rent cars for members?
10   A.   No.
11   Q.   Was Orbit a concierge service?
12   A.   No.
13   Q.   Did G/Clubs offer its members concierge services?
14   A.   Yes.
15   Q.   What sort of concierge services did G/Clubs offer its
16   members?
17   A.   We didn't.  It was named concierge service.
18   Q.   Did G/Clubs have available to its members luxury sports
19   cars to use?
20   A.   No.
21   Q.   Did G/Clubs have available to its members homes to stay in?
22   A.   No.
23   Q.   To your knowledge did G/Club ever purchase a mansion?
24   A.   Not that I was aware of.
25   Q.   Have you ever been to 675 Ramapo Boulevard?

O6HBGUO6                        Reyes - Direct

1    A.  I'm sorry.

2    Q.  Have you ever been to 675 Ramapo Boulevard?

3    A.  I don't know where that is.

4    Q.  Do you know what the Crocker mansion is?

5    A.  The what?  sorry.

6    Q.  The Crocker mansion?

7    A.  No.

8    Q.  Are you aware of G/Clubs ever purchasing property in New

9    Jersey?

10   A.  Not that I was aware.

11   Q.  Are you aware of G/Clubs purchasing property anywhere in

12   the United States?

13   A.  Not that I was aware.

14   Q.  Are you aware of G/Clubs purchasing property anywhere on

15   the planet?

16   A.  Not that I was aware of.

17   Q.  Can we please display what's in evidence as Government

18   Exhibit 134.

19        Ms. Reyes, can you see that on your screen?

20   A.  Yes.

21   Q.  Do you know where this is?

22   A.  No, I do not.

23   Q.  Is this a property that G/Clubs owns to your knowledge?

24   A.  Not that I'm aware of.

25   Q.  We can take that down.

O6HBGUO6                          Reyes - Direct

1           Ms. Reyes, did there come a time, if ever, where you
2  proposed that G/Club should offer a clubhouse to its members?
3  A.   Yes.
4  Q.   Who did you propose that to?
5  A.   We spoke collectively with the team in Puerto Rico that it
6  would make sense at some point to have a club for our members.
7  Q.   And did you propose that idea to anybody?
8  A.   There was a time where there was like a little Island that
9  was on sale and I did propose that to Yvette, yes.
10 Q.   And where was that Island located?
11 A.   In Puerto Rico.
12 Q.   And how much did that Island cost approximately?
13 A.   I'm not exactly sure, but it was in the millions, maybe
14 more than five.  I don't know exactly.
15 Q.   Was it more or less than 12 million?
16 A.   I'm not exactly sure.  I would think more than five.
17 Q.   What did Yvette say, if anything, when you proposed
18 purchasing this Island for members?
19 A.   At the end, it wasn't -- like it didn't make sense to
20 purchase an Island due to the value of it.
21 Q.   Who decided how much money to spend on purchases that
22 G/Clubs made?
23 A.   What purchases specifically?
24 Q.   Were you able to spend money, G/Clubs money on things?
25 A.   Some things.

O6HBGU06                          Reyes - Direct

1    Q.  What are the things you were able to spend G/Club money on?

2    A.  Like if we had a lunch for an event with the employees, I

3    would spend that, office supplies; for example, FAO Schwarz

4    event.

5    Q.  Ms. Reyes, who were multiple memberships?

6    A.  Multiple membership is where members are able to purchase

7    more than one membership.

8    Q.  Whose idea was it to permit members to purchase more than

9    one membership?

10   A.  The request came from Yvette.

11   Q.  Can we please display what's in evidence as Government

12   Exhibit GC-126.  Zoom in at the top, please, Ms. Loftus.

13           What is this document about Ms. Reyes?

14   A.  It's an email from Yvette to Jessica, myself regarding

15   reviewing the membership agreement to allow for multi-members.

16   Q.  Can you read the bottom email.  It says, it's from Jessica

17   Mastrogiovanni starting with please revise?

18   A.  Please revise the membership agreement ASAP to allow

19   members to buy more than one membership.  Need to be unlimited.

