O6IBGUO1

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA,
 3
                    v.                          23 Cr. 118 (AT)
 4
      MILES GUO,
 5
                         Defendant.             Trial
 6    ------------------------------x
                                                New York, N.Y.
 7                                              June 18, 2024
                                                9:30 a.m.
 8
      Before:
 9

10                        HON. ANALISA TORRES,

11                                              District Judge
                                                 -and a Jury-
12
                               APPEARANCES
13
      DAMIAN WILLIAMS
14         United States Attorney for the
           Southern District of New York
15    BY:  RYAN B. FINKEL
           JULIANA N. MURRAY
16         Assistant United States Attorneys

17    SABRINA P. SHROFF
           Attorney for Defendant
18
      PRYOR CASHMAN LLP
19         Attorneys for Defendant
      BY:  SIDHARDHA KAMARAJU
20         MATTHEW BARKAN
           CLARE P. TILTON
21

22    ALSO PRESENT:
      Isabel Loftus, Paralegal Specialist, USAO
      Robert Stout, Special Agent, FBI
23    Ruben Montilla, Defense Paralegal
      Tuo Huang, Interpreter (Mandarin)
24    Shi Feng, Interpreter (Mandarin)
      Yu Mark Tang, Interpreter (Mandarin)
25

O6IBGUO1

1           (Jury not present)

2           THE COURT:  Would you make your appearances, please.

3           MS. MURRAY:  Good morning, your Honor.  Juliana Murray

4      on behalf of the United States.  I'm joined by Paralegal

5      Specialist Isabel Loftus and FBI Special Agent Robert Stout.

6           THE COURT:  Have you seen the defense attorneys?

7           MS. MURRAY:  I have not seen them yet this morning,

8      your Honor.

9           THE COURT:  I will ask my staff to advise me as to

10     when they arrive.  I see Ms. Shroff now.

11          MS. SHROFF:  Good morning, your Honor.

12          THE COURT:  Would you make your appearance, please.

13          MS. SHROFF:  Sabrina Shroff on behalf of Mr. Guo who

14     is standing to my left.

15          THE COURT:  You may be seated.  Are there any issues

16     that either side would like to raise?

17          MS. MURRAY:  Nothing from the government, your Honor.

18          MS. SHROFF:  Nothing from the defense, your Honor.

19     Thank you.

20          THE COURT:  All righty.  We'll start with the witness

21     on the stand at 9:29.  Thank you.

22          (Recess)

23          (Continued on next page)

24

25

O6IBGUO1                         Reyes- Direct

1

2              (Jury not present)

3              THE COURT:  Good morning, and would you have the

4    jurors brought in.

5              THE LAW CLERK:  Jury entering.

6              (Jury present)

7              THE COURT:  Please be seated.  Good morning, jurors.

8    I apologize that your breakfast was not in the jury room until

9    9:30 this morning.  You were here on time, but the breakfast

10   wasn't.  This is not the first time that food has been late.  I

11   want you to know that my staff has been reminding the cafeteria

12   of our schedule.  But because there's been so much lateness,

13   I'm personally going to go down to the cafeteria and speak with

14   them.  So we're getting started later than we expected.  I

15   apologize.  We're going to continue with the direct examination

16   of Ms. Reyes.  You may continue the inquiry.

17             MR. FINKEL:  Thank you, your Honor.

18   LIMARIE REYES, resumed.

19   DIRECT EXAMINATION CONTINUED

20   BY MR. FINKEL:

21   Q.  Good morning, Ms. Reyes.

22   A.  Good morning.

23   Q.  I remind you you're still under oath.  Okay?

24   A.  Yes.

25   Q.  Ms. Reyes, yesterday we talked about something called

1    G Talks.  You recall that?

2    A.  Yes.

3    Q.  Who set the budget for G Talks?

4    A.  I was provided the budget by Yvette.

5    Q.  And what was the approximate budget for each of the G Talks

6    event?

7    A.  The second G Talks event was 2.5 million.  The first one, I

8    don't recall, around 1, 1.5.

9    Q.  1.5 million?

10   A.  Yes, correct.

11   Q.  Did those numbers, the 1.5 million and 2.5 million include

12   the cost of any giveaways for the sweepstakes?

13   A.  Yes, that included the cost of the sweepstakes.

14   Q.  You mentioned also yesterday I believe there was

15   approximately 14 other employees during your time at G/Clubs?

16   A.  Yes.

17   Q.  And those employees were located in Puerto Rico?

18           THE COURT:  Both of you please get closer to the

19   microphone and raise your voices so that everyone can hear.

20           MR. FINKEL:  Certainly, your Honor.

21   Q.  What departments or roles did those employees have in

22   Puerto Rico?

23   A.  The departments that we had was finance department, the

24   legal department, HR department.  We had events, marketing,

25   partnership and membership.

O6IBGUO1                          Reyes- Direct

1    Q.   And those employees reported to who?

2    A.   They were to report to their direct supervisor and those

3    would report directly to me.

4    Q.   And who did you report to?

5    A.   I reported to the owner Mr. He and to Yvette as well.

6    Q.   Was Mr. He referred to by something other than his name

7    Mr. He?

8    A.   UBO.

9    Q.   That was a term used within the office?

10           THE COURT:   What was that term again?

11           THE WITNESS:   UBO.

12           THE COURT:   UBO?

13           THE WITNESS:   Yes.

14   Q.   Standing for?

15   A.   Ultimate beneficial owner.

16   Q.   When approximately did you become the interim CEO?

17   A.   February 2021.

18   Q.   And what is your understanding of who selected you to

19   become the interim CEO?

20   A.   I was provided or I was asked by Zee, the former CEO, and

21   Jessica.

22   Q.   Did you understand who Zee and Jessica consulted with to

23   determine whether you would be CEO?

24           MR. KAMARAJU:   Objection.

25           THE COURT:   I have to remind you to raise your voice

1   because even I'm having some difficulty hearing every sentence

2   clearly.  The objection is sustained.

3   Q.  Did Zee or Jessica mention anything about Yvette's view

4   about you becoming interim CEO?

5           MR. KAMARAJU:  Same objection.

6           THE COURT:  I'm going to allow the question.

7   Q.  You can answer.

8   A.  Yes.

9   Q.  What did they say?

10  A.  That they had discussed with Yvette.

11  Q.  And Yvette's view is what?

12  A.  Positive to me being the interim CEO.

13  Q.  And what did your salary become when you became the interim

14  CEO?

15  A.  To the best of my recollection 160,000.

16  Q.  How did you learn that you became the CEO?

17  A.  I received an email from HR stating that I was going to be

18  CEO.

19  Q.  And who selected you to become the CEO?

20  A.  Yvette.

21  Q.  What did your salary become when you became the CEO?

22  A.  176.

23  Q.  And that's per year?

24  A.  Annual, yes, correct.

25  Q.  Were you entitled to any bonuses?

O6IBGUO1                          Reyes- Direct

1    A.  Yes.

2    Q.  Can you describe to the jury what bonuses you were entitled

3    to?

4    A.  Yes.  There was a Puerto Rican Christmas bonus that's

5    standard per law, and a yearly bonus, but that would depend on

6    the different years.

7    Q.  What was the Puerto Rican Christmas bonus?

8    A.  The amount, it's a percentage.  It is around $600, $700.

9    Q.  And what do you mean by Puerto Rican Christmas bonus?

10   A.  In Puerto Rico there is an employee law that entitles

11   Puerto Ricans to receive Christmas bonuses.

12   Q.  In addition to the Puerto Rican Christmas bonus, you said

13   there was another bonus?

14   A.  Yes.

15   Q.  And how much was that bonus for you?

16   A.  It range from year to year, but to the best of my

17   recollection maybe 5,000.

18   Q.  And you were the interim CEO for approximately how long?

19   A.  From February to around summer, couple of months.

20   Q.  And you were the CEO for how long?

21   A.  Since summer 2021 up until my resignation.

22   Q.  Which was in what month and what year?

23   A.  March 2023.

24   Q.  What was your understanding of where Yvette worked?

25   A.  In New York.

1              THE COURT:  Ms. Reyes, if you could get very close to

2       the microphone very, very close and raise your voice.

3       Q.  Why did Yvette work in New York while G/Clubs was in Puerto

4       Rico?

5       A.  I do not know.  She was there since I started.

6       Q.  Did you ask Yvette why she worked in New York and you

7       worked in Puerto Rico?

8       A.  No, I did not.

9       Q.  Where did Miles Guo work?

10      A.  I seen him in the New York office.

11      Q.  How many times had you been to the New York offices?

12      A.  More than ten.

13      Q.  Ms. Loftus, if we can display what's in evidence two

14      exhibits GX-132 and GX131.

15              Start with the image on the left side of your screen

16      GX-132, do you recognize that?

17      A.  Yes.

18      Q.  What is it?

19      A.  One of the New York office buildings.

20      Q.  Where approximately was that office building located?

21      A.  I do not know the exact address, but using as reference if

22      you're looking at the map and there's Central Park, to the

23      right side.

24      Q.  Have you been inside that building?

25      A.  Yes.

1    Q.  How many floors were in that building approximately in

2    GX-132?

3    A.  More than three.

4    Q.  Where was Guo's office?

5    A.  In this building in one of the higher floors.

6    Q.  Where was Yvette's office?

7    A.  They shared office.

8    Q.  What other companies worked in that building in GX-132 to

9    your knowledge?

10   A.  I saw G Fashion team, finance team.  There were legal

11   departments, Rule of Law Foundation.  Those are the ones that I

12   recall.

13   Q.  The image in the right side of your screen GX-131, what is

14   that?

15   A.  The other New York office space.

16   Q.  Where roughly is that office space located that?

17   A.  That would be to the left of Central Park.

18   Q.  What other companies worked in that office space on the

19   right side GX-131?

20   A.  There was G Fashion, HCHK, Gettr, and other people that I

21   don't know exactly.

22   Q.  Ms. Loftus, can you take down the image on the right and

23   pull up GX-110.

24          Who is the individual depicted in GX-110?

25   A.  Max.

O6IBGUO1                          Reyes- Direct

1    Q.  Did you observe where Max worked in the building on GX-132,

2    what floor?

3    A.  I'm not sure if it's fourth, second or third, but it was

4    the finance department.

5    Q.  Did you observe Max interact with Yvette?

6    A.  In this particular specific building?

7    Q.  In any building?

8    A.  Yes.

9    Q.  Based on your observations, what was your understanding of

10   the nature of Yvette and Max's relationship?

11               MR. KAMARAJU:  Objection.

12               THE COURT:  Overrule.  You can answer.

13   A.  Could you repeat the question.

14   Q.  Based on what you saw and heard, what was your

15   understanding of the nature of Yvette and Max's relationship?

16   A.  Like what did they talk about?

17   Q.  Yeah.

18   A.  They had meetings, and the things that I recall were with

19   regards to information about different assets that we're

20   working on.

21   Q.  And did you have an understanding whether Max reported to

22   Yvette or Yvette reported to Max?

23   A.  I'm not sure.

24   Q.  You can take those down.  Who's Long Island David?

25   A.  My interactions with him, the ones I recall, were with

O6IBGUO1                           Reyes- Direct

1    regards to G Talks.  He supported on the second G Talks.

2    Q.  Do you know what farm Long Island David was apart of?

3    A.  No.

4    Q.  Did you ask him?

5    A.  No.

6    Q.  If we can pull up what's in evidence as GX-441, GXGC-441.

7    Thank you.

8             Ms. Reyes, do you see your name in the CC line of this

9    email?

10   A.  Yes.

11   Q.  And what is the subject of this email?

12   A.  It's information regarding HCHK employees.

13   Q.  What is HCHK Technologies?

14   A.  HCHK is a vendor that provided support on different

15   departments.

16   Q.  Did HCHK provide support to G/Clubs?

17   A.  Yes.

18   Q.  Why did you hire HCHK?

19   A.  HCHK, I did not hire it.  It was an instruction given, but

20   it was hired to support with the technical, like the ITT

21   finance and legal and HR.

22   Q.  Who gave the instruction to hire HCHK for G/Clubs?

23   A.  Yvette.

24   Q.  Did you ask her why HCHK was selected?

25   A.  Yes, I inquire why HCHK was.

1    Q.  And what was the reason for that?

2    A.  We had a previous contract with GTV, and once that contract

3    was canceled, then we replaced it with HCHK.

4    Q.  On this email are some other domains.  You see it says

5    Gettr right there?

6    A.  Yes.

7    Q.  There's G Fashion, G/Clubs, HCHKTech, do you have an

8    understanding why HCHKTech was emailing G Fashion email

9    address, a G/Clubs email address and a Gettr email address?

10   A.  No.

11   Q.  We can take that down.

12           Ms. Reyes, have you ever been to London?

13   A.  Yes.

14   Q.  Did you travel to London as a G/Clubs employee?

15   A.  I traveled to the UK, yes.

16   Q.  Who asked you to travel to the UK?

17   A.  Yvette.

18   Q.  And who did you go with?

19   A.  In the plane?

20   Q.  Who did you go with?

21   A.  I went with Alex, Dowa, Kamel and Manuel.

22   Q.  What was the last one?

23   A.  Manuel.

24   Q.  Who is Alex?

25   A.  Alex was a comptroller for G/Clubs.

1   Q.   What's his last name?

2   A.   Hadjicharalambous.

3   Q.   And who's Dowa.

4   A.   Dowa was a CEO for G Fashion.

5   Q.   And who's Manuel?

6   A.   An attorney for HCHK.

7   Q.   And what were you told was the purpose of your trip to the

8   UK?

9   A.   My purpose was to visit one of the potential partners that

10  we were in communications with and to meet with Mr. He.

11  Q.   How did all of you travel to the UK?

12  A.   In a private jet.

13  Q.   Had you been in a private jet before?

14  A.   No.

15  Q.   What potential partner did you meet with in the UK?

16  A.   Company is L&R Properties.

17  Q.   And what do they do?

18  A.   They had, I think they had hotel chains.

19  Q.   Did L&R properties form a relationship with G/Clubs?

20  A.   Ultimately did not.

21  Q.   Can we pull up GX-103.  Do you know who this individual is?

22  A.   To the best of my recollection William Je.

23  Q.   Have you ever met William Je?

24  A.   Yes.

25  Q.   Where did you meet him?

O6IBGUO1                          Reyes- Direct

1    A.   In the offices of the Himalaya Exchange.

2    Q.   And when did you go to the offices of the Himalaya

3    Exchange?

4    A.   On that trip to London.

5    Q.   And why did you go to the offices of the Himalaya Exchange?

6    A.   That was the request to go and meet with them for -- they

7    were going to give us information about the H Pay app.

8    Q.   Who made the request for you to go to the Himalaya Exchange

9    offices?

10   A.   To the best of my recollection Yvette.

11   Q.   And you said the H Pay app?

12   A.   Yes.

13   Q.   What's that?

14   A.   It's an app that facilitates member payments.

15   Q.   Why is it called H Pay?

16   A.   I do not know.

17   Q.   Did G/Clubs use H pay to accept member payments?

18   A.   Yes.

19   Q.   Who made the decision to allow members to use H Pay?

20   A.   That request came from Yvette and Mr. He.

21   Q.   What happened during the meeting with William Je in the

22   Himalaya Exchange offices?

23   A.   We got introduced and then they took us to meet with the

24   technical team where they provided insight of the development

25   of the H Pay app.  Later on we met their legal team with the

O6IBGUO1                         Reyes- Direct

1   rights to the contract.  That was the concept of the meeting.

2   Q.  How did it work?  How did the H Pay app accept payments and

3   get payments to G/Clubs?

4   A.  I'm not exactly sure.

5   Q.  Did G/Clubs consider using other applications aside from H

6   Pay?

7   A.  Apps?  No, that was the one that we had.

8          THE COURT:  Ms. Reyes, have you made presentations

9   during your professional career?

10         THE WITNESS:  Like?

11         THE COURT:  Presentations, speaking to a group of

12  people.

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  So when you speak to a group of

15  people, you want them to hear what you have to say, right?

16         THE WITNESS:  Yes.

17         THE COURT:  So think of this in that way that you want

18  to make yourself heard because your voice is so low that people

19  are straining to hear what you say.  I would like them to hear

20  what you say, so please speak up.

21  Q.  Ms. Loftus, we can pull up GXGC-293 which is in evidence.

22  If you can blow up the bottom email, please.

23         Ms. Reyes, who is this email from?

24  A.  Tanu.

25  Q.  At what domain?

O6IBGUO1                        Reyes- Direct

1    A.  Himalaya Exchange.

2    Q.  Can you read the second sentence of the email beginning as

3    discussed?

4    A.  As discussed, please fine attached document for more

5    information on agreement which G/Club needs to follow to

6    integrate with Himalaya Pay.

7    Q.  Zoom out of that, please.  We can take that down.

8            Did G/Club have an account with the Himalaya Exchange?

9    A.  To the best of my understanding, yes.

10   Q.  And whose idea was it for G/Clubs to have an account with

11   the Himalaya Exchange?

12   A.  It was the requirement in order to have the H Pay app.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6I1GUO2                            Reyes - Direct

1    BY MR. FINKEL:

2    Q.  Aside from H Pay, what other methods did G|CLUBS use to

3    obtain payments from members?

4    A.  Depending on the time, but there was wire payments, checks,

5    and the H Pay.

6    Q.  Where were the checks sent to?

7    A.  Our offices in Puerto Rico.

8    Q.  And after the checks were received in your offices in

9    Puerto Rico, what, if anything, happened to them?

10   A.  Depending on the time, we would send them to New York, for

11   them to be deposited at the banks, and other times it was to

12   the banks in Puerto Rico.

13   Q.  How would you in Puerto Rico send the checks to New York?

14   A.  Via mail.

15   Q.  And who would receive them in New York?

16   A.  Alex.

17   Q.  You also said wires.  What do you mean by that?

18   A.  There was a time where members could pay via wire.

19        MR. FINKEL:  If we can pull up what's marked for

20   identification as GX 118.

21   Q.  Who is this?

22   A.  Haitham Khaled.

23        MR. FINKEL:  Government offers 118.

24        MR. KAMARAJU:  No objection.

25        THE COURT:  It is admitted.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6I1GUO2                            Reyes - Direct

1              (Government's Exhibit 118 received in evidence)

2     Q.  What is Crane?

3     A.  Crane is like a—an escrow agent.

4     Q.  And what role did Crane have, if any, with respect to

5     receiving member payments?

6     A.  They would receive member payments.

7     Q.  How did members know to send payments to Crane?

8     A.  I do not know.

9     Q.  Did you ask anyone how members knew to send payments to

10    Crane?

11    A.  I do not recall.

12              MR. FINKEL:  You can take that down.

13              And if we can pull up what's been marked for

14    identification as GX 106.

15    Q.  Who is this?

16    A.  Alex.

17              MR. FINKEL:  Government offers 106.

18              MR. KAMARAJU:  No objection.

19              THE COURT:  It is admitted.

20              (Government's Exhibit 106 received in evidence)

21    Q.  And when you say Alex, Alex?

22    A.  Hadjicharalambous.

23    Q.  And his role was what?

24    A.  Comptroller for G|CLUBS.

25    Q.  What was your understanding of why he worked in New York

1   instead of Puerto Rico?

2   A.  I don't know.  He was there before I started.

3          MR. FINKEL:  We can take that down.

4          If you could pull up what's in evidence as GX GC450.

5   And go to the next page, please, Ms. Loftus.

6          Can you zoom in on that.

7   Q.  Who is this email from?

8   A.  David Fallon.

9   Q.  Who is that?

10  A.  He was a part of the Himalaya Exchange team.  I met with

11  him there.

12  Q.  You met with him where?

13  A.  On the offices.

14  Q.  All right.  And what does this email say, from him?

15  A.  "Hi, Limarie,

16          "Mr. He has instructed us to execute the attached OTC

17  transaction.

18          "Can you please sign and email back the attached

19  transaction receipt and I will process the OTC deal."

20  Q.  What does that mean, OTC transaction?

21  A.  I'm not exactly sure.

22          MR. FINKEL:  Zoom out of that, please.  And if you can

23  go to the next page.

24  Q.  What does that say at the top?

25  A.  "Himalaya Exchange OTC Transaction Form."

O6I1GUO2                        Reyes - Direct

1  Q.  And in the middle, it says Transfer to Buyer.  Can you read

2  that.

3  A.  Yes.  "Buyer receives:  +500k, HCN at 31.500 per HCN.

4        "Buyer pays:  15,750,000 HDO."

5  Q.  What was the name of the buyer account?

6  A.  Billing@gclubs.com.

7  Q.  Who signed this?

8  A.  Alex.

9  Q.  What is your understanding of why G|CLUBS purchased

10  15.7 million HDO?

11  A.  I do not know.

12  Q.  Did you ask Mr. He why G|CLUBS was purchasing 15.7 million

13  HDO?

14  A.  I do not recall.

15  Q.  Did you ask Yvette?

16  A.  I do not recall.

17  Q.  Would buying HDO provide member benefits?

18  A.  I do not know.

19        MR. FINKEL:  We could take that down.

20  Q.  Your trip to the UK, did you travel to any other countries?

21  A.  Yes.

22  Q.  Which ones?

23  A.  Naples.

24  Q.  Why did you travel to Naples?

25  A.  To meet with Mr. He.

O6I1GUO2                        Reyes - Direct

1    Q.  Who did you travel with?

2    A.  To Naples, with Alex.

3    Q.  Just you and Alex?

4    A.  Yes.

5    Q.  Where did you meet Mr. He?

6    A.  In a boat.

7    Q.  Was anyone else in the boat?

8    A.  Yes.

9    Q.  Who?

10   A.  Mileson.

11   Q.  What was the name of the boat?

12   A.  Lady May.

13   Q.  What time of day did you meet Mileson, Mr. He, in the Lady

14   May?

15   A.  The time?  I don't recall specifically.

16   Q.  Was it evening, afternoon?

17   A.  Yes, it was late evening.

18   Q.  Late evening?

19   A.  Yeah.

20   Q.  Can you describe what the Lady May is like.

21   A.  It's a big boat, with different floors.

22   Q.  How long were you and Alex on the Lady May with Mileson and

23   Mr. He?

24   A.  Couple hours.

25   Q.  How did you get to the Lady May?

1  A.  From the pier.  So we got to the pier, and then there was a

2  smaller boat that took us there.

3  Q.  What did you do with Mr. He and Mileson and Alex on the

4  Lady May for a couple of hours?

5  A.  We had dinner.

6  Q.  What did you guys discuss?

7  A.  To the best of my recollection, we learned that they had

8  met since college, talked about their——their likes.  One had

9  likes for water, like scuba diving, the other one for race

10  cars.  I believe we talked about our visit to the hotels,

11  partnership; kind of like a collection of that day.

12  Q.  I'll just ask you to please speak up and speak clearly into

13  the microphone.

14  A.  Yes.

15  Q.  Who said they liked race cars?

16  A.  Mileson.

17  Q.  Sorry?

18  A.  Mileson.

19  Q.  And who said that that he liked scuba diving?

20  A.  Mr. He.

21  Q.  Did you discuss with Mileson and Mr. He taking down the

22  Chinese Communist Party?

23  A.  Not that I recall.

24  Q.  Did you discuss Chinese politics?

25  A.  Not that I recall.

O6I1GUO2                         Reyes - Direct

1   Q.  Did you discuss the whistleblower movement?

2   A.  Not that I recall.

3   Q.  The New Federal State of China?

4   A.  Not that I recall.

5   Q.  What did Mr. He refer to Mileson as on the boat?  What name

6   did he use?

7   A.  To the best of my recollection, Mileson.

8   Q.  Did there come a time, if ever, when you were asked to

9   facilitate purchases of assets for G|CLUBS?

10  A.  Yes.

11  Q.  And who asked you to do that?

12  A.  Depending.  It could come from Yvette or Mr. He.

13  Q.  What sort of assets were purchased for G|CLUBS?

14  A.  Vehicles, and there was a boat.

15  Q.  And what?

16  A.  Boat.

17  Q.  What vehicles?

18  A.  There was a Lamborghini, camper van, and a Bugatti.

19  Q.  And what sort of boat?

20  A.  I believe it was a 70 feet yacht.

21  Q.  What were you told was the reason for these asset

22  purchases?

23  A.  We were going to be offering as potential benefits for

24  members.

25  Q.  And by potential benefits, what, if anything, would members

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6I1GUO2                          Reyes - Direct

1   have to pay to use these assets?

2   A.  We had not decided on what was going to be the payment.

3   Q.  Was it your understanding that the assets were going to be

4   free to use or cost money?

5   A.  No, to my understanding they were going to be like renting,

6   so they were going to cost.

7   Q.  Did you say renting?

8   A.  Yes, like when you would rent a car for an amount, yeah.

9   Q.  Again, please speak loudly into the mic.

10         Ms. Reyes, what was done, if anything, during your

11  entire time at G|CLUBS to implement a procedure to allow

12  members to rent these assets, the cars and the boat?

13  A.  We had reached out to a firm in order to put in place a

14  contract as to how to do that negotiation.

15  Q.  And when did you reach out to the firm about that?

16  A.  To the best of my recollection, maybe around early 2022.

17  Q.  Okay.  And after that reaching out to the firm in early

18  2022, what actions, if any others, were taken to put in place a

19  process to allow members to rent these assets?

20  A.  That was all we had done.

21  Q.  You mentioned a Lamborghini.  Who from the New York office,

22  if anyone, directed you to facilitate a purchase of a

23  Lamborghini?

24         MR. KAMARAJU:  Objection to foundation.

25         MR. FINKEL:  I'll withdraw.

1          THE COURT:  Sustained.

2          MR. FINKEL:  I'll withdraw.

3          If we can pull up GX GC276, which is in evidence.

4          Could you go to bottom of this, or not quite the

5   bottom, the last email.

6          Keep going, please, Ms. Loftus.

7          Right there.  Can you zoom in on that.

8   BY MR. FINKEL:

9   Q.  The September 10, 2021 email, who is it from?

10  A.  Bo Collins.

11  Q.  Who is Bo Collins?

12  A.  The president of Mercantile Bank.

13  Q.  Had you ever met him?

14  A.  In person?  Yes.

15  Q.  Where?

16  A.  At his home.

17          MR. FINKEL:  We can zoom out of that.

18          And if you can scroll up, please, Ms. Loftus.  So

19  right there, September 10th email.  No.

20          Yeah.

21  Q.  Who is this email from?

22  A.  Max.

23  Q.  Max who?

24  A.  Max Krasner.

25  Q.  And what's his email address?

O6I1GUO2                          Reyes - Direct

1   A.  Maxk@lampcapital.org.

2   Q.  What's Lamp Capital?

3   A.  I do not know.

4   Q.  And can you read what Max wrote.

5   A.  "Hi, Ana,

6           "Looks like the team is staying with the red Lambo.

7   We need to finalize all paperwork.  Officer resolutions naming

8   officer and allowing the purchase of the vehicle.  We need a

9   drivers license, and a wire payment."

10  Q.  Did you receive this email?

11  A.  Yes, I was copied.

12  Q.  What was your understanding of what Max meant by "the team

13  is staying with the red Lambo"?

14  A.  To the best of my understanding, Yvette.

15          MR. FINKEL:  You can zoom out of that, please, and

16  scroll up, please, Ms. Loftus.  Zoom in on that email.

17          No, the one below it, please.  Thank you.

18  Q.  Can you read what Ana wrote to Max.

19  A.  "Hi Max.

20          "As discussed, it is past cut off and we do not have

21  the documents signed by Mr. He (including the resolution you

22  need).  Once Limarie gets them, she can send them and the wire

23  can go out on Monday."

24  Q.  Stop there.  What was your role in facilitating the

25  purchase of this red Lambo?

O6I1GUO2                         Reyes - Direct

1    A.  I would get the documents for the loan and the resolutions,
2    and I would send them to Mr. He for his signature.
3    Q.  Who would you get the documents from?
4    A.  Sorry?
5    Q.  Withdrawn.  What do you mean by the loan?
6    A.  There were set of loans that were done in order to purchase
7    the asset, so these are the documents for that.
8    Q.  And can you describe what entity loaned to what entity.
9    A.  There was G Club Operations, G Club International BVI.
10   Q.  BV?
11   A.  BVI.
12   Q.  What's G Club Operations?
13   A.  What is?  The G Club is a membership company.
14   Q.  And where did G Club Operations get its money from?
15   A.  Membership payments.
16   Q.  And G|CLUBS Operations would send a loan to G Club BVI?
17   A.  Yes.
18          THE COURT:  Are you saying that Operations was the
19   lender, G|CLUBS Operations?
20          THE WITNESS:  Correct.
21   Q.  And Operations was based where, to your understanding?
22   A.  Puerto Rico.
23   Q.  And G Club BVI was based where, to your understanding?
24   A.  BVI.
25   Q.  How many employees did G|CLUBS BVI have?

O6I1GUO2                        Reyes - Direct

1   A.  None, to my understanding.

2   Q.  What do you mean not to your understanding?

3   A.  None, none.  Sorry.  None to my understanding.

4           THE COURT:  So I'm going to try using the handheld

5   microphone to see if that will work better.

6   Q.  Who was the ultimate beneficial owner of G|CLUBS BVI?

7   A.  To my understanding, Mr. He.

8   Q.  Why, as the CEO of G|CLUBS, did you structure assets in

9   this manner?

10  A.  I did not structure the asset purchases in this manner.

11  Q.  Did you ask Yvette why they were structured in this manner?

12  A.  The asset purchases?  Not that I recall.

13  Q.  What about Mr. He, did you ask him why they were structured

14  in this manner?

15  A.  Not that I recall.

16          MR. FINKEL:  Is the handheld mic better or worse?

17          THE COURT:  Members of the jury?

18          THE JURORS:  Worse.

19          THE COURT:  This is worse.  All right.  So we'll go

20  back to using the other microphone.

21          MR. FINKEL:  Ms. Reyes, feel free to move the

22  microphone to make yourself comfortable, and try to point the

23  microphone directly at your mouth where your voice is coming

24  out, and just speak as loudly and clearly as you can so

25  everyone can hear you.

1          THE COURT:  Ms. Reyes, see how it bends like this?

2     You can just bend it and get it really close so that everyone

3     can hear you.

4          MR. FINKEL:  Point it so it's right——

5          THE WITNESS:  Here?

6          MR. FINKEL:  Yeah.  Speak right into the microphone,

7     okay?

8          Okay.  We can zoom out of that.  And can you scroll

9     up, please.

10          And can you zoom in on the bottom email.

11    BY MR. FINKEL:

12    Q.  Can you read what Max wrote.

13    A.  "Thanks, Ana.  Here is the updated bill of sale.  I will

14    call the dealer first thing Monday morning to confirm they have

15    the vehicle and then we can wire the funds.  Hopefully we have

16    Mr. He's signature prior to that."

17    Q.  Why was Max in touch with the dealer?

18    A.  To my understanding, Max was the one that was in——managing

19    the requirement, the documents.

20    Q.  Why was that being managed by someone in New York rather

21    than Puerto Rico; do you know?

22    A.  I wouldn't know.

23          MR. FINKEL:  Okay.  We can zoom out of that.  And can

24    you scroll——can you zoom in on the top email, please,

25    Ms. Loftus.

1  Q.  And what's the date of this email, Ms. Reyes?

2  A.  September 11, 2021.

3  Q.  And what did you write?

4  A.  "Dear All, please find attached signed documents."

5          MR. FINKEL:  Okay.  Let's zoom out of that.  If we can

6  scroll down, please.

7          Stop right there.

8  Q.  Okay.  What is this document titled?

9  A.  G Club International Limited.

10 Q.  And is this one of the documents that you attached as a

11 signed document?

12 A.  Could you repeat that.

13 Q.  Is this one of the documents that you attached to your

14 email as a signed document?

15 A.  Yes, this is the type of form, correct.

16 Q.  Who signed this document?

17 A.  Mr. He.

18 Q.  Are you familiar with what Mr. He's signature looks like?

19 A.  Yes.

20 Q.  All right.  Can you read Purpose 1.1.

21 A.  "The sole director has deemed it to be in the best interest

22 of the company to request a loan for 2 million USD from its

23 wholly-owned subsidiary G Club Operations LLC."

24         MR. FINKEL:  Can you zoom out of that.

25 Q.  And on the bottom it says Sole Director.  Can you read the

O6I1GUO2                          Reyes - Direct

1   name below Sole Director.

2   A.  Haoran He.

3           MR. FINKEL:  Zoom out of that.  And can you zoom in,

4   Ms. Loftus, on 1.2.

5   Q.  Can you read 1.2, please, Ms. Reyes.

6   A.  "The Sole Director and the Company are interested in

7   purchasing a 2021 Lamborghini AVENTSVJRD (VIN Number——"do you

8   want me to read it completely?

9   Q.  Yes.

10  A.  "——ZHWUN6ZD2MLA10393) from Lamborghini Dallas for

11  832,000.75."

12  Q.  Why was Lamborghini Dallas selected as the seller of this

13  Lamborghini?

14  A.  I do not know.

15  Q.  Did you have any role in selecting Lamborghini Dallas as

16  the seller of this Lamborghini?

