O6K1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                  Defendant.                Trial
 6   ------------------------------x
                                            New York, N.Y.
 7                                          June 20, 2024
                                            9:00 a.m.
 8
     Before:
 9

10                       HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6K1GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6K1GUO1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.

3              ALL COUNSEL:  Good morning, your Honor.

4              THE COURT:  Would you make your appearance, please.

5              MS. MURRAY:  Good morning, your Honor.  Juliana Murray

6    and Micah Fergenson on behalf of the United States.  We're

7    joined by paralegal specialist Isabel Loftus.

8              MS. SHROFF:  Good morning, your Honor.  On behalf of

9    Mr. Kwok, Sabrina Shroff, Sid Kamaraju, and Scott Schirick, and

10   Jorge Salazar.

11             THE COURT:  Please be seated.

12             Very early this morning I received a letter from Bess

13   Fung, and she claims that her father, Henry Fung, was "victim

14   of the GTV scam," and asking to testify on his behalf and, if

15   that's not possible, having the father testify.  So I am going

16   to have that letter uploaded to the docket.

17             Is there anything you'd like to tell me about?

18             MR. FERGENSON:  Yes, your Honor.  One matter from the

19   government.  The government expects that a Morgan Stanley

20   employee will testify today.  Her name is Elizabeth Berstler.

21   She was an account associate for the G|CLUBS account at Morgan

22   Stanley.  The thrust of her testimony concerns wire transfer

23   requests that G|CLUBS made.  Specifically, they requested a

24   10 million GBP——British pound——transfer to Fiesta Properties

25   Development Ltd. in the UK.  That was pursuant to what was

O6K1GUO1

represented to be a loan agreement for that amount between

G|CLUBS and Fiesta.  Morgan Stanley made I think ultimately

four wire transfers pursuant to that request to transfer the

balance of the 10 million to Fiesta.

In connection with those requests, Morgan Stanley's

fraud operations department flagged the initial wire and

requested that Ms. Berstler obtain the purpose of the wire from

the client.  She did so.  The purpose was represented to be a

loan agreement so that Fiesta could make a real estate property

purchase.  That wasn't true.  The Fiesta money was used to buy

a $4½ million Ferrari for Mr. Guo's son, Mileson Guo, or Qiang

Guo.  And I flagged this for your Honor because we would like

to ask, in order to prove materiality of the bank fraud object

of our 1349 count, ask the witness, you know, if she had known

that the purpose provided to her was not how the funds would

actually be used, would she have processed the wire transfer.

And I wanted to raise that in advance for your Honor, given our

prior discussions on it.  That was the subject of our motion *in

limine*, where we asked to be able to ask such questions to

victims and banks in order to prove materiality, banks in

particular, for the 1349 object of bank fraud.

MR. SCHIRICK:  Your Honor, I won't go through the

defense's, you know, factual disputes with Mr. Fergenson's

characterization of that transaction.  Suffice it to say we

don't agree that that's correct.

O6K1GUO1

1          Having said that, I think with respect to the
2   materiality question, the defense's position is twofold.  One,
3   it's unclear to us, at least, that this witness had any
4   authority whatsoever to either approve or disprove or decline
5   to give approval for this particular transaction.  Our
6   understanding is that that approval authority rested with other
7   parts of the bank and that this witness cannot testify to that.
8   So that's a foundational issue number one.

9          And number two, to the extent that the Court does
10  permit this testimony, we would just ask that we have
11  reciprocal ability to ask similar hypothetical questions.

12          THE COURT:  So do you know whether she had
13  decision-making authority?  Because if she did not, then the
14  question would be:  Had you known this, would you have reported
15  this to your superiors?

16          MR. FERGENSON:  Yes, your Honor, and I think your
17  Honor hit the nail on the head with the follow-up question.  As
18  would happen at a large bank, she's one link in the chain of
19  approving a wire transfer.  So she receives the misrep and then
20  she conveys it to fraud operations, which then approves the
21  wire transfer.  So, you know, I think that suffices.  That's
22  enough.

23          THE COURT:  So I will permit first a question as to
24  her decision-making authority, her role, and a question in
25  which you ask had she known that the purpose was the purchase

O6K1GUO1

1    of the car, would she have given that information to whomever

2    it is that she would have given it to.

3                MR. FERGENSON:  Understood.

4                I'm not sure what the other hypothetical questions may

5    be, your Honor.  I guess we can see; we can address them as

6    they come up from the defense.

7                THE COURT:  Okay.

8                MR. SCHIRICK:  Nothing further if the Court is fine

9    with that, leaving the hypothetical issue there.  We can take

10   it up in realtime.

11               MS. SHROFF:  May I, your Honor?

12               THE COURT:  Yes, you may.  Go ahead.

13               MS. SHROFF:  As to Ms. Fung, the defense has no

14   position, just to close that loop.  Thank you.

15               I did have one additional matter to raise regarding

16   the first witness, through whom the government seeks to

17   introduce various photographs, and they're not seeking to admit

18   the underlying seizure of the material, simply the photographs.

19               So part of the photographs that they seek to introduce

20   at trial are several boxes of scarves and personal items that

21   were found in Ms. Wang's apartment, another group of

22   photographs of Ms. Wang's apartment itself, and then the third

23   group of photographs seem to concern cash that was seized/found

24   in her apartment.  I understand that this is a conspiracy case.

25   Nevertheless, it is the defense's position that seeking to

O6K1GUO1

1    introduce photographs of the material seized would be (1)

2    improper based on relevance, (2) photographs themselves are

3    simply evidence of the photograph, not the underlying seizure,

4    but (3) on the matter especially of the credit cards and the

5    cash, the government wants to introduce them without providing

6    the defense with a witness that could be crossed.  So the 3500

7    material for the witness itself says she had no role to play in

8    any of the seizure.  She simply took the photograph.  So if the

9    Court were to allow into evidence, over my objection, for

10   example, the cash, I would not be able to cross-examine because

11   the witness would simply say, I don't know.  I would not be

12   able to elicit from the witness the fact that the cash is dated

13   as far back as 2013, a fact that the government is aware of,

14   because it was flagged for them during Ms. Wang's bail

15   application and there was an affidavit introduced by Ms. Wang's

16   lawyer saying that he had gone to their offices, examined the

17   cash, the denominations of the notes itself go as far back as

18   2013.  So normally, I would understand that the Court would

19   say, well, they're admissible, Ms. Shroff, you can cross on

20   weight.  But I don't have a witness whom I can cross because

21   she's the one who just took the photographs.

22          THE COURT:  So you understand that the prosecution

23   wishes to use these photographs as fruits of the alleged fraud.

24          MS. SHROFF:  Sure.  But——

25          THE COURT:  And so you have not challenged the

O6K1GUO1

1     legality of the seizure.

2              MS. SHROFF:  I can't.  I don't have standing.  It's

3     not my client's home; it's Ms. Wang's home.

4              THE COURT:  And Ms. Wang has pleaded guilty.

5              MS. SHROFF:  Right.

6              THE COURT:  I'll hear from the prosecution.

7              MS. MURRAY:  Yes, your Honor.

8              We believe that all of those categories of photographs

9     reflecting the evidence from the search warrant should come in.

10             As to the first category, well, initial matter, there

11    is a stipulation between the parties as to the

12    photographs——both that the photographs from the search are true

13    and accurate photographs that were taken on that day pursuant

14    to a lawful premises search, and then as to the photographs of

15    the items that were seized, that those were photographs of

16    items that were lawfully seized, and those photos were taken

17    either on the day of the search or later by someone who

18    participated in the lawful seizure of those items.  It's for

19    efficiency that the government seeks to introduce these

20    photographs through one witness in order to bring in the search

21    instead of calling multiple witnesses who can speak to the

22    actual items seized, parading in boxes of the items that were

23    actually seized.  And there's no question as to the

24    authenticity of any of these photographs or what they

25    represent.  The parties have stipulated to that.

O6K1GUO1

1          With respect to the photographs of boxes of Hermès

2    scarves and bags, the government argues that those are fruits

3    of the fraud that's charged.  Those are very expensive items.

4    They're something that has been litigated in Ms. Wang's bail as

5    items that she purchased that were during the charged

6    conspiracy that were high-value items.  There's no reason to

7    prohibit the government from bringing those in.

8          I'm not sure the basis, if any, for excluding

9    photographs of the apartment.  That's just establishing the

10   area that was actually searched pursuant to the warrant.

11         And then with respect to the cash, it was

12   approximately $138,000 in bulk cash that was seized from the

13   safe.  Ms. Shroff is correct; there was argument with respect

14   to Ms. Wang.  Her counsel came to the FBI's offices, inspected

15   every bill of the cash.  The fact that some of the money was

16   brought into circulation in 2013, it's the government's

17   contention, has absolutely no bearing on when it was actually

18   obtained by Ms. Wang.  I don't have a dollar bill on me right

19   now, but I suspect that if I looked at cash that I had in hand,

20   it would not all be dated 2024.  Which is to say that money is

21   in circulation and it is fungible and it comes in and out, and

22   the fact of the issuance of those bills has no bearing on the

23   government's contention; and specifically, the government's

24   contention is that a large amount of bulk cash was taken from a

25   safe pursuant to a lawful seizure warrant, so we don't see any

O6K1GUO1

1    basis to exclude our introducing that.

2              THE COURT:  And the witness, what relationship does

3    she have to the seizure?

4              MS. MURRAY:  The witness was the photographer, so she

5    was present.  It's like one of the other witnesses that we had

6    for a prior lawful premises search.  She was present and took

7    the photos during the search.

8              And again, your Honor, we do have a stipulation as to

9    the photos, both the photos from the search and the photos of

10   the items seized.

11             THE COURT:  I'm going to admit the photos.

12             MS. SHROFF:  Your Honor, may I just——I just want to

13   make sure that I put on the record the following:  I did not

14   argue authenticity of any of the material or the photographs.

15   My argument was simply to relevance.

16             And just to go back to what Ms. Murray is saying to

17   the Court, yes, I too have a dollar bill in my pocket; it could

18   be from 2013, or it could be from 2023.  The point is, that's

19   an equipoise.  I would not be able to argue anything because I

20   do not have a witness that I can cross.  That's the point.  Of

21   course the bill could be in circulation; it could have been in

22   circulation since 2019 or 2001 or 1984.  That's not the point.

23   The point is, I am unable to argue that, (1) because I don't

24   have the correct witness, and (2) because I do not have the

25   underlying notes.  I do not have the dollar bills.

O6K1GUO1

1          I also just want to make sure that the Court is aware

2     that this matter was part of the docket.  It is docket entry

3     81-18.  The government has known about this argument since the

4     filing of that particular docket number.  And there are 16

5     separate stacks of cash.  The review of the stacks of cash show

6     that they range from 2013 to 2017.  I would not be able to

7     cross-examine on any of this.

8          I also just note, in terms of the number of

9     photographs the government seeks to introduce, it's 122

10    photographs.  We have no objection to the photographs of the

11    physical layout of the home.  They believe that to be relevant.

12    I don't see how.  That's the Court's ruling; I understand that.

13    But to argue that everything in that apartment is a proceed of

14    a fraud without providing to the defense a witness that can be

15    crossed on that issue would not be fair to Mr. Guo.

16         And finally, just one point.  Expediency for the

17    government does not trump Mr. Kwok's rights to due process and

18    the proper witness.

19         So for those reasons, we continue to object.  Thank

20    you, your Honor.

21         MS. MURRAY:  And just briefly on that, your Honor, I

22    would note that Mr. Guo does not have standing to challenge

23    this search, nor has he challenged legality of the search.

24         I would also note that we are aware that there will be

25    a defense case——we're aware of that from recent conversations

O6K1GUO1                        Gale - Direct

 1   with the defense——so to the extent that they want to call a

 2   witness to challenge any of these issues, they may do so in

 3   their case.

 4          THE COURT:  Okay.  I've heard enough on the issue.

 5   I've heard enough argument on this issue.  I am admitting the

 6   photographs.

 7          Is there anything else?

 8          MS. SHROFF:  No, your Honor.  I just think burden

 9   shifting would be against the law and the Constitution.

10          THE COURT:  Nothing further before we start at 9:30?

11          MR. KAMARAJU:  Not from the defense.

12          MS. MURRAY:  Not from the government.

13          THE COURT:  All right.  So if you'll have your next

14   witness on the stand, or standing at least next to the stand by

15   9:29, please.

16          MS. MURRAY:  Will do.

17          (Recess)

18          THE COURT:  Please have the jurors brought in.

19          (Continued on next page)

20

21

22

23

24

25

O6K1GUO1                          Gale - Direct

1                    (Jury present)

2                    THE COURT:  Please be seated.

3                    Good morning, jurors, after a glorious day off.

4                    THE JURORS:  Good morning.

5                    THE COURT:  We're going to start fresh with a new

6     witness.

7                    Would the prosecution call its witness, please.

8                    MR. HORTON:  Your Honor, the government calls

9     Alexandra Gale.

10                   (Witness sworn)

11                   THE COURT:  Would you state your name and spell it,

12    please.

13                   THE WITNESS:  Alexandra Gale.  A-L-E-X-A-N-D-R-A, and

14    the last name is G-A-L-E.

15                   THE COURT:  Ms. Gale, I'm going to need you to get

16    very, very close to the microphone so that we can all hear you.

17                   THE WITNESS:  Okay.  Is that better?

18                   THE COURT:  That is better, but you can get even

19    closer.

20                   THE WITNESS:  Okay.

21                   THE COURT:  And Mr. Horton, I want you also to get

22    close to the microphone so that we can hear.

23                   MR. HORTON:  Yes, your Honor.

24                   THE COURT:  You may inquire.

25                   MR. HORTON:  Thank you, your Honor.

1      ALEXANDRA GALE,

2           called as a witness by the Government,

3           having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. HORTON:

6    Q.  Good morning, Ms. Gale.

7    A.  Good morning.

8    Q.  Where do you work?

9    A.  The FBI in New York.

10   Q.  And what is your title at the FBI?

11   A.  I'm a staff operations specialist.

12   Q.  What office are you assigned to?

13   A.  The New York field office.

14   Q.  And Ms. Gale, how long have you been with the FBI?

15   A.  Approximately five years full time.

16   Q.  What are your various duties as a staff operations

17   specialist at the FBI?

18   A.  I'm more of a tactical analyst, so we do analysis of social

19   media, telephones, open-source research kind of stuff.

20   Q.  And when, if ever, does your job require you to take

21   pictures?

22   A.  I am a collateral duty photographer.

23   Q.  And what does that mean, a collateral duty photographer?

24   A.  So I'm a backup.  If they need an extra person, if one of

25   them is out of the office or if they have multiple locations on

1    a search, then they'll ask me to do it.

2    Q.  And as a photographer for the FBI, what do you take

3    photographs of?

4    A.  Typically search warrant executions.

5    Q.  And what is a search warrant execution?

6    A.  We will——if a squad gets a search warrant for a location,

7    then they're allowed to go in and search legally.

8    Q.  And what sort of training, if any, do you have to be an FBI

9    photographer?

10   A.  I learned from the FBI photographers that are full-time

11   photographers, and they taught me by taking me out with them

12   and doing their photo log so I would see the way that they did

13   photography in a search warrant, and then they would have me do

14   it myself while they were there to make sure I was doing it

15   correctly.

16   Q.  You said you learned in part by doing a photo log.  What's

17   a photo log?

18   A.  It's a log that somebody on the search team will keep with

19   the photographer, so every time the photographer takes a photo,

20   the logger will write the number of the photo and what was

21   taken in the photo.

22   Q.  Ms. Gale, I want to direct your attention to March 15,

23   2023.  What, if anything, did you do at work that day?

24   A.  I photographed a search.

25   Q.  And where was the location of the search that you

O6K1GUO1                          Gale - Direct

1   photographed that day?

2   A.  It was somewhere in Manhattan.

3   Q.  Do you remember what street it was on?

4   A.  I think it was East 64th.

5   Q.  Did the FBI have a search warrant that day?

6   A.  Yes.

7   Q.  And what did the search warrant allow the FBI to do?

8   A.  Search the apartment that we had searched.

9           MR. HORTON:  Your Honor, at this time the government

10  offers a stipulation that has been marked as GX Stip 4.

11          THE COURT:  It is admitted.

12          (Government's Exhibit Stip 4 received in evidence)

13          MR. HORTON:  Could we publish it, please, Ms. Loftus.

14          The document is entitled Stipulation Regarding Wang

15  Apartment Search, and it says that the parties agree that if

16  called as a witness at trial, a special agent of the Federal

17  Bureau of Investigation ("the FBI") would testify as follows:

18          On March 15, 2023, Special Agents and other FBI

19  employees executed a lawful search of 188 East 64th Street,

20  Apartment 1601, New York, New York.  During the course of that

21  search, FBI personnel took photographs of interior space of 188

22  East 64th Street, Apartment 1601, New York, New York, and also

23  lawfully seized items, documents, and electronic devices.

24          At the time of the search, Yvette (Yanping) Wang was

25  the sole resident of 188 East 64th Street, Apartment 1601, New

O6K1GUO1                          Gale - Direct

1    York, New York.

2           GX WA1 - 135 are fair and accurate photographs of

3    interior spaces of 188 East 64th Street that were lawfully

4    captured by an FBI photographer on March 15, 2023, when

5    conducting the search.

6           GX WA601 - 656 are fair and accurate images of

7    documents and items that were located at 188 East 64th Street,

8    Apartment 1601, New York, New York, on March 15, 2023, during

9    the search.

10          It says, it is further stipulated and agreed that this

11   stipulation may be received into evidence.

12          GX WA1 - 12, 14 through 79—I apologize.  Let me

13   correct that.  14 - 68, 69 - 79, 83 - 85, 89 - 92, 95 - 115,

14   123, 124, and 126 - 135, all of which are covered in the

15   stipulation.

16          THE COURT:  They are admitted.

17          (Government's Exhibits WA1-WA12, WA14-WA68, WA69-WA79,

18   WA83-WA85, WA89-WA92, WA95-WA115, WA123, WA124, and WA126-WA135

19   received in evidence)

20          MR. HORTON:  Thank you, Ms. Loftus.  You can take that

21   down.

22   BY MR. HORTON:

23   Q.  Ms. Gale, what was the first thing you did when you arrived

24   at this apartment on March 15, 2023?

25   A.  I spoke to the search team leader.

1    Q.  And what did you speak to her about?

2    A.  We did a walk-through of the apartment before I started

3    taking photos to decide what to label each room.

4    Q.  And what happens before you do a walk-through?

5    A.  The agents on the search warrant will clear the apartment

6    to make sure it's safe.

7    Q.  And what does it mean for agents to clear an apartment?

8    A.  They'll go in and check if anyone is in there.

9    Q.  You said you did a walk-through.  Can you explain to the

10   jury what a walk-through is.

11   A.  So basically we'll walk through the apartment and label

12   each room, typically in the order that they walk through it.

13   So, for example, if the kitchen is the first room, we'll label

14   that A.  So we walked through to see what the layout was, and

15   then came back out of the apartment.

16   Q.  And after your walk-through that morning, Ms. Gale, what

17   did you do next?

18   A.  We started entry photos.

19   Q.  And what do you mean by entry photos?

20   A.  So before any searching happens, I take photographs of the

21   entire apartment as is before we start touching anything.

22   Q.  During the walk-through and during the entry photos, what,

23   if anything, do you do, or what, if anything, did you do to

24   items that you see in the apartment?

25   A.  Nothing.

O6K1GUO1                          Gale - Direct

1   Q.  And what happened next after you took entry photos?

2   A.  Then I tell the search team later that they're good to

3   start searching.

4   Q.  And what do you do when the search is happening?

5   A.  I will wait for somebody searching to ask me to take a

6   photo of any evidence or important items that they might have

7   found.

8   Q.  Are you ever able to take photos on your own?  Let me

9   withdraw that.

10          Who decides what photos you take?

11  A.  The searching agents or FBI staff.

12  Q.  And how does an agent ask you to take a photo?

13  A.  They will just call my name and say, hey, can you come take

14  a photo of this.

15          MR. HORTON:  Ms. Loftus, can you pull up what's in

16  evidence as GX WA2.

17  Q.  While that's coming up, Ms. Gale, were you the only person

18  taking photos for the FBI that morning?

19  A.  Correct.

20          MR. HORTON:  Okay.  Can we please publish this,

21  Ms. Loftus.

22  Q.  Did you take this photo, Ms. Gale?

23  A.  I did.

24  Q.  What are we looking at here?

25  A.  This is a picture of——I was standing in the hallway taking

1    a photo with the door open of the first thing you see when you
2    walk into the apartment.
3    Q.  And where in relation to this photo is the kitchen?
4    A.  Just to the left.
5          MR. HORTON:  Okay.  Can we put up WA9, please,
6    Ms. Loftus.
7          THE COURT:  Are you saying that the door on the right
8    is the front door?
9          THE WITNESS:  That's correct.
10   Q.  What room in the apartment was this photo taken in,
11   Ms. Gale?
12   A.  This is the kitchen.
13   Q.  And what does it show?
14   A.  Looks like a number of phones charging, water bottle,
15   fruit.
16   Q.  Are those the only phones you took photos of that morning?
17   A.  I don't think so.
18          MR. HORTON:  Could we pull up WA107.
19   Q.  Did you take this photo, Ms. Gale?
20   A.  I did.
21   Q.  What does it show?
22   A.  An Apple iPhone.
23   Q.  Is this one of the phones that was charging in the kitchen?
24   A.  I don't know if it's the same one.
25          MR. HORTON:  Ms. Loftus, if you could pull up WA15.

O6K1GUO1                           Gale - Direct

1    Q.  What room in the apartment is this, Ms. Gale?

2    A.  This is the bedroom.

3    Q.  And is this how it appeared when you entered that morning?

4    A.  Yes.

5            MR. HORTON:  Ms. Loftus, could you zoom in to the sort

6    of center of the image.

7            And if you could zoom in to the item in the middle of

8    the screen.

9    Q.  Was this item there when you came into the bedroom that

10   morning, Ms. Gale?

11   A.  Yes, it was.

12   Q.  And what is it?

13   A.  Looks like a photo of a person.

14   Q.  Do you know who's in that photo?

15   A.  I don't.

16   Q.  And what does it say, if anything, at the top of the photo?

17   A.  "The Hero."

18           MR. HORTON:  Okay.  You can take that down, please,

19   Ms. Loftus.

20           Ms. Loftus, if you could put up at the same time

21   WA62-64, please.

22   Q.  Looking at the top left of your screen, WA62, Ms. Gale,

23   what are we looking at there?  What's the frame around the

24   outside?

25   A.  This is a photo of the——an open safe, and you're looking at

1    the contents of the safe.

2    Q.  And so where was the bag on the right found?

3    A.  In that safe, on the left.

4    Q.  What's depicted in the image at the bottom here, WA64?

5    A.  Cash.

6    Q.  And where was that cash found?

7    A.  In the bag that was found in the safe.

8    Q.  What room in the apartment was the safe found in?

9    A.  I believe it was the bedroom.

10           MR. HORTON:  Ms. Loftus, if you could take these down,

11   please, and put up WA41.

12   Q.  Ms. Gale, what are we looking at here?

13   A.  This is a clear organizer with paper clips, whiteout, pens,

14   and thumb drives.

15           MR. HORTON:  Ms. Loftus, could you zoom in to the left

16   side of the drawer, please.

17   Q.  And what is shown on the flash drives, Ms. Gale?

18   A.  Two of them have labels.

19   Q.  Do you know what MK is?

20   A.  I don't.

21           MR. HORTON:  You can take that down, please,

22   Ms. Loftus.

23   Q.  Ms. Gale, did you take pictures of hard-copy documents at

24   this apartment?

25   A.  Yes, I did.

O6K1GUO1                          Gale - Direct

1    Q.  And how did you decide which photos to take?

2    A.  Whatever the searching agents and FBI professional staff

3    asked me to take.

4    Q.  And where in the apartment were the hard-copy documents

5    that you took photos of?

6    A.  I know there were some in the living room.  I don't

7    remember if there were others as well.

8              MR. HORTON:  Ms. Loftus, can you pull up WA20, please.

9              If you could zoom in to the top of the document on the

10   left side, please, and highlight the To line and the Date line,

11   please.

12   Q.  Ms. Gale, what kind of document is this?

13   A.  It looks like a printed email.

14   Q.  And what are the names next to the email addresses in the

15   to line?

16   A.  Do you want me to read the email itself or just the name?

17   Q.  I'm sorry.  Could you just read what's written next to the

18   email addresses in the To line, please.

19   A.  Ladym space g and Max Krasner.

20   Q.  Do you know what ladym g means?

21   A.  I don't.

22   Q.  And do you know who Max Krasner is?

23   A.  I don't.

24   Q.  What's the date of this document?

25   A.  Tuesday, March 14th, 2023.

1          MR. HORTON:  Ms. Loftus, if you could zoom out and

2     then capture the part from "Dear Miss Guo" to the third

3     photograph.

4          If you could highlight the first sentence in that

5     third paragraph, please.

6     Q.  And then Ms. Gale, if you could read that, aloud.

7     A.  It says, "I have copied Mr. Max Krasner, whom I was

8     regularly I contact with for Whitecroft, on this reply."

9          MR. HORTON:  Ms. Loftus, can you replace that with

10    WA109, please.

11         And Ms. Loftus, if you could zoom in to what's written

12    on the item on the left, please.

13    Q.  What does this image show, Ms. Gale?

14    A.  It's a photo of a notepad with handwritten notes on it.

15    Q.  And what, if anything, is written at the top of the notepad

16    on the left side?

17    A.  The word Max.

18    Q.  Under that, there are lines that start with what look like

19    hyphens.  Could you just read the first word or acronym for

20    each of those items from top to bottom under Max.

21    A.  Yeah, it's GSNY, and then in parentheses (Citi).

22              The next one is Genever, G-E-N-E-V-E-R.

23              The third one said Leading.

24              The fourth one says Greenwich LLC.

25              And then the next one is S-A-R-A-C-A.

O6K1GUO1                          Gale - Direct

1            And then ROLS and then Hudson.

2   Q.  Do you know what any of those mean?

3   A.  I don't.

4            MR. HORTON:  Ms. Loftus, could you replace this one

5   with WA68, please.

6            And then please zoom in to the text of the document

7   and highlight what's written at the top.

8   Q.  Did you take this photo, Ms. Gale?

9   A.  Yes.

10  Q.  Can you please read what's written at the top of this

11  document.

12  A.  HCN Allocation at USD 0.1.

13  Q.  Do you know what HCN allocation means?

14  A.  I do not.

15           MR. HORTON:  Ms. Loftus, if you could highlight just

16  below the middle of this list, the line that starts Andrew Law

17  and Roger Smee, those two lines, and extend to the end of the

18  row, please.

19  Q.  Ms. Gale, can you please read these two line items.

20  A.  "Andrew Law:  Mileson's friend."

21           And, "Roger Smee:  Mileson's friend."

22  Q.  And what is on the same line of those words?

23  A.  A dollar amount.

24  Q.  And what's the dollar amount for each of those lines?

25  A.  I believe the one in line with Andrew Law is either 980,000

1    or 300,000, and then Roger Smee looks like 250,000, or the line

2    above.

3    Q.  And Ms. Gale, can you read what's at the top of the column

4    where those figures are.

5    A.  It says Total HCN.

6              MR. HORTON:  Ms. Loftus, if you could highlight the

7    line that's three above Andrew Law, please.

8    Q.  And can you read that line item for us, Ms. Gale.

9    A.  Yeah, the name is spelled Y-A-N-P-I-N-G space W-A-N-G, and

10    it looks like the dollar amount is probably the 6,999,800, but

11    it could also be the 20 million.

12    Q.  Do you have any idea what this list represents?

13    A.  I don't.

14              MR. HORTON:  Ms. Loftus, if you could please replace

15    this with WA26.

16              And if you could zoom in around the content of the

17    document, please.

18              Sorry, Ms. Loftus.  If you could get the word that's

19    at the top of the document.  Thank you.

20    Q.  Ms. Gale, was this document in the apartment that day?

21    A.  Yes.

22    Q.  And what does it say at the top?

23    A.  Inventory.

24    Q.  What kinds of things are shown on this document?

25    A.  It looks like motor vehicles.

O6K1GUO1                          Gale - Direct

1    Q.  Looking at the second column from the left, it says

2    Year/Make.

3            MR. HORTON:  Ms. Loftus, can you zoom in on the third

4    from the bottom, starting with 2021 in the Year/Make column,

5    that whole line.

6    Q.  What's written in the Year/Make column here second from the

7    left, Ms. Gale?

8    A.  2021 Lamborghini Aventador.

9    Q.  The column to the——and then there's a picture of a car to

10   its right.  The column to the right at the top says State in

11   that.  What's in that box?

12   A.  CT.

13   Q.  What, if anything, do you understand CT to mean?

14   A.  Connecticut.

15   Q.  Moving to the right side of this line, the box second from

16   the left is in a column entitled Owner.  Can you please read

17   what's in the Owner column for the 2021 Lamborghini Aventador.

18   A.  Yes.  The last name is spelled D-E-F-E-N-G, looks like the

19   given name is C-A-O, with an address, 373 Taconic,

20   T-A-C-O-N-I-C, Road in Greenwich, Connecticut.

21   Q.  And the box to the right of that is in a column entitled

22   Notes.  Can you please read what's in the notes column for the

23   2021 Lamborghini Aventador.

24   A.  It says "G Club International Ltd?"

25           MR. HORTON:  Ms. Loftus, if you could zoom out and

1   then zoom in on the line four above that, starting with 2021

2   Ducati in the Year/Make column.  Do you know what a Ducati is,

3   Ms. Gale?

4   A.  I don't.

5   Q.  Okay.  What's shown in the photo box for this line item for

6   the 2021 Ducati?

7   A.  It looks like a motorcycle.

8   Q.  And going back to the Owner box, second from the right

9   here, can you please read the name and address that's in that

10  box.

11  A.  It looks like the same name, D-E-F-E-N-G, C-A-O, at 88

12  R-E-G-E-N-T Street in Jersey City, New Jersey.

13  Q.  Was that the same address you read for the Lamborghini?

14          MS. SHROFF:  Objection.

15          THE COURT:  Overruled.  You may answer.

16  A.  No.

17  Q.  And in the Notes column to the right of the name and Jersey

18  City address, can you read what's in the notes column for the

19  Ducati.

20  A.  It says, "DMV backed up 6-8 weeks, NY reg, then will need

21  to be transferred, the last name D-E-F-E-N-G, from Scott."

22          MR. HORTON:  You can zoom out of that, Ms. Loftus.

23          If you can zoom in to the bottom two line items on

24  this document, please.

25  Q.  What's written in the top box under Year/Make?

O6K1GUO1                          Gale - Direct

1   A.  Camper Van.

2   Q.  Do you know what a camper van is?

3   A.  Yes.

4   Q.  What is a camper van?

5   A.  It's a, like, bigger motor vehicle that you can also sleep

6   in.

7   Q.  And what, if anything, is written in the Notes column at

8   the end of the camper van line item?

9   A.  "G Club International Ltd importing issue.  Still in

10  Germany.  Nina working on it."

11  Q.  What's written on the line item below the camper van,

12  Ms. Gale?

13  A.  Bugatti.

14  Q.  What's Bugatti?

15  A.  I'm pretty sure it's a type of car.

16  Q.  And what, if anything, is in the boxes to the right of the

17  Bugatti line item?

18  A.  Almost all of them say TBD, and the last one is a question

19  mark.

20  Q.  And in what column is the question mark?

21  A.  The Notes column.

22          MR. HORTON:  Ms. Loftus, if you could put up WA30,

23  please.

24          And actually, Ms. Loftus, I'll ask you to put 30-33

25  side by side.

1   Q.  Did you take pictures of documents that day, Ms. Gale, that

2   had multiple pages?

3   A.  Yes, I did.

4   Q.  And would you always take pictures of every page?

5   A.  Not necessarily.

6   Q.  Okay.  Did you sometimes do that?

7   A.  Absolutely.

8   Q.  The images here at WA30-33, is this a single document?

9   A.  Yes, I believe so.

10          MR. HORTON:  Ms. Loftus, if you could zoom in on WA30

11  on the top left, please.

12  Q.  Ms. Gale, what does it say on the top left of this

13  document?

14  A.  "Summary 2019-2023, all donations, ROLF and ROLS."

15  Q.  Do you know what ROLF is?

16  A.  I don't.

17  Q.  What about ROLS?

18  A.  I don't.

19  Q.  In the top line for ROLF, can you read the figures that are

20  reported for 2019 and 2020.

21  A.  Yes.  2019 is $4,210,315.  2020 is $8,916,019.

22  Q.  And the figures in 2019 and 2020 for ROLS below that,

23  please.

24  A.  2019 is $2,255,391, and 2020 is $4,028,774 *[sic]*.

25  Q.  The line item says Total Both Entities below that.  Can you

1    read the value at the very end of that total line, please.

2    A.  Yes.  For——oh, I'm sorry.  Under the YTD column or for

3    2019?

4    Q.  The line item that says Total Both Entities, sort of the

5    bottom third of the page, if you could read the value that's at

6    the end of that line on the far right.

7    A.  Okay.  36,840——I'm sorry.  $36,841,050.29.

8    Q.  Ms. Gale, is that figure more or less than $100 million?

9    A.  Less.

10          MR. HORTON:  Ms. Loftus, can you put up WA34 and 35

11   together, please.

12   Q.  WA34, on the left side of the screen, Ms. Gale, what's the

13   title?  What's written at the top of this document?

14   A.  G Club Operations LLC Profit and Loss January - December

15   2022.

16          MR. HORTON:  Ms. Loftus, could you zoom in on the line

17   that says Income and the line under that, the five or so lines

18   under Income.

19   Q.  Ms. Gale, what is the value reported next to Total

20   Membership Income on this document?

21   A.  $4,862,954.82.

22   Q.  And what's the bottom value under this income chart?

23   A.  $90,462,483.16.

24          MR. HORTON:  Ms. Loftus, if you could zoom out and

25   then zoom in on line item that says Total 64002 Events.  It's

1   about five up from the bottom of this page.

2   Q.  Ms. Gale, what's the value on the line that says Total

3   54000 Legal and Professional Services?

4   A.  $2,752,228.62.

5   Q.  And what's the value on the line that says Total 64002

6   Events?

7   A.  $2,550,815.84.

8           MR. HORTON:  Ms. Loftus, if you could go back to the

9   top of that first page on WA34.

10  Q.  Ms. Gale, what is the date range on this document?

11  A.  January to December of 2022.

12          MR. HORTON:  And Ms. Loftus, if you could go now to 35

13  on the right side of the screen.

14          And blow up the text on this.

15  Q.  Ms. Gale, what is the line item?  What's the figure

16  reported on the bottom line item for net income for G|CLUBS?

17  A.  $78,361,488.61.

18          MR. HORTON:  Ms. Loftus, if you could put up WA39,

19  please.

20  Q.  Ms. Gale, what is the word that appears on the top left

21  column on this document?

22  A.  Invoice Number.

23  Q.  And could you read the words that are on the right of that

24  line from left to right, after Month.

25  A.  Month.  G|CLUBS.  G Fashion.  G Music.  HCHK Tech.  FMV.

O6K1GUO1                          Gale - Direct

 1   G News.  Gettr.  GEDU.  Service Fees.  And Total.

 2             MR. HORTON:  Ms. Loftus, if you could pull up W85,

 3   please.  85.  And if you could just zoom in on the text,

 4   please.

 5   Q.  Ms. Gale, what is shown, generally, on this document?

 6   A.  It looks like login information.

 7   Q.  And can you read the line items under Login Info from Chase

 8   Genever to the bottom.

 9   A.  Yes.  (Genever) is the first one.  Chase (S-A-R-A-C-A) is

10   the second one.  Chase GVT——GTV, I'm sorry——HSBC (Leading).

11   Investors (Leading).  BOA ROLF.  The next line is PayPal ROLF.

12   Next line is Stripe ROLF.  And then BOA ROLS.  And PayPal ROLS.

13             MR. HORTON:  Ms. Loftus, on the line under Investors

14   (Leading), the first word is Fist.  Could you zoom in on the

15   end of that line, it says "oldest niece."

16   Q.  Ms. Gale, what is written next to "oldest niece"?

17   A.  It says - Gladys, G-L-A-D-Y-S.

18   Q.  Do you know who Gladys is?

19   A.  No.

20             MR. HORTON:  Ms. Loftus, if you could put up 89 and 90

21   side by side.

22             And if you could zoom in on the top half of 89 on the

23   left, please, Ms. Loftus.

24   Q.  Under the name of the bank at the top, Ms. Gale, what's the

25   title of this document?

O6K1GUO1                          Gale - Direct

1    A.  Corporate Banking Questionnaire for New Accounts.

2    Q.  And what does it say next to Company Name a few lines below

3    that?

4    A.  Holy City HK Ventures.

5    Q.  Do you know what that is?

6    A.  No.

7           MR. HORTON:  Ms. Loftus, looking at 90 on the right

8    now, if you could highlight the two names that are under

9    Director 1 and Director 2 and zoom in, please.

10   Q.  And Ms. Gale, what name is under Director 1 for Holy City

11   HK Ventures on this document?

12   A.  Aaron A. Mitchell.

13   Q.  Do you know who Aaron Mitchell is?

14   A.  I don't know.

15   Q.  What's the name written under Director 2 for Holy City HK

16   Ventures on this document?

17   A.  Victor X. Cerda.

18   Q.  Do you know who Victor Cerda is?

19   A.  I don't.

20          MR. HORTON:  Ms. Loftus, if you could put up 91 and 92

21   side by side, please.

22   Q.  Looking at the document on left, Ms. Gale, 91, what is

23   written in the large font at the top?

24   A.  Holy City Hong Kong Ventures Ltd.

25   Q.  And it says under that, "The undersigned, being the sole

1   member of the directors of Holy City Hong Kong Ventures Ltd."

2              MR. HORTON:  Ms. Loftus, if you could go down to the

3   middle of the page, please, to Directors.

4   Q.  And Ms. Gale, what does it say under 3, Directors?

5   A.  "Note the appointment of Yanping Wang as first director of

6   the company by the first registered agent of the company with

7   effect from 13th day of May, 2021."

8              MR. HORTON:  And Ms. Loftus, if you could just zoom in

9   on the last line on this page on 91.

10  Q.  What's written on the bottom of this Holy City Hong Kong

11  Ventures Ltd. document?

12  A.  New Federal State Corporation.

13  Q.  Do you know what the New Federal State Corporation is?

14  A.  No.

15             MR. HORTON:  Ms. Loftus, if you could please replace

16  these with WA96.

17             And if you could——yes, thank you.

18  Q.  What's the subject line——well, first of all, Ms. Gale, what

19  kind of document is this?

20  A.  It looks like a printed email.

21  Q.  And what does the subject line say?

22  A.  Himalaya Exchange-Username Changed.

23  Q.  And could you read the first name and the first letter of

24  the last name on the To line.

25  A.  Alex H.

1   Q.  Can you read the first three lines of the body of the email

2   below.

