O6LBGUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                         23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                       Defendant.            Trial
 6   ------------------------------x
                                             New York, N.Y.
 7                                           June 21, 2024
                                             9:00 a.m.
 8
     Before:
 9

10                       HON. ANALISA TORRES,

11                                           District Judge
                                              -and a Jury-
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6LBGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6LBGUO1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Good morning.  Make your appearances,

3     please.

4                    MS. MURRAY:  Juliana Murray, Ryan Finkel, Micah

5     Fergenson and Justin Horton on behalf of the United States.

6                    MR. KAMARAJU:  Good morning, your Honor.  Sid Kamaraju

7     on behalf of Mr. Guo.  Mr. Guo is at the counsel's table, and

8     we're also joined by Jorge Salazar.

9                    THE COURT:  Please be seated.  Are there any issues

10    you'd like to discuss before we continue with the testimony?

11                   MR. KAMARAJU:  Not from the defense, your Honor.

12                   MR. FINKEL:  Not so much an issue, your Honor, but

13    just an update.  With thanks to the Court for allowing us to

14    sit full days, the government has made real progress this week

15    in its presentation of evidence.  Given our current

16    projections, we believe that we will rest on Tuesday.  Don't

17    hold me to that.  I can't control the cross.  We told defense

18    counsel this on Wednesday, two days ago, and had a good

19    discussion with the defense about the scope of their case and

20    just trying to understand how long that would take.  The

21    government doesn't know exactly who the defense's witnesses are

22    going to be.  We have their witness list, but we understand

23    from discussion that it's going to be a subset of who's on

24    their witness list, so we're going to talk some more, I assume,

25    to figure that out.

O6LBGUO1

1          What we would request is that the defense provide us

2     tomorrow, on Saturday, any additional 26.2 material that has

3     been generated, and on a going forward basis.  Just as the

4     government has provided its 3500 material, the defense should

5     provide its 26.2 material daily to the extent their exist any.

6     And that we ask that the defense tell us early Sunday morning

7     who they anticipate will be their witnesses come either late

8     Tuesday or early Wednesday so that we could appropriately

9     prepare and provide the jury an efficient presentation of

10    evidence.

11         So the Court also knows on Wednesday we told the

12    defense who we think will be our witnesses next week.  We're

13    going to confirm that tonight.  We might add one or two

14    witnesses, like a custodial witness, potentially a police

15    officer from Cambridge, but pretty much who is left is more or

16    less known to the defense.  So that's an update for schedule

17    just so Your Honor knows.

18              THE COURT:  You bring me good news.

19              MR. FINKEL:  I'm happy to do that.

20              THE COURT:  Mr. Kamaraju, with regard to your

21    production?

22              MR. KAMARAJU:  That's fine, your Honor.  We're happy

23    to oblige and we'll continue to produce any witness statements

24    that we have on a rolling basis as we develop them.

25              THE COURT:  All righty.  So if you'll have your

O6LBGUO1

1  witness on the stand at 9:29, please.

2         MR. FINKEL:  We will certainly do that.  I guess the

3  thing to add -- defense counsel can speak more to this, just

4  again for the Court's awareness.  It appears based on their

5  current projections that they think they'll rest their case --

6  and you'll correct me if I have this wrong -- but I think on

7  July 2nd or so.  That doesn't count if the defendant testifies.

8  And obviously that's not something that anyone could say is yes

9  or no.  That's Mr. Guo's decision, and he'll make that

10  decision.  But if he does testify, that's obviously going to

11  add sometime to the trial.  And so we'll sort of see I think

12  how things progress.  The government may request additional

13  full days to the extent it suits the Court and the jury.  I'm

14  not sure what that look means.

15         THE COURT:  That means that I think that all of us

16  would be motivated to help the trial move along.

17         MR. FINKEL:  Yes, certainly that's the government's

18  point of view.  And I appreciate that's your Honor's point of

19  view.  To the extent the defense can provide anymore

20  information to the Court about its schedule and what it

21  presumes will be its presentation, they can certainly do that.

22  I just want to update the Court on what the government knows.

23         MR. KAMARAJU:  We are, I think, as Mr. Finkel sort of

24  alluded to, we are going through our witness list, your Honor.

25  We're trying to streamline it.  We've had discussions with the

O6LBGUO1

1    government about sort of obviating the need for certain

2    witnesses, so we are hopeful -- again, not factoring in whether

3    Mr. Guo testifies, but we're hopeful that at least with respect

4    to the other witnesses that we would be able to rest prior to

5    the 4th of July break under a week.  The only thing I will

6    say -- and we can take it as we go along is given that we are

7    nearing sort of the end of the government's case and the

8    defense case, we would likely need more time to prepare Mr. Guo

9    in the possibility of his testifying.  And so we would just ask

10   at those times that we have the schedule that your Honor had

11   previously proposed to give us some of that time in the

12   afternoon to meet with him, in the event that he decides to

13   testify.  We can address that I think as we see the schedule

14   coming, that's just to give your Honor sort of a preview.

15          THE COURT:  So I do want to go over the days that

16   we're going to have off, and I need to check with my law clerk.

17   All righty.  So we will not be meeting on Friday, June 28th,

18   nor will we be meeting on Monday, July 1st.  We have off July

19   4th, which is Thursday, and July 5th, which is Friday, so just

20   wanted you to keep that in mind.

21          MR. KAMARAJU:  Yes.  Thank you, your Honor.

22          THE COURT:  All righty.  Thank you.

23          (Recess)

24          THE COURT:  Now that we have the good news, I want to

25   know if the parties can get their comments to me about the jury

O6LBGUO1

1   charge by Monday?

2           MR. FINKEL:  Good news always comes with bad news.

3   The government --

4           MS. SHROFF:  Your Honor, the witness is on the stand.

5   I'm just letting the Court know in case it matters.

6           THE COURT:  I don't think it does with respect to this

7   issue.

8           MR. FINKEL:  The government can certainly do that.  I

9   guess we ask could we have till Tuesday.

10          THE COURT:  Tuesday.  The defense can do it by

11  Tuesday?

12          MS. SHROFF:  It's only one here out of the team, I

13  think so, your Honor. But if they disagree with me, I will let

14  the Court know shortly.

15          THE COURT:  Thank you.  All righty.  Let's have the

16  jurors brought in.

17          THE LAW CLERK:  Jury entering.

18          (Continued on next page)

19

20

21

22

23

24

25

O6LBGUO1                          Luciano- Direct

1           (Jury present)

2           THE COURT:  Please be seated.  Good morning, Jurors.

3    We're going to continue with the direct examination of the

4    witness.  Please remember that you're still under oath.  You

5    may inquire.

6           MS. MURRAY:  Thank you, your Honor.

7    GABRIELLA LUCIANO, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MS. MURRAY:

10   Q.  Good morning, Special Agent Luciano.

11   A.  Good morning.

12   Q.  Ms. Loftus, if we could please publish Government Exhibit

13   NJ-808 and go to page two, please.  Zoom in on the bottom

14   portion.

15           Special Agent Luciano, we were looking at this when we

16   left off yesterday.  Can you please read what is listed as

17   service providers on the left?

18   A.  The service provider was Acass Canada, LTD.

19   Q.  On the right, what is the customer?

20   A.  The customer is Whitecroft Shore Limited.

21   Q.  There's a signature below that and then a printed name,

22   what is the printed name?

23   A.  Mei Guo.

24   Q.  And the title listed for Mei Guo?

25   A.  Sole director.

O6LBGUO1                        Luciano- Direct

1    Q.  Of what company?

2    A.  Whitecroft Shore limited.

3    Q.  Ms. Loftus, we can zoom out and go to the next page,

4    please.  Let's focus on the top portion through to the second

5    resolved, please.

6             What is the title of this document?

7    A.  It's the Consent of Sole Member Without a Meeting.

8    Q.  And the line above that, what does that read?

9    A.  Hudson Diamond Holding, LLC.

10   Q.  Special Agent Luciano, do you know what Hudson Diamond

11   Holding LLC is?

12   A.  No, ma'am.

13   Q.  Now looking at the second resolved, can you please read the

14   text there?

15   A.  Resolved that Yanping Yvette Wang will be and hereby is

16   appointed signing officer for the company and be it further.

17   Q.  Let's zoom out of that, please Ms. Loftus, and go to the

18   next page, please, and zoom in on the content here.

19            Looking at election of officers, Special Agent

20   Luciano, who is listed there and what are the titles?

21   A.  Yanping Yvette Wang, president, Max Krasner, vice

22   president.

23   Q.  And then at the bottom, what is the date of this document?

24   A.  July 17, 2019.

25   Q.  And what is the name under the signature line?

1    A.  Mei Guo.

2    Q.  We can take that down.  Can we please put up New Jersey or

3    NJ-209.  What type of room is this, Special Agent Luciano?

4    A.  This is a bathroom.

5    Q.  Let's go to NJ-2010.  This room, what floor was this on in

6    the Mahwah residence?

7    A.  This is on one of the upper floors.

8    Q.  Can we please pull up NJ-335 and NJ-336.

9         What type of room are we looking at here?

10    A.  This room was being used as a closet.

11    Q.  Did you observe this room during your search on March 15,

12    2023?

13    A.  Yes, ma'am.

14    Q.  What observations did you have about this room?

15    A.  The room was filled with luxury designer clothing.  It was

16    predominantly woman's apparel.  There was a dry cleaning

17    station in the room and an extremely large Hermes tote bag.

18    Q.  We can take that down and put up NJ-338, please.

19         What type of room are we looking at here?

20    A.  This looked like an office or media room, but a smaller

21    one.

22    Q.  And on the left side of this photo there's some type of

23    equipment, what does that appear to be?

24    A.  Camera equipment.

25    Q.  Ms. Loftus, if we could zoom in on the right most picture

1   on the wall, please.  We can take that down and put up NJ-259.

2            MS. SHROFF:  I'm sorry, was there a question?

3            MS. MURRAY:  I was just highlighting the picture that

4   the witness just testified to, your Honor.

5            THE COURT:  All righty.  Go ahead.

6   Q.  NJ-259.  Special Agent Luciano, what is this?

7   A.  It's an item reading personal shirt, Miles Kwok, ship to

8   Italy.

9   Q.  Let's put up NJ-229.  What is shown in this photo?

10  A.  Personal photographs.

11  Q.  We can take that down.

12           Special Agent Luciano, are you familiar with the FBI's

13  search warrant protocol?

14  A.  Yes, ma'am.

15  Q.  Does that protocol include identifying or marking rooms to

16  be searched?

17  A.  Yes, ma'am.

18  Q.  Yesterday you mentioned that or we looked at one of those

19  room markings, do you recall that?

20  A.  Yes, ma'am.

21  Q.  What type of document or sketch, if any, does the FBI

22  prepare in conducting a search warrant?

23  A.  There are multiple documents.  There will be a search of

24  the site.  There will be a sketch of the search.  So it will be

25  in this case broken up floor by floor, or in sometimes more

1  specifically wing by wing.  There will be a log of sign-in and

2  sign-out for all personnel.  There will be a log of evidence

3  items collected. Each item will be labeled with the room in

4  which it was found, who found it, a description of where it

5  was, and the date and the location of the item.  And there will

6  also be an FD-597 which is paperwork that is left behind with a

7  generalized receipt so that, should somebody not be home during

8  the search, they can see generally what was taken, but that's

9  not a specific list.

10 Q.  What types of logs, if any, are there regarding the

11 photographs that are taken during the search?

12 A.  There's also a log for all of the photographs taken.

13 Q.  Ms. Loftus, if we could please display just for the witness

14 Government Exhibit NJ-358, and we can flip through the pages.

15      Special Agent Luciano, what is this?

16 A.  This is the sketch from the search.

17 Q.  And the search of what property on what date?

18 A.  This is March 15, 2023, and the location is 675 Ramapo

19 Valley Road, Mahwah, New Jersey.

20      MS. MURRAY:  Your Honor, the government offers

21 Government Exhibit NJ-358.

22      MS. SHROFF:  Objection, your Honor.  Your Honor,

23 there's a slew of objection, so.

24      THE COURT:  We'll have a sidebar.

25      (Continued on next page)

1              (At the sidebar)

2              MS. SHROFF:  Thank you, your Honor.  All of these

3    documents are written hearsay.  They do not fall within any

4    exception, and therefore the defense has an objection to the

5    introduction of them as evidence.  Some of them I only got

6    notice of this morning, so I was not able to raise it earlier.

7              THE COURT:  Are they all drawings?

8              MS. SHROFF:  No.  Some of them -- I'm happy to hand

9    them to the Court which was handed to me just now.

10             MS. MURRAY:  For the clarity of the record, only one

11   document was handed to the defense today. The others had been

12   identified in the list of exhibits that we intended to

13   introduce through Ms. Luciano. The document that was handed to

14   the defense this morning is something we produced long ago in

15   Rule 16 discovery.  I'd also just note for the record, the

16   defense produced a decent quantity of documents today this

17   morning to us marked as defense exhibits that had never been

18   produced to us previously.

19             MS. SHROFF:  I wasn't pointing it out that you hadn't

20   done something correctly.  I was just pointing as to why I

21   hadn't raised it before.

22             THE COURT:  Let's talk about the first item.  That

23   looks like a handmade drawing of the layout of the property.

24   Is that correct?

25             MS. MURRAY:  That's correct, your Honor. And Special

1    Agent Luciano just testified that she's familiar with the FBI's

2    procedure for executing search warrants.  They include creating

3    a hand-drawn sketch.  They include creating evidence logs of

4    items collected, which is one of the items that we seek to

5    introduce through her.  And they include photograph logs that

6    identify where different photographs were taken so that we can

7    link the photographs that we've shown her to the specific

8    location of the search property.

9         THE COURT:  So starting with the drawing.  Is she

10   going to be able to say that she recognizes this as an accurate

11   drawing of the property?

12        MS. MURRAY:  Yes, your Honor.

13        THE COURT:  Let's go to the other documents.  These

14   logs, they come in because?

15        MS. MURRAY:  They come in because they relate to items

16   that she has testified to that she saw herself on that day.  So

17   between the sketch that she's able to authenticate, and then

18   the photograph logs that we have, which are three of them for

19   different floors of the property, it will help her say and

20   confirm that, yes, that is the room where I identified this

21   item that we talked about from the sketch.  And these are

22   maintained in the normal course by the FBI for all the premises

23   searches they conduct.

24        THE COURT:  Is there anything on the log that she had

25   nothing to do with?

O6LBGUO1                        Luciano- Direct

1          MS. MURRAY:  I guess for clarification there are items
2    on the log that relate to photographs of rooms that she might
3    not have gone into, so yes.  It's relating to the broader
4    search, but each of the logs has information relevant to things
5    that she saw that day, things that she tagged as evidence,
6    things that she did in the course of her work that day as a
7    searcher.
8          THE COURT:  It's those items that you're looking to
9    highlight for this witness?
10          MS. MURRAY:  Correct.
11          THE COURT:  And so if there are items that don't
12    relate to the witness, you wouldn't be concerned?
13          MS. MURRAY:  No, your Honor, because all of the logs
14    just maintain information about items that were seized pursuant
15    to the search warrant as through instrumentalities or evidence
16    of the subject offenses.
17          THE COURT:  She will be able to authenticate them as
18    business records?
19          MS. MURRAY:  These documents, yes.  As I just
20    inquired, and I can ask additional questions, but she said that
21    that is the process of maintaining these different documents
22    for all FBI searches.
23          THE COURT:  Mr. Kamaraju.
24          MR. KAMARAJU:  I don't think the issue is an
25    authentication issue.  I think it's a hearsay issue.  And the

O6LBGUO1                    Luciano- Direct

hearsay exception that would typically apply to FBI records is

803(a), a record or statement of a public office, if it sets

out the officer's activities, a matter observed while under a

legal duty to report, but not including in a criminal case, a

matter observed by law enforcement personnel.  FBI records are

not business records.  If they were, your Honor, then the

defense would be able to introduce 302s, for example.  Those

are not -- and the fact that this is what the FBI does in

connection with other searches, doesn't mean that it's

regularly conducted activity to search Mahwah, for example.  So

I don't think the government can rely on the business rule

exception when there's a much more specific hearsay exception

that's specific with regard to what business records are.  I've

actually never seen a case, and maybe the government has

authority for it, where an FBI record is admitted as a business

record.

            THE COURT:  What I don't understand is what would be

the proper foundation?

            MR. KAMARAJU:  Well, I think at least for the logs, I

think the logs contain information that says, photographs 17 is

a picture of this, right.  And it's found in "X" place.  So if

they want to put up a photograph, that is what it is.  But to

put in a log to say, this is a photograph of an item.  That

item was found there.  That's hearsay.

            THE COURT:  What about the items that she has

1   specifically identified, where she has seen the photograph and

2   she said this is a photograph of X and that is simply written

3   out on the log?

4        MR. KAMARAJU:  Well, then, I make two points.  One is

5   I'm not sure why it's relevant that it's on the log; but two, I

6   would say that the log is cumulative of her testimony saying

7   that, I've seen the photograph.  It is what it is.

8        THE COURT:  So suppose I were to reject the cumulative

9   argument?

10       MR. KAMARAJU:  Well, it's worth the defense.

11       THE COURT:  I assume the items that she identified on

12   the property and in the courtroom would not be considered

13   hearsay?

14       MR. KAMARAJU:  I believe they still would, your Honor.

15   It's still an out-of-court statement being admitted for the

16   truth.

17       THE COURT:  In other words, it's merely a record that

18   she created.

19       MR. KAMARAJU:  All FBI reports are merely a record,

20   right.  They're a record of a matter observed by an FBI agent,

21   just like a 302, just like an evidence log.  They're all

22   records of matters observed by law enforcement personnel, which

23   are specifically under the hearsay rule.  Whether she observed,

24   whether she knows it personally or not, because the objection

25   is not authentication or lack of personal knowledge.  It is

1  specifically hearsay, and this witness's knowledge has nothing

2  to do with the hearsay exception.

3          THE COURT:  I have to say I'm not familiar with this

4  rule.  Are you?

5          MS. MURRAY:  I am not deeply familiar with the rule,

6  your Honor.

7          MR. KAMARAJU:  And I have it here.

8          MS. SHROFF:  I do want to cite *United States v.*

9  *Schulte.*  In that case, I tried to introduce the FBI 302.

10  Mr. Kamaraju was the assistant United States attorney versing

11  me and I lost.  And those 302s were deemed inadmissible by the

12  Honorable Judge Crotty.  Because, one, the FBI is not a

13  business; and two, that exception applied which is why

14  Mr. Kamaraju knows it so well.

15          MR. FINKEL:  In the alternative, your Honor,

16  Ms. Murray could ask the agent as to each document, where did

17  you find this. She might say she remembers or she doesn't, and

18  we can use the photograph log to refresh her recollection.  It

19  might refresh her recollection.  We can do that for each one.

20  And then if there are additional items, assuming the Court

21  sustains the objection on this, if there are additional items,

22  then we may need to call additional FBI witnesses who collected

23  those particular items to state as to where those items were

24  found.  That would be the alternative to admitting the record

25  if your Honor sustains the objection.

O6LBGUO1                      Luciano- Direct

1          In some sense, there's an efficiency in this, and that

2    would be up to the defense if they want to pursue the hearsay

3    objection on additional items and your Honor sustains the

4    objection on additional to show where they were found that she

5    didn't personally find.  We'd have to get those agents to come

6    in and explain where they found these items.

7          THE COURT:  Is that a threat?

8          MR. FINKEL:  It's not a threat.  Of course not.  I'm

9    just telling your Honor the government's thinking, and also the

10   defense so they understand.

11         THE COURT:  Are you saying that -- I have to sustain

12   the objection because now I've been educated, but you'll think

13   about whether it's necessary to bring any additional witnesses.

14         MR. FINKEL:  We certainly will.  And just so your

15   Honor knows as we told your Honor this morning, we've

16   streamlined our case quite a bit, so we've definitely been

17   thinking about these things.

18         THE COURT:  Okay.

19         (Continued on next page)

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Sustained.

3    BY MS. MURRAY:

4    Q.  Ms. Loftus, if we could please display for the witness

5    Government Exhibit 358, NJ-358.  Actually, we can take that

6    down.

7              Let's put up for the jury as well what's in evidence

8    as Exhibits NJ-40, 41 and 42.  We can do them one at a time.

9    Let's do 40 first, please.  If we could zoom in on the top

10   portion, please.

11             Special Agent Luciano, what's the date on the top

12   right of this document?

13   A.  2/11/2022.

14   Q.  And what is the name in all caps at the top of this

15   document?

16   A.  Cedric DuPont Antiques.

17   Q.  Looking on the left side, can you read the name of the

18   company and the address under sold to?

19   A.  Sold to Taurus Fund LLC, Sky Pointe Drive, Suite 129-1071.

20   Las Vegas, Nevada 89141.

21   Q.  And then looking at the line under ship to, can you read

22   the same information for ship to, please?

23   A.  Ship to Taurus Fund LLC, 675 Ramapo Valley Road, Mahwah,

24   New Jersey 07430.

25   Q.  We can take out the zoom, Ms. Loftus.  Let's now go to

1    NJ-41, please.  If we could zoom in on the top half of this.

2              Special Agent Luciano, do you see handwriting on the

3    first two items here?

4    A.  Yes, ma'am.

5    Q.  Can you read for the first item what that handwriting

6    indicates?

7    A.  Flower painting location madame's bed south door right.

8    Q.  And what is the price listed for that item and then the

9    amount?

10   A.  The price was $26,500 dollars.  The amount was $19,610.

11   Q.  And item two, the same question with respect to the

12   handwriting, can you please read that?

13   A.  1/F hallway madame's living north close to clock door or

14   closet door.

15   Q.  And what is the price listed and the amount listed for that

16   item?

17   A.  The price is $43,500 and the amount is $32,190.

18   Q.  You can zoom out of that, please, Ms. Loftus, and let's go

19   now and zoom in on the remaining line items here.

20              Looking at item 8588, Special Agent Luciano, what is

21   the description of that item?

22   A.  A sensational and very rare pair of palatially scaled

23   Italian mid-19 Century Baroque st double-framed giltwood

24   mirrors.

25   Q.  What is the price and the amount listed for that item?

1   A.  The price was $165,000, and the amount was $12,100.

2   Q.  Looking now at the next item CDM, what is the handwriting

3   listed for that item?

4   A.  Mei's bedroom, bed left top to ceiling.

5   Q.  Ms. Loftus, if we can take that down and put up NJ-42,

6   please.  If we could zoom in on the very top portion to the

7   first item here.

8           Special Agent Luciano, do you see writing up at the

9   top portion of this document?

10  A.  Yes, ma'am.

11  Q.  What does that say?

12  A.  It looks like it reads, Personal entrance.

13  Q.  We can take that down.  Ms. Loftus, can we show for the

14  witness only Exhibit NJ-358 and scroll through the pages.

15          Special Agent Luciano, do you recognize what is

16  depicted in NJ-358?

17  A.  Yes, ma'am.

18  Q.  What do you recognize it to be?

19  A.  It's the Mahwah residence.

20  Q.  Is NJ-358 a fair and accurate representation of the Mahwah

21  residence as you observed it on March 15, 2023?

22  A.  Yes, ma'am.

23          MS. MURRAY:  Your Honor, the government offers NJ-358.

24          MS. SHROFF:  No objection.

25          THE COURT:  It is admitted.

1              (Government's Exhibit NJ-358 received in evidence)

2    BY MS. MURRAY:

3    Q.  Can you explain to the jury, please, Special Agent Luciano,

4    what we're looking at on page one here?

5    A.  This is an overview of the property done by sketch.

6    Q.  Let's go to the next page, please.

7              What are we looking at here on page two?

8    A.  This is the basement, so the lower level of the residence

9    in a sketch.

10   Q.  Can you please identify on this sketch for the jury where

11   the pool area that we have looked at the photos of yesterday is

12   located?

13   A.  There's a piece that says hot tub.

14   Q.  Is that at the top middle of this sketch?

15   A.  Yes, ma'am.

16   Q.  Let's go to the next page, please.

17             What is this showing us, Special Agent Luciano?

18   A.  This is the main floor of the residence.

19   Q.  And the next page, please.  Which floor is this?

20   A.  This is the second floor of the residence.

21   Q.  Can you identify on this sketch where the safe that we

22   looked at photos of yesterday was located?

23   A.  Yes, ma'am.  It's immediately to the left of the opening to

24   the first floor section in the room that says closet labeled

25   YY.

1  Q.  And the room just below that labeled VV, which room is

2  that?

3  A.  That's the wide open room being used as a closet to store

4  linens.  It was the second in the series that we saw through

5  the doorframes yesterday.

6  Q.  Ms. Loftus, can we pull up alongside, please, Government

7  Exhibit NJ-204.  I think it's the left page on the left.

8          So, Special Agent Luciano, can you explain for the

9  jury how the photo we're looking at on the right relates to the

10  sketch we're looking at on the left of the second floor?

11  A.  Sure. This is room VV.  It's just rotated.

12  Q.  Where in the photo on the right would room YY where the

13  safe was located be?

14  A.  It's in the white closed door on the right-hand side of the

15  wall bearing the open clothing rack.

16  Q.  And, Ms. Loftus, let's keep 358 up on the left, please, and

17  on the right can we please put up Exhibit NJ-201.

18          Special Agent Luciano, I want to look again at NJ-201.

19  It's one of the rooms we talked about yesterday, and just go to

20  the next page on the left side, please.

21          Where on the sketch on the left here is the room

22  that's depicted in NJ-201?

23  A.  If we could zoom in a little bit so I could see the

24  numbers, but it's on the left-hand side.

25  Q.  Ms. Loftus, we can actually zoom out and zoom in on the

1    left column of that sketch.

2    A.  The bedroom is room SS.

3    Q.  And the dresser we're looking at in the photo on NJ-201,

4    where, if anywhere, is that depicted in the sketch in SS on the

5    left?

6    A.  It's the long rectangular object on the right-hand side of

7    room SS.

8    Q.  And, Ms. Loftus, if we could now pull up on the right. We

9    can keep that on the left.  If we could pull up on the right

10   NJ-250.

11             Special Agent Luciano, where in the sketch on the left

12   was this item depicted in NJ-250 located?

13   A.  It was located in room SS in the long rectangular item on

14   the sketch.

15   Q.  We can take those down.  If we could please put up,

16   Ms. Loftus, what's in evidence as Exhibit NJ-607.

17             Special Agent Luciano, if we could focus on the top

18   portion third floor.  Actually, the top above that, what is the

19   word listed above third floor?

20   A.  Crocker.

21   Q.  And what, if anything, do you understand that to refer to?

22   A.  I couldn't say.

23   Q.  So looking down third floor, if you could read just the

24   descriptions of the room, what appears to be description of

25   rooms running down the page?

O6LBGUO1                    Luciano- Direct

1    A.  Mei's closet, Mei's closet ceiling, Mei's bedroom ceiling,

2    Mei's bedroom cove, Mei's bath cove, clubroom bar, clubroom

3    picture, Wayne's bedroom, bathroom vanity, Wayne's office,

4    bathroom; Wayne's bedroom sconces, Wayne's living sconces.

5    Q.  Do you know who Wayne is?

6    A.  No, ma'am.

7    Q.  Do you know who Mei is?

8    A.  No, ma'am.

9    Q.  Looking at the second floor, similarly if you could read

10   down just the names of the rooms?

11   A.  Boss' main bath shower, Boss' main bath toilet, boss' main

12   bath center chandelier, boss' main bath, boss' main bath, boss'

13   sconce lights hall entry, boss' sconce lights living entry,

14   boss' pico bath entry, madame's bath number two ceiling light,

15   madame's bath number two shower light, madame's bath number two

16   vanity light.

17   Q.  We can zoom out of that and go to the next page please,

18   Ms. Loftus.

19        Special Agent Luciano, do you know who boss is?

20   A.  No, ma'am.

21   Q.  Do you know who madame refers to?

22   A.  No, ma'am.

23   Q.  Let's take this down and go to Exhibit NJ-608, please.

24        Looking here if you could just read the words that are

25   bold and underline on this exhibit?

O6LBGUO1                         Luciano- Direct

1    A.  Madame main hall, boss closet, boss grand bath, boss bed,
2    boss sitting.
3    Q.  Let's stay up on the first page, please, Ms. Loftus.
4           And what floor based on this document are those rooms
5    associated with?
6    A.  The second floor.
7    Q.  Let's scroll down.  The bottom of this page, what does it
8    say?
9    A.  Son's hall, son's closet, son's bath, hall club room, Mei's
10   bed, Mei's living, Mei's closet.
11   Q.  Do you know who son refers to?
12   A.  No, ma'am.
13   Q.  Looking at the top of the screen right here the bottom of
14   the first page, what floor are those rooms associated with?
15   A.  The third floor.
16   Q.  Ms. Loftus, let's take that down and pull up NJ-155 and
17   NJ-156, please.
18          Looking first on the left, Special Agent Luciano, what
19   type of equipment appears in the center of this photo?
20   A.  Production equipment.
21   Q.  And looking in the photo of the right, is that a different
22   view of the same room.
23   A.  Yes, ma'am.
24   Q.  Ms. Loftus, let's take it down and just put up 156, please,
25   and zoom in on the bookcase against the wall.

O6LBGUO1                          Luciano- Direct

```
 1              Special Agent Luciano, do you see the item that's in
 2   the center of that bookcase on the shelf?
 3   A.  I do.
 4   Q.  What does that appear to be?
 5   A.  A statue.
 6   Q.  Ms. Loftus, let's take that down, if we could pull up
 7   Government Exhibit GXZ-9 at page 189, and zoom in on the top
 8   portion of this.
 9              Special Agent Luciano, what's the date in the column
10   on the left here?
11   A.  2/8/2023.
12   Q.  And looking at the photo on the top of this exhibit what,
13   if anything, do you recognize from that photo based on your
14   search of Mahwah on March 15, 2023?
15   A.  The bookcase.
16   Q.  Is that the same bookcase we just looked at in Government
17   Exhibit NJ-156?
18   A.  It appears to be.
19   Q.  Do you see an item that appears above the individual's
20   heard you can see a portion of it in this photo in Z-9 at page
21   189?
22   A.  Yes, ma'am.
23   Q.  How, if at all, does that look familiar to you based on
24   your search of Mahwah on March 15, 2023?
25   A.  It looks to be the same statue.
```

O6LBGUO1                          Luciano- Direct

1    Q.  Ms. Loftus, we can take that down and put up Government

2    Exhibit C-461, please.  Actually, let's take that down and

3    let's go back to Government Exhibit Z-9 at page 197.  If we

4    could zoom in on the bottom entry here.

5              Special Agent Luciano, what is the date in the left

6    column here?

7    A.  The date is 2/19/2023.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6L1GUO2                    Luciano - Direct

 1   BY MS. MURRAY:

 2   Q.  And looking in the box on the right with the photo, what is

 3   the text below that, the black text that's written there?

 4   A.  "On February 19, 2023, Miles Guo revealed this breaking

 5   news in his live broadcast."

 6   Q.  Looking at the photo above that, what, if anything, do you

 7   recognize in that photo from your search of Mahwah on March 15,

 8   2023?

 9   A.  The bookcase.

10       MS. MURRAY:  Ms. Loftus, if we could now go to

11   Government Exhibit W5-V.

12       If we could play from the 1:50 mark to the 2:05 mark,

13   please.

14   Q.  Special Agent Luciano——

15       MS. MURRAY:  Before we start that, if we could go

16   back——sorry, Ms. Loftus——to the beginning.

17   Q.  Looking at this image, what, if anything, do you recognize

18   in this image from your search of Mahwah on March 15, 2023?

19   A.  The bookcase and the statue.

20   Q.  And where is the statue in this image?

21   A.  On the shelf immediately to the left of Mr. Guo's head.

22       MS. MURRAY:  All right.  So let's start at 1:50 and

23   play to 2:05, please.

24           (Video played)

25       MS. MURRAY:  If we could play just another few seconds

O6L1GUO2                         Luciano - Direct

1    there, please.

2                 (Video continued)

3    BY MS. MURRAY:

4    Q.  Special Agent Luciano, have you ever seen this video

5    before?

6    A.  No, ma'am.

7    Q.  There is a kind of an oval on the top left of the screen.

8    Do you see that?

9    A.  Yes, ma'am.

10   Q.  What words are written there?

11   A.  New Federal State of China.

12   Q.  And below that?

13   A.  CCP does not equal Chinese.

14   Q.  Do you know what the New Federal State of China is?

15   A.  No, ma'am.

16        MS. MURRAY:  And Ms. Loftus, let's take that down and

17   go to Government Exhibit NJ256.

18        I want to zoom in on the bottom entry, please.

19        If we could actually zoom out so we can see the full

20   document and then zoom in there.

21   Q.  Looking at the bottom entry, Special Agent Luciano, what is

22   the description of that item?

23   A.  Thank you.  Crocodile hoodie leather jacket-50.

24   Q.  And the price that's listed for that item?

25   A.  $129,600.

1          MS. MURRAY:  All right.  Ms. Loftus, let's now go to

2   Government Exhibit Z9 at page 206.

3   Q.  Looking at the bottom entry here, Special Agent Luciano,

4   what is the date in the leftmost column?

5   A.  3/8/2023.

6   Q.  And looking in the right, there is a bracket and then some

7   text.  Can you please read both of those.

8   A.  "March 7th, 2023.  Full text of Miles Guo's GETTR video."

9          MS. MURRAY:  Let's scroll down, please, Ms. Loftus.

10         Actually, just a moment.  Can we take that down and go

11  to──may I have a moment, your Honor?

12         THE COURT:  Yes.

13         MS. MURRAY:  Ms. Loftus, can we go to Government

14  Exhibit W183, please.  And that's what's cited on the right

15  side of that entry we just looked at.

16  BY MS. MURRAY:

17  Q.  Special Agent Luciano, do you see the heading on this

18  document?

19  A.  Yes, ma'am.

20  Q.  Is that the same heading you just read from Government

21  Exhibit Z9 at page 206?

22  A.  Yes, ma'am.

23         MS. MURRAY:  If we could scroll down a bit to the

24  photo please, Ms. Loftus.  And pause there.

25  Q.  Do you see the clothing that is depicted in this photograph

1    on the individual?

2    A.  Yes, ma'am.

3         MS. MURRAY:  If we could zoom in on that, Ms. Loftus.

4    Q.  What does that appear to be?

5    A.  It's a crocodile black jacket bearing the label G Fashion.

6    Q.  And what type of jacket, if any?

7    A.  Crocodile, or leather.

8    Q.  Is there any kind of a collar or any other identifying

9    feature of the jacket?

10   A.  It's a hoodie.

11        MS. MURRAY:  All right.  We can zoom back to normal

12   and scroll down a bit, please.

13   Q.  And actually, what letters are there in yellow on the left

14   side of this?

15   A.  NFSC.

16   Q.  Do you know what NFSC is?

17   A.  Below it, it says the New Federal State of China.

18        MS. MURRAY:  All right.  Ms. Loftus, let's scroll

19   down, please.

20        Keep going a bit.

21        All right.  Pause there, please.

22   Q.  In the middle of this page, Special Agent Luciano, starting

23   with, "Take a look," can you please read that and the next two

24   paragraphs.

25   A.  "Take a look at this leather hoodie I am wearing.  Look at

1    the texture of the leather; it's as soft as flowing water.  One

2    of my friends in France and another family in Japan have the

3    same style as this one; it looks terrific on everybody.

4            "You will look dashing and charming if you wear this

5    style of clothes correctly, right?  You can also put on the

6    hood, making you look more dashing . . . right?  What do you

7    think?  Does it look good?

8            "Wearing this leather hoodie, whether walking with

9    your mate on the beach or boarding a yacht, how romantic it

10   will be, right?  It also looks very cute, isn't it?"

11   Q.  Now, Special Agent Luciano, in the text that you just read,

12   did you see any references to the CCP?

13   A.  No, ma'am.

14           MS. MURRAY:  We can take that down.

15           And let's put up Government Exhibit NJ807, please.

16           Zoom in on the top portion of this for the moment,

17   please, Ms. Loftus.

18   Q.  What is the title of this document?

19   A.  Residential Lease Agreement.

20   Q.  Who is listed on this as the landlord?

21   A.  Taurus Fund SP.

22   Q.  And in what country is the address for Taurus Fund SP?

23   A.  Grand Cayman Islands.

24   Q.  Who is listed as the tenant?

25           MS. SHROFF:  Your Honor, I have an objection.  This is

O6L1GUO2                        Luciano - Direct

 1  not a summary witness.  This is a witness who is testifying

 2  about a specific topic.  She's not a summary witness.

 3          THE COURT:  Is this a document that's already in

 4  evidence?

 5          MS. MURRAY:  Yes, your Honor, and it was seized during

 6  the search that Special Agent Luciano conducted.

 7          THE COURT:  All righty.  You may continue.

 8  BY MS. MURRAY:

 9  Q.  Could you read the Tenant line, please.

10  A.  Naok Hing Chi.

11  Q.  And the address?

12  A.  373 Taconic Road, Greenwich, Connecticut, 06831.

13          MS. MURRAY:  Let's zoom out of that, please,

14  Ms. Loftus.

15          And let's focus on Property, Term, and Rent, the first

16  three items.

17  Q.  What property does this residential lease agreement relate

18  to?

19  A.  675 Ramapo Valley Road, Mahwah, New Jersey 07430.

20  Q.  And the line above that, if you could just read the first

21  line, ending with the parenthetical.

22  A.  "The Tenant agrees to lease from the Landlord and the

23  Landlord agrees to lease to the tenant."

24  Q.  And how is it described in the parenthetical there?

25  A.  The single-family home.

1    Q.  And in item 2, there's a lease term.  Looking at the first

2    sentence, what is the lease term of this residential lease

3    agreement?

4    A.  The term of this lease is for two years starting on June 1,

5    2022, and ending on May 31, 2024.

6    Q.  And item 3 here, the rent, what is the rent for that

7    two-year term of lease?

8    A.  The rent for the term of this lease is $2,400,000, to be

9    paid as follows:  $100,000 per month, which is due on the first

10   day of each month.

