O6O1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                  v.                        23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                     Defendant.            Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         June 24, 2024
                                           9:00 a.m.
 8
     Before:
 9
10                     HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                            APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6O1GUO1

1    ALSO PRESENT:
     Isabel Loftus, Paralegal Specialist, USAO
2    Robert Stout, Special Agent, FBI
     Jorge Salazar, Defense Paralegal
3    Tuo Huang, Interpreter (Mandarin)
     Shi Feng, Interpreter (Mandarin)
4    Yu Mark Tang, Interpreter (Mandarin)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6O1GUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          ALL COUNSEL:  Good morning, your Honor.

4          THE COURT:  Would you make your appearances, please.

5          MR. FINKEL:  Good morning, your Honor.  Ryan Finkel

6     and Justin Horton for the government.  We're joined by Isabel

7     Loftus, a paralegal specialist with our office.  Juliana Murray

8     and Micah Fergenson will be joining us shortly.

9          MS. SHROFF:  Good morning, your Honor.  On behalf of

10    Mr. Kwok, Sabrina Shroff, Sid Kamaraju, Scott Schirick, and

11    Matt Barkan.  Also present at counsel table is Mr. Salazar.

12         THE COURT:  Please be seated.

13         Is there anything before we get started at 9:30?

14         MS. SHROFF:  Not from the defense, your Honor.

15         MR. FINKEL:  Not so much of an issue from the

16    government.  I just want to update the Court on scheduling, if

17    the Court would like.

18         THE COURT:  Okay.

19         MR. FINKEL:  So the government, assuming we can get a

20    certain document in today, we believe we'll hopefully be able

21    to rest tomorrow, if tomorrow is a full day.  If tomorrow is

22    not a full day, I'm not sure.  We have, I would say, two

23    medium-length witnesses today and two short witnesses today.

24    That's our plan.  I'm not sure what the cross is going to be on

25    the medium-length witnesses.  If it's consistent with some

O6O1GUO1

1    other crosses, we might not even be able to get those through

2    today.

3              We received the defense's witness list over the

4    weekend, which we appreciate that they provided.  There are 11

5    witnesses on the witness list, possibly 12.  We might stip on

6    one witness.  The defense estimates that they can complete

7    those 12 witnesses—or 11 witnesses assuming the stip—by

8    July 3rd is my understanding.  That does not seem realistic to

9    the government, particularly if those days are half days.  A

10   lot of the witnesses—I mean, of the witnesses, three of them

11   are experts, which are going to take some time.  There are a

12   number of witnesses who—I mean, some of them we don't really

13   know what their testimony is going to be because there's no

14   26.2 material for those witnesses.  We can guess, and I think

15   it's basically they'll sort of put in Guo's life story and

16   other issues.  I don't know.  But in any event, when we've done

17   the 9:30-to-2:45 days, on average we've done about two

18   witnesses a day; some days we've done three, some days we've

19   done one.  At that two-witness-a-day clip, we're very easily

20   into the end of July at this point, and that's assuming the

21   defendant doesn't testify.  And if the defendant

22   testifies—which, of course, he is entitled to do, and is

23   entirely his right if he chooses to—I imagine such testimony

24   will take days.  He's going to have to explain, I imagine, all

25   the videos, the recordings, all the statements, the businesses,

O6O1GUO1

1    the investments.  It's going to take a lot of time, and so is

2    the cross.

3            So the way the government is looking at this is, we

4    certainly defer to the Court on what makes the most sense in

5    terms of scheduling.  But if the goal is to complete this trial

6    all in by July 12th, it does not seem feasible to the

7    government to continue to sit just until 2:45.  And maybe it's

8    extending just a little bit each day or on certain days, but

9    the government does believe we need to extend the days to make

10   sure we get all this in.  And at a minimum, we would ask your

11   Honor to at least let the jury know that the week of July 8th,

12   that sort of last week, would be a full day, because assuming

13   things go as the defense anticipates, and the government

14   certainly hopes, it would seem to the government that that week

15   would be jury addresses and deliberations, which I assume the

16   Court——and maybe I'm wrong to assume this, but I assume the

17   Court would want to sit until 5 for those events.

18           So sort of the bottom line, your Honor, coming back

19   full circle, is, given what we understand the defense case is

20   going to be, we believe that the Court should consider sitting

21   longer days to make sure we meet the end of the trial by

22   July 12th, which is what the Court predicted for the jury and

23   what the parties had assumed would be the case.

24           MR. KAMARAJU:  Thank you, your Honor.  And good

25   morning.

O6O1GUO1

1          So what I would propose is—I think I heard Mr. Finkel

2     say that the government would like to discuss with the Court

3     and the parties the idea of possibly extending certain days,

4     you know, maybe some a little bit, maybe some a little bit

5     more.  I think it might be productive for us to have a

6     conversation with the government, because we're not opposed to

7     doing some modification of the schedule to make sure that we

8     complete the trial in a timely fashion.  I don't know that the

9     defense believes that that's necessary to sit full 9-to-5 days

10    every day.  And our witnesses, while there are 11 of them, some

11    of them are, I anticipate—particularly in light of your

12    Honor's recent ruling—some of them may be under 30 minutes.

13    And our experts, it's hard for me to envision any of their

14    direct examinations being more than 60 to 90 minutes.  So I

15    think we'd be well on track, but I think what we would propose

16    is to have that discussion with the government, see if we can

17    arrive at something mutual that we all believe can get this

18    trial done in the right time, propose it to your Honor for your

19    Honor's consideration, and, if your Honor agrees, then propose

20    that to the jury.  That would be my proposal.

21          MR. FINKEL:  So, your Honor, certainly happy to speak

22    with defense counsel more about this and try to reach an

23    agreement.  I would just ask two things.  One, I think—I'm not

24    sure, but—a number of the defense witnesses will require a

25    translator, which will extend matters.  If there are three

O6O1GUO1

1    experts who are 60 to 90 minutes, let's assume that it's 75

2    minutes on average, let's say it's a half hour of cross; that

3    itself is two days.  So if they think they're going to put

4    their entire 11 witnesses in in four days, it just doesn't seem

5    feasible, candidly.  And I wish it was.  I hope it moves

6    quickly.  I really do.

7            The second point, your Honor, is we would ask that

8    tomorrow, to the extent it works for your Honor and for the

9    jury, that we would extend the day until either we complete our

10   witnesses for the day or 5:00, whichever happens sooner.  There

11   is one witness, if we need them——and hopefully we won't,

12   but——if there's one witness we need for custodial purpose, that

13   would have to be on Wednesday.  That person is not available

14   until Wednesday morning.  But anyway, that's sort of where we

15   are.  But I very much accept the invitation to have a

16   discussion with defense counsel, and would ask your Honor to

17   consider sitting tomorrow later.

18           MR. KAMARAJU:  And just on the cross-examination

19   point, your Honor, we have been working to try to make them

20   more efficient.  We'll continue to do that.  I'll just give

21   your Honor an example.  On Friday, I believe Special Agent

22   Luciano testified on direct for 107 minutes, and I believe

23   Ms. Shroff's cross-examination was 26 minutes, which is about

24   the same length of time that Special Agent Luciano testified

25   about photographs, about towels and slippers, and lead paint

O6O1GUO1

1    disclaimers in the contract.  So we are working to try to make

2    our crosses more efficient.  I assume the government will do

3    the same.

4            We are looking at our witness list.  We're trying to

5    stipulate to certain things with the government to try to even

6    shorten that list even further.  But candidly, our witnesses

7    are not of the same length that the government's are.  We don't

8    have three- or four- or five-hour witnesses that impact the

9    average that Mr. Finkel was talking about.  So again, I propose

10   that we speak with the government.  Maybe we can come up with a

11   resolution that avoids your Honor having to resolve a dispute.

12   But that would be my proposal.

13           THE COURT:  So what I think that I would like to do is

14   ask them to stay late on Tuesday and Wednesday.  I cannot stay

15   late on Thursday.  And so I will ask that question when they

16   come out this morning, if there's anybody who absolutely cannot

17   stay late on Wednesday and Thursday.  In the meantime, you will

18   have your discussion.  Of course I wish that you had had this

19   discussion during the break.  But I urge you to talk to each

20   other.

21           Anything else?

22           MR. FERGENSON:  Yes, your Honor.  Just a couple points

23   to try and streamline the examination of the bankruptcy

24   witness, Mr. Douglas Skalka.  He is a local counsel in

25   Connecticut to the bankruptcy trustee.  In his direct

O6O1GUO1

1    examination, we are trying to hue very closely to the narrow

2    presentation of particularly probative, relevant evidence from

3    the bankruptcy, as we laid out in our motions *in limine* and as

4    the Court ordered we were permitted to do.  We hope that it

5    will be an efficient presentation.  And, you know, the first

6    point, your Honor, is just that by calling someone related to

7    the bankruptcy, it doesn't mean that cross-examination is now a

8    trial within a trial about the separate bankruptcy case.  It

9    should be focused, of course, on what was elicited in the

10   direct examination.  That's just one point.  And hopefully, to

11   Mr. Kamaraju's point, the defense is, you know, doing focused

12   cross-examinations now as well.

13           There are two other points to raise, your Honor, just

14   about evidentiary disputes, as I understand them to be

15   disputes.  The first relates to the custodial witness we may

16   need to call on Wednesday.  One of the pieces of evidence we

17   were hoping to just include in Mr. Skalka's testimony about the

18   bankruptcy relates to transcripts from what are called 341

19   meetings of creditors.  As I understand it, in a bankruptcy

20   proceeding, the debtor has to testify at a proceeding that is

21   sort of organized and administered by the DOJ's Office of the

22   Trustee.  It's a component of the Department of Justice that

23   sort of helps facilitate bankruptcy proceedings.  I'm not an

24   expert in that, but that is my understanding.  They hold these

25   meetings, they record them, they get transcribed.

O6O1GUO1

1           THE COURT:  Is it sworn?  Are the statements sworn?

2           MR. FERGENSON:  Yes.  And Mr. Skalka was not present

3   at those meetings, but we were still hoping to offer selected

4   excerpts of the defendant's testimony at that through

5   Mr. Skalka, since he is sort of our bankruptcy witness, for

6   this type of evidence.  He wasn't present at these meetings,

7   however.  We understand that the defense is going to object on

8   authenticity grounds to offering these transcripts.  Now as

9   Mr. Finkel indicated, we can call the attorney from the Office

10  of the Trustee, who is in New Haven.  She has court on

11  Tuesdays.  Rather than trying to disrupt the court in New

12  Haven's schedule, she could be available Wednesday morning to

13  come and say, yes, you know, this was a recording, this is the

14  testimony, here's the transcript.  And that would be the extent

15  of it.  We're not really sure why that would be necessary to do

16  that.  We're hoping it would be efficient to just offer them

17  through Mr. Skalka.  But that's ultimately up to the defense, I

18  guess.  You know, what Mr. Skalka can say is that, you know, as

19  local counsel in the bankruptcy proceedings, he received these

20  transcripts, he's used them in filings, they've been relied on

21  in court.  But like I noted, he wasn't present at the meeting

22  itself.

23          The second issue, your Honor, relates to—and I'm not

24  sure if we want defense counsel to address the first and then I

25  can raise the second.

O6O1GUO1

| | |
|---|---|
| 1 | THE COURT:  Yes.  I'd like to hear from the defense on |
| 2 | that issue of the transcripts. |
| 3 | MR. KAMARAJU:  Yes, your Honor.  All we're asking for |
| 4 | is for the government to authenticate documents in the way that |
| 5 | the law requires.  We are happy to talk to them about potential |
| 6 | stipulations, as we have already, and even in the context of |
| 7 | this document.  But I don't think it is asking too much for the |
| 8 | government to introduce evidence through witnesses who can |
| 9 | properly authenticate it.  We've had that issue before, during |
| 10 | this trial.  And that's it.  This witness, I think |
| 11 | Mr. Fergenson essentially conceded, does not have personal |
| 12 | knowledge to authenticate that, and as defense counsel, it's |
| 13 | hard for me to see how I can just automatically stipulate to |
| 14 | something that the government doesn't have a basis for the |
| 15 | witness to put in.  So Mr. Skalka, I don't believe, is coming |
| 16 | up first, so if they'd like to continue that discussion, I'm |
| 17 | happy to.  But it's pretty clear this witness does not have the |
| 18 | ability to authenticate these transcripts. |
| 19 | THE COURT:  But your client certainly would know what |
| 20 | he said, right?  In other words, you could stipulate, based |
| 21 | upon your client's representation to you, that these were his |
| 22 | words. |
| 23 | MR. KAMARAJU:  Well, they're in English, your Honor, |
| 24 | first of all, so— |
| 25 | THE COURT:  Well, of course they could be translated. |

O6O1GUO1

1          MR. KAMARAJU:  They could be, your Honor, but I'm not

2    sure how that—let me put it this way.  My client could tell me

3    if he recalls, during the course of this interview, giving

4    these answers in connection with these questions.  I don't know

5    that he'll be able to do that.  But even if he was able to do

6    that, I'm not sure that obviates the government's requirement

7    to authenticate the documents.

8          THE COURT:  It's not a question of whether it obviates

9    the government's obligation, it's a question as to whether or

10   not you'll stipulate.  It's your call, of course.  You make

11   your decisions as to how to best represent your client.  And so

12   if there is no stipulation, then that witness will have to be

13   called.

14          What is the second issue?

15          MR. FERGENSON:  The second issue, your Honor, is, part

16   of the testimony relates to this $37 million transfer from the

17   Himalaya Exchange's bank accounts to the bankruptcy attorney

18   that was representing Mei Guo, Mr. Guo's daughter, who claimed

19   to be the owner of the yacht, the Lady May.  One of the main

20   disputes that sort of led to the bankruptcy related to the Lady

21   May, your Honor, and there was a $37 million loan from the

22   Himalaya Exchange entities to Mei Guo that was then put in

23   escrow, because the yacht had been moved outside the

24   jurisdiction of the United States.  It relates to a draft loan

25   agreement related to that.  So the executed loan agreement is

O6O1GUO1

1    filed on the docket, filed by both parties in the bankruptcy.

2    Mr. Skalka is going to introduce that document.  There was sort

3    of a global agreement related to this $37 million escrow early

4    on in the bankruptcy.  There's also an initial draft of that

5    loan agreement where the lender was not the Himalaya Exchange

6    entity but ACA Capital Group, which, your Honor may recall, is

7    the entity that had the bank account in Abu Dhabi that the

8    government alleges basically used a money laundering slush fund

9    to cycle fraud proceeds into and then back out of, back into

10   the United States.  That draft loan agreement was produced in

11   discovery by the attorneys for the entity that is the

12   borrower——sorry——basically the shell company that Mei Guo was

13   the listed owner of.  And Mr. Skalka, you know, it was produced

14   in discovery to the trustee.  Mr. Skalka has access to that

15   discovery.  It's Bates stamped with that entity's name.  He's

16   going to identify that as a draft loan produced in discovery.

17   We're going to offer it.  We understand the defense is going to

18   object to that.  I just wanted to raise it so maybe we can

19   handle it now rather than at a sidebar during the jury's time.

20           THE COURT:  So your witness would merely be stating

21   that this is a document that he received.  He doesn't have any

22   personal connection to the document.

23           MR. FERGENSON:  Correct, your Honor.  It's a draft

24   loan agreement between the, you know, the same——the final

25   executed version that's filed on the docket by both parties in

O6O1GUO1

1    connection with the bankruptcy proceeding.  This is just a

2    draft version of it that was produced by that party in

3    discovery to the trustee.

4            THE COURT:  So are you saying that the final document

5    is something that we have a stipulation on?

6            MR. FERGENSON:  No, your Honor.

7            THE COURT:  No.

8            MR. FERGENSON:  I don't think they're objecting to the

9    final.

10           THE COURT:  They're not objecting to the final.

11   They're objecting to the——

12           MR. FERGENSON:  I'm not certain.  That was my——maybe

13   I'm assuming.  I thought it was the draft.

14           MR. KAMARAJU:  Your Honor, I can clear that up.  We

15   won't object to the final coming in.

16           THE COURT:  But you do object to the draft.

17           MR. KAMARAJU:  We had objected to the draft, your

18   Honor.  Frankly, I was curious about what the basis for

19   authentication was that Mr. Fergenson was going to address for

20   the draft.

21           THE COURT:  Well, it's the problem of authentication

22   that he's raising.

23           MR. KAMARAJU:  Right.  I raised the problem of

24   authentication because I don't think it comports with your

25   Honor's prior ruling.  For example, we dealt with this issue

O6O1GUO1

1     with the G Club documents in Ms. Reyes's testimony, and the

2     government offered them, said that Ms. Reyes could authenticate

3     them on the basis of her recognizing the signatures and

4     recognizing those documents as being sort of the packet that

5     G|CLUBS had typically used.  So because she had sort of inside

6     knowledge, right, because she worked there.  Mr. Skalka doesn't

7     have that.

8              I think, your Honor, that if I have a discussion with

9     Mr. Fergenson, we may be able to resolve this issue as well.

10             THE COURT:  I hope so.  So you'll talk to each other,

11    and we'll start at 9:30.

12             MR. KAMARAJU:  Thank you, your Honor.

13             MR. FERGENSON:  Thank you, your Honor.

14             (Recess)

15             THE COURT:  Would you have the jurors brought in.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O6O1GUO1

```
 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              Good morning, jurors.

 4              THE JURORS:  Good morning.

 5              THE COURT:  Welcome back.

 6              Due to circumstances beyond my control and the control

 7    of the parties, it looks like we're going to need some extra

 8    time; otherwise, I don't think we'll be able to finish by

 9    July 12th.  And so I would like you to stay until 5

10    tomorrow——Tuesday——and Wednesday.  So today we stop at 2:45.

11    Tomorrow you'd be staying until 5, Wednesday until 5, Thursday

12    until 2:45, and Friday off.

13              Is there anyone who absolutely cannot do that?  If you

14    would just state your number.

15              JUROR:  10.

16              THE COURT:  And what is it that you're not able to——

17              JUROR:  I can't on Wednesday.  I have——

18              THE COURT:  I can't hear you.

19              JUROR:  I can't on Wednesday.

20              THE COURT:  But tomorrow you can.  Okay.

21              JUROR:  I can't on Wednesday either.

22              THE COURT:  So we will not be in session until 5 on

23    Wednesday.

24              All righty.  So let's continue with the examination of

25    the witness.
```

O6O1GUO1                          Buck - Direct

 1                MR. FERGENSON:  Yes, your Honor.  The government calls

 2    Amy Buck.

 3                THE COURT:  All righty.

 4                (Witness sworn)

 5                THE COURT:  Please state your name and spell it.

 6                THE WITNESS:  Amy Buck Faundez.  A-M-Y, B-U-C-K,

 7    F-A-U-N-D-E-Z.

 8                THE COURT:  You may inquire.

 9                MR. FERGENSON:  Thank you, your Honor.

10     AMY BUCK FAUNDEZ,

11          called as a witness by the Government,

12          having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. FERGENSON:

15    Q.  Good morning, Ms. Buck.

16    A.  Good morning.

17    Q.  Where do you live?

18    A.  New Jersey.

19    Q.  What do you do for work?

20    A.  I'm a real estate attorney.

21                MR. FERGENSON:  Ms. Loftus, if we could please publish

22    Government Exhibit Z12, at page 19.

23    Q.  Ms. Buck, have you ever seen this before?

24    A.  I have not.

25    Q.  Focusing you on the bottom right, can you read the text in

1    the bottom right box.

2    A.   Buck Esq LLC, Attorney Trust Account.

3    Q.   What's the name of your LLC?

4    A.   Buck Esq LLC.

5    Q.   Were you involved in the purchase of the property at 675

6    Ramapo Valley Road in Mahwah, New Jersey?

7    A.   Yes.

8    Q.   What's the name you refer to that property as?

9    A.   Crocker Mansion.

10   Q.   And what was your role in the purchase?

11             MS. SHROFF:  May I have the exhibit taken down if it's

12   not being used.

13             MR. FERGENSON:  That's fine, your Honor.  We can take

14   it down.

15             THE COURT:  Okay.

16   Q.   And I'm sorry, Ms. Buck.  What was your role in the

17   purchase of the Crocker Mansion?

18   A.   I represented the purchaser in the transaction.

19   Q.   After the purchase did you continue to perform work in

20   connection with the Crocker Mansion?

21   A.   I did.

22   Q.   And at a high level, what did you do?

23   A.   I paid invoices to various contractors and vendors in

24   relation to the property.

25   Q.   Now, Ms. Buck, in whose name was title to the Crocker

O6O1GUO1                          Buck - Direct

1   Mansion held?

2   A.   Taurus Fund LLC.

3   Q.   And based on your work with the Crocker Mansion, who did

4   you understand to own the Crocker Mansion as a practical

5   matter?

6            MS. SHROFF:  Objection.

7            THE COURT:  You may answer.

8   A.   A family.

9   Q.   Do you know the name of the family?

10  A.   I do not.

11  Q.   Did you ever meet them?

12  A.   I did not.

13  Q.   All right.  Now, Ms. Buck, let's back up.  How do you

14  typically get business in your real estate practice?

15  A.   Through word of mouth and referrals.

16  Q.   Was the Crocker Mansion a referral?

17  A.   Yes.

18  Q.   And approximately when was it referred to you?

19  A.   The beginning of December of 2021.

20  Q.   And who referred it?

21  A.   Aaron Mitchell.

22  Q.   And in your initial conversation did you speak with Aaron

23  Mitchell or someone else?

24  A.   I spoke with his wife Dara.

25  Q.   And what's her last name?

O6O1GUO1                          Buck - Direct

1    A.  Lawall, L-A-W-A-L-L.  I believe that's the name she

2    practices under.  I'm not certain.

3    Q.  And what's her occupation?

4    A.  She's an attorney with her husband.

5    Q.  Now in that initial conversation what did you discuss with

6    Ms. Lawall?

7    A.  She called me.

8            MS. SHROFF:  Objection to hearsay.

9            MR. FERGENSON:  It's an agent——

10           THE COURT:  You can testify as to the nature of the

11   discussion.

12           THE WITNESS:  Okay.

13   A.  She reached out to refer this particular matter to me.  She

14   told me the clients were like family to her and they were very

15   important to them.  And she also wanted to inquire about my

16   ability to do a accelerated transaction.  It was a quick cash

17   transaction.

18   Q.  And Ms. Buck, was it your understanding she represented

19   this family?

20           MS. SHROFF:  Objection to the leading.

21           THE COURT:  So the witness can testify about the

22   subject matter but not about actual words stated by the

23   individual.

24           MR. FERGENSON:  We may need a brief sidebar, your

25   Honor.

1           THE COURT:  Okay.

2           (At the sidebar)

3           MR. FERGENSON:  Ms. Lawall is the wife of Aaron

4    Mitchell.  They have a law firm together, Lawall & Mitchell.

5    It's a law firm that represents the defendant.  They acted as

6    his agent in the purchase of this New Jersey property.  And

7    so—

8           THE COURT:  The nature of the agency?

9           MR. FERGENSON:  Is the attorney's relationship.

10          THE COURT:  Okay.

11          MR. FERGENSON:  And so I think she can testify to what

12   she was told by the agents of the defendant.

13          MS. SHROFF:  She's not an agent of Mr. Guo.  She's a

14   lawyer who practices law.  He's somebody she's married to, but

15   she's a separate lawyer.  I mean, women do get married and

16   still maintain a very separate professional existence.  She

17   does not have an attorney-client relationship and she's not

18   acting as the agent.

19          THE COURT:  Is there an attorney-client relationship

20   with Mr. Guo?

21          MR. FERGENSON:  Yes.  That's what she will testify to.

22   Ms. Lawall, the testimony will be that they have a very

23   important client to them, it's a family, they're looking for

24   someone to help quickly close on this property in Mahwah.

25   That's perfectly permissible for her to explain what she was

O6O1GUO1                          Buck - Direct

1    told about the representation by the attorney for the defendant

2    and his family.

3         THE COURT:  In addition to that, can you just give me

4    a feel for what else you're going to elicit.

5         MR. FERGENSON:  Yeah, of course.  So that's the

6    initial conversation.  After this initial conversation with

7    Ms. Lawall, she accepts the referral, and then thereafter, her

8    primary point of contact is Aaron Mitchell, Ms. Lawall's

9    husband, also the attorney of the defendant of the same law

10   firm that, you know, the husband and wife's shop.  And

11   thereafter, he's the point of contact, the representative, of

12   Taurus Fund and the family.  And she deals with him and with

13   others such as Scott Barnett, the defendant's primary

14   bodyguard; Gladys Chow, the defendant's translator; Sean Jing,

15   another of the defendant's personal assistants; and she has

16   communications with them about the closing on the property and

17   then also payment of invoices for renovations for the family on

18   the property, purchasing furnishings for the property, you

19   know, various other works that they use to trace back to

20   investor money that was sent to Crane and sent to Hamilton and

21   then to Ms. Buck.  That's, in essence, her testimony.

22        THE COURT:  Short witness then.

23        MR. FERGENSON:  That's what I'm hoping, your Honor.

24        THE COURT:  All right.  I'm going to allow the

25   testimony.

O6O1GUO1                       Buck - Direct

1            MS. SHROFF:  Your Honor, I just wanted to make sure

2    it's noted, we have no objection to Aaron Mitchell and the

3    remaining people.  The government's argument here is designed

4    to sort of obfuscate the issue.  The person I'm objecting to

5    the hearsay coming in is conversations with Ms. Lawall, who

6    does not represent the Guo family, has not had any

7    attorney-client relationship, and that is the narrow scope of

8    my objection.  Mr. Fergenson here went off as to all of the

9    other people, who, arguably, they've already identified as

10   agents or, quote-unquote, co-conspirators, but not this woman.

11   So my objection is narrow, just to this woman's hearsay

12   interactions with this lawyer.

13           THE COURT:  But I understand him to say that she had

14   these dealings with the Guo entity.

15           MS. SHROFF:  There is no such evidence.  There is only

16   evidence of a referral.  We have no—I'm not finished, sir.

17           MR. FERGENSON:  If I may respond.  The Court is

18   looking at me.

19           THE COURT:  One moment.

20           MR. FERGENSON:  You're correct.

21           THE COURT:  So I'm allowing the testimony.

22           MS. SHROFF:  Where is the relationship between her and

23   the Guo family?

24           THE COURT:  So he seeks to elicit that testimony, and

25   I'm relying on his representation as an officer of the court.

O6O1GUO1                     Buck - Direct

1    Let's go.

2              (In open court)

3              THE COURT:  You may continue.

4              MR. FERGENSON:  Thank you, your Honor.

5    BY MR. FERGENSON:

6    Q.  Ms. Buck, what did Ms. Lawall tell you about her client in

7    that conversation?

8              MS. SHROFF:  Objection.  Assumes facts not in

9    evidence.

10   Q.  What, if anything, did Ms. Lawall tell you about her

11   client——

12             MS. SHROFF:  Objection.

13   Q.  ——in that conversation?

14             MS. SHROFF:  Objection.  Assumes facts not in

15   evidence.

16             THE COURT:  You'll establish the relationship first.

17             MR. FERGENSON:  Your Honor, it's just what she was

18   told.

19             MS. SHROFF:  Objection.

20             THE COURT:  This is a conversation between whom and

21   whom?

22             MR. FERGENSON:  Between Ms. Buck and Ms. Lawall.

23             THE COURT:  Okay.  Yes, you may continue.  You may

24   answer.

25   A.  She told me that they were clients of theirs for a long

O6O1GUO1                        Buck - Direct

1    time and they were like family to them.

2    Q.  Did she tell you the client's name?

3    A.  She did not.

4    Q.  Did you understand——

5            THE COURT:  And just for the benefit of the jury,

6    Ms. Buck is who?  You're Ms. Buck.

7            THE WITNESS:  Me.

8            THE COURT:  Okay.  Okay.  I just want to make sure

9    that we know all the parties.  Go ahead.

10            MR. FERGENSON:  Understood, your Honor.  Thank you.

11    BY MR. FERGENSON:

12    Q.  All right.  And did you and Ms. Lawall discuss your fees?

13    A.  We did.

14    Q.  And what were your fees?

15    A.  $2,000.

16    Q.  Did you accept the referral from Ms. Lawall?

17    A.  I did.

18    Q.  After you spoke with Ms. Lawall, who was your primary

19    contact for the Crocker Mansion deal?

20    A.  Aaron Mitchell.

21    Q.  And what did Aaron Mitchell say his role was?

22    A.  He was the authorized representative for the Taurus Fund.

23    Q.  And did Aaron Mitchell tell you the name of the family he

24    represented?

25    A.  He did not.

1              MS. SHROFF:  Objection.  Assumes facts not in

2    evidence.

3              THE COURT:  You may answer.

4    A.  He did not.

5    Q.  And Ms. Buck, you can adjust the microphone.  If you could

6    pull it close to you.  And you could point it right at your

7    mouth.  It will be easier to hear you.

8    A.  There we go.  Better?

9    Q.  Much better.  Thank you.

10   A.  Sorry.

11             MR. FERGENSON:  All right.  May I approach, your

12   Honor?

13             THE COURT:  You may.

14   Q.  All right.  Ms. Buck, what did I just hand you?

15   A.  The witness binder.

16   Q.  And have you reviewed the government exhibits in that

17   binder previously?

