O6PBGUO1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          23 Cr. 118 (AT)

MILES GUO,

              Defendant.                Trial
------------------------------x
                                        New York, N.Y.
                                        June 25, 2024
                                        9:00 a.m.

Before:


                    HON. ANALISA TORRES,

                                        District Judge
                                         -and a Jury-

                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MICAH F. FERGENSON
     RYAN B. FINKEL
     JUSTIN HORTON
     JULIANA N. MURRAY
     Assistant United States Attorneys

SABRINA P. SHROFF
     Attorney for Defendant

PRYOR CASHMAN LLP
     Attorneys for Defendant
BY:  SIDHARDHA KAMARAJU
     MATTHEW BARKAN

ALSTON & BIRD LLP
     Attorneys for Defendant
BY:  E. SCOTT SCHIRICK
```

O6PBGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6PBGUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please make your

3    appearances.

4          MR. FERGENSON:  Micah Fergenson, Ryan Finkel, Julie

5    Murray and Justin Horton for the United States.

6          MS. SHROFF:  Good morning, your Honor.  On behalf of

7    Mr. Guo, Sabrina Shroff.  Mr. Guo is standing to my left.

8          THE COURT:  Please be seated.  Is there anything that

9    either side would like to bring up.

10          MR. FINKEL:  Your Honor, first one minor scheduling

11    issue.  The witness, in consultation with the defense last

12    night, we're reordering the witnesses.  The witness who is

13    going to go on after the current witness has an immovable

14    appointment at 11:45.  We think he's a very short witness.  To

15    the extent that he can't -- he's a United States attorney

16    office paralegal, so he's accessible.  To the extent we can't

17    get him finish with cross at 11:45, we'd ask that he sort of

18    stop and we call the next witness and then we can bring him

19    back either later today or tomorrow when he returns.  I hope

20    that's not an issue for the Court.

21          THE COURT:  No problem.

22          MR. FINKEL:  There's a second issue, and I was

23    wondering if we could discuss that one at sidebar.

24          THE COURT:  Okay.  We're going to go into the robing

25    room because they're going to have to deal with the AV over

O6PBGUO1

1    here.

2                (Pages 4069-4072 Sealed)

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6PBGUO1

1              (In the robing room)

2              THE COURT:  Anything else?

3              MS. SHROFF:  As I was walking to court this morning as

4    I normally do pass the passageway, I was on a phone call with a

5    pretrial services officer on an unrelated matter. I heard

6    somebody say hello.  I turned around.  It was a juror.  The

7    juror immediately recognized that they shouldn't have said

8    hello.  They looked embarrassed.  I didn't respond, and

9    everybody went on their own merry way.  I literally was on a

10   phone call.  I just wanted to let the Court know.

11             MR. FINKEL:  Which juror?

12             MS. SHROFF:  There were two of them together.  One was

13   a man.  One was a woman, but it was literally moments.  When I

14   look at them, I could tell you.  I was just walking to court.

15   I think they were behind me.  I can't remember.

16             THE COURT:  So what it suffice for me to just remind

17   the jurors that they'll not to have contact with the lawyers.

18             MS. SHROFF:  Your Honor, it would think look like I

19   sort of ratted them out.  It was so inconsequential that I

20   really thought I shouldn't mention it, but I did so as an

21   abundance of caution.  Literally, the juror looked abashed that

22   they'd done that.  They made a gesture, like, why did I do

23   that.  The two were talking to each other.  It was the tall

24   man, the female.  I think she's in the second row or maybe the

25   first row.  It was so inconsequential, literally nothing.

O6PBGUO1

         MR. FINKEL:  The government has no issue with
proceeding however the Court sees fit.  This seems like no
issue.  I would just ask that Ms. Shroff inform the government
which juror numbers it is just so we're aware.  Other than
that, I don't think there's anything that unnecessarily needs
to be done.  Of course, the government has no objection to your
Honor reminding the jury of their obligations and requirements
as jurors.

         THE COURT:  If Ms. Shroff is asking that I not do
that, then I won't do it.

         MS. SHROFF:  It really was nothing.  It was so
inconsequential.  I even thought I shouldn't bring it up, but
just to be careful.

         THE COURT:  Okay.

         MR. FINKEL:  Your Honor, given the nature of what was
discussed in the first part of this conference in the robing
room regarding the victim, the government would request that
that portion of this conference be sealed.

         THE COURT:  Yes.  All righty.  Thank you.

         (Continued on next page)

O6PBGUO1                         Skalka- Direct

