O6Q1GUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
              v.                            23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                   Defendant.               Trial
 6   ------------------------------x
                                            New York, N.Y.
 7                                          June 26, 2024
                                            9:00 a.m.
 8
     Before:
 9
10                   HON. ANALISA TORRES,

11                                          District Judge
                                             -and a Jury-
12
                          APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6Q1GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6Q1GUO1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.

3              ALL COUNSEL:  Good morning, your Honor.

4              THE COURT:  Please make your appearances.

5              MR. FERGENSON:  Good morning, your Honor.  Micah

6    Fergenson and Justin Horton for the United States.

7              MS. SHROFF:  For Mr. Ho Wan Kwok, Sabrina Shroff and

8    Scott Schirick.  Good morning, your Honor.

9              THE COURT:  Please be seated.

10             Is there anything before we get started at 9:30?

11             MR. FERGENSON:  Yes, your Honor.  I think we had two

12   points.

13             One, and I don't want to raise something that the

14   proper defense counsel is not here to respond to, but just to

15   inform the Court of an issue.  Maybe we can take it up at

16   lunchtime.  We've been working very well with the defense on

17   stipulations, translations, and we appreciate their assistance

18   in making this a more efficient trial.  There is one recording

19   that we have agreement on with the defense.  It was a recording

20   that was part of Mr. Shamel Medrano's, you know, large summary

21   chart of videos that we redacted because we were still working

22   on translations for that video.  I think we've reached

23   agreement on the translation of it, your Honor, and we've

24   reached agreement that, you know, for what actually goes back

25   into evidence, we can use an updated version of Mr. Medrano's

O6Q1GUO1

1    chart that includes this video and the translated text.  There

2    is one portion of the translated transcript that we have a

3    dispute about.  It's not a translation dispute; it's a Rule 403

4    dispute.  And I won't get ahead of it because I want

5    Mr. Kamaraju or Mr. Barkan, who I've discussed this with more

6    recently, to be here to address it as well, but just very

7    briefly to preview it.  It's about two lines of text where

8    Mr. Guo says something to the effect of:  "The United States

9    will never falsely accuse you.  Listen to what I say.  The

10   United States will never falsely accuse you."  The context for

11   this remark is, in 2020, when the investigations into GTV

12   begin, Mr. Guo is broadcasting that essentially the people who

13   are complaining to the U.S. authorities are in fact fake

14   victims and CCP spies or traitors, and they're going to be

15   criminally charged by the United States, and he makes this

16   remark about how the United States will never falsely accuse

17   you.  Our view is, there's nothing unfairly prejudicial about

18   using, you know, an opposing party's statement against legal

19   interests.  That's sort of the heartland of what an opposing

20   party admission is.  You know, criminal defendants confess in

21   some instances, and confessions are admissible at trial.  And

22   so our view is there's no 403 issue here really, if a statement

23   by the defendant is clearly admissible.  But I don't want to

24   get ahead of myself.  We can take it up—unless the defense

25   wants to take it up now.

O6Q1GUO1

| | |
|---|---|
| 1 | THE COURT:  So we need not hear now because neither of |
| 2 | those attorneys are here, but your understanding is that the |
| 3 | defense position is that the statement is unfairly prejudicial? |
| 4 | MR. FERGENSON:  Yes, your Honor. |
| 5 | THE COURT:  Okay.  Anything else? |
| 6 | MR. FERGENSON:  There was one other matter that |
| 7 | Mr. Horton wanted to address, given that we are hopeful, but |
| 8 | not certain, we may rest today, and I'll let Mr. Horton address |
| 9 | that. |
| 10 | MR. HORTON:  Thank you, your Honor. |
| 11 | Your Honor had indicated one day last week that the |
| 12 | Court would like the government to make a formal application |
| 13 | pursuant to *Geaney* for the admission of co-conspirator |
| 14 | statements that came in at trial, so I just want to address |
| 15 | that briefly. |
| 16 | In six weeks of testimony, give or take—— |
| 17 | THE COURT:  So is this what you're offering at this |
| 18 | time? |
| 19 | MR. HORTON:  If the Court wishes, I'm happy to make |
| 20 | that application now. |
| 21 | THE COURT:  Go right ahead. |
| 22 | MR. HORTON:  So we've had something like six weeks of |
| 23 | testimony and documentary evidence at trial about a sprawling, |
| 24 | interconnected series of racketeering and fraud conspiracies |
| 25 | that were global in nature, extensive in time, and really |

O6Q1GUO1

1    depended on communication as sort of their fuel and lifeblood.

2    And there's been a considerable amount of co-conspirator

3    statements and documents reflecting those statements offered

4    into evidence subject to connection under the circuit's *Geaney*

5    protocol.

6              I'll just start with the top and say that the

7    standard, of course, is a preponderance, so the Court needs

8    only find that it's more likely than not that these declarants

9    were members of conspiracies with the defendant, and spoke

10   during and in furtherance of those conspiracies.  I'll start

11   right at the top with Ms. Wang, who pled guilty to—

12             THE COURT:  One moment, please.

13             MR. HORTON:  Sure.

14             THE COURT:  You're going to specify the individuals,

15   correct?

16             MR. HORTON:  So I think what I'll do, your Honor, is

17   sort of go somewhat in order, and then, you know, given the

18   nature of these conspiracies, there are a number of

19   co-conspirators and agents who were not quite at the periphery,

20   people who were not like Yvette Wang, really.

21             THE COURT:  If you could bring the microphone closer

22   to you.  You said that there were a number of co-conspirators—

23             MS. SHROFF:  Your Honor, I apologize.  Two of our team

24   members are not here, but I wanted to just apologize and ask

25   the Court if I could just flag for the Court one issue.

O6Q1GUO1

```
1         There is a witness that's supposed to testify this

2   afternoon and we do not know what subset of exhibits are being

3   used for that witness.  I'm happy to let Mr. Horton continue,

4   but as to Ms. Chen, the government has identified only a wide

5   number of exhibits.  I believe Ms. Tilton emailed the

6   government yesterday for a narrower subset.  We have not yet

7   received it.  While Mr. Horton is making this argument to the

8   Court──which I apologize again for interrupting──if the lawyer

9   who is in charge of the Chen direct could just please send us

10  the exhibit numbers, it would be very helpful to us.  Thank

11  you.

12         MR. FERGENSON:  We'll be sure to do that, your Honor.

13  I'm not familiar with that exhibit set, but we'll be sure to

14  send them the specific exhibits.  The way we numbered the

15  exhibits for victim witnesses is that each victim witness has

16  its own exhibit series, so, I mean, we can identify the

17  specific ones within that, but it is identified at least by the

18  exhibit series.

19         THE COURT:  So you'll do that right away.

20         MR. FERGENSON:  We will, your Honor.

21         MS. SHROFF:  Your Honor──

22         THE COURT:  One moment.

23         MS. SHROFF:  Oh, sorry.

24         THE COURT:  You had something further, Ms. Shroff?

25         MS. SHROFF:  Yes, your Honor.  I know Mr. Hinton is
```

O6Q1GUO1

1    still going, but for Ms. Chen, we've also received some 3500

2    material with new Bates stamp numbering, so if there's any

3    additional 3500 between yesterday and today, we would

4    appreciate receiving that as well.

5              That's all.  Thank you, your Honor.

6              THE COURT:  Thank you.

7              Okay.  So I interrupted Mr. Horton, and if you want to

8    backtrack, you may.  I specifically wanted to make sure that I

9    have the specific names.

10             Go ahead.  Go ahead.

11             MR. HORTON:  So there were a number of repeat-player

12   co-conspirators, so to speak, that your Honor saw evidence

13   about in this case.

14             Starting with Ms. Wang, who your Honor noted early in

15   trial, there was a colloquy with defense counsel about the

16   admissibility of some of her statements, and at the break we

17   talked about the fact that she had pled guilty in fact to

18   conspiring with the defendant and so her statements came in for

19   the rest of the trial.

20             William Je, a key co-conspirator.  There was evidence

21   about his ownership and control of certain key entities on

22   behalf of the defendant, his transfer of funds between those

23   entities on behalf of the defendant, including proceeds that

24   were retained by himself, and his cooperation with other

25   co-conspirators, including the one I'll go to next, Mileson

O6Q1GUO1

1    Guo.

2              There's evidence about Mileson Guo's use of fraud

3    proceeds to purchase luxury goods.  There's documentary

4    evidence of Mileson Guo's communications on behalf of entities

5    in the G enterprise.  Mileson Guo connects to Haoran He.

6              There is extensive evidence, including from witnesses

7    who dealt with Mr. He directly, about his role as the paper

8    owner of and operator of a large number of significant G

9    Enterprise entities, and of course, he sort of takes center

10   stage at G|CLUBS, through the testimony of Ms. Reyes and many

11   of the documents your Honor saw where he is giving direction

12   for G|CLUBS purportedly as its owner, and of course other

13   evidence suggested that he was doing that in connection and

14   conspiracy with the defendant and the defendant's other

15   co-conspirators.

16             So those are the sort of core co-conspirators in the

17   case.  And of course there was other evidence that came in.

18   Some of it was resolved in realtime.  It was somebody who made

19   one or just several appearances.  And so we—

20             THE COURT:  So Yanping Wang, William Je, Mileson Guo,

21   and Haoran He, correct?

22             MR. HORTON:  That's right.  I would call those the

23   core co-conspirators.  Of course, there's evidence about Aaron

24   Mitchell, Victor Cerda, etc.  I would just draw the Court's

25   attention to two things.  So co-conspirators and agents—and of

O6Q1GUO1

1    course the co-conspirator exception is just the sort of more

2    specific species of 801(b)(2) which deals with agent statements

3    in general.  When somebody came up and they weren't a repeat

4    player, so to speak, we often went to sidebar and we litigated

5    that in realtime and pointed the Court to evidence that had

6    come in or was about to come in and the Court ruled during the

7    course of trial.

8          So just to set that stage and reiterate that the

9    standard is a preponderance, we think that there's evidence

10   beyond a reasonable doubt that the elements are met, that if a

11   conspiracy existed, that the co-conspirator declarants were

12   members of that conspiracy with the defendant, and that the

13   statements that we offered, to the extent we offered them for

14   their truth——and of course the Court saw, not all of these

15   co-conspirator and agent statements were offered for their

16   truth; some of them were offered for their falsity, some of

17   them were offered for their effects on the witness or other

18   people, but to the extent that they were offered for their

19   truth——we'd submit that the evidence over the last six weeks

20   surpasses that preponderance standard that the Court uses in

21   making its *Geaney* finding.  And as Mr. Fergenson said, we're

22   hopeful to rest today, and we'd submit that the Court has more

23   than enough evidence it needs to make that finding today.

24          THE COURT:  So I believe that the case law calls for

25   me to make any findings after the close of the prosecution's

O6Q1GUO1

1    case, and I just don't want to deviate from the formality.

2            MR. HORTON:  I just wanted to tee it up for your

3    Honor.  That's all.

4            THE COURT:  Okay.  Anything further?

5            MS. SHROFF:  Your Honor, I wasn't sure if the Court

6    wanted to hear from us or if we could respond when it is

7    properly brought at the end of the government's case, or after

8    the close of the government's case.  Obviously we had no notice

9    that the government was going to address this issue this

10   morning.  I don't think Mr. Kamaraju was alerted either.  So we

11   would appreciate additional time.

12           I would note just two short points here.  One, the

13   conspiracy has to exist prior to the admittance of the

14   statement, and a generic statement by the government counsel

15   that a conspiracy existed over a six-week—I think it's been

16   six weeks, although I've lost count—trial I do not think meets

17   even the preponderance standard.  And the government, at least

18   this morning, has just sort of generally addressed Ms. Wang,

19   Mileson, Mr. He, and William Je.  I think there were issues

20   with statements made by others, including Dara Lawall.  And we

21   would like an opportunity to make sure we have the transcript

22   pages ready for the Court and be better prepared before

23   addressing it.  Since it should be done after the close of the

24   government's case, we will endeavor to be ready.

25           THE COURT:  And what is the spelling of the

O6Q1GUO1

1   individual's name that you just mentioned?

2               MS. SHROFF:  The first name is D-A-R-A, and the last

3   name is L-A-W-A-L-L.  For the Court's convenience, your Honor,

4   she is the spouse of Aaron Mitchell, who practiced law, and her

5   testimony was brought out, or her issue was raised during Amy

6   Buck's testimony.

7               THE COURT:  Of course I will offer the defense an

8   opportunity to address these issues at the close of the

9   prosecution's case.

10              MS. SHROFF:  Thank you, your Honor.

11              MR. FERGENSON:  I'm happy to address Ms. Lawall, but

12  we can also table it for later, if your Honor prefers that.

13              THE COURT:  I think it's a better idea.

14              MR. FERGENSON:  Okay.  And just one update on the

15  other issue Ms. Shroff raised.  On the specific exhibits,

16  actually, when I checked my email, the other AUSA had already

17  sent them across, so that one's done.

18              THE COURT:  All righty.  So we will have the witness

19  back on the stand at 9:29 and get started at 9:30.

20              MS. SHROFF:  Your Honor, we did receive the email at

21  9:06 this morning.  Thank you.

22              (Recess)

23              (At the sidebar)

24              THE COURT:  I just wanted to make clear that the

25  government needs to specify all the individuals with respect to

O6Q1GUO1                          Hinton - Direct

1    the *Geaney* application, and of course justify why those

2    statements should be allowed in.

3              MR. HORTON:  Understood.  Thank you, your Honor.

4              MR. KAMARAJU:  Thank you, your Honor.

5              (In open court)

6              THE COURT:  Please have the jurors brought in.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6Q1GUO1                      Hinton - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Good morning, jurors.

4              THE JURORS:  Good morning.

5              THE COURT:  We're going to continue with the direct

6    examination of the witness.

7              Sir, remember that you're still under oath.

8              You may continue the inquiry.

9              MS. MURRAY:  Thank you, your Honor.

10    PAUL HINTON, resumed.

11   DIRECT EXAMINATION

12   BY MS. MURRAY:

13   Q.  Good morning, Mr. Hinton.

14   A.  Good morning.

15             MS. MURRAY:  Ms. Loftus, can we please put up

16   Government Exhibit Z26 and go to slide 5.

17   Q.  Mr. Hinton, while we're waiting for this, can you explain

18   to the jury what tracing is.

19   A.  Yes.  Tracing, as I use the term, relates to following

20   money through a series of accounts over time.

21   Q.  And how, if at all, do you trace funds through a series of

22   accounts?

23   A.  Well, you look at the inflows into an account and the

24   subsequent outflows from an account, and then if there are any

25   outflows that go to another account, for example, via a wire

O6Q1GUO1                          Hinton - Direct

1   transfer, you then have to follow the money to that subsequent

2   account, and then you do the same thing there.

3   Q.  How, if at all, did you use tracing of funds in the process

4   of checking the accuracy of the information in these summary

5   slides?

6   A.  Well, strictly, I wasn't asked to do any tracing.

7   Q.  Did you evaluate inflows and outflows in evaluating the

8   accuracy of the information contained on these summary charts?

9   A.  Yes.  For each trans——individual transaction, I was looking

10  at the timing of the flows and the amounts of the flows and

11  which accounts they went between.

12  Q.  And we talked a bit yesterday about the Sources of Funds

13  that's contained within the summary charts.  Do you recall

14  that?

15  A.  Yes.

16  Q.  And specifically how the government characterized Sources

17  of Funds for purposes of G|CLUBS.  What about GTV and Voice of

18  Guo, or VOG; how did the government instruct Brattle to define

19  source of funds for purposes of those accounts?

20  A.  For those accounts, we were simply identifying all of the

21  flows for individuals who weren't otherwise identified as being

22  associated with any of the entities that we talked about

23  yesterday that were in the different categories that were shown

24  on my charts.

25  Q.  And for the Farms, for Sources of Funds for purposes of the

O6Q1GUO1                         Hinton - Direct

1  Farms analysis, did the government provide Brattle with a list

2  of entities or individuals who should be categorized as Sources

3  of Funds for the Farms?

4  A.  Yes, there was a long series of entities that were

5  associated with Farms, and those were shown on the chart as

6  contributing funds through the Farms category on the chart.

7  Q.  And finally, the Himalaya Exchange.  Did the government

8  identify for you certain companies or bank accounts that were

9  associated with incoming Sources of Funds for purposes of the

10  summary of the Himalaya Exchange money?

11  A.  Yes.  So again, in terms of the entities that are part of

12  the Himalaya category, those were all defined, listed for us by

13  the government, so we matched those against the transactions,

14  and then anything that was—any of the Sources of Funds that

15  flowed into those entities' accounts came from individuals who

16  weren't otherwise associated with any of these classified

17  entities.

18  Q.  And can you explain, again, as we're waiting, just a few of

19  the other methods that you used to confirm the accuracy of the

20  information contained on the charts as it's reflected in the

21  source bank records that you reviewed.

22  A.  Yes.  So ultimately, after the government determined which

23  of the financial transactions and groups of transactions they

24  wanted to appear on the charts, we used our database to

25  identify what the underlying individual transactions were that

1    would be summed up and displayed on the chart, and then for

2    each of those transactions, we were able to look at the

3    underlying Government Exhibit, which was a bank record that

4    showed the amount of the transaction.

5    Q.  All right.  We now have Government Exhibit Z26 up at slide

6    5.  What is the title of this slide, Mr. Hinton?

7    A.  This slide is titled GTV/VOG: Select Flows.

8    Q.  And looking at the first-level entities or first-level bank

9    accounts, if I can call them that, from the Source of Funds

10   into each of the first arrows, can you just read the entity

11   names that the funds for GTV and VOG flowed to.

12   A.  Yes.  So from Sources of Funds on the left-hand side, we

13   see the first account is Voice of Guo Media, and it's a Bank of

14   America account, 7226.

15            The second account is also a Voice of Guo Media, Inc.

16   account, this one at Wells Fargo bank, 5536.

17            The third account is a Saraca Media Group, Inc.

18   account at JPMorgan, 5601.

19            The fourth account is a GTV Media Group, Inc. account

20   at Capital One.

21            And the fifth account is a GTV Media Group, Inc.

22   account at JPMorgan, 3335.

23   Q.  And so of those five accounts, is it correct that they are

24   held at four different banks?

25   A.  That's correct.

1    Q.   Looking at the center arrow, down to the JPMorgan 5601

2    Saraca Media account, how much money flowed through Sources of

3    Funds into that account through June 4th of 2020?

4    A.   275.9 million.

5    Q.   And then if we could look at the flows out of that account.

6    Can you just read the amounts and the date ranges of when the

7    money flowed out of that account.

8    A.   Yes.  There were three flows out of that Saraca account

9    that are shown on this chart to other entities.

10        On the left, 125.5 million between June 3rd and

11   June 10th is transferred to Saraca Media Group, Inc.'s JPMorgan

12   account ending 2038.

13        200 million is transferred on June 3rd to GTV Media

14   Group's Citibank account 6691; and 10 million on May 13, 2020,

15   to GTV Media Group, Inc. Capital One account ending 7000.

16   Q.   And Mr. Hinton, just to be clear, did these summary charts

17   reflect all of the transactions that were contained within the

18   bank records that the government provided you?

19   A.   No.  It's only a selected number of the transactions.

20   Q.   And the bank records that you were provided, were those

21   selected by the government?

22   A.   They were.

23   Q.   Did Brattle process only a portion of those bank records in

24   the end and reflect those on these charts?

25   A.   That's correct.  We identified a large number, and the

1　government instructed us to——us to process a subset of those.

2　Q.　Can you describe the process by which the government

3　discussed with Brattle which accounts to prioritize for

4　purposes of processing.

5　A.　Yes.　So initially they gave us this huge volume of

6　documents and we had to identify which accounts were contained

7　in those documents.　We then generated a list of those

8　accounts, showed them to the government, and the government

9　instructed us which of those accounts were the highest priority

10　and we should process.

11　　　　　MS. MURRAY:　Ms. Loftus, could we go to the next

12　slide, please.

13　Q.　What's the title of this slide, Mr. Hinton?

14　A.　This slide is titled VOG: Select Flows.

15　Q.　Looking on the top left, there's a category called Other

16　Inflows.　What, if anything, does that represent?

17　A.　Well, that just shows all the flows into the Voice of Guo

18　Media accounts that are listed there other than the

19　26.7 million coming from Sources of Funds over the time period

20　May 26, 2020, to June 6, 2020.

21　Q.　And there's an individual named on here, Lihong Wei

22　Lafrenz.　Do you know who that is?

23　A.　No.

24　　　　　MS. MURRAY:　All right.　Ms. Loftus, let's go to the

25　next slide.

O6Q1GUO1                          Hinton - Direct

1   Q.  If we could turn now to the Farms, Mr. Hinton.

2           MS. MURRAY:  If we could go to slide 8, please.

3   Q.  So looking here, there are kind of two categories on the

4   top.  There's Farms in green, and then there's Sources of Funds

5   on the right in gray.

6           First, the Farms category showing flows, does that

7   capture the companies or individuals the government provided

8   and identified to Brattle as associated with the Farms?

9   A.  Yes, that's correct.  There's a list, a long list of those.

10  Q.  And what accounts does the 77 million go to from the Farms?

11  A.  It goes to an ACA Capital account at First Abu Dhabi Bank.

12  Q.  Where is First Abu Dhabi Bank located?

13  A.  In Abu Dhabi, I believe.

14  Q.  From your review of bank records the government provided,

15  do you have an understanding of who, if anyone, controlled that

16  ACA Capital account?

17  A.  No.

18          MR. KAMARAJU:  Objection.

19  Q.  If we could look now at the——

20          THE COURT:  The objection is overruled.

21  Q.  If we could look now at the flow of funds from the ACA

22  Capital account.  Let's start on the left.

23          And if you could just read for the jury the amount and

24  then the account holder or holders that the money went to.

25  A.  Yes.  First, 19 million was transferred to Lexington

1  Property & Staffing LLC in two accounts, DCB 0625 and Signature
2  3545.
3  Q.  Sorry.  Could you read the signature number again?
4  A.  Signature 3945.  Sorry.
5  Q.  Thank you.
6  A.  The next transfer shown is 11.2 million transferred to
7  William Je and Sing Ting Rong.  And they're at three different
8  bank accounts that received that money——two Barclays accounts
9  and an HPB account.
10 Q.  And the next flow?
11 A.  The next flow is 18 million to Hudson Diamond.
12 Q.  Over what time period?
13 A.  From February 2, 2021, to February 10, 2021.
14 Q.  And where, ultimately, does 16 million go then from the
15 Hudson Diamond's holding account?
16 A.  Yes, in May through June, 16 million from the Hudson
17 Diamond account is transferred to Lamp Capital LLC.
18 Q.  And just to be clear about the date ranges of that
19 $16 million collective transaction, what was the date range for
20 that flow?
21 A.  May 28, '21, through July 30, 2021.
22 Q.  All right.  Continuing from the ACA Capital account, we
23 just did to Hudson Diamond.  What's the next flow represented
24 on the summary?
25 A.  Well, there's a $13 million transfer from ACA Capital

1    directly to the Lamp Capital accounts.

2    Q.  And then finally—well, not finally, but the next one going

3    to the right.

4    A.  Yes, the next one is 5 million going to Greenwich Land LLC.

5    Q.  And then the last flow that we see going kind of 3:00.

6    A.  Is 32 million to Savio Law.

7         MS. MURRAY:  Ms. Loftus, I'd like to pull up

8    Government Exhibit GX PNC39 at page 3, please.

9    Q.  Focusing on that last transaction that you just mentioned,

10   or the last flow you just mentioned, Mr. Hinton, the 32 million

11   to Savio Law.

12        MS. MURRAY:  All right.  And if we could go to page 3,

13   please.  Actually—sorry—let's go to the top of the page,

14   Ms. Loftus.

15   Q.  Mr. Hinton, is this one of the bank records that you were

16   provided by the government in this case?

17   A.  It is.

18   Q.  Is this one of the records that you reviewed to confirm the

19   accuracy of the charts we've been talking about, including Z26?

20   A.  It is.

21   Q.  Looking at the top left, what is listed in the bold and

22   then, underneath that, on the very top left?

23   A.  It says IOLTA, IOLTA Checking.

24   Q.  And beneath that?

25   A.  PNC Bank.

1    Q.  What is the time period for this particular bank statement?

2    A.  October 31, 2020, through November 30, 2020.

3    Q.  And then beneath that, can you read the entity name and the

4    address associated with this account.

5    A.  Savio Law at 3 Dale Court, Hazlet, New Jersey.

6    Q.  Under Savio Law LLC, there's a description.  Can you read

7    that to the jury, please.

8    A.  IOLTA Attorney Trust Account.

9    Q.  Do you have any independent knowledge of whether Savio Law

10   LLC is a law firm?

11   A.  No.

12   Q.  And looking on the right, what are the last four of the

13   account number we're looking at here?

14   A.  8162.

15          MS. MURRAY:  All right.  We can now go to page 3,

16   Ms. Loftus.

17          And let's focus on Activity Details, Deposits and

18   Other Additions.

19   Q.  Mr. Hinton, do you see the transactions that are listed

20   here for Deposits and Other Additions in this account?

21   A.  I do.

22   Q.  What are the date ranges of the top four transactions?

23   A.  From November 12th to November 16th.

24   Q.  And what are the amounts of each, just from the top down?

25   A.  Yes.  9.5 million, 8.5 million, 7.5 million, and 6,499,935.

1    Q.  Mr. Hinton, did those four transactions collectively

2    represent the 32 million that we just looked at in the flow

3    from ACA Capital to Savio Law?

4    A.  Yes.

5           MS. MURRAY:  Ms. Loftus, we can go back to Z26,

6    please.

7           And we were at page 8.

8    Q.  All right.  So this is the broader summary of the Farm

9    flows, Mr. Hinton.  I'd like to now go and drill down on a few

10   of the different flows.

11          MS. MURRAY:  If we could go to the next page, please,

12   Ms. Loftus.

13   Q.  Looking beneath Savio Law and ACA Capital and what's now

14   the blank space——if we can go to the next slide,

15   please——Mr. Hinton, what are the two flows that are reflected

16   here that occurred on October 15, 2020?

17   A.  There's a $5 million transfer to Greenwich Land LLC and

18   there's a $5 million transfer to Lamp Capital.

19   Q.  And at which bank were the accounts held that received

20   those $5 million transfers on October 15, 2020?

21   A.  Bank of Princeton.

22          MS. MURRAY:  All right.  Ms. Loftus, let's go to the

23   next slide now, please.

24   Q.  And then what do we see reflected here, Mr. Hinton, from

25   ACA Capital to Greenwich Land and then the flow out to the

O6Q1GUO1                     Hinton - Direct

1    right?

2    A.   Right.  So in October, between October 21st and 23rd, 2020,

3    $5 million was transferred from ACA Capital to Greenwich Land,

4    then subsequently on October——between October 26 and

5    November 20, 2020, 9 million was transferred from Greenwich

6    Land to Lamp Capital.

7            MS. MURRAY:  All right.  Let's go to the next slide,

8    please, Ms. Loftus.

9    Q.   This is another portion of the broader Farms chart that we

10   were just looking at, Mr. Hinton.  Can you just explain,

11   generally, starting with Farms and going down to the account

12   that's highlighted in yellow, what type of flows we're looking

13   at here in this summary.

14   A.   Yes.  This is just showing those flows from the previous

15   chart that went from Farms, 77 million transferred to ACA

16   Capital and then two transfers or transfers from ACA Capital to

17   two different entities, Hudson Diamond receiving 18 million and

18   Lamp Capital receiving 13 million from ACA Capital, and of

19   the——there's also a subsequent transfer from Hudson Diamond

20   Holding of 16 million into Lamp Capital.

21   Q.   And just to make sure that we're reading this correctly, so

22   the Farms, 77 million to ACA Capital, ultimately, does

23   $29 million go into the Lamp Capital LLC account, as

24   represented in these transactions?

25   A.   Yes, ultimately, the account that received the $77 million

1    from Farms subsequently transferred money to Lamp Capital with

2    13 million and 18 to Hudson; Hudson Diamond then subsequently

3    transferred 16 million to Lamp Capital; so together, there's

4    29 million coming into Lamp Capital.

5              MS. MURRAY:  And let's go the next slide, please,

6    Ms. Loftus.

7    Q.  On this slide, Mr. Hinton, we're starting with what was the

8    terminus of the last slide, the Lamp Capital account; is that

9    correct?

10   A.  Yes.

11   Q.  And what is the title of this slide?

12   A.  It's Farms: Select Expenses from Lamp Capital Accounts.

13   Q.  Mr. Hinton, does this slide reflect just a subset of

14   outflows from the Lamp Capital Signature Bank account?

15   A.  It does.

16   Q.  And who selected which transactions to reflect on this

17   slide?

18   A.  The government.

19   Q.  I want to look at some of the records underlying these

20   transactions.  But first, Mr. Hinton, if you could just read

21   the categories that are shown in the bubbles starting from left

22   to right for the flows here.

23   A.  Yes.  The select expenses include car-related expenses,

24   Yachtzoo LLC expenses, ACASS Canada Ltd., Cirrus Design

25   Corporation, Mei Guo, and Qiang Guo.

O6Q1GUO1                          Hinton - Direct

1           MS. MURRAY:  All right.  Ms. Loftus, let's go to

2    Government Exhibit SIG102 and go to page 4.

3    Q.  I want to look at one of the car-related expenses that was

4    reflected on the slide we just looked at, slide 13.

5           Actually, focusing on the first page——thank you,

6    Ms. Loftus——just looking at the statement itself, what is the

7    statement period we're looking at here, Mr. Hinton?

