O6RBGUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                v.                          23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                     Defendant.            Trial
 6   ------------------------------x
                                           New York, N.Y.
 7                                         June 27, 2024
                                           9:00 a.m.
 8
     Before:
 9

10                   HON. ANALISA TORRES,

11                                         District Judge
                                            -and a Jury-
12
                         APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN

22   ALSTON & BIRD LLP
          Attorneys for Defendant
23   BY:  E. SCOTT SCHIRICK

24

25
```

O6RBGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O6RBGUO1

1           (Trial resumed; jury not present)

2           THE COURT:  Note your appearances, please.

3           MR. FINKEL:  Ryan Finkel and Justin Horton for the

4    government.  We'll be joined by the rest of the team shortly.

5           MS. SHROFF:  Good morning, your Honor.  On behalf of

6    Mr. Guo, Sabrina Shroff and Scott Schirick.  Mr. Kamaraju will

7    be here shortly.

8           THE COURT:  Is there anything you'd like to bring up

9    before we start?

10          MR. FINKEL:  Your Honor, the government has a few

11   issues.  I think I'll start first with the victim who is on the

12   stand right now.  First, just at the outset, the direct of that

13   victim was approximately an hour and ten minutes.  I think the

14   cross is so far been about 50 minutes just in terms of what is

15   left for today.  But to get to the heart of the issue, last

16   night about 11:00 or so, the defense produced an exhibit to us

17   marked DX7016.  Can I provide a copy to the Court?

18          THE COURT:  Go ahead.

19          MR. FINKEL:  This appears to be the victim's résumé,

20   and a link to a profile that she has online.  There is a very

21   superficial redaction of that profile.  There are a number of

22   reasons I can think about why such an exhibit is improper.  The

23   first is relevance.  Maybe that's the simplest way to deal with

24   it.  I can't understand how a victim's résumé is in anyway

25   relevant to whether or not she was defrauded by Miles Guo.  To

O6RBGUO1

1    the extent they're trying to show that she was an auditor or

2    involved in risk management, those issues were covered, asked

3    and answered many times yesterday, so that's number one.

4            Number two, your Honor, is she is a victim, and I

5    think that this résumé, especially in context of what other

6    exhibits were introduced yesterday, and the line of questioning

7    against this victim, which from the government's perspective is

8    just designed to harass her, violates her rights under the

9    Crime Victims Rights Act.  And, your Honor, there are, of

10   course, confrontation clause issues that arise when a victim

11   takes the stand.  But citing *United States v. Bannister*, this

12   is 2023 WL 2596890.  It's a Judge Engelmayer opinion.  The

13   Crime Victim Rights Act requires district courts to implement

14   procedures to ensure that crime victims are accorded among

15   other rights the right to be reasonably protected from the

16   accused, and the right to be treated with fairness and with

17   respect for the victim's dignity and privacy.

18           Judge Engelmayer goes onto explain that "While the

19   confrontation clause of the Sixth Amendment guarantees

20   defendants the right to confront government witnesses

21   testifying against them, it is not absolute."  Citing a Supreme

22   Court case *California V. Green*.  A defendant's rights under the

23   confrontation clause must yield to accommodate other legitimate

24   interest, citing a Second Circuit case and a Supreme court

25   case.  For instance, trial courts have "wide latitude to impose

O6RBGUO1

1  reasonable limits on cross examination based on concerns about,

2  among other things, harassment, prejudice or witness's safety,

3  quoting a Second Circuit case, and quoting Federal Rule of

4  Evidence 611(b).  If the government, according to Judge

5  Engelmayer, provides a reason to "limit disclosure of

6  identifying information in open court, the defendant must

7  demonstrate a particularized need for such disclosure."

8          That case, your Honor, was in the context of a VOSR in

9  which Judge Engelmayer sealed from the public record a victim's

10  identity and replaced it with initials.  But Judge Engelmayer

11  in this opinion -- and I have a copy for your Honor if you like

12  it -- cites to criminal cases, including *U.S. v. Maxwell* and

13  other criminal cases where pseudonyms were used.  We're not

14  using a pseudonym here, but nonetheless the Crime Victim Rights

15  Act does protect victims from harassment and prejudice.  But

16  more to the point, your Honor, there is no proper purpose to

17  introduce this victim's résumé to make her a target of

18  harassment and attacks online or in other ways.  And so because

19  it's irrelevant, because it was asked and answered, and her

20  history was covered yesterday, and because of the Crimes

21  Victims Rights Act, this exhibit should be excluded.

22          THE COURT:  Ms. Shroff, what would the résumé

23  accomplish that you have not already accomplished by your

24  detailed questioning of her concerning her credentials and her

25  work history?

O6RBGUO1

1          MS. SHROFF:  Your Honor, we don't need to introduce

2     the résumé into evidence.  We provided it to the government

3     because the witness testified that she did not take an

4     accounting class, and she did not have accounting lessons while

5     she was a undergraduate student in China.  I was considering

6     crossing her with it and using it for impeachment purposes.  So

7     in an abundance of caution, we sent it to the government.

8     There would be no scenario under which I would disregard the

9     Court's ruling and introduce into evidence somebody's address,

10     so that's not where we're going.  Thank you.

11          THE COURT:  So essentially you expect to be asking

12     here, Isn't is true you took an accounting class in this year?

13          MS. SHROFF:  That was it.  I wasn't even sure I was

14     going to do it, but we decided to go ahead and send it any way.

15     The document is public.  We only found the document on the

16     internet.  It's still up.

17          THE COURT:  My question for you is, do you intend to

18     use it today to try to refresh her recollection?

19          MS. SHROFF:  No, to impeach her possibly, because she

20     said, she in fact said, I did not take an accounting class.

21          THE COURT:  Right.

22          MS. SHROFF:  That's the only reason I would ask.

23          THE COURT:  I'm trying to understand what your

24     question would be.  Is it, didn't you upload to the internet a

25     résumé stating that you had taken accounting.  Is that the

O6RBGUO1

1    question?

2            MS. SHROFF:  No, your Honor.  What I was going to say

3    is, yesterday you testified you did not take accounting

4    classes, correct?  Let me show you document marked as X.  Isn't

5    it a fact in your résumé you stated otherwise, and point her to

6    the thing and that would be that. It's just pure impeachment.

7    I'm not seeking to introduce the document.  I'm not really sure

8    I'm going to do it.  It was just a thought.

9            THE COURT:  Mr. Finkel.

10           MS. SHROFF:  Only because it's relevant under *Litvak*

11   it was a thought I had.  And again, nobody is seeking to

12   introduce any un-redacted documents or do anything untoward

13   here.  Obviously it's just -- I don't know exactly what

14   happened why we didn't send it to them redacted.  It's been a

15   long night.

16           THE COURT:  All righty.  If it is her plan,

17   Ms. Shroff's plan to state as she just said, Yesterday you said

18   you didn't take an accounting class.  Isn't it true that on

19   your résumé you stated that you did take an accounting class.

20   That's pure impeachment.  It's not for the purpose of actually

21   admitting the résumé.  I don't see what would be objectionable

22   about that.

23           MR. FINKEL:  Your Honor, I'll have to check the

24   transcript on that.  Candidly, your Honor, I disagree with what

25   Ms. Shroff is saying that this is all for proper purposes and

O6RBGUO1

1    not design for improper purposes.  The government's

2    perspective, your Honor, is that Ms. Shroff is crossing this

3    witness to embarrass her and harass her.  Yesterday she told

4    your Honor that she was putting those IDs into evidence because

5    they were going to be chats introduced.  There were no chats.

6    She just wanted to blow up who this person was online, and I

7    don't think that's appropriate.

8        THE COURT:  So she has to have the opportunity to

9    confront the witness.  It simply would be improper for me to

10   deny her the opportunity to try to impeach the witness, so I

11   will permit her to ask the question that I just posed in the

12   form that I posed.  It ends there.

13       MR. FINKEL:  I appreciate that, your Honor, and I

14   completely understand.  And the government's point of view, is,

15   yes, she's allowed to cross-examine about a witness's

16   credibility.  I agree.  The government agrees.  We would just

17   ask in light of what had happened yesterday -- and I'm sure

18   I'll object -- that Ms. Shroff not harass the witness.  That's

19   all.  And I think that our position on that is clear, and I

20   understand the Court's ruling.

21       THE COURT:  Well, vigorous cross-examination sometimes

22   involves making a witness feel uncomfortable, and that simply

23   is a reality of criminal litigation.

24       MR. FINKEL:  I understand.

25       THE COURT:  There is a border of course between

O6RBGUO1

1    vigorous confrontation and crossing over into harassment or

2    badgering.  I have not seen harassment or badgering of this

3    witness, and so I'm confident that Ms. Shroff will not go

4    there.

5          MS. SHROFF:  Thank you, your Honor.  I will be happy

6    to show the government when the moment comes the use of the Ivy

7    handle and the chats.

8          THE COURT:  What is the second issue?

9          MR. FINKEL:  The second issue, your Honor, and we

10   raise this because we had a number of back and forth with the

11   defense via email just trying to get a straightforward answer

12   to two straightforward questions that has not been provided.

13   The defense is going to call Maggie Sklar who is their

14   cryptocurrency expert.  We've asked them whether Ms. Sklar

15   intends to testify about her review of the blockchain or her

16   review of smart contracts.  It's frankly a yes or no question.

17   If the answer is yes, we're going to file a letter on this

18   issue because we believe it's beyond the scope of her

19   disclosure, and we'll brief that, but we don't want to waste

20   the Court's time and file a letter needlessly.  We ask that

21   question I think three times.  We've got circular responses.  I

22   would ask the defense to please inform the government whether

23   Mr. Sklar intends to testify about her review of the smart

24   contracts and the blockchain for HCN and HDO.

25         THE COURT:  Ms. Shroff or Mr. Schirick.

O6RBGUO1

1          MR. SCHIRICK:  Your Honor, we did indeed have a back

2     and forth with the government on this issue.  We referred the

3     government repeatedly to Ms. Sklar's expert disclosures, in

4     particular referred the government specifically to our April

5     29th disclosure, and even more specifically to Section 22 of

6     that disclosure which says in relevant part, and I'm quoting,

7     "Ms. Sklar will further opine that given HCN and HDO each were

8     minted using smart contracts which can be seen on the public

9     ethereum blockchain, and are purchased using fiat currency and

10    traded.  They meet the common market understanding of

11    cryptocurrency."  So the two questions Mr. Finkel posed are

12    answered by that particular disclosures and the other

13    disclosures that contextualize that statement.

14         THE COURT:  Make it easy for me.  What are the

15    answers?  He's asking you a very straightforward question.  I

16    want to hear your answer.

17         MR. SCHIRICK:  The question, your Honor, is will she

18    testify about having reviewed the smart contracts.  The answer

19    is, she may testify about that, yes, that's within her

20    disclosure; and that she reviewed the smart contracts on the

21    publicly available ethereum blockchain.

22         MR. FINKEL:  The answer is yes, and we would have

23    appreciated just getting that straightforward answer via email

24    instead of wasting the Court's time this morning.  We'll

25    respond with a letter so the Court can resolve the dispute.

O6RBGUO1

1    While we're on the topic of experts and defense case in

2    general, we requested last night the defense provide what the

3    government has provided which is a list of the exhibits they

4    intend to introduce via each witness.  We have not received

5    that.  They might have a witness today, Mr. Duran testify. We

6    don't know what exhibits if any -- excuse me, Mr. Dragon

7    testify.  We don't know what exhibits, if any, they're going to

8    introduce, and we ask the defense be held to the same standard

9    the government was held so that the trial is efficient during

10   the defense case, including that they provide any draft slides

11   of work product which would be 26.2 material since it's prior

12   statements of the witness, which we haven't received either.

13        We have no summaries.  We have no demonstratives.

14   Their 26.2 material talks about demonstrative exhibits.  We

15   haven't seen them.  We might have objections to them.  We might

16   not.  We might be able to talk to the defense and resolve these

17   issues without involving your Honor or the jury's time.  It

18   would be appropriate for them to provide this to the

19   government. We ask the Court to order them to do so.

20        MR. SCHIRICK:  Your Honor, to the extent that the

21   defense plans to introduce any documents that are not already

22   in evidence, we will provide that disclosure to the government.

23        THE COURT:  I'm sorry, Mr. Schirick, I did not

24   completely hear what you said.

25        MR. SCHIRICK:  I said to the extent we plan to

O6RBGUO1

1    introduce any documents through the expert testimony that are

2    not already in evidence, we will of course provide the

3    disclosure to the government.

4              THE COURT:  They're asking to know specifically what

5    you intend to introduce, not to hear that there's a body of

6    evidence that pertains to a particular witness.

7              MR. SCHIRICK:  Maybe I misunderstood, your Honor.  I

8    thought the question was whether we plan to introduce any new

9    documents.  I thought Mr. Finkel was referring to a

10   demonstrative that we may use with the experts, not documents

11   that are already in evidence, but perhaps I misunderstood.

12             THE COURT:  My understanding -- and if I'm wrong,

13   correct me, please, is that they want to know what exhibits

14   correlate to each witness that you're going to call.  Am I

15   correct?

16             MR. FINKEL:  Yes, your Honor.  And in particular, any

17   new exhibits they intend to introduce and the demonstratives.

18   The demonstratives it says 26.2 material in effect reviewed

19   demonstrative or demonstrative exhibits.  We don't have those.

20   If they're going to put it in front of the jury even the

21   demonstrative, they should give to the government.

22             MR. SCHIRICK:  Of course, your Honor.  We understood

23   that.  And that's what I understood Mr. Finkel's point to be

24   was demonstrative or new exhibits, and of course we will

25   provide that.  No decisions have been made with respect to the

O6RBGUO1

1   use of demonstratives that would require us to produce them at

2   this point.

3       MR. FINKEL:  Just so your Honor knows, one of their

4   experts may testify today.  We have not received the

5   demonstratives.  We don't know if they're introducing any

6   exhibits.  If the answer is no new exhibits will be introduced

7   through this witness, then just tell us, then we know and we

8   could be more efficient with your Honor's time and the jury's

9   time.  If the answer is maybe, then give us the universe.

10  We've done that.  We've said, here's a body of 30 or so

11  exhibits or more sometimes. It will be a subset of that.  They

12  haven't done that.  And frankly, your Honor, we're at a point

13  in this trial where efficiency should be the rule of the day,

14  not tactics and delay and circular answers.

15      MR. SCHIRICK:  Your Honor, if I just may briefly.

16  First of all, there are no new exhibits.  There's no

17  demonstrative that we plan to use with Mr. Dragon.  Obviously

18  we have continued to work with the experts who are going to be

19  among the first defense witnesses to testify.  And we didn't

20  want to preclude ourselves from potentially, as of yesterday,

21  being able to use something should we want to, so we hadn't

22  made any disclosures to the government.  I'm frankly just not

23  sure what the issue is.  Of course we know our obligations and

24  of course we will disclose them, and we have no intention of

25  using a new exhibit or a demonstrative with Mr. Dragon.

O6RBGUO1

1          THE COURT:  All right.  Now we know there's nothing new

2    and no demonstratives.

3          MR. FINKEL:  And that's helpful.  And, your Honor,

4    just moving forward since they have 11 witnesses or so, we

5    would appreciate the defense works the other way which is,

6    instead of saying, we don't know what we're going to introduce

7    so we're not going to tell you anything, tell us what the

8    government has done.  Which is, here is the subset of exhibits

9    that we might introduce.  And if it turns out they're not going

10   to, that's fine, that would make things more efficient.  That's

11   what the government has done.  We also would request -- and I

12   think they should provide us -- some information as to the

13   compensation for these experts.  That's the government's

14   request.

15         MR. SCHIRICK:  Your Honor, with respect to the

16   compensation disclosure, that's obviously a standard question

17   that the government is going to ask the witnesses on cross

18   examination, which the witnesses will answer candidly.  The

19   government only raised this issue with us I believe in the

20   minutes before we walked into court this morning asking for

21   some disclosure pre-testimony.  We're happy to entertain that,

22   but the parties haven't had a chance to discuss that yet and

23   Mr. Finkel is raising this now for the first time with the

24   Court.  So we're happy to discuss that with counsel and arrive

25   at a mutually agreeable way to go about that.

O6RBGUO1

1              MR. FINKEL:  We appreciate that.

2              THE COURT:  In a word, this trial for me has been

3    unprecedented, and I am hoping that as we move towards the

4    finish line that the attorneys will show a greater degree of

5    cooperation with each other.  All righty.  We'll start at 9:30.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6RBGUO1                          Chen- Cross

 1              THE COURT:  Counsel, I'd like to remind you that the

 2      interpreters would like you to slow down, especially if you're

 3      reading from a document.  Have the jurors come in, please.

 4              THE LAW CLERK:  Jury entering.

 5              (Jury present)

 6              THE COURT:  Please be seated.  Good morning, jurors.

 7      We're going to continue with the cross examination of the

 8      witness.

 9              Ma'am, remember that you're still under oath.  You may

10      inquire.

11              MS. SHROFF:  Thank you, your Honor.

12      WEI CHEN,

13      CROSS-EXAMINATION CONTINUED

14      BY MS. SHROFF:

15      Q.  Good morning, Ms. Chen.

16      A.  Good morning.

17      Q.  Ms. Chen, you testified on direct about GTV, correct?

18      A.  Yes.

19      Q.  And you testified that you heard Mr. Guo say that the GTV

20      business had a bright future ahead of it, correct?

21      A.  Yes.

22      Q.  And you heard -- and you testified that you watched a video

23      where he said that GTV was going to have a very powerful

24      platform, correct?

25      A.  Yes.

O6RBGUO1                          Chen- Cross

1    Q.  And you said on direct testimony that you heard Mr. Guo say

2    that he anticipated GTV would be successful, correct?

3    A.  Yes.

4    Q.  And that was going to be very powerful, correct?

5    A.  That is going to be very valuable.

6    Q.  I'm sorry.

7    A.  That it is going to be very valuable.

8    Q.  That it was going to be very valuable.  Thank you.  And you

9    also understood Mr. Guo to say that he would be working towards

10   acquiring software for the platform, correct?

11   A.  Yes.

12   Q.  And that he would do all he could to make it a strong

13   software platform, correct?

14   A.  Can you repeat that question again.

15   Q.  Sure.  And you testified that you heard him say that he

16   would make it a good platform with good software, correct?

17   A.  Make a good platform with a good software?

18   Q.  Right.  He would have people working on the software behind

19   the platform, correct?

20   A.  He would have the technology infrastructure to build the

21   platform.

22   Q.  Right.  So you heard him say he would get the technology

23   infrastructure to build the platform, right?

24   A.  That's my understanding.

25   Q.  Okay.  And when you say that is your understanding, what

O6RBGUO1                         Chen- Cross

1   exactly is it that you mean?

2   A.  That means I heard him saying that, and I take away that's

3   a messaging conveyed to me.

4   Q.  And that was your understanding back then, correct?

5   A.  Back in the time when I heard it and decide to make the

6   investment.

7   Q.  And sitting here today, do you by any chance know if there

8   was any undertaking of a technological infrastructure?

9   A.  Can you repeat the question again.

10  Q.  Sure.  Do you know sitting here today whether Mr. Guo or

11  anyone at GTV took such steps, do you know?

12  A.  Such steps, what do you mean by that?

13  Q.  Do you know if anyone at GTV was working towards making it

14  a good platform?

15  A.  I'm not sure.

16  Q.  Now, you also testified that you were influenced by

17  Mr. Guo's claims of wealth, correct?

18  A.  I testified that I was influenced by him portraying as a

19  very wealthy person.

20  Q.  Let me ask you a follow-up question.  When you say

21  portraying as, what did you say very --

22  A.  Wealthy person.

23  Q.  Wealthy person, right?

24  A.  Yes.

25  Q.  And did you know if in fact at that time he was wealthy?

O6RBGUO1                          Chen- Cross

1   A.   From what he said at the video, I thought he was very

2   wealthy.

3   Q.   My question was whether you independently knew him to be

4   wealthy?

5           MR. FINKEL:  Asked and answered.

6           THE COURT:  Sustained.

7   Q.   Did you do any research into his wealth?

8           MR. FINKEL:  Your Honor, this is with respect to the

9   Court's ruling discussed after court yesterday.  Objection.

10          THE COURT:  Sustained.

11  Q.   What day did the PPM close?

12  A.   PPM?

13  Q.   The private placement, when did it close?

14  A.   I made the investment till I believe June 2nd, 2020.  And I

15  if I remember clearly or correctly, there might be a day off

16  from whichever June 2nd is.  Don't quote me on exact June 2nd,

17  but around that time.  That was my recollection.

18  Q.   Your recollection is it was June 2nd not June 26?

19  A.   It would not be that far, beginning of June.

20  Q.   Let me show you what is marked as Defense Exhibit 7015, and

21  if I could just make sure it's just shown to the government,

22  the Court and the witness.

23          Do you recognize that, Ms. Chen?

24  A.   Yes.

25  Q.   What is it?

O6RBGUO1                          Chen- Cross

1    A.  It is a video with Miles Guo claiming bankruptcy.

2              MS. SHROFF:  Your Honor, we move DX7015 into evidence.

3              MR. FINKEL:  One moment, please.  Objection, it's the

4    defendant's statements.

5              MS. SHROFF:  I'm going to show it for the effect on

6    her state of mind.  I don't know care if it's true.

7              MR. FINKEL:  This is February 2022.

8              THE COURT:  If you'll step up.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6RBGUO1                        Chen- Cross

1                (At the sidebar)

2                THE COURT:  To show the effect on her state of mind?

3                MS. SHROFF:  He declares bankruptcy.  He does so

4    publicly.  She testified that she's influenced in her

5    investments based on his wealth.  After he declares personal

6    bankruptcy, she continues to invest.  That's it.  State of

7    mind, her knowledge that he openly says he's filing personal

8    bankruptcy.

9                MR. FINKEL:  You can't ask those questions without

10   introducing the video of the defendant's statement.

11               MS. SHROFF:  Of course I can, but that doesn't mean

12   that I should or I'm required to. My client is entitled to a

13   robust defense, and this is admissible for the purpose of which

14   I stated.

15               MR. FINKEL:  Robust defense does not overtake the

16   Federal Rules of Evidence, and the defendant's statements are

17   not admissible by the defendant and that's the purpose.  To the

18   extent there's a dual purpose, which is to say the effect on

19   the listener, the victim, and also the statements of the

20   defense, the defendant, then the Court has discretion to decide

21   how to proceed.  The government's point of view is that the

22   Court should not permit playing a video of the defendant's

23   statements and allow Ms. Shroff to ask the question about what

24   effect, if any, Mr. Guo's declaration of bankruptcy had on her

25   analysis.

1              I would also add that the fact that the defendant

2    declared bankruptcy seems to be suggesting that essentially the

3    victim should have known better, that she should have known

4    that Mr. Guo wasn't really rich.  And that from the

5    government's point of view is that it infringes on your Honor's

6    ruling about the sophistication of victims.

7              MS. SHROFF:  Your Honor, other than the fact it is

8    admissible, I'm not seeking to go as far as the government is

9    attributing to me.  The video is admissible to show how she

10   went through her process.  They went through her process.  They

11   are the ones who focus repeatedly on his wealth, his wealth,

12   his wealth.  I should have some leeway to cross.  And the

13   Federal Rules of Evidence in fact does allow for the admittance

14   of the video, and of course you can give a limiting

15   instruction. I have no objection.

16             MR. FINKEL:  It doesn't allow for the admission of the

17   defendant's statement.  That's the government's point of view.

18             THE COURT:  That's my understanding of the law.  I'm

19   not going to permit it.  Of course you can question on that

20   issue.

21             (Continued on next page)

22

23

24

25

| | |
|---|---|
| 1 | (In open court; jury present) |
| 2 | BY MS. SHROFF: |
| 3 | Q.  Ms. Chen on February 15 of 2022, you watched a video, |
| 4 | correct? |
| 5 | A.  I knew he filed bankruptcy on February 15, 2022. |
| 6 | Q.  My question to you was whether or not you watched a video |
| 7 | on February 15, 2022 where Mr. Miles Guo discussed the fact |
| 8 | that he was filing for bankruptcy? |
| 9 | A.  I don't remember if I watch that video specifically you |
| 10 | talk about. |
| 11 | Q.  So you remember some of the videos where he spoke, you just |
| 12 | don't remember all of the videos where he spoke? |
| 13 | A.  It's been such a long time. |
| 14 | Q.  2022 is after 2017, correct? |
| 15 | A.  Yes. |
| 16 | Q.  After 2018 and '19, correct? |
| 17 | A.  Yes. |
| 18 | Q.  And your testimony is you don't remember this particular |
| 19 | video, correct? |
| 20 | MR. FINKEL:  Asked and answered. |
| 21 | THE COURT:  Sustained. |
| 22 | Q.  Do you recall Mr. Guo's statements that he was declaring |
| 23 | and signing the bankruptcy petition on that very day? |
| 24 | MR. FINKEL:  Asked and answered. |
| 25 | THE COURT:  You may answer. |

1   A.  Sorry.  Can you repeat that question again.

2   Q.  Sure.  Do you recall Mr. Guo saying on the video that he

3   was signing the petition on that day February 15 of 2022?

4   A.  So I think I said I did not remember if I watched that

5   video specifically that you are referring to, and also I stated

6   that I knew that Miles Guo filed bankruptcy on February 15,

7   2022.

8   Q.  Did you read the bankruptcy petition that he signed?

9   A.  I do not think so.

10  Q.  I'm sorry.

11  A.  I don't think so.

12  Q.  Do you know if your husband watched that video?

13  A.  I don't know.

14  Q.  Now let me move to GXVK-5.  May I have it brought up for

15  everyone since it's in evidence.

16          You recall testifying about this document, Ms. Chen?

17  A.  Yes.

18  Q.  And you reviewed this document with Mr. Finkel when you met

19  with him at the United States Attorney's office, correct?

20  A.  He showed me this document.

21  Q.  Right.  And after he showed you the document, did you two

22  go through it?

23  A.  I did not go through after he show me.  I just look at the

24  document when he showed me.

25  Q.  So you only looked at the first page of the document and

1    that was it?

2    A.  He also went through other pages.

3    Q.  Okay.  So he reviewed the document with you, correct?

4    A.  That's not correct.  My understanding of review is review

5    the document entirely.  If I understand when you say review,

6    that's the meaning, so I say that's not correct because I did

7    not review this document with him.

8    Q.  So is it fair to say you did not review the entire document

9    with him?

10   A.  He showed me the document.  When you say review, can you

11   clarify what does review include?

12   Q.  You tell me what you think review means?

13             MR. FINKEL:  I think that was answered already.

14   Objection.

15             THE COURT:  Did you read the document word for word?

16             THE WITNESS:  So her question ask me did Mr. Finkel

17   review this document with me.  So my answer to that is, no, he

18   did not review this document word by word to me.

19             THE COURT:  Go ahead.

20   Q.  How about pages by pages?

21   A.  The answer is no.

22   Q.  How about some pages?

23   A.  Certain pages, yes.

24   Q.  Did you choose the pages or did he choose the pages?

25   A.  He showed me, did you see this page, just ask.  As to the

O6RBGUO1                        Chen- Cross

1   testimony yesterday he show me a page and ask me about it and

2   that's it.

3   Q.  And yesterday when he was showing you the pages in the

4   courtroom, he had shown you those pages before, right?

5   A.  Not all of them.

6   Q.  So you remember what pages you reviewed with him because

7   you're now able to tell me not all of them, right?

8   A.  I don't remember the pages he showed me, but he showed me

9   the page and ask me the information.  I think some of the

10  information is not what he reviewed -- not what he showed me

11  last time when I met with him.

12  Q.  You met with him more than once?

13  A.  I met him more than once, yes.

14  Q.  And did he show you this document more than once?

15  A.  No.

16  Q.  Well, let's see what we can talk about from your testimony

17  yesterday.  Yesterday you testified that you did not consider

18  the risk factors in the PPM, correct?

19          MR. FINKEL:  Misstates the testimony.

20          THE COURT:  Sustained.

21  Q.  Let's pull it up.  You remember talking about the standard

22  language in this document?

23          You remember the judge asking you what you meant by

24  the phrase "standard language?"  Do you understand that?

25          THE COURT:  You may answer.

1    A.  Your question is do I understand that I testify, that is

2    that your question?

3    Q.  Yes.  That is my question in fact.

4    A.  Yeah, I remember I testify that.

5    Q.  And you remember the Court asking you what you meant when

6    you said that those were standard language, correct?

7    A.  Yes.

8    Q.  And your response said, like in a legal document, it often

9    time would have the language talk about risk.  Remember that?

10    A.  Yes.

11    Q.  And when you said that, had you an understanding of

12    standard language in PPMs in other situations?

13            MR. FINKEL:  Objection.

14            THE COURT:  Overruled.  You may answer.

15    A.  No.

16    Q.  And had you ever compare PPM language?

17    A.  No.

18    Q.  So when you said that this was standard language in this

19    document, you had no basis of comparison, correct?

