O721GUO1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
               v.                        23 Cr. 118 (AT)
4
    MILES GUO,
5
                    Defendant.           Trial
6   ------------------------------x
                                         New York, N.Y.
7                                        July 2, 2024
                                         9:00 a.m.
8
    Before:
9
10                    HON. ANALISA TORRES,

11                                       District Judge
                                          -and a Jury-
12
                          APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MICAH F. FERGENSON
         RYAN B. FINKEL
16       JUSTIN HORTON
         JULIANA N. MURRAY
17       Assistant United States Attorneys

18  SABRINA P. SHROFF
         Attorney for Defendant
19
    PRYOR CASHMAN LLP
20       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
21       MATTHEW BARKAN

22  ALSTON & BIRD LLP
         Attorneys for Defendant
23  BY:  E. SCOTT SCHIRICK

24

25
```

O721GUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O721GUO1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.

3              ALL COUNSEL:  Good morning, your Honor.

4              THE COURT:  Please make your appearances.

5              MR. FERGENSON:  Micah Fergenson, Ryan Finkel, Juliana

6    Murray for the United States, and we're joined by a paralegal,

7    Isabel Loftus, your Honor.

8              MR. KAMARAJU:  Good morning, your Honor.  Sidhardha

9    Kamaraju, Sabrina Shroff, and Scott Schirick for Mr. Guo, and

10   we're joined at counsel's table by Jorge Salazar, and Mr. Guo

11   is with us as well.

12             THE COURT:  Please be seated.

13             By letter dated June 30, 2024, the government moves to

14   preclude the defense from introducing five categories of

15   evidence.

16             On July 1, 2024, Guo filed a letter in opposition, ECF

17   No. 386, and the government filed a reply, ECF No. 387.

18             First, the government argues that testimony of

19   "non-victim" investors is irrelevant and, therefore,

20   inadmissible under Federal Rules of Evidence 402 and 403.

21   Specifically, the government seeks to preclude the fact that

22   some investors do not believe they were defrauded.

23             Guo contends that defense witnesses should be allowed

24   to "testify that they heard the alleged misrepresentations upon

25   which the government relies, but did not view them as important

O721GUO1

in their investment decisions," because such testimony "is

evidence that the jury should consider in assessing [the]

materiality" of the alleged misrepresentations.  [Guo Letter at

2.]

In determining whether a scheme to defraud existed,

the jury is tasked with "gaug[ing] the defendant's intent."

United States v. Thomas, 377 F.3d 232, 243 (2d Cir. 2004).

Whether an investor "feel[s] or [is] actually [] victimized" is

irrelevant.  See United States v. Washington, 21 Cr. 603, 2023

WL 6219203, at *9 (S.D.N.Y. Sept. 22, 2023).  Moreover, "the

government need not prove that the scheme successfully

defrauded the intended victim."  United States v. Dinome, 86

F.3d 277, 283 (2d Cir. 1996).

That said, under the Second Circuit's decision in

United States v. Litvak, 889 F.3d 56, 65 (2d Cir. 2018), the

defense may elicit testimony that bears on whether Guo's

alleged misrepresentations were material to the reasonable

investor.  Indeed, in its reply filed July 1, 2024, the

government concedes that "the defense can call witnesses to

testify that they did not believe certain statements made by

Guo were material.  For example, those witnesses might testify

that Guo's statements regarding guaranteeing losses were not

important to their decision to invest."  [Gov. Reply at 2.]

I will permit the defense to ask its "non-victim

witnesses" about what information they personally considered in

O721GUO1

1    deciding to invest, what weight they gave to various

2    statements, and why.  The defense may not imply, however, that

3    the government's victim-witnesses were comparatively negligent

4    or gullible.  See Thomas, 377 F.3d at 242-43.  For example, the

5    defense cannot ask its witnesses for their opinions of other

6    victims, or to opine about what statements other victims should

7    have considered or disregarded.  In short, the defense shall

8    limit its questioning to each witness's own investing

9    experience.

10          Next, the government objects to Defense Witness-1's

11   anticipated testimony about a variety of matters, including his

12   targeting by the CCP.  [Gov. Letter at 4.]

13          The government first takes issue with the timeliness

14   of when exhibits related to Defense Witness-1 were provided by

15   the defense.  [Id. at 6-7.]

16          The defense states that, consistent with Rule 16, they

17   provided the exhibits for Defense Witness-1 once they decided

18   to use the exhibits as part of Guo's case-in-chief.  [Guo

19   Letter at 3.]

20          As I've stated, I expect the parties to be nimble.  I

21   credit the defense's representation as officers of the court as

22   to the timeliness of their disclosure, and I will not preclude

23   the exhibits on that basis.

24          On the substance of the government's letter, in my

25   May 2, 2024, order, I held that Guo may offer evidence that his

O721GUO1

1   "fears of CCP targeting were objectively legitimate."  [Order
2   at 14, ECF No. 319.]  Accordingly, Defense Witness-1 may
3   testify about being arrested and interrogated by the Chinese
4   police and being coerced by the CCP into filing complaints
5   against Guo, which adds objective credence to Guo's beliefs.
6   [Guo Letter at 2.]
7         I disagree with the government that the timing of
8   Defense Witness-1's arrest renders it irrelevant.  [Gov. Letter
9   at 5.]  Although Defense Witness-1 was arrested in October
10  2022——over two years after the GTV Private Placement in which
11  he participated——the arrest occurred within the time frame of
12  the alleged conspiracy and may support nonculpable explanations
13  for Guo's conduct.  [ECF No. 243 at 6.]
14        Although Defense Witness-1 may testify as to his own
15  interactions with the CCP and the CCP forcing him to file false
16  complaints against Guo, I will not allow testimony that is
17  based on pure speculation.
18        For example, Defense Witness-1 cannot testify as to
19  the intent or motivations of the government's victim-witnesses.
20  Nor can he speculate that victim-witnesses are biased in favor
21  of the CCP or are CCP spies.
22        Moreover, Defense Witness-1 cannot testify that
23  Chinese authorities wanted to use a fraud case to "bring down"
24  Guo, a speculative claim.  To the extent that this testimony
25  has any probative value, such as for its effect on Defense

O721GUO1

