O73BGUO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

             v.                           23 Cr. 118 (AT)

MILES GUO,

               Defendant.            Trial
------------------------------x
                          New York, N.Y.
                          July 3, 2024
                          9:00 a.m.

Before:

                  HON. ANALISA TORRES,

                              District Judge
                             -and a Jury-

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  MICAH F. FERGENSON
    RYAN B. FINKEL
    JUSTIN HORTON
    JULIANA N. MURRAY
    Assistant United States Attorneys

SABRINA P. SHROFF
    Attorney for Defendant

PRYOR CASHMAN LLP
    Attorneys for Defendant
BY:  SIDHARDHA KAMARAJU
    MATTHEW BARKAN
    JOHN KILGARD


ALSTON & BIRD LLP
    Attorneys for Defendant
BY:  E. SCOTT SCHIRICK

O73BGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Jorge Salazar, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)
Barbara Robertson, Interpreter (Mandarin)
Tuo Hung, Interpreter (Mandarin)
Peter Ginsberg, Attorney for Witness Jianhu Yi

O73BGUO1

 1              (Trial resumed; jury not present)

 2              THE COURT:  Note your appearances, please.

 3              MS. MURRAY:  Good morning, your Honor.  Juliana

 4   Murray, Ryan Finkel, Micah Fergenson and Justin Horton for the

 5   United States.

 6              MR. KAMARAJU:  Good morning, your Honor.  Sidhardha

 7   Kamaraju and John Kilgard on behalf of Mr. Guo and Mr. Guo is

 8   with us at counsel table.

 9              THE COURT:  Please be seated.  I received a letter

10   dated July 2, 2024, in which the government request that I

11   strike a portion of the testimony of Raymond Dragon, ECF number

12   389.  Mr. Dragon said "My understanding is that the 350 million

13   includes the 200 million of new GTV shares that were issued by

14   GTV and includes shares that were owned by Saraca that were

15   sold because there was a very large investor interest in this

16   offering."  Transcript at 4893.  Mr. Dragon goes onto say that

17   GTV sold 200 million shares, and the remaining 150 million

18   shares came because "Saraca sold some of the GTV shares it

19   already had."

20              The government objects to two aspects of this

21   testimony.  First, the government argues that Mr. Dragon has no

22   personal knowledge that Saraca was the source of the extra 150

23   million shares, and that he did not disclose reviewing any

24   sources that contained this information.  I would like the

25   defense to address this issue by Friday, July 5th.

O73BGUO1

1          Second, the government contends that Mr. Dragon's

2     testimony implies that there was a single "very large investor"

3     who was interested in Saraca's shares of GTV.  I did not

4     interpret Mr. Dragon's testimony that way.  I understood him to

5     say that there was "very large investor interest."  In other

6     words, from multiple investors, which precipitated the sale of

7     the extra 150 million shares.  So my question is, is this

8     correct?  Is my interpreter correct?  And if so, would the

9     parties stipulate to my deletion from the transcript of the

10    word "a" before very large investor interest?

11         MR. KAMARAJU:  From the defense's perspective, your

12    Honor, your interpretation is correct, and we don't have an

13    objection to striking the word "a".

14         MR. FERGENSON:  We have no objection to striking that

15    word either, your Honor, but we maintain our position that that

16    full section of the testimony was improper and should be

17    stricken.

18         THE COURT:  I will hear then from the defense by the

19    5th on that issue generally.

20         MR. KAMARAJU:  No problem, your Honor. We'll file a

21    response to the letter by then.

22         THE COURT:  Is there anything else?

23         MR. KAMARAJU:  Not from the defense, your Honor.

24         MS. MURRAY:  Your Honor, just a point on scheduling.

25    We understand there are seven defense witnesses left.  I expect

O73BGUO1

1  we'll get through four possibly five today, which will leave us

2  with two or three for Monday, and then of course if the

3  defendant chooses to testify that would extend the trial into

4  probably Tuesday or Wednesday of next week.  We understand that

5  the Court is going to sit full days during deliberations and

6  instructions.  We would ask if it works for the Court, if it

7  works for the jury, if we could sit full days all of next week.

8  Obviously everybody is very motivated to get this trial

9  finished suffice it to say.  And we do anticipate that the

10  additional seven witnesses will take sometime.  We know

11  instructions and the charge will take sometime in this case,

12  and of course summations after a six or seven-week trial will

13  take sometime.  We want to make sure that there's sufficient

14  time for the jury to get the case and consider the case

15  including in the event that Mr. Guo testifies.

16          MR. KAMARAJU:  If it's fine with the Court and the

17  jury, it's fine with the defense, your Honor.

18          THE COURT:  I am going to tell the jury that we are

19  sitting full days starting Monday.  Has Mr. Guo decided whether

20  he's going to testify?

21          MR. KAMARAJU:  No, your Honor.  I plan to meet with

22  him this weekend to confer.

23          THE COURT:  Okay.  All righty.  So if that's it, then

24  we will get started at 9:30.

25          MR. KAMARAJU:  Thank you, your Honor.

O73BGUO1

| | |
|---|---|
| 1 | (Recess) |
| 2 | (Jury not present) |
| 3 | THE COURT:  I did not hear what you said. |
| 4 | MR. GINSBERG:  My name is Peter Ginsberg on behalf of |
| 5 | Mr. Li. Is that what your Honor asked? |
| 6 | THE COURT:  I wanted to ask what you were saying.  You |
| 7 | just identified yourself as counsel to the witness. Is that |
| 8 | correct? |
| 9 | MR. GINSBERG:  That's correct, your Honor. |
| 10 | THE COURT:  So you're going to be in the gallery.  Is |
| 11 | that correct? |
| 12 | MR. GINSBERG:  Yes, your Honor. |
| 13 | THE COURT:  All righty.  Please have the jurors come |
| 14 | in. |
| 15 | THE LAW CLERK:  Jury entering. |
| 16 | (Jury present) |
| 17 | THE COURT:  Please be seated.  Good morning, jurors. |
| 18 | I just wanted to remind you that tomorrow and Friday you will |
| 19 | have off. We're going until five today, but come Monday we are |
| 20 | going to be going till five every single day going forward. |
| 21 | All righty.  Please call your next witness. |
| 22 | MS. SHROFF:  Good morning to everyone.  The defense |
| 23 | calls Mr. Yi. |
| 24 | |
| 25 | |

O73BGUO1

1

2    JIANHU YI,

3         called as a witness by the Defendant,

4         having been duly sworn, testified as follows:

5              THE COURT:  Please state your name and spell it.

6              MS. SHROFF:  Your Honor, may I ask the Court to

7    instruct the witness that he may now put his hand down.

8              THE COURT:  Yes, you can put your hand down, sir.  And

9    I need simultaneous interpretation.

10             THE INTERPRETER:  Your Honor, you want me to do

11   simultaneous interpretation?

12             THE COURT:  For the witness, yes.

13             THE INTERPRETER:  I'm sorry, your Honor.  The

14   interpreter is a little confused.  I thought we do consecutive

15   for the witness, but we do simultaneous for the defendant.

16             THE COURT:  No, we're doing simultaneous for both,

17   otherwise it's going to take us a very long time.

18             THE INTERPRETER:  Then we need to bring him a set

19   receiver as well.  We need to bring him another set of

20   equipment.  We were advised by our office to do consecutive.

21             THE INTERPRETER:  Your Honor, the jury won't be able

22   to hear the interpretation.

23             THE COURT:  That's perfectly fine.  So the interpreter

24   is going to interpret in English and make whatever statements

25   that he makes out loud.  In other words, both of them have a

O73BGUO1

1    microphone.

2            THE INTERPRETER:  We're exploring, your Honor.  Give

3    me one second.  We're told to do consecutive.

4            THE COURT:  No, always simultaneous.

5            MR. FINKEL:  Your Honor, while this is going on, can

6    me and Ms. Shroff briefly approach?

7            THE COURT:  Yes.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO1

1                    (At the sidebar)

2          THE COURT:  We could have one interpreter with one

3    microphone and that would settle the problem, so I don't

4    understand what the issue is.

5          MS. SHROFF:  I don't either, your Honor.  We've been

6    in touch with the interpreter's office last weekend, and I did

7    all I could to help them out in terms of getting them ready

8    for -- I previewed for them what his testimony would be so that

9    it would go smoother.

10         THE COURT:  I'm keeping my fingers crossed.  What's

11   the issue?

12         MS. SHROFF:  Nutra is in the courtroom if the Court

13   wants to question him.

14         THE COURT:  No.  No.  No.  No.  Absolutely not.

15         MR. FINKEL:  Sorry, your Honor.  I just want to avoid

16   an issue that arose with another witness's testimony.  I know

17   these are court-pointed interpreters that work for the court

18   system.  I believe they might need to be sworn in under the

19   rule that your Honor exercised last time. That's just why I

20   wanted to do this at sidebar.  Frankly I'm not sure what the

21   Court's position is or the defense's position is on that.

22         THE COURT:  Absolutely.

23         MS. SHROFF:  That's fine, and I checked with Erica

24   from the court interpreter's office.  I confirmed that these

25   are all people who translated before.  I think they've all been

O73BGUO1

1  sworn in previously, but of course I have no objection to them

2  being sworn in.

3         THE COURT:  Could we get the interpreters oath,

4  please.

5         MR. FINKEL:  Your Honor, if the logistics are complex

6  with this witness, should we just call the next witness in the

7  meantime?

8         MS. SHROFF:  No.

9         THE COURT:  There is every single day in courtrooms

10  all over the United States, you have one interpreter with a

11  microphone.  So all of this question equipment is not

12  necessary, and if they can't resolve it among themselves, I

13  will direct them to do it in a way that it's done elsewhere.

14  If you'll have the interpreters step up, please.  Just the

15  Mandarin language interpreters.  I want the Mandarin language

16  interpreters, please step up.  Okay.  We're going to do the

17  formal oath at this time.  Go ahead.

18         THE LAW CLERK:  Do you solemnly swear that you will

19  well and truly act as an interpreter and give a true

20  translation in this matter now before the Court so help you

21  God?

22         (Interpreters sworn)

23         THE COURT:  If you would please identify yourself.

24         THE INTERPRETER:  Barbara Robertson.  I'm a Mandarin

25  interpreter, federal court professionally qualified

O73BGUO1

1    interpreter.

2            THE INTERPRETER:  Mandarin interpreter, Tuo Hung,

3    T-U-O, H-U-N-G.

4            THE INTERPRETER:  Shi Feng, S-H-I, F-E-N-G.  I'm

5    contract to interpreter for the federal court and New York

6    state courts.

7            THE COURT:  Thank you very much.  You may step back.

8            MR. FINKEL:  There's no objection I take it from the

9    defense as to the qualification of the interpreters?

10           THE COURT:  No objection as to the qualification?

11           MR. SCHIRICK:  No objection.

12           THE COURT:  Anything else?

13           MR. FINKEL:  No. Thank you.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O73BGUO1                    J. Yi- Direct

```
 1                (In open court; jury present)
 2                THE COURT:  Is Ms. Shroff present?
 3                MR. SCHIRICK:  I'll be back one second.
 4                THE COURT:  So apparently there's one additional piece
 5   of equipment that we need.  Is it possible to call a different
 6   witness while we wait for that?
 7                MS. SHROFF:  Your Honor, we didn't tell the witness to
 8   come until an hour later.
 9                THE COURT:  All right.  I apologize, members of the
10   jury for the delay.  All right.  Ready to go, Ms. Shroff?  If
11   the interpreter would give the spelling of the witness's name,
12   please.
13                THE INTERPRETER:  First name, J-I-A-N-H-U, last name,
14   Y-I.
15   DIRECT EXAMINATION
16   BY MS. SHROFF:
17   Q.  Good morning, Mr. Yi.
18   A.  Good morning.
19   Q.  Mr. Yi, were you persecuted when you lived in China?
20   A.  In Suzhou City Jiangsu Province I was persecuted, yes.
21   Q.  Tell the ladies and gentlemen of the jury, please, in what
22   years did you live in China?
23   A.  From 2005 to 2022 I lived there.
24   Q.  Did you go to high school there?
25   A.  Yes, I was in high school, and I'm in university as well.
```

O73BGUO1                        J. Yi- Direct

 1              MS. SHROFF:  I apologize, your Honor, now Mr. Kwok

 2      cannot hear what's going on.

 3              THE COURT:  I'm sorry.

 4              MS. SHROFF:  Our client is unable to hear what's going

 5      on.

 6              THE COURT:  So interpret the question and the answer

 7      out loud.

 8              MS. SHROFF:  Your Honor, I believe the additional

 9      equipment is right on its way.  The audio expert is here.  May

10      we have just one minute to resolve it?

11              THE COURT:  Yes.  All righty.  You may continue then.

12      BY MS. SHROFF:

13      Q.  Mr. Yi, did you go to school in China?

14      A.  Yes, I started in China.

15      Q.  Could you tell us what you studied?

16      A.  Simply speaking I was in -- I graduated from Harbin

17      Technical University with master degree.

18      Q.  And what was your master's degree in?

19      A.  Industrial design.

20      Q.  And were you living in China in October of 2020?

21      A.  You mean 2020?

22      Q.  Yes.

23      A.  Yes.

24      Q.  And I'm going to ask you some questions, Mr. Yi, about

25      October 21, and the timeframe there on.  Okay?

O73BGUO1                          J. Yi- Direct

1   A.  Okay.

2   Q.  Mr. Yi, could you tell the ladies and gentlemen of this

3   jury what happened on October 23?

4   A.  I didn't understand the time.  Can you repeat the date.

5   Q.  October 23 of 2020.

6   A.  That day there are two policeman came to my company and

7   took me away.

8   Q.  And where was your company located?

9   A.  In Shanghai.

10  Q.  And what was the name of your company?

11  A.  It's called Schaeffler Shanghai Trading company.

12  Q.  And around what time did these people come and take you

13  away?

14  A.  Roughly about 2:00 in the afternoon.

15  Q.  And how many people came around 2:00 in the afternoon to

16  your work place to take you away?

17  A.  Two people.

18  Q.  And how were they dressed?

19  A.  They in plainclothes.

20  Q.  And do you know who they were?

21  A.  Yes, I knew.

22  Q.  Who did you know them to be?

23  A.  Because when they saw me, they did the self-introduction.

24  They're the police from the national security.

25  Q.  And what is the national security?

O73BGUO1                          J. Yi- Direct

1    A.  Ministry of National Security.

2    Q.  And what does the Ministry of National Security in China

3    do?

4    A.  That I'm not sure.

5    Q.  Did they show you anything when they approached you at your

6    office?

7    A.  He showed me their badge.

8    Q.  And what badges -- what did the badges tell you when you

9    saw their badges?

10   A.  That I really wasn't sure.

11   Q.  I'll move forward.  Did they ask you to do anything and

12   what -- I'm sorry?

13   A.  They ask me to go with them.

14   Q.  And did you know where they were going to take you?

15   A.  I wasn't sure at the time.

16   Q.  Could you have refused to go with them when they asked you

17   to go with them on October 23?

18   A.  No, I couldn't.

19   Q.  Why not?

20   A.  Cause in China when police do their work, if I don't do

21   what they ask me to do, there will be serious consequence.

22   Q.  And what is a serious consequence according to you?

23   A.  I didn't know exactly, but maybe put me in prison or

24   something else.

25   Q.  Mr. Yi, on October 23, did you know why the ministry of

O73BGUO1                          J. Yi- Direct

1   national security police was looking for you?

2   A.  I wasn't sure at the time.

3   Q.  Were you expecting them to show up on October 23rd?

4   A.  Two days ago they called through our HR company and told me

5   they would come to see me in two days.

6   Q.  Were you worried when you heard about that from the HR in

7   your company?

8   A.  I was really worried.

9   Q.  Did you tell anyone that the national security police was

10  attempting to speak to you?

11  A.  Other than my wife, I didn't tell anyone.

12  Q.  Why did you not tell anyone?

13  A.  Because I think it's a secret thing.  It's not easy, not

14  convenient to tell other people.

15  Q.  Were you afraid of any consequences if you had told anyone

16  that the national police was trying to contact you?

17          MR. FINKEL:  Objection.

18          THE COURT:  If you'll step up, please.

19          (Continued on next page)

20

21

22

23

24

25

O73BGUO1                              J. Yi- Direct

1                    (At the sidebar)

2                    THE COURT:  Ms. Shroff, I need you to pick up the

3     pace.  Everybody knows the Chinese is government is horrific,

4     oppressive, authoritarian, totalitarian, awful.  They get it.

5     Move on.

6                    MS. SHROFF:  Okay.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO1                        J. Yi- Direct

 1                  (In open court; jury present)
 2    Q.  Mr. Yi, did you know why they were looking for you?
 3                  MR. FINKEL:  Asked and answered.
 4                  THE COURT:  Sustained.
 5    Q.  Why they were looking for you?
 6                  THE COURT:  Sustained.
 7    Q.  Did you have an understanding as to why the national police
 8    was there?
 9                  THE COURT:  Sustained.
10                  MS. SHROFF:  Your Honor, I haven't asked that
11    question.
12                  THE COURT:  I believe the question was asked.
13                  MS. SHROFF:  I don't believe so, your Honor.
14                  THE COURT:  Move on.
15    Q.  Did they question you about things on October 23rd?
16    A.  Yes, they did.
17    Q.  And what was the most specific topic that they asked you
18    questions about?
19    A.  They asked about I invested in GTV, G Series.
20    Q.  And did the national security police ask you -- first of
21    all, I take that back.
22                  Could you describe for the jury where they took you?
23    A.  They took me to hotel next to my workplace.
24    Q.  Were you handcuffed?
25    A.  No.

O73BGUO1                          J. Yi- Direct

1    Q.  Were you allowed to leave?

2    A.  I wasn't allowed.

3    Q.  How long were you held there?

4             MR. FINKEL:  Objection.

5             THE COURT:  You may answer.

6    A.  About 11 hours.

7    Q.  From what time to what time?

8    A.  Eleven hours total.

9    Q.  From what time to what time?

10   A.  From 2:00, 2:30 to the next morning at 1:30.

11   Q.  And, Mr. Yi, did the national security police let you keep

12   your telephone?

13   A.  They didn't.

14   Q.  Were you able to call your wife from any other phone line

15   in the hotel?

16            MR. FINKEL:  Objection.

17            THE COURT:  I'll let you lead on these questions,

18   please.

19   Q.  Did you have any communication with your wife for those 11

20   hours?

21   A.  No.

22   Q.  Describe the hotel room that you were seated in?

23            MR. FINKEL:  Your Honor --

24            THE COURT:  Ms. Shroff.

25            MS. SHROFF:  Yes, your Honor.

1          THE COURT:  I would like you to heed what I stated at
2    the sidebar.
3          MS. SHROFF:  Then the government objects to the
4    leading.
5          THE COURT:  No, I don't think so.  I think we can lead
6    here.
7    Q.  Mr. Yi, were there video cameras in the room?
8          THE COURT:  Isn't it true that there were video
9    cameras in the room.
10   Q.  Isn't it true, Mr. Yi, there were video cameras in the
11   room?
12   A.  There was a camera there.
13   Q.  How many officers were in the room?
14   A.  In the room, there were three of them waiting for me.
15   Q.  And what were they trying to do?
16   A.  They were waiting for me to come in.
17   Q.  After you came in, what did they ask you to give them?
18   A.  They confiscate my phone.
19   Q.  And what did they do after confiscating your phone?
20   A.  Then they ask me to sit opposite from them.
21   Q.  And do what?
22   A.  They start asking me questions.
23   Q.  About what?
24   A.  First they ask me if I know why I was there.
25   Q.  What else did they ask you?

O73BGUO1                              J. Yi- Direct

1          Did they ask you questions about your G mail account?

2    A.  Yes, they did.

3    Q.  What questions did they ask about you your G mail account?

4    A.  They tried to open up my G mail and Twitter and account

5    with a GTV.

6    Q.  And did you have a GTV account on your G mail?

7    A.  My GTV account is the G mail email address.

8    Q.  And did they ask you questions about that connection?

9    A.  Yes, they did.

10   Q.  Mr. Yi, is it illegal to have a G mail account in China?

11   A.  Strictly speaking, yes.

12   Q.  Did you consent to the national police reading your emails?

13          MR. FINKEL:  Objection.

14          THE COURT:  Leading questions, Ms. Shroff.  You know

15   what the answers are, so lead.

16   Q.  Am I correct, Mr. Yi, that you did not consent to the

17   reading of your G mail account by the national security police?

18   A.  Can you repeat.

19   Q.  You did not tell the national security police that they

20   could look into your G mail account, correct?

21   A.  I did not agree, but they read it anyway without my

22   consent.

23   Q.  Did the national security police tell you that if you did

24   not tell them the truth, they will take you to another place;

25   and in that other place, they were sure you would tell them the

O73BGUO1                          J. Yi- Direct

1    truth?

2              THE COURT:  You may answer.

3    A.  That's correct.

4    Q.  Did the national security police show you a 20-page case

5    file?

6    A.  Yes.

7    Q.  Was that a case file they had prepared on you?

8    A.  Yes.

9    Q.  Did you have to acknowledge the case file?

10   A.  Yes.

11   Q.  Did they make you acknowledge it by putting an ink

12   fingerprint on each page of the 20-page document?

13   A.  Yes.

14   Q.  Did they tell you, you were facing three to five years in

15   prison for investing in GTV which they considered to be their

16   enemy?

17             MR. FINKEL:  Objection.

18             THE COURT:  Overruled.  You may answer.

19   A.  Yes.

20   Q.  Did they tell you that they could easily jail you, but they

21   prefer that you work with them?

22   A.  Correct.

23   Q.  Did they tell you that from now on you're going to do what

24   we tell you to do?

25   A.  Correct.

O73BGUO1                       J. Yi- Direct

1   Q.  Did they ask you questions about your family members who

2   lived in the People's Republic of China?

3   A.  Yes, they did.

4   Q.  Did they tell you that they knew your address?

5   A.  Yes, they did.

6   Q.  Did they tell you that there was no place for you to hide?

7   A.  Yes, they did.

8   Q.  Did they release you after 11 hours of questioning?

9   A.  Yes, they did.

10  Q.  Did you take a cab and go back to your office?

11  A.  I came back to my office and drive my own car home.

12  Q.  And did you meet with them a second time on October 27th of

13  2020?

14  A.  Yes.

15  Q.  Did they contact you by Wechat?

16  A.  Yes.

17  Q.  Did they tell you to bring your GTV shares certificate with

18  you to meet with them?

19  A.  Yes, they did.

20  Q.  Did you take your G certificates with you?

21  A.  Yes, I did.

22  Q.  Did they take the certificates from you?

23  A.  Yes, they did.

24  Q.  And did they tell you during that meeting that the

25  investment was all bogus and that you will lose your money?

O73BGUO1                    J. Yi- Direct

1          MR. FINKEL:  I object to that.

2          THE COURT:  Overruled.  Continue.

3    A.  Can you repeat.

4    Q.  Did they tell you that you were going to lose all your

5    money because GTV investments was all bogus?

6    A.  Yes, they did.

7    Q.  Did they tell you that you were wrong to delete your

8    Twitter?

9    A.  Yes, they did.

10   Q.  Did they tell you that you could not delete your Twitter

11   anymore?

12   A.  Yes, they did.

13   Q.  Did they tell you that you could not talk to anybody if

14   they contacted you from outside the People's Republic of China?

15   A.  Yes, they did.

16   Q.  And did they tell you that if anybody did try to contact

17   you, you had to tell the national security police about that

18   contact immediately?

19   A.  Yes.

20   Q.  Did the national police contact you again on November 30th?

21   A.  Yes.

22   Q.  Was this the third time that you met with them?

23   A.  Yes.

24   Q.  During the November 30th meeting, did they tell you that

25   you committed a crime?

O73BGUO1                        J. Yi- Direct

1   A.  The first time they did already told me that I was

2   committing a crime.

3   Q.  And what crime had you committed?

4   A.  Investment in the hostile organization that's trying to

5   overtaken the national government.

6   Q.  Did they tell you if Guo Wengui took your money?

7   A.  They said Guo Wengui defraud me of my money.

8   Q.  Did they tell you to do legal research about American law?

9          MR. FINKEL:  Objection, your Honor.

10         THE COURT:  Overruled.  Continue.

11  A.  Can you repeat.

12  Q.  Did they tell you to research American law?

13  A.  Yes, they did.

14  Q.  Did they tell you to file a lawsuit against Mr. Guo?

15  A.  Yes, they did.

16  Q.  Did they tell you that Mr. Guo took your money to eat,

17  drink, play, have fun, ride luxury cars and enjoy himself in

18  the sun?

19  A.  Yes, they did.

20  Q.  Did they tell you that he was doing all of this with your

21  money?

22  A.  Yes, they did.

23  Q.  Did they tell you to contact Dodo and use Dodo website to

24  file a complaint against Mr. Guo?

25  A.  Yes, they did.

O73BGUO1                    J. Yi- Direct

1    Q.  Did they tell you, you had to try and get your money back?

2    A.  Yes, they did.

3    Q.  And did they tell you that you had to think about it and

4    they would be back in contact with you with in a very few days?

5    A.  Yes.

6    Q.  Did they then contact you on December 4th of 2020?

7    A.  Yes.

8    Q.  On December 4, did they tell you to send a letter about GTV

9    investments?

10   A.  Yes.

11   Q.  Did they tell you to write to the GTV investment committee

12   and ask for a withdrawal of all of your investment?

13   A.  Yes.

14   Q.  Did they draft a letter and ask you to sign it?

15   A.  What letter am I supposed to sign?

16   Q.  Did they ask you to write a letter to the esteemed

17   investment committee of GTV?

18   A.  Yes, they did.

19   Q.  And did they tell you to write that you were seeking return

20   of your entire investment of 180,000 United States dollars?

21   A.  Yes, they did.

22   Q.  Did they make you draft a letter in front of them?

23   A.  Yes.

24   Q.  And did they tell you to write the same letter so that you

25   could get your investment in G Dollar and G/Club back?

O73BGUO1                          J. Yi- Direct

1   A.  Yes.

2   Q.  Did they want you to wait for instructions from them before

3   mailing those letters out?

4   A.  Yes.

5   Q.  And did they tell you that you would require to take photos

6   of the letters that you sent out and send the photos to the

7   police?

8   A.  Yes.

9   Q.  The next time you met with them was January 8th; is that

10  correct?

11  A.  Yes.

12  Q.  And during your January 8th meeting, they told you that

13  they were going to get you a lawyer, correct?

14  A.  Yes.

15  Q.  They asked you to get your own lawyer and you told them you

16  had no money to hire a lawyer?

17  A.  Correct.

18  Q.  And they said that they would get a lawyer for you and pay

19  that lawyer's fee, correct?

20  A.  Correct.

21  Q.  They said that they would find ways to apply and pay either

22  part or all of the legal fees?

23  A.  Yes.

24  Q.  Did they then tell you that you were to meet with them

25  again and bring your computer with you with a VPN installed?

O73BGUO1                          J. Yi- Direct

1   A.  Yes.

2   Q.  Did they make you write a document detailing all of your

3   investments in G Series?

4   A.  Yes.

5   Q.  And did it take you three days to write such a letter and

6   send it to them?

7   A.  Yes.

8   Q.  Did they give you the email addresses of where to send

9   those letters?

10  A.  Yes.

11  Q.  And did you send those letters to those email addresses?

12  A.  Yes.

13  Q.  And did they tell you that if you did not get a reply by

14  Sunday, January 10th, you were to email them again and show

15  them a tough attitude?

16  A.  Yes.

17  Q.  Did you meet with them again on January 14th of 2021?

18  A.  Yes.

19  Q.  At that time, did you bring with you your computer with the

20  VPN installed?

21  A.  Yes.

22  Q.  Did they then ask you to use your computer and show them

23  the complaints that you had been forced to file?

24  A.  Yes.

25  Q.  Were these legitimate complaints, Mr. Yi?

O73BGUO1                              J. Yi- Direct

 1              THE INTERPRETER:  Interpreter request repetition from
 2      counsel.
 3      Q.  Were these legitimate complaints, Mr. Yi?
 4      A.  No, that was not my intention.
 5      Q.  Let me show you what's mark as Defense Exhibit 60704.
 6              Do you recognize this document?  Not to the jury,
 7      please.
 8              THE INTERPRETER:  Your Honor, interpreter cannot see
 9      my screen.
10      A.  Yes, that is my report.
11              MS. SHROFF:  Your Honor, the defense moves to admit
12      60704 into evidence.
13              MR. FINKEL:  No objection.
14              THE COURT:  It is admitted.
15              (Defendant's Exhibit 60704 received in evidence)
16      BY MS. SHROFF:
17      Q.  Is this the complaint that you filed?
18      A.  Yes.
19      Q.  Was the complaint truthful?
20              Can we scroll down, please, and the jury has it.
21      Let's just keep scrolling down.
22              Who told you what to say in this complaint?
23              MR. FINKEL:  Asked and answered.
24              THE COURT:  Overruled.
25      A.  Do I need to continue answering?

O73BGUO1                        J. Yi- Direct

1              THE COURT:  Yes.  Go ahead.

2    A.  When I fill this report, I opened Dodo teaching of

3    reporting, how to report, and they were few police sitting

4    right next to me.  I fill the form according to their

5    instructions, every word.

6    Q.  Was the complaint in your mind truthful?

7    A.  The data was correct.

8    Q.  And if you could scroll down, please, and down.

9              This portion where there is a description of the

10   incident, was that portion correct or truthful?

11   A.  Regarding the data in the complaint that were accurate.

12   Q.  Where you said that you suspected G Dollar and G Series of

13   financial fraud, was that truthful?

14   A.  The description was not accurate.

15   Q.  And did you file this complaint with the FBI?

16   A.  Yes.

17   Q.  And did you file the exact same complaint with the Attorney

18   General?

19   A.  Yes, the Office of Attorney General of New York.

20   Q.  With whom else did you file this complaint?

21             THE COURT:  Ms. Shroff, lead.

22   Q.  Did you file this complaint with the New York Times?

23   A.  I emailed the New York Times to report this and the

24   contents were pretty much similar.

25   Q.  And you also did that with the Wall Street Journal,

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O73BGUO1                        J. Yi- Direct

1    correct?

2    A.  Correct.

3    Q.  And the national security police told you to do that,

4    correct?

5    A.  Correct.

6    Q.  And you did it because that was the only way for you to

7    protect yourself and your family?

8            MR. FINKEL:  Objection.

9    A.  Correct.

10           THE COURT:  Overruled.

11   Q.  At that time did you have a lawyer?

12   A.  No.

13   Q.  Do you have a lawyer now?

14   A.  Yes, I do.

15   Q.  Is he in the courtroom for you today?

16   A.  Yes.

17   Q.  Did you hire the first lawyer that was given to you while

18   you were still in China?

19   A.  No, it wasn't me.

20   Q.  Did you ever meet him?

21   A.  No.

22   Q.  Were you asked to do anything in contact with that lawyer,

23   the one they gave you in China?

24   A.  No contact was allowed.

25   Q.  Let me show you what is marked, only for the witness and

O73BGUO1                           J. Yi- Direct

1  the Court and the government, DX-60700.

2              Do you see this document, Mr. Yi?

3  A.  Yes.

4  Q.  Were you required to sign it?

5  A.  No.

6  Q.  Did you sign it at the end?

7  A.  No.

8  Q.  And did there come a time when you saw this document?

9              If I could show him page two, please.

10  A.  I did saw this document.

11  Q.  And when was that?

12  A.  My current attorney send it to me.

13              MS. SHROFF:  Your Honor, I move 60700 into evidence.

14              MR. FINKEL:  I have a question.  Sir, do you know

15  where your current attorney received this document from?

16              You don't have personal knowledge of that, do you?

17              THE WITNESS:  No, I don't.

18              MR. FINKEL:  Authentication objection.

19  BY MS. SHROFF:

20  Q.  Can I show you page two, please.

21              Mr. Yi, did your present lawyer give this document to

22  you?

23  A.  Yes.

24  Q.  Did you use this document to then complain about this

25  lawyer?

O73BGUO1                        J. Yi- Direct

1    A.   No.

2              (Continued on next page)

O731GUO2                         Yi - Direct

1    BY MS. SHROFF:

2    Q.   Do you recognize the document?

3    A.   The document he showed me at that time has my signature on

4    it, but I remember clearly I have never signed the document.

5    Q.   Okay.  Did you hire a lawyer?  Can I go back to the first

6    page, please.

7             Did you ever hire a lawyer named Arthur Angel?

8    A.   This attorney was hired by the police from MSS.

9             MS. SHROFF:  Your Honor, I think it's authenticated

10   enough.  I move to admit 60700.

11            THE COURT:  I don't agree.

12            MS. SHROFF:  Okay.

13   Q.   Mr. Yi, did you meet with your lawyer Mr. Ginsberg?

14   A.   Can you repeat the question.

15   Q.   Did you meet with your lawyer Peter?

16   A.   Yes.

17   Q.   Where?

18   A.   He came to my home the first time.

19   Q.   And did he tell you where he got this letter from?

20   A.   This letter, he sent it to me by email.

21   Q.   And can you look at page 3 of the document.  Whose

22   signature is that?

23   A.   I did not sign this document.

24   Q.   Okay.  But did you get a copy of that with your signature

25   on it?

O731GUO2                          Yi - Direct

1    A.  Correct.

2    Q.  And did you tell a judge in this very building that that

3    was not your signature?

4              MR. FINKEL:  Object to that.

5              THE COURT:  Overruled.

6    A.  This signature is my signature, but I did not sign this

7    document.

8              MS. SHROFF:  Okay.  Your Honor, this document is on a

9    civil docket.  It is authenticated by that method as well.  And

10   I renew my request that it be admitted into evidence.

11             MR. FINKEL:  I'm happy to voir dire further.

12             THE COURT:  Go ahead.

13   VOIR DIRE EXAMINATION

14   BY MR. FINKEL:

15   Q.  Sir, you don't know who created this document, correct?

16   A.  I do not know.

17   Q.  And the only information you know about where this document

18   is from is what your attorney told you, correct?

