O78VGUO1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                          23 Cr. 118 (AT)
 4
     MILES GUO,
 5
                      Defendant.             Trial
 6   ------------------------------x
                                             New York, N.Y.
 7                                           July 8, 2024
                                             9:00 a.m.
 8
     Before:
 9

10                   HON. ANALISA TORRES,

11                                           District Judge
                                              -and a Jury-
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MICAH F. FERGENSON
          RYAN B. FINKEL
16        JUSTIN HORTON
          JULIANA N. MURRAY
17        Assistant United States Attorneys

18   SABRINA P. SHROFF
          Attorney for Defendant
19
     PRYOR CASHMAN LLP
20        Attorneys for Defendant
     BY:  SIDHARDHA KAMARAJU
21        MATTHEW BARKAN
          JOHN KILGARD
22

23   ALSTON & BIRD LLP
          Attorneys for Defendant
24   BY:  E. SCOTT SCHIRICK

25
```

O78VGUO1

1   Also Present:

2   Isabel Loftus, Paralegal Specialist, USAO
    Robert Stout, Special Agent, FBI
3   Jorge Salazar, Defense Paralegal
    Tuo Huang, Interpreter (Mandarin)
4   Shi Feng, Interpreter (Mandarin)
    Yu Mark Tang, Interpreter (Mandarin)
5   Barbara Robertson, Interpreter (Mandarin)
    Tuo Hung, Interpreter (Mandarin)
6   Peter Ginsberg, Attorney for Witness Jianhu Yi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78VGUO1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          Please make your appearances.

4          MR. HORTON:  Good morning, your Honor.

5          Justin Horton, Micah Fergenson, Juliana Murray, and

6    Ryan Finkel, for the United States.

7          MR. SCHIRICK:  Good morning, your Honor.

8          Scott Schirick, Sidhardha Kamaraju, and Matthew

9    Barkan, for the defendant, Mr. Guo, together at counsel's table

10   with Mr. Guo.

11         THE COURT:  Please be seated.

12         On June 25, 2024, the parties submitted their proposed

13   revisions and additions to the Court's draft jury charge.

14   Yesterday, July 7, 2024, the government filed a letter

15   requesting additional revisions.  I also received a letter from

16   the defense at 12:13 a.m. today.

17         I will address each of the parties' proposed edits in

18   the order they appear in the jury charge that my law clerks

19   have just provided to you.

20         Starting on page 6, in the first paragraph of the

21   burden of proof and presumption of innocence section — this

22   also applies to page 14 in the first paragraph of the summary

23   of indictment section.  The government requests that the Court

24   add language stating that the government is not required to

25   prove every allegation in the indictment, but instead only the

O78VGUO1

1   elements of the charges.  The defense does not oppose the

2   addition of this language.  I will add the requested language

3   to the burden-of-proof and presumption-of-innocence section,

4   but I will not repeat it in the summary of the indictment

5   section.

6           On page 13, in the second paragraph of the section

7   titled "Government as a Party," the government asks that I add

8   the words "United States" to the sentence beginning "This case

9   is important to the government," which I will do.

10          In the following paragraph, which begins with "The

11  fact that the prosecution," the government requests that I

12  include the following language:  "This prosecution was lawfully

13  brought by the United States of America, and the decision to

14  bring this case was in no way influenced by the Chinese

15  government or the Chinese Communist Party."  I do not believe

16  these sentences are necessary.  The evidence thus far has not

17  left the jurors with the impression that the prosecution was

18  unlawful or influenced by the CCP.

19          On page 14, in the first paragraph under 14, summary

20  of the indictment, the government requests that next to the

21  defendant's name, I include that he is also known as Ho Wan

22  Kwok, Guo Wengui, Brother 7, The Principal, and Boss.  I will

23  include that Miles Guo is also known as Ho Wan Kwok and Guo

24  Wengui.

25          In the last paragraph on page 14, which begins with

O78VGUO1

"The indictment contains," and on page 15 in the second

paragraph, which begins with "In a moment," the defense

requests that I include the words "against the defendant" after

"12 counts."  Because the indictment contains one count against

Mr. Je alone, I will include the defense's language.

On page 15, paragraph 1, the government requests that

the phrase "lifestyle membership company known as G/CLUBS" be

revised to "purported online membership club known as G/CLUBS."

 The government states that this tracks the language in the

indictment.  At this point I do not believe that the additional

descriptors are necessary and shall simply state "in connection

with G/CLUBS."

Page 15 contains a sentence in paragraph 2 stating:

"Each count constitutes a separate crime."  I grant the

defense's request to add the word "alleged" in between

"separate" and "crime."

On page 16, in the second paragraph, under "16.

Elements of Wire Fraud," in the last full sentence which begins

with "Count Nine," the government requests that the phrase "how

their membership dues would be used" be revised to the more

neutral description "how the money individuals sent to G/CLUBS

would be used."  I will make this revision.

In the same paragraph, in a subsequent sentence, the

government requests that the phrase "how the funds raised would

be used" be revised to "how the money sent to the Himalaya

O78VGUO1

1    Exchange or spent on its credits would be used."  The clause

2    beginning with the word "or" is duplicative, so I will state:

3    "How the money sent to the Himalaya Exchange would be used."

4            On page 17, the third full paragraph, and page 19,

5    paragraphs 5 and 6, the government contends that "willfully" is

6    not an element of the wire fraud statute and requests its

7    omission throughout.  As authority, the government cites Judge

8    Oetken's decision in *United States v. Middledorf*, 18 Cr. 36, as

9    well as an Eastern District of New York case.

10            But in *Middledorf*, although Judge Oetken rejected the

11   instruction from the Sand treatise, he still gave a willfulness

12   instruction; other judges in this district have done the same.

13   *See United States v. Bankman-Fried,* 22 Cr. 673; *United States*

14   *v. Avenatti*, 19 Cr. 374; and *United States v. Constanzo Recio*,

15   22 Cr. 281.  The Second Circuit has not explicitly disavowed

16   the willfulness element.  *See United States v. Petrossi*, 786 F.

17   App'x 286, 289 (2d Cir. 2019).

18            However, the definition of "willfully" in my first

19   draft of the charge implies that the defendant needed to know

20   that his action was "unlawful" as opposed to, more generally,

21   "wrong."  Accordingly, I will amend the definition which

22   appears on page 19 in the fourth and fifth paragraphs of the

23   section titled "b.  Second Element:  Knowledge and Intent to

24   Defraud" to state:  "To act 'willfully' means to act

25   voluntarily and with a wrongful purpose.  An act is done

O78VGUO1

knowingly and willfully if it is done purposefully and

deliberately."  This accords with the more limited instructions

that other judges in this district have used, as well as the

Second Circuit's decision in *United States v. Kaiser*, 609 F.3d

556, 567-68 (2d Cir. 2010).

On page 17, in the first paragraph under "a.  First

Element:  Scheme to Defraud," the defense asks that I state

that a scheme or artifice is a "plan to accomplish a fraudulent

objective."

The proposed addition of "fraudulent" is incorrect and

I will not include it.

In the last paragraph on page 17, the defense asks in

addition to stating that a statement "is fraudulent if it was

made with intent to deceive," that I also state that "the

intent to deceive must exist at the time the statement was

made."

This addition is not necessary because it is redundant

and I will not include it.

On page 17, after the first full paragraph in the

section titled "a, First Element:  Scheme to Defraud," the

government asks that I include a paragraph stating:  "It is not

necessary that a false or fraudulent pretense, representation,

or promise be made prior to a victim's decision to part with

money or property; rather, if after having obtained money or

property the defendant devises or participates in a fraudulent

O78VGUO1

scheme to keep that money or property by making a subsequent

false or fraudulent representation as to a material fact, that

is sufficient to establish the existence of a scheme to

defraud."

I do not agree that this instruction is necessary or

helpful and will not include it.

On page 17, after the last full paragraph, the defense

requests that I include a paragraph stating:  "Fraud requires

more than simply proof that a promise was made and then not

fulfilled.  Failing to maintain a promise or to abide by a term

in a contract or other document is not by itself fraudulent.

Instead, the government must prove beyond a reasonable doubt

that the defendant, at the time they made the statement or

promise, never intended to honor.  A subsequent decision by a

defendant not to abide by the terms of a promise, contract, or

document, even one that is willful, cannot be the basis for a

conviction."

I do not agree that this instruction is necessary or

helpful and will not include it.

On page 18, paragraph 1, the third sentence states:

"That means that if you find that a particular sentence was

false, you must determine whether that statement was one that a

reasonable person might have considered important in making his

or her decision."

The defense requests that "might" be changed to

O78VGUO1

 1    "would."  I will make this change.

 2           After the third "that," the defense also requests that

 3    I include the clause "was capable of influencing the decision."

 4           The addition of that language would confuse the jury

 5    and I will not include it.

 6           On page 18, before the paragraph that begins with "in

 7    determining whether a scheme to defraud exists," the defense

 8    requests the insertion of a new paragraph that states:  "To

 9    establish a scheme to defraud, the government must prove beyond

10    a reasonable doubt that the defendant contemplated depriving

11    another of money or property.  It is not enough that some other

12    person or company could have acquired money or property.  To

13    prove the scheme to defraud element, a defendant must have

14    contemplated actual harm would befall victims due to his

15    deception.  A scheme to defraud need not be shown by direct

16    evidence, but may be established by the circumstances and facts

17    in the case."

18           This paragraph duplicates the intent element and I

19    will not include it.

20           On page 19, in the second-to-last full paragraph, the

21    defense requests that I rephrase the intent to defraud

22    definition as follows:  "Put differently, to find specific

23    intent to defraud or fraudulent intent, you must find that the

24    defendant had the intent to cheat or steal money from others at

25    the time the misrepresentation or false promise was made."

O78VGUO1

1          I do not believe that this rephrasing adds clarity and

2     will not include it.

3          On page 20, the government requests that I include two

4     instructions stating that:  One, a defendant's belief that no

5     ultimate harm would result is not a defense to fraud; and that,

6     two, a defendant need not be solely motivated by fraud.  I

7     agree that these two instructions offer important clarification

8     and shall include them.

9          I will state at the end of the second full paragraph

10    on page 20:  "Additionally, it is not necessary for the

11    government to prove that the defendant was motivated solely by

12    improper considerations.  The defendant may have the required

13    intent to defraud even if the defendant was motivated by other

14    lawful purposes as well."

15         Also on page 20, in the last paragraph, in the

16    instruction on good faith, I will state:  "However, in

17    considering good faith, the fact that a defendant believes,

18    rightly or wrongly, that he will ultimately be able to work

19    things out so that no individual suffers a loss, is no excuse

20    for the real and immediate loss resulting from the defendant's

21    fraudulent conduct."

22         The government requests the addition of the following

23    language to the no-ultimate-harm instruction, arguing that it

24    is necessary to address testimony about the Himalaya Exchange.

25         They would like me to state:  "Nor is it a defense

O78VGUO1

1    that certain people were offered or received refunds.  Whether

2    any of the companies involved continued to operate is also not

3    a defense."

4         I believe that the no-ultimate-harm instruction is

5    sufficient as is and will not include the proposed language.

6         The government requests that the Court add the

7    following language at the end of the final paragraph on page

8    20:  "All of that said, you have heard evidence that Miles Guo

9    and certain of the entities in this case had lawyers.  A

10   lawyer's involvement with an individual entity or transaction

11   does not itself constitute a defense to any charge in this

12   case.  The defense has not claimed and it cannot claim that the

13   defendant's allegedly unlawful conduct as charged in the wire

14   fraud counts was lawful because he engaged in such conduct in

15   good faith reliance on the advice of lawyers."

16        I'm going to add a new section under "V.  Final

17   General Instructions," titled "31.  Involvement of the

18   Lawyers."  The section will read as follows:

19        "You have heard evidence that the defendant and

20   certain entities were represented by attorneys.  A lawyer's

21   involvement with an individual or entity does not make that

22   individual or entity's actions legal."

23        Following the final paragraph on page 20, the defense

24   requests an additional paragraph stating:  "If you find that

25   the defendant was not a knowing and willful participant in the

O78VGUO1

1    scheme or lacked the required intent to defraud at the time of

2    the operative false statement or false promise, then you should

3    find the defendant not guilty.  On the other hand, if you find

4    that the government has established beyond a reasonable doubt

5    not only the first element, namely, the existence of the scheme

6    to defraud, but also the second element, that the defendant was

7    a knowing participant and acted with specific intent to

8    defraud, then you should proceed to the third element."

9         I do not agree that this paragraph is necessary and

10   will not include it.

11        On page 21, in the "Third Element" section, the

12   government asks for a clarification that a wire communication

13   can be made after the relevant funds were obtained.  The

14   government requests this specific language:  "A wire

15   communication can also include a communication made after an

16   individual's funds were obtained if the communication was

17   designed to lull that person into a false sense of security to

18   postpone his or her complaint to the authorities or to keep the

19   money obtained from the scheme."

20        I shall include a portion of this language.  But I do

21   not believe that the examples cited by the government are

22   necessary.  Accordingly, I will state at the end of the second

23   full paragraph on page 21:  "A wire communication can also

24   include a communication made after an individual's funds were

25   obtained."

O78VGUO1

1           On page 24, the defense asks that I include at the end

2    of the first paragraph in the materiality subsection the

3    following sentence:  "Expressions of corporate optimism and

4    puffery are not material."

5           I reject this addition as confusing and unhelpful to

6    the jury.

7           On page 24, after the second paragraph in the

8    materiality subsection, the defense requests that I include:

9    "However, you may not assess materiality from the perspective

10   of hindsight, nor is a misrepresentation material simply

11   because it may have been important to an investor."

12          As to the sentence regarding hindsight, I will instead

13   add the following sentence at the end of the first full

14   paragraph on page 24:  "Materiality is judged as of the time

15   the information was disclosed."

16          The second proposed sentence, which aims to

17   distinguish between importance and materiality, is needlessly

18   confusing and I will not include it.  The definition of

19   materiality is sufficient and does not equate materiality with

20   mere importance.

21          On page 24, in the charge's definition of a security,

22   the defense proposes the addition of a paragraph that provides

23   a separate definition of a security if the government takes the

24   position that the farm loans and G CLUB memberships are

25   themselves securities.

O78VGUO1

1          I do not understand the government to be taking this

2     position.  Am I correct?

3          MR. HORTON:  If I can have one second your Honor.

4          THE COURT:  Yes.

5          (Counsel conferred)

6          MR. HORTON:  That's right, your Honor.

7          THE COURT:  Going to page 25.

8          In the "in connection with" section, the defense

9     requests the addition of the following paragraph after

10    paragraph 2:  "However, the 'in connection with' element is not

11    met simply because an alleged fraud happens to involve the sale

12    of securities; it requires something more.  The government must

13    prove beyond a reasonable doubt both that the deceptive conduct

14    coincided with particular securities sales, and that the

15    deceptive conduct was material to the investors' decision to

16    buy particular securities.  If the alleged deceptive conduct

17    did not coincide with the particular sale of the securities,

18    then the 'in connection with' requirement is not satisfied.

19          "In addition, if the defendant's alleged

20    misrepresentations did not concern the value, nature, or

21    investment characteristics of the securities, then the 'in

22    connection with' requirement is not satisfied.  Moreover,

23    alleged misrepresentations that occurred after a security sale

24    cannot have coincided with such purchase or sale and,

25    therefore, cannot have been material to such sale."

O78VGUO1

```
1          I reject the proposed language, first finding that
2    "deceptive conduct coincided with particular securities sales,"
3    is only one way of finding that deceptive conduct "touches
4    upon" a securities transaction.  The addition of this sentence
5    would be confusing and could limit the definition, when the
6    Supreme Court and the Second Circuit have "espoused a broad
7    interpretation" of the phrase "in connection with."  Merrill,
8    Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 85
9    (2006).  The remainder of the proposed paragraph imports
10   aspects of the materiality inquiry into the "in connection
11   with" definition.
12          On page 25, in the first paragraph of the "in
13   connection with" section, the government requests the addition
14   of the following sentence:  "It is not necessary that any
15   actual securities be sold or delivered so long as purported
16   securities were offered as an inducement to transact, and
17   promises that someone will receive stock in the future
18   constitute a sufficient connection with a purchase or sale of
19   securities."
20          Based upon this proposed addition, the Court will add
21   the following sentence before the last sentence in the first
22   paragraph:  "Nor is it necessary that any security was ever
23   issued or sold."
24          On page 26, in the first paragraph, the defense
25   requests the addition of the following sentence:  "Therefore,
```

O78VGUO1

however misleading or deceptive a plan may be, it is not

fraudulent if it was devised or carried out in good faith.

This includes the defendant's honest belief in the truth of the

representations made by the defendant."

I will not include this language but, instead, after

the first sentence of that paragraph, I will repeat the

following definition of "good faith" that I provided earlier in

the wire fraud section:  "A defendant acts in good faith when

he honestly believed at the time that the representations he

was making were true, even if they turned out to be inaccurate

or false."

Also on page 26, after the first paragraph, the

government requests the addition of the following paragraph:

"In considering whether a defendant acted in good faith,

however, you are instructed that a belief by the defendant — if

such belief existed — that ultimately everything would work out

so that no investors would lose any money does not necessarily

constitute good faith.  No amount of honest belief on the part

of a defendant that the scheme will ultimately make a profit

for the investors will excuse fraudulent actions or false

representations by him."

I will not include the proposed language, but will

repeat the following instruction that I provided in the wire

fraud section:  "However, the fact that a defendant believes,

rightly or wrongly, that he will ultimately be able to work

O78VGUO1

things out so that no individual suffers a loss is no excuse for the real and immediate loss resulting from the defendant's fraudulent conduct."

The government at the end of that same paragraph again requests an instruction regarding lawyers' involvement with the defendant and related entities.  Because I have now added the involvement of lawyers instruction, I will not include the instruction here.

On page 34, in the "Second Element:  Participation" section at the bottom of the page, at the end of the paragraph that begins with "it is not necessary for the government," the defense asks that I add the following two sentences:  "If you find that the defendant did not have a financial interest in the outcome of the scheme, that is also a factor you may properly consider in determining whether or not the defendant was a member of the conspiracy.  Ultimately, the defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements."

I will add the following sentence to the end of that paragraph:  "Conversely, if you find that the defendant did not have a financial interest in the outcome of the scheme, that is also a factor you may properly consider in determining whether or not the defendant was a member of the conspiracy."

On page 36, paragraph 1, I grant the defense's request to omit the word "also" before "co-conspirators of the

O78VGUO1

1    defendant," in the second pull paragraph.

2              On page 50, the government asks that I refrain from

3    characterizing the RICO count as "complicated," which I will

4    do.

5              On page 51, in the second paragraph of the subsection

6    titled "a.  First Element:  Racketeering Enterprise," the

7    defense asks that I delete the sentence:  "Of course, proof

8    that the objective of the conspiracy was accomplished, if you

9    find that it was, may be most persuasive evidence or the most

10   persuasive evidence of the existence of the conspiracy."

11             This is a standard conspiracy instruction that I

12   believe is helpful to the jury, so I will not omit it.

13             On page 52, in the final two paragraphs, and page 58,

14   paragraph 1 of "i, Enterprise v. Pattern of Racketeering

15   Activity," the defense asks that I specify that "G Enterprise"

16   is a term used by the government, which I will do.

17             In the final paragraph on page 52, the defense asks

18   that I rephrase the first component of finding a RICO

19   enterprise to state "a common purpose to conduct a racketeering

20   enterprise" instead of only "a common purpose."

21             I do not agree that that is a correct statement of the

22   law.  So that edit is rejected; however, I shall rephrase the

23   last clause to state that:  "Then you may find that the first

24   element of a racketeering conspiracy has been satisfied" rather

25   than suggesting that the whole crime has been proven.

O78VGUO1

In that same paragraph, the government asks that I include the phrase "during a substantial period within the time frame charged in the indictment" after "a continuing unit." The charge already includes substantially similar language on page 52 in the first full paragraph on that page, and I do not agree that the additional language is necessary.

On page 55, in the first paragraph under "Fourth Element:  Pattern of Racketeering Activity," the defense asks that I move the sentence beginning "The government must prove that the defendant agreed" to earlier in the paragraph.  I will do so.

In that same sentence on page 55, the government asks that I clarify that the defendant is also responsible for the acts of agents committed within the scope of their agency.

The government's proposed sentence reads:

"The government must prove that the defendant agreed to participate in the enterprise with the intent that he or another member or members of the conspiracy or their agents commit two or more racketeering acts which I will describe."  I believe that this instruction will confuse the jury and I will not add it.

On page 56, in the third full paragraph which begins with "First," the government asks that I give examples of types of racketeering crimes after the underlined sentence.  I think that this is helpful and will add the government's suggested

O78VGUO1

1     language to the end of that paragraph.

2              On page 57, at the start of the second full paragraph,

3     the government asks that I delete the statement that "a

4     substantial period of time is at least two years."  I will omit

5     the "two years" language, which although the circuit has never

6     approved a shorter period of time, is not a bright-line rule.

7     However, the government's suggested language is also likely to

8     confuse the jurors.  I will follow the model of other RICO

9     conspiracy charges and omit an explanation of "substantial

10    period" in the charge.

11             The defense asks that I delete the conscious avoidance

12    instruction.  This instruction may only be given if there is

13    evidence that, one, the defendant asserts the lack of some

14    specific aspect of knowledge required for conviction; and two,

15    there's evidence that the defendant was aware of a high

16    probability of the fact in dispute and consciously avoided

17    confirming that fact.  *United States v. Ferrarini*, 219 F.3d

18    145, 154 (2d Cir. 2000).  I find that these requirements have

19    not been met and I will omit the instruction.

20             The defense asks that I add a "multiple conspiracies"

21    instruction.  I will not include such an instruction.  The

22    multiple conspiracies charge is designed to assist the jury in

23    determining whether or not a particular charged conspiracy was

24    truly a single conspiracy, not to remind them separately to

25    consider each charged conspiracy.  *United States v. Aguilar*,

O78VGUO1

1    352 F. App'x 522, 525 (2d Cir. 2009).  It appears that the

2    defense wants me to emphasize that the conspiracies charged in

3    Counts One through Four should be considered separately.  I

4    believe that a multiple conspiracy instruction would confuse

5    the jury.  The charge states on page 15 that the jury "must

6    consider each count of the indictment separately," which I find

7    sufficient.  Therefore, I will not add the multiple

8    conspiracies charge.

9            On page 62, in the "28.  Law Enforcement and

10   Government Witnesses" instruction, the defense asks that I add

11   a sentence stating that:  "It is perfectly appropriate for

12   defense counsel to attempt to attack the credibility of such a

13   witness on the ground that his or her testimony may be colored

14   by a personal or professional interest in the outcome of the

15   case."

16           I find that this is duplicative of the existing

17   credibility of witnesses instruction and I will not include it.

18           The defense asks that I delete the

19   accomplice/cooperating witness testimony, immunized witness,

20   and similar acts instructions as inapplicable.  The government

21   does not object and I agree that they should be excluded.

22           On page 64, the defense asks that I add language to

23   the "nonprosecution agreements" instruction, stating that a

24   witness testifying under an NPA should be closely scrutinized.

25           I will omit the sentence that states:  "It may not be

O78VGUO1

1    used by you in any way for or against the defendant," which I

2    agree may be confusing.  And I will add a sentence to the end

3    of that paragraph stating:  "Of course, you may consider

4    whether the fact that the witness entered into this agreement

5    affects the credibility of their testimony."

6          The defense requests an instruction that "the fact

7    that the charges in this case may have involved large sums of

8    money does not mean that the defendant is held to a greater

9    standard of conduct."

10          I do not agree that this instruction is necessary or

11    helpful and will not include it.

12          The defense also asks for an instruction that the jury

13    may not consider Saraca's settlement with the SEC as evidence

14    of criminal conduct.

15          Does the government intend to make the argument that

16    the settlement is evidence of criminal conduct?

17          (Counsel conferred)

18          MR. HORTON:  Your Honor, the answer is no.  It is a

19    relevant fact in the narrative, but the answer to the Court's

20    question is no.

21          THE COURT:  The government asks that the jury be

22    instructed that the defendant has not raised a duress excuse or

23    justification defense.

24          I don't see that the defense has implied this thus

25    far.  Accordingly, I will not give this instruction.

O78VGUO1

1          My law clerks have provided you with a copy of the

2     verdict form.

3          Finally, in preparation for deliberations, the parties

4     are reminded of my May 7th, 2025 order concerning the provision

5     of exhibits to the jury.  For jury deliberations, the parties

6     shall provide a clean laptop containing only the exhibits

7     admitted into evidence.  The laptop must be prepared prior to

8     the start of deliberations.  And the parties shall also provide

9     the required cables to connect the laptop to the monitor in the

10    jury room.

11         During summations, if either party believes that there

12    has been a clear misstatement of a fact or misstatement of the

13    law, certainly you may object.  And if you feel that a sidebar

14    is necessary, you may request that.  But I want to keep that

15    absolutely to a minimum because that interferes with the flow

16    of the attorneys' summation.

17         I'm now going to go to the issue regarding the

18    testimony of Mr. Dragon.

19         By letter dated July 2nd, 2024, the government moves

20    to strike a portion of defense expert Raymond Dragon's

21    testimony from earlier that day, ECF No. 389.  The government

22    raised two issues.  The first issue, which concerned the

23    interpretation of Dragon's testimony concerning "very large

24    investor interest," was resolved by agreement of the parties on

25    July 3rd, 2024.  See transcript at page 5032, lines 1 to 17.

O78VGUO1

1          As to the second issue, I directed the defense to

2     respond to the government's motion by July 5th, 2024.

3          Mr. Dragon testified that $200 million of new GTV

4     shares were sold in the GTV private placement.  During his

5     testimony, which appears on page 4893 of the transcript,

6     Mr. Dragon stated that Saraca sold some of its own GTV shares

7     as part of the GTV private placement, which resulted in the

8     sale of $350 million of GTV shares, exceeding the $200 million

9     of shares initially advertised in the GTV private placement

10    memorandum.

11         The government contends that Mr. Dragon has no

12    personal knowledge that Saraca was the source of the excess

13    shares; and that this information was not in any of the

14    materials that Dragon disclosed as having reviewed.

15         By letter dated July 5th, 2024, the defense opposes

16    the government's motion, stating that Mr. Dragon's

17    understanding is based on the GTV private placement memorandum

18    which is in evidence, ECF No. 390.

19         The defense states that because the private placement

20    memorandum discloses Saraca's ownership percentage of GTV as

21    100 percent, Mr. Dragon reasonably concluded that any excess

22    shares beyond what the GTV private placement initially sought

23    to sell would necessarily come from Saraca's equity holdings.

24    *Id.* at 1.

25         I'm satisfied with the defense's explanation of

O78VGUO1

1    Mr. Dragon's testimony, which the government had the

2    opportunity to probe on recross examination.  Accordingly, the

3    government's motion to strike is denied.

4           We are missing Juror No. 4 -- oh, I'm sorry, Juror No.

5    10.  She says that she is experiencing nausea and diarrhea;

6    that she consulted a doctor who told her to stay home and take

7    certain medication and rest.

8           How would you like me to handle this?

9           MR. HORTON:  If we could have just one moment, your

10   Honor.

11          THE COURT:  Yes.

12          (Counsel conferred)

13          MR. HORTON:  Thank you, your Honor.

14          Given the number of alternates available, the

15   government proposes that we move forward with the trial.

16          THE COURT:  Does the government believe that I have

17   the discretion to substitute the alternate without the consent

18   of the defense?

19          MR. HORTON:  Yes.

20          THE COURT:  I'll hear from the defense.

21          MR. KAMARAJU:  Thank you, your Honor.

22          First of all, I do believe — and I think this has come

23   up before — that the Court has the discretion to excuse the

24   juror and impanel an alternate, even over the defense's

25   objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O78VGUO1

1          We recognize that the trial needs to move along, but

2     we do think that it's possible that not giving one of the

3     jurors a sick day, in essence, could constitute an abuse of

4     that discretion, particularly given that we have now reported

5     that Mr. Guo does not intend to testify; and so that, I think,

6     relieves some of the time pressure.

7          So from our perspective, it is certainly within the

8     Court's discretion to do so if it believes it's appropriate to

9     move it along.  We do think that creates a risk.

10         THE COURT:  So although I don't believe that

11    substituting the alternate would be abuse of discretion, I'm

12    having my clerks look at that question in an abundance of

13    caution.

14         In the meanwhile, I have some questions for Mr. Guo.

15         So Mr. Kamaraju, you have said that Mr. Guo will not

16    be taking the stand, is that right?

17         MR. KAMARAJU:  Yes, that is our belief at this time,

18    your Honor.  He's not planning to take the stand.  I just want

19    to be clear that he does have the right to change his mind at

20    the end of the defense case, but he does not plan to take the

21    stand.

22         THE COURT:  Okay.  So you understand, Mr. Guo, that

23    you have the right to take the stand and testify in your own

24    defense?

25         THE DEFENDANT:  Yes, your Honor.  Saturday and Sunday,

O78VGUO1

1    the attorney Kamaraju and Sabrina has discussed this with me

2    and I made my decision of not testifying.

3             THE COURT:  And are you satisfied that your attorneys

4    have spent enough time with you and answered all your questions

5    about their advice concerning whether or not you should

6    testify?

7             THE DEFENDANT:  Yes, your Honor.

8             THE COURT:  And you understand that the decision

9    whether or not to testify is yours, and yours alone?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  So am I correct that you, on your own,

12   have made the decision that you do not want to testify?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  All righty.

15            So moving forward, I'm looking for simultaneous

16   translation.

17            Are there any other issues that the parties would like

18   to raise at this time?

19            MS. SHROFF:  Your Honor, we did have an issue with the

20   translation.  The witness who was on the stand described the

21   experience as having to parse out information as though he were

22   in the middle of a playground and many, many voices were being

23   heard all at the same time.

24            Over the weekend, I did reach out to the interpreters'

25   office to try and resolve this because the witness was -- this

O78VGUO1

 1   is how exactly how the witness described it, like being on a

 2   playground having to parse through many voices.

 3          So I ask the Court to consider allowing consecutive

 4   translation for the witnesses, which I think is the norm; but

 5   if not, I guess it will have to be what it will have to be.

 6   But he did describe the experience that way.  And I raised it

 7   with the interpreters.

 8          THE COURT:  Does the government wish to be heard on

 9   this question?

10          MS. MURRAY:  Your Honor, I think on this point we

11   would defer to the Court.  We would note the witness seemed

12   able to answer the questions that were posed during the two and

13   a half hours of direct examination we've had so far.

14          MS. SHROFF:  The witness described the experiences

15   exactly the way I recited it.  I then reached out to the

16   interpreters' office.

17          The reason I called for a side break is because

18   throughout the testimony he kept tugging at one ear and had

19   difficulty with the number of voices going in.  So as I

20   understand it, he's not just listening to the English, which

21   he's partially fluent in, then he's listening to one

22   interpreter and at the same time the English voice is

23   continuing.  So there's an overlay.

24          Whether or not he managed to make do for two hours

25   isn't the point.  I've just laid out what the witness said,

O78VGUO1

 1    your Honor, that's all.  Thank you.

 2              THE COURT:  So my strong impression was that he fully

 3    understood the questions.  He did not protest at that time

 4    about the simultaneous translation.  There was a point at which

 5    he said that there was maybe a problem with one of the

 6    earphones, but he also stated that it had been corrected.

 7              In my 24-plus years on the bench, I've always had

 8    simultaneous translation.  That is the norm.

 9              Anything further?

10              MS. MURRAY:  Just a few brief points, your Honor.

11              With respect to the witness who was on the stand at

12    the end of the day Wednesday, the government yesterday received

13    26.2 materials from the defense which indicated that they met

14    with him this weekend, yesterday, and prepared him.

15              We would note he's in the middle of his testimony.

16    The Court has advised every witness in this case up to this

17    point that they should not discuss their testimony.  The

18    defense team is certainly well aware of that rule, that order

19    by the Court.

20              And so we just wanted to raise for the Court's

21    attention we don't know the content of that prep, it simply

22    indicated that there was a prep session.  But we think it's

23    important to note for the Court.

24              MS. SHROFF:  Your Honor, may I have a second?

25              THE COURT:  Yes.

O78VGUO1

1          (Counsel conferred)

2          MS. SHROFF:  Your Honor, I believe the rule is that if

3     the witness is on direct, he's free to talk to whoever is

4     taking his questioning.  In any event, we did not discuss any

5     part of his past testimony.  The rule is when he's on cross, I

6     think that's pretty clear.  But, in any event, I've conferred

7     and we had no discussion at all with any of his past testimony.

8          MS. MURRAY:  I would just note, your Honor, the

9     government has taken the approach, consistent with the Court's

10    instructions, throughout this entire five-and-a-half-week trial

11    that we have not spoken with any of our witnesses, even if they

12    were on direct testimony.  We have taken the Court's request

13    that the witness not discuss their testimony at its word, and

14    we have not prepped witnesses when they have been on direct

15    either over a break or over an evening or over the weekend

16    during the entire trial.

17         THE COURT:  So, Ms. Shroff, are you providing me with

18    a particular rule in the rules of evidence or --

19         MS. SHROFF:  No, I think that's the general rule.

20    But, in any event, we did not discuss his testimony.

21         THE COURT:  Okay.  I'm glad to hear that.  And I will

22    have my clerks look into that rule.  This is the way that I've

23    been doing it.

24         MS. SHROFF:  Just to be extremely clear, we certainly

25    did not give him a copy of his prior testimony.  We did not --

O78VGUO1

1    I personally didn't even review it, if that matters to the

2    Court.  I did not go back and read the transcript.  And I say

3    that to you as an officer of the Court:  I did not open it, I

4    did not download it, I didn't do anything with it.

5            THE COURT:  All righty.

6            MS. MURRAY:  Your Honor, just based on the 26.2

7    materials, I don't believe Ms. Shroff met with the witness.

8    Unless the materials omitted the presence of somebody, we

9    believe it was other members of the defense team, but just

10   another note.

11           One other thing I would like to note for the Court,

12   just with respect to the timing of certain exhibits the defense

13   has produced, the government received exhibits for Leanne Li,

14   who is a witness who is expected to testify, at approximately 1

15   a.m. on Sunday.  Those include a number of exhibits that have

16   Mandarin translations the government has not yet been able to

17   verify.

18           We're going to have various hearsay objections and

19   relevance objections to those exhibits, which are WhatsApp

20   chats that are clearly hearsay out-of-court statements of

21   Mr. Guo or of the witness that are being offered for their

22   truth, in the government's view.  We just wanted to note the

23   timing issue.  They produced additional exhibits for Ms. Li at

24   4 a.m. this morning.  And again, she's expected to testify

25   today.

O78VGUO1