20   Q.  And what was Yvette's response to this email?

21   A.  Jessica, please come to me about this.

22   Q.  What email address did Yvette use in this email?

23   A.  Officework 2020.

24   Q.  Did Yvette have a G/Clubs domain email like you did?

25   A.  Not that I was aware of.

O6HBGUO6                          Reyes - Direct

1   Q.  The benefits that we discussed previously, did multiple --

2   withdrawn.

3           How many memberships could a member purchase if they

4   wanted to?

5   A.  Multiples, I recall seeing at least ten.

6   Q.  One person buying ten memberships?

7   A.  Yes.

8   Q.  Was there any limit to the number of members that an

9   individual could purchase?

10  A.  Not that I recall.

11  Q.  Did you ask Yvette why G/Clubs should implement a multiple

12  membership option?

13  A.  No.

14  Q.  Did you ask Mr. He why G/Clubs should implement a multiple

15  membership option?

16  A.  Not that I recall.

17  Q.  What additional benefits, if any, did multiple memberships

18  get?

19  A.  They would get access more than once at the sweepstakes,

20  participate in sweepstakes, and it was promoted that they would

21  have access to VIP events and a concierge service.

22  Q.  You said it was promoted that multiple members would have

23  access to VIP events, were there any VIP events?

24  A.  We did not host it.

25  Q.  Was there any concierge service for multiple members?

O6HBGUO6                          Reyes - Direct

1    A.  Not at the time.

2    Q.  At any other time that you were at G/Clubs?

3    A.  No.

4    Q.  Were members provided a membership agreement?

5    A.  Upon registration, they had to upon registration.  Online

6    they would see their membership agreement.

7    Q.  Were they required to acknowledge it?

8    A.  To the best of my understanding, they had to check, click

9    on a box.

10   Q.  If we can bring up what's in evidence, please, Ms. Loftus,

11   as Government Exhibit GC-28.  And who's this email from at the

12   top?

13   A.  It's an email from Ana to Jessica and myself.

14   Q.  And what is the attachment called that's attached to this

15   email?

16   A.  G/Club membership agreement, red line multiple membership.

17   Q.  Zoom out of that, please, Ms. Loftus.

18        And this is a response to the email you mentioned

19   before, that we talked about before.  Can you zoom in on the

20   bottom email, please.

21        On this email the CC line it says officework

22   2020@protonmail.com Do you see that, Ms. Reyes?

23   A.  Yes.

24   Q.  Whose email is that?

25   A.  Yvette's.

O6HBGUO6                        Reyes - Direct

1   Q.  Did you ask Yvette why she used that email address for

2   G/Club's business, Officework2020@proton mail.com?

3   A.  No, I did not.

4   Q.  Ms. Loftus, if we can go to the next page.

5          Is this the membership agreement that Ana Izquierdo

6   adjusted?

7   A.  Can you scroll it a bit.  Yes.

8   Q.  If can you go, Ms. Loftus, to page four paragraph 12B.  Go

9   down a little bit, please.  Can you zoom in on that.

10         Ms. Reyes, can you read the underlined text beginning

11  with Member may?

12  A.  Member may purchase more than one membership with G/Clubs

13  for themselves and will be assigned a membership number per

14  membership.  However, members with multiple memberships will

15  only be able to use one membership for special pricings from

16  G/Club affiliates and will not be able to combine said

17  memberships.

18  Q.  Did Ana Izquierdo also report to you that?

19  A.  She would receive instruction from Yvette, yes.

20  Q.  You can zoom out of that, Ms. Loftus.

21         And if you could go to paragraph 16.  Zoom in on

22  paragraph 16, please.  Can you read that paragraph, please?

23  A.  Non-disparagement.  The member and each immediate family

24  member beneficiary hereby agrees not to disparage G/Clubs, its

25  parent or affiliate companies, nor any of their respective

O6HBGUO6                          Reyes - Direct

1    owners, partners, officers, directors, employees agents or

2    other representatives, key host or spokespeople including for

3    avoidance of doubt Mr. Guo Wengui.  For purposes of this

4    agreement, disparage shall mean make any statements to a third

5    party that are unlawful, false, misleading, defamatory,

6    harassing or abusive regarding one or more of the foregoing.