17  A.  No, I did not.

18  Q.  Do you have any role in negotiating the price of this

19  Lamborghini?

20  A.  No, I did not.

21  Q.  Did you have any role in selecting the model of this

22  Lamborghini?

23  A.  No, I did not.

24          MR. FINKEL:  You can zoom out of that.

25  Q.  And what does it say at the top?

1    A.  "Written resolutions of the Sole Director of the Company

2    made in accordance with the Company's Articles of Association."

3    Q.  And above that, what's at the very top?

4    A.  "G Club International Limited, Company No. 2045976."

5            MR. FINKEL:  Okay.  You can zoom out of that.

6            And could we go to the next page, please, Ms. Loftus.

7    Q.  Who signed this document?

8    A.  Mr. He.

9    Q.  And what does it say under Written Consent of the Sole

10   Member at the very top?

11   A.  G Club Operations LLC.

12   Q.  And can you read where it says, "NOW, THEREFORE, it is:

13   RESOLVED."

14   A.  "NOW, THEREFORE, it is:

15           "RESOLVED, Sole Member deems it to be in the best

16   interest of the company and hereby authorizes and directs the

17   company to loan 2 million USD to the sole member for it to

18   deposit, and under the terms and conditions established in the

19   loan agreement.  For efficiency purposes, the Sole Member

20   hereby authorizes and directs the company and its authorized

21   representatives to execute any and all documents necessary to

22   consummate the loan authorized herein."

23           MR. FINKEL:  Zoom out of that, please.

24   Q.  And above that, can you read where it says "WHEREAS."

25   A.  "WHEREAS, Sole Member has deemed it to be in the best

1   interest of the company to loan $2 million USD at 3 % APR to

2   the Sole Member for its investment, under the terms and

3   conditions further stipulated in the loan agreement attached

4   here to as Exhibit A."

5   Q.  Ms. Reyes, to your knowledge did G|CLUBS BVI pay G|CLUBS

6   Operations for this loan?

7   A.  Not that I was aware of, no.

8   Q.  With respect to any of the assets purchases, did G|CLUBS

9   BVI make payments to G|CLUBS Operations?

10  A.  Not that I was aware of.

11          MR. FINKEL:  Zoom out of that, please.

12          Could you scroll down, please, Ms. Loftus.  Stop right

13  there.

14  Q.  What is this document?

15  A.  It's a loan agreement.

16  Q.  Between who?

17  A.  G Club Operations and G Club International Limited.

18  Q.  And G Club Operations is located where?

19  A.  Puerto Rico.

20  Q.  And G Club International Limited is located where?

21  A.  BVI.

22  Q.  And in the G|CLUBS office, what would employees refer to G

23  Club International Limited as?

24  A.  G Club BVI.

25  Q.  Do you recognize the initials at the bottom of the page?

O6I1GUO2                          Reyes - Direct

1    A.  Yes.

2    Q.  Whose initials are they?

3    A.  Mr. He and mine.

4         MR. FINKEL:  Okay.  We can go to the next page,

5    please, Ms. Loftus.

6    Q.  And can you read, "Agreed Terms, Loan Proceeds."

7    A.  "Loan Proceeds.  The lender hereby agrees to lend to

8    borrower 2 million USD."

9    Q.  Did you write this loan agreement?

10   A.  No, I did not.

11   Q.  Did you ask questions about why it was structured this way?

12   A.  Not that I recall.

13        MR. FINKEL:  You can zoom out of that, please,

14   Ms. Loftus.  And could you go to paragraph 15.

15   Q.  Under Notices, there are three email addresses.  Do you see

16   that?

17   A.  Yes.

18        MR. FINKEL:  Can you zoom in on that, please.

19   Q.  For Lender, what's the email address for Lender?

20   A.  Notices@gclubs.com.

21   Q.  And for Borrower?

22   A.  Coolhhr@protonmail.com, and noticesgclubbvi@protonmail.com.

23   Q.  Who used the email address coolhhr@protonmail.com?

24   A.  Mr. He.

25        MR. FINKEL:  You can zoom out of that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6I1GUO2                         Reyes - Direct

1          Can you go to the last page, please, or second to last

2   page, please, Ms. Loftus.

3          One more.  Thank you.

4   Q.  Who signed this?

5   A.  Mr. He and me.

6          MR. FINKEL:  If we can pull up GX GC300, which is in

7   evidence.

8   Q.  And at the very top, who is this email from?

9   A.  From me.

10  Q.  Who is it to?

11  A.  Mr. He.

12         MR. FINKEL:  Can you go to page 6, please, Ms. Loftus.

13  Q.  This was attached to your email?

14  A.  I'm sorry?

15  Q.  Was this attached to your email?

16  A.  I didn't——

17         MR. FINKEL:  Let's go back to page 1.  Let's go to

18  page 1, please, Ms. Loftus.

19  Q.  What are the attachments to this email?

20  A.  Letter of authority, motor vehicle buyers order, and

21  vehicle docs.

22         MR. FINKEL:  And if we can go to page 6, please, of

23  GX GC300.

24         Can you zoom in on that.

25  Q.  And who is this letter addressed to?

O6I1GUO2                        Reyes - Direct

1   A.  Mr. He.

2   Q.  What does it say?  What name does it say?

3   A.  "Dear Mr. Haoran."

4   Q.  And can you read No. 3 under "Here is of items needed."

5   A.  "Down payment of funding (wire, cashier's check to

6   Lamborghini Dallas) (Received)"

7   Q.  Who signed this letter?

8   A.  EG Louie Bonsukan.

9   Q.  Have you ever spoken with Louie Bonsukan?

10  A.  No, I have not.

11  Q.  Have you spoken with anyone from Lamborghini Dallas?

12  A.  No, I have not.

13          MR. FINKEL:  We can pull up GX GC318.  And can you

14  zoom in on the top email, please.

15  Q.  Who is this email from?

16  A.  From Max.

17  Q.  Can you read what it says.

18  A.  "Team, Dealer doesn't think they will be able to install

19  the Lojack, so let's go ahead with the signing of the docs and

20  wiring the funds in the morning.

21          "Additionally, please see the dispatch sheet.  The

22  vehicle will be loaded on Saturday and the planned delivery to

23  CT is Thursday, September 30th.

24          "The cost for shipping is 1,400 and the transport

25  company will request payment upon delivery.  Easiest way is to

O6I1GUO2                          Reyes - Direct

1  pay by credit card, otherwise we can ask if they can accept a

2  wire."

3  Q.  Okay.  What is your understanding of why—well, withdrawn.

4        MR. FINKEL:  Could we zoom out of that for a moment.

5        Can you scroll down, please.

6        Okay.  Great.  Sorry.  Keep going down.

7        Ms. Loftus, can you scroll up.  Keep going.

8        Stop right there.  Can you zoom in at the top email.

9  Q.  Can you just read the first sentence of this email.

10 A.  "Looks like the team is staying with the red Lambo."

11       MR. FINKEL:  Can you zoom out of that, please,

12 Ms. Loftus.  Scroll up.

13       Keep going.  Stop.

14       And can you zoom in on that email.

15 Q.  Can you read the first sentence.

16 A.  "The car dealer will work with us to get the car shipped

17 from Dallas to CT."

18 Q.  What was your understanding of what CT means?

19 A.  Connecticut.

20 Q.  Why was the Lamborghini going to be shipped from Dallas to

21 Connecticut?

22 A.  I do not know.

23 Q.  Have you ever been to Greenwich, Connecticut?

24 A.  No.

25 Q.  Does G|CLUBS have any offices, to your knowledge, in

O6I1GUO2                          Reyes - Direct

1    Greenwich, Connecticut?

2    A.  Not to my knowledge, no.

3            MR. FINKEL:  Zoom out of that.  Scroll up a little

4    bit.

5            Stop right there.  And can you zoom in to from

6    team—from Max, actually.

7            Keep going.  Perfect.

8    Q.  Can you read the first sentence.

9    A.  "We got a lot of declines so far for commercial vehicle

10   insurance, mainly due to the fact that it's a high end car.

11   Nonetheless, please see below message in blue from the broker."

12   Q.  And can you read the first two bullet points.

13   A.  "Who are the owners of the Club LLC?  Why is the vehicle

14   being titled to this Club?"

15           Second one:  "Has Scott previously owned any other

16   exotic vehicles?  I have attached a résumé of high performance

17   driving experience if you could fill this out as well."

18   Q.  Are you aware of anyone named Scott who worked for Miles

19   Guo?

20   A.  At the time?  At the time of this email, no.

21   Q.  Did you later learn of an individual named Scott who worked

22   for Miles Guo?

23   A.  I learned of an individual named Scott, correct.

24   Q.  Do you know Scott's last name?

25   A.  I don't recall.

O6I1GUO2                          Reyes - Direct

1    Q.  What is your understanding of what Scott did for Miles Guo?

2    A.  He was like security, security person.

3         MR. FINKEL:  Can we scroll up, please.

4         Stop right there.

5    Q.  And this email from Ana on September 20, 2021, starts,

6    "Good morning Max."  Can you read the first bullet.

7    A.  "My first question is who is Scott?"

8         MR. FINKEL:  Okay.  Zoom out of that.

9    Q.  Can you read the second bullet.

10   A.  "As you know the Lambo was bought outright; not financed

11   nor leased."

12   Q.  Why was Scott involved in the purchase of the red Lambo?

13   A.  I do not know.

14   Q.  Did you ask anyone why?

15   A.  Not that I recall.

16        MR. FINKEL:  We can take that down.

17   Q.  Was the Lamborghini purchased?

18   A.  I believe so, yes.

19   Q.  Was it ever made available to G|CLUBS members?

20   A.  Not that I was aware of, no.

21   Q.  Did you ever see the red Lamborghini in person?

22   A.  Not in person, no.

23   Q.  Did you ever see it in a video?

24   A.  Yes.

25   Q.  When?

Reyes - Direct

1   A.  I'm not exactly sure the date.  Some point in 2022.

2   Q.  What did you see?  Can you describe it to the members of

3   the jury, please.

4   A.  Yes.  It was a video of Mr. Guo showcasing a red

5   Lamborghini.

6   Q.  And what was your understanding of why Guo was showcasing a

7   red Lamborghini?

8   A.  As a benefit for members; that was something that they

9   would be able to receive, or enjoy.

10  Q.  And at the time you saw this video, Ms. Reyes, was the red

11  Lamborghini available to members?

12  A.  Not at the time.

13  Q.  Was it available to members at any time that you were at

14  G|CLUBS?

15  A.  No, it was not.

16  Q.  Did you ever speak to Guo about the Lamborghini in this

17  video?

18  A.  Not that I recall.

19  Q.  What reaction did you have seeing Guo showcasing the red

20  Lamborghini in this video?

21  A.  What did we do?

22  Q.  How did it make you feel?

23  A.  I was concerned because that was not something that we were

24  offering at the time.

25  Q.  Did you relay these concerns to anybody?

O6I1GUO2                          Reyes - Direct

1   A.  Yes.  Concerns related to the legal department.

2   Q.  Who?

3   A.  Ana.

4   Q.  And what did Ana say, if anything, about the red

5   Lamborghini?

6   A.  She sought advice from Victor as to how to manage.

7   Q.  Victor who?

8   A.  Victor Cerda.

9            THE COURT:  Where was Victor located?

10            THE WITNESS:  In New York.

11            MR. FINKEL:  If we can display for the witness GX 119.

12   Q.  Who is this individual?

13   A.  Scott.

14            MR. FINKEL:  Government offers 119.

15            MR. KAMARAJU:  No objection.

16            THE COURT:  It is admitted.

17            (Government's Exhibit 119 received in evidence)

18   Q.  And what is your understanding of Scott's role again?

19   A.  He was security.

20   Q.  For who?

21   A.  For Mr. Guo and the building.

22   Q.  Did you see him when you traveled to New York?

23   A.  In some occasions, yes.

24   Q.  And approximately how many occasions did you see Scott?

25   A.  I'm not exactly sure.  A few.

O6I1GUO2                          Reyes - Direct

1   Q.  Did you speak with him on those occasions?

2   A.  Mainly if I crossed in the hallway with him.

3   Q.  Did Scott ever tell you anything about the red Lamborghini?

4          MR. KAMARAJU:  Objection, hearsay.

5          THE COURT:  Overruled.  You may answer.

6   A.  Yes, I recall a time where he mentioned about looking for a

7   warehouse.

8   Q.  And what prompted Scott to tell you—excuse me.  Withdrawn.

9          Ms. Reyes, what, if anything, did you say to Scott

10  that prompted him to say they were looking for a warehouse?

11         MR. KAMARAJU:  Objection to form.

12         THE COURT:  Did you say anything to him?

13  Q.  Did you say anything to him before Scott said that they

14  were looking for a warehouse for the red Lamborghini?

15  A.  Not that I recall.

16  Q.  So he said it out of the blue.

17  A.  To the best of my recollection, yes.

18  Q.  Sitting here today, do you know what happened to the red

19  Lamborghini?

20  A.  I do not know.

21  Q.  Did you authorize the red Lamborghini to be stored

22  anywhere?

23  A.  No, I did not.

24  Q.  Did you receive updates about where the red Lamborghini

25  was?

O6I1GUO2                          Reyes - Direct

1   A.  No, I did not.

2   Q.  Did you ask questions about where the red Lamborghini was?

3   A.  Not that I recall.

4   Q.  Did Mr. He inquire with you about where the red Lamborghini

5   was?

6   A.  Not that I recall.

7   Q.  What about Yvette?

8   A.  Not that I recall.

9   Q.  What about Miles Guo?

10  A.  No.

11          MR. HORTON:  We can take that down, and on the left

12  side of the screen, Ms. Loftus, if you could pull up GX GC276,

13  the fourth page.  And can you zoom in on paragraph 1.2.

14          Can you do it so the rest of the document is visible.

15          Can you drag that to the bottom.

16          And on the right side of the screen can you pull up

17  GX CT41.

18  BY MR. FINKEL:

19  Q.  Ms. Reyes, can you read the VIN number from 1.2, the

20  document at the bottom.

21  A.  ZHWUN6ZD2MLA10393.

22  Q.  What is a VIN number?

23  A.  Number that identifies a car.

24  Q.  Say again?

25  A.  A number that identifies a car.

O6I1GUO2                         Reyes - Direct

1   Q.  And can you read the number on the right side of the screen
2   in CT41.
3   A.  ZHWUN6ZD2MLA10393.
4   Q.  Is that the same number?
5   A.  Yes.
6   Q.  Have you seen that image on the right side of the screen
7   before?
8   A.  No, I have not.
9           MR. FINKEL:  Ms. Loftus, if you can take down CT41 and
10  replace it with CT38.
11  Q.  GX CT38, the right side of your screen, Ms. Reyes, where
12  was that photograph taken?
13  A.  I do not know.
14  Q.  Have you ever seen this photograph before?
15  A.  No.
16  Q.  Who is Defeng Cao?
17  A.  I do not know.
18  Q.  Who is Wayne Cao?
19  A.  I do not know.
20  Q.  Is Wayne Cao an employee of G|CLUBS?
21  A.  No.
22  Q.  Is Defeng Cao an employee of G|CLUBS?
23  A.  No.
24          MR. FINKEL:  We can take that down.
25  Q.  Ms. Reyes, what is a Bugatti?

1    A.  A sports car.

2    Q.  Did there come a time, if ever, when Mr. He asked you to

3    help purchase a Bugatti?

4    A.  Yes.

5           MR. FINKEL:  If we can pull up what's in evidence as

6    GX GC341.

7    Q.  Who is this email from?

8    A.  Mr. He.

9    Q.  And who is it to?

10   A.  To me.

11   Q.  And what is Mr. He asking you to do?

12   A.  To sign the purchase contract attached and give updates on

13   the progress of Mr. Ian.

14   Q.  And what's Mr. Ian?  What's he involved in?

15   A.  Mr. Ian is the president or owner of the L&R Properties.

16   Q.  The hotel chain you met with when you went to the UK?

17   A.  Correct.

18          MR. FINKEL:  Can you zoom out of that please,

19   Ms. Loftus.  Go to the next page.

20   Q.  What does it say at the top of this document?

21   A.  Supplemental Terms for the Purchase of the Bugatti Chiron

22   Super Sport.

23   Q.  What's a Chiron Super Sport?

24   A.  The model of the car.

25   Q.  Did G|CLUBS purchase a Bugatti?

O6I1GUO2                          Reyes - Direct

1   A.  We had a loan, correct.

2   Q.  A loan to who?

3   A.  BVI.

4   Q.  And did BVI purchase a Bugatti?

5   A.  Yes.

6   Q.  And what were you told was the reason BVI was purchasing a

7   Bugatti?

8   A.  As part of the benefits for the members.

9   Q.  And aside from that law firm you talked to and you said in

10  2021, was there any other efforts made to set up a way for

11  members to use a Bugatti?

12          MR. KAMARAJU:  Objection.  Misstates the testimony.

13  Q.  Aside from the law firm you spoke to, was there any other

14  efforts made to make a Bugatti or any other vehicle available

15  for members?

16          MR. KAMARAJU:  Objection, compound.

17          THE COURT:  If you'll take it piece by piece.

18  Q.  Was the Bugatti ever made available to members of G|CLUBS?

19  A.  No, it was not.

20  Q.  Why did you, Ms. Reyes, as the CEO of G|CLUBS, select a

21  Bugatti?

22  A.  I did not select a Bugatti.

23  Q.  Who did?

24  A.  Mr. He.

25  Q.  Did you have a discussion with Mr. He about whether it made

O6I1GUO2                          Reyes - Direct

1    sense to spend money on a Bugatti?

2    A.  Not that I recall.

3    Q.  Or a Lamborghini?

4    A.  No.

5         MR. FINKEL:  Ms. Loftus, can you zoom in at the top

6    where it says Buyer.

7    Q.  What's the name listed for Buyer?

8    A.  My name.

9    Q.  Sorry?

10   A.  My name.

11   Q.  Is that your email address, ddimis80@gmail.com?

12   A.  No, it's not.

13   Q.  Is that your telephone number?

14   A.  No, it's not.

15        MR. FINKEL:  You can zoom out of that.

16        You can scroll down.

17        Stop right there.  And can you zoom in on 2a.

18   Q.  What was the base price for the Bugatti?

19   A.  3,825,000 U.S. dollars.

20        MR. FINKEL:  If we can pull up, Ms. Loftus, GX GC363.

21   Q.  And what is Mr. He asking you on this document on

22   November 2, 2021?

23   A.  To please confirm the agreed delivery time.

24   Q.  Was the Bugatti delivered anywhere?

25   A.  Not that I recall.

O6I1GUO2                          Reyes - Direct

1    Q.  Do you know who Lonny Soza is?

2    A.  I'm not exactly sure.

3    Q.  Do you know what Post Oak Motors is?

4    A.  Sorry?

5    Q.  Post Oak Motors.

6    A.  Yes.  The dealership for the Bugatti.

7    Q.  Did you communicate with any individuals from Post Oak

8    Motors in connection with the Bugatti?

9    A.  Yes.

10   Q.  Do you recall who you spoke with?

11   A.  I don't remember the name, but I believe it was like the

12   president.

13   Q.  Okay.  And what were the nature of your communications with

14   Post Oak Motors?

15   A.  Depending.  Changes or modifications and with regard to

16   payments, and registration.

17          MR. FINKEL:  If we could pull up GX GC522, which is in

18   evidence.

19   Q.  Who signed this document, Ms. Reyes?

20   A.  Mr. He.

21          MR. FINKEL:  And Ms. Loftus, can you zoom in on

22   Purpose.

23   Q.  Can you read 1.1.

24   A.  "The Sole Director and the Company are interested in

25   purchasing a Bugatti Chiron Super Sport from Bugatti Houston

O6I1GUO2                         Reyes - Direct

1    for 3,825,000 U.S. dollars, which may be subject to EUR to USD

2    exchange rate fluctuations, to transport it, find proper

3    storage, and to purchase the necessary insurance."

4              MR. FINKEL:  Zoom out of that.

5              Is there another page to this?

6    Q.  You said that the Bugatti was purchased through a loan from

7    G Club Operations to G Club BVI; is that right?

8    A.  Yes.

9    Q.  Was that loan ever paid back by BVI?

10   A.  Not that I recall.

11   Q.  And the money that was sent from Operations to BVI to

12   purchase this Bugatti, where did G|CLUBS Operations get that

13   money from?

14   A.  Member payments.

15   Q.  Did there come a time, if ever, when Mr. He said that he

16   would contact Post Oak Motors instead of you?

17   A.  Yes.

18   Q.  And did Mr. He explain why?

19   A.  No.

20   Q.  What was going on with Post Oak Motors at that time when

21   Mr. He said he would take over?

22   A.  That was a time where the car was available and

23   registration documents needed to be worked on.

24   Q.  What do you mean by the car was available?

25   A.  It was already done, constructed.

O6I1GUO2                          Reyes - Direct

1    Q.   Where was it available from?

2    A.   From the dealership.

3    Q.   Where was the dealership located; do you know?

4    A.   I'm not sure.

5    Q.   And why did Mr. He take over the registration issues with

6    respect to the Bugatti?

7    A.   I do not know.

8            MR. FINKEL:  If we pull up GX 218.

9    Q.   To your knowledge did anyone ever pick up the car, the

10   Bugatti?

11   A.   I do not know.

12   Q.   Do you know where this photograph was taken?

13   A.   No.

14   Q.   Have you seen this photograph before?

15   A.   No.

16           MR. FINKEL:  We can take that down.

17   Q.   You mentioned that another asset that was purchased was a

18   boat; is that right?

19   A.   Yes.

20           MR. FINKEL:  We can pull up GX GC309.

21   Q.   And the top, who is this email from?

22   A.   Mr. He.

23   Q.   And who is it to?

24   A.   To me.

25   Q.   Can you read the subject.

O6I1GUO2                          Reyes - Direct

1   A.  "G|CLUBS Loan Documents and Resolutions, G Club

2   International Limited."

3   Q.  And what's attached to it?  What are the attachments

4   called?

5   A.  Written Resolutions and Yacht Contract.

6           MR. FINKEL:  You can zoom out of that.

7           And can you zoom in on the September 20th email.

8   Q.  Can you read what you wrote to Mr. He on September 20th.

9   A.  "Please find attached Vessel additional documentation, for

10  your review and approval signature.  G Fashion Hold Co. B

11  resolution consent to the adoption of the company to enter into

12  a certain purchase agreement to acquire a Bering 70 vessel with

13  transport to Boston, MA, USA.  Seven Star yacht transport

14  contract."

15  Q.  What is G Fashion Hold Co. B?

16  A.  I'm not sure.

17  Q.  And the Bering 70 vessel, what's that?

18  A.  The boat; the yacht.

19  Q.  What role, if any, did you have in selecting the Bering 70

20  vessel as something to purchase?

21  A.  I did not have a role.

22  Q.  Did you ask any questions to Mr. He about why G|CLUBS was

23  purchasing a Bering 70 vessel?

24  A.  I did not.

25  Q.  What about with Yvette?

O6I1GUO2                          Reyes - Direct

1   A.  Not that I recall.

2               MR. FINKEL:  You can zoom out of that, please.  And if

3   you can scroll down.  Keep going.

4               Bit more, please.

5               Stop right there.

6   Q.  What does it say at the top of this document?

7   A.  G Fashion Hold Co. B Limited.

8               MR. FINKEL:  Scroll down a bit.

9   Q.  Who signed this document?

10  A.  Mr. He.

11              MR. FINKEL:  Zoom out of that, please.  If you could

12  scroll up.

13  Q.  And can you read 1.1.

14  A.  "The company's wholly owned parent, Jovial Century

15  International Limited, issued a capital contribution of

16  $2,300,000 USD to the company on August 30, 2021."

17  Q.  What's Jovial Century International Limited?

18  A.  Among the org chart, it's a higher level above G Club

19  Operations.

20  Q.  And what were you told, if anything, about who the ultimate

21  beneficial owner is of Jovial?

22  A.  I don't recall someone telling me.

23  Q.  Did you ask any questions about why G|CLUBS was structured

24  in this manner, with Jovial at the top?

25  A.  Not that I recall.

O6I1GUO2                          Reyes - Direct

1      MR. FINKEL:  You can zoom out of that.

2  Q.  And can you read 1.2.

3  A.  "The Sole Director has deemed it to be in the best interest

4  of the Company to acquire a Bering 70 vessel with Hull ID

5  Number:"

6  Q.  That's fine.  You don't have to read that.

7      What's the price?

8  A.  $2,130,000.

9  Q.  And did that money come from a loan from G|CLUBS

10 Operations?

11 A.  Best of my recollection, yes.

12 Q.  And where did G Club Operations get that $2,130,000 from?

13 A.  Our member—member payment.

14 Q.  Member payments?

15 A.  Yes.

16     MR. FINKEL:  Could we zoom out of that, please.  Can

17 you scroll down.

18     Keep going.

19 Q.  Can you read what it says at the top, on the right.

20 A.  Yacht Contract.

21     MR. FINKEL:  Zoom out of that, please, Ms. Loftus.

22 Q.  Who signed that contract?

23 A.  Mr. He.

24     MR. FINKEL:  You can take that down.

25 Q.  Did there come a time, if ever, when you spoke to Miles Guo

O6I1GUO2                          Reyes - Direct

 1   about the yacht?

 2   A.  Yes.

 3   Q.  What was the name of the yacht?

 4   A.  Liberty.

 5   Q.  When did you speak with Miles Guo about the Liberty?

 6   A.  I'm not exactly sure the date, but some point in 2022.

 7   Q.  Was it after the boat was purchased?

 8   A.  Could I see the date?

 9   Q.  Sure.

10   A.  Sorry.

11            MR. FINKEL:  If you can pull back up, Ms. Loftus,

12   GC309.

13   Q.  Do you see the date on this email?

14   A.  Yes.

15   Q.  You spoke with Guo about the yacht after it was purchased.

16   A.  Yes.

17   Q.  And what manner did you speak with Guo about the yacht?

18   A.  It was conversation about the boat having some——some

19   issues, some mechanical issues.

20            THE COURT:  What form of communication was used?

21            THE WITNESS:  Physical, physical.  It was in person.

22   It was a meeting.

23   Q.  Where did this meeting take place?

24   A.  In the New York offices.

25            MR. FINKEL:  You can take that down, Ms. Loftus.

O6I1GUO2                          Reyes - Direct

1    Q.  Who else was part of the meeting?

2    A.  As of my recollection, it was the captain, in a video Zoom,

3    Yvette, Max.  Those are the ones I remember.

4    Q.  Why did you participate in this meeting with Guo, Yvette,

5    Max, and the boat captain?

6    A.  I was requested to attend the meeting.

7    Q.  Who requested?

8    A.  Best of my recollection, Yvette.

9    Q.  What did Guo say about the yacht?

10   A.  They were talking mechanical aspects, about not being,

11   like, safe because of——it had like a hole on the front.

12   Q.  Guo was saying these things about the hole in the front?

13   A.  It was conversations between the captain and him, but——I

14   don't remember specifically.

15   Q.  Did Guo explain how he knew that the yacht had problems

16   during the call?

17   A.  Not that I recall.

18   Q.  Were G|CLUBS members able to use the Liberty?

19   A.  Not that I was aware.

20   Q.  Was there any process in place to allow G|CLUBS members to

21   rent the Liberty?

22   A.  No.

23   Q.  Did you ever see the Liberty in person?

24   A.  Yes.

25   Q.  Where?

1    A.  In the marina.

2    Q.  Which marina?

3    A.  I don't know the name.

4    Q.  What state?

5    A.  New Jersey.

6    Q.  Why did you see the Liberty yacht in a marina in New

7    Jersey?  Why were you there?

8    A.  After the——the meeting, I wanted to see what the issue was,

9    so I went to physically see the——the hole and not having, like,

10   a barrier.

11   Q.  What happened to the Liberty yacht?

12   A.  It ultimately got sold.

13   Q.  Why did you decide to sell the Liberty yacht?

14   A.  I did not decide to sell the boat.

15   Q.  Who decided to sell the boat?

16   A.  To the best of my recollection, that Mr. He decided on it.

17   Q.  Did you ask Mr. He why he wanted to sell the boat?

18   A.  What I was told is that because it was not safe, it wasn't

19   seaworthy.

20   Q.  Did there come a time, if ever, when G|CLUBS purchased a

21   camper van?

22   A.  Yes.

23   Q.  How did you learn about this, the camper van?

24   A.  A loan as well.

25   Q.  How did you learn about it?

O6I1GUO2                          Reyes - Direct

1   A.  It was a request that came in.  I'm not exactly sure if it

2   was Yvette or Mr. He.

3   Q.  Yvette or who?

4   A.  Mr. He.

5   Q.  Did you select the camper van?

6   A.  No, I did not.

7   Q.  Do you know who did?

8   A.  No, I do not.

9   Q.  Do you know how much the camper van cost?

10  A.  I don't recall.

11          MR. FINKEL:  If we could pull up GX GC365.

12  Q.  And what's the subject of this email?

13  A.  G Club International Limited Resolution.  Additional asset

14  purchase.

15  Q.  And was the camper van purchased in the same manner, with a

16  loan from G|CLUBS Operations to BVI?

17  A.  To the best of my recollection, yes.

18  Q.  And the money that G|CLUBS Operations sent to BVI, where

19  did that money come from?

20  A.  Membership fees.

21          MR. FINKEL:  Zoom out of that, please.

22          Go to the next page.

23          Keep going.  Stop right there.

24  Q.  Can you read the English in the second line at the top.

25  Right there.

O6I1GUO2                           Reyes - Direct

1    A.  "Binding order of a new motor vehicle/trailer."

2           MR. FINKEL:  Zoom out of that.

3    Q.  And what's the price on the bottom right?

4    A.  343,235.29.

5    Q.  Who signed that document?

6    A.  Mr. He.

7           MR. FINKEL:  Zoom out of that.

8    Q.  And what's the name of the company at the top?

9    A.  SOD, Stone Off Road.

10   Q.  Where was the camper van manufactured, to your knowledge?

11   A.  Germany, if I'm not mistaken.

12   Q.  Was the camper van ever delivered?

13   A.  Not that I was aware of.

14          MR. FINKEL:  You can take that down.

15          We can pull up what's been marked for identification

16   as GC551.

17   Q.  Who is this email from and to?

18   A.  From Pablo to me.

19          MR. FINKEL:  The government offers GC551.

20          MR. KAMARAJU:  No objection.

21          THE COURT:  It is admitted.

22          (Government's Exhibit GC551 received in evidence)

23          MR. FINKEL:  Could we publish that, please.

24   BY MR. FINKEL:

25   Q.  And who's Pablo?

O6I1GUO2                          Reyes - Direct

1   A.  Pablo is an attorney.

2   Q.  And who's copied on this email from Pablo to you?

3   A.  Victor.

4   Q.  Victor who?

5   A.  Cerda.

6   Q.  What's the subject of this email?

7   A.  G Club subpoena.

8   Q.  What's the date?

9   A.  June 13, 2022.

10          MR. FINKEL:  Zoom out of that, please.  Can you zoom

11  in on the bottom.

12  Q.  Who is this email from?

13  A.  Juliana Murray.

14  Q.  And what is the text of this email?

15  A.  Sorry?

16  Q.  What is the text of the email, the content?  Starting with

17  Pablo, could you read it.

18  A.  Yes.  "Thank you for agreeing to accept service of the

19  attached subpoena on behalf of your client, G Club Operations

20  LLC.  Please let us know if you have any questions."

21          MR. FINKEL:  You can zoom out of that.

22  Q.  Did you become aware that G|CLUBS received a subpoena on

23  June 13, 2022?

24  A.  Yes.

25  Q.  At the time, Ms. Reyes, you first learned about this, did

O6I1GUO2                          Reyes - Direct

1   you know what a subpoena was?

2   A.  No.

3   Q.  What did you come to understand the subpoena was?

4   A.  It was a——an inquiry from the government for different

5   charges.

6   Q.  How did you feel learning that G|CLUBS had received the

7   subpoena from the government?

8   A.  I didn't——I didn't know what——what that was, and I was

9   concerned because it involved the government.

10  Q.  You said you were what?

11  A.  Concerned.

12  Q.  Did you discuss the subpoena with Ana?

13  A.  At some point, yes.

14  Q.  Did Ana come to leave G|CLUBS?

15  A.  Yes.

16  Q.  When approximately did she leave?

17  A.  September 2022.

18  Q.  What is your understanding of why Ana left?

19          MR. KAMARAJU:  Objection.

20          THE COURT:  Overruled.  You may answer.

21  A.  When she presented her resignation letter, she said that

22  she had found another job, that it was to happen, and at some

23  point she was concerned with her license being revoked.

24  Q.  What do you mean by concerned about her license being

25  revoked?

O6I1GUO2                        Reyes - Direct

1    A.  Like her——like her lawyer license.

2    Q.  Around the time that G|CLUBS received the subpoena from the

3    government, did you have your own lawyer?

4    A.  No, I did not.

5    Q.  Did you ask for one?

6    A.  At some point I did, yes.

7    Q.  Who did you ask for one?

8    A.  To the best of my recollection, counsel.

9    Q.  What were you told about whether you could have your own

10   lawyer?

11   A.  I was told that I did not need it and if they believed I

12   did, they would let me know.