3            And before you do that, what's between the To, From

4   and the body of the email?

5   A.  There's a, like, what I assume is a company logo.

6   Q.  And what does it say next to——

7            MS. SHROFF:  Objection to what she assumes.

8            THE COURT:  Sustained.

9   Q.  What, if anything, do you see in the middle of this page?

10           MR. HORTON:  And Ms. Loftus, if you could zoom in

11  around it, please.

12  A.  There's a——it says Himalaya Exchange with a little insignia

13  next to it.

14  Q.  Do you know what Himalaya Exchange is?

15  A.  I don't.

16           MR. HORTON:  Ms. Loftus, if you could blow up the

17  first three lines of the email, including the greeting.

18  Q.  Could you read the greeting and the first sentence, please,

19  Ms. Gale.

20  A.  "Hi Freedom Media Ventures Limited" comma.

21  Q.  Could you read the first line of the email under that,

22  please.

23  A.  Yup.  "Your user name & contact email has been changed from

24  alexh@hchktech.com to fmvlimited@proton.me by an

25  administrator."

1           MR. HORTON:  Ms. Loftus, if you could pull up 110,

2    please.  110.

3           And if you can zoom in on the top right of this

4    document, Ms. Loftus.

5    Q.  What does it say on the top right of this document,

6    Ms. Gale?

7    A.  ACA.

8    Q.  Do you know what ACA is?

9    A.  No.

10          MR. HORTON:  If you could go back to the full

11   document, please, Ms. Loftus.

12          If you could zoom in on under "To Whom it May

13   Concern," towards the bottom.

14   Q.  Could you read the line that starts, "This is to certify."

15   A.  "This is to certify the employment details of WANG YAN

16   PING, holder of VANUATU passport No. RV058876, are as follows:"

17   Q.  And under that it says, "Yours faithfully, ACA Capital

18   Group Limited."  What appears under "ACA Capital Group

19   Limited"?

20   A.  A signature.

21   Q.  And what appears under the signature?

22   A.  The name William Je, Chief Executive.

23          MR. HORTON:  If you could please pull up WA69 and 72

24   side by side, Ms. Loftus, as well as 114, those three.

25   Q.  What's shown in the item in WA69?

1    A.  The——that's the one on the left?

2    Q.  Yes.  That's the item on the left.

3    A.  Yeah.  It's the little green zip pouch from the safe that

4    we saw earlier.

5    Q.  What was inside this green zip pouch in the safe?

6    A.  Travel documents.

7    Q.  Are those two of them on the right?

8    A.  Yes.

9    Q.  The top one, WA72, what is that?

10   A.  A passport.

11   Q.  And whose name is on the passport?

12   A.  Given name is Y-A-N-P-I-N-G, surname is Wang, W-A-N-G.

13   Q.  And looking now at the passport below that, 114.

14   A.  The given name is H-O space W-A-N, surname K-W-O-K.

15   Q.  And was this passport found in the apartment where you were

16   on March 15, 2023?

17   A.  Yes.

18          MR. HORTON:  If you could take these down, Ms. Loftus,

19   and put up 76-79.

20   Q.  So as these go up, Ms. Gale, could you tell us what we're

21   looking at.

22   A.  Yes.  The 76 is a picture of Hermès boxes and receipts.

23   The next one is Hermès scarves and I believe a couple of

24   wallets; not sure what brand.  The other photos are the same.

25   Q.  And what's Hermès?

O6K1GUO1                    Gale - Cross

1   A.  A very expensive brand, I think.

2           MR. HORTON:  Zooming in on the image on the bottom

3   right, Ms. Loftus.

4   Q.  At the top of that, what are all of those, Ms. Gale?

5   A.  More boxes of Hermès.

6   Q.  And were all of these in the apartment that morning?

7   A.  Yes.

8           MR. HORTON:  If I could just have a moment, your

9   Honor.

10          THE COURT:  Go ahead.

11          MR. HORTON:  Thank you, your Honor.

12          You can take this down, Ms. Loftus, please.

13  Q.  Ms. Gale, approximately how many photographs did you take

14  on March 15, 2023, in this apartment?

15  A.  I don't remember.

16  Q.  Have we looked at all the photos that you took?

17  A.  No.

18  Q.  And the photos that were admitted into evidence before and

19  the photos that I showed you today, did you have any role in

20  selecting those?

21  A.  No.

22  Q.  And about how many times did you meet with the government,

23  if at all, before you testified today?

24  A.  A few.

25  Q.  And aside from your testimony today and the photographs you

O6K1GUO1                          Gale - Cross

1    took on March 15, 2023, did you have any other involvement in
2    this case?
3    A.  I did not.
4            MR. HORTON:  No further questions, your Honor.
5            THE COURT:  Cross-examination.
6            MS. SHROFF:  Thank you, your Honor.
7    CROSS EXAMINATION
8    BY MS. SHROFF:
9    Q.  Good morning, Ms. Gale.
10   A.  Good morning.
11   Q.  Ms. Gale, you testified on direct that you've worked for
12   the FBI for five years; is that right?
13   A.  Yes.
14           THE COURT:  Ms. Shroff, if you would speak into the
15   mic, please.
16           MS. SHROFF:  Sure.
17   Q.  And before working for the FBI, who did you work for?
18   A.  I was an intern with the FBI while I was in college.
19   Q.  So is it fair to say, ma'am, that you've only worked for
20   the FBI?
21   A.  I had other internships and part-time jobs.
22   Q.  I'm talking about like a full-time job, employment.
23   A.  Yes.
24   Q.  You've only worked for the FBI, correct?
25   A.  Correct.

O6K1GUO1                          Gale - Cross

1   Q.  And you just testified, when asked how many times you met

2   with the government, you testified a few.  Correct?

3   A.  Yes.

4   Q.  So as an FBI agent, is it fair to say that you would want

5   to keep notes of information that would be the subject of your

6   testimony?

7   A.  No.

8   Q.  You would not want to have notes so that you can be

9   accurate and full in your testimony?

10          MR. HORTON:  Objection.  Asked and answered.

11          THE COURT:  Sustained.  So if you'll just ask the

12  question once, Ms. Shroff, and don't repeat it.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
       O6KBGUO2                     Gale - Cross
 1     BY MS. SHROFF:
 2     Q.  Ms. Gale, did you keep a list of the times that you met
 3     with Mr. Horton?
 4     A.  I did not.
 5     Q.  Did you keep a list of the length of each meeting with
 6     Mr. Horton?
 7     A.  I did not.
 8     Q.  Did you keep a list of what you did with Mr. Horton during
 9     the meetings?
10     A.  I did not.
11     Q.  So let me start, if I may, by showing you what is marked as
12     Defense Exhibit 7005, and I'm just going to ask you to look at
13     it, please.  Thank you.
14             Do you recognize this photograph?
15     A.  Yes.
16     Q.  And what is it, please?
17     A.  It's a photo of notebooks with handwritten notes on them.
18             MS. SHROFF:  Your Honor, I move to enter DX7005 into
19     evidence, please.
20             MR. HORTON:  Your Honor, may we briefly approach?
21             (Continued on next page)
22
23
24
25
```

O6KBGUO2                          Gale - Cross

1              (At the sidebar)

2              MR. HORTON:  Thank you, your Honor.  What we're

3       anticipating is a comparison of the document that's Defense

4       Exhibit 7005 to a cropped version that we showed.  I don't

5       remember the exact exhibit number.  We showed a cropped version

6       on this document.  There's background on this that's relevant

7       which is that, we had a productive back and fourth with defense

8       counsel about the fact that some of the documents which photos

9       were taken with respect to the apartment had some Mandarin on

10      them.  So we had a back and forth with them about, we could

11      redact them. We could otherwise make it so that we don't have

12      an issue a foreign language coming into evidence.  We had a

13      back and fourth about how to do that.  We could produce

14      versions of those documents that were altered on agreement to

15      take the Mandarin out, so that's why we showed the document

16      that was cropped that way.

17             THE COURT:  When you say cropped, you mean portions

18      deleted?

19             MR. HORTON:  Yes.  So the three notebook image that's

20      on right now as a defense exhibit, we showed the same image,

21      took out the notebooks that had Mandarin in them.  So we showed

22      only a notebook that had English only.

23             THE COURT:  By cropped you mean literally you cropped

24      the photograph?

25             MR. HORTON:  That's right.  To exclude the Mandarin to

O6KBGUO2                        Gale - Cross

 1    avoid the issue, and we understood that was at the request of

 2    defense counsel or under agreement with defense counsel.

 3         MS. SHROFF:  Defense counsel asked and very clearly

 4    noted the word "redacted" not cropped, redacted.  The word was

 5    redacted.  What they did is --

 6         THE COURT:  So can you give me the whole sentence with

 7    the word "redacted?"

 8         MS. SHROFF:  Sure. They sent us the document I believe

 9    yesterday at some point.  I can't remember the time.  And it

10    had Chinese language on it.  I have the document.  You see

11    Chinese language here, here, here, up here.  They sent us a

12    copy with the translation.  We sent it out to have it

13    translated along with other documents to get translated.  We

14    haven't had a full response back from the interpreter.  We

15    emailed back to the government and said, they gave us an

16    option.  Either we use their translation or we use the redacted

17    version.  We said no we cannot agree to a translation without

18    having our translator signing off, so we would agree to a

19    redacted version, not a cropped version, redacted.

20         So you take a piece of paper, redact the Chinese

21    Mandarin language and you present the evidence.  Apparently at

22    1:00 last time, they sent us a new version which they

23    introduced as evidence.  I have not seen the new version.  And

24    I can show you my email.  I only got that version from an

25    associate today while I was in the direct.  I emailed the

O6KBGUO2                        Gale - Cross

associate back, said please redact the Chinese language and

send me the document.  What they did in cropping it out is they

cropped out CCP.  Now CCP I got to say anybody here would know

would be relevant, that she wrote it down.  And there is no --

I have to say that I would be shocked if somebody said the

defense wouldn't want the CCP.  The tradition of redacted

means, you redact.  You don't crop.  So I am entitled to put

this in.  I never agreed to a cropped version.  I never agreed

to something excised out.  Redacted means redacted.  And we've

all been lawyers for a long time.  I don't think there's any

agreement if they ask me for a cropped version, I would not

have agreed.  Cropped is very different.  And you know what

lawyers do for a living, we use our words, and we use them

precisely.  So I think this is fair cross, your Honor.

          MR. FINKEL:  Ms. Shroff did not suggest nor did any

member of the defense team suggest, including the associate who

is an attorney who was sent the email last night to meet their

request about not having foreign language in the evidence, to

change it, we would have done so.

          THE COURT:  I'm not understanding what you're saying.

Including the attorney on the email, is that what you're

saying?

          MR. FINKEL:  Yes, your Honor.  If I may, we had a good

faith negotiation and discussion about these images back and

forth.

O6KBGUO2                        Gale - Cross

1          MS. SHROFF:  No.

2          MR. FINKEL:  Yes, Ms. Shroff.

3          THE COURT:  Please, I need for him to speak, not the

4    two of you.

5          MR. FINKEL:  We said to the defense, if you want the

6    Mandarin language in, we'll put it in.  If you don't want the

7    Mandarin language in, we'll redact it, and we won't put it in.

8    It's up to you, or we can do translations.  They said they

9    didn't want the Mandarin language in.  So we modified, crop

10   this document, redacted on it so the Mandarin language wasn't

11   come in.  We did that at their request.  Now they're going to

12   take what we did to meet their request and suggest to the jury

13   that we hid information from them.  That is entirely

14   inappropriate.

15         THE COURT:  Let's go backwards.  You concede that they

16   ask for a redacted document?

17         MS. SHROFF:  Here's the email --

18         THE COURT:  Wait a minute, Ms. Shroff.  Do not speak

19   over me.

20         MR. FINKEL:  Your Honor, yes.  We use the word

21   "redacted." That's exactly correct.  However, and I think this

22   is important, we had a good faith negotiation with the defense

23   about this issue.  And to meet what they requested, we removed

24   the Mandarin.  It was easier for this image to do a crop than a

25   redaction.

O6KBGUO2                          Gale - Cross

1          THE COURT:  That is very, very different.  This is a

2     problem.  They're entitled to know, the jury is entitled to

3     know that there are words missing.

4          MR. FINKEL:  But, your Honor, we did that at their

5     request now.

6          THE COURT:  Wait a minute.  They requested a

7     redaction, not a cropping out.  It's a very different result.

8          MS. SHROFF:  Your Honor, may I just add one thing?

9          THE COURT:  No, not yet.  Mr. Finkel, do you have

10    anything to add?

11         MR. FINKEL:  Your Honor, candidly, I'm disappointed in

12    this because we had a discussion with them.  And had they said,

13    can you use the redacted version instead, we would have done

14    that.  We weren't trying any gamesmanship here. We weren't

15    trying to cut out CCP or anything like that.  We tried to meet

16    their request.  I understand your Honor's point.

17         THE COURT:  Are there any other documents that were

18    cropped?

19         MR. HORTON:  I don't believe so, no.

20         THE COURT:  Everything else was redacted?

21         MR. HORTON:  Correct.

22         THE COURT:  You're going to have to live with this

23    cross-examination.

24         MS. SHROFF:  Your Honor, also CCP is in English.

25         MR. FINKEL:  Your Honor, certainly they're not going

O6KBGUO2                      Gale - Cross

1   to be able to argue -- because the reason we cropped it was to

2   meet their request.  They shouldn't be able to argue that we

3   did this to hide anything from the jury, cause that's not why

4   we did it.  That would be unfair and improper.

5           THE COURT:  That would be completely unfair.  You can

6   say that they left out a portion of the document, but to imply

7   that there was bad faith is improper.

8           MS. SHROFF:  Your Honor, may I just be heard on that?

9           THE COURT:  Yes.

10          MS. SHROFF:  Again, here's an email --

11          MR. FINKEL:  You left it out.

12          MS. SHROFF:  Please let me finish.

13          THE COURT:  Please let her talk.

14          MS. SHROFF:  CCP is in English.  The alphabet is

15  English.  It is not Mandarin.  They can crop out the -- we

16  agreed even if you want -- here's the email.  "Just in light of

17  the timing of this witness, we will ask that you simply redact

18  the Mandarin visible in the GXW exhibits you plan to introduce

19  tomorrow, which we understand to be GW, and then we recite them

20  out."  CCP is in English.

21          THE COURT:  Ms. Shroff, I do not need for you to speak

22  over me.  This is rude.

23          MS. SHROFF:  I'm not speaking over you.

24          THE COURT:  Yes, you were speaking over me.

25          MS. SHROFF:  I don't mean to, your Honor.  I do think

O6KBGUO2                         Gale - Cross

1    CCP is in English.

2              THE COURT:  So now be quiet.  This is a problem.  She

3    can cross on this, but you cannot imply that they were looking

4    to hide something, because that would be the impression of bad

5    faith.  This is an error on their part to have done it this

6    way.  It is an error on their part.

7              MS. SHROFF:  Your Honor, CCP is in English.  It's not

8    an error.

9              THE COURT:  What I am saying is that you may cross,

10   you may say, a portion of the document was not shown.  And you

11   may bring up the fact that it has this English language and the

12   Mandarin character.  That is fine.  But to go further and argue

13   that in summation that this was purposely in bad faith, no, you

14   will not be able to do that.  We're done.  We're done.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6KBGUO2                        Gale - Cross

1              (In open court)

2              THE COURT:  Overruled.  Rather, the objection is

3    sustained.  Sorry.  Go ahead.

4              MS. SHROFF:  Your Honor, I move to admit DX7005 into

5    evidence.

6              MR. HORTON:  Objection.

7              THE COURT:  I am sorry.  Let me clarify.  Based upon

8    the sidebar, the prosecution's objection to the admission of

9    this document is overruled.  Go ahead.

10             (Defendant's Exhibit 7005 received in evidence)

11             MS. SHROFF:  May I publish it to the jury now?

12             THE COURT:  You may.  Go ahead.  You may.

13   BY MS. SHROFF:

14   Q.  Ms. Gale, do you recognize this photograph?

15   A.  I recognize the photo, not the black parts covering it.

16   Q.  You don't recognize the black covering?

17   A.  Correct.

18   Q.  The redaction?

19   A.  Correct.

20   Q.  That's fine.  And if I could show you what is marked as

21   Government Exhibit I believe it was 68.

22             MR. HORTON:  Your Honor, we're going to object to this

23   as contrary to our understanding of the ruling at sidebar, the

24   purpose of showing.

25             THE COURT:  I'm sorry.  I did not hear what you said,