11   Q.  And to what entity or individual is the rent payable?

12   A.  Taurus Fund SP.

13           MS. MURRAY:  Zoom out of that and go to the next page,

14   please.

15   Q.  At the bottom of this page, Special Agent Luciano, do you

16   see what appear to be initials?

17   A.  Yes, ma'am.

18   Q.  And what party to this contract initialed this document?

19   A.  The tenant.

20           MS. MURRAY:  Zoom out of that.  Go to the next page,

21   please.

22           Pause there for a moment.

23           If we could focus on items 31 and 32 here.

24   Q.  For item 31, what is the title of that portion of this

25   residential lease agreement?

1    A.   LEAD-BASED PAINT DOCUMENT ACKNOWLEDGMENT.

2    Q.   And item 32, what is the title of that portion of this

3    residential lease agreement?

4    A.   WINDOW GUARD NOTIFICATION.

5    Q.   Can you just read the first sentence of item 32.

6    A.   "THE OWNER (LANDLORD) IS REQUIRED BY LAW TO PROVIDE,

7    INSTALL, AND MAINTAIN WINDOW GUARDS IN THE APARTMENT IF A CHILD

8    OR CHILDREN 10 YEARS OF AGE OR YOUNGER IS, OR WILL BE, LIVING

9    IN THE APARTMENT OR IS, OR WILL BE, REGULARLY PRESENT THERE FOR

10   A SUBSTANTIAL PERIOD OF TIME IF THE TENANT GIVES THE OWNER

11   (LANDLORD) A WRITTEN REQUEST THAT THE WINDOW GUARDS BE

12   INSTALLED."

13           MS. MURRAY:  We can zoom out of that.

14           Let's go to the next page, please.

15           And stop there.  If we could focus here on the

16   handwriting.

17   Q.   What is the date on the left side here?

18   A.   05/29/2022.

19   Q.   And there's a signature on the right.  What is the printed

20   name below the signature on Tenant?

21   A.   Naok Hing Chi.

22           MS. MURRAY:  Zoom out, Ms. Loftus.

23           Go down to the next page.

24           And the next page.

25           The next page.

1   Q.  And again, Special Agent Luciano, on the bottom of these

2   pages, there is a space for initials.  What party to the

3   agreement initialed all of these pages?

4   A.  The tenant.

5           MS. MURRAY:  We can take that down.

6           May I have a moment, please, your Honor?

7           THE COURT:  Yes.

8   Q.  Special Agent Luciano, were you involved in the

9   investigation into Miles Guo beyond executing the search

10  warrant on March 15, 2023?

11  A.  No, ma'am.

12  Q.  The photographs and documents that we've looked at during

13  your testimony, are those all of the photographs and documents

14  that were taken on March 15, 2023?

15  A.  No, ma'am.

16  Q.  Did you select the photos and documents that we discussed

17  during your testimony?

18  A.  No, ma'am.

19  Q.  Who did?

20  A.  The government.

21          MS. MURRAY:  Nothing further, your Honor.  Thank you.

22          THE COURT:  Cross-examination.

23  CROSS EXAMINATION

24  BY MS. SHROFF:

25  Q.  Agent Luciano, you've worked for the FBI since 2017; is

1    that correct?

2    A.  No.

3    Q.  So what year did you start with them?

4    A.  2019.

5    Q.  2019.  And who did you work for before 2019?

6    A.  I worked for Pearson.

7    Q.  What's Pearson?

8    A.  An education publishing company.

9    Q.  And since 2019 until now, you've worked for the same squad?

10   A.  No, ma'am.

11   Q.  Which squads did you work for before this squad?

12   A.  I worked for HIDTA squad, which is a drug trafficking

13   squad; I worked for white collar crime squad; and I worked on a

14   surveillance squad.

15   Q.  Okay.  And as part of your duties for the FBI, you took

16   photographs of this place called Crocker Mansion, correct?

17   A.  No, ma'am.

18   Q.  Okay.  You took none of the photographs that you viewed

19   today, right?

20   A.  No, ma'am.

21   Q.  No, you didn't take them?  I just want to make sure I

22   understand your answer.

23   A.  I did not take any of the photographs.

24          MS. SHROFF:  I thought I heard a dog.  Sorry.

25          THE COURT:  So is there an infant or a small animal

O6L1GUO2                          Luciano - Cross

 1    here?

 2             So the courtroom is not a place for pets.

 3             Oh, it was a sneeze.  Well, then bless you.

 4             All righty.  Go ahead.

 5    BY MS. SHROFF:

 6    Q.  And by the way, do you know how many special agents there

 7    are in the FBI?

 8    A.  I do not.

 9    Q.  Hundred thousand?

10    A.  I couldn't say.

11    Q.  Okay.  And you were telling me that you took none of the

12    photographs that we saw in the courtroom yesterday and today,

13    correct?

14             MS. MURRAY:  Objection.  Asked and answered.

15             THE COURT:  Sustained.

16             MS. SHROFF:  I was just trying to get back to base,

17    your Honor; that's all.

18             THE COURT:  All right.  So don't——

19             MS. SHROFF:  I'll move on.

20    BY MS. SHROFF:

21    Q.  And you met with Ms. Murray to prepare for your testimony

22    here, correct?

23    A.  Yes, ma'am.

24    Q.  And you reviewed these photographs with her, correct?

25    A.  Yes, ma'am.

1    Q.  And when you reviewed them with her, did you juxtapose them

2    just like they were juxtaposed at trial, or was that done just

3    in court for you for the first time?

4    A.  Could you repeat the question.  I don't understand.

5    Q.  Sure.  Of course.  You know at times Ms. Murray put two

6    photographs side by side and asked you questions?  Do you

7    remember that?

8    A.  Yes, ma'am.

9    Q.  So did she do that during the prep or was it the first time

10   for you when she did it in court?

11   A.  We did not review that at prep.

12   Q.  Okay.  So when she put the two photographs side by side,

13   that was the first time you'd ever seen those?

14           MS. MURRAY:  Objection.  Asked and answered.

15           THE COURT:  Sustained.  So don't repeat the questions.

16   Q.  Let me go back to the last document, 807, okay?

17           You testified about this document a minute ago, right?

18   A.  Yes, ma'am.

19   Q.  Okay.  And this is a lease agreement, right?

20   A.  That's what it says, yes, ma'am.

21   Q.  And it tells you who the landlord is right on top, correct?

22   A.  Yes, ma'am.

23   Q.  Okay.  And the landlord is Taurus Fund SP, right?

24   A.  Yes, ma'am.

25   Q.  And then there's a tenant, right?

1    A.  Yes, ma'am.

2    Q.  And the tenant is Naok Hina Chi, correct?

3    A.  Yes, ma'am.

4    Q.  And it seems——you tell me, you're the FBI agent——seems like

5    a standard residential lease agreement, correct?

6    A.  I couldn't say.

7    Q.  Okay.  Well, it has paragraphs there, correct, Property,

8    Term, Rent, Initial Deposit, right?

9    A.  Yes, ma'am.

10   Q.  And the tenant has signed it on the left side, correct?

11   A.  Yes, ma'am.

12           MS. SHROFF:  Okay.  And if we could just go to the

13   last page.

14           And just go one page back.

15           Okay.  There we go.

16   Q.  And you see there are just——does it look like a standard

17   lease agreement to you?

18           MS. MURRAY:  Asked and answered.

19           THE COURT:  Sustained.

20   Q.  And what is the date on the document?

21   A.  I can't see which date you're referencing.

22   Q.  Okay.  Is this one of the documents you reviewed with

23   Ms. Murray?

24   A.  I believe so, yes, ma'am.

25   Q.  At that time did you review whether the document was dated

O6L1GUO2                        Luciano - Cross

1   or not?

2   A.  I can't recall.

3   Q.  Did you review the fact that there was no landlord's

4   initials?

5   A.  I can't recall.

6   Q.  Do you recall if she asked you any follow-up questions if

7   there was in fact an executed copy found?

8   A.  I don't believe so.

9   Q.  Okay.  You don't believe she asked you?

10          MS. MURRAY:  Objection.  Asked and answered.

11          THE COURT:  Sustained.

12          All right.  So Ms. Shroff, ask the question once and

13  don't ask it again.

14  Q.  She directed you to paragraph 32, correct, of this

15  document?

16  A.  I believe so.

17  Q.  And that paragraph talks about window guards?

18  A.  Yes, ma'am.

19  Q.  Right?  Did you look during your search to see if there was

20  any follow-up to this window guard being put into place?

21  A.  I did not.

22  Q.  Okay.  So when you were reading these paragraphs, you were

23  simply reading what Ms. Murray asked you to read?

24  A.  Yes, ma'am.

25  Q.  Okay.  And there was nothing unusual for you about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6L1GUO2                        Luciano - Cross

1    paragraph 32, correct?

2    A.  I couldn't say.

3    Q.  Okay.  Thank you.

4         MS. SHROFF:  You can take that down, Jorge.  Thank you

5    very much.

6         Now let's go to—I think it was NJ256.

7         And if I could just have that brightened up for the

8    jurors and the witness, please.

9    Q.  You were asked questions about this particular invoice,

10   correct?

11   A.  That's correct.

12   Q.  Okay.  And the focus seemed to be on this crocodile hoodie

13   leather jacket, right?

14   A.  Yes, ma'am.

15   Q.  Okay.  How about the cashmere mock neck sweater?

16        THE COURT:  Are you asking a question?

17        MS. SHROFF:  Yes, ma'am.

18   Q.  It cost $2,635; is that correct?

19   A.  That's the price listed, yes, ma'am.

20   Q.  Right.  And for some reason there's one in blue and then

21   there's one in red, correct?

22   A.  Yes, ma'am.

23   Q.  Okay.  And then there's another one, red and blue, correct?

24        THE COURT:  One moment, please.

25        You may continue.

1           MS. SHROFF:  Thank you.

2    Q.  And on the top there is a peplum biker jacket, right?

3    A.  Yes, ma'am.

4           MS. SHROFF:  Okay.  And if I could now ask for Z9 to

5    be pulled up.

6    Q.  I believe that was the video that the government showed

7    you, correct?  Do you recall this video?

8    A.  Was this one the video?

9    Q.  I thought she did show you that video.  Do you recall that?

10   A.  I recall a video, yes, ma'am.

11   Q.  Right.  And the focus seemed to be on some statue behind

12   Mr. Guo's head, correct?

13   A.  Yes, ma'am.

14   Q.  It's a statue of Buddha, correct?

15   A.  I couldn't say.

16          MS. SHROFF:  Okay.  Could we show her Z9.197.

17          Now if you could just scroll up.  And a little bit

18   further up.

19   Q.  Okay.  And Ms. Murray asked you questions about this

20   particular video of February 17, 2023, correct?

21          MS. MURRAY:  Objection, your Honor.  It's not what I

22   asked her about.

23          THE COURT:  Sustained.

24   Q.  She asked you questions about this document?

25          MS. MURRAY:  No, your Honor, also not this entry.

1          MS. SHROFF:  Then she can say no, your Honor.  It's
2     just a question.
3          THE COURT:  All right.  You may answer.
4     A.  I can't recall if it was this specific document or what the
5     specific question was.
6          MS. SHROFF:  Okay.  Let's just keep scrolling down.
7     Q.  And let's just look at that photograph, right?  She asked
8     you questions about what is the New Federal State of China,
9     correct?
10    A.  I don't know if that's what she asked me.
11    Q.  Okay.  Let's look at that little icon on the left side, or
12    my left side, of Mr. Guo's head.  On the corner left.
13    A.  Yes, ma'am.
14    Q.  Right.  She asked you if you knew what the New Federal
15    State of China was, correct?
16    A.  Yes, ma'am.
17    Q.  And what does it say right below that?
18    A.  CCP, equal sign with the crossoff, Chinese.
19    Q.  Okay.  So even though Mr. Guo has not spoken in the video
20    that she played you about CCP, you see a note about CCP on that
21    document itself, or this video itself, correct?
22    A.  I see the note for CCP, yes, ma'am.
23         MS. SHROFF:  Okay.  We can zoom out.
24         If we could show her W183, please.
25    Q.  And do you recall being questioned about this document?

O6L1GUO2                        Luciano - Cross

1    A.   I remember reading the title for this document, yes, ma'am.

2    Q.   Okay.  So why don't we read "The CCP strengthened its rule

3    by."  Could you read from that point onwards.

4    A.   "The CCP strengthened its rule by cleaning up the party

5    members, arresting those unwilling to be 'Party Slaves' and

6    reluctant to obey orders.  God blesses the NFSC; we lived

7    through a tough time being sieged by the world's dark forces

8    and made significant progress."

9              MS. SHROFF:  You can take that down.

10             If I could go to page 156.

11             I mean, not page 156, Exhibit NJ156.

12   Q.   Now you were asked several questions about this bookcase,

13   correct?

14   A.   Yes, ma'am.

15             MS. SHROFF:  Okay.  Now if we could just zoom into

16   that statue that you see.

17   Q.   This bookcase, according to you, appears in several videos

18   of Miles Guo, correct?

19   A.   It appears to be in the background of the videos, yes,

20   ma'am.

21   Q.   Right.  And the room itself——if you could zoom back

22   out——shows a camera and other recording equipment over there,

23   correct?

24   A.   Yes, ma'am.

25   Q.   And it shows a table where a person who would be doing the

1  broadcasting would sit, correct?

2  A.  It shows a table, yes, ma'am.

3          MS. SHROFF:  Okay.  And if you could zoom a little bit

4  more outside of the room, just outside of the photograph.  If

5  you could just make——okay.

6  Q.  And none of your work involved learning whether or not more

7  broadcasts were made from this particular room, correct?

8  A.  Could you rephrase the question.

9  Q.  Sure.  Sitting here today, you do not know how many

10 broadcasts were made from this room, correct?

11 A.  Correct.

12 Q.  And you don't know if other people broadcast from this

13 room, correct?

14 A.  That's correct.

15 Q.  And you don't know if there was any other use to this

16 particular room, correct?

17 A.  Yes, ma'am, that's correct.

18 Q.  Now you were shown photographs of various parts of this

19 place called Crocker Mansion, correct?

20 A.  Could you repeat that, please.

21 Q.  Sure.  You were shown various different vantage points of

22 this Crocker Mansion place, correct?

23 A.  Yes, ma'am.

24 Q.  And you were shown a scale that you made, a drawing that

25 you made, correct?

O6L1GUO2                         Luciano - Cross

1    A.  I did not make the drawing, no, ma'am.

2    Q.  Who made it, by the way?

3    A.  Another search party member for the FBI.

4         MS. SHROFF:  Okay.  Could I show that to the witness,

5    please.

6    Q.  And when you were testifying about it, when was the first

7    time you saw that sketch, this one, NJ358?

8    A.  This piece?  Today.

9    Q.  So before today, you'd never seen this document?

10   A.  That's correct.

11   Q.  You'd not seen it when you prepared with Ms. Murray.

12        MS. MURRAY:  Objection.  Asked and answered.

13        THE COURT:  Sustained.

14   Q.  Okay.  And when you were testifying about this sketch──if I

15   could just ask you to look on the left side.  Do you see where

16   it says Ramapo Valley Road on that part?

17   A.  Yes, ma'am.

18   Q.  What does it say right below that?

19   A.  It's not on the──

20   Q.  What does it say?

21   A.  It's still not on the screen, ma'am.

22   Q.  It's on my screen.

23        MS. SHROFF:  Is it on the jurors' screens?

24        THE JURORS:  Yes.

25   A.  It's not showing up for me.

1    Q.  How about now?

2    A.  Now I can see it, yes, ma'am.

3    Q.  Okay.

4    A.  It says, Preparer:  Laura Rodia.

5    Q.  No, no.  I meant right on the left, all the way on the

6    left, Ramapo Valley Road, right there.  What does it say below

7    that?

8    A.  Guard House, Parking, Building, Tennis Court.

9    Q.  Okay.  What's the guardhouse?

10   A.  A guardhouse.

11   Q.  Were there guards in it?  Do you know when you went and

12   searched the place if the guards were there?

13   A.  I couldn't say.

14   Q.  Okay.  Well, the house had a lot of security on it,

15   correct?

16   A.  Could you repeat the question.

17   Q.  Sure.  Crocker Mansion had a lot of security on it,

18   correct?

19   A.  I believe so.

20   Q.  Right.  There were cameras everywhere, correct?

21   A.  I believe so.

22   Q.  There were cameras in the rooms themselves, correct?

23   A.  I couldn't recall.

24   Q.  There were cameras in the basement, correct?

25   A.  I couldn't recall.

O6L1GUO2                          Luciano - Cross

1    Q.  Well, you were executing a search warrant there, right?

2    A.  Yes, ma'am.

3    Q.  And it's part of FBI protocol to be aware of all of the

4    many nuances of the place you're going to search, correct?

5    A.  Can you rephrase the question.

6    Q.  Sure.  Isn't it FBI protocol to have like a search plan?

7    A.  It is the protocol to have a plan, yes, ma'am.

8    Q.  Right.  And the ERT has a plan, right?

9    A.  Yes, ma'am.

10   Q.  And part of the plan is to make sure that you know the

11   place you're going to search, right?

12   A.  Yes, ma'am.

13   Q.  You want to be aware if there are cameras in the house,

14   correct?

15   A.  We treat all areas as if there are cameras, ma'am.

16   Q.  I didn't hear that.  Could you repeat that for me.

17   A.  It's best practice to always treat areas as if there are

18   cameras, ma'am.

19   Q.  That wasn't my question, but that's okay.  My question was:

20   It is FBI protocol to make sure you're aware of where cameras

21   are in the place you're searching, correct?

22   A.  Yes, ma'am.

23   Q.  You want to make sure there are no animals in the place

24   where you're searching, correct, so a dog doesn't pounce out on

25   you?

O6L1GUO2                          Luciano - Cross

1    A.  Yes, ma'am.

2    Q.  Okay.  And you want to make sure that the people who are

3    still in the place that you're searching, you know who they

4    are, correct?

5    A.  Yes, ma'am.

6    Q.  And when you searched this property, were there ex-NYPD

7    people working there as security guards?

8    A.  I couldn't say.

9    Q.  Did you meet somebody named Scott Barnett who was in charge

10   of security?

11   A.  I did not.

12   Q.  Do you know if anybody on your team met an ex-NYPD officer

13   named Scott Barnett who was working at the Crocker Mansion?

14   A.  I'm not aware of that.

15   Q.  Did you make a list or make note of how many people were

16   working that day?

17   A.  I did not.

18   Q.  Did you make a note of who was in that mansion that day?

19   A.  I did not.

20   Q.  Did you know, sitting here today, who, if anybody, was

21   arrested in that house that day?

22   A.  I'm not aware.

23   Q.  Do you know, before you executed the search warrant,

24   whether or not the——you're FBI, right?

25   A.  Yes, ma'am.

1   Q.  ——had like a drone circling the house?

2   A.  I couldn't say.

3   Q.  How about if any kind of FBI aviation structure was looking

4   to see who was in the house that day?

5   A.  I couldn't say.

6   Q.  Mr. Guo wasn't in that house that day, correct?

7   A.  I'm not aware.

8   Q.  You just——I won't repeat.

9           Was anybody else that you've testified about during

10  your direct and now your cross, do you recall any of those

11  people being in the home that day?

12  A.  I couldn't say if they were.

13  Q.  How long did you spend doing the search?

14  A.  It was a full, long day, late into the evening.

15  Q.  Right.  And before you started the search, you had a

16  tactical plan meeting, correct?

17  A.  There was a tactical plan meeting, yes, ma'am.

18  Q.  Did you attend it?

19  A.  No, ma'am.

20  Q.  Okay.  Which meeting did you attend?

21  A.  The search meeting.

22  Q.  Okay.  And you had a search team meeting so that the search

23  could be organized, correct?

24  A.  Yes, ma'am.

25  Q.  And at the end of the day, when you had finished your

1    search, did you have a meeting at the end of the day?

2    A.  I was not present for that.

3    Q.  So you only participated in one meeting on that day.

4    A.  Yes, ma'am.  I had to leave early.

5         MS. SHROFF:  Okay.  We can take this down.

6    Q.  Now if I could have you recall the questions Ms. Murray

7    asked you about this crocodile hoodie jacket.  Do you remember

8    testifying about that?

9    A.  Yes, ma'am.

10   Q.  Okay.  And she showed you the hooded jacket, correct?

11   A.  Yes, ma'am.

12   Q.  And then she showed you the Gettr photo of Mr. Guo in that

13   jacket, right?

14        MS. SHROFF:  I'm going to be right back.

15        If I could just show it.  Thank you.

16   Q.  She asked you questions about this—I don't know if I

17   should call it a document or whatever it is, but this, right?

18   A.  Yes, ma'am.

19        MS. SHROFF:  Okay.  And if we could just zoom out of

20   this.

21   Q.  And she asked you to read parts of the document, right?

22   A.  Yes, ma'am.

23        MS. SHROFF:  Okay.  And if we could just scroll down

24   on this.  Actually, if I could just—

25   Q.  You see it says March 7th, 2023?

1    A.  Yes, ma'am.

2    Q.  And what does it say right below that?

3    A.  51st Episode.

4    Q.  Okay.  And he's wearing G Fashion in that photograph; is

5    that right?

6    A.  Yes, ma'am.

7    Q.  And that's the jacket that you testified about and the

8    dollar amount and the crocodile and the hoodie, correct?

9    A.  It could be.

10   Q.  Well, you tell me.  You testified on direct about it, so I

11   just want to make sure I understand your testimony.  Is it or

12   is it not?

13   A.  I made observations about the jacket.  I don't believe we

14   said this is the exact jacket.

15   Q.  Okay.  So sitting here today, you do not know if it's the

16   exact jacket.

17   A.  It—I couldn't say.

18   Q.  Okay.  But it says G Fashion on there, right?

19   A.  Yes, ma'am.

20   Q.  Okay.  And as the agent testifying here today, do you by

21   any chance know if Mr. Guo had a contract with G Fashion?

22   A.  I couldn't say.

23   Q.  Do you know if he was the promoter for G Fashion?

24   A.  I couldn't hear your question, ma'am.

25   Q.  Do you know if he was the promoter for G Fashion?

1   A.  I couldn't say.

2   Q.  Do you know if he got a hundred percent discount for

3   promoting the ware that he was putting on?

4   A.  I couldn't say.

5           MS. SHROFF:  Okay.  Well, let's scroll down.

6           Okay.  And the next page.

7           Next page, please.

8   Q.  Did you read all of this or did you only read for the jury

9   the portions Ms. Murray picked?

10  A.  I only read what was——I was asked to read.

11          MS. SHROFF:  Okay.  How about the next page.

12          Oh, actually this is the page.  Go back up there.

13  Q.  This is where you read, right?  "Take a look at this

14  leather hoodie I'm wearing," right?

15  A.  Yes, ma'am.

16  Q.  Okay.  And she had you read this portion, right; how cute

17  it would look?

18          MS. MURRAY:  Asked and answered.

19          THE COURT:  Sustained.

20          MS. SHROFF:  I'll move to the next paragraph.  Could I

21  have her read the next paragraph?

22  A.  Which paragraph, ma'am?

23  Q.  "We shall cherish."

24  A.  "We shall cherish what we already have.  Brothers and

25  sisters, we do have every reason to feel joyful and proud."

O6L1GUO2                        Luciano - Cross

1   Q.  Keep going.

2   A.  I have to find my place.  Sorry.

3   Q.  That's okay.

4   A.  "Is there anyone else who can compare to us?  But we also

5   must love our fellow fighters, for it's our obligation to do

6   so."

7   Q.  Okay.  Do you by any chance know if this document was

8   translated or it was written in the English language?

9   A.  I couldn't say.

10          MS. SHROFF:  Okay.  We can take that out.

11   Q.  Now, Special Agent Luciano, all told, you testified about,

12   what would you say, like 120 photographs?

13   A.  I couldn't approximate.

14   Q.  Do you know how many photographs were taken?

15   A.  No, ma'am.

16   Q.  And sitting here today, do you recall how many rooms you

17   searched?

18   A.  No, ma'am.

19   Q.  It's fair to say it's been more than a year since that

20   search, right?

21   A.  Yes, ma'am.

22   Q.  And is it also fair to say that your memory and your

23   recollection of events was refreshed by Ms. Murray when you met

24   with her, correct?

25   A.  Not particularly.

O6L1GUO2                    Luciano - Redirect

1   Q.  Your memory is still the same after she showed you the

2   photos as it was before she showed you the photos?

3   A.  I believe so, yes, ma'am.

4           MS. SHROFF:  Okay.  Thank you very much.  I have no

5   further questions.

6           THE COURT:  Redirect?

7           MS. MURRAY:  Thank you.

8   REDIRECT EXAMINATION

9   BY MS. MURRAY:

10  Q.  Special Agent Luciano, you were asked questions on

11  cross-examination about the FBI's search protocols.  Do you

12  recall those?

13  A.  Yes, ma'am.

14  Q.  Was the Mahwah mansion cleared prior to the execution of

15  the search?

16  A.  Yes, it was.

17  Q.  Can you explain for the jury what the process of clearing a

18  location entails.

19  A.  Sure.  So a separate tactical team will go through the

20  entire expanse of the property, to include the grounds, any

21  extra buildings, and the entire residence, to make sure that

22  nothing could hurt or harm anyone that's entering for

23  searching, and, in addition, will look for things like weapons

24  that are immediately on the person, anybody who is in the

25  vicinity of the property or the mansion, and any animals.

1   Q.  And did that process happen prior to your execution of the

2   search on March 15, 2023, at the Mahwah mansion?

3   A.  Yes, ma'am.

4   Q.  You were also asked questions about the sketch of the

5   Mahwah property.  Do you recall those?

6   A.  I do.

7        MS. MURRAY:  Ms. Loftus, can we please pull up NJ353.

8   Oh, excuse me, NJ358.

9        And if we could zoom in on the top left portion.  And

10  this can go to the jury and the gallery as well.

11  Q.  Special Agent Luciano, you recall that Ms. Shroff asked you

12  about the structure that is indicated below Ramapo Valley Road,

13  correct?

14  A.  Yes, ma'am.

15  Q.  What is the street that is listed as coming off of Ramapo

16  Valley Road on this portion of the sketch?

17  A.  Emma Court.

18        MS. MURRAY:  We can take that down.

19  Q.  And then you were also asked questions about the NFSC on

20  cross-examination.  Do you recall those?

21  A.  Yes, ma'am.

22  Q.  And about G Fashion?

23  A.  Yes, ma'am.

24  Q.  When you searched the Mahwah mansion on March 15, 2023, did

25  you see any signs or placards that referenced the NFSC on any

O6L1GUO2                         Brown - Direct

1   of the doors within that residence?

2   A.  I couldn't recall.

3   Q.  Did you see any signs or placards referencing the NFSC or G

4   Fashion next to the doorways of any of the rooms in the Mahwah

5   residence on that day?

6   A.  I couldn't recall.

7            MS. MURRAY:  Nothing further, your Honor.

8            THE COURT:  Recross?

9   RECROSS EXAMINATION

10  BY MS. SHROFF:

11  Q.  She asked you about Emma Court, right?

12  A.  Yes, ma'am.

13  Q.  What's Emma Court?

14  A.  I couldn't say.

15           MS. SHROFF:  Okay.  Thank you very much.  You have a

16  good day, ma'am.

17           THE COURT:  All righty then.  You may step out of the

18  courtroom.

19           THE WITNESS:  Thank you.

20           (Witness excused)

21           THE COURT:  And the prosecution may call its next

22  witness.

23           MR. HORTON:  Government calls Jesse Brown.

24           (Witness sworn)

25           THE COURT:  Please state your name and spell it.  You

O6L1GUO2                        Brown - Direct

1    may be seated.

2                  THE WITNESS:  Jesse Brown.  J-E-S-S-E, B-R-O-W-N.

3                  THE COURT:  One moment, please.

4                  You may inquire.

5                  MR. HORTON:  Thank you, your Honor.

6     JESSE BROWN,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. HORTON:

11    Q.   Good morning, Mr. Brown.

12    A.   Good morning.

13    Q.   What are you doing for work these days?

14    A.   I'm currently working on a new project that uses Solidity

15    and Ethereum to tokenize our real-world assets.

16    Q.   And do you have any employees on this new project?

17    A.   I do not at this time.

18    Q.   Where do you conduct your work?

19    A.   Out of my home in Flagler Beach, Florida.

20    Q.   Did there come a time you were named the CEO of the

21    Himalaya Exchange?

22    A.   Yes, there was.

23    Q.   And when were you the CEO of the Himalaya Exchange?

24    A.   That would have been sometime in the spring of 2022.

25    Q.   And for how long were you the CEO of the exchange?

O6L1GUO2                         Brown - Direct

1   A.  I'm sorry.  That would have been the spring of 2021.

2   Q.  And for how long were you the CEO of the exchange,

3   Mr. Brown?

4   A.  Till I resigned in the——in January of 2023.

5           MR. HORTON:  Ms. Loftus, can you please publish what's

6   in evidence as GX 113.

7   Q.  Mr. Brown, who is in this image?

8   A.  That is me.

9   Q.  And were you CEO of the exchange when this image was taken?

10  A.  I was.

11  Q.  As CEO of the Himalaya Exchange, Mr. Brown, how many people

12  reported to you?

13  A.  Zero.

14  Q.  And as CEO of the Himalaya Exchange, what were you in

15  control of?

16  A.  I was in control of nothing at that.

17  Q.  Who appointed you CEO of the Himalaya Exchange?

18  A.  That would have been William Je.

19          MR. HORTON:  Ms. Loftus, can you pull up what's in

20  evidence as GX 103.

21          Can you publish it, please.

22  Q.  Mr. Brown, who is this?

23  A.  That is William Je.

24  Q.  As CEO of the Himalaya Exchange, Mr. Brown, who was your

25  boss?

O6L1GUO2                         Brown - Direct

1    A.  That would have been William Je.

2              MR. HORTON:  You can take that down, please,

3    Ms. Loftus.

4    Q.  Mr. Brown, what, if anything, happened on March 15, 2023?

5    A.  On March 15th, my house was surrounded, and the FBI came

6    and took my personal devices, my work devices, and also

7    documents from my home.

8              THE COURT:  Sir, if you would speak into the

9    microphone so that everyone can hear you.  Bring it closer to

10   you if you want, but speak right into it.

11             THE WITNESS:  Okay.

12   Q.  Mr. Brown, did the FBI have a search warrant when they came

13   to your home that day?

14   A.  Yes.

15   Q.  Were you arrested?

16   A.  I was not.

17   Q.  Did you get a lawyer after that?

18   A.  I did.

19   Q.  And after you got a lawyer, did you meet with the

20   government?

21   A.  I did.

22   Q.  About how many times did you meet with the government?

23   A.  Four or five times.

24   Q.  Mr. Brown, are you testifying today pursuant to an

25   agreement?

1  A.  I am.

2  Q.  And what's your understanding of what that agreement means?

3  A.  The agreement means I will not be prosecuted for anything

4  that I did with Guo Media, GTV, Himalaya Exchange, or a

5  mortgage application that I applied for.

6  Q.  When you say a mortgage application, what happened with

7  that mortgage application?

8  A.  That was a stated income application in 2007.

9  Q.  Why is that mortgage application part of your agreement

10 with the government?

11 A.  Because I——I misrepresented my income.

12 Q.  And what are your obligations under this agreement,

13 Mr. Brown?

14 A.  My obligations are to tell the truth at all times, to

15 provide documentation when asked, and to provide availability

16 as well.

17 Q.  And what's your understanding, Mr. Brown, about whether the

18 nonprosecution agreement protects you from prosecution for

19 conduct other than in connection with the Himalaya Exchange or

20 with the 2007 mortgage application that you mentioned?

21 A.  It does not protect me.

22 Q.  And what is your understanding as to whether the

23 nonprosecution agreement protects you from a prosecution for

24 perjury, obstruction of justice, or making false statements if

25 you lie on the stand today?

O6L1GUO2                         Brown - Direct

1    A.  It does not.  It does not.  It would be voided under those

2    circumstances.

3    Q.  If you were to lie here, could the government tear up your

4    nonprosecution agreement?

5    A.  They could.

6    Q.  Could you then be charged for your past conduct?

7    A.  I could.

8    Q.  Could the statements you made in your meetings with the

9    government be used against you?

10   A.  They could.

11           MR. SCHIRICK:  Objection.  Is this his understanding?

12           THE COURT:  As to what you understand the agreement to

13   mean.

14           You may continue.

15   Q.  That's right, Mr. Brown.  Do you understand that if you

16   were to lie here, the statements that you previously made to

17   the government could be used against you?

18   A.  I do understand.

19   Q.  Aside from this nonprosecution agreement, Mr. Brown, were

20   you made any other promises by the government?

21   A.  I was not.

22   Q.  I want to turn your attention now back to the Himalaya

23   Exchange.

24           What month and year did you interview for that job?

25   A.  That would have been June of 2020.

O6L1GUO2                        Brown - Direct

1    Q.  And how many interviews did you have?

2    A.  I had two interviews.

3    Q.  Who interviewed you the first time?

4    A.  The first time was Yvette Wang and a gentleman named Joe.

5    Q.  And what company did you understand you were interviewing

6    with when you were interviewed by Yvette Wang and Joe?

7    A.  GTV and Guo Media.

8    Q.  Where did you do this interview from?

9    A.  I did it from my home in Florida.

10   Q.  And where was Yvette interviewing you from?

11   A.  New York City.

12   Q.  What, if anything, did you know about Guo Media or GTV at

13   that first job interview?

14   A.  I didn't really know that much for the first interview.

15   Q.  And after Yvette Wang, who interviewed you next?

16   A.  That would have been William Je.

17   Q.  Where did you do that interview with William Je?

18   A.  I actually did that interview from my late mother's home,

19   via videoconference.

20   Q.  After your interview with William Je, did you get a job

21   offer, Mr. Brown?

22   A.  Yes.

23   Q.  I'm going to show you what's marked as Government

24   Exhibit 3419.

25          What is this document, Mr. Brown?

O6L1GUO2                          Brown - Direct

1    A.  This was my offer of employment.

2           MR. HORTON:  Government offers GX 3419.

3           MR. SCHIRICK:  No objection.

4           THE COURT:  It is admitted.

5           (Government's Exhibit 3419 received in evidence)

6           MR. HORTON:  If you could please publish it,

7    Ms. Loftus.

8    BY MR. HORTON:

9    Q.  Mr. Brown, what company did your job offer come from?

10   A.  GTV Media Group.

11   Q.  And what understanding, if any, did you have about what the

12   G in GTV stood for?

13   A.  My understanding——

14          MR. SCHIRICK:  Objection.  At the time?

15          THE COURT:  Yes, at the time.

16   A.  My understanding was that it was a——it was Miles Guo.

17   Q.  And who controlled GTV, as you understood it?

18   A.  Miles Guo.

19   Q.  When is this offer letter dated, Mr. Brown?

20   A.  June 17, 2020.

21   Q.  And when did you start to work on this job for GTV?

22   A.  That would have been that week.

23   Q.  When you got this job offer from GTV, Mr. Brown, at that

24   time what, if anything, did you know about the Himalaya

25   Exchange?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6L1GUO2                         Brown - Direct

1   A.  I didn't know a lot about the Himalaya Exchange.

2   Q.  When you took this job offer, June 2020, Mr. Brown, what

3   did you understand that you were being hired to do?

4   A.  I understood that I was being hired to help launch and

5   create cryptocurrency as well as work to build out or develop

6   an exchange.

7   Q.  And when you were hired for that by GTV, what did you

8   understand the name of the cryptocurrency was you were hired to

9   help launch?

10  A.  The cryptocurrencies at that point were branded G Coin and

11  G Dollar.

12  Q.  And what was your understanding as to why they were called

13  G Coin and G Dollar?

14  A.  I believed it was for Miles Guo.

15  Q.  As you understood it, Mr. Brown, was there any relationship

16  between the cryptocurrency projects you were hired on for GTV

17  and any other Miles Guo companies?

18  A.  Yes.

19  Q.  What was that relationship?

20  A.  The relationship was to work with some of the entities for

21  Miles Guo in the ecosystem.

22  Q.  And when you say the ecosystem, what are you referring to?

23  A.  I'm referring to entities that would have accepted or

24  transferred the cryptocurrencies.

25  Q.  And besides the Miles Guo companies, what other companies

1   were part of that Himalaya Exchange ecosystem?

2   A.  There were no others.

3          MR. HORTON:  Ms. Loftus, if you could zoom in on

4   paragraph 1 of this document, Position and Start Date.

5   Q.  Mr. Brown, this document says you would be reporting to Joe

6   Wang, Chief Tech Officer, and Yvette Wang, Director, at our New

7   York City office.  After you took this job, did you report to

8   Yvette Wang?

9   A.  I did not.

10  Q.  Did you report to Miles Guo?

11  A.  I did not.

12  Q.  Did you report to Joe Wang?

13  A.  I did not.

14  Q.  Who did you report to?

15  A.  I reported to William Je.

16         MR. HORTON:  We can take this down, please,

17  Ms. Loftus.

18  Q.  Mr. Brown, what, if anything, did you understand was the

19  relationship between William Je and Miles Guo?

20  A.  I wasn't really privy to the relationship, but I knew that

21  they spoke frequently.

22  Q.  How did you know that?

23  A.  From——from meetings we had with——with the company and

24  William stating that.

25  Q.  When you say "meetings we had with the company," what did

1    you learn at those meetings?

2            MR. SCHIRICK:  Objection to the hearsay, your Honor.

3            THE COURT:  Overruled.  You may answer.

4    Q.  When you say meetings at the company, what did you learn at

5    those meetings about the relationship between William Je and

6    Miles Guo?

7    A.  Well, there were several times his name was mentioned and

8    talking about his entities and——and then also about

9    certain——certain——certain initiatives that we had with his

10   companies.

11   Q.  And when you say "initiatives that we had with his

12   companies," who's "we"?

13   A.  Himalaya Exchange.

14   Q.  And what were the initiatives that the Himalaya Exchange

15   had with Miles Guo's companies?