18   A.  I have.

19   Q.  Does it contain documents you and your company provided to

20   the government from your work——

21             MS. SHROFF:  Objection to leading.

22             THE COURT:  You may answer.

23   Q.  ——from your work at Crocker Mansion?

24   A.  Yes.

25   Q.  Does it contain invoices and other records related to

O6O1GUO1                              Buck - Direct

1    payments you made on behalf of Taurus Fund?

2    A.   Yes.

3    Q.   Is it fair to say Buck Esq LLC regularly maintains such

4    records as part of its business?

5    A.   Yes.

6    Q.   Does it also contain communications with agents of Taurus

7    Fund?

8    A.   Yes.

9            MR. FERGENSON:  All right.  The government offers the

10   exhibits in the binder.  These are all in the GX BUCK, B-U-C-K,

11   series.  These are Government Exhibits 34, 44, 48, 49, 50, 60,

12   63, 69, 77, 80, 115, 117, 127, 131, 133, 138, 141, 168, 174,

13   194, 218, 221, 227, 232, 235, 236, 241, 243, 375, 391, 428,

14   522, 524, 532, 709, 822, 851, 1204, 1260, 1261, and then 1274

15   through 1291, and 1293 through 1296.  And the government offers

16   those exhibits.

17           MS. SHROFF:  We're not going to massively agree to the

18   admission of these exhibits.  Your Honor, I don't have an

19   authentication issue, but to the extent that we have hearsay

20   and other objections, we maintain them.

21           THE COURT:  All righty.  They are admitted.

22           (Government's Exhibits BUCK 34, BUCK 44, BUCK 48, BUCK

23   49, BUCK 50, BUCK 60, BUCK 63, BUCK 69, BUCK 77, BUCK 80

24   received in evidence)

25           (Government's Exhibits BUCK 115, BUCK 117, BUCK 127,

O6O1GUO1                        Buck - Direct

1    BUCK 131, BUCK 133, BUCK 138, BUCK 141, BUCK 168, BUCK 174,

2    BUCK 194 received in evidence)

3             (Government's Exhibits BUCK 218, BUCK 221, BUCK 227,

4    BUCK 232, BUCK 235, BUCK 236, BUCK 241, BUCK 243 received in

5    evidence)

6             (Government's Exhibits BUCK 375, BUCK 391, BUCK 428,

7    BUCK 522, BUCK 524, BUCK 532 received in evidence)

8             (Government's Exhibits BUCK 709, BUCK 822, BUCK 851,

9    BUCK 1204, BUCK 1260, BUCK 1261, and BUCK 1274-BUCK 1291, and

10   BUCK 1293-BUCK 1296 received in evidence)

11            MR. FERGENSON:  And Ms. Loftus, if we could also show

12   the witness what's marked as GX BUCK 1292.  Just the witness.

13            And if you could scroll up briefly just so she can see

14   it.

15   BY MR. FERGENSON:

16   Q.  What kind of document is this, Ms. Buck?

17   A.  This is an Excel spreadsheet of the payments made.

18   Q.  And did you create this Excel spreadsheet?

19   A.  I did.

20   Q.  Was that part of your work on behalf of Buck Esq LLC for

21   the Taurus Fund?

22   A.  Yes.

23   Q.  And is this another business record for Buck Esq LLC?

24   A.  Yes.

25            MR. FERGENSON:  The government offers Government

1   Exhibit 1292.

2          MS. SHROFF:  Your Honor, may I just have a brief voir

3   dire.

4          THE COURT:  Yes.

5   VOIR DIRE EXAMINATION

6   BY MS. SHROFF:

7   Q.  Ms. Buck, when was this document created?

8   A.  I don't remember the exact date, but from the beginning, I

9   started this Excel spreadsheet, when I started making payments.

10  Q.  And you maintained the Excel sheet throughout the course of

11  your representation?

12  A.  Yes.

13         MS. SHROFF:  Okay.  I have no objection, your Honor.

14         THE COURT:  It is admitted.

15         (Government's Exhibit BUCK 1292 received in evidence)

16         THE COURT:  Would you please repeat the number of the

17  exhibit.

18         MR. FERGENSON:  Yes, your Honor.  This is 1292.  It's

19  GX BUCK 1292.

20         THE COURT:  Okay.  Go ahead.

21         MR. FERGENSON:  Thank you, your Honor.

22         All right.  We can take that down, Ms. Loftus.

23  BY MR. FERGENSON:

24  Q.  All right.  Now, Ms. Buck, after you accepted the referral

25  for Crocker Mansion, what, if anything, did you do to formalize

O6O1GUO1                              Buck - Direct

1   the engagement?

2   A.   I drafted an engagement letter.

3           MR. FERGENSON:  And Ms. Loftus, if we could show

4   what's now in evidence as GX BUCK 1296.

5   Q.   All right.  And what's this document?

6   A.   This is the engagement letter I drafted for this

7   transaction.

8           MR. FERGENSON:  All right.  And if we could scroll

9   down.

10  Q.   All right.  And who signed on behalf of Taurus Fund?

11  A.   Aaron Mitchell.

12  Q.   And what did he write in the signature line?

13  A.   He wrote Attorney-in-Fact.

14  Q.   And what's an Attorney-in-Fact?

15  A.   It's similar to like a power of attorney.  He has the

16  authorization to sign on behalf of an entity.

17          THE COURT:  And what is an engagement letter?

18          THE WITNESS:  An engagement letter is something that

19  attorneys use, or I use in my real estate business when I'm

20  representing either a buyer or a seller, to formalize the

21  engagement and to give the——the client information on the price

22  and if——if any variables come up in the representation.

23          THE COURT:  What do you mean by engagement?

24          THE WITNESS:  They hire me to represent them.

25          THE COURT:  Go ahead.

1            MR. FERGENSON:  Thank you, your Honor.

2            All right.  And we can take that down, Ms. Loftus.

3    BY MR. FERGENSON:

4    Q.  After accepting——or after the engagement letter, Ms. Buck,

5    what did you do next?

6    A.  I called the title company.

7    Q.  What was the name of the title company?

8    A.  Insight Title agency.

9    Q.  And what was their role in the purchase?

10   A.  They provided the title commitment and policy and they were

11   the settlement agent, so they handled the funds for the

12   transaction.

13   Q.  What's a settlement agent?

14   A.  A settlement agent is typically a title company.  In New

15   Jersey, that's how we do the transactions.  They receive the

16   deposit, the buyer's funds, they receive funds from possibly a

17   lender if one's involved, and then they disburse the funds in

18   accordance with the closing statement.

19   Q.  And after the title company and the engagement letter, what

20   did you do next?

21   A.  I asked for a copy of the contract.

22   Q.  What was the contract price?

23   A.  26 million.

24   Q.  And what were the terms of payment for the 26 million?

25   A.  It was a $2 million deposit.  The balance was due at

O6O1GUO1                           Buck - Direct

1   closing.  There was no mortgage contingency.

2   Q.  And when you say no mortgage contingency, what does that

3   mean to a layperson?

4   A.  It's a cash deal.  All the money is coming from the buyer.

5   Q.  And who was the buyer listed on the contract?

6           MS. SHROFF:  Objection.  Asked and answered.

7           THE COURT:  Overruled.  You may answer.

8   A.  Taurus Fund SP.

9   Q.  What is SP?

10  A.  I'm not really sure.

11  Q.  To your knowledge could an SP hold title to this property?

12  A.  No.  I spoke to the title company about it, and it's not a

13  recognized entity for title purposes in New Jersey.

14  Q.  What, if anything, did Aaron Mitchell tell you about Taurus

15  Fund SP?

16  A.  He said they were going to form an LLC at closing.

17  Q.  And what entity ultimately held title to the property?

18  A.  Taurus Fund, LLC.

19  Q.  And how was Taurus Fund, LLC structured?

20          MS. SHROFF:  Objection.

21          THE COURT:  Well, if you know.

22          THE WITNESS:  I do.

23          THE COURT:  Go ahead.

24  A.  It was formed in the state of Nevada, and it was a hundred

25  percent member——excuse me——the 100 percent member was Taurus

O6O1GUO1                          Buck - Direct

1   Fund——I'll start over.

2              It was formed in Nevada.  The sole member was Taurus

3   Management, LLC.

4              MR. FERGENSON:  All right.  Ms. Loftus, if we can show

5   the witness what's in evidence as GX BUCK 1234.

6   Q.  All right.  And what's this exhibit, Ms. Buck?

7   A.  This is a filed articles of organization for Taurus Fund,

8   LLC.

9   Q.  In what state?

10  A.  Nevada.

11  Q.  And just to focus you sort of towards the top middle, when

12  was it incorporated?

13  A.  December 16, 2021.

14  Q.  And how close was that to the closing date for the Crocker

15  Mansion?

16  A.  I believe we closed the next day, on December 17th.

17             MR. FERGENSON:  And if we could scroll down to page 3,

18  Ms. Loftus.

19             And if we could zoom on the bottom half, just to make

20  it larger.

21  Q.  Who were the managers of Taurus Fund, LLC?

22  A.  The managers were Taurus Management, LLC and Scott Barnett.

23  Q.  And——

24             MS. SHROFF:  Your Honor, I'm assuming the government

25  is asking what the document notes as the manager, correct?

O6O1GUO1                              Buck - Direct

1            THE COURT:  That is your question?

2            MR. FERGENSON:  Yes, your Honor.

3            THE COURT:  As to what the document says?

4            MR. FERGENSON:  Yes.

5            THE COURT:  Go ahead.

6    BY MR. FERGENSON:

7    Q.  And what's the address listed for those managers?

8    A.  6628 Sky Pointe Drive, Suite 129-1071, Las Vegas, Nevada

9    89131.

10   Q.  Same address for both?

11   A.  Correct.

12   Q.  All right.  Now, Ms. Buck, who was Scott Barnett?

13   A.  He's the manager of——listed on this document for Taurus

14   Fund, LLC.  He was also a point of contact that I was

15   authorized to receive invoices from and pay them accordingly.

16   Q.  What did you understand his connection to be, if any, to

17   the family?

18   A.  I——I don't know.  He was their——he set up their security

19   systems, and he was handling a lot of the invoices and sending

20   them to me and making sure they were paid.  I don't know if he

21   was a friend or an employee.  I assumed he was an independent

22   contractor.

23   Q.  You mentioned security.  Were there significant security

24   expenses that you helped pay?

25   A.  Yes.

1    MR. FERGENSON:  All right.  Ms. Loftus, if we could go

2    to GX BUCK 1233.

3    Q.  All right.  What's this document, Ms. Buck?

4    A.  This is the filed articles of organization for Taurus

5    Management, LLC.

6    Q.  And that's one of the managers of Taurus Fund, LLC?

7    A.  Correct.

8         MS. SHROFF:  Objection to the leading.

9         THE COURT:  So we can do this the long way or we can

10   do it more efficiently.  The objection is overruled.

11   Q.  All right.  And if we could just—oh, Ms. Buck, quickly,

12   where was Taurus Management, LLC incorporated?

13   A.  New Mexico.

14        MS. SHROFF:  The objection is asked and answered now.

15        MR. FERGENSON:  I did not ask that.

16        THE COURT:  Overruled.  You may answer.

17        MR. FERGENSON:  And if we could scroll to page 2.

18   Q.  All right.  And when was Taurus Management, LLC

19   incorporated?

20   A.  December 15, 2021.

21   Q.  And how close was that to the incorporation of Taurus Fund,

22   LLC?

23   A.  It was the day before.

24        MR. FERGENSON:  We can take it down, Ms. Loftus.

25   Q.  Ms. Buck, what, if anything, did Aaron Mitchell tell you

O6O1GUO1                              Buck - Direct

1   about the reasons for this structure?

2   A.  He said the client was very concerned about privacy and

3   security and they took great length to protect their privacy

4   and stay secure.

5   Q.  And what was your reaction to that?

6   A.  Given the price point of the property, I assumed it was a

7   celebrity or high-net-worth individual, so I wasn't surprised

8   by the level of security.

9   Q.  Now, Ms. Buck, approximately when was the closing date?

10  A.  On or around December 17, 2021.

11  Q.  And you said it was a cash deal, correct?

12          MS. SHROFF:  Objection.  Asked and answered.

13          THE COURT:  Move on.

14  Q.  Who or what entity sent the cash to buy the property?

15  A.  At the time I don't know because I wasn't the settlement

16  agent.  It was sent to the title company.

17  Q.  And did you later learn?

18  A.  I later learned it was from Hamilton.

19  Q.  To your understanding what was Hamilton?

20  A.  My understanding, it was like a parent company to Taurus

21  Fund, since it was a newly formed entity.

22  Q.  And where did that understanding of yours come from?

23  A.  From conversations with Aaron Mitchell.

24  Q.  Now, Ms. Buck, after the closing, what work did you do?

25  A.  After the closing, I paid invoices on behalf of Taurus Fund

O6O1GUO1                          Buck - Direct

1  for various vendors and contractors.

2  Q.  And who was your primary contact for that work?

3  A.  Initially, it was Aaron Mitchell.

4  Q.  And what, if anything, did Mitchell say about why you were

5  asked to do that work?

6  A.  Because Taurus Fund was a newly formed entity, they haven't

7  yet opened their bank accounts, and they had renovations and

8  work being done right after closing, so it was a short-term

9  assignment.

10 Q.  And could you just describe for the jury, you know, what

11 your work entailed.

12 A.  I would receive nondisclosure agreements and invoices to

13 review; I would be told if they were installment contracts,

14 what to pay on them, who to pay; I would verify the wire

15 instructions, and I would send out wires from my trust account.

16 Q.  And around when did you start this work?

17 A.  Immediately after closing.

18 Q.  And until when, approximately, did you continue making

19 these payments?

20 A.  Until February of 2023.

21 Q.  Generally speaking, Ms. Buck, how frequently were you

22 making payments?

23 A.  Frequently.  Sometimes multiple times a day, sometimes

24 daily.  It was sometimes every few days.  It was pretty

25 constant.

O6O1GUO1                          Buck - Direct

1   Q.  What sorts of things were you paying for?

2   A.  Construction and renovation, furnishings, artwork,

3   furniture.

4   Q.  Overall, what was the approximate total amount you handled

5   for payment?

6   A.  Approximately 18 million.

7   Q.  And the money that you paid to vendors, where was that

8   money coming to your trust account from?

9   A.  It was coming from Hamilton.

10  Q.  Do you know where Hamilton got that money from?

11  A.  I do not.

12  Q.  Did you think you were doing anything wrong when making

13  these payments?

14  A.  No.

15  Q.  Now, Ms. Buck, we looked at the engagement letter earlier.

16  Did you have an engagement letter for this payment work?

17  A.  It was a less formal engagement letter.  It was through an

18  email, but yes, it was documented.

19              MR. FERGENSON:  Ms. Loftus, if we could publish

20  GX BUCK 1295.

21              And if we could go to page 2.  And scroll down

22  slightly.  That's good.

23  Q.  Is this the email, Ms. Buck?

24  A.  Yes, it is.

25  Q.  All right.  And who did you send this email to?

O6O1GUO1                          Buck - Direct

1   A.  Aaron Mitchell.

2   Q.  All right.  And I'll ask you to please read the first

3   paragraph.

4   A.  "As you know, the purchase of the above-referenced

5   transaction has closed.  You, as authorized person for the

6   Taurus Fund, LLC, have requested my continued representation in

7   connection with the purchase, delivery and coordination of

8   various furnishings and interaction with various

9   companies/vendors in connection therewith.  As Taurus Fund, LLC

10  is a new entity and in process of opening bank accounts, I will

11  utilize my trust account to receive funds from or on behalf of

12  Taurus Fund, LLC to pay various vendors.  I will also negotiate

13  Non Disclosure Agreements with the vendors to ensure protection

14  of the Buyer and its information.  The expectation is that

15  there is approximately five vendors that I will be coordinating

16  with and Scott Barnett is the authorized person/manager of

17  Taurus Fund, LLC who will give me directions and written

18  authorization to make payments."

19  Q.  Now just to pause there, Ms. Buck, when you said towards

20  the middle there that Taurus Fund, LLC is in the process of

21  opening bank accounts, where did you get that information from?

22  A.  That information was from Aaron Mitchell and Scott Barnett.

23  Q.  And you referenced nondisclosure agreements.  How common

24  are those in your practice?

25  A.  In a typical real estate transaction, residential, not as

1  standard; in commercial, they're a little more standard.

2  Usually bigger transactions.

3  Q.  Did you think there was anything wrong with using

4  nondisclosure agreements?

5  A.  No.

6  Q.  All right.  And I won't make you read it, Ms. Buck, but

7  what was your fee for this work initially?

8  A.  $15,000.

9          MR. FERGENSON:  And if we could scroll up, please.

10         I'm sorry.  Scroll back down.

11  Q.  What did Aaron Mitchell say in response?

12  A.  "Confirmed on behalf of Taurus."

13         MR. FERGENSON:  And if we could scroll back up.  And

14  keep scrolling up.  Great.

15  Q.  All right.  Now what's the date of this top email,

16  Ms. Buck?

17  A.  February 21, 2022.

18  Q.  And about how long after the initial email is this email?

19  A.  Approximately two months.

20  Q.  And who did you send this email to?

21  A.  Aaron Mitchell.

22  Q.  All right.  And Ms. Buck, I'll ask you to please read the

23  first three paragraphs.

24  A.  "I hope you are well.  As previously discussed, my

25  representation has surpassed our initial agreement and you

O6O1GUO1                         Buck - Direct

1    wanted me to present my fees for previous work performed and

2    ongoing monthly fee if the same arrangement is to continue.

3              "As you may recall, my representation was to cover

4    payments to approximately 5 vendors, handling approximately

5    $2 million in client funds and conclude in about a month.  I

6    had one point of contact at the time, Scott (not including

7    you).  My fee was a flat fee of $15,000.  Such arrangement was

8    confirmed on December 21, 2021.

9              "To date, over $10 million of client funds have been

10   wired to my account.  Over 55 payments have been made to

11   approximately 23 vendors.  I have three points of contact,

12   Scott, Sean, and Gladys (again not including you).  As you

13   know, wire instructions are verified verbally, NDAs, COIs and

14   invoices are reviewed by me.  I also discuss priorities of

15   payments with the points of contact, review monies remaining

16   and any other questions they may have."

17   Q.  Now, Ms. Buck, the increase you reference, $10 million and

18   from 5 vendors to 23, was that discussed with you beforehand or

19   did they just happen?

20   A.  They happened.

21   Q.  What was your reaction to that?

22   A.  I wasn't happy.  That wasn't what our—that wasn't what the

23   arrangement was, but I was trying to help a client continue on

24   with their renovations so I didn't want to get in the way.

25   Q.  And again, Ms. Buck, just briefly, what was your ongoing

O6O1GUO1                            Buck - Direct

1    fee for this work going forward?

2    A.  $15,000.

3    Q.  And how often would you get $15,000?

4    A.  Monthly.  It was earned.

5    Q.  All right.  Now in what you read, you listed three points

6    of contact.  You referenced Scott.  Which Scott is that?

7    A.  Scott——excuse me——Scott Barnett.

8    Q.  The one we discussed earlier?

9    A.  Yes.

10   Q.  All right.  And Sean, who was Sean?

11   A.  Sean Jing was also a point of contact that I was authorized

12   to receive invoices from and pay them accordingly.

13   Q.  Did you ever meet him in person?

14   A.  No.

15   Q.  Did you talk to him on the phone?

16   A.  Quite frequently.

17   Q.  And what kinds of things did you talk about?

18   A.  He would send me invoices, he'd check on payments, he would

19   prioritize payments.

20   Q.  Do you know what company, if any, he worked for formally?

21   A.  I don't know formally.

22   Q.  Do you know what his title was?

23         MS. SHROFF:  Objection.  Title to what?

24         THE COURT:  You may answer.

25   A.  He was I think the project manager or the house manager.

O6O1GUO1                        Buck - Direct

1   He seemed to be one at the Crocker Mansion so he knew what was

2   getting done.

3   Q.  Did you have an understanding of who he worked for?

4          MS. SHROFF:  Objection.

5   A.  He worked——

6          THE COURT:  Overruled.  If you know who he worked for,

7   you may say.

8   A.  He worked for Taurus Fund.  I'm just not sure in what

9   capacity.

10  Q.  And you also mentioned another point of contact, Gladys.

11  Who was Gladys?

12  A.  Gladys Chow was another authorized person who sent me

13  invoices.

14  Q.  Did you ever meet her in person?

15  A.  I did not.

16  Q.  Did you talk to her on the phone?

17  A.  I did.

18  Q.  What kinds of things did you discuss?

19  A.  She seemed to be in charge of the higher-end furnishings

20  and artwork, so she would prioritize what needed to be paid and

21  when.

22  Q.  And do you know what her title was?

23  A.  I think she——I think she was a project manager too.

24         MS. SHROFF:  Objection to "think."  Either she knows

25  or doesn't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            THE COURT:  So if you'll just state what you know as

2    opposed to guessing.

3            THE WITNESS:  Understood.  On some emails I saw

4    her——her title as project manager.

5    BY MR. FERGENSON:

6    Q.  And sort of formally, do you know what company she worked

7    for?

8    A.  No.

9    Q.  As a practical matter, who did you understand she worked

10   for?

11   A.  She was an agent of Taurus Fund.  I don't know if she had

12   her own company or——I don't know the extent.

13           MR. FERGENSON:  All right.  Now, Ms. Loftus, if we

14   could publish GX BUCK 822.

15   Q.  And Ms. Buck, you mentioned earlier that there were

16   security-related expenses.  What sorts of security-related

17   expenses do you recall?

18   A.  There was a security system put in place; there was I'm

19   sure cameras type of things; anyone on the property that was

20   coming on the property signed what's called a non-disclosure

21   agreement.  That was for their protection of the buyer.  I

22   don't re——there was a lot of invoices.  I'm sure——there was a

23   lot of security invoices as well.

24   Q.  And in terms of dollar amount, were they significant?

25   A.  I believe so.

1   Q.  All right.  Now, Ms. Buck, let me direct your attention to

2   this.

3            MR. FERGENSON:  And if we could zoom on the bottom

4   email, please, Ms. Loftus.

5   Q.  All right.  Now Ms. Buck, could you please read this email

6   you wrote.

7   A.  "Hi Scott

8            "Please send me a copy of the signed NDA and $100,000

9   invoice from the above-referenced vendor.  In addition, please

10  provide authorization to wire $100,000 to this vendor."

11  Q.  All right.  And what's the date of this email, Ms. Buck?

12  A.  December 22, 2021.

13  Q.  And how soon into your payment work was this email?

14  A.  In the first week.

15  Q.  And in the To line, in the header section, who is this

16  email to?

17  A.  Frontsight1@outlook.com.

18  Q.  And whose email is that?

19  A.  Scott Barnett.

20  Q.  And who is copied?

21  A.  I'm sorry?

22  Q.  Who's copied on the email?

23  A.  Oh, I'm sorry.  Aaron Mitchell.

24  Q.  All right.  Now your email body said "the above-referenced

25  vendor."  What's the subject line of the email?

1    A.  Taurus-Payment to Labarbiera Custom Homes, LLC.

2    Q.  And what was Labarbiera Custom Homes, LLC?

3    A.  It's a construction company.

4    Q.  Were you in contact with anyone there?

5    A.  A person by the name of Vinnie Labarbiera.

6    Q.  And who is Vinnie Labarbiera?

7    A.  He was the owner.

8    Q.  And what, if anything, did he do with respect to the

9    Crocker Mansion.

10   A.  He did a lot of construction work.  He also had a monthly I

11   believe maintenance contract with Taurus Fund.

12           MR. FERGENSON:  All right.  And if we could zoom out.

13           And then if we could just zoom on the top email.

14           Thank you, Ms. Loftus.

15   Q.  What did Scott Barnett write in reply?

16   A.  "Attached are the documents you requested and I am

17   authorizing the payment to the vendor."

18   Q.  All right.  And are there attachments to that email?

19   A.  Yes, there are.

20           MR. FERGENSON:  All right.  Ms. Loftus, if we could

21   scroll down.  We can go to page 7.

22   Q.  All right.  Now, Ms. Buck, at the top here, can you read

23   the very top line at the top center.

24   A.  LABARBIERA CUSTOM HOMES LLC.

25   Q.  And then directing you a little bit downward, what's the

1   date of this document?

2   A.  December 18, 2021.

3   Q.  And then could you please read the Re line beneath that.

4   A.  "Taurus Fund SP.

5           "675 Ramapo Valley Road, Mahwah.

6           "Construction Agreement."

7   Q.  And could you read the sentence beneath that.

8   A.  "Labarbiera Custom Homes, LLC to provide the following at

9   the above-referenced premises."

10          MR. FERGENSON:  And Ms. Loftus, if we could like

11  scroll slightly to see both pages.

12  Q.  All right.  And Ms. Buck, I want to focus you underneath

13  where it says Demolition Work to Be Provided in the Following

14  Areas:  Can you read the text beneath that.

15  A.  "2nd level ladies master wing.

16          "3rd level sons wing.

17          "3rd level daughters wing.

18          "2nd level bedroom bath converted to laundry."

19  Q.  Ms. Buck, what's a wing?

20  A.  It's a section of the house.  It may be how the house was

21  built.  It has different wings that they branch into.

22  Q.  Where it says "master wing," what do you understand the

23  master wing to be?

24  A.  Master is typically the primary heads of the households,

25  spouses, husband and wife.

O6O1GUO1                        Buck - Direct

1   Q.  And son wing, what do you understand that to refer to?

2   A.  Usually one of the children gets a wing.

3         MR. FERGENSON:  All right.  Let's scroll down

4   slightly, Ms. Loftus, please.

5   Q.  All right.  And then focusing you on the bold text

6   Daughter's Wing Level 3, can you just read the first line of

7   text beneath that.

8   A.  "Denoted walls to be removed."

9         MR. FERGENSON:  And we can zoom out, Ms. Loftus.  And

10  if we could scroll down again.

11  Q.  And focusing on Lady's Wing Level 2, can you read the first

12  three lines of text.

13  A.  "Denoted openings to be closed.

14         "Denoted openings formed as per plan.

15         "Marked walls to be removed."

16  Q.  And what do you understand Lady's Wing to mean?

17  A.  The wife of the husband and wife duo, the primaries.

18         (Continued on next page)

19

20

21

22

23

24

25

O6OBGUO2                        Buck - Direct

1    BY MR. FERGENSON:

2    Q.   And where it says denoted openings formed as per plan.  Do

3    you recall reviewing a plan for that?

4    A.   I did not see the architectural plans.

5    Q.   And if we could just focusing you on son's wing level

6    three.  Could you read the first line of text beneath that?

7    A.   Existing theater platforms dividing wall and carpeting to

8    be removed.

9    Q.   And let's go to page 10.

10           Focusing you on the bottom, Ms. Buck, what was the

11   total contract price for this work?

12   A.   $488,300.

13   Q.   Is this contract signed?

14   A.   This is not.

15           MS. SHROFF:  Objection.  It's not a contract.

16   Q.   Is this document signed?

17           THE COURT:  Go ahead.

18   A.   It is not.

19   Q.   Let's go to GXBuck-168.  Did you later receive a signed

20   copy, Ms. Buck?

21   A.   I did.

22   Q.   And you can just scroll to page five, Ms. Loftus.

23           Ms. Buck, is this copy signed?

24   A.   It is.

25   Q.   Do you know who signed on behalf of Taurus Fund, LLC?

O6OBGUO2                          Buck - Direct

1   A.  I believe that's Scott Barnett's.

2          MS. SHROFF:  Objection to believe.  Either she knows

3   or she doesn't know.

4          THE COURT:  Just testify as to what you know.

5   A.  Scott Barnett sent the signed contract to me.

6   Q.  And, Ms. Loftus, we can go to GXBuck-851.  Let's actually

7   start with page three if we could zoom in on the bottom email,

8   Ms. Loftus.

9          Ms. Buck, what's the date of this email?

10  A.  January 6, 2022.

11  Q.  And about how long had you been doing the payment work at

12  this point?

13  A.  Less than a month.

14  Q.  Who is this email from?

15  A.  Gladys Chow.

16  Q.  And what is her email address?

17  A.  GladysC.@HCHKtech.com.

18  Q.  Do you know what HCHK Tech is?

19  A.  I do not.

20  Q.  Could you please read the first two lines of the email?

21  A.  Attached are the documents for the rugs purchase.  There

22  are two separate invoices, 300K attachment one, plus 200K --

23  excuse me, 250K attachment two and the COI and NDA are attached

24  as well.

25  Q.  By the way, Ms. Buck, what is a COI?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                    Buck - Direct

1   A.   Certificate of insurance.

2   Q.   What's a certificate of insurance?

3   A.   They show that, in this instance, that the vendor has

4   insurance cause they're carrying high-end furnishing so we want

5   to see they're insured in case something happens.

6   Q.   And we can zoom out, Ms. Loftus.  We can scroll up to page

7   two.  If we can zoom on that email, yes, please.

8           Ms. Buck, could you please read your response?

9   A.   Hi, Gladys.  I need fine rugs to sign off that we can

10  directly pay the owner.  They can write on their invoice or

11  send email directing me to pay Nahid Botesazan. I also need

12  wire instructions for Nahid. Scott, please authorize both

13  payments for rugs.

14  Q.   Why did you ask Scott to authorize payments?

15  A.   In the beginning with Taurus, Aaron and Scott were only the

16  authorized representatives at this point.  Gladys wasn't

17  authorized, so I needed someone to tell me to pay them.