```
 1                   (In open court)
 2                   THE COURT:  Please have the jurors brought in.
 3                   THE LAW CLERK:  Jury entering.
 4                   (Jury present)
 5                   THE COURT:  Please be seated.  Good morning, Jurors.
 6      I brought you in at 9:34 because we had an audio/visual
 7      failure, and so I needed to have that fixed first.  Remember
 8      yesterday I asked whether you would be able to stay until 5:00
 9      on July 2nd and 3rd.  Is there anybody who cannot do that?
10      Very good.  I appreciate your cooperating with me in this way.
11      We're going to now continue with the direct examination of the
12      witness.  Sir, remember that you are still under oath.
13                   THE WITNESS:  Yes, your Honor.
14      DOUGLAS SKALKA, resumed.
15      DIRECT EXAMINATION CONTINUED
16      BY MR. FERGENSON:
17      Q.  Good morning, Mr. Skalka.
18      A.  Good morning.
19      Q.  Yesterday you explained at a high level the process for
20      your fees being paid.  Do you recall that?
21      A.  Yes, I do.
22      Q.  Do you know even just a ballpark estimate of approximately
23      how much in fees your firm has been paid for the bankruptcy
24      work?
25      A.  Approximately $2 million.
```

1    Q.  And do you have, again ballpark number of how much Paul

2    Hastings has been paid for its bankruptcy work?

3    A.  Approximately $25 million.

4    Q.  And can you remind us how much in assets have been

5    recovered to the bankruptcy estate?

6    A.  Over a hundred million dollars.

7    Q.  Ms. Loftus, if we could go to 1404-B.  If we could scroll

8    down, Ms. Loftus.

9         Mr. Skalka, do you remember looking at this transcript

10   when we broke yesterday?

11   A.  Yes.

12   Q.  And what was the date of this meeting of creditors?

13   A.  April 6, 2020.

14   Q.  How soon after the bankruptcy proceedings were filed just

15   for context?

16   A.  A month and a half after the filing.

17   Q.  So, Ms. Loftus, maybe we can blow up the bottom half or so

18   and we'll just scroll through.

19        Now I'll read the questions, Mr. Skalka, and you can

20   read Mr. Kwok's answers.

21        It says, "Does Greenwich Land, LLC -- yes, Greenwich

22   Land, LLC, own any real estate other than 373 Taconic Road?

23   "A.  I don't know.

24   "Q.  Do you know anything about the property located at 3333

25   Ferncliff in Cos Cob, Connecticut -- if we can just scroll

O6PBGUO1                          Skalka- Direct

1    down.  Then you can read at line two, Mr. Skalka.

2    "A.  Yes.  Now I remember it.  It's also owned by my wife's

3    company.

4    "Q.  That being Greenwich Land?

5    "A.  Maybe.

6    "Q.  Do you know?

7    "A.  I'm not sure.

8    "Q.  Have you ever been to 33 Ferncliff?

9    "A.  Yes.

10   "Q.  How recently?

11   "A.  No not recently.

12   "Q.  Do you know when Greenwich Land purchased 33 Ferncliff?

13   "A.  I don't remember.

14   "Q.  Do you know approximately how much money it cost?

15   "A.  Probably more than $1 million.

16   "Q.  Does 1.37 million sound about right?

17   "A.  I'm not sure.

18   "Q.  Does the approximate purchase date of September 2019 sound

19   about right to you?

20   "A.  Not sure.

21   "Q.  Turning back to 373 Taconic for a moment, how much was

22   that property purchased for?

23   "A.  Probably 400 to 500,000.

24   Q.  And then it says the private interpreter, no, no, no, and

25   then the official interpreter, four to five million.  I'm

1    sorry.

2            The next question, "Approximate time of purchase of

3    373 Taconic if you know?

4    "A.   I don't know.

5    "Q.   Have you ever resided at 33 Ferncliff?

6    "A.   No.

7    "Q.   Do you know whether anyone currently lives there?

8    "A.   Before there is another comrade maybe, you know, for

9    disjoined Chinese Communist Party, and he was to live there.

10   "Q.   How long ago?

11   "A.   Probably one to two years ago.

12   "Q.   Do you remember that person's name?

13   "A.   Yes.

14   "Q.   What is it?

15   "A.   Wong Din Gon.

16   "Q.   Does anyone currently live there if you know?

17   "A.   I don't know.

18   "Q.   Talking about 373 Taconic, where did the money come from

19   to purchase that property?

20   "A.   I don't know.

21   "Q.   Do you know whether the house was purchased with cash or

22   financing?

23   "A.   I don't know.

24   "Q.   Same questions for 33 Ferncliff.  Do you know where the

25   money came from to purchase that house?

O6PBGUO1                           Skalka- Direct

1    "A.   I heard it was purchased by cash.

2    "Q.   From whom did you hear that?

3    "A.   I don't remember.

4    "Q.   Do you know where that money came from?

5    "A.   I don't know.

6    "Q.   If we could scroll down, Ms. Loftus.

7          Do you know what Saraca Media Group is?

8    "A.   Saraca?

9    "Q.   Saraca.

10   "A.   Saraca Media Group, I do.

11   "Q.   What is Saraca Media Group?

12   "A.   Just Saraca, it's a company.

13   "Q.   What kind of company?

14   "A.   I'm not sure.

15   "Q.   Have you ever had any relations with Saraca personally?

16   "A.   No.

17   "Q.   Do you know anything about the type of business that

18   Saraca conducts?

19   "A.   I remember they are related to GTV media platform or they

20   invested on the GTV media platform.

21   "Q.   How do you know that?

22   "A.   Because I was their consultant who owned the consultant

23   and also I was the GTV host, and also this is one of the input

24   and platform for disjoined communist party.

25   "Q.   When you said you were a consultant a moment ago, was that

O6PBGUO1                      Skalka- Direct

1   for Saraca or GTV?

2   "A.  GTV.

3   "Q.  Has Saraca ever been -- ever had the 162 East 64th Street

4   address associated with it?

5           And then the question gets repeated, and you can start

6   at line 19.

7   "A.  I don't know.

8   "Q.  That is the family office address, correct?

9   "A.  It's one of them.

10  "Q.  Where are the other ones?

11  "A.  I don't know.

12  "Q.  Are there others in New York City?

13  "A.  I just want to clarify, Golden Spring is one of the

14  companies in this building 162.

15  "Q.  Understood, and thank you.  We referred to the family

16  office during your questioning and I just want to be clear.

17  When we talk about the family office, are we referring to that

18  address on East 64th Street?

19  "A.  Yes.

20  "Q.  Has GTV ever been associated with the family office

21  address?

22  "A.  I don't know.

23  "Q.  Who owns Saraca?

24  "A.  My son.

25  "Q.  Since when?

O6PBGUO1                        Skalka- Direct

1   "A.  I don't know.

2   "Q.  Does Saraca currently exist?

3   "A.  I don't know.

4   "Q.  Do you have any idea how many -- do you know anything

5   about the value of Saraca's assets?

6   "A.  I don't know.

7   "Q.  Do you know anything about payments Saraca has made to

8   GTV?

9   "A.  No, I don't know.

10  "Q.  Has your wife ever told you about any multi-million dollar

11  payments from Saraca to Greenwich Land?

12  "A.  I don't know.

13  "Q.  You don't know whether he's ever told you or you don't

14  know about the payments?

15  "A.  She never told me, and I don't even know how much.

16  "Q.  Do you know a company called Ziba Limited, Z-I-B-A?

17  "A.  I don't know.

18  "Q.  I'm sorry if I've already asked this.  What is the

19  relationship, if any, between Saraca and GTV?

20  "A.  Saraca is the investor for GTV.

21  "Q.  Do you know how much money Saraca invested in GTV?

22  "A.  I don't know.

23  "Q.  When was GTV founded?

24  "A.  2020, maybe 2019, not very sure.

25  "Q.  Do you know the names of any of the officers or directors

O6PBGUO1                        Skalka- Direct

1  of Saraca?

2  "A.  I don't know.

3  "Q.  Do you know whether Yvette Wang is an officer or director

4  of Saraca?

5  "A.  I don't know.

6  "Q.  Do you know someone called Hong Chong Wang?

7  "A.  Yes.

8  "Q.  Who is that?

9  "A.  He's my partner and also comrade for disjoined communist

10  party.

11  "Q.  Is he a friend of yours?

12  "A.  Friend, comrade and a partner.

13  "Q.  What do you mean by partner?

14  "A.  Because we had a business corporation.

15  "Q.  Tell me about that?

16  "A.  Well, I don't remember the name of that company.  It's a

17  company for investigating communist party in USA doing money

18  laundering and committing crimes.

19  "Q.  Was it a for profit company?

20  "A.  I don't know.

21  "Q.  You don't know?

22  "A.  I don't know.

23  "Q.  What was the name of the company?

24  "A.  I don't remember when getting to English.  I don't

25  remember the name.

O6PBGUO1                        Skalka- Direct

1   "Q.  Approximately what timeframe were you partners with Hong

2   Chong Wang in this company?

3   "A.  I don't remember.

4   "Q.  Within the last three years?

5   "A.  It must be more than three years ago.

6   "Q.  More than ten years?

7   "A.  No.

8   "Q.  Did Hong Chong Wang ever have any connection to Saraca?

9   "A.  I don't know.

10  "Q.  Was he ever an officer or director of Saraca?

11  "A.  I don't know.

12  "Q.  What does the G in GTV stand for?

13  "A.  God, the goal, like in G-O-A-L.

14  "Q.  The English word "goal?"

15  "A.  Yeah, goal or God.

16  "Q.  How long have you known Hong Chong Wang?

17  "A.  I don't remember.

18  "Q.  More than ten years?

19  "A.  Roughly.

20  "Q.  And you still consider him a friend today?

21  "A.  Yes.

22  "Q.  Just a moment, please.  There's been many questions today

23  about Golden Spring funding your living expenses.

24          Is it correct that as far as your living expenses are

25  concerned that none of that is expected to be repaid?

O6PBGUO1                          Skalka- Direct

1    "A.  Yes, true.

2    "Q.  And so those monies are not the subject of any formal

3    agreement, correct?

4    "A.  No.

5    "Q.  And those monies essentially then are a gift to you,

6    correct?

7    "A.  Yes.

8    "Q.  What's the Rule of Law Foundation?

9    "A.  What does that mean?

10   "Q.  The question is, what is it?

11        And then the interpreter ask, Rule of Law Foundation,

12   yes, sir.  And we can scroll down slightly.

13        I'll hopefully save sometime by just asking this

14   question instead.  Are you familiar with the Rule of Law

15   Foundation?

16   "A.  Yes.

17   "Q.  Were you involved in its establishment?

18   "A.  Yes.

19   "Q.  Did you contribute any money to it when it was formed?

20   "A.  Not myself.

21   "Q.  Did you direct any entity to contribute to the Rule of Law

22   Foundation?

23   "A.  Suggestion in a direct and suggesting any difference.

24   "Q.  If there was a suggestion, please tell me it was a

25   suggestion?

1   "A.  I didn't direct anybody or order anybody.  I just always

2   suggest people to make donations for the foundation.

3   Q.  And then the private interpreter says, As an interpreter, I

4   think if the witness is asking the interpreter questions, the

5   interpreter should interpret the question asked by the witness

6   instead of answer that question.  The interpreter responds.  We

7   can scroll down.  We can keep scrolling down.

8          Again it says by Mr. Harbach. I'll start reading the

9   next question.

10          "Did you ever suggest to any of your family members

11  that they donate to the Rule of Law Foundation?

12  "A.  Yes, I did suggest.

13  "Q.  Did any of your family members or the family controlled

14  enterprises contribute money to the Rule of Law Foundation?

15  "A.  Yes.

16  "Q.  How much money?

17  "A.  For cash there is one over $1 million, from Hong Kong,

18  Japan and Mainland in China, and all combined it should be more

19  than 30 million.

20  "Q.  Just focusing for the moment on contributions from your

21  family at your suggestion, approximately how much money is

22  that?

23  "A.  I don't know the details, because of security reasons,

24  they don't want me to know.

25  "Q.  Did you say a moment ago that your family contributed over

1    a million dollars?

2    "A.   One million cash is in New York here.

3    "Q.   When was that?

4    "A.   I don't remember.

5    "Q.   Is the reason -- well, let me ask it this way.

6          Did you suggest an amount to your family members that

7    they should contribute to the Rule of Law Foundation?

8    "A.   I want them to donate, the more the better.

9    "Q.   Is that what you told them?

10   "A.   Yes.

11   "Q.   Did you know whether the rule of law -- do you know

12   whether the Rule of Law Foundation is associated with a family

13   office address on 64th Street?

14   "A.   Yes.

15   "Q.   Did you ever make a $100 million donation to the Rule of

16   Law Foundation in November of 2018?

17         Interpreter ask to repeat the question.  It gets

18   repeated, and you can answer the answer.

19   "A.   No.  In the live stream, like I want, tried to collect the

20   funds in the live stream show.

21   "Q.   You could see the private interpreter says, not quite

22   exactly what the witness said (indiscernible) broadcasting is

23   okay.  Live stream is okay.  But collect money -- and the

24   official interpreter says, asking for donation, right.  Private

25   interpreter says, raise.  And then the witness testimony

1    continues. You can start at line 17.

2    "A.  Raising money, raise donations.  Yeah, in the live stream

3    broadcast thing, or whatever, you know, asking for donations

4    to -- you know, to raise funds, to raise money.

5    "Q.  We can scroll down.

6             Did you ever promise to donate $1 billion to the Rule

7    of Law fund?  And then the interpreter ask 10 billion you said.

8    And Mr. Harbach says, no, sir, 1 billion.  And the answer is at

9    three.

10   "A.  I don't remember.  I don't remember.

11   "Q.  Do you mean that it's possible that you made that promise?

12   "A.  So we could reach that goal if we combine the

13   organizations all over the world.

14   "Q.  Understand.  And it's a simple question.  I just don't

15   know the answer.  Did you yourself ever promise to donate $1

16   billion to the Rule of Law fund?

17   "A.  In the past five years, I did the live stream over 5,000

18   times.  Some of the live stream could have reached four or five

19   hours.  It's hard for me to remember every sentence I said.

20   "Q.  Well, I understand that, but I'm only asking about one

21   issue, and it is whether you ever promised publicly or

22   privately or any how to donate $1 billion to the Rule of Law

23   fund.  And then correction said donate, and the answer to that

24   question 24.

25   "A.  I don't remember.

O6PBGUO1                        Skalka- Direct

 1   "Q.  I'll ask this one more time.  Are you saying that it is
 2   possible that you made such a promise, you just can't be sure?
 3   "A.  In front of Ms. Holley, I wouldn't say anything is
 4   possible, but this is a very serious issue.  Now they start the
 5   scheme again.
 6   "Q.  Well, this isn't what did you have for breakfast three
 7   days ago.  This is, did you promise to donate $1 billion.  And
 8   if the answer is you don't know, that's okay.
 9            Scroll down.  And Mr. Baldiga responds.  Who is he,
10   Mr. Skalka?
11   A.  He was Mr. Kwok's bankruptcy counsel at the time.
12   Q.  If we could scroll down a little more.  I'll read the
13   question, line 17.
14            "So the answer might be no, but you're not saying no?
15   You're saying you don't remember?
16   "A.  I said it three times.  I don't remember.
17   Q.  And you can continue at 21.
18   "A.  Because in the past five years, (indiscernible) always
19   making these kind of answers for me, so that's why the judge
20   from the south district were fooled by you and you started
21   again.
22   Q.  I'll move on.  You can continue.
23   "A.  In the south district court I only met judge 20 seconds.
24   I didn't say one sentence within this five years, and I was
25   fined a total about $300 million because that's what they did.

O6PBGUO1                          Skalka- Direct

1   Q.  And then just pause for a second, Mr. Skalka.  The about

2   $300 million, is that about the amount in the PAX case?

3   A.  The total judgment including the initial judgment plus the

4   fine was approximately a little over $250 million.

5   Q.  And was that case in the Southern District of New York or

6   in a state court?

7   A.  It was in the New York Supreme court which is a state

8   court.

9   Q.  If we can just scroll down slightly more.  There's back and

10  forth between the attorneys.  Then the question continues.

11         "Have you made any donations to the Rule of Law

12  Foundation in the last two years?

13  "A.  Myself, right?

14  "Q.  Yes, sir.

15  "A.  No.

16  "Q.  Have you suggested to any of your family that they make

17  donations to the Rule of Law Foundation within the last two

18  years?

19  "A.  I don't remember.

20  "Q.  Would you ever have made a promise to donate $1 billion to

21  the Rule of Law Foundation if you did not actually have that

22  money?

23         And ask to be repeated.  Would you have ever made a

24  promise to donate $1 billion to the Rule of Law Foundation if

25  you did not actually have that money?

1    And then, Mr. Skalka, you see line 11, it says the

2    official interpreter, and you can read the line that starts, He

3    said.

4    A.  He said are you -- want to sentencing me to death sentence.

5    Q.  Mr. Skalka, are there any death sentences in bankruptcy

6    proceedings?

7    A.  Not that I'm aware of.

8    Q.  And if we scroll down, Ms. Loftus.  That's the end of the

9    exhibit.  We can leave it there.  You can take that down,

10   Ms. Loftus.

11        Now, Mr. Skalka, after the meeting of creditors we

12   were just looking at, did there come a time when a bankruptcy

13   trustee was appointed in Mr. Kwok's case?

14   A.  Yes.

15   Q.  Approximately when was he appointed?

16   A.  He was appointed by order of the bankruptcy court in June

17   of 2022.

18   Q.  Ms. Loftus, could we please publish Government Exhibit

19   VI-194.  Ms. Loftus, if we could zoom on the top left, please.

20        Mr. Skalka, do you recognize whose shown in the top

21   left here?

22   A.  I recognize the person in the picture.

23   Q.  Who is that?

24   A.  That's the chapter 11 trustee.

25   Q.  Mr. Skalka, were you the subject of any protest?

1    A.  I was not.

2    Q.  Who was?

3            MR. KAMARAJU:  Object to form.

4            THE COURT:  Sustained.

5    Q.  Who was the subject of the protest?

6            MR. KAMARAJU:  Object to form.  It's the same

7    question.

8            THE COURT:  If you would lay the foundation, please.

9    Q.  Were there any protest related to the bankruptcy of

10   Mr. Kwok?

11   A.  Yes.

12   Q.  Who was the subject of those protests?

13   A.  The chapter 11 trustee was the subject of some of the

14   protests.

15   Q.  Who else, if anyone, was the subject of the protest?

16   A.  Paul Hastings law firm was the subject of protest.  PAX was

17   a subject of protest, and the law firm representing PAX was a

18   subject of protest.

19   Q.  Were any family members?

20   A.  Yes, the daughter of the chapter 11 trustee.

21   Q.  Mr. Skalka, in your 35 years of bankruptcy related

22   practice, how common are such protest?

23           MR. KAMARAJU:  Objection to relevance.

24           THE COURT:  You may answer.

25   A.  This is the first case I've seen these types of protest.

1    Q.  We can take it down, Ms. Loftus.

2              Mr. Skalka, are Mr. Kwok's bankruptcy proceeding

3    ongoing?

4    A.  Yes.

5    Q.  Has PAX been repaid based upon Kwok's personal guarantee?

6    A.  No.

7    Q.  Have any creditors been repaid yet?

8    A.  None of the pre-bankruptcy often referred to as

9    pre-petition creditors have been paid.  Ongoing expenses during

10   the bankruptcy case are being paid.

11             MR. FERGENSON:  May I have a moment, your Honor.

12             THE COURT:  Go ahead.

13   Q.  Mr. Skalka, you mentioned PAX's law firm, what law firm is

14   that?

15   A.  O'Melveny & Myers.

16             MR. FERGENSON:  No further questions.

17             THE COURT:  Cross examination.

18             MR. KAMARAJU:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. KAMARAJU:

21   Q.  Good morning.  Could you tell me again the bankruptcy

22   trustee's name?

23   A.  Luc Despins.

24   Q.  Now, Mr. Fergenson asked you over your last 35 years of

25   bankruptcy have you ever seen protest?

1   A.  I believe the question was in bankruptcy cases.  That's

2   correct.

3   Q.  How common are chapter 11 bankruptcy filings for

4   individuals?

5   A.  They're not as common as they are corporate entities, but

6   I've been involved in several of them over the years.

7   Q.  Of the several of them that you've been involved in over

8   the years, have any of those people been the subject of plots

9   by the Chinese Communist Party to return them to China?

10  A.  No.

11  Q.  Have any of them been the subject of a plot to kidnap that

12  person and return them to China?

13  A.  No.

14  Q.  Have any of them been the subject of a plot to discredit

15  them online?  Let me rephrase that.  Discredit them online

16  specifically by the Chinese Communist Party?

17  A.  No.

18  Q.  Are you aware that Mr. Guo, all of those things happen to

19  him?

20  A.  I'm not.

21  Q.  So that's in prepared for your testimony today,

22  Mr. Fergenson did not discuss that with you, correct?

23  A.  No.

24  Q.  And could we have back up the photo of from the protest.  I

25  think it's GXVI-194 maybe.  You remember you were asked some

1    questions about this by Mr. Fergenson?

2    A.  Yes.

3    Q.  Do you have any familiarity with what the phrase CCP

4    running dog means?

5    A.  No.

6    Q.  And do you see on that poster, do you see where it says

7    Take Down the CCP?

8    A.  Yes.

9    Q.  Do you understand this to associate Mr. Despins with the

10   CCP?

11   A.  I'm not sure what this is trying to be communicated by that

12   poster other than -- I just don't know.

13   Q.  Let's screen out, let's zoom out real quick.

14          Now, do you see the bottom there's a number $250

15   million?

16   A.  Yes.

17   Q.  And you see above it says extortionist appointed by the

18   DOJ?

19   A.  Yes.

20   Q.  Does that figure $250 million have any significance in the

21   context of the PAX settlement negotiations?

22   A.  I don't know.  I have not been a party to the settlement

23   negotiation between PAX and Mr. Kwok.

24   Q.  Mr. Despins has though, right?

25   A.  Mr. Despins is the trustee representing the estate, which

1    includes many creditors not just PAX.

2    Q.  You're aware that there were negotiations between PAX and

3    Mr. Guo's counsel to settle PAX's claims, correct?

4          MR. FERGENSON:  Asked and answered.

5          THE COURT:  Sustained.

6    Q.  Were there any negotiations between Mr. Despins and

7    Mr. Guo's counsel to settle the bankruptcy?

8    A.  There was a court-ordered mediation in the bankruptcy, and

9    so there were negotiations as part of that bankruptcy

10   court-ordered mediation.

11   Q.  Did Mr. Despins make a demand as part of that court-ordered

12   mediation?

13   A.  I was not present during the mediation, so I believe he

14   did, but I was not present for those mediation sessions.

15   Q.  To your understanding what was that demand?

16   A.  I don't know.

17         THE COURT:  Mr. Kamaraju, please speak into the

18   microphone.

19         MR. KAMARAJU:  Sorry, your Honor.

20   Q.  Now, you see it says appointed by DOJ.  I think on direct

21   you testified about someone named Ms. Claiborne?

22   A.  Yes.

23   Q.  Who is she again?

24   A.  Ms. Claiborne is a trial attorney for the Office of the

25   United States Trustee.

1    Q.  And the Office of the United States Trustee, is that in any

2    particular department?

3    A.  My understanding it's a branch of the department of

4    justice.

5    Q.  And the office of the trustee makes recommendations as to

6    chapter 11 trustees to the bankruptcy court, right?

7    A.  Yes.

8    Q.  That's what happened in this case, right?

9    A.  Yes.

10   Q.  So someone from Mr. Claiborne's office recommended

11   Mr. Despins, right?

12   A.  Yes.

13   Q.  Was Mr. Despins the first trustee put forward to your

14   knowledge?

15   A.  He was not.

16   Q.  Who was the first one?

17   A.  I don't recall the individual's name.

18   Q.  Do you have an understanding as to why there was a second

19   trustee put forward?

20   A.  My understanding is the first trustee had a conflict or

21   conflicts.

22   Q.  And as part of Mr. Despins selection -- let me withdraw.

23           As a general matter, is there any kind of vetting done

24   of a potential chapter 11 trustee?

25   A.  It is my understanding that there is some vetting done,

O6PBGUO1                        Skalka - Cross

1    yes.

2    Q.  What's your understanding of what that vetting is?

3    A.  There's an interview process, U.S. trustee office contacts

4    people that they believe might be a qualified candidate to be a

5    trustee.  And at some point once they get down to a few

6    candidates, my understanding is that there is some conflicts

7    review being done by each candidate before they're selected.

8    Q.  And is it your understanding that that process happened in

9    Mr. Guo's bankruptcy?

10   A.  Yes.

11   Q.  Now, you remember Mr. Fergenson asked you about are there

12   any death sentences in bankruptcy cases.  You remember that?

13   A.  Yes.

14   Q.  Do you know if there are any death sentences possible under

15   Chinese criminal law?

16           MR. FERGENSON:  Objection.

17   A.  I do not know.

18   Q.  Now, you were also asked some questions about the PAX

19   litigation on direct, right?

20   A.  Yes.

21   Q.  Now, PAX filed its complaint against Mr. Guo on April 18,

22   2017, correct?

23   A.  It was filed in early 2017.  I don't recall the exact date.

24   Q.  I'm going to see if I can help you out with that.  Can we

25   put up just for the witness and the parties DX7006, please.

1    Just please review it for yourself.

2    A.  I see it.

3    Q.  So the question solely is, does looking at this document

4    refresh your recollection as to the date of the filing of the

5    PAX complaint?

6    A.  Yes.

7    Q.  Was that date April 18, 2017?

8    A.  Yes.

9    Q.  You're aware that that's the day before the Chinese

10   government filed an Interpol red notice against Mr. Guo, right?

11   A.  I'm not aware of that.

12   Q.  You're aware that that's the day before Mr. Guo did a live

13   interview about Chinese corruption for Voice of America, right?

14   A.  I'm not aware of that.

15   Q.  What is PAX exactly?

16   A.  It's an entity that lends money or lent money in this

17   circumstance to a business known as Shiny Times Holdings.

18   Q.  Do you know any significance to the fact that it's named

19   The Pacific Asia Alliance Opportunity Fund?

20   A.  I do not.

21   Q.  Do you know where it's based?

22   A.  I do not.

23   Q.  Do you know if it has a focus on investments in Asia?

24   A.  I do not.

25   Q.  You didn't represent any of the parties in the PAX

O6PBGUO1                           Skalka - Cross

1    litigation, right?

2    A.  I did not.

3    Q.  So your familiarity with that case comes purely from

4    reading documents filed in it, right?

5    A.  And hearing about the case in bankruptcy proceedings, but

6    yes.

7    Q.  All second-hand information, right?

8    A.  Correct.

9    Q.  You didn't attend any of the hearings in the PAX

10   litigation, right?

11   A.  I did not.

12   Q.  You didn't intervene in any way in the PAX litigation,

13   correct?

14   A.  Correct.

15   Q.  And when Mr. Fergenson was asking you questions about the

16   PAX litigation, he went over with you the documents that he

17   would like you to read from, correct?

18   A.  Yes.

19   Q.  And he went over with you the questions that he was likely

20   to ask you, right?

21   A.  Not specifically.

22   Q.  Well, I'm not saying he asked you the specific questions.

23   Generally speaking, he told you what he'd like you to talk

24   about, right?

25   A.  Correct.

1  Q.  Mr. Fergenson asked you some questions about a state court

2  order in the PAX litigation.  Do you remember that?

3  A.  He asked me about several state court orders I believe.

4  Q.  Let me be specific.  I meant the one granting summary

5  judgment.  Do you remember that?

6  A.  Yes.

7  Q.  When the summary judgment order was granted, that meant

8  that there was effectively obligation for Mr. Guo to pay some

9  money, right?

10  A.  Yes.

11  Q.  And that was north of $100 million, right?

12  A.  Yes.

13  Q.  And I think you testified that PAX was seeking to collect

14  on that judgment, right?

15  A.  Once that judgment was entered, yes.

16  Q.  After the judgment was entered, PAX was making efforts to

17  collect, right?

18  A.  Yes.

19  Q.  And Mr. Guo wasn't paying it, right?

20  A.  Correct.

21  Q.  Now, from your experience in the bankruptcy case, you're

22  aware that Mr. Guo claimed in that case that PAX is controlled

23  by the CCP, right?

24  A.  Yes.

25  Q.  And, in fact, the protest that you refer to against PAX,

O6PBGUO1                          Skalka - Cross

1   Mr. Guo linked those also to the CCP, right?

2   A.  I believe that was his claim.

3   Q.  And the same with the protest against the trustee, correct?

4   A.  Yes.

5   Q.  Now, in addition to aligning PAX with the CCP, Mr. Guo also

6   claimed that the trustee had scuttled a settlement between PAX

7   and Mr. Guo's lawyers, correct?

8           MR. FERGENSON:  Object to form.

9           THE COURT:  Sustained.

10  Q.  Are you aware that Mr. Guo claims in that motion included

11  that the trustee had scuttled a settlement between PAX and

12  Mr. Guo's counsel?

13          MR. FERGENSON:  Object to hearsay.

14          THE COURT:  I'm going to allow the question.

15  A.  I'm sorry.  I don't recall a particular motion that was

16  filed by Mr. Kwok related to the negotiations or mediation.

17  That was your question?

18  Q.  In any bankruptcy filing that you're aware of in Mr. Guo's

19  bankruptcy proceeding, are you aware of him making accusations

20  that Mr. Despins had scuttled the settlement agreement between

21  PAX and Mr. Guo?

22  A.  No.

23  Q.  Now, leading into -- the protest against Mr. Despins began

24  in November of 2022, correct?

25  A.  It was fall of 2022.  I don't recall the exact date or

O6PBGUO1                          Skalka - Cross

1    month, but it was in the fall of 2022.

2    Q.  Around that time you're aware that Mr. Guo made a motion to

3    disqualify Mr. Despins in the bankruptcy case?

4    A.  My recollection is that motion was prior to the protest.

5    Q.  Sure.  It was not immediately coincidental, but it was

6    before, right?

7    A.  Yes.

8    Q.  And as part of that motion, Mr. Guo's lawyer accused the

9    trustee of being part of the CCP?

10             MR. FERGENSON:  Your Honor, objection to hearsay.

11   This is not admissible.

12             THE COURT:  I'm going to allow the question.

13   A.  Can you restate the question.

14             MR. KAMARAJU:  Could we have it read back, please.

15             (Record was read)

16   A.  I don't recall that accusation.

17   Q.  Let me see if I can help you with that.  Let me put up just

18   for the witness and the parties -- can I have just one moment,

19   your Honor -- DX60658, just for the witness and the parties.

20             Can we just scroll through that document for the

21   witness.  We can take that down actually.  Sorry.  Let's move

22   on.

23             Let's go back to the PAX case for a second, okay.

24   Now, there was first an initial contempt order filed in the PAX

25   case, correct?

O6PBGUO1                        Skalka - Cross

1    A.  Yes.

2    Q.  That's a conditional contempt order of some sort?

3    A.  I believe it was referred to as the initial contempt order.

4    Q.  Whatever the term, there was one first and then there was

5    one later, correct?

6    A.  Yes.

7    Q.  And the first one fined Mr. Guo $500,000 a day until the

8    Lady May was returned to New York, correct?

9    A.  Yes.

10   Q.  Now, Mr. Guo faced potential time if he didn't comply,

11   correct?

12   A.   The official contempt order made no reference to jail time

13   or additional fines.  My recollection is that contempt order

14   provided 60 days for Mr. Guo, Mr. Kwok to return the Lady May

15   to the jurisdiction before the fines would start being levied.

16           (Continued on the next page)

17

18

19

20

21

22

23

24

25

O6P1GUO2                    Skalka - Cross

 1  BY MR. KAMARAJU:

 2  Q.  Okay.  And the yacht didn't come back though, right?

 3  A.  It did not.

 4  Q.  Okay.  Do you know where the yacht was at that time?

 5  A.  Based on the pleadings, it was indicated the boat, or the

 6  yacht, was in Europe.

 7  Q.  Okay.  Do you know if Mr. Guo was in Europe at that time?

 8  A.  I do not.

 9  Q.  Okay.  Now there were court hearings in New York in the PAX

10  litigation, correct?

11  A.  Yes.

12  Q.  You testified about an evidentiary hearing, right?

13  A.  Yes.

14  Q.  Mr. Guo was at those hearings, right?

15  A.  I believe so.

16  Q.  Okay.  So he wasn't in Europe at those times, right?

17  A.  The evidentiary hearing was in February of 2022.  I believe

18  he was in New York for that hearing.

19  Q.  Okay.  Now the PAX had also obtained a summary judgment

20  order by this time, correct?

21  A.  By February of 2022, yes.

22  Q.  Sorry.  I meant by the time of the first contempt order

23  going out.

24  A.  Yes.

25  Q.  Okay.  Now Mr. Guo didn't use any money from G|CLUBS to pay

1    that underlying summary judgment order, right?

2    A.  No money was used to pay that summary judgment.

3    Q.  Right.  So not G|CLUBS money, not GTV money, not Himalaya

4    Exchange money; no money, right?

5    A.  Correct.

6    Q.  It went unsatisfied, correct?

7    A.  Yes.

8    Q.  And in early 2022, PAX moved for the final contempt order,

9    right?

10   A.  Yes.

11   Q.  And the court granted that on November 9th; is that right?

12   A.  I believe it was February 9, 2022.

13   Q.  Oh, I'm sorry.  I misspoke.  Thank you.  February 9th,

14   right?

15   A.  Yes.

16   Q.  2022.  And the total fees/fines that Mr. Guo had to pay

17   were $134 million, correct?

18   A.  Yes.

19            MR. KAMARAJU:  Could we pull up GX 1413 at 2, please.

20            Does everybody have it on their screens?  Okay.  Let

21   me just give that a second.

22            Okay.  Great.  Thank you.

23   Q.  All right.  So paragraph 2 there says, "directed to tender

24   immediate payment to PAX," correct?

25   A.  Yes.

1  Q.  And the amount is $134 million, right?

2  A.  Yes.

3  Q.  And then on paragraph 4, it says, "Payment of the amount

4  set forth in paragraph 2 above shall be made to PAX within five

5  business days of the service of this order, with notice of

6  entry," correct?

7  A.  Yes.

8  Q.  Okay.  So Mr. Guo's deadline to comply I think was

9  February 16, 2022, correct?

10 A.  I believe that's correct.  I mean, five business days.  I

11 didn't pull out a calendar, but I believe there's probably a

12 weekend day in there and so that is probably accurate.

13 Q.  Right.  Right.  Well, let me put it this way.  He filed his

14 bankruptcy petition on February 15, 2022, right?

15 A.  Yes.

16 Q.  And that was the day before he was going to have to pay

17 this, right?

18 A.  Yes.

19 Q.  And I think you testified about it; there's a weekend in

20 there, right?

21 A.  Yeah, I believe so.

22 Q.  Okay.  So the bankruptcy judge—sorry.  Withdrawn.

23      The state court judge ordered Mr. Guo to pay more than

24 a hundred million dollars in basically a week, right?

25 A.  Yes.

1  Q.  And Mr. Guo didn't use G|CLUBS money to pay that either,

2  right?

3  A.  Correct.

4  Q.  He didn't use Himalaya Exchange money to pay that, right?

5  A.  Correct.

6  Q.  He didn't use GTV money to pay that, right?

7  A.  Correct.

8  Q.  He didn't use Rule of Law donations to pay that, right?

9  A.  Correct.

10 Q.  And Mr. Guo did face potential jail time if he violated

11 this contempt order, correct?

12 A.  That's my understanding.

13 Q.  And despite that, he still did not use any of that money to

14 pay this fine, correct?

15 A.  Correct.

16 Q.  Now instead, Mr. Guo filed bankruptcy, right?

17 A.  He did file bankruptcy, yes.

18 Q.  Now when one files bankruptcy, it's fair to say that you

19 have to give up certain information about yourself, right?

20 A.  Financial information, yes.

21 Q.  Right.  You have to disclose assets and liabilities, right?

22 A.  Correct.

23 Q.  You have to publicly disclose that you don't have

24 sufficient assets to cover your liabilities, correct?

25 A.  You have to disclose the extent of your assets and

O6P1GUO2                          Skalka - Cross

1   liabilities.  Sometimes it might actually show you can pay off
2   your bills but maybe not pay them off right away, so—but you
3   need to disclose them.
4   Q.  Can you explain what you mean with that last answer.
5   A.  You can disclose assets that appear to be more than your
6   liabilities.
7   Q.  But they might not be liquid so you can't pay right away,
8   right?
9   A.  Correct.
10  Q.  So the fact that somebody declares bankruptcy does not mean
11  that they don't have access to significant assets, it just
12  means they don't have access to liquid assets at that moment,
13  right?
14          MR. FERGENSON:  Object to form.
15          THE COURT:  Sustained.
16  Q.  Okay.  Well, can you explain what you just meant then by
17  the difference between liquid and illiquid assets in the
18  context of a bankruptcy filing.
19  A.  You can disclose assets that—and values of assets
20  that—that are in excess of the amount of your liabilities but
21  they may not all be liquid at the time that you disclose them,
22  meaning that they may not all be in cash; they may be in forms
23  of assets, whether it's real estate or investments, that are
24  not able to be—
25          THE INTERPRETER:  Sorry.  The interpreters are

1    requesting that all parties slow down.  Thank you.

2              THE COURT:  Please slow down.

3              MR. KAMARAJU:  Will do, your Honor.

4    Q.  Please go ahead.

5    A.  You're not able to liquidate those assets for some period

6    of time and therefore not able to pay your bills.

7    Q.  And in this case the period of time was a week, right?

8    A.  The purpose of the bankruptcy is often to provide debtors

9    time to pay your bills, so—but you need to disclose the full

10   extent of your assets, whether they're liquid or not.

11   Q.  Right.  So what I was saying is the amount—well,

12   withdrawn.  We'll move on.

13             Now are you familiar with the term "personal

14   bankruptcy"?

15   A.  Yes.

16   Q.  What, colloquially, is meant by personal bankruptcy?

17   A.  That means a bankruptcy filing by an individual rather than

18   a business entity or a corporate entity.

19             MR. KAMARAJU:  Okay.  Let's pull up, if we can,

20   please, GX 1419, which is in evidence, please.

21             Let's publish it.

22             Actually, sorry.  Before we do that, could we go to

23   GX 1407, real quick.

24             Can everybody see it?  Okay.  Great.

25   BY MR. KAMARAJU:

1   Q.  This is Mr. Guo's petition to file bankruptcy, correct?

2   A.  Yes.

3   Q.  All right.  And just to tie it down——if we can go to

4   page 7——that's his signature, correct, electronic?

5   A.  Yes.

6   Q.  And it was executed on February 15, 2022, right?

7   A.  Yes.

8           MR. KAMARAJU:  Okay.  Now can we go to page——sorry.

9   The page just shifted on me, but can we go to page 1 of

10  the——well, page 10 of 14 at the top there on the pdf.  It's a

11  form, official Form 104.

12          There we go.  Thank you.

13          Now could we just scroll down a little bit.  Oh, we

14  lost it.

15          All right.  Thanks.  Can we scroll down a little bit.

16  BY MR. KAMARAJU:

17  Q.  Okay.  You see No. 2 there?

18  A.  Yes.

19  Q.  Okay.  That's Golden Spring, correct?

20  A.  Yes.

21  Q.  And it says, "What is the nature of the claim?"  Can you

22  read that?

23  A.  Yes.  Oh.

24  Q.  Yeah, could you read what it says.

25  A.  "Litigation funding."

1  Q.  And how much is disclosed as the approximate amount of

2  this?

3  A.  Approximately $21 million.

4  Q.  So does this reflect that Golden Spring is identified as

5  having a $21 million outstanding debt?

6  A.  This is a list of the 20 largest creditors as filed by

7  Mr. Kwok, and Golden Spring is listed as the second largest

8  creditor with a claim of $21 million.

9        MR. KAMARAJU:  And can we go to page 13.

10  Q.  Okay.  And you see No. 16 there?

11  A.  Yes.

12  Q.  Okay.  Can you read the creditor's name.

13  A.  Lamp Capital, LLC.

14  Q.  And what's the nature of that claim?

15  A.  Litigation loan.

16  Q.  And what's the amount?

17  A.  $1 million.

18        MR. KAMARAJU:  Okay.  If we can go to 1419 now,

19  please.

20  Q.  All right.  This is another filing—I'm sorry.  Do you need

21  a sec?

22        Okay.  This is another filing Mr. Guo's counsel made

23  in bankruptcy, right?

24  A.  Yes.

25  Q.  And Global Notes and Statements is basically an explanation

O6P1GUO2                          Skalka - Cross

1    document of some sort?

2    A.  In this case, yes.

3    Q.  Okay.  Provides additional details, right?

4    A.  Regarding the documents, some of which we just looked at,

5    the bankruptcy schedules and statement of financial affairs.

6    Q.  Okay.  So let's just start with page 4, please.

7            And I think Mr. Fergenson asked you some questions

8    about question 1b.  Do you remember that?

9    A.  Yes.

10   Q.  And if you look down——

11           MR. KAMARAJU:  We can go to No. ii, please, Jorge.

12   Thank you.

13   Q.  Okay.  And he asked you some questions about this

14   paragraph, right?

15   A.  Yes.

16   Q.  Now can you actually just read the first paragraph, please.

17   A.  Yes.  "The debtor also has access to an apartment located

18   at the Sherry-Netherland Hotel, 781 Fifth Avenue, New York, NY

19   10022 ('the Apartment').  The cooperative shares in the

20   Apartment are held by Genever Holdings LLC ('the US SPV').  The

21   membership interests in the US SPV are held by Genever Holdings

22   Corporation ('the BVI company').  The debtor holds all of the

23   equity of the BVI company; however, pursuant to a Declaration

24   of Trust and Agreement, dated as of February 17, 2015 ('the

25   Trust Date'), the debtor holds such equity in trust for Bravo

O6P1GUO2                        Skalka - Cross

1    Luck Limited ('the Apartment Owner').  The debtor's son owns
2    the equity of the Apartment Owner.  On or about the Trust Date,
3    the Apartment Owner funded the US SPV with the purchase price
4    for the Apartment.  These funds came from entities owned or
5    controlled by the debtor's son and not from the debtor."
6    Q.  Okay.  So do you understand all that to be a long way of
7    saying that Mr. Guo's son owned the Sherry-Netherland
8    apartment?
9    A.  That's my understanding of what is being asserted in this
10   document.
11   Q.  Right.  That's what's said here, right?
12   A.  Yes.
13   Q.  Do you know what the purchase price was when it was
14   purchased by Mr. Guo's son?
15   A.  Approximately——the purchase price was approximately
16   $60 million.
17   Q.  Okay.  And I'm not going to ask you to read the next
18   paragraph, but if you could just take a look at it.
19          Do you see there's a reference there below to "in the
20   face of multiple court disputes relating primarily to the
21   beneficial ownership of the residence," then it goes on to say
22   "as between Bravo Luck Limited . . . and PAX"?
23   A.  I see that.
24   Q.  Okay.  So PAX had also initiated litigation regarding the
25   Sherry-Netherland apartment, correct?

O6P1GUO2                          Skalka - Cross

1   A.  It was regarding I believe Genever, the two Genever

2   entities, Genever Holdings, LLC and Genever Corporation.

3   Q.  And that litigation was commenced in the British Virgin

4   Islands, correct?

5   A.  Yes, and also in the New York Supreme Court action.

6   Q.  Okay.  So there were two, right?

7   A.  Yes.

8   Q.  And British Virgin Islands is sometimes referred to as BVI,

9   right?

10  A.  Yes.

11  Q.  Okay.  And BVI is a regular place of business, correct?  A

12  lot of businesses are in BVI, right?

13  A.  A lot of businesses are incorporated in BVI, yes.

14  Q.  That's for various corporate benefits, right?

15  A.  That's my understanding.

16          MR. KAMARAJU:  Okay.  Let's go to the next page.

17  Q.  All right.  I'm not going to ask you to read all of it, but

18  question 3, you see where it says, "The Debtor has use of

19  automobiles, including luxury automobiles and motorcycles"?  Do

20  you see that?

21  A.  Yes.

22  Q.  Then it says, "All costs and expenses associated with such

23  vehicles are provided for directly by family and

24  family-controlled enterprises," correct?

25  A.  That's what it says.

O6P1GUO2                         Skalka - Cross

1       THE COURT:  One moment, please.

2       MR. KAMARAJU:  Yes, your Honor.

3       THE COURT:  You may continue.

4       MR. KAMARAJU:  Thank you, your Honor.

5       If we could go to page 6, please.

6  Q.  All right.  And you see question 17?

7  A.  Yes.

8  Q.  And Mr. Fergenson asked you a few questions about that on

9  direct as well, right?

10 A.  Yes.

11 Q.  Now of the individual Chapter 11 cases that you've had

12 during your career, how many of them have had restraining

13 orders, how many of them involved debtors with restraining

14 orders imposed by the High Court of Hong Kong?

15 A.  None other than the Kwok bankruptcy proceeding.

16 Q.  Right.  He's the only one, right?

17 A.  Of the cases I've been involved in.

18 Q.  Sure.

19      MR. KAMARAJU:  And could we go to page 7.

20 Q.  And paragraph i, do you see where it says, "In September

21 and October 2017, the Chinese government raided the offices of

22 Shiny Times and seized all accounting corporate records and

23 many personal financial records"?  You see that?

24 A.  Yes.

25 Q.  So in all those individual Chapter 11 cases you've done,

1    how many of them have had debtors who have had their offices

2    raided by the Chinese government?

3    A.  This was the only case.

4    Q.  Okay.  Fair to say that Mr. Guo's bankruptcy case is pretty

5    unique, in your experience?

6    A.  Yes.

7    Q.  Okay.  And one of the reasons it's unique is because

8    Mr. Guo declared basically having no assets, right?

9    A.  No.  I've been involved in other cases in which debtors

10   have disclosed little or no assets.

11          THE COURT:  Sir, if you'll speak into the microphone

12   so everyone can hear you.

13          THE WITNESS:  I'm sorry.  I'm sorry.

14   A.  I have been involved in other bankruptcy cases in which the

15   debtor has disclosed little or no assets.  But—so that's

16   not—that by itself is not unusual or make it a unique case.

17   Q.  Okay.  Fair enough.  I was just curious if that was one

18   factor.  I'm sorry.  We didn't hear your answer.  Was that one

19   factor?

20   A.  It's—yes, it's one factor.

21          MR. KAMARAJU:  Okay.  Could we go to page 11, please.

22   Q.  All right.  Do you see Schedule I?

23   A.  Yes.

24   Q.  Okay.  You see the sentence there that says, "The Debtor

25   does receive support funded by family and companies controlled

O6P1GUO2                        Skalka - Cross

1   by family for housing, household and living expenses," correct?

2   A.  That's what it says.

3   Q.  Okay.  The fact that Mr. Guo received support from family

4   and companies controlled by family would not make him

5   ineligible to file Chapter 11, correct?

6   A.  Correct.

7   Q.  And in fact, there is a mechanism by which an inappropriate

8   Chapter 11 filing could be dismissed, right?

9   A.  There's a mechanism where parties can seek to dismiss a

10  bankruptcy case for virtually any reason.  The parties can move

11  to dismiss.

12  Q.  And a creditor can do that, right?

13  A.  Yes.

14  Q.  And PAX was a creditor in this bankruptcy, right?

15  A.  Correct.

16  Q.  So PAX could have moved to dismiss the bankruptcy if it had

17  wanted.

18  A.  PAX actually did move to dismiss at some point.

19  Q.  Okay.  And what happened?

20  A.  The judge denied this at the same time that a motion was

21  made to appoint the trustee, and instead of dismissing the

22  case, the court granted the motion to appoint the trustee.

23  Q.  Okay.  So Mr. Despins was appointed in lieu of dismissing

24  the bankruptcy, right?

25  A.  Correct.

O6P1GUO2                    Skalka - Cross

1    Q.  Are you familiar with the term "trust fund baby"?

2            MR. FERGENSON:  Objection to relevance.

3            THE COURT:  Sustained.

4    Q.  Okay.  Are you familiar with other instances in which a

5    debtor has been supported by their family primarily?

6    A.  Yes.

7    Q.  So that's not unusual in a bankruptcy case, right?

8    A.  I've seen it before.  I've seen it in other cases.

9    Q.  Now you testified you weren't party to the settlement

10   negotiations or the mediation conference, correct?

11   A.  Correct.

12   Q.  So as part of that, as part of your work as local counsel,

13   do you familiarize yourself with the proceedings that are going

14   on in court?

15   A.  Yes.

16   Q.  And you submit the applications that go with that, right?

17   A.  Yes.

18   Q.  And you describe the work that you've done?

19   A.  That my firm has done.

20   Q.  Correct.  And I think you testified on direct that

21   Mr. Despins and his firm had received approximately $25 million

22   in fees, right?

23   A.  That's correct.

24   Q.  And that there had been——withdrawn.

25           And where did those fees get paid out of?

O6P1GUO2                          Skalka - Cross

1  A.  The recoveries that have occurred to date in the bankruptcy

2  proceedings.

3  Q.  And that's a little over a hundred million dollars,

4  correct?

5  A.  Correct.

6  Q.  So Mr. Despins's fees have been approximately 25 percent of

7  what's been recovered, correct?

8  A.  Approximately.

9  Q.  Sure.  I'm not asking for specifics but approximately,

10  right?

11        Now when you testified about that, was it called a 314

12  interview, correct?

13  A.  341.

14  Q.  341.  Okay.  Thank you.  So a 341 interview is where the

15  debtor has to sit and answer questions, correct?

16  A.  Correct.  That's the creditors meeting.  341 is a section

17  in the Bankruptcy Code.  Sorry to get so technical, but——and

18  that's what refers to the creditors meeting.

19  Q.  Okay.  So is that a meeting that's available to all of the

20  creditors?

21  A.  Yes.  All creditors get notice of that meeting.

22  Q.  Okay.  And so any of them can show up and ask questions if

23  they want, right?

24  A.  Correct.

25  Q.  And is it appropriate to say the DOJ trustee?  What's the

1    best way to describe Ms. Claiborn's position?

2    A.  I refer to her as the trial attorneys for the Office of the

3    U.S. Trustee, so often it's referred to as U.S. trustee.

4    Q.  Okay.  So it's fair to say the U.S. trustee can ask

5    questions at that as well, right?

6    A.  U.S. Trustee's Office actually administers or runs the

7    meeting, so yes.

8    Q.  Okay.  And they can ask questions about any of the debtor's

9    financial affairs, right?

10   A.  Yes.

11   Q.  They can ask questions about transactions that the debtor

12   has entered into, right?

13   A.  To the extent they know of them, yes.

14   Q.  Sure.  They ask questions about assets and liabilities,

15   right?

16   A.  Yes.

17   Q.  And the debtor has to answer those questions, right?

18   A.  The debtor is obligated to cooperate in the bankruptcy

19   proceeding and answer truthfully.

20   Q.  Okay.  Now you looked at I think a couple of excerpts

21   earlier from that.  Do you remember that?

22   A.  From the transcripts of the creditors meetings?

23   Q.  Yes.

24   A.  Yes.

25   Q.  And Mr. Fergenson sort of did a little role play with you,

1  right?

2  A.  Yes.

3  Q.  I'm not going to do as much, but I'm going to try and do

4  just a little bit, okay?

5         MR. KAMARAJU:  Could we pull out GX 1401A, please, and

6  put it up on everybody's screen.

7         All right.  And if we could go to page 51 of the

8  transcript first.

9  Q.  And you see line 11 there?

10 A.  Yes.

11         MR. KAMARAJU:  Okay.  Actually, I'm going to——yeah,

12 line 11 is fine.

13 Q.  So I'll read it and then we can skip all that other stuff

14 and then you can go to the answer, okay?

15 A.  Okay.

16 Q.  Okay.  "Mr. Kwok, who is Max Krasner?"

17         And then I think it picks up at 22.  That's

18 Mr. Baldiga's answer.

19 A.  "He has to double-check with you because I cannot read and

20 cannot remember English names well.  So just the name, you said

21 Max.  If it's the name Max only, I know Max.  But if you add

22 another name to it, I'm not sure.  I don't know."

23 Q.  "Do you know a Max with respect to Golden Spring?"

24 A.  "Yes, I know."

25 Q.  "And what is Max's role with Golden Spring?"

O6P1GUO2                           Skalka - Cross

1    A.   "I don't know."

2    Q.   "Well, do you know Max?"

3    A.   "I don't remember."

4    Q.   "Do you know more than one person by the name of Max?"

5    A.   "For me English name is very complicated.  Like I can't

6    remember the last name of my lawyer.  If you add something else

7    to Max, I don't know."

8    Q.   "Mr. Kwok, the name Max Krasner is listed as the person to

9    whom the mail for Golden Spring is directed to.  Do you know

10   why that is?"

11              "Interpreter:  Sorry?"

12              "Do you know why that is?"

13   A.   "I only remember there is a Max at Golden Spring.  I only

14   know this one thing."

15   Q.   "And what is Max's job at Golden Spring?"

16   A.   "I'm not sure what role.  I (indiscernible) know he is in

17   charge of finance, but I'm not sure."

18   Q.   "What does he do for Golden Spring with respect to

19   finances?"

20   A.   "I was not involved in the management so I don't know."

21              MR. KAMARAJU:  Okay.  Can we keep going with page 54

22   real quick.

23              Just scroll down to line 20.

24              Right there is fine.  Thank you.

25   Q.   "Mr. Kwok, do you have access to a credit card or a debit

1  card provided to you by or through Golden Spring?"

2  A.  "No."

3  Q.  Okay.  As part of his bankruptcy filings, are you aware of

4  Mr. Guo disclosing any credit card debt?

5  A.  I don't believe he did.

6  Q.  Okay.  Did he disclose having any credit cards?

7  A.  I don't believe he did.

8  Q.  The only property he disclosed was having an iPhone, right?

9  A.  He disclosed some clothing, he mentioned a family dog, and

10  some checks that had not been cashed.

11  Q.  Right.  The Pomeranian, right?

12  A.  Yes.

13  Q.  Okay.  Now how often have bankruptcy debtors had no credit

14  cards?

15          MR. FERGENSON:  Objection to relevance.

16          THE COURT:  You may answer.

17  A.  I've seen it many times in business bankruptcy proceedings.

18  Q.  Sure.  How about individuals?

19  A.  I'm sorry?

20  Q.  How about individuals?

21  A.  I believe I've seen it before, but more common to see

22  credit card debt in individual bankruptcy filings.

23  Q.  Okay.  Now you were asked some questions about a loan

24  document.  Do you remember that?

25  A.  Yes.

1          MR. KAMARAJU:  All right.  So can we just pull up

2     what's been marked as Government Exhibit 1316, please.

3     Q.  Do you remember testifying about this on direct?

4     A.  Yes.

5     Q.  Now the only time you've seen this document is in the

6     context of the bankruptcy case, correct?

7     A.  Yes.

8     Q.  So you weren't there when it was signed, right?

9     A.  No.

10     Q.  You're not a Himalaya International Financial Group

11     employee, correct?

12     A.  Correct.

13     Q.  You are not an employee of HK International Funds

14     Investments, correct?

15     A.  Correct.

16     Q.  You don't know Mei Guo personally, right?

17     A.  I do not.

18     Q.  You don't recognize the signatures on the document, right,

19     other than Ms. Guo?

20     A.  Other than Ms. Guo.  I've seen her signature on several

21     documents.

22     Q.  Right.  But you've never actually seen her sign those

23     documents, right?

24     A.  Correct.

25     Q.  So do you see at the top——and there's a sticker at the top,

O6P1GUO2                      Skalka - Cross

1    but at the top left it says, Case 22-05003.  Do you see that?

2    A.  Yes.

3    Q.  And you see it says Doc 84-1?

4    A.  Yes.

5    Q.  Do you know why that's on there?

6    A.  Yes.

7    Q.  Okay.  Could you explain to us why it is.

8    A.  I believe I testified on direct that there was an adversary

9    proceeding that had been commenced by HK International Funds

10   Investments (USA), commonly referred to as HK USA.  An

11   adversary proceeding is a lawsuit within a bankruptcy

12   proceeding.  And this is the docket number for that lawsuit

13   that had been commenced by HK USA, and this document, this

14   exhibit in this proceeding, was filed as an exhibit in that

15   adversary proceeding, and that's the document number that was

16   assigned to the——this document when it was filed in the

17   adversary proceeding.

18   Q.  Okay.  So this document is now a matter of public record,

19   correct?

20   A.  Yes, it was——again, it was filed in the bankruptcy court

21   adversary proceeding, which is a public filing.

22           MR. KAMARAJU:  Okay.  Could we pull up GX 1314

23   quickly.

24   Q.  You remember testifying about this document before, right?

25   A.  Yes.

1    Q.  Okay.  And it too has that same docket stamp at the top,

2    right?

3    A.  Yes.

4    Q.  So it was also publicly filed, right?

5    A.  Yes.

6    Q.  Now, and you similarly were not there at the execution of

7    this document, right?

8    A.  Correct.

9        MR. KAMARAJU:  All right.  Could we turn to page 4 of

10   the document, please.

11   Q.  All right.  And you see the section that says Purpose?  You

12   see that?

13   A.  Yes.

14   Q.  And you see 3.2 there?

15   A.  Yes.

16   Q.  Okay.  Could you read the first sentence, please.

17   A.  "The Total Facility amount will be used as security for the

18   court in relation to the Yacht."

19   Q.  Okay.  So what's your understanding of what it means to say

20   "security for the court in relation to the Yacht"?

21   A.  My understanding from reading this document was it was

22   intended as a secured loan on the lot—excuse me—on the yacht,

23   and to be disclosed to the bankruptcy court.

24   Q.  Okay.  And why would it need to be disclosed to the

25   bankruptcy court?

O6P1GUO2                          Skalka - Cross

1   A.   Because at the time of this loan being made, there were

2   proceedings pending in the bankruptcy court about what was

3   going to happen to the Lady May and whether or not PAX would be

4   allowed to go back to the state court and try to pursue a

5   recovery of the Lady May.

6            THE COURT:   What do you understand the word "facility"

7   to mean?

8            THE WITNESS:   "Facility" I believe was defined earlier

9   in the document, your Honor, as the loan that was going to be

10  provided by Himalaya to the borrower.

11  Q.   Okay.  Could you look at the next sentence, please.

12  A.   "The period the borrower retains the Total Facility Amount

13  in the escrow account will be the time period from the date of

14  this agreement to when the yacht is returned to the USA."

15  Q.   Okay.  So is it fair to say that this facility amount was

16  intended to be like a bond for when the boat would come back?

17  A.   Yes.

18  Q.   Okay.  And it was going to be held in escrow, right?

19  A.   Yes.

20  Q.   Okay.  So this 37 million wasn't to buy the yacht, right?

21  A.   No.  It was a loan to HK USA, who was then going to put it

22  up as a——as a bond in connection with the

23  negotiation——negotiated settlement of the Lady May in the

24  bankruptcy court.

25  Q.   Right.  No one's getting a new yacht with this 37 million,

O6P1GUO2                          Skalka - Cross

1     right?

2     A.   No.

3     Q.   Okay.  And do you know what happened to that $37 million in

4     the escrow account?

5     A.   Yes.

6     Q.   What happened to it?

7     A.   The bankruptcy court, in connection with the adversary

8     proceeding that is referred to here, ultimately found that the

9     $37 million, as well as the Lady May, were property of the

10    bankruptcy estate, and they——the funds were recovered by the

11    trustee and put into the bankruptcy estate.

12    Q.   Okay.  So that $37 million is part of the $100 million that

13    you testified about before?

14    A.   Yes.

15    Q.   And so after the trustee took that action, the $37 million

16    could not be returned to the lender in this matter, right?

17    A.   Correct.

18    Q.   Now all of this, this whole arrangement, was disclosed to

19    the state court, correct?

20    A.   Not that I'm aware of.

21    Q.   Okay.  It was disclosed to the bankruptcy court?

22    A.   Yes.

23    Q.   And so no one hid this arrangement from the court, correct?

24    A.   Not to the bankruptcy court.

25              MR. KAMARAJU:  Now can we go back to 1316, please,

1    GX 1316.

2              Make sure everybody has that.

3    Q.   Okay.  Do you remember this?  This is the side letter?

4    A.   Yes.

5    Q.   Okay.  And you testified that a side letter is a sort of an

6    amendment to an agreement, right?

7    A.   In this case, yes.

8    Q.   Okay.  And again, you weren't present for the signing of

9    this, right?

10   A.   Correct.

11   Q.   You have no personal knowledge of the circumstances of the

12   execution, right?

13   A.   Correct.

14   Q.   Okay.  Now do you see 1.3(a)?  It says, "The loan in the

15   loan agreement will no longer be deemed to be secured against

16   the yacht."  Correct?

17   A.   That's what it says, yes.

18   Q.   Okay.  So the effect of this is that the yacht is no longer

19   security for the loan, right?

20   A.   Yes.

21   Q.   And you see the date on this document, April 19, 2022?

22              Sorry.  If we blow it back out, you'll see it at the

23   top there.

24   A.   It refers to the loan agreement being dated April 19, 2022,

25   but I believe the date of this document is April 29, 2022.

O6P1GUO2                              Skalka - Cross

1   Q.  You're right.  Thank you.

2   A.  That's all right.

3   Q.  So at that time, April 29, 2022, there were a number of

4   different demands to the yacht, correct?

5   A.  Yes.

6   Q.  PAX had a demand to it, right?

7   A.  They had a demand to it for purposes of collection of their

8   judgment, yes.

9   Q.  Sure.  And the state court had entered a restraining order

10  on it, right?

11  A.  Yes.

12  Q.  So they couldn't have transferred the yacht if they'd

13  wanted to, right?

14          MR. FERGENSON:  Object to form.  Calls for

15  speculation.  I'm not sure what the question is.

16          THE COURT:  Are you asking for a legal conclusion?

17          MR. KAMARAJU:  No.  I'm just asking for his

18  understanding.

19          THE COURT:  I'll allow the question.

20  A.  It would have been possible for HK USA to transfer its

21  title interest in the property, in the yacht at that time.

22  Q.  Okay.  But it didn't do that, right?

23  A.  It did not.

24  Q.  It just left it there, right?

25  A.  Correct.  And as I said, they started——HK USA started a

O6P1GUO2                        Skalka - Cross

1   lawsuit to actually claim that they were the owner of the

2   property, of the boat.

3   Q.  Right.  They availed themselves of the U.S. court system,

4   correct?

5   A.  Yes.

6   Q.  And all of the disclosures that come with that, right?

7   A.  Yes.

8   Q.  So instead of doing the title thing, they filed a lawsuit.

9   A.  I don't know if they were planning to do anything with the

10  title.

11  Q.  Fair enough.  Because, again, you're not part of the

12  company, right?

13  A.  Correct.

14  Q.  You never spoke to Mei Guo about it, right?

15  A.  Correct.

16  Q.  You have no idea what her thinking is, right?

17  A.  Correct.

18  Q.  Have you ever heard of William Je?

19  A.  I've heard the name.

20  Q.  You heard the name in the context of the bankruptcy?

21  A.  Yes.

22  Q.  Okay.  In what context did his name come up?

23  A.  Just that he had a relationship with Mr. Kwok.

24  Q.  Okay.  But you've never spoken to him, right?

25  A.  Correct.

O6P1GUO2                          Skalka - Cross

1   Q.  You have no idea what his reasons are for entering into any

2   loans, right?

3   A.  Correct.

4   Q.  Same with ACA Capital, right?  You have no personal

5   knowledge of anything at ACA Capital?

6   A.  I have no connection to ACA Capital.

7   Q.  Same with the Himalaya Exchange?

8   A.  Correct.  I have no connection to Himalaya Exchange.

9   Q.  And you remember Mr. Fergenson asked you questions about a

10  draft loan agreement, right?

11  A.  Yes.

12  Q.  And that draft had ACA on it, right?

13  A.  Yes.

14  Q.  And then it switched to the Himalaya International

15  Financial Group in the final, right?

16  A.  Correct.

17  Q.  Have you ever heard of a typo?

18          MR. FERGENSON:  Objection.

19          THE COURT:  Sustained.

20          MR. KAMARAJU:  Now if I could have just one minute,

21  your Honor.

22  Q.  Now you're what's called local counsel; is that a fair

23  description?

24  A.  Yes, and conflicts counsel as well.

25  Q.  Okay.  So Mr. Despins's firm hired you as local counsel,

O6P1GUO2                        Skalka - Cross

1    correct?

2    A.   Hired my firm, yes.

3    Q.   Yeah, sorry, your firm.  And you testified that your firm

4    has made roughly $2 million based on that engagement?

5    A.   Yes.

6    Q.   I'm not asking for particulars, but is that a big, small,

7    or large engagement for your firm?

8    A.   We're a 40-lawyer firm.  We've been in——I've been in

9    practice with the firm for 30 years.  We've had larger matters,

10   we've had smaller matters, so I——

11   Q.   Okay.  So it's not substantial, not insubstantial.

12   A.   Correct.

13   Q.   And you testified before about a process by which the

14   trustee——I'll call him the Chapter 11 trustee, Mr. Despins,

15   right——how the Chapter 11 trustee was selected——not

16   selected——recommended by the U.S. trustee, right?

17   A.   Correct.

18   Q.   And that recommendation is a necessary step to somebody

19   being appointed Chapter 11 trustee by the bankruptcy court,

20   right?

21   A.   Yes.

22   Q.   So if Mr. —— if a person wanted to be a Chapter 11 trustee

23   in the District of Connecticut, they would need that

24   recommendation, right?

25   A.   It's actually an appointment by the Office of the U.S.

1  Trustee, but yes.

2  Q.  Okay.  Sorry.  Let's use that word, to make it accurate.

3  So to be appointed, they would need the approval of the U.S.

4  trustee, right, and that's true for every bankruptcy case in

5  the District of Connecticut that comes next, right?

6  A.  As far as Chapter 11 trustees, yes.

7  Q.  So if Mr. Despins wants to plan to be a Chapter 11 trustee

8  down the road, he needs approval from the U.S. trustee, right?

9  A.  Yes.

10  Q.  And again, that's a department of the Department of

11  Justice, correct?

12  A.  It's my understanding it's a branch of the Department of

13  Justice.

14  Q.  Now you were hired by Mr. Despins's firm, correct?

15  A.  We were hired by Mr. Despins.

16  Q.  Okay.  And that's his decision, right?

17  A.  Correct.

18  Q.  He could always decide to hire somebody else down the road,

19  right?

20  A.  Yes.

21  Q.  He could change horses even in this case, right?

22  A.  Absolutely.

23  Q.  Like you said, it's ongoing, right?

24  A.  Absolutely.

25  Q.  So he has an opportunity to pick a different firm if he'd

1    like to, right?

2    A.  Yes.

3    Q.  Now you understand Mr. Despins has spoken with the

4    prosecutors on a number of occasions, correct?

5    A.  I don't know.

6    Q.  Do you know if he's ever spoken with them?

7    A.  I don't know.

8    Q.  When were you approached about testifying in this case?

9    A.  Approximately two weeks ago.

10   Q.  Do you know if prior to you being approached Mr. Despins

11   was going to be a witness in this case?

12   A.  I do not.

13   Q.  Now as part of Mr. Guo's bankruptcy proceedings, you and

14   Mr. Despins had filed a number of court cases, I think you

15   mentioned, right?

16   A.  Yes.

17   Q.  I think you said it was over 300, right?

18   A.  Yes.

19   Q.  And all of those are to recover assets back into the

20   estate, correct?

21   A.  Yes.

22   Q.  Okay.  And by recover assets back into the estate, the

23   trustee's allegation is that that money actually belongs to

24   Mr. Guo, right?

25   A.  They belong to the bankruptcy estate, and it's—it's the

O6P1GUO2                    Skalka - Cross

1    Kwok bankruptcy estate, so the funds would be there to pay

2    creditors of the estate.

3    Q.   Right.  Ultimately, the funds would be used to pay the

4    creditors, right?

5    A.   Yes.

6    Q.   And they'd be used to pay his creditors?

7    A.   Correct.

8    Q.   Right?  And you're paying his creditors with his money,

9    right?

10   A.   With the funds that we believe belong to the bankruptcy

11   estate.

12   Q.   Okay.  And that's his estate.

13   A.   Yes.

14   Q.   And the larger the estate, the more money there is that's

15   available for your fees, right?

16   A.   My fees would have to be approved before they would be

17   paid, but there——if there's the large——I'm not being paid on a

18   contingency fee basis, I'm being paid on an hourly basis, so

19   the larger the estate doesn't necessarily mean I'm going to get

20   paid more money.

21   Q.   No.  My question was:  There's money available to pay you,

22   sir.

23            THE COURT:  Mr. Kamaraju, please speak into the

24   microphone.

25            MR. KAMARAJU:  Sorry.  My apologies, your Honor.

O6P1GUO2                          Skalka - Cross

1    Q.  Did you hear my question?

2    A.  Yes.  The larger the estate, there's more money to pay my

3    firm's fees.

4    Q.  Okay.  And you testified that Mr. Despins is not taking a

5    commission, right?

6    A.  Correct.

7    Q.  But the same is true of him, right?  The larger the estate,

8    the more money that's available to pay his fees, right?

9    A.  And all other expenses of the case, yes.

10   Q.  Sure.  To pay all of it, right?

11   A.  Yes.

12   Q.  So if his fees go north of that $25 million, it's got to

13   come out of the estate, right?

14   A.  It——yes.

15   Q.  And many of the lawsuits that you've filed have subject

16   matter that overlaps with the allegations in this case,

17   correct?

18   A.  I don't know.

19   Q.  Well——

20           MR. FERGENSON:  Objection, your Honor.

21           THE COURT:  You'll step up, please.

22           (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6P1GUO2                     Skalka - Cross

1          (At the sidebar)

2          THE COURT:  So why would that be irrelevant?

3          MR. FERGENSON:  We believe it is excluded under Rule

4    403.  He's not charged with bankruptcy fraud, one; two, it goes

5    well beyond the scope of the direct; three, it is improper to

6    try and impugn the criminal prosecution and the allegations

7    we've brought by trying to impugn the bankruptcy trustee when

8    there's already been significant cross on the fact that

9    Mr. Kwok has said he's an agent of the CCP.  You can't use the

10   bankruptcy trustee's actions and their similarity to our

11   allegations and overlap to try and make some kind of

12   insinuation about our case and that this is improper.  Excluded

13   under 403.

14          MR. KAMARAJU:  I'm sorry.  I wasn't sure if he was

15   done.

16          No, I'm merely asking it to set up a bias cross with

17   respect to this particular——

18          THE COURT:  A what?

19          MR. KAMARAJU:  A cross on bias, your Honor, with

20   respect to this particular witness.  The line of questions are

21   going to go:  There's an overlap; you're aware that the

22   government could ask to pause your case?  In fact, you

23   voluntarily paused your case, and you voluntarily paused your

24   case so as not to interfere with the criminal case, including,

25   in particular, to not have any of the government's witnesses

1   deposed by Mr. Guo.  And he did that, right?  And they've said

2   that in public filings.  And so it's just bias, like you would

3   cross anybody else, like you would cross a cooperator, you took

4   all these steps to help the government, that's all.

5          THE COURT:  What is the nature of the bias?

6          MR. KAMARAJU:  The nature of the bias is that he and

7   his firm get paid the longer the bankruptcy case goes on, and

8   as long as they continue to work on it.  If the government

9   pauses it, right, if the government takes any action, then he

10  doesn't get those fees.  It's that simple.  His fees are

11  basically dependent on them.

12         MR. FERGENSON:  Your Honor, Mr. Kamaraju moved for the

13  stay of the bankruptcy, not the government.

14         MR. KAMARAJU:  No, no.  But he also moved for the stay

15  of the bankruptcy case.  That's my point.  I'm not bringing out

16  that we moved for the stay, I'm bringing out that he moved for

17  a stay.

18         MR. FERGENSON:  How is that bias?

19         THE COURT:  He's somehow now interested?

20         MR. KAMARAJU:  If they said in a public filing, I am

21  voluntarily staying this incredibly lucrative case that we

22  could be bringing because I don't want to interfere with the

23  government's case and I don't want the government's witnesses

24  to be deposed, that is a person or a firm or an entity offering

25  to help the government in the same way that if I had 3500

O6P1GUO2                          Skalka - Cross

1   material that a cooperator said, look, I'll go make a recording

2   against the co-defendant, I would be allowed to cross and be

3   like, look at all the efforts this person is willing to make.

4   It's not that dissimilar from the cross I was going to do on

5   Mr. Bass, who I understand is now not going to be a witness.

6   It's the same idea.  It's just bias.  It's the lengths to which

7   they will go to help the government.

8            THE COURT:  Or themselves.

9            MR. KAMARAJU:  Could be both.  Yeah.

10           THE COURT:  Okay.  Go ahead.

11           MR. FERGENSON:  If he's going to bring up the stay,

12   then I think we can ask on redirect about how Mr. Kwok moved to

13   stay the bankruptcy.

14           THE COURT:  All right.  I'm going to permit the

15   question.

16           MR. KAMARAJU:  Okay.  Thank you, your Honor.

17           (Continued on next page)

18

19

20

21

22

23

24

25

O6P1GUO2                          Skalka - Cross

 1                  (In open court)

 2                  THE COURT:  You may continue.

 3                  MR. KAMARAJU:  Thank you, your Honor.

 4                  THE COURT:  Do you want the question to be read back?

 5                  MR. KAMARAJU:  Yes, that would be great.

 6                  THE WITNESS:  Yes.

 7                  THE COURT:  Go ahead.

 8                  (Record read)

 9    BY MR. KAMARAJU:

10    Q.  One of the actions that the trustee filed is against

11    G|CLUBS, correct?

12    A.  I believe so.

13    Q.  And one of the actions the trustees filed is against ACA,

14    correct?

15    A.  I believe so.

16    Q.  One of the actions it filed is against Golden State New

17    York, correct?  Golden Spring New York.  My apologies.

18    A.  Golden Spring, yes.

19    Q.  Same with GTV, correct?

20    A.  I don't recall whether GTV was named in an action.

21    Q.  Okay.  Have you ever reviewed the indictment in this case?

22    A.  I don't recall if I read the entire indictment.

23    Q.  Okay.  Have you read some of it?

24    A.  I believe I read some of it.

25    Q.  Okay.  Do you remember that G|CLUBS is part of the

1    indictment in this case?

2    A.  I do not.

3    Q.  Now are you aware that the government could seek to pause

4    the bankruptcy case?

5    A.  No.

6    Q.  Okay.  The government could seek to file a motion to ask

7    the bankruptcy case to be stayed, right?

8    A.  I believe any party could theoretically file that motion.

9    Q.  Sure.  So them too, right?

10   A.  If you're referring to the government, yes.

11   Q.  Yes.  Right?  And if that were successful, that would mean

12   that during the period of the pause, there would be no more

13   fees for you, right?

14   A.  If you're referring to my firm?

15   Q.  Yes, sir.  I'm sorry.  Your firm.

16   A.  I don't know what the bankruptcy court would do during a

17   pause of the case.  There's still administrative things that

18   would take place even if the bankruptcy case was paused.

19          THE COURT:  Please speak into the microphone.

20          THE WITNESS:  I'm sorry.

21   A.  There would still be administrative proceedings that would

22   take place even if the case was paused from the sense that no

23   litigation would be going on.  There are still obligations,

24   monthly obligations of documents that have to be filed in the

25   case just to keep it going and alive, frankly, so——

O6P1GUO2                          Skalka - Cross

1   Q.  So it's fair to say that your fees would be less?

2   A.  There would be less work, yes.

3   Q.  Right.  And the same is true of Mr. Despins's firm,

4   correct?

5   A.  Yes.

6   Q.  Now are you aware that Mr. Despins discussed the

7   possibility of a pause with the prosecutors?

8   A.  I am not.

9   Q.  Now there came a time when you and Mr. Despins filed what's

10  called a civil RICO complaint, right?

11  A.  In the bankruptcy proceeding, yes.

12  Q.  And you sued a bunch of people, right?

13  A.  Yes.

14  Q.  And that was all to seek a recovery for the estate, right?

15  A.  Yes.

16  Q.  And as part of that, you would actually be able to recover

17  triple damages, correct?

18  A.  One of the claims would include a treble damage claim, yes.

19  Q.  And so if you won on that, that would bring in even more

20  money into the estate, right?

21  A.  Yes.

22  Q.  So even greater than the other adversary proceedings that

23  you had filed, right?

24  A.  Yes.

25  Q.  And again, that would be more money available to pay your

O6P1GUO2                        Skalka - Cross

1   firm's fees, right?

2   A.  There would be more money in the estate to pay all fees and

3   all creditors.

4   Q.  Okay.  So that includes Mr. Despins's fees as well, right?

5   A.  And all the other professionals in the case, yes.

6   Q.  Sure.  Everybody is getting paid from that bankruptcy,

7   right?

8   A.  Yes.

9           MR. FERGENSON:  Asked and answered.

10          THE COURT:  Sustained.

11  Q.  Now almost immediately after that civil RICO case was

12  filed, Mr. Despins asked for it to be paused, right?

13  A.  There was a motion filed in the bankruptcy case to pause or

14  stay that action, yes.

15  Q.  Okay.  And your firm filed that motion, correct?

16  A.  Yes.

17  Q.  Okay.  Did you review it before it was filed?

18  A.  Yes.

19  Q.  Okay.  And I take for granted that you know as a lawyer you

20  have to be truthful to the court, right?

21  A.  Yes.

22  Q.  Okay.  Now one of the reasons that Mr. Despins told the

23  bankruptcy court that he wanted to stay the RICO cases was to

24  avoid interfering with the criminal prosecution, correct?

25  A.  Yes.

1    Q.  And in particular, he told the bankruptcy court that he

2    wanted to avoid having to depose any of the witnesses that may

3    be called by the government, correct?

4    A.  I don't recall that specific allegation in the motion, but

5    I do recall the statement that——that he wanted to pause that

6    RICO case because of this criminal proceeding.

7    Q.  Okay.  Let me see if I can help you.

8              MR. KAMARAJU:  Can we pull that up.

9              Just for the witness and the parties, please.

10   Q.  And let me know when it's on your screen, sir.  Thank you.

11             Okay.  Could you just review this paragraph just to

12   yourself, please.

13             Okay.  Does that refresh your recollection about one

14   of the reasons being avoiding the possibility of deposing

15   witnesses in the criminal case?

16   A.  Yes.  This refers to staying depositions in the main

17   bankruptcy case, not in connection with the RICO case, which

18   was why I was——didn't recall that, but this is asking for

19   staying depositions in the main bankruptcy case.

20             MR. KAMARAJU:  Okay.  Could we go to paragraph 26.

21   Q.  Okay.  Just review that.

22             Now if the RICO case was paused——

23             MR. KAMARAJU:  We can take that down.

24   Q.  If the RICO case was paused, then there would be no

25   depositions in that case either, correct?

1    A.   Correct.

2    Q.   Okay.  What's a deposition?

3    A.   It's an out-of-court examination or question, questioning

4    of a witness under—under oath.

5    Q.   And if there were a deposition in the RICO case, the

6    trustee's counsel would have an opportunity to question them,

7    right, the witness?

8    A.   If it's a deposition noticed by the trustee's counsel, yes.

9    Q.   Okay.  But even if Mr. Guo's counsel noticed the

10   deposition, wouldn't trustee's counsel have an opportunity to

11   ask questions?

12   A.   Presumably.

13   Q.   Right.  So if the trustee noticed the deposition, then

14   Mr. Guo's counsel would have an opportunity, correct?

15            MR. FERGENSON:  Your Honor, are we getting into

16   hypotheticals?  And it's also outside the scope.

17            THE COURT:  I'll permit some exploration of this.

18            MR. KAMARAJU:  I'm almost done, your Honor.

19            THE COURT:  Yes.

20   Q.   Let me make the question simple.  In the event of a

21   deposition, Mr. Guo's counsel may have an opportunity to

22   question the witness, correct?

23   A.   Yes.

24   Q.   And that would include witnesses that the government

25   intended to call at this trial, if they were served with a

O6P1GUO2                          Skalka - Cross

1    deposition subpoena.

2              MR. FERGENSON:  Objection.  Calls for speculation.

3              MR. KAMARAJU:  I'd like to finish the question,

4    please.

5              THE COURT:  You're not finished?

6              MR. KAMARAJU:  I have now finished.

7              THE COURT:  It does call for speculation, so I'm going

8    to sustain the objection.

9              MR. KAMARAJU:  Okay.

10   BY MR. KAMARAJU:

11   Q.  Until that stay is lifted, there will be no depositions in

12   the RICO case, correct?

13   A.  Correct.

14   Q.  And that's what Mr. Despins wanted, right?

15             MR. FERGENSON:  Objection.

16             THE COURT:  Sustained.

17   Q.  That's what Mr. Despins told the bankruptcy court, correct?

18             MR. FERGENSON:  Objection.  Asked and answered.

19             THE COURT:  I don't know if that question was

20   answered.  You may answer.

21   A.  It's what was included in the motion that we filed for

22   Mr. Despins, yes.

23   Q.  And you're aware that's what the prosecutors want, right?

24             MR. FERGENSON:  Objection, your Honor.  He can't do

25   that.  And that misstates the testimony.

1            THE COURT:  He can't know what the prosecutors want.

2            MR. KAMARAJU:  No further questions, your Honor.

3            MR. FERGENSON:  That's not what we want.  That's fine.

4            THE COURT:  Redirect.

5    REDIRECT EXAMINATION

6    BY MR. FERGENSON:

7    Q.  Mr. Skalka, you were just asked just a moment ago questions

8    about the stay of the bankruptcy proceedings, the stay of the

9    trustee's civil RICO case.  Do you remember that?

10   A.  Yes.

11   Q.  Are you aware that Mr. Kwok moved to stay the bankruptcy

12   prior to the trustee making that motion?

13   A.  Yes.

14   Q.  And he moved actually two times to stay the bankruptcy?

15   A.  Yes.

16   Q.  And that's Mr. Kwok, correct?

17   A.  Correct.

18   Q.  That wasn't the government that made that motion, correct?

19   A.  Correct.

20           THE COURT:  And what do you understand the meaning of

21   "moved"?

22           THE WITNESS:  There was a motion filed.

23           THE COURT:  What do you understand is a "motion"?

24           THE WITNESS:  It's a pleading, a document filed by a

25   party to ask, in this case, to stay the Chapter 11 bankruptcy

O6P1GUO2                          Skalka - Redirect

1  proceedings of the debtor.

2           THE COURT:  Go ahead.

3           MR. FERGENSON:  Thank you, your Honor.

4  BY MR. FERGENSON:

5  Q.  Mr. Skalka, you were asked early on about the PAX lawsuit.

6  Do you remember those questions on cross?

7  A.  Yes.

8  Q.  And you were asked about whether, under Chinese law, there

9  are death sentences.  Do you remember that?

10  A.  Yes.

11  Q.  What court was the PAX lawsuit filed in?

12  A.  New York Supreme Court.

13  Q.  Is that in the United States?

14  A.  Yes.

15  Q.  When Mr. Kwok was the subject of that lawsuit, was he in

16  the United States?

17  A.  Yes.

18  Q.  Does the New York court, where that lawsuit took place,

19  apply New York law?

20  A.  Yes.

21  Q.  Does it apply Chinese law?

22           MR. KAMARAJU:  Objection.  Calls for a legal

23  conclusion.

24           THE COURT:  Sustained.

25  Q.  Who is the judge?

1    A.  In the PAX litigation?

2    Q.  In the PAX litigation?

3    A.  The judge in the PAX litigation is Judge Ostrager.

4    Q.  To your knowledge is he a member of the Chinese Communist

5    Party?

6            MR. KAMARAJU:  Objection.  Calls for speculation.

7            THE COURT:  If he knows.

8    A.  I don't know.

9    Q.  Does he apply New York law in his cases?

10   A.  Yes.

11           MR. KAMARAJU:  Objection.  Calls for a legal

12   conclusion.

13           THE COURT:  Well, he may apply New York law and he may

14   apply other law, depending on what is correct in the case.

15           MR. FERGENSON:  That's fair, your Honor.  That's fair,

16   your Honor.

17   BY MR. FERGENSON:

18   Q.  You were also asked questions about the timing of the PAX

19   lawsuit.  Do you remember that?

20   A.  Yes.

21           MR. FERGENSON:  Ms. Loftus, could we pull up Defense

22   Exhibit 7006.

23   Q.  Mr. Skalka, is this the complaint that started the PAX

24   lawsuit?

25   A.  It's—it's the cover sheet for the complaint, yes.

O6P1GUO2                          Skalka - Redirect

1              MR. FERGENSON:  The government offers Defense

2    Exhibit 7006.

3              MR. KAMARAJU:  Objection, hearsay.

4              THE COURT:  The complaint is not already in evidence?

5              MR. FERGENSON:  No, your Honor.  It's a defense

6    exhibit.  The government is offering it.

7              THE COURT:  Sustained.

8              MR. FERGENSON:  All right.  Ms. Loftus, can you show——

9    BY MR. FERGENSON:

10   Q.  Mr. Skalka, do you recall the exact details in the

11   complaint about what happened before the date of the filing of

12   this complaint?

13   A.  Yes.

14   Q.  And what did PAX allege happened prior to their filing this

15   complaint?

16             MR. KAMARAJU:  Objection.  Hearsay.

17             THE COURT:  Sustained.

18             MR. FERGENSON:  Your Honor, I may need a sidebar then.

19             THE COURT:  Okay.

20             (Continued on next page)

21

22

23

24

25

O6P1GUO2                        Skalka - Redirect

1                    (At the sidebar)

2                    MR. FERGENSON:  So yesterday, Mr. Kamaraju objected to

3       my asking this question.  I said, is there going to be any

4       cross on the fact, you know, suggesting that PAX was acting as

5       an agent of the Chinese Communist Party?  Mr. Kamaraju said he

6       may ask the date.  He asked the date and then he also asked:

7       And you're aware that date was, you know, the day before a Red

8       Notice was filed by the Chinese Communist Party?  Or are you

9       aware that was the day before Miles Guo gave a Voice of America

10      interview?  So now there's a suggestion that this complaint,

11      this entire lawsuit, was filed in conjunction with the Red

12      Notice and with the Voice of America interview.  That's not

13      what the complaint itself even says.  It talks about how they

14      issued demand letters two years prior, they issued demand

15      letters to Mr. Guo in 2015, they issued another demand letter

16      in 2016, and then they filed, a year before this complaint, a

17      proceeding in the BVI to put the entity, Shiny Times, that was

18      the subject of the loan, into liquidation proceedings in the

19      British Virgin Islands.  If we're not allowed to elicit that

20      fact, it completely distorts the picture of what this lawsuit

21      was for the jury, and it will allow them to sum up in an

22      incredibly misleading way at summations.  And I understand that

23      Mr. Kamaraju was eliciting those things on cross to go to

24      defendant's state of mind.  Well, then the government can at

25      least show what the complaint itself that Mr. Kwok read and