8    A.  The statement period is May 1st through 31st——

9    Q.  And what year?

10   A.  ——2021.

11   Q.  Sorry.  I spoke over you.  What year?

12   A.  2021.

13   Q.  And is this one of the bank records the government provided

14   to you which you reviewed in connection with checking the

15   accuracy of the summary charts?

16   A.  It is.

17   Q.  Looking on the left, what is the name and the address for

18   this particular bank account?

19   A.  It's Lamp Capital LLC, at 667 Madison Avenue, New York, New

20   York.

21          MS. MURRAY:  All right.  Ms. Loftus, let's zoom out of

22   that and go to page 4, please.

23          Thank you.  And if we could highlight the May 27th,

24   the larger entry here.

25   Q.  Mr. Hinton, do you see that, that transaction as reflected

O6Q1GUO1                    Hinton - Direct

1    in this bank record?

2    A.  I do.

3    Q.  Looking at that, what type of transaction is reflected

4    here, for May 27, 2021, from this Lamp Capital account?

5    A.  It's an outgoing wire.

6    Q.  And two lines down, to whom was that outgoing wire sent?

7    A.  The wire transfer was made to Wells Fargo bank account

8    8296, which was for the benefit of Miller Motorcars, Inc.

9    Q.  What was the dollar amount of that outgoing wire to Miller

10   Motorcars from Lamp Capital?

11   A.  It was $294,306.

12        MS. MURRAY:  Skipping around on the expenses, if we

13   could look on the same page, Ms. Loftus, the second entry,

14   May 19 of 2021.

15   Q.  What type of transaction is reflected here, Mr. Hinton?

16   A.  This is also an outgoing wire transfer.

17   Q.  And looking two lines down, to whom was this outgoing wire

18   sent?

19   A.  It was sent to Mei Guo.

20   Q.  What was the dollar amount of this outgoing wire from Lamp

21   Capital to Mei Guo on May 19, 2021?

22   A.  It was $500,000.

23        MS. MURRAY:  All right.  Ms. Loftus, let's go now,

24   please, to Z26 again at slide 13.

25   Q.  I just want to look back at where we see the transactions

1    we just saw reflected on this chart.

2              So Mr. Hinton, the Miller Motorcars, where, if

3    anywhere, on this summary chart is that sum included?

4    A.  It's in the red-lined bubble that's titled Car-Related

5    Expenses.

6    Q.  And the $500,000 to Mei Guo, where, if anywhere on this

7    summary slide, is that transaction reflected?

8    A.  That's the second line from the right with the—the

9    lavender-colored bubble at the bottom.

10   Q.  All right.  We're going to look now, Mr. Hinton, at one of

11   the records for ACASS Canada Ltd., which is the third arrow

12   flow on this chart.

13             MR. HORTON:  If we could please go to Government

14   Exhibit NJ808, page 2.

15   Q.  And just to clarify, not looking at one of the bank records

16   but looking at one of the government exhibits relating to that

17   particular flow.  Mr. Hinton, do you know what kind of company

18   ACASS Canada Ltd. is?

19   A.  No.

20   Q.  So this is a Government Exhibit titled NJ808.  Have you

21   seen this before?

22   A.  I don't recall.

23   Q.  Focusing on the top—Ms. Loftus, if we could zoom in—the

24   Company Name/Service Provider listed here, could you read that

25   for us, please, Mr. Hinton.

1          MS. MURRAY:  If we're able to zoom in on that, please,

2    Ms. Loftus.

3    Q.  So it's under Company Name entry there, the first line, the

4    first long line.

5          MS. MURRAY:  Ms. Loftus, can you highlight that,

6    please.

7    A.  Yes, so it says Company Name, ACASS Canada Ltd., and then

8    afterwards, it has in quotes Service Provider, so I believe the

9    service provider you're referring to is ACASS Canada Ltd.

10          MS. MURRAY:  And let's zoom out of that, please,

11   Ms. Loftus, and let's look further down the page.

12   Q.  Focusing now on the bottom, just the "Agreed by" through to

13   the right side.

14          Mr. Hinton, looking here, "Agreed by Service

15   Provider," what is in that field on this document?

16   A.  It's ACASS Canada Ltd.

17   Q.  And who is listed on the right as the customer?

18   A.  "Agreed to by customer Whitecroft Shore Ltd.," and then

19   there's a signature and a printed name.

20   Q.  What is the printed name?

21   A.  The printed name is Mei Guo.

22          MS. MURRAY:  All right.  Let's zoom out of that,

23   please, Ms. Loftus.

24          And if we could focus again just on the very top

25   paragraph, "In accordance with."

1   Q.  Mr. Hinton, looking at this portion of this document, can

2   you just read the first sentence through to the first comma.

3   A.  Yes.  "In accordance with paragraph C6 of the CorporateCare

4   Terms as incorporated in an Aircraft Enrollment Contract, the

5   customer, Whitecroft Shore Limited, hereby authorizes," etc.

6   Q.  And in this text, what type of contract is referenced?

7   A.  It's an Aircraft Enrollment Contract.

8   Q.  Thank you.

9           MS. MURRAY:  Ms. Loftus, let's take that down now and

10  go to Government Exhibit VK10 at page 58.

11          It's VK10 at page 58.  Oh, sorry.  UK, UK10.

12          If we could look at the top of this, please.

13  Q.  Mr. Hinton, have you seen this document before?

14  A.  I don't recall whether I've reviewed this one individually.

15  Q.  What is the title on this page of Government Exhibit UK10?

16  A.  It's Initial Deposit Wire Transfer.

17  Q.  Who is listed as the customer on this document?

18  A.  Mileson Guo.

19  Q.  And the account name a few lines down?

20  A.  Is Wells Fargo Bank.

21  Q.  Oh, not the bank name——sorry——the account name, a couple of

22  lines down.

23  A.  Oh, I'm sorry.  Cirrus Design Corporation is the account.

24  Q.  A few lines further down from that, there's a deposit

25  amount in USD.  Do you see that?

O6Q1GUO1                       Hinton - Direct

1    A.  I do.

2    Q.  What is that amount?

3    A.  It's $95,000.

4           MS. MURRAY:  Could we zoom out of it, Ms. Loftus, so

5    we can see more of this page.

6           And let's go to the next page, please.

7    Q.  Mr. Hinton, what's the title of this page of Government

8    Exhibit UK10?  This is page 59.

9    A.  This page is titled Second Deposit Wire Transfer.

10   Q.  And the customer name here?

11   A.  Mileson Guo.

12   Q.  Again, a few lines down, the account name for this second

13   deposit wire transfer?

14   A.  The——the account name is Cirrus Design Corporation.

15   Q.  And a few lines below that, deposit amount in U.S. dollars?

16   A.  It's 206,700.

17   Q.  And the next line on this document, what is the field and

18   then what is the information in that field?

19   A.  Yes.  It says, "Aircraft Reference:  Vision SF50 G2

20   Position."

21          MS. MURRAY:  All right.  Ms. Loftus, let's go again to

22   Z26, page 13, just to see where the transactions we just

23   reviewed are reflected.

24   Q.  So here, Mr. Hinton, can you explain to the jury where we

25   see those two entities we just looked at, ACASS and Cirrus

O6Q1GUO1                         Hinton - Direct

1   Design.

2   A.  They are the black ovals that are towards the bottom middle

3   of the chart.

4   Q.  And finally, I'd like to look at the 20 million on the

5   right side of this chart that goes to Qiang Guo.  And do you

6   know who that individual is, Mr. Hinton?

7   A.  I do not.

8   Q.  All right.  What is the date range of that $20 million

9   collective transfer?

10  A.  It's May 18, '21, through June 1st——

11  Q.  Of what year?

12  A.  ——of 2021.

13         MS. MURRAY:  All right.  Ms. Loftus, let's go to

14  Government Exhibit 3200, please.

15  Q.  Focusing first on the top of this document, Mr. Hinton, is

16  this one of the bank records that you reviewed in connection

17  with your work verifying the summary charts?

18  A.  Yes.

19  Q.  At the top, what is the date for this account statement?

20  A.  It is December 14, 2021.

21  Q.  And looking on the right, there are three letters on the

22  top right.  Do you see those?

23  A.  I do.

24  Q.  What do those reflect?

25  A.  CHF I believe refers to Swiss francs.

O6Q1GUO1                      Hinton - Direct

1    Q.  And the name beneath that?

2    A.  Qiang Guo.

3            MS. MURRAY:  Let's go to the next page, please,

4    Ms. Loftus.  Oh, actually, let's stay here for a moment.

5    Q.  Mr. Hinton, the first line on this account statement, what

6    was the balance of this account as of July 31, 2020?

7    A.  It indicates a 0 balance on that date.

8            MS. MURRAY:  All right.  Let's go to the next slide,

9    please.

10           And the next slide.  Excuse me.

11   Q.  Looking here, Mr. Hinton, again, the top line, the balance

12   brought forward as of July 31, 2020, what is that amount as

13   reflected here?

14   A.  It's a 0 balance.

15   Q.  Can you read the next entry on this bank statement,

16   starting with the date.

17   A.  On May 19, 2021, there's a credit transaction that's

18   referred to as bonification from Lamp Capital LLC for 7 million

19   U.S. dollars.

20   Q.  And how do you know that that's denominated in U.S.

21   dollars, based on this bank record?

22   A.  Well, this particular page of the statement has USD at the

23   top right.

24           MS. MURRAY:  And Ms. Loftus, let's go to the next

25   slide, please.

1   Q.  Focusing on the third line on this page of the bank

2   statement, what is the date of that transaction?  And can you

3   explain the details.

4   A.  The date of that transaction is the 2nd of June and——2021,

5   and it's a $13 million credit from bonification——it says

6   bonification from Lamp Capital.  So it's——my understanding is

7   that's a transfer to this account from Lamp Capital of

8   $13 million.

9          MS. MURRAY:  All right.  Ms. Loftus, go back to Z26,

10  slide 13.

11  Q.  Mr. Hinton, those two transactions we just looked at, the

12  7 million and the 13 million, are those collectively the

13  20 million reflected on the right side flow on this summary

14  chart?

15  A.  They are.

16          MS. MURRAY:  Go to the next slide.

17  Q.  I'd like to talk through G|CLUBS and Crane a bit.

18          First of all, Mr. Hinton, who determined that Crane

19  accounts were associated with the G|CLUBS category for purposes

20  of these summaries?

21  A.  The government.

22  Q.  Do you have any independent knowledge of what Crane is?

23  A.  I do not.

24  Q.  All right.  Looking at this, there's a lot going on, so

25  we're going to break it down a little bit.

O6Q1GUO1                          Hinton - Direct

 1              Does this show the flow of certain Sources of Funds

 2       that were within the category of G|CLUBS and Crane that the

 3       government identified?

 4       A.   Yes, certain selected funds and certain selected accounts,

 5       yes.

 6       Q.   And does this slide reflect just a subset of the flows that

 7       went to and through the various G Club and Crane accounts?

 8       A.   Yes, it's just a subset.

 9       Q.   Let's look at a couple of the transactions that are

10       reflected here.

11              MS. MURRAY:  Ms. Loftus, if we could go——

12       Q.   Well, first of all, Mr. Hinton, can you just explain the

13       color scheme that we have going on here a bit so the jury

14       understands what those colors reflect.

15       A.   Yes.  The idea here is to use the same color for all the

16       different accounts for the same entity or groups of entities.

17       So the G|CLUBS entities are shown in dark blue, the Crane

18       entities are shown in light blue, and the Hamilton and Himalaya

19       entities are shown in yellow.

20       Q.   And up on the top right there is an inflow from Farms to

21       Crane Advisory.  What color is reflected for Farms?

22       A.   Yes, we're consistently using green to indicate Farms

23       entities.

24       Q.   All right.  So let's break this down a little bit.

25              MS. MURRAY:  If we could go to the next slide, please,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q1GUO1                         Hinton - Direct

 1    Ms. Loftus.

 2    Q.  Focusing now, Mr. Hinton, on the G|CLUBS portion of this

 3    summary of selected flows, can you just narrate us a bit

 4    through the various flows that end up in the G Club Operations

 5    Morgan Stanley account, the three accounts listed here.

 6    A.  Yes.  Between February 3, 2021, and July 9, 2021,

 7    $8.6 million was transferred to those Morgan Stanley G Club

 8    accounts that are listed in the box there from Sources of

 9    Funds.

10    Q.  And in looking at the other inflows into those Morgan

11    Stanley accounts, as reflected here, just at a high level,

12    where do we see the money coming from and into those Morgan

13    Stanley accounts?

14    A.  They're coming from other G Club Operations accounts at two

15    different banks.

16    Q.  Starting on the left, can you read kind of the left bottom

17    from the Signature account going around clockwise.

18    A.  Certainly.  So there's a G|CLUBS Operations LLC account at

19    Signature Bank, 3576, and that account transferred 14.5 million

20    on January 11, 2021, to the Morgan Stanley G Club Operations

21    account.

22          Then next in the rotation, there's a G|CLUBS

23    Operations account at——I think it's First Bank, 7085, and

24    there's a $52.2 million transfer on December 17, 2020, to the

25    Morgan Stanley G Club Operations accounts.

O6Q1GUO1                        Hinton - Direct

1            And finally, there's a separate First Bank account for

2     G Club Operations ending 7052.  The transfer is a hundred

3     thousand, on December 29, 2020.

4     Q.  And Mr. Hinton, each of those three transfers that you just

5     discussed had a single date associated with them; is that

6     correct?

7     A.  That's correct.

8     Q.  Was each of those an individual transaction into the

9     G|CLUBS Morgan Stanley account?

10    A.  I believe so, but that's based on my—my memory.

11    Q.  And then looking from the Morgan Stanley accounts, what are

12    the two outgoing flows that are reflected on this summary

13    chart?

14    A.  Yes, there's a $10 million collection of outflows on

15    January 21, 2021, through February 4, 2021, to Fiesta Property

16    Developments Limited, and there's a series of transfers to a

17    G|CLUBS International account at Mercantile Bank that summed to

18    62.7 million over the period August 20, '21 through October 8,

19    2021.

20    Q.  Mr. Hinton, do you know what Fiesta Property Developments

21    Limited is?

22    A.  I do not.

23            MS. MURRAY:  All right.  Let's go to the next slide,

24    Ms. Loftus.

25    Q.  I'd like to focus now on the Crane portion of the select

1   flows reflected here.

2           We're not going to go through this in every

3   transaction detail, Mr. Hinton, but just starting with the

4   arrow straight down from Sources of Funds to the Citi account,

5   5278, what amount is represented there?

6   A.   59.5 million.

7   Q.   And over what time period?

8   A.   November 23, 2020, through April 1, 2021.

9   Q.   And then following that arrow straight down, what is the

10  next flow that's reflected here from that Citi account?

11  A.   Yes, that same Citi account for Crane Advisory Group at

12  Citibank transfers 58.2 million to Crane Advisory Group at

13  Morgan Stanley.

14  Q.   And I want to focus just briefly on the Crane Advisory

15  Group account on the far right, the Capital One 0887 account.

16  Do you see that?

17  A.   I do.

18           (Continued on next page)

19

20

21

22

23

24

25

O6QBGUO2                          Hinton - Direct

1    BY MS. MURRAY:

2    Q.   There are both inflows and outflows for that account; is

3    that correct?

4    A.   Yes.

5    Q.   Looking at other inflows above which is going down the 25.3

6    million, what types of transactions does that reflect on this

7    chart?

8    A.   Those are all the transactions over that time period that

9    aren't coming from the other entities the explicitly listed on

10   the chart.

11   Q.   And then there's an outflow or outflows over a time period,

12   the $42 million, which accounts and over what time period does

13   that money flow from Capital One?

14   A.   Between May 28 and July 13, 2021.

15   Q.   And that goes to Crane Advisory accounts held at what bank?

16   A.   At Morgan Stanley.

17            MS. MURRAY:  Let's go to the next slide please,

18   Ms. Loftus, and marry those two, the G/Club and the Crane.

19   Q.   Looking at this, this now brings those together, and in

20   particular there's a flow just to the left of the middle of the

21   page from Crane Advisory Group's Morgan Stanley accounts to the

22   G/Club Morgan Stanley accounts, if would highlight that,

23   Ms. Loftus.

24            What is the dollar amount of that collective transfer

25   from Crane to G/Club?

O6QBGUO2                        Hinton - Direct

1   A.  The aggregate amount of the transfers between the Morgan

2   Stanley accounts for Crane Advisory and the Morgan Stanley

3   accounts for G/Club Operations over that period is 87.1

4   million.

5   Q.  What is the period for that 87.1 million transfer?

6   A.  It's a series of transfers over the period May 24, 2021

7   through July 2nd, 2021.

8   Q.  Ms. Loftus, let's go to the next slide and build in the

9   Himalaya Exchange entities.

10          Mr. Hinton, now looking at the accounts we just ended

11  with, the G/Club Morgan Stanley accounts, what is the outflow

12  reflected here over the period of May 6, 2021 to June 23, 2021?

13  A.  $85 million.

14  Q.  If you could highlight that for the jury, please,

15  Ms. Loftus, on the left from G/Club to Hamilton.

16          And then looking from that Hamilton Digital Assets

17  account we see another flow in the amount of $85 million.  Is

18  that right?

19  A.  That is correct.

20  Q.  What is the period of time for that agregation of flows?

21  A.  From September 1, 2021 through September 16.

22  Q.  And that goes to a bank account held in what name?

23  A.  Hamilton Opportunity Fund.

24  Q.  At what bank?

25  A.  At Silvergate Bank, 9306.

O6QBGUO2                          Hinton - Direct

1   Q.  Focusing now on that Silvergate account, the Hamilton

2   Opportunity Fund, there's also another incoming flow above from

3   a Himalaya International Clearing entity.  Do you see that?

4   A.  I do.

5   Q.  What is the dollar amount of that?

6   A.  It's $25 million.

7   Q.  Let's build in the next slide, please, Ms. Loftus.

8           Looking on the right now, Mr. Hinton, we're looking in

9   the September and October 2021 time period with a series of

10  flows to Lawall & Mitchell, LLC account.  Do you see that?

11  A.  I do.

12  Q.  Can you read the dollar amounts and the dates of the

13  inflows into that account from the various Crane accounts as

14  reflected on this chart?

15  A.  The Morgan Stanley account sends 6.8 million on October 19.

16  The IDB bank account send 1.6 million on the 27th of September.

17  The Signature Bank account sends 2.3 million between September

18  27th and October 12, 2021, and the Crane Advisory account at

19  Capital One sends 37 million on September 26, 2021.

20  Q.  Let's go to the next slide.  I want to continue along in

21  our chronology here on this summary.

22          So we're looking again in the middle of the page

23  Hamilton Opportunity Silvergate account.  There's now an

24  outgoing flow from that account on October 27, 2021.  Do you

25  see that?

O6QBGUO2                        Hinton - Direct

1    A.  I do.

2    Q.  What is the dollar amount of that flow?

3    A.  59 million.

4    Q.  And that goes from a Hamilton Opportunity Fund account held

5    at what bank to a Hamilton Opportunity account held at what

6    bank?

7    A.  This transfer between two Silvergate accounts for the same

8    entity, Hamilton Opportunity Fund, so it had a 9306 account

9    that transferred to the 7747 account.

10   Q.  Let's go to the next slide please, Ms. Loftus.

11           What do we see here?

12   A.  We see the same amount being transferred on the same day

13   from the Silvergate 7747 account to a third Hamilton

14   Opportunity Fund account at Silvergate numbered 7739.

15   Q.  And those $59 million transfers from Hamilton Opportunity

16   Fund accounts, those transfers are on the same day among

17   different accounts; is that correct?

18   A.  That's right.

19   Q.  Let's go to the next slide, please.

20           So there's now an account at the bottom of this slide

21   listed as Silvergate 7713.  Do you see that?

22   A.  I do.

23   Q.  In what entity name is that account held?

24   A.  That's also Hamilton Opportunity Fund SPC.

25   Q.  And let's look at the inflows then into that account from

O6QBGUO2                    Hinton - Direct

1   both the Hamilton Opportunity Fund SPC 7721 Silvergate account

2   on the left, and the Hamilton Opportunity Fund SPC 7739

3   Silvergate account on the right?

4   A.  Yes.  There's 5.6 million transferred on November 15, 2021

5   from the Silvergate 7721 to the Silvergate 7713 accounts.

6   Q.  And then looking on right, the incoming transfer to 7713

7   from 7739?

8   A.  Yes, that's 46.5 million on December 2, 2021.

9   Q.  Let's go to the next slide, please, Ms. Loftus.

10          Mr. Hinton, this is now again a subset of the broader

11  G/Club/Crane summary chart we've been looking at.  As you can

12  see, there's a highlight on this G/Club International Limited

13  account at Mercantile Bank.  Do you see that?

14  A.  I do.

15  Q.  And the inflows reflected on this chart into that account,

16  what is the amount from the G/Club Operations Morgan Stanley

17  account?

18  A.  62.7 million.

19  Q.  Let's go to the next slide, please.

20          What is the title of this slide, Mr. Hinton?

21  A.  G/Club select flows and expenses.

22  Q.  Here looking at the top, are we starting with this summary

23  flow analysis from the account we just saw on the prior slide

24  that the 62.7 million came into?

25  A.  We are.

O6QBGUO2                              Hinton - Direct

1   Q.  Focusing on a few of the outflows that are reflected here.

2   Let's start on the right with the blue.

3            What is shown with the outflows on the right to Yacht

4   Zoo, LLC?

5   A.  It shows that between October 26, 2021 and September 1,

6   2022, $478,000 was transferred.

7   Q.  Then looking to the red, what category of transactions is

8   reflected in the summary chart here?

9   A.  The red symbols are associated with car-related expenses.

10  Q.  What is the dollar amount for those collective car-related

11  expenses?

12  A.  6.4 million.

13  Q.  The prior car-related expenses that we looked at

14  Mr. Hinton, those were expenses that originated from a

15  different bank account; is that correct?

16  A.  That's correct.

17  Q.  The Lamp Capital account?

18  A.  That's correct.

19  Q.  And these are expenses from an account held in what

20  entity's name?

21  A.  G/Club International Limited.

22  Q.  Continuing on there's an entry called Stone Offer Design.

23  Do you see that?

24  A.  I do.

25  Q.  From what accounts do we see transactions flowing into

O6QBGUO2                          Hinton - Direct

1   Stone Offer design?

2   A.  We see payments from both the G/Club International

3   Mercantile account and from G/Clubs Operations in a separate TD

4   Bank account.

5   Q.  Looking left, Mr. Hinton, there is a sources of funds

6   section over on the top left, and that flows into both the

7   G/Club Operations account and the Himalaya International

8   Clearing account.  Do you see that?

9   A.  I do.

10  Q.  Does the money that's reflected in the sources of funds,

11  does that include incoming sources of funds that the government

12  identified for Brattle?

13  A.  Yes, these are sources of funds coming from entities that

14  we previously described how the government instructed us to

15  identify.

16  Q.  And based on the information on this slide, does that

17  include sources of funds for both Himalaya Exchange, which

18  would be shown in the flow to Himalaya International Clearing

19  and for G/Clubs which is shown in the flow to G/Club

20  Operations?

21  A.  It does.

22  Q.  Let's focus on the far left side of this.  We have a flow

23  into G/Club Operations, where then do we see $7 million going

24  between March 2, 2022 and April 12, 2022?

25  A.  There are aggregate transfers to -- I'm not sure how to

O6QBGUO2                              Hinton - Direct

1    pronounce the name of the swiss bank, but it's right there.

2    Q.  I represent to you that it's Kyrgyz swiss bank.

3    A.  Thank you.

4    Q.  Let's look at those transactions from the bank records.

5    Ms. Loftus if we could go to Government Exhibit TDB-93.  We'll

6    start on the first page, Ms. Loftus.

7              Mr. Hinton, is this one of the bank records that you

8    reviewed in connection with your work in this case?

9    A.  It is.

10   Q.  What's the statement period for this record?

11   A.  It's January 14, 2022 through January 31st of the same

12   year.

13   Q.  And what is the entity name and the address that this

14   account is held in?

15   A.  It's G/Club Operations, LLC, 162 East 64th Street, New

16   York, New York.

17   Q.  And the last four of the primary account number on the

18   right side?

19   A.  2044.

20   Q.  On the account summary here, what's the beginning balance

21   in this account on this statement period?

22   A.  It has a zero beginning balance.

23   Q.  Let's go to page eight, please, Ms. Loftus and scroll down.

24              On the other withdrawals, Mr. Hinton, can you read

25   that first withdrawal, March 2?

O6QBGUO2                              Hinton - Direct

1    A.  Yes.  March 2nd, there's a ware transfer outgoing to Kyrgyz

2    swiss bank 3 million.

3    Q.  And then let's go to page 12, please, Ms. Loftus.  And

4    scroll down to the other withdrawal section there.

5            On the first entry for April 12 here, Mr. Hinton, do

6    you see that?

7    A.  Yeah, this is a similarly titled wire transfer outgoing for

8    $4 million.

9    Q.  And what bank does that go to?

10   A.  It's going to Kyrgyz swiss bank.

11   Q.  So those two transactions the 3 million and the 4 million,

12   do those collectively represent the $7 million that we saw in

13   the flow on the summary chart at Z26 page 25?

14   A.  They do.

15   Q.  Ms. Loftus, let's go back to Z26.  Let's go to slide 26.  I

16   want to talk through now at a high level about some of the

17   Himalaya exchange flows.

18           Mr. Hinton, starting on the left top here, sources of

19   funds.  Again, do the sources of funds reflected on the

20   Himalaya Exchange flow summary, are those the same category of

21   funds that we discussed earlier?

22   A.  Yes.

23   Q.  So the left most line, just taking us straight down the

24   line, if you could just read the dollar amount and the date

25   ranges and what accounts that monies flows through?

O6QBGUO2                          Hinton - Direct

A.   Yes.   473.8 million is the aggregate amount of transfers

from sources of funds to Himalaya International Clearing FEV

3763 account between June 2, 2021 and June 30, 2022.

Q.   And then from that FV Bank international clearing account,

what do we see reflected inflows between March 21st and May

13th of 2022?

A.   80 million in aggregate transfers to a different Himalaya

International Clearing Limited account at the same bank, but

this account ends in 2119.

Q.   And then from there what is the next flow reflected here?

A.   Yes.   Then from March 5, 2022 through May 13, 2022, there's

30 million flowing to a Mercantile account for Himalaya

International Financial Group limited.

Q.   And looking kind of in the middle of the slide, Mr. Hinton,

there's another Himalaya International Clearing account.   Do

you see that, it's 0133?

A.   I do.

Q.   At what bank is that held?

A.   That's also at Mercantile Bank.

Q.   How much money flows into that account as reflected here

from both Clearing at FV Bank 3763 and from sources of fund?

A.   There's 220 million in aggregate coming from FV Bank

Himalaya International Clearing Limited and 36.9 coming from

sources of funds, so together that's 256.9 million.

Q.   And then there's another inflow reflected here going to the

O6QBGUO2                          Hinton - Direct

1    clearing account at Mercantile Bank, that's from the right

2    side, what is that amount, and what account does that come from

3    or what entity?

4    A.   Yes.   That's a $50 million transfer on December 2, 2021

5    from G/Club International Limited.

6    Q.   So that's $50 million from G/Club International to Himalaya

7    International Clearing; is that right?

8    A.   That's right.

9    Q.   And then looking at the outflow from the Himalaya

10   International Clearing at Mercantile to Hamilton Opportunity

11   Fund, what is the aggregate dollar amount of that outflow?

12   A.   51 million.

13   Q.   And what is the Hamilton Opportunity Fund bank account that

14   that money goes to?

15   A.   It's a Silvergate account ending 7739.

16   Q.   Let's go to the next slide, please, Ms. Loftus.

17           I want to focus on the bottom flow that's reflected

18   here, Mr. Hinton.   From that Himalaya International Financial

19   Group Mercantile account we discussed, the 0139, what flow did

20   we see on April 15, 2022?

21   A.   We see a $37 million transfer to Zeisler & Zeisler, PC,

22   IOLTA account.

23   Q.   Do you know what Zeisler & Zeisler PC is?

24   A.   I understand it's a law firm.

25   Q.   Do you know what role, if any, Zeisler & Zeisler has in the

O6QBGUO2                          Hinton - Direct

1   government's case?

2   A.  I do not.

3   Q.  Let's go to the next slide.  Focusing on just one of the

4   categories of expenses that we had discussed in connection with

5   some of the transactions from the various accounts.

6           On the next slide, Ms. Loftus.  Mr. Hinton, what is

7   the title of this slide?

8   A.  This slide is titled Yacht Zoo, LLC expenses summary.

9   Q.  What is at the top of this slide?

10  A.  It's an oval representing Yacht Zoo, LLC.

11  Q.  Going from left to the right counter clockwise, does this

12  represent various different inflows to Yacht Zoo, LLC from

13  different accounts we've been discussing?

14  A.  Yes.  They're essentially expenses of those accounts,

15  monies that are being transferred to Yacht Zoo, LLCs account.

16  Q.  What is the aggregate amount of money just from the bank

17  transactions reflected on this summary chart that goes to Yacht

18  Zoo, LLC between May 7, 2020 and October 21, 2022?  In the

19  middle there, Ms. Loftus.

20  A.  Yes, it's 3.9 million.

21  Q.  And so starting on the left with the Lamp Capital Signature

22  account, what's the date range of that 1.8 million aggregate

23  flows?