20            MR. FINKEL:  Objection, goes to the Court's ruling.

21            THE COURT:  Overruled.  You may answer.

22    A.  That just a way of my expressing how I think those are just

23    certain terms put in the legal document, and I use standard

24    language to explaining my understanding of terms in a legal

25    document.

O6RBGUO1                        Chen- Cross

1    Q.  Right.  But you're testifying under oath today, right?

2    A.  I testify under oath by saying the truth.

3    Q.  Right.  And the truth is that you did not ever compare the

4    language in PPMs with each other, correct?

5    A.  This is the only PPM I have ever seen.  I have never had an

6    opportunity to see a PPM because Miles Guo said this is right

7    opportunity.  I have no opportunity to even see a PPM document.

8    Q.  Well, you have access to Google, right?

9    A.  Everyone have access to Google.

10   Q.  I'm sorry.

11   A.  Yes.

12   Q.  Let me move on and show you page 29 of the PPM.  Okay.

13   Actually, I'm sorry.  Page 29 is the last page of the PPM,

14   right.  The entire document is 29 pages long, right?

15   A.  I don't remember.  If you say it's 29, it's 29.

16   Q.  It's right there for you to look at.

17   A.  I don't know.  Does that matter if it's 29 pages?  If you

18   say it's 29, it's 29.

19   Q.  Okay.  Let's try and go to page nine.  You see that

20   document?

21   A.  Yes.

22   Q.  And we talked yesterday about the last paragraph, so I

23   won't go back there, okay.  But this, just to give you a

24   perspective -- and let's go to page ten -- you recall being

25   shown this document on your direct testimony?

O6RBGUO1                          Chen- Cross

1   A.  Yes.

2   Q.  And was this one of the pages that Mr. Finkel and you

3   reviewed in his office?

4   A.  He showed me this page in his office.

5   Q.  And then he asked you questions about this page, right?

6   A.  Yes, he did.

7   Q.  And he asked you about the two figures split side-by-side,

8   right?

9   A.  No, he did not.

10  Q.  Well, I'm going to ask you some questions about that.  Is

11  it fair to say, Ms. Chen, that the figure on the left side

12  shows the ownerships structure before the PPM, and the figure

13  on the right side shows the ownership structure after PPM,

14  correct?

15  A.  From what you showing here and you highlight it, yes.

16  Q.  I don't have to highlight it for you if you prefer I not.

17          THE COURT:  Don't testify.  Just ask questions.

18          MS. SHROFF:  I wanted to make sure I did what the

19  witness wanted, your Honor.

20  Q.  And on both sides of the screen, Ms. Chen, it shows Saraca

21  has an ownership interest in GTV, correct?

22  A.  Yes.

23  Q.  And on direct Mr. Finkel also asked you -- and we can take

24  that down and move down on the same page -- about this chart,

25  correct?

O6RBGUO1                        Chen- Cross

1   A.  Yes.

2   Q.  And he specifically asked you a question about this five

3   percent, right?

4   A.  Yes.

5   Q.  And he focused you on the word "other," correct?

6   A.  He ask me what my understanding about the other.

7   Q.  And you said that your understanding was that it was some

8   overhead administrative cost, correct?

9   A.  Yes, I understand it's the HR administrative hiring cost

10  with the people talents.

11  Q.  And that was just your understanding, right?

12  A.  Yes, because you need talents, the people.

13  Q.  Because of what?

14  A.  You need the talent, talented people.

15  Q.  You need talented people?

16  A.  To develop GTV business, that's my understanding of what's

17  this other is for, to hiring talented people to grow and

18  develop GTV business.

19  Q.  Okay.  But you would have talented people if you acquired

20  companies that had talented people working for them, correct?

21  Like as it says on number one, acquisition of companies to

22  strengthen and grow GTV.  If you acquired a company that had a

23  lot of talent, that talent would also come in under the

24  approximate 70 percent, correct?

25          MR. FINKEL:  Objection, form, and calls for

O6RBGUO1                          Chen- Cross

1    speculation.

2              THE COURT:  Sustained.

3    Q.  Is that your understanding?

4              THE COURT:  Sustained.  I sustained the objection. You

5    don't need to answer.

6    Q.  What is your understanding of acquisition of companies to

7    strengthen and grow GTV?

8    A.  My understanding is acquire certain software or technology

9    may have already develop to some extent that you can grow upon

10   it with talents you're hiring for GTV to make it more

11   successful.

12   Q.  And what does acquisition of companies mean to you?

13   A.  Acquisition of companies that already develop somewhat

14   model of software or technologies that are in place.

15   Q.  To develop that technology you need people, right?

16   A.  You would need more than just the people you acquired from

17   that company.  If you make a big business successful for GTV to

18   have not just the media platform, but also doing the

19   transaction, you cannot just acquire companies without having

20   your own people managing the business make it successful.

21   That's common business sense.

22   Q.  Thank you, Ms. Chen.

23              Now, if we could go to page 15, please.  Do you see

24   that?

25   A.  Yes.

O6RBGUO1                        Chen- Cross

1   Q.  And you were asked questions about this page as well,

2   correct?

3   A.  Yes.

4   Q.  You were asked who Mr. Blanton was and Aaron Mitchell was,

5   correct?

6   A.  I don't think, so but maybe.  I don't remember.

7   Q.  And then you see at the bottom it says sponsor and advisor

8   of GTV Media, correct?

9   A.  Yes.

10  Q.  Could you read the first two lines for me?

11  A.  You talk about the 6.3 sponsor and adviser?

12  Q.  Mm hm.

13  A.  I think I read it, yes.  Do you want me to read it again?

14  Q.  Yes, please.  I would really appreciate that.  Thank you.

15  A.  "The sponsor and adviser of GTV Media, Mr. Wengui Guo, AKA

16  Miles Guo, Ho Wan Kwok or Miles Kwok is a billionaire, a

17  successful businessman and a dissident in China."

18  Q.  Keep reading.

19  A.  "He knows deeply how the Chinese Communist Party CCP

20  deprives the people of China of human rights, justice, freedom

21  of speech, freedom of press and freedom of religion.  He's

22  dedicated to overthrow the CCP regime to bring back truth,

23  freedom and justice to the people of China.  Miles Guo is the

24  key host of the GTV media."

25  Q.  This section, it's fair to say describes the billionaire as

1  the sponsor and the key host, correct?

2  A.  That's the word by word in this paragraph.

3  Q.  Thank you, Ms. Chen.  You can take that down.

4          Now, when you read this document, did you recall the

5  role that Mr. Bannon was going to play in this venture?

6          Did you focus on Mr. Bannon at all?

7  A.  I know he was listed as the non-executive director and then

8  that's it.

9  Q.  Did Mr. Bannon's presence as a woman come as a negative for

10  you to invest in GTV?

11          MR. FINKEL:  Object to the form.

12          THE COURT:  Rephrase that, please.

13  Q.  As a woman were you offended that Steven Bannon was going

14  to be part of this project?

15          MR. FINKEL:  Same objection.

16          THE COURT:  You may answer.

17  A.  I don't understand this question.

18  Q.  I'll move on.  Now, let's go to page 15 of the same

19  document and moving down to 18 to 19.  You were asked questions

20  yesterday about the risk factors here, correct?

21  A.  Yes.

22  Q.  And the document list the risk factors, correct?

23  A.  Yes.

24  Q.  The document says that the company has no operating

25  history, correct?

1    A.  I did not see it.  Where do you see that?  You ask me when

2    I'm reading this document now or asking me about the time when

3    I was reading this document when I made the investment?

4    Q.  Well, I was asking you about this document when you read it

5    before you made the investment.

6    A.  Your question is asking me did I read the risk factor

7    saying it has no operating history?

8    Q.  Yes, ma'am.

9    A.  I don't remember I read that part when I made the

10   investment back then.

11   Q.  How about did you read that the company's management has

12   broad discretion in how the company uses the net proceeds of

13   the sale of common stock?

14   A.  Yes, I remember that a hundred percent exactly.

15   Q.  And could you tell the jury what your understanding is of

16   net proceeds?

17   A.  My understanding of net proceeds?

18   Q.  Yes, ma'am.

19   A.  My understanding of net proceeds is you will have sales

20   proceeds or profits that minus the operating cost and then that

21   equals the net proceed.

22   Q.  And if you included the operating cost, would that be gross

23   proceeds?

24   A.  If you're including -- I don't know.

25   Q.  Well, let's go to page 25.  And on page 25, what does it

1    say in bold, The company does not intend.  Could you read that?

2    A.  You are not entitled to receive --

3    Q.  No.  No.  Just the title.

4    A.  The company does not intend to pay dividends for the

5    foreseeable future.

6    Q.  And let's go below that where it says, Saraca owns a

7    controlling interest.  Read that part at the bottom.

8    A.  Saraca owns a controlling interest in the company and can

9    exercise significant control over the company.

10   Q.  And that's on page 25 of 29, correct?

11   A.  It shows on 25 here.

12   Q.  And we can take that down.  Now, Ms. Chen, you also

13   testified about receiving stock certificates reflecting your

14   GTV shares, correct?

15   A.  I testified that I was able to log in to website to

16   purchase two papers.

17   Q.  And you purchase them yourself or did your husband purchase

18   them?

19   A.  We log into account together and I watch him pay for it.

20   Q.  I see.  And you talked about that process with Mr. Finkel

21   when you prepared for your testimony here, right?  You talked

22   to him about that process, right?

23   A.  When you say I talk about the process, meaning I talk about

24   the process of going to the website and downloading the paper;

25   is that what you're asking?

O6RBGUO1                        Chen- Cross

1   Q.  Yes.

2   A.  I think so.

3   Q.  But it was really your husband who went to the website?

4   You were watching, right?

5           MR. FINKEL:  Asked and answered.

6           THE COURT:  Sustained.

7   Q.  Did Mr. Finkel ask you for a copy of the certificate?

8   A.  No.

9   Q.  Well, let's show you DX60672.  Do you recognize that's

10  document, Ms. Chen?

11  A.  Yes.

12          MS. SHROFF:  Your Honor, the defense would move to

13  admit 60672.

14          MR. FINKEL:  Are there any other pages in this

15  exhibit?

16          THE COURT:  Are there any additional pages?

17          MS. SHROFF:  We're showing them to the government now.

18          MR. FINKEL:  May I inquire one question.

19          THE COURT:  Yes.

20          MR. FINKEL:  Ms. Chen, did you send this document to

21  the FBI?

22          THE WITNESS:  I don't remember.

23          MR. FINKEL:  No objection.

24          THE COURT:  It is admitted.

25          (Defendant's Exhibit 60672 received in evidence)

O6RBGUO1                          Chen- Cross

 1   BY MS. SHROFF:

 2   Q.  And if we could just publish that to the jury.

 3        Ms. Chen, you sent a lot of documents to the FBI,

 4   right?

 5   A.  Can you define what is a lot of documents?

 6   Q.  You sent a lot of documents?

 7        MR. FINKEL:  Asked and answered.

 8        THE COURT:  She asked if you would define what you

 9   meant by a lot.

10   Q.  I didn't hear that at all so I apologize.

11        Did you send more than 50 documents?

12   A.  I don't think so.

13   Q.  How about 30?

14   A.  I don't remember if it's -- I don't count.  I sent some

15   documents, yeah.

16   Q.  We can take that down.  I'm sorry.  I just want to make

17   sure the jury saw all pages.

18        Now, yesterday you also testified, did you not, about

19   the Rule of Law Foundation, correct?

20   A.  Yes.

21   Q.  You testified that you donated $30,735, correct?

22   A.  I don't know if I testified that exact number.  I just say

23   I donated about $30,000.

24   Q.  You recall sitting here today that was three days in a row

25   September 28, 29 and 30th?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6RBGUO1                          Chen- Cross

1    A.  So can you repeat?  What do you mean the three days.  Can

2    you clarify your question.

3    Q.  Sure.  You first donated 400, that was your husband who did

4    the first donation, correct?

5    A.  I want to make it clear, when you say my husband did it, we

6    jointly did it, but then he's the one who processed it so that

7    has his name.  So I want to make it very clear is we jointly

8    did it.

9    Q.  Okay.

10   A.  So you can make it clear in the future not just always say

11   your husband did it.

12   Q.  Your husband did it.  You jointly decided; is that

13   accurate?

14   A.  My husband is the one log in the web.  And again, I was

15   there with him, so we did it together, if you can make that

16   clear.  You cannot always say my husband did it.

17   Q.  But your husband did in fact did it?  He logged in and he

18   paid for it?

19         THE COURT:  Ms. Shroff, when you use the word "did,"

20   you need to define for the witness what you meant.

21   Q.  Your husband logged into the website, correct?

22   A.  Yes.

23   Q.  He used his password, correct?

24   A.  I don't know if you need a password to do a donation.  You

25   mean log in the computer or log into the website?

1  Q.  I mean log into the computer.  He logged in, right?

2  A.  Yes.

3  Q.  And he went through the steps of doing the donation,

4  correct?

5  A.  He go to the website and he went to website and he's the

6  person process it, yes.

7  Q.  Thank you.  And the processing was on September 28, 29 and

8  30th, three days in a row, correct?

9  A.  I think you're mixing up the time.  You're talking about

10  donation $400 dollars back in 2020, and you also talk about

11  2022.  You're making it very confusing to me.  I don't know

12  what you're asking.

13  Q.  Well, first of all, I'm just going to ask you to slow down

14  because the interpreter is going to have a lot of trouble, and

15  let's see if we can start again.

16          There was a $400 donation in the first instance,

17  correct?

18  A.  Yes.

19  Q.  What year was that?

20  A.  I think it's in 2020.

21  Q.  And what year was the $30,000 donation?

22  A.  2022.

23  Q.  Okay.  And the 2022 donation was for $30,000, correct?

24  A.  Yes.

25  Q.  And that was three days in a row, 10, 10, 10, September 28,

O6RBGUO1                        Chen- Cross

1    September 29 and September 30, correct?

2    A.  I don't remember exactly.

3    Q.  And you thought -- and you told the government that you

4    would not have made that investment as you call it if you

5    didn't think that you could get your money back from the Rule

6    of Law Foundation, do you remember that?

7            MR. FINKEL:  I have a form objection.  It's confusing.

8            THE COURT:  You may answer.

9    A.  Sorry.  I didn't understand your question.  How would my

10   investment have anything to do with a donation.  I didn't quite

11   understand your question.

12   Q.  Do you recall telling the government that you would never

13   have donated this money if you didn't think the Rule of Law

14   Foundation wouldn't give you the money back?

15   A.  I never say that.  I don't think so.

16   Q.  Let's show you 3526 at page two.  Do you see it on your

17   screen, ma'am?

18   A.  I saw it on my screen.

19   Q.  Does that refresh your recollection that you used a credit

20   card to invest $30,735 in Rule of Law.  You thought it was an

21   investment, and you would not have made that investment if you

22   did not think you would get the money back?

23   A.  I don't recall saying that at all.  I think it's maybe

24   taken down differently.

25   Q.  Thank you.  Let's talk about G/Club.  Okay.  You testified

1   about G/Club yesterday, and you testified that it launched in

2   October of 2020; is that right?

3   A.  Yes.

4   Q.  And you bought -- you tell me whether it was you who bought

5   it or your husband who bought it, the G/Club membership in

6   October of 2020?

7   A.  Let me make it clear, we never bought G/Club membership.

8   Q.  Ma'am, what year did you sign on for a G/Club membership

9   account?

10  A.  So I think your question ask me is in March 2021 who bought

11  the G/Club membership.  So what I'm responding to you is, your

12  statement is not correct.  We never bought any G/Club

13  membership.

14  Q.  You can define it in any way you choose, Ms. Chen.  There

15  is something --

16          MR. FINKEL:  Objection to the commentary.

17          THE COURT:  Stick to the questions.

18  Q.  You know something called G/Club?

19  A.  Yes.

20  Q.  Was there something called the G/Club membership?

21  A.  Yes.

22  Q.  What was the G/Club membership?

23  A.  I don't know what is G/Club membership.

24  Q.  Well, you gave money to that institution, right?

25  A.  I gave money to the bank account that is given to me by the

O6RBGUO1                        Chen- Cross

1    MOS farm volunteer.

2    Q.  And for what reason did you give them the money?

3    A.  To GTV shares, for additional GTV shares acquisition.

4    Q.  And what website did you go to, to follow through on this

5    transaction?

6    A.  I follow-up with the MOS farm volunteer confirming that the

7    money I sent to the bank account be given to me has been

8    received, and then they send me the confirmation confirming

9    that the money has been received.

10   Q.  Right.  And you said you got a confirmation that the money

11   had been received by an entity called G/Clubs, correct?

12   A.  The MOS farm discord confirmation just said this is amount.

13   It's been received.

14   Q.  And received for what?

15   A.  Confirm.

16   Q.  What was the company?

17   A.  You mean the money where I send the money to?  What's your

18   question?

19   Q.  That is my question, what company were you purchasing a

20   product from?

21   A.  I did not purchase any product from any company.  I made it

22   loud and clear.  I send the money to purchase additional GTV

23   shares.

24   Q.  Let's show you GXVB-24.  You testified about this document

25   yesterday, correct?

O6RBGUO1                         Chen- Cross

1    A.   I testified this is a document with instructions provided

2    to us to complete after we sent the payment to Crane Advisory.

3    Q.   And the document says the purpose is G/Club membership,

4    correct?

5    A.   I did not see that.

6              MR. FINKEL:  Objection.

7    Q.   On the right, right under the word "purpose".  I don't want

8    to highlight it for you, but the right column, G/Club

9    membership purpose, right?

10   A.   That's the instruction given.  There's no choices.

11   Q.   Well, the choice is to not fill the document out at all,

12   right?

13             MR. FINKEL:  Object to the commentary.

14             MS. SHROFF:  It's a question.

15             THE COURT:  So keep it to the questions, Ms. Shroff.

16   A.   I can't answer that question because I have already made

17   the payment to Crane Advisory.  I have no choices of not

18   signing this document because I already made the payment, so

19   there's no choices for me no filling out this document.  Are

20   you clear on that?

21             (Continued on next page)

22

23

24

25

O6R1GUO2                          Chen - Cross

1   BY MS. SHROFF:

2   Q.  Ms. Chen, you could have called Crane Advisory and asked

3   for your money back, right, before filling out the document?

4   A.  I'm not as smart as you.

5   Q.  Okay.  Well, do you buy things in normal, everyday life?

6            MR. FINKEL:  Objection.

7            THE COURT:  All right.  So we know she buys things in

8   normal, everyday life.

9   Q.  You know you can ask or change your mind within a certain

10  period of time, correct?

11  A.  Let me make it clear.  I sent the money to the bank account

12  that's given to me by the people that I trusted.

13           MS. SHROFF:  I move to strike, your Honor.  It's

14  nonresponsive to the question.

15           THE COURT:  Overruled.  Overruled.  Let her complete

16  her answer.

17  A.  So I sent the money to the bank account that was sent to me

18  by the person that I trusted.  In that situation, do you think

19  I would call the company to call my money back?  And do you

20  think I would question about the document that was sent to me

21  afterwards to complete?

22  Q.  Well, you worked 15 years at a bank, right?

23  A.  Yes.  So what?

24  Q.  So you know how to ask for a refund, right?

25           MR. FINKEL:  Objection.

1          THE COURT:  Ms. Shroff, I want you to be mindful of my

2     order regarding the subject matter.

3          MS. SHROFF:  Let me move to 24-T.  Let's just put them

4     up side by side, if we can.

5     Q.  Did you fill out the document based on the form on the left

6     side or was it your husband?

7     A.  So I'm sitting here and I feel like, are you trying to ask

8     me am I tricked into signing this document?  And if so, I think

9     yes, I was tricked into signing this document.

10    Q.  That's your position, right?  I understand that.

11         THE COURT:  So Ms. Chen, listen to the question and

12    then give an answer, as opposed to volunteering additional

13    information that was not asked about.

14         Go ahead.

15    Q.  Who signed that form for you; was it you or your husband?

16    A.  My husband signed it for me.

17    Q.  And were you there when he signed it?

18    A.  This one, I did not.

19    Q.  And do you know how he sent the form in?

20    A.  So in this situation, he told me he was contacted by MOS

21    Farm, MOS Farm volunteer to complete a document because we sent

22    the money to Crane Advisory.  In order to complete this

23    investment, he need to sign this document, he told me that, and

24    he signed.  I don't know what happened there.

25    Q.  Okay.  So you don't know how your husband submitted this

O6R1GUO2                          Chen - Cross

1    form.  That was my original question.

2    A.  He submitted it to the MOS Farm volunteer.  That's who sent

3    him this document.

4    Q.  Okay.  And what did the farm volunteer do as the next step?

5    A.  I don't know.  Confirm receipt of the document?

6    Q.  So it's fair to say you do not know what happened between

7    your husband and the Mountains of Spice Farm volunteer after

8    the document was submitted, correct?

9    A.  I do not know what the MOS Farm volunteer do after he

10   received——after they received this document.

11   Q.  My question was:  Do you know what the farm volunteer said

12   to your husband after he had submitted the document?  That was

13   my question.

14   A.  So your question is asking, after my husband sent this

15   document to MOS Farm volunteer, do I know what the farm, MOS

16   Farm volunteer responded to my husband; is that your question?

17   Q.  Yes, ma'am, actually, that is my question.

18   A.  I think they confirm receipt of this document.

19   Q.  Okay.  Now to actually have this document go through, your

20   husband had to affirm the terms of the purchase, correct?

21   A.  I don't understand that.

22   Q.  You had to say, yes, this is what I want, correct?

23   A.  I don't know.  I don't understand what you're asking.

24   Q.  Did there come a time when your husband was in the process

25   of activating the G|CLUBS membership?  Do you recall that?

O6R1GUO2                          Chen - Cross

1    A.  I think what happened is, Miles said we were going to get a

2    free G Club membership for the GTV additional shares we are

3    purchasing.  However, we never got the free G Club membership

4    for the $210,000 we sent to the two accounts that were given to

5    us.  We only got maybe one of them activated, but not the other

6    four.  So if that's what you're asking, that is what's

7    happening, because the free G Club membership were not

8    activated.

9          MS. SHROFF:  I move to strike, your Honor.  And I

10   repeat the question.

11   Q.  To purchase——

12         THE COURT:  Overruled.

13   Q.  Let's look at DX 60676, shall we.

14         Do you recognize that document?

15   A.  Yes.

16   Q.  What is it?

17   A.  This is a document that MOS Farm volunteer told us to send

18   to G Club to activate our free G Club membership account.

19   Q.  Okay.  Let's——all right.  You see it up there again?

20   A.  Yes.

21         MS. SHROFF:  Okay.  Your Honor, the defense moves

22   DX 60676 into evidence.

23         MR. FINKEL:  Could we see the next page, please.

24         THE COURT:  Any additional pages?

25         MR. FINKEL:  Could I just have a moment with

O6R1GUO2                          Chen - Cross

1    Ms. Shroff.

2              (Counsel conferring)

3              MS. SHROFF:  Would you show the government.

4              MR. FINKEL:  Your Honor, objection.  We might need to

5    approach.

6              THE COURT:  Okay.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6R1GUO2                         Chen - Cross

1                 (At the sidebar)

2                 MR. FINKEL:  This should be a minor issue.

3                 The only objection the government has to the document

4      is that it has her husband's name on there.  If the defense

5      redacts that——that's what I pointed out to Ms. Shroff, it's her

6      husband's email address, do we want to redact it, and

7      Ms. Shroff didn't really have a verbal response.  In any event,

8      if they can redact it——I'm sure they have the technology to do

9      that——we have no objection.

10                 MS. SHROFF:  Your Honor, I don't think that the email

11     name is mentioned.  It's LivingSocialFixerUpper is the email

12     address.  They didn't——

13                 MR. FINKEL:  That's——

14                 MS. SHROFF:  I'm not finished, please.  We got this

15     document this way from the government.  The government redacted

16     every email address before.  May I just——I just want to be able

17     to finish this thought, because normally, the redaction would

18     be, I don't know, if the email address is bobsmith@gmail.com,

19     you would take out Bob or you would take out Smith or you take

20     out Bob Smith, but you leave in @gmail.com so at least the jury

21     knows that somebody was copied on it, so we can say you were

22     copied on it.  The government did not redact this

23     LivingSocialFixerUpper email address.  We had no reason to

24     think that they would object to it now, and I don't see why we

25     should have to redact it.  But if you want me to redact it,

1    one, it doesn't belong to her, it belongs to her husband, two,

2    it doesn't matter, but it will take me a minute to do it.

3              THE COURT:  So let's do the redaction.

4              MS. SHROFF:  Okay.  Do you want to give us a

5    five-minute break.

6              THE COURT:  Isn't it possible for your helper to do

7    that?

8              MS. SHROFF:  My helper is having problems with the

9    thing keeps bopping off.  The computer keeps dying, but—

10             MR. FINKEL:  Do you want to go on to something else

11   while he's doing the redactions?

12             MS. SHROFF:  No, I really don't, but it will take us

13   two minutes, your Honor.

14             THE COURT:  All right.  So we'll have to take a very

15   brief break.

16             MR. FINKEL:  Thank you, your Honor.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O6R1GUO2                          Chen - Cross

1          (In open court)

2          THE COURT:  Members of the jury, we're going to take a

3     five-minute break.  I'm going to stick to the five minutes.

4     Remember, don't discuss the case amongst yourselves; don't

5     permit others to discuss it in your presence; don't read,

6     watch, or listen to anything from any source that touches upon

7     the subject matter of this trial.  We will be back in five

8     minutes.

9          (Jury not present)

10         THE COURT:  Ma'am, you may step out.  Don't discuss

11    your testimony.

12         (Witness not present)

13         (Recess)

14         THE COURT:  Please have the jurors brought in.

15         (Jury present)

16         THE COURT:  Please be seated.

17         And the witness?

18         You may continue.

19         MS. SHROFF:  So if we could show her again 60676.

20         And the defense moves 60676 into evidence.

21         MR. FINKEL:  Can I see the next page, please.

22         And the last page?

23         No objection.

24         THE COURT:  It is admitted.

25         (Defendant's Exhibit 60676 received in evidence)

O6R1GUO2                          Chen - Cross

1    BY MS. SHROFF:

2    Q.  So let's see if we can take a look at that, Ms. Chen.

3         Could you read for us the first line.

4    A.  "I previously submitted a request on 1/18/2022 to activate

5    the membership of GC regard order I sent the payment on

6    3/23/2021."

7         MS. SHROFF:  And if we could scroll down to the next

8    paragraph.

9    Q.  "Please activate the memberships accordingly."  Do you see

10   that line?

11   A.  I don't──oh, okay.  Mm-hmm.

12        MS. SHROFF:  Okay.  And if we could just keep

13   scrolling down.

14   Q.  And then it gives the G|CLUBS member legal name, correct?

15   A.  Yes.

16   Q.  That's your husband, correct?

17   A.  Yes.

18   Q.  Not you, correct?

19   A.  Yes.

20        MS. SHROFF:  And if we could just keep scrolling down.

21   Keep scrolling down.

22        If we could just keep going down.

23   Q.  And then it tells you──hold on, please──there's a Ticket

24   Update Time.  Do you see that?

25   A.  Yes.

1    Q.  It says, "Your request has been updated."  Correct?

2    A.  Mm-hmm.

3    Q.  And then it gives you an option, "To add additional

4    comments, please reply to this email," right?

5    A.  Yes.

6          MS. SHROFF:  Okay.  Keep going down.

7    Q.  "This email is a service from G|CLUBS customer service,"

8    correct?

9    A.  Yes.

10          MS. SHROFF:  Okay.  And if we could just scroll down.

11    Q.  And that's the end of the document, correct?

12    A.  Yes.

13    Q.  The membership is in your husband's name, correct?

14    A.  Yes.

15    Q.  And you shared this document with Mr. —— we can take that

16    down——with Mr. Finkel, right?

17    A.  The email you just showed me?

18    Q.  Yes.

19    A.  I don't remember so.

20    Q.  Okay.  Do you talk to Mr. Finkel——you know what, I'll

21    withdraw that.  I'll come back to it later.

22          Now is it fair to say that there were several emails

23    between your husband and G|CLUBS?

24    A.  Several email?

25    Q.  Right.  He emailed them more than once?

O6R1GUO2                          Chen - Cross

1    A.  I think he reached out to the customer services to activate

2    the free G Club membership that we were given.

3    Q.  Right.  And you see the——

4              MS. SHROFF:  Can we bring that document back up.

5              And if I could just show her, "In summary."

6    Q.  "In summary, I have remitted," what's the dollar amount

7    there?

8    A.  100,000.

9    Q.  To cover these G Club orders, correct?

10   A.  This is a standard language.

11   Q.  No.  The question is:  Do you see the language that says G

12   Club orders, yes or no?

13   A.  Yes.

14   Q.  And then the next line on the next page——on the same page

15   says, "Please activate the memberships accordingly," correct?

16   A.  Yes.

17             MS. SHROFF:  You can take that down.

18             Now let's look at GX VB14.

19   A.  So that's a standard language the MOS Farm ask us to put in

20   the email, as I explained earlier.

21             MS. SHROFF:  Your Honor, there was no question before

22   the witness.

23   A.  Because they asked for that verbiage, so I'm telling you

24   that's not the verbiage my husband writing there, that's the

25   verbiage MOS Farm gave us the template, in order to put the

```
 1    template in there.
 2                THE COURT:  So just carefully listen to the question
 3    and answer only what's being asked.
 4                Go ahead.
 5                MS. SHROFF:  Since there was no question pending, I
 6    move to strike the outburst.
 7                THE COURT:  It is stricken.
 8                MS. SHROFF:  Thank you.
 9    BY MS. SHROFF:
10    Q.  Let's look at GX VB14.  You provided this document to
11    Mr. Finkel, correct?
12    A.  Yes.
13    Q.  And you testified about this document on direct, correct?
14    A.  When you say testify, meaning I said about this document
15    yesterday?
16    Q.  Yes, ma'am.
17    A.  I honestly don't remember if I did or not.
18    Q.  Okay.  The memberships were active until May of 2023,
19    correct?
20    A.  Sorry.  What's your question again?
21    Q.  The memberships——
22    A.  Uh-huh.
23    Q.  ——were active until May of 2023, correct?
24    A.  I don't know where you see that.
25    Q.  It's a question for you.
```

O6R1GUO2                          Chen - Cross

```
 1    A.  I don't know.