```
 1   Witness-1's state of mind, it is substantially outweighed by
 2   the risk of prejudice.  It risks creating an inference that
 3   "the prosecution team is 'improperly linked to the CCP or in
 4   any way malicious,'" which I have previously forbid Guo from
 5   arguing.  [Order at 13.]
 6           Lastly, the government argues that Defense Witness-1
 7   should not be allowed to testify that "his profits were frozen
 8   by the [SEC]."  [Gov. Letter at 6.]  I agree that this would
 9   contravene my order that prohibited Guo from arguing that the
10   "SEC or the government are responsible for the victims'
11   financial losses."  [Order at 18.]  However, Guo states that he
12   will not elicit testimony implying that the SEC is responsible
13   for any alleged losses.  [Guo Letter at 3.]  Therefore, this
14   portion of the government's request is denied as moot.
15           Third, the government seeks to preclude defense
16   witness George Higginbotham from offering hearsay testimony
17   "about a conspiracy Higginbotham joined to seek to persuade the
18   Trump Administration to repatriate Guo to China."  [Gov. Letter
19   at 9.]
20           The government is correct that the admission of
21   co-conspirator statements is only allowed under
22   Rule 801(d)(2)(E) when such statements are made by the
23   co-conspirator of an opposing party, and Higginbotham does not
24   fall into that category.
25           But Guo is correct that there may be permissible
```

O721GUO1

 1   nonhearsay purposes for admission of Higginbotham and his

 2   co-conspirators' out-of-court statements, but I cannot evaluate

 3   this in the abstract, and I will address objections as they

 4   arise during Higginbotham's testimony.

 5            Accordingly, the government's motion is denied without

 6   prejudice.

 7            As to the fourth issue, the testimony of expert Maggie

 8   Sklar, the government's motion is denied as moot, because the

 9   defense "does not intend to elicit such testimony."

10            Fifth, the government seeks to preclude summary

11   witness Thomas Bishop from testifying about redemptions

12   provided by the Himalaya Exchange.  The government argues that

13   because the redemptions are not a defense to the charges, they

14   are irrelevant.  [Government Letter at 10.]

15            I disagree.  Although the fact that the Himalaya

16   Exchange permitted its customers to redeem H Dollar for

17   currency is not a defense to fraud, testimony about how the

18   Himalaya Exchange did business is relevant to complete the

19   narrative of how the exchange operated and how funds flowed

20   through the exchange.

21            Accordingly, the government's motion is denied.

22            Are there any further applications?

23            MR. FERGENSON:  Just may we have one moment, your

24   Honor.

25            THE COURT:  Yes.

O721GUO1

1           MR. FERGENSON:  Thank you, your Honor.

2           One other application that we had raised previously

3    related to the statement the defense was objecting to on 403,

4    separate from the letters last night, where Mr. Guo says, "The

5    United States will never falsely accuse you," in sum and

6    substance, "Listen to what I say, the United States will never

7    falsely accuse you."  I had mentioned this I believe last week,

8    and defense counsel who I've been speaking with about it was

9    not present, so we tabled it, but given we're going to rest

10   this morning, your Honor, I wanted to resolve it so we could

11   put in the appropriate version of the summary chart with that

12   redacted or without that redacted.  And the government's

13   position is, there's clearly high probative value to such a

14   statement.  It's a statement of an opposing party.  It's

15   Mr. Guo's recorded statement.  And it's not unfairly

16   prejudicial.  There's nothing unfairly prejudicial about it.

17   Routinely criminal defendants confess to crimes, and if they go

18   to trial, confessions are admitted at their trial.  There's no

19   403 problem with such statements.

20           MR. KAMARAJU:  Yes, thank you.  I think

21   Mr. Fergenson's use of the confession analogy actually shows

22   the problem with this testimony.  When confessions are admitted

23   in court, they are admitted for relevant facts.  So, for

24   example, if a defendant confessed, you know, I shot somebody,

25   then that has relevance to the particular crime charged.  The

O721GUO1

1    statement that they're eliciting here is a blanket statement

2    about the U.S. government moves slow, they will never falsely

3    accuse you.  There's no particular fact in this case that that

4    goes to other than the ultimate question the jury has to

5    decide, which is, has the United States government incorrectly

6    charged Mr. Guo here.  So unlike a confession, that basic

7    connective tissue between a fact that is in dispute, a specific

8    fact that is in dispute and the confession doesn't exist here.

9    And so it has no probative value of those facts.  All it is is

10   Mr. Guo's opinion at the time of this statement as to the U.S.

11   government's veracity, or whatever the right word is.  It's not

12   a statement with respect to the particular charges here.  It's

13   not a statement or an admission with respect to any fact that

14   the government has tried to allege.  And so on that basis it

15   has very little relevance but it does have a significant amount

16   of unfair prejudice, which outweighs whatever relevance the

17   government may be able to argue because essentially it places

18   before the jury a weighted opinion that the government I think

19   obviously will try to argue is Mr. Guo's confession that their

20   entire case is correct.  And I don't think that's the question

21   that the jury has to consider.  The jury has to consider the

22   evidence of the specific allegations that the government has

23   made to determine whether the government has met its burden

24   with respect to that.  So on that ground——relevance and 403——we

25   would object to inclusion of this.

1          MR. FERGENSON:  Whatever context they want to argue

2     this statement should be viewed as, they can argue it, but it

3     doesn't mean it's not admissible, your Honor.  It is not

4     substantially outweighed by a risk of unfair prejudice.  And

5     just to be clear, the defense is putting on an entire defense

6     case centered on the fact that Mr. Guo's belief that, in part,

7     the DOJ was targeting him as an arm of the CCP was objectively

8     reasonable.  They have nine witnesses that are going to put on

9     this defense case.  That's the gravamen of the defense case.

10    This rebuts that.  And it's Mr. Guo's own statement.  He

11    recorded it, he put it on the internet himself.  He voluntarily

12    did all that.  There's nothing unfair about the jury hearing

13    what Mr. Guo said during the time period of the fraud when

14    discussing investigations by the SEC and U.S. authorities.

15    This isn't some unrelated context.  He's talking about this

16    case and says, "The United States will never falsely accuse

17    you."  In fact, he's talking about supporters of his,

18    investors, who had complained to the U.S. authorities and

19    suggesting to his followers that they were going to be

20    criminally charged by the United States because those

21    complaints were false.  It's clearly relevant.  It's clearly

22    admissible.  It's a statement of the defendant himself that is

23    against his penal interests.  There's no question it's

24    admissible.

25          Thank you, your Honor.

O721GUO1

1          MR. KAMARAJU:  Just briefly, your Honor.

2          One, as the Court has made clear, and as the defense

3    has made clear, we have no argument, no part of our defense

4    case is to argue that the prosecutors at this table or that

5    this prosecution is being motivated or constructed or directed

6    by the CCP.  So the point that Mr. Fergenson was making may be

7    responsive if our defense was that this particular prosecution

8    was being driven by the CCP.  That's not our point.  And

9    frankly, your Honor, they're the ones who brought up in the

10   first instance the DOJ's infiltration by the CCP through their

11   protest signs.  We didn't introduce that at all in the

12   beginning.  So the concept that this statement rebuts a defense

13   argument that the defense is not trying to make, doesn't make

14   it relevant.

15         Two, they're right, we're allowed to argue the

16   context, but the statement itself still has to have independent

17   relevance to be admissible, and this statement does not make

18   any particular fact more or less likely, other than the

19   ultimate decision that the jury has to make with respect to

20   guilt.

21         So for all those reasons, we maintain our objection.

22         THE COURT:  I'm going to permit the government to

23   introduce the statement.

24         Is there anything further?

25         MR. FERGENSON:  Not for the government, your Honor.

O721GUO1

| | |
|---|---|
| 1 | MR. KAMARAJU:  I just had an administrative question |
| 2 | for your Honor.  So it sounds like the government anticipates |
| 3 | resting this morning.  As a formal matter, we would obviously |
| 4 | make our Rule 29 motion subsequent to that.  I presume the |
| 5 | government will oppose.  I don't know if it's your Honor's |
| 6 | practice to reserve or to hear argument on it.  If it were to |
| 7 | reserve, I just thought for efficiency's sake, rather than |
| 8 | excusing the jury entirely and having that motion practice, I |
| 9 | could just make on the record a note at sidebar that we're |
| 10 | formally moving and they can make their opposition.  But it's |
| 11 | whatever your Honor's preference is.  I just wanted to know for |
| 12 | planning purposes. |
| 13 | THE COURT:  I'm happy for you to make it at the |
| 14 | sidebar. |
| 15 | MR. KAMARAJU:  Thank you, your Honor.  That's all I |
| 16 | have. |
| 17 | MR. FERGENSON:  No.  Thank you, your Honor. |
| 18 | THE COURT:  All righty.  We'll start at 9:30. |
| 19 | (Recess) |
| 20 | THE COURT:  Please be seated. |
| 21 | I just received word that Alternate No. 4 is not |
| 22 | present and is currently in Tarrytown, and so that would mean |
| 23 | that if he were to remain, we would be delayed by at least an |
| 24 | hour, and so the question that I have for the parties is |
| 25 | whether you would consent to my excusing him. |

O721GUO1

1          MR. KAMARAJU:  Your Honor, I think given the COVID

2     situation and the length of the trial, we think it's important

3     to have our bevy of alternates.  I understand the delay, but

4     just for the record, I think we would object.

5          MR. FINKEL:  Your Honor, the government's view——and I

6     think this is within your discretion——is that it makes sense to

7     move forward.  We're just a few days away.  We have three other

8     alternates.  Three or four other?  Three other alternates.  The

9     jury has been remarkably prompt.  Timing is also an issue,

10    which is to say if it takes too long to finish the trial, we're

11    going to have problems with the rest of the jury, understanding

12    that the jury expects the trial to basically be done on

13    July 12th.  So saving an hour here for alternate juror 4 might

14    hurt us with the rest of the jury.  And so it's the

15    government's view——of course, it's your Honor's discretion;

16    that carries the day as always——that we should move forward and

17    just lose one additional alternate.  We have plenty just in

18    case.

19         THE COURT:  The defense agrees that it's a matter of

20    my discretion, that the defense need not consent to my excusing

21    Alternate No. 4.

22         MR. KAMARAJU:  Yes, it is ultimately your Honor's

23    discretion.

24         THE COURT:  All right.  So I am going to excuse No. 4,

25    and we can get started.

1                    (Jury present)

2                    THE COURT:  Good morning.  Please be seated.

3              Good morning, and welcome back.

4                    THE JURORS:  Good morning.

5                    THE COURT:  We're going to continue with the direct

6        examination of the witness.

7              You may continue your inquiry.

8                    MR. FERGENSON:  Thank you, your Honor.

9         JESSICA VOLCHKO, resumed.

10       DIRECT EXAMINATION

11       BY MR. FERGENSON:

12       Q.  Good morning, Ms. Volchko.

13       A.  Good morning.

14                    MR. FERGENSON:  Your Honor, the government's going to

15       offer, at the start, a few exhibits pursuant to stipulation.

16              So exhibits listed in Stip 8.  These are Government

17       Exhibits 3100-3107.

18              And then exhibits listed in Stip 13.  These are

19       Government Exhibit SW series, and it's 114, 129, and 133.

20              The government also offers, to the extent they are not

21       already in evidence, the government exhibits listed in Stip 21.

22              And then finally, the government offers a new

23       stipulation that's marked as Stip 23 concerning Government

24       Exhibit C62 video clips; and further to that stipulation, the

25       government offers Government Exhibits C62-V1 through -V13, and

1   Government Exhibit C62-TX.

2           MR. KAMARAJU:  Just on the last one, your Honor, we

3   just note our continuing objection.

4           THE COURT:  They are admitted.

5           (Government's Exhibits 3100-3107 received in evidence)

6           (Government's Exhibits SW 114, SW 129, and SW 133

7   received in evidence)

8           (Government's Exhibits [exhibits listed in Stip 21]

9   received in evidence)

10          (Government's Exhibits Stip 23; C62-V1 through -V13,

11  and C62-TX received in evidence)

12          MR. FERGENSON:  Thank you, your Honor.

13          Ms. Loftus, if we could go to GX Z9, please.

14          And we're going to go to page 34.

15  BY MR. FERGENSON:

16  Q.  Ms. Volchko, in the top left, do you see the date there is

17  August 7, 2020?

18  A.  That's correct.

19  Q.  And focusing you in the center column, could you read the

20  text under V1, please.

21  A.  Timestamp——under V1?

22  Q.  Yeah, and beneath Timestamp.

23  A.  "The Communists want to play guerrilla games?  Let's play

24  and see who is better at this.

25          "Aren't you looking for that Hairless Bean and James

1    to smear us in the U.S.?  Aren't you try to frame us with the

2    SEC?  And use the DA's Office to smear us, as well as the DOJ?"

3    Q.  And could you now read the text under V2, please.

4    A.  "As long as you have done something illegal, it is

5    impossible for you to get away with it.  It is just a matter of

6    time.  Do you know what it means to report a faked crime?

7            "In the United States, this is very illegal.  Lying to

8    the federal or U.S. government officials, 3-5 years, nothing

9    else to say.  They 100 percent will be after you if you report

10   fake things.

11           "Then, I will tell my comrades, what do we have to do

12   with G Club.  There are probably 3 million and 5 million who

13   intend to buy G Club now, between 3 million and 5 million

14   people."

15           MR. FERGENSON:  And we could go to the next page,

16   Ms. Loftus.

17   Q.  And I'll ask you to keep reading, Ms. Volchko.  I'll tell

18   you when you can stop.

19   A.  "In the past, I said that if you buy G Club, you will have

20   G Fashion stocks.  Do you remember that I said that?

21   20 percent, 20 percent.

22           "So now, we have a problem, which is, if you talk

23   about the stock . . . as long as this word shows up . . . that

24   is why now Sara and our comrades should not talk carelessly.

25   There is not any . . . you should not talk about this 'stock'

O721GUO1                          Volchko - Direct

word.

          "Because GTV is already a legal U.S. company, every

share of which is protected by the U.S. government.  That's the

great thing about the United States as a country.  Its

regulatory agencies are the strictest, the most stringent, the

most stringent one.  Now me, Guo Wengui, if I took even a dime,

let alone a dollar, from it, it will be the same stealing as

taking 100 million.

          "The protection of small investors in the United

States is paramount.  You know, right now we have 29 subpoenas.

There are 29 investigation orders.  We're asking the SEC to

investigate and we're asking the DA's Office and the DOJ to

investigate.  You can investigate as long as you guys get our

stuff clarified.

          "But during the process, we really admire the United

States government, who is very serious and very responsible.

What is found now is that, a son of a bitch, whose name I would

not say, invested 500,000 and said he was cheated.

          "This was a Communist agent.  Now they start to

investigate his background.  As well as Bean (Doudou) and the

$40,000 that she claimed that she sent to Sara.  Her background

is also under investigation.

          "And those who said they were cheated, and they are

all under investigations for their backgrounds.  The U.S.

government moves slow, but it will never falsely accuse you.

O721GUO1                         Volchko - Direct

1   You must remember my words:  It will never falsely accuse you,

2   okay?"

3   Q.  And Ms. Volchko, if you can skip down now to the bottom

4   paragraph, where it says Timestamp: 1:07, and if you could read

5   a few paragraphs starting there with, "But comrades."

6   A.  "But comrades, you should remember me, Guo Wengui will give

7   you three promises.  The G Club membership cards that you

8   purchase will have nothing to do with me legally.  But I

9   promise that I'll be responsible for the consequences of all

10  the things sold by the G Club.

11        "I will work hard to make G Club the largest

12  membership company in the world.  The G Club will never go

13  public, but the G Club holds 40 percent shares of G Fashion.

14        "Meaning that the world's G|CLUBS together constitute

15  40 percent shareholder.  How much is G Fashion worth?  From

16  today, as well as from a month ago, $100 billion.  G Fashion

17  will not necessarily be a U.S. company.  Don't forget that.  It

18  is not necessarily a U.S. company.

19        "Just like G News, G News is now 100 percent

20  independent and has nothing to do with me legally, nothing to

21  do with me.  We are doing this to hide from the Communist

22  party.  We are fighting a guerrilla war, right?"

23        MR. FERGENSON:  If we scroll down.

24  Q.  And why don't you just read the first sentence under V4.

25  A.  "G Fashion is now worth $100 billion, $100 billion.  Our

1  goal is to make it $1 trillion in three to five years, we

2  hope."

3        MR. FERGENSON:  All right.  Now, Ms. Loftus, let's go

4  back now to Stip 17, please.

5        And your Honor, may I approach to provide a hard copy

6  to the witness.

7        THE COURT:  You may.

8        MR. FERGENSON:  And Ms. Loftus, if we could go to

9  page 4 of Stip 17.  When you're ready.

10        And if we could zoom on the second row, with 1B69.

11  BY MR. FERGENSON:

12  Q.  All right.  Now, Ms. Volchko, what type of device is 1B69?

13  A.  According to the stipulation, it is an iPhone 12 Pro.

14  Q.  And where was it recovered?

15  A.  Wang apartment (inside a bag in closet).

16        MR. FERGENSON:  All right.  Now, Ms. Loftus, if we

17  could now go to one of these extractions, 1B69B-T.  And I think

18  it's an Excel, Ms. Loftus.  You may need to open it separately.

19        Okay.  Thank you.

20  Q.  Now, Ms. Volchko, let me focus you first on the column C

21  here.  Who are the participants in this chat?

22  A.  The participants are a contact name of Mmmmm and the owner

23  of the device.

24  Q.  What's the owner's name?

25  A.  Yvette.

1   Q.  And what does it mean when a participant in a chat has the

2   "owner" parenthetical?

3   A.  That's the device that was extracted.

4           MR. FERGENSON:  All right.  Now, Ms. Loftus, if we

5   could scroll to the right slightly.

6   Q.  And focusing you on column Q, Ms. Volchko, where it says

7   Source, what does it say underneath Source?

8   A.  Signal.

9   Q.  What is Signal?

10  A.  Signal is a third-party messaging application.

11  Q.  All right.  And just looking to the right of that, what's

12  the date of this first chat?

13  A.  November 20, 2021.

14          MR. FERGENSON:  All right.  Now, Ms. Loftus, we can

15  scroll back.

16          And to make this read a little easier, Ms. Loftus, are

17  you able to hide the CC, BCC, Priority—basically columns D

18  through H.

19          All right.  Now let's go to row 49, Ms. Loftus,

20  please.

21  BY MR. FERGENSON:

22  Q.  Now one of the participants was Mmmmm, Ms. Volchko, right?

23  A.  Yes.

24  Q.  Okay.  Now can you read—now focusing you on column B.

25  That's the sender of the chat, right?

1    A.  That's correct.

2    Q.  Can you read, what's in column J, the translation for row

3    49.

4          MR. FERGENSON:  Scroll up, Ms. Loftus.

5    Q.  And row 49 also has a 47 in column A.  Do you see that?

6    A.  Yes.

7    Q.  And can you read the translated body there.

8    A.  "Great!  Thank you, Meimei!"

9    Q.  Do you know who Meimei is?

10   A.  I do not.

11         MR. FERGENSON:  Let's go to row 90, please.

12   Q.  All right.  And Ms. Volchko, and this is another message

13   from Yvette, the owner?

14   A.  That's correct.

15   Q.  And can you read what that voice message translation is.

16   A.  "Meimei [PH], ah, it's like this, possibly starting from

17   today, or tomorrow, that attorney from HKI, Lee [PH] will

18   prepare you, that is to fully prep you to testify.  And then,

19   that . . . um . . . they . . . should be Lee to whom that Aaron

20   [PH] will give . . . that is to give some coach, because Aaron

21   cannot directly participate in your prep.  Right, then . . . er

22   . . . yesterday Da Wang [PH] said to have you secretly call my

23   phone and let me listen on the side, hahaha.  Yes, so perhaps

24   you just call my phone.  What time will it be?  And then you

25   call my phone.  You can call me with this, don't say anything,

1   then it should be okay, I put it on silent mode and just

2   listen, what do you think?"

3   Q.  And then I'll read the responses from the Mmmmm.

4        MR. FERGENSON:  If we could scroll down a little bit,

5   Ms. Loftus.

6   Q.  So it says, "Ouch."

7        "No need.  I'm not a three-year-old child."

8        "My Dad really doesn't understand me very well.  He

9   makes it sound like so hard, he has been nagging me for three

10  days.  Just say I won't call."

11       MR. FERGENSON:  And we can scroll down now.  Let's

12  keep scrolling down.  Let's go to row 112.  And actually, let's

13  just go to row 132, actually.

14  Q.  Okay.  Now this is another chat from Yvette, right,

15  Ms. Volchko?

16  A.  That's correct.

17  Q.  Can you read the translated body.

18  A.  "You tell him/her whether you're willing to . . . you tell

19  him/her . . . he/she asks if you're willing to testify, your

20  tone should be that this is your boat, right?  This is your

21  boat.  What you have heard now is, hey, this is your boat.

22  What is going on?  How come now the boat belongs to my Dad?

23  And now my Dad is going to jail because of it, it's said that

24  he's going to jail.  What is going on?  You should start from

25  this tone, this is your belonging.  You start from this

1    perspective and tell him/her why you are going to testify;

2    isn't that right?  And then, you . . . you . . . you're not

3    saying that you could help, but saying that this is your

4    property and you must claim your rights, your tone should start

5    from the perspective of the owner.  Um."

6            MR. FERGENSON:  Ms. Loftus, could we pull up quickly

7    in Trial Director Government Exhibit 1413.

8            And actually, before we do that, Ms. Loftus——I'm

9    sorry——could we scroll to the right just so we can see the date

10   of that message.

11   Q.  And Ms. Volchko, under Timestamp, what's the date of that

12   message?

13   A.  January 21, 2022.

14           MR. FERGENSON:  All right.  And if we could go to

15   Government Exhibit 1413, Ms. Loftus.

16           And if we could scroll down.

17   Q.  And Ms. Volchko, could you read the very top sentence that

18   starts, "WHEREAS the evidentiary hearing."

19   A.  "WHEREAS the evidentiary hearing specified by the First

20   Department's November 4, 2021, order was held on February 2,

21   2022."

22   Q.  And is February 2, 2022, about two weeks after the message

23   we just looked at?

24   A.  Yes.

25           MR. FERGENSON:  If we could go back to the Excel,

1    please.

2              And if we could go to row 130.

3              We can skip that.  We'll skip down a bit just for

4    time.  GO to row 137.

5    Q.  All right.  And row 137, it's also No. 135.  Is that

6    another message from Yvette?

7    A.  That's correct.

8    Q.  Can you read the translated body, please.

9    A.  "Fine, fine, you can come to me at any time, you can come

10   to me at any time.

11             "Overall, even with your own lawyer, our own lawyer

12   afterward, our dialogue is just pretending that this homework

13   in the background has not been done, as the tone always means

14   that, well, you are one of the managers and representatives of

15   the entire family's assets, and then, the management and

16   representation of family assets in the entire China and Europe,

17   ah, and Asia are different from those in the West.  It's

18   equivalent to you being one of the family representatives, the

19   assets you hold are your assets, they are the assets that the

20   family has authorized you to hold.  This is your boat, right?

21   And then after that, that is, regarding to your ship, um, that

22   means that you are not saying you are insisting.  But saying if

23   you can show up to help, and saying that this is your asset,

24   you have to be responsible for the family, you have to be

25   responsible for your own assets and go out to claim this right.

O721GUO1                          Volchko - Direct

1    You heard that someone distorted and said that this boat

2    belonged to your father, and since your father got into trouble

3    because of this matter, this matter is completely intolerable

4    to you, this is why you have to come forward to testify.  This

5    is the basic keynote and tone behind it, yes.  Regarding this

6    boat, it was your brother who paid for the boat, so, this is

7    between you and your brother, it was your brother who went to

8    pay for the boat.  Both you and your brother are, eh,

9    representatives of the family assets.  That's the situation."

10        MR. FERGENSON:  If we could scroll down.

11   Q.  And if you could read the next message from Yvette,

12   Ms. Volchko.

13   A.  "That is why Victor wants to talk to you, because he wants

14   to go over the whole years of '18 and '17 with you.  Our entire

15   conversations are just about when we made that application,

16   about your story, just making sure that this can be matched,

17   don't have qiang [PH] to have difference.  At the same time, he

18   also wants to remind you, that is, to emphasize about the

19   period of time being persecuted, then emphasize to you about,

20   about the safety's this . . . and then the hidden dangers of

21   this safety being threatened.  Yes, must emphasize these, yes,

22   I am [F word] being threatened and in jail so what, right,

23   similar to this kind, and then there must be this huge

24   potential safety hazard.  In view of this, therefore you asked

25   not to appear before, and now even if appearing, the face

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   cannot be shown, those are the two points, let's emphasize them

2   first.  Yes, the attorney insists that it must be mentioned

3   from your mouth, that's why.  In fact, we have prepared with

4   them many times for these stories behind, and they all know how

5   to deal with it.  It is just because due to their so-called

6   bullshit professional ethics, he must hear it from the client's

7   mouth, that is the reason.  That is why the so-called bullshit

8   is that Aaron can't participate in the prep of your deposition

9   either, only your lawyer Li can, anyway, that's how it works.

10  Yes, you should rest first, feel free to contact me any time

11  tomorrow, feel free to contact me any time."

12  Q.  Ms. Volchko, do you know who Aaron is?

13  A.  I do not.

14  Q.  Do you know who Victor is?

15  A.  I do not.

16          MR. FERGENSON:  All right.  Ms. Loftus, let's go back

17  to Stip 17 at page 3, please.

18          And the fifth row down for 1B204.

19  Q.  All right.  What kind of device, according to the Stip, was

20  1B204?

21  A.  A Sandisk Extreme Pro USB drive.

22  Q.  And where was it recovered?

23  A.  Mahwah Mansion (inside a Faraday bag).

24  Q.  What's a Faraday bag?

25  A.  That's a bag that can prevent any frequencies from entering

1   the inside of the bag.

2   Q.  And what do you mean by that?

3   A.  Any connections.  So it could be cellular service,

4   Bluetooth.

5   Q.  And to your understanding, what purpose do Faraday bags

6   serve?

7   A.  They can be to preserve the contents so there's no changes

8   occurring to the device inside.

9          MR. FERGENSON:  Now if we can go to, Ms. Loftus, some

10  of these contents.  1B204-13.

11         All right.  And if we could go to page 2, please.  And

12  Ms. Loftus, we can zoom on the top.

13  Q.  What does it say on the top left, Ms. Volchko?

14  A.  Brioni, 688 Madison Ave., New York, New York.

15  Q.  And then in the center in all caps, what does it say

16  beneath that?

17  A.  Invoice for Mr. Miles Kwok Bespoke Order.

18         MR. FERGENSON:  And if we could zoom out.

19         And if we could scroll back up to the top.

20  Q.  And what was the total amount?

21  A.  There's a couple values at the bottom.

22  Q.  And just looking at——if you want to do the far right total.

23  A.  The far right is $719,000,489.55.

24  Q.  719,000?

25  A.  719,000.  Sorry.

O721GUO1                          Volchko - Direct

1    Q.  That's all right.

2              MR. FERGENSON:  Let's go to Stip 17 on page 2.

3    Q.  And towards the middle, 1B121, what kind of device is

4    1B121?

5    A.  A red iPhone.

6    Q.  Where was that recovered?

7    A.  Sherry apartment (inside a bag).

8              MR. FERGENSON:  Ms. Loftus, let's pull up side by side

9    1B121C and D, please.

10   Q.  All right.  And Ms. Volchko, have you ever met the

11   individuals pictured here?

12   A.  I have not.

13             MR. FERGENSON:  If we could pull up now four exhibits

14   just all at the same time──1B121H, I, L, and M.

15   Q.  Ms. Volchko, have you ever met the individuals pictured

16   here?

17   A.  I have not.

18             MR. FERGENSON:  All right.  Let's go now to Stip 17 at

19   page 3, please.

20             And can we zoom on the third row, 1B255.

21   Q.  What kind of device is 1B255, Ms. Volchko?

22   A.  An iPhone X.

23   Q.  Where was it recovered?

24   A.  Mahwah mansion.

25             MR. FERGENSON:  All right.  Now let's put up two

1    extractions side by side, 1B255C and 1B255D.

2    Q.  All right.  Now, Ms. Volchko, on the left, 1B255C, what

3    kind of extraction are we looking at there?

4    A.  This is a wireless network extracted from 1B255.

5    Q.  And where it says SSId, what does that indicate?

6    A.  That's the name of the WiFi access point.

7    Q.  And what's the name of the WiFi access point?

8    A.  Mahwah.

9    Q.  And focusing on the right, what kind of extraction are we

10   looking at there?

11   A.  This is a password that was extracted from 1B255.

12   Q.  And what was the account name?

13   A.  Mahwah.

14   Q.  And what's the relation between that account and the

15   wireless network on the left?

16   A.  They appear similar.

17   Q.  And in Password, what was the password?  What's the data on

18   255D?

19   A.  Homesweethome.

20   Q.  All right.  Now if we could just go quickly again to

21   Stip 17, Ms. Volchko.  And we'll go to page 2, second row from

22   the bottom.

23         And you looked at some 1B125 exhibits before, but just

24   as a quick reminder, Ms. Volchko, what type of device was

25   1B125?

1    A.   A blue iPhone.

2    Q.   And where was it recovered?

3    A.   Sherry apartment (inside a bag).

4            MR. FERGENSON:  All right.  Let's go to 1B125L,

5    Ms. Loftus.

6    Q.   All right.  So, Ms. Volchko, I'll keep reading the Gladys

7    messages in these types of chats.  So this one—oh, let me ask

8    you first, what's the date of this chat?

9    A.   The date is December 6, 2021.

10   Q.   All right.  So I'll read the translation.  It says:

11           "House Update Message:

12           "About the curtain and carpet company, the building

13   cleaning, and landscape company, I have asked the property

14   manager Vinnie and the intermediary Christine, and now I'm

15   waiting for a reply.

16           "As for the room and movie theater on the third floor,

17   I have also asked.  We also need to wait for a reply.

18           "Promemoria replied that they wanted to know the

19   concept of the project first, what type of furniture you

20   wanted, the photograph of the house, and the 2D and 3D graphs

21   (I have asked the broker for this, and I'm waiting for a

22   reply).

23           "4.  About the Baccarat crystal lamps, we are waiting

24   for a reply from them that they can give more discounts.  The

25   tax is about 250,000.  I am considering whether we can still

O721GUO1                     Volchko - Direct

 1    send them to the house in New Jersey, but they can help us pay

 2    the tax, and then a smaller discount may be acceptable.

 3              "About the French brands you sent.  There are only

 4    stores in France for the first brand.  The link to the second

 5    and third brand is from the same company.  There are branches

 6    in New York.  Do you have any other favorite brands?"

 7              MR. FERGENSON:  And I think that may be it.  There's

 8    no other page, Ms. Loftus, right?

 9              All right.  Let's go to 1B125M.

10    Q.  All right.  And what's the date of this chat?

11    A.  December 7, 2021.

12    Q.  That's one day after the one we just looked at?

13    A.  That's correct.

14    Q.  All right.  I'll read Gladys, and just focusing on the

15    first chat there, in the body, there's a .pdf file.

16              MR. FERGENSON:  And Ms. Loftus, if we could open

17    1B125M-1 from the Attachments column.

18              And Ms. Loftus, if we could zoom on the bottom right,

19    just briefly.

20    Q.  Ms. Volchko, are you able to read what it says in large

21    text there?

22    A.  Crocker Residence.

23              MR. FERGENSON:  Okay.  Let's zoom out.

24              And we can just scroll, Ms. Loftus.

25              You can keep scrolling.

1              You can just scroll through the end.

2              All right.  Let's go back to the chat now, please.

3    It's 1B125M.

4              All right.  And if we could scroll down slightly.

5              And we can scroll up.  You can go back to the top,

6    Ms. Loftus.

7    BY MR. FERGENSON:

8    Q.  All right.  So I'll read Gladys.  It says, "Another floor

9    plan for the house in New Jersey."

10             And then there's a photograph, and it says, "This is

11   the elevator interior of the house in New Jersey and now we are

12   waiting for the circuit breaker to arrive.  It is expected that

13   the elevators will arrive on December 20 and will work when

14   installed."

15             MR. FERGENSON:  If you could scroll down.

16   Q.  "Vinnie, the steward, said that it would take about 45 days

17   to connect the movie theater and the rooms."

18             And then there's a photograph.

19             MR. FERGENSON:  Ms. Loftus, are you able to just zoom

20   on that photograph?

21   Q.  All right.  And Ms. Volchko, can you read the Miles Guo

22   text at the bottom there.

23   A.  "This, just the south side of the third floor.  It is now

24   another one.  Change it like this.  How long will it take?"

25             MR. FERGENSON:  And if we could zoom out.

 1            And let's scroll down.

 2   Q.  All right.  And there's another photograph, and then can

 3   you read the text from Miles Guo.

 4   A.  "In consideration of his current situation, that one where

 5   I circled probably needs to be built like that.  Just, to open

 6   it, how long will it take so that these two construction works

 7   can be completed as soon as possible, can they be completed

 8   within one month?  You think, if overtime is implemented, can

 9   they be completed within one month?"

10            MR. FERGENSON:  If you could scroll down.

11   Q.  All right.  Now there's a picture and then there's Miles

12   Guo text.  Now, Ms. Volchko, in the bottom entry here, is there

13   both text and an image?

14   A.  That's correct.

15            MR. FERGENSON:  Now, Ms. Loftus, can we please play

16   the attachment 1B125M-8.

17            (Media played)

18            MR. FERGENSON:  All right.  We could go back to 125M.

19   Q.  And Ms. Volchko, could you read the translation of that.

20   A.  "Xiao Zhuo, don't put the head of the bed on the third

21   floor toward the back . . . put it towards here.  After

22   entering here . . . most of the bathroom facilities are placed

23   here, which is Guo Mei's bedroom.  This is Guo Mei's master

24   bedroom.  Guo Mei's big bathroom is here, and from here to here

25   is her dressing room.

1          "Then this is Xiao Cao's room, a small suite.  This

2     entrance is here.  These are two bedrooms.  This bedroom and

3     this bedroom are reserved.  There can be a bathroom behind

4     this.  This is a public living room between the two of them.

5     They all can come here.  How long will this take?  Okay, you

6     can draw [a layout] and send it to him."

7               MR. FERGENSON:  All right.  If we could scroll down.

8               All right.  And again, there's a photo and then

9     there's a message with both text and an image.

10              Ms. Loftus, can we play 1B125M-10.

11              (Media played)

12              MR. FERGENSON:  We can go back to the text.

13    BY MR. FERGENSON:

14    Q.  And can you read the translation, Ms. Volchko.

15    A.  "This is the sides of third floor.  The north side of the

16    third floor is Guo Qiang's room.  Turn this area into a bed,

17    turn this area into a bed.  Open this area up, it should

18    connect with this area.  This is the bedroom . . . Guo Qiang's

19    two bedrooms.  This is his dressing room.  Here is a hallway

20    through here.  How long will it take?"

21              MR. FERGENSON:  All right.  Let's scroll down.

22              And again, there's another image, another photo sent,

23    and then there's a chat with a text and an image.

24              Ms. Loftus, can we play 1B125M-12.

25              (Media played)

O721GUO1                        Volchko - Direct

1          MR. FERGENSON:  We can go back to the chat.

2   BY MR. FERGENSON:

3   Q.  Could you read the translation of the audio, Ms. Volchko.

4   A.  "This is Mrs. Guo's second floor, the north side, the north

5   side.  Do you see it?  Remember the north side of the second

6   floor, the head of the bed is here.  Put it here.

7          "Then, open this up, open this up, there are two . . .

8   this is her bedroom, this is the bathroom, and this is the

9   dressing room.  How long will it take?"

10         MR. FERGENSON:  If we could scroll down.

11  Q.  And can you read the next chat, please.

12  A.  "According to you, I need to connect and restore the entire

13  three floors, and the water, electricity and restrooms need to

14  be done.  30 days, he needs to find three or four teams to work

15  overtime.  OK?  Don't ask for help from one team.  Three teams

16  must be found for the three floors, work overtime, give us some

17  time, and give us a quotation."

18         MR. FERGENSON:  And then the next chat, let's play the

19  attachment first.

20         Ms. Loftus, can you play 1B125M-14.

21         (Media played)

22         (Continued on next page)

23

24

25

O72BGUO2                         Volchko - Direct

1    MR. FERGENSON:  Can we go back to the chat.

2    Q.  Can you read the translated audio, please, Ms. Volchko.

3    A.  "This is dining room on the south side, the southeast

4    corner at the back.  Kitchen is here.  This Mrs. Guo is

5    converted into a kitchen, from here to here is a cabinet which

6    we customize, then put an island in the middle and connect to

7    natural gas, water supply and drainage here, which have to be

8    done at the same time.  This is one of the biggest projects,

9    four projects total, okay."

10    MR. FERGENSON:  Is there anymore, Ms. Loftus, when you

11    scroll down?

12    Q.  There's another photo, and then can you read the last chat

13    Ms. Volchko.

14    A.  "Gladys, this place needs to face east, the place where the

15    line was drawn.  This position needs to be an ignited stove,

16    inside is the cabinet, a kitchen island is in the middle.  This

17    needs to be done, and it's necessary to connect water and

18    natural gas."

19    Q.  Let's go to 1B125N.

20    What's the date of this chat excerpt?

21    A.  December 8, 2020.

22    Q.  I'll read Gladys. It says, "The broker Christine sends an

23    interior designer's profile.  She says the designer has

24    designed hotels, offices, large local and New York properties

25    and other places designated by the client.  He has a good taste

O72BGUO2                        Volchko - Direct

1   and is very creative and his design has high quality.  You can

2   take a look at his information and see if you like it or not."

3   And then there's two web page links sent that I'll skip.

4            It says, "Three Baccarat is still trying to get us

5   more discounts and not all crystal whites are in stock, but the

6   staff said it was easy to place an order and get the goods."

7   A.  "Okay, Bakura.  How about their attitude?  Their attitude

8   is okay? Bakura about this designer.  When can we hold a

9   meeting for him?  This designer is excellent, but it is not

10  enough.  What we want is that super and royal grade.  Ask him

11  if they can find another one.  Give Christina.  We need to have

12  a meeting with the designer as soon as possible to have a

13  understanding okay."

14  Q.  "The attitude of Baccarat is okay."

15  A.  "Then just push, just push that.  20 is impossible.  His

16  tax, what's the tax in New York.  How much tax can we reduce.

17  I definitely want to exempt this tax 100 percent."

18            MR. FERGENSON:  You can scroll down, Ms. Loftus,

19  please.

20  Q.  "The tax is 250,000 and the New Jersey tax rate is 6.65

21  percent.  I also asked him to exempt this for us at least."

22  A.  "No, at least this must be exempted.  This tax must not be

23  paid. The key is it is not 20.  It is impossible.  How will I

24  buy so much at least 50, originally 75 percent discount and now

25  50 is okay."

O72BGUO2                         Volchko - Direct

Q.  "Was the previous 75 percent discount given in China?  Did

you buy something in the name of Beijing Jinquan?"

A.  "Yes.  It seems like they return to Beijing, Jinquan to

sell things.  It is always a discount of 75 percent.  It is

always been like this.  Later it was changed and then even 50

is not given.  This is crazy."

Q.  If we can scroll down.  You can continue.

A.  "I bought some in Jinquan and Pangu of Beijing. The main

problem is that they were registered in my personal name namely

Miles Guo."

Q.  "Because they all need to look at the records when doing

things here.  I ask him to find out the records of our orders

placed in New York.  He said that the discount was 50 percent

because it was in 2010.  Now it is 10 years later and the

policies are different, but I'll keep negotiating with them."

        MR. FERGENSON:  Ms. Loftus, do you want to just zoom

in on the photos, and we can zoom out.  You can scroll down.

Q.  Ms. Volchko, you can continue.

A.  "The place in the circle is the one on the third floor to

be connected.  If we break the location of the bedhead it is

connected.  The location of the two bedheads is the corridor to

be connected, but you fail to reflect it in the drawing.

Second, the new kitchen is located in the corner of the first

floor.  The sink is on the north side and I drew it.  No sink

is around the stove.  There are two sinks on the island of the

O72BGUO2                          Volchko - Direct

1   middle kitchen, two sinks are placed on the north side, and the

2   fire is on the east side.  Please continue to check the drawing

3   I gave you.  There is some mistakes."

4   Q.  "This picture shows the movie theater on the third floor.

5   You said that the room was empty, but should it be connected to

6   the room next to it.  I have marked to connect the room on the

7   second floor, but modified it to extend to the bed side."

8            MR. FERGENSON:  Let's go down to 1B1250.

9   Q.  Now what's the date of this chat?

10  A.  December 8, 2021.

11  Q.  And there's another pdf.  I won't pull it up, but it says

12  12/8/21 updated floor plan, and then there's an image.

13           MR. FERGENSON:  Ms. Loftus, you want to zoom in on

14  that image quickly.

15  Q.  Who's the sender of this image?

16  A.  The contact is Miles Guo.

17           MR. FERGENSON:  You can zoom out.  You can scroll

18  down.  Then there's another message from Miles Guo with text

19  and an image.  Ms. Loftus, let's play 1B1250-4.

20           (Media played)

21           MR. FERGENSON:  We can go back to the chat.

22  Q.  Can you read the translated audio.

23  A.  "Right.  Change the kitchen.  This place is the stove.

24  This place is two sinks.  This is a sink and this is a sink.

25  Here are two sinks.  This is the place where is kept for

O72BGUO2                        Volchko - Direct

1    stoves.  This is the place where the stove can be connected.

2    This.  Then a round table will be placed in this place in the

3    future.  Well, this is what it looks like.  Then this place

4    will also be made into a round table.  These is two tables.

5    Then remember that all the wooden chairs needed to be removed.

6    We need to replace the staircase with all glass ones. The

7    stairs will be very beautiful.  This one comes all the way from

8    the hallway.  This is the kitchen on the first floor which is

9    very important, faucets, stoves."

10            MR. FERGENSON:  If we can play 1B125O-5.

11            (Media played)

12            MR. FERGENSON:  Let's go back to the chat and we can

13   scroll down.

14   Q.  If you can read that translated audio.

15   A.  "We add security door to this place.  Doors that require

16   card swipes.  Doors that require card swipes.  Then from here

17   to the north end, you see this end, there should also be

18   security doors that require card swipes.  You can't enter

19   without swiping your card.  This is one.  Then employees come

20   down from here and come here.  This is an employee space.  This

21   is all reserved.  Then, this is the employee space.  We will

22   not make any change, just change it into a warehouse, nothing

23   else to change.  Then this is the swimming pool.  Remember the

24   bath space, this is the place.  There is a window here. We will

25   replace it.  We will replace this place.  We will replace it,

O72BGUO2                        Volchko - Direct

1    replace it with a copper window that can be opened."

2             MR. FERGENSON:  And can we scroll down.  And then

3    there are more pictures.  We can just keep scrolling down.  If

4    we could play 1B1250-9.

5             (Media played)

6             MR. FERGENSON:  We can go back to the chat.

7    A.   "Mrs. Guo's bedroom.  This are the bedroom and living room.

8    This place is the dressing room, two dressing rooms, big

9    dressing rooms."

10   Q.   Then there's an image.  "You said there would be a custom

11   cabinet at the kitchen range in the faucet position. Will there

12   still be a cabinet?"

13   A.   "Above the stove and on the two stone walls in the north

14   there will be customize cabinets which are full cabinets.  The

15   walls will be full of cabinets and below the cabinets is there

16   such mosaic style."

17            MR. FERGENSON:  And if we could play 1B1250-13.

18            (Media played)

19            MR. FERGENSON:  We can go back to the chat.

20   Q.   Can you read the translated audio.

21   A.   "The north side of the third floor, that's where the pool

22   table is.  This is Guo Qiang's dressing room.  Remove the

23   cinema.  This is Guo Qiang's room.  He can open it from here

24   and go into his dressing room.  See, this, okay?"

25            MR. FERGENSON:  Can you scroll down.  Let's go to

O72BGUO2                          Volchko - Direct

1    1B125P, please.

2    Q.  What's the date of this chat excerpt?

3    A.  December 14, 2021.

4    Q.  There are several.  The first three chats, do you see those

5    are .PDF, the first four?

6    A.  That's correct.

7            MR. FERGENSON:  Can we pull those up quickly,

8    Ms. Loftus.  Let's start with 1B125P-1.

9    Q.  What does the English say?

10   A.  Carpets and rugs.

11   Q.  Ms. Loftus, if we can just scroll through some of these

12   pages, let's go to 1B125P-2.

13           What does it say in English there?

14   A.  Furniture.

15   Q.  If we could scroll.  Just to pause for a moment.

16           Do you see the domain listed there, Ms. Volchko?

17   A.  1stdips.com.

18   Q.  We can keep scrolling for a little bit.  We can stop there.

19           Why don't we go to 1B125P-3.  What does it say in

20   English there?

21   A.  Furniture.

22   Q.  We can scroll some more.  Let's go 1B125P-4.

23           Beneath certificate of authenticity in the top right,

24   what does it say there?

25   A.  Solomon Treasure.

O72BGUO2                          Volchko - Direct

Q.  If we can scroll just a little bit, Ms. Loftus.  Let's go
back to the chat.

        I'll read Gladys.  It says:  "The first door is the
one from which you decided to buy products,"  and if we could
scroll down.  There's another pdf.  We can skip over that.  It
says, "You didn't see products of the first store before, but
the products are good."  There's another pdf, 2nd store .pdf.
Old man from the second store.  3rd store pdf.  It says Jew
from the 3rd store.  You can scroll down.

        And then can you read the text after those images sent
by Miles Guo?

A.  "Zhou, thank you for your hard work.  These two tables
don't buy them because about the table after I checked
yesterday, there is no such room for tables, so we won't buy
those two tables."

Q.  Then there's two images.  Ms. Loftus, can you see if we'll
be able to read it if you zoom on those.  Why don't we pull up
the attachment quickly.  It's 1B125P-11.

        Focusing on the top left, Ms. Volchko, can you read
what's beneath the image of the bed?

A.  Savoir Harlech end two bed set handmade in London U.S.
queen size.

Q.  What's the list price for that?

A.  $45,300.

Q.  we can go back to 1B125P.  Let's scroll down.

O72BGUO2                              Volchko - Direct

1              And then if we can pick up, Ms. Volchko, at the bottom

2    chat there.

3    A.    "There is no other discount for the new sofa."

4    Q.    And then the last chat.

5    A.    "These two can be bought directly by the finance

6    department.  We can enjoy 10 percent off with the above code."

7    Q.    Let's go to 1B125Q.  What's the date of this chat excerpt?

8    A.    December 16, 2021.

9    Q.    I'll read the first one.

10             "Are these all from silk and wool?  Have you bought it

11   or do you want a similar pattern?"

12   A.    "I just want better velvet, I want better, better, better."

13   Q.    Let's go to 1B125R.  I'll read Gladys.  Before I do, what's

14   the date of this chat excerpt?

15   A.    December 19, 2021.

16   Q.    "Boss, let me tell you about the new house, that is, I

17   called Vinnie and he said that because he wanted to accelerate

18   all the procedures then the contract and drawings were ready

19   and have been sent to Evin.  As for the kitchen you requested,

20   it's extended by Alane and the staircases were sealed.  He said

21   that because he knew the architect who had been doing it for 35

22   years, so he knew that basically it's unnecessary to take some

23   special permissions, some permits or anything and specifically

24   deal with Alane. So he doesn't think this needs to be added to

25   the contract or add the image now because you want to do

O72BGUO2                        Volchko - Direct

everything well as soon as possible.  He said that we could do

it later, just add it to an attachment indicating that this is

your requirement.  Then he said that now it's Alane from the

kitchen who wanted to confirm with you.  You said that you

wanted to add a draw.  Do you want to add it to both sides or

just one side.  He suggested only adding to one side because

the other side is narrower.  But please confirm with me with if

it is really added to which side and the style of the draw and

what color do you want?  Does it need to match with others?

According to him, others were built years ago, so this needs to

be confirmed with you, and what style do you want?"

A.  "The style is the same as his current cabinet wood, Gladys,

all the same as him.  It's okay.  Of course add it to one side.

It's definitely impossible to add to the other side, and then

it is deep enough to put the pot bowl and basin.  Place things

below, heavy enough, and it must be of good quality.  If none,

then the same wood.  You can also give us a choice.  No

problem.  Very good."

Q.  If you can scroll down, Ms. Loftus, and can you zoom on

that image.

        Have you ever met the individual shown here?

A.  I have not.

Q.  We can zoom out.  You can continue.

A.  "Yes, yes, that's the first thing.  Second, is the middle

of the island too big.  Does it need to be so big?  After being

O72BGUO2                          Volchko - Direct

1    sealed, does it need to be so big?  Okay, that's it.  Great.

2    Thanks Winnie. It's the island.  If it is too wide compared

3    with the normal island, it is better to buy the off the shelf

4    product, that is the one with an island.  It's guaranteed that

5    it's the whole stone, the highest-level dolomite.  For example

6    the table below can be stainless steel and the drawer can also

7    be stainless steel.  The stainless steel is okay.  Of course

8    the wood is the best just like the Max bedside.  If there are

9    any other options the first choice will be the same at this

10   wood.  If none then select stainless steel, but the quality

11   must be good. If it's so wide, it's okay to be narrower."

12   Q.  Then there's -- I won't make you read the link.  You can

13   continue after that.

14   A.  "This table is 340,000.  It can be bought after it's sure

15   there's no problem with it.  This is the most important which

16   will be placed in the middle of the hall.  It is a great

17   treasure.  In addition, for these two baccarat lights let's see

18   please communicate with him.  If it doesn't work, you can find

19   that young guy who sold the first furniture to us.  You can ask

20   him to help communicate and buy something cheaper.  He can help

21   us buy cheap things.  Gladys the bed, just the green bed.

22   There is a pink one.  I want to order a pink bed for the room

23   of Mrs. Guo.  Order a pink one.  And about the other two or

24   three beds, please check if there is any. My room is large.

25   All king size, the largest bed.  I need to buy a bed in my

O72BGUO2                        Volchko - Direct

1   room.  Mrs. Guo I want to buy a bed and then buy a bed for the

2   room of Guo Mei, others are no longer using beds.  No other bed

3   is needed."

4   Q.  If we can go to 1B125S.  What's the date of this chat

5   excerpt?

6   A.  December 22, 2021.

7   Q.  Can you read the translated text.

8   A.  "Didn't you ask him if he had any round ones.  Is it in

9   stock and how big is the largest one?"

10          MR. FERGENSON:  May I have a moment, your Honor.

11          THE COURT:  Yes.

12  Q.  By the way, Ms. Volchko, did you have any role in selecting

13  which chats got excerpted here?

14  A.  I did not.

15  Q.  Did you have any role in selecting which devices were part

16  of that stipulation we've been referring to?

17  A.  I did not.

18          MR. FERGENSON:  Your Honor, I have a couple more

19  exhibits the government is going to offer.  Pursuant to

20  Stipulation A, Government offers Government Exhibit 1782, and

21  the government also offers the exhibits, to the extent not in

22  evidence, in Stip 20.

23          THE COURT:  No objection.

24          MR. KAMARAJU:  No your Honor.

25          THE COURT:  They're admitted.

O72BGUO2                    Volchko - Direct

1              (Government's Exhibits 1780 and Stip 20 received in

2      evidence)

3              MR. FERGENSON:  And I may need one other moment your

4      Honor.  Apologies.

5      Q.  Ms. Loftus, can we go to 1B125K, please.

6              What's the date of this chat excerpt, Ms. Volchko?

7      A.  December 1, 2021.

8      Q.  First one is from Gladys.  It's an image.  Can we zoom on

9      that image.  We can take it down.  And I'll read Gladys?

10             "Boss, this table you asked your comrade to help order

11     is already ready and will be shipped from Shenzhen.  Where do

12     you want to ship it?"

13     A.  "Now it's going to be delivered, deliver to our warehouse

14     the one in New York."

15     Q.  And it says, "Is this table intended for that company.  Let

16     me see that the company should be responsible for the

17     expenses?"

18     A.  "About this, use G/Club or another private company for

19     payment.  Don't involve anything else, either G/Club or another

20     private company."

21     Q.  Ms. Volchko, do you have any independent knowledge of what

22     that means use G/Club or another private company for payment?

23     A.  I do not.

24             MR. FERGENSON:  No further questions.

25             THE COURT:  Cross examination.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O72BGUO2                     Volchko - Cross

1   CROSS-EXAMINATION

2   BY MR. KAMARAJU:

3   Q.  Thank you, your Honor.  Good morning.

4   A.  Good morning.

5   Q.  Could you just pronounce your name for me.

6   A.  Jessica Volchko.

7   Q.  Thank you.  Could we have Government Exhibit stip 17 up,

8   please.  Could we go to page four.

9        Ms. Volchko, do you remember on direct being asked

10  some questions about the fourth device down on this list

11  GXB71Z?

12  A.  I may have been.  I don't recall if it was that

13  specifically.

14  Q.  This device, this was found in the Wang apartment, correct?

15  A.  According to the stipulation.

16  Q.  According the stipulation it was found inside a bag inside

17  a closet, right?

18  A.  That's correct.

19  Q.  And Wang refers to Yvette Wang, right?

20  A.  I believe so.

21  Q.  So this device was not found in Mr. Guo's apartment,

22  correct?

23  A.  That's correct.

24  Q.  Wasn't found in Mahwah, right?

25  A.  Correct.

1   Q.  It was in a closet in Ms. Wang's apartment, correct?

2   A.  That's correct.

3   Q.  Can we pull up GX1B71-I, please.  You remember being shown

4   this photo on your direct?

5   A.  I do.

6   Q.  And this photograph comes from the device that we just

7   talked about, right?

8   A.  Can I see the exhibit number?

9   Q.  Sure.  GX1B71-I.

10  A.  Yes, that's correct.

11  Q.  So this photograph was found on a phone that was found in

12  Ms. Wang's apartment not in Mr. Guo's apartment, correct?

13  A.  That's correct.

14  Q.  Let's take that down.

15         Now, do you know if Ms. Wang had any connection to a

16  company called G/Clubs?

17  A.  I do not.

18  Q.  Do you know if Ms. Wang was involved in any acquisition of

19  benefits for G/Clubs members?

20  A.  I do not.

21  Q.  Do you know who Limarie Reyes is?

22  A.  I do not.

23  Q.  Is your only exposure to the Lamborghini shown in that

24  photo through your preparation for testimony?

25  A.  Yes.

O72BGUO2                         Volchko - Cross

1   Q.  Now, could we have GX1B124 please.  Alongside it if we

2   could pull up the stip, GX stip 17.  If we could go to page two

3   of the stipulation.

4          You see, I think it's the third from the bottom there,

5   GX1B24Z.  Do you see that?

6   A.  I do.

7   Q.  And so that was found at the Sherry apartment inside a bag,

8   right?

9   A.  That's correct.

10  Q.  So it wasn't found on Mr. Guo's person, right?

11  A.  That's correct.

12  Q.  So now we can take the stip down for a second and blow up

13  the other exhibit, please.  Let's go to page two.

14          Do you remember Mr. Fergenson asking you about certain

15  email accounts reflected here?

16  A.  I believe I was asked about a couple of accounts.

17  Q.  So, for example, I think he asked you about in row 10 an

18  email called Guo Miles@Guomedia.  You see that?

19  A.  I do.

20  Q.  Can we look at the second account listed at the top of the

21  page.  Can you read the user name?

22  A.  The user name is GladysC@HCHKtech.com.

23  Q.  What's the service type?

24  A.  Exchange.

25  Q.  What is that?

O72BGUO2                          Volchko - Cross

1   A.  That's an email service.

2   Q.  Let's look at the one right below it, three.  Can you tell

3   us what the user name there is?

4   A.  QQTANG2022@gmail.com.

5   Q.  What's the service type there?

6   A.  ITunes store.

7   Q.  I think we all know, but can you tell us what that is?

8   A.  ITunes store you can buy applications for your phone.

9   Q.  Can we go down to the next one.  What's the user name

10  there?

11  A.  DHXBHCS20220327@gmail.com.

12  Q.  And the service type?

13  A.  iTunes store.

14  Q.  Can we look at row nine, please.  User name there?

15  A.  JINGANG20.

16  Q.  And the service type?

17  A.  Twitter.com.

18  Q.  And now let's look at row 12.  Can you tell us what the

19  user name is there?

20  A.  WOAIWODEJIANYK@gmail.com.

21  Q.  Can you tell us again the fact that any of these email

22  addresses appear in this report at this section what does that

23  mean?

24  A.  These are accounts that are associated with the device, so

25  they may have been logged into the device, certain applications

1  from the device at some point in time.

2  Q.  Can we go to page one, please.  Could we blow up the line

3  it's right under tethering that says last hot spot act.  Do you

4  see that?

5  A.  I do.

6  Q.  What does last hot spot activity mean?

7  A.  I believe that's referring to the last time it was

8  connected to a hot spot, so you could set up your phone to

9  almost like a wifi connection.

10  Q.  So this is some evidence of internet connectivity?

11  A.  Yes.

12  Q.  What's the date on that?

13  A.  May 11, 2023.

14  Q.  Are you aware that Mr. Guo was arrested on March 15, 2023?

15  A.  I'm not sure of the date.

16  Q.  Would you agree with me that May 11 is approximately two

17  months after March 15, 2023?

18  A.  That's correct.

19  Q.  Now, you can't tell from just this Cellebrite report who

20  actually used the phone, correct?

21  A.  I can just tell the accounts that are associated with the

22  device.

23  Q.  And so you don't know who's sitting at the keyboard, right?

24  A.  That's correct.

25  Q.  You can take that down.  Can we pull up GX1B15G-T.  I think

O72BGUO2                        Volchko - Cross

1    it is GX1B15G, and I think it's-T, the translation.  I think

2    it's the one you had right before this, GX1B15G-T.  You

3    remember testifying about this on direct?

4    A.  I do.

5    Q.  Remind us again what the created time means?

6    A.  The created time appears to be when the tag was created.

7    So as the device was being reviewed, either the case agent or

8    whoever was reviewing the report would have tagging this

9    specific note.

10   Q.  This is an Excel spreadsheet, right?

11   A.  That's correct.

12   Q.  So the created time gets inserted into the Excel

13   spreadsheet?

14   A.  That's correct.

15   Q.  So the data on this Excel spreadsheet could be changed,

16   right?

17   A.  I guess it's possible.

18   Q.  That's what happened with the created time, right?

19   A.  This is from the report, so that was -- when you generate a

20   Cellebrite report, there's certain values that are entered into

21   the tag report.

22   Q.  Right.  But this is not some kind of locked document,

23   right, it's susceptible to being changed, right?

24   A.  That's correct.

25            MR. FERGENSON:  Objection, it's stipulated to.

1              THE COURT:  Sustained. If you would speak into the mic

2       more, Mr. Kamaraju, please.

3              MR. KAMARAJU:  I didn't hear what the objection was.

4              MR. FERGENSON:  Objection, it's stipulated to.

5   Q.  Could we pull up GX1B92B-13.  Do you remember testifying

6   about this document?

7   A.  I do.

8   Q.  So can we look at the email at the top left there.  Can you

9   just read that for us?

10  A.  Cool_HHR@hotmail.com.

11  Q.  That's not a Proton email account, right?

12  A.  It appears to be a Hotmail account.

13  Q.  There's no date on this document, correct?

14         We can zoom out.

15  A.  I don't see a date on the document.

16  Q.  You see where it says experience March 2014 to current?

17  A.  I do.

18  Q.  So we can't tell from this document what "current" means,

19  right?

20  A.  That's correct.

21  Q.  And we can't tell from this document when it was placed on

22  the phone, correct?

23  A.  Not from just looking at the document.

24  Q.  And we can't tell from the document who authored it,

25  correct?

O72BGUO2                        Volchko - Cross

1    A.  That's correct.

2    Q.  And you've never heard of Haoran He, the man named on the

3    document, correct?

4    A.  I have not.

5    Q.  Let's go to GX1B2722, please.

6           Do you remember testifying about this?

7    A.  I don't recall this one specifically, but I remember

8    looking at preliminary device reports.

9    Q.  We can scroll down.  I think this is fine.  If we blow up

10   page two just the first account there.

11          You see that that's Max Krasner?

12   A.  I do.

13   Q.  So this is an account that this Gmail -- withdrawn.

14          This Gmail account was accessed at some point from

15   this phone, correct?

16   A.  That's correct.

17   Q.  Now if we could pull up -- we can take that down and we can

18   pull up GX1B272B.  Remember testifying about this document on

19   direct?

20   A.  I do.

21   Q.  You don't see a date on this document, right?

22   A.  I do not.

23   Q.  And you don't know who Mileson is, right?

24   A.  That's correct.

25   Q.  If we can go to page 21.  Before we talk about this

1    specifically, you testified on direct about certain signal

2    messages that were extracted, right?

3    A.   That's correct.

4    Q.   So when the FBI extracts signal messages, it's actually

5    pulling the actual message out of the phone?

6    A.   That's correct.

7    Q.   And then it gets represented on that spreadsheet that you

8    had?

9    A.   That's correct.

10   Q.   This is not that, right, this is a screenshot, right?

11   A.   It appears to be a screen capture.

12   Q.   And you can't tell from the screen capture who did it,

13   right?

14   A.   What do you mean by who did it?

15   Q.   Who took it.

16   A.   Who took the screen capture, I can't.

17   Q.   And at the top there you see it says Yvette?

18   A.   I do.

19   Q.   If we can go to page 22 the next page, who's it say up

20   there?

21   A.   Mileson.

22   Q.   So that's two different people in your mind?

23   A.   It appears to be, yes.

24   Q.   So this appears to be a screen capture of a collection of

25   text messages, correct?

O72BGUO2                    Volchko - Cross

1   A.  Correct.

2   Q.  And you don't know who put the collection together, right?

3   A.  Who took the screen captures?

4   Q.  Well, who decided to group these various text chains

5   together?

6   A.  I do not.

7   Q.  You never heard of Max Krasner before, right?

8   A.  I have not.

9   Q.  Your only involvement in this case at all is testifying

10  here today, right?

11  A.  Testifying and analyzing some of the digital evidence

12  items.

13  Q.  You weren't part of the team that actually conducted any of

14  the searches, right?

15  A.  I was present at one of the search warrants.

16  Q.  Which one?

17  A.  Mahwah.

18  Q.  Mr. Guo wasn't at Mahwah when you were there, right?

19  A.  I don't believe so.

20  Q.  Could we pull up GXZ9, please.  Can we go to page 35.

21       You remember Mr. Fergenson asking you to read some

22  portions of this?

23  A.  I do.

24  Q.  I'm just going to ask you to read a little bit.  Okay.  Do

25  you see, it's the third full paragraph that starts, The

1   protection of small investors.  Do you see that paragraph?

2   A.  I do.

3   Q.  Could you read the second to last sentence.

4   A.  "We're asking the SEC to investigate and we're asking the

5   DA's office and the DOJ to investigate."

6   Q.  Can you read the next sentence, please?

7   A.  "You can investigate as long as you guys get our stuff

8   clarified."

9   Q.  You can take that down.  Can we go to Government Exhibit

10  1B69Z.  You have a copy of the stipulation in front of you

11  still?

12  A.  I do.

13  Q.  Would you mind turning to page four, please.

14          GX1B69Z was a white iPhone found in Ms. Wang's

15  apartment, correct?

16  A.  That's correct.

17  Q.  And again it was found inside a bag in a closet, right?

18  A.  That's correct.

19  Q.  So it wasn't found on Ms. Wang's person, right?

20  A.  That's correct.

21  Q.  Could we pull up now 1B69B-T.

22          This spreadsheet is from the phone that was found in

23  Ms. Wang's apartment, correct?

24  A.  That's correct.

25  Q.  In the bag in the closet, right?

O72BGUO2                              Volchko - Cross

1    A.  That's correct.

2    Q.  Now, could we go to row 47, please.  Sorry, I meant 49.

3          So do you see there it says, Great, thank you Mei Mei?

4    A.  I do.

5    Q.  And then there's a message below that that's from whatever

6    that MMMMM account handle is, right?

7    A.  Can you just scroll over so I can see the sender column.

8    Q.  Sure.

9    A.  The other direction.

10   Q.  To the left.

11   A.  Yes.  It was sent from the MMMMM contact.

12   Q.  And could you read the message that appears in row 48.  I

13   guess it is the one right under thank you, Mei Mei.

14   A.  "There's an account on Twitter posting a video of my

15   grandmas pass away.  Can you find a team to get rid of it."

16   Q.  And then if you go down two more rows, do you see a message

17   from Yvette the owner?

18   A.  I do.

19   Q.  What's that say?

20   A.  "I'll arrange that."

21   Q.  Can we go to row 90, please.  It's the red highlighted one.

22   There's two sets of row number.

23          Can you read the first sentence of the message there.

24   A.  "Mei Mei, ah, it's like this, possibly starting from today

25   or tomorrow that attorney from HKI Lee will prepare you.  That

1    is to fully prep you to testify."

2    Q.  You don't know who any of those people are, right?

3    A.  That's correct.

4    Q.  And you never heard of Aaron before?

5    A.  That's correct.

6    Q.  You don't know if Aaron is a lawyer involved in this case,

7    right?

8    A.  That's correct.

9    Q.  You don't know if Aaron has any involvement whatsoever,

10   right?

11   A.  That's correct.

12   Q.  Can we go to row 132, please.  I guess it's 131.  That one

13   right there.

14          Do you see about four sentences in there's something

15   that starts, "Then, that, don't use video."  Do you see that?

16   A.  I do.

17   Q.  Could you read that sentence.

18   A.  "Then that don't use video because it will endanger safety,

19   endanger your, your safety."

20   Q.  Can you read the next sentence.

21   A.  "You can bring out all the safety concerns including

22   persecution."

23   Q.  And then the next sentence.

24   A.  "Because the lawyers internally are fighting with the other

25   party and the court that is to say about not allowing you to

O72BGUO2                        Volchko - Cross

1    appear in video which means ah, ah, ah either by audio or only

2    by that is to say, ah, ah, transcript."

3    Q.  You don't have any idea what the speaker means when they

4    talk about safety concerns including persecution, right?

5    A.  That's correct.

6    Q.  You don't know in fact what any of this text message is

7    about, right?

8    A.  That's correct.

9    Q.  Take that down, and if we can go down to -- you have the

10   stipulation still in front of you?

11   A.  I do.

12   Q.  If we can look at page three.  And do you see it's the

13   fifth device down GX1B204Z?

14   A.  I do.

15   Q.  That says that that phone was found inside a Faraday bag,

16   right?

17   A.  This was a USB drive.

18   Q.  Sorry. The USB drive was found inside a Faraday bag, right?

19   A.  Yes.

20   Q.  You testified a little bit about what a Faraday bag is,

21   correct?

22   A.  Yes.

23   Q.  The FBI also uses Faraday bags, right?

24   A.  Yes.

25   Q.  Describe for the jury how the FBI uses Faraday bags?

O72BGUO2                          Volchko - Cross