19   A.  Yes, this document was sent to me by my attorney.

20   Q.  And you don't——

21             MR. FINKEL:  And could we go back.

22   Q.  And this document is in English, correct, sir?

23             THE INTERPRETER:  Counsel, if you can speak up.

24   Q.  This document is in English, correct?

25             MS. SHROFF:  Is what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O731GUO2                         Yi - Direct

 1                MR. FINKEL:  In English.

 2    A.  Yes.

 3                THE COURT:  Let's go to the first page.

 4                Do you recognize the first page of this document?

 5                THE WITNESS:  Yes.

 6                THE COURT:  Let's go to page 2.

 7                Do you recognize the second page?

 8                THE WITNESS:  Yes.

 9                THE COURT:  Is there a page 3?

10                Do you recognize page 3?

11                THE WITNESS:  Yes.  What do you mean by recognize?

12                THE COURT:  In other words, you said that this is not

13    your real signature, but do you recall having seen this page

14    that contains the fake signature?

15                THE INTERPRETER:  Your Honor, I'm sorry.  Can you

16    repeat that.

17                THE COURT:  You have said this is not your real

18    signature, but do you recall having seen this page with a fake

19    signature?

20                THE WITNESS:  The first time I saw the signature, I

21    know that was not my signature.

22                THE COURT:  All right.  It is admitted.

23                (Defendant's Exhibit 60700 received in evidence)

24    BY MS. SHROFF:

25    Q.  Let me show you the first page.  It says here that it's you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    and your wife who are hiring this lawyer, correct?

2    A.  Correct.

3    Q.  That was a false statement; is that right?

4    A.  It was not to say this was false.  I did sign a power of

5    attorney, but it was not this one.

6    Q.  Okay.  Can you just, Mr. Yi—let me just scroll down, okay,

7    and ask you if you wanted to have the $260,000 that you had

8    invested returned back to you.

9         THE INTERPRETER:  Counsel, the interpreter would

10   request repetition.

11   Q.  Okay.  You see the highlighted portion there?  Yes or no,

12   Mr. Yi?

13   A.  Yes, I did.

14   Q.  Okay.  And you did not want this money returned to you,

15   correct?

16   A.  Correct.

17   Q.  You want it to stay invested in the G series, correct?

18   A.  Correct.

19        MS. SHROFF:  And let's just scroll down.

20        You know what, I'm okay with the rest of the document.

21   I can move forward, your Honor.  Thank you.

22   Q.  Did the lawyer ever send you a bill for any work that he

23   did?

24   A.  No.

25   Q.  And let me show you what is DX 60701.  Do you recognize

O731GUO2                        Yi - Direct

1    this document as a document you signed?

2    A.  Yes, this document, I signed.

3           MS. SHROFF:  Okay.  Your Honor, the defense moves to

4    admit the document into evidence.

5           MR. FINKEL:  No objection.

6           THE COURT:  It is admitted.

7           (Defendant's Exhibit 60701 received in evidence)

8    Q.  This lawyer never called you, correct?

9    A.  No.

10   Q.  And you never spoke to him, right?

11   A.  No.

12   Q.  He filed a complaint against Miles Guo on your behalf,

13   correct?

14   A.  Yes.

15   Q.  And you never authorized the filing of that complaint

16   voluntarily, correct?

17   A.  Correct.  I was coerced into signing my signature.

18          MS. SHROFF:  Okay.  And let me move forward, if the

19   jury has——it was published, right?

20          Thank you.  We can take that down.

21   Q.  And let me ask you something, Mr. Yi.  Did there come a

22   time when you left China?

23   A.  Correct.

24   Q.  When was that?

25   A.  I left on November 5, 2022.

O731GUO2                         Yi - Direct

1   Q.  Did you leave China, go to Macau, from Macau, go to Dubai,

2   and from Dubai, come to the United States?

3   A.  Correct.

4   Q.  Was your wife with you?

5   A.  Correct.

6   Q.  And the rest of your family also traveled with you?

7   A.  Correct.

8   Q.  Did you then move to Washington, DC?

9   A.  I moved to Virginia.

10  Q.  I'm sorry.  Okay.  Virginia.  Did you then from Virginia

11  contact that lawyer named Arthur Rangel?

12  A.  Correct.

13  Q.  Did you send him an email and tell him to stop representing

14  you in all cases of GTV and other investments in New York?

15  A.  Correct.

16              THE COURT:  One moment.

17              You may continue.

18              MS. SHROFF:  Do you want me to repeat the question?

19  Oh, I think he answered yes, right?

20              THE COURT:  He answered your last question.

21              THE WITNESS:  I already answered your question.

22              MS. SHROFF:  Sorry about that, Mr. Yi.

23  BY MS. SHROFF:

24  Q.  Did you tell anyone else that you wanted this lawyer to

25  stop representing you?

O731GUO2                        Yi - Direct

1    A.  Correct.

2    Q.  Let me show you what's marked as DX 60695.  Do you see this

3    document?

4    A.  Yes.

5    Q.  And did you write it?

6    A.  Correct.

7            MS. SHROFF:  Your Honor, we move the document into

8    evidence at this time.

9            MR. FINKEL:  Sir, you wrote this document in English?

10           THE WITNESS:  I wrote this document and send it to the

11   judge.

12           MR. FINKEL:  Objection.

13           THE COURT:  You wrote the document?

14           THE WITNESS:  Correct.

15           THE COURT:  It is admitted.

16           (Defendant's Exhibit 60695 received in evidence)

17           THE COURT:  Counsel, would you step up for a moment.

18           (Continued on next page)

19

20

21

22

23

24

25

O731GUO2                        Yi - Direct

1              (At the sidebar)

2              THE COURT:  Does anyone know whether Mr. Rangel was

3     disciplined in connection with this?

4              MS. SHROFF:  I know that there was a complaint filed

5     against him.  Mr. Rangel took the position that he had done

6     nothing wrong, that he in fact had been deceived by the

7     intermediary.  This is all that I know secondhand, but I think

8     Mr. Ginsberg and Mr. Kamaraju know more.  I'm a late-comer.

9              MR. FINKEL:  We spoke to Mr. Angel.  That's his

10    understanding is that he was operating through an intermediary

11    and was following the client's direction.  It's unclear exactly

12    what happened behind the intermediary.

13             MS. SHROFF:  Your Honor, it would be an ethical

14    violation to file a single document on the word of an

15    intermediary.  The law does not allow that.

16             MR. FINKEL:  I assume Ms. Shroff is not getting into

17    that.

18             MS. SHROFF:  No.

19             THE COURT:  I raised this because I have an obligation

20    to go to the disciplinary committee if I see this sort of

21    misconduct, so there's already been a complaint.

22             MS. SHROFF:  Yes, your Honor.

23             THE COURT:  All right.  Thank you.

24             MR. KAMARAJU:  Thank you, your Honor.

25

O731GUO2                        Yi - Direct

1               (In open court)

2               THE COURT:  You may continue.

3    BY MS. SHROFF:

4    Q.  Mr. Yi, this document is written in English, right?

5    A.  Yes.

6    Q.  And you told the jury you wrote it, correct?

7    A.  Yes.

8    Q.  Could you tell them how you wrote it.

9    A.  How do I wrote it?

10   Q.  Yes.  Do you write in English?

11   A.  Yes.

12   Q.  Okay.  And you sent it to the judge, Judge Clark, right?

13              MS. SHROFF:  I'll move forward, your Honor.

14              I think that the letter actually does speak for

15   itself, so if I could just have the jury have a minute to

16   review it, I can move forward.

17              THE COURT:  Go ahead.

18   Q.  Did there come a time, Mr. Yi, that you did in fact get a

19   new lawyer?

20   A.  After this, yes, I did find a new attorney.

21   Q.  Now, Mr. Yi, I showed you a set of documents today in

22   court, correct?  Have I ever gone over those documents with

23   you?

24   A.  Yes, you showed me before.

25   Q.  Okay.  And was your lawyer there when I showed you this

O731GUO2                        Yi - Direct

1    document?

2    A.   Are you talking about the previous attorney?

3    Q.   No.   I'm saying I never——let me ask you again.

4          Did I, me, Sabrina, ever show you any of these

5    documents?

6    A.   No.

7    Q.   Okay.   And have I ever met with you without your lawyer

8    being present?

9    A.   No.

10   Q.   And how many times have I met with you along with your

11   lawyer?

12   A.   Twice.

13   Q.   Mr. Yi, do you feel safe living in the United States today?

14   A.   Not completely safe.

15   Q.   And could you tell the jury why.

16          MR. FINKEL:   Objection.

17          THE COURT:   Overruled.   You may go ahead.

18   A.   Because the police and other force from the Chinese

19   government exist in United States.

20   Q.   On January 25th or 26th of 2023, did you give an interview

21   in Washington, DC?

22   A.   Yes.

23   Q.   Did you talk about what the CCP had done to you?

24   A.   Mainly about the CCP and the police from MSS, how did they

25   interrogate me.

O731GUO2                          Yi - Cross

```
 1   Q.  Mr. Yi, did you invest $180,000 in GTV?

 2   A.  Correct.

 3   Q.  Did you ever voluntarily want that money back?

 4          MR. FINKEL:  Asked and answered.

 5          THE COURT:  You may answer.

 6   A.  I do not want this money back.

 7   Q.  Did you invest in H Dollar?

 8   A.  Are you referring to G Dollar?

 9   Q.  If you invested in G Dollar, how much did you invest?

10   A.  $30,000.

11          THE INTERPRETER:  Excuse me, your Honor.  He asked the

12   interpreter to help him turn up the volume.  Give me a second.

13          We may proceed.

14   A.  $30,000.

15   Q.  Did you buy a G Club membership?

16   A.  Yes.

17   Q.  And did you buy a G Club membership because you came to the

18   United States as an adult and you wanted the camaraderie,

19   friendship, and services that G|CLUBS offered?

20          MR. FINKEL:  Objection.

21          THE COURT:  Overruled.

22   A.  Yes.

23          MS. SHROFF:  I have nothing further.

24          THE COURT:  Cross-examination.

25
```

1   CROSS EXAMINATION

2   BY MR. FINKEL:

3   Q.  Sir, you're a follower of Miles Guo, correct?

4   A.  Yes.

5           THE COURT:  Mr. Finkel, speak into the microphone.

6           MR. FINKEL:  Yes, your Honor.

7   Q.  You're a follower of Miles Guo, correct?

8   A.  Yes.

9   Q.  Sitting here today, you're a follower of Miles Guo,

10  correct?

11  A.  Are you talking about as a follower?  Yes.

12  Q.  And you're a member of the DC Farm, right, Washington, DC

13  Farm?

14  A.  Previously, for a long period of time, yes; currently, no.

15  Q.  Okay.  And you've participated in protests, correct?

16  A.  I've participated in some protests.

17          MR. FINKEL:  Could we pull up GX CO400, please.

18  Q.  This is a picture of you, right, sir?

19  A.  Yes.

20          MR. FINKEL:  Government offers GX CO400.

21          THE COURT:  Sir, there are two individuals—actually,

22  there are four individuals in this photograph.  Which one is

23  you?

24          MR. FINKEL:  You're in the white hat, right, sir?

25          THE WITNESS:  Correct.

O731GUO2                    Yi - Cross

1                  MS. SHROFF:  There are three people in a white hat.

2                  MR. FINKEL:  You're in the white hat with the green

3      scarf, correct, sir?

4                  THE WITNESS:  Correct.

5                  THE COURT:  So you're the second from the left; is

6      that it?

7                  THE WITNESS:  Correct.

8                  THE COURT:  All right.  It is admitted.  Go ahead.

9                  MR. FINKEL:  Thank you, your Honor.

10                 (Government's Exhibit CO400 received in evidence)

11     BY MR. FINKEL:

12     Q.  And this is you participating in a protest outside the

13     Capitol Building, right?

14     A.  Correct.

15     Q.  And you were protesting the SEC, right?

16     A.  Yes.

17     Q.  And this was a farm protest, correct, organized by the

18     farm?

19     A.  Correct.

20     Q.  And you're wearing a New Federal State of China hat, right,

21     sir?

22     A.  Yes.

23     Q.  And that's Miles Guo's organization, New Federal State of

24     China, right?

25     A.  That I don't know.

O731GUO2                         Yi - Cross

1    Q.  You don't know that Miles Guo founded the New Federal State

2    of China?

3    A.  That I know.

4    Q.  And you're wearing a New Federal State of China hat, right,

5    sir?

6    A.  Yes.

7    Q.  And the star on your hat is a seven-sided star, correct?

8    A.  Yes.

9    Q.  And that represents Brother Seven, Miles Guo, right?

10   A.  This protest was organized, initiated by our farm.

11   Q.  Right.  And the star on your hat has seven points, correct?

12   A.  Correct.

13   Q.  And it's a seven-pointed star because it represents Miles

14   Guo, who calls himself Brother Seven, correct?

15   A.  You cannot understand like that.

16   Q.  And you gave an interview to NFSC-TV during this protest,

17   correct?

18   A.  No.

19   Q.  This is you being asked questions by this gentleman on the

20   left in the hood, correct?

21   A.  This is our own farm's livestream.

22   Q.  And you were being interviewed by your farm's livestream,

23   correct?

24   A.  Correct.

25   Q.  And you told the farm livestream that the SEC is colluding

O731GUO2                    Yi - Cross

1   with the Chinese Communist Party, right?

2   A.  I did not say that.

3           MR. FINKEL:  We can take that down.

4   Q.  The letter that—well, withdrawn.

5           Sir, you have an attorney named Peter Ginsberg,

6   correct?

7   A.  Correct.

8   Q.  And he represents you with respect to this matter, right?

9   A.  Correct.

10  Q.  And you also have an attorney in your immigration case;

11  isn't that right?

12  A.  What attorney?  Yes.

13  Q.  And his name is Yongbing Zhang, correct?

14  A.  Zhang Yongbing.

15          MR. FINKEL:  And we could pull up GX 121.

16  Q.  This is your immigration attorney, right?

17  A.  Correct.

18  Q.  And you met with him along with Mr. Guo's attorneys,

19  correct?

20          MS. SHROFF:  Could the government clarify which of

21  Mr. Guo's attorneys he's talking about.

22          THE COURT:  Mr. Finkel?

23          MR. FINKEL:  Yes.

24  A.  When I was meeting this attorney, Mr. Guo's attorney was

25  not there.

O731GUO2                     Yi - Cross

1   Q.  On May 19th, you had a meeting with this gentleman and

2   Mr. Guo's former attorneys, correct?

3   A.  I do——I cannot be certain whether he was Mr. Guo's former

4   attorney.

5   Q.  Did you have a meeting with this man, Mr. Yongbing Zhang,

6   and other attorneys in which you described what happened to you

7   in China?

8   A.  Yes.

9   Q.  And so Mr. Zhang was present for that, correct?

10  A.  He was.

11  Q.  And Mr. Zhang, you know he's an associate of Miles Guo;

12  he's a follower of Miles Guo too, right?

13  A.  I know.

14          MR. FINKEL:  We can take that down and put up CO419,

15  just for the witness.

16  Q.  The man on the left in the red jacket, that's your

17  immigration attorney, right?

18  A.  Correct.

19  Q.  And the man in the center with the sunglasses, that's Miles

20  Guo, right?

21  A.  Yes.

22          MR. FINKEL:  Government offers CO419.

23          MS. SHROFF:  We have no objection.

24          THE COURT:  It is admitted.

25          (Government's Exhibit CO419 received in evidence)

1   Q.  And so, sir, this is a photograph of Miles Guo in the

2   center of the table, right?

3           MS. SHROFF:  I believe that's asked and answered.

4           MR. FINKEL:  The jury didn't see it.

5           MS. SHROFF:  The man with the sunglasses is in the

6   middle.

7           THE COURT:  So that's Miles Guo with the sunglasses in

8   the middle, right?

9           THE WITNESS:  Yes, Mr. Guo was in the middle.

10  BY MR. FINKEL:

11  Q.  Right.  And on the left in the red coat, that's your

12  immigration attorney, Mr. Zhang, right?

13  A.  Correct.

14          MR. FINKEL:  And if we can take that down.  Or

15  actually—sorry.  Could you put that back up, CO419.  Sorry

16  about that.

17  Q.  And the man on the left in the gray, with the sort of buzz

18  cut, that's Long Island David, right?

19  A.  Correct.

20          MR. FINKEL:  Take that down.

21          If we could put up CO418 just for the witness.

22  Q.  The man on the left, that's your immigration attorney,

23  correct, Mr. Zhang?

24  A.  Yes.

25  Q.  And the man in the center, that's Long Island David,

O731GUO2                    Yi - Cross

1    correct?

2    A.  Yes.

3            MR. FINKEL:  Government offers CO418.

4            MS. SHROFF:  May I, your Honor?

5            THE COURT:  Go ahead.

6    VOIR DIRE EXAMINATION

7    BY MS. SHROFF:

8    Q.  Mr. Yi, have you ever seen this photo?

9    A.  I don't recall.

10   Q.  Did you take it?

11   A.  No.  It was not me.

12           MS. SHROFF:  I could object, but it's fine.  I don't

13   mind.

14           THE COURT:  It is admitted.

15           (Government's Exhibit CO418 received in evidence)

16           MR. FINKEL:  If we could publish it, please,

17   Ms. Loftus.  Thank you.

18   BY MR. FINKEL:

19   Q.  Sir, now that we can see it, on the left, that's your

20   immigration attorney, Mr. Zhang, right?  And in the center is

21   Long Island David, correct?

22   A.  Yes.

23   Q.  And you're aware of NFSC Speaks, correct?

24   A.  I do.

25   Q.  That's a program where they talk about Miles Guo's criminal

O731GUO2                    Yi - Cross

1    case, correct, NFSC Speaks?

2    A.  I don't know what they were discussing.

3    Q.  Well, you're aware of NFSC Speaks, right?

4    A.  I don't know what this logo is.

5    Q.  I'm not asking about the logo.  Sir, NFSC Speaks is a

6    program, right?  It's a broadcast on Twitter, correct?

7    A.  Could you repeat that again.  NF what?

8    Q.  NFSC, the New Federal State of China, Speaks; it's a

9    broadcast on Twitter, correct?

10    A.  I only——I only know NFSC.

11    Q.  NFSC does broadcasts on Gettr as well?

12    A.  Yes, they would post Gettr.

13    Q.  And Mr. Zhang, your immigration attorney, he appears on

14    some of those NFSC broadcasts, right?

15    A.  I could not be certain.

16    Q.  Well, you know Mr. Zhang comments about the criminal trial

17    and evidence that he wishes would be introduced at the trial,

18    right?

19    A.  I don't know.

20    Q.  You know Mr. Zhang is Mr. Guo's immigration attorney also,

21    right?

22    A.  I do not know.

23    Q.  You know Mr. Zhang has been getting nightly transcripts of

24    this trial?

25    A.  I do not know.

O731GUO2                          Yi - Cross

1              MR. FINKEL:  Just one moment, please.

2              We can take that down.

3    Q.  Now, sir, your decision to invest in GTV, you made that

4    decision after listening to Miles Guo's broadcasts, correct?

5    A.  That was not the main reason.

6    Q.  But you listened to Miles Guo's broadcasts, right?

7    A.  Yes.

8    Q.  And Miles Guo's broadcasts discussed GTV, correct?

9    A.  Could you repeat that question.

10   Q.  Miles Guo, in his broadcasts, he talked about GTV.

11   A.  Yes.

12   Q.  You heard those broadcasts, correct?

13   A.  I heard some.

14   Q.  He gives a lot of broadcasts, right?

15   A.  He frequently talk about those matters during livestream.

16   Q.  And Miles Guo also talks about G|CLUBS in his broadcasts,

17   correct?

18   A.  Yes, he mentioned.

19   Q.  And you listened to those broadcasts too, correct?

20   A.  Yes, I heard.

21   Q.  And you believe in Miles Guo, right?

22   A.  I do.

23   Q.  You trust Miles Guo.

24   A.  I do.

25   Q.  You want to help Miles Guo, right?

O731GUO2                          Yi - Redirect

1    A.  Correct, but more like helping myself.

2    Q.  And in addition to helping yourself, you want to help Miles

3    Guo, right?

4           MS. SHROFF:  Asked and answered.

5           THE COURT:  Overruled.  You may answer.

6    A.  Correct.

7           MR. FINKEL:  Nothing further.

8           THE COURT:  Redirect?

9    REDIRECT EXAMINATION

10   BY MS. SHROFF:

11   Q.  Mr. Yi, let me pull up for you, if I may, CO419, please.  I

12   think that's what the government showed you.

13          You see that photograph that they showed you?

14   A.  Yes.

15   Q.  And you see the man in red?  They've asked you questions

16   about him?

17   A.  Correct.

18   Q.  Does he send you nightly trial transcripts?

19   A.  No.

20   Q.  When you came to the United States, did you need help with

21   getting asylum here?

22   A.  Correct.

23   Q.  Did he help you get asylum?

24   A.  Yes.

25   Q.  Did your asylum application get filed because of him?

O731GUO2                          Yi - Redirect

1   A.  Correct.

2   Q.  Do you have asylum now?

3   A.  I have work authorization card, I have Social Security

4   number.  I think that counts.

5   Q.  Thank you.

6           Mr. Yi, do you see this man seated here with white

7   hair in the front row, right there?

8   A.  Yes.

9   Q.  Who is that?

10  A.  My current attorney.

11  Q.  And what's his name?

12  A.  Peter something.  I usually refer him as Peter.

13  Q.  And was this man in the red coat with Peter when Peter was

14  preparing you for your testimony today?

15  A.  He was not.  Can you repeat the question?

16  Q.  Sure.  Did Peter and this man in the red coat ever meet

17  together with you about this case for which you are here today?

18  A.  They did not meet me at the same time together.

19  Q.  Ever.  Ever, right?

20  A.  Never.

21  Q.  I've never met you with the man in this red jacket, right?

22  A.  No.

23  Q.  And Peter Ginsberg has never been in a video with Miles

24  Guo, right?

25  A.  No.

O731GUO2                    Doran - Direct

1   Q.  Now when the prosecutor asked you these questions about

2   trusting and helping Miles Guo, you said, I also did it to help

3   myself.  Correct?

4   A.  I want to help myself more.

5   Q.  And how would you like to help yourself, Mr. Yi?

6   A.  First, my biggest goal is to overthrow the CCP.  Because I

7   filed a false claim, I have to clarify the truth.

8   Q.  And I'm assuming your other goal is to be happy, right,

9   Mr. Yi?

10  A.  Correct.

11          MS. SHROFF:  I have nothing further.

12          THE COURT:  Recross?

13          MR. FINKEL:  No, your Honor.

14          THE COURT:  Thank you, sir.  You may step out of the

15  courtroom.

16          (Witness excused)

17          THE COURT:  And the defense may call its next witness.

18          MS. SHROFF:  Yes, your Honor.

19          In defense of Mr. Miles Guo, we call Paul Doran.

20          (Witness sworn)

21          MS. SHROFF:  Good morning, Mr. Doran.

22          THE COURT:  Sir, if you would please state your name

23  and spell it.

24          THE WITNESS:  Yes.  My name is Paul Doran.  That's

25  spelled D-O-R-A-N.

1              Is that better?  Shall I repeat that?  Okay.  It's

2     D-O-R-A-N.

3              THE COURT:  So, sir, I'll need you to speak right into

4     the microphone.

5              THE WITNESS:  Okay.

6     PAUL DORAN,

7          called as a witness by the Defendant,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MS. SHROFF:

11    Q.  Mr. Doran, tell the ladies and gentlemen of the jury what

12    you do for a living.

13    A.  I'm a corporate risk advisor or corporate risk manager.

14    Q.  And could you tell us, please, what does that mean, in real

15    life?

16    A.  Essentially what I do is I advise corporations and

17    high-net-worth individuals or sometimes NGOs——or nonprofit

18    organizations——in how to protect themselves from hostile

19    activity, and that hostile activity could be from interference

20    by foreign governments or it could be terrorism or it could be

21    criminal activity.

22    Q.  Mr. Doran, how long have you been a corporate risk

23    management professional?

24    A.  I've been doing this for about 25 years.

25    Q.  And could you tell the jury, please, how did you get

O731GUO2                        Doran - Direct

1   started doing this line of work?

2   A.  So I have an advanced degree in intelligence and

3   international relations from a university in the UK, which I

4   obtained in the mid '90s; I then worked for a London-based

5   international risk consulting business which advised companies

6   and individuals on the kind of matters that I've just

7   described; I then worked in public sector for the British

8   government in foreign intelligence; after that, I held a series

9   of increasingly senior security and intelligence roles within a

10  number of multinational companies, including U.S. companies;

11  and most recently I have founded and I'm currently running my

12  own consulting business.

13  Q.  Where is your consulting business located, Mr. Doran?

14  A.  It's located in London.

15  Q.  Mr. Doran, you're going to have to let me finish the

16  question.

17  A.  I apologize.

18  Q.  And please, could you use that microphone because I'm a

19  little hard of hearing.

20          THE COURT:  Yes, just bring that as close as possible

21  to your mouth.

22          THE WITNESS:  Okay.

23  Q.  All right.  Where is your company located?

24  A.  My company is based in London, UK.

25  Q.  And could you just very briefly tell us about your

O731GUO2                          Doran - Direct

1   education.

2   A.   So I——I have two degrees——a degree in modern languages, and

3   an advanced degree in international relations and intelligence

4   from the University of Salford in the UK.

5   Q.   Mr. Doran, the clients at your company, where do they draw

6   from?

7   A.   They could be U.S. clients, they could be European, really

8   global client base.

9   Q.   And is it fair to say that your clients are not just

10  companies but also NGOs?

11  A.   Yes, that's correct.

12  Q.   And how about individuals; do you help individuals?

13  A.   I do.

14  Q.   Now tell us, please, in advising your clients, do you

15  assess the risk associated with different nations in this

16  world?

17  A.   Yes, I do.

18  Q.   And could you tell us, please, which countries you focus

19  on, and why.

20  A.   So the list would include People's Republic of China, the

21  Russian Federation, Islamic Republic of Iran, the Democratic

22  People's Republic of North Korea, Venezuela, and Cuba.

23  Q.   And why did you pick these countries upon which to focus?

24  A.   These countries generally act in international affairs in a

25  way which is not generally respectful of international norms

O731GUO2                          Doran - Direct

1    and laws and standards.  They operate according to their own

2    principles, and often that's in conflict with what we might

3    call democratic norms that we enjoy in the United Kingdom or

4    the United States.

5    Q.  What type of governments do all of these countries have in

6    common?

7    A.  The common thread which runs through all of those countries

8    is that, to a greater or lesser extent, they are all run by one

9    party dictatorships, by totalitarian governments which do not

10   allow democratic expression in those countries.

11   Q.  And how do these countries respond to exertion of influence

12   from outside of their borders?

13   A.  These countries are very sensitive to criticism or any kind

14   of challenge that they may receive from disgruntled citizens

15   within their own borders and also foreign critics or their

16   citizens who may happen to live abroad.

17   Q.  Mr. Doran, do these factors matter in the work you do as a

18   risk assessment manager?

19   A.  Yes.  They are absolutely primary, of primary importance.

20   Q.  And could you tell the jury why that is.

21   A.  For countries like the People's Republic of China, to take

22   that as the example, a number of my clients have been critical

23   of the Chinese government or the Chinese Communist Party.

24   They've been advocating for freedom and democracy in China and

25   human rights, or they've been involved in disputes with Chinese

O731GUO2                          Doran - Direct

1   government entities.  And in that case, the Chinese government

2   takes a very, very hostile view of that kind of challenge to

3   its authority and its power, and they often use the levers of

4   state power to victimize and target my clients.

5   Q.  What is the People's Republic of China's view towards

6   dissent?

7   A.  People's Republic of China absolutely will not tolerate

8   dissent.

9   Q.  Mr. Doran, in your work, is the People's Republic of China

10  one of the main focal countries?

11  A.  It's perhaps the most focal country.

12  Q.  And could you tell the jury why.

13  A.  Since 2012, since the ascent of Xi Jinping as President of

14  China, or dictator of China, China's external actions have

15  become much more aggressive than they were previously.  The

16  Chinese government and the CCP regularly use its Ministry of

17  Foreign Affairs, its police, and its intelligence agencies to

18  intimidate and coerce Chinese dissidents overseas, including

19  some who have been my client.

20  Q.  Mr. Doran, how much of your work involves protecting

21  individuals and corporations from the hostilities of the

22  People's Republic of China?

23          MR. FINKEL:  Objection.  Asked and answered.

24  A.  I would judge about——

25          THE COURT:  Overruled.

O731GUO2                        Doran - Direct

1    A.  I would judge about 50 percent, although that number is

2    growing.

3    Q.  And could you just describe your experience as it relates

4    to the security threats posed by the PRC.

5    A.  Do you mean my personal experiences?

6    Q.  And professional.

7    A.  Yeah.  So I have lived and worked in China in a sensitive

8    commercial position, and while I worked there, I was absolutely

9    sure that all of my phone calls were listened to; I was sure

10   that my emails were being read, clandestinely, without my

11   knowledge, permission; I know that agents of the Chinese

12   government from time to time entered my apartment while I

13   wasn't there, there were signs that they'd been intruding; and

14   they also tried to recruit me as a spy for the Ministry of

15   State Security.

16   Q.  Mr. Doran, does your experience also include training in

17   the structure and operations of the Chinese Communist Party,

18   which is the CCP?

19   A.  Yes, it does.

20   Q.  And could you tell us, please, what is the correlation

21   between the CCP and the PRC?

22   A.  So the People's Republic of China is the name which the

23   country of China has had since 1949, when the Communist party

24   emerged victorious in the Chinese Civil War, and they renamed

25   the country the People's Republic of China, on the basis that

1  they are a Marxist, Leninist party, a Communist party.  The

2  CCP, the Chinese Communist Party, is the sole legal party in

3  China.  It dominates every aspect of political, economic,

4  social, cultural life there, and it jealously guards its

5  monopoly on power.  You could say that the Chinese state is the

6  CCP, and the CCP is the Chinese state.

7  Q.  Mr. Doran, does your experience include the methods in

8  which the PRC government targets its critiques?

9  A.  Yes.

10  Q.  And what does that matter?  Why does this matter in your

11  line of work?

12  A.  It matters because my clients are often subject to very

13  coercive or intimidatory tactics by Chinese government

14  agencies, and knowing how they operate, I can advise my clients

15  on how to take measures to reduce that risk or mitigate that

16  risk.

17  Q.  Mr. Doran, do you have experience with something called

18  Operation Fox Hunt?

19  A.  I do.

20  Q.  Now just at a very general level for now, what is Operation

21  Fox Hunt?

22  A.  Operation Fox Hunt is a global intelligence program

23  directed from the top of the Chinese bureaucracy by President

24  Xi and implemented by the Chinese police and intelligence

25  agencies.  Its purpose is to surveil, harass, coerce,

1  persecute, Chinese dissidents outside China to persuade them to

2  renounce their activities, which may be pro-democracy, for

3  example, or to return to China to face trial, or, if neither of

4  those things are possible, to pressure them into committing

5  suicide.

6  Q.  Mr. Doran, why does Operation Fox Hunt matter in your line

7  of work?

8  A.  Operation Fox Hunt matters in my line of work because I

9  have a number of clients who have been targeted by Operation

10  Fox Hunt activities, and my job has been to work with those

11  clients to help them reduce the risk that they face and to

12  enjoy some degree of security in their lives outside China.

13  Q.  Mr. Doran, have you been retained by Mr. Guo as an expert

14  in this matter?

15  A.  I've been retained by Mr. Guo's counsel.

16  Q.  And did Mr. Guo's counsel compensate you for your work here

17  as an expert?

18  A.  I am receiving professional fees.

19  Q.  And do you know by now how much money you've been paid for

20  your expert work here?

21  A.  I could give you an approximate figure in British pounds,

22  which is around 15,000 British pounds.

23  Q.  And those 15,000 British pounds, do they go to you or to

24  someone else?

25  A.  They go to me.  That's my fee.

O731GUO2                        Doran - Direct

1   Q.  And are your expenses included in this 15,000 pounds?

2   A.  Yes.

3   Q.  Mr. Doran, are your expenses included in the 15,000?

4   A.  You mean my hotel fare——hotel bill and——no, they're not

5   included, no.

6   Q.  You want to correct your first answer.

7   A.  Yes, I correct that, yes.

8   Q.  Okay.  And does your testimony here depend on whether or

9   not we pay your bill?

10  A.  No, not at all.

11          MS. SHROFF:  Your Honor, at this time we would like to

12  have Mr. Doran qualified as an expert on the People's Republic

13  of China, the CCP, and——

14          MR. FINKEL:  May I inquire on just two issues.

15          THE COURT:  You may.

16  VOIR DIRE EXAMINATION

17  BY MR. FINKEL:

18  Q.  Sir, what is the PLA?

19  A.  People's Liberation Army.

20  Q.  And that's the Army for what government?

21  A.  That's the Chinese military.

22  Q.  And so the PLA is under the control of the CCP; is that

23  correct?

24  A.  It's under the control of the Central Military Commission,

25  which is controlled by the CCP.

O731GUO2                          Doran - Direct

1   Q.  And who sits at the head of the Central Military

2   Commission?

3   A.  Xi Jinping.

4   Q.  And so the PLA works for President Xi; is that correct?

5   A.  Yes.

6           MR. FINKEL:  No objection.

7           THE COURT:  He is so qualified.

8           MS. SHROFF:  Thank you.

9   BY MS. SHROFF:

10  Q.  Okay, Mr. Doran, tell the jury, what is the People's

11  Republic of China, very briefly?

12  A.  So the People's Republic of China is the term that's used

13  to describe the country of China since 1949.  Before that it

14  was just called China, or the Republic of China.  But when the

15  Communist party was victorious in the Chinese Civil War, it

16  renamed the country the People's Republic of China.

17  Q.  And is the CCP the sole political power in the People's

18  Republic of China?

19  A.  Yes, it is.

20  Q.  And what does the CCP control?

21  A.  So the CCP is a totalitarian organization.  It directs all

22  political life, it directs all economic life, it directs what

23  citizens can see, what they can read, what they can believe,

24  how they can assemble; it controls cultural life, so it acts as

25  the censor for what's permissible art and what's not

1   permissible art.  So essentially it's a one-party state that

2   governs China in an exclusive fashion.