```
 1                THE COURT:  All right.  So that is what you call sharp
 2     practice.  You do not produce exhibits so late that -- this is
 3     when you expect people to be asleep.
 4                MS. SHROFF:  Your Honor, there was a problem
 5     yesterday.  Once the government reached out, we sent them a
 6     chart of what we anticipated using.  Mr. Schirick and I were
 7     together at the office where there was an actual human and
 8     computer problem that caused the delay.
 9                THE COURT:  What kind of a human and computer problem
10     caused the delay?
11                MS. SHROFF:  Your Honor, may we just have a sidebar on
12     this?
13                THE COURT:  I want you to give me the explanation now.
14                MS. SHROFF:  The person who was working on it couldn't
15     put it together.  The person couldn't put it together and had
16     to take a break and so that delayed it.
17                THE COURT:  Okay.  I've told you before that you need
18     to have enough people on your team who are competent in order
19     to handle the trial.  You cannot have somebody who falls apart
20     at a crucial moment.  You need steady, stable people.
21                MS. SHROFF:  Your Honor, a large amount of Ms. Li's
22     exhibits are photographs.  We've moved Ms. Li down on the
23     testifying chain.  She's not likely to take the stand; she's
24     the second to the last witness.
25                THE COURT:  All right.
```

O78VGUO1

1              MS. SHROFF:  That's what happened.

2              There was no sharp practices.  We did not purposely

3       delay anything.  I think you have two lawyers were at the

4       physical location, others were not.  And we tried to get the

5       paperwork together.

6              THE COURT:  You need to hire competent people.

7       Manhattan is full of them; full of people who are prepared to

8       carry those types of tasks.  Don't let this happen again.

9              All righty.  I'd like to bring out Alternate No. 1.

10              (Juror present)

11              THE COURT:  Good morning, sir.  You may sit down.

12              I just wanted to let you know that you are now going

13       to become Juror No. 10.

14              JUROR:  Okay.

15              THE COURT:  All righty?  You may step back inside.

16              (Juror not present)

17              THE COURT:  Please have the jurors brought in.

18              MR. SCHIRICK:  Your Honor, may I address just one

19       brief other thing before we bring the jury?

20              THE COURT:  Why are we having this feedback problem?

21              MR. SCHIRICK:  I think that's taken care of it, your

22       Honor.

23              I just wanted to mention a couple of things that are

24       relevant to what we expect to be the defense's final witness,

25       hopefully later this afternoon.

O78VGUO1

1          The witness's name is George Higginbotham.  And he is

2    a former Department of Justice lawyer who pleaded guilty to

3    engaging in a conspiracy to lobby officials in the Trump

4    Administration on behalf of the PRC government to extradite

5    Mr. Guo.  And as part of the agreement to enter into Defense

6    Stip 1, with which I'm sure the Court is familiar, the Fox Hunt

7    stip, the defense agreed not to call several other witnesses

8    who were related to this conspiracy, as well as other Fox

9    Hunt-related witnesses, and only to call Mr. Higginbotham.

10          We expect Mr. Higginbotham to testify, among other

11    things, that he joined the conspiracy in April of 2017, at the

12    time that he was a lawyer for DOJ; that as part of the

13    conspiracy, Mr. Higginbotham, who lives in Washington, went to

14    the Chinese Embassy in Washington in July of 2017, to meet with

15    the Chinese Ambassador to the United States.  He also traveled

16    to China in September of 2017 to meet with several

17    co-conspirators.  And he facilitated the transfer of tens of

18    millions of dollars into the United States as part of the

19    conspiracy.  Ultimately, he pled guilty to conspiracy in

20    November of 2018 in the District of D.C.

21          We have not, your Honor, had an opportunity to -- the

22    defense has not had an opportunity to meet with this witness.

23    He is still under a cooperation agreement with the government,

24    with the District of D.C. U.S. Attorney's Office.  And his

25    lawyers would not give us access to him, so we have not met

O78VGUO1

 1    with him to prepare him today.  And the events at issue date

 2    back approximately seven years.  I just want to bring that to

 3    the Court's attention.

 4            And lastly, as part of Mr. Higginbotham's testimony,

 5    the defense will enter a stipulation into evidence between the

 6    parties relating to certain recordings of conversations between

 7    Mr. Guo and a Chinese government official Liu Yanping.  And we

 8    will read select portions of those transcripts to the jury at

 9    the conclusion of Mr. Higginbotham's testimony.  I just wanted

10    the Court to have this for reference in terms of what we expect

11    from Mr. Higginbotham, again, not having had the opportunity to

12    meet with him or prepare him today.

13            THE COURT:  So is there an application?

14            MR. SCHIRICK:  No, your Honor.  I just wanted to make

15    the Court aware of those facts.

16            THE COURT:  Very well.

17            MS. MURRAY:  Your Honor, if I may, just with respect

18    to Mr. Higginbotham, since Mr. Schirick brought it up, one

19    component of Mr. Higginbotham's situation, as Mr. Schirick

20    mentioned, is that he had entered into a cooperation agreement

21    with the government.  To be clear, he did not enter into that

22    agreement with this office; he entered into that agreement with

23    the Public Integrity Unit and MLARS in D.C.

24            We have spoken with the defense.  We understand they

25    are not going to elicit the fact of his cooperation agreement;

O78VGUO1

 1    and they are not going to elicit details about his -- things

 2    relating to his cooperation with the government on direct;

 3    that, in our view, would be inappropriate.  They've agreed to

 4    that.  So that is a component of what we understand to be part

 5    of his testimony.

 6            With respect to the timing here -- or, actually, one

 7    other point on Mr. Higginbotham.

 8            As Mr. Schirick mentioned, he was a DOJ employee at

 9    the time that he participated in the entirely separate

10    conspiracy that they are looking to elicit.  We assume that

11    they are not going to highlight that fact.  We've discussed

12    that with the Court at length.  That would be inappropriate

13    because it would be intended only to suggest that the front

14    table has in any way something to do with the communist party

15    or, again, this separate conspiracy to repatriate Mr. Guo,

16    which we've already stipulated to.  It's been introduced into

17    evidence a number of times.

18            Mr. Doran, their expert, said that that paragraph 7 of

19    Defense Stip 1 adequately summarized the entire case that

20    Mr. Higginbotham was involved with.

21            We understand his testimony is coming in.  We will

22    cross-examine him as appropriate.  But that fact has been

23    covered, the fact of that 2017 conduct, which predates any of

24    the charged conduct in this case has been covered.  So, again,

25    we assume that the defense won't elicit the fact that he is a

O78VGUO1

1    DOJ employee and we will object as appropriate.

2         Another component that the defense said that they

3    would not elicit is his sentence in his case.  That relates to,

4    again, his cooperation.  So to the extent that he received a

5    minimal sentence for his involvement in, again, the separate

6    conspiracy from 2017, they are not going to bring that out on

7    direct.

8         And then the last point I would note, Mr. Schirick

9    just indicated that he expects to call Mr. Higginbotham today.

10   That suggests to the government that they expect to get through

11   all of their witnesses today, as he is scheduled to be last.

12        We may reserve the right at the break this morning to

13   request that they instead call Leanne Li last, in light of the

14   late production of these exhibits, including approximately 44

15   audio files that they produced at 4 this morning.

16        THE COURT:  Mr. Schirick, you are not going to elicit

17   testimony about the cooperation agreement or about his

18   sentence, right?

19        MR. SCHIRICK:  Your Honor, we have no plans to elicit

20   that testimony on direct; but obviously, depending on what the

21   government's cross is, reserve the right to raise that, should

22   it become necessary.

23        THE COURT:  And you're not going to be implying at any

24   point that the government is being manipulated by the Chinese

25   government or the Chinese Communist Party; correct?

O78VGUO1

1    MR. SCHIRICK:  No, your Honor.  The defense has been

2    clear that we don't plan to make that argument.

3         I would note, however, that it is a fact — a simple

4    fact — that Mr. Higginbotham was employed by the Department of

5    Justice at the time of the conspiracy and at the time that he

6    had the meetings that I described to the Court earlier today.

7    And, in fact, it is part of the narrative, your Honor, because

8    he was asked to go to those meetings in part because he was an

9    attorney for the Department of Justice.

10         So while we have no plans to make the argument that,

11   you know, your Honor just described, we would ask for some

12   latitude to be able to elicit the narrative, which is important

13   and is, frankly, just part of the factual landscape here,

14   without placing undue emphasis on it.

15         MS. MURRAY:  Your Honor, we strenuously, strenuously

16   object to that.

17         The statement of facts in connection with

18   Mr. Higginbotham's guilty plea in the D.C. case make it very

19   clear that he was not acting in his DOJ capacity when he

20   conducted any of the conduct that was the offense conduct.  He

21   made it clear when he went to the embassy in D.C. and when he

22   went to visit the Chinese official in China, that he was not

23   acting in an official capacity.  It is entirely improper for

24   the defense to bring that out as part of the narrative of what

25   happened in 2017.

O78VGUO1

1          THE COURT:  You're saying to bring out his employment.

2          MS. MURRAY:  That's correct.

3          THE COURT:  So I'm directing you to not bring out the

4    fact that he was a DOJ employee.  I'm directing you to tell him

5    that he may not volunteer that information.  Clearly bringing

6    that up is merely a rather clumsy way of trying to link the

7    prosecution in this case with corruption and the Chinese

8    government.

9          MS. MURRAY:  Your Honor, if I may make one

10   clarification, because we have had certain discussions with the

11   defense about the protest signs that have been produced into

12   evidence in this case that suggested that the DOJ had been

13   influenced by the CCP.

14         We don't object to one factual question about whether

15   at the time he had been employed by DOJ, if that's what the

16   defense would like to elicit.  We would object to any further

17   questioning that would suggest in any way that his employment

18   had something to do with his offense conduct.

19         MR. SCHIRICK:  And, your Honor, Ms. Murray anticipated

20   where I was going to go.  To an extent, the government did open

21   the door on this by showing the jury the signs that Ms. Murray

22   referenced.  And I believe we had an understanding with the

23   prosecution team that we would be permitted to do what

24   Ms. Murray just described.  Again, that goes to the point that

25   I was attempting to make, your Honor, which is we have no plan

O78VGUO1

1    to unduly emphasize this.  But it is a fact that he was

2    employed by DOJ.  And you know, as Ms. Murray said, we have an

3    agreement to be able to at least elicit that fact, you know, as

4    part of his direct, again, without unduly emphasizing it or --

5         THE COURT:  Well, is the prosecution asking for some

6    type of a curative instruction?

7         MS. MURRAY:  Your Honor, not at this time; although

8    subject to how the direct testimony comes in, it might be

9    possible.

10         As Mr. Schirick said, we've had certain discussions.

11   We don't have an objection.  We understand that the view is

12   that the government might have opened the door to this by

13   showing protest signs that Mr. Guo's enterprise had, you know,

14   posted up against the bankruptcy trustee that mentioned DOJ.

15         A curative instruction might be appropriate.  We can

16   discuss that.

17         But, again, fine with their establishing the fact that

18   he was a DOJ employee.  Any further questioning, and just kind

19   of reacting to Mr. Schirick, because we don't intend to push

20   the issue or emphasize, feels a little wishy-washy, so we just

21   wanted to bring it to the Court's attention.  If it goes down

22   the path, we might object.

23         THE COURT:  I want the parties to agree on the exact

24   question that's going to be posed regarding this photograph.

25   And I want you to instruct him that he is not to elaborate on

O78VGUO1

1     his relationship with the Department of Justice.

2            MR. SCHIRICK:  Thank you, your Honor.

3            We will speak to the prosecution and agree on the

4     question.

5            Just to be clear, again, I and the defense team do not

6     have access to Mr. Higginbotham.  I will do my best to

7     communicate what your Honor has just instructed to his lawyer

8     before he testifies.

9            THE COURT:  Anything further?

10           MS. MURRAY:  Not from the government.  Thank you.

11           THE COURT:  All right.

12           Please have the jurors brought out.

13           (Jury present)

14           THE COURT:  Please be seated.  Good morning, jurors.

15           THE JURY:  Good morning.

16           THE COURT:  It is 10:07.  And I am sorry that I did

17     not bring you out promptly at 9:30.

18           THE INTERPRETER:  We need some help here.  I'm sorry.

19           Your Honor, the witness is asking to test the device.

20     May we test the device with him now?

21           (Pause)

22           THE COURT:  As I was saying, I'm sorry that I didn't

23     get you out promptly at 9:30.  There were a couple of issues.

24           One issue is that Juror No. 10 has now been replaced

25     by Alternate No. 1.  In addition, I had to discuss some

O78VGUO1                    Dai - Direct

1  important legal matters with the attorneys.  And so I am very

2  mindful that you're waiting.  And I don't want to waste your

3  time; I know your time is important, so I apologize.  I will

4  try to keep that to a minimum.

5         So now we're going to continue with the direct

6  examination of Mr. Lai Dai.

7         You may inquire.

8         MS. SHROFF:  Thank you, your Honor.

9         Your Honor, perhaps the Court would like to remind

10 Mr. Dai he's still under oath.

11        THE COURT:  Yes, that is a good idea.

12        Sir, remember that you're still under oath.

13  LAI DAI,

14     called as a witness by the Defendant,

15     having been previously duly sworn, testified as follows:

16 DIRECT EXAMINATION (continued)

17 BY MS. SHROFF:

18 Q.  Good morning, Mr. Dai.

19 A.  Good morning.

20 Q.  Mr. Dai, was the functionality of the H Pay app in 2022 the

21 same as that of what we saw in the video and pictures last

22 week?

23 A.  Yes, it is the same.

24        THE INTERPRETER:  Your Honor, I apologize.  I'm having

25 a device issue.  I cannot hear him very well.  Can you give me

O78VGUO1                        Dai - Direct

1    one second to switch my device?  I apologize.  I'm so sorry.

2              THE COURT:  Go ahead.

3              All right.  So we're having a failure here of the

4    audio equipment.  And we'll take a five-minute break.

5              Remember that you're not allowed to discuss the case

6    amongst yourselves or with anyone else.  Don't permit anyone to

7    discuss the case in your presence.  Don't read, listen to, or

8    watch anything from any source concerning the subject matter of

9    this case.

10             (Jury not present)

11             THE COURT:  We will recommence when the interpreter

12   returns.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O78BGUO2                        Dai - Direct

1           THE COURT:  Please have the jurors brought in.

2           THE LAW CLERK:  Jury entering.

3           (Jury present)

4           THE COURT:  Please be seated.  Remember, sir, that you

5    are still under oath.  You may inquire.

6    BY MS. SHROFF:

7    Q.  Mr. Dai, was the functionality of H Pay in 2022 the same as

8    we saw in the videos and pictures last week?

9    A.  Yes, the same.

10   Q.  Was the user experience of the H Pay app in 2022 the same

11   as we saw in those videos and pictures last week?

12   A.  Yes, the same.

13   Q.  Was the functionality of the Exchange's website in 2022 the

14   same as we saw in the videos last week?

15   A.  All functions are the same, however, two functions were

16   restricted.

17   Q.  Mr. Dai, please try and answer my question, okay.  Whatever

18   restrictions there were is not -- I'll withdraw that, your

19   Honor.

20           Was the experience of the Exchange's website in 2022

21   the same as those that we saw in the video last week?

22   A.  Yes, the same.

23   Q.  Mr. Dai, what is the New Federal State of China?

24   A.  New Federal State of China, it is to overthrow the CCP, to

25   build the democracy and the Rule of the Law, and it is to build

O78BGUO2                          Dai - Direct

1   a new regime in China.

2   Q.  When did you first hear about the New Federal State of

3   China?

4   A.  The first time it was June 4, 2020.

5   Q.  Where were you when you heard it?

6   A.  I was in Germany.

7   Q.  And how did you hear it?

8   A.  I heard it from Mr. Guo's live stream that day.  He was --

9   Mr. Guo was with Mr. Steve Bannon in New York and announce the

10  funding of the New Federal State of China.

11  Q.  Was there anyone else on the broadcast?

12  A.  Yes.

13  Q.  Who?

14  A.  It should be other people who were in the live stream

15  because there were in the boat on the ocean.

16  Q.  Mr. Dai, if you could listen to my question.

17          Do you know if anybody else was present at the

18  broadcast?

19          MR. HORTON:  Objection, asked and answered.

20          THE COURT:  Sustained.

21  Q.  Did anyone else speak about the New Federal State of China?

22          MR. HORTON:  Asked and answered.

23          MS. SHROFF:  He did not answer that question.

24          THE COURT:  You may answer that question.

25  A.  Everyone was discussing the New Federal State of China, a

O78BGUO2                        Dai - Direct

1    lot of news media reported.

2    Q.  Who read the declaration of the New Federal State of China?

3    A.  Mr. Hao Haidong.

4    Q.  And who is that?

5    A.  He was a famous soccer player in China.  You can say that

6    he was the mister football in China.

7    Q.  Was his wife also part of the broadcast?

8            MR. HORTON:  Objection.

9            THE COURT:  Was there anyone else on the broadcast?

10   A.  Should be.  I don't recall clearly --

11   Q.  All right.

12   A.  -- because it was long.  During the broadcast live mainly

13   were Mr. Guo, Steve Bannon and Mr. Hao Haidong.

14   Q.  Mr. Dai, did there come a time that you became aware that

15   the New Federal State of China had a base?

16   A.  Yes, I believe the earliest was 2020.

17   Q.  And what is your understanding of what the base was

18   supposed to be?

19   A.  The base will provide for member of New Federal State of

20   China and G/Club member a place for events.  They can live

21   there for a period of time like a vacation.  They can also host

22   friends of New Federal State of China, famous people, media,

23   senators.

24           MR. HORTON:  Objection.  Move to strike for hearsay.

25           MS. SHROFF:  That's his understanding, your Honor.

O78BGUO2                         Dai - Direct

1          THE COURT:  Overruled.  Go ahead.

2   A.  Also during the time of emergency, this place can provide

3   help for G/Club members.

4   Q.  Did you learn if in fact a base had been found?

5          MR. HORTON:  Objection, calls for hearsay, your Honor.

6   He has no personal knowledge.  He's describing what he heard

7   from other people.

8          THE COURT:  If you'll step up, please.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO2                          Dai - Direct

1          (At the sidebar)

2          THE COURT:  So aside from what he may have heard on a

3   broadcast, did he personally have contact with the location?

4          MS. SHROFF:  I don't believe that would be the

5   testimony, your Honor.  But imagine if you're part of a member

6   club, say you're part of the union club or the Harvard club,

7   are you going to really talk to the executive of the Harvard

8   club and each day he's going to call you and say, hey, listen,

9   you know what, I'm going to put this new service in place; but

10  all of you come to the executive meeting, and we'll all sit

11  down and learn about this.  And how else does one learn other

12  than by listening to what the membership of the executive

13  committee tells you is a benefit offered by a membership club.

14  That's how you learn.  That's the whole point of a membership

15  club.  We're not going to the truth of the matter asserted.

16  They can say no such basis existed.

17          But I note here again, your Honor:  One, if you're a

18  member of Netflix, the only way you're going to know what

19  Netflix has to offer next is by looking at the Netflix website,

20  of getting an advertisement, of getting a notification and

21  reading about it.  That's the way it work.  Netflix's CEO is

22  not calling me to say, hey, you know what, this show is going

23  to stream again tomorrow, make sure you watch.  And even that

24  according to them would be hearsay, so how would a member know?

25          THE COURT:  Why can't he testify about what he heard

O78BGUO2                          Dai - Direct

1    on these broadcasts?

2              MR. HORTON:  Because they're offering it for its

3    truth, your Honor.  There's a difference between the Netflix

4    member saying, well, the CEO told me that Netflix does X, Y and

5    Z, and as a member I used this service and this is my

6    experience in using the service.  He's not saying he went to

7    the base.  He's not saying he experienced it personally.  He

8    said I heard from other people what it was.  They can call

9    somebody who's at the base, who operated the base, who operated

10   G/Clubs to testify from their personal knowledge, but this

11   witness doesn't have personal knowledge.

12             THE COURT:  So when the prosecution have witnesses on

13   the stand and they asked them about all of the promised

14   services and benefits, it was certainly not for their truth.

15   The prosecution is not claiming that any of these services were

16   offered, but my sense is that your witness is here in order to

17   say that they did exist.

18             MR. KAMARAJU:  I think there's a difference between

19   saying that the statement is being offered in fact for

20   something existing versus the topic is being discussed that it

21   is something that people are addressing.  It is something that

22   members understand.  It is something even the defendant

23   understands.  That's *United States v. DiMaria*.

24             THE COURT:  You're saying that you're not offering it

25   for the truth?

O78BGUO2                    Dai - Direct

1          MR. KAMARAJU:  This is for their understanding, your

2     Honor. Whether they are right or wrong as to whether that was a

3     base or not, it's a question of what they believed, and that's

4     the question.  It's an intent case. It's a fraud question.  If

5     we're not allowed to introduce evidence of statements, if we're

6     not allowed to introduce evidence of understanding, then the

7     only way that a fraud defendant can ever defend themselves is

8     by taking the stand.  Because otherwise, you're never going to

9     be permitted.  That's why you have a state of mind hearsay

10    exception. That's why you have a present sense impression.

11    That's why you have all of these exceptions.  So we have no

12    problem with any of this testimony with an instruction that

13    says it's not being offered for the truth, which that's the

14    standard way that you deal with a hearsay issue. It is not to

15    preclude the testimony in its entirety.

16          THE COURT:  Certainly this has come in already through

17    other witnesses, hasn't it?

18          MR. HORTON:  The context matters for the hearsay rule,

19    your Honor.  When we bring in something that the defendant or

20    his agents or his co-conspirator says, the rule allows us to

21    admit an opposing parties' statements.  What Mr. Kamaraju was

22    just talking about Miles Guo's intent, which we agree is the

23    only intent that matters.  This witness can't testify about

24    Miles Guo's intent.  The state of mind exception is about the

25    declarant's state of mind, and your Honor we had a pre-trial

O78BGUO2                        Dai - Direct

1    argument about this a few weeks ago.  This witness cannot

2    testify, I heard this thing from somebody else, and so

3    therefore it's Miles Guo's state of mind.  That's not how it

4    works.

5           MR. KAMARAJU:  Mr. Horton is correct.  The state of

6    mind exception is not specific to the defendant.  It's specific

7    to a declarant.  With respect to Mr. Guo's intent, it can be

8    corroborated by independent evidence, including the

9    understanding of other people.  They're allowed to challenge

10   that weight.  They're allowed to challenge whether that's how

11   significant the jury should afford that.  Your Honor has

12   already ruled that Mr. Guo's intent corroborated by

13   reasonable -- sorry corroborated to be proven reasonable by

14   objective evidence.  The fact that they were being discussed is

15   evidence.

16          THE COURT:  So you're saying that you want to

17   introduce Mr. Guo's statements.  I don't understand how you get

18   around the hearsay problem.

19          MR. KAMARAJU:  That's exactly what's in *DiMaria*, your

20   Honor, and I have a copy of the case which I'll bring up.  In

21   *DiMaria*, the facts of DiMaria were, the defendant was present

22   in a place to buy illegal cigarettes.  It was either FBI or DHS

23   agents -- I don't know specifically -- showed up and the

24   defendant said, Why are you guys here?  I just came for some

25   cheap cigarettes.  And the prosecution move to exclude that

O78BGUO2                      Dai - Direct

1    statement on hearsay grounds.

2           The Court -- the district court agreed with the

3    exclusion on hearsay grounds.  The Second Circuit reverse and

4    called it wasn't harmless.  Because what they said was, it goes

5    to the state of the mind of the defendant, his then existing

6    belief as to why he was there, which was relevant to the mind.

7    And they also rejected arguments about it being a false

8    exculpatory statement, about the exception swallowing the rule

9    because the hearsay state of mind exception already has a carve

10   out in between.  I can hand it up, your Honor.  That's the

11   difference.  We are allowed to say that Mr. Guo's statement --

12   we're allowed to say that Mr. Guo's intent is proveable by one

13   of Mr. Guo's statements if it is a then existing statement of

14   his mental state.  And that's what *DiMaria* says, and I have it

15   here for your Honor.

16          MR. HORTON:  Ms. Shroff's question wasn't about

17   Mr. Guo's statements. The hearsay that the witness is

18   testifying about wasn't attributed to anybody in particular.

19   This case is about a defendant at a crime scene making a

20   contemporaneous statement that comes in for his then

21   existing -- his then existing state of mind.  That's not what

22   is happening here, your Honor.

23          THE COURT:  Are you going to limit it to only

24   Mr. Guo's statements?

25          MS. SHROFF:  Sure.

O78BGUO2                        Dai - Direct

1             MR. FERGENSON:  That's not permissible.

2             THE COURT:  It seems to me that you're arguing they

3     can bring in the defendant's statement?

4             MR. HORTON:  My point is that the case they're hinging

5     all this onto a single parallel purpose.  Mr. Fergenson wants

6     to supplement what I said.  I certainly didn't mean to suggest

7     that they just bring in Mr. Guo's statements it's fair game and

8     hearsay and what they're aiming for is not nearly that broad.

9             THE COURT:  I remember looking at this case, and I

10    don't recall interpreting it the way that you do, but I am

11    going to take a second look at the case.  So let us move onto

12    something while I -- well, my clerks will look at this.

13            MR. KAMARAJU:  Would your Honor like the hard copy?

14            THE COURT:  That's terrific.  Thank you.

15            MR. KAMARAJU:  She's almost done at this point.

16            THE COURT:  We can always recall the witness if I

17    don't come up with an answer soon enough.

18            MS. SHROFF:  That's fine.  Whatever you want to do.

19            THE COURT:  Okay.

20            (Continued on next page)

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  You may continue.

 3   BY MS. SHROFF:

 4   Q.  Mr. Dai, let me show you what is marked not yet in evidence

 5   as Government Exhibit VD-6.  You could take a look at that

 6   document for me, please.

 7              MR. HORTON:  Your Honor, is there a question pending?

 8   A.  Yes, I see it.

 9   Q.  Are you done, Mr. Dai, reading the document?

10   A.  Yes, I finish it.

11   Q.  Mr. Dai, do you recognize that document?

12   A.  Before today, I haven't seen this before.

13   Q.  I couldn't hear him?

14   A.  Before today I didn't see it.  I didn't see it before.

15              MS. SHROFF:  I have no further questions at this time

16   pending the Court's ruling.

17              THE COURT:  Understood.  All righty.  Cross

18   examination.

19   CROSS-EXAMINATION

20   BY MR. HORTON:

21   Q.  Good morning, Mr. Dai.

22   A.  Good morning.

23   Q.  You're a supporter of Miles Guo, correct?

24   A.  Yes.

25   Q.  You found him through his online videos, right?

O78BGUO2                              Dai - Cross

1    A.  Yes.

2    Q.  And you understood from watching Miles Guo's videos you

3    thought he was a successful business person; isn't that right?

4    A.  Yes.

5    Q.  And when you met with Mr. Guo's lawyers earlier this year,

6    you told them that you thought Miles Guo had a lot of

7    credibility on investments; isn't that true?

8    A.  To whom I met?

9    Q.  You met with Mr. Guo's lawyers earlier this year, do you

10   remember that?

11   A.  Yes, I told them that I like Mr. Guo's courage and his

12   honesty.

13           THE COURT:  Sir, I want you to limit your answer to

14   the question that's being asked.  The answer that you just gave

15   was not responsive to the question that was just asked, so I'm

16   going to ask the reporter to read back the question and you

17   answer only the question that's been asked.  I'm going to

18   strike the answer.

19           (The record was read)

20   A.  Yes, I remember.

21   Q.  And you told Mr. Guo's lawyers that you thought Mr. Guo was

22   credible when he spoke about investments, right?

23   A.  Yes.

24   Q.  You believe Miles Guo when he talks about GTV, don't you?

25   A.  You mean he mention GTV investment?

O78BGUO2                          Dai - Cross

1   Q.  Yes.  When Miles Guo talks about GTV investments, you

2   believe what he's saying, don't you?

3   A.  Yes, before my investment, I had not heard about GTV

4   investment by Mr. Guo.

5   Q.  But then you heard him talk about it, and ever since you

6   believed what he said; isn't that right?

7   A.  No, I didn't hear him mention about GTV investment.  I,

8   through the group, the chat group of my fellow fighters, I got

9   that information.

10  Q.  Well, but after that, Mr. Dai, didn't you exchange WhatsApp

11  messages with Miles Guo about investing in GTV?

12          MS. SHROFF:  Your Honor, the witness testified he did

13  so after the investment.  The government should be clear.

14  A.  Yes.

15  Q.  And after that you watched GTV for five hours a day, that

16  was your testimony, right?

17  A.  No, not like that.  When I watching the video that was five

18  hours a day, that was before, before I got information about

19  investment.  I started -- the information I got from the

20  investment in May, late May 20 something, by then I already

21  watched GTV for over a month.

22  Q.  But you heard Miles Guo talk about GTV stocks, for example,

23  in his broadcast, for example, didn't you?

24  A.  No.  He has not mention anything GTV investment or stocks

25  during his live stream --

1    Q.  Mr. Dai --

2    A.  -- therefore I learn this much later.

3             THE COURT:  You need to stop answering.  Once you've

4    answered the question that been's asked, you just stop.  So if

5    I ask you what is today's date, you tell me today's date, but

6    you don't also tell me what time it is.  You understand?  Go

7    ahead.

8    Q.  Mr. Dai, over the last several years you've watched Miles

9    Guo's live streams, haven't you?

10   A.  Yes.

11   Q.  And on those live streams you heard Miles Guo talk about

12   G/Club, didn't you?

13   A.  Yes.

14   Q.  And you heard on those live streams Miles Guo talk about

15   the Himalaya Exchange; isn't that right?

16   A.  Yes.

17   Q.  Is it your testimony that on those live streams Miles Guo

18   never talked about GTV stocks?

19           MS. SHROFF:  Your Honor, objection.

20           THE COURT:  Overruled.  Overruled.  Please answer.

21   A.  G/Club and Himalaya Exchange were all in 2020, after

22   October of 2020.  About GTV investment was from April, and I

23   learned this was May of 2020, so how could I learn about GTV

24   investment by watching the other live stream on the other --

25           THE COURT:  Once again you have not answered the

O78BGUO2                    Dai - Cross

1    question.  I'm going to ask the reporter to read the question

2    back and only answer the question that has been asked.

3                (The record was read)

4    A.  Before my investment, no, he didn't mention that.

5    Q.  Mr. Dai, my question is, you testified that you've watched

6    Miles Guo's live streams for the last several years.  Over that

7    period when you watched his live streams, isn't it true that

8    Miles Guo talked about GTV shares?

9    A.  Yes, he did mention that.

10   Q.  And you believed everything he said about it, isn't that

11   true?

12   A.  Yes.

13   Q.  And he talked about other investments as well; isn't that

14   right?

15   A.  Yes.

16   Q.  And you believed everything he said about those investments

17   as well; isn't that true?

18   A.  After I read the document, yes, I believe that.

19   Q.  And GTV the "G" in that stands for Guo; isn't that right?

20   A.  No.

21   Q.  The "G" in G/Clubs, that "G" stands for Guo doesn't it?

22   A.  No.

23   Q.  And the "G" in G Fashion, that "G" stands for Guo, doesn't

24   it?

25   A.  No.

O78BGUO2                          Dai - Cross

Q.  And the "G" in the G Series investment that Miles Guo

talked about in those broadcast, that "G" stands for Guo,

doesn't it?

A.  To me I wouldn't say the G Series, I wouldn't say that.  I

don't know what it represented.

Q.  Your testimony, Mr. Dai, is that after investing in GTV and

in G/Clubs and in other G Series investments, you don't know

what the "G" stands for?

            MS. SHROFF:  Objection.  That's not what he said.

That misstates his answer completely.

            THE COURT:  You may answer.

            THE WITNESS:  May I answer now?

            THE COURT:  Yes.  Go right ahead.

A.  I know what "G" means.  It doesn't mean Guo.  It means

global.

Q.  Your testimony is that when Miles Guo promoted GTV, G/Club,

G Fashion and the G Series investments that "G" stood for

global?

            MS. SHROFF:  Asked and answered.

            THE COURT:  Overruled.  You may answer.

A.  That's correct, it means global.  This is very obvious.

Can I explain?

            THE COURT:  No.  Go ahead.

Q.  You've heard of Guo Media, Mr. Dai, haven't you?

A.  Guo Media did you say?  I've heard of it.

O78BGUO2                        Dai - Cross

Q.  And the "Guo" in Guo Media, that refers to Miles Guo,
right?

A.  Or maybe, but he's not what you just mentioned earlier.

Q.  Mr. Dai, your testimony is that "Guo" in Guo Media only
maybe refers to Miles Guo; is that right?

A.  I don't know.  I didn't invest in Guo Media.  I have never
seen certain documents or explanation or description of what it
means.

Q.  Okay.  You heard Miles Guo talk in his broadcast about the
Himalaya Exchange; isn't that right?

A.  Yes.

Q.  And when Miles Guo said that the Himalaya Exchange is a
cryptocurrency exchange, you believe that, right?

A.  I heard this, but I believe the content is because when I
read the relevant information, at that point I couldn't decide
it was true or not.

Q.  Well, you heard Miles Guo talk about the Himalaya Exchange
and H Coin and H dollar on his live streams that you watched,
didn't you?

A.  Yes.

Q.  And when Miles Guo talked about Himalaya Coin or Himalaya
Dollar, you believe what he said on his broadcast that you
watched, didn't you believe it?

A.  No, I didn't believe that at the time.  I was only
interested.

O78BGUO2                        Dai - Cross

1   Q.  Mr. Dai, it's your testimony that there were times when you

2   heard Miles Guo talk about the Himalaya Exchange and you did

3   not believe what he was saying?

4   A.  Correct.

5   Q.  And there were times that Miles Guo talked about GTV and

6   you did not believe what he was saying?

7              MS. SHROFF:  Your Honor --

8   A.  I had no way to judge.  I just heard some interesting

9   information, and then I was waiting to have more information

10  come up in order for me to decide if that's true or should I

11  believe it.

12  Q.  You agree with me, don't you, that H Coin is not backed by

13  gold?

14  A.  H Coin does not have gold as backup.

15  Q.  Right.  And when Miles Guo said that it did, was he lying?

16  A.  I don't believe he was lying.  I was thinking that he was

17  expressing his understanding of H Coin.  But obviously in the H

18  Exchange in his white paper, he didn't specify that the H Coin

19  was backed by gold, so I think the H Coin is independent

20  platform so he can do his -- he can decide or design to decide

21  how to do this cryptocurrency.

22  Q.  Mr. Dai, you agree with me don't you, that Miles Guo

23  designed H Coin?

24  A.  I don't know.

25             MR. HORTON:  Ms. Loftus, can we pull up what's in

1  evidence as GX9 and go to page 120.

2  Q.  Mr. Dai, the Himalaya Exchange launched on November 1,

3  2021; isn't that right?

4  A.  Yes, the formal launch, yes.

5  Q.  On the screen in front of you there's a document called

6  GX9, if you look at the top of this page.  Mr. Dai, you see the

7  date September 29, 2021, top left in highlight.

8          Mr. Dai, the question is, do you see the date in the

9  top left corner?

10  A.  Yes, I see it.

11  Q.  By the way, G News, is your testimony that G news, the "G"

12  doesn't stand for Guo either?

13  A.  That obviously is not representing Guo.  You can enlarge

14  it.

15  Q.  Your testimony is that --

16          MS. SHROFF:  Your Honor, may we ask for the document

17  to be enlarged.

18          THE COURT:  We haven't heard the question.

19          MS. SHROFF:  The witness asked for the document to be

20  enlarged.

21          THE COURT:  Absolutely, it should be enlarged.

22  Absolutely.

23  Q.  Mr. Dai, the G News --

24  A.  As you can see, the G News --

25          THE COURT:  One moment.  You have to wait for the

O78BGUO2                         Dai - Cross

1    question in order to offer an answer.

2    Q.  Mr. Dai, the question is whether your testimony today is

3    that the "G" in G News doesn't stand for Guo neither?

4    A.  Does not represent Mr. Guo.

5    Q.  You see that this document is entitled highlights of Miles

6    Guo's live broadcast on September 29, 2021.  Do you see that?

7    A.  Yes, I can see the title.

8    Q.  And do you see Mr. Guo in the middle of the screenshot

9    there on the top of the page?

10   A.  Yes, I see it.

11   Q.  Thank you.

12           MR. HORTON:  If you could zoom out, please, Ms.

13   Loftus.

14   Q.  Mr. Guo's statement on this date, Mr. Dai, September 29,

15   2021, that was just a few weeks before the Himalaya Exchange

16   launched; isn't that right?

17   A.  I think maybe over a month prior, yes.

18   Q.  And Mr. Guo says "The safest virtual coin at the moment is

19   the Himalaya Coin because 20 percent of the value is anchored

20   to gold."  Do you see that right there?

21   A.  Yes, I see that.

22   Q.  So when Mr. Guo said that, that was not true, was it?

23           MS. SHROFF:  Your Honor, I have an objection under

24   Federal Rule of Evidence 609, and if I need to elaborate, I'm

25   happy to have a sidebar.  608, I'm sorry.

O78BGUO2                          Dai - Cross

1               THE COURT:  All right.  Let's have a sidebar.

2               (Continued on next page)

O78BGUO2                          Dai - Cross

1          (At the sidebar)

2          THE COURT:  Are you going to tell me about Mr. 608,

3     Mr. Kamaraju?

4          MR. KAMARAJU:  I'm going to do that with another rule

5     in combination, your Honor.  Rule 608 precludes specific

6     instances of conduct being used to attack a witness's

7     testimony.  Basically you cannot ask another witness whether

8     somebody lied.  And because Mr. Guo's statements are being

9     offered for as an out-of-court declarant, he falls under those

10    same rules.

11         THE COURT:  So aren't you looking to impeach Mr. Guo

12    essentially?

13         MR. FERGENSON:  The question was whether this

14    statement that he just read was true.  It doesn't bring up --

15    it's not character evidence under 608.

16         MR. KAMARAJU:  It's 609(b).

17         MR. HORTON:  Your Honor, I admit, I'm confused.  This

18    is a fraud case.  What's at issue is whether Mr. Guo lied when

19    talking about investments.  The witness testified that he

20    watched Mr. Guo's broadcast where he made statements about

21    investments.  The witness also testified H Coin was not backed

22    to gold.  He agreed with me on that.  Mr. Guo said repeatedly

23    H Coin is backed to gold.  The question of this fraud case is,

24    that's not true, right?

25         MR. KAMARAJU:  You still can't ask a witness to

O78BGUO2                          Dai - Cross

1    impeach another witness's credibility in specific instances.

2    Mr. Guo is an out-of-court declarant who can be impeached.  It

3    is a fraud case.  They are allowed to prove that he lied, but

4    the way you do that is not saying to one witness, did he lie on

5    this instance.

6              MS. SHROFF:  You cannot ask about specific instances.

7              MR. HORTON:  It cannot be the case that they can bring

8    in a witness for the purpose of bolstering the credibility of

9    Mr. Guo, talking about materiality pro and con, and then we

10   can't ask that this particular statement wasn't true based on

11   the witness's prior testimony that H Coin was in fact backed by

12   gold.

13             MS. SHROFF:  Actually, the witness testified that he

14   read the white paper and that is what he relied on.  He has

15   repeatedly told you that he has not relied on Mr. Guo's video.

16   You ignored all of his answers and you keep pummeling down this

17   video road. And the rule has no exception to a fraud case -- I

18   think the statute is the very clear -- you may not ask about

19   specific instances and ask somebody who is in court whether

20   those are true or false.  If the statute says, and by the way,

21   we're making an exception in a fraud case, I would be delighted

22   to hear that.

23             THE COURT:  What's the other rule, Mr. Kamaraju?

24             MR. KAMARAJU:  If you give me a second.  It's an

25   impeachment of out-of-court declarant statements.  I have to

O78BGUO2                          Dai - Cross

1    remember the rule number.

2              MR. FERGENSON:  If I may, your Honor.  I think just

3    going back to sort of fundamental building blocks. This is a

4    case about representations made to investors and whether

5    they're true.  That's not about -- there's no, like, the

6    entire -- if Mr. Kamaraju was correct, then the government's

7    entire case in chief was improper because we're impeaching an

8    out-of-court declarant, meaning the defendant.  Of course in a

9    fraud case you're going to say the things the defendant said

10   are untrue.  That's the entire basis for the prosecution. This

11   rule, well it's sort of nuanced, it has no application here.

12   And we're asking the witness if he agrees this representation

13   was not factually true.  That's the question pending.  The

14   objection should be overruled.

15             THE COURT:  My recollection is the prosecution asked

16   the same question of their witnesses.  Why didn't you object

17   then?

18             MR. KAMARAJU:  I did.

19             THE COURT:  Why didn't you bring up the rule then?

20             MR. KAMARAJU:  I did.  I did, your Honor, but I do

21   think there is a difference -- and I want to draw this

22   distinction.  There's a difference between whether it's in a

23   fraud case or any other case asking a witness for the

24   underlying facts that show the defendant's statement is not

25   true.  They are undoubtedly permitted to do that.  There's no

1  bar to that.  The point that I'm objecting to is asking the

2  witness his opinion as to whether Mr. Guo lied in a specific

3  instance.  That is what the rule bars.  This does not hamstring

4  the Southern District of New York from bringing fraud cases in

5  the future, they just have to do it consistent with the rules

6  of evidence.

7         MR. FERGENSON:  That's not the question pending.  The

8  question pending is whether that factual representation is

9  true.  There's no reason the witness can't answer that, and I

10 don't think Mr. Horton needs to ask, and Miles Guo was

11 knowingly lying when he said that, right?  He's not going to

12 ask that.  He can just ask was this representation true, which

13 is the question pending, and it should be overruled.

14        THE COURT:  Is there anything further?

15        MR. KAMARAJU:  I just note, I don't think that was the

16 question before. If that's going to be the question, that's a

17 different answer.

18        THE COURT:  My recollection is that that was the

19 question.

20        MR. KAMARAJU:  Just so I understand the ruling, it's

21 not that he can say did Miles Guo lie in that instance.  He can

22 say is that factual statement that Miles Guo said is true?

23        THE COURT:  That's what he asked.

24        MR. KAMARAJU:  I'm just making sure that I understand

25 the Court going down this road.

1          THE COURT:  And you're not objecting to that question?

2          MR. KAMARAJU:  I won't continue to.

3          THE COURT:  I said you're not objecting to that

4     question?

5          MS. SHROFF:  We are.

6          THE COURT:  You are?

7          MR. KAMARAJU:  To the factual predicate of his

8     understanding if it's true?

9          THE COURT:  Yes.

10         MR. KAMARAJU:  I don't think I can object to that,

11    your Honor.  I've made my objection.

12         THE COURT:  Okay.  If you can just hold on a second.

13    I just want to talk to my clerk about the other issue.

14         MS. SHROFF:  Your Honor, there was also a whole stream

15    of questions that were asked prior to this one as to whether or

16    not Mr. Guo had lied about specific instances.  I didn't

17    interrupt, but those questions are also improper to the extent

18    they talk about specific instances that the witness is being

19    asked about.  And the record should be clear, the witness has

20    repeatedly said, he did not rely on the video in determining

21    whether to invest.  He said that over and over again.

22         THE COURT:  Did you ask questions that contain the

23    word "lie?"

24         MS. SHROFF:  Yes.

25         MR. FERGENSON:  He did, and they were not objecting

O78BGUO2                          Dai - Cross

1    to. We're not going to keep asking those questions.  We'll ask

2    about factual representations, which is what was objected to,

3    and I think is not objectionable.

4              THE COURT:  Wait one moment, please.

5              MS. SHROFF:  The question about him lying should be

6    stricken.

7              THE COURT:  Wait a minute.  I want to go back to the

8    *DiMaria* issue.  I think that the defense is offering Mr. Guo's

9    statement for the purposes of showing his state of mind.

10   *DiMaria* is different.  It's a different circumstance where the

11   defendant was saying something in the moment, so I'm not going

12   to permit these questions about the location of the club shall

13   we say.

14             MR. KAMARAJU:  Just two points.  You asked me

15   previously about what rule I was citing in terms of attacking

16   an out-of-court declarant's credibility.  That's rule 806 which

17   says that the declarant's credibility may be attacked if

18   supported by any evidence that would be admissible for those

19   purposes if the declarant had testified as a witness, so it is

20   subject to 608's limitations.

21             And then the other thing I would say about *DiMaria*,

22   your Honor, is I believe -- I could be wrong, but I believe

23   that that was not admitted as a present sense impression.  I

24   believe that was admitted as a state of mind exception because

25   the Court specifically addressed the carve out in that case and

O78BGUO2                         Dai - Cross

1    the distinguish other Second Circuit cases that had addressed

2    the carve out.   So that case is certainly in my reading a

3    state of mind case not a present sense impression case.   So I

4    suspect we are going to have this issue come up again, so I

5    just wanted to flag that point because I think we're going to

6    cite it again.

7              THE COURT:  All righty.  I'm not going to permit the

8    statement with regard to the location.

9              MR. KAMARAJU:  With this witness or with any

10   questioning?

11             THE COURT:  With this witness so far.  I don't know

12   what the others are going to talk about.  They may say they

13   visited the location.  I don't know.

14             MR. KAMARAJU:  Understood.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O78BGUO2                    Dai - Cross