7              Nothing herein shall prohibit or restrict a member or

8    immediate family member beneficiaries ability to publish an

9    honest review or performance assessment of G/Clubs or any goods

10   or services it provides.

11   Q.  What was your understanding, if any, why the G/Clubs

12   membership agreement as it text says, prohibited disparaging

13   statements about Guo?

14   A.  I do not have an understanding.

15   Q.  Did you ask anyone why this paragraph was included in the

16   membership agreement?

17   A.  No, I did not.

18   Q.  You can take that down.  Can I have one moment.

19             What was G/Clubs' policy, if any, about refund

20   request?

21   A.  The policy changed through time.  Originally it was

22   cancellation three days after the membership and later on it

23   was extended to 12 or 14 days.  I'm not exactly sure.

24   Q.  What do you mean it was a three-day policy initially?

25   A.  That after a member got their membership, they had three

O6HBGUO6                          Reyes - Direct

1   days to request cancellation.

2   Q.  And then it was extended to 14 days, is that what you said

3   or 12?

4   A.  Twelve or 14 days.

5   Q.  Why was it extended to 12 or 14 days?

6   A.  I was told that it was due to something along the lines of

7   a European law that required that time.

8   Q.  And when you started at G/Clubs, was the refund policy

9   strict?

10  A.  Yes.

11  Q.  Were a lot of refunds given out?

12  A.  No.

13  Q.  Did that change where the refund changed, when the refund

14  policy became less strict?

15  A.  Yes.

16  Q.  What changed for the refund policy to become less strict?

17  A.  After G/Clubs receive a subpoena, the refunds changed.

18  Q.  Subpoena from who?

19  A.  The government.

20  Q.  Ms. Reyes, one of the benefits I think you mentioned was --

21  let me take a step back.

22          What is G talk?

23  A.  G talks, it was originally intended to be an in-person

24  event.  Due to Covid, we had to shut to virtual, so it was a

25  virtual event where we would have different topics.  We had a

O6HBGUO6                          Reyes - Direct

1    sweepstakes for our members.

2    Q.  And what happened?  How many G talks were there while you

3    were at G/Club?

4    A.  We hosted two.

5    Q.  And when were they?

6    A.  The first one was in February 2021.  The second one was in

7    March 2022.

8    Q.  And can you just describe what happened at G Talks?

9    A.  Depended.  The first one was, we talked about G/Clubs.  We

10   presented the G Fashion collection, and we had the sweepstakes

11   of the G Fashion prices.  There were vehicle prizes as well and

12   cash value.  The second one was more towards Community Through

13   Love, so we had different videos of different locations and we

14   had the sweepstakes as well.

15   Q.  Where did the G Talks event occur?

16   A.  The first one it was virtual, so the different speakers

17   were in different locations.  The second one, the main

18   broadcast was in New York, New York office.

19   Q.  Who could watch or how could someone watch the G Talks

20   event?

21   A.  It was a link to the best of my understanding that was

22   provided.

23   Q.  So it was online?

24   A.  Yes.

25   Q.  Were only members permitted to watch G Talk?

O6HBGUO6                        Reyes - Direct

1    A.  The first G Talk was members only.  The second G talk was

2    open to the general public.

3    Q.  What was Miles Guo's role, if any, at G Talk events?

4    A.  He spoke at the G Talks.

5    Q.  We can take a look at what's in evidence as GXCT-171.

6    Ms. Reyes, what is this document?

7    A.  It looks like the agenda for one of the G Talks.

8    Q.  If we can look at GXCT-170.  What is this?

9    A.  Continuation of the agenda for the G Talk.

10   Q.  And is that you, by host?

11   A.  Yes.

12   Q.  What did you say in your welcoming remarks?

13   A.  I don't recall exactly.

14   Q.  If we can look at GXCT-172.  Can you zoom in at the top

15   please, Ms. Loftus.