13   Q.  How did that make you feel that you weren't being provided

14   your own lawyer?

15           MR. KAMARAJU:  Objection.  Misstates testimony.

16           THE COURT:  You may say how you felt.

17   A.  Not considered, because I was asking for it.

18   Q.  What do you mean by not considered?

19   A.  Like they were not really thinking of me, even though I was

20   asking for it.

21           THE COURT:  Keep your voice up, please.

22           THE WITNESS:  Sorry.

23   Q.  Ms. Reyes, after G|CLUBS received the subpoena, did you

24   meet with Miles Guo?

25   A.  In person?  I believe so.

1    Q.  Where?

2    A.  In the New York office.

3    Q.  Have you ever been to the Sherry-Netherland?

4    A.  Yes.

5    Q.  And why did you go to the Sherry-Netherland?

6    A.  It was to have dinner.

7    Q.  With who?

8    A.  Mr. Guo, Alex, and Yvette.

9    Q.  Was this after the subpoena was received by G|CLUBS?

10   A.  Yes.

11   Q.  What did Miles Guo tell you during that dinner?

12   A.  It was like a thank-you dinner for the job that we were

13   doing in——in G|CLUBS, and during the conversations he asked

14   about my family, personal information, and there was a

15   conversation along the lines of, like, his brother being killed

16   because of his political views and how that meant that he was,

17   like, trustworthy or true to his——to his beliefs.

18   Q.  Is that the only time you had dinner with Miles Guo?

19   A.  Yes.

20   Q.  Did Miles Guo during that dinner mention anything about

21   loyalty?

22   A.  Yes.

23   Q.  What did he say about loyalty?

24   A.  It was referencing how——like how his brother was loyal to

25   his beliefs and he died because of it.

1    Q.  And what?

2    A.  He died because of it.

3    Q.  And this conversation about loyalty, this was after G|CLUBS

4    received the subpoena?

5            MR. KAMARAJU:  Asked and answered, your Honor.

6            THE COURT:  Sustained.

7            MR. FINKEL:  I see it's 11:30.  Is this a good time to

8    break?

9            THE COURT:  Although it's 11:30, since we started

10   late, we'll go until noon, then we'll break.  Well, we'll come

11   back at 12:30, we'll break at 2:30 again.

12           Go ahead.

13           MR. FINKEL:  Okay.  Thank you, your Honor.

14           We can take that down, Ms. Loftus.

15   BY MR. FINKEL:

16   Q.  Did there come a time where G|CLUBS sued Crane?

17   A.  Yes.

18   Q.  And what role did you have, if any, as CEO of G|CLUBS, in

19   deciding to sue Crane?

20   A.  I did not have a role.

21   Q.  Have you ever participated in a phone call with Miles Guo

22   about Crane's money?

23   A.  Not that I recall.

24   Q.  After G|CLUBS sued Crane, was there an arbitration

25   proceeding?

1    A.  Yes.

2    Q.  And at that time did you have your own lawyer?

3    A.  No, I did not.

4    Q.  Were you asked to testify at that arbitration proceeding?

5    A.  Yes.

6    Q.  Did you want to?

7    A.  No.

8    Q.  Did you say you didn't want to?

9    A.  Yes.

10   Q.  What were you told?

11   A.  That because I was the CEO, I had to.

12   Q.  How did that make you feel?

13   A.  Uneasy.  I wasn't comfortable doing so.

14   Q.  Generally speaking, at the time of this arbitration

15   proceeding how were you feeling about G|CLUBS?

16   A.  I was feeling concerned, stressed; there were many things I

17   didn't understand.

18   Q.  Did you testify at the arbitration proceeding?

19   A.  Yes.

20   Q.  Were you told to say anything in particular at the

21   arbitration proceeding?

22   A.  What was I going to be talking about?

23   Q.  In advance of the arbitration proceeding, were you told to

24   say anything in particular during the arbitration?

25   A.  No.

O6I1GUO2                          Reyes - Direct

1   Q.  Did you go into the arbitration proceeding with an

2   intention to lie?

3   A.  No.

4   Q.  Were you completely truthful with the arbitration panel?

5   A.  There were things that were inaccurate.

6   Q.  What was inaccurate in your testimony?

7   A.  To the best of my recollection, as I referenced Yvette,

8   Mr. Guo, I did not include him as part of promoting G|CLUBS.

9   And concierge service.  Those are the things I can remember.

10  Q.  How did you describe Yvette during the arbitration

11  proceeding when you were testifying?

12  A.  As a representative.

13  Q.  And was this arbitration testimony under oath?

14  A.  Yes.

15  Q.  Was Yvette just a representative?

16  A.  That's how I've heard her being described, but she

17  instructed and——advice on other things.

18  Q.  You also said something about concierge service?

19  A.  Yes.

20  Q.  What did you tell the arbitration panel about concierge

21  services?

22  A.  Being——having a concierge service.  That's how it was

23  called.  But it's more of a customer service.

24  Q.  So when you said that there was a concierge service to the

25  arbitration panel, was that true?

O6I1GUO2                          Reyes - Direct

1    A.  No.

2    Q.  You also mentioned that——you mentioned something about Guo

3    during the arbitration testimony.  What did you say that wasn't

4    correct about Guo?

5    A.  I didn't include him as the promotion of G|CLUBS.

6    Q.  Was Guo involved in the promotion of G|CLUBS?

7    A.  Yes.

8    Q.  When you told the panel that he wasn't involved, or you

9    didn't say to the panel that he was involved in the promotion

10   of G|CLUBS, was that true?

11   A.  That was inaccurate.

12   Q.  Did G|CLUBS prevail in the Crane arbitration?

13   A.  Sorry?  Could you say that again.

14   Q.  Did G|CLUBS win the Crane arbitration?

15   A.  I'm not sure.

16          MR. FINKEL:  If we can pull up GX GC377.

17   Q.  Who is this email from?

18   A.  From me.

19   Q.  To who?

20   A.  Mr. He.

21   Q.  And what's it in regards to?

22   A.  G|CLUBS loan documents and resolution for Hamilton digital

23   assets.

24   Q.  What's Hamilton digital assets?

25   A.  I'm not exactly sure.

O6I1GUO2                          Reyes - Direct

1  Q.  And these documents that you attached, sending to Mr. He,
2  what was the purpose of these documents?
3  A.  They were loan documents and resolutions.
4  Q.  For what?
5  A.  For this case in particular, invest proceeds in the
6  Hamilton Digital Assets.
7  Q.  What role did you have, if any, in deciding whether to
8  invest G|CLUBS' funds into Hamilton Digital Assets?
9  A.  I did not have a role.
10  Q.  What was your understanding——well, withdrawn.
11           Did you ask Mr. He why G|CLUBS funds were being
12  invested into Hamilton Digital Assets?
13  A.  Not that I recall.
14  Q.  Did you ask Yvette?
15  A.  Not that I recall.
16  Q.  Can you read No. 2 and 3 in your email.
17  A.  G Club International Limited BVI resolution consent to the
18  adoption of the company to request a loan of 60 million from G
19  Club Operations.
20           G Club International Limited BVI resolution II.
21  Consent to, approves and authorize investment of
22  $460,549,275.17 in Hamilton Digital Assets.
23  Q.  And can you read the asterisk where it says, "Please note"
24  at the bottom.
25  A.  "Please note:  The 13,450,724.83 difference is considered

1  as a buffer to cover any additional asset purchase/investments

2  for the remaining of the year."

3  Q.  What is your understanding of why that $46,549,275.17 is so

4  specific?

5  A.  I do not know.

6          MR. FINKEL:  You can zoom out of that, please, and can

7  we go to the next page.

8  Q.  And can you read where it says "WHEREAS."

9  A.  "WHEREAS, Sole Member has deemed it to be in the best

10  interest of the company to loan 60 million USD at 2.2 APR to

11  the Sole Member, under the terms and conditions further

12  stipulated in the loan agreement attached here to as Exhibit

13  A."

14          MR. FINKEL:  Zoom out of that.  And if we can scroll

15  down.

16          Scroll more.  And can you zoom in on paragraph 1,

17  please, Ms. Loftus.

18  Q.  And can you read the first, 1.1.

19  A.  "The Sole Director and the Company are interested in

20  investing 46,549,275.17 proceeds in Hamilton Digital Assets

21  FDSP.

22          MR. FINKEL:  Could we zoom out of that.

23  Q.  And who's indicated as the sole director at the bottom?

24  A.  Mr. He.

25          MR. FINKEL:  If we can pull up GX GC497, which is in

O6I1GUO2                          Reyes - Direct

1    evidence, I believe.

2    Q.  Who is this document addressed to?

3    A.  G Club Operations, me.

4    Q.  And what?

5    A.  Me.

6    Q.  And what's Lawall & Mitchell?

7    A.  It's a law firm that we had retained.

8              MR. FINKEL:  You don't need to zoom in on that right

9    now.  Thank you.

10   Q.  What lawyer worked at Lawall & Mitchell that G|CLUBS

11   interacted with?

12   A.  Aaron.

13   Q.  Who decided to hire Aaron of Lawall & Mitchell for G|CLUBS?

14   A.  To the best of my recollection, it was Victor that took

15   care of this.

16   Q.  Victor Cerda?

17   A.  Yes.

18   Q.  Did you play any role in deciding to hire Aaron Mitchell?

19   A.  No, I did not.

20   Q.  Can you read the first paragraph, "As you are aware."

21   A.  "As you are aware, on or about September 29, 2021, G Club

22   Operations LLC retained Lawall & Mitchell LLC to advise and

23   represent G Club with respect to its dispute with Crane

24   Advisory Group, LLC."

25   Q.  Keep going, please.  Can you read the next paragraph.

O6I1GUO2                         Reyes - Direct

1  A.  "In connection with the above referenced arbitration, the

2  arbitrator directed Crane Advisory Group to transfer certain

3  funds to G Club.  To facilitate the transfer, on or about the

4  dates below, I received into my escrow account the following 11

5  wire transfers totaling $46,549,275.17."

6  Q.  What is your understanding to mean in the letter where it

7  says "I received into my escrow account the following 11 wire

8  transfers"?

9  A.  He had an escrow account and the funds were received there.

10 Q.  Funds from Crane?

11 A.  Yes.

12 Q.  And what's your understanding, if any, as to why Aaron

13 Mitchell received the funds from Crane?

14 A.  He was the attorney on Crane, and there was a request to

15 have an escrow account, and his firm was the escrow.

16         MR. FINKEL:  Zoom out of that, please.

17         Scroll down.

18         And can you blow up the "On November 8" paragraph.

19 Yeah.

20 Q.  Can you read that, please, Ms. Reyes.

21 A.  "On November 8, 2021, upon the direction of G Club, I

22 transferred the above sums, totaling $46,549,275.17 from my

23 attorney escrow account to Hamilton Digital Assets Fund SP;

24 IMAD—"

25 Q.  You don't have to read that number.

1          Ms. Reyes, did you provide the direction to Aaron

2    Mitchell to transfer the above sums totaling $46 million and

3    change to Hamilton Digital Assets?

4    A.  No, I did not.

5    Q.  Do you know who did?

6    A.  I'm not sure.

7    Q.  Were you consulted about whether transferring the $46½

8    million to Hamilton Digital Assets was a good idea for G|CLUBS?

9    A.  Not that I recall.

10   Q.  Did you have a view one way or the other when you were the

11   CEO whether transferring $46½ million to Hamilton Digital

12   Assets was a good idea for G|CLUBS?

13   A.  No, I did not.

14          MR. FINKEL:  You can take that down.

15          If we can pull up GX GC380.

16          No.  380, please.  Sorry.

17          Actually, Ms. Loftus, can you put that on the left

18   side of the screen.

19          And can you zoom in on the top email.

20   BY MR. FINKEL:

21   Q.  Who is this email from?

22   A.  From Alex.

23   Q.  Are you copied on it?

24   A.  Yes.

25   Q.  Who is it to?

O6I1GUO2                          Reyes - Direct

1    A.   David Fallon.

2    Q.   Who is David Fallon?

3    A.   David Fallon was amongst the Himalaya Exchange employees.

4    Q.   And what did Alex write to David?  Can you read it?

5    A.   "Good morning, David.  Please accept this email as

6    confirmation that we wish to increase our subscription amount

7    to our Hamilton PE Fund SP in the amount of $46,549,275.17.

8    Q.   That's good.  You can stop there.

9         Ms. Reyes, did you participate in any discussions

10   about whether or not to increase G|CLUBS subscription amount in

11   Hamilton PE Fund?

12   A.   Not that I recall.

13            MR. FINKEL:  Can you zoom out of that, please.

14            Can you scroll down.

15            Stop right there.

16            Actually, if you can go up just a little bit,

17   Ms. Loftus.  Yup.

18   Q.   And can you read what David Fallon wrote on November 9,

19   2021.

20   A.   "Morning Alex, I see a credit of the below amount into the

21   fund bank account.  For the fund admin records can you please

22   provide the following:

23            "Proof of the relationship with Lawall & Mitchell LLC

24   for this transfer.

25            "Our fund administrator will need to know that the

1    money sent through the law firm is G|CLUBS.

2            "Also a confirmation email of the subscription

3    increase amount.  So you are increasing your subscription in

4    Hamilton Digital Assets SP."

5    Q.  And below that is an image, and it says "Description:

6    Incoming money transfer.  Did I read that right?

7    A.  Yes.

8    Q.  And what's it say below that, after the—

9            THE COURT:  Could you blow that up.

10            Oh, is there a problem on the screen?

11            You need to go to the bathroom?  Okay.  So we'll take

12    a break.  Take a break and we'll come back, ten minutes.

13            MR. FINKEL:  Is this good for a lunch break now or—

14            THE COURT:  Well, actually, now I see that it is

15    11:45.  So we'll break now and return at 12:30.

16            Do not discuss this case with anyone or amongst

17    yourselves.  Don't permit anyone to discuss the case in your

18    presence.  Do not read, listen, or watch anything from any

19    source which touches upon the subject matter of this case.

20            (Jury not present)

21            THE COURT:  You may step out of the courtroom.

22    Remember not to discuss your testimony.

23            (Witness not present)

24            THE COURT:  You may be seated.

25            Is there anything from either party before we return?

O6I1GUO2                          Reyes - Direct

 1                MR. KAMARAJU:  Not from the defense, your Honor.

 2                MR. FINKEL:  Just a logistical issue that the

 3     government and defense are discussing.  I just want to flag it

 4     for the Court.  There's no need for the Court to intervene at

 5     this point, as the parties are still discussing, but our next

 6     witness is a FBI analyst.  She has an appointment on Thursday

 7     morning that she cannot move.  But she'll be available Thursday

 8     afternoon.  We noticed the defense that this FBI analyst would

 9     be next——well, next after Ms. Reyes.  And so it seems,

10     depending on the timing of when Ms. Reyes is done, it's

11     possible that that witness would still be on the stand at the

12     end of the day and would not be able to return on Thursday

13     morning, would have to come back to finish their testimony.  So

14     we could either do that, if your Honor is okay with it and the

15     defense is okay with it——the government has no preference——or

16     we can just call the witness after, which is a banker from

17     Morgan Stanley.

18                THE COURT:  Are you saying call the witness Thursday

19     afternoon?

20                MR. FINKEL:  So the analyst, if we don't finish her

21     today, she wouldn't be able to finish her testimony on Thursday

22     morning, so she could come back on Thursday afternoon to

23     complete her testimony, so it would be out of order in that

24     sense.

25                THE COURT:  Understood.  That's fine with the Court.

O6I1GUO2                        Reyes - Direct

1              MR. FINKEL:  Okay.  So the parties will discuss and

2    advise the Court.

3              THE COURT:  Thank you.

4              MR. FINKEL:  Thank you, your Honor.

5              (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6I1GUO2                          Reyes - Direct

| 1 | AFTERNOON SESSION |
|---|---|

1                          AFTERNOON SESSION

2                            12:31 p.m.

3          (Jury not present)

4          THE COURT:  Would you get the witness, please.

5          MR. FINKEL:  Your Honor, just for our own planning

6  purpose, will the afternoon break be shorter to make up for the

7  time for the longer break this morning or will it be the same

8  30 minute?

9          THE COURT:  Are you making a request?

10          MR. FINKEL:  Yes.  We would request a slightly shorter

11  break to make up for the lost time.

12          THE COURT:  That's fine.

13          MR. FINKEL:  Thank you.

14          THE COURT:  Please get the jurors.

15          THE LAW CLERK:  Jury entering.

16          (Jury present)

17          THE COURT:  Please be seated.  Ms. Reyes, remember

18  you're still under oath.  You may continue the inquiry.

19          MR. FINKEL:  Thank you, your Honor.

20  BY MR. FINKEL:

21  Q.  Ms. Loftus, could you publish GC-380.  I believe we had

22  this document up before we broke for lunch.  And you can zoom

23  in, Ms. Loftus, on the image.

24          What does it say below money transfer, Ms. Reyes?

25  A.  Original Lawall & Mitchell.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  And on the right side of the screen, Ms. Loftus, can you

2  bring up GXZ-12 at page 19.  Ms. Loftus, can you zoom in on the

3  credit amount on the left side of the screen.

4          The document on the right side of your screen,

5  Ms. Reyes, Z-12, have you seen that document before?

6  A.  No.

7  Q.  Can you read the number next to the arrow between Lawall &

8  Mitchell, LLC, and Hamilton Opportunity Fund SPC?

9  A.  46,549,275.

10  Q.  Is that the same number as the number on the left side of

11  the screen?

12  A.  Yes.

13  Q.  And can you read the number between Hamilton Opportunity

14  Fund SP, the middle box, and Hamilton Opportunity Fund SP the

15  lower box?

16  A.  46,549,275.

17  Q.  We can take that down.  If we can pull up GC-433.

18          This is an email from June 21, 2021; is that correct?

19  A.  Yes.

20  Q.  And who did you send this email to?

21  A.  Mr. He.

22  Q.  Can you read what you wrote beginning with thank you.

23  A.  Thank you for the signed documents.  Please find attach

24  fully executed loan agreement for your records.  We've

25  submitted the wire transfer request.  The 50 million will be

1   sent in two separate as described below.  Fire wire 35 million

2   on Monday.

3           THE COURT:  Could you highlight what is being read

4   because I can't read such small print.  Go ahead.

5   A.  Today June 21, 2021.  Second wire.  15 million on

6   Wednesday, June 23, 2021.  Should you have any questions or

7   doubts do not hesitate to reach me.

8   Q.  If you scroll down, Ms. Loftus.  What does that say?

9   A.  It's a loan agreement.

10  Q.  Between who?

11  A.  G/Club Operations and G/Club International Limited.

12  Q.  And G/Clubs Operations is located where?

13  A.  Puerto Rico.

14  Q.  And International Limited is located where?

15  A.  BVI.

16  Q.  Do you recognize the initials at the bottom of the

17  document?

18  A.  Yes.

19  Q.  Whose are they?

20  A.  Mr. He and mine.

21  Q.  Go the next page please, Ms. Loftus.

22          What's the date at the top, Ms. Reyes?

23  A.  June 18, 2021.

24  Q.  Zoom out of that please, Ms. Loftus.

25          And the use of funds at the bottom, can you scroll so

O6I1GUO2                          Reyes - Direct

1   we have both pages.  Can you read use of funds?

2   A.  The borrower intends to use the loans to increase its

3   investment into Hamilton Digital Assets FD SP registered in

4   Cayman Islands and having its registered address at McGrath

5   Tonner Corporate Services Limited, genesis building, 5th floor,

6   genesis Close PO Box 446, Grand Cayman KYI 1106, Cayman

7   Islands.  For efficiency purposes, the borrower has requested

8   lender to send the loan proceeds directly to fund receiver on

9   its behalf.

10  Q.  Have you been to that location in the Cayman Islands, the

11  PO Box?

12  A.  No, I have not.

13  Q.  Zoom out of that please and scroll up.  And under one,

14  who's the lender?

15  A.  G/Clubs Operations LLC.

16  Q.  And the borrower is BVI?

17  A.  Yes.

18  Q.  Zoom out of that, please.

19          And under two, who's the fund receiver under two use

20  of funds?

21  A.  Should I read it?

22  Q.  Who's the fund receiver under number two?

23  A.  Hamilton Digital Assets FD SP.

24  Q.  In this case G/Club Operations sent the money directly to

25  Hamilton; is that right?

1  A.  I don't recollect exactly, but that's what it says.

2  Q.  To your knowledge was there ever any repayment made to

3  G/Club Operation?

4  A.  Not that I recall.

5  Q.  We can take that down.  If we can put up what's in evidence

6  as GXGC-198.  Who is this an email from?

7  A.  Could you repeat that.

8  Q.  Who is this an email from?

9  A.  Mr. He.

10  Q.  And who did he send it to?

11  A.  To me.

12  Q.  Can you read what Mr. He wrote below hope you well?

13  A.  Since our projects in London are doing well, would like to

14  ask the rest amount of loan agreement to be transferred to

15  Fiesta Property Developments Limited.  Loan agreement is 10

16  million GBP.  We have received 10M USD so far. Once amount has

17  been confirmed, account will be provided.

18  Q.  Ms. Reyes, what is Fiesta Property Developments LTD?

19  A.  I don't know.

20  Q.  What projects are doing well in London?  Do you have an

21  understanding what that means?

22  A.  I do not know.

23  Q.  And 10 million GBP, do you know what GBP means?

24  A.  British pounds.

25  Q.  If we can pull up what's been marked for identification as

1  GXGC-544 just for the witness, please, Ms. Loftus.  You can

2  scroll to the end of that.

3          Do you recognize that signature?

4  A.  Yes.

5  Q.  Whose is it?

6  A.  Mr. He's.

7  Q.  Could you scroll up, please.  Do you recognize that

8  signature?

9  A.  Yes.

10 Q.  Whose is it?

11 A.  Zee.

12         MR. FINKEL:  The government offers GC-544.

13         MR. KAMARAJU:  Can I ask one voir dire question, your

14 Honor?

15         THE COURT:  Go ahead.

16         MR. KAMARAJU:  Prior to meeting with the government,

17 Ms. Reyes, had you ever seen this document before?

18         THE WITNESS:  No, I had not.

19         MR. KAMARAJU:  Objection.

20         THE COURT:  Go ahead.

21         (Government's Exhibit GC-544 received in evidence)

22 BY MR. FINKEL:

23 Q.  If you could publish that, please, Ms. Loftus, and go to

24 the first page.

25         What does this say on this document?

O6I1GUO2                              Reyes - Direct

1    A.  Facility agreement.

2    Q.  Keep going.

3    A.  Between G/Club Operations LLC and Jovial Century

4    International Limited and Fiesta Property Developments LTD.

5    Q.  Can you go to the next page, Ms. Ms. Loftus.

6            Can you read what it says below facility?

7    A.  The lender hereby agrees to lend the borrower an amount not

8    exceeding 10 million GBP.

9    Q.  Who's the lender according to this document?

10   A.  G/Club Operations, LLC.

11   Q.  And who's the borrower?

12   A.  Jovial Century International Limited.

13   Q.  And who's the fund receiver?

14   A.  Fiesta Property Developments LTD.

15           MR. FINKEL:  Approaching the witness with a binder.

16   Q.  Ms. Reyes, can you flip through that binder, please.

17           Ms. Reyes, have you reviewed the documents in that

18   binder previously?

19   A.  Yes.

20   Q.  Did you select which documents ended up in that binder?

21   A.  No, I did not.

22   Q.  Who signed the documents in that binder?

23   A.  Mr. He.

24           MR. FINKEL:  Your Honor, I'll represent that binder

25   contains GX1GC-519, 523, 524, 529, 535, 349, 373, 177.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6I1GUO2                        Reyes - Direct

1    government offers those documents.

2              MR. KAMARAJU:  One moment of voir dire, your Honor.

3              THE COURT:  Go ahead.

4    BY MR. KAMARAJU:

5    Q.  Ms. Reyes, prior to meeting with the government, had you

6    ever seen those documents before, the ones that are in the

7    binder Mr. Finkel just handed you?

8    A.  I have seen the format of the documents.  I don't recall

9    all of them.

10   Q.  The specific documents that he showed you, have you seen

11   those before?

12   A.  I don't recall all of them specifically.

13   Q.  And besides recognizing the signature on that document, do

14   you recognize those documents at all?

15   A.  I recognize the format of the documents.

16   Q.  But not the documents themselves, right?

17   A.  Not necessarily all of them.

18             MR. KAMARAJU:  Same objection.

19             THE COURT:  Which ones do you recognize?  You said not

20   all of them, and my question is which ones do you recognize?

21             THE WITNESS:  I don't necessarily remember all of

22   them.

23             THE COURT:  If you'll step up, please.

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At the sidebar)

2          THE COURT:  So if it's just the format and the

3   signatures, but she can't recognize the documents, I'll have to

4   revoke my admitting of the ones that we just admitted, and I

5   wouldn't let the others come in.

6          MR. FINKEL:  Your Honor, under 901(b)(2) and (b)(4)

7   which allows authenticity subject to recognition of a signature

8   and also distinctive characteristics of a document, I think the

9   requirement has met the threshold requirement for authenticity

10  for a few reasons:  These documents which your Honor is free to

11  take a look at are the same distinctive formatting, and in fact

12  she's familiar with the general formatting of other documents

13  that have come into evidence without objection.  These are

14  materials that on their face are from entities that are

15  involved in this case that are all signed by Mr. He.  She has

16  recognized and authenticated that signature.  In addition,

17  these materials I can represent to the Court were produced by

18  G/Clubs to the government.  They are Bates stamped with G/Clubs

19  Bates stamps on them.  That's another factor that the Court can

20  take into consideration.

21         THE COURT:  They are Bate stamped?

22         MR. FINKEL:  Yes. I have some case law if the Court

23  would like.  Judge Engelmayer in 2012 in a civil case, but

24  applying Rule 901 ruled, a district court has broad discretion

25  over the admissibility of evidence.  This is 890 F. Supp. 2nd

278 to 298.  The test for authentication under Federal Rule of

Evidence 901 is simply whether a reasonable juror could find

the proffered evidence authentic, citing some cases under Rule

901(a).  Under 901(a), "The bar for authentication of evidence

is not particularly high." Citing U.S. v. Ardiglia, Second

Circuit case from 2007, and also a Second Circuit case from

2001.  The proponent, continuing from Judge Engelmayer, need

not rule out all possibilities inconsistent with authenticity

which are proved beyond any doubt that evidence is what it

purports to be, citing the Second Circuit again.

        Rather, a document may be authenticated based on its

"appearance, contents, substance internal patterns or other

distinctive characteristics, taken in conjunction with the

circumstances," citing Rule 901(b)(4).  And circumstantial may

establish authenticity citing several cases. Such evidence can

include a document's appearance and content, and it goes on.

So under that case law, your Honor, which cites the Second

Circuit, I think we certainly met that threshold.  And the

preliminary question under Rule 904, it's a preponderance that

the government must show.  And as Judge Engelmayer articulated,

it's not a particularly high threshold for authenticity.

There's no evidence to suggest these documents are not

authentic.  And so the question is whether they are sufficient

to allow a juror to conclude, and of course the defense is free

to cross-examine about these particular documents and argue

O6I1GUO2                          Reyes - Direct

whatever they wish to argue about their authenticity, but we
have met our threshold.

THE COURT:  I have tremendous admiration for Judge
Engelmayer.  He clerked for Justice Marshal.  So if you can go
through each of these documents and identify those
characteristics that Judge Engelmayer wrote about so
eloquently, I would consider admitting them.  Mr. Kamaraju.

MR. KAMARAJU:  Well, I guess I would make a couple of
points, your Honor.  First of all, the comment about there's no
evidence suggesting their inauthentic nature misses the point.
They have the burden to supply evidence's authenticity.  Two,
none of the case law that Mr. Finkel cited dealt with the
particular question that your Honor ask which was whether you
could consider the Bates number as a question of authenticity.
I don't think there is any case law that supports that
proposition.

THE COURT:  I think he just said that there is a case.

MR. KAMARAJU:  I didn't hear the one he read.

THE COURT:  He's looking for the case.

MR. KAMARAJU:  So while he finds that.  Three, the
question about whether you can authenticate the document
through a signature.  What actually 901 says is that you can
take a non-expert's opinion that handwriting is genuine, right.
So you can authenticate the handwriting, that doesn't mean you
authenticate the entirety of the document.  You need to be able

O6I1GUO2                         Reyes - Direct

1    to say that's somebody's signature, and I recognize this

2    document for what it is.  Frankly, the best evidence that these

3    documents do not have distinctive characteristics and the like

4    is the fact that the government has put in so many of them.

5    They're not corporate records.  I'm not aware of a case that

6    has found corporate records as being distinctive.  In fact,

7    your Honor kind of dealt a little bit with this issue with the

8    First Abu Dhabi Bank records where the government made a

9    similar argument with respect to authenticity.  And your Honor

10   said, well just because they look like bank records, doesn't

11   make them authentic.  It doesn't satisfy the authentication

12   part.  The fact that like we say G/Club sole forum, that's not

13   sufficiently distinctive under -- and I'll try to remember my

14   case law.  But I don't think that's sufficiently distinctive

15   under any Second Circuit case law, and I'm not sure Mr. Finkel

16   has cited one that says it is.

17        MS. SHROFF:  May I just have the Judge Engelmayer cite

18   so I can look it up.

19        MR. FINKEL:  It's 890 F. Supp 278.  To your Honor's

20   first question.  Judge -- it's actually a District of

21   Connecticut case, Faulkner v. Arista Records.  It's SDNY,

22   excuse me.  797 F. Supp. 2d. 299.  I'm not certain. I think

23   it's Judge Preska.  I could be wrong about that.  In any event,

24   the court reviewed that all the documents were Bate stamp with

25   a particular prefix as part of its analysis.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          To respond directly to what defense counsel just said.

2     I want to make a few points.  The first is, that's true.  The

3     question about whether a signature is authentic can be

4     determined by a witness.  And Ms. Reyes has determined that

5     she's familiar with Mr. He's signature.  That all of these

6     documents are signed by Mr. He.  That is direct evidence of

7     authenticity that Mr. He personally signed those documents

8     based on what the witness said.  There are other

9     circumstances -- I submit that in and of itself is sufficient

10    for authenticity.  When your Honor ruled with respect to the

11    First Abu Dhabi records was about 807 hearsay, which is to say

12    that they can come in for its truth.  That's a different

13    inquiry.  It's not relevant here.  We did not have a custodial

14    witness or any witness who can look at the First Abu Dhabi bank

15    records and say Mr. He signed them.  Ms. Reyes did that.

16         The second piece of circumstantial and direct evidence

17    that shows their authenticity again, just a threshold showing,

18    is that these documents look just like the documents, very

19    similar in format, in fact Ms. Reyes said so, to the other loan

20    agreement.  The third circumstance, your Honor, is that, yes,

21    I'm saying as an officer of the court they were provided to the

22    government from G/Clubs, and they have a G/Club Bates stamp.

23    That is another fact.  The fourth circumstance is the content

24    of the document itself, which your Honor is free to review and

25    look at, and the contents of those documents concerns loans and

1   other factors that this witness and other witnesses have

2   testified about that are relevant to the proceeding further

3   corroborating again the bear threshold finding of authenticity.

4   And so while the government has the burden, it's a

5   preponderance, and it's fair for your Honor to evaluate what

6   suggests they are not authentic.  And I've heard no evidence

7   suggesting that, so they should be admitted.

8              MR. KAMARAJU:  I want to respond to a couple of points

9   before your Honor rules.  First of all, just for a point of

10  clarification, the argument that we made with respect to the

11  First Abu Dhabi bank account was both authenticity and the

12  residual exception.  And your Honor found that it couldn't be

13  authenticated or admitted under the rule exception.  That's

14  point one.  Point two, I would be curious if the Faulkner case

15  that Mr. Finkel has cited is actually about admission of

16  evidence into the trial record, or admission with respect to a

17  motion, cause I think those are different standards.  Three, I

18  would say that the fact that somebody recognizes handwriting is

19  sufficient to authenticate the document is signed by that

20  person.  It is not sufficient to authenticate the substance of

21  the document, i.e., I can show that Ms. Shroff signed a letter.

22  I can't say further that that letter is a letter that went to

23  the Court or that letter is one that went to the probation.

24  All I can say is I recognize Ms. Shroff's handwriting on that.

25             Third, the distinctive characteristics.  If they want

O6I1GUO2                         Reyes - Direct

1   to go through and have her identify what's distinctive, okay,

2   maybe she can do it.  But otherwise, I think what she answered

3   is, I recognize generally the format.

4          MR. FINKEL:  If I could just respond to that.  The

5   witness could do that, but she doesn't have to.  Your Honor is

6   the fact finder here and makes the preliminary ruling, and

7   you're free, your Honor, to review the documents and compare

8   them to the other documents that have been admitted.  With

9   respect to Judge Engelmayer's opinion, I'm not certain whether

10  it was about a trial or not --

11         MR. KAMARAJU:  I was talking about Faulkner.

12         MR. FINKEL:  Judge Engelmayer's opinion analyzed Rule

13  901. Rule 901 is the same regardless of the circumstances.