```
O6KBGUO2                        Gale - Cross
```

1    Ms. Shroff.

2            MS. SHROFF:  I'll move on, your Honor.

3            THE COURT:  Go ahead.

4    Q.  So let me start with the legal pad that says Max, correct?

5    A.  Yes, it looks like the one on the bottom.

6    Q.  And did you arrange these three legal pads this way?

7    A.  I don't remember.

8    Q.  You were taking photographs to present as evidence to a

9    jury at a trial, correct?

10   A.  I was taking photographs of whatever the agents gave me

11   that day on the search.

12   Q.  For what purpose?

13   A.  To have them documented.

14   Q.  For what purpose?

15           MR. HORTON:  Objection, asked and answered.

16           THE COURT:  Sustained.

17   Q.  The FBI gathers evidence, correct?

18   A.  Correct.

19   Q.  And the FBI gathers evidence because it's going to be used

20   against another person in court one day, correct?

21   A.  Potentially.

22   Q.  And you want the evidence to be accurate, correct?

23   A.  What do you mean by accurate?

24   Q.  I mean accurate.  You want your logs to be accurate,

25   correct?

O6KBGUO2                        Gale - Cross

1   A.  The photo log?

2   Q.  Yes.

3   A.  Yes.

4   Q.  And you want your photos to be accurate, correct?

5   A.  The photos are just of whatever is there.

6   Q.  And complete, correct?

7   A.  I'm not sure what you mean by complete.

8   Q.  Well, is the photograph of the first legal pad that starts

9   with the word "Max" complete?  Can you see the whole page?

10  A.  No, you can't see the whole page.

11  Q.  Can you see the whole page of the second legal pad?  I

12  don't know.  It's not legal, but whatever, office size pad?

13  A.  You cannot.

14  Q.  And how about the third one?

15  A.  Yes, the third one you can.

16  Q.  And is it fair to say, Ms. Gale, that the time that you

17  were taking the photographs there was an FBI agent in the

18  apartment?

19  A.  Correct.

20  Q.  And there was FBI agents in the apartment who carried out

21  the search, correct?

22  A.  Yes, there were multiple.

23  Q.  And there were multiple agents who put these things out for

24  you to photograph; is that fair?

25  A.  Yes, they probably said you can take a picture of these.

O6KBGUO2                          Gale - Cross

1    Q.  And you could interact with them because you're all part of

2    the same team, correct?

3    A.  Correct.

4    Q.  There were no defense lawyers present, correct?

5    A.  There were not.

6    Q.  It was possible to say, let's just take a photograph of

7    each legal pad separately, correct?

8            THE COURT:  Don't ask her what was possible.  I don't

9    want you asking questions that call for speculation.

10   Q.  So you didn't take a photograph of the legal pad in such a

11   way that we could see the entirety of page one of the document

12   that starts with Max, correct?

13   A.  I don't remember if I took a separate photo of it other

14   than this.

15   Q.  How about the second one that says, Thank you, do you

16   recall if you took photos of that?

17   A.  I don't remember if I took a separate photo.

18   Q.  And let's look at the third document, third legal pad,

19   correct, you see that?

20   A.  Yes.

21   Q.  And you see there's a lot of handwriting on there, right?

22   A.  Correct.

23   Q.  And in the corner box you see that little box over there,

24   if I could have it made larger for you, and also the jury maybe

25   that will help you.

O6KBGUO2                        Gale - Cross

1   A.  On the right side of the page?

2   Q.  Yes, ma'am.

3   A.  Yes, I see that.

4   Q.  What does it say over there, could you read that for me?

5   A.  Civil, civil rights.

6   Q.  How about below that?

7   A.  It says SEC, but the rest is redacted.

8   Q.  And how about below that?

9   A.  In the box?

10  Q.  Yes.

11  A.  It either says CCP or COP and then it's redacted.

12  Q.  So it says -- what is right next to the word CCP, what's

13  next to that?

14  A.  A redaction and then --

15  Q.  And then a tick mark, correct?

16  A.  I think it says IA, and then the pound sign and could be a

17  check mark.

18  Q.  Let's go back to the top part of the page.

19          You see the date up there 10/17 Saturday, right?

20  A.  Yes.

21  Q.  And you don't know what year, correct?

22  A.  I don't know if that's a month and a day or a month and a

23  year, 10/17 could be either.

24  Q.  It could be October 2017 or it could be October 17, that's

25  your testimony?

O6KBGUO2                         Gale - Cross

1    A.  Correct.

2    Q.  And also the same for the other one, right, October 19,

3    right?

4    A.  Yes.

5    Q.  Could be 2019, right?

6    A.  Yeah.

7    Q.  More logically it would be October 17, which is a Saturday?

8            MR. HORTON:  Objection to the commentary.

9            MS. SHROFF:  It's a question.

10           THE COURT:  Sustained.

11   Q.  Okay.  October 17 is a Saturday, so what would October 18

12   be?

13   A.  Sunday.

14   Q.  And what would October 19 be?

15   A.  Monday.

16   Q.  So let's move down.  Just please stay on that same page,

17   the third one, third legal pad or pad, whatever it's called.

18   And if you could read for me, you see where it says G/Club EIN?

19   A.  I do.

20   Q.  Do you know what that means?

21   A.  I do not.

22   Q.  And how about G Fashion, and then there's a phone number,

23   correct?  Am I reading that correctly?  Is it a phone number?

24   A.  It looks like a phone number, yes.

25   Q.  Do you know what that means?

O6KBGUO2                    Gale - Cross

1    A.  I don't.

2    Q.  And then it says G/Club, and it looks like, I don't know

3    what that word is, Square, Paypal and wire, right?

4    A.  Yes.

5    Q.  Now could I zoom out of that full page where it says CCP on

6    the corner.

7            Did you by any chance flip that page and take a photo

8    of the next one?

9    A.  I don't remember.

10   Q.  Now, when you reviewed this photograph with Mr. Horton, was

11   it one amongst many that you reviewed with him?

12   A.  I don't remember if I reviewed this one with him.  Are you

13   talking about on direct?

14   Q.  No, no.  I mean on the times you met with him in your

15   office or his office.  I don't know where?

16   A.  I don't know if we reviewed this one.

17   Q.  Let's look at the one that had -- let's look at number 68,

18   okay.  You see this one?  Do you remember if you reviewed this

19   one with him in his office?

20   A.  I don't remember.

21   Q.  And he asked you on direct, right --

22   A.  Yes, we did review this on direct.

23   Q.  So look at the right-hand column for me if you don't mind.

24   A.  Yes, the total HCN column.

25   Q.  And you testified on direct that these are dollar amounts,

O6KBGUO2                          Gale - Cross

1    correct?

2    A.  I did.

3    Q.  You have no knowledge that they are in fact dollar amounts,

4    correct?

5    A.  At the top it says USD which typically stands for U.S.

6    dollar.

7    Q.  But look at the column on the right under which these

8    numbers appear, does it say over there USDO?

9    A.  No.

10   Q.  What does it say?

11   A.  Total HCN.

12   Q.  And what does HCN mean to you?

13   A.  I don't know.

14   Q.  So are these numbers, right?  They're under a column that

15   says total HCN, right?

16   A.  Correct.

17   Q.  And this is a number of HCN, not dollars, right?

18   A.  I guess.

19   Q.  There's no need to guess.  There's no dollar sign before

20   250,000 or whatever that number is, right?

21   A.  There is no dollar sign.

22          MR. HORTON:  Objection, your Honor.

23          THE COURT:  Don't testify.

24   Q.  Is there a dollar sign before this column?

25          MR. HORTON:  Asked and answered.

O6KBGUO2                        Gale - Cross

1           THE COURT:  Sustained.

2    Q.  Is there a pound sign?

3    A.  No.

4    Q.  Is there a sterling sign?

5    A.  No.

6    Q.  Is there a Yen sign?

7           MR. HORTON:  Objection.

8           THE COURT:  Sustained.

9    Q.  So the dollar amount on this column is at 10 cents each,

10   right?

11   A.  Yes.

12   Q.  So you can take that down.  And if we could just show

13   Ms. Gale the photos of the cash that the government showed her.

14   You remember testifying about the cash that was found in the

15   apartment?

16   A.  I do.

17   Q.  By any chance do you know whose apartment it was?

18   A.  I don't remember.

19   Q.  During the times that you met with Mr. Horton, did you

20   discuss whose apartment it was?

21   A.  We did not.

22   Q.  Did you discuss how many people lived there?

23   A.  We did not.

24   Q.  Did you discuss how you came to take the photographs of the

25   cash?

O6KBGUO2                          Gale - Cross

1   A.   Somebody probably found it in the search and ask me to take

2   pictures of it.

3   Q.   When you say probably, does that mean you really don't

4   remember?

5   A.   No, I do remember that somebody ask me to take photos of

6   the cash when they found it in the safe.

7   Q.   When you took this photograph, did you make a note as to

8   where you were when you took the photograph?

9   A.   In the photo log it should say what room this was in.

10  Q.   My question was did you take a note?

11            MR. HORTON:  Objection.

12            THE COURT:  Overruled.  You may answer.

13  A.   I was not doing the photo log, no, so I didn't take a note

14  personally.

15  Q.   And do you know how that pouch was in the safe when it was

16  first opened?

17  A.   It looked like it does in the photo when we --

18  Q.   Well, were you there when they opened the safe?

19  A.   I don't remember if I was in the room, but I was in the

20  apartment.

21  Q.   So you don't know if it looked like this cause you weren't

22  there, correct?

23  A.   They had me photograph it before they move anything.

24  Q.   Ma'am, please, could you listen to my question.

25            MR. HORTON:  Objection, asked and answered.

O6KBGUO2                       Gale - Cross

1           MS. SHROFF:  I move to strike actually.  It's

2     non-responsive.

3           MR. HORTON:  It was responsive.  We object.

4           THE COURT:  Overruled.  You may answer.

5     Q.  Let me try it this way.  Was the safe locked?

6     A.  I don't remember.

7     Q.  How was the safe opened?

8     A.  I don't remember.

9     Q.  Do you mean you don't remember or do you mean you don't

10    know?

11          MR. HORTON:  Objection.

12          THE COURT:  Overruled.  You may answer.

13    A.  I don't remember.

14    Q.  So you were there when it was opened, but you no longer

15    remember how it was opened?

16    A.  I don't remember if I was in the room at the time that it

17    was opened and found, or if I was in a different room and they

18    called me when they found it and opened it.

19    Q.  So I just want to understand the process.

20          If you were taking a photograph in a different room

21    and they opened the safe, would they just simply ask you to

22    abandon that task and run to the safe?

23          THE COURT:  So you cannot ask, Would they.  It is a

24    question of, Did they.

25    Q.  Did they?

O6KBGUO2                        Gale - Cross

1   A.  I don't remember if I was in the room or not.  If I wasn't,

2   they would have held the safe and not touched it until I finish

3   whatever task I was doing and then come and take the picture

4   the way it looked before they pulled stuff out of it.

5   Q.  Let's try this.  You said they would not have touched it,

6   correct, that's what you just said, right?

7   A.  I don't remember.

8   Q.  So it's possible they could have touched it, correct?

9           MR. HORTON:  Objection.

10          THE COURT:  So don't ask for speculation.

11  Q.  You see the photograph right next to the one on the left?

12  A.  With the pouch opened, yes.

13  Q.  So the pouch was moved, correct?

14  A.  Yes.

15  Q.  It was opened, correct?

16  A.  Yes.

17  Q.  And then the photo was taken of the open pouch, correct?

18  A.  Correct.

19  Q.  And sitting here today, you cannot tell the jury if any

20  denominations were taken out, correct, before you took the

21  photograph cause you weren't there?

22  A.  I might have been.  I just don't remember.

23  Q.  How many denominations are in this particular photograph?

24  A.  I don't know.

25  Q.  Do you know what year those notes are?

O6KBGUO2                    Gale - Cross

1    A.  I don't.

2    Q.  Do you know if they're from 2003?

3    A.  I don't.

4    Q.  What about the red envelopes, do you see those?

5    A.  I see them.

6    Q.  Do you know what they signify in the Chinese culture?

7    A.  I do not.

8    Q.  Do you know what the design was on each one of the

9    envelopes?

10   A.  I don't.

11   Q.  Let's look at the next photograph of the money.  You see

12   how it's all fanned out, now?

13   A.  Yes.

14   Q.  Who fanned it out?

15   A.  The agents who found it probably did.

16   Q.  If you don't know, you can just say I don't know.  Probably

17   is not a good answer.

18          MR. HORTON:  Objection.

19          THE COURT:  Don't speculate, don't guess, don't say

20   what might have been.  If you know the answer, say it.  If you

21   don't know, you could say that or you don't remember.

22          THE WITNESS:  Okay.

23          THE COURT:  Go ahead.

24   Q.  You don't know, correct?

25   A.  Correct.

O6KBGUO2                      Gale - Cross

1   Q.  And there are denominations in 20s, correct?

2   A.  Yes.

3   Q.  Denominations in 50s, correct?

4   A.  Yes.

5   Q.  Denominations in 100s, correct?

6   A.  Yes.

7   Q.  And on the corner over there you can see it's a foreign

8   currency, correct?

9   A.  Correct.

10  Q.  And there is a document on the right side which is in

11  Mandarin, correct?

12  A.  Yes.

13  Q.  You have no idea what it says, correct?

14  A.  Correct.

15  Q.  And obviously the money wasn't found on the bed, right?

16  A.  It came from the pouch in the safe, correct.

17  Q.  Do you know who put it on the bed?

18  A.  I don't.

19  Q.  Now, you were shown a document or two about passports.  Do

20  you remember that?

21  A.  I do.

22  Q.  And I'm assuming -- you can take this one down.  Thank you.

23         And you testified that you did not know any of the

24  people that were depicted in the passports, correct?

25  A.  Correct.

O6KBGUO2                          Gale - Cross

1   Q.  And you simply took the photos because some agent told you

2   to; is that right?

3   A.  Right.

4   Q.  And you remember spelling out for Mr. Horton, Vanuatu,

5   V-A-N-U-A-T-U, correct?

6   A.  I think so.

7   Q.  And do you know what that is?

8   A.  I don't.

9   Q.  Do you know if it's a country?

10  A.  I have no idea.

11  Q.  When you read it, did you then look it up?

12  A.  I didn't.

13  Q.  If I could go to 76, please.  You testified about this

14  photograph, correct?

15  A.  I did.

16  Q.  And when you testified about this photograph, you said it

17  is Hermes, a very expensive brand I think, correct?

18  A.  I did say that.

19  Q.  Now, what are the things below each box here?

20  A.  Tags or receipts.

21  Q.  Do you know if they are in fact tags or they're receipts or

22  are you guessing?

23  A.  I don't know for sure.

24  Q.  Do these appear to be gift boxes to you?

25  A.  I don't know for sure.

O6KBGUO2                         Gale - Cross

1    Q.   Let's look at the next photograph.  You see this photograph

2    here.  I can't see the number.  I think it's 77.  Did you

3    unpack each box?

4    A.   I don't think all of them were unpacked.

5    Q.   Move to strike.  Let me ask you again, please.

6             THE COURT:  So the answer is stricken.  Go ahead and

7    answer what she's asking.  Listen to the question and respond

8    to the specific question that's being asked.

9    Q.   Did you unpack each box?

10   A.   I remember helping unpacking some of them, yes.

11   Q.   Were they all tied with a bow on top?

12   A.   I believe some of them were.

13   Q.   So let's show you 78.  I think the next photo of the

14   scarfs.  You see right there in this photograph right below the

15   bag, do you see that?

16   A.   The bows?

17   Q.   Right.

18   A.   Yes.

19   Q.   Those were the bows that were used to tie the boxes, right?

20   A.   Yes.

21   Q.   And that says Hermes on it?

22   A.   I can't see, but -- yeah, I think so.

23   Q.   So let's just look at this photograph.  Let's look at the

24   one that's brown, shall we.  Is it your recollection that this

25   is how the scarf was in the box?

O6KBGUO2                        Gale - Cross

1  A.  Yes.

2  Q.  So I just want to make sure.  You have a recollection that

3  the label was up top?

4          MR. HORTON:  Objection, asked and answered.

5          THE COURT:  Sustained.

6  Q.  Was the label up top?

7          MR. HORTON:  Objection, asked and answered.

8          THE COURT:  Sustained.

9  Q.  Let's look at the orange one.

10          What does the card say?

11  A.  I'm sorry.  I can't read that.

12  Q.  Did you take a photograph of what the card itself said?

13  A.  I don't remember if I did.  The bottom, the last word under

14  before the signature says holidays.

15  Q.  Let's just scroll down.  Let's look at the one -- you see

16  the one that's gray with those pretty little flowers over

17  there?

18  A.  In the middle?

19  Q.  Yes.

20  A.  Yes.

21  Q.  Is it your recollection that the label was showing when you

22  opened the box?

23  A.  I don't remember specifically, but I don't remember moving

24  any of the scarfs within the box.

25  Q.  You didn't open each box you just testified on cross,

O6KBGUO2                          Gale - Cross

1   correct?

2   A.  I helped with some of them, correct?

3   Q.  And you don't know which ones you helped with, correct?

4   A.  Correct, I don't remember.

5   Q.  Can you just scroll down.  You see the wallets that are

6   placed near the box?

7   A.  Yes.

8   Q.  Did you place them there?

9   A.  I don't remember.

10  Q.  Do you know if they are in fact Hermes wallets?

11  A.  I don't know.

12  Q.  I just want the full photograph again one last time.  You

13  see on the top right corner in the left corner are both showing

14  the same brown tape, correct?

15  A.  I'm sorry.  The top corners of the photo?

16  Q.  The top corner right above the brown scarf, and on the

17  right-hand side near that rainbow colored scarf?

18  A.  Oh, the ribbons.

19  Q.  That's a much better word.  The gift ribbons are the box

20  ribbons, did you collect each ribbon for each box?

21  A.  I don't remember.

22  Q.  Did they have you take a photo of all the ribbons on all

23  the boxes that were found in this apartment?

24  A.  I don't remember.

25  Q.  Did you take a photograph of each card that you found in

O6KBGUO2                        Gale - Cross

1    the apartment or you only -- I'll stop there.

2           Did you take a photograph of each card that you found?

3    A.  I don't remember.

4    Q.  You can take that down.  Thank you.  May I go to 41,

5    please.  You testified about this photograph as well, right?

6    A.  I did.

7    Q.  And they asked you, Mr. Horton did over there, what does

8    "MK" stand for, right?

9           THE COURT:  One moment, please.

10          JUROR:  Are we supposed to be seeing this?

11          THE COURT:  These are up for the jurors?

12          JUROR:  We don't see anything.

13          THE COURT:  So we'll put that up.

14          MS. SHROFF:  Your Honor, may I just go back if the

15    jury didn't see it. I'm not going to relive the testimony, but

16    may I publish each of the photographs to them?

17          THE COURT:  Yes.

18          MS. SHROFF:  If I could just go back.  Can the jurors

19    see?

20          JUROR:  Yes.

21          MS. SHROFF:  If I may, your Honor.  May I just point

22    out that's the card --

23          THE COURT:  Let's just identify the exhibit if you

24    would.

25          MS. SHROFF:  Thank you.  This is exhibit 78 that

O6KBGUO2                    Gale - Cross

1    depicts the scarfs, the labels and the ribbons and the wallets.

2    If I could just have the jurors see 77.  These depict the

3    scarfs and the wallets that are on top.  And this is 76 that

4    the testimony that it was unclear to the witness --

5              MR. HORTON:  Objection to Ms. Shroff testifying.

6              THE COURT:  Ms. Shroff, if you'll speak up.

7              MS. SHROFF:  I don't want to repeat testimony, this

8    was covered --

9              MR. HORTON:  Objection, she's summarizing the

10   testimony.  That's improper.

11             THE COURT:  Do you have a question, Ms. Shroff?

12   BY MS. SHROFF:

13   Q.  Are you a special agent?  Should I call you a special

14   agent?

15   A.  No, the title is SOS.

16   Q.  So this is the bottom of the boxes reflect either a tag or

17   a receipt and you don't know which one of the two, correct?

18   A.  Yes, that's what I said before.

19   Q.  I'll just continue, your Honor.  Thank you for allowing me

20   this opportunity.  If I could just go to, I believe I was at

21   the kitchen with the USBs.  There we go.  Thank you.

22             When you took this photograph, did you have any

23   knowledge of how old these USBs were?

24   A.  No, I did not.

25   Q.  And you see the label over there on the right, copy

O6KBGUO2                        Gale - Cross

1    Jessica's files, correct?

2    A.  I do see that.

3    Q.  Do you know who Jessica is?

4    A.  I do not.

5    Q.  And on the very right corner there is another USB with red

6    handwriting on it, correct?  Do you see that in the corner?

7    A.  Yes.

8    Q.  Do you know what that says?

9    A.  I do not.

10   Q.  And if you could just look at the left-hand side of the

11   photograph.  Those are food items, correct, or you tell me what

12   it is?

13              What is that, do you know?

14   A.  I don't know.

15   Q.  And if you could just zoom back out.  If I could just look

16   at the photograph right after.  You see how all of these USBs

17   are placed in a line?

18   A.  I do see that.

19   Q.  What is the one on the right-hand corner, the right most

20   with the green writing?

21   A.  The biggest part of it says NYC.

22   Q.  Do you know what was on there?

23   A.  I don't.

24   Q.  And, obviously, you had no role to play in downloading

25   these USBs or anything like that, correct?

O6KBGUO2                        Gale - Cross

1   A.  Correct, I did not.

2   Q.  Now, if I could look at number 26.  You testified about

3   this document, correct?

4   A.  I did.

5   Q.  Is it fair to say that you reviewed this document with

6   Mr. Horton in his office?

7   A.  I have seen it before.

8   Q.  How many times?

9   A.  Once.

10  Q.  And did you go through what he would have you read in court

11  today?

12  A.  No.

13  Q.  So he would just in court highlight something, and you

14  would read it out loud for the jury?

15          MR. HORTON:  Objection.

16          THE COURT:  Sustained.

17  Q.  You remember your direct examination?

18  A.  I do.

19  Q.  So if you could just highlight any one line, just pick one.

20  So your role was to read out loud the row that he highlighted,

21  right?

22  A.  That's what I did earlier, yes.

23  Q.  And you have no understanding of any of the data on these

24  documents, correct?

25  A.  I do not.

O6KBGUO2                          Gale - Cross

1   Q.  We can take that down.  Now, if I could just have document

2   number 30.  You see that number on the corner up top?

3   A.  The handwritten number?

4   Q.  Yes, please.

5   A.  Yes.

6   Q.  What does that stand for?

7   A.  It says 2/10.

8   Q.  What is your understanding of 2/10?

9   A.  I don't know.

10  Q.  You have no idea what it means?

11  A.  There's multiple options of what it could be.

12  Q.  Okay.  That's fair enough.  Thank you.  You can take that

13  down.

14          You were shown documents number 91 and 92, correct,

15  and if I could have those pulled up.

16  A.  Yes.

17  Q.  Is it fair to say that you don't know what this document

18  means, right?

19  A.  Correct.

20  Q.  Somebody told you to take a photograph.  You took a

21  photograph?

22  A.  Correct.

23  Q.  And then you came here and read it out loud?

24  A.  Correct.

25  Q.  Okay.  You can take that down.  Thank you.

O6KBGUO2                          Gale - Cross

1                Now, Mr. Horton asked you during his direct testimony

2      that there were photos that you took that were not introduced

3      into evidence, correct?

4      A.  Yes.

5      Q.  You didn't choose which photos to show at trial, correct?

6      A.  I did not.

7      Q.  And you did not exclude any yourself, correct?

8      A.  Correct.

9      Q.  And you stated that you took these photographs on March 15,

10     2023, correct?

11     A.  Yes.

12     Q.  You have no idea what happened on March 15, 2023, correct?

13     A.  Other than what I was doing that day?

14     Q.  Yes.

15     A.  I don't.

16             MS. SHROFF:  Could I just have one moment, your Honor?

17             THE COURT:  Yes.

18     Q.  Ms. Gale, you recall seeing some photographs of wallets

19     that were shown to you?

20     A.  Yes.

21     Q.  Did you open the wallets at all?

22     A.  I don't remember.

23     Q.  Do you know what was in the wallets?

24     A.  I don't remember.

25     Q.  When was the last time you met with Mr. Horton prior to

O6KBGUO2                          Gale - Cross

1   your testimony today?

2   A.  Last week.

3   Q.  How about this morning?

4   A.  We didn't meet this morning.

5   Q.  How about yesterday?

6   A.  No.

7   Q.  Did you speak to him yesterday?

8   A.  I did see him, yes.

9   Q.  I didn't hear that.

10  A.  I did see him, but we didn't have a meeting.

11  Q.  You saw him?

12  A.  Yes.

13  Q.  But you didn't speak?

14  A.  Correct, we didn't have a meeting.  I was waiting to see if

15  I would get called up here.

16  Q.  And before that, when was the last time you prepared for

17  your testimony with Mr. Horton?

18  A.  I believe it was last week.

19  Q.  And did you prepare with anybody other than Mr. Horton?

20  A.  Yes.

21  Q.  Who else?

22  A.  There was another attorney that came in to ask a couple of

23  questions.

24  Q.  Do you see the attorney in court today?

25  A.  She's not at the table.

1  Q.  So it was an attorney that is not at this table now?  I

2  just want to make sure I understood.

3  A.  Correct.

4  Q.  And was there an FBI agent present?

5  A.  Yes, there was.

6  Q.  Which FBI agent?

7  A.  I don't see him sitting in court right now.

8  Q.  Do you know his name?

9  A.  Nick.  I don't remember his last name.

10  Q.  For how long did you meet?

11  A.  It depends.  I think it was around half an hour.

12  Q.  And is it fair to say that you did not review any of the

13  photographs with anyone at the defense table, right?

14  A.  Correct.

15          MS. SHROFF:  I have nothing further, your Honor.

16          THE COURT:  Redirect.

17  REDIRECT EXAMINATION

18  BY MR. HORTON:

19  Q.  Ms. Gale, about how many people were involved in the search

20  of the apartment that morning?

21  A.  I don't remember the exact number.

22  Q.  About how many was it?

23  A.  More than five, less than 20.

24  Q.  Did those different people have different roles during the

25  search?

O6KBGUO2                    Gale - Redirect

1   A.  Yes.

2   Q.  Ms. Loftus, can you pull up GX Stip 4, please.

3           GX Stip 4, which is in evidence says that on March 15,

4   2023, special agents and other FBI employees executed a lawful

5   search of 188 East 64th Street in apartment 1601, New York, New

6   York.  And it says that during the course of that search, FBI

7   personnel took photographs of interior spaces of 188 64th

8   Street, Apartment 1601, New York, New York, and also lawfully

9   seized items, documents and electronic devices.  GXWA-1 through

10  -- and it should say WA135 --

11          MS. SHROFF:  Objection, your Honor, may we have a

12  sidebar because this is clearly beyond the scope.

13          THE COURT:  Overruled.  You may continue.

14          MR. HORTON:  The stipulation the parties agreed to

15  continues, GXWA-1 through GX -- and it should say, WA-135 are

16  fair and accurate photographs of interior spaces of 188 64th

17  Street, apartment 1601, that were lawfully captured by an FBI

18  photographer on March 15, 2023 when conducting a search.

19  Q.  Is that FBI photographer you, Ms. Gale?

20  A.  Yes.

21  Q.  Ms. Loftus, can you put up WA-30 through 33, and zoom in on

22  WA-30, please.

23          Ms. Gale looking at WA-30 on the top left.  It says

24  summary 2019 to 2023, all donations ROLF and ROLS.  Is that a

25  pull page document right there?

1    A.  Yes.

2    Q.  And WA30 through 33, are those four pages stapled together

3    in a single document?

4    A.  They are.

5    Q.  Ms. Gale, the red Lamborghini you testified about on the

6    document before, do you know where the FBI found that

7    Lamborghini?

8    A.  I don't.

9              MS. SHROFF:  Objection.

10             THE COURT:  Overruled.

11             MR. HORTON:  No further questions.

12             THE COURT:  Recross.

13   RECROSS EXAMINATION

14   BY MS. SHROFF:

15   Q.  Let's put that stipulation back up, please.  Had you read

16   this before today?

17   A.  The search warrant?

18   Q.  That's not a search warrant, ma'am.  I'm asking you about

19   the document that is before you as GX Stip-4?

20   A.  No, I hadn't.

21   Q.  You hadn't read it, correct?

22   A.  Correct.

23   Q.  So when Mr. Horton highlighted and read it out loud to you,

24   he was just reading you a document, right?

25   A.  Yes.

O6KBGUO2                          Gale - Recross

1   Q.  You have no understanding on your own of what this document
2   is about, correct?
3   A.  I've never seen it before.
4   Q.  In fact, you just called it a search warrant, correct?
5   A.  Yeah.
6   Q.  Let's look at the last page.  Do you see that?
7   A.  I see it.
8   Q.  Do you know who Sidhardha Kamaraju is?
9   A.  No.
10  Q.  You can take it down.  Let's go through 30 to 33.
11          Mr. Horton asked you questions about this document,
12  correct?
13  A.  Yes.
14  Q.  This document was laid out for you this way, correct?
15  A.  Yes.
16  Q.  On the left-hand side, right?
17  A.  Yes.
18  Q.  Sitting here today, do you recall who move page one over,
19  who flipped it over?
20  A.  I do not.
21  Q.  How about page two, do you recall if anybody flipped it
22  over?
23  A.  I don't remember.
24  Q.  Do you know if there's anything at the very end of the
25  document at the back side that is written on there?

O6KBGUO2                          Gale - Recross

1    A.  I don't know.

2    Q.  Do you know if there are any handwritten notes at the very

3    end of that document?

4    A.  I don't know.

5    Q.  You don't know anything about any of this other than what

6    he showed you, correct?

7              MR. HORTON:  Objection, asked and answered.

8              THE COURT:  Sustained.

9    Q.  Do you see 2/10 on the corner on the front page?

10   A.  I do see it.

11   Q.  Is there any such designation on any of the remaining

12   pages?

13   A.  Based on the photographs, it doesn't look like there is.

14   Q.  You recall on cross-examination being shown a document that

15   said 10/17 and 1/19, correct?

16   A.  Yes.

17             MR. HORTON:  Objection to the scope.

18             THE COURT:  Overruled.  You may go ahead.

19   Q.  And you recall testifying you couldn't even say if that was

20   October 17 or October of 2017, correct?

21   A.  It could have been either without looking at the bottom

22   one.

23             MS. SHROFF:  I have nothing further.

24             MR. HORTON:  Just briefly, your Honor.

25   REDIRECT EXAMINATION

O6KBGUO2                      Recross - Gale

1   BY MR. HORTON:

2   Q.  Ms. Loftus, can you put up GXWA-30 please and zoom in on

3   the top right.

4           This document is summary 2019 through 2023 all

5   donation.  Ms. Loftus, can you zoom in on the top right.

6           Ms. Gale, what was the date, the month and the year.

7           MS. SHROFF:  Objection.  She never testified it's a

8   date.

9           MR. HORTON:  It's in evidence, your Honor.

10          THE COURT:  I haven't heard the question.

11  Q.  What was the date of the search you performed, the month

12  and the date?

13  A.  It was March 15.

14  Q.  And what does this say on this document?

15  A.  2-10.

16          MR. HORTON:  No further questions.

17          THE COURT:  Well, you're asking her what those red,

18  the red numbers and slash say.  Is that your question?

19          MR. HORTON:  That's correct.  What it says on the

20  document.

21          MS. SHROFF:  Could I just see the first page again.

22  RECROSS EXAMINATION

23  BY MS. SHROFF:

24  Q.  It's stapled, correct?

25  A.  Correct.

1    Q.  Do you recall sitting here today if there was another

2    stapled packaged that said one of ten.

3    A.  I don't recall.

4    Q.  Do you recall if there was one that said three of ten?

5    A.  I don't recall.

6             MR. HORTON:  Objection.

7             THE COURT:  Overruled.

8    Q.  How about four of ten?

9    A.  I don't remember.

10   Q.  Five of ten, six of ten, seven of ten and 10 of 10, do

11   remember any of that?

12   A.  No.

13            MS. SHROFF:  Thank you.  Nothing further.

14            MR. HORTON:  Nothing further.

15            THE COURT:  You may step out of the courtroom.  Thank

16   you, and the prosecution may call its next witness.

17            MR. FERGENSON:  The government calls Elizabeth

18   Berstler.

19   ELIZABETH BERSTLER,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22            THE COURT:  Please state your name and spell it and

23   speak right into the microphone.

24            THE WITNESS:  Elizabeth Berstler, E-L-I-Z-A-B-E-T-H,

25   B-E-R-S-T-L-E-R.

O6KBGUO2                         Berstler- Direct

1              THE COURT:  You may inquire.

2    DIRECT EXAMINATION

3    BY MR. FERGENSON:

4    Q.  Good morning, Ms. Berstler.

5    A.  Hi.

6    Q.  Where do you work?

7    A.  Morgan Stanley.

8    Q.  What's your position at Morgan Stanley?

9    A.  Client service associate.

10   Q.  How long have you worked at Morgan Stanley?

11   A.  Sixteen years.

12   Q.  What are some of your duties and responsibilities as a

13   client service associate at Morgan Stanley?

14   A.  One of the administrative assistants on a team of financial

15   advises.  I help clients with their day-to-day transactional

16   request, checks, journals, wires, bill pay, new account

17   opening.

18   Q.  And for a given account do -- who is your boss for giving

19   client account?

20   A.  The head financial advisor on our team Christina Schatz.

21   Q.  And you said administrative work, what sorts of things do

22   you do in your day-to-day?

23   A.  I process transactions which are usually journals, internal

24   transfers, checks, wire transfers, new account opening, helping

25   clients with anything that they need help with.

O6KBGUO2                      Berstler- Direct

1    Q.  Are bank deposits at Morgan Stanley FDIC insured?

2    A.  Yes.

3         THE COURT:  If you'll speak into the microphone

4    please.

5    Q.  If a client with a brokerage account holds cash, what

6    happens to that cash?

7    A.  It's swept into the bank deposit program.

8    Q.  Ms. Berstler, are you familiar with a company called Crane

9    Advisory Services?

10   A.  Yes.

11   Q.  How are you familiar with it?

12   A.  They had an account with us.

13   Q.  And who did you interact with at Crane?

14   A.  Haitham Khaled.

15   Q.  What was his role at Crane if you know?

16   A.  I don't know.

17   Q.  And what was Crane to your understanding?

18   A.  Some type of consulting firm.

19   Q.  Do you know what kind of consulting?

20   A.  No.

21   Q.  And what did you do for Crane when they were your client?

22   A.  Help with the wire transfers in and out.

23   Q.  Are you familiar with a company called G/Clubs?

24   A.  Yes.

25   Q.  And how are you familiar with it?

1   A.  They had an account with us.

2   Q.  And who did you interact with at G/Clubs?

3   A.  Alex Hadjicharalambous.

4   Q.  And what was his role at G/Clubs to your understanding?

5   A.  Financial controller.

6   Q.  And what did you do for G/Clubs when they were your client?

7   A.  I helped process transactions, checks, journals, wire

8   transfers.

9   Q.  Ms. Loftus, if we could publish Government Exhibit Stip-14

10  which is in evidence.  We'll go to page six.

11          Ms. Berstler, you see at the top it says Morgan

12  Stanley Smith Barney at the top?

13  A.  Yes.

14  Q.  Pursuant to the stipulation, the government offers

15  Government exhibits 112 through 125.

16          MR. SCHIRICK:  No objection.

17          THE COURT:  They're admitted.

18          (Government's Exhibits 112, 113, 114, 115, 116, 117,

19  118, 119, 120, 121, 122, 123, 124 and 125 received in evidence)

20  BY MR. FERGENSON:

21  Q.  We can take that down, Ms. Loftus.

22          Ms. Berstler, do you recall approximately when G/Clubs

23  became a client?

24  A.  December of 2020 or January 2021.

25  Q.  And approximately what amount was the account funded with?

O6KBGUO2                        Berstler- Direct

1   A.  About 50 million.

2   Q.  What sorts of things was G/Clubs paying for with their

3   account at the start?

4   A.  Business operational expenses, rent, payroll, event

5   expenses.

6   Q.  Ms. Loftus, if we could please publish Government Exhibit

7   MSS-112.  If we can go to page two.  Thank you, Ms. Loftus.  If

8   we could actually scroll down.  If we could blow up that bottom

9   email.

10            Now, Ms. Berstler, who is this email from?

11  A.  Alex H.

12  Q.  And what's the domain in his email address?

13  A.  G/Club.com.

14  Q.  Who is this email to?

15  A.  To Christina Schatz.

16  Q.  Remind us what her role was?

17  A.  She's the financial advisor.

18  Q.  Are you also a recipient on this email?

19  A.  Yes.

20  Q.  Who's copied?

21  A.  Haitham Khaled.

22  Q.  I can go ahead and read the body.  It says, Hi, Christina,

23  please find the information below in regards to the transfer we

24  would like to schedule for tomorrow 1.19.21 from our account

25  ending 8564 ADP and expenses.  Just to pause.

1          Ms. Berstler, do you recall the account ending 8564

2    was?

3    A.  It was the account that they paid bills out of.

4    Q.  I'll continue reading.  It says I have attached the

5    beneficiaries account information for you as a reference.

6    Please be aware that this account only accepts GBP.  Again to

7    pause.

8          Ms. Berstler, what is GBP?

9    A.  Great British Pounds.

10   Q.  And to read the stars.  It says amount, 1 million U.S.D.

11   beneficiary account name is Fiesta Property Developments, LTD.

12   And then there's more information.

13         Ms. Berstler at the time you received this email, did

14   you know what Fiesta Property Developments LTD was?

15   A.  No.

16   Q.  And if we could scroll up to page two, please.  We can

17   actually keep scrolling up.  We'll go to page one.  I'll focus

18   you, Ms. Loftus, if we could blow up the middle email.

19         Ms. Berstler, what did you reply on January 20 at 9:02

20   a.m.?

21   A.  Can you give a brief explanation purpose of this wire.

22   Q.  And do you recall why you asked for a brief

23   explanation/purpose of the wire?

24   A.  The outgoing wire had been flagged by our fraud operations

25   department for some further explanation that the wire

O6KBGUO2                    Berstler- Direct

1    instructions had been verified.

2    Q.  We'll turn to that in a moment.  Just if we could,

3    Ms. Loftus, zoom on the top email.  Is this a response from

4    Alex H?

5    A.  Yes.

6    Q.  I'll go ahead and read the body.  It says, This transfer

7    was initiated from G/Club Operations, LLC to Fiesta Property

8    Developments, LTD, a real estate holding company owned by

9    Mr. He in the UK.  Same owner of G/Clubs Operations, LLC, for a

10   possible down payment on a property they plan to purchase for a

11   total of $10 million.  It says the transaction is recorded with

12   an internal loan agreement from the lender G/Club Operation,

13   LLC, to the borrower Fiesta Property, LLC, for the amount of

14   $10 million with a repayment plan.

15          Ms. Berstler, so this email says that Fiesta Property

16   Developments is a real estate holding company.  Did you ever

17   receive further information about Fiesta's business?

18   A.  No.

19   Q.  It says the purpose is a possible down payment on a

20   property they plan to purchase.  Did you ever receive further

21   information on the property being purchased?

22   A.  No.

23   Q.  And then it references an internal loan agreement.  Do you

24   ever recall receiving the loan agreement?

25   A.  No.

O6KBGUO2                      Berstler- Direct

1   Q.  Do you know why Alex H specified the loan agreement had a
2   repayment plan?
3   A.  No.
4   Q.  Ms. Loftus, if we could now go to Government Exhibit
5   MSS-125.  If we could blow up the header.  First, what's the
6   date of this email?
7   A.  January 20, 2021.
8   Q.  Same date as the chain we were just looking at?
9   A.  Yes, I think.
10  Q.  And who is it from?
11  A.  Deidra Harrell.
12  Q.  Where does Deidra Harrell work at Morgan Stanley?
13  A.  Fraud operations.
14  Q.  And who is this email to?
15  A.  This email was to me.
16  Q.  And could you read the subject line of the email, please?
17  A.  Urgent action required outgoing wire review MS number
18  552068564.
19  Q.  And 8564, do you recognize those numbers?
20  A.  Yes.
21  Q.  What are they?
22  A.  G/Clubs account number.
23  Q.  If we could zoom out Ms. Loftus, and if we could zoom in on
24  the bottom half with the body.
25          Now, the email says, Hello, I'm contacting you from

1  fraud operations regarding the below wire.  In light of

2  increase events where fraudulent parties directly target

3  clients, the following information is needed to verify the

4  legitimacy of the wire request and the legitimacy of

5  instructions the client has received.  Fraud operations is

6  requiring the response to the below questions in order to have

7  the wire processed in a timely fashion.  We appreciate your

8  continued partnership to continue to protect our clients.

9          And then, Ms. Berstler, do you see under client

10  account name, can you read the entity listed there?

11  A.  G/Club Operations LLC.

12  Q.  And the from account, can you read the last four?

13  A.  8564.

14  Q.  And the amount listed there, what is the amount?

15  A.  734,000.

16  Q.  And had this wire been in GBP?

17  A.  Yes.

18  Q.  If we could scroll down to the next page, Ms. Loftus.  Now

19  looking at these boxes, let's first zoom on the first set of

20  boxes, Ms. Loftus.

21          Ms. Berstler, directing you to the, I guess the second

22  from bottom row, could you read what is the text there in the

23  left column?

24  A.  The second from the bottom?

25  Q.  Yes, start with Purpose.

O6KBGUO2                        Berstler- Direct

1    A.  Purpose of the wire manually input.

2    Q.  And there's nothing inputted there, yet, correct?

3    A.  Correct.

4    Q.  If we can zoom out.  If we could zoom on the second box,

5    please.  Ms. Berstler, could you read the text in the top box?

6    A.  How did the client connect with Fiesta Property

7    Developments, LTD.

8    Q.  If we could zoom out, please, and if we could scroll down.

9    Here if we can zoom on the very top.

10            Did Ms. Schatz forward this email to you on January

11   20, 2021?

12   A.  Yes.

13   Q.  If we could zoom out and scroll down, and if we could keep

14   scrolling down.  If we could zoom on the top email, please.

15            Ms. Berstler, how did you respond to the email from

16   fraud alert escalations?

17   A.  See answers below.  Thanks.

18   Q.  If we could scroll down.  We could go boxes.  We'll zoom on

19   the first box.  Can you read the text, the answer to the text

20   purpose of the wire?

21   A.  This is a wire to an affiliated business for real estate

22   investment.

23   Q.  Where did that information come from?

24   A.  Alex's email.

25   Q.  If we could zoom out.  If we could zoom on the bottom box.

O6KBGUO2                        Berstler- Direct

 1  Could you read the answer to the top row, how did the client

 2  connect with Fiesta Property LTD?

 3  A.  Fiesta Property Developments, LTD is another company owned

 4  by the UBO Haoran He.

 5  Q.  Where did that information come from?

 6  A.  Alex's email.

 7  Q.  And, Ms. Berstler, after you supplied this information, did

 8  the wire go out?

 9  A.  Yes.

10  Q.  Ms. Berstler, if you had known that the purpose of the wire

11  given to you was not how the funds would actually be used,

12  would you have processed this wire transfer?

13            MR. SCHIRICK:  Objection.

14  A.  No.

15  Q.  Ms. Berstler, are you the final decision maker on wire

16  transfers at Morgan Stanley?

17  A.  No.

18  Q.  Now you responded to fraud operations email, correct?

19  A.  Yes.

20  Q.  And you supplied the information given to you about the

21  purpose of the wire?

22  A.  Yes.

23  Q.  If you had known that the purpose of the wire given to you

24  was not how it would actually be used, would you have passed on

25  that information to fraud operations?

1          MR. SCHIRICK:  Objection, your Honor.

2          THE COURT:  Overruled.  You may answer.

3  A.  Can you ask the question again.

4  Q.  If you had known that the purpose of the wire given to you

5  was not how the funds would actually be used, would you have

6  passed on that information to fraud operations?

7  A.  Yes.

8  Q.  You would have if you knew it was how it would not be used?

9          MR. SCHIRICK:  Asked and answered, your Honor.

10         MR. FERGENSON:  I think it was just confusion, your

11  Honor, with the question.

12         THE INTERPRETER:  your Honor, can you ask all parties

13  to speak into the mic.  I cannot hear.

14         THE COURT:  You can read back the question.

15         (Record was read)

16         MR. FERGENSON:  If I could rephrase.

17  Q.  If you had known the purpose of the wire given to you was

18  not how they would actually be used, would you have passed onto

19  fraud operations the purpose of the wire given to you as the

20  real purpose?

21         MR. SCHIRICK:  Objection.

22         MR. FERGENSON:  I can rephrase.

23         THE COURT:  The question assumes that she knows the

24  real purpose.  So, yes, you can have another shot.

25  BY MR. FERGENSON:

O6KBGUO2                        Berstler- Direct

1   Q.  Ms. Berstler, if you had known that the purpose given to

2   you was not true, would you have conveyed that purpose to fraud

3   operations?

4          MR. SCHIRICK:  Objection.

5          THE COURT:  You may answer.

6   A.  We would have halted the wire and not have allowed it to go

7   out.

8          MR. SCHIRICK:  Objection, your Honor.

9          THE COURT:  Sustained.  Your answer is not responsive.

10   If you knew that the purpose of the wire was not what was

11   stated, it was a different purpose, would you have let your

12   fraud department know that?

13          THE WITNESS:  Yes.

14   Q.  Do you rely on a client to provide you accurate information

15   about the purpose of a wire?

16   A.  Yes.

17   Q.  And if you knew that a client was lying to you about it, do

18   you rely on that information if you knew it was a lie?

19          MR. SCHIRICK:  Objection.

20          THE COURT:  Overruled.  You may answer.

21   A.  Could you ask it again.

22   Q.  If you knew that a client was lying to you about the

23   purpose of a wire, would you rely on that information and pass

24   it on.  The question is hypothetically.

25          MR. SCHIRICK:  Objection.

O6KBGUO2                     Berstler- Direct

1           MR. FERGENSON:  I'll just move on, your Honor.

2           THE COURT:  Go ahead.

3   Q.  Let's go to page 10.

4           Ms. Berstler, if you could read Deidra Harrell's

5   response?

6   A.  Thank you for confirming.  The transaction has been

7   released from review.

8   Q.  Ms. Loftus, if we could go to Government Exhibit MSS-113.

9   If we could go to pages three to four.

10          Now, who is this email from?

11  A.  The email is from Alex H.

12  Q.  And what's the date?

13  A.  January 25, 2021.

14  Q.  So five days after the initial wire request?

15  A.  Yes.

16  Q.  And it's to you and Christina Schatz, right?

17  A.  Yes.

18  Q.  Who's copied?

19  A.  Haitham Khaled.

20  Q.  And again, what is the amount of this wire request?

21  A.  Five million U.S. dollars.

22  Q.  And where is it going?

23  A.  Fiesta Property Developments LTD.

24  Q.  And I won't ask you to reread it.  Is the same purpose

25  given beneath the wire details?

O6KBGUO2                          Berstler- Direct

1    A.  Yes.

2    Q.  And if we could just go up to page one.  Did this second

3    wire go out?

4    A.  Yes.

5    Q.  Let's go to MSS-114, Ms. Loftus.  We can scroll down

6    slightly.  If we could zoom in on Alex H's email, the bottom

7    one.  Another email from Alex H, right?

8    A.  Yes.

9    Q.  And this is about a week later February 2?

10   A.  Yes.

11   Q.  And again to you and Christina Schatz, right?

12   A.  Yes.

13   Q.  And what was the amount of this wire?

14   A.  Four million U.S. dollar.

15   Q.  And who is the beneficiary?

16   A.  Fiesta Properties Developments, LTD.

17   Q.  And I won't ask you to reread it, but is the same purpose

18   given beneath the wire info?

19   A.  Yes.

20   Q.  And if we can go back up to page one.

21          Do you see you responded or can you read your

22   response, the middle email?

23   A.  Alex, we bought 2,932,000 British Pounds today.  I'll call

24   you tomorrow morning to confirm the wire.

25   Q.  And did this wire ultimately go out, Ms. Berstler?

O6KBGUO2                    Berstler- Direct

1    A.  Yes.

2    Q.  Ms. Loftus, let's now go to Government Exhibit MSS-116.

3    Let's go to page three, please.  If we could zoom on this

4    email.  What's the date of this email from Alex H?

5    A.  May 6, 2021.

6    Q.  I can go ahead and read the body.  It says, Good afternoon,

7    Liz, please find the information below in regards to the one

8    wire transfer we would like to schedule from our accounts.  He

9    says I attached the beneficiary's account information for you

10   as reference.  And then there's wire information.

11           What is the amount of this wire?

12   A.  20 million U.S. dollars.

13   Q.  What's the account name?

14   A.  Deltec Bank and Trust Limited.

15   Q.  What country is the vendor address listed?

16   A.  The Bahamas.

17   Q.  Now, beneath that, a few rows beneath that it says bank's

18   name Citibank.  What do you understand that to mean?

19   A.  That's the clearing bank.

20   Q.  And what's a clearing bank?

21   A.  It's the bank we wire the money to for the beneficiary.

22   Q.  And can you explain to the jury what you mean by that, how

23   that works?

24   A.  The money is wired to Citibank.  Deltec Bank in Trust

25   Limited have an account at Citibank.

O6KBGUO2                         Berstler- Direct

1   Q.  And then beneath the bank name do you see it says

2   reference/memo?

3   A.  Yep.

4   Q.  And can you read what it says to the right of

5   reference/memo?

6   A.  100179601 Hamilton Digital Assets FD SP.

7   Q.  What's your understanding of what a reference/memo line is?

8   A.  It's usually used for further credit to a further

9   beneficiary.

10  Q.  And what do you mean by that?

11  A.  So it would be the further credit to Hamilton Digital Asset

12  account at Deltec Bank and Trust.

13          THE COURT:  What is your understanding of the role of

14  Citibank in this transaction?

15          THE WITNESS:  They're the bank that receives the money

16  on behalf of another bank.

17  Q.  Ms. Berstler, do you know what Hamilton Digital Assets is?

18  A.  No.

19  Q.  Do you know what the numbers, the 1001796 refer to?

20  A.  No.

21  Q.  Focusing on the last line there, Ms. Loftus, the internal

22  reference info.

23          Ms. Berstler, what's your understanding of internal

24  reference info means?

25  A.  That would be what G/Clubs would put in their books for

O6KBGUO2                         Berstler- Direct

1    their records as to what the wire was for.

2    Q.  And what does it say in that row?

3    A.  Cash dividend distribution.

4    Q.  And if we could zoom out and go to the top, just top of

5    page one.

6            Did this wire go out, Ms. Berstler?

7    A.  Yes.

8    Q.  Let's go now, Ms. Loftus, to Government Exhibit MSS-118.

9    If we could just scroll down one to two so you can see the

10   email.  If we could zoom on Alex H's email.

11           What's the date of this email?

12   A.  May 11, 2021.

13           THE COURT:  One moment.  It's 11:30.  Time for our

14   half hour break.  Remember that you're not permitted to discuss

15   the case amongst yourselves.  Don't permit anyone to discuss

16   the case in your presence.  Don't read, watch or listen to

17   anything from any source that touches on the subject matter of

18   this case.  We'll resume at noon.

19           THE LAW CLERK:  Jury exiting.

20           THE COURT:  You may step out of the courtroom,

21   Ms. Berstler.  Don't discuss your testimony.

22           (Witness temporarily excused)

23           (Jury not present)

24           THE COURT:  Please be seated.  Is there anything

25   before we resume at noon?

O6KBGUO2                        Berstler- Direct

1              MR. SCHIRICK:  Nothing from the defense.

2              MR. FERGENSON:  Nor from the government.

3          (Recess)

O6K1GUO3                          Berstler - Direct

 1                THE COURT:  Please have the jurors brought in.

 2                (Jury present)

 3                THE COURT:  Please be seated.

 4                Remember that you're still under oath.

 5                THE WITNESS:  Yes.

 6                THE COURT:  You may continue the inquiry.

 7                MR. FERGENSON:  Thank you, your Honor.

 8     BY MR. FERGENSON:

 9     Q.  Ms. Berstler, would you take steps to process a customer's

10     wire if you knew the purpose provided by the customer was

11     false?

12                MR. SCHIRICK:  Objection, your Honor.

13                THE COURT:  You may answer.

14     A.  No.

15                MR. FERGENSON:  Ms. Loftus, if we could go back to

16     Government Exhibit MSS118.

17                And if we could scroll down slightly and just zoom on

18     Alex H's email.

19     Q.  All right.  Now, Ms. Berstler, we were looking at this

20     before the break.  Can you remind us what the date is?

21     A.  May 11, 2021.

22     Q.  All right.  And what's the amount being requested here?

23     A.  $15 million.

24     Q.  And where is it going to?

25     A.  Deltec Bank and Trust Limited.

1          MR. FERGENSON:  Ms. Loftus, is it published?

2    Q.  Okay.  Now the amount is $15 million, right, Ms. Berstler?

3    A.  Yes.

4    Q.  And what's the account name it's going to?

5    A.  Deltec Bank and Trust Limited.

6    Q.  And the vendor address, is that the same address in the

7    Bahamas?

8    A.  Yes.

9    Q.  All right.  And the Reference/Memo, is that the same

10   Reference/Memo?

11   A.  Yes.

12   Q.  And then what is the Internal Reference Info provided here?

13   A.  Loan.

14   Q.  And do you recall what the last one to Deltec Bank said?

15   A.  Dividend distribution.

16   Q.  Do you have any independent knowledge of whether this was

17   in fact a loan?

18   A.  No.

19   Q.  Did you just rely on the information provided?

20   A.  Yes.

21          MR. FERGENSON:  All right.  If we could zoom out and

22   go to page 1.

23   Q.  Did this wire go out?

24   A.  Yes.

25          MR. FERGENSON:  All right.  Ms. Loftus, let's go to

O6K1GUO3                    Berstler - Direct

1  Government Exhibit MSS119.

2           All right.  And if we could zoom in on Alex H's email.

3  Q.  What's the date of this email from Alex H, Ms. Berstler?

4  A.  June 21, 2021.

5  Q.  And what's the amount of this wire request?

6  A.  35 million.

7  Q.  And same destination as the last two?

8  A.  Yes.

9  Q.  And same Reference/Memo as the last two?

10  A.  Yes.

11  Q.  What's the Internal Reference Info here?

12  A.  Loan.

13  Q.  All right.  And I'll read just the body up top, which says,

14  "Please find the information below in regards to the first of

15  the one wire transfer we would like to schedule from our

16  accounts today 06.21.21 for 35mm.  As discussed I will send you

17  another wire request this Wednesday 06.23.21 for the remaining

18  15mm."

19           Ms. Berstler, do you recall why the transfer was

20  broken into two different wires?

21  A.  No, I don't remember.

22  Q.  All right.  Let's go to MSS—and did this wire go out?

23  A.  Yes.

24           MR. FERGENSON:  Let's go to MSS120.

25           And if we could scroll down slightly.

1   Q.  All right.  What's the date of this email, from Alex H?

2   A.  June 23, 2021.

3   Q.  And what's the amount of this transfer?

4   A.  15 million U.S. Dollars.

5   Q.  Same recipient info?

6   A.  Yes.

7   Q.  What's the Internal Reference Info on this?

8   A.  Loan.

9   Q.  All right.  And Ms. Berstler, do you recall, looking at

10  these wire transfers, what the total amount was sent to

11  Hamilton Digital Assets at Deltec Bank?

12  A.  85 million.

13  Q.  And this is June 23rd.  The first we looked at was May 6th.

14  And approximately what time period was that sent?

15  A.  About a month and a half.

16          MR. FERGENSON:  Ms. Loftus, let's go to MSS122.

17          All right.  And if we could just zoom on the top

18  email, Ms. Loftus.

19  Q.  All right.  Who is this email from?

20  A.  Alex H.

21  Q.  To whom?

22  A.  Sorry?

23  Q.  Who is it to?

24  A.  Christina Schatz.

25  Q.  And are you copied?

O6K1GUO3                           Berstler - Direct

1     A.  Yes.

2     Q.  What's the date of this email?

3     A.  July 15, 2021.

4     Q.  And what's the subject?

5     A.  Statement of Account.

6     Q.  All right.  And Alex H says, "Good afternoon Christina,

7     Please find attached statement of account as requested for G

8     Club International Limited."  What was G Club International

9     Limited?

10    A.  I don't know.

11    Q.  And Ms. Berstler, do you recall why this was requested?

12    A.  Nope.

13          MR. FERGENSON:  All right.  Let's zoom out.

14          And if we could scroll.

15    Q.  Let's first read the bottom email, Alex H's email.

16          All right.  Ms. Berstler, do you see this is an email

17    from Alex H to David Fallon?

18    A.  Yes.

19    Q.  And what's the date of the email?

20    A.  July 14, 2021.

21    Q.  All right.  And what's the subject?

22    A.  Statement of Account.

23    Q.  All right.  And Alex H says——actually, let me ask you, do

24    you know who David Fallon is, Ms. Berstler?

25    A.  No.

1    Q.  Did you ever speak to David Fallon?

2    A.  No.

3    Q.  He says, "Hi David, Based on the phone call we just had—"

     Alex says this.  "Based on the phone call we just had can you

5    please provide me a summary receipt (statement of account) that

6    we have with Hamilton Digital Assets containing all

7    information."

8              MR. FERGENSON:  And if we could zoom out, please.

9              And just zoom on the middle email.

10   Q.  What was David's reply, Ms. Berstler?

11   A.  "Hi Alex, Please find attached the statement of account for

12   G Club International."

13             MR. FERGENSON:  All right.  And if we could zoom out.

14             And actually, we'll keep going down.  We'll go to

15   page 3.

16             All right.  Now, yeah, if we could zoom—just pull up

17   the text so it's larger.  Thank you, Ms. Loftus.

18   Q.  All right.  Ms. Berstler, do you see in the top right it

19   says, "NAV Fund Services (Cayman) Ltd."?

20   A.  Yes.

21   Q.  Do you know what NAV Fund Services is?

22   A.  No.

23   Q.  And then just focusing you, the large bold text towards the

24   middle that says Hamilton Digital Assets Fund SP a Segregated

25   Portfolio of Hamilton Opportunity Fund SPC, do you know what a

1    segregated portfolio is?

2    A.  No.

3    Q.  Do you know what Hamilton Opportunity Fund SPC is?

4    A.  No.

5    Q.  Okay.  And then beneath that——oh, and what's the Issued

6    Date in the top left here?

7    A.  June 3, 2021.

8    Q.  All right.  And so focusing you in the box beneath, what's

9    the name listed there?

10   A.  G Club International Limited.

11   Q.  And what was the name of the G Club entity that was a

12   Morgan Stanley client?

13   A.  G Club Operations.

14   Q.  All right.  So the focusing on the next row, what's the

15   transaction?

16   A.  Subscription (by cash amount).

17   Q.  And what's the amount?

18   A.  $15 million.

19   Q.  And then what's the effective date there?

20   A.  August 1, 2021.

21           MR. FERGENSON:  All right.  Now let's go to the next

22   page, Ms. Loftus, please.

23           And if we could zoom on the text just to make it

24   larger.

25   Q.  Okay.  Now what's the Issued Date here, Ms. Berstler?

O6K1GUO3                          Berstler - Direct

 1  A.  July 14, 2021.

 2  Q.  That's the same date as Alex H's email?

 3           MR. FERGENSON:  We can zoom out and scroll up.

 4  A.  I don't know.

 5           MR. FERGENSON:  Can you scroll up to Alex H's email.

 6  And if you want to zoom on the date.

 7  Q.  Or can you read the date, Ms. Berstler?

 8  A.  Yeah, July 14, 2021.

 9  Q.  Same date?

10  A.  Yes.

11           MR. FERGENSON:  All right.  Let's scroll back down,

12  please.

13           We can zoom on that text.

14  Q.  All right.  Now what's the name listed on this one?

15  A.  G Club Operations LLC.

16  Q.  And is that the name of the entity that was a Morgan

17  Stanley client?

18  A.  Yes.

19  Q.  All right.  And what's the amount listed there?

20  A.  $85 million.

21  Q.  And what's the effective date?

22  A.  August 1, 2021.

23  Q.  And 85 million, is that the same amount that Morgan Stanley

24  transferred to Hamilton at Deltec?

25  A.  Yes.

1    Q.   Okay.  Now, Ms. Berstler, do you know what these dates, the

2    Effective Date or the Order——I'll start with Effective Date.

3    Do you know what that means?

4    A.   No.

5    Q.   Do you know what Order Received Date means?

6    A.   No.

7           MR. FERGENSON:  All right.  Ms. Loftus, let's go to

8    MSS121, please.

9           And if we could go down to the first email, page 4.

10          All right.  And if we could zoom on Alex H's email.

11   Q.   All right.  Now, Ms. Berstler, what's the date of this

12   email from Alex H?

13   A.   July 12, 2021.

14   Q.   And I'll go ahead and just read the third paragraph in his

15   email, which says, "This is in regards to the 10mm USD we sent

16   back in January to Fiesta Property Developments Ltd.  The

17   agreement was for 10mm GBP not 10mm USD——this was myself and my

18   teams error."  He says, "Based on our transaction history we

19   transferred over 8,060,000 worth of GBP.  We need to wire the

20   remaining 1,940,000 worth of Great Britain pounds."  And then

21   he says, "Please use this email as authorization."

22          And in the beneficiary account name beneath that,

23   what's the beneficiary account?

24   A.   Fiesta Property Developments Ltd.

25          MR. FERGENSON:  All right.  And if we could scroll up,

1    Ms. Loftus.

2           And if we can zoom on the response.

3    Q.  And Ms. Berstler, how did you respond?

4    A.  I wrote, "Total sent to Fiesta so far is 7,326,000 GBP.  On

5    January 21, 2021, 734,000 GBP; January 27, 2021, 3,660,000 GBP;

6    February 4, 2021, 2,932,000 GBP.  If you needed 10mm GBP total

7    sent to Fiesta, we would need to send 2,674,000 GBP."

8           MR. FERGENSON:  All right.  And if we could scroll up,

9    please.

10          And then, yeah, we can zoom on Alex's email.

11   Q.  All right.  And then Ms. Berstler, just focusing you on the

12   address line, could you read the address line.  In Alex's

13   email.

14   A.  "Transferwise, 56 shore ditch high street, London, E1 6JJ,

15   United Kingdom."

16   Q.  Do you know what's at that address?

17   A.  No.

18   Q.  Do you know what Transferwise is?

19   A.  No.

20          MR. FERGENSON:  All right.  You can zoom out.

21          And we can scroll up.

22          And we can keep scrolling up.  You can keep going.

23   Q.  All right.  And Ms. Berstler, did this wire go out?

24   A.  Yes.

25          MR. FERGENSON:  All right.  Let's go to MSS124,

O6K1GUO3                       Berstler - Direct

1   please.

2           All right.  And if we could, let's start at page 2,

3   the first email.  Let's zoom on that, please.

4   Q.  Okay.  So this is from Alex H, right?

5   A.  Yes.

6   Q.  And what's the date?

7   A.  July 29, 2021.

8   Q.  And who is it to?

9   A.  It is to Christina Schatz.

10  Q.  And who is copied?

11  A.  Me.

12  Q.  And what's the subject?

13  A.  Returned Wire.

14  Q.  And could you read Alex H's email.

15  A.  "Good afternoon Christina, Attached you'll find the wire

16  that was returned to us.  It was the funds we sent to Fiesta in

17  British pounds.  Can you let us know if you see any activity on

18  the back end——I don't see the return in our account.  Thank

19  you."

20  Q.  And this is about two weeks after that last Fiesta wire?

21  A.  I think.

22          MR. FERGENSON:  If you could scroll up, please.

23          All right.  And if we could zoom on——thank you.

24  Q.  Is this July 29th again?

25  A.  Yes.

1  Q.  And this is from you?

2  A.  Yes.

3  Q.  Could you read your response, please.

4  A.  "Alex:  I checked with our back office on this.  Funds were

5  not sent to Morgan Stanley following the correct GBP wire

6  instructions, therefore MS never received this wire.  Please

7  have the sending bank trace the wire from their end.  In

8  addition, we would not have been able to accept this wire, even

9  if it was sent correctly, since the account is only allowed

10 outgoing same-name wires to G Club.  All incoming third party

11 wires would be returned.  Fiesta should wire funds to another G

12 Club account.  Sorry for the inconvenience."

13 Q.  Ms. Berstler, when you wrote, "we would not have been able

14 to accept this wire even if it was sent correctly since the

15 account is only allowed outgoing same-name wires to G Club,"

16 what did you mean by that?

17 A.  At this point the G Club account had a——was blocked from

18 any——any third-party transactions by another department at

19 Morgan Stanley.

20 Q.  And——

21         THE COURT:  What do you mean by third-party

22 transaction?

23         THE WITNESS:  To any account that is not in the name

24 of G Club Operations.

25 Q.  And Ms. Berstler, based on your time at Morgan Stanley, why

1    are some accounts only allowed same-name transfers?

2    A.   If our——if another Morgan Stanley department is monitoring

3    the activity and investigating an account, they might only

4    allow you to do same-name transfers.

5    Q.   And what departments do that?

6    A.   I guess fraud operations, our AML department, and our

7    global financial crimes department.

8    Q.   And what's AML?

9    A.   Anti-money laundering.

10           MR. FERGENSON:  All right.  And if we could zoom out.

11   And scroll up.  Yeah, let's zoom on the top one.

12   Q.   Could you read the last response here.  I'm sorry.

13   Withdrawn.

14           What's the date of this email?

15   A.   August 5, 2021.

16   Q.   And could you read your further reply to Alex H.

17   A.   "Unfortunately I was not given approval to enter the recall

18   request for this wire and was reminded that the account is

19   allowed outgoing same-name wires only and a returned wire would

20   not be accepted.  Sorry."

21   Q.   And "the account is allowed outgoing same-name wires only,"

22   what were you referring to there?

23   A.   That the account was blocked, and only outgoing wires to

24   another G Club account were——was allowed.

25           MR. FERGENSON:  Ms. Loftus, we can take that down.

1    Q.  Ms. Berstler, what ultimately happened with the G Club

2    account?

3    A.  They were forced to transfer out.

4    Q.  And what do you mean by that?

5    A.  Morgan Stanley closed the account and—and told them to

6    transfer the money to another G Club account.

7    Q.  And do you know where the money was transferred?

8    A.  I do not.

9    Q.  Do you know who Bo Collins is?

10   A.  Sorry.  What was the name?

11   Q.  Bo Collins?

12   A.  No.

13               MR. FERGENSON:  May I have a moment, your Honor.

14               THE COURT:  You may.

15               MR. FERGENSON:  Nothing further, your Honor.

16               THE COURT:  Cross-examination.

17               MR. SCHIRICK:  Thank you, your Honor.

18   CROSS EXAMINATION

19   BY MR. SCHIRICK:

20   Q.  Hi.  Good afternoon, Ms. Berstler.  Just a couple of

21   questions about your preparation for testimony today.

22               Did you meet with the government lawyers here before

23   giving testimony here today?

24   A.  Yes.

25   Q.  Okay.  And when I say meet, I mean, you know, sort of by

1   phone or videoconference or in person.

2   A.  Yes.

3   Q.  Okay.  And how many times did you meet with them?

4   A.  Three.

5   Q.  Okay.  And were those three times all by videoconference?

6   A.  One videoconference and two in-person.

7   Q.  Okay.  And if you can just tell me, who was there when you

8   met with them, to the best of your recollection?

9   A.  My first two meetings were with Micah, and my third meeting

10  was with Ryan.

11  Q.  And was there anyone else there besides Micah on the first

12  two occasions and Mr. Fergenson [sic] on the third?

13  A.  Yes, but I don't know the names.

14  Q.  Okay.  Fair enough.

15          Was there anyone else from Morgan Stanley there with

16  you?

17  A.  Yes.

18  Q.  Okay.  And who was that?

19  A.  Jeremy Winer.

20  Q.  And is Mr. Winer an attorney for Morgan Stanley?

21  A.  Yes.

22  Q.  All right.  Thank you.

23          THE COURT:  Mr. Schirick, please speak into the

24  microphone.

25          MR. SCHIRICK:  Yes.  Apologies, your Honor.

O6K1GUO3                           Berstler - Cross

1    Q.   Now you testified that you worked as an administrative

2    assistant to a number of Morgan Stanley financial advisors,

3    right?

4    A.   Yes.

5    Q.   And approximately how many do you cover at any given time?

6    A bunch, I'm guessing.

7    A.   Five.

8    Q.   Okay.  And that includes Ms. Schatz.

9    A.   Yes.

10   Q.   All right.  And Ms. Schatz was the primary point of contact

11   for G|CLUBS——

12   A.   Yes.

13   Q.   ——on the G|CLUBS account for Morgan Stanley.

14   A.   Yes.

15   Q.   Okay.  And you testified that——withdrawn.

16            Do you recall that G|CLUBS' business was as a

17   membership services company?

18   A.   Yes.

19   Q.   Okay.  And that it offered perks or services to its

20   members?

21   A.   I don't know what they offered.

22   Q.   Okay.  But it was a membership services company, to your

23   understanding.

24   A.   Yes.

25   Q.   All right.  And were you working with Ms. Schatz when

1     G|CLUBS first became a client of Morgan Stanley?

2     A.  Yes.

3     Q.  Okay.  And do you recall whether, at the time that G|CLUBS

4     became a client, Ms. Schatz met in person with anyone from

5     G|CLUBS?

6     A.  I don't know.

7     Q.  Okay.  Do you know if she ever met with anyone in person

8     from G|CLUBS?

9             MR. FERGENSON:  Objection.

10            It's fine, your Honor.

11            THE COURT:  You may answer.  You may answer.

12    A.  I don't know.

13    Q.  Okay.  And you mentioned someone named Alex——I'm going to

14    give it a shot here——Hadjicharalambous, if that's the correct

15    pronunciation.  You recall mentioning him during your

16    testimony?

17    A.  Yes, yes.

18    Q.  And he was a representative of G|CLUBS, I think you

19    testified on direct, right?

20    A.  Yes.

21    Q.  Okay.  Did you ever meet——we'll just call him Alex H?

22    A.  No.

23    Q.  And you don't know whether Ms. Schatz ever met Alex H.

24    A.  No.

25    Q.  Or Yvette Wang, for that matter.

O6K1GUO3                          Berstler - Cross

1   A.  Who?

2   Q.  Yvette Wang.

3   A.  No, I don't know.

4   Q.  And do you know whether Ms. Schatz ever went to the G|CLUBS

5   office on East 64th Street here in town?

6   A.  I don't know.

7   Q.  Okay.  Now I believe you testified that G|CLUBS accounts

8   were first opened at Morgan Stanley in December of 2020, or

9   thereabouts?

10  A.  Mm-hmm.

11  Q.  Does that sound right?

12  A.  Yes.

13  Q.  And do you know when they were closed, approximately?  Just

14  the best of your recollection.

15  A.  Late summer 2021.

16  Q.  Okay.  So August, September 2021, something in that

17  neighborhood?

18  A.  Yeah.

19  Q.  Okay.  And during the time that its account was open at

20  Morgan Stanley, I believe you testified on direct that G|CLUBS

21  used the account to pay for all kinds of, you know, ordinary

22  business expenses; is that fair?

23  A.  Yes.

24  Q.  Okay.  So they used it to pay vendors, for example?

25  A.  Yes.

1   Q.  You're aware of this?  And they used it to pay taxes, for

2   example?

3   A.  I don't know if taxes were paid.

4   Q.  Okay.  And you knew this because your role was to sort of

5   handle these kinds of client requests for payment, right?

6   A.  Yes.

7   Q.  And I believe you testified on direct you would handle like

8   client requests for wires, right?

9   A.  Yes.

10  Q.  And sort of other operational kind of tasks——

11  A.  Yes.

12  Q.  ——that clients would request of Morgan Stanley?

13  A.  Yes.

14  Q.  Fair?  Okay.  All right.  Now you also testified on direct

15  I think that you had some interactions with people in the

16  bank's compliance department; is that fair?

17  A.  Yes.

18  Q.  Okay.  And those interactions that you described when you

19  were speaking with Mr. Fergenson were related to G|CLUBS,

20  right?

21  A.  Yes.

22  Q.  Okay.  And now since you started at Morgan Stanley in——I

23  believe you said it was 2008?

24  A.  Yes.

25  Q.  Okay.  So you've been there for 16 years, approximately?

1    A.  Yes.

2    Q.  Okay.  Now since you started at Morgan Stanley in 2008,

3    have you had multiple occasions to interact with the compliance

4    department at Morgan Stanley?

5    A.  Yes.

6    Q.  Okay.  And you've had a number of occasions to—withdrawn.

7            And as part of that interaction, it's been because of

8    various issues that have come up in other client accounts,

9    right?

10   A.  Yes.

11   Q.  Okay.  And so I think included in compliance department,

12   just to make sure we're talking about the same thing, I believe

13   you testified about like a fraud department earlier?  Would you

14   include that in compliance?

15   A.  Fraud operations, yes.

16   Q.  Fraud, right, fair enough.  Fraud operations?  Okay.  And

17   then you also testified I think about an AML group.  Would you

18   consider that also to be in the compliance group within Morgan

19   Stanley?

20   A.  Yes, it is a compliance group.

21   Q.  Okay.  All right.  And now when it comes to the compliance

22   function—I think you testified to this on direct, but just to

23   be clear—you don't have any decision-making authority when it

24   came to compliance-related issues, right?

25   A.  I do not have any authority.

O6K1GUO3                        Berstler - Cross

1  Q.  Okay.  And so for example, you don't have decision-making

2  authority when it comes to whether the bank approves a

3  particular wire transfer request, as we were talking about, or

4  as you were talking about a few moments ago.

5  A.  Correct.

6  Q.  Okay.  And Ms. Schatz didn't even have that authority,

7  right?

8  A.  Correct.

9  Q.  Okay.  That's purely the compliance group.

10  A.  Yes.

11  Q.  Okay.  All right.  Now you also testified I believe on

12  direct a bit about an entity called Crane; is that right?

13  A.  Yes.

14  Q.  Okay.  And Crane had something to do——withdrawn.

15          Fair to say that Crane was some kind of consulting

16  firm, in your understanding?

17  A.  I don't know exactly what their role was.

18  Q.  Sure.  Fair enough.  But do you have an understanding,

19  generally, about what Crane was?

20  A.  No.

21  Q.  Okay.  And so you didn't have any impression as to how

22  Crane related to G|CLUBS in any way?

23  A.  No.

24  Q.  Okay.  But you've heard the name Haitham Khaled, I think

25  you testified, right?

1    A.  Yes.

2    Q.  And you knew he was a representative of Crane?

3    A.  Yes.

4    Q.  And are you aware that there was a lawsuit in which G|CLUBS

5    sued Crane?

6    A.  No.

7    Q.  Okay.  And are you aware that at some point G|CLUBS severed

8    its relationship with Crane?

9    A.  No.

10          MR. SCHIRICK:  Okay.  Now I'd like to pull up, if we

11   can, Government Exhibit MSS112.  And if we could just——well,

12   before we go there:

13   Q.  Do you remember being asked some questions on direct about

14   Government Exhibit MSS112?

15   A.  Yes.

16          MR. SCHIRICK:  Okay.  If we can just scroll down,

17   please, to page 3.

18   Q.  And I believe you talked to Mr. Fergenson on direct about

19   this request for a million-dollar transfer?

20   A.  Yes.

21   Q.  Okay.  And actually, I want to correct myself.  It was

22   actually a transfer for a million pounds Sterling, right, GBP?

23   I know you saw a lot of these.  This is the first one.  112 is

24   the first transfer.

25          THE COURT:  Did you want to call her attention to a

1   particular exhibit?

2          MR. SCHIRICK:  Sure.  Happy to, your Honor.

3   Q.  So what's being displayed in front of you, the email dated

4   January 18, 2021, do you see that?

5   A.  Yes.

6   Q.  Okay.  And does this look like the email that you talked to

7   Mr. Fergenson about on direct, about the million-dollar GBP

8   transfer?  Do you recognize it?

9   A.  Yes.

10          MR. SCHIRICK:  Okay.  And then if we can just please

11   scroll up to the top of this.  And all the way to the top, if

12   we can, please.

13          Okay.  And if we can just zoom in on the top portion,

14   where it begins, "Good morning Liz."

15   Q.  Okay.  And again, you recall that you reviewed this on

16   direct, right?

17   A.  Yes.

18   Q.  Okay.  And I believe you testified that this email from

19   Alex H that we're looking at right now—you see at the bottom

20   there where he signs it, Alex H?

21   A.  Yes.

22   Q.  —was a response to—withdrawn—was in response to your

23   request that G|CLUBS provide a purpose for the wire that was

24   requested?  Do I have that right?

25   A.  Yes.

O6K1GUO3                      Berstler - Cross

1    Q.  Okay.  And that request that you made to Alex H originated

2    with the compliance folks at Morgan Stanley, right?

3    A.  Yes.

4    Q.  And you were just passing it along.  Passing the request

5    along.

6    A.  I was asking the question that I didn't know the answer to

7    in their email.

8    Q.  Right.  Fair enough.  So is the distinction you're drawing

9    that they asked you, you didn't know, so you then asked Alex H?

10   A.  Yes.

11             MR. FERGENSON:  Objection to form.

12             THE COURT:  That's very compound.

13             MR. SCHIRICK:  Fair enough, your Honor.  I'll

14   rephrase.

15             THE COURT:  Okay.

16   Q.  So just to be clear, the process, or the sequence, was that

17   the compliance department asked you if you knew what the

18   purpose of the wire was, and you didn't know, right?

19   A.  Correct.

20   Q.  So you took that request and then you just passed it on to

21   Alex H, right?

22             MR. FERGENSON:  Objection.  Asked and answered.

23             MR. SCHIRICK:  Or clarifying, I think.

24             THE COURT:  I'll allow the answer.

25             MR. SCHIRICK:  Thank you.

1   A.  I——I asked Alex for the reason of the wire because it was

2   the question in fraud operations email that I didn't know the

3   answer to.

4   Q.  Okay.  Fair enough.  That's all I was asking.

5         And his explanation here——and I'll just read it

6   briefly——"that this transfer was initiated from G Club

7   Operations LLC to Fiesta Property Developments, a real estate

8   holding company."  Do you see that?

9   A.  Yes.

10   Q.  Let's just pause there for a moment.  And is it okay with

11   you if we call G Club Operations just Operations, or Ops, just

12   for short?

13   A.  Okay.

14   Q.  Okay.  And Fiesta Property, we'll just call Fiesta, okay?

15   A.  Okay.

16   Q.  And Fiesta is described here as a "real estate holding

17   company," right?

18   A.  Yes.

19   Q.  All right.  And then as we continue on reading, it says,

20   Owned by Mr. He in the UK, same owner of G Club Operations LLC.

21   We'll stop there.  And do you know who Mr. He is?

22   A.  He was the——he was listed as the ultimate beneficial owner

23   of G Club.

24   Q.  Okay.  And Alex H is telling you here that Mr. He is also

25   the owner of Fiesta, right?

1    A.  Yes.

2    Q.  Okay.  And that he's located in the UK, right?

3    A.  Yes.

4    Q.  All right.  And then Alex continues, as we read, for a

5    possible down payment on a property they plan to purchase for a

6    total of $10 million.

7            Do you see that?

8    A.  Yes.

9    Q.  Did I read that correctly?

10   A.  Yes.

11   Q.  And as you sit here today, does that language sound

12   definitive to you?

13   A.  I don't know.

14   Q.  Well, let's look at it.  It says that the transfer was for

15   a "possible down payment on a property they plan to purchase."

16   Did I read that correctly?

17   A.  Yes.

18   Q.  Okay.  It doesn't say "we signed a contract to buy property

19   and the payment is due next week," right?

20          MR. FERGENSON:  Objection.  The document speaks for

21   itself, your Honor.

22          MR. SCHIRICK:  Well, I'm just trying to clarify the

23   witness's understanding.

24          THE COURT:  You can answer the question.

25   A.  Can you repeat the question.