16   A.  The idea was to work with G Fashion, G|CLUBS, and these

17   other entities with the cryptocurrency.

18   Q.  After you were hired by GTV, what was your understanding of

19   why you were reporting to William Je?

20   A.  Because William Je was launching the coins.  He was

21   involved in the——in issuing and launching the coins.

22   Q.  You accepted a job offer with GTV.  Was reporting to

23   William Je a different job or part of that same job?

24   A.  I saw it as part of the same job.

25   Q.  Mr. Brown, what was Hamilton Investment Management?

1    A.   That was a fund from London that William Je also managed.

2    Q.   And when you were interviewing for the GTV cryptocurrency

3    job, what, if anything, were you told at that time about

4    Hamilton?

5    A.   Nothing when I interviewed.

6    Q.   And when did you hear about Hamilton?

7    A.   Later on when I was hired.

8    Q.   Who did you hear about Hamilton from?

9    A.   William Je.

10   Q.   And what did you understand Hamilton did?

11   A.   Hamilton was an investment fund.

12   Q.   And why were you being told about it when you were working

13   for William Je and GTV on a cryptocurrency project?

14   A.   The fund was going to be part of the——of the ecosystem as

15   well, and the fund was going to work with the exchange.

16   Q.   When you say the fund, the Hamilton Fund was going to work

17   with the Himalaya Exchange, what do you mean by that?

18   A.   Well, the——what they did is, the fund, people in the fund

19   were allowed access to the——to the——to the coins.

20   Q.   Mr. Brown, taking a step back, when you worked for the

21   Himalaya Exchange, how were you paid?

22   A.   I was——

23            MR. SCHIRICK:   Objection.   Time frame.

24            THE COURT:   Would you couch it in a certain time

25   frame.

1    MR. HORTON:  Sure.

2  Q.  Mr. Brown, how long did you work for the Himalaya Exchange?

3  A.  Two and a half years, approximately.

4  Q.  During those two and a half years, how were you paid for

5  your work?

6        MR. SCHIRICK:  Objection.  Time frame.

7  A.  The first——

8        THE COURT:  From when until when?

9  Q.  Well, were there different ways that you were paid for your

10  work, Mr. Brown?

11  A.  There were.

12  Q.  Can you explain what those were.

13        THE COURT:  It's the start of the work.

14        MR. HORTON:  Sure.

15  Q.  Starting at the time you joined——

16        THE COURT:  What year was that?

17        THE WITNESS:  The year I joined was 2020.

18  Q.  And how were you first paid for your work?

19  A.  I was first paid by Guo——Guo Media, and GTV.

20  Q.  And what was the form of payment?

21  A.  It was——I was paid biweekly.

22  Q.  You said there was more than one way you were paid.  What

23  happened?  How were you paid after Guo Media?

24  A.  I was——I was let go by Guo Media at the end of the year,

25  and I went onto the books of the London entity, Hamilton.

O6L1GUO2                          Brown - Direct

1   Q.  And how were you paid from the books of the London entity

2   Hamilton?

3   A.  I was wired money into my business account.

4   Q.  You said you were let go.  What else, if anything, changed

5   besides the way you were paid?

6   A.  I lost my health insurance.

7   Q.  And other than the entity paying you and your health

8   insurance benefits, what, if anything, changed about your work

9   when you were paid by Hamilton instead of Guo Media?

10  A.  Nothing changed.

11  Q.  Did you have colleagues at the Himalaya Exchange,

12  Mr. Brown?

13  A.  Yes.

14  Q.  Who employed your colleagues at the exchange?

15  A.  The Hamilton Group.

16  Q.  When you were reporting to William Je, where was he based?

17  A.  London.

18  Q.  And where were you working when you were reporting to him?

19  A.  Florida.

20  Q.  Where in Florida?

21  A.  Flagler Beach.

22  Q.  What kind of office were you working in?

23  A.  My home office.

24  Q.  How long did you spend reporting——withdrawn.

25          How long did you report to William Je at the Himalaya

O6L1GUO2                      Brown - Direct

1    Exchange?

2    A.   Until my resignation in January of 2023.

3    Q.   And how long a period was that, Mr. Brown?

4    A.   That would have been two and a half years.

5    Q.   During those two and a half years reporting to him, when,

6    if ever, did you meet William Je?

7    A.   I did not meet William Je.

8            MR. SCHIRICK:   Objection.   Can we define "meet."   In

9    person?

10           THE COURT:   Are you speaking about an in-person

11   meeting?

12           MR. HORTON:   I can ask a few different questions, your

13   Honor.

14           THE COURT:   Okay.

15   BY MR. HORTON:

16   Q.   Mr. Brown, during your two and a half years reporting to

17   William Je, did you ever meet him in person?

18   A.   I did not.

19   Q.   How did you communicate with the people you were working

20   with at the exchange from your home in Florida?

21   A.   We had daily meetings in the mornings.

22   Q.   And how often, if ever, was William Je in those meetings?

23   A.   Pretty much every day.

24   Q.   You say daily meetings.   What form did they take?

25   A.   They were videoconferences for me and for another employee

1   in Australia, but they were in person for everyone else in

2   London.

3   Q.   Were there any other Himalaya Exchange employees in

4   Florida, Mr. Brown?

5   A.   There were not.

6   Q.   Who led these video meetings that you participated in?

7   A.   That would be William Je.

8   Q.   And where would he sit in these meetings?

9   A.   He would sit at the end of a long table.  There were——there

10  were two screens.  I was on one screen, the compliance manager

11  from Australia was on another.  And then the stakeholders would

12  sit next to each other, and William would be at the end of the

13  bench.

14  Q.   Could you just keep the microphone close to your mouth.

15  A.   Oh.

16  Q.   Just pull it closer to you so you don't have to lean

17  forward.

18           You said the stakeholders were in the meeting.

19  A.   Yes.

20  Q.   Who was that?

21  A.   The stakeholders would be the chief security officer, the

22  chief financial officer, the chief marketing officer, and

23  internal auditor.

24  Q.   Those executives you just mentioned, where did they work?

25  A.   They worked for Hamilton.

O6L1GUO2                          Brown - Direct

1   Q.  And where in the world did they work?

2   A.  London.

3   Q.  Did you ever meet any of them in person?

4   A.  I did not.

5   Q.  At the Himalaya Exchange, Mr. Brown, what were country

6   heads?

7   A.  Country heads were people who were helping market the coin.

8   Q.  And who selected the country heads?

9   A.  I'm not sure of that.

10  Q.  How did you know who the country heads were?

11  A.  They were spoken about during these meetings.

12  Q.  And who spoke about the country heads in the Himalaya

13  Exchange meetings?

14  A.  That would have been William Je.

15  Q.  You said the country heads were to market the exchange.

16  What did that mean?

17  A.  Well, they would──they would go out and seek people to

18  participate in the private sale.

19  Q.  Who directed the country heads at the Himalaya Exchange?

20  A.  That would be William Je.

21  Q.  Mr. Brown, what are farms?

22  A.  I'm not──I'm not sure of that.

23  Q.  What's the Himalaya Farm Alliance?

24  A.  I have no──I have no──I don't know what that is.

25  Q.  When did you first learn about something called H Coin and

O6L1GUO2                          Brown - Direct

1   H Dollar?

2   A.  Pretty much my first day.

3   Q.  And other than the names, Mr. Brown, what, if anything, was

4   the difference between G Dollar and G Coin on one hand and H

5   Dollar and H Coin on the other hand?

6   A.  There was no difference.

7   Q.  And focusing on the time period when you were hired in

8   mid-2020, what did you understand you were hired to do?

9   A.  I understood I was hired to help with the creation of the

10  coins.

11  Q.  And who were you doing that work for?  Who were you

12  creating the coins for?

13  A.  That would have been Guo Media.

14  Q.  And what did you understand that to mean, hired to create a

15  coin?

16  A.  Well, it—typically, in the—in the crypto industry, there

17  are certain things you do to develop and issue a coin.

18  Q.  And what are those things?

19  A.  Well, there's—there's the tech development on the Ethereum

20  blockchain was what we were looking at, and then also writing

21  white papers and raising awareness.

22  Q.  And what's a white paper?

23  A.  A white paper is typically a document that you would—that

24  you would release for a crypto that would talk about its

25  utility, the team that's building it, and, you know, some

1   things you're going to be doing with a roadmap in the future.

2   Q.  You said you were looking at the Ethereum blockchain.

3   First of all, what's the Ethereum blockchain?

4   A.  Well, the Ethereum blockchain is one of the most used

5   blockchains.  It's something that you can, you know, develop

6   and create coins on top of.

7   Q.  And what does it mean to create a coin on top of the

8   Ethereum blockchain?

9   A.  Well, Bitcoin is its own blockchain, and it's a little bit

10  different.  Ethereum allows developers to actually build coins

11  on top of it through smart contracts.

12  Q.  Bitcoin and Ethereum, are these public launchings?

13  Actually, withdrawn.  Let me step back one step.

14          When you say blockchain, what do you mean?

15  A.  Well, a blockchain is a publicly distributed ledger that

16  shows all the transactions for that ledger.

17  Q.  And what do you mean by a public distributed ledger?

18  A.  Well, it's a——it's a ledger where typically there are what

19  are called nodes in the system, so those are computers that

20  approve or disapprove transactions.

21  Q.  Are all blockchains public?

22  A.  They are.

23  Q.  Is there such as thing as a private blockchain?

24  A.  There are private blockchains, but the——but the data is

25  still made public to the members of that consortium.

O6L1GUO2                        Brown - Direct

1  Q.  You said the exchange when you joined was looking at the

2  Ethereum blockchain.  But what do you mean by they were looking

3  at it?

4  A.  Well, we were looking at using Quorum for it at that point.

5  Q.  And what's Quorum?

6  A.  Quorum is a JPMorgan product that allows for——for, like I

7  was talking about, a private consortium to use a blockchain.

8  Q.  And what, if anything, did you understand when you first

9  started working on this project about whether the coins would

10  be on a public blockchain or a private blockchain?

11  A.  I understood that they were going to be on a private

12  blockchain or something like Quorum, where members would be

13  able to participate in it.

14  Q.  And why did you have that understanding?

15  A.  Well, because that's really how——the only way that crypto

16  works.

17  Q.  What do you mean it's the only way that crypto works?

18  A.  Well——well, crypto has to be——it's a——it's something that

19  is a public chain, so——so it's——everything is——is able to be

20  viewed or seen by——by anyone who has——

21         MR. SCHIRICK:  Your Honor, objection.

22  A.  ——online access.

23         MR. SCHIRICK:  Could we have a brief sidebar on this,

24  please.

25         THE COURT:  All righty.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6L1GUO2                          Brown - Direct

1           (At the sidebar)

2           MR. SCHIRICK:  So I'm going to raise an objection.

3     It's the same objection that we raised with respect to

4     Mr. Roberts's testimony, from a week ago.  We're veering into

5     what is expert testimony here.  I understand that Mr. Brown has

6     held roles in the crypto and blockchain industry, just the same

7     way Mr. Roberts held roles in the crypto and blockchain

8     industry.  But he's not been noticed as an expert, he's not

9     been qualified as an expert, and to have him testify on, you

10    know, general topics which is now I think, if you review the

11    transcript, veering into opinion testimony as to what his view

12    is of the way that crypto works and blockchain works. . .  Now

13    the question may have not been put that way.  Mr. Horton was

14    careful not to use the word "view" or "opinion."  But the

15    answer was opinion.

16          MR. HORTON:  Your Honor, this is heartland 701

17    testimony.  He was hired—first of all, the context is, he was

18    hired by an agent, one of the charged co-conspirators in the

19    scheme.  He was hired by GTV Media in the first instance and

20    then reported to an agent who is a charged conspirator to carry

21    out the conspiracy.  Was an insider.  He's very different from

22    Mr. Roberts, who is approaching this from the outside and who

23    had a limited several-month investigation from the outside of

24    this.  Mr. Brown was inside for two and a half years, and he's

25    being asked questions about, when you were hired by the

O6L1GUO2                          Brown - Direct

1    co-conspirators, about people who reported to the defendant.

2    What did you understand you were being hired to do?  When you

3    say you were hired to do something on the blockchain, what did

4    that mean to you at the time?  That's the only way he can give

5    the jury context about what he personally observed in realtime

6    as an insider of the conspiracy.

7              MR. SCHIRICK:  Your Honor, we can look at the

8    transcript.  I may be wrong, but I believe the witness answered

9    the question about what he believed he was hired to do, and

10   then the next question veered into——it may not have been the

11   questioner's fault, but the answer veered into generally that

12   area.

13             THE COURT:  Would you read back the last question and

14   answer.

15             (Record read)

16             MR. SCHIRICK:  And that's the essence of the generic

17   question about how the thing works, which is improper.

18             THE COURT:  He's hired to create this crypto exchange,

19   and so it would be odd not to have him discuss his

20   understanding of what he had to do.

21             MR. SCHIRICK:  Well, it's one thing, again, if he's

22   discussing his understanding in the context of what he was

23   hired to do.  I understand that point, your Honor.  But I

24   think, you know, that answer is a more generic answer, a more

25   sweeping answer.  And again, we're just trying to police the

O6L1GUO2                         Brown - Direct

1    line here between expert testimony, and we're raising the

2    objection.  It has nothing to do with whether there's a

3    co-conspirator exception or whether there's a hearsay

4    objection.  So the fact that, you know, he worked for the

5    Himalaya Exchange, reported to William Je, really is of no

6    moment.  It's just the answer that's been given, or was in the

7    process of being given, I think veers towards expert testimony.

8              THE COURT:  So just how far do you expect to go?

9              MR. HORTON:  So he was the CEO of the Himalaya

10   Exchange, cryptocurrency exchange for two and a half years.  He

11   experienced the projects that were being represented to the

12   world as cryptocurrency projects.  His testimony is about what

13   the projects actually were, from his perspective, in realtime,

14   as the CEO.  And so to the extent that he mentions a term like

15   blockchain, Quorum, or something that the jury is not going to

16   know, I think it's fair to ask him, as an insider of the

17   conspiracy, what did it mean in the conspiracy at the time?

18   What did you understand it to mean?  If there's a discrepancy,

19   why?

20             THE COURT:  So you expect that he will say that what

21   was created was inconsistent with what he expected?

22             MR. HORTON:  Yeah.

23             THE COURT:  That's fine.

24

25

O6L1GUO2                         Brown - Direct

1                    (In open court)

2                    THE COURT:  Members of the jury, it's 11:30, so we'll

3       take our half-hour break now.

4                    Remember, do not discuss the case amongst yourselves

5       or with anyone else.  Don't permit anyone to discuss the case

6       in your presence.  Don't read, listen to, or watch anything

7       from any source that touches upon the subject matter of this

8       case.

9                    And sir, you may step out of the courtroom.  Don't

10      discuss your testimony.

11                   (Jury not present)

12                   (Witness not present)

13                   THE COURT:  Is there anything before we return at

14      noon?

15                   MR. HORTON:  Not from the government.

16                   MR. SCHIRICK:  Not from the defense, your Honor.

17                   (Recess)

18

19

20

21

22

23

24

25

O6L1GUO2                          Brown - Direct

                            AFTERNOON SESSION

1

2                              12:00 p.m.

3              THE COURT:  Please bring the jurors in.

4              THE LAW CLERK:  Jury entering.

5              (Jury present)

6              THE COURT:  Remember, sir, that you're under oath.

7    You may continue the inquiry.

8              MR. HORTON:  Thank you, your Honor.

9    BY MR. HORTON:

10   Q.  Mr. Brown, before the break you were discussing your

11   understanding of the cryptocurrency and exchange project you

12   were hired for.  What did you understand about whether the

13   coins you were hired to work on would be on a public blockchain

14   or a private blockchain?

15   A.  I understood that they would be on a public blockchain.

16   Q.  What, if anything, did you understand the role -- before

17   the break you mention something called Quorum.  Can you remind

18   the jury what Quorum is?

19   A.  Quorum is a JPMorgan open source blockchain that is an

20   enterprise chain for ethereum.

21   Q.  Is quorum a public blockchain or a private blockchain?

22   A.  It's a private blockchain.

23   Q.  And when you were hired to work on the cryptocurrency

24   project for GTV, what understanding, if any, did you have about

25   the role that the Quorum blockchain would have in this project?

O6L1GUO2                          Brown - Direct

```
 1   A.  I understood that it would be the chain that the coins
 2   would be distributed on and transferred and traded on.
 3   Q.  Now, Mr. Brown, in your two and a half years with the
 4   Himalaya Exchange, when, if ever, could customers buy H Coin on
 5   a blockchain?
 6   A.  Never.
 7   Q.  And when, if ever, could customers buy H Dollar on a
 8   blockchain?
 9   A.  Never.
10   Q.  Was that what you were expecting when you took this job in
11   2020?
12           MR. SCHIRICK:  Objection, asked and answered.
13           THE COURT:  Overruled.  You may answer.
14   A.  It was not.
15   Q.  What were you expecting about the type of coin you
16   developed?
17   A.  I was expecting something that would be built on top of the
18   Quorum chain and something that would be what a typical crypto
19   would be.
20           MR. SCHIRICK:  Objection.
21           THE COURT:  Are you saying what you expected it to be?
22           THE WITNESS:  Yes.
23           THE COURT:  Go ahead.
24   Q.  You said you were expecting it to be what a typical crypto
25   would be, how is what you actually observed at the exchange
```

1   different from what you'd expected typical crypto to be?

2   A.   The exchange used just a database.  It wasn't a blockchain.

3   Q.   And what was the database you're talking about?  What does

4   that mean?

5   A.   Well, a database is a typical tech tool where data is

6   stored and accessed by computers.

7   Q.   And what was the name of the database that the Himalaya

8   Exchange was using?

9   A.   It was Posgrest I believe.

10  Q.   Can you spell that.

11  A.   P-O-S-G-R-E-S-T, I believe.

12  Q.   And this database, how does it compare to a spreadsheet?

13  A.   It's typical to a spreadsheet only it would allow, not only

14  structured data, but unstructured data.

15  Q.   Was this database on the blockchain?

16  A.   It was not.

17  Q.   Where was it if it wasn't on the blockchain?

18  A.   It was controlled by the Exchange and the technology team

19  there.

20  Q.   As CEO of the Exchange, did you have access to this

21  internal database?

22  A.   I did not.

23  Q.   Why not?

24  A.   I wasn't allowed access to any of the technology that they

25  were building in London.

1  Q.  What do you mean that you weren't allowed access to any of
2  the technology that the Exchange was building?
3  A.  There was only a small group of people in London that had
4  access for security reasons.
5  Q.  Did you ever ask William Je why you didn't have access to
6  the Exchange's internal database as its CEO?
7  A.  I did not.
8  Q.  Why not?
9  A.  I just felt as though the chief security officer and the
10  chief operations officer were the ones really managing that.
11  Q.  If customer couldn't buy H Coin on the blockchain, what
12  could they buy from the Exchange?
13  A.  They could buy credits.
14  Q.  And when you were hired to work on this GTV cryptocurrency
15  project, were you told about credits then?
16  A.  No, I was not.
17  Q.  What were credits at the Himalaya Exchange?
18  A.  Credits were when people would join the exchange, they
19  would buy certain credits with U.S. dollar that they had
20  deposited into their accounts and then they would receive
21  credits for the crypto.
22  Q.  And what were the name of the credits at the Himalaya
23  Exchange?
24  A.  The names of the credits, could you repeat that?
25  Q.  Sure.  What were the names of the credits that people could

1    buy at the Himalaya Exchange, what were they called?

2    A.   Himalaya Dollar and Himalaya Coin.

3    Q.   And were Himalaya Dollar credits and Himalaya Coin credits

4    the same or different from Himalaya Dollar and Himalaya Coin?

5    A.   They were different.

6    Q.   How were they different?

7    A.   The Himalaya Dollar was a stable coin which was backed.

8    For every Himalaya Dollar, it was to be backed by a U.S. dollar

9    in a bank account.

10   Q.   And how was the Himalaya Dollar credit different from the

11   Himalaya Dollar stable coin?

12   A.   It was not.

13   Q.   It was not the same you said?

14   A.   No, it was the same.

15   Q.   It was the same?

16   A.   Yes.

17   Q.   When somebody bought a Himalaya Dollar credit, were they

18   actually buying a Himalaya Dollar?

19   A.   They were buying credits to the dollar, not the actual

20   dollar itself.

21   Q.   And where were these credits, Himalaya Dollar credit,

22   Himalaya Coin credit, where were they stored?

23   A.   They would have been stored on the database I believe.

24   Q.   Could customers buy Himalaya Coin credits and Himalaya

25   Dollar credits on the blockchain?

1    A.  They could not.

2    Q.  In your understanding at the time as the CEO of the

3    Exchange, were these credits cryptocurrency?

4    A.  No, they were not.

5            MR. SCHIRICK:  Objection, your Honor.

6            THE COURT:  Overruled.

7    Q.  In your understanding, Mr. Brown, at the time as the CEO of

8    the Himalaya Exchange, were these credits cryptocurrencies?

9            MR. SCHIRICK:  Same objection.

10           THE COURT:  He answered that question.

11           MR. HORTON:  I'm sorry, your Honor. I wasn't sure if

12   the jury heard the answer.

13   A.  Could you repeat it.

14           THE COURT:  No.  He answered the question.  He did.

15   Q.  Who did you first hear about the credits from?

16   A.  I first heard about the credits from William Je in a

17   meeting, team meeting.

18   Q.  And, Mr. Brown, what did William Je say about the credits

19   in this meeting?

20   A.  He spoke to them as if they were like an amusement park

21   credits where you pay for tickets and cash them out when you

22   left the park.

23   Q.  What did you think when you heard William Je describe the

24   credits that way?

25   A.  Somewhat amusing.

1  Q.  What was amusing about it to you?

2  A.  It just kind of flies in the face of a cryptocurrency,

3  right --

4           MR. SCHIRICK:  Objection, your Honor.

5           THE COURT:  Overruled.  You may continue.

6  Q.  Mr. Brown, what do you mean that the credits at the

7  Himalaya Exchange fly in the face of a cryptocurrency?

8  A.  Well, what cryptocurrency is about, it's about a public

9  chain where transactions are viewed to for everyone.  And

10 everything that goes on, on that chain people have access to.

11 This wasn't anything like that.

12 Q.  Why weren't the credits anything like that?

13          MR. SCHIRICK:  Same objection.

14          THE COURT:  Sir, you're speaking based upon your

15 personal understanding.  Is that correct?

16          THE WITNESS:  Yes.

17          THE COURT:  Go ahead.

18 Q.  Mr. Brown, why as the former CEO of the Himalaya Exchange,

19 why in your view, why in your understanding, were the credits

20 at the Exchange nothing like the cryptocurrencies you've just

21 described?

22 A.  Because the credits were obfuscated.  They weren't public

23 knowledge like a public blockchain were or like a private chain

24 would be for all the consortium members.

25 Q.  You said earlier that you helped draft white papers at the

1    Exchange?

2    A.   Yes.

3    Q.   Where were these white papers published?

4    A.   They were published on the Himalaya Exchange website.

5    Q.   Were they available for the public?

6    A.   They were.

7    Q.   Did these white papers discuss HCN and HDO credits?

8    A.   Yes, they did.

9    Q.   Did you ask William Je questions about why the exchange was

10   using credits instead of cryptocurrencies on the blockchain?

11   A.   Yes, I did.

12   Q.   What did you ask him?

13   A.   I asked him why we were using this model as opposed to just

14   issuing the coins on the chain.

15   Q.   And what did William Je say when you asked him why the

16   Exchange wasn't issuing credits on the blockchain?

17   A.   At that point we were looking for a place to issue the coin

18   and the British Virgin Islands was a jurisdiction that they

19   picked.  And that at this point legal counsel in the British

20   Virgin Islands suggested this.

21   Q.   Mr. Brown, you were at the Exchange for two and a half

22   years.  At any time during your time there were H Coin and H

23   Dollar able to be bought or sold on the blockchain?

24              MR. SCHIRICK:  Objection.

25              THE COURT:  Asked and answered.  You don't need to

O6L1GUO2                          Brown - Direct

1   answer.

2   Q.  Mr. Brown, if you thought that these credits were not

3   cryptocurrencies, why didn't you leave your job?

4               MR. SCHIRICK:  Objection.

5               THE COURT:  You may answer.

6   A.  I kept my job for my paycheck.

7   Q.  When you worked at the Exchange at that time, did you

8   believe it was a legitimate business?

9   A.  Yes.  Yes.

10  Q.  Did you believe you were committing crimes when you worked

11  there?

12  A.  I didn't, no.

13  Q.  And remind the jury when did you leave the Exchange?

14  A.  January of 2023.

15  Q.  By the way, Mr. Brown, was G/Club a client of the Himalaya

16  Exchange when you were there?

17  A.  They were.

18  Q.  And what did G/Club use the Exchange for?

19  A.  I believe it was for the money transfer for the purchase of

20  the G/Club memberships.

21  Q.  And did you understand what that meant at the time?

22  A.  I did not.

23  Q.  Did you ask William Je what it meant?

24  A.  I did not.

25  Q.  In general, Mr. Brown, what was your understanding of how

1    William Je treated your views and opinions?

2    A.  You know, I think because I was in Florida, I wasn't able

3    to get in his ear as much as a lot of the people in London

4    were, so most of my concepts or strategies or ideas never

5    really made it to fruition.

6    Q.  And how, if at all, did that effect your experience being

7    the CEO of the Exchange that William Je -- that your ideas

8    didn't take fruition?

9              MR. SCHIRICK:  Object to form.

10             THE COURT:  You may answer.

11   A.  I just felt like I was kind of a strawman, like the face of

12   the company.  I didn't really have any say in anything that

13   went on.

14   Q.  Why did you feel like a strawman?  What do you mean by

15   that?

16             MR. SCHIRICK:  Asked and answered.

17             THE COURT:  You may explain what strawman means.

18   A.  Strawman is someone who is, they don't really have any say

19   in the decision making, right.  They're just kind of the face

20   of it but don't really have any input into the decisions.

21   Q.  What understanding, if any, Mr. Brown, did you have about

22   why the Exchange wanted you to be its face?

23   A.  I think part of it was I was willing to move to the BVI,

24   and I think part of it too was my experience at DTCC and at

25   Ford working with blockchain there.

O6L1GUO2                          Brown - Direct

1   Q.  And did you feel like you were able to bring that

2   experience to bear when you were working at the Exchange?

3   A.  Not at all.

4   Q.  You said you were willing to move to the BVI, did you

5   ultimately move there?

6   A.  I never did make it there.

7   Q.  Did you spend time at the BVI for the Exchange?

8   A.  I did.

9   Q.  And what were you doing there for the Exchange?

10  A.  Part of the time was spent seeking out an office space.

11  Other time was spent talking to telecom providers about a

12  potential data room, and then other times I was working with a

13  sandbox application there as well.

14  Q.  And did the Exchange ever get a property in the BVI?

15  A.  We did not.

16  Q.  Did it ever get a data room in the BVI?

17  A.  It did not.

18  Q.  What happened to the sandbox application?

19  A.  Denied.

20  Q.  What is a sandbox application?

21  A.  A sandbox application is an application where you apply for

22  an exchange license, but you're placed in a sandbox kind of as

23  a test period to see if everything will be compliant and

24  everything you do with your company will meet their guidelines.

25  Q.  Was that's the application that was denied?

1  A.  That was.

2  Q.  How many hours a day were you working on Exchange projects

3  down in the BVI?

4  A.  Probably about three or four hours.

5  Q.  How did that compare to the amount of day you were spending

6  on Exchange work back in Florida?

7  A.  It was about the same.

8  Q.  Did you like being in the BVI?

9  A.  I did.

10  Q.  Other than three hours a day working for the Exchange, what

11  did you do down there?

12  A.  I surfed.

13  Q.  What was your title when you were hired in 2020, Mr. Brown?

14  A.  Associate blockchain manager I believe.

15  Q.  Did you seek out -- did there come a time that you sought

16  out the title of CEO?

17  A.  No.

18  Q.  How did you find out you'd been named the CEO?

19  A.  During one of our stakeholder meetings William appointed me

20  CEO.

21  Q.  Before that happened in the meeting, did you know it was

22  going to happen?

23  A.  I did not.

24  Q.  Was it on the agenda for that meeting?

25  A.  It was not.

1    Q.  What was your reaction when you heard William say that you

2    were their CEO?

3    A.  I was pretty surprised.

4    Q.  Why were you surprised?

5    A.  I don't consider myself CEO material.

6    Q.  Why do you mean by that?  Why aren't you CEO material?

7    A.  Well, I'm a terrible public speaker.  I don't really

8    understand all the dynamics that go with being a chief

9    executive.  I'm a tech guy.

10   Q.  Had you ever been a CEO before that?

11   A.  I had not.

12   Q.  Did you ever lead an organization?

13   A.  No.

14   Q.  Mr. Brown, what, if anything, about the work you were doing

15   change after you were named CEO?

16   A.  I guess I was involved more in the marketing side.

17   Q.  What did that entail being involved in more of the

18   Exchange's marketing side?

19   A.  It meant doing some video sessions and doing some

20   interviews that were given to me by the marketing team.

21   Q.  What do you mean that interviews were given to you by the

22   marketing team?

23   A.  They would decide who I would talk to and when.  They would

24   set the agendas.

25   Q.  And what kinds of things would you talk about in these

1    interviews?

2    A.  Talk about the Exchange, the coin, technologies that were

3    used.

4    Q.  Did you have an understanding of why the Exchange wanted

5    you to do public interviews?

6    A.  No.  Like I said, I'm terrible at them.

7    Q.  Did you ever ask William Je why you're asking me to do

8    this?

9    A.  No, I just considered it something that I had to do.

10   Q.  Mr. Brown, what, if anything happened with the Exchange in

11   November 2021?

12   A.  That's when we had the official launch.

13   Q.  What do you mean by the official launch?

14   A.  The Exchange -- prior to the launch, there was a private

15   sale for the HCN coins or for the H Dollar coins.  People were

16   topped up to buy H Dollar.  And then when the Exchange launched

17   would be the first time people could buy these coins.

18   Q.  The private sale you referred to, were people buying H

19   Coins or H Coin credits?

20   A.  They were buying H Coin credits.

21   Q.  Were they buying H Dollars or H Dollar credits?

22   A.  They were buying H Dollar credits.

23   Q.  When you say building up to the launch, what do you mean

24   building up to the launch?

25   A.  There was a presale where a $100 million was raised before

1  the launch of the Exchange?

2  Q.  What was the date of the launch?

3  A.  November 1, 2021.

4  Q.  What's your understanding of why that date was chosen for

5  the launch?

6  A.  My understanding was, it was a drop dead day issued by

7  Miles Guo.

8  Q.  How do you have that understanding?

9  A.  Well, we had really struggled to launch the Exchange.  It

10  was scheduled to launch several times previously in the

11  previous months, and every time we failed, and there was a time

12  where that was it.  We had to launch the exchange on November 1

13  come hell or high water.

14  Q.  Did Miles Guo have a title at the Exchange?

15  A.  Not that I'm aware of.

16  Q.  Did he participate in those daily video meetings with

17  William Je?

18  A.  No.

19  Q.  What is your understanding of how that drop dead launch

20  date came from Miles Guo?

21  A.  It was from some conversation that I had after with some

22  team members and then also --

23          MR. SCHIRICK:  Objection to the hearsay.

24          THE COURT:  Overruled.  You may continue.

25  Q.  Mr. Brown, the question was how do you have the

O6L1GUO2                          Brown - Direct

1   understanding that Miles Guo gave you instruction for the

2   Exchange to launch on November of 2021?

3              MR. SCHIRICK:  Your Honor, can we have a brief sidebar

4   on this, please.

5              THE COURT:  All right.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Mr. Horton, do you expect that he is going

3     to say that the people he was speaking with were part of the

4     alleged conspiracy?

5          MR. HORTON:  Yes.  What he's going to say is that what

6     the people working with William Je at the Himalaya Exchange

7     telling him what the Exchange is doing for Miles Guo.

8          MR. SCHIRICK:  Your Honor, the question is, how far

9     does this co-conspirator exception goes, and to what extent

10    does the government have to build up.  As we understood the

11    Court's opinion to require specific statements from specific

12    people that can be relaid as hearsay under the exception.

13    Right now, we don't even know who he's talking about.  He's

14    just talking about people at the Exchange, right.  So is every

15    person -- we understood the Court's ruling pretrial to be that

16    there was no blanket exception under which hearsay would be

17    permitted.  Just because someone used, of the various entities

18    here, had conversation with witnesses.  And right now that's

19    where we're at.

20         MR. HORTON:  Your Honor, there is now in evidence

21    minutes if not hours of the defendant talking about G Dollar,

22    G Coin, H Dollar, H Coin, the Exchange, video of him saying

23    that.  William Je's testimony.  William Je was running that

24    project.  He's charged as a co-conspirator.  The information

25    Mr. Brown was getting was from people who worked directly for

O6L1GUO2                          Brown - Direct

1    William Je at the Himalaya Exchange which is instrumentality in

2    this Rico conspiracy telling him what was going on.

3              MR. SCHIRICK:  There's a difference, your Honor,

4    between saying that William Je said something that this witness

5    will identify and saying unidentified views of people who

6    worked for Mr. Je.

7              MR. HORTON:  There's a co-conspirator exception.

8    There's also an agent exception.  They worked together.  He's

9    the principal and he's speaking on behalf of a co-conspirator.

10   That comes in.

11             THE COURT:  All right.  I'm going to let it in.  I've

12   ruled.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6L1GUO2                          Brown - Direct

1            (In open court; jury present)

2            THE COURT:  Overruled.  You may continue.

3   BY MR. HORTON:

4   Q.  Mr. Brown, the question was how did you understand that it

5   was Miles Guo who gave the instruction for the Exchange to

6   launch on November 1, 2021?

7   A.  After having some conversations with some colleagues after

8   the launch and then also during the launch, GTV had a big

9   presentation going on at the time.

10  Q.  And what role, if any, did you have in GTV's presentation

11  on the launch day of the Himalaya Exchange?

12  A.  I was to speak live as soon as the launch, as soon as the

13  Exchange was launched.

14  Q.  And where did you get that assignment from?

15  A.  I got that assignment from William Je.

16  Q.  We'll come back to that in a second.

17            Were you CEO on the day of the launch?

18  A.  Yes.

19  Q.  Were you CEO in the days running up to the launch?

20  A.  Yes.

21  Q.  In your view was the Exchange ready to launch?

22  A.  It was not.

23  Q.  Why was it not ready to launch?

24  A.  We had struggled so long with the technology.  I had a lot

25  of talks with the technology leaders and they felt the same

1   way.

2   Q.  And you said struggle with the technology, what does that

3   mean?

4   A.  It means we weren't able to deliver on time.  At the time

5   there was the pandemic.  It was hard to get really talented

6   blockchain developers, and we just really didn't have the skill

7   set or the means to deliver on time.

8   Q.  What time on November 1, 2021, was the Exchange suppose to

9   launch?

10  A.  I believe it was nine or ten in the morning.

11  Q.  And what time did it launch?

12  A.  Eleven at night.

13  Q.  And why is that?

14  A.  Because it wasn't ready.  And from my understanding from

15  conversations, one developer kind of put together the Exchange

16  quickly in that time to launch.

17  Q.  How did that happen?

18          How did it happen that one developer put the Exchange

19  together quickly?

20  A.  He was just kind of like the top superman developer I guess

21  that was there and he took matters into his own hands.

22  Q.  Mr. Brown, after the Exchange launched that day, at this

23  point were customers able to buy H Coin on the blockchain?

24  A.  No.

25  Q.  Were customers able after the launch to buy H Dollar on the

1  blockchain?

2  A.  No.

3          MR. SCHIRICK:  Objection, asked and answered.

4          THE COURT:  Overruled.  You may answer.

5  A.  No.

6  Q.  You said that there was a long broadcast on GTV on launch

7  day, did you participate in it?

8  A.  Yes.

9  Q.  And where did you film your interview from?

10 A.  My office in Florida.

11 Q.  The people interviewing you on GTV, do you know where they

12 were broadcasting from?

13 A.  I do not.

14 Q.  What were you -- can you sort of walk the jury through that

15 day, what was it like for you?

16 A.  Well, it was stressful.  I was supposed to talk at ten.

17 I'm not great at public speaking, so I was a little nervous.  I

18 didn't think the tech would be ready, and then it just dragged

19 on for hours and hours and hours which led to more anxiety.

20 Q.  And what specifically were you asked to do on GTV that day,

21 launch day?

22 A.  I believe just to be interviewed.

23 Q.  Ms. Loftus, can you please pull up what's been marked as

24 GX3401, just for the witness, please.  Then with the sound off,

25 Ms. Loftus, if you could please scroll through it for the

1    witness, please.  Mr. Brown, what is this?

2    A.  This would be my interview during the launch day.

3              MR. HORTON:  Government offers GX-3401.

4              MR. SCHIRICK:  No objection.

5              THE COURT:  It is admitted.

6              (Government's Exhibit 3401 received in evidence)

7    Q.  Can you please publish this, Ms. Loftus, and if you could

8    take it to the one minute and 45 second mark and play that with

9    sound for the room.

10             (Media played)

11   Q.  Mr. Brown, you said we suffered some delays, but we wanted

12   to make sure we did it right, and I think we have.

13             Do you think the Exchange had gotten it right that

14   day?

15   A.  No.

16   Q.  Why did you say that on GTV?

17   A.  For fear of disrupting the whole launch.

18   Q.  Ms. Loftus, can we go to the 2:45 mark, please.

19             (Media played)

20   Q.  Mr. Brown, the question you were asked was what are the

21   advantages of H Coin compared to other crypto like Bitcoin.

22   When you were asked that question on GTV, was H Coin a

23   cryptocurrency like Bitcoin?

24             MR. SCHIRICK:  Objection, asked and answered.

25             THE COURT:  Overruled.  You may answer.

1    A.   It was not.

2    Q.   Why not?

3    A.   It wasn't on the blockchain.

4    Q.   In your answer on the video, you said we have this

5    permissioned chain that we use, what were you referring to by

6    permissioned chain?