18  Q.   Can we zoom in on the response.  What did Gladys say in

19  response?

20  A.   Attached is the email directing you to pay Nahid for the

21  two Chinese rugs and the wire info of Nahid is attached too.

22  Thank you.

23           MS. SHROFF:  Your Honor, I think it says, Hi Amy,

24  comma, and then goes to the body of the email.

25           THE COURT:  Did you say you wanted to pause?

O6OBGUO2                        Buck - Direct

1           MR. FERGENSON:  No, I didn't want to interrupt you.

2           THE COURT:  If you would just state what it says.

3           THE WITNESS:  You want me to reread it?

4           THE COURT:  Yes.

5   A.  Hi Amy, attached is the email directing you to pay the

6   Nahid for the two Chinese rugs, and the wire info of Nahid is

7   attached too.  Thank you.  Regards.

8   Q.  If we can zoom out and scroll up.  If we could zoom on

9   Ms. Buck's email.

10          Ms. Buck, in your response there's a image there.

11  What is that image?

12  A.  That image is from my excel spreadsheet.

13  Q.  What was that excel spreadsheet tracking?

14  A.  The payments made on behalf of Taurus Fund.

15  Q.  If we could zoom out and scroll up.  Then what does Gladys

16  say in response?

17  A.  Please hold on with DND.  The client wants to double

18  confirm the items.  Regards.

19  Q.  Who did you understand the client to refer to?

20  A.  The family.

21  Q.  If we could zoom out.  Let's actually go to GX Buck-532.

22  And if we could scroll down slightly.

23          Ms. Buck, could you please read Gladys' initial email

24  here?

25  A.  Hi Amy, attached please find document for furniture

O6OBGUO2                        Buck - Direct

1   purchase from DND gallery.  Thank you, regards.

2   Q.  And let's go up.  What did you write back in response?

3   A.  Hi Scott, please authorize payment if acceptable.

4   Q.  And if we could go to the next email.

5        What did Gladys say in response?

6   A.  Hi Amy, here is the final invoice and the certificate of

7   authenticity for a total of 41 items.  The principal has

8   approved and authorized the payment.  Please process the

9   payment today.  Thank you so much, Gladys.

10  Q.  When she said the principal has approved and authorized the

11  payment, who did you understand the principal to be?

12  A.  Someone in the family.

13  Q.  If we could zoom out, Ms. Loftus, if we could scroll down.

14       And there's attachments to this email, right,

15  Ms. Buck?

16  A.  Yes.

17  Q.  And could you read the description here, Ms. Buck?

18  A.  A very rare and unusual antique French Louie -- I don't

19  remember my Roman numerals, XVI Gilt bronze mounted boule and

20  silvered bronze rectangular form desk/center table of

21  exceptional craftsmanship embellished with fine detail and

22  adorned with gilt bronze figural mask 19th Century.

23  Q.  That's fine.  Thank you.  If we could just keep scrolling

24  through.  Thank you, Ms. Loftus.  We can stop there.

25  Ms. Loftus, if we can go to GX Buck-709.

O6OBGUO2                          Buck - Direct

1      Ms. Buck, focusing you on the top here, can you read

2  the text in the top right corner?

3  A.  Flat rate elite.

4  Q.  And what does it say in large text to the left of that?

5  A.  Your move plan.

6  Q.  And focusing you sort of above that in smaller text, what's

7  the name listed?

8  A.  Taurus Fund, LLC.

9  Q.  And what's the date on this document?

10 A.  January 18, 2022.

11 Q.  And about how soon after the closing is that?

12 A.  It's about a month.

13 Q.  And beneath the header, could you read the large text there

14 what it says?

15 A.  I'm sorry.  I don't know where you're referring.

16 Q.  Do you see, Your upcoming elite move there.

17 A.  Yes.

18 Q.  Focusing you beneath that where it says where, do you see

19 that?

20 A.  I do.

21 Q.  Could you please read the origin address?

22 A.  373 Taconic Road, Greenwich, Connecticut 06831, flights

23 2.5.

24 Q.  Do you know that address in Greenwich, Connecticut?

25 A.  I do not.

O6OBGUO2                          Buck - Direct

1   Q.  Did anyone tell you what it was?

2   A.  No.

3   Q.  Did anyone tell you who lived there?

4   A.  No.

5   Q.  Could you please read the destination address?

6   A.  675 Ramapo Valley Road, Mahwah, New Jersey 07431, flights

7   2.0.

8   Q.  And what's at that address?

9   A.  That's the Crocker mansion address.

10  Q.  And when was this move scheduled for, focusing you beneath

11  that?

12  A.  Packing date Thursday, January 20, 2022.

13  Q.  And when were the move-in dates?

14  A.  Friday, January 21, 2022, and Friday January 28, 2022.

15  Q.  And, Ms. Loftus, if we could zoom out slightly.

16         Beneath what we just looked at, Ms. Buck, what was the

17  price for this move?

18  A.  $118,000.

19  Q.  If we could scroll to page two and if we can blow up the

20  first few lines and make it larger.

21         Ms. Buck, in the top left it says furniture, could you

22  read on the left the first two lines there?

23  A.  One extra large cabinet in living room, 20 x 25 x 2 master

24  bedroom.

25  Q.  And what's the line beneath that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                          Buck - Direct

1    A.  One gold orb 15 x 1 x 1 master bedroom, one cabinet storage

2    extra large dining room.

3    Q.  Ms. Loftus, we can zoom out.  We could go to page seven, if

4    we could zoom on the signature.

5            Now, Ms. Buck, you see it says E-sign at the top?

6    A.  Yes.

7    Q.  What name is listed in large text there?

8    A.  Scott Barnett.

9    Q.  What does it say in the sign by row?

10   A.  Signed by Scott Barnett.

11   Q.  What's the email address signed by email?

12   A.  GladysC@HCHKtech.com.

13   Q.  And to your understanding who used that email?

14   A.  Gladys Chow.

15   Q.  Did Scott Barnett use that email?

16           MS. SHROFF:  Objection.

17           THE COURT:  You may answer.

18   A.  He didn't use that email with me.

19   Q.  Let's go to GXBuck-1204, if we can zoom in on the text.

20           Ms. Buck, is this one of the invoices you received for

21   your payment work?

22   A.  Yes.

23   Q.  Did you pay this invoice?

24   A.  I did.

25   Q.  What does it say in the top left?

O6OBGUO2                          Buck - Direct

1   A.  Meritt Plumbing.

2   Q.  And what's the date of this invoice focusing you on the top

3   right?

4   A.  January 24, 2022.

5   Q.  What was the job location for this invoice?

6   A.  373 Taconic Road Greenwich, Connecticut.

7   Q.  How does that address compare with the origin address that

8   we just looked at?

9   A.  It's the same.

10  Q.  So beneath the address, what does it say after bill to?

11  A.  Sean.

12  Q.  Who did you understand Sean to refer to?

13  A.  Sean Jing.

14  Q.  Scrolling down or looking at the bottom, what was the total

15  amount due on this invoice?

16  A.  $400.

17  Q.  Let's go to Government Exhibit Buck-375.  Who's this email

18  from?

19  A.  Gladys Chow.

20  Q.  What's the date on this email?

21  A.  January 27, 2022.

22  Q.  And just as a reference, about how long after the closing

23  was this?

24  A.  A little over a month.

25  Q.  And who's this email to?

O6OBGUO2                          Buck - Direct

1    A.   It's to me and Scott Barnett.

2    Q.   What is Scott Barnett's email?

3    A.   ScottB@GSNYUS.com.

4    Q.   Do you know what GSNYUS is?

5    A.   I do not.

6    Q.   What's the subject line of this email?

7    A.   Hastens mattress purchase.

8    Q.   What's Hastens if you know?

9    A.   A mattress company.

10   Q.   Could you please read Gladys' email, the body?

11   A.   Hi, Amy, please find attached the client has approved

12   already.   Thanks.

13   Q.   Who did you understand the client to refer to?

14   A.   The family.

15   Q.   Are there attachments to this email?

16   A.   There are.

17   Q.   If we could scroll down to page three, Ms. Loftus.   Who is

18   this sales order book from?

19   A.   This is from Hastens.

20   Q.   And, Ms. Loftus, maybe we can blow up the top portion to

21   make it easier to read.   What's listed under bill to?

22   A.   Taurus Fund, LLC.

23   Q.   And is that the Las Vegas address?

24   A.   Yes.

25   Q.   And what's listed under ship to?

O6OBGUO2                              Buck - Direct

1   A.  675 Ramapo Valley Road, Mahwah.

2   Q.  Is that the Crocker mansion address?

3   A.  It is.

4   Q.  If we could scroll down, Ms. Loftus, if we can blow up the

5   remainder of it starting with that chart.

6          Ms. Buck, focusing you first on rows one and two, what

7   are those items?

8   A.  Mattress and top mattress.

9   Q.  What color is listed for both of those items?

10         MS. SHROFF:  Objection as to relevance, what color is

11  the mattress.

12         THE COURT:  Overruled.  You may answer.

13  A.  Blue.

14  Q.  And how much is the mattress?

15  A.  $36,590.

16  Q.  How much is the top mattress?

17  A.  $5,590.

18  Q.  Focusing you on rows three and four, what are those items?

19  A.  Mattress and top mattress.

20  Q.  What color are those items?

21  A.  White.

22  Q.  And what's the price of the mattress?

23  A.  $36,210.

24  Q.  And the top mattress?

25  A.  $5,840.

O6OBGUO2                         Buck - Direct

1   Q.  And then focusing you on row five, what's that item?

2   A.  Accessories.

3   Q.  And in the bold, what does it say there?

4   A.  Mattress cover.

5   Q.  And how many -- what's the quantity?  How many pieces were

6   there?

7   A.  Two.

8   Q.  And just focusing on the total cost, how much was this in

9   total?

10  A.  The invoice or the cover?

11  Q.  The bold total after the discount?

12  A.  $80,829.21.

13  Q.  Let's go to GXBuck-522.  If we could go to page three,

14  scroll up slightly, and we can zoom in on the bottom one.

15          Ms. Buck, is this the initial email we were just

16  looking at?

17  A.  Yes.

18  Q.  We could scroll up now.  What did you write back?

19  A.  Hi, Scott, please approve the purchase.  Gladys advises

20  that the delivery will be made to her New York office address

21  so NDA is not necessary.  Thanks.

22  Q.  If we could scroll up.

23          Ms. Buck, what was your understanding of why an NDA

24  would not be needed if it was going to the New York office?

25  A.  If the vendor is not going to be on site at the Crocker

O6OBGUO2                          Buck - Direct

1    mansion, there's no need for NDA.

2    Q.  You wrote back again, can you read your next email?

3    A.  Apologies.  It looks like you have a signed NDA and COI.

4    Good on my end.  Gladys, I assume there is another request that

5    is being delivered to your office.  Thanks.

6    Q.  Can you read Gladys' response like the first line?

7    A.  Correct.  Mattress are still going to NJ.

8    Q.  The bottom line of her response?

9    A.  Only the piano is going to New York office first.  Will

10   send that invoice over as soon as I received it.  Thanks.

11   Q.  Do you recall the address for the New York office,

12   Ms. Buck?

13   A.  I do not.

14   Q.  Ms. Loftus, if we could show GX Buck-69 or publish, please.

15          While we're waiting, Ms. Buck, did you receive an

16   invoice for a piano?

17   A.  I did.

18   Q.  If we could zoom in on the top half.  In the top center,

19   who's this bill of sale from?

20   A.  Faust Harrison Pianos.

21   Q.  And on the top right, what's the date?

22   A.  January 27, 2022.

23   Q.  The sold to, can you read the top line there?

24   A.  Taurus Fund, LLC.

25   Q.  And can you read the full ship to?

O6OBGUO2                              Buck - Direct

1    A.   Gladys Chow, 3 Columbus Circle 20th floor, New York, New

2    York 10019.

3    Q.   And do you know what was at that address, Ms. Buck?

4    A.   I do not.

5    Q.   And could you read the first line of the description,

6    please?

7    A.   Bosendorfer 185VC Porsche # 49539 with custom bench.

8    Q.   Focusing you on the bottom right, what was the total due?

9    A.   $140,938.69.

10   Q.   Ms. Loftus, let's go now to GXBuck-428.

11            What's the date of this email, Ms. Buck?

12   A.   February 17, 2022.

13   Q.   And focusing you on the from line, what's the email address

14   in the from line?

15   A.   675payable@proton mail.com.

16   Q.   What's that email address?

17   A.   It's an email address I received emails from Gladys Chow

18   and Sean Jing.

19   Q.   Focusing on the bottom email, who signed this email?

20   A.   Gladys.

21   Q.   What did she list beneath that?

22   A.   Project manager.

23   Q.   Can you read just the first line underneath purchase, could

24   you just read one and two, please?

25   A.   Hastens mattress $36,596.90, Cedric DuPont shipping

O6OBGUO2                          Buck - Direct

1    $38,651.80.

2    Q.  Focusing you on the header where it says attachments, could

3    you please read the name of the first attachments, Ms. Buck?

4    A.  Hastens invoice daughter 2.17.22. pdf.

5    Q.  Who did you understand daughter to refer to?

6    A.  The daughter, the family.

7    Q.  If we can go to page two, please.

8           Ms. Buck, just quickly here focusing you on rows one

9    and two, what's the color indicated there?

10   A.  It's abbreviated, seem to be silver blue.

11   Q.  And we can zoom out.  What's the total cost?

12   A.  $36,596.90.

13   Q.  If we can go to page six now, Ms. Loftus.  We can zoom on

14   the top half just make it larger.

15          Now, the shipper origin, do you see that, Ms. Buck?

16   A.  Yes.

17   Q.  Can you read the second line?

18   A.  Cedric DuPont Antiques.

19   Q.  Let's actually pull up GXBuck-77.  Actually, Ms. Loftus, if

20   we could do GXBuck-77 and GXBuck-80.

21          Now, Ms. Buck, in both of these, what is the large

22   text in the center?

23   A.  Cedric DuPont Antiques.

24   Q.  Focus on the document on the right, can you read the

25   description there?

O6OBGUO2                            Buck - Direct

1   A.  A stunning and large scale Italian 19th Century wrought

2   iron lantern.

3   Q.  Let's go to GXBuck-194, please.  And we can zoom in on

4   that.

5           Now, Ms. Buck, focusing you on the top left there when

6   it says date, what's the date?

7   A.  February 2, 2022.

8   Q.  And then moving over to the top right, what's the customer

9   name?

10  A.  Sean Jing.

11  Q.  Back on the left under bill to, what are the first two

12  lines?

13  A.  Taurus Funds LLC, Sean Jing.

14  Q.  In the email address listed at the bottom there, what's

15  that email address?

16  A.  NewJ6909@protonmail.com.

17  Q.  Whose email address is that?

18  A.  Sean Jing.

19  Q.  The ship to, can you read the first line there?

20  A.  Sean Jing.

21  Q.  Is the Crocker mansion's address beneath that?

22  A.  Yes, it is.

23  Q.  Now, if we could just -- actually, I think you can see it.

24  Can you read the description under order items?

25  A.  Samsung Q900 series, QN98Q900RBF, 98 inches, QLED Smart

O6OBGUO2                          Buck - Direct

1    TV-8K new.

2    Q.  To the right of that, what's the unit price?

3    A.  $59,969.

4    Q.  And what's the unit price for the freight?

5    A.  $2,818.54.

6    Q.  Let's go to GX Buck-218, please.

7        Ms. Buck, is this an invoice you received as part of

8    your work?

9    A.  Yes.

10   Q.  What's the name of the company on the top left?

11   A.  Luca, Inc.

12   Q.  And beneath that on the right, what's the date?

13   A.  February 20, 2022.

14   Q.  And could you read the second line from the top under

15   description?

16   A.  Painting and fixing boss door.

17   Q.  Could you read the second one from the bottom?

18   A.  Supplying and installing two towel racks for boss bathroom.

19   Q.  Who did you understand boss to be?

20   A.  The head of the family.

21   Q.  Did you ever meet anyone name boss?

22   A.  No.

23   Q.  Let's go to page two.  Just quickly, can you read the

24   second line from the top?

25   A.  Installation two closet rods in madam's laundry room.

O6OBGUO2                         Buck - Direct

1    Q.  Let's go to GXBuck-391, please.

2           Ms. Buck, focusing you on the top, whose this email

3    from?

4    A.  Gladys Chow.

5    Q.  What's the date?

6    A.  March 29, 2022.

7    Q.  And if we could zoom out.  Just focusing on the bottom

8    email to focus you at the bottom there, Ms. Buck, can you read

9    what it says after to?

10   A.  Golden Spring New York LTD.

11   Q.  Do you know what Golden Spring New York LTD is?

12   A.  I do not.

13   Q.  You can go to GX Buck-1275, please.

14          Who sent this email to you, Ms. Buck?

15   A.  Gladys.

16   Q.  What's the date of this email?

17   A.  May 23, 2022.

18   Q.  And I'll ask you just to read the first line of the second

19   paragraph?

20   A.  Attached please find the invoice wire instruction and COI

21   for Amuneal bookcase.

22   Q.  In the same paragraph can you read the last line of that

23   paragraph?

24   A.  The client has approved it already.

25   Q.  Who did you understand the client to be?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                          Buck - Direct

1   A.  The family.

2   Q.  If we could, Ms. Buck, could you read one more sentence,

3   the next sentence there, There is no?

4   A.  There is no certificate of authenticity since it is not an

5   antique item and is a custom-made piece for the client.

6   Q.  If we could scroll down to page three for the client.

7   Under description, Ms. Buck, can you read just that first row

8   right there?

9   A.  Brass bookcase.

10  Q.  If we can zoom on the top left, please, page two.  It

11  should be the same exhibit 1275, the top left.

12          What does it say after attention?

13  A.  Leanne Leonal @ G Fashion.com.

14  Q.  Do you know what G Fashion is?

15  A.  I do not.

16  Q.  Do you know who Leanne is?

17  A.  I do not.

18  Q.  Can you read what it says after reference?

19  A.  Brass bookcase to match brass pantry.

20  Q.  And focusing on the bottom line, where was this being sent?

21  A.  675 Ramapo Valley Road, Mahwah, New York.

22  Q.  Is that the Crocker mansion?

23  A.  Yes.

24  Q.  Let's go to GX Buck-1279, if we could scroll down, and we

25  can zoom on the bottom email.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                          Buck - Direct

1          Ms. Buck, who is Ilona Musial?

2    A.  She was another authorized person that sent me invoices to

3    pay.

4    Q.  What is the date of this email that she sent you?

5    A.  June 2, 2022.

6    Q.  Can you read her message, please.

7    A.  Hello Amy.  It's Ilona Musial for the house manager for

8    Crocker mansion.  I am sending you some bills to pay.  If this

9    is not a problem, from now on I will be sending all invoices or

10   bills directly to you skipping Scott.  Thank you, Ilona Musial.

11   Q.  If we can zoom out and keep going up.  Let's just go back

12   up to page one.  If we could zoom on the bottom email.

13          Ms. Buck, just for context in this part of the email

14   chain, who are you emailing with?

15   A.  Aaron Mitchell.

16   Q.  Can you read your email to Aaron Mitchell?

17   A.  Okay.  She said she's taking the place of Scott, so I

18   wasn't sure.  She sent me two bills for Rockland Electric that

19   are already paid. I can just let her know they are paid and

20   paid the other ones.  She knows we need sign NDA, COI, etc, for

21   each contract/vendor.

22   Q.  If we could zoom out of that email and scroll to the top

23   email.  Can you just read Aaron Mitchell's first line response?

24   A.  I haven't spoken to her.  Just found out they hired a house

25   manager.

O6OBGUO2                          Buck - Direct

1    Q.  When he said her, who did you understand her to be?

2    A.  Ilona Musial.

3    Q.  When he said found out they just hired a house manager, who

4    did you understand the "they" to refer to?

5    A.  The family.

6    Q.  Let's go to GX Buck-1274.  If we can just zoom on the

7    bottom email, please.  Who's this email from?

8    A.  Ilona Musial.

9    Q.  If you can read the first two lines of her email to you?

10   A.  Hello, Amy.  Thank you for getting back to me.  I spoke

11   with Scott and Yvette, and from now on I would be sending

12   payments to you to process them.

13   Q.  Do you know who Yvette is?

14   A.  I do not.

15   Q.  Did you ever meet her?

16   A.  No.

17   Q.  Did you ever speak with her directly?

18   A.  Not that I recall.

19   Q.  Do you know what company or companies she worked for?

20            MS. SHROFF:  I think she testified she doesn't know

21   who Yvette is.

22            THE COURT:  Sustained.

23   Q.  Let's go to GX Buck-1277.  If we can zoom on the top email,

24   please.  Who's this email from?

25   A.  Ilona Musial.

O6OBGUO2                          Buck - Direct

1   Q.  Who is it to?

2   A.  Me, Amy Buck.

3   Q.  And who is copied?

4   A.  Scott Barnett and Sean Jing.

5   Q.  I'll ask you if you could just read the last sentence in

6   the long paragraph there?

7   A.  We would need to hear from you daily if the payments went

8   out because of the family requirement to pay all vendors on

9   time and specially for priority transfers.

10  Q.  Who did you understand the family to refer to?

11  A.  The family behind Taurus Fund.

12  Q.  If we could go to GX Buck-1282.

13          Ms. Buck, who did you understand Wayne Cao to be?

14  A.  I saw that name on invoices, so I assumed he was part of

15  the family.

16          MS. SHROFF:  Objection to the assumption.

17          THE COURT:  Don't say what you assume.  Just say what

18  you know.

19  A.  I saw the name Cao on various invoices.

20  Q.  And if we could zoom on the bottom email.  Who is this

21  email from?

22  A.  Wayne Max Cao.

23  Q.  Could you please read just the main question there?

24  A.  Would you please give me a heads up when the balance of the

25  fund is getting close to 200K.

O6OBGUO2                          Buck - Direct

1   Q.  And what did you understand him to be referring to by

2   balance of the fund?

3   A.  The balance of money in my trust account.

4   Q.  How did you respond?

5   A.  Absolutely not a problem.

6   Q.  Did you ever meet Wayne Cao in person?

7   A.  No.

8   Q.  Did you ever have a phone call with him?

9   A.  No.

10  Q.  What sort of interaction did you have with him?

11  A.  He would be copied on some emails or he sent emails that I

12  was copied on, so only through emails I saw his name.

13  Q.  Let's go to GX Buck-1294.

14         Is this another invoice you received as part of your

15  work?

16  A.  Yes.

17  Q.  If we could zoom on the top left, please.

18         Now, can you read what's written in the bottom left?

19  A.  Cao residence, 675 Ramapo Valley Road, Mahwah, New Jersey

20  07430.

21  Q.  Did you see Cao residence on other invoices you received as

22  well?

23  A.  I did.

24  Q.  And then just focusing on the top right there, what does it

25  say after customer number?

O6OBGUO2                          Buck - Direct

1    A.  Cao.

2    Q.  You can take that down, Ms. Loftus.

3         Ms. Buck, in the witness binder you reviewed, did you

4    select which documents went in that witness binder?

5    A.  I did not.

6    Q.  Did you receive, fair to say, many invoices?

7    A.  Yes.

8    Q.  And are all of them in that witness binder?

9    A.  No.

10   Q.  Now, Ms. Buck, did there come a time when you received a

11   subpoena in connection with your work?

12   A.  Yes.

13   Q.  Who was the subpoena from?

14   A.  The SEC.

15   Q.  And approximately when did you receive it?

16   A.  In May of 2022.

17   Q.  After receiving that subpoena, what did you do?

18   A.  I freaked out.

19   Q.  Why did you freak out?

20   A.  I'm not a litigator.  I don't go to court.  Subpoenas are

21   very knew for me.

22   Q.  After freaking out, what did you do next?

23   A.  I immediately sent a copy to Aaron Mitchell and called him.

24   Q.  And what did you discuss with Aaron Mitchell?

25   A.  That I received a subpoena and next steps.

O6OBGUO2                          Buck - Direct

1   Q.   What did he say to you?

2   A.   He was much calmer than me and said this is the cost of

3   doing business and they would hire counsel and we'd move

4   forward.

5   Q.   When he said, This is the cost of doing business, what did

6   you understand that to mean?

7   A.   That they either weren't surprised about the subpoena or

8   had other ones.  I don't really know.

9   Q.   What, if anything, did he tell you about the family in

10  connection with that call?

11  A.   He said that the government doesn't like the client cause

12  they're part of the federalist party of China and the subpoena

13  didn't seem unexpected.

14  Q.   Had you ever heard of the federalist party of China?

15  A.   No.

16  Q.   Do you follow Chinese politics?

17  A.   No.

18  Q.   Do you follow U.S China foreign relations?

19  A.   I try not to.

20  Q.   Do you know what the federalist party of China is?

21  A.   No.

22  Q.   When he said the government doesn't like them, do you have

23  any independent knowledge of whether that's true?

24  A.   I do not.

25  Q.   After that conversation, Ms. Buck, what did you do in

O6OBGUO2                          Buck - Direct

1   response to the subpoena?

2   A.  Counsel was hired and then I was communicating with counsel

3   to respond to the subpoena.

4   Q.  And without getting into any discussions with your counsel,

5   did your counsel ultimately respond to the subpoena on your

6   behalf?

7   A.  Yes.

8   Q.  Now, Ms. Buck, did there come a time when the funds in your

9   trust account were running low and not being refilled?

10  A.  Yes.

11  Q.  Approximately when was that?

12  A.  The first time was July of 2022.

13  Q.  And what, if anything, did you do as a result?

14  A.  Most of the contractors had my cell phone number.  So when

15  they weren't getting paid, I received a lot of calls, so I was

16  reaching out to mostly Aaron to find out if the fund was going

17  to be replenished so I could pay the various contractors.

18  Q.  What happened after that, after you reached out to Aaron?

19  A.  I don't remember the days, sometime later in July I did

20  receive another wire.

21  Q.  Approximately how much was that?

22  A.  Five million.

23  Q.  Did that five million eventually run out?

24  A.  It did.

25  Q.  And what happened after that?

O6OBGUO2                          Buck - Direct

1    A.  Around October, November of 2022, the funds were low again.

2    I was trying to find out if my representation was concluding so

3    I can turn over the records and whatever information was

4    necessary for the next person.  I wasn't being told any

5    information.  I was just getting the calls from the contractors

6    of who wasn't getting paid.

7             Eventually I did connect with Aaron, and he told me to

8    reach out to someone else to find out about the funds and if

9    they were going to be authorized to be paid through my trust

10   account.

11   Q.  And where was that someone else located?

12   A.  The UK.

13   Q.  Ms. Loftus, if we could publish GX Buck-1283.  If we can

14   zoom in on the text.  Who is this invite from, Ms. Buck?

15   A.  David Fallon.

16   Q.  And what's the domain of his email address?

17   A.  Hamilton-IM.

18   Q.  And who is this invite to?

19   A.  Priya Patel, William Je, myself and Aaron Mitchell.

20   Q.  And what's the date of this invite?

21   A.  December 1, 2022.

22   Q.  And what's the subject?

23   A.  Buck Esq. LLC Taurus call.

24   Q.  And, Ms. Buck, did you have a call around this time?

25   A.  We did.

O6OBGUO2                        Buck - Direct

1    Q.  Who was on the call?

2    A.  I was on the call, Priya Patel.  There were other

3    individuals there male, I just don't know if Mr. Fallon and

4    Mr. Je were on that call.

5    Q.  Who did you understand David Fallon to be?

6    A.  He was the person at Hamilton that authorized my payments

7    and my monthly fee.

8    Q.  And who did you understand William Je to be?

9    A.  I don't know.  I know he was part of Hamilton.

10   Q.  What did you discuss on this call?

11   A.  We discussed a couple of things.  One of them was my

12   counsel legal fee for responding to the subpoena.  They wanted

13   me to run a title search on the property.  It's called a

14   rundown, and it tells you if there's any liens that have been

15   placed on the property.  And also if I was going to continue in

16   my role or if it was concluding and then transition to someone

17   else.

18   Q.  Did they ask anything about the SEC subpoena?

19   A.  They also ask in connection with the legal fee from my

20   counsel, they ask for a copy of the subpoena and our response.

21   Q.  Now, around this time, Ms. Buck, what was your

22   understanding of whether some bills were still being paid?

23   A.  I got the impression from how the contractors were calling

24   me that some payments were being paid from someone else and

25   some weren't just from how they were calling me and telling me

O6OBGUO2                        Buck - Direct

1    what was paid and what wasn't, because I knew what I was paying

2    and not paying.

3    Q.  Do you know where they were being paid from?

4    A.  Sean Jing was making payments.

5    Q.  Did you ever speak with him about that?

6    A.  I did.

7    Q.  Tell us about that conversation?

8    A.  I asked him if they set up bank accounts to move forward

9    with payments, and he didn't really answer me.  He just said he

10   was taking care of it.

11   Q.  Ultimately were you able to pay the invoices that Taurus

12   had due?

13   A.  At that time, no.

14   Q.  Let's go to -- actually, Ms. Loftus, if we could publish GX

15   Buck-1290.

16           Ms. Buck, what is this exhibit?

17   A.  This is a text message between me and Aaron Mitchell.

18   Q.  And are your text in green or in gray?

19   A.  Mine are in green.

20   Q.  If we could scroll down.  The January 26 message, what year

21   is that, January 26?