```
 1    supposedly had this state of mind that, oh, this must be a

 2    Communist party plot, the government should be allowed to show

 3    what that complaint actually alleged happened before the date

 4    the complaint was filed.

 5              THE COURT:  How do you propose to elicit the

 6    testimony?

 7              MR. FERGENSON:  I think the simplest way is just to

 8    offer the complaint and say it could be offered for its

 9    effect——

10              THE COURT:  The whole thing?

11              MR. FERGENSON:  Yeah, just offer it.  It's 11 pages.

12              MR. KAMARAJU:  There's no evidence in the record that

13    Mr. Guo read the complaint.

14              MR. FERGENSON:  He filed an answer, your Honor, and he

15    testified that he filed an answer.

16              MR. KAMARAJU:  So there's still no evidence that

17    Mr. Guo read the complaint.  The fact that the lawyers filed an

18    answer is not evidence that Mr. Guo read the complaint, which

19    is in English, by the way.

20              Second, everything Mr. Fergenson started with was they

21    want to talk about the complaint for purposes of showing there

22    was a demand letter and there was an action in BVI and there

23    were these collection efforts.  All of that is just for the

24    truth.

25              MR. FERGENSON:  It's——
```

1          MR. KAMARAJU:  So——excuse me.  May I finish, please.

2          MR. FERGENSON:  I'm sorry.

3          MR. KAMARAJU:  So if they're offering it for the

4   truth, then obviously it's hearsay.  If they're offering it for

5   state of mind, they would have to have some evidence that

6   Mr. Guo read it or saw it, which is consistent with your

7   Honor's prior ruling, and if they are offering it for some

8   other purpose, then they need to establish it.  But if they

9   really want to get into PAX's motivations for filing it, then

10  call a PAX witness.  But putting in a hearsay document because

11  they have concerns about the way we're going to sum up is not

12  the way the evidence works.

13         MR. FERGENSON:  We have no objection to your Honor

14  instructing the jury that this document is not coming in only

15  for its effects.

16         MR. KAMARAJU:  You still don't have evidence he read

17  it.

18         MR. FERGENSON:  This wasn't a third-party litigation.

19  Mr. Guo was the defendant.  This litigation was going on for

20  years.  He was threatened to be put in jail.  He filed an

21  answer.  He was deposed.  He was also served with the

22  complaint.

23         THE COURT:  All right.  I'm going to allow that.

24             (Continued on next page)

25

1              (In open court)

2              MR. FERGENSON:  The government offers Defense

3      Exhibit 7006.

4              THE COURT:  So the objection is overruled and the

5      document is admitted.

6              (Defendant's Exhibit 7006 received in evidence)

7              MR. KAMARAJU:  With a limiting instruction, your

8      Honor?

9              THE COURT:  Yes.  The complaint is not being offered

10     for the truth of the statements contained in the complaint,

11     only for its effect upon the reader.

12             MR. FERGENSON:  Thank you, your Honor.

13             Ms. Loftus, if we could scroll down.

14     BY MR. FERGENSON:

15     Q.  Now, Mr. Skalka, could you read paragraph 1, please.

16     A.  "This is a straightforward breach of contract case.  Kwok

17     Ho Wan—"

18     Q.  And you can skip the a/k/as.

19     A.  "—a reported billionaire, and his controlled entities

20     borrowed millions of dollars from plaintiff Pacific Alliance

21     Asia Opportunity Fund L.P. ('PAX LP') but have failed to pay

22     any of the amount owed to PAX LP under binding written

23     agreements."

24             MR. FERGENSON:  And if we could zoom out, Ms. Loftus.

25             Let's scroll down, please.

O6P1GUO2                          Skalka - Redirect

 1              Scroll down.  Keep scrolling down.

 2              And keep scrolling down, Ms. Loftus.

 3              Keep going, please.

 4              You can go more quickly.

 5              Yeah, keep going.

 6              All right.  I'm sorry.  Scroll back up, please.

 7    Sorry.

 8              One more.

 9    BY MR. FERGENSON:

10    Q.   Okay.  Now towards the bottom, Mr. Skalka, do you see the

11    bold that says "PAX LP seeks to enforce its contractual rights

12    and collect amounts owed"?

13    A.   I see that.

14    Q.   All right.  Can you read paragraph 38, please.

15    A.   "On October 16, 2015, after the Deeds of Settlement and

16    Option Agreement were terminated and the 2011 Facility Letter

17    reverted to being in full force and effect, PAX LP sent a

18    written notice of demand ('the Notice of Demand') to Kwok's

19    address in Hong Kong, as specified under the terms of the

20    personal guarantee."

21    Q.   Generally speaking, what's a notice of demand?

22    A.   It's a——in this case, written notice of demand is a letter

23    demanding a full payment, or payment on an obligation or a

24    debt.

25    Q.   And this was alleged to be sent in 2015, right?

O6P1GUO2                          Skalka - Redirect

1   A.   That's what the allegation is, yes.

2   Q.   And is that around a year and a half before the ultimate

3   filing of this lawsuit in April 2017?

4   A.   Yes.

5           MR. FERGENSON:   Let's zoom out, please.   Let's scroll

6   down.

7           Next page.

8   Q.   Can you read paragraph 40.

9   A.   "Kwok never responded to the Notice of Demand."

10  Q.   Can you read paragraph 41, please.

11  A.   "On February 19, 2016, PAX LP sent a letter to Shiny Times

12  demanding payment of $82,219,404.08 due and owing under the

13  2011 Facility Letter ('the Shiny Times Demand Letter'), which

14  represented the principal plus contractual interest of

15  15 percent per annum calculated up to the date of the Shiny

16  Times Demand Letter."

17  Q.   And February 2016, is that over a year before the ultimate

18  filing of this lawsuit in New York court?

19  A.   Yes.

20          MR. FERGENSON:   Can we zoom out, please.

21  Q.   Now can you read the first sentence of paragraph 43,

22  please.

23  A.   "When Shiny Times did not respond, PAX LP submitted an

24  application to court in the British Virgin Islands (BVI) on

25  February 29, 2016, seeking the appointment of joint liquidators

1    to put Shiny Times, which is a BVI corporation, into

2    liquidation.  The application alleged that (i)—"

3    Q.  And that's good, Mr. Skalka.

4            Is that also over a year before this New York State

5    court action was filed?

6    A.  It's about a year.

7            MR. FERGENSON:  All right.  We can take that down.

8    Q.  You were asked questions about whether—well, withdrawn.

9            MR. FERGENSON:  If we could pull up, Ms. Loftus,

10   Government Exhibit 1407 and go to page 7.

11           And if we could zoom on the bottom portion, Part 7.

12   Q.  Mr. Skalka, do you see the first sentence says, "I have

13   examined this petition, and I declare under penalty of perjury

14   that the information provided is true and correct"?

15   A.  Yes.

16   Q.  Is there any exception in this document for being targeted

17   by the CCP?

18   A.  No.

19   Q.  If you're targeted by the CCP, do the perjury laws not

20   apply?

21           MR. KAMARAJU:  Objection.  Calls for a legal

22   conclusion.

23           THE COURT:  Sustained.

24   Q.  Does this document say that the perjury laws do not apply

25   if you're targeted by the CCP?

O6P1GUO2                          Skalka - Redirect

1            MR. KAMARAJU:  Document speaks for itself.

2            THE COURT:  Sustained.

3    Q.  Now, Mr. Skalka, you were also asked questions about the

4    summary judgment ruling entered by Justice Ostrager?

5    A.  Yes.

6    Q.  And you were asked questions about how G|CLUBS didn't pay

7    that fine, correct?

8    A.  Correct.

9    Q.  Or, I'm sorry, that judgment.

10           And you were also asked the same about the contempt

11   fines, right?

12   A.  Yes.

13   Q.  You were asked how G|CLUBS didn't pay that and the Himalaya

14   Exchange didn't pay that, correct?

15   A.  Yes.

16   Q.  Who lent the money for the $37 million loan that kept the

17   PAX litigation stayed?  What was the entity?

18   A.  Himalaya International Finance or Financial Group.

19   Q.  Are you aware that that entity is connected to Himalaya

20   Exchange?

21   A.  I believe there is a connection.

22   Q.  By the way, do you know why Mei Guo needed a loan to pay

23   that money?

24   A.  Ms. Guo's attorneys had alleged in the bankruptcy

25   proceeding that the only asset of HK USA was the Lady May.

```
1    Q.  And do you know why Mei Guo didn't give HK USA the money
2    herself and instead got a loan?
3    A.  I do not.
4              MR. KAMARAJU:  Objection.  Calls for speculation.
5              THE COURT:  Sustained.
6              MR. FERGENSON:  I'm just asking if he knows.  He
7    doesn't know.
8    Q.  Do you know why the initial loan agreement said ACA
9    Capital?
10             MR. KAMARAJU:  Same objection.
11   A.  I don't.
12             THE COURT:  Sustained.
13   Q.  Do you know why it was changed to Himalaya International
14   Financial Group?
15             MR. KAMARAJU:  Same objection.
16             THE COURT:  Sustained.
17   Q.  You were also asked what happened ultimately to that
18   $37 million.  Why did the bankruptcy judge find it was part of
19   the bankruptcy estate?
20   A.  The judge made a finding that HK USA was an alterego of the
21   debtor and therefore the——made a finding that the Lady May was
22   property of Mr. Kwok's bankruptcy estate and the funds in
23   escrow were property of Mr. Kwok's bankruptcy estate.
24   Q.  You were asked several questions about the Office of the
25   U.S. Trustee, Department of Justice.
```

O6P1GUO2

1          THE COURT:  One moment.  It's time for our break.

2          MR. FERGENSON:  Oh.

3          THE COURT:  So members of the jury, don't discuss the

4     case amongst yourselves.  Don't permit others to discuss it in

5     your presence.  Don't read or watch or listen to anything from

6     any source that touches upon the subject matter of this case.

7          Sir, you can step out.  Don't discuss your testimony.

8          (Jury not present)

9          (Witness not present)

10          THE COURT:  You may be seated.

11          And we'll have a sidebar.

12          (Page 4162 SEALED by order of the Court)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
O6PBGUO3                        Skalka - Redirect
```

AFTERNOON SESSION

12:00 p.m.

1

2

3            THE COURT:  Please have the jurors brought in.

4            THE LAW CLERK:  Jury entering.

5            (Jury present)

6            THE COURT:  Please be seated.  Remember, sir, that

7    you're still under oath, and you may continue the redirect.

8            MR. FERGENSON:  Thank you.

9    BY MR. FERGENSON:

10   Q.  Mr. Skalka, you were also asked questions on cross about

11   the Office of the U.S. Trustee and bankruptcy proceeding?

12   A.  Yes.

13   Q.  Is that also the same or a different office from my office?

14   A.  It is different.  Their role is to oversee the

15   administration of bankruptcy in every federal district in the

16   country.

17   Q.  You also were asked on cross about how targeting by the CCP

18   and issues related to that made this bankruptcy unique.  You

19   remember those questions?

20   A.  Yes.

21   Q.  And you said I guess that could be one factor about what

22   made it unique.  What were some of the other factors that made

23   this bankruptcy unique?

24   A.  The fact that the debtor indicated that he had virtually no

25   assets on his bankruptcy schedule, but listed over $373 million

1    of liability.  It was unusual to me in my experience as a

2    bankruptcy attorney.  As I noted I believe earlier, the fact

3    that there were protest associated with the bankruptcy case was

4    unique.  To be frank, most bankruptcy cases are fairly dry.

5    They're disputes over money, so it's not uncommon to see a lot

6    of debts and disputes over how those debts are going to be

7    paid; but usually you don't see protests and bankruptcy courts

8    getting involved with providing restraining orders and First

9    Amendment right claim in a bankruptcy proceeding.  That's

10   unusual.

11              MR. FERGENSON:  No further questions.

12              THE COURT:  Recross.

13              MR. KAMARAJU:  Thank you, your Honor, just briefly.

14   RECROSS EXAMINATION

15   BY MR. KAMARAJU:

16   Q.  Can we have DX7006, please.  This is a complaint, right,

17   sir?

18   A.  Yes.

19   Q.  The complaint filed by PAX?

20   A.  Yes.

21   Q.  So PAX decides what to put in here, right?

22   A.  It's my understanding.

23   Q.  And these are PAX's allegations, right?

24   A.  Correct.

25   Q.  And you have no way of knowing if any of what's in here is

1   true, right?

2   A.  I know they're allegations, and I know what the court

3   found.  That's my knowledge.

4   Q.  An allegation is just an allegation, right?

5   A.  Yes.

6   Q.  And Mr. Guo denied the allegation, right?

7   A.  Correct.

8   Q.  And this complaint was filed online, correct?

9   A.  It was filed with the New York County clerk electronically,

10   but online, not necessarily on the internet.  What do you mean

11   by on line, I guess?

12   Q.  Not to get too inside baseball.  When you file something

13   electronically, you go on the internet and file it, right?

14   A.  Yes.

15   Q.  Can we pull up DX Stip 0001, please.  Can we go down.  You

16   see paragraph five there?

17   A.  Yes.

18   Q.  Could you read the first sentence?

19   A.  To carry out some of the objectives of Fox Hunt in 2017,

20   the PRC government tasked a specially designated group of

21   operatives, (the group) with discrediting and harassing

22   individuals, including Mr. Guo, by using interactive computer

23   services and electronic communication systems.

24   Q.  We can pull that down.  2017, that was the year that the

25   PAX litigation started, right?

O6PBGUO3                          Skalka - Recross

1    A.  Yes.

2    Q.  Can we go to the next paragraph.  Can you read the second

3    sentence, please?

4    A.  In May 2017, the PRC government sent four undeclared agents

5    from the PRC Ministry of State Security (MSS) to the United

6    States to attempt to cause Mr. Guo's coerced repatriation to

7    the PRC as part of a Fox Hunt initiative.

8    Q.  May 2017, that's the month after PAX filed its litigation,

9    right?

10   A.  I think it was a couple months after.  I believe it was

11   filed in February of 2017.

12           MR. KAMARAJU:  No further questions.

13           MR. FERGENSON:  Just one question.

14   REDIRECT EXAMINATION

15   BY MR. FERGENSON:

16   Q.  Mr. Skalka, are you a Chinese spy?

17   A.  No.

18           MR. KAMARAJU:  One last one.

19   RECROSS EXAMINATION

20   BY MR. KAMARAJU:

21   Q.  If you were a Chinese spy, would you tell us?

22           MR. FERGENSON:  Calls for speculation, your Honor.

23           THE COURT:  You may step out, and the government may

24   call its next witness.

25           (Witness excused)

1        MS. MURRAY:  Thank you, your Honor.  The government

2   calls Owen Foley.

3   OWEN FOLEY,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6            THE COURT:  Please state your name and spell it.

7            THE WITNESS:  Owen Foley, first name O-W-E-N, last

8   name F-O-L-E-Y.

9            THE COURT:  Mr. Foley, I need you to speak right into

10  the microphone.

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  You may inquire.

13           MS. MURRAY:  Thank you, your Honor.

14  DIRECT EXAMINATION

15  BY MS. MURRAY:

16  Q.  Good afternoon, Mr. Foley.

17  A.  Good afternoon.

18  Q.  Where do you work?

19  A.  I work at the United States Attorney's office for the

20  Southern District of New York.

21  Q.  What is your position at the U.S. Attorney's office for the

22  Southern District of New York?

23  A.  I'm a paralegal specialist.

24  Q.  What are your duties and responsibilities as a paralegal

25  specialist?

1    A.  Assisting the Assistant United States Attorney with

2    discovery legal process, trial preparation.

3    Q.  How long have you been a paralegal at the U.S. Attorney's

4    office for the Southern District of New York?

5    A.  Just about two years.

6    Q.  Besides your testimony today and preparation for that

7    testimony, did you have any involvement in this case?

8    A.  I did not, no.

9    Q.  In advance of your testimony, were you asked to review a

10   government exhibit and verify the accuracy of information in

11   it?

12   A.  I was.

13   Q.  And when were you asked to review that summary chart?

14   A.  Roughly a week ago.

15   Q.  Did you review the summary chart for accuracy?

16   A.  I did.

17   Q.  Is the summary chart based on voluminous records?

18   A.  It is.

19   Q.  Were those records provided to you by the government?

20   A.  They were.

21   Q.  What types of exhibits generally speaking is the summary

22   chart based on?

23   A.  They were loan payments.

24   Q.  Who decided which exhibits you reviewed and what

25   information to include in the summary chart?

O6PBGUO3                          Foley- Direct

1   A.  You did.

2   Q.  Did you note corrections to the summary chart to make sure

3   that it was accurate after your review?

4   A.  I did.

5   Q.  Was the chart revised to reflect your corrections?

6   A.  It was.

7   Q.  After the chart was revised, is it now accurate?

8   A.  Yes.

9   Q.  Just to be clear, Mr. Foley, did you review all of the

10  evidence gathered in the government's case here or just the

11  summary chart and the exhibits it's based on?

12  A.  Just the summary chart and the exhibits that it's based on.

13          MS. MURRAY:  Ms. Loftus, if you could please put up GX

14  Stip 8 which is in evidence.  It's a stipulation between the

15  parties.

16          This reads on page two that the parties stipulate and

17  agree that Government Exhibits 1601 through 1849 were lawfully

18  obtained by the government and are authentic business records

19  of the entity indicated on the face of the exhibit that were

20  made at or near the time by or from information transmitted by

21  a person with knowledge of the matter set forth in the record.

22  Such records were kept in the course of a regularly conducted

23  activity, and it was the regular practice of that entity to

24  make the records.

25          On the next page please, Ms. Loftus.  GX Stip 8 also

O6PBGUO3                          Foley- Direct

1  indicates that government exhibits listed in this stipulation,

2  including Government Exhibit 1601 through 1849, may be received

3  as evidence.  And your Honor, pursuant to Stip 8, at this time

4  the government offers the following government exhibits for

5  admission.  Government Exhibits 1628, 1630, 1631, 1632, 1634,

6  1636, 1637, 1639, 1643, 1644, and 1646.