24  A.  1.8 million.

25  Q.  What's the date range?

O6QBGUO2                          Hinton - Direct

1  A.  It's May 7, 2021 through September 13, 2021.

2  Q.  And the next account, the IDB account held in the name of

3  Lamp Capital, what's the date range for those Yacht Zoo, LLC

4  payments?

5  A.  October 25 through December 20, 2021.

6  Q.  And in the middle there, Lamp Capital, LLC, DCB or Dime

7  Community Bank, what is the dollar amount that goes up to Yacht

8  Zoo from that account?

9  A.  $990,000.

10 Q.  Continuing right, HCHK Tech, what is the date of the

11 transfers to Yacht Zoo from that account?

12 A.  October 21, 2022.

13 Q.  By the way, you see money going from G/Club as well to

14 Yacht Zoo, what is the dollar amount of that collection of

15 transactions?

16 A.  478,000.

17 Q.  Let's just take a look at one of those for the HCHK Tech

18 transfer to Yacht Zoo, LLC.  Ms. Loftus, if you could pull up

19 Government Exhibit MTB-83.  Let's focus on the top first.

20        What is the last four of the account number looking on

21 the right here?

22 A.  The account number ends in 2176.

23 Q.  And the statement period for this particular bank record?

24 A.  October 1 through October 31, 2022.

25 Q.  What is the name and address for this particular bank

O6QBGUO2                          Hinton - Direct

1    account?

2    A.  It's HCHK Technologies, Inc, 750 Lexington Avenue, New

3    York, New York.

4    Q.  Let's zoom out, Ms. Loftus, and look down the page a bit.

5    If we could look at the second entry for October 21, 2022.

6              Do you see that, Mr. Hinton?

7    A.  I do.

8    Q.  What is the description of that transaction as reflected in

9    this HCHK Tech bank record?

10   A.  It's entry says outgoing chips transfer auto rep Yacht Zoo

11   Limited G Fashion Hold Co. B Li.

12   Q.  Do you know what G Fashion hold Co. B. Li refers to?

13   A.  I imagine it's a G Fashion entity.

14   Q.  And looking to the right, the second column which shows the

15   transaction amount, what is that transaction amount here?

16   A.  $123,452.

17   Q.  Let's go back to Z26, slide 30, Ms. Loftus.

18             Is that then the 123,000 rounded that we see reflected

19   on this summary chart?

20   A.  It is.

21   Q.  Let's continue, and let's go to the next slide.

22             Mr. Hinton, is this kind of a high level summary of

23   the sources of funds for the primary categories that we've been

24   looking at over the course of your testimony?

25   A.  It is.

O6QBGUO2                          Hinton - Direct

1    Q.  And if you could just take us through left to right -- and

2    again, just for clarity, the summary charts that we've been

3    reviewing, Mr. Hinton, is it correct that these reflect only a

4    portion of the total transactions that were in the records that

5    Brattle received?

6    A.  That's correct.

7    Q.  And is it also correct that Brattle did not process every

8    bank record that it received from the government?

9    A.  That's correct, yes.

10   Q.  So sources of funds, what is the approximate aggregate flow

11   to the GTV/VOG category?

12   A.  Of all the transactions that we processed, of which there

13   were thousands for this category, the aggregate amount was

14   $411 million going to GTV and VOG.

15   Q.  And what about for the farms category, what's the aggregate

16   amount of sources of funds that flowed to the farms category

17   that the government identified?

18   A.  Of the transactions we processed, there's $110 million

19   worth of transactions categorized as going from sources of

20   funds to farms entities.

21   Q.  What about the G/Clubs category?

22   A.  Likewise for the G/Clubs category, we identified and

23   processed $240 million of individual transactions from sources

24   of funds accounts.

25   Q.  And finally the Himalaya Exchange category, what is the

O6QBGUO2                        Hinton - Direct

1    aggregate amount of processed money flowing to that category?

2    A.  517 million.

3    Q.  Ms. Loftus, can we go to the next slide, please.  This sums

4    it up for us, Mr. Hinton.

5           Among those four broad categories, what amount do we

6    see going from sources of funds into those categories?

7    A.  Collectively they make up $1.3 billion.

8    Q.  And let's go to the next slide.

9           What is reflected here at the bottom of this slide for

10   outflows from that broad $1.3 billion worth of sources of

11   funds?

12   A.  Yes.  At the bottom of the slide we're indicating that

13   there were outflows collectively from these four entities,

14   entities that were classified into these four categories.  From

15   all of the transactions that we processed, we were able to

16   identify net inflows into these two other groups of accounts.

17   Q.  And so looking first at the left, family offices and family

18   members, is that a collective category reflective of what we

19   saw yesterday on Government Exhibit Z27 where the government

20   identified who qualifies as a family member or what qualifies

21   as a family office?

22   A.  Right. I think you're referring to that beautifully

23   multi-colored list of all the different accounts, and we had a

24   column for family offices and family members.  And at the

25   bottom there was a footnote that descrived what were the

O6QBGUO2                          Hinton - Direct

1   entities that were classified in that column.

2   Q.  And for purposes of this summary chart, is the

3   classification the same for family offices and members here as

4   it was on that other summary chart?

5   A.  Yes, it is.

6   Q.  What are the net inflows we see from the collective 1.3

7   billion going to either family offices or family members?

8   A.  We compute that the net amount of inflows, that means the

9   amount coming in less whatever amounts went out is $100

10  million.

11  Q.  And then looking on the right companies owned by William

12  Je, are those the companies we discussed yesterday that the

13  government identified for you, the Hamilton and ACA Capital

14  entities?

15  A.  That's correct.

16  Q.  And of the aggregate $1.3 billion, what approximate amount

17  of net inflows do we see going into those companies, the

18  William Je companies?

19  A.  From these four different entities we see net inflows to

20  the ACA Capital and Hamilton accounts of 550 million.

21  Q.  Let's go to the next slide, please, Ms. Loftus.

22          What's the title of this slide, Mr. Hinton?

23  A.  This is titled cumulative sources of funds inflows by

24  category.

25  Q.  Is this a different visual representation of the $1.3

O6QBGUO2                          Hinton - Direct

1    billion sources of funds money that we just looked at on the

2    prior slides?

3    A.   Yes, it just shows how it built up over time.

4    Q.   Can you explain for the jury what the different colors

5    represent and how they build over time as we go from 2020 here

6    to 2023?

7    A.   Yes.  Well, because we're building up this number from all

8    the individual over 200,000 transactions, we have the date of

9    every single transaction, so it's possible to compute a daily.

10   In this case we do it monthly, but a cumulative amount of the

11   inflows into all the accounts that are classified into these

12   four different categories, each one having a different color.

13   So underlying each of those bands of color are many, many

14   individual entities, and for each of those entities many

15   individual accounts that are receiving money in the form of

16   sources of funds.

17   Q.   And the amounts that are totaled within each color band,

18   Mr. Hinton, are those the amounts associated with the

19   categories indicated on the bottom of this chart?

20   A.   Those are the amounts that you get to by the end of July

21   2023.  You can see that in each case they sort of build up at

22   different points in time to reach that total.

23   Q.   And then starting at the bottom of this chart working up,

24   is it correct based on the key at the bottom and the colors

25   that we start with GTV/VOG, add on the farms, then G/Club and

O6QBGUO2                    Hinton - Cross

1    finally starting at some point it looks like in late 2022 the

2    Himalaya Exchange?

3    A.  Yes, just by stacking them up, you can see what they sum to

4    altogether.

5    Q.  Mr. Hinton, in this case for purposes of the summary

6    exhibits that we reviewed with the jury yesterday and today, is

7    it correct that the government prepared or advised what

8    information it wanted reflected on those summary charts?

9    A.  It did.

10   Q.  And in the course of either preparing or reviewing those

11   summary charts, did you and Brattle take instruction from the

12   government?

13   A.  We did.

14          MS. MURRAY:  May I have a moment, your Honor?

15          THE COURT:  You may.

16          MS. MURRAY:  Thank you, Mr. Hinton.  I have nothing

17   further.

18          THE COURT:  Cross examination.

19          MR. KAMARAJU:  Thank you, your Honor.

20   CROSS-EXAMINATION

21   BY MR. KAMARAJU:

22   Q.  Good morning, Mr. Hinton.

23   A.  Good morning.

24          MR. KAMARAJU:  Before we start, just a little bit of

25   housekeeping, your Honor.  At this time I'd like to read a

O6QBGUO2                          Hinton - Cross

1    stipulation between the parties.

2              THE COURT:  Go ahead.

3         MR. KAMARAJU:  Could we please pull up Government

4    Exhibit Stip-14, please, and it's in evidence already so we can

5    publish it.

6              "It is hereby stipulated and agreed by the United

7    States of America and Miles Guo, the defendant, the below

8    listed exhibits were lawfully obtained by the government and

9    are authentic records of the entity listed in column A that

10   were made at or near the time by or from information

11   transmitted by a person with knowledge of matters set forth in

12   the records.  Such records were kept in the course of the

13   regularly conducted activity, and it was a regular practice of

14   the entity to make the records."

15             And then could we go to page eight of this

16   stipulation.

17             "It is further stipulated and agreed that the defense

18   exhibits listed in column C may be received as defense exhibits

19   at trial."  Then can we go back to the front page, please.

20             Your Honor, pursuant to this stipulation, I'm going to

21   offer several exhibits at this time.

22             THE COURT:  All righty.

23             MS. MURRAY:  No objection.

24             MR. KAMARAJU:  So the defense offers DX-11124 through

25   11129, DX-11255, DX-11432 through 11436, DX-10299 through

O6QBGUO2                        Hinton - Cross

1   DX-10301, DX-13005 through DX-10329, DX-10526, DX-10528 through

2   DX-10530, DX-10551 through DX-10562, DX-10564 through DX-10577,

3   DX-11299 through DX-11300, DX-11302, DX-11304 and DX-11305,

4   DX-11485, DX-11486 through, DX-11488, DX-11489, DX-11491

5   through DX-11492, DX-11548 through DX-11549, DX-11552 through

6   DX-11553, DX-11562 through DX-11570, DX-10430 through DX-10457,

7   DX-10960 through DX-10971, DX-11073 through DX-11078, DX-11110

8   through DX-11121, DX-11493 through DX-11506, DX-10007,

9   DX-10531, DX-10606 through DX-10626, DX-10008 through DX-10010,

10   DX-10330 through DX-10356, DX-10578 through DX-10605, DX-11256

11   through DX-11257, DX-11281, DX-11517 through DX-11526, DX-11572

12   through DX-11573, DX-11581, DX-11585, DX-10357 through

13   DX-10359, DX-10627 through DX-10631, DX-10972, DX-10013,

14   DX-10017 through DX-10028, DX-10360 through DX-10373.

15          (Counsel conferred)

16          MR. KAMARAJU:  If it will speed it along, your Honor,

17   I'll offer every exhibit in Column C of the stipulation.

18          THE COURT:  They are admitted.

19          (Defendant's Exhibits DX-11124 through 11129,

20   DX-11255, DX-11432 through 11436, DX-10299 through DX-10301,

21   DX-13005 through DX-10329, DX-10526, DX-10528 through DX-10530,

22   DX-10551 through DX-10562, DX-10564 through DX-10577, DX-11299

23   through DX-11300, DX-11302, DX-11304 and DX-11305, DX-11485,

24   DX-11486 through, DX-11488, DX-11489, DX-11491 through

25   DX-11492, DX-11548 through DX-11549, DX-11552 through DX-11553,

O6QBGUO2                        Hinton - Cross

1    DX-11562 through DX-11570, DX-10430 through DX-10457, DX-10960

2    through DX-10971, DX-11073 through DX-11078, DX-11110 through

3    DX-11121, DX-11493 through DX-11506, DX-10007, DX-10531,

4    DX-10606 through DX-10626, DX-10008 through DX-10010, DX-10330

5    through DX-10356, DX-10578 through DX-10605, DX-11256 through

6    DX-11257, DX-11281, DX-11517 through DX-11526, DX-11572 through

7    DX-11573, DX-11581, DX-11585, DX-10357 through DX-10359,

8    DX-10627 through DX-10631, DX-10972, DX-10013, DX-10017 through

9    DX-10028, DX-10360 through DX-10373 received in evidence)

10            MR. KAMARAJU:  Thank you.

11   BY MR. KAMARAJU:

12   Q.  Just one other housekeeping detail, Mr. Hinton, can you

13   confirm for the jury, please, sir that you are not in fact a

14   Chinese spy?

15   A.  Yes.

16   Q.  Thank you.  Now, Brattle was first retained by the

17   government in the summer of 2023, correct?

18   A.  Yes.

19   Q.  And Brattle has a team working on this project, right?

20   A.  Yes.

21   Q.  And you were involved from the start of Brattle's

22   engagement, correct?

23   A.  Correct.

24   Q.  And over the course of that engagement, Brattle has been

25   compensated for its work by the government?

O6QBGUO2                        Hinton - Cross

1   A.  That's correct.

2   Q.  And I believe you testified on direct you receive about $2

3   million, correct?

4   A.  Well, I think that's an estimate of the amount of fees.

5   I'm not sure what's being collected.

6   Q.  You're owed $2 million?

7   A.  As I said, I think my -- we've accrued certain amounts of

8   fees.

9   Q.  That work entailed doing the fund analysis that you

10  testified about on direct among other things, correct?

11  A.  That's right.

12  Q.  And you only learned about GTV from the prosecutors, right?

13  A.  Yes.

14  Q.  You only learn about the farm loan program from the

15  prosecutors, correct?

16  A.  Yes.

17  Q.  Same with G/Clubs, right?

18  A.  Yes.

19  Q.  And the same with the Himalaya Exchange, right?

20  A.  Yes.

21  Q.  Now, did you learn about Mr. Guo from the prosecutors?

22  A.  No.

23  Q.  When did you first hear of him?

24  A.  When the government contacted us.

25  Q.  Your testimony today was about summaries you prepared of

1   evidence in this case, right?

2   A.  Yes.

3   Q.  And the prosecutor provided you with the evidence they

4   wanted you to summarize, right?

5   A.  They provided us with a large number of documents at the

6   beginning we had to sort of identify, and then they selected

7   certain of those for us to put onto certain charts.

8   Q.  So it's fair to say they identified the evidence they

9   wanted summarized?

10  A.  Yes.

11  Q.  As part of that, for example, they gave you companies that

12  they wanted you to focus on, right?

13  A.  Yes.

14  Q.  Same with the bank accounts, they gave you those too,

15  right?

16  A.  Yes.

17  Q.  And they told you what kind of charts they wanted, right?

18  A.  That's right.

19  Q.  And they instructed you to make changes to those charts,

20  right?

21  A.  Yes, additions, yes, adjustments.

22  Q.  Additions, subtractions, modifications, all kinds of

23  changes, right?

24  A.  Yes.

25  Q.  You also testified that you had been working in earnest on

 1   this project I think since the start of the year; is that

 2   right?

 3   A.   That was the more intensive period, yes.

 4   Q.   So even though Brattle has been retained for more than a

 5   year, it's true that the prosecutors were directing changes to

 6   your chart through last night, correct?

 7   A.   Yes.

 8   Q.   I want to talk just a little bit about the process.

 9              So you testified I think on direct about the process

10   that Brattle uses to analyze data, right?

11   A.   A little bit, yes.

12   Q.   Not the entire process, but just a little bit, right?

13   A.   Yes.

14   Q.   And that's, to use a colloquial term, maybe you scrub the

15   data in different ways?

16   A.   I wouldn't say that.

17   Q.   But part of the process is deciding what's relevant to the

18   task, right?

19   A.   Well, not for me.

20   Q.   That's going to be my next question.  It's the government

21   deciding what's relevant, right?

22   A.   Yes.

23   Q.   And then they tell you, right?

24   A.   Yes.

25   Q.   And then you go out and find it, right?

1   A.  No.

2   Q.  So what do you do after the government tells you what they

3   think is relevant?

4   A.  I think the sequencing is a little different.  They gave us

5   the records.  We told them what's in the record, and then they

6   told us which of those records they wanted us to process.  But

7   they didn't know what was in the records until we processed

8   them, so we were then to share the results with the government.

9   Q.  So it's a back and forth; fair to say?

10  A.  Yes.

11  Q.  You told them, this is what's out there.  They said, that's

12  what we care about, right?

13  A.  That's right.

14  Q.  And they never told you that they care about anything that

15  was helpful to Mr. Guo, right?

16  A.  I have no idea.

17  Q.  Cause that's not part of your retention, right?

18  A.  I'm sorry.

19  Q.  Withdrawn.  Now, the prosecutors also reviewed your summary

20  charts for accuracy, right?

21  A.  I believe so.

22  Q.  Was that part of the changes that they made or proposed

23  changes for accuracy, sir?

24  A.  Not so much for accuracy, to ensure that all the

25  transactions that they wanted included were actually included,

1    and not those that should not be included.

2    Q.  Does Brattle do its own independent check for accuracy?

3    A.  Yes.

4    Q.  Can you describe that process to us?

5    A.  Well, there's many different checks.  Obviously when the

6    database and the extraction is happening, individual team

7    members are checking each others work.  But then ultimately

8    what happens here is after the charts have been produced based

9    on the transactions that the government wanted to be

10    represented on the charts, we're able to identify every single

11    source document associated with those transactions and then

12    check the amounts against those source documents.

13    Q.  So let's take a look at one of those charts.  Could we

14    please pull up Government Exhibit Z26.  Could we go to slide

15    four, please.

16         So you testified about this on direct, correct, sir?

17    A.  I did.

18    Q.  First, the sources of funds box, what sources go into that?

19    A.  Well, sources of funds are identified as flows of funds

20    from individual accounts where those individuals are not

21    persons who have been identified as persons of interest or

22    persons who are associated with any of the corporate agreements

23    that we processed for the entities that are associated with the

24    categories the government gave us.

25         There was also in some charts I discussed on direct,

```
 1    you may recall that there were certain amounts that were
 2    flowing into G/Clubs/Crane account that were in round amounts
 3    of 10,000, 20,000, 30,000, 40,000, 50,000 where there wasn't
 4    actually the name of an individual indicated in the bank
 5    records, that information was blank.  But in those specific
 6    instances, the government told us to also categorize those an
 7    inflows, as sources of funds.
 8    Q.  Got it.  So with the exception of that last category that
 9    you talked about, the blind contracts, is it fair to say that
10    the sources of fund process was a process of elimination?
11    A.  I wouldn't say that.
12    Q.  Well, you eliminated persons of interest, right?
13    A.  No, we started by identifying all the transactions in the
14    accounts that the government told us to process and identified
15    all the transactions of inflows from individuals.
16    Q.  And then you categorized those individuals, right?
17    A.  Then we identified which, if any, of those individuals
18    should not be included and excluded those.
19    Q.  And one of the groups of people who should not be included
20    were persons of interest, right?
21    A.  Yes.
22    Q.  Who decided what a person of interest was?
23    A.  The government.
24    Q.  Can you give me an example of who some of the people are
25    who are in the persons of interest category?
```

1   A.  That would be the persons who were showing up in family

2   members category or the defendant for example.

3   Q.  And were there any other categories of people that you

4   excluded?

5   A.  Yes.  As I said, there were persons who were identified as

6   signatory or counter-parties in service agreements and other

7   contracts between the entities that were in the various

8   categories that were in my summary charts.

9   Q.  And those are service agreements that were identified to

10  you by the government?

11  A.  Yes.  One of the assignments the government gave us,

12  actually our first assignment was to review various different

13  types of agreements, including the farm loans that we discussed

14  on my direct.  There was a detail list of those loans.  Those

15  were actually individual loan documents, and those were among

16  some of the agreements that we processed.

17  Q.  So the farm loan documents that you testified about on

18  direct, they were signed by the lenders, correct?

19  A.  Yes.

20  Q.  But not the borrowers, right?

21  A.  Yes.

22  Q.  Did you exclude the lenders from the sources of funds?

23  A.  No, just the persons who were associated with the entities

24  that are in each of these farms, GTV, Himalaya, etc.,

25  categories.

1   Q.  So there's further selection within the idea of the

2   counter-parties on the agreements, right?

3   A.  Yes.  So anybody who is a party to an agreement who's

4   working for one of these entities or signing on behalf of one

5   of these entities, not a person who is providing sources of

6   funds.

7   Q.  Did you discuss with the prosecutors why they focused on

8   these particular sources of funds on slide four?

9   A.  No.

10  Q.  So you have no idea what the import of this slide is in

11  term -- withdrawn.  That's a bad question.  I apologize.

12          Let's just look at the VOG box on the left.  You see

13  that?

14  A.  Yes.

15  Q.  The date range on that is from April 2020 to October 13,

16  2020, correct?

17  A.  Yes.

18  Q.  Have you ever heard of the GTV private placement?

19  A.  I think I've seen references to a private placement in the

20  documents.

21  Q.  Could we pull up GXC63-T alongside this exhibit, please.

22  So on the left is the translation of a June 2020 broadcast.

23  Could we just blow up or highlight the line that starts, It's

24  almost in the first bucket there.

25          Can you just read that, Mr. Hinton?

O6QBGUO2                          Hinton - Cross

1   A.  It's almost 12 o'clock noon on June 2nd.

2   Q.  Can we go to page seven and highlight the line when you get

3   there, GTV is now, it's in the fourth box down.

4           Can you read the part of that sentence that starts,

5   GTV is?

6   A.  GTV is now starting to be legal.

7   Q.  You would agree with me, sir, that June 2, 2020 is earlier

8   than October 13, 2020?

9   A.  Yes.

10  Q.  And you would agree with me that if you expand the scope of

11  the date range that you're looking in that could include more

12  money flows, correct?

13  A.  Yes.

14  Q.  We can take that down.  Can we put up GXZ26 again, same

15  slide.  Let's look in the middle box, the one that says Saraca.

16  You see that?

17  A.  Yes.

18  Q.  What's the date range for that $286 million?

19  A.  February 22, 2019 through July 3, 2020.

20  Q.  Could we just pull up alongside of GXBK-5, please,

21  alongside it.  Do you see a date on that document on the right?

22  A.  April 20th, 2020.

23  Q.  And you would agree with me, sir, that April 20, 2020 is

24  more than a year after February 22, 2019?

25  A.  I agree.

1  Q.  And again if you expand that date range, it would increase

2  the amount of money coming in, right?

3  A.  Well, just to be clear, this date range represents the date

4  range of all the transactions that we processed, so those we're

5  just showing all the transactions that we processed.  And, yes,

6  if there are more transactions from other accounts, we didn't

7  process, that number could go up.

8  Q.  Sure.  And if you expanded the time period, the number

9  could go up, right?

10  A.  Perhaps.  I don't know.  I haven't processed those

11  transactions.

12  Q.  So let's go to slide five.  Actually, let's go to slide

13  six.  This is the VOG flow of funds, right?

14  A.  Yes.

15  Q.  And you see the middle arrow there?

16  A.  I do.

17  Q.  That's $17.3 million, right?

18  A.  Yes.

19  Q.  And the date range there is March 12, 2018 through May 12,

20  2020, right?

21  A.  Yes.

22  Q.  Again, that's more than two years from the private

23  placement start date, correct?

24  A.  Based on your representation of when that date was, yes.

25  Q.  Based on the document that I had you read the April 20th

1    date, right?

2    A.  Yes.

3    Q.  And then if we look to the box to the right of that, that

4    goes to Voice of Guo Media, right.  Do you see that?

5    A.  Yes.

6    Q.  And that's $2 million?

7    A.  I'm a little confused as to which arrow you're referring

8    to.

9    Q.  So maybe can you help me out.  The middle box there, the

10   one for Lafrenz that has WFB 1005.  You see that?

11   A.  Yes.

12   Q.  Correct me if I'm wrong, it looks like there's an arrow

13   going from that box to Voice of Guo Media with WFB 5536, right?

14   A.  Yes.

15   Q.  And that arrow reflects a fund flow of $2 million over the

16   period of time between July 11, 2019 and May 5, 2020, correct?

17   A.  Yes.

18   Q.  And July 11th, 2019 is several months before April 20,

19   2020, correct?

20   A.  Yes.

21   Q.  Let's look at slide 15.  Let's just start at the top left

22   there.  So you see all those I think you call them dark blue

23   boxes?

24   A.  Yes.

25   Q.  Those are associated with G/Clubs -- withdrawn.

1            Those reflect bank accounts associated with G/Clubs

2    Operations, LLC, correct?

3    A.   There's also another blue box for a different G/Club

4    entity.

5    Q.   So let's start with the ones at the top, the four at the

6    top.  Those are all G/Clubs Operations, right?

7    A.   Yes.

8    Q.   And the way that you're able to associate them with G/Clubs

9    Operations is because all of those accounts are in the name of

10   G/Clubs Operations, right?

11   A.   Yes.

12   Q.   And so the same is true with the other dark blue box that

13   is in the name of G/Club International Limited, correct?

14   A.   Yes, the one, the Mercantile 0103 account is G/Club

15   International Limited.

16   Q.   Another way to represent what's going on at the top,

17   instead of having four boxes, you could just have one

18   representing G/Club operations, correct?

19   A.   Yes.

20   Q.   But the prosecutors asked you to have four, right?

21   A.   Yes.

22   Q.   Now, the same is true if we go over to the light blue boxes

23   on right.  Do you see those?

24   A.   Yes.

25   Q.   Those are all for Crane Advisory, right?

O6QBGUO2                        Hinton - Cross

1   A.  That's correct.

2   Q.  And again you were able to associate those with Crane

3   Advisory because all of those accounts are in the name of Crane

4   Advisory, right?

5   A.  That's right.

6   Q.  So you could have collapse those six boxes into one, right?

7   A.  In theory, yes.

8   Q.  But they didn't want you to do that, right?

9   A.  They instructed us on the format of the chart.

10  Q.  So now let's look at the yellow boxes down at the bottom.

11  Do you see those?

12  A.  Yes.

13  Q.  Now, the yellow boxes down at the bottom, almost all of

14  them are associated with something called Hamilton, right?

15  A.  Yes.

16  Q.  There's one that's not that doesn't have the word

17  "Hamilton" in the box, right?

18  A.  Yes, there's a Himalaya International Clearing account.

19  Q.  Who told you to put that box in yellow?

20  A.  The government.

21  Q.  So again, all of the Hamilton accounts, the ones that are

22  actually labeled with Hamilton, you are able to associate those

23  with Hamilton because they're all in Hamilton's name, right?

24  A.  Yes, there's five Hamilton Opportunity Fund and one

25  Hamilton Digital Assets.

O6QBGUO2                        Hinton - Cross

1    Q.  Now I'm just going to pick one at random.

2            The Crane Advisory account that receives $59.5 million

3    between 11-23-2020 and April 1, 2021, you see that at the top?

4    A.  Yes.

5    Q.  CIT is Citibank, right?

6    A.  Yes.

7    Q.  Citibank is a U.S. bank, right?

8    A.  Yes.

9    Q.  Almost all the banks represented on this slide are U.S.

10   banks, right?

11   A.  Most of them, that's right.

12   Q.  In fact, of the, I don't remember, the 600 bank accounts

13   that you analyzed roughly, the hundreds of bank accounts that

14   you analyzed roughly, almost all of them were U.S. bank

15   accounts, right?

16   A.  Well, there's swiss accounts.

17   Q.  That wasn't my question.  I asked you almost all of them?

18   A.  The majority were U.S. bank accounts.

19   Q.  Just staying on this for a second, let's look at the top

20   left, and I'd like to just circle the 52.2 million from G/Club

21   Operations to G/Club Operations, that's at the top left box.

22   Can we circle that 52.2, please.

23           That's a transfer of $52.2 million on December 17,

24   2020 between two G/Clubs bank accounts, correct?

25   A.  Yes.

1    Q.  And then let's circle the 14.5 below that.  That reflects a

2    $14.5 million transfer on January 11, 2021, between G/Clubs

3    bank accounts, correct?

4    A.  Yes.

5    Q.  Now let's circle the $10 million one below that to Fiesta,

6    and that represents a $10 million payment -- withdrawn.  A $10

7    million transfer from G/Clubs Operations account to Fiesta

8    Property Developments, correct?

9    A.  It's the aggregate amount of transfers between those

10   periods from those accounts.

11   Q.  So those transfers started on January 21, 2021, right?

12   A.  Yes.

13   Q.  And so those transfers started after the $52 million

14   transfer and the $14.5 million transfer, right?

15   A.  Yes.

16   Q.  So from this chart, how much of the 52.2 million and 14.5

17   million make up that $10 million?

18   A.  I don't know.

19   Q.  You can't know, right?

20   A.  Well, you could do some tracing analysis and come up with

21   an estimate.

22   Q.  Right, but you testified on direct that you didn't do that,

23   right?

24   A.  That's correct.

25   Q.  So there's no way based on this chart to link those amounts

1    to that $10 million, right?

2    A.   They are linked to it on this chart.

3    Q.   Well, I understand that you put arrows there, but there's

4    no way to say that this dollar is this dollar, right?

5    A.   Well, I disagree.  The funds come in at an earlier point in

6    time, and then funds leave at a later point in time, so that is

7    a connection.

8    Q.   That is a connection between two dates, right?

9    A.   Between flows of funds.

10   Q.   It's a chronology?

11   A.   Yes.

12   Q.   We'll come back to that.  Let's go to the Crane Advisory,

13   the center bucket there.  You see those?  Let's start with the

14   $58.2 million that goes from Citibank account 5278 down to that

15   light blue box below it, the other Crane Advisory account.  You

16   see that one?

17   A.   Yes.

18   Q.   Then there's an arrow going $6.8 million from that account

19   to the Lawall Mitchell account.  You see that?