 2    Q.  Okay.  Well, let's look.  Tier 1.  Active.  And then it has

 3    an expiration date, correct?

 4    A.  Yes.

 5    Q.  Okay.  Tier 2, Active, and an expiration date, correct?

 6    A.  Tier 2?  Where do you see that, Tier 2?

 7    Q.  I'm sorry.  Row 2.

 8    A.  Okay.

 9    Q.  Okay.  And do you see all of them, 1, 2, 3, 4, say Active,

10    correct?

11    A.  Yes.

12    Q.  Okay.  And they were active as of May '23, until you called

13    to cancel, correct?

14    A.  Yes.

15    Q.  Okay.  And you know, sitting here today, that Mr. Guo was

16    arrested on March 15—you can take that down, Jorge, thank

17    you—that Mr. Guo was arrested on March 15th of 2023, correct?

18    A.  Yes.

19         MS. SHROFF:  All right.  Well, let's show Ms. Chen

20    GX VB16.

21    Q.  You see that document, ma'am?

22    A.  Yes.

23    Q.  Okay.  Do you recognize it?

24    A.  Yes.

25    Q.  Okay.  And that's Government Exhibit VB16, right?  Do you
```

O6R1GUO2                          Chen - Cross

1    see that corner little stamp over there?

2    A.   Yes.

3            MS. SHROFF:   Okay.   The defense moves to admit

4    Government Exhibit VB16.

5            MR. FINKEL:   Sorry, your Honor.   Just one moment.

6            I don't think a proper foundation has been laid for

7    this document, which is the witness's statements.

8    Q.   Whose email address is there on the corner?

9    A.   Our joint email address.

10   Q.   Okay.   You recognize this gmail account, correct?

11   A.   Yes.

12   Q.   Okay.   Let's scroll down.

13           Who attached those attachments to the email?

14   A.   We attached it.

15   Q.   Yes.   Was it you or your husband?

16   A.   It's our joint email account.   I don't remember in this

17   whether it was me or he attached it.

18           MS. SHROFF:   Okay.   I think I laid a foundation and I

19   move to admit it, your Honor.

20           MR. FINKEL:   I don't think there's a proper foundation

21   for the witness's statements.

22           THE COURT:   I think there's one additional question

23   that needs to be asked.

24   BY MS. SHROFF:

25   Q.   Did you keep your gmail account and send a copy to

O6R1GUO2                        Chen - Cross

1    Mr. Finkel?

2    A.  Did I keep——

3    Q.  Did you keep this email and then send it to Mr. Finkel?

4    A.  I don't remember what I sent to the government.  I'm sorry.

5    Q.  How about to the FBI agent that you emailed?

6    A.  I don't remember.  I'm sorry.

7    Q.  But you recognize this to be an email from your and your

8    husband's joint email account, correct?

9    A.  I recommend——I recognize this document you put in front of

10   me.  That's an email I sent from our joint account to G Club.

11   Q.  Okay.  You sent it, right?

12   A.  We sent it together.

13           MS. SHROFF:  Okay.  I think I've laid a foundation,

14   your Honor.

15           THE COURT:  Yes.  It is admitted.

16           (Government's Exhibit VB16 received in evidence)

17           MS. SHROFF:  All right.  So let's take a look at it.

18   And if we could publish it to the jury, please.

19   Q.  Dated May 14, 2023, correct?

20   A.  Yes.

21   Q.  Okay.  And it says, "Hello, I'd like to send the notice of

22   my membership cancellation and request a refund of the five

23   membership cards I paid for."  Correct?  Right?

24   A.  You just read it.

25   Q.  Yes.  And then you scroll down and then you say, "I

1  purchased the G|CLUBS membership because it was marketed as an

2  investment with stock and shares."  Correct?

3  A.  Yes.

4  Q.  And then you say you did not receive stocks or shares or

5  any membership benefits.  Right?

6  A.  Yes.

7  Q.  It's May of 2023.  And then you say it's an investment

8  fraud, correct?

9  A.  Yes.

10 Q.  And how many years after you first paid for this is this

11 email sent?

12 A.  You can count.  I don't need to answer.

13         MS. SHROFF:  Your Honor, could you help me out and

14 direct the witness to answer the question, please.

15         THE COURT:  So if you'll just answer the question

16 that's before you, please.

17 A.  Okay.  Between——because I——I mean, to answer your question,

18 I sent two payments, right?  So which one do you want me to

19 tell you?

20 Q.  Let's start with the first one.  How many years between the

21 first payment and May 14th of 2023?

22         MR. FINKEL:  Your Honor, I think this goes to the

23 Court's ruling, the amount of time.

24         THE COURT:  I'll allow the question.

25 A.  From March 2021 to May 2023, it's a little bit over two

O6R1GUO2                          Chen - Cross

 1   years.

 2           MS. SHROFF:  All right.  Now let's take that down.

 3   And let's go to GX VB12-T.

 4   A.  I don't see it show up yet.

 5           Don't look at me.  Don't stare at me.

 6           MS. SHROFF:  I cannot see.  I was literally going to

 7   my table to get my glasses because I cannot see that far.

 8           THE COURT:  Okay.  So no more testifying.  Your job is

 9   to ask the question.  Your job is to answer.  That's the only

10   thing that you should be doing, respectively.

11   BY MS. SHROFF:

12   Q.  Do you see the document now?

13   A.  Yes.

14   Q.  Okay.  Do you recognize it?

15   A.  Yes.

16   Q.  Okay.  What is it?

17   A.  It's the email communication with the Hamilton Opportunity

18   Fund.

19   Q.  Okay.

20           MS. SHROFF:  Your Honor, may I just have a minute.

21           THE COURT:  Okay.

22           THE WITNESS:  The document, I don't see it.

23           THE COURT:  There's no question at this time.

24           THE WITNESS:  Okay.

25           MS. SHROFF:  He's pulling it up, your Honor.  We're

1   having a little trouble.  There you go.

2   BY MS. SHROFF:

3   Q.  You recall testifying about this document yesterday, right?

4   A.  Yes.

5   Q.  All right.  Well, now you testified that you had——did you

6   fill out this document, by the way, or was it your husband?

7   A.  We filled out the form together.

8   Q.  Okay.  And that form is dated June 30, 2021, correct?

9   A.  I think so.

10  Q.  Okay.  Well, look at the date up on top.  Maybe that will

11  help you.

12  A.  Yes, I said I think so.

13  Q.  And did you read the numbers 1 through 6, or 7, before you

14  filled it out?

15  A.  I think so.

16  Q.  Did you fill it out or your husband filled it out?

17          MR. FINKEL:  Asked and answered.

18          THE COURT:  Sustained.

19  Q.  Tell me how you jointly fill out one form.

20  A.  So every time when we do this type of form, want to making

21  sure we are filling out all the information correctly, so it's

22  either me filling out, my husband sitting next to me checking,

23  confirming I'm filling out the correct information, or I'm the

24  one filling out that, he's sitting next to me, confirming that

25  we're filling out the correct information.

1    Q.  And who was filling out the information on this one?

2    A.  I don't remember.  It was a long time ago.

3    Q.  All right.  Well, let's scroll down.  And if we could look

4    at that question there on page 6.  Do you see question No. VI?

5    A.  Okay.  Yes, mm-hmm.

6    Q.  And the question is:  "Have you participated in the

7    borrowing from the Himalaya New York Mountains of Spice?"

8    Correct?

9    A.  Yes.

10   Q.  And you answered no, right?

11   A.  Correct.

12   Q.  And Mr. Guo had in fact done many, many videos saying you

13   should get into the borrowing from the Himalaya New York plan,

14   correct?

15   A.  I don't know.

16   Q.  You didn't watch his videos saying that?

17   A.  I don't know how to answer your question.  Sorry.

18   Q.  You watched all Miles Guo's videos, right?

19   A.  I don't think I watched all the videos.

20   Q.  You didn't watch all of them, only some of them?

21   A.  He had videos every day.  I don't think I can watch it, all

22   the videos.

23   Q.  Okay.  Well, do you recall watching a video about the farm

24   loan program?

25   A.  I don't remember specific about the farm loan program.

O6R1GUO2                          Chen - Cross

1   Q.  Do you remember Mr. Guo encouraging you to invest in the

2   farm loan program?

3   A.  I remember Miles Guo said to get the GTV shares through

4   borrowing from the farm, participating in the farm loan

5   program, and that is for people who are not from the Old Chair,

6   because we already part of Old Chair that we had GTV share, so

7   we did not do the farm loan borrowing.

8   Q.  Okay.  But you had GTV shares from the Old Chair, correct?

9   A.  Yes, but Miles Guo also said participating in the——

10  Q.  Okay.

11  A.  Yes, mm-hmm.

12  Q.  Okay.  Nevertheless, you invested, according to you, in G

13  membership only to get GTV shares, correct?

14          MR. FINKEL:  Mischaracterizes.

15          THE COURT:  Sustained.

16  Q.  And you invested in G Club membership, according to you, to

17  get the shares, right?

18          MR. FINKEL:  Objection, Judge.

19          THE COURT:  You're repeating the question.  She's

20  already answered this.  Move on.

21  Q.  You did not invest in the farm loan program, right?

22          MR. FINKEL:  Asked and answered.

23          THE COURT:  Sustained.

24  Q.  Your husband didn't invest in the farm loan program,

25  correct?

O6R1GUO2                          Chen - Cross

1                    MS. SHROFF:  It's a different question.

2     Q.  Did your husband invest?

3     A.  You just asked me to read this question, did we answer no,

4     I said no.

5     Q.  So your husband did not invest.

6     A.  I answered already.

7     Q.  So the answer is no, right?

8     A.  I answered it's a joint form we filled out.  It's no.

9                    THE COURT:  Okay.

10    Q.  So when Mr. Guo told you to invest in the farm loan

11    program, you were able to say no to him, right?

12    A.  Because he said to get more GTV shares through the farm

13    loan program.  We already have the GTV shares.  My

14    understanding is for those who do not have the GTV shares, that

15    are not part of the Old Chair, to invest in the loan program to

16    get the GTV shares, so that's not applied to us.

17    Q.  Does it say there, doesn't apply to Old Chair?

18    A.  That's from Miles Guo's broadcasting videos.  I have

19    explained to you.

20    Q.  Okay.  And when Miles Guo did the broadcasting videos for G

21    Club membership, did he also say that if you have Old Chair

22    shares, don't go to G Club?

23    A.  So for that video, I remember clearly that it's for Old

24    Chair to gain additional GTV shares, that in order to complete

25    that investment, pay money to the G Club accounts.

O6R1GUO2                          Chen - Cross

1  Q.  So you'd get additional shares here too, right?  If you did

2  the farm loan program, you'd get additional shares?

3          MR. FINKEL:  Objection to the form.  We've been

4  through this.  She's answered why she didn't invest.

5          THE COURT:  Sustained.

6  Q.  Let's keep going down.  You said no, right?

7  A.  I did not——

8          MR. FINKEL:  Your Honor, three times.  At least.

9          THE COURT:  Okay.  So she's established——

10          MS. SHROFF:  It's okay, your Honor.  I'll move on.

11          THE COURT:  She said no, so don't repeat the question

12  again, and again, and again, once you receive an answer.

13  Q.  All right.  Page 6.  We're still on page 6.  Okay.  And

14  let's look at the next question.  This one asked you if you

15  participated in borrowing from other farms, and you said no,

16  correct?

17  A.  Yes.

18          MS. SHROFF:  Okay.  Let's scroll down.

19          And let's look at page 9 of the document.

20  Q.  Now on page 9, on the top, right, it says, "As of

21  September 17, are you planning for an additional investment?"

22  Correct?  And you answered yes, right?

23  A.  Yes.

24  Q.  What year was this document?

25  A.  This document was from 2021, so——you already asked me, I

1    filled it out on June 30, 2021, at the very beginning.

2    Q.  Okay.  Let's scroll down.

3         Now, Mr. Finkel asked you about 13-2, correct?

4    A.  Yes.

5    Q.  And when you met with him in his office, you went over this

6    question with him, right?

7    A.  Yes.

8    Q.  And he specifically asked you whether you or your husband

9    filled this out, right?

10   A.  I don't remember that.

11   Q.  Did Mr. Finkel ever ask to speak to your husband?

12   A.  I don't think so.

13   Q.  Okay.  And there were three options here, correct?

14   A.  Yes.

15   Q.  Okay.  The first option is, "Only to purchase G Club card,

16   without purchase of equities (card annual fee is required)."

17   Right?

18   A.  That's the English translation of——

19   Q.  Ma'am, I'm only asking you about the document that's before

20   you.

21   A.  So what's your question again?

22   Q.  You did not pick the first option, correct?

23   A.  That's correct.

24   Q.  You did not pick the second option, which reads, "Only for

25   investment, voluntarily giving up G Club card (no card annual

O6R1GUO2                          Chen - Cross

1   fee is required)."  Correct?

2   A.  Correct.

3   Q.  Okay.  And then the third option is the option you picked,

4   "To participate in investment through card project," correct?

5   And then it says "(purchase card and equities)," correct,

6   including——

7   A.  That's incorrect.  I explained it yesterday.  The English

8   translation was wrong.

9   Q.  Ma'am, listen to my question.

10  A.  But you said is it correct?  I said it's incorrect.

11          THE COURT:  So if you'll pose the question.

12  Q.  You picked option number three on this document, "To

13  participate in investment through card project (purchase card

14  and equities), including upgraded card (card annual fee is

15  required)."  Correct?

16  A.  I select the option of:  To participate in investment

17  through card project (distribute card and equities), including

18  upgraded card (annual fee is required).  I explained yesterday

19  the translation here is wrong, so I cannot answer your question

20  being that was correct, because the translation here is wrong.

21  Q.  Are you finished?

22          THE COURT:  All right.  So she has stated that she did

23  not accept the English version here and so that's the answer.

24          MS. SHROFF:  Okay.

25  Q.  You filled out the English version, though, right?

1        MR. FINKEL:  Objection.

2        THE COURT:  Overruled.

3        MR. FINKEL:  But——

4   Q.  You filled out the English version, correct?

5   A.  That's incorrect.  I filled out the Chinese version.

6        MS. SHROFF:  Okay.  Well, let's scroll down.

7        MR. FINKEL:  Your Honor, for the record, this is a

8   translated document that's stipulated to.

9        MS. SHROFF:  That's okay.

10       THE COURT:  There is a translated document so that the

11  jurors understand.  Go ahead.

12       MS. SHROFF:  Keep scrolling down.

13       Scroll down.

14  BY MS. SHROFF:

15  Q.  And that's the end, right?

16  A.  Yes, I guess.

17  Q.  Okay.  Let's go to the email itself.

18       You see this email that you sent?

19  A.  It's a Google response.  I didn't send email to anyone.

20  Q.  Well, you filled out the form, right?

21       MR. FINKEL:  Asked and answered.

22  Q.  You filled out the form and you uploaded it, right?

23       THE COURT:  The question has been posed and the

24  witness has answered.

25  Q.  And after you did this in the Chinese version of this

1    document, you reviewed it with Mr. Finkel in English, right?

2    A.  I want to make it clear on the word.  I did not review this

3    document with him.

4    Q.  You didn't review this document, the attachments, with

5    Mr. Finkel?

6    A.  He showed me this document.  I did not review because

7    I—because we just talk about what is review, and review is

8    every page, line by line.  I did not do the review.

9              MS. SHROFF:  Let's go back to page 6, and page 9.

10   Q.  Let's just talk about page 9.  You reviewed this page with

11   him, right?

12   A.  He showed me this page.

13   Q.  Okay.  And what did he do after he showed you the page?

14   A.  So he asked me questions.

15   Q.  And you answered them, right?

16   A.  Yes.

17   Q.  Okay.  And you didn't have an interpreter present, right,

18   when you talked to him about this page?

19   A.  So when Mr. Finkel showed me this document, he showed me

20   the Chinese version that I submitted and then also showed me

21   the interpretation, the interpretation version as shown up on

22   the screen here.

23   Q.  Well, it's not interpreted, right?  It's translated.  It's

24   a big difference.  It's not interpreted.

25             THE COURT:  So the witness is not part of the

1  translation or interpretation process and so she cannot testify

2  about this.

3          MS. SHROFF:  Okay.  Let's move on.

4  Q.  Sitting here today, you said to the jury that you filled

5  out the Mandarin version, correct?

6  A.  Yes, I did.

7  Q.  And when you received this document, did you receive it

8  both in Mandarin and in English?

9  A.  The answer is no.

10  Q.  You only received it in Mandarin.

11  A.  That is correct.

12  Q.  How about the PPM, did you receive that document both in

13  Mandarin and in English?

14  A.  I don't remember.

15  Q.  How about the subscription agreement, did you receive that

16  both in English and in Mandarin?

17  A.  I don't remember.

18  Q.  How about the forms that you signed when you signed up for

19  the PPM, did you sign those in English or in Mandarin?

20  A.  That's back in 2020.  I don't remember.

21          MS. SHROFF:  Okay.  We can take that down.

22  Q.  Now you testified about an H Coin offering, correct?

23  A.  Yes.

24  Q.  And the H Coin initial offering was in November of 2021,

25  right?

1    A.  Yes.

2    Q.  And you purchased H Coin, did you not?

3    A.  Did you say did I not?

4    Q.  Did you purchase H Coin?

5    A.  Yes.

6    Q.  Okay.  And you knew——you're a citizen of the United States,

7    right?

8    A.  Yes.

9    Q.  And as a citizen of the United States, you're not supposed

10   to purchase H Coin, correct?

11            MR. FINKEL:  Objection.

12            THE COURT:  You may answer.

13            MR. FINKEL:  Calls for——

14   A.  Miles Guo asked us to use the Chinese identity to open H

15   Coin account.

16   Q.  Miles Guo asked you to do everything.  I understand that.

17   My question to you was——

18            THE COURT:  All right.  Ms. Shroff, I've already told

19   you, do not testify.

20   Q.  It is your testimony today, right, Ms. Chen, that every

21   single thing you did is what Miles Guo told you to do, correct?

22            MR. FINKEL:  Mischaracterizes.

23            THE COURT:  Sustained.  She has never stated that in

24   her testimony, that Miles Guo told her to do everything.  No.

25   Q.  Did Miles Guo tell you to do everything you did in this

O6R1GUO2                          Chen - Cross

```
 1   case?
 2            MR. FINKEL:  Objection to the form.
 3            MS. SHROFF:  It is a question.
 4            THE COURT:  Sustained.
 5   Q.  What did Miles Guo tell you to do that you did not do,
 6   according to you?
 7            THE COURT:  Sustained.
 8   Q.  Did Miles Guo tell you to invest in GTV?
 9            THE COURT:  You may answer.
10   A.  Miles Guo promoted the GTV to me.
11   Q.  I'm sorry?
12   A.  He promoted the GTV investment.
13   Q.  Because he was GTV's promoter, correct?
14   A.  Because he owned GTV, in my opinion.
15   Q.  I didn't ask you your opinion of whether he owns GTV,
16   ma'am.
17   A.  So that's——
18            MR. FINKEL:  Your Honor, I would just ask that
19   Ms. Shroff just pose questions and not comment on the answers
20   that the witness is providing.
21            THE COURT:  Ms. Shroff.
22            MS. SHROFF:  I did ask a question, your Honor.
23            THE COURT:  But you also added a comment that was not
24   a question.  Ask questions.
25   BY MS. SHROFF:
```

O6R1GUO2                          Chen - Cross

Q.   In each of your answers during your direct, you said you
did each thing that Mr. Finkel asked you about because of Miles
Guo's statements in videos, correct?

            MR. FINKEL:  Mischaracterizes.

            THE COURT:  Sustained.

Q.   Your testimony, sitting here today, is you purchased H Coin
because of what Miles Guo said, correct?

A.   Yes.

Q.   Okay.  And at the time that Miles Guo told you, according
to you, to purchase H Coin, you were a citizen of the United
States, correct?

            MR. FINKEL:  Asked and answered.

            THE COURT:  Sustained.

Q.   And knowing that you were a citizen of the United States,
you knew that you should not purchase H Coin, correct?

            MR. FINKEL:  Mischaracterizes, and asked and answered.

            THE COURT:  You may answer.

A.   Miles Guo asked me to use my Chinese identity to open and
purchase H Coin.

Q.   And you did that, right?

A.   I did it.

Q.   And you did it only because Miles Guo asked you, right?

A.   I did it because Miles Guo said H Coin would go to the
moon.

Q.   Okay.  So there are two reasons.  You did it because he

1    said it's going to go to the moon and also because he asked you

2    to use a certain pin, correct?

3              MR. FINKEL:  Object to form.

4              MS. SHROFF:  I'll move on.

5    Q.  Whose credentials did you use to open the account?

6    A.  Sorry.  What's your question?

7    Q.  Whose credentials did you use to open the account?

8    A.  I answered.  Miles Guo asked me to use my Chinese identity

9    to open account.

10   Q.  So you used your own Chinese identity to open the account;

11   is that your testimony?

12   A.  Yes.

13   Q.  Which identity did you use?

14             THE COURT:  Sustained.

15   Q.  What document did you use to open the account?

16             THE COURT:  You may answer which document.

17   A.  It's a Chinese ID.  I said it already.

18   Q.  Was your Chinese ID still valid?

19             MR. FINKEL:  Object to the relevance.

20             THE COURT:  You may answer.

21   A.  Yes.

22   Q.  And it's still valid today, correct?

23   A.  Yes.

24   Q.  Now you testified about this phrase, "H Coin to the moon,"

25   right?

1    A.  I'm sorry.  Can you repeat.

2    Q.  You testified on direct to the phrase "H Coin to the moon"?

3    A.  Yes.

4    Q.  Okay.  And you told Mr. Finkel that you were impressed by

5    that phrase, correct?  I'll rephrase that for you.

6         Did Mr. Guo's use of that phrase impact your decision

7    about H Coin?

8    A.  Yes.

9    Q.  Okay.  What price did Mr. Guo say H Coin would rise to?

10   A.  He said that it would be more valuable than Bitcoin and in

11   the short term it will be reaching a hundred dollars very soon.

12   Q.  Okay.  And how much was Bitcoin valued at that time?

13   A.  I don't remember.

14   Q.  You don't remember, or do you not know?

15            MR. FINKEL:  Objection.

16            THE COURT:  Sustained.

17   Q.  Did you know how much Bitcoin was valued at that time?

18            MR. FINKEL:  Asked and answered.

19            THE COURT:  Are you asking whether at that time she

20   knew the value?

21            MS. SHROFF:  Yes, your Honor.

22            THE COURT:  You may answer.

23   A.  I don't remember exactly how much it is, but it was like a

24   10,000, like some sort of item like 50,000, or maybe 40,000.

25   Q.  10,000, 50,000, 40,000, right?  Any of those numbers.

1  A.  So it's more than——I think it's more than 40,000, yeah,

2  maybe back then, but I don't remember exactly how much it was

3  back in that time.

4  Q.  Okay.  Did you know back then that Bitcoin fluctuated?

5  A.  Yes.

6  Q.  And you talked at length with Mr. Finkel about Mr. Guo's

7  statements about the gold reserve, correct, on H Coin?

8  A.  Yes.

9  Q.  Okay.  Do you know if there was in fact a gold reserve?

10  A.  Sorry.  Can you repeat?

11  Q.  Do you know in fact if there was actually a gold reserve?

12  A.  I trust what Miles said.

13  Q.  So there was a gold reserve.

14  A.  Are you asking me back then do I——I'm confused with your

15  question.  What are you trying to ask me?

16  Q.  Mr. Guo said there was a gold reserve, correct?

17  A.  Yes.

18  Q.  As far as you know, there was a gold reserve, correct?

19  A.  I trusted what Miles said.

20  Q.  Okay.  So there was a gold reserve, right?  Because you

21  trusted him and there was a gold reserve.

22          MR. FINKEL:  Asked and answered.

23          MS. SHROFF:  I actually don't have an answer, your

24  Honor.

25          THE COURT:  Sustained.

1  Q.  Did you ask anybody on the exchange to see proof of the

2  gold reserve?

3          MR. FINKEL:  Court's ruling, your Honor.  Objection.

4          THE COURT:  Sustained.

5  Q.  Let's talk about the H Coin white paper, shall we.  Do you

6  know what that is?

7  A.  It's a document.

8  Q.  Okay.  Where is it found?

9  A.  I don't remember.  Somewhere on the Himalaya Exchange

10  website.

11  Q.  Somewhere in the Himalaya Exchange website?

12  A.  I don't remember, so I think it could be, yeah.

13  Q.  Did you read it?

14  A.  Read it, but I don't remember what's in it.

15  Q.  You purchased over $500,000 worth of H Coin; is that

16  correct?

17  A.  Sorry.  Can you repeat?

18  Q.  You purchased more than $500,000 worth of H Coin, correct?

19  A.  I send more than $500,000 to purchase H Coin.

20  Q.  I'm sorry.  Did you say "I said"?

21  A.  I send more than 500,000——$500,000 to purchase H Coin.

22  Q.  Okay.  And that was over a period of time and not all at

23  once, correct?

24  A.  Yes.  I think between maybe January 2022 to February 2022,

25  yes, mm-hmm.

O6R1GUO2                         Chen - Cross

1    Q.  And the first time you did that, you put in $20,000,

2    correct?

3    A.  I don't remember.

4    Q.  You don't remember a $20,000 purchase?

5           MR. FINKEL:  Asked and answered.

6           THE COURT:  Sustained.

7    Q.  Did you keep a note of how many investments you were making

8    on H Coin?

9    A.  I'm sorry.  I don't.

10   Q.  You don't what?

11   A.  Don't do the thing you just asked me the question.

12   Q.  You don't keep a note of how much you invest.

13          MR. FINKEL:  Asked and answered.

14          THE COURT:  Sustained.

15   Q.  Did you keep an Excel sheet?

16          MR. FINKEL:  Cumulative.

17          THE COURT:  Did you keep an Excel sheet?

18   A.  Of what?

19   Q.  Of your investments.

20   A.  Of H Coin?  Of what?

21   Q.  Yes, of H Coin.  We're talking about H Coin.

22   A.  Like, what do you mean by keep an Excel document of H Coin?

23   Q.  Make a column saying, on this day I invested $20,000 in H

24   Coin.

25   A.  I don't.