```
 1   A.  Sometimes when we're executing a search warrant when we
 2   seize devices, if we can't disable any kind of communications,
 3   to preserve the data we'll put them in a Faraday bag.
 4   Q.  How does the Faraday preserve the data?
 5   A.  It blocks any signals from reaching the device or any
 6   signals from leaving the device.
 7   Q.  What's the import of blocking signals that are coming into
 8   the device?
 9   A.  It preserves the device at the state when it was seized and
10   it can also prevent the device from being wiped remotely.
11   Q.  So it helps stop remote access of the phone; is that right?
12   A.  That's correct.
13   Q.  So like packing of the phone, right?
14   A.  I guess you could say that.
15   Q.  Could we look at GX1B204-13, please.
16          You remember being asked some questions about this?
17   A.  I do.
18   Q.  And you remember being asked to read I think it's at the
19   top of the page the name Brioni?
20   A.  I do.
21   Q.  You do?
22   A.  I do.
23   Q.  Now, pick any of these rows, you don't see any dates
24   associated with them, right?
25   A.  I do not.
```

O72BGUO2                         Volchko - Cross

1    Q.  And that number that you read out $719,489.55.  You

2    remember reading that?

3    A.  I do.

4    Q.  You have no idea when that money was spent, right?

5    A.  That's correct.

6    Q.  Could we pull up GX1B125 please, H, I, L and M.  I'm sorry.

7    My apologies.  Could we do GX1B121C and D first.

8            You remember being asked about these?

9    A.  I do.

10   Q.  You have no idea when these photographs were taken, right?

11   A.  Not from looking at the photographs.

12   Q.  You don't know who any of the people in there are, right?

13   A.  That's correct.

14   Q.  You don't even know if this is actually a Brioni suit

15   place, right?

16   A.  That's correct.

17   Q.  It's just a photo of a man trying on a suit, right?

18   A.  That's what it appears to be.

19   Q.  Now could we do GXB125H, I, J, L and M.

20           You remember being asked some questions about these

21   photographs?

22   A.  I do.

23   Q.  They're photographs of men talking, right, fair to say?

24   A.  That's what it appears to be.

25   Q.  Do you see the bottom two.  You see there's an airplane in

1    the background?

2    A.   That's correct.

3    Q.   This was taken in an airport hanger, correct?

4    A.   I'm not sure.

5    Q.   Are you aware that these photos were of an interview that

6    occurred in 2018?

7    A.   I'm not.

8    Q.   Are you aware that 2018 is two years before the GTV private

9    placement?

10   A.   I'm not.

11   Q.   Are you aware that 2018 is two years before the farm loan

12   program?

13   A.   I'm not.

14   Q.   Are you aware that 2018 is two years before the launch of

15   G/Club?

16   A.   I'm not.

17   Q.   Are you aware that 2018 is nearly three years before the

18   launch of the Himalaya Exchange?

19   A.   I'm not.

20           MR. KAMARAJU:  No further questions, your Honor.

21           THE COURT:  Redirect?

22           MR. FERGENSON:  No redirect, your Honor.

23           THE COURT:  You may step out.

24           (Witness excused)

25           THE COURT:  The government may call its next witness.

O72BGUO2                         Volchko - Cross

1          MR. HORTON:  Just something briefly from the podium,

2     your Honor.  Your Honor, at this time the government intends to

3     play a video that's in evidence as GXVI151.

4          THE COURT:  All right.

5          MR. HORTON:  Your Honor, we have some technical issues

6     which we're working to resolve.  It should be one moment.

7          THE COURT:  Okay.

8          (Media played)

9          MR. HORTON:  Thank you, your Honor.  The United States

10     rests.

11          THE COURT:  All righty.  Would you please step up.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O72BGUO2                    Volchko - Cross

1          (At the sidebar)

2          MS. SHROFF:  We thought the day would never come.

3          THE COURT:  Okay.

4          MR. KAMARAJU:  At this time, your Honor, pursuant to

5     Federal Rule of Criminal Procedure 29, Mr. Guo ask for a

6     directed verdict of acquittal on the basis that the government

7     has failed to prove several elements of its case, including

8     Mr. Guo's fraudulent intent, materiality or misrepresentations

9     or alleged misrepresentations at issue.  In addition in

10    connection with the money laundering counts as a result of

11    their failure to prove the underlying fraud counts, there's no

12    specified unlawful activity for criminally derived property.

13    And similarly, the government has failed to prove racketeering

14    conspiracy.  I'm happy to address that further if your Honor

15    wants.

16         MR. FINKEL:  Your Honor, as the Court is aware, the

17    defendant bears a heavy burden.  As the Second Circuit has made

18    clear, a valid Rule 29 motion of all evidence and all

19    inferences must be drawn in the government's favor.  Frankly, I

20    think your Honor's decision yesterday indicating motion pretty

21    much addresses that there is sufficient evidence for this case

22    to be brought to a jury.  Happy to address any particular

23    arguments that defense counsel is ready to if the Court would

24    like.

25         THE COURT:  The application is denied.  May I tell the

O72BGUO2                        Volchko - Cross

1    jury that the defense is going to put on a case?

2            MS. SHROFF:  Yes, your Honor.  Your Honor, just under

3    Rule 29, the statute gives us seven days.  We would ask for the

4    Court to give us additional time so that we consider what we

5    would like to put in, in a written submission.  We can put

6    those timetables to the Court.

7            THE COURT:  Yes.

8            MS. SHROFF:  Thank you.

9            (Continued on next page)

O72BGUO2                        Volchko - Cross

1          (In open court)

2          THE COURT:  Members of the jury, the government has

3    rested and has finished presenting evidence, but that does not

4    mean that the case is over.  The defense is going to put on a

5    case, and we will start that after your break.  It's very

6    tempting now that the government has rested to start talking

7    about the case, but you can't.  You can't do that until I tell

8    you that it's time, and that won't happen until after the

9    defense's finish its case.  We have summations and my

10   instructions on the law.  So remember that you're not allowed

11   to discuss the case amongst yourselves or with anyone else.

12   Don't permit anyone else to discuss the case in your presence.

13   Don't read, watch, or listen to anything from any source that

14   touches upon the subject matter of this case.  We will resume

15   at noon.

16          THE LAW CLERK:  Jury exiting.

17          (Jury not present)

18          THE COURT:  Please be seated.  Is there anything

19   before we break.

20          MR. KAMARAJU:  Not from the defense.

21          MR. FERGENSON:  Not from the government.

22          THE COURT:  All righty then.  We'll start again at

23   noon.

24          (Recess)

25

1            (Jury not present)

2            THE COURT:  Please be seated.

3            Mr. Kamaraju, is he——

4            MS. SHROFF:  Good afternoon, your Honor.  He isn't

5    here, but——

6            THE COURT:  Oh.  Has there been a decision with

7    respect to whether or not Mr. Guo will be taking the stand?

8            MR. SCHIRICK:  There has not yet, your Honor.

9            THE COURT:  Mr. Guo, do you understand that you have

10   the right to take the stand and testify in your own defense?

11           MS. SHROFF:  Your Honor, may we just have a moment.

12           THE COURT:  Yes.

13           MS. SHROFF:  Thank you.

14           (Ms. Shroff conferring with the defendant)

15           MS. SHROFF:  Thank you, your Honor.

16           THE COURT:  So Mr. Guo, you understand that you have

17   the right to take the stand to testify in your own defense?

18           THE DEFENDANT:  Yes.

19           THE COURT:  And you're going to discuss that with your

20   attorneys thoroughly, and I am going to return to this question

21   about whether or not you're going to take the stand.  Do you

22   understand?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  All righty.  Let us have the jurors

25   brought in, please.

O721GUO3                        Dragon - Direct

1           (Jury present)

2           THE COURT:  Please be seated.

3           And the defense may call its first witness.

4           MR. SCHIRICK:  Thank you, your Honor.  The defense

5    calls Raymond Dragon.

6           (Witness sworn)

7           THE COURT:  Would you please state your name and spell

8    it.

9           THE WITNESS:  Yes.  My name is Raymond Joseph Dragon.

10   That's R-A-Y-M-O-N-D, J-O-S-E-P-H, D-R-A-G-O-N.

11          THE COURT:  You may inquire.

12          MR. SCHIRICK:  Thank you, your Honor.

13    RAYMOND JOSEPH DRAGON,

14       called as a witness by the Defendant,

15       having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SCHIRICK:

18   Q.  Good afternoon, Mr. Dragon.  Where are you currently

19   employed?

20   A.  I am employed at Anchin, Block & Anchin, LLP.

21   Q.  Okay.  And what is Anchin, Block & Anchin?

22   A.  Anchin, Block & Anchin is an accounting and consulting firm

23   based in New York City.

24   Q.  Okay.  Thank you.  Mr. Dragon, where did you go to school?

25   A.  I went to undergraduate college at Lehigh University, where

1   I majored in international relations and graduated with high

2   honors; I have a master of business administration degree,

3   commonly referred to as an MBA, from the Kellogg School of

4   Management of Northwestern University; and I have a master's of

5   science degree in economics from the University of London.

6   Q.  Okay.  Now just returning to your current employment at

7   Anchin, Block, how long have you been with that firm?

8   A.  I've been with Anchin for eight years.

9   Q.  Okay.  And what is your role at Anchin?

10  A.  At Anchin, I'm the director of business and intellectual

11  property valuation.

12  Q.  And how large is that group at Anchin?

13  A.  The group is called our forensic litigation and valuation

14  services group, and it's approximately 20 people.

15  Q.  And did I understand you correctly that you're the head of

16  this group?

17  A.  I am the head of the valuation services.  The overall head

18  of the group is Anthony Bracco.

19  Q.  Okay.  Now what do you do in the valuation services group;

20  what services do you provide?

21  A.  I provide valuation of privately held companies, interests

22  in companies, and intellectual property.

23  Q.  Okay.  And prior to your time at Anchin, Block, do you have

24  other experience in valuation services?

25  A.  Yes.  I've used valuation services in a variety of roles.

O721GUO3                      Dragon - Direct

1   I worked for an international bank in the mergers and

2   acquisitions area.  I worked for a international trading

3   company, looking at their venture investments.  All of these

4   jobs require the use of valuation skills.

5   Q.  And for approximately how many years before you joined

6   Anchin did you work in those other roles that you just

7   described for us?

8   A.  In addition to valuation consulting, my overall valuation

9   banking and investment experience is over 25 years.

10  Q.  Okay.  Now do you have any certifications in the field of

11  business valuation?

12  A.  I do.  I'm an accredited senior appraiser with the American

13  Society of Appraisers in the area of business valuation.

14  Q.  And what does it mean to be a certified appraiser?

15  A.  Membership in the American Society of Appraisers requires

16  that you complete a course of study on——specifically devoted to

17  valuing privately held businesses, that you have at least five

18  years of experience valuing privately held companies, and that

19  you submitted two peer-reviewed reports of business valuations

20  that the society reviewed and found acceptable.

21  Q.  Okay.  Now are you a member of any other trade associations

22  or professional groups related to business valuation?

23  A.  Yes.  I'm also a certified patent valuation analyst, and

24  I'm a member of the local New York City American Society of

25  Appraisers chapter.

O721GUO3                    Dragon - Direct

1  Q.  Okay.  Thank you for that description of your experience.

2            Now what have you been asked to do as part of this

3  case?

4  A.  I've been asked to determine the value of the equity of GTV

5  Media Company.

6  Q.  Okay.  Now have you been compensated for your work on this

7  matter?

8  A.  I have.

9  Q.  Okay.  And how?

10 A.  I bill at an hourly rate, for my time.

11 Q.  And what is that hourly rate?

12 A.  My hourly rate is $695 an hour.

13 Q.  Okay.  And approximately, to date, what have your total

14 fees been?

15 A.  Approximately $68,200.

16 Q.  Okay.  Now have you also been reimbursed for some of your

17 expenses?

18 A.  Yes.

19 Q.  And can you just describe those briefly for the jury.

20 A.  Sure.  I have driven in to Manhattan to testify to this

21 court area, I have parked my car, and I have also had bridge

22 tolls.  So those all together——the toll is I believe, for New

23 York bridges, 17.63, the parking is about 30, and the——the

24 other component is——oh, the mileage is about 67 cents a mile.

25 Q.  Okay.  And is it the case that the defense team here has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O721GUO3                          Dragon - Direct

1    agreed to cover your travel costs that you just described?

2    A.  Yes, it is.

3    Q.  Okay.  Now does your compensation here today depend in any

4    way on the outcome of this case?

5    A.  No, it doesn't.

6    Q.  Does your compensation depend on whether you testify a

7    certain way?

8    A.  No, it doesn't.

9    Q.  And before you were engaged on this matter, had you and I

10   ever worked together before?

11   A.  No.  This is the first time that we——I've ever been on a

12   case where you've been present.

13   Q.  Okay.  And how about any other member of the defense team,

14   have you ever worked with any member of the defense team before

15   this engagement?

16   A.  No.

17   Q.  Okay.  And then how about Mr. Guo, have you ever done any

18   work for Mr. Guo before?

19   A.  No.

20   Q.  Okay.  Now I'd just like to talk a bit about what materials

21   you reviewed in connection with your engagement.  What

22   materials did you review prior to your testimony today?

23   A.  I reviewed the April 20, 2020, private placement

24   memorandum; I reviewed valuation report from a consultant; I

25   reviewed company forecasts; I reviewed a consultant's

O721GUO3                        Dragon - Direct

1   forecast—

2           MR. FERGENSON:  Your Honor, objection.  It's not in

3   evidence.

4           THE COURT:  Sustained.

5   Q.  Okay.  Apart from the forecasts that you were just

6   describing, can you please describe what other materials you

7   may have reviewed.

8           MR. FERGENSON:  Same objection.

9           THE COURT:  Sustained, to the extent they're not in

10  evidence.

11          MR. SCHIRICK:  Your Honor, may we have a brief sidebar

12  on this, please.

13          THE COURT:  Okay.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O721GUO3                          Dragon - Direct

1            (At the sidebar)

2            MR. SCHIRICK:  Your Honor, the way we understand the

3    Court's rulings is that the witness is permitted to review any

4    number of materials, even those materials that are not in

5    evidence, and at this point I'm simply asking him what he

6    reviewed.  He's not relating any hearsay from those documents,

7    which of course we understand your Honor has ruled on.  He's

8    simply describing to the jury what materials he's reviewed.

9            MR. FERGENSON:  Those materials relate to portions of

10   his proposed opinions that the Court has excluded.  So I don't

11   know why they would be relevant, particularly with reference to

12   the consulting report.  That's the A&M report that your Honor

13   said cannot be part of his testimony.  I think the comparator

14   companies is another example of what cannot be part of his

15   testimony.  So I don't see how this is relevant at all, in

16   addition to not being evidence.

17           THE COURT:  So are you referring to general materials,

18   not specific to this case?

19           MR. SCHIRICK:  No, your Honor.  We're referring to

20   materials that are specific to this case.  But Mr. Fergenson

21   objected, your Honor sustained the objection when he listed

22   materials that I take it the government takes the position are,

23   you know, out of bounds based on the Court's rulings.  I then

24   asked him, aside from those materials, have you reviewed

25   anything else, trying to——

1          THE COURT:  But I don't know what he knows.  How do I

2     know what's been excluded?  Does he know?

3          MR. SCHIRICK:  I mean, aside from the materials that

4     the government objected to him testifying about, I asked what

5     else has he reviewed, so——

6          THE COURT:  Yes, but I don't know that he can read the

7     government's mind.  So I just don't want him to start talking

8     about something that's prohibited.

9          MR. SCHIRICK:  Understood.  He is aware that there are

10    other——I am representing to the Court there are other materials

11    that he's reviewed that have nothing to do with the materials

12    the government has objected to.  That's all I'm trying to get

13    out.

14         THE COURT:  Like what?

15         MR. SCHIRICK:  He's reviewed a couple of stipulations

16    in the case that are relevant to his testimony, and he's

17    reviewed——there are other materials.  It's escaping my mind at

18    this point, but there are other materials having nothing to do

19    with materials that the Court has excluded.

20         MR. FERGENSON:  If he wants to just lead and say, did

21    you also review stipulations, that's fine, just to make this

22    faster.

23         MS. SHROFF:  Or he can object and she can decide.

24         THE COURT:  So there was a suggestion.  Go ahead and

25    lead.

```
 1          MR. SCHIRICK:  Okay.  I'll take the Court up on it.
 2          (In open court)
 3   BY MR. SCHIRICK:
 4   Q.  Now, Mr. Dragon, did you also review other materials that
 5   were provided by the defense to you in connection with your
 6   preparation for testimony today?
 7   A.  I did.
 8   Q.  Okay.  And did you review certain stipulations that were
 9   entered into by the parties in this case?
10   A.  I did.
11   Q.  Okay.  And were there other materials in addition to that
12   as well?
13   A.  There were.
14   Q.  Okay.  Now did you perform a valuation analysis of GTV?
15   A.  I did.
16   Q.  Okay.  Can you just briefly explain the methodology that
17   you used to the jury.
18   A.  Yes.  In valuation, I use what is called a market approach.
19   Q.  Mr. Dragon, we're focused on the particular approaches that
20   have been the subject of recent discussions.
21          MR. FERGENSON:  And your Honor, we would just move to
22   strike reference to the market approach.
23          THE COURT:  Yes, that is stricken.
24   A.  Okay.  The methodology I used is called the backsolve
25   method.
```

O721GUO3                         Dragon - Direct

1   Q.  Can you just explain to the jury briefly what that is.

2   A.  Yes.  The backsolve method is that——used to determine the

3   value of a company by looking at the value of a large

4   transaction in the company's shares.

5           MR. SCHIRICK:  Okay.  Your Honor, the defense offers

6   Mr. Dragon as an expert in business valuation.

7           THE COURT:  Any objection?

8           MR. FERGENSON:  No objection.

9           THE COURT:  All right.  So he is qualified as an

10  expert in business valuation.

11          MR. SCHIRICK:  Thank you, your Honor.

12  BY MR. SCHIRICK:

13  Q.  Mr. Dragon, what is a valuation analysis?

14  A.  A valuation analysis is determining the value of a company

15  or its stock or a portion of its stock for various purposes, in

16  cases where the company is not publicly traded.  With a

17  publicly traded company like, say, Ford Motor Company, I could

18  go to the New York Stock Exchange and see what the price of a

19  Ford share is today, and then I could multiply that by the

20  number of Ford shares outstanding and come to the value of the

21  stock of Ford Motor Company.  A valuation expert is called in

22  when the company is not publicly traded.

23  Q.  Okay.  Thank you for that.

24          And can you just explain to us why a valuation

25  analysis may be performed.

A.   Sure.  The valuation analyses are performed for a variety

of reasons.  I mean, one of them is if——say I have three

partners in a business and one of them is getting old and wants

to retire, and we want to——the other two partners want to buy

him out.  So the question is, what's a fair price for his

portion of the company.  That would be one example.

A second example would be for estate and gift tax

purposes.  The IRS requires that if I gift, say, 25 percent of

a company I own to my children, that I have that valued so that

the IRS knows the value that was given to the children for

estate and gift tax purposes.

Another reason valuations are performed is for

financial reporting.  If a company is a company getting an

audit, according to generally accepted accounting principles,

let's say this company has an investment in another company

that's private.  The generally accepted accounting

principles——which are often referred to as GAAP, you may have

heard that term——are that this investment has to be valued at

its fair value, so in order for the financial statements to be

accurate.  So in that case, the investment that one company has

in another company would be valued.  So that's another example.

Another example of valuation being used is in divorce

cases under marital law.  You have to, under marital law,

determine the value of a business, which is often a couple's

biggest asset, for equitable distribution and also for alimony

O721GUO3                        Dragon - Direct

1   purposes; how much does that business throw off his income.

2   And so a valuation expert will be called in to analyze the

3   company, determine its income, and determine the value of the

4   company.

5           And then the final area or another area that valuation

6   is used is in the context of litigation where there's a dispute

7   over valuation.  The valuation expert is called in to determine

8   the value of the company in question.

9   Q.  Okay.  Thank you for that.

10          Now does valuation also arise as part of fundraising

11  for private companies?

12  A.  It does.

13  Q.  Okay.  And does that include private placements?

14  A.  Yes.

15  Q.  Okay.

16  A.  Before——

17  Q.  I'm sorry.  Go ahead.

18  A.  When a company is planning a fundraising, they need to know

19  what to——price to offer the shares they're going to sell at.

20  So that could be a private placement or it could be an initial

21  public offering, and the people working on the offering will

22  determine a valuation for the company and the shares being

23  offered.

24  Q.  Okay.  Now did you review documents relating to the GTV's

25  private placement?

O721GUO3                        Dragon - Direct

1   A.  I did.

2              MR. SCHIRICK:  Okay.  If we could please bring up what

3   is in evidence GX VK-5.

4              Does everybody have it?  Okay.

5   Q.  Now, Mr. Dragon, are you familiar with this document that's

6   displayed on your screen?

7   A.  I am.

8   Q.  Okay.  And is this one of the documents you've reviewed in

9   preparation for your testimony?

10  A.  That's correct.

11  Q.  Okay.  Can you just explain briefly to the jury what this

12  document is.

13  A.  Sure.  This is the GTV Media Group, Inc. Private Placement

14  Memorandum dated April 20, 2020.

15  Q.  Okay.  And is it fair to say that a private placement

16  memorandum is sometimes referred to by the acronym PPM?

17  A.  Yes, that's the case.

18  Q.  And sometimes by the acronym CIM, for Confidential

19  Information Memorandum?

20  A.  That could be used as well.

21  Q.  Okay.  Now are private placements common transactions?

22  A.  They're very common.  Private placements are done very

23  regularly.

24  Q.  Okay.  And why do companies offer shares of their stocks,

25  stock to investors in private placements?

O721GUO3                          Dragon - Direct

1              MR. FERGENSON:  Objection.

2              THE COURT:  You may answer.

3    A.   Investors offer shares of their stock to——or companies

4    offer shares of their stock to investors so that they can raise

5    capital to expand and grow their business.

6    Q.   Okay.  And is PPM or CIM a general term that's used in the

7    industry?

8    A.   PPM is a commonly used term, and CIM is used as well,

9    although less frequently.

10   Q.   Okay.  If we could please go to page 2 of this exhibit in

11   evidence, GX VK5.

12              And Mr. Dragon, I'd just like to focus you on the top

13   of this document, the first paragraph, under the heading

14   Confidentiality and Disclaimer.  Do you see that?

15   A.   I do.

16   Q.   Okay.  And if you could just read that aloud, please.

17   A.   It says, "Confidentiality and Disclaimer."

18              "This confidential information memorandum is intended

19   for discussion purposes with select parties interested in

20   evaluating an opportunity to invest capital into GTV Media

21   group, Inc. ('the Company' or 'GTV Media').  GTV Media is a

22   newly formed company incorporated in April 2020.  All

23   descriptions of the business of GTV Media in this document

24   refers to business GTV Media intends to do in the future.

25   There is no guarantee that GTV Media will enter into those

1    identified businesses or that GTV Media will be successful in

2    those businesses."

3    Q.   Now, Mr. Dragon, did you consider this language in

4    conducting your valuation analysis of GTV?

5    A.   I did.

6    Q.   And what stage of development was GTV at at the time?

7    A.   GTV Media was what we would call a startup company.   A

8    startup company has a business plan, has looked at the markets

9    it intends to go into, has put together a management team, but

10   it hasn't yet raised money or commenced operations.

11   Q.   Okay.   Now is it unusual for a company in the startup phase

12   you just described to seek investment shortly after

13   incorporating?

14          MR. FERGENSON:   Objection.

15          THE COURT:   Overruled.   You may answer.

16   A.   No, it's not unusual at all.   In fact, it's typical for

17   companies to go and seek capital because they need the capital

18   to develop their business.

19   Q.   Okay.   Now with an early-stage startup company, what ways

20   are there of valuing such a company before it goes into

21   business?

22   A.   In valuing a company like this, you can consider a variety

23   of things—the size of the markets, the potential customers,

24   the products and services that are going to be offered, the

25   potential interest in these products and services, if there's

1    forecasts available, forecasts or projections for the business,

2    and overall, you know, is this a—an industry that's growing,

3    is this where other companies have been successful, and if it

4    is, you know, then potentially is this a good business

5    opportunity.

6    Q.  Okay.  And because a startup company doesn't yet have any

7    historical operating record, does that prevent a business

8    valuation from being performed?

9            MR. FERGENSON:  Object to leading.

10           THE COURT:  Overruled.  You may go ahead.

11   A.  No, it doesn't prevent a business valuation from being

12   done.  In fact, there is a whole industry of people called

13   venture capitalists whose job it is to look at business plans

14   and new business opportunities and decide whether they want to

15   invest people's money in them.

16   Q.  Okay.  Thank you for that.

17           MR. SCHIRICK:  If we could please, Jorge, just turn to

18   page 6 of this document.

19           And please blow up Section 1.3 entitled Goals.

20   Q.  Now, Mr. Dragon, could you please read this, these four

21   bullets.

22   A.  Yes.  "Section 1.3 Goals."

23           "To create a unique and the only news-focused social

24   media platform revealing the truth about China;

25           "To build an online business trading platform, free of

O721GUO3                     Dragon - Direct

1    control by the Chinese Communist Party, focused on the

2    1.4 billion Chinese people for their personal and business

3    transactions;

4         "To be the safest platform to advocate for truth,

5    freedom of speech and religion, justice, human rights, and

6    democracy in China; and

7         "To be a bridge between China and the western world,

8    and allowing for free and open communication, business

9    transactions and trading, uncensored by the Chinese

10   government."

11   Q.  Thank you.  Did you consider this language in conducting

12   your valuation analysis?

13   A.  I did.

14   Q.  Okay.  And how did this impact your valuation analysis?

15        MR. FERGENSON:  Objection, your Honor.  It's outside

16   the scope of the Court's ruling.

17        THE COURT:  I'm going to permit the question.

18   A.  Could you repeat the question.

19   Q.  Yeah, sure, of course.  The question is:  How did this

20   Section 1.3 that you just reviewed impact your valuation

21   analysis?

22   A.  As part of my analysis, I assess the potential market for a

23   business opportunity and my——

24        MR. FERGENSON:  Objection and move to strike, your

25   Honor.  This is outside the scope.  And we may need a sidebar.

O721GUO3                          Dragon - Direct

1              THE COURT:  All righty.  Step up.

2              (At the sidebar)

3              MR. FERGENSON:  Your Honor permitted him to testify

4     about the backsolve method, which is essentially they sold

5     shares at 1 dollar per share, they issued 2 billion shares, a

6     lot of people bought at that price, therefore, its reasonable

7     valuation is $2 billion.  He's just talking about the market.

8     Your Honor excluded market approach.  This is not the backsolve

9     method.  He should not be allowed to offer expert testimony

10    about this.  It's way beyond the scope.  And it should be

11    stricken.

12             MR. SCHIRICK:  Your Honor, I think that analysis is a

13    touch facile.  Just because he used the word "market," doesn't

14    mean that he was using or referring to the market approach to

15    valuation, which is entirely different from just talking

16    generically about the market that exists for a company's goods

17    or services.  As your Honor knows, the market approach to

18    valuation has to deal with selecting comparator companies and

19    looking at their revenues and looking at their profits and then

20    trying to derive from that information a value based on other

21    data points in the market.  That is not at all what he's

22    talking about.  Now what he's talking about are qualitative

23    factors that went into his analysis and thinking on the

24    valuation.  And that goes into whether or not the backsolve

25    method, when it's applied, is a logical way to check a

O721GUO3                         Dragon - Direct

1    company's value by using the data points that the Court has

2    already approved as being a valid method of assessing

3    valuation, and he's got to be able to testify to these

4    qualitative areas that he took into consideration.  The

5    government didn't move on it.  There's no order excluding these

6    qualitative factors.

7         THE COURT:  So I think this is general background

8    information that is relevant to any valuation of a company, not

9    so specific as to the methods that I've excluded.

10        MR. SCHIRICK:  Thank you, your Honor.

11        MR. FERGENSON:  I would say, your Honor, it seems like

12   this just doesn't relate to the backsolve method he employed,

13   so we're worried that we don't know how he's going to answer

14   these questions of "what did you think about in valuing the

15   company."  We should just get to the backsolve he actually did,

16   which your Honor ruled was reliable, and not the things that

17   your Honor excluded as unreliable.  And we did move on it, and

18   the Court excluded it.

19        THE COURT:  Do you have any more questions about the

20   market?

21        MR. SCHIRICK:  We're just going through his——he's

22   looking at the PPM, he's looking at the CIM, which is a key

23   document.  That's part of his analysis.  And I'm just asking

24   him, did you rely on this, what did you take from this, that's

25   all.  That's it.  I mean, it's——

 1            THE COURT:  What else are you going to ask him?

 2            MR. SCHIRICK:  There's a handful of other points in

 3   this PPM that we're going to go through, and that's really it.

 4   And it goes to your point, your Honor's point.  This is

 5   background.  It's all relevant to the background of valuation.

 6            THE COURT:  How many questions?

 7            MR. SCHIRICK:  Let me just count.

 8            MR. FERGENSON:  In the PPM is the offering of

 9   $2 billion shares and 1 dollar a share, and we assumed that was

10   what they were going to go to with the PPM, not other stuff

11   talking about things that are not the backsolve method.

12   Otherwise we would have raised this objection in the morning

13   before your Honor.

14            MR. SCHIRICK:  Well, there are probably six or seven

15   different things I would like to point him to that are all—

16            THE COURT:  Tell me what you want to point him to.

17            MR. SCHIRICK:  Sure.

18            The section, just to be clear for the record, is

19   labeled Goals, right?  Goals of the company.  That's what we're

20   questioning him about now.  The next section is Plan.  The next

21   section is Proposed Transaction, which describes the shares

22   that are going to be sold.  The next is the Summary of

23   Investment Terms.  Risk Factors.  The fact that the company has

24   no operating history.  The fact that the company's management

25   has broad discretion.  The fact that the company doesn't expect

O721GUO3                          Dragon - Direct

1      to gain any dividends.  And that's it.

2                  MR. FERGENSON:  Your Honor, he is not an expert on any

3      of those things.  He's reading a document as an expert.  It's

4      improper expert testimony.  They should go to what he actually

5      did as an expert.  This is totally improper.  You can't call an

6      expert to bolster him reading a document that he has no

7      personal knowledge of as if it were——to bolster it, and it

8      violates the Court's Daubert order, orders.

9                  MR. SCHIRICK:  We completely disagree, your Honor.

10     This is a foundational document.  It is the offering memorandum

11     for the transaction that he is——may I finish, please.

12                 MR. FERGENSON:  Yes, of course.  I am waiting.

13                 MR. SCHIRICK:  I didn't interrupt you.

14                 It's the foundational document for this transaction

15     that is obviously an enormous issue in this case, and he's got

16     to be allowed to explain what he took into consideration.  This

17     document is in evidence, right?  He's got to be allowed to say

18     what he took into consideration, and reading factors that go to

19     all of the things that I just read, and it has nothing to do

20     with the market approach or the income approach to valuation,

21     your Honor.  It has absolutely nothing to do with it.  We're

22     not asking for him to talk about comparator companies.  We're

23     not asking to talk about the projections.  The Court excluded

24     discussing the Alvarez and Marsal report.  We're not going

25     anywhere near it.  That is excluded.  This is merely background

1    to help inform the jury as to what he relied on in arriving at

2    his opinion.  Otherwise there's no rule that says I need to

3    stand an expert up and he just spits out his opinion and it's

4    over.  I have to be allowed to provide some context for it.

5         MR. FERGENSON:  Of course he can talk about what goes

6    to that opinion.  None of this goes to his actual opinion.

7         MR. SCHIRICK:  That's your view, not his.  He hasn't

8    even testified to it yet.

9         MR. FERGENSON:  They qualified this person as an

10   expert, and now they're trying to use that expertise, clearly

11   in violation of the principles of the Daubert case, to bolster

12   stuff he has no idea about, he's not offering any expert

13   opinion about, he has no personal knowledge of, and he's going

14   to say, yeah, no, that's totally normal, this is——this is——

15        THE COURT:  You can ask, did you consider the offering

16   memo with respect to, and then just hit the topics without

17   going through the details, not reading from it, just ask

18   whether he considered those, the plan, etc.

19        MR. SCHIRICK:  Okay.  In that context, your Honor, may

20   I be permitted to lead so that I can summarize what those

21   topics are.

22        THE COURT:  No.  No.  It's just the general topics.

23        MR. SCHIRICK:  Okay.  All right.  Well, I'm happy to

24   give it a shot.  I think without being able to ask a somewhat

25   leading question, it's going to be difficult for me to do

O721GUO3                        Dragon - Direct

1    summary, but I'll do my best.

2              THE COURT:  Well, you can lead to the extent that you

3    can say, did you consider the business plan, that sort of

4    general kind of a question.

5              MR. SCHIRICK:  Sure.  That was my thought, your Honor,

6    to some extent.  Thank you.

7              THE COURT:  All right.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2                    THE COURT:  Go ahead.

3                    MR. SCHIRICK:  Thank you, your Honor.

4     BY MR. SCHIRICK:

5     Q.  Now, Mr. Dragon, we've just reviewed Section 1.3 labeled

6     Goals, which is highlighted on everyone's screen.

7                    Now is it fair to say that this impacted your

8     valuation analysis?

9                    MR. FERGENSON:  Asked and answered.

10                   THE COURT:  Sustained.

11                   MR. SCHIRICK:  I'm not sure we ever got an answer.

12                   THE COURT:  I'll permit the answer.  Go ahead.

13                   MR. SCHIRICK:  Thank you, Judge.

14    A.  Yes, I considered this.

15    Q.  Can you explain, please.

16                   MR. FERGENSON:  Objection.

17                   THE COURT:  Sustained.

18                   MR. SCHIRICK:  Okay.  If we could please go to page 7.

19    And if we can zoom in on the bottom, Section 2.1, titled "Our

20    plan to allow the Chinese people to communicate freely with the

21    western world."

22    BY MR. SCHIRICK:

23    Q.  Do you see that, Mr. Dragon?

24    A.  I do.

25    Q.  Did you consider this language in conducting your valuation

O721GUO3                         Dragon - Direct

1    analysis?

2    A.   I did.

3    Q.   Okay.  And how did this impact your analysis?

4              MR. FERGENSON:  Objection.

5              THE COURT:  Sustained.

6              MR. SCHIRICK:  Your Honor, can we return to sidebar

7    briefly, please.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O721GUO3                        Dragon - Direct

1              (At the sidebar)

2              THE COURT:  Mr. Schirick.

3              MR. SCHIRICK:  Yes, thank you.  I just want to bring

4     to the Court's attention, this is your Honor's ruling from

5     May 17, 2024, that reads, in relevant part, "The Court shall

6     not preclude Dragon's qualitative testimony that, broadly, the

7     CCP censorship could create a market that could bolster a

8     company's value."  But you precluded him testifying about the

9     related data.  And that's precisely the line I'm trying to walk

10    here, your Honor.

11             MR. FERGENSON:  And your Honor, if I may just, the

12    next sentence is about quantitative impact, and he cannot offer

13    any testimony about that, and the question was, did that impact

14    your valuation analysis, which is going to be a quantitative

15    analysis.

16             MR. SCHIRICK:  I'm sorry.  That's completely

17    misconstruing not only what we just all read together but it

18    misconstrues his testimony.  The first sentence says that the

19    Court is not going to preclude qualitative testimony.  And this

20    is all qualitative, not quantitative.  I haven't asked him

21    about any numbers, your Honor.

22             THE COURT:  Can I take a look at that.

23             So it says, "The Court will not preclude Dragon's

24    qualitative testimony that, broadly, CCP censorship could

25    create a market niche that could bolster a company's value, but

O721GUO3                          Dragon - Direct

 1    as Dragon has not offered any data, he shall not be permitted

 2    to testify as to any quantitative 'impact of the censorship on

 3    the company's value.'"

 4              MR. SCHIRICK:  We haven't asked him about any numbers,

 5    your Honor.

 6              THE COURT:  His opinion now is about a number, and so

 7    the only logical conclusion that one can draw when you ask what

 8    is the impact on his conclusion about the numerical valuation—

 9              MR. SCHIRICK:  I mean, respectfully, your Honor, I

10    have not asked that question.

11              THE COURT:  I know that.  I know you haven't.

12              MR. SCHIRICK:  I merely asked whether it impacted his

13    valuation analysis, and his thinking as to valuation, right?

14              THE COURT:  So that goes to the number he puts to the

15    value of the company.

16              I'm going to permit you to ask whether he's considered

17    these subject matters, but I'm not permitting you to ask the

18    impact question.  We're done.

19              (Continued on next page)

20

21

22

23

24

25

```
 1                  (In open court)

 2                  THE COURT:  Go ahead.

 3                  MR. SCHIRICK:  Thank you.

 4                  THE COURT:  Sustained.

 5                  MR. SCHIRICK:  Now if we could please go to page 9.

 6      And if we could focus in on paragraph 3, Proposed Transaction.

 7      BY MR. SCHIRICK:

 8      Q.  Now, Mr. Dragon, do you see this paragraph 3 that is on

 9      your screen?

10      A.  I do.

11                  MR. SCHIRICK:  Okay.  And if we could just scroll down

12      to the chart that's on the top of the following page.

13      Q.  And Mr. Dragon, did you consider this in conducting your

14      valuation analysis?

15      A.  I did.

16      Q.  Okay.  And Mr. Dragon, to your understanding, based on this

17      document, how many shares were being offered for sale in the

18      GTV Private Placement?

19      A.  The offering was for between 20 million and 200 million

20      shares.