3   Q.  Is it fair to say that one should use China, the People's

4   Republic of China, and CCP interchangeably?

5   A.  That's permissible.

6   Q.  Tell us, please, who is Xi Jinping?

7   A.  Xi Jinping is, in my view, the dictator of China.

8   Officially, he is the President of China, and the Secretary

9   General of the Chinese Communist Party.

10  Q.  All right.  Well, I'm going to just show you, the

11  government, and the Court what is marked as Defense

12  Exhibit 60692.

13          Do you recognize this document?

14  A.  Yes, I do.

15  Q.  Who is that?

16  A.  That's President Xi Jinping.

17          MS. SHROFF:  The defense moves 60692 into evidence.

18          MR. FINKEL:  401 objection.

19          THE COURT:  It's admitted.

20          (Defendant's Exhibit 60692 received in evidence)

21  Q.  Where do you recognize the gentleman from?

22  A.  International media.

23  Q.  And who is he?

24  A.  He is the president of China, General Secretary of the

25  Chinese Communist Party.

 1              MS. SHROFF:  And is it published to the jury?  Thank

 2      you.

 3              So I can have that taken down.

 4      Q.  And you can tell the jury, what is the Chinese Ministry of

 5      Public Security?

 6      A.  The Chinese Ministry of Public Security is the official

 7      government body which controls all police activity in China and

 8      internationally.  It's divided into a number of different

 9      bureau or different offices, and for example, the first bureau

10      is what you would call the Political Police or the National

11      Security Police.  That bureau is essentially the Chinese

12      Gestapo.  It's the——

13      Q.  I'm going to stop you there just for a minute, Mr. Doran.

14      And first I'm going to show you an exhibit, which is 60691.  Do

15      you recognize that photograph?

16      A.  I do.

17      Q.  Who is that?

18      A.  That's Wang Xiaohong.

19      Q.  And what is his position?

20      A.  He is the Minister of Public Security.

21              MS. SHROFF:  Your Honor, the defense moves 60691 in

22      evidence.

23      VOIR DIRE EXAMINATION

24      BY MR. FINKEL:

25      Q.  Have you met this man in person?

O731GUO2                        Doran - Direct

```
1    A.  No.

2    Q.  So you don't know if that's a fair and accurate photograph

3    of him?

4    A.  I do know.

5    Q.  You've never seen him in person?

6    A.  No, but I recognize the photograph.

7    Q.  Have you seen him in person?

8    A.  I haven't seen him in person.

9              MR. FINKEL:  Objection.

10             THE COURT:  It is admitted.  Go ahead.

11             (Defendant's Exhibit 60691 received in evidence)

12   BY MS. SHROFF:

13   Q.  All right.  So tell the jury who this man is.

14   A.  He is the Minister of Public Security.

15   Q.  And what is the Ministry of Public Security?

16   A.  As I mentioned, the Ministry of Public Security is the

17   Chinese government body or agency which controls all police and

18   law enforcement activity in China and its law enforcement

19   activities overseas, but it's also what you might call the

20   secret police, the Chinese Gestapo, which its purpose is

21   essentially to identify and eliminate threats to the Chinese

22   Communist Party.

23   Q.  Is there an acronym for the Ministry of Public Security?

24   A.  MPS.

25   Q.  Thank you.  I'm sorry.  I shouldn't have said that.
```

O731GUO2                          Doran - Direct

1                   What is the Ministry of State Security?

2    A.  So the Ministry of State Security is China's intelligence

3    agency.  I think as a useful analogy, the closest equivalent in

4    the United States would be the Central Intelligence Agency.

5    Q.  And who is the head of the Ministry of State Security?

6    A.  Head of the Ministry of State Security is Chen Yixin.

7    Q.  And let me show you what is marked as Defense

8    Exhibit 60689.

9                   Have you met this man in person?

10   A.  Not in person.

11   Q.  Do you know who he is?

12   A.  Yes, that's Chen Yixin.

13   Q.  Is that an accurate photograph of the person?

14   A.  I believe it to be.

15            MS. SHROFF:  All right.  So I would move 60689 into

16   evidence.

17            MR. FINKEL:  No objection.

18            THE COURT:  It is admitted.

19            (Defendant's Exhibit 60689 received in evidence)

20            MS. SHROFF:  Does the jury have it?

21   BY MS. SHROFF:

22   Q.  Okay.  Give me the guy's name one more time?

23   A.  It's Chen Yixin.

24   Q.  Thank you.

25            Is the Ministry of State Security also referred to by

O731GUO2                          Doran - Direct

1    an acronym?

2    A.  Yes, it's commonly referred to as the MSS.

3              MS. SHROFF:  All right.  We can take that down.

4    Q.  And you can tell the jury, what is 3PLA?

5    A.  3PLA, or the Third Department of the General Staff of the

6    People's Liberation Army, is, or was until relatively recently

7    when there was a reorganization, the——the intelligence wing or

8    the intelligence department of the Chinese military.

9    Q.  And what is it responsible for?

10   A.  So it's responsible, amongst other things, for cyber

11   warfare, cyber espionage, and cyber subversion.

12   Q.  And what is cyber warfare, cyber espionage, and cyber

13   submersion?

14   A.  Subversion.  So these are three terms of art, which I'll

15   explain very briefly, if I may.

16             Cyber warfare would be hostile activity in cyberspace

17   against an enemy, so it would be things like sabotaging a

18   nuclear power station through cyber activity or breaking

19   controls on a dam to release water through hostile cyber

20   activity.

21             Cyber espionage uses much of the same tools and

22   techniques but its purpose is to gain information, confidential

23   information which is held on computer systems.

24             And cyber subversion is the use of the internet and

25   social media to sow disinformation and to create false or fake

O731GUO2                        Doran - Direct

1    news stories with the purpose of advancing China's national

2    security objectives.

3    Q.  Mr. Doran, could you tell the jury, what is the Information

4    Support Force?

5    A.  So the Information Support Force, which is recently

6    created, is the body of the Chinese military which actually

7    carries out those activities that I've just mentioned.

8    Q.  And what was it called before April of 2024?

9    A.  Before April 2024, it was called the Strategic Support

10   Force.

11   Q.  And who is the current head of Information Support Force?

12   A.  Is Lieutenant General Bi Yi.

13   Q.  And let me show you Defense Exhibit 60688.  Who is that?

14   A.  That's Lieutenant General Bi Yi.

15           MS. SHROFF:  And I move Defense Exhibit 60688 into

16   evidence.

17           MR. FINKEL:  No objection.

18           THE COURT:  It is admitted.

19           (Defendant's Exhibit 60688 received in evidence)

20   Q.  Mr. Doran, have you had any interactions with either the

21   MPS or the MSS?

22   A.  Yes, I've had interactions with both.

23           MR. FINKEL:  Objection to relevance.

24           THE COURT:  Overruled.

25   Q.  Could you tell the jury what your interactions have been.

O731GUO2                          Doran - Direct

1    A.  When I lived in China, as a foreign national and a national

2    of a country—the United Kingdom—which China considers to be

3    hostile or potentially hostile, I was subject to routine

4    surveillance by Chinese intelligence agents.  That included

5    routine intercept of my telephone conversations and intercept

6    of my emails and things like my internet browsing history, for

7    example.

8         I also know that Chinese agents, without my

9    permission, entered my apartment and searched it several times.

10   The MS—that was the MPS, in my view.

11        And then the MSS, knowing my background as a former

12   employee of the British government, approached me on two

13   occasions to try to persuade me or coerce me into spying on

14   their behalf.

15   Q.  Mr. Doran, if you were spying on their behalf, you wouldn't

16   tell us today, correct?

17   A.  If I were spying on their behalf, I'd probably be in prison

18   by now.

19   Q.  Okay.  Now, Mr. Doran, does the PRC hold elections?

20   A.  Yes, but they are sham elections.

21   Q.  And what do you mean by sham elections?

22   A.  So no candidate other than a candidate from the Chinese

23   Communist Party or a bogus sham party created by the Communists

24   will ever be elected to the National People's Congress in

25   China.

1    Q.  And why is that?

2    A.  Because the Chinese Communist Party believes it has a

3    unique and sole right to govern China, and it cannot tolerate

4    and will not tolerate any other political parties.

5    Q.  What is the fundamental mission of the CCP?

6    A.  The fundamental mission of the CCP is to maintain itself in

7    power.

8    Q.  For how long?

9    A.  Indefinitely.

10   Q.  What is the CCP's views on free speech?

11   A.  The CCP does not tolerate free speech.

12   Q.  Are the citizens of the People's Republic of China allowed

13   to criticize the CCP?

14   A.  They're not allowed to criticize the CCP.

15   Q.  Are they allowed to advocate political positions?

16   A.  They can only advocate political positions which are

17   consistent with the views of the CCP.

18   Q.  And what if they are opposite to the views of the CCP?

19   A.  Then they would be treated as criminals.

20   Q.  What is the CCP's view of the Chinese citizen who supports

21   democracy or free speech?

22   A.  That they are a criminal and a traitor.

23   Q.  Are they also considered to be enemies of the state itself?

24   A.  Yes, that's a good term to use.

25   Q.  Mr. Doran, what happens to the Chinese citizen who supports

1    democracy?

2    A.   A lot of different things can happen to them, but typically

3    they would be thrown in prison, after a show trial; or they

4    could be disappeared into a black prison system, which is

5    essentially being held incommunicado for an indefinite period

6    of time.

7    Q.   Does it matter to the CCP from where those Chinese citizens

8    support democracy and free speech, what countries they're

9    located in?

10   A.   It doesn't matter.  The Chinese Communist Party demands the

11   loyalty of every Chinese person, every Chinese citizen, whether

12   they're resident in the PRC or whether they reside abroad.

13   Q.   Mr. Doran, what does it mean when someone says it crosses

14   Chinese Communist Party red lines?

15   A.   So that would mean——let me take a step back.  There are

16   certain things and certain activities which the Chinese

17   Communist Party cannot tolerate, and they would be their red

18   lines, so that would be advocating for freedom of speech,

19   advocating for representative democracy, advocating for

20   religious freedom, advocating for the freedom of certain

21   nationalities within China; anything which goes against the

22   official orthodoxy of the Chinese Communist Party.

23        MS. SHROFF:  Please may we have DX Stip 001 pulled up

24   for everyone.

25        And if I could just have the first paragraph

O731GUO2                          Doran - Direct

1    highlighted.

2    Q.  And Mr. Doran, I'm going to ask you, please, to read the

3    first paragraph that starts with, "IT IS HEREBY," right above

4    the numbered paragraph.

5    A.  "IT IS HEREBY STIPULATED AND AGREED, by the United States

6    of America and Miles Guo, the defendant, through their

7    attorneys of record that:"

8    Q.  And if you could read paragraph 1.

9    A.  "The FBI has investigated individuals who, working at the

10   direction of the government of the People's Republic of China

11   ('the PRC government') have engaged in an international

12   campaign, known as Operation Fox Hunt, to coerce individuals

13   located in the United States and elsewhere to return to China

14   to face charges brought by the PRC government or to otherwise

15   reach financial settlements with the PRC government."

16   Q.  Mr. Doran, could you tell the jury, what is Operation Fox

17   Hunt?

18            MR. FINKEL:  Asked and answered.

19            THE COURT:  Sustained.

20   Q.  Could you tell us the aspects of Operation Fox Hunt and

21   what it entails.

22            MR. FINKEL:  Asked and answered.  This was all

23   covered.

24            THE COURT:  Sustained.

25   Q.  What is a "dirty tricks campaign" run by Operation Fox

O731GUO2                        Doran - Direct

1    Hunt?

2              MR. FINKEL:  Same objection.

3              THE COURT:  Sustained.

4    Q.  Mr. Doran, are there specific or particular Chinese

5    government agencies that conduct Operation Fox Hunt?

6    A.  Yes, there are.

7    Q.  And could you tell the jury which government agencies those

8    are.

9    A.  So that would be the Ministry of Public Security as the

10   lead agency, supported by the Ministry of State Security and by

11   elements of the Chinese military.

12   Q.  Now earlier I showed you DX 60691.

13             MS. SHROFF:  If we could just pull that up again.

14   Q.  And what is this gentleman's role in the processes or the

15   work of the Operation Fox Hunt?

16   A.  So Wang Xiaohong, as the Minister of Public Security,

17   received instruction and receives instructions from President

18   Xi to conduct Operation Fox Hunt.

19   Q.  And what relationship, if any, does he have to the direct

20   workings of Operation Fox Hunt?

21   A.  So as the head of the Ministry, he has overall operational

22   control of Operation Fox Hunt.

23   Q.  And what do you mean when you say operational control?

24   A.  So he would direct resources, he would discuss targets, he

25   would allocate priorities in terms of targets, and then he

1   would delegate that operational work to his subordinates.

2   Q.  Mr. Doran, generally speaking, how large is the Operation

3   Fox Hunt apparatus in the People's Republic of China?

4   A.  Well, bearing in mind that as a totalitarian state, it's

5   very opaque, but my professional judgment would be Operation

6   Fox Hunt involves thousands, if not tens of thousands, of

7   Chinese agents from either the MPS, the MSS, and other

8   agencies, and it probably, in my view, has an unlimited budget.

9   Q.  Does it also include Chinese prosecutors and operatives?

10  A.  Yes.  So the Chinese procurator, which is the equivalent of

11  the national prosecutor, who draw charges against the targets

12  of Operation Fox Hunt, but you'd have to understand that for

13  many of those charges, they're really bogus.  They're charges

14  which are laid in an exaggerated or false way, because the

15  objective is to clamp down on dissent rather than to actually

16  apprehend criminals.

17  Q.  Mr. Doran, in terms of intended targets, how wide or how

18  large is the pool or the reach of Operation Fox Hunt?

19  A.  Targets, probably thousands, if not tens of thousands.

20  Q.  And how does the CCP identify them, their targets?

21  A.  So they have a very sophisticated global intelligence

22  program, a monitoring program, that looks out for dissidents or

23  activists around the world, particularly those who use social

24  media or broadcast media—academics, for example, or people who

25  can access mainstream media—and they look for people who have

O731GUO2

1  advocated for democracy and freedom in China, and they

2  especially look for people who have exposed corruption at the

3  senior levels of the Chinese Communist Party.

4           THE COURT:  All righty.  It's now 11:29 and so we will

5  take our half-hour break.

6           Remember, do not discuss the case amongst yourselves

7  or with anyone else.  Don't permit anyone to discuss the case

8  in your presence.  Don't read, watch, or listen to anything

9  from any source that touches upon the subject matter of this

10  case.

11           (Jury not present)

12           THE COURT:  Sir, you may step out of the courtroom.

13           (Witness not present)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O731GUO2

1          THE COURT:  Please be seated.

2          Is there anything before we resume at noon?

3          MR. FINKEL:  Just two brief things, your Honor.

4          One, I understand that Mr. Doran was in the courtroom

5    during a large part, about an hour or so, of Mr. Yi's

6    testimony.  I would just ask that the defense not have their

7    witnesses wait in the courtroom.  I don't think that's

8    appropriate.

9          And second, there were—I counted three references to

10   the Gestapo, and references to black sites and rendition and

11   suicide, all of which I think are a bit far afield of what the

12   Court has permitted with respect to this particular witness.  I

13   didn't object because I didn't want to draw attention to it,

14   but I think it's inappropriate for those sort of really overly

15   prejudicial statements to be coming from, in particular, an

16   expert witness in the context of this trial, given what the

17   defense is attempting to use this witness for.  So I just ask

18   that that not continue, ask that Ms. Shroff not go down those

19   lines, and, if necessary, that you instruct the witness not to

20   use such terminology.

21         MR. KAMARAJU:  In terms of the first issue, your

22   Honor, we have not had any fact witnesses sit in the courtroom.

23   It's obviously appropriate for an expert witness to observe

24   testimony if it's relevant to their particular expert opinions

25   or their testimony, so that's why Mr. Doran was here for

O731GUO2

1    Mr. Yi's testimony, but we have not and will not have any fact

2    witnesses sitting in the courtroom during any trial testimony.

3         THE COURT:  And with regard to the second aspect?

4         MR. KAMARAJU:  I'll let Ms. Shroff——it's Ms. Shroff's

5    witness.  I'll let her answer.

6         MS. SHROFF:  I wasn't planning to follow up on it.  He

7    said what he said.  I'm not planning to follow up on whether or

8    not, you know, half of China has committed suicide or anything

9    like that, but what he said is what he said.  I'm not planning

10   to follow up.  I actually didn't——we're just less scripted, so

11   I don't quite know where he's going half the time, so——I'm not

12   going to follow up.  I'm not being articulate, but I'm not

13   going to go down the suicide road, if that's the government's

14   concern.

15        THE COURT:  So is there an application, Mr. Finkel?

16        MR. FINKEL:  We ask that that be stricken from the

17   record.

18        MS. SHROFF:  No.  We would oppose that because that is

19   what the CCP does; they drive people to suicide.

20        MR. FINKEL:  So——

21        MS. SHROFF:  That is part and parcel of his testimony.

22   It wasn't any information that we specifically geared him

23   toward.  That is what the expert says, and it should stand.

24        MR. FINKEL:  It's the term Gestapo, which is a Nazi

25   term.  And just to be clear, your Honor, we don't vouch for

O731GUO2

1  anything the CCP does.  We're trying to just maintain the

2  integrity of this trial.  We're assistant United States

3  attorneys enforcing U.S. law.  And for a witness to say that

4  the Gestapo is out to get Miles Guo is just not appropriate,

5  given the issues that are before the Court.

6          THE COURT:  My understanding is that it is his opinion

7  that they use Gestapo-like tactics, and Ms. Shroff says she's

8  not going to pursue the Gestapo theme, or the suicide theme.

9          MS. SHROFF:  I'm not going to mention the word

10 Gestapo, suicide, or any such word again.  And you know what,

11 if the CCP employs Gestapo-like tactics, I think the Department

12 of Justice may want that to stop, so it's good that it's out

13 there.

14         MR. FINKEL:  That's why the Department of Justice has

15 investigated and prosecuted these crimes, as has been

16 stipulated to, and Ms. Shroff I think knows that very well.

17         MS. SHROFF:  And that's why we will bring that out,

18 but I'm not going to touch Gestapo or suicide again.

19         THE COURT:  So I'm not going to strike his references

20 to the Gestapo, the suicide, and the rendition.

21         Anything further?

22         MR. FINKEL:  Just briefly, your Honor, I assume

23 Mr. Doran is not going to offer an opinion about the veracity

24 of Mr. Yi's testimony.  The defense said they weren't going to

25 do that, but they had him sit in the courtroom, so I just want

O731GUO2

1    to make sure that's not going to happen.

2              MR. KAMARAJU:  No.  Mr. Doran is not going to offer

3    any opinion on Mr. Yi's credibility or the truth of his

4    testimony.

5              MR. FINKEL:  That seems like a bit of a very specific

6    answer.

7              THE COURT:  He's not going to be vouching for him; is

8    that correct?

9              MR. KAMARAJU:  That's absolutely right.

10             MR. FINKEL:  Is he going to comment about his

11   testimony?

12             MR. KAMARAJU:  No.  He's an expert viewing testimony

13   about a CCP operation.  He's not going to say anything about

14   Mr. Yi did this or Mr. Yi's right or Mr. Yi's wrong.  Experts

15   sit in trials all the time to view testimony.  But he is not,

16   your Honor, going to opine in any way on the credibility of

17   Mr. Yi's testimony.

18             MR. FINKEL:  So, your Honor, I think this is an issue.

19   What is he going to say about Mr. Yi's testimony?

20             MR. KAMARAJU:  Nothing.  Nothing.

21             THE COURT:  He's not going to be commenting on Mr. Yi,

22   period, correct?

23             MR. KAMARAJU:  Yeah, he's not going to use Mr. Yi's

24   name once.

25             THE COURT:  Okay.  Anything further?

O731GUO2

1        MR. FINKEL:  No.  Thank you, your Honor.

2        MR. KAMARAJU:  Not from us, your Honor.

3        MS. SHROFF:  Nothing further.

4        THE COURT:  All righty.

5        (Recess)

O73BUO3                         Doran - Direct

1

2                            AFTERNOON SESSION

3                               12:0 p.m.

4            (Trial resumed; jury not present)

5            THE COURT:  Please have the jurors brought in.

6            THE LAW CLERK:  Jury entering.

7            (Jury present)

8            THE COURT:  Please be seated.  And please remember,

9     sir, you're still under oath.

10    BY MS. SHROFF:

11    Q.  What is the Hong Kong Special Administrative Region?

12    A.  So the Hong Kong Special Administrative Region is the

13    former British colony of Hong Kong.  It's a territory in

14    Southwest China.  It was handed back to the People's Republic

15    of China in 1997 under an international treaty between the

16    United Kingdom and the PRC.

17            And under the terms of that treaty, a certain way of

18    life was supposed to be maintained in Hong Kong under something

19    called One Country Two Systems.  And that meant that residents

20    in Hong Kong could enjoy a greater degree of personal freedom.

21    They could express political views that were not allowed in the

22    PRC, and they could expect a fair and transparent justice

23    system in Hong Kong.  Unfortunately over the last three to four

24    years, perhaps longer than that, those freedoms have been

25    eroded because the PRC government has broken its treaty

O73BUO3                    Doran - Direct

1   obligations to the United Kingdom.  And now unfortunately Hong

2   Kong is no longer a oasis of democracy and freedom in China,

3   but simply another part of China.

4   Q.  Mr. Doran, are threats to the family and people who are

5   dissidents a common practice by the CCP?

6   A.  Very common.

7   Q.  Is denial of education, work or shelter also a common

8   practice of the CCP?

9   A.  Yes, it is.

10  Q.  How about spamouflage, what is that concept?

11  A.  Spamouflage is a term that means the use of online and

12  social media outlets, perhaps also broadcast or print media,

13  YouTube, for example, to spread false or exaggerated and

14  certainly defamatory information about a target.  It is

15  designed to denigrate the target, to ruin their reputation, to

16  caste doubt on their ethics and integrity, to make them out to

17  be bad people generally.

18  Q.  Mr. Doran, is it a common practice to seize and freeze

19  assets so as to keep dissidents from speaking out?

20  A.  Yes, it is.  Assets and bank accounts in China are often

21  frozen, and it sometimes has the unintended consequence of bank

22  accounts in other countries being frozen as well.

23  Q.  Is the CCP likely to freeze a bank account or assets

24  outside of the People's Republic of China if it knows of a

25  dissident who is speaking out?

O73BUO3                         Doran - Direct

1    MR. FINKEL:  Objection to the leading and calls for

2    speculation.

3        THE COURT:  You may answer.

4    A.  Yes. If I may just take a moment to describe how that

5    process would work.

6        MR. FINKEL:  Object to this description.

7        THE COURT:  You may answer.

8    A.  Thank you.  The process would be that a bank account in

9    China or perhaps in Hong Kong would be frozen.  For the

10   dissident who lives outside China and is seeking a banking

11   relationship here in the United States; for example, they may

12   then subsequent find it difficult to open a bank account here

13   or maintain a bank account because the compliance officers at

14   the U.S. bank would look at that freeze and say, okay, this guy

15   or this person is a risk.  We don't want them to be our client.

16       Unfortunately, that often means that they don't do

17   deep research into why those assets are being frozen.  It's

18   just much easier for the bank sometime to dismiss account

19   holders as a high risk without really knowing what the content,

20   context, of that freeze may have been.

21   Q.  Mr. Doran, does the CCP pressure host countries to return

22   individuals to the People's Republic of China?

23   A.  Yes, it does very much so.

24   Q.  How?

25   A.  So it uses a number of diplomatic levers and other tools to

O73BUO3                          Doran - Direct

pressure countries.  So, for example, if I can give the example

of countries like Cambodia or Thailand, there are others.

Chinese government would threaten to withhold loans, for

example, or it might imply that bilateral relations would

suffer if that country did not cooperate in returning

dissidents to China.

Q.  What about vis-a-vis the United States or the United

Kingdom?

A.  So it's a bit more challenging for the Chinese authorities

to do that because the U.S. and the UK are less susceptible to

that kind of diplomatic blackmail.  But nevertheless, the

Chinese authorities would threaten those countries with

sanctions in an overt sense and clandestinely or covertly they

may conduct online cyber-espionage or cyber-subversion against

those countries or individuals in those countries to pressure

them to agree to Chinese demands.

Q.  What about the tactic of bringing false criminal

accusations?

           MR. FINKEL:  Your Honor, can we have a brief sidebar?

           THE COURT:  Yes.

           (Continued on next page)

O73BUO3                          Doran - Direct

1              (At the sidebar)

2              MR. FINKEL:  Your Honor, there's obviously a tension

3    in the question about false accusations.  And to the extent

4    Ms. Shroff is inquiring about a false accusation of Chinese

5    law, I think that would be in the scope of your Honor's ruling

6    as appropriate inquiry.  The danger -- and it's an ongoing

7    danger from the government's perspective -- is the implication

8    subtly that this trial is a false accusation that's been

9    influenced by the CCP.  And in fact the way this question came

10   to be was about pressuring other countries, pressuring the U.S.

11   and UK.  Mr. Doran said that the U.S. and UK are not as

12   susceptible, but can be susceptible to, I think he said

13   sanctions or something like that that are threatened.

14   Immediately following that question, are there also false

15   accusations of criminal conduct.  And this is approaching, I

16   think if not over the line, of what your Honor ruled yesterday

17   that they can't imply -- and having said many times they won't

18   imply -- because it is not true that this case is in anyway, in

19   anyway, pressure or brought upon by the Chinese Communist Party

20   because that's not true.

21              THE COURT:  I'd like you just to clarify your question

22   and then just insert Chinese law.

23              MS. SHROFF:  That's fine, your Honor.  But the

24   question on those factors is a different question than this

25   one. There has in fact been pressure on those countries.  The

O73BUO3                          Doran - Direct

 1  government knows.  The prosecutor --

 2          THE COURT:  I understand that.  I'm just saying for

 3  this particular question --

 4          MS. SHROFF:  I'm happy to.

 5          MR. FINKEL:  Your Honor, this is a rare time I'm going

 6  to say something, Ms. Shroff is right.  There has been

 7  pressure.  It's stipulated to in part in our stipulation, but

 8  there's a difference between what's in the stipulation, what

 9  the parties have agreed to, what your Honor has ruled and using

10  pressure to suggest that this is part of that pressure campaign

11  because it's not.

12          THE COURT:  I really don't believe that they have

13  gotten there.  I know that it's a sensitive issue, but --

14          MS. SHROFF:  I'm not trying to go there honestly.

15          MR. KAMARAJU:  And I will commit again, we have no

16  intention of making that argument at summation.  I can commit

17  to that since I'm the one doing it.

18          THE COURT:  I completely never expected it.  It's not

19  something that we have to worry.

20          MR. FINKEL:  I certainly understand, your Honor.  We

21  appreciate that promise, but still we're very concerns for

22  obvious reasons trying to protect our case that there's even

23  just subtle implications to allow the jury to draw an

24  inference.  And that's what we're trying to police against.

25          MS. SHROFF:  Tell me what is the next question you

```
O73BUO3                        Doran - Direct
```

1   want me to ask?

2          MR. FINKEL:  Next is no further questions.

3          THE COURT:  I just ask you not to address him.

4   Address me.

5          MS. SHROFF:  Your Honor, tell me, please, if I may,

6   how would you like me to clean that up?  Were the false

7   accusations -- I just want to reword it correctly.  The false

8   criminal accusations were brought in China or under China law.

9          MR. FINKEL:  False accusations were under China law.

10         MR. KAMARAJU:  May I suggest this?  I think he said

11   yes there are false accusations.  Could Ms. Shroff just ask,

12   when you just testified about false accusations, were you

13   referring to false accusations by the Chinese government.

14         THE COURT:  False accusations about violations of

15   Chinese law.

16         MR. FINKEL:  I think at this point we could just move

17   on.  The government is made its point.  I understand Ms. Shroff

18   is not going any further and we can just move on.

19         THE COURT:  No need to ask anything further.

20         MS. SHROFF:  Okay.

21         (Continued on next page)

22

23

24

25

O73BUO3                          Doran - Direct

1              (In open court; jury present)

2              THE COURT:  You may continue.

3    BY MS. SHROFF:

4    Q.  Has the CCP also been known to abuse Interpol red notices?

5    A.  Yes, it frequently does so.

6    Q.  How about the use of surveillance and hacking of the target

7    or the target's family and colleagues?

8    A.  Yes, that's a common tactic.

9    Q.  And how is that put into play?

10   A.  So do you refer to hacking?

11   Q.  You can start with either, surveillance or hacking.

12   A.  So that would include the deployment of undercover Chinese

13   agents who would conduct surveillance of the target, the target

14   being the dissident, that would include physical surveillance.

15   It might also include telephone intercept, illegal telephone

16   intercept if it's carried out outside China without the

17   knowledge or permission of the host government.  It might also

18   include illegal or improper access to email through the use of

19   spyware which would be unintentionally uploaded to the target

20   devices for example.

21   Q.  How about the use of physical intimidation and beatings?

22   A.  Yes, that has occurred as well.

23   Q.  What about kidnapping or other such acts?

24   A.  Kidnap has certainly been used as a tactic in Operation Fox

25   Hunt.

O73BUO3                    Doran - Direct

Q.  What about the filing of false lawsuits, could you tell the
jury how Fox Hunt employs that tactic?

A.  So one aspect of Fox Hunt -- and this is related to
Interpol Red Notices as well -- is that the victim may be
accused of crimes in China, which are either false accusations
or grossly exaggerated accusations related to something
relatively trivial or minor.

        They then issue a Interpol Red Notice which you'll
understand is an international document designed to enable
cooperation between police forces.  So if a subject of a Red
Notice is a resident in the United States, there is by the
Interpol guidelines and regulations an obligation on the United
States to arrest that person.  But my view is that the Chinese
government, the CCP routinely abuses that system.

Q.  In your expert opinion, Mr. Doran, are there actual
legitimate Red Notices issued by the CCP?

A.  Yes.

Q.  And how does the CCP choose its targets for Operation Fox
Hunt?

A.  It chooses its targets based on the perceived threat to the
legitimacy prestige and monopoly on power of the Chinese
Communist Party.

Q.  And who is included within that target group?

A.  So included in that target group would be a range of
people, but it would typically include people who advocate for

O73BUO3                         Doran - Direct

1   democracy in China, advocate for the overthrow of the Chinese

2   Communist Party, make criticism of individual senior members of

3   the Chinese Communist Party, people who advocate for freedom

4   for religious minority for example.

5   Q.  How about people who either mock or just make fun of the

6   CCP leaders?

7   A.  Yes, that's also the case.  A good example of that was

8   recently in Cambodia where a young man who made derogatory

9   cartoons portraying President Xi as a teddy bear, as a Panda

10  bear.  He was added to the Fox Hunt list.

11  Q.  How about individuals with large social media followings?

12  A.  In my professional view individuals with large social media

13  followings are particularly sensitive targets for the Chinese

14  authorities in Operation Fox Hunt because they have influence

15  amongst the Chinese expatriate or deaspirate community.  They

16  have a platform on which to share their views and advocate for

17  their views, so they're not just acting in isolation.  They're

18  advocating to a large constituency of people.

19  Q.  Mr. Doran, does the CCP employ these tactics against its

20  critics both inside and outside of the People's Republic of

21  China?

22  A.  Yes, it does.

23  Q.  And could you give us some examples of how it has done so

24  outside the People's Republic of China?

25  A.  So here in the United States, I think it's a matter of

O73BUO3                        Doran - Direct

1    record that undeclared MSS agents have traveled to the United

2    States with the intention of pressuring individuals, dissidents

3    here to return to China under threat of violence or harm to

4    their families.

5              In terms of specific examples outside the United

6    States, I've mentioned the cartoonist in Cambodia.  I could

7    also mention that in 2021 a gentleman called He Wui who is

8    resident in British Columbia in Canada.  He committed suicide

9    and the Canadian authorities are strongly investigating the

10   links to Operation Fox Hunt.  They believed he was pressured

11   into that suicide by  --

12   Q.  Mr. Doran, let me redirect your attention to the United

13   States, and if you could tell us what the United States is

14   doing about Operation Fox Hunt?

15   A.  So the United States government along with many other

16   western governments take Operation Fox Hunt as a very serious

17   threat to national security.  The DOJ and the FBI have

18   something called the transnational repression program within

19   their counterintelligence remit.  And that specifically is to

20   protect the rights of Chinese citizens, resident in China or

21   U.S. passport holders, U.S. citizens who are naturalized from

22   China to protect them from the kind of activities that I've

23   described by the Chinese police and intelligence agencies.

24   Q.  Mr. Doran, did you say transnational repression or

25   suppression?

O73BUO3                          Doran - Direct

1    A.  Repression.

2    Q.  Are you familiar with what the DOJ has done in response to

3    Operation Fox Hunt?

4    A.  Yes.  I've read various complaints that been published by

5    the DOJ relating to Operation Fox Hunt activities in the US.

6    Q.  Where in the U.S.?

7    A.  In New York, but also in California.

8    Q.  Sitting here today do you recall which actions the DOJ has

9    brought in either the Eastern District of New York or in

10   California?

11   A.  I know that the DOJ has indicted a number of Chinese

12   intelligence officers and also U.S. citizens who've been

13   involved in acting as undeclared agents for the Chinese

14   government in terms of seeking the extradition to China of

15   dissident resident in the United States.

16   Q.  Are there Fox Hunt activities outside of the United States

17   in countries such as Canada?

18   A.  Yes, there are.  As I mention earlier, there's an example

19   --

20   Q.  I'm going to just -- give me one second.  Okay.  I just

21   wanted to make sure that when you talk about Canada, your scope

22   sort of is a little bit defined.

23         Could you just tell the jury if there was a matter

24   where the individuals were intimidated through state and

25   non-state proxies?

O73BUO3                          Doran - Direct

1          MR. FINKEL:  Asked and answered.

2     A.  Yes.

3          THE COURT:  Sustained.

4     Q.  How about in Thailand?

5     A.  Yes.

6          MR. FINKEL:  Objection, scope, relevance.

7          THE COURT:  Sustained.

8     Q.  Mr. Doran, is there a particular profile that you are

9     familiar with as an expert for Operation Fox Hunt target?