```
 1                  (In open court)
 2                  THE COURT:  You may continue.
 3                  MR. HORTON:  Thank you, your Honor.
 4      BY MR. HORTON:
 5      Q.  Mr. Dai, just redirecting your attention back to Mr. Guo's
 6      statement on the screen.
 7                  Mr. Guo's statement on September 29, 2021, on G News
 8      that the safest virtual coin at the moment is the Himalaya Coin
 9      because 20 percent of the value is anchored to gold. That
10      statement was not true, was it?
11      A.  You mean compared with the white paper from the H Exchange,
12      whether that's true?  If that's the case, that's not true
13      because it's not linked to gold.
14      Q.  Right.
15                  MR. HORTON:  Ms. Loftus, can you scroll down, please
16      to the second paragraph on page 121.  And, actually, if you
17      could stop at the bottom of 120.
18      Q.  You see the date on the left-hand side October 20, 2021?
19      A.  Yes, I see it.
20      Q.  And that's just 12 days before the launch of the Himalaya
21      Exchange, correct?
22      A.  Yes.
23      Q.  And that's Mr. Guo in the middle of the screenshot, isn't
24      it?
25      A.  Yes.
```

O78BGUO2                          Dai - Cross

1          MR. HORTON:  Ms. Loftus, if you could scroll down to

2    the excerpt.  It's the second paragraph on this page, and

3    highlight starting at, What is called the next three lines,

4    four lines, please.

5    Q.  Mr. Dai, on October 20, 2021, Mr. Guo said, "What is

6    called?  I am talking about your H Coins.  Brother Seven

7    designed it at that time."

8          Do you agree that Brother Seven is Miles Guo, correct?

9    A.  Yes.

10   Q.  And so Miles Guo designed H Coin; isn't that right?

11         MS. SHROFF:  Objection.  Is he asking for his

12   understanding or is he asking what that document states?

13         MR. HORTON:  My question, your Honor, to Mr. Dai is --

14   Q.  Mr. Dai, didn't Miles Guo design H Coin?

15         MS. SHROFF:  Objection.  He has no personal knowledge.

16         THE COURT:  You may answer.

17   A.  At this place that says so, but I wasn't sure who was the

18   real designer behind it.

19   Q.  Well, was Miles Guo -- is this statement true what Miles

20   Guo said --

21         MS. SHROFF:  Objection.

22         THE COURT:  You may answer.

23         MS. SHROFF:  We discussed this at the sidebar, and he

24   also said he doesn't know.

25         THE COURT:  You may answer.

1    A.  Can you repeat your question because I was interrupted.

2    Q.  Is Miles Guo's statement that H Coin has 20 percent gold

3    and it is linked to gold, not the others, clear gold directly.

4    Is that statement true, Mr. Dai?

5    A.  This particular sentence he did say that.  He did say that

6    sentence, but it's not inconsistent with the white paper from

7    the Himalaya Exchange.

8    Q.  Mr. Dai, your testimony is that this statement is not

9    inconsistent with the white paper?

10   A.  That's correct, inconsistent.

11   Q.  Just so I make sure I understand, Mr. Dai, Mr. Guo's

12   statement on October 20, 2021 that H Coin has 20 percent gold,

13   your testimony is that that is consistent or inconsistent with

14   the white paper?

15   A.  Inconsistent.

16   Q.  This statement on your screen from Miles Guo is not true,

17   is it?

18            MS. SHROFF:  Objection, asked and answered.

19            THE COURT:  He didn't answer.  You can answer now.

20   Q.  This statement on your screen from Miles Guo, Mr. Dai, is

21   not true, is it?

22   A.  I believe that's his understanding of H Coin.

23   Q.  It's not true, is it?

24            MS. SHROFF:  Objection, asked and answered.

25            MR. HORTON:  He did not answer the question.

O78BGUO2                    Dai - Cross

1          THE COURT:  The question was not answered.  Sir,
2    answer the question.
3    Q.  This statement, Mr. Dai, from Miles Guo is not true, isn't
4    that right?
5    A.  The content was not true, but I don't understand -- do you
6    mean to say --
7          THE COURT:  I want you to answer exactly what is being
8    asked.  Is there something that you don't understand about the
9    question?
10         THE WITNESS:  I understood the question.
11   A.  He did say that.  But if you ask me whether he said this
12   thing, yes, he did say that.
13         MR. HORTON:  Your Honor, the government would move to
14   strike the answer after "the content is not true."
15         MS. SHROFF:  He answered the government's question.
16         THE COURT:  What comes after the word "true" is
17   stricken.
18   Q.  Last week, Mr. Dai, Ms. Shroff ask you some questions.
19         MR. HORTON:  We can take this down please, Ms. Loftus.
20   Q.  Ms. Shroff ask you some questions about -- last week --
21   whether buying a G/Club membership would get you GTV stock, do
22   you remember that?
23   A.  Yes, I remember.
24   Q.  And your testimony last week was that G/Club and GTV seems
25   not to be related at all, do you remember testifying to that?

O78BGUO2                          Dai - Cross

1    A.  Yes, I remember.

2              MR. HORTON:  Ms. Loftus, can we show Mr. Dai what's in

3    evidence as GX29 at page 113.

4    Q.  That's Miles Guo in this screenshot; isn't it, Mr. Dai?

5    A.  Yes.

6    Q.  And it's from July 30, 2021.  Do you see the date on the

7    top left?

8    A.  Yes, I see it.

9    Q.  And it's recorded on GTV, do you see that in the URL?

10   A.  Yes.

11   Q.  And you watched GTV; isn't that right?

12   A.  Yes.

13             MR. HORTON:  And, Ms. Loftus, can we scroll down to --

14             MS. SHROFF:  Your Honor, the government hasn't

15   established that the witness has seen this particular video.

16             MR. HORTON:  It's in evidence.

17             MS. SHROFF:  That's not the question.

18             THE COURT:  So I haven't heard a question so I'd like

19   to hear the question.

20             MR. HORTON:  If I could have, Ms. Loftus, scroll down

21   to the right part of the document.  It's the part that

22   straddles 114 and 115.

23             THE COURT:  I'm just realizing that it's 11:33, so

24   it's time for the half hour break.  Remember you're not

25   permitted to discuss this case amongst yourselves.  Don't

O78BGUO2                          Dai - Cross

1   permit anyone to discuss it in your presence.  Don't read,

2   listen to or watch anything from any source that touches on the

3   subject matter of this case.

4            THE LAW CLERK:  Jury exiting.

5            (Jury not present)

6            THE COURT:  Sir, you may step out.  Don't discuss your

7   testimony.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO2                          Dai - Cross

1          (Jury not present)

2          THE COURT:  You may be seated.  Is there anything

3    before we reconvene at noon?

4          MR. HORTON:  Very briefly from the government.  Just

5    before the break I didn't have a question pending.  I don't

6    believe Ms. Shroff made an objection.  There was just an

7    interruption and an assertion from Ms. Shroff.  Just ask that

8    she not be permitted to do that. She can make objections.  She

9    can wait for the Court's rulings and she can follow them.

10          THE COURT:  So you've been testifying, Ms. Shroff, as

11    opposed to merely making objections.  Don't do that.

12          MS. SHROFF:  Yes, your Honor.  I do have a matter to

13    raise though.  The government is purposely not asking the

14    witness whether or not the document that is being shown is

15    something that this witness ever saw before or ever looked at

16    before or has even viewed before.  It is consistently asked --

17    could you sit down, Mr. Horton, so I may finish?  Thank you.

18          THE COURT:  Whether someone is standing or sitting is

19    up to me, Ms. Shroff.

20          MS. SHROFF:  I can't see.

21          THE COURT:  Don't be directing them what to do.

22          MS. SHROFF:  Your Honor, could I ask that the

23    government not stand while I'm speaking cause I can't see.  I'm

24    rather short.

25          THE COURT:  Well, I can see you well.  There's a space

O78BGUO2                        Dai - Cross

1    in between Mr. Horton and Mr. Fergenson, so limit yourself to

2    purely legal issues.

3              MS. SHROFF:  I object to the way the government is

4    asking the witness questions.  The government is deliberately

5    skipping the step of asking the witness whether or not the

6    witness is ever seen this particular video before, or whether

7    he's even heard it before.  And what they're saying is, this is

8    a document in evidence, and now read from it.  Now tell me if

9    what you're reading is true.  That is what the government is

10   doing, and that is why I have a continuing objection to the

11   manner in which they're asking that question.  Thank you, your

12   Honor.

13             MR. HORTON:  Your Honor, that's what redirect is for.

14   There's no rule that says if a document is in evidence I need

15   to establish some personal relationship from the witness to the

16   document.  The witness has also testified that he watched five

17   hours of GTV a day.

18             MS. SHROFF:  Your Honor, that is exactly what

19   Mr. Schirick did and what --

20             THE COURT:  Ms. Shroff, don't speak over me.

21   Mr. Horton has stated the law correctly.  If you want to ask

22   him on redirect whether he's looked at a document or video, you

23   can do that.  We'll return at noon.

24             (Recess)

25

O78VGUO3                          Dai - Cross

1                    A F T E R N O O N   S E S S I O N

2                              12:05 P.M.

3              THE COURT:  Please have the jurors brought in.

4              (Jury present)

5              THE COURT:  Please be seated.

6              And please continue with your inquiry.

7              MR. HORTON:  We're just awaiting the witness, your

8    Honor.

9              (Witness present)

10             THE COURT:  Sir, remember that you're still under

11   oath.

12             MR. HORTON:  May I inquire?

13             THE COURT:  Yes, you may.

14   BY MR. HORTON:

15   Q.  Mr. Dai, can you hear me okay?

16   A.  Yes, I can hear you.

17   Q.  Before the break, I asked you whether you remembered

18   testifying last week that G CLUB and GTV seems not to be

19   related at all.  Do you remember that?

20   A.  Yes.

21   Q.  And if someone were to say that G CLUB and GTV were

22   related, that would not be true, right?

23   A.  But for my testimony, I was only talking about my fellow

24   fighters, and I didn't know what else you were talking about,

25   no.

O78VGUO3                          Dai - Cross

1          MR. HORTON:  Ms. Loftus, if we could please put up

2     what's in evidence as GX-9 at page 113.

3     Q.  Do you see, Mr. Guo?

4     A.  I was talking about a private -- sorry.

5          THE COURT:  So we don't have any question.  So just

6     wait for the question.

7     Q.  Do you see Mr. Guo in the screenshot here, Mr. Dai?

8     A.  Yes.

9     Q.  And do you see this is from GTV?  Do you see the URL on the

10    left?

11    A.  Yes, I can see.

12         MR. HORTON:  Ms. Loftus, can you go down to the bottom

13    of 114 and the top of 115, please.  You can scroll down just a

14    few more lines, please.  Oh, can we publish it to the jury,

15    please.

16         Can the jury see the screen?

17    Q.  This is a statement of Miles Guo on July 30th, 2021.  Do

18    you see that, Mr. Dai?  Can you see the statement on the

19    screen?

20    A.  Yes, I can see.

21    Q.  There are still many people asking questions, Miles Guo

22    said, including Brother Long Island.

23         And you know who Brother Long Island is, Mr. Dai?

24    A.  Yes, I know who Long Island Brother is.

25    Q.  He was the leader of the Himalaya Farm Alliance, right?

1    A.  Yes.

2    Q.  In your answer to my question a moment ago, you referred to

3    fellow fighters, isn't that right?

4    A.  Yes.

5    Q.  Miles Guo says here in July 2021:  There's still many

6    people asking questions, including Brother Long Island.  And

7    Kai told me that some of the fellow fighters asked, Will I

8    still get a stock offer when I buy a G CLUB membership.  And

9    Miles Guo says 100 percent.  Because I said that I have to

10   promise that anyone who buys G CLUB membership before

11   September 17th must be allotted shares, which is exactly the

12   same.  Because we said that anyone can choose whether to use

13   your money to buy G CLUB before September 17, G CLUB and the

14   stock shares.  You'll get both.

15             Do you see that, Mr. Dai?

16   A.  Yes.

17   Q.  And you believe that Miles Guo tells the truth, don't you?

18             MS. SHROFF:  Objection.

19             Asked and answered several times.

20             THE COURT:  I believe so.  Sustained.

21   Q.  Last week, Mr. Dai, you were shown some screenshots and

22   videos that you recorded before you testified.  Do you remember

23   that?

24   A.  Yes, I do.

25   Q.  And Mr. Guo's lawyers asked you to make those recordings,

1    didn't they?

2    A.  I recorded.

3    Q.  And you recorded videos for Mr. Guo's lawyers of your H Pay

4    and Himalaya Exchange accounts, isn't that right?

5    A.  Yes.

6    Q.  And earlier today, Ms. Shroff asked if all the features on

7    your account were the same last week as they were in 2022, do

8    you remember that?

9    A.  I remember.

10   Q.  And you said under oath that two features were different,

11   they were restricted.  Do you remember that?

12   A.  I remember.

13   Q.  And one of those restricted features was redemptions,

14   wasn't it?

15   A.  What do you mean by "redemption"?

16   Q.  You said that two features were not accessible to you in

17   2022, one of those features --

18           MS. SHROFF:  Objection.  That is not what he

19   testified.

20           THE COURT:  Overruled.

21   Q.  One of those restricted features was redemptions, isn't

22   that true?

23   A.  When you say "redemption," do you mean transfer HDO into

24   U.S. dollar to bank account?

25   Q.  Exactly right.  That was one of the restricted features for

O78VGUO3                         Dai - Cross

1   some time, wasn't it?

2          MS. SHROFF:  Objection to "some time."

3          THE COURT:  Overruled.

4   A.  Yes, the redemption amount went down.

5   Q.  Mr. Dai, you have a Twitter account, don't you?

6          MR. HORTON:  I'm sorry, if the interpreter could read

7   the answer please.

8          THE COURT:  I'm waiting.

9          THE INTERPRETER:  Do you want the interpreter

10  reading --

11         MR. HORTON:  Mr. Dai answered it.

12  A.  Yes, I do.

13  Q.  And you follow some cryptocurrency-related accounts, don't

14  you?

15  A.  Yes.

16  Q.  And you know that the Himalaya Exchange has a Twitter

17  account, isn't that right?

18  A.  Yes.

19  Q.  Do you know that while you were testifying last Wednesday,

20  the Himalaya Exchange tweeted that its site was down for

21  maintenance?

22         MS. SHROFF:  Objection.  Hearsay.

23         THE COURT:  Overruled.  You may answer.

24  A.  This maintenance is to accurate and it will end shortly and

25  goes back to normal.  It happen a few times before previously.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    It does not affect usage.

2    Q.  Mr. Dai, do you know that the Himalaya Exchange deleted

3    that July 3rd tweet?

4    A.  I don't know.

5    Q.  In between your testimony last week and your testimony

6    today, there was a break in these proceedings.  Do you remember

7    that?

8            THE INTERPRETER:  Interpreter repeat.

9    A.  Did I rest?  I rest.

10   Q.  And between your testimony last week and your testimony

11   today, you met again with Miles Guo's lawyers, isn't that

12   right?

13   A.  Yes.

14   Q.  You met with Ms. Shroff?

15   A.  Yes.

16   Q.  You met with Mr. Schirick over there?

17   A.  Yes.

18   Q.  You met with Mr. Barkan, who's not in the room, isn't that

19   right?

20   A.  Yes.

21   Q.  There are other lawyers for Miles Guo in those meetings,

22   right?

23   A.  I have.

24   Q.  This was after you started testifying last week, isn't that

25   right?

O78VGUO3                        Dai - Cross

1   A.  Yes.

2   Q.  And Miles Guo's lawyers gave you advice on how to finish

3   your testimony, isn't that right?

4   A.  No, they did not give me advice.

5   Q.  Well, they talked to you about your testimony, didn't they?

6   A.  Testimony.  They ask me questions; I answered.

7   Q.  They gave you feedback on your answers, didn't they?

8   A.  No, they mention that my voice was low last time.

9   Q.  Are you aware that today is July 8th, Mr. Dai?

10  A.  I know.

11  Q.  You know that last night the Himalaya Exchange once again

12  shut down for maintenance?

13  A.  Yes, I know.

14  Q.  You want to help Miles Guo if you can, isn't that right,

15  Mr. Dai?

16  A.  Yes.

17  Q.  And you flew here from your home in Germany back on

18  June 28th to try to help Mr. Guo, isn't that true?

19  A.  Yes.

20  Q.  You've been here for almost two weeks now to try to help

21  Mr. Guo, isn't that right?

22  A.  Yes, ten days.

23  Q.  And this morning, before you resumed your testimony, while

24  you were sitting in that chair, Mr. Dai, and Miles Guo was

25  sitting in the seat where he is in right now, Miles Guo looked

1  at you and went like this, and nodded and smiled; isn't that

2  right?

3  A.  I did not see.

4  Q.  Your testimony under oath, Mr. Dai, is that earlier this

5  morning, before you resumed your testimony, Miles Guo didn't

6  look over to you, standing where he's now sitting, while you

7  sat in that chair, and Miles Guo did not look at you and go

8  like this?

9  A.  I saw he smiled at me, but I did not see the hand gesture.

10 Q.  You still believe in Miles Guo, don't you, sir?

11 A.  Yes, I believe him.

12         MR. HORTON:  Your Honor, if I could just have one

13 moment, please.

14         THE COURT:  Okay.

15         (Counsel conferred)

16         MR. HORTON:  Thank you.  We have no further questions.

17         THE COURT:  Redirect.

18 REDIRECT EXAMINATION

19 BY MS. SHROFF:

20 Q.  Mr. Dai, let me show you G-9 that was -- I'm sorry,

21 apparently it's GX CC-9 or Z-9.

22         MS. SHROFF:  May I have the first part made bigger for

23 him.

24 Q.  Mr. Dai, you were asked questions about what the "G" stands

25 for in G News; correct?  By Mr.  -- by the government lawyer

1    here?

2    A.  Yes.

3    Q.  And your answer was interrupted; correct?

4            MR. HORTON:  Objection.

5            THE COURT:  Overruled.  You can answer.

6    A.  "G" stands for global.

7    Q.  Okay.  Could I just point out your answer was interrupted

8    and you said it is obvious why the "G" is global.  Do you

9    remember saying that?

10           MR. HORTON:  Your Honor, objection.  First part of the

11   question was Ms. Shroff's testimony.

12           THE COURT:  Don't testify.

13   Q.  Do you remember saying that it's obvious?

14   A.  Yes.

15   Q.  And could you tell the jury why it is obvious to you that G

16   News stands for Global News?

17   A.  It was obviously from the design of the logo, this was the

18   globe, it was a circle and its symbolic design.

19           MS. SHROFF:  All right.  So could we just --

20   A.  Obviously represent global.

21           MS. SHROFF:  Could I have that blown up, please.

22   Q.  Do you see Miles Guo's face in the middle of the G?

23   A.  No.

24           MS. SHROFF:  Thank you, Jorge.

25           You may take that down.