16           Can you read what it says at the top?

17   A.  List of do not words/ideas.

18   Q.  What is this document?

19   A.  It was a document of do not say words that was provided to

20   Mr. Guo.

21   Q.  Why was a document of do not say words provided to Guo?

22   A.  I do not know.

23   Q.  What was the purpose of this document?

24   A.  To be a list of do not say words.

25   Q.  Do you know if Guo said these words or not?

O6HBGUO6                          Reyes - Direct

1    A.  I do not know.

2    Q.  Why not?

3    A.  I do not know Mandarin.

4    Q.  Can you scroll down, please, Ms. Loftus.  Stop right there.

5          Do you see where it says growth and growth projections

6    at the top?

7    A.  Yes.

8    Q.  Do you know why growth and growth projections were words

9    that Guo should not say?

10         MR. KAMARAJU:  Objection to the form, your Honor.

11         THE COURT:  Overruled.  You may answer.

12   A.  I do not know.

13   Q.  Participation, participate, business or profits.  Do you

14   know why those were words Guo was not supposed to say?

15   A.  I do not know.

16   Q.  GTV.  You know why that was a word Guo was not supposed to

17   say?

18   A.  I do not know.

19   Q.  What about Saraca, do you know why that was a word Guo was

20   not supposed to say?

21   A.  I do not know.

22   Q.  Do you know what Saraca is?

23   A.  No.

24   Q.  What about voice of Guo, Voice of Good.  Do you know what

25   that is?

O6HBGUO6                          Reyes - Direct

1    A.  No.

2    Q.  Rule of Law Foundation, Rule of Law Society.  Do you know

3    why Guo was not supposed to say those words?

4    A.  I do not know.

5    Q.  Was this list for G Talk one or G Talk two?

6    A.  To the best of my recollection G Talk One.

7    Q.  What was the date of G Talk One approximately?

8    A.  February 2021.

9    Q.  And then a couple of rows down it says Yvette Wang, Yvette.

10   Do you know why Guo was not supposed to mention Yvette?

11   A.  I do not know.

12   Q.  Can we scroll down, Ms. Loftus.  And it says Sara, below

13   Sara it says Mulan.  Do you know why Guo was not supposed to

14   mention Mulan?

15   A.  I do not know.

16   Q.  Do you know who Mulan is?

17   A.  I've seen an image of the Disney character of Mulan if you

18   will.  I do not know.

19   Q.  What was your understanding of what Mulan did in relation

20   to G/Club?

21          MR. KAMARAJU:  Object to the foundation, your Honor.

22          THE COURT:  Did she do anything in relation to the

23   G/Clubs.

24   Q.  I'll withdraw it.  What was your understanding of who Mulan

25   was?

O6HBGUO6                          Reyes - Direct

1    A.  I do not know who she was.

2    Q.  Did Mulan do anything in relation to G/Club?

3            MR. KAMARAJU:  Same objection, your Honor.

4            THE COURT:  You may answer.

5    A.  She participated in the committee for the G Talks, that's

6    where I saw the image.

7    Q.  Do you know what the iron blooded group is?

8    A.  I'm sorry.

9    Q.  The iron blooded group, do you know what that is?

10   A.  No.

11   Q.  Below Mulan, Ms. Reyes, it says SEC, investigation and

12   litigations, do you know why Guo was not supposed to say those

13   words?

14   A.  I do not know.

15   Q.  What about Golden Spring, do you know why Guo was not

16   supposed to say Golden Spring?

17   A.  I do not know.

18   Q.  Do you know what Golden Spring is?

19   A.  I do not know.

20   Q.  Below Golden Spring, regulators, DOJ, Attorney General,

21   prosecutors, U.S. government.  Do you know why Guo was not

22   supposed to say anything about those words?

23   A.  I do not know.

24   Q.  Scroll down.  And below U.S. government it says G Coin, G

25   Dollar, H Coin, H Dollar.  Do you know why Guo was not suppose

O6HBGUO6                        Reyes - Direct

1    to say anything about G Coin, G Dollar, H Coin and H Dollar?