14  Second just to quote from another SDNY opinion.  I'm sorry I

15  don't have the judge.  Another civil case, but again same rule,

16  901.  A finding of authenticity "may be based entirely on

17  circumstantial evidence."  Citing the Second Circuit U.S. v.

18  Bagaric, 706 F. 2d. 42.  That's from 1983.  One of the

19  circumstances is that she identified the signature.  There are

20  other circumstances which I've already listed.  Putting them

21  altogether we have passed, I certainly believe, the place where

22  a reasonable juror could find the proffer of evidence

23  authentic.  That's all that needs to be satisfied.  They're

24  free to cross-examine her on the document.  They're free to

25  make arguments about the document, but we've met our threshold

O6I1GUO2                          Reyes - Direct

1    for the finding.

2              MS. SHROFF:  Your Honor, I would like the cites, and

3    it's really unfortunate that this wasn't -- we didn't have any

4    notice.  So if you could just send me the case cites that

5    you've recited.  I will step out and look at them.  But I'm

6    pretty sure Judge Engelmayer case was in the civil context.

7              MR. FINKEL:  It is a civil case.

8              MS. SHROFF:  And I believe that the requirements would

9    be different in a criminal case versus a civil trial.

10             MR. FINKEL:  There's no difference between Rule 901 in

11   a civil case and a criminal trial. To the extent there's a

12   confrontation clause issue, which maybe what you're alluding

13   to, the witness is on the stand, and you can cross-examine her

14   about the signature on the documents.

15             THE COURT:  So did you go through the signature on

16   each of the documents that you wanted to admit?

17             MR. FINKEL:  Yes, we can certainly do that.  They're

18   all signed by Mr. He.

19             THE COURT:  I think you have to do that, and I think

20   you have to ask whether the format is consistent with other

21   documents that the corporation used.  On that basis, I would

22   find them admissible.

23             MS. SHROFF:  Could I have the cites, please.

24             (Continued on next page)

25

O6I1GUO2                         Reyes - Direct

1              (In open court; jury present)

2              MR. KAMARAJU:  Your Honor, just a point of

3     clarification.  Does the ruling at the sidebar apply to the

4     exhibit you previously admitted or just what's in the binder?

5              THE COURT:  The ruling at the sidebar applies to the

6     admission of the first document as well as the ones that

7     follow.  The government is going to go through each document.

8     BY MR. FINKEL:

9     Q.  Ms. Reyes, can you take a look at the binder.  On each

10    particular document, can you let the jury know if you recognize

11    any signatures on the document?

12    A.  I recognize the signature on all the document.

13    Q.  Whose signature do you recognize on every single document?

14    A.  Mr. He.

15    Q.  You mentioned I think in response to defense counsel's

16    questions that the format I think you said familiar or

17    something like that.  Can you describe what you mean?

18    A.  When loan documents were created, it included a said

19    package and resolutions were made as well, and the format of

20    the resolutions is like the ones that are here.

21             MR. FINKEL:  Government offers GX GC-519, 523, 524,

22    529 535, 349, 373 and 177.

23             THE COURT:  They are admitted.

24             (Government's Exhibits GC-519, GC-523, GC-524, GC-529

25    GC-535, GC-349, GC-373 and GC-177 received in evidence)

O6I1GUO2                         Reyes - Direct

1    BY MR. FINKEL:

2    Q.  If we can please put up for the witness GXGC-544.

3          You can go to last page, Ms. Loftus.  Second to last

4    page.  Ms. Reyes, do you recognize any signature on this page?

5    A.  Yes.

6    Q.  Whose signature is that?

7    A.  Mr. He.

8    Q.  Can you go back a page.

9          Whose signature is on page 14 of this document?

10   A.  Zee.

11   Q.  Can you scroll up, please.  In your time at G/Clubs, did

12   you see documents where the lender was G/Clubs Operations?

13   A.  Yes.

14          MR. FINKEL:  Your Honor, the government offers GC-544.

15          MR. KAMARAJU:  I maintain my objection, your Honor.

16          THE COURT:  It is admitted.

17          (Government's Exhibit GC-544 received in evidence)

18   BY MR. FINKEL:

19   Q.  You can take that down.  Ms. Loftus, if you can put up for

20   identification GC-515 just for the witness.

21          Do you recognize the signature on this document?

22   A.  Yes.

23   Q.  Whose signature is it?

24   A.  Mr. He.

25          MR. FINKEL:  The government offers GXGC-515.

1          MR. KAMARAJU:  We make the same objection, your Honor.

2          THE COURT:  It is admitted.

3          (Government's Exhibit GC-515 received in evidence)

4     BY MR. FINKEL:

5     Q.  Can we publish that.  What's the amount of the transfer

6     indicated on this document?

7     A.  There are two transfers.  One is 20 million and the other

8     one is 15 million.

9     Q.  We can take that down.  If you can put up what's been

10    marked for identification just for the witness, please,

11    Ms. Loftus, GXGC-378.

12         Ms. Reyes, who is this an email from?

13    A.  Mr. He.

14    Q.  And who received it?

15    A.  Me.

16         MR. FINKEL:  Government offers GC-378.

17         MR. KAMARAJU:  No objection.

18         THE COURT:  It is admitted.

19         (Government's Exhibit GC-378 received in evidence)

20    BY MR. FINKEL:

21    Q.  We can take that down.  And one more if we could put up

22    GC-232.

23         Ms. Reyes, who is this an email from?

24    A.  Me.

25    Q.  And who's it to?

1   A.  Mr. He.

2          MR. FINKEL:  Government offers GC-232.

3          MR. KAMARAJU:  No objection.

4          THE COURT:  It is admitted.

5          (Government's Exhibit GC-232 received in evidence)

6   BY MR. FINKEL:

7   Q.  We can take that down.  If you could put up GXGC-552 for

8   identification just for the witness.

9          Ms. Reyes, did you receive this email dated October

10  17, 2022?

11  A.  Yes.

12          MR. FINKEL:  Government offers GXGC-552.

13          MR. KAMARAJU:  No objection.

14          THE COURT:  It is admitted.

15          (Government's Exhibit GC-552 received in evidence)

16  BY MR. FINKEL:

17  Q.  If we can publish that, please.

18          Who is Manuel?

19  A.  Manuel is an attorney for G/Clubs.

20  Q.  And who's copied on this email on October 17, 2022.  Sorry,

21  who is it to?

22  A.  Victor and me.

23  Q.  Victor who?

24  A.  Cerda.

25  Q.  What's the attachment on this email?  Can you read that?

1  A.  Mercantile Bank Seizure Warrant.

2  Q.  Did there come a time, Ms. Reyes, when you learned that

3  G/Clubs' funds were seized by the government?

4  A.  Yes.

5  Q.  Zoom out of that please, Ms. Loftus.  Can you zoom into the

6  bottom email.  Who is this email from?

7  A.  Juliana Murray.

8  Q.  Who is it sent to?

9  A.  Manuel Pietrantoni.

10  Q.  Can you read the text of it.

11  A.  Mr. Pietrantoni, the attached seizure warrant which was

12  served yesterday provides for the freezing of G/Club's account

13  at Mercantile Bank pending the transmission of the funds in

14  that account which are subject to seizure and forfeiture to the

15  United States.  My colleagues and I are available if you have

16  any questions.

17  Q.  You can zoom out of that.  Go to the next page.

18          Can you read what it says right below that box?

19  A.  Warrant of seizure.

20  Q.  What does it say at the top left?

21  A.  United States District Court Southern District of New York.

22  Q.  Zoom out of that, and can you scroll down, please,

23  Ms. Loftus.  Can you go to paragraph A.

24          Can you read paragraph A, Ms. Reyes?

25  A.  All monies contained in Mercantile Bank International

1    Account MVI10103000 held by G/Clubs International Limited and

2    all funds traceable thereto including accrued interest.

3    Q.  Ms. Reyes, what reaction did you have, if any, when you

4    learned that the U.S. government had seized G/Clubs funds held

5    at Mercantile bank?

6    A.  I was concerned because it involved the government and

7    that's not to be taken lightly.

8    Q.  Can you scroll to the top, please, Ms. Loftus.

9            What's the date of this email in which you learned

10   about the seizure?

11   A.  October 17, 2022.

12   Q.  We can take that down, and if you can put up for the

13   witness GXGC-41.

14           Who is this email from?

15   A.  Mr. He.

16   Q.  Who did he send it to?

17   A.  Me and Alex.

18           MR. FINKEL:  Government offers GC-41.

19           MR. KAMARAJU:  No objection.

20           THE COURT:  It is admitted.

21           (Government's Exhibit GC-41 received in evidence)

22   BY MR. FINKEL:

23   Q.  Can you publish it, please.

24           Ms. Reyes, do you remember this email?

25   A.  Yes, I do.

1   Q.  What do you remember about it?

2   A.  I remember receiving the email, and I felt that I was not

3   being valued at the time.  I felt it was a harsh difficult

4   email to receive.

5   Q.  What's the date of this email?

6   A.  October 18, 2022.

7   Q.  That's the date after the seizure warrant email?

8   A.  Yes.

9   Q.  What do you mean you didn't feel valued?

10  A.  I've been working very hard to create the benefits for the

11  members and setting up the team and working for the business to

12  the best of my abilities.  And reading those types of comments

13  made me feel that it's just like if it didn't matter.

14  Q.  Can you read the first two sentences of the email?

15  A.  I am extremely disappointed about Limarie not replying to

16  my messages and emails.  I have no idea what kind of CEO she

17  is.  She acts as if she's the owner of this business which is

18  complete non-sense.  From now we must cancel all her signatory

19  rights and wait for my further instruction.

20  Q.  What happened that caused you to receive this email,

21  Ms. Reyes?

22              MR. KAMARAJU:  Objection to form.

23              THE COURT:  Did something happen?

24  Q.  Did something happen prior to you receiving this email?

25  A.  Yes.

O6I1GUO2                           Reyes - Direct

1    Q.  What?

2    A.  It was asked for us to send some funds to the bank and the

3    recommendation from legal was not to do so and that related to

4    the email.

5    Q.  Who did you convey the recommendation from legal not to

6    transfer the funds to?

7    A.  To the best of my recollection Yvette or Mr. He.

8    Q.  And after you conveyed that, you received this email?

9    A.  To the best of my recollection yes.

10        THE COURT:  I did not hear what you said.

11   A.  To the best of my recollection yes.

12        THE COURT:  And who is HHR?

13        THE WITNESS:  Mr. He.

14   Q.  I'm going to ask you to speak into the microphone so

15   everyone can hear you.  Thank you.

16        After the paragraph in which Mr. He said that he was

17   extremely disappointed, can you read what he wrote for

18   secondly?

19   A.  Secondly, going back to business, we must maintain our bank

20   relationships so we are asked to send some funds to the

21   accounts, so please do the following.  Five million to K Bank

22   ASAP.  Five million to Black Thorn after my further

23   instructions.  Do keep me updated on the progress and I need to

24   see progress not unanswered messages or emails.

25   Q.  What did you understand that to mean when Mr. He said I

1   need to see progress?

2   A.  That he wanted things to get done.

3   Q.  Were you not answering his emails?

4   A.  Around the time, no.

5   Q.  Why not?

6   A.  Because I was working on legal matters that we had

7   received.

8   Q.  Which legal matters are you referring to?

9   A.  The seizure.

10  Q.  Did you ask for your own attorneys at the time of the

11  seizure?

12  A.  I don't recall exactly, but I did ask for my attorneys.

13  Q.  If we can pull up what's in evidence as GXGC-43/

14          THE COURT:  Who was O'Neil & Jorge representing?

15          THE WITNESS:  I'm sorry.

16          THE COURT:  Pietrantoni, who was he representing?

17          THE WITNESS:  G/Clubs.

18          THE COURT:  Go ahead.

19  BY MR. FINKEL:

20  Q.  Did you have a personal lawyer that represented you,

21  Limarie Reyes, at that time?

22  A.  No, I did not.

23  Q.  First just to orient us, Ms. Loftus, if you can zoom in on

24  the bottom email.  Ms. Reyes, is that the email we just looked

25  at?

O6I1GUO2                        Reyes - Direct

1    A.   Yes.

2    Q.   Did you respond to that?

3    A.   Yes.

4    Q.   Zoom out of that, please, and scroll up.

5         Can you read what you wrote in response?

6    A.   Yes.   Dear, Mr. He, hope this message finds you well.   My

7    sincerest apologies for the lack of communication during past

8    days.   I've been handling a few legal issues that have taken my

9    full attention.   Among those legal issues, please find the

10   below box link including copy of the recent seizure warrant to

11   G/Club International Limited, BVI.   Please note we are

12   currently looking for an attorney to represent BVI and will

13   keep you updated during this process.   Under no circumstance my

14   intention has been to act as the owner of the business.

15        On the contrary, I deeply respect you as my superior

16   and any action taken by me has been carefully carried out

17   taking into consideration the best interest of the company.   To

18   this point, I respect your decision to cancel all my signatory

19   rights and will act accordingly.   Regarding G/Club banking

20   relationship, please note that while no action has been taken

21   towards G/Club Operations, in light of the recent circumstances

22   with BVI transferring funds out of the existing accounts to

23   fund foreign accounts could provoke the U.S. authorities to

24   cease G/Club Operations U.S. accounts.   Nevertheless, please

25   confirm that you wish to proceed in funding the accounts as

1    stated below.  I've attached the wire instructions for both

2    accounts.  SKB Bank and Black Thorn for your confirmation as

3    the correct wiring instructions.

4    Q.  Was this a difficult time for you at G/Clubs?

5    A.  Yes.

6    Q.  Do you believe that you ever took an action to consider

7    yourself as the owner of G/Clubs?

8    A.  No.

9    Q.  You can zoom out of that.  Can we scroll down.

10           What is this document?

11   A.  The wiring instruction details.

12   Q.  Where did Mr. He want you to wire this money after the

13   seizure warrant?

14   A.  The wire instruction say Kyrgyz Swiss bank.

15   Q.  Ms. Reyes, after the legal department recommended not to do

16   this wire, Mr. He told you to do it.  Did this wire go through?

17   A.  Yes.

18   Q.  Take that down.

19           Did there come a time G/Clubs tried to get the money

20   that was seized back from the U.S. government?

21   A.  Could you say that again.

22   Q.  Did there come a time, if ever, when G/Clubs tried to get

23   the money back from the U.S. government, the money that was

24   seized?

25   A.  Yes.

O6I1GUO2                          Reyes - Direct

1   Q.  What were you asked to do, if anything, as part of that

2   litigation?

3   A.  I was asked to sign an affidavit.

4   Q.  Can you please speak into the mic.

5           Did you have your own attorneys at this time?

6   A.  No, I did not.

7   Q.  Did you want to sign the affidavit?

8   A.  No, I did not.

9   Q.  Did you write the affidavit?

10  A.  No, I did not.

11  Q.  Did you express your concern that you didn't want to sign

12  this affidavit?

13  A.  Yes.

14  Q.  What were you told?

15  A.  That I was the CO and that I had to sign it.

16  Q.  I'm sorry.

17  A.  I had to sign it.

18  Q.  Did you sign the affidavit?

19  A.  Yes, I did.

20  Q.  Is everything in the affidavit completely truthful?

21  A.  Not everything.

22  Q.  What are some things in the affidavit that weren't

23  truthful?

24  A.  I don't remember the full content on top of my mind, how I

25  describe travel, concierge service, and how I describe the

1    community.

2    Q.  Did you consider leaving G/Clubs around this time?

3    A.  Yes.

4    Q.  Did you ultimately leave G/Clubs?

5    A.  Yes.

6    Q.  When?

7    A.  When, March 2023.

8    Q.  Why?

9    A.  At that time many legal issues going on.  There had been

10   arrests.  I had concerns.  And by that time I had my personal

11   lawyers.

12   Q.  Did you get a personal lawyer after Miles Guo was arrested?

13   A.  Yes.

14   Q.  Looking back on it, do you feel that Mr. He valued your

15   contributions, if any, at G/Club?

16   A.  I'm not sure.  It didn't feel like it.

17   Q.  It did not feel like it?

18   A.  Yeah.

19   Q.  Ms. Reyes, after the seizure in October of 2022, did you

20   travel again to Europe?

21   A.  Yes.

22   Q.  Who asked you to go to Europe?

23   A.  Yvette.

24   Q.  How much notice did you have before you traveled to Europe?

25   A.  Not much notice.

O6I1GUO2                          Reyes - Direct

1    Q.  How much?

2    A.  Couple of days.

3    Q.  What were you told by Yvette as to why you had to go to

4    Europe?

5    A.  We were to meet with the banks for them to get to know us

6    and us to get to know them.

7    Q.  Where in Europe did you go?

8    A.  I'm sorry.

9    Q.  Where in Europe did you go?

10   A.  Switzerland.

11   Q.  Had you been to Switzerland before?

12   A.  No.

13   Q.  How did you travel there?  What mode of transportation?

14   A.  Plane.

15   Q.  Commercial or private?

16   A.  Commercial.

17   Q.  Did you travel with anyone?

18   A.  Alex.

19   Q.  Who did you meet in Switzerland if anybody?

20   A.  Mr. He, some attorneys and representative of the bank.

21   Q.  Was there a meeting with a representative of the bank?

22   A.  Yes.

23   Q.  What bank?

24   A.  mBear.

25   Q.  Can you spell that?

1  A.  M-B-A-E-R if I'm not mistaken.

2  Q.  What was your understanding of the purpose of this meeting

3  with mBear?

4  A.  It was to meet with the bank, for them to get to know us

5  and us to get to know them.

6  Q.  What did Mr. He say, if anything, about G/Clubs during this

7  meeting with mBear?

8  A.  During the meeting, during that meeting, we had to talk

9  about the benefits and explain some like financial as to how

10  members are referencing bank statements.

11  Q.  When did this meeting occur?  Do you know the month?

12  A.  November 2022.

13  Q.  What did you talk about in the meeting, which topic?

14  A.  The benefits.

15  Q.  What did Alex talk about?

16  A.  Finances.

17  Q.  What did Mr. He talk about?

18  A.  He interjected in the meeting and he explain how G/Clubs

19  was his idea and how it came to be.

20  Q.  Did Mr. He after mentioning that G/Clubs was his idea and

21  how it came to be, did he say anything about how Guo got

22  involved?

23  A.  To the best of my recollection, he mention Guo as his

24  person of interest.

25  Q.  Did he provide any detail about how Guo became the

O6I1GUO2                          Reyes - Direct

1    spokesperson?

2    A.  I don't recall specifically.

3    Q.  If we can put up what's in evidence as GXGC-438.

4            Can you read this?

5    A.  It's a loan agreement between G/Club International Limited

6    and Mileson.

7    Q.  And who?

8    A.  Mileson.

9    Q.  What does the document say, and who does it say Mileson is

10   on the document?

11   A.  Qiang Guo.

12   Q.  And you know that name as Mileson?

13   A.  That's what I was told.

14   Q.  Scroll down, please.  Who's the lender?

15   A.  G/Club International Limited.

16   Q.  And the borrower?

17   A.  Qiang Guo.

18   Q.  And can you read the second Whereas clause?

19   A.  Whereas subject to the terms of this agreement lender will

20   loan 10 million to borrower.

21   Q.  If we could pull up what's in evidence as GXGC-416.

22            And who's this email from?

23   A.  Mr. He.

24   Q.  To who?

25   A.  To me.

1  Q.  What does it say?

2  A.  Hi, Limarie, bank account details attached.

3  Q.  Go to the next page.

4        Who is this account in the name of at the bottom of

5  your screen?

6  A.  Qiang Guo.

7  Q.  Can we look at GXGC-415.

8        What's the date of this email?

9  A.  January 14, 2022.

10 Q.  Can you read it.

11 A.  Hi, Limarie.  We have green light from Mr. Guo bank for the

12 loan.  Please prepare the transaction today, and I will come

13 back with and details.  We have to change the currency to Swiss

14 Frank as this is the request from them.  We must make sure we

15 don't have a bad rate if we do this.

16 Q.  Did Mr. He explain why they wanted to change the currency

17 to Swiss Frank?

18 A.  Not that I recall.

19 Q.  Did you ask him why?

20 A.  I don't remember.

21 Q.  Did you ask Mr. He why there was a loan being made to

22 Mileson?

23 A.  Not that I recall.

24 Q.  Did you ask Yvette?

25 A.  Not that I recall.

O6I1GUO2                        Reyes - Direct

1  Q.  Did you have any role in the decision to loan money to

2  Mileson?

3  A.  No, I did not.

4  Q.  Can you pull up GXGC-418.

5          Who is this document from?

6  A.  From me.

7  Q.  Who's it to?

8  A.  Mr. He.

9  Q.  And what did you attach to this document?

10 A.  Loan agreements.

11 Q.  For which loan?

12 A.  Could you scroll it a bit.

13 Q.  Sure.  Can we scroll the attachments, Ms. Loftus.

14 A.  It's a loan to Qiang Guo.

15 Q.  The next page, please.  We can take that down.

16         Ms. Reyes, do you know if the loan to Mileson was ever

17 paid back?

18 A.  Not that I recall.

19 Q.  Ms. Loftus, if we can pull up GXC-212.  Can you go to one

20 minute and 35 seconds.  Can you play.

21         (Media played)

22 Q.  Ms. Reyes, when a member bought a membership in G/Clubs,

23 did they immediately become a shareholder in G/Clubs?

24 A.  No.

25         MR. FINKEL:  Nothing further.

O6IBGUO3                        Reyes - Cross

 1              THE COURT:  Cross examination.

 2    CROSS-EXAMINATION

 3    Q.  Good afternoon, Ms. Reyes.

 4    A.  Good afternoon.

 5    Q.  Can you hear me okay?

 6    A.  Yes.

 7    Q.  Do you need a minute?

 8    A.  I'm okay.

 9    Q.  Now, I'd like to just start A little bit with the video we

10    just watched.  Okay.

11              Now, Mr. Guo became a spokesperson for G/Clubs at a

12    certain point, right?

13    A.  He was the spokesperson for G/Club, yes.

14    Q.  And he was the spokesperson before you got to G/Club,

15    right?

16    A.  Yes.

17    Q.  And you were introduced to G/Clubs through a recruiter I

18    believe you testified, right?

19    A.  Recruiter interview me, yes.

20    Q.  And was that Steve Weber?

21    A.  Yes.

22    Q.  And the position that you originally had at the company was

23    VP in marketing, right?

24    A.  Yes.

25    Q.  And as part of your role, then you had to secure benefits

O6IBGUO3                          Reyes - Cross

1    for G/Club members, right?

2    A.  Yes.

3    Q.  And that part of your job at least, securing benefits,

4    continued throughout your time at G/Clubs, right?

5    A.  Yes.

6    Q.  When you refer to sort of the contribution that you thought

7    Mr. He had not valued, part of it was the work you had put in

8    securing benefits, right?

9    A.  The work throughout.

10   Q.  Throughout, through your whole time there?

11   A.  Yes.

12   Q.  And in terms of providing benefits or services, you had a

13   lot of experience before you got to G/Club doing that kind of

14   work, right?

15   A.  I had experience in events.

16   Q.  You had almost ten years worth of experience in events

17   before you got there, right?

18   A.  Yes.

19   Q.  You had worked at a large hotel chain as an event manager,

20   right?

21   A.  Yes.

22   Q.  You were the director of member services at a premier golf

23   club in Puerto Rico, right?

24   A.  Yes.

25   Q.  You had worked at for planning events at something called

1    Invest Puerto Rico, right?

2    A.   Yes.

3    Q.   What's Invest Puerto Rico?

4    A.   It's a company that brings new business to Puerto Rico.

5    Q.   And you were in charge of planning their events, right?

6    A.   Yes.

7    Q.   And now you run your own event planning business, right?

8    A.   Yes.

9    Q.   And Mr. Finkel asked you some questions about that, right?

10   A.   Yes.

11   Q.   It's called Sprinkle; is that right?

12   A.   Sprinkle events.

13   Q.   And you just started that in November, right?

14   A.   Yes.

15   Q.   So a little over six months ago?

16   A.   Yes, around that time.

17   Q.   So you're just getting started, right?

18   A.   Yes.

19   Q.   And when you joined G/Club, it was also just getting

20   started, right?

21   A.   Yes, that was my understanding.

22   Q.   There weren't a whole lot of employees, right?

23   A.   No.

24   Q.   You were employee number one in the Puerto Rico office?

25   A.   Yes.

1    Q.  And there were some employees in New York, right?

2    A.  There's some people in New York, yes.

3    Q.  But still not very many, right?

4    A.  There was just a few people.

5    Q.  Do you remember how many there were when you started?

6    A.  Not exact amount.

7    Q.  Under five?

8    A.  Doing a rough count.

9    Q.  Totally fine.

10   A.  A little bit over five.

11   Q.  And when you first joined G/Clubs, you understood that the

12   primary audience for the company's offering was Chinese, right?

13   A.  Yes.

14   Q.  And in particular it was a specific group of Chinese people

15   who were opposed to the Chinese Communist Party?

16   A.  Could you repeat that.

17   Q.  The people who you understood would be particularly

18   attracted to G/Clubs offerings were Chinese people who were

19   opposed to the Chinese Communist Party, right?

20   A.  Yes.

21   Q.  And Ms. Wang told you that during the first interview?

22   A.  I do not recall specifically.

23   Q.  But over the course of your time at G/Club, you came to

24   understand that, right?

25   A.  Yes.

O6IBGUO3                              Reyes - Cross

1    Q.  I think you testified on direct that you don't personally

2    have a lot of experience with the Chinese community, right?

3    A.  Yes.

4    Q.  And you don't personally have a lot of knowledge about

5    Chinese politics, right?

6    A.  Yes.

7    Q.  And you don't personally have a lot of knowledge about

8    Chinese culture, right?

9    A.  No, I do not.

10   Q.  It's not the culture you grew up in, right?

11   A.  No.

12   Q.  Now, Mr. Guo is part of that community, right?

13   A.  Which community?

14   Q.  Well, the Chinese anti-CCP community, let's just start

15   there?

16              MR. FINKEL:  Objection.

17              THE COURT:  If you would be more specific if you

18   could.

19   Q.  You understand Mr. Guo is Chinese, right?

20   A.  Yes.

21   Q.  And you understand that he is taken an anti-CCP position in

22   public, correct?

23   A.  Yes.

24   Q.  So his views are similar to the views of G/Clubs' target

25   audience, correct?

O6IBGUO3                          Reyes - Cross

1              MR. FINKEL:  Objection.

2              THE COURT:  If you happen to know what the view point

3     is of the audience, you may answer if you know.

4     A.  My understanding is that they're like-minded individuals.

5     Q.  And maybe you can just tell the jury what you mean when you

6     may "like-minded?"

7     A.  That amongst the members, they have a league to be in

8     opposition of the Chinese government.

9     Q.  Could you say that again.

10    A.  In opposition of the government.

11    Q.  Opposition of the Chinese government.  Okay.

12             Now, it made sense to you that Mr. Guo would be a

13    spokesperson for G/Clubs, right?

14    A.  He was the spokesperson for G/Club.

15    Q.  Sure, but that didn't strike you as odd, right?

16    A.  That's how it was when I came in.

17    Q.  I understand.  I'm asking you a slightly different

18    question, Ms. Reyes.

19             My question is, did it strike you as strange to have

20    Mr. Guo as the spokesperson?

21             MR. FINKEL:  Objection.

22             THE COURT:  You may answer.

23    A.  Can you repeat the question.

24    Q.  Did it strike you as strange that Mr. Guo would be working

25    as the spokesperson for G/Club?

O6IBGUO3                          Reyes - Cross

1   A.  I understood he was in the opposition, so I don't think so.

2   Q.  And when you say he was in a position, he was in a position

3   to attract potential G/Club members, right?

4   A.  Sorry, he was in opposition of the Chinese government.

5   Q.  I'm sorry.  He was in opposition to the Chinese government,

6   and so that made sense that he would be a spokesperson to

7   G/Club.  Is that what you were saying?

8   A.  Yes.

9   Q.  Now, you testified on direct that he didn't receive any

10  monetary compensation for that role, right?

11  A.  Not that I was aware of.

12  Q.  Now, part of G/Clubs' marketing was access to affluent life

13  experiences, right?

14  A.  I'm sorry.

15          THE COURT:  Mr. Kamaraju, if you would please get

16  closer to the microphone so we could hear you.

17  Q.  Part of G/Clubs' marketing was sort of marketing life

18  experiences, right?

19  A.  Benefits, we offer benefits.

20  Q.  But some of those benefits, for example, you looked at a

21  website yesterday with Mr. Finkel.  You remember that?

22  A.  Yes.

23  Q.  And some of those benefits curated life experiences, right?

24  A.  What do you mean by "curated?"

25  Q.  Let me give you a specific example.

1          G/Clubs had entered into an engagement with the F-1

2   Racing Association, correct?

3   A.   We had offered a benefit with F-1 yes.

4   Q.   And the idea there was to give G/Club members the

5   opportunity to experience an F-1 race, right?

6   A.   Yes.

7   Q.   That's what I mean by a life experience or curated life

8   experience.  Okay.  Are we on the same page?

9   A.   Yes.

10  Q.   And that was sort of G/Club's business model, right?

11          MR. FINKEL:  Your Honor, I object to defense counsel

12  defining terms different from how Ms. Reyes may understand

13  them.

14          THE COURT:  You may answer the question.

15  A.   Could you repeat the question.

16  Q.   Sure.  I was just saying part of G/Club's business was

17  offering those kinds of experiences, right?

18  A.   To offer different benefit for the members, yes.

19  Q.   Now, those benefits included things like luxury hotel

20  deals, right?

21  A.   Yes.

22  Q.   Potential trips on yachts, right?

23  A.   Yes.

24  Q.   There were membership summits, right?

25  A.   What do you mean by summits?  G Talks.

1    Q.  Sure. G Talks. There was discounts on G Fashion?

2    A.  Yes.

3    Q.  And you were pursuing other benefits during the course of

4    your employment there, correct?

5    A.  Yes.

6    Q.  You tried to get a Super Bowl event at some point, right?

7    A.  A what, sorry?

8    Q.  An event for somebody to go to the Super Bowl?

9    A.  Not that I recall.

10   Q.  We'll come back to that.

11           Now, in addition to those benefits, you understood

12   that one of the things that G/Club members got was the ability

13   to say they were part of the club, right?

14   A.  They were part of the membership club.

15   Q.  Right.  So there was a social affinity that the members

16   could feel, right?

17   A.  What do you mean like social affinity?

18   Q.  I'm trying to go back to your idea of like-minded group of

19   people.  There were people that were united by sort of a common

20   purpose?

21   A.  They were like-minded, yes.

22   Q.  And having G/Club membership was one way of demonstrating

23   that, right?

24   A.  Yes, they were among the membership.

25   Q.  And within the potential target audience for G/Clubs, you

1    considered Mr. Guo to be a bit of a tastemaker, right?

2    A.  What's a tastemaker?

3    Q.  Well, somebody whose perspective on lifestyle might be

4    valued by G/Clubs members, right?

5            MR. FINKEL:  Object to the form.

6            THE COURT:  Are you asking whether she agrees with

7    your definition, or are you offering that definition in order

8    that she answer the question?

9            MR. KAMARAJU:  I was just asking her understanding

10   I'll try to rephrase it and see if I can do it a different way,

11   your Honor.

12   Q.  You watch the video on direct of Mr. Guo appearing on like

13   a yacht, right?

14   A.  Yes.

15   Q.  And you testified about seeing a video where Mr. Guo

16   showcasing the Lamborghini on behalf of G/Clubs, right?

17   A.  Yes.

18   Q.  And part of the marketing efforts for G/Clubs was to tell

19   members that they could have those kinds of experiences, right?

20   A.  Like yachts and cars?

21   Q.  Yeah.

22   A.  Right.

23   Q.  And so Mr. Guo to your understanding was living a life like

24   that, right?

25           MR. FINKEL:  Objection, your Honor, to the form.

O6IBGUO3                          Reyes - Cross

 1              THE COURT:  You can answer whether you thought that
 2   Mr. Guo was living a life like that.
 3   A.  What's the question?  Was that the question, if he's living
 4   a life like that?
 5   Q.  That was your understanding?
 6   A.  Yes.
 7   Q.  And you went to his home for dinner, right?
 8   A.  Yes.
 9   Q.  It's a very nice house, right?
10   A.  Yes.
11   Q.  It was on the 18th floor of a hotel in Manhattan?
12   A.  I don't remember the floor.  It was high.
13   Q.  And I won't ask you which side of Central Park it was on,
14   but in Manhattan, right?
15   A.  You could see Central Park.
16   Q.  You could see Central Park from it, right.  It was a very
17   large place, right?
18   A.  It was big.
19   Q.  Luxurious, right?
20   A.  Yes.
21   Q.  There's a security desk at the bottom before you could come
22   upstairs, right?
23   A.  Yes.
24   Q.  The elevator opened right up into the apartment, right?
25   A.  Yes.

O6IBGUO3                          Reyes - Cross

1    Q.   There are a bunch of rooms, right?

2    A.   There are different rooms.

3    Q.   Mr. Guo took you on a tour of the place, right?

4    A.   Yes.

5    Q.   Did you see any camping equipment when you were there?

6    A.   Camping?

7    Q.   Yes.

8    A.   None that I recall.

9    Q.   Now, you testified that -- what did you consider Mr. Guo's

10   responsibilities to be as spokesperson for G/Club?