```
 1              MR. SCHIRICK:  Sure.  Could we have the court reporter
 2     read back the question.  I'm sorry.
 3              THE COURT:  Just take it in pieces, please.
 4              MR. SCHIRICK:  Sure.
 5     Q.  So this doesn't say, for example, we signed a contract to
 6     buy property, right?
 7     A.  Correct.
 8     Q.  And it doesn't say the down payment is due next week,
 9     right?
10     A.  Correct.
11     Q.  It says that there was a plan, words in the document, for a
12     possible——
13              MR. FERGENSON:  Objection to mischaracterizing the
14     document.
15              THE COURT:  Are you claiming that he's not reading the
16     words accurately?
17              MR. FERGENSON:  I'll withdraw it, your Honor.
18              THE COURT:  Okay.  Go ahead.
19     BY MR. SCHIRICK:
20     Q.  So it says that there is a plan, right?
21     A.  Yes.
22     Q.  Prospective, right?
23     A.  Yes.
24     Q.  Not definitive, right?
25     A.  Yes.
```

O6K1GUO3                        Berstler - Cross

1   Q.  Tentative sounding, right?

2           MR. FERGENSON:  Objection, your Honor.

3           THE COURT:  Overruled.  You may answer.

4   A.  Yes.

5   Q.  For a possible down payment, not definite, right?

6   A.  Yes.

7   Q.  Okay.  Now you were asked on direct by Mr. Fergenson

8   whether you reviewed additional information about the loan

9   that's referenced between Ops and Fiesta.  Do you remember him

10  asking you that?

11  A.  No.

12  Q.  Did you receive any additional information about the loan

13  from Ops and Fiesta?

14  A.  No.

15  Q.  Okay.  Did you ask for any additional information about the

16  loan from Ops to Fiesta?

17  A.  No.

18  Q.  Right.  You didn't, right?  And did you receive a copy of

19  the loan agreement?

20  A.  No.

21  Q.  No.  But you didn't ask for a copy of the loan agreement,

22  right?

23  A.  No.

24  Q.  Okay.  And did you receive a copy of the real estate

25  purchase contract?

1   A.  No.

2   Q.  That's because Morgan Stanley didn't ask for a copy of the

3   real estate purchase contract, right?

4            MR. FERGENSON:  Objection, your Honor.

5            THE COURT:  You may answer.

6   A.  No.

7   Q.  Just to clarify, Morgan Stanley did not ask for that,

8   right?

9   A.  Correct.

10           MR. SCHIRICK:  Okay.  Now if we can please go to

11  what's in evidence MSS125.

12           And just take a second to look at this.

13  Q.  Do you see the date at the top of this email, January 20,

14  2021?

15  A.  Yes.

16  Q.  Okay.  And do you remember talking to Mr. Fergenson about

17  this a few minutes ago, before the lunch break?

18  A.  Yes.

19  Q.  Okay.  And this is the email that came from fraud

20  operations asking for the information about the purpose of the

21  wire, right?

22  A.  Yes.

23  Q.  Okay.  And Deirdra Harrell is the one who sends this,

24  correct?  I'm sorry.  Withdrawn.

25           MR. SCHIRICK:  Let's, if we could, go to——just for

1    clarity, if you can go to——I'm sorry.  Just give me a moment.

2              Just go to page 11 of this document.  Jorge, the Bates

3    number on the bottom.

4              Yeah, perfect.  Great.  Thank you.

5    Q.  And I believe you reviewed this with Mr. Fergenson and the

6    question that was asked by the compliance was as relevant here,

7    the purpose of the wire, which is in the box two up from the

8    bottom on the left.  Do you see that?

9    A.  Yes.

10   Q.  Okay.  And that's the question to which you were

11   responding, right?

12   A.  Yes.

13   Q.  Okay.  And ultimately that——

14             MR. SCHIRICK:  If we can go page 8, please.

15   Q.  And we can see here again in the box that is on the left

16   labeled "Purpose of the wire (manually input)," do you see

17   that?

18   A.  Yes.

19   Q.  Okay.  And what's reflected in the box to the right there

20   is what you manually input; is that right?

21   A.  Yes.

22   Q.  And it reads, this is a wire to an affiliated business for

23   real estate investment.  Right?

24   A.  Yes.

25   Q.  Now that description doesn't have any of the tentative

O6K1GUO3                          Berstler - Cross

1  quality to it that Mr. —— or that Alex H's answer had; is that
2  a fair statement?
3  A.  Yes.
4  Q.  Okay.  And ultimately this information is what's forwarded
5  to the fraud department, right?
6  A.  Yes.
7  Q.  And they make their decision based on this information.
8  A.  Yes.
9  Q.  The fraud department never receives Alex H's email, right?
10  A.  Correct.
11  Q.  They never receive the tentative sounding email, right?
12  A.  Correct.
13  Q.  Okay.  So they didn't have the benefit of that, fair?
14  A.  Yes.
15          MR. SCHIRICK:  Okay.  Now if we can please go to
16  MSS113.
17  Q.  And do you recall this document, the January 27, 2021,
18  email which you discussed with Mr. Fergenson on direct?
19  A.  Yes.
20  Q.  And this relates to a different wire than the set of
21  documents that we just reviewed, right?
22  A.  I believe so.
23  Q.  Okay.  It was a second wire in a series of wires that you
24  went through on direct, right?
25  A.  Yes.

O6K1GUO3                    Berstler - Cross

1  Q.  Okay.  And this second wire was authorized based on the

2  same information that you manually input for the benefit of the

3  compliance department, right?

4  A.  Yes.

5          MR. SCHIRICK:  Okay.  And if we could go to MSS114.

6  Q.  Now again, you reviewed this with Mr. Fergenson on direct,

7  and this——withdrawn.

8          Do you recall discussing this document with

9  Mr. Fergenson on direct?

10 A.  Yes.

11 Q.  February 3, 2021 email chain?

12 A.  Yes.

13 Q.  And this relates to yet another wire, correct?

14 A.  Yes.

15 Q.  And this one too was authorized based on the information

16 that you manually input, correct?

17 A.  Yes.

18 Q.  Which lacked the tentative quality that we agreed upon

19 earlier, right?

20 A.  Yes.

21 Q.  You agreed with me that Alex H's email had a tentative

22 quality to it, right; his explanation had a timely quality.

23 A.  Yes.

24 Q.  And that is not included here, right?

25 A.  No.

1          MR. SCHIRICK:  Okay.  Now let's please go to MSS119.

2     Q.  And this is a June 21, 2021 email chain.  Do you recall

3     reviewing this with Mr. Fergenson earlier?

4     A.  Yes.

5          MR. SCHIRICK:  And if we scroll down in the document a

6     bit.

7          Right there.  If we blow up that bottom page, please,

8     Jorge, bottom of the page.

9     Q.  And this relates to a $35 million wire transfer request; is

10    that right?

11    A.  Yes.

12    Q.  And the request is that the wire be sent to Hamilton

13    Digital Assets FD SP, right?

14    A.  Yes.

15    Q.  Okay.  And do you know——withdrawn.  I believe you testified

16    on direct that you don't know what Hamilton is, right?

17    A.  Correct.

18    Q.  Okay.  And you don't know what agreements, if any, are in

19    place between Hamilton and G|CLUBS, right?

20    A.  Correct.

21    Q.  You just don't have that information?

22    A.  Correct.

23    Q.  In a way you could, right?

24          MR. FERGENSON:  Objection, your Honor.

25          THE COURT:  You may answer the question.

1            Is the question could she have asked?  Is that what

2   you were saying?  You wouldn't ask her to speculate, though.

3            MR. SCHIRICK:  No.  Could have asked for that

4   information, right?

5            THE COURT:  Well, that is speculation.  Are you saying

6   was she able to ask?  Is that the question?

7            MR. SCHIRICK:  Yes.  That's fair, your Honor.

8            THE COURT:  Okay.  Go ahead.

9   BY MR. SCHIRICK:

10  Q.  Could Morgan Stanley have asked for that?

11           MR. FERGENSON:  Objection.

12           THE COURT:  I just want to stay away from the "could

13  have" piece.

14           MR. SCHIRICK:  Fair enough.

15           THE COURT:  Did Morgan Stanley have the ability to

16  ask?

17           THE WITNESS:  Yes.

18           THE COURT:  Go ahead.

19  BY MR. SCHIRICK:

20  Q.  Okay.  But Morgan Stanley didn't ask, right?

21           MR. FERGENSON:  Asked and answered, your Honor.

22           THE COURT:  Sustained.  Okay.  Move on.

23           MR. SCHIRICK:  Okay.  If we can please go to MSS120.

24  And sort of home in on the bottom of this one as well, please.

25  Q.  And Ms. Berstler, this email relates to yet another request

O6K1GUO3                      Berstler - Cross

1    for a wire transfer, right?

2    A.  Yes.

3    Q.  And this one's for 15 million to Hamilton Digital Assets FD

4    SP, right?

5    A.  Yes.

6    Q.  And again, Morgan Stanley did not ask for the agreement

7    that was in place between Hamilton and G Club that relates to

8    this wire, right?

9    A.  Correct.

10        MR. SCHIRICK:  Okay.  Now let's please go to MSS124.

11   Q.  Okay.  And this is an August 5, 2021 email chain, correct?

12   A.  Yes.

13   Q.  This email chain relates to a returned wire that you talked

14   to Mr. Fergenson about a few minutes ago, right?

15   A.  Yes.

16   Q.  Okay.  And this is about two weeks or so after the Fiesta

17   wire for 2.6——withdrawn.

18        This email is about two weeks after a failed wire

19   transfer that was initiated by Morgan Stanley; is that right?

20   A.  I don't know if it was failed.

21        MR. SCHIRICK:  Okay.  Well, if we just scroll down in

22   the document a little bit.

23        And we can blow up there.

24   Q.  Alex H's email, July 29, 2021.  Do you see that?

25   A.  Yes.

O6K1GUO3                          Berstler - Cross

1    Q.  Importance is high, do you see that?

2    A.  Yes.

3    Q.  Okay.  And it says, "Good afternoon, Christina.  Attached

4    you'll find the wire that was returned to us."  Right?

5    A.  Yes.

6    Q.  Okay.  So does that refresh your recollection that this was

7    a failed wire transfer?

8    A.  I—I don't know.

9    Q.  Okay.  Well, I believe you testified on direct that at this

10   point the account was blocked from any third-party

11   transactions, correct?

12   A.  Yes.

13   Q.  And based on your experience at Morgan Stanley, sometimes

14   accounts are blocked from third-party transactions by

15   compliance, right?

16   A.  Yes.

17   Q.  Okay.  And this was in August of 2021, right?

18   A.  This was in July.

19   Q.  Fair enough.

20          If we zoom out and scroll up, you'll see that the top

21   email is August 5, 2021.

22   A.  Yes.

23   Q.  Okay.  And to the best of your recollection, is this when

24   the accounts for G|CLUBS first became blocked at Morgan

25   Stanley?

1    A.  I don't remember the timing.

2    Q.  Okay.  Well, do you recall any blocked wire transfers

3    before this?

4    A.  I don't remember.

5    Q.  Okay.  So you don't remember one way or another?

6           MR. FERGENSON:  Objection.  Asked and answered.

7           THE COURT:  Sustained.

8    Q.  Do you believe you would remember had it been blocked

9    earlier?

10          MR. FERGENSON:  Objection.

11          THE COURT:  All right.  So the speculation and asking

12   these hypotheticals, please don't do that.

13          MR. SCHIRICK:  Thank you, your Honor.

14   Q.  Okay.  Now you testified earlier that you had experience

15   with the bank's compliance department over your 16-year career

16   at Morgan Stanley, right?

17   A.  Yes.

18   Q.  And would you agree with me that Morgan Stanley is, you

19   know, one of the biggest banks in the world?

20   A.  Yes.

21   Q.  Okay.  And it has a global reputation?

22   A.  Yes.

23   Q.  And to sort of be blunt about it, Morgan Stanley is a big

24   deal in the banking world, right?

25          MR. FERGENSON:  Objection to relevance.

1          THE COURT:  I want to know if she has the opinion that

2    her employer is a big deal.  You may answer.

3          MR. SCHIRICK:  In the banking world.

4    A.  Morgan Stanley is a large bank.

5    Q.  Okay.  Fair enough.

6          Has it been your experience that the bank is sensitive

7    to its reputation?

8    A.  I don't know.

9    Q.  Is it sensitive to risks to its reputation?

10   A.  Yes.

11   Q.  Okay.  Yeah.  I mean, that's fair enough.  And do you have

12   a general understanding of how the bank reacts when it receives

13   a subpoena from the government inquiring about a bank customer?

14   A.  No.

15   Q.  Okay.  Have you had the experience in your 16-year working

16   career at Morgan Stanley where a bank customer that you were

17   involved with, that Morgan Stanley received a subpoena related

18   to that customer?

19         MR. FERGENSON:  Objection to form.

20         THE COURT:  Are you asking whether in the past she's

21   aware that a Morgan Stanley customer received a subpoena?  Is

22   that the question?

23         MR. SCHIRICK:  The question is whether she's aware of,

24   in the past, Morgan Stanley has received a subpoena related to

25   a customer, a Morgan Stanley customer that she's worked with.

1          THE COURT:  You may answer.

2    A.  I don't know.

3    Q.  Okay.  In your experience with the compliance department,

4    would it be a red flag for the compliance department to receive

5    a subpoena about a bank customer?

6    A.  I don't know.

7    Q.  Okay.  Do you know whether Morgan Stanley received a

8    subpoena from the government related to G|CLUBS?

9    A.  No, I don't know.

10   Q.  Okay.  Did you ever ask compliance whether that happened?

11   A.  No.

12   Q.  And did they ever tell you whether that happened?

13   A.  No.

14   Q.  Okay.  So you don't know whether the bank receiving a

15   subpoena is——

16          MR. FERGENSON:  Objection, your Honor.

17          THE COURT:  Sustained.  You can't ask that question.

18   Q.  All right.  So the G|CLUBS funds at Morgan Stanley's

19   account, those funds belong to G|CLUBS, right?  Fair to say?

20   A.  Yes.

21   Q.  Okay.  And from the bank's point of view, G|CLUBS owns

22   those funds, right?

23   A.  Yes.

24   Q.  And it can do what it wants with those funds.

25   A.  Yes.

1   Q.   And G|CLUBS doesn't have to ask Morgan Stanley's position

2   to use its funds, right?

3   A.   They need to put in a request to withdraw funds.

4   Q.   Sure.  But it doesn't have to ask Morgan Stanley for

5   permission about how to use the funds is the question?

6            MR. FERGENSON:  Asked and answered.

7            MR. SCHIRICK:  I think it's a different——the witness

8   answered a different question.

9            THE COURT:  You may answer.

10  A.   Can you ask the question again.

11  Q.   Sure.  G|CLUBS doesn't have to ask Morgan Stanley for

12  permission as to how to use its farms, right?

13  A.   Correct.

14  Q.   So when the compliance department asks what the purpose of

15  a wire is, it's just looking for information, right?

16           MR. FERGENSON:  Objection.

17           THE COURT:  Overruled.  If you know, you may answer.

18  A.   What was the question?

19  Q.   Let's try it this way:  Is it your understanding that one

20  of the purposes of Morgan Stanley's compliance department,

21  including the fraud department, is to protect customers?

22  A.   It's to protect the client and the firm.

23  Q.   Sure, both.  That's right.  To protect both, right?

24  A.   Yes.

25  Q.   Okay.

O6K1GUO3                          Berstler - Cross

1              MR. FERGENSON:  Objection to commentary.

2              THE COURT:  Overruled.  Let's go.

3    Q.  Now as long as——withdrawn.

4              Based on your experience, as long as the purpose for a

5    wire was a business purpose, you would have passed that

6    information along to the fraud department, right?

7    A.  Yeah, I guess so.

8    Q.  Okay.  So for example, G|CLUBS could have said that the

9    purpose——

10             THE COURT:  All right.  Here we go with the

11   hypotheticals again.  No hypotheticals.

12             MR. SCHIRICK:  Your Honor, may we have a brief

13   sidebar.

14             THE COURT:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6K1GUO3                         Berstler - Cross

1          (At the sidebar)

2          MR. SCHIRICK:  So your Honor, during direct, the

3   government was allowed to ask questions about what the witness

4   would or would not have passed along in terms of the

5   information she was provided, and the government asked a number

6   of hypothetical questions about that, and I raised this issue

7   this morning at 9:00 about the hypothetical questions, and I

8   think really all the defense is trying to do is be able to ask

9   hypothetical questions on the other side of this issue.

10         THE COURT:  We know that's what you're trying to do.

11         MR. FERGENSON:  I think just the key point is, if he

12  wants to ask, if a client gave you false information, would you

13  take steps to process that wire, that's okay, but I don't know

14  what the other——

15         MR. SCHIRICK:  That's the question you want to ask,

16  not the question I want to ask.

17         THE COURT:  It's just that the hypotheticals are

18  permitted in order to elicit evidence concerning the fraud.

19  You're not asking about fraud.

20         MR. SCHIRICK:  Well, your Honor——

21         THE COURT:  Your hypothetical does not bear on fraud.

22         MR. SCHIRICK:  Well, your Honor, I think it does.  I

23  think the hypothetical is to suss out whether the witness would

24  have passed along the information had she been provided with

25  information, with different information to show that she would

1   have, she would have passed that information along all the

2   same.  She's testified it's not her job to make these

3   decisions.

4           THE COURT:  Wasn't your question whether she would

5   pass along information concerning a business purpose use of

6   funds?

7           MR. SCHIRICK:  Well, well, the original question,

8   which I think was already asked and answered, was whether if

9   there was any business purpose, if she would have passed that

10  along.  I think she already answered that question.  We can

11  look at the record.  My understanding is—

12          THE COURT:  One moment.  Let's go back to business

13  purpose.

14          (Record read)

15          MR. SCHIRICK:  So she's already answered the answer to

16  this question.  So I'm just trying to ask questions for

17  illustrative purposes further to that question.

18          THE COURT:  What is it you wanted to ask?

19          MR. SCHIRICK:  Right.  So the witness has agreed that

20  as long as the purpose was a business purpose, that she would

21  have passed the information along.

22          THE COURT:  Okay.

23          MR. SCHIRICK:  So the idea is, we should be able to

24  ask two additional questions about examples of these business

25  purposes to show that there was no reason for G|CLUBS to

O6K1GUO3                    Berstler - Cross

 1    conceal what its prior use of that funds was, because it

 2    wouldn't——

 3            THE COURT:  So there's no objection after the business

 4    purpose question; am I correct?

 5            THE REPORTER:  Yes.

 6            MR. FERGENSON:  So that's——

 7            THE COURT:  You let that one in.

 8            MR. FERGENSON:  Yeah, I let them do that.  I don't

 9    think you get to go and speculate about further illustrative

10    examples.  That's just calling for speculation.

11            THE COURT:  What's your example?

12            MR. SCHIRICK:  That they said that they planned to

13    purchase a high-end sports car for use for members, that that

14    would have been passed along all the same.

15            MR. FERGENSON:  But they didn't.  I mean, that's the

16    whole point.

17            THE COURT:  So I would have sustained the objection

18    had one been made and so I don't think two wrongs will make a

19    right, so I'm not going to permit the question.

20            MR. SCHIRICK:  Okay, your Honor.  Thank you.

21            (Continued on next page)

22

23

24

25

1              (In open court)

2              MR. SCHIRICK:  Thank you.

3    BY MR. SCHIRICK:

4    Q.  Ms. Berstler, just a couple more questions.

5              Now Alex H expressed a tentative plan for Fiesta

6    to——withdrawn.

7              MR. FERGENSON:  Objection.

8    Q.  Alex H expressed——

9              MR. SCHIRICK:  Are you objecting to me withdrawing?

10   No.  Okay.

11   Q.  Ms. Berstler, Alex H expressed that Fiesta had a tentative

12   plan for a possible purchase of real estate.  We talked about

13   that earlier, right?

14   A.  Yes.

15   Q.  Okay.  And the tentative element of his explanation didn't

16   get passed along to fraud operations, right?

17   A.  Correct.

18   Q.  So we have no idea what fraud operations would have said

19   had that information been passed along, right?

20             MR. FERGENSON:  Objection.  Calls for speculation.

21             THE COURT:  Sustained.  Don't ask her to speculate.

22             MR. SCHIRICK:  I tried, your Honor.

23             No further questions, Ms. Berstler.

24             THE COURT:  Redirect.

25             MR. FERGENSON:  Thank you, your Honor.

1          Ms. Loftus, could we please publish MSS112.

2     REDIRECT EXAMINATION

3     BY MR. FERGENSON:

4     Q.  Ms. Berstler, you were asked questions about the emails

5     from Alex H regarding the Fiesta transfers.  Do you recall

6     that?

7     A.  Yes.

8          MR. FERGENSON:  Sorry.  Just a moment.

9          Thank you.

10    Q.  And Ms. Berstler, you were asked questions about this

11    initial wire request to Fiesta from Alex H.  Do you recall that

12    on cross?

13    A.  Yes.

14         MR. FERGENSON:  And Ms. Loftus, if we can zoom on the

15    top email.

16    Q.  Now before we turn to this exact email, Ms. Berstler, do

17    you know why the $10 million request was broken into three

18    different requests?

19    A.  No.

20         MR. SCHIRICK:  Objection, scope.

21         THE COURT:  Overruled.  You may answer.

22    Q.  Do you know why the $10 million request was broken into

23    three different wire transfers?

24    A.  No.

25    Q.  Do you know why Alex H specified that there was a repayment

1    plan for this loan?

2              MR. SCHIRICK:  Same objection.

3              THE COURT:  Overruled.  You may answer.

4    A.  No.

5    Q.  Do you know if this loan was ever actually repaid at all?

6    A.  No.

7    Q.  Ms. Berstler, does this email say anything about Mileson

8    Guo?

9    A.  No.

10             MR. SCHIRICK:  Objection.  Document speaks for itself.

11             THE COURT:  Overruled.  You may answer.

12   Q.  Does it say anything about someone named Qiang Guo?

13   A.  No.

14   Q.  Does it say anything about how Mileson Guo is the settler

15   of the foundation that owns G|CLUBS?

16             MR. SCHIRICK:  Objection.

17             THE COURT:  Overruled.

18   Q.  Does it say anything about how Mileson Guo is the settler

19   of the foundation that owns G|CLUBS?

20   A.  No.

21   Q.  Does it say anything about a Ferrari?

22             MR. SCHIRICK:  Objection.

23   A.  No.

24             THE COURT:  Overruled.

25   A.  No.

1    Q.  Does it say anything about FXXK EVO Ferrari?

2    A.  No.

3    Q.  Does it say anything about the Stichting Still We Rise?

4    A.  No.

5            MR. FERGENSON:  Nothing further, your Honor.

6            THE COURT:  Recross.

7    RECROSS EXAMINATION

8    BY MR. SCHIRICK:

9    Q.  At the risk of asking you further things that we all know

10   you don't know the answer to, do you know that this loan had a

11   10-year term?

12   A.  No.

13           MR. SCHIRICK:  Thank you.  No further questions.

14           THE COURT:  Any re-re?

15           MR. FERGENSON:  No, your Honor.

16           THE COURT:  All righty.  You may step out of the

17   courtroom.

18           THE WITNESS:  Thank you.

19           THE COURT:  Thank you.

20           (Witness excused)

21           THE COURT:  And the prosecution may call its next

22   witness.

23           MS. MURRAY:  Yes, your Honor.  The government calls

24   Jocelyn Reyes.

25           (Witness sworn)

1               THE COURT:  Please be seated.

2               State your name and spell it.

3               THE WITNESS:  Jocelyn Reyes.  J-O-C-E-L-Y-N,

4    R-E-Y-E-S.

5               THE COURT:  You may inquire.

6               MS. MURRAY:  Thank you, your Honor.

7     JOCELYN REYES,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MS. MURRAY:

12   Q.  Good afternoon, Ms. Reyes.

13   A.  Good afternoon.

14   Q.  Where do you work?

15   A.  The FBI.

16   Q.  What is your position at the FBI?

17   A.  Forensic accountant.

18   Q.  What are your duties and responsibilities as a forensic

19   accountant at the FBI?

20   A.  As a forensic accountant, I use a combination of

21   accounting, audit, and investigative skills to analyze

22   financial information.

23   Q.  How long have you been a forensic accountant at the FBI?

24   A.  For two years and four months.

25   Q.  Besides your testimony today and preparation for that

1    testimony, have you had any involvement in this case?

2    A.  No.

3    Q.  When were you first contacted by the government and asked

4    to testify in this case?

5    A.  Less than a week ago.

6    Q.  In advance of your testimony, were you asked to review

7    certain government exhibits that were provided to you?

8    A.  Yes.

9    Q.  Were you asked to verify the information in a government

10   exhibit that summarized those exhibits?

11   A.  Yes.

12   Q.  Did you review a government exhibit for accuracy?

13   A.  I did, yes.

14   Q.  Is the information in that government exhibit, the summary

15   exhibit, based on voluminous records?

16   A.  Yes.

17   Q.  What type or types of exhibits is the summary chart based

18   on?

19   A.  The exhibits that I reviewed.

20   Q.  Yes.  What type of documents were those?

21   A.  A combination of bank statements, signature cards, purchase

22   agreements, and some emails.

23   Q.  Ms. Reyes, who decided which exhibits you reviewed?

24   A.  The prosecutors and the case agent.

25   Q.  And who decided what information to include in a summary

1  chart that you reviewed for accuracy?

2  A.  The prosecutor and the case agent.

3  Q.  Were you provided the opportunity to note corrections to

4  the chart to make sure that it was accurate?

5  A.  Yes.

6  Q.  Did you provide suggested corrections to the chart?

7  A.  I did provide minor suggestions to some of the charts.

8  Q.  And after the charts were revised, are they all now

9  accurate?

10  A.  Yes.

11  Q.  And Ms. Reyes, just to be clear, did you review all of the

12  evidence gathered in this case or just the charts and the

13  exhibits that those charts are based on?

14  A.  Just the charts and the exhibits that those charts were

15  based on.

16          MS. MURRAY:  Ms. Loftus, if we could please publish

17  what's in evidence as Government Exhibit Stip 14.  This is a

18  stipulation regarding bank records, and it's in evidence.

19          Your Honor, pursuant to this stipulation, the

20  government observes Government Exhibits MSS87, MSS88, FAN1,

21  FAN2, MET19, and MET27.

22          THE COURT:  No objection?

23          MR. SCHIRICK:  Could we just have a moment, your

24  Honor.

25          (Counsel conferring)

1          MR. SCHIRICK:  No objection, your Honor.

2          THE COURT:  They're admitted.

3          (Government's Exhibits MSS87, MSS88, FAN1, FAN2,

4   MET19, and MET27 received in evidence)

5          MS. MURRAY:  And Ms. Loftus, if you could now please

6   publish Government Exhibit Stip 8, which is in evidence.  This

7   is a stipulation regarding documents, and pursuant to this

8   stipulation, the government offers Government Exhibit BR445.

9          MR. SCHIRICK:  No objection, your Honor.

10          THE COURT:  It is admitted.

11          (Government's Exhibit BR445 received in evidence)

12          MS. MURRAY:  Thank you, Ms. Loftus.

13          If we could please show just the witness what's been

14   marked as Government Exhibit GX Z14.

15          And we can flip through a few of the pages.

16   BY MS. MURRAY:

17   Q.  Ms. Reyes, what is Government Exhibit Z14?

18   A.  This is an exhibit of the—a summary of the exhibits that I

19   reviewed.

20   Q.  And did you review the exhibits that support these summary

21   charts in preparation for your testimony today?

22   A.  Yes.

23   Q.  Are the charts contained within Government Exhibit Z14

24   accurate?

25   A.  Yes.

1          MS. MURRAY:  Your Honor, the government offers

2    Government Exhibit Z14.

3          MR. SCHIRICK:  No objection, your Honor.

4          THE COURT:  It is admitted.

5          (Government's Exhibit Z14 received in evidence)

6          MS. MURRAY:  Ms. Loftus, if we could please go to the

7    first page and then publish.

8    BY MS. MURRAY:

9    Q.  Ms. Reyes, at a high level, what type of information is

10   shown or contained within Government Exhibit Z14?

11   A.  The exhibits that I reviewed.

12   Q.  And what information, if any, do those exhibits relate to?

13   A.  To the main source documents where I——with this

14   information, where this information was obtained.

15   Q.  All right.  Let's start with this.  This is slide 1.  Can

16   you read the title of this slide.

17   A.  G Club Operations LLC — Morgan Stanley Account ending in

18   8564.

19   Q.  And Ms. Reyes, the x8564, can you explain to the jury what

20   information that reflects.

21   A.  The 8564 are the last four digits of the account number.

22   Q.  And there's a GX number cited on the right side of this

23   slide.  Do you see that?

24   A.  Yes.

25   Q.  Is that a reference to the underlying government exhibit

1    that contains the information summarized herein?

2    A.  Yes.

3    Q.  Ms. Reyes, do you know what G Club Operations LLC is?

4    A.  No.

5            MS. MURRAY:  Let's go the next slide, please.

6    Q.  Ms. Reyes, what's the title of this slide?

7    A.  Account Profile for Morgan Stanley Account ending in 8564.

8    Q.  And that 8564 account, is that the same G Club Operations

9    LLC account that was referenced on the prior slide?

10   A.  Yes.

11   Q.  Looking at the screenshot on this slide, Ms. Reyes, is this

12   a screenshot from an underlying bank record that you reviewed

13   in connection with your testimony?

14   A.  Yes.

15   Q.  For this account, the Morgan Stanley 8564, what entities or

16   individuals are named as client contacts in the bank records?

17   A.  G Club Operations LLC, Alex Hadjicharalambous, Limarie

18   Reyes Molinaris, and Haoran He.

19   Q.  And in the bank record, how, if at all, is G Club

20   Operations LLC described?

21   A.  As the entity.

22   Q.  And how, if at all, is Alex Hadjicharalambous described?

23   A.  As the authorized individual person.

24   Q.  What about Limarie Reyes Molinaris?

25   A.  As the authorized individual person and key controller.

1    Q.  What's the description for Haoran He?

2    A.  UBO.

3    Q.  Do you know what UBO means, Ms. Reyes?

4    A.  It stands for ultimate beneficial owner.

5    Q.  Looking down the screenshot, there's a section entitled

6    Account Instruction and then Sort Name.  What information is

7    listed under that field?

8    A.  G Club——ADP & Expenses.

9    Q.  Ms. Reyes, do you understand what the reference to ADP &

10   Expenses relates to?

11   A.  No.

12   Q.  And then at the bottom of this screenshot there's an

13   account mailing and plating address.  First of all, what is a

14   plating address?

15   A.  It's an address where documents are——are sent, if needed.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

O6KBGUO4                         J. Reyes - Direct

1    BY MS. MURRAY:

2    Q.  And what is the information that is in this bank record for

3    the Morgan Stanley 8564 account for the mailing and plating

4    address?

5    A.  It notes G/Club Operations, LLC, Alex Hadjicharalambous,

6    162 East 64th Street, New York, New York 10065, United States.

7    Q.  Ms. Reyes, had you ever been to 162 East 64th Street?

8    A.  No.

9    Q.  Let's go to the next slide, please, Ms. Loftus.

10           What is the title of this slide?

11   A.  Fiesta Property Developments LTD Santander Bank Account

12   ending in 6389.

13   Q.  And looking down at the middle of the page, Ms. Reyes,

14   there's a box.  What information is to the right of that box?

15   A.  Balance as of December 28, 2020, 30 pounds and 39 pence.

16   Q.  So GBP, Ms. Reyes, what is that relate to?

17           What is that reference?

18   A.  That stands for Great British Pounds.

19   Q.  And is it correct from this slide that that is the balance

20   in the Santander 6389 account?

21   A.  Yes.

22   Q.  Let's go to the next slide, please.

23           What information is reflected on this slide,

24   Ms. Reyes?

25   A.  Company information for Santander bank account ending in

O6KBGUO4                        J. Reyes - Direct

1    6389.

2    Q.  And that's the Fiesta Property Developments Limited account

3    we just saw in the prior slide?

4    A.  Yes.

5    Q.  The screenshot on this slide, is that a screenshot taken

6    from the bank records cited on the right of this slide?

7    A.  Yes.

8    Q.  Looking at the information in that screenshot for, company

9    appointments, what is the name listed?

10   A.  Haoran He.

11   Q.  And over to the right of Haoran He, this is down in the

12   bottom left, what is the title listed for Haoran He?

13   A.  Director.

14   Q.  Below director, if you go through those three fields, what

15   is the date that's listed for the appointment of director?

16   A.  August 5, 2019.

17   Q.  And, Ms. Reyes, can you explain to the jury why you read

18   that as day, month, year?

19   A.  Based on the address, the address notes it's in the United

20   Kingdom, so they switch the month and the day.

21   Q.  And what is the nationality listed for Haoran He in this

22   bank record?

23   A.  Chinese.

24   Q.  Looking to the left side of that same portion of the

25   screenshot, can you please list the address listed for Haoran

O6KBGUO4                    J. Reyes - Direct

1  He?

2  A.   79 East Works Drive, Cofton Hackett, Birmingham, United

3  Kingdom B45AGR.

4  Q.   Ms. Reyes, looking higher up on the screenshot under

5  registered number there is a field for name, what is the name

6  of the company for this bank record?

7  A.   Fiesta Property Developments, LTD.

8  Q.   Ms. Reyes, do you know what Fiesta Properties Developments

9  LTD is?

10 A.   No.

11 Q.   Do you know who Haoran He is?

12 A.   No.

13 Q.   Ms. Loftus, we can go to the next slide, please.

14      Ms. Reyes, what's the title of this slide?

15 A.   Disbursements to Fiesta Property Developments LTD.

16 Santander bank account ending in 6389.

17 Q.   Looking at the arrow that is depicted on this slide,

18 Ms. Reyes, what timeframe or time range does the arrow reflects

19 transactions for?

20 A.   January 21, 2021 through February 4, 2021.

21 Q.   And from what bank account to what bank account?

22 A.   From G/Club Operations LLC Morgan Stanley account ending in

23 8564 to Fiesta Property Developments LTD Santander bank account

24 ending in 6389.

25 Q.   Ms. Reyes, what is the total amount of transactions from

O6KBGUO4                        J. Reyes - Direct

1    the G/Club Morgan Stanley account to the Fiesta Santander

2    account during that time period?

3    A.  10,026,220.20 or 7,326,000 pounds.

4    Q.  Ms. Loftus, if we could go out of this exhibit and please

5    pull up what's in evidence as Government Exhibit GXGC-544.

6              Ms. Reyes, can you read the words on the front page of

7    this exhibit which is GXGC-544?

8    A.  Facility agreement between G/Club Operations LLC and Jovial

9    Century International Limited and Fiesta Property Developments

10   LTD.

11   Q.  Ms. Loftus, can we go to the next page, please.  You can

12   zoom in on the top.  What is the date of this agreement

13   Ms. Reyes?

14   A.  January 15, 2021.

15   Q.  Looking at the parties listed here under number one, what

16   is the company name of the lender?

17   A.  G/Club Operations LLC.

18   Q.  And looking under item three, what is the company name of

19   the fund receiver?

20   A.  Fiesta Property Developments LTD.

21   Q.  Later in that same paragraph what is the address associated

22   with Fiesta Properties Developments limited?

23   A.  79 East Works drive, Cofton Hackett, Birmingham B45AGR,

24   United Kingdom.

25   Q.  Ms. Loftus, if we could scroll down a bit, please, and

O6KBGUO4                        J. Reyes - Direct

1   focus on item one under agreed terms.

2          Ms. Reyes, can you please read item one facility?

3   A.  The lender hereby agrees to lend to the borrower an amount

4   not exceeding 10 million pounds.

5   Q.  And if we could go to the next page, please, Ms. Loftus.

6          Item two at the top, Ms. Reyes, can you please read

7   that, use of funds?

8   A.  The borrower intends to use the loans to increase its

9   investment into the fund receiver which is a property

10  development company.

11  Q.  And the fund receiver that's referenced in item two, if we

12  could go back up, Ms. Loftus, to the prior page.

13         Looking at parties, item three, which company is

14  listed as the fund receiver in this contract?

15  A.  Fiesta Property Developments LTD.

16  Q.  Let's keep going down, please, Ms. Loftus.  If you can

17  scroll through.  We're going to go to the signature page,

18  please.  Starting here, this is page 14 of GXGC-544.

19         Ms. Reyes, do you see a signature for G/Club

20  Operations LLC?

21  A.  Yes.

22  Q.  What is the name of the individual who signed this facility

23  agreement for G/Club?

24  A.  Ziyang Liu.

25  Q.  How is that individual described in this document?

O6KBGUO4                        J. Reyes - Direct

1   A.  As the manager.

2   Q.  Do you know Ziyang Liu?

3   A.  No.

4   Q.  Ms. Loftus, let's go to the next page, please.

5           Ms. Reyes, on this signature page there are signatures

6   on behalf of Jovial Century International Limited and Fiesta

7   Properties Development Limited.  What is the printed name for

8   the signature for each of those entities?

9   A.  Haoran He.

10  Q.  And how is Haoran He described below the signature for

11  Jovial Century International Limited?

12  A.  Director.

13  Q.  And how is Haoran He described below the signature for

14  Fiesta Properties Development Limited?

15  A.  Director.

16  Q.  Ms. Loftus, we can take that down and please go back to

17  Government Exhibit Z14 at slide six.  Actually, let's go back

18  to slide five for a moment, please.

19          Ms. Reyes, what is the date range of the transactions

20  that are summarized on this slide?

21  A.  January 21, 2021 through February 4, 2021.

22  Q.  We can go to the next slide, please.

23          What information is shown on this slide, Ms. Reyes?

24  A.  This slide shows foreign currency transfers from G/Club

25  Morgan Stanley account ending in 8564.

O6KBGUO4                        J. Reyes - Direct

1    Q.  And that's the same Morgan Stanley account that we've been

2    discussing during your testimony so far, correct?

3    A.  Yes.

4    Q.  Looking at the top screenshot, what time period is this a

5    screenshot of a client statement?

6    A.  January 1 through January 31, 2021.

7    Q.  And looking right to the information that's within a red

8    box there, can you explain what information is on that portion

9    of the screenshot?

10   A.  The active asset account number 552068564-454, next to it

11   is G/Club Operations LLC, Ziyang Liu.

12   Q.  And that spelling of Ziyang Liu is the same spelling on the

13   facility agreement we just looked at in GXGC-544, correct?

14   A.  Can I look at the previous exhibit?

15   Q.  Sure.  We can pull that up, GXGC-544.

16   A.  Yes.

17   Q.  Let's go back to GXZ-14, please.  Again focusing on the top

18   screenshot, Ms. Reyes, what information is contained in this

19   portion of the bank record?

20   A.  This first portion shows foreign currency wires sent on

21   January 21 in the amount of $1,700,268.20, as well as a second

22   foreign currency wire transfer dated January 27 in the amount

23   of $5,942,000.

24   Q.  Ms. Reyes, taking that first transfer, the January 1

25   transfer, the second column states activity type, can you state

O6KBGUO4                         J. Reyes - Direct

1    what is listed under activity type for that wire?

2    A.  Transfer out of account.

3    Q.  And this is an account statement for the G/Club Morgan

4    Stanley 8564 account, correct?

5    A.  Yes.

6    Q.  Now, in the next column their security or symbol, what is

7    reflected there?

8    A.  GBP savings deposit.

9    Q.  And in the comments it indicates foreign currency wire

10   sent.  To the right of that is quantity, what quantity is

11   listed for the GBP for this outgoing wire?

12   A.  734,000.

13   Q.  Same question for the next wire, Ms. Reyes, the January 27

14   wire, what quantity in GBP was that outgoing wire from the

15   G/Club Morgan Stanley account?

16   A.  3,660,000.

17   Q.  And so on the farthest right column, the dollar amount that

18   you read previously, based on this bank record, are those

19   converted total amounts from GBP to U.S. dollars?

20   A.  Yes.

21   Q.  Looking now at the bottom screenshot, Ms. Reyes, what time

22   period does that portion of the client statement cover?

23   A.  February 1 through February 28, 2021.

24   Q.  And that's for the same G/Club Morgan Stanley account

25   ending in 8564, correct?

O6KBGUO4                    J. Reyes - Direct

1    A.  Yes.

2    Q.  What foreign currency transfer is reflected on this portion

3    of the bank statement?

4    A.  The foreign currency transfer sent on February 4 in the

5    amount of $4,900,510.

6    Q.  And again looking for a moment at the quantity of GBP or

7    Great British Pound, what was the quantity of this outgoing

8    wire in pounds?

9    A.  2,932,000.

10   Q.  And, Ms. Reyes, again focusing on the top screenshot, what

11   was the total amount of those two wires in U.S. dollars?

12   A.  $6,016,710.20.

13   Q.  And the total amount of the wire out on February 4?

14   A.  $4,009,510.

15   Q.  Let's go to the next slide, please, Ms. Loftus.

16         Looking again at the dollar amount and the GBP

17   reflected on the right side of this slide, Ms. Reyes, can you

18   explain to the jury how the information reflected on this slide

19   was derived from the bank records that we just looked at?

20   A.  Yes.  The 10,026,220.20 is the sum of the three wire

21   transfers that we just looked at as well as the 7,326,000

22   pounds is the sum of the three wire transfers that we also just

23   looked at.

24   Q.  And what is the title of this slide, Ms. Reyes?

25   A.  Fiesta Property Developments LTD Metro Bank account ending

O6KBGUO4                         J. Reyes - Direct

in 7427.

Q.   Looking at the bottom of this slide under the second box
with yellow around it, what information is reflected to the
right of that for the Fiesta Metro Bank account ending in 747?

A.   Balance as of April 21, 2021, 101,000 pounds.

Q.   Let's go to the next slide, please.

        Ms. Reyes, what's the title of this slide?

A.   Signature card for Metro Bank account ending in 747.

Q.   What is a signature card?

A.   A signature card is a document listing the authorized
signers of an account.

Q.   Focusing on the top screenshot here which indicates
business account mandate.  First of all, the account number
listed here, is that the Metro Bank account ending in 7427?

A.   Yes.

Q.   And individual one here who is listed.  First, let's focus
on the very bottom of this screenshot, relationship type.

        What box is checked for relationship type for this
individual?

A.   Authorize signatory.

Q.   And what is the individual's name as reflected in this bank
record?

A.   Mr. Haoran He.

Q.   And the position in business listed for Haoran He?

A.   Director.

O6KBGUO4                         J. Reyes - Direct

1   Q.  Looking at the second screenshot at the bottom half of this

2   slide, do you see a printed name on this signature card?

3   A.  Yes.

4   Q.  And what name is that?

5   A.  Haoran He.

6   Q.  And is this signature card in fact signed?

7   A.  Yes.

8   Q.  Let's go to the next slide, please.

9          What's the title of this slide, Ms. Reyes?

10  A.  Disbursements to Fiesta Property Developments LTD, Metro

11  Bank account ending in 7427.

12  Q.  Looking at the second green arrow, what information is

13  reflected there from Santander 6389 to Metro Bank 7427?

14  A.  A 7,176,372 pounds and 62 pence transferred on April 23,

15  2021.

16  Q.  Let's go to the next slide, please.  What's the title of

17  this slide, Ms. Reyes?

18  A.  Fiesta Property Developments LTD flow of funds.

19  Q.  And looking at the left side in the bottom, what

20  information is contained within those boxes?

21  A.  Fiesta Property Developments LTD's Wells Fargo, as well as

22  Passione Rossa, LLC, Ferrari Beverly Hills.

23  Q.  Ms. Reyes, do you know what Passione Rossa, LLC is?

24  A.  No.

25  Q.  Have you ever been to a Ferrari location in Beverly Hills?

O6KBGUO4                          J. Reyes -  Direct

1    A.  No.

2    Q.  Can we go to the next slide, please.

3            Looking here now, Ms. Reyes, on the left side at the

4    bottom, what is shown in the arrow from the Fiesta Wells Fargo

5    box to the Passione Rossa, LLC box?

6    A.  $500,000 transfer sent on May 26, 2021 between Fiesta

7    Property Developments LTD to Passione Rossa, LLC.

8    Q.  And let's go to the next slide, please.

9            Ms. Reyes, in connection with these charts, did you

10   also review business records that the government provided to

11   you?

12   A.  Yes.

13   Q.  Did that include an exhibit listed on the right here

14   GXBR-440?

15   A.  Yes.

16   Q.  Does this slide show screenshots from that Government

17   Exhibit?

18   A.  Yes.

19   Q.  Focusing on the top screenshot, what is that?

20   A.  It's an email.

21   Q.  What's the date of that email?

22   A.  May 28, 2021.

23   Q.  What's the subject line of the email?

24   A.  ACH inquiry Passione Rossa, LLC.

25   Q.  Ms. Reyes, what does ACH mean?

O6KBGUO4                        J. Reyes - Direct

1   A.  ACH stands for automated clearing house.

2   Q.  Is that another reference to a wire transfer?

3   A.  It's a type.  It's another type of electronic transfer.

4   Q.  Looking at the body of the email, can you just read that

5   for us starting with I just?

6   A.  I just wanted to reach out regarding our earlier

7   conversation pertaining to the ACH credit for Passione Rossa.

8   The only information we are able to obtain is that the funds

9   came from Wells Fargo in addition to the transaction details

10  shown below.

11  Q.  And then focusing on the second screenshot, Ms. Reyes, top

12  left says Passione Rossa, LLC.  On the bottom of this portion

13  there's a date and a debit, can you read what that reflects?

14  A.  May 26, 2021, the debit amount is $500,000.

15  Q.  Let's go to the next slide, please.  The arrow here,

16  Ms. Reyes, from Metro Bank 7427, the Fiesta Property

17  Developments account to Passione Rossa, what dollar amount and

18  pounds amount is shown there?

19  A.  $3,500,000 and 2,556,000 and 50 pounds and 54 pence.

20  Q.  And what was the date of that either 3.5 million U.S.

21  dollar or 2.5 and change million pounds transaction?

22  A.  June 16, 2021.

23  Q.  Let's go to the next slide, please.

24          What's the title of this slide, Ms. Reyes?

25  A.  Passione Rossa, LLC business records.

O6KBGUO4                        J. Reyes - Direct

Q.  And the screenshot on the top just, I'm going to read and
let me know if I read it correctly.

        The letter from Passione Rossa, LLC, Ferrari Beverly
Hills, which is defined as the seller to Stichting
Administratiekantoor Still we Rise Incorporated and registered
in the Netherlands which is described as the purchaser.  Did I
read that correctly.

Q.  The second screenshot item one, could you please read that?

A.  This is to confirm our agreement pursuant to which we agree
to sell you and you agree to purchase our vehicle Ferrari FXX-K
EVO car, chassis number 240860 (the car or FXX-K as described
on schedule C.)

Q.  Looking at item two here, is it correct that the agreed
purchase price is listed as 4 million U.S. dollars?

A.  Yes.

Q.  And then further down there's an indication the agreed
price shall be paid as follows.

        Focusing on the first paragraph, the non-refundable
deposit, what is the dollar amount of that deposit for this
purchase of the car?

A.  $500,000.

Q.  And then the last sentence here, the balance, what is the
balance that will be due on the car?

A.  $3,500,000.

Q.  And the bottom screenshot, Ms. Reyes, there's a name and a

O6KBGUO4                          J. Reyes - Direct

1    surname, what does that say?

2    A.  Qiang Guo.

3    Q.  Do you know who Qiang Guo is?

4    A.  No.

5    Q.  What date was this signed by Qiang Guo?

6    A.  May 17, 2021.

7    Q.  Let's go to the next slide, please.

8              Ms. Reyes, what's the title of this slide?

9    A.  Passione Rossa, LLC business records bill of sale.

10   Q.  And looking at this on the top right, what is the text that

11   we see on the top right of the screenshot here?

12   A.  Official Ferrari dealer, Ferrari Beverly Hills.

13   Q.  At the very bottom screenshot in the middle, what

14   information is written there?

15   A.  Mattioli Automotive Group.

16   Q.  Looking at this document, it's titled bill of sale, what's

17   the date of this bill of sale?

18   A.  June 18, 2021.

19   Q.  And the make and model of the item that's reflected in this

20   bill of sale?

21   A.  Ferrari FXX-K Evo.

22   Q.  Ms. Loftus, if we can zoom in on the ID number.  Looking at

23   the bottom here ID number starting with the 24, what are the

24   last six numbers listed for the ID number or the Chassis

25   number?

O6KBGUO4                    J. Reyes - Direct

1    A.  240860.

2    Q.  Zoom out of that, please.  I'm going down to cash price

3    listed on this bill of sale for this FXX-K Evo?

4    A.  $4 million.

5    Q.  The company listed for the seller?

6    A.  Ferrari of Beverly hills.

7    Q.  And then the company listed for the buyer of this Ferrari?

8    A.  Fiesta Property Developments LTD.

9    Q.  Let's go to the next slide, please.

10            Ms. Reyes, the title of this slide?

11   A.  Flow of funds G/Club Operations LLC to Passione Rossa, LLC.

12   Q.  Ms. Reyes, does this contain the transactions that we have

13   just walked through on the prior slides?

14   A.  Yes.

15   Q.  And looking at the bottom for the combined transfer from

16   Fiesta Property Developments to Passione Rossa, what is the

17   combined amount that was transferred between the Wells Fargo

18   and the Metro Bank accounts?

19   A.  $4 million.

20   Q.  And let's go to the last slide, please.

21            Ms. Reyes, can you read the title of this slide?

22   A.  Passione Rossa, LLC business records, FXX-K, Evo, Chassis

23   number 240860.

24   Q.  And, Ms. Reyes, the photo that's on this slide, is that a

25   photo of the car that was discussed in the bill of sale that we

1    just looked at?

2    A.  Yes.

3    Q.  With a purchase price of $4 million?

4    A.  Yes.

5    Q.  Purchased by Fiesta Property Development?

6    A.  Yes.

7    Q.  Is this a photo from a business record that you reviewed

8    which is cited on this slide?

9    A.  Yes.

10              MS. MURRAY:  May I have a moment, your Honor?

11              THE COURT:  You may.

12              MS. MURRAY:  Nothing further.  Thank you.

13              THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. SCHIRICK:

16   Q.  Just briefly, Ms. Reyes.  I believe you testified on direct

17   that the government lawyers first asked you to testify here

18   less than a week ago.  Is that right?

19   A.  Yes.

20   Q.  And you didn't know anything about this case before the

21   prosecutors asked you to get up on the stand and testify today,

22   right?

23   A.  Correct.

24   Q.  And you weren't part of the FBI's investigative team in

25   this matter?

1    A.  No.

2    Q.  And you weren't part of the prosecution team?

3    A.  No.

4    Q.  And you didn't actually investigate any of the money

5    transfers that you just covered in the Government Exhibit Z-14,

6    right?

7    A.  Correct.

8    Q.  So really the only things that you know about this case are

9    what the government has given you or put in front of you,

10   right?

11   A.  The only thing I know are the exhibits that were presented

12   and the source documents to those exhibits.

13   Q.  Right.  And all of those things were given to you by the

14   government lawyers?

15   A.  They were given to me by the prosecutors and the case

16   agent.

17   Q.  So by the government lawyers and the FBI case agent?

18   A.  Yes.

19   Q.  That's accurate?

20   A.  Yes.

21   Q.  Now, how many times did you meet with the prosecutors in

22   the last six days or so?

23   A.  I would say three or four times.

24   Q.  And do you remember who attended those meetings?

25   A.  The prosecutor and the case agent.

1   Q.  Now, let's turn to the chart, Government Exhibit Z-14, if

2   we could just have that displayed.

3           You can see that on your screen?

4   A.  Yes.

5   Q.  And the jury just to confirm.  Okay.

6           Who created the first draft of this chart?

7   A.  The prosecutor and the case agent.

8   Q.  And after that first draft, you and the government lawyers

9   and the case agent talked about the chart, right?

10  A.  Yes.

11  Q.  And I believe you said on direct that you made some

12  suggested revisions, right?

13  A.  Yes.

14  Q.  And those were only suggestions, right?

15  A.  What I suggested was to correct a minor typo.

16  Q.  But you understood that you were making suggestions, right?

17          MS. MURRAY:  Objection, your Honor, asked and

18  answered.

19          THE COURT:  Sustained.

20  Q.  You understood that the prosecutors ultimately decided what

21  would go in the exhibit, right?

22  A.  Yes.

23  Q.  And how many versions of this chart were created?

24  A.  Five.

25  Q.  And is it fair to say that the government lawyers and the

O6KBGUO4                        J. Reyes - Cross

1   case agent mainly created this chart and you offered some

2   comments to it?

3   A.  No.

4   Q.  That's not the case?

5   A.  No.

6   Q.  You created the chart?

7   A.  I did not.

8   Q.  I'm just trying to understand your testimony.

9           MS. MURRAY:  Objection, your Honor.

10          THE COURT:  Please read back the question.

11          (Record was read)

12          THE COURT:  You may answer.

13  A.  Yes.

14  Q.  Let's just take a quick look at the chart.  Just generally

15  speaking, this chart is about funds that were used to purchase

16  a Ferrari, right?

17  A.  This chart?

18  Q.  Is that fair?  I'm sorry.  I didn't mean to interrupt.

19  A.  Yes.

20  Q.  That's a fair statement?

21          MS. MURRAY:  Asked and answered.

22          MR. SCHIRICK:  I spoke over the witness.  I was just

23  looking to clarify.

24  Q.  If we can please go to page 13 of this chart.  I'm sorry.

25  I apologize.  Let's start with page five.  Just to be clear in

1  the flow of funds here that's displayed with a green arrow --

2  withdrawn.

3          The flow of funds is displayed here by a green arrow;

4  is that fair?

5  A.  Yes.

6  Q.  Just to be clear, the $10 million, approximate $10 million

7  USD. number on the top is the equivalent of USD of what is

8  displayed below in pound sterling, right?

9  A.  According to the statement, yes.

10 Q.  That's right fair enough.  According to the bank statements

11 that's you reviewed?

12 A.  Yes.

13 Q.  So just to be clear, these are not two different transfers

14 of two different amounts.  They're the equivalent, one in U.S.

15 dollars, one in pound sterling?

16 A.  Yes.

17 Q.  And now if we can please go to -- before we move on in the

18 chart, if we could just please pull up Government Exhibit

19 GXGC-544.

20         Now, this is the facility agreement that you reviewed

21 just a few moments ago on direct, right?

22 A.  Yes.

23 Q.  And let's -- I'm sorry.  Withdrawn.

24         This facility agreement is between G/Club Operations

25 Jovial Century International Limited and Fiesta Property

1    Developments, right?

2    A.  Yes.

3    Q.  Now, when you reviewed this agreement on direct, did the

4    government lawyers ask you about what the term of the facility

5    agreement was if you recall?

6    A.  No.

7    Q.  They didn't, right.  Let's go on page 17, please.

8            Now, can you see this page 17 that at the top says

9    basic amortization schedule?

10   A.  Yes.

11   Q.  You see that.  Do you know what an amortization schedule

12   is?

13   A.  Not exactly.

14   Q.  Is it fair to say in your understanding that an

15   amortization schedule reflects the repayment schedule?

16           MS. MURRAY:  Objection to the testifying, your Honor.

17           MR. SCHIRICK:  I'm asking if that is a fair --

18           THE COURT:  He's asking a leading question.  Go ahead.

19   Q.  Is it fair to say that this reflects the repayment terms of

20   the loan?

21   A.  I would say yes.

22   Q.  And if you go down about roughly halfway on the left-hand

23   side there's a line that says amount of loan.  Do you see that

24   it's highlighted there, and if you track that across it says

25   annually.  Do you see that?

1    A.  Yes.

2    Q.  And then if you go two lines up from there where it says

3    origination date, do you understand origination date to be the

4    date that the loan is started?

5    A.  I would need more information to know that exactly.

6    Q.  But if we go across there you can see that the origination

7    date is listed as January 1, 2021; is that right?

8    A.  Yes.

9    Q.  And then if we look at the line just below that where it

10   says first payment date, right.  And if we track that across to

11   the right, there it says January 1, 2023, right?

12   A.  Yes.

13   Q.  So it's fair to say that the first payment on this loan was

14   due January 1 of 2023, right?

15   A.  According to what is shown here, yes.

16   Q.  And then if we go up to the second line in the left-hand

17   column which says initial periods and then (number or pound

18   sign) and then we track that across to the right and it says

19   ten.  You see that?

20   A.  Yes.

21   Q.  Fair to say that this reflects that this is a ten-year

22   repayment schedule to the best of your understanding based on

23   the document?

24   A.  Yes.

25   Q.  We can take that down.  So if we can now go back to the

1    chart slide 14.  I'm sorry, it's 13.

2            Now, starting at the top, do you know who the owner is

3    of G/Clubs Operations LLC?

4    A.  No.

5    Q.  Do you know who the owner is of Fiesta Property

6    Developments LTD?

7    A.  No.

8    Q.  So you don't know if they have the same ownership, right?

9    A.  I would have to reference the source documents and the

10   exhibits.

11   Q.  Well, did any of those source documents or exhibits tell

12   you who owns the company?

13   A.  I would have to review them extensively to know that

14   exactly.

15   Q.  Well, is it fair to say that you reviewed bank records in

16   this chart?

17   A.  I reviewed the bank records for the bank accounts shown on

18   this slide.

19   Q.  You didn't review any shareholders agreement as part of

20   preparing this slide, right?

21   A.  No.

22   Q.  You didn't review any agreements that would reflect the

23   ownership of the underlying entities, right?

24   A.  I do remember in one of the exhibits it stated one of the

25   beneficial owners.

1   Q.  Right.  Mr. He, right, H-E?

2   A.  Yes.

3   Q.  But apart from that, you didn't review any underlying

4   documents that would show who owned G/Clubs Operations LLC or

5   who owned Fiesta Properties Developments, LTD?

6   A.  No.

7   Q.  Now, if we now flip to page 14, and you recall being shown

8   this on direct just a few minutes ago?

9   A.  Yes.

10  Q.  And you can see here that -- withdrawn.

11          This is the contract for the sale of the Ferrari from

12  the Ferrari dealership, right?

13  A.  Yes.

14  Q.  Do you see that the buyer of the car is listed as Stichting

15  Administratiekantoor Still We Rise Incorporated?

16  A.  Yes.

17  Q.  For ease of that I will just call that Still We Rise. Is

18  that okay?

19  A.  Yes.

20  Q.  Do you know who created Still We Rise?

21  A.  No.

22  Q.  And you don't know whether there's common ownership between

23  Still We Rise and G/Clubs, right?

24  A.  No.

25  Q.  Or whether there's common ownership between Still We Rise

1   and Fiesta Properties Developments, LTD, right?

2   A.  Correct.

3   Q.  And so you don't know if G/Clubs is a subsidiary of Still

4   We Rise, right?

5   A.  Correct.

6   Q.  And you don't know whether all of the transfers that are

7   displayed in this GXZ-14 are transfers happening within the

8   same family of companies, right?

9        You just don't have that information available to you.

10  That's all I'm asking you.

11  A.  I don't.

12  Q.  So let's just look.  If we could go back to slide 13 at the

13  timing in this chart for a moment.

14       Now, if you look at the top, the first transfer from

15  G/Club Operations to Fiesta, those start in January of 2021,

16  right?

17  A.  Yes.

18  Q.  And that's shown here in the green box at the top?

19  A.  Yes.

20  Q.  And then if we zoom out and go to the bottom.

21       The transfers, now the purchase of the Ferrari happens

22  in June of 2021, right, and that's shown with this orange box

23  down to the yellow box, right?

24  A.  That's when the $3,500,000 was sent from Fiesta Property

25  Developments to Passione Rossa, LLC Ferrari Beverly Hills.

1   Q.  And that's the final payment for the Ferrari, right?

2   A.  Yes.

3   Q.  And that's five months after the January 2021 transfer that

4   we looked at, at the top of the chart, right?

5   A.  About, yes.

6   Q.  Approximately.  Fair enough.

7           So now when it comes to the purchase of the Ferrari,

8   you didn't review any records about when that car came up for

9   sale, correct?

10  A.  Not that I recall, no.

11  Q.  And you don't -- you didn't review -- withdrawn.

12          You don't know when the Still We Rise, the buyer,

13  became aware that the car was for sale, right?

14          MS. MURRAY:  Objection.

15          MR. SCHIRICK:  I'm asking her if she knows.

16          MS. MURRAY:  You're asking if somebody is aware of

17  something.

18          MR. SCHIRICK:  I'll rephrase.

19          THE COURT:  Go ahead.

20  Q.  Do you know when Still We Rise the purchaser of the car

21  became aware when it was for sale?

22  A.  No.

23  Q.  So you don't know if the first communications about this

24  potential Ferrari sale were in May of 2021, right, just not

25  information that's available to you?

1    A.  No.

2    Q.  Now, if we look just one last time at the top of this chart

3    in the green box on page 13.  Is it fair to say that this chart

4    focuses exclusively on a $10 million approximate transfer that

5    leaves G/Club Morgan Stanley account, right, ending 8564?

6    A.  Yes.

7    Q.  That's all this chart shows, right?

8    A.  No.  It shows the flow of funds between G/Club Operations

9    Morgan Stanley account 8564 to Fiesta Property Developments

10   Santander account 6389 and ultimately to Passione Rossa.

11   Q.  Understood. But that starts with that first transfer out of

12   the G/Clubs Operations Morgan Stanley account?

13   A.  Yes.

14   Q.  That's all I'm asking.  So you don't know what other bank

15   accounts G/Club has, right?

16   A.  The only account I'm aware of is G/Club Operations, LLC

17   Morgan Stanley account ending in 8564.

18   Q.  So you don't know even if there are other G/Clubs accounts

19   at Morgan Stanley, correct?

20   A.  Correct.

21   Q.  And you also don't know whether there are other G/Clubs

22   accounts at other banks, right?

23   A.  Correct.

24   Q.  And you don't know whether there are other G/Club accounts

25   with other investment firms, right?

O6KBGUO4                          J. Reyes - Cross

1   A.  Correct.

2   Q.  Now, if we focus on the box, the orange box at the bottom

3   left Fiesta Property Developments LTD Wells Fargo, do you see

4   that?

5   A.  Yes.

6   Q.  And there's a $500,000 transfer for the Ferrari purchase

7   that's reflected here, right?

8   A.  Yes.

9   Q.  And you don't have records for that account, do you?

10  A.  No.

11  Q.  That wasn't included in what was made available to you,

12  right?

13  A.  From what I remember, the Wells Fargo account was mentioned

14  in one of the exhibits within an email.

15  Q.  Right.  But my question is, do you have access to the

16  records of that account?

17  A.  No.

18  Q.  So you don't know where that money came from, right?

19  A.  I know that the $500,000 transfer to Passione Rossa, LLC,

20  came from Fiesta Properties Developments LTD.

21  Q.  And I'm asking you whether you know where that $500,000

22  came from before it was in that account, and you don't know

23  because you don't have access to those records?

24  A.  Correct.

25          MR. SCHIRICK:  No further questions.

O6KBGUO4                          J. Reyes

1           THE COURT:  Redirect?

2           MS. MURRAY:  Thank you, your Honor, just briefly.

3    REDIRECT EXAMINATION

4    BY MS. MURRAY:

5    Q.  Ms. Reyes, you were asked some questions on cross

6    examination about your suggestive corrections to Government

7    Exhibit Z-14.  Do you recall those?

8    A.  Yes.

9    Q.  Were all of the corrections that you pointed out or

10   identified in fact made to the charts?

11   A.  No.

12   Q.  What suggestions or corrections were not made to the charts

13   that you had proposed?

14   A.  From what I remember, including specific account numbers or

15   last digits of account number.  Off the top of my head, that's

16   what I remember.

17   Q.  Were those more stylistic suggestions that you made to the

18   charts?

19   A.  Yes.

20   Q.  You reviewed the underlying documents that support the

21   information reflected in the charts, correct?

22   A.  Yes.

23   Q.  And the charts are accurate based on the source documents,

24   correct?

25   A.  Correct.

 1   Q.  All of the information contained within Z-14 is accurate?

 2   A.  Correct.

 3   Q.  And, Ms. Reyes, your involvement in this investigation or

 4   in this case was limited to your testimony today and your

 5   review of that chart and those exhibits; is that right?

 6   A.  Yes.

 7   Q.  And those are exhibits the government provided to you?

 8   A.  Yes.

 9           MR. SCHIRICK:  Asked and answered.

10           THE COURT:  Overruled.

11   Q.  Ms. Reyes, do you know what the G in G/Clubs stands for?

12   A.  No.

13           MR. SCHIRICK:  Scope.

14           THE COURT:  Overruled.

15           MS. MURRAY:  Nothing further.  Thank you.

16           THE COURT:  Recross.

17   RECROSS EXAMINATION

18   BY MR. SCHIRICK:

19   Q.  I believe you made stylistic suggested changes to chart,

20   right?

21   A.  Can you define stylistic changes?

22   Q.  I'm going to ask you to do that because I think that was

23   the word you used?

24   A.  From what I remember, I discussed with the prosecutor the

25   idea of adding the last four digits of an account number to one

O6KBGUO4                        Hinz- Direct