7    A.   Quorum.

8    Q.   And were customers able to buy H Coin or H Dollar using

9    Quorum on the date of this interview?

10   A.   They were not.

11   Q.   Were your answers in this interview truthful, Mr. Brown?

12   A.   They were not.

13   Q.   Why did you lie in these interviews?

14   A.   Again, I was fearful of causing a major selloff during the

15   launch of the coin, and I was kind of toeing the company line

16   on what to say during these events.

17   Q.   And what do you mean by the company line?

18   A.   Well, there were certain talk points that, you know, we

19   were to discuss at all times, and one of those was the Quorum

20   chain.

21   Q.   And where did you get your understanding of what the

22   talking points were to be?

23   A.   That would have been from the legal team and from the

24   marketing team as well.

25   Q.   And legal and marketing at the Exchange, who did they

O6L1GUO2                          Brown - Direct

1  report to?

2  A.  William Je.

3  Q.  Mr. Brown, was this November 2021 GTV interview the only

4  time you gave an interview in public on behalf of the Exchange?

5  A.  It was not.

6  Q.  In those other interviews, did you say things about the

7  Exchange and its coins that were not true?

8  A.  I did.

9  Q.  And what are the things that you lied about in these other

10  interviews?

11  A.  Really constantly talking about the coin being on the

12  blockchain and us using Quorum.

13  Q.  You said a moment ago that you were fearful of causing a

14  selloff?

15  A.  Yes.

16  Q.  What is a selloff?

17  A.  Well, a selloff is when there's fear in the marketplace and

18  people rush to sell their currencies.

19  Q.  And what effect, if any, would a selloff have on the price

20  of H Coin?

21  A.  It would drop the price.

22  Q.  What happened to H Coin's price on the day of the launch?

23  A.  It popped.

24  Q.  What does that mean that it popped?

25  A.  It went from 10 cents to a dollar while I was interviewing,

1  and it later went to $20 dollars in 14 days.

2  Q.  And as the CEO of the Exchange at the time, what was your

3  understanding of -- well, let me ask you this.

4      What was your reaction of seeing that price hike?

5  A.  Kind of amazed.

6  Q.  And why is that?

7  A.  It was kind of a giant leap for a coin that was really only

8  on a small exchange.  It wasn't on any big exchanges.

9  Q.  And what do you mean that the coin wasn't on any big

10  exchanges?

11  A.  Well, typically when you launch a coin, two exchanges will

12  pick you up.  And when that happens and the coin is kind of

13  broadcast on a lot of sites that rank coins and show prices

14  like the NASDAQ does.  So, we weren't anything like that.  So

15  the awareness for our coin globally didn't exist.

16  Q.  When the H Coin price was rising the way you explain,

17  Mr. Brown, at this time were customers able to hold an H Coin

18  or were they able to hold an H Coin credit?

19      MR. SCHIRICK:  Objection.

20      THE COURT:  You may answer.

21      MR. SCHIRICK:  Over and over.

22  A.  Credits.

23  Q.  Did you ever ask William Je if there's an explanation for

24  the price hike?

25  A.  No.

1   Q.  Was H-Coin ever listed on other exchanges other than the

2   Himalaya Exchange?

3   A.  It was not.

4   Q.  What about H Dollar?

5   A.  No.

6   Q.  And as the CEO at the time, what was your understanding of

7   why H Coin and H Dollar weren't listed anywhere except the

8   Himalaya Exchange?

9   A.  There was quite a bit of fear among the stakeholders that

10  if it was listed on other exchanges, the price would drop.

11  Q.  And who were the stakeholders who had this fear about a

12  price drop?

13  A.  Pretty much all of them, but the chief security officer,

14  the legal team and the chief operations officer.

15  Q.  What was your understanding of why listing H Coin and

16  H Dollar on other exchanges could cause a price drop?

17  A.  Well, because it would allow a free market to participate

18  in a much broader scale, so more people could come in and it

19  would give the people who owned the coin more liquidity to

20  sell.

21  Q.  And why didn't the exchange want that?

22          MR. SCHIRICK:  Objection.

23          THE COURT:  By the word "exchange," why didn't the

24  exchange want that?  Who are you referring to?

25  Q.  Mr. Brown, you were the CEO at the time?

O6L1GUO2                          Brown - Direct

1   A.  Yes.

2   Q.  What was your understanding why stakeholders at the

3   Exchange didn't want the coins or the dollar to be listed on

4   another exchange?

5   A.  For fear that the price would drop.

6   Q.  What is humming bot.  Do you know what that is?

7   A.  Yes.

8   Q.  Can you spell it, please?

9   A.  H-U-M-M-I-N-G, B-O-T.

10  Q.  What is humming bot?

11  A.  It's a software that trades takes both sides of a trade.

12  It will buy and sell autonomously.

13  Q.  Was humming bot used at the Himalaya Exchange?

14  A.  It was.

15  Q.  And how did you know that?

16  A.  It was spoken about in several meetings.

17  Q.  And who told you that humming bot was being used at the

18  Exchange?

19  A.  That would be David Fallon.

20  Q.  Who is David Fallon?

21  A.  He was the fund manager for Hamilton Fund.

22  Q.  Who did David Fallon work for?

23  A.  William Je.

24  Q.  What's your understanding as the CEO of the Exchange why

25  humming bot was being used on the Exchange?

1    A.   There were primarily two purposes.  One was to -- a bot is

2    typically used in a low volume scenario where there aren't a

3    lot of traders.  That does not bode well for other investors

4    because they don't want to see a ghost town, so these bots

5    automatically trade to give the impression of activity.

6    Q.   Why are they called bots?

7    A.   Because they're automated.  There's no human behind them.

8    It's just software.

9    Q.   You said a low volume scenario?

10   A.   Yes.

11   Q.   What does that mean?

12   A.   A low volume scenario means there's not a lot of trades.

13   Typically an Exchange will trade in the millions everyday.

14   Q.   At the time did you observe a low volume scenario at the

15   Himalaya Exchange?

16   A.   Yes.  It got gradually worse after the launch.

17   Q.   And as the volume got gradually worse, what, if anything,

18   was happening to the price?

19   A.   The price remained stable for the most part.

20   Q.   What was your understanding of how that was?

21   A.   My understanding was that the bot was driving a lot of the

22   trades and propping the price.

23   Q.   Did you ever ask William Je about the humming bot?

24   A.   I did not.

25   Q.   Why not?

1  A.  That was a David Fallon fund task.

2  Q.  Mr. Brown, did there come a time you learned anything about

3  GTV and the SEC?

4  A.  There did.

5  Q.  And were you CEO at the time you learned this information?

6  A.  I was.

7  Q.  What did you learn?

8       First of all, what's the SEC?

9  A.  The Securities Exchange Commission.

10 Q.  And what did you learn when you were CEO of the Himalaya

11 Exchange about GTV and the SEC?

12 A.  I learned that they entered into a settlement with the SEC,

13 and part of the SEC stated that Miles Guo was not to

14 participate in any crypto or security issuances directly or

15 indirectly.

16 Q.  As CEO of the Himalaya Exchange, why did you learn that

17 information?

18 A.  I typically read some of the SEC filings because at that

19 point there was a lot going on with FTX and their collapse, and

20 basically to understand compliance moving forward because

21 compliance is a very difficult thing in this field, so you kind

22 of have to get a feel for the industry.

23 Q.  What, if anything, did you do when you learned that there

24 was a GTV settlement with the SEC about cryptocurrency?

25 A.  I raised it in one of the meetings.

1  Q.  Mr. Brown, was this a Himalaya Exchange meeting?

2  A.  Yes, it was.

3  Q.  Why did you raise GTV's settlement with the SEC in a

4  Himalaya Exchange meeting?

5  A.  Because there was a lot of marketing being done by Miles

6  Guo at that time around the Exchange, and I felt that that was

7  indirectly being involved.

8  Q.  What do you mean marketing being done by Miles Guo around

9  the Exchange?

10  A.  He spoke about the Exchange a lot on his platforms.  He

11  created an I-tunes song about HCN to the moon.

12  Q.  Did you hear that song?

13  A.  I did.

14  Q.  Before the Himalaya Exchange, had you worked in black

15  chain?

16  A.  I had.

17  Q.  What, if anything, did the title HCN to the Moon mean to

18  you?

19  A.  Well, to the moon is a crypto saying that everyone wants to

20  invest in a coin and then it skyrockets in price to the moon.

21  Q.  Mr. Brown, what was your understanding about why Miles Guo

22  was making a song called H Coin to the Moon?

23          MR. SCHIRICK:  Objection.

24          THE COURT:  You may answer.

25  A.  I don't know if I had an understanding of why.

O6L1GUO2                          Brown - Direct

1   Q.  You said that you raised the GTV settlement in a meeting at

2   the Himalaya Exchange, who was in this meeting?

3   A.  The stakeholders that I mention before, as well as William

4   Je and head of legal.

5   Q.  And who was the head of legal?

6   A.  Priya Patel I believe is the name.

7   Q.  What did you say about this GTV cryptocurrency settlement

8   in this meeting?

9   A.  Well, I raised the issue because I felt that, you know, by

10  promoting the coin and by talking about the coin that was being

11  indirectly involved in it.

12          MR. SCHIRICK:  Your Honor, can we have a brief sidebar

13  here again?

14          THE COURT:  Yes, you may step up.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. SCHIRICK:  Your Honor, I let two questions go

3     there where the subject of the question was a meeting at the

4     Exchange that involved the stakeholders of the Exchange

5     including the general counsel of the Exchange.  Now we're

6     clearly getting into -- I think the witness was just asked

7     about what counsel said.  In any event, we're clearly in the

8     context of what would be a privileged discussion and it's

9     inappropriate for the government to elicit testimony.

10          THE COURT:  One moment.  I just want to hear the

11    question.

12          (Record was read)

13          THE COURT:  So what is it that you expect might be

14    elicited that you object to?

15          MR. SCHIRICK:  I think eliciting any testimony about

16    this conversation where the witness, according to his own

17    words, raising a legal question, a legal issue, concern.  And I

18    expect that the next question or two or five is going to get

19    further into that.  In fact -- well, I'll leave it at that.

20          THE COURT:  I think Mr. Horton is going to tell us

21    about an exception.  Go ahead.

22          MR. HORTON:  It's the crime fraud exception is

23    relevant here.  First of all, if there was a privilege to

24    assert Himalaya Exchange, the lawyers in this meeting aren't

25    able to assert that privilege.  They don't represent the

1    Himalaya Exchange.  I don't believe they're asserting that

2    Priya Patel was representing Miles Guo. They'll free to assert

3    that, that would be relevant to the case. There's a privilege

4    to assert.  It's not their privilege to assert.  To be really

5    clear, Priya Patel is a co-conspirator.  If she speaks on

6    behalf of the instrumentality of a Rico conspiracy, it's not

7    privilege.  When she lies to Mr. Brown, it's not privileged.

8             MR. SCHIRICK:  May I just respond to that, your Honor.

9    So again we have the agent and co-conspirator exceptions here

10   swallowing the rule.  All the government appears to need to say

11   is that someone is an agent of one of the many entities or just

12   assert that a person is a co-conspirator without so much of

13   proving either of those things out.  And then not only do we

14   have testimony coming into evidence for its truth, we also have

15   privilege conversations coming in.  Now we're happy to take a

16   break and see if we can raise someone at the Exchange to see if

17   they'd like to assert privilege.  The government has not -- we

18   had no notice that this was going to happen, right.  You didn't

19   tell us beforehand that you were going to go through it. We

20   didn't have an opportunity ahead of time to get ahead of this.

21   We're dealing with it in realtime.  We can't very well say that

22   no one from the Exchange is here to assert privilege.  That is

23   the ultimate argument.

24             MR. HORTON:  Just two brief things on that, your

25   Honor.  Ms. Patel all over Mr. Brown's 3500 because this was

1    important for him as the CEO of the Exchange.  Second thing,

2    there was extensive testimony from Sam Roberts from Bitgo about

3    communications he had with Priya Patel where she was not only a

4    spokesperson for the Himalaya Exchange, she spoke extensively

5    about Miles Guo and his relationship to the Exchange.

6         MR. SCHIRICK:  I'm not sure what that has to do with

7    anything. Those were third-party conversations. We're talking

8    about privileged conversations.

9         THE COURT:  So the government is alleging that she was

10    part of the conspiracy?

11         MR. SCHIRICK:  I understand that, your Honor.  We

12    understand the Court's pretrial ruling to require that there be

13    some proof of that before the testimony comes in.  That only

14    takes care of one issue.  We're still on the privilege issue.

15         THE COURT:  I think the foundation has been laid to

16    establish the rule.

17         MR. SCHIRICK:  In a conspiracy?

18         THE COURT:  Yes.

19         MR. SCHIRICK:  I'm not sure I'm aware of what that

20    evidence is, but I think it's a separate question whether crime

21    fraud applies.  Obviously I think, my understanding at least,

22    is that it would require the Court to make a finding that at

23    the advice of counsel was used in connection with a crime, was

24    used to facilitate a crime.  And just a conversation that's

25    happening around a round table about developments with an SEC

1    settlement is far from proving that the lawyer's advice was

2    used in connection with committing a crime.

3              MR. HORTON:  Your Honor doesn't need to go there.  The

4    question can be about what happened when Mr. Brown raised the

5    issue of the GTV settlement in this meeting.  What happened is

6    not Ms. Patel gave legal advice.  She did not give legal

7    advice.  For one thing she said, he believes is a lie.  Another

8    thing, there's no world in which her response was legal advice.

9              MS. SHROFF:  He literally said he raised a legal

10   concern and he raised it with a lawyer in the meeting in her

11   capacity as a lawyer.  She's certainly not there in any other

12   capacity.

13             MR. HORTON:  I expect Mr. Brown will testify that

14   after he raised this issue, Priya Patel looked to William Je

15   and said, that's the first I'm hearing of that.  And he will

16   say that struck him as not credible even what he understood.

17             MR. SCHIRICK:  That doesn't make it not true.

18             MR. HORTON:  That's not legal advice, this is the

19   first I heard of it.

20             THE COURT:  Considering all the testimony concerning

21   Ms. Patel, I think that an accurate foundation has been laid,

22   so I'm going to permit the testimony.  I just wanted to make

23   clear that under *Guiney* I'm making a conditional finding of I'm

24   expecting the prosecution to be making a motion at the end of

25   their case.

1          (In open court; jury present)

2          THE COURT:  Overruled.  You may continue.

3  BY MR. HORTON:

4  Q.  Mr. Brown, who were the stakeholders in the Himalaya

5  Exchange meeting when you raised the GTV settlement about

6  cryptocurrency?

7  A.  That would have been the chief security officer, the chief

8  operations officer, the chief financial officer, the chief

9  marketing officer, William Je, legal and internal audit.

10  Q.  And, sorry, you mentioned Priya Patel before the sidebar?

11  A.  Yes.

12  Q.  Who is that?

13  A.  She was the head of legal.

14  Q.  And as you observed it, what was her role at the Exchange?

15  What did she do?

16  A.  She basically made all the decisions at the end, all the

17  commercial decisions.

18  Q.  And who did Ms. Patel report to?

19  A.  William Je.

20  Q.  What happened when you raised the SEC settlement with GTV

21  about cryptocurrency in this meeting with the Exchange?

22  A.  There was somewhat of an awkward silence.  I observed Priya

23  looking at William and then she basically turned to me and

24  stated that was the first she had heard of it.

25  Q.  Had you previously heard Ms. Patel talk about Miles Guo?

1    A.  I don't recall.

2    Q.  How did it strike you when Ms. Patel said that was the

3    first she heard of it?

4    A.  Between the awkwardness, the sheepness, I found it somewhat

5    untruthful.

6    Q.  Why did you find it some what untruthful when Ms. Patel

7    said she hadn't heard about this SEC settlement before?

8            MR. SCHIRICK:  Objection to relevance, your Honor.

9            THE COURT:  You may answer.

10   A.  I just felt that she was a competent lawyer.  She would

11   have done due diligence and understood it.

12   Q.  Mr. Brown, why would someone from the Himalaya Exchange

13   know about the SEC settlement with GTV from the cryptocurrency?

14           MR. SCHIRICK:  Objection, hypothetical.

15           THE COURT:  Sustained.

16   Q.  Mr. Brown, was it your expectation that Ms. Patel would

17   know what you were talking about?

18   A.  It was.

19   Q.  Why did you expect that the head of legal at the Himalaya

20   Exchange would know about the SEC settlement with GTV on

21   cryptocurrency?

22   A.  Because she spoke to William all the time and understood

23   all of the dynamics of the relationship between William and

24   Miles.

25           MR. SCHIRICK:  Objection to testifying about what

1   Ms. Patel understood.

2            THE COURT:  He cannot speak to what was on her mind.

3   So that portion about what she understood is stricken.

4   Q.  Mr. Brown, why did you expect -- withdrawn.

5            Did you ask William any questions about the

6   settlement?

7   A.  I did not.

8   Q.  Why not?

9   A.  We quickly moved on after that with our regular agenda.

10  Q.  Mr. Brown, you said earlier that Miles Guo promoted H Coin

11  on social media, did you personally observe any of that?

12  A.  I heard the I-tune song.

13  Q.  I'm going to show you a document that's in evidence as

14  GXC-405.  Ms. Loftus, can you please put that up.  If you could

15  scroll to the top.

16           Mr. Brown, what is this?

17  A.  It looks like an article from G News.

18  Q.  And what was G News?

19  A.  I believe it was one of the entities in Guo Media.

20  Q.  Ms. Loftus, if you could scroll down.

21           Mr. Brown, what you do understand this document shows?

22  A.  There was a live broadcast and it's reporting highlights

23  from September 29.

24  Q.  Ms. Loftus, can you please scroll down about just under

25  halfway down the page.  There's a paragraph caption, What's the

1  Best Way to keep the Chinese People's Money Safe.  When you get

2  there, can you enlarge that paragraph.

3           Mr. Brown, do you see this paragraph, it's entitled

4  What's the Best Way to Keep the chinese People's Money Safe

5  Without Devaluation?

6  A.  I do.

7  Q.  Ms. Loftus, in the middle of this paragraph there's a

8  sentence that starts, the Safest Virtual Coin.  If you could

9  highlight that, please.

10           Mr. Brown, could you read this statement?

11  A.  Yes.  The safest virtual coin at the moment is Himalaya

12  Coin because 20 percent of the value is anchored in gold.

13  Q.  Ms. Loftus, can you go to the top and show the date of this

14  interview.

15           Were you the CEO of the Himalaya Exchange on September

16  29, 2021?

17  A.  I was.

18  Q.  Was it true, Mr. Brown, that 20 percent of the value of

19  H Coin was anchored to gold?

20  A.  No, it wasn't.

21  Q.  How much of the value of H Coin was anchored to gold?

22  A.  None to my knowledge.

23  Q.  How much of the Himalaya Dollar Reserve was in gold?

24  A.  Zero.

25  Q.  As CEO of the Exchange, did you have any role on what Miles

1    Guo said?

2    A.   I did not.

3    Q.   Did you ever tell Miles Guo not to make statements like

4    this?

5    A.   I did not.

6    Q.   Why not?

7    A.   I never spoke to Miles Guo.

8    Q.   And as CEO of the Himalaya Exchange, Mr. Brown, were you

9    told to sign documents?

10   A.   Yes.

11   Q.   Who told you to sign documents?

12   A.   I was requested to sign documents often by the chief

13   financial officer and also the compliance officer at the time.

14   Q.   And what kinds of documents would these executives at the

15   Exchange tell you to sign?

16   A.   Mostly they were bank applications because getting banking

17   was very difficult for crypto companies at this time, and then

18   also I would sign other things around audits and other things

19   representing the Exchange.

20   Q.   What was your understanding of why you were being asked to

21   sign documents that were going to banks and auditors?

22   A.   Could you repeat that.

23   Q.   What was your understanding, Mr. Brown, of why you were

24   being told to sign documents that were going to banks and

25   auditors?

O6L1GUO2                          Brown - Direct

1    A.  Cause I was the CEO.

2    Q.  Did you read these documents when you were asked to sign

3    them?

4    A.  Yes.

5    Q.  How carefully did you read them?

6    A.  Not that carefully.

7    Q.  Why is that?

8    A.  I'm a quick scan reader.

9    Q.  When, if ever, did you ask a document to be changed before

10   you signed it?

11   A.  I don't recall ever asking.

12   Q.  And why is that?

13   A.  They were just typical CEO things I thought needed to be

14   signed and pushed through.

15   Q.  Ms. Loftus, can you please pull up what's in evidence as

16   GXBR-208-A.  It's the first page.  Can you show the second

17   page, Ms. Loftus.  You can zoom in on the text above Jesse

18   Brown's CEO signature line to the top of the page, please.

19           Did you sign this document, Mr. Brown?

20   A.  Yes.

21   Q.  It says U.S. dollars held in Himalaya own bank accounts.

22   How much money does it report were being held in the Himalaya

23   own bank accounts?

24   A.  That would be almost over a little over $401 million.

25   Q.  When you signed this as CEO, did you know if this was true?

1   A.  I did not.

2   Q.  What did you know at that time about how much money the

3   Exchange had?

4   A.  I had no knowledge on any money that the Exchange had.

5   Q.  Before you signed this, did you ask anyone to verify if it

6   was true?

7   A.  I don't recall.

8   Q.  The lines below this refer to collateralized HDO credits on

9   Himalaya ecosystem platforms and collateralized HDO tokens on

10  the ethereum blockchain.

11          What's the number on the line item for collateralize

12  HDO tokens on the blockchain?

13  A.  That would be zero.

14  Q.  Where it says collateralized HDO credits on Himalaya

15  ecosystem platform, what does Himalaya ecosystem platforms

16  refer to?

17  A.  That would be all the entities on the platform.

18  Q.  And what is the purpose, as you understood it of this

19  document that refers to collateralize HDO credits, what did

20  collateralize mean in this context?

21  A.  I believe the coin would be collateralized against that

22  amount.

23  Q.  How, if at all, does this document relate to the HDO

24  reserve?

25  A.  As I stated before in my testimony, with a stable coin each

1  coin has to be backed by a dollar, and that's what this would

2  have represented.

3  Q.  What, if anything, does this document say about how much

4  gold was used to collateralize H Dollar?

5  A.  There's no gold mentioned in this document.

6  Q.  When you worked at the Himalaya Exchange, Mr. Brown, did

7  there come a time you learned about a seizure of funds?

8  A.  Yes.

9  Q.  And what was the seizure you learned about?

10  A.  We had funds in I believe it was a bank in Puerto Rico that

11  were frozen by the U.S. government.

12  Q.  How did you find out that the government had frozen the

13  Himalaya Exchange funds?

14  A.  I heard about it in an emergency meeting.

15  Q.  And what did you hear in that emergency meeting at the

16  Exchange after the seizure?

17  A.  I heard that the funds were frozen, and we were going to be

18  unable to provide redemptions.

19  Q.  What were redemptions?

20  A.  Redemptions are when Himalaya Exchange users would cash in

21  their credits and receive fiat for that amount.

22          THE COURT:  What do you mean by fiat?

23          THE WITNESS:  U.S. dollar.

24  Q.  What would it mean for a customer to not be able to make a

25  redemption at the Himalaya Exchange?

O6L1GUO2                        Brown - Direct

1   A.   It would mean that their money was trapped in the Exchange

2   and they couldn't take it out and deposit it into their own

3   accounts.

4   Q.   And were you CEO at the time you learned about the

5   seizures?

6   A.   I was.

7   Q.   What was your understanding of why the Exchange stopped

8   redemptions at that time?

9   A.   Because we were unable to provide any fiat or any U.S.

10  dollar to satisfy the redemption.

11  Q.   Mr. Brown, what effect, if any, was there on the money in

12  the H Dollar reserve after the seizures?

13  A.   There was no reserve to my knowledge.

14  Q.   What, if anything, would that mean about the status of

15  H Dollar?

16  A.   It would mean it's no longer backed and worthless.

17  Q.   What did the Exchange tell its customers about this?

18  A.   There was a big customer service push to mention that we

19  were having problems with banking at the time and that we were

20  hoping to resolve them in the immediate future and to please be

21  patient.

22  Q.   Did the Exchange say that H Dollar was no longer a stable

23  coin?

24  A.   They did not.

25  Q.   Was it a stable coin at this point?

1    A.  No.

2              MR. SCHIRICK:  Objection.

3              THE COURT:  Sustained.

4    Q.  Were you the CEO at the time, Mr. Brown?

5    A.  I was.

6    Q.  After the H Dollar reserve the funds were gone, was your

7    understanding that H Dollar was a stable coin?

8              MR. SCHIRICK:  Objection, misstates the record.

9              THE COURT:  Was it your understanding -- I didn't hear

10   the last part.

11   Q.  The question was as CEO at the time, after the seizure of

12   funds, was it Mr. Brown's understanding that H Dollar was still

13   a stable coin at this point?

14             THE COURT:  I'm going to sustain the objection.

15   Q.  Was there any cash left at the Exchange at this point as

16   far as you knew, Mr. Brown?

17   A.  As far as I knew we were cash strapped.

18   Q.  Was that disclose to customers?

19   A.  It was not.

20   Q.  As the CEO of the Exchange at the time, did you have an

21   expectation about how these seizures would affect the price of

22   H Coin?

23   A.  Yes.

24   Q.  And what was your expectation?

25   A.  Well, at this point there was a lot of fear in the

marketplace after what had happened to FTX and some other big

Exchanges.  So there would have been a big run, what's called a

run where everyone tries to sell at once.

Q.  Just to be clear, what was your expectation about what

would happen if anything to the price of the Himalaya

Exchanges's coins?

            MR. SCHIRICK:  Objection.

            THE COURT:  What did you fear, is that the question?

            MR. HORTON:  Yes.

            THE COURT:  Go ahead.

A.  A big price drop because that's what happens during these

times.

Q.  And what did happen to H Coin's price?

A.  Very little.

Q.  Were you able to account for that, Mr. Brown?

            MR. SCHIRICK:  Objection, calls for speculation.

            THE COURT:  You may answer.

A.  I was not.

Q.  Did you ask William Je about why the H Coin price didn't

drop after the seizure?

A.  I did not.

Q.  As a CEO at the Exchange at the time, Mr. Brown, what, if

anything, did you know about the Exchange making a $37 million

loan?

A.  I recall there was a meeting about that during one of

1    our -- during a meeting we had.  We had meetings around -- I

2    can't remember the specific term, but it was based on -- there

3    were five or six of us in a board and things came up, and we

4    determined we were going to do them collectively as a team or

5    not.  I can't remember the exact name of what that group was,

6    but there was a group that collectively made decisions that

7    William Je led.

8    Q.  And as the CEO of the Exchange at the time, did you know

9    what that $37 million expense was for?

10   A.  Yes.

11   Q.  What was it for?

12   A.  It was stated that it was for a loan.

13   Q.  Did you know what the purpose of that loan was as the CEO?

14          MR. SCHIRICK:  Objection, foundation.

15          THE COURT:  You may answer if you know.

16   A.  Yes, I believe it was for a yacht.

17   Q.  Were you asked to approve that, Mr. Brown?

18   A.  I was.

19   Q.  What, if anything, did you do to look into the

20   circumstances around the Exchange making a $37 million loan for

21   a yacht?

22   A.  It was discussed.  It was discussed internally.  There were

23   some objections made, but ultimately it was voted to go ahead

24   and make the loan.

25   Q.  And what understanding, if any, did you have at the time as

1  CEO about why the Himalaya Exchange was loaning $37 million for

2  a yacht?

3  A.  It seemed like a personal loan to me.

4  Q.  Did you take any steps to stop it from going through?

5  A.  Marios and myself objected and talked through it and then

6  begrudgingly agreed to it.

7  Q.  Who is Marios?

8  A.  Marios was the COO.

9  Q.  When you say it seem like a personal loan, personal loan

10  for who?

11         MR. SCHIRICK:  Objection to seem like. It's

12  speculation.

13         THE COURT:  Sustained.

14  Q.  Why did it appear to you to be a personal loan?

15         MR. SCHIRICK:  Same objection.

16         THE COURT:  Sustained.

17  Q.  Why was your understanding that it was a personal loan?

18         MR. SCHIRICK:  Same objection.

19         THE COURT:  Sustained.

20  Q.  I'll move on.  In your two and a half years at the Exchange

21  before that, had the Exchange made a loan for a yacht?

22  A.  No.

23  Q.  Who was this loan for if you knew?

24         MR. SCHIRICK:  Objection.

25         THE COURT:  You may answer that, yeah.

1   A.  William stated it was for Miles Guo's daughter.

2   Q.  And what understanding, if any, did you have about why the

3   Himalaya Exchange was making a loan for Miles Guo's daughter?

4           MR. SCHIRICK:  Objection, relevance.

5           THE COURT:  You may answer.

6   A.  I didn't really have an understanding why.

7   Q.  What happened with this $37 million loan for Miles Guo's

8   daughter after you and the COO objected?

9   A.  It ultimately passed.

10  Q.  Mr. Brown, did there come a time that your title changed

11  again from CEO to something else?

12  A.  It did.

13  Q.  What did it change to?

14  A.  I was promoted to president.

15  Q.  And how, if at all, did your job change when you became

16  president of the Exchange?

17  A.  It didn't really change at all.

18  Q.  How did you find out that you were becoming president of

19  the Exchange?

20  A.  I believe it was in another meeting, a group meeting.

21  Q.  And who told you that you were no longer the CEO?

22  A.  Well, I had gotten a few messages from colleagues who asked

23  me if I was fired originally.

24  Q.  Before you got those messages asking you if you were fired,

25  what, if anything, did you know about your job title at the

1    Exchange?

2    A.  I didn't know it had changed.

3    Q.  Who replaced you if anybody as CEO?

4    A.  There was a gentleman.  His name was Kevin and he replaced

5    me.

6    Q.  And as far as you understood who picked Kevin to replace

7    you as the Himalaya Exchange CEO?

8            MR. SCHIRICK:  Objection.

9            THE COURT:  You may answer.

10   A.  It was well-known that he was placed there.  Miles Guo

11   placed him there.

12   Q.  How did you learn that Miles Guo had placed Kevin at the

13   Exchange?

14   A.  Kevin told me.

15           MR. HORTON:  If I could have just a moment, your

16   Honor.

17   Q.  Going back to a minute for your interview with Yvette Wang,

18   were you asked by Ms. Wang about your views of the Chinese

19   Communist Party?

20   A.  I was not.

21   Q.  Do you have a view of the Chinese Communist Party?

22   A.  I do not.

23           MR. SCHIRICK:  Objection.

24           THE COURT:  Sustained.

25   Q.  In your two and a half years at the Himalaya Exchange,

1    Mr. Brown, did you understand it to be a political

2    organization?

3    A.  I did not.

4              MR. HORTON:  No further questions, your Honor.

5              THE COURT:  Cross examination.

6              MR. SCHIRICK:  Thank you, your Honor.

7    CROSS-EXAMINATION

8    BY MR. SCHIRICK:

9    Q.  Good afternoon, Mr. Brown.

10   A.  Good afternoon.

11   Q.  I'd like to take us back to the beginning here if it's okay

12   with you and just talk about how you got your start in crypto.

13             You first started working in the blockchain in crypto

14   industry in 2016 or thereabout?

15   A.  Yes, late 2016.

16   Q.  And do you sort of consider yourself self-taught?

17   A.  That's a fair statement.

18   Q.  And we'll get to your work at the Himalaya Exchange in a

19   moment.  You had a number of other positions in the industry

20   before the Himalaya Exchange, right?

21   A.  Yes.

22   Q.  So let's just walk through them briefly.  The first was at

23   Ford; is that correct?

24   A.  Yes, I was --

25   Q.  I'll follow-up.  Thank you.  That's the car company, right?

1    A.  Yes.

2    Q.  And you were a consultant for four to five months there?

3    A.  A little bit shorter.

4    Q.  And now you can explain if you would what you did there?

5    A.  I was Ford's first blockchain consultant.

6    Q.  And the next role you had was working with electronic

7    health records, but it was crypto-related; is that right?

8    A.  Yes.

9    Q.  And the concept was that you would own your own health

10   records, but be able to send them securely over the blockchain?

11   A.  That's correct.

12   Q.  And that was in 2017?

13   A.  Yes.

14   Q.  And you were there for less than a year or so?

15   A.  Yes.

16   Q.  And why was it only a year or so that you were there?

17   A.  I was fired.

18   Q.  And then the next venture you went to was something called

19   Data Blockchain, right?

20   A.  Yes.

21   Q.  And you worked there for a couple of years?

22   A.  Yes.

23   Q.  And what did Data Blockchain do?

24   A.  It made it easier for small companies to purchase records

25   to market to people for specific industries.  So a mom and pop

1    shop would have the same advantages of someone buying, you
2    know, a $100,000.
3    Q.  It was like an advertisement related?
4    A.  Yeah, that's fair.
5    Q.  And then a time came when you left there, right?
6    A.  Yes.
7    Q.  And why was that?
8    A.  The job ended then.  They no longer wanted to pursue
9    issuing a coin.
10   Q.  And then at some point you also -- withdrawn.
11            Following the Data Blockchain job, at some point you
12   began talking to, if I have it correct, the Government of Nevis
13   about a potential crypto project; is that right?
14   A.  That's correct.
15   Q.  And Nevis the Caribbean Island?
16   A.  That's correct.
17   Q.  And why don't you tell us about that?
18   A.  I was going to raise a token to enable the country to
19   launch a geothermal plant and build data centers there.
20   Q.  And what happened with that?
21   A.  Kind of ran out of steam with the government.  There was
22   some back and forth, but never got the financing.
23   Q.  And how long did that last?
24   A.  It was ongoing back and forth for a couple of years, but it
25   was just something that, you know, these types of things have

1    to pass through multi-layers of government.

2    Q.  Just didn't get traction?

3    A.  Yeah.

4    Q.  And your next position was at the DTCC, right?

5    A.  Yeah, that's right.

6    Q.  And the DTCC is a clearing house; is that right?

7    A.  That's right.

8    Q.  And it's a clearing house for, among other things, stock

9    transactions, transaction in equity, right?

10   A.  Yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6L1GUO4                          Brown - Cross

BY MR. SCHIRICK:

Q.  Okay.  And am I right that the DTCC is, well, probably the largest clearing entity, at least in the United States?

A.  Yes, in the world.  They settle all over a trillion dollars a day in stock transactions.

Q.  It's a massive operation.

A.  Yes.

Q.  And you were there for approximately four months, right?

A.  Yes.

Q.  And then why did you leave that job?

A.  That was a consultant role, and it ended.

Q.  Okay.  And now these roles that we just went through, you were not a coder or a programmer in these positions, right?

A.  No.

Q.  No.  And you weren't a software engineer, right?

A.  No.

Q.  Because you have no formal training in computer science, right?

A.  No.  I studied computer science in college.

Q.  Did you graduate with a degree in computer science?

A.  I did not.

Q.  Okay.  And even today, you don't really do coding on crypto projects, right?  Your role is a little different.

A.  I——I do——I don't code in Solidity, but I——I can architect, I read it, I understand it.

1    Q.  Sure.

2    A.  But yeah, I don't—I don't create production code.

3    Q.  Okay.  So code not really your thing, right?  Not your

4    strength.

5    A.  No, not my strength.

6    Q.  As you said before, you're more of a designer or sort of

7    architect for—

8    A.  Architect, yeah.

9    Q.  —crypto projects.  Okay.  And fair enough.

10         So let's just talk—I mean, for some of us who are not

11   as initiated in crypto and blockchain as you are, if we can,

12   for a second, about some of the jargon in—

13   A.  Okay.

14   Q.  —crypto and blockchain, all right?

15   A.  Yeah.

16   Q.  Now so just, what is a blockchain?

17   A.  It's a public ledger.  It's called a distributed ledger

18   technology.

19   Q.  Okay.  And it allows you to record transactions that occur

20   on that chain, right?

21   A.  Yes.

22   Q.  Okay.  And on a public blockchain, those transactions are

23   visible.

24   A.  That's correct.

25   Q.  All right.  But there are also transactions that can occur

1    on a public blockchain but that are off-chain, right?

2    A.  Not to my knowledge.

3    Q.  So just to be clear, is it possible to have transactions in

4    cryptocurrency that occur——

5         MR. HORTON:  Objection.  Calls for speculation.  He

6    asked if it's possible.

7         MR. SCHIRICK:  Your Honor, we had extensive testimony

8    about this on direct.

9         THE COURT:  You may answer.

10   Q.  So it's true, isn't it, that you can have transactions that

11   occur in cryptocurrency that are off blockchain, right?

12   A.  No, that's incorrect.

13   Q.  Okay.  Now if you have——well, let's put it this way:  Is

14   there such thing as a private blockchain?

15   A.  Yes.

16   Q.  Okay.  And you testified about that, right?

17   A.  Yes.

18   Q.  And for example, you worked with a blockchain project that

19   was in the health care industry?

20   A.  Yes.

21   Q.  Is that an example of one where it would be a private

22   blockchain?

23   A.  It would be.

24   Q.  Okay.  So it's not open to the public; it can't be seen by

25   anyone; you have to be invited to enter as a participant on the

1    blockchain in order to see what's happening.

2    A.  Yes.

3    Q.  Okay.  And are you familiar with JPM Coin?

4    A.  Is that JPMorgan you're referring to?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And is that another example of a private blockchain, or

8    token that trades on a private blockchain?

9    A.  I believe so.

10   Q.  Okay.  Now these private blockchains, the transactions

11   still occur on the chain even though not everybody can see them

12   from outside, right?

13   A.  Correct.  There's privacy involved.

14   Q.  Okay.  And those tokens that trade are still

15   cryptocurrencies, right?

16   A.  Correct.

17   Q.  Now do you know what I mean if I say a centralized

18   cryptocurrency exchange?

19   A.  I do.

20   Q.  Okay.  And what is that?  Just explain that.

21   A.  A centralized cryptocurrency exchange is where the exchange

22   holds the users' keys, and a key is to a wallet, so essentially

23   they hold the crypto for them.