22   A.  2024.

23   Q.  What did you write to Aaron Mitchell?

24   A.  Did you get this.

25   Q.  And what did you send him a screenshot of?

O6OBGUO2                          Buck - Direct

1    A.  A notice of a motion in connection with a bankruptcy

2    matter.

3    Q.  If we could zoom on that again.

4           Ms. Buck, focusing you on the caption where it says In

5    Re.  Can you read what it says after In Re?

6    A.  Ho Wan Kwok, *et al.*

7    Q.  Did you know who Ho Wan Kwok was?

8    A.  I do not.

9    Q.  Do you know who Luc Despins is?

10   A.  I do not.

11   Q.  Did you know about the bankruptcy before receiving this

12   document?

13   A.  I did.

14   Q.  If we could zoom out and scroll down.

15          What did Aaron Mitchell say?  Actually, why don't I

16   read Aaron Mitchell's responses and you can read yours.

17          Yes, about 1,000 people got it.

18   A.  That sounds amazing.

19   Q.  Some people are fighting.  So if they win, we win.

20   A.  Gotcha.  Do I need counsel for this too?

21   Q.  Up to you, but I'm not getting counsel or responding.

22   A.  Gotcha.

23   Q.  Any further response to this with Aaron Mitchell?

24   A.  No.

25   Q.  After receiving -- without getting into any discussion with

1   counsel, what did you do?

2   A.  I responded to the subpoena.

3   Q.  We can take that down, Ms. Loftus.

4          Ms. Buck, we discussed a number of people, correct?

5   A.  Yes.

6   Q.  And we discussed a few entities in connection with your

7   work, right?

8   A.  Yes.

9   Q.  Did any of your contacts ever bring up the entity G/Club?

10  A.  No.

11         MR. FERGENSON:  May I have a moment, your Honor.

12  Q.  Ms. Buck, what's a HUD-1 statement?

13  A.  A HUD-1 is used for closings.  It's where you see all the

14  numbers for disbursement in a real estate transaction.

15         MR. FERGENSON:  Thank you.  Nothing further.

16         THE COURT:  Cross examination.

17  CROSS-EXAMINATION

18  BY MS. SHROFF:

19  Q.  Good morning, Ms. Buck.

20  A.  Good morning.

21  Q.  Ms. Buck, how long have you been a lawyer?

22  A.  23 years.

23  Q.  And you said you were not a litigator, correct?

24  A.  I am not.

25  Q.  I understand.  Your primary practice was in real estate,

O6OBGUO2                        Buck  -  Cross

1    correct?

2    A.  It is.

3    Q.  And it has always been in real estate; is that right?

4    A.  A majority of it.

5    Q.  And is it fair to say that your practice was initially New

6    Jersey, then you moved to Florida and you moved back to New

7    Jersey?  Do I have the chronology generally correct?

8    A.  I'm only licensed in New Jersey and New York.  Personally

9    we did Florida once or twice.

10   Q.  And it didn't quite work out, right?

11   A.  Yeah.

12   Q.  You moved back to New Jersey?

13   A.  I did.

14   Q.  And unfortunately, I'm assuming you moved back to New

15   Jersey during Covid, correct?

16   A.  Yes.

17   Q.  And when you moved back during Covid, at that time you did

18   not have a physical office space; is that right?

19   A.  I have an office address that I use through a friend of

20   mine, but I maintain a home office.

21   Q.  Can you help me with that last sentence again.

22   A.  I maintain a home office.  I don't use that address for

23   clients for safety, but I have an office address where mail

24   goes and I can go to, to use for a conference room if I need

25   to.

1  Q.  So you use a friend's office address to get your mail,

2  correct?

3  A.  Correct.

4  Q.  And then you work out of your home?

5  A.  Correct.

6  Q.  Which is, what, 90 percent of us did during Covid, correct?

7  A.  Yes.

8  Q.  Do you also have some kind of virtual office or do you use

9  your friend's office space?

10  A.  Just my friend's.

11  Q.  And you testified that your practice is based in New

12  Jersey?

13  A.  Yes.

14  Q.  And you talked about, is there a county named Darlington in

15  New Jersey?

16  A.  I don't think so.

17  Q.  How about do you know -- is your practice county-based or

18  just statewide?

19  A.  Statewide.

20  Q.  And you testified on direct, right, that you got a referral

21  from someone name Dara Lawall, correct?

22  A.  Correct.

23  Q.  And did you know Dara from before?

24  A.  I met her through mutual friends.

25  Q.  And your connection was with her, was that many years

1    before she sent you this referral?

2    A.  No, it's when we moved to Chester, New Jersey.

3    Q.  So you reconnected with her; is that right?

4    A.  No, we both live in Chester, so we met like through mutual

5    friends.

6    Q.  And when you met through mutual friends, she -- let me

7    withdraw that.

8            She's also a lawyer, right?

9    A.  Correct.

10   Q.  And she's the one who sent you the referral, correct?

11   A.  Correct.

12   Q.  And she sent you the referral in her capacity as an

13   attorney; is that right?

14   A.  Yeah.

15   Q.  Or did she just send it to you because you guys had become

16   friends?

17   A.  As an attorney.

18   Q.  And when she sent you that referral, she said she was

19   referring, you said, a family to you; is that right?

20           That's what you said on direct?

21   A.  Yeah, she indicated they were important to her.  They were

22   like family.

23   Q.  And I'm assuming that you had a nice back and forth with

24   her when she did the introduction, correct?

25   A.  I'm sure we spoke for a few minutes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                          Buck - Cross

1   Q.  Did you ask her who's this family?

2   A.  At the time I probably didn't cause I know I'll see it on

3   the contract.

4   Q.  So you didn't ask her how she knew the family, correct?

5   A.  I did not.

6   Q.  You didn't ask her how long she knew the family, correct?

7   A.  I did not.

8   Q.  And you already told me that you didn't ask the name of the

9   family, correct?

10  A.  Correct.

11  Q.  And you became aware that it was -- the referral was about

12  a specific property, correct?

13  A.  Yes.

14  Q.  And what name did you know that property by just so I can

15  refer to it the same way for you?

16  A.  Crocker mansion.

17  Q.  So you were aware that the property was Crocker mansion,

18  right?

19  A.  Yes.

20  Q.  And you were also aware that the Crocker mansion had been

21  on the market for at least a decade, correct?

22  A.  I didn't know that actually.

23  Q.  Did you know how long it had been on the market?

24  A.  I didn't look.

25  Q.  It's okay if you didn't look.  My question was, if you were

1    aware in any other way how long it had been on the market?

2    A.  I was aware through one of my conversations with Aaron

3    Mitchell that it must have been a while because there was a

4    price reduction.

5    Q.  There was a huge price reduction, correct?

6    A.  Correct.

7    Q.  The initial price was 39 million?

8    A.  That's what I saw on Zillow.

9    Q.  And then it had dropped all the way down to 26 million,

10   correct?

11   A.  Yes.

12   Q.  And according to you there was a lot of back and forth on

13   the price of the sale of the property?

14   A.  I wasn't involved at that point.  It seemed like there was

15   negotiation between the parties.

16   Q.  I know you weren't involved.  By the time you got involved,

17   the sale was complete?

18   A.  The price was set, yes.

19   Q.  And you were aware though that there was some urgency on

20   the part of the seller to the sale, correct?

21   A.  Correct.

22   Q.  And you in fact told the government that you were aware of

23   this urgency, but that the urgency came from the seller, right?

24   A.  Both parties seem to be very urgent.

25   Q.  You didn't say that when you met with Mr. Fergenson,

O6OBGUO2                          Buck  -  Cross

1    correct?

2              You told him that the urgency was coming from the

3    seller, right?  Do you recall that?

4    A.  I don't recall the difference between both parties and the

5    seller.

6    Q.  Let me show you 3507-004 and see if that refreshes your

7    recollection.

8    A.  Okay.

9    Q.  It's just only for the witness, the Court and the parties,

10   please.

11             MS. SHROFF:  Your Honor, may I just have a minute.

12   Q.  Does that refresh your recollection that it was the

13   seller's attorney that was contacting you a lot?

14   A.  In regard to the deposit.

15   Q.  Right.  And it was never the buyer's attorney that was

16   contacting you with a rush, correct?

17   A.  I was the buyer's attorney.

18   Q.  I understand, but nobody from the buyer side contacted with

19   a rush, right?

20   A.  In connection with the deposit, no.

21   Q.  And the times that the sellers attorney was contacting you,

22   do you recall how many times she -- was it a "her" or a "him?"

23   A.  It was a "he."

24   Q.  And how often did he contact you?

25   A.  I don't recall, several.

O6OBGUO2                         Buck - Cross

1    Q.  Several times, right?

2    A.  I believe so, yes.

3    Q.  You can take that down.

4           Now, Ms. Buck, it's fair to say that you have spoken

5    with the -- do you recall also -- let me go back for a minute.

6           Do you recall also telling the government that there

7    was a closing deadline before Christmas, and it was the seller

8    driving that urgency.  Do you recall the timing of it being

9    before Christmas?

10   A.  Yes.

11   Q.  And you were also aware, were you not, given the work you

12   were doing that the property itself was old, correct?

13   A.  I didn't know the age of the estate, but through the

14   invoices seem like it needed a lot of work.

15   Q.  And you told that to Mr. Fergenson, correct, when you met

16   with him?

17   A.  Yes.

18   Q.  And you told him it was your impression that the property

19   was such that a lot of contractors would be needed to work on

20   it, correct?

21   A.  Yes.

22   Q.  And that a lot of contractors would need to be paid,

23   correct?

24   A.  Initially I was only paying a few.  As it went on, I paid

25   many.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6OBGUO2                              Buck - Cross

1   Q.  And the same is true for the vendors, right?

2   A.  Correct.

3   Q.  Initially there were a few, then you paid a lot?

4   A.  Yes.

5   Q.  Now, you were asked a lot of questions repeatedly about

6   what you understood the family to mean, correct?

7   A.  Yes.

8               MR. FERGENSON:  Objection.

9               THE COURT:  Overruled.

10  Q.  There is a time when you learned that the purchaser was

11  going to be an SP, right?

12  A.  That's the name that was on the contract.

13  Q.  Could you tell us, please, the full name of the contract as

14  you recall it?

15  A.  Taurus Fund SP.

16  Q.  And when you saw Taurus Fund SP, what did you think "SP"

17  stood for?

18  A.  In my world immediately comes to mind sole proprietorship.

19  Q.  When you saw that, did it ring a bell for you that New

20  Jersey had a different rule and it wouldn't be allowed?

21  A.  Immediately, and I could confirm with the title company.

22  Q.  Right, because that's what you do for a living, right.

23          Did you then tell Mr. Mitchell that that would not

24  work in New Jersey?

25  A.  Yes.

1  Q.  Do you know if Mr. Mitchell was versed in these laws of

2  real estate?

3  A.  I don't know his background.

4  Q.  And that's because you're really fully familiar with the

5  wife, right?

6  A.  I wasn't familiar with their work at all, because they've

7  referred other matters to me.  I knew their practice was

8  primarily commercial litigation, and they did some residential

9  real estate, but I don't know how complex or not.

10 Q.  Was it your perception that it was a husband and wife with

11 a separate practice for each, or that they both worked on the

12 same matters?

13 A.  They made one firm.  I don't know if they divvied up their

14 practice.

15 Q.  You don't know one was a criminal lawyer and the other was

16 a real estate lawyer?

17 A.  I do not.

18 Q.  And do you recall when you spoke to Aaron Mitchell him

19 telling you and discussing with you the topic of the new

20 federal state of China?

21 A.  I thought he told me it was federalist party of China, but

22 I don't remember the exact name.

23 Q.  But putting aside the exactness of the name, you do recall

24 sitting here today Mr. Mitchell talking to you about that,

25 correct?

1    A.  Yes.

2    Q.  And is it fair to say that it was not an area of your

3    interest so you didn't follow-up with them?

4    A.  It was not.

5    Q.  And it's still not an area of your interest, right?

6    A.  No.

7    Q.  There came a time when you started really just working with

8    Mr. Mitchell on this matter, correct?

9    A.  Yes, after my initial conversation with Dara, we did not

10   discuss Taurus Fund.

11   Q.  And when you were speaking with Mr. Mitchell, did he talk

12   to you about NDA?

13   A.  He did from the beginning.

14   Q.  And just, I'm allowed to lead, but that is a non-disclosure

15   agreement, correct?

16   A.  Yes.

17   Q.  And is it fair to say that he gave you a written out

18   non-disclosure agreement for you to use?

19   A.  Yes, he gave me a form.

20   Q.  Like a template, right?

21   A.  Yes.

22   Q.  And did you use that template?

23   A.  I reviewed it, but the signed NDAs were sent to me so I

24   didn't typically deal with them.  I had copies of them from the

25   various vendors or contractors.

1    Q.  So if a vendor was going to do a dropoff at the property,

2    it would not be your responsibility to ensure that a NDA was

3    signed.  You checked to see if it was signed?

4    A.  I asked if they have one.  Somebody else's responsibility

5    to gather the information.

6    Q.  And when you first started working with this property, what

7    was the month and the year?  I'm sorry.  I've forgotten.

8    A.  December of 2021.

9    Q.  In December of 2021, at that point had Mr. Mitchell talk to

10   you about the need for security on the property?

11   A.  When we initially spoke, since I didn't have -- every

12   company or entity has people, so you usually have the name.

13   When I ask for the name so I knew who natural person was behind

14   the client, I didn't get it.  And he said they were very

15   concerned about security and privacy.  So from the getgo, I

16   assumed, like I said, it was a celebrity or high net worth

17   individual, and it was very important that they feel safe, be

18   safe, and their information kept as nonpublic as possible.

19   Q.  And when he, by "he" I mean Mr. Mitchell, talked to you

20   about the new federal state of China, you didn't ask him if

21   that had anything to do with the property, correct?

22   A.  That came up when I received the first subpoena.

23   Q.  No, I'm not asking about the subpoena.

24   A.  I'm sorry.  Can you ask it again.

25   Q.  Sure. When Mr. Mitchell first mentioned the new federal

O6OBGUO2                          Buck  -  Cross

1   state of China, you didn't ask if that property was going to be

2   used vis-a-vis the new federal state of China, right?

3   A.  I did not.

4   Q.  When you were talking about the security of the property,

5   you understood Mr. Mitchell to be talking about the physical

6   security of the property, correct?

7   A.  Correct.

8   Q.  And also the physical security of the property would

9   include the periphery of the property, right?

10  A.  Yes.

11  Q.  And the security within the property, right?

12  A.  Yes.

13  Q.  Ms. Buck, did you actually ever visit the property?

14  A.  I did not.

15  Q.  You didn't go see what it looked like, right?

16  A.  I would have loved a tour, but I didn't.  No one gave me

17  one.

18  Q.  So when you were testifying about all of these invoices,

19  you did not know how the shipment was done at the physical

20  location, right?

21          You're just moving the paper along; is that fair?

22  A.  Correct.  I wasn't there to see the property.

23  Q.  Now, I'm going to come back to Mr. Barnett, but Mr. Barnett

24  was also one of the people who also discussed physical safety?

25  A.  Yes.

1    Q.  Is it your testimony that you did knot know Mr. Barnett

2    well or did you know him well?

3    A.  I don't know him at all.

4    Q.  Do you know if he was ex-NYPD or not?

5    A.  He told me in one of our conversation he was a retired cop.

6    Q.  Did he talk about being a cop a lot?

7    A.  No.

8    Q.  Did he tell you what his role was at the facility?

9    A.  He said it chartered the security system, and he was my

10   initial contact for all the invoices until he got too busy.

11   Q.  Did he talk to about what the security system was?

12            MR. FERGENSON:  Objection to hearsay.

13            THE COURT:  Overruled.  You may answer.

14   A.  No.

15   Q.  He didn't tell you.  Okay.  Let me move to a little bit of

16   a different point.  Okay.

17            You remember the government showing you a few invoices

18   involving -- and I have trouble with this word, LaBarbiera

19   Custom Homes, correct?

20   A.  Yes.

21   Q.  And there was a point-person for that company named Vinny,

22   right?

23   A.  Yes.

24   Q.  Is it fair to say that you were aware that Vinny had been

25   at that property for many years before the sale to Taurus S,

O6OBGUO2                              Buck  -  Cross

1    LLP?

2    A.  I don't know if that's the case or not.

3    Q.  Do you know if the same LaBarbiera Custom House had done

4    work on the property before?

5    A.  Before when?

6    Q.  Before you came on the scene?

7    A.  I don't know one way or the other.

8    Q.  Did you ever speak to this person name Vinny?

9    A.  Yes.

10   Q.  Did he ever tell you that he had worked on that property

11   for many years?

12   A.  He did not mention it.

13   Q.  Did he speak to you in English?

14   A.  Yes.

15   Q.  He didn't speak Mandarin to you, right?

16   A.  I don't speak Mandarin.

17   Q.  And did you physically ever meet him?

18   A.  No.

19   Q.  Did you ever zoom with him?

20   A.  No.

21   Q.  Now, do you recall discussing with him renovations that

22   would be needed on the property, including the renovations in

23   the garage on the property?

24   A.  I received invoices from him for the renovations, and he

25   was also in the beginning receiving payment on behalf of his

O6OBGUO2                          Buck - Cross

1   subcontractors until I was paying them directly.

2   Q.  So is it fair to say that when you got an invoice, right,

3   you didn't evaluate -- you didn't make any evaluation of the

4   invoice itself, right?

5   A.  The evaluation I did, if it was an installment contract and

6   there were several payments to make sure I was paying what was

7   supposers to be paid and it wasn't duplicative to make sure the

8   work was completed before I paid it, but that was the extent of

9   my review.

10  Q.  If Vinny double-billed, you wouldn't check that, right?

11          MR. FERGENSON:  Speculation.

12          MS. SHROFF:  I'm asking if she would check that.

13          THE COURT:  So the question would be did you check his

14  bills.

15  Q.  Did you check his bills?

16  A.  I did.

17          THE COURT:  So it's now 11:30, and we're going to take

18  our break.  Members of the jury, remember that you're not

19  allowed to talk amongst yourselves about the case.  Don't

20  permit anyone to discuss it in your presence.  Don't read,

21  listen or watch anything from any source that touches on the

22  subject matter of this case.

23          THE LAW CLERK:  Jury exiting.

24          THE COURT:  Ms. Buck, you can step out.  Don't discuss

25  your testimony.

O6OBGUO2                          Buck - Cross

1          (Jury not present)

2          THE COURT:  You may be seated.  Is there anything

3     before we reconvene at noon?

4          MR. FERGENSON:  Not from the government.

5          MS. SHROFF:  Your Honor, just one matter.  The defense

6     has given the government the defense exhibits it seeks to

7     introduce through Ms. Buck.  They are the same documents that

8     were produced pursuant to the Buck LLC account.  To the extent

9     the government wants to stipulate to the admittance, it will

10    certainly make the cross go faster.

11         MR. FERGENSON:  We have not been told about any

12    exhibits that they're seeking to introduce through Ms. Buck.

13         THE COURT:  So you'll work it out during the break.

14         MR. FERGENSON:  Thank you, your Honor.

15         (Recess)

16

17

18

19

20

21

22

23

24

25

O6O1GUO3

AFTERNOON SESSION

12:00 p.m.

1

2

3          (Jury not present)

4          THE COURT:  Please be seated.

5          Juror No. 12 told a member of my staff that he wanted

6     to speak with me concerning a scheduling issue.  So if you'll

7     bring him in, please.

8          (Juror present)

9          THE COURT:  And just sit in the first seat.

10         You may sit down.

11         You're Juror No. 12, correct?

12         JUROR:  Yes.

13         THE COURT:  What's the problem?

14         JUROR:  I'm the executive direcder of a small non

15    profit.  We are short-staffed.

16         THE COURT:  If you'll speak up, please.

17         JUROR:  We're short-staffed.  We're at the end of the

18    fiscal year, a lot of things going on.  One thing that is going

19    on is we're vacating one of our offices by June 30th.  That's

20    the end of the lease.  We haven't been able to negotiate

21    anything with the landlord, and I'm concerned that he might

22    lock us out.  If there is a way that the Court could intervene

23    so that we get an extension, so that I can continue?  I'm fully

24    committed to this, but——I hate to be locked out.  We have

25    confidential records of our clients and——

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

O6O1GUO3

| 1 | THE COURT:  Do you have an attorney? |

1           THE COURT:  Do you have an attorney?

2           JUROR:  Yes.

3           THE COURT:  And your attorney is dealing with the

4   landlord?

5           JUROR:  Not at this point, but I could call him and—

6           THE COURT:  So that would be my first suggestion is

7   that you speak with your attorney.  Maybe you can get an

8   extension.

9           JUROR:  I tried to negotiate that with him and he

10  got—he wants me to stay and negotiate a long-term lease.  And

11  we're not going to do that.

12          THE COURT:  So you're looking for a short-term

13  extension.

14          JUROR:  A short-term extension; a month, maybe two

15  months.  Not even that.

16          THE COURT:  That seems like something that might be

17  able to be accomplished by your attorney, and so I would like

18  you to check with the attorney and find out.  You could call

19  him or her this afternoon.

20          If you're not able to get an extension, what would

21  happen?

22          JUROR:  He will probably lock us out.  He will want

23  the rent anyway.  My concern is the records, that they—we're

24  trying to remove all the records in case he does lock us out.

25          THE COURT:  And so what impact, if any, would that

O6O1GUO3                           Buck - Cross

 1    have on your role as a juror in this case?

 2                 JUROR:  If it's locked out and we cannot do anything,

 3    then I'm here and I wait till we finish.

 4                 THE COURT:  So essentially your request is whether I

 5    can intervene in this issue.

 6                 JUROR:  Right.

 7                 THE COURT:  I wish I could.  But because this is a

 8    private matter between your organization and the landlord, I

 9    have no authority to get involved, and so I regret to give you

10    that news, and I wish you luck.

11                 JUROR:  Okay.  Thank you.  Thank you, your Honor.

12                 THE COURT:  Yes.

13                 (Juror not present)

14                 THE COURT:  Would you have all the jurors brought out,

15    please.

16                 (Jury present)

17                 THE COURT:  You may resume the stand.

18                 Please be seated.

19                 Ms. Buck, remember that you're still under oath.

20                 You may continue the inquiry.

21    BY MS. SHROFF:

22    Q.  Ms. Buck, I apologize.  I'm not quite sure where we left

23    off.  But I am going to pick up where we were talking about

24    NDAs, okay?

25    A.  Okay.

O6O1GUO3                            Buck - Cross

1    Q.  Did you keep a file of the NDAs that were signed and sent

2    back to you, or did you just simply confirm they were signed?

3    A.  I kept a file.  I have a file folder for each contractor or

4    vendor.

5    Q.  And would it be fair to say that you had no NDA for

6    Mr. Barnett?

7    A.  I don't recall having one, no.

8    Q.  And did you have an NDA for Ms. Chow?

9    A.  I don't recall having one for her either.

10   Q.  Do you recall if you had an NDA for Mr. Cao?

11   A.  No.

12   Q.  How about for Sean Jing?

13   A.  I don't recall having one, no.

14   Q.  Okay.  Did you know that Sean Jing worked for G Club?

15   A.  No.

16   Q.  Did you ask him where he worked?

17   A.  I did not.

18   Q.  Did you know where Mr. Cao worked?

19   A.  No.

20   Q.  Did you ask him?

21   A.  I never spoke to him.

22   Q.  Did you email with him?

23   A.  Yes.

24   Q.  Did you email and ask him where he worked?

25   A.  No.

O6O1GUO3                         Buck - Cross

1   Q.  Now about Mr. Barnett, you testified that at one point he

2   was always your first point of contact, correct?

3   A.  Correct.

4   Q.  And I'm not sure if I recall this correctly.  Did you in

5   person ever meet him?

6   A.  No.

7   Q.  And it's fair to say that the government showed you a fair

8   number of documents from Mr. Barnett, correct, email exchanges

9   from Mr. Barnett, right?

10  A.  Yes.

11  Q.  And at times they highlighted for you the different email

12  addresses that he used, correct?

13  A.  Yes.

14  Q.  And sitting here today, do you know how many email

15  addresses Mr. Barnett had?

16  A.  I don't.

17  Q.  Do you know if he had an email address called

18  frontsight1@outlook.com?

19  A.  That's the primary one I emailed back and forth with him.

20  Q.  And Mr. Fergenson here highlighted for you a GS email

21  address that he had, correct?

22  A.  Correct.

23  Q.  Do you know if he had any other addresses?

24  A.  Not that I recall.

25  Q.  And when you were sent email addresses from different

O6O1GUO3                         Buck - Cross

1   emails from Mr. Barnett, you assumed it was the same

2   Mr. Barnett, right?

3   A.  Yes.

4   Q.  You didn't email back and say, which Mr. Barnett are you?

5   A.  No.

6   Q.  Okay.  Now it's fair to say, Ms. Buck, that throughout the

7   course of your work, you never thought you were doing anything

8   improper, correct?

9   A.  Correct.

10  Q.  And sitting here today, you still don't think you were

11  doing anything improper, correct?

12  A.  Correct.

13  Q.  You had invoices that you received, right?

14  A.  Yes.

15  Q.  And you checked to make sure that the person was

16  authorizing payments on the invoices, right?

17  A.  Yes.

18  Q.  Then you processed the invoices, correct?

19  A.  First I confirmed the wire instructions verbally.

20  Q.  Right.  As you're required to, correct?

21  A.  Correct.

22  Q.  And in fact, you were quite diligent; you always put that

23  in your email, "Please confirm them orally," correct?

24  A.  Yes, to——for problems with wire fraud.

25  Q.  Right.  And they would be confirmed orally, correct?

1   A.  All of them.

2   Q.  Right.  And if they weren't confirmed orally, you wouldn't

3   process the payment, correct?

4   A.  Correct.

5   Q.  And you in fact were quite diligent, you kept an Excel

6   sheet, right?

7   A.  Yes.

8   Q.  And did you share that Excel sheet with anybody else such

9   as Scott Barnett or anyone else?

10  A.  Yes, with the authorized people, Scott Barnett, Sean Jing,

11  Gladys Chow, obviously Aaron Mitchell.

12  Q.  Right.  And there was no issue ever; nobody ever raised an

13  issue saying something hadn't been paid or some number was

14  overstated, correct?

15  A.  Sometimes there would be questions.  If invoices were paid,

16  if the wire didn't go through, depending on timing; sometimes

17  they're held up, like, in the cloud, that they don't see them,

18  but——I don't think there were any issues of what I was paying.

19  Q.  Right.  And they were generally pretty happy with you,

20  right?

21  A.  I didn't hear complaints.

22  Q.  Good.  Okay.  So with that, may I just direct your

23  attention with a little more focus to certain documents that

24  you were shown, okay?

25             And maybe I can ask you some of the questions without

O6O1GUO3                          Buck - Cross

1    the documents.

2              The government showed you the certificate of

3    incorporation and documents from the State of Nevada, correct?

4    A.  It was articles of organization, yes.

5    Q.  Right.  Nothing unusual about that, right?

6    A.  It's a filed copy for that state, yes.

7    Q.  Right.  And they can open a corporation if they want in

8    Nevada or in Maine, right?

9    A.  They can open an entity anywhere.

10   Q.  Right.  And they told you where they opened the entity,

11   right?

12   A.  Well, I could see it on the articles of organization.  It

13   was in Nevada.

14   Q.  Right.  But they're the ones who sent you the documents,

15   right?

16   A.  Correct.  I did not form it.

17   Q.  Right.  And you had no questions; you didn't ask them why

18   Nevada or why did you pick this state or anything like that,

19   right?

20              MR. FERGENSON:  Object to form.  Multiple questions.

21              THE COURT:  If you'll break it down.

22   Q.  Did you ask them why Nevada?

23   A.  I did.  I asked Aaron again, 'cause typically, in a New

24   Jersey transaction, it's a New Jersey LLC.  It's not uncommon,

25   if you want to use a different state, but we were also getting

1  pressure to close on time because it's year end, and he said it

2  was just a layer of privacy—

3  Q.  Okay.

4  A.  —for the client.

5  Q.  Right.  And when he answered that question for you, did you

6  feel like you got a proper answer from him?

7  A.  I did.

8  Q.  Okay.  Now you were shown a document, which was 1295.  If I

9  could just have that pulled up for you.

10         This is your email to Aaron Mitchell, correct, where

11  you set out your terms of your representation?

12  A.  Yes.

13  Q.  Okay.  And it goes to his—is that his law firm address

14  that you see up top?

15  A.  Yes.

16  Q.  Okay.  And this was just an easy way to set up the

17  agreement between you and the person you were going to work

18  for, correct?

19  A.  This was to document a continuing representation because

20  what I signed on for and what we did were not the same, so I

21  wanted documentation of what we were doing going forward.

22  Q.  Okay.  And Mr. Mitchell received this email and responded

23  to you, correct?

24  A.  He did.

25  Q.  Okay.  And did he tell you what the estimate was so that

1    you could plan accordingly?

2    A.   No.

3    Q.   Okay.  And did you follow up with him?

4    A.   I did.

5    Q.   Okay.  Now you were also asked questions about——

6            MS. SHROFF:  You can take that down.  Thank you.

7    Q.   You were also asked about several payments that you made

8    and you were shown a whole group of invoices, correct?