7            MR. SCHIRICK:  No objection.

8            THE COURT:  They are admitted.

9            (Government's Exhibits 1628, 1630, 1631, 1632, 1634,

10  1636, 1637, 1639, 1643, 1644, and 1646 received in evidence)

11  BY MS. MURRAY:

12  Q.  Ms. Loftus, we can put that down, and if you could please

13  put up for the witness what's been marked as Government Exhibit

14  Z-13.

15            Mr. Foley, do you recognize the document in front of

16  you?

17  A.  I do.

18  Q.  Is that the summary chart you reviewed in preparation for

19  your testimony today?

20  A.  It is.

21  Q.  Did you review all of the exhibits this summary chart is

22  based on?

23  A.  Yes.

24  Q.  Are those exhibits indicated by exhibit number on this

25  chart?

O6PBGUO3                          Foley- Direct

```
 1   A.  Yes.

 2   Q.  Is the chart accurate based on your review?

 3   A.  It is.

 4           MS. MURRAY:  Your Honor, the government offers

 5   Government Exhibit Z-13.

 6           MR. SCHIRICK:  Your Honor, if I may have one moment?

 7           MS. MURRAY:  Could we just have a moment, please, your

 8   Honor.

 9           THE COURT:  Are you ready?

10           MS. MURRAY:  We just need another moment, your Honor.

11   Thank you very much.

12           THE COURT:  Okay.

13   Q.  Mr. Foley, if you could take a look at the document that's

14   on your screen.  This is marked for identification as

15   Government Exhibit Z-13, and I'm going to give it to defense

16   counsel to look at it as well.

17           Is this the summary chart that you reviewed in

18   preparation for your testimony?

19   A.  Yes.

20           MS. MURRAY:  Defense counsel is reviewing it before I

21   move to admit.  At this time, the government moves to admit

22   Government Exhibit Z-13.

23           MR. SCHIRICK:  No objection your Honor.

24           THE COURT:  It is admitted.

25           (Government's Exhibit Z-13 received in evidence)
```

O6PBGUO3                         Foley- Direct

1   BY MS. MURRAY:

2   Q.  If we could please publish.

3           Mr. Foley, looking at this summary chart, what is the

4   title of this chart?

5   A.  G/Club loan agreements and select investments.

6   Q.  And generally speaking, what type of agreements are

7   summarized in this exhibit Z-13?

8   A.  Various loans ranging from 1 million to 60 million U.S.

9   dollars.

10  Q.  And looking at the second column here, who is the lender of

11  the majority of these loans that are reflected on Z-13?

12  A.  G/Club Operations, LLC.

13  Q.  Mr. Foley, do you know what G/Club Operations, LLC is.

14  A.  I do not.

15  Q.  Looking at the borrower column, what is the borrower listed

16  as reflected for the majority of the loans?

17  A.  Majority of them are G/Club International Limited.

18  Q.  Mr. Foley, do you know what G/Club International Limited

19  is?

20  A.  I do not.

21  Q.  I'd like to look at the various different fields that are

22  reflected in this exhibit.  Starting on the left most column,

23  what information is reflected there for the loans that are

24  summarized here?

25  A.  The left most column is the date of the loan.

O6PBGUO3                        Foley- Direct

1   Q.  And then the next column, what is that information?

2   A.  The lender.

3   Q.  The third column, what does that indicate?

4   A.  The lender signatory.

5   Q.  And looking at rows two and three, is there --

6               THE COURT:  What does signatory mean?

7               THE WITNESS:  The name signed on the loan.

8               THE COURT:  Go ahead.

9               MS. MURRAY:  Thank you, your Honor.

10  Q.  Looking at rows two and three, there's no lender signatory

11  listed there, do you see that?

12  A.  Yes.

13  Q.  Going to the next column borrower, what information is

14  reflected there?

15  A.  The borrower was the name of the borrower listed in the

16  lease agreement in the underlying documents.

17  Q.  And then the next column, what individuals' names are

18  reflected there, if any?

19  A.  The borrower signatory.

20  Q.  And then the following column is titled fund receiver, what

21  information does that reflect from the loan agreements?

22  A.  The name of the individual or organization that was

23  designated as the fund receiver in the loan agreements.

24  Q.  In the following two columns first there's amount and then

25  currency.  Can you explain what information is reflected there?

1  A.  The amount was the amount listed on the underlying loan

2  agreement, and the currency was the currency of that amount.  A

3  majority are U.S. dollars.  There are payments for GPB and CHF

4  as well.

5  Q.  And finally the right most column, does that reflect the

6  government exhibit numbers of the supporting documents?

7  A.  Yes, it does.

8  Q.  We can take this down for a moment, Ms. Loftus.

9        I'd like to look at one of those underlying loan

10 agreements, Mr. Foley, and then, we'll look at the chart.

11 Ms. Loftus, if you could please pull up GXGC-515, and zoom in

12 on the text portion please.

13       Mr. Foley, what is the name of the entity listed at

14 the top of this document?

15 A.  Hamilton Digital Assets FD SP.

16 Q.  And do you know what Hamilton Digital Assets is?

17 A.  I do not.

18 Q.  What information does this reflect the first bold entry

19 here?

20 A.  The transfer is from G/Club Operations LLC.

21 Q.  And what is the transfer to based on this document?

22 A.  G/Club International Limited.

23 Q.  And the name of the fund?

24 A.  Hamilton Digital Assets FD SP.

25 Q.  Now looking at the effective date of the transfer, what

1    date is listed there?

2    A.   March 6, 2021.

3    Q.   And the next field indicates two dollar amounts with

4    different dates.  Can you read each of those, please?

5    A.   The first one is $20 million on May 6, 2021, and the second

6    is $15 million on May 13, 2021.

7    Q.   Mr. Foley, there are two signatures on this document who is

8    the first one based on the typed information below the line?

9    A.   Haoran He.

10    Q.   And what is the title listed for Haoran He there?

11    A.   UBO.

12    Q.   That's on behalf of which party to this agreement?

13    A.   The transferor.

14    Q.   The next signature, Mr. Foley, what's the typed name for

15    that one?

16    A.   Haoran He.

17    Q.   By what title?

18    A.   Director.

19    Q.   That's on behalf of what entity to this agreement?

20    A.   The transferee.

21    Q.   Ms. Loftus, if we could please pull up alongside Z-13.  If

22    we could focus in on the second and third rows of Z-13.  It's

23    fine if it kind of overlaps.

24            Mr. Foley, looking at these entries -- is there any

25    way to make it larger, Ms. Loftus.

1        Looking at these entries, the second and third entries
2   here on Z-13, do those reflect the information that we just
3   looked at in the legal agreement in GXGC-515?
4   A.  Yes.
5   Q.  And looking at the dates listed here, the first date in the
6   zoomed out portion is May 6, 2201, what is the dollar amount
7   that's listed for that particular entry?
8   A.  20 million U.S. dollars.
9   Q.  And looking at the document on the left, GXGC-515, where do
10  we see that information on the loan agreement?
11  A.  In the fifth bolded section under amount of transfer.
12  Q.  And same question with respect to the second row that's
13  highlighted from GX-Z-13 here, what is the date listed for that
14  entry?
15  A.  May 13, 2021.
16  Q.  And the dollar amount associated with that transfer?
17  A.  15 million U.S. dollars.
18  Q.  Where do we see that in the source document GXGC-515?
19  A.  Under the section of the amount of the transfer.
20  Q.  And looking at the portion of GXZ-13, the parties that are
21  listed here for fund receiver -- and, Ms. Loftus, perhaps we
22  can zoom out and zoom in including the header.
23        Fund receiver for these entries are listed as Hamilton
24  Digital Assets FD SP, where do we see that information
25  reflected in the loan agreement that's on the left?

1    A.  Beneath the third bolded section that says name of the

2    fund.

3    Q.  And then looking all the way to the right, Mr. Foley, the

4    GX number that's listed for those two entries, GXGC-515, is

5    that the government exhibit number for the source document that

6    we're seeing on the left of our screen?

7    A.  Yes.

8    Q.  Ms. Loftus, we can take up 515 and leave up Z-13.

9            Mr. Foley, generally speaking, the exercise that we

10   just went through, is that the process that you undertook to

11   verify the accuracy of the information in Z-13?

12   A.  It is.

13   Q.  If we could just read through some of the entries on this

14   chart, Mr. Foley.

15           So starting with the first entry, what was the date of

16   that loan agreement?

17   A.  January 15, 2021.

18   Q.  Who was the lender?

19   A.  G/Club Operation, LLC.

20   Q.  Who was the borrower for that loan?

21   A.  Jovial Century International Limited.

22   Q.  And what individual signed that loan agreement on behalf of

23   Jovial century International limited?

24   A.  Haoran He.

25   Q.  And who was listed in that loan agreement as the fund

1    receiver?

2    A.  Fiesta Property Developments, LTD.

3    Q.  And what was the amount and the currency for that loan?

4    A.  It was 10 million GBP.

5    Q.  Do you know what GBP stands for?

6    A.  I do not.

7    Q.  Ms. Loftus, could we please pull up GXGC-544.  That's the

8    source document for this entry.  If we can't do that, let's go

9    back to Z-13.  If we could zoom in on the text portion so it's

10   a bit larger, please.

11             Mr. Foley, on this document on the bottom left there,

12   do you see kind of a key that indicates what italic indicate on

13   this summary chart?

14   A.  Yes.

15   Q.  What do the italics indicate?

16   A.  The loan was not fully executed.

17   Q.  What does that mean not fully executed?

18   A.  It was missing one or more of the signatures.

19   Q.  And looking at the entries on this summary chart, are the

20   italics for the execution status of the loan documents, are

21   those listed in the GX column on the far right?

22   A.  Yes.

23   Q.  Now, the loans that are reflected on this summary chart,

24   Mr. Foley, what was the total US dollar and/or other currency

25   amount of loans that were fully executed based on the exhibits

O6PBGUO3                          Foley- Direct

1   you reviewed?

2   A.  Total was 110 million U.S. dollars and 10 million GBP.

3   Q.  And what was the total of the loans reflected on this chart

4   that were not fully executed either missing one or both

5   signatures?

6   A.  192 million U.S. dollars and 10 million CHF.

7   Q.  Do you know what CHF stands for?

8   A.  I do not.

9   Q.  And looking, Mr. Foley, at the next box, the total combined

10  for all of the loans reflected on this chart, what is the total

11  U.S. dollar amount and the total amount additionally in GBP and

12  CHF?

13  A.  302 million U.S. dollars, 10 million GBP and 10 million

14  CHF.

15  Q.  Focusing again on those first, or the second and third

16  entry that we looked at the document for the Hamilton Digital

17  Assets, Ms. Loftus, if we could please pull up GXSCB-13 and go

18  to the second page.  If we could zoom in on the text portion,

19  please.

20          Mr. Foley, have you ever seen this before?

21  A.  I have not.

22  Q.  What is the entity name listed on the top left here?

23  A.  Hamilton Digital Assets FD SP.

24  Q.  Looking on the right, what is the text that's indicated on

25  the right of this government exhibit?

O6PBGUO3                          Foley- Direct

A.  U.S. dollar transactions from January 1, 2021 to January
18, 2022.

Q.  Mr. Foley, the way you read the second date there, can you
explain why you read it in that manner?

A.  It's date, month, year.

Q.  Ms. Loftus, focusing on the first two lines here.

Mr. Foley, do you see that first entry, can you read
the transaction date and the value date?

A.  The transaction date was May 6, 2021 and the value was 20
million U.S. dollars.

Q.  And what is listed under payment receipt -- excuse me,
description?

A.  Payment receipt G/Club Operations, LLC.

Q.  Mr. Foley, same question for the second line there, what is
the transaction date listed?

A.  May 13, 2021.

Q.  What's the description of that particular transaction?

A.  Payment receipt G/Club Operations, LLC.

Q.  And then looking in the credit column, what is the amount
of that transaction?

A.  15 million U.S. dollars.

Q.  So let's go back please, Ms. Loftus, to Z-13.

Mr. Foley, the information we just saw on that bank
record, is that the same information reflected in the second
and third row of this summary chart?

1   A.  It is.

2   Q.  I'd like to look at one other example with you.  If we

3   could look a few rows down.  There's an entry on June 23, 2021.

4           Do you see that, Mr. Foley?

5   A.  Yes.

6   Q.  Can you read the lender for that particular transaction and

7   the lender signatory?

8   A.  The lender is G/Club Operations LLC and the lender

9   signatory is Limarie Reyes Molinaris.

10  Q.  And what is the borrower and the borrower signatory for

11  that entry?

12  A.  The borrower is G/Club International Limited and the

13  borrower signatory is Haoran He.

14  Q.  What's the fund receiver listed for this particular loan?

15  A.  Yieldesta LP.

16  Q.  Do you know what Yieldesta is?

17  A.  I do not.

18  Q.  Ms. Loftus, if we can pull up Government Exhibit 1639.  If

19  we could go to the next page, please.

20          Mr. Foley looking, at -- if we could zoom in on the

21  first two items on this page, please.  Looking at item one,

22  what is listed as the dollar amount of this loan?

23  A.  3 million U.S. dollars.

24  Q.  And under item two, can you read the first sentence of that

25  up until the words "registered address."

O6PBGUO3                         Foley- Direct

1    A.  The borrower intends to use the loan to invest in Yieldesta

2    LP (fund receiver) registered in Delaware USA and having its

3    registered address at.

4    Q.  We can zoom out of that.  Going to the first page focusing

5    on the top portion.  Pardon, the second page.

6            What is the effective date of this particular loan

7    agreement?

8    A.  June 21, 2021.

9    Q.  The lender entities that are listed here?

10   A.  G/Club Operations LLC.

11   Q.  And the borrower entities that are listed here?

12   A.  G/Club International Limited.

13   Q.  Ms. Loftus, we can zoom out of that.

14           Finally, Mr. Foley, there's an entry on Z-13, if we

15   can pull that up, Ms. Loftus.  It's on the bottom quarter of

16   the chart.  The date is November 23, 2021.  Do you see that?

17   A.  Yes.

18   Q.  What is the lender for that loan and the lender signatory?

19   November 23, 2021 is what we're looking at.

20   A.  The lender is G/Club Operations LLC, and the lender

21   signatory is Limarie Reyes Molinaris.

22   Q.  And the borrower and the signatory for the borrower to that

23   loan?

24   A.  The borrower is G/Club International Limited, and the

25   borrower signatory is Haoran He.

O6PBGUO3                           Foley- Direct

1   Q.  And what is the dollar amount of that loan from G/Club

2   Operations LLC to G/Club International Limited?

3   A.  50 million U.S. dollars.

4   Q.  Ms. Loftus, if we could please go to Government Exhibit

5   MER-204 and go to row 135.

6            Mr. Foley, have you ever seen this document before?

7   A.  No, I have not.

8   Q.  There are some column titles along the top row one in this

9   document. Do you see the title for the column B entity?

10  A.  Yes.

11  Q.  What is listed as the entity for the row that's highlighted

12  row 135?

13  A.  G/Club International Limited.

14  Q.  And what is the date listed?

15  A.  December 2, 2021.

16  Q.  What type of transaction does this reflect?

17  A.  A withdrawal.

18  Q.  And what is the dollar amount of that withdrawal?

19  A.  50 million.

20  Q.  Thank you, Ms. Loftus.  We can go back to Z-13 one more

21  time.

22            Mr. Foley, on this exhibit there are a couple of

23  asterisks that are indicated and some text on the bottom left.

24  Do you see that?

25  A.  Yes.

1   Q.  Is that information that's reflected in the source loan

2   documents that you reviewed?

3   A.  It is.

4   Q.  And does that indicate that certain of these entries

5   reflect amendments to other entries that are the loan chart?

6   A.  Yes.

7   Q.  Mr. Foley, looking at the last entry as an example,

8   borrower and borrower signatory are listed as Quiang Guo. Do

9   you see that?

10  A.  Yes.

11  Q.  Do you know who that individual is?

12  A.  I do not.

13          MS. MURRAY:  May I have a moment, your Honor.

14          THE COURT:  You may.

15          MS. MURRAY:  Thank you, your Honor.

16  Q.  Mr. Foley, aside from your testimony today, do you have any

17  knowledge of any facts in this case?

18  A.  I do not.

19  Q.  Did you have any involvement in the government's

20  investigation in this case beyond reviewing the summary chart

21  and the underlying exhibits for accuracy?

22  A.  No, I did not.

23          MS. MURRAY:  Nothing further, your Honor.

24          THE COURT:  Cross examination.

25  CROSS-EXAMINATION

1    BY MR. SCHIRICK:

2    Q.  Good afternoon, Mr. Foley.

3    A.  Good afternoon.

4    Q.  You testified that you're a paralegal with the U.S.

5    Attorney's office?

6    A.  Correct.

7    Q.  That the government lawyer first asked you to testify in

8    this case just about a week ago, right?

9    A.  Correct.

10   Q.  And you didn't really know anything about this case before

11   the folks sitting at the government table asked you to testify,

12   fair?

13   A.  Correct.

14   Q.  And you didn't do any paralegal work for the folks sitting

15   at the government's table in connection with this case?

16   A.  I did not, no.

17   Q.  And you didn't investigate any of the loans or investments

18   that we just -- or that you just went through in the chart,

19   fair?

20   A.  Fair.

21   Q.  And so really the only thing that you know is what I think

22   we sort of covered on direct is what the government lawyers

23   showed you, fair?

24   A.  Correct.

25   Q.  Now, how many times did you meet with the government

1  lawyers before you testified here today?

2  A.  Two to three times.

3  Q.  Including this morning?

4  A.  Not this morning, no.

5  Q.  Yesterday?

6  A.  Briefly maybe.

7  Q.  Fair enough.  Now, the chart GXZ-13 that you just looked at

8  a few moments ago, you didn't make that chart, right?

9  A.  No, I did not, no.

10 Q.  Who made it?

11 A.  AUSA Julie Murray.

12 Q.  And how many drafts of this draft were there?

13 A.  I'm not aware of how many drafts there were before it was

14 given to me.

15 Q.  Unfair question.  How many drafts are you aware of?

16 A.  Three.

17 Q.  And you were only asked to review the chart for accuracy

18 based on the information that you were given, right?

19 A.  Correct.

20 Q.  And is it fair to say that you were only given the

21 documents that showed up in the far right-hand column of that

22 chart?

23 A.  Correct.

24 Q.  And if we could just pull up the chart for reference

25 briefly.  Just to be clear for the jury, when I said the

1   columns in the far right column, that's the GX column, right?

2   A.  Correct.

3   Q.  That's all you had access to?

4   A.  Yes.

5   Q.  Now, as a result, you didn't really review any additional

6   G/Club document that might have been related to these loans,

7   fair?

8   A.  Fair, just the items in the far right column.

9   Q.  You didn't have access to a review, for example, of any

10  related corporate resolutions?

11  A.  No.

12  Q.  Or any related email correspondence?

13  A.  No.

14  Q.  Or any other documents that may have explained what the

15  reasons or purpose of any of the transactions were, right?

16  A.  No.

17  Q.  And you also didn't review any bank records; is that fair

18  too?

19  A.  No.

20  Q.  Is it accurate to say you didn't review any bank records

21  just to be clear?

22  A.  Just the loan records here.

23  Q.  Now, we'll just go back to the chart here briefly.  At the

24  top the title reads G/Club loan agreements and select

25  investments, right?

1   A.  Correct.

2   Q.  And select investments withdrawn.

3        The "select investments" that are referred to in the

4   title in this chart, those were selected by the prosecutors,

5   right?

6   A.  Yes.

7   Q.  So it's not all investments, right, as far as you know?

8   A.  I have no knowledge of that.

9   Q.  In any event, the chart says select investments?

10  A.  Yes.

11  Q.  I want to clarify one thing that I think you testified to

12  on direct just to be clear.  I believe you may have testified

13  that the documents that you looked at were loan payments.

14       Now I think we just cleared up that you didn't really

15  look at any payments, right?

16  A.  They were loan agreements.

17  Q.  Loan agreements.  You didn't look at bank records, so you

18  don't know whether there were actually any payments related to

19  these loan agreements, right?

20  A.  Correct.

21  Q.  Just to be clear, we're not talking about payments when we

22  looked at this schedule?

23       MS. MURRAY:  Asked and answered.

24       THE COURT:  Sustained.

25  Q.  I'll move on.  Now, there are two separate G/Club entities

O6PBGUO3                          Foley - Cross

1   listed in this chart; is that right?

2   A.  Correct.

3   Q.  G/Club Operations?

4   A.  Yes.

5   Q.  If we're focusing on the first row under lender, and then

6   there's G/Club International Limited, for example, on the July

7   26, 2021 entry, right?

8   A.  Correct.

9   Q.  And those are different entities, right?

10  A.  They have different names.

11  Q.  As far as you know different entities?

12          MS. MURRAY:  Asked and answered.

13          THE COURT:  Sustained.

14  Q.  Now, the loans for both of these entities are put together

15  in the same chart though, right?

16  A.  Yes.

17  Q.  Now, if we could just highlight the first row the January

18  15, 2021 row.

19          Now, with the exception of row one that we're looking

20  at here, for every loan that this chart says that G/Clubs

21  Operations made, G/Clubs International is the borrower; is that

22  right?

23          And I want you to take a second to look at it closely

24  to make sure that you understand.

25  A.  Sorry.  Could you repeat the question one more time.

O6PBGUO3                         Foley - Cross

```
 1   Q.  Sure.  And I think if we move that up so the witness can
 2   take a look at the chart.  Can you see the balance of the chart
 3   here?
 4   A.  Yes.
 5   Q.  So the question is, for every loan made by G/Clubs
 6   operations, G/Clubs International is the borrower?
 7   A.  That is correct.
 8   Q.  And to your understanding is G/Club International the sole
 9   member of G/Clubs Operations?
10   A.  I have no knowledge of that.
11   Q.  Well, let's see if we can pull up GX1630.  If we can go to
12   page two, please.
13           Now, GX1630 is among the documents that you reviewed
14   in preparing this chart, right?
15   A.  Correct.
16   Q.  And if we can please zoom in on the top where it says
17   lender and borrower, if we can just focus on the whereas clause
18   that's in the middle there under recitals.
19           Do you see there at the top where it says, Whereas the
20   borrower is lender's sole member?
21   A.  Yes.
22   Q.  Does that indicate to you that the borrower here G/Club
23   International is the sole member of G/Clubs Operations?
24           MS. MURRAY:  Objection, your Honor, document speaks
25   for itself.
```

1          THE COURT:  Sustained.

2   Q.  Do you see that there?

3   A.  Yes.

4   Q.  Now, the sole member means that G/Club International owns

5   G/Club Operations, right?

6          MS. MURRAY:  Objection, your Honor.

7          THE COURT:  Sustained.

8          MR. SCHIRICK:  I'm asking his understanding.  He put

9   together the chart.

10          MS. MURRAY:  Your Honor, that misrepresent his

11   testimony.  He verified the accuracy of the chart.  He did not

12   prepare it.  This is beyond direct.

13          MR. SCHIRICK:  I didn't characterize his testimony.

14   I'm asking his understanding.

15          THE COURT:  Do you understand?

16          THE WITNESS:  Do I understand what the borrower is the

17   lender's sole member means?

18          THE COURT:  Is that the question?

19   Q.  I'm asking if he understands that that means that G/Clubs

20   International owns G/Clubs Operation as the sole member,

21   there's no other members?

22   A.  I have no way of verifying that.

23   Q.  Do you know what "member" means in the context of a limited

24   liability corporation?

25   A.  Not in this context, no.

O6PBGUO3                        Foley - Cross

1  Q.  So you reading what we just reviewed on GX1630, that

2  doesn't mean anything to you about the ownership of the

3  entities?

4           MS. MURRAY:  Asked and answered.

5           THE COURT:  Sustained.

6  Q.  Now, if we go to -- I'll move on from this.  If we can

7  please go to pull up -- actually, you know what, let's do this

8  quickly.

9           If we can go back to 1630 and scroll to page two.

10  We're going to go to GC-544.  Again, Mr. Foley, this is one of

11  the documents that your reviewed in connection with the chart?

12  A.  I believe so, yes.

13  Q.  And now this is called a facility agreement.  Do you see

14  that?

15  A.  Yes.

16  Q.  And it's entered into between three entities, G/Club

17  Operations, Jovial Century International Limited and Fiesta

18  Property Developments.  You see that?

19  A.  Correct.

20  Q.  If we can scroll down to page two under parties, and we can

21  see here that the lender is G/Clubs Operations?

22  A.  Correct.

23  Q.  And the borrower is Jovial Century International, right?

24  A.  Correct.

25  Q.  And if we go to the top of the -- if we go down a little

1    bit further, the fund receiver is Fiesta Property Development

2    right?

3    A.  Yes.

4    Q.  Now if we scroll down to the background section, you see

5    the background section?

6    A.  Yes.

7    Q.  And it says there, the borrower is the 100 percent

8    shareholder of lender, right?

9    A.  Yes.

10   Q.  Does that mean to you that Jovial, which is the borrower,

11   is the 100 percent owner of G/Clubs Operation?

12          MS. MURRAY:  Your Honor, objection.  The document

13   speaks for itself.

14          THE COURT:  Sustained.

15   Q.  We'll keep reading here.  The next sentence says, the

16   ultimate beneficial owner of the borrower is the same as that

17   of the fund receiver.  Do you see that?

18   A.  Yes.

19   Q.  Do you know what ultimate beneficial owner means?

20   A.  Not in this context.

21   Q.  I believe you testified on direct that Mr. He was the

22   ultimate beneficial owner of one of the entities?

23          MS. MURRAY:  Objection, mischaracterizes his

24   testimony.

25          THE COURT:  Sustained.

1  Q.  The relationship between and amongst the entities listed in

2  this chart, if any, isn't displayed in the chart; is that fair?

3  A.  Just the relationship of lender and receiver.

4  Q.  So, in other words, just to be clear, in other words to the

5  extent that some or more than one of these entities owns the

6  other entities or has an interest in the other entities, that's

7  not reflected in the chart?

8  A.  Yes.

9  Q.  Is it also true that the terms of the loan agreements are

10  not reflected in this chart?

11  A.  That is correct.

12  Q.  Now, if we just go back to the chart GXZ-13.

13          Now, is it fair to say that with the exception of the

14  first entry in this chart for which the underlying agreement we

15  just reviewed, is that fair, we just reviewed that underlying

16  agreement?

17  A.  Yes.

18  Q.  With the exception of that entry and agreement, this chart

19  does not reflect any of the underlying agreements between the

20  borrower and the fund receiver?

21          MS. MURRAY:  Objection to form, your Honor.

22          THE COURT:  Sustained.

23  Q.  Does the chart, apart from the first entry, reflect any

24  relationship between the borrower and the fund receiver?

25          MS. MURRAY:  Object to form.  Again, I'm not sure what

1   the question is.

2   Q.  I'll back it up.  So the chart reflects a relationship

3   between the lender and the borrower, right, like it

4   characterizes one entity as the lender and it characterizes

5   another as a borrower?

6   A.  Correct.

7   Q.  It's reflecting a relationship between the two entities?

8           MS. MURRAY:  Objection to the follow-up question about

9   the relationship.

10          THE COURT:  So you can take the questions separately.

11  He answered yes to the characterization of one party as the

12  lender and the other as the borrower.  Now you can ask the

13  relationship question.

14  Q.  Sure.  One column shows that a certain set of entities is

15  the lender and the other column shows that the other set of

16  entities is a borrower, fair?

17  A.  Yes.

18  Q.  Would you agree with me that that means that the chart

19  reflects the nature of the relationship between them as to the

20  transactions listed here?

21  A.  Yes.

22  Q.  Now, if we move to the right with this chart, the

23  relationship between the borrower entity in that column and the

24  relationship between the fund receiver entity is not reflected

25  in this chart, right?

1              MS. MURRAY:  Objection to form again.

2              THE COURT:  If you know you may answer.

3    A.  I'm not sure what the relationship between the borrower and

4    fund receiver is.

5    Q.  Right.  The chart doesn't say what the relationship is

6    between the borrower and fund receiver is?

7              MS. MURRAY:  Asked and answered.

8              THE COURT:  Sustained.

9              MR. SCHIRICK:  Your Honor, I'm just clarifying the

10   witness's answer.  That's all.

11             THE COURT:  You're asking the question a second time.

12   That's what you're doing.

13   Q.  For example, you can't tell from this chart why the fund

14   receiver, again apart from the first entry, why the fund

15   receiver received the funds or why the borrower may have

16   engaged in a transaction with the fund receiver, right?

17             MS. MURRAY:  Calls for speculation.

18             THE COURT:  You can ask him what the document states.

19   Is that what you're asking?

20             MR. SCHIRICK:  I believe that's what I asked, your

21   Honor, whether one can tell from the chart.

22             THE COURT:  Well, that's a different question.  You're

23   asking whether a person can interpret the chart to mean a

24   certain thing.

25             MR. SCHIRICK:  Your Honor, I believe he testified to

1    the creation of this chart.  I'm just asking whether he can

2    tell, the person who helped create it, what the relationship is

3    between the fund receiver and the borrower.

4              MS. MURRAY:  Again, your Honor, mischaracterizes

5    Mr. Foley's testimony and his role.  He did not create the

6    chart.

7              THE COURT:  He did not create the chart.

8              MR. SCHIRICK:  But he's familiar with the chart.

9              THE COURT:  Yes, to the extent of his limited role.

10             MR. SCHIRICK:  Sure.  Your Honor, I think it's fair to

11   ask whether given his role in helping to work on this chart

12   whether he can tell something that maybe I can't tell from it.

13             THE COURT:  Well, you're asking him to interpret the

14   chart.

15             MR. SCHIRICK:  As someone who helped create it,

16   someone who had a hand in generating.

17             THE COURT:  Yes, he played a role in generating the

18   chart.  Were you asked to interpret the chart?

19             THE WITNESS:  No, just verify for accuracy.

20             THE COURT:  Move on.

21   BY MR. SCHIRICK:

22   Q.  Is it fair to say that there are no agreements between the

23   entities listed as borrowers and the entities listed as

24   receivers or you just don't know?

25   A.  I do not know.

1  Q.  So if there were other contracts that govern the

2  relationship as entities listed as borrower and an entity

3  listed as fund receiver, that's just something you don't know

4  about, right?

5  A.  I only reviewed the underlying exhibits listed on the

6  right-hand side.

7  Q.  And the government gave you those underlying exhibits,

8  right?

9  A.  Correct.

10 Q.  Now I like to draw your attention to the second and third

11 rows of the chart.  The second row, if we can just highlight

12 briefly is dated May 6, 2021, and the third row is dated May

13 13, 2021?

14 A.  Correct.

15 Q.  And in both of these rows, the lender is G/Clubs

16 Operations, right?

17 A.  Yes.

18 Q.  And there is no lender signatory indicated in the chart,

19 right?

20 A.  Correct.

21 Q.  And the fund receiver is Hamilton Digital Asset FD SP,

22 right?

23 A.  Correct.

24 Q.  And the first entry is for 20 million?

25 A.  Yes.

O6PBGUO3                          Foley - Cross

1   Q.  And the second entry is for 15?

2   A.  Yes.

3   Q.  Can we please pull up GXGC-515.  If we can blow up the

4   relevant portion of that.

5          Now, it doesn't say anywhere on this document that

6   this is a loan, right?

7   A.  No, it does not.

8   Q.  It doesn't say borrower here anywhere, right?

9   A.  No, it doesn't.

10  Q.  Doesn't say lender here anywhere?

11  A.  It does not.

12  Q.  This is a letter of direction, right?

13  A.  Correct.

14  Q.  But this is included in the chart that we looked at labeled

15  loans, right?

16  A.  Yes, I believe it was labeled loans and select investment.

17  Q.  Is there anything on the face of this document that we're

18  looking at right now which was included as an underlying

19  exhibit to the chart that indicates that this transaction was a

20  loan?

21         MS. MURRAY:  Asked and answered, your Honor.

22         MR. SCHIRICK:  I don't think I asked that particular

23  question.

24         THE COURT:  Sir, do you hold a license to practice law

25  in the state of New York?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6PBGUO3                          Foley - Cross

1              THE WITNESS:  No, I do not.

2              THE COURT:  Don't ask him legal questions.

3   Q.  If we could just hold onto this document, but also bring up

4   alongside it Government Exhibit 1630 and go to the last page,

5   the signature page if we could.  It may be the second to last

6   page.

7              Now, this is another one of the documents, 1630,

8   that's included as a source document for the chart?

9   A.  Correct.

10  Q.  And you see here on the signature line it says lender

11  G/Club Operations?

12  A.  Yes.

13  Q.  And on the other signature line it says borrower G/Club

14  International?

15  A.  Yes.

16  Q.  Now, you don't see similar words on the other exhibit

17  GXGC-515, right?

18  A.  No.

19  Q.  And we can take that down.  Thank you.  And if we could

20  please go back to the chart GXZ-13.  If we can go to the entry

21  dated July 21, 2021.

22             This list the lender as G/Club Operations.  I'm sorry,

23  the July 21 entry, not 26.  So this shows that G/Club

24  Operations is the lender, right?

25  A.  Correct.

O6PBGUO3                        Foley - Cross

1   Q.  And the borrower is G/Club International?

2   A.  Yes.

3   Q.  And borrower signatory is Mr. He?

4   A.  Yes.

5   Q.  And the fund receiver is Himalaya International Clearing

6   Limited, right?

7   A.  Yes.

8   Q.  And the amount is for $25 million, right?

9   A.  Yes.

10  Q.  And this row summarizes the source document GXGC-221,

11  right?

12  A.  Yes.

13  Q.  If we can just please go quickly to GXGC-221.  If we can go

14  to page four of the pdf which is the first page of the

15  agreement.

16          This is a loan agreement between G/Club Operations and

17  G/Club International, right?

18  A.  Yes.

19  Q.  Now, if we can just go to the second to last page of this,

20  the signature page.

21          And this I believe you testified on direct that there

22  were some agreements that didn't have -- withdrawn.

23          You testified on direct that there were some

24  agreements that weren't fully executed, right?

25  A.  Correct.

1    Q.  And is this one of those?

2    A.  Yes.

3    Q.  Now, if we can go back to the beginning of the document to

4    the Whereas clauses, and we can just focus on the second

5    whereas clause.

6            It says, Subject to the terms of this agreement,

7    lender will loan $25 million to borrower, right?

8    A.  Yes.

9    Q.  And it says, Whereas for efficiency purpose and pursuant to

10   borrower's request, lender will send the loan proceeds directly

11   to the Himalayan International Clearing on borrower's behalf.

12   You see that?

13   A.  Yes.

14   Q.  Now, let's go back to the summary chart GXZ-13.  And if we

15   go down to the entry dated July 27, 2021.  There's that little

16   asterisk there.  You see that?

17   A.  Yes.

18   Q.  And if we go down to the key at the bottom of the chart

19   that asterisk indicates the amendment.  This agreement is an

20   amendment to the July 21, 2021 agreement?

21   A.  Yes.

22   Q.  We just looked at the July 21st agreement, right?

23   A.  Correct.

24   Q.  Now let's look at the July 27 agreement, and if we can just

25   pull up before we look at the agreement itself, July 21 entry

O6PBGUO3                          Foley - Cross

 1    and the July 27 entry, and all the way up to the 21st entry.

 2    And now we'll just looking at the entry for the July 21st and

 3    July 27 entry carefully.

 4              Is it fair to say that the only difference between

 5    these is that there's a different fund receiver?

 6    A.  The fund receiver, the date, and the underlying government

 7    exhibit number.

 8    Q.  Yes.  Thank you.  You're right.  The only difference in the

 9    terms of the loan is the fund receiver, right?

10              THE COURT:  Here we go again.  He's not an attorney.

11    He cannot give you legal definitions.  He cannot define the

12    terms.

13              MR. SCHIRICK:  Your Honor, I'm sorry.  I wasn't asking

14    him to define terms.  I was asking him to verify that the only

15    difference in the entries on the chart.

16              THE COURT:  He can read.  He can tell you what is on

17    the chart.

18    Q.  So the difference here is that Yieldesta is the fund

19    receiver, right?

20              MS. MURRAY:  Asked and answered.

21              THE COURT:  Sustained.

22    Q.  Let's just pull up now the underlying exhibit which is

23    GX1636, if we can just blow up the recitals there, and it says,

24    Whereas the parties entered into the loan agreement on July 21.

25    You see that?

O6PBGUO3                        Foley - Cross

1    A.  Yes.

2    Q.  And again, that's the other agreement that we looked at,

3    right, a second ago?