20   A.   Yes.

21   Q.   The date range of the $58 million transfer is January 22,

22   2021 through March 30, 2021, correct?

23   A.   Yes.

24   Q.   And the transfer of the $6.8 million is October 19, 2021,

25   right?

O6QBGUO2                          Hinton - Cross

1    A.  Yes.

2    Q.  So that's almost seven months after the last transfer of

3    the $58.2 million, correct?

4    A.  Yes.

5    Q.  And I believe you testified on direct that this is select

6    flows, so it doesn't represent all of the transactions,

7    correct?

8    A.  That's true.

9    Q.  It doesn't reflect any other money that went into that

10   Crane Advisory group box that received the $58.2 million,

11   right?

12   A.  No.

13   Q.  Let's stay with this blown up for a second.

14   A.  I disagree.  I said no.

15   Q.  You said no to what?  I'm sorry.  What is it that you're

16   disagreeing with?

17   A.  With your prior question.  I didn't affirm your question.

18   I disagreed with it.

19   Q.  Okay.  Tell me what you're disagreeing with?

20   A.  You said there weren't any other flows coming into that

21   account.  There's another arrow coming into that account.  I

22   just want to be clear.

23   Q.  Understand.  That's a fair point.  All the potential other

24   flows that are coming into that account, right?

25   A.  Correct.

1   Q.  Thank you for that.  Let's look then at there is an arrow,

2   the $58 million.  The account that sends $58 million to the

3   Crane Advisory account also sends $10.7 million to this Crane

4   Advisory set of IDB bank accounts, correct?

5   A.  Correct.

6   Q.  And that is the last date of those transfers were May 28,

7   2021, right?

8   A.  Yes.

9   Q.  And then there's another transfer to -- from the IDB Crane

10  accounts to Lawall Mitchell of $1.6 million, correct?

11  A.  Yes.

12  Q.  And that occurs on September 27, 2021, right?

13  A.  Yes.

14  Q.  So that's almost four months after the last of those $10.7

15  million transfers, right?

16  A.  Correct.

17  Q.  Let's now go to slide 27, please.

18          Now this shows various flows of funds related to the

19  Himalaya Exchange, right?

20  A.  Yes.

21  Q.  So the first box sources of funds that represents the same

22  sources of funds we were talking about before, right?

23  A.  Correct.

24  Q.  And then it shows about $470 million going from that gray

25  box to a Himalaya International Clearing bank account, right?

O6QBGUO2                         Hinton - Cross

1    A.  Yes.

2    Q.  And that's an account for the Himalaya Exchange you

3    understand?

4    A.  I have no independent understanding of what it's for.

5    Q.  So you don't know what company that's associated with?

6    A.  Well, the chart says Himalaya Exchange, and these are the

7    accounts that are designated, but the title of the account is

8    Himalaya International Clearing, so I don't know what the role

9    of that account is.

10   Q.  But the government told you that this was a Himalaya

11   Exchange bank account?

12   A.  To color it yellow so it's in that category.  To say it's a

13   Himalaya Exchange account is -- that's just a classification

14   for the purposes of these charts.

15   Q.  Fair enough.  They gave you the paint by numbers, right?

16   A.  Yes.

17   Q.  Now, the date range for that is June 2, 2021 through June

18   30, 2022, right?

19   A.  Yes.

20   Q.  Would you agree with me, sir, that November 2021 comes

21   after June 2, 2021?

22   A.  Yes.

23   Q.  Are you're aware that the Himalaya Exchange first launched

24   trading on November 20, 2021?

25   A.  No.

O6QBGUO2                          Hinton - Cross

1   Q.  So let's go to slide 30, please.  This is titled Yacht Zoo

2   expenses, right?

3   A.  Yes.

4   Q.  Now, there's a $3.9 million sum of all the inflows in the

5   middle there, right?

6   A.  Yes.

7   Q.  And that's suppose to represent all the money coming in

8   from these other entities, right?

9   A.  Yes.

10  Q.  So bank accounts, right?

11  A.  Yes.

12  Q.  So you got the G/Club International with 478,000 right; you

13  got the HCHK, and then the three Lamp bank accounts, right?

14  A.  Yes.

15  Q.  Now, the 478 from G/Clubs that counts in the 3.9 million,

16  you ever heard of a yacht called the Liberty before?

17  A.  No.

18  Q.  And the date range listed under the 3.9 million, that's May

19  7, 2020 through October 21, 2022, right?

20  A.  Yes.

21  Q.  Can you find for me on this chart a transfer that began on

22  May 7, 2020?

23  A.  I think it's a typo.  It looks like it starts on May 7,

24  2021 if you look at the transfer on the left.

25  Q.  That's the Lamp Capital one, right?

O6QBGUO2                          Hinton - Cross

1   A.  Correct.

2   Q.  The prosecutors didn't ask you to include any transfers to

3   Yacht Zoo from 2020, right?

4   A.  These are the flows they selected to present on the chart.

5   Q.  And they're all suppose to be from 2021, right?

6   A.  I don't know what the criteria they used to select them.

7   Q.  I'm meant ignoring the typo they're all suppose to be from

8   2021, right?

9   A.  These all are between 2021 and October 2022.

10  Q.  And that's the date range that they gave you, right?

11  A.  Well, they identified the transactions, and these are the

12  dates of the transactions.

13  Q.  Now, let's look at slide eight I believe it is.  This is

14  the farm select flows, right?

15  A.  Yes.

16  Q.  Now, you have no idea what farms means in the context of

17  this case, right?

18  A.  That's correct.

19  Q.  And there's $77 million that are reflected on this chart

20  going to a company called ACA Capital, right?

21  A.  Yes.

22  Q.  So first let's take a look at -- there's a transfer from

23  ACA Capital that goes to Savio Law for $32 million, correct?

24  A.  Yes.

25  Q.  That occurs between of a period of November 12 and November

1    16, 2020, correct?

2    A.  Yes, correct.

3    Q.  And then your chart reflects an arrow going from Savio Law

4    to Leading Shine of $3 million on August 20, 2020, correct?

5    A.  Correct.

6    Q.  So August 20, 2020 is before November 12, 2020, correct?

7    A.  Yes.

8    Q.  So as a logical matter, the 3 million that went from Savio

9    Law to Leading Shine could not have been part of the 32 million

10   that went from ACA Capital, correct?

11   A.  I would agree.

12   Q.  So then let's look down to Lamp Capital the one below it.

13           Now that's a $5 million transfer from Savio Law to

14   Lamp Capital, correct?

15   A.  Yes.

16   Q.  And what's the date of that transfer?

17   A.  That is October 15, 2020.

18   Q.  You would similarly agree with me that October 15, 2020 is

19   before November 12, 2020, correct?

20   A.  Yes.

21   Q.  As a logical matter, that $5 million couldn't have come

22   from that $32 million, correct?

23   A.  That's correct.

24   Q.  And then there's also a $5 million transfer from Savio Law

25   to Greenwich Land, correct?

O6QBGUO2                        Hinton - Cross

1    A.  Yes.

2    Q.  And what's the date of that?

3    A.  October 15, 2020.

4    Q.  Same thing, right, October 15th is before November 12,

5    2020?

6    A.  Correct.

7    Q.  So that money couldn't have come from the $32 million,

8    correct?

9    A.  That's correct.

10   Q.  But the prosecutor asked you to put these arrows this way

11   anyway, right?

12   A.  I don't know what you mean by anyway.  These arrows reflect

13   transactions that are represented accurately on the chart.

14   Q.  They represent transactions that happened, right?

15   A.  Yes.

16   Q.  Now, there's another box all the way up in the top left.

17   Do you see that?

18   A.  Yes.

19   Q.  It says other inflows.  You see that?

20   A.  Yes.

21   Q.  What are other inflows?

22   A.  Well, it's other sources of funds -- well, sorry.  Other

23   transfers into the ACA Capital account that aren't otherwise

24   represented on this chart, so from sources other than farms.

25   Q.  You met with the prosecutors this past Saturday, correct?

1    A.   Yes.

2    Q.   June 20th, right?

3    A.   I believe that was the date.

4    Q.   And during that meeting you discussed this slide?

5    A.   I don't remember which of the slides we discussed on

6    Saturday versus Sunday versus Monday.

7    Q.   Now, prior to that meeting, there was a version of this

8    slide that didn't have the other inflows on it, correct?

9    A.   Probably, yes.

10   Q.   And after your meeting -- and you told the prosecutors that

11   there were these other inflows, right?

12   A.   I don't remember whether that was something I said.

13   Q.   So can you tell me the process by which the other inflows

14   box got added to this slide?

15   A.   Well, the prosecutors asked that we add it to the slide.

16   Q.   When did that happen?

17   A.   I don't recall.

18   Q.   Now, do you remember or recall in reference of this issue

19   Brattle using the phrase inflow/outflow violation?

20   A.   Yes.

21   Q.   What's that mean?

22   A.   It's just a balancing check that was conducted for certain

23   of the needs on the chart.

24   Q.   Can you break that down for the jury a little bit?

25   A.   Sure.  Just that because these charts don't show all of the

1    transactions, they're only showing the transactions that we

2    processed and the transactions between the entities that were

3    selected on the charts, it's possible that the amounts that are

4    shown on the arrows, if you sum up all the arrows going into

5    the account and going out, that the amount going out might be

6    larger than the amount coming in; so that's just the balancing

7    question or check that we were asked to sometime perform for

8    some of these nodes.

9    Q.  So if the outflows exceed the inflows from a particular

10   source, that means that there was money in the account outside

11   of the specific source that you were looking at, correct?

12   A.  Right.  That either means that there was a preexisting

13   balance in the account before the time period where we had

14   data, or there were other entities that had transferred money

15   into the account that weren't being shown on the chart.

16   Q.  So one of the ways that the prosecutors try to address this

17   violation was by sending you more entities that they could

18   classify as farms, right?

19   A.  If you want to try to explain more of the inflows, you've

20   got to identify what are those transactions and who are they

21   with.  So there were a couple of examples where there were

22   changes made to the chart to give us more financial records so

23   we could add those financial records to the chart.

24   Q.  Right.  And the goal of that was to increase the inflows

25   from the so-called farms, right?

1    A.  In that particular case, yes.  There were additional

2    entities identified as farms while we were preparing the

3    summary charts and looking at different iterations of those,

4    the government decided to add additional entities to the farms

5    classification.

6    Q.  And Brattle didn't do any kind of independent check to

7    figure out if those were actually farms, right?

8    A.  That's correct.

9    Q.  That all came from the government, right?

10   A.  That's correct.

11   Q.  Even after that were you able to solve the so-called

12   violation?

13   A.  It's nothing really to solve.  It's just a balancing test

14   to see whether or not the number of inflows, the amounts are

15   greater than -- inflows are greater or less than the amounts

16   that you're showing going out.  That's all it is.

17   Q.  And is it fair to say that the fact that there's this other

18   inflows box means that the farm inflows did not account for all

19   of the money that came out of the ACA Capital account?

20   A.  That's right.

21   Q.  Now, there's no amount of money on this chart associated

22   with those other inflows, right?

23   A.  That's right.

24   Q.  So the chart doesn't tell the jury how large those inflows

25   are, right?

1   A.  That's right.

2   Q.  There's no dates associated with it, right?

3   A.  That's right.

4   Q.  There's no date range, right?

5   A.  That's right.

6           MS. MURRAY:  Asked and answered.

7           THE COURT:  Sustained.

8   Q.  So if you take that $19 million that goes from ACA Capital

9   to Lexington Property, you see that?

10  A.  Yes.

11  Q.  How much of that money comes from the other inflows versus

12  the 77 million from the farms?

13  A.  I haven't been asked to do that calculation.

14  Q.  So you don't know?

15  A.  I don't know.

16  Q.  Same question with the 11.2 million that goes to William Je

17  and Sing Ting Wang?

18  A.  I don't know.  I haven't been asked to do that calculation.

19  Q.  Let's go to Hudson Diamond, the 18 million that Ms. Murray

20  asked you about, how about that one.  How much of the 18

21  million comes from the 77 million?

22  A.  I don't know.

23  Q.  Were you asked to look?

24  A.  No.

25  Q.  All right.  How about the 13 million that goes to Lamp

1   Capital right next to it, how about that?

2   A.  I don't know.

3   Q.  Were you asked to look?

4   A.  I wasn't instructed to perform a tracing analysis.

5   Q.  So the five million that goes to Greenwich Land, same

6   answer?

7   A.  Same answer.

8   Q.  So even though there are arrows connecting the ACA Capital

9   box and those entities we just talked about and arrows

10  connecting the farms and ACA Capital, you don't actually know

11  if any of that $77 million accounts for these transfers, right?

12  A.  I haven't traced the funds through to their ultimate uses,

13  that's correct.

14  Q.  In fact, I believe you testified on direct that there are

15  bank accounts that Brattle hasn't even looked at, right?

16  A.  That's correct.

17          THE COURT:  It's time for our 11:30 break.  Members of

18  the jury, we will come back in a half an hour.  Remember that

19  you're not allowed to discuss the case amongst yourselves.

20  Don't permit anyone to discuss the case in your presence.

21  Don't read, watch or listen to anything that has to do with

22  this case.

23          THE LAW CLERK:  Jury exiting.

24          (Jury not present)

25          THE COURT:  Sir, you may step out of the courtroom.

1    Don't discuss your testimony.

2             THE WITNESS:  I will not.

3             (Witness exited the courtroom)

4             THE COURT:  You may be seated.  Is there anything

5    before we return at noon?

6             MS. MURRAY:  One brief matter to raise, your Honor.

7    With respect to certain of Mr. Kamaraju's questioning, in

8    particular relating to the ACA Capital account at First Abu

9    Dhabi Bank, this is on slide eight of the exhibit we were just

10   looking at.  Mr. Kamaraju pursued a line of questioning about

11   this category reflected on the summary chart that is listed as

12   other inflows where there's no date range or dollar amount

13   associated with that.  As the Court and Mr. Kamaraju are both

14   aware, the First Abu Dhabi bank account records were apart of

15   the government's collected evidence in this case.  They were

16   used in the course of the government's financial analysis over

17   the period of several years.  Ultimately, the Court excluded

18   those from being admitted because of the issues we had with the

19   Arab Emirates not giving us the certification that we could use

20   to introduce those into evidence.  But they are very

21   corroborative of the flows that are on this chart.

22             The government consistent with the Court's order

23   stripped out any sourcing from any of those records.  So we

24   redid all of the financial analysis not tied to those records,

25   but instead tied to counter-parties records.  As a result, the

1    numbers went down on the summary charts, and that's fine.

2    That's been covered with Mr. Hinton on his direct.  But this is

3    not -- this is not fully inclusive of all of the flow of funds

4    we see.  And again, that's because the government consistent

5    with the Court's order did not rely on those records.  But for

6    Mr. Kamaraju to imply very strongly with the witness here that

7    this other inflows category was suggested by the government in

8    what he appears to be suggesting an apparent effort to

9    manipulate the summary of the financial flows, your Honor, we

10   would submit that opens the door and we can question Mr. Hinton

11   on redirect whether he did receive First Abu Dhabi bank account

12   records from the government, and whether the transactions

13   reflected therein are consistent with the information on these

14   summary charts.  And we can establish that he did not rely on

15   those for purposes of the total amounts reflected on the

16   charts, but we would like to acknowledge their existence as a

17   way of explaining the purpose of this other inflows category

18   now that the door has been open by Mr. Kamaraju.

19           THE COURT:  Well, how do you explain the absence?

20           MS. MURRAY:  The absence of what, your Honor?

21           THE COURT:  References to that bank?

22           MS. MURRAY:  Well, there are references to the bank

23   because we have represented the transactions as they were

24   established and sourced through the counter-parties, so we have

25   up slide eight of Government Exhibit Z26.  You can see the ACA

1    Capital FAB account. That's the first Abu Dhabi bank account,

2    and I think Ms. Loftus is pulling that up.  To the extent that

3    there are transfers that are indicated here, we show -- if we

4    could zoom out, Ms. Loftus, and show more of the context there.

5    To the extent there are transfers that are shown flowing out

6    from that account, that's from the accounts that are referenced

7    here, the government exhibit cited in the appendix to this

8    chart.  I think with respect to the absence, it could just be a

9    question to Mr. Hinton, Did you review records from that

10   account?  Are they consistent with the information on this

11   summary chart?  Did you rely on those records in sourcing the

12   information on this chart?  Why not?  Is it because the

13   government asked you not to rely on these as source records?

14   And we could leave it at that.

15            THE COURT:  Mr. Kamaraju.

16            MR. KAMARAJU:  A couple of points, your Honor.  Number

17   one, Mr. Hinton is a summary witness.  He can only summarize or

18   speak to evidence that's admissible and admitted in the record.

19   Your Honor has already decided that the First Abu Dhabi bank

20   account is not admissible.  They chose to present a chart that

21   tried to link those funds to these transfers without the

22   necessary evidentiary link.  I was entitled to point that out.

23   They've been on notice of this issue since your Honor decided.

24   These charts all come after that.

25            On top of that, your Honor, the concept that they

1    would say, well, you had these records.  You reviewed them.

2    They corroborate it, would necessarily open the door to us

3    being able to say, in fact, the Court found that those records

4    were not reliable enough to be entered into evidence in this

5    case, and those records were hearsay, and that the government

6    had failed to authenticate them.  So I don't understand how the

7    government can refer to evidence that's not been admitted at

8    trial simply because I attack their summary chart and the

9    material that they had.  He still -- and I circle back to my

10   original point -- a summary witness by rule has to testify to

11   evidence that is in, that has been admitted.  And your Honor's

12   already ruled on this issue. They didn't have to present this

13   chart this way.  That was their choice.

14            THE COURT:  Ms. Murray.

15            MS. MURRAY:  Your Honor, I think at this point what

16   we're facing is Mr. Kamaraju has created a Rule 403 problem.

17   To the extent that the Court doesn't want the government to

18   explore this line of questioning with Mr. Hinton, I guess we

19   understand that.  It does seem like a strategy in play by the

20   defense to exploit the Court's ruling with respect to the ACA

21   Capital records in particular, which as we indicated in the

22   briefing leading up to trial are extremely important records

23   for the purposes of the flow of funds.  We did summarize the

24   flow of funds using other admissible exhibits from other

25   accounts that we collected, but that's accurately reflected on

O6QBGUO2                          Hinton - Cross

1    these charts.

2            However, to continue going down this line of

3    questioning knowing what the parties know and the Court knows

4    about those records and the status of those records risk

5    prejudicing the jury and confusing the issues.  At kind of the

6    bottom, the government would ask that the Court request that

7    Mr. Kamaraju move on from this line of questioning.

8            MR. KAMARAJU:  I'll just say this, your Honor.  It is

9    very emphatically the defense's strategy to point out the lack

10   of evidence in the government's case.  To the extent they are

11   concerned about that, that is our strategy.  Here, we are

12   pointing out the fact that they do not have admissible evidence

13   to link these bank flows, which is directly responsive to their

14   attempt to say that this money was misused on Mr. Guo's family.

15   The fact that they were not able to authenticate that record

16   does not create a 403 problem.  And my ability to attack that

17   is fundamental to presenting a defense.  I've never heard of a

18   case where undermining the government's evidence creates a 403

19   issue.  And there's no prejudice to the jury, as Ms. Murray

20   said.  The jury can understand what's going on.  They can make

21   arguments about the tracing if they want.  But the jury is the

22   one who gets to decide that.

23           They don't get to say, well, Mr. Kamaraju shouldn't

24   pursue questions that show a weakness in our case because we

25   know about inadmissible records.  I know about inadmissible

O6QBGUO2                    Hinton - Cross

1    information also that I would love to refer to in Mr. Guo's

2    defense, but I can't do it because it's not admitted into

3    evidence.

4            THE COURT:  So I am not going to permit the government

5    to go into these Abu Dhabi records.

6            MR. KAMARAJU:  Thank you, your Honor.

7            THE COURT:  That's it.

8            (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6Q1GUO3                     Hinton - Cross

                         AFTERNOON SESSION

1                            12:00 p.m.

2                THE COURT:  Please have the jurors brought in.

3                (Jury present)

4                THE COURT:  Please be seated.

5                Sir, remember that you're still under oath.

6                THE WITNESS:  Yes.

7                THE COURT:  You may continue the inquiry.

8                MR. KAMARAJU:  All right.  Could we have those two

9    exhibits back up, or I think we were looking at GX Z26 when we

10   broke, please.  Slide 8.

11   BY MR. KAMARAJU:

12   Q.  Okay.  Now just go through this slide quickly.  The Savio

13   Law account you looked at before with Ms. Murray, you remember

14   that?

15   A.  Yes.

16   Q.  Okay.  That was a U.S. bank account, correct?

17   A.  Yes.

18   Q.  Okay.  The IDB account for HCHK Technologies, U.S. bank

19   account, correct?

20   A.  Yes.

21   Q.  The IVB account for Leading Shine, U.S. bank account,

22   right?

23   A.  Yes.

24   Q.  All the Lamp Capital bank accounts, U.S. bank accounts,

O6Q1GUO3                    Hinton - Cross

1    right?

2    A.  Yes.

3    Q.  Same with the Greenwich Land account, right?

4    A.  Yes.

5    Q.  Same for the Signature accounts reflected for Lamp Capital?

6    A.  Yes.

7    Q.  Same for the IDB accounts, correct?

8    A.  Yes.

9    Q.  And the same for the DCB account, correct?

10   A.  Yes.

11   Q.  For Lexington Property?

12   A.  Yes, I believe so.

13          MR. KAMARAJU:  Now could we pull up alongside this

14   Exhibit GX Z27, please.

15   Q.  All right.  So Ms. Murray took you through this.  Do you

16   remember that?

17   A.  I do.

18   Q.  Okay.  So on GX Z27, which is on the right side, the total

19   number of accounts that Brattle identified was 681 accounts,

20   correct?

21   A.  Yes.

22   Q.  Processed accounts, 450, right?

23   A.  Yes.

24   Q.  Okay.  So that means that—is processed and analyzed the

25   same subset?

O6Q1GUO3                          Hinton - Cross

1   A.  Well, it depends on what you mean by processed and

2   analyzed.  Analyzed sometimes we think of as including the

3   processing, right?  That's part of the analysis in a broad

4   sense.

5   Q.  Okay.  I guess what I'm trying to ask, sir——and maybe doing

6   it inartfully——is:  The 450 accounts that are reflected there,

7   those are ones that Brattle actually looked at and reviewed and

8   attempted to provide evidence on?  Sorry.  Withdrawn.

9            Those are accounts that Brattle actually reviewed and

10  kind of dove into, the 450?

11  A.  Right.  Those are the ones that we extracted the

12  transaction data from, put them in the database, and that was

13  the starting point for various exhibits that were developed for

14  testimony, but——but not all of the transactions and accounts

15  that are in the database end up in the exhibits.

16  Q.  Got it.  Understood.  Thank you, sir.  That's helpful.

17            So then the 231 that's reflected there, those accounts

18  never made it to the database, right?

19  A.  We did not process those; that's correct.

20  Q.  Okay.  So no data from those 231 bank accounts is reflected

21  in the summary chart anywhere, right?

22  A.  That's correct.

23  Q.  And it's not reflected in any of the summary charts that

24  you've testified about today other than this little entry that

25  we're looking at, right?

O6Q1GUO3                        Hinton - Cross

1    A.  Correct.

2    Q.  So the chart reflects——withdrawn.

3            MR. KAMARAJU:  We can take GX Z27 down.  And I'd like

4    to put up DX 10339 alongside, which is in evidence, so we can

5    publish it, please.

6            Okay.  Can we go to page 3, please.

7    Q.  Okay.  Do you see at the bottom there, three transfers,

8    May 2nd?

9    A.  Yes.

10           MR. KAMARAJU:  Okay.  Actually, I'm sorry.  Can we

11   zoom out real quick.

12   Q.  I think it would be helpful to establish the date.  Do you

13   see the Line Service Charge Summary?  Can you read that,

14   please.

15           MR. KAMARAJU:  Maybe we can highlight it.

16   A.  Yes.  "Service Charge Summary from April 1, 2018 thru

17   April 30, 2018."

18   Q.  So that's the period of this bank statement, correct?

19   A.  Yes.

20   Q.  Okay.  And now let's look down at those transfers.  You see

21   the ones from May 2nd?

22   A.  Yes.

23   Q.  Okay.  So that's $300,000 over the course of those three

24   transfers, correct?

25   A.  Yes.

O6Q1GUO3                         Hinton - Cross

1    Q.  And who were those transfers from?

2    A.  They're from ACA Capital.

3            MR. KAMARAJU:  Okay.  And let's zoom back out.

4            And let's go to the top.  And let's see whose bank

5    account this is, please.

6    Q.  Do you see Golden Spring (New York) there?

7    A.  Yes.

8    Q.  Okay.  That's the bank account holder, correct?

9    A.  I believe so.

10   Q.  All right.  Now these three transfers of $300,000 are not

11   reflected in your summary chart, correct?

12   A.  That's correct.

13           MR. KAMARAJU:  Let's go to page 13, please.

14   Q.  All right.  And do you see a transaction on July 19th, for

15   $2 million?

16           MR. KAMARAJU:  Maybe we can blow that up.

17   A.  I do.

18   Q.  Who is that from?

19   A.  That is from ACA Capital also.

20   Q.  That's not reflected on your summary chart, right?

21   A.  That's correct.

22           MR. KAMARAJU:  Okay.  Let's go to page 18, please.

23   Q.  All right.  And do you see the transfer on August 20, 2018,

24   for $500,000?

25   A.  I do.

O6Q1GUO3                    Hinton - Cross

1    Q.  Who is that from?

2    A.  ACA Capital.

3    Q.  That's not reflected on your chart, right?

4    A.  That's correct.

5           MR. KAMARAJU:  So let's go to page 45, please.

6    Q.  All right.  And do you see a transfer on January 14, 2019,

7    for approximately $4,499,000?

8    A.  I do.

9    Q.  Okay.  Who is that from?

10   A.  ACA Capital.

11   Q.  That's not reflected on your chart, right?

12   A.  That's correct.

13          MR. KAMARAJU:  Let's go to page 89.

14   Q.  All right.  And do you see a transfer of $3 million on

15   August 8, 2019?

16   A.  I do.

17   Q.  Who is that from?

18   A.  This one's from ACA Capital.

19   Q.  Okay.  That's not reflected on your chart either, right?

20   A.  That's correct.

21          MR. KAMARAJU:  Okay.  Let's take down 10339 and put up

22   10381.  Alongside, please.

23          Okay.  And let's flip to the next page, please.  Keep

24   going.

25          All right.  Actually, let's go to page 23.

1  Q.  All right.  Let's start at the top.  Can you tell us who

2  the account holder is.

3  A.  Leading Shine NY Ltd.

4          MR. KAMARAJU:  All right.  And let's scroll back down.

5  Q.  And do you see a transfer on January 22, 2019, for almost

6  $3 million?

7  A.  I do.

8  Q.  Okay.  Who is that from?

9  A.  Well, it's from a—it's from ACA Capital.

10 Q.  Okay.  And what bank?

11 A.  First Abu Dhabi Bank.

12 Q.  All right.  That's not reflected on your chart, right?

13 A.  That's—that's correct.

14         MR. KAMARAJU:  All right.  Can we go to page 41,

15 please.

16 Q.  And do you see a transfer on August 8, 2019, for

17 $3 million?  Do you see that?

18 A.  Yes.

19 Q.  Who is that from?

20 A.  It's from ACA Capital also.

21 Q.  What bank account?

22 A.  From the First Abu Dhabi Bank account.

23 Q.  That's not reflected on your chart either, is it,

24 Mr. Hinton?

25 A.  That's correct.

 1              MR. KAMARAJU:  No further questions at this time, your

 2   Honor.

 3              THE COURT:  Redirect.

 4              MS. MURRAY:  Thank you, your Honor.

 5   REDIRECT EXAMINATION

 6   BY MS. MURRAY:

 7   Q.  Mr. Hinton, you were asked some questions on

 8   cross-examination about some of the transactions reflected on

 9   slide 8 of Z26.

10              MS. MURRAY:  Ms. Loftus, if we could please pull that

11   up.

12   Q.  In particular, you were asked about certain of the

13   transactions reflected going into and out of the ACA Capital

14   account depicted here.  Do you recall those questions?

15   A.  I do.

16   Q.  And Mr. Hinton, the government asked you to conduct a check

17   of summary charts that it directed; is that correct?

18   A.  That's correct.

19   Q.  Is it accurate that the government did not ask that you do

20   a detailed flow-of-funds analysis for the various accounts that

21   are reflected here?

22   A.  That's correct.

23   Q.  Or a flow-of-funds analysis for any of the bank records

24   that the government had provided to Brattle in the course of

25   this case?

1    A.   That's correct.

2    Q.   Looking at the outflows from the ACA Capital account, those

3    numbers flowing out to the various different entities' bank

4    accounts, are those accurate?

5    A.   They are.

6         MS. MURRAY:   Ms. Loftus, if we could now go to slide

7    12, please.

8    Q.   There is a subset, kind of a zoom-in view of the prior

9    chart; is that correct?

10   A.   That's correct.

11   Q.   So for example, the flows, the collective flows of

12   $29 million from the ACA Capital account to these Lamp Capital

13   accounts, that's accurate based on the records, correct?

14   A.   Yes, we verified those transactions into the Lamp Capital

15   accounts are reflected in the underlying source documents.

16        MS. MURRAY:   And then Ms. Loftus, next slide, please.

17   Q.   And these expenses, these transactions reflected here then

18   from those Lamp Capital accounts out to these different

19   expenses, these are accurate as well, right, Mr. Hinton?