```
 1   Q.  At your first purchase the H Coin price was 10 cents a
 2   coin, correct?  Is that correct?
 3   A.  That's not correct.
 4   Q.  Okay.  Well, you tell me.
 5   A.  I think by the time I purchased, it's 4——it's more than $40
 6   or so.
 7   Q.  And when you purchased it when it was more than $40 or so,
 8   did you purchase it on the secondary market?
 9   A.  When you say secondary market, you talk about buying
10   market, right?
11   Q.  Mm-hmm.
12   A.  Yes.
13   Q.  Okay.  And you decided to purchase at the $40 price point,
14   correct?
15   A.  I purchased because Miles said it would go to a hundred
16   dollars very soon.
17          THE COURT:  So the question was whether or not you
18   purchased at the $40 price point.
19          THE WITNESS:  The question was?
20          THE COURT:  She said:  "And you decided to purchase at
21   the $40 price point, correct?"
22   A.  I decided based on the Miles Guo's promise of going to a
23   hundred dollars, yes.
24   Q.  And there was a time when you purchased at a higher price
25   point, correct?
```

O6R1GUO2                              Chen - Cross

1   A.  Yes.

2   Q.  And you purchased H Coin after his bankruptcy, correct?

3   A.  I don't think so.  I think the time I send in the money is

4   prior to February 15, 2022.

5   Q.  How about after the SEC litigation or before?

6   A.  What SEC litigation you're referring to?

7   Q.  The SEC litigation you referred to yesterday.

8   A.  The SE——about the GTV that was not proper registered or

9   something?  Is that what——

10  Q.  Exactly.

11  A.  I think that's after that one, mm-hmm.

12  Q.  So your purchase was after that, correct?

13  A.  My purchase is in January 2022, and then I think that that

14  SEC thing happened before that, yes, mm-hmm.

15  Q.  Okay.  So SEC said to this man, you didn't do something

16  correctly, and you decide to listen to him and buy H Coin,

17  correct?

18          MR. FINKEL:  Object to form, and the Court's ruling.

19          THE COURT:  Sustained.

20  Q.  How many months after the SEC litigation did you buy H

21  Coin?

22          MR. FINKEL:  Same objection.

23          THE COURT:  Sustained.

24  Q.  You had an initial allotment of H Coin purchase based on

25  the 10 cents price, correct?

O6R1GUO2                          Chen - Cross

1    A.   I was allocated a quota of certain H Coin at 10 cents per

2    coin, and I paid for it, but I never had those coins.

3    Q.   Can you try, Ms. Chen, to listen to my question, please.

4              THE COURT:   Okay.   So I'd like the parties to step up,

5    please.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6R1GUO2                          Chen - Cross

1          (At the sidebar)

2          THE COURT:  So Ms. Shroff, you said:  "So SEC said to

3     this man, you didn't do something correctly, and you decide to

4     listen to him and buy H Coin, correct?"  That's exactly

5     crossing the line at this point.

6          MS. SHROFF:  That's the direct that they elicited,

7     your Honor.  I'm not seeking to touch a topic they didn't bring

8     out.  They brought out the SEC litigation.  Those were her

9     words on direct, that he broke some regulatory rules, so I was

10    literally trying to follow exactly what she had said in her

11    direct to limit my scope to what was said in the direct, so not

12    to go beyond that.  That is all I was trying to do.  Simply a

13    matter of timing is what I was trying to show; that's it.

14         THE COURT:  No.  I think you're trying to show that

15    despite what would have been an obvious warning that this is an

16    extremely risky investment, she decided to do it anyway.  That

17    is what I think you're getting at.

18         MS. SHROFF:  I wasn't trying to get at that.  I'm

19    trying to show the timing.  And I've repeatedly tried to show

20    the timing because I put in the timing of the bankruptcy, I put

21    in the timing of when she did the first allotment and when she

22    subsequently buys on the secondary market.

23         THE COURT:  So if you want to show timing, then you

24    ask for dates.  You don't say, essentially, the SEC warned you

25    but you did it anyway.  You ask for dates.

O6R1GUO2                          Chen - Cross

1              MS. SHROFF:  I didn't say SEC warned her.  She said

2       the SEC warned her.  She said the SEC made a finding that he

3       broke the regulatory rules.  She testified to that yesterday.

4              MR. FINKEL:  She did not testify to that yesterday.

5              MS. SHROFF:  You are free to reread the transcript.

6       She said the SEC fined him for breaking some regulatory rules.

7       That's her testimony.

8              THE COURT:  So what you need to do is ask for dates.

9              MS. SHROFF:  Okay.

10             (Continued on next page)

O6R1GUO2                        Chen - Cross

1             (In open court)

2    BY MS. SHROFF:

3    Q.  I'm going to come back to this topic in a minute, but I'm

4    going to switch gears for a minute and talk to you about your

5    volunteer work, okay?

6             Now, Ms. Chen, you wanted to volunteer for the

7    Mountains of Spice Farm, correct?

8    A.  Yes.

9    Q.  Okay.  And you first wanted to volunteer, you said

10   yesterday, in 2022, correct?

11   A.  Yes.

12   Q.  That was your testimony yesterday?

13   A.  Mm-hmm.

14   Q.  In fact, you first reached out to volunteer in 2021.  Do

15   you remember that?

16   A.  I remember I joined a group within the MOS Farm and

17   expressed that, my interest to volunteer.

18   Q.  Well, you didn't just express your interest to volunteer,

19   you told them why you would be a good volunteer, correct?

20   A.  I—I don't remember.  I think they have some specific

21   things you have to explain to them before I could volunteer,

22   request that type of thing.

23   Q.  Well, let's see if we can refresh your recollection by

24   showing you Defense Exhibit No. 7014.

25             Yesterday you said your first volunteer was in 2022,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6R1GUO2                          Chen - Cross

1  but today you agree it was in 2021, correct?

2  A.  So I said in 2021 I started to express my interest, but I

3  think my real volunteer work started in March 2022, like truly

4  doing something that is being——doing the true volunteer, while

5  I started reaching out to express interest in 2021, and

6  then——here, end of 2021, yeah.

7  Q.  Let's just go through the chronology together, okay?

8          In December of 2021, you approached——who did you

9  approach.  Do you remember?

10  A.  I'm sure they were here.  It's——

11  Q.  I don't want you to look at the document.  I just showed it

12  to you to refresh your recollection about the date.

13          MR. FINKEL:  Should we take down the document if the

14  recollection has been refreshed.

15          THE COURT:  You're showing the document now?

16          MS. SHROFF:  Well, the witness had testified——you know

17  what, I'll come back to the document.  I'll come back to the

18  document.

19  BY MS. SHROFF:

20  Q.  You now remember, right, that it was in December of 2021,

21  correct?

22  A.  I think I mentioned to you I expressed interest of doing

23  the volunteer work.

24  Q.  Okay.  And that was about December, early December, right,

25  by December 9th, maybe?

1   A.  I did not remember that, but since you just showed me the

2   document, the date is there, yes.

3   Q.  Okay.  And in December 9th, you reached out to a particular

4   group of Mountains of Spice, correct?  Do you remember that?

5   A.  I reached out to a group.  I don't know why you say a

6   particular group.

7   Q.  What's the name of the group?

8   A.  I think that was something related to the finance group.

9   Q.  All right.  And you reached out to them and you told them

10  what your qualifications were, correct?

11  A.  I think that's their requirement before you express

12  interest, talk about the volunteer work, you like to

13  participate, they ask you to provide some background so that

14  they know you, who you are, and see what other volunteer work

15  that can be there that will be suitable based on your

16  experiences.

17  Q.  And what was your experiences that were suitable for that

18  volunteer work?

19  A.  You already said I work in a bank.

20  Q.  Ms. Chen——

21  A.  I work in a bank.  I work in a bank.

22  Q.  What else did you tell them?  Do you remember?

23  A.  I don't remember.

24          MS. SHROFF:  All right.  Well, let's show her again

25  DX 7014.

O6R1GUO2                      Chen - Cross

1   Q.  Take a look at the column on the right.

2               MR. FINKEL:  What's the question?

3               THE COURT:  We're waiting for the question.

4   Q.  Are you finished reading, Ms. Chen?

5   A.  Yes.

6   Q.  Okay.  Does that refresh your recollection as to what it is

7   that you told them your qualifications were?

8   A.  Yeah, that is what I said.  It gave you a template, you

9   have to explain your experiences, and that's what I filled out,

10  based on the template they're giving us.

11  Q.  Where is the template, in this document?

12              MR. FINKEL:  The document is not in evidence.

13              MS. SHROFF:  Okay.  Well, let's see.

14  Q.  Is that your handle over there in the corner?

15  A.  My handle?

16  Q.  Yes.  Who's there on the photo on the left side?

17  A.  When you say handle——

18  Q.  Who is IvyIvy?

19  A.  That's a nickname I used when I register in the MOS Farm.

20  Q.  And this is all your document, correct?

21  A.  Yeah, this is my communication.

22              MS. SHROFF:  Let's just keep scrolling down.

23              Scroll down some more.

24  Q.  Do you recognize this document?

25  A.  Yes.

O6R1GUO2                            Chen - Cross

1          MS. SHROFF:  Okay.  Let's keep scrolling down.

2     Q.  And you recognize page 2 of this document, correct?

3     A.  I don't remember this one.

4     Q.  Okay.  Well, let's go down to page 3.

5          Who is AlWell?

6     A.  That's a nickname my husband used.

7     Q.  Okay.  And the page 2, do you recognize who you're talking

8     about when I say my husband AlWell?

9     A.  I recognize my husband.  You mean I recognize my husband

10    nickname?  Yes, mm-hmm.

11    Q.  Okay.  And you're on Discord, correct, having these chats?

12    A.  Yes.

13         MS. SHROFF:  Okay.  I move DX 7014 into evidence.

14         MR. FINKEL:  Your Honor, may I ask a question or two.

15         THE COURT:  Yes, you may.

16    VOIR DIRE EXAMINATION

17    BY MR. FINKEL:

18    Q.  Ms. Chen, these chats that you had, were they in Mandarin

19    or in English?

20    A.  In Mandarin.

21    Q.  And this English language on the side, did you write it?

22    A.  No.

23    Q.  Do you know where that's from?

24    A.  I don't know.

25    Q.  Do you know if it's right?

O6R1GUO2                          Chen - Cross

1    A.  I don't know.

2            MR. FINKEL:  We object, and if necessary, a sidebar

3    may be appropriate.

4            MS. SHROFF:  Your Honor, may I just ask her a few

5    questions.

6            THE COURT:  Yes.  Go ahead and ask a few questions.

7    BY MS. SHROFF:

8    Q.  You read Mandarin?

9    A.  Yes.

10   Q.  Do you read English?

11   A.  Yes.

12           MS. SHROFF:  We move DX 7014 into evidence.

13           THE COURT:  So the question is whether or not the

14   translation, in her opinion, accurately reflects what was

15   written in Mandarin.

16           MS. SHROFF:  I'm happy not to question her about any

17   of the English language.

18           MR. FINKEL:  Maybe we can approach.

19           THE COURT:  So let's approach.

20           (Continued on next page)

21

22

23

24

25

O6R1GUO2                      Chen - Cross

1              (At the sidebar)

2              MR. FINKEL:  There are a few reasons why this is

3    objectionable.  The first is, we received these documents at

4    9:56 a.m. this morning, which is when this witness was on

5    stand.  There's no stipulated translations for this document at

6    all.  While the parties have had good conversations and have

7    reached stipulations on most Mandarin-language issues, that has

8    taken time.  The government experts have reviewed their

9    proposals, their experts have reviewed our proposals, we've

10   been able to reach an accommodation.  The Court has been

11   consistent throughout this trial that Mandarin language that's

12   not translated cannot be admitted.  We would have preferred to

13   put in a variety of documents that were in Mandarin that we

14   ourselves translated, but absent a stip, we didn't do that.  So

15   that's number one is, this is a Mandarin-language document

16   which she has not had time to review the accuracy of the

17   English translations, nor could she.  As Ms. Shroff in fact

18   objected yesterday, she's not a 702 witness who is qualified to

19   render an opinion about whether the English language is correct

20   from the Mandarin.  That's the simplest way to deal with this

21   document.

22              Number two, she didn't authenticate page 2.  She

23   doesn't recognize it.

24              Number three, these are statements of the witness, so

25   they're hearsay.  And they're not inconsistent with anything

O6R1GUO2                          Chen - Cross

she has said, so that's not a reason.  And to the extent her

memory needs to be refreshed, she can be shown this document.

I didn't object to that.  But we can't introduce it as an

exhibit because of the Mandarin language; because it's her

statements and there's no proper basis; three, I don't really

understand the relevance, but maybe there is relevance.  So

those are the primary reasons.

          THE COURT:  Are you looking to impeach her with this?

          MS. SHROFF:  I was actually looking to put it in as

well, but I will certainly use it to impeach her, number one.

          Number two, yesterday, when she testified as to her

translation and her understanding of the Mandarin document, and

again today, her understanding and her position that it wasn't

accurately translated was in fact allowed.  Mr. Finkel objected

to my objection, and the Court allowed the testimony to stand

that she was of the opinion that the translation of that

document was incorrect.

          MR. FINKEL:  That's not correct.

          MS. SHROFF:  I haven't even finished.

          MR. FINKEL:  I thought you had.

          MS. SHROFF:  So the record is just out there.  And the

Court actually said she disagrees as to whether or not the

translation is accurate.  I think that happened today.

          THE COURT:  So just going backwards, if they have not

had a chance to have their translators review it, then it

O6R1GUO2                          Chen - Cross

1    cannot come in.  You can certainly use it to try to impeach her

2    by showing it to only her.

3              MS. SHROFF:  Okay.

4              THE COURT:  Okay.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6R1GUO2                          Chen - Cross

1              (In open court)

2              THE COURT:  You may continue.

3   BY MS. SHROFF:

4   Q.  In December of 2021, you were on Discord, correct?

5   A.  Yes.

6   Q.  And on Discord, you sought to join the finance group

7   because you wanted to volunteer in that particular group,

8   correct?

9   A.  I joined a group——sorry.  What's your question?  I joined a

10  group because I want to volunteer?

11  Q.  In the finance group specifically, yes.

12  A.  I joined the group but not because I want to volunteer

13  specifically in that group.  I just joined the group.

14  Q.  Okay.  Well, you told the group why you would be a

15  particularly good person in that group, correct?

16  A.  I explained earlier, they ask you to provide your

17  background so I provided my background.

18  Q.  Well, you did more than that, right?  You told them you

19  were eager to join the farm's finance department, correct?

20  A.  Where did you see that?

21              MR. FINKEL:  So this——

22              THE COURT:  So——

23              MS. SHROFF:  The document shouldn't be in front of

24  her.

25  Q.  My question to you is:  Do you recall telling them on

O6R1GUO2                         Chen - Cross

1    Discord that you were "eager to join our farm's finance

2    department to contribute my modest efforts"?  Do you recall

3    saying that on Discord?

4    A.  I don't remember that.

5    Q.  Let's show you again 7014.

6          THE COURT:  And so you don't have to read from the

7    document.  The only question would be:  Does that help you

8    remember?  Does that refresh your recollection?

9    A.  By—I don't remember I said that.  I—

10   Q.  Just take a minute and read the document and just the only

11   question, as the judge said, was—

12         THE COURT:  The Mandarin version, if that is the

13   language in which she was—

14         MS. SHROFF:  Sure.  There you go.  It's right there,

15   on the left column.

16   A.  So you ask me, so I think I said I joined the group, but

17   not because I want to contribute in that group.

18   Q.  That wasn't the question, Ms. Chen.  The question—maybe

19   the judge can repeat it.

20         THE COURT:  So the question is:  Does this help

21   refresh your recollection as to what you said?

22   A.  And what did I say?

23   Q.  That you were eager to join the farm's finance department,

24   eager to join.

25   A.  I think, okay, when I say eager to join, it's—

O6R1GUO2                          Chen - Cross

1   Q.  The question only is whether you said that.

2              THE COURT:  No.  The question is whether this document

3   refreshes her recollection.  That's the first question.

4   A.  I don't remember.

5   Q.  Okay.  And do you recall then telling them why you would be

6   particularly suited to the finance department?

7              MR. FINKEL:  Asked and answered.

8              THE COURT:  Sustained.

9   Q.  Did you list your skills as to why you would be

10  particularly suited to the finance department?

11             MR. FINKEL:  Asked and answered three times.

12             THE COURT:  Sustained.

13             MS. SHROFF:  I did not ask that question, your Honor.

14  A.  I explained, asked me to——

15             THE COURT:  So the objection is sustained, so don't

16  answer.

17  Q.  What were the skills that you listed?

18             MR. FINKEL:  Asked and answered.

19             MS. SHROFF:  I did not ask that question.

20             THE COURT:  If you have a recollection.  Do you

21  recollect?

22             THE WITNESS:  I don't.

23  Q.  Do you recall saying to them that you had skills in

24  English, financial management, risk analysis, credit, legal

25  compliance, auditing, business process organization, certified

O6R1GUO2                          Chen - Cross

1  public accountant, certified internal auditor, education, MBA,

2  over ten years of experience at large financial companies in

3  the U.S.?

4           MR. FINKEL:  Objection, because Ms. Shroff is reading

5  from a document that is not in evidence.

6           MS. SHROFF:  I'm asking her if she listed those

7  things.

8  A.  I don't remember.  I answered your question——

9  Q.  All right.

10  A.  ——already.

11  Q.  I'll show you again the same document to see if the

12  document refreshes your recollection as to the last question.

13           THE COURT:  The objection was overruled.  Go ahead.

14           MS. SHROFF:  Show her the Mandarin language, please.

15  A.  I don't remember.

16  Q.  Okay.  Let's move forward.

17           Do you recall also on Discord telling——oh, let me go

18  back to the question.  You were talking to——

19           THE COURT:  So it's now 11:30, so we're going to take

20  our half-hour break.

21           Members of the jury, remember, don't discuss the case

22  amongst yourselves or with anyone else.  Don't permit anyone to

23  discuss the case in your presence.  Don't read, listen to, or

24  watch anything that touches on the subject matter of this case.

25           (Jury not present)

O6R1GUO2

1          THE COURT:  Ma'am, you may step out of the courtroom.

2     Don't discuss your testimony.

3          (Witness not present)

4          THE COURT:  Is there anything before we reconvene?

5          MR. FINKEL:  Your Honor, I'd just like to understand

6     how much more Ms. Shroff has.  She's now had cross-examination

7     for three hours.  Ms. Chen was on direct for an hour and ten

8     minutes.  The government's point of view is most of this is

9     entirely irrelevant.  But it would just be helpful to know,

10    because we have one more witness.  We're trying to figure it

11    out.  We'd like to rest today.  We were hoping to rest two days

12    ago.  I don't know if this is a filibuster to prevent the

13    defense from having to present their case until Tuesday, but

14    we're way far afield from scope and relevance and a host of

15    other issues.

16         THE COURT:  Ms. Shroff, how much more?

17         MS. SHROFF:  Your Honor, this is well within the

18    scope.  Did the Court want me to address that issue or no?

19         THE COURT:  I want you to address the timing.

20         MS. SHROFF:  I think about 45 minutes.

21         THE COURT:  45 minutes?

22         MS. SHROFF:  Yes, your Honor.

23         THE COURT:  I'd like you to cut that back.

24         MS. SHROFF:  We tried.

25         THE COURT:  I'd like you to cut it back.

1          MS. SHROFF:  I will definitely try, your Honor.

2          MR. FINKEL:  Your Honor, may I just raise one other

3     issue.

4          THE COURT:  Yes.

5          MR. FINKEL:  Just further to what was discussed at

6     sidebar, the question that Ms. Shroff posed about the timing of

7     the SEC settlement and her decision to invest after the SEC

8     said—as Ms. Shroff put it, in effect, SEC said Mr. Guo did

9     something wrong, you still decided to invest, there's only one

10    possible inference to draw from such a question, and that is

11    that Ms. Shroff is suggesting to the jury that Ms. Chen, who

12    she has emphasized many times over and over, was involved in

13    risk management at a bank, Ms. Shroff's point is, Ms. Chen

14    should have known better.  That's the only point to draw,

15    and—all right.  I don't want to—

16         THE COURT:  So the date that I'm referring to is the

17    date that she decided to make the investment.  Ms. Shroff can

18    raise or whoever is going to do the summation can raise the

19    date of the SEC warning or statement but not in a question to

20    the witness are you to raise the SEC issue, just the issue of

21    when she actually made the investment; in other words, not to

22    draw the jury's attention to the timing of the SEC's statement

23    and the timing of her investment.

24         MR. FINKEL:  Yes, your Honor.  I agree with that.  And

25    the government's concern—and we've articulated this in other

O6R1GUO2

1    instances; I think this is the best example of it——is the jury

2    thinks, or we're concerned the jury might think, and certainly

3    can be confused to think, that if the victims are negligent or

4    unsophisticated or didn't do enough research——there was another

5    question posed:  Did you reach out to Himalaya Exchange to ask

6    if they had gold?  Your Honor sustained that.  The question in

7    this trial for this jury is whether Miles Guo had intent to

8    defraud.  The intent and sophistication of the victims is not

9    relevant.  And I really feel, the government feels, that the

10   jury is confused.  And we'd ask your Honor to consider giving

11   an instruction, which is a correct statement of the law, so

12   that there will be no confusion and because the defense has

13   never objected to the fact of that instruction as a practical

14   statement of the law.  We think it's appropriate.

15        MS. SHROFF:  Your Honor, under *Litvak*, I'm entitled to

16   show what information this witness had access to.  I reread

17   *Litvak*, I consulted with the person who has a deeper

18   understanding of it, and I believe the questions I asked were

19   permissible.

20        More importantly, this jury does not seem in the least

21   bit confused.  It seems like a very sophisticated, enthralled,

22   and attention-paying jury.

23        And finally, your Honor, I am quite certain that the

24   Court's jury instructions, which will come after, I'm assuming,

25   a day or two day's break, this witness, we hope, will be a very

O6R1GUO2

1    distant memory for all of us.

2         So for those reasons, your Honor, I do not think any

3    instruction at this point is needed.

4         MR. FINKEL:  May I respond.

5         THE COURT:  Yes.

6         MR. FINKEL:  So your Honor, after this witness, which

7    I guess has another 45 minutes, so she'll be on the stand for

8    four hours, in which she has been crossed extensively about

9    what she knew, when she knew it, what research she did——and

10   she's not the first witness to experience this——they're going

11   to have a defense case, which is going to be filled with

12   information from the white paper and all kinds of other things,

13   all to suggest to the jury that they should have known better.

14   And Ms. Shroff's right.  I think the jury is very attentive,

15   but we don't know what they're thinking about what they need to

16   decide, and as they're taking this information in, given the

17   two questions——there were several, but the two in particular

18   that I referenced——"Did you call the Himalaya Exchange and ask

19   if they had gold," that's not *Litvak*.  That's suggesting she

20   should have made a phone call to the Himalaya Exchange and

21   researched it.  And then she did the same thing:  And did you

22   have Google?  Do you have Google?  And Ms. Chen said:  Yes, of

23   course I have Google.  These are suggesting the victim should

24   have done more.  This is not a mix of information.  An

25   instruction here is appropriate.

O6R1GUO2

1                THE COURT:  So I don't know that you're right.  If you

2       can provide some appellate authority that an instruction at

3       this moment would be appropriate, I would look at it.

4                We'll start again at noon.

5                MR. FINKEL:  Yes, your Honor.

6                (Recess)

O6RBGUO3

AFTERNOON SESSION

12:06 p.m.

1          THE COURT:  Please be seated.  I just received news

that juror number eight just received news that his daughter

has tested positive for Covid.  I have sent back a mask which

number eight has put on and we will just proceed from here.

          MR. KAMARAJU:  Your Honor, can I just note one thing

since we're talking about jurors.  I believe alternate number

four this morning when I was riding up on the elevator

approached me and ask if he could get on the elevator with me.

I said no, why don't you take this one, and I conferred with

government counsel.  I don't think there's anything to be done.

I just wanted to let your Honor know.

          MR. FINKEL:  That's fine from the government's

perspective.  Your Honor, the government emailed chambers a

copy of Second Circuit authority regarding the issue we

discussed before the break.  Happy to answer any questions if

the Court has any.  The government's view is that this case is

on all fours with the situation that is before the Court right

now.  In that case the defendant disclaimed a duress defense,

then testimony elicited information about threats.  The

government objected on the basis it appears that such threat

information was confusing the jury about the appropriateness of

that information, and the Court mid-trial Judge Rakoff provided

a corrective instruction mid-trial and post-trial.  Second

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6RBGUO3

Circuit affirmed both instructions.  We think both are appropriate here so that the jury is not confused and that the Court deliver what is unobjectionably a correct statement of the law.  And that's all the Second Circuit would review is whether the statement your Honor makes is a correct statement of the law.  And based on the responses to the proposed jury charge, I don't believe that the defense has objected to the statement in the proposed jury charge that the sophistication of the jurors is not what is relevant to this trial, and they are not under any obligation to discover the fraud.

MR. KAMARAJU:  Your Honor, I think, one, there's a difference between a duress defense, which is obviously a defense that the defendant has to notify the government and the Court of before.  My understanding is Ms. Shroff's questions were targeted toward access, towards the access to the information.  And your Honor did rule that sophistication is a factor that the jury can consider under *Litvak*.  I'm not sure that any kind of instruction is appropriate now.  And I'm not sure that *Peterson* actually speaks to the appropriateness of it in this context.

MR. FINKEL:  Not to go down this path again, but Ms. Shroff ask the witness, Did you call the Himalaya Exchange and ask them if they had gold?  Suggesting did you do research to determine that there was no gold.  She also asked, Did you know that Miles Guo was told by the SEC that he did an

O6RBGUO3

1   unregistered security offering on this date, and then after

2   that date you invested again?  This is saying that there were

3   red flags, which there were, there were red flags for this

4   victim, but there's no reliance.  It's a question of Miles

5   Guo's intent, not their intent, and the jury is confused about

6   this issue.  This Second Circuit authority provides basis for

7   the Court to provide a mid-trial instruction in such

8   circumstances.  Your Honor noticed this *sua sponte* and called

9   for a sidebar in response to Ms. Shroff's question about the

10  timing of the SEC investment.  This is not about access to

11  information.  They have done it through Ms. Chen.  They have

12  done it through other witnesses.  They have tried to lay sort

13  of subtext that the victim should have known.

14          THE COURT:  So I don't agree that it's appropriate to

15  give the instruction at this time, so let's have the jurors

16  brought in.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O6RBGUO3

1          THE LAW CLERK:  Jury entering.

2          (Jury present)

3          THE COURT:  Please be seated.  Members of the jury,

4    juror number eight has informed the Court that his daughter was

5    just diagnosed with Covid, and I directed that he wear a mask,

6    and so I want all of you to be very mindful of your health as

7    we go along.  And if you should be diagnosed with Covid, I'd

8    like you to text the three numbers that we will be giving to

9    you at the break.  All righty.  You may continue.

10   BY MS. SHROFF:

11   Q.  Ms. Chen, in early December of 2021, you also on behalf of

12   your husband asked for the opportunity for him to volunteer,

13   correct?

14   A.  I don't remember that.

15   Q.  Do you recall -- okay.  Let me show you again the same

16   document to refresh your recollection, 704.  And if I could

17   show her the Mandarin version, please, and the English version

18   as well, whichever one she picks.

19   A.  I don't remember I did.

20   Q.  Thank you.  And did there come a time when both you and

21   your husband were volunteering for Faith Night, correct?

22   A.  We're not volunteering for Faith Night, no.

23   Q.  You were volunteering in her group, correct?

24   A.  I volunteering MOS farm.

25   Q.  My question was, she ran the finance group, correct?

O6RBGUO3

1   A.  I'm not sure.

2   Q.  Well, didn't she tell you that you were welcome?

3   A.  I don't remember.

4   Q.  All right.  Let's go back to the document again.  Does that

5   document refresh your recollection that you in fact approached

6   Faith Night, and she is the one who said you and he are

7   welcome?

8           MR. FINKEL:  That's not the question that was asked.

9           MS. SHROFF:  I'm happy to rephrase.

10  Q.  Let me try the first question again.  Do you recall asking

11  or directing your Discord chat to Faith Night?

12  A.  I recall I express interest to join a group.

13  Q.  Right.  And the group leader at that time was Faith Night,

14  right?

15  A.  I don't remember.

16  Q.  Well, does that refresh your recollection, the document?

17  A.  I don't remember.

18  Q.  The document that's on the screen?

19  A.  I don't remember.

20          THE COURT:  So if you'll look at the document on the

21  screen and then say whether or not that refreshes your

22  recollection.

23  A.  I have look at this document and I said I don't remember.

24  Q.  And you also don't remember whether it was Faith Night who

25  welcomed you, correct?

O6RBGUO3

1          MR. FINKEL:  Asked and answered.

2          THE COURT:  Overruled.  You may answer if you remember

3    that.

4    A.  I don't remember.  There are like different volunteers in

5    MOS farm.  I reach out to someone first and tell us to provide

6    the template, and then we follow the template and reach out to

7    another person, so I don't remember who is who.

8    Q.  Sitting here today you do know who Faith Night is, right?

9    A.  I do.

10   Q.  And let's move forward.  Did you also know somebody named

11   Octopus who was in the same finance group in December of 2021?

12   A.  I don't remember.

13   Q.  And in December of 2021, you were aware, were you not, that

14   Mr. Guo rewarded people who volunteered, correct?

15   A.  I was not aware.

16   Q.  And you were not aware that Mr. Guo had produced videos and

17   talked about the benefits of volunteering at a farm?

18   A.  I don't think I recall.

19   Q.  There did come a point when they accepted you into the

20   group, right, in December of 2021?

21   A.  I think so.

22   Q.  And do you remember that was on December 9 of 2021?

23   A.  I don't remember.

24   Q.  And do you remember saying to them that you were happy to

25   be a volunteer and called it, Our finance group?

O6RBGUO3

1   A.  I don't remember.

2   Q.  Do you recall telling them that your husband had experience

3   in finance and Fintech?

4   A.  I don't remember.

5   Q.  May we show her again the same document.

6   A.  I don't remember.

7   Q.  We can take that down.

8           And do you recall telling them about his extensive IT

9   experience?

10  A.  I don't recall.

11  Q.  And this is still in December of 2021, do you recall that

12  you started volunteering in December?  Do you recall that?

13  A.  I don't recall.

14  Q.  Do you recall that in December, on December 20 of 2021, you

15  stopped volunteering, do you recall that?

16  A.  I don't recall.

17  Q.  Do you recall that your husband also stopped volunteering

18  on December 20 of 2021?

19  A.  I don't recall.

20  Q.  Now moving onto February of 2022, you were working at that