21      Q.  And for what percentage of the company did that represent?

22      A.  10 percent of the company if it was 200 million shares.

23      Q.  And if you could just explain to the jury, in your

24      understanding, who owned the remainder of the shares, both

25      before and after the transaction.
```

1    A.  The remaining 1.8 billion shares were owned by a company

2    called Saraca Media Group Incorporated.

3    Q.  And that was post-private placement, correct?

4    A.  That was both pre and post.

5    Q.  Okay.  Well, is there a difference between before the

6    transaction and after the transaction?

7    A.  Yes.  Before the transaction the company had what we called

8    a pre-money valuation.  The way to think of this is, if I had a

9    company that was worth $5 million and then I raised another

10   $1 million, pre-money the company would be worth 5 million and

11   post-money it would be worth 5 million plus the $1 million I

12   raised, for a total of 6 million.

13           MR. SCHIRICK:  Okay.  Now if we could go to page 16 of

14   this document, please.

15           And focusing in on paragraph 7, Summary of Investment

16   Terms.

17   Q.  Now did you consider this language in conducting your

18   valuation analysis?

19   A.  Yes, I did.

20   Q.  Okay.  And can you explain what the financing amount would

21   be as part of this transaction?

22   A.  Yes.  The amount to be raised could be between 20 million

23   and $200 million.  As I understand it, the entire new shares of

24   200 million were sold, so $200 million was raised.

25           MR. SCHIRICK:  Okay.  Now if we could please go to

1    page 18, and just blow up paragraph 9 entitled Risk Factors.

2    Q.  Now, Mr. Dragon, did you consider this language under Risk

3    Factors as part of your valuation analysis?

4    A.  Yes, I considered the risk factors as—language here as

5    part of my analysis.

6    Q.  Okay.  And did you consider the fact that GTV was—

7             MR. FERGENSON:  Objection to leading.

8             THE COURT:  I did not hear the question.

9    Q.  Did you consider that the investment in GTV was described

10   as highly speculative as part of your analysis?

11            THE COURT:  So, Mr. Schirick, the general subject

12   matters, not the specific language.

13            MR. SCHIRICK:  Sure, your Honor.  I didn't address any

14   numbers.  It was the general subject matter.

15            THE COURT:  The risk factors.  That's the is general

16   subject matter.

17            MR. SCHIRICK:  If we could go to page 19, please.

18   BY MR. SCHIRICK:

19   Q.  And this language at the top of page 19, did you consider

20   that as well?

21   A.  I did.

22            MR. SCHIRICK:  Okay.  Now if we can go to page 20.

23            And at the top, if we could please blow up that first

24   bolded sentence in the top paragraph.

25   Q.  Now what does this paragraph describe?

1          MR. FERGENSON:  Objection, your Honor.

2          THE COURT:  All righty.  So we're going to stick to

3   the general subject matters, the headings.

4          MR. SCHIRICK:  Certainly.  The general——

5   Q.  What is the general subject matter of this paragraph?

6          THE COURT:  Mr. Schirick, I know you know what I mean.

7   A.  The general subject matter is that——

8          THE COURT:  No, no, no, no.

9   Q.  Hold on.  I'm going to give you another question.

10          THE COURT:  He's going to give you a different

11   question.

12   Q.  Is it fair to say this paragraph describes the discretion

13   that the company's management has——

14          THE COURT:  Okay, Mr. Schirick.  The heading.  Just

15   the general subject matter.

16          MR. SCHIRICK:  Your Honor, can we have another

17   sidebar, please.

18          THE COURT:  So it's separated into sections, which I

19   believe are numbered.  Those numbered sections, those are the

20   general headings that I'm referring to, not the subheadings.

21          MR. SCHIRICK:  Your Honor, I believe this is a

22   heading.

23          THE COURT:  I think this is a subheading.

24          MR. SCHIRICK:  Thank you, your Honor.

25   BY MR. SCHIRICK:

O721GUO3                        Dragon - Direct

1   Q.  This subheading is under Risk Factors; is that fair?

2            THE COURT:  Well, my point is that you're to stick to

3   the headings and not go into the subheadings.

4            MR. SCHIRICK:  And my question was just to confirm

5   that this is under the heading that your Honor is referring to,

6   Risk Factors.

7            MR. FERGENSON:  We'll stipulate it's underneath the

8   Risk Factors top heading, your Honor.

9            THE COURT:  So this is one of the subheadings, and the

10  government has stipulated to that.  Now you can ask about that

11  general overarching numbered heading but not the subheadings.

12           MR. SCHIRICK:  Okay.

13  BY MR. SCHIRICK:

14  Q.  The risk factors listed here, is this among the risk

15  factors listed?

16           MR. FERGENSON:  Your Honor, can we——objection.

17           THE COURT:  All right.  So, sir, did you consider the

18  risk factors that were listed?

19           THE WITNESS:  I did, your Honor.

20           THE COURT:  Okay.  Next question.

21           MR. SCHIRICK:  If we can go to page 25, please.

22           And if we can blow up, on the bottom of the page, the

23  bolded portion.

24           MR. FERGENSON:  Your Honor, this is still subheadings.

25           THE COURT:  Would you like me to ask the questions?

O721GUO3                        Dragon - Direct

1             MR. SCHIRICK:  No.  Can we have another sidebar,

2     please.

3             THE COURT:  Okay.

4             (Continued on next page)

1           (At the sidebar)

2           THE COURT:  So Mr. Schirick, you're an incredibly

3     smart person.  I know that you understand what I'm saying.  But

4     you're resisting me, and I want you to stop.

5           MR. SCHIRICK:  Respectfully, your Honor, I truly don't

6     understand what the line is that we're drawing between

7     setting——

8           THE COURT:  Let me make it very clear.  So you have

9     these numbered sections, and you can ask about what is in that

10    heading that follows the number.  None of the text, none of the

11    subheadings.  So if it's Risk Factors, you would say:  Did you

12    consider the risk factors listed?  Period.

13          MR. SCHIRICK:  Your Honor, I think——I'm trying to

14    understand the difference between just asking about a

15    subheading entitled Risk Factors and the bolded portions which

16    actually list the risk factors, and what the distinction is

17    being between being able to elicit testimony about a heading

18    that says Risk Factors and the substantive risk factors.

19          THE COURT:  Well, because, Mr. Schirick——I know you

20    know the answer——the subheadings are more specific than the

21    general heading.  I know that you know this.

22          MR. SCHIRICK:  And I'm just trying to understand for

23    my purpose.  Frankly, your Honor, for the balance of the

24    questioning in this case, I want to make sure that I'm adhering

25    to the Court's ruling and that I understand.  Am I only

O721GUO3                    Dragon - Direct

permitted to ask about headings in certain documents?

          THE COURT:  Not in certain documents; in this

document.  You're going through the headings in this document.

And they're general categories, and following the general

categories, there's more specific language.  It's the specific

subheadings and the paragraphs that you're not to go into, just

the general categories.

          MR. SCHIRICK:  Okay.  And I just want to make sure I

understand.  The reason that I'm not permitted to ask about the

specific risk factors is because that is somehow quantitative

as opposed to qualitative?

          THE COURT:  So you want to ask him about the impact

that these representations had on him, and he's here to give us

a number, and so necessarily the impact is about drawing this

conclusion about the valuation, the number, and so that's where

I'm not letting you go.

          MR. SCHIRICK:  Okay.  And my final question——and I

appreciate your Honor's indulgence——if I'm at some point

permitted to ask about the qualitative factors that relate to

the portion of your Honor's ruling that we read before, am I

not?

          THE COURT:  We are here.  These are the qualitative

factors.  You can't get into them.  You can't have him

elaborate on it.

          MR. SCHIRICK:  Okay.  I understood the Court's ruling

1    to permit us to discuss with this witness the qualitative

2    factors that went to the size of the market or the potential

3    market, and that's where I find it, your Honor——to be clear,

4    that was our understanding of the Court's ruling.  I believe

5    that's what the text of the ruling said.  So I'm trying to

6    figure out how I'm permitted to do that within the confines of

7    what your Honor just described.

8              THE COURT:  So now we're moving away from this

9    document to what?

10             MR. SCHIRICK:  No.  The language in this document is

11   relevant to that, to the market, the size of the market.

12             THE COURT:  So I'm just going to take you back to

13   where I started.  You can ask questions about these general

14   categories without going into the impact, without having him

15   elaborate on the language in the subheadings or in the text.

16             MR. SCHIRICK:  Okay.  Would I be permitted to ask, for

17   example, on the size of the market issue, whether language in

18   this document——where it says there are 1.4 billion Chinese

19   people who are interested in the content, can I ask specific

20   questions about that or am I not permitted to ask specific

21   questions about that?

22             THE COURT:  No, no specific questions about that.

23             MR. FERGENSON:  And your Honor, he's asked about the

24   risk factor thing.  I assume we're going to move on to a

25   different numbered paragraph heading.  He asked about it many

O721GUO3                        Dragon - Direct

1    times.

2              THE COURT:  Okay.  We are.  I know that we are.

3              MR. SCHIRICK:  Yes.  Just for the record, your Honor,

4    you know, this seems to me to be inconsistent with our

5    understanding of the Court's ruling.  We understand the Court's

6    ruling now.  And we will be guided accordingly.

7              THE COURT:  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. SCHIRICK:

3    Q.  Okay.  Mr. Dragon, the paragraph at the bottom of this

4    page, the second bolded portion, to be clear, is that something

5    that——

6              MR. FERGENSON:  Objection, your Honor.

7    Q.  ——you took into consideration?

8              THE COURT:  So just stick to the numbered headings.

9              MR. SCHIRICK:  Understood, your Honor.

10             Let's move to——we can take this document down.

11   Q.  Now, Mr. Dragon, returning to the private placement, what

12   is your understanding of what happened in the GTV Private

13   Placement?

14   A.  The company sought to raise $200 million by selling

15   200 million shares at a dollar a share, and these would be new

16   shares that did not exist before in GTV Media, and they sold

17   the entire allotment of those shares.

18   Q.  Okay.  And so it was a successful fundraise; fair to say?

19   A.  Yes.

20   Q.  Okay.  Now, Mr. Dragon, based on your review of the

21   materials that you described before, including the private

22   placement memo that we just reviewed, did you reach a

23   conclusion about the valuation of GTV?

24   A.  I did.

25   Q.  Okay.  And what valuation method did you apply to reach

1   that conclusion?

2   A.  I applied what's called the backsolve method.  That's a

3   method where you look at a transaction in the company's stock

4   and determine if it's a good indicator of value of the entire

5   company.

6   Q.  Okay.  And is that a valuation, a methodology that looks at

7   the placement of the company's securities?

8   A.  Yes.  That's usually—there's some sort of transaction in

9   the company's securities, so a placement of the company's

10  securities would be a transaction in the company's securities.

11  They sold 200 million shares.

12  Q.  Okay.  And why is the backsolve method a valid valuation

13  methodology?

14  A.  The backsolve method for—is actually considered one of the

15  best valuation methodologies.  The reason it's valid is it is

16  determining the value of the company by looking at the demand

17  and—for securities in the company, so that if, for example,

18  you sold 10 percent of the company for 200 million, then that

19  would imply that the value of the total company is 2 billion.

20  Q.  Okay.  And why is that validation that you just described

21  important?

22  A.  It's very important, when you look at a backsolve

23  transaction, you put it to what I would call a three-prong

24  test.

25          The first thing you look at is, was it for a large

1    amount of money.  If I only sold one share in the company,

2    whether it was sold for a dollar or $20, that wouldn't really

3    tell you much about the value.  However, here we sold

4    200 million shares in the company and so that's a very

5    significant transaction in terms of number of shares.

6            The second thing that makes——the second test is, was

7    this for a significant dollar amount.  If we sold a lot of

8    shares but they were for just a fraction of a penny and the

9    overall money raised was only $2 million, that wouldn't tell us

10    much about the value of a $2 billion company.  However, here,

11    we sold shares equal to $200 million worth of value, and that

12    is a large amount of money.

13            The third prong of the three-prong test is, was there

14    a lot of people interested in the transaction.  At the price

15    the shares were being offered, were lots of people interested

16    in investing in this company, after they went and did their own

17    research and came to a conclusion about whether or not this was

18    a good investment.  And we know that there was over 5,000

19    investors in this company, which is a significant number of

20    investors.

21    Q.  Now ultimately, Mr. Dragon, did you arrive at a conclusion

22    about the value of GTV at the end of its private placement?

23    A.  I did.

24    Q.  And what was that conclusion?

25    A.  My conclusion was that the equity of GTV, all of its common

1    stock, the—was worth $2 billion.

2              MR. SCHIRICK:  Thank you, your Honor.  No further

3    questions at this time.

4              THE COURT:  Cross-examination.

5              MR. FERGENSON:  Thank you, your Honor.

6    CROSS EXAMINATION

7    BY MR. FERGENSON:

8    Q.  Good afternoon, Mr. Dragon.

9    A.  Good afternoon.

10   Q.  I'm one of the prosecutors on the case.  I have some

11   questions for you.

12   A.  Okay.

13   Q.  Now you were testifying as an expert in valuation, right?

14   A.  That's correct.

15   Q.  And Mr. Schirick had you read a bunch of lines from the

16   PPM.  Do you recall that?

17   A.  I do.

18   Q.  Are you an expert in reading documents?

19             MR. SCHIRICK:  Objection.

20             THE COURT:  Overruled.  You can answer.

21   A.  I read financial documents daily as part of doing my job,

22   yes.

23   Q.  And you're not offering any expert opinion on reading what

24   a document says, correct?

25             MR. SCHIRICK:  Objection, your Honor.  It's a really—

O721GUO3                         Dragon - Cross

1            THE COURT:  I don't understand the question.

2    Q.  You didn't have any personal involvement in the PPM,

3    correct?

4    A.  I was not involved in creating the PPM, that's correct.

5    Q.  And you didn't have any personal involvement in the

6    fundraising, correct?

7    A.  I did not have any involvement in the fundraising either.

8    Q.  Now what you did do is offer an opinion using the backsolve

9    method, correct?

10   A.  That's correct.

11   Q.  And the backsolve method has a few inputs that are

12   relevant; fair to say?

13   A.  There's things you look at, yes.  I listed them.

14   Q.  And so it's fair to say there's a few inputs that are

15   relevant?

16            MR. SCHIRICK:  Asked and answered.

17            THE COURT:  Sustained.  Go ahead.

18   Q.  One of the inputs is investor demand.  You said demand on

19   direct, correct?

20   A.  That's correct.

21   Q.  And demand depends on the investor views of the value of a

22   company's shares, right?

23   A.  That's part of what creates demand, yes.

24   Q.  And for GTV, thousands of investors paid 1 dollar a share,

25   right?

O721GUO3                        Dragon - Cross

1    A.  That's correct.

2    Q.  And the total amount paid by the investors was significant,

3    right?

4    A.  It was $200 million, in new shares.

5    Q.  And you said that was a, you know, significant amount; is

6    that fair?

7    A.  That's correct.

8    Q.  And so there was also a large number of investors, the

9    number of investors was significant; fair to say?

10   A.  The number of investors was significant; over 5,000.

11   Q.  And so your opinion essentially is that valuing GTV shares

12   at 1 dollar per share is a reasonable valuation; is that fair?

13   A.  That's correct.

14   Q.  And since there were 2 billion shares, a $2 billion

15   valuation for GTV is also reasonable; is that fair?

16   A.  My conclusion was the company was worth $2 billion,

17   correct.

18   Q.  Now this method depends on the investors' assessment of the

19   company, correct?

20   A.  That's correct.

21   Q.  And it depends on how the investors assess the company's

22   value, correct?

23   A.  That's correct.

24   Q.  And for this method to be accurate, the investors have to

25   accurately assess the company's value, correct?

1           MR. SCHIRICK:  Objection.

2           THE COURT:  Overruled.  You may answer.

3   A.   In a marketplace, you're going to have numerous people look

4   at this.  Some people assess it and determine that it is a

5   worthwhile investment; other people can look at it and

6   determine that it's not.  So that overall, you have a supply of

7   shares, and the demand is then met by the people who, after

8   assessing the investment, the industry, how other companies may

9   have done in this industry, decided that this was a good

10  investment and that the price that the shares was being offered

11  at was a fair price.

12  Q.   I'm talking about the people that actually bought the

13  shares, okay?  Do you understand that?

14  A.   Yes, I understand that.

15  Q.   Okay.  So the people that actually bought the shares, the

16  valuation by them is the basis for your opinion; fair to say?

17          MR. SCHIRICK:  Objection.  Form.

18          THE COURT:  Overruled.  You may answer.

19  A.   The——my opinion is based on the overall transaction, all

20  the people who bought shares and all the people who looked at

21  it, and that is how you come to the conclusion that 10 percent

22  of the company was worth 200 million, so therefore, a hundred

23  percent of the company was worth 2 billion.

24  Q.   But I just want to be clear.  Do you agree with me that

25  part of the basis for your opinion is the investors who

O721GUO3                          Dragon - Cross

1    actually bought the shares at 1 dollar?

2    A.  Yes, that's part of the basis of my opinion.

3    Q.  And if those investors had a misconception about the value

4    of the shares, your method would incorporate that

5    misconception, correct?

6              MR. SCHIRICK:  Objection.  Objection.

7              THE COURT:  Overruled.  You may answer.

8    Q.  If those investors had a misconception about the value of

9    GTV's shares, your method would incorporate that misconception;

10   fair to say?

11             MR. SCHIRICK:  Objection.  Asked and answered.

12             THE COURT:  Overruled.  You may answer.

13   A.  Okay.  Well, the way that supply and demand works in the

14   market is each investor comes to their own conclusion as to

15   what the opinion was, and those who came to the conclusion that

16   this was a good investment at this price bought the shares.

17             MR. FERGENSON:  Your Honor, we move to strike as

18   nonresponsive, and I can ask the question again.

19             THE COURT:  Sustained.  The answer is stricken.

20             If you'll read the question back.

21             Sir, if you'll listen to the question carefully and

22   only answer what's being asked.

23             THE WITNESS:  Okay.

24             (Record read)

25   A.  If there was a misconception, that's basically assuming

 1  that markets don't work, but if there was a misconception on
 2  the value, that would be incorporated into their decision to
 3  buy the shares.
 4  Q.  So is that a yes?
 5          MR. SCHIRICK:  Objection.  Asked and answered.
 6          MR. FERGENSON:  I'm just trying to get an answer to
 7  the question.
 8          MR. SCHIRICK:  He answered.
 9          THE COURT:  If you'll just read back the question one
10  more time, please.
11          (Record read)
12          MR. SCHIRICK:  I believe he answered it.  It's the
13  previous set of questions.
14          THE COURT:  No.  That's the reason that I asked for it
15  to be read back because I did not hear an answer to the
16  question.
17          Would you mind reading back the question one more
18  time, please.
19          (Record read)
20  A.  If that was how they made their decision to purchase on a
21  misconception, that would be incorporated into their decision
22  to purchase and my methodology.
23  Q.  Now, Mr. Dragon, you testified that you considered the risk
24  factors in the PPM.  Do you recall that?
25  A.  Yes.

O721GUO3                        Dragon - Cross

1   Q.  And you agree with me that risks are an important thing to
2   consider when valuing a company, right?
3   A.  That's correct.
4   Q.  Risk is an important thing to consider when making an
5   investment, right?
6   A.  That's correct.
7   Q.  That's because risk is about the likelihood your investment
8   will lose money, right?
9   A.  That is a component of risk, yes.
10  Q.  And when risk is lower, when the likelihood of losing money
11  is lower, the investment appears better; fair to say?
12          MR. SCHIRICK:  Objection.
13          THE COURT:  Overruled.  You may answer.
14  A.  Lower-risk investments generally are preferred, all other
15  things being equal.
16  Q.  And so when investors are guaranteed there is no risk, the
17  investment that had no risk would appear better; fair to say?
18          MR. SCHIRICK:  Objection.
19          THE COURT:  It's a compound question.
20  A.  Excuse me.  Are you asking me whether this investment had
21  no risk?
22  Q.  I'll rephrase.
23          THE COURT:  Go ahead.
24  Q.  If investors are guaranteed there is no risk, that means
25  there's no likelihood of losing money; fair to say?

O721GUO3                         Dragon - Cross

1    A.  That's fair to say, hypothetically, yes.

2    Q.  And if there's no likelihood of losing money on an

3    investment, the value of the investment would be higher; fair

4    to say?

5              MR. SCHIRICK:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A.  Yes.

8    Q.  Now if the GTV investors relied on a guarantee there was no

9    risk, the apparent value of the investment is not accurate, in

10   those investors' view.

11             MR. SCHIRICK:  Objection, form.  The word reliance.

12             THE COURT:  Sustained.

13   Q.  Now you agree with me that the likelihood of making money

14   is also an important representation, right?

15   A.  I'm not sure what you mean by the term important, important

16   representation.

17   Q.  Well, let me rephrase.

18             If you're assessing the value of investment, it would

19   be significant to know what the potential upside of that

20   investment might be; fair to say?

21   A.  When you assess any investment, you don't know what the

22   upside is.  You can only estimate what the upside is.

23   Q.  Right.  And so if someone guaranteed there could only be

24   upside, is that an accurate representation, in your view?

25             MR. SCHIRICK:  Objection.

1          THE COURT:  Sustained.

2     Q.  Now, Mr. Dragon, the backsolve method you used to value GTV

3     depends on GTV's investors, right?

4          MR. SCHIRICK:  Objection.  Asked and answered.

5          THE COURT:  Overruled.  You may answer.

6     A.  It involves, as I said, on a number of factors, and that's

7     why I applied what I call the three-prong test.

8     Q.  And the method you used, it doesn't factor in at all

9     whether GTV's investors were lied to, correct?

10          MR. SCHIRICK:  Objection.

11          THE COURT:  You may answer.

12     A.  The——the methodology I used was looking at the legal

13     documents that were provided for the memorandum and the actual

14     purchases by the people who, after making their own risk

15     assessment, were willing to pay the price for the shares.

16          (Continued on next page)

O72BGUO4                    Dragon - Cross

1      MR. FERGENSON:  Move to strike I guess and I'll ask

2    the question again.

3      THE COURT:  If you'll read back the question, please.

4      (The record was read)

5  A.  There was no indication on the memorandum that there was

6  any lies, so I did not factor in that the investors were lied

7  to because I don't know whether that's the case or not.

8  Q.  And so that's a yes you didn't factor that in?

9      MR. SCHIRICK:  Asked and answered.

10     THE COURT:  Sustained.  Go ahead.

11 Q.  You said there's no indication on the PPM that investors

12 were lied to, right?

13     MR. SCHIRICK:  Asked and answered.

14     MR. FERGENSON:  I'm trying to get to the next

15 question.

16 Q.  Well, you know what, your Honor.  Let's go on.

17     Now, Ms. Loftus, can we pull up Government Exhibit Z9

18 at page six.

19     Mr. Dragon, your opinion is that $2 billion was a

20 reasonable valuation, right?

21     MR. SCHIRICK:  Asked and answered.

22     MR. FERGENSON:  I'm just trying to get to the

23 question, your Honor.

24     THE COURT:  Go ahead.  You can finish your question.

25 Q.  I want to focus you on the exhibit in front of you.  Do you

O72BGUO4                        Dragon - Cross

1   see in the top left the date is June 2, 2020?

2   A.  I do.

3   Q.  And do you see that -- you know that June 2, 2020 is the

4   date that the private placement for GTV closed, right?

5   A.  That's correct.

6   Q.  And the person pictured in this photograph, that's Miles

7   Guo, right?

8   A.  Yes.

9   Q.  And he's holding up a share certificate in this photo, you

10  see that?

11  A.  Yes.

12  Q.  All right.  I'll ask you to please read the first paragraph

13  listed there?

14  A.  "We had an initial valuation of 200 million for GTV and the

15  private placement required a minimum investment of 20 million.

16  The private placement exceeded the highest expectation and

17  raised 350 million.  This is up to now this figure is about 360

18  million.  Let's say 350 million.  350 million does not include

19  the 117 million from VOG.  If 117 million plus 350 million is

20  more than 480 million which is almost, almost, almost, 500

21  million, almost 500 million.  But the figure we have now is 350

22  million received which is just for the contracts with GTV.

23  This turned out to be a conservative estimate and 17 times the

24  valuation."

25  Q.  If we can scroll down, Ms. Loftus, and can you read the

O72BGUO4                         Dragon - Cross

1    next paragraph, the one in the middle there?

2    A.  "Given the tremendous demand for GTV shares and the good

3    capital of GTV going forward, my lawyers and financial experts

4    mutually agree that a 2 billion valuation is probably too low

5    and that the actual value of the company is probably closer to

6    10 billion given the tremendous demand for GTV shares."

7    Q.  Mr. Dragon, just to start, this reference to my lawyers and

8    financial experts who according to Mr. Guo mutually agree that

9    2 billion valuation is probably too low, you weren't one of

10   those experts, correct?

11   A.  I was not.

12   Q.  You didn't value GTV in 2020, right?  At the time of this,

13   you didn't value GTV?

14            MR. SCHIRICK:  Objection, asked and answered.

15            THE COURT:  You may answer.

16   A.  I was not involved in valuing GTV in 2020.  My involvement

17   is in 2024.

18   Q.  You only valued GTV in connection with this case, right?

19   A.  That's correct.

20   Q.  And you're not offering any opinion that a $10 billion

21   valuation was reasonable, correct?

22   A.  I'm not offering that opinion.

23   Q.  Were you even asked to try to justify a $10 billion

24   valuation?

25            MR. SCHIRICK:  Objection.

O72BGUO4                         Dragon - Cross

1          THE COURT:  You may answer.

2  A.  As part of looking at the company I was not asked, but I

3  looked at the company from a lot of different perspectives.

4          MR. FERGENSON:  Your Honor, objection.

5          MR. SCHIRICK:  He asked, your Honor.

6          THE COURT:  That last sentence is stricken.  Go ahead.

7  Q.  So you're not offering any opinion that $10 billion is a

8  reasonable valuation, correct?

9  A.  That's correct.

10 Q.  Let go to GXZ9 at page 76, please.  And do you see the date

11 in the top left is March 30, 2021?

12 A.  Yes, I do.

13 Q.  And the person pictured here is Miles Guo again, right?

14 A.  I believe so.

15 Q.  Now let's scroll down to the next page, Ms. Loftus, and

16 let's focus on the bottom paragraph.  If we could blow that up.

17         Could you read that bottom paragraph please

18 Mr. Dragon?

19 A.  "For GTV how many funds tell GTV now hmmm that with the

20 assessment the worth of GTV is now probably 60 billion, 60

21 billion.  In other words, for the shares you have bought in the

22 past, er, for example, one million shares, how many shares

23 shall we give you now?  It's multiplied by 30 times, that is,

24 18 million shares."

25 Q.  Sir, you're not offering any opinion that a $60 billion

O72BGUO4                    Dragon - Cross

1   valuation of GTV was reasonable, correct?

2   A.  I'm not offering any opinion on that.

3   Q.  If we could go to GXZ9 at 115.

4           Do you see the date there is August 11, 2021?

5   A.  I do.

6   Q.  And the person in the split screen on the left, that's

7   Miles Guo, correct?

8   A.  I believe so.

9   Q.  Now can you read focusing on the bottom paragraph could you

10  read the last two sentences in that paragraph?

11  A.  "Rolex is worth 7.8 billion which is about 8 billion

12  rounding up, right?  It's only worth 8 billion, which is only

13  1/5 or 1/6 of our GTV in terms of market value.

14  Q.  If $8 billion is 1/6 of GTV's market value, that would mean

15  GTV's market value is $48 billion, correct?

16          MR. SCHIRICK:  Objection.

17          THE COURT:  Overruled.  You may answer.

18  A.  If you accept the premise that would be 48 billion.

19  Q.  That's exactly right.

20          MR. SCHIRICK:  Objection to the testifying.

21          MR. FERGENSON:  Can I ask the question.

22          THE COURT:  I did not hear the objection.

23          MR. SCHIRICK:  Object to counsel testifying.

24          THE COURT:  Don't testify.  Go ahead.

25  Q.  You're not offering an opinion that GTV's value was $48

O72BGUO4                    Dragon - Cross

1   billion, correct?

2           MR. SCHIRICK:  Asked and answered.

3           THE COURT:  Overruled.  You may answer.

4   A.  I am not offering the opinion.

5   Q.  Ms. Loftus, if we could please pull up GXZ212-V.  You can

6   start playing at about a minute 39 in.

7           (Media played)

8   Q.  Sir, you're not offering any opinion that G Fashion is

9   valued at $100 billion?

10          MR. SCHIRICK:  Objection, your Honor.  Well-beyond the

11  scope.

12          THE COURT:  You may answer.

13  A.  Well, first of all, I was asked to value the company as of

14  April 2020, both in this case and in the two previous cases you

15  mentioned.  You asked for valuations totally significantly

16  after the valuation date I was asked to determine value.  So in

17  that sense, these are questions I haven't even considered.  So

18  companies' values can change over time.  I can't tell you what

19  the value of the company would be after the valuation date

20  because I was only engage to value the company as of April 20,

21  200.

22  Q.  Ms. Loftus, let's go to GXZ9 at 134, please.

23          The date in the top left here is November 16, 2021, do

24  you see that?

25  A.  I do.

O72BGUO4                          Dragon - Cross

1   Q.  And there's a person in the image person in the middle

2   that's Miles Guo, right?

3   A.  I believe so.

4   Q.  Ms. Loftus, can we please play GXC432-V.

5              (Media played)

6   Q.  Can we go back to Government Exhibit Z9 at 134.  Can you

7   scroll down a little bit.

8              Now, Mr. Dragon, you're not offering any opinion that

9   the Himalaya Exchange was worth $2 trillion, correct?

10              MR. SCHIRICK:  Objection, beyond the scope.

11              THE COURT:  You may answer, sir.

12   A.  The Himalaya Exchange was not part of the scope of my

13   valuation so I'm offering no opinion.

14   Q.  And you're not offering any opinion that five percent of

15   the Himalaya Exchange was worth $100 billion, correct?

16              MR. SCHIRICK:  Objection.

17   A.  I was engaged to value the company at the time of the

18   offering memorandum.  This is over a year later.  This is not

19   something I would look at because it was out of the scope that

20   I was engaged to value the company.  I was engaged to value at

21   the time of the offering memorandum in 2020.

22   Q.  It's fair to say you weren't asked to value the Himalaya

23   Exchange at $2 trillion, sir?

24              MR. SCHIRICK:  Objection, asked and answered.

25              THE COURT:  Sustained.

1          MR. FERGENSON:  May I have a moment, your Honor.

2   Q.  Sir, you testified how you valued GTV around April 2020.

3   Are you aware that Miles Guo continued selling what he said

4   were GTV shares well after that?

5          MR. SCHIRICK:  Objection.

6          THE COURT:  Overruled.  You may answer.

7   A.  Are you asking me whether Miles Guo sold his personal

8   shares?

9   Q.  No, GTV shares well after April 2020.

10          MR. SCHIRICK:  Objection.

11          THE COURT:  You may answer.

12   A.  I'm not aware of any sales of new GTV shares after the

13   closing of the private placement memorandum.

14          MR. FERGENSON:  Just one moment, your Honor.

15          (Pause)

16          MR. FERGENSON:  No further questions.

17          THE COURT:  Redirect.

18   REDIRECT EXAMINATION

19   BY MR. SCHIRICK:

20   Q.  Thank you, Mr. Dragon.  You were asked some questions on

21   cross examination about potential investors misconceptions.

22   You remember that?

23   A.  I remember questions about that, yes.

24   Q.  And you were asked whether if investors had misconceptions

25   whether that would be incorporated into the valuation analysis

O72BGUO4                        Dragon - Redirect

1   that you performed.  Do you recall that?

2   A.  Yes.

3   Q.  Now, was one reason that companies selling shares issue

4   written documents like a PPM to avoid misconceptions?

5              MR. FERGENSON:  Objection to leading and improper.

6              THE COURT:  Sustained as to leading.  Go ahead.

7   Q.  What is one reason that companies selling shares issue

8   written documents to potential investors?

9              MR. FERGENSON:  Objection.  He's not an expert on

10  that.

11             THE COURT:  Sustained.

12             MR. SCHIRICK:  He's a valuation expert, your Honor.

13             THE COURT:  Sustained.  Go ahead.  Move on.

14  Q.  Now, with respect to potential investor misconceptions,

15  does the backsolve method assume that every investor has

16  perfect information?

17             MR. FERGENSON:  Objection to leading.

18             THE COURT:  You may answer that question.

19  A.  No, it doesn't.

20  Q.  Can you explain that, please.

21  A.  Sure.  Every single investor is gonna read the memorandum

22  and they're going to go and do their own research on, you know,

23  what the prospect for this company might be.  And everyone

24  comes to a different conclusion, so there's no way of, you

25  know, that some individual could maybe draw an incorrect

1    conclusion of preventing that.  And that's the same for any

2    stock offering.

3           MR. FERGENSON:  Your Honor, we move to strike as

4    non-responsive and total speculation.  He has no personal

5    knowledge of any of that, and it violates the Court's order.

6           THE COURT:  He's not an expert on investor behavior as

7    far as whether they read or not read the prospectus.  Move on.

8    The answer is stricken.

9           MR. SCHIRICK:  Your Honor, the question is with

10   respect to the methodology, the backsolve method.  How does

11   that account for the possibility that investors may have

12   varying levels of information or judgments.

13          MR. FERGENSON:  Asked and answered.

14          THE COURT:  You may answer that question.  Go ahead.

15   A.  Thank you.  The way it accounts for it is a large number of

16   people look at it.

17          THE COURT:  So you're not to give an opinion though

18   about what individual investors may be thinking or may have

19   read.

20          THE WITNESS:  I'm just talking how markets work, your

21   Honor.

22          THE COURT:  Go ahead.

23   A.  The way markets work is an opportunity, whether it's stock

24   or selling a hamburger, something is put up for sale and people

25   look at it and decide whether it's a good opportunity or not,

1    and the ones who do buy it decide its worth their money.

2           In this case, there was a very large number of people

3    who looked at it and over 5,000 people after doing their

4    research decided this was a good investment.

5    Q.  Now, Mr. Dragon, you were also asked some questions on

6    cross about the risk factors.  Do you recall that?

7    A.  I do.

8    Q.  And you were asked about a guaranty.  Do you recall that?

9    A.  I do.

10   Q.  Now, in conducting valuation analyses, do you take

11   guaranties into account?

12   A.  I might.

13   Q.  Can you explain that, please?

14   A.  Yes.  If there was a guaranty that was backed by legal

15   documentation and that after discussing with an expert in say

16   guaranties, a lawyer or something who is understands this area,

17   if they said that the guaranty was legally valid, then I would

18   consider that in my valuation.

19          MR. FERGENSON:  Your Honor, objection and move to

20   strike to the hearsay of what may be some legal conclusion on a

21   speculative nature.

22          MR. SCHIRICK:  There's no hearsay your Honor.  This is

23   about how valuation analysis works.

24          THE COURT:  I'm going to permit the answer.  Let's

25   continue.

1   Q.  Thank you, judge.  And so if a valuation analysis the

2   guaranty were one that was not valid and legally binding would

3   that effect your analysis?

4           MR. FERGENSON:  Your Honor, objection.

5           THE COURT:  You may answer.

6           MR. FERGENSON:  He cannot testify about legal

7   conclusions.

8           THE COURT:  You may answer as to what would affect

9   your analysis.

10  A.  If I felt the guaranty was legally binding and had the

11  ability to be backed up with sufficient resources, then I would

12  consider it in my valuation.  However, if it's just someone

13  talking and there's no legally binding document, I would not

14  consider it.

15          MR. FERGENSON:  Your Honor, I think we need to

16  approach.  I apologize.

17          THE COURT:  All right.

18          (Continued on next page)

19

20

21

22

23

24

25

O72BGUO4                          Dragon - Redirect

1           (At the sidebar)

2           THE COURT:  Mr. Fergenson, you opened the door to

3     guaranty.

4           MR. FERGENSON:  I didn't open the door to him opining

5     on whether oral guaranties are legally binding versus written

6     guaranties are legally binding.  He is not an expert in that.

7     He has no expertise to offer about it.  Second, the point of

8     these questions, your Honor, like we've objected to many times

9     throughout the trial is to suggest that the victims were

10    gullable, were negligent and they listened to this guy make

11    some crazy guaranty, and isn't it really on them.

12          THE COURT:  I think that you opened the door wide

13    enough to permit these questions, and I think he's about to

14    stop, so we're going to move on.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O72BGUO4                          Dragon - Redirect

 1              (In open court)
 2              THE COURT:  The answer stands.
 3   Q.  In addition to the guaranties, you were also asked some
 4   questions about a document that is in evidence called GXZ9, the
 5   chart.  Do you recall that?
 6   A.  I probably would if you showed me the document.  I don't
 7   know that code number.
 8   Q.  If we could please pull that up for the witness and
 9   everyone for that matter.  And if we can go to the entry from
10   June 2, 2020, which I think is on page six.
11              Do you recall this now, Mr. Dragon?
12   A.  I do.
13   Q.  And Mr. Fergenson ask you some questions about this.  You
14   recall that?
15   A.  He did, yes.
16   Q.  And you recall that this is the date on which the GTV
17   private placement closed; is that right?
18   A.  That's correct.
19   Q.  There's a reference here to a potential -- excuse me,
20   withdrawn.
21              There's a reference here that you read that the
22   private placement "exceeded the highest expectation and raised
23   $350 million."  Do you see that?
24   A.  Yes, I do.
25   Q.  Now do you have an understanding as to what is being

O72BGUO4                        Dragon - Redirect

1   referred to here?

2   A.  My understanding is that the 350 million includes the 200

3   million of new GTV shares that were issued by GTV and includes

4   shares that were owned by Saraca that were sold because there

5   was a very large investor interest in this offering.

6   Q.  And so it's fair to say that GTV sold more than 200 million

7   worth of shares?

8   A.  GTV itself sold 200 million.

9   Q.  And the remainder came from where to your understanding?

10  A.  Saraca sold some of the GTV shares it already had.

11  Q.  Now, did --

12          MR. FERGENSON:  Your Honor, what is the basis of this?

13  I'm sorry.  I think we may need a sidebar.  Your Honor,

14  apologies.  We object on personal knowledge.

15          MR. SCHIRICK:  I'm not sure how that's an objection to

16  the question, your Honor.

17          THE COURT:  If he has personal knowledge you may

18  answer.

19  Q.  Now, there's also reference here, if we scroll up a bit in

20  this chart to the middle paragraph beginning, Given the

21  tremendous demand.  Do you see that?

22  A.  I do.

23  Q.  You read this on cross examination with Mr. Fergenson as

24  well, right?

25  A.  Yes.

O72BGUO4                              Dragon - Redirect

1  Q.  And it reads "Given the tremendous demand for GTV shares

2  and the good capital position of GTV going forward, my lawyers

3  and financial experts mutually agreed that a 2 billion

4  valuation is probably too low."  Do you see that?

5  A.  I do.

6  Q.  And then you were asked some questions by Mr. Fergenson

7  whether a higher valuation was something that you evaluated.

8  Do you recall that?

9  A.  I do recall that.

10  Q.  Now, did you have access to the information that Mr. Guo

11  did at this time in June of 2020?

12          MR. FERGENSON:  Objection, how could he possibly know

13  that.

14          MR. SCHIRICK:  I think he would know.

15          THE COURT:  He doesn't know what Mr. Guo knows, so he

16  can't answer that question.

17          MR. SCHIRICK:  Your Honor, can he answer the question

18  whether he had access to the lawyers and financial expert who

19  were referred to here.

20          MR. FERGENSON:  Objection.

21          THE COURT:  Sustained.

22  Q.  Did you have access to any information about the GTV

23  fundraise apart from what you received in connection with your

24  testimony here today?

25  A.  No.

1    Q.  So you didn't have access to or you don't know whether

2    Mr. Guo had access to a broader set of information than you

3    did, right?

4            MR. FERGENSON:  Calls for speculation.

5            MR. SCHIRICK:  You don't know.  The question is you

6    don't know.

7            THE COURT:  He can answer whether he knows or doesn't

8    know.  You can answer.

9    A.  I don't know what Mr. Guo had access to.

10   Q.  Right.  Now, in order to determine in your expert opinion

11   whether a higher valuation was justified at this point in time,

12   you would need access to a broader set of facts?

13           MR. FERGENSON:  Objection to leading.

14           THE COURT:  You can answer.  Go ahead.

15   A.  I considered --

16           THE COURT:  The question is not what you considered.

17   A.  I would have to have access to additional information if I

18   were to try and determine whether a higher valuation was

19   justified.

20   Q.  Now, at this time your understanding, this time being June

21   2 of 2020, your understanding is that the private placement is

22   closed, correct?

23   A.  That's correct.

24   Q.  So what was said here by Mr. Guo available to GTV investors

25   in the private placement?

1    A.  No.

2    Q.  Now, you were also asked several questions by Mr. Fergenson