10    A.  Yes.  In my work and my experience of dealing with targets

11    of Operation Fox Hunt, there is a common theme which they all

12    share, and that is generally they have undertaken activity or

13    advocated for something which is one of the Chinese Communist

14    Parties redlines as we discussed before.  And that would be

15    things like pro-democracy pro-human rights, Hong Kong freedoms

16    for example.

17    Q.  How about religious freedom?

18    A.  Religious freedom certainly.

19    Q.  And criticism of President Xi?

20    A.  That's probably one of the most sensitive matters.

21    President Xi has built his political reputation in China as

22    being an anticorruption president, but in fact a lot of the

23    dissidents have pointed out his corruption.

24    Q.  Mr. Doran, have you ever heard of a person named Miles Guo?

25    A.  Yes.

O73BUO3                              Doran - Direct

1    Q.  Could I show you, please, what is DX60690.  Do you

2    recognize the person in this photograph?

3    A.  I do recognize that person.

4    Q.  Who is that?

5    A.  That's Miles Guo.

6              MS. SHROFF:  We move 60690 into evidence.

7              MR. FINKEL:  No objection.

8              THE COURT:  It is admitted.

9              (Defendant's Exhibit 60690 received in evidence)

10   BY MS. SHROFF:

11   Q.  Mr. Doran, have you ever seen Mr. Miles Guo in person

12   before today?

13   A.  Not before today.

14   Q.  And based on your expert opinion, Mr. Doran, does Miles Guo

15   fit the profile of an Operation Fox Hunt target?

16   A.  In my professional opinion, Mr. Guo is public enemy number

17   one in China.  He would be right at the top of the target list

18   for Operation Fox Hunt.

19   Q.  And why would that be?

20   A.  He has exposed corruption at the highest levels in China

21   which is extremely embarrassing for President Xi and his close

22   circle.  He's also advocated for democracy and freedom in China

23   which is intolerable to the Chinese Communist Party, and he has

24   a social media following which gives him a prominent voice and

25   platform to advocate those views.  So taken together that makes

O73BUO3                    Doran - Direct

1    him probably public enemy number one in China.

2    Q.  Before you were retained as an expert in this matter, had

3    you heard of Miles Guo?

4    A.  Yes, I had.

5    Q.  And was it your impression that he was an outspoken

6    critique of the CCP?

7    A.  Yes.

8    Q.  Were you aware if the PRC had in fact filed an Interpol Red

9    Notice against Mr. Guo?

10   A.  I was aware that a Red Notice had been filed.

11   Q.  Do you know on what date that Red Notice had been filed?

12   A.  If I recall correctly, it was the 19th of April 2017.

13   Q.  Are you aware if Mr. Guo having done a Voice of America

14   interview?

15   A.  Yes.

16   Q.  Did you watch that interview?

17   A.  Not at the time, but I've watched it subsequently.

18   Q.  And what date was that interview done?

19   A.  That was also the 19th of April 2017.

20   Q.  May I please have the stip brought up, please, and may I

21   ask for it, please, if we can go to paragraph five.

22           Could you read for me what paragraph five is?

23   A.  "To carry out some of the objectives of Fox Hunt, in 2017

24   the PRC government tasked a specially designated group of

25   operatives (The group) with discrediting and harassing

O73BUO3                    Doran - Direct

individuals, including Mr. Guo, by using interactive computer
services and electronic communication systems.  The group is
based out of the Beijing municipal public security bureau at a
facility in Beijing's Dongcheng's District.  The group was
previously referred to as the cyber investigation team, and was
later referred to as the 912 special project working group.
The group's tactics aimed at Mr. Guo included using anonymized
social media accounts operated by the group and by pressuring
U.S. social media companies to remove Mr. Guo and U.S. based
associates of Mr. Guo from social media platforms.  These
efforts were part of the PRC government's broader effort to
prevent, disrupt, and harass Mr. Guo's use of social media and
other online platforms to disseminate and discuss disfavored
content.  In or about December 2018, officers of the group were
directed to post three videos or posts daily with YouTube and
Facebook accounts, with one of the posts required to be
anti-Mr. Guo.  On February 3, 2020, a PRC government official
issued a tasking requirement that every member of the group
shall write an original article with content related to
targeting Mr. Guo, the Covid pandemic or Hong Kong.  The FBI
investigated the group's activities, including its activities
aimed at Mr. Guo, and the U.S. government has charged many of
the group's members with violations of U.S. law."
Q.  Mr. Doran, let me show you what is marked as Defense
Exhibit number 7006.  Could you tell me, please, what is the

O73BUO3                          Doran - Direct

1   date of this complaint?

2   A.   The date is the 18th of April 2017.

3   Q.   Now going back to defense stip one.  Could I have you look

4   at paragraph number two which reads:  In 2017, a U.S. law

5   enforcement agency assessed that Miles Guo was the highest

6   priority of China's repatriation efforts.

7        Mr. Doran, were you aware of this fact in 2017?

8   A.   No, I wasn't.

9   Q.   Mr. Doran, is there a list of targets maintained by the

10  CCP?

11  A.   Yes, there is.

12  Q.   And may I just ask, Mr. Salazar, if you could keep the stip

13  on the left side and bring up GXC63.

14       Mr. Doran, have you seen GX-63-T before?

15  A.   Yes, I believe so.

16  Q.   That's the document to your right have you seen it before?

17  A.   No, the one on the right.  No, I haven't seen it before.

18  Q.   Could I go to page six if you could highlight the right

19  section for him, Mr. Salazar.  Could you read that for the

20  jury, please.

21  A.   "This includes the $4 billion that the Communist Party has

22  spent to stop, to halt, hackers are trying to stop the ceremony

23  of the declaration of our founding of the New Federal State of

24  China tomorrow June 3 at 7 p.m. New York time, and the day

25  after, that is, before 12 p.m. on June the 4th."

O73BUO3                          Doran - Direct

Q.  What is June 4th in the history of the People's Republic of
China?

A.  It's the anniversary of the Tiananmen Square massacre.

Q.  Let me just ask you a few questions about the means and
methods of Operation Fox Hunt and it's hacking of its targets.

        I think I need 63-T back, and if I could go to page
six.  Would you agree with the statement that you just read?

A.  Yes.

Q.  You can take that down and just have the stip back up.
Could you describe for the jury, please, what is online
propaganda and disinformation used by the CCP?

A.  In simple terms this is fake news, false news.  This
information means the reader is deceived into believing
something which isn't true or confused into thinking we don't
know what fact and fiction is here.  This is a tactic commonly
used by the Chinese Communist Party.

Q.  If I could have you look at this stip and go to paragraph
four and five, if you could just read that for the jury?

A.  "In 2018, a U.S. law enforcement agency received
information that the PRC government had established a special
investigative group in China to manage China's investigation of
and actions against Mr. Guo."

Q.  Were you aware of this fact in 2018?

A.  No.

Q.  And keep reading, please, to paragraph five.

O73BUO3                          Doran - Direct

A.   "To carry out some of the objectives of Fox Hunt, in 2017, the PRC government tasked a specially designated group of operatives (The group) with discrediting and harassing individuals including Mr. Guo by using interactive computer services and electronic communication systems."

Q.   We can stop there.

     Now, Mr. Doran, you also testified as part of Operation Fox Hunt's means and methods, the CCP does in fact seize a target's assets, correct?

A.   Correct.

Q.   And could you please read paragraph eight of the stipulation that is before you?

A.   "On October 23, 2018, a court in Hong Kong entered an order seizing and restraining Mr. Guo's assets in Hong Kong and elsewhere under the court's jurisdiction."

Q.   Now, you also testified about the means and methods Fox Hunt uses by pressuring host countries to return the target to the PRC.  You remember that?

A.   Yes.

Q.   If you could read paragraph seven of the stip.

A.   "Between May 2017 and January 2018, at least four individuals, including George Higginbotham, Elliot Broidy, Nicke Lum Davis and Prakazrel Michel, never disclosed that they were actually acting on behalf of foreign actors, including the PRC government to lobby officials in the Trump administration

O73BUO3                    Doran - Direct

1    in an effort to cause Mr. Guo's extradition to China.

2    Higginbotham, Broidy, Davis and Michel were each convicted of

3    violating U.S. law regarding their lobbying efforts.  The

4    efforts of these individuals were not successful and Mr. Guo

5    was never extradited at the request of the PRC government.

6    Instead and since approximately 2015, Mr. Guo has been able to

7    reside in the United States with his family."

8    Q.  Mr. Doran, you also testified to the physical intimidation

9    as the method and means used by Operation Fox Hunt, correct?

10   A.  Correct.

11   Q.  And if you could look at paragraph six and tell the jury

12   what it says, please, the stipulation between the United States

13   and Mr. Guo?

14   A.  "Since Mr. Guo fled the PRC, the PRC government has sought

15   his return for prosecution in the PRC and has employed numerous

16   methods to effect Mr. Guo's capture or arrest.  In May 2017,

17   the PRC government sent four undeclared agents from the PRC's

18   Ministry of State Security (MSS) to the United States to

19   attempt to cause Mr. Guo's coerced repatriation to the PRC as

20   part of the Fox Hunt initiative.  The U.S. government disrupted

21   the PRC government's efforts to forcefully repatriate Mr. Guo,

22   and Mr. Guo continue to reside in the United States."

23   Q.  You can take that down.  Thank you.

24          Mr. Doran, have you worked with other people or

25   individuals who have been targeted by Operation Fox Hunt?

O73BUO3                          Doran - Direct

1      THE COURT:  Ms. Shroff, I need for you to speak into

2  the microphone.

3  Q.  Do you know why your business has been retained by them?

4      MR. FINKEL:  Calls for speculation, personal

5  knowledge.

6  Q.  What is your understanding of why your clients retain you?

7  A.  Because of my professional expertise and my experience in

8  China.

9      THE COURT:  Ms. Shroff, I need you to get closer to

10  the microphone.

11  Q.  And what is it that your clients seek from you in terms of

12  advice?

13  A.  They seek advice on how to reduce the risk to themselves

14  and their families and to their businesses posed by hostile

15  actions by the PRC.  They also ask me to deliver training to

16  them on how to do that.

17  Q.  And do you advise your clients on how to combat the tactics

18  of Operation Fox Hunt?

19  A.  Yes, I do.

20  Q.  What do you advise them to do?

21  A.  Well, each individual case is different, but I would say

22  broadly I advise them on how to dissipate their risk.  Would

23  you like me to give you some examples?

24  Q.  Sure.

25  A.  So one thing to do would be to hold multiple cellular

O73BUO3                    Doran - Direct

1   phones so that if one is being surveilled or hacked, then there

2   are others which may not be.  Another tactic would be to use

3   various online email addresses and personalities online in

4   order to dissipate risk.  And very importantly, financial

5   assets to be held across different banks or different asset

6   categories so that if one is seized or frozen, then the subject

7   would have access to other resources that aren't frozen at that

8   time.

9   Q.  Do you also advise them to diversify their identity online?

10  A.  Yes, I do.

11  Q.  Could you tell the jury what exactly that means?

12  A.  So I'll put this into context.  I think many people would

13  know that Chinese people often have two versions of their name.

14  They have an English version and a Chinese version.  And that's

15  a good start, but that's not to do with this case in

16  particular, that's just a cultural issue.  But what I would

17  advise them to do is to use those kinds of variants on their

18  name so they have four, five, six, seven different email

19  addresses or eight different email accounts that they're

20  associated with, but in some slightly different way so that if

21  one email account is compromised or hacked, that they still

22  have un-compromised accounts to work with.

23  Q.  And have you heard of a phrase called "Harden your physical

24  location?"

25  A.  Yes, that's a standard risk mitigation phrase in terms of

O73BUO3                          Doran - Direct

1   physical security.

2   Q.  What does that mean?

3   A.  So it means if a person is a potential or likely target for

4   kidnapping, for example, they may wish to invest in hardening

5   their residence.  And by that I mean things like introducing

6   CCTV cameras, access control, special security lighting, alarm

7   systems.  They may even choose to employ bodyguards as well.

8   Q.  Let me show you what is DX60623.  Have you seen this

9   document before?

10  A.  No, I haven't.

11  Q.  Would you expect the target of Operation Fox Hunt to have

12  installed a surveillance system?

13  A.  Absolutely.

14  Q.  You can take that down.

15          Mr. Doran, would it be best practices for Miles Guo to

16  have several burner phones?

17  A.  In my professional view, it would be good security risk

18  management practice for Mr. Guo to have multiple burner phones.

19  Q.  How about several bank accounts?

20  A.  Similarly I think it would be good security practice.

21  Q.  Would it also be good security practice for him to hire

22  ex-NYPD or law enforcement for physical safety?

23  A.  Yes, if that's within his financial resources.

24  Q.  And how about for him to have surveillance installed at his

25  offices and home?

O73BUO3                          Doran - Cross

1   A.  If by surveillance you mean CCTV cameras, yes, I would

2   recommend that.

3   Q.  Mr. Doran, you spent about an hour and a half testifying

4   here today, have any of your answers been motivated by the

5   amount of money you've been paid?

6   A.  Absolutely not.

7   Q.  Have your answers been motivated by how many times you met

8   me?

9   A.  No.

10  Q.  How many times did you meet me?

11  A.  I met you in person in London on the 25th and 26th of

12  April.  We subsequently had a zoom call in mid-May, and then I

13  met you here in New York last week, 25th and 26th of June.

14  Q.  Did I meet you yesterday?

15  A.  Yes, I met you yesterday.

16  Q.  Did we talk about the case?

17  A.  No.

18  Q.  Did you meet me the day before?

19  A.  I don't think so, no.

20          MS. SHROFF:  I have nothing further, your Honor.

21          THE COURT:  Cross examination.

22  CROSS-EXAMINATION

23  BY MR. FINKEL:

24  Q.  Good afternoon.

25  A.  Good afternoon.

O73BUO3                          Doran - Cross

1   Q.  My name is Ryan Finkel.  I'm an Assistant United States

2   attorney.  Did you know that?

3   A.  Yes, I do.

4   Q.  And my job along with my colleagues is to enforce

5   violations of United States law.  Did you know that?

6   A.  Yes.

7   Q.  Did you know that to perform this you have to take an oath

8   to the Constitution of the United States?

9   A.  Yes, I did know that.

10  Q.  And this trial is being conducted in the United States of

11  course, right?

12  A.  Yes.

13  Q.  And it's subject to U.S. law, right?

14  A.  Yes.

15  Q.  And it's being presided over by a United States district

16  judge, Judge Torres, right?

17          MS. SHROFF:  Objection, your Honor.  I don't know if

18  Mr. Doran knows.

19          THE COURT:  Am I presiding over the case?

20          THE WITNESS:  Yes.

21  Q.  We can put up DX Stip 1, please, Ms. Loftus.

22          You testified about this stipulation during your

23  direct examination correct, sir?

24  A.  Yes.

25  Q.  I want to draw your attention to a few points.

O73BUO3                          Doran - Cross

1              First, could we go to the last page, Ms. Loftus.

2              Do you see the signatures at the bottom?

3   A.  Yes, I do.

4   Q.  This is a stipulation between the government, the United

5   States government, and Mr. Guo's attorneys, right?

6   A.  I understand that to be, yes.

7   Q.  The parties agree.  There's no dispute about what's in this

8   stipulation, right?

9   A.  I can't speak for you.  I don't know.

10  Q.  Let's go to the first page.  It is hereby stipulated and

11  agreed by the United States of America and Miles Guo, the

12  defendant, through their attorneys of record that -- and it

13  list several parties.  So the parties agree?

14  A.  Yes.

15  Q.  Go back to the last page, please, Ms. Loftus.

16              In fact, that signature where below it says Damian

17  Williams United States Attorney Southern District of New York

18  by and there are four names.  You see that?

19  A.  Yes.

20  Q.  That line with the signature --

21  A.  Yes.

22  Q.  -- you know that's my signature?

23  A.  I didn't know that was your signature, but I take your word

24  that's your signature.

25  Q.  I signed this document.

O73BUO3                          Doran - Cross

1          MS. SHROFF:  Objection, is Mr. Finkel testifying.

2          THE COURT:  Don't testify, Mr. Finkel.

3   Q.  I signed this document, correct?

4          MS. SHROFF:  Objection.

5          THE COURT:  Mr. Finkel, he could not possibly know

6   your signature.  If you want to ask whether your name falls

7   below what appears to be a signature, you may do that.

8   Q.  My name and my colleagues' name falls below the signature;

9   isn't that correct?

10  A.  Yes.

11  Q.  We can zoom out of that and go to paragraph five.

12          And you read parts of paragraph five I think, correct,

13  sir?

14  A.  Yes.

15  Q.  And the last sentence, can you read that where it says the

16  FBI?

17  A.  "The FBI investigated the groups' activities, including its

18  activities aimed at Mr. Guo and the U.S. government has charged

19  many of the groups members with violation of U.S. law."

20  Q.  That's what the FBI does. It investigates violations of

21  U.S. Law, charge people who violate it, correct?

22  A.  Correct.

23  Q.  If we can look at paragraph six, please, Ms. Loftus.

24          Can you read the paragraph beginning, sorry the

25  sentence beginning the US government sort of at the bottom.

O73BUO3                        Doran - Cross

1  A.  "The US government disrupted the PRC's government efforts

2  to forcefully repatriate Mr. Guo and Mr. Guo continue to reside

3  in the United States."

4  Q.  The United States government stopped what the PRC was doing

5  to Mr. Guo.  That's what it says, right?

6  A.  Yes.

7  Q.  And if we can look at the next paragraph, please,

8  Ms. Loftus, paragraph seven.

9          And this is a paragraph, sir, about George

10 Higginbotham, Elliot Broidy, Nicke Lum Davis and Prakazrel

11 Michel as he's known. Is that correct?

12 A.  Yes.

13 Q.  Did you learn about this case generally speaking?

14 A.  In which timeframe?

15 Q.  In your work as a security professional who follows Fox

16 Hunt related issues and CCP-related issues, did you follow this

17 particular case, this investigation?

18 A.  To a certain extent.

19 Q.  So you didn't follow it?

20 A.  To a certain extent I did.

21 Q.  Does this paragraph in your view accurately reflect what

22 that case was about?

23 A.  Yes.

24 Q.  It summarizes it pretty well?

25 A.  For me it does.

O73BUO3                          Doran - Cross

1    Q.  This is sufficient information about this case?

2              MS. SHROFF:  Objection, it's the same question five

3    different ways.

4              MR. FINKEL:  I'll move on.

5    Q.  Can you read where it says Higginbotham, Broidy Davis and

6    Michel, it's sort of in the middle.

7    A.  "Higginbotham, Broidy, Davis and Michel were each convicted

8    of violating U.S. law regarding their lobbying efforts."

9    Q.  They were charged and convicted for violating US law,

10   right?

11   A.  Yes.

12   Q.  And their efforts were not successful?

13   A.  They weren't successful.

14             THE COURT:  What do you understand that they were

15   trying to do?

16             THE WITNESS:  My understanding was that they were

17   trying to use their influence with the Trump administration to

18   pressure or coerce or persuade the U.S. government to

19   repatriate Mr. Guo back to China.

20             THE COURT:  What do you mean by "repatriate?"

21             THE WITNESS:  Put him on a plane and put him back to

22   China.

23   Q.  And it didn't happen, right?

24   A.  It didn't happen.

25   Q.  We can take that down, Ms. Loftus.

O73BUO3                          Doran - Cross

1                And, Mr. Doran, how long did you live in China for?

2    A.  I live in China for four years.

3    Q.  During those four years, you testified about this on

4    direct, you were surveilled; is that correct?

5    A.  Yes.

6    Q.  You were watched physically and also through electronic

7    surveillance?

8    A.  Yes.

9    Q.  You said that people broke into your apartment; is that

10   right?

11   A.  There were covert entry into my apartment.

12   Q.  Fair to say you were harassed by the CCP?

13   A.  I was targeted by them.

14   Q.  You were targeted by the CCP?

15   A.  Yes.

16   Q.  Have you ever raised money by making false promises online?

17   A.  No.

18   Q.  You haven't committed fraud?

19   A.  No.

20   Q.  Being targeted by the CCP doesn't give you license to do

21   those things, does it?

22   A.  No.

23   Q.  You're familiar with the South China sea?

24   A.  Yes, I am.

25   Q.  Just can you describe to the jury the geographic location

O73BUO3                          Doran - Cross

1    of the South China sea?

2    A.  So the south China sea is in the Western Pacific region.

3    It's that part of the ocean which borders on Southern China and

4    goes down to Vietnam, the Philippines, Indonesia, Malaysia,

5    Brunei and it's a contested area.

6    Q.  And fair to say tensions are rising in that area between

7    the PRC and some neighboring countries?

8    A.  Yes.

9    Q.  And one of those neighboring countries would be Taiwan,

10   right?

11   A.  Taiwan certainly, yeah.

12   Q.  What is Taiwan also known as?

13   A.  Republic of China.

14   Q.  Why is it called the Republic of China?

15   A.  In 1949 at the conclusion of the Chinese Civil War, the

16   non-communist forces evacuated to China, but they retained

17   their claim to be the government of the whole of China, so they

18   retain the name Republic of China.

19   Q.  And that was Chiang Kai-Shek, right?

20   A.  That's correct.

21   Q.  He was the leader of democracy in China, and they were

22   defeated by the CCP and escaped to Taiwan?

23   A.  Yes.

24          MS. SHROFF:  Is Mr. Finkel testifying about the

25   history of China?

O73BUO3                          Doran - Cross

1         THE COURT:  He's cross-examining and asking leading

2    questions.  Go ahead.

3    BY MR. FINKEL:

4    Q.  Thank you, your Honor.

5         Mr. Doran, you're of course familiar with the fact

6    that the United States government provides military support to

7    the government of Taiwan, right?

8    A.  I am aware of that.

9    Q.  In fact it's under the provisions of the Taiwan Relations

10   Act, right?

11   A.  Yes.

12   Q.  And some of the hardware that the American government

13   provides to the Taiwanese includes things like missiles,

14   correct?

15   A.  To my knowledge, yes.

16   Q.  Battle tanks, correct?

17   A.  Yes.

18   Q.  F16s, correct?

19   A.  I'm not sure which combat aircraft is supplied, but I

20   imagine F16s.

21   Q.  Combat aircraft though, right?

22   A.  Yes.

23   Q.  Himars rockets, correct?

24   A.  Yes.

25   Q.  Drones, correct?

O73BUO3                          Doran - Cross

1   A.  Yes.

2   Q.  And these are equipment for the Taiwanese to defend

3   themselves against the CCP, correct?

4   A.  Yes.

5   Q.  How many Lamborghinis has the United States government sent

6   to Taiwan?

7           MS. SHROFF:  If you know.

8   A.  I don't know.

9   Q.  What about Bugattis, how many Bugattis has the United

10  States government sent to Taiwan?

11  A.  I don't know.

12  Q.  Can we pull up GXZ9 at page 140, please.  Zoom in on that

13  bottom please.

14          This is Miles Guo in a Lamborghini, right, sir?

15  A.  Yes.

16  Q.  To your knowledge has the United States government sent any

17  Lamborghinis to Taiwan?

18  A.  I have no idea.

19  Q.  A Lamborghini wouldn't do pretty good against a Chinese

20  tank, would it?

21          MS. SHROFF:  Objection, how would he know?

22  Q.  In your expert opinion?

23          THE COURT:  If you happen to know about the

24  capabilities of Lamborghinis.

25  A.  What I would say is that of course a Lamborghini would be

O73BUO3                        Doran - Cross

1    no challenge to a Chinese tank, but there may be other reasons

2    that US government might choose to send Lamborghinis to Taiwan

3    that I'm not aware of.

4    Q.  Who would be.  We can take that down.

5         You also talked about some equipment and materials

6    that your clients, you recommend your clients obtain.  Is that

7    correct?

8    A.  Yes.

9    Q.  Surveillance cameras, for example, right?

10   A.  Yes.

11   Q.  Bodyguards for example?

12   A.  Yes.

13   Q.  Do you recommend that your clients sleep on a $35,000

14   mattress?

15   A.  I don't have any professional interest on my clients'

16   sleeping arrangements.

17   Q.  Sleeping on a $35,000 mattress has nothing to do with

18   protecting yourself from CCP targeting, right?

19   A.  No.

20   Q.  No it doesn't?

21   A.  No, it doesn't.

22   Q.  And also a $90,000 QLED TV, do you recommend that your

23   clients purchase that to protect themselves from the CCP?

24   A.  Well, I would recommend that clients have access to the

25   best media they have at their disposal.

1    Q.  So a $400 Vizio television that you buy at Best Buy that's

2    not good enough.

3         MS. SHROFF:  Objection, he lives in the UK and I don't

4    think he knows Best Buy.

5         THE COURT:  Overruled.  You may answer if you know.

6    A.  What I would say is my recommendations to my clients is

7    always to purchase the best equipment that they can afford.

8    Q.  Where do you buy your electronics?  Do you have Amazon?

9    A.  Yes.

10   Q.  Amazon tells TVs, right?

11   A.  Yes.

12   Q.  There's a difference between a $90,000 QLED TV and a $400

13   Vizio TV, right?

14   A.  That's correct.

15   Q.  Is your expert testimony that a $90,000 TV is necessary to

16   protect one's self against the CCP?

17   A.  No, that's not my expert testimony.  But what I would say

18   is, I advise my client to avail themselves of the best

19   equipment that they can afford for reliability reasons.

20   Q.  If we can put up 1B124F, please.

21        You haven't seen this picture before?

22   A.  Yes.

23   Q.  You see the three young women are circled in red?

24   A.  Yes.

25   Q.  It's like they're targets, right?

O73BUO3                              Doran - Cross

 1              MS. SHROFF:  Objection.  What does he mean because
 2   they're circled.
 3              THE COURT:  Sustained.
 4   Q.  Circling someone identifies them as a target, correct?
 5   A.  No.
 6   Q.  No?
 7   A.  I would disagree.  I think circling them can be a means of
 8   drawing my attention to them.  It doesn't mean that they're
 9   target of anything.
10   Q.  But if these women were harassed, that would be targeting,
11   right?
12              MS. SHROFF:  Objection, assumes facts not in evidence.
13              THE COURT:  He's asking an expert a hypothetical
14   question which is acceptable.  You may answer.
15   A.  Could you repeat the question.
16   Q.  Certainly.  You can that down.
17              You've been harassed.  You just testified to that a
18   moment ago, right?
19   A.  Yes.
20   Q.  And the manner in which you were harassed was how by the
21   CCP?
22   A.  Yes.  As I said, I was surveilled, my telephone
23   communications were not private.  My email was not private.
24   Q.  People were watching you?
25   A.  Yes.

O73BUO3                              Doran - Cross

1    Q.  That's harassment, right?

2    A.  It's harassment.  Certainly it's harassment.  I would

3    characterize it as surveillance.  It's the kind of activities

4    that foreign intelligence agencies conduct.

5    Q.  To just stand outside of people's homes and watch them?

6    A.  In my case they weren't that crude.  They were a bit more

7    sophisticated than that, but certainly that could happen, yeah.

8    Q.  One of the surveillance techniques that CCP operatives use

9    is to film people, right?

10   A.  Yes, that's true.

11   Q.  So standing outside someone's home and filming them whether

12   surreptitiously or overtly is a CCP tactic, right?

13   A.  Yes.

14   Q.  Especially if you do it at their place of work to and their

15   home, right?

16   A.  Yes.

17            MS. SHROFF:  Your Honor, may Mr. Finkel not ask a

18   compound question.

19            THE COURT:  So break it down.

20   Q.  I'm move on.

21            Sir, is this sensationalizing, please tell me if it

22   is, that President Xi is determined to ensure party control

23   over the economy in China?

24   A.  That's a matter of fact, not sensationalized.

25   Q.  That's a fair statement?

O73BUO3                          Doran - Cross

1   A.  Yes.

2   Q.  And you would agree, sir, that the CCP has factions within

3   it, right?

4   A.  Yes.

5   Q.  And there's infighting within the Chinese Communist Party,

6   right?

7   A.  Yes.

8   Q.  In fact somewhat recently Hu Jintao -- you know who he is,

9   right?

10  A.  Yes.

11  Q.  Who is Hu Jintao?

12  A.  He's the former president of China.

13  Q.  I think you know what I'm referring to probably.

14          What happened with Hu Jintao recently?

15  A.  If I assume I'm talking about the same incident you're

16  talking about it was at the plenum session of the Chinese

17  Communist Party, and he was prevented from speaking and kind of

18  forcefully hustled out of the chamber.

19  Q.  Right.  And Hu Jintao it's understood, you tell me,

20  represented a different faction within the CCP than President

21  Xi, correct?

22  A.  Yes.

23  Q.  And these factions were fighting, right?

24  A.  Yes.

25  Q.  Not necessarily physically fighting, but they were --

O73BUO3                        Doran - Cross

1          MS. SHROFF:  Objection.  Is there a question.

2          MR. FINKEL:  I'm trying to get there.

3          THE COURT:  We're waiting for the question.

4    Q.  Not necessarily physical fighting, correct?

5    A.  Power struggles.

6    Q.  Right. There was a power struggle within the CCP, correct?

7    A.  Yes.

8    Q.  And President Xi's faction fair to say prevailed, right?

9    A.  Yes.

10   Q.  And to demonstrate his authority and control over the CCP,

11   President Xi had President Hu Jintao ejected from that meeting

12   you mentioned, correct?

13         MS. SHROFF:  I believe this has been asked and

14   answered.

15         THE COURT:  You may answer.

16   A.  I would say that was the reason he was ejected from the

17   plenum session.

18   Q.  And so President Xi's in control of the Chinese economy.

19   You're aware, sir, that Miles Guo earned a lot of money when he

20   was in China, right?

21   A.  Could you repeat that.

22   Q.  You're aware, sir, that Miles Guo earned a lot of money

23   when he was in China, right?

24   A.  I'm aware he was a successful entrepreneur.

25   Q.  Right. He owned a hotel, right?

O73BUO3                          Doran - Cross

1    A.  Yes.

2    Q.  Said to have millions of dollars, right?

3    A.  I'm not very expert on his business dealings, but that's

4    what I understand.

5    Q.  You're not testifying about his business dealings.

6            And you know, sir, that Miles Guo had a benefactor in

7    the Chinese Communist Party, right, Ma Jian?

8    A.  Yes.

9    Q.  Who's Ma Jian?

10   A.  So Ma Jian I believe was a former vice minster.

11   Q.  For the MSS, right?

12   A.  Yes.

13   Q.  And that's the, as you said it, the CIA for the Chinese

14   Communist Party?

15   A.  That's correct.

16   Q.  That was Miles Guo's benefactor?

17           MS. SHROFF:  Objection, that's not what he testified

18   to.  He simply identified who the person was.

19           THE COURT:  You may answer.

20   A.  I stated that the MSS is the Chinese equivalent of the

21   Central Intelligence Agency.

22   Q.  And you understand that Miles Guo lent money to Ma Jian's

23   sister, right?

24   A.  I don't know that.

25   Q.  And then Guo then bought back from Ma Jian's sister --

O73BUO3                         Doran - Cross

 1  sorry. Ma Jian's sister then spent that money to buy

 2  properties.  You know that, right?

 3  A.  I don't know that.

 4  Q.  Then Guo bought back those properties from Ma Jian's

 5  sister.  Did you know that?

 6  A.  I don't know that.

 7  Q.  And this was designed to Ma Jian can make a profit?

 8          MS. SHROFF:  He said he doesn't know that so how would

 9  he talk about what it's designed for.

10          THE COURT:  Sustained.

11  Q.  Exploring this expert's knowledge.

12          In exchange you know, sir, that Ma Jian helped Miles

13  Guo with businesses, correct?

14  A.  I didn't know that.

15  Q.  To be a billionaire in China requires some connections or

16  help from the CCP, right?

17          MS. SHROFF:  Objection.

18          THE COURT:  You may answer if you know.

19  A.  I think in many countries there is an intersection between

20  the very rich and the very powerful.

21  Q.  Including in China?

22  A.  Including in China, but not only in China.

23  Q.  You're here to testify about China?

24  A.  Mm hm.

25          THE COURT:  Is that a yes?

O73BUO3                          Doran - Cross

1   A.  Yes.

2   Q.  And do you know that Miles Guo is been a long time

3   affiliate of the MSS and that he had a handling name known as

4   of Wunan (sic)?

5           MS. SHROFF:  Objection, compound.

6   A.  I didn't know that.

7   Q.  You do know that Ma Jian ran into trouble with President

8   Xi's faction of the CCP, right?

9   A.  I know that there was a dispute.  I'm not aware of what the

10  nature of that dispute was.

11  Q.  There was a dispute Ma Jian was arrested, right?

12  A.  Yes.

13  Q.  And Miles Guo then fled, went to Hong Kong, right?

14          MS. SHROFF:  Objection.

15          THE COURT:  Overruled.

16  A.  Yes.

17  Q.  And after being in Hong Kong, Miles Guo came to the United

18  States, that was in 2015, right?

19  A.  Yes.

20  Q.  And in 2015, he kept a low profile, wasn't doing broadcast,

21  correct?

22          MS. SHROFF:  Objection.

23          THE COURT:  Overruled.

24          MS. SHROFF:  It's not part of his expert knowledge.

25          THE COURT:  If he knows, he can answer.

O73BUO3                          Doran - Cross

1   A.  I was personally not aware of Mr. Guo and his activities in

2   2015.

3   Q.  And Mr. Guo kept a low profile in 2016 too, correct?

4           MS. SHROFF:  Objection.  He said he doesn't know.

5   A.  Same answer, I don't know.

6   Q.  You know in 2017 --

7   A.  Yes.

8   Q.  Then Mr. Guo cause --

9   A.  Yes.

10  Q.  You testified about that?

11  A.  Yes.

12  Q.  He had that interview with Voice of America --

13  A.  Well, that's when he came to my attention.

14  Q.  That was in 2017, right?

15  A.  Yes.

16  Q.  That 2017 Voice of America interview, you watched it,

17  right?