```
 1   Q.  Mr. Dai, when did you first hear about GTV?
 2   A.  Are you referring to the GTV Media platform or the GTV
 3   private placement?
 4   Q.  Let's start with the platform.  When did you first learn
 5   about the platform?
 6   A.  April 2020.
 7   Q.  And how about the private placement?
 8   A.  Whenever private placement information, that was May 2020.
 9   Q.  And you remember being asked questions by the government
10   lawyer about you listening to Miles Guo's videos about GTV?
11   A.  I do.
12   Q.  Do you remember watching each and every one of Miles Guo's
13   videos that mentions the words "GTV"?
14   A.  Could you repeat the question?
15           THE INTERPRETER:  Interpreter can repeat.
16   A.  I cannot be certain if I remember all of them.  But if I --
17   Q.  Are you finished, Mr. Dai, or are you still speaking?
18           THE INTERPRETER:  Could you repeat your response one
19   more time.
20           MS. SHROFF:  I'll rephrase the question.
21   BY MS. SHROFF:
22   Q.  Mr. Dai, did you watch each and every video that Miles Guo
23   ever made?
24   A.  I cannot be certain, but I believe I saw most of it.
25   Q.  And before you invested through the private placement, had
```

1   you seen each one of his GTV discussions on live broadcasts?

2   A.   Before I finish the private placement, I did not saw

3   Mr. Guo did the private placement livestream investment.

4   Q.   Did you read the private placement, all the accompanying

5   documents, in English and in Mandarin?

6   A.   Yes.

7   Q.   Mr. Dai, you were asked questions about the phrase "G

8   Series," you recall that?

9   A.   Yes.

10  Q.   Before today in court when the government lawyer used the

11  phrase "G Series," had you ever used that phrase yourself?

12  A.   I don't remember if I used this phrase.

13  Q.   Do you know what he meant when he asked you the question, G

14  Series?

15  A.   I know what it meant.

16  Q.   You were asked questions about Guo Media, do you remember

17  that?

18  A.   Yes.

19  Q.   Did you invest in Guo Media?

20  A.   No.

21  Q.   Did you research Guo Media?

22  A.   No.

23  Q.   You were asked questions of the Himalaya Exchange, H Pay, H

24  Coin and H Dollar; correct?

25  A.   Yes.

1    Q.  And then you were asked questions about what happened to

2    the exchange while you were actually testifying in court last

3    week; correct?

4    A.  Yes.

5    Q.  Do they allow you to bring your cell phone into this

6    building?

7    A.  No.

8    Q.  Do they allow you to bring a computer into this building?

9    A.  No.

10   Q.  Is there any other way for you to check what is going on on

11   the Himalaya Exchange other than through the internet?

12   A.  No.

13   Q.  When you invested in H Pay, H Coin, H Dollar, and the

14   Himalaya Exchange, did you read the white paper?

15   A.  Yes, I did.

16   Q.  Have you ever reviewed that white paper with me?

17   A.  No.

18   Q.  Have you reviewed that white paper with any lawyer from

19   Mr. Guo's legal team?

20   A.  No.

21   Q.  Between July 3rd or whenever it was that you last

22   testified, and here today, did anyone on the Guo team show you

23   a single piece of paper?

24   A.  No.

25   Q.  On July 4th, did we tell you to go watch the fireworks and

O78VGUO3                          Dai - Redirect

1   celebrate Independence Day?

2            MR. HORTON:  Objection.

3            THE COURT:  You may answer.

4   A.  Yes, they told me that there were fireworks.  And I went to

5   the Brooklyn Bridge Park to saw the fireworks.

6   Q.  You were asked questions about Mr. Guo designing H Coin;

7   correct?

8   A.  Yes.

9   Q.  And you said you did not believe that he designed it

10  himself; correct?

11  A.  I said I am not certain if he designed it.

12  Q.  And do you recall, sitting here today, if Mr. Guo talked

13  about how he had consulted with professionals before the coin

14  was designed?

15           MR. HORTON:  Objection.  Issue raised at sidebar.

16           THE COURT:  Sustained.

17  Q.  You were asked questions about having a Twitter account;

18  correct?

19  A.  Yes.

20  Q.  And on your Twitter account you follow Himalaya Exchange;

21  correct?

22  A.  Yes, I follow.

23  Q.  And do you think that Elon Musk's upgrading of Twitter is

24  any less or more frequent than the ones being done on Himalaya

25  Exchange?

O78VGUO3                              Dai - Redirect

1          MR. HORTON:  Objection.

2          THE COURT:  Sustained.

3   Q.  You were asked questions about the two restrictions, do you

4   remember that?

5   A.  Yes.

6   Q.  What are these two restrictions that you were talking

7   about?

8   A.  Redeem and top out cannot transfer -- cannot transfer U.S.

9   dollar into Himalaya Exchange to purchase.  And you want to --

10  you want to convert the HDO into U.S. dollar, the amount limit

11  went down.

12  Q.  And when did the amount limit go down, what year?

13  A.  Sometime -- I believe sometime in 2023.

14  Q.  So it was better in 2022; correct?

15         MR. HORTON:  Objection, your Honor.

16  Q.  The redemption amount was higher --

17         THE COURT:  Sustained.

18  Q.  The restriction was not in place in 2022; correct?

19         MR. HORTON:  Objection.

20         Mischaracterizes the testimony.

21         THE COURT:  Sustained.

22  Q.  In 2022, could you redeem more or less than in 2023?

23  A.  More.  At that time -- at the time it was $100,000 limit

24  redemption.

25  Q.  And what is it in 2023?

1    A.  5,000.

2    Q.  And you were asked questions, were you not, about

3    statements made by Mr. Guo regarding the gold; correct?  The

4    gold package; correct?

5    A.  Yes.

6    Q.  Did you take those statements into account while

7    considering your decision in whether or not to purchase H Coin

8    or H Dollar?

9    A.  Those statement, that's not, in fact, my investment into

10   Himalaya Exchange.

11   Q.  Why not?

12   A.  Because I saw one versus one ratio with a U.S. dollar

13   bonding.  This ratio was good enough for me.

14   Q.  Mr. Dai, you were asked questions about you having flown

15   all the way from Germany to come here to help Mr. Guo; correct?

16   A.  Correct.

17   Q.  The testimony that you've given here last week and today,

18   has it been truthful?

19   A.  Truthful.

20   Q.  Has it been complete?

21   A.  Complete.  You mean did I tell everything?

22   Q.  Yes.

23   A.  Yes, all that I know, I disclose.

24   Q.  And did any one of us tell you how to answer these

25   questions?

1    A.  No.

2    Q.  And other than me telling you to keep your voice up and

3    annunciate, did I give you any other advice?

4    A.  And as a matter of fact, I complained to Ms. Shroff about

5    the headphone device.  And she tried to help me resolve this

6    issue.  And she wanted me to listen to the question clearly and

7    tell the truth and speak up.

8    Q.  Mr. Dai, would you lie for Mr. Guo here today?

9    A.  No.

10   Q.  Do you have a full-time job today?

11   A.  Yes.

12   Q.  Do you have a wife and children?

13          MR. HORTON:  Objection.  Relevance.  Scope.

14          THE COURT:  Sustained.

15          MS. SHROFF:  I have nothing further.

16          THE COURT:  Recross.

17          MR. HORTON:  We have nothing further, your Honor.

18          THE COURT:  Thank you, sir.  You may step out of the

19   courtroom.

20          (Witness excused)

21          (Continued on next page)

22

23

24

25

O78VGUO3                          Bishop - Direct

 1              THE COURT:  And the defense may call its next witness.

 2              MR. KAMARAJU:  The defense calls Thomas Bishop, your

 3      Honor.

 4       THOMAS BISHOP,

 5          called as a witness by the Defendant,

 6          having been duly sworn, testified as follows:

 7              THE COURT:  You may inquire.

 8              MR. KAMARAJU:  Thank you, your Honor.

 9      DIRECT EXAMINATION

10      BY MR. KAMARAJU:

11      Q.  Afternoon, Mr. Bishop.

12      A.  Afternoon.

13      Q.  Sir, where did you go to school?

14      A.  I graduated from Penn State University with a bachelor's

15      degree in accounting.

16      Q.  And after your time at Penn State, did you work?

17      A.  Yes.  I was hired by the Internal Revenue Service, criminal

18      investigation division.

19      Q.  What is the criminal investigations division of the IRS?

20      A.  The IRS criminal investigation division is the criminal

21      enforcement arm of the Internal Revenue Service.

22      Q.  And what kind of investigations, generally speaking, did

23      you work on?

24      A.  Income tax, money laundering, and currency crimes under the

25      Bank Secrecy Act.

Bishop - Direct

1   Q.  In your time at the IRS, did you hold any supervisory

2   positions?

3   A.  Yes, I held four.

4   Q.  Let's just start with the first one.  What was the first

5   one?

6   A.  The first one was a supervisory special agent.

7   Q.  And could you just tell the jury what your general

8   responsibilities were in that role?

9   A.  I supervised the operational day-to-day activities of a

10  group of 10 to 12 special agents or criminal investigators in

11  their investigations.

12  Q.  And approximately how long were you in that role?

13  A.  Approximately six years in that role.

14  Q.  And after that role came to an end, where did you go next?

15  A.  I was promoted to a policy position in IRS headquarters

16  dealing with offshore banking issues and ensuring consistency

17  among that program in the IRS.

18  Q.  And can you just tell us generally what your

19  responsibilities were in that role.

20  A.  In that role, it was to ensure consistency and uniformity

21  in the investigation of foreign offshore bank account-type

22  cases.

23  Q.  And about how long were you in that role?

24  A.  About 16 months.

25  Q.  What did you do next?

O78VGUO3                          Bishop - Direct

1    A.  I came back to New York, the New York field office, as an

2    assistant special agent in charge.

3    Q.  And could you just describe generally what your

4    responsibilities were there.

5    A.  Sure.  It's an operational role.  And you oversee the

6    investigative program of four groups -- four to five groups of

7    special agents.

8    Q.  And how long were you in that role for?

9    A.  About four years.

10   Q.  What did you work on after that?

11   A.  I went to headquarters, Washington, D.C., and I was the

12   director of international field operations.

13   Q.  And just give us a general sense of your responsibilities

14   there.

15   A.  In that role, I supervised our foreign posted employees —

16   the IRS has special agents posted across the world — along with

17   supervising global investigations.

18   Q.  Can you give the jury an example of a global investigation

19   you supervised?

20   A.  The last one that I did before I retired was the Panama

21   Papers.

22   Q.  Was that a money laundering investigation?

23   A.  There were components of it, yes.

24   Q.  Now, how much time did you spend at the IRS in total?

25   A.  A little bit more than 25 years.

O78VGUO3                          Bishop - Direct

1    Q.  Did you work anywhere else after that?

2    A.  I did.

3    Q.  What did you do after?

4    A.  I went to work in the forensics practice of Baker Tilly

5    U.S., which is a top ten accounting firm.

6    Q.  And what were your responsibilities in that practice?

7    A.  In that practice we provided forensic accounting,

8    investigative and litigation support, legal and regulatory

9    compliance services to our clients.

10   Q.  And about how long were you at Baker Tilly?

11   A.  Four years, a little bit more.

12   Q.  And did you work any more after that?

13   A.  I did.  I went to BDO.

14   Q.  What's BDO?

15   A.  BDO is another large accounting firm, a little bit bigger

16   than Baker Tilly.  I worked in that forensic practice as well.

17   Q.  Were your responsibilities at BDO similar to Baker Tilly?

18   A.  They were virtually identical.

19   Q.  Sir, where do you work now?

20   A.  About 18 months ago I started my own firm.

21   Q.  And what kind of work generally does your firm do?

22   A.  The same type of work I just described.

23   Q.  And as a general matter, are there kinds of matters that

24   you consult on?

25   A.  Yes.  I consult predominantly on white-collar litigation

1  matters, tax controversy and advocacy-type engagements.

2  Q.  Have you ever testified at a trial before?

3  A.  Yes, I have.

4  Q.  Have you testified previously as an expert witness?

5  A.  I have.

6  Q.  And how about as a summary witness?

7  A.  Yes, I have.

8  Q.  And have you testified before on behalf of the United

9  States government?

10  A.  I have.

11  Q.  And how about on behalf of criminal defendants?

12  A.  Yes, I have.

13  Q.  I'd like to talk about this case.

14       Now, were you retained in this case?

15  A.  I was retained.

16  Q.  Who retained you?

17  A.  Mr. Guo's counsel.

18  Q.  And are you compensated for your work?

19  A.  I am.

20  Q.  How are you compensated?

21  A.  I'm paid by the hour.

22  Q.  What is your hourly rate?

23  A.  425, $425 per hour.

24  Q.  Now, sir, just generally speaking, can you tell the jury

25  what you were retained to do?

O78VGUO3                         Bishop - Direct

1    A.   In general, I was retained to review bank records and data.

2    Q.   Now, were those bank records provided to you by Mr. Guo's

3    lawyers?

4    A.   Yes.

5    Q.   And did Mr. Guo's lawyers direct you as to which accounts

6    to look at?

7    A.   They did.

8    Q.   And did Mr. Guo's lawyers provide feedback on your work?

9    A.   Yes, they did.

10            MR. KAMARAJU:  I'd like to pull up what's already in

11   evidence, DX 11598, please.

12   Q.   Sir, do you recognize this type of record?

13   A.   Yes.

14   Q.   Generally speaking, how would you describe it?

15   A.   It is an Excel spreadsheet containing transactional bank

16   data.

17   Q.   Do you know which bank it's a record for?

18   A.   I believe it's FV Bank.

19   Q.   All right.  And so let's just go through as an example some

20   of these columns.

21            So what's the date column there?

22   A.   Column A is the date.

23   Q.   What's that intended to reflect?

24   A.   The date of the transaction.

25   Q.   All right.

1            If we go over to column C, what's that intended to

2    reflect?

3    A.  That is the originating transactor.

4            MR. KAMARAJU:  All right.  We could scroll over a

5    little bit.  There's a lot of columns.  Let's go over to column

6    I real quick.

7    Q.  What's column I reflect?

8    A.  Column I reflects the amount of the transaction.

9    Q.  Okay.  So if we can go back over, do you see column G,

10   where it says "payment type"?

11   A.  Yes.

12   Q.  What's that reflect?

13   A.  That reflects the type of transaction.

14           MR. KAMARAJU:  We could scroll over to column T,

15   please.

16   Q.  What's that reflect?

17   A.  Column T is the beneficiary company name.

18   Q.  What's the beneficiary company?

19   A.  That's the recipient entity account name.

20   Q.  And do you see what's listed in row 2 there?

21   A.  Yes.

22   Q.  Do you know what that is?

23   A.  Row 2, Sharps Pixley, is a gold dealer in London.

24           MR. KAMARAJU:  We could take that down.

25           Can we pull up what's already in evidence as GX AS-18,

1    please.  And we can publish that.  Could we go to page 10,
2    please.  All right.  And if we could blow up the paragraph that
3    says "Additionally."
4    Q.  Do you see that, sir?
5    A.  I do.
6    Q.  Okay.  Would you mind reading that to the jury, please.
7    A.  Sure.
8            "Additionally, a member may make a request to the
9    Himalaya Exchange to accept a transfer of Himalaya dollar
10   credits in exchange for an equivalent payment in U.S. dollars
11   to be paid to the bank account of the member.  However, such
12   exchanges are at the discretion of the Himalaya Exchange and
13   the Himalaya Coin.  A new coin issued by Himalaya International
14   Financial Group, 'HCN,' or Himalaya Coin, HDO, or any other
15   type of asset on account at the Himalaya Exchange or through
16   the Himalaya Pay app are references to credits corresponding to
17   that asset."
18   Q.  Thank you, sir.
19           MR. KAMARAJU:  Could we go to page 12, please.
20   Q.  All right.  Do you see the blown-up language here that
21   starts with "The issuer"?
22   A.  I do.
23   Q.  Would you mind reading that, please.
24   A.  "The issuer is not obliged to provide liquidity support and
25   the Himalaya Exchange is not obliged to agree to any request

1    from a member to exchange HDO credits for U.S. dollars.  And

2    such actions are at the sole discretion of the issuer and the

3    Himalaya Exchange respectively.  Members do not have any direct

4    or indirect claim on the issuer or the reserve."

5    Q.  Thank you.

6          MR. KAMARAJU:  Could we take that down and please go

7    to DX 11431, which is in evidence.

8          (Counsel conferred)

9    Q.  Now, sir, I'd like you to take a look at this record.  Have

10   you seen it before?

11   A.  I have.

12   Q.  And is it a summary of bank data?

13   A.  Yes, it is.

14   Q.  And do you see the date column at the left there?

15   A.  Yes, column A.

16   Q.  What's the first date there?

17   A.  January 12, 2022.

18         MR. KAMARAJU:  All right.  Can we go down to the last

19   row, please.  Sorry, the last row down.

20   Q.  All right.  And do you see the date listed -- it's actually

21   the third row up, but 62951?

22   A.  Yes.

23   Q.  All right.  What's the date listed there?

24   A.  June 21, 2022.

25         MR. KAMARAJU:  If we could scroll back up to the top,

O78VGUO3                           Bishop - Direct

1    please.

2    Q.  All right.  Now, do you know who the account holder is for

3    this account, sir?

4    A.  This is a Himalaya bank account.  I just don't think the

5    screen is scrolled up enough.

6    Q.  Thank you.

7         MR. KAMARAJU:  Why don't we take a look at a couple of

8    specific rows.  We look at row 62187, please.

9    Q.  All right.  Do you see the date of that?

10   A.  Yes, it's November 22, 2021.

11        MR. KAMARAJU:  Could we scroll over to column H,

12   please.

13   Q.  All right.  And do you see what's listed in the description

14   there?

15   A.  Yes, it says "client redemption."

16        MR. KAMARAJU:  All right.

17        Can we go over to column J, please.

18   Q.  All right.  And what's listed there?

19   A.  Client redemption.

20   Q.  And do you see an amount column?

21   A.  Yes, I; column I.

22   Q.  And how much is the redemption there?

23   A.  30,000.

24        MR. KAMARAJU:  Okay.  Could we go now to row 59802.

25   Q.  Okay.  What's the date of that transaction?

O78VGUO3                         Bishop - Direct

1    A.  June 17, 2022.

2            MR. KAMARAJU:  Okay.  And if we can scroll over again

3    to the description column.

4    Q.  All right.  What's listed there?

5    A.  Client redemption.

6            MR. KAMARAJU:  And if we could scroll over to column

7    S, please.

8    Q.  Who's listed as the beneficiary, once we pull it up for

9    you?

10   A.  The beneficiary first name is Lai.  I'm presuming that's

11   the way you pronounce it.  L-A-I.

12   Q.  Do you see the last name, too?

13   A.  Yes.  It's D-A-I, Dai.

14   Q.  Thank you.

15           MR. KAMARAJU:  And if we could scroll now to row

16   62057, please.

17   Q.  All right.  What's the date of that transaction?

18   A.  February 4, 2022.

19   Q.  All right.  And is that also a client redemption?

20   A.  Yes.

21           MR. KAMARAJU:  And could we scroll over to the amount

22   column, please.

23   Q.  What's the amount of the redemption?

24   A.  $23,468.40.

25           MR. KAMARAJU:  Okay.  And if we can scroll over now to

1   the beneficiary columns, columns S and T.

2   Q.  And who's identified as the beneficiary there?

3   A.  Lai Dai.

4         MR. KAMARAJU:  All right.

5         Could we now go to row 62579.

6   Q.  And what's the date of this transaction, sir?

7   A.  4/19/2022.

8   Q.  Okay.  And is this also a client redemption?

9   A.  Yes.

10         MR. KAMARAJU:  And let's go over to the amount.

11  A.  $53,261.68.

12         MR. KAMARAJU:  All right.

13         And can we go to column S and T, please.

14  Q.  And who's listed as the beneficiary?

15  A.  Zhiwei Jia, J-I-A.

16  Q.  All right.

17         MR. KAMARAJU:  And last one, could we go to row 62678,

18  please.

19  Q.  Okay.  What's the date there?

20  A.  6/28/2022.

21         MR. KAMARAJU:  All right.  And let's scroll over to

22  the -- sorry.  Withdrawn.

23  Q.  Is this a client redemption?

24  A.  Yes, it is.

25         MR. KAMARAJU:  And let's look at the amount.

1    A.  $79,890.00.

2    Q.  Okay.

3            MR. KAMARAJU:  And could we scroll over to column S

4    and T, please.

5    A.  The beneficiary first name is Feng, F-E-N-G; beneficiary

6    last name is Tian, T-I-A-N.

7    Q.  Okay.  Now, Mr. Bishop, did you review the data contained

8    in this exhibit?

9    A.  Yes.

10   Q.  Did you summarize it in any form?

11   A.  Yes.

12           MR. KAMARAJU:  I'd like to pull up just for the

13   witness, the parties, and the Court what's been marked as DX

14   Z-02.

15   Q.  Sir, do you recognize this document?

16   A.  I do.

17   Q.  What is it?

18   A.  It's a summary bar graph of the data contained in the chart

19   we just saw, the Excel spreadsheet.

20   Q.  Is it a fair and accurate summary?

21   A.  It is.

22           MR. KAMARAJU:  The government offers -- sorry.  The

23   defense offers DX Z-02 please.

24           MS. MURRAY:  No objection.

25           MR. KAMARAJU:  Could we publish it please.

1          THE COURT:  Go ahead.

2          (Defendant's Exhibit DX Z-02 received in evidence)

3  Q.  So, sir, this is a bar graph of the redemption activity

4  that we looked at?

5  A.  Yes.

6  Q.  Okay.  And what's the first month that it starts in?

7  A.  November 2021.

8  Q.  And across how many months does it continue?

9  A.  Continues through June of 2022.

10 Q.  Okay.  And is June 2022 when the bank records cut off that

11 we looked at?

12 A.  Yes.

13 Q.  And now just looking at it, approximately what is the high

14 watermark for redemptions in terms of dollar value?

15 A.  Roughly $11 million in December 2021.

16 Q.  Okay.  And in terms of transactions, what's roughly the

17 high watermark?

18 A.  The same month, 561.

19         MR. KAMARAJU:  Okay.  Now, could we go to the next

20 slide, please.

21 Q.  So based on your review, sir, during that time period,

22 approximately how many redemption transactions were made to

23 customers?

24 A.  3680.

25 Q.  And the total dollar amount was approximately how much?

1  A.  Slightly more than 64 million.

2          MR. KAMARAJU:  Your Honor, at this time I'd like to

3  read a stipulation between the parties.

4          THE COURT:  Go ahead.

5          MR. KAMARAJU:  Thank you.

6          This is Defense Exhibit Stip 3.  If we could just pull

7  that up.  And I'll offer it, your Honor, so that the jury can

8  see it, if that's all right.

9          THE COURT:  Okay.

10          (Defendant's Exhibit Stip 3 received in evidence)

11          MR. KAMARAJU:  It is hereby stipulated and agreed by

12  the United States of America and Miles Guo, the defendant, that

13  the exhibits listed below in columns B and C were lawfully

14  obtained by the government, and are authentic records of the

15  entity listed in column A, that were made at or near the time,

16  by or from information transmitted by a person with knowledge

17  of the matters set forth in the records.  Such records were

18  kept in the course of a regularly conducted activity, and it

19  was the regular practice of that entity to make the records.

20          And then there are a number of exhibits listed, your

21  Honor, which I can go through or I can just offer them all

22  together, whatever the Court would prefer.

23          THE COURT:  You're asking that I admit them all?

24          MR. KAMARAJU:  Yes, your Honor.

25          THE COURT:  They are admitted.

1           MR. KAMARAJU:  Thank you.

2           No further questions at this time.

3           THE COURT:  Cross-examination.

4           MS. MURRAY:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MS. MURRAY:

7   Q.  Mr. Bishop, you're testifying as a summary witness today;

8   correct?

9   A.  Correct.

10  Q.  You haven't set up an account at the Himalaya Exchange,

11  have you?

12  A.  No, I have not.

13  Q.  You've never logged into an account at the Himalaya

14  Exchange, have you?

15  A.  No, I have not.

16  Q.  And you've never purchased HDO, right?

17  A.  That's correct.

18  Q.  You've never purchased HCN?

19  A.  That's correct.

20  Q.  You only looked at bank records for certain accounts, isn't

21  that right?

22  A.  That's correct.

23  Q.  And those were the bank records that defense counsel

24  provided to you; correct?

25  A.  Yes, yes.

1  Q.  And those were bank records for accounts held at FV Bank,

2  right?

3  A.  Yes.

4         MS. MURRAY:  Now, if we can pull up, Ms. Loftus, DX

5  Z-02.

6  Q.  While we're waiting, Mr. Bishop, you testified about some

7  of your background.  Do you recall that?

8  A.  Yes.

9  Q.  You said, for example, you worked on money laundering cases

10 when you were at the IRS CI?

11 A.  Yes.

12 Q.  And a money mule is someone who receives and transfers

13 criminal proceeds, isn't that right?

14 A.  I agree, yes.

15 Q.  All right.  Now we've got DX Z-02 up.

16        This is a chart that you prepared for your testimony

17 today; correct?

18 A.  Correct.

19 Q.  DX Z-02 doesn't clearly identify which bank accounts it

20 summarizes, does it?

21 A.  It summarizes the records at the bottom, which records were

22 used.

23 Q.  Right.  But it doesn't clearly identify what accounts at

24 which bank it's summarizing, isn't that right?

25 A.  It's what we just went through, yes.

1   Q.  Now, the defense didn't give you records for Himalaya

2   Exchange accounts at Mercantile Bank, did they?

3   A.  For this examination, no, I don't think so.

4   Q.  And the defense didn't give you records for this

5   examination for Hamilton accounts at Silvergate Bank; correct?

6   A.  I don't recall that bank, no.

7   Q.  The bank records that you reviewed to put together this

8   chart reflect withdrawals, right?

9   A.  This chart, yes.  Client redemptions.

10  Q.  Those bank records also reflect deposits into the bank

11  accounts; correct?

12  A.  Yes.

13  Q.  And those deposits are not summarized in DX Z-02, right?

14  A.  That's correct.

15  Q.  And DX Z-02 only reflects withdrawals that were categorized

16  as redemptions; is that correct?

17  A.  Yes.

18  Q.  Now, you didn't choose the title of this slide, did you?

19  A.  This particular -- no, I don't think that's the -- that's

20  the -- the basis for the chart, the redemptions from the prior

21  screen.

22  Q.  Well, the defense chose to call this "Himalaya Exchange

23  Client Redemptions," correct?

24  A.  We did, yes.

25  Q.  The determination of redemption for purposes of your

1    summary chart is based on those wire transaction details we saw

2    in one of the columns; is that right?

3    A.   That's what the bank records stated.

4    Q.   And you don't have any personal knowledge whether those

5    withdrawals were, in fact, redemptions; correct?

6    A.   We know what the bank records said.

7    Q.   That was not my question, sir.  I asked if you had personal

8    knowledge whether those withdrawals were, in fact, redemptions?

9            MR. KAMARAJU:  Asked and answered.

10           THE COURT:  You may answer.

11   A.   Well, can you describe what you mean by "personal

12   knowledge"?

13   Q.   Sure.  To your understanding, what is a redemption of a

14   Himalaya Exchange account?

15   A.   Someone asking for their money back.

16   Q.   How is that your understanding?

17   A.   That's just through my basis in this case.

18   Q.   And what records did you study that described or defined

19   redemption that way?

20   A.   These bank records and my collaboration with the defense

21   team.

22   Q.   All right.  Let's take one of the withdrawals categories

23   categorized as a redemption as an example.

24           MS. MURRAY:  Ms. Loftus, if we could pull up DX 11605.

25   Q.   While we're waiting for that, Mr. Bishop, do you know

1    what's in all those boxes at the front table?

2    A.  I didn't see -- well, no, I don't know.

3    Q.  The records that you reviewed to put together your summary

4    chart, was that just the one Excel file that Mr. Kamaraju went

5    through with you?

6    A.  No.  We looked at the FV Bank records, the statements.

7    Q.  Excuse me.  Do you remember what the last four digits of

8    the accounts that you looked at were?

9    A.  589 -- I can't remember.  367 -- I had them on the Excel

10   spreadsheet.  There were 94 accounts that we've looked at,

11   so --

12   Q.  All right.  Now that we have this up, this is a record from

13   FV Bank; correct?

14   A.  Mm-hmm.

15   Q.  And if we look at this, what is the time period covered in

16   this particular bank record?

17   A.  I can see the first date.

18           MS. MURRAY:  We can scroll down, Ms. Loftus.

19   A.  Go all the way to the bottom.

20   Q.  Generally speaking, what month do these records cover?

21   A.  April 2022.

22   Q.  Okay.

23           MS. MURRAY:  And Ms. Loftus, if we could scroll to the

24   right a little bit.  Little further, please.  And let's go up

25   to the top again.

1   Q.  In the description column, Mr. Bishop, is that where you

2   went to identify the transactions that you described as

3   redemptions?

4   A.  Yes.

5          MS. MURRAY:  And Ms. Loftus, if we could just scroll

6   down a little bit until we get one of those client redemption

7   descriptions that Mr. Bishop testified to.  There we go.

8   Q.  So, for example, Mr. Bishop, row 60, you don't know who

9   populates that transfer ID, do you?

10  A.  I know that this came from -- it's my understanding that

11  this came from the bank.

12  Q.  Right.  But with respect to the wire description, you don't

13  know who populates that transfer ID; is that correct?

14  A.  No.

15  Q.  You don't know what that information reflects?

16  A.  No.

17  Q.  You don't know whether that information accurately reflects

18  the purpose of these wires out of the account, do you?

19  A.  No.

20         MS. MURRAY:  All right.

21         And Ms. Loftus, if we could go back again to DX Z-02,

22  please.

23  Q.  Mr. Bishop, there are no withdrawals described as

24  redemptions from August 2021 through October 2021, right?

25  A.  Not that we -- not that we located in that spreadsheet, no.

1   Q.  And to be clear, sir, you looked at the actual bank

2   records; correct?

3   A.  Our team did, yes.

4   Q.  And you didn't identify any redemptions during that period?

5   A.  There might have been one, I believe, that's not captured

6   early on in August for a very small amount of money.

7   Q.  So that redemption is not reflected on your summary chart;

8   is that correct?

9   A.  No, because it was considered immaterial.

10  Q.  You're aware that the Himalaya Exchange didn't officially

11  launch until November 1, 2021, right?

12  A.  I'm not aware of when it exactly did that.

13  Q.  Are you aware that there were deposits into these FV

14  Himalaya Exchange bank accounts before November 1, 2021?

15  A.  Yes.

16  Q.  Mr. Bishop, the source documents cited on the bottom right

17  here, this exhibit cites a number of different source documents

18  for the information here; is that correct?

19  A.  That's correct.

20  Q.  Including about 50 documents in the last section, 6,001

21  through 6,050, right?

22  A.  Correct.

23  Q.  None of the information summarized on this chart actually

24  was sourced from those 50 documents; correct?

25  A.  You'd have to give me -- I don't know exactly what the

1    numbers are.

2              MS. MURRAY:  Okay.  Let's pull up Defense Exhibit

3    6,002, please.

4    Q.  This is one of those documents that was cited in that last

5    group of source documents, right?

6    A.  6,002, yes.

7    Q.  And this is a page 1 of 1 bank record; correct?

8    A.  Correct.

9    Q.  There's nothing reflected here about any redemptions,

10   right?

11   A.  That's correct.  This is also dated 1/1/23.

12   Q.  Right.  So it's inaccurate to cite this as one of the

13   source documents for your summary chart; correct?

14   A.  That was not in the summary chart, no.

15             MS. MURRAY:  We could go back to DX Z-02.

16   Q.  So looking at the bottom right where it identifies source

17   documents, a number of those documents that are reflected as

18   the source for this chart are not, in fact, the source of any

19   information; correct?

20   A.  Again, you'd have to -- the one you had showed me, correct.

21   You'd have to go back through.

22             MS. MURRAY:  We can zoom out on that.

23   Q.  Now, you established that you didn't have bank records for

24   the FV Bank accounts after June 2022, right?

25   A.  I think it's December '22.

1    Q.  Looking at your chart, sir --

2    A.  I'm sorry, I'm sorry.  June '22.

3    Q.  So you don't know whether withdrawals as they're defined

4    here as redemptions continued, do you?

5    A.  No, that was the end of the bank records.

6    Q.  You're aware the government seized more than $608 million

7    in Himalaya Exchange money in October 2022 correct?

8    A.  I know there was a seizure, just don't know the amounts.

9    Q.  Did you know that those seizures included money that was

10   held at FV Bank accounts that you summarized?

11   A.  No, I don't.

12   Q.  You weren't aware that William Je submitted a request to

13   withdraw 48 million of his own money from a Himalaya Exchange

14   bank account at Mercantile Bank in October 2022, were you?

15   A.  No.

16   Q.  You don't know whether those wires that were requested were

17   paid out to William Je, do you?

18   A.  No.

19        MS. MURRAY:  Ms. Loftus, can you please publish what's

20   in evidence as Government Exhibits MER-5 and MER-6

21   side-by-side.

22   Q.  While we're waiting, Mr. Bishop, you were asked some

23   questions about the white paper for the Himalaya Exchange.  Do

24   you recall those?

25   A.  Yes.

1   Q.  Did you review the entire Himalaya Dollar white paper?

2   A.  No.

3   Q.  Did you review the entire Himalaya Coin white paper?

4   A.  No.

5   Q.  What portions, if any, of those did you review in

6   connection with your summary chart?

7   A.  The pages from which I read from.

8   Q.  All right.  So looking on the left here, we'll get it

9   published, this is Government Exhibit MER-6.  Do you see that,

10  sir?

11  A.  Yes.

12  Q.  Have you reviewed these documents in connection with your

13  redemptions summary chart?

14  A.  No.

15  Q.  Do you recognize what type of document this is from the

16  materials the defense gave you for your redemption summary

17  chart?

18  A.  I didn't see these documents.  I didn't look at them, no.

19  Q.  And you didn't review similar OTC transaction forms for

20  each of the withdrawals reflected on your chart; correct?

21  A.  No, just the bank record.

22  Q.  You haven't seen any Himalaya Exchange redemption forms at

23  all; correct?

24  A.  No.

25  Q.  You don't know whether such redemption forms exist for all

1    the withdrawals that are reflected on your chart, isn't that

2    right?

3    A.  Like this, what you're showing me here?  No.

4    Q.  You're not aware of any other visual type of redemption

5    form that exists for the transactions reflected on your chart,

6    right?

7    A.  There was a review of Himalaya Exchange computer records.

8    Q.  In what format did you review those records?

9    A.  They were reviewed in a computer format, on location and

10   site.

11   Q.  Do you know whether the defense provided those records to

12   the government?

13   A.  I don't know what the defense provided.

14           MS. MURRAY:  We can take that down, Ms. Loftus.  And

15   we can pull up government Exhibit AS-18.

16   Q.  This is the Himalaya Dollar white paper dated January 2022,

17   right, Mr. Bishop?

18   A.  I presume so, yes.

19   Q.  Well, if we look at the top, that's the date on this;

20   correct?

21   A.  Yes, yes.

22   Q.  Okay.  You're aware the word "redemption" only appears once

23   in this entire white paper; correct?

24   A.  No.

25           MS. MURRAY:  Let's go to page 33, please, Ms. Loftus.

1    Q.  This heading is titled "Switzerland," right?

2    A.  Yes.

3    Q.  The language in this portion of the white paper relates to

4    customers of the exchange who are located in Switzerland;

5    correct?

6    A.  I'd have to read it.

7            MS. MURRAY:  We could zoom in on the text here,

8    Ms. Loftus, just to make it larger.

9    Q.  Are you aware that this section relating to Switzerland

10   customers is the only place where the word "redemption" appears

11   in the entire white paper?

12   A.  If that's what you're telling me, I have no reason not to

13   believe you.

14   Q.  All right.

15           MS. MURRAY:  And, Ms. Loftus, if we could now go to

16   page 10, please.

17   Q.  This is a portion that Mr. Kamaraju showed you, do you

18   recall that?

19   A.  Yes.

20           MS. MURRAY:  And if we focus on the paragraph that

21   begins with "Additionally."

22   Q.  This portion of the white paper says:  Exchanges of

23   Himalaya Dollar credits for U.S. dollars are at the discretion

24   of the Himalaya Exchange.  Right?

25   A.  Yes, that's what it says.

1    Q.   It further says:  The Himalaya Exchange is not obliged to

2    fulfill any such request.  Correct?

3    A.   Yes.

4    Q.   Himalaya Exchange customer withdrawal requests that the

5    Himalaya Exchange denied are not reflected on your summary

6    chart; is that right?

7    A.   No.

8         MS. MURRAY:  We can take this down, Ms. Loftus.

9    Q.   And Mr. Bishop, you don't know where the money that was

10   wired out of the FV Bank accounts as redemptions ultimately

11   went, do you?

12   A.   Only to where -- according to the bank records, what

13   accounts it was sent to.

14   Q.   You don't know whether it went along to other accounts

15   after making that first transfer, right?

16   A.   That's correct.

17   Q.   You don't know whether the money that was withdrawn was

18   reinvested into Guo's other investment offerings, do you?

19   A.   I do not.

20        MS. MURRAY:  May I have a moment, your Honor?

21        THE COURT:  Go ahead.

22        (Counsel conferred)

23        MS. MURRAY:  Nothing further.

24        THE COURT:  Redirect.

25        MR. KAMARAJU:  Just briefly, your Honor.

```
 1    REDIRECT EXAMINATION
 2    BY MR. KAMARAJU:
 3    Q.  Now, Mr. Bishop, you remember being asked some questions on
 4    cross-examination about whether you could verify whether
 5    certain transactions were redemptions?
 6    A.  Yes.
 7    Q.  And you were asked about whether you had personal knowledge
 8    as to whether they were redemptions?
 9    A.  That's correct.
10    Q.  Do you remember that one of the transactions I asked you
11    about on direct was a redemption related to a man named Lai
12    Dai?
13    A.  Yes.
14    Q.  Are you aware that Lai Dai testified in this courtroom to
15    making that redemption?
16    A.  I know that he testified; I don't know exactly what he
17    testified to.
18    Q.  Okay.  You remember another one of the redemptions that I
19    asked you about was for a person named Dia Li?
20    A.  Yes.
21    Q.  Are you aware that Ya Li testified in this courtroom before
22    this jury as to making that redemption?
23    A.  That's the same answer I'd give you, I don't know.
24    Q.  Now, do you remember you were asked about slides and the
25    sources for slides?  Do you remember that?
```

1    A.  Yes.

2    Q.  Now, just because you review something, does that mean you

3    put it on a slide?

4    A.  No.

5    Q.  You make discretionary choices; correct?

6    A.  Correct.

7    Q.  And you remember you were asked whether you had ever opened

8    a Himalaya Exchange account?

9    A.  Yes.

10   Q.  And you were asked whether you had ever bought HCN, right?

11   A.  Yes.

12   Q.  And you were asked whether you had ever bought HDO, right?

13   A.  Correct.

14   Q.  You answered no to all those questions, right?

15   A.  Correct.

16   Q.  Mr. Bishop, are you a high-net Chinese individual who's

17   dedicated to overthrowing the Chinese Community Party?

18             MS. MURRAY:  Objection, your Honor.

19             This is a summary witness.

20             THE COURT:  Sustained.

21             MR. KAMARAJU:  No further questions.

22             THE COURT:  Any recross?

23             MS. MURRAY:  Yes.

24   RECROSS EXAMINATION

25   BY MS. MURRAY:

1  Q.  Mr. Bishop, do you know what else Ya Li testified to during

2  this trial?

3  A.  I don't know what she testified or he testified to.

4          MS. MURRAY:  Nothing further, your Honor.

5          THE COURT:  Sir, you may step out of the courtroom.

6          THE WITNESS:  Thank you, your Honor.

7          THE COURT:  The defense may call its next witness.

8          (Witness excused)

9          MS. SHROFF:  Your Honor, the defense calls Scott

10  Barnett.

11   GERALD SCOTT BARNETT,

12      called as a witness by the Defendant,

13      having been duly sworn, testified as follows:

14          THE COURT:  Go ahead.

15          MS. SHROFF:  Thank you, your Honor.

16  DIRECT EXAMINATION

17  BY MS. SHROFF:

18  Q.  Good afternoon, Mr. Barnett.

19  A.  Afternoon.

20  Q.  Mr. Barnett, could you tell the jury what you do for a

21  living?

22  A.  Currently, I am the owner of GS Security Solutions.  And I

23  provide executive protection for celebrities, dignitaries, and

24  high-net-worth individuals.

25  Q.  What does "GS" stand for?

O78VGUO3                          Barnett - Direct

1    A.  Well, it was supposed to stand for Global Solutions, but

2    that was taken.  So I guess it just stands for Gerald Scott

3    Security really, unfortunately.

4    Q.  And when did you start your company?

5    A.  That company was started in June of 2022.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                          Barnett - Direct

1   BY MS. SHROFF:

2   Q.  And by what time was it up and running?

3   A.  January 2 -- I don't recall the exact dates, January of

4   '23.

5   Q.  Mr. Barnett, who provided the funding or the finances to

6   start GS Security?

7   A.  HCHK.

8   Q.  And how much money did HCHK provide to set up GS Security?

9   A.  Originally they provided approximately give or take about

10  400,000 I believe.

11  Q.  And was there additional funding that was provided?

12  A.  There was in the beginning, correct.  In -- excuse me.  I'm

13  sorry.  I'm trying to remember the date.  In December I think

14  of 2022, they provided monies for insurance, and I believe it

15  was just insurance if I recall, but I have to look back.

16  Q.  And did you have any agreement as to this funding?

17  A.  Yes.  At first we had a verbal agreement.  It was going to

18  be a written agreement, but that never came to pass so it stood

19  as a verbal agreement.

20  Q.  Mr. Barnett, could you tell the jury why you wanted to set

21  up a separate company called GS Security?

22  A.  In order to have proper security for anybody, you really

23  need to have insurance.  You have to have -- due to certain

24  liabilities for the client that you're protecting, God forbid

25  something were to happen.  If it's just either the client

O78BGUO4                          Barnett - Direct

1   themselves or any other entity, they're liable.  God forbid we

2   had to put our hands on somebody or anything worse than that or

3   even anything minor, any lawsuit would go directly to that

4   company instead of to a properly insured security company.  But

5   I guess the real reason is for legal reasons.  You legally have

6   to have a license in order to conduct security.

7   Q.  Does your company still exist today?

8   A.  Yes, it does.

9   Q.  And who is your largest client now?

10  A.  My largest client is Mei Guo.

11  Q.  And who is Mei Guo?

12  A.  That's the daughter of Miles Guo.

13  Q.  What does your job entail regarding Mei Guo?

14  A.  Right now it just entails house security.  At first it was

15  for complete protection.  But as, I guess, money got tighter,

16  we had to scale back, but now it's basically house security.

17  We just monitor their house and, you know, do canvassing around

18  their house, that kind of stuff.  We no longer transport or

19  provide executive protection, personal bodyguard protection for

20  that.

21  Q.  And who other than Mei Guo do you protect?

22  A.  It varies.  We get contracts, very minimal contracts, but I

23  had one for an executive in the city.  We did four-hour

24  security detail for them.  I've done security for other

25  companies as well.  We had one gentleman who needed security

O78BGUO4                          Barnett - Direct

1   for jewelry, was showing at a, like, a showcase, and that's

2   really it.

3   Q.  Mr. Barnett, going back to Mei Guo, have you discussed your

4   testimony with her?

5   A.  No, I have not.

6   Q.  Has she ever asked you about what you would be testifying

7   to?

8   A.  No, she has not.

9   Q.  Have you ever talked to her about the details of this case?

10  A.  No, I have not.

11  Q.  Have you ever talked to her about the arrest of her father?

12  A.  Yes.

13  Q.  And in discussing that, did you discuss anything that had

14  to do with your testimony today?

15  A.  No.

16  Q.  And when was the last time you spoke to her about the

17  arrest of her father?

18  A.  Maybe about a week ago.  I think I asked her how her father

19  was doing.

20  Q.  And other than that, have you had any substantive

21  discussions with her?

22  A.  Not in regards to this case, no.

23  Q.  Mr. Barnett, did you ever work for Miles Guo?

24  A.  Not directly, no.

25  Q.  So describe for us how you worked for him indirectly?

O78BGUO4                        Barnett - Direct

1  A.  I worked for, originally, for a company called Golden

2  Spring.  Part of that job was guarding Miles Guo, the company

3  later switched over to --

4  Q.  Let me stop you there. When did you start with Golden

5  Spring?

6  A.  October of 2020.

7  Q.  And prior to being hired by Golden Spring, did you have

8  experience doing private security?

9  A.  Yes.  So once I retired from the police department in 2013,

10 I went into security in executive protection.  Basically the

11 gentleman that I trained with, we work with celebrities and

12 dignitaries, and I did that for a number of years.  And then

13 branched off to another company called pro-protection which was

14 basically for --

15         THE COURT:  Sir, I'd like you to draw the microphone

16 close to you so that everyone can hear you.  Speak right into

17 the microphone.

18 A.  And then I went to pro-protection which is a company out in

19 Long Island.  It was just an easier commute.  I got tired of

20 guarding celebrities.  That wasn't really something that I

21 enjoyed very much, and then I had applied online. I can't

22 remember where I applied through -- whether it was Indeed, one

23 of those websites -- for a company looking for executive

24 protection.  That was -- I don't remember it saying the name of

25 the company, but they were offering a certain salary, so I

O78BGUO4                    Barnett - Direct

1    applied to it.  And then I think in October -- well, little

2    before that, beginning of October of 2020 is when they called

3    me for that particular job in regards to Miles.

4    Q.  Were you hired at the first try?

5    A.  No, I was not.

6    Q.  What was the reason why you weren't hired?

7    A.  Well, this was a recruiting company.  The reason that I was

8    not hired was because of my date of birth, and that it was the

9    year of the boar, and that was found to be -- at least they

10   told me -- it was unlucky, so I was not hired for that reason.

11   Q.  And then subsequently were you hired despite being born in

12   the year of the boar?

13   A.  I think that was a year prior.  So a year later I got a

14   call.  I actually didn't apply again.  I just received a call,

15   ask if I was still interested in the position.

16   Q.  And, Mr. Barnett, prior to this, were you an officer of the

17   NYPD?

18   A.  I was.

19   Q.  For how long were you an officer of the NYPD?

20   A.  From 1997 to 2013.

21   Q.  And I won't ask you for all the details, could you just

22   tell us, just summarize very briefly what your experience was

23   as an NYPD officer?

24   A.  I started out as a regular police officer in East Flatbush,

25   Brooklyn, spent most of my time there, went to narcotics in

O78BGUO4                          Barnett - Direct

1    Brooklyn North for a while, then went back to the 67.  I don't

2    remember what year it was.  And then I got my first -- I think

3    I was injured the first time in 2008, and then went back to

4    work.  And then again I was injured in 2011, where my shoulder

5    was torn out again after struggling with somebody and the

6    department decided to retire me at that time.

7    Q.  Mr. Barnett, did you serve for the United States?

8    A.  Yes, ma'am.

9    Q.  Where did you serve?

10   A.  The U.S. Navy.

11   Q.  And for how long?

12   A.  I was only in for a year and two months.  I fell 20 feet

13   and shattered my wrist, broke a bone in my left leg and my back

14   and they basically retired me at that point.

15   Q.  Mr. Barnett, do you have a lawyer?

16   A.  Yes, I do.

17   Q.  And through your lawyer were you served with a subpoena to

18   testify here today?

19   A.  Yes, I was.

20   Q.  And was the subpoena from Mr. Kamaraju's office?

21   A.  I believe so.

22   Q.  And before you were served with the subpoena in this case,

23   had you met with these four prosecutors who are seated at the

24   table here?

25   A.  Yes, I did.

O78BGUO4                         Barnett - Direct