2    A.  I do not know.

3    Q.  Do you know what G Coin and G dollar are?

4    A.  No.

5    Q.  Do you know what H Coin and H Dollar are?

6    A.  Yes.

7    Q.  What do you understand those things to be, H Coin and

8    H Dollar?

9    A.  Those are methods of payments amongst -- H Dollar is, my

10   understanding, like a one-on-one, and H Coin is, it fluctuates.

11   Q.  You can take that down.  If we could please display for the

12   witness GC-511.

13            What is this a picture of?

14   A.  Mr. Guo and myself.

15            MR. FINKEL:  Government offers GC-511.

16            MR. KAMARAJU:  No objection.

17            THE COURT:  It is admitted.

18            (Government's Exhibit GC-511 received in evidence)

19   BY MR. FINKEL:

20   Q.  Where was this photograph taken?

21   A.  In the New York office.

22   Q.  Where was this New York office located?

23   A.  I don't know exactly the address.  If I look at a map,

24   Manhattan is in the front, so it's in the left side.  If

25   Central Park is in the center, it's in the left.

O6HBGUO6                          Reyes - Direct

```
 1    Q.  To the left side of Central Park?

 2    A.  Yes.

 3    Q.  Ms. Reyes, why was this photograph taken?  I'm going to ask

 4    you to point the mic toward you.

 5    A.  Can you repeat the question.

 6    Q.  What was the occasion for this photograph?

 7    A.  This was taken during the second G Talks event.

 8    Q.  And who selected your outfit?

 9    A.  Mr. Guo.

10    Q.  And what brand made that outfit that you're wearing?

11    A.  G Fashion.

12    Q.  Did you keep that G Fashion outfit after the G Talks event?

13    A.  It was offered, but I did not keep it ultimately.

14    Q.  Why did you not keep it ultimately?

15    A.  Because we're asked to pay for it.

16    Q.  Who was asked to pay for it?

17    A.  G/Clubs.

18    Q.  How much was G/Clubs charge for the outfit that you wore

19    during the G Talk event?

20    A.  I do not recall the exact amount of the dress.

21    Q.  Approximately how much?

22    A.  If I was to guess, maybe around a thousand.

23            MR. KAMARAJU:  Object to the guessing, your Honor.

24            THE COURT:  Don't guess.  If you don't know, just say

25    you don't know.
```

O6HBGUO6                              Reyes - Direct

1   Q.  You can take that down.  Ms. Reyes, you mentioned something

2   about a sweepstakes in connection with the G Talk.  Can you

3   explain your understanding of that sweepstakes?

4   A.  The sweepstakes were, we had different prizes and members

5   that register for the event were selected to be the lucky

6   winners of the different prizes.

7   Q.  What were the kinds of prizes that the members could win if

8   they were selected?

9   A.  We had vehicles, G Fashion items, different G Fashion items

10  and cash values.

11  Q.  Do you know how the winners were selected, exactly how it

12  worked?

13  A.  There was a sweepstake company and they were the ones that

14  selected the different winners.

15  Q.  If we can please display what I believe is in evidence as

16  GX-121.  Do you know who this individual is?

17  A.  Mr. Yong .

18  Q.  Did Mr. Yong ever win the sweepstakes?

19  A.  Yes.

20  Q.  What did he win?

21  A.  A Lamborghini.

22  Q.  Did you ever meet him, Mr. Yong?

23  A.  In person?

24  Q.  Yes.

25  A.  Yes.

O6HBGUO6                         Reyes - Direct

1   Q.  If we can please display what's in evidence as Government

2   Exhibit GXGC-547.  Zoom in on that one, please, Ms. Loftus.

3        Can you read that message?

4   A.  These three members would like to visit your office.

5   Ideally take off tomorrow from New York City, fly back on

6   Sunday.  Let me know when you can talk about this.  Thank you.

7   Q.  Who was that message sent to?

8   A.  It was sent to -- I don't see, but I recall the message

9   sent to me.

10  Q.  Sent to you?

11  A.  Yes.

12  Q.  From whom?

13  A.  From Yvette.

14  Q.  And what is your understanding of what Yvette meant, these

15  three members would like to visit your office?