11   A.   He was the spokesperson.

12   Q.   So what's a spokesperson do?

13   A.   Talk on behalf of company.

14   Q.   So they advertise, right?

15   A.   To speak, yeah.

16   Q.   Their role is to try to get business for G/Club?

17   A.   To speak on behalf of the company.

18   Q.   Right.  But the purpose of them speaking on behalf of the

19   company is to bring perspective members to the company, right?

20   A.   It would attract people, yes, to attract people.

21   Q.   G/Club is fundamentally a business, right?

22   A.   Yes.

23   Q.   As a business, it makes money the more members it can

24   attract, right?

25   A.   It's based on the members.

O6I1GUO4                         Reyes - Cross

 1  BY MR. KAMARAJU:
 2  Q.  Right.  And the role of advertising, I think you testified
 3  it was word-of-mouth advertising principally for G|CLUBS,
 4  right?
 5          THE COURT:  Mr. Kamaraju, you have to get closer to
 6  the microphone; and so do you, Ms. Reyes.
 7          MR. KAMARAJU:  Sorry.
 8  Q.  Right?  You testified on direct that it was word-of-mouth
 9  advertising, principally?
10  A.  I don't recall specifically saying that, but part of it was
11  word of mouth.
12  Q.  Okay.  So whatever form of advertising G|CLUBS was doing,
13  that was intended to bring potential members to the company,
14  right?
15  A.  Correct.
16  Q.  And Mr. Guo was part of that effort, right?
17  A.  Spokesperson, yes.
18  Q.  And he made videos as part of that effort, right?
19  A.  I know that he made videos.
20  Q.  Okay.  And in those videos——you testified already about at
21  least one.  In those videos, he advertised for G|CLUBS, right?
22  A.  Which specifically?  Sorry.
23  Q.  Well, you testified on direct about the one with the
24  Lamborghini, right?
25  A.  Yes.

O6I1GUO4                        Reyes - Cross

1   Q.  And he was talking about the Lamborghini as a benefit for

2   G|CLUBS, right?

3   A.  Correct.

4   Q.  Okay.  So that's him advertising G|CLUBS, right?

5   A.  Talking about future benefits.

6   Q.  Sure.  Talking about future benefits that G Club members

7   could enjoy, right?

8   A.  Those benefits were to be future benefits for—for the

9   members.

10  Q.  Okay.  Now you testified on direct that G|CLUBS had to put

11  out a disclaimer about Mr. Guo's statements.  Do you remember

12  that?

13  A.  There was a disclaimer.

14  Q.  Okay.  I'd like to show you just what's been marked for

15  identification as DX 60600.

16          MR. KAMARAJU:  And that's just for the witness and the

17  parties, please.

18  Q.  If you could just take a second to look over that, please.

19  A.  Okay.

20  Q.  Tell me when you're done.

21  A.  Okay.

22  Q.  This is a version of that disclaimer, right?

23  A.  To the best of my recollection, yes.

24  Q.  Okay.  And this disclaimer appeared on the website, right?

25  A.  To the best of my recollection, yes.

O6I1GUO4                          Reyes - Cross

1              MR. KAMARAJU:  Okay.  Your Honor, the defense offers

2     DX 60600.

3              MR. FINKEL:  Provided there's an instruction, no

4     objection.  I'm happy to discuss at sidebar, but—

5              THE COURT:  All right.  We'll have a sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. FINKEL:  I just ask for a limiting instruction.

3    With the limiting instruction, no objection.

4              THE COURT:  You're saying you want me to tell them

5    what?

6              MR. FINKEL:  That it's not being offered for its

7    truth.

8              MR. KAMARAJU:  We're offering it for what G Club

9    members were being told, so if your Honor wants to instruct

10   them that it's for the effect on or the impact on the readers,

11   that's fine, yeah.

12             MR. FINKEL:  Well, given that, actually, I'm not sure

13   Ms. Reyes can testify as to the impact on the members.  She can

14   testify as to the impact on herself.

15             MR. KAMARAJU:  I'm not saying I'm going to ask her

16   questions about the impact on the members; I'm just trying to

17   admit the actual disclaimer, which she can authenticate.

18             MR. FINKEL:  You said for the impact on the members,

19   no?

20             MR. KAMARAJU:  But that doesn't——

21             THE COURT:  He's trying to introduce it, and using her

22   to authenticate it.  And she's not a member so she couldn't say

23   what impact it had on her as a member, but she doesn't need to

24   talk about the impact on members.

25             MR. FINKEL:  Understood.  The government would request

O6I1GUO4                          Reyes - Cross

1    a limiting instruction, and with that, we have no objection.

2              THE COURT:  Okay.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Members of the jury, this document here on

3    the screen titled Disclaimer, it is not being offered for the

4    truth of what is written there, what is said there, it's merely

5    being offered for its impact on those who read it.

6          Go ahead.

7          (Defendant's Exhibit 60600 received in evidence)

8          MR. KAMARAJU:  Thank you, your Honor.

9          Could we publish it for the jury, please.

10   BY MR. KAMARAJU:

11   Q.  So Ms. Reyes, you said this appeared on the website,

12   correct?

13   A.  Yes, to the best of my recollection, yes.

14   Q.  Okay.  And let's just start at the top.  Could you read the

15   first line, please.

16   A.  "The concept for G|CLUBS and scope of benefits available to

17   members has developed over time and may differ from promotional

18   statements G|CLUBS or others may have made in the past before

19   you sought to become a member."

20         MR. KAMARAJU:  All right.  Now let's go down to the

21   second paragraph, please.

22   Q.  Could you read that.

23   A.  "You should not rely on any descriptions by Mr. Guo Wengui

24   or any other person of (i) the benefits that could or would be

25   available to G|CLUBS' members or (ii) any other aspect of the

1    structure or terms of membership in G|CLUBS.  Membership is not

2    an investment in G|CLUBS, nor does it provide an equity or

3    ownership interest in G|CLUBS or any other entity.  G|CLUBS is

4    not an investment club, nor does it provide investment services

5    as a membership benefit.  If you are seeking to make an

6    investment in any entity, do not send any funds to G|CLUBS as

7    G|CLUBS only accepts payment for memberships."

8              MR. KAMARAJU:  Just one moment.

9              Thank you.  We can take that down.  And I'm going to

10   ask that we pull up Government Exhibit C160-V and go to the

11   11:35 mark.

12   Q.  And while that's happening, Ms. Reyes, do you remember on

13   direct Mr. Finkel asked you some questions about G Fashion

14   stock, right?

15   A.  Yes.

16   Q.  And questions about the availability of G Fashion stock to

17   G|CLUBS members, right?

18   A.  Yes.

19   Q.  And you remember he asked you about this portion of this

20   video?

21   A.  What exactly?  Sorry.

22   Q.  Well, I'm happy to play it.  We can play a little bit of it

23   for you.

24              MR. KAMARAJU:  Could we play just a few seconds.

25              (Video played)

O6I1GUO4                          Reyes - Cross

1              MR. KAMARAJU:  Pause there.

2   Q.  All right.  So you remember Mr. Finkel asked you some

3   questions about that?

4   A.  I don't remember specifically, but I——

5   Q.  Okay.  Do you remember testifying that this comment by

6   Mr. Guo about receiving G Fashion stocks wasn't true?

7   A.  We did not offer stock.

8   Q.  Okay.  G|CLUBS didn't offer the G Fashion stock, right?

9   A.  Correct.

10  Q.  Now you were the CEO of G|CLUBS, not G Fashion, right?

11  A.  Correct.

12  Q.  You didn't have any responsibility for G Fashion, right?

13  A.  No.

14  Q.  So you don't have any reason to know if G Fashion could

15  offer stock to G Club members, right?

16  A.  I do not know.

17  Q.  Just like a rental company offering benefits through a

18  frequent flyer mile program, right?

19             MR. FINKEL:  Objection.

20             THE COURT:  Sustained.

21  Q.  And you were never part of any discussions related to that,

22  right?

23  A.  Not that I recall.

24  Q.  All right.  Now do you see the date on this video?

25  A.  Yes.

O6I1GUO4                          Reyes - Cross

1    Q.  June 28, 2020, right?

2    A.  Yes.

3    Q.  G|CLUBS hadn't launched by then, right?

4    A.  I'm not sure.

5    Q.  When is the first date you remember G|CLUBS being alive?

6    A.  When I started.

7    Q.  Okay.  So that's December of 2020, right?

8    A.  Yes.

9           MR. KAMARAJU:  All right.  So now can we pull up

10   Government Exhibit GX GC541.  Should be the consulting

11   agreement.  I think that's in evidence, so we can put it up.

12          All right.  And let's have it up for the jury too,

13   please.  Thank you.

14   Q.  Okay.  This is Mr. Guo's consulting agreement with G|CLUBS,

15   right?

16          MR. KAMARAJU:  Why don't we blow up the first

17   paragraph under Consulting Agreement.

18   Q.  Do you see that?

19   A.  Yes.

20   Q.  So this is the consulting agreement?

21   A.  Yes.

22   Q.  Okay.  And do you see it says something called the

23   Effective Date, right?

24   A.  Yes.

25   Q.  What's the effective date?

O6I1GUO4                        Reyes - Cross

1   A.  October 15, 2020.

2   Q.  Okay.  So that's after June 28, 2020, right?

3   A.  Yeah.

4   Q.  Okay.  So that's after the video that Mr. Finkel showed

5   you, right?

6   A.  Yes.

7           MR. KAMARAJU:  Now could we pull up Government Exhibit

8   GX Z9, please.  And go to page 57.

9           Okay.  And let's just blow up the date in the top left

10  corner.  And can we highlight it.

11  Q.  Okay.  Can you read that date for me.

12  A.  October 13, 2020.

13  Q.  Okay.  So it's within two days of the consulting agreement,

14  right?

15  A.  I don't remember the date.  Could we go back.  I'm sorry.

16  Q.  Oh, it's okay.  We'll move on.

17  A.  Okay.

18          MR. KAMARAJU:  Can we go to page 59 of this.  And can

19  we blow up the text that starts, "Under the reviewed launch

20  plan."

21          And maybe we can just highlight that.  Well, you know

22  what?  Withdrawn.

23  Q.  Could you just read the text on the screen, please.

24  A.  "Under the reviewed launch plan for G-Clubs, however,

25  members will not thereby have opportunity to subscribe for or

1    purchase any shares to be issued in the future, will NOT

2    receive G-TV stock, and will NOT receive loans to purchase

3    memberships.

4            "This is serious business, brothers and sisters.  Even

5    if you have bought G-Club, it absolutely will not come with the

6    stocks; it does not mean that you can buy stocks of G-Fashion

7    and G-TV; and, it does not mean that you will be able to

8    receive loans in the future.  No! No! No!

9            "I'll repeat, this is a very serious topic.  No!  No!

10   There is no GTV's stock and there is no G-Fashion's stock.

11   When I hear all this, I got chills.  There is none of that."

12           MR. KAMARAJU:  Okay.  We can take that down.  Thank

13   you.

14   Q.  Now in order to obtain a G Club membership, prospective G

15   Club members had to fill out an application, right?

16   A.  Yes.

17   Q.  And they did that online?

18   A.  To the best of my understanding, yes.

19           MR. KAMARAJU:  Okay.  Could we show just for the

20   witness and the parties and the Court DX 60601, please.

21   Q.  This is how they would get to the application, correct?

22   A.  I have to take a read.

23           It looks like one of the steps, amongst the process.

24   Q.  This is one of the click-throughs or whatever.

25   A.  Yes.

1          MR. KAMARAJU:  The defense would offer DX 60601.  Same

2     basis as the last document, your Honor.

3          MR. FINKEL:  I think we're approaching a point that

4     your Honor has ruled on previously.  If we could be heard at

5     sidebar.  Or not.  The government objects.

6          THE COURT:  Are you asking for the limiting

7     instruction?

8          MR. FINKEL:  No.  This is different, your Honor.

9     But——

10          THE COURT:  If you would please give me a hard copy of

11     what you're referring to.

12          What I'm referring to is the hard copy of the document

13     you're seeking to admit.

14          MR. FINKEL:  Oh, that's the defense.

15          MR. KAMARAJU:  Do we have a copy?

16          I can move on or we can come back to it, your Honor.

17          THE COURT:  Okay.

18     BY MR. KAMARAJU:

19     Q.  Now as part of your work at G|CLUBS, you helped with

20     marketing of the company's products, right?

21     A.  Could you say that again.

22     Q.  Sure.  You helped design the marketing of the company's

23     products, right?

24     A.  What do you mean by the products?  The marketing products?

25     Q.  I just mean the services or the benefits that G|CLUBS was

1    selling.

2    A.  The benefits, yes.

3    Q.  You were VP of marketing when you first got there, right?

4    A.  Yes.

5    Q.  And that continued while you were——when you became interim

6    CEO, right?

7    A.  At some point there was a team.

8    Q.  Okay.  Let's talk about that team.  At what point did that

9    team come in?

10   A.  Throughout——throughout time.

11   Q.  Okay.  And about how large was that team by the time you

12   left?

13   A.  Best of my recollection, around 14 employees.

14   Q.  Okay.  Were those all marketing people?

15   A.  No.

16   Q.  Okay.  So how large was the marketing staff itself?

17   A.  It changed through time.  The marketing itself, roughly

18   around three.

19   Q.  Okay.  And what were their responsibilities?

20   A.  Different responsibilities throughout time.  Redesign of

21   the website; designing of gift boxes that we did; reaching out

22   to partners, potential partners; design of communication

23   emails.

24   Q.  Okay.  Let's start with the website.  You never spoke with

25   Mr. Guo about the website content, right?

1    A.  Not that I recall.

2    Q.  Okay.  And you mentioned I think it was communications

3    emails; is that what you said at the end there?

4    A.  Yes, emails.

5    Q.  So those are communications to the members, right?

6    A.  Yes.

7    Q.  You never spoke with Mr. Guo about what went in those

8    either, right?

9    A.  Not that I recall.

10   Q.  Okay.  And there was a newsletter that went out to G|CLUBS

11   members, right?

12   A.  Those emails were communicated.

13   Q.  So there were emails where you communicated with them.

14   A.  Yes.

15   Q.  You never asked Mr. Guo for his views on the content of

16   those, right?

17   A.  Not that I recall.

18   Q.  Okay.  Now in terms of what was described on the website,

19   that was up to you and the marketing team, right?

20   A.  That depends, 'cause there are different phases.  When

21   specifically?

22   Q.  Okay.  All the things that Mr. Finkel asked you about

23   yesterday.

24   A.  I don't remember all.  Could you—

25   Q.  Any of them.

1   A.  Any of the things that——

2   Q.  That Mr. Finkel asked you about yesterday.  Did you bear

3   responsibility for any of that content?

4   A.  Of the website.

5   Q.  Mm-hmm.

6   A.  Sorry.  The question is if I created the content?

7   Q.  Were you responsible for any of the content that Mr. Finkel

8   asked you about yesterday?

9   A.  The marketing team and I, yes.

10  Q.  Okay.  And you did that totally independent of Mr. Guo,

11  right?

12  A.  We did not ask him.

13  Q.  Okay.  So when you described things on the website, that

14  was the result of your work with the marketing team, right?

15  A.  Yes.

16  Q.  Okay.  And when you communicated with members, that was

17  G|CLUBS' employees' work, right?

18          MR. FINKEL:  Object to the form.

19          MR. KAMARAJU:  Okay.  Withdrawn.

20  Q.  There were G|CLUBS employees responsible for putting

21  together the emails that went out to the members, right?

22  A.  There were different components puts in all the emails,

23  what went out.

24  Q.  I'm sorry.  I couldn't hear you.

25  A.  There were different components in order to put out an

1   email.

2   Q.  Okay.  And those components are comprised of G|CLUBS

3   employees; is that right?

4   A.  Some of them, yes.

5   Q.  Okay.  And there are others, right?

6   A.  Yes.

7   Q.  Okay.  Who were the others?

8   A.  Copywriters.

9   Q.  Are the copywriters not G|CLUBS employees?

10  A.  Outsourced.

11  Q.  Okay.  So there was a third party that was working on that,

12  right?

13  A.  Some of them, yes.

14  Q.  And the same thing is actually true of the sweepstakes too,

15  right?

16  A.  What do you mean?

17  Q.  The sweepstakes were administered by third parties, right?

18  A.  The selection of the sweepstakes winner, yes.

19  Q.  And that third-party sweepstakes administrator, that's a

20  company that you picked, right?

21  A.  There are two, two events.  The first one, I did not pick

22  it; the second one, it was a review amongst the legal team and

23  myself.

24  Q.  Okay.  Not Ms. Wang, right?

25  A.  I'm sorry?

1   Q.  Not Ms. Wang, right?

2   A.  On the second event, no.

3   Q.  Okay.  And not Mr. Guo, right?

4   A.  Not that I was made aware of.

5   Q.  Okay.  Mr. Guo never spoke to you about a particular

6   sweepstakes winner at all, right?

7   A.  A particular?

8   Q.  Well, let me try it this way.  Mr. Guo never came to you

9   and said, make sure this person wins the sweepstakes, right?

10  A.  No.

11  Q.  He never came to you and said, make sure this person

12  doesn't get their sweepstakes prize, right?

13  A.  No.

14  Q.  He never came to you and said, make sure this person gets a

15  refund, right?

16  A.  No.

17  Q.  He never came to you and said, make sure this person

18  doesn't get a refund, right?

19  A.  No.

20  Q.  He never came to you and said, this person's a CCP spy so

21  make sure they don't get anything, right?

22  A.  No.

23  Q.  In fact, you did not communicate with Mr. Guo very often,

24  did you?

25  A.  I communicated with Mr. Guo a fair amount of times.

O6I1GUO4                          Reyes - Cross

1   Q.  And yet in all those times, he never said any of that to

2   you, right?

3   A.  Not that I recall, no.

4   Q.  And Mr. Guo never told you what benefits you needed to

5   offer, right?

6   A.  Not that I recall.

7   Q.  Okay.  So he didn't dispatch you to London, right?

8   A.  No.

9   Q.  He didn't tell you to go look for this property or that

10  property, right?

11  A.  No.

12  Q.  He never told you, go buy me a Bugatti, right?

13  A.  No.

14  Q.  He never said, go buy me a Lamborghini, right?

15  A.  No.

16  Q.  He never said, go buy me a Ferrari, right?

17  A.  No.

18  Q.  He never said, go buy me a camper van, right?

19  A.  No.

20  Q.  He never said, go buy me a boat that has a hole in it, did

21  he?

22  A.  No.

23  Q.  Mr. Guo never asked you for a single benefit through

24  G|CLUBS, correct?

25  A.  Not that I recall.

O6I1GUO4                          Reyes - Cross

1   Q.  Now you testified on direct that there was an effort at one

2   point to take Mr. Guo's image off of the website, right?

3   A.  Yes.

4   Q.  And that was because banks had difficulty with the

5   association between G|CLUBS and Mr. Guo, correct?  That was

6   your understanding?

7           MR. FINKEL:  Objection.

8           THE COURT:  Sustained.

9   Q.  Okay.  Did you have an understanding of why Mr. Guo's image

10  needed to come off the website?

11  A.  I was told that it was making it difficult for banking

12  relationship that Mr. He was doing.

13  Q.  So at the time your understanding was it was difficult with

14  banking relationships?

15          MR. FINKEL:  Objection.  Misstates the witness's

16  testimony.

17          THE COURT:  Sustained.

18  Q.  Okay.  So at the time what was your understanding?

19          MR. FINKEL:  Objection.  Asked and answered.

20          THE COURT:  Sustained.  Asked and answered.

21  Q.  Okay.  Now at the same time when you took Mr. Guo off the

22  website, he was still very publicly associated with the

23  company, right?

24  A.  What do you mean by publicly?

25  Q.  He spoke——he spoke at the G Talk summit, right?

1    A.  Yes.

2    Q.  He made videos, right?

3    A.  The one that I saw.

4    Q.  If you wanted to find out that there was a connection

5    between Mr. Guo and G|CLUBS, you could do it, right?

6              MR. FINKEL:  Objection.

7              THE COURT:  Overruled.  You may answer.

8    A.  Could you repeat the question.

9              MR. KAMARAJU:  I'm sorry.  Could we read it back,

10   please.  I don't think I could do it again.

11             (Record read)

12   A.  What do you mean by "connection"?

13   Q.  What's your understanding of the word "connection"?

14   A.  Something tied.

15   Q.  Okay.  So using that, using that definition, your

16   understanding of that phrase, can you answer my question from

17   before.

18   A.  If it was tied or related to G|CLUBS?  Yes.

19             MR. KAMARAJU:  Okay.  Could we pull up Government

20   Exhibit GC431, please, which is in evidence.

21             And we'll pull it up for the jury, please.

22   Q.  Okay.  So do you remember this document?

23   A.  Yes.

24   Q.  Okay.  And it's an email from you to Mr. He, correct?

25   A.  Correct.

1    Q.   And it's from June 9, 2021, correct?

2    A.   Correct.

3    Q.   And it's attaching something called the Business Alliance

4    Presentation, right?

5    A.   G|CLUBS Alliance presentation, yes.

6    Q.   What is that presentation?

7    A.   It's a presentation that talked about——it was a

8    presentation made for one of the Alliances that we reached out

9    to.

10   Q.   Okay.  And for the jury's benefit, can you tell us what you

11   mean by the Alliances.

12   A.   Yes.  This was the hotel chain, L&R Properties, that was

13   created for it.

14   Q.   Okay.  So you were preparing this to submit to the L&R

15   chain; is that right?

16   A.   This was a presentation to present to the L&R people.

17   Q.   Okay.  And I believe you testified on direct that

18   that——there was a man named Mr. Ian who was in connection with

19   that company; is that right?

20   A.   Correct.

21   Q.   What's his last name?

22   A.   I don't remember.

23   Q.   Okay.  Robinson, by any chance?

24   A.   I don't recall.  It doesn't sound——

25   Q.   Okay.  And what was the purpose of sending or designing

1    this presentation?

2    A.   It was a request from Mr. He.

3    Q.   Okay.  And this is the presentation that he asked you to

4    remove Mr. Guo from, right?

5    A.   Best of my recollection, yes.

6    Q.   Okay.  And would you describe L&R as a potential partner?

7    Is that the—I just want to use the right word.  Is that the

8    way you described them?

9    A.   Yes.

10   Q.   Okay.  And G|CLUBS had other partners that they were trying

11   to develop relationships with, right?

12   A.   Correct.

13   Q.   Okay.  And at one point G|CLUBS had a partnership with the

14   US Tennis Association, correct?

15   A.   US Open.

16   Q.   Yes.  Yes.

17   A.   Yeah.

18   Q.   Now was that association terminated?

19   A.   The agreement?

20   Q.   Yes.

21   A.   It—it never happened.

22   Q.   Okay.  Do you have an understanding of why it didn't

23   happen?

24              MR. FINKEL:  Objection.

25              THE COURT:  You may answer.

A.  We received an email; there was some difficulties with the
banks, and the payment.

            MR. KAMARAJU:  Okay.  Can we go down to page 6 of
this, please.

            All right.  Could we just blow up the text there.

Q.  Do you see where it says Target Market?

A.  Yes.

Q.  Okay.  And can you just read what it says under that, that
first sentence.

A.  "High net worth Chinese individuals/families, though
membership is available to everyone."

Q.  Okay.  And then can you keep going to read the rest of it.

A.  "Marketing strategies are undertaken by leveraging the
reach and impact of key spokespeople, strategic partners,
influencers and well-connected individuals in these Chinese
communities."

Q.  So what did you mean when you wrote "leveraging the reach
and impact of key spokespeople, strategic partners, influencers
and well connected individuals in these Chinese communities"?

            MR. FINKEL:  Objection.  I don't think the witness
stated that she wrote that.

            THE COURT:  You need to first ask whether she wrote
it.

Q.  Did you write it?

A.  I don't recall writing it.

O6I1GUO4                        Reyes - Cross

1   Q.  Okay.  Do you know who wrote it?

2   A.  I'm not exactly sure.

3   Q.  All right.  When you sent this to Mr. He, did you review it

4   before sending it?

5   A.  I believe I did.

6   Q.  I'm sorry?

7   A.  I believe I did.

8   Q.  Okay.  Did you make any changes to it?

9   A.  There were changes made to the different versions.

10  Q.  Okay.  Did you suggest any changes?

11  A.  Not that I recall.

12  Q.  Okay.  Was it important to you in sending this to your boss

13  that it was well done?

14  A.  Yes.

15  Q.  Okay.  If there had been mistakes in the presentation, you

16  would have fixed them, right?

17          MR. FINKEL:  Objection.

18          THE COURT:  You may answer.

19  A.  If requested to do changes, I would have done it.

20  Q.  Okay.  But you were communicating directly with Mr. He

21  about it, right?

22  A.  Correct.

23  Q.  And I think you testified on direct that he could be pretty

24  abrasive, right?

25  A.  What do you mean abrasive?

O6I1GUO4                          Reyes - Cross

1    Q.  He could be harsh.

2    A.  In instances.

3    Q.  Sure.  From time to time, right?

4    A.  There were some instances.

5    Q.  Okay.  When he was dissatisfied with something that was

6    happening, right?

7    A.  There were instances, yes.

8    Q.  Now did you have an understanding of what this phrase

9    means?

10   A.  I'm not exactly sure.

11   Q.  So you sent it to Mr. He without knowing what it meant?

12   A.  I don't recall.

13   Q.  You don't recall if you sent it to him or——

14   A.  No, no, no.  I recall sending it to him.

15   Q.  Okay.

16   A.  I don't recall at the time——

17          MR. KAMARAJU:  Okay.  Let's look at page 15 of the

18   presentation.

19          And can we blow that up.

20   Q.  Could you read what that says at the top.

21   A.  Physical Clubs.

22   Q.  Okay.  And can you read the first sentence, please.

23   A.  "G|CLUBS anticipates establishing its first club

24   headquarters in Puerto Rico, with plans to develop physical

25   clubs around the world."

1  Q.  Okay.  Could you read the next one.

2  A.  Members will enjoy club benefits and amenities, including

3  guest rooms, conferences, ballrooms, restaurants, business

4  centers, spas, and others.

5  Q.  Okay.  Do you have an understanding of what these two

6  paragraphs mean?

7  A.  It's a—the idea of having physical clubs, ideally, in

8  Puerto Rico, and later on, throughout the world.

9  Q.  Okay.  So G|CLUBS was representing itself to its potential

10 partners as planning to have physical clubs, right?

11 A.  Yes.

12 Q.  Okay.  And do you see where it says, "The clubs allow

13 members to safely congregate in luxury with other like-minded

14 individuals or simply spend quality time with their families"?

15 A.  Yes.

16 Q.  Do you understand why it says "safely congregate"?

17 A.  No, I do not.

18 Q.  Now you testified that there weren't G|CLUBS members in

19 Puerto Rico, right?

20 A.  Not that I was aware of.

21 Q.  Okay.  So why would the first club headquarters be in

22 Puerto Rico?

23 A.  The thought process, at least our team, was that our

24 offices were in Puerto Rico and we wanted to make Puerto Rico

25 their home.

O6I1GUO4                          Reyes - Cross

1   Q.  Okay.  So in your understanding, G|CLUBS members would

2   travel from around the world to Puerto Rico to visit this

3   location, right?

4   A.  As one of them.

5   Q.  Okay.  But that was the thought, right?

6   A.  Yes.

7   Q.  And there would be others, right?

8   A.  Ideally, yes.

9   Q.  And you thought about——for example, there was an island

10  that you were looking at buying, right?

11  A.  Yes, there was an island.

12  Q.  Okay.  Now while there weren't G|CLUBS members in Puerto

13  Rico, you knew that there were G|CLUBS members in New York,

14  right?

15  A.  Yes.

16  Q.  And there were G|CLUBS members in London, right?

17  A.  Yes.

18  Q.  And there were G|CLUBS members in other parts of Asia,

19  right?

20  A.  Yes.

21  Q.  And there were G|CLUBS members in Australia, right?

22  A.  Yes.

23  Q.  And there were G|CLUBS members on the West Coast, right?

24  Of America.

25  A.  Yeah, yes.

1    Q.  Right?  There were G|CLUBS members on the East Coast of

2    America, right?

3    A.  Different parts.

4    Q.  Okay.  Just not Puerto Rico, right?

5    A.  Not that I was aware of.

6    Q.  Now you testified that a big part of your job was trying to

7    secure benefits, right?

8    A.  Yes.

9    Q.  Oh, sorry.  Take your time.

10   A.  No, no.  Yes.

11   Q.  And you remember Mr. Finkel asked you questions about the

12   benefits that G Club members received, right?

13   A.  Yes.

14   Q.  And you listed several of them, right?

15   A.  Yes.

16   Q.  There were luxury hotel benefits you had, right?

17   A.  Yes.

18   Q.  That was a benefit that was secured under your leadership

19   at G|CLUBS, right?

20   A.  Yes.

21   Q.  There was a yacht brokerage sort of arrangement, correct?

22   A.  Boating company.

23   Q.  Okay.  Boating company.  That was another benefit that was

24   secured under your leadership, right?

25   A.  Yes.

O6I1GUO4                        Reyes - Cross

1   Q.  There was the Formula One thing that we talked about

2   before, right?

3   A.  Yes.

4   Q.  Another benefit secured under your leadership, right?

5   A.  Yes.

6   Q.  There was the FAO Schwarz event, right?

7   A.  Yes.

8   Q.  That was another benefit that was secured under your

9   leadership, right?

10  A.  Yes.

11  Q.  There was hotel stays in Fiji, right?

12  A.  Yes.

13  Q.  Right?  That was another benefit that was secured under

14  your leadership, right?

15  A.  Yes.

16  Q.  There was also a block of rooms available in Australia,

17  right?

18  A.  There was a stay, yes.

19  Q.  Another benefit, right?

20  A.  Yes.

21  Q.  So those were all benefits that G|CLUBS members had access

22  to while you were working at the company, right?

23  A.  Yes.

24  Q.  And that's in addition to the G Fashion discount that they

25  got, right?

1   A.  Yes.

2   Q.  Now on direct, Mr. Finkel asked you some questions about

3   what G|CLUBS paid to get those benefits.  Do you remember that?

4   A.  Yes.

5   Q.  And you said that G|CLUBS had not actually paid any money

6   to get those benefits, right?

7   A.  Not all of them, some of them.

8   Q.  Okay.  So some of them they paid for and some of them they

9   didn't, right?

10  A.  Yes.

11  Q.  Okay.  So let's talk about the ones that they——well, let me

12  ask you this first.  Withdrawn.

13          Do you remember which ones they paid for?

14  A.  I recall the FAO Schwarz.

15  Q.  Okay.  And for the ones that they didn't pay for, those

16  benefits were offered pursuant to an agreement between G|CLUBS

17  and the partner, right?

18  A.  There were agreements, yes.

19  Q.  There were contracts, right?

20  A.  Right.

21  Q.  And those contracts provided for certain benefits that the

22  partner would receive, right?

23  A.  Well, if——could you——

24  Q.  Let me take a step back.  Let me try it this way, okay?  So

25  as part of those agreements, the partners agreed to give

1    certain——let's just use the discount example——discounts to

2    G|CLUBS members, right?

3    A.  Right.

4    Q.  And in exchange for doing that, the partners got something,

5    right?

6    A.  If it was a hotel, they would get a hotel room night

7    booked.

8    Q.  Sorry.  They would get a hotel night, right?  A hotel room

9    booked, right?

10   A.  Yes.

11   Q.  And other agreements had cross-marketing opportunities,

12   right?

13   A.  I don't remember specifically.

14   Q.  Well, do you remember an agreement with a yacht company?

15   A.  There was a boating company, yes.

16   Q.  Was that YachtLife?

17   A.  I don't remember the name.  Jet Life resonates.

18   Q.  Okay.  And part of your agreement, G|CLUBS' agreement with

19   YachtLife is that G|CLUBS would market YachtLife to its

20   members, right?

21   A.  Could you repeat that.

22   Q.  Sure.  Part of G|CLUBS' agreement with YachtLife was that

23   G|CLUBS would market YachtLife to its members, right?

24   A.  G|CLUBS would promote the benefit to its members.

25   Q.  Okay.  I'm just going to show you what's been marked as

1   Defense Exhibit 20121.

2           MR. KAMARAJU:  And this is just for the witness and

3   the parties.

4           And maybe we can scroll through.

5           Okay.  Maybe we can go to the signature page that we

6   were just on.

7   Q.  Okay.  Do you see a signature line for G|CLUBS Operations?

8   A.  Yes.

9   Q.  Do you recognize that signature?

10  A.  Yes.

11  Q.  Do you recognize what this document is?

12          MR. KAMARAJU:  If you can go back to the first page if

13  you need.

14  A.  The agreement.

15  Q.  Okay.  And the signature that you recognize, whose

16  signature is it?