```
 1   of the charts.
 2   Q.  So no substantive changes were suggested, right?
 3   A.  They were minor possible changes.
 4              MR. SCHIRICK:  Thank you.  No further questions.
 5              THE COURT:  All righty.  Thank you.  You may step out
 6   of the courtroom.
 7              (Witness excused)
 8              THE COURT:  The prosecution can call its next witness.
 9              MR. HORTON:  Government calls Jacob Hinz.
10   JACOB HINZ,
11        called as a witness by the Government,
12        having been duly sworn, testified as follows:
13              THE COURT:  Please state your name and spell it, and
14   move the microphone close to you so.
15              THE WITNESS:  Jacob, J-A-C-O-B, Hinz, H-I-N-Z.
16              THE COURT:  You may inquire.
17   DIRECT EXAMINATION
18   BY MR. HORTON:
19   Q.  Good afternoon, Mr. Hinz.
20   A.  Good afternoon.
21   Q.  Where do you work?
22   A.  For the Federal Bureau of Investigation.
23   Q.  And what's your title at the FBI?
24   A.  I'm a special agent.
25   Q.  And Special Agent Hinz, could I ask you to pull the
```

O6KBGUO4                        Hinz- Direct

1   microphone as close as possible to your mouth and point it

2   right where you're speaking.  How long have you been a special

3   agent with the FBI?

4   A.  Since March of this year.

5   Q.  And what were you doing before you joined the FBI?

6             MS. SHROFF:  Your Honor, may we just have a brief

7   sidebar.

8             THE COURT:  All righty.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6KBGUO4                          Hinz- Direct

1           (At the sidebar)

2           MS. SHROFF:  Your Honor, I don't believe there's any

3    relevance to the fact that he served in the army or that he was

4    a school teacher before that, so I don't think that's in any

5    way relevant to his testimony.

6           MR. HORTON:  It's a single question, your Honor. He

7    has only been an agent since March of this year, so I think

8    it's relevant, particularly he's going to be cross-examine, for

9    the jury to know what he did before he joined the FBI.

10          THE COURT:  These are basic pedigree questions. It

11   goes to credibility.  The objection is overruled.

12          MS. SHROFF:  Your Honor, it's only because he was in

13   the army and --

14          THE COURT:  When I overrule the objection, Ms. Shroff,

15   you need to stop.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O6KBGUO4                         Hinz- Direct