24   Q.  Okay.  So all of the exchange's—withdrawn.

25           All of the customers' crypto is held in the exchange's

1   wallets, right?

2   A.  Yes, that's true.

3   Q.  Okay.  And now is it typical for centralized exchanges to

4   have off-chain transactions?

5   A.  No.

6   Q.  So let's talk about—are you familiar with Coinbase?

7   A.  I am.

8   Q.  Okay.  So when Coinbase facilitates a trade between two

9   customers, are all of those transactions recorded on a

10  blockchain, as you understand it?

11  A.  Yes, they would be.

12  Q.  All of the transactions recorded on the blockchain?

13  A.  Yes.

14          MR. HORTON:  Objection.  Asked and answered.

15  Q.  So to your understanding, centralized exchanges don't use

16  internal mechanisms to match orders, correct?

17          MR. HORTON:  Objection.  Asked and answered.

18          MR. SCHIRICK:  That's a different question.

19          THE COURT:  Sustained.

20  Q.  Okay.  Now are there reasons why an exchange and users may

21  want transactions to happen off a chain?

22          MR. HORTON:  Objection.  Calls for speculation.  Your

23  Honor—

24          THE COURT:  You may answer.

25  A.  Could you repeat, counsel.

O6L1GUO4                          Brown - Cross

1    Q.  Sure.  Are there reasons why users may want transactions in

2    cryptocurrency to happen off-chain?

3    A.  I couldn't——I couldn't think of any.

4    Q.  Okay.  Maybe I'll suggest some to you and you can let me

5    know if they make sense.

6            Do off-chain transactions settle more quickly than

7    on-chain transactions, typically?

8    A.  Depends on the network congestion at the time.

9    Q.  Sure.  But with Ethereum, for example.  Ethereum can be

10   slipped sometimes, right?  That's just a——

11   A.  Well, the most recent upgrade has eliminated most of that.

12   Q.  Let me just——

13           MR. HORTON:  Objection.  He's got to let the witness

14   answer the question.

15           MR. SCHIRICK:  I hadn't finished my question.

16           THE COURT:  You have to let him answer before the next

17   question.

18           MR. SCHIRICK:  I believe the witness started talking

19   before I ended my question; that's all.  But it's fine.  We can

20   move on.

21           Mr. Brown, we just have to wait for each other to

22   finish.

23           THE WITNESS:  Sorry, counsel.

24           MR. SCHIRICK:  No problem.  I apologize too.

25   BY MR. SCHIRICK:

1    Q.  So my question again was:  Is one reason that off-chain

2    transactions might be preferable is because they settle more

3    quickly?

4    A.  I guess you could make that case.

5          THE COURT:  So I don't want you to guess.  If you

6    know, you can say yes or no or you can say "I don't know" or "I

7    don't remember," something like that.

8          THE WITNESS:  All right.

9    Q.  It's a possibility, right?

10         THE COURT:  No, I'm not asking him to speculate.

11    Don't speculate.

12    A.  Can you repeat the question again, please.

13    Q.  Sure.  Is one reason that participants in a transaction may

14    want to settle off-chain, they want to conduct transactions off

15    a chain in crypto because it settles faster?

16         MR. HORTON:  Object to the form of the question, your

17    Honor.

18         THE COURT:  I'll allow the question.

19    A.  I don't agree with that.  Even——even something, what you're

20    referring——

21    Q.  Okay.

22    A.  Okay.  I don't agree.  I don't agree.

23    Q.  Are you familiar with something called gas?

24    A.  Yes.

25    Q.  Okay.  And is gas the fee that one has to pay in order to

1   use a public blockchain?

2   A.   No.  Gas is the fee for the Ethereum public blockchain.

3   Q.   Okay.  Fine.  So is one reason that people may want to have

4   off-chain transactions because they are less expensive to

5   settle because you don't have to pay gas?

6            MR. HORTON:  Objection.  Calls for speculation.

7            MR. SCHIRICK:  It's his understanding, your Honor.

8            THE COURT:  I'll allow the question.

9   A.   That's true.

10  Q.   Okay.  Now in fact, a significant amount of cryptocurrency

11  transactions today happen on centralized exchanges, right?

12  A.   Right.

13  Q.   Okay.  And viewed from the outside, is it your

14  understanding that centralized exchanges have a number of

15  wallets in which they hold customers' crypto?

16  A.   Yes.

17  Q.   And that they don't necessarily have a separate wallet for

18  every customer, right?

19  A.   Yes.

20  Q.   Right.  The customer may have their——I see your hesitation

21  so let's get there.  So the customer may have his or her, its

22  own wallet, right?

23  A.   Yes.

24  Q.   But the exchange itself has its wallets, and for tokens

25  that it custodies, the exchange custodies, they hold them in

O6L1GUO4                          Brown - Cross

1    those wallets, right?

2              MR. HORTON:  Objection to the testifying, your Honor.

3              THE COURT:  I'll allow the question.

4    A.  Correct.

5    Q.  Okay.  And so when there is a transaction, say, between two

6    users on Coinbase, it's true, isn't it, that those tokens that

7    the users want to exchange may reside in the same exchange

8    wallet?

9    A.  Yes.

10   Q.  Okay.  In that scenario, were those two customers to engage

11   in a transaction, you could not see that transaction happen

12   from the outside, right?

13   A.  That is not true.

14   Q.  You could see into the exchange's wallet, is your

15   testimony?

16             THE COURT:  Sustained.  Asked and answered.

17             MR. SCHIRICK:  Okay, your Honor.

18   Q.  Can you tell me how one can see inside Coinbase's wallets.

19   A.  Any transaction made on Ethereum blockchain, whether it's

20   what you're referring to, Coinbase or any level two, is still

21   broadcast on the public blockchain.

22   Q.  Now remember, I just want to make sure that we're clear.

23   The question that I asked you before was whether, if two users

24   whose tokens are held in a single wallet, single exchange

25   wallet, want to engage in a transaction.  That's what I'm

O6L1GUO4                    Brown - Cross

1    talking about.  Does that make sense?

2    A.  Can you repeat it again.

3    Q.  Yes, sir.  So if you have two users on an exchange, on a

4    centralized exchange, and the exchange's wallet holds both

5    users' tokens, and those users engage in a transaction—are you

6    with me so far?  Does that make sense?

7    A.  Yes.

8    Q.  Okay.  You cannot see into that wallet when that

9    transaction happens, right?  You cannot see into the exchange's

10   wallet.

11             MR. HORTON:  Objection.  Asked and answered.

12             MR. SCHIRICK:  He asked me to clarify, your Honor.

13   I'm just trying to clarify.

14             THE COURT:  You may answer.

15   A.  It sounds true.

16   Q.  Right.  So if you have transactions that are happening on a

17   centralized exchange, it is the case that sometimes you can't

18   see those transactions because they happen inside a wallet, not

19   across the blockchain.

20   A.  Fair enough.

21   Q.  Okay.  All right.  Thank you.

22             Now let's just go back to your work history here for a

23   second and talk about the Himalaya Exchange.

24             So I believe you testified on direct that you started

25   work in June 2020; is that right?

O6L1GUO4                        Brown - Cross

1    A.  Yes.

2    Q.  Okay.  And this was during the pandemic, as everybody

3    knows.  Right?

4    A.  Yes.

5    Q.  And you were at home, stuck at home like the rest of us?

6    A.  I was.

7    Q.  Okay.  And now at that time the crypto and blockchain

8    sectors were pretty hot, is that fair to say?  Popular?

9    A.  Yeah, that's fair to say.

10   Q.  Enjoying some media and press, fair to say?

11   A.  Yeah, at that point.

12   Q.  Yeah.  Okay.  And is it also fair to say that you felt like

13   you had a lot of potential job opportunities around that time?

14   A.  Yeah, that's a fair point.

15   Q.  Right.  And I mean, do you recall telling the government

16   when you met with them that your phone was ringing off the hook

17   around this point in time?

18   A.  My phone rings off the hook.

19   Q.  At this point in time.  I have no doubt.

20   A.  All the time.

21   Q.  But at this point in time.  At this point in time, just to

22   be clear.

23   A.  Yes.

24   Q.  Okay.  And then you had, you testified on direct, a first

25   interview with someone named Yvette Wang, right?

1    A.  Yes.

2    Q.  Okay.  And fair to say this was sort of an initial

3    interview with Ms. Wang?

4    A.  It was.

5    Q.  And did you get the sense that Ms. Wang knew anything about

6    blockchain or crypto?

7            MR. HORTON:  Objection.

8            MR. SCHIRICK:  Asking his impression.

9            THE COURT:  You can answer that question, yeah.

10   A.  I didn't get the impression she knew a lot about blockchain

11   or crypto.

12   Q.  Okay.  It was just sort of a general interview, right?

13   A.  Yes.

14   Q.  And it was relatively short?

15   A.  It was probably half an hour.  There was another gentleman

16   involved in that interview too.

17   Q.  Sure.  And was that one call that you had with Ms. Wang and

18   the other gentleman or were there two?

19   A.  They were both on the same call.

20   Q.  And it was a single call.

21   A.  Yes.

22   Q.  Okay.  Thanks.  Thanks for that.

23           And the person who was on that call was the chief

24   technology officer of GTV?

25   A.  Yes.

1  Q.  Okay.  And did that person ask you some questions about

2  blockchain?

3  A.  He did.

4  Q.  Okay.  Now following that call you had, I believe you

5  testified on direct, an interview with Mr. Je, right?

6  A.  Yes.

7  Q.  Okay.  And now there were two interviews with Mr. Je,

8  right?

9  A.  Yes.

10 Q.  Okay.

11 A.  Yes, I believe.

12 Q.  Right.  And the first interview happened fairly shortly

13 after the first interview with Ms. Wang, right?

14 A.  Yes.

15 Q.  Okay.  And you took those interviews via video call, I

16 believe you testified.

17 A.  Yes.

18 Q.  Okay.  And the scope of the job, as you understood it, was

19 that you were interviewing for blockchain architect?

20 A.  Yes.

21 Q.  And the role wasn't for a CEO role.

22 A.  It was not.

23 Q.  Right.  Okay.  And now can you just tell us a little bit

24 about what you discussed with Mr. Je during that first call.

25 A.  I went over my job history and kind of dug into the

1    DTT——DTCC component of it.

2    Q.  Okay.  And did he seem particularly interested in your work

3    at the DTCC?

4    A.  He did.

5    Q.  Okay.  And you spoke in depth with him about blockchain and

6    finance?

7    A.  Yes.  I crushed the interview.

8    Q.  As history shows.

9            And you had the impression that William Je had a lot

10   of experience in finance, right?

11   A.  Tremendous amount.

12   Q.  Right.  And you found him pretty impressive, I think you

13   said, right?

14   A.  Very impressive.

15   Q.  And knowledgeable, right?

16   A.  Very knowledgeable.

17   Q.  Okay.  Now you didn't talk to William Je during the first

18   interview about GTV, did you?

19   A.  I did not.

20   Q.  Right.  That didn't come up, right?

21   A.  I don't recall it coming up.

22   Q.  Yeah.  You were talking about the idea of an exchange.

23   A.  I was pitching the chain.

24   Q.  Sure.  A crypto chain?

25   A.  Yeah.

1  Q.  And the tokens, right?

2  A.  Yeah.

3  Q.  Okay.  And one of the tokens that you talked about was I

4  think what we've been referring to here today as a stablecoin,

5  right?

6  A.  Yes.

7  Q.  All right.  And that's basically sort of like a crypto

8  dollar; is that a fair——

9  A.  That's a good analogy.

10  Q.  ——analogy?  Okay.  And the idea was for that crypto dollar

11  to be backed by cash, right?

12  A.  Yes.

13  Q.  Okay.  And eventually——and we'll get to this later,

14  but——eventually that becomes HDO, right?

15  A.  Yes.

16  Q.  Okay.  And then the second token that you talked to him

17  about was what people referred to as a trading coin.

18  A.  Yes.

19  Q.  All right.  And that is what eventually becomes HCN, right?

20  A.  Correct.

21  Q.  Okay.  And did you talk to Mr. Je about a longer-term

22  vision for the exchange too during these interviews?

23  A.  I didn't.

24  Q.  Yeah.  And what was his longer-term vision, to your

25  understanding?

1    A.  His envision was to be the biggest exchange in the world.

2    Q.  Okay.  And was he also trying to, as you understood it,

3    create an ecosystem, so to speak?

4    A.  Yes.

5    Q.  Okay.  And to recruit merchants who would accept these

6    coins for payment for various goods and services, right?

7    A.  That is correct.

8    Q.  Okay.  And did that strike you as a pretty grand vision at

9    the time?

10   A.  Yeah, I thought it was cool.

11   Q.  Okay.  Now is it fair to say these two interviews with

12   Mr. Je had a lot more substance to them than the initial

13   interview with Ms. Wang?

14   A.  Yes.

15   Q.  Okay.  And you felt like the interviews with Mr. Je were

16   sort of the ones that counted, right?

17   A.  I felt they all counted.

18   Q.  Okay.  Did you feel like you had to impress Mr. Je?

19   A.  Yeah, you have to impress anyone when you're trying to get

20   a job.

21   Q.  And you said before you crushed it, right?

22   A.  Killed it.

23   Q.  Yeah, killed it.  Killed it.  So you felt like you were out

24   to impress him; fair to say?

25   A.  Just——

1           MR. HORTON:  Asked and answered.

2   A.  Just doing what I do.

3   Q.  We get it.  We get it.

4           Now did you have the impression that Mr. Je was the

5   decision-maker as to who to hire?

6   A.  I did.

7   Q.  Yeah.  And do you know if he was interviewing any other

8   candidates?

9           MR. HORTON:  Objection.

10          MR. SCHIRICK:  To his knowledge.

11          THE COURT:  You may answer.

12  A.  None that I was aware of.

13          MR. SCHIRICK:  Okay.  So if we could just briefly

14  please pull up the government exhibit that's in evidence, 3419.

15  Q.  And you see this document, Mr. Brown?

16  A.  I do, counsel.

17  Q.  And you were shown this on direct, right?

18  A.  Could you repeat that.

19  Q.  You were shown this document on your direct testimony——

20  A.  Yes, yes.

21  Q.  ——right?  Okay.  And this was the offer letter that came

22  from GTV, right?

23  A.  Right.

24  Q.  Okay.  Now before you accepted the job, did you look up

25  Mr. Guo?

O6L1GUO4                          Brown - Cross

1    A.  I don't believe I did.

2    Q.  Okay.  So at the time you had no idea what Guo Media was,

3    right?

4    A.  Well, can I retract that.  I did do a little bit of

5    research, yeah, typical quick scan.

6    Q.  Okay.  And you believed that these companies——that GTV was

7    associated with Mr. Guo, right?

8    A.  Right.

9    Q.  Okay.  Now I believe you testified that you saw your job as

10   part of the same job——withdrawn.

11            ——that you saw your job at the Himalaya Exchange as

12   part of the same job as the GTV job, right?

13   A.  Well, I was hired by GTV.

14   Q.  Right.  Did you ever talk to Yvette Wang again?

15   A.  I did one other time.

16   Q.  And what was the purpose of that?

17   A.  She was calling to push along our development.  They were

18   getting very frustrated that we weren't delivering on time, as

19   I stated previously in my testimony.

20   Q.  Okay.  So that call had nothing to do with GTV, right?

21            MR. HORTON:  Objection.

22            THE COURT:  Sustained.

23   Q.  Okay.  What is Guo Media?  I'm sorry.  Let me take that

24   back.

25            At this point in time, in June of 2020, what's your

O6L1GUO4                         Brown - Cross

1   understanding of what Guo Media is?

2   A.  Just a large group of——of social media companies and of

3   publications, a lot of it politically driven.

4   Q.  You understood that in June of 2020?

5   A.  Yeah, I think so.

6   Q.  And then how was Guo Media different from GTV, again, as

7   you understood it in June of 2020?

8   A.  I didn't know.  I don't know that.

9   Q.  You don't know.

10  A.  No.

11  Q.  Can you name an employee of Guo Media?

12  A.  The first interviewer that I had, yeah.

13  Q.  Besides——do you know that she was employed by Guo Media?

14  A.  Or the——the technology——the head of tech, yeah.

15  Q.  Okay.  So besides the two people that you spoke to, can you

16  name another employee of Guo Media?

17  A.  I cannot.

18  Q.  Can you name another employee of GTV?

19  A.  I can't name them, but I've——I've been on a couple of video

20  calls with them later on.

21  Q.  Okay.  So just to be clear, your service for the Himalaya

22  Exchange was different than, and separate from, Guo News and

23  Guo Media, right?

24          MR. HORTON:  Objection.  It's a compound question.

25          MR. SCHIRICK:  I'll take it piece by piece.

O6L1GUO4                          Brown - Cross

1               THE COURT:  Okay.

2   Q.  So just to be clear, your work for the Himalaya Exchange

3   was separate from GTV, right?

4   A.  I wouldn't say that.  At the beginning, I was employed by

5   GTV.  I talked to their——to their PR person——I mean, their

6   human resource person.

7   Q.  Mr. ——

8   A.  Quite a bit.

9   Q.  I just want you to listen to my question, okay?

10  A.  Okay.

11  Q.  Apart from interviewing with people who you believed to

12  work at GTV, okay, did you ever work with anyone else at GTV?

13              MR. HORTON:  Asked and answered.

14              THE COURT:  You may answer.

15  A.  I did.  I worked with human resource.

16  Q.  In connection with your——

17  A.  With GTV.

18  Q.  Let me finish.  This is the part where we have to let each

19  other finish, okay?

20  A.  Sorry, counsel.

21  Q.  So you worked with human resources to get set up to be paid

22  by GTV?

23  A.  That's correct.

24  Q.  Okay.  Other than that, did you work with GTV at all?

25  A.  No.

1    Q.   Okay.  Same question for Guo Media.  Other than initial

2    administrative setup stuff, did you do any work with Guo Media?

3    A.   I did not.

4    Q.   Okay.  So now we get to the question.  Your work at the

5    Himalaya Exchange was separate from GTV, right?

6    A.   Correct.

7    Q.   And it was separate from Guo Media, whatever that is,

8    right?

9    A.   Yes.

10   Q.   Okay.  Now you testified on direct, I believe, that you

11   never met your——met in person, I should say——your work

12   colleagues from Himalaya; is that right?

13   A.   Right.

14   Q.   Okay.  Now isn't it true that at the time Himalaya was a

15   startup company?

16   A.   That's right.

17   Q.   Okay.  And it had employees at that point in time——again,

18   we're just focusing on, you know, June 2020——it had employees

19   who were all over the world, right?

20   A.   Well, in June of 2020, there were only three of us, but

21   yes, they were all scattered over the world.

22   Q.   Scattered over the world, right?  And as we covered before,

23   this was during COVID, right?

24   A.   That's right.

25   Q.   Okay.  And the folks who were scattered over the world,

1    just to cover off the geography, some were in the UK, right?

2    A.  Right.

3    Q.  Some were in Australia?

4    A.  Yes.

5    Q.  Is that fair?

6    A.  Fair.

7    Q.  You were in the U.S.?

8    A.  Yes.

9    Q.  And some were other places, right?

10   A.  Yes.

11   Q.  Okay.  So for the period when COVID was still with us,

12   people didn't travel all that much, right?

13   A.  No.

14   Q.  Right.  And, you know, you didn't think that these people

15   that you worked with for two and a half years were, like, not

16   real people, right?

17   A.  No, they were real people.

18   Q.  They were real people, right?  Doing real work.

19   A.  Yes.

20   Q.  Okay.  So just to be clear, just because you didn't meet

21   them in person, that didn't mean that they weren't real people

22   doing real work, right?

23   A.  That's correct.

24   Q.  Okay.  Now you also testified that GTV paid your salary, I

25   believe from June to December of 2020, right?

O6L1GUO4                        Brown - Cross

1    A.  Correct.

2    Q.  Okay.  And then shortly after that you started to be paid

3    by Himalaya, right?

4    A.  After I was kicked to the curb by GTV.

5    Q.  Well, we'll get to that.  And let's just keep it to the

6    facts, right?

7            The question was:  After you left GTV, you were being

8    paid by Himalaya, right?

9    A.  Yes.

10   Q.  Okay.  And do you know whether Hamilton or Himalaya

11   reimbursed GTV for its payment of your salary?

12   A.  I do not know that, counsel.

13   Q.  Okay.  Now when you started at Himalaya——just to reset now

14   and go back to that——when you started at Himalaya, again, in

15   June of 2020, you knew to report to Mr. Je, right?

16   A.  Right.

17   Q.  Okay.  That was, like, clear to you off the bat.

18   A.  Yes.

19   Q.  Okay.  And because you had initial calls with him, right?

20   A.  Yes.

21   Q.  Right.  And you had some Skype messages with him?

22   A.  Yes.

23   Q.  Okay.  And at that time, as I think you alluded to before,

24   the Himalaya also hired some other people, right?

25   A.  That's——that's correct.

O6L1GUO4                          Brown - Cross

1    Q.  And some other senior people, like you, right?

2    A.  Yes, but they weren't Himalaya employees.

3    Q.  Okay.

4    A.  Per se.

5    Q.  We'll get to that.

6            Now at the time that you started working for the

7    exchange, it wasn't called the Himalaya Exchange yet, right?

8    A.  I'm not sure that's true.  I believe it was called the

9    Himalaya Exchange by the time I had——I had left GTV and gone

10   and worked there.

11   Q.  Okay.  Do you recall telling the government in your

12   meetings with them that you had some input into naming Himalaya

13   Exchange?

14   A.  I did not have input into naming Himalaya Exchange, but the

15   coins I did.

16   Q.  How about——fair enough.

17           And who is Marios Mamzeris?

18   A.  He was the chief operating officer.

19   Q.  Okay.  And was Marios also someone who was hired around the

20   same time that you were?

21   A.  Yeah.  I was the assistant——yes.

22   Q.  Yes is fine.

23   A.  Yes.

24   Q.  Okay.  And he was a blockchain consultant, right?

25   A.  He was.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  And he eventually became, as we just covered, the chief

2   operating officer.

3   A.  That's correct.

4   Q.  And he was based in Greece, right?

5   A.  That's right.

6   Q.  Okay.  And you all worked remotely together.

7   A.  That's true.

8   Q.  Okay.  And then there was also someone——and you may need to

9   help me with this——named Di, D-I?

10  A.  Yes.  Di, Di.

11  Q.  I'm sorry.  Di.  And was that Di first or last name?

12  A.  That was his first name.

13  Q.  And what was his last name?

14  A.  I can't recall.

15  Q.  Okay.

16  A.  Unfortunately.

17  Q.  And how long did you work with Di?

18  A.  The whole duration.

19  Q.  For two and a half years.

20  A.  Yes.

21  Q.  Okay.  And he was the head of IT?

22  A.  He was.

23  Q.  Okay.  And again, he was also hired around the same time.

24  A.  I'm not sure that's true.  I believe he had been working

25  for William long before that.

1   Q.  He was brought into the project around the same time,

2   right?

3   A.  He was before me, a little before me.

4   Q.  Okay.  But——

5   A.  Yes.

6   Q.  Within a couple months of you joining, right?

7   A.  Yes.

8   Q.  Okay.  And then was there a compliance person who also

9   joined around the same time?

10  A.  The compliance person would have been a month or two later.

11  Q.  Okay.  Fair enough.  I mean, within a couple of months I

12  would consider around the same time, if that makes sense to

13  you.

14  A.  Fair.

15  Q.  Okay.  Now when you came on to join the exchange project,

16  was it your understanding that the project already had obtained

17  a license, in Australia?

18  A.  I'm not sure if it had already obtained it, but it was

19  obtained, you know, right away.

20  Q.  Sure.  So it was either obtained or in the process of

21  obtaining it.

22  A.  Correct.

23  Q.  And ultimately it did get the license in Australia.

24  A.  That's right.

25  Q.  And what was the license for?

1    A.  The license was for—for the exchange to conduct business
2    as an exchange in Australia.
3    Q.  Okay.  And as I think we covered before, there was also a
4    compliance person who was based in Australia, right?
5    A.  Yes.
6    Q.  All right.  But ultimately the exchange decided to move
7    away from the idea of operating out of Australia because of tax
8    implications; is that your understanding?
9    A.  That's correct.
10   Q.  Okay.  Now let's talk about Hamilton briefly.
11            Now you became familiar with Hamilton after starting
12   your job in June of 2020, right?
13   A.  Yes.
14   Q.  Okay.  And you understood that Hamilton was an investment
15   firm; is that fair?
16   A.  Yes, that's fair.
17   Q.  And it had a consulting wing, as people say, to it?
18   A.  Yes.
19   Q.  Okay.  And that both of those were started by Mr. Je,
20   right?
21   A.  Correct.
22   Q.  And he was the owner of both of those.
23   A.  The UBO, yes.
24   Q.  UBO.  Okay.  I wasn't going to use it, but you used it, so
25   we'll go with it.  So he was the UBO.

1          Now Hamilton had, in your understanding, at this time,
2     a pretty big office in the UK, right?
3     A.  They eventually got an office, yes.
4     Q.  Okay.  And as Hamilton grew, they started to put more
5     people in place, right?
6     A.  Right.
7     Q.  And more people in place who were working on the exchange
8     project, right?
9     A.  Yes.
10    Q.  Now I believe you testified earlier that it was hard for
11    Hamilton and Mr. Je to get people to come into the office
12    during the pandemic, right?
13    A.  To get talented people.
14    Q.  Right.  And Mr. Je wanted people in the office, right?
15    A.  Yes, that was a mandate.
16    Q.  Okay.  And as you said, as a result, in your view, you felt
17    like perhaps the exchange project didn't get some of the best
18    people they could have gotten because of that, you know,
19    requirement that people come into the office.
20    A.  True.
21    Q.  Okay.  Now again, even at this stage, in the second half of
22    2020 now, just to put down a time marker, still fair to say
23    that the exchange project is in startup mode, right?
24    A.  Yes.
25    Q.  Okay.  And there was a lot of excitement in startup mode;

O6L1GUO4                          Brown - Cross

1   folks were excited about trying to build this product, right;
2   fair to say?
3   A.  That's fair.
4   Q.  Right?  A lot of passion?
5   A.  A lot of passion.
6   Q.  Right.  And a lot to do.
7   A.  Could you repeat that.
8   Q.  And a lot to do.
9   A.  Yes.
10  Q.  Right.  But especially given the big goals that we talked
11  about before that Mr. Je had, right?
12  A.  Right.
13  Q.  And it sort of felt overwhelming sometimes, fair to say?
14  A.  I wasn't overwhelmed.
15  Q.  Okay.  Now you said that you never met Mr. Je in person on
16  direct, right?
17  A.  Correct.
18  Q.  Okay.  And again, this is during the time of COVID.  That
19  covers a fair part of the period that you worked there, right?
20  A.  Right.
21  Q.  Okay.  Now when you joined the exchange——and again, I'm
22  focusing on let's say the sort of back half of 2020 into maybe
23  early 2021——is it fair to say that your impression was that
24  there was a lot of money being spent to stand up this project?
25  A.  Yes.

1    Q.  And can you just give us some examples of that.

2    A.  Our—well, we had a huge payroll, we had huge tech bills

3    and huge cloud bills, and we were developing data centers.

4    Q.  Okay.  And you had outside vendors for various things as

5    well?

6    A.  Yes, quite a few.

7    Q.  Okay.  And I believe you told the government that you

8    thought the IT spending was in the millions of dollars, just to

9    get things stood up, right?

10   A.  It was.

11   Q.  Okay.  And at this point you understood that the money for

12   these startup costs was coming from Mr. Je, right?

13   A.  Yes.

14   Q.  And in early—I'm sorry.  Withdrawn.

15          In 2020 and early 2021, the exchange hadn't sold any

16   tokens to anybody, right, prior to April of 2021?

17   A.  Correct.

18   Q.  The exchange hadn't raised any money, as far as you knew,

19   right?

20   A.  As far as I knew.

21   Q.  Right.  And they didn't sell any HCN during that period?

22   A.  No.

23   Q.  They didn't sell any HDO during that period?

24   A.  No.

25   Q.  Okay.  So pretty clear to you that during this time the

1   money that was spent to build the exchange was not money from

2   investors.

3   A.  Yes.

4   Q.  And not money from token purchasers.

5   A.  Yes.

6   Q.  Or anyone else, as far as you knew.

7   A.  Yes.

8   Q.  Okay.  And I believe you told the government——am I

9   correct——that it was something of——

10          THE COURT:  You had testified that there were no token

11  purchases; is that correct?

12          MR. SCHIRICK:  At that point in time, your Honor.

13          THE WITNESS:  At that point in time.

14          THE COURT:  Okay.  Go ahead.

15  Q.  And it was something of a——withdrawn.

16          You and your colleagues would talk about how much

17  money was being spent on the exchange, right, to stand it up?

18          MR. HORTON:  Objection.  Hearsay.

19          THE COURT:  You may answer.

20  A.  Yeah, yeah, a few of us——a few of us talked about

21  exorbitant expenses, yes.

22  Q.  Yeah.  Okay.  So let's just briefly talk about the

23  exchange's leadership team.

24          So you have Mr. Je, right, who's the UBO?

25  A.  Yes.

1    Q.  And sort of, you know, at this point de facto head of the

2    operation, right?  Sort of like, titles aside, he's calling the

3    shots, right?

4    A.  Head honcho.

5    Q.  Yeah, sure.  Okay.  And then you have David Fallon, who is

6    the CEO at Hamilton, right?  Is that your understanding?

7    A.  Not sure about I knew CEO.  I knew he was a fund manager.

8    Q.  Okay.  Fair enough.  But he's a senior figure at Hamilton——

9    A.  Yes.

10   Q.  ——fair?  And maybe one manager under him.

11   A.  Yes.

12   Q.  And Tim Clark; who was Tim Clark?

13   A.  Yes, he was the——he was the first CTO.

14   Q.  Okay.  You weren't a fan of his, right?

15   A.  Not of his skill set.  I liked him as a person though.

16   Q.  Sure.  Okay.  But at some point——well, withdrawn.

17          At this point, at this point in time——again, focusing

18   on late 2020, early 2021——Tim is the chief technology officer,

19   right?

20   A.  That's right.

21   Q.  Okay.  And later he gets replaced by somebody else, right?

22   A.  Right.

23   Q.  Okay.  And then Tom O'Leary; who is Tom O'Leary?

24   A.  He was the chief marketing officer that was hired during

25   that time.

1   Q.  And then we talked about Marios Mamzeris.  And he was the

2   COO, right?

3   A.  Yes.

4   Q.  Okay.  And then how about Azeem Bashir?

5   A.  He was the chief security officer.

6   Q.  Okay.  So chief information officer, chief security

7   officer?

8   A.  Yes, yes.

9   Q.  And who's Joe Wang?

10  A.  Joe Wang.  I'm not sure I recall that name.

11  Q.  Okay.  How about Hesop (ph) Chin?

12  A.  He was the compliance officer from Australia.

13  Q.  So that's the person we referred to before.

14  A.  Yes.

15  Q.  And Hesop was the chief compliance officer for the

16  exchange, right?

17  A.  Yes.

18  Q.  Okay.  And then how about Ehsan Haque?

19  A.  He was the lead counsel at that time.

20  Q.  Okay.  And now I think we just listed roughly eight or nine

21  fairly senior people who were working at the exchange during

22  this period of time; fair to say?

23  A.  Well, they were working for Hamilton consulting.

24  Q.  Right.  They were spending a lot of their time working on

25  the exchange, right, because those were the people you were

1  working with?

2  A.  That's true.

3  Q.  Right.  So fair to say that there were eight or nine senior

4  people who were working at the exchange during that period of

5  time?  On the exchange?  Forgive me.

6  A.  In the spring.  There weren't that many in the fall.

7  Q.  Are we talking, I'm sorry, 2020——

8  A.  Yeah, during the first——it took a little while to onboard

9  all that, all those executives, so it was probably January of

10 2021 before everyone was in place there.

11 Q.  Okay.  Fair.  Thank you.  Thank you for that clarification.

12      So in the fall and sort of winter of 2020, there's

13 still this gearing up that's happening with the exchange.

14 A.  Yes.

15 Q.  The exchange is still hiring talent and hiring senior

16 people, right?

17 A.  Yes.

18 Q.  Okay.  And in your recollection, that kind of comes

19 together in roughly January of 2021.

20 A.  Yes.

21 Q.  Okay.  And then at its peak, how many people did Hamilton

22 have working on the exchange, approximately?

23 A.  Well, there were 200 employees——

24 Q.  Okay.

25 A.  ——in London at one point.

1   Q.  Right.  So isn't it true that the exchange——withdrawn.

2               Understanding that the consulting wing of Hamilton was

3   the former employer of some of these people, okay?  We accept

4   that.  But those people were working on the exchange project;

5   is that fair?

6   A.  That is fair, counsel.

7   Q.  A fair description?  Okay.  So understanding that, is it

8   fair to say that the exchange employed multiple people in

9   finance who were working on the exchange?

10  A.  That's fair.

11  Q.  And multiple people in IT who were working on the exchange?

12  A.  Multiple, multiple.

13  Q.  Yes, correct.  And multiple, multiple developers, right?

14  A.  Yes.

15  Q.  Okay.  And now the exchange also had a 24/7 customer

16  service line, right?

17  A.  That is correct.

18  Q.  Okay.  And when does that come in?

19  A.  That was early on too, you know, probably about that same

20  period.  Maybe lagged a couple weeks to get everyone in place.

21  Q.  Okay.  Fair.  The exchange didn't really have any

22  customers, which we'll get to in a second, until kind of later

23  in 2021, right?

24  A.  Yeah, it was a training and onboarding period.

25  Q.  So the exchange was getting ready and getting prepared to

1    have a customer service function when it anticipated having

2    customers.

3    A.   Yes.

4    Q.   Okay.  And that was, again, a 24/7 operation, right?

5    A.   It was.

6    Q.   And it wasn't even outsourced, right?

7    A.   No.

8    Q.   And they were employed directly by the exchange, or

9    Hamilton, right?

10   A.   Yes.

11   Q.   And the customer service folks spoke both Mandarin and

12   English, right?

13   A.   The majority, right.

14   Q.   And fair to say you found that pretty impressive?

15   A.   I did.

16   Q.   Yeah.

17          Okay.  Now let's just talk a little bit about the

18   day-to-day work.  And you touched on this I believe on direct a

19   little bit, but you had daily conference calls; is that fair?

20   A.   Yes.

21   Q.   Okay.  And those conference calls started pretty early for

22   you, right?

23   A.   7 a.m.

24   Q.   Yeah.  7 a.m., 'cause a lot of other folks were across the

25   pond and a few hours ahead.

1  A.  Yes.

2  Q.  Time zonewise.

3  A.  Right.

4  Q.  And sometimes you had one-on-one meetings with different of

5  your senior colleagues?

6  A.  I did.

7  Q.  Okay.  And sometimes did you have one-on-one meetings with

8  William?

9  A.  Not really.

10  Q.  Okay.  Well, did you have meetings with William where there

11  were like one or two other people there?

12  A.  Yes.

13  Q.  Okay.  He wasn't alone often in meetings; he had people who

14  came with him, right?

15  A.  Right, right.

16  Q.  But understanding that, you did have lots of interaction

17  with William during this period, right?

18  A.  Yes.

19  Q.  Okay.  And is it fair to say that your weekly schedule was

20  made up of a Monday call that was a sort of all employees

21  meeting?

22  A.  Yes.

23  Q.  And either William or Azeem would sort of run that meeting?

24  A.  That's correct.

25  Q.  And then on Tuesdays, Tuesdays were for tech meetings,

1   right?

2   A.  As I recall, yes.

3   Q.  Okay.  And that was run by the chief technology officer,

4   right?

5   A.  Yes.

6   Q.  And you would have, you know, depending on the time,

7   anywhere from between sort of 20 to 30 people on those calls,

8   right, Tuesday calls?

9   A.  No.  Probably closer to 10 or 15.

10  Q.  Okay.  10 or 15 people on the Tuesday calls.

11          And then on Wednesdays, you would have operations

12  meetings, right?

13  A.  Yes.

14  Q.  And those were run by the COO of the exchange, right?

15  A.  Correct.

16  Q.  Okay.  And about how many people attended those, on

17  average?

18  A.  That's about the same as tech.

19  Q.  Okay.  And then Thursdays you had finance meetings, right?

20  A.  Yes.

21  Q.  All right.  And then on Fridays you had stakeholder

22  meetings, right?

23  A.  That's right.

24  Q.  And that was the phrase that was used to describe the sort

25  of more senior group of executives, including you.

O6L1GUO4                         Brown - Cross

1   A.  That's true, but most of the——most of the stakeholders were

2   involved in all the meetings.

3   Q.  Yeah, fair enough, but you had kind of a separate call——

4   A.  Yes.

5   Q.  ——to a smaller, more senior group.

6   A.  Correct.

7   Q.  Okay.  Now that's an awful lot of people working on this

8   project, isn't it?

9   A.  It is.

10  Q.  All right.  And do you recall——and I believe you, again,

11  may have touched on this on direct, that you filled out what

12  I'll just call time sheets?  I don't know if that's the right

13  word.  But do you know what I'm referring to?

14  A.  I do.  I do.

15  Q.  Okay.  And you sort of, in a chart format, you know, listed

16  kind of what you had done for the weeks of the month, for the

17  entire month, right?

18  A.  That's right.

19  Q.  In summary.

20  A.  Correct.

21  Q.  Okay.  And that was kind of the way that you billed the

22  exchange so that you could be paid for your work.

23  A.  That's right.  That's right.

24  Q.  All right.  And what was your salary during this period of

25  time?

1   A.  I believe I started at 180,000.

2   Q.  Okay.  Now let's just talk a little bit about the sort of

3   evolution of the exchange from a regulatory perspective.

4        We talked before about the exchange initially thinking

5   that it might operate with an Australia license, right?

6   A.  That's right.

7   Q.  Okay.  But that was abandoned, as we discussed before,

8   right?

9   A.  Right.

10  Q.  Okay.  And then there was a pivot to potentially operating

11  out of the British Virgin Islands, right?