9    A.   Yes.

10   Q.   All right.  So some of the invoices were from a person

11   named Gladys Chow, correct?

12   A.   Yes.

13   Q.   And she signed off on the emails and said she was the

14   project manager, right?

15   A.   That was in her email, yes.

16   Q.   Right.  Did you ever ask her what project she was managing?

17   A.   I did not.

18   Q.   Did you know what the name of the project was?

19   A.   I don't.

20   Q.   Now let me show you what the government marked as 822.

21   It's Exhibit 822.

22           MS. SHROFF:  And if we could just scroll down.

23   Q.   And I think that the government was focused on page 7,

24   correct, 7 and 8?  Do you recall looking at this document?

25           MS. SHROFF:  Let's just stay on the first page.

O6O1GUO3                          Buck - Cross

1    Q.  Do you recall this document, ma'am?

2    A.  I do.

3    Q.  Okay.  And it says Demolition Work to Be Provided in the

4    Following Areas.  Correct?

5    A.  Yes.

6    Q.  And could you read what it says below that.

7    A.  "2nd level ladies master wing."

8    Q.  Right.  Is that ladies in plural?

9    A.  It is.

10           MS. SHROFF:  Okay.  And if we could just go to the

11   next page.

12   Q.  You see on the top it says "3rd level sons wing," correct?

13   A.  Yes.

14   Q.  Do you know if that family in question had a son?

15   A.  I don't know anything about the family.

16   Q.  Do you know if there was even a son that was living in the

17   United States at any point in time of your representation?

18   A.  I don't know one way or the other.

19   Q.  Okay.  And it said, on the same thing, on the same

20   document, it talked about the second level bedroom bath

21   converted to laundry, correct?

22   A.  Yes.

23   Q.  You have no idea what that means.

24   A.  I do not.

25   Q.  Okay.  And I don't want to belabor this by going through

O6O1GUO3                              Buck - Cross

1    each one of these, but none of us know what——well, forget about

2    us.  You don't know what it means, what the work was when it

3    says, "Ceiling to be sawcut to receive 7 chandelier locations

4    centered on existing arches," right?  No?

5    A.  I do not.

6              MS. SHROFF:  And if we could just scroll down some

7    more on this document.  And keep going down.

8    Q.  And you see right there, it says, "Daughter's Wing Level

9    3," right?

10   A.  Yes.

11   Q.  And you've already said you don't know if he had a

12   daughter, but what does it mean to you when it says, "Denoted

13   walls to be removed"?

14             MR. FERGENSON:  Objection to form, and she didn't say

15   that.

16             THE COURT:  Sustained.  The witness did not state

17   that.

18   Q.  Do you know if the family had a daughter?

19   A.  I don't know one way or the other.

20   Q.  Thank you.  What were the denoted walls to be removed?

21   A.  I don't know.  I didn't have construction plans.

22   Q.  What are marked openings?

23   A.  Usually they're on construction plans, that I didn't see.

24   Q.  Okay.  Do you know if there were even construction plans?

25   A.  I don't know if there was or was not.

1  Q.  Then it talks about "new partitions to be sheetrocked and

2  spackled," correct?

3  A.  Yes, that's what it says.

4  Q.  And I'm assuming you also don't have an understanding of

5  what that means?

6  A.  I don't.

7        MS. SHROFF:  Okay.  And if I could just have us just

8  keep scrolling down.

9        Just keep going down.

10        And still one more page down.

11        And the last page, please.

12  Q.  And that document tells you that there is a total contract

13  price, correct?

14  A.  It does.

15  Q.  And then it tells you a deposit amount, a midway payment,

16  right?

17  A.  Yes.

18  Q.  And there is no computation on balance on completion.

19  A.  Correct.

20  Q.  Okay.  And these are just documents that you would process;

21  you would not question whether or not the bill was appropriate,

22  right?

23        MR. FERGENSON:  Object to form.

24        THE COURT:  So if you'll break it down, please.

25        MS. SHROFF:  Sure.  You know what, it's okay.  I'll

O6O1GUO3                          Buck - Cross

 1    withdraw that question.  We can just move on to the next

 2    document.

 3             Let's look at Document 168.

 4    BY MS. SHROFF:

 5    Q.  So is it fair to say that the bills that you got from this

 6    Labarbiera generally had the same format, right?

 7    A.  For this contract, I paid the installment payments, but for

 8    other invoices, he had subcontractors included so they would

 9    look different.

10             MS. SHROFF:  Okay.  So if we could just go to the next

11    page of this particular document.

12             And then the next one.

13             The next page, please.

14             Okay.  Right there.

15    Q.  Okay.  You see these additional terms?

16    A.  Yes.

17    Q.  Okay.  Were those terms worked out by you or just between

18    these two individuals, the Taurus Fund and Labarbiera Custom

19    Homes?

20    A.  For this particular contract, I don't recall dealing

21    directly with the contractor, so I gave suggestions for

22    contract terms to Aaron or Scott Barnett.  I don't recall which

23    one.

24    Q.  Okay.  And would you give those suggestions to them by

25    telephone or would you email those to them?

O6O1GUO3                          Buck - Cross

1    A.  I emailed them.

2    Q.  Okay.  And do you know if they incorporated your

3    suggestions or not?  It's fine if you don't recall.

4    A.  I'm reading them.  I——I don't recall if those were my words

5    or if they were Aaron's.

6              MS. SHROFF:  Okay.  Let's move on to Government

7    Exhibit 851, please.

8              And if I could just have the middle section, which is

9    12:33 p.m., enlarged.

10   Q.  Do you know what Prevenitas is?

11   A.  That's the company that I received invoices for.  It looked

12   like a——for security equipment.

13   Q.  Okay.  How about New York Business Systems?

14   A.  I do not recall.

15   Q.  Okay.  And Monster Air Heating and Cooling?

16   A.  HVAC equipment.

17   Q.  Okay.  And the remaining fees seem self-evident, but do you

18   recall with any specificity what those were for?

19   A.  I'm sorry.  Can you repeat that?

20   Q.  I said the remaining three payments——Fine Rugs, RDM Fine

21   Art, and Fine Rugs——seem self-evident, but do you recall what

22   they were for?

23   A.  For rugs and fine art.  I don't remember specifics other

24   than that.

25   Q.  Okay.  And this email is from you, and you're letting

O6O1GUO3                          Buck - Cross

1   Gladys know, right?

2   A.   Yes.

3   Q.   Scott and Gladys, correct?

4   A.   Correct.

5   Q.   And Gladys you're reaching at hchktech.com, right?

6   A.   Yes.

7   Q.   And Scott Barnett at frontsight1@outlook, correct?

8   A.   Yes.

9   Q.   Now when you were emailing Ms. Chow at this email address,

10  were you perplexed by the use of that email address, by any

11  chance, back then?

12  A.   I didn't think much of it.  I assumed she was maybe an

13  independent contractor and had her own company.

14  Q.   Okay.  And sitting here today, you don't know otherwise,

15  right?

16  A.   I don't know anything about it.

17          MS. SHROFF:  Okay.  Now let's move on, if we may, to

18  709, please.

19          Okay.  And this document, if I could just have it made

20  somewhat larger.

21  Q.   Now the government showed you this document, correct?

22  A.   Yes.

23  Q.   And you testified on direct that you did not know who lived

24  at 373 Taconic Road, Greenwich, Connecticut, right?

25  A.   That is correct.

O6O1GUO3                          Buck - Cross

1   Q.  And is it fair to say that sitting here today, you still

2   don't know who lives there, right?

3   A.  I don't know who lives there.

4   Q.  Okay.  And if we could just take a look, the date on the

5   top is 1/18/2022, right?

6   A.  Yes.

7   Q.  And is it fair to say that there was more than one of these

8   invoices that you processed?

9   A.  I believe there was more invoices from Flat Rate, yes.

10          MS. SHROFF:  Okay.  So let's just scroll down, if we

11  can.

12  Q.  Okay.  And this one's for how much?

13  A.  $118,000.

14          MS. SHROFF:  Okay.  And if we could just keep

15  scrolling down.

16          All right.  And let's just look at the items that are

17  shipped, okay?  If we could just make them larger.

18  Q.  So I'm not going to have you read each one of these, but do

19  you know where these items were coming from?

20  A.  I didn't think about it.

21  Q.  Okay.  But looking at the document now, can you tell where

22  they're coming from?

23  A.  It looks like they're being moved from 373 Taconic Road.

24  Q.  Okay.  So when you looked at this document and the

25  inventory, you cannot tell if any of these items are purchased

O6O1GUO3                        Buck - Cross

1    and being shipped from the Connecticut address——

2            MR. FERGENSON:  Object to form.

3            MS. SHROFF:  I hadn't finished, but I'm happy to try

4    again.

5            THE COURT:  Go ahead.

6    Q.  ——or whether they were items that were in that Connecticut

7    home that are now being shipped?

8            MR. FERGENSON:  Object to form.

9            THE COURT:  So——

10           MR. FERGENSON:  It's confusing.

11           THE COURT:  You need to break it down.

12   Q.  Do you know, that extra large cabinet in living room, when

13   it was purchased?

14   A.  I do not.

15   Q.  Looking on the third side, the chair desk study, do you

16   know if it was purchased or simply in the Connecticut home and

17   being shipped here?

18           MR. FERGENSON:  Object to form.

19           THE COURT:  So are you asking whether it was purchased

20   through the system that she was involved with or whether it was

21   purchased ever?  What is the question?

22           MS. SHROFF:  Sure.  I'll try again, your Honor.  Sorry

23   about that.

24   BY MS. SHROFF:

25   Q.  You don't know if that chair desk was an old piece of

1  furniture in the Connecticut home being shipped to New Jersey,

2  correct?

3  A.  I don't know anything about that chair.

4  Q.  Right.  So you don't even know, for example——

5          MS. SHROFF:  Let's just scroll down.

6          MR. FERGENSON:  Asked and answered.  She doesn't know.

7          MS. SHROFF:  I have not asked the question yet.

8  Please keep scrolling down.

9          Right there.

10 Q.  You see the credenza large, bedroom three?  Sitting here

11 today, you don't know if that credenza had anything in it when

12 it was moved, correct?

13 A.  I don't know anything about it.

14 Q.  Okay.  And you don't know, for example, on the left side,

15 if the table side small had papers in it, correct?

16 A.  I don't know anything about it.

17 Q.  Okay.  And is it fair to say that you don't know anything

18 about any of these items that were shipped?

19 A.  That's a fair statement.

20 Q.  And that is because it was simply not your job, correct?

21 Your job was just to pay the invoice.

22 A.  You didn't ask me a question.

23 Q.  Oh, I'm sorry.  Your job was just to pay the invoice that

24 had been authorized for payment, correct?

25 A.  Yes.

1   Q.  Okay.  You received invoices for camera equipment; is that

2   right?

3   A.  I believe so.

4   Q.  And you received invoices for lighting, correct?

5   A.  Yes, for lighting.

6   Q.  Okay.  And you processed those invoices as well, right?

7   A.  I did.

8   Q.  Now let me show you what is marked as Defense

9   Exhibit 60613.  Do you recognize that document?

10  A.  I do.

11  Q.  Okay.

12          MS. SHROFF:  Your Honor, the defense moves DX 60613

13  into evidence.

14          MR. FERGENSON:  No objection, your Honor.

15          THE COURT:  It is admitted.

16          (Defendant's Exhibit 60613 received in evidence)

17  Q.  And did you review this proposal?

18          MS. SHROFF:  Oh, I'm sorry.  May I have it shown to

19  the jury.  I always forget that.

20  Q.  Do you review it at all, this document?

21  A.  Can you show me other pages of it.  I don't—

22  Q.  Of course.  Of course.  So let's just slow down.

23          MS. SHROFF:  Can we go one page back.

24  Q.  Do you see on the top it reads, "Provides video

25  monitoring," correct?

O6O1GUO3                          Buck - Cross

1    A.  It does.

2    Q.  Okay.  And one page before this one, "Benefits of a

3    security operations center."  Correct?

4    A.  Yes.

5    Q.  Okay.  And is it fair to say that you didn't inquire about

6    what the security operations center was, right?

7    A.  I did not.

8    Q.  Okay.  And let's just look at the last page then.

9            Do you recall what you did with this document?

10   A.  I saved it in my system.

11   Q.  Did you make a payment on it, do you recall?

12   A.  I made several payments to Prevenitas.  I don't recall if

13   it was specific to this proposal.

14   Q.  Okay.  But let's look at the next one, which is 60614.

15   That's Defense Exhibit 60614.  Do you recall receiving this

16   document?

17           MR. FERGENSON:  We have no objection to admitting it.

18           THE COURT:  So it is admitted.

19           (Defendant's Exhibit 60614 received in evidence)

20           MS. SHROFF:  Thank you, your Honor.

21   Q.  Do you recall receiving this document?

22   A.  I believe, yes, I received this.

23   Q.  And you see the dollar amounts on the side?  I'm not going

24   to make you read them, but do you see them there?

25   A.  Okay.  I do.

O6O1GUO3                          Buck - Cross

```
 1   Q.  Okay.  And there's a total of 392,000 some-odd change,

 2   right?

 3   A.  Yes.

 4   Q.  Did you pay it; do you know?  Not you.  I'm sorry about

 5   that.  I know you didn't pay any of these bills.  You

 6   authorized payments.

 7   A.  Yes.  I don't remember the amounts, but I did make several

 8   payments to Prevenitas.

 9   Q.  Okay.  Thank you.

10           MS. SHROFF:  We can take that down and move to 60618.

11   Q.  And it says there, if you could read—

12           MR. FERGENSON:  If this is being offered, your Honor,

13   we do not object to it coming in.

14           THE COURT:  And which one is this?

15           MS. SHROFF:  60618, your Honor.

16           THE COURT:  It is admitted.

17           (Defendant's Exhibit 60618 received in evidence)

18   BY MS. SHROFF:

19   Q.  And I'm going to do this very briefly.  This discussed the

20   threat and vulnerability assessment, correct?

21   A.  Yes.

22   Q.  And it is for the same property that is listed to Taurus

23   Fund, LLC on the top, correct?

24   A.  Yes.

25   Q.  Okay.  And it's the attention to Scott Barnett, correct?
```

Buck - Cross

1   A.  Yes.

2               MS. SHROFF:  Okay.  We can take that down.

3               We can do 60620.  And assuming the government has no

4   objection, your Honor, we would move it into evidence.

5               MR. FERGENSON:  If they could show it to the parties

6   first so we can see.

7               THE COURT:  So bring it up.

8               MR. FERGENSON:  No objection, your Honor.  Thank you.

9               THE COURT:  It is admitted.

10              (Defendant's Exhibit 60620 received in evidence)

11  BY MS. SHROFF:

12  Q.  You recognize it, right?

13  A.  I do.

14  Q.  Okay.  And was that dollar amount paid; do you know?

15  A.  That's my handwriting on the bottom so it was probably part

16  of that larger payment total is my guess.  I'd have to see my

17  records, but it was paid.

18              MS. SHROFF:  Okay.  And if I could just have it zoomed

19  out.

20  Q.  And I'm assuming that you don't know what camera powder

21  coating or any of these other expenses are, right?  They just

22  seem to be related to security cameras?

23  A.  Correct.  I don't know what they are one way or the other.

24  Q.  Thank you.

25              MS. SHROFF:  If I could have 60621 shown to government

O6O1GUO3                        Buck - Cross

 1   counsel and the witness and the Court.

 2              MR. FERGENSON:  We have no objection, your Honor.

 3              THE COURT:  It is admitted.

 4              (Defendant's Exhibit 60621 received in evidence)

 5   Q.  Did the government show you this document when you met with

 6   them to prepare?

 7   A.  I don't specifically recall this one.

 8              MS. SHROFF:  Okay.  You can take that down.

 9              If I could please do the same with 60623.

10              And if the government has no objection, we would move

11   60623 into evidence.

12              MR. FERGENSON:  No objection, your Honor.

13              THE COURT:  It is admitted.

14              (Defendant's Exhibit 60623 received in evidence)

15   BY MS. SHROFF:

16   Q.  Did you discuss this document with Mr. Fergenson when you

17   met with him?

18   A.  I don't specifically recall this document being discussed.

19   Q.  And I'm assuming you do not know which innovation

20   technology they actually ended up using, but you paid the bill

21   once you were authorized to pay, correct?

22              MR. FERGENSON:  Objection to form.

23              THE COURT:  So it's two questions in one.

24              MS. SHROFF:  I'm happy to do it——

25              THE COURT:  Just ask them separately.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MS. SHROFF:  Okay.

2      Q.  What is the document titled?

3      A.  It's a Security Camera Surveillance System Installation

4      Proposal.

5      Q.  And the date?

6      A.  January 29, 2022.

7           MS. SHROFF:  And if I could just have——Mr. Salazar,

8      could you just scroll through for me.

9      Q.  What is that an image of?

10     A.  It says Property Overview.

11     Q.  Okay.  And do you know what property it's talking about?

12     A.  If you look at the first page, I think it's the Crocker

13     Mansion address.

14          MS. SHROFF:  Okay.  And let's just go to page 3.

15          Page 4.

16          Page 5.

17          And is there a page 6?  No.  Okay.  So page 5 is the

18     last one.

19     Q.  And there's the total project costs, correct?

20     A.  Yes.

21     Q.  And I'm assuming you don't recall if you discussed this

22     document with Mr. Fergenson.

23     A.  I don't specifically recall discussing this document.

24     Q.  Okay.  Do you recall if this amount was paid?

25     A.  This amount, I don't specifically recall.  I've paid

O6O1GUO3                    Buck - Cross

1  several payments to Prevenitas.

2          MS. SHROFF:  Okay.  Let's look at 60625, still a

3  defense exhibit.

4  Q.  What is that, ma'am?

5  A.  This is an email to me from Scott Barnett.

6  Q.  Okay.  And if we could just——

7          MR. FERGENSON:  I'm sorry.  Is this being shown to the

8  jury?

9          THE JURORS:  No.

10         MR. FERGENSON:  Okay.  I apologize.  I have no

11 objection to this coming in.

12         THE COURT:  It is admitted.

13         (Defendant's Exhibit 60625 received in evidence)

14         MS. SHROFF:  Now may we show it to the jury, please?

15         THE COURT:  Go ahead.

16 BY MS. SHROFF:

17 Q.  And it says, "Amy, here is a photo of the invoice,"

18 correct?

19 A.  It does.

20 Q.  Okay.  And does he attach an invoice for you?

21 A.  I believe he did.  I don't specifically recall.

22 Q.  Okay.  And sitting here today, you don't recall if you

23 actually paid that invoice, correct?

24 A.  I don't even remember what it is.

25 Q.  All right.  Well, let's just show you then 60624.

O6O1GUO3                         Buck - Cross

1              MS. SHROFF:  And don't show it to the jury, please,

2    Mr. Salazar.  Thank you.

3              And if we could scroll down just for the witness and

4    the Court and the parties.

5    Q.  Do you recall this document and its attachment?

6    A.  It looks familiar, yes.

7              MS. SHROFF:  Okay.  We move 60624 into evidence.

8              MR. FERGENSON:  No objection.

9              THE COURT:  It is admitted.

10             (Defendant's Exhibit 60624 received in evidence)

11   Q.  And with this document, he attaches the information from

12   Prevenitas, right?

13   A.  Yes.

14             MS. SHROFF:  And if we could just show that to the

15   jury and scroll down.

16             Thank you.

17   Q.  Let me show you what is marked for evidence as 60626,

18   please.  Do you recognize——

19             MS. SHROFF:  Don't show it to the jury, Jorge.  Thank

20   you.

21   Q.  Do you recognize this document, Ms. Buck?

22   A.  I don't specifically recall it, but it looks familiar, if

23   that makes sense.

24   Q.  Was it sent to you?

25   A.  Yes.

O6O1GUO3                                    Buck - Cross

1    Q.  And is it from an electronic mail address that you

2    recognize?

3    A.  Yes.

4          MS. SHROFF:  Okay.  The defense moves 60626 into

5    evidence.

6          THE COURT:  No objection?

7          MR. FERGENSON:  Just one moment, your Honor.

8          No objection, your Honor.

9          THE COURT:  It is admitted.

10         (Defendant's Exhibit 60626 received in evidence)

11         MS. SHROFF:  So if we could just take a look at that

12   document, please.

13   BY MS. SHROFF:

14   Q.  Would you tell the jury what B&H is.

15   A.  I believe it's the company name.  I don't know.  I don't

16   remember offhand.

17   Q.  And does the remaining portion of that line tell you what

18   kind of company it could be?

19   A.  Do you want me to read it?

20   Q.  Please.

21   A.  Broadcast equipment.

22         MS. SHROFF:  And if I could just go to the second page

23   of this document.

24         And if it could be enlarged for the jurors.

25         And if we could just move our way down.

1    Q.  You received this particular document, right?

2    A.  I believe so, yes.

3            MS. SHROFF:  And if I could just scroll back up for a

4    moment.

5    Q.  It very clearly tells you, right, sold to Gladys——

6            MR. FERGENSON:  Objection to the characterization,

7    your Honor.

8            THE COURT:  So you can just state the words without

9    giving it a spin.

10   Q.  This document tells the reader that the equipment is sold

11   to Gladys Chow, correct?

12   A.  Yes.

13   Q.  6628 Sky Point Drive, Las Vegas, Nevada 89141, right?

14   A.  Yes.

15   Q.  And then it tells you where it's going to be shipped to,

16   correct?

17   A.  Yes.

18   Q.  And the date on this is June 1, 2022.

19   A.  Yes.

20   Q.  Nobody's hiding any addresses, correct?

21           MR. FERGENSON:  Objection.

22           THE COURT:  Are you asking whether, looking at the

23   document, she can tell that something is hidden?

24           MS. SHROFF:  Yes.

25           THE COURT:  Go ahead and answer.

O6O1GUO3                          Buck - Cross

 1    A.  I took the document on its face.  I don't know anything
 2    otherwise.
 3            MS. SHROFF:  Okay.  And let's just keep scrolling
 4    down.
 5    Q.  And can you tell just by the title on the top who generated
 6    that document?
 7    A.  B&H Photo-Video, I think.
 8            MS. SHROFF:  Okay.  And if we could just go to the
 9    last page, please.
10    Q.  The total is for $67,416.73, right?
11    A.  Yes.
12            MS. SHROFF:  Okay.  And the last one is 60628.
13            You know, actually, it's okay.  I think we have
14    enough.  I'll withdraw the last one.
15    Q.  Now, Ms. Buck, Mr. Fergenson here asked you questions about
16    the documents in your binder, right?
17    A.  Yes.
18    Q.  And do you know how that binder was created?
19    A.  I don't understand the question.
20    Q.  Okay.  Let me try again.
21    A.  Okay.
22    Q.  Do you know how he chose the documents?
23    A.  I do not.
24    Q.  Did he share his process with you?
25    A.  No.

O6O1GUO3                          Buck - Cross

1    Q.  Okay.  He gave you a set of documents and the two of you

2    reviewed them; is that correct?

3    A.  He gave me the binder to review and stepped out of the

4    room.

5    Q.  Okay.  And then you sat and reviewed them, correct?

6    A.  I did.

7    Q.  And then did you discuss the documents with him?

8    A.  I did.

9    Q.  Okay.  You and I have never met to discuss any documents,

10   right?

11   A.  No.

12        MS. SHROFF:  Okay.  Give me one minute.

13   Q.  Now you were shown 709 by the government, right?  And if I

14   could just have that pulled up for you.

15        We went through this document before.  Do you recall

16   what Mr. Barnett's role was in this, in the move, if he had a

17   role?

18   A.  I don't recall if he sent any of those invoices to me.

19        MS. SHROFF:  Okay.  We can take that down and look at

20   1204.

21   Q.  You remember testifying about this document on direct?

22   A.  Yes.

23   Q.  Okay.  And the government here, Mr. Fergenson, pointed your

24   attention to the job location being at Connecticut, correct?

25   A.  Yes.

O6O1GUO3                           Buck - Cross

1    Q.   Okay.  And the total bill for this one was what, $400; is

2    that right?

3    A.   Yes.

4    Q.   And did you authorize payment on this?  Sitting here, do

5    you remember?

6    A.   Not specifically, but I'm sure I paid it.

7    Q.   Okay.  Did you ask Sean why you were paying $400 for some

8    work done in Connecticut?

9    A.   I did not.

10   Q.   Okay.  Now let's look at Government Exhibit 375.

11          And the government spent a lot of time asking you

12   about these mattresses, correct?

13   A.   He asked me questions about them, yes.

14   Q.   Yes.  What color they were, how much they cost, correct?

15   A.   Yes.

16   Q.   Okay.  And you testified that you knew what Hästens

17   mattresses are, right?

18          Are you aware of the company?

19   A.   I've heard of the name, but I couldn't tell you from where.

20   Q.   Okay.  And it's fair to say that the government also asked

21   you questions about this email address for Mr. Barnett,

22   correct?  Remember they focused your attention to GSNYUS.com?

23   A.   Yes, they asked me questions today about that email

24   address.

25   Q.   Okay.  Do you know what that stands for?

O6O1GUO3                          Buck - Cross

1    A.  I do not.

2    Q.  Did you ask Mr. Barnett, hey, why are you emailing me from

3    this address?

4    A.  I'm not sure I realized it at the time, but I didn't ask

5    him.

6    Q.  And you didn't ask Ms. Chow, right?

7    A.  No.

8           MS. SHROFF:  Okay.  If we could just keep scrolling

9    down on that document, please.

10          Still 375, right?

11   Q.  I'm not going to go over the price of all the mattresses

12   and everything, but you testified at great length about whether

13   they were blue or white and had a checked pattern, right?

14   A.  Yes.

15   Q.  Okay.  You paid for the mattresses because you were

16   authorized to release payment?

17   A.  Yes, I was authorized to pay this invoice.

18   Q.  Okay.  And you didn't question why the mattresses were

19   being bought, right?

20   A.  No.  I didn't question them.

21   Q.  And the only reason you're testifying about these

22   mattresses is because Mr. Fergenson picked this document and

23   asked you questions about it, right?

24   A.  I don't think I understand your question.  I'm sorry.

25   Q.  You didn't choose this document to testify about, right?

1    A.  Correct, I didn't choose it.

2    Q.  And you didn't flag it as a document that you found odd,

3    correct?

4    A.  I didn't flag anything.

5            MS. SHROFF:  Okay.  Let's just move on.

6            Now let's go to Government Exhibit 522.

7    Q.  You see this document?

8    A.  Yes.

9    Q.  You testified about this one as well?

10   A.  Yes.

11   Q.  And there were questions asked about where different things

12   were going, correct?

13           MS. SHROFF:  You know what, just show her the photo

14   again since you had it up on the screen here already.

15           MR. FERGENSON:  Your Honor, I'm not sure what this is.

16   Is it a document in evidence?

17           MS. SHROFF:  It's a Government Exhibit.

18           THE COURT:  Which exhibit?

19           MS. SHROFF:  It's W5V.1.  It's a Government Exhibit in

20   evidence.

21   BY MS. SHROFF:

22   Q.  Do you know who this person is?

23   A.  I do not.

24   Q.  Okay.  Do you recognize the brass bookcases in the

25   background?

O6O1GUO3                          Buck - Cross

1    A.  I do not.

2    Q.  You would not be able to match something you read on an

3    inventory sheet with this brass bookcase, correct?

4    A.  I can't make that match, no.

5    Q.  And you cannot tell if this photograph was taken in the New

6    Jersey residence or not, correct?

7    A.  I don't know one way or the other.

8              MS. SHROFF:  Okay.  You can take that down.

9              Going back to 522.

10   Q.  On the topmost part of this email, right?

11   A.  Yes.

12   Q.  Mr. Fergenson asked you questions about the piano going to

13   the New York office, correct?

14   A.  Yes.

15   Q.  Do you know why the piano was going to the New York office

16   first?

17   A.  I didn't ask.

18   Q.  Do you know if it had to do with insurance?

19   A.  I—I don't know one way or the other.

20   Q.  How about the mattresses?

21   A.  No one discussed with me where things were going or why.

22   Q.  Okay.  They sent you an email about it.  As long as you

23   were authorized to pay it, you paid it, right?

24   A.  Correct.

25             MS. SHROFF:  All right.  We can take that down.

O6O1GUO3                        Buck - Cross

1    Q.  You don't know who is at 3 Columbus Circle, correct?

2    A.  I do not know that address.

3    Q.  You don't know an address on East 64th Street, correct?

4    A.  Can you repeat that.  I'm sorry.

5    Q.  Sure.  Do you know of any significance to an address on

6    East 64th Street?

7    A.  I don't recognize that address.

8    Q.  You never heard of any place called the townhouse, correct?

9    A.  I don't know one way or the other.

10   Q.  Let me show you 1275, please.

11          Do you recall being asked questions about this——I

12   don't even know how to pronounce it——Amuneal bookcase?

13   A.  I do.

14   Q.  Okay.  Do you know what an Amuneal bookcase is?

15   A.  I do not.

16   Q.  If I showed it to you, would you recognize one?

17   A.  No.

18          MS. SHROFF:  Okay.  We can take that down.

19          Let's go to 1279, please.  Thank you Jorge.

20          And if I could just have you scroll down, please.

21          And is there one more down?  Go further down.

22   Q.  Okay.  And you see this email?

23          MS. SHROFF:  If I could just have it made larger.

24   Q.  You see this person?  It's Ilona Musial, right?

25   A.  Yes.

O6O1GUO3                          Buck - Cross

1   Q.  Was she fired?

2   A.  I was told she was, yes.

3           MS. SHROFF:  Okay.  You can take that down.

4           How about 1275?  If I could just have that made

5   larger.