4              MS. MURRAY:  Your Honor, objection.  Mr. Foley is a

5    summary witness and these documents speak for themselves.

6              THE COURT:  Sustained.

7    Q.  If we go down to the final whereas clause it says, The

8    parties wish to amend the agreement to authorize and direct the

9    lender to send $25 million of loan proceeds of the agreement

10   directly to Yieldesta instead of the Himalayan International

11   Clearing Limited?

12             MS. MURRAY:  Same objection, your Honor.

13             THE COURT:  I haven't heard the question yet.

14             MR. SCHIRICK:  I'm simply asking him to confirm that

15   I've read that correctly.

16             MS. MURRAY:  Same objection.

17             THE COURT:  So the document speaks for itself.

18             MR. SCHIRICK:  Your Honor, may we have a brief

19   sidebar?

20             THE COURT:  Yes.

21             (Continued on next page)

22

23

24

25

1                (At the sidebar)

2                MR. SCHIRICK:  Your Honor, the last question was

3     merely to ask the witness if I read that correctly. Even with a

4     summary witness my understanding is that I'm permitted to ask

5     the witness if I read the document correctly. It's one of the

6     source documents in the chart, and I'm trying to show that

7     there were changes in the agreements that are not reflected in

8     the chart.  And I'm not sure how I can do that without being

9     able to question the witness about what the underlying

10    documents are.

11                THE COURT:  So the chart list the underlying

12    documents?

13                MR. SCHIRICK:  Correct, and I'm going through them to

14    show that there are changes in the transactions that are not

15    reflected in the chart.  And it goes directly to the integrity

16    of the chart, the reliability of the chart, which is I think is

17    highly relevant.

18                MS. MURRAY:  Your Honor, the continued objections to

19    documents speak for themselves is largely for efficiency.  This

20    is a summary witness.  He's testified to verifying the accuracy

21    of the chart.  We've moved in the exhibits that support the

22    entries in the chart, and they are listed.  So the defense can

23    go and look at those underlying exhibits.  But Mr. Foley simply

24    confirm the accuracy of what's in the chart itself, and I don't

25    see from what Mr. Schirick is saying that the chart is

1  inaccurate.  Based on the documents, it accurately reflects the

2  charts in the document.

3       MR. SCHIRICK:  If I can respond to that, your Honor,

4  that is where I'm going because I believe the chart is

5  inaccurate.  The only way I can do that and show that through a

6  witness is to be able to ask the witness questions about the

7  underlying document.  I understand the government has to object

8  where it needs to object, but I would be through this already

9  if there weren't continued objections about me just trying to

10 establish underlying facts.

11      THE COURT:  So he can read the title of a document.

12 He can read from a document, but he can't tell you what it

13 means.

14      MR. SCHIRICK:  I understand.  Your Honor has made that

15 point, and I think what I'm doing here, I haven't asked a

16 question.  You can check the record.  I have not asked a

17 question about what anything means.  I'm simply asking him to

18 confirm that that information is in the underlying document.

19      MS. MURRAY:  With respect to the particular issue that

20 was in the last question, I'm not clear what information

21 Mr. Schirick is saying is inaccurate in the chart.

22      MR. SCHIRICK:  We haven't gotten through the cross

23 yet.  I'm trying to elicit it through the witness, which is the

24 only way I have to do it.

25      MS. MURRAY:  Sure, but looking at, for example, the

 1    recitals that you just read and asking Mr. Foley to confirm,

 2    what part of that language from the document are you going to

 3    say is inaccurate in the chart itself?

 4              MR. SCHIRICK:  There are two purposes in this cross,

 5    right, generally speaking.  One is to show that there is

 6    information that is not in the chart so that I can demonstrate

 7    to the jury that there will be information outside of the four

 8    corners of that document that may be relevant to interpreting

 9    what's inside the document.  I should be entitled to do that.

10    The second is to show that there are inaccuracies in the chart.

11    What you're just referring to is not in -- reading the recitals

12    was not to show that the document was inaccurate.  It was to

13    show that there was other information that was not in the

14    chart. So those are the two purposes.

15              THE COURT:  So the other information that's not in the

16    chart, there's plenty of information that's not in the chart.

17    There are whole documents that are not in the chart.  That's

18    why he's a summary witness.

19              MR. SCHIRICK:  Your Honor, if there is -- the defense

20    is entitled to argue that there is other information that's

21    relevant to --

22              THE COURT:  You do that at summation for goodness

23    sake.  If you want to lose the jury completely, keep it up.  Go

24    ahead.  Go ahead.

25              (Continued on next page)

1            (In open court)

2            THE COURT:  All righty.  Go ahead.

3            MR. SCHIRICK:  Thank you.

4  Q.  Do you see, Mr. Foley, the portion of the document that's

5  highlighted on your screen there?

6  A.  Yes.

7  Q.  And it says, Whereas the parties wish to amend the

8  agreement.  Do you see that?

9  A.  Yes.

10 Q.  Now, if we can just please pull up GXGC-221, page two, side

11 by side with GX-1636.  Now GX -- actually, if it's possible to

12 switch these.  If not, that's fine.

13            Is it fair to say based on the passage that we just

14 read that the document and loan agreement dated July 27, 2021

15 replaced the loan agreement dated July 21, 2021?

16            THE COURT:  One moment, please.

17            (Pause).

18            THE COURT:  Go ahead.

19 A.  It's fair to say it's an amendment to.

20 Q.  And so it changed the previous agreement, right, that's

21 what amendment means?

22            THE COURT:  You're asking for a legal conclusion.

23            MR. SCHIRICK:  Your Honor, he testified it's an

24 amendment.

25            THE COURT:  That's right.  He's testifying to what the

O6PBGUO3                          Foley - Cross

1   document states.

2   BY MR. SCHIRICK:

3   Q.  Now, if we go back to the summary chart GXZ-13 and we focus

4   on the two lines July 21 and July 27, 2021.  Now both of those

5   entries are for $25 million.  Is that right?

6   A.  That is correct.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6P1GUO4                          Foley - Cross

1    BY MR. SCHIRICK:

2    Q.  And one of those agreements, the later agreement, changed

3    the earlier agreement, right, as you testified before?

4              MS. MURRAY:  Objection, your Honor.  Mischaracterizes.

5              THE COURT:  Sustained.

6    Q.  I believe you testified that it amended the earlier

7    agreement?

8              MR. SCHIRICK:  Those were the witness's words, I

9    believe.

10             MS. MURRAY:  Yes, your Honor, which is different than

11   changed.

12             THE COURT:  Amended is one word, changed is another.

13             MR. SCHIRICK:  Okay.

14   BY MR. SCHIRICK:

15   Q.  So the later agreement amended the earlier agreement, yet

16   we still have $25 million in the amount column for each

17   agreement, right?

18   A.  Correct.

19   Q.  Okay.  So that total calculation at the bottom of GX Z13 is

20   overstated by at least 25 million then, correct?

21   A.  That I——I have no knowledge of.

22   Q.  Isn't this double-counting?

23   A.  I——I have no way to confirm whether or not the payments

24   went through.

25   Q.  Right.  Because you can't tell from this chart whether

1    there were actual transactions, right?  This is just the loan

2    agreements themselves, just the paper.

3    A.  This was the amount listed on the loan agreement, yes.

4             MR. SCHIRICK:  Okay.  Thank you.  No further questions

5    at this time.

6             MS. MURRAY:  No redirect, your Honor.

7             THE COURT:  Thank you.  You may step out.

8             THE WITNESS:  Thank you.

9             (Witness excused)

10            THE COURT:  You may call your next witness.

11            MS. MURRAY:  Thank you, your Honor.  The government

12   calls Daniel Copeland.

13            (Witness sworn)

14            THE COURT:  Please state your name and spell it.

15            THE WITNESS:  My name is Daniel Copeland.

16   D-A-N-I-E-L, Copeland, C-O-P-E-L-A-N-D.

17            THE COURT:  You may inquire.

18            MS. MURRAY:  Thank you, your Honor.

19    DANIEL COPELAND,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MS. MURRAY:

24   Q.  Good afternoon, Mr. Copeland.

25   A.  Good afternoon.

O6P1GUO4                          Copeland - Direct

1   Q.  If I could ask you to pull the microphone in front of you

2   and speak directly into it, please.

3   A.  Is that better?

4   Q.  That's better.  Thank you.

5          Mr. Copeland, how old are you?

6   A.  I am 29.

7   Q.  Where do you live?

8   A.  I live in Cambridge, Massachusetts.

9   Q.  Do you work?

10  A.  I do.

11  Q.  What is your profession?

12  A.  I'm a researcher at MIT.

13  Q.  What is your educational background?

14  A.  I studied mechanical engineering at Vanderbilt, became

15  interested in medical devices, got a MD at Tufts, and then just

16  received a master's in mechanical engineering at MIT, where I'm

17  working now.

18  Q.  Mr. Copeland, are you married?

19  A.  Yes.

20  Q.  What is your wife's name?

21  A.  Isabelle Despins.

22  Q.  How do you spell Despins?

23  A.  D-E-S-P-I-N-S.

24  Q.  Does your wife work?

25  A.  She does.

1    Q.   Where does she work?

2    A.   She works at Cambridge Public Schools, Kennedy-Longfellow

3    School.

4    Q.   And what is her role at that school?

5    A.   She is a third grade teacher in the SEI program, which is

6    Sheltered English Immersion.

7    Q.   What does Sheltered English Immersion mean?

8             MS. SHROFF:  Objection as to relevance.

9             THE COURT:  Overruled.  You may answer.

10   A.   It means that her students speak a different language at

11   home, and they come to her class to learn math and other things

12   but primarily to learn English.

13   Q.   And Mr. Copeland, in the 2022-2023 school year, what grade

14   did your wife teach?

15   A.   Third grade.

16   Q.   When did you get married?

17   A.   I got married in October of 2022.

18   Q.   What is your father-in-law's name?

19   A.   Luc Despins.

20   Q.   What does Luc Despins do for work?

21   A.   He is a bankruptcy lawyer.

22   Q.   Mr. Copeland, are you testifying today pursuant to a

23   subpoena that you were served by the government?

24   A.   Yes.

25   Q.   Mr. Copeland, can you describe your home in Cambridge,

O6P1GUO4                      Copeland - Direct

1   Massachusetts.

2   A.   So we live in a five-family home, so there's five units.

3   Our unit is on the first——on the ground floor.  It's kind of

4   a——a long unit, so all of the living room, dining area, kitchen

5   are all in one room that faces right onto the street.

6   Q.   What type of neighborhood or area is your home located in?

7   A.   We live in a residential neighborhood.  Most houses are

8   kind of similar to ours, multifamily homes.  Relatively dense;

9   maybe 10, 15 feet max between houses.  And most houses don't

10  have front yards, they're just right on the sidewalk, the front

11  of the house.

12  Q.   When did you move into that home?

13  A.   We moved in July of 2022, before we got married.

14  Q.   And who lives in that home with you?

15  A.   Me, my wife, and our dog.

16  Q.   Directing your attention to late 2022, did there come a

17  time when individuals appeared outside of your home in

18  Cambridge, Massachusetts?

19  A.   Yes.

20  Q.   What were the circumstances?

21  A.   So in November of 2022, we——some protestors showed up

22  outside of our home.  We knew at that point that they were

23  there related to Isabelle's dad's work.  And——yeah.

24  Q.   To that point you just made, Mr. Copeland, what type of

25  work did Isabelle's dad, Luc Despins do?

1    A.  He is a bankruptcy lawyer, but he was working appointed by

2    the government on a bankruptcy case.

3    Q.  A bankruptcy case related to whom?

4    A.  To a guy who I had not heard of before then but then had

5    looked up named Miles Guo.

6    Q.  And why, if at all, is it your understanding that the

7    protestors who showed up at your house related to Luc Despins's

8    work?

9    A.  So after——I think prior to them showing up at our

10   apartment, they'd showed up at Luc's work and Luc's house, so

11   we had kind of understood by then that they——that this has been

12   a pattern and that they were there because——to put pressure on

13   Luc and his family in order to stop working on this case for

14   the government.

15        MS. MURRAY:  Ms. Loftus, can we please put up what's

16   in evidence as Government Exhibit VI194.

17   Q.  Mr. Copeland, do you recognize any of the signs that are

18   depicted in VI194?

19   A.  Yeah.  I can't say for sure that any of these exact signs

20   were outside of our house, for example, but the——some images

21   within the signs were definitely outside of our house, yeah.

22   Q.  And focusing on the top left sign.

23        MS. MURRAY:  If we could zoom in on that, Ms. Loftus.

24   Q.  Do you recognize the individual depicted on this sign,

25   Mr. Copeland?

1    A.  Yes, that is Isabelle's dad, Luc.

2    Q.  Isabelle's dad and your father-in-law; is that correct?

3    A.  And my father-in-law.

4        MS. MURRAY:  We can take this down, Ms. Loftus.

5    Q.  So turning back to that day in November of 2022, can you

6    describe for the jury what, if anything, the protestors were

7    doing outside of your home.

8    A.  Yeah.  So there was about a handful, five people.  They had

9    signs similar to the ones that was just shown, and some flags.

10   And they were all wearing masks over their faces and then large

11   sunglasses and most wearing hats.  So they were kind of

12   incognito.  And they were handing out pamphlets that were

13   similar——had similar images and related messages to our

14   neighbors that were walking by.

15       MS. MURRAY:  Ms. Loftus, if you could please show the

16   witness what's been marked as Government Exhibit 3450.

17   Q.  Mr. Copeland, do you recognize the image in Government

18   Exhibit 3450?

19   A.  Yes.

20   Q.  What is that a photograph of?

21   A.  It is an edited photograph of Luc being seduced by some

22   devil-type form.  Yeah.

23   Q.  Focusing on the photograph itself, Mr. Copeland, do you

24   recognize the photograph of this item?

25   A.  Yeah.  This——so I have this pamphlet.  It was one of the

1    ones being distributed outside my home.  My neighbor gave it to

2    me.

3    Q.  And did you take this photograph, Mr. Copeland, of the

4    pamphlet that you have that had been distributed outside of

5    your home?

6    A.  Yes.

7            MS. MURRAY:  Your Honor, the government offers

8    Government Exhibit 3450.

9            MS. SHROFF:  No objection.

10           THE COURT:  It is admitted.

11           (Government's Exhibit 3450 received in evidence)

12           MS. MURRAY:  Could we publish that, please.

13   BY MS. MURRAY:

14   Q.  So Mr. Copeland, now that the jury can see it, can you read

15   the text that's written and the numbers on the top of this

16   pamphlet, the image of the pamphlet that had been handed out

17   outside of your home.

18   A.  Just the large white text there?

19   Q.  Correct.

20   A.  Extortion, and then the number 250 million, with a dollar

21   sign next to it.

22   Q.  And the individual who's depicted on the bottom left of

23   this, as you said, I think edited or manipulated photo——

24           MS. SHROFF:  Objection.

25   Q.  ——who does that appear to be?

1          THE COURT:  Overruled.

2    A.  Okay.  That is a photo of Luc Despins.

3    Q.  Do you see the image that is on his forehead in this

4    particular photo?

5    A.  Yes.

6    Q.  Do you recognize it?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's a hammer and sickle.

10          MS. MURRAY:  All right.  Ms. Loftus, we can take that

11    down.

12    Q.  Now, Mr. Copeland, you mentioned that in November of 2022,

13    the protestors—

14          MS. SHROFF:  Your Honor, could the government just ask

15    a question.

16          THE COURT:  So sometimes facts need to be stated in

17    order to lead up to the question, and that's what she's doing

18    here.

19          Would you go ahead.

20          MS. MURRAY:  Thank you, your Honor.

21    BY MS. MURRAY:

22    Q.  You'd mentioned that the protestors in November 2022 had

23    flags.  Can you describe the general appearance of those flags.

24    A.  Yes.  There was one flag that was blue and had yellow stars

25    on it that I had not seen prior.

O6P1GUO4                          Copeland - Direct

1              MS. MURRAY:  Ms. Loftus, if we could please publish

2      what's in evidence as Government Exhibit W185.

3              If we could zoom in on the top left portion of this

4      image.

5      Q.  First of all, Mr. Copeland, have you ever seen this exhibit

6      before?

7      A.  This whole graphic?

8      Q.  Correct.

9      A.  No.

10     Q.  Do you recognize the image that's in the blue box on the

11     top left here?

12     A.  Yeah, that looks similar——you know, this was two years ago,

13     but it looks similar to the flag that I remember.

14     Q.  And the letters NFSC, do you know what that stands for?

15     A.  Yes.

16     Q.  What does it stand for?

17     A.  Well, the answer is on the page, but the New Federal State

18     of China.  But it's the organization, or movement, that

19     these——that the protestors were supposed to be a part of.

20     Q.  Was that your understanding at the time, in November 2022,

21     that the protestors were affiliated with the NFSC?

22              MS. SHROFF:  Objection to the leading.

23              THE COURT:  Did you understand that they were

24     affiliated with any particular movement?

25              THE WITNESS:  Yes.

1    Q.  What movement, if any?

2    A.  I mean, before——before this whole thing started, I did not

3    know, but then I watched like a Vice news article, so I don't

4    know if that was before or after they showed up at my house,

5    but I knew that, yeah, this movement existed.

6              MS. MURRAY:  We can take that down, Ms. Loftus.

7    Q.  Mr. Copeland, did there come a time in early 2023 when

8    individuals came to your home again?

9    A.  Yes.

10   Q.  Can you describe for the jury what happened then.

11   A.  Yeah.  So it was a——I think January 2nd.  So there was that

12   one day in November, late November, and then they stopped

13   coming after that one day, and then they showed up, started

14   showing up regularly——

15             MS. SHROFF:  Objection and move to strike as

16   nonresponsive to the question posed to the witness.

17             THE COURT:  The question was:  Can you describe what

18   happened then.

19             THE WITNESS:  Okay.

20   A.  Yeah, it was a similar situation to what happened on that

21   day in November.  There was also a handful of people outside of

22   the home wearing masks, glasses, hats, and displaying similar

23   signs and handing out pamphlets.

24   Q.  And on what date in 2023, approximately, did that begin?

25   A.  January 2nd.

1  Q.  And approximately how long did the protest continue from

2  January 2, 2023, outside of your home?

3  A.  They were there every day outside my home between around 9

4  to 5, from January 2nd to January 9th.

5  Q.  Focusing on that time period, January 2nd to January 9th,

6  what, if anything, were the protestors holding or displaying?

7  A.  Mostly these posters or, on sticks, signs, that were——had

8  similar images of Luc wearing devil horns or——or text on them

9  saying, like, Luc was getting money from the Chinese Communist

10 Party and that he was working with them, and that then that

11 Isabelle was kind of indirectly benefiting from the Chinese

12 Communist Party through Luc.

13 Q.  Did your wife Isabelle have any participation in the

14 bankruptcy case of Miles Guo?

15 A.  No.

16 Q.  Is your wife Isabelle an attorney?

17 A.  No.

18 Q.  Does your wife Isabelle work with her father Luc Despins in

19 connection with the bankruptcy case of Miles Guo?

20 A.  No.

21 Q.  What was your reaction, if any, to the protestors

22 reappearing outside of your house between January 2nd and

23 January 9th of 2023?

24 A.  Yeah, it was——it was pretty unsettling, for many reasons.

25 You know, we were——yeah, it's——new to the neighborhood, we

1  didn't really, you know, know what they were saying to our

2  neighbors or what our neighbors would think of them, and we

3  still don't really know.  It was—we'd, like, put our blinds

4  down because our—our—most of our house is just kind of

5  straight visible from the street.  You know, I work from home

6  in the mornings, so it was kind of unsettling to know that

7  there were, like, people standing outside while I was working.

8  I think it affected my wife a lot more than even me.  So, yeah,

9  it was very unsettling, very disturbing.  Yeah.

10 Q.  Did the protestors have any equipment with them when they

11 came outside of your home?

12 A.  Yeah, they would—they would livestream from outside our

13 home, so that was a big reason we wanted to keep the blinds

14 down all the time is because they would kind of like videotape

15 us.  If not, they'd be videotaping us moving around our home.

16 So—yeah.

17 Q.  How, if at all, did that make you feel?

18 A.  Yeah, I mean, it felt definitely like a violation of—of

19 kind of privacy, and we also would hear about things that they

20 were saying about Luc and then as, by extension, Isabelle

21 online, and so, you know, Isabelle was concerned that someone

22 maybe loosely affiliated or affiliated with the group would

23 really believe this stuff and, you know, try and break into our

24 house or—or follow her to work or—or, yeah, follow her.

25 Q.  Mr. Copeland, you mentioned January 9th.  What, if

O6P1GUO4                        Copeland - Direct

1    anything, happened after January 9, 2023?

2    A.   Yeah.  So Isabelle would——Isabelle's work starts early so

3    she leaves——she had a routine down when they were coming that

4    she would——her school starts at 7.

5         MS. SHROFF:  Objection, your Honor.  The question was

6    what happened after January 9th, not what Isabelle's schedule

7    is at work.

8         THE COURT:  Overruled.  You may continue.

9    A.   So she would leave before they showed up at 9 p.m.——9 a.m.,

10   and then she would work later at school than she normally does

11   so that she would get back after they'd already left, usually

12   around 5 p.m.  So my schedule was, I'd be working from home in

13   the morning, but that morning I got a call from her, I guess

14   around——

15        MS. SHROFF:  Objection to the hearsay.  And your

16   Honor, may we just approach.

17        THE COURT:  All right.

18        (PAGES 4223-4227 SEALED by order of the Court)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may continue.

3              MS. MURRAY:  Thank you, your Honor.

4    BY MS. MURRAY:

5    Q.  Mr. Copeland, directing your attention again to January 10,

6    2023, can you continue to tell the jury what happened that day.

7    A.  Yeah.  So Isabelle left for school before, you know, before

8    7 a.m., got to school, and then I got a call around——from her,

9    around 9, and, yeah, she was clearly distraught, and told me

10   that they had shown up at her school.

11   Q.  Can you describe how she seemed during that call, from your

12   observations.

13             MS. SHROFF:  He wasn't observing her.  He was on the

14   phone.

15             THE COURT:  So he can describe his impressions that he

16   got through the way she spoke.

17             MS. MURRAY:  Thank you, your Honor.

18   A.  Yeah, so she was clearly distraught, in tears, having

19   trouble getting words out.  This was kind of her——kind of her

20   biggest fear, that this would affect her school community, and

21   her——yeah.

22             THE COURT:  So you'll just limit your testimony to

23   what you observed, not words that she communicated or thoughts

24   that she had.

25             THE WITNESS:  Got it.

1          THE COURT:  Go ahead.

2   Q.  What, if anything, did you do in response to that phone

3   call?

4   A.  Yeah, so I left immediately to go to her school, which is

5   in Cambridge.

6   Q.  What, if anything, did you see when you arrived at the

7   school that day, January 10, 2023?

8   A.  So her school is a short bike ride away, so I——I rode my

9   bike, and on the way to the back of the school, I saw the——you

10  pass by the front of the school, and I saw where the protestors

11  were, and then I went to the back of the school where I was let

12  in by one of the staff and then brought to the principal's

13  office where Isabelle was——was.

14  Q.  And when you arrived in the principal's office, how did

15  Isabelle seem at that time?

16  A.  Yeah.  She was still——she was still, you know, really

17  panicked, really upset, just really, you know, crying and

18  unsettled and just kind of overcome with fear and worry about

19  what this would mean and——

20          THE COURT:  So don't talk about what her thoughts

21  were.  You can just talk about what you observed.  If you see

22  somebody who is laughing, you can say they seemed happy, for

23  example.

24          THE WITNESS:  Gotcha.

25  A.  So she seemed pretty miserable.

1   Q.   And based on your arriving at the school on that day, were

2   the protestors visible from the front of the school?

3   A.   Yeah.  Or from where I arrived?  I arrived from the back,

4   but I then——yeah, out from the principal's office, which is in

5   the front of the school, you could——you could see them.

6   Q.   Did there come a time that day when you spoke with the

7   police?

8   A.   Yeah.  When I arrived, the police were there as well,

9   Cambridge Police.

10  Q.   And what, if anything, did you report to the police?

11  A.   So I think at this point we hadn't——well, we'd told the

12  police when they were coming to our house and so the police

13  drove by on their rounds kind of more frequently, but at that

14  time there was not much more they could do.  And then, you

15  know, the——so the protestors at the school had similar kind of

16  graphic signs with, you know, the devil on it or bloody

17  handprints or blood splatter, so we were kind of talking with

18  them, if this is allowed to be shown in front of a public

19  school, is there rules against, like, graphic images and

20  displaying graphic images to schoolchildren.

21              MS. SHROFF:  Your Honor, all of this is hearsay.

22              THE COURT:  So——

23              MS. SHROFF:  I move to strike.

24              THE COURT:  ——you can't talk about what other people

25  said.  You can talk about the general topic that you discussed.

O6P1GUO4                         Copeland - Direct

1   So for example, I could say I had a discussion with my husband

2   about breakfast.  But I can't say, he said, I want sausage and

3   toast and eggs.  You understand?

4              THE WITNESS:  Yeah.

5              THE COURT:  Go ahead.

6   A.  So we had a discussion about whether or not it was okay for

7   or legal for them to be there.

8   Q.  After that meeting at the school, what, if anything, did

9   you do that day?

10  A.  So—so the Cambridge Police, when we asked them that, they

11  didn't know—they said they didn't know.  This is a pretty

12  unusual—

13             MS. SHROFF:  Objection.  Hearsay.  Move to strike.

14             THE COURT:  So you can't say the words of anybody,

15  okay?  Those words are stricken.

16  A.  So we went to the Cambridge courthouse or the courthouse

17  that is—that—whose district Cambridge is in.

18  Q.  What did you do there, if anything?

19  A.  We—so we didn't really know what mechanisms there were to

20  prevent this kind of thing, so—

21             MS. SHROFF:  If the witness could just answer the

22  question as to what he did.

23             MS. MURRAY:  Your Honor—

24             MS. SHROFF:  The thought process is not relevant.

25             THE COURT:  It is relevant.  It is relevant in

1   explaining what he did.

2          Go ahead.

3   A.  So the mechanism that they suggested or that was close——

4          THE COURT:  Okay.  So don't talk about what they

5   suggested.

6          THE WITNESS:  Yeah, sorry.

7   Q.  What did you do?  What did you do?

8   A.  We applied for a harassment protection order.

9   Q.  Against whom?

10  A.  We wanted to apply for one against the actual people that

11  showed up, but we didn't have anyone's names and that was a

12  requirement for the harassment protection order, so we applied

13  for it against Miles Guo, which was the only name we had.

14  Q.  And why, if at all, did you list Miles Guo under the

15  restraining order relating to the protests at your home and at

16  Isabelle's school?

17  A.  We knew that Isabelle's dad was working this case against

18  him and that this was the tactic that had been employed in the

19  past, and it was the only name that we had that we could put

20  down for the harassment protection order.

21  Q.  Now, Mr. Copeland, did there come a time when you retracted

22  that restraining order?

23  A.  Yes.

24  Q.  Around when was that?

25  A.  Later that evening.

1    Q.  And why, if at all, did you take that step?

2    A.  We quickly realized that it was not going to be effective

3    for or stopping protestors that were not actually the person we

4    listed, so we——we just told them to rescind it.

5    Q.  To your knowledge did Miles Guo himself ever show up to

6    protest outside of your home?

7    A.  No.

8    Q.  To your knowledge did he ever show up himself to protest

9    outside of Isabelle's school?

10   A.  No.

11   Q.  After January 10, 2023, did the protests continue?

12   A.  Yes.

13   Q.  Where?

14   A.  So during the week they would show up at her school, and

15   then on the weekends they would show up at our house.

16   Q.  For approximately how long did they continue to protest

17   outside of either your home or Isabelle's school?

18   A.  For a few weeks.

19   Q.  What steps, if any, did you take regarding your physical

20   safety during that time?

21   A.  In November, Isabelle had a car service come hired by Luc's

22   company to take her to and from school.  That was for a week.

23        In January, the Cambridge Police were aware so they

24   showed up at the school, and definitely, especially during the

25   first week or so, when they were kind of figuring out what was

1  happening, and then——so I was instructed to bring any kind of

2  weapons I had into my bedroom, so I had a baseball bat in my

3  bedroom.

4  Q.  And where——

5  A.  In my closet.

6  Q.  And where, if anywhere, did you maintain that baseball bat?

7  A.  I put it in my closet near my bed.

8  Q.  To your knowledge did Luc Despins stop working on the Miles

9  Guo bankruptcy case after the protestors arrived at Isabelle's

10  school on January 10, 2023?

11  A.  He did not stop working.

12  Q.  Mr. Copeland, can you describe the effect on you of these

13  protests outside of your home and Isabelle's school.

14  A.  Yeah.  It was extremely unsettling.  Yeah, it was extremely

15  unsettling, and it felt——also the——dealing with the court

16  system and seeing that there was kind of no mechanism to——that

17  would help was kind of——

18          MS. SHROFF:  Objection.  That is not relevant to how

19  he was feeling.

20          THE COURT:  Overruled.  You may continue.

21  A.  ——made me feel kind of powerless in the situation, so,

22  yeah, that was——

23  Q.  Mr. Copeland, did any of the protestors ever physically

24  confront you or Isabelle?

25  A.  No.

O6P1GUO4                    Copeland - Direct

1   Q.  Did any of the protestors ever speak directly to you or

2   Isabelle?

3   A.  No.

4   Q.  Did you feel that your safety was threatened in any way by

5   their presence outside of your home during those weeks in

6   January and February of 2023?

7   A.  To some degree, yes.

8   Q.  And can you explain why.

9   A.  I mean, I didn't really know what these people were capable

10  of, whether or not they really believed what was being said,

11  and we didn't know, you know, they had put our address online

12  so we didn't know if someone else was going to show up that was

13  affiliated or not affiliated with this.  And yeah, I had read

14  things in the past where people had gotten into altercations

15  with them, so, yes, unsettling, yeah.

16  Q.  Did there come a time when the protestors stopped coming

17  either to your home or Isabelle's school?

18  A.  Yes.

19  Q.  Around when was that?

20  A.  A few weeks——I'm not exactly sure what date——after

21  January 10th.

22  Q.  Do you know why they stopped coming?

23  A.  No, I don't know why.

24  Q.  Mr. Copeland, have you ever taken any action against Miles

25  Guo, other than the restraining order we discussed earlier?

1    A.  No.

2    Q.  Have you or your wife ever attempted to kidnap Miles Guo?

3    A.  No.

4    Q.  Have you ever attempted to repatriate him to China on

5    behalf of the Chinese Communist Party?

6    A.  No.

7    Q.  Are you now or have you ever been an agent of the Chinese

8    Communist Party?

9    A.  No.

10            MS. MURRAY:  Your Honor, may I have a moment.

11            THE COURT:  You may.

12            MS. MURRAY:  Nothing further.  Thank you.

13            THE COURT:  Cross-examination.

14            MS. SHROFF:  Thank you, your Honor.

15   CROSS EXAMINATION

16   BY MS. SHROFF:

17   Q.  Good afternoon, Mr. Copeland.

18   A.  Good afternoon.

19   Q.  Mr. Copeland, you're testifying pursuant to a subpoena

20   here, you said on your direct testimony, correct?

21   A.  Correct.

22   Q.  Who served you the subpoena?  And could you keep your voice

23   up for me, please.

24   A.  The government served me the subpoena.  Is that—

25   Q.  Could you keep your voice up for me, please.

1   A.  The government.

2   Q.  How?

3   A.  Through a lawyer that Luc's firm hired, I think.

4   Q.  Excuse me?

5   A.  Through a lawyer that Luc's firm hired.

6   Q.  Luc, meaning your father-in-law?

7   A.  His firm, I think.

8   Q.  His firm.  What is his firm?

9   A.  Paul Hastings.

10  Q.  Paul Hastings hired a lawyer for you?

11  A.  Yes.

12  Q.  So Ms. Murray here served a subpoena on Paul Hastings'

13  hired lawyer for you; is that right?

14  A.  That's my understanding, yeah.

15  Q.  How did you get it?

16  A.  Sorry?

17  Q.  How did you get the subpoena?

18  A.  Through this lawyer.

19  Q.  How?  Like, did he email it to you, mail it to you?

20  A.  Oh.  Email.

21  Q.  Okay.  And then after you got the emailed subpoena, what

22  did you do?

23          Let me try a different question, okay, just for a

24  second.  What was the return date on the subpoena?

25  A.  I don't know.

O6P1GUO4                        Copeland - Cross

1    Q.  Did you read the subpoena?

2    A.  No.

3    Q.  Did you open it?

4    A.  No.

5    Q.  You just went and met with Ms. Murray, right?

6    A.  No.  That's not accurate.  I met with this lawyer, who was

7    representing me.

8    Q.  Okay.  And then that lawyer and you met with Ms. Murray

9    together or did that come around separately?

10   A.  Sorry.  Can you say one more time?

11   Q.  Sure.  You met with this lawyer, right?

12   A.  Yes.

13   Q.  You weren't paying for this lawyer, right?

14   A.  Me personally, no.

15   Q.  Okay.  And then this lawyer——don't tell me what the advice

16   was.  And this lawyer then put you in touch with Ms. Murray; is

17   that right?

18   A.  Yeah.

19   Q.  And when you met with Ms. Murray, was that lawyer there?

20   A.  Yes.

21   Q.  Okay.  And where did you meet?

22   A.  On Zoom or Teams or something like that.  Video.

23   Q.  Okay.  So the subpoena didn't tell you that you had to come

24   meet with her, right?  The subpoena asked you to come to court,

25   right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yeah, that sounds right.

2   Q.  Right.  But you decided you were going to meet with her,

3   right?

4   A.  Yes.

5   Q.  You had no obligation to meet with her, right?

6   A.  I think that's correct, yeah.

7   Q.  Right.  You could have just answered the subpoena, come and

8   testified and left, right?

9   A.  Yes, I could have done that.

10  Q.  How many times did you meet with her?

11  A.  Two times.

12  Q.  And both times on Zoom or one time in person and one time

13  on Zoom?

14  A.  Two times on Zoom, and then I guess today, we shook hands,

15  but that was it.

16  Q.  Okay.  So the first time that you met with her on Zoom, how

17  long was the meeting?

18  A.  It was two hours.

19  Q.  And the second time you met on Zoom was how many times?

20  A.  Was how long?

21  Q.  Yeah.

22  A.  One hour.

23  Q.  One hour.  Okay.  And it's fair to say, right, that the

24  government is the only people you've met with before you

25  testified here, right?  You didn't meet with me, right?

1    A.  I did not meet with you.

2    Q.  Okay.  And when you spoke with Ms. Murray, she was taking

3    notes of what you were saying?

4    A.  I don't know.

5    Q.  Okay.  She asked you questions, correct?

6    A.  Yes.

7    Q.  And you told her the story that you told the jury now,

8    correct?

9    A.  Yes.

10   Q.  Did you take notes?

11   A.  Yeah.

12   Q.  You took notes.

13   A.  Yeah.

14   Q.  Did you give the notes to Ms. Murray?

15   A.  I think they were just like logistics, just where I needed

16   to be and when, so——

17   Q.  Okay.  And how many times did she give you the logistics?

18   A.  I think they changed a little bit from——so as they changed.

19   Probably twice, maybe.  I don't know.

20   Q.  How did she get in touch with you, she called you or texted

21   you?

22   A.  We only met through the Zoom link.  She never sent me any

23   other——it would have been either through email or——but mostly

24   just the Zoom links, like.

25   Q.  How did you know to come here today?

1    A.  The lawyer that was hired by Luc's firm kind of handled the

2    last-minute logistics so told me where to meet him and then how

3    to get into the building, stuff like that.

4    Q.  Okay.  And when you met with Ms. Murray, you told her

5    basically everything you now testified to before the jury,

6    correct?

7    A.  Yeah, just about.

8             MS. SHROFF:  Now let's just see if we could just go

9    to, Jorge——may I just ask for, one second, your Honor.

10   Q.  If I could just show you 3450 that the government showed

11   you during your direct testimony.

12            The government showed you this photograph, correct?

13   A.  Yes.

14   Q.  And it's a photograph that you gave to Ms. Murray?

15   A.  Yes.

16   Q.  Okay.  And you had maintained that photograph at your home,

17   right?