20   A.   That's correct.

21   Q.   Including luxury car-related expenses depicted in red here?

22   A.   Yes.

23   Q.   Including yacht-related expenses depicted in blue here?

24   A.   Yes.

25   Q.   Including aircraft-related expenses depicted in the black

1   here?

2   A.  Yes.

3   Q.  And including, for example, $20 million going to a Swiss

4   bank account held in the name of Qiang Guo depicted on the

5   right here?

6   A.  That's correct.

7          MS. MURRAY:  Ms. Loftus, if we could go to slide 15 of

8   this exhibit, please.

9   Q.  Mr. Hinton, Mr. Kamaraju asked you some questions about the

10  different boxes that are depicted on this summary chart.  Do

11  you recall those questions?

12  A.  I do.

13  Q.  In particular, for example, he asked you whether the

14  government had requested that the Crane Advisory Group boxes on

15  the right, in the light blue, be reflected in separate boxes

16  rather than aggregated into one.  Do you remember that?

17  A.  I do.

18  Q.  Looking at those Crane Advisory Group boxes, let's start on

19  the top left.  What bank account does that reflect?

20  A.  The top left is a Citibank account, Crane Advisory account,

21  5278.

22  Q.  And then tracing to the right, what bank does the next one,

23  the 5522 account, reflect?

24  A.  It's at Signature Bank, 5522.

25  Q.  Going right again, what bank is reflected by the third box?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  It's a different bank again; it's Capital One, 0887.

2    Q.  Let's go now, middle at the left, there are a series of MSS

3    accounts.  What banks are those accounts in the name of Crane

4    Advisory Group held?

5    A.  Morgan Stanley accounts.  There's four of them.

6    Q.  To the right here, IDB, what bank does that represent?

7    A.  I think it's an Israel Deposit Bank.

8    Q.  So these five different boxes on this summary chart, is it

9    correct that those represent accounts held at five different

10   banks in the name of Crane Advisory Group?

11   A.  It does.

12   Q.  And the flow of funds depicted among and between those

13   accounts reflected on this chart, those are accurate, correct?

14   A.  They are.

15           MS. MURRAY:  Ms. Loftus, if we could go to the same

16   exhibit, and let's go to slide 4, please.

17   Q.  Mr. Hinton, you were asked some questions about time

18   periods reflected on various of the summary charts.  Do you

19   recall that?

20   A.  I do recall.

21   Q.  In particular, with respect to this slide, Mr. Kamaraju

22   asked you whether expanding a time period would account for a

23   larger amount of funds shown on a summary; is that correct?

24   A.  Yes.

25   Q.  Now, Mr. Hinton, these summary charts that we've been going

1   through, these only reflect certain of the processed

2   transactions that Brattle had been given bank records for; is

3   that right?

4   A.  That's correct.

5   Q.  And the government selected what information, if any, to

6   include in these summary charts?

7   A.  That's correct.

8   Q.  And I believe you testified, sir, that the summary charts

9   were underinclusive of transactions based on the bank records,

10  even just the bank records that Brattle processed; is that

11  right?

12  A.  That's correct.

13  Q.  So looking here at the GTV/VOG Overview, and I'm going to

14  ask you, sir, to do a little bit of quick and dirty math on the

15  spot.

16          So we have 286.9 million going to Saraca.  Do you see

17  that?

18  A.  Yes.

19  Q.  If we add the approximately 29.6 million on the right and

20  the 72.9 million on the left——and you may approximate——can you

21  let me know what the total aggregate amount would be for

22  GTV/VOG.

23  A.  Yes.  Well, adding the approximately 30 million to the 286,

24  that would get you 316, and then adding 73 would get you to

25  403.

1    Q.  Try it one more time.

2    A.  Sorry.  309.  Yeah, 309 or 310 million.  Sorry.

3    410 million.

4    Q.  Let's break it down one more time.  And again, I'm sorry to

5    put you on the spot.

6            So the 286 plus the 30 million or so gets us to 316;

7    is that right?

8    A.  Yeah.

9            MR. KAMARAJU:  Objection.  Asked and answered.

10   A.  Yeah, 316, and then 72 onto 316 is 400——406.

11           THE COURT:  Overruled.

12   Q.  So fair to say approximately 400 million or so, give or

13   take?

14   A.  Yes.

15           MS. MURRAY:  Ms. Loftus, can you please put up

16   alongside this Government Exhibit Stip 19.

17   Q.  Mr. Hinton, have you seen this exhibit before, on the

18   right?

19   A.  On the right, no.

20   Q.  This is a stipulation between the parties that, if called

21   to testify, an employee of the SEC, or Securities and Exchange

22   Commission, would state the following, among other things:

23           MS. MURRAY:  And going to page 2 of Stip 19, please,

24   Ms. Loftus.

25   Q.  If you could read the first sentence in paragraph 3 there,

1    please, Mr. Hinton.

2    A.  Pursuant to the agreement——

3    Q.  I'm sorry.  If you could just read slowly and read each of

4    the words in that text.

5    A.  Certainly.  "Pursuant to the Settlement Agreement, Saraca,

6    GTV, and VOG have sent to the SEC $455,211,346.39 related to

7    the GTV Private Placement, including $69,713,578.6 from

8    Saraca's investment in Hayman Capital Management."

9    Q.  And you can stop there for a moment.

10             And then going to the next sentence, "As of the date

11    of this Stipulation," can you please read that portion as well.

12    A.  "As of the date of this Stipulation, Saraca and GTV

13    together (on a joint and several basis) owe an additional

14    $31,488,392.52 to the SEC, and VOG owes an additional $45,324

15    to the SEC."

16    Q.  Now, Mr. Hinton, the entity names reflected in the

17    stipulation on the right, are those the same entity names we

18    see in the summary chart on the left?

19    A.  They are.

20    Q.  So that's VOG, GTV, Saraca?

21    A.  Yeah.  I mean, Hayman Capital is not mentioned, but the

22    others are.

23    Q.  Understood.  And in the summary chart, which reflects a

24    subset of the bank records that Brattle was provided, I think

25    we said the aggregate amount for this overview of GTV/VOG

```
 1   Sources of Funds was approximately 400 million; is that right?

 2   A.  Yes.

 3   Q.  The initial amount in the stipulation on the right, what's

 4   the approximate amount of that, in the second line?

 5   A.  455 million.

 6   Q.  Plus there's an additional amount in the second to last

 7   line.  What is that amount?

 8   A.  31 million.

 9   Q.  Is 480 million more than 400 million?

10   A.  Yes.

11           MS. MURRAY:  All right.  Ms. Loftus, we can take down

12   Stip 19.

13           We could go to slide 27 of Z26.

14   Q.  Mr. Hinton, you were also asked various questions about

15   some of the date ranges reflected on this Himalaya Exchange

16   flow slide.  Do you recall those questions?

17   A.  Yes.

18   Q.  In particular, Mr. Kamaraju pulled up a document and he

19   indicated to you that the launch date of the exchange was

20   November of 2021.  Do you recall that?

21   A.  Yes.

22   Q.  And then pointed to some of the flows here that included an

23   earlier time period, and in particular, if we're looking at the

24   Sources of Funds, the 473.8 million begins on the summary chart

25   on June 2, 2021, right?
```

O6Q1GUO3                          Hinton - Redirect

1   A.  Yes.

2           MS. MURRAY:  Ms. Loftus, if we could pull up

3   Government Exhibit Z9, and go to page 93.

4   Q.  Mr. Hinton, what is the date in the leftmost column on this

5   Government Exhibit?

6   A.  May 20, 2021.

7           MS. MURRAY:  And if we could zoom in on the top

8   portion, Ms. Loftus, through to the end of the second

9   paragraph.

10  Q.  Mr. Hinton, there's a bracket with a date and then some

11  text in bold on the top of the screenshot.  Can you please read

12  that.

13  A.  "[May 20, 2021] Miles Guo's Gettr (3rd)."

14  Q.  All right.  And let's read the first paragraph here,

15  starting with, "There is another issue."  Can you read that

16  carefully please for the jury.

17  A.  "There is another issue I want to mention to my brothers

18  and sisters.  I want to reiterate that all those who have

19  bought G-Club membership cards must hurry up and finish a

20  series of actions, including KYC and reconciliation, as quickly

21  as you can.  This is a race against time.  I don't want to talk

22  about other things anymore."

23  Q.  All right.  And then let's go to the next paragraph.  You

24  could start the beginning of that paragraph.

25          MS. MURRAY:  And Ms. Loftus, I may ask you to

1   highlight some of the text as we go.

2   Q.  But go ahead, Mr. Hinton.

3   A.  "More importantly, fellow fighters who want to buy Himalaya

4   Coins and Himalaya Dollars must complete their KYC carefully

5   and thoughtfully.  Read the instructions carefully, contact the

6   Himalaya farms if you need help.  You must not waste any time

7   completing your KYC."

8   Q.  If you could pause there, please, Mr. Hinton.

9        MS. MURRAY:  Ms. Loftus, if you could highlight those

10  two points, the text at the beginning, "buy Himalaya Coins"

11  through to "Dollars."  And then the sentence, "You must not."

12  Q.  And Mr. Hinton, again, looking at the left, with respect to

13  the text that's written here, "You must not waste any time," on

14  what date was this summary posted online, according to this

15  exhibit?

16  A.  May 20, 2021.

17  Q.  And then let's go just to the last couple of lines here.

18       MS. MURRAY:  Ms. Loftus, if you could highlight

19  starting with, "please try your best," the third to last line,

20  through to the end.

21  Q.  Can you read that, please, Mr. Hinton.

22  A.  "Please try your best to pay with the Himalaya Dollar (HDO)

23  account that you will get after you have passed KYC.  Soon you

24  can buy G Fashion products through your HDO account."

25       MS. MURRAY:  Thank you, Ms. Loftus.  You can take that

O6Q1GUO3                         Hinton - Redirect

1    down.

2    Q.  Mr. Hinton, Mr. Kamaraju also asked you some questions

3    about whether the information reflected in your summary charts

4    is helpful to Miles Guo.  Do you recall those questions?

5    A.  Yes.

6    Q.  Do you know what's helpful to Miles Guo?

7    A.  I do not.

8    Q.  Do you know what's helpful to the government?

9    A.  I do not.

10   Q.  Do you know any of the government's other witnesses in this

11   case?

12   A.  I do not.

13   Q.  Do you know any of the government's other evidence other

14   than materials that the government has provided to you for

15   purposes of Brattle's work in this case?

16   A.  I do not.

17   Q.  Have you been told anything about the underlying facts of

18   this case by the government?

19   A.  I have not.

20           MS. MURRAY:  May I have a moment, your Honor.

21           THE COURT:  Okay.

22           MS. MURRAY:  I'm not sure if we have this, Ms. Loftus.

23   If not, I might request the defense pull up Defense

24   Exhibit 10339.

25           MR. KAMARAJU:  Jorge, do you mind pulling that up.

1              MS. MURRAY:  And we can go page 29.

2     BY MS. MURRAY:

3     Q.  Mr. Hinton, this is one of the documents that Mr. Kamaraju

4     asked you about on cross-examination.

5              MS. MURRAY:  Sorry.  Maybe it's a couple of pages

6     past.  It was the $3 million transaction that Mr. Kamaraju

7     inquired about.

8              Sorry.  Page 89, please.  Thank you.

9              All right.  And if we could zoom in on the bottom

10    portion.  There are a couple of entries for August 8.  Thank

11    you.

12    BY MS. MURRAY:

13    Q.  Mr. Hinton, you were asked questions about this $3 million,

14    the first funds transfer that's depicted here.  Do you recall

15    those questions?

16    A.  Yes.

17    Q.  And that's a wire from ACA Capital Group; is that correct?

18    A.  Yes.

19    Q.  A wire into this Golden Spring account, right?

20    A.  Yes.

21    Q.  Do you then see two lines down that there is a debit or an

22    outgoing transaction from the same Golden Spring account?

23    A.  I do.

24    Q.  And what is the amount of that transaction?

25    A.  It's also $3 million.

1    Q.  And is that the same day that the $3 million came in from

2    the ACA Capital Group?

3    A.  Yes, it is.

4            MS. MURRAY:  Thank you so much.  I appreciate it.  We

5    can take that down.

6            Ms. Loftus, let's puts up Z26.  And let's go to

7    page 33.

8    Q.  Mr. Hinton, this is kind of the high-level summary of the

9    flow of funds contained within this summary exhibit; is that

10   correct?

11   A.  It is.

12   Q.  And looking at the Himalaya Exchange category the

13   government identified, what is the amount of Sources of Funds

14   into the Himalaya Exchange account based on the processed

15   accounts that Brattle looked at here?

16   A.  Yeah, grouping all of the Himalaya accounts together, the

17   total is 517 million of inflows from Sources of Funds.

18   Q.  Mr. Hinton, are you aware that the government seized

19   approximately $640 million from bank accounts that were held in

20   the name of the Himalaya Exchange or entities that controlled

21   it, including Hamilton?

22   A.  No.

23   Q.  And 640 million is more than 517 million, correct?

24   A.  Yes.

25           MS. MURRAY:  We can take that down.  Thank you.

1   Q.  Finally, Mr. Hinton, are you aware that Miles Guo filed for

2   bankruptcy in 2022?

3   A.  No.

4   Q.  Are you aware that he reported that he had less than

5   approximately $500,000 in assets?

6   A.  I do not.

7   Q.  Are you aware that he——withdrawn.

8          Are you aware that G|CLUBS purchased a mansion in New

9   Jersey for approximately $24.5 million, of the funds that were

10  analyzed during the flow of funds reflected on these summary

11  charts?

12         MR. KAMARAJU:  Object to form.

13  A.  I have seen——

14         THE COURT:  Can you break that down.

15         MS. MURRAY:  Sure.

16  Q.  In the course of reviewing bank records, Mr. Hinton, did

17  those include bank records relating to the transfer of

18  $24.5 million to title services and other companies?

19  A.  Yes.

20  Q.  And was the source of those funds G|CLUBS accounts?

21  A.  I believe so.

22         MS. MURRAY:  If I may have a moment, your Honor?

23         THE COURT:  Okay.

24         MS. MURRAY:  Thank you, Mr. Hinton.

25         Nothing further, your Honor.

```
 1                THE COURT:  Recross?

 2                MR. KAMARAJU:  Very briefly, your Honor.

 3                Could I have Z26, please, slide 12.

 4   RECROSS EXAMINATION

 5   BY MR. KAMARAJU:

 6   Q.  Mr. Hinton, Ms. Murray asked you about this slide on

 7   redirect, correct?

 8   A.  Yes.

 9   Q.  And she asked you whether you'd been asked by the

10   government to do a——I believe the phrase was detailed

11   flow-of-fund analysis, correct?

12   A.  I believe——I believe that's what she said.

13   Q.  Okay.  Now you weren't asked to do that, right?

14   A.  That's correct.

15   Q.  And because you weren't asked to do a detailed flow-of-fund

16   analysis, you can't say whether any part of that $77 million

17   accounts for any part of that $13 million that goes to Lamp,

18   right?

19   A.  Right.  If you——if you wanted to know precisely how much

20   flowed through the accounts, you'd have to do a tracing

21   analysis.

22   Q.  And you didn't do that, right?

23   A.  I haven't done that.

24                MR. KAMARAJU:  Okay.  No further questions.

25                THE COURT:  All righty.  Thank you, sir.  You may step
```

```
 1    out.

 2                (Witness excused)

 3                THE COURT:  And the prosecutor may call its next

 4    witness.

 5                MR. FINKEL:  The government calls Wei Chen.

 6                (Witness sworn)

 7                THE COURT:  Please state your name and spell it, and

 8    speak into the microphone.

 9                THE WITNESS:  My name is Wei Chen, spelled as W-E-I,

10    and C-H-E-N.

11                THE COURT:  So I need you to speak even louder than

12    that so that everyone can hear you.

13                You may inquire.

14                MR. FINKEL:  Thank you, your Honor.

15     WEI CHEN,

16         called as a witness by the Government,

17         having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MR. FINKEL:

20    Q.  So Ms. Chen, further to what the judge was saying, you can

21    just point the microphone directly actually at your mouth so it

22    picks up the sound, okay?  Feel free to move it.  You can move

23    that top piece so it's pointed directly at your mouth.  Thank

24    you.

25                Ms. Chen, where were you born?
```

1   A.  I was born in China.

2   Q.  And when did you come to the United States?

3   A.  I came to the United States in 2007.

4   Q.  Why did you come to the United States?

5   A.  For a master degree.

6   Q.  Did you obtain a master's degree?

7   A.  Yes.

8   Q.  In what?

9   A.  Master of business administration.

10  Q.  What state do you live in now?

11  A.  Virginia.

12  Q.  What do you do for work?

13  A.  I work in a bank.  I help the bank manage the risk,

14  including operational risk, financial risk, and reputational

15  risk.

16          MS. SHROFF:  I'm sorry.  I didn't catch the last one.

17          MR. FINKEL:  Reputational risk.

18  Q.  Ms. Chen, were you ever a follower of Miles Guo?

19  A.  Yes.

20  Q.  Are you a follower of Miles Guo today?

21  A.  No.

22  Q.  Why not?

23  A.  Because he's a liar; he's a fraudster.

24  Q.  Ms. Chen, when did you first learn about Miles Guo?

25  A.  In 2007.

O6Q1GUO3                          Chen - Direct

1   Q.  2007?

2   A.  Sorry.  2017.

3            MR. FINKEL:  Your Honor, could we approach for a

4   moment.

5            THE COURT:  All right.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. FINKEL:  Your Honor, I'm hearing a tremendous

3     amount of scoffing and cackling from the gallery, more than

4     normal.  I don't know why that is, but it's not appropriate.

5     And I don't want to do this in public, in front of everyone,

6     but at some point I'd ask the Court to just remind the gallery

7     to settle down.

8          THE COURT:  I have heard the same thing, and I'm going

9     to tell them to stop vocalizing.

10         MR. FINKEL:  Thank you.

11         MS. SHROFF:  Your Honor, is the Court planning to tell

12    them in front of the jury?  I would——

13         THE COURT:  The jury is sitting here listening to them

14    make remarks and laugh and ridicule.

15         MS. SHROFF:  Your Honor, I just walked in.  I have not

16    been here all morning.  So I was not focused——I actually

17    couldn't see the person so I was trying to get that thing down,

18    but——

19         MR. FINKEL:  It's happened throughout this trial.

20    It's never been a big deal.  This is to a different degree.

21    That's why I wanted to tell your Honor.

22         THE COURT:  Yes.  I am going to let them know that

23    right now.  I have been very upset with the way that some

24    individuals have been chatting and making faces.  Some have

25    even come in with sunglasses on.  So I am going to say

O6Q1GUO3                        Chen - Direct

1    something now.

2              (In open court)

3              THE COURT:  I'm now addressing myself to those of you

4    who are sitting in the gallery, in the audience, on the

5    benches.  I do not want to hear laughing or any chatter.  If

6    you cannot be quiet, you will have to leave.

7              Please go ahead.

8              MR. FINKEL:  Thank you, your Honor.

9    BY MR. FINKEL:

10   Q.  Ms. Chen, you said you first learned about Miles Guo in

11   2017.  How did you first learn about Miles Guo?

12   A.  My husband was listening to his YouTube videos and

13   introduced him to me.

14   Q.  And did you yourself start listening to Miles Guo's YouTube

15   videos?

16   A.  Yes.

17   Q.  And when did you start watching Miles Guo's videos?

18   A.  About end of 2018 or beginning of 2019, around that time

19   period.

20   Q.  And in that time period, 2018 to 2019, what, generally

21   speaking, was Miles Guo's message?

22   A.  He was talking about bringing American values to China.

23             MS. SHROFF:  Objection, your Honor.  I think she can

24   only testify to her understanding of Mr. Guo's message.

25             THE COURT:  She can testify as to what he stated.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              You may continue.

2     BY MR. FINKEL:

3     Q.  Let me reask the question.  Ms. Chen, when you started

4     watching Miles Guo's videos, what was his message in 2018,

5     2019?

6     A.  My understanding, the messaging I take away is bringing

7     American values to China.

8     Q.  Did you agree with that message?

9     A.  Yes.

10    Q.  I want to direct your attention, Ms. Chen, to June of 2020.

11    Around that time did Miles Guo mention something called the GTV

12    Private Placement?

13    A.  Yes.

14    Q.  And did you invest in the GTV Private Placement?

15    A.  Yes.

16    Q.  Approximately how much money?

17    A.  At the very beginning, approximately $200,000.

18    Q.  What did Miles Guo say, if anything, that caused you to

19    invest at that time, around June 2020, in the GTV Private

20    Placement?

21    A.  Miles Guo promoted it as a very rare opportunity.  He

22    promoted it as a prepublic offering, that the followers can buy

23    at $8 a share, and then when it goes to the public, the value

24    would go up to ten or hundred, even a thousand.  So have very

25    large returns.  He also said the GTV investment is because the

1    GTV business would have a bright future.  It would be better

2    than YouTube, Amazon.  It is not just a social media platform,

3    it would also allow connections, like you can buy things from

4    Amazon.com or eBay.com.  It is going to be a very powerful

5    platform.  It's going to be successful.  They're going to have

6    huge returns.

7    Q.  Around that time, Ms. Chen, did Miles Guo say anything

8    about whether it was risky or not risky to invest in the GTV

9    Private Placement?

10    A.  Not at all.  Only returns, huge returns, zero risk.

11    Q.  That's what Miles Guo said?

12    A.  That's exactly right.

13    Q.  And Ms. Chen, when you decided to invest in the GTV Private

14    Placement, what was your understanding, based on what Miles Guo

15    said, about how that money that you invested would be used?

16    A.  My understanding is that the money will be used to develop

17    and grow GTV business, including acquiring the software,

18    building of the structure to make the business successful, to

19    be a competitor like YouTube, Amazon, eBay, and so on.

20    Q.  Ms. Chen, prior to your decision to invest in the GTV

21    Private Placement, had you invested very much in the stock

22    market?

23    A.  No.  I don't do risky investment.

24    Q.  Why did you decide to invest in the GTV Private Placement

25    if you don't normally invest in stocks?

O6Q1GUO3                          Chen - Direct

1    A.  Because——

2            MS. SHROFF:  Objection.  That is not what she said.

3            MR. FINKEL:  It's a question.

4    Q.  Why did you decide to invest in the GTV Private Placement

5    if you don't normally invest in stocks?

6            MS. SHROFF:  She didn't say——

7            THE COURT:  She didn't mention stocks specifically.

8            MS. SHROFF:  Yes, she did, and she said she doesn't

9    invest in risky stock.

10           THE COURT:  Correct.

11   A.  I can clarify.

12   Q.  Let me ask the question, if I can.

13           Ms. Chen, why did you decide to invest in the GTV

14   Private Placement if you don't generally invest in risky

15   stocks?

16   A.  Because there's no risk.  And I want to clarify.  In my

17   opinion, stock is a risky investment, so I don't invest in

18   stock.

19           MR. FINKEL:  We can pull up what's in evidence as

20   GX VK5.

21   Q.  Ms. Chen, prior to investing in the GTV Private Placement——

22   A.  Sorry.  I don't see anything showing up.

23   Q.  I know.  I'm asking a question.

24   A.  Oh, okay.

25   Q.  Okay.  It should be on everyone's screen now.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6Q1GUO3                          Chen - Direct

1  A.  Yeah, I see it now.

2  Q.  Have you seen this document before, Ms. Chen?

3  A.  Yes.

4  Q.  Did you see this document before you invested in the GTV

5  Private Placement?

6  A.  Yes, I did.

7  Q.  Did you review it?

8  A.  Yes, I did.

9  Q.  By the way, how did you get this document?

10 A.  Miles Guo sent a link to this document to my husband via

11 the WhatsApp chat.

12 Q.  After you reviewed——well, withdrawn.

13         MR. FINKEL:  We could turn to page 10.

14 Q.  Do you see where it says 4. Use of Proceeds?

15 A.  Yes.

16 Q.  What was your understanding, after reviewing this Use of

17 Proceeds, how money invested in the GTV Private Placement would

18 be used?

19 A.  It would be used according to the chart here, of the

20 percentage of the money to those activities as outlined in

21 page 10.

22 Q.  And do you see where it says Other, approximately

23 5 percent?

24 A.  Yes.

25 Q.  What was your understanding of what Other meant?

1  A.  My understanding is some overhead costs, administrative, HR

2  hiring.

3       MR. FINKEL:  If we can go to page 15.

4  Q.  Ms. Chen, when you were considering investing in GTV, what

5  was your understanding of what the G in GTV stood for?

6  A.  My understanding was that's Guo TV.

7  Q.  And when you were considering whether to invest in the GTV

8  Private Placement, what was your understanding of what—well,

9  withdrawn.

10      Do you see at the bottom where it says 6.3 Sponsor and

11 Adviser of GTV Media?

12 A.  Yes.

13 Q.  Can you read what it says.

14 A.  "The Sponsor and Adviser of GTV Media, Mr. Wengui Guo

15 (a/k/a Miles Guo, Ho Wan Kwok or Miles Kwok), is a billionaire,

16 a successful businessman, and a dissident in China."

17 Q.  You can stop there.  Ms. Chen, it says here that Mr. Guo is

18 a billionaire.  What factor, if any, did Miles Guo's claims of

19 wealth influence your decision to invest in the GTV Private

20 Placement?

21 A.  It played a critical influence in my decision.  That made

22 me believe that he is a wealthy person and he has resources,

23 and he emphasized about institutional investors investing GTV;

24 that will make it successful.

25 Q.  It says here, Ms. Chen, that Mr. Guo is the sponsor and

O6Q1GUO3                        Chen - Direct

1   adviser of GTV Media.  That's what it says in this document.

2   Based on your review of broadcasts that Mr. Guo had made, what

3   was your understanding of Guo's role, if any, with GTV?

4   A.  My understanding of his role is he owns it, he controls it,

5   and he created it.

6   Q.  And that's based on the broadcasts you watched.

7   A.  Yes.

8            MR. FINKEL:  If we can go to page 18.

9            Or actually——excuse me——let's go to page 13.

10           Page 12.

11  Q.  Okay.  You see where it says Executive Directors?

12  A.  Yes.

13  Q.  What's the name of the first executive director listed?

14  A.  Yvette Wang.

15           MR. FINKEL:  Could we go to the next page, please.

16  Q.  And what's the name of the next executive director listed?

17  A.  Max Krasner.

18  Q.  At the time you were considering whether to invest in GTV,

19  did you have an understanding of what the relationship was, if

20  any, between Miles Guo and Max Krasner?

21  A.  No, I have no idea.

22           MR. FINKEL:  Okay.  Could we go to page 15,

23  Ms. Loftus.

24  Q.  Can you read who's listed as nonexecutive directors.

25  A.  Darren Blanton and Aaron Mitchell.

1          MR. FINKEL:  If we could go back one page to 14,

2    please, Ms. Loftus.

3    Q.  And can you read the nonexecutive directors listed here.

4    A.  Steve Bannon, Kyle Bass.

5          MR. FINKEL:  If we can go, please, to page 17.

6    Q.  Ms. Chen, at the time that you invested in the GTV Private

7    Placement, what was your understanding about whether or not you

8    and your husband were an accredited investor?

9    A.  My understanding is we met the accredited investor

10   requirements, and qualified for it.

11   Q.  And as a result——well, withdrawn.

12         MR. FINKEL:  Could we go to the next page, please,

13   Ms. Loftus.

14   Q.  So you see where it says Risk Factors at the bottom?

15   A.  Yes.

16         MR. FINKEL:  Can you flip through that, please,

17   Ms. Loftus.

18   Q.  Did you review those risk factors before you invested in

19   GTV?

20   A.  Yes.

21   Q.  And what impact, if any, did the risk factors have on your

22   decision to invest?

23   A.  Not any impact.

24   Q.  Why not?

25   A.  Because in my view back then, those were standard language

1  and that I trusted what Miles Guo said in the video, there are

2  no risk, only huge returns.

3          THE COURT:  What do you mean by "standard language"?

4          THE WITNESS:  Like in a legal document, it oftentimes

5  would have the language talk about risk.

6          MR. FINKEL:  We can take that down, Ms. Loftus.

7  Q.  What was more important to you, the memo that we just

8  looked at or what Miles Guo said in his videos?

9  A.  What's more important to me?

10  Q.  When you were considering whether to invest in the GTV

11  Private Placement, what was more important, the memo we just

12  looked at or what Miles Guo said in his videos?

13  A.  Miles Guo said in his videos.

14  Q.  Why?

15  A.  Because I trusted him, I trusted what he said, I trusted

16  that he is a wealthy person, and I trusted that he's a

17  trustworthy person.  I trusted what he said, that I am just his

18  sisters, he want me to be rich.  I trusted that he never lied,

19  he's a very truthful person, so I trusted every single word he

20  said about GTV investment.

21  Q.  Ms. Chen, if you had known that the money you sent for the

22  GTV Private Placement would be used as part of a

23  hundred-million-dollar investment in a hedge fund in the name

24  of Miles Guo's son, would you have sent any money to GTV?

25  A.  No, absolutely not.

O6Q1GUO3                        Chen - Direct

1   Q.  If you had known that your investment wasn't guaranteed

2   despite what Miles Guo said in his videos, would you have sent

3   any money to GTV?

4   A.  No, absolutely not.

5   Q.  Did you receive any stock certificates?

6   A.  I was able to log in to a website to be able to pay for two

7   papers that would have the share amounts on the paper.

8   Q.  And did you order those papers?

9   A.  Yes.

10  Q.  How much did they cost?

11  A.  A hundred dollars.

12  Q.  Where exactly did you send your GTV——well, how much money

13  did you invest in the GTV Private Placement?