21  time, correct?

22  A.  When you say I working, can you help clarify.

23  Q.  Sure.  First you were just working as a mother, correct?

24  A.  No, I'm always working.

25  Q.  Mothering is work.  I'm asking you.  That's work.  I'm

O6RBGUO3

1  acknowledging your work.

2          MR. FINKEL:  Objection to the commentary.

3          MS. SHROFF:  I'm trying to answer her question.

4          THE COURT:  Just ask the questions.

5  Q.  You worked at home, correct?

6  A.  No, I always have a job.  I don't understand what's your

7  question.  When you say work, can you help me understand.  When

8  you say work as a mom, what does that mean?

9  Q.  You looked after your child. You fed your child.  You put

10 him to bed, he, she, your children.  You took care of them,

11 right?

12         MR. FINKEL:  Relevance objection.

13         MS. SHROFF:  I'm literally trying to do what the

14 witness asked.

15         THE COURT:  Overruled.  What's the question.

16 A.  What's the question?

17 Q.  You had a full-time, correct?

18 A.  Yes.

19 Q.  And then you worked at home also, correct?

20 A.  When you say I work at home, meaning I take care of my kids

21 at home?

22 Q.  Yes, that's work.

23 A.  Yes.

24 Q.  Okay.  And that was in February of 2022 as well, correct?

25 A.  That's all the time when I have kids, I do that type of

O6RBGUO3

1    job.

2    Q.  And in February 2022, it was Covid time, was it, do you

3    remember?

4    A.  Yes.

5    Q.  And at that time were you actually physically going to work

6    at that time during Covid?

7    A.  I work remote.

8    Q.  And how long do you recall working remote?

9              MR. FINKEL:  Relevance objection.

10             MS. SHROFF:  I'll move on, your Honor.

11   Q.  I'll move forward.  It's okay.  As part of your volunteer

12   work in 2022, were you a volunteer?

13   A.  Yes.

14   Q.  And you testified on direct, right, that you were working

15   ten hours at volunteering, correct?

16   A.  What do you mean by ten hours?

17   Q.  How many hours did you volunteer?

18   A.  I testify on average I volunteer about 40 hours per week.

19   Q.  So on arrange you -- you know what.  I won't repeat it.

20   And at this time you were also working remotely 40-hour weeks?

21   A.  Yes, that's correct.

22   Q.  And there came a time when you had to submit time sheets

23   for your volunteer work, right?

24   A.  Yes.

25   Q.  And do you recall sitting here today that you submitted

O6RBGUO3

1    time sheets for 2,390 hours?

2    A.  Me alone?

3    Q.  Yes.

4            THE COURT:  Covering what period?

5            MS. SHROFF:  I didn't hear.

6            THE COURT:  2,000 hours covering what period of time?

7            MS. SHROFF:  For February.

8            THE COURT:  For February alone?

9            MS. SHROFF:  I'll see how she put it.

10    Q.  You submitted time sheets to Discord, correct?

11    A.  Yes.

12    Q.  And your Discord hours you noted as daily average working

13    hours were ten, correct?

14    A.  So my testimony talk about an average hours 40 hours

15    between March 2022 and March 2023, so I work more hours during

16    the period of March 2022 till September 2022, and less hours

17    from September 2022 till March 2023.  So by the time you say

18    about ten hours a day, that was during the time that I was

19    working between March 2022 till September 2022.

20    Q.  Actually it was February of 2022 to October of 2022,

21    correct?

22    A.  So maybe my recollection has a month off or so, but if you

23    say that.

24    Q.  To be precise, it's February 26 of 2022 to October 22 of

25    2022?

O6RBGUO3

1  A.  Okay.  If you say February 26, 2022, it's close to March,

2  yeah.  It's close to March, yes.  So it's a few days off

3  between you say starting on February 26 versus I say March

4  2022.

5  Q.  And that's all through Covid, right?

6          March was Covid, right?

7  A.  Yes.

8  Q.  April was Covid, right?

9          MR. FINKEL:  Objection to the relevance.  What are we

10  doing?

11          THE COURT:  Sustained.

12  Q.  You were working remotely during that time, correct?

13          MR. FINKEL:  Asked and answered.

14          THE COURT:  Sustained.

15  Q.  You submitted these time sheets, right?

16          MR. FINKEL:  Asked and answered.

17          THE COURT:  Sustained.

18  Q.  Who did you submit it to?

19  A.  You said Discord.  If that is true, I submit in Discord.  I

20  don't remember who I submitted it to.

21  Q.  And somebody in Discord contacted you about your time

22  sheets, correct?

23  A.  I don't remember.

24  Q.  They told you these were exaggerated time sheets, correct?

25  A.  Sorry.  What's your question?

O6RBGUO3

1    Q.  They said you had inflated your time sheets, correct?

2    A.  I don't recall that.

3    Q.  You don't recall them saying you couldn't possibly have put

4    in all of those hours?

5            MR. FINKEL:  Asked and answered.

6            THE COURT:  Sustained, asked and answered.

7    Q.  You were in fact asked to describe what work you did as a

8    volunteer, correct?

9    A.  I think so.

10   Q.  Right.  And you provided a description, correct?

11   A.  I think so.

12   Q.  And they took issue with your description of the work you

13   provided, correct?

14   A.  They took an issue with?

15   Q.  They disagreed with you, correct?

16   A.  I don't recall that.

17   Q.  And then did there come a time when you also stopped

18   volunteering again?

19   A.  There come a time that I stopped volunteering or started

20   up.

21   Q.  Stopped.

22   A.  I answered, March 2023.

23   Q.  And you stopped because the people in your group pushed

24   back on your hours, correct?

25   A.  That's incorrect.

O6RBGUO3

Q.  So why did you stop?

A.  Why did I stop?

Q.  Yes.

A.  Back then my parents their house were not being doing very well, so I plan to take a step back and spend more time with them.

Q.  But that was in December of 2021, right?

That's what you told the people on Discord in December of 2021?

A.  That's what I told them in March of 2023.

Q.  Let me show you again the same document exhibit.  Actually, I'll move on.

When you decided to stop volunteering, did you tell anyone over Discord the reason why you stopped?

A.  I message Octopus through the Whatsapp chat on March 2023.

Q.  But you and Octopus did not get along, correct?

A.  I don't understand when you say do not get along?  What does that mean.

Q.  Because you and Octopus and you and Faith Night and you and Fay Fay had a disagreement about how you were calculating your volunteer hours and how they related to your H Coin allotment, correct?

MR. FINKEL:  Form objection.

A.  That's incorrect.

THE COURT:  Overruled.

O6RBGUO3

Q.  Let's look at your H Coin allotment, okay.  You agree with me that the initial H Coin allotment was based on several factors, correct?

A.  You didn't say what those factors are.  You said it's based on several factors.

Q.  You know they were based on several factors, do you know that or not?

A.  Can you tell me those factors so I can answer your question yes or no?

Q.  Sure.  One of the factors was the amount of volunteer work done, correct?

A.  So the H Coin allotment was provided before H Coin launched in November 2021, so the volunteer work calculated is for the volunteer work done before November 1, 2021.  So back then, I did not even volunteer, so it's not have anything to do with my H Coin allotment.

Q.  We'll get there.  I'm just talking about the initial allotment.  Okay.  The initial allotment you knew was based on volunteer work, correct?

A.  I did not know.

Q.  How about did it depend on how much money you had invested?

A.  That's what I know.

Q.  And then wasn't it also multiplied by a certain co-efficient, correct?

          There was a formula that they used, correct?

O6RBGUO3

1  A.  Yes.

2  Q.  And the formula was either 0.5, 0.7 or .02, correct?

3  A.  Yes.

4  Q.  And when you were doing the calculation for yourself, there

5  was a disagreement about your particular calculation, correct?

6          MR. FINKEL:  Asked and answered.

7          THE COURT:  Sustained.

8          MS. SHROFF:  I have not even touched the November

9  portion of this allotment.

10         THE COURT:  You've asked that question generally.  Are

11  you asking it with regard to a specific time?

12         MS. SHROFF:  Yes, your Honor.  I'm asking it about the

13  timeframe that the witness just referred to which was the

14  pre-period when it was calculated before H Coin was offered.

15         THE COURT:  Okay.  You may answer.

16  A.  So what's the question?

17  Q.  There was a disagreement as to your actual calculation,

18  correct?

19  A.  I have explained in my testimony yesterday, my investment

20  got miscounted in H Coin allotment.

21  Q.  You believed it was miscounted and they did not agree with

22  you, correct?

23  A.  When you say they, who are you referring to?

24  Q.  The people who were in charge of allotments, they did not

25  agree with you, correct?

O6RBGUO3

1  A.  Who are in charge of the H Coin allotment?

2  Q.  You tell me.

3  A.  I don't know.

4  Q.  Well, they told you that they disagreed with your

5  calculation?

6  A.  Who told you they disagree with my calculation?

7  Q.  Ms. Chen --

8  A.  I don't know who she's referring to so I cannot answer her

9  question.  She told me they, but she didn't tell me who is

10  they.

11            THE COURT:  Ms. Shroff.

12  Q.  You did the calculation at a 0.7 rate, correct?

13  A.  I didn't do the calculation at 07 rate.  It was provided to

14  me at 0.7 rate because I think they said the coin is gone, so I

15  have no choice of doing the coin.  I can only do the fund, and

16  the fund is 0.7.

17  Q.  They told you specifically that your calculation should

18  have been at the 0.2 rate, correct?

19            MR. FINKEL:  We've been through this.

20            THE COURT:  You may answer.

21  A.  I don't recall that.

22  Q.  Now, Ms. Chen, you were an active trader on the Himalaya

23  Exchange; is that correct?

24  A.  I'm not saying I'm active trader, but I do sell and buy

25  because the price drop so much.  So when it kind of get to the

O6RBGUO3

1  point it's just so low, I don't know what to do, so I do sell.

2  Q.  You had 90 buy transactions since the opening of your

3  account, correct?

4  A.  I don't remember that amount.

5  Q.  You made 80 sale transactions, correct?

6  A.  I don't remember.

7  Q.  You were playing on the H Coin market to see if you could

8  make a profit, correct?

9  A.  That's incorrect.

10  Q.  What did you trade for if not to make a profit?

11  A.  Incur as much as I can.

12  Q.  I'm sorry.

13  A.  Have as much as I can.

14  Q.  Same thing, right?

15  A.  It's different.

16  Q.  All told, you had 80 buys and 90 sales transactions, right?

17  A.  I don't remember.

18  Q.  Well, you have access to your sales and your buys, right?

19  A.  I haven't log in account for a long time.

20  Q.  I didn't ask if you had logged in for a long time.  My

21  question was whether you had access to that information?

22  A.  Yes.

23  Q.  By the way, did you and Mr. Finkel over there access this

24  information to prepare for your testimony today?

25  A.  No.  The answer is no.

O6RBGUO3

1    Q.  Ms. Chen, you testified on direct that you took a second

2    loan on your home to purchase additional GTV shares, correct?

3    A.  Yes.

4    Q.  That was in December of 2021; is that right?

5    A.  That's incorrect.

6    Q.  Well, you tell me the correct date?

7    A.  I think yesterday I said it's the Crane Advisory.  That was

8    in March of 2021.

9    Q.  You think you took your second home loan in March of 2021?

10   I just want to get the month right.

11              MR. FINKEL:  Objection.  I think it's

12   mischaracterizing what was just said.

13   Q.  I'll ask the question again.  In what month did you take

14   your second loan on your home to purchase additional GTV

15   shares?

16              MR. FINKEL:  Objection to form.  Year too, right?

17              THE COURT:  Put in the year, please.

18   Q.  2021?

19              MR. FINKEL:  Objection to the testimony.  Ms. Shroff

20   can ask the question.

21              MS. SHROFF:  You told me to put a year.

22              THE COURT:  So the month and the date that you're

23   asking about, Ms. Shroff.

24              MS. SHROFF:  I'm asking her what month and date she

25   took the loan out. I'm asking her the question.

O6RBGUO3

 1              THE COURT:  Okay.  You may answer.
 2    A.  If I remember correctly, I think it's March 2021.
 3    Q.  And at that time in March of 2021, you also owned a
 4    townhouse in Falls Church Virginia, correct?
 5              MR. FINKEL:  Objection to the relevance.
 6              THE COURT:  Does this have to do with the home equity
 7    loan?
 8              MS. SHROFF:  No, this is her other assets.
 9              MR. FINKEL:  Highly irrelevant.
10              THE COURT:  Sustained.
11    Q.  But you had other assets, right?
12              MR. FINKEL:  Same objection.
13              THE COURT:  Sustained.
14    Q.  Did you invest in real estate, Ms. Chen?
15              MR. FINKEL:  Same objection.
16              THE COURT:  Sustained.
17              MS. SHROFF:  Your Honor, may we have a sidebar?
18              MR. FINKEL:  I don't think one is needed.
19              THE COURT:  Okay.
20              (Continued on next page)
21
22
23
24
25

O6RBGUO3

1              (At the sidebar)

2           MS. SHROFF:  Your Honor, the jury is left with an

3    impression that she took a second loan on her home.  And as a

4    result of that, there should be some sort of sympathetic

5    reaction to somebody taking a second loan.  The same person can

6    take a second loan on a home because it seems like a financial

7    astute thing to do or a financially solvent thing to do.  I

8    think it's fair for the jury to know that she had options, and

9    she was a investor in real estate.  She actually leased out and

10   rented out these properties.  And all told she had nine

11   properties in the state of Virginia.  It simply goes to

12   takeaway that sympathy factor that the government created by

13   asking how and why she took a second loan so she could buy GTV

14   shares.

15          THE COURT:  I think the government is merely

16   establishing that she used these funds to make a purchase and

17   that she was defrauded, not that the jury should feel sympathy.

18   The prosecution is using this for a finding of fraud.

19          MS. SHROFF:  But a second loan on an apartment

20   wouldn't be irrelevant.  It's her money.

21          THE COURT:  The question of how she made the payment

22   is relevant, but whether or not she has other types of

23   investment, I don't agree is relevant, so let's move on.

24              (Continued on next page)

25

O6RBGUO3

1              (In open court; jury present)

2    BY MS. SHROFF:

3    Q.  Ms. Chen, on direct examination you recall testifying about

4    the email you sent about the Hamilton Fund, correct?

5    A.  Sorry.  I miss part of the question.  Can you repeat.

6    Q.  You testified on direct about emails you sent to

7    Mr. Fallon, correct?

8    A.  So you mean I emailed Mr. Fallon, right, that's your

9    question?  You said I testified I email Mr. Fallon?

10   Q.  Yes.

11   A.  Yes, I email him.

12   Q.  And you emailed him and your husband also emailed him,

13   correct?

14   A.  Let me put this way, we emailed Mr. Fallon.

15   Q.  And you testified on direct that Mr. Fallon didn't reply

16   but sent you to a lawyer, correct?

17   A.  I testify Mr. Fallon didn't respond and then his lawyer

18   responded.

19   Q.  And the lawyer told you that the funds you were seeking

20   return of were frozen, correct?

21              MR. FINKEL:  Objection, hearsay.

22              MS. SHROFF:  It's not being offered for the truth.

23              THE COURT:  I'll allow the question.

24   A.  What's the question?

25   Q.  He told you the funds were frozen, correct?

O6RBGUO3

1    A.  He told me my money was frozen, yes.

2    Q.  And you disagreed, right?

3    A.  Right.

4    Q.  And you kept emailing that the funds were not frozen,

5    correct?

6    A.  I explain it.

7    Q.  And they disagreed with you, correct?

8    A.  They saying the same thing, my money was frozen.

9    Q.  And at the same time that you were emailing Mr. Fallon and

10   his lawyer, you were also emailing the department of justice,

11   correct?

12   A.  I don't think -- when you say emailing, what do you mean

13   emailing?

14   Q.  In May of 2023, you were in touch with the United States

15   Attorney's office, right?

16   A.  I do not think so.

17   Q.  Well, let me see.  You don't think you were in touch with

18   the United States Attorney's office, these prosecutors in May

19   of 2023?

20   A.  So I follow the website on DOJ where they have a link to

21   submit victim information, so I filled out information

22   following that link.  And at the same time, they have an email

23   address that I email them letting them know that I completed

24   information.  In addition, that form does not include a

25   specific investment item I have, so therefore I'm including

O6RBGUO3

1    that specific investment item in the email that I sent to the

2    victim mailbox.

3    Q.  And Mr. Finkel works for the department of justice, right?

4    A.  I actually don't know.  I guess yes.  I don't know.

5    Q.  Who do you think he works for?

6    A.  I don't know.

7    Q.  Do you think he works for Mr. Guo?

8    A.  No.

9    Q.  So who do you think he works for?

10   A.  He works for the government.

11   Q.  Okay.  And that's the email address you emailed, right, in

12   May of 2023, right?

13   A.  I email one that is available on the DOJ website.  It's

14   victim mailbox, specifically just for the victim.

15   Q.  And then after that you followed up by sending emails to

16   the FBI, right?

17   A.  No, I did not.

18   Q.  Let's show you 3602-26.  Does that refresh your

19   recollection that in June of 2023 you met with FBI D. Marino?

20          MR. FINKEL:  Objection.  The question was about May,

21   not June.

22          MS. SHROFF:  I was off by a month.

23   Q.  June, June of 2023, did you meet with the FBI agent?

24   A.  So you're asking me my recollection, asking me to read this

25   document?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6RBGUO3

1  Q.  I'm asking.  I'm just asking you if you met with the FBI

2  Mr. D Marino. Do you remember?

3  A.  Someone reach out to me from FBI and I met them.  To answer

4  your question, I did not email FBI.  So I send the email to the

5  victim mailbox and then FBI reach out to me and schedule the

6  meeting.

7  Q.  After he reached out to you, you emailed back and forth

8  with the FBI agent, correct?

9  A.  I don't know when you say email back and forth.

10 Q.  Which FBI did you email yesterday?

11 A.  You just want to know the name?

12 Q.  Yes.

13 A.  I email yesterday, I didn't email any FBI yesterday.

14 Q.  When is the last time you emailed an FBI agent?

15 A.  Don't remember.

16 Q.  Did you text an FBI agent yesterday?

17 A.  You just ask me the name of my FBI agent, right?

18 Q.  Yes.

19 A.  You want me to tell the name now?

20 Q.  Yes.

21 A.  It's Nick.

22 Q.  Nick what, or do you just call him Nick?

23 A.  I just call him Nick.

24 Q.  And this is the same Nick that you met in June of 2023?

25 A.  I met Nick, but I don't remember when I met Nick.

O6RBGUO3

1    Q.  Let me show you the same document again 3602-26.  Does the

2    top of the document refresh your recollection that you met with

3    Nick?

4    A.  Yes, I think it's a webex source.

5    Q.  And you've been in touch with Nick all the way consistently

6    through June of 2023, correct?

7    A.  That's incorrect.  I not contact him consistently.  I think

8    I only met him one time, and I don't hear from him for a very

9    long time.  I don't remember when he reach out to me again.

10   Q.  Well, do you remember meeting with him again in early

11   February of 2024?

12   A.  So you talk about after I met with Nick in June about eight

13   month later we met again?

14   Q.  Yes, I'm asking you if you remember having Nick as a point

15   person for you from June of 2023 to today?

16        You may not have talk to him everyday, but you've

17   known him for the whole time period, correct?

18        THE COURT:  There's so many questions in there.  First

19   you ask if he was the point person.  Why don't you answer that

20   question.

21   A.  Yes, he's the point person.

22   Q.  You were in contact with him since June of 2023, correct?

23   A.  Yes.

24   Q.  You had an interview with him and with the prosecutors on

25   February 4, of this year, correct?

O6RBGUO3

1   A.  I don't remember.

2   Q.  February 27, of this year, correct?

3   A.  I don't remember.

4   Q.  April 23, of this year, correct?

5   A.  I don't remember.

6   Q.  May 6, of this year, correct?

7   A.  I don't remember.

8   Q.  May 13, of this year, correct?

9   A.  I don't remember.

10  Q.  June 3, of this year?

11  A.  I don't remember.

12  Q.  June 23, of this year?

13  A.  Yes.

14  Q.  How about yesterday?

15  A.  Yesterday, you mean do I meet with them?

16  Q.  Yes.

17  A.  Briefly right before the court time, yeah, mm hm.

18  Q.  But you met with Mr. Finkel and he showed you documents

19  yesterday, right?

20  A.  I said I met him briefly.

21  Q.  And during that brief meeting, he showed you documents,

22  correct?

23  A.  Yes.

24  Q.  And you reviewed the documents with him, right?

25  A.  I did not review the document.  He show me the document.

O6RBGUO3

1    That's it.

2    Q.  And then he asked you questions about the document, right?

3    He didn't just show you and that's it.  He actually asked you

4    questions?

5    A.  Yes, I think we only met for ten minutes or so; so, yes,

6    it's a few questions.

7    Q.  So he asked you about two documents that he showed you,

8    right?

9    A.  I don't remember how many documents.

10   Q.  And then he asked you questions and you answered them,

11   correct?

12   A.  Yes.

13   Q.  He took notes, right?

14   A.  I don't think so.

15   Q.  And you met him right in this building, right?

16   A.  Yesterday morning, yes.

17   Q.  And in all of these meetings that you met with him, you

18   never once told him about Ivy Ivy, correct?

19   A.  That's incorrect.  He never ask me about the nickname I use

20   at the Discord.

21   Q.  You also never told him that you were active on Discord,

22   correct?

23   A.  He didn't ask me if I am active.  He didn't ask me about

24   the Discord.  He didn't even ask me that.

25   Q.  So he didn't ask you and you didn't tell him, correct?

O6RBGUO3

1          MR. FINKEL:  Asked and answered.

2          THE COURT:  Sustained.

3     Q.  You didn't voluntarily tell him about Discord, correct?

4          THE COURT:  Sustained.

5          MS. SHROFF:  That's a different question, your Honor.

6          THE COURT:  Sustained.

7     Q.  How long did you stay on Discord after you started talking

8     to the government?

9          MR. FINKEL:  Relevance objection.

10         THE COURT:  You may answer.

11    A.  I don't remember.

12    Q.  You don't remember being active in Discord even until

13    today?

14    A.  I don't know if I'm still on Discord because I don't -- you

15    know, Discord.  I don't know.  I don't know.  Seriously, I

16    don't know.

17    Q.  How many farms do you visit as a visitor on Discord?

18    A.  I don't know.

19    Q.  Ten?

20    A.  I don't know.

21    Q.  Fifteen?

22    A.  I don't know.  I answered.  I have answered I don't know.

23         THE COURT:  Sustained.

24    Q.  You were a visitor on Discord at the Himalaya New York Rock

25    farm, correct?

O6RBGUO3

1   A.  I don't remember.

2   Q.  How about the Nuremberg Justice farm, do you remember being

3   a visitor on that farm this year?

4            THE COURT:  Overruled.  You may answer.

5   A.  This year I don't think so.

6   Q.  How about last year?

7   A.  Last year, I don't remember.  I don't think so.

8   Q.  How about the Himalaya Melbourne Affina sic) farm?

9   A.  Do you mean last year?

10  Q.  All the way till today, you're still a visitor on that

11  farm, correct?

12  A.  I don't know.

13  Q.  How about the Himalaya New Zealand farm?

14  A.  I don't know.

15  Q.  How about the Himalaya 77 Engineer farm?

16  A.  I don't know.

17  Q.  How about the Rule of Law Foundation?

18  A.  I don't know.

19  Q.  How about the Rule of Law Society?

20  A.  I don't know.

21  Q.  Ms. Chen, is it fair to say that if Mr. Finkel did not ask

22  you a question about a specific topic, you did not bring it up?

23  A.  So.

24  Q.  Just yes or no would be great.

25  A.  Can you repeat that question?

1          THE COURT:  I'll allow the answer.

2     A.  What's the question again?

3     Q.  You testified moments ago that Mr. Finkel did not ask you

4     about Discord, and therefore you did not discuss that topic,

5     correct?

6     A.  Yes.

7     Q.  Were there other topics that he simply didn't ask you about

8     that you did not volunteer about pertaining to this case?

9          THE COURT:  Sustained.

10    Q.  Did you tell him about the role your husband played in all

11    of these interactions?

12    A.  I don't remember.

13    Q.  And your husband has never spoken to Mr. Finkel, correct?

14    A.  That's correct.

15         MS. SHROFF:  I have nothing further, your Honor.

16         THE COURT:  Redirect.

17    REDIRECT EXAMINATION

18    BY MR. FINKEL:

19    Q.  Ms. Chen, approximately how many meetings have you had with

20    me?

21    A.  I guess six or eight, between six or eight.

22    Q.  And were those meetings -- how many of those meetings were

23    online or in person?

24    A.  I think we have two in person and the rest are online.

25    Q.  And during those meetings, did we talk about Harry Potter?

O6RBGUO3                        Chen - Redirect

1   A.  No.

2   Q.  Did we talk about the New York Jets?

3   A.  No.

4   Q.  What is the general topic of information that we discuss?

5   A.  Mr. Finkel ask a question and I provide answer.

6   Q.  And what were the general topics of information I ask you

7   questions about?

8   A.  Related to the investments.

9   Q.  Ms. Shroff ask you some questions about trading you may

10  have done on the Himalaya Exchange.  You recall those

11  questions?

12  A.  Yes.

13  Q.  Have you been able to withdraw any real money from the

14  Himalaya Exchange?

15          MS. SHROFF:  Objection to what is real money.

16          THE COURT:  If you'll define what you consider to be

17  real money.

18  Q.  Have you been able to withdraw any United States money,

19  United States dollars from the Himalaya Exchange?

20          MS. SHROFF:  Since from what time period.

21  Q.  Ever?

22  A.  No.

23  Q.  What about pounds, British pounds, have you been able to

24  withdraw any British pounds?

25  A.  No.

1   Q.  What about swiss franks?

2   A.  No.

3   Q.  Have you ever been able to withdraw any fiat currency from

4   the Himalaya Exchange?

5   A.  No.

6   Q.  So those trades you haven't profited any real money from,

7   correct?

8   A.  That's correct.

9   Q.  If we can pull up VK-5 at page 10.

10          Ms. Chen, do you remember being asked questions by

11  Ms. Shroff on cross examination about this page?

12  A.  Yes.

13  Q.  Do you see where it says use of proceeds?

14  A.  Yes.

15  Q.  Does it say under use of proceeds invest $100 million into

16  Hayman Capital?

17          MS. SHROFF:  Your Honor, I have an objection.  I think

18  the government knows the document speaks for itself.

19          THE COURT:  Overruled.  You may answer.

20  A.  No, I don't see it.

21  Q.  After reviewing this document, reviewing Miles Guo' videos

22  online --

23          MS. SHROFF:  Objection to the leading.

24          THE COURT:  I haven't heard a question yet.

25  Q.  After considering the information in this document and

O6RBGUO3                        Chen - Redirect

1    Miles Guo's videos online, what was your understanding of what

2    your investment in GTV would be used for?

3    A.  Would be used according to the description of the usage of

4    the proceeds in this chart.

5    Q.  If you had known that the money you had sent to Miles Guo,

6    to Saraca, would be used to invest $100 million in a hedge fund

7    in the name of his son, would you have sent your approximately

8    $200,000 investment?

9    A.  No.

10           MS. SHROFF:  Objection.  It's beyond the scope and

11   it's been asked and answered.

12           THE COURT:  Overruled.

13   A.  No.

14   Q.  If we can go back to page two I think, Ms. Loftus.  Sorry,

15   page one, page three.

16           You see that information below it says contact

17   details?

18   A.  Yes.

19   Q.  And there's a Whatsapp text number at the bottom?

20   A.  Yes.

21   Q.  And then there's an address 162 East 164th Street?

22   A.  Yes.

23   Q.  Have you ever been there to the offices that are indicated

24   on this document?

25   A.  No.

1   Q.  We can take that down.  If we can display for the witness

2   what's been marked for identification as VB-36.

3           Do you recognize this, Ms. Chen?

4   A.  Yes.

5   Q.  What is it?

6   A.  This is the Whatsapp chat I spoke to earlier that Miles Guo

7   sent the GTV investment information including wire instruction

8   to my husband.

9           MR. FINKEL:  Government offers VB-36.

10          MS. SHROFF:  No objection.

11          THE COURT:  Okay.  It is admitted.

12          (Government's Exhibit VB-36 received in evidence)

13  BY MR. FINKEL:

14  Q.  Can we publish that, please.

15          Ms. Chen, is this a Whatsapp chat?

16  A.  Yes.

17  Q.  And is it this chat that you and your husband used to

18  communicate with Miles Guo about the GTV investment?

19  A.  Yes.

20  Q.  And what language did you communicate with Miles Guo in?

21  A.  In Mandarin.

22  Q.  You can take that down.

23          Do you remember being asked some questions by

24  Ms. Shroff about the co-efficient that you had to multiply your

25  prior investments in to make a determination as to how much

1  H Coin you were entitled to through the MOS farm.  Do you

2  remember questioning about that?

3  A.  Yes.

4  Q.  What is your understanding, if anything, sitting here today

5  why trying to calculate the amount of H Coin you were owed was

6  so complicated?

7  A.  It's on purpose.

8  Q.  Why do you believe that sitting here today?

9  A.  So that you can never calculate the H Coin each person is

10  entitled to correctly.

11  Q.  At the time that you were filling out that form, Ms. Chen,

12  what was your understanding of what the co-efficient even was?

13  A.  I have no idea what it is.

14  Q.  If we could put up VB-16 which is in evidence.

15         Do you remember being asked questions about this

16  document by Ms. Shroff?

17  A.  Yes.

18  Q.  Can you read the second paragraph please that begins, I

19  purchased.

20  A.  "I purchase the G/Club membership because it was marked as

21  an investment with stock and shares.  However, I never received

22  any stock or shares, nor did I receive any membership benefits.

23  Therefore, I think this is an investment fraud.  I am sending

24  this cancellation notice to request a refund."

25  Q.  Did you get a refund, Ms. Chen?

1    A.  No.

2    Q.  Do you still think that it was an investment fraud?

3    A.  Yes.

4    Q.  We can take that down.

5         Ms. Chen, you were asked some questions about chats

6    you had with Octopus and someone else on Discord; is that

7    correct?  Do you remember being asked those questions?

8    A.  Yes.

9    Q.  And those chats were in 2021; is that correct?

10   A.  Yes.

11   Q.  And Ms. Shroff was asking you questions about specific

12   words used in a chat from December 2021; is that right?

13   A.  Yes.

14   Q.  And sitting here today, do you remember the specific words

15   you used in a chat from two and a half years ago?

16   A.  No.

17   Q.  If we can put up what's in evidence as VB-31.

18        Do you remember being asked questions about the timing

19   of your investments and your investments in Miles Guo'

20   investment project?

21   A.  Yes.

22   Q.  Do you recognize this document, Ms. Chen?

23   A.  Yes.

24   Q.  Who created this document?

25   A.  I create this document.

O6RBGUO3                        Chen - Redirect

1   Q.  What is reflected on this document?

2   A.  This reflect all the money I give to this fraud.

3   Q.  And so column one reflects the various entities or projects

4   that you sent money to; is that correct?

5   A.  Yes.

6   Q.  And what does column two reflect?

7   A.  Reflect the payment amount I send each of the fraud

8   program.

9   Q.  Ms. Chen, sitting here today and reflecting on the money

10  you sent to these various investment projects, how do you feel

11  about your decision, the decision you made back then to invest?

12  A.  I feel very regretted.  I blame myself that why was I so

13  stupid to be brainwashed and trusted a fraudster and send all

14  the money to all the different entities that's all part of a

15  fraud scheme.

16  Q.  Ms. Chen, sitting here today are you also angry about the

17  money you lost?

18  A.  It's hard feeling.  It's extremely painful, and I don't

19  know how to describe the feeling.  It's hurting a lot.

20  Q.  Ms. Chen, you said just a moment ago that you felt like you

21  were brainwashed, what are the things that happened to you that

22  you think caused you to be brainwashed by Miles Guo?

23          MS. SHROFF:  Objection to the form.

24          THE COURT:  Overruled.  You may answer.

25  A.  I think it is a messaging, keeping repeating and

1   emphasizing in your mind that make you believe it is true and

2   make you believe it is true without any doubt.  I don't know

3   how it happened, but unfortunately it happened to me.  That

4   messaging is repeating.  It's emphasizing.  It's instilling in

5   my mind, make me trusted every single thing and make me acting

6   as an idiot back then.

7   Q.  Ms. Chen, when you were a follower of Miles Guo,

8   approximately how many videos or broadcasts or articles about

9   Miles Guo did you watch?

10  A.  I don't remember.

11  Q.  Approximately?

12  A.  Approximately hundreds.

13  Q.  And your husband and you watched videos too?

14  A.  Yes.

15  Q.  And your husband discussed Miles Guo?

16  A.  Yes.

17  Q.  And discussed these investments?

18  A.  Yes.

19  Q.  And the two of you made a decision together to invest in

20  these investments?

21  A.  Yes.

22  Q.  Would you make the same decision today?

23  A.  Would I make the same decision today?

24  Q.  Sitting here today knowing what you know would you make the

25  same decision today to invest in these?