3    about statements that were made by Mr. Guo later in time

4    concerning the valuation of GTV.  Do you recall that?

5    A.  I do recall that.

6    Q.  And you were asked some particular questions about a

7    statement about a $60 billion valuation that was made in 2021.

8    Is that right?

9    A.  I was asked about that, yes.

10   Q.  Did you look at information from that point in time to be

11   able to assess whether that valuation estimate was fair at the

12   time it was stated?

13   A.  No, I didn't.  My assignment was to value the company as of

14   the time of the private placement in April 20, 2020.

15   Q.  You were also asked a similar set of questions by

16   Mr. Fergenson about a $48 billion valuation that was implied

17   from something Mr. Guo said in 2021.  Do you recall that?

18   A.  I do.

19   Q.  Same question, did you have access to any information about

20   the valuation of GTV at that point in time?

21   A.  No, I didn't, and that was not in the scope of my

22   assignment.

23   Q.  You were also asked some questions by Mr. Fergenson about

24   G Fashion.  Do you recall that?

25   A.  I do.

O72BGUO4                    Dragon - Recross

1    Q.  Do you know what G Fashion is?

2    A.  Not intimately, no.

3    Q.  Fair enough.  And you weren't asked to value G Fashion,

4    right?

5    A.  That's correct, I was not.

6    Q.  Same question with respect to the Himalaya Exchange.  You

7    weren't asked to value Himalaya Exchange?

8    A.  I was not asked to value the Himalaya Exchange either.

9    Q.  Now, does any of what we just talked about, the 2021

10   statements concerning valuation about GTV affect your opinion

11   as to the value of GTV at the time of the close of the private

12   placement?

13   A.  No, it doesn't.  Valuation experts consider what is known

14   and knowable at the time of the valuation which was April 20,

15   2020, and the window of the private placement memorandum

16   offering.

17              MR. SCHIRICK:  Thank you.  No further questions.

18              THE COURT:  Recross.

19   RECROSS EXAMINATION

20   BY MR. FERGENSON:

21   Q.  Sir, you didn't work at GTV, correct?

22   A.  No, I didn't.

23   Q.  You didn't work at Saraca, correct?

24   A.  No.

25   Q.  In 2020, you didn't work for Miles Guo?

1   A.  That's correct.

2   Q.  In 2020, you didn't do any valuation of GTV, correct?

3   A.  I did not value the company in 2020 if that's the question

4   you're asking.

5   Q.  Thank you, Mr. Dragon.

6           Now, Mr. Schirick asked you questions about other

7   valuations of higher numbers on redirect.  You remember those?

8   A.  I do.

9   Q.  And you testified you didn't have any information about

10  those later valuations; isn't that right?

11          MR. SCHIRICK:  Objection, misstates testimony.

12  A.  What I testified to --

13          THE COURT:  Overruled.

14  A.  What I testified, my assignment was to value the company

15  during the period of the private placement memorandum, and that

16  valuation was known and knowable at the time of the private

17  placement offering.

18  Q.  The materials you reviewed were provided you by the defense

19  lawyers here, correct?

20  A.  That's correct.

21  Q.  You don't have any personal knowledge that factored into

22  your valuation related to GTV, correct?

23          MR. SCHIRICK:  Objection, asked and answered.

24          THE COURT:  You may answer.

25  A.  It depends what you define as personal knowledge.

1   Q.  Well, you relied on the material they gave you; that's fair
2   to say, right?
3   A.  I relied on the materials I was given and also on research
4   I did independently.
5   Q.  Sir, they didn't give you materials to justify a $100
6   billion valuation of G Fashion; fair to say?
7           MR. SCHIRICK:  Asked and answered three times.
8           THE COURT:  You may answer.
9   A.  I'm not sure what the question is.  Could you restate that,
10  please.
11  Q.  They didn't give you, the defense lawyers did not give you
12  materials to conduct a valuation of G Fashion for $100 billion,
13  correct?
14          MR. SCHIRICK:  Same objection.
15          THE COURT:  Overruled.
16  A.  Valuation experts by our professional standards are not
17  allowed to be given a value by legal counsel.  We come to our
18  own independent conclusions.
19  Q.  They didn't give you any documents related to that; is that
20  fair?
21          MR. SCHIRICK:  Objection.
22          THE COURT:  You may answer.
23          MR. SCHIRICK:  Related to what?
24  Q.  To G Fashion and the valuation of it.
25  A.  I was knot hired to value G Fashion.  I was hired to

1    determine the value of GTV at the time of the private placement

2    memorandum.

3    Q.  Did the defense lawyers ask you to value G Fashion in 2021?

4    A.  No.

5    Q.  Did the defense lawyers ask you to value GTV in 2021?

6          MR. SCHIRICK:  Objection, this has been asked and

7    answered repeatedly.

8          THE COURT:  Sustained.

9    Q.  Sir, you don't know what the investors who have testified

10   in this trial have said, correct?

11         MR. SCHIRICK:  Objection.

12         THE COURT:  You may answer.

13   A.  I have not been present at this trial until today, so I

14   have no idea what has been said beforehand.

15         MR. FERGENSON:  No further questions.

16         THE COURT:  All righty.

17         MR. SCHIRICK:  No questions, your Honor.

18         THE COURT:  Thank you.  You may step out, and the

19   defense may call its next witness.

20         (Witness excused)

21         MR. SCHIRICK:  Defense calls Maggie Sklar.

22   MAGGIE SKLAR,

23       called as a witness by the Defendant,

24       having been duly sworn, testified as follows:

25         THE COURT:  Please state your name and spell it,

O72BGUO4                      Sklar- Direct

1   please.

2           THE WITNESS:  Sure.  My name is Maggie, M-A-G-G-I-E,

3   S-K-L-A-R.

4           THE COURT:  You may inquire.

5           MR. SCHIRICK:  Thank you, your Honor.

6   DIRECT EXAMINATION

7   BY MR. SCHIRICK:

8   Q.  Good afternoon, Ms. Sklar.  Where are you presently

9   employed?

10  A.  I'm employed as a managing director at Seda Experts,

11  S-E-D-A experts.  That is a expert witness consultancy firm

12  where I provide expert witness testimony in crypto and

13  financial markets cases.  I also run my own consultancy

14  business, Sklar Strategies where I represent clients in the

15  crypto industry as well as other financial markets industries.

16  Q.  Thank you.

17          Now, Ms. Sklar, can you tell us a bit about your

18  educational background, please?

19  A.  I'm a graduate of Georgetown University.  Georgetown is in

20  Washington D.C. I graduated with a BA in 2001.  I also

21  graduated from Georgetown with a law degree in 2005.

22  Q.  And, Ms. Sklar, have you spent any time in public service?

23  A.  I have.  I was in the government for about a decade.  I

24  started at the CFTC.  That's the U.S. Commodity Futures Trading

25  Commission, and the CFTC is the regulator responsible after

O72BGUO4                          Sklar- Direct

1    Dodd-Frank Act for regulating a lot of financial markets called

2    derivatives.  Also I'm sure you'll ask when we get to crypto,

3    but a lot of focus on crypto as well.

4          While I was there, I started as a special counsel in

5    the division of market oversight where I regulated some of the

6    largest exchanges.  I was associate director for international

7    affairs.  I was also the senior counsel and policy advisor for

8    commissioner, and I was also the senior counsel and policy

9    advisor for Chairman Giancarlo.

10   Q.  Thank you for that.

11         And as part of your work at the CFTC, did you advise

12   on cryptocurrency and blockchain related issues?

13   A.  I did in 2015 when I was advising for Commissioner Wetjen

14   at the CFTC.  The CFTC was the first agency to claim some level

15   of authority over Bitcoin, and so I advised on that matter.

16   But I also while the senior counsel and policy advisor to Chair

17   Giancarlo, also known as Crypto Dad, by the way.  That is the

18   title of his book, but also the title of many of memes and

19   other things in the crypto industry that he has been associated

20   for.  And that is because while I was also working for him and

21   advising him, he testified before Congress for the first time

22   describing what the CFTC could do with crypto, why he was

23   interested, and why he was interested in crypto.

24         And importantly as well, while we were there, while I

25   was there, we approved the first regulated crypto product

O72BGUO4                          Sklar- Direct

1    Bitcoin futures in the United States, as well as the world.  So

2    it gained both attention all across the United States

3    government as well as governments all over the world.

4    Q.  And while you were at the CFTC, did you also advise on

5    crypto exchange related issues?

6    A.  Yes.  So the first Bitcoin futures product we advise on,

7    but others came after that as well, as well as others not just

8    Bitcoin, but other types of cryptocurrency.

9    Q.  And then did a time come when you left the CFTC?

10   A.  I did.  I joined the federal reserve in Chicago as their

11   senior policy advisor and director of international engagement

12   for financial markets.

13   Q.  And while you were at the federal reserve, did you also

14   advise on crypto-related issues?

15   A.  I did.  I did internally as well as continue to do speaking

16   engagement externally as well on crypto.

17   Q.  And then following your work for the federal reserve, what

18   did you do next?

19   A.  I went to -- I became a partner at Davis Wright Tremaine

20   which is a large international law firm, and I was in the

21   banking and financial services practice.

22   Q.  And did a time come when you left the law firm?

23   A.  I did at the end of last year to join Seda Experts and do

24   my own consultancy, but also in between I also was the chair of

25   the public policy and regulation committee for the Global DCA,

1   which is the Global Digital Asset and Cryptocurrency

2   Association.

3   Q.  That's a trade association of some sort?

4   A.  Yes.

5   Q.  Ms. Sklar, do you also have speaking engagements that you

6   participate in?

7   A.  I do.  I've spoken on cryptocurrency and blockchain issues

8   at most major industry associations, including, for example,

9   SIFMA which is the Securities Industry Association, as well as

10  specifically crypto associations.  Most recently just last

11  month at the Government Blockchain Association, but also for

12  academic institutions, I think most recently at Duke

13  University.

14  Q.  Now, what is your connection to this case?

15  A.  I was hired to discuss cryptocurrency and the blockchain.

16  Q.  Are you being compensated for your work on this matter?

17  A.  I am.

18  Q.  And how?

19  A.  I'm being compensated at an hourly rate through Seda

20  Experts which is the firm I work for.

21  Q.  And what is your hourly rate?

22  A.  For this case 1450 an hour.

23  Q.  And approximately how much have your fees been as part of

24  this matter to date?

25  A.  I think around now maybe 70,000 maybe 60,000, but around

O72BGUO4                         Sklar- Direct

1   there.

2   Q.  And has the defense team covered your costs for traveling

3   to testify here today?

4   A.  Yes, on Amtrak and staying at hotels locally, yes.

5   Q.  Ms. Sklar, does your compensation depend in any way on the

6   outcome of this case?

7   A.  No, it does not.

8   Q.  Does your compensation depend on whether you testify a

9   certain way?

10  A.  No, it does not.

11  Q.  Before you were engaged in this matter, had you and I

12  worked together before?

13  A.  No, we have not.

14  Q.  And how about any other members of the defense team, before

15  your engagement on this matter, had you worked with any other

16  members of the defense team before?

17  A.  I have not.

18  Q.  And then how about Mr. Guo, had you ever done any work for

19  Mr. Guo before your engagement on this case?

20  A.  No, I have not.

21  Q.  Now, did we prepare for your testimony here today?

22  A.  Yes, we've met before, yes.

23  Q.  And do you recall approximately how many times we met?

24  A.  I think about four times in person and maybe three times on

25  zoom.

O72BGUO4                         Sklar- Direct

1   Q.  Now, Ms. Sklar, did you review certain materials as part of

2   your preparation for testimony here today?

3   A.  Yes, I did.

4   Q.  What materials did you review?

5   A.  I reviewed the indictment.  I reviewed the exchange's white

6   papers.  I reviewed third-party contracts related to the

7   exchange, Armanino, Certik, Bitgo.  I reviewed certain

8   testimony and I reviewed the blockchain.

9           MR. SCHIRICK:  Your Honor, the defense offers

10  Ms. Sklar as an expert in cryptocurrency and cryptocurrency

11  exchange blockchain issues.

12          MR. HORTON:  Your Honor, we have two discrete issues

13  to raise at sidebar.

14          THE COURT:  Okay.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O72BGUO4                          Sklar- Direct

1              (At the sidebar)

2              MR. HORTON:  Thank you, your Honor.  This is an expert

3    witness who is also a lawyer who has worked at the CFTC

4    regulatory agency jurisdiction in this country.  We'd ask given

5    that background, given that her subject matter is not sort of

6    the law of crypto, but rather mechanics in the normal

7    cryptocurrency industry that your Honor give a brief

8    instruction.  Instructions on the law in this case should not

9    come from a lawyer.  That will come from your Honor.  So we ask

10   for that instruction given this is the first lawyer witness in

11   the case.  Then there's two issues that come out of the path up

12   to qualifying her.

13             THE COURT:  Can I interrupt you.  Are you expecting

14   that she is going to be giving legal expert testimony?

15             MR. HORTON:  I don't know.  But given that apart of

16   establishing her expertise was that she's a lawyer.  She went

17   to law school, worked at regulatory agency.  She a got law

18   degree from Georgetown.  She was a lawyer at CFTC to

19   commissioner at the CFTC.  I think it qualifies that we're not

20   getting instructed on the law of cryptocurrency.  That will

21   come shortly from the Court.  She's testifying as to something

22   else.

23             THE COURT:  So are you expecting her to testify on

24   legal conclusions?

25             MR. SCHIRICK:  No, your Honor.  The disclosure in this

O72BGUO4                    Sklar- Direct

1    case have been clear that Ms. Sklar is not being called to

2    testify as a legal expert.  She's being called to testify for

3    her expertise into the industry.

4         MR. FINKEL:  Another point, your Honor.  She worked at

5    the CFTC.  She knows what is legal and isn't legal, not

6    specific to the law.  The law will come from your Honor and

7    that should be --

8         THE COURT:  Could you repeat the scope of the

9    qualification that you're asking for.

10         MR. SCHIRICK:  She's being offered as an expert in

11   cryptocurrency, the functioning of cryptocurrency exchanges and

12   relatedly blockchain.  And I will add, because I foresee the

13   government raising this in a moment, that she is not being

14   offered for having conducted some forensic analysis from a sort

15   of code software expert point of view.  She's not an expert in

16   software.  She's not an expert in coding.  She's being offered

17   as an industry expert in how things work.

18         MR. FINKEL:  Your Honor, on that point if I may.  The

19   other day I think last week I raised an issue that we ask a

20   couple of questions of defense whether she reviewed the

21   blockchain and whether she reviewed the smart contract.  And

22   your Honor directed defense to confer with us, and the

23   government and defense, me and Mr. Schirick and Ms. Murray, had

24   a very good conversation.  In that conversation we were told by

25   Mr. Schirick she did not review and analyze the blockchain.  She

merely looked to see on Etherscan that there was a blockchain

available.  Ms. Sklar just said she reviewed the blockchain,

analyzed the blockchain in this case.  That's beyond the scope

of her disclosure, and it's not permitted.  And to the extent

Mr. Schirick is going to go against what's in the disclosure,

and frankly is different than what we discussed which is really

disappointing, we would have put that in our letter.  We

flagged a lot of issues for your Honor.  She can't testify

about the blockchain or analysis she did on the blockchain,

what was happening on the blockchain.  One, she's not qualified

to do that, and we would object to her qualification on that

issue.  She's an attorney who worked on contract.  And more to

the point, it's not in their disclosure that she analyzed the

blockchain, and we were told that she wouldn't testify to that.

MR. SCHIRICK:  If I could respond to that, please.

THE COURT:  I just want to go back to what you said.

You said you want me to qualify her as an expert in

cryptocurrency and the functioning of cryptocurrency exchanges

and relatedly blockchain, so.

MR. SCHIRICK:  Cryptocurrency, as your Honor well

knows, operates on a blockchain.  So to the extent that she

needs to -- I expect to ask her if she knows she can explain

what a blockchain is at a high level, how it functions.  We're

not going to need to get into too much detail than that.  It's

pretty basic description of how it works.  Does that answer

1    your Honor's question?  If I may respond to Mr. Finkel's point.

2              THE COURT:  Go ahead.

3              MR. SCHIRICK:  I have to say, first of all, I'm a bit

4    disappointed how that conversation was reported.  I don't

5    believe that that is how that conversation went, and I listened

6    to you and I'd appreciate it if you'd listen to me.  I never

7    said that she wasn't going to testify that she looked at the

8    blockchain.  In fact, I was very specific as to the disclosures

9    in this case that have been very specific that she can use

10   publicly available tools such as Etherscan.  This was something

11   that was an issue in briefing before your Honor and the motions

12   was to preclude.  We were very clear.  She used publicly

13   available resources like Etherscan to look things up on the

14   blockchain which is something that frankly either of us can do.

15   It certainly helps that she has the expertise, and she is going

16   to testify to observations that she made based on using those

17   publicly available tools.  That is the distinction.

18              If I understood you correctly, Mr. Finkel, you were

19   asking whether she was going to testify whether she did some

20   forensics of all of the movements of the tokens on the

21   blockchain.  She did not do comprehensive analysis of that, but

22   she can testify to things that she sees using publicly

23   available resource and tools, some of which will be whether

24   they exist, whether the token exist, where they were at certain

25   points when they were created.  None of which is the subject or

O72BGUO4                          Sklar- Direct

1  needs to be the subject of any forensic analysis.

2          MR. FINKEL:  I don't want to get into a back and forth

3  about the conversation between Mr. Schirick, Ms. Murray and

4  myself, but that's not an accurate reflection of what

5  Mr. Schirick told us about Ms. Sklar's testimony.  And we had

6  that conversation to avoid this one to have to bring the issue

7  to your Honor.  The point is that Ms. Sklar we had understood

8  could say that she went on Etherscan, which is a publicly

9  accessible tool and saw that there is a smart contract on the

10  blockchain.  They exist.  We didn't call our expert.  We will

11  on our rebuttal.  He will testify there is really no activity

12  on the blockchain.  To the extent she is going to say anything

13  more than there is a blockchain which exist, Mr. Schirick, we

14  don't object to that fact that she saw there is a blockchain --

15          MR. SCHIRICK:  You mean the tokens on the blockchain?

16          MR. FINKEL:  No, no.  There is a blockchain.  If I

17  could just finish.  She cannot testify -- she's not an expert

18  on it, number one.  Number two, it's not disclosed she saw any

19  transactional activity on the blockchain, or what it means or

20  the analysis of it.  That's beyond the scope of her testimony.

21  Her testimony, as we already understood, they had a contract

22  with Bitgo.  They got Armanino.  They have white paper.  They

23  have certificates.  All that suggest it's a cryptocurrency or

24  whatever it's going to say.  But any analysis of what's

25  occurring on the blockchain that's what our expert disclosed in

O72BGUO4                          Sklar- Direct

 1   detail what he saw on the blockchain.  Ms. Sklar did not, and

 2   so that's a disclosure problem.  And two, she's a regulator.

 3   She doesn't know about blockchain.  She doesn't have a chain

 4   analysis.

 5          THE COURT:  Is that information publicly available,

 6   the transactions?

 7          MR. SCHIRICK:  Yes, your Honor.

 8          MR. FINKEL:  The transactional information is public,

 9   however, what it means and how it's interpreted requires

10   expertise, and she is not suited to deliver that opinion,

11   number one.  And more to the point, your Honor -- and this is I

12   think the problem, it wasn't disclose.  It's not in her

13   disclosure, so we're not prepared for it at all for her to say

14   these movements and these transactions back and forth.

15          MR. SCHIRICK:  Your Honor, I'm happy to refer the

16   Court to the ruling dated May 17 on Ms. Sklar's testimony.  The

17   relevant portions are highlighted here.  It's a publicly

18   available tool.  It's used to review the blockchain, and your

19   Honor held gives them a fair opportunity, the disclosure was

20   adequate and gives them a fair opportunity on cross.

21          MR. FINKEL:  What that says is different than what

22   Mr. Schirick just said she's going to testify about.

23          THE COURT:  Let me just read this again.  So I said

24   that Guo clarified that "publicly available" information is a

25   "reference to the publicly available blockchain on which HCN

O72BGUO4                          Sklar- Direct

 1  and HDO were minted which was available to view using website

 2  called Etherscan."

 3          What I understand the government to say is that she

 4  did not go into her specific observations; am I correct?

 5          MR. FINKEL:  That's exactly right.  We can't go

 6  further than what the Court's order says.

 7          MR. SCHIRICK:  Of course she has observations.  What's

 8  the point of looking up the information on the blockchain?

 9  That's the only reason one would do that?

10          THE COURT:  So she's not here to merely state the

11  transactions she observed, you want her to interpret what that

12  activity means.  Am I correct?

13          MR. SCHIRICK:  Your Honor, I believe her testimony is

14  going to cover the fact that she looked these tokens up on

15  Etherscan.  She can tell that there was movement of the token,

16  which is obvious using Etherscan.  She can testify they were

17  created, dates they were created.  This is all information that

18  was publicly available via Etherscan.

19          THE COURT:  It's one thing to state that the

20  information is available publicly.  You can look it up using

21  Etherscan.  It's another thing to get into the specifics of the

22  actual transactions.

23          MR. SCHIRICK:  She can see the transactions on the

24  blockchain just the way that or anyone can.  It's mere

25  observation.

O72BGUO4                          Sklar- Direct

1            THE COURT:  That brings me back to the question that I

2       asked.  So, sure, she can say what's there, but the question is

3       her interpretation of that activity, what it means?

4            MR. SCHIRICK:  The blockchain not only records, as

5       your Honor knows, static snap shots of where tokens are at a

6       given point in time.  It also reports transactions.  That's the

7       nature of it inherently is that it records transactions.  It

8       makes them publicly available.  It's no different than saying

9       she observed transactions.  So, I mean, that's the same thing.

10      It's enabling her to say, I saw the tokens on the blockchain

11      and observe transactions.

12           THE COURT:  What was your disclosure of your expert?

13           MR. FINKEL:  The disclosure -- there are a few things

14      sort of circling The disclosure.  Our expert did an analysis of

15      the blockchain.  He traced the movement in the blockchain.  He

16      determined that according to the blockchain 99.9 I think 99

17      percent of HCN and HDO were owned by the Himalaya Exchange.

18      There's very few transactions on the blockchain, despite the

19      fact that HCN and HDO were according to the market

20      capitalization it makes it the sixth most valuable

21      cryptocurrency.  Essentially his opinion is that the value of

22      HCN and HDO as reported on the Himalaya Exchange doesn't fit

23      with the number of the transactions on the blockchain, plus the

24      concentration of the ownership on the blockchain suggest that

25      it's entirely controlled by the Himalaya Exchange which implies

O72BGUO4                         Sklar- Direct

1   that it's not a true cryptocurrency because it's not owned by

2   the publicly and it's not useable by the public.

3           To get back to sort of Ms. Sklar, and the problem is

4   twofold.  One is, I hate to say this, but we were told in

5   explicit terms that Ms. Sklar would testify that she could see

6   HCN and HDO on Etherscan.  And the fact that they're available,

7   exactly what your Honor's ruled is part of her opinion, we

8   don't object to that.  What we object to is what Mr. Schirick

9   is now saying which is different than what he told us Thursday.

10  It's a little frustrating and I apologize for being frustrated

11          MR. SCHIRICK:  I share the frustration.

12          MR. FINKEL:  I'm glad you do.  What Mr. Schirick now

13  said is she went on the blockchain and saw transactional

14  movement on the blockchain.  That's an analysis of what's going

15  on.

16          MS. SHROFF:  No, it's not.

17          MR. FINKEL:  Excuse me.  Excuse me.  Why then didn't

18  you tell us that?

19          MS. SHROFF:  He did.

20          MR. FINKEL:  You weren't part of the conversation.

21          THE COURT:  All right.  Please direct your comments to

22  me, Ms. Shroff.

23          MR. FINKEL:  You don't.

24          THE COURT:  Mr. Finkel, direct your comments to me.

25          MR. FINKEL:  I'm sorry.  The fact that she is now

O72BGUO4                         Sklar- Direct

1   going to analyze what she saw on the blockchain, we don't know

2   what that analysis is.  There's no opinion about it in the

3   disclosure.  The mere fact that it existed that was disclosed.

4   What your Honor wrote is disclosed, and that's fair.  But going

5   beyond that saying she saw movement back and forth and what

6   that movement means, we don't know her opinion.

7           MR. SCHIRICK:  I feel, your Honor, that this is why

8   just one more comment to reiterate.  Unlike many other kinds of

9   records or data, a blockchain is unique in that it reflects

10  movements that you can see moving, right.  You don't need

11  someone to interpret the blockchain when you can -- let me

12  finish.  You don't need someone to interpret it in the same way

13  because you can see movement on the blockchain.  So she will

14  offer her observations about those movements which she can see

15  which are publicly available, which are publicly accessible

16  through Etherscan.  There's nothing about that that goes beyond

17  the bounds of what your Honor ruled on, nor is there anything

18  about that that goes beyond the bounds of what our disclosures

19  were.

20          MR. FINKEL:  It's not in the disclosure.  That's the

21  problem.

22          THE COURT:  She's not going to say what she observed.

23  She's going to draw a conclusion from that?

24          MR. SCHIRICK:  No, your Honor.

25          THE COURT:  What use is it to you if she can't draw a

O72BGUO4                         Sklar- Direct

1    conclusion?

2              MR. SCHIRICK:  Well, she doesn't need -- I think we

3    get to the conclusion that we need to without necessarily

4    needing to rely on the kind of analysis.  There's lots of ways

5    to do that.  We don't need to do the kind of analysis that

6    they're expert did.

7              THE COURT:  You plan to elicit from her a series of

8    transactions and then for you to draw the conclusion yourself?

9              MR. SCHIRICK:  No, your Honor.  Just to back up for a

10   second.  I haven't even -- we just got to the part where we're

11   offering her as an expert.  I haven't even asked specifics.

12   This is all being done in the abstract which I recognize is

13   difficult for us and particularly for the Court to analyze.  I

14   haven't asked a single question about this topic.

15             THE COURT:  But he's anticipating and it sounds to me

16   like you're going to where he thinks you're going to go.

17             MR. SCHIRICK:  I'm not sure that's true.  Again, we

18   may have a disconnect over what is publicly available, publicly

19   accessible, and what a witness can report they observed which

20   is frankly, your Honor, as far as we plan to go.

21             THE COURT:  What exactly do you expect her to state?

22             MR. SCHIRICK:  I expect her to state that she use

23   Etherscan to look up the token to confirm they were created, to

24   see the date on which they were created, the wallets in which

25   they were held when they were created and the fact that

1    those -- that both cryptocurrencies are moved at different

2    points in time, which you can see on the blockchain, and that

3    those facts are frankly the only facts that she needs.  We

4    don't need to get into anything else.

5            MR. FINKEL:  Can I respond to that?

6            THE COURT:  Yes.  So my law clerks have pointed out to

7    me that page three of Mr. Kamaraju's letter dated April 29,

8    2024, paragraph D, which states, As a result of this structure

9    typically when a user trades cryptocurrency through a

10   centralized exchange, that trading activity would not be

11   reflected on the blockchain because the cryptocurrency is not

12   actually being transferred from one wallet to another.  So this

13   does sound like there is --

14           MR. FINKEL:  So that concept, it is disclosed.  The

15   notion of that that's an off-chain transaction, which

16   Mr. Schirick explored extensively on cross of Jesse Brown and

17   Sam Roberts, that concept of what an off-chain transaction is,

18   they're free to ask her about.  Your Honor allowed them to do

19   that. What is not disclosed -- they can point it to us if it

20   is -- her analysis of movement on the blockchain she observed

21   and what that means.

22           THE COURT:  You're distinguishing the public versus

23   the non-public.

24           MR. FINKEL:  No, I'm distinguishing the concept of how

25   blockchains work and off-chain transactions versus the actual

O72BGUO4                          Sklar- Direct

analysis of HCN and HDO specific blockchain.  She did disclose

that -- Ms. Sklar did disclose, and I don't contest.  She can

speak to the general nature of how blockchain-s work and the

general nature of off-chain transactions.  What is not

disclosed is the specific transactions that she observed on HCN

and HDO reported blockchains.

        And telling me -- I don't need to belabor this, but

I'll just leave it at that.  That's not in there.  And I don't

believe that defense counsel can point to something that says

that it is.  An analysis of what actually happened to HCN and

HDO that she observed and necessarily informs her view because

if it didn't inform her view, why are they asking her.  If she

wants to generally speak about how blockchains work and your

Honor permits her to do that, I believe that's fine.  But to go

specifically to the HCN and HDO blockchain and say I saw this

is the concentration of ownership and this is the movement on

blockchain and that is a real cryptocurrency, it's not

disclosed.

        MR. HORTON:  Your Honor, with respect to this

highlighted paragraph, the difference is typically an exchange

has off-chain activity like saying typically banks report

customers' audits in internal ledgers, a typical factor she has

from the knowledge with regulating the space.  That's different

from saying, and I looked at 100 terabytes of Bank of America's

internal ledger, and I saw that customer John Doe did this

1    transaction in this currency became larger. The general fact

2    that it's her experience is regulating the exchange, they often

3    have this kind of transaction.  It's a common transaction.

4    It's totally different from, I'm now going into a particular

5    database and analyzing it with from within.

6             MR. SCHIRICK:  Last point because there's some

7    confusion here.  There aren't HCN and HDO blockchain.  There is

8    no such thing.

9             MR. HORTON:  They're on the ethereum blockchain.

10            MR. FINKEL:  And their transactions are recorded.

11            MR. SCHIRICK:  I don't think you know this space

12   because you wouldn't say that if you did.

13            MR. FINKEL:  I do, and our expert will say it.  Please

14   don't impune my integrity.

15            MR. SCHIRICK:  There is a blockchain.  This is the

16   ethereum blockchain, which your Honor knows well.  The question

17   is merely using -- and the blockchain is publicly available.

18   There are ways to look at it.  You don't need to have any

19   special experience or access to information.  You can do it if

20   you know how to use it and use Etherscan.  All she's done is

21   employed those publicly available tools to look at a publicly

22   available resources and make the observations just the same as

23   any witness would make observations about things that happen

24   around them or what they saw or what they heard and what they

25   smell.

O72BGUO4                          Sklar- Direct

1          THE COURT:  The problem that I have is she's an

2     expert, and it would be appropriate for her to be making those

3     observations and drawing conclusions if she had discussed that

4     in her disclosures, and this is what I'm not seeing.  I see a

5     general statement, but I don't see the specific analysis.

6          MR. SCHIRICK:  I'm happy to go back and look at this

7     and find the disclosure for your Honor.  I thought that the

8     reference that your Honor made in your opinion picks up the

9     disclosure that this is something that's publicly available and

10     in a viewable view in Etherscan.

11          THE COURT:  That's not what I meant.  I understood of

12     course that that material is publicly available, but it's

13     different to say that she's permitted to now testify about

14     these specifics without having first disclosed them.

15          MR. SCHIRICK:  My point, I understand the Court's

16     point.  My point, your Honor, your opinion was based on our

17     disclosures.  That's all that the Court had at the time that

18     you wrote the opinion was our disclosures and the government

19     challenged our disclosures, so that's why I think the fact that

20     it's in the opinion shows that it was disclosed.  I think your

21     Honor quoted from our disclosures, and I'm happy to take a

22     look.  I don't have it in front of me.

23          THE COURT:  If you want to point me to something

24     that's specific; in other words, that tracks what you expect

25     her to say today, then fine, but I think that what the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O72BGUO4                         Sklar- Direct

1    government is saying is that you can't do that, that there is

2    no search specific information.

3                MR. SCHIRICK:  If your Honor would indulge me to give

4    me two minutes to look through.

5                MR. FINKEL:  Your Honor's right.  I think the

6    conflating on what we don't object which is the general concept

7    of how blockchains work and the specifics of the analysis.  If

8    Mr. Schirick is telling us he's going to point to anything in

9    disclosure, here is my analysis --

10                MR. SCHIRICK:  I just said I'm going to try to do

11    that.

12                THE COURT:  Go ahead and I'll wait for you.

13                MR. SCHIRICK:  Are we close to the 2:30 break?  Would

14    it make sense --

15                THE COURT:  I suppose the question of how quickly you

16    can get to that information.  We have six minutes.

17                MR. SCHIRICK:  I'll try.  Thanks.

18                (Continued on next page)

19

20

21

22

23

24

25

O72BGUO4                           Sklar- Direct

 1                (In open court; jury present)

 2                THE COURT:  Members of the jury, it's time for our

 3     2:30 break.  We will continue at 3:00.  Remember, you're not to

 4     discuss the case amongst yourselves or with anyone else. Don't

 5     permit anyone to discuss the case in your presence.  Don't

 6     read, watch or listen to anything from any source that touches

 7     on the subject matter of this case.  Ma'am, you may step out,

 8     don't discuss your testimony.

 9                THE LAW CLERK:  Jury exiting.

10                (Jury not present)

11                THE COURT:  Counsel if you step up again.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MS. SHROFF:  Somebody seems to left our binder at the

3    office. We are reprinting them now, and we'll have it for the

4    Court shortly.

5              THE COURT:  Is what you're talking about something

6    different from what this April 29, 2024 letter?

7              MR. SCHIRICK:  I would have to go through because we

8    have two disclosures.  This was the supplemental disclosure.

9              THE COURT:  I think it's the same.  I'm looking on

10   page three paragraph G which says, that evidence that there is

11   not substantial on-chain trading or redemption activity of a

12   token such as is the case with HCN and HDO does not demonstrate

13   that the token is not a cryptocurrency.  So here she's

14   referring to her observation of an absence of activity to draw

15   the conclusion that does not mean that HCN and HDO are not

16   cryptocurrencies, so there is some reference to the specific

17   activity.

18             MR. FINKEL:  That one activity, yes.  But what we

19   understand from the questioning and from Mr. Schirick's answers

20   to your inquiries at sidebar is that she did more than that.

21   She performed an analysis on what was on the chain.  She looked

22   to see how -- who was being moved to who, the concentration of

23   ownership.  If they want to ask that one question that was

24   disclosed, then they can do that.  But all we're trying to do

25   is protect what we were disclosed under Rule 16.  Mr. Schirick

O72BGUO4                          Sklar- Direct

1     hasn't identified any other Rule 16 disclosure to suggest that

2     they're entitled to offer an opinion as to more.  That's all.

3                THE COURT:  Did you want to go beyond what's stated in

4     G?

5                MR. SCHIRICK:  I think G and two, Roman 2.2 which is

6     the minting.

7                THE COURT:  What page are you on?

8                MR. SCHIRICK:  This is page two.

9                THE COURT:  So you are referring to, "Ms. Sklar will

10    also opine that in the cryptocurrency industry there is a

11    common market understanding that a cryptocurrency is digital

12    currency that uses blockchain technology to record transactions

13    on a distributed ledger.  Cryptocurrencies are frequently

14    created pursuant to self-executing smart contracts and are used

15    as a store of value.  She will further opine that given that

16    HCN and HDO each were minted using smart contracts which can be

17    seen on the public ethereum blockchain and are purchased using

18    fiat currency and traded, they meet the common market

19    understanding of cryptocurrencies.  Finally, Ms. Sklar will

20    opine that they based on the white papers HCN was designed to

21    operate as a trade-in coin and HDO was a stable coin."

22                MR. HORTON:  If I might address that?

23                THE COURT:  Yes.

24                MR. HORTON:  We spent a lot of time in preparing for

25    today's testimony there.  There's a single opinion in paragraph

1   two about something that can be seen on the blockchain.  Set

2   aside whether they're saying something can be seen means that

3   she went and saw it and analyzed it.  But she says can be seen

4   are the smart contracts for HCN and HDO.  Those are two

5   discrete documents, one each.  Those are the constitutional

6   documents so to speak, the formation documents for these

7   tokens.  Saying if you go on Etherscan you can see there was a

8   smart contract for HCN and a smart contract for HDO, that's

9   what we understood.  That is what paragraph two says.  That's

10  got nothing with them saying, and then I analyzed and here's

11  the import of that.

12          MR. FINKEL:  Or the analysis of the smart contract

13  itself.

14          MR. HORTON:  It can be seen.

15          MR. SCHIRICK:  Your Honor, I just want to point out

16  for the record that in --

17          THE COURT:  Where are you.

18          MR. SCHIRICK:  -- in paragraph 5E which may or may not

19  be the paragraph your Honor may have been reading from before.

20  Yes, 5E second sentence relating to redemptions.

21          THE COURT:  For similar reasons?

22          MR. SCHIRICK:  Yes.

23          THE COURT:  It starts, "Furthermore centralized

24  cryptocurrency exchanges permit their users to redeem or

25  convert their cryptocurrency tokens into the equivalent value

1    and fiat currency, such as U.S. dollars.  For similar reasons,

2    such redemptions would also not typically be reflected on the

3    blockchain.  Because even though the user is trading their

4    token for fiat, there is no transfer of cryptocurrency between

5    wallets, rather cryptocurrency remains in the exchange's wallet

6    and a corresponding debit is made in the user's account on the

7    exchanges's internal ledger."

8            MR. HORTON:  Once again, that paragraph uses the word

9    "typically" as the other paragraphs do to describe what she

10   understands as typical features, not of the Himalaya Exchange,

11   but of cryptocurrency exchanges writ large based on her general

12   knowledge of the industry.  Nothing in that paragraph of that

13   particular analysis that was undertaken for purposes of her

14   testimony.  To say that typically you see future A at industry

15   institution B, is totally different from saying, and then I

16   went in and look, and it matches the normal typical features

17   that I'm going to opine about.

18           MR. FINKEL:  She's always been an expert and that's

19   what she's been qualified to do to talk about industry

20   practices and what she's interacted with the CFTC.  We objected

21   to that, your Honor, but we're not revisiting your Honor's

22   conclusion.  What we understand they're now seeking to do is an

23   analysis of those smart contracts and of the blockchain, which

24   is not what's disclosed.  And there still hasn't been in all

25   this time Mr. Schirick saying, no, look, this is her opinion

O72BGUO4                          Sklar- Direct

1    about the blockchain.  She can testify, because your Honor

2    ruled that she can, about, as Mr. Horton just said, how

3    cryptocurrency exchanges typically operate, but not to take it

4    a step further which is, and I looked at the HCN and HDO smart

5    contracts or the HCN and HDO blockchain and determine these two

6    purported cryptocurrencies are tokens or credits whatever

7    phrase you want to use act consistently with what is

8    specifically market practice.

9         MR. SCHIRICK:  Your Honor, what's clearly disclosed

10   here is that she used publicly available tools as I said before

11   to make observations, right, to make observations about what

12   exist and what happened, all of which I don't think -- I hope

13   anybody would argue is beyond the ability of an expert to

14   testify when third-parties otherwise qualified to testify about

15   observations in their industry, right.  And then we've also

16   made clear that she's going to infer certain things from those

17   observations and infer certain things from the lack of

18   transaction or the absence of transaction which is a different

19   inference than the government wants to draw, but it's an

20   inference nonetheless that's permissible with an expert

21   testifying based on her own observation that again are mere

22   observation.

23        We don't need to be clear.  We don't need her in our

24   review to conduct the same sort of analysis.  There's more than

25   one way to skin a cat to conduct the same sort of analysis that

O72BGUO4                          Sklar- Direct

the government's expert conduct.  She can offer her view based
on what she saw and based on inference from what she didn't see
and that's entirely permissible.

          THE COURT:  So my understanding is that she does not
go into any specific about what she saw in the disclosures?