18  A.  Yes.

19  Q.  He was talking about the Chinese Communist Party, right?

20  A.  Yes.

21  Q.  And he was saying that he was promoting freedom in China,

22  right?

23  A.  Yes.

24  Q.  He didn't launch a business in that interview.  It was an

25  interview about politics, right?

O73BUO3                          Doran - Cross

1    A.   Yes.

2    Q.   Then in November 2018, Miles Guo launch the Rule of Law

3    Foundation, right?

4    A.   Yes.

5    Q.   And in that launch he asked for money, right, donations,

6    right?

7              MS. SHROFF:   Is he asking the question of Mr. Doran

8    knows this?

9              THE COURT:   He's asking that question.   He makes a

10   statement and it goes, comma, right, question mark.   You can

11   answer.

12   A.   I'm aware that he solicited donation for the foundation.

13   Q.   For the Rule of Law Foundation in November of 2018, right?

14   A.   Yes.

15   Q.   Can if we pull up DX Stip One.   Let's go to paragraph

16   eight.   Can you read that please, Mr. Doran.

17   A.   "On October 23, 2018, a court in Hong Kong entered an order

18   seizing and restraining Mr. Guo's assets in Hong Kong and

19   elsewhere under the court's jurisdiction."

20   Q.   So October 23, 2018, Miles Guo's assets in Hong Kong were

21   seized by the Chinese government, right?

22   A.   Yes.

23   Q.   We can put up GXW1005, please.   This is the launch.   This

24   is a screenshot, but this is the launch of the Rule of Law

25   Foundation, right?

O73BUO3                          Doran - Cross

1   A.  Yes.

2   Q.  On November 20, 2018, correct?

3   A.  Yes.

4   Q.  About a month after the Hong Kong court seized Mr. Guo's

5   assets, he started raising money through the Rule of Law

6   Foundation, right?

7   A.  Yes.

8   Q.  And then after the Rule of Law Foundation he launched GTV,

9   right?

10              MS. SHROFF:  Objection.

11              THE COURT:  Overruled.  If he knows, he may answer.

12  A.  Yes, I'm aware of that.

13  Q.  And he asked for money for GTV, right?

14  A.  Yes.

15  Q.  You don't know what he did with that money, do you?

16              MS. SHROFF:  Objection.

17              THE COURT:  You may answer if you know.

18  A.  I have no personal knowledge of that.

19  Q.  Then he set up the Himalaya Farm Alliance?

20  A.  I understand that, yes.

21  Q.  And he set up the farm loan program to raise more money,

22  right?

23  A.  Yes.

24  Q.  Then he set up G/Club, right?

25  A.  Yes.

O73BUO3                          Doran - Cross

1    Q.  To raise more money, right?

2    A.  Yes.

3    Q.  And then the Himalaya Exchange H Coin, right?

4    A.  Yes.

5    Q.  Also for money, right?

6    A.  Yes.

7    Q.  So all after October 2018 when the Chinese government

8    seized his money, right?

9    A.  I'm not sure you can establish cause and effect there.

10   Q.  It all happened after October 2018?

11            MS. SHROFF:  Actually, Mr. Finkel is wrong.  It's not

12   the Chinese government.  It's the Hong Kong government.

13            THE COURT:  You cannot testify.

14            MR. FINKEL:  I'll withdraw it and back up.

15   Q.  Mr. Doran, didn't you testify that essentially the Hong

16   Kong government and the Chinese government one in the same?

17   In fact you testified --

18            MR. FINKEL:  Can Mr. Finkel, one, slow down.

19            THE COURT:  Slow down, Mr. Finkel.

20   Q.  Did you testify, Mr. Doran, do you remember Ms. Shroff ask

21   you questions?

22   A.  Yes.

23   Q.  That was today, right?

24   A.  Yes.

25   Q.  Do you remember when she asked you whether the Hong Kong

O73BUO3                         Doran - Cross

1   government and the Chinese government, the CCP were one in the

2   same and you said yes?

3   A.  Yes.

4   Q.  Cause they are, right?

5   A.  Yes.

6           MS. SHROFF:  In what timeframe?  Never mind.

7           MR. FINKEL:  Can I finish?

8           MS. SHROFF:  Objection to the question.  It's vague.

9           THE COURT:  Overruled.  You may continue.

10  Q.  In all those investment opportunities that I just went

11  through, all of those were after October 2018, correct?

12  A.  Yes.

13  Q.  Now, you were asked to -- am I correct, sir, that you were

14  asked to review to testify about the Voice of America interview

15  today?

16  A.  Yes.

17  Q.  You weren't provided with other statements Miles Guo made

18  about his investment opportunities, were you?

19  A.  No.

20          MR. FINKEL:  If we could pull up VI151, please,

21  Ms. Loftus.

22          (Media played)

23  Q.  Mr. Doran, you haven't seen that video before, have you?

24  A.  No.

25  Q.  There were dates on those videos.  Those dates were all

O73BUO3                              Doran - Cross

 1  after October 2018, right?

 2  A.  Yes.

 3  Q.  If we could pull up Z9 at page 16, please, Ms. Loftus.

 4          Can you read underneath where it says 459?

 5  A.  "This is completely a business operation.  Do not link the

 6  G Series, under any circumstances, to the NFSC.  That is all

 7  bullshit."

 8  Q.  That's Miles Guo's statement?

 9          MS. SHROFF:  Objection, how would he know.

10  Q.  Do you know?

11  A.  I don't know.

12  Q.  Zoom out of that, Ms. Loftus, and scroll up.

13          That's Miles Guo right there, right?

14  A.  Yes.

15  Q.  Do you know, sir, that in 2017, Miles Guo had conversations

16  with government officials in China while he was in the United

17  States?

18  A.  I didn't know that.

19  Q.  Do you know he told them --

20          MS. SHROFF:  If he didn't know there was a

21  conversation, how could he know what he told them.  Objection.

22          THE COURT:  Sustained.

23  Q.  Do you know if he told them --

24          MS. SHROFF:  Objection.

25          THE COURT:  Sustained.

1  Q.  Part of the way, sir, that the Chinese Communist Party

2  maintains influence in the country of China and elsewhere is

3  through symbols, right?

4  A.  Symbols, yes.

5  Q.  Symbols are important, right?

6  A.  Yes.

7  Q.  For example, the Chinese Communist Party -- well, the

8  People's Republic of China has a flag, right?

9  A.  Yes.

10 Q.  What does that flag look like?

11 A.  So it's a red flag with a prominent yellow star in the top

12 left-hand corner which is surrounded by constellation of

13 smaller yellow stars.

14 Q.  Do you know what those stars symbolize?

15 A.  Those stars symbolize the People's Republic of China in my

16 knowledge.

17 Q.  You don't know that symbolize the unity between the four

18 social classes of China and the government at the top.  You

19 didn't know that?

20 A.  No, I didn't know that.

21 Q.  And you're also familiar, sir, with the Nanchang uprising?

22 A.  Nanjing uprising.

23 Q.  Was that the beginning of the Civil War in China?

24 A.  That's an interesting historical question, and I can answer

25 it if you allow me.

O73BUO3                           Doran - Cross

```
 1    Q.  What year was that?
 2    A.  1937.
 3    Q.  And that was a battle, a fight between the Chinese
 4    Communist Party forces and Chiang Kai-Shek's forces; is that
 5    right?
 6    A.  No, it was a battle between Chinese forces and occupying
 7    Japanese forces.
 8    Q.  And that's where the People's Liberation Army sort of got
 9    its start; is that right?
10    A.  No.
11    Q.  When did the People's Liberation Army get its start?
12    A.  It started before then with the communist party began its
13    uprising in China in the late '20s.  So the armed wing of the
14    Chinese Communist Party's been in existence almost as long as
15    the CCP was, so from 1923 onwards.
16    Q.  So the People's Liberation Army, the PLA, is used by the
17    CCP to enact its policy goals; it's fair to say?
18    A.  The People's Liberation Army is the military of China is a
19    tool that can be used by the Chinese government to advance its
20    national security objectives.
21    Q.  And the People's Liberation Army, it wasn't established
22    prior to the Chinese Communist Party's gaining power?
23             MS. SHROFF:  Asked and answered.
24    A.  So --
25             THE COURT:  You may answer.
```

O73BUO3                          Doran - Cross

1    A.  So the PLA as we know it today was constituted when the

2    Chinese communist won the civil war.

3    Q.  And you testified that PLA is ultimately -- the control of

4    the PLA is ultimately President Xi, he's in charge of it,

5    right?

6    A.  Yes.

7    Q.  Are you familiar with the symbols of the People's

8    Liberation Army of the Chinese Communist Party?

9    A.  Yes.

10   Q.  What does the PLA flag look like?

11   A.  PLA flag depends on the branch of the military you're

12   talking about.  But if it was the PLA ground forces or the

13   army, that would be an "N" sign which is based on the Chinese

14   flag, it's a star in the left-hand corner, and I believe it has

15   white and green stripes on the bottom.

16   Q.  There's also a PLA flag without the stripes, right?

17   A.  Yes.  There's a navy flag and an air force flag.

18   Q.  If you can put up SH-146, Ms. Loftus. Can we zoom in on the

19   left one.

20        And, sir, the symbol on the left, that's the star

21   that's taken from the Chinese Communist Party's flag, right?

22   A.  Yes.

23   Q.  And the slash, the two slashes and the line, those are

24   insignias of the PLA, right?

25   A.  Yes.

O73BUO3                          Doran - Cross

1   Q.  And the insignia on the right, that's also an insignia of

2   the PLA, right?

3   A.  Yes.

4   Q.  Did you know this box was found in Miles Guo's desk?

5   A.  I didn't know that.

6   Q.  If we can look at 151, please, Ms. Loftus.  Zoom in on

7   that.

8           These are the same symbols, just physical form,

9   correct?

10  A.  Yes.

11  Q.  Ms. Loftus, can you put up 146 on the left side and DX6688

12  on the right.  You talked about this gentleman on your right

13  during your direct testimony, right?

14  A.  Yes.

15  Q.  Can you remind the members of the jury who is?

16  A.  Lieutenant General Bi Yi.

17  Q.  Ms. Loftus, can you zoom in on the box on the left, and can

18  you zoom in on the logo on the general's hat.  Appears to be

19  the same logo, right?

20  A.  Yes.

21  Q.  PLA logo, right?

22  A.  Yes.

23          (Continued on next page)

24

25

1      MR. FINKEL:  Take that down.

2  Q.  You reviewed, sir, a document of Miles Guo's statements

3  that was GX C63-T, right?

4  A.  Yes.

5      MR. FINKEL:  Could we pull that up, please,

6  Ms. Loftus.

7      MS. SHROFF:  Mr. Doran, could I just remind you to

8  keep your voice up.

9      THE WITNESS:  Yes.

10     MS. SHROFF:  Thank you.

11 BY MR. FINKEL:

12 Q.  Do you remember being asked some questions about this

13 document on direct?

14 A.  Yes.

15     MR. FINKEL:  Ms. Loftus, we can go to page 27.

16     And can you zoom in on 40:24, please.

17 Q.  And these were statements that you read of Miles Guo, this

18 document, right?

19 A.  Only when you showed them to me.

20 Q.  Didn't Ms. Shroff show you this document before?

21 A.  I don't think, so, no.

22 Q.  You forgot?

23 A.  I can't recall whether I've seen this document or not.

24     MR. FINKEL:  Okay.  Zoom out.  Could we go to the

25 first page, please.

1   Q.  Take a look at it; let me know if that refreshes your

2   recollections about being asked questions by Ms. Shroff about

3   this document.

4   A.  You asked me questions about this document.

5   Q.  Do you remember Ms. Shroff asking you questions about this

6   document, sir?

7   A.  Yes, I do.

8   Q.  Okay.  And did you review this document in advance of your

9   testimony?

10  A.  Yes, I think it was part of the package of documents I was

11  sent.

12  Q.  Right.  This is one of the packages—this is one of the

13  documents that defense counsel sent you?

14  A.  Yeah.

15          MS. SHROFF:  Objection.

16          THE COURT:  You may answer.

17  A.  It's a document that I've seen, but I've seen a lot of

18  documents, and I'm struggling to remember this particular one.

19  Q.  Okay.  See at the top it says Speaker:  Wengui Guo?

20  A.  Yes.

21          MR. FINKEL:  Ms. Loftus, if we can please go to

22  page 27.  And zoom in on 40:24.

23  Q.  Can you read that.

24  A.  "In this GTV investment, I had a separate conversation with

25  each investor.  This is a serious and solemn commitment and

1  responsibility of Wengui Guo to you—to be responsible for this

2  investment forever, this is a legally valid commitment, an

3  attitude."

4  Q.  Miles Guo's statement, according to this document, right?

5  A.  I understand it to be, yes.

6       MR. FINKEL:  Can we go to page 30, please.

7       And can you zoom in on 45:02.

8  Q.  This starts, Mr. Doran, "Our Whistleblower Movement does

9  not have any cult of the individual."  Did I read that right?

10 A.  Yes.

11 Q.  Can you read the rest.

12 A.  "There can be no cult of the individual, let alone

13 mythologize any individual.  Without the Whistleblower

14 Movement's fellow fighters, Wengui Guo is nothing.  Anyone who

15 is apart from Whistleblower Movement will be nothing either."

16 Q.  There can be no cult of the individual, right?  That's what

17 it says.

18 A.  Yes.

19       MR. FINKEL:  Ms. Loftus, if you could please play

20 what's in evidence as C281-V.

21       (Media played)

22       MR. FINKEL:  Stop right there, please.

23 Q.  Mr. Doran, did you know that video cost a million dollars?

24 A.  I did not know that.

25 Q.  Do you know that Miles Guo is in every frame of that video?

O731GUO4                          Doran - Cross

1   A.  I saw that, yes.

2   Q.  Fair to say that President Xi is trying to promote a cult

3   personality within China, correct?

4   A.  Yes.

5   Q.  That's common among dictators, right?

6   A.  Yes.

7   Q.  Happens in North Korea, for example?

8   A.  Yes.

9   Q.  And one of the ways to promote that cult of personality in

10  China is that if the Chinese people express views contrary to

11  President Xi, they're retaliated against, right?

12  A.  Yes.

13  Q.  People criticize the leader, they're retaliated against,

14  right?

15  A.  Yes.

16  Q.  Those are the rules of the Chinese Communist Party, right?

17  A.  Yes.

18  Q.  Are you familiar with the rules of the Himalaya Farm

19  Alliance?

20  A.  No.

21  Q.  How about the New Federal State of China?

22  A.  No.

23  Q.  Do you know if you criticize Miles Guo, you're retaliated

24  against?

25  A.  I didn't know that.

O731GUO4                    Doran - Redirect

1    Q.  The Himalaya Farm Alliance will retaliate against you?

2            MS. SHROFF:  Is that a question?

3    Q.  Correct?

4            THE COURT:  There's the question.

5    A.  I have no knowledge of that.

6    Q.  New Federal State of China will retaliate against you if

7    you criticize Miles Guo?

8    A.  I have no knowledge of that.

9            MR. FINKEL:  Nothing further.

10           THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MS. SHROFF:

13   Q.  How are you doing, Mr. Doran?

14   A.  I'm good.  Thank you.  You?

15   Q.  Hanging in there.

16           So let me just start with this video that we just

17   watched, okay?

18   A.  Yes.

19   Q.  And I promise you I will not make you watch it again.

20           Did you read the captions on that video?

21   A.  Yes.

22   Q.  And if I get it wrong, I am sure Mr. Finkel will pull it

23   right up.  But did you read the text that said, "Take down the

24   CCP," and then "(Mongolia)"?

25   A.  Yes.

O731GUO4                          Doran - Redirect

1   Q.  Is there some specific thing going on with China and

2   Mongolia?

3   A.  Not that I'm aware of, but maybe the phrase itself was

4   expressed in Mongolian rather than Mandarin.  I don't know.

5          MR. FINKEL:  Move to strike.  Speculation.  He said

6   maybe.

7          THE COURT:  If you know, you may state it, but don't

8   speculate.

9   Q.  Do you know if Mongolia has a specific culture that is

10  somewhat separate from the rest of China?

11  A.  Well, Mongolia is an independent country separate from

12  China.

13  Q.  And do you think that it's possible that somebody could

14  make a video to support the culture of Mongolia?

15         MR. FINKEL:  Calls for speculation, is it possible.

16  Q.  You know what, I'll play the video then and show you the

17  language on the video so I can pinpoint to you what it says.

18  A.  Okay.

19         MS. SHROFF:  Could we pull up the video.

20         MR. FINKEL:  Her question was, is it possible someone

21  would do something, not what the language in the video says.  I

22  didn't object to the language in the video.

23  Q.  Let's look at the title.  What does it say?

24  A.  It says, "Take down the CCP (Mongolian)."

25  Q.  Do you understand what that means?

1  A.  I understand take down the CCP, but I'm not sure what

2  "(Mongolian)" refers to.

3          MS. SHROFF:  Okay.  Just keep it right there.

4  Q.  As a CCP expert, do you know that the CCP is specifically

5  intent on destroying the culture of Mongolia?

6  A.  Yes, Mongolian culture in China, like other nonHan

7  cultures, like nonmainstream ethnic Chinese cultures, is under

8  immense pressure, so Mongolians, like Tibetans, like Uyghurs,

9  like other national and ethnic minorities, are being forcibly

10  assimilated into a predominantly Han Chinese culture.

11  Q.  And in this video——if we could just try and get that

12  language——do you see where it says repeatedly, "We are the real

13  owners of the pastures"?  Did you remember that phrase?

14  A.  Yes.

15  Q.  Do you see it right there?

16  A.  Yes.

17  Q.  It doesn't say, "I, Miles Guo, am the real owner of this

18  pasture," correct?

19  A.  No, it doesn't.  It says "we."

20  Q.  And "we" is inclusive, correct?

21  A.  Yes.

22  Q.  It is not a dictator that would say "we," correct?

23  A.  Correct.

24          MS. SHROFF:  You can take that down, please.

25  Q.  Is it fair to say, Mr. Doran, just using your common sense,

O731GUO4                    Doran - Redirect

1    that not everybody has the same taste in music?

2              MR. FINKEL:  Objection to common sense, but I will

3    stipulate that everyone has different tastes in music.

4    Q.  And because a video is made and you don't agree with that

5    taste, it does not necessarily mean it's a cult video, correct?

6    A.  Yes, correct.

7              MR. FINKEL:  Form.

8              THE COURT:  I'll allow the question.

9    A.  Yes, it's correct.

10   Q.  He calls it a cult video, you didn't call it a cult video,

11   right?

12   A.  I don't believe it's a cult video.

13             MR. FINKEL:  Objection.  I didn't call it a cult

14   video.

15             THE COURT:  No, he did not even mention that word.

16   Q.  Did you think that that was a video promoting a cult?

17   A.  No.

18   Q.  Did you think it was a video promoting the separatist

19   culture of Mongolia?

20   A.  I saw it as a video by a person representing the group

21   advocating for a certain goal.

22   Q.  Did you see where, in the video, it says, "Brothers, stand

23   up and fight"?

24   A.  Yes.

25   Q.  And did you see in the video where it says, "Take down the

O731GUO4                           Doran - Redirect

1   CCP"?

2   A.  Yes.

3   Q.  Did you see anywhere where he stands up and says, "Worship

4   me"?

5   A.  No.

6   Q.  Did you know if Miles Guo's music was on Apple's——whatever

7   it is, iPhones, wherever they sell the music?  I don't do that,

8   but——

9            MR. FINKEL:  Objection to form.

10           THE COURT:  You can answer.

11  A.  I wasn't aware, but my taste doesn't run to that kind of

12  music.

13  Q.  Mine either.  But did you know he topped the charts in

14  Cambodia?

15  A.  I didn't, but congratulations.

16  Q.  Do you know if what he's wearing in that video are clothing

17  made by G Fashion?

18  A.  I don't know that.

19  Q.  Did you know if Miles Guo was a promoter of G Fashion?

20  A.  I don't know that.

21  Q.  Mr. Finkel here asked you many questions about

22  dictatorships, and then he juxtaposed the Himalaya Alliance,

23  correct?

24  A.  Yes.

25           MR. FINKEL:  Objection to the form, and argumentative.

O731GUO4                          Doran - Redirect

1   I posed questions.

2             THE COURT:  Sustained.

3   Q.  Do you know anything about the Himalaya Alliance?

4   A.  Not very much at all.

5   Q.  Do you know if they have committees?

6   A.  I assume as a——an organization they have governance.

7   Q.  Do you know if they have more than one committee?

8   A.  I don't know.

9   Q.  Do you know if they have an audit committee?

10  A.  I don't know.

11  Q.  Do you know if they have a membership committee?

12  A.  I don't know.

13  Q.  Do you know if China has an audit committee?

14  A.  I don't know.

15  Q.  Do you know if the Himalaya Alliance is separate and apart

16  from Miles Guo?

17            MR. FINKEL:  Objection.  He testified he doesn't know

18  about the Himalaya Farm Alliance.

19            THE COURT:  Sustained.

20  Q.  Do you know anything about the New Federal State of China?

21  A.  From what I've read in the media.

22  Q.  Right.  And when Mr. Finkel asked you about people being

23  exterminated from the New Federal State of China if they

24  criticize Mr. Guo, you don't know any such thing, correct?

25            THE COURT:  He did not use that term.

O731GUO4                      Doran - Redirect

1    Q.  Do you remember him asking you questions about the New

2    Federal State of China?

3    A.  I do.

4    Q.  Do you remember him asking you what would happen if

5    somebody criticized the New Federal State of China?

6    A.  He did ask me that question.

7    Q.  Do you remember what he intimated was the response?

8              MR. FINKEL:  Objection.

9              THE COURT:  So it's only about what he states.

10   Q.  Do you know anything about the New Federal State of China

11   and how it either accepts or not accepts members?

12   A.  All I know about the New Federal State of China is what it

13   stands for and what it advocates.

14   Q.  And what does it stand for?

15   A.  It stands for——

16             MR. FINKEL:  Objection.  Because he said he didn't——

17             MS. SHROFF:  He opened the door.

18             MR. FINKEL:  It's his lack of personal knowledge.

19   It's what he read.

20             THE COURT:  It's a question of whether you have

21   knowledge and you can answer from your own knowledge.

22             THE WITNESS:  Yes, I can.

23             THE COURT:  Go ahead.

24   A.  So contacts of mine in China, who I'm in regular contact

25   with, who——

1              MR. FINKEL:  Objection.  This is hearsay.

2              THE COURT:  So don't say what others have said to you.

3     A.  Okay.  My understanding is——

4              THE COURT:  No.  If you have an understanding from

5     someone else, don't express that understanding.

6     BY MS. SHROFF:

7     Q.  Through your experience and knowledge and your work, do you

8     have an understanding of what the New Federal State of China

9     stands for?

10    A.  Yes.

11             THE COURT:  If it's just a way of getting around

12    hearsay. . .  The idea, sir, is that you're not to give an

13    answer that depends upon something that someone else told you.

14    A.  I would answer then in saying that in the course of my

15    work, which generally tracks and follows political events in

16    China, I have been aware of the New Federal State of China and

17    what it——

18    Q.  And have you been aware of what it stands for?

19    A.  Yes.

20    Q.  What does it stand for?

21             MR. FINKEL:  Same objection, your Honor.  Based on

22    hearsay.

23             THE COURT:  If it's not based on hearsay, he may

24    answer.

25    A.  So my understanding is that it's based on advocacy for

O731GUO4                    Doran - Redirect

1    freedom and democracy in China.

2    Q.  Mr. Doran, does the MSS engage in protests against its

3    critiques?

4    A.  Sorry.  Could you repeat the question.

5    Q.  Sure.  Does the MSS engage in peaceful protests against its

6    critiques?

7    A.  No.

8            THE COURT:  Do you mean critics, against its critics?

9    A.  Against its critics?

10           MS. SHROFF:  Sorry, your Honor.  I mispronounced the

11   word.

12   A.  Critics?  No, it doesn't.

13   Q.  Now you recall you were shown those many buttons that were

14   found, according to the government, in Mr. Guo's home——

15   A.  Yes.

16   Q.  ——or drawer?

17   A.  Yes.

18           MS. SHROFF:  Can we pull all of them back up.  Does

19   anybody have those?

20   Q.  You remember being asked questions about this?

21   A.  Yes.

22   Q.  Would you say that if somebody had one of these things,

23   they might be worth money?

24           MR. FINKEL:  Objection.

25           THE COURT:  So he's not here to testify about the

O731GUO4                          Doran - Redirect

1   value of objects.

2   Q.  You were asked questions about these objects, correct?

3   A.  Sorry.  Repeat that?

4   Q.  This prosecutor asked you questions about these objects,

5   correct?

6   A.  Yes, yes.

7   Q.  And then he asked you questions about the flag, and then he

8   showed you that general's insignia on his head with the hat,

9   correct?

10  A.  Yes.

11  Q.  Okay.  And is it fair to say, sir, that symbols have, as he

12  asked you, specific meanings, correct?

13  A.  Yes, they do, but can I——can I just add something to that.

14          THE COURT:  No.  You just answer the question.

15          THE WITNESS:  Okay.

16  Q.  Symbols can be co-opted, correct?

17  A.  Yes.

18  Q.  So you can take a symbol that symbolizes one thing, co-opt

19  it so that it means something different to a whole new group of

20  people, correct?

21  A.  That's possible, or it could just be merchandising.

22  Q.  And same thing with words, right?  You co-opt a word that

23  is negative in culture to make it positive, correct?

24  A.  Yes.

25  Q.  Okay.  Now it is also fair to say that——

O731GUO4                          Doran - Redirect

1              MS. SHROFF:  You know what, you can take this thing

2    down.  Thank you.

3    Q.  It's fair to say that people have falling-outs within

4    political parties, correct?

5    A.  Yes, that's correct.

6    Q.  People have falling-outs in personal relationships,

7    correct?

8    A.  Yes.

9    Q.  And people have fallings-out in professional relationships,

10   correct?

11   A.  Yes.

12   Q.  I mean, you could be a lifelong Democrat and then stop

13   being one when Donald Trump becomes president, correct?

14             MR. FINKEL:  Objection on a few levels, but we'll

15   start with calls for speculation.

16             THE COURT:  Sustained.

17   Q.  Would you want to be a Republican for Donald Trump?

18   A.  It's one of the times I'm thankful for being British.

19             MR. FINKEL:  Objection.

20             THE COURT:  Okay.  He gave us his answer.  He's

21   thankful to be British.

22   Q.  Let me pull up for you GX 63-T.

23             Mr. Doran, you were asked questions about this

24   document, correct?

25   A.  Yes.

1  Q.  Is it fair to say, Mr. Doran, that I have never sent you

2  any documents?

3  A.  Yes, that's correct.

4  Q.  And I have not asked you to review this document with me

5  before you testified about it today?

6  A.  That's correct.

7  Q.  You've never reviewed this document in its entirety,

8  correct?

9  A.  Yes, that's correct.

10  Q.  Okay.  You don't know anything about how Mr. Miles Guo was

11  employed as a promoter for G|CLUBS, correct?

12  A.  I don't know anything about that.

13  Q.  You don't know how he raised money for G|CLUBS, correct?

14  A.  I don't know other than what I've read in the media.

15  Q.  And you don't know anything about the cost of a G|CLUBS

16  membership, correct?

17  A.  No, I don't.

18  Q.  You don't know anything about the benefits of a G Club

19  membership, correct?

20  A.  No, I don't.

21  Q.  Is it fair to say, Mr. Doran, that Operation Fox Hunt does

22  not target the PLA, correct?

23            MR. FINKEL:  Objection to scope.

24            MS. SHROFF:  That's what he—it's well within—he

25  brought up the PLA.

O731GUO4                          Doran - Redirect

1              THE COURT:  You may answer.

2    A.  No, that's a completely counterintuitive question.  The

3    Chinese state doesn't target its own agencies.

4    Q.  And as far as you're concerned, sitting here today, Miles

5    Guo is a target of Fox Hunt, correct?

6    A.  Absolutely.

7    Q.  You were asked a lot of questions about drones, planes, and

8    things being sent to Taiwan, was it?  Taiwan, correct?

9    A.  Yes, yes.

10   Q.  And then you were asked if a Lamborghini had been sent to

11   Taiwan, correct?

12   A.  I was asked that question.

13   Q.  Are you an expert in gift-giving between countries?

14   A.  No, I'm not.

15   Q.  You were asked a series of questions about Mr. Miles Guo's

16   seizure of assets and then his actions in G series.  You recall

17   that?

18   A.  Yes.

19   Q.  Do you know how much money Mr. Miles Guo's family has in

20   China today?

21   A.  I don't.

22   Q.  How about in 2016?

23   A.  I don't.

24   Q.  2017?

25   A.  I don't.

O731GUO4                        Doran - Redirect

1    Q.  2019?

2    A.  No.

3    Q.  Right after any seizure that happened?

4    A.  No.

5           MS. SHROFF:  Could we pull up the stip again.

6           And could we go to the last paragraph, please.

7    Q.  After October 23rd of 2018, do you have any idea how much

8    money Miles Guo's brothers had?

9    A.  No.

10   Q.  How about his Family Fund?

11   A.  No.

12   Q.  How about his wife's money?

13   A.  No.

14          MS. SHROFF:  You can take that down.

15   Q.  Sitting here today, do you have any idea what the Rule of

16   Law Foundation does?

17   A.  My understanding of the Rule of Law Foundation, again, is

18   that it's an advocacy body for introducing democracy into

19   China.

20   Q.  Do you know if it distributes money to other people?

21   A.  I don't know.

22   Q.  Do you know if it supports Ukrainians in need of help?

23   A.  I don't know.

24   Q.  Do you know if it helps dissidents get political asylum in

25   the United States?

O731GUO4                        Doran - Redirect

1   A.  I don't know.

2   Q.  Do you know if it gives charitable money elsewhere?

3   A.  I don't know.

4   Q.  You don't know anything about the Rule of Law Foundation,

5   right?

6   A.  No.

7   Q.  Okay.  Thank you.

8           You were asked questions, were you not, about Elliot

9   Broidy and Higginbotham and how the Department of Justice

10  prosecuted them, correct?

11  A.  Yes.

12  Q.  Before they were prosecuted, do you know what actions they

13  took against Miles Guo?

14  A.  Yes.

15          THE COURT:  When you say "they," who are you referring

16  to?

17          MS. SHROFF:  The group——Higginbotham, Broidy, all of

18  them.

19  Q.  Do you know what actions they took?

20  A.  I know what was reported in the media.

21  Q.  Other than that, do you know what actions they took?

22  A.  And also in the US DOJ documents I've read.

23  Q.  And other than that, do you know what other actions they

24  took?

25  A.  No.

O731GUO4                          Doran - Redirect

1    Q.  Do you know how close Mr. Guo was to being put on a plane

2    and shipped back to China?

3    A.  I understand it was very close.

4    Q.  You were asked many questions about this person named——I'm

5    going to mess up the names.  So sorry.  Ma Jian, correct?

6    A.  Who?  Sorry?

7    Q.  Ma Jian, the guy who went to prison, according to

8    Mr. Finkel; arrested in China, sent to prison?

9    A.  The——which person are you referring to?

10   Q.  Ma Jing?  Ma Jian.  Sorry about that.

11   A.  Ma Jian, yes.

12   Q.  Sorry about that.

13          And you were asked a whole series of questions about

14   that by Mr. Finkel, correct?

15   A.  Yes.

16   Q.  And you're not an expert in his life, correct?

17   A.  No, I'm not.

18   Q.  And you're certainly not an expert on Miles Guo's life,

19   correct?

20   A.  That's correct.

21   Q.  And is it fair to say that it's part of Operation Fox Hunt

22   to bring false criminal charges against Chinese citizens?

23   A.  That's a very common tactic of Fox Hunt.

24          MR. FINKEL:  Objection.

25          THE COURT:  So that needs to be qualified.

1   Q.  In China.

2            THE COURT:  Based upon Chinese law.

3   A.  Yes.

4   Q.  That man has never left China, correct?

5   A.  Yes, is my understanding, yes.

6   Q.  Right.  And the charges that were brought against him were

7   under Chinese law, correct?

8   A.  Yes.  To——to clarify that, I would say China is not

9   governed by the rule of law, it's governed by the rule——rule by

10  law, which means essentially that the law is whatever the

11  government says it is.  So charges against somebody can be

12  legal in a technical sense but they can be completely bogus.

13  Q.  Okay.  But this man was charged in China, correct?

14  A.  Yes.

15  Q.  By the CCP, correct?

16  A.  Yes.

17  Q.  And the CCP routinely falsely charges its own dissidents in

18  China, correct?

19  A.  Yes.

20  Q.  Under Chinese law.

21  A.  Yes.

22           MS. SHROFF:  May I have a moment, your Honor?

23           THE COURT:  Go ahead.

24  Q.  Mr. Doran, you were asked many questions, were you not, by

25  Mr. Finkel about a $35,000 mattress, correct?

1    A.  Yes.

2    Q.  You don't know anything about a mattress, right?

3    A.  I know nothing about a mattress.

4    Q.  Okay.  And you were asked questions about buying equipment,

5    correct?

6    A.  Yes.

7    Q.  And you testified that you would recommend to your clients

8    to buy the best quality equipment they could afford, correct?

9    A.  Yes.

10   Q.  And why is that?

11   A.  Well, from a physical security perspective, if you're

12   installing CCTV cameras in your residence or in your place of

13   work, you need the best quality output.  Now they have discrete

14   screens and discrete systems, but you may wish to channel that

15   to your TV screens, in which case my recommendation would

16   always be to buy the best quality you can afford.

17   Q.  Mr. Doran, before you were retained on this case, did you

18   have any personal knowledge of Miles Guo?

19   A.  Only from what I'd read in the media.

20   Q.  And even after you were retained, you don't have any

21   personal knowledge of Mr. Miles Guo, correct?

22   A.  No, no, not at all, no.

23            MS. SHROFF:  I have nothing further.

24            THE COURT:  Recross.

25

RECROSS EXAMINATION

BY MR. FINKEL:

Q.  Sir, an N95 mask, you know what that is, right?

A.  Say that again?  Sorry?

Q.  An N95 mask, you know what that is, right?

A.  It's a piece of protective equipment.

Q.  Right.  And in March of 2020, those were used to try to protect everyone from COVID, right?

A.  In the United States, maybe.  I'm not sure about other countries.

MS. SHROFF:  It's way beyond the scope.