```
 1   Q.  And how many times did you meet with these four
 2   prosecutors?
 3   A.  Twice.
 4   Q.  Did you have phone calls with these four prosecutors?
 5   A.  Yes, once.
 6   Q.  Let me show you what is marked as DX60761.
 7          Do you recognize this document, and can I show
 8   Mr. Barnett the last page of this document as well.
 9   A.  Yes, I recognize it.
10          MS. SHROFF:  Defense moves DX60761 into evidence.
11          MR. FERGENSON:  Objection.
12          THE COURT:  Is this a document that he authored?
13          MS. SHROFF:  He signed it, your Honor.
14   Q.  Mr. Barnett, let's look at the last page.  Is your
15   signature there?
16   A.  Yes.
17   Q.  Did you review this document?
18   A.  I did with my attorney.
19   Q.  And did you also sign it several times, if you look at the
20   right side?
21   A.  I signed it in -- it looks like -- I only see one spot
22   where I signed it.
23   Q.  Well, let's look at the date on the top.  It's dated --
24   look at the date.  And you signed it on that date, correct?
25   A.  Yes.
```

O78BGUO4                        Barnett - Direct

1    Q.  And you signed it on a second date at the corner, right?

2    A.  I don't see where you're pointing to.  Where it says

3    4/11/24?

4    Q.  Yes.

5    A.  That's correct.

6            MS. SHROFF:  Your Honor, the defense moves the

7    document into evidence.

8            MR. FERGENSON:  No objection.  It's fine.

9            THE COURT:  It is admitted.

10           (Defendant's Exhibit 67061 received in evidence)

11           THE COURT:  Did you assign a number to that?

12           MS. SHROFF:  Yes, your Honor, DX67061.  And may I

13   please publish it to the jury?

14           THE COURT:  Go ahead.

15           MS. SHROFF:  Thank you.

16   Q.  Mr. Barnett, prior to meeting with these prosecutors, did

17   you review this document with your attorney and sign it?

18   A.  Yes, I did.

19   Q.  And when you met with the prosecutors, did you tell them

20   the truth?

21   A.  Yes, I did.

22   Q.  And on April 11, 2024, did you tell the prosecutors that

23   when the Mahwah property was purchased, Mr. Guo told you --

24           MR. FERGENSON:  Objection, your Honor.  He could

25   testify.  She can't ask him about out-of-court statements.

O78BGUO4                         Barnett - Direct

1           THE COURT:  Sustained.

2   Q.  What did you tell the prosecutors on April 11 of 2024?

3           MR. FERGENSON:  Objection, it's hearsay.

4           THE COURT:  It's hearsay.

5   Q.  On April 11, of 2024 --

6           MR. FERGENSON:  Objection.

7           MS. SHROFF:  I have not finish the question.

8   Q.  -- did the prosecutors ask you your understanding of

9   certain events when you were working for and with Miles Guo?

10          MR. FERGENSON:  Objection to relevance.

11          THE COURT:  You can answer that question.  It's a yes

12  or no answer or I don't know or I don't remember.

13          THE WITNESS:  Yes, your Honor.

14  A.  Can you repeat that question.

15  Q.  Sure.  I'll actually ask you a different question,

16  Mr. Barnett.

17          For the times that you met with the prosecutors, did

18  they ask you questions about what you did for Miles Guo?

19  A.  Yes, I believe so, yes.

20  Q.  Did they ask you questions about your understanding of

21  certain events?

22  A.  Yes.

23  Q.  Did they ask you for your understanding about the purchase

24  of Mahwah?

25  A.  I believe so.  I can't remember exactly what was asked, but

O78BGUO4                        Barnett - Direct

1    I believe so.

2    Q.  Well, let's see if we can refresh your recollection.

3           THE COURT:  Keep in mind, sir, that you cannot repeat

4    the statements of others.

5           THE WITNESS:  Yes, ma'am.

6           MS. SHROFF:  Let's show 006.  Could you go down

7    please.

8           MR. FERGENSON:  Is there a question pending, your

9    Honor?

10          THE COURT:  Ms. Shroff.

11          MS. SHROFF:  We're trying to highlight the refresher

12   portion of the document for the witness, and here we go.

13   Q.  Does that document -- just the question of whether or not

14   this document refreshes your recollection as to whether or not

15   you told these prosecutors?

16          MR. FERGENSON:  Objection, he cannot say that.

17          THE COURT:  He said he forgot or that he didn't

18   remember.

19          MS. SHROFF:  I'm sorry.

20   Q.  Does this document refresh your recollection as to whether

21   or not you were asked questions about why Mr. Miles purchased

22   the Mahwah property?

23   A.  Yes.

24   Q.  It does?

25   A.  Yes.

O78BGUO4                          Barnett - Direct

1    Q.  Thank you.  You can take that down.

2          Mr. Barnett, let's go to Miles Guo.  When was the

3    first time you met Miles Guo?

4    A.  It would have -- probably the first time that I met Mr. Guo

5    was at a residence in Connecticut when I was first got hired

6    doing security there.  I couldn't give you a exact date.  I

7    would assume it was about two weeks, maybe two and a half weeks

8    after I started.

9    Q.  And, Mr. Barnett, what was your salary when you started?

10   A.  I believe it was $100,000 a year.

11   Q.  And when you started the job, did you know who Miles Guo

12   was?

13   A.  No, I had looked it up, did a internet search before I was

14   hired.

15   Q.  And did other people work security with you?

16   A.  Yes, they did.

17   Q.  And who were those people?

18   A.  The first gentleman was Greg Burnhart was one of them.  The

19   second one was -- we just called him Johnny, and the other one

20   was Henry.  I couldn't tell you their last names off the top of

21   my head.

22   Q.  Mr. Barnett, did all of them have experience as prior NYPD

23   officers?

24   A.  One was ex-correction.  I believe that was Johnny.  Henry

25   was ex-NYPD, and I believe Greg was ex-Nassau County police

O78BGUO4                         Barnett - Direct

department.

Q.  Mr. Barnett, at that time who did you consider your boss to

be?

A.  Grace Yang was my boss at this time.

Q.  And if somebody gave you direction, who did you confirm

those directions with?

A.  At that time I would have confirmed something with Grace

unless I was directly told either by Mr. Guo in regards to

security.  But anything that had to do with a direction, that

we had to go in or we had to take somebody somewhere, it would

have been by Grace at that time.

Q.  Mr. Barnett, after Covid did your job duties change?

A.  Yes, it did.

Q.  Could you tell us how?

A.  It was more now executive protection where we were driving

Mr. Guo to the office at 64th Street in New York, and then

either back home or to the residence in Connecticut or the

residence in New York City.

Q.  And how many cars did you use to transport Mr. Guo?

A.  Two.

Q.  What were the two cars?

A.  It depends, but the first car was -- I'm trying to think at

that time.

Q.  It's all right.  Did you have a general protocol as to how

to transport Mr. Guo?

O78BGUO4                           Barnett - Direct

1    A.  Mr. Guo was transported in one car.  There was one arms

2    security officer with him in the car, and then there was a

3    driver.  And then there was a backup car behind that car, and

4    that was an armored Lexus.

5    Q.  Mr. Barnett, you testified that you would drive him to East

6    64th Street; is that correct?

7    A.  That's correct.

8    Q.  What was at East 64th Street?

9    A.  Office building.  It was called the Himalaya Exchange I

10   believe.

11   Q.  Did you ever hear anyone refer to that building as the

12   townhouse?

13   A.  No.

14   Q.  Did there come a time when you were promoted to director of

15   security?

16   A.  Yes.

17   Q.  When was that?

18   A.  I believe it was June -- it was after I want to say

19   mid-June of 2021 I believe.

20   Q.  And did you get a raise along with that promotion?

21   A.  I did.

22   Q.  And as part of your promotion, did your job

23   responsibilities shift?

24   A.  Yes, they did.

25   Q.  Did they expand?

O78BGUO4                    Barnett - Direct

1   A.  Yes.

2   Q.  And as part of -- what was your position then and what was

3   your job title?

4   A.  My job was overall security of the office building.  I

5   can't remember.  I believe at that time we had just -- they had

6   just moved into 3 Columbus Circle, but I can't be sure of the

7   date on that.  I was responsible for the security of that.

8   There was security for a small warehouse in Manhattan that I

9   had to oversee the guard there.  I wasn't in charge of anybody

10  else in there except for the security guard and his executive

11  protection detail.

12  Q.  Mr. Barnett, let me show you what is marked as GXSB8.

13            Do you recognize that document?

14  A.  Yes, I do.

15  Q.  What is this document?

16  A.  That's just the security assessment I did.  This was prior

17  to given the role of director of security.

18  Q.  And did you -- what is it?  Is it a report?

19  A.  It's just a report stating there were a lot of problems

20  with the security as it was when I first started.  There was a

21  lack of organization where it -- there was -- there was really

22  basically a lack of leadership.  The person who was my boss at

23  this time, her name was Grace, had no security experience at

24  all, and she was not very good at kind of managing security and

25  managing her other duties.  So we were kind of doing things on

O78BGUO4                              Barnett - Direct

1   our own, and it just -- it was a little chaotic.  It was not

2   organized security which was what I was use to.

3   Q.  Did you send this report -- did you send this document to

4   anyone?

5   A.  Yes, I did.

6   Q.  To whom?

7   A.  I believe I sent it to Grace and I believe I sent it to

8   Yvette.

9   Q.  And where did Grace work?

10  A.  Grace worked at the office at 64th Street.

11  Q.  And what was at 64th Street, what company?

12  A.  That was Golden Spring in the beginning.

13  Q.  And where did Yvette work?

14  A.  The same office.

15  Q.  Did Golden Spring keep records like this at part of its

16  business?

17  A.  I have no idea.

18          MS. SHROFF:  Your Honor, we move Government Exhibit

19  SB8 into evidence.

20          MR. FERGENSON:  Objection, lack of foundation.

21          THE COURT:  Sustained.

22  Q.  Did you prepare documents that were security assessments on

23  a regular basis?

24  A.  At first there was only one security assessment that I did.

25  After that, I did -- if we had like an event coming up, I would

O78BGUO4                        Barnett - Direct

1    do basically a small assessment of what was needed for that

2    event.  And then after a while, it just didn't -- I didn't need

3    the security assessment anymore because of the promotion that I

4    received.  We started to have a chain of command, so it wasn't

5    really necessary at that time.

6    Q.  Mr. Barnett, did you refer to -- let me ask you an easier

7    question.  What did you call Mr. Guo?

8    A.  Usually for the most part I called him sir.  If I was

9    texting with someone, usually it would have been symbolized

10   with the letter "P."  If I was talking to Yvette directly, it

11   would have been use the letter "P" and that stood for

12   principal.  I've called him boss, usually those three.  Most of

13   the time it was sir .

14   Q.  Who came up with the word "principal?"

15   A.  That I don't know.

16   Q.  How about who came up with the word "boss?"

17   A.  I don't know if anybody came up with that word.  I think it

18   was just common knowledge.  Anybody that I would protect or

19   anybody that was above me, I probably would have just called

20   them boss.  That may have been something from my earlier days

21   in the police department.  It was nothing.

22   Q.  So if you were protecting me, you'd call me boss?

23   A.  Probably.

24   Q.  Mr. Barnett, as part of your security job, did you access

25   different levels of risk?

O78BGUO4                    Barnett - Direct

1   A.   At times I did, yes.

2   Q.   What are the different levels of risk in your opinion?

3   A.   When we first started, I didn't really have much

4   assessment.  We had over the time.  We started to see more and

5   more of different individuals coming, trying to get into the

6   office on 64th Street without any type of authority, so we had

7   most of that problem.  We had a few people that would follow in

8   cars when we were driving.  You would see one car in particular

9   was like a giant billboard that would drive around the block

10  all the time.

11  Q.   Did you consider that to be a serious, medium or low risk

12  threat?

13  A.   At that time it was more of a medium threat.  I didn't see

14  anything severe.  I was more concerned about the people showing

15  up to the office trying to get in.  That would have been more

16  of a serious threat.

17  Q.   And while you worked there, were there occasions when

18  people just left suspicious packages at the East 64th location?

19  A.   I remember one in particular there was one bag that we

20  called the NYPD for.  And I think one of my security guys, I

21  think he actually donned a helmet and went out there to look

22  into the bag, but I don't believe there was anything of serious

23  note in it.

24  Q.   Do you recall if there were any times when people who were

25  armed tried to get into East 64th Street?

O78BGUO4                        Barnett - Direct

1    A.  Not that I know of, no.

2    Q.  Mr. Barnett, how long did you work for Miles Guo?

3    A.  I started in October of 2020 and worked for him all the way

4    up to, I guess that would be March of 2023.

5    Q.  And how would you describe him as an employer?

6    A.  In all honesty, one of the better people that I worked for.

7    And the reason I say that is because he's very cordial, very

8    courteous, thought about.  He seem to care about his security

9    detail.  You don't see that a lot when you do executive

10   protection, especially for high net worth individuals.  They

11   tend to treat you subpar.  I don't know if that's the best word

12   to use.  He was never like that.  He was always very courteous.

13   He was a gentleman.

14   Q.  How did you communicate with him?

15   A.  Usually we'd have sporadic conversation.  It was not

16   anything at length.  If I had to really talk to him, I would

17   have to use someone to translate.

18   Q.  How was his English?

19   A.  It was okay.  It took me a while to get an ear for it.  It

20   wasn't great, so it took me a little while to understand what

21   he was saying sometime, especially if he was behind me in the

22   back seat in the car and I'm in the front.  It was hard.

23   Q.  Mr. Barnett, did you use any sort of apps to communicate

24   with Mr. Guo?

25   A.  Yes, we used WhatsApp.

O78BGUO4                          Barnett - Direct

1  Q.  And did Mr. Guo have the same number throughout the time

2  that you worked for him, the same phone number?

3  A.  No, I don't believe so.

4  Q.  And what was your experience with his phone numbers, could

5  you tell the jury?

6  A.  Well, Mr. Guo would switch his phones.  He would explain

7  that his phones had been hacked by the Chinese government, so

8  he would switch his phone semi-regularly.  It wasn't that

9  often, but it was semi-regularly.

10  Q.  Mr. Barnett, did there come a time when you learned about

11  something called the New Federal State of China?

12  A.  Yes.

13  Q.  And what did you understand it to be?

14  A.  Basically my understanding of it was that Miles was trying

15  to create a new order for a Chinese people.  He wanted to take

16  down basically the Chinese Communist Party based on, you know,

17  different issues.  But in regards to the New Federal State of

18  China, that was kind of his -- it's going to be his new

19  foundation for all the Chinese people.

20  Q.  Did you believe he was sincere in his efforts?

21          MR. FERGENSON:  Objection, he can't testify to the

22  sincerity of the defendant.

23          MS. SHROFF:  I'm asking about his understanding of

24  what he viewed of Miles Guo, your Honor.

25          THE COURT:  You can answer.

O78BGUO4                          Barnett - Direct

1    A.  Yes, I thought he was sincere about it, yes.

2    Q.  Mr. Barnett, do you recall if you provided security for an

3    event at the World Trade Center?

4    A.  Yes, I did.

5    Q.  What year was that?

6    A.  I believe that was June 4 of 2021, don't quote me on the

7    date, but I thought that's what it was.

8    Q.  Do you recall who was present there?

9    A.  Yes, for the most part I couldn't tell you everybody.

10   That's for sure.

11   Q.  And, Mr. Barnett, on June 4 of 2021, did the Mahwah

12   property exist?

13   A.  No, not that I know of, no.

14   Q.  Mr. Barnett, did your job require you to go to Sherry

15   Netherlands?

16   A.  Yes, it did.

17   Q.  What was Sherry Netherlands?

18   A.  That was a residence, one of the residences that Miles

19   stayed at.

20   Q.  Mr. Barnett, did you provide security in that -- is it an

21   apartment building?

22   A.  Yes, it is.  It's a hotel/apartment building.

23   Q.  Did you provide security within that building?

24   A.  Sometimes, not all the time.  We weren't there 24-7 because

25   they had security downstairs.  There was no need for us to stay

O78BGUO4                          Barnett - Direct

1    there overnight.

2    Q.  Mr. Barnett, and part of your duties or job description was

3    to drive Mr. Guo, correct?

4    A.  That's correct.

5    Q.  And did there come a time when there were two cars that

6    were purchased to ensure the security of Mr. Guo?

7              MR. FERGENSON:  Objection to the leading.

8    BY MS. SHROFF:

9    Q.  Were two cars purchased?

10             THE COURT:  You may answer that question.

11   A.  I don't know which two cars you're referring to.

12   Q.  You tell us which cars were purchased?

13   A.  There's two cars that my company purchased.

14   Q.  Which were those?

15   A.  Two BMWs.

16   Q.  And when was that?

17   A.  I believe that was January of 2023.

18   Q.  Do you know who ordered those two BMWs?

19   A.  Yes, I did.

20   Q.  And who paid for them?

21   A.  Well, it was -- I paid for them out of the funding from

22   HCHK.

23   Q.  Do you know how much it cost?

24   A.  Each car was -- with tax I believe was about $165,000.

25   Q.  Were those two BMWs used to transport anyone, any other

O78BGUO4                    Barnett - Direct

1   people?

2   A.  Yes, at different times, but for the most part they were

3   used to transport Miles.

4   Q.  And who other than Miles did they transport?

5   A.  I've transported Yvette in those cars.  If we had an event

6   we probably would have transported someone from that event, but

7   I can't give you an exact name on that.

8   Q.  How many events do you recall -- I'll withdraw that.

9           Was part of your job to transport people back and

10  forth from events?

11  A.  Yes.

12  Q.  And were these events related to the New Federal State of

13  China?

14          MR. FERGENSON:  Objection to the leading again, your

15  Honor.

16          THE COURT:  What were the events related to?

17  Q.  What were these events related to?

18  A.  The first one that we did was New Federal State of China.

19  There was an event for Himalaya Coin.  There was another event

20  for the -- I believe it was after the purchase of the house in

21  Mahwah if I'm not mistaken, and there were a few other events

22  here and there, but I couldn't tell you what they were for.

23  Q.  Mr. Barnett, did Miles Guo know how to drive?

24  A.  I believe he did.  I seen him drive.

25  Q.  Where did you see him drive?

O78BGUO4                          Barnett - Direct

1   A.  I saw him drive once when we were looking at a property.

2   He drove a car around the property, that's about the only time

3   I've seen him drive.

4   Q.  Did you ever see him drive on a road?

5   A.  Maybe once, but I can't recall when that was.

6   Q.  Mr. Barnett, do you recall seeing any motorcycles while you

7   guarded Mr. Guo?

8            MR. FERGENSON:  Objection to the leading.

9   Q.  Did you see any other vehicles while you were guarding

10  Mr. Guo?

11  A.  Yes.

12  Q.  What other vehicles did you see?

13  A.  I saw motorcycles.  There was other cars.  There was a

14  Rolls-Royce.  There was a Lamborghini.  There was a other

15  Mercedes, a van.

16  Q.  Let's start with the motorcycle.  Do you know what the

17  motorcycles were used for?

18  A.  They weren't used.  They were -- originally they were going

19  to be purchased to use for --

20  Q.  Could you keep your voice up for me.

21  A.  They were going to be used for, originally, for like the --

22  he was doing a lot of music videos, like that kind of stuff.

23  The reason that no one use them was because they were in my

24  name.

25  Q.  And why was that a problem for other people to use

O78BGUO4                    Barnett - Direct

1   something that was in your name?

2   A.  The main reason why they were put in my name, not only, was

3   I ask, I was the only one that had a motorcycle license.  The

4   problem I had with it was that anybody that wanted to use them

5   didn't have a motorcycle license and it was under my name, and

6   God forbid something were to happen, I would be liable.

7   Q.  Did you watch any videos in which these motorcycles

8   features?

9   A.  No, because the first video that I was actually privy to

10  was -- didn't have the motorcycle at that time.

11  Q.  And were these motorcycles purchased for just use by

12  Mr. Guo or for other people as well?

13          MR. FERGENSON:  Objection.

14          THE COURT:  Overruled.  You may answer.

15  A.  Originally they were purchased for Mr. Guo from what I

16  remember.

17  Q.  And did that ever change?

18  A.  It did.  So it came to -- I was -- I believe I was

19  approached by Yvette.  And I can't remember if Max was there or

20  not.  But, anyway, they wanted to rent out the motorcycles,

21  meaning they wanted to have some of the supporters be able to

22  rent these.  Not really rent them, but sign them out and use

23  them.  And I immediately put a stop to that because, again,

24  they were in my name, and it wasn't a rental service.

25  Q.  Where were these motorcycles initially kept?

O78BGUO4                           Barnett - Direct

1    A.  Initially they were kept in Connecticut.

2    Q.  Were they moved?

3    A.  Yes, we moved them.  I moved them to the house in New

4    Jersey.  Scratch that, I believe I drove one of them to the

5    house in New Jersey, and the other ones we had the trailer.

6    Q.  So these motorcycles, Mr. Barnett, are they now still in

7    your name?

8    A.  I believe one still is according to what an attorney told

9    me the other day.

10   Q.  And where is the other one?

11   A.  Say again.

12   Q.  And whose name is the other one in now?

13   A.  I have no idea.  I turn those over to Max Krasner.  I don't

14   remember what the date was.  I want to say it was sometime in

15   2023, but I couldn't tell you what date that was.

16   Q.  You mention a Lamborghini, correct?

17   A.  Yes.

18   Q.  What was the plan with the Lamborghini?

19   A.  I have no idea.  At one point I know when they were talking

20   about the motorcycle being rented -- sorry, I keep use the word

21   "rented."  It was meant to be signed out, almost like someone

22   wanted to use something.  It's the same thing with the

23   Lamborghini.  That's the only time I ever heard plans with that

24   Lamborghini.  Otherwise, it wasn't really discussed that I know

25   of.

O78BGUO4                          Barnett - Direct

1    Q.  When you say signed out, were you ever given like a

2    sign-out sheet that someone would have to fill out to --

3    A.  That never came to fruition.  I was not having that.

4    Q.  You were not having that?

5    A.  No.

6    Q.  Mr. Barnett, do you recall learning anything about a

7    Bugatti?

8    A.  I remember hearing about it, but I didn't really have much

9    to do in regards to purchase or anything like that with it.

10   Q.  Do you know what it was for, whom it was bought?

11   A.  No, I don't.

12   Q.  Mr. Barnett, do you have any knowledge of an entity called

13   G/Clubs?

14   A.  Yes, I know about it.

15   Q.  What is G/Clubs?

16   A.  I can only tell you the way it was explained to me.  It's

17   basically a club that you paid for, almost like any type of

18   country club or anything, and you receive services for that,

19   whether it be -- I believe it was money off of clothing.  I

20   thought there was something about there were trips that you

21   could win or something like that.  I don't know the full extent

22   of what it entailed.

23   Q.  Mr. Barnett, did you know anything about any boats while

24   you worked for Mr. Guo?

25   A.  Yes.

O78BGUO4                          Barnett - Direct

1    Q.   What boats did you know about?

2    A.   There was the -- the only boat that I had any dealings with

3    was, I believe it was the Lady May Two, and there was a boat

4    that came later that was called Liberty.

5    Q.   What do you recall about the Liberty?

6    A.   I don't know much about the purchase of the Liberty.  I

7    remember when we it actually arrived, it had massive amounts of

8    problems with it.  It was not very seaworthy.  And the only

9    reason I know that was from speaking to the captain of the boat

10   at that time.

11   Q.   Did the fellow fighters or supporters use the Liberty?

12   A.   Yes.

13   Q.   When?

14   A.   It was different occasions to do broadcasting.  I couldn't

15   tell you the dates.

16   Q.   Do you know somebody named Prince Li?

17   A.   Yes, I do.

18   Q.   Who was Prince Li or is Prince Li?

19   A.   I don't know his official title.  To me he was kind of

20   almost what I would consider like a team lead for the

21   supporters.

22   Q.   And did he take the Liberty out with the supporters?

23   A.   I believe so, yes.

24   Q.   Now, Mr. Barnett, are you familiar with a property called

25   Mahwah?

O78BGUO4                        Barnett - Direct

1    A.  Yes.

2    Q.  Did you ever visit Mahwah?

3    A.  Yes, many times.

4    Q.  And when was your first visit to Mahwah?

5    A.  I don't believe I know the date, but it had to be early of

6    2022.  I don't recall the date.

7    Q.  Was that before or after its purchase?

8    A.  I went there once before I believe it was purchased.  I

9    don't know the date it was actually purchased, but I believe I

10   was there before.

11   Q.  Do you recall who you were there with?

12   A.  I was there with I believe -- well, I know it was Miles.  I

13   thought Yvette was there, and the owner of the Mahwah residence

14   was there.  I can't remember his name.

15   Q.  Did you ask Mr. Guo if he was going --

16        MR. FERGENSON:  Objection to the leading, your Honor.

17        MS. SHROFF:  It's a question.

18   Q.  Did you ask Mr. Guo if he was going to buy that property?

19   A.  No, I did not ask him that, no.

20   Q.  Did Mr. Guo ever volunteer to you for whom he was buying

21   that property?

22        MR. FERGENSON:  Objection to the hearsay.

23        THE COURT:  So, once again, this would be a yes or no

24   or I don't know or I don't recall kind of a question.  It's not

25   a question where you repeat what you were told.  You

O78BGUO4                          Barnett - Direct

1   understand?

2            THE WITNESS:  Yes, ma'am.

3            THE COURT:  Go ahead.

4   A.  Yes.

5   Q.  Were you surprised when Mr. Guo purchased that property?

6   A.  Yes.

7   Q.  Why?

8   A.  It just didn't seem like his type of property, but that's

9   just my own personal take on it.

10  Q.  And why did it not seem like his type of property?

11  A.  I always felt that Mr. Guo like properties that had an

12  intense amount of land.  This was, in this particular property,

13  even though it was on 12 acres, it was surrounded basically by

14  a neighborhood.  It wasn't very easily -- it wasn't easy to

15  secure due to that problem.  And for those reasons, it was

16  very, very ornate.  It just didn't seem like a property that I

17  felt that something he would purchase.

18  Q.  Did Mr. Guo ever tell you whether the property was for him

19  or for someone else?

20           MR. FERGENSON:  Objection.

21           THE COURT:  Here we go again.  This is one of those

22  questions where you can't say what he said.  You can say yes,

23  no, I don't recall.  I don't know.

24           THE WITNESS:  Yes, ma'am.

25  A.  Yes.

O78BGUO4                          Barnett - Direct

1    Q.  Mr. Barnett, were you asked similar questions such as the

2    ones I've just asked you by the government when you met with

3    them during proffer sessions?

4              MR. FERGENSON:  Asked and answered.

5              MS. SHROFF:  Not these questions.

6              THE COURT:  Overruled.  You may answer.

7    A.  I believe so, but I can't remember everything that I was

8    asked.

9              MS. SHROFF:  Well, let's show him 006 again.

10             MR. FERGENSON:  Your Honor, we'll stipulate that we

11   asked him about Mahwah just to speed things along.

12             MS. SHROFF:  Are they going to stipulate to what he

13   said back?

14             MR. FERGENSON:  No, because it's hearsay.

15             THE COURT:  I don't think so.

16   Q.  When you met with the government and you were asked these

17   questions, was your lawyer present?

18   A.  Yes, he was.

19   Q.  And after you answered all of their questions, did they

20   accuse you of not telling the truth?

21   A.  Not to me, or at least not to my attorney, not that I know

22   of.

23   Q.  And how many times did the government talk to you about

24   these topics?

25             MR. FERGENSON:  Asked and answered.

O78BGUO4                        Barnett - Direct

1           THE COURT:  Sustained.

2   Q.  Mr. Barnett, were you anticipating being a witness at this

3   trial for the United States Attorney's office?

4           MR. FERGENSON:  Objection.

5           THE COURT:  Sustained.

6   Q.  Were you told by the United States Attorney's office that

7   you would be called as a witness?

8           MR. FERGENSON:  Objection.

9           THE COURT:  Sustained.

10  Q.  Mr. Barnett, when did I first reach out to you?

11  A.  I believe it was after I received a subpoena to testify.

12  Q.  I know, but when, this month, last month?

13  A.  Last month, right, yeah, June I believe.

14  Q.  You remember which week of June?

15  A.  No, I don't.  I'm sorry.

16  Q.  Mr. Barnett, in all the times that you worked for Mr. Guo,

17  did he live at the Mahwah facility?

18  A.  No, he did not live there.  He stayed there, but he did not

19  live there.

20  Q.  What was the longest period of time that he ever stayed

21  there?

22  A.  I believe about four or five days at most.

23  Q.  And what did he do during those four or five days?

24  A.  Mostly he would broadcast for the most part.

25  Q.  Did you ever see Mr. Guo's wife at Mahwah?

O78BGUO4                      Barnett - Direct

1   A.  Yes.

2   Q.  And what was your perception of her at Mahwah?

3   A.  In my perception she did not like it very much.

4   Q.  And did she look happy while she was there?

5   A.  Not that I know of.  I didn't think that she looked it

6   there.  I couldn't tell you whether she looked happy or not.  I

7   got the impression she did not like it.

8   Q.  What is your impression based on?

9   A.  Just communication between kind of husband and wife.  It

10  doesn't really matter what language it is.  Sometimes you can

11  just tell.

12  Q.  Body language?

13  A.  Body language and verbal cues.  My wife gives them to me

14  all the time.

15  Q.  Sorry about that.

16          Mr. Barnett, did you ever see Mr. Guo's son at Mahwah?

17  A.  No.

18  Q.  Have you seen Mr. Guo's son in all the time that you've

19  ever worked for him?

20  A.  Yes, I saw him one time.

21  Q.  What time, in which year?

22  A.  It was when I first started in 2020.  I believe he was at

23  the residence in Connecticut, but we did not know that he was

24  there.  I was actually surprised when I saw him walking up the

25  driveway.  I didn't know who he was.