16  A.  There was a time where three members came to our Puerto

17  Rican office to see the office.

18  Q.  What were their names?

19  A.  Alex Chi, Mr. Yong and Sharon or Shannon.

20  Q.  Mr. Young, the image of the individual we just saw with the

21  air pods?

22  A.  Yes.

23  Q.  Can you zoom out of that, Ms. Loftus, and scroll down.  Can

24  you zoom in on the second line.  Can you read that?

25  A.  Mr. Yong Zhang.

O6HBGUO6                    Reyes - Direct

1   Q.  Who do you understand that to be?

2   A.  Mr. Yong.

3   Q.  The air pods picture?

4   A.  Yes.

5   Q.  Did Mr. Yong come to the Puerto Rico office?

6   A.  Yes.

7   Q.  Was it around this time in the summer of 2022?

8   A.  To the best of my recollection, yes.

9   Q.  What was your understanding of why Mr. Yong visited the

10  Puerto Rico office?

11  A.  They were there to visit the Puerto Rico office, meet the

12  team, get to know the different departments and talk about

13  G/Clubs.

14  Q.  How much time did you spend with Mr. Yong in Puerto Rico?

15  A.  I don't recall specifically.

16  Q.  Did Yvette ask you to take him out to dinner as well

17  Mr. Yong?

18  A.  I don't remember her specifically telling me to take them

19  out to dinner, but to be hospitable and host them, so we did.

20  Q.  What did you talk about with Mr. Yong?

21  A.  I don't remember specifically.

22  Q.  Did you talk about taking down the Chinese Communist Party?

23  A.  No.

24  Q.  Did you talk about the democratic movement against the

25  Chinese Communist Party?

O6HBGUO6                          Reyes - Direct

1    A.  No.

2    Q.  What was your understanding of what, if anything, Mr. Yong

3    did?

4    A.  I understood he was a lawyer, an attorney.

5    Q.  Take that down, please.

6            Aside from the Lamborghini that Mr. Yong won, were

7    there other members who won cars?

8    A.  There were other members that won cars, but to the best of

9    my recollection they ultimately decided for the cash value.

10   Q.  What do you mean they ultimately decided for the cash

11   value?

12   A.  Instead of having the physical car, they decided on the

13   value of the car.

14   Q.  And to your knowledge were payments made to some of those

15   members?

16   A.  To the best of my knowledge, yes.

17   Q.  Did all of those members who selected cash value accept a

18   wire transfer?

19   A.  No, there were different payment methods.  There's wires.

20   There came a time I believe there was checks and there's -- in

21   form of credit to their membership.

22   Q.  What do you mean by a form of credit?

23   A.  The value of the price would be credited to their annual

24   fee or any membership depending on what they selected.

25   Q.  Did some of the winners choose that option, the credit for

O6HBGUO6                          Reyes - Direct

1   G/Club membership?

2   A.  I do recall, yes, one.

3   Q.  Are you familiar with an email address Notices@G mail.com?

4   A.  Yes.

5   Q.  Who used that email address?

6   A.  The legal department.

7   Q.  For what purpose?

8   A.  Legal matters, cancellations, member complaints.

9   Q.  What do you mean by cancellations?

10  A.  When members requested for cancellation, it would be

11  assigned to the legal for review.

12  Q.  If we can pull up what I think is in evidence as GXW-17.

13  Can you see that on your screen, Ms. Reyes?

14  A.  Yes.

15  Q.  What is this?

16  A.  It's the G/Clubs website.

17  Q.  Can you scroll down, please, Ms. Loftus, scroll down a

18  little bit more.

19          On the right below Experiences that Enrich, can you

20  read the text below that, please?

21  A.  Our concierge staff crafts individually curated experiences

22  that give you exclusive access to the world's most remarkable

23  destinations, products and services.

24          MR. FINKEL:  Your Honor, in the abundance of caution,

25  the government offers GXW-17. I believe it's in, but if not the

O6HBGUO6                        Reyes - Direct

1   government offers.