17  A.  Max Troy.

18  Q.  And who is that?

19  A.  He worked at the partnership.

20  Q.  And I'm sorry.  When you say partnership, he worked at a

21  G|CLUBS partnership?

22  A.  A G|CLUBS——correct.  Apologies.

23  Q.  Okay.  And you said this is the agreement, this is the

24  YachtLife agreement?

25  A.  Yes.

O6I1GUO4                          Reyes - Cross

1          MR. KAMARAJU:  Okay.  The defense would offer

2     DX 20121, please.

3          MR. FINKEL:  No objection.

4          THE COURT:  It is admitted.

5          (Defendant's Exhibit 20121 received in evidence)

6          MR. KAMARAJU:  Okay.  Thank you.

7          And could we publish that.

8          Okay.  So let's blow up paragraph 2 first, please.

9          Oh, sorry.  Before we do that, let's just blow up the

10    top paragraph where it says, "This strategic partner

11    agreement."

12    BY MR. KAMARAJU:

13    Q.  Okay.  Now do you see it says, "Entered into by and between

14    G|CLUBS Operations LLC," and then it says "the Company," right?

15    A.  Yes.

16    Q.  Okay.  So this document uses the Company to refer to

17    G|CLUBS Operations LLC, correct?

18    A.  Yes.

19    Q.  And then it says YachtLife Technologies Inc., and that's

20    referred to as "the Service Provider," right?

21    A.  Correct.

22          MR. KAMARAJU:  Okay.  So now if we could blow up

23    paragraph 2, please.

24    Q.  Okay.  Now can you read 2a, please.

25    A.  "Company shall advertise and market service provider's good

1   and services to its members."

2   Q.  Okay.  So you understand that's G|CLUBS shall advertise and

3   market YachtLife's goods and services to its members, right?

4   A.  Correct.

5   Q.  Okay.  And then let's look at paragraph b.  And you see it

6   says, "Service Provider shall provide to the Company and its

7   eligible members——"and then I'm going to skip the next

8   part——"certain services (collectively, 'the Services') stated

9   as follows and as applicable due to the nature of Service

10  Provider."  Do you see that?

11  A.  Yes.

12  Q.  And then it goes on to the next page, right?

13          THE COURT:  All righty.  We're at 2:30 and so we're

14  going to take our break.

15          Members of the jury, don't discuss the case amongst

16  yourselves or with anyone else.  Don't permit anyone to discuss

17  the case in your presence.  Don't read, listen to, or watch

18  anything from any source that touches on the subject matter of

19  this trial.

20          Ms. Reyes, you may step out.  Don't discuss your

21  testimony.

22          (Jury not present; witness not present)

23          THE COURT:  Please be seated.

24          So during this break I have to attend to another

25  matter and so to the extent that you want to raise something,

```
 1   it will be when we return.

 2               MR. KAMARAJU:  Thank you, your Honor.

 3               (Recess)

 4               (Jury present)

 5               THE COURT:  You may continue your inquiry.

 6               MR. KAMARAJU:  Thank you, your Honor.

 7               I think we had up on the screen DX 2121.

 8   BY MR. KAMARAJU:

 9   Q.  Ms. Reyes, do you have it up on your screen?

10   A.  Yes.

11   Q.  Okay.  Great.

12               MR. KAMARAJU:  Jurors have it?

13   Q.  Okay.  So I think we talked about provision (a) already, so

14   let me just go back to that quickly.

15               So you see services are, "The company shall advertise

16   and market service provider's good and services to its

17   members."  You see that, right?

18               THE COURT:  Mr. Kamaraju, I think that the jury would

19   benefit from just hearing again the parties to this—

20               MR. KAMARAJU:  Hundred percent, your Honor.  Thank

21   you.

22               THE COURT:  ——document.

23               MR. KAMARAJU:  Let me remind them.  So let's blow back

24   out.

25               And let's go to the very first paragraph.
```

O6I1GUO4                          Reyes - Cross

1   BY MR. KAMARAJU:

2   Q.  Okay.  So you see here it says, "This strategic partner

3   agreement," and then it goes on.  I'm going to skip the date.

4   It says, "Entered into by and between G Club Operations LLC."

5   Do you see that?

6   A.  Yes.

7   Q.  Okay.  And that's referred to here as the Company, right?

8   A.  Yes.

9   Q.  Okay.  And YachtLife Technologies Inc. is referred to as

10  the service provider, right?

11  A.  Yes.

12  Q.  Okay.  And together, if you go on to the next sentence, it

13  says "may be referred to as the parties."  You see that?

14  A.  Yes.

15  Q.  Now let's go back to paragraph 2.

16          All right.  So you see this, right?

17  A.  Yes.

18  Q.  Provision (a)?

19  A.  Yes.

20  Q.  Okay.  And you understand that what G|CLUBS is giving under

21  this agreement is advertising and marketing YachtLife's goods

22  and services to G Club members, right?

23  A.  Yes.

24  Q.  Okay.  G|CLUBS is not paying any money to YachtLife under

25  this agreement, right?

```
 1   A.  Correct.
 2   Q.  Okay.  But YachtLife entered into the agreement anyway,
 3   right?
 4   A.  There's an agreement, correct.
 5   Q.  Right.  And YachtLife signed it.
 6   A.  Yes.
 7   Q.  Okay.  And that's YachtLife's decision to do, right?
 8   A.  Yes.
 9   Q.  And you're not aware of any connection between YachtLife
10   and Mr. Guo, right?
11   A.  Not that I'm aware.
12           MR. KAMARAJU:  Okay.  We can take that down.
13           I'd like to put up just for the witness, the Court and
14   the parties DX 20235.
15           Okay.  Maybe we can just blow up the top first.
16           Okay.  And maybe we can scroll through this for
17   Ms. Reyes.
18           Keep going towards the signature page, please.
19   BY MR. KAMARAJU:
20   Q.  Okay.  Do you see the signature line there?
21   A.  Yes.
22   Q.  Okay.  Who signed it on behalf of G|CLUBS Operations?
23   A.  I did.
24   Q.  Okay.  And what company is this with?  Sorry.  Withdrawn.
25   That's a bad question.
```

1           Who's the counterparty to this agreement other than

2     G|CLUBS?  Who's the contract with?

3     A.   Luxury Cruise Connections.

4     Q.   Okay.  And this was a contract for an additional set of

5     benefits for G|CLUBS members; is that right?

6     A.   It was contract for a partner, correct.

7               MR. KAMARAJU:  Okay.  So the defense offers DX 20235.

8               MR. FINKEL:  No objection.

9               THE COURT:  It is admitted.

10              (Defendant's Exhibit 20235 received in evidence)

11              MR. KAMARAJU:  Okay.  So let's publish for the jury,

12    please.

13    BY MR. KAMARAJU:

14    Q.   Okay.  And do you see the first WHEREAS clause, under

15    Recitals?

16              MR. KAMARAJU:  If you can blow that up.

17    A.   Yes.

18    Q.   Okay.  Could you read that.

19    A.   "G|CLUBS is a luxury membership service with access to

20    events, concierge services, benefits and special pricing for

21    its members."

22    Q.   And when you signed this agreement, you believed that

23    statement to be true, right?

24    A.   Yes.

25    Q.   Okay.  Now the next WHEREAS clause, now this says company,

O6I1GUO4                          Reyes - Cross

 1  so this is referring to the company as Luxury Cruise

 2  Connection, right?

 3  A.  Yes.

 4  Q.  Okay.  What does Luxury Cruise Connection do?

 5  A.  I don't recall specifically.

 6  Q.  Okay.  Do you recall whether it has anything to do with a

 7  cruise line?

 8  A.  I do recall there was an—they were working on a cruise

 9  line.  I just don't know specifically.

10  Q.  Okay.  And so what was your understanding of what G|CLUBS

11  members were going to get through this contract?

12  A.  I'm not exactly sure.  Could we look into it.

13          THE COURT:  So I need for you to speak into the

14  microphone.

15          MR. KAMARAJU:  Okay.  Let's go zoom out to the larger

16  agreement, please.

17          All right.  So let's just look at 1(a), under Scope of

18  Agreement.

19  BY MR. KAMARAJU:

20  Q.  Okay.  And you see it says company, and that's Luxury

21  Cruise Connections, right?

22  A.  Yes.

23  Q.  Okay.  And it agrees to provide members—that's G|CLUBS

24  members, right?

25  A.  Correct.

1  Q.  Okay.  With services and preferred terms set forth in

2  Attachment A.  Right?

3  A.  Yes.

4         MR. KAMARAJU:  Okay.  And let's take that down.  Let's

5  go to the next paragraph.

6  Q.  Okay.  And again, it says company, and that's, again,

7  Luxury Cruise, right?

8  A.  Yes.

9  Q.  All right.  And could you read that.

10 A.  "Company will provide G|CLUBS with a code or other means in

11 which members can request company's preferred terms regarding

12 the serviced listed in Attachment A."

13 Q.  Okay.  And you remember yesterday on direct Mr. Finkel

14 asked you a number of questions about how G|CLUBS members could

15 access certain benefits, right?

16 A.  Yes.

17 Q.  And you talked about how they could access certain benefits

18 by visiting the website, right?  Or a website?  Sorry.

19 A.  Yes.

20 Q.  Right?  Like a hotel website, for example?

21 A.  Correct.

22 Q.  Right?  And they would put in a code, right, to access

23 their benefits?

24 A.  Depending on, but some of them had a code, yes.

25 Q.  Okay.  Just like what's referred to in this paragraph,

```
 1   right?
 2   A.  Yes.
 3           MR. KAMARAJU:  Okay.  Let's look at the next
 4   paragraph.
 5   Q.  Could you read that, please.
 6   A.  "All services offered by company under this agreement will
 7   be sold to the members directly by company."
 8   Q.  Okay.  So you understand that to mean that Luxury Cruise
 9   will market directly to the G|CLUBS members, right?
10   A.  The services will be offered to the members directly by
11   Luxury Cruise.
12   Q.  Okay.  So that it's not going to go through G|CLUBS, right?
13   A.  Correct.
14           MR. KAMARAJU:  Okay.  Let's keep scrolling down to the
15   next page, please.
16           Okay.  Just let's blow up 3(a).
17   Q.  Do you see that?
18   A.  Yes.
19   Q.  Okay.  So what's your understanding of this provision?
20   A.  I'm going to read it.
21           That G|CLUBS is responsible for marketing to its
22   members, the services offered by cruise.
23   Q.  Luxury Cruise?
24   A.  Thank you.  Luxury Cruise.
25           MR. KAMARAJU:  All right.  We could take that down for
```

1    now.

2            And I'd like to pull up what's been marked for

3    identification as DX 20234.

4            Okay.  And if we can just scroll through that for

5    Ms. Reyes.

6    BY MR. KAMARAJU:

7    Q.  Okay.  Do you see a signature there on that page we were

8    just on?

9    A.  Yes.

10   Q.  Okay.  And who signs for G|CLUBS?

11   A.  I do.

12   Q.  Okay.  And let's go back to the top paragraph, please.  And

13   do you see at the top it says Condado Vanderbilt?

14   A.  Yes.

15   Q.  Is this a partnership with Condado Vanderbilt Hotel?

16   A.  Yes.

17           MR. KAMARAJU:  The defense offers DX 20234.

18           MR. FINKEL:  No objection.

19           THE COURT:  It is admitted.

20           (Defendant's Exhibit 20234 received in evidence)

21           MR. KAMARAJU:  Okay.  So could we publish to the jury.

22           Okay.  Put it up on the screen.

23   Q.  Now the Condado Vanderbilt is located in San Juan, right?

24   A.  Correct.

25   Q.  It's a luxury hotel in that city?

O6I1GUO4                          Reyes - Cross

1    A.  Yes.

2    Q.  And is it fair to say—or withdrawn.

3         Is it your understanding that San Juan has a pretty

4    vibrant tourist industry?

5    A.  Yes.

6    Q.  People come to visit Puerto Rico, right?

7    A.  Yes, they do.

8    Q.  Particularly in the winter?

9    A.  Any time of the year.

10   Q.  Okay.  And G|CLUBS, when you joined G|CLUBS in December of

11   2020, the COVID pandemic was still going on, correct?

12   A.  Yes.

13   Q.  And that made it difficult to secure travel benefits for

14   G|CLUBS, right?

15   A.  Yes.

16   Q.  Okay.  Because people weren't traveling as much anymore,

17   right?

18   A.  During that time, no.

19   Q.  Right.  Now under this agreement, if we can just bold—do

20   you see where it says "G|CLUBS will be honored"?  Do you see

21   that?

22   A.  Yes.

23   Q.  Okay.  Could you just read that first sentence.

24   A.  "G|CLUBS will be honored a 15 percent off our best

25   available rate as promoted on our hotel website with all

Reyes - Cross

1   corporate amenities included."

2   Q.  Okay.  And could you go on to read the next sentence,

3   please.

4   A.  This discounted rate will be honored for all room

5   categories.

6   Q.  Okay.  So you understand that to mean whatever kind of room

7   at the Condado, they will receive a discount, right?

8   A.  Correct.

9   Q.  And that's available specifically to G|CLUBS members under

10  this agreement, right?

11  A.  Correct.

12  Q.  Do you know how much a room runs at the Condado?

13  A.  It depends on the season.

14  Q.  Fair enough.  How about peak season?

15  A.  I'm not exactly sure, but I've seen a little bit over 500.

16          MR. KAMARAJU:  Now we can take out the blowout for a

17  second.

18          Now can we look at the—scroll down to the signature.

19  Q.  Okay.  Do you see the date you signed this?

20  A.  Yes.

21  Q.  January 16, 2023, correct?

22  A.  Yes.

23  Q.  That's months after G|CLUBS got the subpoena, correct?

24  A.  Yes.

25  Q.  And that's months after there was a seizure of G|CLUBS'

O6I1GUO4                          Reyes - Cross

1   accounts, correct?

2   A.  Yes.

3   Q.  So despite those events, you continued trying to secure

4   benefits for G|CLUBS members, right?

5   A.  Yes.

6   Q.  In fact, you tried to secure benefits for G|CLUBS members

7   throughout your time at the company, correct?

8   A.  Yes.

9   Q.  It was your job, right?

10  A.  Part of my job, yes.

11  Q.  Okay.  And you remember Mr. Finkel asked you a number of

12  questions about the G|CLUBS website on direct?  Do you remember

13  that?

14  A.  Yes.

15  Q.  And he took you through the website and he said, did

16  G|CLUBS offer this service, right?  Do you remember that?

17  A.  Yes.

18  Q.  And you responded not at that time, right?

19  A.  Yes.

20  Q.  And in one instance you responded, we were working on it

21  but we didn't have it yet, right?

22  A.  Yes.

23  Q.  Because G|CLUBS was an evolving company, right?

24  A.  Yes.

25  Q.  You were building, right?

1    A.  Correct.

2    Q.  And you had started during the pandemic, right, at least

3    when you joined?

4    A.  Yes.

5    Q.  And you were open about that with people, right?

6    A.  What do you mean by open?

7    Q.  Well, you weren't telling vendors that we're a fully formed

8    company with all of our benefits put together, right?

9    A.  No.

10   Q.  And you weren't telling prospective members that, right?

11   A.  I don't believe I was telling prospective members——

12            THE COURT:  Okay.

13   A.  ——anything.

14            THE COURT:  I need for you to get really close to that

15   microphone because it's sounding like a whisper.

16            THE WITNESS:  Sorry.

17   A.  Can you repeat it, please.

18            MR. KAMARAJU:  All right.  I'm going to trouble the

19   court reporter, if she doesn't mind, to read it back, please.

20            THE COURT:  Go ahead.

21            (Record read)

22   Q.  Anything, right?  That was the answer?

23   A.  On that——on the COVID.

24   Q.  Oh, yes.  Sorry.  I wasn't asking about COVID specifically.

25   I was saying:  You weren't telling prospective members that all

O6I1GUO4                          Reyes - Cross

1  of G|CLUBS benefits were available right up at the front,

2  right?  That was not part of G|CLUBS marketing, right?

3            MR. FINKEL:  Objection.  Compound, form.

4            THE COURT:  I'm going to permit the question.

5  A.  There were ongoing benefits.

6  Q.  Right.  Additional benefits would be added down the line,

7  right?

8  A.  Over time, yes.

9  Q.  Okay.  So there were some benefits to start, right?

10  A.  Correct.

11  Q.  And when you joined, that included the G Fashion discount,

12  right?

13            MR. FINKEL:  Asked and answered.

14            THE COURT:  You may answer.

15  A.  Yes, that was already in place.

16  Q.  Okay.  And then during your time as CEO you added

17  additional benefits, right?

18  A.  Correct.

19  Q.  And then you were seeking even more benefits, right?

20  A.  Correct.

21  Q.  'Cause that was your job.

22  A.  It was part of my job, yes.

23  Q.  Now among the benefits that you were looking for potential

24  G Club members, you were looking for immigration services,

25  right?

1   A.  I do not recall looking for that.

2           MR. KAMARAJU:  Okay.  Just for the witness——I'd like

3   to see if I can help you——can we just pull up for her DX 34063.

4           I'm sorry.  Actually, can we do DX 34064.  My

5   apologies.  This is just for the witness and the parties and

6   the Court.

7   BY MR. KAMARAJU:

8   Q.  All right.  Can you take a look at that.

9           Okay.  And just let me know when you're ready.

10  A.  I read it.

11  Q.  Okay.  So don't read anything off the document out loud.

12  My question is solely:  Does looking at this document refresh

13  your recollection as to whether G|CLUBS was looking into a

14  potential immigration services for its members?

15  A.  I do not recall this document.

16          MR. KAMARAJU:  Okay.  We can take it down then.

17  Q.  Do you remember looking for a bespoke luxury travel service

18  through something called Internova?

19  A.  No, I do not recall that name.

20  Q.  Okay.  How about looking for concierge services through a

21  company called Bold Luxury?

22  A.  I do recall concierge service.  I don't really know the

23  name, but I do recall that.

24          MR. KAMARAJU:  Okay.  Can we just show the witness,

25  the Court, and the parties DX 31571.

1    Q.  If you can just take a look at that for yourself.

2    A.  Yeah.

3           MR. KAMARAJU:  And if we can scroll through it for

4    Ms. Reyes.

5    A.  Would you mind scrolling to the bottom?

6    Q.  Of course.  Let's keep going.

7    A.  Yes.

8    Q.  Okay.  Does this refresh your recollection as to whether

9    that company was called Bold Luxury?

10   A.  Bold Luxury was a company for travel and transportation

11   services.

12   Q.  Okay.  And that was a company that G|CLUBS was seeking a

13   partnership with, right?

14   A.  Correct.

15   Q.  Okay.  Now as part of your responsibilities as a CEO, did

16   you prepare a business plan to send to banks?

17   A.  Not that I recall.

18   Q.  Okay.  Did you revise a business plan that was going to be

19   sent to banks?

20   A.  Not that I recall.

21   Q.  Do you recall ever revising a G|CLUBS business plan for any

22   purpose?

23   A.  Yes, I believe so.

24   Q.  Okay.  So you remember doing so?

25   A.  Best of my recollection, there was a business plan created,

1      yes.

2                  MR. KAMARAJU:  Okay.  Could we pull up for the witness

3      and the parties and the Court DX 60604, please.

4      Q.  Do you recognize this?

5      A.  Could you scroll.

6      Q.  Of course.  Please.  Take your time.

7                  Do you recognize this document, Ms. Reyes?

8      A.  Yes, I recall it.

9      Q.  What is it?

10     A.  The business plan.

11     Q.  Okay.  And you were involved in revising this business

12     plan?

13     A.  Me and other people, yes.

14     Q.  Sure.  Not just you; you were one of the people who

15     commented on it, right?

16     A.  To review it, yes.

17     Q.  Okay.  And this is a draft?

18     A.  Looks like a draft, yes.

19                 MR. KAMARAJU:  Okay.  The defense would offer

20     DX 60604.

21                 MR. FINKEL:  May I inquire.

22                 THE COURT:  You may.

23     VOIR DIRE EXAMINATION

24     BY MR. FINKEL:

25     Q.  Ms. Reyes, do you know if this draft was sent out, this

O6I1GUO4                         Reyes - Cross

1   version?

2   A.  I'm not sure.

3           MR. FINKEL:  Objection.  Hearsay.  And relevance.

4           THE COURT:  Are you offering it to show that there was

5   a draft?

6           MR. KAMARAJU:  Yeah, just that they were discussing it

7   internally; that's all.

8           THE COURT:  Do you recognize the document?

9           THE WITNESS:  I recognize the document, the format of

10  it.

11          MR. FINKEL:  We object to it for that purpose as well,

12  internal discussion.

13          THE COURT:  Overruled.  You may ask your question.

14          MR. KAMARAJU:  Thank you, your Honor.  Can I publish

15  it to the jury?

16          THE COURT:  Yes.

17          (Defendant's Exhibit 60604 received in evidence)

18          MR. KAMARAJU:  Okay.  Thank you.  Can we publish it to

19  the jury, please.

20  BY MR. KAMARAJU:

21  Q.  Okay.  Now, Ms. Reyes, you testified that a number of

22  different people commented on this, correct?

23  A.  It wasn't just me that reviewed this document.

24  Q.  Sure.  Do you remember who else within the company reviewed

25  it?

O6I1GUO4                          Reyes - Cross

1    A.  Legal.

2    Q.  Okay.  I'm not going to ask you about any of the

3    discussions with legal.  Do you remember if there was anybody

4    other than legal who reviewed it?

5    A.  I don't recall at the time.

6              MR. KAMARAJU:  Okay.  Can we scroll down, please.

7              Keep going.

8              Keep going.

9    Q.  All right.  Do you see under Proposed Future Benefits,

10   subsection B?

11   A.  Yes.

12   Q.  Can you look at 1.

13   A.  Yes.

14   Q.  Okay.  What's 1?

15   A.  Multi membership.

16   Q.  Okay.  And can you just read that.

17   A.  "We foresee a member would purchase multiple memberships

18   for access to multiple benefits and inheritance reasons.

19   Exclusive benefits for our multi members may include the

20   ability to have multiple participations in events like the

21   summits and talks, as well as promotions offered in those

22   events."

23   Q.  And what was the purpose of developing a business plan at

24   this time?

25   A.  I'm not sure at the time, but I do recall the business plan

1    was part of the requirements for the tax incentive decree.

2    Q.  Okay.  Can you just explain to the jury what tax incentive

3    decree you're talking about.

4    A.  It's the Act 60 tax incentive.

5    Q.  Okay.  Without getting into too many particulars, that's a

6    Puerto Rican law of some sort?

7    A.  It's a Puerto Rican tax incentive.

8    Q.  And it creates certain kinds of tax incentives for certain

9    kinds of businesses in Puerto Rico?

10   A.  I'm not exactly sure how it specifically incorporates the

11   tax incentive.

12   Q.  But G|CLUBS was benefiting from that incentive, right?

13   A.  Correct.

14   Q.  Okay.  And can you explain to us how this document

15   connected to the G|CLUBS receiving the tax incentive.

16   Withdrawn.

17            Let me pull it back from this document.

18            Why was G|CLUBS creating a business plan in connection

19   with the tax incentive?

20   A.  To the best of my recollection, it was a requirement.

21   Q.  Okay.

22            THE COURT:  Are you saying that it was a requirement

23   in order to qualify for the benefit?

24            THE WITNESS:  In order to submit—correct, to apply

25   for the Act 60 benefit.

O6I1GUO4                          Reyes - Cross

1    Q.  Okay.  And to your knowledge did G|CLUBS submit for that

2    benefit?

3    A.  Yes.

4    Q.  Okay.  Now did you submit an application to a Puerto Rican

5    governmental entity to get that benefit?  Not you, G|CLUBS, I

6    mean.

7    A.  It's a Puerto Rican entity, correct.

8    Q.  Okay.  Do you know who gets the application?

9    A.  Can I say it in Spanish, the name of the agency?

10   Q.  It's up to your Honor.  I don't know if that——

11           THE COURT:  You can say it.  Go ahead.

12   A.  Departamento de Desarollo Economico y Comercio.  So

13   Department of Economic——

14   Q.  Just whatever you remember is fine.  It's a Puerto Rican

15   governmental department of some sort?

16   A.  Yes.

17   Q.  Okay.  Can we now go to, in the same Proposed Future

18   Benefits section, No. 5.

19           Okay.  Do you see this?

20   A.  Yes.

21   Q.  All right.  So this is, again, a discussion about physical

22   clubs, correct?

23   A.  Yes.

24   Q.  And this is what was being discussed within G|CLUBS, right?

25   A.  Correct.

O6I1GUO4                         Reyes - Cross

1  Q.  Okay.  Do you see where it says, "Our members will be able

2  to enjoy the benefits and amenities of the club including," and

3  then it lists a number of things, and then it says, "allowing

4  them to securely congregate in luxury with other like-minded

5  individuals."  Do you see that?

6  A.  Yes.

7  Q.  What's your understanding of the phrase "allowing them to

8  securely congregate in luxury with other like-minded

9  individuals"?

10 A.  For them to meet in luxury, like in high end, with other

11 like-minded people.

12 Q.  And what about the phrase "securely"?

13 A.  Not exactly sure.  Secure.

14 Q.  Sorry.  I didn't hear you.

15 A.  I'm not exactly sure what does it mean specifically.  It's

16 a—like a safe place?

17 Q.  Okay.  Now you understood this was going to a government

18 department of some sort, right?

19 A.  Yes.

20 Q.  And it was to enjoy some kind of benefit, right?

21 A.  Correct.

22 Q.  It was important for this to be accurate, right?

23 A.  Yes.

24 Q.  Okay.  Now you testified—

25          MR. KAMARAJU:  We can take that down.

1              You testified about a trip that you took to London,

2     England.  Do you remember that?

3     A.  Yes.

4     Q.  Were there two trips to London or just one?

5     A.  Just one.

6     Q.  Okay.  And while you were in London, you toured a castle in

7     the English countryside, right?

8     A.  There were two hotels.

9     Q.  Okay.  Two hotels.  All right.  And you were touring them

10    in your capacity as G|CLUBS CEO, right?

11    A.  Correct.

12    Q.  All right.  It wasn't a personal trip to go see them,

13    right?

14    A.  No.

15              MR. KAMARAJU:  Okay.  Could we show the witness and

16    the parties DX 60595.

17    Q.  Is this a photograph of one of the hotels that you toured?

18    A.  Yes.

19    Q.  Is it a fair and accurate depiction of one of the hotels?

20    A.  I'm sorry?

21    Q.  Is it a fair and accurate depiction of that hotel?  Does it

22    look like the hotel that you toured?

23    A.  Yes.

24              MR. KAMARAJU:  Okay.  The defense offers DX 60595.

25              MR. FINKEL:  No objection.

O6I1GUO4                          Reyes - Cross

1                    THE COURT:  It is admitted.

2                    (Defendant's Exhibit 60595 received in evidence)

3                    MR. KAMARAJU:  Could we publish it, please.

4    Q.  All right.  So do you remember what the name of this place

5    was?

6    A.  I'm not exactly sure.  Glutenten [ph] or something like

7    that if I'm not mistaken.

8    Q.  All right.  But it's a luxury hotel, right?

9    A.  Yes.

10   Q.  And the idea was that it could be rented out for G|CLUBS

11   members, right?

12   A.  It could be offered as a benefit, for members.

13   Q.  And specifically for G|CLUBS members, right?

14   A.  Correct.

15   Q.  And there were a number of G|CLUBS members who lived in

16   Europe, right?

17   A.  Yes.

18   Q.  Okay.  So this might be convenient for them, right?

19   A.  Would be a benefit for them.

20   Q.  Sure.  Now you said there were two properties you looked

21   at, right?

22   A.  Yes.

23   Q.  Okay.  Well, before we go to that one, did you actually

24   tour this hotel?

25   A.  Yes.

1   Q.  Was it pretty luxurious?

2   A.  Pretty nice, yes.

3   Q.  Pretty big?

4   A.  Yes.

5   Q.  Do you remember how much a room cost at that hotel?

6   A.  No.  I don't remember specifically.

7   Q.  Okay.  Do you remember if it was more than what the Condado

8   charged at the peak?

9   A.  I believe so.

10  Q.  Okay.  A lot more?

11  A.  I'm not exactly sure.

12  Q.  Okay.  Now we were going to the second property.  You said

13  there was a second one that you also toured, right?

14  A.  Yes.

15          MR. KAMARAJU:  Okay.  Could we show Ms. Reyes what's

16  been marked as DX 60597.

17  Q.  All right.  Is this a photograph of the other hotel that

18  you visited?  Oh, I'm sorry.

19  A.  It looks like it, yes.

20  Q.  Okay.  And this photograph depicts that hotel; is that

21  right?

22  A.  Yes.

23          MR. KAMARAJU:  Okay.  The defense offers DX 60597.

24          MR. FINKEL:  No objection.

25          THE COURT:  It is admitted.

O6I1GUO4                          Reyes - Cross

1                    (Defendant's Exhibit 60597 received in evidence)

2                    MR. KAMARAJU:  Okay.  Could we publish it, please.

3   Q.  Okay.  So again, you actually toured this hotel?

4   A.  Yes.

5   Q.  All right.  And pretty luxurious; fair to say?

6   A.  Yes.

7   Q.  Pretty expensive, right?

8   A.  Yes.

9   Q.  Lots of services for guests of the hotel?

10  A.  They had different services, yes.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6IBGUO5                         Reyes - Cross

1   BY MR. KAMARAJU:

2   Q.  Was there a spa?

3   A.  Yes.

4   Q.  Were there conference rooms?

5   A.  I don't remember.

6   Q.  Places for guest to meet?

7   A.  Yes.

8   Q.  Bar maybe?

9   A.  Yes.

10  Q.  All right.  Now, Mr. Guo never asked you to tour any other

11  places, right?

12  A.  No.

13  Q.  He never spoke to you about them at all, right?

14  A.  Not that I recall.

15  Q.  You never told him you was going to look at them?

16  A.  No.

17  Q.  You never told him about the island you were looking for,

18  right?

19  A.  Not that I recall.

20  Q.  You didn't communicate any of that with the spokesperson

21  for G/Clubs, right?

22  A.  Could you repeat.

23  Q.  Sure.  It's okay.  You didn't communicate anything about

24  these particular properties to Mr. Guo, correct?

25  A.  Not that I recall.

O6IBGUO5                        Reyes - Cross

1   Q.  You never had a discussion with him about it, right?

2            MR. FINKEL:  Asked and answered.

3            THE COURT:  Sustained.

4   Q.  Now, did you fly commercial to London?  No.  Withdrawn.

5            You testified on direct that you took a private jet,

6   correct?

7   A.  Yes.

8   Q.  Was that a G/Clubs jet?

9   A.  Not that I'm aware of.

10  Q.  Do you know if G/Club chartered the jet?

11  A.  I don't believe so.

12  Q.  Do you know who owned the jet?

13  A.  I'm not sure.

14  Q.  We could take that down.

15           G/Clubs Operation, that was based in Puerto Rico,

16  right?

17  A.  Yes.

18  Q.  And it had a parent company that I think you referred to it

19  as International, right, or BVI?

20  A.  Yes.

21  Q.  BVI owned 100 percent of operations, right?

22  A.  Can you repeat that.

23  Q.  Sure.  BVI owned a hundred percent of operations, right?

24  A.  I'm not exactly sure.  BVI was on top of G/Club operations.

25  Q.  Let me ask the question this way.

O6IBGUO5                         Reyes - Cross

1           You refer to Mr. He as the owner, right?

2    A.  Correct.

3    Q.  He was the owner of G/Club BVI?

4    A.  To my understanding, yes.

5    Q.  And through that he was the owner of operations, right?

6    A.  Correct.

7    Q.  And you had that email exchange with him where you said,

8    I'm not trying to be the owner -- I'm paraphrasing -- right,

9    cause he was the owner, right?

10   A.  Yes.

11   Q.  And you knew that G/Clubs was trying to expand

12   internationally, correct?

13   A.  What do you mean expand internationally?

14   Q.  There was an effort to build the company out in the Middle

15   East, right?

16   A.  I was not involved in that.

17   Q.  But you were aware of it, right?

18   A.  I was told at some point.

19   Q.  You knew that Alex Hadjicharalambous, you knew that he was

20   the controller of G/Clubs operations, right?

21   A.  Yes.

22   Q.  And he went to the Middle East as part of that effort,

23   right?

24           MR. FINKEL:  Objection.  She testified she knows about

25   this based on what she was told.

O6IBGUO5                        Reyes - Cross

1          THE COURT:  Do you know whether he went to the Middle

2    East?

3          THE WITNESS:  Yes, he went to the Middle East.

4    Q.  Just to stay on Alex for a second, his responsibilities as

5    controller were to manage bank accounts; is that correct?

6    A.  Yes.

7    Q.  Manage the company's cash flow, right, keep track of it?

8    A.  Of the accounts?

9    Q.  Yeah, sure.

10   A.  Yes.

11   Q.  Keep track of the money going out and coming in, right?

12   A.  He had access.

13   Q.  That wasn't your job, right?

14   A.  No.

15   Q.  You had other responsibilities?

16   A.  Yes.

17   Q.  When Mr. Finkel asked you all those questions about the

18   loans being repaid, you weren't looking at the bank accounts to

19   see if that happened, right?