```
 1              (In open court; jury present)
 2              THE COURT:  You may continue.
 3   BY MR. HORTON:
 4   Q.  Special Agent Hinz, you said you joined the FBI in March,
 5   what were you doing before you joined the Bureau?
 6   A.  Before I became a special agent, I was an NCO in the U.S.
 7   Army Reserves for six years, and before that I was a teacher,
 8   high school teacher.
 9   Q.  Generally speaking, what are your -- let me ask you this.
10   Do you belong to a particular quad with the FBI?
11   A.  Yes, sir, it's called OS4.
12   Q.  What does OS4 do?
13   A.  General conduct background investigations.
14   Q.  Besides your testimony today and your preparation for that
15   testimony, Agent Hinz, did you have any involvement in this
16   case?
17   A.  No, sir, none.
18   Q.  In advance of your testimony, Special Agent Hinz, were you
19   asked to review certain government exhibits and summarize
20   information in them?
21   A.  Yes.
22   Q.  Did you prepare or review for accuracy some summary charts?
23   A.  I reviewed, yes.
24   Q.  Are these charts all based on voluminous records?
25   A.  Yes, sir.
```

1  Q.  And what type or types of exhibits are these charts based

2  on?

3  A.  The majority would be email exchanges and some photographs.

4  Q.  Who decided what information you review and what

5  information would be included on the charts?

6  A.  I do not know.

7  Q.  Was it you?

8  A.  It was not.

9  Q.  Were you given opportunity to make revisions to the chart

10 to make sure they were accurate?

11 A.  I was.

12 Q.  Did you make revisions to the charts?

13 A.  Yes.

14 Q.  And after you revised the chart, are they all now accurate?

15 A.  Yes.

16 Q.  Agent Hinz, did you review some of these charts for

17 accuracy earlier today?

18 A.  I did.

19 Q.  And just to be clear, did you review all of the evidence

20 that's gathered in this case or just the charts and the

21 exhibits that those charts are based on?

22 A.  Just the charts and the exhibits related to those charts.

23        MR. HORTON:  Your Honor, at this time I'd like to

24 offer a stipulation between the parties that's been marked as

25 Stipulation 15, an online account stipulation.

O6KBGUO4                          Hinz- Direct

1           THE COURT:  No objection, correct?

2           MS. SHROFF:  No, your Honor.

3           THE COURT:  It's admitted.

4           (Government's Exhibit Stipulation 18 received in

5    evidence)

6           MR. HORTON:  Could we please publish it, Ms. Loftus.

7    I misspoke.  It's been marked as Government Exhibit Stip 1-8,

8    18, not 15.  This document says stipulation regarding online

9    account.

10          It says that the parties agree that GXUK-768 contains

11   a subscriber information for the account

12   UKistruehome@gmail.com.  It says GXUK-1 through GXUK-417 are

13   emails and their attachments, if any, that were sent or

14   received by the account UKistruehome@gmail.com on the dates

15   indicated on the face of the exhibit.  GXUK-700 through

16   GXUK-777 are images and other files that were stored in the

17   Google drive file storage for the account

18   UKistruehome@gmail.com.  And four says the above listed

19   exhibits were lawfully obtained by the government.

20          It concludes, it's further stipulated and agreed that

21   this stipulation may be received, as well as the exhibits

22   listed in the stipulation, may be received as government

23   exhibits at trial subject to objections.  It has today's date

24   on it.  Government offers stip 18 for the record.

25          THE COURT:  It is admitted.

1              (Government's Exhibit Stip 18 received in evidence)

2    BY MR. HORTON:

3    Q.  Ms. Loftus, could you please take this down and bring up

4    what's in evidence as GXBR-1604.  If you could please zoom in

5    to the message at the top of this exhibit.

6              Agent Hinz, were the documents reviewed only emails or

7    were there other kinds of documents as well?

8    A.  I believe there was some other types of documents.  There

9    were screenshots of some accounts and like photographs as I

10   said before.

11             MR. HORTON:  And, your Honor, while the next exhibit

12   is loading, the government offers with reference to GXStip-18,

13   GXUK-1 through 417 and GXUK-700 through 777.

14             THE COURT:  No objection, correct?

15             MS. SHROFF:  No, your Honor.

16             THE COURT:  It is admitted or they are admitted.

17             (Government's Exhibits UK-1 through UK-417, UK-700

18   through UK-777 received in evidence)

19   BY MR. HORTON:

20   Q.  On the screen is what's in evidence, and can you publish

21   it, please, what's in evidence as GXBR-1604.

22             Special Agent Hinz, what is the name and email address

23   in the from line in this email?

24   A.  It says Mileson and the email is UKistruehome@gmail.com.

25   Q.  What's the subject line?

O6KBGUO4                          Hinz- Direct

1   A.  It just says reply for FXX-K, Evo Chassis 240860.

2   Q.  Can you please read the two sentences below Dear All?

3   A.  Yes.  I don't understand this email.  We are trying our

4   best to be patient and move the deal forward ASAP.  We've been

5   waiting to pay the rest of the invoice for weeks.

6   Q.  Thank you.  Ms. Loftus, can you please take this down and

7   replace it with GXUK-768 which is also in evidence.

8        Special Agent Hinz, these are Google subscriber

9   records, what does that mean?

10  A.  They are information provided by the company to us about

11  the sender and receiver of certain documents over the internet.

12  Q.  And what information does the subscriber information relate

13  to?

14  A.  The contact email, the address is UKistruehome@gmail.com.

15  Q.  And, Ms. Loftus, if you could zoom in on what's below this

16  under billing, tax shipping legal default at the top.

17       Agent Hinz, can you please read the name and address

18  of the subscriber for UKistruehome@gmail.com?

19  A.  Please excuse my pronunciation, but Qiang Guo, apartment 6,

20  5 Princess, Princess Gate, London, Great Britain.

21  Q.  And, Ms. Loftus, could you please zoom in on the bottom two

22  sets of names on the part of this subscriber.

23       Agent Hinz, what are the two names shown here on

24  subscriber information?

25  A.  Mei Guo and Qiang Guo.

O6KBGUO4                          Hinz- Direct

1    Q.   What address do these two names have?

2    A.   373 Taconic Road, Greenwich, Connecticut, United States.

3    Q.   Thank you, Ms. Loftus.  You can take this down, and please

4    show the witness what's marked as GXZ-20.  If you could flip

5    through it and then go back to the first page, please.

6              Agent Hinz, what is this document?

7    A.   It's one of the summaries that I guess looked through the

8    validity or accuracy of prior to this.

9              MS. SHROFF:  Your Honor, I'm sorry.  I cannot hear the

10   witness.

11             THE COURT:  If you'll speak up, please.

12   A.   This is one of the documents provided to me that I verified

13   the accuracy of the corresponding documents in evidence.

14   Q.   And did you review all of the exhibits that this chart is

15   based on?

16   A.   Yes, every one.

17   Q.   Is the chart accurate?

18   A.   Yes.

19             MR. HORTON:  Government offers GXZ-20.

20             THE COURT:  No objection, it's admitted.

21             (Government's Exhibit Z-20 received in evidence)

22   BY MR. HORTON:

23   Q.   If you can publish, Ms. Loftus.  Generally speaking, Agent

24   Hinz, what does this chart show?

25   A.   Some correspondence.  It has passport in it and variety of

1   photographs.

2   Q.   In the selected content, did you select that content, Agent

3   Hinz?

4   A.   No.

5   Q.   Did you have any choice of what was included or excluded

6   from it?

7   A.   No.

8   Q.   In that selected content column, are the items in it the

9   full set of text from a corresponding exhibit or a full image

10   or just an excerpt?

11   A.   General excerpt.

12   Q.   In the column to the right, Agent Hinz, what is GX refer to

13   in the items in that column?

14   A.   Exhibits.

15   Q.   Looking at the first row in this chart, what's shown in the

16   first row here under selected content?

17   A.   It's authorization for Qiang Guo to a person to act on

18   behalf of the company Genever.

19   Q.   Ms. Loftus, if you could highlight the second line of

20   what's in the first row here.

21        It says authorize Qiang Guo.  And Agent Hinz, if you

22   could read what's in parenthesis after that, please?

23   A.   Also known as Mileson Kwok.

24   Q.   What kind of document is shown in the selected content in

25   the second row in this chart?

1   A.  The to and from information, it's subscriber information

2   for an email.

3   Q.  Can you read the subject line, please?

4   A.  From Mileson Guo.

5   Q.  And what kind of document is shown down on the third row on

6   the first page of the chart?

7   A.  A passport from Cypress.

8   Q.  And is there a name on the passport?

9   A.  There is.

10  Q.  What's the name?

11  A.  Qiang Guo.

12  Q.  Can we go to the page three of this chart GXZ-20,

13  Ms. Loftus.  What kind of document is this, Agent Hinz?

14  A.  Photograph.

15  Q.  And generally speaking, what's depicted in the photograph?

16  A.  Some individuals enjoying a meal.

17  Q.  Do you know who any of them are?

18  A.  I do not.

19  Q.  Can we go to the next slide, please, Ms. Loftus.

20          And what kind of document is this?

21  A.  Another photograph.

22  Q.  And what does it depict?

23  A.  A gentleman standing on what I believe to be a boat.

24  Q.  These excerpts, do they all come from the UK is True Home

25  Google account?

O6KBGUO4                          Hinz- Direct

1    A.  I don't know.

2    Q.  Can we go to the last page of this chart, Ms. Loftus.

3    There are excerpts from how many documents in this row?

4    A.  Two.

5    Q.  On the left side, what kind of document is excerpted there?

6    A.  Some subscriber information, address.

7    Q.  And what kind of document is it?

8    A.  I'm not sure.  I believe an email.

9    Q.  What does it say on the registered address under Mr. Qiang

10   Guo?

11   A.  373 Taconic Road, Greenwich, Connecticut, United States.

12   Q.  And what's shown on the right side of this row?

13   A.  What appears to be a mobile phone, maybe Google maps is

14   what it seems to be for some directions.

15   Q.  Is there an address shown on this image?

16   A.  There is.

17   Q.  Can you read that address?

18   A.  373 Taconic Road.

19   Q.  Ms. Loftus, can you show the witness what's been marked as

20   GXZ-21, please.

21         Agent Hinz, what is this document?

22   A.  Another one of the summaries that I examined.

23   Q.  Did you review all the exhibits that are referred to in

24   this chart?

25   A.  Yes.

O6KBGUO4                        Hinz- Direct

1    Q.  Is the chart accurate?

2    A.  Yes.

3            MR. HORTON:  The government offers GXZ-21.

4            MS. SHROFF:  No objection, your Honor.

5            THE COURT:  It is admitted.

6            (Government's Exhibit Z-21 received in evidence)

7    BY MR. HORTON:

8    Q.  The left most column to, from, subject and date, what does

9    that refer to, Agent Hinz?

10   A.  The subscriber information for the emails contained.

11   Q.  And the selected content of GX columns, do they have the

12   same meanings as on chart we just looked at?

13   A.  They do.

14   Q.  Ms. Loftus, if you could zoom in on the first row on this

15   first page, please.

16           What is the text in the left most box indicate about

17   this document, Agent Hinz?

18   A.  That the email is coming from Matteo to UKistrueHome@gmail.

19   Q.  And what's the email domain for the Matteo Gandini address?

20   A.  Matteo.Gandini@Ferrari.com.

21   Q.  Can you read the selected content part of this row.

22   A.  Yes.  Dear Mileson, great meeting you and having a chat

23   together.  We have just spoken to Catta about some of your

24   wishes and we might be lucky.  There are potentially 2X, FXX-K

25   Evo cars available.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6KBGUO4                         Hinz- Direct

1    Q.  Do you know what an FXX-K Evo car is?

2    A.  I believe it's a Ferrari.

3    Q.  If we can go to the second page of this exhibit, Ms.

4    Loftus, if you could zoom in.

5            Agent Hinz, on the left side of this page, what does

6    that text indicate about this document?

7    A.  The subscriber information for where this photograph came

8    from.

9    Q.  And what does the sent line indicate?

10   A.  It says FNE, FXX-K Mileson Guo and then a vin number for a

11   vehicle.

12   Q.  Below that it says sent, what does that line indicate?

13   A.  The time it was sent on the date.

14   Q.  And what date and time was this email sent?

15   A.  5/12/2021 at 4:03 p.m.

16   Q.  If we could look at the selected content box, Ms. Loftus.

17           Agent Hinz, what's shown in this box?

18   A.  It's a photograph of a car.

19   Q.  And what's the text say on top of the photograph of the

20   car?

21   A.  It says FXX-K Evo chassis number 240860.

22   Q.  If we could go to page three of this chart, Ms. Loftus.

23   I'm sorry, if we could go to page seven.

24           Looking at the left most column, Agent Hinz, was this

25   document in the UKistruehome@gmail.com account?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes, that was where it was from.

2   Q.  Is there anything in here that indicates that there was an

3   attachment to this email?

4   A.  Yeah, the pdf that's noted at the bottom.

5   Q.  What's the title of that email?

6   A.  Payment confirmation one.

7   Q.  Ms. Loftus, if you could zoom in on the content in selected

8   content.

9           At the top it says, please see attached.  If you

10  could -- first of all, Agent Hinz, what is the document that's

11  shown on the bulk of this page?

12  A.  Seem some kind of account summary.

13  Q.  Ms. Loftus, if you could zoom in on the text above debit

14  advice.  What is the name of the bank on this page?

15  A.  Metro Bank.

16  Q.  Is there a date reference on this document?

17  A.  Yes.

18  Q.  What's the date?

19  A.  June 16, 2021.

20  Q.  To the right of that date, what does it say?

21  A.  It says Fiesta Property Developments LTD, 79 East Works

22  Drive, Cofton Hackett, Birmingham, Great Britain.

23  Q.  Do you know what Fiesta Property Developments is?

24  A.  I do not.

25  Q.  Ms. Loftus, if you could zoom out and go down to where it

1   says payment details.

2           Agent Hinz.  What does it say to the right of payment

3   details?

4   A.   FXX-K Evo 240860 car investment.

5   Q.   And next to transfer amount, what's the U.S. dollar value?

6   A.   I believe that's 3.5 million.

7   Q.   If you could zoom out, Ms. Loftus.  Zoom into the

8   beneficiary line on this document under debit advice.

9           Agent Hinz, what does it say next to the beneficiary?

10  A.   Passione Rossa, LLT.

11  Q.   Do you know what Passione Rossa is?

12  A.   I do not.

13  Q.   Ms. Loftus, if you could pull up what's in evidence as

14  GXZ-14 at page 11.

15          Have you ever seen this document before, Agent Hinz?

16  A.   No.

17  Q.   What does it say at the top of this document?

18  A.   It says flow of funds G/Club Operations LLC to Passione

19  Rossa, LLC.

20  Q.   And what's the entity listed at the very bottom of the

21  page?

22  A.   The bottom one is Passione Rossa, LLC, Ferrari Beverly

23  Hills.

24  Q.   Ms. Loftus, if you could go to the last page of the GXZ-21

25  chart, please.  The row in the middle of this page if you could

1    zoom into that, Ms. Loftus.  The from line says from Santoro

2    Federica, Federica.Santoro@ferrari.com to Mileson UKistruehome.

3    Could you read the selected content of this excerpt, Agent

4    Hinz.

5            THE COURT:  All righty.  It is 2:30 now so we're going

6    to take our half hour break.  Remember, members of the jury,

7    you're not permitted to discuss this case amongst yourselves.

8    Don't let anyone discuss the case in your presence.  Don't

9    read, watch or listen to anything from any source that touches

10   on the subject matter of this case.

11           Sir, you may step out.  Don't discuss your testimony.

12           (Witness temporarily excused)

13           THE LAW CLERK:  Jury exiting.

14           (Jury not present)

15           THE COURT:  Please step out.  Is there anything else

16   before we return at 3 p.m.?

17           MR. HORTON:  Not from the government.

18           MS. SHROFF:  No, your Honor.  Thank you.

19           THE COURT:  Very well.

20           (Recess)

21

22

23

24

25

O6K1GUO5                        Hinz - Direct

1                THE COURT:  Could we have the jurors brought in.

2                (Jury present)

3                THE COURT:  You may be seated.

4                Remember, sir, you're still under oath.

5                You may continue the inquiry.

6                MR. HORTON:  Thank you, your Honor.

7                Ms. Loftus, if you could put up page 8 of GX Z21.

8   Q.  Agent Hinz, what's shown in the——

9                MR. HORTON:  Well, actually, Ms. Loftus, if you could

10  zoom in to this first row, please.

11  Q.  And what's in the From line, on the left side, Agent Hinz?

12  A.  It's from Matteo Gandini, matteo.gandini@ferrari.com.

13  Q.  And who is it sent to?

14  A.  To Mileson Guo, Guo at ukistruehome@gmail.com.

15  Q.  And what's the subject line of this email?

16  A.  It says, FNE - FXX-KEVO 240860 - call with Mileson Guo.

17  Q.  What's depicted, Agent Hinz, in the Selected Content

18  column.  Can you describe for the jury what that is.

19  A.  Yes.  A car with Ferrari symbols, silver and black.

20               MR. HORTON:  If we could go down to the second row,

21  Ms. Loftus.

22  Q.  And Agent Hinz, who is this email sent from and to?

23  A.  This is from Mileson at ukistruehome@gmail.com, and it's to

24  Matteo Gandini, matteo.gandini@ferrari.com.

25  Q.  And can you read what's at the top of this email in the

1    Selected Content column, please.

2    A.  "Yes and I can't wait to see in my colors."

3           MR. HORTON:  Could you go to page 9 of this chart,

4    Ms. Loftus.

5           If you can blow up the row so we can see the From and

6    To, please.

7    Q.  Agent Hinz, who sent this email?

8    A.  It was sent from Mileson, ukistruehome@gmail.com.

9    Q.  And what, if anything, is the name of an attachment to it?

10   A.  The attachment is Mileson Guo 2021 Bell Helmet pdf.

11          MR. HORTON:  Can you blow up the Selected Content row,

12   please, Ms. Loftus.

13   Q.  So that says, "I don't need the flags for now but we can

14   put my initial like the others M.Q.G.  I've already done my

15   helmet and it should be finished around the end of this month.

16   Please see attached."

17          And what's below that in this email, Agent Hinz?

18   A.  It's a helmet with the inscribed name Mileson on the side

19   and 30 and FXX KEVO on it.

20          MR. HORTON:  Ms. Loftus, could you pull up side by

21   side for us, GX UK299 in evidence and Stipulation 2, at page

22   24, also in evidence.

23          GX UK299 and Stipulation 2.

24   Q.  While that's loading, Agent Hinz, have you seen GX UK299 on

25   the right?

O6K1GUO5                        Hinz - Direct

1   A.  Yes.

2   Q.  At the top of GX UK299, can you read the body of that

3   email, please.

4   A.  "Dear Mileson.  Here below the link with the video which

5   you can also download.  Thank you and look forward to having

6   you with us again."

7   Q.  And Agent Hinz, if I could just ask you to pull the

8   microphone closer to your mouth again.

9   A.  Yeah.

10  Q.  And what's at the bottom of the email on GX UK299?

11  A.  It's a link; appears to be a video link.

12  Q.  And what website is that link to?

13  A.  Vimeo.com.

14  Q.  And over on page 24 of GX Stip 2——

15          MR. HORTON:  Ms. Loftus, if you can pull up——yeah.

16  Blow up the bottom line, GX W1058.

17  Q.  Do you see the link that's in Stip 2 next to GX W1058,

18  1058, 1058A, and 1058-V, Agent Hinz?

19  A.  I do.

20  Q.  Are those two urls the same?

21  A.  They are.

22          MR. HORTON:  Ms. Loftus, if you could pull up GX ——oh,

23  sorry, your Honor.  The government offers GX W1058, 1058A, and

24  1058-V.

25          THE COURT:  No objection?

O6K1GUO5                          Hinz - Direct

1           MS. SHROFF:  No, your Honor.

2           THE COURT:  They are admitted.

3           (Government's Exhibits W1058, W1058A, W1058-V received

4    in evidence)

5           MR. HORTON:  And Ms. Loftus, if you could pull up

6    GX W1058-V, please.

7    BY MR. HORTON:

8    Q.  And Agent Hinz, in preparing this summary chart, did you

9    review the video with that link?

10   A.  I did, yes.

11   Q.  Is that what's shown on your screen?

12   A.  Yes.

13          MR. HORTON:  Can you publish it for the jury, please.

14   And we can play it with the sound on, please.

15          (Video played)

16          MR. HORTON:  Thank you, Ms. Loftus.

17          Can you please pull up what's marked as GX Z25 for the

18   witness.

19   BY MR. HORTON:

20   Q.  Agent Hinz, what is this document?

21   A.  It's another one of the summary exhibits that I reviewed

22   for this.

23   Q.  And did you review all the exhibits that it references?

24   A.  I did.

25   Q.  And is the chart accurate?

O6K1GUO5                          Hinz - Direct

 1   A.  Yes.

 2              MR. HORTON:  Government offers GX Z25.

 3              MS. SHROFF:  No objection, your Honor.

 4              THE COURT:  It is admitted.

 5              (Government's Exhibit Z25 received in evidence)

 6   Q.  Agent Hinz, what's shown on the first page of this summary

 7   chart; what kinds of things?

 8   A.  Variety of photographs of some cars in what appears to be a

 9   hangar.

10   Q.  And are these photographs from the ukistruehome Google

11   account?

12   A.  I don't know.

13              MR. HORTON:  Can we go to page 2 of the chart,

14   Ms. Loftus.

15   Q.  Agent Hinz, what is the email address at the top of this

16   chart?

17   A.  Ukistruehome@gmail.com.

18   Q.  And could you please read the first sentence under "Good

19   afternoon" in this email from ukistruehome.

20   A.  Yes.  "I am attaching Dimitry, who is my mechanic in the

21   UK."

22              MR. HORTON:  On the next page, Ms. Loftus, next page

23   of this chart.

24   Q.  Agent Hinz, what is written next to the name Dimitri at the

25   bottom of this document?

1   A.  A phone number.

2           MR. HORTON:  And Ms. Loftus, will you please put up

3   page 3 of this chart.

4           Sorry.  Could I have you put up page 3 and 4 together.

5           If you could highlight the phone number next to

6   Dimitri on the left side.  It's on the bottom on the left side.

7   Q.  Agent Hinz, what kind of documents are shown in the

8   Selected Content row in the document on the right?

9   A.  Looks like messaging exchange of some kind.

10  Q.  And is there a phone number depicted on the messaging

11  exchange on the right?

12  A.  There is.

13  Q.  Is that phone number the same as the one next to Dimitri on

14  the left?

15  A.  It is.

16  Q.  Looking over to the right side of that messaging exchange

17  on the right——

18  A.  Yes.

19  Q.  ——can you read the message under what looks like a picture

20  of a dog and a play sign, the message and text under that in

21  white.

22  A.  "Yes, that's fine.  I will come earlier tomorrow and

23  uncover 911.  VW is not back from dealer yet."

24  Q.  Do you know what that refers to, "VW is not back from

25  dealer yet"?

1    A.  I do not.

2              MR. HORTON:  Ms. Loftus, if you could please put up

3    pages 5 and 6 of this chart together.

4              If you could just zoom in around the content on each

5    one as they both load.

6    Q.  Looking over to the left side, Agent Hinz, what's the title

7    of this document that's in yellow here?

8    A.  Used Car Purchase Invoice.

9    Q.  And looking down below under Vehicle Details, what kind of

10   car does it refer to, this purchase invoice?

11   A.  Looks like a Bentley Bentayga.

12             MR. HORTON:  Can you highlight the name and address

13   lines on both the left and right side documents, Ms. Loftus.

14   Q.  Under Purchase From on the left side, Agent Hinz, on this

15   car invoice, what is the name next to that?

16   A.  The name says ACA Capital Group Ltd.

17   Q.  And what's the address provided for ACA Capital?

18   A.  Apartment 3, 5 Princess Gate, London.

19   Q.  Looking over on the right side, is the Google subscriber

20   data for ukistruehome?

21   A.  Yes.

22   Q.  And what's the address associated with the account

23   ukistruehome?

24   A.  Apartment 6, 5 Princes Gate, London.

25             MR. HORTON:  Ms. Loftus, if you could go to page 7 of

O6K1GUO5                          Hinz - Direct

1    GX Z25, please.

2    Q.   Agent Hinz, in the top right corner of this document, it

3    says Annual Form Invoice Form.  What does it say on the top

4    right corner?

5    A.   It says XX Programmes.

6    Q.   Do you know what that means?

7    A.   I do not.

8    Q.   And under Car Registrations/Details, can you read the three

9    items that are top to bottom under Car Registrations/Details.

10   A.   Yes, FXX, 599XX, and FXXK.

11           MR. HORTON:  Thank you, Ms. Loftus.  If you could blow

12   up the line under that, under Car Ownership, Name and Address.

13   Q.   So it says Name, Stichting Still We Rise.  Could you read

14   the address associated with Stichting Still We Rise, Agent

15   Hinz.

16   A.   1053 Great West Road, Brentford.

17           MR. HORTON:  And Ms. Loftus, if you could go to page 8

18   now of GX Z25.

19   Q.   The first row at the top, is this content from an email,

20   Agent Hinz?

21   A.   Yes.

22   Q.   Which account sent the email?

23   A.   The ukistruehome@gmail.com.

24   Q.   What's the substance excerpted from this email?

25   A.   "I propose we meet in my 'man cave' in Brentford."

O6K1GUO5                          Hinz - Direct

1    Q.  And under the row under that, is that excerpted from a

2    document from the ukistruehome gmail account?

3    A.  I believe so, yes.

4    Q.  Under Cirrus Aircraft Order Form SR22T, what's the

5    purchaser name?

6    A.  Mileson Guo.

7    Q.  And what's the main address?

8    A.  1053 Great West Road, Brentford, United Kingdom.

9          MR. HORTON:  If you can go to the—if you could zoom

10   in now on the bottom email on this page, Ms. Loftus.

11   Q.  Who is this email—which account was this sent from, Agent

12   Hinz?

13   A.  I'm not certain.

14   Q.  If you look at the top, is there an email address?

15   A.  There is.  It says Pippa Mack.  Contact@KHStaff.com.

16   Q.  If you could read from "Further to our conversation."

17   A.  "Further to our conversation early and signed contracts

18   below, I am writing to confirm that Fee Bencheou was offered

19   and accepted the permanent PA/manager role working for Mileson

20   Guo/Rising Sun Capital Ltd., based at your offices, 1053 Great

21   West Road, Brentford, on an agreed salary of—"

22   Q.  That's okay.  You can stop there.  Thanks, Agent Hinz.

23   A.  Yup.

24         MR. HORTON:  Ms. Loftus, if you can go to page 9 of

25   the same summary chart, GX Z25.

O6K1GUO5                        Hinz - Direct

1   Q.  What kinds of documents are these excerpted from, Agent

2   Hinz?

3   A.  Emails.

4   Q.  If we look at the bottom row, can you read——so it's an

5   email from apeter@gonet.ch.  Do you know what that means?

6   A.  I do not.

7         MR. HORTON:  I'm sorry, Ms. Loftus.  If you can go to

8   the top of these two rows first.

9   Q.  Same email address sender and it says——why don't you read

10  what it says from Peter Albert.

11  A.  Sorry.  One more time?  What would you like me to read?

12  Q.  The email at the bottom from Peter Albert.

13  A.  Yes.  "Just a quick question from compliance . . .  Who is

14  the CEO of Rising Sun Capital Ltd.?"

15  Q.  And on top of that, response from Mileson, "Dear Albert:

16  The CEO is Mr. Haoran He.  I hope this is okay."

17        MR. HORTON:  Ms. Loftus, can we go down to the second

18  row now, same page.

19  Q.  And can you read Mr. Albert's email here.

20  A.  Yeah.  "And sorry, a follow-up question:  Who is the owner

21  of Rising Sun Capital Ltd.?"

22  Q.  And the response from Mileson, same email chain, "The owner

23  is also Mr. Haoran He."

24        MR. HORTON:  Ms. Loftus, can we go to page 10 of

25  GX Z25.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6K1GUO5                          Hinz - Direct

1    Q.  Agent Hinz, what's the GX number shown here?

2    A.  GX UK717.

3    Q.  And what appears to be depicted in this image?

4    A.  It appears to be a photograph of a debit card.

5    Q.  Is there a bank name on the debit card?

6    A.  Yes.

7    Q.  What is it?

8    A.  Santander.

9    Q.  And above 09/01/28 at the bottom, can you read what's

10   listed above that, please.

11   A.  Yes, it says "Mr. H He."

12           MR. HORTON:  Ms. Loftus, can you please pull up what's

13   in evidence as GX SW2061.  GX SW2061.

14   Q.  Have you seen this document before, Agent Hinz?

15   A.  Yes, I think so.

16   Q.  In the From line it says at the top From Alex

17   Hadjicharalambous, alexh@gclubs.com.  Who is it sent to,

18   according to this document?

19   A.  Haitham Khaled.

20           MR. HORTON:  And Ms. Loftus, can you go to page 2 of

21   SW2061.

22   Q.  At the top it says—well, can you say what it says at the

23   top of this document?

24   A.  G|CLUBS.

25   Q.  And under that, it says, "Miles Guo does not have any

O6K1GUO5                      Hinz - Direct

 1   decisive control over G Club BVI or its parent Jovial or its

 2   parent Stichting Duurzane."  Do you see that, Agent Hinz?

 3   A.  I do.

 4            MR. HORTON:  Now could we go back to the summary

 5   chart, please, GX Z25, at page 12, Ms. Loftus.

 6   Q.  What's shown on this page of the summary chart, GX UK746

 7   from the ukistruehome account?

 8   A.  It looks like a pamphlet that has some writing on it,

 9   Incorporation of Stichting Duurzame.

10   Q.  And what's the date on the document that says Incorporation

11   of Stichting Duurzame?

12   A.  August 15, 2019.

13            MR. HORTON:  Ms. Loftus, can you pull up for the

14   witness the chart GX Z22.

15   Q.  And what kind of document is this, Agent Hinz?

16   A.  It's a chart that describes totals for transactions,

17   financial transactions.

18   Q.  And did you review all of the GX UK documents that are

19   referenced on it?

20   A.  I did, every one.

21   Q.  And are the figures on here accurate based on that review?

22   A.  They are.

23            MR. HORTON:  Government offers GX Z22.

24            THE COURT:  No objection?

25            MS. SHROFF:  No, your Honor.

O6K1GUO5                          Hinz - Direct

1            THE COURT:  It is admitted.

2            (Government's Exhibit Z22 received in evidence)

3            MR. HORTON:  Ms. Loftus, if you could pull up GX UK12

4    and 223 alongside the chart, please.

5    BY MR. HORTON:

6    Q.  And while that's coming up, GX UK12 on the right, GX 223 on

7    the bottom right, are these two exhibits that you reviewed when

8    you assessed the accuracy of GX Z22?

9    A.  Yes.

10            MR. HORTON:  Going back to just GX Z22, Ms. Loftus.

11    Q.  What does this chart reflect?  Looking at the bottom row,

12    Rising Sun capital, can you explain what that line represents.

13    A.  It shows funds received by the Rising Sun Capital in 2023

14    to the total amount of 150,000 Great British pounds.

15    Q.  And the emails you reviewed, where it says funds received

16    from Rising Sun Capital, which account were those emails sent

17    to?

18    A.  I don't recall.

19            MR. HORTON:  Okay.  Let's pull up GX ZK397.

20    Q.  Is this one of the exhibits that's referenced on the line

21    for Rising Sun Capital, Agent Hinz?

22    A.  Yes.

23    Q.  And which account was the email sent to?

24    A.  It was sent to ukistruehome@gmail.com.

25            MR. HORTON:  Okay.  Ms. Loftus, if you could please

O6K1GUO5                          Hinz - Direct

1    pull up GX Z24 for the witness.

2    Q.  Agent Hinz, what kind of document is this?

3    A.  It's another one of the summaries that I verified for this.

4    Q.  Did you review all the exhibits that are cited in it?

5    A.  I did.

6    Q.  Is it accurate?

7    A.  It is.

8            MR. HORTON:  Government offers GX Z24.

9            MS. SHROFF:  No objection.

10            THE COURT:  It is admitted.

11            (Government's Exhibit Z24 received in evidence)

12            MR. HORTON:  Ms. Loftus, if you could pull up what's

13    in evidence as GX GC415.

14    BY MR. HORTON:

15    Q.  Agent Hinz, this is an email.  Can you read the first

16    sentence below "Hi Limarie."

17            Before you do that, can you say what the From line

18    says.

19    A.  The from line reads HRR.

20    Q.  And the sentence under—

21            MS. SHROFF:  Actually, it reads HHR.

22            THE WITNESS:  Oh, excuse me.  HHR.  Thank you.

23    Q.  And if you could just read the sentence that follows "Hi

24    Limarie."

25    A.  "We have green light from Mr. Guo bank for the loan."

1          MR. HORTON:  And Ms. Loftus, if you could show what's

2    in evidence as GX GC418 at page 3.

3    Q.  What's the title of this document, Agent Hinz?

4    A.  Amendment to Loan Agreement.

5    Q.  And if you could just read the first sentence under

6    Amendment to Loan Agreement.  And you don't have to read what's

7    in parentheses.

8    A.  Okay.  "This Amendment to Loan Agreement dated as of

9    January 18, 2022, is made by and between G Club International

10   Limited, registered in British Virgin Islands, and Qiang Guo."

11   Q.  And what was the date that you just read?

12   A.  It was January 18, 2022.

13         MR. HORTON:  Ms. Loftus, if you could go back to

14   GX Z24 on the first page.

15         If you could zoom into the middle row here.

16   Q.  What's the date sent on this email, Agent Hinz?

17   A.  Monday, January 24, 2022.

18   Q.  And it was sent from the ukistruehome account to whom?

19   A.  To Albert Peter, A Peter@gonet.ch.

20   Q.  And can you please read the Selected Content from that

21   email.

22   A.  Yes, sir.  "Dear Albert:  Can I please request you to

23   transfer 3 million CHF to the account attached as soon as

24   possible?"

25         MR. HORTON:  And if we could just go briefly to page 2

O6K1GUO5                          Hinz - Direct

1    of GX Z24, Ms. Loftus.

2    Q.   Is this from an email in the ukistruehome account?

3    A.   Yes.

4    Q.   And the document on the right, what's it titled?

5    A.   Account Statement.

6    Q.   And what does the document appear to be?

7    A.   It appears to be an account statement, a series of

8    transactions.

9            MR. HORTON:  Ms. Loftus, if you could highlight the

10   top and bottom line items here, please.

11   Q.   And Agent Hinz, if you could read them, starting with the

12   Description column and then reading the Credit value.

13   A.   Yes.  Bonification from Lamp Capital LLC, and then the

14   credit was 7 million.

15   Q.   And the one at the bottom.

16   A.   Again, bonification from Lamp Capital LLC, 13 million.

17   Q.   Do you know what Lamp Capital is?

18   A.   I do not.

19           MR. HORTON:  And Ms. Loftus, if you could now show the

20   witness what's marked as GX Z23.

21   Q.   Agent Hinz, what's this document?

22   A.   It's a summary of the exhibits.

23   Q.   And did you review all the exhibits it references?

24   A.   I did.

25   Q.   Is the chart accurate?

1    A.  It is.

2              MR. HORTON:  Government offers GX Z23.

3              MS. SHROFF:  No objection.

4              THE COURT:  It is admitted.

5              (Government's Exhibit Z23 received in evidence)

6    Q.  First, the top row here, Agent Hinz, who does this email

7    appear to be sent from?

8    A.  It says it's sent from Mileson at ukistruehome@gmail.com.

9    Q.  And what's the date on it?

10   A.  Monday, 5/2/2022.

11   Q.  And the email domain, the three emails it's sent to, what's

12   their domain?

13   A.  @ferrari.com.

14   Q.  Could you read the top part of the email above the

15   ellipses.

16   A.  "Please allow me to thank you all for the amazing two days

17   that you have allowed me and my friends to discover, learn but

18   must importantly enjoy with Ferrari.  It had been a dream for

19   me since 2011 when I came with my other friend Antony Liu for a

20   shakedown to his F1 car.  It is truly a realization off a

21   dream!"

22   Q.  Below that it says, "In my culture we say, 'Honour is only

23   a moment of your heartbeat, but to keep the blood flowing, you

24   need to work even harder.'  So I have already instructed our

25   Exchange to concentrate on a proposal for Ferrari."  Do you

O6K1GUO5                          Hinz - Direct

1    know what's referred to by "our Exchange," Agent Hinz?

2    A.  I don't.

3            MR. HORTON:  And if you could zoom out, Ms. Loftus,

4    and zoom in on the image at the bottom here.  Sorry, the row at

5    the bottom.

6    Q.  What email domain sent this email?

7    A.  It's from @ferrari.com.

8    Q.  What's the subject line on this email?

9    A.  Himalaya Exchange-LMH.

10   Q.  What's depicted in the image in the Selected Content row?

11   A.  It's a sports car with Ferrari symbols on it and the words

12   Himalaya Exchange.

13           MR. HORTON:  Okay.  Ms. Loftus, if you could go to the

14   third page of GX Z23.

15           I'm sorry.  Could you stop at the second page.

16           And zoom in on the bottom row here.  GX UK315.

17   Q.  Who is this email sent from?

18   A.  It comes from Je William, or William Je, @hamilton-ch.com.

19   Q.  Do you know who that is?

20   A.  I do not.

21   Q.  And what's depicted in the——first of all, is there a file

22   name in the Selected Content from this email?

23   A.  There is.

24   Q.  And what is it?

25   A.  Ferrari underscore share holding chart.

1   Q.  And the title of this chart is Ultimate Beneficial Owner

2   (UBO) and Shareholding Structure.  The excerpt on the right,

3   can you please read that, Agent Hinz.

4   A.  "Note:  Mileson is an investor in Hamilton Opportunity Fund

5   and is also responsible for the Ferrari project for Himalaya

6   Exchange."

7           MR. HORTON:  We could now go to the third page of

8   GX Z23, Ms. Loftus.

9   Q.  Who is this email from?

10  A.  This is from Je William or williamje@hamilton.ch.com.

11  Q.  And what's the subject line?

12  A.  It's Reply Himalaya Exchange Partnership Next Steps.

13  Q.  And what's the date?

14  A.  It's from 7/13/2022.

15  Q.  If you could show us the Selected Content, Ms. Loftus.

16          It starts, "Dear Matteo, Thanks and it was a good

17  discussion yesterday.  Please find below our statement on the

18  questions raised."  Do you see that?

19  A.  I do.

20  Q.  Can you read No. 1, please.

21  A.  "One Himalaya Exchange (HE) is a commercial entity with no

22  political agenda.  HE has never made any announcement on any

23  political stand especially those related to China;"

24  Q.  And No. 4 says, "We noticed that some websites seeking Rule

25  of Law and financial freedom put HE as one of their supporting

O6K1GUO5                          Hinz - Direct

 1  organizations.  HE wants to emphasize that HE has no
 2  relationship nor any financial dealings with those these
 3  organizations (including the Federal State of China).  There is
 4  no official statement from HE suggesting that HE supports any
 5  political believe."
 6          Could you read No. 6 please, Agent Hinz.
 7          MS. SHROFF:  Is there a question pending after the
 8  reading by the government.  There seems to be no questioning.
 9          THE COURT:  Is there a question?
10          MR. HORTON:  The document is in evidence, and I was
11  asking if he'd seen the part that I read and asking him to read
12  the part that followed.
13          THE COURT:  Okay.  Go ahead.
14  A.  "On the sponsorship, the board of directors requires that
15  the Himalaya Exchange name be there.  We believe that this will
16  be extremely welcomed by the Chinese people.  While we could
17  not control how the media reports, Ferrari should be confident
18  that this is a pure commercial cooperation and should not
19  involve in any political considerations;"
20          MR. HORTON:  You can take this down, Ms. Loftus.
21  Q.  Agent Hinz, what's an email search warrant?
22  A.  It's a search warrant to get the content of emails.
23  Q.  And what does it allow the government to do?
24          MS. SHROFF:  Objection.
25          THE COURT:  I would like a sidebar.

O6K1GUO5                        Hinz - Cross

 1              MR. HORTON:  Your Honor, I'll move on and wrap up the
 2    questioning.
 3              THE COURT:  Okay.  Go ahead.
 4              MR. HORTON:  Just one final question.
 5    BY MR. HORTON:
 6    Q.  Agent Hinz, other than reviewing the summary charts and the
 7    exhibits that they reference, do you know anything about this
 8    case?
 9    A.  I do not.
10              MR. HORTON:  If I could just have one moment, your
11    Honor.
12              THE COURT:  Yes.
13              MR. HORTON:  Thank you.  No further questions.
14              THE COURT:  Cross-examination?
15    CROSS EXAMINATION
16    BY MS. SHROFF:
17    Q.  Good afternoon.
18    A.  Good afternoon, ma'am.
19    Q.  I just want to make sure I pronounce your name correctly.
20    Is it Heinz?
21    A.  It's Hinz, ma'am.
22    Q.  Hinz?
23    A.  Yes, ma'am.
24    Q.  And should I call you Special Agent Hinz?  Is that your
25    title?

O6K1GUO5                          Hinz - Cross

1   A.  Yes, ma'am.

2   Q.  Okay.  So Special Agent Hinz, you testified that you were

3   an NCO in the U.S. Army.  Is that a noncommissioned officer?

4   A.  Yes, ma'am.

5   Q.  And were you in the Reserves?

6   A.  Yes, ma'am.

7   Q.  Okay.  And you stated that you've been with the FBI for

8   five months; did I get that right or wrong?

9   A.  I entered the academy last year in October and graduated in

10  March of this year and reported to the New York field office in

11  that same month.

12  Q.  Okay.  And do you work in the FBI New York?

13  A.  Yes, ma'am.

14  Q.  Okay.  So let me show you what is GX Z25, if I may, okay?

15          You remember testifying about this document, correct?

16  A.  I do.

17  Q.  Okay.  And the first page that you see here, you testified

18  that these are photographs of some cars, correct?

19  A.  Yes, ma'am.

20  Q.  And if I could just have you see page 2 of this document.

21          There you go.  And Mr. Horton had you read this

22  document out loud.  Remember?

23  A.  Yes.

24  Q.  Okay.  And you testified that you believed this to be

25  accurate because it's based on an exhibit, correct?

1    A.  Yes, ma'am.

2    Q.  So the exhibit is GX UK283?

3    A.  Yes, ma'am.

4    Q.  What else is in 283; do you know?

5    A.  I do not recall.

6    Q.  Now the document itself says, "I am attaching Dimitry, who

7    is my mechanic in the UK."  Correct?

8    A.  Yes.

9    Q.  You'll agree with me that you can't possibly attach

10   Dimitry, right?  The email means something else?

11   A.  Yes.

12   Q.  Okay.  And he says "he will make sure the head scan guys is

13   in contact with you asap."  Right?

14   A.  Yes.

15   Q.  Okay.  And then he says "let him know as he manages my

16   racing events too."  Right?

17   A.  Yes.

18   Q.  Do you know what racing events this person is talking

19   about?

20   A.  I do not.

21   Q.  And going back to the full document, do you know if

22   GX UK283 said anything more about those racing events?

23   A.  I do not recall.

24   Q.  So when you were reading this for Mr. Horton over here, you

25   don't know what was left out of GX 283.

O6K1GUO5                          Hinz - Cross

1    A.   No, ma'am.

2    Q.   Okay.  No, ma'am, you don't know, right?

3    A.   No, ma'am, I do not recall.

4    Q.   Okay.  You don't have to call me ma'am, but you feel free

5    to if you want to.

6              MS. SHROFF:  Could I just look at the next page if I

7    could.

8    Q.   There's a + 44 phone number for Dimitri, right?

9    A.   Yes.

10   Q.   Would you agree with me + 44 is the United Kingdom, or do

11   you think it's some other country?

12   A.   I don't know for sure.

13             MS. SHROFF:  And then if I could just have the next

14   photograph, or the next page, right?

15   Q.   You testified about this document, right?

16   A.   Yes.

17   Q.   Who is Rav?

18   A.   I don't know.

19   Q.   Did you go back and look at all the documents to see where

20   else Rav appears?

21   A.   No.

22   Q.   Okay.  And it says that "yes, maybe tonight around the

23   block," right?

24   A.   It does.

25   Q.   Okay.  And I'm assuming you have no knowledge of what this

O6K1GUO5                          Hinz - Cross

1   person is talking about?

2   A.  No.

3   Q.  And on the right-hand side, who's Martin?

4   A.  I do not know.

5   Q.  Okay.  Let's look at two pages after this one, where you

6   looked at the profile.

7          Remember this document you testified about, that it's

8   a Google profile?

9   A.  I do.

10  Q.  Okay.  And you see the name over there Qiang Guo?

11  A.  Yes.

12  Q.  It gives a London address, correct?

13  A.  Yes.

14  Q.  Do you know if he actually lived there?

15  A.  I do not know.

16  Q.  Do you know if he had more than one address?

17  A.  I do not.

18  Q.  Is it fair to say as an FBI agent that you would be able to

19  know that you could have an email address from a certain time

20  period and the email address would continue with you no matter

21  where you moved?

22  A.  Could you say that again?

23  Q.  Sure.  So if I open an email address in New York and then I

24  decide to move to Yemen, I could still have the same email

25  address, right?

1    A.  Yes.

2    Q.  Okay.  And if I could just have you look at the next page.

3         You see this thing that you testified about, this

4    page?

5    A.  Yes.

6    Q.  Okay.  And do you know, are these three different cars on

7    the left-hand side, Car Registrations/Details?

8    A.  I do not know.

9    Q.  What do this N, N, and N30 stand for?

10   A.  I do not know.

11   Q.  "The undersigned Haoran He," do you see that?

12   A.  I do.

13   Q.  Okay.  And it says "Signature of Owner," correct?

14   A.  It does.

15   Q.  Did Mr. Horton ask you to find out where Haoran He lived?

16   A.  No.

17   Q.  Did he ask you to find out if he was in fact the true

18   owner?

19   A.  No.

20   Q.  Did he ask you to find out if that is in fact his

21   signature?

22   A.  No.

23   Q.  Okay.  May I just have you look at the next page, please.

24        He had you talk about this aircraft order form,

25   correct?

O6K1GUO5                          Hinz - Cross

1   A.  Yes.

2   Q.  And then he also showed you photographs of—

3          MS. SHROFF:  You can take that one down.

4   Q.  And he showed you photographs of people eating food on a

5   yacht, correct?

6   A.  People eating food somewhere, yes.

7   Q.  Right.  And you said that they seemed to be a family

8   enjoying a dinner, correct?

9   A.  I believe I said they appeared to be individuals enjoying

10  some food.

11  Q.  And you don't know who those people are, correct?

12  A.  I do not.

13  Q.  And Mr. Horton didn't ask you to know anything about those

14  people, correct?

15  A.  No.

16  Q.  Now if I could just have you take a look at GX Z20.

17         Right?  He showed you this photograph, right?

18  A.  Yes.

19  Q.  And do you know where that passport was?

20  A.  I do not.

21         MS. SHROFF:  Okay.  And if we could just scroll down

22  on that document, please.

23         And keep scrolling down.

24         And down.

25         And one—there you go.  And here.  Let's just—no,

O6K1GUO5                          Hinz - Cross

1    just could I go back to the map, please.

2    BY MS. SHROFF:

3    Q.  Okay.  You testified about this document as well, correct?

4    A.  I did.

5    Q.  Okay.  And you testified that you think that the email is

6    from somebody called questions@dyson.com, correct?

7    A.  I don't believe I said that.

8    Q.  Okay.  Is it from dyson.com?

9    A.  That's what it says, ma'am, yes.

10   Q.  Okay.  Sitting here today, do you know what Dyson is?

11   A.  I know they're a manufacturer of appliances—vacuums,

12   cleaners, home appliances.

13   Q.  Okay.  And you see the map on the right-hand side?

14   A.  I do.

15   Q.  Right.  And the map, Mr. Horton asked you to read 373

16   Taconic Road, correct?

17   A.  He did.

18   Q.  Okay.  But he didn't ask you to read the line below.  Could

19   you read the line below for me.

20   A.  Yes.  The destination, ma'am?

21   Q.  Uh-huh.

22   A.  H Mart Hartsdale.

23   Q.  Do you know what H Mart is?

24   A.  I do.

25   Q.  What is it?

1   A.  It's a grocery store.

2   Q.  You think the grocery store sells Dyson vacuum cleaners?

3   A.  I—I couldn't say.  I don't know.

4   Q.  You don't know, right?

5   A.  I don't know.

6   Q.  Sitting hire today, you don't know if this map has anything

7   at all to do with this Dyson warranty that is on the left,

8   right?

9   A.  With the exception of the same address, I don't know.

10  Q.  Well, let's just put those two together, in a more

11  organized way so I can have them side by side for you, right?

12          So there is no date match-up to these two documents,

13  correct?

14  A.  I don't see any.

15  Q.  Okay.  In fact, there is not even a year match-up to these

16  two documents, right?

17  A.  Not that I can see.

18  Q.  Okay.  And you don't know if H Mart Hartsdale sells

19  anything from Dyson, correct?

20  A.  I do not know.

21  Q.  Okay.  And let me just ask you this question.  On the

22  left-hand side, is somebody registering a warranty, right?

23  A.  It appears to be, yes.

24  Q.  Right.  And it's saying "your Dyson warranty is now

25  active," correct?

1    A.  Yes.

2    Q.  Okay.  And do you know what it takes to activate a

3    warranty?

4    A.  I do not.

5    Q.  Okay.  And sitting here today as an FBI agent, can you tell

6    the jury if there's any correlation at all between these two

7    documents?

8    A.  Other than the address, I do not know.

9    Q.  How did they come to be together on the same slide?

10   A.  I do not know.

11   Q.  Well, you testified about these two—this document, right?

12   This page.

13   A.  Yes, ma'am.

14   Q.  So before you testified, did you ask Mr. Horton, how are

15   you putting these two things together?

16   A.  No.

17   Q.  Why not?

18   A.  I wasn't asked to ask those questions.  I was asked to

19   verify that this summary matched the documents that they came

20   from for accuracy.

21   Q.  Well, let's look at where they came from for accuracy,

22   shall we?

23          So one comes from GX UK68, right?

24   A.  Yes.

25   Q.  That's the top one, right?  So logically that would be the

O6K1GUO5                        Hinz - Cross

1   document on the left side because it says below that UK68,

2   correct?

3   A.  Yes, ma'am.

4   Q.  And then the one on the right says GX UK775, right?

5   A.  Yes, ma'am.

6   Q.  That's a lot of numbers in the middle missing, right?

7   A.  Yes.

8   Q.  You're jumping from 68 to 775.

9   A.  Yes.

10  Q.  Did you not ask him what's in the middle?  Do these things

11  have anything to do with each other?

12  A.  No.

13          MS. SHROFF:  Okay.  Let's look at the page below.

14          Same exhibit, just one page down.

15          Or is it one page up?  Sorry.  I meant the photo of

16  the bags and the plane.

17          There we go.

18  BY MS. SHROFF:

19  Q.  You see this?

20  A.  I do.

21  Q.  Okay.  And one is from GX UK740 and then the next one is

22  741, right?

23  A.  Yes, ma'am.

24  Q.  Do you know where these photos were used?

25  A.  I do not.

1   Q.  Do you know if they were any part of an advertisement?

2   A.  I do not.

3   Q.  Do you know if they were any part of a brochure?

4   A.  No, I don't know.

5   Q.  Do you know who took them?

6   A.  No.

7   Q.  Do you know if they were taken by a professional or a

8   nonprofessional?

9   A.  No.

10          MS. SHROFF:  Okay.  You can take that down.

11          Let me show you GX UK127, if I may, okay?

12  Q.  What does that mean, "Here we go"?

13  A.  I don't know.

14  Q.  So what did Mr. Horton ask you to check for this particular

15  creation?

16  A.  The entirety of my involvement has been to verify that the

17  documents presented in the summary match the documents entered

18  as exhibits, that they were the same.

19  Q.  Which one did this match?

20  A.  I imagine GX UK127.1.

21  Q.  You imagine?

22  A.  I don't know.

23  Q.  You don't know.

24  A.  I don't know.

25  Q.  Okay.  Can I show you please, or may I show you GX 299.

O6K1GUO5                          Hinz - Cross

1              I can move on.  You know what, let's go to the video
2      that was shown to you, GX W1058.
3              MS. SHROFF:  Could you pull up the video.
4      Q.  Do you recall being shown this video during your direct
5      testimony?
6      A.  I do.
7              MS. SHROFF:  Okay.  And if we could just play it and
8      fast forward a little bit into where the individuals are just
9      standing.
10             (Video played)
11     Q.  Do you see these people on the left-hand side?
12     A.  I do.
13     Q.  Okay.  The man in the suit that has his hands in his
14     pocket?
15     A.  I see him.
16     Q.  Okay.  Do you know who he is?
17     A.  I do not.
18     Q.  How about the person next to him?
19     A.  On which side, ma'am?
20     Q.  On his right.
21     A.  No.
22     Q.  With the red shoes.
23     A.  I do not.
24     Q.  How about the person behind him?
25     A.  No.

O6K1GUO5                            Hinz - Cross

1   Q.  And then you see the gentleman all the way in the back,
2   with the suit again?
3   A.  I see him.
4   Q.  Okay.  Do you know who they are?
5   A.  I do not.
6   Q.  Do you know what company they're from?
7   A.  I do not.
8   Q.  Do you know if they're from G Club?
9   A.  I don't know.
10  Q.  Do you know somebody named Ian Livingston?
11  A.  No, ma'am.
12  Q.  Do you know, did the government have you look for anybody
13  with that name?
14  A.  No.
15  Q.  And the government asked you to take a look at this video
16  and we played it for the jury already, correct?
17  A.  Yes.
18  Q.  Okay.  And I'm not going to replay the whole thing, but do
19  you recall seeing two people driving in the car?
20  A.  Yes.
21  Q.  If you don't remember, I'm happy to—I'd rather not play it
22  again, but I'm happy to do that.
23          THE COURT:  He answered yes.
24  A.  I recall two people, yes.
25  Q.  Okay.  And do you know who the second person was?

O6K1GUO5                          Hinz - Cross

 1   A.  I do not.

 2   Q.  Do you know if that person was from Ferrari or from any

 3   other company?

 4   A.  I do not know.

 5   Q.  Do you know if after this video was made anybody approached

 6   Ferrari for a Monaco Grand Prix event?

 7   A.  No, I don't know.

 8   Q.  Do you know if you reviewed any documents about a Monaco

 9   Grand Prix event?

10   A.  I don't recall.

11   Q.  Do you recall a document regarding the sponsorship of

12   Formula Two cars?

13   A.  No, ma'am.

14   Q.  Do you recall a proposal being made to Mr. He?

15   A.  No, ma'am.

16   Q.  Do you recall if Mr. He agreed or disagreed with the

17   proposal?

18   A.  I do not.

19   Q.  Do you know if the——if Mileson here wanted to reach a

20   three-year contract with Ferrari?

21   A.  Say that one more time?

22   Q.  Do you know if Mileson Guo was attempting to reach a

23   three-year contract with Ferrari?

24        MR. HORTON:  Objection.  It's cumulative and beyond

25   the scope of direct.

O6K1GUO5                          Hinz - Cross

1           THE COURT:  Sustained.

2   Q.  Do you know if Mileson Guo was a customer of Ferrari for

3   more than a decade or less?

4           MR. HORTON:  Objection.  Same objection, your Honor.

5           THE COURT:  Sustained.

6           MS. SHROFF:  Let's look at GX Z25.  Right?  And if I

7   could go to page 4.

8           No, could you go one page back, please.

9   Q.  Do you see on the top paragraph on the right side, it says,

10  "VW is not back from dealer yet"?  Correct?

11  A.  I see that, yes.

12  Q.  Do you know who the dealer was?

13  A.  No.

14  Q.  How about VW?

15  A.  I don't know.

16          MS. SHROFF:  How about we go to page 6.

17          And one more page down.

18  Q.  I already asked you about this document before, right?

19  A.  Yes, ma'am.

20  Q.  Okay.  I'm going to move from there and go to GX Z25.

21          MS. SHROFF:  GX Z25.  Take this down.

22  Q.  Do you remember being asked questions about a man cave?

23  A.  I don't believe I was asked questions about a man cave, no.

24  Q.  Do you recall reading the phrase "man cave," "we will meet

25  in my 'man cave' in Brentford"?  Do you recall that?

1    A.  I do recall.

2    Q.  Do you know what that meant, what the person meant when he

3    wrote that?

4    A.  No.

5    Q.  Do you know what Brentford is?

6    A.  No.

7    Q.  Do you recall giving testimony about a Cirrus aircraft?

8    A.  I do.

9    Q.  Do you recall there was an email address of a person named

10   Pippa Mack?

11   A.  I do.

12   Q.  Who's Pippa Mack?

13   A.  I do not know.

14          MS. SHROFF:  Now if I could just go to page 8.  Oh,

15   there you are.  And you see—no, just—thank you.  Thank you,

16   Jorge.  My bad.

17   Q.  You see that last two lines on the Selected Content

18   portion?

19   A.  For which Selected Content, ma'am?

20   Q.  The last paragraph on this document.

21   A.  Yes, ma'am.

22   Q.  Okay.  And it says that Fee Bencheou was offered and

23   accepted the permanent PA manager role, right?

24   A.  Yes.

25   Q.  For Mileson Guo, Rising Sun Capital Limited, right?

O6K1GUO5                         Hinz - Cross

1   A.  Yes.

2   Q.  And an agreed salary about 85,000 pounds, right?

3   A.  Yes.

4   Q.  And this email is sent to Rav and Arethusa?

5   A.  That is the name on it, yes.

6   Q.  Who are these people?

7   A.  I do not know.

8   Q.  You don't know, right?

9   A.  I don't know.

10  Q.  And this document, right, all you can say is that portions

11  of this document appear in another document that Mr. Horton

12  showed you?

13  A.  Yes, that is one of the exhibits, yes.

14  Q.  Now let me go to GX SW2061, right?  Do you recall

15  testifying about this email exchange?

16  A.  I do.

17  Q.  Okay.  And basically is it fair to say that you don't know

18  any of these individuals?

19  A.  Yes, that's fair.

20  Q.  Okay.  And as an FBI agent, Mr. Horton didn't ask you to

21  verify any of this information, right?

22  A.  Only in comparison to the full exhibits, documents, to the

23  chart.  That was the only verification I did.  Nothing beyond

24  that.

25  Q.  Okay.  But this is not part of the chart, is it?

O6K1GUO5                        Hinz - Cross

1    A.  No.

2    Q.  Okay.  Just a freestanding document.

3    A.  Yes, ma'am.

4    Q.  So Mr. Horton put it up and asked you to read it and you

5    read it, right?

6    A.  A portion of it, yes.

7          MS. SHROFF:  Okay.  And if I could just go to the next

8    page.

9    Q.  You see he had you read the first line of this page, right?

10   A.  Yes.

11   Q.  What does "decisive control" mean to you?

12   A.  I believe I only read the G|CLUBS portion, but decisive

13   control, I don't know.

14   Q.  Okay.  And you don't even know if that is a legal term or a

15   term of art, correct?

16   A.  No, ma'am.

17   Q.  And can you read for me from "public figures" on.

18   A.  "Public figures like——" and excuse my pronunciation.  ——Hao

19   Haidong, Ren, Zhiqiang, and Gordon Guthrie Chang, former soccer

20   player for Sheffield United, retired real estate tycoon, and

21   Stanford law professor respectively."

22          Would you like me to continue?

23   Q.  Please.

24   A.  "Spoke out against the CCP and its regime."

25   Q.  Uh-huh.

O6K1GUO5                          Hinz - Cross

1   A.  "Public figures such as the ones listed have taken upon

2   themselves via various social media platforms to be more vocal

3   and raise awareness among the vast following of the injustices

4   occurring in mainland China against humanity."

5   Q.  Okay.  And of course you just wanted to—your task was not

6   to verify any of this, correct?

7   A.  Correct.

8   Q.  Okay.  You can take that down.

9           If I could just have you take a look at GX Z22.

10          You were asked questions about this, correct, this

11  chart?

12  A.  I was, yes.

13  Q.  Okay.  And I'm assuming you correct me if I'm wrong about

14  the process, okay?  You were given the documents on the

15  right-hand column, the rightmost column, right?

16  A.  Yes.

17  Q.  And then you were asked to see if the date range column

18  matched the funds received from and the funds sent to, correct?

19  A.  The date range, the funds received from and to, and then

20  the total amounts.

21          (Continued on next page)

22

23

24

25

O6KBGUO6                        Hinz - Cross

1   BY MS. SHROFF:

2   Q.  So you see the one that says transfers wise, transfer wise,

3   wise?

4          THE COURT:  There's more than one.

5   Q.  The fat one in the middle?

6   A.  I do see it.

7   Q.  It has like a whole bunch of documents on the right side,

8   right?

9   A.  Yes.

10  Q.  Is it fair to say that's 573,100 U.S. dollars, that amount

11  is based on the information in the column on the right side?

12  A.  Based on a total of the sums within those documents.

13  Q.  So if there was a mistake on the document on the right

14  side, right, the number 573 would still remain accurate, right?

15  All you did was make sure the math was accurate?

16         MR. HORTON:  Objection, compound and calls for

17  speculation.

18         THE COURT:  I'll allow the question.

19  A.  Could you repeat it one more time, ma'am.

20  Q.  All you did is make sure that the math is correct, right?

21  A.  Yes.

22  Q.  Now, you were shown a lot more documents, special agent,

23  but would it be fair to say that you were selected as a witness

24  here because you really know nothing about this case, correct?

25         THE COURT:  Sustained.  He cannot testify as to why he

O6KBGUO6                          Hinz - Cross

1    was selected because that would be in the mind of the

2    prosecutor or prosecution team.

3    Q.  But you told the prosecution team about your understanding

4    as to why you were called to testify today, right, you recall

5    that?

6    A.  Yes.

7    Q.  And what is it you understood why you were chosen?

8    A.  To tell the truth of the accuracy of the documents that

9    corroborated --

10   Q.  Why?

11          MR. HORTON:  Objection, interrupting the witness's

12   answer.

13          MS. SHROFF:  I did.  I move to strike.

14   Q.  My question to you was, do you recall telling Mr. Horton

15   why it is that you were selected as a witness?

16          THE COURT:  Are you asking him did he ask Mr. Horton?

17          MS. SHROFF:  I'm asking him if he told Mr. Horton his

18   understanding of why he was selected.

19          THE COURT:  You can answer that question.

20   A.  I don't know their reasoning for it.

21   Q.  That wasn't my question, sir.

22          Do you recall meeting with Mr. Horton today?

23   A.  Yes.

24   Q.  And do you recall meeting with him yesterday?

25   A.  Yes.

1    Q.   And during one of those meetings, did you not tell him that

2    you were selected as a witness because you know nothing about

3    the case?  Do you recall telling him that?

4    A.   Something along those lines, yes.

5    Q.   You told him that, right?

6    A.   Yes.

7              MS. SHROFF:  I have nothing further.

8              THE COURT:  Redirect.

9              MR. HORTON:  Nothing further.  Thank you.

10             THE COURT:  Thank you, sir, you may step out of the

11   courtroom.

12             (Witness excused)

13             THE COURT:  The prosecution may call its next witness.

14             MS. MURRAY:  Yes, your Honor.  The government calls

15   Gabriella Luciano.

16   GABRIELLA LUCIANO,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             THE COURT:  Please state your name and spell it and

20   speak into the microphone.

21             THE WITNESS:  Gabriella Luciano, G-A-B-R-I-E-L-L-A,

22   L-U-C-I-A-N-O.

23             THE COURT:  You may inquire.

24   DIRECT EXAMINATION

25   BY MS. MURRAY:

1    Q.  Good afternoon.  Where do you work?

2    A.  I work for the FBI in New York City.

3    Q.  What is your title?

4    A.  I am a special agent.

5    Q.  How long have you been a special agent with the FBI?

6    A.  Since July 7, 2019.

7    Q.  Do you work for a particular squad with the FBI?

8    A.  Yes, ma'am.  I work for a white collar squad.

9    Q.  What are your duties and responsibilities as an FBI special

10   agent?

11   A.  Investigate crime to the best of my ability, not just in my

12   own violation, but sometimes in others.

13   Q.  Have you participated in the execution of search warrants

14   during your time at FBI?

15   A.  Yes, ma'am.

16   Q.  What is a search warrant?

17   A.  It's a legal document that provides authorization to look

18   for and or seize specific items related to the crime.

19   Q.  Special Agent Luciano, I want to direct your attention to

20   March 15 of 2023.  Did you work that day?

21   A.  Yes, ma'am.

22   Q.  At a high level, what did you do that day?

23   A.  I worked as a searcher for a search warrant at a Mahwah

24   mansion residence.

25   Q.  In what state was that mansion residence located?

O6KBGUO6                          Luciano- Direct

1    A.  New Jersey.

2    Q.  What did the search warrant permit the FBI to do at that

3    location, if anything?

4    A.  It gave the FBI authorization to enter the premises and

5    look for specified items and also a broader spectrum of items

6    pertaining to the crime.

7    Q.  Special Agent Luciano, were you involved in the

8    investigation of Miles Guo?

9    A.  No, ma'am.

10          MS. MURRAY:  Your Honor, at this time I offer a

11   stipulation.  This is Government Exhibit Stip-5.

12          THE COURT:  It's admitted.

13          (Government's Exhibit Stip-5 received in evidence)

14          MS. MURRAY:  Can we publish that please, Ms. Loftus.

15   This is a stipulation between the parties.  It reads that the

16   parties agree that if called as a witness at trail, special

17   agent of the Federal Bureau of Investigation, FBI, would

18   testify as follows:

19          On March 15, 2023, special agents and other FBI

20   employees executed a lawful search of 675 Ramapo Valley Road,

21   Mahwah, New Jersey.  During the course of that search, FBI

22   personnel took photographs of exterior and interior spaces of

23   675 Ramapo Valley Road, Mahwah, New Jersey.  Government Exhibit

24   NJ-1 through Government Exhibit NJ-357 are fair and accurate

25   photographs of interior and exterior spaces of 675 Ramapo

O6KBGUO6                    Luciano- Direct

1    Valley Road Mahwah, New Jersey that were lawfully captured by

2    an FBI photographer on March 15, 2023.  Following the March 15,

3    2023 search, FBI personnel scanned and photographed items and

4    documents that were lawfully seized during the search.

5    Government Exhibit NJ-601 through NJ-839 are fair and accurate

6    images of documents and items that were lawfully seized by the

7    FBI on March 15, 2023.  And a stipulation indicates that both

8    the stipulation may be received into evidence.

9           Your Honor, at this time pursuant to this stipulation,

10   the government offers the following exhibits:  These are all

11   Government Exhibits NJ numbers.  Government Exhibit, NJ-7,

12   NJ-12, NJ-14, NJ-15, NJ-22 through NJ-26, NJ-32 through NJ-37,

13   NJ-40 through NJ-42, NJ-44 through NJ-45, NJ-53, NJ-55, NJ-58

14   through NJ-61, NJ-85, NJ-94, NJ-95 through NJ-106, NJ-111,

15   NJ-112, NJ-114, NJ-116 through NJ-117, NJ-120, NJ-121, NJ-125,

16   NJ-127, NJ-135 through NJ-147, NJ-149, NJ-151, NJ-153 through

17   NJ-157, NJ-160, NJ-172, NJ-175 through NJ-177, NJ-181, NJ-184

18   through NJ-187, NJ-189, NJ-190, NJ-198 through NJ-199, NJ-201

19   through NJ-207, NJ-209 through NJ-210, NJ-214 through NJ-215,

20   NJ-221 through NJ-225, NJ-228, NJ-230, NJ-233, NJ-246, NJ-249

21   through NJ-250, NJ-254 through NJ-259, NJ-265, NJ-267, NJ-271

22   through NJ-276, NJ-283 through NJ-286, NJ-289 through NJ-294,

23   NJ-314, NJ-315, NJ-324, NJ-335, NJ-336, NJ-338, NJ-341 through

24   NJ-349, NJ-354, NJ-356, NJ-357, NJ-607 through NJ-612, NJ-662,

25   NJ-669, NJ-745, NJ-798 and NJ-800, NJ-807 and NJ-808.

1           THE COURT:  They are admitted.

2           (Government's Exhibits NJ-7, NJ-12, NJ-14, NJ-15,

3    NJ-22 through NJ-26, NJ-32 through NJ-37, NJ-40 through NJ-42,

4    NJ-44 through NJ-45, NJ-53, NJ-55, NJ-58 through NJ-61, NJ-85,

5    NJ-94, NJ-95 through NJ-106, NJ-111, NJ-112, NJ-114, NJ-116

6    through NJ-117, NJ-120, NJ-121, NJ-125, NJ-127, NJ-135 through

7    NJ-147, NJ-149, NJ-151, NJ-153 through NJ-157, NJ-160, NJ-172,

8    NJ-175 through NJ-177, NJ-181, NJ-184 through NJ-187, NJ-189,

9    NJ-190, NJ-198 through NJ-199, NJ-201 through NJ-207, NJ-209

10   through NJ-210, NJ-214 through NJ-215, NJ-221 through NJ-225,

11   NJ-228, NJ-230, NJ-233, NJ-246, NJ-249 through NJ-250, NJ-254

12   through NJ-259, NJ-265, NJ-267, NJ-271 through NJ-276, NJ-283

13   through NJ-286, NJ-289 through NJ-294, NJ-314, NJ-315, NJ-324,

14   NJ-335, NJ-336, NJ-338, NJ-341 through NJ-349, NJ-354, NJ-356,

15   NJ-357, NJ-607 through NJ-612, NJ-662, NJ-669, NJ-745, NJ-798

16   and NJ-800, NJ-807 and NJ-808 received in evidence)

17   BY MS. MURRAY:

18   Q.  Special Agent Luciano, how would you describe the property

19   that you searched on March 15, 2023?

20   A.  Vast, luxurious, grandiose.

21   Q.  Ms. Loftus, can you please publish what is in evidence as

22   Government Exhibit 134.

23           Do you recognize the property that's depicted in

24   Government Exhibit 134?

25   A.  Yes, ma'am.

1    Q.  What is it?

2    A.  This is the Mahwah residence.

3    Q.  And is that the residence you searched on March 15, 2023?

4    A.  Yes, ma'am.

5    Q.  We can take that down.

6            What preparations, if any, did the FBI search team

7    take in advance of that search?

8    A.  There was a search brief going over the umbrella large

9    scale plan of how the day would go and to whom we would be

10   receiving direction from, but a lot of that was covered by the

11   evidence team and by the investigation team.

12   Q.  And were you on the evidence team that day?

13   A.  I was a searcher.  I was not on an evidence team that day.

14   Q.  Were you a member of the investigation team?

15   A.  No, ma'am.

16   Q.  Can you describe what actions you took on March 15, 2023

17   during the search of the Mahwah property?

18   A.  Sure.  I was a searcher, so my plan that I received was to

19   go through a designated area.  Because of the expanse of the

20   property, it would have been impossible for us to look at every

21   single room individually myself, so I was given a hallway and I

22   searched all of the rooms and all of the pieces of that

23   hallway.

24   Q.  On March 15, 2023, did you walk through areas of the Mahwah

25   property other than your designated areas?

O6KBGUO6                        Luciano- Direct

1   A.  Yes, ma'am.

2   Q.  Is it fair to say that you didn't walk through every inch

3   of that property?

4   A.  Could you repeat that, please.

5   Q.  Is it fair to say that you did not walk through every inch

6   of that property on that day?

7   A.  That's correct.

8   Q.  Ms. Loftus, can we please put up side by side Government

9   Exhibit NJ215 and 241.

10          Special Agent Luciano, can you describe what part of

11  the residence we're looking at here?

12  A.  This is one of the main doors to the residence.

13  Q.  We can take those down and put up 214, 342.  Starting with

14  the top left, what part of the residence is reflected in this

15  picture?

16  A.  An entrance to the residence.

17  Q.  And then looking on the top right in the lower picture, are

18  those other angles in other photos?

19  A.  Yes, ma'am.

20  Q.  We can take those down.

21          Special Agent Luciano, did you go into the garage of

22  the property on March 15, 2023?

23  A.  Yes, I did.

24  Q.  Ms. Loftus, can we please put up NJ94, 33 and 34.

25          What did you see in the garage at the Mahwah residence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    that day?

2    A.  Several vehicles such as depicted here.

3    Q.  From your observation that day, what types of vehicles, if

4    any, did you observe in that garage?

5    A.  Luxury high-end vehicles.  There was a black Range Rover

6    SUV which you see in this picture closest to where I was

7    standing, in addition to multiple high-end motor bikes.

8    Q.  Ms. Loftus, we can take those down and let's pull up 36, 37

9    and 35, please.

10            Special Agent Luciano, are these other photos from

11   that garage?

12   A.  Yes, ma'am.

13   Q.  Ms. Loftus, if we could zoom in on the top left photo.

14   What's shown here?

15   A.  Several bikes.

16   Q.  And did you observe those bikes on March 15, 2023?

17   A.  Yes, ma'am.

18   Q.  We can take that down.  We can put up exhibits 111 and 356,

19   please.

20            Do you recognize the room depicted in those photos

21   from your search on March 15, 2023?

22   A.  Yes, ma'am.

23   Q.  Can you describe for the jury where this room was situated

24   within the house?

25   A.  Sure.  It was on a ground floor off of a main entryway that

1    had a large circular table.  I believe it was immediately to

2    the left.

3    Q.  And, Ms. Loftus, on the photo on the right on the wood

4    paneling, if we could zoom in on what appears to be photographs

5    that are taped up or tacked up to that wall.  Let's take that

6    down and we can put up 116, 112 and 114.

7         Starting with this photo on the top left, can you

8    describe for the jury what view we're looking at in the

9    residence in this photo?

10   A.  This appears to be a sitting room.

11   Q.  And in the photo on the top right, does that show a

12   different angle of kind of the archway and hallway into that

13   sitting room?

14   A.  Yes, ma'am.

15   Q.  And looking at the photo on the bottom, what vantage point

16   is that relative to the room?

17   A.  It runs parallel down the length of the room.

18   Q.  Ms. Loftus, let's take those down and put up 117 and 121,

19   please.

20        By the way, Special Agent Luciano, do you know that

21   property 675 Ramapo Valley Road goes by any other name?

22   A.  Yes, ma'am.

23   Q.  And what name is that?

24   A.  The Crocker Estate.

25   Q.  Looking at these photos, can you explain for the jury where

1    this room is situated within the residence?

2    A.   Sure.  It's on the ground floor, and it was the main area I

3    would say of the residence.  All of the second floor hallways

4    that I had been in looked into this room.

5    Q.   How big was it?

6    A.   Expansive.

7    Q.   Let's take those down and put up 120 and 125.

8            Are these other angels of that same room we just

9    looked at?

10   A.   Yes, ma'am, they are.

11   Q.   Focusing on the photo on the left, can you explain where

12   the second floor hallway is depicted in that photo?

13   A.   If you look at the chandelier and you look slightly up and

14   behind it, those are the second floor hallways.  In addition

15   you'll see there's a white archway behind either end of the

16   rooms, so one is behind the cathedral and one is directly

17   across from that.

18   Q.   And then in the photo on the right, if we can zoom in on

19   the back portion, Ms. Loftus, where there appears to be an item

20   that rises the height of the room.  Can you explain what that

21   was?

22   A.   Sure.  I misspoke before.  I called it a cathedral, and it

23   is an organ.

24   Q.   And that was an organ that was on one side of the main

25   hall; is that correct?

O6KBGUO6                        Luciano- Direct