12  A.  That's right.

13  Q.  We're going to get to the surfing.  I promise.

14  A.  Okay.

15  Q.  I want to hear more about that.

16       Now that decision to pivot to the BVI, do you have an

17  understanding of why that was?

18  A.  I believe it was a jurisdiction where we could issue the

19  coin without having a license at the time.

20  Q.  Okay.  So it was favorable, from a regulatory point of

21  view.

22  A.  It was.

23  Q.  Just more relaxed from a regulatory point of view.

24  A.  At the time, yes.

25  Q.  At the time, right.  And so you actually were asked to

1    travel to the BVI.

2    A.   I was.

3    Q.   Okay.  And to explore establishing an entity there, right?

4    A.   That's right.

5    Q.   And you actually hired lawyers down there, right?

6    A.   Yes.

7    Q.   Okay.  And you made a recommendation as to who to hire,

8    right?

9    A.   No, I did not make the recommendation.

10   Q.   Did you meet with the lawyers?

11   A.   I did.

12   Q.   Okay.  And then there was this BVI sandbox application,

13   right?

14   A.   Correct.

15   Q.   That you testified about on direct, right?

16   A.   Right.

17   Q.   Okay.  And when was this, approximately, that you go down

18   BVI to explore the BVI sandbox?

19   A.   I believe it would have been in the late spring or summer

20   of 2021, but I don't recall exactly.

21   Q.   Okay.  All right.  Fair enough.

22            But definitely 2021; it wasn't 2020.

23   A.   Yeah.

24   Q.   Yeah.  Okay.  Fair enough.

25            Now I believe you also testified on direct that you

O6L1GUO4                          Brown - Cross

1    kind of did some prospecting for potential office space down in

2    the BVI——

3    A.  Yes.

4    Q.  ——right?  And you also looked for some telecom providers?

5    A.  Yeah, that's——yes, yes, I did.

6    Q.  Like data, internet service providers?

7    A.  Yes.

8    Q.  Which one needs to run a crypto exchange, right?

9    A.  Yes.

10   Q.  And then you also spoke to people in the BVI FSC, right?

11   A.  Yes, yes.

12   Q.  And is that the Financial Services——

13   A.  Committee.

14   Q.  ——Committee?

15   A.  Or Commission.  Yeah, one of those two.

16   Q.  Whatever; it's a regulator down on BVI.

17   A.  Right.  It's a regulating body there.

18   Q.  Understood.  Regulating body.

19          And you spoke to them about that sandbox application,

20   right?

21   A.  Yes.

22   Q.  And about how long were you down in the BVI?

23   A.  I would only go down for a couple weeks at a time, but I

24   went back and forth a couple, few times.

25   Q.  Okay.  Two times, more than two times?

1    A.  I think it——I think it was three total.

2    Q.  Three.  Okay.  And this sandbox application, that was

3    because the BVI was sort of looking to attract innovative

4    technologies and businesses in the islands——

5           MR. HORTON:  Objection.

6    Q.  ——to your understanding?

7           THE COURT:  Overruled.  You may answer.

8    A.  Yes.

9    Q.  Okay.  And it was called a sandbox——again, asking for your

10   understanding——sandbox is sort of a metaphor, right, for being

11   able to play?

12   A.  Yeah.

13   Q.  Right?

14   A.  Yes.

15   Q.  And you can play because the rules are a little bit more

16   relaxed, as you described before.

17   A.  They are.

18   Q.  Right.  Okay.  And you discovered that in order to succeed

19   on a BVI sandbox application, you had to have I think it was

20   50 percent or so of your employees based on the islands?

21   A.  That's correct.

22   Q.  Right.  And fair to say that that became something that was

23   a little difficult to work with given where most of the folks

24   for the exchange were located throughout the world?

25   A.  I'm not sure that's fair.

O6L1GUO4                         Brown - Cross

1   Q.  Well, in any event, it was something that you all found

2   difficult to work with as a condition, right?

3             MR. HORTON:  Objection.  Asked and answered.

4             THE COURT:  Sustained.

5             MR. SCHIRICK:  Did I ask that question?  Okay.

6   Q.  In any event, you ended up and the exchange ended up

7   abandoning the BVI effort, right?

8   A.  Yes.

9   Q.  But it got, fair so say, to at least sort of—withdrawn.

10            Would you say that it got to a mature stage as a

11  possibility of where to run operations out of?

12  A.  That's a—

13            MR. HORTON:  Object to the form of the question.

14            THE COURT:  You can answer.

15  A.  That's a fair statement.

16  Q.  Okay.  And there was significant resources invested in that

17  effort, right?

18  A.  No.  That's incorrect.

19  Q.  There weren't significant resources invested in it?

20            MR. HORTON:  Objection.  Asked and answered.

21            THE COURT:  Sustained.

22  Q.  Okay.  Did the exchange have to hire lawyers to work on the

23  sandbox application?

24  A.  Yeah, they hired lawyers.

25  Q.  Okay.  And they were paying you, right?

1   A.  They were paying me.

2   Q.  Okay.  You don't consider that a significant investment, I

3   guess?

4          MR. HORTON:  Objection.

5          THE COURT:  You may answer.

6   A.  I don't, because they weren't willing to pay the rent.

7   Q.  And by rent, you mean literally the——

8   A.  Yeah, they weren't willing to put a deposit down on the

9   office.

10  Q.  Okay.  All right.  Fine.  So they didn't want to put down

11  the money for the office.

12         So whatever the reason was, that didn't end up panning

13  out, right?

14  A.  Yes.

15  Q.  It would have been nice if it had.

16  A.  Much to my chagrin.

17  Q.  Yes.  It would have been nice if it had.

18         Now while you were down there, I think you said you

19  worked on some other sort of side projects?

20  A.  I said that?

21  Q.  Let's try it this way.  Did you work on any other side

22  projects that were not exchange related when you were down in

23  the BVI?

24  A.  Yeah, I did have a side project by that point.

25  Q.  Okay.  And I believe you testified on direct that you were

1   really only working three or four hours a day for the exchange?

2   A.  That's fair.

3   Q.  Right.  And you were spending the rest of the time, fair to

4   say, either surfing or working on your side project, right?

5   A.  That's right.

6   Q.  Okay.  Now after the exchange gives up——well, withdrawn.

7           Can you kind of give us your best estimate as to when

8   the decision is made to, you know, not do the BVI anymore.

9   A.  It was——I believe it was right after we got denied the

10  sandbox application.

11  Q.  Right.  Okay.  And then there was another pivot, and this

12  was to potentially move the exchange operations to Abu Dhabi,

13  right?

14  A.  That's right, counsel.

15  Q.  Okay.  And then the exchange started working on trying to

16  get licensed in Abu Dhabi, right?

17  A.  Correct.

18  Q.  Okay.  And this——withdrawn.

19          Did Mr. Je ask you at any point whether you would be

20  willing to move to the BVI if the exchange had successfully

21  been able to locate in the BVI?

22  A.  He did.

23  Q.  He did.  And you told him you were willing to do that,

24  right?

25  A.  More than willing.

1    Q.  Sounds like it.

2          And did Mr. Je also ask you at other times whether you

3    would be willing to relocate for this job to other locations?

4    A.  He did.

5    Q.  Okay.  And did he ask you if you'd be willing to relocate

6    within the United States?

7    A.  Yes.

8    Q.  And did he ask you whether you'd be willing to locate to

9    Europe?

10   A.  No.

11   Q.  To the UK?

12   A.  No.

13   Q.  Okay.  And at some point did he ask you whether you'd be

14   willing to relocate to Abu Dhabi?

15   A.  He did.

16   Q.  Okay.  And that's one you weren't willing to do, right?

17   A.  That's right.

18   Q.  Okay.  Now what——

19          MR. SCHIRICK:  I'm sorry.  If I could just have one

20   moment, your Honor.

21   Q.  Okay.  Now when it comes to Abu Dhabi, you had the

22   impression that Mr. Je sort of felt comfortable there, right?

23          MR. HORTON:  Objection.

24   Q.  Like he knew the landscape?

25          THE COURT:  You may answer that, whether he felt

1  comfortable; whether, by observing him, you got the impression

2  that he felt comfortable.

3  A.  I did.

4  Q.  Yeah.  Like he sort of knew the landscape there?

5  A.  Knew the landscape and connected.

6  Q.  Right.  Okay.  And at this point in time──and we're talking

7  about Abu Dhabi──it's sort of early fall 2021; is that fair?

8  A.  Early fall 2021.  No, I──I believe that would have been a

9  2022 thing.

10  Q.  Okay.

11  A.  I'm not sure of the dates though.

12  Q.  All right.  Fair enough.  It was sort of in the later

13  stages of your time there; fair to say?

14  A.  Yes.

15  Q.  Okay.  Now I just want to talk a little bit about this

16  credit system that was much discussed on direct.

17  A.  Okay.

18  Q.  Okay?  Can you just tell me how the credit system worked.

19  A.  Sure.  So a user would be onboarded onto the exchange, they

20  would go through a compliance checklist, they would be accepted

21  by the exchange, and then they would be asked to top up their

22  account with──with dollar, and then they would purchase these

23  credits with those.

24  Q.  Okay.

25  A.  And the credits would show in their account on their

1   dashboard.

2   Q.  Okay.  Got it.  Sorry.  And I think you used the phrase

3   "top up" there.

4   A.  Yes.

5   Q.  Now was there a reason that that phrase was used in

6   particular?

7   A.  Yeah, it's an—it's a London term.

8   Q.  Sure.  And was part of the reason that it was used, to your

9   understanding, because the word "deposit" would connote a

10  banking transaction, right?

11  A.  That's right.

12  Q.  Right.  And so "top up" was a better way to put it, right?

13  A.  There was some discussion back and forth.  We ended up with

14  "top up."

15  Q.  Okay.  And so once the ex—once the—let's just call them

16  dollars.  Is that fair to say, they were almost always U.S.

17  dollars that were used to top up accounts?

18  A.  That's right.

19  Q.  Okay.  So once the dollars were put into an account, as I

20  understand it—and you'll confirm this for me—the customer

21  would receive a credit on Himalaya's internal records for an

22  equivalent in the relevant—

23          MR. HORTON:  Objection to counsel testifying about his

24  understanding.

25          MR. SCHIRICK:  I can rephrase.  I'm happy to rephrase.

1        That's fine.

2                    THE COURT:  Go ahead.

3    Q.  Is it fair to say that the way that it worked was that a

4    customer would top up an account with dollars and then the

5    exchange would issue the customer a credit on its internal

6    books, internal ledger, for the relevant cryptocurrency?

7                    MR. HORTON:  Object to form.

8                    THE COURT:  You may answer.

9    A.  That's a fair statement, yes, that's true.

10   Q.  Okay.  And when the customer wanted to make a trade, the

11   exchange would, on its internal ledger, move those credits as

12   appropriate on its internal ledger, right?

13   A.  That's how I understood it, yes.

14   Q.  Okay.  And if a user——

15                   THE COURT:  Are you testifying as to what you

16   understood was the system or what actually happened?

17                   THE WITNESS:  What I understood was the system.

18                   THE COURT:  In other words, that was what you

19   understood to be the plan?

20                   THE WITNESS:  Yes, yes.

21                   THE COURT:  Go ahead.

22   BY MR. SCHIRICK:

23   Q.  And when a user wanted to, for example, purchase HCN, the

24   trading coin, with HDO that the user held, that transaction

25   would be effected on the exchange's internal ledger, correct?

1    A.  Correct.

2    Q.  So you could use HDO credits to buy HCN, right?

3    A.  Yes.

4    Q.  Okay.  And then the HCN credit was tradeable with others

5    who had HCN or HDO, right?

6    A.  Yes.

7    Q.  And the HDO Credits were redeemable for cash, right?

8    A.  Right.

9    Q.  Okay.  All right.  Now is it fair to say that that credit

10   system that we just talked about wasn't meant to last forever

11   at the exchange?

12   A.  I believe that's fair.

13   Q.  Right.  You had plans to further develop the system, right?

14   A.  Yes.

15   Q.  And move away from the credit system, right?

16   A.  Yes.

17   Q.  Right.  And the plan ultimately was for the exchange to

18   operate on-chain, right?

19   A.  That was the plan.

20   Q.  And to do away with the credit system, right?

21   A.  Eventually, yes.

22   Q.  Right.  And the plan was for the exchange to become a

23   regular crypto exchange that would allow trading in other

24   cryptocurrencies besides HCN and HDO, right?

25   A.  That was a goal, yes.

1    Q.  Right.  And no different than other crypto exchanges,

2    right, in the sense that you could trade other

3    cryptocurrencies.

4    A.  Yes, it would have been more like a typical exchange at

5    that point.

6    Q.  Okay.  And those goals were ones that the Himalaya team

7    that we talked about earlier was working towards, right?

8    A.  Yes.

9    Q.  Okay.  And in fact, the plan, as we talked about earlier,

10   was for the exchange to eventually become a full-blown

11   ecosystem.

12   A.  The ambitious plan, yes.

13   Q.  Yeah, fair.  We covered that before.  Very ambitious, but

14   that was the plan.

15              And in fact, that's what people were working towards,

16   right?

17              MR. HORTON:  Asked and answered.

18              MR. SCHIRICK:  The ecosystem is different, your Honor.

19              THE COURT:  Sustained.

20   Q.  Okay.  Now as part of the ecosystem, there was a plan at

21   the exchange to build what was called a merchant portal, right?

22   A.  Yes.

23   Q.  Okay.  And what was that?

24   A.  It was a portal that would consist of retail clients who

25   would be able to accept HCN or HDO as payment and ship

1  products.

2  Q.  Okay.  Right.  And merchants in this context means like

3  businesses, right?

4  A.  Yes.

5  Q.  And so the idea was that the exchange was building

6  something that would allow businesses to accept the tokens that

7  were traded on the exchange.

8  A.  That's right.

9  Q.  Right.  And so the idea was so that people could transact

10 in those tokens.

11 A.  Yes.

12 Q.  Right.  And are you aware of something called H Pay?

13 A.  Yes, I am.

14 Q.  Okay.  And is it true that Hamilton and the folks at the

15 exchange were working on an H Pay app?

16 A.  That is true.

17 Q.  Okay.  And true that people at Hamilton complained that the

18 merchant portal was not being built as quickly as they wanted

19 it to be, right?

20 A.  Not people at Hamilton complained.

21 Q.  Didn't——

22 A.  Could you rephrase that.

23 Q.  Sure.  Was Mr. Je at points frustrated that the merchant

24 portal wasn't coming along as quickly as he wanted?

25 A.  He was.

1   Q.  Right.  And he was a little frustrated that the ecosystem

2   wasn't coming along as quickly as he wanted?

3   A.  To a lesser extent.

4   Q.  Okay.  And how about same question with respect to H Pay.

5   A.  H Pay was started much later so there wasn't big

6   frustration level there, but probably a minor frustration

7   level.

8   Q.  But it was started; there was actual work done on H Pay,

9   right?

10  A.  Yes.

11  Q.  And there was actual work done on the merchant portal,

12  right?

13  A.  Yes.

14  Q.  Right.  And you didn't see anything the whole time you were

15  there to suggest that people weren't working towards these

16  things, right?

17  A.  That's correct.

18  Q.  Okay.  Now do you recall telling the government that it was

19  your impression that Mr. Je was out hustling to get merchants

20  onto the platform?

21  A.  Could you rephrase that one more time.  Could you say that

22  again.

23  Q.  Sure.  I'll try it again.  Do you recall telling the

24  government, in your meetings with them, that it was your

25  impression that Mr. Je was out hustling to get merchants onto

O6L1GUO4                        Brown - Cross

1    the platform?

2    A.  I don't recall stating that, no.

3    Q.  Okay.  Let's see if we can refresh your recollection.

4           MR. SCHIRICK:  Can we pull up for just the parties and

5    the witness, Jorge, please, 3506, at 13.

6           If I may just have one moment, your Honor.

7    Q.  So Mr. Brown, do you see the excerpt of the document that's

8    appeared on your screen?

9    A.  I do.

10   Q.  And do you see the highlighted portion of that document?

11   A.  I do.

12   Q.  Okay.  Does that refresh your recollection of having said—

13   A.  It does.

14   Q.  ——that to the government?

15   A.  It does.  Thank you.

16   Q.  So you did tell the government in your meetings with them

17   that in fact Mr. Je was out hustling to get merchants onto the

18   platform, right?

19   A.  Yes.

20          MR. HORTON:  Asked and answered.

21          MR. SCHIRICK:  Well, we're just clarifying.

22          THE COURT:  Asked and answered.  Sustained.

23   Q.  All right.  So again, in your experience, at your time at

24   the exchange, you didn't see anything to suggest that people

25   weren't working hard to try to bring merchants onto the

1  platform, right?

2          MR. HORTON:  Asked and answered, your Honor.

3          THE COURT:  Sustained.

4  Q.  Now they didn't always succeed, right?

5  A.  That's right.

6  Q.  Okay.  And you believed that the team was spread a bit too

7  thin; is that fair to say?

8  A.  The team was spread too thin?

9  Q.  Yes.

10  A.  I'm not sure that——that's not——I'm not sure that was

11  something that I would have said.  I thought there was too many

12  people.

13  Q.  Okay.  Well, let's see if we can refresh your recollection.

14  A.  Okay.

15          MR. SCHIRICK:  Bring up that same document.

16          Just give me one moment.

17          THE COURT:  The question is not whether the document

18  says that; the question is whether the document refreshes your

19  recollection that you said that.

20          THE WITNESS:  Understood, your Honor.

21          MR. SCHIRICK:  Okay.  Thank you.  So can we please

22  publish only for the parties, the Court, and the witness, the

23  document.

24          And if we could blow it up and just highlight the

25  relevant portion, please.

1   BY MR. SCHIRICK:

2   Q.  Do you see that, Mr. Brown?

3   A.  Yes, I do.

4   Q.  Okay.  Now I'm going to show you another excerpt here.

5   Just give us one second.

6           Okay.  Thanks for your patience.  I think we have it

7   now.

8           Mr. Brown, this is the same document but a different

9   entry, just for your context?

10          MR. HORTON:  Sorry.  Is there a question pending?

11          THE COURT:  The document is up.  I think the question

12  is whether this refreshes his recollection.

13          MR. SCHIRICK:  Yes.

14  A.  It does refresh it, but it's——it's in the context of the

15  techs team, of the tech team.

16  Q.  Fair enough.  I mean, I hadn't asked that question, but

17  yes, I understand.

18          The point was, as you told the government, they

19  were——you believed that the tech team was spread too thin,

20  right?

21  A.  Early on, yes.

22          THE COURT:  You said in the context of the tech team

23  as opposed to what?

24          THE WITNESS:  The overall——the overall staff was

25  bloated.  So the marketing staff, other departments were top

1    heavy.

2    Q.  Okay.  And the tech team was spread too thin, and they were

3    biting off more than you thought they could chew by trying to

4    build a whole ecosystem, right?

5    A.  Yes, yes.

6    Q.  Okay.  Now again, you didn't see anything in your time at

7    the exchange to suggest that that tech team wasn't working in

8    good faith to build out that ecosystem.

9              MR. HORTON:  Asked and answered, your Honor.

10             MR. SCHIRICK:  Well, we're on the tech team now, your

11   Honor.  I think it's a different question.

12             THE COURT:  You can answer as to the tech team.

13   A.  Could you repeat that one more time.

14   Q.  Sure.  So you didn't see anything at your time at the

15   exchange that suggested that the tech team wasn't working as

16   hard as it could to build out the ecosystem, right?

17   A.  That's correct.  That's correct.

18             MR. SCHIRICK:  Your Honor, if it makes sense to the

19   Court, I think before I move on to another topic, it might be a

20   good time.

21             THE COURT:  All righty.  It's 2:29.  We'll take our

22   break now and return at 3:00.

23             Remember, don't discuss the case amongst yourselves or

24   with anyone else.  Don't permit anyone to discuss the case in

25   your presence.  Don't read, watch, or listen to anything from

O6L1GUO4                        Brown - Cross

 1  any source that touches on the subject matter of this case.

 2          Sir, you may step out of the courtroom.  Don't discuss

 3  your testimony.

 4          (Jury not present)

 5          (Witness not present)

 6          THE COURT:  Is there anything before we have our

 7  break?

 8          MR. HORTON:  Just a brief housekeeping issue, your

 9  Honor.  It would be helpful to know, for witness scheduling

10  purposes, if the defense has an estimate for how long the rest

11  of the cross is going to last.

12          THE COURT:  How long the cross will last?

13          MR. HORTON:  That's right.

14          MR. SCHIRICK:  Your Honor, my best estimate at this

15  point is maybe another 45 minutes.

16          THE COURT:  All righty.  See you later.

17          (Recess)

18

19

20

21

22

23

24

25

O6LBGUO5                    Brown - Cross

1          THE COURT:  Please have the jurors brought in.

2          THE LAW CLERK:  Jury entering.

3          (Jury present)

4          THE COURT:  Please be seated.  Remember that you're

5    still under oath.  You may continue the cross-examination.

6          MR. SCHIRICK:  Thank you, your Honor.

7    BY MR. SCHIRICK:

8    Q.  Mr. Brown, you testified on direct about white papers.  Do

9    you recall that?

10   A.  I do.

11   Q.  And I believe you testified, and you'll correct me if I'm

12   wrong, that white papers are sort of an industry custom thing

13   to issue before you issue tokens, right?

14   A.  Yes.

15   Q.  In fact, you worked on the white paper for HCN?

16   A.  Yes.

17   Q.  And for HDO?

18   A.  That's true.

19   Q.  And if we could just please pull up the April 2021 white

20   paper for HDO.  I believe it's GXBR-190.

21          Just to remind the jury, HDO is the cash back token

22   that we talked about earlier, right?

23   A.  That's correct.

24   Q.  And the process of writing these white papers was quite a

25   process, right?

O6LBGUO5                    Brown - Cross

1    A.  It was.

2    Q.  It took about 10 or 11 months; is that fair to say?

3    A.  Very arduous, yes.

4    Q.  And you had a significant hand in drafting this, right?

5    A.  Yes.

6    Q.  You worked with others, but you had a significant part?

7    A.  Yes.

8    Q.  Let's just take a look if we could at, it's the page with

9    the Bates stamp ending in 9898.

10            While we pull that up, Mr. Brown, this is dated April

11   2021, right?

12   A.  Yes.

13   Q.  It's dated April 2021.  And this is around the time of the

14   very first sort of private token offering, right; is that fair

15   to say?

16   A.  That's fair to say.

17   Q.  Cause there was, before November 2021, which we'll come to

18   in a second, there was just a private sale to kind of friends

19   and family, right, fair to say?

20   A.  Yes.

21   Q.  So this paper is issued in connection with that private

22   sale, fair, or at least around the same time?

23   A.  Around the same time.

24   Q.  There's going to be a sale, so you put out information

25   about what's being sold?

O6LBGUO5                    Brown - Cross

1    A.  That's true.

2    Q.  Now we're at this page here, and if you could see at the

3    top it says the Himalaya Dollar solution.  Do you see that?

4    A.  Yes.

5    Q.  And has this been published to the jury?  Yes.  All right.

6            I'm going to read a short passage, and you let me know

7    if I get it right.  Third paragraph down beginning with the

8    word Members.

9            Members of the Himalaya Exchange will be able to

10   participate in an issuance of the Himalaya Dollar through the

11   purchase of HDO credits through the Himalaya Exchange.  Do you

12   see that?

13   A.  Yes.

14   Q.  And then moving down two paragraphs to the sentence

15   beginning in the middle if the market.  You see here it says,

16   If the market for HDO credits experiences significant liquidity

17   shortfall, the issuer will have the ability to use the funds in

18   the reserve to provide liquidity support.  Do you see that?

19   A.  Yes.

20   Q.  And then moving down another two paragraphs to the sentence

21   that begins, In addition.  In addition to the trading solution

22   benefits, HDO credits are also designed for use through the

23   "Himalaya pay app."  The Himalaya pay app, which will be

24   launched during phase three, will allow members to use HDO

25   credits to offer domestic and cross-broader payments to

O6LBGUO5                        Brown - Cross

1    merchants who accept payment for good and services through

2    Himalaya pay within the Himalaya ecosystem.  It defines

3    Himalaya Ecosystem.  Members will also be able to make

4    transfers of HDO credits from their Himalaya pay account to the

5    Himalaya pay accounts of other members. did I read that

6    correctly?

7    A.  Yes.

8    Q.  Now, is it fair to say that this describes the HDO credit

9    system that you and I discussed earlier today?

10   A.  That's fair.

11   Q.  And is it also fair to say that what we just read describes

12   the anticipated launch of the H Pay app?

13   A.  Yes.

14   Q.  If we could just move to the next page, please.

15          At the top it says Roll Out.  You see that?

16   A.  Yes.

17   Q.  And this just generally speaking, this slide or page from

18   the white paper shows the sort of phased roll out of the

19   ecosystem; is that fair?

20   A.  Yes, that's fair.

21   Q.  In fact it says right there on the top of the left what the

22   anticipated schedule for the phase roll out is, right?

23   A.  Yes.

24   Q.  Let's read one there.  It says, Himalaya Exchange prelaunch

25   and launch of HDO, private placement participants.  Just to

O6LBGUO5                        Brown - Cross

1    pause there, do you understand that to mean the private sale

2    that you and I were just talking about a second ago?

3    A.   I understand, yes.

4    Q.   It says, Private placement participants may apply to open a

5    Himalaya Exchange account and complete KYC procedures following

6    opening of an account, private placement participants may top

7    up their account by purchasing Himalaya dollar credits with USD

8    on a 1:1 ratio.

9           If we zoom out just go to two, please, under Himalaya

10   Coin launch.  Do you understand that Himalaya Coin is HCN?

11   A.   Yes.

12   Q.   And there it says that registration period for private

13   placement participants expires.  Private placement participants

14   may purchase HCN credits up to their allocated amount?

15          MR. HORTON:  Your Honor, may we have a second to

16   confer with defense counsel.

17          THE COURT:  Yes.

18          (Counsel conferred)

19          MR. SCHIRICK:  Thank you, your Honor.

20   Q.   And then if we go to arrow three it says, Full Himalaya

21   Exchange and Himalaya Pay app launch.  Under that it says,

22   Members make commence trading HDO, HCN and other crypto asset

23   credits through their account on the Himalaya Exchange.  The

24   Himalaya Exchange is open to the public for registration and

25   trading.  The Himalaya pay app will enable members to start

O6LBGUO5                        Brown - Cross

1    sending and receiving payments globally.  And again, that

2    describes the anticipated roll out of H pay app?

3             MR. HORTON:  Your Honor, may we approach?  There's an

4    observation.

5             THE COURT:  Okay.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6LBGUO5                          Brown - Cross

1              (At the sidebar)

2              MR. HORTON:  Your Honor will recall that during

3     Mr. Robert's testimony a week ago had an objection to the

4     purposes of for which the defense was offering this white

5     paper, and there was a ruling from the Court that they couldn't

6     come in for its truth.  They could use the white paper to ask,

7     we could go to Mr. Robert's the same as Mr. Brown, non-hearsay

8     questions about the document, but not use it to sort of assert

9     to the jury that so and so is true.  I spoke to Mr. Schirick to

10    say that we anticipated in his questions rather than the use of

11    the document because it's mostly reading the document as

12    opposed to questions, we're veering into the territory that we

13    understood was set aside with the Court's ruling last week.  We

14    think that reading the document over and over again with this

15    witness crosses that line that the Court set.

16             THE COURT:  So are you asking for a limiting

17    instruction?

18             MR. HORTON:  Yes.

19             MR. SCHIRICK:  We're offering this for a non-hearsay

20    purpose.  We're just offering it for the fact that it was said.

21    It's relevant to -- directly relevant to materiality because we

22    will argue that this was a disclosure of the way that the

23    system actually worked.  The government will argue that by

24    saying these tokens were crypto that that was somehow

25    misleading, and we're entitled to be able to put this in.

O6LBGUO5                          Brown - Cross

1   Again, for non-hearsay purpose of showing that this was in fact

2   said and a disclosure was made.

3           THE COURT:  Are you saying that the document does not

4   describe the asset as crypto?

5           MR. SCHIRICK:  That is a true statement.  It's not

6   only that, though, your Honor, yes.

7           THE COURT:  But you're not seeking to offer it for its

8   truth?

9           MR. SCHIRICK:  I don't think we need to offer it for

10  its truth.  The statements that are statements of anticipated

11  events, of upcoming events are also being offered simply for

12  the fact that they were disclosed.

13          MS. SHROFF:  Or made.

14          MR. SCHIRICK:  It's also relevant because they're

15  obviously going to argue that Mr. Guo through some series of

16  other people intended to mislead folks by saying it's crypto

17  when it wasn't, so we're entitled to bring this in to show that

18  there wasn't any intent to deceive.

19          MR. HORTON:  There wasn't a question about, Mr. Brown,

20  were these things actually said.  Mr. Brown, what was the

21  effect on you of these things non-hearsay purpose.  This

22  document is in evidence.  It came in last week, and it came a

23  week ago, a lot has happened at trial with a limiting

24  instruction.  We think it would be appropriate given the amount

25  of time being spent on the same document with a similar witness

O6LBGUO5                        Brown - Cross

1   to again remind the jury that that's how this document should

2   be viewed.

3           THE COURT:  That's what I'll do.

4           MR. SCHIRICK:  Your Honor, just for purposes of

5   efficiency, I'm going to go through subsequent white papers,

6   hopefully very quickly, but there are three more and I will try

7   to cover them quickly.

8           THE COURT:  Quickly.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6LBGUO5                         Brown - Cross

1              (In open court; jury present)

2              THE COURT:  Members of the jury, I want you to

3    understand that this document is not being offered for its

4    truth.  It's only being offered for the fact that it exists and

5    those statements were made.

6    BY MR. SCHIRICK:

7    Q.  I've forgotten where we were.  I think we were on phase two

8    describing Himalaya pay out.

9              My question, Mr. Brown, is that did I accurately read

10   that?

11   A.  Yes.

12   Q.  And you were the author of this, in part, of this document,

13   right?

14   A.  In part.

15   Q.  If we can move to page 9901.  And if I can just focus your

16   attention on the last paragraph of this page beginning, In

17   addition.

18             It says, In addition following the launch of the

19   Himalaya pay app, members will be able to use HDO credits to

20   offer payment to merchants who can accept payment for goods and

21   services through the Himalaya pay app to make transfers of HDO

22   credits from their Himalaya pay account to the Himalaya pay

23   accounts of other members.  When the planned infrastructure

24   upgrade to a hybrid Ethereum and Quorum blockchain platform is

25   completed, we believe that the Himalaya pay out will provide

O6LBGUO5                          Brown - Cross

1   significant benefits against pure offerings and represent a

2   highly scalable solution.

3           Did I read that correctly?

4   A.  You did.

5   Q.  Let's go to page 9903, please.

6           At the top first paragraph reads:  Following

7   commencement of phase three roll out, members will be able to

8   make a request to exchange credits to their Himalaya Exchange

9   account for the corresponding crypto assets which if approved

10  by the Himalaya Exchange would then be transferred to a

11  member's external wallet address.

12          Did I read that correctly?

13  A.  Yes.

14  Q.  Now, as a co-author of this April 2021 HDO white paper, did

15  you believe those statements were true when they were made?

16          Anything incorrect in that?

17  A.  No.

18  Q.  Let's move to --

19          THE COURT:  There were two questions there.  The first

20  was, did you consider that statement to be true, and so he

21  needs to answer both questions.

22          MR. SCHIRICK:  I believe he answered the second

23  question, your Honor.

24          THE COURT:  I don't know that he answered both

25  questions, and I'd like him to answer both questions.

O6LBGUO5                          Brown - Cross

1           MR. SCHIRICK:  I jumped the gun.

2   Q.  The question is, did you believe that what we just read to

3   be true at the time?

4   A.  Yes.

5   Q.  And nothing incorrect in there, right?

6   A.  Nothing incorrect.

7   Q.  Okay.  Thank you.  Now, if we could please pull up what's

8   been marked as GXAS-13.  This is just for the witness, the

9   Court and the parties, please.

10          Mr. Brown, do you recognize this document?

11  A.  I do.

12  Q.  Is this a copy of the Himalaya Coin HCN white paper for

13  April of 2021?

14  A.  It appears so, yes.

15          MR. SCHIRICK:  Your Honor, we move this document or

16  offer this document into evidence consistent with the Court's

17  prior instruction.

18          THE COURT:  Is there any objection?

19          MR. HORTON:  No objection provided there's a similar

20  instruction given to the nature of the document.

21          THE COURT:  So how many of these similar documents do

22  you have?

23          MR. SCHIRICK:  Three more including this one.

24          THE COURT:  So the instruction that I just gave you

25  that these documents are not being offered for their truth, but

O6LBGUO5                         Brown - Cross

 1   merely for the fact that they existed.  We'll leave it at that.

 2   That applies to a total of four documents.

 3           MR. SCHIRICK:  And we're on the second here.  Now can

 4   we please publish to the jury, your Honor.

 5           THE COURT:  Go ahead.  It is admitted.

 6           (Government's Exhibit AS-13 received in evidence)

 7   BY MR. SCHIRICK:

 8   Q.  Now, Mr. Brown, you had a hand in co-authoring this paper

 9   as well, right?

10   A.  Yes.

11   Q.  If we can please go to page seven.  Just to draw your

12   attention to the second paragraph beginning participation.  It

13   says, Participation in the issuance of the Himalaya Coins will

14   only be available to certain members of the Himalaya Exchange a

15   new digital asset exchange which is at the heart of our mission

16   to create a new digital financial system.  The operation of the

17   Himalaya Exchange and associated application and infrastructure

18   will be facilitated through the use of "credits." Credits

19   within the system will correspond to a particular type of

20   crypto asset.

21           Did I read that correctly?

22   A.  You did.

23   Q.  Now, if we go down to the second to last paragraph on the

24   same page beginning the Himalaya Ecosystem.

25           It reads, A Himalaya Ecosystem is being developed

O6LBGUO5                          Brown - Cross

1  through partnerships with businesses who it is anticipated will

2  provide access to their products and services.  The creation

3  and development of the Himalaya Ecosystem is intended to

4  support the commercial value proposition of HCN and HCN credits

5  incentivizing adoption and use.

6          Did I read that correctly?

7  A.  You did.

8  Q.  Let's go to page nine, please.  You can see here this is

9  substantially similar to the chart we just looked at, the

10  previous document?

11  A.  Right.

12  Q.  If we can agree on that, we can spare everybody having to

13  read it.  If you go to page 11 and focusing on that last

14  paragraph and just the last sentence of that last paragraph

15  beginning, When the planned infrastructure upgrade to a hybrid

16  ethereum and Quorum blockchain platform is completed, we

17  believe the Himalaya pay app will provide significant benefits

18  against peer offerings and represent a highly scalable

19  solution.  Is that the same HDO April 2021 white paper?

20  A.  Seems similar.

21  Q.  Now, same question, Mr. Brown, when you helped to co-author

22  this document, you believed everything that was stated in this

23  document was accurate; is that right?

24  A.  I'm not sure that is right, no.

25  Q.  What in this document is different from the earlier

O6LBGUO5                        Brown - Cross

1   document you looked at?

2   A.  So the question was, Is this document the same as the one

3   we just looked at?

4   Q.  No.  The question was whether this document, you believe

5   this document to be accurate at the time you co-authored it?

6   A.  All of this verbiage is not anything that I wrote.

7   Q.  My question is different.  At the time you co-authored

8   this, did you believe that the statements in this document were

9   accurate?

10          MR. HORTON:  Objection, mischaracterizes his

11   testimony.

12          MR. SCHIRICK:  I'm not sure I characterized his

13   testimony.

14          MR. HORTON:  The statement about co-authorship.

15          THE COURT:  You threw in at the time he co-authored.

16   He said he did not, so the question needs to be limited to, At

17   the time, did you believe what was written in this document to

18   be true.

19          MR. SCHIRICK:  Your Honor, respectfully, I believe he

20   did testify that he co-authored this.

21          THE COURT:  But this section I thought he said this

22   was not correct.

23          MR. SCHIRICK:  He said some verbiage.

24          THE COURT:  Did you write a portion of the sentence

25   that we're looking at right now?

O6LBGUO5                          Brown - Cross

1                THE WITNESS:  I did not.

2                MR. SCHIRICK:  Your Honor, may we have a brief

3       sidebar.

4                THE COURT:  Okay.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6LBGUO5                          Brown - Cross

1              (At the sidebar)

2              MR. SCHIRICK:  Your Honor, candidly, your Honor, I was

3    trying to be more efficient to find a way to get this to show

4    it to the witness and ask if certain statements are accurate at

5    the time.  And if I can't do it this way, I may have to do it

6    the slow way, which I preferred not to do obviously for

7    everyone's sake.

8              MR. FINKEL:  Is that a threat?

9              MR. SCHIRICK:  No, I just want to be candid.  I can

10   move quickly through the part that I want to highlight.  I

11   don't need him to affirm everything.  I just need him to affirm

12   certain questions.

13             THE COURT:  There's a question out there, did he

14   believe those statements in that section to be true at the

15   time.

16             MR. SCHIRICK:  I think I asked him, I may be wrong, I

17   thought I asked him about the entire document.  And I think

18   this is where we're running into -- he's going to say, he

19   wasn't responsible for the entire document, so I'm going to

20   have to go piece by piece then.  I'm open to suggestion.  I'm

21   not sure --

22             THE COURT:  You use those words, "entire document?"

23             MR. SCHIRICK:  I said what's in this document, do you

24   believe what's in this document to be accurate.  Do you believe

25   this document to be co-authored by --

O6LBGUO5                         Brown - Cross

1          THE COURT:  He said yes?

2          MR. SCHIRICK:  He said he wasn't responsible for

3    portions of it.

4          MR. HORTON:  It's a fact.  It is true.  That's what

5    he's saying.  He didn't write certain pieces that are being

6    shown to him.

7          MR. SCHIRICK:  Be careful.  He didn't say pieces that

8    were shown to him.  I asked him about the entire document.