6           And you know, I think I have the wrong number.  Hold

7   on one second.

8           I'm sorry.  I may have the wrong number, your Honor.

9   May I just have a moment?

10          THE COURT:  Go ahead.

11          MS. SHROFF:  Sorry.

12          I must have written down the exhibit number

13  incorrectly.

14  BY MS. SHROFF:

15  Q.  But you recall Mr. Fergenson asking you questions about an

16  individual named Lee Ann at G Fashion?

17  A.  Yes.

18          MS. SHROFF:  Ms. Loftus, could you possibly help me

19  out with the exhibit number.

20  Q.  Do you recall giving testimony about that document?

21  A.  Yes.

22  Q.  Do you know who Lee Ann is?

23  A.  I don't know.

24  Q.  Do you know what G Fashion is?

25  A.  I do not.

O6O1GUO3                          Buck - Cross

1    Q.  Do you know if that company exists today?

2    A.  I—I don't know one way or the other.

3    Q.  Have you ever Googled G Fashion?

4    A.  No.

5    Q.  Do you know if G Fashion had some sort of office or space—

6            MR. FERGENSON:  Objection.

7    Q.  —at the Mahwah mansion?

8            THE COURT:  So she's testified that she doesn't know

9    of the company.

10   Q.  Do you know if any company had space and did work out of

11   the Ramapo property?

12   A.  I don't know one way or the other.

13   Q.  Do you know if G Fashion clothing was left in that mansion?

14           MR. FERGENSON:  Same objection.

15           THE COURT:  Sustained.

16   Q.  Now you testified to certain questions posed by

17   Mr. Fergenson that you felt payment was authorized by the

18   family behind the Taurus Fund.  Remember that?

19   A.  I do.

20   Q.  Okay.  Sitting here today, you do not know if there was one

21   or several families behind the Taurus Fund, correct?

22   A.  I don't know one way or the other.

23   Q.  Right.  So when you said family, you just used the

24   nomenclature, right?

25   A.  The people I talked to, that's how they referred to them.

O6O1GUO3                          Buck - Cross

 1    I don't know anything beyond them being called the family.

 2    Q.  Okay.  So you don't know how many people were in this

 3    quote-unquote family, correct?

 4    A.  I do not know.

 5    Q.  Do you know if it was a joint family or a nuclear family?

 6    A.  Don't—

 7         MR. FERGENSON:  Objection to form.  I'm not sure what

 8    that means.

 9         THE COURT:  I don't understand what the meaning of

10    "joint family" is.

11    Q.  Do you know what a joint family is?

12    A.  I don't know.

13    Q.  Okay.  Would it be fair to say that a family can be defined

14    as a smaller unit versus a family with all of the siblings

15    included?

16         MR. FERGENSON:  Just I guess objection to relevance

17    and knowledge.

18         THE COURT:  Perhaps you could be more specific.

19    Q.  Would it be fair to say that in certain cultures, family

20    would include all brothers, all of their wives, and all of

21    their children?

22         MR. FERGENSON:  Objection, your Honor.  She's not a

23    cultural expert.

24         MS. SHROFF:  I'm asking for her understanding.

25         THE COURT:  I'd like her opinion on that.  Go ahead.

O6O1GUO3                         Buck - Cross

 1  A.  I don't really have an opinion.  All cultures are

 2  different.

 3  Q.  Possible, right?

 4          MR. FERGENSON:  Objection to speculation.

 5          THE COURT:  Don't ask her to speculate.  She's told

 6  you all cultures are different.

 7  Q.  Are you familiar at all with the Chinese culture?

 8  A.  I am not.

 9  Q.  Do you know how a Chinese family would define family?

10          MR. FERGENSON:  Objection.  She said she doesn't know.

11          THE COURT:  Sustained.

12  Q.  You were asked questions about a person named Cao, correct?

13  A.  Yes.

14  Q.  You've never met the person, correct?

15  A.  Correct.

16  Q.  You got emails from this person, correct?

17  A.  I was copied on emails that he wrote, yes.

18  Q.  Did you ask what his job was?

19  A.  No.

20  Q.  Did you ask who he was employed by?

21  A.  I did not.

22  Q.  Now you testified about freaking out about the SEC

23  subpoena, right?

24  A.  Correct.

25  Q.  Okay.  And I hope somebody told you that's a normal

O6O1GUO3                         Buck - Cross

1  reaction.  But you reached out to Aaron Mitchell, correct?

2  A.  I did.

3  Q.  Okay.  And you had a text exchange with Mr. Mitchell,

4  right?  Was that a text exchange that——

5       MS. SHROFF:  I need the exhibit up.  I believe it

6  is——I'm sorry.  What was the exhibit, Government Exhibit

7  number?

8  Q.  Okay.  This is 1290, correct?

9  A.  This is a text exchange with Aaron and myself, yes.

10  Q.  Okay.  And you're in green?

11  A.  Yes.

12  Q.  Okay.  So you say you're in Hershey and you can't talk

13  right now.  "Can I call u later," right?

14  A.  Yes.

15  Q.  And you then exchange a text with him in November, right?

16  November 9th.

17  A.  Correct.

18  Q.  And you say you wanted to give him a heads up that "I got

19  an information subpoena and deposition notice," right?

20  A.  Yes.

21  Q.  For Taurus Fund.

22  A.  Yes.

23  Q.  "Can we please catch up next week?"  Right?

24  A.  Yes, that's my text.

25  Q.  Okay.  And he suggests Monday at 2, right?

O6O1GUO3                          Buck - Cross

1    A.  I'm the green.  That's me.

2    Q.  Oh, sorry.  So you suggest Monday at 2.

3    A.  Yes.

4    Q.  And do you know if you're being noticed for a deposition by

5    the Taurus Fund?

6    A.  I don't believe it was, no.

7    Q.  Okay.  So who was noticing you for a deposition?

8    A.  I don't remember, but it was for bankruptcy court.

9         MS. SHROFF:  Okay.  So let's just scroll down.

10         No, one page up.

11    Q.  He says, "U got it!  Thanks," right?

12    A.  No, that's me.

13    Q.  Still you?

14    A.  Yeah, I'm green and then——oop, I'm gone.

15    Q.  So what happens in the middle?

16    A.  I——

17    Q.  We've lost all signal.

18         MS. SHROFF:  Your Honor, I think we have some

19    technical difficulties with the equipment.

20         THE COURT:  Okay.  Well, we have sent an email to the

21    audiovisual department so they'll come up.  Is there anything

22    that you could ask about that doesn't require the screen?

23         MS. SHROFF:  Maybe Ms. Loftus can help me out.

24         Very good.  Thank you.

25         MR. FERGENSON:  Do you have the——I think it was 1290.

O6O1GUO3                              Buck - Cross

1    Okay.

2                MS. SHROFF:  So Ms. Loftus has it.  Thank you so much,

3    Ms. Loftus.

4    BY MS. SHROFF:

5    Q.  Okay.  So you see there is a response saying, "Sure.  Call

6    this number."  Right?  That's from Mr. Mitchell to you, right?

7    A.  Yes.

8    Q.  And then you say, "U got it!  Thanks."  Right?

9    A.  Yes.

10   Q.  And could you not reach him so you say to him, "Call me

11   please"?

12   A.  I think it was he wanted me to call him on his cellphone

13   and not his work number, so——

14   Q.  Okay.  And do you know if he was traveling that day?

15   A.  I have no idea.

16   Q.  Okay.  And then who is in blue now?

17   A.  Blue is me.

18   Q.  Okay.  So you say to him, "Please call me asap.  Thanks."

19   Right?

20   A.  Yes.

21   Q.  Okay.  And does he call you?

22   A.  I don't think he did, 'cause I sent another text.

23   Q.  Okay.  And you text him and you say, "Call me when free

24   please-looking for update," correct?

25   A.  Yes, that's my text.

```
 1   Q.  Okay.  Does that refresh your recollection that somewhere
 2   along the way he told you he was busy but would call you back?
 3            MR. FERGENSON:  I don't think there was a failure to
 4   recall, but that's fine.
 5   Q.  You see a response that says, "Call me when free please"?
 6   A.  Yes.
 7            MR. FERGENSON:  That's Ms. Buck's text, your Honor, as
 8   she testified.
 9            THE COURT:  So which are you referring to?  Is that in
10   blue?
11            THE WITNESS:  Yes.
12            THE COURT:  So what's the question?
13   BY MS. SHROFF:
14   Q.  My question is:  Do you see the first line, "Call me when
15   free please," right?  Is that line in response to Mr. Mitchell
16   letting you know that he was not free to speak?
17   A.  I think he didn't respond to my earlier text so I texted
18   him again.
19            MS. SHROFF:  Okay.  So let's keep scrolling down.
20   Q.  And you see the government showed you this document,
21   correct?
22   A.  Yes.
23   Q.  And do you know what the title of that document is?
24   A.  It's too small.
25   Q.  Do you have any recollection of what that document was?
```

1   A.  I know that's from the bankruptcy court.  It's Notice of

2   Motion.

3   Q.  Right.

4   A.  Do you want me to read it?

5   Q.  Just the title, please.

6   A.  Notice of Motion for Extension of Time for Trustee to Bring

7   Claims Against Potential Defendants.

8   Q.  Right.  So is it fair to say you're a lawyer?  I take that

9   back.  You are a lawyer, right?

10  A.  Yes.

11  Q.  Okay.  And it's fair to say, right, as a lawyer, you can

12  tell this jury that this is for an extension of time, correct?

13  A.  Yes.

14  Q.  And when Mr. Mitchell tells you he's not intending to

15  respond to it, doesn't that tell you that he has no opposition

16  to the extension of time request?

17          MR. FERGENSON:  Objection, your Honor.

18          THE COURT:  Sustained.  She cannot possibly know what

19  is on Mr. Mitchell's mind, what he meant.

20  Q.  The motion is for an extension of time, correct?

21          MR. FERGENSON:  Asked and answered.

22          THE COURT:  Sustained.

23  Q.  And Mr. Mitchell's response to this front page, you

24  testified, was that he did not plan to respond to this motion,

25  correct?

O6O1GUO3                                Buck - Cross

1    A.  Yes, that was his text response.

2    Q.  Okay.  And sitting here today, do you know if you objected

3    to the extension of time?

4    A.  I didn't respond to this one.

5          MS. SHROFF:  Okay.  So let's keep scrolling down.

6    Q.  And then you and Mr. Mitchell continue to have an

7    interaction, correct?  You keep texting, right?

8    A.  Yes.

9    Q.  Okay.  And he says, "Yes.  About 1,000 people got it."

10   Correct?

11   A.  Yes.

12   Q.  Did you take that as hyperbole or a true statement of fact?

13   A.  I took it as an exaggeration, that a lot went out.

14   Q.  Okay.  And you responded saying, "That sounds amazing,"

15   correct?

16   A.  Yes.

17   Q.  And Mr. Mitchell replied, like many litigators do, "Some

18   people are fighting——"

19          MR. FERGENSON:  Objection to the commentary.

20          THE COURT:  Don't enhance.  Just ask the question.

21   Q.  "Some people are fighting it, so if they win, we win,"

22   correct?

23   A.  Yes.

24   Q.  Okay.  And you say, "Gotcha.  Do I need counsel for this

25   too?"  Right?

O6O1GUO3                                  Buck - Cross

1    A.  Correct.

2    Q.  And he says, "Up to you, but I am not getting counsel or

3    responding."  Correct?

4    A.  Yes, that's his text.

5    Q.  And the only document in this chain is a motion for

6    extension of time, correct?

7    A.  Yes.

8         MS. SHROFF:  Okay.  Could we go all the way down.

9    Q.  That's the end of the document, right?

10   A.  Yes.

11        MS. SHROFF:  Okay.  We can take that down.

12   Q.  You also testified about another conversation you had with

13   Mr. Aaron Mitchell, right, where you talked about——he talked to

14   you about the cost of doing business, correct?

15   A.  Yes.

16   Q.  And you testified that Mr. Mitchell told you that the

17   government doesn't like the family, correct?

18   A.  He said something along those lines, yes.

19   Q.  Right.  And he did not elaborate on which government it

20   was, correct?

21   A.  He did not.

22   Q.  He didn't tell you if the government was the United States

23   government, correct?

24   A.  Correct.

25   Q.  He didn't tell you if it was the Chinese Communist Party,

O6O1GUO3                          Buck - Cross

1  correct?

2  A.  Correct.

3  Q.  And he didn't tell you why the government did not like the

4  family, correct?

5  A.  I don't recall him explaining any of it.

6  Q.  And sitting here today, you have no idea whether or not the

7  government liked or disliked this family, correct?

8  A.  I don't know one way or the other.

9  Q.  Exactly.  And is it fair to say that when Mr. Mitchell was

10  talking to you about the Federalist Party of China——that's the

11  name you recall, right?

12  A.  That's the name I recall, yes.

13  Q.  You had no follow-up questions for him, right?

14  A.  We may have conversed.  I don't remember the details.  It

15  wasn't important to me.

16      MS. SHROFF:  Okay.  Your Honor, may I just have a

17  moment, please.

18      THE COURT:  Yes.

19      MS. SHROFF:  Thank you.

20  Q.  You were asked a series of questions about a person named

21  Luc Despins, correct?

22  A.  Yes.

23  Q.  Do you know who that is?

24  A.  I think that's the name on the bankruptcy paperwork.

25  Q.  Okay.  But do you know who it is?

1   A.  Oh, no.

2   Q.  Do you know if it's a lawyer or not a lawyer?

3   A.  I don't know one way or the other.

4   Q.  Okay.  Ms. Buck, sitting here today, could you tell the

5   jury how much you paid or how much you authorized in payments

6   for security at the property?

7   A.  I don't know the number, the aggregate number.

8   Q.  You didn't keep an aggregate number in your head for any of

9   the expenses, correct?

10  A.  I did not.

11  Q.  Right.  And you had a limited role to play in all of this,

12  correct?

13  A.  I paid the invoices that I was authorized to pay.

14  Q.  And you gave a copy of all of those invoices to

15  Mr. Fergenson here, correct?

16  A.  I believe so.

17          MS. SHROFF:  I have nothing further, your Honor.

18  Thank you.

19          THE COURT:  All righty.  Let's have our redirect.

20          MR. FERGENSON:  Thank you, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. FERGENSON:

23  Q.  Ms. Buck, you were asked some questions about the

24  conversation regarding the Federalist Party of China.  Do you

25  remember that?

1    A.  Yes.

2    Q.  Just for clarity, who was that conversation with?

3    A.  Aaron Mitchell.

4    Q.  And when did the Federalist Party of China come up?  When

5    was that conversation?

6    A.  Around when I got the first subpoena.

7    Q.  And who was that first subpoena from?

8    A.  The SEC.

9    Q.  Is the SEC part of the United States government?

10   A.  Yes.

11   Q.  Okay.  Do you remember, Ms. Buck, you were asked questions

12   about whether Sean Jing worked for G|CLUBS?  Do you remember

13   that?

14   A.  Yes.

15           MR. FERGENSON:  Can we please publish, Ms. Loftus,

16   GX BUCK 194.

17           And if we can just zoom on the top half, please.

18   Q.  Ms. Buck, you see on the top right here, it says Customer

19   Name, Sean Jing?

20   A.  Yes.

21   Q.  And on the left it says Bill To, and it says Taurus Funds,

22   LLC and Sean Jing beneath that?

23   A.  Yes.

24   Q.  Is G|CLUBS listed anywhere on this document?

25   A.  No.

O6O1GUO3                    Buck - Redirect

```
 1   Q.  And Sean Jing's email address, is that a G|CLUBS email
 2   address?
 3   A.  No.
 4          MR. FERGENSON:  If we could go to, Ms. Loftus, Defense
 5   Exhibit 60613.
 6   Q.  Now, Ms. Buck, you were asked a number of questions about
 7   payments for security invoices.  Do you remember those?
 8   A.  Yes.
 9   Q.  And this is one of the invoices you were shown, right?
10   A.  Yes.
11          MR. FERGENSON:  We can scroll down.  And we can scroll
12   down to page 3, please.
13          And if we could just zoom in on the top paragraph
14   there.
15   Q.  Ms. Buck, could you read the second sentence there that
16   starts, "Having 24/7."
17   A.  "Having 24/7 video capabilities can keep your family and
18   operations safe."
19   Q.  Now, Ms. Buck, who did you understand to be behind Taurus
20   Fund, LLC?
21   A.  A family.
22          MR. FERGENSON:  We can take that down, Ms. Loftus.
23   Q.  Ms. Buck, I'm not going to show you documents again.
24          You were asked questions on cross about the
25   mattresses.  Do you remember that?
```

O6O1GUO3                         Buck - Recross

1    A.  Yes.

2    Q.  Those were Hästens mattresses, right?

3    A.  Yes.

4    Q.  They cost some $30,000 apiece, right?

5    A.  Yes.

6    Q.  Do you know if those mattresses have any special security

7    features?

8    A.  I——I don't know.

9              MR. FERGENSON:  Nothing further, your Honor.

10             THE COURT:  Recross?

11   RECROSS EXAMINATION

12   BY MS. SHROFF:

13   Q.  Do you know any mattress to have a security feature, ever?

14   A.  I don't know one way or the other.

15   Q.  Okay.  Let's look at 194, shall we.

16             You see that document about Sean Jing, right?  He

17   asked you questions if there was a G Club on here, correct?

18   A.  Yes.

19   Q.  Okay.  Do you know people to have more than one job at one

20   given time?

21   A.  Sure, people can have more than one job.

22   Q.  Right.  This man could work here and at G Club, right?

23             MR. FERGENSON:  Calls for speculation.

24             THE COURT:  Can a person have more than one job?

25             THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              THE COURT:  Go ahead.

2    Q.  I can work two jobs, right?

3    A.  You can.

4    Q.  Right.  I could have a job at G|CLUBS in the morning and at

5    Walmart in the day, right?

6    A.  I'm sure you can.

7    Q.  There you go.

8              MS. SHROFF:  We can take that one down.

9              And let's go to 60613.

10             Let's go to that line, "family and operations."

11   Q.  Do you see that?

12   A.  I do.

13   Q.  Okay.  Businesses have operations, correct?

14   A.  They do.

15             MS. SHROFF:  Thank you.  You can take that down.

16   Q.  And let me just take you to your many, many meetings with

17   Mr. Fergenson over here, right?

18             MR. FERGENSON:  Scope, your Honor.  This is recross.

19   We didn't talk about this.

20             MS. SHROFF:  I think it's well within the scope.

21             THE COURT:  Okay.  Go ahead.

22   Q.  You and Mr. Mitchell discussed the New Federal State of

23   China far earlier than June, correct?  Do you recall that,

24   talking with Mr. Aaron Mitchell about the New Federal State of

25   China more than once?  Right?  You recall that?

O6O1GUO3                          Buck - Recross

1   A.  We may have.  I don't specifically recall.

2   Q.  All right.  Well, let's see if we can help you out.

3            MS. SHROFF:  If we could just show her.

4   Q.  Does that help you out?

5   A.  I don't know what NFSC is.

6   Q.  New Federal State of China?

7   A.  Oh.

8            MR. FERGENSON:  Your Honor, the question is if it

9   refreshes her recollection.  She should not read the document

10  into the record.

11           THE COURT:  So you just look at the document and

12  you'll say whether it refreshes your recollection.

13           THE WITNESS:  Yes.

14  BY MS. SHROFF:

15  Q.  Okay.  You don't really remember much about this because

16  the New Federal State of China doesn't interest you, right?

17           MR. FERGENSON:  Objection.

18           THE COURT:  Overruled.  You may answer.  Go ahead.

19  A.  I wasn't interested, no.

20           MS. SHROFF:  Thank you.  I have nothing further.  Have

21  a nice day.

22           THE COURT:  All righty.  Thank you.  You may step out.

23           (Witness excused)

24           THE COURT:  The government may call its next witness.

25           MR. FERGENSON:  The government calls Douglas Skalka.

1    DOUGLAS SKALKA,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Please state your name and spell it.

5              THE WITNESS:  My name is Douglas Skalka, S-K-A-L-K-A.

6              THE COURT:  You may inquire.

7    DIRECT EXAMINATION

8    BY MR. FERGENSON:

9    Q.  Good morning, Mr. Skalka.

10   A.  Good afternoon.

11   Q.  Good afternoon.

12             MR. FERGENSON:  Your Honor, just before we get

13   started, if I may just offer an exhibit pursuant to a

14   stipulation?

15             THE COURT:  Yes.  Go ahead.

16             MR. FERGENSON:  GXC-146 and GXC-146-T.

17             MR. KAMARAJU:  No objection, your Honor.

18             THE COURT:  They are admitted.

19             (Government's Exhibits C-146, C146-T received in

20   evidence)

21   BY MR. FERGENSON:

22   Q.  Mr. Skalka, what do you for work?

23   A.  I'm an attorney in private practice.

24   Q.  What firm do you work at?

25   A.  I work at the firm known as Neubert, Pepe & Monteith.

1    Q.  Mr. Skalka, you can adjust the microphone and you can pull

2    it closer to you.

3              What type of law do you practice?

4    A.  I practice primarily in the area of bankruptcy and

5    financial distress, creditors rights, commercial transactions

6    involving financially distress entities and assets.  Those are

7    my practice areas.

8    Q.  How long have you been bankruptcy related law?

9    A.  Approximately 35 years.

10   Q.  Are you familiar with the bankruptcy proceedings of Ho Wan

11   Kwok or Miles Guo?

12   A.  Yes, I am.

13   Q.  How are you familiar with that?

14   A.  My firm Neubert, Pepe & Monteith has been retained as

15   Connecticut counsel and conflicts counsel for the Chapter 11

16   trustee appointed in Mr. Kwok's bankruptcy proceeding.

17   Q.  What name do you refer to him by?

18   A.  I refer to him as Mr. Kwok or the debtor.

19   Q.  Where was Mr. Kwok's bankruptcy filed?

20   A.  It was filed in the bankruptcy court for the District of

21   Connecticut in Bridgeport, Connecticut.

22   Q.  What type of bankruptcy did Kwok file?

23   A.  It's a Chapter 11 bankruptcy proceeding.

24   Q.  What typically happens in that type, the Chapter 11

25   proceeding that Mr. Kwok filed?

1    A.   Chapter 11 bankruptcy proceedings are commonly referred to

2    as reorganization proceedings, meaning that they're an effort

3    by the debtor to reorganize their financial affairs with an

4    effort to obtain a plan that's acceptable to the entities

5    creditors or the person's creditors and to emerge from the

6    bankruptcy proceeding as a more viable entity with a plan

7    acceptable to his or their creditors.

8    Q.   Is there a bankruptcy trustee in Mr. Kwok's Chapter 11

9    case?

10   A.   Yes.

11   Q.   How was that trustee appointed at a high level?

12   A.   The trustee was appointed by the bankruptcy court in the

13   District of Connecticut.  I believe the order was entered in

14   June of 2022, and it was in response to a motion filed in the

15   bankruptcy case.

16   Q.   And again just at a high level, what is the trustee's role

17   in Mr. Kwok's bankruptcy?

18   A.   A Chapter 11 trustee, essentially the Chapter 11 trustee in

19   Mr. Kwok's bankruptcy case, essentially steps in the shoes of

20   the debtor and has all the powers and rights of a debtor, which

21   means he has the right to pursue the recovery of assets, to

22   pursue claims to recover assets for the benefit of creditors.

23   He also has a right to object to claims, and also to keep the

24   court and the creditors advised of what is going on in the

25   bankruptcy proceeding, meaning he has to file monthly reports

1   with the bankruptcy court.

2   Q.  You used the phrase creditor, what's a creditor?

3   A.  A creditor is any party who has a claim against the debtor

4   and a claim can be brought, and it's broadly defined under the

5   bankruptcy code.  Could be for a specific amount of money, an

6   unknown amount of money.  It could be a contingent claim.

7   Those are all creditors.

8          THE COURT:  Do you mean a creditor is a person or an

9   entity that believes that they are owed money?

10         THE WITNESS:  It could be owed money or property.

11         THE COURT:  Go ahead.

12  Q.  Mr. Skalka, without getting into any privileged areas or

13  discussions, what role, if any, has your firm played as counsel

14  to the trustee?

15  A.  My firm was retained as Connecticut counsel and conflicts

16  counsel for the Chapter 11 trustee.

17  Q.  again without getting into any privileged stuff, at a high

18  level, what sort of work have you done in the bankruptcy?

19  A.  So in that role, myself and my firm, my colleagues, have

20  filed pleadings on behalf of the trustee, attended hearings on

21  behalf of the trustee, pursued discovery from third parties on

22  behalf of the trustee, including serving subpoenas on third

23  parties to obtain information or documents from third parties.

24  In connection with pleadings, we have filed lawsuits.  We have

25  filed motions.  We have filed objections to other parties'

1    motions.

2    Q.  Could you at a high level just please explain the process

3    for your firm to be compensated for that work in the bankruptcy

4    proceedings?

5    A.  Yes.  As a court-approved professional, which is what my

6    firm is in the bankruptcy case, we are required to file what

7    are called fee applications periodically with the bankruptcy

8    court and seek to have our fees approved by the bankruptcy

9    court.  Those fee applications are subject to objections by any

10   party in the bankruptcy case, as well as by the judge.  The

11   judge ultimately has the decision as to what fees are awarded

12   and when they are paid.

13   Q.  Have your fees been paid in Mr. Kwok's bankruptcy so far?

14   A.  Some of my firm's fees have been paid.

15   Q.  Now generally speaking, how is a trustee compensated in a

16   Chapter 11 case?

17   A.  A Chapter 11 trustee like the Chapter 11 trustee in

18   Mr. Kwok's case has the right to seek a commission under the

19   bankruptcy code commission, meaning a percentage of the funds

20   that are recovered and run through the bankruptcy estate during

21   the course of the bankruptcy case.  The trustee has the right

22   to seek that commission.

23   Q.  And what's your understanding of how Mr. Kwok's bankruptcy

24   trustee is being compensated?

25   A.  Mr. Kwok bankruptcy trustee --

O6OBGUO4                              Skalka- Direct

 1              THE INTERPRETER:  Interpreter request all parties to
 2    slow down.
 3              THE COURT:  Please slow down.
 4    Q.  Mr. Skalka, what's your understanding of how Mr. Kwok's
 5    bankruptcy trustee is being compensated?
 6    A.  Mr. Kwok's bankruptcy trustee has indicated he is not going
 7    to seek commission as the trustee.
 8    Q.  What is the trustee's name?
 9    A.  His name is Mr. Luck Despins.
10    Q.  Where does he work?
11    A.  He is an attorney with the law firm of Paul Hastings.
12    Q.  And what kind of law does he practice?
13    A.  He's a bankruptcy attorney.
14    Q.  What law firm is the main counsel or the primary counsel
15    for the trustee?
16    A.  The trustee retained his law firm Paul Hastings as lead
17    counsel.
18    Q.  Is it common or uncommon for a trustee to hire his or her
19    own bankruptcy practice?
20    A.  When a trustee has a bankruptcy practice, sometimes
21    trustees are not in bankruptcy firms.  A trustee could be not
22    even attorneys.  But in this case, he's a bankruptcy attorney,
23    and he has a bankruptcy practice, so it is common for trustees
24    to retain their firms under these circumstances.
25    Q.  Has the trustee filed actions to recover funds related to

O6OBGUO4                          Skalka- Direct

1    the bankruptcy?

2              THE INTERPRETER:  Your Honor, if we may have both

3    parties to slow down.

4              THE COURT:  Please speak slowly.

5    Q.  Has the trustee filed actions to recover funds related to

6    the bankruptcy?

7    A.  Yes, the trustee has commenced actions.

8    Q.  Approximately how many actions?

9    A.  The trustee has commenced to date approximately 300

10   actions.

11   Q.  Approximately how much has been recovered to date?

12   A.  To date the trustee has recovered over a hundred million

13   dollars.

14   Q.  Mr. Skalka, are you billing for your testimony today?

15   A.  I am not.

16   Q.  Why are you testifying today?

17   A.  I was requested to testify by your office.

18   Q.  How many times approximately have you met with the U.S.

19   Attorney's office to prepare for your testimony?

20   A.  I have met with the U.S. Attorney's office three times,

21   twice remotely and once in person.

22   Q.  Now, Mr. Skalka, who is Mr. Kwok's largest known creditor?

23   A.  Mr. Kwok's largest known creditor in the bankruptcy is an

24   entity known as Pacific Alliance Asia Opportunity Fund.

25   Q.  Do you refer to that by any acronym?

1    A.  Yes, that entity is commonly referred to in the bankruptcy

2    case as PAX because frankly it's a lot to say Pacific Alliance

3    Asia Opportunity Fund.

4    Q.  Can you spell PAX?

5    A.  It's commonly spelled as PAX.

6    Q.  At a high level, what is PAX?

7    A.  PAX is a fund that lends money to commercial enterprises.

8    Q.  And, Mr. Skalka, you could probably adjust the mic closer

9    to your mouth, if you could keep your voice up slightly.  It's

10   a difficult to hear.

11   A.  I'll get a little bit closer.  Sorry.

12   Q.  Perfect.  Thank you.

13           Now, really quick, Mr. Skalka, could you spell the

14   last name of the trustee for us?