18   A.  I had the——the pamphlet.

19   Q.  Okay.  And do you know what the top part of it said, the

20   part that we cannot read?

21   A.  In yellow?  No, I don't.

22   Q.  Yeah.  The yellow part.

23   A.  No, I don't have it memorized, no.

24   Q.  Okay.  And what does the part over there in the white say?

25   You don't remember that either, right?

1   A.  Where are you looking?

2   Q.  At the bottom.  You see that little corner?

3   A.  In the box?

4   Q.  Yeah.

5   A.  Yeah, I don't know what that said, no.

6   Q.  Okay.  And you testified that this is the pamphlet

7   that——was it given to you by your neighbor?  Is that what you

8   said on direct?

9   A.  Yes.

10  Q.  And when the neighbor gave it to you, he was sympathetic to

11  your plight, correct?

12  A.  Yeah.

13  Q.  He felt bad for you?

14  A.  She, but yes.

15  Q.  Right.  And since the time of these protests until now,

16  you've lived in the same——you can take that down, Jorge,

17  please——you lived in the same neighborhood?

18  A.  Yes.

19  Q.  And basically your neighbors have been supportive of you,

20  correct?

21  A.  The ones we know and talked to about it and have explained

22  it to, yes.

23  Q.  That's far more than what we do in New York.  We don't talk

24  to anyone.

25          But the neighbors that you talked to, they've been

O6P1GUO4                          Copeland - Cross

1   supportive, right?  Yes?

2   A.  The ones I've talked to, yeah.

3   Q.  Okay.  And during the time that you lived there, the

4   protests were across from your house; is that right?

5   A.  Yes.

6   Q.  They were not on the same street as your house, right?

7   A.  They were on the same street.  They're on the opposite side

8   of the street.

9   Q.  Right.  So this is your house, they are here, right?

10  A.  If you're——if that's the street, then yeah.

11  Q.  Okay.

12  A.  It's a one-way, one-lane street.

13  Q.  Okay.  And you testified that this happened in November,

14  right?

15  A.  The first time they showed up was in November.

16  Q.  It's a winter month, correct?

17  A.  Technically, no.

18  Q.  Technically, no?  November is not winter?

19  A.  It's fall.

20  Q.  Okay.  How about January?

21  A.  That's winter.

22  Q.  How about December?

23  A.  Most of it's fall.

24  Q.  Okay.  Wait.  December is also fall?

25  A.  Yes.

O6P1GUO4                          Copeland - Cross

```
 1   Q.  I've been doing it all wrong.
 2            Okay.  So you saw people with masks, correct?
 3   A.  Yeah.
 4   Q.  You saw people with hats, correct?
 5   A.  Yes.
 6   Q.  And these people never approached you, correct?
 7   A.  They were outside my house but never approached me beyond
 8   that.
 9   Q.  I couldn't hear you.  I apologize.
10   A.  Oh, they were outside my house; they never approached me.
11   Q.  Right.
12   A.  Like, if I walked out, they wouldn't walk up to me.
13   Q.  Right.  So you were able to go to the grocery store, do
14   your thing; they never came up to you, right?
15   A.  Correct.
16   Q.  They never hurt you, correct?
17   A.  Physically, no, definitely not.
18   Q.  No.  And they never threatened to hurt you either, correct?
19   A.  Not directly, no.
20   Q.  Well, tell me how they threatened to hurt you indirectly.
21   A.  I mean, they were holding up, like, bloody signs with my
22   wife's name on them, so that was kind of—
23   Q.  Well, the name on the bloody signs, I didn't see your
24   wife's name on them.
25   A.  Her name was on them.
```

1   Q.  So let's just put that aside because we'll talk about that

2   in a minute, okay?

3   A.  Okay.

4   Q.  But there were no bloody signs with your name on it, right?

5   A.  My name, no.

6   Q.  And the bloody signs wouldn't physically hurt you, correct?

7   A.  That is correct.

8   Q.  And they never would threaten you physically, correct?

9   A.  That is correct, yeah.

10  Q.  Okay.  And when they had bloody signs about your wife, your

11  wife unfortunately was linked to Luc Despins, correct?

12  A.  She's his daughter.

13  Q.  Right.  So the sign didn't say anything specific just about

14  your wife, she was linked to her father, right?  It said

15  Isabelle Despins, daughter of Luc, benefiting from Luc Despins,

16  correct?

17  A.  They would say stuff like, Isabelle Despins, you are not

18  innocent, with like bloody handprints.

19  Q.  Okay.  One second.

20          So it had her last name, right?  And she still has her

21  last name which is also her father's last name, correct?

22  A.  Correct.  Yeah.

23  Q.  Okay.  And you and your wife, I'm assuming, lived together

24  the whole time, correct, of this happening, right?

25  A.  Yes.

O6P1GUO4                          Copeland - Cross

1   Q.   And sitting here today, you can tell the jury that nobody

2   physically threatened your wife, correct?

3   A.   No one physically—no one verbally or physically threatened

4   her in person, that is correct.

5   Q.   Okay.  All right.  Do you by any chance know the age of the

6   protestors that were there?  Could you tell?

7   A.   I'd be guessing.

8   Q.   Right.  Do you remember a rather short old lady that always

9   came protesting?

10  A.   I don't remember any individual.  They were wearing kind of

11  masks that intentionally de-identified them, blocked their

12  faces.

13  Q.   And this was in November of 2020?

14  A.   One day in November of 2020, the rest in January.

15  Q.   Okay.  And on that one day in November of 2020, did you

16  call the police?

17          MS. MURRAY:  Objection, your Honor.  Just

18  mischaracterizes the date that he testified to.

19  Q.   I'm sorry.  You tell me the date, sir.  I've forgotten.  My

20  apologies.

21  A.   I think it was down as November 20th.

22  Q.   November 20th?

23          MS. MURRAY:  Just with respect to the year.

24  Q.   Which year?

25  A.   2022.

O6P1GUO4                          Copeland - Cross

1   Q.  Sorry about that.  November 20, 2022.  Did you call the

2   police?

3   A.  I think so.

4   Q.  You did, right?

5   A.  I think so.  I——I'm not a hundred percent sure about that,

6   but probably, yes.

7   Q.  The police didn't make them move, right?

8   A.  No.

9   Q.  The police, did they give you a reason why they wouldn't

10  make them move?

11  A.  There was——

12          MS. MURRAY:  Objection.  Calls for hearsay.

13          THE COURT:  Sustained.

14  Q.  Do you have an impression as to why the police didn't make

15  them move?  Do you have an understanding as to why the police

16  didn't make them move?

17          MS. MURRAY:  Same objection, your Honor, to the extent

18  it calls for hearsay.

19          THE COURT:  If you have an understanding that is

20  independent of what the police explained to you.

21  A.  Yeah, I mean, the police explained——well, they explained

22  it, but——prior to them explaining it, I did not know what the

23  rules were.

24  Q.  Okay.  But the police came and left the protestors there,

25  correct?

O6P1GUO4                          Copeland - Cross

```
1    A.  Yes, that's correct.

2    Q.  And then they eventually went home, right?

3    A.  The protestors?

4    Q.  Yeah.  Well, the police did too, but definitely the

5    protestors.

6    A.  Yes.

7    Q.  And then we talked a lot on your direct about the protests

8    in January, correct?

9    A.  Depends what you think a lot is, but I think so, yes.

10   Q.  Okay.  And in January you also called the police, correct?

11   A.  Yes.

12   Q.  And the police responded, correct?

13   A.  Yes.

14   Q.  In fact, they were pretty responsive to you; they would do

15   drive-bys for you, correct?

16   A.  Yes.

17   Q.  They wanted to make sure you were safe, correct?

18   A.  Yeah.

19   Q.  You live in a nice part of the neighborhood where the

20   police are actually responsive, right?

21   A.  Yeah.

22   Q.  Okay.  And when the police drove by, did they disperse the

23   crowds?

24   A.  No.

25   Q.  No, right?  Yes or no?  I'm sorry.
```

1          MS. MURRAY:  Asked and answered.

2          MS. SHROFF:  I can't hear him, so——

3   A.  No.

4   Q.  Okay.  So the crowds were still there but the police were

5   also there for your protection, right?

6   A.  They weren't there around the clock, but they were——yeah,

7   they picked up the phone, yeah.

8   Q.  Okay.  And you testified that these people were outside and

9   they had some equipment, correct?

10  A.  Equipment being a camera, yes.

11  Q.  Okay.  It was just like a camera or like a whole unit, like

12  a video and all the accoutrements that follow?

13  A.  They had a tripod.

14  Q.  They had a tripod, right?

15  A.  Yeah.

16  Q.  And you never saw anything from your family home published

17  on the internet, right?

18  A.  No, that's not true.

19  Q.  You did see the inside of your home published on the

20  internet?

21  A.  I saw the——our home from the vantage point of the

22  protestors published on the internet.

23  Q.  No, no.  That's the outside facade of your home, right?

24          MS. MURRAY:  Objection, your Honor.  Asked and

25  answered.

O6P1GUO4                          Copeland - Cross

1          MS. SHROFF:  I did not ask that.

2    Q.  Whether the video was of the outside facade of your home.

3    That's the question.

4    A.  Yeah, it was the outside of my home, yeah.

5    Q.  And nobody took a photo of your dog and posted it on the

6    internet, right?

7    A.  We didn't have a dog by that point.

8    Q.  Okay.  And throughout this time, these protestors were

9    still allowed to be there by the——what is it called, the

10   Cambridge Police, the Boston Police, the Beacon Hill Police?

11   Which one is it?

12   A.  Cambridge Police.  Wait.  Sorry.  What was the question,

13   though?  I was answering that part of the question.  What was

14   the first part of the question, they were allowed to be there?

15   Q.  Right.

16   A.  Yeah.

17   Q.  They weren't ticketed, correct?

18   A.  No.

19   Q.  They weren't told to disperse, correct?

20          MS. MURRAY:  Objection, your Honor.  He wouldn't know.

21          THE COURT:  Well, he might have observed them being

22   ticketed.  He might have observed the police shooing them away.

23   A.  Not to my knowledge.

24   Q.  You testified having a baseball bat in the closet, correct?

25   A.  Yes.

1  Q.  Never had to use that baseball bat, right?

2  A.  Not for home defense.

3          MS. SHROFF:  Okay.  Can you give me one second.

4          THE COURT:  Go ahead.

5  Q.  Let me show you what is marked as Defense Exhibit 70777.

6  I'm only going to show it to you and government counsel, okay?

7  And the Court.

8          Do you see this photograph?

9  A.  Yes.

10 Q.  Were these the protestors that were outside your home?

11         Do you recognize this photograph?

12 A.  I don't recognize this photograph.  I recognize the setting

13 of the photograph.

14 Q.  What's the setting?

15 A.  The setting is the outside of my home.

16 Q.  Outside your home, right?

17 A.  Yes.

18         MS. SHROFF:  Your Honor, we move to admit this into

19 evidence.

20         MS. MURRAY:  No objection.

21         THE COURT:  It is admitted.

22         (Defendant's Exhibit 70777 received in evidence)

23 Q.  Are these the people that were protesting outside your

24 home?

25 A.  I never saw a person outside my home that wasn't wearing

1  big sunglasses.  Personally never saw——this picture is

2  different, so they don't look like the people necessarily

3  outside my home, or they don't look like the people looked like

4  when they were outside my home.

5           MS. SHROFF:  Okay.  One minute.  I just want to make

6  sure the jury has the photograph.

7  Q.  Okay.  The man on the very left, right?

8  A.  Okay.

9  Q.  The smiling guy over there?

10  A.  I see him.

11  Q.  With the glasses?  No mask, right?

12  A.  Yeah, that's true.

13  Q.  Okay.  How about the lady over there with the hat, no mask?

14  A.  She is not wearing a mask.

15  Q.  Okay.  How about the lady in that yellow coat; she's

16  wearing a COVID mask, right?

17  A.  Yeah.

18  Q.  And the man next to that?  Yes?  No mask?

19  A.  Yeah, no mask, right, correct.

20  Q.  And these are the four or five people that would show up,

21  right?

22  A.  Sorry?

23           MS. MURRAY:  Objection.  Asked and answered.  Also I'm

24  not sure what people she's referring to.

25           THE COURT:  What is the question?

1          MS. SHROFF:  It's okay.

2     Q.  You do recognize this to be outside of your house, right?

3     A.  This is outside—this is outside my house, yes.

4          MS. SHROFF:  Okay.  We can take that down.

5     Q.  Now you testified about this protective order that you

6     applied for, correct?

7     A.  Yes.

8     Q.  And you were granted the protective order, right?

9     A.  Yes.

10    Q.  And the protective order was against Miles Guo?

11    A.  Yes.

12    Q.  Okay.  And it's a protective order that just basically—you

13    tell me, right—said that Miles Guo had to stay X number of

14    feet away from you, right?  Is that what the protective order—

15    A.  I'm not sure.  I think—that seems reasonable.  I'm not

16    really sure what was—what rules—the rules were around it.

17    Q.  Okay.

18    A.  Yeah.

19    Q.  It was issued to you, right?

20    A.  Yes.

21    Q.  Why did you bother rescinding it?

22    A.  After talking to law enforcement, it was determined that

23    this would not be helpful with our situation.

24    Q.  Okay.  But why bother rescinding it?  It's there.  Who

25    cares?

1      MS. MURRAY:  Asked and answered, your Honor.

2      THE COURT:  Sustained.

3  Q.  I asked you:  Why did you rescind it?

4  A.  Yeah, we didn't want it to get sent because we didn't want

5  to enter some legal battle that wasn't going to help.

6  Q.  Okay.  And Mr. Guo never responded, right?

7  A.  No.

8  Q.  He was never within any feet of you, right?

9  A.  Not to my knowledge.

10  Q.  Okay.  And since January 10th of 2023, you've had no more

11  protests at your home?

12  A.  That's not correct.

13  Q.  There have been protests after January of 2023?

14  A.  It was on for a few weeks so probably—

15  Q.  No, no.  I mean after the complete month of January of

16  2023.

17  A.  It might have went into February, but after that, no.

18  Q.  After that, no, right?

19  A.  Yes, after that period.

20  Q.  Okay.  So on direct you said it stopped in January, now

21  you're not sure, it could have gone into February; is that what

22  you're saying?

23      MS. MURRAY:  Your Honor, objection.  It

24  mischaracterizes his testimony.

25      THE COURT:  Sustained.

1   Q.  Okay.  You tell me.

2   A.  It started in January 2nd, they were there every day until

3   January 9th, then they started to go weekends at our home and

4   weekdays at the school.

5   Q.  Okay.  And then when did it stop?

6   A.  A few weeks after January 10th, so——

7   Q.  You didn't keep track of when it stopped?

8   A.  No.

9   Q.  This very unsettling thing, you did not keep track of when

10  it stopped.

11              MS. MURRAY:  Asked and answered.

12              THE COURT:  Sustained.

13              MS. SHROFF:  I have nothing further.

14              THE COURT:  Redirect?

15              MS. MURRAY:  Thank you, your Honor.

16              If I could ask the defense to put up Defense

17  Exhibit 70777.  I'd appreciate it.

18  REDIRECT EXAMINATION

19  BY MS. MURRAY:

20  Q.  Mr. Copeland, you were asked some questions——

21              MS. SHROFF:  Oh, I don't have it.  Do you have it?

22  Q.  You were asked some questions on cross-examination about

23  this photo.  Do you recall those?

24  A.  Generally, yes.

25  Q.  Ms. Shroff asked you about the happy protestor on the left.

1    Do you recall those questions?

2    A.  Yes.

3    Q.  During the weeks that protestors showed up outside of your

4    home, did you ever——can you please keep that up, thank you——did

5    you ever see any of the protestors smiling?

6    A.  No.

7    Q.  If we could focus on the bottom of these signs, what are

8    the words that are near the bloody handprints on each of these

9    three signs?

10   A.  It says:  "Isabelle Despins You Are Not Innocent."

11   Q.  How, if at all, was the fact that the protestors outside of

12   your home were holding these signs that included the bloody

13   handprints and your wife's name, how was that a threat?

14   A.  How was that a threat?

15   Q.  Yes.  How, if at all, did that feel threatening to you?

16   A.  Well, this is being livestreamed on the internet, so even

17   if the people here were peacefully protesting, it's possible

18   that other people would believe that Isabelle was somehow

19   involved or would believe what these things, these signs are

20   saying, and try and harm us or——or, you know, make, you

21   know——yeah.  Yeah.

22          MS. MURRAY:  And we can take that down.  Thank you

23   very much.

24   Q.  Mr. Copeland, based on your observations, how, if at all,

25   did these signs impact your wife?

1    A.   Tremendously.  She's a—kind of a—well, a little bit more

2    tight—

3              MS. SHROFF:  Objection.

4              MS. MURRAY:  These are his observations, your Honor.

5              MS. SHROFF:  Objection.

6              THE COURT:  So you can describe your observations of

7    her.  Go ahead.

8    A.   All right.  Over the eight plus years I have observed her,

9    she has been a very high-strung person.  She really cares

10   about—I've witnessed her dedication to her school community.

11   I've seen how much she cares—

12             MS. SHROFF:  Objection.  Move to strike.

13   A.   —about her job.

14             THE COURT:  Overruled.  You may continue.

15   A.   And I saw how—how stressful—yeah, I saw how hard it was

16   on her.  I have seen that she really cares about her kids and

17   keeping them safe and making sure school is a safe environment

18   for them and that they feel comfortable at school and

19   comfortable with her, and I saw how the idea that—that she

20   could be causing additional trauma in some of these kids' lives

21   was negatively impacting her.

22   Q.   Mr. Copeland, you were asked some questions on

23   cross-examination about having rescinded the restraining order

24   against Mr. Guo.  Do you remember those questions?

25   A.   Yeah.  Yes.

1    Q.  What concerns, if any, did you have in pursuing a

2    restraining order against Miles Guo?

3    A.  I was concerned that we would enter some legal dispute that

4    would be pointless and, you know, time-consuming and—and

5    fruitless, so it was not worth it.

6              MS. MURRAY:  May I have a moment, your Honor.

7              THE COURT:  Yes.

8              MS. MURRAY:  Thank you, Mr. Copeland.  Nothing

9    further.

10             THE COURT:  Recross?

11             MS. SHROFF:  Would you put the photo back up.

12   RECROSS EXAMINATION

13   BY MS. SHROFF:

14   Q.  Ms. Murray—do you need a moment, Mr. Copeland, or are you

15   okay?

16   A.  I'm good.

17   Q.  Okay.  So Ms. Murray asked you questions about this

18   particular photograph, right?

19   A.  Yes.

20   Q.  And she asked you if you'd seen any smiling protestors,

21   correct?

22   A.  Yes.

23   Q.  Mr. Copeland, isn't it fair to say that you didn't

24   particularly want to make any eye contact with them, right?

25   A.  Yes, I would say that's true.

1  Q.  Right.  They were protesting, you didn't want them

2  protesting, right?

3  A.  I did not want them protesting outside of our house or my

4  wife's school.

5  Q.  Exactly.  Exactly.  It's a hassle, right?

6  A.  A hassle is one way of putting it.  I would put it another

7  way.

8  Q.  Scary, right?

9       MS. MURRAY:  Your Honor, if she could let the witness

10  finish his answer.

11       THE COURT:  Okay.  Please finish your answer.

12  A.  Yeah, scary.

13  Q.  Scary, right?  So you wouldn't want to make eye contact

14  with them, right?

15       THE COURT:  Asked and answered.

16  Q.  So you wouldn't know if somebody was smiling or not

17  smiling, correct?

18  A.  I never saw them smile or saw someone's face.  They were

19  wearing masks whenever I looked.

20  Q.  They were all wearing masks whenever you looked; that's

21  your recollection?

22  A.  Yeah, that's my recollection, yes.

23       MS. SHROFF:  Okay.  Now you can take that down.

24       Wait.  Actually, leave it up here.

25  Q.  Ms. Murray also asked you questions about how this language

1   made you feel, correct?

2   A.  Yes.

3   Q.  Okay.  And none of the language is pleasant, correct?

4   A.  Yeah, no, I would say this is unsettling language.

5   Q.  Right.  And the police were aware of this unsettling

6   language, correct?

7   A.  Probably.  They were driving by, so I would guess yes.

8   Q.  And they continued to allow the protests, right?

9   A.  Yes.

10       MS. SHROFF:  Okay.  We can take that down.

11  Q.  Now Ms. Murray asked you questions about your wife,

12  correct?

13  A.  I believe so.  I believe so, yes.

14  Q.  And one of the questions, or one of the answers that you

15  gave was that she was deeply concerned about the kids at her

16  school, correct?

17  A.  Yes.

18  Q.  She taught at a public school, correct?

19  A.  She teaches at a public school still, same school.

20  Q.  Right.  And it's basically an ESL class, right, English as

21  a foreign language class?

22  A.  Her classroom is an ESL class.  Her school has a general

23  public school as well that's——

24  Q.  Okay.  And is it fair to say that the school was supportive

25  of her?

1          MS. MURRAY:  Objection, your Honor.  Beyond the scope.

2          THE COURT:  Sustained.

3          MS. SHROFF:  She asked about her reaction and what he

4  observed.  That's within the scope.

5          THE COURT:  Not about what the school did.

6  Q.  Did your wife feel supported by the school?

7          MS. MURRAY:  Objection, your Honor.

8          MS. SHROFF:  That's within the scope.

9          THE COURT:  Sustained.  He can describe what he

10  observed.

11  Q.  Okay.  Did you observe the principal being supportive of

12  your wife?

13  A.  On January 10th, I would say yes.  Other times, she had,

14  you know——she would have handled things differently than how

15  the school handled it, but——

16  Q.  I cannot hear you.  I'm sorry.  But that's okay.

17          Did you observe the other teachers being supportive of

18  your wife?

19  A.  No, I didn't——I mean, I heard it from my wife but I didn't

20  observe it.

21  Q.  Okay.  And you testified about the length of the protests,

22  correct?  You testified about the dates, correct?

23  A.  Yes, to the best of my knowledge, yes.

24  Q.  Right.  And was that date specific to your home or do you,

25  sitting here today, know that that same length applied to the

O6P1GUO4                    Copeland - Recross

1   protests near the school?

2           MS. MURRAY:  Objection, just to form.

3           THE COURT:  Sustained.

4   Q.  Do you know how long they protested outside the school?

5   A.  I think it was a few weeks after—during the school day,

6   after January 10th.

7   Q.  After January 10th, right?

8   A.  Starting on January 10th for a few weeks.

9   Q.  Okay.  And it ended before February, correct?

10          MS. MURRAY:  Objection.  Asked and answered.

11          THE COURT:  Sustained.

12          MS. SHROFF:  I'm asking about the school, not the

13  home.

14          THE COURT:  It's 2:29.

15          MS. SHROFF:  I have two more questions, your Honor.

16          THE COURT:  Go ahead.

17  BY MS. SHROFF:

18  Q.  When you got the protective order against Miles Guo, did

19  you even serve him?

20          MS. MURRAY:  Asked and answered, your Honor.

21          MS. SHROFF:  No.  I did not ask if he was served.

22          THE COURT:  Did you personally serve him?

23          THE WITNESS:  No.

24  Q.  So Mr. Guo didn't even have knowledge of the protective

25  order, correct?

1           MS. MURRAY:  Objection.

2           THE COURT:  He cannot speak to what knowledge Mr. Guo

3    had.

4    Q.  And since you got the protective order or rescinded the

5    protective order, Mr. Guo has not engaged in any litigation

6    with you, correct?

7    A.  Correct.

8    Q.  He's never sued you, correct?

9           MS. MURRAY:  Asked and answered.

10          THE COURT:  Sustained.

11   Q.  He's never sued your wife, correct?

12   A.  Correct.

13          MS. SHROFF:  Okay.  Thank you very much.

14          MS. MURRAY:  Nothing further.  Thank you.

15          THE COURT:  Thank you, sir.  You may step out.

16          (Witness excused)

17          THE COURT:  And it's time for our break.  We'll

18   reconvene in half an hour.  Remember that you're not allowed to

19   talk amongst yourselves about the case or permit anyone to talk

20   about the case in your presence.  Don't read, listen, or watch

21   anything having to do with this case.

22          (Continued on next page)

23

24

25

O6P1GUO4

 1                    (Jury not present)

 2                    THE COURT:  You may be seated.

 3                    Is there anything further?

 4                    MS. MURRAY:  Nothing from the government.

 5                    MS. SHROFF:  No, your Honor.  Thank you.

 6                    MR. FINKEL:  Just, we were notified by the defense

 7      with respect to the issue we talked about at sidebar.  The

 8      parties reached an accommodation.

 9                    THE COURT:  Okay.  Thank you.

10                    (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6PBGUO5                          Johnson- Direct

1           THE COURT:  Let's have the jurors brought in.

2           THE LAW CLERK:  Jury entering.

3           (Jury present)

4           THE COURT:  Please be seated, and please call the next

5    witness.

6           MR. FINKEL:  Yes, your Honor.  The government calls

7    Stephen Johnson.

8    STEPHEN JOHNSON,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11          THE COURT:  Please state your name and spell it.

12          THE WITNESS:  Stephen Johnson, S-T-E-P-H-E-N,

13   J-O-H-N-S-O-N.

14          THE COURT:  You may be seated and speak into the

15   microphone.  You may inquire.

16   DIRECT EXAMINATION

17   BY MR. FINKEL:

18   Q.  Good afternoon, Mr. Johnson.

19   A.  Hello.

20   Q.  Where do you work?

21   A.  Securities and Exchange Commission.

22   Q.  What is the Securities and Exchange Commission?

23   A.  It's a government agency that protects investors and

24   investigates violations of securities fraud.

25   Q.  And is it independent from the department of justice?

O6PBGUO5                         Johnson- Direct

1    A.  Yes.

2    Q.  What is your title with the SEC?

3    A.  Branch chief.

4    Q.  Could you just briefly describe at a high level for the

5    members of the jury what you do as a branch chief for the SEC?

6    A.  I supervise a group of investigators in the New York

7    regional office and I also participate in investigations.

8    Q.  Mr. Johnson, I'm going to ask you to point the microphone

9    at your mouth.  You can feel free to move it this way.

10            THE COURT:  The acoustics are not good in here.  You

11   have to speak right into it.

12            MR. FINKEL:  Your Honor, may I approach?

13            THE COURT:  You may.

14            MR. FINKEL:  I'm approaching the witness with a USB

15   drive which is been marked as GX-37.

16            Your Honor, I represent that USB drive contains the

17   following government exhibits in the GXSM series, 11, 12, 17 to

18   21, 62, 73, 88, 96, 126 to 130, 133, 147, 149, 151, 155, 156,

19   159, 170, 176, 178, 180, 181, 183, 187, 189, 191, 201, 205,

20   206, 208, 210, 217, 218, 224, 226, 227, 233, 235, 237, 252,

21   264, 277, 283, 284, 287, 296 through 299 and 310.

22   Q.  Mr. Johnson, do you recognize the USB drive I just handed

23   you.

24   A.  Yes.

25   Q.  How do you recognize it?

O6PBGUO5                          Johnson- Direct

1   A.  I initialed it.

2   Q.  Have you reviewed the contents of that USB drive?

3   A.  I have.

4   Q.  What's on it?

5   A.  56 files that were part of a production from Saraca Media

6   Group to the Securities and Exchange Commission in answer to a

7   subpoena.

8           MR. FINKEL:  Your Honor, at this time the government

9   offers SM in the SM series, 11, 12, 17, 18, 19, 21, 73, 96,

10  126, 127, 129, 130, 133, 147, 149, 151, 155, 156, 159, 170,

11  176, 178, 181, 210, 217, 218, 224, 226, 235, 252, 277, 283, 296

12  through 299.

13          MR. SCHIRICK:  Objection, your Honor.  Can we have a

14  brief sidebar, please.

15          THE COURT:  Okay.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            MR. SCHIRICK:  Our understanding, your Honor, is that

3     this witness from the SEC is going to testify about how the SEC

4     received these documents.  They're a production from Saraca, so

5     I don't believe that this witness can authenticate the

6     underlying documents.  He can authenticate the fact that -- he

7     can testify to the fact that the SEC received these documents.

8     But as to authenticating the underlying documents themselves,

9     he has no knowledge.

10           THE COURT:  So has he inspected the documents?  In

11    other words, was he on the receiving end?

12           MR. SCHIRICK:  He said he reviewed the thumb drive.

13           THE COURT:  Go ahead.

14           MR. FINKEL:  I'm happy to lay an additional

15    foundation.  What I expect this witness will testify to, so we

16    can solve these issues at sidebar, is that he reviewed the

17    SEC's storage of these materials.  He compared them to the

18    cover letters from the Saraca attorneys, verified the Bate

19    stamping match those cover letters from Saraca's attorneys.  He

20    reviewed each and every file that was on the USB drive and

21    compared it to what was stored on the SEC system, was able to

22    confirm based on his knowledge of the SEC document handling

23    protocol that these documents were all produced by Saraca.

24    These documents, I can also tell the Court, are expense

25    reports.  In fact, your Honor this is an expense report which

O6PBGUO5                          Johnson- Direct

1    is similar to, but not exactly like, the other expense reports

2    that would be found on this USB drive.  This document was

3    admitted into evidence already for Karin Maistrello.  Karin

4    Maistrello discussed during her testimony how this was a

5    payment form that she was generally familiar with used by

6    Saraca and Golden Spring.  The documents that are on the USB

7    drive are similar documents with similar signatures, similar

8    identifying information, and the name Saraca Golden Spring.  In

9    addition, there are two other documents on that USB drive which

10   we are seeking to admit which are documents from Hayman.

11          As the Court may recall, Hayman received the

12   investment from Saraca Media.  The two documents that are on

13   the USB drive are the final signed documents that Saraca

14   signed, that Yvette Wang signed, that Max Krasner signed to

15   finalize the Saraca investment agreement.  And the letter that

16   Haynes and Boone sent to Saraca to say, where is this money

17   from.  So those documents are already in evidence from Steele

18   Schottenheimer. She put them into evidence from what Hayman

19   has, and they match what Saraca produced to the SEC.  This is

20   another way of saying, your Honor, that there are multiple

21   indications suggesting the authenticity of the documents on

22   that USB which allow a reasonable juror to find that the

23   documents are authentic.

24          MR. SCHIRICK:  Your Honor, I think there's two issues

25   here.  One is the authenticity issue, and the maintaining

O6PBGUO5                          Johnson- Direct

1    objection that this witness cannot authenticate underlying

2    Saraca documents.  The most this witness can do based on his

3    knowledge is to say that those documents were received by the

4    SEC.  Now if that's a fact that's the government wants to get

5    in, that's fine.  But as to the underlying documents, he can't

6    authenticate the underlying Saraca documents.

7              THE COURT:  I think that they're only trying to get

8    him to say those are what the SEC received, correct?

9              MR. FINKEL:  That's exactly right.

10             THE COURT:  All righty.  That's it.  Let go.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. FINKEL:  The government renews its request to

3   submit the exhibits.

4           THE COURT:  If you could ask a few foundational

5   questions, please.

6   BY MR. FINKEL:

7   Q.  Mr. Johnson, how do you know that those materials were

8   produced by Saraca to the SEC?

9   A.  So when we issue a subpoena, it contains instructions on

10  how to return the documents and in what format, and everyone's

11  instructed to return documents to a centralized production unit

12  or CPU which is a department in the SEC that takes in all of

13  the documents.  They get the documents loaded into our

14  eDiscovery platform called Case Point and every document that's

15  produced is loaded in by the matter number, the producing party

16  and the date produced.

17  Q.  What did you do to understand that the documents produced

18  on that USB were produced by Saraca?  What steps did you take,

19  if any, that it was in the SEC system?

20  A.  I opened the documents in here on this thumb drive, and on

21  another monitor I opened up the same document in the Case Point

22  system by Bates number.

23  Q.  And did you open every document that was on that USB drive?

24  A.  I did.

25  Q.  And what did you compare each and every document to that

O6PBGUO5                          Johnson- Direct

1    was on the USB drive?

2    A.  The number of pages, the title of the page and the Bates

3    number.

4    Q.  And the Bates numbers, what entity were they associated

5    with in the SEC systems?

6    A.  Saraca Media Group.

7           MR. FINKEL:  Government renews offering the documents

8    I outlined before.

9           MR. SCHIRICK:  Same objection, your Honor.

10          THE COURT:  They're admitted.

11          (Government's Exhibits SM-11, SM-12, SM-17, SM-18,

12   SM-19, SM-21, SM-73, SM-96, SM-126, SM-127, SM-129, SM-130,

13   SM-133, SM-147, SM-149, SM-151, SM-155, SM-156, SM-159, SM-170,

14   SM-176, SM-178, SM-181, SM-210, SM-217, SM-218, SM-224, SM-226,

15   SM-235, SM-252, SM-277, SM-283, SM-296 through SM-299 received

16   in evidence)

17   BY MR. FINKEL:

18   Q.  Mr. Johnson, can you describe to the jury what is a

19   subpoena?

20   A.  A subpoena is a request for information that we send out in

21   the course of an investigation.

22   Q.  And were you apart of an investigation concerning Saraca

23   personally?

24   A.  No.

25   Q.  Were you personally apart of an investigation concerning

O6PBGUO5                        Johnson- Direct

1    Miles Guo?

2    A.  No.

3    Q.  Or GTV?

4    A.  No.

5    Q.  Or G Coins?

6    A.  No.

7    Q.  Aside from your testimony today and the preparation you did

8    including the review you just described, did you have any other

9    involvement in this case?

10   A.  No.

11   Q.  Can we pull up GXSM-77.  Is this one of the documents that

12   Saraca produced?

13   A.  It is.

14   Q.  You see at the top it says Saraca Media Group, Inc. payment

15   request form?

16   A.  Yes.

17   Q.  And then below that is says name of payee, Voice of Guo

18   Media, Inc.  You see that?

19   A.  Yes.

20   Q.  What's the payment amount?

21   A.  7875.

22   Q.  There are two letters next to that, do you see the two

23   letters at the top?

24   A.  MK.

25   Q.  Do you know what MK stands for?

1   A.  No.

2   Q.  Can we go to the next page.

3           Am I correct, Mr. Johnson, this document was attached

4   to the payment request form?

5   A.  Yes.

6   Q.  And can you read what that says underneath the image of the

7   check that says Voice of Guo Media?

8   A.  Yes.  Hi, Max, the principal has engaged new developers to

9   develop the G News and they urgently need to pay 7875 U.S.

10  dollars.  Could you pay through the followings:  Routing number

11  is.

12  Q.  You don't have to read those.

13          Do you know who the principal is?

14  A.  No.

15  Q.  If we can go to the next page, Ms. Loftus, and the page

16  after that.

17          Below where it says thanks can they send contract

18  today, can you read what it says?

19  A.  No, still negotiating, but the principal wants to pay

20  today.  We could pay without contract first.  Thanks.

21  Q.  We can take that down if we could put up SM283.

22          Mr. Johnson, who is the payee for this particular

23  payment request form from Saraca Media Group?

24  A.  Yvette Wang.

25  Q.  Do you know who she is?

O6PBGUO5                     Johnson- Direct

```
 1    A.   No.
 2    Q.   And what's the total payment amount to Yvette Wang?
 3    A.   $30,906.56.
 4    Q.   If we can go to SM-296.  Who's the payee of this document?
 5    A.   Ya Li.
 6    Q.   And how much is the amount?
 7    A.   $2,850.
 8    Q.   And if we can go to the next page.
 9              Do you see the date in the top left?
10    A.   Yes.
11    Q.   What's the date?
12    A.   April 27, 2020.
13    Q.   You can take that down, if we could put up SM-178.
14              And here in this Saraca Media Group payment request
15    form, Mr. Johnson, who is the payee?
16    A.   Max Krasner.
17    Q.   Do you know who that is?
18    A.   No.
19    Q.   What's the amount that Max Krasner was paid?
20    A.   $30,906.56.
21    Q.   We can put up SM-73 please.  Who is the payee on this
22    document?
23    A.   Aaron Mitchell.
24    Q.   What's the date of the expense?
25    A.   6/3/2020.
```

1   Q.  And how much is the amount that Aaron Mitchell was due to

2   be paid on this document?

3   A.  $30,906.56.

4   Q.  And do you know one way or another whether these amounts

5   were actually paid?

6   A.  I don't.

7   Q.  If we can please go to SM-235.

8           And what's the name of the payee for this document?

9   A.  New England Home Inspections.

10  Q.  How much is the payment amount?

11  A.  $1,750.

12  Q.  Can you read purpose of expense right sort of in the middle

13  of your screen?