14  A.  Close to $200,000.

15  Q.  And to what entity did you send that money to?

16  A.  Saraca Media.

17  Q.  What instructions did you——well, how did you know to send

18  to Saraca Media?

19  A.  Because Miles Guo sent a document link to my husband

20  through the WhatsApp chat, and when we click the web app——or

21  the link, it takes you to a document that has wire instruction

22  information.

23          MR. FINKEL:  Your Honor, may I approach the witness.

24          THE COURT:  Yes.

25          MR. FINKEL:  Your Honor, I've handed Ms. Chen a binder

1  which contains the following documents in the VB series:  14,

2  24, 26, 27, 29, 31, and 33.

3  Q.  Ms. Chen, can you please flip through that binder and let

4  me know when you're done.

5  A.  Yes, I did.

6  Q.  Do you recognize the documents in that binder?

7  A.  Yes, I do.

8  Q.  What are they?

9  A.  Those are the documents I provided.

10  Q.  And what do those documents relate to?

11  A.  Related to Miles Guo's fraud scam.

12         MR. FINKEL:  Ms. Loftus, if we can pull up Stip 21.

13         Your Honor, the government offers the stipulation into

14  evidence, Stip 21.

15         THE COURT:  It is admitted.

16         (Government's Exhibit Stip 21 received in evidence)

17         MR. FINKEL:  Stip 21 reads, "It is hereby stipulated

18  and agreed——"

19         MS. SHROFF:  Your Honor, could Mr. Finkel slow down

20  because I think the translator is having trouble.

21         MR. FINKEL:  I'm happy to slow down.

22         THE INTERPRETER:  Thank you.

23         THE COURT:  Go ahead.

24         MR. FINKEL:  "It is hereby stipulated and agreed by

25  the parties:  In the below chart, the exhibit listed under

Column A contains text, audio, or video in a foreign language.

"In the below chart, the exhibit listed under column B and their subparts is a true and accurate translation of the audio or text contained in the exhibit and their subparts listed under column A."

And if we can go to the next page, please, Ms. Loftus.

And in column A, there is listed VB24, 13, 10, 27, and 24T, 13T, 10T, 27T.

Your Honor, at this time the government offers the documents in the binder, which are VB13, 14, 24, 26, 27, 29, 31, 33, and their corresponding translations as stipulated to by the parties, which are VB24-T, 13-T, 10-T, 27-T.

THE COURT:  They are admitted.

(Government's Exhibits VB13, VB14, VB24, VB26, VB27, VB29, VB31, VB33 received in evidence)

(Government's Exhibits VB10-T, VB13-T, VB24-T, VB27-T received in evidence)

MR. FINKEL:  We can take that down, Ms. Loftus.

BY MR. FINKEL:

Q.  Ms. Chen, when did you first learn about something called G|CLUBS?

A.  I first learned about it in around about—around about October 2020.

Q.  And at first, Ms. Chen, what did Miles Guo say, if anything, about G|CLUBS?

1    A.  If I remember, I think he talk about it as a membership.

2    Q.  Did you send money for a G|CLUBS membership?

3    A.  No, never ever.

4    Q.  Did you send money to a company called Crane?

5    A.  Yes.

6    Q.  Why did you send money to a company called Crane?

7    A.  Because Miles Guo promoted opportunities to add more GTV

8    share, and in order to do so, Miles Guo asked us to contact the

9    farm to complete investment into additional GTV share.  So we

10   contacted the MOS farm and was given a bank account of Crane.

11   Q.  What's MOS?

12   A.  Mountains of Spice Farm.

13   Q.  And what was your understanding of who the leader of the

14   Mountains of Spice Farm is?

15   A.  Back then it was Lo——

16       MS. SHROFF:  Are you asking who the leader is now or

17   in what year?

18   Q.  What is your understanding of——yeah, what is your

19   understanding of who the Mountains of Spices leader is,

20   Ms. Chen?

21       MS. SHROFF:  Same objection.

22       THE COURT:  Are you asking is or was?

23       MR. FINKEL:  Well, I think it's the same, but——

24   Q.  At the time that you were considering sending money to

25   Crane, who was the leader of the Mountains of Spice farm?

1    A.  Back then it was Long Island Brother.

2    Q.  Did you see Long Island Brother and Miles Guo appear

3    together in videos?

4    A.  Yes, all the time.

5    Q.  What is a farm?

6    A.  The farm, in my opinion, is the entity that Miles Guo asked

7    people to form to help the followers to join the farm to

8    complete the investment.

9    Q.  At the time you were considering, Ms. Chen, sending money

10   to Crane for additional GTV shares, what was Miles Guo saying,

11   if anything, in his videos about the value of GTV?

12   A.  Miles Guo said he had independent valuation company did a

13   valuation of the GTV business, it has already been——it has

14   already been appreciated.  I don't remember the exact how many

15   times, maybe ten times or so, but it is high enough to attract

16   me to send more money for additional GTV shares.

17   Q.  And did Miles Guo explain why, in order to get additional

18   GTV shares, you had to go through the farms and Crane instead

19   of just sending it to Saraca as you had previously done?

20   A.  I don't recall he did so.

21        MR. FINKEL:  If we can pull up what's in evidence, on

22   the left side, VB24, and on the right side, VB24-T.

23        All right.  And as stipulated by the parties, the

24   translations are on the right side of the screen.

25   Q.  Ms. Chen, do you recognize the document that's on the left

1    side of the screen?

2    A.  Yes.

3    Q.  And it says at the top, Crane.  Do you see that?

4    A.  Yes.

5    Q.  All right.  Where is this document from; what entity?

6    A.  This document was provided to us by the MOS Farm volunteer.

7    I don't know where it's coming from, but it's sent to us

8    through Discord chat by an MOS volunteer.

9    Q.  What's Discord?

10   A.  Discord is a social media platform that the farm and the

11   Himalaya Alliance are using to gather followers.

12          MR. FINKEL:  Could we go to the next page of each of

13   these, please, Ms. Loftus.

14   Q.  And so Ms. Chen, what was your understanding of what this

15   document was, VB24?

16   A.  When we signed this document, we thought, this is the

17   document that is required to complete this investment.

18   Q.  And this particular document on the screen, is this the

19   document you signed?

20   A.  My husband signed it.

21   Q.  What is the red text at the top?  What is your

22   understanding of what the red text at the top is?

23   A.  The red text top says to the G Club customer, meaning the

24   person who made the payment, and put a name on there.

25   Q.  Were these instructions that the farm provided through the

1   Discord channel?

2           MS. SHROFF:  Objection.  The farm did not provide

3   instructions.  The farm provided a document.

4           THE COURT:  Sustained.

5   Q.  Was it your understanding that this document provided by

6   the farm were instructions on how to process the payment to

7   Crane?

8   A.  Yes, that's my understanding.

9           MR. FINKEL:  We can pull up, please, VB26.

10  Q.  Whose name is at the top of this document?

11  A.  My name.

12  Q.  And it says below that G|CLUBS reference number.  Do you

13  see that?

14  A.  Yes.

15  Q.  What is that number for?

16  A.  That's a number that my husband obtained when he created an

17  order on the G|CLUBS website.

18  Q.  And Ms. Chen, what was your understanding, if any, about

19  the relationship between G|CLUBS and these additional GTV

20  shares that you wanted to purchase?

21  A.  My understanding is what Miles Guo promoted in his

22  broadcasting video, that those G|CLUBS membership are free as a

23  benefit, if we are buying additional GTV shares.

24  Q.  Do you see at the top it says Crane Advisory Group,

25  Ms. Chen?

1    A.  Yes.

2    Q.  Did you in fact send money to Crane Advisory Group?

3    A.  Yes.

4    Q.  Approximately how much?

5    A.  About a hundred thousand dollars.

6    Q.  And where did that hundred thousand dollars come from?

7    A.  The hundred thousand dollars are coming from my home

8    equity.

9    Q.  What do you mean by that?

10   A.  Meaning the second loan on my house.

11   Q.  Did you get a second loan on your house for the purpose of

12   trying to purchase additional GTV shares?

13   A.  Yes.

14   Q.  Why?

15   A.  Because I trusted Miles Guo that the GTV shares would

16   provide huge returns, that would provide the return that

17   offsetting the cost of borrowing from my home equity.

18   Q.  Ms. Chen, what was your understanding, if any, about how

19   many G|CLUBS memberships you would get for the hundred thousand

20   dollars you sent to Crane?

21   A.  My understanding is that will be two free G|CLUBS

22   memberships of tier 5.

23   Q.  And what was that understanding based on?

24   A.  Based on what Miles Guo emphasized and repeated over and

25   over again in his YouTube, in his broadcasting videos, that if

1    you buy GTV shares, you get G|CLUBS membership for free, and

2    that's a benefit he's giving to his fellow followers.

3    Q.  Did you ever send money to an entity called HCHK?

4              MR. FINKEL:  Ms. Loftus, we can take that down.

5    A.  Yes.

6              MR. FINKEL:  If we can pull up what's in evidence as

7    VB29.

8    Q.  What is this document?

9    A.  This is the wire receipt or confirmation of the money I

10   sent to HCHK Technology.

11   Q.  And is that you and your husband's name under Debit Party?

12   A.  Yes.

13   Q.  And how much did you send to HCHK Technologies?

14   A.  A hundred and ten thousand.

15   Q.  Why did you send 110,000 to HCHK Technologies?

16   A.  To purchase additional GTV shares.

17   Q.  And did these additional GTV shares, based on your

18   understanding from Miles Guo's videos, come with G|CLUBS

19   memberships as well?

20   A.  Yes.

21   Q.  Ms. Chen, did you need multiple G|CLUBS memberships?

22   A.  No.  I don't need any G|CLUBS membership because it doesn't

23   offer anything.

24   Q.  What is HCHK Technologies?

25   A.  I have no idea what HCHK Technologies is.

1  Q.  Around this time, Ms. Chen——I think this document is dated

2  August 2021——what, if anything, was Miles Guo saying about

3  whether there was an urgency to purchase additional GTV shares?

4  A.  The urgency is the opportunity window is closing down.  If

5  you want to get more GTV shares, you got to hurry up.

6  Q.  And this urgency that Miles Guo talked about, what impact,

7  if any, did that have on your decision to try to purchase more

8  GTV shares?

9  A.  That stipulated me sending to this account as soon as

10  possible.  I believe we received a bank account August 15 and

11  we sent the money on August 16, the next day.

12  Q.  At the bottom of this document it says, REF: MOS.  Do you

13  see that?

14  A.  Yes.

15  Q.  What does MOS stand for?

16  A.  Mountains of Spice.

17          MR. FINKEL:  We can take that down, Ms. Loftus.

18  Q.  When you were considering——did you visit the G|CLUBS

19  website?

20  A.  Yes.

21  Q.  And what did you see?

22  A.  I see Miles Guo smoking cigar and on his yacht.

23  Q.  Did you ever get additional GTV shares for the 110,000 you

24  sent to HCHK and the approximately hundred you sent to Crane?

25  A.  No, I don't think so.

O6Q1GUO3                        Chen - Direct

  1              MR. FINKEL:  If we could put up VB14, which is in

  2    evidence.

  3              If you had known, Ms. Chen, that you wouldn't receive

  4    shares for the money you sent to HCHK and the money you sent to

  5    Crane, would you have sent that money?

  6    A.  Of course not.

  7    Q.  What are we looking at here in VB14?

  8    A.  This is my husband's G|CLUBS membership account that he was

  9    logging into his account and it showed up in his account

 10    information.

 11    Q.  And did you see this account information on the computer

 12    online?

 13    A.  Yes.

 14    Q.  And Ms. Chen, did there come a time, if ever, where you or

 15    your husband used a G Fashion discount from your G|CLUBS

 16    membership?

 17    A.  We did.

 18    Q.  And how much in G Fashion clothing did you purchase,

 19    approximately?

 20    A.  I paid about $2,000.

 21    Q.  And what was the discount you received?

 22    A.  50 percent.

 23    Q.  Ms. Chen, if you had known that all you would get for the

 24    money you sent to HCHK Technologies and Crane Advisory Group

 25    was a 50 percent discount on G Fashion items, would you have

1    sent that money?

2    A.   Sorry.  Can you repeat that question again.

3    Q.   Sure.  If you had known that for sending $200,000 to Crane

4    and HCHK all you would get is a 50 percent discount on G

5    Fashion, would you have sent that money?

6    A.   No.  The 50 percent G Fashion discount is nothing.  The

7    2,000 I paid for, even after discount, is not well worth the

8    money I paid for it.

9    Q.   Did G|CLUBS, to your knowledge, offer any hotel discounts?

10   A.   I'm not aware.

11   Q.   Did you receive anything in the mail from G|CLUBS?

12   A.   I received one time a Christmas gift.

13   Q.   What was in the Christmas gift?

14   A.   Some cookies, coffee, and a coffee mug.

15            MR. FINKEL:  You can take that down.  And Ms. Loftus,

16   if you can display, just for the witness, VB35.

17   Q.   What is this?

18   A.   That's the coffee mug I received.

19            MR. FINKEL:  Government offers VB35.

20            MS. SHROFF:  No objection, your Honor.

21            THE COURT:  It is admitted.

22            (Government's Exhibit VB35 received in evidence)

23   Q.   Ms. Chen, if you had known that all you would receive from

24   G|CLUBS was a coffee mug, some cookies, coffee, and the G

25   Fashion discount, would you have sent money to HCHK and Crane?

1    A.  No.

2    Q.  Did you learn anything, or did you hear anything from

3    G|CLUBS about a discount for an F1 race?

4    A.  No.

5              MR. FINKEL:  You can take that down.

6              If we can pull up, please, Ms. Loftus, on the left

7    side VB27 and on the right side, 27-T.

8    Q.  So on the right side is the stipulated translation.

9              Ms. Chen, do you recognize the document on the left

10   side of your screen?

11   A.  Yes.

12   Q.  Can you just describe to the jury what your understanding

13   of what this document is.

14   A.  My understanding of this document is the form the MOS Farms

15   asked us to complete to calculate the total of the GTV shares.

16   Q.  What do you mean the total of GTV shares?

17   A.  Because all the investments, including donations, has GTV

18   share tied to it.  Miles Guo said in the videos and emphasized

19   all different investments plus donation would entitle the

20   follower equivalent GTV share.

21   Q.  So what was your understanding of why there needed to be a

22   calculation?

23   A.  Because the investments are very complex, they are

24   different investment programs, that starting to lose track of

25   how many investments each member have completed, so we need to

1  submit this form, including the amount and the payment receipt

2  for the MOS Farm to verify and then calculate a total of GTV

3  shares for each member.

4  Q.  And did you and your husband fill out this form for that

5  purpose?

6  A.  Yes.

7  Q.  Okay.  It says here, No. 2, "This form is for requirements

8  for the reconstruction project."  Do you see that, Ms. Chen?

9  A.  Yes.

10  Q.  What is your understanding of what the reconstruction

11  project is?

12  A.  My understanding is because of the SEC litigation, Miles

13  Guo said about a new GTV platform, restructuring the old one,

14  so it's called restructuring the GTV.

15  Q.  What do you mean the SEC litigation?

16  A.  My understanding back then, there was a charge by the SEC

17  and some litigations ongoing with the GTV investment we made

18  back in June 2020.

19  Q.  Ms. Chen, did you receive money from the SEC?

20  A.  Yes.

21  Q.  And was that part of the Fair Fund distribution?

22  A.  Yes.

23  Q.  What do you recall, if anything, Ms. Chen, about what Miles

24  Guo said on his broadcasts about what people should do with the

25  money they received from the Fair Fund from the SEC?

1    A.  Miles Guo asked people to send back the distribution of the

2    Fair Funds to Miles Guo-related entities.

3    Q.  And did Miles Guo say anything about whether the people who

4    received the Fair Fund distribution should do so quickly or

5    slowly?

6    A.  Miles Guo said they should do it quickly and set a timeline

7    of 45 days within the receipt of the Fair Fund distribution.

8    Q.  And what did Miles Guo say, if anything, about why there

9    was a 45-day timeline?

10   A.  I don't remember exactly what he said, but my understanding

11   is, there are Himalaya H Coin tied to the investments that are

12   part of the Fair Funds.  If you don't send back the money

13   within the 45-day timeline, the Himalaya H Coin that is

14   allocated to the members, based on the investment that they

15   were able to purchase at 10 cents per coin, will be gone.

16          MR. FINKEL:  Ms. Loftus, if we can go to page 3 of

17   these documents.

18   Q.  And looking at the English version, Ms. Chen, do you see at

19   the bottom it says "Apple Coin, G1, Have you successfully

20   purchased G1 Apple Coin?"

21   A.  Yes.

22   Q.  What was that?

23   A.  My understanding, that was an initial version of the

24   digital coin that is available to purchase from Apple Store.

25   Q.  Had you purchased the G1 Apple Coin?

1    A.  No, I did not.

2              MR. FINKEL:  Okay.  Could we go to the next page of

3    each, Ms. Loftus.

4    Q.  And so is this form that we're looking at, Ms. Chen, the

5    answers you provided to the questions on this form?  "No," for

6    example, under G Dollar?

7    A.  Sorry.  Can you repeat your question again.

8    Q.  Absolutely.  You see where it says "No" under "Did you

9    successfully purchase G2 and not ask for a refund or already

10   get a refund?"  Do you see that?

11   A.  Yes.

12   Q.  That "No," is that you and your husband's response?

13   A.  Yes.

14   Q.  Okay.  And then for No. 4, it says, "Old Chair.  Are you an

15   owner of an old chair?"  And you selected "Yes"; is that

16   correct?

17   A.  Yes.

18   Q.  What's an Old Chair?

19   A.  So the Old Chair, in my understanding, were the initial GTV

20   shares investors.  We were in contact directly with Miles Guo

21   to get the wire instructions to send the money to the Saraca

22   Media, and there was a minimum investment requirement of a

23   hundred thousand dollars, and to meet that requirement, it is

24   considered one of the Old Chair, and then across all the farms,

25   there are about a total of 1300 Old Chairs.

O6Q1GUO3                         Chen - Direct

1  Q.  And that number at the bottom, the 198,700, what does that

2  number represent?

3  A.  That number represents the money I sent to Saraca Media for

4  a total of 90——90——yeah, for this dollar amount here.

5  Q.  Okay.  Ms. Chen, did you participate in the farm loan

6  program?

7  A.  No, I did not.

8          MR. FINKEL:  Okay.  Could we go to the next page,

9  please, Ms. Loftus.

10          And over here——does that not work?

11  Q.  Okay.  It says "GC Order Number."  What order number did

12  you place there?

13  A.  This is an order number that is the same as the one we

14  completed for that Crane compliance package, so that's a number

15  my husband obtained after he created order at the G|CLUBS

16  website.

17          MR. FINKEL:  Could we go to the next page, please,

18  Ms. Loftus.

19  Q.  And so here, for No. 8, it says G Club Card, do you see

20  that, at the bottom?

21  A.  Yes.

22          MR. FINKEL:  Okay.  And Ms. Loftus, we could go to the

23  next page.

24  Q.  And you selected "No," correct?

25  A.  Yes.

O6Q1GUO3                          Chen - Direct

1   Q.   Okay.  Why did you select "No"?

2   A.   Because I'm buying additional GTV shares, not purchase G

3   Club membership.

4            MR. FINKEL:  Go to the next page, please.

5   Q.   And then for 12 it says Summary.  Do you see that?

6   A.   Yes.

7   Q.   And it says, "Your Total Investment (USD).  Total

8   investment = G1 + G2 + Old Chair + Original VOG/Phoenix +

9   Borrowing from Himalaya New York MOS + Borrowing from Other

10  Farms + Actual Purchase of G Club + Frozen Amount in Other

11  Farms + Donation Amount."  Do you see all that?

12  A.   Yes.

13  Q.   What was your understanding of what that math equation was

14  for?

15  A.   To calculate total GTV share.

16  Q.   And what did it mean, "Frozen Amount in Other Farms"; do

17  you know?

18  A.   My understanding is there are certain farm loans called

19  frozen by the local government, so they are defined as "Frozen

20  Amount in Other Farms" outside MOS Farm.

21            MR. FINKEL:  Could we go to the next page, please,

22  Ms. Loftus.

23  Q.   And here, for 13-2, right in the center, it says, "Your

24  plan for investment."  Do you see that?

25  A.   Yes.

1   Q.  And what did you select?

2   A.  I selected to participate in investment through card

3   project.  So the translation here is not accurate.  It's not

4   purchase card and equities.  It's distribute cards and

5   equities.

6          MS. SHROFF:  Objection.  She has no qualification to

7   translate.  The document speaks for itself and the document——

8          THE COURT:  I'm going to sustain the objection.

9   Q.  What is your understanding of why you selected that third

10  button?

11  A.  Because I read the Chinese version.  In the Chinese

12  version, it said to participate in investment through card

13  project.  In Chinese version, it means distribute card and

14  equity shares.

15  Q.  And the other two selections, only purchase G Club card or

16  only for investment, can you explain what you understood those

17  options to mean.

18  A.  Yes.  Those option means it's a GTV share investment, and

19  the G Club card is a benefit provided for free, and you have

20  the option of voluntarily giving up this benefit of free G Club

21  membership, so therefore, the second option, meaning only GTV

22  shares, you're giving up the free benefits of G Club

23  membership.

24  Q.  So you thought that you were buying shares——

25          MS. SHROFF:  Objection to the leading.

O6Q1GUO3                          Chen - Direct

1              MR. FINKEL:  I didn't finish my question.

2              THE COURT:  He hasn't gotten to the question yet.

3              Go ahead.

4    Q.  Ms. Chen, you sent money to HCHK and Crane, correct?

5    A.  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6QBGUO4                          Chen - Direct

```
 1   BY MR. FINKEL:
 2   Q.  And what was your understanding of what you would get for
 3   sending money to those two entities?
 4   A.  GTV shares.
 5   Q.  Would you get anything else in addition?
 6   A.  G/Club membership for free.
 7   Q.  You can take that down, Ms. Loftus.
 8           Ms. Chen, did you ever join a farm?
 9   A.  Yes.
10   Q.  Which one?
11   A.  MOS farm.
12   Q.  Did you volunteer for that farm?
13   A.  Yes.
14   Q.  What were the nature of the work you did as a volunteer for
15   the MOS farm?
16   A.  My work was to reverify the Himalaya H Coin that was
17   allocated to each member at ICO price at 10 cent per coin to
18   confirm if that allocation was accurate.
19   Q.  How many hours did you spend volunteering for the MOS farm?
20   A.  On average about 40 hours a week.
21   Q.  Were you also working at this time?
22   A.  Yes.
23   Q.  Do you have children?
24   A.  Yes.
25   Q.  How did you find time to do all that?
```

1  A.  I don't sleep and I take vacation hour from work to do this

2  volunteer work.

3  Q.  Why did you decide to spend so much time volunteering for

4  the MOS farm?

5  A.  Because Miles Guo ask us to volunteer.  He ask us not just

6  invest, but also to do volunteer work.  And also back then my

7  H Coin allocation, there's a miscount of my past investment, so

8  I had concerns of other members' investment could got miscount

9  for the H Coin they are deserving for.

10        I know every dollar those fellow followers sent to

11 Miles Guo are hard earn money, and I don't want them to have

12 the same situation as me of their hard earn money got sent to

13 Miles Guo and they're miscounted.

14 Q.  When did you start volunteering for the MOS farm?

15 A.  In March 2022.

16 Q.  When approximately did you stop?

17 A.  March 2023.

18 Q.  Did Miles Guo say where he was located during the various

19 videos that you watched about him talking about these

20 investment projects?

21 A.  My understanding is the rooftop condo at the Netherland

22 Sherry hotel in Manhattan, and also his house in Greenwich,

23 that house he has bought long time ago.

24 Q.  Ms. Loftus, can you pull up C205 which is in evidence.

25 While that's being pulled up, Ms. Chen, did you ever see Miles

1    Guo appear in a video with a car?

2    A.  Yes.

3    Q.  What did the car look like?

4    A.  A red color sports car.

5    Q.  What kind of car was it, do you know?

6    A.  I know it's a sports car, looks very expensive, but I don't

7    know exact what it is.

8    Q.  What did Miles Guo say, if anything, about that car?

9    A.  That's his car.

10   Q.  Can you scroll down a little bit, Ms. Loftus.

11           Do you recognize the individual in the sunglasses and

12   the hat?

13   A.  Yes.

14   Q.  Who is it?

15   A.  Miles Guo.

16   Q.  Do you recognize that flag in the back?

17   A.  Yes.

18   Q.  What is it?

19   A.  The flag of New Federal State of China.

20   Q.  Based on what Miles Guo would say in his videos, do you

21   have an understanding of where this video was recorded from?

22   A.  My understanding this is from the rooftop condo at the

23   Sherry Netherland, that expensive hotel in Manhattan.

24   Q.  We can take that down.  What is G Bank?

25   A.  G Bank is another investment opportunity Miles Guo promoted

1    as the bank that has the digital currency license that can

2    compliment the Himalaya Exchange to settle between digital

3    currency and the fiat currency.  It is very lucrative, and they

4    were able to acquire it because William Je is very influential

5    in the finance world.  He has his connections to be able to

6    allow them to purchase this G Bank successfully.

7    Q.  Did you participate in any video conferences about the G

8    Bank?

9    A.  Yes.

10   Q.  And was Miles Guo apart of those conferences?

11   A.  Yes.

12   Q.  Was William Je?

13   A.  William Je attended separate Webex call from Miles Guo.

14   Q.  What, if anything, did Miles Guo about G Bank?

15   A.  Miles Guo said the G Bank is the bank that has the digital

16   currency license.  It's very rare to get digital currency

17   license.  It's going to forming the future of the H Coin

18   Himalaya Exchange ecosystem to compliment it.  It's going to be

19   very lucrative, have a very bright future, and that is the type

20   of assets you can passing down to your kids and your kids' kids

21   for many generations.  It's a rare opportunity that can only

22   appear one time in your life.  You will become initial

23   shareholder of the G Bank if you make that investment.

24   Q.  Did Miles Guo mention anything about a casino in the

25   context of the G Bank?

O6QBGUO4                        Chen - Direct

```
 1   A.  Yes.

 2   Q.  What did he say about a casino?

 3   A.  I don't remember clearly what he said, but I think

 4   opportunity presented at the beginning including G Bank and the

 5   casino investment, and later the casino investment didn't go

 6   through, so it dropped.

 7           MS. SHROFF:  I didn't get that last part.

 8           MR. FINKEL:  Didn't go through so it dropped.

 9   Q.  Ms. Chen, what did Miles Guo say, if anything, about

10   whether he was investing his own money into the G Bank?

11   A.  Miles Guo said the institutional investors have lot of

12   money to purchase the G Bank.  They have already completed the

13   G Bank acquisition with all the money.  They don't need our

14   money at all.  They have way more enough money, that our money

15   is nothing to the institutional investors he has to acquire the

16   G Bank.

17   Q.  Did you invest in G Bank?

18   A.  Yes.

19   Q.  How much money did you invest into G Bank?

20   A.  $300,000.

21   Q.  To what entity did you send that $300,000?

22   A.  Hamilton Opportunity Fund.

23   Q.  You ever heard the song, Ms. Chen, H Coin to the Moon?

24   A.  Yes.

25   Q.  Where have you heard it?
```

O6QBGUO4                          Chen - Direct

1   A.  I heard it on Gettr.  I heard it on Apple Itunes.

2   Q.  Did you purchase it on Apple Itunes?

3   A.  Yes.

4   Q.  How many times did you purchase H Coin to the Moon on Apple

5   Itunes?

6   A.  About 600 or 700 times.

7   Q.  Why did you purchase it so many times?

8   A.  Because Miles Guo ask us to download many, many times of

9   this song to boost up the ranking in the Itunes chart.

10  Q.  What do you mean to boost up the ranking in the Itunes

11  chart?

12  A.  So that it shows the top in Itunes that everyone would know

13  H Coin to the Moon song.

14  Q.  What did that phrase mean to you, to the moon?

15  A.  Meaning the price will go skyrocketing.

16  Q.  What did Miles Guo say, if anything, in his videos about

17  H Coin?

18  A.  Miles Guo said H Coin is better than Bitcoin.

19  Q.  What is Bitcoin?

20  A.  Bitcoin is a very valuable cryptocurrency.

21  Q.  What did Miles Guo say H Coin was?

22  A.  A cryptocurrency.

23  Q.  Did Miles Guo mention anything about H Coin being on the

24  blockchain?

25  A.  Yes.

O6QBGUO4                          Chen - Direct

1   Q.  What did Miles Guo say, if anything, about H Coin in the

2   blockchain?

3   A.  Miles Guo said H Coin is the most advance technology of

4   blockchain.  It's better than any current digital currency in

5   the current markets.

6   Q.  And what impact did those statements about H Coin having

7   the most advance blockchain technology have on you, if any?

8   A.  That influence my decision of buying H Coin, that make me

9   believe that H Coin will be very valuable.

10  Q.  What, if anything, did Miles Guo say about whether H Coin

11  was backed by gold?

12  A.  Miles Guo said H Coin has 20 percent gold as a reserved

13  backup.

14  Q.  And what impact did those statements that H Coin has a 20

15  percent gold reserve have on your consideration whether to buy

16  H Coin?

17  A.  That is critical to me, that sold me the idea that what he

18  promoted that H Coin is better than Bitcoin.  It is going to be

19  more valuable than Bitcoin because it has a gold reserve while

20  Bitcoin does not.

21  Q.  What is your understanding of the association, if any,

22  between the Himalaya Exchange and Miles Guo?