```
 1    A.  Absolutely not.

 2    Q.  Why not?

 3    A.  Because this is fraud.  Everything, every program that

 4    Miles Guo designed, created and promoted including all the

 5    entities here are a fraud.

 6              MR. FINKEL:  I have nothing further.  Thank you,

 7    Ms. Chen.

 8              THE COURT:  Recross.

 9    CROSS-EXAMINATION

10    BY MS. SHROFF:

11    Q.  Ms. Chen, what is Gettr?

12              MR. FINKEL:  Objection, scope.

13              MS. SHROFF:  She said all of this is a big fraud.

14              THE COURT:  I'll allow the question.  Go ahead.

15    Q.  What is Gettr?

16    A.  She made a statement of something I did not say.  I said

17    all the programs.

18              MS. SHROFF:  Your Honor, it's a question for the

19    witness.

20              THE COURT:  You can answer the question.  What is

21    Gettr.

22    A.  My understanding it's a social media platform.

23    Q.  And it is a social media platform today, correct?

24              MR. FINKEL:  Scope.

25              THE COURT:  Overruled.  You may answer.
```

O6RBGUO3                          Chen - Recross

1              MR. FINKEL:  Also there's like a feedback.  I don't
2       know whose microphone that is.
3       A.  I guess so.
4       Q.  How about G Fashion, what is G Fashion?
5              THE COURT:  Sustained.
6              MS. SHROFF:  She said everything was a fraud.
7       A.  I didn't say that.  I say all the money I sent to those.
8       That's what I'm saying, I did not say that.
9              THE COURT:  Sustained.
10      Q.  G Fashion was an access that you had through G/Club,
11      correct?
12             THE COURT:  Sustained.
13      Q.  Let's see VB-36.  You were shown this video, correct,
14      Ms. Chen?
15      A.  Yes.
16      Q.  And Mr. Finkel asked you in what language you spoke to
17      Mr. Guo, correct?
18      A.  Yes.
19      Q.  Mr. Guo speaks terrible English, correct?
20      A.  I don't know.
21      Q.  You never had a conversation with Mr. Guo, correct?
22             MR. FINKEL:  Objection.
23             THE COURT:  The question is whether or not she's had a
24      conversation with Mr. Guo.  You may answer.
25      A.  When you say conversation, are you saying have I talked to

1    him?

2    Q.  That's a conversation, to talk to someone.

3    A.  I been in meetings with him.

4    Q.  My question is have you ever had a conversation with

5    Mr. Guo?

6    A.  No.  The answer is no.

7    Q.  You were asked questions about the co-efficient, correct?

8    You can take that down.  Jorge.  Thank you.

9             And you told Mr. Finkel and this jury that you thought

10   the formula used was on purposely complicated so that nobody

11   can ever calculate their amount.  That's what you said, right?

12   A.  That's not what I said.

13   Q.  Well, you tell me what you said.

14   A.  I said the H Coin allotment calculation is based on the

15   investment, and there's a co-efficient goes with the

16   investment.  There are so many different investment projects

17   out there.  Some of them are still not being -- either being

18   part of the fair fund distribution or some other reasons that

19   there's no way to calculate the true benefits of all the

20   confirmed investment in order to calculate the confirmed H Coin

21   allocation.

22   Q.  Didn't you say on direct that you thought it was purposely

23   complicated so that nobody can ever calculate it?  Isn't that

24   what you just said?

25   A.  As I said, yes, that's what I said.

 1  Q.  Okay.  So let's try this, this way.  You know that there

 2  were audit committees at the farms, right?

 3          MR. FINKEL:  Scope objection.

 4          MS. SHROFF:  It is part of the co-efficient question

 5  that Mr. Finkel pushed.

 6          THE COURT:  Go ahead.

 7  Q.  There were audits conducted, correct?

 8  A.  Yes.

 9  Q.  There were audit committees, correct?

10  A.  I don't know what you mean by audit committees.  I know

11  there are audits.

12  Q.  Weren't you part of the audit committee?

13  A.  No.

14  Q.  You did not check and do audits on whether or not the

15  H Coin was properly allocated?

16          MR. FINKEL:  Asked and answered.

17          THE COURT:  Sustained.

18  Q.  Ru Shui was part of the audit committee, correct?

19          MR. FINKEL:  Scope.

20  A.  I don't know if Ru Shui is part of audit, and then I

21  explain my role.  My role is to verify if the H Coin for the

22  MOS farm members were calculated correctly.  And based on my

23  volunteer experience, I think the design of calculating H Coin

24  quota is so complicated in the design that complicated for

25  purposes so that it can never get H Coin calculated or

1   confirmed correctly.

2   Q.  But you calculated it, correct, while you were doing this

3   evaluation?

4   A.  I say I reverify it, but --

5   Q.  To reverify something, you have to undertake a calculation,

6   correct?

7   A.  Right.

8   Q.  And you did it as a volunteer, correct?

9           MR. FINKEL:  Your Honor, ask Ms. Shroff to allow the

10  witness to answer the question, and to just pose a question and

11  just let her answer instead of just.

12          THE COURT:  Go ahead and answer.

13  Q.  You did it as a volunteer, correct, yes or no?

14  A.  What's your question?

15  Q.  You verified as a volunteer, correct, you undertook

16  verification process as a volunteer, correct?

17  A.  That's incorrect because I verified H Coin, but in H Coin

18  verification is never ending because there are monies still out

19  there have not been sent back to Miles Guo; so therefore even

20  though I verify the coin to the extent, by the time I no longer

21  volunteer, that coin is not the final coin each person is

22  entitled to.

23  Q.  That wasn't my question, but okay.

24          My question to you was, you were part of the

25  verification process, correct?  It's a simple question.

1          MR. FINKEL:  Asked and answered.

2          THE COURT:  Sustained.

3   Q.  Ru Shui was part of that process, correct?

4          THE COURT:  Sustained.

5   Q.  Fay Fay was part of that process, correct?

6          MR. FINKEL:  Scope.

7          MS. SHROFF:  Same scope that you opened the door to.

8   Q.  Fay Fay was part of that process, correct?

9          MR. FINKEL:  I don't think I opened that door.

10          THE COURT:  Not to this.

11   Q.  Little Sarah was part of that process, correct?

12          THE COURT:  Sustained.

13   Q.  When Mr. Finkel asked you what co-efficient was used, you

14   said and I quote, "you have no idea."  That was your question

15   on redirect, right?  That was your response.  You remember

16   that?

17          MR. FINKEL:  Mischaracterizes.

18          MS. SHROFF:  I don't think so.

19          THE COURT:  I'll let you answer.  Go ahead.

20   Q.  You said you had no idea, correct?

21   A.  I have no idea why design like that.  I think it's overly

22   complicated.

23   Q.  You never told anybody that the whole time that you

24   volunteered for them, right?

25          Never once did you say, this is too complicated

O6RBGUO3                          Chen - Recross