          MR. SCHIRICK:  We did state, your Honor, that she
looked at the blockchain, that she reviewed and made
observations about what was happening on the blockchain.

          THE COURT:  She doesn't share those observations with
the government or with me.

          MR. SCHIRICK:  It's no different than saying we showed
an expert a document dated April 29, 2024.  Do we need to go
and say, here are all the things that are in that letter dated
April 29, 2024.  It's the same thing as saying she looked at
the document.  She looked at the blockchain.  It's the
equivalent.

          MR. FINKEL:  The prior expert is instructive here.
Mr. Dragon I believe it was disclosed reviewed the PPM.  As
part of his analysis of the PPM, he reached the opinion of the
$2 billion valuation was appropriate. That's the opinion.  Here
there's no opinion about what her analysis was of the
blockchain.  As your Honor just pointed out, she reviewed it.
She looked at it.  It doesn't mean we know what her opinion is.
That's what Rule 16 disclosures are all about. And they still
haven't pointed to exactly what your Honor's question was, what

O72BGUO4                          Sklar- Direct

1   was the observations that she had that informed her opinion to

2   inform the government and to inform your Honor when your Honor

3   ruled on this.  This is simply a disclosure issue.  And it's

4   just a question of -- just to be clear, we do not object --

5   because your Honor already ruled on it -- general practices are

6   fine.  But with respect to what she reviewed specifically and

7   had formed an opinion on HDO and HCN smart contracts and

8   blockchain activity it's not the same thing.

9          THE COURT:  My understanding is that the government is

10  not challenging the conclusions that are stated in Mr. Kamaraju

11  April 29, 2024 letter.  They're not saying she cannot draw

12  these conclusions.  What they're objecting to is going into a

13  granular analysis that has not previously been disclosed.  Am I

14  correct?

15         MR. FINKEL:  Yes.

16         THE COURT:  I think that is only fair that she has to

17  stick to what has been disclosed as oppose to what's coming up

18  with brand new data that is not --

19         MR. SCHIRICK:  To be clear, there's no new data.  I'm

20  frankly hopeful that when we get to the specific questioning on

21  this issue some of this will be obviated by seeing where we

22  take the specific questioning.  I just want t be clear in the

23  interest of being efficient and having minimal interruption, I

24  am permitted to ask what she viewed on the blockchain using

25  Etherscan that seems foundational.  That was clearly disclosed,

O72BGUO4                         Sklar- Direct

1    and in fact referred to in your Honor's opinion.

2           MS. SHROFF:  An observation is different from an

3    analysis of the observation.  That's the distinction I think

4    that the government doesn't --

5           MR. FINKEL:  Her answer is the analysis of the

6    observation.

7           MS. SHROFF:  No, it's not.

8           MR. FINKEL:  This is frankly a replay of what happened

9    with Mr. Dragon. Your honor made a pretty clear ruling of where

10   Mr. Schirick could or could not go, and he tried to get around

11   it.  I don't think that's appropriate with another expert here.

12   She didn't disclose it.  It hasn't been disclosed. They

13   shouldn't be able to put information the government didn't have

14   an opportunity to prepare for in front of the jury.

15          THE COURT:  They can't cross-examine her adequately if

16   they're just getting this information for the first time.

17          MR. SCHIRICK:  They're not, your Honor.  The fact is

18   we said use this tool to look up publicly available

19   information, the same publicly available information that their

20   expert looked at that.  They're well-aware of that.  They had

21   analysis.  There is no surprise here whatsoever, your Honor.  I

22   think at the end of the day we have clearly disclosed that she

23   used this tool to look at what's publicly available on the

24   blockchain, and I think everybody would agree that was

25   disclosed, that was incorporated in your Honor's May 17

O72BGUO4                            Sklar- Direct

1    opinion.  It seems to me that should be fair game.

2              MR. HORTON:  The question is not whether there's new

3    data in the world. The question is what data is in the Rule 16

4    disclosure the purpose of which is to put us on notice so we

5    can prepare for the cross examination.  This document which was

6    their second notice by the way.  They supplemented deficient

7    notice to provide your Honor says that she observed particular

8    discrete things on the blockchain; namely, two smart contracts.

9    That's what it says.  That's what it said for two months now.

10   We've been talking about this document for 25 minutes, and it's

11   not clear what it means because we're still looking at it.

12             MS. SHROFF:  It's like talking about the number six

13   train and saying there's six stops on the number six train.

14   We're not seeking to analyze the six stops, but the six stops

15   are completely apparent.  They know the six stops.  I know the

16   six stops.  What is the issue?

17             THE COURT:  I think the problem is that they don't

18   know.  That's the problem.

19             MS. SHROFF:  The six stops -- I think that's what

20   Ms. Schirick it's saying.  It's all publicly available.  We

21   know they have it is because their expert has it and opine on

22   it for us.

23             MR. FINKEL:  Rule 16 doesn't have an exception that if

24   the government's expert did something and reached an entirely

25   different conclusion than Ms. Sklar by the way, that somehow

O72BGUO4                         Sklar- Direct

1    makes it okay.  There's no exception to that.  We don't know

2    what her view is.  We know her view is ultimately different

3    than our expert's view, and we know that our expert disclose

4    discrete aspects of what he observed and traced on the

5    blockchain.  Ms. Sklar did not disclose that.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O721GUO5

         (At the sidebar, continued)

         THE COURT:  Yours sort of goes into specifics,

correct?

         MR. FINKEL:  Yes.

         THE COURT:  All right.  Well, it should be parallel,

and I'm not going to permit you to go beyond what was

disclosed.  That is my ruling.

         MR. SCHIRICK:  And I just want to be clear, your

Honor.  Am I permitted to ask, did you use Etherscan to observe

the blockchain?

         THE COURT:  Absolutely, because that has been

disclosed.

         MR. SCHIRICK:  Okay.  And what did you observe?

         THE COURT:  What I want you to do is to study what was

disclosed, and you'll see, from looking at Mr. Kamaraju's

words, what had been disclosed, and that's what you can go

into, not into this granular analysis.

         MR. SCHIRICK:  I don't think there's any granular

analysis, your Honor.  I just want to make sure, when I ask,

what did you observe, in a non-leading fashion, that the

government's not going to jump up and object to her saying she

saw them manipulated on the blockchain, which is clearly

disclosed, that she saw that.  That's clearly disclosed.

         THE COURT:  One way to handle this is for you to ask

leading questions that have been agreed to in advance so that

O721GUO5                                Sklar - Direct

1     we don't get into her saying something she should not say.  So

2     why don't you come up with the leading questions, between the

3     two of you.

4                    ALL COUNSEL:  Thank you, your Honor.

5                    (Recess)

6                    (In open court; jury not present)

7                    THE COURT:  Have the parties come to a conclusion?

8     You're winding up?

9                    MR. FINKEL:  I think we have, but we just need one

10    minute.

11                   THE COURT:  Okay.  All righty.

12                   MS. SHROFF:  Your Honor, may we have the witness take

13    the stand?

14                   THE COURT:  Sure.

15                   MR. FINKEL:  So, your Honor, we've agreed to two

16    questions, to be asked in a leading fashion.  The government

17    does not believe——

18                   MS. SHROFF:  Excuse me.  The translator cannot hear.

19                   MR. FINKEL:  The government does not believe there

20    needs to be follow-up to those questions in light of the

21    discussion at the sidebar.  And that's where the parties have

22    an agreement on that concept.

23                   THE COURT:  Well, I'll hear the questions when they're

24    asked and decide if there can be any follow-up.

25                   I just want to remind Mr. Schirick and the witness to

O721GUO5                          Sklar - Direct

 1   speak slowly, because the interpreters need to interpret.

 2              THE WITNESS:  Okay.

 3              THE COURT:  All right.  Let's have the jurors brought

 4   back in.

 5              (Jury present)

 6              THE COURT:  Please be seated.

 7              You may continue the inquiry.

 8              MR. SCHIRICK:  Thank you, your Honor.

 9              I believe that we left off when the defense was

10   offering Ms. Sklar as an expert, I believe, when the sidebar

11   was called.

12              THE COURT:  All righty then.  Members of the jury, I

13   am qualifying Ms. Sklar as an expert in cryptocurrency and the

14   functioning of cryptocurrency exchanges and, relatedly, the

15   blockchain.

16              MR. SCHIRICK:  Thank you, Judge.

17   BY MR. SCHIRICK:

18   Q.  Now, Ms. Sklar, for the benefit of the jury, let's talk a

19   little bit about crypto 101.  What is a cryptocurrency?

20   A.  A cryptocurrency is a form of digital currency in that it

21   exists purely on the internet and online.  But it is also used

22   not just as currency but as a means of exchange, a store of

23   value, a form of technology, and has also become its own sort

24   of culture and philosophy about how money should be used.

25   Q.  Okay.  And when you say it's on the internet, what is the

O721GUO5                          Sklar - Direct

role of the blockchain in cryptocurrency?

A.   Right.  So technically, and the technology behind
cryptocurrency and what makes it different than, say, using
your visa—which also feels like it's online money, but you're
really using real money through a credit card—the
cryptocurrency only exists through a blockchain.  So in this
case, for example, or, you know, Bitcoin, which I think people
are generally familiar with, but in this case Ethereum, these
are—they're on a blockchain.  So the blockchain is an online
form of technology that serves as a public ledger, to—to
explain transactions.  And I guess how I would try to I guess
maybe visually explain it, if you haven't seen it, you could
think of it as an Excel spreadsheet.  So you have rows and
columns.  And one column, you're going to have what's called
the hash, but just think of it as a bunch of whole letters and
numbers that represent the transactions, so a bunch of data.
And then next to that you'll have a whole bunch of numbers and
letters that represent the "from" column, and next to that the
"to" column.  Also a whole bunch of numbers and letters.
You'll have date, and then you'll have an—the amount that was
transferred.  And so when you think about it, you know, from an
Excel spreadsheet perspective, think about it the way the
blockchain works is you take that and—I don't know if this
dates myself, but—use SharePoint to your office mates, or
maybe use MS Teams, you could use Google Docs.  The point of

why I'm using that to visually try to explain it is, it goes to

a bunch of people and then everyone has to vote on it.  And so

everyone votes, and then that block, that chain, becomes, when

everyone votes on it, permanent on the blockchain.  And so, and

that continues sequentially over and over and over across the

days, weeks, months, and it could be——let's say John and Joe

are transacting that first block, maybe Joe's fast enough that

the next time he sells, the next block is him selling.  That's

not usually how it works, but——but, you know, it could be just

something completely different that happens.  But you can see

the chain, it just keeps going like this and going across, and

that's——and it's publicly available to——to review.  There were

private websites as well, but that's part of the purpose of the

blockchain is that you see that.  But there's no names

involved.  It looks like letters and numbers.

Q.   Okay.  Thank you.

         And what is the functioning of a wallet when it comes

to cryptocurrency and blockchain?

A.   Sure.  So in order to——to know what you have on the

blockchain and your crypto, if you're doing it

individually——and there are other ways of doing this, too, but

just to start, a wallet is, you know, a term borrowed from just

regular finance, right?  You have your wallet, you know, your

money is in your wallet.  In cryptocurrency, a wallet is the

digital representation of that.  So you have a service that has

O721GUO5                          Sklar - Direct

all those letters and numbers I'm mentioning that just goes

across, like, it stores that, that value for you, so that you

know what it is that you have.  It's very hard to remember

otherwise.  It's a lot of numbers and letters.

Q.  Okay.  Thank you.

And what is a cryptocurrency exchange?

A.  A centralized cryptocurrency exchange is——is an exchange

where people come together to buy and sell cryptocurrency.  The

exchange is the intermediary or the body that stands in between

them, so you're not directly buying and selling with someone,

there is an exchange in between you, similar to——again,

borrowing terms from, you know, regular finance, how an

exchange works as well, you——when you buy and sell stocks,

you're not, you know, buying directly from Apple when you buy

Apple stock.  There's someone in between you that's——that's

facilitating that transaction.

Q.  Okay.  And what are some of the benefits of a centralized

cryptocurrency exchange?

A.  Well, first of all, you don't have to remember your——your

hashtag of all these letters and numbers.  That is the

responsibility of a centralized exchange, to maintain——to

maintain that type of information.  A centralized exchange also

provides other types of services——usually compliance, KYC and

AML.  KYC is know your customer; AML, anti-money laundering.

Also cybersecurity and auditing and recording functions.  So

1    that you just, similarly to when you buy or sell stock, the

2    centralized crypto exchange also should be able to tell you

3    what it is you bought and sold, for how much, and what date.

4    Q.  Okay.  And now how is cryptocurrency created?

5    A.  Similar to wallets and other sort of terms borrowed from

6    traditional finance, cryptocurrency is created by what's called

7    minting, so just as money is minted and created, cash,

8    cryptocurrency is minted by creating new cryptocurrency

9    on—that's put on the blockchain through what's called a smart

10   contract, and that information is also publicly available

11   online, on the blockchain.

12   Q.  Okay.  And what is the role, if any, of the smart contract

13   or code in crypting—in minting?  Excuse me.

14   A.  Well, it shows you—it—it provides public access to people

15   that want to see the code, that want to understand the code, to

16   see whether it exists or not or how—how it's being minted.

17   Not a coding expert, but you can see it online, you know,

18   coding experts obviously can, but it is publicly available.

19   It's part of the crypto—how crypto culture has evolved that

20   it's very open source in that way.

21   Q.  Okay.  Now what is a white paper?

22   A.  A white paper is a term used in crypto for—it's usually

23   publicly available and on their website, to show what the

24   technology is, what—what the purpose is, what the value

25   proposition is, why someone should purchase that crypto.  It's

O721GUO5                         Sklar - Direct

usually also forward looking, so it will usually——they usually

start with what they think the value is at the time, but they

often, very often typically include what their value

proposition is in the future and where they see their crypto

being used and why.

Q.  Okay.  And is there a custom or practice in the space with

respect to white papers?

A.  Yes, they're——they're typically put online on the website

and shared, again, part of the open-source culture, but also to

encourage people to want to use or adopt that cryptocurrency by

showing the technology and what the potential uses are.  That's

how——that's how people learn about it.

Q.  Okay.  Now you mentioned the culture that surrounds

cryptocurrency once or twice in your answers.  Are you familiar

with the term HODL, H-O-D-L?

A.  Yes, it means to hold on for dear life.

Q.  And could you just explain for the benefit of the members

of the jury what that means.

A.  Sure.  It's——it's an expression used in the crypto culture

online frequently as an expression of enthusiasm.  When——and

it's used both ways.  It's used when the price of

cryptocurrency goes up, HODL can mean to hang on because they

believe the price is going up, and not to sell early, but also

when the price of cryptocurrency——and if I didn't say this

before, it's used across all cryptocurrencies.  When the price

O721GUO5                                    Sklar - Direct

1    goes down, too, it's also used as in, don't sell off right now,

2    hold on, because we believe this—this cryptocurrency has

3    value.

4    Q.  Okay.  And the same question with respect to the phrase "to

5    the moon."  Are you familiar with that?

6    A.  Yes.

7    Q.  Okay.  And can you explain what that is, please.

8    A.  It's also an expression used in the crypto community.  Also

9    an expression of enthusiasm.  I mean, the moon is, I think

10   what, 239,000 miles away?  Maybe some people actually believe

11   the price of crypto will hit $239,000, but in general, it is

12   just—it's an expression of the price going up and being

13   enthusiastic about that price going up.

14   Q.  And in your experience, are those terms common in the

15   crypto world?

16   A.  Yes.  And as I mentioned, they're used across all

17   cryptocurrencies.  It's not specific to any cryptocurrency.

18   Q.  Okay.  Thank you.

19          Now that we understand the terms a little bit better,

20   let me ask you:  Why do people use cryptocurrency?

21   A.  There are a couple reasons.  First, I'd say enthusiasm for

22   the technology; second, privacy; third, the unbanked and

23   underbanked; and fourth, for cross-border remittances.

24   Q.  Okay.  Maybe we'll sort of take each one of those in turn.

25          I think the first one you said was a belief in

O721GUO5                         Sklar - Direct

cryptocurrency, or enthusiasm.  Can you just expand on that a
little bit, please.

A.   Yeah.  So the——I mean, the concept of cryptocurrency, of
having a digital currency that doesn't exist through or for a
bank is——is new and novel.  It excites people in the industry
and who——the people that create it and people that invest in it
and believe in it, and even from the time of Bitcoin's
inception until now, a lot has changed.  And there's a lot of
enthusiasm about it.  You know, one comparison is often used to
the internet.  And when the internet first came out, there were
some skeptics, thoughts about government regulation, but we all
remember the first time we got our first email and it was an
exciting moment.  And so it's——cryptocurrency is also in that
moment, that it continues to evolve.  And when you think about
the internet, you know, we had the internet, we had email, now
we have things that people couldn't even imagine were possible
with the internet, TikTok and social media and every——virtual
reality and things like that.  And so cryptocurrency, for
enthusiasts, is also——still has a lot of potential, and current
potential.

Q.   Okay.  And then I think another reason you identified as to
why people would use cryptocurrency was privacy.  Could you
just explain that a bit more.

A.   Sure.  It doesn't——cryptocurrency can be issued not from or
through a bank or other intermediary.  So it affords a certain

1    level of privacy in that respect.  As I mentioned, you can

2    follow what's happening on the blockchain, but there aren't

3    names involved, or addresses.  And if you have, you know——if

4    you create different types of systems, ecosystems for crypto,

5    people from the outside can't see what's happening on the

6    inside.

7    Q.  Okay.  And then I think a third reason you identified was

8    access to banking.  Maybe you can just explain that one a bit

9    as well.

10   A.  Sure.  So underbanked refers to people that have access to

11   bank accounts but do not have the full sort of services of a

12   bank account.  They may not be able to afford a savings

13   account; they might not have the credit ratings to get a

14   mortgage from their bank, for example.  And unbanked are people

15   that don't have bank accounts at all.  And in the United

16   States, there are millions of people that are unbanked and

17   underbanked.  Around the world, there are over a billion people

18   unbanked.  And when you count underbanked too, you're over

19   2 billion people.  So in——when you——I mean, how I think about

20   it too is, you know, in the United States, I take for granted

21   that I can walk to an ATM, that my bank will be backed by the

22   U.S. government and have money when I go, and——and my bank will

23   be backed, obviously, as well, when I go take out money.  That

24   is not the situation for a lot of people in the world.  And

25   so——but a lot of people do have cellphones, a lot of people do

O721GUO5                          Sklar - Direct

1    have access to either wireless or WiFi, and so having apps that

2    allow them to transact money, cryptocurrency, is one way

3    of—for the unbanked and underbanked to transact money.  It is

4    being used in many developing countries as a way of increasing

5    financial inclusion in that respect for people that don't have

6    bank accounts.

7              And, you know, I would also point to, there are

8    situations where people even that were banked may become

9    unbanked.  For example, in Ukraine, when Russia invaded, there

10   are—there were a lot of people that were not able to access

11   ATMs.  They were not able to—when they went to their banks,

12   there were—there wasn't enough money left to be circulated

13   around.  People turned to cryptocurrency.  And indeed, hundreds

14   of millions of dollars' worth of cryptocurrency has actually

15   been sent to Ukraine to help because of—because of the banking

16   situation there.

17   Q.  Okay.  Thank you for that.

18             And then I think the last reason that you identified

19   as to why people would use cryptocurrencies was cross-border

20   remittances.  Can you just explain that.

21   A.  Sure.  So somewhat relatedly to, you know, this, that in

22   other countries—well, also in the United States—people have

23   access to phones, but may not have access to bank accounts.

24   Cross-border remittances refers to, when you don't have a bank

25   account, but you're making money, how do you, and your family

1  that lives abroad, how do you send——how do you send that money.

2  And one way that cryptocurrency is used is because of that.

3  Cross-border remittances through some major providers can

4  charge 30 percent or more of what you're sending.  And so when

5  you're thinking about people that are unbanked or underbanked,

6  why they're using these services, 30 percent of——or more of

7  what they're sending is, well, I think it's a large percentage

8  for anyone, but it's particularly a large burden for people

9  that are just trying to send——trying to send what they're

10 trying to send, which might be minimum wage or less.

11 Q.  Okay.  Thank you for that.

12          Now how does a sort of typical

13 cryptocurrency——withdrawn.

14          How does a typical cryptocurrency transaction work on

15 a centralized exchange?

16 A.  On a centralized exchange, you would either——depending on

17 the exchange, either send U.S. dollars to the exchange

18 to——which would be converted into either crypto or——or other

19 stablecoins, which I haven't defined yet, but again——but it

20 will be converted into whatever the token or crypto that you're

21 buying is, or other exchanges accept crypto for crypto, so you

22 can put crypto into the exchange to buy other forms of crypto.

23 Q.  Okay.  Now let's just talk about custody and custodians.

24 What is a custodian?

25 A.  A custodian is the entity or representative that holds your

1    cryptocurrency; that could be a wallet, an exchange, or some

2    other entity that——that has custodial rights to your crypto.

3    Q.   Okay.  And is the custodian akin to a bank that holds the

4    crypto on your behalf?

5              MR. HORTON:  Objection to leading.

6              THE COURT:  Overruled.  You may answer.

7    A.   Sure.  So by entity——we said entity, yes, it's some party,

8    intermediary, broker, bank, some entity that is holding your

9    crypto and has custodial rights over it.  So that, well, they

10   have custody of——of it.  You're not physically holding——you

11   can't physically hold cryptocurrency.  So it has to go

12   somewhere.

13   Q.   Okay.  Now what are stablecoins?

14   A.   Stablecoins are a form of cryptocurrency that are meant to

15   be pegged or equivalent to a one-to-one ratio.  So one

16   stablecoin equals one U.S. dollar, for example.

17   Q.   Okay.  And are there other stablecoins that could be pegged

18   to other currencies as well?

19   A.   Yes.  U.S. dollar stablecoins are the most common, but

20   stablecoins are often also pegged to the Euro.  That's probably

21   the second most common.

22   Q.   Okay.  Now why do people use stablecoins?

23   A.   There are a couple of reasons.  One is just, when you think

24   about just holding a basket of——of assets, stablecoins are just

25   another type of asset.  So they're——again, sort of the

1    intention is for it to be one to one, so, you know, if you

2    think of having, you know, your own, you know, basket of

3    assets, you know, you might have stocks, stocks go up and down,

4    like cryptocurrencies do; stablecoins might be more like having

5    money in a money market, mutual fund, which is meant to be like

6    one to one, or like a savings account with a relatively low

7    interest rate.  It's——it's something stable in your basket of

8    assets, but is——and it's not going to fluctuate.

9             Next in the cryptocurrency sort of system, just

10   how——how it's developed is, stablecoins are often used when

11   you're using cryptocurrency because of the instability in the

12   price.  When you're trying to transfer your cryptocurrency to

13   different venues or means, trans——it's common to transfer it to

14   a stablecoin so you know where your money——what the dollar

15   value is when you then try to transfer that out to somewhere

16   else.

17   Q.  Okay.  Now are you familiar with what, if any, outside

18   service providers a centralized exchange may work with?

19   A.  Yes.

20   Q.  Okay.  Can you give us some examples, please.

21   A.  Sure.  They might use compliance providers, and that would

22   include, or could include, AML and KYC providers,

23   cybersecurity; outside wallet providers are also very common,

24   and auditing services, as well as probably other services;

25   looking at the code, for example, as well.

1    Q.  Okay.  Thank you for that.

2            Now moving on to the facts of this case and the

3    specific cryptocurrencies at issue, I believe you said a few

4    minutes ago that amongst the materials you reviewed were the

5    white papers.  Right?

6    A.  Yes.

7    Q.  Okay.  Can you provide an explanation of the white papers

8    for HDO, please.

9    A.  It explained the stablecoin and what the value proposition

10   for it was going to be, and what it was at the time.

11   Q.  Okay.  And based on your review of the white paper for HCN,

12   can you just explain what your understanding is of HCN, please.

13   A.  Sure.  That was the exchange's cryptocurrency, and the

14   white paper there too explained the purpose of it and the value

15   proposition and where they expected that to go as well.

16   Q.  Okay.  And why is it that an exchange would want both a

17   stablecoin and a trading token?

18   A.  There's, you know——I think it makes sense when you think

19   about then the sort of transfer——well, first of all,

20   the——again, the difference in——in value, holding one that's

21   more volatile, holding one that's more stable, so there's that,

22   in your basket of assets.

23           And then there's also just the transferring in and

24   out.  When you transfer your crypto to a stablecoin, you know

25   what it is, when you try to transfer your stablecoin out or to

1    something else, what it is that you're doing, and

2    it's——it——that's done.  Again, the price of crypto can be

3    volatile so, like, you don't, you know——so transferring it to a

4    stablecoin is frequently the way that people move their crypto

5    around when they're transferring it around.

6    Q.  Okay.  And what, if any, role does a stablecoin like HDO

7    play in getting sort of value into a centralized exchange?

8    A.  It's one way of purchasing a crypto from the exchange, from

9    a cryptocurrency from the exchange, and then it's, you

10   know——the exchange can——well, pursuant to the white paper and

11   how the exchange operates, how that gets used.

12   Q.  Okay.  Fair to say it's something of an on-ramp into the

13   exchange——

14   A.  In this——

15   Q.  ——the value into the exchange?

16   A.  Yes, in this case you could buy a stablecoin to, yes,

17   transact on the exchange.

18   Q.  And so one would purchase stablecoins using U.S. dollars,

19   and that value in U.S. dollars would then be tradeable on the

20   exchange, fair?

21   A.  Yes, that's——

22            MR. HORTON:  Objection, your Honor.

23            THE COURT:  Overruled.  You may answer.

24   Q.  And the same——

25   A.  Oh, sorry.  Yeah, according to the white papers and what

1    I've seen, yes, that was the purpose of that.

2    Q.  Okay.  And the same question with respect to getting value

3    out of the exchange.  Did it function, serve that function as

4    well?

5    A.  Yes, according to the white papers and the documents I've

6    seen, that was the purpose.

7    Q.  Okay.  Now, Ms. Sklar, did you——withdrawn.

8         I believe you testified earlier that you used

9    something called Etherscan to make some observations about the

10   tokens at issue here?

11   A.  Yes, Etherscan is a publicly available version of the

12   blockchain to look at the Ethereum blockchain.

13   Q.  Okay.  And can you just explain that a little bit further

14   for members of the jury.

15        MR. HORTON:  Objection, your Honor, in view of the

16   sidebar, scope.

17        MR. SCHIRICK:  I'm just asking for an explanation of

18   what Etherscan is, how it works, not what she observed here,

19   your Honor.

20        THE COURT:  Generally.  Generally.

21   A.  Sure.  So similarly to how I explained visually, using an

22   Excel spreadsheet example, the Etherscan website looks

23   relatively similar.  It just has the——it has columns going

24   across with the hash, which is the identifier, has the "from"

25   and the "to," has the date, has the amount, and it's

1   searchable.  So you can search by token, by stablecoin, if you

2   know the hash numbers you're looking for, the "from," "to," you

3   can search it by date.  It's a—it's on the internet.  It's

4   part of the—part of the way crypto and Ethereum works is that

5   it's a public blockchain.

6   Q.  And is it typical for people to use Etherscan to observe

7   the blockchain?

8   A.  I think so, because it's—it's free.  I mean, there are

9   other versions you can pay for, but, you know, the free one is

10  usually what people go to.

11  Q.  Fair enough.  Okay.

12          Now did you use the Etherscan to observe the tokens at

13  issue here?  Just yes or no.

14  A.  Yes.

15  Q.  And did you observe a minting event for HDO?

16  A.  Yes.

17  Q.  And by minting event, we mean when it was created.

18  A.  Yes, as I explained, yes.

19  Q.  Okay.  And did you observe a minting event for HCN on the

20  blockchain?

21  A.  Yes, I did.

22  Q.  Okay.  And can you just briefly tell us what you observed

23  about those minting events.

24          MR. HORTON:  Objection, again, due to the sidebar.

25          THE COURT:  Sustained.

1  Q.  Did you observe on Etherscan that there were relatively few

2  transfers of HCN and HDO?

3  A.  Yes.

4  Q.  And was that surprising to you?

5  A.  No, not for tokens that are relatively new.  There's

6  usually——typically, when tokens start trading, there's a lot of

7  illiquidity in the market.

8  Q.  Okay.  Now let's just talk about the nature of the Himalaya

9  Exchange for a moment.

10         What kind of exchange was the Himalaya Exchange?

11 A.  A centralized exchange.

12 Q.  Okay.  And I believe you testified before that a

13 centralized exchange may use a single wallet or a set of

14 wallets?

15 A.  Yes, part of why people use a centralized exchange is

16 because the exchange has the wallet in custody so that, again,

17 you don't have to remember all of the numbers, all of the

18 transactional data.  The centralized exchange does that.

19 Q.  Okay.

20 A.  And Himalaya Exchange was a centralized exchange——is a

21 centralized exchange.

22 Q.  Okay.  And from your review of the white papers for the two

23 tokens at issue, do you have an understanding of a credit

24 system that the Himalaya Exchange used?

25 A.  Yes.

O721GUO5                         Sklar - Direct

1    Q.  And can you just explain that to the jury, please.

2    A.  The——their credit system was an internal system to keep

3    track of——of cryptocurrency being transacted.  It was called a

4    credit system.  But you could probably use any other word

5    to——the word "credit" is just the word that was used.  It could

6    have been described as an internal ledger system.  Other

7    centralized exchanges do similarly have internal systems to

8    account for crypto.

9    Q.  Okay.  And you testified before that there were relatively

10   few transfers that you observed using Etherscan.  Is it fair to

11   characterize those as on-chain transactions?

12   A.  The ones that are available——the ones that you can view on

13   Etherscan are publicly available, and that would be an on-chain

14   transaction because it's publicly available on the blockchain.

15   Q.  Now what would you expect to see in terms of the public

16   visibility of transactions conducted in a centralized exchange?

17   A.  Internally, if there's an internal ledger, credit system,

18   or a tokenization system, however the accounting is being

19   termed or called internally, those transactions would be

20   considered off-chain.  They would not be on the public

21   blockchain.  But there would be an internal system within the

22   centralized exchange to keep track.

23   Q.  So one would not be able to see transactions happening on

24   the Himalaya Exchange, for example, on-chain; is that fair?

25            MR. HORTON:  Objection.  Compound.

1              MR. SCHIRICK:  It's one question.

2              THE COURT:  If you'll rephrase that, please.

3              MR. SCHIRICK:  Sure.

4    Q.  For a centralized exchange, would you expect to see all of

5    the transactions conducted on that exchange on the blockchain?

6    A.  No, and in fact, one of the largest centralized exchanges

7    in the world doesn't do that either.

8    Q.  And what exchange are you referring to?

9    A.  Coinbase.

10   Q.  Okay.  So for the Himalaya Exchange, could you tell how

11   many transactions were conducted by the exchange simply by

12   looking at the blockchain?

13   A.  No.

14             MR. HORTON:  Objection, scope.

15             THE COURT:  Sustained.

16   Q.  The Himalaya Exchange is a centralized exchange, right?

17   A.  Yes.

18   Q.  And any reason to expect the Himalaya Exchange to reflect

19   transactions differently than any centralized exchange?

20             MR. HORTON:  Same objection, scope.

21             THE COURT:  Sustained.

22   Q.  Okay.  Have you heard of the phrase "closed system" when it

23   comes to a cryptocurrency exchange?

24   A.  Yes.

25   Q.  Okay.  And what does that mean?

1    A.  That the centralized exchange would be more internalizing

2    its own crypto and functions and conducting more off-chain than

3    on-chain, but when it needed to be on-chain would be on-chain.

4    Q.  Okay.  And so fair to say you would expect most of the

5    transactions to be off-chain.

6    A.  For a closed system, yes.

7    Q.  For a closed system.  Okay.

8            Now would you consider the Himalaya Exchange a closed

9    system?

10   A.  That's my understanding from the white papers and what I've

11   seen was the intent of it——is the intent of it, yes.

12   Q.  Thank you.  Now, Ms. Sklar, I believe you——withdrawn.

13           Did you review any third-party contracts that the

14   exchange had with outside service providers?

15   A.  Yes.

16   Q.  Okay.  And can you just tell us about those briefly.

17   A.  I saw CertiK, which reviewed the code; Armanino, which did

18   the auditing; and Bitgo, which was the wallet custodian.

19   Q.  Okay.  And what significance, if any, do you draw from the

20   exchange's use of these third-party service providers?

21   A.  It's——it's very typical, as I mentioned, to outsource

22   certain things to third parties, and in fact, it's——it's

23   usually considered a best practice, particularly when you think

24   of who they were using.  Well, first of all, to——outside

25   auditors are always a best practice rather than relying on your

1    own, and Bitgo is one of the world's biggest and most

2    well-known wallet custodians for crypto.

3    Q.   Okay.  And how about Armanino, the auditor?

4    A.   Again, you need to——having a third-party audit for any type

5    of exchange is always a best practice.

6    Q.   And in terms of best practices, what, if any, best practice

7    would there be with respect to the auditing of reserves?

8    A.   Well, you would look at, you know, the bank accounts to see

9    whether——what their reserves were, and, you know, what——what

10   mix that was, whether it was cash, U.S. dollars, or other types

11   of assets.

12   Q.   Okay.  And just to be clear, because I think I may have

13   jumped over the part about what reserves are, what are

14   reserves?

15   A.   Sure.  For stablecoins, to——when you have a reserve-backed

16   stablecoin and you're trying to do one to one, it means do you

17   have what's backing the stablecoin to make it one to one.

18   Q.   Okay.  Now the outside service providers that you just

19   described, are those common service providers for a

20   cryptocurrency exchange?

21   A.   Yes.

22   Q.   In particular for a centralized cryptocurrency exchange?

23   A.   For a centralized, yes.

24   Q.   Okay.  Now, Ms. Sklar, based upon your review of the

25   materials that you've described, and your expertise, did you

1    reach any conclusion with respect to HDO and HCN?

2    A.  I mean, that they were cryptocurrencies being, you know,

3    offered from the exchange, and they were on the blockchain.

4    Q.  Okay.  And so your view is that HCN is a cryptocurrency

5    that exists on the blockchain?

6    A.  Yes.

7    Q.  And that HDO was a cryptocurrency that exists on the

8    blockchain?

9    A.  A stablecoin, yes, form of cryptocurrency, yes.

10   Q.  Thank you for that.

11            And what is the basis for that conclusion?

12   A.  My review of the documents, including third-party documents

13   we just mentioned, and my review of Etherscan and the

14   blockchain.

15            MR. SCHIRICK:  Okay.  Thank you, Ms. Sklar.

16            Your Honor, no further questions at this time.

17            THE COURT:  Cross-examination.

18   CROSS EXAMINATION

19   BY MR. HORTON:

20   Q.  Good afternoon, Ms. Sklar.

21   A.  Good afternoon.

22   Q.  To learn about the Himalaya Exchange, you reviewed its

23   white papers, right?

24   A.  Yes.

25   Q.  And those are documents that are written and issued by the

O721GUO5                    Sklar - Cross

1   exchange; is that correct?

2   A.  Yes.

3   Q.  Did you pull those down from the exchange's website?

4   A.  They're on the website, but I was also given the——I also

5   saw them through the attorneys.

6   Q.  And did Mr. Guo's lawyers allow you to interview any

7   authors of these white papers?

8           MR. SCHIRICK:  Objection.

9           THE COURT:  Overruled.  You may answer.

10  A.  I did not, no.

11  Q.  And did you in fact interview any of the authors of these

12  white papers?

13  A.  I didn't, no.

14  Q.  You don't know the names of the authors of these white

15  papers, do you?

16  A.  I don't, no.

17  Q.  And in preparing to testify today, you didn't visit the

18  exchange's headquarters in Abu Dhabi, did you?

19  A.  I did not.

20  Q.  You testified about your understanding of the intent of the

21  exchange.  Do I have that right?

22          MR. SCHIRICK:  Objection.

23          THE COURT:  Overruled.  You may answer.

24  A.  The intent from the white papers, yes.

25  Q.  Those were based on what the Himalaya Exchange said its

O721GUO5                          Sklar - Cross

1    intentions were; is that correct?

2    A.  Yes.

3    Q.  You didn't create an account at the Himalaya Exchange, did

4    you?

5    A.  No.

6    Q.  You didn't purchase H Coin credits, did you?

7    A.  No.  I don't think it would be appropriate for me to

8    testify if I——if I actually owned anything in Himalaya

9    Exchange.

10   Q.  So just so I'm clear, you haven't personally used the

11   Himalaya Exchange.

12   A.  No.

13   Q.  Okay.  And, I mean, just, again, so I'm clear, you didn't

14   buy any H Dollar credits for yourself.

15           MR. SCHIRICK:  Asked and answered.

16           THE COURT:  Sustained.

17   Q.  Do you have a cryptocurrency wallet, Ms. Sklar?

18   A.  Yes.

19   Q.  Does it have Himalaya dollars in it?

20   A.  No.  As I said, I haven't——

21           MR. SCHIRICK:  Objection.  Asked and answered.

22   A.  No financial——yeah.

23           THE COURT:  Sustained.

24           MR. HORTON:  I'll move on, your Honor.

25   Q.  There were at least four white papers issued by the

O721GUO5                        Sklar - Cross

1    exchange; isn't that right?

2    A.  I think so.

3    Q.  Did you review all the white papers?

4    A.  Yes.

5    Q.  So how many were there?

6    A.  I've seen——

7              MR. SCHIRICK:  Objection.  Asked and answered.

8              THE COURT:  Overruled.  You may answer.

9    A.  I've seen drafts, I want to say I think there's four, but,

10   yeah, I mean, I saw what I was——what I was given.  And there

11   were drafts, yeah.  It was more than, probably, four.

12   Q.  I see.  And there was at least one for H Coin and at least

13   one for H Dollar; is that right?

14   A.  Yes.

15   Q.  And two of those white papers were issued in 2021, correct?

16   A.  Yes.

17   Q.  And another two were issued in 2022; is that right?

18   A.  Yes.

19   Q.  And each of those white papers is almost 40 pages long; is

20   that true?

21   A.  Yes.

22   Q.  Each one?

23   A.  If you represent they were 40 pages, I'll believe you.  I

24   don't have them in front of me.

25   Q.  Did you read them all the way through?

O721GUO5                         Sklar - Cross

 1  A.  Yes.

 2  Q.  More than once?

 3  A.  Yes.

 4  Q.  And each one of them, each one of those four I just

 5  mentioned is more than 12,000 words long; is that right?

 6          MR. SCHIRICK:  Objection.

 7          THE COURT:  Overruled.  If you know, you can answer.

 8  A.  I don't know.

 9  Q.  And you just testified that you read them more than once;

10  is that right?

11  A.  Yes.

12  Q.  And did you feel that you understood them after reading

13  them more than once?

14  A.  Yes.

15  Q.  You've reviewed white papers before you were hired to

16  testify in this case, right?

17  A.  Yes.

18  Q.  In fact, you're a lawyer, aren't you?

19  A.  Yes.

20  Q.  You've been a lawyer for more than 15 years; isn't that

21  right?

22  A.  19, yes.

23  Q.  And in fact, you're a regulatory lawyer in particular;

24  isn't that correct?

25  A.  Yes.

O721GUO5                         Sklar - Cross

1   Q.  And you used to regulate cryptocurrency exchanges; isn't
2   that right?
3            MR. SCHIRICK:  Objection.  The witness——
4            THE COURT:  You may answer.
5            MR. SCHIRICK:  The witness didn't regulate.
6            THE COURT:  You may answer.
7   A.  I can sort of——well, so, as you know, technically,
8   cryptocurrency exchanges aren't regulated by the CFTC or the
9   SEC right now, but regulating——regulated financial products,
10  yes.
11  Q.  Ms. Sklar, you have a lot of experience reading and
12  understanding cryptocurrency white papers; isn't that fair to
13  say?
14           MR. SCHIRICK:  Objection.  Cumulative.
15  A.  Yes.
16           THE COURT:  You may answer.
17  A.  Yes.
18  Q.  And in fact, you've advised clients of your own on drafting
19  white papers; isn't that right?
20  A.  I have, yes.
21  Q.  You said that white papers are how people learn about
22  crypto tokens, right?
23  A.  Yes.
24  Q.  You don't know how members of the Mountains of Spices Farm
25  learned about H Coin, do you?

O721GUO5                          Sklar - Cross