MR. FINKEL:  I'll get to the scope.  Give me like three questions.

Q.  So, sorry.  You are familiar with N95 masks?

A.  I know what it is, but I wouldn't be able to say whether everybody used it because we have multiple masks in the UK.

Q.  Right.  But you do know that in March of 2020, when COVID first hit in the UK and in the U.S., it was hard to get personal protective equipment like N95 masks, right?

MS. SHROFF:  Objection.  Objection to the compound.

THE COURT:  All right.  So I'm just waiting to get to the scope here.

MR. FINKEL:  I'm going to get there right now.

THE COURT:  Okay.

Q.  Do you know that the Rule of Law Foundation used donor

O731GUO4                        Doran - Recross

1  money to send a shipment of N95 masks in March of 2020 to Miles

2  Guo's house?

3  A.  I did not know that.

4  Q.  The PLA is controlled by what committee?

5  A.  Central Military Commission.

6  Q.  Central Military Commission.  And what's the politburo?

7  A.  Politburo is the sort of governing committee of the Chinese

8  Communist Party.  So it's President Xi is the chair, and then

9  there are several members, and they're his sort of closest

10 political allies and advisors.

11 Q.  Okay.  So it's a committee, right?

12 A.  Yeah.

13 Q.  So Chinese Communist Party has committees, right?

14 A.  Yes.

15 Q.  And you were asked some questions about the symbols and

16 co-opting symbols, right?

17 A.  Yes.

18 Q.  And if someone were to co-opt a symbol, they would display

19 it and try to rebrand it, correct?

20         MS. SHROFF:  Objection.

21         THE COURT:  You may answer.

22 A.  That could be one purpose, yes.

23 Q.  Right.  You sort of put it out there to change its meaning

24 so that people associate that symbol with a new meaning,

25 correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O731GUO4                       Doran - Recross

1   A.  That could be true, yes.

2            MR. FINKEL:  If we can put up CT58.

3   Q.  All right.  Please take a look at this.  And let me know if

4   you see any symbols of the PLA.

5   A.  I can't see any symbols of PLA.

6   Q.  The NFSC flag is on the right, correct?

7   A.  I understand it to be, yes.

8   Q.  And a seven-pointed star in the center, right?

9   A.  Yes.

10  Q.  For Brother Seven, right?

11  A.  Yes.

12  Q.  And the symbols, the PLA symbols that you looked at on

13  cross and redirect, those were in Miles Guo's desk in the

14  drawer; did you know that?

15  A.  You told me that they were there, yeah.

16           MR. FINKEL:  We can take that down.

17  Q.  You were asked some questions on redirect about G Fashion.

18  You don't know anything about G Fashion, right?

19  A.  No.

20  Q.  G Fashion has nothing to do with why you were hired to

21  testify here today, right?

22  A.  No.

23  Q.  Okay.  And you don't know anything about G|CLUBS, as you

24  testified, right?

25  A.  I don't.

O731GUO4                        Doran - Recross

1    Q.  Right.  G|CLUBS has nothing to do with why you were hired
2    to testify here today, correct?
3    A.  Would you like me to clarify why I was hired to testify?
4    Q.  No.  I'm just asking a question.
5    A.  No, I wasn't.
6    Q.  You don't know anything about how the Himalaya Exchange
7    ran, correct?
8    A.  I don't.
9    Q.  Right.  That has nothing to do with why you were hired to
10   testify today, correct?
11   A.  Correct.
12   Q.  And the farm loan program, you don't know how that worked,
13   right?
14   A.  No.
15   Q.  That has nothing to do with why you were hired to testify
16   here today, correct?
17   A.  That's correct.
18   Q.  Right.  The business opportunities that Miles Guo promoted
19   have nothing to do with why you were hired here to testify
20   today, correct?
21   A.  I was hired to testify as an expert in the Chinese
22   intelligence and police agencies, and Operation Fox Hunt.
23   Q.  Right.  That has nothing to do with the business
24   opportunities that Miles Guo promoted, correct?
25   A.  Correct.

O731GUO4                    Doran - Redirect

1   Q.  And that flag, right there, that one, do you recognize that

2   flag?

3   A.  The United States flag, yes.

4           MR. FINKEL:  Nothing further.

5   REDIRECT EXAMINATION

6   BY MS. SHROFF:

7   Q.  In all the time that you and I have met and spoken,

8   Mr. Doran, have I ever mentioned G Club?

9   A.  No.

10  Q.  GTV?

11  A.  No.

12  Q.  Farm loan?

13  A.  No.

14  Q.  Himalaya Exchange?

15  A.  No.

16  Q.  Any exchange, for that matter?

17  A.  No.

18  Q.  The first time any of these phrases were asked of you was

19  by Mr. Finkel on cross-examination, correct?

20  A.  Yes.

21  Q.  Thank you.

22          Now were you provided transcripts of this trial?

23  A.  No.

24  Q.  And when Mr. Finkel asked you if you knew about some

25  shipment of masks to Mr. Miles Guo's home, you don't know that

O731GUO4                          Dai - Direct

1    to be true, correct?

2    A.  No knowledge of that at all.

3    Q.  So if Mr. Finkel's statement is correct, do you know how

4    many people at that time during COVID lived in that home?

5    A.  I don't.

6    Q.  Do you know if the masks were distributed after they got to

7    his home?

8    A.  I don't.

9    Q.  And by the way, did I ever talk to you about any masks or

10   anything having to do with Mr. Guo— with masks and Mr. Guo?

11   A.  This is the first time I'm having a conversation about

12   masks.

13   Q.  And that's with Mr. Finkel, right?

14   A.  Yes.

15   Q.  Did I ask you about what was found in his desk, his

16   drawers, or anything like that?

17   A.  No.

18   Q.  Did you even know he was brother No. 7 of 8 children?

19   A.  No.

20   Q.  And do you have any particular knowledge about the American

21   flag?

22   A.  I believe it has 50 stars and 13 stripes.

23   Q.  Well, do you know why you were asked about the American

24   flag?

25   A.  No idea.

O731GUO4                          Dai - Direct

1              MS. SHROFF:  Nothing further.

2              MR. FINKEL:  Nothing further.

3              THE COURT:  Thank you, sir.  You may step out of the

4    courtroom.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  And the defense may call its next witness.

8              MS. SHROFF:  Your Honor, may I have a moment to go get

9    the witness.

10             THE COURT:  Yes.

11             MS. SHROFF:  Thank you.

12             (Witness sworn)

13             MS. SHROFF:  May I, your Honor.

14             THE COURT:  You may.

15    LAI DAI,

16         called as a witness by the Defendant,

17         having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. SHROFF:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  Mr. Dai, could you tell the ladies and gentlemen of the

23   jury, what is GTV?

24             THE COURT:  Sir, state your name and spell it.

25             THE WITNESS:  Lai Dai.  L-A-I, D-A-I.

O731GUO4                          Dai - Direct

1   Q.  Mr. Dai, could you tell the ladies and gentlemen of the

2   jury, what is GTV?

3   A.  GTV is a global-wise multimedia platform.  And because of

4   the whistleblower movement, it emerged from there.  Then

5   Mr. Guo is the main speaker or broadcaster of the platform.

6   And it's promoting the freedom of speech as well as religion,

7   and also it's a bridge between China and western world.  And on

8   that platform, there are a lot of multimedia technology, such

9   as YouTube or G Talk, and some social media functions.

10  Q.  Mr. Dai, did there come a time when you learned that the

11  members of the whistleblower movement could invest in GTV?

12  A.  And that is May of 2020, that's when I learned about it.

13  Q.  And how did you learn about it?

14  A.  On one hand, through the broadcasts of Mr. Guo, and the

15  other is through my comrades, discussion with my comrades, but

16  at that time I didn't know the investment project is GTV

17  because Mr. Guo in his broadcast has never mentioned it.

18  Q.  When you say you discussed it with your—did you say—I

19  couldn't hear the word, but do you mean your fellow fighters

20  that you discussed it with?

21  A.  Yes, they mentioned there is such a investment opportunity.

22  Q.  And when did you have these discussions?

23  A.  Roughly about May of 2020.  It's not really a discussion.

24  I just saw them and heard them talk about this information.

25  Q.  And did you view this as an investment opportunity?

O731GUO4                          Dai - Direct

1    A.  Yes, I view it as an investment opportunity, but at the
2    time I didn't know I was qualified to do this type of
3    investment.
4    Q.  And during that time, in May of 2020, where were you
5    living?
6    A.  I live in Germany.
7    Q.  And how long have you lived in Germany as of May of 2020?
8    A.  Roughly about 17 to 18 years.
9    Q.  And before that, where did you live?
10   A.  I'm——I was in China before 2003.
11   Q.  And did you go to school in China?
12   A.  Yes.
13   Q.  And are you married?
14   A.  Yes.
15   Q.  Did you meet your wife in China or in Germany?
16   A.  We were classmates in high school, and we were
17   boyfriend-girlfriend starting in college.
18   Q.  And did she also accompany you when you left China and
19   moved to Germany?
20   A.  She came one year after me.
21   Q.  Mr. Dai, could you tell me where you went to school in
22   terms of college.
23   A.  I went to——I have two bachelor degree, one in law and one
24   in MBA management, and in Germany, I have a master degree in
25   law, in Germany.

1   Q.   So did you get the master's degree of law as a student in a

2   German university?

3   A.   Yes.

4   Q.   Now going back to evaluating the investment opportunity in

5   GTV, could you tell us what steps you took to decide whether or

6   not you wanted to invest in GTV.

7   A.   First of all, I heard about this opportunity, then I

8   learned that to have more information about how to invest and I

9   need to communicate with my fellow comrades, or fellow

10  fighters, to get more information.  At that time I chose to——a

11  famous comrade, her name is Sara, and I contact her and

12  inquired about the details of this investment.  And I told her

13  I would like to invest a hundred thousand U.S. dollars plus,

14  say, hundred fifty thousand U.S. dollars.

15  Q.   Mr. Dai, who is Sara?

16  A.   Sara is one of the known fellow fighters during the

17  whistleblower movement because she contribute a great deal for

18  this movement.

19  Q.   And does Sara have a last name that you know of?

20  A.   Her family name is Wei.

21  Q.   And Mr. Dai, did you want to invest in GTV immediately or

22  did you want to think about it?

23  A.   I need to see more detailed information to be able to

24  decide if I will invest or not.

25  Q.   And what information did you want to take a look at before

1  deciding whether or not to invest?

2  A.  I think I would like to see, for example, its business plan

3  for the requirement to the investors and how much money

4  required or any related information to see if I can make a

5  successful investment, and before I make——I knew all this

6  information, it's not possible for me to make a decision.  And

7  also personally, I believe it's an interactive, two-way

8  process, because if I wanted to invest, maybe I'm not going to

9  be accepted.

10  Q.  Mr. Dai, did you have any concerns about investing in GTV?

11  A.  I didn't understand.  I didn't understand the interpreter,

12  what he said.

13          THE INTERPRETER:  The interpreter will repeat.

14  A.  To invest in GTV?  As a matter of fact, to do any

15  investment, GTV or not, there's still going to be risk

16  associated with it.

17          MR. HORTON:  Objection.  Nonresponsive.

18          THE COURT:  So, sir, the answer is stricken.  I want

19  you to listen carefully to the question and then only answer

20  what has been asked of you.  Don't add additional information.

21  A.  The answer is yes.

22  Q.  What were the concerns you had before deciding to invest in

23  GTV?

24  A.  Just like I said earlier, I need to see the documents of

25  this investment and to see if I have the capacity to do this

O731GUO4                          Dai - Direct

 1    investment, yes.

 2    Q.  Were you concerned that GTV was a startup company?

 3              MR. HORTON:  Objection to the leading.

 4              THE COURT:  All right.  So I'm going to permit some

 5    leading so that we can be more efficient.  Go ahead.

 6    Q.  Was one of the concerns that you had that GTV was a startup

 7    company?

 8    A.  That's not much of my concern at the time because before I

 9    made the investment, GTV has been in existence and operated and

10    I have some experience with it.  It was great even though it's

11    a startup company, but the development and——made me to be very

12    confident about this company.

13    Q.  Mr. Dai, did there come a time when you decided to invest

14    in GTV?

15              MR. HORTON:  Objection.  Asked and answered.

16              THE COURT:  Sustained.  Don't answer.

17    Q.  What is it that the GTV platform would carry, according to

18    you?

19    A.  What's on the GTV platform?

20    Q.  Yes.

21    A.  GTV has lots of the livestream and also broadcasting

22    functions, and they can also provide social and communication

23    function, and there——there has already been some digital

24    currencies function so you can also pay when they do the

25    livestream.  You can pay up the livestreamer.

O731GUO4                          Dai - Direct

1   Q.  Were you interested in the news of the livestream that was

2   on GTV?

3   A.  Yes, I'm very——I was very interested in the content of

4   those broadcasts.

5   Q.  Could you tell the jury what content it was that interested

6   you.

7   A.  At that time there was a lot of whistleblower about what

8   the reality is in China, by Mr. Guo.  As a Chinese myself, I

9   would know and be very——I would like to know and be very

10  interested in this kind of information.  He also would provide

11  a lot of new political, economic trends, and also there are a

12  lot of the livestream by other people to do all type of

13  broadcasting, including politics, economics, body build and

14  some——and also gourmet cooking.

15  Q.  Did you think that investing in GTV carried risks?

16  A.  Yes, there is risk.

17  Q.  Did you think that investing in GTV carried any more or

18  less risk than any other investment?

19  A.  It's not going to be more risk.  It's going to be less risk

20  than others, investment opportunities, and it's also possible

21  to have a higher risk because some of the content it carried

22  are focusing on the CCP and——who might want to interfere with

23  the development of the GTV, and GTV, there's a lot of projects

24  that is to also have competitors, so it's very challenging.

25  Q.  Mr. Dai, could you tell the jury what you do for a living

O731GUO4                          Dai - Direct

1  now.

2  A.  Right now I have my own company.  I'm doing e-commerce.

3  Q.  And in deciding whether or not to invest in GTV, did you

4  consider any quantitative data?

5  A.  Yes, at that time I——Alexa, provided by Amazon, there

6  is——they do the web traffic evaluation, so I look at the GTV's

7  traffic trend, I see it's a very good development trend.

8  Q.  What do you mean by Alexa traffic trend?  Could you explain

9  that.

10  A.  Correct, yes.  Because that's specialized in monitoring

11  such particular website, the web traffic that's created online.

12  Q.  Was there any other quantitative data that you looked at

13  before deciding to invest in GTV?

14  A.  At that time, that's one of the factors that I considered

15  to invest, but more importantly, I have watched carefully, read

16  carefully of those investment documents and the manual, so I

17  think the investment plan very competitive.  It's a very

18  good——with very good potential and perspective.

19  Q.  Did the fact that GTV not have advertisements on its

20  platform influence your decision to invest in it?

21  A.  No, that's a good function, because I do not hope platform

22  with content would be impacted by the advertisers or

23  advertisement because this platform, the goal, the aim is to

24  provide the truth as well as the freedom of speech.

25          In addition, without the ad, the user can be more

O731GUO4                          Dai - Direct

1    directly pay whoever the broadcaster was for the particular

2    content he or she provided and so those broadcasters can

3    concentrate on their intent——content to generate more income,

4    so there is their own system generated on this platform.

5    Q.   Did your own experience in e-commerce allow you to explore

6    search rankings and other information related to GTV?

7    A.   Yes.  Because of my work, my business, I'm pretty sensitive

8    to this type.

9    Q.   And how long have you had this business?

10   A.   My own company?  I started in 2012.

11   Q.   Now, Mr. Dai, could you tell the jury how much you invested

12   in GTV.

13   A.   In GTV, total investment is $155,000, total, U.S. dollars.

14   Q.   Was that the total that you invested?

15   A.   Yes, yes, total is the——the value of my stock got from GTV

16   is $155,000 U.S.

17            THE INTERPRETER:  Your Honor, may the interpreters

18   have a minute.

19            THE COURT:  A moment?  Okay.

20            Go ahead.

21   Q.   Are you ready, Mr. Dai?

22   A.   Yes.

23   Q.   Okay.  What was the first step that you took in your

24   investment in GTV?  Could you tell us.  And could you just give

25   the translator enough time to translate, please.

O731GUO4                          Dai - Direct

1    A.  Yes, I willing to introduce my whole process of investment.

2    First, I get in contact with Sara, ask her about relevant

3    investment information——

4    Q.  Okay.  Let me stop you there.  How did you come to contact

5    Sara?

6    A.  I contact Sara through Discord.

7    Q.  And what is Discord?

8    A.  Discord is a communicating software that fellow fighters

9    use among us.

10   Q.  And after you contacted Sara, what did you do?

11   A.  I told her after——after I told her I was going to invest

12   $155,000, she send me VOG's information.

13   Q.  And what is VOG?

14   A.  VOG should be Sara's company.

15   Q.  And did you have an understanding at that time who was

16   permitted to invest directly into GTV?

17   A.  At that time I did not attend the official investment

18   document into GTV.  Obviously Sara gave me the wrong

19   information.

20            MR. HORTON:  Objection, your Honor.

21   A.  Because I need to invest more than a hundred thousand.

22            MS. SHROFF:  Your Honor, may we just have a quick

23   sidebar, your Honor.

24            THE COURT:  Yes.

25            MS. SHROFF:  Thank you.

O731GUO4                        Dai - Direct

1              (At the sidebar)

2              MS. SHROFF:  Your Honor, could you ask the witness if

3      he's having trouble with the headset or the headpiece.

4      Something's not working out correctly from the way he's

5      looking, and he keeps tugging at the right side of his ear.  I

6      don't want to bring it up in front of the jury, but I don't

7      know.  And we've not had any problems with him before, so—

8              MR. HORTON:  Well, for whatever it's worth, I haven't

9      observed him having difficulty with the equipment.  The answers

10     are coming quickly.  There were one or two occasions where I

11     thought they weren't responsive, which has been, in both

12     parties' experience, from time to time with witnesses who are

13     testifying through a different language.  So I don't totally

14     see the basis for adjusting the equipment.  But my objection,

15     which I was hoping was a quick one, was that I didn't think it

16     matched the question and the way that suggested

17     misunderstanding.

18             THE COURT:  I don't agree with you.  He seems to want

19     to volunteer information that is favorable to Mr. Guo.  That's

20     my sense.  So he may be just disregarding your questions.  I

21     can certainly remind him that he needs to answer what has been

22     asked.

23             MS. SHROFF:  Your Honor, I made a record of what I

24     observed him to be having trouble with.  If the government

25     doesn't want to take up my offer, that's fine, but I think he's

O731GUO4                    Dai - Direct

1    having trouble with the headset.  I didn't say he was having

2    any trouble with the interpretation.  I think he's having

3    trouble with the headset.

4            THE COURT:  So I will make an inquiry about the

5    equipment.

6            MS. SHROFF:  Thank you.

7            THE COURT:  Okay.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O731GUO4                          Dai - Direct

1                    (In open court)

2              THE COURT:  Sir, is the headset equipment working all

3    right?

4              THE WITNESS:  Earlier, I couldn't hear very clearly,

5    but now is good.

6              THE COURT:  All right.  You may continue.

7    BY MS. SHROFF:

8    Q.  Mr. Dai, did there come a time when you contacted Sara Wei

9    about investing in VOG?

10             MR. HORTON:  Objection.  Asked and answered.

11             THE COURT:  I'm going to permit the answer.  Go ahead.

12   A.  Yes, I contacted Sara.  She provide me with VOG's

13   investment information, but I did not mean to invest in VOG.  I

14   want to invest in GTV.

15   Q.  Mr. Dai, if you could just listen to my question.

16             THE COURT:  All right.  So sir, it's very important

17   that you listen carefully to the question and then you answer

18   only what is asked of you.  So if you're asked what is your

19   favorite color, let's assume that it's blue, you would say

20   blue, but you don't also say, and my favorite dessert is ice

21   cream.  That's volunteering information that has not been

22   asked.  Do you understand?

23             THE WITNESS:  Understood.

24             THE COURT:  Go ahead.

25   BY MS. SHROFF:

1    Q.  And did Sara Wei respond to your inquiry about how to

2    invest?

3    A.  Yes, she did.

4    Q.  And how did she respond?

5    A.  She send me a message on Discord, including method to

6    invest in VOG and a link.  Within the link, it has some

7    material regarding investing in VOG.

8    Q.  Okay.  Now did you open the link?

9    A.  I did.

10   Q.  Did you fill out the forms?

11   A.  Yes.

12   Q.  Did you send her money?

13   A.  I did.

14   Q.  How much money did you send Sara Wei?

15   A.  $155,000.

16   Q.  And how did you send the money to Sara Wei?

17   A.  Through bank transfer.

18   Q.  And did Sara Wei acknowledge receiving the money?

19   A.  She kept saying she did not receive the money.

20   Q.  And when Sara Wei said she did not receive the money, did

21   you take any steps to figure out where that money was?

22   A.  Yes, I get in contact with my bank to search this transfer

23   information, and I even called the receiver's bank, Wells

24   Fargo, and I contact Sara many times, ask her to verify this

25   transfer, and she kept telling me that she did not see the

1    transfer.

2    Q.  Okay.  Mr. Dai, did there come a time when you just never

3    heard back from Sara Wei?

4    A.  Yes, she was slow in response and subsequently——and she——

5    Q.  I'm just going to stop you there, okay?

6    A.  ——pretty much did not respond me at all.

7    Q.  Okay.  Did you do anything?  Were you concerned that she

8    wasn't responding to you?

9    A.  At first few days, I was not concerned because I did not

10   realize this was a mistake, then I soon discover that the

11   correct way to invest in GTV is get in contact with Mr. Guo and

12   get in contact with investment committee.

13   Q.  Okay.  Mr. Dai, was there a reason that you were in a rush?

14   A.  Correct, because I came to know about the private placement

15   opportunity later on and——and during the pandemic, and I was

16   very busy with my work and I came to know about the information

17   in May.

18   Q.  And were you worried that if Sara Wei did not receive the

19   money in time, you would miss out on an opportunity?

20   A.  Yes, I was very concerned.

21            THE COURT:  All righty.  So it's now 2:30.  We'll take

22   our half-of-an-hour break and we'll continue at 3 p.m.

23            Sir, you may step out of the courtroom.

24            (Witness not present)

25            THE COURT:  Don't discuss the case, don't permit

O731GUO4                         Dai - Direct

1   anyone to discuss it in your presence, don't read, watch, or

2   listen to anything having anything to do with this matter.

3          (Jury not present)

4          THE COURT:  You may be seated.

5          Is there anything before we resume at 3 p.m.?

6          MR. HORTON:  Not from the government.  Thank you, your

7   Honor.

8          MS. SHROFF:  No, your Honor.  Thank you.

9          THE COURT:  All righty.

10          (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                          Dai - Direct

1              (Jury not present)

2              THE COURT:  Please be seated.  Ms. Shroff.

3              MS. SHROFF:  We tried to work out the issues on the

4    break, but we are having issues of how he's hearing the

5    interpreter.

6              THE COURT:  Is it worked out?  In the meantime,

7    Ms. Shroff, consider leading.  You may be seated.

8              Well, we're going to have to stand for the jurors, so.

9    All righty.  Are we ready?

10             THE INTERPRETER:  Interpreter is ready.

11             THE COURT:  All righty.  Let's have the jurors.

12             THE LAW CLERK:  Jury entering.

13             (Jury present)

14             THE COURT:  Please be seated.  Members of the jury, it

15   is 3:07.  I was late in bringing you out because we were having

16   some difficulties with the audio, so now we're ready.  You may

17   continue.

18             MS. SHROFF:  Thank you, your Honor.

19   BY MS. SHROFF:

20   Q.  Mr. Dai, did you ever get back the money that you sent to

21   Sara Wei?

22   A.  I received the money from SEC.

23   Q.  After you sent the money to Sara Wei, you then contacted

24   Miles Guo, correct?

25   A.  Yes.

O73BGUO5                        Dai - Direct

1   Q.  And you contacted Miles Guo on WhatsApp; is that correct?

2   A.  Correct.

3   Q.  And on WhatsApp when you contacted Miles Guo, you got a

4   voice note from him, correct?

5   A.  Yes.

6   Q.  At that time you did not actually have a dialogue with

7   Miles Guo, correct?

8   A.  Before that, no.

9   Q.  And after you got the voice note -- let me back up.

10          The voice note was sent to you on WhatsApp, correct?

11  A.  Yes.

12  Q.  And had you used WhatsApp in your work, in your line of

13  work before?

14  A.  Yes, I have.

15  Q.  And when you got the voice note, you listened to the voice

16  note, correct?

17  A.  Yes, I heard it.

18  Q.  Then there came a time that Miles Guo or somebody from that

19  number sent you documents, correct?

20  A.  Yes.

21  Q.  And the documents that was sent to you were about GTV,

22  right?

23  A.  Yes.

24  Q.  So let me show you what is marked as GXVK-4.

25          Do you see this document?

O73BGUO5                          Dai - Direct

1    A.  Yes.

2    Q.  And do you recognize it?

3    A.  Yes.

4    Q.  And do you recognize it to be one of the documents that

5    Miles Guo sent you in the WhatsApp voice note that you got on

6    WhatsApp?

7    A.  Yes.

8              MS. SHROFF:  The defense moves GXVK-4 into evidence.

9              MR. HORTON:  No objection.

10             THE COURT:  It is admitted.

11             (Defendant's Exhibit GXVK-4 received in evidence)

12   BY MS. SHROFF:

13   Q.  Can I also show the witness DX60724.

14             THE INTERPRETER:  Your Honor, may I have a minute.  Go

15   ahead, please.  I cannot see it on my screen.

16             MS. SHROFF:  This is just for the witness, the second

17   document is Defense Exhibit 60724.

18   Q.  You see that, Mr. Dai?

19   A.  Yes.

20   Q.  And is this also one of the documents that you received

21   through that voice note that you got from Miles Guo's number?

22   A.  Yes.

23             MS. SHROFF:  The defense moves DX60724 into evidence.

24             MR. HORTON:  No objection.

25             THE COURT:  It is admitted.

O73BGUO5                          Dai - Direct

1              (Defendant's Exhibit 60724 received in evidence)

2    BY MS. SHROFF:

3    Q.  Now, Mr. Dai, if you could take a look at the document on

4    the left side which is the government exhibit.

5              Do you read English?

6    A.  I could read some English.

7    Q.  And could you read from the third sentence of the first

8    paragraph.  Please read all.  Could you read that out loud in

9    English for the jury and keep your voice up would you, please,

10   Mr. Dai.

11   A.  "Please read all the documents carefully before making a

12   decision.  Please be aware that the Chinese version of these

13   documents are for ease of reference, but the English versions

14   are the controlling documents.  As such, please complete and

15   return the English versions only and all information should be

16   completed in English."

17   Q.  When you received this document, did you read it in

18   English?

19   A.  I read in Mandarin Chinese first and then I have reference

20   read both English and Chinese version.

21   Q.  Let's start with the document that you read first.  The

22   document that you read first is to your right, correct?

23   A.  Correct.

24   Q.  And the document on the right is a translation of the

25   document on the left, correct?

O73BGUO5                          Dai - Direct

1    A.  Correct.

2    Q.  So you read the Mandarin version and then after that you

3    read the English version, correct?

4    A.  Correct.

5    Q.  And did you follow the instruction that says that the

6    English version is the controlling document?

7              MR. HORTON:  Objection to the testimony of Ms. Shroff.

8              THE COURT:  Excuse me.

9              MR. HORTON:  Objection.

10             THE COURT:  Overruled.  You may answer.

11   Q.  And as directed did you complete and return the English

12   versions of this application form?

13   A.  Yes, I fill the English form and send it back.

14   Q.  Let me show you what is in evidence now as GXVK-5.  The two

15   documents I showed you previously accompanied this document in

16   the voice note, correct?

17   A.  Yes.

18   Q.  Did you read this document?

19   A.  I read it.

20   Q.  And did you read it in English or did you read it in

21   Mandarin?

22   A.  I read both versions.

23   Q.  And did you read the entire document in both languages?

24   A.  Yes.

25   Q.  Let me show you what is now marked as GXVK-7.  Okay.  Do

O73BGUO5                          Dai - Direct

1    you see this document?

2    A.  Yes.

3    Q.  Could you read the title for the jury, please, and keep

4    your voice up if you can.

5    A.  Stock holders agreement.

6    Q.  Could we scroll down, please.  And did you read this

7    document?

8    A.  Yes.

9    Q.  Did you read it in English, in Mandarin or both?

10   A.  Both.

11           MS. SHROFF:  The defense moves GXVK-7 into evidence.

12           MR. HORTON:  No objection.

13           THE COURT:  It is admitted.

14           (Defendant's Exhibit GXVK-7 received in evidence)

15   BY MS. SHROFF:

16   Q.  Let me show you GXVK-8.  Did you read this document the

17   confidentiality agreement?

18   A.  Yes.

19           MS. SHROFF:  Your Honor, at this time we move this

20   version into evidence GXVK-8.

21           MR. HORTON:  No objection.

22           THE COURT:  It is admitted.

23           (Defendant's Exhibit GXVK-8 received in evidence)

24   BY MS. SHROFF:

25   Q.  Now I've gone through several documents with you, Mr. Dai.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O73BGUO5                         Dai - Direct

1   You received each one of these documents in that voice note,

2   correct?

3           MR. HORTON:  Asked and answered.

4           MS. SHROFF:  I'll move on.

5   Q.  How many times would you say you read each one of these

6   documents?

7           MR. HORTON:  Your Honor, we object in view of the

8   Court's Tuesday morning ruling.

9           MS. SHROFF:  I'll move on.

10          THE COURT:  Okay.

11  Q.  Mr. Dai, what did you do after you read these documents?

12  A.  After I finish reading those documents, I signed it and I

13  sent the signature page back to the investment committees

14  WhatsApp number.

15  Q.  And you signed the English version of the document,

16  correct?

17  A.  Correct.

18  Q.  You first submitted the documents to Voice of Guo and then

19  after that you submitted them directly to GTV, correct?

20          MR. HORTON:  Asked and answered, your Honor.

21          THE COURT:  Sustained.

22  Q.  Mr. Dai, you did not get anything in return for the

23  $155,000 that you sent to Sara, correct?

24  A.  No.

25  Q.  And there came a time in 2021 that you learn that other GTV

O73BGUO5                          Dai - Direct

1   investors had had the same experience with Sara Wei, correct?

2           MR. HORTON:  Objection, your Honor, hearsay.

3           THE COURT:  Overruled.

4           MR. HORTON:  Your Honor, it goes right into Tuesday

5   morning's ruling.  If we have to have a sidebar, it flies right

6   into the Tuesday morning's ruling.

7           THE COURT:  If you'll step up.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                        Dai - Direct

1           (At the sidebar)

2           THE COURT:  Your concern is his just speaking about

3    his own investing experience?

4           MR. HORTON:  Exactly.

5           THE COURT:  All right.  So stick to his experience.

6           MS. SHROFF:  They all sued her, so it is their

7    experience.  It's not just his experience.  He joins a lawsuit

8    and that has nothing to do with whether or not he's

9    sophisticated or unsophisticated, dumb or smart, Litvak or not

10   Litvak.  She stole is money, he sued her.  So what you can read

11   all you what.

12          MR. FINKEL:  Please address your questions to the

13   judge, not to me.  I don't make any decisions here.

14          MS. SHROFF:  And we're very grateful for that.

15          MR. FINKEL:  Me too.

16          THE COURT:  Please.  Please.  Please.  Mr. Horton.

17          MR. HORTON:  Your Honor question was about what he had

18   heard from unknown about other investors. Your Honor said the

19   defense shall advance questioning of each witnesses' own

20   investment experience.  That's why I objected.

21          MS. SHROFF:  It's not the investing experience.  It's

22   the stealing experience.  She stole.

23          THE COURT:  Did you want to say something, Mr. Finkel?

24          MR. FINKEL:  No, your Honor.

25          THE COURT:  You can ask whether he brought a lawsuit,

O73BGUO5                          Dai - Direct

1      but I think we cannot go into all the other stuff.

2                 MS. SHROFF:  How about I ask him if he joined a

3      lawsuit?

4                 THE COURT:  No.

5                 MS. SHROFF:  He can't personally because he's in

6      Germany.

7                 THE COURT:  Well --

8                 MS. SHROFF:  How about if I ask if he has knowledge

9      that a lawsuit was brought against Sara Wei?

10                THE COURT:  No.  No.

11                MS. SHROFF:  Can I ask him if Sara Wei stole his

12     money?

13                MR. HORTON:  Your Honor, first of all, beyond the

14     relevance of this other lawsuit, it's not clear on that.  And

15     getting through -- you hear there's something happened with

16     other people that they did, then we're going to have to make a

17     hearsay objection.

18                THE COURT:  Yes.

19                MS. SHROFF:  The relevance --

20                THE COURT:  I understand.

21                MS. SHROFF:  The relevance is that they are arguing

22     that Ms. Wei remain a co-conspirator of Mr. Guo all throughout

23     the conspiracy.

24                MR. FINKEL:  No, we're not.

25                THE COURT:  Just ask a leading question, ultimately

O73BGUO5                          Dai - Direct

1    legal action was brought against Ms. Wei, like that.

2              MS. SHROFF:   Okay.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                          Dai - Direct

 1              (In open court)

 2              THE COURT:  Sir, if you're asked a yes or no question,

 3    just answer yes or no.  Do not add any additional information.

 4    Do you understand?

 5              THE WITNESS:  Okay.

 6              THE COURT:  Go ahead.

 7    BY MS. SHROFF:

 8    Q.  Mr. Dai, did you think that Sara stole your $155,000?

 9              MR. HORTON:  Objection.

10              THE COURT:  Sustained.

11    Q.  Do you know if there was a lawsuit filed against Sara Wei

12    for the return of money?

13    A.  I know.

14    Q.  And did you know through either this court or any other

15    means that Sara Wei and Mr. Guo had a falling out?