```
O78BGUO4                        Barnett - Direct
```

 1  Q.  And after that have you ever seen him at the Connecticut

 2  residence?

 3  A.  No.

 4  Q.  How about Sherry Netherland?

 5  A.  No.

 6  Q.  How about Mahwah?

 7  A.  No.

 8          MR. FERGENSON:  Objection, your Honor.

 9          THE COURT:  Overruled.

10  Q.  How about at 3CC?

11          THE COURT:  He has stated that he never saw him again.

12  Q.  Did you see Mr. Miles Guo's daughter at these places?

13  A.  I saw his daughter at the house in New Jersey in Mahwah.

14  Q.  And how many days did you see her there for?

15  A.  Not many, maybe she would visit for a day, maybe two at

16  most, but I believe it wasn't more than a day, and she would

17  leave.

18  Q.  Do you know somebody name Wayne?

19  A.  Yes, I do.

20  Q.  Who is Wayne?

21  A.  Wayne is the fiancee' of Mei.

22  Q.  Did he live there?

23  A.  No, he did not.

24  Q.  Now, Mr. Barnett, is it fair to say that it's a pretty big

25  house?

O78BGUO4                      Barnett - Direct

1   A.  Yes, it is.

2   Q.  Could you describe the house for us?  It might be less

3   leading?

4   A.  The house sits on 12 acres.  It's up on a hill.  When you

5   pull around the driveway, as you come up the driveway, there's

6   a security house on the right.  As you pull up the gate, you go

7   up a hill.  As you go up the hill and you enter on the front of

8   the residence as you walk in, it's just a giant living room.

9   Basically there's a giant living in the front.  And then off to

10  the right would have been where the kitchen is, and then off to

11  the left was where there was an office, and then that was the

12  main floor.

13          I'm sorry.  Are you asking me what it was like when I

14  first went there or what it's like after some of the renovation

15  were done?

16  Q.  I was asking you what it was like when you first went

17  there.  I can interrupt you if I may.

18  A.  Okay.

19  Q.  Mr. Barnett, were there cameras at Mahwah when you first

20  saw it?

21  A.  Yes, there were.

22  Q.  And as part of your -- did you have a job at Mahwah at some

23  point?

24  A.  Yes.  So I was task with redoing all the security at

25  Mahwah.  The security cameras and the equipment there were very

O78BGUO4                          Barnett - Direct

1    substandard.  And for something that size, you really needed to

2    have a complete overhaul of all the security systems, cameras,

3    internet and stuff like that.

4    Q.  Mr. Barnett, do you need some water?  Do you have water

5    there?

6    A.  I don't know.  Do I have water here?  I'm good.  Go ahead.

7    Q.  Were you in charge of installing the camera system?

8    A.  No, I was not.

9    Q.  And did you pick the vendors who would install the camera

10   system?

11   A.  Yes, I did.

12   Q.  And which vendor did you pick?

13   A.  Company was called Prevenitas.

14   Q.  Was that a company -- it's fine.

15        How long -- did you supervise the installation of the

16   cameras?

17   A.  Some days.  I wasn't there everyday, so.

18   Q.  Could you tell us what was the rest of your work while you

19   were in charge of Mahwah?

20   A.  So at first it was really just doing the security system.

21   Unfortunately what end up happening, the amount of construction

22   that was going on with all the different vendors that were

23   coming in, all my security guys had to keep track of which

24   vendors were coming in.  And then we had to worry about who was

25   coming in with those vendors.  We had one MS-13 gang member

O78BGUO4                          Barnett - Direct

1    that had to be removed, stuff like that.  But for the most part
2    I had left that to another one of my team leads to kind of
3    oversee that.
4    Q.  Now, when you -- for how long were you in charge of
5    overseeing things at Mahwah?
6    A.  I guess when it first started, I don't remember the date of
7    start.  I know it ended in September of 2023 for me.
8    Q.  Mr. Barnett, what were the types of things -- was the house
9    in good shape?
10   A.  No, it was not.
11   Q.  Could you use that mic for me.
12   A.  It was not in good shape.
13   Q.  Was authority of your job to put it in shape?
14   A.  No.  My job was to oversee the construction, make sure that
15   the contractors were doing what they're supposed to do,
16   basically just keeping track of the -- make sure nobody was
17   doing anything wrong, more of like a security role than it was
18   overseeing contractors.
19   Q.  Mr. Barnett, were there names attributed to different rooms
20   within the facility?
21   A.  Yes.
22   Q.  What were the names?
23   A.  I'd have to look at the map, but the ground floor I don't
24   remember that having a name.  The second floor, one side was
25   Miles' wing.  The other side was madam's wing, which was

O78BGUO4                           Barnett - Direct

1    Miles's wife.  And I believe on the third floor one side was

2    for Mei, and the other side was for his son.

3    Q.  Were those the names given to the four areas of the two

4    floors?

5    A.  I believe so, on the security map they were I believe.

6    Q.  Did you have a security map?

7    A.  I did, yes.

8    Q.  Who created the security map, do you know?

9    A.  Prevenitas, they did a security assessment.

10   Q.  And they created the map?

11   A.  Yes, it was taken off of blueprints, but they created the

12   name on the map, correct.

13   Q.  Was there construction done to create more bedrooms on the

14   first floor?

15   A.  On the first floor.

16          MR. FERGENSON:  Objection, your Honor.

17          THE COURT:  What was the nature of the construction on

18   the first floor.

19   Q.  Or any floor for that matter while you worked there?  Go

20   ahead and tell us.

21   A.  There wasn't a whole lot of construction at first.  On the

22   first floor, the main floor, most the construction was on the

23   second and third floor I believe.

24   Q.  How many bathrooms all told were on the second floor, do

25   you know?

O78BGUO4                        Barnett - Direct

1   A.   There was definitely two.  It might have been three, but I

2   know there definitely were two.

3   Q.   And did there come a time when there were meetings held at

4   Mahwah?

5   A.   Yes.

6   Q.   And who was present for those meetings?

7             MR. FERGENSON:  Your Honor, objection.  I think we may

8   need a sidebar.

9             THE COURT:  All righty.  Step up.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                         Barnett - Direct

1              (At the sidebar)

2              MR. FERGENSON:  I assume this is post-indictment,

3    post-arrest meetings what you're getting at?

4              MR. KAMARAJU:  No.  No.  It's pre-arrest,

5    pre-indictment.

6              MR. FERGENSON:  Sorry.

7              THE COURT:  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO4                        Barnett - Direct

1          (In open court)

2          THE COURT:  You may answer.

3          MS. SHROFF:

4    A.  Yes.

5    Q.  Mr. Barnett, was Miles Guo present for that meeting?

6    A.  For that particular meeting I'm thinking of, yes.

7    Q.  Who else was there with Miles Guo just generally, try and

8    describe for us who was there?

9    A.  The meeting I'm thinking of is more of in the beginning of

10   the residence, but I'm pretty sure there were certain

11   supporters there.  And I thought Yvette was there, I'm almost

12   positive, but that's all I can remember.  I don't remember who

13   else was there.

14   Q.  And during that meeting was there a broadcast that was

15   undertaken?

16   A.  There may have been.  That I don't recall.

17   Q.  Mr. Barnett, do you know which entity bought the property

18   that has been referred to as Mahwah?

19   A.  Yes, Taurus Fund purchased the property.

20   Q.  Did you have a role at the Taurus Fund?

21   A.  I did not have a role at the Taurus Fund.

22   Q.  Did you have a signatory role at the Taurus Fund?

23   A.  Yes, I did.  I was unaware of that; but yes, I did.

24   Q.  And what was the signatory role that you had?

25   A.  Well, apparently, which I didn't find out until much later,

O78BGUO4                          Barnett - Direct

1    that I was the manager, one of the managers of that, of the

2    fund.

3    Q.  Did you sign a document that made you a manager of the

4    Taurus Fund?

5    A.  Yes, I did.

6    Q.  Did there come a time when that property was to be

7    transferred out of the Taurus Fund into another fund?

8    A.  Yes, for my understanding it was to be transferred to HCHK

9    Properties.

10   Q.  Mr. Barnett, while you worked at the Mahwah facility, did

11   you do any work with the guard house?

12   A.  I'm sorry.

13   Q.  Did you have any work done on the guard house?

14   A.  Yes.

15   Q.  What work did you have done?

16   A.  The guard house was basically, it was gutted.  We had to

17   create what's called a security operation center inside that

18   house, and then the rest of the house basically was just being

19   redone.  The house was in complete disarray.  There was mold in

20   it.  It was in really bad shape.

21   Q.  Could you tell the jury what is a license plate reader?

22   A.  A license plate reader is basically a camera that picks up

23   a license plate.  If it was a police department, it would

24   actually pick up the license plate and tell you all the

25   information registered to that particular license plate.

O78BGUO4                          Barnett - Direct

 1   Civilian wise, you can't do that, so basically it reads the
 2   actual license plate, lets you know how many times that license
 3   plate's been there.  And you can actually, on a computer, you
 4   can make it so that if that license plate appears, it will
 5   notify you that there is a problem if you don't want that
 6   particular car in your area.
 7   Q.  Did you install a license plate reader in Mahwah?
 8   A.  It was installed.  I didn't personally install it.
 9   Q.  Do you know when it was installed?
10   A.  I believe it was later.  I want to say more towards August
11   or September of '23.  That I don't know for sure.
12   Q.  Mr. Barnett, do you recall that people -- do you know what
13   a non-disclosure agreement is?
14   A.  Yes, I do.
15   Q.  What is it?
16   A.  That's basically an agreement stating that whatever you --
17   the gist of it is whatever you see or hear, whatever, it's to
18   be kept confidential.
19   Q.  Did you sign one?
20   A.  Not for -- for Mahwah, no, I did not.
21   Q.  Did vendors who came to the Mahwah facility sign them?
22   A.  Yes, everybody had to sign them.
23   Q.  And was there a reason -- did you have an understanding of
24   why there was such a focus on security at Mahwah?
25   A.  Well, it was just because of basically the size of the

O78BGUO4                          Barnett - Direct

1   property, and we were more concerned with the safety of the

2   property and Miles' safety for the most part.

3   Q.  And why were you concerned about Miles' safety?

4   A.  That was my job, to make sure that he was protected.

5   Q.  Do you know somebody name Sean Jing?

6   A.  I'm sorry.

7   Q.  Do you know somebody named Sean?

8   A.  Yes.  I'm sorry.

9   Q.  Who did he work for?

10  A.  I believe he worked for HCHK.  I don't know whether it was

11  properties or technologies.  I don't have that answer.

12  Q.  Mr. Barnett, in January of 2023, did you perceive a

13  security threat?

14  A.  January of 2023, I don't recall that date.

15          MS. SHROFF:  Well, let me show you something that

16  might help you recall.  Let me show you DX60686.  Could you

17  scroll down for him, please.  It's just for the witness.  Thank

18  you, and the Court and the government.  If you could just

19  scroll down.

20  Q.  Does that document refresh your recollection?

21  A.  Yes, it does.

22          MS. SHROFF:  You could take that down, please.

23  Q.  And could you tell us what security threat you perceived in

24  January of 2023?

25  A.  I received a call from my team lead, his name is Tom Carino

O78BGUO4                        Barnett - Direct

1   (sic).  He stated that he had received a call.  I don't

2   remember whether it was from Yvette or it was from --

3             MR. FERGENSON:  We object to the hearsay, your Honor.

4             MS. SHROFF:  It's not being offered for the truth of

5   the matter.

6             MR. FERGENSON:  Really.

7             THE COURT:  If he is -- sir, don't repeat anything

8   that was said to you.

9             THE WITNESS:  Okay.

10  Q.  What did you do?

11  A.  Basically we had -- I instructed them to take Mrs. Guo and

12  Mei to New Jersey, the New Jersey residence, because I felt

13  like that would be the most secure place if someone was

14  following them.

15  Q.  How long did they stay at the secure place in New Jersey?

16  A.  I believe a few hours.  I don't have an exact time.

17  Q.  And then where did you take them back?

18  A.  Back to their residence in Connecticut.

19  Q.  Mr. Barnett, moving forward to June 2022, was the

20  construction still going on at the Mahwah facility?

21  A.  Yes.

22  Q.  And how focus -- was it light construction work or heavy

23  construction work?

24  A.  It was always heavy construction work going on.

25  Q.  Now, Mr. Barnett, sitting here today, do you recall if

O78BGUO4                          Barnett - Direct

1   around June of 2022, whether there was another meeting at

2   Mahwah residence that you supervised?

3   A.  I don't recall that.  There may have been.  I just don't

4   recall.

5   Q.  Sitting here today, do you recall if there was a Lunar

6   celebration at Mahwah?

7   A.  Yes.

8   Q.  When was that?

9   A.  I don't know the date of that, but there was, yes.

10  Q.  Could you describe what the celebration looked like over

11  there?

12  A.  I don't think I was present at that celebration.

13  Q.  Did you provide security for the celebration?

14  A.  Yes.

15  Q.  And what security did you provide?

16  A.  I believe it was security that was already there that would

17  have been my team lead Tom Carino and who was on duty that day.

18          THE COURT:  Speak into the microphone.

19  A.  Tom Carino and whoever was on duty that day that was

20  securing the estate.

21  Q.  Mr. Barnett, as part of your job duty for Mr. Guo, did you

22  scout out properties for him to view?

23  A.  Yes, I scouted out offices and warehouses.

24  Q.  Could you keep your voice up.

25          You scouted out offices and what?

O78BGUO4                        Barnett - Direct

1    A.  Offices and warehouse.

2    Q.  What else?

3    A.  I scouted out homes as well.

4    Q.  Where did you scout out homes?

5    A.  Most of the scouting I did, it was online.  One was in

6    Arizona.  One was in Colorado.  I think there was one in Texas

7    as well.

8    Q.  And were these properties that you were scouting, can

9    out -- was it your understanding that they were for?

10              MR. FERGENSON:  Objection.

11              THE COURT:  Sustained.

12   Q.  Describe what directions you --

13              THE COURT:  Sustained.

14              MR. FERGENSON:  Objection.

15              THE COURT:  Don't repeat anything that was said to

16   you.

17              MS. SHROFF:  Your Honor, may we have a sidebar?

18              THE COURT:  Okay.

19              (Continued on next page)

20

21

22

23

24

25

O78BGUO4                         Barnett - Direct

 1              (At the sidebar)

 2              MR. KAMARAJU:  I wasn't sure what the basis of the

 3      hearsay objection is to a direction from Mr. Guo.  Under *U.S.*

 4      *v. DiMaria*, a direction is not hearsay.

 5              THE COURT:  I'm waiting for the direction to be, get

 6      me a house for G/Club, something hike that.

 7              MR. KAMARAJU:  He didn't even -- she didn't even get a

 8      chance to ask the question as to what the direction was.

 9              THE COURT:  Anticipating what his answer would be, I

10      sustained an objection.

11              MR. KAMARAJU:  I'm sorry, your Honor.  I'm being slow

12      on this.  If the objection is to hearsay, then don't we have to

13      hear what the direction was going to be.

14              THE COURT:  Well, then, the jury would hear that, and

15      that can be a problem.

16              MR. KAMARAJU:  I'm not sure how we can ever get to it

17      if the direction was for G/Club or for fellow fighters or for

18      anybody else, I don't know how to ask that question I guess is

19      my point.

20              MS. SHROFF:  Your Honor, we have to be candid.  We

21      have no idea what his answer is going to be.  We didn't have

22      the level of access to Mr. Barnett that the government did.

23      They know what he is going to say.  We don't know.  We were not

24      allowed to prep these witnesses.

25              MR. FERGENSON:  Your Honor, my understanding is that

O78BGUO4                          Barnett - Direct

1    he has prepped with them.  I think that's superly incorrect.

2    They also have the 302s.  But that aside, I think your Honor is

3    exactly right.  There can be mix statements where what is sort

4    of clothed as a command is really an assertion of truth.

5    Meaning, these are for G/Clubs like your Honor's example.  That

6    is still hearsay.  It isn't permissible.  It is a proper

7    objection that the question calls for hearsay because that is

8    like your Honor clearly discerned what is coming.

9             THE COURT:  You want to get out that these potential

10    properties had a certain purpose.  That is the reason you're

11    asking these questions?

12            MR. KAMARAJU:  We are entitled to get out that Mr. Guo

13    directed people to look for properties for a certain purpose.

14    That's not hearsay.  That's both his state of mind and his

15    direction.

16            THE COURT:  You can ask did you receive directions to

17    look for properties for certain purposes without his naming the

18    purpose.

19            MR. KAMARAJU:  Your Honor, maybe I'm not

20    understanding.  If part of the hearsay exception is for his

21    state of mind as well as his direction, then I don't understand

22    how the purpose is not appropriate.

23            THE COURT:  You want to get this in for the truth of

24    the matter.  That's the reason that I don't buy any other

25    reason.

O78BGUO4                          Barnett - Direct

1          MR. KAMARAJU:  That's why I come back to the *DiMaria*

2    case. He was here to buy cheap cigarettes.  That was the

3    intention that was expressed in the statement that the Second

4    Circuit said.  So the Second Circuit said, even though there is

5    some argument that that could be viewed as he's really there

6    for the purpose of buying cigarettes, it went to his state of

7    mind.  It's the same concept.

8          THE COURT:  So he's acting as a scout, and what

9    exactly did you expect that he would say about what he was

10   thinking about?

11         MS. SHROFF:  He was told to look for properties that

12   were large, that had land attached to them, that had height to

13   them so that there would be dwellings on the top and dwellings

14   below.  The point of the properties was to make sure that there

15   was room for everyone to live if they so wanted.  The property

16   was such to have zoning that would allow for the building of

17   new structures.  And I want to be clear because the government

18   just said that what I said was superly incorrect or something

19   like that.

20         The defense has had one meeting with his lawyer and

21   him, and we have not had access to him after that because his

22   lawyer has been on vacation in the Poconos and has no phone

23   service, and we have not spoken to somebody who is represented

24   by counsel without them being present.  This is what I am

25   surmising would be his answer.  More importantly under *DiMaria*,

O78BGUO4                          Barnett - Direct

1    the fact that he has a state of mind and he knows that Miles

2    Guo is looking for property that is of a certain type and for a

3    certain purpose is properly admissible, your Honor.

4              THE COURT:  As a generality, absolutely.  Were you

5    given certain criteria with respect to the property?  He's

6    going to say yes.  Did you apply that criteria when you

7    searched online?  He's going to say yes.

8              MR. KAMARAJU:  Your Honor, I'm going to maintain the

9    objection because I think the appropriate solution is a

10   limiting instruction.  It's not the exclusion of the testimony.

11   If the Court has concerns that the testimony could be taken by

12   the jury or even argued by defense counsel, then I believe that

13   the proper course is not exclusion.  It's a limiting

14   instruction, or an objection by the government if I try to do

15   that in summation.

16             THE COURT:  Are you telling me that in summation you

17   will not be trying to use his testimony about the purpose of

18   the properties for the truth?

19             MR. KAMARAJU:  I'm going to be saying, this is what

20   Miles Guo thought.  That's a classic state of mind statement.

21   That's what I'm going to say.  You want to know what Miles Guo

22   thought?  This is how you know what Miles Guo thought.  If

23   Miles Guo was wrong, he was wrong, but that's what he thought.

24   That's what I'm going to say in summation.

25             MR. FERGENSON:  I think your Honor's proposal was

O78BGUO4                          Barnett - Direct

1    correct.  I think your Honor recognized earlier, this case is

2    in a different universe than the *DiMaria* case, and it just

3    doesn't have any traction in a case like that.  And

4    particularly the context like this, this person is just

5    following orders.  The purpose is the effect.  It's not what he

6    was told about why, it's what he did.

7               MS. SHROFF:  He was told why.

8               THE COURT:  He was told why, and so he took certain

9    steps.  He put certain words into the search bar when he was

10   looking at these properties.  He put it in a certain price.  He

11   put in certain criteria concerning use of the property.

12              MS. SHROFF:  Right.  Is the Court's ruling that I may

13   not inquire into what the purpose of the property was?

14              THE COURT:  Correct.

15              MS. SHROFF:  And I may not inquire about the specific

16   terms that he put into the search?

17              THE COURT:  Correct.

18              MS. SHROFF:  And I could not inquire as to what this

19   witness's understanding is of Mr. Guo's state of mind at the

20   time he gave those directives?

21              THE COURT:  Correct.

22              MS. SHROFF:  So I think that is in conflict with

23   *DiMaria*. That's our position, your Honor.

24              (Continued on next page)

25

O78BGUO4                          Barnett - Direct

1              (In open court)

2    BY MS. SHROFF:

3    Q.  Mr. Barnett, were you given certain criteria when you were

4    directed to look for properties, just yes or no?

5    A.  Yes.

6    Q.  And who gave you those directives or directions criteria?

7    A.  Miles Guo.

8    Q.  And did you, without telling us what they were, did you use

9    that criteria to look for properties?

10   A.  Yes, I did.

11   Q.  And what properties did you find?

12   A.  Again, I found a property in Texas.  I found a property --

13   Q.  Could you take a minute and describe for the jury the

14   property that you found in Texas?

15   A.  The one that I found in Texas was extremely large property.

16   I believe it was about 600 acres.  It was -- I believe it

17   already had an airstrip on it, and I don't recall much about

18   the residence on the property.  I just remember it being very

19   large.

20   Q.  What other states did you -- did you look for properties

21   in -- that was a bad question, but I think you get it?

22   A.  I looked for properties in Arizona as well as Colorado.

23   Q.  Tell us about the property that you found in Arizona?

24   A.  The properties that I found in Arizona, actually visited

25   that property with Miles Guo.

O78BGUO4                          Barnett - Direct

1   Q.  I'm sorry.

2   A.  I visited that property with Miles Guo.

3   Q.  And could you describe the property for us?

4   A.  It was a large property.  One part of it was up on a hill

5   and it cascaded down almost like into a valley and it was in

6   Sedona.

7   Q.  What other state did you look for property in?

8   A.  Colorado was the other state that I found property.

9   Q.  Did you look for property in Connecticut?

10  A.  I looked at properties in Connecticut.  I believe that was

11  with Mr. Guo though.

12  Q.  Without telling us what it was, did you have an

13  understanding of what the purpose of these properties was?

14  A.  Yes.

15  Q.  And from whom did you get that understanding?

16  A.  Mr. Guo.

17  Q.  After you found these properties, did you communicate

18  information about these properties to others?

19  A.  Yes.

20  Q.  To whom?

21          THE COURT:  All right.  It's now 2:30, so we'll take

22  our half hour break.  Remember that you're not allowed to

23  discuss the case amongst yourselves.  Don't permit anyone to

24  discuss it in your presence.  Don't read, listen to or watch

25  anything from any source that touches on the subject matter of

O78BGUO4                     Barnett - Direct

1   this case.  Sir, you can step out.  Don't discuss your

2   testimony.

3               THE LAW CLERK:  Jury exiting.

4               (Jury not present)

5               THE COURT:  Please be seated.  Is there anything

6   before we return at 3 p.m.?

7               MR. FERGENSON:  Not from the government.

8               MS. SHROFF:  Not from us, your Honor.  Thank you.

9               THE COURT:  Okay.

10              (Recess)

O78VGUO5                         Barnett - Direct

```
1          THE COURT:  Please be seated.

2          MS. SHROFF:  Your Honor, may I run to go get the

3    witness?

4          THE COURT:  Yes, go ahead.  Except, Ms. Shroff?

5          MS. SHROFF:  Yes, your Honor.

6          THE COURT:  I want to make a ruling before you do

7    that.  Can someone else get the witness?

8          MS. SHROFF:  Sure.

9          THE COURT:  All righty.

10         I have reviewed the transcript and case law.  And I

11   will permit the defense to pursue a broader line of

12   questioning, broader than what I had indicated at the sidebar.

13         The defense seeks to ask Scott Barnett what directions

14   he received from Mr. Guo when searching for a property.

15   Mr. Barnett may testify that Mr. Guo told him to look for a

16   property with certain characteristics.  Such instructions

17   constitute commands and are, therefore, not hearsay.

18         Oh, would the witness please exit.

19         THE WITNESS:  Oh, I'm sorry.

20         THE COURT:  *See United States v. Bellomo*, 176 F.3d

21   580, 586, (2d Cir. 1999).

22         I will permit the defense to elicit the specific

23   criteria that Mr. Guo gave to Mr. Barnett.  Mr. Barnett may

24   also testify that Mr. Guo told him why he was seeking a

25   property with those criteria.  Although this would not
```

1    constitute a command, such a statement would be indicative of

2    Guo's "then-existing state of mind, such as motive, intent, or

3    plan" under Rule 803(3).

4              So long as the statement is forward-looking and not

5    backward-looking, it is admissible under the state of mind

6    hearsay exception pursuant to *United States v. DiMaria*, 727

7    F.2d, 265, 270-71 (2d Cir. 1984).

8              So now you may bring the witness back.

9              MR. KAMARAJU:  Thank you, your Honor.  We'll get him.

10             (Witness present)

11             THE COURT:  All righty.

12             Let's have the jurors come in, please.

13             (Jury present)

14             THE COURT:  Please be seated.

15             Remember, sir, that you're still under oath.

16             THE WITNESS:  Yes, ma'am.

17             THE COURT:  You may continue the inquiry.

18             MS. SHROFF:  Thank you, your Honor.

19   BY MS. SHROFF:

20   Q.  Mr. Barnett, before we broke, we were discussing the

21   criteria you were given when looking for these properties.

22             Do you recall that?

23   A.  Yes.

24   Q.  And could you tell the jury what criteria you were given

25   while searching for these properties?

1    A.   The basic criteria had to be a large -- a large property;

2    had to be able to house numerous people, over 1,000 is really

3    the extent of it; it had to have the capabilities of being able

4    to have -- being able to have numerous houses on it; as well as

5    having access both by vehicle and airplane.

6    Q.   And did you look for properties that met that criteria?

7    A.   Yes.

8    Q.   And Mr. Barnett, did Mr. Guo tell you why it is that he was

9    looking for these types of properties?

10   A.   Yes, he did.

11   Q.   Why?

12   A.   It was explained to me that Mr. Guo felt that the -- best

13   way to put it is the world as we know it was not going to be

14   sustainable with COVID and the vaccines.  He felt like that

15   there would be a lot of deaths, there would be a lot of chaos,

16   the world would go into massive turmoil.  And he wanted to have

17   places set up for, as he called it, his people, so that they

18   would have places to go when this happened.

19   Q.   And who were his people?

20   A.   The Chinese people, meaning his supporters.

21   Q.   His what?

22   A.   Supporters.

23   Q.   And did he tell you what other reasons he was looking for

24   these properties?

25   A.   Well, primarily it was for that reason.  The reason for the

1    access for airplanes and that nature was to be able to go to

2    and from these properties, as well as bring in supplies, you

3    know, as needed.

4    Q.  And you mentioned it had to have space for 1,000 people.

5    Did you have an understanding of who these thousand people

6    would be?

7    A.  My understanding was -- for the way it was described to me,

8    was over 50,000 supporters.  But I don't have exact names or --

9    of who it would be or, you know, which people would go where.

10   Q.  Mr. Barnett, you testified about a property that you looked

11   at in Colorado; correct?

12   A.  That's correct.

13   Q.  And could you describe that property for me.

14   A.  It was a large property.  I don't recall the acreage.  It

15   had already had a runway on it.  I believe it was a grass

16   runway, if I remember correctly.  It had -- I believe it

17   already had different homes on it, but I'm a little fuzzy about

18   the details of the exact property.  I just remember it being

19   very large.  And I don't know, I remember the price tag being

20   quite big from -- I couldn't tell you exact amount, but it was

21   definitely 200 million, give or take.  I don't know the exact

22   amount.

23            MS. SHROFF:  Your Honor, could I just have a minute?

24            (Counsel conferred)

25   Q.  Mr. Barnett, did you visit the Colorado property or did you

1   just research it online?

2   A.  I just saw it online.  I did not visit it.

3   Q.  Mr. Barnett, you testified about the property in New

4   Jersey, you remember that?

5   A.  Yes.

6   Q.  Okay.  And were you aware of an anticipated purchase of a

7   restaurant also close to that property?

8           MR. FERGENSON:  Objection.

9           THE COURT:  Sustained.  Don't lead.

10  Q.  Mr. Barnett, were you told to look for the purchase of any

11  other property in Mahwah, New Jersey, the area of Mahwah, New

12  Jersey?

13  A.  Yes, I looked at other properties in Mahwah.

14  Q.  And what were those properties?

15  A.  The properties I looked at was mostly like office space and

16  warehouses.

17  Q.  And what else?

18  A.  There was one restaurant that I think that -- referring to,

19  but it was -- I don't believe it was for sale.

20  Q.  Mr. Barnett, as part of your job description at Mahwah, do

21  you recall purchasing any ready-to-eat meals in large

22  quantities?

23          MR. FERGENSON:  Objection to leading.

24          THE COURT:  You may answer.

25  A.  I personally purchased not in large quantities basic

1  different types of meals to kind of show Mr. Guo, you know,

2  what they were.  And then if he had approved those, and it was

3  approved by Yvette, then we would have purchased a bunch of

4  them.  We were looking into it, but we never purchased them.

5  Q.  And who were you going to purchase them for?

6  A.  For the plan that Mr. Guo had already wanted to do in

7  regards to having like different survival areas for the

8  supporters.

9            THE COURT:  What do you mean by "survival areas"?

10           THE WITNESS:  I considered those -- the properties in

11  regards to what he was looking for, was almost like survival

12  areas for what the -- for what his vision was as to what the

13  world was going to become.  That's kind of why I call it that.

14           THE COURT:  So in case there were some crisis, is that

15  what you're saying?

16           THE WITNESS:  That's correct.

17           THE COURT:  Go ahead.

18  BY MS. SHROFF:

19  Q.  Mr. Barnett, let me show you what is Defense Exhibit

20  60678A.  Do you recognize this document?

21  A.  Yes.

22  Q.  What is it?

23  A.  I believe it's one of the properties that we were looking

24  at.

25  Q.  And where is this property located, do you recall?

```
 1   A.  I believe that one was in Arizona.

 2              MS. SHROFF:  Your Honor, the defense moves DX 60678A

 3   into evidence.

 4              MR. FERGENSON:  May we briefly voir dire, your Honor?

 5              THE COURT:  You may.

 6              MR. FERGENSON:  Who prepared this document?

 7              THE WITNESS:  I have no idea.

 8              MR. FERGENSON:  We object.

 9   BY MS. SHROFF:

10   Q.  Do you recognize the document regardless of who prepared

11   it?

12   A.  I recognize the property from seeing it before, but I never

13   visited the property, nor did I pick out that property myself.

14              MS. SHROFF:  Okay.  Let's scroll down.  Scroll down.

15   And keep going.

16   Q.  Do you recall reviewing this property for purchase by

17   Mr. Guo for fellow supporters?

18   A.  Yes, that I remember.  I remember that specific picture

19   that you're showing now.

20              MS. SHROFF:  Your Honor, we move again to have the

21   document admitted.

22              THE COURT:  Are you saying that it consists of only

23   those two pages that he just identified?

24              MS. SHROFF:  No, no, it's a larger document.  I'm

25   happy to have him scroll through it to see if he recognizes the
```

1    entire document.

2              THE COURT:  He would need to do that before it's

3    admitted.

4              MS. SHROFF:  Okay.  Can you keep scrolling down,

5    please, Jorge.  Keep scrolling down.

6    Q.  Do you recognize that document now, Mr. Barnett?

7    A.  Yes, I do.

8              MS. SHROFF:  Okay.  The defense moves to admit it into

9    evidence.

10             THE COURT:  I just don't know how far you've gotten

11   through the document.  There's some photographs.  I don't know

12   if there's written language.

13   Q.  Do you recognize the document as it's unfolding before you?

14   A.  I do recognize it.  I can't tell you that I recognize every

15   single picture, but I do recognize the document.

16             MS. SHROFF:  Your Honor, we renew the motion to admit

17   the document into evidence.

18             THE COURT:  Was that the full document?

19             MS. SHROFF:  Yes, your Honor.

20             THE COURT:  And do you recognize the full document?

21             THE WITNESS:  Your Honor, I recognize some of the

22   photos in that document.  I can't tell you that I recognize all

23   the photos.

24             THE COURT:  What percentage do you recognize?

25             THE WITNESS:  It's definitely over 50 percent, your

1   Honor.

2                THE COURT:  I'll admit it.  Go ahead.

3                (Defendant's Exhibit DX 60678A received in evidence)

4                MS. SHROFF:  Your Honor --

5   Q.  Is this the property that you scouted, Mr. Barnett?

6   A.  It's one of the properties that was shown to me.  I did not

7   find this property personally.

8                MS. SHROFF:  And may we publish it to the jury,

9   please.  We can just keep scrolling, please.

10  Q.  Mr. Barnett, sitting here today, do you recall sending this

11  brochure to someone?

12  A.  I believe I sent this to Yvette.  I know -- I know it was

13  shown to Miles, and also I think it was sent to Anthony

14  Dibatista.

15  Q.  Mr. Barnett, was zoning one of the criterias that you were

16  asked to consider when looking for properties?

17  A.  Meaning what?  I don't know what that --

18  Q.  Whether property was zoned for a single dwelling or

19  multiple dwellings?

20  A.  No, it had to be -- some of the properties had to be

21  multiple dwellings, but there was always -- if it was just

22  regular like land, straight land, then there would have to

23  be -- there wasn't any zoning consideration at the time, it was

24  more of showing the property.  And then it would have to be

25  zoned for multiple -- multiple homes on the property.

```
 1   Q.  Mr. Barnett, were you present -- let me try it a different
 2   way.
 3              MS. SHROFF:  You can take that down for me.
 4              Thank you.
 5   Q.  Mr. Barnett, were you aware of something called the Rule of
 6   Law Foundation?
 7   A.  Yes, I was aware of it.
 8   Q.  And as part of your security experience, were you asked to
 9   respond to protests undertaken by the Rule of Law Foundation
10   supporters?
11   A.  I didn't respond to -- well, I responded to one protest,
12   and that was in Grand Central Station.  I responded to that.
13   Q.  And who contacted you?
14   A.  I believe it was the -- the MTA police.  I can't remember
15   the -- I can't remember his name off the top of my head, but
16   I -- be honest with you, I can't remember how he got my phone
17   number.  But he had called me and asked me to come down to
18   speak with the protesters.
19   Q.  And did you do that?
20   A.  Yes, I did.
21   Q.  And what did you do as a result of being down there?
22   A.  Basically, alls I did was I talked to, I believe it was,
23   Prince Li at the time; explained to him, you know, about
24   following the rules of whatever the police department required.
25   And then after that, I spoke with -- I left a business card
```

1    with the two police officers that were in the train station,

2    and then spoke to the deputy after.  I believe it was on the

3    phone; I don't recall it being in person.  And he asked me, you

4    know -- I said, If they don't follow the rules then, they're

5    subject to be either summonsed or arrested.  It's just the way

6    it is.

7    Q.  Mr. Barnett, you testified about having been employed for

8    Mr. Guo for more than a year; correct?

9    A.  Yes.

10   Q.  And during that time, did you see him interact with fellow

11   supporters?

12   A.  Yes.

13   Q.  And what is your impression of his attitude towards the

14   fellow supporters?

15   A.  My impression of it is he loved them very much.  He was --

16   he was always talking to them.  They were like his primary

17   concern.

18   Q.  Mr. Barnett, on the Mahwah property, there is a part that

19   is called the gazebo; is that correct?

20   A.  There is a gazebo on the property; correct.

21   Q.  And were there plans to do something with the area that is

22   the gazebo?

23   A.  There may have been.  I don't know what those plans were.

24   Q.  Do you recall at all what the plans were for that area?

25            MR. FERGENSON:  Objection.  He just said he doesn't

O78VGUO5                          Barnett - Direct

```
 1   know.
 2              THE COURT:  Sustained.
 3   Q.  Do you recall if there was ever a plan to have a
 4   spaceship --
 5              MR. FERGENSON:  Objection.
 6              THE COURT:  Sustained.  Don't lead.
 7   Q.  Do you recall of any other plans that you were aware of for
 8   the building at Mahwah?
 9   A.  I'm sorry?
10   Q.  Were you aware of any other plans for -- that were going to
11   be put in place at Mahwah?
12   A.  Yes, I was aware of other plans.
13   Q.  What were they?
14   A.  The only -- the only plan -- other plan that I'm aware of
15   was the -- the changing of a kitchen for the office space that
16   was going to be created on the first floor.
17   Q.  How about the outside area of Mahwah, were you aware of any
18   other plans?
19   A.  No, not in regards to the gazebo, I wasn't aware of that
20   plan.  I don't know when that plan was initiated because I was
21   out -- I left Mahwah in late August/early September.
22   Q.  Were there drones at Mahwah?
23   A.  No, there was an anti-drone system.  There were no drones
24   at Mahwah.
25   Q.  Okay.  What was the anti-drone system at Mahwah?
```

1    A.  Basically, the anti-drone system was a system that was

2    installed on the roof of the house in Mahwah.  And its

3    capabilities were that it can detect a drone, a launch of any

4    drone, I want to say about 15 to 20 miles out.  As soon as a

5    drone is launched, it will tell you exactly what that drone is,

6    what its capabilities were, where the person who was actually

7    flying the drone was standing.  And that's really the main --

8    its main capabilities.  There was supposed to be a camera that

9    would actually zoom into the location of that drone, but it was

10   never -- it was never installed.

11   Q.  Mr. Barnett, did you install this anti-drone equipment?

12   A.  No, I did not.

13   Q.  Was it already there when you got there?

14   A.  No, it was not.

15   Q.  Do you know who installed it?

16   A.  It was contracted through Prevenitas.  They hired a company

17   that installed it.  I don't recall the name of it.  I'd have to

18   see the paperwork for it.

19   Q.  Mr. Barnett, sitting here today, do you have any doubt

20   about the fealty Mr. Guo felt for his fellow supporters?

21              MR. FERGENSON:  Objection, your Honor.

22              THE COURT:  Sustained.

23              MS. SHROFF:  I have nothing further.

24              THE COURT:  Cross-examination.

25              MR. FERGENSON:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. FERGENSON:

3    Q.  Good afternoon, Mr. Barnett.

4    A.  Afternoon.

5    Q.  You were Miles Guo's head of security, right?

6    A.  That's correct.

7    Q.  You were -- in layman's terms, you were a bodyguard for

8    Miles Guo?

9    A.  Yes, that's correct.

10   Q.  You called him at times the principal, right?

11   A.  Yes.

12   Q.  And at times you called him boss, right?

13   A.  Correct.

14   Q.  Starting in October 2020, you were paid by Golden Spring,

15   right?

16   A.  That's correct.

17   Q.  You understood that that was Miles Guo's money; correct?

18   A.  No, I didn't understand that at that time, no, sir.

19   Q.  And you thought other people were paying for Miles Guo's

20   bodyguard?

21   A.  I wouldn't have had knowledge of that.  It was basically

22   hired by a company to do security services for an individual,

23   so I wouldn't have access to whoever funded that.

24   Q.  And then after Golden Spring, Lamp Capital paid you;

25   correct?

1  A.  Yes, that was switched from Golden Spring to Lamp Capital.

2  I don't remember the date though when that was done.

3  Q.  And Lamp Capital was another Guo family company, right?

4  A.  That I had no knowledge of.  We only received a couple of

5  paychecks from Lamp Capital, and I never really asked about why

6  the switch was done.

7  Q.  And fair to say you don't even know what Lamp Capital was,

8  right?

9  A.  I honestly have no idea what Lamp Capital was.

10  Q.  But you know you got money from it; correct?

11  A.  That's correct.

12  Q.  And then after that, HCHK paid you, right?

13  A.  Yes, I believe it was HCHK Technologies; and then later,

14  HCHK Properties, something like that.

15  Q.  And HCHK, those companies were run by Guo and Yvette?

16  A.  Yes.  So my immediate boss was Yvette, that's who I

17  reported to.  At that time that's pretty much her and Anthony

18  are who I reported to every day.

19  Q.  And HCHK had offices at Columbus Circle?

20  A.  Correct.

21  Q.  Guo had an office in HCHK's floor?

22  A.  Right.

23  Q.  And Yvette had an office on HCHK's floor?

24  A.  Yes, she did.

25  Q.  They were on opposite sides of the floor, right?

1   A.  No, I believe -- I believe Yvette's office -- I guess that

2   was later on.  So initially, yes.  And then eventually Yvette

3   had moved up to an upper floor.

4   Q.  And Guo and Yvette, they were together a lot, right?

5   A.  Yes.

6           MS. SHROFF:  Objection to what is a lot.

7           THE COURT:  You can ask him to gauge.

8   Q.  They were together every week, right?

9   A.  Yes, to my knowledge, when I was with them, yes.

10  Q.  Fair to say they worked closely together?

11  A.  Yes.

12  Q.  And now after -- withdrawn.

13          There came a point where you started your own company;

14  correct?

15  A.  That's correct.

16  Q.  Its name was -- tell me if I have this right.  Was it GS

17  Security Solution?

18  A.  That's correct.  It's called GS Security Solutions.

19  Q.  And you started that company with the help of Guo and

20  Yvette, right?

21  A.  Well, I started that company with the permission of Yvette.

22  Miles didn't really have any say in that.  I never had a

23  discussion with him in regards to that company; was with

24  Yvette, Max Krasner and Anthony Dibatista is who I discussed

25  that with.

O78VGUO5                          Barnett - Cross