2              MR. KAMARAJU:  No objection.

3              THE COURT:  It is admitted.

4              (Government's Exhibit GXW-17 received in evidence)

5   BY MR. FINKEL:

6   Q.  Ms. Reyes, did G/Clubs have concierge staff that crafted

7   individually curated experiences for its members?

8   A.  No, we did not.

9   Q.  Was written on the G/Clubs website true?

10  A.  No, we did not offer.

11             MR. FINKEL:  Government also offers GXW-16 and GXW-19.

12             MR. KAMARAJU:  No objection, your Honor.

13             THE COURT:  They're admitted.

14             (Government's Exhibits GXW-16 and GXW-19 received in

15  evidence)

16  BY MR. FINKEL:

17  Q.  Ms. Loftus, if we can pull up GXW-16.  What is this?

18  A.  The G/Club website.

19  Q.  Can you scroll down a little bit.  By the way, who selected

20  these images?

21  A.  The marketing agency and our marketing team.

22  Q.  So here it says, Where Will your Curiosity Take you.  Can

23  you read what it says below that?

24  A.  G/Clubs members are empowered to curate their own one of a

25  kind experiences, be it a hot air balloon ride over the

O6HBGUO6                         Reyes - Direct

1   vineyards of northern Spain, a romantic dinner on the shores of

2   the Seine river, or a private guided safari.  The only limit is

3   your imagination.

4   Q.  Ms. Reyes, did the G/Clubs offer its members a hot air

5   balloon ride?

6   A.  Not at the time, no.

7   Q.  Did it offer its members a romantic dinner on the shores of

8   the Seine river?

9   A.  Not at the time, no.

10  Q.  Or a private guided safari?

11  A.  Not at the time, no.

12  Q.  Is this information about what G/Clubs offered its members

13  true?

14  A.  We did not offer it at the time, no.

15  Q.  Let's scroll down, please.  Keep going please.

16          Below next to the helicopter, it says Be Inquisitive

17  Live inspired.  Did I read that right?

18  A.  Yes.

19  Q.  Can you read the text below that?

20  A.  You have the support of a complete team of professionals

21  that not only crafts unique experience for your pleasure, but

22  also works with you to fulfill those items that are on your

23  bucket list.

24  Q.  Was there a complete team of professionals that crafted

25  unique experiences for G/Club members?

O6HBGUO6                        Reyes - Direct

1    A.  Not at the time.

2    Q.  At any time while you were at G/Clubs was there?

3    A.  We were working on it, but it wasn't in place.

4    Q.  Is there a time that Guo was on the website?

5    A.  Yes.

6    Q.  Did there come a time when he was removed from the website?

7    A.  Yes.

8    Q.  Who asked that he be removed from the website?

9    A.  Mr. He.

10   Q.  Did Mr. He explain why he wanted Guo to be removed from the

11   website?

12   A.  To the best of my recollection, it was because creating

13   difficulties with his banking relationships.

14          MS. MURRAY:  Your Honor, I see it's 4:56.  If your

15   Honor would like, this is a good time to break, but it's up to

16   the Court of course.

17          THE COURT:  That's fine.  Members of the jury, we will

18   finish now, and you will return tomorrow ready to come into the

19   courtroom at 9:30.  Remember that you're not allowed to discuss

20   this case amongst yourselves or with anyone else.  Don't permit

21   anyone to discuss it in your presence.  Don't read, watch or

22   listen to anything from any source that touches on any matter

23   related to this case.  Have a good evening and you may step

24   out.  Don't discuss your testimony.

25          THE LAW CLERK:  Jury exiting.

O6HBGUO6                          Reyes - Direct

1              (Jury not present)

2              THE COURT:  Please be seated.  Is there anything

3    before we stop for the day?

4              MR. KAMARAJU:  Not from the defense.

5              MR. FINKEL:  Nor the government.  Have a nice evening.

6              THE COURT:  Same to you.

7              (Adjourned to June 18, 2024 at 9:00 a.m.)

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    JAMES ROBERT COLLINS JR.