20         THE COURT:  I can't hear you.

21   A.  No, I didn't.

22         THE COURT:  Speak up.

23   A.  Could you repeat that.

24   Q.  So when Mr. Finkel asked you those questions about whether

25   the loans had been repaid, do you know what loans I'm referring

O6IBGUO5                        Reyes - Cross

1   to?

2   A.  Yes.

3   Q.  When he asked you the questions about that, it wasn't your

4   job to go look at the bank statements to see if the loans had

5   been repaid, correct?

6   A.  I did not look at the bank statements.

7   Q.  And that wasn't your responsibility?

8   A.  I didn't view that as my responsibility.

9   Q.  There were other people at the company responsible for

10  that, right?

11  A.  Yes.

12  Q.  Because in a company you can have a division of labor,

13  right?

14  A.  Yes.

15  Q.  The CEO is not necessarily responsible for everything,

16  right?

17  A.  I don't believe so.

18  Q.  You had several departments that reported to you, right?

19  A.  Yes.

20  Q.  And you relied on their advice, right?

21  A.  Yes.

22  Q.  Now, you testified about meeting Mr. He and Mileson Guo on

23  a yacht outside of Europe, correct?

24  A.  Yes.

25  Q.  Do you remember approximately what year that was?

```
     O6IBGUO5                    Reyes - Cross
 1   A.  2021.
 2   Q.  Do you remember if it was in the summer, when it was
 3   generally?
 4   A.  September.
 5   Q.  And so do you think you'd recognize Mileson today?
 6   A.  I'm not exactly sure.
 7   Q.  Could we pull up, it's already in evidence, GXHN-82, please
 8   and publish it.
 9            Do you see it?
10   A.  Yes.
11   Q.  Do you recognize that guy?
12   A.  I'm not exactly sure, no.
13   Q.  We can take it down.  On direct you did recognize Mr. He,
14   right?
15   A.  Yes.
16   Q.  And Mr. He owned 100 percent of BVI, right?
17            MR. FINKEL:  Asked and answered.
18            THE COURT:  Sustained.
19   Q.  So Mr. He controlled all of the assets in the company,
20   right?
21   A.  What do you mean by control the assets?
22   Q.  I mean he made the decision about where certain money would
23   go, right?
24   A.  Yes.
25   Q.  So he asked you to make certain loans, right?
```

O6IBGUO5                    Reyes - Cross

1    A.  Yes.

2    Q.  And you made them, right?

3    A.  Made loans, yes.

4    Q.  And sometimes he asked you for loans to make investments,

5    right?

6    A.  There were different purposes for the loans.

7    Q.  So, for example, one time he asked for a loan to make an

8    investment in something called Yield Esta, right?

9    A.  I recall Yield Esta.

10   Q.  And Mr. He asked you to put money into that company, right?

11   A.  It's not a -- to my understanding it's not a company.

12   Q.  What's your understanding of what it is?

13   A.  It's a product from a bank, like a bank account.

14   Q.  It's an investment product of some sort?

15   A.  I'm not exactly sure.  It's among, like, the account in the

16   bank.  You had to have the Yield Esta, the funds.

17   Q.  G/Clubs transferred $3 million to Yield Esta at the start

18   of the relationship with Mercantile Bank; isn't that right?

19   A.  Correct.

20   Q.  And what did you understand the $3 million was going to be

21   doing?

22   A.  It was funds in that account in order to have our account.

23   Q.  So the money was just going to sit there?

24   A.  I understood that it was going to be there for a period of

25   time.

O6IBGUO5                    Reyes - Cross

1   Q.  And then what would happen next?

2   A.  I'm not sure.

3   Q.  Were you involved in transferring the $3 million to Yield

4   Esta?

5   A.  I do the transfer?

6   Q.  In any way were you involved in that transfer, not that you

7   just press the button, but in any way were you involved?

8   A.  I don't recall specifically.  I recall the Yield Esta.

9   Q.  How did you find out about it then?

10  A.  About who, about Yield Esta?

11  Q.  The $3 million that G/Clubs put in Yield Esta, how did you

12  find out about it?

13  A.  That was a product that was provided by Mercantile bank.

14          MR. KAMARAJU:  Motion to strike.

15          THE COURT:  He was asking you how did you come to know

16  about Yield Esta.

17  A.  By Mercantile Bank.

18  Q.  Mercantile told you?

19  A.  That was their product.

20  Q.  And how did you find out that $3 million was invested by

21  G/Clubs into Yield Esta?

22  A.  I believe that was a requirement.  To open an account with

23  them, you had to do.  You have to have that amount in Yield

24  Esta account.

25  Q.  So Mercantile -- your understanding is that Mercantile told

O6IBGUO5                        Reyes - Cross

1    you that you had to invest this money?

2    A.  Correct.

3    Q.  And how did you find out that G/Clubs in fact invested that

4    amount of money?

5    A.  How did I find out?

6    Q.  Yes, ma'am.

7    A.  I'm not exactly sure.

8    Q.  Are you done?

9    A.  I don't remember.

10   Q.  Now, Mr. He also decided to invest in something called

11   Hamilton, right?

12   A.  There was a loan, correct.

13   Q.  And Mr. He is the one who directed that the loan should

14   happen, right?

15   A.  I'm not exactly sure.  It would come from Yvette or Mr. He.

16   Q.  You understand even if it came from Yvette, it was coming

17   from Mr. He?

18   A.  Yes.

19   Q.  And Mr. He signed off on using those loan proceeds to go to

20   Hamilton, right?

21   A.  He would sign off on the documents, the loan documents,

22   yes.

23   Q.  And you were aware that those loan proceeds were going to

24   Hamilton, right?

25   A.  I'm not exactly sure.

O6IBGUO5                          Reyes - Cross

1    Q.  Let's pull up what I believe is in evidence as GXGC-175.

2    You see that?

3    A.  Yes.

4    Q.  This is an email from you to Mr. He, right?

5    A.  Yes.

6    Q.  And it's concerning a $50 million investment.  Do you see

7    that?

8    A.  Yes.

9    Q.  So what did you mean when you wrote, I'm writing with

10   regards to the $50 million investment from G/Club International

11   BVI into Hamilton Digital Assets?

12   A.  That's how the loan documents end.  Resolutions would be

13   reference as.

14   Q.  To write this sentence you had to know that there was going

15   to be a $50 million investment by BVI into Hamilton Digital

16   Assets, right?

17           MR. FINKEL:  Objection, mischaracterizes.

18           THE COURT:  Sustained.

19   Q.  So again, what did you mean?

20           MR. FINKEL:  Asked and answered.

21   Q.  What did you mean specifically about into Hamilton Digital

22   Assets?

23           MR. FINKEL:  Asked and answered.

24           THE COURT:  Sustained.

25   Q.  Why did you send this email?

O6IBGUO5                    Reyes - Cross

1   A.  Every time there was a loan across, I would send Mr. He the

2   different loan documents and resolution for him to sign off on.

3   Q.  And which loan request did this pertain to?

4   A.  A $50 million loan to Hamilton Digital Assets.

5   Q.  Do you remember testifying about this exhibit with

6   Mr. Finkel on direct?

7   A.  No, I do not.

8   Q.  So earlier today you have no recollection about talking

9   about this exhibit?

10  A.  I don't recall specifically.

11  Q.  What was your understanding of what was going to happen

12  with this $50 million once it got to Hamilton?

13  A.  I do not know.

14  Q.  Did you ask anybody to find out?

15  A.  I do not recall.

16  Q.  You don't recall if you asked anybody?

17  A.  I do not recall if I asked anyone.

18  Q.  Did you consider it part of your responsibilities as CEO of

19  the company to know what was going to happen to this money?

20  A.  No.

21  Q.  That wasn't your job, right?

22  A.  I didn't view that as me asking.

23  Q.  That was Mr. He's decision, right?

24  A.  It was an instruction from Mr. He.

25  Q.  And it was his decision to make, right?

O6IBGUO5                          Reyes - Cross

1    A.  Yes.

2    Q.  That's why you didn't ask him any questions about it,

3    right?

4    A.  I didn't view as asking questions, no.

5    Q.  I'm sorry.

6    A.  I didn't view as asking questions, no.  It was his

7    instruction.

8    Q.  And that was his instruction to give, right?

9              MR. FINKEL:  Asked and answered.

10              THE COURT:  Sustained.

11   Q.  Now, do you remember being asked on direct some questions

12   about Mr. He using a proton email account, right?

13   A.  Yes.

14   Q.  And you see here he's using a proton email account, right?

15   A.  Yes.

16   Q.  But you knew that was Mr. He, right?

17   A.  That was Mr. He's email?

18   Q.  That's the email you used to communicate with him, right?

19   A.  Yes.

20   Q.  He wasn't hiding it from you, right?

21   A.  No, I can see it.

22   Q.  Now, on direct Mr. Finkel asked you whether you knew why he

23   used a proton email account and you had a G/Club account,

24   remember that?

25   A.  Yes.

O6IBGUO5                          Reyes - Cross

1   Q.  You're an employee or at the time -- withdrawn.

2          At the time you were an employee of G/Clubs

3   operations, correct?

4   A.  Yes.

5   Q.  And you got your email account from G/Clubs operations,

6   correct?

7   A.  Yes.

8   Q.  Mr. He was not an employee of G/Clubs operations, correct?

9   A.  No.

10  Q.  He was the owner, right?

11  A.  Yes.

12  Q.  You also talked about on direct how Mr. He talked to you

13  about Puerto Ricans being slow.  Do you remember that?

14  A.  Yes.

15  Q.  And he would complain about the pace of your work, right?

16  A.  Yes.

17  Q.  Now, you said that you spoke to Mr. Guo frequently.  Do you

18  remember that?

19          MR. FINKEL:  Mischaracterizes.

20          THE COURT:  Sustained.

21  Q.  How often did you speak to Mr. Guo?

22  A.  When I went to New York if he was in the office.

23  Q.  Never spoke to him in Puerto Rico?

24  A.  No.

25  Q.  Now, Mr. Guo was always nice to you, right?

O6IBGUO5                          Reyes - Cross

1    A.  Yes.

2    Q.  He was polite, right?

3    A.  Yes.

4    Q.  He didn't make any comments about Puerto Ricans being slow,

5    right?

6    A.  No.

7    Q.  He didn't do any of that, right?

8    A.  No.

9    Q.  And even at the dinner that you had with him, the one that

10   Mr. Finkel asked you about, right, you remember that dinner?

11   A.  Yes.

12   Q.  And that occurred after G/Club had gotten the subpoena,

13   right?

14   A.  Yes.

15   Q.  And Mr. Finkel asked you questions about Mr. Guo's comments

16   about loyalty, right?

17   A.  Yes.

18   Q.  He didn't tell you that you had to be loyal, right?

19   A.  Not that I recall, no.

20   Q.  He talked about the loyalty that his brother showed to an

21   ideal, right?

22   A.  Yes.

23   Q.  And that loyalty got his brother killed according to

24   Mr. Guo at that dinner, right?

25   A.  Yes.

O6IBGUO5                        Reyes - Cross

```
 1   Q.  That's what he talked to you about loyalty, right?
 2   A.  Yes.
 3   Q.  Now, you talked about on direct how you didn't discuss the
 4   structure of the loans that you testified about with Ms. Wang.
 5   Do you remember that?
 6            MR. FINKEL:  Mischaracterizes.
 7            THE COURT:  Sustained.
 8   Q.  Did you discuss the structure of the loans from operations
 9   to BVI with anybody at G/Clubs?
10   A.  To the best of my recollection with legal.
11   Q.  I'm not asking about legal.  But based on your
12   conversations, what was your understanding as to why it was
13   being done that way?
14   A.  I don't recall.  That's how it was structured.
15   Q.  Now, you also testified on direct that there was a loan
16   request that an in-house attorney told you not to do, right?
17            MR. FINKEL:  Mischaracterizes.
18            THE COURT:  Sustained.  Are you talking about the $5
19   million?
20            MR. KAMARAJU:  She testified that a lawyer told her
21   not to do it.
22            THE COURT:  She didn't characterize it as a loan.
23   Q.  My apologies.  I'll withdraw it.  The $5 million
24   transaction, fair enough, you know the one what I'm talking
25   about?
```

O6IBGUO5                        Reyes - Cross

1   A.  Yes.

2   Q.  An in-house lawyer at G/Clubs told you not to do it?

3   A.  Not to execute on that.

4   Q.  When did that happen?

5   A.  The end of 2022.  I don't know exactly the month.  I don't

6   recall exactly the month.

7   Q.  So after you got the subpoena?

8   A.  To the best of my recollection, yes, correct.

9   Q.  You didn't quit, right?

10  A.  When?

11  Q.  At that time when the $5 million got executed, you didn't

12  quit, right?

13  A.  No, I didn't.

14  Q.  And you didn't think you were committing any crime at that

15  time either, right?

16  A.  No, I did not.

17  Q.  And that's true even though you were going against that

18  lawyer's advice, right?

19  A.  Correct.

20  Q.  I want to talk a little bit about refunds.  Remember you

21  were asked about that on direct?

22  A.  Yes.

23  Q.  Now, G/Club did allow people to cancel their membership,

24  right?

25  A.  Yes.

O6IBGUO5                         Reyes - Cross

1   Q.  And it's not really a cancellation, but G/Club members

2   could let their memberships lapse, right?

3   A.  What do you mean by lapse?

4   Q.  If there was an annual fee, they had to pay, right?

5   A.  Yes.

6   Q.  And that was in addition to whatever the initial fee they

7   paid, right?

8   A.  Correct.

9   Q.  Just by way of the example, they may have paid $50,000 for

10  the initial fee, and they would have some rolling annual fee

11  going forward, right?

12  A.  They had their initial fee and annual fee, correct.

13  Q.  And if they stopped paying their annual fee, then I think

14  you said that they're account was deactivated, right?

15  A.  Yes, there was a term to it.

16  Q.  I'm sorry.

17  A.  There's a specific term it's deactivated.

18  Q.  And they couldn't use the services anymore?

19  A.  They couldn't use the benefits, correct.

20  Q.  But G/Club did allow for you to, just for a member, to just

21  cancel straight out their membership, right?

22  A.  There was a cancellation period.

23  Q.  There was a period of time in which that could happen,

24  right?

25  A.  Yes.

O6IBGUO5                           Reyes - Cross

Q.  Now, Mr. Guo did not set that period of time, right?

A.  Not that I recall.

Q.  And when it changed from three days to I think you said it
was either 12 or 14 days, right?

A.  Yes.

Q.  You didn't consult Mr. Guo about that change either, right?

A.  Not that I recall, no.

Q.  That was a G/Clubs corporate policy, right?

A.  It was a G/Club policy, yes.

Q.  And the policy was that if somebody asked for a refund
outside of the -- let's just use 14-day window, they were
entitled to a refund, yes?

A.  If it was outside of the 14 days, they were not entitled to
a refund.

Q.  Was there a process at G/Clubs about processing refunds?

A.  Yes.

Q.  Could you describe it for the jury?

A.  The ones that were outside or the ones -- what type of --
three day or the 14-day?

Q.  Let's say one came in within two days, what happens then?

A.  Member would send an email to us.  That email would be sent
to legal.  Legal would review what we call the ticket, and they
would approve or deny the request for the cancellation.

Q.  Were you involved in that process at all?

A.  Not on the process of approving or denying cancellation.

O6IBGUO5                         Reyes - Cross

1    Q.   To your knowledge was Mr. Guo involved in that process?

2    A.   No.

3    Q.   What happens if a member submitted, let's use the three-day

4    period for right now.  Okay.

5    A.   Yes.

6    Q.   Let's say a member submitted it six days outside of the

7    refund period, is there a different process?

8    A.   It's the same process.  The evaluation is different.

9    Q.   How is the evaluation different?

10   A.   Because it's outside the period, so that won't get

11   canceled.

12   Q.   So if somebody submits outside the period, they don't get a

13   refund, right?

14   A.   At some point they did not, yes.

15   Q.   Now, you testified on direct about knowing what the farms

16   were.  Do you remember that?

17   A.   Could you repeat that.

18   Q.   You know what the farms are, right?

19   A.   I'm not exactly sure how they work.

20   Q.   You have a general understanding as to what they are is all

21   I'm asking?

22             MR. FINKEL:  Asked and answered, mischaracterizes.

23             THE COURT:  Sustained.

24   Q.   Do you have a general understanding?

25             MR. FINKEL:  Asked and answered.

O6IBGUO5                          Reyes - Cross

1           THE COURT:  Sustained.

2   Q.  Were the farms involved in the refund process at G/Clubs?

3   A.  Not that I recall.

4   Q.  During your time at G/Clubs, do you remember how many

5   refund request there were?

6   A.  No.

7   Q.  Ballpark?

8   A.  I'm not sure.

9   Q.  More than a hundred?

10  A.  I believe so.

11  Q.  More than a thousand?

12  A.  I'm not sure, could have.  I'm not sure.

13  Q.  You testified also about sweepstakes, right?

14  A.  Yes.

15  Q.  Now, some of the people who won the sweepstakes, they live

16  in China?

17  A.  Yes.

18  Q.  And could G/Clubs ship a prize to China?

19  A.  The ability to do it or if it was received?

20  Q.  Well, was it your understanding that G/Clubs could ship

21  like a Lamborghini to China?

22  A.  No, we cannot ship a car.

23  Q.  And you're not aware if Mr. Guo ever telling you not to

24  give a sweepstakes winner a prize, right?

25  A.  Not that I recall.

O6IBGUO5                          Reyes - Cross

1   Q.  Let's stick with cars for a second.

2           Now, you met Mr. Guo, Mileson Guo on a yacht, and he

3   discussed how he liked race car driving, right?

4   A.  Yes.

5   Q.  It was your impression that he was pretty well-connected in

6   that world, right?

7   A.  To my understanding, yes.

8   Q.  In fact, he connected G/Clubs with the Bugatti dealership,

9   right?

10  A.  That's what I was told.

11  Q.  Could we publish Government Exhibit 227, please.  And we

12  can publish this for the jury please.

13          Do you see it?

14  A.  Yes.

15  Q.  This is an email you received from Lonny Soza, right?

16  A.  Yes.

17  Q.  And you can see that he's the president of Post Oak Motor

18  Cars, right?

19  A.  Yes.

20  Q.  And this is relate to the Bugatti that G/Clubs purchased,

21  right?

22  A.  The Bugatti, yes.

23  Q.  You see the date that this was sent November 1, 2021,

24  right?

25  A.  Yes.

O6IBGUO5                          Reyes - Cross

1   Q.  Could you we go to page three, please.

2          You see a customer name there?

3   A.  Yes.

4   Q.  Who's listed there?

5   A.  Mileson Guo.

6   Q.  Could we bring up alongside that GX-230 which is also in

7   evidence.  You see the document on the right?

8   A.  Yes.

9   Q.  That's another email from Mr. Soza to you, right?

10  A.  Yes.

11  Q.  And it's dated November 12, 2021, right?

12  A.  Yes.

13  Q.  And it's about that same Bugatti purchase?

14  A.  Yes.

15  Q.  Can we go to page four, please.  You see this?

16  A.  Yes.

17  Q.  You see the customer name?

18  A.  Yes.

19  Q.  Who's listed as the customer's name there?

20  A.  G/Club International Limited.

21  Q.  Did you tell Mr. Soza to make that change?

22  A.  I don't remember.

23  Q.  Do you know if there was any other G/Club employees

24  communicating with Mr. Soza about this purchase?

25  A.  Not that I was aware of.

O6IBGUO5                          Reyes - Cross

1   Q.  Do you know why this change was made?

2   A.  The loan was to G/Club international limited.

3   Q.  Not to Mileson Guo, correct?

4   A.  Correct.

5   Q.  Mileson Guo wasn't buying this car, right?

6   A.  Not to my understanding.

7   Q.  Even though his name is on this customer speck on the left

8   side, right?

9   A.  Yes.

10  Q.  Now, you were asked whether Bugatti was ever made available

11  to G/Club members, right?

12  A.  Not sure the Bugatti or -- I'm not sure if it was the

13  Bugatti or the Lamborghini, not sure.

14  Q.  Do you know -- withdrawn.

15          Do you know if the Bugatti ever left the lot?

16  A.  The dealership?

17  Q.  Yeah.

18  A.  To my understanding, no.

19  Q.  So you have no way of knowing if it ever could have been

20  made available to G/Club members, right?

21          MR. FINKEL:  Calls for speculation.

22          THE COURT:  You can answer whether you know whether it

23  was made available.

24  A.  To my understanding it was not made available.

25  Q.  Now, Mr. Finkel asked you about your role in picking the

O6IBGUO5                              Reyes - Cross

1    Lamborghini.  Do you remember that?

2    A.  Yes.

3    Q.  Prior to your time as CEO of G/Club, had you ever bought a

4    Lamborghini before?

5    A.  No.

6    Q.  Did you ever negotiate a Lamborghini sale?

7    A.  No.

8    Q.  Ever toured a Lamborghini facility?

9    A.  No.

10   Q.  You ever visited a Lamborghini dealership?

11   A.  No.

12   Q.  Did you ever dream about buying a Lamborghini?

13   A.  Dreamed?

14   Q.  Yeah.

15   A.  No.

16   Q.  Fair to say you didn't have a lot of experience with

17   purchasing Lamborghini-s?

18   A.  No.

19   Q.  He also asked you about camper vans that G/Club purchased.

20   Do you remember that?

21   A.  Yes.

22   Q.  You ever seen a video of Mr. Guo camping?

23   A.  No.

24   Q.  You ever seen Mr. Guo advertise a camper in a video?

25   A.  No.

O6IBGUO5                          Reyes - Cross

1  Q.  You ever heard anyone say Mr. Guo went camping?

2          MR. FINKEL:  Objection.

3          THE COURT:  Overruled.  You may answer.

4  A.  No, I've never heard.

5  Q.  So as the CEO of G/Club, you were aware that the Bugatti

6  was being purchased, right?

7  A.  Yes.

8  Q.  And you were aware that the Lamborghini was being

9  purchased, right?

10  A.  Yes.

11  Q.  And you knew that both cars were supposed to be delivered

12  to Connecticut, right?

13  A.  I don't remember the delivery specifically.

14  Q.  You don't remember Mr. Finkel was asking about what CT

15  means?

16  A.  I know what CT means.  I didn't remember knowing that it

17  was going to be delivered there.

18  Q.  Now, you testified that there were a lot of G/Club members

19  in New York, right?

20  A.  There are G/Clubs in New York, yes.

21  Q.  Now, was it your understanding that before any of these

22  cars could be used, there had to be special insurance obtained,

23  right?  There had to be insurance obtained, right?

24  A.  Yes.

25  Q.  And G/Club was having trouble obtaining that insurance,

O6IBGUO5                          Reyes - Cross

1    right?

2    A.   They were working on it.

3    Q.   They were working on it, right?

4          MR. FINKEL:   Asked and answered.

5    Q.   Withdrawn.  And you testified on direct I believe that you

6    had approached a firm of some sort to handle that rental

7    situation; is that fair?

8    A.   It was a firm to work with future benefits of renting for

9    members, yes.

10   Q.   And that was in 2022, right?

11   A.   To the best of my recollection, yes.

12   Q.   G/Clubs pay the firm?

13   A.   I believe so.

14   Q.   So the firm was working on it, right?

15   A.   Yes.

16   Q.   Now, you testified that you saw the Lamborghini being

17   driven by Mr. Guo in a video, right?

18   A.   Not driven.

19   Q.   Please tell me.

20   A.   It was a Lamborghini that was like showcased on a video.

21   Q.   Got it.  So he showcased it in a video, right?

22   A.   Yes.

23   Q.   And you were concerned because the Lamborghini wasn't ready

24   yet for consumption by G/Clubs members, right?

25   A.   G/Club had not put in place or offered that sort of

O6IBGUO5                    Reyes - Cross

1   service.

2   Q.  It was still working on whatever it needed to offer that

3   service, right?

4   A.  Correct.

5   Q.  And you in fact never heard that Mr. Guo was actually

6   driving the Lamborghini, right?

7           MR. FINKEL:  Objection, hearsay.

8           THE COURT:  You can testify as to what you know.

9   A.  I'm sorry.

10          THE COURT:  Do you know if he was driving the

11  Lamborghini?

12          THE WITNESS:  I didn't see him driving.  It was just

13  like parked.

14  Q.  And you never heard anything similar about a video

15  involving him and the Bugatti, right?

16          MR. FINKEL:  Same objection.  What she heard, hearsay.

17          THE COURT:  Talk about what you know as opposed to

18  what you heard.

19  A.  I didn't know of him driving a Bugatti.

20  Q.  Now, before somebody could become a G/Club member, there

21  was a vetting process, right?

22  A.  What do you mean a vetting process?

23  Q.  There was like a 30-day-period between when the application

24  was submitted and when G/Clubs would accept it, right?

25  A.  I don't remember that.

O6IBGUO5                        Reyes - Cross

1    Q.   Was it instantaneous?

2    A.   The approval?

3    Q.   Mm hm.

4    A.   Members would fill out the application.  And once it was

5    received and payment was received, then they would get

6    approved.

7    Q.   Was there ever any kind of requirement what was called KYC?

8    A.   Yes, there was a time.

9    Q.   When was that?

10   A.   That was, best of my recollection, either late 2022

11   December or early 2023.

12   Q.   Do you remember Alex H having to work on sort of a

13   reconciliation project paring membership agreements with money

14   that was coming in?

15   A.   Member payments needed to be reconciled.

16   Q.   Just so we're saying the same thing, what do you mean when

17   you say they needed to be reconciled?

18   A.   When a member receives a payment, when we receive a member

19   payment that has to match the application on the system.

20   Q.   And Alex H was handling that on the G/Club side?

21   A.   Under financing.

22   Q.   And given the amount of money coming in, that was a bit

23   overwhelming for the company, right?

24            MR. FINKEL:  Objection.

25            THE COURT:  Overruled.  You can answer if you thought

O6IBGUO5                         Reyes - Cross

1    it was overwhelming.

2    A.   There were a lot of member payments.

3    Q.   That's why you brought in Crane, right?

4    A.   I did not brought in Crane.

5    Q.   Withdrawn.  That's why G/Clubs brought in Crane, right?

6    A.   I'm not exactly sure the reason.

7    Q.   Remember you were shown a picture of Haitham Khaled on

8    direct?

9    A.   Yes.

10   Q.   Do you have an opinion about his character for

11   truthfulness?

12            MR. FINKEL:  Objection.

13            THE COURT:  So if you'll step up, please.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O6IBGUO5                           Reyes - Cross

1                    (At the sidebar)

2              THE COURT:  So you need to lay a foundation if you're

3     going to ask about character.

4              MR. KAMARAJU:  Just to be clear for the record, I'm

5     relying on 608(a).  The witness's credibility may be attacked

6     if supported by testimony about the witness's reputation for

7     having a character for truthfulness or untruthfulness.

8              MR. FINKEL:  When is the character been attacked?

9              MR. KAMARAJU:  It says may be attacked.

10             MR. FINKEL:  The last sentence. Evidence of truthful

11    character is admissible only after the witness's character for

12    truthfulness has been attacked.

13             MR. KAMARAJU:  Ms. Shroff extensively attacked his

14    character.

15             MS. SHROFF:  I attacked his character.

16             THE COURT:  You've got to establish how she knows his

17    reputation.

18             MR. KAMARAJU:  Fair enough.

19                    (Continued on next page)

20

21

22

23

24

25

O6IBGUO5                          Reyes - Cross

1            (In open court; jury present)

2   BY MR. KAMARAJU:

3   Q.  I'm going to withdraw that last question and ask you this.

4   Did you have interactions with Mr. Khaled while you were at

5   G/Club?

6   A.  Yes.

7   Q.  What were those interactions?

8   A.  He was looking at the very beginning for business office

9   space and in charge of banking.

10  Q.  And was he involved in G/Club's dispute with Crane?

11  A.  He was, yes.

12  Q.  And as a result of your interactions with Mr. Khaled, did

13  you develop a view as to his character for truthfulness?

14           THE COURT:  You need to lay a foundation with respect

15  to reputation, and reputation is developed by speaking with

16  others.

17  Q.  Did you ever speak with others about Mr. Khaled's

18  reputation for truthfulness?

19  A.  If I spoke with other people if Mr. Khaled was truthful?

20  Q.  Yes.

21  A.  I don't remember.

22  Q.  That's your answer.  You don't remember.  Okay.

23           Was your understanding that Crane was holding onto

24  money that G/Club wanted to be processed, correct?

25  A.  Crane had G/Club money.

O6IBGUO5                        Reyes - Cross

1    Q.  Crane had G/Club money, right?

2    A.  Yes.

3    Q.  And G/Club wanted that money back, right?

4    A.  We wanted the money, yes.

5    Q.  At the time that Crane was holding onto the money, G/Clubs

6    had access to other money, right?

7    A.  Could you repeat that.

8    Q.  Sure.  At the time that Crane was holding onto the money,

9    G/Clubs had access to other funds, right?

10   A.  Depending on the time because there were times that we had

11   banking issues.

12   Q.  During the period of the dispute with Crane, did your

13   salary ever go unpaid?

14   A.  No.

15   Q.  Are you aware of any employee's salary being unpaid at this

16   time?

17   A.  No.

18   Q.  Did you continue to work to obtain benefits during the

19   Crane's dispute?

20   A.  Yes.

21   Q.  So G/Clubs operation were continuing during the time of the

22   Crane dispute, correct?

23   A.  Yes.

24   Q.  And it was funding those operations with money outside of

25   Crane's control, right?

O6IBGUO5                        Reyes - Cross

1   A.  Yes.

2   Q.  Now, you testified on direct that you gave some untruthful

3   answers during that arbitration, right?

4   A.  Yes.

5   Q.  When did you first realize that you had given inaccurate

6   answers in the arbitration?

7   A.  After I read the transcript.

8   Q.  When was that?

9   A.  When I was with my attorneys.

10  Q.  I just want to make sure.  Your personal attorneys?

11  A.  Yes.

12  Q.  Again, I don't want you to tell me anything, but I believe

13  you testified on direct that your personal attorneys, you

14  retain your personal attorneys after Mr. Guo's arrest, correct?

15  A.  Yes.

16  Q.  So when did you first realize that you had made inaccurate

17  statements in the arbitration, before or after you first met

18  with the prosecutors?

19  A.  Before.

20  Q.  Say that again.

21  A.  The question is if I --

22  Q.  Let me try to rephrase it.  Let me see if I can break it

23  down.

24          You first met with the prosecutors in this case, the

25  folks at this table in August of 2023, right?

O6IBGUO5                    Reyes - Cross

1    A.  I don't recall the date.

2    Q.  Was it several months after the arrest?

3    A.  It was after, yes.

4    Q.  It wasn't weeks after, right?

5    A.  No.

6    Q.  It was months after, right?

7    A.  Yes.

8    Q.  And did you realize you had given inaccurate answers in the

9    arbitration during that period between Mr. Guo's arrest and

10   your first meeting with the prosecutors?

11   A.  Yes, while I was reviewing with my attorneys.

12   Q.  Okay.  Now, during your first meeting with the prosecutors,

13   you didn't tell them that you had given inaccurate answers in

14   the arbitration, did you?

15   A.  Could you repeat that.

16   Q.  In your first meeting with the prosecutors, you did not

17   tell them that you had given inaccurate or misleading answers

18   during the arbitration?

19   A.  I don't remember what I said during that first meeting.

20   Q.  In fact, the issue about you giving misleading answers in

21   the arbitration was first raised by the prosecutors after your

22   first meeting with them, correct?

23   A.  I don't recall that.

24   Q.  And your lawyer had multiple meetings with the prosecutors

25   about that subject, correct?

O6IBGUO5                          Reyes - Cross

1    A.  I'm not sure what my lawyers said on those meetings.

2    Q.  Your lawyers are in the room, right?

3    A.  Yes.

4    Q.  Your lawyers have a habit of going off on their own?

5           MR. FINKEL:  Objection.

6           THE COURT:  Sustained.

7    Q.  When did you first tell the prosecutors about it then?

8    A.  I don't remember specifically when.

9    Q.  How many times did you meet with the prosecutors?

10   A.  I don't know exactly how many times.  As I said, more than

11   ten.

12   Q.  More than ten?

13   A.  Yes.

14   Q.  So if we split ten in half, was it during the first five or

15   the second five?

16          MR. FINKEL:  Asked and answered.

17          THE COURT:  Overruled.  You may answer.

18   A.  I'm not exactly sure, maybe the first five.

19   Q.  But you don't recall specifically which one?

20          MR. FINKEL:  Asked and answered.

21          THE COURT:  Sustained.

22   Q.  You testified previously -- withdrawn.

23          It was several meetings before you got a

24   non-prosecution agreement, right?

25   A.  There were a few meetings before, yes.

O6IBGUO5                        Reyes - Cross

Q.  More than ten?

A.  No, I don't believe that.

Q.  But you spoke with the prosecutors about your supposedly
misleading answers during the arbitration prior to getting a
non-prosecution agreement, right?