```
 1   A.  Yes, it is.
 2              MS. SHROFF:  Objection to the leading.
 3              MS. MURRAY:  I think Ms. Shroff had an objection.
 4              THE COURT:  I did not hear an objection.
 5              MS. SHROFF:  It's okay.  I was objecting to the
 6   leading.
 7              THE COURT:  All right.  Don't lead.
 8              MS. MURRAY:  Yes, your Honor.
 9   Q.  Ms. Loftus, we can take those down and can we put up 127,
10   please.  If we could zoom in on the window portion of this,
11   please.
12              Special Agent Luciano, what is this looking toward,
13   this photo?
14   A.  The outside of the residence.
15   Q.  Let's take that down and put up 103 and 104, please.
16              What type of room is shown here?
17   A.  This is another sitting room.
18   Q.  Ms. Loftus, if we could zoom in on the left photo on kind
19   of the table and chair area in the center.
20              Special Agent Luciano, do you see what is against what
21   appears to be the fireplace in this photo?
22   A.  Yes, ma'am.
23   Q.  The rectangular object?
24   A.  Yes, ma'am.
25   Q.  What does that appear to be?
```

O6KBGUO6                         Luciano- Direct

1    A.  Some sort of statute.

2    Q.  And above the statute, we can zoom in directly against the

3    fireplace, please.  Let's try it on the right side.

4           The fireplace the, full white fireplace on the right

5    side, what is that item that is up in front of the fireplace?

6    A.  A large screen TV.

7    Q.  Take that down and put up exhibits 314, 315 and 324.

8           Now, Special agent Luciano, do you see that there's

9    something hanging from each of the items depicted in these

10   photos?

11   A.  I do.

12   Q.  What is that?

13   A.  They appear to be tags.

14   Q.  If we could take that out and focus in on the item on the

15   bottom for a moment.  Do you know what type of item this is?

16   A.  I do not.

17   Q.  Let's go to 101 and 102, please.

18          Now, Special Agent Luciano, in the photo on the left

19   there's a piece of paper on the wall.  Do you see that?

20   A.  Yes, ma'am.

21   Q.  What, if anything, does that represent?

22   A.  That's a room number which helps designate where you find

23   something.  So in this picture we see that we have the

24   sculpture or a statute of a vehicle, and we can clearly see we

25   saw this in room Q.  Helps us to keep organize.

O6KBGUO6                    Luciano- Direct

1   Q.  And in the process of the search warrant who, if anyone,

2   designates rooms with different identifiers?

3   A.  That would be the evidence response team and the search

4   team lead.

5   Q.  Focusing on the object in the center, did you see that on

6   March 15, 2023?

7   A.  Yes, ma'am.

8   Q.  Ms. Loftus, we could take those down and let's put up 153

9   and 154, please.

10          Are these additional photos of that same object,

11  Special Agent Luciano?

12  A.  Yes, ma'am.

13  Q.  If we could zoom in on the item on the left side.  Thank

14  you.  What is it appear to be based on your observations?

15  A.  Sports car.

16  Q.  Let's take that down and pull up 153 alongside 800, please.

17          Special Agent Luciano, Exhibit NJ800, is that a scan

18  of one of the items that was recovered during the search of the

19  Mahwah property?

20  A.  Yes, ma'am.

21  Q.  If we could just have you focus on the English language at

22  the top.  Could you please read that in gray?

23  A.  The course management states that Qiang Guo has

24  successfully attended the Ferrari challenge.

25  Q.  Do you know who Qiang Guo is?

1    A.   No, ma'am.

2    Q.   Looking at the bottom left, what is the date that's listed

3    on this document for the Ferrari challenge?

4    A.   The 29th through 31st of January in 2015.

5    Q.   And what date was the search warrant executed where this

6    document was recovered?

7    A.   On March 15, 2023.

8    Q.   Take those down and put up 149 and 151, please.

9            What type of room is this, Special Agent Luciano?

10   A.   This is another sitting room.

11   Q.   And on the left, the photo on the left looking through the

12   doorway, if we could zoom in on that, Ms. Loftus.

13           What, if anything, do we see through the doorway here?

14   A.   You see the sculpture.

15   Q.   Is that the same sculpture we just looked at in the prior

16   photo?

17   A.   Yes.

18   Q.   Focusing on the item on the right, if we could zoom in on

19   the fireplace, please.

20           What type of item is in front of the fireplace in this

21   room?

22   A.   This is that large TV.

23   Q.   Let's take these down and put up 189 and 190, please.

24           What type of room did this appear to be?

25   A.   This is a sitting room.

1    Q.  Focusing on the photo on the left on the couch and the

2    chair, if you could zoom in on those.

3              Do you see the white pillows?

4    A.  Yes, ma'am.

5    Q.  Do you recognize the image that is on those white pillows?

6    A.  I do not.

7    Q.  Do you know what G Fashion is?

8    A.  No, ma'am.

9    Q.  Let's take that down and now go to 99 and 100, please.

10   Special Agent Luciano, there appears to be some equipment in

11   this room.  Do you see that?

12   A.  I do.

13   Q.  What type of equipment does that appear to be?

14   A.  It appears to be lighting equipment.

15   Q.  Let's take this down and put up 155 and 156, please.

16             Are these additional photos of the same room, Special

17   Agent Luciano, that we just looked at?

18   A.  Yes, ma'am.

19   Q.  And now, Ms. Loftus, if we could please pull up on the left

20   side alongside 156, exhibit 662, and if we could go to page

21   five.

22             And Special Agent Luciano, this is another scan of an

23   item that was recovered from the residence pursuant to the

24   stipulation between the parties.  Looking at page five here,

25   can you please compare the image on page five of the scanned

1    document with the photo in 662 or in 156?

2    A.  They look to be very similar if not the same.

3    Q.  And, Ms. Loftus, can we zoom in on the text on the left

4    side of 662.  Can you read in the bold text the scripter?

5    A.  A monumental Ormolu mounted mahogany bookcase.

6    Q.  And look at the prices, what appears to be pounds, dollars

7    and euros, could you read those ranges, please?

8    A.  In dollars it's 19,000 to 31,000.

9    Q.  Ms. Loftus, let's put up 144 and 145.

10           What type of room was this?

11   A.  This appears to be a dining room.

12   Q.  Let's put up now Exhibits 135, 136, 137 and 138.

13           What room was this?

14   A.  This is one of the kitchens at the residence.

15   Q.  And looking at the windows taking the top right as an

16   example, what view, if any, are we looking at through those

17   windows?

18   A.  It appears to be a view onto the grounds.

19   Q.  Ms. Loftus, can we pull up 140 and 141, please.

20           By the way, what level was that kitchen on that we

21   just looked at?

22   A.  I would think that it's on the first floor.

23           MS. SHROFF:  Objection.

24   A.  But I would want to see a full walk-through because there

25   were so many kitchens.

1          THE COURT:  Don't guess.  If you don't know, just say

2    you don't mow.

3    Q.  And looking at these exhibits, what room within the

4    residence is depicted in these?

5    A.  This is another kitchen.

6    Q.  And then we can take those down and put up 142 and 143.

7          Do you see the structure for lack of a better term

8    that's in the photo on the left side?

9    A.  Yes, ma'am.

10   Q.  What is that?

11   A.  That's a staircase down to one of the lower floors.

12   Q.  And leading from where to the lower from?  Leading from

13   what room down to the lower floor?

14   A.  One of the kitchens to lower floor.

15   Q.  And let's take that down and put up 85 and 7, please.

16         Do you recognize what's depicted on the left side

17   here?

18   A.  This is one of the lower floor hallways.

19   Q.  And, Ms. Loftus, on the right side photo, if we could zoom

20   in on the black rectangular items that are on the wall.

21         What does that appear to be an image of?

22   A.  Artwork of a monkey.

23   Q.  We can take that down.  And let's go to 14 and 15, please.

24   Looking first at the left, can you describe what, if anything,

25   is shown in this photo?

O6KBGUO6                      Luciano- Direct

1   A.  We have four pop art sculptures and more art of a monkey.

2   Q.  And the photo on the right, if we can zoom in on the

3   picture on the wall, Ms. Loftus.

4           What is shown there?

5   A.  Artwork of a monkey.

6   Q.  Let's zoom out of that for a moment and leave these up.

7   What type of equipment, if any, do you see on the photo in the

8   right?

9   A.  Gym equipment.

10  Q.  And let's go to 22, 23, 24 and 25, please.

11          What part of the house was this located in?

12  A.  This is on the lower level of the residence.

13  Q.  And what type of rooms were these?

14  A.  They would be comparable to a spa.  You have a washing off

15  room and the enlit pool.

16  Q.  Did you walk through this portion of the house?

17  A.  Yes, ma'am.

18  Q.  On the top left photo if we could focus on the mat,

19  Ms. Loftus.  What is next to the mat in this photo?

20  A.  A pair of shoes.

21  Q.  Take that down and put up 26 and 32, please.

22          What part of the house were these rooms in?

23  A.  These were also on the lower floor of the house.

24  Q.  Where were they in proximity to photos we just saw of the

25  pool for lack of a better word?

1   A.  They were nearby.

2   Q.  Let's go now to 97 and 98, please.

3        The photo on the right is a bit clearer, what part of

4   the house are we looking at on the photo of the right?

5   A.  This was a landing between several of the floors.

6   Q.  And we can take this down and go to 210, please.

7        What type of room was this?

8   A.  This was a sitting room.

9   Q.  Take that down and go to 198 and 201, please.  What type of

10  room was this?

11  A.  This was a bedroom.

12  Q.  Did you go into this room on March 15, 2023?

13  A.  Yes, ma'am.

14  Q.  Looking above the fireplace, what, if anything, is hung on

15  the wall, the mantel?

16  A.  A TV.

17  Q.  Let's zoom out of that.  Special Agent Luciano, looking at

18  the photo on the right, do you see a piece of furniture under a

19  mirror?

20  A.  Yes, ma'am.

21  Q.  What, if anything, did you do on March 15, 2023, relative

22  to that piece of furniture?

23  A.  I was the one who searched it.

24  Q.  Was the FBI authorized under the search warrant to search

25  closed draws, locked containers and items?

1          MS. SHROFF:  Objection, your Honor.

2          THE COURT:  You may answer if you know.

3   A.  We had the authority to do so.

4   Q.  Can you describe for the jury how you searched this

5   dresser?

6   A.  Sure.  We opened the drawers and then we went through the

7   items that were in there.

8   Q.  What, if anything, did you find in this dresser?

9   A.  I found a leather case containing a card of sorts.

10  Q.  Ms. Loftus, if we could take those down and pull up

11  exhibits 249 and 250.

12          Do you recognize what's depicted in those photos,

13  Special Agent Luciano?

14  A.  Yes, ma'am, I do.

15  Q.  What is it?

16  A.  This is the leather case that I found containing the card,

17  and you can see my name on the item sheet.

18  Q.  So focusing first in the image on the left, and if we could

19  zoom in, Ms. Loftus.

20          What type of material was that case made out of on the

21  left?

22  A.  A pebbled leather.

23  Q.  And what, if anything, did it say on that item?

24  A.  It reads Stefano Ricci club.

25  Q.  And zoom out of that and room on the right side, please,

1    the right photo.  What type of view of the box on the left are

2    we looking at here?

3    A.  These are the contents of that leather case.

4    Q.  And looking at the piece of paper, what, if anything, does

5    it say for description of item?

6    A.  black Stefano Ricci membership package monogram.

7    Q.  To be clear, who, if anyone, fills out that information on

8    this type of item sheet?

9    A.  I wrote that because I found the item.

10   Q.  And on collected by, whose name is that?

11   A.  My name.

12   Q.  Now, looking at the item itself, what are we looking at to

13   the left of the white piece of paper.  It's a card sized item?

14   A.  That was the membership card.

15   Q.  What color is that?  That's a black with a gold circle?

16   A.  Yes, ma'am.

17   Q.  Ms. Loftus, if we could just zoom in on that portion.  So

18   this is the left half of the zoom that we're in presently.

19          Did you pick up or feel the card that day, Special

20   Agent Luciano?

21   A.  I did.

22   Q.  Can you describe for the jury what it felt like?

23   A.  It was a metallic card.  It was heavier than a regular

24   plastic credit card.

25   Q.  What does it read here on the bottom portion?

1   A.   Ho Wan Kwok.

2   Q.   And the printed words above Ho Wan Kwok?

3   A.   This welcome booklet belongs to.

4   Q.   Do you know who Ho Wan Kwok is?

5   A.   No, ma'am.

6   Q.   We can take that down and go to 199, please.

7         What are we looking at here?  What direction are we

8   looking?

9   A.   This is the bedroom in which that membership case was just

10  found, and you'll see that the door on the left opens into a

11  bathroom and the doorways on the right feed into a series of

12  three rooms.  The first of which was a closet.  The second of

13  which was a large room being used as a closet for linens, and

14  the third of which is the door that you can see which is closed

15  was another closet.

16  Q.   So let's go to 202 and 203, please.

17        Now, this room, where is this room relative to the

18  view that we were just looking at in 199?

19  A.   This is the first in that series of rooms through the first

20  set of doorframes.

21  Q.   Looking at the photo on the right, can you explain what

22  room we're looking into on the right side through the doorway

23  here?

24  A.   The room through that doorway is another large room being

25  used as a closet.

1  Q.  And if we could just zoom in on the clothes that are

2  hanging in the photo on the right for a moment, Ms. Loftus.  We

3  can take that down and let's go to 204 and 205, please.

4          Special Agent Luciano, which room is this?

5  A.  This is the middle of the series of rooms.  It's the large

6  room being used as a closet.

7  Q.  Let's go to 283 and 284, please.  Are these additional

8  views of that room?

9  A.  Yes, ma'am.

10 Q.  Ms. Loftus on, the photo on the right, can we please zoom

11 in on the entirety of the hanging rack that's against the back

12 wall.

13         Special Agent Luciano, what is hanging from that rack,

14 what appears to be hanging from that rack?

15 A.  Clothing.

16 Q.  Do you know whether any clothing was seized on March 15,

17 2023?

18 A.  I do.

19 Q.  Ms. Loftus, can you pull up alongside this 284 exhibit 221.

20 Special Agent Luciano, what does this show on the left side

21 here?

22 A.  This is a tag on a suit.

23 Q.  Is that a suit that was seized on March 15, 2023, from the

24 Mahwah residence?

25 A.  Yes, ma'am.

O6KBGUO6                          Luciano- Direct

1    Q.  Can you read what that tag says?

2    A.  Brioni for Miles Kwok.

3    Q.  Let's take that down and put up 185 and 186, please.  What

4    type of room was this?

5    A.  This was a bedroom.

6    Q.  And let's put up 187 now, please.  Zooming in on the mat

7    next to the bed.  What, if anything, is on that mat?

8    A.  Slippers.

9    Q.  Let's go to 181, please.

10            What type of room was this?

11   A.  This is a bathroom.

12   Q.  And on the bottom left of this photo what, if anything, are

13   we looking at there?

14   A.  The towels.

15   Q.  Yes?

16   A.  Towels.

17   Q.  Did you observe towels during your search on March 15,

18   2023?

19   A.  Yes, ma'am.

20   Q.  Ms. Loftus, if we could pull up alongside exhibit 228,

21   please.  Are these some of the towels that you observed during

22   your search on March 15,023?

23   A.  Yes, ma'am.

24   Q.  What type were they?

25   A.  Versace.

O6KBGUO6                        Luciano- Direct

1   Q.  Let's go now to 174 and 177.  What type of room is this,

2   Special Agent Luciano?

3   A.  This is a bedroom.

4   Q.  Do you see a pattern on the edge of the mattress in this

5   bedroom?

6   A.  I do.

7   Q.  How would you describe that pattern?

8   A.  It looks to be checked similar to plaid or Buffalo.

9   Q.  And now let's go to 224 and 254, please.

10          What are we looking at on the left here?

11  A.  This is a safe.

12  Q.  Where was that safe located?

13  A.  In third of the closets in that series of rooms that we had

14  looked at previously with the closed door.

15  Q.  Did there come a time on March 15, 2023, when the FBI

16  accessed the contents of this safe?

17  A.  Yes, ma'am.

18  Q.  What, if anything, was your role when accessing the

19  consents of this safe?

20  A.  I observed the opening of the safe, and I searched through

21  the contents of the safe.

22  Q.  What is the photo on the right of the safe?

23  A.  Several of the items in the safe.

24  Q.  If we could now put up exhibits 255 and 265.

25          What are we looking at in the photo on the left?

O6KBGUO6                        Luciano- Direct

1    A.  The contents of the safe.

2    Q.  And if we could zoom in on the top left portion of that

3    left photo, Ms. Loftus.  The top left here, Special Agent

4    Luciano, what is that?

5    A.  It was a bag of money.

6    Q.  You can zoom out of that, and we can zoom in on the right

7    side, please.

8           And Special Agent Luciano, what is this?  What's

9    depicted in this photo?

10   A.  This is the money seized from that safe.

11   Q.  Did there come a time when you counted that money?

12   A.  Yes, ma'am.

13   Q.  Ms. Loftus, if we could zoom out and zoom in closer on the

14   white piece of paper.

15          Approximately how much money was located in that safe?

16   A.  It was approximately $394,040.

17   Q.  What type of currency was that $394,040?

18   A.  U.S. cash.

19   Q.  Let's go to exhibits 275 and 276, please.

20          What type of room was this?

21   A.  This is a closet.

22   Q.  Let's go now to 273 and 274.  What are we looking at here?

23   A.  Mens apparel.

24   Q.  Ms. Loftus, on the right side, if we could zoom in on first

25   the black item on the top left.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Do you see words written on this, Special Agent

2    Luciano?

3    A.   I do.

4    Q.   Do you know what they mean?

5    A.   No, ma'am.

6    Q.   What type of fabric, if any, does that appear to be made

7    out of?

8    A.   Leather.

9    Q.   Ms. Loftus, if we could pull up alongside 274, Exhibit 256,

10   please, and let's zoom in on the text portion as much as we

11   can.  There are words on the top right of this, what are they?

12   A.   G Fashion.

13   Q.   And on the top left there's a word, what does that say?

14   A.   Invoice.

15   Q.   What is the order date for this invoice?

16   A.   December 15, 2022.

17   Q.   Let's zoom out.  There are a couple of items.  I want to

18   focus your attention on the last one here.  If we could zoom in

19   on that, Ms. Loftus.

20          First of all, what is the quantity of this item on

21   this invoice?

22   A.   One.

23   Q.   How is it described?

24   A.   Crocodile hoodie leather jacket.

25   Q.   Above that before the 50, do you see three letters?

1   A.  Yes, ma'am.

2   Q.  What do they say?

3   A.  BLK.

4   Q.  What is the price that's listed.  In the second column,

5   what is the price that was listed for this jacket?

6   A.  The price was $129,600.

7   Q.  Let's zoom out of that.  And, Ms. Loftus, if we could now

8   please put up 257 and 258.

9           Focusing now on the left side, if we could just zoom

10  in on the subtotal shipping discount information.  On this

11  document, what was the subtotal,?

12  A.  $177, 525.

13  Q.  What was the discount?

14  A.  $177,525.

15  Q.  What percentage of discount is that?

16  A.  100 percent.

17  Q.  So what was the total price for this invoice?

18  A.  Zero dollars.

19  Q.  If we could focus now, Ms. Loftus, on the right side.

20  Actually, let's take down the one on the right so we can look

21  at 258 clearly.  Thank you.

22          Can you just read down the description of the five

23  items that are listed here, please?

24  A.  Biker zip-up dress, leather Rosita pants, leather jumpsuit,

25  leather jumpsuit, crocodile leather jacket.

O6KBGUO6                         Luciano- Direct

1   Q.   And looking at the quantities list for these items, Special

2   Agent Luciano, how many of the crocodile leather jackets were

3   there, for example?

4   A.   There were two.

5   Q.   And what was the price for each of those?

6   A.   The price was $186,000.

7   Q.   So adding up the quantities of items that are listed on

8   this invoice, how many individual items are reflected on this

9   invoice?

10  A.   There were ten by my math.

11  Q.   And what was the subtotal for those ten items?

12  A.   $425,065.

13  Q.   And the discount?

14  A.   $425,065.

15  Q.   What percentage discount is that?

16  A.   100 percent.

17  Q.   Is that more than 50 percent?

18  A.   Yes, ma'am.

19  Q.   Is that more than 10 percent?

20       MS. SHROFF:   Your Honor, we stipulate that a hundred

21  percent is more than all of those.

22       THE COURT:   Okay.

23  Q.   What was the total for these ten items?

24  A.   Zero dollars.

25  Q.   We can take that down.

O6KBGUO6                         Luciano- Direct

1              Ms. Loftus, can we now please go to 233.  Focus in on

2     the top portion of this.  What information is reflected on this

3     document?

4     A.  Security personnel.

5     Q.  What is the title listed?

6     A.  Director of security.

7     Q.  And there's a photo there.  Do you recognize that person?

8     A.  No, ma'am.

9     Q.  Looking on the right, what is the name listed for that

10    person?

11    A.  Scott Barnett.

12    Q.  You can take that down now, and put up exhibit 61, please.

13    What is this in this photograph?

14    A.  This appears to be an envelope.

15    Q.  What is the return address in the top left corner of this

16    envelope?

17    A.  162 East 64th Street, New York, New York 10065.

18    Q.  And what address was this sent to?

19    A.  It was sent to 33 Ferncliff Road, Cos Cob, Connecticut

20    06807.

21    Q.  Under that there's a two and a colon, what does it say

22    after that?

23    A.  To Ho Wan Kwok, Wen Gui Guo.

24    Q.  Do you know who Wen Gui Guo is?

25    A.  No, ma'am.

1    Q.  Let's put up now exhibits 55 and 230.  Starting on the left

2    if we could zoom in, Ms. Loftus, on kind of the green portion

3    through to the card.

4             What are we looking at here, Special Agent Luciano?

5    A.  This appears to be a New York state ID.

6    Q.  And what is the name of the individual for this ID?

7    A.  Hoe Wan Kwok.

8    Q.  It's a bit hard to read, do you see the address listed

9    below for Ho Wan Kwok?

10   A.  I do see the address.

11   Q.  Are you able to read it?

12   A.  Not clearly.

13   Q.  What street is that address on if you can tell?

14   A.  The first digit is not clear.

15   Q.  All right.  Ms. Loftus, we can zoom out of that, and let's

16   zoom in on the ID on the right side, what appears to be an ID.

17   What type of card is this?

18   A.  This looks like an ID card as well.

19   Q.  Can you read on the top the name or the title of this card?

20   A.  Hong Kong permanent identity card.

21   Q.  For whom?

22   A.  Ho Wan Kwok.

23   Q.  And looking at the date of issuance, it's a bit blurry. Can

24   you read the date of issuance for this?

25   A.  It's 10-12-04.

O6KBGUO6                    Luciano- Direct

1   Q.  We can zoom out of that.  Let's go to 267 and 745.

2   Starting with 267 on the left of the screen, if we could zoom

3   in on the envelope and the documents on top of it.

4           What are we looking at here?

5   A.  These appear to be social security cards.

6   Q.  If we can zoom out again, Ms. Loftus, and zoom in just on

7   the white portion on the social security card on the left side.

8   Can you read the name of this mail to whom it's addressed?

9   A.  Hing Chi Ngok.

10  Q.  What's the address it was sent to?

11  A.  The address is 781 Fiesta Avenue Apartment, 1801, New York,

12  New York 10022.

13  Q.  Looking at the right of the social security card on the

14  bottom right, what's the date of issuance of that card?

15  A.  10/5/2018.

16  Q.  Do you know who this individual is Hing Chi Ngok?

17  A.  No, ma'am.

18  Q.  Zoom out of that and look on the right side and zoom in.

19  What type of document is this?

20  A.  This is a passport.

21  Q.  Issued from where?

22  A.  Hong Kong Special Administrative Region Peoples republic of

23  China.

24  Q.  We can take that down.  And, Ms. Loftus, let's go now to

25  347 and 348.  First focusing on 347, if we could zoom in on the

1    item.  What type of item is this?

2    A.  It appears to be a wallet with pictures and a health

3    insurance card with a credit card.

4    Q.  And the card on the top on the middle in the right side,

5    can you read a portion of that name that's printed on that

6    card?

7    A.  Yes, ma'am.

8    Q.  What does it say?

9    A.  Hing Chi Ngok.

10   Q.  Zoom out of that and look on the right side, please.  And

11   zoom in on those items.

12          Looking at the photograph of the two individuals,

13   Special Agent Luciano, is that the photographs that we saw in

14   the image that we just looked at on the left side?

15   A.  Could we pull up the other picture as well?

16   Q.  Sure.

17   A.  Yes, ma'am.

18   Q.  So the image on the right, are those the items that were

19   taken from the wallet that's depicted on the left?

20   A.  I couldn't say.  I didn't search that wallet.

21   Q.  Let's take that down and go to exhibit 272.

22          What types of documents are depicted in this photo?

23   A.  Travel and ID documents.

24   Q.  And if we're able to zoom in on the top left, let's zoom in

25   on that item and see.  It may be too fuzzy. Let's do instead

O6KBGUO6                     Luciano- Direct

1    798, please.

2              Do you recognize the individual depicted in these

3    photographs?

4    A.  No, ma'am.

5    Q.  Let's go to 346 and 246, please.  Focusing on the left,

6    what do these appear to be?

7    A.  Personal photographs.

8    Q.  Do you recognize the individuals depicted in these

9    photograph?

10   A.  No, ma'am.

11   Q.  And then on the right if we could zoom out and look on the

12   right again.  What do these appear to be?

13   A.  These also appear to be personal photographs.

14   Q.  Let's go to exhibit 808, please.

15             If we could go to the next page.  What is the text on

16   the top right of this document?

17   A.  Rolls Royce.

18   Q.  Let's zoom in on the top portion through to aircraft serial

19   number.  If you could read starting with the customer on the

20   first paragraph here?

21   A.  Whitecroft Shore Limited.

22   Q.  And continue reading that sentence here?

23   A.  Hereby authorizes the following company to act as its agent

24   and receive services on behalf of the customer under that

25   aircraft enrollment contract.

O6KBGUO6                        Luciano- Direct

1    Q.  And the company name listed here is Acass Canada Limited.

2    Do you see that?

3    A.  Yes.

4    Q.  Please zoom out and zoom in on the bottom portion.

5         Agreed by customer, what is listed for the customer.

6    A.  Whitecroft Shore Limited.

7    Q.  And the printed name?

8    A.  Mei Guo.

9    Q.  Title of Mei Guo?

10   A.  Sole director.

11   Q.  Zoom out and go to the next page, please.

12        THE COURT:  All righty.  It's 5:00.  We're going to

13   stop our work for today.  We'll resume tomorrow.  You'll be

14   here ready to walk into the courtroom at 9:30.  Remember,

15   members of the jury, that you're not permitted to discuss the

16   case amongst yourselves.  Don't permit anyone to discuss it in

17   your presence.  Don't read, watch or listen to anything from

18   any source that touches on the subject matter of this case.

19   Have a good evening.

20        THE LAW CLERK:  Jury exiting.

21        (Jury not present)

22        THE COURT:  You may step out.

23        (Witness temporarily excused)

24        THE COURT:  Please be seated.  Does either side want

25   to say anything before we break for the evening?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. MURRAY:  Nothing from the government, your Honor.

2          MS. SHROFF:  Your Honor, just one matter.  I believe

3     in the exhibits that were demonstrated to the jury this

4     afternoon, one of them had a photograph and information about a

5     gentleman named Scott Barnett.  His phone number was made

6     public, and Mr. Barnett is not -- I just wanted to flag for the

7     Court that perhaps it might be prudent not to have his phone

8     number be made public, but I leave that up to the Court.

9          MS. MURRAY:  We're happy to redact that.  It appeared

10    to be a business number.  We'll redact that for the exhibits

11    that we actually put into evidence.

12          THE COURT:  Very well.  Have a good evening.

13          (Adjourned to June 21, 2024 at 9:00 a.m.)

1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3     ALEXANDRA GALE

4    Direct By Mr. Horton . . . . . . . . . . . .3302

5    Cross By Ms. Shroff  . . . . . . . . . . . .3328

6    Redirect By Mr. Horton . . . . . . . . . . .3363

7    Recross By Ms. Shroff . . . . . . . . . . .3365

8    Redirect By Mr. Horton . . . . . . . . . . .3368

9    Recross By Ms. Shroff . . . . . . . . . . .3368

10   ELIZABETH BERSTLER

11   Direct By Mr. Fergenson . . . . . . . . . .3370

12   Cross By Mr. Schirick . . . . . . . . . . .3401

13   Redirect By Mr. Fergenson . . . . . . . . .3433

14   Recross By Mr. Schirick . . . . . . . . . .3435

15    JOCELYN REYES

16   Direct By Ms. Murray . . . . . . . . . . . .3436

17   Cross By Mr. Schirick . . . . . . . . . . .3459

18   Redirect By Ms. Murray . . . . . . . . . . .3472

19   Recross By Mr. Schirick . . . . . . . . . .3473

20   JACOB HINZ

21   Direct By Mr. Horton . . . . . . . . . . . .3474

22   Cross By Ms. Shroff  . . . . . . . . . . . .3511

23   GABRIELLA LUCIANO

24   Direct By Ms. Murray . . . . . . . . . . . .3533

25                      GOVERNMENT EXHIBITS