9          MR. HORTON:  I think you showed him an excerpt and he

10   said I did not.  He said I did not.

11         MR. SCHIRICK:  We can have the record read back.

12         (Record was read)

13         THE COURT:  Back on the record.  He is disavowing at

14   least a portion of it, and it's not proper to characterize it

15   in another way.

16         MR. SCHIRICK:  I can take it piece by piece and ask

17   him statement by statement which is really what I want to do.

18   Again, your Honor, I was looking to save time.

19         MR. FINKEL:  I think what going to come up, the

20   document that he authored, he doesn't believe he authored all

21   of it.  If he wants to ask, do you believe everything in this

22   document is accurate, I suppose he could ask that question.  I

23   don't know.  Mr. Brown would need to review it.  We can't, for

24   efficiency, decide that the witness should just adopt something

25   that the defense wants him to adopt.  I don't think that's

O6LBGUO5                        Brown - Cross

appropriate.

          MR. SCHIRICK:  Nobody is implying that.  I'm saying I
would reluctantly go back and do it in pieces because I think
in pieces comes out differently.  He's saying he didn't do the
whole document.

          THE COURT:  I don't know any other way of doing it.

          (Continued on next page)

O6LBGUO5                          Brown - Cross

1              (In open court; jury present)

2   BY MR. SCHIRICK:

3   Q.  If we could please go back to page nine.  Actually, I'm

4   sorry.  Let's make it page ten.

5              Now, Mr. Brown, if I could focus you on the third

6   paragraph down from the top beginning credits.  You see that?

7   A.  Yes, I do.

8   Q.  It says, Credit can only be used on the Himalaya Exchange

9   within the Himalaya Ecosystem representing a right to

10  participate in trading on the Himalaya Exchange and do not

11  carry any right to require their exchange for fiat currency on

12  crypto assets.  A member may make a request to the Himalaya

13  Exchange to exchange credits on their account and receive a

14  transfer of corresponding crypto assets to their external

15  wallet addresses.

16             Did I read that accurately?

17  A.  I believe you did.

18  Q.  And if we can now go to page seven, second paragraph.  We

19  read this earlier.  Participation in the issuance of the

20  Himalaya Coins will only be available to certain members of the

21  Himalaya Exchange, a new digital asset exchange which is at the

22  heart of our mission to create a new digital financial system,

23  the Himalaya Exchange, the operation of the Himalaya Exchange

24  and associated applications and infrastructure will be

25  facilitated through the use of credits.  Credits within the

O6LBGUO5                        Brown - Cross

1   system will correspond to a particular type of crypto asset.

2          Did I read that correctly?

3   A.  You did.

4   Q.  At the time this was written in April of 2021, did you

5   believe that to be an accurate statement about the functioning

6   of the credit system?

7   A.  Yes.

8   Q.  If we could go down in the same document to the second to

9   last paragraph, please, beginning the Himalaya Ecosystem.  It

10  says here, the Himalaya Ecosystem is being developed through

11  partnerships with businesses who it is anticipated will provide

12  access to the products and services.  The creation and

13  development of the Himalaya Ecosystem is intended to support

14  the commercial value proposition of HCN and HCN credits

15  incentivizing adoption and use.

16         Did I read that correctly?

17  A.  Yes, you did.

18  Q.  And understanding that this is a statement of future

19  intention, at the time this was made in April of 2021, did you

20  believe --

21         MR. HORTON:  Your Honor, objection to the testimony

22  including legal conclusions.

23         MR. SCHIRICK:  I'm happy to do it in pieces.

24         MR. HORTON:  It's not the size of the testimony.  It's

25  the fact that it's testimony.

O6LBGUO5                          Brown - Cross

1           THE COURT:  Don't ask him for legal conclusions.  He's

2      not a lawyer.

3           MR. HORTON:  The objection is that counsel is stating

4      legal conclusions and testifying about them not even asking a

5      question.

6           THE COURT:  And, Mr. Schirick, you're not to state

7      legal conclusion.

8      BY MR. SCHIRICK:

9      Q.  The question is, what do you understand hereby the

10     ecosystem is being developed?

11     A.  I understand that the ecosystem is being built out.

12     Q.  Right.  And it's in process, right?

13     A.  According to that wording, yes.

14     Q.  As you and I talked about earlier before the lunch break,

15     it was in fact being worked on, right?

16     A.  Yes.

17     Q.  So is that an accurate statement of what was being worked

18     on at the time in April of 2021?

19     A.  Yes.

20     Q.  Now, if we could please go to Government Exhibit AS-12.

21          Mr. Brown, do you recognize this document?

22     A.  I do.

23     Q.  And what is it?

24     A.  It's the white paper for the Himalaya Coin.

25     Q.  And what's the date on this document?

O6LBGUO5                        Brown - Cross

1   A.  That would be January 2022.

2   Q.  And were you a co-author of this white paper?

3   A.  I would say at this point I pretty much given up the pen to

4   the attorneys.

5   Q.  So did you participate in drafting this in any way?

6           MR. HORTON:  Asked and answered.

7           MR. SCHIRICK:  That's a different question.

8           THE COURT:  Overruled.  You may answer.

9   A.  I would have to see the whole document to comment on that.

10  Q.  Sure.  We're happy to just flip through it briefly.  I'm

11  happy to focus you on a particular page if that would be

12  helpful?

13  A.  If there's any page about the Quorum and ethereum ecosystem

14  that would have been the only thing that I wrote.

15  Q.  Let's focus on page eight if you don't mind.  It's halfway

16  down on this page, the sentence beginning, The Himalaya

17  Exchange is intended.

18          It says, The Himalaya Exchange is intended to provide

19  high levels of liquidity and credits traded on the platform and

20  other crypto assets.  Do you see that?

21  A.  I do.

22  Q.  And this document still describes in January of 2022 the

23  system at the exchange as being one based on credits, right?

24          MR. HORTON:  Your Honor, I don't believe this document

25  is in evidence.  I don't believe it's been offered.

O6LBGUO5                        Brown - Cross

1          THE COURT:  So it needs to have a foundation first.

2   Q.  Do you recognize this document?

3          MR. HORTON:  To be clear, we have no objection subject

4   to the same instruction given that it's a similar document.

5          THE COURT:  So have you offered it to be admitted?

6          MR. SCHIRICK:  Yes, your Honor.

7          THE COURT:  So it's admitted.

8          (Government's Exhibit AS-12 received in evidence)

9          THE COURT:  Is there an objection to this item?

10          MR. HORTON:  No objection, asking for an instruction

11   given the substantially similar nature of this document.

12          THE COURT:  You may go ahead.

13          MR. SCHIRICK:  If this isn't published to the jury,

14   can we publish to the jury.

15   Q.  My question is that at this point in time January of 2022,

16   the white paper still describes the system that the exchange is

17   operating on as a credit system, right?

18   A.  Yes.

19   Q.  Hopefully lastly if we can turn to, again just for Court,

20   the witness and the parties Government Exhibit AS-18.

21          Mr. Brown, do you recognize this document?

22   A.  Yes.

23   Q.  Do you recognize it as the January 2022 white paper for the

24   Himalaya Dollar HDO?

25   A.  I do.

O6LBGUO5                        Brown - Cross

1           MR. SCHIRICK:  We offer this document AS-18 into

2    evidence.

3           MR. HORTON:  No objection.

4           THE COURT:  It is admitted.

5           MR. HORTON:  Excuse me.  No objection subject to the

6    same limitation.

7           THE COURT:  Understood.

8           (Government's Exhibit AS-18 received in evidence)

9    BY MR. SCHIRICK:

10   Q.  If we could quickly go to page eight in the third paragraph

11   from the top beginning, Members of the Himalaya Exchange will

12   be able to participate in the issuance of Himalaya Dollar

13   through the purchase of the HDO credits through the Himalaya

14   Exchange.  Do you see that?

15   A.  Yes, I do.

16   Q.  Is it true at this point in time January of 2022 when this

17   document is put on -- withdrawn.

18          You testified earlier that the white papers were put

19   on the Himalaya Exchange website, right?

20   A.  Yes.

21   Q.  And that applies to all of the white papers that we looked

22   at here in the last few minutes, right?

23   A.  I'm not sure about that.

24   Q.  But it was the practice to put the final white papers on

25   the Himalaya Exchange website, right?

O6LBGUO5                          Brown - Cross

1    A.  It was the practice.

2    Q.  And you don't have any reason to believe that these weren't

3    posted to the website consistent with that practice, right?

4              MR. HORTON:  Objection, asked and answered.

5              THE COURT:  Sustained.

6    Q.  Would you consider posting something to -- withdrawn.

7              Is it fair to say that January of 2022 the white paper

8    that we just reviewed that is in evidence as GXAS-18 continues

9    to describe the Himalaya Exchange system as one that's based on

10   credits?

11   A.  That's fair, counsel.

12   Q.  If we can just go to page 11, the final paragraph there,

13   just to blow that up.

14             And I believe, Mr. Brown, you testified before that

15   you recall that your role in drafting the white papers at this

16   point in time would have been focused on descriptions of

17   Quorum; is that fair?

18   A.  Yes, that's fair.

19   Q.  So I'm going to read this paragraph.  It says, In addition,

20   following the launch of the Himalaya pay app, members will be

21   able to use HDO credits to offer payments to merchants who

22   accept payment for goods and services through the Himalaya pay

23   app or make transfers of HDO credits from their Himalaya pay

24   account to the Himalaya pay accounts of other members.  When

25   the planned infrastructure upgrade to a hybrid ethereum and

O6LBGUO5                        Brown - Cross

1    Quorum blockchain platform is completed, we believe that the

2    Himalaya pay app will provide significant benefits against peer

3    offerings and represent a highly scalable solution.

4            Did I read that right?

5    A.  You read that right.

6    Q.  Do you recognize this as, a portion of this document, to

7    which you contributed as an author?

8    A.  No, that is not true.

9    Q.  Is there some other portion that relates to Quorum that you

10   believe you contributed to?

11   A.  I believe in previous white papers there was a whole

12   section devoted to Quorum.

13   Q.  And you were working on Quorum, right?

14   A.  Well, I was working on the white paper around Quorum, yes.

15   Q.  The Exchange was working on Quorum, right, during your time

16   there?

17   A.  Yes.

18   Q.  Is it fair to say that the paragraph that we just read here

19   at the bottom of page 11 of this document that's in evidence is

20   an accurate statement of what was happening at the Exchange at

21   the time this was published?

22   A.  It is fair, yes.

23   Q.  Thank you.  I believe you testified that on direct that

24   there was no difference between G Coin and H Coin.  Do you

25   recall that?

O6LBGUO5                         Brown - Cross

1    A.  I do.

2    Q.  Did you ever write a white paper for G Coin?

3    A.  I may have contributed to one, yes.

4    Q.  Was one ever finalized?

5    A.  Not to my knowledge or my recollection.

6    Q.  Did G Coin ever exist?

7    A.  It did not.

8    Q.  Was G Coin ever anything more than a concept?

9    A.  Yeah, it was a concept of H Coin.

10   Q.  Try to answer my question.  Was G Coin ever anything more

11   than a concept?

12            MR. HORTON:  Asked and answered.

13            THE COURT:  Sustained.

14            MR. SCHIRICK:  Move to strike, your Honor.

15            THE COURT:  It was already asked and answered.

16            MR. SCHIRICK:  Move to strike as non-responsive.  The

17   prior answer was non-responsive.

18            MR. HORTON:  Objection.

19            THE COURT:  Sustained.

20   Q.  When you say there's no difference between G Coin and

21   H Coin, do you mean that the G Coin concept became the H Coin

22   later?

23   A.  I'm not sure that's entirely true either.

24   Q.  So G Coin was never created, right?

25   A.  No, it was never created.

O6LBGUO5                        Brown - Cross

1    Q.  Right.  And H Coin was the thing you worked on, right?

2    A.  Could you repeat that.

3    Q.  H Coin was the thing that you worked on, right?

4    A.  It was, yes.

5    Q.  Not G Coin, just to draw a distinction between the two?

6    A.  For the first month or so, we were calling H Coin G Coin.

7    Q.  So it was renamed?

8    A.  That's right.

9    Q.  Okay.  Fair enough.  But G Coin never became a reality,

10   right?

11          MR. HORTON:  Asked and answered.

12          THE COURT:  Sustained.

13   Q.  Now, you testified that on direct that your work at the

14   Exchange was not what you expected at the time that you joined,

15   right?

16   A.  That's right.

17   Q.  But you understood that the long-term goal of what the

18   Exchange was trying to build was consistent with what you

19   expected, right?

20          MR. HORTON:  Objection, we've been through this, your

21   Honor.

22          MR. SCHIRICK:  This is as to his expectation.

23          THE COURT:  You're asking whether the long-term goal

24   was consistent with what, his expectation?

25          MR. SCHIRICK:  Correct, of what the Exchange was going

O6LBGUO5                        Brown - Cross

1   to build.

2           THE COURT:  You may answer.

3   A.  I didn't expect it to build to be credits.

4   Q.  In the long-term as we've discussed, it wasn't going to be

5   credits, right?

6           MR. HORTON:  Objection.

7           MR. SCHIRICK:  I have to be able to ask the question.

8           THE COURT:  You can answer that question.

9   A.  That's right.

10  Q.  So you didn't expect it to be a credit system, but you also

11  understood that eventually it was going to move to a real

12  crypto system that was not based on credits in your view,

13  right?

14  A.  That's right.

15  Q.  So that would have been consistent with your expectation,

16  right?

17  A.  Yes.

18  Q.  So therefore the question is, the long-term plan of what

19  Himalaya Exchange was building was consistent with your

20  expectations?

21          It was just the short-term plan that was inconsistent,

22  right?

23          MR. HORTON:  Objection, your Honor.

24          THE COURT:  So there's a lot of questions in there.

25  Q.  Isn't it true that the long-term plan of what the Himalaya

O6LBGUO5                         Brown - Cross

 1   Exchange was building was consistent with your expectation of

 2   what they were going to build when you joined?

 3              MR. HORTON:  Asked and answered.

 4              THE COURT:  Sustained.

 5   Q.  Now, you were frustrated that it was taking longer than you

 6   wanted to bring about the developments in the Himalaya

 7   Exchange; is that fair?

 8   A.  That is fair.

 9   Q.  And you testified I believe on direct that you weren't

10   allowed access to some of the trading data from the Exchange;

11   is that right?

12   A.  I wasn't allowed access to any data.

13   Q.  Can you answer my question.

14   A.  Yes.

15   Q.  The trading data?

16   A.  The trading data.

17   Q.  You never asked William Je for access to that trading data,

18   right, as you testified to on direct?

19   A.  That's correct.

20   Q.  And Mr. Je wasn't really running that as you said, right?

21   A.  Could you ask that question again.

22   Q.  Sure.  I believe you testified on direct that Mr. Je wasn't

23   really running the trading data.  He wasn't really the owner of

24   the trading data, right?

25   A.  That's fair.  That was the CISO.

O6LBGUO5                          Brown - Cross

1    Q.  Right.

2    A.  Azeem.

3    Q.  Who was in charge of information and security?

4    A.  That's correct.

5    Q.  And he was in your view sort of hyper-security conscious,

6    right?

7    A.  Yes.

8    Q.  You don't think that Mr. Je was keeping anything from you,

9    right, in terms of the trading data because Mr. Azeem was

10   hyper-security conscious?

11   A.  I found it odd that I couldn't have a peak at what was

12   going on.

13   Q.  Did you ever hear Mr. Je say that you, Mr. Brown, couldn't

14   have a peak?

15           MR. HORTON:  Objection, calls for hearsay.

16   Q.  Is it your understanding that Mr. Je ever told Mr. Azeem

17   not to show you the data?

18           THE COURT:  You may answer.

19   A.  Could you repeat that one more time.

20   Q.  Is it your understanding that Mr. Je ever told Azeem not to

21   show you the data?

22           He never told Mr. Azeem not to show you the data,

23   correct?

24           MR. HORTON:  Objection, two questions.

25           THE COURT:  If you'll just ask the main question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6LBGUO5                          Brown - Cross

1    Q.  To your knowledge Mr. Je never told Mr. Azeem not to show

2    you the data, right?

3    A.  That's correct.

4    Q.  Now, you testified earlier a point came when you were

5    promoted to CEO?

6    A.  That's right.

7    Q.  And this was roughly in the spring of 2021?

8    A.  Yes.

9    Q.  And that was at a stakeholders meeting?

10   A.  Yes.

11   Q.  And were all of the heads of the departments for the

12   Exchange there?

13   A.  They were.

14   Q.  The folks that we talked about before as being kind of the

15   senior group, right?

16   A.  Yes, correct.

17   Q.  And you had the impression that there were some other folks

18   in that senior group who wanted that CEO job, right?

19   A.  Yes, that's correct.

20   Q.  And you had the impression that they were maybe bugging

21   Mr. Je to get that CEO job, right?

22   A.  I'm not so sure "bugging" is the correct word.  They were

23   overzealous maybe.

24   Q.  Fair enough.  And prior to that there was no CEO role,

25   right, it was just Mr. Je effectively in control?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6LBGUO5                          Brown - Cross

1    A.  That's correct, counsel.

2    Q.  And you believe that you made CEO because you were fluent

3    in the language of blockchain, right?

4    A.  No.  No.

5    Q.  Do you recall telling the government that you believed that

6    you were made CEO because in part you were fluent in the area

7    of blockchain?

8    A.  No.  I recall saying that Mr. Je was impressed with some of

9    the things I had done here in the states and that was one of

10   the reasons.

11   Q.  And you also understood that in your view one of the

12   reasons he promoted you to CEO was because of your willingness

13   to relocate if necessary?

14   A.  That's fair.

15   Q.  Within limits.  We understand there are some things were

16   out of bounds.

17   A.  Fair.

18   Q.  There were real reasons for you to be made CEO, right?

19   Those are two reasons, right?

20   A.  Those are two.

21   Q.  And now you testified you don't really feel like you're CEO

22   material?

23   A.  That's true.

24   Q.  Currently you have your own company, right?

25   A.  Yes, consulting company.

O6LBGUO5                    Brown - Cross

1    Q.  You're the CEO of that company?

2    A.  It's a one man company, so I'm not really sure.  A lot of

3    people like to say they're CEO of a one man company.  I don't

4    really make that boast.

5    Q.  There's nobody else in charge?

6    A.  Well, there's no one to run anything.

7    Q.  During the time that, the entire time you were at the

8    Himalaya Exchange, is it true you never had any substantive

9    interactions with Mr. Guo?

10   A.  That's true.

11   Q.  And the only time you interacted with him was when he

12   toasted you on a live stream, right?

13   A.  That's true.

14   Q.  You never spoke to Mr. Guo ever aside from that?

15   A.  Not to my recollection.

16   Q.  And he never gave you any management direction whatsoever,

17   right.

18   A.  No.

19   Q.  Now, did a time come when the smart contracts for HCN and

20   HDO were created?

21   A.  There were.

22   Q.  And those were published to the blockchain, right?

23   A.  Yes, they would have been.

24   Q.  And they were publicly available for review as a result of

25   being published to the blockchain, right?

O6LBGUO5                          Brown - Cross

1   A.  Could you repeat that.

2   Q.  Were the smart contracts for HCN and HDO publicly available

3   for review because they were on the blockchain?

4   A.  I'm not sure that's accurate.  I believe the smart contract

5   work was testing at the time.

6   Q.  I didn't give you a time.  My question is --

7   A.  Well, at any time in my tenure there.

8   Q.  Are you familiar with Ether scan?

9   A.  Yes.

10  Q.  And you can use Ether scan to check to see if a smart

11  contract is on the blockchain?

12  A.  You can.

13  Q.  Have you ever used Ether scan to check if the smart

14  contract for HCN or HDO were on a blockchain?

15  A.  I did not.

16  Q.  Now, Himalaya had these smart contracts audited by a

17  software code expert, right?

18  A.  Yes, if you call Certek an expert.

19  Q.  Are they not -- are Certek not a recognized expert in

20  software security?

21  A.  No longer.

22  Q.  At the time?

23  A.  At the time it was suspect too because of the FTX crash.

24  Q.  Did in fact Himalaya hire Certek to audit the smart

25  contracts for HCN and HDO?

O6LBGUO5                        Brown - Cross

1   A.  They did.

2   Q.  In fact Certek made recommended changes to the smart

3   contracts of HCN and HDO, right?

4   A.  I believe so.  I wasn't privy to it.

5   Q.  Do you understand that those smart contracts for HCN and

6   HDO are upgradeable?

7   A.  I had no knowledge of that, but the potential to be

8   upgradeable through solidity is there.

9   Q.  Right, as a matter --

10  A.  It's inherently.

11  Q.  They're inherently upgradeable?

12  A.  Yes.

13  Q.  Now, I just want to talk briefly about the KYC process at

14  the exchange.

15              What does KYC stand for?

16  A.  Know Your Customer.

17  Q.  And in your view the on-boarding of an Exchange customer

18  was a pretty time intensive thing?

19  A.  It's very arduous.

20  Q.  Very arduous.  And I think there was something like 16

21  questions that customers had to go through in order to sign up?

22  A.  That's correct.

23  Q.  Do you recall telling the government in your view most

24  people had trouble filling out more than four fields of the 16?

25  A.  Yeah, that's an industry understanding that after four

O6LBGUO5                          Brown - Cross

1    fields, you begin to get a dropoff in people signing up.

2    Q.  And even if someone did manage to fill out all of the

3    fields, they still had to go through Bitgo's onboard process,

4    right?

5              MR. HORTON:  Your Honor, we object to the line of

6    questioning beyond the scope of direct of KYC and on-boarding.

7              MR. SCHIRICK:  Your Honor, I'm happy to --

8              THE COURT:  I don't remember anything about customers

9    signing up, so this is beyond the scope.

10             MR. SCHIRICK:  Your Honor, I'm happy to call him as my

11   own witness if we need to.  This goes to the general operations

12   of the Exchange which I think is well inbounds given

13   Mr. Brown's direct testimony.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O6L1GUO6                          Brown - Cross

1              THE COURT:  Okay.

2              MR. SCHIRICK:  Thank you.

3    BY MR. SCHIRICK:

4    Q.  So the question is, even if someone did fill out all

5    fields, all 16 fields, they still had to get through Bitgo's

6    onboard process, right?

7    A.  I don't recall if Bitgo was part of that 16 or not, but

8    Bitgo was involved in that, yes.

9    Q.  Okay.  So whether they were part of the 16 or followed the

10   16, they were involved in the process somehow.

11   A.  That's right.

12   Q.  Okay.  And do you recall that the Bitgo onboarding process

13   required customers to take a picture?

14   A.  Yes, I do.

15   Q.  Okay.  And it turned out that a lot of people had trouble

16   taking pictures of their IDs when they were foreign IDs, right?

17   A.  That's right.

18   Q.  By foreign, I mean non-U.S. IDs, right?

19   A.  That's accurate.

20   Q.  And that gave the technology fits, right?

21   A.  It did.

22   Q.  Okay.  And because the technology wasn't good at handling

23   Mandarin characters in particular, right?

24   A.  That's correct.

25   Q.  All right.  And also because the software was designed for

O6L1GUO6                          Brown - Cross

1  like a first name-last name, and in China, at least, that is

2  typically switched.

3  A.  Exactly.

4  Q.  And as a result of the arduous—to borrow your

5  phrase—onboarding process, it took customers sometimes a month

6  or more just to complete the paperwork, right?

7  A.  That is correct.

8  Q.  Okay.  And you thought it should have taken something more

9  like 24 to 48 hours, right?

10  A.  20 minutes.

11  Q.  Fair enough.  Even shorter.

12       And you were concerned that people were getting

13  frustrated with it, right?

14  A.  It was obvious.

15  Q.  Okay.  And there were calls to the 24/7 Mandarin-English

16  hotline about that, right?

17  A.  Flooded the hotline.

18  Q.  Okay.  And one of the reasons that there were all of these

19  checks was because the exchange restricted users by geography,

20  right?

21  A.  Can you repeat that.

22  Q.  Yeah.  I mean, sure.  One of the reasons that there was all

23  of this process that we just talked about was because the

24  exchange restricted onboarding users from certain geographies.

25  A.  Yeah, that's true.

```
 1   Q.  Okay.  And the U.S. was one of those geographies, right?

 2   A.  It was.

 3   Q.  And Canada was too, right?

 4   A.  As well, yes.

 5   Q.  All right.  And do you recall telling the government that

 6   you believed that the exchange spent more money on these

 7   compliance procedures than anything other than IT?

 8   A.  I don't recall saying that, no.

 9   Q.  Okay.  Maybe we can refresh your recollection real quick.

10           Actually, withdrawn.  Do you remember telling the

11   government during one of your meetings with them that you

12   thought the people at the exchange were overly compliant?

13   A.  I do.

14   Q.  Okay.  And your view was there was too much compliance,

15   right?

16   A.  Yes.

17   Q.  It was excessive.

18   A.  Yes.

19   Q.  And you recall telling the government that you thought the

20   exchange could have taken more customers.

21   A.  I think that's true.

22   Q.  Okay.  Now let's just talk about marketing briefly.

23           The exchange——withdrawn.

24           In your view, the exchange was too conservative when

25   it came to its own marketing about its services and products,
```

1   right?

2   A.  Yes.

3   Q.  And you felt the lawyers were making the decisions about

4   marketing, right?

5   A.  I did.

6           MR. HORTON:  Objection.

7   Q.  Right.  And they could have been doing much more marketing

8   but didn't, right?

9   A.  They could have done some marketing, but didn't.

10  Q.  Right.  You felt like they did virtually none.

11  A.  Yes.

12  Q.  Okay.  And the exchange was particularly diligent about not

13  letting—withdrawn.  Sorry.

14          During your Wednesday meetings, which I believe were

15  the compliance meetings, there were discussions about customer

16  onboarding, right?

17  A.  Yes.

18  Q.  And at the committee—I'm sorry.  Withdrawn.

19          At those meetings, the compliance folks would assess

20  the risk of onboarding particular customers, right?

21  A.  I'm not sure if that's accurate.

22  Q.  Okay.  Well, what did the committee do with respect to

23  onboarding or what—withdrawn.

24          What did the committee do with respect to assessing

25  the risk of particular customers?

1    A.  There's a process called regulatory mapping.

2    Q.  Mm-hmm.

3    A.  That's what we did.

4    Q.  Okay.  And you would assign customers who you were doing a

5    regulatory mapping for a risk score?

6    A.  Yes, yes.

7    Q.  And in your view, this process was a good way of being able

8    to monitor who was buying and selling?

9    A.  Can you repeat that again.

10   Q.  And in your view, this risk scoring and regulatory mapping

11   process was a good way of having the exchange track who was

12   buying and selling.

13   A.  No, no.  I don't see the correlation there.

14   Q.  Well, if only approved——withdrawn.

15           Only approved customers can buy and sell on the

16   exchange, right?

17   A.  Yes.

18   Q.  Okay.  So in order to get onto the exchange, this

19   regulatory mapping process was designed to allow only trusted

20   customers onto the exchange, right?

21   A.  Yes, if you're referring to the risk scoring, yes.  There

22   were certain——yes.

23   Q.  Yeah.  And again, that was another part, I think——you

24   correct me if I'm wrong——in your view that was a bit overly

25   restrictive, right?

1    A.  It was.  It had flaws.

2    Q.  Okay.  Now in the summer and fall of 2022, do you recall

3    that new registrations for the exchange started to decline?

4    A.  I do recall that.

5    Q.  Okay.  And in your view this was due in part to the lack of

6    any marketing, right?

7    A.  That's fair.

8    Q.  And the problems with onboarding people, right?

9    A.  The problems had been solved with onboarding at that point.

10   Q.  But the excessive compliance, right?

11   A.  No.  That had kind of been filtered down too to where it

12   was——it was acceptable by me.

13   Q.  Okay.  So in your view it really came down to no marketing

14   that was being done by the exchange; that was responsible for

15   the decline.

16   A.  No, that's not entirely true either.

17   Q.  Was it partially true?

18   A.  Yes.

19   Q.  Okay.  Was another part of it that the crypto market was

20   experiencing a contraction, so to speak?

21   A.  That was a small part of it, yes.

22   Q.  Okay.  Now you testified on direct about the HCN launch in

23   November of 2021, right?

24   A.  Yes.

25   Q.  And your role in that, right; your role in the launch?

1    A.  Yes.

2    Q.  That's the video that we looked at, right?

3    A.  Yeah, yeah.

4    Q.  And you testified that you didn't like public speaking,

5    right?

6    A.  Terrified.

7    Q.  Right.  You're doing great so far today.

8         But would you agree that we all have some aspects of

9    our job that we don't like; fair to say?

10   A.  No.  I think there's a few who love their job.

11   Q.  Okay.  Most have aspects of their job that they don't like,

12   right?

13         MR. HORTON:  Objection to relevance, your Honor.

14         THE COURT:  Sustained.

15   Q.  Now you remember telling the government that you were

16   pretty upset that the launch of HCN took as long as it did?

17   A.  I'm not sure I used the word "upset," but if I did, yes.

18   Q.  Okay.  Well, I mean, you weren't particularly happy about

19   how long it took, right?

20   A.  No.  I thought——I thought that we could have come to market

21   much quicker.

22   Q.  Okay.  And actually, Mr. Je was unhappy too, right?

23   A.  Oh, yeah.

24   Q.  Yeah.  About the pace, right?

25   A.  Oh, my, he was.

1    Q.  Okay.  Yeah.  I get it.

2            And you understood that Mr. Je's focus was to get the

3    exchange up and running on the credit system and then continue

4    to develop it, right?

5    A.  That's fair.

6    Q.  That's—I'm sorry?

7    A.  That's fair.

8    Q.  That's fair, right?  Okay.  And you were continuing to

9    develop it, and in particular, working on the Quorum private

10   blockchain, right?

11   A.  Yes.

12           MR. SCHIRICK:  Okay.  Now if we could just please pull

13   up GX 3401.

14           And we don't need to play the video; just the still,

15   please.

16           This was I believe admitted on direct.

17   Q.  While we're waiting for that, I believe you testified on

18   direct that you thought the exchange wasn't quite ready to

19   launch, right?

20   A.  That's correct.

21   Q.  All right.  And did you tell Mr. Je that you advised

22   against launching?

23   A.  I did not.

24   Q.  Okay.  And isn't it true that sometimes businesses launch

25   and experience difficulty in their first weeks or months?

1            MR. HORTON:  Objection.

2            THE COURT:  Sustained.

3   Q.  Is it your experience that businesses, particularly

4   startups, when they first launch, experience difficulties in

5   the first weeks and months?

6            MR. HORTON:  Same objection.

7            THE COURT:  Sustained.

8   Q.  Okay.  Now you remember——

9            MR. SCHIRICK:  Let's just leave that up.  Sorry.  Just

10  the still.

11  Q.  Now you recall testifying that you believe you made false

12  statements in this video, right?

13  A.  Yes.

14  Q.  Okay.  Because you said that Himalaya Exchange——withdrawn.

15           You said in this video that the trading happened on

16  the blockchain, and you believe that was misleading, right?

17  A.  I do.

18  Q.  Okay.  Now you testified that you said that because you

19  didn't want to disrupt the launch of HCN, right?

20  A.  Yes.

21  Q.  And you testified that you were just toeing the line, the

22  company line, right?

23  A.  That's correct.

24  Q.  Okay.  Now no one in marketing told you to say that the

25  blockchain was going to be used for trading, right?

1   A.  No one told me——could you repeat that again.

2   Q.  Yeah.  No one——I believe you testified that you got some

3   guidance from marketing before this video?

4   A.  Yes.

5   Q.  Okay.  So my question is:  No one in marketing told you to

6   say that the blockchain would be used for trading, right?

7   A.  That's correct.

8   Q.  Right.  And in fact, we just looked at all these white

9   papers that say that it's a credit system, right?

10  A.  Right.

11  Q.  Right.  So people who had access to the internet could find

12  that out, right?

13          MR. HORTON:  Objection.  Calls for speculation.

14          THE COURT:  You can answer.

15  A.  Could you repeat that one more time.

16  Q.  Sure.  If you had access to the internet and those white

17  papers, you would know that the exchange used a credit system,

18  not the blockchain, right?

19          MR. HORTON:  Objection as to what somebody else would

20  know.

21          THE COURT:  Sustained.

22  Q.  Isn't it true that the white papers disclosed that the

23  exchange ran on a credit system, as we talked about earlier?

24          MR. HORTON:  Your Honor, as the question indicated, we

25  have been through this.  We've talked about it.

1          THE COURT:  So you may ask him whether the document or

2     documents say that.  You can ask him whether he believed those

3     words to be true.

4     Q.  You testified earlier that the white papers we looked at

5     contained accurate statements about the exchange's use of a

6     credit system, right?

7          MR. HORTON:  Objection.  Cumulativeness, your Honor.

8          THE COURT:  Sustained.  Are you speaking about

9     portions of the white papers?

10          MR. SCHIRICK:  Your Honor, the portions I'm referring

11    to just relate to the HDO Credits, which is what I was focused

12    on.  Just asking about the HDO credit system.

13          THE COURT:  Well, then you would need to frame the

14    question that way.

15          MR. SCHIRICK:  Sure.

16    BY MR. SCHIRICK:

17    Q.  So the white papers that we reviewed earlier accurately

18    disclosed that the exchange used an HDO credit system, right?

19          MR. HORTON:  Objection.  Mischaracterizes his

20    testimony.

21          THE COURT:  So——

22          MR. SCHIRICK:  I didn't characterize his testimony.  I

23    just asked him if it accurately——

24          THE COURT:  You're asking for a legal conclusion.  You

25    can ask him whether they stated those things; you can ask him

1   whether they believed those things to be true.

2           MR. SCHIRICK:  Okay.

3   BY MR. SCHIRICK:

4   Q.  Did the white papers state that the exchange used an H——a

5   credit system?

6   A.  They did.

7   Q.  Okay.  And to be clear, no one told you that you couldn't

8   say on the launch video that the exchange used a credit system,

9   right?

10          MR. HORTON:  Asked and answered.

11          THE COURT:  Sustained.

12          MR. SCHIRICK:  Your Honor, I believe I asked the other

13  question.

14          THE COURT:  All right.  So then you can answer.  Go

15  ahead.

16  A.  Could you repeat it one more time, please.

17          MR. SCHIRICK:  Could the court reporter please read

18  that back.

19          THE COURT:  Please.

20          MR. SCHIRICK:  Thank you.

21          (Record read)

22  A.  That's true.

23  Q.  Right.  So you said that, right?  What you said wasn't

24  directed by anyone else at the exchange, right?

25  A.  That's right.

1  Q.  Okay.  Now we talked before about how users in the U.S.

2  were restricted from using the exchange, right?

3  A.  Yes.

4  Q.  They were prohibited, actually, from using the exchange,

5  right?

6  A.  Yes.

7  Q.  Okay.  And you were not so happy about that, right?

8  A.  That's true.  It's fair.

9  Q.  And you wanted to be able to participate in, again, to

10  borrow your phrase, the fruits of your labor, right, by

11  purchasing some HCN?

12  A.  No.  I felt that a typical startup, the founders receive

13  HCN without buying it.

14  Q.  Okay.  So, forget the use of the word "purchase."  You

15  expected to be granted some tokens for your work at the

16  exchange, right?

17  A.  Yeah, that's fair.

18  Q.  Right.  And you were frustrated that you didn't get any,

19  right?

20  A.  Yeah, that's fair too.

21  Q.  Okay.  And you were frustrated because others did get some,

22  right, and you didn't?

23  A.  Accurate.

24  Q.  Okay.  And isn't it true that you actually tried to get

25  your father-in-law signed up to be able to purchase some

O6L1GUO6                        Brown - Cross

1    tokens?

2    A.  Yes, yes, we did try that.

3    Q.  Okay.  And it's because your father-in-law had a Venezuelan

4    ID, right?

5    A.  He had a—he had a expired Venezuelan ID.  That's why he

6    was unable to purchase it.

7    Q.  Sure.  And that's what happened, right?  So you tried to

8    have him register with the exchange using that expired ID,

9    right?

10   A.  Right.

11   Q.  And in fact, you encountered issues, right?

12   A.  Yes.

13   Q.  You encountered issues because of that KYC process we

14   talked about before, right?

15   A.  That's right.

16   Q.  And then you actually had him call the 24/7 hotline that we

17   talked about, right?

18   A.  The customer service line.

19   Q.  Customer service line.  Thank you.  You had him call the

20   customer service line?

21   A.  Yes.

22   Q.  And tried to work these issues out so that he could

23   register to buy HCN, right?

24   A.  I did.

25   Q.  And ultimately it turned out, as you said, that the ID was

O6L1GUO6                           Brown - Cross

1   no longer valid, right?

2   A.   That's right.

3   Q.   And he couldn't; he couldn't purchase them, right?

4   A.   That's right.

5   Q.   Okay.  So you wanted to purchase them and you wanted to——

6   A.   No.  I didn't want to purchase them.

7   Q.   Fair.  You wanted to be granted them, right?

8   A.   Can you——

9   Q.   You testified before you expected a grant of HCN, right?

10  A.   A grant?

11  Q.   A grant, that you were given HCN.

12  A.   Oh, yes, yes.

13  Q.   Right.  So you expected a grant of HCN, and when that

14  didn't work, you tried to go through your father-in-law to

15  purchase HCN.

16  A.   No, that's not——that's not true.  My father-in-law wanted

17  to purchase HCN.

18  Q.   Oh, okay.  Your father-in-law wanted to purchase HCN.

19  A.   Yeah.  It was $20 at that point.  I wanted no part of it.

20  Q.   Okay.  Now at the point in time where you expected to have

21  these tokens and were upset you didn't get them, you couldn't

22  have thought the tokens were all that bad, right?

23  A.   At $20, they were.

24  Q.   Well, that's relative, right?  You didn't want to pay $20

25  for it.

1  A.  They were drastically overpriced.

2  Q.  When they were first launched, you wanted them, at that

3  price, fair?

4  A.  That's fair.

5  Q.  Okay.  How bad could they have been then?  Couldn't have

6  been that bad, right?