15   A.  Despins, D-E-S-P-I-N-S.

16   Q.  Now, going back to PAX.  As part of your involvement in

17   Mr. Kwok's bankruptcy, have you become familiar with the

18   litigation between PAX and Mr. Kwok?

19   A.  Yes, I have.

20   Q.  Prior to the bankruptcy filing, was there a lawsuit between

21   PAX and Mr. Kwok?

22   A.  Yes.

23   Q.  What was PAX's claim against Mr. Kwok?

24   A.  PAX claimed that Mr. Kwok had sign a personal guarantee

25   related to a loan that was made by PAX to a commercial

1  enterprise, a business known as Shiny Time Holding.  And PAX

2  was seeking to recover that loan that it had made to Shiny

3  Times Holding from Mr. Kwok.

4  Q.  In laymen's terms, what's a personal guarantee?

5  A.  It is a separate contract between a lender and the person

6  who signs the personal guarantee which essentially says if the

7  party that the loan is made to doesn't pay the loan for

8  whatever reason, the person who signs the personal guarantee,

9  often referred to as the guarantor, is essentially saying, I'm

10  going to be obligated to pay the loan if the party, the

11  borrower, doesn't pay the loan for whatever reason.

12  Q.  Where was PAX's lawsuit regarding the personal guarantee

13  filed?

14  A.  It's filed in the New York Supreme Court.

15  Q.  And when approximately did PAX file this lawsuit in New

16  York Supreme court?

17  A.  In 2017.

18  Q.  And by the way, that court, is that state court or federal

19  court?

20  A.  That is a state court.

21  Q.  At a high level, what kind of document did PAX file to

22  start the lawsuit?

23  A.  The document they filed was called a complaint.

24  Q.  Just again at a very high level, what's a complaint?

25  A.  A complaint is a document that commences a piece of

1   litigation.  It states the claim that the plaintiff, who is the

2   party that starts the litigation, the claim of the plaintiff

3   against a defendant or defendants, that claim is set forth in

4   the complaint.

5   Q.  Did Mr. Kwok file an answer?

6   A.  Yes.

7   Q.  And what's an answer, again just very high level?

8   A.  High level is the answer is, again a document filed in the

9   lawsuit responding to the claims asserted in the plaintiff's

10  complaint.

11  Q.  And, Mr. Skalka, do you recall what PAX alleged in the

12  complaint that it had done prior to 2017 to recover the alleged

13  debt?

14  A.  Yes, the complaint indicates that there were efforts made

15  by PAX to collect on its loan from Shiny Times and I believe

16  Mr. Kwok, and that there had been negotiations and even a

17  potential settlement reached at one point; but the complaint

18  indicates that that settlement fell apart or didn't go forward

19  for some reason.

20  Q.  What's a demand letter?

21  A.  A demand letter is a letter that is what it sounds like.

22  It's a letter written usually to a party that is owed, may owe

23  money to the sender of the letter.  It's a demand to pay on a

24  debt.

25  Q.  And were there, if ever, demand letters sent by PAX?

O6OBGUO4                           Skalka- Direct

1              MR. KAMARAJU:  Objection to personal knowledge, your

2    Honor.

3              MR. FERGENSON:  I can rephrase, your Honor.

4              THE COURT:  Go ahead.

5    Q.  Do you recall if PAX alleged they had sent demand letters?

6              MR. KAMARAJU:  Objection to relevance.

7              THE COURT:  If you'll set up.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 (At the sidebar)

2                 THE COURT:  Is the complaint in evidence?

3                 MR. FERGENSON:  It's not.  I think I can move on.  My

4       only question, if I may ask Mr. Kamaraju just a question.  We

5       can maybe resolve this, is there going to be cross on the

6       complaint that's filed in response to him being a Chinese

7       dissident?

8                 MR. KAMARAJU:  I'm going to ask the date when it was

9       filed.  That's all.

10                MR. FERGENSON:  If I need to get into this, I think we

11      can address it on redirect.  I'll move on for now.

12                THE COURT:  Thank you.

13                (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6OBGUO4                              Skalka- Direct

 1                    (In open court)

 2    BY MR. FERGENSON:

 3    Q.  Mr. Skalka, at a high level did Mr. Kwok's answer admit or

 4    deny the allegations?

 5    A.  Mr. Kwok's answer denied the allegation in the complaint.

 6    Q.  What, if anything, happened with the PAX lawsuit?

 7    A.  PAX at some point in the litigation filed what's referred

 8    to as a motion of summary judgment seeking a judgment on its

 9    complaint against Mr. Kwok.

10    Q.  Was there a summary judgment ruling in the PAX case?

11    A.  Yes.

12    Q.  And at a high level, what was the ruling?

13    A.  The court granted the motion filed by PAX and entered

14    judgment against Mr. Kwok.

15    Q.  And what, if any, damages were awarded as well?

16    A.  The court entered a judgment in the amount of roughly $114

17    million.

18    Q.  And approximately when was that entered?

19    A.  September of 2020.

20    Q.  And at a high level, what was the basis for that amount of

21    damages?

22    A.  That was the principal amount of the loan plus interest and

23    I believe some attorneys fees.

24    Q.  What, if any, efforts did PAX make to collect on that

25    judgment?

1    A.  Soon after the court granted the summary judgment motion,

2    PAX filed a motion for a restraining order to restrain the

3    debtor or Mr. Kwok from transferring assets outside of the

4    jurisdiction.

5    Q.  And were any restraining orders entered?

6    A.  Yes.

7    Q.  What is a restraining order?

8    A.  It's an order from the court to restrain a party from doing

9    something.  In this case it was an effort to restrain the

10   debtor Mr. Kwok from transferring assets.

11   Q.  Ms. Loftus, if we could show the witness what's marked as

12   Government Exhibit 1416.

13            What's this document, Mr. Skalka?

14   A.  This is a copy of the restraining order entered by the New

15   York Supreme court on October 15, 2020.

16            MR. FERGENSON:  The government offers Government

17   Exhibit 1416.

18            MR. KAMARAJU:  No objection.

19            THE COURT:  It is admitted.

20            (Government's Exhibit 1416 received in evidence)

21   BY MR. FERGENSON:

22   Q.  Mr. Skalka, what date was this filed?

23   A.  It was entered I believe on October 15, 2020.

24   Q.  And if we could, Ms. Loftus, maybe we can make the text a

25   little larger just for reading.

1            Mr. Skalka, could you please read these paragraphs
2    please?
3    A.    On October 15, 2020, the court held oral argument via
4    Microsoft Teams with counsel for all parties participating on
5    plaintiff's motion for a post-judgment restraining order
6    pursuant to CPLR 5229 (motion 011).  On September 15, 2020, the
7    court granted summary judgment in favor of plaintiff on
8    liability with damages on the issue of whether the corporate
9    defendants are defendant Kwok's alter egos to be determined at
10   a later date.
11   Q.    If you could just read the next paragraph.
12   A.    Plaintiff's motion for a restraining order pursuant to CPLR
13   5229 is granted.  Mr. Kwok is restrained from making or causing
14   any sale, assignment, transfer or interference with any
15   property in which he as an interest, whether directly or
16   indirectly, and from paying over or otherwise disposing of any
17   debt now due or thereafter coming due to him subject to the
18   exception set forth in CPLR 5222 in accordance with the
19   proceedings on the record of October 15, 2020.
20            Specifically, Mr. Kwok and/or the registered owners
21   of, one, the residence at the Sherry-Netherland hotel; and two,
22   the yacht "The Lady May" are restrained from making or causing
23   any sale, assignment, transfer or interference with those
24   assets.
25   Q.    Mr. Skalka, some of this refers to the word "plaintiff,"

O6OBGUO4                          Skalka- Direct

1   who is the plaintiff in this case?

2   A.  PAX.

3   Q.  And there's a reference to alter ego, what's an alter ego?

4   A.  An alter ego is a related entity or an entity that is

5   controlled by a third party.

6   Q.  And focusing you on the bottom paragraph number one, the

7   residence at the Sherry-Netherland hotel, are you familiar with

8   that residence?

9   A.  I am in the context of the Kwok's bankruptcy proceeding.

10  Q.  What's your understanding of the residence being referred

11  to?

12  A.  I believe it refers to the co-op that was -- it is owned by

13  an entity known as Jennifer Holdings, LLC.  It owns actually

14  the shares in that co-op.

15  Q.  What kind of apartment was it?

16  A.  It's a penthouse apartment at the property known as the

17  Sherry-Netherlands hotel on 5th Avenue, New York City.

18  Q.  What, if any -- were there collection efforts with respect

19  to the Sherry-Netherland apartment?

20  A.  Yes, PAX was seeking to recover its judgment or its claim

21  from the asset known as the Sherry-Netherland hotel apartment.

22  Q.  What, if anything, happened with those efforts?

23  A.  I'm sorry.  I didn't hear your question.

24  Q.  What, if anything, happened with PAX's efforts to collect

25  on the apartment?

1    A.  Shortly after the entry of this order, Jennifer Holdings,

2    LLC, filed its own Chapter 11 bankruptcy proceedings, so that

3    automatically stayed or stopped PAX's efforts to collect from

4    that entity.

5    Q.  Why did it filing for bankruptcy automatically stop those

6    efforts?

7    A.  Under the bankruptcy code, any bankruptcy filing creates

8    what is known as an automatic stay.  It's under Section 362 of

9    the bankruptcy code.  That stays all efforts by any creditor to

10   try to collect from the debtor while they're in bankruptcy

11   unless they obtain bankruptcy court relief to do so.

12   Q.  Focusing on number two, the yacht, the Lady May.  What, if

13   any, efforts did PAX make to collect via the yacht?

14   A.  Well, in this case they had obtained this restraining

15   order, and I believe they were in the process of trying to

16   collect their judgment from the Lady May.

17   Q.  Do you recall -- withdrawn.

18        What of note happened next with respect to the Lady

19   May?

20   A.  According to the pleadings in this case, the Lady May was

21   moved outside of the jurisdiction of the New York Supreme

22   court, and PAX filed a motion for contempt against Mr. Kwok for

23   allegedly violating this restraining order by moving the boat

24   outside of the jurisdiction of the court.

25   Q.  What is contempt?

O6OBGUO4                         Skalka- Direct

1    A.   Contempt in this case is knowingly violating the court's

2    order.

3    Q.   If we could show the witness what's marked as Government

4    Exhibit 1413.

5            Was the motion for contempt granted?

6    A.   Yes, it was.

7    Q.   Is this the order of contempt?

8    A.   What I'm looking at now is a copy of the final order of

9    contempt which was entered in February of 2022.

10           MR. FERGENSON:   Government offers Government Exhibit

11   1413.

12           MR. KAMARAJU:   Subject to our prior objection, no

13   objection at this time.

14           THE COURT:   All righty.

15           (Government's Exhibit 1413 received in evidence)

16   BY MR. FERGENSON:

17   Q.   While we're waiting, Mr. Skalka, what date was this final

18   order of civil contempt entered?

19   A.   February 9, 2022.

20   Q.   Ms. Loftus, if we could zoom on the actual text, the bottom

21   half.

22           Mr. Skalka, could you please read the first paragraph?

23   A.   Whereas this court's conditional order of civil contempt,

24   dated March 16, 2021, directed that if defendant Kwok Ho Wan

25   ("Kwok") failed to return the Lady May yacht, the Lady May, to

O6OBGUO4                         Skalka- Direct

1   the jurisdiction of this court by May 15, 2021, he would be

2   subject to a $500,000 fine for each day that the Lady May

3   remained outside of the jurisdiction.

4   Q.  And if you could read the next line, please.

5   A.  Whereas the Lady May was not returned to the jurisdiction

6   by May 15, 2021.

7   Q.  And if you could go ahead and read the next one, please.

8   A.  Whereas on November 4, 2021, the Appellate Division's First

9   Department affirmed this court's order holding Kwok in

10  conditional civil contempt finding that "the daily fine of

11  $500,000 was intended to strongly encourage defendant to purge

12  himself of the contempt, which despite being permitted two

13  months to accomplish, he has shown no interest in doing." And

14  instructing this court to proceed with an evidentiary hearing

15  to resolve a dispute as to ownership and control of the yacht

16  and to assess appropriate penalties.

17          THE COURT:  One moment, please.

18          (Pause)

19          THE COURT:  You may continue.

20  Q.  Mr. Skalka, if you could read the last line on this page.

21  A.  Whereas Kwok to date has failed to return the Lady May to

22  the jurisdiction.

23  Q.  Ms. Loftus, if you could go to the next page, please.  Why

24  don't we zoom on the top half first.

25          Could you continue, Mr. Skalka.

O6OBGUO4                          Skalka- Direct

1   A.   Whereas the evidentiary hearing specified by the First

2   Department's November 4, 2021, order was held on February 2,

3   2022.

4   Q.   And if you could read the next line, please.

5   A.   Whereas both Kwok and the registered title holder of the

6   Lady May, HK International Funds Investments (USA) Limited,

7   LLC, appeared at the hearing by counsel, proffered evidence and

8   were represented by counsel.

9   Q.   Who is the owner, Mr. Skalka, of HK International Funds

10  Investments or the registered owner of HK International Funds

11  Investments USA Limited.  LLC?

12  A.   Mei Guo.

13  Q.   What relationship, if any, did Mei Guo have to Mr. Kwok?

14  A.   Mei Guo is Mr. Kwok's daughter.

15  Q.   The evidentiary hearing reference here which family

16  members, if any, testified at that hearing?

17          MR. KAMARAJU:  Objection, personal knowledge.

18          THE COURT:  If you know.

19  Q.   Which family members, if any, testified at that hearing?

20  A.   The pleadings indicate that Mei Guo testified at the

21  hearing.

22  Q.   If you could continue and read the third paragraph, please.

23  A.   Whereas based on the evidence adduced at the hearing, the

24  court determines that PAX has clearly and convincingly

25  established that Kwok has a beneficial interest in and control

O6OBGUO4                          Skalka- Direct

1   over the Lady May as set forth in the court's February 9, 2022

2   decision and order.

3   Q.  What is a beneficial interest, Mr. Skalka.

4         What's your understanding?

5   A.  My understanding of beneficial interest as used in this

6   order is that he had, if he didn't have title to this property,

7   he had some interest in the property, some ownership interest

8   in the property.

9   Q.  If we can scroll down.  It says that accordingly it is

10  hereby ordered, adjudged and decreed that, and there's a list

11  or several things.  Could you please read number one.

12  A.  Kwok has violated New York Judiciary Law Section 753 and is

13  in civil contempt of this court's order.

14  Q.  And number two?

15  A.  Kwok is directed to tender immediate payment to PAX in the

16  amount of $134 million representing $500,000 for each day

17  between May 15, 2021 and February 7, 2022.

18  Q.  And number three?

19  A.  The amount due to PAX shall continue to accrue at the rate

20  of $500,000 per day until Kwok returns the Lady May to the

21  jurisdiction which additional accrual shall begin 10 business

22  days from service of this order with notice of entry.

23  Q.  And number four, please.

24  A.  Payment of the amount set forth in paragraph two above

25  shall be made to PAX within five business days of the service

O6OBGUO4                         Skalka- Direct

1    of this order with notice of entry.

2    Q.  And number five?

3    A.  The court shall exercise its full authority under New York

4    Judiciary Law Section 753 in the event the fine is not timely

5    paid to PAX.

6    Q.  And what authority besides filings does the court have

7    under that law?

8    A.  The court under that statute also has the right to issue

9    what are called capias orders.

10   Q.  What does that mean?

11   A.  An arrest warrant.

12   Q.  Mr. Skalka, focusing you on number four, approximately how

13   long did Kwok, Mr. Kwok, have to pay the $134 million?

14   A.  He had five business days.

15   Q.  Did Mr. Kwok in fact make that payment?

16   A.  No.

17   Q.  What happened instead?

18   A.  On February 15, 2022, the Chapter 11 bankruptcy filing was

19   made in the District of Connecticut.

20   Q.  And how soon was that filing made -- withdrawn.

21        What was the timing of that filing with respect to the

22   deadline to pay the 134 million?

23   A.  It was six days.  I believe it's within the five business

24   days though of this order.  It's six days after the entry of

25   this order from Judge Ostrager.

O6OBGUO4                          Skalka- Direct

1    Q.  Can we show the witness what's marked as Government Exhibit

2    1407. Mr. Skalka, what's this document?

3    A.  This is a copy of the voluntarily petition filed by

4    Mr. Kwok on February 15, 2022 in the District of Connecticut.

5            MR. FERGENSON:  Government offers Government Exhibit

6    1407.

7            MR. KAMARAJU:  No objection.

8            THE COURT:  It is admitted.

9            (Government's Exhibit 1407 received in evidence)

10   BY MR. FERGENSON:

11   Q.  Ms. Loftus, maybe we can just blow up the middle portion

12   perhaps.  Underneath about debtor one, what name is listed

13   there?

14   A.  Ho Wan Kwok.

15   Q.  And what are the other names listed beneath that?

16   A.  Miles Kwok, Miles Guo, Wengui Guo.

17   Q.  And to the right of that it says about debtor two, and in

18   parenthesis spouse only in a joint case.  Is that filled out?

19   A.  No.

20   Q.  What is the name of Mr. Kwok's spouse?

21   A.  Hing Chi Ngok.

22   Q.  Could you spell that for the court report, please.

23   A.  H-I-N-G, C-H-I, N-G-O-K.

24   Q.  Ms. Loftus, if we can go to page two, please.  If we could

25   zoom on where you live.

1    What did Mr. Kwok put for where he lives?

2    A.  He put an address care of Golden Spring New York Limited at

3    162 East 64th Street in New York.

4    Q.  Ms. Loftus, let's go to page seven, please.  If we can zoom

5    on the bottom half.

6        Mr. Skalka, in number 18, how many creditors did

7    Mr. Kwok estimate he owed?

8    A.  He estimated that he had somewhere between 50 to 99

9    creditors.

10   Q.  And how much did he estimate that he owned in assets?

11   A.  He indicated that he had assets worth between $50,001 and

12   $100,000.

13   Q.  And focusing you on the bottom left, who signed this?

14   A.  Mr. Kwok.

15   Q.  Now we can take that down, Ms. Loftus.

16       Mr. Skalka, did filing for a bankruptcy resolve the

17   issue with the Lady May?

18   A.  No, it did not.

19   Q.  Did there come a time when an agreement was reached to hold

20   funds in escrow as security for the Lady May?

21   A.  Yes.

22   Q.  Ultimately how much was put into escrow?

23   A.  $37 million.

24   Q.  And who were the parties to that agreement?

25   A.  It was an agreement reached between PAX, Mr. Kwok, the

1   creditors committee, which was a committee appointed by the

2   U.S. bankruptcy court in the District of Connecticut and HK --

3   what I refer to as HK USA.

4   Q.  Just remind us, what is HK USA?

5   A.  It was the entity owned by Mei Guo that claim to be the

6   title holder to the Lady May.

7   Q.  What was the source of the $37 million that was put into

8   escrow pursuant to that agreement?

9   A.  The source was a loan made to HK USA.

10  Q.  Ms. Loftus, if we could show the witness what's marked as

11  Government Exhibit 1314.

12          MR. FERGENSON:  May I have just a quick moment, your

13  Honor.

14          THE COURT:  Go ahead.

15  Q.  While we're waiting, Mr. Skalka, do you recall the date the

16  loan agreement was executed or the date on the loan agreement?

17  A.  I believe it was April 19, 2022.

18  Q.  And just for context, about how long after the filing of

19  Mr. Kwok's bankruptcy is that?

20  A.  It's approximately two months after the filing.

21  Q.  Can you see it on your screen, Mr. Skalka?

22  A.  Yes.

23  Q.  What is this document?

24  A.  This is a copy of the loan agreement between HK

25  International Funds Investment USA, Limited LLC and Himalaya

1    International Financial Group, LTD.

2              MR. FERGENSON:  The government offers Government

3    Exhibit 1314.

4              MR. KAMARAJU:  No objection your Honor.

5              THE COURT:  It is admitted.

6              (Government's Exhibit 1314 received in evidence)

7    BY MR. FERGENSON:

8    Q.  Now that we can see it, Ms. Loftus if you can zoom in on

9    the text on the cover page.

10             So it says dated 19th of April 2022, do you see that,

11   Mr. Skalka?

12   A.  Yes.

13   Q.  Can you read who this loan agreement is between?

14   A.  Loan agreement between HK International Funds Investments

15   USA Limited LLC and Himalaya International Financial Group LTD.

16   Q.  Let's go to page two, Ms. Loftus, if we could just keep

17   scrolling down.  Just to focus on the bottom line there where

18   it says the yacht.

19             Can you read what's just in the quotation mark after

20   the yacht, Mr. Skalka?

21   A.  Lady May.

22   Q.  And if we can go to page four, please, and scroll down.

23             Mr. Skalka, under purpose if you could read 3.1 and

24   3.2?

25   A.  Yes.  The total facility amount will be paid into an escrow

O6OBGUO4                         Skalka- Direct

1    account as agreed between the parties in writing (the escrow

2    account) as per this agreement.  The total facility amount will

3    be used as security for the court in relation to the yacht.

4    The period the borrower retain the total facility amount in the

5    escrow account will be the time period from the date of this

6    agreement to when the yacht is returned to the USA.  The

7    borrower will make all reasonable efforts for the prompt return

8    of the yacht.

9    Q.  And focusing on 2.1, what was the amount, what was the

10   facility amount?

11   A.  $37 million.

12   Q.  If we could go to page five, please, focusing you on 4.3.

13   Could you read 4.3?

14   A.  The total facility amount shall be secured against the

15   yacht and all other assets of the company directly and

16   indirectly and shall take priority against all other liability

17   or debts claim against the borrower.

18   Q.  At a high level, what does it mean for the loan to be

19   secured against the yacht?

20   A.  This indicates that there was going to be a lien against

21   the yacht, that's the security that I believe the lender was

22   looking for.

23   Q.  If we can go to page 13.

24        Mr. Skalka, who signed for what you called HK USA I

25   believe?

O6OBGUO4                              Skalka- Direct

1   A.  Mei Guo.

2   Q.  And what is her position listed as?

3   A.  She's listed as the sole member of that LLC.

4   Q.  And who signed for Himalaya International Financial Group?

5   A.  I do not recognize the signature.

6   Q.  Is there a title listed for that person?

7   A.  No.

8   Q.  Is there a name listed for that person?

9   A.  No.

10  Q.  What does it say?

11  A.  It just says authorized signature.

12  Q.  If we could show the witness, Ms. Loftus, Government

13  Exhibit 1316.  What's this document, Mr. Skalka?

14  A.  This document is a side letter to the loan agreement that

15  we just looked at, the loan agreement dated April 19, 2022

16  between HK USA and Himalaya International Financial Group.

17          MR. FERGENSON:  Government offers Government Exhibit

18  1316.

19          MR. KAMARAJU:  Can I have one moment real quick, your

20  Honor?

21          THE COURT:  Yes.

22          MR. KAMARAJU:  No objection, your Honor.

23          THE COURT:  It is admitted.

24          (Government's Exhibit 1316 received in evidence)

25  BY MR. FERGENSON:

Q.  Thank you.

        Mr. Skalka, you said side letter, very high level,
what's a side letter to an agreement?

A.  It's an amendment.  This is designed to be an amendment to
the loan agreement, so it has some new terms or revised terms.

Q.  Focusing you sort of on the upper left, what's the date of
this letter?

A.  April 29, 2022.

Q.  Is this between the same parties as the loan agreement we
just looked at?

A.  Yes, it is.

Q.  If we could focus, Ms. Loftus, on 1.2 and 1.3.

        Mr. Skalka, I'll ask you to just read 1.3, please,
through the subparagraph?

A.  In consideration of the sum of one pound sterling, we agree
as follows: A, the loan in the loan agreement will no longer be
deemed to be secured against the yacht.

        B, the borrower will instead provide a personal
guarantee (a signed copy of which has been received)

        C, the terms --

Q.  That's actually okay.

        Mr. Skalka, in 1.3 where it says in consideration of,
what's your understanding of what that means in this context?

A.  There were some considerations for the change in the terms
of the loan agreement so that it would no longer be secured,

1    but there'd be a personal guarantee.

2    Q.  In laymen's terms, what consideration?

3    A.  Some value, some value in this case.  It was only one pound

4    sterling, but laymen's terms it is some value.

5    Q.  And, Ms. Loftus, if we could show what's marked --

6    actually, if we could scroll down quickly to page two.  If we

7    could zoom on the signatures.  Is there a signature for HK USA?

8    A.  Yes.

9    Q.  Is there a name listed?

10   A.  No.

11   Q.  What's the position listed?

12   A.  Director.

13   Q.  What was the position listed on the loan?

14   A.  Sole member.

15   Q.  And then for Himalaya International Financial Group, who

16   signed there?

17   A.  I don't recognize the signature.

18   Q.  Is there a name listed?

19   A.  There is a name.  There's a signature.  There's no name

20   listed.

21   Q.  Let's show what's marked as Government Exhibit 1315 just

22   for the witness, please.

23           What's this document, Mr. Skalka?

24   A.  This is a copy of a guarantee agreement.

25           MR. FERGENSON:  Government offers Government Exhibit

1    1315.

2              MR. KAMARAJU:  No objection.

3              THE COURT:  It is admitted.

4              (Government's Exhibit 1315 received in evidence)

5    BY MR. FERGENSON:

6    Q.  Mr. Skalka, who is this guarantee agreement between?

7    A.  It is between Mei Guo and the Himalaya International

8    Financial Group, LTD.

9    Q.  And the document we looked at earlier referenced a personal

10   guarantee, at a high level what is this agreement about?

11   A.  This is a personal guarantee from Mei Guo indicating that

12   she's personally guaranteeing the obligation between HK

13   International Funds Investments USA, as I refer to as HK USA,

14   and Himalaya International Financial Group.

15   Q.  If we can scroll down, Ms. Loftus, to the signature page.

16   Who signed it?

17   A.  Mei Guo.

18   Q.  How does this kind of agreement compare to the one that PAX

19   had alleged Mr. Kwok had given?

20             MR. KAMARAJU:  Objection to form.

21             THE COURT:  Sustained.

22   Q.  If we could go now, Ms. Loftus, to government exhibit --

23   show the witness only please, what's marked as Government

24   Exhibit 1303.

25             What's this document, Mr. Skalka.

1    A.   This is a draft loan agreement between Hong Kong

2    International Fund Limited and ACA Capital Group Limited.

3    Q.   Was this document produced to the trustee in discovery?

4    A.   Yes.

5    Q.   Who was it produced by?

6    A.   Counsel for HK USA.

7    Q.   That's the registered title holder of the Lady May?

8    A.   Yes.

9                MR. FERGENSON:  Government offers Government Exhibit

10   1303.

11               MR. KAMARAJU:  No objection.

12               THE COURT:  It is admitted.

13               (Government's Exhibit 1303 received in evidence)

14   BY MR. FERGENSON:

15   Q.   If we can publish, please.

16               Mr. Skalka, who is the draft loan agreement between?

17   A.   Hong Kong International Fund Limited and ACA Capital Group

18   Limited.

19   Q.   If we could scroll down now.

20               Mr. Skalka, do you know why the lender was changed

21   from ACA Capital Group to Himalaya entity?

22   A.   I do not.

23   Q.   If we can keep scrolling down and we can just go all the

24   way down to page 15, Ms. Loftus.

25               Mr. Skalka, could you read the first signature line,

1   the entity for the first signature line?

2   A.  Hong Kong International Fund Limited.

3   Q.  And could you read the second entity?

4   A.  Fortress Spark Limited.

5   Q.  Do you know what Fortress Spark Limited is?

6   A.  I do not.

7   Q.  To your knowledge has Fortress Spark Limited otherwise come

8   up in Mr. Kwok's bankruptcy?

9   A.  Not to my knowledge.

10  Q.  We could take that down, Ms. Loftus.

11          Mr. Skalka, was $37 million ultimately put into

12  escrow?

13  A.  Yes.

14  Q.  And who received those funds first?

15  A.  The loan proceeds went to HK USA's counsel in the

16  bankruptcy case.

17  Q.  And what was the name of their counsel?

18  A.  The law firm of Zeisler & Zeisler.

19  Q.  Who, if anyone, else did Zeisler & Zeisler come to

20  represent in the bankruptcy?

21  A.  They also represented Mei Guo, and subsequently they've

22  also become counsel for Mr. Kwok.

23  Q.  Ms. Loftus, if we could show the witness -- these are four

24  docs.  These are government exhibits -- Mr. Skalka before we do

25  that -- I'll tell you, Ms. Loftus, 1419. 1420, 1421 and 1422.

1   While we're waiting, Mr. Skalka, what, if anything, happened in

2   the PAX case after the $37 million was put in escrow with

3   respect to the yacht?

4   A.  The PAX case was stayed as a result of the bankruptcy

5   filings, so there was no further action being taken in the PAX

6   case while the bankruptcy case was pending.

7   Q.  Mr. Skalka, are you able to see what these documents are at

8   a high level?

9   A.  Yes, I could see them.

10  Q.  Are these filings by Mr. Kwok and his attorney in the

11  bankruptcy regarding his assets?