14  A.  Building Inspection.

15  Q.  For?

16  A.  For Greenwich Land, 373 Taconic Road, Greenwich,

17  Connecticut.

18  Q.  You ever been there, 373 Taconic?

19  A.  No.

20  Q.  Ms. Loftus, can you zoom in on the bottom.  There's a

21  little asterisk.  Can you read that asterisk Mr. Johnson?

22  A.  Payment request form must be approved by the chief

23  operating officer Yvette and/or director of operations Melissa.

24  Q.  You can take that down, and if we can put up SM-151.

25          Who's the payee for this one?

1   A.  Greenwich Land, LLC.

2   Q.  Do you know what that entity is?

3   A.  No.

4   Q.  What's the amount?

5   A.  $2 million.

6   Q.  If we can go to SM-147.

7           What's the name of the payee listed on this one?

8   A.  Go Daddy.

9   Q.  What's the amount?

10  A.  $149.97.

11  Q.  Do you see the Bates number on the bottom right of the

12  screen?

13  A.  Yes.

14  Q.  What's the last four digit?

15  A.  1320.

16  Q.  Could we go to the next page, please.

17          What's the last four digit of the Bates number on this

18  one.

19  A.  1321.

20  Q.  Can you read this email that's attached?

21  A.  Good morning, Max. Attach please find invoice number 4900

22  for the balance due for the completion of the fence.  The

23  remaining balance of $2,846.26 will be due when the painting is

24  finish.  Please kindly remit payment at your earliest

25  convenience.  Thanks very much, Bobby.

O6PBGUO5                        Johnson- Direct

1   Q.  What does it say under Bobby?

2   A.  Connecticut Fence and Landscaping, LLC, 16 Valmar Drive,

3   New Milford, Connecticut.

4   Q.  Do you know if Greenwich is in Connecticut?

5   A.  Yes.

6   Q.  Ms. Loftus, if we could pull up SM-126.

7           Can you read the purpose of this expense, please?

8   A.  G level.org domain for G Fashion.

9   Q.  If we can pull up SM-133.

10          What's the date of this expense on the lower right?

11  A.  January 30, 2020.

12  Q.  Can you read the itemize expense description right in the

13  center?

14  A.  Multiple hosting roll society.org security email essr.

15  Q.  What does it say under expense account?

16  A.  ROL, rolf.

17  Q.  Do you know what the Rule of Law Society has to do with

18  Saraca Media Group?

19  A.  No.

20  Q.  Can we pull up SM-176.

21          You see at the top where it says Saraca, sir?

22  A.  Yes.

23  Q.  Can you make out what's crossed out underneath it?

24  A.  Looks like Golden Spring New York, LTD.

25  Q.  Do you know what relationship it is between Golden Spring

O6PBGUO5                          Johnson- Direct

1   and Saraca?

2   A.   No.

3   Q.   Take that down and put up SM-156, please.

4        What's the name of this payee?

5   A.   Hermes of Paris.

6   Q.   What's the amount?

7   A.   $24,000.

8   Q.   And what are the names at the bottom of the document here?

9   A.   Max Krasner, Yvette Wang.

10  Q.   Can you go to the next page, please, Ms. Loftus.  Can you

11  zoom in at the top of that receipt please.

12       Can you read the top of that receipt, please?

13  A.   Hermes of Paris HOP Greenwich, 289 Greenwich Avenue,

14  Greenwich Connecticut.

15  Q.   What's the name under the customer information?

16  A.   Yanping Wang.

17  Q.   Can you zoom out of that, please.  You can look at 210.

18  What's the payee for this document?

19  A.   G Fashion Media Group, Inc.

20  Q.   How much was this payment request form for?

21  A.   $200,000.

22  Q.   Now, if we can look at SM-11.

23       Mr. Johnson, is this one of the documents that Saraca

24  Media produced to the SEC?

25  A.   Yes.

O6PBGUO5                          Johnson- Direct

 1  Q.  Hayman Hong Kong Opportunities Onshore Fund, LP.  You see
 2  that?
 3  A.  Yes.
 4  Q.  Do you know what that is?
 5  A.  No.
 6  Q.  If we can Ms. Loftus go to 26 pages in approximately.
 7       Can you read what it says at the top?
 8  A.  Hayman Hong Kong Opportunities Onshore Fund, LP, investor
 9  profile.  Investor name Saraca Media Group, Inc.  Capital
10  contribution $100 million.  Investor type, beneficial holder.
11  Briefly identify the subscriber's primary source of wealth.
12  Selling shares of subsidiary.
13  Q.  If you can go back, Ms. Loftus, two pages.
14       And who according to this document signed as
15  president?
16  A.  Yanping Wang.
17  Q.  And what's the total requested capital contribution at the
18  bottom?
19  A.  $100 million.
20  Q.  Requested closing date?
21  A.  June 8, 2020.
22  Q.  If we could put up, please, Ms. Loftus, SM-12.
23       Mr. Johnson, is this another document that Saraca
24  Media Group produced to the SEC in response to a subpoena?
25  A.  Yes.

1  Q.  And who according to this letter dated July 15, 2020, whose

2  attention was this letter sent?

3  A.  William Je, Max Krasner, Yvette Wang and Aaron Mitchell.

4  Q.  Can you read the second paragraph as the general partner?

5  A.  As the general partner to the fund in the performance of

6  its continuing diligence and compliance with the securities

7  laws, Hayman requires a response to the following:  What was

8  the source of capital used by Saraca Media Group, Inc., Saraca

9  to invest in the group.

10  Q.  Do you know if Saraca ever answered that question?

11  A.  On the previous slide.

12  Q.  Can you read the third bullet, please?

13  A.  If the proceeds were derived from securities offering, did

14  the offering documents disclose the use of proceeds to include

15  investment in the fund or in any similar private fund vehicle.

16  If yes, please provide a copy of the disclosure agreement.

17  Q.  Do you know if the disclosure agreement was provided to any

18  of these?

19  A.  No.

20  Q.  What's the date of this document?

21  A.  July 15, 2020.

22  Q.  Ms. Loftus, you could pull up SM-11 again at page 24.

23        What's the date here?

24  A.  June 3, 2020.

25  Q.  So this is before the letter that we just looked at as

1    SM-12?

2    A.  Yes.

3            MR. FINKEL:  Your Honor, at this time the government

4    offers a stipulation. At this time the government offers a

5    stipulation between the parties which is GX Stip 19.

6            MR. SCHIRICK:  No objection.

7            THE COURT:  It is admitted.

8            (Government's Exhibit GX Stip 19 received in evidence)

9            MR. FINKEL:  I'll read it.  It is hereby stipulated

10   and agreed by the United States of America, and Miles Guo the

11   defendant, that an employee of the US Securities and Exchange

12   commission, the SEC, would testify as follows:

13           One, the SEC is an independent federal agency whose

14   mission is, among other things, to protect investors maintain

15   fair, orderly and efficient markets and facilitate capital

16   formation.

17           Two, following an SEC investigation, on July 28, 2021,

18   Saraca Media Group Inc., Saraca, agreed to a settlement with

19   the SEC concerning civil administrative allegations by the SEC

20   that Saraca, GTV Media Group, GTV, and Voice of Guo Media, Inc.

21   VOG, conducted an unregistered securities offering through the

22   GTV private placement.  The consent settlement was memorialized

23   into a written agreement, the settlement agreement, which was

24   signed by Yanping Wang on behalf of Saraca. Pursuant to the

25   settlement agreement, Saraca, GTV and VOG have sent to the SEC

$455,211,346.39 related to the GTV private placement, including

$69,713.578.06 from Saraca's investment in Hayman Capital

Management, which was transmitted from the escrow account of

Morvillo, Abramowitz, Grand, Iason & Anello, PC, to the SEC. As

of the date of this stipulation, Saraca and GTV together on a

joint and several basis owe an additional $31,488,392.52 to the

SEC, and VOG owes an additional $45,000, $45,324 to the SEC.

          The SEC established a fair fund to distribute the

collected money to individuals and entities who had invested in

the GTV stock offering and the G Coins, G Dollars offerings.

After hiring an administrator to manage the distribution

process, notifying investors and collecting verification

information from investors, distribution to investors began on

September 26, 2022.  Through the fair fund, the SEC has

distributed approximately $365,040,744.90 to approximately

4,835 investors throughout the world, including at least 31

investors in the Southern District of New York.  The fair fund

distribution process is ongoing.

          As part of the consent settlement with the SEC,

Saraca, GTV, and VOG neither admitted nor denied the SEC's

civil administrative allegations.  The settlement agreement

concerned allegations regarding an unregistered securities

offering and did not allege any fraud by Saraca, GTV or VOG.

The settlement agreement did not include any allegations of or

conclusions as to criminal conduct.  This stipulation may be

1  received into evidence as an exhibit at trial, and it is signed

2  dated June 21st and signed by the parties.

3         Your Honor, at this time pursuant to GX Stip 8, the

4  government offers from GXPRO series the following exhibits:

5  545, 544, 541, 539, 537, 535, 534, 533, 531, 526, 525, 523,

6  522, 521, 520, 508, 504, 488, 478, 477, 476, 473, 466, 467,

7  473, 474, 486, 489, 492, 494, 496, 498, 499, 506, 508, 509.

8         MR. SCHIRICK:  Your Honor if I can just have one

9  moment.

10         THE COURT:  Yes.

11         MR. SCHIRICK:  No objection.

12         THE COURT:  They're admitted.

13         (Government's Exhibits PRO-545, PRO-544, PRO-541,

14  PRO-539, PRO-537, PRO-535, PRO-534, PRO-533, PRO-531, PRO-526,

15  PRO-525, PRO-523, PRO-522, PRO-521, PRO-520, PRO-508, PRO-504,

16  PRO-488, PRO-478, PRO-477, PRO-476, PRO-473, PRO-466, PRO-467,

17  PRO-473, PRO-474, PRO-486, PRO-489, PRO-492, PRO-494, PRO-496,

18  PRO-498, PRO-499, PRO-506, PRO-508, PRO-0509.

19  BY MR. FINKEL:

20  Q.  Mr. Johnson, do you know what Promemoria is?

21  A.  No.

22  Q.  If we can pull what's in evidence as pro466.  If you can

23  please go to page 19, Ms. Loftus, excuse me, page 20.  If you

24  can zoom in on the bottom, please, Ms. Loftus.

25         You see at the top, Mr. Johnson, it says Gladys Chow?

O6PBGUO5                         Johnson- Direct

1    A.  Yes.

2    Q.  And her email ends at HCHK Tech?

3    A.  Yes.

4    Q.  You don't know who she is?

5    A.  No.

6    Q.  Can you read the text of the body of this email starting

7    Hi, Paolo.

8    A.  Hi, Paolo and Davide.  Hope you both had a wonderful

9    Thanksgiving and staying safe under the current circumstance.

10   It has been almost a year since we last talked about the bronze

11   statute.  Please allow me to introduce myself again.  I am

12   Gladys the assistant of Mr. Miles Kwok. I was using

13   GladysSC@GSNYUS.com, and this is my new email address that I

14   will be using moving forward.

15              I am writing today mainly to relay a message.  There

16   is an upcoming project in New York, and we would like to buy

17   some furniture from Promemoria, both in-stock items and newly

18   designed items.  Mr. Guo would like to see if Davide would be

19   able to come to New York for a meeting.  He would like to

20   discuss with Davide in person to let him know about the vision

21   and see what could be achieved.  Please let me know what your

22   thoughts are.  Thank you very much.  Regards, Gladys Chow.

23   Q.  We can scroll up a bit, Ms. Loftus.

24              And what's the date of this email?

25   A.  December 2, 2021.

1    Q.  Can you just read the first sentence below Dear Gladys?

2    A.  Very nice to hear that Mr. Miles Kwok and you are all fine

3    and healthy despite this crazy time due to COVID-19.

4    Q.  Who's this email from?

5    A.  Paolo.

6    Q.  We can scroll up, please, Ms. Loftus.

7         And can you read the response from Gladys Chow

8    beginning this project?

9    A.  This project is taking place in a mansion in Mahwah, New

10   Jersey.  The client would like to design three walk-in closet.

11   Below is the link for the three rooms.  They're all labeled

12   accordingly.

13   Q.  That's fine.  Thank you.  And if we can scroll up a bit

14   please, Ms. Loftus.

15        Do you see right here in February 2022 from Gladys

16   Chow right below thank you.  Can you read that?

17   A.  Given the confidentiality of this project, could you please

18   sign the attached NDA and return it to me.  I will send over

19   the floor plan shortly.  Thank you.

20   Q.  If we can scroll up a bit, Ms. Loftus.  We're going to

21   about page 10.

22        And so here it says, Hi, Paolo, here are the links for

23   the current design plan.  Can you read what it says below link?

24   A.  Kitchen cinema walk-in closet 01 Mrs.

25   Q.  And below the next link?

O6PBGUO5                         Johnson- Direct

1   A.  Closet 02, daughter; closet 03 son; closet 04, Mr.

2   Q.  Can you read the next sentence?

3   A.  The clients do like the layouts of each rooms.  The main

4   thing is to be changed is the furniture.

5   Q.  And below that it says, below is the client's comment on

6   the current plan.  Do you see that?

7   A.  Yes.

8   Q.  Then it says cinema, do you see that?

9   A.  Yes.

10  Q.  Can you read what it says page six?

11  A.  Seats layout, he prefer all six single chairs.

12  Q.  What's the heading below cinema?

13  A.  Mrs closet 01.

14  Q.  Can you scroll down, Ms. Loftus.

15          What's the heading below Mrs. closet?

16  A.  Daughter 02, sons 03, Mr. 04 closets.

17  Q.  If we can scroll up please, Ms. Loftus.

18          Can you read from Gladys Chow, it says hi Paolo, and

19  can you read what it says below that.

20  A.  Thank you for getting back to me.  That sounds great.

21  Would it be helpful if you visit the New Jersey property and

22  take a look of all the rooms that need to be developed.  Also

23  is there any traveling cost incurred on us for this trip.

24  Regards.

25  Q.  Can we scroll up please, Ms. Loftus.  This is also from

O6PBGUO5                          Johnson- Direct

1    Gladys Chow, can you read where it says below Hi Paolo the site
2    address.
3    A.   I am checking with the design firm to see --
4    Q.   Sorry, Mr. Johnson, if you can read from the site address
5    the third line.
6    A.   The site address is 675 Ramapo Valley Road, Mahwah New
7    Jersey.
8              MR. SCHIRICK:  Your Honor, can we have another
9    sidebar, please?
10             THE COURT:  Yes.
11             (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

O6PBGUO5                          Johnson- Direct

1          (At the sidebar)

2          MR. SCHIRICK:  Your Honor, these documents, the

3     Promemoria documents relate to a design fit out by a designer.

4     This witness has absolutely no knowledge of these documents.

5     They have nothing to do with the SEC, nothing to do with the

6     SEC settlement, nothing to do with what Saraca produced to the

7     SEC.  Instead he's just being used to read these documents out

8     loud to the jury.

9          THE COURT:  One second.  Weren't these produced to the

10    SEC?

11         MR. SCHIRICK:  No.

12         THE COURT:  So how do they come in?

13         MR. FINKEL:  These documents are in pursuant to a

14    stipulation.

15         MR. SCHIRICK:  That's a completely different issue.

16    It has nothing to with the SEC.

17         THE COURT:  If you stipulated that they be admitted,

18    they're admitted, period.

19         MR. SCHIRICK:  Of course.  Understood, your Honor.  My

20    point is that they have nothing to do with this witness, and

21    the government specifically is using this witness to read these

22    documents aloud.  And my understanding is they're in evidence,

23    the government can argue from them of whatever they want to

24    argue from them.  And given frankly the premium and the

25    emphasis that has been put on saving time and being efficient,

1    I'm not sure why this SEC witness is reading from documents

2    that were produced by a decorator.  He has no knowledge or

3    anything to do with this.

4         MR. FINKEL:  I'm happy to ask the witness if he knows

5    anything or any involvement in the Mahwah property.  The

6    government will stipulate that he doesn't.  We are actually

7    being efficient by using one witness, killing two birds in one

8    stone as they say.  There are only a few of these documents.

9    These are documents that the jury should see, and the

10   government wants to present them as part of its case.  The use

11   of the Mahwah residence is a key issue.  We've heard much about

12   the secret base that Mr. Guo allegedly intended it for. These

13   documents show it was not a secret base.  He was designing it

14   for his family, so these are documents we want the jury to see.

15   Could we put a paralegal on the stand to do this instead, I

16   suppose we could.  We thought it'd be efficient by using this

17   witness.  I have no problem asking the question to draw out the

18   point that Mr. Schirick would like to be drawn out.

19        MR. SCHIRICK:  That's one point.  The other point is,

20   it is an efficiency point.  The government has gotten these

21   documents. We stipulated to them.  The government can argue

22   from the document.  We don't need to sit here to read the

23   documents.

24        THE COURT:  Well, they do have the right to have a

25   witness read the documents, and it's just now going to be a

O6PBGUO5                          Johnson- Direct

1    question of which witness.  We either sit here and deal with

2    him or someone else.

3              MR. SCHIRICK:  Understood, your Honor.  But the

4    alternative would be the documents are in evidence.  The

5    government could close on it.  It was the same point that was

6    made at sidebar to me not that long ago.

7              MR. FINKEL:  You had the whole white paper.

8              MR. SCHIRICK:  I had the opportunity to read it.

9              THE COURT:  In your case, you had shown sections of

10   the white paper.  You also showed sections of that chart, and

11   you had people read from those documents.

12             MR. SCHIRICK:  Yes, I was referring to the witness

13   earlier today, the summary witness, but that's fine.  Certainly

14   again if we're talking about efficiency here to have the SEC

15   witness read from a bunch of decorators documents, that doesn't

16   seem like the most efficient thing, but I just wanted to point

17   that out.

18             THE COURT:  So how much more of this do you have?

19             MR. FINKEL:  Maybe a couple of these documents.

20   However, even though they're just documents, these are very

21   important documents.

22             THE COURT:  I'm just trying to understand how much

23   more do we have to endure.

24             MR. FINKEL:  In fact, we're being very efficient.  We

25   were originally going to call Paolo Sozzi who is the individual

O6PBGUO5                          Johnson- Direct

1    who interacted with Gladys Chow.  We cut that witness to be

2    efficient.  This is the trade in our view instead of having

3    Paolo Sozzi testify for an hour, maybe cross for a time of

4    choosing by the defense, we're just going to read a few

5    documents. I don't have many, maybe three or four.

6              THE COURT:  Time wise?

7              MR. FINKEL:  For the rest of this witness?

8              THE COURT:  Yes.

9              MR. FINKEL:  Fifteen-ish minutes, 20 minutes.

10             THE COURT:  That's not so bad.  Very good.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Sir, if you're reading from a document,

3    don't read too fast because we have interpreters who need to

4    translate as you're reading.

5    BY MR. FINKEL:

6    Q.  Mr. Johnson, does the SEC have anything to do with 675

7    Ramapo Road in Mahwah, New Jersey?

8    A.  I don't know.

9    Q.  Can we scroll up.  Can you read the last line of this email

10   from Gladys Chow to Paolo beginning, May I know?

11   A.  May I know if you would be available after visiting the New

12   Jersey house.  The client would like to meet with you in the

13   New York office after that.

14   Q.  Scroll up, please, Ms. Loftus, if you can zoom out of that

15   so we can see the full email, please.

16           Do you see the email, Thank you, Paolo, and it says

17   the client will be available?

18   A.  Yes.

19   Q.  Can you read that?

20   A.  Thank you, Paolo.  The client will be available after 1

21   p.m. on Wednesday so we can go straight from New Jersey, 675

22   Ramapo Valley Road to the office after the site visit.

23   Q.  That's fine.  Thank you.

24           At the first page, Ms. Loftus, can you zoom in at the

25   top, the very top.  Do you see where it says Taurus Fund, LLC?

1    A.  Yes.

2    Q.  Do you know what that is?

3    A.  No.

4    Q.  If we can pull up pro531, please.

5            Do you see where it says, here are some more comments

6    from the clients regarding the drawings?

7    A.  Yes.

8    Q.  What does it say as number one?

9    A.  Daughter's closet.

10   Q.  And what does it say as number five?

11   A.  Mrs. closet and son's closet.

12   Q.  We can go to the next page, please.  This is from Gladys

13   Chow on Monday December 1, 2022.  Can you read where it says,

14   Also the client is unable to go?

15   A.  Also the client is unable to go to the city this week.

16   Could you meet him in Greenwich, Connecticut instead.

17   Q.  Keep going.  Keep reading, please.

18   A.  The address 373 Taconic Road, Greenwich, New York.  Please

19   let me know at 12:15 Thursday 3 p.m. will work for you.  If

20   not, we could move things around.

21   Q.  That's fine.  Thank you.  If we could pull up pro-536.  If

22   we can go to the third page.

23           Here it says, Hi, Paolo.  Thank you for the info.  The

24   client would like to order the following, and there's some

25   information.  And it says please deliver the table to the

O6PBGUO5                         Johnson- Direct

1  following addresses.  Do you see that?

2  A.  Yes.

3  Q.  675 Ramapo, 337 Taconic and 3 Columbus Circle.  Is that

4  correct?

5  A.  Yes.

6  Q.  If we could pull up pro-477.  Can you read the sentence

7  under Hi Paolo?

8  A.  The client would like to convert the family lounge into a

9  new kitchen and would like Promemoria to design as well.

10  Attached are the floor plan for the new kitchen and pictures of

11  how the room looks like now.  Please let me know if there are

12  any questions.  Thank you.

13  Q.  You see at the top left it says kitchen floor plan pdf?

14  A.  Yes.

15  Q.  If we can pull up pro-3478.  You see on the lower right

16  side sort of in the bubble, can you read that?  It says new

17  kitchen there.  On the left side of the document, what does

18  that say?

19  A.  Crocker residence Mahwah New Jersey, Crocker residence

20  Mahwah, New Jersey.

21  Q.  If we can pull up pro486 at page 17.

22          Can you read that email from Gladys Chow?

23  A.  Hi Paolo, for the contract could you please remove all the

24  addresses of the property and the contract will be entered

25  between Promemoria and HCHK Property Management, Inc. Thank

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6PBGUO5                          Johnson- Direct

1    you.

2    Q.  We could pull up pro-506.  Can you read, this is November

3    5, 2022, here are the clients comments.  Can you read them?

4    A.  Spa room put on hold for now until further notice.  Son's

5    closet need lighter and warmer color wood for all furniture.

6    Need chandelier design for the room.  Thank you very much.

7    Q.  If we could pull up pro-541.  Can you read below where it

8    says thank you, Paolo.

9    A.  This defective one is the purple colored one You can see it

10   to Mahwah, New Jersey location.  Regards.

11   Q.  If we can pull up 534.  What's at the top it says RE, New

12   Jersey.  Do you see that?

13   A.  Yes.

14   Q.  Can you read that?

15   A.  RE, New Jersey project, updated info.

16   Q.  And then it says, Hi, Paolo, may I know if all the design

17   plans are read for the client to review or not.  Did I read

18   that right?

19   A.  Yes.

20   Q.  If we could pull up please 508.  It says, Hi, paolo, here

21   are the clients comments on the cinema.  Can you read what it

22   says for chairs?

23   A.  Remove two chairs in the front row and at the armrest.  Can

24   the team add more storage spaces for like phones, keys, etc.

25   Q.  What does it say for ceiling?

1    A.  Add stars throughout the ceiling.  Can use the velvet from

2    the wall as the main material.  Client likes the soft furry

3    touch.

4    Q.  What does it say for screen?

5    A.  Makes it as big as possible please, fully utilize the wall.

6    Q.  And what about overall vibe?

7    A.  Good, but if it could be more futuristic likes in the

8    universe it would be even better.

9    Q.  Last one, pro-523.  Let's try pro-522.  We'll do 476.  What

10   does it say on the lower right?

11   A.  Crocker residence, Mahwah, New Jersey.

12   Q.  Can we zoom out of that, please.  Can you zoom in the whole

13   panel of the left.  What does that say in the center in red?

14   A.  Madams closet.

15   Q.  Do you know who the madam is?

16   A.  No.

17           MR. FINKEL:  Nothing further.

18   CROSS-EXAMINATION

19   BY MR. SCHIRICK:

20   Q.  Good afternoon, Mr. Johnson.  Just a few questions.  Do you

21   know anything about the building located in Mahwah, New Jersey

22   that you were just asked to read about?

23   A.  No.

24   Q.  Do you know anything about a company called Promemoria?

25   A.  I don't.

1   Q.  Do you know anything about a building called Crocker

2   mansion?

3   A.  No.

4   Q.  Do you know anything about a renovation project related at

5   that property?

6   A.  No.

7   Q.  Do you have any information or knowledge about what use was

8   made of that property?

9   A.  No.

10  Q.  Do you have any knowledge or information about who used it?

11  A.  No.

12  Q.  Do you have any idea why Mr. Finkel had you read all those

13  documents when you know nothing about it?

14  A.  No.

15  Q.  Now, you testified on direct about the SEC's mission,

16  right?

17  A.  Yes.

18  Q.  And I believe you said that among other things the SEC

19  investigates securities fraud; is that right?

20  A.  Yes.

21  Q.  Now, isn't it true that the SEC also investigates potential

22  issues with securities laws that have nothing to do with fraud?

23  A.  Yes.

24  Q.  And if we could just please bring up GX Stip 19.  You

25  remember that Mr. Finkel read this stipulation a bit earlier to

1  you just a few minutes ago?

2  A.  Yes.

3  Q.  And this is as you understand it an agreement stipulation

4  and agreement between the defense and the government as to

5  certain facts; is that fair?

6  A.  Yes.

7  Q.  And if we could just go to page paragraph five.  And this

8  says as part of the consent settlement with the SEC,

9  Mr. Johnson, are you familiar with consent settlements?

10  A.  Not particularly.

11  Q.  Fair enough.  As part of the consent settlement with the

12  SEC, Saraca, GTV and VOG neither admitted nor denied the SEC

13  civil administrative allegations.  The settlement agreement

14  concerned allegations regarding an unregistered securities

15  offering and did not allege any fraud by Saraca, GTV or VOG.

16  The settlement agreement did not include any allegations or

17  conclusions as to criminal conduct.  Did I read that correctly?

18  A.  Yes.

19          MR. SCHIRICK:  Thank you.  No further questions.

20          MR. FINKEL:  Nothing further.

21          THE COURT:  You may step out, and the government may

22  call its next witness.

23          (Witness excused)

24          MS. MURRAY:  Thank you, your Honor.  The government

25  calls Paul Hinton.  Your Honor, we understand that Mr. Kamaraju

O6PBGUO5                          Johnson - Cross

1   is going to be handling the next witness, and we discussed with

2   defense and we request maybe a five to ten-minute break before

3   the next witness comes on.

4              THE COURT:  All righty.

5              MS. MURRAY:  And just for the record to discuss a

6   stipulation that's relevant to Mr. Hinton's testimony.

7              THE COURT:  So you're seeking the break at this time?

8              MS. MURRAY:  Not for the day.

9              THE COURT:  Not for the day.  Ten-minute break at this

10  time.

11             MS. MURRAY:  Yes, thank you.

12             THE COURT:  Members of the jury, we'll take a

13  ten-minute break.  Remember you're not permitted to discuss the

14  case amongst yourselves.  Don't

15

16

17

18

19

20

21

22

23

24

25

1          (Recess)

2          THE COURT:  Please have the jurors brought in.

3          (Jury present)

4          THE COURT:  Please be seated.

5          And you may call your witness again.

6          MS. MURRAY:  Thank you, your Honor.  The government

7   calls Paul Hinton.

8          (Witness sworn)

9          THE COURT:  Please state your name and spell it, and

10  speak into the microphone.

11         THE WITNESS:  Paul Hinton.  P-A-U-L, H-I-N-T-O-N.

12         THE COURT:  All right.  Sir, you're going to have to

13  do better than that.  I need for you to speak up.

14         THE WITNESS:  I will.

15         THE COURT:  Good.  Go ahead.

16         MS. MURRAY:  Thank you, your Honor.

17   PAUL HINTON,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MS. MURRAY:

22  Q.  Good afternoon, Mr. Hinton.

23  A.  Good afternoon.

24  Q.  And if you could actually pull the microphone directly in

25  front of you, that would help.  The acoustics are not great.

O6P1GUO6                    Hinton - Direct

1              Could you please describe your educational background.

2    A.  I have an undergraduate degree from Oxford University in

3    England and a master's degree from Harvard Kennedy School of

4    Government.

5    Q.  What subject matter is your undergraduate degree?

6    A.  It's an engineering science degree.

7    Q.  And what is the subject matter of your master's degree?

8    A.  It's a public policy degree that covers statistics,

9    economics, and finance.

10   Q.  Are you currently employed?

11   A.  I am.

12   Q.  Where do you work?

13   A.  I work at the Brattle Group.

14   Q.  What is the Brattle Group?

15   A.  The Brattle Group is an economic consulting firm that

16   provides expert testimony in a range of settings, including

17   litigation and arbitration.

18   Q.  How long have you been with the Brattle Group?

19   A.  Over ten years.

20   Q.  Mr. Hinton, if I refer to the Brattle Group as Brattle,

21   will you understand what I'm referring to?

22   A.  I will.

23   Q.  Where did you work prior to Brattle?

24   A.  Prior to Brattle, I worked at another similar economic

25   consulting firm for 18 years.

1   Q.  What is your title at Brattle?

2   A.  I'm a principal.

3   Q.  What generally are your duties and responsibilities as a

4   principal at Brattle?

5   A.  Well, other than the professional development of staff, I

6   lead projects where I am either the expert who is going to

7   testify or I'm supporting another expert who is going to

8   testify.

9   Q.  Do you yourself conduct financial analysis in the course of

10  your work at Brattle?

11  A.  I do.

12  Q.  Have you testified in financial cases in the past?

13  A.  I have.

14  Q.  Has that testimony been on both the defense side and on the

15  side of the plaintiff or the government?

16  A.  It has.

17  Q.  Has that testimony included expert testimony and summary

18  witness testimony?

19  A.  Yes.

20  Q.  And Mr. Hinton, did there come a time when the government

21  contacted Brattle regarding this case?

22  A.  Yes.

23  Q.  Around when was that?

24  A.  It was around the—March or the summer last year.

25  Q.  What, if anything, did the government ask Brattle to do

1    with respect to this case?

2    A.  At that time they said they expected to have a large volume

3    of financial records that they wanted us to review and

4    summarize.

5    Q.  Did the government in fact engage Brattle to provide

6    litigative services on this case?

7    A.  Yes.

8    Q.  During approximately what time period has Brattle conducted

9    those services on this case?

10   A.  Well, we officially started summer last year, but started

11   working more intensively at the beginning of this year.

12   Q.  And is Brattle engaged with the government pursuant to a

13   contract relating to its work on this case?

14   A.  Yes.

15   Q.  What is the approximate dollar amount that Brattle has

16   billed or will be paid for its work on this case?

17   A.  About $2 million.

18   Q.  Does that include analysis that has been conducted prior to

19   your testimony today?

20   A.  Yes.

21   Q.  Does that also include bills for your testimony here today?

22   A.  Yes.

23   Q.  Mr. Hinton, what was the scope of work of the project that

24   the government engaged Brattle to do in this case?

25   A.  Well, initially in the contract, it was——there were some

1    work streams that were contemplated that included looking at

2    data from devices and, as I said, reviewing bank records,

3    amongst other things.

4    Q.    Focusing in turn on some of the work that Brattle has done,

5    did there come a time when the government provided certain

6    agreements and corporate documents to Brattle in this case?

7    A.    It did.

8    Q.    Generally speaking, what type of agreements or documents

9    were those?

10   A.    They were a range of different types of documents.  Many of

11   them were service contracts; others were documents indicating

12   loan agreements or investment amounts.

13   Q.    In addition to those corporate agreements or documents, did

14   the government provide Brattle with other types of records or

15   exhibits in this case?

16   A.    Yes, bank records.

17   Q.    And what approximate volume of bank records did the

18   government provide to Brattle in this case?

19   A.    Well, there were thousands of——of documents in the form of

20   pdfs and Excel files representing over 200,000 transactions.

21   Q.    What, if anything, did the government engage Brattle to do

22   with respect to those bank records?

23   A.    Well, initially it was just to identify what the documents

24   were that were in the production and which entities they

25   related to and which bank accounts.

O6P1GUO6                          Hinton - Direct

1            MS. MURRAY:  Ms. Loftus, if we could please pull up

2   for the witness what's been marked for identification as

3   Government Exhibit Z27.

4   Q.  Mr. Hinton, do you recognize this exhibit?

5   A.  Yes.

6   Q.  Did you review it in advance of your testimony?

7   A.  I did.

8            MS. MURRAY:  Your Honor, the government offers

9   Government Exhibit Z27.

10           MR. KAMARAJU:  No objection, your Honor.

11           THE COURT:  It is admitted.

12           (Government's Exhibit Z27 received in evidence)

13           MS. MURRAY:  If we could publish, please.

14  BY MS. MURRAY:

15  Q.  Mr. Hinton, can you describe for the jury what information

16  is reflected on this page of Government Exhibit Z27, as it

17  relates to Brattle's work with respect to the bank records in

18  this case.

19  A.  Yes.  This just summarizes the volume of materials that we

20  identified and then later the subset of those records that we

21  processed to extract information.

22  Q.  And when you say Processed Accounts in the first column,

23  what does that mean with respect to work that Brattle did?

24  A.  Well, by processed, I mean, we had to take each of these

25  various bank documents that included financial transactions and

1    extract the relevant transaction details from them and put them

2    into an Excel spreadsheet.

3    Q.   Looking at the last row here, Mr. Hinton, Number of Banks,

4    approximately how many unique banks did the government provide

5    records from in this case?

6    A.   Well, we identified 72 different banks in the overall

7    document production that we were sent.

8    Q.   For those 72 banks, the records from those banks, can you

9    describe for the jury how, if at all, the format of the bank

10   records differed.

11   A.   Well, some of——yeah, some of the bank records were just

12   ordinary bank statements that are very similar to the type of

13   bank statement that any individual would have from their bank,

14   and those would be pdfs, and they usually have the summary of

15   the monthly activity at the top and then you show all the

16   transactions and the balance.  But there were a lot of other

17   types of documents too.  One other common format was a record

18   of what's called wire transactions, and those are transactions

19   that occur between banks, and those records could come in the

20   form of, you know, detailed statements that were pdfs but they

21   could also come in the form of a spreadsheet where there were

22   many columns of data that described different features of each

23   of the wire transfers.  There were also, in some statements,

24   images of checks, so just the canceled checks or the checks

25   after they had been processed and received at a bank.  And

1    there were other miscellaneous bank records also.

2    Q.  And looking again at the first column, Processed Accounts,

3    approximately how many files of bank documents did Brattle

4    process in the course of its work on this case?

5    A.  So over 2,000.  So 2,173.

6    Q.  And looking at the next item there, Number of Entities,

7    those bank records were in the names of approximately how many

8    different entities or individuals?

9    A.  Well, there were about 100—well, 119 different entities

10   for whom we processed bank records.

11   Q.  And those 119 entities for the processed accounts, how many

12   bank accounts did those represent?

13   A.  There were 450 bank accounts for the 219 *[sic]* entities.

14           MS. MURRAY:  Ms. Loftus, if we could go to the next

15   slide, please.

16   Q.  Mr. Hinton, can you describe for the jury, first of all,

17   who provided the categories that are reflected on this slide.

18   A.  The government.

19   Q.  And did the government inform or advise Brattle what

20   entities to place within each of these categories?

21   A.  Yes, they did.

22   Q.  And that was a determination made by the government; is

23   that correct?

24   A.  That's correct.

25   Q.  So looking here, and this is Identified Accounts.  Can you

1    just explain the difference between Identified Accounts and

2    Processed Accounts.

3    A.   Yes.   The——initially we received a large volume of

4    documents, and we had to identify what those documents were,

5    which entities were named in them, which banks, and which of

6    them were actually documents that contained financial

7    transaction information, so that was the identification phase,

8    and the government later indicated which of those identified

9    bank records they wanted us to process.

10   Q.   And reading across this slide, first of all, with respect

11   to the Rule of Law category, do you have any independent

12   understanding of what the Rule of Law is?

13   A.   No.

14   Q.   How many identified accounts were there for Rule of Law?

15   A.   20.

16   Q.   Looking next, GTV/VOG, do you have any independent

17   knowledge of what GTV is?