23  A.  Miles Guo created Himalaya Exchange and he owns it.

24  Q.  Did you invest in H Coin?

25  A.  Yes.

1   Q.  Approximately how much money did you spend purchasing

2   H Coin?

3   A.  I spent about $530,000 to purchase H Coin.

4   Q.  Why did you decide to purchase H Coin?

5   A.  Because back then Miles Guo said the H Coin will go up to

6   $100 in a few weeks very soon.

7   Q.  Ms. Chen, if it had turned out that instead of being backed

8   by gold H Coin was backed by dollars instead of gold, would

9   that have mattered to you?

10  A.  Of course it matters.

11  Q.  Why?

12  A.  Because if it's only backed by dollars, not the gold, it

13  means it's not going to be better than Bitcoin.  It's not going

14  to be that valuable.  It's not going to be worth me thinking

15  about making investment in H Coin.

16  Q.  Did Miles Guo say anything about whether investing in

17  H Coin or H dollar was guaranteed?

18  A.  Miles Guo said about, for people like me that purchase

19  the H Coin at the very high price, and later on the price drop

20  to even half or less than half, Miles Guo will compensate for

21  all their losses we incurred through the purchasing the H Coin.

22  Q.  Did you visit the Himalaya Exchange website?

23  A.  Yes.

24  Q.  Did you see anything called white paper on the Himalaya

25  Exchange website?

1    A.  I may have seen that.

2    Q.  Did you read it?

3    A.  I read it.

4    Q.  And what was your understanding of what the white paper

5    meant?

6    A.  My takeaway from it is there are challenges out there in

7    current cryptocurrency market.

8             MS. SHROFF:  I'm sorry.  Could I have that respond

9    read back.

10            (Record was read)

11   Q.  What do you mean by challenges?

12   A.  Challenges about the price of the digital cryptocurrency,

13   the challenges about the security, the current cryptocurrency

14   are not that secured, the challenges about the cost, the

15   current cryptocurrency are costly.  So those are the challenges

16   of the current cryptocurrency in the market, and H Coin is

17   created to overcome all those challenges.  It gone be the most

18   secured affordable efficient currency that would be the future

19   of all the cryptocurrency.

20   Q.  When you decided to purchase H Coin, Ms. Chen, did you

21   think you were purchasing cryptocurrency or credits?

22   A.  I was thinking I was purchasing cryptocurrency.

23   Q.  Were the farms involved in your purchase of H Coin?

24   A.  They are involved when I purchased the H Coin at the ICO,

25   the initial currency offering at 10 cents per coin.

1   Q.   What is the H Coin lockup?

2   A.   The H Coin lockup in my understanding is the ICO of the

3   initial currency offering at 10 cent per coin are locked up for

4   a period of time, that the fellow followers are not allowed to

5   sell them.

6   Q.   If we can pull up what's in evidence as VB33.  Do you

7   recognize this, Ms. Chen?

8   A.   Yes.

9   Q.   What is it?

10  A.   That's my Himalaya Exchange account.

11  Q.   What is your understanding, if anything, of why it says

12  130,000 HDO and zero HCN?

13  A.   That's the balance of my account.

14  Q.   What is your understanding, if any, of the difference

15  between HDO and HCN?

16  A.   Back then my understanding that HDO is one-to-one to U.S.

17  dollars, and HCN is the cryptocurrency.

18  Q.   And when you sent money into -- how did you send money into

19  the Himalaya Exchange?

20  A.   I log into the account and it provide you payment

21  instructions of the bank account to send the money, and it also

22  include a reference number that is specifically for me to add

23  that reference number when I wire the number to that bank

24  account.

25  Q.   What state were you in when you logged into the Himalaya

O6QBGUO4                          Chen - Direct

1   Exchange to send money?

2   A.  I use the virtual private network, the VPN.

3            MS. SHROFF:  The question was what state she was in.

4   Move to strike.

5            THE COURT:  If you can answer what state.

6   A.  I live in Virginia.

7   Q.  Were you in Virginia?

8   A.  Yes.

9   Q.  What's a VPN?

10  A.  Virtual private network.

11  Q.  Why did you use a VPN to log into the Himalaya Exchange?

12  A.  Because Miles Guo ask us to VPN to log into Himalaya

13  Exchange.

14  Q.  What is your understanding Miles Guo asked you to use a VPN

15  to log into the Himalaya Exchange from the United States?

16  A.  Because my understanding is I need to log in from a country

17  outside of US to get into the Himalaya Exchange account.

18  Q.  When you sent money to the Himalaya Exchange, did you think

19  you were buying H dollar or H Coin?

20  A.  I send in U.S. dollars that become equivalent HDO, and I

21  use HDO to purchase HCN.

22  Q.  You can take that down.  If we can put up Z10 at page two.

23            Ms. Chen, what did Miles Guo say, if anything, about

24  A10?

25  A.  Miles Guo promoted another investment called A10.  I don't

1    understand what it is.  Miles Guo said it include five percent

2    of Gettr and five percent of Himalaya Exchange.

3    Q.  If you can just scroll up a little bit, Ms. Loftus, just to

4    the date.

5           When you first learned about A10, in what manner did

6    you first learn about A10?

7    A.  Sorry.  When you ask me what matters?

8    Q.  How did you first learn about A10?

9    A.  Miles Guo broadcasting video on Gettr.

10   Q.  After learning about A10, Ms. Chen, what impact did that

11   have on you?

12   A.  When he promoted A10, I'm confused.

13   Q.  Why?

14   A.  Because why is another investment.  It feels to me that

15   just keep asking us to give money to investment, just keep

16   draining out our pocket, is always giving, giving, investment,

17   investment, but where is the return?  Why keeping giving money

18   out?  When is the money coming in as a return?

19   Q.  Did you invest in the A10?

20   A.  No.

21   Q.  Did you try to get your money back from the other

22   investments that you had made from Miles Guo's videos?

23   A.  Yes.

24   Q.  What steps did you take to try to get your money back?

25   A.  For the G Bank investment, I contacted the farm manager of

1    Hamilton Opportunity Fund David Fallon.

2    Q.  And what did David Fallon tell you, if anything?

3    A.  David Fallon did not respond.  His lawyer in UK James

4    responded to me.

5    Q.  What did James say?

6    A.  James said.

7              MS. SHROFF:  All of this is hearsay.

8              THE COURT:  Overruled.  You may answer.

9    A.  Sorry.

10   Q.  You can answer, what did James said?

11   A.  Jim said your money is part of the DOJ freeze order.

12   Q.  And what response did you have to that, if anything?

13   A.  My response is, I don't believe so because I sending the

14   money back in January 2022.  The money was not frozen till

15   September 2022.  There are eight months in between the time I

16   send in the money till the time the money is frozen.  I believe

17   there are money outflows.  The money I sent to the account is

18   no longer in that account when DOJ freeze that account.

19   Q.  Did you try to get your money back from G/Club?

20   A.  I contact G/Club for refund.

21   Q.  What did G/Club tell you?

22   A.  The G/Club customer services provided me an email address

23   to contact the legal department of G/Club.

24   Q.  Did you contact that email address?

25   A.  I contact the email address and completed the forms that

O6QBGUO4                          Chen - Direct

1    requested to cancel the G/Club membership.

2    Q.  What did G/Club tell you, if anything?

3    A.  G/Club legal team did not respond to my request at all.

4    Q.  Did you contact anyone else trying to get your money back?

5    A.  I contacted Mulan to ask about the G Bank investment.

6    Q.  What did Mulan tell you?

7    A.  Mulan told me that my money is frozen as part of the DOJ

8    order.

9    Q.  Did you try to redeem and get cash out of the Himalaya

10   Exchange?

11   A.  Yes.

12   Q.  What happened then?

13   A.  I request a redemption I believe back in May 2023, and two

14   months later I receive a notice that the request is canceled,

15   no more redemption.

16   Q.  You can take that down, Ms. Loftus.

17          Ms. Chen, did Miles Guo ever talk in his videos about

18   being targeted by the Chinese Communist Party, the CCP?

19   A.  Yes.

20   Q.  What, if anything, would he say about being targeted by the

21   CCP?

22   A.  He said he's a target.

23   Q.  Did you invest in the Miles Guo investments because he said

24   he was being targeted by the CCP?

25   A.  No.

O6QBGUO4                          Chen - Direct

1   Q.  Why did you invest in the Miles Guo's investments?

2   A.  Because I want to make money.  He promise huge return with

3   no risk.

4   Q.  Of the money that you invested, how much have you gotten

5   back?

6   A.  I got back the SEC fair fund distribution about 180,000 or

7   something.

8   Q.  In total how much money did you invest?

9   A.  I invest almost 1.3 million.

10  Q.  So how much are you still owed?

11  A.  About 1.1 million.

12          MS. SHROFF:  Objection to the word "owed."

13          THE COURT:  Overruled.

14  Q.  Ms. Chen, if it were true that Miles Guo was targeted by

15  the CCP, would you still want your $1.1 million back?

16  A.  Yes.

17  Q.  If it were true that Miles Guo was targeted by the CCP,

18  does that change your view on whether you're still owed $1.1

19  million?

20  A.  No, it would not change my view.

21  Q.  What does Miles Guo's being targeted -- withdrawn.

22          Ms. Chen, does the fact that the CCP may have targeted

23  Miles Guo, what impact, if any, does that have on your

24  experience investing in the Miles Guo projects?

25  A.  It has no impact.  Fraud is a fraud.  It has no impact with

1    anything else.

2    Q.  If it's true that Miles Guo was targeted by the CCP, does

3    it make what he did to you okay?

4            MS. SHROFF:  Objection, assumes facts not in evidence.

5            THE COURT:  Overruled.  You may answer.

6            THE WITNESS:  Sorry, am I answer or --

7            THE COURT:  Yes, you answer.

8    A.  Can you repeat the question.  And I couldn't hear that

9    attorney very well.  Do you mind putting the mic closer to you.

10           MS. SHROFF:  Most people don't have trouble not

11   hearing me, but, sure.  I objected and the judge overruled my

12   objection.

13   A.  Okay, then, I got distracted.  Do you mind repeating the

14   question again.

15   Q.  No problem.  Ms. Chen, if it is true that Miles Guo was

16   targeted by the CCP, does that make what he did to you okay?

17   A.  No, he damaged my life.

18   Q.  How so?

19   A.  He lied to me by --

20           THE COURT:  All right.  I have to interrupt now.  I

21   have told the members of the audience I do not want laughing.

22   I do not want noise.  You must be respectful in this courtroom

23   or I will have you ejected.  Go ahead, please.  You were

24   answering.  I interrupted.  You can read back what she has

25   already stated.

1            (Record was read)

2   A.   Miles Guo lied to me and gain my trust by emphasizing and

3   repeating over and over again that he's very honest,

4   trustworthy person.  He never lied.  He brainwash me into

5   believing him by telling his story that made me believe that

6   he's a very nice, kind, carrying person.  He lied to me to make

7   me believe that he cares about me as his sister.  He lied to me

8   to make me believe that he's willing to share his wealth with

9   me as his sister.

10           And he took advantage of my hope, of my hope for

11  providing a better life for my older parents and young children

12  by promising huge returns with zero risk.  He depicted a

13  beautiful future for my family that deceived me in giving all

14  my money, all my hard earned money and all my hard saved money

15  to him to pay for his families, his daughters, his sons, lavish

16  and extravagant life.  Miles Guo is a liar.  He's a cheater.

17  He's shameless and heartless cheater and fraudster.

18  Q.   Do you see Miles Guo in the courtroom here today?

19           MS. SHROFF:  Your Honor, I stipulate Mr. Guo is seated

20  to my left.

21           THE COURT:  All right.

22  Q.   Is that Miles Guo?

23  A.   Yes.

24           MR. FINKEL:  Nothing further.

25           THE COURT:  Cross-examination.

O6QBGUO4                          Chen - Cross

1    CROSS-EXAMINATION

2    BY MS. SHROFF:

3    Q.  Good afternoon, Ms. Chen.

4    A.  Good afternoon.

5    Q.  How are you?

6    A.  I'm good.  How are you?

7    Q.  I'm a little tired, but let's see.

8            Ms. Chen, could you tell the ladies and gentlemen of

9    this jury who is IvyIvy6538?

10   A.  That's my nickname at MOS farm.

11   Q.  Let me show you --

12           MR. FINKEL:  Your Honor, can we approach for a moment?

13           THE COURT:  Yes.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           MR. FINKEL:  Maybe this isn't an issue, but especially

3   in light of what's been happening in the gallery today.  I

4   certainly hope that Ms. Shroff is not just going to go through

5   personal identifying information of the victim from the witness

6   which would be inappropriate and just a way to harass her.  So

7   I raise this only at sidebar to make sure there will be nothing

8   else in terms of her personal identifying information.

9           THE COURT:  I feel confident that she would not do

10  that.  Isn't that correct, Ms. Shroff?

11          MS. SHROFF:  I should hope so, your Honor.  I have

12  deep respect for the Court's ruling, and I'm happy to lay out

13  what I was trying to do.  What I was going to do is show the

14  handles that she used during the time that she was active in

15  the community.  And before I forget, I just want to say that

16  what the audience does, we don't have control over.  There are

17  certain people in this audience that we have specifically

18  asked, do not be here, for example.  We've even tried to

19  communicate with those people's lawyers that they should not be

20  here.  So to attribute anything to us is really, I don't know

21  where that's going, but I'm just putting it out there.  We're

22  not friends.  We have no control over who's in the audience.

23          Let me get back to Ivy.  Ivy is a handle that she

24  used.  I'm going to show her a photo of the handle.  I'm also

25  going to show her the photo of the handle of her husband.  The

O6QBGUO4                        Chen - Cross

government knows this because the government has emails from

somebody name All Well.  I plan to show a handle photo of

somebody named Octopus.  I plan to show a photo of somebody

name Faithfully.  They're open handles.  I'm never going to ask

her if she's XXXXX.  I don't intend to ask her that.  I have no

intention of helping the jury feel sympathetic for her.  That's

not my role.  I think all of this is proper cross-examination.

And if the government doesn't know of these handles, I

apologize, but that's not my responsibility.

        MR. FINKEL:  First, before I forget, we ask that we

seal the answer of her name XXXXX and just put the witness.

        MS. SHROFF:  That's fine.  You can just take out the

name from the sidebar.  I do note this, your Honor, her last

name is Chen.  When the jury was picked, XXXXX was one of the

names we cited.  If somebody really wanted to put two and two

together, it's not going to take a rocket scientist to do that.

        MR. FINKEL:  We don't have to help people do it.  We

should protect the victims.  They have a statutory right to

such protection.

        THE COURT:  It's also an extremely common name.

        MR. FINKEL:  If I could respond to what Ms. Shroff

said?

        THE COURT:  Go ahead.

        MR. FINKEL:  I don't think there's any relevance of

going through the various handles that she used with the farms

1    about which she is now testifying and telling things about what

2    happened in the farms.  It should be excluded because it's just

3    designed to harass the witness.  It's entirely fine for

4    Ms. Shroff to say, Did you use handles?  Did you use different

5    log-in names, and I suspect the answer to those questions would

6    be yes.  If she wants to put Fay Fay's user name in front of

7    her, fine.  If she wants to put Octopus's name in front of her,

8    fine.  And make the point, I'm sure it's a very important one,

9    that she used handles just like Octopus and Fay Fay.  But to

10   use the specific names that this witness used, which I think is

11   in our 3500.  It says that she's nervous about being found out

12   of her handles.  And in fact --

13              MS. SHROFF:  There's no such thing.

14              MR. FINKEL:  Please don't interrupt me.  Your Honor

15   may recall that in one of the bank records it said MOS, and

16   there is a line redacted.  The line redacted was her MOS, her

17   Mountain of Spices ID number because she doesn't want the

18   Mountain of Spices people to go after her, like they went after

19   Luc Despins and his daughter and his son-in-law.  And so I

20   object to the use of these user names and questioning as to

21   specificity because it was just designed to harass this victim.

22              MS. SHROFF:  It is not.

23              THE COURT:  Let me understand something, are you

24   saying that all of these user names are associated with her?

25              MR. FINKEL:  I don't know, but apparently Ms. Shroff

1    believes that these two user names are associated with her.

2    It's not the association that Ms. Shroff is trying to draw out

3    based on what she just represented to your Honor, it's the

4    point that she used user names as opposed to her true name.  So

5    that point is fine to make and it could be made in a generic

6    fashion and have the same dramatic impact on the jury as using

7    the specific ones.

8              THE COURT:  How is it that you know that these fake

9    names will enable members of the public to identify her?

10             MR. FINKEL:  Because that's how the community knows

11   her, in the same way that the community knew Ya Li as Mulan.

12   The community knows her by this identity.  And I know it is her

13   identity because Ms. Shroff asked the question and she said

14   yes.  And I suspect that there's going to be a slew of this.

15   This is the government's objection.  If we're overruled, we're

16   overruled. That's fine.  But this is a point that we felt is

17   important to make.

18             MS. SHROFF:  May I just clarify?

19             THE COURT:  Yes.

20             MS. SHROFF:  So the handler is linked to the name

21   under which she is testifying.  She's testifying under her own

22   name, right?

23             MR. FINKEL:  Yes.

24             MS. SHROFF:  That's what it's linked to.  She engages

25   with people under that handle.  She sends out text under that

1    handle.  She sends out emails with that handle.  She filled out

2    her volunteer hours with that handle.  She talks to H Coin

3    people with that handle, and I intend to very properly march

4    through that evidence with this witness.  I will never say that

5    this person is associated with XXXXX, which is what the Court

6    prescribe me from doing.

7            THE COURT:  Is there anything that links any of those

8    names to XXXXX?

9            MR. FINKEL:  Your Honor, I'm not sure.  That's the

10   candid answer.  What I do know is that the community uses these

11   handles to identify people, and that's how they find people.

12   That's how all this works.  That's how the enterprise is

13   structured.  Everyone is known by Fay Fay or Feather or Octopus

14   or Saturn or what have you.  If Ms. Shroff wants to put

15   specific statements to her, okay.  But to go through each and

16   every ID we object because we think that's harassment.

17           THE COURT:  How many IDs do you think that she has?

18           MS. SHROFF:  I don't think she has more than Ivy Ivy

19   and the number.  That's her ID.  That's how she communicated

20   with her everyone, and it's not linked through the name XXXXX.

21   I have exhibits to show her with that ID, and I have exhibits

22   to show her with that handle.  That is her handle.  She also

23   uses multiple Gmail accounts, right.  So the government has

24   literally redacted the entire account.  We ask that at least it

25   make clear, the document make clear, that she's copied on the

O6QBGUO4                         Chen - Cross

1   email.  They refused, so I don't care that her actual email

2   shows.  Some of the evidence, the truthfulness of the evidence

3   is, she got a copy of that document.

4           THE COURT:  So what I understand you to be saying is

5   that you want to ask whether she goes by a particular handle,

6   one handle?

7           MS. SHROFF:  That's it, one handle.

8           THE COURT:  You also want to ask whether she is really

9   affiliated with other handles?

10          MS. SHROFF:  No, her interactions with the other

11  handles.

12          THE COURT:  I find that to be acceptable.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court)

 2                    THE COURT:  Go ahead.

 3    BY MS. SHROFF:

 4    Q.  I was asking you about IvyIvy 6538, correct?

 5    A.  Yes.

 6    Q.  Is that a handle you use, ma'am?

 7    A.  That's just a nickname that I had for the MOS farm

 8    registration.

 9    Q.  And did you tell the government about that MOS farm

10    registration that you used?

11    A.  I did not.

12    Q.  Let's pull it up just for the government and the witness,

13    please.  Do you recognize Defense Exhibit 7010?

14    A.  That's my discord registration.

15                    MS. SHROFF:  Your Honor, the offense moves DX-7010

16    into evidence.

17                    MR. FINKEL:  I object for the reasons described at

18    sidebar.

19                    THE COURT:  It is admitted.

20                    (Defendant's Exhibit 7010 received in evidence)

21                    MS. SHROFF:  If I could publish to the jury.

22    Q.  Who is All Well 5921?

23    A.  That's my husband discord registration number.

24    Q.  And let me show you DX7011.  Do you recognize that

25    document?

O6QBGUO4                          Chen - Cross

1    A.    Yeah.

2    Q.    Is that DX7008?

3    A.    Yes.

4    Q.    And what do you recognize it to be?

5    A.    That's my husband's discord registration number as being

6    are registering on any social media platform they use a

7    nickname.

8              MS. SHROFF:  And we move DX-7008 into evidence.

9              MR. FINKEL:  Your Honor, can we approach?

10             THE COURT:  All righty.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6QBGUO4                          Chen - Cross

1              (At the sidebar)

2              MR. FINKEL:  Your Honor, I'm sorry to belabor this,

3      but this is different from what Ms. Shroff had told your Honor.

4              MS. SHROFF:  Those are the two handles.

5              MR. FINKEL:  Ms. Shroff is doxing this witness.  What

6      this community does in this enterprise is they attack people

7      online, on Twitter, on Discord and other social media channels.

8      She's putting into evidence just the handle to make it a point

9      so all the people in the courtroom and everyone else know how

10     to go after her and her husband.  This is entirely

11     inappropriate.  This has nothing to do with the reasons that

12     Ms. Shroff articulated here at the sidebar just a moment ago.

13     This is pure harassment and doxing.

14             THE COURT:  Mr. Finkel, if I don't let her confront

15     this witness and you get a conviction, it's going to get

16     overturn.  She needs to be able to confront the witness.  She

17     has come here freely.  She's stated her name.  You may go

18     forward.

19             (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              MS. SHROFF:  And we move 7008 into evidence.

3              THE COURT:  It is admitted.

4              (Defendant's Exhibit 7008 received in evidence)

5   BY MS. SHROFF:

6   Q.  And may we publish to the jury.

7              Ms. Chen, do you know somebody named Octopus?

8   A.  Yes.

9   Q.  And who is she?

10  A.  She's the current farm owner of MOS farm.

11  Q.  And let me show you what is marked as Defense Exhibit 7011.

12  Do you recognize that document?

13  A.  Yes.

14  Q.  And what is it?

15  A.  That's Octopus's discord information.

16             MS. SHROFF:  And we like to move 7011 into evidence.

17             MR. FINKEL:  No objection.

18             THE COURT:  It is admitted.

19             (Defendant's Exhibit 7011 received in evidence)

20  BY MS. SHROFF:

21  Q.  Could you tell the members of the jury who is Faith Night?

22  A.  Faith Night is working at MOS farm.

23  Q.  And let me show what you is marked as DX7009.  Do you

24  recognize that?

25  A.  Yes.

O6QBGUO4                          Chen - Cross

1   Q.  Is that the handle for Ms. Faith Night?

2   A.  Yes, discord registration information.

3           MS. SHROFF:  And we like to move DX7009 into evidence

4   and publish it to the jury.

5           MR. FINKEL:  No objection.

6           THE COURT:  It is admitted.

7           (Defendant's Exhibit 7009 received in evidence)

8   BY MS. SHROFF:

9   Q.  Can you tell me who Fay Fay is?

10  A.  Fay Fay is someone who is also part of the movement.

11  Q.  And how about Little Sarah?

12  A.  Same here, also part of the movement.

13  Q.  And, Ms. Chen, did you interact with Octopus?

14  A.  When you say interact, do you mean I communicated with her?

15  Q.  Did you talk to her over Discord?

16  A.  Yes, I talk to her over Discord.

17  Q.  How about Faith Night?

18  A.  Yes, I talk to her over Discord.

19  Q.  And we're going to come back to that, but you were in a

20  group with them, correct?

21  A.  I explain earlier I was doing volunteer work.

22  Q.  We will come back to that too, but those are the three

23  people who were in the group with you, right?

24  A.  In volunteer work, there are certain aspects that I

25  communicate to them about my volunteer work.

1  Q.  We'll come back to that.  Let's just talk for a moment

2  about your background.

3        You testified on direct that you came to the United

4  States, was it in 2007?

5  A.  Yes.

6  Q.  And you were a student in China before you came, correct?

7  A.  Yes.

8  Q.  You studied at the Shanghai Institute of Foreign Trade,

9  correct?

10  A.  Yes.

11  Q.  And you studied international business, correct?

12  A.  That's not correct.

13  Q.  Well, tell me what did you study?

14  A.  I studied English.

15  Q.  And did you then study and have a business education?

16  A.  So when you say I studied and have a business education, do

17  you mean I came to the U.S. for the business education or can

18  you clarify?

19  Q.  Sure.  Did you have any studies in business while you were

20  a student in China?

21  A.  I studied English and it's considered business English.

22  Q.  And did you also study accounting while you were in China?

23  A.  No, I did not.

24  Q.  And then you graduated from Shanghai Institute of Foreign

25  Trade in 2006, correct?

O6QBGUO4                         Chen - Cross

```
 1   A.  Yes.

 2   Q.  You graduated with honors, correct?

 3   A.  Yes.

 4   Q.  And you worked in China for a year following graduation,

 5   right?

 6   A.  Yes.

 7   Q.  You worked as an internal audit analyst; is that right?

 8   A.  No, that's not correct.

 9   Q.  You tell me in what capacity you worked?

10   A.  I worked as assistant.

11   Q.  Assisted to what?

12   A.  To a department manager back then.

13   Q.  And was that at Huntsman Polyurethanes in Shanghai?

14   A.  Yes.

15   Q.  And you stayed there until July of 2007, correct?

16   A.  Yes.

17   Q.  What did you do for Huntsman?

18   A.  I was doing some assistant type of job.

19   Q.  Did it include accounting?

20   A.  No.

21   Q.  You came to the United States in 2007, right?

22   A.  Yes.

23   Q.  And you attended Louisiana State University; is that right?

24   A.  Yes.

25   Q.  You came here for graduate school, correct?
```

O6QBGUO4                           Chen - Cross

```
 1   A.  Yes.
 2   Q.  Were you a full scholarship student, Ms. Chen?
 3             MR. FINKEL:  Object to relevance.
 4             THE COURT:  You may answer.
 5   A.  Yes.
 6   Q.  You were part of the MBA program at LSU, correct?
 7   A.  Yes.
 8   Q.  You graduated with a masters in business administration,
 9   correct?
10   A.  Yes.
11   Q.  Your specialization while you attended school and got an
12   MBA was internal auditing, correct?
13   A.  That's correct.
14   Q.  Your husband has a Ph.D. in computer science, correct?
15   A.  Yes.
16   Q.  And he has a Ph.D. from a university in the United States,
17   correct?
18   A.  That's correct.
19   Q.  And you are presently employed, correct?
20   A.  Yes.
21   Q.  You work at a bank, correct?
22   A.  Yes.
23   Q.  And after LSU and before you started working at this bank,
24   you worked at Deloitte, correct?
25   A.  Yes.
```

O6QBGUO4                          Chen - Cross

1   Q.  What is Deloitte?

2   A.  It's one of the Big Four accounting firms.

3   Q.  And what did you do for them?

4   A.  I do consulting work.

5   Q.  Did you do risk assessment as a consultant?

6   A.  I do advisory on the processing improvement and risk

7   management related work.

8   Q.  Let's break that down.  Did you have experience in insuring

9   compliance at Deloitte?

10  A.  No.

11  Q.  Did you have expertise in assessing risk when you worked at

12  Deloitte?

13              MR. FINKEL:  Scope, relevance, cumulative.

14              THE COURT:  Overruled.  You can answer.

15  A.  Can you repeat that question.

16  Q.  While you worked at Deloitte and you were there until 2011,

17  correct?

18  A.  Yes.

19  Q.  Was part of your job duties assessing risk?

20  A.  It's helping the clients managing the risk.

21  Q.  And what is it that you mean when you say helping clients

22  manage risk?

23              Describe your job for the jury?

24  A.  So the clients that I work for, they may have different

25  risk out there, so my job is to helping them to identify what

1    those risk are and be able to prioritize in managing them.

2    Q.  And these are the risk of investment, correct?

3    A.  Of course not.

4    Q.  Well, you tell me what risk you're helping them evaluate?

5    A.  So the client that have was in oil and gas company.

6    Q.  I'm sorry.

7    A.  The client I have is in oil and gas industry, so there are

8    potential operational risk, and this is where I'm helping them

9    to evaluate.

10   Q.  You help them evaluate financial risk and --

11   A.  Operational risk.

12   Q.  Operational risk.  And after that you worked as a senior

13   auditor, correct?

14   A.  Yes.

15   Q.  And you worked as a senior auditor -- and can you just tell

16   the jury generally what a senior auditor does?

17   A.  The auditor will go to the business, asking for the

18   processes, how it works to pinpoint the potential risk; and

19   then from there identify the controls and then develop an audit

20   plan to audit the business processes.

21   Q.  And part of your job duties was to right out that process,

22   correct?

23   A.  Yes.

24   Q.  And then you testified you now work at a bank, right?

25   A.  Yes.

```
 1   Q.  And what is your job title at the bank?

 2   A.  I'm manager.

 3   Q.  Manager of what?

 4   A.  Of risk.

 5   Q.  Of compliance risk, correct?

 6   A.  Yes.

 7   Q.  So your exact title is you're the manager of compliant

 8   risk, right?

 9   A.  Yes.

10   Q.  How many people do you manage?

11   A.  I manage five people.

12   Q.  And part of your job includes conducting annual compliance

13   risk assessments, correct?

14   A.  Yes.

15   Q.  And there is a process to conducting annual compliance risk

16   assessment, isn't there?

17   A.  Yes.

18   Q.  And to do the work that you do, you have to pay attention

19   to detail, correct?

20              MR. FINKEL:  Objection, the Court has made a ruling on

21   this issue.

22              THE COURT:  Ms. Shroff, I want you to be mindful of my

23   ruling, please.

24              MS. SHROFF:  I'm simply asking what her processes is.

25   Q.  To do your assessment, regardless of where you do it, and
```

1   please don't tell me where, you have to assess operational

2   risk, correct?