```
 1   redesign it, correct?
 2            MR. FINKEL:  Relevance.
 3            THE COURT:  Sustained.
 4   Q.  Did you ever express what you said to the jury now to
 5   anyone at the Mountain of Spice farm?
 6            THE COURT:  Sustained.
 7   Q.  Let me show you VB-16.  You see this, Mr. Finkel asked you
 8   questions about this document?
 9   A.  Yes.
10   Q.  And the left-hand side is your and your husband's joint
11   email address, correct?
12   A.  Yes.
13   Q.  And on the side over there gives you the date of May 14,
14   correct?
15   A.  Yes.
16   Q.  2023, right?
17   A.  Yes.
18   Q.  And you wrote this email, correct?
19   A.  We wrote this email.
20   Q.  Right.  And you wrote it because you wanted your money
21   back, correct?
22   A.  We wrote the email to get my money, to ask for refund.
23   Q.  And if you had written, I purchased G/Club membership, and
24   I have simply changed my mind, you would never get your money
25   back, right?
```

1          MR. FINKEL:  Calls for speculation, irrelevant.

2          THE COURT:  Sustained.

3    Q.  You drafted this because you thought this is the best shot

4    at you getting your money back, right?

5    A.  I drafted this because I want my money back.

6    Q.  Exactly.  And you thought this language would help you get

7    your money back?

8          MR. FINKEL:  Objection.

9          THE COURT:  You may answer.

10   A.  I put this language because that's what I believe is true.

11   I purchase GTV shares and the G/Club membership was given as

12   free, so I am just telling the truth here.  It was promoted as

13   GTV share investment.  I have gain nothing, so I need my money

14   back because my money was into the so-called G/Club account.

15   Q.  No, it was sent to G/Club membership account, correct?

16         MR. FINKEL:  That's argumentative.

17         THE COURT:  Sustained.

18   Q.  Where does it say in this email that G/Club was going to be

19   free?

20   A.  What's your question?

21   Q.  Where in this email do you see that G/Club was meant to be

22   free?  Let's scroll down for you.

23         You see the word "free" anywhere in here?  I'll move

24   on.  Let's go to the next document.

25         MR. FINKEL:  I object.  It mischaracterizes testimony.

O6RBGUO3                        Chen - Recross

1      MS. SHROFF:  The document speaks for itself.

2  Q.  The email is dated May 2023?

3      MR. FINKEL:  Asked and answered.

4      THE COURT:  Sustained.

5  Q.  When was Mr. Guo arrested?

6  A.  March 2023.

7  Q.  And you sent this after his arrest, correct?

8      MR. FINKEL:  Objection, Court's ruling.

9      THE COURT:  Overruled.

10  Q.  You sent it after his arrest, right?

11  A.  Yes.

12  Q.  Let's go to GXVB-31.  You talked about the summary chart,

13  right?

14  A.  Yes.

15  Q.  Mr. Finkel went over this with you?

16  A.  This is the chart I put together.  No one went over with

17  me.

18  Q.  You never discussed this chart with him when you met him in

19  his office?

20  A.  There's no need to discuss the chart.  It's just an outline

21  of the payment.

22  Q.  I didn't ask you if it was discussed.

23  A.  I didn't discuss. I didn't discuss.

24  Q.  And you sent this document to him, correct?

25  A.  Yes.

1   Q.  And you sent it to your friend Nick at the FBI, correct?

2            MR. FINKEL:  Objection.

3   Q.  You sent it to the FBI agent?

4            THE COURT:  Sustained.  There's no evidence that

5   they're friends.

6   Q.  Do you consider him a friend?  Do you consider him your

7   friend?

8   A.  No, he's not someone I know.

9   Q.  But you don't consider him a friend?

10           MR. FINKEL:  Asked and answered.

11           THE COURT:  Sustained.

12  Q.  Let's look at this document you created.  You created this,

13  right?

14  A.  Yes.

15  Q.  And you created -- you put all of this information, right?

16  A.  Yes.

17  Q.  And who did you first send this document to?

18  A.  This document I think first I sent -- I don't remember who

19  I sent this document to.  I think I send it to Nick I think,

20  yes, mm hm.

21  Q.  And you were also asked by Mr. Finkel were you ever able to

22  get your H Coin investment money back or redeem it for pounds

23  or yen.  You remember that question?

24  A.  Yes.

25  Q.  The first time you ever tried to do that was in May of

1   2023, correct?

2              MR. FINKEL:  Objection to relevance.

3              THE COURT:  You may answer.

4   A.  You mean the redemption?

5   Q.  Yep.

6   A.  Yes.

7   Q.  After Mr. Guo's arrest, correct?

8   A.  Yes.

9   Q.  After his indictment, correct?

10  A.  After I realize it's a fraud because I read indictment

11  document.  He's using my money to pay for his luxury item.

12  Q.  After you read it in the indictment, correct?

13  A.  Yes.

14  Q.  And an indictment is nothing but a piece of paper accusing

15  someone, right?

16             MR. FINKEL:  Objection.

17             THE COURT:  Sustained.  Don't ask her for legal

18  conclusions.

19             MS. SHROFF:  I'm asking for her understanding, your

20  Honor.

21             MR. FINKEL:  It was sustained is my understanding.

22             THE COURT:  Sustained.

23             MS. SHROFF:  I have nothing further.

24             MR. FINKEL:  Nothing further.  Thank you, Ms. Chen.

25             THE COURT:  Thank you.  You may step out of the

1    courtroom.

2              (Witness excused)

3              THE COURT:  Would you approach, please.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6R1GUO4                        Volchko - Direct

1              (At the sidebar)

2              THE COURT:  Any further witnesses?

3              MR. FINKEL:  Yes.

4              THE COURT:  I just want to remind you that you need to

5    address the *Geaney* matter before the close of your case.

6              MR. FINKEL:  Should we do that now?

7              THE COURT:  You can do it now, yes.

8              MR. HORTON:  I just wanted to put the option of doing

9    it after the jury is excused so we don't take up the jury's

10   time.

11             THE COURT:  Okay.  That's fine.

12             (Continued on next page)

1            (In open court)

2            THE COURT:  The government may call its next witness.

3            MR. FERGENSON:  The government calls Jessica Volchko.

4            (Witness sworn)

5            THE COURT:  Please state your name and spell it.

6            THE WITNESS:  Jessica Volchko.  J-E-S-S-I-C-A,

7    V-O-L-C-H-K-O.

8            THE COURT:  Please speak into the microphone so that

9    you can be heard.

10           And when the mics are tilted up towards the ceiling,

11   that is when we get the feedback, so please don't do that.

12           Go ahead.  You may inquire.

13           MR. FERGENSON:  Thank you, your Honor.

14    JESSICA VOLCHKO,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. FERGENSON:

19   Q.  Good afternoon, Ms. Volchko.

20   A.  Good afternoon.

21   Q.  Where do you work?

22   A.  I work for the Federal Bureau of Investigation, which is

23   also known as the FBI.

24   Q.  What part of the FBI do you work for?

25   A.  I work for the Computer Analysis Response Team, which is

1    also known as CART.

2    Q.  And what is CART?

3    A.  CART is responsible for the collection, preservation, and

4    analysis of digital evidence.

5    Q.  And what's your position within CART?

6    A.  Digital forensic examiner.

7    Q.  What are some of your duties or responsibilities as a

8    digital forensic examiner in CART?

9    A.  To receive digital evidence——items such as hard drives,

10   cellphones, laptops——and extract data from those devices and

11   then process and analyze the data.

12   Q.  When you say extract data from the devices, what do you

13   mean by that?

14   A.  I mean we can collect all of the user-generated files or

15   all the files from a piece of digital evidence and then process

16   that copy.  It's an exact copy of the original item.

17   Q.  What's a 1B number?

18   A.  That is a number that's assigned to an evidence item, so

19   each evidence item for a case has a unique 1B number.

20   Q.  And what are some examples of evidence items you commonly

21   deal with in CART?

22   A.  Some of the digital evidence items could be a cellphone, a

23   laptop, a hard drive, an SD card.

24   Q.  And Ms. Volchko, if you tilt the mic towards your mouth, or

25   point it towards your mouth, maybe it will help with the

 1   feedback.

 2          Now, Ms. Volchko, aside from testimony, what

 3   involvement, if any, did you have in this case?

 4   A.   Just an administrative role, communicating with the case

 5   agents about the items that they requested to be examined and

 6   then certain timelines, deadlines that we needed to produce

 7   results.

 8   Q.   What, if anything, did you do on March 15, 2023?

 9   A.   I assisted with the collection of digital evidence at a

10   search warrant in Mahwah.

11   Q.   What state is that in?

12   A.   New Jersey.

13   Q.   Ms. Volchko, do you recall, or even just a ballpark

14   recollection of approximately how many devices were seized in

15   this case?

16   A.   I would say a couple hundred, maybe.

17          MR. FERGENSON:  Okay.  Your Honor, at this time──sorry

18   for the feedback.  At this time we'll offer a stipulation

19   between the parties.  It is Government Exhibit Stip 17.  And

20   Ms. Loftus──I assume no objection.

21          MR. KAMARAJU:  No.  That's fine.

22          MR. FERGENSON:  All right.  Is it admitted, your

23   Honor?

24          THE COURT:  It is admitted.

25          (Government's Exhibit Stip 17 received in evidence)

1          MR. FERGENSON:  Thank you.

2          If we could publish that, Ms. Loftus.

3          All right.  So I'll just read the intro to the stip.

4   It says, It is hereby agreed, in the below chart, the exhibits

5   listed under column A—and if we could scroll down slightly,

6   Ms. Loftus.  There we go.

7          In the below chart, the exhibits listed under column A

8   are electronic devices and/or true and correct photographs of

9   electronic devices.

10          Column B lists a description of each electronic device

11   identified in column A.

12          Column C lists the location from which each electronic

13   device listed under column A was recovered or obtained.

14          And then the below chart, the exhibits listed under

15   column D are true and accurate copies of data extracted from

16   the electronic devices described in column B.

17          And I think, your Honor, just for reference—I don't

18   need to pull it up and read it right now—there's another

19   stipulation between the parties that's in evidence.  It's

20   GX Stip 21 that relates to some of the exhibits I'm also about

21   to offer, and it has translations.

22          So pursuant to those stipulations, the government is

23   going to offer the following exhibits:  Government Exhibits

24   1B15D, G, and G-T, and I; 1B16C, 1B18A, A1, A2; 1B69B and B-T,

25   B-1 through B-18, and their corresponding-Ts; 1B70A and A-1;

O6R1GUO4                    Volchko - Direct

1   1B71A-1 to A-6; and 1B71E, F, G, H, and I; 1B89; 1B89J, and J-1
2   and J-2; 1B91C-38; 1B91B-26, -27, -31 through -33; 1B92B-13;
3   1B121; 1B121A-M; 1B124, 1B124A, C, E, F, G, H, M, and R; 1B125,
4   1B125A, and 1B125F through 1B125S; 1B185M; 1B204-13, -47, -48;
5   1B227A, B, and F; 1B255C and D; and finally, 1B272B.  That's
6   all.

7            MR. KAMARAJU:  No objection pursuant to the parties'
8   stip, your Honor.

9            THE COURT:  It is admitted.

10            (Government's Exhibits 1B15D, G, G-T, I; 1B16C, 1B18A,
11   A1, A2; 1B69B and B-T, B-1 through B-18, and their
12   corresponding-Ts; 1B70A and A-1; 1B71A-1 to A-6; and 1B71E, F,
13   G, H, and I; 1B89; 1B89J, and J-1 and J-2; 1B91C-38; 1B91B-26,
14   -27, -31 through -33; 1B92B-13 received in evidence)

15            (Government's Exhibits 1B121; 1B121A-M; 1B124, 1B124A,
16   C, E, F, G, H, M, and R; 1B125, 1B125A, and 1B125F through
17   1B125S; 1B185M; 1B204-13, -47, -48; 1B227A, B, and F; 1B255C
18   and D; and 1B272B received in evidence)

19            MR. FERGENSON:  All right.  Actually, Ms. Loftus, if
20   we could go back to Stip 17 just to start.

21            And your Honor, may I approach to give a copy of the
22   stips to the witness.

23            THE COURT:  You may.

24            MR. FERGENSON:  Thank you.

25            Okay.  Ms. Loftus, if we could go to—oh, thank you,

1    page 4.  And if we could zoom on row 4.

2    BY MR. FERGENSON:

3    Q.  All right.  Now, Ms. Volchko, looking at this stipulation,

4    what type of device was 1B71?

5    A.  A white iPhone XR.

6    Q.  And it references an IMEI.  Just briefly, could you explain

7    what IMEI is.

8    A.  An IMEI is kind of similar to a serial number.  It's a

9    unique number assigned to a cellphone.

10   Q.  And where was this white iPhone recovered?

11   A.  It was recovered from Wang apartment inside a bag in

12   closet.

13        MR. FERGENSON:  All right.  And let's go to,

14   Ms. Loftus, if we could, show on the left side 1B71I.

15        And if we could put on the right GX GC276, at page 2.

16        And Ms. Loftus, if you could zoom on the center email

17   from Max K.  Can you just put that on the right.

18   Q.  Ms. Volchko, looking on the left, what color is that car?

19   A.  It's red.

20   Q.  Do you know the model?

21   A.  I'm not sure.

22   Q.  Do those doors open horizontally or vertically?

23   A.  Looks like up and down, vertically.

24   Q.  And Ms. Volchko, looking at the stipulation that you have,

25   on the left, is this one of the exhibits from 1B71, the phone

1   from Wang apartment?

2   A.  Yes, according to the stipulation.

3           MR. FERGENSON:  All right.  And if we could look at

4   now on the left, if we could actually pull up Stip 17 again on

5   the left, please.

6           And if we could go to page 4 and zoom on row 5.

7   Q.  All right.  And now what device is 1B89?

8   A.  1B89 was a red iPhone 11.

9   Q.  And who was that recovered from?

10  A.  The location was Alex H, pursuant to a search warrant

11  executed on March 15, 2023.

12          MR. FERGENSON:  And if we could now replace on the

13  left Government Exhibit 1B89J-2.

14  Q.  Okay.  And Ms. Volchko, is this an audio recording from the

15  phone recovered from Alex H we just looked at?

16  A.  Yes, according to the stipulation.

17          MR. FERGENSON:  And can we play the recording, please.

18          (Audio played)

19  Q.  All right.  Ms. Volchko, I want to go back to 1B71.  We

20  don't need to pull it up.  But if you can, could you just

21  remind us where the phone 1B71 was recovered from.

22  A.  1B71 was recovered from Wang apartment inside a bag in

23  closet.

24          MR. FERGENSON:  Okay.  Ms. Loftus, let's publish four

25  exhibits.  It's 1B71E, F, G, and H.

O6R1GUO4                          Volchko - Direct

1    Q.  Ms. Volchko, just focusing on the top right, can you read

2    what it says on that flyer there.

3    A.  "GTV INVESTORS PROTEST SEC's COLLABORATION WITH CCP."

4              MR. FERGENSON:  All right.  We can take that down.

5    And Ms. Loftus, if we could just pull up Stip 17 quickly.

6              Could we go to page 2.  And the third row from the

7    bottom, if we could zoom on that.

8    Q.  Ms. Volchko, what type of device was 1B124?

9    A.  A white iPhone.

10   Q.  And where was that white iPhone recovered?

11   A.  Sherry apartment (inside a bag).

12   Q.  And the exhibits to the right of that, those are items that

13   were taken or extracted from that cellphone, correct?

14   A.  That's correct.

15             MR. FERGENSON:  All right.  Let's go to, Ms. Loftus,

16   Government Exhibit 1B124.

17   Q.  Let me ask you first, Ms. Volchko, what type of report is

18   this?

19   A.  This is a preliminary device report of an iPhone.

20   Q.  And what sort of information is on a preliminary device

21   report?

22   A.  The identifiers that are associated with the device, it

23   would be a model number, a serial number, a phone number.

24             MR. FERGENSON:  And if we could go to page 2.

25   Q.  Ms. Volchko, directing your attention to where it says User

1  Accounts.  What type of information is in that section of a

2  report like this?

3  A.  Those are user accounts that are extracted from the

4  cellphone, so it could be from different applications that are

5  on the cellphone that a user logged into.

6        MR. FERGENSON:  And could we zoom on row 10,

7  Ms. Loftus.

8  Q.  Can you read what's in row 10, please.

9  A.  Row 10 is a user account associated with Chrome.  There's

10 an email, guomiles@guo.media.

11 Q.  And then what's the website address to the right of that?

12 A.  Https://gtv.org.

13       MR. FERGENSON:  And if we could scroll down slightly,

14 just to row 16.

15 Q.  All right.  Can you read what's in row 16, please.

16 A.  Row 16 is a user account associated with Chrome, with an

17 email wenguiguo@gmail.com.

18       MR. FERGENSON:  And if we could go to row 21.  Just

19 scroll down.

20 Q.  Ms. Volchko, just focusing you on the right-hand side of

21 these rows, do you see how it says gettr.com?

22 A.  Yes.

23 Q.  And then what does it say to the left of that?

24 A.  Miles.

25 Q.  And then focusing you on row 24 where it says Threema,

1    what's the name to the right?

2    A.   Miles Guo.

3    Q.   Do you know what Threema is?

4    A.   It's a messaging application.

5         MR. FERGENSON:  If we could scroll down.

6    Q.   And 29, where it says WhatsApp Business, what's the name?

7    A.   Miles Guo.

8         MR. FERGENSON:  And if we could zoom out and go back

9    to page 1.

10        And if we could zoom on Device Name.

11        May I just have a moment, your Honor?

12        THE COURT:  Yes.

13        MR. FERGENSON:  Ms. Loftus, you could zoom on

14   the──that's great.

15   BY MR. FERGENSON:

16   Q.   And focusing on where it says Device Name, what's the

17   device name?

18   A.   Boss, with a 2 in parentheses.

19   Q.   All right.  Now let's go to some of the contents of this

20   phone.  Let's go to 1B124A.

21        Ms. Volchko, can you read what it says on the sign in

22   the center.

23   A.   "SEC AND DOJ ARE KILLERS."

24   Q.   Let's go to 1B124G.  Can you read in the bottom left, in

25   the sign being held there, can you read the name listed there.

O6R1GUO4                        Volchko - Direct

 1   A.   Paul Hastings.

 2   Q.   Let's go to 1B124F.

 3        Ms. Volchko, can you read the text in the top left.

 4   A.   "Isabelle Despins and Daniel Copeland wedding 2022.10.15."

 5   Q.   And this photograph was on the Boss phone, the one we were

 6   just looking at, right?

 7        MR. KAMARAJU:   Asked and answered, your Honor.

 8        THE COURT:   Sustained.

 9   Q.   Ms. Volchko, do you know who Isabelle Despins is?

10   A.   I do not.

11   Q.   Do you know who Daniel Copeland is?

12   A.   I do not.

13        MR. FERGENSON:   Ms. Loftus, can we zoom on the, you

14   know, the right half of this photograph.

15   Q.   Ms. Volchko, the man wearing the white shirt in the middle,

16   do you know who he is?

17   A.   I do not.

18   Q.   On the left, the young woman circled in red, do you know

19   who she is?

20   A.   I do not.

21   Q.   On the right, the two young women circled in red, do you

22   know who they are?

23   A.   I do not.

24   Q.   Do you know who circled them in red in this wedding

25   photograph?

O6R1GUO4                          Volchko - Direct

1  A.  I do not.

2          MR. FERGENSON:  Ms. Loftus, if we could pull up on the

3  left this same photograph, 1B124F, and then on the right,

4  1B124R.

5          And if you could zoom, Ms. Loftus, on the picture on

6  the right, the one we were just looking at, on the man's face,

7  the one in the white shirt.

8  BY MR. FERGENSON:

9  Q.  Ms. Volchko, directing your attention to the left, can you

10  read what it says in the top center.  On the left.

11  A.  On the left?

12  Q.  Yes, please.

13  A.  "Dear all victims from Luc Despins, Paul Hastings, and

14  O'Melveny.  If they have represented your legal cases and have

15  blackmailed, extorted, or scammed you.  NFSC fellow fighters

16  will spend 10 million (Minimum) to reward those who can provide

17  us the proof of their:

18          "Criminal activities.

19          "Illegal bank accounts.

20          "Illegal incomes.

21          "Scan the code to contact us."

22  Q.  And then focusing on the left still, there's a picture of a

23  man.  Can you read the text underneath that picture.

24  A.  "Luc A. Despins, Partner of Paul Hastings."

25  Q.  Do you recognize the image on his forehead?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6R1GUO4                          Volchko - Direct

1    A.  I do not.

2    Q.  And Ms. Volchko, directing your attention back to the

3    stipulation you have.  What device did 1B124R come from?

4    A.  A white iPhone seized from Sherry apartment, inside a bag.

5           MR. FERGENSON:  Let's go back to Stip 17, please.

6    Let's go to page 3, please.

7           And if we can zoom on the third row from the bottom.

8    Q.  And just focusing you on where it says GX 4, what type of

9    device was 1B15?

10   A.  A white iPhone 12.

11   Q.  And where was that white iPhone recovered from?

12   A.  Wang apartment (bedside table).

13          MR. FERGENSON:  And Ms. Loftus, if we could now

14   publish 1B15G-T, the translation.

15   Q.  Now while this is coming up, what are Notes on an iPhone?

16   A.  Notes is an application where a user can write memos or

17   save text.

18          MR. FERGENSON:  Thank you, Ms. Loftus.  Maybe we can

19   make it——perfect.

20   Q.  Okay.  And what type of information was extracted from

21   1B15G?

22   A.  A note, content from a note from the phone.

23   Q.  And could you read in the column D, the translation column.

24   Could you read——I won't make you read all of it, but can you

25   read some of those lines.  You can start from the beginning.

O6R1GUO4                      Volchko - Direct

A.   "The scheduled farm meetings with Mr. Guo in 2023 (Eastern

Time, subject to confirmation) are as follows:

        "Mifan Group:  Wednesday, January 11, 5 p.m. Eastern

Time (using WebEx).

        "Athena:  Friday January 13, 7 p.m. Eastern Time.

        "Taiwan Farm:  Saturday, January 14, 9 a.m., ET."

Q.   And Ms. Volchko, I'll ask you now——you can just skip down

to the bottom of the list and read where it begins "The boss."

A.   "The boss just mentioned that no meetings will be scheduled

from the 20th to the 25th.  Please check if the times in this

table conflict with any legal meetings."

Q.   And now focusing you to the column to the right of that

where it says Created Time, what's the created time?

A.   Is 3/31/2024 at 8:44 a.m.

Q.   And what dates or times can be populated in that field?

A.   It appears to be the time that this note was tagged from

the full phone report.

Q.   And what does it mean to tag a note in a phone?

A.   Items that are tagged from a cellphone report can later be

used to generate a smaller excerpt version of that report.

Q.   And directing you to the top left, what does it say there?

A.   Tags.

        MR. FERGENSON:  All right.  Let's go back to Stip 17.

We'll go to page 4.

Q.   And just on that tagging topic, how commonly are cellphone

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6R1GUO4                         Volchko - Direct

1    extractions reviewed?

2    A.  They're often reviewed.

3    Q.  And so let me focus you, Ms. Volchko, on the third row from

4    the bottom here, with 1B92.

5            MR. FERGENSON:  If you could zoom on that.

6    Q.  All right.  And what device is 1B92?

7    A.  An Apple MacBook Pro.

8    Q.  And from whom was that MacBook Pro recovered?

9    A.  Alex H.

10           MR. FERGENSON:  And if we could now publish something

11   from the MacBook, 1B92B-13.

12           And if we could zoom on the top half.

13   Q.  Can you read the name on the top left.

14   A.  I'm unsure of the pronunciation, but H-A-O-R-A-N, last name

15   H-E.

16   Q.  And just focusing you on the top right, starting with

17   "Accomplished," can you just read those four lines there.

18   A.  "Accomplished business development manager bringing

19   five-year track record of success improving sales and growing

20   company customer base through effective program management,

21   strategic planning, and team leadership."

22           MR. FERGENSON:  And if we could scroll down.  If you

23   could scroll.

24   Q.  Just underneath experience, Ms. Volchko, can you just read

25   the first two lines underneath experience.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.   "March 2014 to current.  Director and shareholder several

2   property development firms."

3            MR. FERGENSON:  And if we could zoom out.

4            And just zooming on the top left.

5   Q.   What's the email address listed here?

6   A.   Cool_hhr@hotmail.com.

7   Q.   Are you familiar with Proton Mail?

8   A.   I'm aware of what it generally——

9   Q.   I'm sorry.  What is Proton Mail?

10  A.   It is a encrypted email.  It can be accessed through a web

11  browser or an application.

12  Q.   And what's your understanding of whether, you know,

13  government search warrants can get the contents of a Proton

14  Mail account?

15           MR. KAMARAJU:  Objection.  Speculation.

16           MR. FERGENSON:  Based on her——

17           THE COURT:  If you know.

18  A.   I have never seen a Proton Mail search warrant return.

19           MR. FERGENSON:  All right.  Ms. Loftus, let's just

20  pull up quickly what's in evidence as GX GC309.  And if we can

21  just zoom on the top email quickly.

22  Q.   And Ms. Volchko, just looking at the very top line, what's

23  the domain of that email address?

24  A.   Gclubs.com.

25  Q.   And then focusing you still on the header, the very last

O6R1GUO4                        Volchko - Direct

1    line of the header, can you read that, under, you know, that

2    ends in .pdf.

3    A.  YachtContract.pdf.

4              MR. FERGENSON:  And let's now go to page 8, please.

5              And if we could just zoom on line 9, please.

6    Q.  Do you see at 9, it says, "Description of the yacht," and

7    then beneath that, there's an entry that says "Name"?  Can you

8    read the name?

9    A.  Liberty.

10             MR. FERGENSON:  And if we could zoom out.  And if we

11   can zoom on just the top line, please, of this contract,

12   like—yeah.  Perfect.  Thank you.

13   Q.  Do you see in the middle there's a star?  Can you read the

14   text to the right of the star.

15   A.  Seven Star Yacht Transport.

16             MR. FERGENSON:  All right.  Now, Ms. Loftus, let's put

17   on the left Stip 17 at page 2, please.

18             And then on the right Stip 21 at page 2.

19             And I'll ask you, on the right, can you zoom in on

20   paragraph 3, please.

21             And then on the left, can you please zoom in on the

22   second row from the bottom.

23   BY MR. FERGENSON:

24   Q.  Okay.  Ms. Volchko, focusing you on 1B125, what type of

25   device was that?

1    A.   A blue iPhone.

2    Q.   And where was that blue iPhone recovered?

3    A.   Sherry apartment (inside a bag).

4    Q.   All right.  Now focusing you on the stipulation on the

5    right, can you read paragraph 3.

6    A.   "GX 1B125F - GX 1B125S, and their subparts (GX 1B125F - I,

7    etc.) are true and accurate copies of data extracted from

8    1B125Z.  GX 1B125F - GX 1B125S contain a column titled

9    'Translation,' which contains true and accurate translations of

10   foreign language text/audio/video from GX 1B125F - GX 1B125S,

11   and their subparts."

12        MR. FERGENSON:  Now, Ms. Loftus, let's now publish

13   1B125F.

14   Q.   And while we're waiting, Ms. Volchko, in the email we just

15   looked at, what was the name of the yacht?

16   A.   I believe it was Liberty.

17   Q.   And what was the name of the shipping company?

18   A.   I think it was Seven Star.

19   Q.   All right.  Now, Ms. Volchko, focusing you on this exhibit,

20   what's the date in the top center?

21   A.   September 17, 2021.

22   Q.   And focusing you on the far left column, what's the date

23   listed there?

24   A.   September 17, 2021.

25   Q.   And then in the From column, are you able to tell what type

O6R1GUO4                          Volchko - Direct

1   of chat this is?

2   A.  Based on the phone number, it looks like WhatsApp.

3   Q.  And what is the name listed in the From column?

4   A.  That's the contact name.

5          MR. FERGENSON:  All right.  Now, Ms. Loftus, if we

6   could scroll down slightly.  This may only be one . . .

7          Okay.  If we could keep scrolling.

8   Q.  All right.  Now focusing you on the next text, who is that

9   text——I'm sorry——or chat message.  Who is that one from?

10  A.  I'm sorry.  Which one are you referring to?

11  Q.  Just the second column from the left, the first message on

12  this page, who is that message from?

13  A.  That's the other——the owner of the device.

14  Q.  And what's the name?

15  A.  Miles Guo.

16         MR. FERGENSON:  Okay.  Let's go back up.

17  Q.  And Ms. Volchko, if we could read this.  I'll read the part

18  of Gladys and you can read the part of Miles Guo.

19  A.  Okay.

20  Q.  All right.  "So boss, this is the information about the new

21  boat Max sent to you:

22         "The first shipping company is Seven Star, and their

23  price is $90,000, from Genoa, Italy to Boston (it takes 15

24  days).  The ship will arrive at Boston on October 26.  If the

25  weather is good, then the ship can travel to Connecticut, which

1    will take about 3-4 days, meaning it will arrive in Connecticut

2    at the end of October.

3            "Another shipping company is Peters & May, with a

4    lower price of about $59,000.  The ship will travel to Ft.

5    Lauderdale, Florida.  But it is even farther than Connecticut,

6    and it will take longer to arrive in Connecticut.  Also, it

7    doesn't have a fixed delivery date.  It may arrive in October

8    or November.  Another thing to note, the cost of arranging a

9    ship to travel from Florida to Connecticut is very high,

10   because it is far away from Connecticut.  It will cost about

11   15-$20,000 and it will take about 5-6 days.

12           "So if you want low risk, and the ship must arrive by

13   the end of October, we should use the first company, Seven

14   Star.  But if the time can be flexible, we may choose the

15   second company, Peters & May.  It's cheaper."

16   A.  "Max, I'm very annoyed.  I agreed with the end of

17   September, but he scheduled it to the end of October.  I'm very

18   annoyed and very annoyed.  OK.  Just send it to Seven's house

19   according to this.  It's very annoying.

20           "It's the fastest one."

21   Q.  And just to pause for a moment, Ms. Volchko, do you see——

22           MR. FERGENSON:  And maybe we can scroll up just so we

23   can see the column headings.

24   Q.  All right.  At the far right column, what's that column

25   titled?

1    A.  Attachments.

2              MR. FERGENSON:  And if we scroll down.

3    Q.  Ms. Volchko, when an audio message is sent in an extracted

4    WhatsApp chat, how is the audio message extracted from the

5    phone?

6    A.  It's extracted as an attachment.

7              MR. FERGENSON:  And we'll continue with the dialogue

8    in a moment, but Ms. Loftus, if we could play GX 1B125F-1.

9              (Audio played)

10             MR. FERGENSON:  All right.  Let's go back to the chat.

11   It's 1B125G.

12   Q.  Okay.  So I'll keep reading Gladys's part.

13             "Seven Star gave me a schedule.  Our boat can be

14   loaded on the ship in Italy on October 10 and it will arrive at

15   Boston on October 26.  After that, it will travel to

16   Connecticut."

17   A.  "[F word] [PH], November 10 again, this is really crazy.

18   It's the only way.  There's no way out.  What should we do?"

19             MR. FERGENSON:  Scroll down.  Oh, that's the end.

20             If we could pull up quickly, Ms. Loftus, Government

21   Exhibit PRO466 at page 20.

22             And if you could scroll down slightly.

23             All right.  If you could just zoom on the—yeah, that

24   paragraph, please.

25   BY MR. FERGENSON:

1   Q.  All right.  Can you please read the second sentence here.

2   A.  "Please allow me to introduce myself again, I am Gladys,

3   the assistant of Mr. Miles Kwok."

4           MR. FERGENSON:  All right.  Ms. Loftus, let's go back

5   to GX 1B125, the next one.  Let's go to G.

6   Q.  All right.  And what's the date of this chat excerpt,

7   Ms. Volchko?

8   A.  September 24, 2021.

9   Q.  And who is this chat between?

10  A.  This appears to be between Gladys and Miles Guo.

11  Q.  Same as the one we just looked at before?

12  A.  That's correct.

13  Q.  Okay.  So in this one, the first entry has something in

14  images.  Do you see that?

15  A.  I do.

16  Q.  And the Attachment column is filled out.  When someone

17  sends, you know, a photo message, how is that extracted from a

18  chat report?

19  A.  It's extracted as an attachment.

20          MR. FERGENSON:  So Ms. Loftus, if we could just pull

21  up quickly 1B125G-1.

22          It's actually——Okay.  If you have it, Ms. Loftus.

23          Okay.  Thank you, Ms. Loftus.  So we can go back to

24  the report.

25          And if you want to just zoom on that image we just

1    looked at.

2    BY MR. FERGENSON:

3    Q.  Can you read the text on that.

4    A.  Liberty.

5              MR. FERGENSON:  And if we could zoom out.

6    Q.  All right.  And we can do the dialogue again.  If you could

7    read the Miles Guo part and I'll read the Gladys part.

8    A.  "We'll see, don't say it now, let's say it by then.

9              "This square and upright font, the same font as Lady

10   May [PH], the square and upright font."

11   Q.  "That's the third one?"

12   A.  "The three models, that . . ., that R, that E, and that

13   non-standard, please be more standard, OK?"

14   Q.  And are R and E letters in the word Liberty, Ms. Volchko?

15   A.  They are.

16             MR. FERGENSON:  All right.  Let's go to 1B125I.

17             And if we could just zoom on the image.

18   Q.  And these are from Gladys.  What's the text in these

19   images?

20   A.  Liberty.

21             MR. FERGENSON:  You can zoom out.

22   Q.  All right.  I'll read Gladys.

23             "Boss, these are the fonts of the new ship, which one

24   do you like best?  The row on the left is 28cm in height and on

25   the right 30cm."

1      MR. FERGENSON:  We can scroll down.

2  Q.  And then it says, "The one below is just a clearer

3  version."

4  A.  "This one."

5      MR. FERGENSON:  And then can we zoom on the picture

6  that Miles Guo sends.

7  Q.  And do you see one of these is circled in blue?

8  A.  I do.

9      MR. FERGENSON:  We can zoom out.

10  Q.  And then the question, "So you like the fourth 28cm high,

11  right?"

12      MR. FERGENSON:  All right.  We can take that down.

13      And let's go to Stip 17, at page 4, please.  We're

14  going to look at the bottom row.

15  Q.  All right.  What type of device is 1B272?

16  A.  A black iPhone 13.

17  Q.  And where was that recovered?

18  A.  Max Krasner's person, pursuant to a search warrant executed

19  on March 15, 2023.

20  Q.  And if we can go to 1B272B.

21      While we're waiting, Ms. Volchko, in March 2020, what

22  state were you living in?

23  A.  New Jersey.

24  Q.  And around that time how difficult, if at all, was it to

25  obtain N95 masks?

O6R1GUO4                         Volchko - Direct