```
 1   A.  I don't.

 2   Q.  Do you know if David Dai shared the white papers with

 3   members of the UK Farm?

 4           MR. SCHIRICK:  Objection.  Your Honor, can we have a

 5   sidebar.

 6           THE COURT:  If you know, you may answer.

 7   A.  I──I don't know.

 8           MR. HORTON:  I just have one more question on that

 9   topic, your Honor, right now.

10   Q.  Do you know if any farm leader shared white papers with

11   farm members?

12           MR. SCHIRICK:  Objection, foundation.

13   A.  I don't know what that means.

14           THE COURT:  You may answer.

15   A.  Sorry.  I don't know.

16   Q.  Okay.  You testified earlier about cryptocurrencies and

17   credits, right?

18   A.  Yes.

19   Q.  And I think in your words, cryptocurrency only exists

20   through the blockchain; do I have that right?

21   A.  That's how you can tell if it's a cryptocurrency is when

22   you can look at it on a blockchain.

23   Q.  And if you can't see a coin on a public ledger, you can

24   tell it's not cryptocurrency, right?

25   A.  I wouldn't characterize what I said that way, but──
```

O721GUO5                          Sklar - Cross

1          MR. SCHIRICK:  Objection.

2          THE COURT:  You may answer.  I'm sorry.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  I spoke over you.

5          If you'll read back the question, please.

6          (Record read)

7          THE COURT:  Go ahead.

8    A.  No.  I wouldn't characterize what I said that way.

9    Q.  Okay.  But I understand you correctly that cryptocurrency

10   only exists through the blockchain, right?

11   A.  For it to be a cryptocurrency, it would need to at some

12   point be on the blockchain, but that doesn't mean what you're

13   doing doesn't involve cryptocurrency.

14   Q.  And you testified about exchange credits, right?

15   A.  Yes.

16   Q.  And those are notations on internal databases, right?

17   A.  In this case, yes.

18   Q.  Yeah.  And those internal databases, they're not on the

19   blockchain, right?

20   A.  In my understanding, the credit system was not on the

21   blockchain.

22   Q.  The Coinbase internal credits, those are off-chain; that's

23   what Coinbase calls it, right?

24   A.  They call it an internal distributed ledger system, but

25   yes, they could have called it credits or anything else, but

O721GUO5                          Sklar - Cross

1    that's what they call it.  That's on their website, yes, and

2    that's——

3    Q.  Okay.  But——

4    A.  ——the usage of Coinbase.

5    Q.  I'm sorry.  I didn't mean to interrupt you.

6    A.  No, no.  Yeah, go ahead.

7            THE COURT:  When you say "they," who are you referring

8    to?

9            THE WITNESS:  Sorry.  Me?

10           THE COURT:  Yes.

11           THE WITNESS:  Sorry.  Can you repeat back, when did I

12   say "they"?  Sorry.

13           THE COURT:  If you just please restate the answer, the

14   question and the answer.

15   Q.  You said that Coinbase——

16           THE COURT:  I'm asking for the reporter to read it

17   back.

18           MR. HORTON:  Sorry.

19           (Record read)

20   A.  Sorry.  Yes, by "they," I meant Coinbase.  It's——it's part

21   of the usage of Coinbase, but it's also publicly available, as

22   an explanation, how Coinbase operates.

23           THE COURT:  Go ahead.

24           MR. HORTON:  Thank you, your Honor.

25   BY MR. HORTON:

O721GUO5                         Sklar - Cross

1   Q.  The internal database at Coinbase, Ms. Sklar, that you're

2   just describing now, that's not on the blockchain, correct?

3   A.  That's my understanding, without also revealing anything

4   that I'm not allowed to reveal.  I'm only going to discuss

5   things that are publicly available.

6   Q.  Understood.  These internal databases where an exchange

7   keeps their credits, they're not publicly available, right?

8   A.  The internal database, no.

9   Q.  And the Himalaya Exchange's internal database, where its

10  credit transactions are located, that's not publicly available,

11  right?

12  A.  That's my understanding.

13  Q.  You haven't seen the Himalaya Exchange's internal database;

14  isn't that right?

15  A.  I have not.

16  Q.  And you testified about what you expect to see on a

17  centralized exchange's ledger; isn't that right?

18            MR. SCHIRICK:  Objection.

19  A.  What's usual or could be?

20            THE COURT:  You may answer.

21  A.  What's usual or could be, but every centralized exchange is

22  allowed to, frankly, have its own model.

23  Q.  And you don't know, sitting here today, whether the

24  Himalaya Exchange's private ledger matches your expectations;

25  isn't that right?

1   A.  Sorry.  My expectations of?

2   Q.  Well, you just testified about what's usual at a

3   centralized exchange; isn't that right?

4   A.  Yes.

5   Q.  Sitting here today, you haven't looked at the Himalaya

6   Exchange's internal ledger; isn't that right?

7   A.  Right.

8   Q.  So you have no way of opining about whether the Himalaya

9   Exchange's actual internal ledger matches your expectations of

10  what's usual at a centralized exchange; isn't that true?

11  A.  I haven't——I haven't seen it, so I——I can't really say

12  either way.  I have——as I just said, I haven't seen it.

13  Q.  Your testimony today was that the Himalaya Exchange is

14  designed to be a centralized exchange, right?

15  A.  Yes.

16  Q.  And that means that some person or group of people control

17  its operations; isn't that true?

18  A.  Yes.

19  Q.  Do you know who those people are?

20  A.  I've seen the diagrams and the, you know, organizational

21  charts.  I haven't memorized them, but I've seen them.

22  Q.  And who gave those to you?

23  A.  They're in a document that may or may not be an exhibit.

24  There's a business plan.

25  Q.  And——sorry——who gave that document to you, the org chart at

O721GUO5                          Sklar - Cross

1   the exchange, before you testified?

2   A.  The lawyers, but it's in the Himalaya Exchange business

3   plan.  It may even be in the white paper as well.  In fact, in

4   the white paper, there are bios in there.  The org chart is in

5   their business plan, as I recall.

6   Q.  And so because it's designed to be a centralized exchange,

7   that means there's some group of people with control over this

8   internal database that you haven't seen; isn't that right?

9   A.  Yes.

10  Q.  Okay.  Now some centralized exchanges sell crypto tokens

11  directly to customers' wallets; isn't that true?

12  A.  Yes.

13  Q.  It's possible to use Coinbase, for example, bring your own

14  wallet as a customer, and receive and hold crypto token

15  yourself; isn't that right?

16          MR. SCHIRICK:  Objection, compound.

17          THE COURT:  You're asking whether it can be done?

18          MR. HORTON:  I can break it down a little bit, your

19  Honor.

20          THE COURT:  Okay.  Go ahead.

21  Q.  If a person goes to Coinbase with their own wallet, they

22  can obtain cryptocurrency to hold themselves directly; isn't

23  that true?

24          MR. SCHIRICK:  Objection.

25          THE COURT:  You may answer.

1   A.  Now, but that wasn't always the case.

2   Q.  But it's true now, isn't it?

3   A.  It is true now.  It took time though.

4   Q.  And Coinbase, not the only centralized exchange where you

5   can show up with your own wallet and get crypto tokens to store

6   in your wallet; isn't that right?

7   A.  Yes.

8   Q.  But in the Himalaya ecosystem, customers could not hold H

9   Coin tokens in their own wallets; isn't that true?

10  A.  At that time, but that's not what the plan was, according

11  to the white papers.

12  Q.  Well, I'm not asking about the plan.  Is it currently the

13  case, right now, today, that you can hold H Coin tokens in a

14  customer wallet?

15  A.  As of today, I don't believe so.

16  Q.  Okay.  In fact, all that Himalaya Exchange customers can

17  buy are credits, right?

18  A.  Right now?  I think so.

19  Q.  Well, what about for the entire period of your review?

20  A.  I mean, the plan was, obviously, for——

21  Q.  I'm sorry.  I'm going to just interrupt you really quickly,

22  Ms. Sklar, because I'm not asking you about the plan or the

23  future or anyone's intentions.

24          MR. SCHIRICK:  Your Honor, can she be allowed to

25  answer the question.

1        THE COURT:  Right.  So he's asking you not about what

2   they may have planned to do but what they actually did.

3   A.  Sure.  At the time, yes.

4   Q.  In fact, isn't it true, Ms. Sklar, that even in the white

5   papers, stating their intentions, the Himalaya Exchange said

6   that customers couldn't hold any crypto assets at all in the

7   Himalaya ecosystem?  Isn't that true?

8   A.  Honestly, you'd have to point me to where that says.  I

9   actually don't recall that sentence.

10  Q.  That's fine.

11        MR. HORTON:  Can we pull up GX AS12, which is in

12  evidence, please, Isabel, and go to page 11.

13        Let's start at the first page, actually, so we can see

14  what document we're looking at.

15  Q.  So Ms. Sklar, this is the January 2022 Himalaya Coin white

16  paper.  Did you review this?

17  A.  Yes.

18        MR. HORTON:  Okay.  If we can go to page 11, please,

19  Ms. Loftus.

20  Q.  And do you see the section of this page, Ms. Sklar, that's

21  titled Structural Considerations?

22  A.  Yes.

23        MR. HORTON:  If you could blow that up, please,

24  Ms. Loftus.

25  Q.  Ms. Sklar, if you could just read on this last paragraph,

O721GUO5                        Sklar - Cross

1    it starts, "Prospective Members," and if you could just read

2    that sentence, aloud.

3    A.  Sure.  The one that starts with "Prospective Members"?

4    Q.  Sure.  It's the last paragraph, the first sentence.

5    A.  "Prospective Members are advised that neither crypto assets

6    or fiat currency may be held by Members within the Himalaya

7    Ecosystem, and the Himalaya Ecosystem does not provide, and

8    none——"it's a long sentence——"and none of the Himalaya Exchange

9    or any other entity within the Himalaya Ecosystem holds any

10   necessary licenses or authorizations to provide any type of

11   custody or other arrangements to facilitate this."

12   Q.  Ms. Sklar, that four-line sentence says that members cannot

13   hold any crypto assets of any kind at the Himalaya Ecosystem;

14   isn't that right?

15   A.  No.  It says——

16        MR. SCHIRICK:  Objection.

17   A.  ——the Himalaya Ecosystem does not provide.  The sentence

18   refers to that they didn't yet have the ability to do Bitcoin

19   and Ether, which was their plan.

20   Q.  Let's start at the beginning of the sentence.

21   A.  Okay.

22   Q.  There's a line and a half before we hit the first comma.

23   Can you read that line, please.

24   A.  Before the first comma.  The "Prospective Members"?

25   Q.  That's right.

1    A.   Okay.  "Prospective Members are advised that neither crypto

2    assets or fiat currency may be held by members within the

3    Himalaya Ecosystem."

4    Q.   Okay.  That language from the white paper released by the

5    Himalaya Exchange says that members cannot hold crypto assets

6    within the Himalaya Ecosystem, does it not?

7              MR. SCHIRICK:  Objection.

8    A.   I mean, the sentence says what it says, but I may disagree

9    with whether——how I read it.

10   Q.   Well——

11             THE COURT:  So what is the question?  Is the question

12   what does it say?

13   Q.   Ms. Sklar, you interpret documents like this for a living,

14   correct?

15             MR. SCHIRICK:  Objection, your Honor, relevance.

16             THE COURT:  Overruled.  Of course it's relevant.

17   A.   Yes.  Just give me——

18   Q.   And these documents are not written only for lawyers; isn't

19   that right?

20   A.   Right.

21   Q.   They're written for people who might invest in coins they

22   might find on the internet; isn't that right?

23   A.   Yes, but they're heavily edited by lots of lawyers and lots

24   of other people, so this is not the clearest sentence I've ever

25   seen, just to be honest.

O721GUO5                         Sklar - Cross

1   Q.  Stipulating that it's not a clear sentence, does the first

2   clause, before we get to the comma, say that neither crypto

3   assets or fiat currency may be held by members within the

4   Himalaya Ecosystem?  Yes or no; is that what it says?

5            MR. SCHIRICK:  Document speaks for itself.

6   A.  It says that, but I disagree with what I think the sentence

7   means.

8   Q.  Ms. Sklar, the question was—

9            THE COURT:  The question wasn't how you interpret it

10  but what does it say.

11  A.  I read it, though.  I mean, it says what it says, and I've

12  read it now a few times.

13           THE COURT:  Okay.

14           MR. HORTON:  Your Honor, we can move on.

15           THE COURT:  Excuse me?

16           MR. HORTON:  We can move on from the topic.

17           THE COURT:  Go ahead.

18  Q.  Ms. Sklar, if somebody wanted to buy a credit on the

19  Himalaya Ecosystem, they would have to send U.S. dollars to a

20  Himalaya bank account; isn't that right?

21  A.  Yes.

22  Q.  And you said in your testimony earlier that one reason that

23  people use crypto tokens is to avoid using banks; isn't that

24  right?

25           MR. SCHIRICK:  No.  Objection.  Totally misstates the

O721GUO5                        Sklar - Cross

1    testimony.

2              MR. HORTON:  The question was for the witness, not

3    Mr. Schirick.

4              THE COURT:  Sustained.

5              MR. HORTON:  Maybe I misunderstood, your Honor.

6    BY MR. HORTON:

7    Q.  Ms. Sklar, did you not testify that a reason to use

8    cryptocurrency is to not use a bank for financial transactions?

9              MR. SCHIRICK:  Same objection.

10             THE COURT:  Overruled.  You may answer.

11   A.  I mentioned privacy and I mentioned not using third-party

12   intermediaries like banks, yes.

13   Q.  Like banks, correct?

14   A.  Yes.

15   Q.  But isn't it a fact that to buy a credit on the Himalaya

16   Ecosystem, you had to send U.S. dollars through a wire

17   transfer; isn't that right?

18   A.  I mean, they had to send U.S. dollars.  Whether they were

19   using Venmo or wire transfers, I actually don't know, but yes,

20   the dollars had to get there, yes.

21   Q.  Is there a way to use Venmo or wire transfers without using

22   a bank?

23   A.  No, not usually.  Well, no.

24   Q.  Not usually or no?

25   A.  I mean, no.

1  Q.  And sending those U.S. dollar wires to the Himalaya

2  Exchange, that transaction, that's not on the blockchain,

3  right?

4  A.  A wire transfer, no.

5  Q.  It's not a cryptocurrency transaction when you do that, is

6  it?

7  A.  Right.  It's not.

8  Q.  And after the exchange gets the U.S. dollars from a

9  customer——by the way, I'm sorry.  One question.  Are wire

10 transfers anonymous?

11 A.  No.

12 Q.  Can you send U.S. dollars without revealing your true name?

13         MR. SCHIRICK:  Asked and answered.

14         THE COURT:  Overruled.  You may answer.

15 A.  When you send a wire transfer through your bank, your bank

16 knows your name.

17 Q.  And after a customer sends U.S. dollars through the wires

18 and gets an H Coin credit, the customer at the Himalaya

19 Exchange, they have no right to get an actual H Coin token;

20 isn't that true?

21 A.  They have——they get the credit, which is representative of

22 a right, but are you asking whether they get an actual coin

23 or——

24 Q.  Well, both of those.  Do they get an actual coin?

25 A.  I don't think so.  I think they——at the time that they

O721GUO5                          Sklar - Cross

1    would get the credit.

2    Q.  And you said a moment ago that the credit is representative

3    of a right to get the coin; is that your testimony?

4    A.  That's my understanding of what——the credit system.

5              MR. HORTON:  Ms. Loftus, can we bring the white paper

6    back up, please, GX AS12, same page, page 11.

7              If you can blow up the third paragraph from the top.

8    Q.  I'm going to read this one this time, Ms. Sklar.

9              "Credits can only be used on the Himalaya Exchange or

10   within the Himalaya Ecosystem, representing a right to

11   participate in trading on the Himalaya Exchange and do not

12   carry any right to require their exchange for fiat currency or

13   crypto assets."

14   A.  Mm-hmm.

15   Q.  So holding an H Coin or an H Dollar credit at Himalaya did

16   not carry a right to require its exchange for crypto; isn't

17   that what this says?

18   A.  To require it, yes.

19             MR. HORTON:  Okay.  We can take it down, Ms. Loftus.

20   Q.  The credits that customers could buy at the Himalaya

21   Exchange, those credits couldn't be used anywhere else other

22   than the Himalaya Ecosystem; isn't that right?

23   A.  Right.

24   Q.  When you go to Coinbase, for example, you can buy

25   cryptocurrency and take it out of the exchange, can't you?

O721GUO5                        Sklar - Cross

1   A.  Yes.

2   Q.  You could buy Bitcoin on Coinbase and sell it on Binance;

3   isn't that right?

4           MR. SCHIRICK:  Objection.

5   A.  Bitcoin isn't issued by Coinbase, it's——

6           THE COURT:  You——

7   A.  Oh, sorry.

8           THE COURT:  You may answer.

9   A.  It's a little bit apples and oranges there because Bitcoin

10  isn't issued by Coinbase, so of course you can get it out; it's

11  not a closed system.

12  Q.  Well, my question isn't whether Coinbase issued the coin;

13  it's whether you can buy Bitcoin at Coinbase and then sell it

14  at a different exchange.

15  A.  That is how they've set up their system, yes.

16  Q.  And cryptocurrencies are often listed on multiple

17  exchanges; isn't that right?

18          MR. SCHIRICK:  Objection.

19          THE COURT:  Overruled.  You may answer.

20  A.  If——if the issuer has designed it that way, but it doesn't

21  have to be.

22  Q.  And Bitcoin, for example, that's listed on over a hundred

23  exchanges; isn't that true?

24          MR. SCHIRICK:  Objection, foundation.

25          THE COURT:  You may answer.

O721GUO5                          Sklar - Cross

1    A.  I mean, Bitcoin is the most decentralized cryptocurrency,

2    no one even knows who created it, so yes, it's everywhere.

3    Q.  Tether, that's another stablecoin; isn't that right?

4    A.  Tether is a stablecoin, yes.

5    Q.  And Tether is listed on 115 different exchanges; isn't that

6    true?

7            MR. SCHIRICK:  Objection.

8            THE COURT:  You may answer.

9    A.  I can't confirm 115, but yes, it is the most—I think the

10   most highly traded stablecoin right now, yes.

11   Q.  You said a moment ago that Coinbase didn't issue Bitcoin;

12   is that right?

13   A.  Yes.

14   Q.  And you were drawing a comparison with the Himalaya

15   Exchange issuing its H Coin and H Dollar; isn't that right?

16   A.  I was, yes.

17   Q.  Binance is another cryptocurrency exchange; isn't that

18   true?

19   A.  Yes.

20   Q.  And they issued an exchange coin called BNB; isn't that

21   right?

22   A.  Yes.

23   Q.  And Binance's exchange coin, BNB, is listed on exchanges

24   other than Binance, isn't it?

25   A.  Yes, as part of their design, yes.

O721GUO5                        Sklar - Cross

1   Q.  In fact, it's listed on 62 other exchanges, isn't it?

2          MR. SCHIRICK:  Objection.

3          THE COURT:  You may answer, if you know.

4   A.  I don't know 62, but I know it is—it is traded, yes.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O72BGUO6                        Sklar - Cross

1   BY MR. HORTON:

2   Q.   You said in your testimony today that you reviewed other

3   witnesses' testimony in this case; is that right?

4   A.   Yes.

5   Q.   Did you review Jesse Brown's testimony?

6   A.   Yes.

7   Q.   Do you know that he's the former CEO of the Himalaya

8   Exchange?

9   A.   Yes.

10  Q.   Do you recall that Mr. Brown testified that his

11  understanding was that Himalaya Coin wasn't listed at any other

12  Exchange because the Exchange was worried that would cost its

13  price to drop?

14  A.   I can't if -- if he said that, he said that, but I can't

15  testify whether that's true or not.  I don't know.

16  Q.   My question is not whether it's true, it is whether you

17  read Jesse Brown the former CEO of the Exchange testified that

18  H Coin wasn't listed at any other Exchange to avoid its price

19  dropping?

20  A.   That's what he said.

21  Q.   And he was sitting right where you're sitting right now

22  when he testified to that?

23          MR. SCHIRICK:   Objection.

24          THE COURT:  She wasn't here for the testimony so she

25  can't answer.

O72BGUO6                          Sklar - Cross

1    Q.   Withdrawn.  By the way, Ms. Sklar, Himalaya Coin was not

2    listed at any other Exchange, was it?

3    A.   It was not.

4    Q.   And H Dollar was not listed any other Exchange?

5    A.   It was not.

6    Q.   Now speaking of H dollar, Ms. Sklar, that was described in

7    the exchange's papers as a stable coin; isn't that right?

8    A.   Yes.

9    Q.   When I refer to it as HDO, you'll know I'm talking about

10   the same thing?

11   A.   Yes.

12   Q.   And sort of basic feature of stable coins is that they're

13   redeemable; isn't that true?

14   A.   It depends on the terms of the contract.

15   Q.   Well, let me ask you this, are you familiar with any stable

16   coins that can't be redeemed into the currency their associated

17   with?

18   A.   Yes.

19   Q.   Which are those?

20   A.   Tether before it was subject to the CFTC's and New York

21   State Department of Financial Services action was only

22   redeemable by people who had over a hundred thousand, which

23   meant that the vast majority of average users of Tether could

24   not redeem Tether.

25   Q.   But some could, right?

O72BGUO6                    Sklar - Cross

1   A.  If you had over a $100,000 you could, yes.

2   Q.  And redeemable means that you can convert the stable coin

3   into real world currency; isn't that right?

4   A.  Yes.

5   Q.  I don't say fiat because that's confusing, but that's what

6   that means?

7   A.  Yes.

8   Q.  And in fact a true fully reserved stable coin, it's

9   redeemable one-to-one at all times, isn't it?

10  A.  That's the intent, but even the best stable coins sometime

11  drop down a peg to 98 percent, but, yes, that's the purpose of

12  reserved coins, yes.

13  Q.  And if it wasn't redeemable at all times, it wouldn't be a

14  true fully reserved stable coin, right?

15          MR. SCHIRICK:  Objection.

16          THE COURT:  Overruled.  You may answer.

17  A.  The purpose of a redeemable full reserve stable coin is to

18  be able to redeem it.

19  Q.  Putting aside it's purpose, Ms. Sklar, what makes it a true

20  stable coin is that it's redeemable at all times, right?

21          MR. SCHIRICK:  Asked and answered.

22          THE COURT:  You may answer.

23  A.  It sort of goes back to what I just mention about Tether

24  and the issuer.  If you have a stable coin right now on

25  Coinbase, for example, Coinbase doesn't have an obligation to

O72BGUO6                           Sklar - Cross

1    redeem it back one-to-one.  If you wanted to go to your issuer,

2    you could try to do that, but it depends on the contract with

3    the issuer.

4    Q.  Ms. Sklar, didn't you write the words, A true fully

5    reserved stable coin is redeemable one-to-one for U.S. dollars

6    at all times.  Didn't you write that?

7    A.  Is that from something I wrote?

8    Q.  Isn't it?

9    A.  It's possible, could you just refresh my recollection.

10   Q.  Yes.  Ms. Loftus, can we pull up GXC0207 and go to page

11   seven of it.  Actually let's go to the first page for the

12   author.

13            So, Ms. Sklar, just for the witness and the parties,

14   please.  This is the first page.

15            THE INTERPRETER:  Your Honor, can you please remind

16   all parties to please slow down, please.

17            THE COURT:  Please slow down.

18   Q.  If you could go to page two for Ms. Sklar, please.  That's

19   your name there as an author of this document?

20   A.  Yes.

21   Q.  Can we go to page seven, please.  I may have the wrong

22   page.  Can we try the next page.

23            At the top of page eight, Ms. Sklar -- Ms. Loftus, can

24   you highlight that two line fragment.

25            Looking at this, Ms. Sklar, does it refresh your

O72BGUO6                          Sklar - Cross

1    recollection that you wrote, A true fully reserved stable coin

2    is a hundred percent backed by cash and short-dated U.S.

3    treasuries and is redeemable one-to-one for U.S. dollars at all

4    times?

5    A.  Yes.  The point is a true fully reserve stable coin.  This

6    paper is about stable coins that is are different, but I did

7    write this sentence, yes.

8    Q.  And, in fact, the Himalaya Dollar was not redeemable for

9    U.S. dollars at all times; isn't that true?

10   A.  I don't know that that's not true.

11   Q.  Ms. Loftus, if we can look back at the January 2022 H

12   dollar white paper GXAS18.  This is a document in evidence, if

13   we can go to page 10, and if you could zoom in on the fourth

14   paragraph down.

15           Ms. Sklar, this paragraph says, Additionally a member

16   may make a request to the Himalaya Exchange to accept a

17   transfer of HDO credits in exchange for an equivalent payment

18   in U.S. dollars to be paid to the bank account of the member.

19   Just stopping there, that's describing a redemption, right?

20   A.  Yes.

21   Q.  However, such exchanges are at the discretion of the

22   Himalaya Exchange, and the Himalaya Exchange is not obliged to

23   fulfill any such request.

24   A.  Yes, that's what it says, yes.

25   Q.  And the meaning of that is that H dollars were not

O72BGUO6                          Sklar - Cross

1   redeemable into cash whenever a holder wanted; isn't that

2   right?

3           MR. SCHIRICK:  Objection.  These aren't her words.

4           THE COURT:  You may answer.

5   A.  It says at the discretion.

6   Q.  What that means for nonlawyers is the Himalaya Exchange

7   could decide not to redeem for dollars, right?

8   A.  I mean that's my understanding of the words at the

9   discretion.

10  Q.  For any reason they wanted, right?

11          MR. SCHIRICK:  Objection.

12  A.  I have no idea what the reasons.

13          THE COURT:  Overruled.

14  Q.  Or for no reason at all, right?

15          MR. SCHIRICK:  Same objection.

16          THE COURT:  Overruled.

17  A.  I didn't work there.  I don't know what the reasons would

18  be.  Do I understand what the word at the discretion means,

19  yes.

20  Q.  That means that the exchange could decide no redemptions

21  for H dollars for any reason we decide.

22  A.  I don't know for any reasons.  They might have their own

23  reasons.

24          MR. SCHIRICK:  Objection.

25  Q.  I'm not asking if they had reasons.  I'm saying what this

O72BGUO6                          Sklar - Cross

1  document says that you reviewed and testified about says that

2  the Himalaya Exchange gets to decide for any reason it wants

3  whether to redeem an HDO credit for U.S. dollars?

4            MR. SCHIRICK:  Objection.

5            THE COURT:  Overruled.  You may answer if you agree

6  with him.

7  A.  It says at the discretion does that mean any reason, I

8  assume there must have been some internal process that it

9  wasn't just any reason.

10 Q.  I'm not asking about internal processes.

11 A.  I didn't work there, so I don't know.

12 Q.  And you don't know about any internal processes there, do

13 you?

14 A.  I don't know what this sentence refers to.

15 Q.  Did you review any minutes of board meetings there?

16 A.  I did not, no.

17 Q.  Ms. Sklar, you're a regulatory lawyer, what limits on the

18 discretion to deny redemption for H dollars are in this

19 document?

20           MR. SCHIRICK:  Objection, foundation calls for

21 speculation.

22           THE COURT:  You can ask whether she knows of any

23 limitation on their discretion.

24           THE WITNESS:  Is that the question?

25           THE COURT:  That's my question.

O72BGUO6                    Sklar - Cross

1    A.  I'm not aware.

2    Q.  Okay.  And the last sentence of this paragraph that we have

3    up now says, References in this document, this is the January

4    2022 H dollar white paper, references in this document to HCN,

5    the Himalaya Coin, a new coin issued by Himalaya International

6    Financial Group, HCN or Himalaya Coin, HDO or any other type of

7    asset on an account at the exchange or through the Himalaya pay

8    app, references in this document to that list of things are

9    references to credits corresponding to that asset.  Is that

10   what that says?

11   A.  Yes.

12   Q.  In fact, Ms. Sklar, the Himalaya Exchange did refuse

13   redemption for Himalaya Dollars; isn't that true?

14          MR. SCHIRICK:  Objection, foundation.

15          THE COURT:  If you know.

16   A.  I also thought they gave redemption.

17   Q.  You testified a moment ago that you read jesse brown's, the

18   transcript of his testimony in this trial, right?

19   A.  Yes.

20   Q.  Do you remember that Mr. Brown testified that after the

21   Himalaya Exchange's bank accounts were seized in the fall of

22   2022, the Exchange stopped doing redemptions for H Dollars?

23   A.  After the accounts were seized, yes.

24   Q.  So the Himalaya Exchange stopped doing H Dollar

25   redemptions?

O72BGUO6                          Sklar - Cross

1   A.  After its accounts were seized, yes.

2   Q.  What was the exchange using to backup H Dollar with cash

3   after its accounts were seized?

4           MR. SCHIRICK:  Objection to form.

5           THE COURT:  If you know you may answer.

6   A.  I don't know actually.

7   Q.  I want to talk about those.  Those are the reserves, right,

8   cash that backs up stable coins are reserves, right?

9   A.  Yes.

10  Q.  I want to talk about those reserves for a minute.  You

11  testified about reviewing documents that Himalaya sent to a

12  company called Armanino, right?

13  A.  Yes.

14  Q.  And Armanino at that time did audits of crypto companies,

15  right?

16  A.  Yeah.

17  Q.  Does Armanino still do audits of crypto companies?

18  A.  No.

19  Q.  Do you know why they don't?

20          MR. SCHIRICK:  Objection, relevance, your Honor.

21          THE COURT:  You may answer if you know.

22  A.  I don't know why.

23  Q.  Did you review a document that said the Exchange has $400

24  million more or less in cash reserves for its H Dollar?

25  A.  Yes.

O72BGUO6                        Sklar - Cross

1   Q.  Do you remember that document had a part at the bottom that

2   says, I'm representing that this is accurate and complete?

3   A.  I believe so.

4           MR. SCHIRICK:  Objection.

5   A.  I think I know what document you're talking to.

6           THE COURT:  You may answer.

7   A.  I think I know the document you're referring to.  I can't

8   recall that it says that sentence, but if you represent to me

9   that it does, I mean I have no reason to believe it doesn't say

10  that.

11  Q.  And crypto auditors rely on information that's given to

12  them by the companies they're auditing, right?

13  A.  All auditors do, not just for crypto.

14  Q.  Do you remember that Armanino document where information

15  was represented by the Himalaya Exchange, do you remember it

16  was signed by Jesse Brown?

17  A.  Yes.

18  Q.  Do you know if Jesse Brown read that document before he

19  signed it?

20          MR. SCHIRICK:  Objection.

21          THE COURT:  If you know, you may answer.

22  A.  I don't know.

23  Q.  Do you know sitting here today if the information in that

24  document is accurate and complete as Mr. Brown represented with

25  his signature?

O72BGUO6                          Sklar - Cross

1   A.  All I know is what the document says and what was

2   represented in it.

3   Q.  Did you speak with Priya Patel when you were learning about

4   the Himalaya Exchange?

5   A.  I did not.

6   Q.  Do you know who she is?

7   A.  Yes, from some references in documents, yes.

8   Q.  And she was a general counsel at the Himalaya Exchange

9   isn't that right?

10  A.  Yes.

11  Q.  Did you know that Ms. Patel gave that same document the

12  $400 million cash reserve document to Bitgo in January of 2020?

13          MR. SCHIRICK:  Objection.

14          THE COURT:  If you know, you may answer.

15  A.  I don't know.

16  Q.  And that document said that Himalaya Exchange had $400

17  million in cash reserves in August 2022, right?

18          MR. SCHIRICK:  Objection, your Honor.  She already

19  said she doesn't know.

20  A.  Which document the one I saw?

21  Q.  The $400 million cash reserve --

22          MR. SCHIRICK:  Excuse me.

23          THE COURT:  It's not clear that she said that she was

24  aware of that document.

25  Q.  Let's take a quick look at it.  Ms. Loftus, can you pull up

O72BGUO6                      Sklar - Cross

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | GXBR208A.  It's in evidence.  If you can go to the second page     |
| 2  | please.  This is one of the documents you looked at right,         |
| 3  | Ms. Sklar?                                                          |
| 4  | A.  Yes.                                                            |
| 5  | Q.  Can you blow up the top of the second page, please,            |
| 6  | Ms. Loftus.  So this bank and fund holdings report signed by       |
| 7  | Mr. Brown is dated July 31, 2022.  Isn't that right?               |
| 8  | A.  Yes.                                                            |
| 9  | Q.  And you said a moment ago you knew that the seizures of the    |
| 10 | Himalaya Exchange's bank account were in the fall of 2022?         |
| 11 |            MR. SCHIRICK:  Objection, mischaracterizes testimony.   |
| 12 |            THE COURT:  I don't recall her stating that.            |
| 13 | Q.  You know that the Himalaya Exchange's bank accounts were       |
| 14 | seized, right?                                                     |
| 15 | A.  Yes.                                                           |
| 16 | Q.  And did you know that Ms. Patel, Priya Patel, who you know,    |
| 17 | gave this document to Bitgo the company you testified about in     |
| 18 | January of 2023?                                                   |
| 19 |            MR. SCHIRICK:  Objection.                               |
| 20 |            THE COURT:  Do you know?                                |
| 21 | A.  I don't know.  I don't know that.                              |
| 22 | Q.  And do you know that in January of 2023, the exchange's        |
| 23 | bank accounts had already been seized?                             |
| 24 |            MR. SCHIRICK:  Objection.                               |
| 25 |            THE COURT:  If you know.                                |

O72BGUO6                        Sklar - Cross

1    A.  I know they were seized.  If you represent to me that was

2    the month that it happened, I have no reason to doubt that.

3    Q.  And what's your understanding of what the cash reserves

4    were for H Dollar after the exchange's accounts were seized?

5    A.  I don't know that.

6            MR. SCHIRICK:  Objection.

7    Q.  Ms. Sklar, you testified a little bit about reviewing

8    documents about the exchange's relationship with Bitgo, right?

9    A.  Yes.

10   Q.  And Bitgo, there's was a contract with Bitgo for wallet

11   services; isn't that right?

12   A.  Yes.

13   Q.  What happened with the Bitgo/Himalaya Exchange

14   relationship, do you know how it ended?

15   A.  I mean, I know it ended.  I don't know if I should be

16   characterizing.

17   Q.  Do you know that Bitgo terminated its relationship with the

18   Himalaya Exchange?

19   A.  Yes.

20   Q.  And do you know that happened after Bitgo found red flags

21   in its account review of the Himalaya Exchange?

22           MR. SCHIRICK:  Objection.

23           THE COURT:  You may answer.

24   A.  If that's what they said, I can't say what they said.

25   Q.  You also reviewed documents about the exchange's

O72BGUO6                        Sklar - Cross

1   relationship with a company called Certik?

2   A.  Certik, yes.

3   Q.  And a company called Jumio; is that right?

4   A.  I didn't see the Jumio documents, but I know what they do.

5   Q.  You know about their relationship?

6   A.  Yes.

7   Q.  And GXBR208A, that wasn't the only Armanino document you

8   looked at, right?

9           MR. SCHIRICK:  Objection.  You didn't show her that

10  document.

11          THE COURT:  Overruled.  You may answer.

12  A.  If I seen other Armanino documents?

13  Q.  Yes, in the course of this review.

14  A.  Yes.

15  Q.  By the way, did the exchange ever publicly release its

16  audits?

17  A.  I'm not aware if they did.

18  Q.  But they said they would, right?

19          MR. SCHIRICK:  Objection.

20          THE COURT:  If you know.

21  A.  I don't know.

22  Q.  Can we pull up GXAS18.  It's the January 2022 H Dollar

23  white paper, and can we go to page eight and blow up the third

24  paragraph above the gold writing on the bottom.  It says if the

25  market, it's in the middle of the page.

O72BGUO6                          Sklar - Cross

1        So this says -- and you reviewed the January 2022 H

2   Coin white paper that we're looking at.  This says, The reserve

3   will be manage -- and that's referring to the H Dollar reserve?

4   A.  Yes.

5   Q.  "With the aim of maintaining its value at a level equal to

6   the value of all HDO in circulation and will be subject to

7   independent audit with audit reports made public."  Isn't that

8   what it says?

9   A.  Yes.

10  Q.  Sitting here today, you don't know if that ever happened,

11  right?

12  A.  That 2022 document wasn't made public before it was seized

13  in 2023, yeah.

14  Q.  My question, Ms. Sklar, is sitting here today, you don't

15  know whether the Himalaya Exchange ever made any audit report

16  public, do you?

17  A.  Right, I'm not aware that they made it public.

18  Q.  In all of the documents you reviewed from the exchange, all

19  the documents reviewed from third-party contractors and the

20  time you spent on Etherscan, you didn't see any evidence that

21  H Coin was backed by gold, did you?

22        MR. SCHIRICK:  Objection, foundation, calls for

23  speculation.

24        THE COURT:  You may answer.  If you know, you can

25  answer.

O72BGUO6                    Sklar - Cross

1    A.  That it was backed by gold, no, I didn't see anything.

2    Q.  And you didn't see any balance sheet at the exchange

3    reflecting that the exchange held gold or owned gold, did you?

4    A.  I saw something about them holding gold.  I don't know.  I

5    can't recall what document it was though.

6    Q.  And you reviewed a lot of documents about H Dollar

7    reserves, right?

8    A.  That they had reserves, yes.

9    Q.  And none of those documents said the reserves were in gold,

10   right?

11   A.  I don't recall seeing that.