16              MR. HORTON:  Objection, hearsay.  Objection raised at

17    sidebar.

18              THE COURT:  Sustained.

19    Q.  Mr. Dai, did there come a time when you actually managed to

20    invest in GTV, correct?

21    A.  Can you repeat the question.

22              (Record read back)

23    A.  Correct.

24    Q.  And how many shares did you receive in exchange for your

25    investment?

O73BGUO5                              Dai - Direct

1    A.  I invest in 155,000 shares.

2    Q.  Could we go to GXBR430, and if I could go to E2983.  And if

3    you could highlight that for him.

4               Do you recognize this document and what it shows?

5    A.  I can see my name on it.

6               MS. SHROFF:  Your Honor, we move GXBR430 into

7    evidence.

8               MR. HORTON:  Your Honor, may I voir dire?

9               THE COURT:  Yes.

10   VOIR DIRE EXAMINATION:

11   BY MR. HORTON:

12   Q.  Mr. Dai, have you ever seen this document before?

13   A.  I don't recall.

14              MR. HORTON:  We object.

15              THE COURT:  All righty.  So I'm not going to admit it.

16              MS. SHROFF:  May I, your Honor?

17              THE COURT:  Go ahead.

18   BY MS. SHROFF:

19   Q.  Do you know if there was an SEC action brought that listed

20   all of the investors that got a refund?

21   A.  Yes.

22              MR. HORTON:  Your Honor, may we ask that the document

23   be taken down.  It was not admitted.

24              THE COURT:  Please take it down.

25   Q.  And were you shown a list of everybody who did get a

O73BGUO5                    Dai - Direct

1   refund?

2   A.  Could you repeat.

3   Q.  It's okay.  I'll move forward.

4           Mr. Dai, did you get a stock certificate for 155

5   shares that you purchased in GTV?

6   A.  Yes.

7   Q.  Now, could you tell the jury if you actually used the GTV

8   platform?

9   A.  Yes.

10  Q.  And could you tell me when is the first time that you

11  started using the platform?

12  A.  It should be April 2020.

13  Q.  And you could tell us how often you used it?

14  A.  Five hour, approximately five hours per day.

15  Q.  And is it fair to say, Mr. Dai, when you saw bugs on the

16  platform, you let people know so that the platform could be

17  fixed, correct?

18  A.  Yes.

19  Q.  You considered yourself an investor in GTV, correct?

20  A.  Yes.

21  Q.  You considered yourself a user of GTV, correct?

22  A.  Yes.

23  Q.  And you also considered yourself a tester of the GTV

24  platform, correct?

25  A.  Yes.

O73BGUO5                          Dai - Direct

1   Q.  As an investor, you were committed to strengthening the GTV

2   operation platform, correct?

3   A.  Yes.

4   Q.  Mr. Dai, do you have an understanding of what entity own

5   GTV before the private placement?

6   A.  Saraca.

7   Q.  And what is your understanding based on that Saraca owned

8   GTV?

9   A.  Saraca should be GTV's parent company, that it has hundred

10  percent share of GTV.

11  Q.  And that is reflected in the PPM, correct?

12  A.  Correct.

13  Q.  And you read the PPM, correct?

14          MR. HORTON:  Asked and answered.

15          THE COURT:  Sustained.

16  Q.  And, Mr. Dai, do you have an understanding of what entity

17  was the majority owner of GTV after the private placement?

18  A.  Saraca.

19  Q.  So before and after the private placement, Saraca was the

20  owner of GTV, correct?

21          MR. HORTON:  Asked and answered.

22          THE COURT:  Sustained.

23  Q.  Mr. Dai, did you have an understanding about how Saraca

24  control of GTV remained in place even after the private

25  placement?

O73BGUO5                          Dai - Direct

1          MR. HORTON:  Objection, compound and asked and

2    answered.

3          THE COURT:  Sustained.

4          MS. SHROFF:  I didn't ask a single question about

5    control.

6    Q.  Mr. Dai, after the PPM, it was Saraca that controlled GTV,

7    correct?

8          THE COURT:  Sustained.

9    Q.  Did you have an understanding of who controlled GTV?

10          MR. HORTON:  Same objection, your Honor.

11          THE COURT:  Sustained.  Move on.

12    Q.  Was it your understanding, Mr. Dai, that the private

13    placement was a successful one?

14    A.  Yes.

15    Q.  And, in fact, that was your understanding because it sold

16    more shares than it was expected to sell, correct?

17    A.  Correct.

18    Q.  And the additional shares that was sold was shares that

19    belong to Saraca, correct?

20    A.  Yes.

21    Q.  And when Saraca sold those shares, the money that came from

22    selling those shares went back to Saraca, correct?

23          MR. HORTON:  Objection.

24          THE COURT:  Sustained.

25    Q.  The additional money that came from selling of the Saraca

O73BGUO5                          Dai - Direct

1    shares went back to Saraca, correct?

2              MR. HORTON:  Same objection.

3              THE COURT:  Sustained.

4              MS. SHROFF:  Your Honor, may we have a sidebar?

5              THE COURT:  Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                          Dai - Direct

1              (At the sidebar)

2              THE COURT:  Mr. Horton.

3              MR. HORTON:  Your Honor, this was the same objection

4    that Mr. Fergenson made during the testimony of Mr. Dragon.

5    The witness is being asked to vouch for the truth of

6    essentially a disputed fact.  The documents that contain that

7    assertion are not in for their truth.  They're in on for the

8    effect on the listener.  It's not appropriate in our view to

9    have him ratify their truth through the questions of

10   Ms. Shroff.

11             MR. FERGENSON:  If I could just add. I don't think

12   there is any document that said they raised a lot more money,

13   but the document just says they were selling 200 million

14   shares.  There's no evidence at all that Saraca sold its shares

15   and somehow Saraca didn't send the money payment which is where

16   they're going ultimately.  There just no basis for this, so we

17   object.  There's no personal knowledge.

18             THE COURT:  What basis would he have to know this?

19             MS. SHROFF:  He said he read the PPM.  He did his own

20   research.  And if Saraca sold the shares, because he knows --

21   it was all over Discord.  It was everywhere that the demand for

22   shares was in for greater than what was being sold.  So when

23   Saraca -- first of all, it's just logical.  I don't mean to use

24   the quote.  I apologize.  If I sold my shares, the money would

25   come back to me.  So if Saraca sells its shares, the money goes

O73BGUO5                        Dai - Direct

1    back to Saraca.  It's a basic proposition.

2          THE COURT:  I just don't think he is in a position to

3    know.

4          MS. SHROFF:  They're free to cross him on whether or

5    not he knows or whether he has a basis to know or not.

6          MR. SCHIRICK:  And he will say that was his

7    understanding, your Honor.

8          MS. SHROFF:  It is his understanding, and therefore --

9    it is his understanding.  I'm confused as to why we're not

10   allowed to ask his understanding of what happened after Saraca

11   sold his shares and who got the money.

12         MR. SCHIRICK:  We understand the government disputes

13   it.  Clearly, it's a fact at issue, but why a witness who was

14   an investor, studied the PPM is very careful and cautious can't

15   testify as to his understanding.  It goes directly to

16   materiality.  It goes to every issue in this case.

17         THE COURT:  But it's not in the PPM.

18         MR. SCHIRICK:  It can be inferred from facts in the

19   PPM.  They're free to cross on that your Honor if that's their

20   point of view.

21         MS. SHROFF:  It doesn't matter whether it's in the PPM

22   or not.  We're asking about his understanding.  His

23   understanding may have come from a boat of wisdom from God.

24         MS. MURRAY:  It's hearsay.

25         MS. SHROFF:  It's his understanding.  You can cross on

O73BGUO5                        Dai - Direct

1    it.

2            MR. FERGENSON:  He's not competent to testify to

3    something that he doesn't have personal knowledge of.

4            THE COURT:  I don't feel that he has -- there's any

5    foundation for his knowledge of this at all.  Where the money

6    went that it went back to Saraca, no.  So you're going to have

7    to move on.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                         Dai - Direct

1              (In open court)

2              THE COURT:  Sustained.

3              THE WITNESS:  Your Honor, can I add something?

4              THE COURT:  No.  You can't volunteer any information.

5    All you can do is answer a question, and there is no question

6    before you at this time.  Go ahead, Ms. Shroff.

7    BY MS. SHROFF:

8    Q.  Mr. Dai, was Saraca the controller -- was Saraca --

9              THE COURT:  Sustained.

10   Q.  Was the company Saraca discussed on Discord?

11             THE COURT:  Sustained.  Sustained.

12   Q.  Did you have any knowledge about Saraca?

13             MR. HORTON:  Your Honor, cumulative for the last

14   several questions.

15   Q.  Where did your understanding of Saraca come from?

16   A.  My understanding of Saraca was from the prospectus.

17             THE COURT:  All righty.  So you've got to move on now.

18   Q.  Mr. Dai, what entity did you send your money to?

19             MR. HORTON:  Asked and answered.

20             THE COURT:  Sustained.

21   Q.  Did you send your money to Saraca?

22             MR. HORTON:  Your Honor --

23             THE COURT:  What is the time period that you're

24   speaking of.

25             MS. SHROFF:  At the time of his investment.

O73BGUO5                      Dai - Direct

1   Q.  When he was buying shares, you sent money to Saraca,

2   correct, Mr. Dai?

3   A.  Yes.

4   Q.  Mr. Dai, when the funds was sent, was it your

5   understanding -- what was your understanding of how that money

6   would be used?

7   A.  This money would be invested into GTV's development.

8   Q.  And if the money was sent to Saraca, was Saraca free to use

9   its money?

10         THE COURT:  All righty.  No.  He has no basis to know

11  what Saraca was free to do or not.

12  Q.  If the money didn't belong to GTV, that entity was free to

13  spend its money any way it chose, correct?

14         MR. HORTON:  Objection, calls for speculation.

15         THE COURT:  Sustained.

16  Q.  Mr. Dai.  Did there come a time when you became aware that

17  the United States Securities and Exchange Commission had seized

18  funds from GTV and was trying return them to investors?

19         MR. HORTON:  Objection to the characterization and may

20  require sidebar if it's repeated.

21         THE COURT:  I'm not hearing you, Mr. Horton.

22         MR. HORTON:  We have an objection to Ms. Shroff's

23  characterization in that question.  The Court has ruled on this

24  issue.

25         THE COURT:  You've got to refer to it in the formal

O73BGUO5                    Dai - Direct

1    way.

2    Q.  Mr. Dai, did you learn that SEC had reached a settlement

3    and therefore had the money that the GTV investors had invested

4    into GTV?

5    A.  Yes.

6    Q.  And did you receive a refund as a result of that?

7    A.  Yes.

8    Q.  And did you get a full refund of the money you had invested

9    into GTV?

10   A.  No.

11   Q.  How much was taken out?

12   A.  I think there were 7.5 percent less.

13   Q.  And do you know to whom that 7.5 percent went?

14          MR. HORTON:  Objection.

15          THE COURT:  Sustained.

16   Q.  Did you want the money that you had invested in GTV

17   returned to you, Mr. Dai?

18          MR. HORTON:  Objection.

19          THE COURT:  You can answer that question.

20   A.  If SEC seize the money, I would wish them to return the

21   money to me.  But if it's up to me, I want the money to stay in

22   GTV to help with the normal operating development.  I do not

23   want the money to be refund to me.

24   Q.  Mr. Dai, did there come a time when you learned about an

25   investment that had been made in a hedge fund?

O73BGUO5                    Dai - Direct

1   A.  No.

2   Q.  Did you learn about the specific nature of that investment

3   which was shortening the Hong Kong dollar?

4   A.  No.

5            MR. HORTON:  Objection.

6            THE COURT:  He answered no.

7   Q.  Mr. Dai, did you learn about an investment for shortening

8   the Hong Kong dollar?

9            THE COURT:  He just answered no.

10           MS. SHROFF:  I don't think he answered that particular

11  question, your Honor.

12           MR. HORTON:  I heard it.  The Court heard it.  I think

13  we should move on.

14           THE COURT:  Move on.

15           MS. SHROFF:  He did not answer that question, your

16  Honor.

17           MR. HORTON:  Your Honor, it's almost 4:00.

18           THE COURT:  Move on.

19  Q.  Do you know what shortening the Hong Kong dollar is?

20  A.  Yes.

21  Q.  And did you know of any investment in that respect?

22  A.  Are you referring to GTV?

23  Q.  Yes.

24  A.  GTV did not invest in shorten the Hong Kong dollar.

25  Q.  Who did?

O73BGUO5                      Dai - Direct

1    A.  But I heard Saraca --

2           THE COURT:  Don't talk about what you heard.

3           MR. HORTON:  We move to strike the testimony.

4           THE COURT:  The "but I heard part is stricken."

5    Q.  Mr. Dai, did you have an understanding as to who invested

6    in the shortening of the Hong Kong dollar?

7           MR. HORTON:  Objection, foundation.

8           THE COURT:  Sustained.

9    Q.  Did you have an understanding of who invested in the Hong

10   Kong dollar?

11          THE COURT:  Sustained.

12   Q.  Let me show you what is GXV1158.  Okay.  Could I go to the

13   next page, please.  Could I go back to the first page.  Thank

14   you.

15          Mr. Dai, do you recall watching a video where Mr. Guo

16   talks about investing in Kyle Bass' fund?

17   A.  Yes.

18   Q.  In that video does he talk about an investment in

19   shortening of the Hong Kong dollar?

20   A.  He mention it.

21   Q.  And he mentions also that the loss is Saraca's loss,

22   correct?

23   A.  Yes.

24   Q.  And it is Saraca who invested in the Hong Kong dollar

25   according to this video, correct?

O73BGUO5                    Dai - Direct

1   A.  Yes.

2   Q.  And it is Saraca that bore the loss, correct?

3              MR. HORTON:  Objection.

4              THE COURT:  Sustained.

5   Q.  In your mind at that time when you watched this video,

6   Mr. Dai, was that investment a high risk investment?

7              THE COURT:  Which investment?

8   Q.  The investment into shortening of the Hong Kong dollar?

9   A.  Shorten Hong Kong dollar is a high risk investment.

10  Q.  Did you have an understanding or have an understanding of

11  what funds Saraca used to make that investment?

12             THE COURT:  Sustained.  Sustained.  There's no amount

13  of commentary that permits you to get to a question that I have

14  already said you cannot ask.

15             MS. SHROFF:  Your Honor, he watched this video which

16  is the transcript --

17             THE COURT:  Yes.  I understand that, but you are

18  putting words into his mouth.

19  Q.  Did you watch this video, Mr. Dai?

20             MR. HORTON:  Asked and answered.

21             THE COURT:  Asked and answered.

22  Q.  And in this video there was discussion about Saraca

23  investment, right?

24             MR. HORTON:  Asked and answered.

25             THE COURT:  Sustained.

O73BGUO5                      Dai - Direct

1   Q.  From watching this video, did you have any understanding as

2   to whether Saraca made its investment?

3              THE COURT:  Sustained.  Sustained.  Move on.

4   Q.  Was it your understanding, Mr. Dai, that it was Saraca that

5   made the investment in shortening the Hong Kong dollar?

6              THE COURT:  All right.  You're going to step up now.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                          Dai - Direct

1          (At the sidebar)

2          THE COURT:  Ms. Shroff, your impertinence is crossing

3    the line and I have to warn you that you must stop this because

4    there are consequences for disregarding the Court's ruling.

5          MS. SHROFF:  Your Honor, this is an exhibit that the

6    government has put into evidence.  The exhibit itself speaks to

7    precisely this topic.  The government introduced not only the

8    video, but it also introduced the transcript of the video.

9    Mr. Dai's testified that he watched the video and was informed

10   by it.  So all I'm trying to do is to figure out what his

11   understanding was as a result of watching a piece of evidence

12   that the government introduced into evidence.  It was not at

13   our doing.  The government introduced it, and he testified that

14   he watched the video, so I'm not quite sure why -- I'm not

15   trying to disobey your ruling.  I'm trying to figure out why

16   his understanding is something that they would object to.  It's

17   not hearsay.  It's his state of mind, and it's his state of

18   mind at the time that he watched the video.  I'm not trying to

19   be impertinent.  I'm just trying to figure out what I'm doing

20   wrong because it seems like the understanding question seems

21   like a proper one.  It doesn't elicit any hearsay.

22          MR. HORTON:  Look, there's two issues.  The first is

23   that this witness is testifying about the materiality of

24   statements made in connection with an investment.  It happened

25   after he invested in GTV is one things, so we have a relevance

O73BGUO5                    Dai - Direct

1   objection to that.

2          THE COURT:  This is a statement that's made

3   afterwards?  That's a problem.

4          MS. SHROFF:  It's only a problem if we're asking for

5   anything other -- I'm not asking him if it impacted his

6   investment, right.  I'm not asking for that.  I'm asking you,

7   watched a TV show, right.  You saw the TV show and you had an

8   understanding of what happened.  They put in the video.  He saw

9   the video.  I'm asking his understanding.  That's it.  What is

10  objectionable about it other than the fact that it harms their

11  case?

12         MR. HORTON:  If she wants to do, you watched a TV show

13  and you saw what happened on that TV series of questions, we

14  won't object to that.  Did you believe Miles Guo said these

15  things, no objection.  She's asking him instead, first it comes

16  in just for the effect, and then it's, id you believe that it

17  was true.

18         MS. SHROFF:  I did not ask if he believed it was true

19  at all, sir.

20         MR. HORTON:  I'm starting with relevance, and clearly

21  he is being asked to be a mouthpiece for hearsay.  The notion

22  that there's nothing to it, the Court has sustained like four

23  objections in a row.  If there's nothing to it, we're now

24  delaying endlessly your Honor's ruling.  Your Honor's ruling

25  was limit questioning to each witness on investment experience.

O73BGUO5                        Dai - Direct

This is a question to a witness about a statement by Miles Guo

after the investment.

THE COURT:  To the extent that it comes after the

statement could -- that video could not have influenced the

investment decision.

MS. SHROFF:  And therefore it does not go to reliance,

and therefore they have no reason to object to it at all.  What

I'm trying to show is that he looked -- let me try it this way.

The government showed these same videos to its witnesses,

right, who they called "victim," and they asked them what was

the impact on them.  So why is it in good for the goose and not

the gander?  I'm not trying to disregard anything this Court is

saying.  And I ask Mr. Schirick to help me out.  I'm just

trying to get to the bottom of it.  If he can do it, why can't

I?

MR. HORTON:  First of all, reliance has no place in

this criminal trial. Look, at the risk of repeating myself,

he's being asked to endorse the truth of Mr. Guo's statements

in the defense case in a matter that's irrelevant. I believe

that's why the Court has ruled multiple times in a row, and

Ms. Shroff has quite really steamrolled your Honor's ruling.

We are here at sidebar because she asked the same question

multiple times after you sustained the same objection to the

same question.

MS. SHROFF:  And I've asked the same question multiple

O73BGUO5                    Dai - Direct

1    times because you've done the same questioning with your

2    witnesses.

3          THE COURT:  Right, but my ruling with respect to your

4    witness is that you should limit your questions to his

5    investing experience, not the post-investing experience.

6          MS. SHROFF:  If he watched any of Miles Guo videos

7    after the investment period closed, and it reinforced his

8    belief in the investment or all -- so the government is not

9    going to be able to show him six videos afterward and ask him,

10   right, hey, did this change your mind?  Did this tell you that

11   Miles Guo was lying?  Does this video tell you that it was

12   really a cult he was investing in?  They're not going to be

13   able to do that either, right?  Because they've done it with

14   every witness.

15         MR. HORTON:  Your Honor, the Court's ruling, I'll

16   permit the defense to ask its non-victim witnesses, and that's

17   in quotes, about what information they considered and what

18   weight they gave to various statements, and yes, doing all of

19   that in deciding to invest.  So, first of all, this is not in

20   deciding to invest.

21         Second of all, if Ms. Shroff wants to ask him, what

22   weight did you give to what Miles Guo said, this was the truth.

23   That's fine.

24         MS. SHROFF:  Ms. Shroff is trying to figure out why it

25   is that after the SEC return his money this man still wanted to

O73BGUO5                      Dai - Direct

1  invest. One of the reasons he didn't want the SEC to give him

2  his money back is because Mr. Guo did nothing wrong.  The

3  investment was Saraca, and it was Saraca's money to do with as

4  Saraca chose.  That is his understanding.  I know you don't

5  like the understanding, but Ms. Shroff is not trying to

6  steamroll anyone.  Ms. Shroff is just trying to defend her

7  client in exactly the same way that you're defending yours.

8        MR. FINKEL:  That's exactly what your Honor precluded

9  is that exact point, his view of whether he was defrauded or

10  whether GTV or Saraca used the money incorrectly.  His intent,

11  this witness's intent just like the other victims, their intent

12  was not relevant.  What matters is Miles Guo's intent, and

13  that's why we introduced this video because it speaks to Miles

14  Guo's intent.  Because when Miles Guo was making the statement,

15  we are going to argue that he knew they weren't truthful

16  because he knew that's he used investor money to invest in

17  payments.  That intent matters.

18        Reliance, which Ms. Shroff has used to justify the

19  relevance of this witness has no place in a criminal fraud

20  trial, which this is.  This witness's testimony, as your Honor

21  already held, is relevant insofar as it speaks to materiality,

22  which is to say the information he considered and the weight he

23  gave that information when deciding to invest.  That's a quote

24  I believe directly from your Honor.  This is post-investment.

25  They're trying to vouch for the truth of what their client

O73BGUO5                        Dai - Direct

1    said.  That's improper.  Your Honor already ruled that this

2    shouldn't happen.

3            MR. SCHIRICK:  Right before this series of questions,

4    your Honor, Ms. Shroff spent several questions trying to ask

5    precisely, precisely what Mr. Finkel just described which was

6    what his understanding was at the time he was making the

7    investment, what his understanding was about who the money was

8    going to, Saraca or GTV, and for what purpose and who had

9    control of the money, and what use could be made of that money.

10   And they objected to the point where we couldn't explore that

11   issue at all.  And to hear Mr. Finkel describe that and read

12   from your Honor's ruling, I think just reinforces that line of

13   questioning going back to the May period of time which we tried

14   to explore before.  It is entirely proper and it's frankly the

15   key issue in this case.

16           MR. FINKEL:  Your Honor, they did get that in.

17           MS. SHROFF:  We didn't.

18           MR. FINKEL:  Excuse me, Ms. Shroff.

19           THE COURT:  One minute.  Mr. Finkel.

20           MR. FINKEL:  Thank you, your Honor.  They did get that

21   in.  Did you read this document?  He said yes.  Did you read it

22   in Mandarin or in English?  Did you read the PPM?  I read it in

23   Mandarin and English.  Did you think it was risky?  What

24   research did you do?  We didn't object to that because that

25   went to materiality.  That was your Honor's ruling.

O73BGUO5                    Dai - Direct

1          THE COURT:  I'm not going to permit this

2    post-investment line of questioning.

3          MS. SHROFF:  Your Honor, we didn't get to -- if the

4    Court wants to, it can, but every question we ask about his

5    understanding of whether or not Saraca sold his shares

6    pre-investment, Saraca invested, if Saraca got its money back,

7    the government objected to every one of those questions.

8          THE COURT:  He has no basis to --

9          MS. SHROFF:  I wasn't allowed to explore his basis

10   because they objected.  I tried to ask if he had any basis to

11   know that from Discord, from his own resource, from anything

12   that he investigated about Saraca.  They objected to every

13   single question about that.  And as Mr. Schirick says, this is

14   a point that we think it's proper for multiple reasons.  And I

15   can understand why the government doesn't want this evidence

16   in.  It's clear, but that does not make it irrelevant.  And

17   actually I said that it could not be reliance because this

18   testimony is post-investment, so obviously it's not about

19   reliance.  So I don't know why Mr. Finkel is talking about

20   reliance at all.  The question that he objected to went to

21   reliance, went to what scope of knowledge and information this

22   witness --

23         MR. SCHIRICK:  Not reliance, but what information he

24   had access to and what his understanding was at the time, and

25   he couldn't get it into it.

O73BGUO5                          Dai - Direct

1            MR. FINKEL:  Your Honor ruled I think three times now.

2    We're happy to be heard more if you'd like.

3            THE COURT:  I don't want to hear more from any of you.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O73BGUO5                    Dai - Direct

1             (In open court)

2             THE WITNESS:  Your Honor, please give me a chance

3    to -- earlier there was a question.

4             THE COURT:  Sir, at this time there is no question

5    before you, and you can only answer questions that I permit you

6    to answer.  Go ahead.

7    BY MS. SHROFF:

8    Q.  That's how it works in the United States so we have to

9    listen to the judge and move forward, okay.  Mr. Dai.

10            Let me ask you something, were you a member of

11   G/Clubs?

12   A.  Yes.

13   Q.  And could you tell the jury, please, what is G/Clubs?

14   A.  G/Club is club, provide high-end life experience and

15   events, let people join events together, offered opportunities

16   for fellow fighter in the whistleblower movement join.  G/Club

17   is symbol of identity.  We are very happy to join the club to

18   join with people share common faith.

19   Q.  Mr. Dai, what did you mean when you said symbol of

20   identity, could you tell us?

21   A.  It's a membership eligibility.  It can provide various

22   benefits.

23            MS. SHROFF:  I can't tell if he's still speaking, your

24   Honor.  It's too far.

25            MR. HORTON:  Is there a question pending?

O73BGUO5                          Dai - Direct

1           THE COURT:  Ms. Shroff.

2           MS. SHROFF:  I couldn't tell if he had finished.

3    That's why I asked the Court.

4    Q.  Mr. Dai, did G/Club give you a place to meet people who

5    were of symbol culture?

6    A.  A place to meet.

7    Q.  Did G/Club give people -- let me rephrase that.

8           Were the membership in G/Clubs reflected a similar

9    mission and similar interest?

10   A.  G/Club in fact is open to all and they can buy the

11   membership and enjoy the different benefits.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. SHROFF:

2  Q.  Mr. Dai, how did you learn about G|CLUBS?

3  A.  Initially from Mr. Guo's livestream.

4  Q.  And by livestream, can you tell me what you mean by

5  livestream.

6  A.  Mr. Guo mentioned in his live broadcast that there is such

7  a club called the G Club, and people can join.

8  Q.  And were you interested in following up and learning more

9  about G Club membership?

10 A.  Yes, I was interested, and I came to know more.

11 Q.  And did you buy a membership in G Club?

12 A.  Yes.

13 Q.  And what level of membership did you decide to buy?

14 A.  Tier 5.

15 Q.  And how much did you pay for a tier 5 membership?

16 A.  50,000 U.S. dollars.

17 Q.  And when you filled out the application form to get

18 membership in G Club, did you do it online?

19 A.  Yes.

20 Q.  And on what web browser did you fill out the application?

21 A.  Should be Chrome.

22 Q.  And maybe my question was inartful.  I'm sorry.

23      Did you go on the G|CLUBS website to fill out the

24 application?

25 A.  Yes, on G Club.

O731GUO6                          Dai - Direct

 1    Q.  And did the application form have a series of questions?

 2    A.  Yes.

 3    Q.  And did you fill out each answer online?

 4            MR. HORTON:  Asked and answered.

 5    A.  Yes.

 6    Q.  And after you answered each one of the questions, did you

 7    have to agree to the terms of the membership?

 8    A.  You need to.

 9    Q.  I'm sorry I interrupted you.  What did you say?

10            THE COURT:  He said, "You need to."

11    Q.  Okay.  And you in fact did that, right; you put in the

12    checkmark?

13            MR. HORTON:  Objection.  Asked and answered.

14    Q.  Did you put in the checkmark?

15            THE COURT:  So don't repeat the questions, please.

16    A.  Yes.

17    Q.  And did you get a confirmation that you were now being

18    considered for membership in G|CLUBS?

19    A.  Yes.

20    Q.  And you were told, were you not, on that application

21    website that if you wanted to cancel, you had 14 days to cancel

22    your application for membership, correct?

23    A.  Yes.

24    Q.  And did there come a time when you got confirmation,

25    electronic confirmation that your membership in G|CLUBS was

O731GUO6                        Dai - Direct

1   good and ready for use?

2   A.  Yes, I received a confirmation email.

3   Q.  And at that time you did not get any confirmation that you

4   were going to get GTV shares because you got membership in

5   G|CLUBS, correct?

6           MR. HORTON:  Objection.  Argumentative.

7           THE COURT:  Overruled.

8   A.  G Club and GTV seems to be not related at all.

9   Q.  Thank you.

10          Now could you tell the jury what benefits you got for

11  being a member of G Club.

12  A.  G Club can provide some G Fashions purchase discount.  For

13  example, on my tier, I have a 50 percent discount.

14  Q.  Let's just stay with G Fashion for one minute, okay?

15  Sitting here today, Mr. Dai, do you remember when you became a

16  member of G Club?

17  A.  I suppose it is end of October 2020.

18  Q.  And since October of 2020, have you shopped G Fashion?

19  A.  Yes, I have.

20  Q.  And do you shop G Fashion just for yourself or also for

21  your wife?

22  A.  For me and my wife and my family.

23  Q.  And how many other members are there in your family?

24  A.  Two kids.

25  Q.  And did G|CLUBS also have benefits for its members on hotel

O731GUO6                         Dai - Direct

1   discounts?

2   A.  Yes.

3   Q.  And did G|CLUBS also have benefits for Formula One games at

4   the Grand Prix in Monaco?

5   A.  Yes.

6   Q.  Did G|CLUBS have travel discounts?

7   A.  Yes.

8   Q.  And did G|CLUBS have sweepstakes each year?

9   A.  Yes.

10  Q.  And did G|CLUBS have a newsletter, Mr. Dai?

11  A.  Yes, yes, through email, newsletter through email.

12  Q.  And did you get those newsletters?

13  A.  Yes.

14  Q.  Did you read them?

15  A.  Yes, I have.

16  Q.  And are you a member of G|CLUBS now?

17  A.  Yes.

18  Q.  And have you ever had any problems with your G Club

19  membership?

20  A.  No.

21  Q.  And do you pay annual dues on your G Club membership today,

22  in 2024?

23  A.  Yes.

24  Q.  And how do you pay your annual fee, using what?

25  A.  I use the Himalaya Exchange, HDO, H Dollar.

O731GUO6                        Dai - Direct

1  Q.  Okay.  So that's a good segue.  Let's talk about the

2  Himalaya Exchange now, okay?

3          Mr. Dai, could you tell the ladies and gentlemen of

4  the jury, how did you first become aware of the Himalaya

5  Exchange?

6  A.  Sometime, first time I learned about Himalaya Exchange was

7  supposed to be the end of 2020 or the beginning of 2021.  And

8  I—I also heard that from livestream from Mr. Guo.

9  Q.  This livestream, on what platform was the livestream?

10 A.  GTV.

11 Q.  You know what?  Actually, I apologize.

12         How much money did you spend on G Fashion?  I forgot

13 to ask you.  My bad.

14 A.  My estimate is about 20,000 U.S. dollars.

15 Q.  Okay.  And what clothing did you—did you buy clothing or

16 something else?

17 A.  I have bought different things.  Clothes, jewelry.

18 Q.  And have you been satisfied with the quality of the

19 clothing?

20 A.  Yes, satisfied.

21 Q.  And are you satisfied or happy with the jewelry you bought?

22 A.  Satisfied and I like them.

23 Q.  And did you keep them or did you return them?

24 A.  I have kept them.

25 Q.  Okay.  Now sorry about having to go back, but I was asking

O731GUO6                          Dai - Direct

1    you about the Himalaya Exchange, right?

2                Where did you first hear about it, on what platform?

3                MR. HORTON:  Asked and answered.

4                MS. SHROFF:  Actually, I didn't have an answer.  I

5    went back to G Fashion, so——

6                THE COURT:  You may answer.

7    A.  Supposed to be through GTV, Mr. Guo's livestream.  That's

8    the first time I heard about Himalaya Exchange.

9    Q.  Mr. Dai, would it be fair to say that you listened to lots

10   of Mr. Guo's livestreams?

11   A.  Yes.

12   Q.  Sitting here today, would you be able to say you listened

13   to all of them?

14   A.  I'm not totally certain.

15   Q.  And eventually you came to understand that the Himalaya

16   Exchange was a cryptocurrency platform, correct?

17   A.  Correct.

18   Q.  And you knew from Miles Guo's broadcasts or from some other

19   means that the system of Himalaya Exchange was going to be

20   built in multiple stages, correct?

21               MR. HORTON:  Objection to form, your Honor.  Compound

22   question.

23               MS. SHROFF:  I'm happy not to lead.

24               MR. HORTON:  That's not the objection.  Compound

25   question, calls for hearsay.

O731GUO6                          Dai - Direct

1          THE COURT:  Lead, but in not compound sentences.

2   BY MS. SHROFF:

3   Q.  You wanted to know how the Himalaya Exchange would

4   function, correct?

5   A.  Yes.

6   Q.  And you had an understanding that the system was going to

7   be built in multiple stages, correct?

8   A.  Yes.

9   Q.  And that HCN and HDO could be traded on the Himalaya

10  Exchange, correct?

11  A.  Yes.

12  Q.  You were attracted to the exchange because it had good

13  security, correct?

14  A.  Correct.

15  Q.  And you understood that the exchange was developing an

16  internal blockchain that would ultimately connect to the

17  Ethereum blockchain, correct?

18  A.  Correct.

19  Q.  And you understood that while it was similar to Bitcoin,

20  there was an added layer of security on the Himalaya Exchange,

21  correct?

22          MR. HORTON:  Objection to the testimony.

23  A.  Yes.

24  Q.  And how did you know that, Mr. Dai?

25          THE COURT:  Overruled.

O731GUO6                           Dai - Direct

1   A.  This detailed information, I was looking at the white paper

2   issued by the Himalaya Exchange.

3   Q.  Could you tell us——

4   A.  And then——

5   Q.  Go ahead.  Sorry.  I didn't know he wasn't done.

6   A.  Then also, when I'm using that in the Himalaya Exchange, I

7   confirmed those functions.

8   Q.  Okay.  Let's talk about the white papers.  Where did you

9   find the white papers on the Himalaya Exchange?