```
 1   Q.  And Yvette approved the plan for --
 2   A.  That's correct.
 3   Q.  For that company.
 4            And Anthony Dibatista, you also discussed that plan
 5   with him, right?
 6   A.  I did.
 7   Q.  Max Krasner, he had access to your company's books, right?
 8   A.  Yes, he did.
 9   Q.  And he was kind of a finance guy for the Guo family
10   companies, fair to say?
11   A.  Yes, he -- when I first met Max, he was the finance guy for
12   Golden Spring.
13   Q.  Max called Miles Guo boss, right?
14   A.  I believe so.
15   Q.  And Anthony called Miles Guo boss, right?
16   A.  Yes, I believe so.
17   Q.  And Yvette called Miles Guo the principal, right?
18   A.  Well, the only term she used with me was the P.  She never
19   used the full term "principal," just so you know.
20   Q.  You understood --
21   A.  That's correct.
22   Q.  -- that that meant principal; correct?
23   A.  Yes.
24   Q.  And they weren't the only employees who called Miles Guo
25   boss, right?
```

O78VGUO5                         Barnett - Cross

1    A.  No, a lot of people called him boss.

2    Q.  And they weren't the only employees -- Yvette wasn't the

3    only employee -- you and Yvette weren't the only employees who

4    called him the principal, right?

5    A.  That I don't know.  I don't -- that wasn't a common term.

6    It was a term that me and Yvette used with each other.  I

7    don't -- I don't remember -- I don't know if it was used with

8    my other team members, but I know it was used between me and

9    Yvette.  I don't remember anybody else calling him the

10   principal, but they may have, but I don't recall that.

11   Q.  But you and your team members also referred to him as

12   principal or P, right?

13   A.  Yeah.  Most of the time it would have been boss, but I

14   referred to him as P with Yvette all the time.

15   Q.  Now, after you started your company, your company received

16   money from HCHK, right?

17   A.  Correct.

18   Q.  And HCHK sent your company money on multiple occasions,

19   right?

20   A.  For payroll until it was fully -- fully switched over.  So

21   there was an agreement in regards to how the company was going

22   to be run and what services that I would be giving and getting

23   in return.

24   Q.  And in December 2022, your company received $50,000 from

25   HCHK Property Management?

1   A.  That's correct.

2   Q.  And in January 2023, your company received $400,000 from

3   HCHK, right?

4   A.  That's correct.

5   Q.  In February 2023, your company received $200,000 from HCHK,

6   right?

7   A.  That's correct.

8   Q.  So sir, in the three months leading up to Miles Guo's

9   arrest, your company received $650,000 from HCHK; correct?

10  A.  Correct.

11  Q.  And that was after Miles Guo had declared bankruptcy;

12  correct?

13  A.  I didn't know Miles Guo had declared bankruptcy.

14  Q.  He never told you that?

15  A.  No, he did not.

16  Q.  Sir, didn't you take him --

17          MS. SHROFF:  Objection as to hearsay that the

18  government is seeking to elicit.

19          MR. FERGENSON:  He's an opposing party, your Honor.

20          THE COURT:  Overruled.

21  Q.  Didn't you take him to court proceedings in Connecticut in

22  connection with bankruptcy?

23  A.  I did.  That's correct.

24  Q.  So what did you think he was going there for?

25  A.  I didn't know it was in regards to anything that was

O78VGUO5                         Barnett - Cross

1    current, meaning HCHK.  I had no knowledge of that.

2    Q.  But you knew he had declared bankruptcy because you took

3    him to court --

4    A.  From a previous company, that's correct.

5              MS. SHROFF:  Your Honor, could Mr.  --

6              THE COURT:  Just allow him to answer.

7              MS. SHROFF:  Thank you.

8    Q.  But you understood that it was Miles Guo -- Miles Guo had

9    declared bankruptcy; correct?

10   A.  My understanding is the company declared bankruptcy.  I

11   don't know if it was Miles Guo personally.  But I did take him

12   to court, that's correct.

13   Q.  Was it Miles Guo who told you that the company declared

14   bankruptcy?

15   A.  No.

16   Q.  Did he ever tell you that he himself had declared

17   bankruptcy in early 2022?

18   A.  Not that I remember, not personally.

19   Q.  Now, Mr. Barnett, since Miles Guo's arrest, you've

20   continued working for the Guo family, right?

21   A.  That's correct.

22   Q.  You still work for the Guo family, right?

23   A.  Yes, I do.

24   Q.  Miles Guo's daughter is your client?

25   A.  That's correct.

O78VGUO5                          Barnett - Cross

1    Q.  Mei Guo is her name?

2    A.  Yes, it is.

3    Q.  Mei Guo is your most important client, right?

4    A.  That's correct.

5    Q.  And that's just -- you know, before Miles Guo's arrest, he

6    was your most important client, right?

7    A.  He was one of them, that's correct.  The companies also.

8    The whole -- the whole entity was the most important company.

9    Q.  And, in fact, Mei Guo is your only major client, right?

10   A.  That's constant client, that's correct.

11   Q.  And I think you testified -- I think you testified on

12   direct, but correct me if I'm wrong, that your other client

13   engagements were very minimal?

14   A.  That's correct.

15   Q.  Now, since Miles Guo's arrest, you've received money sent

16   by individuals who are not your actual clients; correct?

17   A.  I guess so, yes.  I mean, meaning my invoices, how they are

18   paid, is that what you're asking, sir?

19   Q.  Well, individuals who are not your actual clients have sent

20   your company money since Miles Guo's arrest; correct?

21            MS. SHROFF:  Objection to the form.

22            THE COURT:  Overruled.  You may answer.

23   A.  I don't know if they are individuals.  I just give an

24   invoice to Mei, and then she has whatever, pays the invoice.

25   Q.  And since Miles Guo's arrest, you've received monies sent

1  by companies who are not your actual clients; correct?

2  A.  I'm unaware of who is actually sending the money; I just

3  know it does arrive in my bank.  I don't have an exact name of

4  each person or how Mei sends the money.

5          THE COURT:  But the question is whether those

6  individuals or entities are actually your clients.

7          THE WITNESS:  No, they are not my clients.  Mei Guo is

8  my client.

9  Q.  And sir, on May 4th, 2023, your company received $152,000

10  approximately from an individual named Jingrui Sun, right?

11  A.  Yeah, I did receive that money.  I couldn't tell you if

12  that's who it was from, but I did receive that money.

13  Q.  And the next month, on June 12, 2023, your company received

14  over $25,000 from a company called HGA Property Operation LLC,

15  right?

16  A.  Yes.

17  Q.  And that same month, on the next day, on June 13, 2023,

18  your company received an incoming wire of $105,000 from an

19  individual named Shengxu Wang; correct?

20  A.  I did receive that money.  Again, I don't know who those

21  were from.  Those are all invoices for securities services.

22  Q.  And, sir, you work for the NYPD, right?

23  A.  Yes, sir.

24  Q.  And you know a money mule is someone who receives and

25  transfers fraud proceeds, right?

O78VGUO5                        Barnett - Cross

 1              MS. SHROFF:  Objection.

 2              THE COURT:  Overruled.  You may answer.

 3   A.  Yes.  Provides services for that money.  It's not -- I

 4   don't just get money; I provide service for that, sir.

 5   Q.  No, no, I'm talking about money mules.

 6   A.  Oh, in general.  I thought you were calling me one.  I'm

 7   sorry.

 8   Q.  No, no.  But you're aware that that's what a money mule is,

 9   right?

10   A.  Yes.

11   Q.  And on July 6, 2023, your company received over $107,000

12   from an individual named Xuehong Zhang; correct?

13   A.  I did receive that money, yes, sir.

14   Q.  And then on September 5th, 2023, your company received over

15   $49,000 from an individual named Desheng Yin; correct?

16   A.  Again, I received that money.

17   Q.  And then the next month, on October 30, 2023, your company

18   received $10,000 from that same entity, HGA Property

19   Operations; correct?

20   A.  That's correct.  That was for an invoice for legal fees;

21   correct.

22   Q.  And then after that, the next month, on November 10, 2023,

23   your company received over $55,000 from a wire that was from an

24   individual named Yu Xuanlin; correct?

25   A.  That's correct.

O78VGUO5                          Barnett - Cross

1    Q.  And that was transferred through the Overseas Chinese

2    Banking Corporation Ltd. in Singapore; correct?

3    A.  I assume so.  You know better than I would.

4    Q.  And then the next month, on December 7th, 2023, your

5    company received another $55,000, approximately, from that same

6    individual; correct?

7    A.  Yes, I received that money for invoices; correct.

8    Q.  And then coming into this year, on January 16th, your

9    company received — again from this same individual — over

10   $55,000; correct?

11   A.  Correct.

12   Q.  And then the next day, on January 17th, your company

13   received $55,000 from a different individual, Wei Lai; correct?

14              THE COURT:  Counsel, please step up.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O78VGUO5                          Barnett - Cross

1              (At sidebar)

2              THE COURT:  So I need to protect him from

3      self-incrimination.  Is his lawyer here?

4              MR. FERGENSON:  I'm not sure, your Honor.

5              MS. SHROFF:  No, he's not, your Honor.  We told him

6      that he was going to testify today.  And his lawyer is away, as

7      best as I can tell.  But he's had somebody in -- who can step

8      in.  But I'm happy to take a break and call.

9              But I think the government knows about all of this and

10     the government never asked him any of these questions when they

11     proffered him several, several times.

12             THE COURT:  Have you asked these questions of him

13     beforehand?

14             MR. FERGENSON:  No.

15             MS. SHROFF:  No, they didn't ask.

16             MR. FERGENSON:  He's not our witness, your Honor.

17             THE COURT:  No, no, no.  I just don't know whether or

18     not you've had any contact with him.

19             I think I need to take a little recess and talk to

20     him.

21             MS. SHROFF:  Sure.

22             (Continued on next page)

23

24

25

O78VGUO5                          Barnett - Cross

 1                 (In open court)

 2                 THE COURT:  Members of the jury, we're going to take a

 3     brief break.  I will call you back in a few minutes.

 4                 (Jury not present)

 5                 THE COURT:  Please be seated.

 6                 Sir, you have been asked a series of questions

 7     concerning an inflow of a considerable amount of money into

 8     your account.  I am concerned that you may be answering these

 9     questions without the proper advice of an attorney.

10                 THE WITNESS:  Okay.

11                 THE COURT:  And so I want you to know that you have

12     the right to not answer these questions and you have the right

13     to consult an attorney.  Do you have somebody who is on call?

14                 THE WITNESS:  I do have someone I can call.

15                 THE COURT:  All righty.  I'd like you to take a break

16     and to make a call and to express to your attorney my concern

17     about this line of questioning.

18                 THE WITNESS:  Okay.

19                 THE COURT:  And then ask for his or her advice about

20     whether you should continue to answer questions about the

21     subject matter.

22                 THE WITNESS:  Okay.

23                 THE COURT:  All righty?

24                 THE WITNESS:  Yup.

25                 THE COURT:  Okay.

1          So go ahead and we will wait for you to come back.

2    He'll have to get his phone.

3          In the meantime, we can call another witness.  You may

4    go downstairs.  And just when you're finished, come back and --

5          MS. SHROFF:  Your Honor, may we just confer with him

6    about if he can use -- if he knows the phone number, he can

7    certainly use one of our phones.  That's the only thing I was

8    going to offer.

9          THE COURT:  Or maybe the name of the attorney can be

10   put into Google and you can find that phone number.

11         MS. SHROFF:  I do have his attorney's name.  I'm happy

12   to get in touch with the attorney and hand over the phone to

13   Mr. Barnett.  I'll just give him my phone so he can call his

14   attorney after I give him the number.

15         THE COURT:  Okay.  Mr. Fergenson?

16         MR. FERGENSON:  That's fine, your Honor.

17         We also have the cell phone number of his attorney.

18         MS. SHROFF:  That attorney is not around today, that

19   particular attorney.

20         We'll figure it out, your Honor.  But I'm just going

21   to give him the number of the contact attorney and let him call

22   him.

23         THE COURT:  Okay.

24         MS. SHROFF:  Okay.

25         THE COURT:  And in the meantime, I'd like you to call

1    another witness.  Is there somebody at the ready?

2              MR. KAMARAJU:  We do have someone.  I just want to

3    swap out with Ms. Shroff.

4              THE COURT:  Okay.

5              MS. SHROFF:  Your Honor, Mr. Barnett is on the phone

6    with his counsel.  Would the Court prefer to just give him five

7    minutes or should we start and interrupt again?

8              THE COURT:  I want to get as much in as possible.  So

9    if we could have your next witness.

10             MS. SHROFF:  She's right here.

11             THE COURT:  All righty.  If you'll come to the stand,

12   please.  And if you'll have the jurors brought in.

13             MS. SHROFF:  Your Honor, could we ask for a standby

14   interpreter for Ms. Li?

15             She has requested a standby interpreter.  She has

16   English and Mandarin fluency of --

17             THE COURT:  One second.

18             The answer is yes on the standby interpreter.

19             You can have the jurors brought in, please.

20             (Jury present)

21             THE COURT:  Please be seated.

22             Members of the jury, in the interest of efficiency, I

23   have decided that, for logistical reasons, we're going to take

24   the testimony of another witness.

25             You may swear the witness.

1     LEANNE LI,

2          called as a witness by the Defendant,

3          having been duly sworn, testified as follows:

4               THE COURT:  All right.  You can make the inquiry.

5     DIRECT EXAMINATION

6     BY MS. SHROFF:

7     Q.  Good afternoon, Ms. Li.

8     A.  Good afternoon.

9     Q.  Ms. Li, where were you born?

10    A.  I was born in China.

11    Q.  And how long did you live in China?

12    A.  Until I was 11, 12 years old.

13    Q.  And where in China did you live?

14    A.  I lived in Beijing.

15    Q.  And in Beijing, did you attend elementary school?

16    A.  Yes.

17    Q.  What school did you go to?

18    A.  I don't remember the name.

19    Q.  Ms. Li, did there come a time when you left China?

20    A.  Yes.

21    Q.  And how old were you when you left?

22    A.  Eleven or 12 years old.

23    Q.  And with whom did you leave China?

24    A.  My parents.

25    Q.  Do you recall what year that was?

1    A.  2001 or 2002, around that time.

2    Q.  Ms. Li, after you left China, where did you move to?

3    A.  I moved to Vancouver, Canada.

4    Q.  And did your parents move with you?

5    A.  Yes.

6    Q.  Did you attend school in Vancouver?

7    A.  Yes.

8    Q.  Where did you go to school?

9    A.  Fairview.

10   Q.  And did you attend college?

11   A.  Yes.

12   Q.  Where did you go to college?

13   A.  I went to University of Ottawa.

14   Q.  And did you graduate from University of Ottawa?

15   A.  Yes.

16   Q.  And with what degree did you graduate?

17   A.  Business degree.

18   Q.  Did you attend any other schooling after you graduated from

19   the University of Ottawa?

20   A.  Yes.

21   Q.  Where did you go to school?

22   A.  UBC.

23   Q.  What is UBC?

24   A.  Sorry.  Let me clarify that, okay.  So it's University

25   British Columbia.

Leanne Li - Direct

1    Q.  And what did you study there?

2    A.  Real estate.

3    Q.  And for how long did you study real estate?

4    A.  For a year.

5    Q.  And as a result of those studies, did you get a license?

6    A.  Yes.

7    Q.  And what are you licensed to do?

8    A.  To become a Realtor agent.

9    Q.  And were you, in fact, working as a Realtor agent in

10   Canada?

11   A.  Yes.

12   Q.  We'll come back to that.  But first let me ask you, Ms. Li,

13   are you currently employed?

14   A.  Yes.

15   Q.  And who do you work for now?

16   A.  I work for Heran Hao.

17   Q.  Ms. Li, what company do you work for?

18   A.  I work for G Fashion.

19   Q.  And G Fashion what?

20   A.  I'm sorry, I don't understand the question.

21   Q.  Okay.  Where do you live now?

22   A.  I live in Milan.

23   Q.  Milan as in what country?

24   A.  Italy.

25   Q.  And what is your title right now?

O78VGUO5                    Leanne Li - Direct

```
 1    A.   CEO.
 2    Q.   CEO of what?
 3    A.   Of G Fashion.
 4    Q.   Ms. Li, when did you first hear of Miles Guo?
 5    A.   In 2017.
 6    Q.   And where did you first hear of Miles Guo?
 7    A.   I heard him on YouTube.
 8    Q.   And could you describe what kind of program was it on
 9    YouTube where you first saw him.
10    A.   I'm sorry, can you rephrase that?
11    Q.   Sure.
12         On YouTube, was it a live broadcast or a replay?
13    A.   At that time it was a replay, I think.
14    Q.   And do you recall sitting here today when you heard that
15    replay what it is that Mr. Guo was talking about?
16    A.   He was talking about corruptions of the CCP and -- and let
17    me think.  And CCP was using BGY strategies to the future is
18    the west.  And he was talking about the love scandals between
19    the high-rank Chinese government officials with -- yes, with
20    all the celebrities in China.
21    Q.   So let's break that down, Ms. Li.
22         What is BGY?
23    A.   BG --
24    Q.   Could you see if you can adjust the mic so you don't have
25    blowback.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O78VGUO5                          Leanne Li - Direct

1   A.   Is it better now?

2   Q.   I think so.

3   A.   Okay.  So B represented blue, means networking, monitoring,

4   and controlling.  So the Chinese government say they can

5   manipulate the social medias and work towards to their favor.

6        BG -- BGY -- okay.  G means gold, represent gold.  So

7   they're using -- they are using money to bribe all the

8   political -- political figures and influencing people around

9   the world so that these people -- so will do whatever they are

10  asking for.

11       And BG -- Y stands for yellow.  So they are using

12  sexually bribing the political figures and also the influential

13  people.  And after that, they use that videos or message to

14  blackmail them so that these people will -- will listen to

15  whatever they're asking them to do.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

O78BGUO6                        Leanne Li - Direct

 1   BY MS. SHROFF:

 2   Q.  And then you said -- I had a little trouble there.  Ms. Li,

 3   were you trying to say they were "infiltrating" the media; is

 4   that the word?

 5   A.  Yes, correct.

 6   Q.  Now, Ms. Li, have you ever met Miles Guo in person?

 7   A.  No.

 8   Q.  Is this the first time you're seeing Miles Guo in person?

 9   A.  Yes.

10   Q.  And after seeing Miles Guo in the 2017 YouTube, did you

11   continue to watch broadcasting by Mr. Guo?

12   A.  Yes.

13   Q.  And for how many years did you watch the broadcast, from

14   what year to what year?

15   A.  From 2017 to 2020, first half of year.

16   Q.  First half of 2020?

17   A.  Correct.

18   Q.  Why did you stop watching after the first half of 2020?

19   A.  Because I went to LA to work for G Fashion.

20   Q.  And what did that have to do with you stopping to watch

21   videos?

22   A.  Because I was so busy, I do not have time to watch his live

23   broadcast.

24   Q.  Ms. Li, did there come a time after 2017 when you were

25   contacted by Miles Guo?

O78BGUO6                         Leanne Li - Direct

1   A.  Yes.

2   Q.  When was that, do you remember?

3   A.  I think it was 2018.

4   Q.  And how did Mr. Guo contact you?

5   A.  He contact me through Guo Media.

6   Q.  Through what?

7   A.  Guo Media.

8   Q.  And could you explain how that came about?

9   A.  What do you mean by that?  I'm sorry.  Can you rephrase

10  your question again?

11  Q.  So did he call you through Guo media?

12          Did he DM you?

13          How did the contact happen?

14  A.  So he send me a direct message on Guo Media.

15  Q.  And what is a direct message?

16  A.  He said hi.

17  Q.  No, what is it?  I understand what his direct message was.

18  My question is, what is a direct message?

19  A.  Direct message is private chat, so he send me a message

20  through private chat.

21  Q.  Okay.  And were you active on Guo Media at that time?

22  A.  Yes.

23  Q.  And do you know -- could you describe Guo Media for the

24  jury?

25  A.  Okay.  Guo media was social platform like a Twitter, like a

O78BGUO6                        Leanne Li - Direct

1    app that people can exchange information, upload videos.

2    Q.  Did you have an account on Guo Media?

3    A.  Yes.

4    Q.  And what language was Guo Media available in or in what

5    language was Guo Media available?

6    A.  I think it was Chinese and English.

7    Q.  And which language did you use?

8    A.  I use English.

9    Q.  And why did you use the English version of the app?

10   A.  Because that was the default mode.

11   Q.  Because that was the what?

12   A.  The default mode.

13   Q.  The default mode?

14   A.  Yes.

15   Q.  Ms. Li, are you fluent in both English and Mandarin?

16   A.  Well, I don't know how to say that because I was born in

17   China, study until 11, 12, and then afterwards I move to

18   Canada.  I speak English.  Now living Italy, I'm learning

19   Italian right now, so my language system is all messed up.  So.

20   Q.  Okay.  Ms. Li, what did you use -- what did you primarily

21   use Guo media for?

22   A.  I was use to upload the videos that I made.

23   Q.  And what videos did you make, videos yourself?

24   A.  Yes.

25   Q.  Of what?

O78BGUO6                            Leanne Li - Direct

1    A.  I translate some parts of Mr. Guo's live broadcast, and I

2    add the subtitle, English and Chinese subtitle on video club.

3    Q.  Hold on, Ms. Li.

4        When you just testified that you made videos, you

5    don't mean you made videos.  Let me try this again.  They

6    weren't videos about you that you made, correct?

7    A.  Sorry.  I don't understand your question.

8    Q.  The videos that you made, describe the process of how you

9    made these videos?

10   A.  Okay.  So I will watch Mr. Guo's live broadcast.  After I

11   finish his live broadcast, I will pick, myself, the most

12   important part, or the part I think the western people need to

13   know, the whole world need to know.  So I would download those

14   part, only that part, and then afterwards I add the subtitle,

15   English subtitle, so people can able to understand.

16   Q.  And after you did that, did you upload the video?

17   A.  Yes, I upload the video.

18   Q.  To where?

19   A.  To Guo Media.

20   Q.  Did somebody ask you to do this or did you do this by

21   yourself?

22   A.  I did it by myself.

23   Q.  And why?

24   A.  Because I think whatever what Mr. Miles said, you know, it

25   is very important for people to know these things are really

O78BGUO6                      Leanne Li - Direct

1    happening in China, and then they try to infiltrate the west.

2    So I think the western people need to know about this.  This is

3    very important.

4    Q.  Did you post these translated videos on any other social

5    media other than Guo Media?

6    A.  YouTube.

7    Q.  As a result of posting of these videos, Ms. Li, did

8    anything happen to your own account on Guo Media?

9    A.  Can you ask that question again?

10   Q.  Sure.  After you posted these videos, did you gain

11   followers on your account?

12            MS. MURRAY:  Objection, your Honor.  She's testifying.

13            THE COURT:  I'll allow the question.  Go ahead.

14   A.  Yes.

15   Q.  How many followers did you have?

16   A.  I don't remember.

17            MS. SHROFF:  Your Honor, may we have one quick

18   sidebar?

19            THE COURT:  Yes.

20            (Continued on next page)

21

22

23

24

25

O78BGUO6                          Leanne Li - Direct

 1              (At the sidebar)

 2              MS. SHROFF:  I just receive Mr. Barnett is squared

 3     away, and he has some work whatever issues.  I don't know if

 4     you wanted to finish --

 5              THE COURT:  Yes, we can finish with him.  We'll bring

 6     him back.

 7              MS. SHROFF:  We don't even have to leave the jury.

 8              THE COURT:  No. We'll just leave them in place.  Sure.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O78BGUO6                          Barnett- Cross

```
 1              (In open court)
 2              THE COURT:  Members of the jury, we are going to go
 3    back to the prior witness now.  You can go out of the
 4    courtroom.  Don't discuss your testimony.
 5              THE WITNESS:  Okay.
 6              THE COURT:  We're going to go back to the cross
 7    examination of Mr. Barnett.
 8              (Witness entered the courtroom)
 9              THE COURT:  And, sir, remember that you're still under
10    oath.
11              THE WITNESS:  Yes, ma'am.
12
13    GERALD SCOTT BARNETT,
14    CROSS-EXAMINATION CONTINUED
15    BY MR. FERGENSON:
16    Q.  Mr. Barnett, when we broke we were talking about certain
17    payments your company had received.  Do you recall that?
18    A.  Yes, I do.
19    Q.  It's a fact, sir, that you've received at least over
20    $500,000 from individuals or companies who are not your actual
21    clients, right?
22    A.  That's correct.
23    Q.  And you said you provided services for that money, right?
24    A.  That's correct, I provided security services for all that
25    money.
```

O78BGUO6                        Barnett- Cross

1   Q.  But you didn't provide services to those people who sent
2   you that money, right?
3   A.  No, sir.
4   Q.  You provided those services to Miles Guo's daughter, right?
5   A.  That's correct.
6   Q.  And then you sent Miles Guo daughter's invoices, right?
7   A.  That's correct.
8   Q.  And then these other people whom you don't even know sent
9   you hundreds of thousands of dollars, right?
10  A.  Yes, sir.
11  Q.  Now, the Guo family has helped pay for your lawyers as
12  well, right?
13  A.  No, I had to do a Go Fund Me for that.
14  Q.  Before the Go Fund Me, sir, didn't you ask Mei Guo for help
15  paying for your bankruptcy lawyers?
16  A.  I did. That's correct.
17  Q.  And you needed a lawyer because you got sued for the money
18  your company had received from HCHK, right?
19  A.  That's correct.
20  Q.  You were sued by the U.S. bankruptcy trustee in Miles Guo's
21  bankruptcy?
22  A.  That's correct.
23  Q.  And you talked to Victor Cerda about that, right?
24  A.  Yes, I did.
25  Q.  Victor Cerda is a lawyer for the Guo family, right?

 1  A.  Yes.

 2  Q.  And you knew Cerda from your work for the Guo family,

 3  correct?

 4  A.  Yes.

 5  Q.  And Victor Cerda helped you find the bankruptcy lawyer who

 6  represented you in that proceeding, right?

 7  A.  I believe Mei Guo found that attorney for me.  I'm not sure

 8  who found that attorney.

 9  Q.  And Victor Cerda help pay for that attorney?

10  A.  Originally for the initial $10,000 that I invoiced for,

11  that was from Victor, correct, his law firm.

12  Q.  And Victor Cerda helped pay for your criminal lawyers too,

13  right?

14  A.  I think in the beginning, I believe so.

15  Q.  And Victor Cerda asked that you talk to Miles Guo's defense

16  lawyers, right?

17  A.  I don't recall that.

18  Q.  And you did talk to Miles Guo's defense lawyers, right?

19  A.  I did in the very, very beginning, but I don't think Victor

20  ask me to do that.  I don't recall that, but I remember having

21  that conversation in New Jersey.

22  Q.  And Victor Cerda also wanted you to testify in this trial,

23  right?

24  A.  Yes, I believe he did, correct.

25  Q.  And you did that too, right?

O78BGUO6                        Barnett- Cross

1    A.  I was subpoena to.  I said, if you want me to testify, you
2    have to subpoena me.
3    Q.  And you mention a Go Fund Me a few moments ago, right?
4    A.  That's correct.
5    Q.  Victor Cerda help you set up your Go Fund Me, right?
6    A.  Well, I set up my own Go Fund Me, and I shared it with him,
7    correct?
8    Q.  You did that because he was going to help you get donations
9    to that Go Fund Me?
10   A.  I had hoped so, correct?
11   Q.  That was your understanding, right?
12   A.  That's why I sent it to him, yes.
13   Q.  You understood that Victor Cerda was going to send your Go
14   Fund me to a guy name Long Island David, right?
15   A.  That I didn't have that conversation with him.  I didn't
16   know who he sent it to.
17   Q.  You knew he was going to send it to Miles Guo's supporters,
18   right?
19   A.  That's correct, yes.
20   Q.  And, in fact, it was sent to Miles Guo's supporters, right?
21   A.  Yes.
22   Q.  And you raised tens of thousands of dollars in your Go Fund
23   Me from them, right?
24   A.  That's correct, all spent on attorneys.
25             MS. SHROFF:  Your Honor, could the government please

1   let Mr. Barnett finish.

2           THE COURT:  So permit him to answer before the next

3   question.

4   Q.  You don't know who those people are either, right?

5   A.  I don't recognize the names on there, I do not.

6   Q.  But you know they sent you money, right?

7   A.  Of course.  I get a thing from Go Fund Me that shows who

8   sent money.

9   Q.  Now, Mr. Barnett, you testified about various large

10  properties that you looked at in person or online, right?

11  A.  That's correct.

12  Q.  Now, nobody actually bought those properties, right?

13  A.  Nope.

14  Q.  And when you were looking at those properties, Miles Guo

15  had already purchased Mahwah, right?

16  A.  Yes, this was after Mahwah.

17  Q.  And you went on at least one trip, correct?

18  A.  Trip?

19  Q.  Like you went in person to one of the properties, correct?

20  A.  That's correct.

21  Q.  And was part of that trip a vacation for the Guo family?

22  A.  It was a vacation/business trip.  Any trip that we went on

23  regarding Miles was always really 80 percent of his business,

24  but the family did come along on that trip, correct.

25  Q.  You and Miles Guo were on that trip, right?

1   A.  Yes.

2   Q.  And other of your security team were on that trip, right?

3   A.  That's correct, the whole security team.

4   Q.  And Gladys Chow went on that trip?

5   A.  Yes, she did.

6   Q.  And Gladys Chow was Miles Guo's translator, right?

7   A.  Yeah, she translated for me.  I don't know if that was her

8   exact title, but she did translate.

9   Q.  Her formal company she worked for was HCHK, right?

10  A.  Yes.

11  Q.  In terms of what she actually did, she was Miles Guo's

12  personal translator, right?

13          MS. SHROFF:  Objection.

14          THE COURT:  You may answer.

15  A.  Yes, she translated.  That's correct.

16  Q.  And she was also performing kind of personal assistant type

17  task as well, right?

18  A.  That's correct.

19  Q.  And in addition to you, security guys, Gladys Chow, Miles

20  Guo's wife went on that trip, right?

21  A.  On that trip, yes.

22  Q.  And Miles Guo's daughter's fiancee' went on that trip,

23  right?

24  A.  I don't remember him being on that particular trip.

25  Q.  Wayne Cao is --

O78BGUO6                        Barnett- Cross

1   A.  I don't remember him being there, but I can't say that he
2   wasn't.  I'm trying to remember who went on that trip.  Sorry.
3   I went on a few trips.  I'm just trying to remember what trip
4   that was.
5   Q.  Just on Mei Guo's fiancee', that's Defeng Cao, right?
6   A.  Yes.
7   Q.  He also goes by Wayne Cao?
8   A.  I call him Wayne, correct.
9   Q.  And after looking at that property in person, nobody bought
10  it, right?
11  A.  No.
12  Q.  Now, it wasn't just large properties that you looked at as
13  part of your work for Miles Guo, right?
14  A.  That's correct.
15  Q.  You also looked at penthouse apartments in Manhattan,
16  correct?
17  A.  Yes, that's correct.
18  Q.  They were worth tens of millions of dollars, correct?
19  A.  I guess.
20  Q.  Some of them only had four bedrooms, correct?
21  A.  Yes.  The one that I went on, yes, that's correct.
22  Q.  And there are four people in Miles Guo's immediate family,
23  correct?
24  A.  As far as I know, correct.
25  Q.  There's Miles Guo, right?  There's Miles Guo's wife, right?

O78BGUO6                         Barnett- Cross

1   A.  Yeah, as far as I know that's correct.

2   Q.  And then there's Miles Guo's son, right?

3   A.  Yes.

4   Q.  And then there's Miles Guo's daughter?

5   A.  That's correct.

6   Q.  Now, those penthouse apartments, they weren't purchased

7   either, right?

8   A.  No, not that I know of.

9   Q.  What was purchased was a property earlier in Mahwah, New

10  Jersey, right?

11  A.  That's correct.

12  Q.  And you had a role with that property, fair to say?

13  A.  Yes.

14  Q.  And you discussed that role with Yvette, right?

15  A.  That's correct.

16  Q.  And you discussed Taurus Fund with Yvette, right?

17  A.  I didn't discuss Taurus Fund with Yvette, but I did discuss

18  if we had like an invoice, it would go to Yvette.

19        MR. FERGENSON:  If we could pull up, Ms. Loftus,

20  what's in evidence and publish it GX Buck 1234.

21  Q.  Sir, you know what Taurus Fund LLC is, right?

22  A.  Do I know that they purchase the house in New Jersey,

23  that's correct.

24  Q.  And the entity held title to the Mahwah mansion, it was

25  Taurus Fund LLC?

O78BGUO6                          Barnett- Cross

```
 1   A.  That's correct.
 2              MS. SHROFF:  Is he showing something?
 3              MR. FERGENSON:  It's being fulled up.
 4   Q.  And while we're waiting, I'll just ask a few questions.
 5              You were one of the managing members of Taurus Fund,
 6   LLC?
 7   A.  So, on paper they had me down as a manager.  That wasn't my
 8   idea of what my job role was.  So when they ask me to be a
 9   manager, I just thought they just meant to manage the property
10   and install the security services.  It wasn't to manage Taurus
11   Fund because I would have no experience, nor would I undertake
12   something like that.
13   Q.  Did you know what Taurus Fund was?
14   A.  No, I just assume it was a company.
15   Q.  But you were given paperwork by Aaron Mitchell to sign?
16   A.  Yes.
17   Q.  And Aaron Mitchell was another lawyer for the Guo family,
18   right?
19   A.  Yes, he was.
20   Q.  He was close with the Guo family, right?
21   A.  Yes.
22   Q.  Fair to say he was a trusted person in the inner circle?
23              MS. SHROFF:  Objection.
24              THE COURT:  You may answer.
25   A.  I don't have an answer for you on that.
```

1    THE COURT:  I need for you to speak into the

2    microphone so everyone can hear you.

3    A.  He was friendly with them.  I don't know how close he was.

4    I wasn't that close with Aaron, so I don't know.

5    Q.  And you signed the paperwork that Aaron Mitchell gave you,

6    right?

7    A.  I did.

8    Q.  And you thought the paperwork made you some kind of

9    property manager, right?

10   A.  So when I signed it, I didn't really understand.  I just

11   thought it meant to manage the property, and I didn't really

12   understand the whole ins and outs of it until later on.

13   Q.  And, Mr. Barnett, we got the document up now.  Do you see

14   towards the middle of the page it says on the right, it says

15   entity name?

16   A.  Yes, I do.

17   Q.  And it says Taurus Fund LLC to the right of that?

18   A.  Yep.

19   Q.  If we could go to page three, please.  Why don't we zoom on

20   the boxes four, five and six.  You see on number six it says

21   name and address of each manager or managing members?

22   A.  Yes.

23   Q.  And number two is Scott Barnett, that's you, right?

24   A.  That's correct.

25   Q.  Do you live in Las Vegas, Nevada?

O78BGUO6                         Barnett- Cross

1   A.  No, I do not.

2   Q.  Is that your correct address?

3   A.  No, it is not.

4   Q.  Now, you didn't think you were actually the owner of the

5   Taurus Fund LLC, correct?

6   A.  No, I did not.

7   Q.  You learned what the paperwork you signed actually meant

8   after filing bankruptcy, right?

9   A.  After I showed it to my attorney, he explained it to me.

10  Q.  And that was when you got sued in the bankruptcy, right?

11  A.  That's correct.  They put me down as the owner of it which

12  took me a little bit by surprise, correct.

13  Q.  Because that's not true, sir, you're not the actual owner

14  of the Mahwah mansion, right?

15  A.  No, I'm not.

16          MR. FERGENSON:  And we can take that down, Ms. Loftus.

17  Q.  That wasn't your house, right?

18  A.  No.

19  Q.  But you did take Miles Guo there, correct?

20  A.  Yes, I did take him there.

21  Q.  And he was there two to three times a week?

22          MS. SHROFF:  Objection, misstates testimony.

23          THE COURT:  Overruled. You may answer.

24  A.  I took him there.  I don't think it was two or three times

25  a week, maybe in the beginning when it first started.  Other

1    than that, it was sporadic.  And I wasn't with him everyday so

2    I don't have an actual accounting of how many times he was

3    there.

4    Q.  Sure.  You didn't have a bedroom there?

5    A.  No, I did not.

6    Q.  Miles Guo had a bedroom there, right?

7    A.  Yes, on the second floor.

8    Q.  And Miles Guo's wife had a bedroom there?

9    A.  That's correct.

10   Q.  Miles Guo's son had a bedroom there?

11   A.  Yes.

12   Q.  Miles Guo's daughter had a bedroom there?

13   A.  That's correct.

14   Q.  Miles Guo daughter's fiancee' had a bedroom there?

15   A.  That I don't know.

16   Q.  And, in fact, the Guo family did not just have bedrooms

17   there; is that correct?

18        MS. SHROFF:  Objection, what's the question.

19   Q.  The question was, the Guo family didn't just have bedrooms

20   at Mahwah mansion, correct?

21        MS. SHROFF:  Objection to form.

22        THE COURT:  You can answer.  Did they have something

23   in addition to bedrooms.

24   A.  I don't understand the question.  I know what you're

25   asking, but I don't know what you're referring to.

1    Q.  Let me rephrase.  These weren't just bedrooms.  They were

2    whole wings, correct?