 4   Direct By Mr. Finkel . . . . . . . . . . . .2775

 5   Cross By Mr. Kamaraju  . . . . . . . . . . .2815

 6   Redirect By Mr. Finkel . . . . . . . . . . .2892

 7    CHRISTINE FROSINI

 8   Direct By Ms. Murray . . . . . . . . . . . .2897

 9   Cross By Ms. Shroff  . . . . . . . . . . . .2952

10   Redirect By Ms. Murray . . . . . . . . . . .2969

11   Recross By Ms. Shroff  . . . . . . . . . . .2970

12   Redirect By Ms. Murray . . . . . . . . . . .2971

13   Recross By Ms. Shroff  . . . . . . . . . . .2972

14    LIMARIE REYES

15   Direct By Mr. Finkel . . . . . . . . . . . .2973

16                     GOVERNMENT EXHIBITS

17   Exhibit No.                               Received

18    MER-5 and MER-6  . . . . . . . . . . . . .2802

19    145 and 146  . . . . . . . . . . . . . . .2900

20    1850, 1850A  . . . . . . . . . . . . . . .2998

21    GC3, GC27, GC28, GC33, GC37, GC38,  . . . .2998

22           GC40, GC43, GC54, GC59, GC60,

23             GC93, GC95

24    GC121, GC122, GC197, GC126, GC136,  . . . .2998

25             GC150A, GC150, GC157, GC158,
```

```
 1                  GC160, GC168, GC175, GC178,
 2                  GC184, GC187, GC189, GC198
 3     GC209, GC213, GC218, GC220, GC221,  . . . . .2998
 4                  GC222, GC227, GC228, GC233,
 5                  GC242, GC254, GC276, GC286,
 6                  GC292, GC293, GC299
 7     GC300, GC307, GC309, GC317, GC318,  . . . . .2998
 8                  GC332, GC334, GC340, GC341,
 9                  GC346, GC363, GC365, GC372,
10                  GC376, GC377, GC379, GC380,
11                  GC382, GC387, GC389, GC392,
12                  GC393
13     GC483, GC484, GC485, GC486, GC487,  . . . . .2998
14                  GC422, GC423, GC424, GC405,
15                  GC406, GC409, GC415, GC416,
16                  GC418, GC419, GC422, GC427,
17                  GC428, GC431, GC432, GC433,
18                  GC436, GC438, GC441, GC443,
19                  GC444, GC450, GC452, GC453,
20                  GC454, GC455, GC467, GC470,
21                  GC476, GC480, GC484, GC486,
22                  GC487, GC494, GC495, GC497
23     GC504, GC541, GC517, GC518, GC520,  . . . . .2999
24                  GC521, GC522, GC525, GC526,
25                  GC527, GC528, GC530-534,
```

```
 1              GC536-538, GC540, GC544,

 2              GC547, GC549, GC553, GC553A,

 3              and GC550

 4    GXW-16 and GXW-19  . . . . . . . . . . . .3035

 5    MER-8  . . . . . . . . . . . . . . . . . .2808

 6    GXW-17  . . . . . . . . . . . . . . . . . .3035

 7    101  . . . . . . . . . . . . . . . . . . .2995

 8    112  . . . . . . . . . . . . . . . . . . .2989

 9    113  . . . . . . . . . . . . . . . . . . .2776

10    134  . . . . . . . . . . . . . . . . . . .2899

11    MER138  . . . . . . . . . . . . . . . . . .2792

12    GC-511  . . . . . . . . . . . . . . . . . .3028

13    1100  . . . . . . . . . . . . . . . . . . .2903

14    1101  . . . . . . . . . . . . . . . . . . .2918

15    1102  . . . . . . . . . . . . . . . . . . .2930

16    MER1203  . . . . . . . . . . . . . . . . . .2784

17    MER1204  . . . . . . . . . . . . . . . . . .2786

18    MER1205  . . . . . . . . . . . . . . . . . .2798

19    MER-1206  . . . . . . . . . . . . . . . . .2810

20                    DEFENDANT EXHIBITS

21    Exhibit No.                        Received

22    60554  . . . . . . . . . . . . . . . . . .2821

23    60556  . . . . . . . . . . . . . . . . . .2873

24

25
```