A.  I believe so, yes.

Q.  And in fact you had a meeting with the prosecutors where
your lawyer ask you to leave the room, right?

A.  When specifically?

Q.  I'm just asking do you remember any meeting like that?

A.  That I was asked to leave the room?

Q.  Yes.

A.  Yes.

Q.  Were there more than one meeting like that?

A.  I believe so.

Q.  And what was your understanding as to why you were being
asked to leave the room?

A.  My attorneys would be talking to the government.

Q.  What was your understanding of what they would be
discussing with the government?

A.  I don't remember specifically what the topics were at the
time.

Q.  So your testimony, ma'am, is that you don't remember
sitting here today what your lawyers were going to talk to the
prosecutors about, right?

O6IBGUO5                           Reyes - Cross

1              MR. FINKEL:  Asked and answered.

2              THE COURT:  Sustained.

3   Q.  Do you remember when you signed your non-prosecution

4   agreement?

5   A.  A few months back.

6   Q.  I'm sorry.

7   A.  A few months back.

8   Q.  So this year?

9   A.  Yes.

10  Q.  Do you remember if you had told them about your misleading

11  statements in the arbitration last year?

12             MR. FINKEL:  I think this has been asked and answered.

13             THE COURT:  I'm going to allow this question.

14  Q.  Do you remember?

15  A.  To the best of my recollection, yes.

16  Q.  So you told them last year, right?

17             MR. FINKEL:  Asked and answered.  We keep circling

18  this.

19             THE COURT:  Sustained.

20  Q.  I'd like to show you -- if can we pull up just for the

21  witness, the Court and the parties 3533-010.  Can we blow that

22  up for the witness, the paragraph that starts at August 1st.

23  A.  Yes.

24  Q.  You had a second to look that over?

25  A.  Yes.

O6IBGUO5                          Reyes - Cross

1  Q.  Does looking at this refresh your recollection as of the

2  first date your meeting with the prosecutors was?

3  A.  I'm not exactly sure.

4  Q.  Meeting with the U.S. Attorney's office for the Southern

5  District of New York is a pretty memorable event, right?

6  A.  Yes.

7  Q.  Prior to meeting these folks at this table, have you ever

8  met with a prosecutor before?

9  A.  No.

10  Q.  You were pretty scared when you sat down with them, right?

11  A.  Pretty nervous.

12  Q.  Because you were worried they might think you had done

13  something wrong, right?

14  A.  I was worried.

15  Q.  Okay.  Worried about what?

16  A.  About their views.

17  Q.  Their views about what?

18  A.  My time at G/Clubs.

19  Q.  And what were you -- withdrawn.

20          What were you worried about might happen about your

21  time at G/Clubs?

22  A.  Can you repeat that.

23  Q.  Let me ask it a different way.  Why would you care what the

24  people sitting at this table thought about your work at G/Club?

25  A.  I could get charged of a crime.

O6IBGUO5                          Reyes - Cross

 1   Q.  And you were worried about that, right?

 2            MR. FINKEL:  Asked and answered.

 3            THE COURT:  Sustained.

 4   Q.  That's why you sat down with them, right, cause you were

 5   worried about being charged?  You went to speak to the

 6   prosecutors?

 7            MR. FINKEL:  Asked and answered.

 8            THE COURT:  Sustained.

 9   Q.  And when you spoke with them, you had a lawyer, right?

10   A.  Yes.

11   Q.  And over the course of several meetings, you explained to

12   them about your time at G/Clubs, right?

13   A.  Yes.

14   Q.  And you testified on direct that you didn't believe you had

15   committed any crimes while you were at G/Clubs, right?

16   A.  Correct.

17   Q.  But you were still worried that they may charge you with a

18   crime, right?

19   A.  Yes.

20   Q.  So you were trying to get a way out of that, right?

21   A.  No.

22   Q.  Well, that's why you met with them to avoid being charged,

23   right?

24            MR. FINKEL:  Asked and answered.

25            THE COURT:  Sustained.

O6IBGUO5                          Reyes - Cross

1    Q.  So when you met with them, did you tell them that you were

2    afraid of being charged?

3    A.  I don't recall.

4    Q.  Did they tell you that you might have the prospect of being

5    charged?

6    A.  Could you repeat that.

7    Q.  Did any of the folks sitting at this table right here tell

8    you during any of your more than ten meetings with them that

9    you might be facing criminal charges in connection with your

10   time at G/Clubs?

11   A.  I'm not exactly sure.  I believe I could be charged with

12   criminal charges.

13   Q.  Could you say that first part again.

14   A.  I don't remember a conversation, but I was aware I could be

15   charged.

16   Q.  It would be pretty frightening to hear from a federal

17   prosecutor that you might be charged with a crime, right?

18          MR. FINKEL:  Objection.

19          THE COURT:  Asked and answered.

20   Q.  Now ultimately you secured a non-prosecution agreement,

21   correct?

22   A.  I was provided a non-prosecution agreement.

23   Q.  And you signed it, right?

24   A.  Yes.

25   Q.  And your lawyer signed it?

O6IBGUO5                    Reyes - Cross

1   A.  Yes.

2   Q.  And one of the people sitting at this table signed it?

3   A.  Yes.

4   Q.  Why don't we take a look at it.  Could we pull up I guess

5   it's marked GX3533-50.  You recognize this document?

6   A.  Yes.

7   Q.  Can we flip to the last page, please.  That's your

8   signature?

9   A.  Yes.

10  Q.  That's your lawyer's signature?

11  A.  Yes.

12  Q.  You signed it just a couple of months ago, right?

13  A.  Yes.

14          MR. KAMARAJU:  The defense offers GX-3533-50.

15          MR. FINKEL:  No objection.  I don't think it has a GX.

16  It's just 3533-50.

17          THE COURT:  It is admitted.

18          MR. KAMARAJU:  We can give it a defense number at the

19  end of the day.

20          (Government's Exhibit 3533-50 received in evidence)

21  BY MR. KAMARAJU:

22  Q.  Can we publish that, please.  Let's scroll down to the

23  first paragraph.  Could you read the first paragraph?

24  A.  On the understandings specified below, the office of the

25  United States attorney for the Southern District of New York

O6IBGUO5                              Reyes - Cross

will not criminally prosecute Limarie Reyes Molinaris for any

crimes, except for criminal tax violation, if any, as to which

this office cannot and does not make any agreement related to

any and all actions taken in connection with her employment at

G/Clubs and its related entities from in or about December 2020

through on or about March 23, 2023 to the extent Reyes has

disclosed such conduct to this office as of the date of this

agreement.

Q.  What's your understanding as to the scope of protection

from criminal prosecution that you enjoy right now?

A.  As long as I tell the truth, I will not be charged.

Q.  Let's pull that down for a second, not the whole document,

just zoom back out to the bigger one.  Let's go to the next

paragraph.

         You see the paragraph starts, Moreover.  Can you read

that first sentence?

A.  Moreover, if Reyes fully complies with the understanding

specified in this agreement, no testimony or other information

given by her or any other information directly or indirectly

derived therefrom will be used against her in any criminal tax

prosecution.  This agreement does not provide any protection

against prosecution for any crimes except as set forth above.

Q.  And you testified on direct that you, under this agreement,

you have an obligation to testify truthfully, correct?

A.  Correct.

O6IBGUO5                        Reyes - Cross

1   Q.  And if you don't testify truthfully, then this agreement

2   could be null and void, right?

3   A.  Yes.

4   Q.  It's the government that decides if you testify truthfully,

5   right?

6   A.  No.

7   Q.  Who decides?

8   A.  I do.

9   Q.  You do?

10  A.  Yes.

11  Q.  So if you decide that you testified truthfully and the

12  government disagrees, what happens to your agreement?

13  A.  It gets nulled.

14  Q.  Sorry.

15  A.  It gets canceled.

16  Q.  So they decide, right?

17  A.  I decide to tell the truth.

18  Q.  Sure.  And they decide if it's actually the truth?

19  A.  They decide if I'm telling the truth.

20  Q.  Now, there have been times during your meetings with them

21  where they have chastised you for not telling the truth,

22  correct?

23          MR. FINKEL:  Objection.

24          THE COURT:  Overruled.  You may answer.

25  A.  Could you repeat the question.

O6IBGUO5                        Reyes - Cross

1   Q.  There have been times during your meetings with them where

2   they have chastised you for not telling the truth, right?

3   A.  What does chastise?

4           THE COURT:  Did they scold you.

5           THE WITNESS:  Could you explain scold?

6   Q.  Well, okay.  During a meeting with the prosecutors,

7   Mr. Finkel told you that he didn't think you were telling the

8   truth and reminded you of your obligation under your proffer

9   agreement, correct?

10  A.  Could you repeat that.

11  Q.  I'll ask the court reporter to read it back, please.

12          (Record was read)

13  A.  No, I do not recall that.

14  Q.  And you're aware, are you not, that Mr. Horton told your

15  lawyer that they didn't think you were telling the truth about

16  the arbitration testimony, right, the gentleman with the beard

17  right there?

18  A.  I don't remember.

19  Q.  Could we pull up just for the witness 3533-0303.  If you

20  could read that to yourself, please.

21          MR. FINKEL:  Is there a question?

22          MR. KAMARAJU:  She's reviewing the document.

23  A.  Yes.

24  Q.  Does looking at this document refresh your recollection as

25  to whether Mr. Horton ever told your lawyers that they thought

O6IBGUO5                         Reyes - Cross

1    you were not being truthful about your arbitration testimony?

2              MR. FINKEL:  Objection this document.

3              THE COURT:  The question is whether this document

4    refreshes her recollection.  That's the question.  You may

5    answer.

6    A.  I don't remember Mr. Horton.

7    Q.  Okay.  We could take it down.

8              Now, you testified that G/Clubs had retained a lawyer

9    named Aaron Mitchell, correct?

10   A.  Yes.

11   Q.  And that was in connection with the Crane situation?

12   A.  Yes.

13   Q.  Now, on direct you testified that money that was used to

14   buy to the Bugatti, sorry that was used to buy the Bugatti came

15   from G/Clubs members' payments, right?

16   A.  Monies for G/Clubs came from member payments.

17   Q.  But you testified specifically that the Bugatti payment

18   came from that, right?

19   A.  Monies came from member payments.

20   Q.  Do you not remember testifying to that just a little while

21   ago?

22             MR. FINKEL:  Asked and answered.

23             THE COURT:  Sustained.

24   Q.  All right.  Do you remember testifying that the Lamborghini

25   was purchased with money from G/Clubs members' payments?

O6IBGUO5                    Reyes - Cross

1   A.  Money were received from member payments.

2   Q.  What about the camper van, do you remember testifying just

3   a little while ago that that was purchased using money from

4   G/Clubs member payments?

5   A.  Money was received from member payments.

6   Q.  You testified that you received a salary at G/Clubs, right?

7   A.  Yes.

8   Q.  Was that paid for using money from G/Clubs member payments?

9   A.  It was to payroll.

10  Q.  I'm sorry.

11  A.  It was through payroll and monies came from members

12  payments.

13  Q.  Now, you also testified that you got a discretionary bonus,

14  right?

15  A.  What do you mean a discretionary bonus, the yearly bonus?

16  Q.  I'm not referring to the Puerto Rican Christmas bonus, but

17  the other one?

18  A.  Yes.

19  Q.  The money for that bonus came from the proceeds of the sale

20  of G/Clubs memberships, right?

21  A.  I do not know where those funds came from.

22  Q.  How else did G/Clubs make money?

23  A.  Member payment.

24  Q.  If it didn't come from there, where did it come from?

25  A.  I do not know.

O6IBGUO5                          Reyes - Cross

1    Q.   How about the money you spent on G Talks, did that come

2    from the proceeds of sales of G/Club memberships?

3    A.   Could you repeat that.

4    Q.   You testified on direct that you spent money on G Talks,

5    right?

6    A.   Yes.

7    Q.   The money you spent on G Talks, did that come from the

8    proceeds of the sale of G/Club memberships?

9    A.   Monies were from member payments, correct.

10   Q.   Now, you testified on direct the payments -- the member

11   payments, to use your reference, that didn't entitle G/Club

12   members to any stock in the company, right?

13   A.   Correct.

14   Q.   They weren't making an investment into the company, right?

15   A.   No.

16   Q.   You didn't check with the members about whether you should

17   get a bonus, right?

18   A.   No, I did not.

19   Q.   Because it wasn't their business, right?

20   A.   I don't believe so.

21   Q.   G/Clubs could decide to give you a bonus, right?

22   A.   The bonus was provided by Yvette.

23   Q.   Sorry.

24   A.   The bonus was provided by Yvette.

25   Q.   Yvette paid you personally?

O6IBGUO5                          Reyes - Cross

1    A.  She approved.

2    Q.  And where did the money come from?

3    A.  I'm not sure.

4    Q.  You didn't clear your salary with the members, right?

5    A.  Did I clear?

6    Q.  You didn't ask the members if it was okay to get a salary,

7    right?

8    A.  No.

9    Q.  Even though your salary was coming from the member

10   payments, right?

11   A.  Correct.  It was our operations.

12   Q.  Cause the member payments were G/Club's revenue, right?

13   A.  Yes.

14   Q.  It's no different than your company Sprinkle, right?  Let

15   me break it down.

16           Your company is an event planning business, your

17   current one?

18   A.  Yes.

19   Q.  You plan events for people, right?

20   A.  Yes.

21   Q.  They pay you money to do it, right?

22   A.  Yes.

23   Q.  You're the owner of the business, right?

24   A.  Yes.

25   Q.  You then decide how to spend that money, right?

1  A.  Yes.

2  Q.  Haoran He was the owner of G/Clubs, right?

3  A.  Yes.

4  Q.  So it's his decision how to spend that money, right?

5  A.  Yes.

6  Q.  It's his decision if he wants to buy a Ferrari, right?

7          MR. FINKEL:  Objection.

8          THE COURT:  You may answer.

9  A.  He provide instructions.

10  Q.  His decision if he wants to buy a Lamborghini, right?

11  A.  He provided the instructions for us to execute.

12  Q.  His decision if he wants to buy a mansion in New Jersey,

13  right?

14  A.  I'm not aware of that.

15  Q.  His decision if he wants to make an investment in Hamilton,

16  right?

17  A.  His instructions.

18  Q.  None of that has anything to do with the G/Clubs members,

19  right?

20          MR. FINKEL:  Objection, asked and answered.

21          THE COURT:  Sustained.

22          MR. KAMARAJU:  No further questions.

23          THE COURT:  Redirect.

24  REDIRECT EXAMINATION

25  BY MR. FINKEL:

1    Q.  Ms. Reyes, at Sprinkle Events do you promise that your

2    clients will receive stock in Sprinkles?

3    A.  No, I did not.

4    Q.  You were asked other places you worked at.  Do you remember

5    those questions?

6    A.  Yes.

7    Q.  Did any of the other places you worked at send $5 million

8    to Kyrgyzstan after their money was seized by the United States

9    government?

10   A.  No.

11   Q.  You were asked some questions about G/Clubs benefits, were

12   you a member of G/Club?

13   A.  No, I was not.

14   Q.  Did you recommend to your friends that they should become

15   members of G/Club?

16   A.  No, I did not.

17   Q.  Did you recommend to your family members that they should

18   purchase a membership in this G/Club that you were working at?

19   A.  No, I did not.

20   Q.  If we can pull up SH-150, please.

21            When you went to the Sherry-Netherland, did Miles Guo

22   show you these pens?

23   A.  I don't recall seeing this.

24   Q.  We can take that down.  Refund request -- withdrawn.

25            Member complaints, were there complaints from members

1    throughout your time period at G/Club?

2    A.  Yes.

3    Q.  What were the nature of those complaints?

4    A.  They were different, refund request, and amongst those

5    different reasons.

6    Q.  What were the reasons that members sought refund request?

7    A.  They thought it was investment, not having enough benefit.

8    Q.  Did that happen through your whole period at G/Clubs?

9    A.  I recall specific time period.

10   Q.  Did it happen when you were CEO?

11   A.  Yes.

12   Q.  When did you become CEO?

13   A.  Summer 2021.

14   Q.  The hotels that defense counsel showed you on cross

15   examination that you saw in London, did that hotel company

16   engage with G/Club?

17   A.  No, they did not.

18   Q.  Whose idea was it to -- withdrawn.  Did Alex H tell you

19   that the loans were not repaid?

20            MR. KAMARAJU:  Objection, hearsay.

21            THE COURT:  Overruled.  You may answer.

22            MR. FINKEL:  Withdrawn.

23   Q.  Did Alex H tell you that the loan to BVI and other entities

24   were being repaid?

25            MR. KAMARAJU:  Same objection.

O6IBGUO5                        Reyes - Redirect

 1              THE COURT:  You may answer.
 2    A.  They were not being paid.
 3    Q.  They were not being paid?
 4    A.  Correct.
 5    Q.  That's what Alex told you?
 6    A.  They had not been paid.
 7    Q.  If we could pull up GC-157, please.  You remember being
 8    asked some questions about what would happen when a member's
 9    payments weren't made and their membership would lapse?
10    A.  Could you repeat that, please.
11    Q.  Ms. Loftus, can you zoom in on the bottom.
12              Can you read this email from Alex H to you on June 28,
13    2021, beginning with, Attach you will find.
14    A.  Attach you will find spreadsheet that James was kind enough
15    to organize for us containing breakdown of all the square
16    transactions paid unpaid.  I believe we have extended a long
17    enough grace period for members to repay and keep their
18    memberships.  As controller it is my recommendation we cancel
19    and void all outstanding memberships that have not been repaid.
20    I simply wanted to run this by you first so we are in
21    agreement.  I have discussed this with Yvette yesterday.
22    Q.  What ask your understanding of why Alex discussed this
23    issue with Yvette?
24              MR. KAMARAJU:  Objection.
25              THE COURT:  Overruled.

1  A.  She would be asked about different topics of the business.

2  Q.  Where did Yvette work?

3  A.  New York.

4  Q.  If we can pull up GXGC-175.  These emails that you sent to

5  Mr. He like this one containing the loan documentation or asset

6  documentation, the body of the email, how did you write it?

7  A.  It was like an extract from the different documents.

8          THE COURT:  Did you mean excerpt?

9          THE WITNESS:  Like I extracted.

10          THE COURT:  Extracts you're saying?

11          THE WITNESS:  I extracted word from the loan

12  documents.

13  Q.  When did you meet Mileson, what year?

14  A.  2021.

15  Q.  How long did you meet with him for?

16  A.  Just for that dinner.

17  Q.  How long was that dinner?

18  A.  Couple of hours.

19  Q.  That's the only time you saw him?

20  A.  Yes.

21  Q.  Do you see on your screen HN-28?

22  A.  Yes.

23  Q.  You see date of issue at the bottom left?

24  A.  Yes.

25  Q.  What's the date of issue?

O6IBGUO5                           Reyes - Redirect

1   A.  November 3, 2014.

2   Q.  So seven years before you saw Mileson on the boat?

3   A.  Yes.

4   Q.  You can take that down.  You can pull up GXGC-93. This is

5   an email from you, is that correct, to Yvette?

6   A.  Yes.

7   Q.  And can you read the first sentence after Dear Yvette?

8   A.  Please find attached the design options for G/Club member

9   physical card and packaging for your review and Mr. Guo's

10  feedback.

11  Q.  Why did you send an email to Yvette seeking Mr. Guo's

12  feedback?

13  A.  I was told that the original designs had been reviewed by

14  him and there was an interest to have a titanium physical card.

15  Q.  But why did you send it to Yvette seeking Mr. Guo's

16  feedback?

17          MR. KAMARAJU:  Asked and answered.

18          THE COURT:  Overruled.  You may answer.

19  A.  I would seek Yvette's approval in different matters.

20  Q.  You say for your review and Mr. Guo's feedback. This email

21  is not sent to Mr. Guo.  Why did you send it to Yvette seeking

22  Mr. Guo's feedback?

23          MR. KAMARAJU:  Same objection.

24          THE COURT:  Sustained.

25  Q.  If we could put up GC-541.  You remember you were asked

O6IBGUO5                              Reyes - Redirect

1   some questions about Mr. Guo's consulting agreement?

2   A.  Yes.

3   Q.  And it's dated October 15, 2020 at the top?

4   A.  Yes.

5   Q.  Go to the next page, please, Ms. Loftus.

6           You see where it says consideration?

7   A.  Yes.

8   Q.  It says level five membership?

9   A.  Yes.

10  Q.  Does it say red Lambo Aventador?

11  A.  No.

12  Q.  Does it say Bugatti?

13  A.  No.

14  Q.  Does it say $10 million for my son?

15  A.  No.

16  Q.  Does is say a house that cost $26 million in Mahwah, New

17  Jersey?

18          MR. KAMARAJU:  Object to form.

19          THE COURT:  Overruled.  You may answer.

20  A.  No.

21  Q.  Go back to the first page, Ms. Loftus.  And this is October

22  15, 2020, correct?

23  A.  Yes.

24  Q.  Can we pull up Z9 and go to page 57.  This is October 13,

25  2020, you see that in the left corner?

1   A.  Yes.

2   Q.  Can you scroll down a little bit, Ms. Loftus.

3           You remember being asked to read pieces of this during

4   cross examination?

5   A.  Yes.

6   Q.  Scroll down a little bit.  And you read how Guo had said

7   that you don't get stock in G/Clubs. That was the segment that

8   you were asked to read.  Do you recall that?

9   A.  Yes.

10  Q.  Can you read the last paragraph at the bottom of page 58.

11  A.  To put it bluntly, this is all non-sense.  I'll be straight

12  forward with you.  This is what we need to have to legally

13  avoid Me Too, but don't think that we are being mingy here.

14  There is no other way.  We'd have to have that.

15  Q.  Go to page 101 of this document, please.

16          Who is that a picture of?

17  A.  Mr. Guo.

18  Q.  And what's the date on the left?

19  A.  June 23, 2021.

20  Q.  Can you scroll down, please.  Can you read that bottom

21  paragraph?

22  A.  A couple of days ago our G/Club president Limarie who has a

23  very tiny face in real life, gorgeous, came to New York for

24  meetings.  Our Limarie and Wen Xiao also interviewed brother

25  seven about the future planning of the G/Club.

1   Q.  You can stop right there.  Can you zoom out of that,

2   Ms. Loftus, and can you scroll down a little bit.  Can you zoom

3   in on the paragraph that says a month ago.  Can you read

4   beginning of where it says then I proposed?

5   A.  Then I proposed a condition to allow our G/Club members to

6   buy their car at the best price in the world.  They said that

7   they would discuss it again, and we'll have to wait a little

8   longer.  Think about the G/Club membership now.  You know that

9   back then it was purchased in two tiers.  10,000 U.S.D and

10  50,000 U.S.D.  Now for those of you who bought the tier of

11  10,000 U.S.D, you have a 1,000 shares.  And for those of you

12  who bought the tier of 50,000, U.S.D. and you have 500,000

13  shares and then you have a lifetime access to the card.

14  There's nothing else I can say.

15  Q.  Ms. Reyes, when someone bought a $10,000 membership in

16  G/Clubs, did they get a 100,000 shares?

17  A.  Not that I was not aware of.

18  Q.  We can zoom out of that and please go to page 111.  Can you

19  scroll up a little bit please, Ms. Loftus.

20          Who is that a picture of?

21  A.  Mr. Guo.

22  Q.  Can you scroll down to 114, please, Ms. Loftus.  Can you

23  start reading from, We will have all investors.

24  A.  We will have all investors in G/Club, all investors now who

25  are currently set at 50,000.  When paying $50,000 for the

membership card, you will have 10,000 shares of G Fashion in the future.  At the time of the IPO, you'll have 10,000 shares of G Fashion, but then these days there are so many fellow fighters sending me messages.  They all express their wishes saying, Mr. Guo, I only have 30,000, can I buy a G/Club card?  Yes.  I have 40,000, can I buy G/Club card?  Yes.  But I've been thinking, the people who haven't spent 50,000, can they get 10,000 shares?  It's like giving them 10,000 shares for free, right?  I mean that when it goes public, you have to pay a dollar per share for 10,000 shares, it's $10,000.

But think about it, those who pay $40,000 or $30,000 won't be allocated shares which is not fair.  The poorer the fellow fighters, the more care we have to render, right?  This is not good.  This is not good at all.  So I was thinking how to get this fellow fighters to own the shares, which is the only question.

Q.  You can stop right there.

Ms. Reyes, did you refer to G/Clubs members as investors?

A.  No.

MR. FINKEL:  Nothing further.

MR. KAMARAJU:  I can be done in two minutes.

THE COURT:  Okay.  Go ahead.

RECROSS EXAMINATION

BY MR. KAMARAJU:

1    Q.  Do you remember Mr. Finkel asked you if you recommended

2    G/Clubs to any of your friends?

3    A.  Yes.

4    Q.  Are any of your friends high net worth Chinese individuals?

5    A.  No.

6    Q.  Are any of your friends active in Chinese politics?

7    A.  No.

8    Q.  Are any of your friends anti-CCP?

9    A.  No.

10           MR. KAMARAJU:  I'm done.  Thank you, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. FINKEL:

13   Q.  The hotels in Puerto Rico that you were asked about, do

14   those hotels have anything to do with the Chinese Communist

15   Party.

16   A.  No.

17           MR. FINKEL:  Nothing further.

18           THE COURT:  You may step out.

19           (Witness excused)

20           THE COURT:  Members of the jury, the good news is that

21   we have ended for the day and you have tomorrow off. You will

22   be returning on Thursday ready to walk into the courtroom at

23   9:30.  Remember that you're not allowed to talk about the case

24   amongst yourselves or with anyone else.  Don't permit anyone to

25   talk about the case in your presence.  Don't read, listen or

O6IBGUO5                          Reyes - Redirect

1    watch anything from any source having to do with the subject

2    matter of this case.  Have a good day off.

3              THE LAW CLERK:  Jury exiting.

4              (Jury not present)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6IBGUO5                          Reyes - Redirect

1                  (Jury not present)

2              THE COURT:  Please be seated.  Is there anything

3     before we resume on Thursday morning?

4              MR. FINKEL:  Your Honor, just briefly, and this may

5     come up with other witnesses.  The reason I objected regarding

6     the disclaimer in the membership agreement pertains to your

7     Honor's ruling. Your Honor decided that it is proper and fair

8     for the defense to question victims about whether the

9     disclaimers made representations by the defendant not material,

10    or sort of seek to underline the materiality of what the

11    defendant said.  Your Honor's ruled on that.  Ms. Reyes did not

12    invest in G/Clubs. She did not invest in any of Guo's

13    investment offerings.  For that reason, it occurred to us that

14    based on your Honor's ruling, it would be improper to suggest

15    to the jury that, as your Honor put it, there's a fine line

16    between properly asking about an investor's sophistication and

17    improperly implying to the jury that the investor should have

18    found out the truth about the alleged misrepresentations.

19    Which is to say that by Mr. Guo saying in videos that he was

20    offering stock, if the investor, member, or victim went to the

21    website and saw the disclaimer, they should have known this was

22    fine.

23             Mr. Reyes being used as a vehicle to sort of plaster

24    the disclaimer, the government views as improper and in

25    contrary to your Honor's ruling.  That ship has sailed. But in

1   an appropriate time and if this comes up again, I expect that

2   we'll ask for some sort of instruction, cause the government is

3   concerned that the jury is confused about how to consider these

4   disclaimers.  And while it's fair for them to consider them as

5   your Honor has already ruled as an issue of materiality for the

6   victims, it's improper for them to consider it as a reason why

7   victims should not have been defrauded, and that was the reason

8   for my objection.

9        THE COURT:  But are you saying that only a victim can

10  be questioned about these disclaimers?  Are you saying that a

11  non-victim should not be questioned about this?

12       MR. FINKEL:  I think it depends.  Really the devil is

13  in the details.  The way the questions were posed to Ms. Reyes

14  were just reading the disclaimer and saying in effect, and

15  forgive me if I'm misquoting, the member saw this, member knew

16  this, something to that effect.  That's what I recall.  I do

17  think that's improper to Ms. Reyes.  She can't speak to what

18  members saw.  I think the purpose of those questions was to

19  plant a seed in the jury's mind that because the disclaimer is

20  there, it renders -- it undermines the government's proof.  As

21  your Honor ruled, the disclaimer has a purpose in the

22  consideration of the matters before them, it's a specific

23  purpose.  And so the government is concerned that the jury is

24  confused about what that purpose is.

25       MR. KAMARAJU:  Your Honor, while I am sure that the

1    government is concerned about evidence undermines its proof,

2    the law is that materiality is determined by the totality of

3    information available to the potential investors.  That's TSC

4    v. Basic Industries and U.S. v. Litvak.  And that a jury is

5    suppose to consider the totality of information in deciding

6    whether a particular statement is material or not material for

7    purposes of the securities law or the wire frauds statute.

8    There is no ruling by the Court that I'm aware of that says

9    that a witness cannot authenticate one of the disclaimers,

10   which is what happened with Ms. Reyes.  Your Honor gave a

11   limiting instruction.  Your Honor is going to give instructions

12   as to the law which will clear up any confusion that the jury

13   might have, especially since they're not supposed to be

14   deliberating now anyway.  And now this is the second or third

15   time I believe that the government has now asked for this

16   similar limiting instruction.

17          So I would say that given that the jury is entitled to

18   consider the total mix of information.  And given that at least

19   I don't believe I did anything to suggest that this was a

20   reliance argument or ask Ms. Reyes any question about whether

21   G/Clubs purchasers should be able to rely on the disclaimer, I

22   don't think there's an issue, and I think your Honor ruling was

23   correct. And it should come in the same way through other

24   witnesses whether they're victims or non-victims.

25          MR. FINKEL:  Your Honor, first of all, a lot of what

1     defense counsel said, not all of it, but a lot of what defense

2     counsel said is correct, but he avoided the issue that the

3     government is complaining about.  In the government's view, and

4     this is reading from your Honor's ruling.  This is docket 319

5     at page 17.  The government sought to preclude certain evidence

6     and certain arguments because "from arguing that victims were

7     negligent or insufficiently vigilant."  Meaning there should be

8     no suggestion -- and this is the law, and defense counsel has

9     not stated otherwise.  The jury shouldn't think, oh, wait a

10    second.  They had the disclaimer on the website.  And if Ming

11    Yang Woo just went to the disclaimer and saw the disclaimer,

12    this wouldn't have happened to her.  It's her fault.  And

13    that's not the law. And that's defense counsel has not

14    suggested otherwise.

15            So while defense counsel is correct that the full mix

16    of information maybe relevant to materiality, meaning the

17    materiality of Guo's statements, it should not be used for an

18    improper purpose.  So the government's request for a

19    instruction is consistent with what defense counsel just said

20    which is to deliver to them the law so they know how to

21    assimilate this information that's coming at them because they

22    don't know.

23            THE COURT:  So my sense is that Mr. Kamaraju was

24    merely pointing to the disclaimer, not making a reliance

25    argument.  And I will in the jury charge make very explicit

O6IBGUO5                         Reyes - Redirect

1   what the law is, and I think that that is adequate as oppose to

2   a limiting instruction in the middle of the trial.

3          MR. KAMARAJU:  Thank you, your Honor.

4          MR. FINKEL:  Understood.

5          THE COURT:  Anything further?

6          MR. KAMARAJU:  Nothing from the defense, your Honor.

7          MR. FINKEL:  Nor the government, your Honor.  See you

8   on Thursday.

9          (Adjourned to June 20, 2024 at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   LIMARIE REYES

 4   Direct By Mr. Finkel . . . . . . . . . . . .3044

 5   Cross Q. . . . . . . . . . . . . . . . . . .3151

 6   Redirect By Mr. Finkel . . . . . . . . . . .3270

 7   Recross By Mr. Kamaraju  . . . . . . . . . .3279

 8   Redirect By Mr. Finkel . . . . . . . . . . .3280

 9                    GOVERNMENT EXHIBITS

10   Exhibit No.                          Received

11    GC-519, GC-523, GC-524, GC-529 GC-535,  . . .3133

12          GC-349, GC-373 and GC-177

13    GC-41  . . . . . . . . . . . . . . . . . . .3138

14    106  . . . . . . . . . . . . . . . . . . . .3059

15    118  . . . . . . . . . . . . . . . . . . . .3059

16    119  . . . . . . . . . . . . . . . . . . . .3082

17    GC-232  . . . . . . . . . . . . . . . . . .3136

18    GC-378  . . . . . . . . . . . . . . . . . .3135

19    GC-515  . . . . . . . . . . . . . . . . . .3135

20    GC-544  . . . . . . . . . . . . . . . . . .3122

21    GC-544  . . . . . . . . . . . . . . . . . .3134

22    GC551  . . . . . . . . . . . . . . . . . . .3099

23    GC-552  . . . . . . . . . . . . . . . . . .3136

24    3533-50  . . . . . . . . . . . . . . . . . .3262

25                    DEFENDANT EXHIBITS
</pre>

```
 1   Exhibit No.                                  Received
 2    20121   . . . . . . . . . . . . . . . . . .3195
 3    20234   . . . . . . . . . . . . . . . . . .3204
 4    20235   . . . . . . . . . . . . . . . . . .3200
 5    60595   . . . . . . . . . . . . . . . . . .3219
 6    60597   . . . . . . . . . . . . . . . . . .3221
 7    60600   . . . . . . . . . . . . . . . . . .3168
 8    60604   . . . . . . . . . . . . . . . . . .3213
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```