```
 1    Exhibit No.                                    Received

 2     WA1-WA12, WA14-WA68, WA69-WA79, . . . . . . .3305

 3              WA83-WA85, WA89-WA92,

 4              WA95-WA115, WA123, WA124, and

 5              WA126-WA135

 6     MSS87, MSS88, FAN1, FAN2, MET19, and  . . . .3439

 7              MET27

 8     UK-1 through UK-417, UK-700 through . . . . .3480

 9              UK-777

10     W1058, W1058A, W1058-V . . . . . . . . . .3494

11     NJ-7, NJ-12, NJ-14, NJ-15, NJ-22  . . . . .3537

12              through NJ-26, NJ-32 through

13              NJ-37, NJ-40 through NJ-42,

14              NJ-44 through NJ-45, NJ-53,

15              NJ-55, NJ-58 through NJ-61,

16              NJ-85, NJ-94, NJ-95 through

17              NJ-106, NJ-111, NJ-112,

18              NJ-114, NJ-116 through NJ-117,

19              NJ-120, NJ-121, NJ-125,

20              NJ-127, NJ-135 through NJ-147,

21              NJ-149, NJ-151, NJ-153 through

22              NJ-157, NJ-160, NJ-172, NJ-175

23              through NJ-177, NJ-181, NJ-184

24              through NJ-187, NJ-189,

25              NJ-190, NJ-198 through NJ-199,
```

1                 NJ-201 through NJ-207, NJ-209

2                 through NJ-210, NJ-214 through

3                 NJ-215, NJ-221 through NJ-225,

4                 NJ-228, NJ-230, NJ-233,

5                 NJ-246, NJ-249 through NJ-250,

6                 NJ-254 through NJ-259, NJ-265,

7                 NJ-267, NJ-271 through NJ-276,

8                 NJ-283 through NJ-286, NJ-289

9                 through NJ-294, NJ-314,

10                NJ-315, NJ-324, NJ-335,

11                NJ-336, NJ-338, NJ-341 through

12                NJ-349, NJ-354, NJ-356,

13                NJ-357, NJ-607 through NJ-612,

14                NJ-662, NJ-669, NJ-745, NJ-798

15                and NJ-800, NJ-807 and NJ-808

16   Stip 4    . . . . . . . . . . . . . . . .3304

17   Stip-5    . . . . . . . . . . . . . . . .3535

18   Z14   . . . . . . . . . . . . . . . . . .3440

19   Stipulation 18   . . . . . . . . . . . .3479

20   Stip 18   . . . . . . . . . . . . . . . .3480

21   Z-20   . . . . . . . . . . . . . . . . .3482

22   Z-21   . . . . . . . . . . . . . . . . .3486

23   Z22   . . . . . . . . . . . . . . . . . .3503

24   Z23   . . . . . . . . . . . . . . . . . .3507

25   Z24   . . . . . . . . . . . . . . . . . .3504

```
1    Z25    . . . . . . . . . . . . . . . . . . .3495

2    BR445    . . . . . . . . . . . . . . . . . .3439

3                     DEFENDANT EXHIBITS

4    Exhibit No.                              Received

5    7005    . . . . . . . . . . . . . . . . . .3338

6     112, 113, 114, 115, 116, 117, 118, 119,  . 3372,

7             120, 121, 122, 123, 124 and

8             125

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```