7  A.  No, no.

8  Q.  Right.  Wasn't that bad of a product, right?

9  A.  No, it wasn't a bad product.

10  Q.  Okay.  Now let's talk about——

11        MR. SCHIRICK:  I'm sorry, your Honor.  If I may just

12  have a moment.

13        THE COURT:  Yes.

14        MR. SCHIRICK:  Okay.  Thank you.

15  Q.  Now, Mr. Brown, you recall testifying on direct about

16  something called Hummingbot?

17  A.  I do.

18  Q.  Okay.  And I think you testified that you were told by

19  David Fallon about Hummingbot, right?

20  A.  That's correct.

21  Q.  And David Fallon was a senior person at Hamilton.

22  A.  He was.

23  Q.  Okay.  And you testified that the bot is used in low-volume

24  situations, right?

25  A.  That's one of its use cases.

1    Q.  Right.  There's other use cases, right?

2    A.  Yes.

3    Q.  Okay.  And Hummingbot is what, is referred to as an

4    automated matching engine, right?

5    A.  Yes.

6    Q.  It's an algorithmic trading tool, right?

7    A.  That's right.

8    Q.  And was everything that you knew about Hummingbot at this

9    point in time based on what Mr. Fallon told you?

10   A.  Yes.

11   Q.  Okay.  And Hummingbot really just matches buyers and

12   sellers, right; that's what it does?

13   A.  I'm not—I'm not sure that—

14   Q.  So you're not sure what Hummingbot does.

15   A.  Well, I'm not sure that accurately describes it.

16   Q.  You're not sure if its only use case is in low-volume

17   situations, right?

18   A.  No, I'm not sure if it matches buyers and sellers.

19   Q.  Okay.  Now I'm going to ask a different question.  You're

20   not sure that Hummingbot's only use case is in low-volume

21   situations, right?

22   A.  Right.

23   Q.  Right.  It could have other use cases.

24   A.  It could.

25   Q.  Right.  And so it's possible that Hummingbot was used for

1   something else other than related to a low-volume situation at

2   the exchange, right?

3           THE COURT:  Don't ask him hypotheticals.

4   Q.  Are you aware that Hummingbot is what's called open-source

5   software?

6   A.  I am.

7   Q.  All right.  Now you also testified on direct about an SEC

8   settlement.  Do you remember that?

9   A.  I do.

10  Q.  Okay.  And the fact that you raised the GTV settlement in a

11  meeting at the exchange, right?

12  A.  That's right.

13  Q.  Okay.  At this point the SEC settlement was public, right?

14  A.  It was.

15  Q.  Okay.  And you testified about certain people's reactions

16  when you raised this issue in the meeting, right?

17  A.  That's right.

18  Q.  Okay.  And you testified in particular about the head of

19  legal's reaction, right?

20  A.  That's right.

21  Q.  Okay.  Now to be clear, you're just speculating about what

22  she knew or didn't know, right?  You don't know for sure.

23  A.  Could you repeat that?

24  Q.  When you testified about what you read into her reaction,

25  you were speculating, right?

O6L1GUO6                    Brown - Cross

1   A.  Yeah, right.

2   Q.  Yeah.  You were speculating, right?  I mean, you can't know

3   what's in her head.  That's how at least telepathy works these

4   days, in that it doesn't work.

5           MR. HORTON:  Objection.

6           THE COURT:  Overruled.

7   A.  Yeah, yeah, I can't read minds.

8   Q.  Right.  Okay.  And you testified that you didn't ask

9   William Je about it, right?

10  A.  Right.

11  Q.  Okay.  You were also shown a document that was marked

12  GX C405.

13          MR. SCHIRICK:  Can we please pull that up and—

14  Q.  Okay.  And you testified that you saw this video at some

15  point, right?  I'm sorry.  Withdrawn.  That you testified that

16  you saw this article at some point, right?

17  A.  No.

18          MR. HORTON:  Objection.  Yeah, misstates the

19  testimony.

20          THE COURT:  Sustained.

21  Q.  Okay.  Did you see this live broadcast at some point?

22  A.  I've never seen a live broadcast, no.

23  Q.  You read an article summarizing it, right?

24  A.  Yes.

25  Q.  Okay.  Now when you read that article, you didn't raise

1   this issue with Mr. Je, right?

2   A.  I hadn't seen this article until recently.

3   Q.  Ah.  So you hadn't seen this article at the time, right?

4   A.  That's right.

5   Q.  You hadn't even seen this article while you were still

6   working at the exchange, right?

7   A.  That's right.

8   Q.  You saw this article in preparation for your testimony?

9   A.  That's correct.

10  Q.  Okay.  So there was no way you could have raised whatever

11  Mr. Guo was saying in this article with folks at the exchange,

12  right?

13  A.  Not this article.

14  Q.  Right.  Okay.  Now I'd just like to talk briefly about

15  Armanino.  Do you recognize the name of that company?

16  A.  I do.

17  Q.  Okay.  And who were they?

18  A.  They're a Silicon Valley auditing group.

19  Q.  Okay.  And were you involved in the decision to hire them?

20  A.  I was not.

21  Q.  Okay.  And what was their role?

22  A.  I believe it was to audit the coins.

23  Q.  Okay.  And they conducted in particular an audit of the HDO

24  reserves, right?

25  A.  They did.

1          MR. SCHIRICK:  Okay.  And if we can just bring up

2     GX BR208, please.  208A.

3          And just go to the next page.

4     Q.  Now you recall being asked some questions about this on

5     direct?

6     A.  I do, counsel.

7     Q.  Okay.  And is it your understanding that HDO——withdrawn.

8          Is it your understanding that this report that we're

9     looking at here relates to just HDO?

10    A.  Yes.

11    Q.  Okay.  Doesn't relate to HCN, right?

12    A.  Right.

13    Q.  Okay.  And this is an audit of the cash reserves backing

14    the HDO Credits, right?

15    A.  That's right.

16    Q.  Okay.  And would you agree with me that this document

17    shows——this document, which is in evidence, shows that the

18    dollar reserves exceed the total amount of HDO Credits in

19    circulation; that is, the top number is bigger than the bottom,

20    than the number on the second line?

21    A.  I agree with that.

22    Q.  Okay.  Now you were asked questions about whether this

23    document reflected any holdings of gold.  Do you recall that?

24    A.  I do.

25    Q.  Okay.  There's no reason that this document would show any

1    holdings in gold, right?

2              MR. HORTON:  Objection.

3    Q.  Well, we just established that it's an audit of the cash

4    reserves, so the question is:  There's no reason that gold

5    would be reflected here.

6              THE COURT:  You prepared this document.

7              MR. SCHIRICK:  No.  This is an auditor's report, your

8    Honor.

9              THE COURT:  This is an auditor's report.

10             MR. SCHIRICK:  Yes.

11             THE COURT:  You're asking him whether an auditor

12   should include gold on the document?

13             MR. SCHIRICK:  No.  We established with the previous

14   questions, your Honor, that this report reflects cash reserves.

15   So my question is, he wouldn't expect to see gold on here

16   because it's cash only.

17             MR. HORTON:  Objection.  That misstates the testimony.

18             MR. SCHIRICK:  I didn't ask him about his testimony.

19             MR. HORTON:  Mr. Schirick stated that something was

20   established.  That misstates the testimony.

21             THE COURT:  You can ask him what he expected in the

22   auditor's report.

23             MR. SCHIRICK:  Okay.  I'll move on.  That's fine, your

24   Honor.

25   BY MR. SCHIRICK:

```
 1   Q.  Do you know in fact whether HCN was backed by any gold?
 2   A.  I'm not privy to any——any gold being held at any time.
 3   Q.  Okay.  You just don't know.  You wouldn't have had access
 4   to that, right?
 5   A.  I probably would have known that if we ever had gold, yes.
 6   Q.  You testified before that you were denied access to all
 7   kinds of information, right?
 8   A.  Yes, but early on, there was discussions about gold——
 9   Q.  Right.
10   A.  ——and the——what was going to happen then is the gold is
11   going to be kept in a third-party custodian and it was going to
12   have a live feed to it——
13   Q.  Okay.
14   A.  ——that was a public feed, so I would have had to have
15   private access.
16   Q.  Let's talk about the gold for a second.
17              MR. HORTON:  Objection.  Excuse me.  Objection to
18   cutting off the witness's answer to counsel's question.
19              THE COURT:  Don't cut off the witness.
20              MR. SCHIRICK:  I'm sorry.  I didn't realize.
21   Apologies.
22              MR. HORTON:  Can the witness finish the answer.
23              THE COURT:  Would you read back the portion of the
24   answer that he gave, and then you can add if you were indeed
25   cut off.
```

1                    (Record read)

2                    THE WITNESS:  Yes, yes, that's accurate.

3     BY MR. SCHIRICK:

4     Q.  Okay.  So let's just talk about the gold for a second.

5                    Was it your understanding that the original intention

6     was to have HCN's——withdrawn.

7                    Was it your understanding that the original intention

8     was to have 10 percent of the original value of HCN in gold

9     reserves?

10    A.  That's correct.

11    Q.  Okay.  It didn't have anything to do with HDO, right?

12    A.  Right.

13    Q.  Right.  Just HCN.

14    A.  Correct.

15    Q.  And just HCN's value at launch, right?

16    A.  Yes.

17    Q.  And just 10 percent, right?

18    A.  Yes.

19    Q.  Okay.  Now have you ever heard of something called Sharps

20    Pixley?

21    A.  I don't believe I have.

22    Q.  Okay.  You also testified on direct about some seizures

23    that took place, right?

24    A.  Yes.

25    Q.  And you were asked whether you knew if the exchange

1   informed its customers about the seizure, right?

2   A.  Yes.

3   Q.  And were you aware that the exchange challenged the

4   seizure?

5   A.  I was aware of that.

6   Q.  That it hired lawyers to litigate the seizure?

7   A.  Yes.

8   Q.  Right.  And the fact of the seizure was public knowledge,

9   to your understanding, right?

10  A.  I'm not sure I understood it was public knowledge.

11  Q.  Did you ever take the time to Google it?

12  A.  No.

13  Q.  Did you ever look it up on a court docket?

14  A.  I did not.

15  Q.  Okay.  Now you also testified about a loan and a yacht,

16  right?

17  A.  Yes.

18  Q.  Okay.  And you were asked some questions about that, right?

19  A.  That's correct.

20  Q.  Okay.  Now Mr. Je was the ultimate beneficial owner of

21  Himalaya, right?

22  A.  That's right.

23  Q.  Okay.  And as the ultimate beneficial owner of Himalaya, if

24  he wanted to make a loan, he simply needed to follow the right

25  procedures to be able to make a loan, right?

1    A.  Yes.

2    Q.  Right.  And he followed the right procedures, to your

3    understanding, right?

4    A.  That's correct.

5    Q.  He brought it up for a vote to the board, right?

6    A.  That's—I'm not sure.  I believe it was a committee.  I'm

7    not sure it was a board.

8    Q.  Okay.  So a committee, he brought it up for a vote to the

9    committee.

10   A.  Yeah.

11   Q.  And the committee deliberated, right?

12   A.  That's right.

13   Q.  And then the committee approved it, right?

14   A.  That's right.

15   Q.  Okay.  Now sitting here today, you don't understand what

16   exactly that loan was for, do you?

17   A.  I do.  I do.  I do understand what that loan was for.

18   Q.  Do you understand that the loan was not to purchase a

19   yacht?  Do you understand that?

20   A.  I do not understand that, no.

21   Q.  Okay.  Now you also testified on direct about the Chinese

22   Communist Party.  Do you remember that?

23   A.  Yes.

24   Q.  Okay.  And I believe you testified—and you'll correct me

25   if I'm wrong—that you didn't think that the Himalaya Exchange

1   had anything to do with being anti-CCP, right?

2   A.  The exchange, no.

3   Q.  Okay.  And do you recall telling the government during your

4   interviews with them that you understood that the CCP

5   whistleblower movement was the basis for everything?  Do you

6   recall that?

7   A.  I do not recall that.

8   Q.  Okay.  Let's see if we can refresh your recollection.

9            MR. SCHIRICK:  If we could please bring up 3506, at

10  11.  And again, just for the witness and the parties and the

11  Court.

12  Q.  Okay.  Is that displayed on your screen, Mr. Brown?

13  A.  Yes.

14  Q.  Okay.  And we'll highlight it, and then just please read it

15  to yourself, not aloud.

16           MR. SCHIRICK:  And you can keep going, Jorge.

17  Q.  Okay.  Now does that refresh your recollection that you

18  told the government that the whole CCP whistleblower thing was

19  the basis for everything?

20  A.  It does.

21  Q.  Okay.  And in fact, William Je would talk about the

22  anti-CCP whistleblower movement at Hamilton, right?

23  A.  Yes, he would.

24  Q.  Right.  And he told you about it, right?

25  A.  He did.

O6L1GUO6                           Brown - Cross

1    Q.  Right.  So you understood in fact that about 2/3 of the

2    exchange's customers were based in China, right, based on

3    information that was made available to you?

4    A.  They were.

5    Q.  Right?  And that was the market, right, the main market?

6    A.  2/3 of the market.

7    Q.  Right.  So your testimony earlier today wasn't correct,

8    right?

9    A.  I'm——I'm——I'm not sure, I'm not sure what——

10   Q.  You testified earlier today that the anti-CCP movement had

11   nothing to do with the exchange, and then we just read, and you

12   just testified, that the anti-CCP movement was the basis of the

13   whole thing.

14              MR. HORTON:  Objection.  That's not a question.

15   Q.  Right?

16              THE COURT:  So I haven't——oh, okay.

17              MR. SCHIRICK:  There we go.

18              THE COURT:  That was the question, comma, right?

19              MR. HORTON:  Your Honor, it's an argument from

20   counsel.

21              MR. SCHIRICK:  It's two sets of testimony, your Honor.

22   I'm asking——

23              THE COURT:  You can ask the question, and you can

24   answer.

25              MR. SCHIRICK:  Could the court reporter please read

1    back the question.

2              (Record read)

3    A.   Yes, but there's a distinction there.  Himalaya Exchange

4    and everything that Miles Guo was saying on social media.

5    Q.   Okay.  So just to be clear, your testimony here is that the

6    anti-CCP movement and the whistleblower movement had nothing to

7    do with the exchange; you're sticking with that.

8    A.   I'm sticking with the exchange was nonpolitical, yes.

9    Q.   Okay.  Now are you aware of something called a DDoS attack?

10   A.   Yes.

11   Q.   Okay.  What's that?

12   A.   That's when the servers for your web entities are attacked

13   to try to knock you off line.

14   Q.   Right.  Okay.  Now did the exchange experience DDoS

15   attacks?

16   A.   Yes.

17   Q.   Yeah.  How many would you say, if you can count?

18   A.   I'm not sure of the real numbers.  I'm not sure of the——of

19   the hard numbers.

20   Q.   Okay.  But it was an issue for the exchange, right?

21   A.   It wasn't an issue because we had protections in place.

22   Q.   Right.  Well, Azeem, the security guy, was pretty focused

23   on the potential for DDoS attacks, right?

24   A.   He was.

25   Q.   Or other bad-party or bad-actor attacks, right?

1    A.  Correct.

2    Q.  Did you understand that that had anything to do with the

3    anti-CCP whistleblower movement, based on your time at the

4    exchange?

5    A.  It was talked about.

6    Q.  Right.  It was talked about as perhaps being why the

7    exchange was targeted, right?

8    A.  Yes.

9    Q.  Yeah.  Right?

10   A.  Yeah.

11   Q.  Okay.  And did you hire vendors to analyze the DDoS

12   attacks?  When I say you, I mean the exchange.

13   A.  Yes.

14   Q.  And did one of these DDoS attacks happen in June of 2022,

15   if you recall?

16   A.  I don't recall.

17   Q.  Okay.  Now you left the exchange in January of 2023, right?

18   A.  That's right.

19   Q.  Okay.  And after you left the Himalaya Exchange, did you

20   solicit Mr. Je for an investment in a new project you were

21   working on?

22   A.  I did.

23   Q.  Okay.  And did you send him an agreement asking him for an

24   investment?

25   A.  I did.

O6L1GUO6                          Brown - Cross

1    Q.  And how much money were you looking for?

2    A.  I don't recall.

3    Q.  Was it more or less than a hundred thousand dollars?

4    A.  I'm going to say more.

5    Q.  Was it more or less than a half a million dollars?

6    A.  Probably right around there.

7    Q.  Okay.  And you discussed this investment with him?

8    A.  Yes.

9    Q.  Potential investment with him?

10   A.  Yes, yes.

11   Q.  Yeah.  But he never ended up getting back to you, right?

12   A.  He didn't.

13   Q.  Okay.  All right.  Now is it fair to say that in the two

14   months before you resigned from the exchange, you continued to

15   work on the long-term goals of the exchange?

16   A.  I don't think so.  I kind of checked out by then.

17   Q.  So you were just collecting a paycheck?

18   A.  Pretty much.

19   Q.  Okay.  So you don't recall whether, in December 2022 and

20   January 2023, you were continuing to work on things like the

21   merchant portal?

22   A.  I don't recall the merchant portal.

23   Q.  Okay.  Or any self-custody options that may have been——

24   A.  Yeah, self-custody options.

25   Q.  Okay.  All right.  And what about HEU?  Do you know what

1    that is?

2    A.  Please——please state that again?

3    Q.  Sure.  What about HEU?

4    A.  HEU.  HEU.  Oh, that——I believe that would have been

5    Himalaya Euro.

6    Q.  Right.  So it was another stablecoin that the exchange

7    planned to offer, right?

8    A.  Yes.

9    Q.  Right.  Another token that it was going to add to the

10   tokens available for trading on the exchange.

11   A.  Yes.

12   Q.  Right.  And even though you may have stopped working on the

13   exchange's long-term goals, is it your understanding that other

14   people at the exchange continued to work on those long-term

15   goals?

16           MR. HORTON:  Objection.

17           MR. SCHIRICK:  During his time.

18           THE COURT:  You can say what you observed.

19           MR. HORTON:  Objection.  The question was about after

20   he had departed.

21           THE COURT:  I did not hear you.

22           MR. HORTON:  I said the question was about after he

23   departed, so——

24           MR. SCHIRICK:  No.  The question was——and I'm happy to

25   rephrase.

1   BY MR. SCHIRICK:

2   Q.   The question was:  During the end of your tenure, while you

3   were still there, even if you were checked out and just

4   collecting a paycheck, as you testified, were other people at

5   the exchange still working on the long-term goals of the

6   exchange?

7   A.   That's fair.

8   Q.   Okay.  Now, Mr. Brown, you met with the government lawyers

9   on a number of occasions before your testimony here today?

10  A.   Yes.

11  Q.   And how many times, if you recall?

12  A.   I believe it was four; four or five times.

13  Q.   And would you be surprised to learn that in fact it was

14  nine times—including this morning, a total of ten?

15  A.   No, not surprised.

16  Q.   Okay.  Sounds about right, right?

17  A.   It sounds—it sounds like more, but—

18  Q.   I'm sorry?

19  A.   It sounds like more, but—

20  Q.   Yeah, okay.  Now in addition to the times that you met with

21  the government lawyers, your lawyer also had separate

22  conversations with them, right?

23  A.   Yes.

24  Q.   Okay.  And your lawyer would—withdrawn.

25              I'm going to just caution you to be careful.  I don't

```
 1   want you to tell me about any communications that you had with
 2   your lawyer, okay?  I don't want you to recount those
 3   conversations, okay?  Does that make sense?
 4   A.  It does.
 5   Q.  Okay.  Is it fair to say that your lawyer would report back
 6   to you on his conversations with the government?
 7   A.  Yeah, that's fair to say.
 8   Q.  Okay.  Now did a time come when you reached an agreement
 9   with the government concerning its nonprosecution of you?
10   A.  Yes.
11               MR. SCHIRICK:  Okay.  If I may just have a moment,
12   your Honor.
13               Okay.  Could we please show the witness what's been
14   marked as DX 60657.
15               Not the jury, just the witness.
16               MR. HORTON:  Your Honor, we have no objection to its
17   admission.
18               MR. SCHIRICK:  Okay.  We move its admission, your
19   Honor.
20               THE COURT:  It is admitted.
21               (Defendant's Exhibit 60657 received in evidence)
22   BY MR. SCHIRICK:
23   Q.  Okay.  Now, Mr. Brown, do you recognize this as the
24   nonprosecution agreement that you reached with the government
25   here?
```

1    A.  I do.

2    Q.  Okay.  Now I believe you testified at the beginning of your

3    direct that you believed this agreement covered you for your

4    involvement with Guo Media.  Do you recall that?

5    A.  Yes.

6    Q.  Does Guo Media appear anywhere in this first paragraph?

7    A.  It does not.

8    Q.  Okay.  So Guo Media was not included in this agreement,

9    right?  You were just mistaken about that?

10   A.  I was mistaken.

11   Q.  Okay.  Now this agreement covers you for your time working

12   at GTV Media and the Himalaya Exchange, right?

13   A.  Yes.

14   Q.  Okay.  For the period June 2020 to January 2023.

15   A.  That's correct.

16   Q.  Right.  And do you believe that you committed any crimes

17   during that time?

18   A.  I do.

19   Q.  And is the crime that you're referring to the false

20   statements that you made in the video?

21   A.  Yes.

22   Q.  And those crimes were your crimes, right?

23   A.  Yes.

24   Q.  Because, as we covered before, no one told you to say what

25   you said on those videos; no one from the Himalaya Exchange

O6L1GUO6                          Brown - Cross

1    told you to say what you said in those videos, right?

2    A.  No one told me what to say on the videos, no.

3    Q.  Right.  Those words were your own; they weren't the

4    Himalaya Exchange's words, they weren't——right?  No one at the

5    Himalaya Exchange——withdrawn.

6            Those words were your words, right?

7    A.  They were.

8            MR. SCHIRICK:  Okay.  Now if we can please flip to the

9    second page.

10   Q.  Now who do you understand——withdrawn.

11           You understand, I believe you testified on direct,

12   that as long as you tell the truth today, you will get the

13   benefit of this nonprosecution agreement, right?

14   A.  Yes.

15           MR. SCHIRICK:  Okay.  And if we just blow up the

16   second to last paragraph there on the first sentence.

17   Q.  And it reads, "It is understood that if the government has

18   determined that Brown has committed any crime after signing

19   this agreement. . ."  Do you see that?

20   A.  I do.

21   Q.  Okay.  Now who gets to determine whether you tell the truth

22   here today?

23   A.  I determine if I'm telling the truth.

24   Q.  Who gets to determine whether this agreement remains in

25   force?

1  A.  The government.

2  Q.  Right.  And if the government determines that you've lied,

3  then they can rip it up, right?

4  A.  That's true.

5  Q.  Right.  So it's the government that determines whether you

6  told the truth here today, right?

7           MR. HORTON:  Objection.  Asked and answered.

8           THE COURT:  You may answer.

9  A.  The facts determine if I tell the truth.

10  Q.  At the end of the day, some human being is going to judge

11  those facts, right?

12  A.  That's correct.

13  Q.  And who are the human beings who get to judge those facts?

14  The folks sitting right here, right?

15  A.  No, that's—

16           MR. HORTON:  Objection, your Honor.

17           THE COURT:  All righty.  Sustained.

18           MR. SCHIRICK:  If I can have a moment, your Honor?

19           THE COURT:  Yes.

20           MR. SCHIRICK:  Okay.  No further questions at this

21  time.

22           THE COURT:  Redirect?

23  REDIRECT EXAMINATION

24  BY MR. HORTON:

25  Q.  Mr. Brown, you testified earlier that when you spoke in

1   public on behalf of the exchange, you were toeing the company

2   line.  Do you remember that?

3   A.  I do.

4   Q.  Where did you get the company line?

5   A.  Well, the company line was spoken about in meetings and,

6   you know, what was proper to say and what wasn't.

7   Q.  And the things you said in the interviews in public, was

8   that consistent with the company line?

9   A.  It was.

10  Q.  Who arranged those interviews for you?

11  A.  Marketing did.

12  Q.  And who did marketing report to?

13  A.  William Je.

14  Q.  You were asked some questions on cross about other people

15  at the Himalaya Exchange getting access to H Coin.  Do you

16  remember that?

17  A.  I do.

18  Q.  Did those people get access to H Coin before the launch or

19  after it?

20          I'll withdraw that.

21          When was the private placement?

22  A.  It was before the launch.

23  Q.  And did anybody at the Himalaya Exchange get access to H

24  Coin in the private placement?

25  A.  Everyone had an opportunity to get the coin in the private

1  placement.

2  Q.  Did you?

3  A.  No.

4  Q.  And what price did people at the exchange, other than you,

5  get access to H Coin at the private placement?

6  A.  10 cents.

7  Q.  Was that before the launch or after the launch?

8  A.  Before the launch.

9  Q.  Was there anyone outside the exchange who had access to H

10  Coin at 10 cents at that time?

11  A.  People involved in the private placement.

12  Q.  And was anybody involved——let me ask this:  Were there

13  people involved in the private placement who didn't work at the

14  exchange?

15          MR. SCHIRICK:  Objection, foundation.

16          THE COURT:  You can answer.

17  A.  Yes.

18  Q.  And who were those people?

19  A.  Those were individual investors.

20  Q.  And how did they get that access?

21  A.  It was granted to them by William.

22  Q.  And what happened to the 10-cent price of H Coin after the

23  people you are talking about got access?

24  A.  After the launch?

25  Q.  That's right.

1  A.  Yes, after the launch the price spiked.

2  Q.  From 10 cents to what?

3  A.  It went to 1 dollar immediately when I was doing the

4  interview, and it went to $20 in two weeks, and it eventually

5  got up to close to 60-something dollars, I believe.

6  Q.  And what, if anything, did that mean for the value of H

7  Coin that was given to the insiders you mentioned?

8           MR. SCHIRICK:  Objection, form.

9           THE COURT:  Sustained.

10  Q.  What, if anything, did that mean, Mr. Brown, for the value

11  of the H Coin that was given to certain people at 10 cents?

12           MR. SCHIRICK:  Same objection.

13           THE COURT:  Are you asking him an arithmetical

14  question?

15           MR. HORTON:  I'm asking him what the later price spike

16  meant for the value of the coins that were granted earlier on;

17  what his understanding was of what that meant.

18           I can move on, your Honor.

19  BY MR. HORTON:

20  Q.  You were asked some questions on cross about the Himalaya

21  Exchange's statements that it made about credits and crypto.

22  You remember that?

23  A.  I do.

24  Q.  Were H Coin credits crypto?

25  A.  They were not.

Brown - Redirect

```
 1   Q.  Why not?

 2   A.  Because they weren't on the blockchain.

 3            MR. SCHIRICK:  Objection, your Honor.  It goes back to

 4   the sidebar earlier.

 5            THE COURT:  Overruled.

 6   Q.  Were H Dollar credits crypto?

 7   A.  They were not.

 8   Q.  Why not?

 9   A.  They weren't on the blockchain.

10   Q.  And when, if ever, could Himalaya Exchange customers buy H

11   dollars on the blockchain?

12   A.  Never during my tenure.

13   Q.  And when, if ever, could Himalaya customers buy H Coin on

14   the blockchain?

15   A.  Never during my tenure, counsel.

16   Q.  You were asked a series of questions about what it's like

17   for customers at other cryptocurrency exchanges.  Do you

18   remember that?

19   A.  I do.

20   Q.  When, if ever, was H Coin listed at another cryptocurrency

21   exchange?

22   A.  It—it never was.

23   Q.  And when, if ever, was H Dollar listed on another

24   cryptocurrency exchange?

25            THE INTERPRETER:  Counsel, slow down.
```

```
 1              MR. HORTON:  Fair enough.
 2   Q.  Mr. Brown, when, if ever, were customers able to buy H
 3   Dollar at another cryptocurrency exchange?
 4              MR. SCHIRICK:  Objection.  During his time at the
 5   exchange?
 6              THE COURT:  You may answer.
 7   A.  Never.
 8   Q.  You were asked some questions on cross about the
 9   distribution of the white papers.  Do you remember that?
10   A.  I do.
11   Q.  Did Long Island David give out the white paper?
12              MR. SCHIRICK:  Objection.
13              THE COURT:  Overruled.
14   Q.  The question was:  Did Long Island David give out the
15   Himalaya Exchange white paper?
16   A.  I'm not sure who Long Island David is.
17   Q.  Did David Dai in the UK give out the white paper?
18   A.  David Fallon?
19   Q.  Oh, no.  Did David Dai, in the UK, did he give out the
20   white paper?
21   A.  No.
22   Q.  Did the Phoenix Farm give out the white paper?
23              MR. SCHIRICK:  Objection, your Honor.  Assumes facts
24   not in evidence.
25              THE COURT:  Overruled.  You may answer.
```

O6L1GUO6                          Brown - Redirect

1   A.  No.

2   Q.  Did Minran Wu get a copy of the white paper?

3              MR. SCHIRICK:  Objection.  Foundation.  There's no way

4   he can know that.

5              THE COURT:  You may answer if you know.

6   A.  I'm not sure who that is or if they got a copy of it.

7   Q.  Did the Mountain of Spices Farm distribute the white paper?

8              MR. SCHIRICK:  Same objection.

9              THE COURT:  You may answer.

10  A.  Not that I know of.

11  Q.  What about the UK Farm, did they distribute the white

12  paper?

13  A.  Not that I know of.

14             MR. SCHIRICK:  Same objection.

15  Q.  Did the G Translators translate the white paper?

16             MR. SCHIRICK:  Objection.

17             THE COURT:  If you know, you may answer.

18  A.  I'm not sure who translated the white paper.  I think it

19  was our customer service team.

20  Q.  Did the Iron Blood Group distribute the white paper?

21             MR. SCHIRICK:  Objection.

22             THE COURT:  You can answer if you know.

23  A.  Well, I don't know.

24  Q.  Do you know if Miles Guo distributed these white papers to

25  his followers?

1   A.  I don't know that.

2           MR. HORTON:  Could I have a moment, your Honor.

3           THE COURT:  Yes.

4   Q.  You were asked questions on cross about a second

5   conversation you had with Yvette Wang.  Do you remember that?

6   A.  Yes.

7   Q.  What was she calling you about?

8   A.  She was calling me to try to push the development team to

9   connect the ecosystem of Miles Guo's entities.

10  Q.  Who did Yvette Wang work for?

11          MR. SCHIRICK:  Objection.

12          THE COURT:  Overruled.  You may answer if you know.

13  A.  I believe it was GTV or G Groups.

14  Q.  And who controlled GTV?

15          MR. SCHIRICK:  Objection.

16          THE COURT:  You can answer if you know.

17  A.  Miles Guo did.

18          MR. HORTON:  Just one moment, your Honor.

19  Q.  Mr. Brown, in your two and a half years at the Himalaya

20  Exchange, did it hold gold?

21  A.  Not to my——

22          MR. SCHIRICK:  Objection.  Asked and answered.

23          THE COURT:  Overruled.

24  A.  Not to my knowledge.

25  Q.  In your time at the Himalaya Exchange, was H Coin backed by

O6L1GUO6                          Brown - Recross

1    gold?

2    A.  It was not; not to my knowledge.

3    Q.  The live feed of gold that you mentioned in response to

4    Mr. Schirick's questions, did that ever happen?

5    A.  Never saw it.

6              MR. HORTON:  No further questions.

7              THE COURT:  Recross?

8              MR. SCHIRICK:  Very briefly, your Honor.

9    RECROSS EXAMINATION

10   BY MR. SCHIRICK:

11   Q.  Mr. Horton just listed a whole bunch of peoples and

12   entities, right?

13   A.  Yes.

14   Q.  Right?  Do you have any idea who those people are?

15   A.  I hadn't heard of them, no.

16   Q.  Yeah.  Do you have any idea whether they received a copy of

17   the white paper or not?

18   A.  I don't.

19   Q.  Yeah.  But it's true that the white papers, in your

20   understanding, were posted to the internet, correct?

21   A.  Yes.

22   Q.  Okay.  Do you know if any of those people he listed have

23   access to the internet?

24   A.  Could you repeat that?

25   Q.  Do you know if any of the people that he listed have access

O6L1GUO6

1    to the internet?

2    A.  I do not know that.

3              MR. SCHIRICK:  Okay.  No further questions.

4              MR. HORTON:  Nothing further.  Thank you.

5              THE COURT:  Thank you.  You may step out.

6              (Witness excused)

7              THE COURT:  Members of the jury, it's now 4:59.  So we

8    have finished our work for the week.  You'll be coming back on

9    Monday, and we will revert to our prior schedule where you'll

10   be able to leave at 2:45.  So I want you to be ready to come in

11   on Monday into the courtroom at 9:30.

12             I also want to remind you about our schedule going

13   forward.  During the week of June 24th, next week, we have no

14   court on Friday.  So it's just four days.  And the following

15   week, we only are in on Tuesday and Wednesday, the 2nd and the

16   3rd of July.

17             So I wish you a good weekend.  Remember that you're

18   not allowed to discuss the case amongst yourselves or with

19   anyone else.  Don't permit anyone to discuss the case in your

20   presence.  Don't read, listen to, or watch anything from any

21   source that touches on the subject matter of this case.

22             Have a good weekend.

23             (Jury not present)

24             THE COURT:  You may be seated.

25             Is there anything before we break for the weekend?

O6L1GUO6

1          MR. FINKEL:  Your Honor, I just want to temper now

2     what I said this morning, in light of this afternoon's pacing.

3     We had anticipated in our projection to accomplish another

4     three witnesses today, two of which are short, one of which is,

5     I would say, a medium-length witness, probably along the lines

6     of the Mahwah special agent.  Not short but not really long

7     either.  The cross today was very long——much longer than the

8     direct.  We would ask the Court to consider sitting a full day

9     on Tuesday to ensure that the government——what the government

10     hopes to do is rest on Tuesday.  We think that will help pick

11     up the time.  There are a number of witnesses that are left,

12     many of which we think are short, but we don't know how long

13     the crosses are going to be.  And our projection of the cross

14     for this particular witness was clearly wrong.  I think

15     Mr. Schirick said he had 45 minutes left at the lunch break.

16     That didn't prove to be the case either.  That happens; we

17     understand.  But to stick to the Tuesday, we might need more

18     time.

19          I just want to keep the Court informed of where we are

20     in terms of progress.  That's all.

21          THE COURT:  So I'm not opposed to asking the jurors if

22     they can stay until 5 on Tuesday.  So why don't we see where we

23     are on Monday.

24          MR. FINKEL:  That makes sense to the government, your

25     Honor.  Just so your Honor understands, from the government's

O6L1GUO6

1    perspective, it's not just about when the government rests.

2    The defense has a case, as they are entitled, and we're trying

3    to predict the length of their case, also the possibility that

4    the defendant chooses to testify, and sort of where that puts

5    us with the date that the Court told the jury of July 12th, I

6    think, if I have that right, plus the days off. So that's the

7    government's thinking, and we appreciate the Court's indulgence

8    on that and wish your Honor a good weekend.

9              THE COURT: Anything from the defense?

10             MS. SHROFF: Your Honor, I believe that Mr. Kamaraju

11    has communicated that the defense case is not long, and we're

12    kind of confused as to why the government keeps thinking that

13    we are going to exceed our time slot. We fully anticipate

14    being on track with the trial end date that the Court has told

15    the jurors. I do not believe we need to change the schedule.

16    But I think that there is no concern from the defense side of

17    the case, and I'm trying to assuage that for the Court. We do

18    not believe it will be a long case. We've said this several

19    times before, and we reiterate it here. And should that

20    change, we will let the Court know immediately as well.

21             Thank you, your Honor.

22             MR. FINKEL: Your Honor, I have talked with defense

23    counsel about the case, and their estimate is that it ends on

24    July 3rd, without the defendant testifying, right? If the

25    defendant testifies, that's going to change things, obviously.

O6L1GUO6

1   But we also have their witness list, and it doesn't look like a

2   four-day defense case.  If there are witnesses that the defense

3   has scratched off the list, some they told us about, some we

4   agreed to scratch off as part of stipulation negotiations, but

5   there are a lot who are still pending, and if they already know

6   that they're not calling them, we'd ask that they tell us today

7   who they're not going to call.

8           MS. SHROFF:  Your Honor, to the extent that we have

9   any additional information, I'm sure we will be able to

10  communicate that to them.  But again, the defense does not

11  anticipate this trial going beyond the time told to the jurors.

12  I just reiterate that.  It's been a long week, your Honor, and

13  if we have any updated information, we're happy to pass it

14  along.

15          THE COURT:  All right then.

16          MS. SHROFF:  Thank you.

17          THE COURT:  On Monday, at 11:30, I will revisit this

18  issue.

19          MR. FINKEL:  Thank you, your Honor.

20          THE COURT:  Have a good weekend.

21          ALL COUNSEL:  You too.

22          (Adjourned to June 24, 2024, at 9:00 a.m.)

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   GABRIELLA LUCIANO

 4   Direct By Ms. Murray . . . . . . . . . . . .3580

 5   Cross By Ms. Shroff  . . . . . . . . . . . .3610

 6   Redirect By Ms. Murray . . . . . . . . . . .3630

 7   Recross By Ms. Shroff  . . . . . . . . . . .3632

 8    JESSE BROWN

 9   Direct By Mr. Horton . . . . . . . . . . . .3633

10   Cross By Mr. Schirick  . . . . . . . . . . .3706

11   Redirect By Mr. Horton . . . . . . . . . . .3843

12   Recross By Mr. Schirick  . . . . . . . . . .3851

13                        GOVERNMENT EXHIBITS

14   Exhibit No.                              Received

15    AS-12   . . . . . . . . . . . . . . . . . .3792

16    AS-13   . . . . . . . . . . . . . . . . . .3781

17    AS-18   . . . . . . . . . . . . . . . . . .3793

18    NJ-358  . . . . . . . . . . . . . . . . . .3595

19    3401    . . . . . . . . . . . . . . . . . .3677

20    3419    . . . . . . . . . . . . . . . . . .3639

21                         DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    60657   . . . . . . . . . . . . . . . . . .3840

24

25
```