12  A.  Yes, his assets and his liabilities.

13          MR. FERGENSON:  The government offers government

14  Exhibit 1419 through 1422.

15          MR. KAMARAJU:  No objection.

16          THE COURT:  They're admitted.

17          (Government's Exhibits 1419, 1420, 1421 and 1422

18  received in evidence)

19  BY MR. FERGENSON:

20  Q.  Ms. Loftus, if we could zoom first on 1421.

21          Mr. Skalka, this says declaration about an

22  individual's debtor schedule.  Could you read in the bottom

23  left there's a signature, could you read the text above the

24  signature?

25  A.  Under penalty of perjury I declare that I have read the

O6OBGUO4                          Skalka- Direct

1    summary and schedules filed with this declaration and that they

2    are true and accurate.

3    Q.  And who signed this?

4    A.  Mr. Kwok.

5    Q.  And what was the date?

6    A.  March 9, 2022.

7    Q.  Now, Ms. Loftus, let's just go to, if we could, just pull

8    up Government Exhibit 1420.  If we could zoom, Ms. Loftus, on

9    the middle portion on official form 106.

10          Mr. Skalka, at a high level, what kind of filing is

11    this?

12    A.  These are referred to as bankruptcy schedules that need to

13    be filed by any debtor in any bankruptcy case filed in the

14    United States.  These are government forms, and this particular

15    document I'm looking at is a summary of the assets and

16    liabilities that had been set forth by the debtor on the

17    various schedules.

18    Q.  What was the total value in real estate assets Mr. Kwok

19    claim?

20    A.  Zero.

21    Q.  What was the total value in personal property Mr. Kwok

22    claim?

23    A.  $3850.

24    Q.  And under part two, how much in liabilities did Mr. Kwok

25    claim?

1  A.  $373,803,498.09.

2  Q.  How much income did Mr. Kwok claim to have?

3  A.  Zero.

4  Q.  What about expenses?

5  A.  Zero.

6  Q.  If we could go to page three of this, Ms. Loftus.  If we

7  could, again, you can blow up about the same portion as we did

8  last time.

9        Mr. Skalka, what did Mr. Kwok say in response whether

10 he had any legal or equitable interest in real estate?

11 A.  He said none.  He didn't have any.

12 Q.  What did Mr. Kwok say about interest in any vehicles?

13 A.  He said no, he didn't have any.

14 Q.  What about interest in any watercraft?

15 A.  He said no, he didn't have any.

16 Q.  What about any legal or equitable interest in any household

17 goods and furnishings?

18 A.  He indicated no, he didn't have any interest.

19 Q.  What about electronics?

20 A.  He did indicate yes that he had an interest in electronics.

21 Q.  And if we could scroll down, Ms. Loftus.

22        What did he list for electronics?

23 A.  An iPhone.

24 Q.  And what was the value of that?

25 A.  Unknown.

O6OBGUO4                          Skalka- Direct

1    Q.  If we could scroll down a little bit more.

2            Now, in addition to the iPhone, what other assets did

3    Mr. Kwok declare in this form?

4    A.  He indicated that he had some clothing.  He had a family

5    dog.

6    Q.  What kind of dog?

7    A.  A Pomeranian.

8    Q.  And what were the value of these assets?

9    A.  Unknown.

10   Q.  If we could go to page five, please.  What did he list as

11   assets on this page?

12   A.  He listed that he had some tax refund checks to him from

13   the state of New York and some Covid relief check that had not

14   been negotiated.

15   Q.  Ms. Loftus, if we can now go to Government Exhibit 1419.

16   Maybe we can zoom in on the top half.

17           Mr. Skalka, at a high level what was this document?

18   A.  These were notes and statements filed by the debtor by the

19   debtor counsel describing some limitations as to the disclosure

20   set forth in the debtor schedule that we just looked at and

21   some other responses to questions related to what's called the

22   statement of financial affairs which we haven't seen, but

23   that's another form that needs to be filled out by a debtor in

24   any bankruptcy case.

25   Q.  Ms. Loftus, if we could zoom out, and if we could go down

1    to page four.

2              Mr. Skalka, could you please read question one?

3    A.  Do you own or have any illegal or equitable interest in any

4    residence, building, land or similar property.

5    Q.  Can you read the first entry -- Mr. Skalka, just for

6    reference, when we looked at the earlier document, how did

7    Mr. Kwok answer that question on that document?

8    A.  On the schedules in the other document he said he had no

9    interest in real estate.

10   Q.  And could you read bullet number one under that?

11   A.  The debtor has use and occupancy of real estate located at

12   373 Taconic Road, Greenwich, Connecticut ("residence").  The

13   debtor has no legal title to the residence and no court has

14   made any determination that the debtor has any other interest

15   equitable or otherwise in it.  All related costs and expenses

16   associated with the residence are paid directly by family and

17   family controlled enterprises.  The residence is owned by

18   Greenwich Land, LLC ("Greenwich Land") the sole member of

19   Greenwich Land is the debtor's spouse.

20   Q.  And if we could scroll down to number two.  I'll ask you if

21   you could just read -- why don't you just read the first two

22   sentence?

23   A.  The debtor also has access to an apartment located at the

24   Sherry-Netherland hotel, 781 5th Avenue New York, New York

25   10022 (the apartment).  The cooperative shares in the apartment

1    are held by Jennifer Holdings, LLC (the USS PV) the membership

2    interest.

3    Q.  Mr. Skalka, could you just skipping down a couple of

4    sentences read the sentence that starts the debtor's son?

5    A.  The debtor's son owns the equity of the apartment owner.

6    On or about the trust date, the apartment owner funded the USS

7    PV with the purchase price for the apartment.  These funds came

8    from entities owned or controlled by the debtor's son and not

9    from the debtor.

10   Q.  And Ms. Loftus if we can zoom out, and if you can just

11   scroll slightly to page four.

12           Now, Mr. Skalka, are any other properties discussed

13   under that question?

14   A.  No.

15   Q.  By the way, did Mr. Kwok claim to have an interest in

16   either of these properties that are discussed?

17   A.  No.

18   Q.  Now, do these discuss at all a property in Mahwah, New

19   Jersey?

20   A.  They do not.

21   Q.  Let's go to page six, Ms. Loftus, please.  If we could zoom

22   on paragraph J, please.  Could you read question 17?

23   A.  Question 17, deposits of money.

24   Q.  And what do these notes say in response to that?

25   A.  These notes make reference to a restraining order entered

1    in Hong Kong in 2018.

2    Q.  If you could read starting at the second sentence just the

3    restraint order?

4    A.  The restraint order stated that it would remain in force up

5    to and including April 30, 2019, with the understanding that it

6    would remain in effect pursuant to a further order of the high

7    court entered on May 3, 2019.  The effective the restraint

8    order was to freeze HK $3.7 million, Hong Kong dollars of funds

9    alleged to belong to the debtor, as much as billions more of

10   funds and property, including real estate in Hong Kong of

11   individuals and entities purportedly subject to the debtor's

12   effective control (according to the restraint order) were also

13   frozen and/or seized.  Due to the freezing/seizure of these

14   assets, the debtor does not include them in his estate.

15   Q.  And if we could go to page seven, please.  If we could zoom

16   on the very top paragraph there.  If you could read the first

17   sentence there, please?

18   A.  In September and October 2017, the Chinese government

19   raided the office of Shiny Times and seized all accounting

20   corporate records and many personal financial records.

21   Q.  Can you remind us, Mr. Skalka, what, if any, relevance did

22   Shiny Times have to the PAX case?

23   A.  Shiny Time Holdings was their full name was the borrowing

24   entity in the loan from PAX, and the entity that Mr. Kwok

25   personally guaranteed the obligation.

1    Q.  If we could go to page eight, please, and if we could zoom

2    on question 26 just at the top please.

3            Question 26, an underline says, patent, copyrights,

4    trademarks, trade secrets and other intellectual property.

5    Could you please read Mr. Kwok's note to that answer?

6    A.  The debtor has possible unregistered copyrights and other

7    intellectual property interest in music and videos posted to

8    various digital and media platforms, such as YouTube, GTV,

9    Twitter and Gettr.  The debtor ascribes no value to his social

10   media assets and has made no attempts to monetize his social

11   media presence.

12   Q.  What's your understanding of ascribes no value to these

13   assets?

14   A.  My understanding was that thought that there was no value

15   to these assets.

16   Q.  Ms. Loftus, we can take it down.  If we could Ms. Loftus

17   show the witness what's marked as Government Exhibit 1401-A.

18           While that comes up, Mr. Skalka, what's a meeting of

19   creditors in a bankruptcy?

20   A.  In every Chapter 11 bankruptcy case, the court soon after

21   the filing of the case sets up a creditors meeting.  It's under

22   Section 341 of the bankruptcy code, in which all creditors in

23   the case are invited to attend and could ask questions; but the

24   meeting itself is run by the Office of the United States

25   Trustee and the debtor is required to appear at the meeting and

1    answer questions under oath.

2    Q.  Did those occur in Mr. Kwok's bankruptcy?

3    A.  Yes.

4    Q.  Mr. Skalka, what is Government Exhibit 1401-A?

5    A.  This is a portion of the transcript of the creditors

6    meetings held in Mr. Kwok's bankruptcy case on March 21, 2022.

7            MR. FERGENSON:  The government offers Government

8    Exhibit 1401-A.

9            MR. KAMARAJU:  No objection.

10           THE COURT:  It is admitted.

11           (Government's Exhibit 1401-A received in evidence)

12   BY MR. FERGENSON:

13   Q.  Now, Mr. Skalka, in this excerpt who is being questioned?

14   A.  Mr. Kwok is being questioned.

15   Q.  And so where it says Q and A, what does Q and A stand for?

16   A.  Question for Q and A is answer.

17   Q.  Now, if we could, if I could ask, I'll read the question

18   and if you want to read the answers of Mr. Kwok:

19           "Does Golden Spring own that building that's located

20   at that address?

21   "A.  I don't know.

22   "Q.  Have you ever been to that address?

23   "A.  Yes.

24   "Q.  What type of building is it?  What's located there?

25   "A.  It was a building.

1    "Q.   Is the building a residential building or commercial

2    building?

3    "A.   Business building.

4    Q.   And then there's some back and forth with Claiborne and the

5    interpreter.  Just for reference, Mr. Skalka, who is

6    Ms. Claiborne?

7    A.   She's an attorney with the U.S. Trustee's Office in

8    Connecticut.

9    Q.   Is that the office you said runs these meetings?

10   A.   In Connecticut, yes.

11   Q.   I'll continue here:

12             Does anyone live at that address?

13   "A.   I don't know.

14   "Q.   What type of business does Golden Spring do?

15   "A.   It's a big family business.  My son works, but I don't

16   know specifically what categories of business it has.

17   "Q.   Mr. Kwok, when you use the term --

18   "A.   It is a family office own by my son.  He has other

19   businesses, but I don't know.

20   "Q.   Mr. Kwok, when you use the term family business or family

21   office, what do you mean by those terms?

22   "A.   It's mainly for the whole family, all the family members.

23   When there is something we (indiscernible) and help each other.

24   "Q.   Mr. Kwok, can you explain in more detail?

25   "A.   I don't know how to explain.

1  "Q.  Does Golden Spring have any employees?

2  "A.  Yes.

3  "Q.  How many?

4  "A.  I don't know.

5  "Q.  Does Golden Spring own any real estate?

6  "A.  I don't know.

7  "Q.  Does Golden Spring own any other business?

8  "A.  I don't know.

9  "Q.  Does Golden Spring have any bank accounts?

10  "A.  I don't know.

11  "Q.  Mr. Kwok, you previously said in documents filed with the

12  bankruptcy court that Golden Spring pays for your personal

13  living expenses.  Can you please explain how they do that?

14  "A.  I don't know what you mean by they pay me.  In what

15  regard?

16  "Q.  Mr. Kwok, you previously told the court in your bankruptcy

17  documents that Golden Spring pays for your clothing, your food

18  and your housing.  My question is, how they do that?  Do they

19  give you money?  Do they pay other people directly?  How does

20  it work?

21  "A.  Whenever I need any expenses for my basic living, I talk

22  to my son and he will tell his office to give it to me.

23  "Q.  Who are the owners of Golden Spring?  And then there's

24  back and forth and we can scroll down skip over that.

25           If you could, Mr. Skalka, you can start after it says

1    the interpreter, I'll repeat the interpretation, starting with

2    when I need.  It's the third line.

3    "A.  When I need expenses for my basic living, I tell my son.

4    My son will tell the office to take --

5    "Q.  Mr. Kwok, who are the owners of Golden Spring?

6    "A.  My son.

7    "Q.  Are there any other owners of Golden Spring other than

8    your son?

9    "A.  No.

10   "Q.  Mr. Kwok, have you ever owned an interest in Golden

11   Spring?

12   "A.  No.

13   "Q.  Who are the officers and directors of Golden Spring?

14            And we could scroll down.

15            I'll read again, it says by Ms. claiborne.  Mr. Kwok,

16   as of today, who are the officers of Golden Spring?

17   "A.  (Indiscernible.)

18   "Q.  I'm going to repeat that name so everyone understands what

19   I thought I heard.  What I heard was Yanping also known as

20   Yvonne Wang; is that accurate?

21   "A.  Yes.

22   "Q.  Is Yvonne Wang the only officer of Golden Spring?

23   "A.  I don't know.

24   "Q.  As of today, who are the directors of Golden Spring?

25   "A.  I don't know.

1    "Q.  Mr. Kwok, have you ever been a direct of Golden Spring?

2    "A.  I don't remember.

3    "Q.  Mr. Kwok, who is Max Krasner?

4    "A.  I don't know.  I don't know.

5    "Q.  Mr. Kwok, who is Max Krasner?  And it says Mr. Kwok can

6    you please answer.

7              For reference, Mr. Skalka, who is Mr. Baldiga?

8    A.  He was Mr. Kwok's bankruptcy counsel at the time.

9    Q.  If we could just scroll down.  So you can continue at line

10   22, Mr. Skalka.

11   "A.  He has to double check with you because I can not read and

12   cannot remember English names well, so just the names.  You

13   said Max.  If it's the name Max, only I know Max.  But if you

14   add another name to it, I'm not sure.  I don't know.

15   "Q.  Do you know a Max with respect to Golden Spring?

16   "A.  Yes, I know.

17   "Q.  And what is Max's role with Golden Spring?

18   "A.  I don't know.

19   "Q.  Well, how do you know Max?

20   "A.  I don't remember.

21   "Q.  Do you know more than one person by the name of Max?

22   "A.  For me English name is very complicated.  Like I can't

23   remember the last name of my lawyer.  If you add something else

24   to Max, I don't know.

25   "Q.  Mr. Kwok, the name Max Krasner is listed as a person to

O6OBGUO4                          Skalka- Direct

1   whom the mail for Golden Spring is directed to.  Do you know

2   why that is?

3   "A.  I only remember there is a Max in Golden Spring.  I only

4   know this one thing.

5   "Q.  And what is Max's job at Golden Spring?

6   "A.  I'm not sure what role I (indiscernible) know he is in

7   charge of finance, but I'm not sure.

8   "Q.  What does he do for Golden Spring with respect to

9   finances?

10  "A.  I was not involved in the management so I don't know.

11  "Q.  If Golden Spring gives you money, does it come through Max

12  Krasner's efforts?  Does he help make that happen?

13  "A.  I don't know, he didn't give me money in person.

14  "Q.  Mr. Kwok, when you get money from Golden Spring, how do

15  you get money?  Does it come in the form of cash or something

16  else?

17  "A.  From my son and (indiscernible.)

18  Q.  That gets repeated by the interpreter and the question is.

19  My question was, how do you get money from your son?  Does it

20  come in the form of cash or some other form?

21  "A.  I don't understand what you mean by how, the word how.  I

22  never get money directly from them.

23  "Q.  If you don't get money directly from your son, how do you

24  get the money from your son?  Where does it go?

25  "A.  I don't use cash and I don't use credit cards.  My son and

(indiscernible).  Wan, they just pay my expenses for me. It's
impossible for me to get any cash from them.  Also, I don't
have bank account, any bank accounts.

"Q.  Mr. Kwok, do you have access to a credit card that was
taken out by Golden Spring?  And then Mr. Baldiga.

        Asked again, Mr. Kwok, do you have access to a credit
card or a debit card provided to you by or through Golden
Spring?

"A.  No.

"Q.  Mr. Kwok, are you obligated to pay Golden Spring back for
the money that it pays on your behalf for your living expenses?

A.  No, no need.

        MR. FERGENSON:  Ms. Loftus, if we could show the
witness what's marked as Government Exhibit 1401-B.  Your
Honor, at this time the government offers other excerpts.  They
are 1404-A and 1404-B.

        MR. KAMARAJU:  No objection.

        THE COURT:  They are admitted.

        (Government's Exhibits 1401-B, 1404-A, 1404-B received
in evidence)

BY MR. FERGENSON:

Q.  I'll continue.  Are these answers still from Mr. Kwok?

A.  Yes.

Q.  And this is the same meeting of creditors, the same one we
were looking at, another excerpt?

```
 1   A.  Yes.

 2   Q.  I'll continue with the questions.

 3        What is your relationship to Golden Spring?

 4   "A.  I don't understand what you mean by your question.  I

 5   don't know how to answer your question.

 6   "Q.  Do you know what the word "relationship" means?

 7   "A.  Relationship means love of things in China.  It could be

 8   between husband and wife.  It could be between government

 9   relationship, a financial relationship, money, and it could be

10   a lot of things.

11        MR. FERGENSON:  Ms. Loftus, can you please publish.

12   "A.  So I don't know which one you mean.  Is it a man/woman

13   relationship or a money relationship or what?

14   "Q.  Any relationship.  What is it?  What is your -- it says

15   (indiscernible.)

16        And then question comes again, any relationship, what

17   is yours to Golden Spring?

18   "A.  Now the relationship is between is he lends me money.  I

19   owe money to him.  It helps me.

20   "Q.  Why does he do this?

21   "A.  Because I was once a member of the Guo family.

22   "Q.  Does Golden Spring pay the expenses of any other member of

23   the Guo family?

24   "A.  Yes.

25   Q.  Which other members of the Guo family?
```

1   "A.  I don't know.

2   "Q.  A year ago I asked you why does Golden Spring pay

3   Mr. Podhaskie, spelled, for services rendered to you in your

4   individual capacity.  I'm asking that again now.

5          Why does Golden Spring pay Mr. Podhaskie for services

6   rendered to you in your individual capacity?  And if we could

7   scroll down.  And then it says, can you start at line 12 where

8   it says Mr. Kwok, how did he answer that?

9   "A.  I don't know.

10  "Q.  Have you ever asked anyone why they pay for him to advise

11  you?

12  "A.  I don't remember.

13  "Q.  I asked you last year why did Golden Spring New York pay

14  that judgment on your behalf, and I was referring to the one my

15  client Mr. Cheng held against you.

16         I'm asking you again, why did Golden Spring New York

17  pay that judgment on your behalf?

18  "A.  It was money lended.

19  "Q.  Why did Golden Spring loan you that money?

20  "A.  I don't have anything so I borrowed from them.

21  "Q.  Where did Golden Spring get the money from?

22  "A.  I don't know.

23  "Q.  Where does Golden Spring get any money from?

24  "A.  I don't know.

25  "Q.  Your son owns Golden Spring, correct?

O6OBGUO4                          Skalka- Direct

1    "A.   Yes.

2    "Q.   Does your son owe you any money?

3    "A.   No.

4    "Q.   How does your son get the money that funds Golden Spring?

5    "A.   I don't know.

6    "Q.   Did you ever provide your son with any seed capital?

7    "A.   No.

8    "Q.   Have you ever invested in any of your son's businesses?

9    "A.   No.

10   "Q.   When did Connecticut become your residence?

11   "A.   End of February or early March of 2020.

12   "Q.   And if we could scroll down, Ms. Loftus, if we could now

13   go to 1404-A.  is this another excerpt from a meeting of

14   creditors?

15   A.   Yes.

16   Q.   What was the date of this meeting?

17   A.   April 6, 2022.

18   Q.   And the answers here, are they from Mr. Kwok?

19   A.   Yes.

20   Q.   So I will read the question again.

21        Did you meet with anyone else beside your attorney to

22   prepare for today's meeting while you were at the office?

23   "A.   I don't know what you mean the other people.

24   "Q.   Well, did you meet with anyone who worked for Golden

25   Spring?

O6OBGUO4                            Skalka- Direct

1    "A.  Yes, I meet Yvonne Wang.

2    "Q.  And this was yesterday?

3    "A.  Yes, I met her yesterday.

4    "Q.  Did you ask some questions of her yesterday?

5    "A.  No.

6    "Q.  And tell me about your conversation with Ms. Wang?

7    "A.  What do you mean?

8    "Q.  Well, I like to know what you talk about with her?

9    "A.  I ask her to arrange the food to eat and the coffee.

10   "Q.  Is that all?

11   "A.  And also we talked about how to abolish communist party.

12   "Q.  I want to make sure I get this right.  I think you said --

13   and then Mr. Baldiga. If you can read line six again.

14   "A.  We talk about how to abolish communist party.

15   "Q.  Ms. Wang is an officer of Golden Spring, correct?

16   "A.  Yes.

17   "Q.  And you directed her to bring coffee, right?

18   "A.  No, I didn't direct her.  I'm just hoping her to bring

19   some coffee.

20   "Q.  You were hoping or helping?

21   "A.  Help.

22   "Q.  You were helping.  Because my question to you was what you

23   talked about with Ms. Wang, and I thought you said you asked

24   her to bring some coffee or maybe even told her to bring some

25   coffee?

O6OBGUO4                          Skalka- Direct

1    "A.  No, your attorney office, you attorney office making and

2    imagining things again.

3    "Q.  What did you discuss with Ms. Wang yesterday?

4    "A.  Do you want me to talk about it in detail?  I can talk

5    about this for hours.

6    "Q.  Not if the detail concerns how to overthrow the Chinese

7    communist party, so I'll be more precise.

8    "A.  So you don't want us to abolish Chinese communist party?

9    Our job is to abolish Chinese communist party.

10   Q.  And Mr. Baldiga says just answer the question. And the

11   witness.

12   "A.  You don't have a question.  You're just directing

13   something.

14   Q.  We can just scroll down.

15          Did you discuss with Yvette yesterday anything related

16   to preparing for the meeting today?

17   "A.  Yes.

18   "Q.  What did you discuss?

19   "A.  I ask her to bring those documents here.

20   "Q.  Anything else?

21   "A.  I don't remember.

22   "Q.  When was Lamp Capital created?

23   "A.  I don't know.

24   "Q.  Why was Lamp Capital created?

25   "A.  I don't know.

O6OBGUO4                          Skalka- Direct

1    "Q.  Who created Lamp Capital?

2    "A.  My son.

3    "Q.  How do you know that?

4    "A.  Because I borrow money from my son to pay attorney fee.

5    "Q.  The question is how do you know that your son created Lamp

6    Capital?

7    "A.  Because my son said it.

8    "Q.  He told you himself?

9    "A.  Yes.

10   "Q.  Did he ask for any advice from you about whether to create

11   Lamp Capital?

12   "A.  No.

13   "Q.  Did he ask you your opinion on whether he should create

14   Lamp Capital?

15   "A.  No.

16   "Q.  Did he tell you why he was creating Lamp Capital?

17   "A.  No.

18   "Q.  Thank you.  Do you have an understanding of what business

19   Lamp Capital is engaged in, if any?

20   A.  No.

21         MR. FERGENSON:  Ms. Loftus let,s now publish 1404-B.

22   Q.  Is this excerpt from this same creditors meeting?

23   A.  Yes.

24   Q.  If we could scroll down.  And again the answers in this

25   excerpt are coming from Mr. Kwok?

1    A.   Yes.

2    Q.   Among that documents that you filed were some specific

3    notes and one of those notes discusses the residence of Taconic

4    road or on Taconic Road, and then there's a reference to

5    Mr. Harbach.  Do you recall who he?

6    A.   He's an attorney for at least one creditor, perhaps more.

7    Q.   If we can scroll down.  I'll start at line 21.

8            First question, is it true that all expenses related

9    to the Taconic Road house are paid directly by family and

10   family controlled enterprises?

11   "A.   Yes.

12   "Q.   Which family members?

13   "A.   My wife, sometime by my son.

14   "Q.   Which family controlled enterprises?

15   "A.   Which country, my wife.

16   "Q.   Your wife's not an enterprise.  I'm trying to ask which

17   family controlled enterprises pay the expenses for the Taconic

18   house?

19   "A.   Greenwich, LLC.

20   "Q.   Incidentally how do you know that your wife or sometimes

21   your son pay these expenses?

22   "A.   Because I live there.

23   "Q.   Did you observe them pay the expenses?

24   "A.   Yes.

25   "Q.   Is that ever at your request?

1    "A.  I don't remember I request anything.

2    "Q.  Does Greenwich Land LLC -- yes, Greenwich Land LLC, own

3    any other real estate beside 373 Taconic Road?

4    A.  I don't know.

5              THE COURT:  We're going to stop there.  Members of the

6    jury, you have graciously agreed to stay until 5 p.m. tomorrow.

7    That's Tuesday.  On Wednesday and Thursday, we're going to go

8    to 2:45, and on Friday you have the day off.  The following

9    week Monday, the first of July, you have off.  Tuesday and

10   Wednesday, you come in.  Then Thursday and Friday, the 4th and

11   the 5th, you have off.  And so what I'm asking you to please

12   think about this evening, you don't have to tell me now.  Could

13   you stay for a full day on Tuesday and Wednesday, July 2nd and

14   3rd.  You can think about it and tell me tomorrow morning.  In

15   the meantime, don't discuss the case amongst yourselves or with

16   anyone else.  Don't permit anyone to discuss the case in your

17   presence.  Don't read, watch or listen to anything from any

18   source that touches upon the subject matter of this case.  Have

19   a good evening.

20             THE LAW CLERK:  Jury exiting.

21             (Jury not present)

22             THE COURT:  Sir, you may step out of the courtroom.

23   Don't discuss your testimony.

24             (Witness temporarily excused)

25             THE COURT:  Please be seated.  Is there anything

O6OBGUO4                              Skalka- Direct

1    before we reconvene in the morning?

2              MR. KAMARAJU:  Not from the defense, your Honor.

3              MR. FERGENSON:  No, your Honor.  Just for context for

4    the Court, I have maybe I hope around 15 minutes left.  This is

5    the last excerpt.  We're almost there, and then I think pretty

6    short questioning after that.

7              THE COURT:  Great.  All right.  Have a good evening.

8              (Adjourned to June 25, 2024 at 9 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2    Examination of:                        Page
 3     AMY BUCK FAUNDEZ
 4    Direct By Mr. Fergenson  . . . . . . . . . .3873
 5    Cross By Ms. Shroff  . . . . . . . . . . .3935
 6    Redirect By Mr. Fergenson  . . . . . . . .4000
 7    Recross By Ms. Shroff  . . . . . . . . . .4003
 8    DOUGLAS SKALKA
 9    Direct By Mr. Fergenson  . . . . . . . . . .4006
10                    GOVERNMENT EXHIBITS
11    Exhibit No.                          Received
12     BUCK 34, BUCK 44, BUCK 48, BUCK 49, . . . . .3883
13             BUCK 50, BUCK 60, BUCK 63,
14             BUCK 69, BUCK 77, BUCK 80
15     BUCK 115, BUCK 117, BUCK 127, BUCK 131, . . .3883
16             BUCK 133, BUCK 138, BUCK 141,
17             BUCK 168, BUCK 174, BUCK 194
18     BUCK 218, BUCK 221, BUCK 227, BUCK 232, . . .3884
19             BUCK 235, BUCK 236, BUCK 241,
20             BUCK 243
21     BUCK 375, BUCK 391, BUCK 428, BUCK 522, . . .3884
22             BUCK 524, BUCK 532
23     BUCK 709, BUCK 822, BUCK 851, BUCK  . . . . .3884
24             1204, BUCK 1260, BUCK 1261,
25             and BUCK 1274-BUCK 1291, and
```

1              BUCK 1293-BUCK 1296

2     C-146, C146-T   . . . . . . . . . . . . . .4006

3     1419, 1420, 1421 and 1422   . . . . . . . .4039

4     1401-B, 1404-A, 1404-B  . . . . . . . . . .4053

5     BUCK 1292  . . . . . . . . . . . . . . . .3885

6     1303   . . . . . . . . . . . . . . . . . .4037

7     1314   . . . . . . . . . . . . . . . . . .4031

8     1315   . . . . . . . . . . . . . . . . . .4036

9     1316   . . . . . . . . . . . . . . . . . .4033

10    1401-A   . . . . . . . . . . . . . . . . .4047

11    1407   . . . . . . . . . . . . . . . . . .4028

12    1413   . . . . . . . . . . . . . . . . . .4023

13    1416   . . . . . . . . . . . . . . . . . .4019

14                    DEFENDANT EXHIBITS

15    Exhibit No.                        Received

16    60613  . . . . . . . . . . . . . . . . . .3971

17    60614  . . . . . . . . . . . . . . . . . .3972

18    60618  . . . . . . . . . . . . . . . . . .3973

19    60620  . . . . . . . . . . . . . . . . . .3974

20    60621  . . . . . . . . . . . . . . . . . .3975

21    60623  . . . . . . . . . . . . . . . . . .3975

22    60624  . . . . . . . . . . . . . . . . . .3978

23    60625  . . . . . . . . . . . . . . . . . .3977

24    60626  . . . . . . . . . . . . . . . . . .3979

25