18   A.   No.

19   Q.   Or VOG?

20   A.   No.

21   Q.   How many identified bank accounts were there that went into

22   the government's category of GTV or VOG?

23   A.   We identified 49.

24   Q.   And then Farms, aside from the common understanding of the

25   word, do you know what Farms means in the context of this case?

1   A.  No.

2   Q.  Did the government provide that category and identify what

3   entities or individuals fell within that category?

4   A.  It did.

5   Q.  And how many identified bank accounts were there under the

6   Farms category?

7   A.  85.

8   Q.  Looking now at G|CLUBS and Crane, first, do you have any

9   independent knowledge of G|CLUBS?

10  A.  No.

11  Q.  Do you have any independent knowledge of what Crane is?

12  A.  No.

13  Q.  How many identified bank accounts fell within the

14  government's category of G|CLUBS or Crane?

15  A.  82.

16  Q.  And finally, Mr. Hinton, Himalaya Exchange, do you know

17  what the Himalaya Exchange is?

18  A.  No.

19  Q.  How many identified bank accounts fell within that

20  category?

21  A.  27.

22          MS. MURRAY:  If we could go to the next slide, please,

23  Ms. Loftus.

24          Actually, let's go back one for a moment.

25  Q.  Mr. Hinton, can you explain the process by which Brattle

1    extracted data from the bank records that the government

2    provided.

3    A.   Certainly.  Well, there were two different processes——one

4    for data that was already in a spreadsheet and a different

5    process for the——the documents that came as pdfs, so the pdfs

6    had to be OCR'd, so the optical character recognition run, so

7    that the fields of information could be copied from those

8    documents, and then computer programs were used to extract

9    those fields of information and put them into a spreadsheet.

10   So at that point we had two——we had all the records in

11   spreadsheet form and we then just had to organize the fields of

12   information for each account so that they were formatted in a

13   consistent way across all the banks and all the accounts.

14        MS. MURRAY:  Ms. Loftus, can we take this down,

15   please, and let's put up for the witness only Government

16   Exhibit Z28.

17   Q.   Mr. Hinton, do you recognize Exhibit Z28?

18   A.   I do.

19   Q.   At a high level, what information does it reflect?

20   A.   It lists all the bank——banks down the left-hand side, and

21   then in the columns, there's a count of the number of different

22   bank accounts that——that we identified that are associated with

23   each of the categories that were on the prior chart.  I think

24   there are also a couple of other categories on this particular

25   chart, but the point here is that it dem——it records the

1  breakdown or the composition of all the bank accounts that we

2  identified that were classified into all the categories the

3  government gave us.

4  Q.  And Mr. Hinton, did you review Government Exhibit Z28 in

5  advance of your testimony today?

6  A.  I did.

7  Q.  Did you confirm that the information contained within this

8  summary chart is accurate?

9  A.  I did.

10          MS. MURRAY:  Your Honor, the government offers Z28.

11          MR. KAMARAJU:  No objection.

12          THE COURT:  It is admitted.

13          (Government's Exhibit Z28 received in evidence)

14          MS. MURRAY:  Could we please publish.

15  Q.  All right.  Mr. Hinton, now that the jury can see it——it's

16  a bit small.  We'll zoom in on various portions.

17          MS. MURRAY:  First, Ms. Loftus, if we could zoom in on

18  the top portion, to include the first few rows but all of the

19  column titles as well.

20  Q.  So Mr. Hinton, looking across this document, the first few

21  columns, those reflect the categories that we just saw on the

22  prior slide; is that correct?

23  A.  Yes, that's correct.

24  Q.  And those are categories that the government defined and

25  provided to Brattle?

O6P1GUO6                        Hinton - Direct

1   A.  It did.

2   Q.  Looking at the column titled ACA Capital, Hamilton (William

3   Je), what information, generally speaking, did the government

4   define for that category?

5   A.  It identified specific entities that should be categorized

6   in that category, and those included entities ACA Capital and

7   Hamilton.

8   Q.  And do you know who William Je is personally?

9   A.  No.

10  Q.  Do you have any independent knowledge of ACA Capital or

11  Hamilton?

12  A.  No.

13  Q.  Looking at the next column, it's indicating Family Members

14  with an asterisk.  Do you see that?

15  A.  I do.

16  Q.  And the final column, Family Offices with two asterisks.

17  Do you see that?

18  A.  Yes.

19          MS. MURRAY:  Ms. Loftus, if we could zoom out of this

20  and go to the bottom, please, of this page.  And zoom in on the

21  bottom left portion.

22  Q.  Mr. Hinton, for purposes of this summary chart, how is the

23  Family category defined, the government's Family category?

24  A.  It is defined to include all accounts for Mei Guo, Qiang

25  Guo, William Je, and Sing Ting Rong.

1    Q.  And do you know who any of those individuals is,

2    Mr. Hinton——Mei Guo, Qiang Guo, William Je, or Sing Ting Rong?

3    A.  No.

4    Q.  And then Family Offices category that the government

5    provided, Mr. Hinton, what entities is that defined to include?

6    A.  The government told us to include the entities Lamp

7    Capital, Golden Spring, Hudson Diamond, Lexington Property, and

8    Greenwich Land.

9    Q.  And same question with respect to those entities.  Do you

10   have any understanding or knowledge of those entities?

11   A.  No.

12           MS. MURRAY:  All right.  Let's zoom out again,

13   Ms. Loftus.  And if we could kind of zoom in on the top half of

14   the chart or so.

15   Q.  I just want to take a few examples here, Mr. Hinton.

16   Looking, for example, at Bank of America, which is the second

17   row, if you could just read across for the jury and read the

18   number of identified accounts and the relevant category that

19   those accounts fell under.

20   A.  Yes.  We identified bank account records for Bank of

21   America accounts.  For Rule of Law, there were four; in the

22   Farms category, there were 11; in the GTV/VOG category, there

23   were four; there were eight for Family Members; and that came

24   to a total of 27.

25   Q.  Taking another example here, let's look at JPMC, or

1    JPMorgan Chase, and read across the row the bank accounts that

2    were identified for the various categories where there were

3    accounts.

4    A.   Yes.   For JPMorgan Chase there were 25 Farms accounts; 10

5    GTV/VOG accounts; five G|CLUBS/Crane accounts; and five Family

6    Office accounts; for a total of 45 different accounts.

7              MS. MURRAY:   Let's zoom out of that, please,

8    Ms. Loftus.

9              And if we could zoom in now on the bottom portion of

10   this, down to the end.

11   Q.   Taking just one more example, Mr. Hinton, Silvergate Bank,

12   if you could read across there.

13             MS. MURRAY:   And Ms. Loftus, maybe we could scroll up

14   for a moment for Mr. Hinton so he can see which column that is.

15   Q.   There were 27 identified accounts in which category at

16   Silvergate Bank?

17   A.   It's the ACA Capital, Hamilton column that has 27

18   Silvergate Bank accounts.

19   Q.   And just looking at the totals here, Mr. Hinton, what was

20   the total number of identified accounts for these various

21   categories that are reflected on this chart?

22   A.   422 different accounts.

23             MS. MURRAY:   Thank you, Ms. Loftus.   We can take that

24   down.

25             Your Honor, at this time the government would like to

1  offer various exhibits pursuant to stipulations between the

2  parties.

3        First, Ms. Loftus, if we could please pull up Stip 8,

4  which is already admitted and in evidence.

5        Pursuant to Stip 8, the government offers the

6  following exhibits, which are reflected in parts of column B:

7        Government Exhibits GX BR300-GX BR356;

8  GX 3200-GX 3202; GX 3210-GX 3213; GX 3214; GX 3204-GX 3207;

9  GX BR900-GX BR931; GX2001-GX 2717; and GX BR1001-GX BR1031.

10  The government offers those exhibits pursuant to this stip.

11        MR. KAMARAJU:  No objection.

12        THE COURT:  They're admitted.

13        (Government's Exhibits BR300-BR356; 3200-3202;

14  3210-3213; 3214; 3204-3207; BR900-BR931; 2001-2717;

15  BR1001-BR1031 received in evidence)

16        MS. MURRAY:  All right.  Ms. Loftus, if you could

17  please now pull up GX Stip 14.  Again, this is a stipulation

18  between the parties that has been admitted.

19        Your Honor, in the interest of time and everyone's

20  attention, I'll just reference the government exhibits that are

21  cited in this stipulation and offer them pursuant to the

22  stipulation.  This stipulation indicates that the parties have

23  agreed that the government exhibits listed in column B were

24  lawfully obtained by the government, they're authentic records

25  of the entity listed in column A, they were made at or near the

1    time by, or information transmitted by a person with knowledge,

2    they were kept in the regular course, and it was the regular

3    practice of the entity to make the records.  The government

4    exhibits listed in column B are bank records from producing

5    parties that are banks.  Pursuant to this stipulation, the

6    government offers all of the government exhibits listed in

7    column B.

8              THE COURT:  They're admitted.

9              (Government's Exhibits Column B of Stip 14 received in

10   evidence)

11             MS. MURRAY:  Finally, your Honor, the government would

12   offer at this time Government Exhibit Stip 22 for admission.

13             THE COURT:  It is admitted.

14             (Government's Exhibit Stip 22 received in evidence)

15             MS. MURRAY:  And pursuant to Government Exhibit

16   Stip 22, the government offers the following additional bank

17   records.

18             Government Exhibit Stip 22 is a stipulation between

19   the parties agreeing that the Government Exhibits cited in

20   column B are records maintained in the course of the regular

21   business of the entities listed in column A, which are banks

22   that are producing parties.  Pursuant to Government Exhibit

23   Stip 22, the government offers all of the government exhibits

24   cited in column B of Stip 22.

25             THE COURT:  They are admitted.

1            (Government's Exhibits Column B of Stip 22 received in

2      evidence)

3            MS. MURRAY:  Thank you.  We can take that down,

4      Ms. Loftus.

5            So if we could go back now, please, to GX Z27.

6            And let's go to slide 3.

7      BY MS. MURRAY:

8      Q.  Mr. Hinton, can you describe for the jury what is reflected

9      on this summary chart.

10     A.  This chart lists the names of the entities that were

11     classified as Family Office entities and the number of

12     processed bank accounts for each.

13     Q.  And to be clear, the processed bank accounts, is it correct

14     that those are accounts that Brattle extracted the data from—

15     A.  That's correct.

16     Q.  —bank records?

17     A.  That's correct.

18     Q.  All right.  And we could go—actually, let's look at this

19     for a moment.

20            How many processed bank accounts were there for Lamp

21     Capital, LLC?

22     A.  25.

23     Q.  What about for Greenwich Land, LLC?

24     A.  Three.

25     Q.  So in total for these five Family Office entities under the

O6P1GUO6                     Hinton - Direct

1   government's category, how many processed bank accounts were

2   there?

3   A.  52.

4           MS. MURRAY:  Let's go to the next slide, please,

5   Ms. Loftus.

6           And if we could scroll up a bit.

7           And just zoom so we can see the full summary chart.

8   Q.  Mr. Hinton, generally speaking, what information is

9   reflected on this slide?

10  A.  This is a similar chart that lists all the processed

11  accounts for the individual entities that were categorized in

12  the Farm group.

13  Q.  And those were categories that the government provided; is

14  that correct?

15  A.  That is correct.

16  Q.  And is it correct that this summary chart lists only

17  processed accounts for the Farm entities that are listed here?

18  A.  Yes, just those for which we extracted data.

19          MS. MURRAY:  If we could scroll down a bit,

20  Ms. Loftus.

21  Q.  For those Farm accounts for which Brattle extracted data,

22  how many accounts were there?

23  A.  55.

24  Q.  And looking at the fourth row here, what is the name of

25  that Farm entity?

O6P1GUO6                        Hinton - Direct

1   A.  Maywind Trading, LLC.

2           MS. MURRAY:  We can take that down, Ms. Loftus.

3   Q.  Now, Mr. Hinton, you mentioned that in addition to bank

4   accounts, Brattle also received loan agreements and other

5   documents from the government; is that correct?

6   A.  That's correct.

7   Q.  Did the government ask Brattle to conduct a certain

8   analysis of some of those agreements?

9   A.  It did.

10  Q.  Did that include a summary analysis of Maywind Trading, LLC

11  loan agreements?

12  A.  It did.

13          MS. MURRAY:  Ms. Loftus, if we could please go to

14  Government Exhibit Z29, just for the witness for the moment.

15  Q.  Mr. Hinton, do you recognize Z29?

16  A.  I do.

17  Q.  At a high level, what is it?

18  A.  It's the first page of a long list of all of the loan

19  agreements that we identified for Maywind Trading, LLC, which

20  was——and it's labeled here Phoenix Farm.

21  Q.  And did you review this exhibit in advance of your

22  testimony today?

23  A.  I did.

24  Q.  Is the information in Z29 accurate?

25  A.  It is.

1              MS. MURRAY:  Your Honor, the government offers

2    Government Exhibit Z29.

3              MR. KAMARAJU:  No objection.

4              THE COURT:  It is admitted.

5              (Government's Exhibit Z29 received in evidence)

6              MS. MURRAY:  Can we please publish, Ms. Loftus.

7    BY MS. MURRAY:

8    Q.  Can you read the title, now that the jury can see it, of

9    this exhibit, please, Mr. Hinton.

10   A.  It says Phoenix Farm, and in brackets it says Maywind

11   Trading LLC, Loan Agreements.

12   Q.  Do you know what the Phoenix Farm is, Mr. Hinton?

13   A.  I do not.

14   Q.  Now looking at this summary chart that's contained within

15   this exhibit, the farthest-right column, what information is

16   reflected there under the column titled GX?

17   A.  Those were all the Government Exhibit numbers that

18   correspond to the loan agreements.

19             MS. MURRAY:  If we could focus on the top portion,

20   Ms. Loftus, before the table.

21   Q.  Mr. Hinton, how many Maywind Trading, LLC or Phoenix Farm

22   loan agreements did Brattle identify in the materials the

23   government provided?

24   A.  We identified 686 distinct loan agreements.

25   Q.  Did Brattle evaluate or analyze those loan agreements to

O6P1GUO6                          Hinton - Direct

1  determine whether they were signed?

2  A.  We did.

3  Q.  How many of those 686 loan agreements were signed by the

4  borrower, or the Phoenix Farm (Maywind Trading LLC)?

5  A.  None of them had a signature for the borrower.

6  Q.  And how many of those 686 loan agreements were signed by

7  the lender, or the individuals who were the counterparties to

8  those agreements?

9  A.  They were all signed.

10            MS. MURRAY:  All right.  If we could zoom out of that,

11  please.

12            I just want to look at one or two examples, if we

13  could.

14            Ms. Loftus, let's go down, please, to—thank you.

15  Actually, let's go one more page down.

16            And—perfect.

17  Q.  So looking at one of the entries for December 3, 2020,

18  Mr. Hinton, do you see that the amount is listed as Not

19  Applicable on this summary chart?

20  A.  There are some entries that say NA, that's correct.

21            MS. MURRAY:  If we could go to that source exhibit,

22  Ms. Loftus.

23            So this is December 3, 2020.  That's Government

24  Exhibit 2502, which is in evidence.

25            If we could focus on the top portion here, Ms. Loftus.

1  Q.  Mr. Hinton, what is listed for the borrower on this loan

2  agreement?

3  A.  It says Phoenix Farm, and in brackets, it says Maywind

4  Trading, LLC.

5  Q.  And who is listed as the lender?

6  A.  The lender is listed as Cai Yanting.  Excuse my

7  pronunciation.

8  Q.  There's a certain field that's called Lender's Phoenix Farm

9  Code.  Do you see that?

10  A.  Yes.

11  Q.  What information is reflected there?

12  A.  It's just an alphanumeric code.

13  Q.  And can you read that, please.

14  A.  FH1-1560.

15  Q.  And this loan agreement is dated.  What is the date?

16  A.  It's dated December 3, 2020.

17  Q.  Under Section 1, Terms, can you read (a) Use of Proceeds.

18  A.  It says, "The loan proceeds advanced under this agreement

19  is for the general working capital purposes of the borrower."

20  Q.  Looking at item (b) Loan Amount, what loan amount is

21  reflected on this agreement?

22  A.  Well, there's a little blank space in the sentence that is

23  empty in this particular agreement.

24  Q.  What is the interest rate that's reflected here under 1(c)?

25  A.  3 percent per annum.

1    Q.  Payable when?

2    A.  It is payable in full on the final maturity date.

3    Q.  And then (d), Final Maturity Date, what's reflected there?

4    A.  "The final maturity date is 36 months after the effective

5    date."

6            MS. MURRAY:  If we could zoom out of this, please,

7    Ms. Loftus.

8            And let's go down a few pages.

9    Q.  So there are initials on the bottom, Mr. Hinton.  Do you

10   see that?  Oh.

11   A.  I see that there are some typed——three letters are typed at

12   the bottom of each page, which appear to be——well, they——the

13   first two of which match——match the first name and the last

14   name of the lender.

15           MS. MURRAY:  All right.  Let's keep going through the

16   next few pages, please, Ms. Loftus.

17   Q.  On this page, Mr. Hinton, does it appear that this document

18   is signed?

19   A.  Yeah, in the signature area of the agreement, there are

20   some Chinese characters.

21   Q.  And that's for which party to this agreement?

22   A.  It's for the——for Cai Yanting, who is the lender.

23   Q.  Is there a signature on the line that is associated with

24   Phoenix Farm (Maywind Trading, LLC)?

25   A.  No.  The line is blank.

1   Q.  And Mr. Hinton, this is signed even though there's no loan

2   amount listed; is that correct?

3   A.  That's correct.

4         MS. MURRAY:  If we can go back, Ms. Loftus, to

5   Government Exhibit Z29.  Thank you.

6         And if we could go to the last page, please.

7   Q.  Mr. Hinton, for the 686 Phoenix Farm loan agreements that

8   are reflected in this summary chart, what is the cumulative

9   dollar amount associated with those loan agreements?

10  A.  The sum of the loan amounts for these agreements is

11  $23,158,757.

12        MS. MURRAY:  Thank you, Ms. Loftus.  We can take that

13  down now.

14  Q.  Mr. Hinton, since the government engaged Brattle in

15  connection with this case, has the government provided guidance

16  to Brattle regarding the analysis that it was requesting?

17  A.  Yes, it has.

18  Q.  Did that include calls and meetings to discuss Brattle's

19  findings and to provide, for example, categories of information

20  for Brattle to characterize certain records?

21  A.  It did.

22  Q.  Did the government provide edits or other feedback to

23  Brattle regarding its analysis and findings?

24  A.  It did.

25  Q.  Does Brattle's work product, including the exhibits we've

1    looked at so far today, reflect certain of the government's

2    feedback and instruction?

3    A.  They do.

4    Q.  Now, Mr. Hinton, besides the analysis you've been

5    describing that Brattle performed in this case, your testimony

6    today, and your preparation for that testimony, did you have

7    any involvement in this case?

8    A.  I did.

9    Q.  What was the degree of your involvement in this case,

10   besides the analysis you described, your testimony today, and

11   your preparation for that testimony?

12   A.  Could you repeat the question.

13   Q.  Sure.  What was your involvement in this case besides the

14   analysis that Brattle performed, your testimony today, and your

15   preparation for the testimony?

16   A.  Well, that was——those are the main elements of——those are

17   the elements of——of my work.  I performed——I supervised the

18   staff to perform the analysis, I prepared for testimony, and

19   I'm delivering the testimony today.  That was the scope of our

20   engagement.

21   Q.  And Mr. Hinton, did you review all of the evidence that the

22   government has collected in this case or did you just review

23   the records and exhibits that the government provided to

24   Brattle?

25   A.  Only the documents that were provided to Brattle.

O6P1GUO6                     Hinton - Direct

1   Q.  Did Brattle have any role in determining what exhibits or

2   records the government would provide to Brattle?

3   A.  No.

4   Q.  And you mentioned the process of extracting data from the

5   bank records that the government provided.  How, if at all, did

6   Brattle catalog or categorize that extracted data?

7   A.  Well, we used the——the category——the categorizations that

8   we discussed earlier to identify not just the bank accounts but

9   the individual transactions based on which entities were

10  involved and what category they were in, and then as I've

11  mentioned before, we——we took the transaction data from each of

12  the different sources and organized them into a single database

13  so that they could be looked at together.

14  Q.  And what was your role, if any, with respect to that

15  database that contained the bank——the extracted bank record

16  data?

17  A.  Well, I designed the database structure and I supervised

18  and directed the work to——along the way to populate it.

19  Q.  At a high level, can you describe for the jury how that

20  database operated.

21  A.  Well, it was really——it's a more secure way of organizing

22  the hundreds of different bank account records, sets of

23  records, than just keeping them in a spreadsheet, so it enabled

24  us to organize all the different banks' transaction records in

25  the same format and also capture the categories that the

1   government had given us and associate it with every single

2   transaction along with the reference numbers telling us which

3   document they came from.

4   Q.  And when you say the reference numbers reflecting the

5   document, did those documents link to identified government

6   exhibits in this case?

7   A.  Yes, that means that every single transaction, of which

8   there are over 200,000 in the database, can be linked back to a

9   source document that is a GX—has a GX number in this case.

10  Q.  And in preparing for your testimony today, Mr. Hinton, did

11  you review and verify the accuracy of the various summary

12  charts we've looked at so far?

13  A.  I did.

14  Q.  And did you do that in part by going to the database that

15  Brattle maintained of bank records?

16  A.  Yes.  In fact, the individual transactions represented on

17  each chart were taken from the database, and I was able to then

18  identify which government exhibit the data came from and look

19  at the underlying source document to verify the data.

20          MS. MURRAY:  Ms. Loftus, can we please put up what's

21  been marked for identification as Government Exhibit Z26.

22          And that's just for the witness.

23          And if we could scroll through a few pages.

24  Q.  Mr. Hinton, do you recognize Z26?

25  A.  I do.

1    Q.  Did you assist in preparing Government Exhibit Z26?

2    A.  I did.

3    Q.  Does Z26 contain a summary of certain bank records that

4    Brattle reviewed in connection with this case?

5    A.  Yes, reviewed and processed.

6            MS. MURRAY:  And if we could go to the last page,

7    please, Ms. Loftus.

8    Q.  Looking at the last page of this presentation, does this

9    reflect the government exhibits that are the source documents

10   that support the data contained within Z26?

11   A.  Yes.

12   Q.  Have you reviewed the information in Z26 and the source

13   documents cited on this slide, Mr. Hinton?

14   A.  I have.

15   Q.  Have you confirmed the information is accurate?

16   A.  I have.

17           MS. MURRAY:  Your Honor, the government offers

18   Government Exhibit Z26.

19           MR. KAMARAJU:  No objection.

20           THE COURT:  It is admitted.

21           (Government's Exhibit Z26 received in evidence)

22           MS. MURRAY:  Ms. Loftus, if we could go to the first

23   slide, please, and publish to the jury.

24   BY MS. MURRAY:

25   Q.  Mr. Hinton, what is the title of Government Exhibit Z26?

1    A.  Bank Record Summaries.

2    Q.  Excellent.

3            MS. MURRAY:  Let's go to the next slide, please.

4    Q.  What information, generally, is reflected on this chart,

5    Mr. Hinton?

6    A.  Well, this is the result of summing up the value of all the

7    transactions in the database, so that's all the transactions we

8    processed and categorized according to the categories that the

9    government gave us for GTV, Farms, G|CLUBS, and Himalaya.

10   Q.  And the top of this chart, Mr. Hinton, says Sources of

11   Funds.  Did the government provide Brattle with instruction

12   regarding how and whether to categorize certain transactions as

13   Sources of Funds?

14   A.  It did.

15   Q.  Focusing on, for example, G|CLUBS, what was some of the

16   instruction that the government provided to Brattle regarding

17   what type of transactions should be tagged or categorized as

18   Sources of Funds that flow through to G|CLUBS?

19   A.  So these are transactions that come from individuals, not

20   from entities, and only those individuals who aren't associated

21   with—in some way with any of the—the entities that are listed

22   on the chart.

23   Q.  What, if anything, did the government direct Brattle with

24   respect to the dollar amounts of transactions that should be

25   included within G|CLUBS Sources of Funds?

1    A.  So for certain accounts there were——we observed there were

2    amounts in round numbers of 10,000, 20,000, 30,000, 40,000, and

3    50,000, and the government instructed us that any transactions

4    for those amounts, plus or minus a hundred dollars, from

5    individuals, should be classified——or even if they weren't from

6    identified individuals, those amounts should be classified as

7    Sources of Funds.

8    Q.  Did the government explain to you why it instructed Brattle

9    to tag transactions in those amounts as Sources of Funds for

10   G|CLUBS?

11   A.  No.

12   Q.  Do you have any independent understanding why the

13   government gave that instruction?

14   A.  No.

15   Q.  What discretion, if any, did Brattle have in deviating from

16   the government's definition of Sources of Funds for purposes of

17   this summary analysis?

18   A.  We did not have any discretion.

19   Q.  Reading along the amounts here, what is the sum dollar

20   amount reflected in this summary exhibit of Sources of Funds

21   that flowed through to the government's category of GTV or VOG?

22   A.  $411 million.

23   Q.  What about the Farms?

24   A.  $110 million.

25   Q.  And what amount went through to G|CLUBS?

1    A.  $240 million.

2    Q.  And finally, what amount went through to the Himalaya

3    Exchange?

4    A.  $517 million.

5    Q.  And that's for a combined total of what amount, as

6    reflected here for purposes of this summary?

7    A.  $1.3 billion.

8              MS. MURRAY:  And Ms. Loftus, we can go to the next

9    slide.

10   Q.  Looking at the top of this, Mr. Hinton, what is the title

11   of this slide?

12   A.  The title is GTV/VOG: Overview.

13   Q.  And is that one of the categories that the government

14   defined for Brattle?

15   A.  Yes.

16   Q.  Looking at the Sources of Funds here, there are three

17   entities listed, kind of at the bottom of the slide.  Do you

18   see those?

19   A.  I do.

20   Q.  Under those entities, there are parentheticals and there

21   are some letters and numbers.  What information, if any, does

22   that reflect?

23   A.  The numbers and letters represent particular bank accounts.

24   Q.  And so the letters, what about the bank accounts do the

25   letters reflect?

O6P1GUO6                          Hinton - Direct

1    A.  So the number——the letters are just an acronym or shorthand

2    for the name of the bank.  So BOA stands for Bank of America.

3    Q.  And then the numbers that are listed throughout these

4    slides for different bank accounts, what portion, if any, of

5    the relevant account number are those?

6    A.  Those are the last four digits of the bank account number.

7    Q.  So looking at this overview slide, how much money from the

8    Sources of Funds that were identified went to Voice of Guo

9    Media, Inc., between April 20, 2020, and October 13, 2020?

10   A.  72 million——72.9 million went into the two——the Bank of

11   America and Wells Fargo bank——Voice of Guo Media accounts on

12   this chart.

13   Q.  And looking in the middle, how much went into those two

14   JPMorgan accounts held in the name of Saraca Media Group, Inc.?

15   A.  286.9 million.

16   Q.  And on the right, how much went into the Capital One and

17   the JPMorgan bank accounts held in the name of GTV Media Group,

18   Inc.?

19   A.  29.6 million.

20   Q.  And over what time period did that 29.6 million go into the

21   GTV Media Group, Inc.'s bank account?

22   A.  Between May 11, 2020, and June 12, 2020, that those amounts

23   went into the two bank accounts shown there.

24              MS. MURRAY:  All right.  Ms. Loftus, the next slide,

25   please.

1   Q.  Mr. Hinton, what is the title of this slide?

2   A.  This slide is titled GTV/VOG: Select Flows.

3   Q.  Generally speaking, at a high level, what does this summary

4   chart or summary slide reflect?

5   A.  It shows the dollar——aggregate dollar amount of flows of

6   funds between particular bank accounts over certain time

7   periods.

8   Q.  And Mr. Hinton, who selected which bank account to include

9   on this summary flow slide?

10  A.  The government.

11  Q.  If we could just follow through a few examples.

12          Looking at the second arrow on the top left from

13  Sources of Funds going to the Wells Fargo bank account in the

14  name of Voice of Guo Media, Inc., what is the dollar amount

15  that goes to that account from Sources of Funds?

16  A.  $46.3 million.

17  Q.  And then looking at the next select flow from that account,

18  where does $15 million in the form of a cashier check go from

19  that account?

20  A.  It goes from Wells Fargo to JPMorgan at Saraca Media Group.

21  Q.  And from that JPMorgan account ending in 5601, where then

22  do we see a flow of $125.5 million going?

23  A.  To Saraca Media Group at JPMorgan 2038.

24  Q.  And over what time period?

25  A.  From June the 3rd to June 10th.

1  Q.  Of what year?

2  A.  2020.

3  Q.  And then let's look at the outflows from that Saraca Media

4  Group, Inc. account, the JPMorgan 2038.

5          First, on the left, what do we see going straight down

6  on June 5, 2020?

7  A.  There's a transfer of 100 million on June 5th to Hayman

8  Hong Kong Opportunities Fund.

9  Q.  Mr. Hinton, do you know what the Hayman Hong Kong

10  Opportunities Fund is?

11  A.  I do not.

12  Q.  All right.  And then let's look at another outflow from

13  that JPMorgan 2038 account, over——going to the right on

14  June 9th of 2020.  What amount do we see listed there?

15  A.  $38 million on June 9, 2020.

16  Q.  Now looking down the center of this slide, Mr. Hinton, just

17  briefly, can you follow through the Sources of Funds that go

18  down the center of the slide directly to the Saraca Media

19  JPMorgan account ending in 5601 and then on through to the GTV

20  Media account at Citibank ending in 6691.

21  A.  Yes.  Starting in February, on the 22nd, of 2019, over the

22  following year and a half or so, there's 275.9 million in funds

23  from Sources of Funds, as they've so been defined, into Saraca

24  Media Group's JPMorgan account ending in 5601.  Then on June 3,

25  2000 *[sic]*, there's a 200 million transfer from that Saraca

O6P1GUO6

1    Media Group account to GTV Media Group, at Citigroup account

2    6691.

3    Q.  And just to be clear, Mr. Hinton, what year was that, the

4    June 3rd transaction of 200 million from Saraca at JPM to GTV

5    at Citi?

6    A.  In 2020.

7    Q.  If we can go to the next——actually, stay on this slide for

8    a moment, please.

9           Looking at the far right, Mr. Hinton, do you see a

10   name that's in the far right bottom box?  There's a company

11   name and a PNC?

12   A.  I do.

13   Q.  What is that name?

14   A.  Lawall & Mitchell.

15   Q.  Do you know what Lawall & Mitchell is?

16   A.  I know that it's a law firm.

17           THE COURT:  All righty.  We need to stop because it's

18   5:00.

19           Members of the jury, don't discuss the case amongst

20   yourselves or with anyone else.  Don't permit anyone to discuss

21   the case in your presence.  Don't read, watch, or listen to

22   anything from any source having to do with the subject matter

23   of this trial.  Have a good evening.

24           (Jury not present)

25           THE COURT:  Sir, you may step out.

O6P1GUO6

1             THE WITNESS:  Okay.  Thank you.

2             THE COURT:  Don't discuss your testimony.

3             THE WITNESS:  I will not.

4             (Witness not present)

5             THE COURT:  You may be seated.

6             Is there anything further before we break?

7             MR. KAMARAJU:  Not from the defense, your Honor.

8             MR. FINKEL:  Just a scheduling update from the

9     government.

10            After Mr. Hinton, the government believes it has two

11    witnesses left.  After those two witnesses, the government

12    would like to play a handful of videos or show a few documents

13    that the jury has not yet seen but are already in evidence, and

14    I just want to make sure that's okay with the Court that we

15    don't have a witness on the stand for that?

16            THE COURT:  If they're in evidence, that's fine.

17            MR. FINKEL:  Okay.  We'll plan to do that.

18            Just for the Court's knowledge and for defense

19    counsel's knowledge, after Mr. Hinton, who approximately has 30

20    to 45 minutes left on direct, the direct of the two remaining

21    witnesses, one is probably just north of an hour and then the

22    last witness we would estimate as around 90 minutes, depending

23    on how quick the technology moves.  It's mostly cellphone

24    extractions, text messages, things like that.

25            So that's sort of where the government is in its case.

1    I just wanted the Court to be aware of that.  So we expect to

2    rest tomorrow, assuming crosses are not voluminous.

3            Outside of that, your Honor, absent any questions, the

4    government is just inquiring about the week of July 8th.  With

5    the understanding now we're sitting full days on July 2nd and

6    3rd, on July 8th, if things move at the clip that the defense

7    has predicted and the government certainly hopes, I think we'll

8    be in jury addresses and deliberations.  Is the Court planning

9    to sit a full day for——I know for deliberations, your Honor

10   said it would.  Is the same for jury deliberations?  In other

11   words——sorry.  I apologize.  I'm a little tired.  Is the week

12   of July 8th going to be a full 9-to-5 week as well?

13           THE COURT:  So for summations and deliberations, we

14   will sit a full day.

15           MR. FINKEL:  Okay.  That's helpful.  Thank you, your

16   Honor.

17           THE COURT:  Have a good evening.

18           MR. KAMARAJU:  You too, your Honor.

19           MS. MURRAY:  Thank you, your Honor.

20           (Adjourned to June 26, 2024, at 9:00 a.m.) permit

21   anyone to discuss the case in your presence.  Don't read, watch

22   or listen to anything that touches on the subject of this case.

23           THE LAW CLERK:  Jury exiting.

24           (Recess)

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   DOUGLAS SKALKA

 4   Direct By Mr. Fergenson  . . . . . . . . . .4075

 5   Cross By Mr. Kamaraju  . . . . . . . . . . .4092

 6   Redirect By Mr. Fergenson  . . . . . . . . .4148

 7   Recross By Mr. Kamaraju  . . . . . . . . . .4163

 8   Redirect By Mr. Fergenson  . . . . . . . . .4165

 9   Recross By Mr. Kamaraju  . . . . . . . . . .4165

10   OWEN FOLEY

11   Direct By Ms. Murray . . . . . . . . . . . .4166

12   Cross By Mr. Schirick  . . . . . . . . . . .4184

13    DANIEL COPELAND

14   Direct By Ms. Murray . . . . . . . . . . . .4210

15   Cross By Ms. Shroff  . . . . . . . . . . . .4236

16   Redirect By Ms. Murray . . . . . . . . . . .4255

17   Recross By Ms. Shroff  . . . . . . . . . . .4258

18   STEPHEN JOHNSON

19   Direct By Mr. Finkel . . . . . . . . . . . .4265

20   Cross By Mr. Schirick  . . . . . . . . . . .4297

21    PAUL HINTON

22   Direct By Ms. Murray . . . . . . . . . . . .4301

23                     GOVERNMENT EXHIBITS

24   Exhibit No.                        Received

25    1628, 1630, 1631, 1632, 1634, 1636, . . . .4169
```

1                   1637, 1639, 1643, 1644, and

2                   1646

3    SM-11, SM-12, SM-17, SM-18, SM-19,  . . . . .4272

4              SM-21, SM-73, SM-96, SM-126,

5              SM-127, SM-129, SM-130,

6              SM-133, SM-147, SM-149,

7              SM-151, SM-155, SM-156,

8              SM-159, SM-170, SM-176,

9              SM-178, SM-181, SM-210,

10             SM-217, SM-218, SM-224,

11             SM-226, SM-235, SM-252,

12             SM-277, SM-283, SM-296 through

13             SM-299

14   [Exhibits]*[received]  . . . . . . . . . . .4284

15   BR300-BR356; 3200-3202; 3210-3213;  . . . . .4316

16             3214; 3204-3207; BR900-BR931;

17             2001-2717; BR1001-BR1031

18   Column B of Stip 14  . . . . . . . . . . .4317

19   Column B of Stip 22  . . . . . . . . . . .4318

20   Z-13  . . . . . . . . . . . . . . . . . .4170

21   GX Stip 19  . . . . . . . . . . . . . . .4282

22   Stip 22  . . . . . . . . . . . . . . . . .4317

23   Z26  . . . . . . . . . . . . . . . . . . .4329

24   Z27  . . . . . . . . . . . . . . . . . . .4306

25   Z28  . . . . . . . . . . . . . . . . . . .4312

```
 1    Z29   . . . . . . . . . . . . . . . . . .4321

 2    3450    . . . . . . . . . . . . . . . . .4216

 3                       DEFENDANT EXHIBITS

 4    Exhibit No.                              Received

 5    7006    . . . . . . . . . . . . . . . . .4155

 6    70777   . . . . . . . . . . . . . . . . .4251

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```