3          MR. FINKEL:  It's an objection, and asked and

4   answered.

5          THE COURT:  Asked and answered.

6   Q.  And you have to idea responsible parties, correct?

7          MR. FINKEL:  Objection, Court's ruling.

8          THE COURT:  I'm going to allow this.  Go ahead.

9   A.  When you say identify responsible party, can you clarify

10  what are you asking me?

11  Q.  Which parties are undertaking the risk?

12  A.  That's not necessarily my job.  That's not my job.

13  Q.  Okay.  Is it your job to review related policies?

14  A.  No, that's not my job.

15  Q.  How about to set procedures in place?

16  A.  That's not my job.

17  Q.  How about to consider audits?

18  A.  That's not my job.

19  Q.  How about to evaluate reports?

20  A.  That's not my job.

21  Q.  How is it, would you tell the jury, that you ensure that

22  compliance controls are in place?

23          MR. FINKEL:  Objection, relevance, Court's ruling.

24          THE COURT:  I'll allow the answer.  Go ahead.

25  A.  The assessment we do is more top down risk assessment

1    coming from the enterprise level to identify what are the top

2    risk out there, so it does not involve the processes you just

3    spoke about.

4    Q.  Well, you tell me what processes are involved?

5    A.  I have explained.  It's a top down risk assessment.

6    Q.  And what is the risk that you're evaluating?

7          MR. FINKEL:  Objection, relevance.

8          THE COURT:  You may answer.

9    A.  Evaluating the risk of consumer compliance from the

10   consumer protection bureaus to protect the customers from

11   potentially being deceived into the bank practice.

12   Q.  Thank you.  Is it also part of your job to create a plan of

13   action?

14   A.  No.

15   Q.  And how about to make recommendations as to how compliance

16   can improve?

17   A.  No.

18   Q.  And for how long have you been doing this work, Ms. Chen?

19   A.  For about 14 or 15 years.

20   Q.  You testified on direct, correct, that you first heard of

21   Miles Guo in 2017, right?

22   A.  Yes.

23   Q.  And before you heard of Miles Guo, your husband, you

24   testified, was listening to the videos of Miles Guo; is that

25   right?

1    A.  Yes.

2    Q.  And when Miles Guo's videos were being watched by your

3    husband, did he tell you what about his videos interested your

4    husband?

5            MR. FINKEL:  Objection, hearsay.

6            MS. SHROFF:  I'm not offering it for the truth.

7            THE COURT:  You may answer.

8    A.  Talk about bringing American value of China.

9    Q.  I'm sorry.

10   A.  Talk about bringing American value to China.

11   Q.  In 2017, was Mr. Miles Guo talking about bringing American

12   values to China?

13   A.  That's what my husband told me.

14   Q.  Do you know if in 2017 Mr. Guo was talking about

15   disinformation coming from the CCP?

16           MR. FINKEL:  Objection.

17           THE COURT:  You may answer.

18   A.  I did not watch back then.  I don't know.

19   Q.  When you first started listening to Mr. Guo, do you recall

20   him talking about corruption in China?

21   A.  I did.

22   Q.  And did you hear about him talking about the lack of

23   freedom in China?

24   A.  I don't remember.

25   Q.  Do you remember if he talked about the lack of property

1    rights in China?

2    A.  I don't remember.

3    Q.  Do you remember if he talked about the lack of choice in

4    China?

5    A.  I don't remember.

6    Q.  Do you recall if his videos talked about how one could not

7    choose their own jobs in China?

8            MR. FINKEL:  Same objection.

9            THE COURT:  Overruled.  You may answer.

10   A.  I don't remember.

11   Q.  In what year, Ms. Chen, did you start listening to Miles

12   Guo's videos?

13   A.  End of 2018.

14   Q.  And I'm not going to go through the whole list with you,

15   but were any of those topics that I mentioned before topics

16   that you recall in 2018?

17   A.  It's been so long, I don't remember.

18   Q.  Do you ever recall Mr. Guo talking about the state of

19   affairs in Hong Kong?

20   A.  I think so.

21   Q.  And what do you recall him saying about Hong Kong?

22   A.  I don't remember.

23   Q.  Sitting here today, Ms. Chen, would you agree that speaking

24   against the CCP whether in 2017 or in 2024 is risky?

25   A.  You're asking my opinion?

1    Q.  Yes, ma'am.

2    A.  If it's risky?

3    Q.  Yes, ma'am.

4    A.  I don't know.

5    Q.  And when you were interacting on Discord -- you know what.

6    I'll withdraw that.

7            You decided at some point to join what is called the

8    whistleblower movement, correct?

9    A.  I join the farm in 2022.

10   Q.  And before you joined the farm in 2022, is it your

11   understanding that you did not join any movement at all?

12   A.  So I ask -- can you clarify that question in a simple way?

13   Q.  I'll try it this way.  What was your first step towards the

14   whistleblower movement?

15   A.  My first step towards the whistle -- I have nothing to do

16   with the whistleblower movement.

17   Q.  Did you have anything to do with the goals of the Rules Of

18   Law Foundation?

19   A.  I donated money.

20   Q.  I was asking you about the goals of the Rule of Law

21   Foundation, were you familiar with that?

22   A.  My understanding is helping the people that needs help.

23   Q.  And with that understanding, did you know if Rules of Law

24   Foundation helped bring people to the United States from China?

25   A.  That I don't know.

O6QBGUO4                          Chen - Cross

```
 1   Q.  Do you know if they helped people in the Ukraine war?
 2   A.  That is my understanding, so I donated money for that help.
 3   Q.  And how about providing Covid mask and other mask to
 4   people?
 5   A.  That part I'm not sure.
 6   Q.  Now, you donated money to Rule of Law Foundation, correct?
 7   A.  Yes.
 8   Q.  How much did you donate?
 9   A.  About $30,000.
10   Q.  And do you recall what year you donated in?
11   A.  So it's between 2020 and 2022.
12   Q.  Well, let's talk about that.  In 2020, how much did you
13   donate according to you?
14   A.  My husband donated a couple of hundred dollars.
15   Q.  400 to be precise, right?
16   A.  I said a couple of hundred.  I don't remember exactly how
17   much he donated.
18   Q.  How much did you donate in 2020?
19   A.  Back then it's a joint donation.
20   Q.  How about in 2021?
21   A.  I don't remember, maybe also a couple of hundred dollars.
22   Q.  And how about in 2022?
23   A.  About $30,000.
24   Q.  And you donated that in September of 2022, correct?
25   A.  That's correct.
```

1   Q.  And before you made that donation, you familiarized

2   yourself with who was on the board of the Rule of Law

3   Foundation, correct?

4   A.  No, I don't know who's on the board of the Rule of Law

5   Foundation.

6   Q.  So you did not check the Rule of Law Foundation website?

7   A.  I just open the website, and I don't know where to find the

8   board of directors and I don't think that matters to me at that

9   point.

10  Q.  It did not matter to you who was part of the foundation?

11  A.  You said the board of directors specifically, right?

12  Q.  Yes.

13  A.  At that time?

14  Q.  The board did not matter?

15  A.  When you say at that time, what time are you referring to?

16  Can you clarify?

17  Q.  When you made the $30,000 donation in September of 2022.

18  A.  I did not check who is the board of directors when I made

19  that investment back in September 2022.

20  Q.  Well, let's shift courses if we may, and let's talk about

21  the GTV investment that you testified here on direct testimony.

22  Okay.

23  A.  Okay.

24  Q.  Now, was it your husband who first decided to invest in GTV

25  or was it you?

1    A.  It's a joint decision.

2    Q.  And was it a joint decision from the very first moment?

3    A.  Yes.

4    Q.  And would it be fair to say that you heard of the private

5    placement for GTV in April of 2020?

6    A.  Yes.

7    Q.  And would it also be fair to say that you and your husband

8    were involved in the full process of the investment?

9    A.  Yes.

10   Q.  And you understood at the time that you were evaluating

11   investing in GTV that the private placement was scheduled to

12   close on June 2 of 2020, correct?

13   A.  So you say evaluate to investing, so meaning I was

14   assessing?  Can you clarify that question?

15   Q.  You tell me if you assessed.

16   A.  We trusted Miles Guo so we invested.

17   Q.  So you did not assess anything other than the trust you had

18   in Miles Guo, that's your testimony?

19   A.  We trusted Miles Guo said about what the GTV would look

20   like, and we read the documents and confirmed what Miles Guo

21   said would be its competitors and what they're going to use the

22   money for.

23   Q.  Finish your answer, please.  Sorry.

24   A.  I was not sure what you were asking, that's why I was

25   trying to make sure I understand what you're asking there.

1   Q.   Let me try again.  You first heard about GTV more than a

2   month before you invested, correct?

3   A.   Yes.

4   Q.   And you told Mr. Finkel that, right, that you had a whole

5   month to talk about it with your husband between the time you

6   heard about GTV and the time that you actually invested in GTV,

7   correct?

8   A.   I did not say that.  I think what happened is, there's a

9   process it takes to be approved for a GTV investor, so there is

10  certain criteria you have to meet to be able to get the payment

11  information because it was considered privileged.  Miles said

12  you have to meet certain requirement to be allowed for this

13  investment, and that requirement validation took about that

14  much time to be validated to be approved.

15  Q.   So it took a whole month from the start of the application

16  for you to be approved, correct?

17  A.   For us to obtain the bank account information.

18  Q.   So it took a month, right?

19  A.   That's long time ago.  If you say it's a month, about a

20  month.

21  Q.   Let's see if we can help you out.  Let me show you what is

22  3602-30 at page two, and just for Ms. Chen over there.  Please

23  just only for the witness.  Okay.

24            MR. FINKEL:  Is there a failure of recollection?

25            MS. SHROFF:  That's what she said.

1    Q.  Does that document refresh your recollection about a month

2    passing between -- you know what, I'll leave you to read the

3    document and then ask my question.

4    A.  Is this --

5    Q.  The only question, ma'am, is if this document refreshes

6    your recollection?

7              THE COURT:  As to the time period?

8              MS. SHROFF:  As to the timing, your Honor.

9              THE COURT:  Don't read from it, just say whether this

10   helps you remember.

11   A.  You mean about the month, is that what you ask me, about

12   the month?

13             As I explain, you have a process between you heard

14   about the ATO.  You are able to obtain a bank account, send the

15   money, so that's about a month.

16   Q.  And for that month you were waiting for information to come

17   to you, correct?

18   A.  Yes.

19   Q.  Nobody from GTV was blasting you and saying we've sent you

20   documents, get back to us, right?

21   A.  There is a deadline about the investment.

22   Q.  My question wasn't whether there was a deadline.  My

23   question was whether anybody from GTV contacted you and said

24   where is your application?

25   A.  You're asking me --

1   Q.  If you could please listen to my question.

2           Did anyone from GTV investments ask you where is your

3   application?  For the month that you were waiting, did GTV

4   reach out to you?

5           MR. FINKEL:  I object to the form.  What people from

6   GTV investments.  What does that mean?

7           THE COURT:  Overruled.  You may answer.

8   A.  I'm sorry.  I still don't quite understand.  You're asking

9   are there any people from GTV investment contact me about my

10  application or --

11  Q.  Yes.

12  A.  Yeah, there are people contact me about an application.

13  Q.  And which people were those?

14  A.  So the broadcasting said about reaching out --

15  Q.  No.  No.  Which people at GTV investment?

16          MR. FINKEL:  Ms. Shroff should not interrupt the

17  witness.

18          THE COURT:  Let her answer.

19  Q.  Did you understand my question, Ms. Chen?

20  A.  Sorry, I think for this question, are there any people from

21  GTV investment contacting me?

22  Q.  The company.

23  A.  Company contacting me?

24  Q.  Yes.

25  A.  So Miles Guo contacted us.

1   Q.  Miles Guo never contacted you, correct?

2   A.  Miles Guo contacted my husband.

3   Q.  You do not know if Miles Guo contacted your husband,

4   correct?  You were not part of that contact, right?

5   A.  My husband --

6   Q.  You only know --

7        THE COURT:  You have to allow her to answer.  You

8   cannot talk over her.  Allow her to answer.  Go ahead.

9   A.  My husband was chatting directly with Miles Guo on

10  Whatsapp, and I am next to him hearing Miles Guo voice mail

11  from the Whatsapp messaging.

12  Q.  Okay.  So then it's you were physically present when you

13  hear a voice mail from Mr. Guo, correct?

14  A.  Yes.

15  Q.  And regardless of his voice mail, you were still waiting

16  for 30 full days to get an account number where you could get

17  your money, correct?

18  A.  That's not correct.

19  Q.  Okay.  How long did you wait between the first time you

20  heard his voice and to the time that somebody actually sent you

21  a bank account number?  How long was the wait?

22  A.  So it's been a while I wanted to say that we did not first

23  get contacted with Miles Guo.  So when I say the full month, it

24  started sending application to Sara Wei first telling her that

25  we have an interest in investment and it's above 100,000.  And

1    we waited a while to hear back, and then Sara told us we pass

2    the qualification test, and then we were given Miles Guo

3    contact information, so that has been some time pass to your

4    question earlier on that one month.

5            So by the time we receive Miles Guo contact and he

6    send us the information to make the GTV investment, we made the

7    GTV investment in sending the money very quickly.  I think only

8    a couple of days as soon as we receive the wire instruction

9    information.

10   Q.  So let's break that down.  You contacted Sara Wei, correct?

11   A.  Because Miles Guo said in the video to contact Sara Wei to

12   get the information for completing GTV investment.

13   Q.  Miles Guo told you, we've heard that before.  I understand.

14           My question is, you contacted Sara Wei.  Did you

15   contact her or did your husband contact her?

16   A.  My husband contacted her.

17   Q.  And how long did your husband wait to hear back from Sara

18   Wei?

19   A.  It's been sometime.  I want to say it's been a couple of

20   weeks, maybe two or three weeks if I remember correctly, but

21   it's been sometime, maybe between his first contact and got

22   approval.

23   Q.  And for the couple of weeks that you were waiting, do you

24   recall your husband telling you that he had tried to reach

25   Mr. Guo himself?

1    A.  He doesn't have information to contact Miles Guo.

2    Q.  So your husband did not tell you that; is that right?

3    A.  He told me -- what do you mean he did not tell me that?

4    What's your question again?  Are you asking me -- can you

5    repeat your question again?

6    Q.  Sure.  By the time that you're waiting to hear back from

7    Sara Wei, right, does your husband tell you that he is

8    impatient and trying to reach Mr. Guo?

9    A.  He did not say that to me.

10   Q.  Now, when you were evaluating what GTV was, did you do any

11   research at all?

12          MR. FINKEL:  Object on the basis of the Court's

13   ruling.

14          THE COURT:  You may inquire as to whether she did any

15   research.  You can answer.

16   A.  When you say research, oh, I listen to his broadcasting

17   video, and then I heard his like blueprint about the GTV and

18   then that's it.

19   Q.  Was it important to you that Kyle Bass was on the board of

20   GTV?

21   A.  It had some influence.

22   Q.  And you knew who Kyle Bass was, right?

23   A.  I don't know that well in details, but I know he's a

24   investor.

25   Q.  You know him to be an investor?

O6QBGUO4                          Chen - Cross

1   A.  I know him being a successful institution investor private

2   equity.  He's successful in investments.

3   Q.  And you testified on direct that you started the GTV

4   investment process on May 11 of 2020, right?

5   A.  When you say I started a process, can you clarify what you

6   mean when you say --

7   Q.  Contacting Sara Wei, that was on May 11?

8   A.  I don't remember that date.

9   Q.  You don't remember that date?

10          MR. FINKEL:  Asked and answered.

11          THE COURT:  She has asked the question.

12          MS. SHROFF:  Sometimes I just can't understand so I

13   repeat the response.

14          THE COURT:  So speak into the microphone, please.

15   Q.  On May 12, 2020 is when you received the private placement

16   memorandum, right?

17   A.  I don't remember the date.

18   Q.  Did you receive the GTV first private placement memorandum

19   or was it your husband?

20   A.  Miles sent the link to that document and we open a link and

21   look at them together.

22   Q.  And along with the PPM, you were also sent a

23   confidentiality agreement, correct?

24   A.  We follow the instruction provided and send in whichever

25   document that's required for.

1    Q.  I'm asking you whether you recall receiving the

2    confidentiality agreement?

3    A.  I think so.

4    Q.  Do you recall receiving the subscription agreement?

5    A.  I think so.

6    Q.  And do you recall receiving the shareholders agreement?

7    A.  Maybe.  I don't remember exactly what it is.

8    Q.  Do you remember receiving the note along with those

9    documents that said old friends and perspective investors who

10   receive this agreement, please read it carefully?

11   A.  I don't remember that.

12   Q.  Do you recall being told that the private placement would

13   end at 11 a.m. New York time on May 26 of 2020?

14   A.  I don't remember the detail date.

15   Q.  Let me ask you something, when your husband was responding

16   or corresponding with Mr. Guo, you said you were right there,

17   correct?

18   A.  Yes.

19   Q.  So you recall your husband telling Mr. Guo that he would go

20   and carefully review the agreement and meticulously follow all

21   the requirements stated in it, do you recall your husband

22   saying that?

23            MR. FINKEL:  Objection, hearsay and the Court's

24   ruling.

25            THE COURT:  Overruled.  You may answer.

1   A.  I don't remember that.

2   Q.  Do you recall after that your husband confirming that he

3   had read the conditions for GTV private placement?

4   A.  I don't remember that.

5   Q.  You testified on direct about what it is to be an

6   accredited investor, correct?

7   A.  Yes.

8   Q.  And to be an accredited investor, you tell me what was your

9   understanding of that?

10  A.  A joint income of above $300,000 and in equity of more than

11  a million excepting the primary home.

12  Q.  And you had that, right?

13  A.  Yes.

14  Q.  Do you recall when you first transferred the money after

15  noting that you were an accredit investor?

16  A.  Yes, I'm accredited investor.

17  Q.  Do you recall sitting here today whether the investment was

18  made in your name, your husband's name or both your names?

19  A.  We sent a couple wires.  Some of them are in my name.  Some

20  of them are in his name, and some of them are in our joint

21  name.

22  Q.  And, Ms. Chen, just for a moment if I could ask you, you

23  testified on direct, right, that you -- well, let me ask you

24  this.  Before you invested in GTV, you had bought stock,

25  correct?

O6QBGUO4                          Chen - Cross

```
 1   A.  No, I have not.
 2   Q.  Your testimony is that -- not shares, stock?
 3           MR. FINKEL:  Asked and answered.
 4           THE COURT:  Sustained.
 5   Q.  Did you ever have an investment where you had lost money,
 6   do you recall that?
 7   A.  I don't remember that.
 8   Q.  Well, let me show you 3530 at page three.  See if reading
 9   that document refreshes your recollection.
10   A.  I don't remember, so.
11   Q.  So you do not remember investing in stock or losing money?
12           MR. FINKEL:  Asked and answered.  She doesn't
13   remember.
14           THE COURT:  Sustained.
15   Q.  You can take that down.  Was it your understanding that GTV
16   was an investment in a startup?
17   A.  My understanding of the GTV that Miles promoted is private
18   placement.
19   Q.  Private placement of what?
20   A.  You can buy a share before it goes to the public market.
21   Q.  But for what?
22   A.  For it to go --
23   Q.  For a startup, right?
24           MR. FINKEL:  Objection.  She didn't finish the answer.
25           THE COURT:  Sustained.
```

1    Q.  Go ahead, finish.

2    A.  For it to go up 10 times or 100 times, that's what Miles

3    Guo promoted and I believed back then.

4    Q.  He promoted a private placement and you believed; is that

5    what you said?

6    A.  He promoted a private placement that could go up to 10

7    times a hundred times that I believe in what he said.

8    Q.  You said that before.  My question is whether you knew what

9    he was talking about was it a startup?

10            MR. FINKEL:  Asked and answered.

11            THE COURT:  You already asked the question about the

12   startup.

13   Q.  Let me show you what Mr. Finkel there showed you on your

14   direct, the private placement itself.  Do you recognize GXVK-5?

15   A.  Yes.

16   Q.  And this is the private placement memorandum, correct?

17   A.  Yes.

18   Q.  And I just want to be sure.  I'm asking you did you read

19   it?

20   A.  Yes.

21   Q.  You read it page to page, correct?

22   A.  I read this document.

23   Q.  Entirely?

24            MR. FINKEL:  Asked and answered.

25            THE COURT:  Sustained.

O6QBGUO4                          Chen - Cross

1   Q.  Let's take a look at it.  Let's go to page nine.  And if we

2   could just have the full page shown to her first.  You see that

3   page?

4   A.  Yes.

5   Q.  And you see the bottom paragraph there?

6   A.  Yes.

7   Q.  It tells you, right, what the next page is going to be

8   about, right?

9   A.  Yes.

10  Q.  And what is your understanding of what they're talking

11  about in terms of the 200 million new shares?

12  A.  My understanding is it was holding by Saraca Media 100

13  percent. Now Miles Guo want us to be rich, so he's taking 10

14  percent and then giving his share to us to acquire at a dollar

15  per share.

16  Q.  Where do you read Miles Guo wants us to be rich in the

17  paragraph I've shown you?

18          MR. FINKEL:  Misstates the testimony.  The question

19  was, what was her understanding, not what it said.

20          THE COURT:  Sustained.

21  Q.  My question to you what does that paragraph state -- and I

22  would move to strike and I will start the question all over

23  again.

24          THE COURT:  Let's move on.

25  Q.  The offering that is on that piece of paper is for 200

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  million shares in exchange for $200 million, correct?

2  A.  So you're talking about the one you highlighted there you

3  ask me?

4  Q.  I'm happy to take the highlight off.

5  A.  You're asking me if I'm reading it as 200 million for 200

6  million shares?

7  Q.  That's my question.

8  A.  So my understanding is that talk about it issue the share

9  at a dollar for a total of 20 million new share and maximum can

10  be 200 million new share.

11  Q.  And it tells you, that document told you, right, that it

12  was Saraca that was looking to sell 200 million shares,

13  correct?

14  A.  My understanding back then was not Saraca selling it.  My

15  understanding back then is Miles told us he is finding this

16  opportunity for us for a dollar a share, not saying Saraca is

17  selling it to us.

18  Q.  I understand you've told us many times about your

19  understanding.  My question really relates to the document,

20  right, Ms. Chen?

21  A.  I understand you're asking me about this document, but what

22  I'm telling you is, I agree with you said.  I read this

23  document.  And when I read this document, I have an

24  understanding of what Miles said about it.  So when I read it,

25  I interpret it the way as Miles Guo said and broadcast it in a

O6QBGUO4                          Chen - Cross

1    video, that's why I'm explaining to you my understanding about

2    it based on the time when I read it, based on the time I got

3    influence from Miles Guo, from his broadcasting video.

4            THE COURT:  All right.  This is the end of the day, so

5    we're going to have to stop.  Members of the jury, don't

6    discuss the case amongst yourselves or with anyone else.  Don't

7    permit anyone else to discuss the case in your presence.  Don't

8    read, watch, listen to any source that touches upon the subject

9    matter on this case.  Have a good evening.

10           THE LAW CLERK:  Jury exiting.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You may step out.  Don't discuss your

3   testimony.

4           (Witness temporarily excused)

5           THE COURT:  Please be seated.  Is there anything that

6   either party would like to raise before we get started tomorrow

7   morning?

8           MS. SHROFF:  Your Honor, I just had one matter to

9   raise if I may.  Thank you.  Your Honor, given the Court's

10  admonition to the audience during the time the jury was here, I

11  respectfully request that the Court just reiterate it now

12  because there is no jury present.  And we would have no

13  objection just so that the future testimony is not interrupted

14  in any way, and hopefully things will go smoother.  And I don't

15  have to worry about prejudice to the jury, so I would rather it

16  happen now.

17          THE COURT:  Under our system of law, a defendant is

18  entitled to a public trial.  That means that anyone can come

19  and sit and listen.  However, you must observe courtroom

20  decorum.  That means not talking, not laughing, not making

21  faces, not making gestures, just sitting quietly and politely.

22  Anything further from either side?

23          MS. SHROFF:  No, your Honor.

24          MR. FINKEL:  Your Honor, just briefly.  There were two

25  of the Court's orders that I was referring to in my objection.

One was from the robing room the other day, the other -- and I
think the Court recognized this -- is about the sophistication
of the investor issue.  And specifically your Honor's ruling at
Docket 319 at page 17, quoting your Honor, "There is a fine
line between properly asking about an investor's
sophistication, and improperly implying to the jury that the
investor should have found out the truth about the alleged
misrepresentations." Granting the government's motion and
permitting the government "may object at the appropriate time
if the defendants' questions verges to the latter," meaning
implying that the victim should have realized that she was
being scammed.

          And so the objections for today were overruled.
That's fine.  Tomorrow if there's additional lines of
questioning on that, the government will object.  The
government reiterates that it would be appropriate in light of
the questioning towards Ms. Chen and other victims and other
witnesses, we ask the Court to consider instructing the jury as
to that, which is that an investor's sophistication is not at
issue.  Investors are not held to having to find out that they
were being defrauded.  And so we would ask the jury so that
they are not confused as this trial continues and we move into
the defendant's case that your Honor instruct them as to that
matter.

          THE COURT:  So you have my proposed jury charge which

O6QBGUO4                         Chen - Cross

 1   contains a very clear instruction on that issue.  Ms. Shroff

 2   has not crossed the line.  I feel confident that she will not.

 3            MR. FINKEL:  Thank you, your Honor.

 4            THE COURT:  Good evening.

 5            MR. FINKEL:  Can I ask a question.  How much time does

 6   Ms. Shroff have left on the cross?

 7            THE COURT:  Ms. Shroff?

 8            MS. SHROFF:  Honestly, I'm having difficulty with the

 9   witness, so it could easily be two, two and a half more hours.

10            THE COURT:  How much did you say?

11            MS. SHROFF:  Two hours.

12            THE COURT:  Oh my goodness.  That sounds excessive,

13   really.

14            MS. SHROFF:  She's very combative, your Honor.  So I

15   have to be careful.  She could implode at any moment.

16            THE COURT:  I don't have that sense.  She comes across

17   as an intelligent, thoughtful, calm person, so I have no fear

18   of implosion, so I would ask that you reach for efficiency.

19            MS. SHROFF:  I will try my very best, your Honor.

20            MR. FINKEL:  If it's two hours, two and a half

21   realistically, your Honor, we're not resting until Friday at

22   that point.  Tuesday, there is no Friday.

23            THE COURT:  We'll have to see. Good evening.

24            (Adjourned to June 27, 2024, at 9 a.m.)

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     PAUL HINTON

 4    Direct By Ms. Murray . . . . . . . . . . . .4355

 5    Cross By Mr. Kamaraju  . . . . . . . . . . .4399

 6    Redirect By Ms. Murray . . . . . . . . . . .4444

 7    Recross By Mr. Kamaraju  . . . . . . . . . .4458

 8     WEI CHEN

 9    Direct By Mr. Finkel . . . . . . . . . . . .4459

10    Cross By Ms. Shroff  . . . . . . . . . . . .4509

11                        GOVERNMENT EXHIBITS

12    Exhibit No.                              Received

13     VB13, VB14, VB24, VB26, VB27, VB29, . . . .4474

14            VB31, VB33

15     VB10-T, VB13-T, VB24-T, VB27-T  . . . . . .4474

16     Stip 21  . . . . . . . . . . . . . . . . .4473

17     VB35  . . . . . . . . . . . . . . . . . . .4483

18                        DEFENDANT EXHIBITS

19    Exhibit No.                              Received

20     DX-11124 through 11129, DX-11255, . . . . .4401

21            DX-11432 through 11436,

22            DX-10299 through DX-10301,

23            DX-13005 through DX-10329,

24            DX-10526, DX-10528 through

25            DX-10530, DX-10551 through
```

```
 1                    DX-10562, DX-10564 through

 2                    DX-10577, DX-11299 through

 3                    DX-11300, DX-11302, DX-11304

 4                    and DX-11305, DX-11485,

 5                    DX-11486 through, DX-11488,

 6                    DX-11489, DX-11491 through

 7                    DX-11492, DX-11548 through

 8                    DX-11549, DX-11552 through

 9                    DX-11553, DX-11562 through

10                    DX-11570, DX-10430 through

11                    DX-10457, DX-10960 through

12                    DX-10971, DX-11073 through

13                    DX-11078, DX-11110 through

14                    DX-11121, DX-11493 through

15                    DX-11506, DX-10007, DX-10531,

16                    DX-10606 through DX-10626,

17                    DX-10008 through DX-10010,

18                    DX-10330 through DX-10356,

19                    DX-10578 through DX-10605,

20                    DX-11256 through DX-11257,

21                    DX-11281, DX-11517 through

22                    DX-11526, DX-11572 through

23                    DX-11573, DX-11581, DX-11585,

24                    DX-10357 through DX-10359,

25                    DX-10627 through DX-10631,
```

DX-10972, DX-10013, DX-10017

through DX-10028, DX-10360

through DX-10373

7008  . . . . . . . . . . . . . . . . . .4519

7009  . . . . . . . . . . . . . . . . . .4520

7010  . . . . . . . . . . . . . . . . . .4516

7011  . . . . . . . . . . . . . . . . . .4519