```
 1            MR. KAMARAJU:  Objection.  I'm not sure what the
 2   relevance is.
 3            THE COURT:  I'll allow the question.
 4   A.  I recall it being fairly difficult.
 5   Q.  If we could—oh, it's still coming up.
 6            MR. FERGENSON:  Okay.  Thank you, Ms. Loftus.
 7   Q.  Ms. Volchko, what type of images are these from 1B272?
 8   A.  These appear to be screen captures.
 9   Q.  And can you remind us, who was 1B272 recovered from?
10   A.  Max Krasner.
11   Q.  Okay.  And focusing on the image, what does it say at the
12   very top, next to the, you know—well, just at the top,
13   underneath the time?
14   A.  Mileson.
15   Q.  Do you know who Mileson is?
16   A.  I do not.
17   Q.  All right.  So I'll read the white and you can read the
18   green.
19            "Let's do some from Hudson to lamp and lamp to me
20   before end of the week.  Amount 10mm."
21   A.  "So this will be a loan from Hudson NY to lamp?"
22   Q.  "What is the source for Hudson?"
23   A.  "Loan from ACA."
24   Q.  "Can we do another loan to lamp?"
25   A.  "From Hudson?"
```

O6R1GUO4                       Volchko - Direct

1    Q.  "Yes."

2    A.  "Hi Mileson, GSNY——"

3    Q.  We can stop there.

4           Do you know what Hudson is?

5    A.  I do not.

6    Q.  Do you know what Lamp is?

7    A.  I do not.

8    Q.  Do you know what ACA is?

9    A.  I do not.

10   Q.  If we can go to page 2.

11          All right.  Is this another screen capture,

12   Ms. Volchko, from the same phone?

13   A.  Yes.

14   Q.  All right.  If you could read the first two——the green

15   messages, please.

16   A.  "Hi Mileson, the 3m has been processed.  We should be able

17   to do the 7m tomorrow.  Can you confirm the address on your

18   account as it doesn't say in the wiring instructions."

19   Q.  And we can go to page 3.

20          And can you read the green text here.

21   A.  "Promissory Note from Lamp to Hudson Diamond v 5 19

22   21.docx."

23   Q.  And the next?

24   A.  "Promissory Note from Mileson to Infinity v 5 19 21.docx."

25   Q.  And can you read the last screen text there.

O6R1GUO4                         Volchko - Direct

1    A.   "I will be processing the gift from Lamp to May for 500,000

2    now."

3               MR. FERGENSON:  Let's go to page 4.

4               And we can keep scrolling, actually.

5               You can keep going.  Let's scroll to page 6, please.

6    Q.   And can you read the first three green texts.

7    A.   "Sure I will check.

8               "Hudson NY has about 13m in IDB and about 5m in Morgan

9    Stanley.

10              "Lamp signature has 7.3m at the moment."

11   Q.   Let's skip down to page 15.

12              All right.  And I'll read the white.  The white says,

13   "Hi Max, let's do the 10 from Lamp."

14   A.   "Hi Mileson, does it have to be all in one shot?"

15   Q.   "Nope.  How much are you thinking?"

16   A.   "Where do you prefer IDB or Signature?"

17   Q.   "Only Signature."

18              Let's go to page 18.

19              So I had said, "Only Signature," and then it says,

20   "They insist, so we need to do 20 before Signature has problem.

21   Haitham knows."

22   A.   "Ok, currently we have seven in signature, so maybe five

23   first?  We need to send funds back to Signature from IDB which

24   has five."

25   Q.   Do you know who Haitham is, Ms. Volchko?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6R1GUO4                          Volchko - Direct

1    A.  I do not.

2    Q.  All right.  Let's go now to page 20.

3          All right.  Now what name is listed underneath the

4    time on this image capture?

5    A.  William Je.

6    Q.  And can you read the first three texts.

7    A.  "Hi William, attached is a new account for Hudson.

8    HudsonDiamondNYLLCInternationalWireInstructions.pdf."

9    Q.  And then the white says, "Ok.  Please prepare the loan

10   agreement ASAP.  Thanks hi."

11         Let's go now to page 21.

12         All right.  Now what's the name underneath the date in

13   this screen capture from Max's phone?

14   A.  Yvette W 7.15.20.

15   Q.  All right.  And I'll read the white.  We can just read the

16   first two.

17         "Hi Max, any updates about the new 15 of IDB?"

18   A.  "Hi Yvette, I had shared the info with W and he said he is

19   working on it.  I can follow up with him."

20         MR. FERGENSON:  All right.  Let's go to 22.

21         Just go to the next page.

22         One more.

23   Q.  All right.  And now the name underneath the time here?

24   A.  Mileson.

25   Q.  All right.  And I'll read the white, you can read the

1  green.

2          "Hi Max, you have the 20mm directors draw ready to

3  go?"

4  A.  "Hi Mileson, I think some is ready but not 20m.  The

5  company doesn't have that much we will need funding first."

6  Q.  "I believe you have 10?"

7  A.  "There is 5m in Kearny bank now and about 7m in Signature."

8  Q.  "Ok, 7 will be sent out end of the week, please prepare.  I

9  will fund more after."

10 A.  "Signature is the operating account Haitham says it should

11 go from Kearny.  Will prepare to do a transfer, Kearny."

12         MR. FERGENSON:  All right.  Let's go back to Stip 17

13 at page 3, please.

14         Actually, maybe we can just use the paper.

15 Q.  Ms. Volchko, just focusing you on 1B18 on page 3, towards

16 the middle of the page, you got it?

17 A.  Yes.

18 Q.  What kind of device is that?

19 A.  It's a mint green iPhone.

20 Q.  And where was it recovered from?

21 A.  188 East 64th Street, apartment 1601, New York, New York.

22 Q.  And how is that defined?

23 A.  The Wang apartment, kitchen counter.

24         MR. FERGENSON:  All right.  Ms. Loftus, on the left

25 side can we pull up 1B18A-1 and on the right 1B18A-2.  And

O6R1GUO4

1    those are from the Wang apartment phone, or the one we were

2    just talking about, 1BA2.

3            We may need just a moment, your Honor.

4            Your Honor, unfortunately, Ms. Loftus's computer

5    crashed so it may be a few minutes.  If the Court wanted to

6    address that matter we had discussed briefly at sidebar, we

7    could do that now and take a break?

8            THE COURT:  All righty.  Members of the jury, we'll

9    take a very brief pause of a few minutes, and I'll call you

10   back.  Remember, you're not allowed to discuss this case

11   amongst yourselves.  Don't permit anyone to discuss it in your

12   presence.  Don't listen, watch, or read anything having to do

13   with this matter.

14           (Continued on next page)

O6R1GUO4

1           (Jury not present)

2           THE COURT:  You may step out.  Don't discuss your

3   testimony.

4           (Witness not present)

5           THE COURT:  You may be seated.

6           Is it Mr. Horton who will be addressing this matter?

7           MR. HORTON:  Yes.  Thank you, your Honor.

8           THE COURT:  Go ahead.

9           MR. HORTON:  The government makes a formal application

10  pursuant to *Geaney* for the admission of co-conspirator

11  statements and agent statements that have been elicited through

12  the trial.  Your Honor has heard now six weeks of evidence

13  about the RICO and fraud conspiracies in this case, and how the

14  defendant Miles Guo operated the conspiracy, both through his

15  own words—

16          THE COURT:  If you'll get a little closer to the mic,

17  please.

18          MR. HORTON:  Evidence about how the defendant, Miles

19  Guo, operated his conspiracy both through his own words on

20  broadcasts that are in evidence and by directing of agents to

21  act, and that includes co-conspirators and others who took

22  direction from Miles Guo and his co-conspirators.  Many of

23  these statements were not offered by the government for their

24  truth but because they were false, they were lies, and so

25  they're not hearsay for that reason.  Others of these

1    statements were offered for additional nonhearsay purposes.

2    They were commands to other agents.  They were offered for

3    their effect on witness listeners, for example.  To the extent

4    that the government has offered Guo's and his agents'

5    statements for their truth, the Court has much more evidence

6    than it needs to make its *Geaney* finding.  Again, the standard

7    for that is preponderance, just that it's more likely than not

8    that a conspiracy existed, that Miles Guo and these declarants,

9    who I'll walk through in a moment, were all members of that

10   conspiracy together and the declarants were speaking in

11   furtherance of that conspiracy when the statements that the

12   government elicited were made.  And of course in making that

13   determination, the Court ought to consider the hearsay

14   statements themselves as evidence for the *Geaney* finding.

15          So I'll start with——I grouped them for the Court.

16   Start with the group of the sort of core co-conspirators.

17          THE INTERPRETER:  Your Honor, the interpreter would

18   ask the counsel to slow down.  I was not able to catch up.

19          MR. HORTON:  I can slow down.

20          Co-conspirators who are repeat players who

21   participated in and spoke in furtherance of the conspiracy.  So

22   the Court addressed Yvette Wang early in trial, in view of her

23   guilty plea to the conspiracy with Miles Guo.  Of course there

24   was extensive additional statements of Ms. Wang elicited

25   throughout the trial, including that she introduced other

1  co-conspirators to other of the G Enterprise agents in the

2  case.

3           One of those is William Je.  There was testimony at

4  the beginning from Karin Maistrello that he was Guo's "finance

5  person" and that he asked Ms. Maistrello, for example, to take

6  a position at a company that the Court has seen has a critical

7  role in the case.  That's ACA Capital.  There was more

8  testimony from Ms. Schottenheimer about Mr. Je's central role

9  in the $100 million hedge fund investment with misappropriated

10 GTV investor funds.  And then the Court heard Mr. Je on the

11 recordings that were introduced through Mr. Khaled and heard

12 additional testimony.  I'll just give one additional example as

13 Mr. Collins talked about, when he was negotiating with Mr. Je,

14 how William told him that he and Miles had a long and trusted

15 relationship with each other.

16          There's Mileson Guo, the defendant's son.  There's

17 testimony and documents that show his paper ownership of the

18 Saraca entity and how he's the beneficiary of the $100 million

19 hedge fund investment made with misappropriated funds.  There's

20 documentary evidence that shows his ownership of the

21 constituent entities of the Himalaya Exchange, the document

22 that was shown early in the case recovered from the Greenwich

23 mansion, which Mr. Je, trustee, holds the shares of these

24 entities for the benefit of Mileson Guo, which is of course the

25 series of evidence about the purchase of the Ferrari with

investor funds, and there's the discussions on the recordings

through Mr. Khaled where Mileson Guo is talking about the use

of the Crane entity to launder funds and specifically referring

to G Club investor money that came through the Crane entity as

investor money.

There is Mei Guo, the defendant's daughter, and her

personal guarantee on the $37 million transfer from the

Himalaya Exchange in connection with the yacht in connection

with the bankruptcy.

There is Haoran He, who is the paper owner of the

G|CLUBS parent entity.

THE COURT:  I'm sorry.  Would you spell that.

MR. HORTON:  H-A-O-R-A-N, H-E.

THE COURT:  Go ahead.

MR. HORTON:  He's the paper owner of the G|CLUBS

parent entity.  He's a paper owner or director of numerous

other G Enterprise entities that are featured in evidence.  The

property——one example, the entity that pays the investor money

over to buy Mileson's Ferrari.  And in that capacity, he

communicates with other agents, and also with people outside of

the conspiracy, for the purpose of obscuring the actual

ownership and control of these entities and what their purposes

is.

There's Max Krasner, whose role is somewhat different

from the sort of core group I've just described.  He's more in

O6R1GUO4

1     the mode of executing tasks than planning and benefiting from

2     the conspiracy, but he's notable for the breadth of his

3     involvement and how he links these various parts together.

4     There was testimony early in trial from Ms. Maistrello, who

5     worked alongside him, that Max handled lots of payments for

6     Miles Guo.  On the first day of testimony, the Court saw

7     Mr. Krasner's role in using G|CLUBS investor money to buy the

8     red Lamborghini that was parked in Mr. Guo's garage in

9     Greenwich.  And there's additional documents to that effect.

10    And on top of that, the Court has evidence that he was a paper

11    owner, Max Krasner, or director of various of the G Enterprise

12    entities.  The Rule of Law Foundation, the Hudson Diamond,

13    Mr. Krasner signed the Saraca paperwork that's instrumental in

14    that $100 million hedge fund investment.  Beyond that, there

15    was testimony about the Rule of Law Foundation and Society, and

16    that involves Mr. Krasner, Ms. Maistrello.  It also

17    involved——there was testimony about Steve Bannon's statements,

18    his actions in furtherance of this conspiracy.

19            THE COURT:  But you're not now asking that I include

20    Maistrello and Bannon?

21            MR. HORTON:  I was using Maistrello's testimony to

22    underscore that Steve Bannon is a co-conspirator and that there

23    were statements that he made in furtherance of the conspiracy.

24    Early on in trial, there was a video admitted about the Rule of

25    Law——

1          THE COURT:  But not Ms. Maistrello.

2          MR. HORTON:  Not Ms. Maistrello.

3          THE COURT:  Okay.  Go ahead.

4          MR. HORTON:  So in that context, there were statements

5   from Mr. Bannon.

6          I think the next category is these figurehead

7   executives, and the Court heard testimony from two of them.

8   Ms. Reyes, the CEO of G|CLUBS, she makes false statements in

9   the G|CLUBS arbitration.  She puts together paperwork for the

10  transfers of fraud proceeds at Mr. He's and Yvette Wang's

11  direction.

12         I'll just also note that she testified about a

13  conversation she had with Scott Barnett about the red

14  Lamborghini, the one that was purchased with investor funds.

15  So Ms. Reyes testified about a statement Mr. Barnett made about

16  looking for a warehouse for that car.  Mr. Barnett is

17  unquestionably at least an agent of Mr. Guo.  He's described by

18  both parties as head of security and somebody who acted for and

19  at the direction of Mr. Guo.

20         THE COURT:  But you're focusing on Limarie Reyes.

21         MR. HORTON:  Yes, and I wanted to just note, because

22  there are some co-conspirators and agents who make fewer and

23  smaller appearances in the evidence, and I just wanted to point

24  out Mr. Barnett is one of them.

25         Jesse Brown, the CEO of the Himalaya Exchange,

testified that Mr. Je was the one who was really in control. He testified about the extent of Miles Guo's influence over the exchange's operations. Of course Mr. Khaled, who testified about his role at Crane and the entity that was created as a sort of adjunct of G|CLUBS for purposes of moving funds and in an effort to purchase a bank, and of course that was undertaken in conjunction with William Je, among other of the co-conspirators mentioned.

At G|CLUBS, moving to this category, there's Alex Hadjicharalambous, the comptroller for G|CLUBS, who was in charge of accounting. He reconciled member IDs with funds that were coming in before they were sent out and used to purchase goods for the Guo family. He communicated with numerous banks on behalf of G|CLUBS. And he touched other G Enterprise entities in his capacity as a paper employee of the G|CLUBS entity. There's a document that's recovered from Ms. Wang's apartment, just, for example, that shows him, Alex Hadjicharalambous, as the operator of the Freedom Media Ventures email account for that enterprise's, entity's account to the Himalaya Exchange. Just an illustration of the sort of breadth of the role that even some of the smaller parts played.

There's Ana Izquierdo, in-house lawyer at G|CLUBS. On Mr. Khaled's recording, she's giving directions about funds transfers, including the laundering of fraud proceeds. She met with Bo Collins, who testified here, was instrumental in

1     getting G|CLUBS a bank account at Mercantile, and Ms. Reyes

2     testified that Ms. Izquierdo got direction from Yvette Wang and

3     from Victor Cerda on handling the purchase of the Lamborghini

4     that was found in Mr. Guo's garage.

5          There are a number of lawyers who were co-conspirators

6     and whose statements were elicited at trial.  Aaron Mitchell, a

7     long-time lawyer for Guo and the G Enterprise entities.  He's a

8     director himself of GTV.  He's a director of Holy City HK

9     Ventures.  Your Honor may recall that it was Ya Li's

10    involvement or her request to be involved with Holy City that

11    was part of how Ms. Li became aware of the fraudulent nature of

12    the enterprise.  Ms. Li was asked to sign a bunch of paper for

13    Holy City, and Mr. Mitchell was a direct——Mr. Mitchell

14    represented G|CLUBS at the Crane arbitration.  His law firm

15    account holds tens of millions of dollars of fraud proceeds,

16    including the 47 million transfer from Crane to G|CLUBS.  And

17    he's instrumental, as the Court saw, in Mr. Guo's purchase of

18    the Mahwah mansion as a residence using investor money.

19         There's Victor Cerda, who is a director of the Rule of

20    Law Foundation.  He helps Mr. Khaled stand up Crane as a

21    vehicle for G|CLUBS-related money laundering.  He advises Ana

22    Izquierdo on G|CLUBS purchase of Mr. Guo's Lamborghini.  And he

23    worked, of course, on the Crane arbitration in which false

24    statements were used to effect a funds transfer.

25         There's Alex Lipman, a lawyer for Yvette Wang.  After

O6R1GUO4

1    Ms. Wang's arrest, Mr. Lipman conveys a message to Ya Li,

2    please sign these documents for the Holy City Ventures, as I

3    mentioned in connection with Mr. Mitchell.

4        At the Himalaya Exchange, the Court heard statements

5    made by Priya Patel.

6        THE COURT:  Who?

7        MR. HORTON:  Priya Patel.  She featured in the

8    testimony of Mr. Roberts from Bitgo and from Mr. Brown.  She

9    represented——she was held out as a representative of the

10   Himalaya Exchange to outside entities, including Bitgo.  She

11   passed on lies to Bitgo about the nature of Miles Guo's

12   connection with Himalaya Exchange.  And Mr. Brown testified

13   that he understood her to make false statements in internal

14   meetings when Mr. —— the topic of Mr. Guo's relationship to the

15   exchange was raised by Mr. Brown.  There were also statements

16   made in documents in which Marios Mamzeris, who was an employee

17   of Hamilton——

18       THE COURT:  If you could remind me of the spelling.

19       MR. HORTON:  The last name is M-A-M-Z-E-R-I-S.

20       THE COURT:  Did you say Mario?

21       MR. HORTON:  Marios.

22       THE COURT:  Marios?  Okay.

23       MR. HORTON:  Yes.  So Mr. Brown testified about

24   discussions he had where Mr. Mamzeris was conveying information

25   about William Je.  There's also the Himalaya Exchange email

O6R1GUO4

```
1    with Bitgo that came in through Mr. Roberts, where

2    Mr. Mamzeris, in March of 2023, is making a number of

3    statements about sort of fundamental characteristics of the

4    exchange and its coins that are contrary to representations

5    Mr. Guo is making in public.

6              And then there are people at the farms.  There is

7    extensive testimony about statements from Long Island David,

8    Xia Qidong, also in the transcript as Brother Chang Dao.  Ya Li

9    testified that he was the secretary——

10             THE COURT:  I'm sorry.  Long Island David, are you

11   saying he has the same name as this person you just mentioned?

12             MR. HORTON:  That's right.

13             THE COURT:  Okay.

14             MR. HORTON:  So I think the proper name is Qidong,

15   Q-I-D-O-N-G, and nicknames included Long Island David, Brother

16   Long Island, and Chang Dao.  Ya Li testified referring to him

17   as Brother Long Island, that he was the Himalaya Alliance

18   secretary, the sort of umbrella organization that held and

19   represented all the farms together.  And he sent a farm loan

20   agreement to Ya Li on Mr. Guo's behalf.

21             He was the leader of the Mountains of Spices Farm.

22   There was extensive testimony about the role of that particular

23   farm, the Mountains of Spices Farm.  Long Island David signs an

24   H Coin-related agreement with Ya Li, and he tells Ya Li to

25   delete the content from her phones after the defendant's
```

O6R1GUO4

1      arrest.

2              There is Yongbing Zhang, Z-H-A-N-G.

3              THE COURT:  I'm sorry.  You're going to have to spell

4      that one for me.

5              MR. HORTON:  So it's Y-O-N-G-B-I-N-G, Z-H-A-N-G.  Ya

6      Li testified that Mr. Zhang was a lawyer and Guo supporter who

7      sent her a farm loan agreement that would have effected a

8      transfer to an entity called Alpha Global.  She also testified

9      that Mr. Zhang asked her, Ya Li, to sue the bankruptcy trustee

10     and, in connection with that, to sign a false affidavit, and

11     then threatened her when she refused to do that.

12             And then there's two sort of much more peripheral sets

13     of statements that come in in this farms category.  There's a

14     video where somebody named Fay Fay is speaking alongside Miles

15     Guo.

16             THE COURT:  You're saying there was an individual by

17     that name who you're including on this list?

18             MR. HORTON:  That's right.  We played a video where

19     Mr. Guo and Fay Fay are side by side speaking, and it's a video

20     that promotes the sort of set of post-GTV investment schemes.

21             And then there's—I'll just spell this one out.

22     L-A-O-B-A-N Z-H-A-N-G.  And Ya Li testified that this

23     individual directed her to sign a G|CLUBS-related loan writeoff

24     agreement.

25             So that's the roster.  There was evidence from day one

O6R1GUO4

1    through today of statements made by the people I named in

2    furtherance of the conspiracy and of course in their capacity

3    as agents for Mr. Guo.  And all of that, we submit, is

4    admissible under 801(d)(2).

5              THE COURT:  So are you including Mr. Barnett on the

6    list?

7              MR. HORTON:  That's right.

8              THE COURT:  All right.  I'll hear from the defense.

9              MR. KAMARAJU:  Thank you, your Honor.

10             That was quite a list, but first, let me start

11   with——maybe it's housekeeping.

12             At page 395, line 9 of the transcript——and I have

13   copies for your Honor that I can hand up——the government

14   introduced the statements of David Dai as under the

15   co-conspirator exception.  I did not hear him on Mr. Horton's

16   list, so we're going to move to strike that testimony.

17             THE COURT:  If they had wanted him on the list——

18             MR. HORTON:  If I could just make two brief additions,

19   one of which is Mr. Dai, who was the UK Farm leader.  He should

20   have been included on my list.  And there was a single or a

21   small set of statements from Dara Lawall, who is Aaron

22   Mitchell's wife.  We had a sidebar on this issue.  She was

23   quite clearly communicating as an agent of Mr. Guo.

24             THE COURT:  Are there any other people, Mr. Kamaraju,

25   that you think they left off?

1          MR. KAMARAJU:  Yes, there are.

2          THE COURT:  Go ahead.  Just go one by one.

3          MR. KAMARAJU:  Sure.  So at 477, line 2, there is an

4    unnamed Rule of Law Foundation paralegal who they admitted as a

5    co-conspirator statement, statement of agent.  Do you want to

6    ask them if they want——

7          THE COURT:  Yes, I do.

8          MR. HORTON:  So that one we had resolved at the

9    sidebar, your Honor, as a discrete piece of information, but

10   for the avoidance of doubt, we include that paralegal as an

11   agent of the G Enterprise entity on our list.

12         THE COURT:  Who else, Mr. Kamaraju?

13         MR. KAMARAJU:  Let's see.  There are unnamed Himalaya

14   Exchange employees who——I'm sorry, I don't have the cite on my

15   chart, your Honor, but during the testimony of Mr. Brown, there

16   were unnamed Himalaya Exchange employees who were referred to

17   as both I think agents and the co-conspirator exception, so I

18   guess we can hear from Mr. Horton on those as well.

19         MR. HORTON:  So we think there was extensive evidence,

20   certainly more than a preponderance, that people who were

21   employed at the Himalaya Exchange and but for Jesse Brown,

22   those were employees of Hamilton, which was William Je's

23   entity, were agents of William Je and agents of Miles Guo.

24         THE COURT:  So these are unnamed individuals, and so

25   you're not asking for them to be on the list.

O6R1GUO4

1          MR. HORTON:  To the extent they can't be identified by

2     name, I suppose that's right, but Mr. Brown's testimony was

3     that he met with people who were Hamilton employees, they

4     worked for William Je, they worked with Himalaya Exchange, and

5     we view them as agents.

6          THE COURT:  So unnamed Himalaya Exchange employees

7     referred to by Mr. Brown.

8          MR. HORTON:  That suffices.

9          THE COURT:  Go ahead, Mr. Kamaraju.

10         MR. KAMARAJU:  So maybe we can just start──I think

11     that's all I have on people they haven't referred to, but I'll

12     confirm that.

13         But I think the last description that Mr. Horton gave

14     actually goes right to the point.  The hearsay exception, first

15     of all, for agency, is a hearsay exception for agents of the

16     defendant, not agents of a co-defendant.  So that's step one.

17     So everything he says about agents of Mr. Je don't come in

18     under an agency relationship with Mr. Guo.  The only way they

19     would be able to do that is through a co-conspirator statement.

20         Second, if they were trying to offer that somebody is

21     an agent of Mr. Guo's, then under *United States v. Rioux*, 97

22     F.3d 648, 660 (2d Cir. 1996), they need to show the existence

23     of an agency relationship, that the statement was made during

24     the course of the relationship, and that it relates to a matter

25     within the scope of the agency.  And the Second Circuit has

O6R1GUO4

emphasized that that test is very fact-specific.  So there can

be agency relationships when there is no employment agreement.

So for example, in *Rioux*, the Second Circuit dealt with

employees of the sheriff's department and whether they were

agents of the sheriff, and the evidence that the government

offered in that case was that they were, for example, hand

picked by the defendant, that they served at his pleasure, and

that they received their instructions through the defendant

himself, or an employee who served in a position the defendant

created.  The government has no evidence, for example, that

Limarie Reyes received any instruction from Mr. Guo.  In fact,

her testimony was to the exact opposite.  The government also

has no information, no evidence whatsoever that Mr. Guo placed

Ms. Wang at a position in G|CLUBS.  There's simply nothing in

the record, and I don't believe Mr. Horton will ever be able to

cite anything in the record, showing how Ms. Wang got the

position that she did with G|CLUBS.  That's true, frankly, your

Honor, for every name that's on that list.  They have no

evidence to show the nature of the agency relationship.  And

from the beginning of this case, your Honor, they have tried to

short-circuit that showing and skip those steps.

So—I apologize, your Honor.  I just lost the list for

a second.

But take Priya Patel, for example.  They've never

shown any connection between Mr. Guo and Priya Patel.  Their

1    entire argument is that she's an agent of Mr. Je and the

2    Himalaya Exchange.  Again, that's not what the agency hearsay

3    exception is.

4           So as we go down, the principal issue, I think, your

5    Honor, with the government's showing is, it essentially has no

6    limitation.  Their showing is somebody worked at one of these

7    companies and took actions in furtherance of that company's

8    business heretofore, they are a co-conspirator.  They have no

9    evidence of intent, they have no evidence of agreement, they

10    have no evidence that they even met or spoke with Mr. Guo in

11    any of these scenarios.

12           So the list is long, and I know——

13           THE COURT:  Okay.  So it's now 2:42, and you folks are

14    going to have to do this on papers.

15           MR. KAMARAJU:  Fair enough.

16           THE COURT:  It would be fine for you to go further on

17    the record, but I think it would be more efficient for you to

18    do it on papers.  And so we're going to need to come up with a

19    schedule.

20           MR. KAMARAJU:  That's fine, your Honor.  I assume

21    we'll just respond to whenever the government files theirs.  So

22    whatever the Court prefers.

23           THE COURT:  This is going to have to be over the

24    weekend.  When can you get me your papers?

25           MR. KAMARAJU:  And I'm sorry, your Honor.  Just for

O6R1GUO4

1  point of clarification, my understanding is that this needs to

2  be done prior to the government resting their case.

3           THE COURT:  It does.  It has to be done before then,

4  and of course I and my assistants will also have to consult the

5  record, and so it's quite an undertaking.

6           MR. KAMARAJU:  Yes.  That was my assumption as well,

7  your Honor.

8           THE COURT:  So it looks like, if I'm going to have to

9  assimilate this, along with my assistants, we will need Sunday

10 and Monday to do that, so that means the government's papers

11 tomorrow and defense papers on Saturday.

12          MR. KAMARAJU:  No problem, your Honor.

13          MR. HORTON:  No problem with us.  Thank you.

14          THE COURT:  I'm assuming, Mr. Kamaraju, that you don't

15 feel the need to go further on the record; is that correct?

16          MR. KAMARAJU:  No, your Honor.  No need to belabor it

17 now.

18          THE COURT:  Okay.  So from the government, I'm going

19 to need references to the transcript.

20          MR. HORTON:  Yes, your Honor.

21          THE COURT:  Page and line.

22          MR. HORTON:  Understood.

23          THE COURT:  Okay.  All right.  So we should bring our

24 jurors out and let them go.

25          MR. KAMARAJU:  Thank you, your Honor.

O6R1GUO4

1          (Jury present)

2          THE COURT:  Please be seated.

3          Members of the jury, it's 2:45, and so it's time to

4    go.  Tomorrow you will not be coming in, nor will you be coming

5    in on Monday.  So you have four days off.  And you'll return to

6    court on Tuesday.  And on Tuesday and Wednesday, we will have

7    full days.  In addition, once the parties have rested and have

8    finished presenting evidence——and that means if the defense

9    chooses to put on a case.  They don't have to put on a case.

10   They're not obligated to do so.  But once the evidentiary

11   portion of the trial is over, we will then have summations.

12   Rather, we'll first have my instructions, then the summations,

13   and then we'll go into deliberations.  And at that point, once

14   the evidentiary portion is finished, you will have to stay full

15   days.  So I want you to be prepared for that.  I don't know

16   exactly when that will be, but once it starts, there will be

17   full days.

18          All righty.  So I wish you a good short break.

19   Remember that you're not allowed to discuss the case amongst

20   yourselves, you cannot permit anyone to discuss the case in

21   your presence, and you're not permitted to read, listen to, or

22   watch anything, from any source, that touches on the subject

23   matter of this case.

24          Have a good weekend.

25          (Jury not present)

O6R1GUO4

| | |
|---|---|
| 1 | THE COURT:  Please be seated. |
| 2 | So the instructions I was referring to were the |
| 3 | pre-summation instructions, just so that you understand that |
| 4 | there will be instructions after summations. |
| 5 | MR. FINKEL:  Judge Schofield as I understand it, does |
| 6 | it before summations, but thank you, your Honor. |
| 7 | THE COURT:  Yes.  Anything further? |
| 8 | MR. KAMARAJU:  Not from the defense, your Honor. |
| 9 | MR. FINKEL:  Just one thing.  Just to avoid issues and |
| 10 | make sure our presentation of evidence is efficient or the |
| 11 | defense's presentation of evidence is efficient next week, by |
| 12 | when can we expect the defense's exhibits that they intend to |
| 13 | introduce through their witnesses?  The government has |
| 14 | generally provided it Saturday by noon.  If it narrows or gets |
| 15 | broader, that's fine.  We understand things will change.  But |
| 16 | it would be helpful to have and I think efficient to have a |
| 17 | good-faith assertion of the exhibits they intend to introduce |
| 18 | by Saturday before noon. |
| 19 | MR. KAMARAJU:  Saturday at noon is fine, your Honor. |
| 20 | THE COURT:  All righty. |
| 21 | MR. FINKEL:  Thank you, your Honor.  Have a nice |
| 22 | weekend. |
| 23 | THE COURT:  Same to you. |
| 24 | MR. KAMARAJU:  Have a good weekend, your Honor. |
| 25 | (Adjourned to July 2, 2024, at 9:00 a.m.) |

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     WEI CHEN

4     Cross By Ms. Shroff  . . . . . . . . . . . .4570

5     Redirect By Mr. Finkel . . . . . . . . . . .4685

6     Cross By Ms. Shroff  . . . . . . . . . . . .4694

7      JESSICA VOLCHKO

8     Direct By Mr. Fergenson  . . . . . . . . . .4707

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                               Received

 3    1B15D, G, G-T, I; 1B16C, 1B18A, A1, A2; . . .4711

 4            1B69B and B-T, B-1 through

 5            B-18, and their

 6            corresponding-Ts; 1B70A and

 7            A-1; 1B71A-1 to A-6; and

 8            1B71E, F, G, H, and I; 1B89;

 9            1B89J, and J-1 and J-2;

10            1B91C-38; 1B91B-26, -27, -31

11            through -33; 1B92B-13

12    1B121; 1B121A-M; 1B124, 1B124A, C, E, . . . .4711

13            F, G, H, M, and R; 1B125,

14            1B125A, and 1B125F through

15            1B125S; 1B185M; 1B204-13, -47,

16            -48; 1B227A, B, and F; 1B255C

17            and D; and 1B272B

18   VB16   . . . . . . . . . . . . . . . . . . .4612

19   Stip 17  . . . . . . . . . . . . . . . . . .4709

20   VB-36   . . . . . . . . . . . . . . . . . . .4689

21                    DEFENDANT EXHIBITS

22   Exhibit No.                               Received

23   60672   . . . . . . . . . . . . . . . . . . .4590

24   60676   . . . . . . . . . . . . . . . . . . .4605

25
```