12   Q.  And the Armanino audit document we just looked at a few

13   moments ago, that was an HDO reserve audit document, right?

14   A.  Yes.

15   Q.  That document didn't say anything about its reserves being

16   gold, did it?

17              MR. SCHIRICK:  Objection.

18              THE COURT:  You may answer.

19   A.  It said cash.

20   Q.  But cash isn't gold, right?

21   A.  Right.

22   Q.  You're a former regulator, if the HDO was backed by gold

23   would they need to tell their auditor that?

24              MR. SCHIRICK:  Objection, calls for legal conclusion.

25              THE COURT:  You may answer.

O72BGUO6                          Sklar - Cross

1    A.   There's technically no requirement for any of this when it

2    comes to stable coins.   The purpose, the philosophy behind it

3    is, yeah, when you say something is reserved by something, it

4    should be reserved by that.   If you say it's reserved by gold,

5    then there should be gold.   If you say it's cash or cash

6    equivalence, which I also believe I saw somewhere too which is

7    what most stable coins do.   There's no regulatory requirement

8    right now that says how to do it at all.

9    Q.   You testified earlier that you advise clients on white

10   paper; is that right?

11   A.   Right.

12   Q.   Have you advised clients on dealing with crypto audits?

13   A.   Yes.

14   Q.   Would you advise a client to not tell its auditor about the

15   nature of its --

16          MR. SCHIRICK:   Objection, calls for speculation.

17   She's not testifying as a legal expert.

18          MR. HORTON:   I'm asking about the facts of how she

19   interacts with the clients she advises.

20          MR. SCHIRICK:   It's a hypothetical question about what

21   she would do.

22          THE COURT:   She's an expert.   She can answer

23   hypothetical questions.

24   A.   I would tell my clients to be honest, but, you know, my

25   clients are also my clients.   I don't control what it is they

O72BGUO6                    Sklar - Cross

 1  actually do in these situations, but I give my advice for them

 2  to be honest.

 3  Q.  Now, in addition to reviewing documents, you reviewed some

 4  witness testimony in this case; is that right?

 5  A.  Yes.

 6  Q.  Did you review everything that Miles Guo has said about

 7  H Coin?

 8  A.  I have not, no.

 9  Q.  Did you review anything that Miles Guo had said about H

10  Coin?

11  A.  I actually don't think I have.

12  Q.  Did you review anything that Miles Guo said about H Dollar?

13  A.  No.

14  Q.  Ms. Loftus, can we please pull up what's in evidence as

15  GXZ9 and go to the bottom of page 120 of this document, please.

16         Ms. Sklar, the person who's in the middle of the

17  screenshot at the top of this page, do you know who that is?

18  A.  I've never seen this before.  That's Miles, right?

19  Q.  I couldn't hear you.

20  A.  That's Miles Guo, right.

21  Q.  What's the date on the left-hand top left of this page?

22  A.  October 20, 2021.

23  Q.  That's less than two weeks before the launch of the

24  Himalaya Exchange, isn't it?

25  A.  Yes.

O72BGUO6                    Sklar - Cross

1   Q.  And, Ms. Loftus, if you can scroll down to the next page

2   121 and zoom in on the second large body paragraph there.

3           Ms. Sklar, the sentence the third line down starts

4   with what is called, Do you see that?

5   A.  Yes.

6   Q.  Starting with what is called, can you please read aloud

7   until I stop you?

8   A.  Can I ask like who is saying this?  Is that Mr. Guo?

9   Q.  This document is in evidence as a statement of Miles Guo.

10  A.  Okay.

11  Q.  Starting at, What is called, can you just plead read aloud

12  until I stop you.

13  A.  What is called.  I'm talking about your H Coins Brother

14  Seven designed it at that time.

15  Q.  I'll stop you there.  You don't know who Brother Seven is,

16  do you?

17  A.  Yes.

18  Q.  You do know who Brother Seven is?

19  A.  It's in the caption of the indictment.

20  Q.  And who is Brother Seven?

21  A.  Referring to Mr. Guo.

22  Q.  From Brother Seven designed it at that time, please keep

23  reading?

24  A.  It has the first one.  It has the attribute of currency.

25  Why?  It is 20 percent gold.  Awesome.  It was born as currency

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O72BGUO6                    Sklar - Cross

1   on the first day, so it is value, and it is linked to gold, not

2   to others.  Clear gold directly.

3           Do you want me to keep going?

4   Q.  Just the next sentence, please.

5   A.  No matter how much it raises 20 percent will turn into

6   gold.

7   Q.  Thank you, Ms. Sklar.  Ms. Loftus, if we can take us to 168

8   of this same document that is in evidence.  If you could scroll

9   up sort of the top part of the page with the screenshot.

10          Do you see the date on this page is May 2022,

11  Ms. Sklar?

12  A.  Yes.

13  Q.  You see the URL there says G News.org?

14  A.  Yes.

15  Q.  You know that G News is Miles Guo's media outlet, right?

16          MR. SCHIRICK:  Objection, foundation.

17          THE COURT:  You may answer if you know.

18  A.  I haven't been to this website, but if that's his, then

19  I'll take your representation for it.

20  Q.  Do you see there's a pricing chart for H Coin and H Dollar

21  in this screen gram?

22  A.  Yes.

23  Q.  Where does that pricing data come from?

24  A.  G News.

25  Q.  My question is where did G News get that information?

O72BGUO6                    Sklar - Cross

                MR. SCHIRICK:  Objection, how could she possibly know

that.

                THE COURT:  If you happen to know you may answer.

A.  Just reading off the screen follow NFSC news on Gettr.  I

don't know.

Q.  Ms. Loftus, if you could go down to the paragraph it

straddles the bottom of 168 to the top of 169, please.

                I'll read some of this, Ms. Sklar, and I'll ask you to

pick up where I leave off.  And again this is the same document

we're looking at it's statements from G News.

                Luna coin plunged 99.99 percent to almost zero this

week from $120 a month ago, and it's stable coin UST plummeted

from $1 to under 20 cents exposing a major flaw in the current

stable coin reserve in the digital currency industry.  Can you

start reading from there please.

A.  Miles emphasize in the live broadcast that the traditional

financial institutions and many digital currency projects

around the world collapse when faced with a run.

                You want me to continue?

Q.  Yes, just to the bottom of the text, please.

A.  But the H Coin stable coin, HDO, H Dollar can guaranty that

no run will ever happen under any circumstances.  The stable

coin, HDO and U.S.D. deposited by users always maintain a

constant 1:1 exchange rate without any financial leverage or

room for misappropriation.

O72BGUO6                           Sklar - Cross

1  Q.  Ms. Sklar, this says that HDO can guaranty that no run will

2  ever happen under any circumstances.  Do you see that?

3  A.  Yes.

4  Q.  And a run refers to when the price of a stable coin

5  basically plummets, right?

6  A.  Technically the run is when people are actually running to

7  try to take their money out and the price may plummet because

8  of that, but the run is the activity that might lead to it.

9  Q.  And if you hold a stable coin, you don't want there to be a

10  run on it, right?

11  A.  Right.

12  Q.  You're an expert in stable coin, right, Ms. Sklar?

13  A.  Right.

14  Q.  And you read all about Himalaya Dollar to testify today;

15  isn't that right?

16         MR. SCHIRICK:  Objection, asked and answered.

17  A.  I read the documents I referred to, yes.

18  Q.  Ms. Sklar, what was the mechanism in H Dollar to guaranty

19  that a run would never happen under any circumstances?  How did

20  that work?

21  A.  I think it was one of the documents you showed me before,

22  the Armanino document shows that they were overcapitalized

23  one-to-one for their stable coin, that they had slightly over

24  400 million, so they had enough also to probably pay out

25  whatever fees or wind down expenses they needed on top of a

O72BGUO6                        Sklar - Cross

1     one-to-one.

2     Q.  Just so I'm clear, Ms. Sklar, is it your testimony that

3     H Dollar could guaranty that no run would ever happen under any

4     circumstances?

5              MR. SCHIRICK:  Objection.  That's not her testimony.

6              THE COURT:  Overruled.

7     A.  I don't think anyone can guaranty anything, but the

8     document showed that it had more than one-to-one.

9     Q.  Is that the only stable coin that's over-collateralized as

10    far as you know?

11    A.  Some of them are supposed to be, but again there's no

12    regulation requiring it.  It's good practice --

13    Q.  Just so I understand --

14    A.  -- to overcapitalize if you can.

15    Q.  Is your testimony that there are right now in the world

16    stable coins that can guaranty people who may buy or hold them

17    that they will never have a run never under any circumstances?

18             MR. SCHIRICK:  Objection.

19             THE COURT:  Overruled.  She may answer.  Go ahead.

20    A.  They might have a run.  A run is irrelevant if you have

21    one-to-one backing.  Give everyone their money back and it

22    works.

23             THE INTERPRETER:  If the witness and counsel can slow

24    down.

25             THE COURT:  Slow down.

O72BGUO6                      Sklar - Cross

1   Q.  It can't be guaranteed, right, Ms. Sklar?

2              MR. SCHIRICK:  Objection.

3   A.  A run can't be guaranteed?

4   Q.  Right, can't be guaranteed?

5   A.  Yes, runs can happen.

6   Q.  Ms. Loftus, if we can go back to the bottom of page 120,

7   GXZ9.

8              This is the same screenshot we were looking at a

9   moment ago; isn't that right, Ms. Sklar?

10  A.  Yes.

11  Q.  Same date, October 20, 2021, and that's a few weeks before

12  the exchange launch?

13  A.  Yes.

14  Q.  Ms. Loftus, you can go down to the top of 123, please, if

15  you could blow up the paragraph that starts with second,

16  Remember what Brother Seven said.

17             I'll read some of this, and then ask you to read some

18  Ms. Sklar.  And again, this is a statement by Miles Guo.

19  Second, Remember what Brother Seven said. The real H Coin, you

20  don't care about the first three months.  You don't care if it

21  rises to one million or falls to .001 cents.  The real owner of

22  H Coin is two years later, and it can almost tell you whether

23  you should hold it or not.  H Coin must be making money. Can

24  you read the next three sentences.

25  A.  If anyone loses money, I can say that I will compensate 100

O72BGUO6                          Sklar - Redirect

| | |
|---|---|
| 1 | percent.  I give you 100 percent.  Whoever loses money, I will |
| 2 | bear it.  Do you want me to keep going? |
| 3 | Q.  No, that's okay.  You're also an expert on crypto trading |
| 4 | coins, right? |
| 5 | A.  Yes. |
| 6 | Q.  Are you aware of any crypto coin whose holders are |
| 7 | guaranteed against any losses by a particular individual? |
| 8 |         MR. SCHIRICK:  Objection. |
| 9 |         THE COURT:  You may answer. |
| 10 | A.  No, but I probably want to invest in that cryptocurrency. |
| 11 | I mean that's -- yeah.  No one does that, but not because they |
| 12 | can't.  Most people can't. |
| 13 | Q.  Ms. Sklar, what was the total amount you were paid to |
| 14 | testify today? |
| 15 | A.  It's somewhere around 70,000. |
| 16 |         MR. HORTON:  No further questions, your Honor. |
| 17 |         THE COURT:  Redirect. |
| 18 |         THE WITNESS:  Actually, sorry, can I revise that |
| 19 | answer? |
| 20 |         THE COURT:  You may. |
| 21 | A.  That's what Seda Experts was paid.  I get paid less than |
| 22 | that.  That's what the management company charges. |
| 23 |         MR. HORTON:  Thank you, Ms. Sklar. |
| 24 | REDIRECT EXAMINATION |
| 25 | BY MR. SCHIRICK: |

1  Q.  Ms. Sklar, you were asked some questions on cross about,

2  toward the beginning, about whether you were allowed to

3  interview people from the Himalaya Exchange.  Do you recall

4  that?

5  A.  Yes.

6  Q.  Did you ask to interview anyone from the Himalaya Exchange?

7  A.  I did not.

8  Q.  Did we deny you the opportunity to interview anyone from

9  the Himalaya Exchange?

10  A.  No.

11  Q.  Mr. Horton, also read you -- withdrawn.

12          Mr. Horton also referred to a number of individuals

13  and entities back toward the beginning of his cross

14  examination.  Do you recognize any of those individuals or

15  entities?

16  A.  No.

17  Q.  Mountain of Spices?

18  A.  No.

19  Q.  Does that mean anything to you?

20  A.  No.

21  Q.  Now, Mr. Horton also asked you the question whether if you

22  can't see a cryptocurrency on the public ledger, it doesn't

23  exist.  Do you recall him asking you that?

24  A.  Yes.

25  Q.  Now, are you familiar with private blockchains?

O72BGUO6                          Sklar - Redirect

1    A.  Yes.

2    Q.  And what are private blockchains?

3    A.  It's an internal blockchain, an internal ledger system,

4    similar to how a public blockchain would look, but it's

5    internal.  One popular example is JPM coin, that's for JP

6    Morgan. They have an internal blockchain and an internal coin.

7    It's not public.  Blockchain isn't public.

8    Q.  And on a private blockchain, you can't see those

9    cryptocurrencies on the public blockchain, right?

10   A.  Right.

11   Q.  And on a centralized exchange, you can't see transactions

12   reflected on the public blockchain, right?

13   A.  Right. That's traditionally how it works.  I have crypto as

14   I mentioned.  I have no idea where it is on the blockchain

15   cause I use a centralized exchange to do transactions.

16   Q.  Would you agree with me that those are at least two

17   examples there of transactions on a blockchain that might not

18   be publicly viewable from outside?

19        MR. HORTON:  Objection to the compound leading

20   question.

21        THE COURT:  Can you break it down, please.

22   Q.  Would you agree with me that the -- a private blockchain,

23   the use for a private blockchain cannot be viewed from the

24   public blockchain?

25        MR. HORTON:  Objection, asked and answered.

O72BGUO6                     Sklar - Redirect

 1              MR. SCHIRICK:  You can't object and --

 2              THE COURT:  You May answer.

 3   A.   If it's a private blockchain, it wouldn't be reflected on

 4   the public blockchain.

 5   Q.   Right.  And same question with respect to transactions on a

 6   centralized exchange, would those also not be viewable on a

 7   public blockchain?

 8   A.   Right.  If that's the way the centralized exchange has it

 9   set up, as many do, yes, you don't see the individual

10   transaction on the blockchain.

11   Q.   Would you agree with me that's at least two examples of

12   cryptocurrency transactions that are not viewable from a public

13   blockchain?

14   A.   Yes.

15   Q.   Now, you were also asked several questions by Mr. Horton

16   about the internal ledger nature of the Himalaya Exchange.  You

17   recall those?

18   A.   Yes.

19   Q.   And he asked whether the Himalaya Exchange's internal

20   system sort of would meet your expectation of what an internal

21   ledger system would look like.  Do you recall that?

22   A.   Yes.

23   Q.   Now, do you have a specific expectation of what an internal

24   ledger system would look like at a centralized exchange?

25   A.   No.

O72BGUO6                          Sklar - Redirect

1   Q.  And why is that?

2   A.  Each exchange would have its own software and technology

3   which would be proprietary, frankly.  So even if I did know

4   what some of these systems might look like, those would be

5   things I learn from privileged conversations.

6   Q.  Now, you were asked on cross whether a Himalaya Exchange

7   user could hold tokens in their own wallet.  Do you recall

8   that?

9   A.  Yes.

10  Q.  Do you know whether that was possible as a technical

11  matter?

12  A.  Not aware whether it was or wasn't a technical matter or

13  not.

14  Q.  Sorry, just to be clear.  As a technical matter, was that

15  possible?

16          MR. HORTON:  Objection, asked and answered.

17          THE COURT:  Sustained.

18  Q.  Is it your understanding that it was technically possible,

19  but it was part of the closed system of the Himalaya Exchange

20  not to transmit tokens to customer wallets?

21          MR. HORTON:  Objection, leading.

22          THE COURT:  If you could not ask leading questions,

23  please.

24  Q.  What's your understanding of what was technically possible

25  to do in terms of transferring tokens on the Himalaya Exchange?

O72BGUO6                      Sklar - Redirect

1   A.  It was my understanding that they were developing that

2   technology and that build out and that was also why they were

3   working with Bitgo and working to develop ways of having

4   wallets and connecting wallets as well as other crypto.

5   Q.  And you testified both on direct and cross about the closed

6   nature of the Himalaya Exchange system, right?

7   A.  Yes.

8   Q.  Is it surprising to you given that closed system that the

9   exchange didn't permit users to send tokens off the exchange?

10          MR. HORTON:  Objection, leading, testifying.

11          THE COURT:  Sustained.

12  Q.  In a closed exchange in your experience is it typical for

13  an exchange to allow customers to send tokens off exchange?

14          MR. HORTON:  Same objection.

15          THE COURT:  You can answer.

16  A.  If the intent is to create a close system, the purpose of

17  the token is to be used through how the system is designed.

18  And in this case eventually the purpose was, according to the

19  white papers, to allow merchants to exchange the tokens too so

20  that you could use it as an exchange of value.

21  Q.  That's right.  And so in your experience as an expert in

22  this industry is there anything unusual about having a closed

23  system like the Himalaya Exchange?

24          MR. HORTON:  The question was previously objected to.

25  It's sustained, leading.

Sklar - Redirect

1                    THE COURT:  Sustained.

2     Q.  What, if anything, is unusual in your experience --

3     withdrawn.

4                    Now, in response to a number of Mr. Horton's questions

5     I believe you started to testify or at least tried to about the

6     long term plans of the Himalaya Exchange.  Do you recall that?

7                    MR. HORTON:  Objection.

8                    THE COURT:  Sustained.

9     Q.  Do you recall trying to testify about the long-term plans

10    of the Himalaya Exchange?

11                   MR. HORTON:  Same objection your, Honor.

12                   THE COURT:  Sustained.

13    Q.  What were the long-terms plans of the Himalaya Exchange,

14    Ms. Sklar?

15                   MR. HORTON:  Objection, lack of foundation to the

16    exchange long-term plans.

17                   MR. SCHIRICK:  Your Honor, she got all the foundation

18    one could ask for.  She's read all the white papers which she

19    described earlier as talking about the long-term plans.

20                   THE COURT:  Long-term plans as to?

21                   MR. SCHIRICK:  The exchange the long-term plans for

22    its system, your Honor.

23                   MR. HORTON:  Objection, about the long-term plans of a

24    group of people she testified she never met.

25                   MR. SCHIRICK:  Whether she met them or not --

O72BGUO6                          Sklar - Redirect

 1              THE COURT:  Can you be more specific.

 2              MR. SCHIRICK:  I will try.  We'll see if Mr. Horton

 3    objects.

 4    Q.  Do you recall that part of the long-term plan of the

 5    exchange was to permit the deposit of other cryptocurrencies

 6    with the exchange?

 7              MR. HORTON:  Objection, leading.

 8              THE COURT:  Sustained.

 9              MR. SCHIRICK:  Your Honor, can I have a brief sidebar,

10    please.

11              THE COURT:  Okay.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (At sidebar)

 2                    MR. SCHIRICK:  Your Honor, I believe I'm permitted to

 3       lead on redirect.

 4                    MS. SHROFF:  That is the government's position in

 5       every single trial, and the Southern District of New York has

 6       always taken the position that the statute is clear that they

 7       can lead on redirect, and they have led on redirect throughout

 8       this entire case.

 9                    MR. SCHIRICK:  There's no mystery, your Honor.  I'm

10       just asking about her understanding about the long-term plan of

11       the exchange.  I can either ask in a general way or in a

12       specific way which the government has also objected to.

13                    THE COURT:  You can ask long-term plans with respect

14       to --

15                    MR. SCHIRICK:  I thought I just did that and that also

16       drew an objection.

17                    MR. HORTON:  From our perspective I think there's

18       leading and then there's leading and some of Mr. Schirick's

19       questions put a developed argument into his witness's mouth and

20       I objected.

21                    THE COURT:  I feel like you can get to this answer

22       fairly easily.

23                    MR. SCHIRICK:  Your Honor, I just ask that I be

24       permitted to some degree -- this is obviously an appropriate

25       topic for questions.  The government is just going to be

1    objecting on form.  I suppose we could be here all day until we

2    get one that's not objected to.

3            MS. SHROFF:  I'll certainly cite this portion of the

4    transcript in future trials that the government doesn't think

5    we're not allowed to lead on redirect.

6            THE COURT:  So instead of talking with your adversary,

7    talk to me.

8            MS. SHROFF:  Sorry about that.  Your Honor, I think

9    that the government's position has always been in this trial

10   and in every trial -- and I note the silence from the

11   government on this point -- that they're allowed to lead, and

12   the statute says you can.  You are permitted to lead on

13   redirect examination, so that that's my point.

14           MR. FINKEL:  Happy to respond on behalf of the

15   government.  As Mr. Horton said quite correctly, there's

16   leading and then there's leading.  And thank you for shaking

17   your head.

18           THE COURT:  Mr. Finkel.

19           MR. FINKEL:  Sorry, your Honor.

20           THE COURT:  That was very snarky.

21           MR. FINKEL:  You're right.  I apologize.  As

22   Mr. Schirick was doing, it was more leading than I think is

23   appropriate like Mr. Horton said and that's why he raised the

24   objection.

25           THE COURT:  Okay.  What do you understand were the

O72BGUO6                     Sklar - Redirect

1    plans for X, okay.

2              (Continued on next page)

1          (In open court)

2          MR. SCHIRICK:  May I, your Honor?

3          THE COURT:  Go ahead.

4    BY MR. SCHIRICK:

5    Q.  Ms. Sklar, what was your understanding of the exchange's

6    long-term plans when it comes to other cryptocurrency besides

7    HCN and HDO?

8    A.  From my understanding it was to eventually accept Ether and

9    Bitcoin which were the two largest cryptocurrencies in

10   circulation to be used instead of U.S. dollars to buy HCN and

11   HDO.

12   Q.  Fair to say they would be opened to other cryptocurrencies?

13          MR. HORTON:  Objection to leading.

14          THE COURT:  Overruled.  You may answer.

15   A.  To accepting other cryptocurrencies as a meet of exchange

16   for other cryptocurrency.  Whether they listed it for trading,

17   I don't know that that was the plan in order to keep a close

18   system, but to make it more inclusive in what types of crypto

19   they were accepting, yes.

20   Q.  What was your understanding about the exchange's long term

21   plan when it comes to eventually permitting the tokens to trade

22   themselves?

23   A.  The long-term plan was for it to be a closed system in that

24   it would be trading HCN and HDO, but that they would be able to

25   translated back and forth into U.S. dollars and into other

O72BGUO6                            Sklar - Redirect

1    crypto and to be used by merchants they selected.

2    Q.  And that would replace the credit system?

3    A.  Yes.

4    Q.  And what was your understanding of the long-term plan to

5    permit HCN to be traded off the Himalaya Exchange?

6    A.  I'm not sure I know exactly what their long-term plan was,

7    but presumably any crypto that gains traction does get traded

8    on a secondary market.

9              MR. HORTON:  Objection, motion to strike.  The

10   testimony is that she doesn't know the plan and the

11   speculation.

12             THE COURT:  Sustained.

13   Q.  In your experience is it common for a centralized exchange

14   to have a period of development towards its long-term plans?

15   A.  Yes.

16   Q.  In your understanding where was Himalaya Exchange in its

17   development at the end of 2021 and in 2022?

18   A.  There is still building out the technology, developing

19   their user base, obviously editing their white papers and the

20   philosophy and the use cases of what they wanted it to look

21   like.

22             Crypto is no different than any other startup.

23   There's an idea.  You need money and users for it to make

24   sense, and you continue to develop it depending also on what

25   your users want.

O72BGUO6                          Sklar - Redirect

1   Q.  And lastly, Ms. Sklar, what was your understanding of the

2   exchange's long-term plans with respect to something called

3   H pay?

4   A.  H pay would be a way to transmit crypto some more of either

5   more of a means of exchange or just a payment system.  So sort

6   of as I stated, as I saw it, like their Venmo system so you

7   could actually send the coin to someone else without using --

8   going through the exchange itself.

9   Q.  Now, if we could please pull up what's in evidence as

10  Government Exhibit BR208A and if we could please go to the

11  second page of this.

12          Now, Ms. Sklar, you recall being asked some questions

13  about this document?

14  A.  Yes.

15  Q.  And do you recall testifying that you believe that this

16  document shows that the HDO tokens -- withdrawn.

17          You recall testifying that in your view this document

18  shows that HDO in circulation was over-collateralized?

19  A.  Yes.

20  Q.  Can you just explain what you mean by that?

21  A.  If you look at the top line, it's over 401 million, that's

22  U.S. dollars held in the bank accounts.  And if you go to the

23  bottom line which is collateralize HDO which is the -- on the

24  platform, you can see that number is slightly smaller, which

25  means they're holding more money, more dollars in the bank

O72BGUO6                          Sklar - Redirect

1  accounts than are on the collateralized HDO credits.

2  Q.  And now you were asked some questions about the white

3  papers.  Do you recall that?

4  A.  Yes.

5  Q.  And you were specifically pointed to some portion of the

6  white paper that said it was in the Himalaya Exchange's

7  discretion whether or not to pay redemptions in dollars.  You

8  recall that?

9  A.  Yes.

10 Q.  In your experience is that provision a common one in

11 cryptocurrency exchanges?

12         MR. HORTON:  Objection.

13         THE COURT:  You may answer.

14 A.  I can't say how common it is, but it's not unusual to

15 create your own redemption policies.  It's a contract like any

16 other that you're signing onto when you buy cryptocurrency as

17 well as any sort of other thing you might be buying.

18 Q.  And is it common in your experience to have some

19 restrictions on redemptions from an exchange?

20         MR. HORTON:  Same objection, your Honor.

21         THE COURT:  You may answer.

22 A.  Yes, for startup exchanges, yes.

23 Q.  And you testified that you just don't have any information

24 with respect to how the exchange exercised that discretion, do

25 you?

1    A.  I don't.

2    Q.  Now, you were asked several questions by Mr. Horton about

3    whether HDO ceased to be backed by dollars at the point that

4    the government seized the Himalaya Exchange bank accounts.  Do

5    you recall that?

6    A.  Yes.

7    Q.  Prior to the time that the Himalaya Exchange accounts were

8    seized by the US government, have you seen anything that

9    indicates to you that HDO was not fully backed?

10   A.  No.

11   Q.  You were asked several questions by Mr. Horton to the

12   effect that the Himalaya Exchange halted redemptions when its

13   account were seized by the US government.  Do you recall that?

14   A.  Yes.

15   Q.  Have you seen anything in this case that indicates that the

16   Himalaya Exchange did not honor redemption consistent with its

17   policy prior to the seizure?

18   A.  No.

19   Q.  You were asked a series of questions by Mr. Horton about

20   audit report issued by Armanino and whether they were made

21   public.  Do you recall that?

22   A.  Yes.

23   Q.  Do you know whether the audit reports -- withdrawn.

24           Do you know whether the Himalaya Exchange accounts

25   were seized before it could make any audit reports public?

1          MR. HORTON:  Objection.

2          MR. SCHIRICK:  She was asked a whole series of

3   questions about audits.

4          THE COURT:  You may answer.

5   A.  The audit report wasn't issued before the accounts were

6   seized; is that the question?

7   Q.  The question is, do you know whether the timing of the

8   account seizure affected the public release of the audit

9   report?

10         MR. HORTON:  Objection, calls for speculation.

11         THE COURT:  You may answer if you know.

12  A.  I don't know.

13  Q.  Now, you were asked several questions about gold backing.

14  Do you recall that?

15  A.  Yes.

16  Q.  And do you know that the only representations about gold

17  backing at all in this case relate to HCN, not HDO?

18  A.  I mean, that's my understanding.

19  Q.  Right.  Because HDO is a stable coin?

20  A.  Yes.

21  Q.  By dollars?

22  A.  Yes.

23  Q.  Now were you asked to review any gold reserve issue as part

24  of your expert testimony today?

25  A.  No.

O72BGUO6                          Sklar - Redirect

1   Q.  So you wouldn't know one way or the other about any gold

2   reserves because it wasn't in scope for you, right?

3                MR. HORTON:  Objection.

4                THE COURT:  Overruled.  You may answer.

5   A.  I don't know.

6   Q.  Now, you were shown by Mr. Horton the transcript of

7   statements by Mr. Guo to the effect that no run could happen.

8   Do you recall that?

9   A.  Yes.

10  Q.  Now, can you just describe to us what a run is, please?

11  A.  Sure.  A run is generally when people panic and they run.

12  The way it's used in traditional financial senses is people use

13  to actually run to the bank and pull their money out.  Now a

14  run can be like electronic in the crypto world.  It happened

15  with another crypto.  Everyone ran to get redemptions or to try

16  to sell it.  Now runs can happen through social media or other

17  ways. It's when everyone tries to get money back.  It's a

18  process.

19  Q.  Understood.  And what role does confidence play in a run?

20  A.  If you have confidence that what you're investing in is

21  backed and something real behind it, there isn't an incentive

22  to run.  A run is usually psychological effect that happens

23  when people run to the bank or they run to sell something.

24  Q.  If they lose confidence, fair?

25  A.  Yes.

1  Q.  And adversely if people believe that the reserves are

2  there, there's no reason for a run, right?

3          MR. HORTON:  Object to the leading.

4          THE COURT:  Overruled. You can answer.

5  A.  Again, like I said it is mainly a psychological effect. So

6  if you don't have a reason to make a run on something, then you

7  wouldn't need to.

8  Q.  And would maintaining a cash reserve one-to-one of all HDO

9  in circulation provide just that kind of confidence to prevent

10  a run in your view?

11  A.  Yes, because that's also the purpose of a stable coin is

12  that you're supposed to have confidence in it, having the

13  backing, unlike other forms of crypto which are more

14  speculative and are intended to go up and down.

15          MR. SCHIRICK:  Thank you.  No further questions, your

16  Honor.

17          THE COURT:  Recross.

18          MR. HORTON:  Very brief.

19  CROSS-EXAMINATION

20  BY MR. HORTON:

21  Q.  Ms. Sklar, you were just asked some questions by

22  Mr. Schirick on redirect about whether Miles Guo ever said

23  H Dollar was backed by gold.  Do you remember that?

24          MR. SCHIRICK:  Objection, misstates the testimony.

25  A.  It was whether it was backed by -- I'm sorry.

 1          THE COURT:  Overruled.  You may answer.

 2   Q.  Ms. Loftus, can you please pull up GXZ9 at the top of 105

 3   and blow up the first two lines.  This is a document in

 4   evidence at GXZ9.  It's a statement from Miles Guo.  Can you

 5   read the line that starts with the word "there." Read that

 6   sentence, please.

 7   A.  This is H dollars backing H Coins and H dollars is backed

 8   by Himalaya reserve as well as gold.

 9   Q.  We can take that down, Ms. Loftus.

10          Ms. Sklar, you were also asked questions by

11   Mr. Schirick about Himalaya Exchange future plans, right?

12   A.  Yes.

13   Q.  Ms. Loftus, if you can go to page 120 at GXZ9.  If you

14   could blow up the top half of this page.

15          Do you see the date at the top left?

16   A.  Yes.

17   Q.  That's September 29, 2021, right?

18   A.  Yes.

19   Q.  That's just a few weeks before the exchange launched in

20   November first of this year, right?

21   A.  Yes.

22   Q.  This is highlights of Miles Guo's live broadcast on that

23   same day, right?

24   A.  Yes.

25   Q.  Can you read the sentence below it, please.

O72BGUO6                        Sklar - Recross

1    A.  The safest virtual coin at the moment is the Himalaya coin

2    because 20 percent of the value is anchored to gold.

3    Q.  Does that say the safest coin at the moment, Ms. Sklar?

4    A.  That's what that sentence says.

5              MR. SCHIRICK:  Objection.

6              THE COURT:  Overruled.

7    A.  That's what the sentence says, yes.

8              MR. HORTON:  One moment, please.  Thank you, Ms.

9    Sklar.  No further questions from us.

10             MR. SCHIRICK:  No further questions, your Honor.

11             THE COURT:  Thank you, you may step out.

12             (Witness excused)

13             THE COURT:  Members of the jury, it's 4:59.  We'll

14   continue tomorrow at 9:30, so I'll expect you to, as usual, be

15   ready to come into the courtroom at this time.  Remember that

16   you're not allowed to discuss the case amongst yourselves or

17   with anyone else.  Don't permit anyone to discuss the case in

18   your presence.  Don't read, watch or listen to anything from

19   any source that touches on the subject matter of this case.

20   Have a good evening.

21             (Continued on next page)

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.  Is there anything

3     before we start tomorrow.

4          MS. MURRAY:  Your Honor, briefly a couple of points.

5     One thing to note with respect to the direct examinations of

6     both of the witnesses today, there were a lot of commentary

7     after each answer.  So the witness would give an answer and the

8     questioner would say thank you or some kind of acknowledgment.

9     We would just ask that the Court police that and limit it.  We

10    don't think that's at all appropriate in a direct examination

11    to kind of validate or acknowledge the answer that is given.

12    It's commentary.  It shouldn't be existent. It's also akin to

13    the government's continuing objection to the direct questions

14    being overly leading.

15          Again, as we discussed at sidebar, we understand it's

16    within the Court's discretion.  We don't object to certain

17    leading questions particularly for efficiency.  But when they

18    veer into testimonial and they bake into the questions some

19    judgment that's implicit that's being placed into the mouth of

20    the witness, we would object.  We note under Rule 611 it's up

21    to the Court's discretion to what extent, if any, to permit

22    leading questions on direct, so we would just note that point.

23          Separate and apart from that, we would ask if the

24    defense could advise how many witness it currently expects to

25    get through tomorrow for planning purposes and also because we

O72BGUO6                        Sklar - Recross

1    understand there was some question about scheduling issues that

2    might arise for certain witness, we'd just like an update on

3    what we expect tomorrow.

4           MS. SHROFF:  Your Honor, I think what we are going to

5    have to adjust the roll call because two of our witnesses have

6    to be out of the United States by the end of day tomorrow, so

7    it may involve a brief reshuffling.  I'm happy to get back to

8    the government in about 30 minutes.  I need to talk to the rest

9    of the team and I've been in here all day.  We've had two

10   witnesses waiting here in the room across all day, so actually

11   we ran out of room so one was in the cafeteria, but anyway.

12          MS. MURRAY:  Which witnesses, your Honor.

13          THE COURT:  If you'll please let the prosecution know.

14          MS. SHROFF:  In 30 minutes.  I'm not a scout, but 30

15   minutes it is.

16          THE COURT:  So with regard to the leading and the

17   commentary, too much commentary diminish the positive effects

18   of leading, so not too much leading and no commentary.  Thank

19   you.  Have a good evening.

20          (Adjourned to July 3, 2024 at 9:00 a.m.)

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     JESSICA VOLCHKO

4    Direct By Mr. Fergenson . . . . . . . . . .4773

5    Cross By Mr. Kamaraju . . . . . . . . . . .4808

6     RAYMOND JOSEPH DRAGON

7    Direct By Mr. Schirick . . . . . . . . . . .4830

8    Cross By Mr. Fergenson . . . . . . . . . . .4870

9    Redirect By Mr. Schirick . . . . . . . . . .4886

10   Recross By Mr. Fergenson . . . . . . . . . .4897

11   MAGGIE SKLAR

12   Direct By Mr. Schirick . . . . . . . . . . .4901

13   Cross By Mr. Horton  . . . . . . . . . . . .4958

14   Redirect By Mr. Schirick . . . . . . . . . .5005

15   Cross By Mr. Horton  . . . . . . . . . . . .5023

16                      GOVERNMENT EXHIBITS

17   Exhibit No.                              Received

18    3100-3107  . . . . . . . . . . . . . . . .4774

19    SW 114, SW 129, and SW 133  . . . . . . . .4774

20    [exhibits listed in Stip 21]  . . . . . . .4774

21    Stip 23; C62-V1 through -V13, and . . . . .4774

22          C62-TX

23    1780 and Stip 20 . . . . . . . . . . . . .4807

24

25
```