10  A.  On the Himalaya Exchange website, they have the

11  corresponding HCN or HDO page and where you can download all

12  the white papers.

13  Q.  Did you download all of them?

14  A.  Yes, I did.

15  Q.  How many were there——do you recall——that you downloaded?

16  A.  For HDO and HCN, Chinese and English, so total at least

17  four different documents.

18  Q.  I'm sorry.  Just to be clear, were they four documents in

19  English and four documents in the Chinese language?

20  A.  What I meant to say was HDO white paper has English and

21  Chinese and HCN also has English and Chinese white paper.

22  Q.  Did you read in both languages or just one?

23  A.  I read both language, in both languages.

24  Q.  Could you tell the jury how logging into that, into the

25  Himalaya Exchange system compares to your experience

O731GUO6                          Dai - Direct

1   registering for a bank account in Europe or in Germany.

2   A.   The Himalaya Exchange, when I registered, compared to

3   register of bank account in Europe, it's a little more

4   complicated because the security confirmation to, like the

5   MT——money laundering and others, it's a lot of the terms and

6   lot of the documents; and also, for ID verification, it's more

7   strict comparatively.  In Europe, when I open a bank account,

8   it's easier after identify ID.

9   Q.   Mr. Dai, did you also register your company for an account

10  on the Himalaya Exchange?

11  A.   Yes.

12  Q.   And in doing that, did you have to submit original

13  documents with notaries and stamps to the engineering

14  department before you could register your company?

15  A.   Correct.

16  Q.   Did there come a time when you started to use the Himalaya

17  Exchange?

18  A.   Yes, I'd be using it.

19  Q.   Since when?

20  A.   Since after the registration.  That would be April 2021.

21  Q.   And what is it about the exchange that you liked?

22  A.   Because it enables me to invest in cryptocurrency, and also

23  the HDO, it sort of relate to the U.S. dollars, and I can

24  invest because the HDO has the fluctuation in price.

25              And also through HDO to purchase, and so the whole

O731GUO6                         Dai - Direct

1   transfer and operations were very quick and convenient.
2                MS. SHROFF:  Your Honor, may I just have one moment,
3   please.
4                THE COURT:  Okay.
5   Q.  Mr. Dai, could you tell the jury why you registered two
6   accounts, a personal account and a company account, on the
7   Himalaya Exchange.
8   A.  For the business account, because I think that in the
9   future, the company, when they're making sales, I can use the
10  Himalaya Exchange to collect the payment.
11  Q.  And what does it mean to say that you could top off your
12  account on the exchange through your bank account?
13  A.  I don't understand your question.
14  Q.  Okay.  Could you transfer U.S. dollars to your exchange
15  account to purchase HDO?
16  A.  Yes, I can.
17  Q.  And once you have the HDO, you could convert the HDO into
18  HCN, correct?
19  A.  Yes.
20  Q.  And how much money did you invest into the cryptocurrencies
21  on the Himalaya Exchange?
22  A.  All together, over 300,000 U.S. dollars.
23  Q.  And is it fair to say that because you were a GTV investor,
24  you had an opportunity to make a priority purchase of the coins
25  for 10 cents per coin?

1    A.  Correct.

2    Q.  And you purchased 200,000 HCN and that cost you $20,000,

3    correct?

4    A.  For 200,000 HCN, it would be 200——it will be $20,000.

5    Q.  $20,000.  My bad.  My math is off.  $20,000, right?  And

6    you did that, right?

7    A.  Yes.

8    Q.  Did you also purchase on the secondary market?

9    A.  Yes.

10   Q.  How much of your purchase was on the secondary market

11   compared to the initial purchase, or the priority purchase?

12   A.  300,000 U.S. dollars, roughly.

13   Q.  And at what price point on the secondary market did you

14   purchase HCN?

15   A.  Roughly from $6 to up to $40 U.S., anywhere in between.

16   Q.  And how did you decide what purchase points at which to

17   purchase HCN?

18   A.  Because HCN price have been increasing and so I thought

19   there are a lot of potential to grow, so I continue to purchase

20   on the secondary market.

21   Q.  Mr. Dai, have you been satisfied with your investments in

22   the cryptocurrency on the Himalaya Exchange?

23   A.  Yes, I'm satisfied.

24   Q.  And is that because HCN continues to grow?

25   A.  Correct.

1   Q.  And as an investor, you wanted to capture the growth

2   momentum, correct?

3   A.  Correct.

4   Q.  And did there come a time when you tried to take money out

5   of the Himalaya Exchange?

6   A.  I have.

7   Q.  And can you tell the jury about your experience with that

8   process, please.

9   A.  To HCN change to the HDO and then HDO to U.S. dollars, one

10  to one, so then I can take the U.S. dollars out into my own

11  bank account to receive U.S. dollars.

12  Q.  And how many times have you redeemed HCN?

13  A.  About five times all together.

14  Q.  And by the way, before you started redeeming it, did you do

15  a test run to see if it worked?

16  A.  Yes, the first time I tried it, it was for testing.

17  Q.  And was that a successful test run?

18  A.  Yes.

19  Q.  Did you have any trouble with the exchange?

20          MR. HORTON:  Objection, your Honor.  Asked and

21  answered.

22          THE COURT:  Sustained.

23  Q.  Mr. Dai, have you heard the phrase that HCN is backed by

24  gold?

25  A.  HCN does not have any backup with gold; not mentioned in

1   the white paper.

2   Q.  Have you heard the phrase "HCN to the moon"?

3   A.  Yes, I have.

4   Q.  Do you think that has anything to do with HCN or the value

5   of HCN?

6   A.  That's not a direct influence, because I think it's—for

7   the HCN customers, it's their mission, but for the HCN

8   development trend, seems like it's growing.

9          MS. SHROFF:  Your Honor, just one moment.

10  Q.  Let me show you what is marked as Defense Exhibit 60740.

11         MS. SHROFF:  And if I could not have the jury see it

12  right now, please.

13         And if you could just flip through that.

14  Q.  Do you recognize this document?

15  A.  Yes, I can.

16  Q.  And what is it, sir?

17  A.  This is a H Pay software, a screenshot.

18  Q.  And whose account is it a screenshot of?

19  A.  It's my account's screenshot.

20         MS. SHROFF:  Your Honor, we move the document into

21  evidence at this time.

22         MR. HORTON:  No objection.

23         THE COURT:  It is admitted.

24         (Defendant's Exhibit 60740 received in evidence)

25         MS. SHROFF:  So let's show the first screen to the

O731GUO6                          Dai - Direct

 1  jury.

 2  BY MS. SHROFF:

 3  Q.  Mr. Dai, we're having some technical issues, so while

 4  they're trying to fix that, let me ask you something.  Do you

 5  know when these photographs were taken?

 6  A.  Last night.

 7  Q.  I'm sorry?

 8  A.  Last night.

 9  Q.  Do you know around what time?

10  A.  About 7 to 8 or 9 to 10 p.m.

11  Q.  Okay.  And who took these screenshots?

12  A.  Myself.  Myself.

13  Q.  And did you use your cellphone to take screenshots of your

14  own cellphone?

15  A.  Yes.

16  Q.  And do these photos reflect the process by which you would

17  sign on to Himalaya Exchange?

18  A.  I don't understand your question.

19  Q.  Okay.  I'll try it a different way.  Do you have a Himalaya

20  Exchange app on your iPhone?

21  A.  This is a Himalaya Pay APP.

22          MS. SHROFF:  Okay.  Your Honor, we're having some

23  technical difficulties.  May I just have a second?

24          THE COURT:  Yes.

25          MS. SHROFF:  Thank you.

O731GUO6                          Dai - Direct

1   Q.  Okay.  Here we go.  Does that work for you?  Can you see

2   it?

3   A.  Yes, I can.

4   Q.  Okay.  And hopefully the jury can see it?

5        Okay.  Let's look at the first page.  Could you tell

6   me what that is.

7        MS. SHROFF:  Actually, could we go to the next?

8   A.  Himalaya Pay APP's top page, or the front page.

9   Q.  Okay.  And can we——

10  A.  Before I get on the web.

11  Q.  Okay.  And you see that little sign down there that says

12  Login, correct?

13  A.  Yes.

14  Q.  And is the first step where you log in?

15  A.  Correct.

16  Q.  Okay.  Let's look at the next screen, shall we.

17       And this screen tells you this is where you put in

18  your password, correct, and your email, right?  Email,

19  password, correct?

20  A.  Correct.

21  Q.  And these two boxes tell you that you have to agree to the

22  terms and conditions of the exchange before you can sign on,

23  right?  Sign on to H Pay, right?

24  A.  Correct.

25  Q.  Okay.  And then the next screen would show you putting in

1   your gmail information, right?  Your personal information is

2   not there, but your password is shown, correct?

3   A.  Yes.

4   Q.  And you have to tick you're not a robot and then you hit

5   login, correct?

6   A.  Correct.

7   Q.  Okay.  So let's look at the next screen where you've marked

8   "I'm not a robot," correct?  And then we go to the next screen

9   after that.

10          And tell us what this screen shows.  Could you tell

11  the jury what this screen shows.

12  A.  So this one shows it's secondary verification and there is

13  a one-time security code is sent to my cellphone.

14  Q.  Okay.  So once you get that security code, where do you put

15  it in, on the next screen?

16  A.  So in the center here, there is the one to fill in the

17  code.

18  Q.  Okay.  And this is——I'll move on.  Let's look at the next

19  page, okay?

20          And where it says Resend, right, you see a number?  It

21  says 38S, right?  But below that, before I get there——I'm

22  sorry.  Actually, let me go to the box on the left.

23          And it says to enter a six-digit code, correct?

24  A.  Yes.

25  Q.  And the six-digit code, is it sent to your cellphone

1   number?

2   A.  Correct.

3   Q.  Okay.  And what does it mean where it says 38S?

4   A.  That means that's the first time it's sent, and you have to

5   wait for 60 seconds before it's sent a second time, so this is

6   counting back to 38 seconds.

7   Q.  Okay.  Let's look at the next screen, right?

8           And it now shows 32 seconds, correct?

9   A.  Correct.

10  Q.  On the Resend.

11          And then on the next slide of Himalaya Pay, what does

12  this show you?

13  A.  This is where is my face ID is verifying.

14  Q.  Okay.  And is that why it's buffering at the bottom over

15  there?

16  A.  Correct.

17  Q.  Okay.  Let's go the next page.

18          And this is all on your cellphone, right?

19  A.  Yes.

20  Q.  Okay.  Could you tell us what this page shows.

21  A.  This page shows a Himalaya Pay, after I load it at the top

22  page, it shows in Himalaya Pay, HCN and HDO's balance.

23  Q.  And what is your HCN balance?

24  A.  54,112.

25  Q.  And what does it mean on the left side where it says, "1

O731GUO6                          Dai - Direct

1    HCN = 19.959 USD"?

2    A.   This means the Himalaya Exchange, the realtime HCN price is

3    1 HCN = $19.95 USD.

4    Q.   Okay.  And then the corresponding on the right, it's how

5    much you have, right, in your H Pay account?

6    A.   Correct.

7    Q.   Okay.  And what about the line below that says HDO?

8    A.   So the HDO underneath here is the H Dollar balance.

9    Q.   Okay.  And what's your H Dollar balance?

10   A.   Is 8.98.

11   Q.   Let's look at the next page.

12         And what is it that you're trying to do here, on this

13   screen?

14   A.   This is that enable me to transfer the Himalaya Pay's

15   balance to the Himalaya Exchange.

16   Q.   Okay.  So how does it work?  What does the word "token"

17   mean?

18   A.   This token meant HDO or HCN.  So it's corresponding to

19   whatever the cryptocurrency type, so I can choose HDO or HCN.

20   Q.   Okay.  And on this particular screen what did you choose?

21   A.   HDO.

22   Q.   Okay.  Let's look at the next screen.

23         And what does that show you?  Could you tell the jury.

24   A.   This is to enable me to invite others for a payment.

25   Q.   Okay.  Let's look at the next page.

1          What part of the app is this?

2   A.  This is the account setting page.

3   Q.  And let's go to the next screen.

4          And tell us what this shows.

5   A.  This one shows that all the transaction record through

6   Himalaya Pay.

7   Q.  Okay.  So let's flip to the next page.

8          And you see that where it says gift card redemption?

9   A.  Yes.

10  Q.  And who is that from?

11  A.  This one is what I use to purchase G Fashion clothes.

12  Q.  Okay.  And what is the incoming transfer under column

13  below——or the row below?  Sorry.

14  A.  This is to change the Himalaya balance into the H Pay

15  wallet.

16  Q.  Okay.  And we could keep going to the next page.

17          And what does this show?

18  A.  This one is I——through the HDO on G Fashion, when I made a

19  purchase, that's the detail.

20  Q.  And let's go to the next page.

21          And what does this show?

22  A.  This is what I transfer HCN to——

23          MS. SHROFF:  Your Honor, may we ask the interpreter to

24  speak up because it's very hard to hear.

25          THE COURT:  All righty.  If the interpreter would

1  please speak up.

2           THE INTERPRETER:  We're switching, your Honor.  Thank

3  you.

4  A.  It's like a red envelope.

5           THE COURT:  Is there a question?

6           MS. SHROFF:  Oh, I thought she said it was a red

7  envelope.  Is that what she said?

8           THE INTERPRETER:  Actually, if we can make an

9  application, we would like to reinterpret the previous

10  question.  Thank you.

11           THE COURT:  Okay.  Go ahead.

12           THE INTERPRETER:  I need a moment.

13           I'm ready.  Could you repeat the answer.

14           Actually, the question, please, the question.

15           THE COURT:  The question.

16           MS. SHROFF:  Okay.  I'm——

17           THE COURT:  All right.  Would you read back the

18  question.

19           (Record read)

20  A.  This page shows that a transfer record from me to a friend.

21  Q.  And before I heard you say this is a red envelope.  What

22  does that mean?

23  A.  Yes, you can see under what I wrote in Chinese, the money

24  got a rise on the fifth day of new year.  This is a red

25  envelope.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  What does red envelope mean to you?

2   A.  This is the cultural tradition between Chinese people

3   during the Lunar New Year that they will send red envelope to

4   each other to show their best wishes.

5   Q.  Okay.  Let's go to the next page.

6           And this shows that a transaction is complete; it

7   tells you the transaction status, correct?

8   A.  Correct.

9   Q.  It shows you the time of the transaction being complete,

10  right?

11  A.  Correct.

12  Q.  And then it shows you the transaction number, correct?

13  A.  Correct.

14  Q.  And it shows you the receiver's account, so the person who

15  is getting the money, correct?

16  A.  Correct.

17  Q.  And then it gives you the receiver's name, correct?

18  A.  Yes.

19  Q.  And what does it mean on that note that says "You are the

20  one"?

21  A.  This is from me to my wife, in fact.

22  Q.  Okay.  Fair enough.

23  A.  This is my first transaction on Himalaya Pay.

24  Q.  All right.  So let's go to the next page.

25          And this is where you send money to someone and you're

O731GUO6                          Dai - Direct

1   saying "Best wish to your family," correct?

2   A.  Correct.

3   Q.  Okay.  And let's look at the last sheet here.

4          And you said you took this screenshot yesterday in the

5   evening, correct?

6   A.  Yes.

7   Q.  And when you took this screenshot on your cellphone, is

8   this the warning that showed up?

9   A.  Correct.

10  Q.  And you get that warning from H Pay, correct?

11  A.  Yes.

12  Q.  All right.  Mr. Dai, how long have you been using the H Pay

13  app that we just reviewed here?

14  A.  Since the early 2022, where you saw the first transaction.

15  Q.  Okay.  So that would be February 2nd of 2022?

16  A.  Yes.

17  Q.  Okay.  Now let's see if we can show you the video, please.

18         Mr. Dai, while they're trying to put this up, did you

19  make two videos yesterday?

20  A.  Yes.

21  Q.  And what are they videos of?

22  A.  I used Himalaya Pay, logging in and show the functions

23  within.  Another one is that I used Himalaya Exchange on the

24  computer, I log on and show the functions within.

25  Q.  And how did you make the video?

1    A.   I used the iPhone and the computer.  Both have recording

2    functions.

3            MS. SHROFF:  Your Honor, we move both videos into

4    evidence at this time.

5            MR. HORTON:  Your Honor, just given the time, to the

6    extent they're not cumulative of the screenshots we've just

7    seen, we wouldn't object, but if it's just a video of the

8    screenshots, we would.

9            THE COURT:  Is it cumulative?

10           MR. HORTON:  Also, we haven't seen the exhibit that's

11   being offered, so we'd have to see it first.

12           MS. SHROFF:  It was sent to you yesterday.

13           MR. HORTON:  Well, what I mean——

14           MS. SHROFF:  It's not cumulative, your Honor, as——oh,

15   sorry, go ahead.

16           MR. HORTON:  We haven't been shown the exhibit that's

17   being offered, so as is typical practice throughout this trial,

18   we'd ask that the party show the proposed exhibit to us before

19   offering it.  It sounds like it would be cumulative, but we

20   haven't seen it.

21           THE COURT:  All right.  So you first need to show it

22   to the prosecution.

23           MS. SHROFF:  We sent it to them.

24           MR. HORTON:  The objection is not that it wasn't

25   produced; it's that it hasn't been shown to the parties before

1    being offered, as every other exhibit was throughout trial.

2                THE INTERPRETER:  Counselor, we're having trouble

3    hearing you.  If you could speak into the mic, please.

4                MS. SHROFF:  Should I show it to the Court and the

5    government, your Honor?

6                THE COURT:  Go ahead.

7                MS. SHROFF:  Can you see it?

8                MR. HORTON:  Your Honor, this appears to be the video

9    of the screenshots we've already seen.  We object as

10   cumulative.

11               MS. SHROFF:  Just one moment.

12               MR. HORTON:  Same objection, your Honor.

13               THE COURT:  Is there something new in the video that

14   we have not already seen?

15               MS. SHROFF:  So can we play this so that the

16   government can decide if this too, in their mind, is

17   cumulative.

18               Your Honor, I just want to put for the record,

19   DX 60741 is a video of the HEX website; 60742 is the video of

20   the use of H Pay; and 60743 is a video of somebody actually

21   making a HDO transfer on the exchange.  So those are not

22   cumulative of each other.  And I'm happy to discuss further at

23   the sidebar if the Court wishes.

24               MR. HORTON:  If I could have just one second, your

25   Honor, please.

```
 1              No objection, your Honor.  I assume we're not going to
 2    cover ground that's already been covered.
 3              THE COURT:  So Mr. Horton, we're just not able to hear
 4    you because you're so far from the mic.  I want the reporter to
 5    get everything that you say.
 6              MR. HORTON:  I apologize.  No objection.  I assume
 7    we're not going to cover ground that was previously covered.
 8              THE COURT:  Okay.  So they are admitted.
 9              (Defendant's Exhibits 60741, 60742, 60743 received in
10    evidence)
11              THE COURT:  Are you going to play them now?
12              MS. SHROFF:  If that's possible, your Honor.  Or we
13    can do them Monday.
14              THE COURT:  No, no, no.  Let's get going.
15              MS. SHROFF:  All right.  Well, let's play them for the
16    jury.  Let's play the last one first, shall we.
17    BY MS. SHROFF:
18    Q.  Okay.  Mr. Dai, tell us what this is.
19    A.  This is my account from Himalaya Pay and transfer HDO into
20    Himalaya Exchange.  Here I transfer 7 HDO.
21              MR. HORTON:  Your Honor, we object.  We were shown a
22    lengthy video.  This was not part of it.  None of the lawyers——
23              THE COURT:  So I did not see this either.  So you need
24    to first play it for the attorneys and then——
25              MS. SHROFF:  Okay.  Sorry.  We can show it to them
```

O731GUO6                          Dai - Direct

1    separately.

2                THE COURT:  Is that it?

3                MS. SHROFF:  Yes.

4                MR. HORTON:  If we could have a brief sidebar on this

5    document, your Honor.

6                THE COURT:  All right.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. FINKEL:  Your Honor, this video we just saw for

3     the first time has a calendar on it indicating that it was made

4     yesterday.  The government doesn't object provided that——and

5     I'm sure this is not something that the defense will do, but

6     just to be sure——they're not going to make any argument that

7     because the Himalaya Exchange is working today——happens to be

8     based out of Abu Dhabi right now, run by William Je——that that

9     makes it somehow okay or legal; in other words, they'd be

10    arguing that because we didn't stop the exchange, not going to

11    the government's investigative techniques and choices, that it

12    would make it okay.  Assuming they're not going to argue

13    anything along those lines, which I hope is the case, then we

14    don't have an objection.

15         MR. KAMARAJU:  I just didn't hear the last thing you

16    said about investigative techniques.

17         MR. FINKEL:  So as you know, the government's

18    investigative techniques and choices are not on trial.  So

19    whether the government has chosen to, for example, take down

20    the Himalaya Exchange or whether it exists in Abu Dhabi and run

21    by William Je at the moment, those are questions that aren't

22    for the jury to consider.  So provided those arguments aren't

23    made, the government has no objection.  It's a nuanced point.

24         MR. KAMARAJU:  We're not going to argue that the

25    government elected to let the Himalaya Exchange keep going and

 1    so that's some evidence of——

 2                THE COURT:  Legitimacy?

 3                MR. KAMARAJU:  ——legitimacy or whatever.

 4                THE COURT:  I don't understand why any of this is

 5    relevant, what is happening today.  I don't understand why you

 6    have an objection to all of this conduct that has nothing to do

 7    with the allegations in the indictment.

 8                MR. SCHIRICK:  Well, your Honor, he testified that he

 9    started using H Pay app in February of 2022.

10                MS. SHROFF:  But that's part of——

11                THE COURT:  Right, right.  So if that's the case, show

12    him the video from February of 2022, not from today.

13                MR. SCHIRICK:  The transaction history and the

14    screenshots we just showed, and the live use of the app that

15    reflect those transactions is 2024.

16                MS. MURRAY:  On this particular video, your Honor, we

17    completely agree the primary basis is a relevance objection,

18    particularly if what they're showing in the new video is a

19    transaction that took place yesterday.  That has nothing to do

20    with this witness.  If it were relevant, which it is not, it

21    would be cumulative of the exhaustive walk-through we did of

22    the sign-in process for the H Pay app.

23                MS. SHROFF:  Which is exactly how the Southern

24    District prosecutors do it, and I'm going from one who is now

25    an ex-prosecutor, and therefore, it is being done exactly in

1    the Southern District way, which is what Leonard Joy for years

2    taught us, that the best way to beat the government is to act

3    like the government.  So that is why.

4           But number two, the fact that if a video was made

5    yesterday or in 2022, all he's doing is having a demonstrative

6    to show how easy it is to walk through it, and he's entitled to

7    show that because it's exactly the same process.  And if you

8    think it's not the same process, you can cross him.

9           THE COURT:  So to the extent that the current video

10   reflects 2022, then it is relevant.  But I don't understand why

11   the other stuff that happened last night is relevant.  But

12   let's show the videos and get it over with.

13          MS. SHROFF:  Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MS. SHROFF:  All right.  Just so that we can show this

3     to the jury, could we just play it.

4           Mr. Dai, I'm not going to ask you any questions and

5     just let it play, okay?

6           If that's all right with the Court, your Honor?

7           THE COURT:  Yes.  Go right ahead.

8           MS. SHROFF:  Okay.

9           (Media played)

10          MS. SHROFF:  Thank you.  You can take that down.

11          MR. HORTON:  Is there a question pending?

12          MS. SHROFF:  Yes.  We're pulling up the last video.

13          (Media played)

14          MS. SHROFF:  And if we can just pause here.

15    BY MS. SHROFF:

16    Q.  And can you just tell us, what does this screen show?

17    A.  Here shows the date range two months, the trend of HCN in

18    recent two months.

19          MS. SHROFF:  And if we can fast forward it along a

20    little bit, please.

21          (Media played)

22          MS. SHROFF:  Now if I could just have you pause just

23    there.

24    Q.  On the Himalaya Exchange website, you can see all of your

25    transactions from the very beginning, correct?

O731GUO6                        Dai - Direct

1    A.  Yes.

2              MS. SHROFF:  Okay.  Let's just keep moving.

3              (Media played)

4              MS. SHROFF:  And if you can pause there on the trade.

5    Q.  It would show you all your open orders all the way back to

6    when you first opened your account, correct?

7              MR. HORTON:  Objection.  Asked and answered.

8              THE COURT:  Sustained.

9    Q.  How about your order history?  I didn't ask that.

10             MR. HORTON:  Objection, relevance.

11   Q.  All the way back to February of 2022, it would show all of

12   your order history, correct?

13             THE COURT:  You may answer.

14   A.  Yes.

15   Q.  And it would show your trading history and your portfolio,

16   correct?

17   A.  Yes.

18             MS. SHROFF:  Could I go back to that screen.  I'm

19   sorry, Jorge.

20   Q.  Okay.  And you see the rest of the information there, it

21   would take you back all the way to the very inception of your

22   account, correct?

23             THE COURT:  Asked and answered.

24             MS. SHROFF:  I'll move forward, your Honor.

25             Keep playing, please.

O731GUO6

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   |                 (Media played)                                       |
| 2   |                 MS. SHROFF:  And could you go back for a minute.      |
| 3   | Q.  What is the first date on the left-hand side?                    |
| 4   |                 MS. SHROFF:  Could you go down, please.  I'm sorry.  I |
| 5   | have the wrong——could you scroll down, please.                      |
| 6   |                 On the left, keep scrolling down.                    |
| 7   | Q.  You see at the bottom there?                                     |
| 8   | A.  Now I can see.                                                    |
| 9   | Q.  Could you read?                                                  |
| 10  | A.  Yes.                                                              |
| 11  | Q.  Okay.  And what's that date?                                    |
| 12  | A.  September 12, 2022.                                               |
| 13  | Q.  Okay.  And that's because that's how you write your dates       |
| 14  | in Germany; is that right?                                          |
| 15  | A.  Correct.                                                          |
| 16  | Q.  Okay.  We can keep going further.                              |
| 17  | A.  The date and the small point in Germany were different.         |
| 18  | Q.  I understand.                                                    |
| 19  |                 THE COURT:  All righty.  It is now 5 p.m.  Members of |
| 20  | the jury, our work has come to an end for the day, and now you     |
| 21  | have that long weekend to look forward to.                         |
| 22  |                 Remember that you're not allowed to discuss the case |
| 23  | amongst yourselves or with anyone else.  Don't permit anyone to    |
| 24  | discuss it in your presence.  Don't read, listen to, or watch      |
| 25  | anything from any source that touches on the subject matter of     |

O731GUO6

1  this trial.  I wish you a wonderful weekend.

2          (Jury not present)

3          THE COURT:  Sir, you may step out of the courtroom.

4          (Witness not present)

5          THE COURT:  Please be seated.

6          Ms. Shroff, how much more of this witness do we have?

7          MS. SHROFF:  I think maybe 15 to 20 minutes.  I don't

8  anticipate longer than that, your Honor.  Maybe 20 minutes.

9          THE COURT:  Is there anything that anyone would like

10  to raise before we break?

11          MS. SHROFF:  Not from the defense, your Honor.

12          MS. MURRAY:  Just a few things, your Honor.

13          So with respect to scheduling, appreciate Ms. Shroff's

14  estimate that this witness will be done after about three hours

15  of direct Monday morning.  We'll move on to the subsequent

16  witnesses.  I don't know whether the defense will rest on

17  Monday absent Mr. Guo's testimony at this stage, given how long

18  the afternoon has taken.  But were they to rest on Monday and

19  Mr. Guo decides not to testify, we wanted to confirm that

20  closings would proceed on Tuesday.  To that point as well——

21          THE COURT:  I'm sorry.  You want to confirm that?

22          MS. MURRAY:  Closings would be on Tuesday.  If the

23  defense rests on Monday, the defendant doesn't testify and the

24  government has no rebuttal case, we just wanted to confirm

25  whether closings would be on Tuesday.

O731GUO6

1        THE COURT:  Yes.  And 9:00 on Monday, we will have our

2   charging conference.

3        MS. MURRAY:  Okay.  And then I guess an additional

4   question is whether the Court might consider asking the defense

5   to identify a time on Sunday, perhaps noon, by which they will

6   advise the Court and the government whether Mr. Guo intends to

7   testify so the government can adequately prepare, for

8   efficiency.

9        THE COURT:  So that would be very helpful, considering

10  that we have just next week and I don't want to lose these

11  jurors.

12       MR. KAMARAJU:  Excuse me, your Honor.  I will confer

13  with Mr. Guo over the next few days and provide an answer to

14  the government and the Court.  Obviously it is ultimately his

15  choice, he can change his mind, but I will certainly represent

16  to the Court and the government by 12 p.m. on Sunday what his

17  understanding is and what his intention is at that time.

18       THE COURT:  Thank you.

19       MS. SHROFF:  Your Honor, actually, I think it should

20  be 1.  Because of the MDC weekend hours, could we have until 1?

21       THE COURT:  Yes.

22       MS. SHROFF:  Thank you.

23       THE COURT:  Anything further?

24       MR. FINKEL:  Your Honor, just one issue.

25       Just related to the sidebar, I just want to make sure

O731GUO6

1    I understand the defense's position so we don't have to brief

2    it needlessly.  It's not just that the government techniques in

3    terms of whether to take down the Himalaya Exchange, to the

4    extent it could——it's in Abu Dhabi——but I assume the defense is

5    not going to argue that the mere fact that it exists online

6    today is somehow relevant to what Mr. Guo intended when he made

7    misrepresentations.  And so I just want to confirm that

8    understanding, that the defense won't make such an argument.

9         THE COURT:  Well, whether or not they make that

10   argument, now that the jury has seen the videos and heard the

11   testimony, they will naturally be wondering why it is still

12   existing.

13        MR. FINKEL:  Right, which may require an instruction

14   about whether it's relevant to the charges if it exists or not,

15   and the government wants to think about that, but there's still

16   a difference, I think, your Honor, between just the jury

17   hearing some evidence and the defense arguing about it in

18   closing, and so I just want to confirm to see whether there is

19   an issue, which we may need to brief if there is, that the

20   defense won't argue that the existence of the Himalaya Exchange

21   today, the fact that it exists today——or G|CLUBS, for that

22   matter, because there's testimony about that too, G|CLUBS is in

23   receivership——that those concepts will not be argued to show

24   that these were legitimate enterprises because they presently

25   exist today, which isn't relevant.

O731GUO6

1          THE COURT:  Mr. Kamaraju?

2          MR. KAMARAJU:  We don't intend to argue either one of

3    those things, your Honor.

4          MR. FINKEL:  The word "intend" is a tricky one.

5          MR. KAMARAJU:  I'm sorry, your Honor.  Since I'm the

6    only one who's going to do the argument, I will not make that,

7    if that makes Mr. Finkel feel better.

8          MR. FINKEL:  It does.  Thank you.

9          I guess last, your Honor—and actually, we just

10   discussed this—I think to the extent the Court is interested

11   in setting time limits for closing arguments, the parties have

12   a joint proposal for the Court, which is, closings for the

13   government and the defense would each be three hours, and then

14   a rebuttal, which I think would allow us to finish all the

15   arguments on Tuesday, which seems to be where we're heading,

16   and then I guess your Honor would charge them on Wednesday and

17   we'd go into deliberations.

18         THE COURT:  That's fine.  And if you confer and decide

19   you wanted to make those summations shorter, that also would be

20   fine.

21         MR. FINKEL:  I know, but we have to talk about all

22   these videos and logging into the Himalaya Exchange.  No, I'm

23   kidding.  There's a lot to go through, but your Honor's point

24   is well taken and certainly something I and my colleagues will

25   be thinking about this weekend.  I'm sure the defense will too.

O731GUO6

1    Happy July 4th.

2              THE COURT:  Happy July 4th to everyone.

3              MR. FINKEL:  Thank you, your Honor.

4              MR. KAMARAJU:  Thank you, your Honor.

5              (Adjourned to July 8, 2024, at 9:00 a.m.)

<pre>
 1                    INDEX OF EXAMINATION

 2    Examination of:                         Page

 3    JIANHU YI

 4    Direct By Ms. Shroff . . . . . . . . . . . .5040

 5    Cross By Mr. Finkel  . . . . . . . . . . . .5073

 6    Redirect By Ms. Shroff . . . . . . . . . . .5082

 7     PAUL DORAN

 8    Direct By Ms. Shroff . . . . . . . . . . . .5085

 9    Cross By Mr. Finkel  . . . . . . . . . . . .5136

10    Redirect By Ms. Shroff . . . . . . . . . . .5169

11    Recross By Mr. Finkel  . . . . . . . . . . .5187

12    Redirect By Ms. Shroff . . . . . . . . . . .5191

13     LAI DAI

14    Direct By Ms. Shroff . . . . . . . . . . . .5193

15                    GOVERNMENT EXHIBITS

16    Exhibit No.                           Received

17     CO400   . . . . . . . . . . . . . . . . . .5074

18     CO418   . . . . . . . . . . . . . . . . . .5079

19     CO419   . . . . . . . . . . . . . . . . . .5077

20                    DEFENDANT EXHIBITS

21    Exhibit No.                           Received

22     60741, 60742, 60743  . . . . . . . . . . .5270

23     60688   . . . . . . . . . . . . . . . . . .5100

24     60689   . . . . . . . . . . . . . . . . . .5098

25     60690   . . . . . . . . . . . . . . . . . .5126
</pre>

1  60691  . . . . . . . . . . . . . . . . . .5097
2  60692  . . . . . . . . . . . . . . . . . .5095
3  60695  . . . . . . . . . . . . . . . . . .5068
4  60700  . . . . . . . . . . . . . . . . . .5064
5  60701  . . . . . . . . . . . . . . . . . .5066
6  60704  . . . . . . . . . . . . . . . . . .5057
7  60724  . . . . . . . . . . . . . . . . . .5212
8  60740  . . . . . . . . . . . . . . . . . .5258
9  GXVK-4  . . . . . . . . . . . . . . . . .5211
10  GXVK-7  . . . . . . . . . . . . . . . . .5214
11  GXVK-8  . . . . . . . . . . . . . . . . .5214

12
13
14
15
16
17
18
19
20
21
22
23
24
25