3    A.  That's correct.

4    Q.  They were multi-rooms portions of this mansion were just

5    for --

6    A.  Yes, one side like the -- I don't know what direction that

7    is, but if you walk into the right, one side was Miles' area.

8    The other side was the miss's area.  That's correct.

9    Q.  And you didn't keep a set of Brioni suits at Mahwah

10   mansion, correct?

11            MS. SHROFF:  Objection.

12            THE COURT:  Overruled.  You may answer.

13   A.  If you're asking if I kept them personally?

14   Q.  Yes, sir.

15   A.  No.

16   Q.  Do you own a whole set of Brioni suits?

17   A.  I own Brioni suits, but they're from the Real Real, so

18   they're used.  I can't afford Brioni suits, sir.

19   Q.  But Miles Guo kept a whole set of Brioni suits at the

20   Mahwah mansion, correct?

21   A.  I don't know.

22   Q.  And, sir, you didn't pick the renovation to those wings,

23   correct?

24   A.  I did not, no.

25   Q.  Miles Guo was the one who designed that, correct?

O78BGUO6                          Barnett- Cross

1          MS. SHROFF:  Objection.

2          THE COURT:  You may answer if you know.

3  A.  I don't know.  I don't know if he was the only one that

4  picked.  I don't know.

5  Q.  He had a role in designing them?

6  A.  Yes, he did.

7  Q.  In fact, you walked through sort of the wing with Miles Guo

8  at a time, correct?

9  A.  Yes, I have.

10  Q.  And there were also renovations just not to bedrooms, but

11  to closets, correct?

12  A.  That's correct.

13  Q.  And Miles Guo picked the renovations done to his closet,

14  right?

15  A.  I believe so, but I can't confirm that.

16          MS. SHROFF:  Could you keep your voice up,

17  Mr. Barnett.  I missed what you said after I believe so.

18  A.  I said I believe so.  I can't confirm that.  I believe so.

19  Q.  And you didn't pick out the beds that were in the Guo

20  family's bedroom?

21  A.  No, I did not.

22  Q.  Miles Guo did that, right?

23  A.  That I don't know cause I didn't have anything to do with

24  that part of the construction.

25  Q.  Do you know if the Guo family more generally picked out the

O78BGUO6                         Barnett- Cross

1    beds in their bedrooms?

2    A.  I don't know.

3    Q.  You didn't pick out the furnishing in their bedroom, right?

4    A.  No, I did not.

5    Q.  Miles Guo did that, correct?

6    A.  Again, I don't know.  I didn't have -- I wasn't privy to

7    that part of it.  Unless we went to a specific store and he

8    pick something out, then I could confirm that, but I wasn't

9    with him when they were picking out anything in regards to

10   bedroom furniture or I wasn't privy to that.

11   Q.  Now, you did know though that that wing when you took -- I

12   think you said it was to the right?

13   A.  That's correct.

14   Q.  The wing to the right was Miles Guo's wing?

15   A.  That's right, on the second floor, correct.

16   Q.  And you knew that because you were helping him with that

17   property, correct?

18           MS. SHROFF:  Objection.

19           THE COURT:  You may answer.

20   A.  As part of the construction plans then, yes, I knew that.

21   Q.  You became aware that there was a bankruptcy proceeding,

22   correct?

23   A.  In regards to HCHK?

24   Q.  Involving Miles Guo at least.

25   A.  Yes.

1  Q.  Are you aware that Miles Guo did not mention this mansion

2  in Mahwah in his bankruptcy filings at all?

3  A.  No, I did not.

4  Q.  Are you aware that he didn't mention any of the money spent

5  on the renovations at this mansion?

6  A.  No.

7  Q.  Are you aware he didn't mention any of the $35,000 beds

8  bought for this mansion?

9  A.  No, I did not.

10 Q.  Are you aware he didn't mention any of the furniture, the

11 hundreds of thousands of dollars in furniture or millions

12 bought for this mansion?

13 A.  No, I did not have knowledge.

14 Q.  Are you aware he didn't mention --

15         MS. SHROFF:  Your Honor, I think Mr. Barnett has no

16 knowledge of what Mr. Miles Guo mentioned in his bankruptcy.

17         THE COURT:  Ms. Shroff, I have said to you in the past

18 that you are not to testify. If you want to make an objection,

19 make an objection.

20         MS. SHROFF:  Objection, your Honor, cumulative.

21         THE COURT:  Overruled. you may answer.

22 Q.  Are you aware he didn't disclose the millions or thousands

23 at least of dollars spent on artwork for this mansion where his

24 family had wings?

25 A.  No, I'm not aware of that.

1   Q.  Now, the money that went to Mahwah it was passed through a

2   woman named Amy Buck, correct?

3   A.  That's correct.

4   Q.  It was pass through her attorney --

5           MS. SHROFF:  Objection to the form of the question as

6   to pass through.  It's inappropriate, your Honor.

7           THE COURT:  Well, if you could be more specific.

8   Q.  Amy Buck was paying the expenses for the Mahwah mansion,

9   correct?

10  A.  That's who I sent the invoices to, correct.

11  Q.  She was paying it through her attorney trust account,

12  correct?

13  A.  Yes, I believe so, yes.

14  Q.  Now, you testified on direct about a man name Sean or Sean

15  Jing?

16  A.  Yes.

17  Q.  And Sean Jing you said worked for HCHK, right?

18  A.  I believe so, yes.

19  Q.  That was the company that he worked for, correct?

20  A.  I believe so.

21  Q.  Same company that you believe Gladys Chow formally worked

22  for?

23  A.  That's correct.

24  Q.  Sean Jing was another personal assistant to the Guo family,

25  right?

1   A.  I don't -- he was at one time.  I think when -- are you

2   asking in regards to Mahwah?

3   Q.  Well, he performed kind of personal assistant type task for

4   the Guo family?

5   A.  Yes, he did.

6   Q.  And he also acted as a property manager for the mansion in

7   Mahwah, right?

8   A.  Yes.

9   Q.  And in the personal assistant type work, he did things for

10  Miles Guo, right?

11  A.  That I don't know.  I know he did assistant stuff, but I

12  don't know what jobs he did or didn't do.

13  Q.  And he did things for the Guo family more generally,

14  correct?

15          MS. SHROFF:  Objection, he just said he answered the

16  question.

17  Q.  One was to Miles Guo.  This is the Guo family more

18  generally.

19          THE COURT:  So you may answer the question.

20  A.  Sorry.  Can you ask that again.

21  Q.  Of course.  Sean Jing, he performed -- he did things for

22  the Guo family more generally?

23  A.  Yes.

24  Q.  There were other people who did personal assistant type

25  work for the Guo family, correct?

O78BGUO6                          Barnett- Cross

 1                  MS. SHROFF:  Form.

 2                  THE COURT:  You may answer.

 3     A.  Yes.

 4     Q.  One of them was named Hank, right?

 5     A.  Yes.

 6     Q.  He had a Chinese name, but in English he went by Hank,

 7     right?

 8     A.  I don't know his Chinese name.

 9     Q.  And another one was named Jason, right?

10     A.  Yes.

11     Q.  And you describe them before as kind of like indentures

12     servants, right?

13                  MS. SHROFF:  Objection.

14                  THE COURT:  Overruled.

15     Q.  You described them before as kind of like indenture

16     servants, right?

17     A.  That's how I classified it as more of a joking manner.

18     That's how I classified it, sorry.

19     Q.  You said that, right?

20     A.  I did.

21     Q.  And they did whatever personal stuff the family needed,

22     right?

23     A.  Yes, I believe so.

24     Q.  They did shopping?

25     A.  Yes.

O78BGUO6                         Barnett- Cross

1    Q.  They did cooking?

2    A.  Yes.

3    Q.  They chauffeured the family around?

4    A.  Yes, sometimes, yes.

5    Q.  And they would buy things the family wanted, right?

6    A.  I guess.  I wouldn't be privy to what they bought for the

7    family except for groceries.

8    Q.  Now, at times Miles Guo had you buy things for him, right?

9    A.  Me personally, sir?  Yeah, if it was mostly like anything,

10   like, if he needed a pair of I-pods for your ears, but

11   nothing -- anything of real expense I had to ask.

12   Q.  He had you buy motorcycles for him, right?

13   A.  Yes, they had me buy motorcycles.  No, they didn't have me

14   buy it.  They ask.

15   Q.  And you did that, right?

16   A.  I did.

17   Q.  How many was it, four or five?

18   A.  I believe in the end it was five.

19   Q.  And each one cost a few tens of thousands of dollars?

20   A.  They varied in price.

21   Q.  And the motorcycles were in your name, right?

22   A.  Yes, they were.

23   Q.  But those were not really your motorcycles?

24   A.  No, they were not.

25   Q.  You weren't the real owner of those motorcycles, correct?

O78BGUO6                        Barnett- Cross

1   A.  No, I wasn't.

2   Q.  Miles Guo asked you to do this after he filed for

3   bankruptcy, correct?

4           MS. SHROFF:  Objection, your Honor, assumes facts not

5   in evidence.

6           THE COURT:  Overruled.  You may answer.

7   A.  I don't know.  I don't know when as far as a bankruptcy and

8   when they ask, I don't know.

9   Q.  You testified on direct that at a certain point Yvette

10  wanted you to rent them to supporters?

11  A.  We had a discussion about it, that's correct.

12  Q.  And that was in late 2022, right?

13  A.  I believe so.

14  Q.  Were you aware that shortly before that the United States

15  had seized hundreds of millions of dollars from the entities

16  associated with Miles Guo?

17  A.  No, I was not.

18  Q.  Did Guo ever say that the department of justice had just

19  done that?

20  A.  No.

21  Q.  Did Yvette ever say that the department of justice had just

22  done that before she had this conversation about renting out

23  these assets?

24  A.  No.

25          MR. FERGENSON:  If we could pull up, Ms. Loftus,

1    what's in evidence as Government Exhibit WA26.  Ms. Loftus, why

2    don't we just zoom in on the bottom half, please.

3    Q.  Now, sir, this list several vehicles.  Do you see the

4    pictures of the vehicles?

5    A.  I do.

6    Q.  Some of them are the motorcycles you purchased, correct?

7    A.  Yes, that's correct, the two at the top there.

8    Q.  For instance, the Ducati, in the bankruptcy proceedings

9    when that came up, you didn't even know that was still in your

10   name, right?

11   A.  I did not.

12        MS. SHROFF:  Objection, your Honor.  I think we've

13   established what his knowledge basis is about the bankruptcy.

14        THE COURT:  Overruled.  You may answer.

15   A.  I did not.

16   Q.  You didn't know that that was still in your name, correct?

17   A.  I did not, correct.

18   Q.  And if we could zoom out.

19        Now, the person listed under owner, do you see that in

20   the second to right column?

21   A.  Barely.

22   Q.  We can blow it up.  You see that says owner?

23   A.  Yep.

24   Q.  And then in the person listed there is Defeng Cao, correct?

25   A.  Correct.

1    Q.  He wasn't the actual owner of these motorcycles either,

2    correct?

3            MS. SHROFF:  Objection to form.

4            THE COURT:  You may answer.

5    A.  I was the original owner.  I don't know who the second

6    owner of those motorcycle was or became.

7    Q.  If we can just scroll down.  Let's zoom on the Lamborghini.

8            Mr. Barnett, you see under the owner column for the

9    Lamborghini it says Defeng Cao.  You see that?

10   A.  That's correct.

11   Q.  And there's an address for 373 Taconic Road in Greenwich

12   Connecticut.  You see that?

13   A.  Yes.

14   Q.  That was one of the Guo family homes, correct?

15   A.  That's where I currently do security, yes.

16   Q.  And do you see in the notes column it says G/Club

17   International LTD?

18   A.  Yes.

19   Q.  Do you know why it says that?

20   A.  I have no idea.

21   Q.  You also testified in your discussions with Yvette about

22   signing out certain of the assets to supporters they mention

23   the Lamborghini too?

24   A.  That was mentioned, correct.

25   Q.  In discussing the Lamborghini, did Yvette say that the

O78BGUO6                        Barnett- Cross

1    United States government had just seized hundreds of millions

2    of dollars from G/Clubs?

3    A.  No, she did not.

4              MR. FERGENSON:  If we can go to Government Exhibit

5    WA27, if we can zoom on the text here.

6    Q.  Mr. Barnett, you see how in the notes column you're listed

7    as Scott Barnett driver?

8    A.  Yes, that's correct.  I see that.

9    Q.  And then under owner it says HCHK Technologies for the

10   first two?

11   A.  That's correct.

12   Q.  And in the bottom two it says GS Security Solutions, right?

13   A.  That's correct.

14   Q.  GS Security Solutions that's your company, right?

15   A.  That's correct.

16   Q.  These are the BMWs that you purchased, correct?

17   A.  Yes.

18   Q.  And you purchased them with money from HCHK Technologies,

19   correct?

20   A.  I did.

21   Q.  And that was in January of 2023, right?

22   A.  Correct.

23   Q.  That's nearly a year after Miles Guo had declared

24   bankruptcy, right?

25   A.  Apparently.

O78BGUO6                       Barnett- Cross

1              MS. SHROFF:  Objection, assumes knowledge that this

2    witness has disclaimed.

3              THE COURT:  Do you know what year he declared

4    bankruptcy?

5              THE WITNESS:  No, ma'am, I do not.

6              THE COURT:  Sustained.

7    Q.  Sir, you used money from HCHK to buy those BMWs, right?

8    A.  That's correct.  The money was apart of the startup

9    agreement, that's correct.

10             MR. FERGENSON:  Now, we can take that down,

11   Ms. Loftus.

12   Q.  You also had a role in managing a yacht, correct?

13   A.  No.

14   Q.  You received emails from the Liberty yacht captain, right?

15   A.  Yes, that's correct.  That was in regards to repairs that

16   were being done because I guess Max Krasner was inundated with

17   whatever he was doing and couldn't keep up with the constant

18   emails from the captain, so Yvette ask me to join in on that to

19   make sure that the repairs were getting done.

20   Q.  Now, your attorneys produced some of those emails to the

21   government, right?

22   A.  Yes.

23   Q.  Max Krasner who you just mention, he also received those

24   emails, right?

25   A.  Yes, as far as I know.

O78BGUO6                          Barnett- Cross

1   Q.  Sir, you didn't work for G/Club, right?

2   A.  No, I did not.

3   Q.  Max Krasner, he didn't work for G/Club either, right?

4   A.  I have no idea.

5          MR. FERGENSON:  Ms. Loftus, can we show the witness

6   what's marked as Government Exhibit SB212.

7          THE COURT:  Mr. Fergenson.

8          MR. FERGENSON:  I'm waiting for an exhibit, your

9   Honor.  It's okay, your Honor.  I'll just move on.

10          THE COURT:  Okay.

11          MR. FERGENSON:  Thank you for the indulgence.

12   Q.  Sir, you also talked a bit about Miles Guo's supporters on

13   direct, right?

14   A.  Yes.

15   Q.  And sometimes the supporters would go to 3 Columbus Circle,

16   right?

17   A.  Yes.

18   Q.  They would listen to Miles Guo talk?

19   A.  Yes.

20   Q.  They would clap for him?

21   A.  Yes.

22   Q.  Fair to say they idolized him?

23   A.  Yes.

24   Q.  They would ask him to hold babies, right?

25   A.  I've seen that.  I don't know if they asked or not.  It

1    would have been in Chinese.  I wouldn't have understood.

2             MS. SHROFF:  What you did say.

3    A.  I've seen him hold people's babies.  I don't know if they

4    asked or not.  They were speaking in Chinese, so I don't know.

5    Q.  Sometimes they would bring their children with them to 3

6    Columbus Circle?

7    A.  Yes, I've seen that.

8    Q.  And they would bring their children and give those children

9    an I-pad, right?

10   A.  Yes, I've seen that.

11   Q.  And then those supporters would just work all day, right?

12            MS. SHROFF:  Objection.

13            THE COURT:  Overruled.  You can answer.

14   A.  I wasn't there all day, but, yes, they worked.

15   Q.  And these supporters when they were working, they didn't

16   listen to other workers, right?

17            MS. SHROFF:  Objection as to form.

18            THE COURT:  Well, it's impossible for him to say

19   whether others were listening.  He can't perceive that.

20            MR. FERGENSON:  I can rephrase, your Honor.

21            THE COURT:  Okay.

22   Q.  You're aware of instances -- withdrawn.

23            Your impression, Mr. Barnett, being in 3 Columbus

24   Circle when this was happening was that these supporters didn't

25   always listen to other workers, correct?

1   A.  I can't speak for other workers, but I have seen instances

2   where if there was issues with other workers, I had spoken with

3   other workers in regards to it.

4   Q.  And these supporters, they always listen to Miles Guo,

5   right?

6   A.  Again, all the conversation were in Chinese.  I could tell

7   you that they did listen to him, but I can't tell you what was

8   said.

9   Q.  And, look, your impression was that this stuff with the

10  supporters was weird, fair to say?

11          MS. SHROFF:  Objection.

12          THE COURT:  You may answer.

13  A.  Weird, I guess -- I don't know if I'd use the word "weird."

14  I guess it was just different for me because I've never seen it

15  before.  Usually I would say that with like celebrities where

16  people were kind of in awe of a celebrity.  That's kind of the

17  impression I got from it.

18  Q.  Sir, you testified about how Miles Guo was one of the

19  better people you been a bodyguard for, right?

20  A.  That's correct.

21  Q.  You like him, right?

22  A.  I like him very much.

23  Q.  And you testified about how you thought he was sincere with

24  the stuff he was doing with the NFSC, right?

25  A.  That's correct.

```
 1   Q.  Sir, you didn't watch his live broadcast in Mandarin,

 2   correct?

 3   A.  No, I did not.

 4   Q.  You didn't follow him online, correct?

 5   A.  No, I did not.

 6   Q.  You didn't invest in any of those investment projects, did

 7   you?

 8   A.  No, I did not.

 9   Q.  You didn't send companies affiliated with Miles Guo your

10   personal money, correct?

11   A.  No, sir.

12   Q.  You didn't send him your retirement money, correct?

13           MS. SHROFF:  Objection, asked and answered.

14           THE COURT:  Overruled.  You may answer.

15   A.  No, I did not.

16   Q.  You didn't send him money you had borrowed from your home

17   equity, correct?

18           MS. SHROFF:  Objection, asked and answered.

19           THE COURT:  Overruled.  You can answer.

20   A.  No, I did not.

21   Q.  You didn't send him your families' money, correct?

22   A.  No, sir, I did not.

23   Q.  And it's true, sir, that actually you got money from

24   working for Miles Guo, right?

25   A.  Meaning for services, sir?  I don't know what you're
```

1    asking.

2    Q.  We talked about all the money you got paid earlier?

3    A.  For services, correct.

4            MS. SHROFF:  Objection to the form, your Honor.

5            THE COURT:  Sustained.

6            MR. FERGENSON:  May I just have a moment, your Honor?

7            THE COURT:  Yes.

8    Q.  Sir, you didn't lose money after sending it to Miles Guo,

9    correct?

10   A.  I'm sorry.

11           MS. SHROFF:  Assumes facts that are clearly not

12   verified.

13           THE COURT:  He stated he did not send money.

14   Sustained.

15           MR. FERGENSON:  Nothing further, your Honor.

16           THE COURT:  Redirect.

17   REDIRECT EXAMINATION

18   BY MS. SHROFF:

19   Q.  Mr. Barnett, good afternoon again.

20   A.  Hello.

21   Q.  Mr. Barnett, for how many years did you honorably serve the

22   People of the City Of New York as an NYPD officer?

23           MR. FERGENSON:  Objection.

24           THE COURT:  It's all right.  How long did you serve as

25   a police officer.

1  A.  For 17 and a half years, ma'am.

2  Q.  And for 17 years did you testify on behalf of the City of

3  New York or the State of New York?

4  A.  Yes, I have testified.

5  Q.  Did you take an oath as you've taken here today?

6  A.  Yes, I have.

7  Q.  Have you ever lied under oath?

8  A.  No.

9  Q.  Today did you ever lie under oath?

10  A.  No, ma'am.

11  Q.  And would you lie under oath for Miles Guo?

12  A.  No, ma'am.

13  Q.  Would you lie for Miles Guo because he had HCHK send you

14  $15,000 or $30,000 or $650,000 or 600 and a million dollars?

15            MR. FERGENSON:  Argumentive.

16            THE COURT:  Overruled.  You can answer.

17  A.  No, ma'am, I would not.

18  Q.  Mr. Barnett, you got money for the work you did for Mei

19  Guo, correct?

20  A.  That's correct.

21  Q.  I'm not going to go through all of the iterations, but you

22  got that money into a bank account, correct?

23  A.  That's correct, my company's bank account.

24  Q.  And the company's bank account is at a real bank, right?

25  A.  Chase Bank, that's correct.

1   Q.  And Chase bank has never flagged your account, correct?

2          MR. FERGENSON:  Objection, your Honor.

3          THE COURT:  You may answer.

4   A.  No, they have not.

5   Q.  These are wire transfers, correct?

6   A.  Yes, ma'am.

7   Q.  And do you know who these people were that wired the money?

8   A.  I do not.

9   Q.  Do you know if they were Mei Guo's uncles?

10         MR. FERGENSON:  Objection.

11         THE COURT:  You may answer.

12         MR. FERGENSON:  He said he doesn't know, your Honor.

13  Q.  Were they her uncles?

14  A.  I don't know.

15  Q.  Were they her family in China?

16         MR. FERGENSON:  Objection again, asked and answered.

17  Same question.

18         THE COURT:  You can answer.

19  A.  I don't know.

20  Q.  You were asked about a person name Jian Wu Zhang, correct?

21  A.  I believe so, yes.

22  Q.  Do you know if he's related to Mei Guo?

23  A.  I don't.

24  Q.  You were asked about a transfer of a $105, 000 by Su Zu

25  Wang, correct?

O78BGUO6                          Barnett  -  Redirect

1    A.  Yes, I believe so.

2    Q.  Do you know if Su Zu Wang is related to Mei Guo?

3    A.  I don't know.

4    Q.  You were asked about a $107,000 transferred again by

5    Mr. Zhang, correct?

6    A.  Yes, I believe so.

7    Q.  Do you know that Mr. Zhang is related to Mei Guo?

8    A.  I don't know.

9    Q.  Do you know who Desheng Yin is?

10   A.  I do not.

11   Q.  Do you know if Desheng Yin is related to Mei Guo?

12   A.  I do not.

13   Q.  You were asked about some money that came from Singapore,

14   correct?

15   A.  Yeah.

16   Q.  Do you know if Mei Guo has a uncle, aunt or cousin in

17   Singapore?

18   A.  I don't know.

19   Q.  You were asked many questions about a man name Victor

20   Cerda, correct?

21   A.  Yes.

22   Q.  Did Mr. Cerda assist you when you needed a lawyer?

23   A.  Yes, he did.

24   Q.  Did he give you a referral?

25   A.  I don't know if he gave me the referral or it came from

1  Mei.  I don't recall who gave me the referral.

2  Q.  Did Mr. Cerda ever tell you, I'll give you the money if you

3  testify for Miles Guo?

4  A.  No, he did not.

5  Q.  Did Mr. Cerda tell you I'll give you the money if you talk

6  to Ms. Shroff?

7  A.  No, he did not.

8  Q.  Did Mr. Cerda tell you, I'll only give you the money if you

9  talk to Ms. Shroff and not talk to the government?

10         MR. FERGENSON:  Objection.

11         THE COURT:  Overruled.  You can answer.

12  A.  No, he did not.

13  Q.  Did Mr. Cerda attach any strings to the help he gave you?

14  A.  No, he did not.

15  Q.  You were asked questions about a criminal lawyer that you

16  hired or you were helped hire, correct?

17  A.  I hired a criminal lawyer, that's correct.

18  Q.  Who chose that criminal lawyer?

19  A.  I did.

20  Q.  Let me rephrase that.  I apologize.  I should know better.

21  Criminal defense lawyer, who chose him?

22  A.  I did.

23  Q.  Did Mr. Cerda have anything to do with him?

24  A.  Not in picking him out, no.

25  Q.  Did I have anything to do with him?

O78BGUO6                    Barnett  - Redirect

```
 1   A.  No.
 2   Q.  Did any of Mr. Guo's lawyers have anything to do with the
 3   lawyer you chose?
 4   A.  No, it did not.
 5   Q.  You were asked about a Go Fund Me page, correct,
 6   Mr. Barnett?
 7   A.  Yes, that's correct.
 8   Q.  Why did you need a Go Fund Me page?
 9   A.  Because the lawyers that I've had to retain were requesting
10   their money, and I had nowhere else to turn to get the money.
11   I don't have that kind of money personally.
12   Q.  Victor Cerda didn't give you that money, correct?
13   A.  No, he did not.
14   Q.  Mei Guo didn't give you that money, correct?
15   A.  No, she did not.
16   Q.  Wayne Cao didn't give you that money, correct?
17   A.  No.
18   Q.  Yvette Wang didn't you give that money, correct?
19   A.  No.
20   Q.  Miles Guo didn't give you that money, correct?
21   A.  No, he didn't.
22   Q.  By the way the money that you got all those wire transfers
23   that the government asked you about, you declared that on your
24   income tax, correct?
25   A.  Yes.
```

O78BGUO6                          Barnett  - Redirect

1   Q.  And you declared the Go Fund Me money on your income tax,

2   correct?

3           MR. FERGENSON:  Objection, relevance and scope.

4           THE COURT:  You may answer.

5   A.  Not on this year tax. It would be next year tax that would

6   be claimed on.

7   Q.  Now, you were asked many questions about other properties

8   in New York City that you saw, correct?

9   A.  Yes.

10  Q.  And one of the properties that they asked you about was a

11  penthouse that had four bedrooms, correct?

12  A.  Yes.

13  Q.  Did you know if Mr. Guo's son has been here in the year of

14  2024?

15  A.  I have no idea.

16  Q.  When was the last time you saw his son?

17  A.  The only time that I ever met him was in 2020, and I think

18  it was October or November.  I couldn't tell you what month it

19  was.

20  Q.  Is it fair to say, sir, other than that one time you have

21  never seen Mr. Mileson in this country?

22  A.  I never seen him except that one time.

23  Q.  These four bedroom penthouses, do you know the reason why

24  it wasn't purchased?

25  A.  I don't.

O78BGUO6                    Barnett  -  Redirect

1    Q.  You were asked questions about Aaron Mitchell, correct?

2    A.  Yes.

3    Q.  Did you ever observe Aaron Mitchell and Miles Guo have a

4    conversation?

5    A.  Yes.

6    Q.  Did they seem to understand each other without an

7    interpreter?

8    A.  I don't know.  I wasn't privy to the conversation.  I

9    witness them talking, but I couldn't tell you what the

10   conversation was, nor what it was about.

11   Q.  Now, you were asked questions about the Taurus Fund,

12   correct?

13   A.  Yes.

14   Q.  Was your signature on the Taurus Fund forged?

15   A.  No, it was not.

16   Q.  Did you sign it without understanding what the role was?

17   A.  Yes, I did.

18   Q.  You were asked questions, were not you not, Mr. Barnett,

19   about Brioni suits, correct?

20   A.  Yes.

21   Q.  Do you know how many suits Mrs. Miles Guo owns?

22   A.  I don't.

23   Q.  Do you know how many suits there are at the Sherry

24   Netherlands?

25   A.  I do not.

O78BGUO6                    Barnett  -  Redirect

1    Q.  Do you know how many there are in Connecticut?

2    A.  No, ma'am, I don't.

3    Q.  For all you know, the suits at Mahwah are one third of the

4    suits he owns, you just don't know, correct?

5    A.  I don't know.

6    Q.  At Mahwah did he broadcast from there?

7    A.  Yes, he did.

8    Q.  Did he wear the same suit for every broadcast?

9    A.  I didn't watch the broadcast.  I can't answer that.  I

10   don't know.

11   Q.  You were asked many, many questions about Mr. Guo's

12   bankruptcy, correct?

13   A.  Yes.

14   Q.  Did you know when he declared bankruptcy?

15   A.  I did not know.

16   Q.  Do you know if he declared bankruptcy?

17   A.  I didn't know.  No, I don't.

18   Q.  Do you know sitting here today what he did or did not

19   disclose in his bankruptcy petition?

20   A.  No, I don't know that.

21   Q.  Do you know if he consulted a lawyer who decided what to

22   put in the petition?

23   A.  I don't know.  No, I don't.

24   Q.  You were asked questions about Sean Jing, Hank and Jason,

25   correct?

1    A.  That's correct.

2    Q.  And the government said that you called them indentured

3    servants, correct?

4    A.  That's correct.

5    Q.  And you said you were joking when you said that, correct?

6    A.  I said I was using it as a joke, but, um, they did serve

7    the family.  That's correct.

8    Q.  Let's talk about this.  Did you see Miles Guo interact with

9    Hank?

10   A.  I've seen it, yes.

11   Q.  How would you describe that interaction?

12   A.  More family -- the best way to describe is family like, but

13   he was a -- he was basically someone who did a lot of the work.

14   He's a very hard worker.

15   Q.  Do you know sitting here today if Hank and Miles left China

16   together when he left?

17   A.  I have no idea.

18   Q.  Do you know if they escaped China together?

19            MR. FERGENSON:  He just said he doesn't know, your

20   Honor.

21            THE COURT:  Sustained.

22   Q.  Do you know if they were in Hong Kong together?

23   A.  I don't.

24   Q.  Do you know if they came from Hong Kong to the United

25   States together?

1    A.  I don't know.

2    Q.  Do you know how much Mr. Miles has supported Hank?

3    A.  I don't.

4    Q.  Do you know if he supports Hank's wife?

5    A.  I don't know.

6    Q.  Do you know if he supports Hank's child?

7    A.  I don't know.

8    Q.  You were asked several questions about motorcycles,

9    correct?

10   A.  Yes.

11   Q.  Lamborghini, correct?

12   A.  Yes.

13   Q.  And then you were told or you were asked whether or not you

14   were aware of DOJ's seizing assets, correct?

15   A.  That's correct.

16   Q.  Do you know when the DOJ seized any asset of Mr. Guo's?

17   A.  No, I don't.

18   Q.  So you would have no way to place your conversation with

19   Yvette about renting these instrumentalities versus the DOJ's

20   seizure, correct?

21   A.  Yes, correct.

22   Q.  You don't know if the conversation was months before the

23   seizure, correct?

24          MR. FERGENSON:  Objection, asked and answered.

25          THE COURT:  Sustained.

1    Q.  You simply don't know, correct?

2           MR. FERGENSON:  Asked and answered.

3           THE COURT:  Sustained.

4    Q.  You were asked question after question about incidents and

5    the seizure, correct?

6    A.  Yes.

7    Q.  You have no knowledge of the timeline between the two,

8    correct?

9           MR. FERGENSON:  Objection, asked and answered.

10           MS. SHROFF:  I could go through each of the

11    instrumentalities.  It will just take us a lot longer.

12           MR. FERGENSON:  He said he doesn't know.

13    Q.  Okay.  Do you know any correlation of the renting of the

14    motorcycle and the seizure by DOJ?

15    A.  No, I don't.

16    Q.  How about renting the Lamborghini and the seizure of DOJ?

17           THE COURT:  All righty.  It's 5:00.

18           MR. FERGENSON:  Your Honor, may I have a very brief

19    moment before you dismiss the jury, very brief.

20           THE COURT:  Yes.

21           (Continued on next page)

22

23

24

25

O78BGUO6                          Barnett  -  Redirect

1                    (At the sidebar)

2                    MR. FERGENSON:  I'm having a child tomorrow.  If

3        there's anyway I would be able to finish this witness today,

4        I'll do very brief recross.  I have very limited questions, if

5        there is anyway we can finish the witness.

6                    THE COURT:  How long do you have?

7                    MS. SHROFF:  Since he objected, quite a bit.

8                    THE COURT:  Oh God, this is terrible.

9                    MS. SHROFF:  Nobody comes before the client.  Sorry.

10                    THE COURT:  Do you know when the baby is suppose to

11        come?

12                    MR. FERGENSON:  It's a scheduled C-section.  You have

13        to leave at nine to be there.

14                    MS. SHROFF:  I'm sure one of his colleagues can step

15        in.

16                    MR. FERGENSON:  It's fine, your Honor, if Ms. Shroff

17        is not going to accommodate.  We'll sort it out.

18                    THE COURT:  I'm so happy for you.

19                    (Continued on next page)

20

21

22

23

24

25

O78BGUO6                          Barnett  - Redirect

1                    (In open court)

2                    THE COURT:  Members of the jury, it's time to stop our

3      work.  We'll continue tomorrow morning as usual.  Remember that

4      you're not allowed to discuss the case amongst yourselves or

5      with anyone else. Don't permit anyone to discuss the case in

6      your presence.  Don't listen to, watch, or read anything from

7      any source about this trial.  Have a good evening.

8                    THE LAW CLERK:  Jury exiting.

9                    (Jury not present)

10                   THE COURT:  Please be seated.  Sir, you may step out.

11                   (Witness temporarily excused)

12                   (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury not present)

2                THE COURT:  So how much more do we have on the defense

3      case?

4                MS. SHROFF:  Your Honor, we have Ms. Li, and I think

5      we have one last witness after that and then we're done.

6                THE COURT:  How long do you think all of that will

7      take?

8                MS. SHROFF:  Your Honor, I'm hoping that the direct

9      will be no more than an hour, hour and a half.  I'm hoping

10     shorter.

11               THE COURT:  You're saying total?

12               MS. SHROFF:  I don't know the second witness.  He's

13     not mine, your Honor.  Sorry.

14               MR. SCHIRICK:  Your Honor, the final witness I would

15     expect to be maybe an hour on direct.

16               THE COURT:  So it's not looking like we will have the

17     prosecution sum up tomorrow.  Okay.  Well, I hope that you can

18     be efficient so that we can get this done.

19               MS. MURRAY:  Your Honor, if I may, one proposal.  We

20     had the chance to speak with the defense on timing and on

21     summations.  I think the parties are in agreement that,

22     assuming the timing is what we expect, which is the defense

23     will rest tomorrow assuming that Mr. Guo does not testify as

24     they've indicated, we would do summation on Wednesday, but

25     perhaps we could take some of the time tomorrow afternoon with

1    the jury for the Court to instruct them just on the law part of

2    the instructions so we don't waste too much time in the

3    afternoon.

4              THE COURT:  You mean the substantive instruction?

5              MS. MURRAY:  Correct.

6              THE COURT:  I think that's a great idea.  You both

7    agree to that?

8              MR. KAMARAJU:  That's fine, your Honor.

9              THE COURT:  Sure.  Absolutely.

10             MR. KAMARAJU:  I think -- and you'll correct me -- I

11   think part of your Honor's instruction turns on deliberation

12   specifically, so that might just come after summations, but all

13   the substantive legal stuff would be out of the way.

14             THE COURT:  So I just want to get a letter from you as

15   to from what section to what section you'd like me to charge

16   the jury.

17             MR. KAMARAJU:  Absolutely, your Honor.  That proposal

18   is generally fine with us.

19             THE COURT:  Okay.  Have a good evening.

20             (Adjourned to July 9, 2024 at 9 a.m.)

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    LAI DAI

 4   Direct By Ms. Shroff . . . . . . . . . . . .5326

 5   Cross By Mr. Horton  . . . . . . . . . . . .5338

 6   Redirect By Ms. Shroff . . . . . . . . . . .5372

 7    THOMAS BISHOP

 8   Direct By Mr. Kamaraju . . . . . . . . . . .5381

 9   Cross By Ms. Murray  . . . . . . . . . . . .5396

10   Redirect By Mr. Kamaraju . . . . . . . . . .5409

11   Recross By Ms. Murray  . . . . . . . . . . .5410

12    GERALD SCOTT BARNETT

13   Direct By Ms. Shroff . . . . . . . . . . . .5411

14   Cross By Mr. Fergenson . . . . . . . . . . .5480

15    LEANNE LI

16   Direct By Ms. Shroff . . . . . . . . . . . .5495

17   GERALD SCOTT BARNETT

18   Cross By Mr. Fergenson . . . . . . . . . . .5506

19   Redirect By Ms. Shroff . . . . . . . . . . .5535

20                    DEFENDANT EXHIBITS

21   Exhibit No.                              Received

22    67061   . . . . . . . . . . . . . . . . . .5420

23    DX 60678A  . . . . . . . . . . . . . . . . .5475

24    DX Z-02  . . . . . . . . . . . . . . . . . .5394

25    Stip 3   . . . . . . . . . . . . . . . . . .5395
```