O79VGUO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                  v.                      23 Cr. 118 (AT)
4
    MILES GUO,
5
                  Defendant.              Trial
6   ------------------------------x
                                          New York, N.Y.
7                                         July 9, 2024
                                          9:00 a.m.
8
    Before:
9
10                      HON. ANALISA TORRES,

11                                        District Judge
                                           -and a Jury-
12
                             APPEARANCES
13
    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MICAH F. FERGENSON
         RYAN B. FINKEL
16       JUSTIN HORTON
         JULIANA N. MURRAY
17       Assistant United States Attorneys

18  SABRINA P. SHROFF
         Attorney for Defendant
19
    PRYOR CASHMAN LLP
20       Attorneys for Defendant
    BY:  SIDHARDHA KAMARAJU
21       MATTHEW BARKAN
         JOHN KILGARD
22

23  ALSTON & BIRD LLP
         Attorneys for Defendant
24  BY:  E. SCOTT SCHIRICK

25

O79VGUO1

1    Also Present:

2    Isabel Loftus, Paralegal Specialist, USAO
     Robert Stout, Special Agent, FBI
3    Jorge Salazar, Defense Paralegal
     Tuo Huang, Interpreter (Mandarin)
4    Shi Feng, Interpreter (Mandarin)
     Yu Mark Tang, Interpreter (Mandarin)
5    Barbara Robertson, Interpreter (Mandarin)
     Tuo Hung, Interpreter (Mandarin)
6    Peter Ginsberg, Attorney for Witness Jianhu Yi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O79VGUO1

```
 1                (Trial resumed; jury not present)

 2                THE COURT:  Good morning.

 3                MR. FINKEL:  Good morning.

 4                THE COURT:  Please make your appearances.

 5                MS. MURRAY:  Good morning, your Honor.

 6                Juliana Murray, Ryan Finkel, and Justin Horton, on

 7    behalf of the United States.

 8                MR. SCHIRICK:  Good morning, your Honor.

 9                Scott Schirick, Matt Barkan, and Mr. Guo at counsel's

10    table.  Ms. Shroff and Mr. Kamaraju will join us shortly.

11                THE COURT:  Please be seated.

12                So have the parties decided from what section to what

13    section I'll be giving the instructions?

14                MR. SCHIRICK:  Your Honor, I apologize for

15    interrupting.

16                Mr. Guo doesn't have the translation set up yet.

17                THE INTERPRETER:  I'm going to give him mine right

18    now, okay?

19                THE COURT:  Okay.

20                Have the parties decided what paragraphs of the

21    instructions you want me to read in my first stage of

22    delivering the jury charge?

23                MR. HORTON:  Yes, your Honor.

24                So the parties conferred and agree that sections one

25    through five of the Court's charge, so that's the introductory
```

O79VGUO1

1    section, the legal section, so to speak, on the counts

2    themselves.  And then there's some general legal instructions

3    that follow that would be appropriate before the summations.

4    And then that would leave the sort of deliberation-specific

5    instructions, the two sections at the back of the charge, to

6    follow summations.  We think that makes sense.

7         THE COURT:  If you could just tell me the pages.

8         MR. HORTON:  Yeah.  So the first five sections go

9    through page 68.  That would leave the deliberation

10   instructions from pages 69 to 72 and the concluding remarks.

11        THE COURT:  Okay.  And when is it that you expect that

12   I would be delivering those instructions just timing-wise?

13        MR. HORTON:  We think those would come sort of after

14   the defense rests their case today.

15        THE COURT:  Yes, yes.  I'm trying to understand when

16   it is the defense plans to rest.

17        MR. HORTON:  I think that's a question for the back

18   table.

19        MR. SCHIRICK:  Yes.  Thank you, your Honor.

20        I believe we have the redirect of Mr. Barnett, and

21   then we will resume the direct of Ms. Li.  I think our best

22   estimate is that Ms. Li's -- if I understand from Ms. Shroff

23   correctly, our best estimate is Ms. Li's direct testimony is

24   probably, you know, somewhere short of 90 minutes.  Of course,

25   we have no idea what the cross will be, the length on that.

O79VGUO1

```
 1              And then the final witness, Mr. Higginbotham, I
 2     expect, you know, barring any objections that sort of slow
 3     things down, that Mr. Higginbotham's direct can be accomplished
 4     within probably 45 minutes.  So I think that my rough math
 5     would be that we ought to be done perhaps right after the 12
 6     o'clock break or the 11:30 break.
 7              THE COURT:  Good.
 8              MR. HORTON:  Just one related thing to add.  We have a
 9     consent proposal, I'm happy to say.  Parties agree on an
10     addition.  It's a conforming edit to page 24 of the Court's
11     jury charge.
12              THE COURT:  Okay.
13              MR. HORTON:  There's a sentence added by the Court and
14     described at yesterday morning's conference.  This is the last
15     sentence of the first paragraph on page 24.  It's in the
16     materiality subsection of the securities fraud charge.
17              THE COURT:  Okay.
18              MR. HORTON:  The sentence currently reads:
19              "Materiality is judged as of the time the information
20     was disclosed."
21              So we propose adding "or omitted" just to conform with
22     the statements or omission structure throughout the rest of the
23     charge.
24              MR. SCHIRICK:  No objection from the defense, your
25     Honor.
```

O79VGUO1

| 1 | THE COURT:  No problem.  I will add that. |

1              THE COURT:  No problem.  I will add that.

2              MR. HORTON:  Thank you, your Honor.

3              We have a few other matters to raise.

4              THE COURT:  Okay.

5              MS. MURRAY:  The next matter, your Honor, relates to

6    George Higginbotham.  We spoke yesterday morning about his

7    testimony and the fact that he was a DOJ employee at the time

8    of his offense conduct in the separate conspiracy.

9              We've spoken with defense counsel.  We've reached

10   agreement on a limited number of questions that they would ask

11   to elicit the fact that he was a DOJ employee and to establish

12   what the nature of his job was at DOJ.  I expect to include

13   that he did not work on criminal investigations or criminal

14   prosecutions.  That would be the scope of what the parties have

15   agreed.  And then the government, of course, could inquire on

16   that same limited scope on cross-examination.

17             THE COURT:  So he was an attorney.

18             MS. MURRAY:  He was an attorney, yes.  He was an

19   attorney adviser and a congressional kind of policy person.

20             THE COURT:  So he was not a prosecutor.

21             MS. MURRAY:  Correct.

22             THE COURT:  Okay.

23             MS. MURRAY:  And then with respect to that part of

24   Mr. Higginbotham's testimony, I know we've gone over the

25   government's request for a limiting instruction.  We previously

O79VGUO1

1    proposed a limiting instruction that indicated that this

2    prosecution is lawfully brought by the United States of

3    America, and that it's not being influenced by the communist

4    party.

5            The government now would ask — and we understand that

6    it may be over defense objection, but just for the very factual

7    and accurate statement — that this prosecution was lawfully

8    brought by the United States of America — full stop — after the

9    DOJ employment is elicited in Mr. Higginbotham's testimony.

10           MR. SCHIRICK:  So, your Honor, two things with respect

11   to Mr. Higginbotham.

12           One is I just wanted to make the Court aware that

13   consistent with your Honor's instructions yesterday, I have

14   communicated with Mr. Higginbotham's attorney to convey the

15   Court's instruction that Mr. Higginbotham avoid raising --

16   affirmatively raising the fact that he was a DOJ employee

17   beyond what the defense and the government have agreed are

18   appropriate questions on his direct and cross.  So just to tick

19   and tie that off for the Court.

20           And then to address Ms. Murray's request for a

21   limiting instruction, frankly, your Honor, this is just another

22   attempt -- another bite at the apple.  Your Honor has already

23   denied the government's request for that limiting instruction

24   yesterday.  Both parties wrote letters to the Court over the

25   long weekend with respect to it.  Your Honor considered it and

O79VGUO1

1    rejected it.  We don't think there's anything that's happened

2    since then that would warrant any change in the Court's ruling,

3    particularly given the parties' agreement on the appropriate

4    scope of questioning with respect to Mr. Higginbotham's

5    appointment by DOJ.

6            THE COURT:  If you would just repeat, Ms. Murray, the

7    instruction that you're asking for.

8            MS. MURRAY:  Yes, your Honor.

9            The instruction would be:  This prosecution was

10    lawfully brought by the United States of America.

11            And just to elaborate briefly in response to

12    Mr. Schirick, the reason that we're asking for this — and

13    again, this is a very truncated version of the prior limiting

14    instruction — is it is a fact that this prosecution was

15    lawfully brought by the United States of America.  It's a fact,

16    but we want to make sure that the jury is aware of that,

17    because we think it is possible that they are not necessarily

18    aware that there's no question about the lawfulness of this

19    prosecution.

20            THE COURT:  So when I made my decisions with respect

21    to the instruction, I did not know the full scope of his

22    testimony.  And so I do -- having heard more yesterday, I do

23    believe that the instruction is appropriate.

24            MR. SCHIRICK:  Your Honor, if I may just briefly on

25    that.  We understand the Court's reasoning.

O79VGUO1

1          I believe that ordinarily this type of instruction is

2     not something that's given in typical cases.  It's usually only

3     given in the context of where there's a defense -- or where

4     there's an argument by the defense of selective prosecution

5     which, of course, has not been the case here.  So I just wanted

6     to note that for the record, your Honor.  We continue to

7     believe that it's unnecessary, but we understand the Court's

8     ruling.

9          THE COURT:  This is an extraordinarily unusual

10    circumstance where an individual, who is an attorney and

11    employed by the Department of Justice, got himself involved in

12    a scandalous scheme that goes to the very core of a lack of

13    patriotism, a lack of his allegiance to his oath.  It's a very

14    rare circumstance.  And I am afraid that the jurors may think

15    that somehow his conduct infected the rest of the work of the

16    Department of Justice.

17         MR. SCHIRICK:  I certainly understand your Honor's

18    point.  I think the only thing that I would add is I fully

19    expect that the government on cross with Mr. Higginbotham will

20    elicit that he was not a prosecutor; he worked in the office of

21    legislative affairs of DOJ in Washington; and they will also

22    likely elicit that this scheme was, you know, frankly,

23    interrupted by the FBI and that it was not brought to fruition,

24    despite the co-conspirators' attempts.

25         And so I think there is probably enough that the

O79VGUO1

 1    government will do on a cross to draw the sting that -- or the

 2    potential sting that the Court is identifying.  And frankly,

 3    the need for any sort of affirmative instruction is taken care

 4    of by what the government can do on cross, your Honor.  But,

 5    again, we understand the Court's point; we just maintain the

 6    objection.

 7              THE COURT:  Anything further?

 8              MR. FINKEL:  Yes, your Honor.  One final issue from

 9    the government.

10              The government gave further review to the defense's

11    July 8th letter, which was a response to the government's

12    request for various jury charges which the Court addressed and

13    dealt with primarily yesterday.  But there's a factual issue

14    embedded in that letter, frankly, which we didn't appreciate

15    until later.  And we just want to make sure that the defense

16    does not make arguments that are improper and not based in the

17    evidence.

18              Defense's letter states — and this is the July 8th

19    letter — that they intend to argue through -- because of

20    witness testimony concerning the communist -- the Chinese

21    Communist Party's coercion of "GTV investors," plural, into

22    filing false complaints, plural, with the FBI concerning this

23    case.  And they go on to suggest that the jury should be able

24    to consider that the CCP tampered with witnesses when they

25    consider, I suppose, Guo's intent.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79VGUO1

1          There is testimony about, one, false filing from a

2     defense witness, Mr. Yi.

3          As the Court was clear in its order on Tuesday

4     morning:  That witness — quoting from your Honor, this is page

5     4764 of the transcript — cannot testify as to the intent or

6     motivations of the government's victim witnesses, nor can he

7     speculate that the victim witnesses are biased in favor of the

8     CCP or are CCP spies.  Moreover, Defense Witness 1 — now we

9     know is Mr. Yi — cannot testify that the Chinese authorities

10    wanted to use a fraud case to bring down Guo, a speculative

11    claim.

12         Your Honor went on to say that to the extent that

13    testimony has any probative value "it risks creating an

14    inference that the prosecution team is improperly linked to the

15    CCP or in any way malicious, which I have previously forbid Guo

16    from arguing."  And you cite your order at 13.

17         So, your Honor, while they can, I suppose, argue that

18    Mr. Yi himself was coerced into filing a false complaint, they

19    cannot, by your own order, use Mr. Yi's testimony and supplant

20    what he did onto any of our victim witnesses or any other

21    witness -- any other victims who did not testify.

22         To the extent that victims had intent to, I don't

23    know, file a false claim or whatnot, has low relevance.  What

24    the jury is considering is Mr. Guo's intent.  And so the

25    application, your Honor, is to ensure that the defense does not

O79VGUO1

1   use Mr. Yi's testimony for an improper purpose and make an

2   inference that your Honor has forbidden.  And it appears from

3   the July 8th letter that that's exactly what the defense is

4   intending to do.  So we just want to make sure that doesn't

5   happen so we don't have to object during the closing.

6          MR. SCHIRICK:  So, your Honor, just first to be clear

7   on the sequence of events, I believe the ruling that Mr. Finkel

8   referred to came prior to Mr. Yi's testimony.  So the Court did

9   not have the benefit of having heard the full scope of Mr. Yi's

10   testimony before having made that ruling.

11          Mr. Yi testified, if memory serves, that not only was

12   he coerced, as everyone heard, into filing false complaints

13   with the FBI, the DOJ, the SEC, and the New York Attorney

14   General, among other authorities in the U.S., he testified that

15   the CCP agents who he interacted with on multiple occasions

16   when he was detained said that this was how they planned to

17   bring down Mr. Guo; that that is how -- that was part of the

18   plan.  So based on that testimony, we should be permitted to

19   argue that that was the CCP's goal and that was the means by

20   which they aim to achieve that goal.

21          Now, your Honor has made clear that, you know,

22   certainly there are limits to our ability to make that

23   argument.  Look, bias, as we all know, is never collateral; and

24   we ought to be able to argue in closing that this raises

25   questions about bias of the complainants who have contacted

O79VGUO1

1    government authorities in this country, including the

2    Department of Justice and the SEC.  And that is not an

3    inference --

4         THE COURT:  How is their bias implicated?

5         MR. SCHIRICK:  Your Honor, to the extent that there

6    are individuals in China who contacted government authorities

7    here, like Mr. Yi, I think the testimony that Mr. Yi gave that,

8    as I said before, the CCP's plan was to coerce people into

9    making false complaints, goes to the potential bias of other

10   complainants.

11        THE COURT:  So I'm just not following your argument at

12   all.  I don't get it.

13        MR. SCHIRICK:  So, your Honor, if -- Mr. Yi testified

14   that the CCP told him, the agents of the CCP told him -- if I'm

15   recalling this correctly.  We will confirm, to the extent

16   there's any question about the facts.  I just don't, frankly,

17   have it in front of me.

18        My recollection is that Mr. Yi testified that the

19   agents told him that this was how they were going to bring down

20   Miles Guo, was by coercing individuals in China, who we all

21   know made up the large majority of the folks who sent money for

22   the investments at issue were based in China, right.  So if

23   that's a fact, and it's a fact in evidence that the CCP planned

24   to coerce people in China into making false complaints, the

25   defense ought to be able to argue to the jury in closing that

O79VGUO1

1    that is something that has likely happened with respect to

2    others besides Mr. Yi.

3         THE COURT:  This is a very hard no.  No, you cannot

4    make that argument.  There is no evidence that the CCP coerced

5    the victims in this case.

6         MR. SCHIRICK:  And your Honor, I think there's a

7    distinction that I'm trying to draw, perhaps inartfully,

8    between the victims that the government has called in this case

9    and other complainants.

10        THE COURT:  So that would be just speculation.  You

11   don't have specific evidence.

12        MR. SCHIRICK:  Well, I mean, your Honor, I mean, I

13   would suggest to the Court that Mr. Yi's testimony about this

14   plan by the CCP takes it out of the speculative land.  He had

15   said that that is what he was told; that's evidence of the

16   CCP's intent, methods and means by which they have gone about

17   undermining Mr. Guo, attempting to undermine Mr. Guo.  And he

18   is a representative example of that.

19        And so, you know, again, putting aside the

20   government's victim witnesses, which, again, are a small subset

21   of the entire population of individuals that the government

22   contends are victims here, we ought to be able to argue in

23   fairness and based in fact on evidence that is in the record

24   that it is conceivable that other victim witnesses have been

25   coerced by the CCP, the same way that Mr. Yi was.

O79VGUO1

1          MR. FINKEL:  Just a few points, your Honor.

2          One, I don't believe that Mr. Yi testified that the

3   Chinese Communist Party told him they were trying to take down

4   Guo through a fraud case.  And the reason he didn't testify to

5   that or I don't have a recollection of it is because that was

6   my witness and I would have objected.  And the reason I would

7   have objected is because your Honor excluded that testimony,

8   correctly.  Defense Witness 1 — this is 4764 of the transcript

9   — cannot testify that Chinese authorities wanted to use a fraud

10  case to bring down Guo's speculative claim.

11         THE COURT:  Let me just interrupt you for one moment.

12         Mr. Schirick, if you could please point us to the part

13  of the transcript where you say that the witness said that it

14  was the CCP's plan to bring down Miles Guo through this --

15  these complaints.

16         MR. SCHIRICK:  We are trying to find it right now,

17  your Honor.  Yes, we're attempting to find that now.

18         THE COURT:  Okay.

19         MR. FINKEL:  A few other points.

20         The targeting evidence which we've stipulated to in

21  large part, is relevant because it shows that Mr. Guo's

22  thoughts about being persecuted by the CCP were objectively

23  reasonable; that he wasn't paranoid, to use the Court's

24  phrasing.  That's why it's relevant.  And we're not disputing

25  that at all.

O79VGUO1

1          To use Mr. Yi's testimony to supplant it, one, on our

2    victim witnesses, would be speculative and forbidden by the

3    Court's prior order.  And I understand Mr. Schirick is not

4    asserting that.  What he's asserting actually is in some place

5    worse.  He's saying that the victim witnesses, who the jury has

6    not heard from, are biased in that they filed false complaints,

7    okay.

8          Number one, their bias isn't relevant because they

9    weren't witnesses.  That's number one.

10          Number two, it doesn't matter their motivation for

11    filing a complaint.  What the jury is going to consider is

12    whether the government has proven beyond a reasonable doubt

13    whether Miles Guo had an intent to commit a crime, not whether

14    the filings of witnesses that didn't testify were true or not

15    true.

16          At its heart, your Honor, what the defense is trying

17    to do is use their witness to paint a broad picture about other

18    things the jury has not heard about.  That is using speculation

19    to make an argument.  And it goes to this ongoing theme where

20    the defense very strategically is saying, This table?  We're

21    not CCP agents; we're not arguing this table is CCP agents.

22    That's not our argument.  We're just arguing everything around

23    them is tainted by the CCP; and that the four of us and the FBI

24    agents that we've worked with for the last couple of years had

25    been unwitting tools in some sort of plot to take down Miles

O79VGUO1

1    Guo.  All of that is not proper.

2            The question for the jury is Miles Guo's intent.  And

3    while they're certainly free to say that our witnesses were

4    biased or lied, they did not ask our witnesses, Did you file a

5    false complaint?  They did not cross our witnesses on what they

6    used Mr. Yi for.

7            So to do this strategic, tactical approach of not

8    asking our witnesses, and then impeaching them through their

9    witness, and then using their witness to speak to the

10   motivation of individuals who aren't even part of this trial,

11   because their testimony is not in it, is improper.  And your

12   Honor already ruled that they shouldn't be able to do it.

13           So I'd ask the Court to adhere to your Honor's prior

14   ruling and make sure that the defense not argue that our

15   witnesses filed false complaints at the behest of the CCP, and

16   certainly not that other victims who the jury did not hear from

17   filed false complaints.

18           And your Honor, this is consistent with a Second

19   Circuit case, *U.S. v. Bautista*, 252 F.3d, 145 (2d Cir. 2001).

20   Second Circuit quoting:  A district court has broad discretion

21   in limiting the scope of summation.  That was affirming a

22   conviction of a defendant who complained that the summation was

23   improperly limited.  The court, as I understand it, precluded

24   the defense from making arguments that weren't supported by the

25   facts that were elicited at trial.  That, of course, is an

O79VGUO1

1    appropriate use of your discretion.  We ask the Court to adhere

2    to its prior rulings and do so.

3            MR. SCHIRICK:  Your Honor, if I may, excuse me.

4            Just briefly.

5            First of all, we had no notice that the government was

6    going to make this argument this morning.  It's obviously a

7    very important issue.  We would like to make sure --

8            MR. FINKEL:  We've been making this argument for

9    weeks.

10            THE COURT:  Mr. Schirick, this has been at the core of

11    the case, so this cannot amount to a surprise.

12            MR. SCHIRICK:  No, no, I'm not saying it's a surprise,

13    your Honor.  I'm sorry if that's the impression I left.

14            My point is we're looking for the testimony; we just

15    weren't prepared to be able to put that in front of the Court.

16    And I think it's obviously an important issue.  And we would

17    certainly like to have the opportunity on that, given the

18    Court's observation that we agree that this is an important

19    issue at the center of the case.  So that's number one.

20            Number two, look, I just want to reiterate what we've,

21    I think, made abundantly clear repeatedly.  The defense has no

22    intention whatsoever of making the argument that this

23    prosecution and this prosecution team is somehow a tool of the

24    CCP.  Clearly that's not going to happen.  Mr. Kamaraju stated

25    that repeatedly on the record.  We've represented that to the

O79VGUO1

1      Court over and over.

2              There is a difference, however, between that on one

3      hand, and on the other hand being able to argue about the bias

4      or potential bias of complainants, and not just the victims in

5      this case, but others.  And that is what we're seeking to do.

6              THE COURT:  So it's appropriate to sum up on the issue

7      of bias.  And that goes on a witness-by-witness basis.  You

8      cannot generalize from Mr. Yi's individual experience.  You

9      cannot speculate that he represents the majority of the

10     complainants, because we have no evidence about any

11     complainants other than the ones who testified here.

12             MR. SCHIRICK:  Your Honor, I think --

13             THE COURT:  Don't invite them to speculate.  That's my

14     ruling.  I cannot be more clear about this.

15             MR. SCHIRICK:  Your Honor, I would just point out two

16     other facts.

17             One is we will try to find this record citation that I

18     was referring to before in Mr. Yi's testimony.

19             There is also testimony from a victim witness Ya Li,

20     also known as Mulan, who testified that she believed that in

21     order to go back to China to be able to visit her parents, she

22     had to disclaim any association with Miles Guo to be able to

23     safely travel back there.

24             There is certainly other evidence in this case that we

25     can point the Court to that ought to allow us to make the

O79VGUO1

1    argument about bias that I'm referring to.

2            A parallel point here, Judge, is, of course, your

3    Honor has ruled with respect — to going back to May on the Fox

4    Hunt order, that the Chinese government's methods of trying to

5    undercut and discredit Mr. Guo are also highly relevant, and

6    also have obviously been the subject of a lot of evidence

7    that's been introduced in this trial.  And this is just further

8    evidence of that as well.  So it not only goes to bias, but is

9    also relevant to the Chinese government's targeting of Mr. Guo,

10   and the means and methods by which they targeted him, that have

11   impacted his state of mind and what he's done here.

12           So I think it's relevant for both of those reasons,

13   your Honor.  And if the Court would permit us to just gather

14   our record citations to be able to present that to the Court

15   perhaps at the 11:30 break so that we can have a full record

16   before the Court.

17           THE COURT:  Of course you can present me with whatever

18   portions of the transcript that you think are relevant.  But I

19   am not inclined to permit any form of speculation.

20           Is there anything further?

21           MR. SCHIRICK:  Your Honor, we have one additional

22   application that is relevant to the testimony of Mr. Barnett,

23   who is still on the stand, on redirect.

24           Yesterday during cross-examination, there was a series

25   of questions asked about Mr. Barnett's role with respect to the

O79VGUO1

1   Taurus Fund, which the Court may recall is the entity --
2   intermediate entity that was the owner of the Mahwah property.
3   And Mr. Barnett, on cross-examination by Mr. Fergenson, stated
4   in sum or substance that he believed that the paperwork that he
5   signed made him the owner of that fund that, in turn, owns
6   Mahwah.
7           Now, that is incorrect as a factual matter.  And
8   unfortunately, I don't -- I'm sure this was not on purpose by
9   Mr. Fergenson, but Mr. Fergenson on cross picked up that
10  misstatement and continued to ask the witness whether he was
11  surprised to learn that he was the owner, whether he first
12  learned that he was the owner during the bankruptcy proceeding.
13          And, of course, the government knows that just as a
14  matter of basic, you know, LLC law, being a manager or a member
15  of an LLC does not make one owner of the entity.  So we would
16  ask, your Honor, that that testimony be stricken as misleading.
17  And, of course, it is -- those are facts that the government
18  well knows, and that testimony was improper.
19          MS. MURRAY:  Your Honor, just briefly on that point.
20          It's entirely appropriate testimony for Mr. Barnett.
21  It's his understanding of what happened.  He was stating facts.
22          I would also note, like Le Zhou, Mr. Barnett is not a
23  lawyer.  He is not drawing legal conclusions.  He is stating
24  his understanding, paperwork was put in front of him, he signed
25  it, and what he understood that paperwork to represent.

O79VGUO1

 1          Just a moment, please, your Honor.

 2          And, your Honor, I would just note it's akin to

 3     Mr. Dragon's testimony.  He testified to his understanding

 4     regarding the GTV stock shares.  That wasn't based on

 5     necessarily personal knowledge; it's factually inaccurate based

 6     on the government's case and the facts.  It was not struck,

 7     however, because it's his understanding.

 8          So similar to that, Mr. Barnett testified to his

 9     understanding appropriately.  There's absolutely nothing

10     improper about that.  There's no basis — zero basis — to strike

11     it.  And I would also note that's what redirect is for.  He's

12     their witness.

13          MR. SCHIRICK:  Your Honor, just briefly.

14          The Dragon comparison is apples and oranges.

15          Our point here is that the government knows the actual

16     facts; yet on cross, they picked up on a witness's mistake and

17     continued to -- and they adopted his mistake and continued to

18     ask questions in the same vein that suggested to the jury that

19     he was the owner of the entity, when the government knows he is

20     not.

21          THE COURT:  So are you arguing that the government

22     acted in bad faith?

23          MR. SCHIRICK:  No, your Honor.  As I said before, I

24     don't have any reason to believe it was intentional,

25     inadvertent, doesn't matter.  At the end of the day, the

O79VGUO1

1    question is everyone -- I believe the representatives for the

2    parties would agree that that was factually incorrect and left

3    an incorrect perception with the jury.  And the issue on

4    redirect is because this witness is not someone who necessarily

5    appreciates the distinctions between a manager or a member or

6    an owner, that our ability to deal with this on redirect is

7    very limited and it will have left a misleading impression with

8    the jury on a critical issue, your Honor, a very critical

9    issue.

10            Obviously, who owns Mahwah is perhaps, you know, the

11    issue or one of the handful of issues that are at the center of

12    this case.  And to leave the jury with the impression that

13    somehow the people who, in the government's telling, worked for

14    Mr. Guo, you know, duped Mr. Barnett into signing paperwork

15    that made him the owner, without his knowledge, is highly

16    prejudicial and it's not clear that that's something we're able

17    to clean up on redirect.

18            MS. MURRAY:  Your Honor, just briefly.

19            What Mr. Schirick just stated is factually true.

20    That's exactly what happened.  It's consistent with the means

21    and methods of the RICO conspiracy that the government has

22    presented over the last six weeks.  Paperwork was created.

23    People signed it.  It wasn't Mr. Guo.  It will surprise no one

24    to learn that during summations, the government is going to

25    argue that Miles Guo was the owner of the Mahwah mansion.

O79VGUO1

1          With respect to Mr. Barnett's understanding of what

2     certain paperwork meant, that's his understanding.  He also

3     understood that he was the manager of Mahwah.  And he testified

4     that he thought manager meant security manager, not manager of

5     a fund.

6          Again, the defense can redirect him on that, they can

7     confirm that was his understanding, they can argue in summation

8     that that's not what happened based on LLC law, to the extent

9     that that's in the case.  But there is no basis to strike, to

10    limit.  It's entirely appropriate for him to testify to his

11    understanding.

12          MR. SCHIRICK:  Just one last point, your Honor.

13          What you have not heard from the government in the

14    discussion on this so far is that the government knows that

15    that is incorrect; that Ms. Murray didn't address that at all.

16          If the government knows that being a manager of an LLC

17    does not make one the owner, which I think we can all agree

18    with, then any questioning that compounded that

19    misunderstanding is improper, particularly in light of our

20    inability -- potential inability to rehabilitate that on

21    redirect, and it risks leaving a very serious misimpression

22    with the jury that we're not able to cure.

23          THE COURT:  So part of what a jury does is to assess a

24    witness's intelligence, how well-informed they are, how they

25    perceive their reality.  And this was his belief.  He said he

O79VGUO1                    Barnett - Redirect

1    was the owner.  The prosecution picked up on that.  You call it

2    a slip-up.  Well, sometimes your witnesses slip up and you just

3    have to live with that.  You will address that on redirect.

4              MR. SCHIRICK:  Thank you, Judge.

5              THE COURT:  Let's get the jurors and the witness,

6    please.

7              (Jury present)

8              THE COURT:  Please be seated.

9              Good morning, jurors.

10             THE JURY:  Good morning.

11             THE COURT:  I apologize for bringing you out five

12   minutes late.  I had to clear up some matters with the parties.

13             All righty.  Let's have our witness brought back to

14   the stand.

15             (Witness present)

16             THE COURT:  Remember, Mr. Barnett, you're still under

17   oath.  You may be seated.

18             THE WITNESS:  Thank you.

19             THE COURT:  And you may continue the inquiry.

20             MS. SHROFF:  Thank you, your Honor.

21    GERALD SCOTT BARNETT,

22         called as a witness by the Defendant,

23         having been previously duly sworn, testified as follows:

24   REDIRECT EXAMINATION (continued)

25   BY MS. SHROFF:

O79VGUO1                         Barnett - Redirect

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  Mr. Barnett, yesterday when we last spoke, we were talking

4   about the timing of the DOJ seizures that the prosecutor had

5   asked you about.  Do you recall that?

6   A.  Yes, I do.

7   Q.  Mr. Barnett, is it fair to say that, sitting here today,

8   even now, you do not know anything about these DOJ seizures?

9            MS. MURRAY:  Asked and answered.

10           THE COURT:  Sustained.

11  Q.  Sitting here today, do you recall the dates that you spoke

12  to Yvette about renting out motorcycles?

13  A.  I don't have exact dates for that.

14  Q.  Mr. Barnett, you were shown GX WA26.  If I could have that

15  pulled up for you.

16           You recall being shown this document?

17  A.  Yes.

18  Q.  And you were asked to read from it; correct?

19  A.  Yes, I believe so.

20  Q.  Had you ever seen this document before yesterday?

21  A.  Yes, I've seen it before.

22  Q.  And when did you see it?

23  A.  Now probably about a year ago was probably the last time I

24  actually saw it, give or take.  I don't have an exact date on

25  that.

O79VGUO1                          Barnett - Redirect

1    Q.  And who showed it to you?

2    A.  I don't think anybody showed it to me.  I believe it was on

3    my computer.

4    Q.  Okay.  When you met with the United States Attorney's

5    Office, they didn't review this document with you; correct?

6    A.  Not that I remember, no.

7    Q.  And they asked you questions about your discussions with

8    Yvette about a Lamborghini, do you recall that?

9            MS. MURRAY:  Objection, your Honor, unless the limited

10   yes or no, as with yesterday.

11           THE COURT:  You may answer yes or no or I don't recall

12   or I don't know.

13   A.  Sorry.  Can you repeat that please?

14   Q.  Sure.

15           You were asked questions yesterday about a

16   Lamborghini, you remember that?

17   A.  Yes.

18   Q.  And then you testified about discussions you had with

19   Yvette regarding that Lamborghini; correct?

20   A.  Yes.

21   Q.  And sitting here today, you don't recall when those

22   discussions occurred; correct?

23           MS. MURRAY:  Asked and answered.

24           THE COURT:  Sustained.

25   Q.  Do you know where that Lamborghini was?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  At the time of those conversations, is that what you're

2  asking?

3  Q.  Yes.

4  A.  I believe it was in a residence in Connecticut.

5  Q.  Okay.  And do you recall if it was moved?

6  A.  Not that I'm aware of, no.

7  Q.  Now, let me show you what is marked in evidence as SB212.

8        By the way, do you know how many garages there are at

9  the residence in Connecticut?

10  A.  Yes.

11  Q.  How many?

12  A.  Four.

13  Q.  Four?

14  A.  There's four garage doors; correct.

15  Q.  Thank you.

16        MS. SHROFF:  Could I have that pulled up again, SB212.

17  Q.  This document is in evidence, Mr. Barnett.  You can believe

18  me when I tell you that because it has the little sticky on the

19  document below.

20        And you recall getting this email?  You see that, your

21  name right on the left side?

22  A.  I see it.  I don't recall receiving the email, but I do see

23  my name on the top.

24  Q.  All right.

25        MS. SHROFF:  Well, let's scroll down.  Let's keep

O79VGUO1                        Barnett - Redirect

1    scrolling down.  There we go.

2    Q.  You see the text of this email?

3    A.  Yes.

4    Q.  And you remember yesterday being asked questions about this

5    boat or ship, whatever it's called, I don't know what it is

6    actually, a boat, a ship, a yacht, Liberty?

7    A.  Yes.

8    Q.  Okay.  Did you have any involvement with the maintenance

9    and upkeep of this instrumentality?

10   A.  No.

11   Q.  You see these progress reports that you were sent emails

12   about?

13   A.  Yes.

14           MS. SHROFF:  Can you scroll down for Mr. Barnett,

15   please.

16   Q.  You see all the things it lists?

17           MS. MURRAY:  Your Honor, just one note.  This document

18   is not in evidence.  The government doesn't object, but it

19   needs to be formally admitted.

20           MS. SHROFF:  It was the government who showed it on

21   their cross, so I'm happy to admit it or -- well, I move it

22   admit it.

23           MS. MURRAY:  No objection.

24           THE COURT:  It is admitted.

25           (Defendant's Exhibit SB212 received in evidence)

O79VGUO1                    Barnett - Redirect

1   BY MS. SHROFF:

2   Q.  You recall yesterday the prosecutor asking you about a

3   document named SB212?

4   A.  Yes.

5   Q.  Okay.  Let's scroll down, shall we.

6           Do you have any recollection of what is being

7   discussed in this email?

8   A.  I don't recall the email.  I recognize some of the pictures

9   in the email, but I don't recall the actual email that I

10  received.

11  Q.  Was this the boat that was in poor shape and had to be sent

12  back?

13  A.  Yes.

14          MS. SHROFF:  Thank you.

15          You can take that down, please.

16  Q.  Mr. Barnett, you remember yesterday you were asked a series

17  of questions about the left and the right wings in Mahwah?

18  A.  Yes.

19  Q.  And you testified that you did not believe that Mr. Guo and

20  his family were going to live in Mahwah; correct?

21          MS. MURRAY:  Objection.

22          Mischaracterizes his testimony.

23          THE COURT:  Sustained.

24  Q.  Did you believe that Mr. Guo and his family were going to

25  live in Mahwah?

O79VGUO1                      Barnett - Redirect

1            MS. MURRAY:  Asked and answered.

2            THE COURT:  Sustained.

3            MS. SHROFF:  It's not.  There isn't an answer, your

4    Honor.  He didn't answer it.

5            MS. MURRAY:  This was covered extensively yesterday,

6    your Honor.

7            MS. SHROFF:  I'm on redirect.

8            THE COURT:  The intended use of the property was gone

9    over by you.

10            MS. SHROFF:  Yes, but this is redirect, your Honor.  I

11    haven't asked him since they did their cross.

12            THE COURT:  You are not to elicit -- you are not to

13    repeat the same questions that come from the direct.

14            MS. SHROFF:  This is from his cross.  The wings only

15    came up on cross.

16            THE COURT:  No, I don't think so.  If I'm incorrect,

17    I'm happy for you to point me to the portion of the transcript.

18            MS. SHROFF:  May I have a minute, your Honor?

19            THE COURT:  Yes.

20            MS. SHROFF:  Thank you.

21            Your Honor, could we have a sidebar?

22            THE COURT:  Yes.

23            MS. SHROFF:  Thank you.

24            (Continued on next page)

25

O79VGUO1                          Barnett - Redirect

 1                   (At sidebar)

 2              THE COURT:  I do have the direct.

 3              MS. SHROFF:  Yes, your Honor.

 4              THE COURT:  One moment, please.

 5         I'm going to have him print the portion of the direct

 6    in which he testifies about the different wings.

 7              MS. SHROFF:  And then the government crossed on 5518.

 8    So I'm allowed on redirect to address the points that they

 9    brought out on cross.  That's correct.

10              THE COURT:  What I'm saying is you can't reask the

11    same questions.

12              MS. SHROFF:  I can under the rules, your Honor, if

13    they brought out something on cross.  I mean, I think --

14              THE COURT:  So I'm the one making the rules, and I'm

15    saying that you cannot repeat the same question that was

16    already asked on direct.

17              MS. SHROFF:  Even if the issue was addressed on cross,

18    your Honor?

19              THE COURT:  Correct.

20              MS. SHROFF:  So I just want to make sure I understand.

21    So my redirect is limited to things that were never brought up

22    on direct, even if they crossed on it?

23              THE COURT:  No.  My point is that you have already,

24    during the direct examination, covered this area.

25              Now I'm going to go to page 5448 of the transcript.

O79VGUO1                    Barnett - Redirect

1              MS. SHROFF:  48?

2              THE COURT:  5448.  This is the direct examination of

3       the witness Mr. Barnett.

4              At line 19:  Mr. Barnett, were there names attributed

5       to different rooms within the facility?

6              Answer:  Yes.

7              Question:  What were the names?

8              Answer:  I'd have to look at the map, but the ground

9       floor, I don't remember that having a name.  The second floor,

10      one side was Miles' wing.  The other side was madam's wing,

11      which was Miles' wife.  And I believe on the third floor one

12      side was for Mei, and the other side was for his son.

13             So this has been covered.

14             MS. SHROFF:  So the question I asked was about rooms,

15      and he answered with wings.  Then on cross, the government

16      asked:  They weren't just bedrooms; correct?  These were whole

17      wings?

18             That's correct.

19             They were multi-room portions of this mansion that

20      were just for -- and then they go on to ask again about all of

21      the areas, and then they question him about Brioni suits.

22             They weren't just bedrooms, they were whole wings;

23      correct?  This is on the cross.

24             THE COURT:  So let's just identify the page of the

25      transcript.

O79VGUO1                      Barnett - Redirect

1              MS. SHROFF:  5518.

2              THE COURT:  Okay.  Go ahead, Ms. Murray.

3              MS. MURRAY:  If I may briefly, your Honor.

4              Your Honor has ruled already.  We consistently have

5    this issue that's come up in this trial where you make a

6    ruling, consider all the evidence, you cite to the record, and

7    the defense keeps challenging and arguing.  We would really

8    like to get through this case.

9              MS. SHROFF:  I believe that is the job.

10             THE COURT:  Well, your job though involves adhering to

11   the rules.  Part of the rules are that you have to listen to my

12   rulings and conform your conduct.

13             MS. SHROFF:  That's fine, your Honor.  I just wanted

14   to make sure the Court had seen 5518.  If the Court's ruling is

15   after having reviewed 5518, I have no problem.  Sure.

16             THE COURT:  All righty.

17             MS. SHROFF:  Thank you.

18             MS. MURRAY:  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

O79VGUO1                          Barnett - Redirect

1              (In open court)

2              THE COURT:  Sustained.

3              You may continue the inquiry.

4    BY MS. SHROFF:

5    Q.  Mr. Barnett, when you were being questioned by the

6    prosecutor, you were asked questions about Amy Buck, do you

7    recall that?

8    A.  Yes.

9    Q.  And do you recall being asked questions about money passing

10   through Amy Buck?  You remember that?

11   A.  Yes.

12   Q.  Amy Buck was an attorney; correct?

13   A.  Yes.

14   Q.  And could you use that mic for me?

15   A.  Sorry.  Yes.

16   Q.  And she had an escrow account through which she allowed

17   payments, right?

18   A.  Yes, I believe so.

19   Q.  And it was through an attorney escrow account that the

20   bills for Mahwah were paid; correct?

21   A.  Yes.

22   Q.  It is your understanding, is it not, that Amy Buck was

23   hired precisely to make sure that the bills were paid?

24              MS. MURRAY:  Objection.

25              THE COURT:  Sustained.

O79VGUO1                          Barnett - Redirect

1   Q.  What is your understanding of why Amy Buck was hired?

2   A.  I don't -- I don't have an understanding why she was hired.

3   I know she was -- who I was required to send invoices to, but I

4   couldn't tell you why particularly she was hired.

5   Q.  You would send emails to Amy Buck for payment; correct?

6   A.  That's correct.

7   Q.  She would evaluate the document or the invoice; correct?

8           MS. MURRAY:  Objection.

9           THE COURT:  Sustained.

10          So he cannot testify as to her conduct unless he was

11  with her.  Were you with her?

12          THE WITNESS:  No, ma'am, I was not.

13          THE COURT:  Go ahead.

14  Q.  Did Ms. Buck have follow-up questions on the invoices you

15  sent her?

16  A.  Yes, sometimes.

17  Q.  And did you answer those invoice-based questions for

18  Ms. Buck?

19  A.  Yes.

20  Q.  And after you answered those questions, did she sanction

21  the payment?

22  A.  Yes.

23  Q.  You were asked questions about a person named Gladys Chow;

24  correct?

25  A.  Yes.

1   Q.  Do you know if Ms. Chow is fluent in both English and

2   Mandarin?

3   A.  I know she speaks both.  I can't tell you she's fluent, but

4   I know she speaks both.

5   Q.  And do you know if Ms. Chow went with Mr. Guo when he

6   attended meetings where there were only English speakers?

7   A.  Yes.

8   Q.  Did you ever observe Ms. Chow translate from English to

9   Mandarin and Mandarin to English for Mr. Guo?

10  A.  Yes, in a meeting I was in, yes.

11  Q.  You were asked questions about whether or not you had to

12  purchase motorcycles, you remember that?

13  A.  Yes.

14  Q.  Mr. Barnett, was somebody forcing you to purchase these

15  motorcycles?

16  A.  No.

17  Q.  Were you asked to purchase them and you agreed?

18  A.  Yes, I agreed.

19  Q.  You were asked questions about a Ducati; correct?

20  A.  Yes.

21  Q.  And whether or not it was listed in various bankruptcy

22  filings; correct?

23  A.  Yes.

24  Q.  Would it be commonplace for somebody else to consult you on

25  what would be in a bankruptcy filing for them?

O79VGUO1                        Barnett - Redirect

 1                MS. MURRAY:  Objection.

 2                THE COURT:  Sustained.

 3   Q.  Is it fair to say, Mr. Barnett, that boat maintenance is

 4   not part of your skill set?

 5   A.  Yes, that's correct.

 6   Q.  You were asked about emails that your lawyers sent to the

 7   United States Attorney's Office; correct?

 8   A.  Yes.

 9   Q.  And was Ms. Murray one of the attorneys that received those

10   emails?

11   A.  I believe so.

12   Q.  And did you meet with her when you were meeting with the

13   government pursuant to your proffer agreement?

14   A.  Yes.

15   Q.  Did she review those documents with you?

16   A.  No.

17   Q.  Did your lawyer produce any documents to me?

18   A.  Yes, sorry, yes.

19   Q.  Okay.  When was that, do you know?

20   A.  About a week ago, week and a half maybe.

21   Q.  And when is the first time you spoke to me?

22   A.  Around -- right after I received the subpoena with my

23   attorney.

24   Q.  Since that one time that I spoke to you, have I ever

25   substantively spoken to you again?

O79VGUO1                          Barnett - Redirect

1    A.  Yes, I've spoken to you, yes.

2    Q.  No, I meant substantively about any fact in this case?

3    A.  No.

4    Q.  You were asked questions, were you not, about supporters

5    that came to 3 CC?

6    A.  Yes.

7    Q.  What is 3 CC?

8    A.  It's an office building.

9    Q.  And does it stand for 3 Columbus Circle?

10   A.  Yes, it does.

11   Q.  And the prosecutor yesterday asked you if you found the

12   whole situation there quote/unquote weird; correct?

13   A.  Yes.

14   Q.  You were asked questions about whether Mr. Guo -- whether

15   people would clap for Mr. Guo, that was one of the questions;

16   correct?

17   A.  Yes.

18   Q.  And when you observed people clapping, was it after Mr. Guo

19   had given a speech?

20   A.  Yes.

21   Q.  Did you have any idea whether his speech was any good or

22   not?

23   A.  I have no idea.  I don't speak Chinese.

24   Q.  You don't know if the applause was justified or not;

25   correct?

1           MS. MURRAY:  Objection.

2           THE COURT:  You may answer.

3  A.  No, I don't.

4  Q.  You were asked questions about Mr. Guo holding babies;

5  correct?

6  A.  Yes.

7  Q.  Is he the age of a grandfather?

8           MS. MURRAY:  Objection.

9           THE COURT:  You can answer.

10  A.  I don't know Mr. Guo's age.

11  Q.  Okay.  Fair enough.

12           You were also asked questions, were you not, about

13  whether or not people brought their children and they had iPads

14  and they worked; correct?

15  A.  Yes.

16  Q.  And these people that the government was referring to were

17  fellow fighters or supporters; correct?

18  A.  Yes, I believe so.

19  Q.  And would it be fair to say, Mr. Barnett, that the staff at

20  3 CC was not the biggest fan of these supporters coming in

21  every day; correct?

22  A.  That's correct at times, that's correct.

23  Q.  Right.

24           And, in fact, you said that that drove them crazy; is

25  that right?

1   A.  Sometimes.

2   Q.  And is it fair to say that Yvette also wasn't a big fan of

3   the supporter base coming into 3 CC; correct?

4   A.  That is correct.

5   Q.  Was Mr. Miles a big fan of the supporters coming whenever

6   they wanted?

7   A.  I never had that conversation with him.

8   Q.  Did you ever see him turn away a supporter?

9   A.  No.

10  Q.  Did you ever see him tell a supporter "Come back tomorrow"?

11  A.  No.

12  Q.  Thank you.

13          MS. MURRAY:  Your Honor --

14  Q.  Mr. Barnett --

15          MS. MURRAY:  Excuse me, Ms. Shroff.

16          I just object to the commentary, the "thank you."

17  We've covered that before.

18          THE COURT:  Just limit it to questions, Ms. Shroff.

19          MS. SHROFF:  I didn't realize I said it.  I'm sorry.

20  Q.  Mr. Barnett, did you observe Mr. Guo interact with the

21  supporters at 3 CC?

22  A.  Yes.

23  Q.  Did you observe Mr. Guo interact with supporters at his

24  home?

25  A.  Which --

 1   Q.  In Connecticut.

 2   A.  Very rarely.

 3   Q.  How about at Sherry-Netherland?

 4   A.  Yes.

 5   Q.  When the supporters came to Sherry-Netherland, would they

 6   participate in the broadcast that he was putting out?

 7   A.  Yes, sometimes.

 8   Q.  Did you observe Mr. Guo interact normally and socially with

 9   the supporters?

10   A.  Yes.

11   Q.  Mr. Barnett, you were asked many questions about whether or

12   not you had invested your retirement amount or your second loan

13   on your mortgage or any such thing in any one of the Guo

14   series, as the government called it; correct?  You remember

15   those questions?

16   A.  Yes.

17   Q.  Were you interested in taking down the CCP?

18   A.  Me personally, ma'am?

19   Q.  Yes.

20   A.  Well, I mean, it sounds like a good idea, being an

21   American, but I don't want to get political.

22   Q.  You were never persecuted by the People's Republic of

23   China; correct?

24   A.  I was not.

25   Q.  Nobody has ever tried to extradite you to a country that

O79VGUO1                     Barnett - Redirect

1    tortured you, right?

2            MS. MURRAY:  Objection, your Honor.

3            THE COURT:  Sustained.

4    Q.  You met with Ms. Murray when you proffered pursuant to your

5    proffer agreement, right?

6            MS. MURRAY:  Asked and answered.

7            THE COURT:  Sustained.

8    Q.  Mr. Barnett, did she ask you if you'd ever invested in any

9    one of Mr. Guo's G Series?

10   A.  No, not that I'm aware of.

11   Q.  Mr. Barnett, when you met with Ms. Murray, did she ask you

12   if you'd ever overbilled for the work you did for Mei?

13   A.  No, not that I remember.

14   Q.  Did you overbill for the work you did for Mei?

15   A.  No.

16   Q.  Did you ever get paid on an invoice for more than what work

17   you did?

18           MS. MURRAY:  Asked and answered.

19           THE COURT:  Sustained.

20   Q.  Were all your invoices legitimate?

21   A.  Yes.

22   Q.  Mr. Barnett, on cross-examination yesterday, you were asked

23   questions as to whether or not you were a managing member of

24   the Taurus Fund.  Do you recall that?

25   A.  Yes.

1  Q.  And you responded that you believed you were a managing

2  member, do you recall that?  Do you recall saying that?

3  A.  Yes, I believe so.

4  Q.  Mr. Barnett, isn't it true that you were not marked as a

5  managing member on that document; correct?

6  A.  I don't recall exactly what's on the document.  But to my

7  memory of it, I was just the manager of the property for the

8  installation of security.  I didn't really understand the

9  document in full, which is --

10  Q.  Right.  But regardless of your understanding of the

11  document --

12          MS. SHROFF:  Actually, you know what?  Let me pull up

13  GX Buck 1234, please.

14  Q.  You recall the government showing you this document

15  yesterday?

16  A.  Yes.

17  Q.  Okay.  And let's see if we can make it bigger.  And if I

18  could work down.  And if I could go to page 3, which is the

19  document that you were shown.  And if I could just have that

20  enlarged.

21          Can you read line 5?

22  A.  Yes.

23  Q.  And it says that the company shall be managed by, and

24  there's a check on "manager"; correct?

25  A.  That's correct.

O79VGUO1                        Barnett - Redirect

1   Q.  And yesterday when you were asked this question,

2   Mr. Fergenson asked you if you were, in fact, a managing

3   member; correct?

4   A.  Yes.

5   Q.  And you're, in fact, not a managing member even on the

6   document; correct?

7             MS. MURRAY:  Objection, your Honor.

8             The document speaks for itself.  And Section 6 says

9   "managing member."

10            THE COURT:  Sustained.

11  Q.  Did you see the distinction yesterday between manager and

12  member?

13            MS. MURRAY:  Objection, your Honor.

14            THE COURT:  You may answer.

15  A.  No, I did not see it yesterday.

16  Q.  Okay.  Thank you.

17            How about let's go to number six --

18            MS. MURRAY:  Again with the "thank you."

19            MS. SHROFF:  I'm sorry, I'm sorry.  It's just habit.

20            Page number six.

21  Q.  And on number six, on the left-hand side, it says:  Name

22  and address of each manager.  And what's the word after

23  "manager"?

24  A.  It says "or managing members."

25  Q.  Okay.  So it's manager or managing member; correct?

O79VGUO1                        Barnett - Redirect

1    A.  That's correct.

2    Q.  And by the document, you were a manager and not a managing

3    member; correct?

4            MS. MURRAY:  Objection.

5            THE COURT:  Sustained.

6    Q.  Did you realize this distinction when you answered the

7    question yesterday, not when Mr. Fergenson asked you the

8    question?

9            MS. MURRAY:  Objection, your Honor.

10           THE COURT:  Sustained.

11   Q.  Mr. Barnett, you were not the owner of Taurus Management;

12   correct?

13   A.  No, I was not.

14   Q.  In fact, Taurus Management is owned by Taurus Management,

15   right?

16   A.  As far as I know.

17           MS. SHROFF:  We can take that down.

18   Q.  Mr. Barnett, do you recall speaking with Ms. Murray on

19   May 18 of 2024?

20   A.  Yes.

21   Q.  Did you have a meeting or a phone call?

22   A.  I think it was a meeting.  I don't recall.  I think it was

23   a meeting.

24   Q.  And where was that meeting?

25   A.  I believe at the U.S. Attorney's Office.

O79VGUO1                     Barnett - Redirect

1  Q.  And how many people were there?

2  A.  It was myself, my attorneys, and one individual from the

3  FBI, Marie, and one other person.

4         THE COURT:  Please speak into the microphone.

5         THE WITNESS:  I'm sorry.  I'm trying to remember who

6  was in the room.

7         THE COURT:  I just want you to bring the microphone

8  closer to your mouth.

9         THE WITNESS:  Sorry.

10  Q.  Mr. Barnett, at the end of that meeting, was it your

11  understanding that you were going to be called as a witness for

12  the government?

13         MS. MURRAY:  Asked and answered.

14         THE COURT:  Sustained.

15         MS. SHROFF:  I didn't ask at the end of this meeting,

16  your Honor.

17         THE COURT:  Sustained.

18  Q.  Were you asked by the United States government to testify

19  here?

20         MS. MURRAY:  Asked and answered.

21         THE COURT:  Sustained.

22  Q.  Mr. Barnett, between yesterday and today, have you given

23  truthful testimony?

24  A.  Yes, I have.

25         MS. SHROFF:  Thank you very much.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79VGUO1                          Barnett - Recross

1              I have no further questions.

2              THE COURT:  Is there any recross?

3              MS. MURRAY:  Yes, your Honor.  Briefly.

4    RECROSS EXAMINATION

5    BY MS. MURRAY:

6    Q.  Mr. Barnett?

7    A.  Yes.

8    Q.  You testified Mr. Guo was in Mahwah maybe two to three

9    times a week after he purchased the property; is that right?

10   A.  That's correct.  It was an estimate.

11   Q.  By the way, were there Legos at the Guo family homes?

12   A.  Yes.

13   Q.  Who in the Guo family liked Legos?

14   A.  I believe it was Mrs. Guo.

15   Q.  And there were a lot of Legos at Mahwah; correct?

16   A.  That's correct.

17             MS. MURRAY:  Your Honor, the government offers

18   pursuant to Government Stip 5, Government Exhibit NJ252.

19             THE COURT:  It is admitted.

20             (Government's Exhibit NJ252 received in evidence)

21             MS. MURRAY:  Ms. Loftus, can we please pull up

22   Government Exhibits NJ111 and 354.

23   Q.  Mr. Barnett, were there Legos at the Guo family home in

24   Greenwich as well?

25             THE COURT:  There's nothing on the screen.

1      MS. MURRAY:  I understand.  I'm just asking questions

2  while we wait for the document to come up.

3      THE COURT:  All right.

4      MS. MURRAY:  Thank you.

5  A.  Yes.

6  Q.  Were there Lego structures at the Sherry-Netherland

7  residence as well?

8  A.  Yes.

9      MS. MURRAY:  Just give a moment to pull up those

10  documents.

11  Q.  While we're waiting, Mr. Barnett, Mr. Guo's wife liked to

12  work in the garden at Mahwah, isn't that right?

13  A.  That's correct.  That's her hobby.

14  Q.  Starting with the photo on the left, Mr. Barnett, or both

15  photos, do you recognize the room depicted in these photos?

16  A.  Yes.

17  Q.  Where is that room?

18  A.  That room is immediately to the left as you enter the front

19  door.

20  Q.  The front door of what residence?

21  A.  Sorry.  Mahwah, New Jersey.

22      MS. MURRAY:  And Ms. Loftus, on the photo on the left,

23  if we could zoom in on the items that are on the shelves,

24  please.

25  Q.  Mr. Barnett, those are some of the Lego structures that

```
 1    were at the Mahwah house; correct?
 2    A.  Yes.
 3            MS. MURRAY:  We can take those down.
 4    Q.  You spoke some yesterday and today about the Liberty yacht,
 5    right?
 6    A.  Yes.
 7    Q.  And Ms. Shroff showed you an email that you received from
 8    the Liberty yacht captain; correct?
 9    A.  Yes.
10    Q.  Your attorneys produced some of those emails regarding the
11    Liberty to the government, right?
12    A.  Yes.
13    Q.  And Max Krasner also received those emails; is that right?
14    A.  Yes.
15            MS. MURRAY:  Ms. Loftus, if we could please pull up
16    just for the witness and the parties Government Exhibit SB217.
17    We could zoom in on the top so Mr. Barnett can see that.
18    Q.  Mr. Barnett, what is this?
19    A.  I'm sorry, I'm having a real hard time seeing that.
20    Q.  Sure.  We'll try to make it larger.
21    A.  That was an email that was sent to myself, Max Krasner.  I
22    don't recognize the other two names.
23    Q.  This is one of the emails you received regarding the
24    Liberty yacht; correct?
25    A.  Yes.
```

1            MS. MURRAY:  Your Honor, the government offers

2    Government Exhibit SB217.

3            THE COURT:  It is admitted.

4            (Government's Exhibit SB217 received in evidence)

5            MS. MURRAY:  We can publish it, Ms. Loftus.  We can

6    zoom out of the top.  And we can go down to the next page,

7    please.  And the next.  We could just scroll through.  And stop

8    there, please.  We could zoom in on the photo of the yacht

9    itself here.

10   Q.  Mr. Barnett, you see the word "Liberty" on the back of that

11   yacht; correct?

12   A.  Yes.

13   Q.  Do you know who picked the font for that "Liberty" writing

14   on the back of the yacht?

15   A.  I have no idea.

16           MS. MURRAY:  We can take that down, Ms. Loftus.

17   Q.  Mr. Barnett, the Mahwah residence was purchased by the

18   Taurus Fund; correct?

19   A.  Yes.

20   Q.  And as we've established again today, you were the manager

21   of the Taurus Fund on paper, right?

22   A.  On paper.

23           MS. SHROFF:  Objection to her commentary.

24           THE COURT:  Overruled.

25   Q.  Aaron Mitchell gave you that paperwork to sign, right?

O79VGUO1                        Barnett - Recross

 1  A.  Yes.

 2  Q.  He was one of Guo's family lawyers; correct?

 3  A.  Yes.

 4  Q.  But you didn't own the Mahwah residence in fact, isn't that

 5  right?

 6  A.  No, I did not.

 7  Q.  You did not pay $24 and a half million of your own money to

 8  purchase the Mahwah residence; correct?

 9          MS. SHROFF:  Assumes facts not in evidence.

10          THE COURT:  Overruled.

11          MS. SHROFF:  He doesn't have any personal knowledge.

12          THE COURT:  Overruled.

13          Ms. Shroff, if you want to make an objection, make an

14  objection.  No testimony or commentary.

15          Go ahead.

16          MS. MURRAY:  Ms. Loftus, can you please pull up what's

17  in evidence as Government Exhibit NJ807.

18  Q.  While we're waiting, Mr. Barnett, the Liberty, the yacht

19  that we just looked at in your photos in the emails, that was

20  Miles Guo's yacht; correct?

21          MS. SHROFF:  Objection to the form.

22          THE COURT:  Overruled.

23  A.  I don't -- I don't know who bought the personal yacht.

24  Q.  Looking at this document, this is NJ807, this is a

25  residential lease agreement; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79VGUO1                        Barnett - Recross

1          MS. SHROFF:  Your Honor, is there a question to the

2     witness?  That's an objection from me.

3          THE COURT:  That is a question.

4          Sir, do you know if this is a residential lease?

5          THE WITNESS:  I know it says it on there.

6          MS. MURRAY:  And if we could zoom in on the top,

7     please, Ms. Loftus.

8     Q.  The tenant listed here is — I'm going to spell the name —

9     N-G-O-K, H-I-N-G, C-H-I; correct?

10    A.  Yes, that's what it says.

11    Q.  That's Mr. Guo's wife, right?

12    A.  I have no idea.

13    Q.  The address listed here, 373 Taconic Road in Greenwich,

14    that's the Guos' Greenwich residence; correct?

15    A.  That's correct.

16    Q.  And that's where you still work for Mei Guo today, right?

17    A.  That's correct.

18    Q.  Have you ever seen this residential lease agreement before?

19    A.  Not that I'm aware of.

20         MS. MURRAY:  We could zoom out of this, please.  And

21    we could focus on Item 1, property.

22    Q.  This indicates that the individual listed here with the

23    last name Chi is agreeing to lease the Mahwah property;

24    correct?

25    A.  Yes, it appears that way, yes.

1          MS. MURRAY:  We can zoom out of that, please,

2    Ms. Loftus.

3          THE COURT:  But in what role, as the landlord or the

4    tenant?  I'm asking the witness.

5          THE WITNESS:  I'm sorry, ma'am?

6          MS. SHROFF:  Your Honor, the witness has -- I object

7    because the witness has never seen this document before and is

8    being asked to read from it.

9          THE COURT:  Overruled.

10          My question is whether or not the individual is acting

11    as the landlord or tenant of the property?

12          MS. SHROFF:  Your Honor, I object to the government

13    highlighting the document.

14          MS. MURRAY:  Ms. Shroff, I'm not doing anything nor

15    did I direct it.

16          THE COURT:  Overruled.  Please answer.

17          THE WITNESS:  On the document it says "and tenant";

18    assuming they are acting as the tenant.

19          THE COURT:  Go ahead.

20    BY MS. MURRAY:

21    Q.  And on this document, Taurus Fund SP is listed as landlord;

22    correct?

23    A.  Yes, on the document, that's correct.

24          MS. MURRAY:  We can take this down, Ms. Loftus, and go

25    to Government Exhibit SIL57.  We could zoom in on the top.

O79VGUO1                         Barnett - Recross

1    Q.  Mr. Barnett, in this bank record, which is in evidence,
2    what is the title of the account?
3            MS. SHROFF:  Your Honor I have a continuing objection
4    to asking a witness to read documents he has no knowledge of.
5            THE COURT:  This is a document which is in evidence.
6    It's proper to ask the witness questions about documents that
7    have been admitted.
8            You may continue.
9    A.  The document states:  Hamilton Opportunity Fund SPC.  And
10   then on the bottom of that it says:  Taurus Fund SP.
11   Q.  And below that, what is the name of officer number one in
12   this bank record?
13   A.  Kin Ming Je, if I'm pronouncing that correctly.  If not, I
14   apologize.
15   Q.  Do you know who that is?
16   A.  I have no idea who that is.
17           MS. MURRAY:  We can take this down.
18   Q.  Mr. Barnett, you talked yesterday about money you received
19   from individuals you don't know; correct?
20   A.  Correct.
21   Q.  You understood them to be followers of Miles Guo, right?
22           MS. SHROFF:  Objection.
23           THE COURT:  Overruled.  You may answer.
24   A.  No, I don't know them at all.
25   Q.  With respect to their relationship, if any, with Miles Guo,

1   you understood them to be fellow fighters, right?

2           MS. SHROFF:  Objection.

3   A.  I really don't have any knowledge --

4           THE COURT:  Asked and answered.  You may continue.

5   Q.  You also talked about your Go Fund Me account, right?

6   A.  Yes.

7   Q.  And the purpose of that was to fund your attorneys' fees;

8   correct?

9   A.  That's correct.

10  Q.  Because you were sued in the bankruptcy proceeding relating

11  to the Guos' Mahwah residence, right?

12  A.  That's correct.

13  Q.  And it's expensive to defend yourself in a lawsuit, right?

14  A.  Yes, it is.

15  Q.  One of the people who sent money to your Go Fund Me was

16  Qidong Xia, X-I-A, or Brother Long Island; correct?

17  A.  I don't -- I don't have that list in front of me, so I'll

18  take your word for it.

19  Q.  You've driven that person before, correct, Long Island

20  David, Brother Long Island?

21  A.  Oh, yes, that's correct.

22  Q.  Mr. Barnett, you don't have a view of the Chinese Communist

23  Party, do you?

24  A.  A personal view, ma'am?

25  Q.  Correct.

1    A.  I guess I do.  I don't know if you want me to share that.

2    Q.  You don't view yourself as a freedom fighter against the

3    CCP, do you?

4    A.  No, I do not.

5    Q.  You're not a member of the NFSC or the New Federal State of

6    China, right?

7    A.  No, I'm not.

8    Q.  You've seen some of the comments that are posted on the Go

9    Fund Me page that you have; correct?

10   A.  Yes.

11   Q.  Comments from people who sent you money, right?

12   A.  Yes.

13   Q.  You're aware that people sending you money referenced your

14   "fighting against the CCP"; correct?

15   A.  Yes, I believe I saw that.

16   Q.  Mr. Barnett, you don't take any actions to fight against

17   the CCP, do you?

18   A.  No, not personally, no.

19             MS. MURRAY:  May I have a moment, your Honor?

20             THE COURT:  Yes.

21             (Counsel conferred)

22             MS. MURRAY:  Nothing further.  Thank you.

23             THE COURT:  All righty.

24   REDIRECT EXAMINATION

25   BY MS. SHROFF:

1    Q.  Good morning again, Mr. Barnett.

2    A.  Good morning.

3    Q.  Mr. Barnett, you were shown pictures of Legos; correct?

4    A.  Yes.

5    Q.  And you were asked questions about where there were Legos,

6    in which places; correct?

7    A.  Yes.

8    Q.  Does Mrs. Guo speak English at all?

9    A.  Not to my knowledge, no.

10   Q.  When Mrs. Guo travels, doesn't she take Legos with her?

11   A.  I believe I've seen that once, yes.

12   Q.  And, in fact, no matter where she goes, she takes Legos

13   with her because she does Legos; correct?

14   A.  She does do Legos.  I only can verify the one time I saw

15   her take Legos.

16   Q.  And Mr. Barnett, isn't it fair to say that another thing

17   that she does is garden; correct?

18   A.  Yes, quite often.

19   Q.  And would it also be fair to say that both activities do

20   not involve the use of English; correct?

21   A.  No.

22   Q.  I really would like it if you would help me and keep your

23   voice up or use the mic.

24   A.  Sorry.

25   Q.  That neither activity involves the use of English; correct?

O79VGUO1                        Barnett - Redirect

 1   A.  No.

 2   Q.  When Mrs. Guo gardened at Mahwah, do you recall what it is

 3   that she was growing or attempting to grow?

 4          MS. MURRAY:  Your Honor, objection to relevance.

 5          This is re-redirect.

 6          MS. SHROFF:  This is what she brought up, gardening.

 7          THE COURT:  It's within the scope of gardening.

 8   Q.  You know what?  I'll rephrase that question for you,

 9   Mr. Barnett.

10          Is it fair to say that Mrs. Guo was trying to see if

11   they could implement a vegetable garden at Mahwah?

12          THE COURT:  You may comment on whether you know if it

13   was vegetables or something else.

14   A.  They looked like vegetables.  I don't -- I'm not a gardener

15   myself, so I don't --

16   Q.  And it was huge, right?

17   A.  Yes, it was.

18   Q.  Could feed 20 or 30 people; correct?

19          MS. MURRAY:  Objection, your Honor.  Speculation.

20   Q.  Could it feed 20 or 30 people?

21          THE COURT:  You may answer.

22   A.  I don't know.

23   Q.  You were asked questions about SB217.

24          MS. SHROFF:  You know, Ms. Loftus, if I may impose

25   upon you, it might just -- oh, you have it?  Thank you, Jorge.

1   Q.  You were shown these pictures, right?

2   A.  Yes.

3   Q.  Do you know anything about this boat?

4   A.  Yes.

5   Q.  What do you know about it, in a nutshell?

6   A.  The only things I know about it were the mechanical issues

7   with the boat.  That's the most knowledge that I have of the

8   boat.  And the only reason I know that is from the

9   conversations I had with the captain at the time.

10  Q.  Okay.

11          MS. SHROFF:  Thank you.  We can take that down.

12  Q.  Ms. Murray asked you questions about whether or not Aaron

13  Mitchell gave you paperwork to sign; correct?

14  A.  Yes.

15  Q.  Did Mr. Mitchell make you sign those documents in front of

16  him?

17  A.  No.

18  Q.  Did he give you time to read them?

19  A.  I believe so.  They were sent to me via -- I don't know if

20  it was email or WhatsApp, but, yes.

21  Q.  Do you know how much Mahwah costs?

22  A.  I do now.

23  Q.  No, before -- before the government told you, did you know

24  how much Mahwah costs?

25          MS. MURRAY:  Objection.

O79VGUO1                     Barnett - Redirect

1              THE COURT:  Overruled.

2   A.  I had a guess on what it cost.

3   Q.  Nobody shared the price with you, right?

4   A.  Not that I remember.

5   Q.  Okay.  Let's look at NJ807.

6              Do you recall being shown this document?

7   A.  Yes.

8   Q.  And Mr. Horton had a portion highlighted for you.

9              MS. MURRAY:  Objection, your Honor.

10             MS. SHROFF:  And I'd ask that the same portion be

11  highlighted now.

12             THE COURT:  So no testifying.

13  Q.  You see that name there where it says "between landlord and

14  tenant"; correct?

15  A.  Yes.

16  Q.  All right.  So this document, you correct me if I'm wrong,

17  is a residential lease agreement, okay.  And the tenant is

18  going to be Miles Guo's wife; is that right?

19  A.  Yes, that's correct.

20  Q.  And she is going to rent -- what contraption is she

21  planning to rent in this lease agreement?

22             MS. MURRAY:  Speaks for itself.

23             THE COURT:  You're asking what property is being

24  rented?

25             MS. SHROFF:  Yes.

O79VGUO1                         Barnett - Redirect

 1              THE COURT:  Go ahead.

 2              MS. SHROFF:  Let's keep scrolling down and let's go to

 3    paragraph number one.

 4    A.  According to the document, it says 675 Ramapo Valley Road,

 5    which is the residence in New Jersey.

 6    Q.  Okay.  So Miles Guo's wife is going to rent Mahwah?

 7              MS. MURRAY:  Asked and answered.

 8              MS. SHROFF:  I'll move on.

 9              THE COURT:  Sustained.

10              MS. SHROFF:  We can take that down.

11              Let's look at SIL57.

12    Q.  You were asked questions about -- you actually were just

13    asked to read this document, right?

14    A.  Yes.

15    Q.  Okay.  And do you have any information about anything on

16    this piece of paper?

17    A.  No.

18    Q.  Okay.

19              MS. SHROFF:  We can take that down.

20    Q.  You were asked questions about somebody named Kin Ming Je,

21    and then you were asked questions about your Go Fund Me

22    account, right?

23    A.  That's correct.

24    Q.  Okay.  You were also asked a question, were you not, about

25    your views on CCP?

O79VGUO1                        Barnett - Redirect

1    A.   Yes.

2    Q.   Could you tell us your views on the CCP?

3    A.   My personal views on the CCP are based on what I've read

4    and what I've heard news-wise.  They are based on principles

5    that I don't agree with, which is oppressing people.  I don't

6    really know how else to expand on that without -- I just

7    don't -- I don't agree with their philosophies of how they

8    treat their people.

9    Q.   And if somebody sent you money because they wanted to

10   support your philosophy, would there be something wrong with

11   that?

12               MS. MURRAY:  Objection.

13               THE COURT:  Sustained.

14   Q.   Mr. Barnett, the people who sent you money on your Go Fund

15   account, they left comments for you; correct?

16   A.   Yes.

17   Q.   And each comment, how did you receive those comments, in a

18   positive or negative way?

19   A.   I received everything that -- everything that I received, I

20   received in a positive way.

21   Q.   And Ms. Murray asked you questions about Long Island David;

22   correct?

23   A.   Yes.

24   Q.   And he supported you on the Go Fund Me page, is that right?

25   A.   Yes.

O79VGUO1                          Barnett - Redirect

1   Q.  Did he ask you for anything in return?

2   A.  No.

3   Q.  In fact, did anybody who gave you money on your Go Fund Me

4   page ask for anything from you in return?

5   A.  No.

6   Q.  And the last question you were asked by Ms. Murray was

7   whether or not you had taken any actions against the CCP;

8   correct?

9   A.  Yes.

10  Q.  Do you know of an action an American citizen can take

11  against the CCP?

12          MS. MURRAY:  Objection.

13          THE COURT:  Sustained.

14  Q.  Mr. Barnett, would you be supportive of actions against the

15  CCP?

16  A.  If they were taken by the U.S. government, I would be.

17  Q.  How about if they were taken by people?

18  A.  It depends on what those actions were, ma'am.  If they were

19  legal actions, then I don't have an issue with that.

20  Q.  And you'd support them, right?

21  A.  Yes.

22  Q.  Thank you.

23          MS. SHROFF:  I have nothing further.

24          MS. MURRAY:  Nothing further.

25          THE COURT:  All righty, sir.

O79VGUO1                          Leanne Li - Direct

1            You may step out of the courtroom.

2            THE WITNESS:  Thank you.

3            (Witness excused)

4            THE COURT:  And the defense may call its next witness.

5            MS. SHROFF:  Your Honor, may I step out for a minute?

6            THE COURT:  Yes.

7            Ma'am, if you would just restate your name to remind

8    the jurors of your identity.

9            THE WITNESS:  Okay.  All right.

10           My name is Leanne Li.

11           THE COURT:  Okay.  Go ahead.

12           You don't need to spell it at this point.

13           So we're going to continue with her testimony.

14           Remember that you're still under oath.

15    LEANNE LI,

16        called as a witness by the Defendant,

17        having been previously duly sworn, testified as follows:

18    DIRECT EXAMINATION (continued)

19    BY MS. SHROFF:

20    Q.  Ms. Li, I believe we left off yesterday when you were

21    telling us about the followers you had on your YouTube account,

22    do you recall that?

23    A.  I think the last question was -- you were asking me was my

24    follower on Guo Media.

25    Q.  And go ahead.  And if you could answer that.

O79VGUO1                        Leanne Li - Direct

1   A.  Yeah.  That one I don't remember.

2   Q.  Do you remember on what app you had followers?

3   A.  I have YouTube channels.

4   Q.  How many YouTube channels did you have?  Thank you.

5   A.  Okay.  So I personally have one, and another one upload all

6   the pictures on the VOG, the English channels.

7   Q.  And at the time that you were uploading videos, how many

8   followers did you have on the YouTube account?

9   A.  Okay.  So on my personal ones, I think roughly around

10  1,600.  And then the one was on the VOG, the English Channel,

11  because I put most picture -- most videos on there.  So I'm

12  thinking is more than 6,000, I think, more than.

13  Q.  Now, Ms. Li, going back to when Mr. Guo contacted you, did

14  you respond to the direct message you received from him?

15  A.  Yes.

16  Q.  And was it a text message that you received or a voice

17  note?

18  A.  Voice note.

19  Q.  And did you have further conversations or voice -- did you

20  ever have -- I'll rephrase that question.

21          Did you respond via voice note or by text?

22  A.  To be honest, I don't remember.

23  Q.  And what was the gist of the exchange between you and

24  Mr. Guo?

25          MS. MURRAY:  Objection.  Hearsay, your Honor.

 1              THE COURT:  One moment, please.

 2              (Pause)

 3              THE COURT:  Sustained.

 4    Q.  Ms. Li, as a result of that exchange, did you take any

 5    steps?

 6    A.  What do you mean by that?

 7    Q.  Did you do anything after you got a reach-out from Mr. Guo?

 8    A.  He shared --

 9              THE COURT:  Okay.  Let me just explain that you're not

10    allowed to repeat something that someone has said to you.

11              THE WITNESS:  Oh, I'm really sorry.

12              THE COURT:  That's okay.  Go ahead.

13    A.  Do you mind rephrase the question again?  Sorry.

14    Q.  What did Mr. Miles Guo do next?

15              MS. MURRAY:  Objection.  How would she know?

16              THE COURT:  So, for example, if you had a conversation

17    with somebody, you can say, I had the conversation.  But you

18    cannot say what the other person said.  You cannot repeat the

19    discussion.

20              THE WITNESS:  I understood.

21              THE COURT:  And with respect to the question about

22    what Mr. Guo did, if you know what he did, you can say so, if

23    you have personal knowledge.

24              THE WITNESS:  Okay.

25              THE COURT:  Okay.  Very good.

O79VGUO1                           Leanne Li - Direct

1           THE WITNESS:  Thank you for the explanation.

2   A.  He shared his WhatsApp with me.

3   Q.  And after he shared his WhatsApp with you, did he invite

4   you into any groups?

5   A.  Yes.

6   Q.  And what groups were they?

7   A.  Take Down the CCP Group, I think.

8   Q.  And on what application was Take Down the CCP Group?

9   A.  WhatsApp.

10  Q.  Is WhatsApp an app available on your iPhone?

11  A.  Yes.

12  Q.  And before you started speaking with Mr. Guo, did you

13  already have that app on your iPhone?

14  A.  Yes.

15  Q.  Were there other people in the Take Down the CCP Group?

16  A.  Yes.

17  Q.  How many?

18  A.  At that time was roughly around like 10 or 15 people.

19  Q.  Could you tell the names of each one of the 10 or 15

20  people?

21  A.  I think Lude was there --

22  Q.  I'm sorry, I wasn't asking you the names.  You could tell

23  who the 10 or 15 people were; correct?

24  A.  Sorry?

25  Q.  Let me try it again.

O79VGUO1                        Leanne Li - Direct

1              You were in a WhatsApp group; correct?

2   A.  Correct.  Correct.

3   Q.  And could everybody in the group respond?

4   A.  Yes.

5   Q.  Could everybody in the group speak, so to speak?

6   A.  Yes.

7   Q.  And could you see who was talking at any given time?

8   A.  Yes.

9   Q.  Do you recall, sitting here today, if everybody

10  participated in this group?

11             THE COURT:  What do you mean by "everybody"?

12  Q.  The members -- the ten people or 12 people who were in the

13  group, did everybody speak?

14  A.  Yes.

15  Q.  Did the size of this group increase?

16  A.  Yes.

17  Q.  And to what number did it increase to?

18  A.  Over 100.

19  Q.  And what were the topics that were discussed in this chat

20  group?

21  A.  People will exchange information about -- about CCP, what

22  they have done, and then the news --

23  Q.  Would you slow down, please.

24  A.  Okay.  I'm sorry.

25             The news that were taboos in China.  And some people

1   will share the summary of Mr. Miles Guo's live broadcast.

2   Q.  What were topics that were considered taboo in China?

3           MS. MURRAY:  Objection, your Honor.

4           It is getting to hearsay at this point.

5           MS. SHROFF:  They are not being offered for the truth.

6           THE COURT:  You may answer that question.

7   A.  Okay.  So, for example, on June 4th, on the Tiananmen

8   massacre, organ harvesting.

9   Q.  What did you say?

10          THE COURT:  Organ harvesting.

11  Q.  Okay.

12          And were these topics discussed in the group chat?

13  A.  Yes.

14  Q.  And at that time, Ms. Li, were you working?  Did you have a

15  job?

16  A.  Yes.

17  Q.  And what was your job at that time?

18  A.  Realtor.

19  Q.  And for whom were you a Realtor?

20  A.  I was working for McDonnell Realty.

21  Q.  And where was McDonnell Realty located?

22  A.  Zurich.

23  Q.  Where?

24  A.  Zurich.

25  Q.  And where were you based when you worked for them?

1   A.  Greater Vancouver, everywhere.

2   Q.  And did McDonnell Realty have an office in Vancouver?

3   A.  Yes.

4   Q.  For how long did you work for them?

5   A.  Probably one -- one year or so.

6   Q.  And at the time that you were working for them, did you

7   also do anti-CCP work?

8   A.  Yes.

9   Q.  What work did you do?

10  A.  I translate Mr. Miles' live broadcast.  And then, as I

11  said, the most summarize -- not summarize, that's wrong word.

12  I should say I translate the most important parts of his live

13  broadcast with English subtitles.

14  Q.  Other than that, did you do any other work?

15  A.  No.

16  Q.  Ms. Li, did there come a time when you became the

17  coordinator for the founding of the New Federal State of China?

18  A.  Yes.

19  Q.  And could you tell us what is the New Federal State of

20  China?

21  A.  New Federal State of China is -- based on my understanding,

22  New Federal State of China is organization with government

23  that's going to replace the CCP, and where many people are

24  waiting for this day to come because we promote the Rule of

25  Law, democracy, right to vote, freedom of religion.

O79VGUO1                         Leanne Li - Direct

1    Q.  Ms. Li, could you tell the jury what you did as a

2    coordinator for the NFSC?

3    A.  So at that time, we have a different groups.  We have

4    translation groups, we have video groups, new federal state

5    flag groups, and also manufacturing new federal -- New Federal

6    State China flag group.  So I was coordinating between all of

7    these groups and making sure that we have a successful launch.

8    Q.  What launch are you referring to?

9    A.  I'm referring to the establishment of New Federal State of

10   China.

11   Q.  And when was it supposed to launch?

12   A.  On June 4th.

13   Q.  Of what year?

14   A.  2020.

15   Q.  Did it launch on June 4th of 2020?

16   A.  Yes.

17   Q.  And where was the announcement made from, do you know?

18   A.  New York.

19   Q.  And who made the announcement?

20   A.  It was Mr. Miles and Steve Bannon.

21   Q.  And who else?

22   A.  And Hao Hai Dong and Yezhao Ying.

23   Q.  And who was the last person?

24   A.  Yezhao Ying.

25   Q.  And who's that?

O79VGUO1                    Leanne Li - Direct

1   A.  Hao Hai Dong, he is a very famous soccer player in China.

2   And Yezhao Ying, she is the badminton world champion.  She has

3   won many awards in Olympics, gold medals.

4   Q.  Ms. Li, as a result of this volunteer work, were you

5   offered a job?

6   A.  Yes.

7   Q.  And what job were you offered?

8   A.  Executive directors in G Fashion L.A.

9   Q.  And what is G Fashion L.A.?

10  A.  G Fashion L.A. is a global luxurious brand.  We selling

11  clothings.

12  Q.  And were you given a geographical place where you would be

13  working from?

14       MS. SHROFF:  You know, that was an awkward question.

15  I withdraw it, your Honor.

16  Q.  Where were you going to be based?

17  A.  Okay.  So I will be based in L.A.

18  Q.  And did you, in fact, move from Vancouver to L.A.?

19  A.  Yes.

20  Q.  And where -- you know what?  Let me backtrack.

21       Who told you about this job opportunity?

22  A.  Mr. Miles.

23  Q.  And as a result of that, were you interviewed for the job?

24  A.  Yes.

25  Q.  And did you eventually move to L.A.?

O79VGUO1                          Leanne Li - Direct

1    A.  Yes.

2    Q.  Where did you live?

3    A.  In L.A.?

4    Q.  Yes, where in L.A.?

5    A.  Melrose.

6    Q.  At that time, did you have an office for G Fashion L.A.?

7    A.  No.

8    Q.  And at that time, how old were you, Ms. Li?

9    A.  Thirty or 31.

10   Q.  Ms. Li, did you view your work with G Fashion as supporting

11   anti-CCP or the whistleblower movement?

12   A.  Yes.

13   Q.  Did G Fashion have a physical office space in L.A.?

14        MS. MURRAY:  Asked and answered.

15        THE COURT:  Sustained.

16   Q.  Where was G Fashion working out of when you first got to

17   L.A.?

18   A.  At that time we don't have an office, so we worked from my

19   residential place in L.A.

20   Q.  And where was your residential place?

21        MS. MURRAY:  Asked and answered.

22        THE COURT:  Sustained.

23   Q.  Where in Los Angeles was your residential place?

24        MS. MURRAY:  Same objection.

25        THE COURT:  Are you asking for an address, a specific

1    address or a neighborhood?

2            MS. SHROFF:  I apologize, your Honor.  I'll move on.

3    Q.  Who paid the rent for your residence?

4    A.  G Fashion.

5    Q.  And were there other employees who worked out of G Fashion

6    L.A.?

7    A.  Yes.

8    Q.  Who?

9    A.  At that time we were three people, so Kamel, Hao Tian --

10   Q.  Ms. Li, let's try again.

11           There were three people; correct?

12   A.  Correct.

13   Q.  Who's the first?

14   A.  Kamel.

15   Q.  How do you spell his name?

16   A.  K-A-M-E-L.

17   Q.  And do you know his last name?

18   A.  Dubech, but I don't know how to spell it.

19           MS. SHROFF:  Your Honor, may I spell it for the

20   record?

21           THE COURT:  Go ahead.

22           MS. SHROFF:  D-U-B-E-C-H.

23           MS. MURRAY:  Your Honor, for the record, it's

24   D-E-B-E-C-H-E.

25           MS. SHROFF:  We disagree, your Honor, but we can move

1    on.

2    BY MS. SHROFF:

3    Q.  What was his job title, Ms. Li?

4    A.  He was CEO of G Fashion.

5    Q.  And then the second person you said was Tian Hao, am I

6    pronouncing it correctly?

7    A.  Yes.

8    Q.  What was her position?

9    A.  Executive assistant.

10   Q.  Ms. Li, were you responsible for hiring people to work at G

11   Fashion L.A.?

12   A.  Together with Kamel, yes.

13   Q.  And did you and Kamel together hire anyone to work at G

14   Fashion L.A.?

15   A.  Yes.

16   Q.  Go ahead and tell us, please, who you hired jointly.

17   A.  Oh, we hired designers, graphic designers, patternmaker,

18   tack pack.

19          THE COURT:  What does that mean?

20          THE WITNESS:  You know, like when designer, they

21   finish the drawing, right, and then they need to transfer to a

22   technical drawing.  So the factories, they are able to

23   understood that, so they can make it to come true, make that

24   drawing come into a real piece.  So that's called tack pack.

25   A.  And I hired a legal counsel, like, yeah.  And HR manager.

1    And a merchandiser.  Fabric manager.

2    Q.  Ms. Li, who determined the salary for each one of these

3    individuals?

4           THE COURT:  You may answer.

5    A.  Kamel and I.

6    Q.  Did there come a time when G Fashion L.A. was shut down?

7    A.  Yes.

8    Q.  When was that?

9    A.  2021 May, in May.

10   Q.  And Ms. Li, do you know why G Fashion L.A. was shut down?

11   A.  I don't know.

12   Q.  And once it was shut down, what did you do?

13   A.  I moved back to Vancouver.

14   Q.  Did you continue volunteering?

15   A.  Yes.

16   Q.  Upon your return to Vancouver, did you look for a paying

17   job?

18   A.  Not at that time because I want to spend some quality time

19   with my mom.

20   Q.  What did you do as a volunteer during that time period

21   after you returned to Vancouver?

22   A.  I continued to do the videos, you know, the short clip

23   videos, and doing some translation job and the -- and helping

24   Mr. Miles look for the properties for the New Federal State of

25   China.

1    Q.  What type of properties were you looking for?

2    A.  We're looking for a property that contains like larger land

3    and especially the zoning was very important.

4              THE COURT:  Zoning?

5              THE WITNESS:  The zoning, yes, the zoning.  So allowed

6    us to build multiple properties on the land.

7    Q.  Go ahead.

8    A.  And the same time we were looking for somewhere that's

9    secure.  And secure for us to do live broadcast, secure place

10   for us to hold guests, secure place for all the -- all the

11   supporters to come and meet.

12   Q.  Could you tell the jury how you searched for a base for the

13   New Federal State of China?

14             MS. MURRAY:  Mischaracterizes.

15             THE COURT:  Sustained.

16             This is assuming facts that are not in evidence.

17   Q.  Ms. Li, were you looking for a space for a base for the New

18   Federal State of China?

19             MS. MURRAY:  I'm going to object to testifying.

20             THE COURT:  I'm going to permit the question.

21   A.  Yes.

22   Q.  Could you tell the jury how you undertook that search?

23   A.  I just Google, and then I have used -- there's one website

24   I really like, it's called Zillow, I think.  And then I use

25   that to search.

1  Q.  And after you would search, what would you then prepare?

2  A.  And then I will prepare a deck.

3  Q.  Could you tell the ladies and gentlemen of the jury what is

4  a deck?

5  A.  I'm sorry.  The deck -- I use deck because we're using

6  fashion, so I use -- so it's pretty much --

7  Q.  Ms. Li?

8  A.  Sorry, I'll slow down.

9          It's like a Power Point presentation.

10 Q.  And would you prepare Power Points for each property you

11 found?

12 A.  Yes.

13 Q.  And what would the Power Point include?

14 A.  How many rooms, where it is located.  Sometimes I will

15 include the property tax and a lot of the pictures.  Location

16 were important.  Did I say weather?  Weather conditions?  Yeah.

17 Q.  Ms. Li, when did you first start working on identifying

18 properties that would serve as a base for the New Federal State

19 of China?

20 A.  I think it was starting 2020.

21 Q.  And what were some of the physical -- what were some of the

22 places that you looked for these properties?  Which states or

23 countries?

24 A.  Mainly U.S.  California, Texas, Colorado, Hawaii,

25 Connecticut.  And I have also searched some islands around the

1   U.S.

2   Q.  Did you physically travel to any of these places?

3   A.  No.

4   Q.  Why not?

5   A.  There are two reasons, okay.  So the first reasons, some of

6   the price was too high --

7   Q.  No, did you -- I'm sorry.

8   A.  Sorry.

9   Q.  Maybe you miss -- I'll let you continue.  Sorry.

10          Did you physically travel to look at these locations?

11  A.  No.

12  Q.  Why not?

13  A.  So there are two reasons.  So one, you know, the -- the

14  property was never chosen because there were two factors,

15  right.  One is too expensive, and the zoning was -- is not

16  right.

17  Q.  Ms. Li, my question was did you physically travel to look

18  at these properties?

19  A.  No.

20  Q.  Why?

21  A.  Because --

22  Q.  What was going on in 2020?

23  A.  Okay.  Pandemic.

24  Q.  After you prepared these -- did you prepare decks for every

25  property you looked at?

O79VGUO1                          Leanne Li - Direct

1   A.  Yes.

2   Q.  And did you share those decks with anyone?

3   A.  I only shared with Mr. Miles.

4   Q.  And how did you share them with Mr. Miles?

5   A.  On WhatsApp.

6   Q.  Ms. Li, was any property purchased in 2020 that you are

7   aware of?

8   A.  Darlington.

9   Q.  And where is the Darlington property located?

10  A.  New Jersey.

11  Q.  Where in New Jersey?

12  A.  Mahwah.

13  Q.  Now, let me show you what is marked as GX 134, please.

14          Do you recognize this photograph?

15  A.  Yes.

16  Q.  What is it a photograph of?

17  A.  Darlington.

18  Q.  Ms. Li, did you do any research on the property that you

19  see in Government Exhibit 134 that you've called Darlington?

20  A.  Yes.

21  Q.  What research did you do?

22          Actually, let me withdraw that and ask you this

23  question first:  Who instructed you to do research on this

24  property?

25  A.  Mr. Miles.

O79VGUO1                        Leanne Li - Direct

1          MS. SHROFF:  Your Honor, may I just have one second?

2          THE COURT:  Yes.

3          MS. SHROFF:  You can take that down, please.

4          I apologize, your Honor.  I just need one minute.

5          Could we pull up DX 60760 and 60760-T.

6   Q.  Ms. Li, while the document is being pulled up, do you

7   recall around what month and what year you were asked to

8   research that property?

9   A.  2020.

10  Q.  And --

11  A.  November, I think.  Around November.

12  Q.  And did you, in fact, conduct the research you were asked

13  to conduct?

14  A.  Yes.

15  Q.  And did you, in conducting the research, use the Zillow

16  link?

17  A.  Maybe.  I don't remember.

18  Q.  Let me show you what is marked as DX 60760 and 60760-T.

19          Do you recognize these documents?

20          MS. SHROFF:  If you could -- is there a second page?

21  It's not for the jury, just for the witness.  Thank you.

22  Q.  Do you recognize this document?

23  A.  Yes.

24          MS. SHROFF:  Your Honor, the defense offers 60760 and

25  60760-T.

O79VGUO1                    Leanne Li - Direct

1          MS. MURRAY:  Objection.  Hearsay.

2          THE COURT:  You'll have to step up.

3          (At sidebar)

4          THE COURT:  Why are you objecting?

5          MS. MURRAY:  Your Honor, this is a chat communication

6     between the defendant and the witness.  It's an out-of-court

7     statement.  It's being offered for its truth.  It's including

8     the address of the Mahwah mansion, other context is redacted.

9     My understanding it was in Mandarin.

10         And there are also -- a second basis for the objection

11    is incompleteness.  There are certain voice memos that are sent

12    that are part of this conversation.  They have not been

13    produced and translated in their entirety for the government,

14    so it's not clear to us what the full conversation would be.

15         MS. SHROFF:  So, your Honor, these are not hearsay

16    because it is not an out-of-court statement; it is clearly a

17    direction and an instruction from Mr. Guo to the witness.

18         It is also not being offered for the truth of the

19    matter asserted as to whether or not any of the information

20    borne out in these chats is, in fact, accurate or inaccurate or

21    truthful.  It is a recorded -- or a recording and a

22    present-sense impression of what the witness was doing at the

23    time that she was doing it.

24         THE COURT:  So you're saying that these amount to

25    commands from Mr. Guo?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79VGUO1                          Leanne Li - Direct

1              MS. SHROFF:  Well, it was a command.  According to the

2     government, Mr. Guo commands, and every witness that has

3     appeared in this trial obeys.

4              THE COURT:  But I'm asking from your point of view.

5              MS. SHROFF:  Yes, your Honor.

6              THE COURT:  So we have a problem if the full content

7     of the conversation, a portion of which is audio messages, if

8     they are not produced for the government, they can't review it.

9              MS. SHROFF:  The government has had these documents.

10     We got these documents from the government's Rule 16 discovery.

11     And as I understand it, on the uploaded exhibits, the

12     translations were provided to the government.

13              I do want to caveat this, your Honor.  As I told you

14     yesterday, there had been a machine breakdown, which is why

15     some of the documents were also sent to the government late.  I

16     know you told us to do better, but that was part of the delay

17     in production.

18              THE COURT:  But this is not an explanation for missing

19     transcripts and translations of audio conversations that are

20     part of the chat.

21              MS. SHROFF:  We don't believe --

22              MS. MURRAY:  If I may, your Honor.  I have the

23     document in question here for you to review.

24              So this is 60760-T, which Ms. Shroff referred to.  You

25     can see there are messages.  It references 111 messages in this

1    chart report.  These are excerpted.  They are redacted.

2            I don't see any commands by Mr. Guo.  I see an audio

3    message referenced, the transcript and translation of which the

4    government does not have.  Then I see a response:  Okay, my

5    Mr. Guo.  Then I see a website with no instructions attached to

6    it.

7            Again, I see a PDF that I don't have.  Then I see the

8    witness sending an address; the witness asking Mr. Guo a

9    question.  And then his responses are audio messages, the

10   transcripts and translations of which the government does not

11   have.

12           THE COURT:  So there is an insufficient foundation.

13           I will not permit it to be admitted.

14           Please continue.

15           (In open court)

16           MS. SHROFF:  Your Honor, may I just have a minute?

17           THE COURT:  Yes.

18           MS. SHROFF:  Your Honor, I'm sorry, may we

19   re-approach?

20           THE COURT:  One moment.

21           Yes, you may step up.

22           (At sidebar)

23           MS. SHROFF:  Your Honor, I believe — I don't think I'm

24   wrong, but if I am, we were struggling, so -- the document that

25   is marked as T --

O79VGUO1                    Leanne Li - Direct

1            MS. MURRAY:  It's this one.

2            MS. SHROFF:  Right.  It has the transcription of the

3   voice notes.  I don't know why it's not matching up to what we

4   see.

5            MS. MURRAY:  This was the revised set that we received

6   at 4 in the morning on Sunday -- on Monday.

7            MS. SHROFF:  So each one is broken down for you here.

8   If you look at 6076 -- that's the chart that we sent to you

9   with each breakdown where we explain that we had given you the

10  long transcription.

11           MS. MURRAY:  So those have different control numbers.

12           MS. SHROFF:  Right.

13           MS. MURRAY:  Exhibit numbers.  Are you seeking to --

14           MS. SHROFF:  If I could just explain what you have,

15  that might help you.

16           MS. MURRAY:  Sure.

17           MS. SHROFF:  And that each was broken down just very

18  arbitrarily to keep the documents manageable.  They are marked

19  in the email chart that we sent you.  And if I could just have

20  one minute, I could go grab the chart.

21           So here's the chart.  In the chart we gave you the DX

22  number, then we gave you the category, then I gave you the

23  description, then the text.  And these are my cheat notes about

24  hearsay, so I didn't give you that.  But we sent you one, two,

25  three, and four.  So if -- I'm happy to --

O79VGUO1                        Leanne Li - Direct

 1              MS. MURRAY:  I appreciate that.

 2              Your Honor, just to correct myself, I do see now that

 3    for this particular chat we have audio messages that were

 4    broken out with different numbers.  I would note, however, that

 5    they do not fall under the command exception to hearsay.

 6              Here's an example.  It says:  Xiaomei — which I

 7    understand to be this witness's Chinese name, although that

 8    hasn't been established — did a great job.  It was amazing.  It

 9    was done even better than G Fashion in this regard.

10              That is not a command.

11              Thank you very much.

12              THE COURT:  These are all from Mr. Guo?

13              MS. SHROFF:  Yes, your Honor.  Those are his voice

14    notes that we downloaded, translated, and then provided.  I

15    just want to make sure we had provided them.

16              THE COURT:  Okay.  So now she's going through and

17    challenging your characterization of them.

18              Go ahead.

19              MS. MURRAY:  This says:  I want to find a place where

20    the people of the New Federal State of China can live together

21    in case of a disaster, such as a vaccine disaster.  I have

22    looked for many places to see how we can live together at the

23    critical moment.  Not a command.

24              I don't have A in my binder.  If I could ask for the

25    defense to pull that up.

1          While we're doing that, your Honor, I would note for

2     this witness there are a series of other chat conversations

3     that I expect we will be raising the same objections.  For all

4     of those I will reconfirm at the break, but I am certain for

5     all of those because I followed up with the defense, those are

6     situations where we do not have all of the audio messages in

7     the chat and, therefore, we had completeness objections.  We

8     conveyed those to the defense a couple days ago after we

9     received these chats, and we did not receive a response.

10         MS. SHROFF:  I believe she responded to you.  I'm

11    happy to confirm.  The person who was working on this

12    particular task confirmed that.  Maybe there's a glitch, but

13    I'm happy to look.  But at least for these particular

14    transcriptions, you have them, right?

15         MS. MURRAY:  These I do.  For 60760.  If I could just

16    impose on you to pull up A so that I can address that

17    objection.

18         MR. KILGARD:  This is 60760A.

19         MS. SHROFF:  You may scroll down.

20         MS. MURRAY:  This is the deck, your Honor, from

21    Mahwah.  That's not an instruction or a command.

22         MS. SHROFF:  The deck is a document that she prepared.

23    There is no hearsay objection to a deck or a Power Point being

24    prepared and sent to someone because we're not -- we're not

25    introducing any part of the deck for the truth of the matter

O79VGUO1                        Leanne Li - Direct

1    asserted that her research was accurate, that she did it

2    correctly, that Mahwah, in fact, is called Darlington.  We are

3    certainly not suggesting that it is truthful.

4          What we are showing is that she was given a task, she

5    prepared a Power Point, and she sent the Power Point back to

6    Miles Guo.

7          The other objection that I had also raised, along with

8    whether or not the original introduction which the government

9    objected to was an order from Mr. Guo to her, it was a command

10   for her to undertake the research.  His followup is certainly

11   not being offered for the truth.  Whether or not she did a

12   great job or whether or not she did well, it doesn't matter.

13   We are not suggesting that his evaluation of her work product

14   is being offered for the truth of the matter asserted.

15          THE COURT:  But evaluation is not command.

16          MS. MURRAY:  Correct, your Honor.

17          And just with respect to this in particular, the

18   others aren't even close to a command, and I don't know why

19   they would be relevant.  This one obviously has relevance.

20   This is 60760D-T.  This is clearly being offered for the truth.

21   They are trying to introduce hearsay that Mr. Guo wants to find

22   a place where the people of the New Federal State of China can

23   live, and they are linking that to Mahwah.

24          THE COURT:  So expressing his desire does not amount

25   to a command.

1             So we are left with the deck.

2             Do you object to the deck?

3             MS. MURRAY:  I do not object to the deck.

4             THE COURT:  All right.  Let's go back.

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O79VGUO1                    Leanne Li - Direct

 1                  (In open court)

 2   BY MS. SHROFF:

 3   Q.  Ms. Li, just to reset, did you research the property called

 4   Darlington?

 5   A.  Yes.

 6   Q.  And how did that research project start?

 7           MS. SHROFF:  You can take this document down, please.

 8           Thank you.

 9   Q.  Who prompted the research project?

10   A.  Mr. Miles sent me an address.

11   Q.  I'm sorry, can you --

12   A.  Okay.  So Mr. Miles, he send me an address.

13   Q.  How did he send you an address?

14   A.  He send me the address on WhatsApp.

15   Q.  And did he type out an actual address or did he send you a

16   link?

17   A.  Actual address, type it out.

18   Q.  And as a result of receiving that actual address, what did

19   you do next?

20   A.  I use that address and start searching for this properties

21   on the internet.

22   Q.  How did you search for this property on the internet?

23   A.  I use the -- I think I use the Zillow or Google or some

24   other web -- some other website.

25   Q.  And for how long did you research -- how long did your

1    research take?  Actually, that's a better question.  How long

2    did your research take, do you recall?

3    A.  Probably several hour.

4    Q.  And after you did the research, what did you do?

5    A.  And put all the information into one deck.

6    Q.  And what did you name the deck, do you remember?

7    A.  I always call it Darlington.

8    Q.  And Ms. Li, I've referred to you as Leanne Li; correct?

9    A.  Yes.

10   Q.  Do you also have another name or a Mandarin version of your

11   name?

12   A.  I have a middle name.

13   Q.  Okay.

14   A.  My middle name is Nan, N-A-N.  So Leanne Nan Li.

15   Q.  Were you referred to by any other name by Mr. Guo?

16   A.  Oh, yes.

17   Q.  Okay.  And could you tell us what other names he used when

18   referring to you?  Please slow down.

19   A.  Okay.  He refers me Xiaomei.

20   Q.  And could you spell that for the court reporter, Martha,

21   please.

22   A.  X-I-A-O-M-E-I.

23   Q.  Okay.  Now, let me show you what is marked as DX 60760A.

24           Do you recognize -- let's scroll down for you.

25           MS. SHROFF:  Your Honor, may we just -- I'm sorry,

O79VGUO1                        Leanne Li - Direct

1  could we -- I seem to have the wrong version up.  I apologize,

2  your Honor.

3           Thank you, your Honor.  I think we've sorted out the

4  numbering.

5  Q.  If I could just have you relook at 60760A, and just pick up

6  where you were, more than halfway through.

7           Do you recognize this deck?

8  A.  Yes.

9  Q.  And did you create this deck?

10 A.  Yes.

11 Q.  And do you recall when you created it?

12 A.  2021, probably November-ish.

13          MS. SHROFF:  Your Honor, at this time the defense

14 moves 60760A and 60760-T into evidence.

15          MS. MURRAY:  To be clear on the numbering, I believe

16 it's 60760A and 60760A-T.

17          The government has no objection to those.

18          MS. SHROFF:  The T is for the translation of the

19 document.

20          THE COURT:  They are admitted.

21          (Defendant's Exhibits 60760A, 60760A-T received in

22 evidence)

23          MS. SHROFF:  Thank you, your Honor.

24          Your Honor, may I publish 60760A to the jury?

25          THE COURT:  Yes.

1              MS. SHROFF:  Thank you.

2    BY MS. SHROFF:

3    Q.  Ms. Li, how many slides were in this deck?

4    A.  I don't remember.  It's a lot.

5    Q.  Do you remember an approximate number?

6    A.  No.

7    Q.  Okay.  And what information did you include in this deck?

8              MS. SHROFF:  And if we could pull up 60760A-T.

9    Q.  Do you recall what kind of information you included on this

10   deck?

11   A.  Yes.

12   Q.  And what kind of information did you include?

13   A.  General history about Darlington and the property tax and

14   how many rooms and who are the designers.

15   Q.  And again, did you send this deck to Mr. Guo?

16   A.  Yes.

17   Q.  And in what language was the deck when you sent it to

18   Mr. Guo?

19   A.  Chinese.

20   Q.  Now, did there come a time when Mr. Guo informed you of

21   the -- of what it is he was looking for for the New Federal

22   State of China?

23             MS. MURRAY:  Objection, your Honor.  Hearsay.

24             THE COURT:  Sustained.

25             MS. SHROFF:  Your Honor, I'm not asking the contents,

O79VGUO1                    Leanne Li - Direct

1   I'm just asking if he informed her of something.

2           THE COURT:  If he informed her of?

3           MS. SHROFF:  What his plans were for the New Federal

4   State of China.

5           THE COURT:  You may answer that, but you may not say

6   what he stated.

7           THE WITNESS:  Okay.  I understand.

8   A.  So, yes.

9   Q.  And after you sent him this deck, was there any followup

10  from Mr. Guo to you?

11          MS. MURRAY:  Objection, your Honor.  Hearsay.

12          THE COURT:  So you can say whether he followed up, but

13  not what he said.

14          THE WITNESS:  Understood.

15  A.  He followed up.

16  Q.  And as a result of that followup, what is it that you did?

17  A.  I did more research on this property.

18  Q.  And what is this property that you're referring to?

19  A.  Darlington.

20  Q.  Did you have an understanding of what Darlington was going

21  to be used for?

22  A.  A base for New Federal State of China.

23  Q.  Did there come a time, Ms. Li, when you were asked to

24  contact Kamel and have him assist you with projects?

25  A.  Yeah.

O79VGUO1                           Leanne Li - Direct

1    Q.  And could you tell us what that project was?

2    A.  He need to look for the furnitures for this property.

3    Q.  Let me ask you this, Ms. Li:  What languages do you speak?

4    A.  I speak English and Mandarin, Chinese.

5    Q.  What languages does Kamel speak?

6    A.  English.

7    Q.  Does he speak any other language?

8    A.  French.

9    Q.  And what languages did Mr. Guo speak?

10   A.  Chinese.

11   Q.  Did you translate chats or instructions from Mr. Guo to

12   Kamel from English to Mandarin -- I mean from Mandarin to

13   English?

14   A.  Yes.

15   Q.  And if Mr. Miles directed you to do something with the

16   assistance of another, would you translate that instruction

17   from him?  Do you understand my question?  It was a little

18   awkward.

19   A.  Yes.  Can you rephrase that?

20   Q.  If Mr. Guo wanted to instruct somebody who did not speak

21   Mandarin, did you assist in the interpretation of his Mandarin

22   instruction into English?

23   A.  Yes.

24   Q.  Ms. Li, at the time that you were researching this

25   property, did you have an understanding of whether or not your

1    work product was to be publicly shared?  Were you free to share

2    that -- the deck with other people?

3    A.  No.

4    Q.  At the time that you prepared the deck, were you aware if

5    that property had, in fact, been bought already?

6    A.  Yes.

7    Q.  Had it been bought already?

8    A.  Yes.

9    Q.  And were you asked to do additional research on the same

10   property?

11            MS. MURRAY:  Objection.

12            THE COURT:  What happened next?

13            THE WITNESS:  Can I answer?

14            Started looking for furnitures.

15   Q.  Let me show you what is marked as DX 72661-R.

16            MS. SHROFF:  And this is just for the witness and the

17   Court and the government.

18   Q.  Do you recognize this document, Ms. Li?

19   A.  Yes.

20   Q.  Do you need us to scroll down?

21   A.  Yes.

22   Q.  Could you tell us what this document is?

23   A.  Photos of Darlington.

24   Q.  And were these also made into a new deck?  Did you make a

25   new deck?

1   A.  Yes, this one I made a new deck.

2   Q.  And when did you make this deck?

3   A.  2022.

4   Q.  What did you include -- did you add to the previous deck or

5   did you make a brand-new deck?

6   A.  I made a brand-new deck.

7   Q.  And what did you put in this deck?

8   A.  All the old pictures, all the pictures I can find on the

9   internet about Darlington.

10  Q.  And do you know how many slides constitute DX 72661-R?

11  A.  I don't know.  I think it's over 100 slides maybe.

12          MS. SHROFF:  Your Honor, the defense moves DX 72661-R

13  into evidence.

14          MS. MURRAY:  No objection.

15          THE COURT:  It is admitted.

16          (Defendant's Exhibit 72661-R received in evidence)

17  Q.  Ms. Li, did you include into this deck information that

18  Mr. Guo had requested of you?

19          MS. MURRAY:  Objection, your Honor.

20          THE COURT:  Sustained.

21          MS. MURRAY:  Both to the leading and hearsay.

22          THE COURT:  Sustained.

23          MS. SHROFF:  Your Honor, I'm not asking for the

24  contents of the information.

25          THE COURT:  Right.  But once it's in evidence, the

O79VGUO1                         Leanne Li - Direct

1   jury will be able to look at the content and then discern what

2   the hearsay statements were.

3            (Counsel conferred)

4            MS. SHROFF:  Your Honor, just for the record, the

5   exhibit does not have statements.  I will move on.

6   BY MS. SHROFF:

7   Q.  What types of photographs did you include in this deck?

8   A.  All the -- all the history I can find about Darlington --

9   Q.  All the what?

10  A.  All the pictures, all the photos I can find about

11  Darlingtons on the internet.  I have gather them all together

12  in this deck.

13  Q.  Let me show you what is marked as DX 60734.

14           Do you recognize this document?

15  A.  Yes.

16  Q.  Okay.

17           MS. SHROFF:  And could we just scroll down very

18  quickly for the witness.

19  Q.  What is this document, Ms. Li?

20  A.  This was after the first deck, and this was the second one

21  I made.  But then it was added on on the previous -- on the

22  first deck.  So more slides, more informations about

23  Darlington, especially about the designers, who are the

24  designers.

25  Q.  You mean the designers of the Darlington property?

1    A.  Yes.

2    Q.  Okay.

3                MS. SHROFF:  So, your Honor, at this time the defense

4    would move 60734 into evidence.

5                MS. MURRAY:  No objection.

6                THE COURT:  It is admitted.

7                (Defendant's Exhibit 60734 received in evidence)

8    Q.  To whom did you send this deck?

9    A.  I sent to Mr. Miles.

10   Q.  Ms. Li, how many decks did you make about the Darlington

11   property, do you recall?

12   A.  Three.

13   Q.  And did you update the decks frequently?

14   A.  Yes.

15   Q.  And did you do additional research to update the decks?

16   A.  Yes.

17   Q.  And after the purchase of Mahwah or Darlington --

18               MS. SHROFF:  We can take that down from the jury,

19   please.  Thank you.

20   Q.  Did you continue to research other properties?  Did you

21   continue to look for other properties as possible bases for the

22   New Federal State of China?

23   A.  Yes.

24   Q.  And could you tell me where it is that you focused your

25   search?

1    A.  I think more California.

2    Q.  And do you, sitting here today, recall what property you

3    looked at in California?

4    A.  I remember one property, the name -- I forgot the unit

5    number.  I think something Eagle something.

6    Q.  Let me show you what is marked as DX 60730.  Does that

7    document refresh your recollection as to what property you

8    looked for in California?  Just if you could answer me yes or

9    no.

10   A.  Yes.  Yes.

11   Q.  Okay.  And do you recognize the document that is before you

12   now?

13   A.  Yes.

14   Q.  Would you take a look at it and tell us what that is?

15   A.  This is like a piece of land located California.

16       MS. SHROFF:  Your Honor, the defense moves to

17   introduce into evidence 60730.

18       MS. MURRAY:  No objection.

19       THE COURT:  It is admitted.

20       (Defendant's Exhibit 60730 received in evidence)

21   Q.  Ms. Li, I will publish this to the jury in a minute.

22       But in regards to 0 Eagle Canyon Creek, did you speak

23   to anyone about the listing of the property?

24   A.  I talked to -- I shared this with -- I shared the deck with

25   Mr. Miles.

1   Q.  Did you contact the listing agent on this property?

2   A.  Yes.

3   Q.  And why did you contact the listing agent on this property?

4   A.  I think regarding to the price and the location, the size

5   of the land, it can be a good choice for base of a New Federal

6   State of China.

7   Q.  And Ms. Li, sitting here today, do you know one way or

8   another if this property was purchased?

9   A.  I'm sorry, I don't understand your question.

10  Q.  Sitting here today, do you know one way or another if this

11  property was either purchased or not purchased?  Do you know?

12  A.  I don't know.

13  Q.  Okay.  Did you also look for other properties in California

14  as a possible base?

15  A.  Yes.

16  Q.  Did you look at a property in Rancho Dos Vistas in

17  California?

18  A.  I don't recall the address.  Maybe I need to see the

19  picture, see if you have it.

20  Q.  I'll actually move forward so that -- all right.

21          Let me show you DX 60729.  Does that refresh your

22  recollection as to the property in California?

23  A.  Yes.

24          MS. SHROFF:  The defense moves 60729 into evidence.

25          MS. MURRAY:  No objection.

O79VGUO1                        Leanne Li - Direct

1     THE COURT:  It is admitted.

2         (Defendant's Exhibit 60729 received in evidence)

3  Q.  Do you recall looking for property in Texas?

4  A.  Yes.

5  Q.  And do you recall where in Texas that was?

6  A.  I don't remember.

7         MS. SHROFF:  Could we show the witness DX 60728.

8  Q.  Do you recognize this document?

9         MS. SHROFF:  If we could just scroll down for her.

10        Your Honor, the defense moves 60728 into evidence.

11        MS. MURRAY:  No objection.

12        THE COURT:  It is admitted.

13        (Defendant's Exhibit 60728 received in evidence)

14  Q.  And Ms. Li, did you make a deck out of this property?

15  A.  Yes.

16  Q.  And did you send that deck to Mr. Guo?

17  A.  Yes.

18  Q.  Did he respond to the deck?

19  A.  Yes.

20  Q.  Was this property purchased?

21  A.  I don't know.

22  Q.  Do you recall if -- what the price on this property was?

23  A.  I don't recall.

24        THE COURT:  All righty.  It's now 11:29.  So we will

25  take our half of an hour break.

1          Remember, do not discuss the case amongst yourselves

2     or with anyone else.  Don't permit anyone to discuss the case

3     in your presence.  Don't read, watch, or listen to anything

4     from any source that touches upon the subject matter of this

5     case.

6          (Jury not present)

7          THE COURT:  Ma'am, you may step out of the courtroom.

8          (Witness not present)

9          THE COURT:  You may be seated.

10         Is there anything before we resume at noon?

11         MS. MURRAY:  Nothing from the government.  Thank you.

12         MS. SHROFF:  Your Honor, I'm going to try and see if

13    the government, since they have no objections to some of these

14    decks, we can just stipulate to them coming in.

15         MS. MURRAY:  Absolutely.

16         MS. SHROFF:  I think that will move the witness along.

17         THE COURT:  Yes.

18         MS. SHROFF:  I don't need to publish all the decks

19    now.  If Mr. Kamaraju chooses to use them in summation, that's

20    fine.

21         THE COURT:  I wish you would have thought of that

22    beforehand.

23         MS. SHROFF:  I'm sorry, your Honor.  I'll try and move

24    it along.

25         THE COURT:  All righty.  We'll resume at noon.

O79VGUO1                          Leanne Li - Direct

1              MS. MURRAY:  Thank you, your Honor.

2          (Luncheon recess)

3          (Continued on next page)

O79BGUO2                        Leanne Li  - Direct

1          (Jury not present)

2          THE COURT:  Please get the jury.

3          MR. SCHIRICK:  Your Honor, I apologize, before the

4   jury comes in just briefly.

5          THE COURT:  Okay.  One moment, please.

6          MR. SCHIRICK:  Sorry, your Honor.  We had offered

7   after this morning's 9:00 to come back to address the issue

8   that we had brooched with the Court about Mr. Yi's testimony

9   and reasonable inferences.  Happy to do that now.  Happy to do

10  it later.  I just had told the Court that I would come back so

11  I wanted to make sure I did that.

12         THE COURT:  Thank you for letting me know.  I think

13  I'd like to continue with the testimony.

14         MR. SCHIRICK:  Fair enough, your Honor.  Thank you.

15         THE COURT:  Please have the jurors brought in.

16         THE LAW CLERK:  Jury entering.

17         (Jury present)

18         THE COURT:  Please be seated and please continue.

19  Please remember that you're still under oath.

20  BY MS. SHROFF:

21  Q.  Ms. Li, let me show what you is marked as Defense Exhibit

22  60727, which we move to admit into evidence with no objection

23  from the government.

24         THE COURT:  So this has already been admitted?

25         MS. SHROFF:  Your Honor, we move for its formal

O79BGUO2                      Leanne Li  - Direct

1   admission.  I believe the government has no objection.

2            MS. MURRAY:  No objection.

3            THE COURT:  I want to go on the record as having

4   admitted it.

5            (Defendant's Exhibit 60727 received in evidence)

6   BY MS. SHROFF:

7   Q.  Ms. Li, do you recall looking at properties in Hawaii?

8   A.  Yes.

9   Q.  Do you know what year that was in?

10  A.  Maybe 2021 or 2022.  I'm not sure.

11  Q.  And did you prepare a slide deck for this property?

12  A.  Yes.

13  Q.  Did you speak to anyone about this property?

14  A.  No.

15  Q.  Did you take into consideration any of the factors that you

16  mentioned before while determining the appropriateness of this

17  property?

18           MS. MURRAY:  Objection, form.

19           THE COURT:  Sustained.

20  Q.  Was this property ever purchased by anyone?

21  A.  I don't know.

22  Q.  We can take that down.

23           Do you know if as part of your coordination whether

24  you looked at properties for G/Clubs?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O79BGUO2                        Leanne Li  - Direct

1    Q.  And where did you look for properties for G/Clubs?

2    A.  The same areas.

3    Q.  Did you look for properties for G/Clubs outside of the

4    United States?

5    A.  No.

6    Q.  And where in the United States did you look for properties

7    for G/Clubs?

8    A.  Same areas, like California, Colorado, Texas, Hawaii.

9    Q.  Ms. Li, I'm going to go back to speaking about Darlington.

10           After Darlington was purchased, did you do any

11   projects for that property?

12   A.  Yes.

13   Q.  Were you part of any project groups that were created on

14   WhatsApp?

15   A.  I think it was called live streaming group or something.

16   Q.  And what was the live streaming group?

17   A.  We're trying to build a live broadcast room in Darlington.

18   Q.  And what was your role as part of that group?

19   A.  To share my findings, my research with some of other

20   members in the group.

21   Q.  Sitting here today, do you recall who else was part of that

22   group?

23   A.  Gandolf was in there, Jason, Brian.

24   Q.  Who is Brian?

25   A.  Brian, he was the CTO of Gettr.

O79BGUO2                         Leanne Li  - Direct

1   Q.  And what is Gettr?

2   A.  Gettr is social media platform.

3   Q.  And how did you communicate with was -- Yvette in this

4   group?

5   A.  Yeah, she is.

6   Q.  And how did you -- did each member communicate with each

7   other?

8   A.  We would just chat on the group, on the group chat.

9   Q.  And was the name of the group chat -- what was the name of

10  that group chat?  Do you remember?

11          MS. MURRAY:  Asked and answered, your Honor.

12          THE COURT:  Sustained.

13  Q.  Was it more than one group chat that you were apart of?

14  A.  Yes.

15  Q.  What was the second group chat that you were part of?

16  A.  I'm not sure.  Maybe the names call recording group or

17  something, recording room group.

18  Q.  Do you recall if Darlington was used to set up streaming

19  broadcast for the NFSC?

20  A.  Yes.

21  Q.  Can you tell us where the broadcast was streamed from?

22  A.  In the Darlington, one of the room in Darlington we're

23  going to turn it into a live broadcast room.

24  Q.  And how were you going to turn it into a live broadcast

25  room?

O79BGUO2                          Leanne Li  - Direct

1   A.  I have searched for a vendor and they -- this company, they

2   can help us to build it.

3   Q.  Do you remember the name of the vendor?

4   A.  I don't recall.

5   Q.  Do you remember what the vendor did?

6   A.  Yeah, they send their plan and quotation with me.

7   Q.  Did the vendors visit Mahwah?

8   A.  Yes.

9   Q.  Were you there when they visited Mahwah?

10  A.  No.

11  Q.  How did you learn that they had in fact visited Mahwah?

12          MS. MURRAY:  Objection.

13          THE COURT:  Well, you can say the manner in which you

14  learned, but you cannot state something that was said to you.

15          THE WITNESS:  Understood.

16  A.  I coordinate with Gladys.

17  Q.  And was part of the coordination include letting you know

18  that they had in fact visited?

19          MS. MURRAY:  Objection, your Honor.

20          THE COURT:  Okay.  This is pure rank hearsay.  Don't

21  do that.

22  Q.  Ms. Li, did you coordinate visits to Mahwah?

23  A.  Yes.

24  Q.  Did you coordinate visits to Mahwah by vendors?

25  A.  Yes.

O79BGUO2                        Leanne Li  - Direct

1   Q.  Was one of the vendors the vendor who was going to set up

2   the live streaming group?

3   A.  Can you repeat that question again.

4   Q.  Was one of the vendors you coordinated with the person who

5   was going to help build the live streaming room?

6   A.  Yes.

7   Q.  Over what app did you do the coordination?

8   A.  WhatsApp.

9   Q.  Who is Gandolf?

10  A.  Gandolf is one of the supporters and he help live broadcast

11  in 3C office.

12  Q.  Do you know if Gandolf had any training in live streaming?

13  A.  He was doing live broadcast in 3C office already at this

14  time.

15  Q.  Do you know somebody named Sunglasses?

16  A.  Yes.

17  Q.  Who was that?

18  A.  His name, I think English name call Jason.

19  Q.  And was he part of the group?

20  A.  Yes.

21  Q.  And what was his role?

22  A.  He also help to coordinate the supporters and the vendors

23  to Mahwah, to visit Mahwah.

24  Q.  Now, Ms. Li, did the vendor send you quotation price,

25  quotations for this project?

```
O79BGUO2                      Leanne Li  - Direct
```

1   A.  Yes.

2   Q.  And did you evaluate those price quotations?

3   A.  What do you mean by evaluate?

4   Q.  Do you recall sitting here today how many cameras they sent

5   you and a price range for --

6            MS. MURRAY:  Objection, your Honor, to the testifying.

7   Q.  What did the vendors -- what equipment did the vendors

8   discuss with you?

9   A.  Camera, lights, tons of cables.

10  Q.  And did you get a price for each one including camera,

11  light -- and what was the last one?

12  A.  A lot of cables, like wires, cables.

13  Q.  Did you get a price quote from the vendor?

14  A.  Yes.

15  Q.  And did you evaluate that price quote?

16  A.  I share the quotation in the group so, for example, Brian

17  --

18           MS. MURRAY:  Objection, your honor.

19  A.  -- Gandolf can help me.

20           MS. SHROFF:  She's not saying what they said.

21           THE COURT:  Remember not to say what was said.

22           THE WITNESS:  Okay.

23  Q.  Did other people chime in and give their views on the

24  price?

25  A.  Yes.

O79BGUO2                         Leanne Li  - Direct

1    Q.  And ultimately was there a group decision made as to

2    whether or not the vendor should be hired?

3    A.  I think later on this project did not proceed because the

4    pricing, Gandolf and Brian think it was too high.

5          THE COURT:  All righty.  So you're not to say what was

6    said to you or what you think somebody was thinking.

7          THE WITNESS:  Thinking, okay.  Sorry about that.

8          THE COURT:  Go ahead.

9    Q.  Ms. Li, did you also get price quote on audio equipment for

10   Mahwah?

11   A.  Yes.

12   Q.  From whom did you get price quotes?

13   A.  I think from the same vendor.

14   Q.  Do you recall what audio equipment was going to be

15   purchased?

16   A.  I don't recall.

17   Q.  Who's Brian?

18   A.  Brian, he is the CTO for Gettr.

19   Q.  And what was Brian's area of expertise?

20   A.  IT.

21   Q.  What is IT?

22   A.  Information technology.

23   Q.  What was Brian's position at Gettr?

24   A.  He was CTO.

25   Q.  At the time that you were undertaking these projects, did

O79BGUO2                        Leanne Li  - Direct

 1   you sign an NDA?

 2   A.  Yes.

 3   Q.  Did everyone else in the group that you mentioned sign an

 4   NDA?

 5           MS. MURRAY:  Objection.

 6           THE COURT:  Go ahead.

 7   Q.  Do you know, Ms. Li, if everyone was required to sign an

 8   NDA prior to joining that group?

 9   A.  Yes.

10   Q.  Were they required to sign an NDA before joining that

11   group?

12   A.  I think later there were request to sign NDA.

13   Q.  Do you know how much later?

14   A.  Maybe one day.

15   Q.  Ms. Li, did there come a time when you received a call from

16   the Rule of Law Foundation, without telling us the content of

17   the call?

18   A.  Yes.

19   Q.  And as a result of that call, what did you do?

20   A.  I continue to translate the documents from English to

21   Chinese and Chinese to English and video making with the

22   English subtitles or Chinese subtitles.

23   Q.  And in what year was this?

24   A.  2021.

25   Q.  Ms. Li, were you ever offered a job or a sponsorship

O79BGUO2                        Leanne Li  - Direct

1    through the Rule of Law Foundation?

2    A.   Yes.

3    Q.   For what?

4    A.   For the work I was doing.

5    Q.   And were you going to be paid for that work?

6    A.   Yes.

7    Q.   And who was going to pay you?

8    A.   Rule of law.

9    Q.   And how much were you going to be paid per month?

10   A.   5,000 U.S.D.

11   Q.   Do you know somebody name Mulan?

12   A.   Yes.

13   Q.   Was she opposed to you being paid by the Rule of Law

14   Foundation?

15   A.   I don't know.

16   Q.   For how long did you work for the Rule of Law Foundation,

17   Ms. Li?

18   A.   Less than a year.

19   Q.   And after that, what did you do next?

20   A.   I visit London.

21   Q.   Why did you visit London?  Actually, let me rephrase that.

22          Who sent you for a visit to London?

23   A.   Mr. Miles.

24   Q.   Where were you told to visit?

25   A.   Himalaya Exchange.

O79BGUO2                          Leanne Li  - Direct

1   Q.  What were you supposed to do at the Himalaya Exchange?

2   A.  To review their financial documents or statements.

3   Q.  Who were you supposed -- who were you given as a contact

4   person to review the financial statements for the Himalaya

5   Exchange?

6   A.  William Je.

7   Q.  And what exactly were you supposed to review?

8   A.  Bank statements, cash flow, balance sheet, income

9   statement, work chart.

10  Q.  Do you sitting here today without telling us the -- did you

11  have an understanding as to why you were being asked to look at

12  Mr. Je's accounting books?

13  A.  Mr. Miles --

14  Q.  No, no.

15          THE COURT:  That's where you should not repeat what

16  somebody said or thinks.

17          THE WITNESS:  Sorry.

18  Q.  Do you have an understanding as to why you were sent to

19  look at the books?

20  A.  Yes.

21  Q.  And what was your understanding based on -- don't tell me

22  the content.  It's all right.  I'll ask another question.

23          Did you have any expertise, Ms. Li, in evaluating

24  financial records?

25  A.  No.

O79BGUO2                              Leanne Li  - Direct

1   Q.  By this time for how long had you worked for G Fashion?

2   A.  A year.

3   Q.  And did you have any other experience reading or auditing

4   books?

5   A.  Well, I have a business degree, so I have learned all of

6   these things at the university.

7   Q.  Did you in fact go to the Himalaya Exchange offices in

8   London?

9   A.  Yes.

10  Q.  Did you meet with anyone there?

11  A.  William Je.

12  Q.  Were you given access to any documents pertaining to the

13  Himalaya Exchange?

14  A.  No.

15  Q.  When you were denied access to the documents for the

16  Himalaya Exchange, what did you do next?

17  A.  I went to Milan.

18  Q.  I meant immediately after you were denied access, what did

19  you do that day?

20  A.  I went back to the hotel.

21  Q.  And after you went back to the hotel, what did you do?

22          Did you inform anyone that you were not given access?

23  A.  Yes.

24          MS. MURRAY:  Objection, your Honor.

25          THE COURT:  You know what hearsay is.  I know that you

O79BGUO2                          Leanne Li  - Direct

 1   do, and so I don't want you to elicit it.

 2   Q.  While you in London, were you ever able to review any of

 3   the financial records for the Himalaya Exchange?

 4   A.  No.

 5   Q.  Were you part of a single chat group that was formed while

 6   you were in London?

 7   A.  Yes.

 8   Q.  Who was in that chat group?

 9   A.  William Je, Mr. Miles, Kathy and myself.

10   Q.  Who is Kathy?

11   A.  Kathy is a girl who's working in Himalaya Exchange.

12   Q.  After that chat group, did you -- do not disclose the

13   contents -- was that chat group active while you were there in

14   London?

15   A.  Yes.

16   Q.  Did you do anything the next day while you were still in

17   London?

18   A.  I visit there again.

19   Q.  Where is there?

20   A.  Sorry, I visit Himalaya Exchange again.

21   Q.  And was this on the following day or the same day?

22   A.  Following day.

23   Q.  And were you given access to any financial records on the

24   following day?

25   A.  No.

O79BGUO2                           Leanne Li  - Direct

1    Q.  What did you do after that?

2    A.  I went back to the hotel.

3    Q.  After that did you leave London, Ms. Li, or did you take

4    any other steps while you were in London?

5    A.  I look for audit company.

6    Q.  And what is an -- what kind of audit company did you look

7    for?

8    A.  They are specialized in cryptocurrency.

9    Q.  And did you in fact -- who did you contact to help you find

10   an audit committee?

11   A.  Myself.

12   Q.  How did you go about trying to find an audit company?

13   A.  I search on the internet.

14   Q.  Did you do anything else other than search on the internet?

15   A.  After the search, then I evaluate a few candidate, and then

16   I narrow down one, so I paid a visit there with Kathy together.

17   Q.  And did you in fact locate someone that you hired?

18   A.  I'm sorry.

19   Q.  Did you in fact hire anyone -- did you in fact hire an

20   auditing company?

21   A.  No.

22   Q.  Ms. Li, after London, where did you go next?

23   A.  I went to Milan.

24   Q.  And why did you go to Milan?

25   A.  I went to audit G Fashion.

O79BGUO2                         Leanne Li  - Direct

 1   Q.  And where did you go to audit G Fashion?

 2   A.  Milan.

 3   Q.  And to whose offices did you go?

 4   A.  G Fashion office.

 5   Q.  I apologize.  I need to go back to the meeting at the

 6   Himalaya Exchange.

 7          Ms. Li, were you the person that was originally

 8   suppose to take that trip to London?

 9          MS. MURRAY:  Objection.

10          THE COURT:  Sustained.

11   Q.  Were you asked to go to London at the last minute?

12   A.  Yes.

13   Q.  By whom?  I'll rephrase that.

14          Were you substituting for someone else?

15          MS. MURRAY:  Objection to the testifying, your Honor.

16          THE COURT:  Sustained.

17   Q.  Did you have an understanding of why it was such a last

18   minute thing?

19          MS. MURRAY:  Objection.

20          THE COURT:  Sustained.  Sustained.  Sustained.

21   Q.  Moving forward back to G Fashion.  What did you do when you

22   got to Milan?

23   A.  I meet the team.

24   Q.  The team for whom?

25   A.  I meet the G Fashion team in Milan office.

O79BGUO2                          Leanne Li - Direct

1  Q.  Who did you meet with specifically?

2  A.  Michella, Kiara, Marina, Federica, Dina and two other girls

3  in the office.  Maybe one girl is call Rica.

4  Q.  How about somebody named Ms. Volpe, Andrea Volpe?

5  A.  He was not there at that time.

6  Q.  Were you given access to the books for G Fashion?

7  A.  Not in the beginning.

8  Q.  And did there come a time when you were given access?

9  A.  Yes.

10  Q.  How many days later was that?

11  A.  Maybe after a month or so.

12  Q.  And did you in fact audit the backs for G Fashion?

13  A.  Yes.

14  Q.  And what did you do as part of the audit?

15  A.  So I reviewed all the financials.  I check all the vendor

16  list, and afterwards I have to visit all the factories.

17  Q.  How many factories -- what were the factories for?

18  A.  Those factories are making clothings.

19  Q.  Making what?

20  A.  Clothing, garments.

21  Q.  And who were they making clothings for?

22  A.  G Fashion.

23  Q.  Did you visit each one of these factories?

24  A.  Yes.

25  Q.  How many factories did you in fact visit?

O79BGUO2                          Leanne Li  - Direct

1   A.  Maybe ten.

2   Q.  And were any of these factories of concern to you?

3   A.  Yes.

4           MS. MURRAY:  Objection, your Honor.

5           THE COURT:  Overruled.  You may answer.

6   Q.  How many?

7   A.  How many?

8   Q.  How many factories were you satisfied with, let me start

9   with that?

10          MS. MURRAY:  Your Honor --

11          THE COURT:  How did you feel about the factories.

12  A.  All of it or just the one?

13          THE COURT:  You can talk about all of them, some of

14  them, just let us know what you thought.

15  A.  So after visit all the factories and I'm very satisfied

16  with most of them, only one factories I was unsatisfied.

17  Q.  Which was the factory that you were not satisfied with?

18  A.  Cataldi.

19  Q.  And can you spell that for us, please?

20  A.  C-A-L-T-A-D-I.

21  Q.  Is it possible that you mean C-A-T-A-L-D-I?

22          THE COURT:  Don't ask her to guess.

23          MS. SHROFF:  I'm trying to do this for the record,

24  your Honor, but I'm happy to refrain.

25  Q.  What did you do about the problem that you perceive with

O79BGUO2                    Leanne Li  - Direct

1   this factory?

2   A.  I stopped all the payments.

3   Q.  And what was the problem with this factory for you?

4   A.  It's not -- okay.  Cataldi is not factory.  In fact it is

5   agent.  They outsource the work.

6   Q.  And was that not to your satisfaction?

7   A.  Yes.

8   Q.  And who decided to terminate the contract with Cataldi?

9   A.  I did.

10  Q.  Did you visit a factory called ASAP factory?

11  A.  Yes.

12  Q.  Did you visit the Morelli factory?

13  A.  Yes.

14  Q.  Did you terminate their contracts?

15  A.  No.

16  Q.  How many people were working at G Fashion Milan at that

17  time?

18  A.  Seven people, around seven.

19  Q.  Did you evaluate whether there was a need for G Fashion to

20  have seven employees?

21          MS. MURRAY:  Objection, your Honor.

22  A.  Yes.

23          MS. MURRAY:  I'm also going to object on relevance

24  grounds, at this point I'm not sure how these questions are

25  relevant.

O79BGUO2                        Leanne Li  - Direct

1          MS. SHROFF:  Your Honor, I'm happy to have a sidebar

2    and explain to the government.

3          THE COURT:  I'll permit the questions.  I just don't

4    want you to lead.

5          MS. SHROFF:  Could the court reporter read back the

6    question.

7          (The record was read)

8    Q.  Did you take any steps after your evaluation?

9    A.  Yes.

10   Q.  What steps did you take?

11   A.  I terminate the two front desk girls.

12   Q.  Could you explain to the jury what you mean by that?

13   A.  There were two Italian girls that were working.  I

14   terminate them.  Their job title was front desk assistant, and

15   another girl was some sort of assistant as well.  And at that

16   time at the office we don't even have a front desk, so that's

17   why.

18   Q.  For how long did you stay in Milan?

19   A.  Until now.

20   Q.  After your time -- from the time that you were there in

21   2021 until now, you've continuously resided in Milan?

22   A.  Yes.

23   Q.  Are you still employed by G Fashion?

24   A.  Yes.

25   Q.  What do you do now?

O79BGUO2                          Leanne Li  - Direct

1   A.  I run the operations of G Fashion.

2           MS. SHROFF:  May I show the witness and the Court and

3   the government DX60738-X.  We can pause it there.

4   Q.  Do you recognize this?

5   A.  Yes.

6   Q.  What is it?

7   A.  We're doing the video shoot for the launch.

8   Q.  In what year was this made?

9   A.  2022.

10          MS. SHROFF:  Your Honor, the defense moves to admit

11  60738-X into evidence.

12          MS. MURRAY:  I don't see the relevance, but no

13  objection.

14          THE COURT:  It is admitted.

15          (Defendant's Exhibit 60738-X received in evidence)

16          MS. SHROFF:  May we play it for the jury?

17          THE COURT:  Go ahead.

18          (Media played)

19          MS. SHROFF:  It's DX60738-X.

20  Q.  Ms. Li, did you organize this shoot?

21  A.  Yes.

22  Q.  Did you plan this shoot yourself or with others?

23  A.  With G Fashion team together.

24  Q.  And who -- what did the G Fashion team consist of?

25  A.  We do design and we have eCommerce manager, so manage the

O79BGUO2                    Leanne Li  - Direct

1   entire website, and the logistic also has a site in Italy, so

2   shipping.

3   Q.  Let me show you what is marked as DX60764.

4           Do you recognize that?  I think I got the wrong

5   number.  Sorry.  It's being pulled up, your Honor.

6           Do you recognize this photograph, Ms. Li?

7   A.  Yes.

8   Q.  What is it?

9   A.  John Legend, he's wearing like G Fashion Buddha silk jacket

10  on the voice.

11          MS. SHROFF:  Your Honor, defense would like to enter

12  into evidence DX60764.

13          MS. MURRAY:  No objection.

14          THE COURT:  It is admitted.

15          (Defendant's Exhibit 60764 received in evidence)

16  BY MS. SHROFF:

17  Q.  Could you tell us what collection he's wearing?

18  A.  Silk Buddha collection.

19  Q.  How much does that cost?

20  A.  I don't recall.

21  Q.  We can take that down, please.

22          Ms. Li, are you familiar with something called

23  G Music?

24  A.  Yes.

25  Q.  What is it?

O79BGUO2                        Leanne Li  - Direct

1   A.  We make music that we get anti-CCP music.

2   Q.  And do you have any role in making anti-CCP music?

3   A.  Yes.

4   Q.  What was your role?

5   A.  As a coordinator.

6   Q.  What did you coordinate?

7   A.  I coordinate between Mr. Miles and Hollywood production

8   team, and also I coordinate with Chinese songwriting team.

9   Q.  And who was the Chinese songwriting team?

10  A.  Tang Ping and William --

11  Q.  Could you spell the name for the court reporter.

12  A.  Okay.  Tang, T-A-N-G; Ping, P-I-N-G.

13  Q.  And what is her claim to fame?

14  A.  She's a very famous singer in China.

15  Q.  And what was the other person that you coordinate with,

16  William something?

17  A.  William, yes.

18          MS. MURRAY:  Objection, your Honor.

19          MS. SHROFF:  She testified to the name.  I'm just

20  reminding her to move it along.

21          THE COURT:  So moving it along, that is a good thing.

22  Q.  So you mentioned William in your answer before, correct?

23  A.  Yes.

24  Q.  And what is William's full name?

25  A.  William Wong.

O79BGUO2                              Leanne Li  - Direct

1    Q.  And who is he?

2    A.  He writes lyrics.

3    Q.  And what nationality is he?  Lyrics in what language?

4    A.  In Chinese.

5    Q.  Did they help with the writing of music for G Music?

6    A.  Yes.

7    Q.  What song did they help write?

8    A.  My Bing Jon (sic), the name called the hero, in English

9    called The Hero.

10   Q.  Did you play a role in the production of the song The Hero?

11   A.  Yes.

12   Q.  And what is the song The Hero about?

13   A.  It's about Mongolian people.

14   Q.  What about the Mongolian people?

15   A.  The CCP try to eradicate the Mongolian culture and the

16   languages, and those Mongolian people, they are able to stand

17   up and fight and to do protest, so this song honor them.

18   Q.  And who wrote the song?

19   A.  Tang Ping.

20   Q.  What was the Chinese name of the song, do you know?

21          THE INTERPRETER:  From interpreter.  The witness

22   actually said it in Chinese.  The translation should be

23   horseback hero.

24   Q.  What is the horseback hero?

25   A.  Horseback means, okay, it represents the Mongolian people

O79BGUO2                          Leanne Li  - Direct

1    because Mongolian people is famous for their riding skills.

2    Q.  Their writing skills?

3    A.  Riding.

4              THE COURT:  You mean horseback riding, right?

5              THE WITNESS:  Yes, exactly.

6    Q.  Ms. Li, how many bank accounts have you opened all told?

7              THE COURT:  Do you mean in her life or in connection

8    with a particular business?

9    Q.  In your life?

10   A.  Around 28.

11   Q.  And for what entities did you open these accounts?

12   A.  G Fashion, G/Club, G/Club One and G/Club Two and G/Club

13   Three.

14   Q.  Let's look at Government Exhibit JPM49.

15             Have you seen this document before?

16   A.  No.

17   Q.  Do you have knowledge of these transfers that are reflected

18   on this document?

19   A.  Please give me a minute to look at it.  Can I double refer.

20   This is a transfer, right?

21   Q.  I'm not going to be able to answer questions for you.

22             Do you recognize that document?

23   A.  No.

24   Q.  Can you tell the jury if you can read the name on the

25   account?

O79BGUO2                         Leanne Li  - Direct

1    A.  G/Club Two.

2    Q.  And do you see the first column there?  Do you see row four

3    as you scroll down?  You see a date paid?

4    A.  Yes.

5    Q.  And what is the date there?

6    A.  January 5, 2021.

7    Q.  I'm talking about the row above.

8    A.  It doesn't have a number there.

9    Q.  Before January 5.

10   A.  It doesn't show on my screen.  Oh, now it's showing.  It's

11   November 12, 2020.

12   Q.  And what is in column E?

13   A.  Inbound.

14   Q.  What is your understanding of "inbound?"

15   A.  I think it's coming in, right?

16   Q.  And where is it coming in from?

17   A.  Maywind.

18   Q.  What is that?

19   A.  It's a company.

20   Q.  What kind of company?

21   A.  I don't know.

22   Q.  And what is it in column H?

23   A.  One million.

24   Q.  Is that the dollar amount?

25   A.  Yes.

O79BGUO2                    Leanne Li  - Direct

1   Q.  Is it fair to say that the document reflects two transfers

2   from Maywind into G/Clubs?

3   A.  Yes.

4   Q.  And was it your understanding that these were pursuant to a

5   loan?

6   A.  Correct.

7           MS. MURRAY:  Objection, your Honor, to the testifying.

8           THE COURT:  All righty.  I don't want you to lead the

9   witness.

10  Q.  What is your understanding of where this money was coming

11  from?

12  A.  It was from Sara Wei.

13  Q.  And was the money coming from some particular program from

14  Sara Wei?

15  A.  It's a loan agreement.

16  Q.  For a loan agreement through what?

17  A.  Loan agreement, loan program I will say it.

18  Q.  Let's look at GXFBA18 which is also in evidence.

19          Have you seen this document before?

20  A.  No.

21  Q.  Do you see the first column?

22  A.  Yes.

23  Q.  Who are the customers listed?

24  A.  G/Club Two.

25  Q.  Let's go to the next column.  What's the header on the next

O79BGUO2                          Leanne Li  - Direct

1  column?

2  A.  Transaction number.

3  Q.  What's the column after that?

4  A.  Customer ID.

5  Q.  The column after that?

6  A.  Account ID.

7  Q.  The column after that?

8  A.  Payment method.

9  Q.  The column after that?

10         MS. MURRAY:  Your Honor, the government will stipulate

11  to the titles of the columns if it would help.

12         THE COURT:  Okay.

13  Q.  Let's go to column O and row eight, please.

14         What is the base amount there?

15  A.  $3,000,035.

16  Q.  What's the base amount at row 10?

17  A.  $1,999,862.08.

18  Q.  Let's go to column AB.  What's the beneficiary name there

19  row 8 and row 10?

20  A.  ACA Capital Group.

21  Q.  Is that ACA Capital Group for both rows 8 and 10?

22  A.  Yes.

23  Q.  Do you recognize these transfers sitting here today,

24  Ms. Li?

25  A.  Yeah, I think so.

O79BGUO2                        Leanne Li  - Direct

1   Q.  Did ACA receive these transfers?

2   A.  Yes.

3           MS. MURRAY:  Objection.

4   Q.  Do you know what happened -- do you know what happened

5   after the money was transferred into the ACA account?

6           MS. MURRAY:  Objection.

7           THE COURT:  If you know if there was a transfer.

8   A.  Can you please repeat the question.

9   Q.  I think you answered the first part of the question, but

10  I'll ask it again.  Do rows 8 and 10 reflect a transfer into

11  ACA Capital?

12  A.  Yes.

13  Q.  All right.  Let's move to GX60N25.  This is also in

14  evidence.  Let's go to page seven.  If you can look at the

15  date.  What is the date on this balance sheet.

16  A.  September 1, 2020.

17  Q.  Let go to page eight.  You see a transfer there?

18  A.  Yes.

19  Q.  Could you read the row that starts with September 23?

20  A.  You want me to read the amount?

21  Q.  Yes, please, just the whole row.

22  A.  120,000 U.S.D. and wire at 006037, org Golden Spring.

23  Q.  And now let's go to GXJPM38.  If you could go to row 98,

24  please, column A.  Could you read the date?

25  A.  August 6, 2020.

O79BGUO2                          Leanne Li  - Direct

1   Q.  And read column G?

2   A.  Fedwire Credit VA Investors Bank 221272031B/0, Leading

3   Shine NY Limited, 100657478 reference, Chase NYC/CTR --

4   Q.  That's fine.  Thank you.  We can take that down.

5           Ms. Li, did you open bank accounts for G Fashion?

6   A.  Yes.

7           MS. MURRAY:  Asked and answered.

8           THE COURT:  Sustained.

9           MS. SHROFF:  I'm just relaying a basic foundation.

10  Q.  G/Club One, Two and Three?

11          MS. MURRAY:  Objection.

12          THE COURT:  Sustained.

13  Q.  What did you do after you opened these accounts?

14          What did you do with G/Club One account?

15  A.  We didn't do anything.

16  Q.  Did you eventually close it?

17  A.  Yes.

18  Q.  How about G/Club Two?

19  A.  The same.

20  Q.  How about G/Club Three?

21  A.  The same.

22  Q.  And is there a reason for that, just yes or no?

23  A.  No.

24  Q.  You didn't have a reason for why you closed the account?

25          MS. MURRAY:  Asked and answered.

O79BGUO2                          Leanne Li  - Direct

1              THE COURT:  Sustained.  Move on.

2    A.  Well, because --

3              THE COURT:  You don't have a question before you.

4    Q.  Did you want to correct your answer from before?

5              THE COURT:  We are moving onto another topic,

6    Ms. Shroff.

7              MS. SHROFF:  Your Honor, may we have a sidebar?

8              THE COURT:  No.  Move on.

9    Q.  Where were these accounts opened?

10   A.  In LA.

11   Q.  And when did you leave LA for good?

12   A.  I went to Vancouver.

13   Q.  When did you leave LA for good?

14   A.  2021 May.

15   Q.  And since then have you been back to LA to live?

16   A.  No.

17   Q.  Have you been back to visit?

18   A.  No.

19   Q.  Ms. Li, have you given truthful testimony here today?

20   A.  Yes.

21   Q.  Do you know Miles Guo?

22   A.  Yes.

23   Q.  Are you fond of Miles Guo?

24   A.  No.

25              MS. SHROFF:  May I repeat my question, your Honor?

1          THE COURT:  No, she's answered.  Move on.

2          MS. SHROFF:  I don't think she --

3          THE COURT:  Do not make comments.

4     Q.  Ms. Li, are you testifying here under subpoena?

5     A.  No.

6     Q.  Have you spoken to Miles Guo since his arrest in 2023?

7     A.  Yes.

8     Q.  Do you remain supportive of Mr. Guo?

9     A.  Yes.

10    Q.  And do you believe or credit the charges against Mr. Guo?

11         MS. MURRAY:  Objection, your Honor.

12         THE COURT:  Sustained.

13    Q.  From which country did you come here to testify?

14    A.  Milan.

15    Q.  And what are your plans after your testimony is complete?

16    A.  I'm going back to Italy.

17    Q.  Going back where?

18    A.  Going back to Italy, Milan.

19         MS. SHROFF:  Thank you.  I have no further questions.

20         THE COURT:  Cross examination.

21         MS. MURRAY:  Thank you, your Honor.

22    CROSS-EXAMINATION

23    BY MS. MURRAY:

24    Q.  Ms. Li, you testified that you started watching Miles Guo's

25    broadcast in 2017, correct?

O79BGUO2                         Leanne Li  - Cross

1   A.  Correct.

2   Q.  And you said that you voluntarily translated certain Guo

3   Media broadcast, correct?

4   A.  Would you please rephrase that question again.

5   Q.  You voluntarily translated certain of Miles Guo's broadcast

6   that had been posted on Guo Media, correct?

7   A.  Correct.

8   Q.  And "Guo" in Guo Media stands for Miles Guo, correct?

9   A.  I don't know.

10  Q.  Your testimony is you don't know whether the "Guo" in Guo

11  Media stands for Miles Guo?

12  A.  I'm not sure.

13  Q.  You donated to the Rule of Law Foundation in 2019, right?

14  A.  Yes.

15  Q.  You donated a hundred dollars; is that correct?

16  A.  Correct.

17  Q.  You knew that Miles Guo said that Rule of Law donations

18  would be used to fund anti-CCP activities, right?

19  A.  Correct.

20  Q.  And you knew that from his broadcasts, right?

21  A.  Yes.

22  Q.  And in 2020, you invested in GTV, right?

23  A.  Correct.

24  Q.  Approximately $19,994?

25  A.  Yes.

O79BGUO2                    Leanne Li  - Cross

1   Q.  And you made that investment through GTV Canada, right?

2   A.  Say that again.  I'm sorry.

3   Q.  You were living in Canada at the time you made that

4   investment, correct?

5   A.  Yes.

6   Q.  You made the decision to invest in GTV after watching Miles

7   Guo's broadcasts, right?

8   A.  Yes.

9   Q.  And Guo talked about GTV during those broadcasts, correct?

10  A.  Yes.

11  Q.  He said that investment in GTV would result in the investor

12  getting stock in GTV, right?

13  A.  Yes.

14  Q.  You started working for G Fashion in 2020, correct?

15  A.  Correct.

16  Q.  And Miles Guo offered you that job, didn't he?

17  A.  No.

18  Q.  Miles Guo suggested the job to you or mentioned the job to

19  you, correct?

20  A.  He did a referral.

21  Q.  And the "G" in G Fashion stands for Miles Guo, correct,

22  stands for Guo?

23  A.  No, "G" stands for God and Goodness.

24  Q.  Your testimony is for G Fashion in particular the "G"

25  stands for both God and Goodness?

O79BGUO2                         Leanne Li  - Cross

1    A.  Yes, correct.

2    Q.  You stopped working at G Fashion LA when that office was

3    shutdown in 2021, right?

4    A.  Yes.

5    Q.  And you were paid a salary for your work at G Fashion LA,

6    correct?

7    A.  Yes.

8    Q.  Approximately $80,000 in 2020; isn't that right?

9    A.  Yeah.

10   Q.  And approximately $70,000 in 2021; is that correct?

11   A.  Yeah.

12   Q.  And you testified on direct that you also got paid by the

13   Rule of Law Foundation for about a year, right?

14   A.  Correct.

15   Q.  You were paid $5,000 per month from July of 2021 through

16   July of 2022 from Rule of Law Foundation, right?

17   A.  Yes.

18   Q.  And those payments were under a consulting agreement; is

19   that right?

20   A.  Correct.

21            MS. MURRAY:  Ms. Loftus, if we could please pull up

22   Government Exhibit CO805 for the witness and the parties, and

23   if we could go to page 234.  Actually, this is not it. It's

24   only for the witness and the parties, Ms. Loftus.  We'll come

25   back to that.

O79BGUO2                           Leanne Li  - Cross

1   Q.  Ms. Li, you know the Rule of Law's money comes from donors,

2   right?

3   A.  Yes.

4   Q.  Donors like you, correct?

5   A.  Correct.

6   Q.  And you know that people believe they're donating so that

7   the Rule of Law money can be spent to help Chinese dissidence,

8   right?

9            MS. SHROFF:  Objection to what people believe.

10           THE COURT:  Overruled.  You may answer.

11  A.  Sorry.  Would you please ask the question again.

12  Q.  Sure.

13           MS. MURRAY:  If we could have that read back.

14           (The record was read)

15           MS. SHROFF:  Your Honor, objection, how would she

16  know.

17           THE COURT:  Overruled.  Do not make comments,

18  Ms. Shroff.  Go ahead.

19  A.  They're apart of it I believe.  I think.

20  Q.  Miles Guo said in his broadcast that the Rule of Law

21  companies were charities, correct?

22           THE INTERPRETER:  Counsel, can you repeat that.

23  Q.  Miles Guo said in his broadcasts that the Rule of Law

24  companies were charities, correct?

25  A.  I don't remember, but I think it is nonprofit organization.

1  Q.  And Miles Guo said in his broadcasts that the donations

2  would be used to further the whistleblower movement activities,

3  correct?

4  A.  Yes.

5  Q.  And you were paid approximately $60,000 over that year from

6  the Rule of Law Foundation, correct?

7  A.  I think so, yes.

8  Q.  Ms. Li, you own 50 percent of G Fashion on paper, don't

9  you?

10  A.  No, I don't think so.

11          MS. MURRAY:  Ms. Loftus, can we pull up Government

12  Exhibit 0PB12 which is in evidence, if we can publish it.

13  Q.  Ms. Li, this is a bank document that's in evidence.

14          If we can zoom in, Ms. Loftus, down to the bottom.

15          Do you see the name on the left here, Ms. Li?

16  A.  Yes.

17  Q.  Whose name is that?

18  A.  Leanne Li.

19  Q.  Is that your name?

20  A.  Yes, that's correct.

21  Q.  And the next line beneficial ownership, do you see the box

22  that's checked yes?

23  A.  Correct.

24  Q.  Do you see it says you own 50 percent?

25  A.  Correct.

O79BGUO2                          Leanne Li  - Cross

1  Q.  And on the right do you see the name Tian Hao?

2  A.  Yes.

3  Q.  Do you see that she is listed as owning 50 percent?

4  A.  Yes.

5  Q.  Ms. Li, you didn't pay anything for your 50 percent

6  ownership of G Fashion, correct?

7  A.  No.

8  Q.  You testified that in your role at G Fashion you opened

9  various bank accounts, right?

10  A.  Yes.

11  Q.  Including bank accounts in the name of G/Club?

12  A.  Correct.

13  Q.  And G/Club, that "G" stands for Guo, right?

14  A.  No.

15  Q.  What does that "G" stand for, Ms. Li?

16  A.  The "G" stand for God.

17  Q.  So G Fashion is God and Goodness and G/Clubs is the God and

18  Goodness club; is that your testimony?

19  A.  Yes.

20  Q.  The bank accounts that you opened received money from the

21  Himalaya farms, right?

22  A.  Sorry.

23  Q.  The G Fashion related bank accounts that you opened

24  received money from the Himalaya farms, correct?

25  A.  Yes.

1    Q.  And you're aware that Maywind is one of the companies

2    associated with the Phoenix farm?

3    A.  I don't know.

4    Q.  Are you aware, Ms. Li, that Medical Supply is one of the

5    companies associated with the Phoenix farm?

6    A.  I don't know.

7    Q.  You do know, Ms. Li, that Mountain of Spices is affiliated

8    with the New York farm, right?

9    A.  Yes.

10           MS. MURRAY:  Ms. Loftus, let's pull up Government

11   Exhibit BOA176.

12   Q.  Ms. Li, you know that Long Island David or brother Chang

13   Dao is the leader of the New York farm, correct?

14   A.  Can you repeat that question again.

15   Q.  You know that Long Island David or brother Chang Dao is the

16   leader of the New York farm, correct, Qidong Xia is another one

17   of his names?

18   A.  Before he was not, now I think so.

19   Q.  He was the leader of the New York farm in 2020, correct?

20   A.  I think so.

21   Q.  So this is a bank record for Mountain Of spices.  Do you

22   see that, top left?

23   A.  Yes.

24           MS. MURRAY:  And if we could go, Ms. Loftus, now to

25   page 12.

O79BGUO2                          Leanne Li  - Cross

 1   Q.  Looking at the first page, this is for August of 2020,
 2   right, Ms. Li?
 3   A.  Yes.
 4          MS. MURRAY:  And we can go to page 12, please,
 5   Ms. Loftus.
 6   Q.  Looking at the top here, Ms. Li, do you see on August 14,
 7   there's a transaction.  Do you see that?
 8   A.  Yes.
 9   Q.  And that's a wire out from the Mountain of Spices account
10   to a G Fashion account, correct?
11   A.  Yes.
12   Q.  For $1.1 million, right?
13   A.  Yes.
14          MS. MURRAY:  And now, Ms. Loftus, let's take that down
15   and go to Government Exhibit 0PB3 also in evidence.
16   Q.  Ms. Li, this is an Open Bank, bank record for a G Fashion
17   account, right?
18   A.  Yes.
19   Q.  For January of 2021, correct?
20   A.  Yes.
21   Q.  And that North Harper Avenue address, that was the address
22   where you worked for G Fashion in LA, correct?
23   A.  That's the initial address.
24   Q.  And looking at this --
25          MS. MURRAY:  If we could go down, Ms. Loftus, to the

O79BGUO2                    Leanne Li  - Cross

1    next page, the next page if we could.  So focusing in on the

2    top portion of this down, the text.  We don't need to get the

3    header, just Carefree business checking account to the bottom.

4    Q.  Ms. Li, this shows that there was an incoming wire for

5    Medical Supply System International on November 18, 2020,

6    right?

7    A.  Yes.

8    Q.  That's a wire into your G Fashion account, correct?

9    A.  Correct.

10   Q.  For $2.83 million?

11   A.  Yes.

12   Q.  We can take that down.

13          Ms. Li, Miles Guo gave instructions for how you, Tian

14   Hao and Sara Wei of the Phoenix farm should work together

15   regarding money transfers, right?

16   A.  Correct.

17   Q.  And you used some of this money from the Himalaya farms to

18   fund G Fashion's business, correct?

19   A.  I don't remember.

20   Q.  Ms. Li, is it your testimony that you didn't use the money

21   in the G Fashion account in part to fund G Fashion's business?

22   A.  Maybe I did, but I don't remember.

23   Q.  You sent some of the money in the G Fashion accounts to ACA

24   Capital bank account in Abu Dhabi, right?

25   A.  Yes.

1              MS. MURRAY:  If we could just pull up, please,

2     Government Exhibit OPB6 which is in evidence so we can publish

3     it.

4     Q.  Ms. Li, this is one of the G/Club account that you opened,

5     correct?

6     A.  Yes.

7     Q.  G/Club Three at the same address in Los Angeles, correct?

8     A.  Correct.

9     Q.  And this is a statement from January 31, 2021 correct?

10    A.  Correct.

11             MS. MURRAY:  If we can focus, Ms. Loftus, through to

12    the bottom of this section.

13    Q.  Ms. Li, looking at the first outgoing wire, that's a wire

14    on January 20, 2021 from this G/Club account to ACA Capital

15    Group, right?

16    A.  Yes.

17    Q.  And that's in the amount of a million dollars?

18    A.  Yes.

19    Q.  There's a second wire that same day from this account to

20    ACA Capital, correct?

21    A.  How do you know it's the same account?

22    Q.  We're looking at account statement for the account that you

23    had an Open Bank, right, Ms. Li?

24    A.  Yes.

25    Q.  I asked if it was the same day?

1   A.  Yes.  Okay.

2   Q.  And it's going to ACA Capital, correct?

3   A.  Correct.

4   Q.  And it's for $3 million, right?

5   A.  Yes.

6   Q.  And then two days later, January 22, 2021, there's an

7   outgoing wire to ACA Capital Group, correct?

8   A.  Yes.

9   Q.  And this is in the amount of $5,829,885, right?

10  A.  Correct.

11  Q.  Ms. Li, you made those outgoing wire transfers to ACA

12  Capital at Miles Guo's direction, right?

13  A.  No.

14  Q.  Your testimony is that you made the decision to send the

15  money to ACA Capital on your own?

16  A.  No.

17  Q.  Who directed you to send that money to ACA Capital?

18  A.  Yvette.

19  Q.  Yvette Wang?

20  A.  Correct.

21  Q.  What role, if any, did Yvette Wang have at G Fashion?

22  A.  I think based on my memory, I think she was the president

23  of G Fashion Media.

24          MS. MURRAY:  We can take that down, Ms. Loftus.

25  Q.  By the way, Ms. Li, do you know what money laundering is?

```
 1   A.  Yes.
 2   Q.  Can you describe for the jury your understanding of what it
 3   is?
 4   A.  I'm sorry.  I don't know how to describe it.
 5   Q.  That's okay.  I'll move on.
 6           G Fashion lost money in its first year in business,
 7   right?
 8   A.  Yes.
 9   Q.  Between July of 2020 and May of 2021, G Fashion had lost
10   about $23 million, correct?
11   A.  I don't think so.
12   Q.  Do you recall Miles Guo having broadcast that G Fashion had
13   lost about $23 million during that time period?
14   A.  I don't know.
15   Q.  And people complained about the quality of the merchandise
16   that G Fashion sold, right?
17   A.  Yes.
18   Q.  Miles Guo himself described some of the products of poor
19   quality on a broadcast, right?
20   A.  Yes.
21           MS. MURRAY:  Ms. Loftus, if we could pull up
22   Government Exhibit Z9 at page 93.
23   Q.  Ms. Li, looking at the top left here, what is the date of
24   this entry on this chart which is in evidence?
25           MS. MURRAY:  Sorry, just give us a moment, please.
```

1    A.  Can you highlight it for me?

2              MS. MURRAY:  Ms. Loftus.

3    A.  May 20, 2021.

4    Q.  And on what website was this posted according to the second

5    column?

6    A.  G News.

7    Q.  And, Ms. Li, the "G" in G News stands for Miles Guo, right?

8    A.  No.

9    Q.  What does it stand for?

10   A.  It stands for God and Goodness.

11   Q.  Looking at this, Ms. Li, the photo that is shown in the

12   screen capture there, Ms. Li, that's Mr. Guo, right?

13   A.  Yes.

14             MS. MURRAY:  If we could zoom out a little please,

15   Ms. Loftus, and if we could focus on the bottom paragraph

16   leading into the next page 94, down to the next paragraph as

17   well.

18   Q.  Ms. Li, this is a transcript and translation of Miles Guo's

19   broadcast.  It says here that G Fashion has lost at least 23 to

20   25 million U.S. dollars.  Do you see that?

21   A.  Yes.

22   Q.  And then looking at the next paragraph down there, do you

23   see where Miles Guo said some of the products are poor quality?

24   A.  Yes.

25             MS. MURRAY:  And if we could zoom out of that,

1  Ms. Loftus, and zoom in on the next paragraph, please.

2  Q.  Ms. Li, some of the G Fashion items were made in China,

3  right?

4  A.  Yes.

5  Q.  So G Fashion paid companies in China to make certain

6  products that it sold to anti-CCP freedom fighters; is that

7  right?

8  A.  No, we did not pay the Chinese company directly.  I think,

9  based on my memory, it was LA American company, but they

10 outsource the work to China.

11 Q.  But you were aware that G Fashion's products had been made

12 in China, right?

13 A.  Only hat, socks and underwears, and we do not sell those.

14 We give it away as a gift.

15 Q.  And those items were not free for G Fashion to acquire,

16 correct?

17 A.  Yes.

18 Q.  And this is again from that same broadcast from Miles Guo,

19 do you see where he said, Structural parts of this hat are made

20 in China and there is no alternative.  Do you see that second

21 line into the third?

22 A.  Yes.

23 Q.  Do you see where he says, We're only told about this after

24 we had brought it.  Do you see that?

25 A.  Yes.

O79BGUO2                        Leanne Li  - Cross

1   Q.  So G Fashion did buy the items, paid for the items that had

2   been made in China, right?

3   A.  Not directly to the Chinese company.

4   Q.  My question was whether G Fashion paid for the merchandise

5   that it ended up receiving that had been made in China?

6   A.  Yes.

7           MS. MURRAY:  We can take that down, Ms. Loftus.

8   Q.  You testified on direct that Miles Guo sent you to the UK

9   to meet with William Je at the Himalaya Exchange, right?

10  A.  Yes.

11  Q.  That was in 2022, correct?

12  A.  Around that time.

13  Q.  And it was Miles Guo who directed you to review the

14  finances of the Himalaya Exchange, right?

15  A.  Correct.

16  Q.  And you testified that William Je sent you away the first

17  day, right?

18  A.  Correct.

19  Q.  Ms. Li, you're aware that the Himalaya Exchange has since

20  moved its operations to Abu Dhabi, aren't you?

21  A.  Can you repeat that question again.

22  Q.  You're aware that the Himalaya Exchange has since moved its

23  operation to Abu Dhabi, aren't you?

24  A.  Part of the operation.

25  Q.  Is that a yes, ma'am?

```
 1              MS. SHROFF:  Objection, the witness is answered the
 2    question.
 3              THE COURT:  Sustained.  Go ahead.
 4    Q.  And you said that you went back a second day to the
 5    Himalaya Exchange during that trip to the UK, correct?
 6    A.  Yes.
 7    Q.  Do you know who Jesse Brown is?
 8    A.  No.
 9    Q.  You weren't aware that Jesse Brown was the CEO of the
10    Himalaya Exchange for a period?
11              MS. SHROFF:  Objection, asked and answered.  She said
12    she doesn't know who Jesse Brown is.
13              THE COURT:  Sustained.  Go ahead.
14    Q.  Ms. Li, were you aware that an individual named Jesse Brown
15    was the CEO of the Himalaya Exchange?
16              MS. SHROFF:  Objection.
17              THE COURT:  She's already said she doesn't know who
18    Jesse Brown is.
19              MS. MURRAY:  I asked whether an individual with that
20    name was the CEO of the Himalaya Exchange, your Honor.
21              MS. SHROFF:  Same objection.
22              THE COURT:  Sustained.
23    Q.  Ms. Li, the US government seized nearly $10 million from a
24    G Fashion bank account at U.S. Bank in October of 2022,
25    correct?
```

O79BGUO2                    Leanne Li  - Cross

1   A.  Correct.

2   Q.  That was one of the accounts you were a signer on, right?

3   A.  Yes.

4   Q.  You testified yesterday that you had never seen Miles Guo

5   before yesterday; is that right?

6   A.  Yes.

7   Q.  And you testified today that you've never been to the

8   Mahwah residence; is that right?

9   A.  Yes.

10  Q.  You're asked a number of questions on direct about power

11  points that you prepare for different properties.  Do you

12  remember those?

13  A.  Can you rephrase that question again.

14  Q.  You were asked a number of questions on direct examination

15  about decks that you prepared with information about different

16  real estate properties.  Do you remember those?

17  A.  Yes.

18  Q.  And the decks that related to properties in California and

19  Texas and Hawaii, those were from June of 2022, right?

20  A.  I don't remember.

21  Q.  Ms. Li, you testified at one point that the Mahwah property

22  was purchased in 2020, do you remember saying that?

23  A.  I don't remember.

24  Q.  I think later you testified that it was purchased at the

25  end of 2021, do you recall that testimony?

O79BGUO2                      Leanne Li  - Cross

1   A.  Yes.

2   Q.  The Mahwah residence was a large mansion, correct?

3   A.  Depends which property you going to compare to.

4   Q.  Is it your testimony that a 50,000 square foot property is

5   not large?

6   A.  I have seen bigger ones.

7   Q.  Ms. Li, Miles Guo broadcast from the Mahwah residence,

8   correct?

9   A.  I think so, yes.

10   Q.  And he broadcast from his apartment at the Sherry

11   Netherland in Manhattan, right?

12   A.  Yes.

13   Q.  And he broadcast from his home in Greenwich, Connecticut,

14   right?

15   A.  Yes.

16   Q.  You have an account on Gettr, correct?

17   A.  Correct.

18   Q.  And the "G" in Gettr, that stands for Miles Guo, right?

19   A.  No.

20   Q.  Does that one also stand for God and Goodness; is that your

21   testimony?

22   A.  Yes.

23   Q.  Your account on Gettr is under the G Fashion name, right?

24   A.  Yes.

25   Q.  And your handle is @Cornfieldsis; is that correct?

O79BGUO2                        Leanne Li  - Cross

1  A.  Correct.

2          MS. MURRAY:  If we could show the witness and the

3  parties and the Court what's marked for identification as

4  Government Exhibit CO801.

5  Q.  Ms. Li, are you able to see what's up on your screen?

6  A.  Yes.

7          MS. MURRAY:  Ms. Loftus, if we could scroll through

8  the next few pages, please.

9  Q.  Are these screenshots taken from your getter account,

10  Ms. Li?

11  A.  Yes.

12          MS. MURRAY:  Your Honor, the government offers CO801.

13          THE COURT:  No objection.

14          MS. SHROFF:  Have you played the whole one?  Is it

15  complete.

16          MS. MURRAY:  Yes.

17          MS. SHROFF:  No objection.

18          THE COURT:  It is admitted.

19          (Government's Exhibit CO801 received in evidence)

20  BY MS. MURRAY:

21  Q.  If we can go to the first page again, please, Ms. Loftus.

22          Ms. Li, who is shown in the photo associated with your

23  Gettr profile there?

24          MS. MURRAY:  If we could publish, Ms. Loftus, please.

25  Thank you. Everyone can see it now.

O79BGUO2                     Leanne Li  - Cross

1  Q.  Can you please tell us who is shown in that horizontal

2  photo associated with your Gettr account?

3       MS. SHROFF:  I don't think she's going to understand

4  "horizontal."

5       THE COURT:  You can answer.

6       MS. MURRAY:  If we can zoom in on that image that's

7  referring to the photograph, not the emoji.

8  Q.  Who is that?

9  A.  Can you please ask the question again because I thought you

10 were talking to the jury.

11 Q.  Sure.  Ms. Li, who is in this photograph?

12 A.  Mr. Miles.

13 Q.  We can zoom out of that.

14      And looking here, Ms. Li, G Fashion.com, that website

15 is listed as part of your Gettr profile, correct?

16 A.  Yes, so the people can redirect to G Fashion.com.

17 Q.  Let's go to next page please, Ms. Loftus.

18      Ms. Li, this is a screenshot of a post from June 22,

19 2023 on your account, right?

20 A.  Yes.

21 Q.  And we can see there before the date that's your handle,

22 correct, Cornfieldsis?

23 A.  Yes.

24 Q.  If we could zoom in on the four photos, please, Ms. Loftus.

25      Who's in these photos, Ms. Li?

O79BGUO2                    Leanne Li  - Cross

1    A.  Mr. Miles.

2    Q.  What is he doing in these photos?

3    A.  He's checking the fabrics.

4    Q.  We can zoom out for a moment.

5            The post has a number of hearts on top of it; is that

6    right?

7    A.  Correct.

8    Q.  Let go to the next page, please.

9            This is a post from your Gettr account from May 11,

10   2023, right?

11   A.  Yes.

12   Q.  And that's a still from the filming of The Hero music

13   video, correct?

14   A.  Yes.

15   Q.  And there is an emoji of a face with heart eyes and then

16   hearts on this post, right?

17   A.  Yes.

18   Q.  And you testified on direct I believe that the substance of

19   that music video and that song related to fighting the CCP,

20   correct?

21           MS. SHROFF:  Objection, misstates the testimony.

22           THE COURT:  Overruled.  You may answer.

23   Q.  Ms. Li, you testified that Hero is a song in substance

24   about fighting against the CCP, correct?

25           MS. SHROFF:  Objection, misstates the testimony of the

1    witness.

2              THE COURT:  Overruled.  She stated that the video had

3    to do with the CCP oppression of Mongolian culture.

4              MS. SHROFF:  That's correct, your Honor.

5              THE COURT:  Go ahead.

6              MS. MURRAY:  Thank you, your Honor.

7    Q.  Ms. Li, is it fair to say that you would characterize the

8    song Hero as being anti-CCP?

9    A.  Yes, it's honor the people that stood up to the CCP for the

10   Mongolian people for the bravery.

11   Q.  Ms. Li, do you know whether the people who stood up to the

12   CCP for the Mongolian people used lightsabers?

13   A.  I don't know.

14   Q.  And you were involved with the filming of this music video,

15   correct?

16   A.  I coordinate it.

17   Q.  And it cost approximately a million dollars to make; isn't

18   that right?

19   A.  No, I don't think so.

20   Q.  What is your testimony about how much that music video

21   cost?

22   A.  I don't remember.

23             MS. MURRAY:  Let's go to next page please, Ms. Loftus.

24             THE INTERPRETER:  I want to make sure, did you say

25   light savers or lightsabers?

O79BGUO2                    Leanne Li  - Cross

1              MS. MURRAY:  Lightsabers.

2    Q.  Ms. Li, this is a post on your account from May 9 of 2023,

3    right?

4    A.  Yes.

5    Q.  And who is in the photo for this post?

6    A.  Mr. Miles.

7    Q.  Can you read what you wrote in English in the caption?

8    A.  Happy birthday and miss you very much.  You are the hero of

9    our time.  Waiting for you to come home.

10             MS. MURRAY:  We can take that down, Ms. Loftus.  Thank

11   you.

12   Q.  Ms. Li, you testified that some of the real estate

13   searching that you did related to the NFSC, correct?

14   A.  Yes.

15   Q.  You also testified that you and Kamel of G Fashion did work

16   relating to the NFSC, right?

17   A.  Can you repeat that question again or rephrase that.

18   Q.  Sure.  You also testified that you and Kamel among others

19   were in a chat group that discussed things relating to the

20   NFSC, right?

21   A.  Kamel is not in that group.  That group is myself, Jason,

22   Brian and Gandolf.  Kamel is not in that group.

23   Q.  During the period that you have been paid by G Fashion,

24   you've also done work relating to the NFSC, correct?

25   A.  Yes.

1           MS. MURRAY:  Ms. Loftus, if we could pull up

2     Government Exhibit Z9 at page 15.

3     Q.  Ms. Li, this is a date, can you read the date that's on

4     this chart?

5     A.  June 28, 2020.

6     Q.  And on what website was this posted?

7     A.  G News.

8     Q.  Do you see where it says, me, Miles Guo, will never ask for

9     a cent from you for G Series?

10    A.  Yes.

11    Q.  And, Ms. Li, is it your testimony that the "G" in G Series

12    stands for God and Goodness?

13    A.  Yes.

14    Q.  The text here in this transcript says, "The NFSC, please

15    remember in the future that it is a quasi-political entity.

16    The G Series GTV, G Fashion, G/Club, G Coin and G Dollar have

17    no substantial connection with the NFSC."

18           Do you see that?

19    A.  Yes.

20    Q.  When you were doing research relating to a physical

21    location for the NFSC, you were being paid by G Fashion, right?

22    A.  Correct.

23           MS. MURRAY:  We can take that down.  Ms. Loftus, if we

24    can put up just for the witness Government Exhibit CO802.

25    Q.  Ms. Li, do you recognize what is depicted here?

O79BGUO2                           Leanne Li  - Cross

1    A.  Yes.

2    Q.  What is it?

3    A.  It's New Federal State of China's national flag.

4              MS. MURRAY:  Your Honor, the Government offers

5    Government Exhibit C0802.

6              MS. SHROFF:  No objection, your Honor.

7              THE COURT:  It is admitted.

8              (Government's Exhibit C0802 received in evidence)

9              MS. MURRAY:  We don't need to publish that, Ms.

10   Loftus.  Thank you.

11   Q.  By the way, Ms. Li, when you sent money from one of the G

12   Fashion accounts that you controlled to the company called

13   Medical Supply, you weren't buying medical supplies, were you?

14   A.  Can you tell me which year?

15   Q.  We can pull it up again.  Ms. Loftus, if we could please

16   pull up Government Exhibit 0PB3, the document we looked at from

17   November of 2020.

18              This is November of 2020, Ms. Li, and let me just

19   clarify.  It was incoming from medical supplies.

20   A.  Exactly.  It's not outsourcing.  Exactly.  Correct.

21   Q.  Was Medical Supply supplying medical supplies to G Fashion?

22   A.  No, it was a loan agreement with them.

23   Q.  And that was with one of the farms, correct, the Himalaya

24   farms?

25   A.  I don't know.

Q.  You didn't draft that loan agreement, did you, Ms. Li?

A.  No.

          MS. MURRAY:  You can take that down, Ms. Loftus.  May
I have a moment, your Honor?

          THE COURT:  Yes.

          MS. MURRAY:  Nothing further.  Thank you.

          THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. SHROFF:

Q.  Ms. Li, you were asked questions about the money G Fashion
lost, correct?

A.  Yes.

Q.  In what year was it that G Fashion lost money, do you know?

A.  2020.

Q.  Did G Fashion do better in 2021?

A.  Roughly or about the same because you're founding a
company.  You're setting up, so the first few year is all about
investment.

          MS. MURRAY:  Your Honor, objection.  Move to strike as
non-responsive.

          THE COURT:  I will strike everything after -- I'm
going to strike the whole thing.

Q.  Did G Fashion do better financially in 2022?

A.  I was not involved.

Q.  How about in 2023?

O79BGUO2                          Leanne Li - Redirect

1    A.   Yes.

2    Q.   And how about now in 2024?

3    A.   Better.

4    Q.   Is G Fashion still up and running?

5    A.   Yes.

6            MS. MURRAY:  Objection, your Honor, relevance.

7            THE COURT:  Sustained.

8            MS. SHROFF:  Your Honor, she opened the door on cross.

9            THE COURT:  You can step up.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O79BGUO2                          Leanne Li - Redirect

1                   (At the sidebar)

2                   THE COURT:  You're saying that she opened the door to

3       current operations?

4                   MS. SHROFF:  We're entitled to show that G Fashion

5       grew, that it was not a defunct company.  And the government

6       has an ongoing Rico charge.  Part of the Rico enterprise is to

7       say they're sham companies, and we're entitled to show there

8       was a trajectory of growth.  This was not a sham company.  If

9       it was a crappy product at one point in time, the crappiness

10      was eliminated, which I intend to go into next.

11                  THE COURT:  What they're trying to show is that your

12      client is a fraudster during a certain period of time that does

13      not include today.

14                  MS. SHROFF:  Okay.  I will stop as to where -- where

15      is it that the government claims the Rico stops?  What is the

16      date?

17                  MS. MURRAY:  Your Honor, we charged a date range in

18      the indictment that's through in or about, and that's in or

19      about the defendant's arrest, March 15, 2023.  But I also note

20      that we renew our objection for -- our request for the

21      continuing operations limiting instruction.  I believe

22      yesterday the Court said it wasn't necessary.  To the extent

23      that Ms. Shroff intends to go into this line of questioning,

24      including the argument that the revenue of these fraud entity

25      was somehow relevant to this defendant, we would ask for a

1    limiting instruction.

2             THE COURT:  What's the date of the request?

3             MR. HORTON:  We submitted it as part of our July 7th,

4    letter requesting a few supplemental instructions in the jury

5    charge, an instruction that the continued operations of any of

6    the entities is irrelevant.  And your Honor explained in the

7    Court's ruling yesterday morning that you didn't think it was

8    necessary on the record at the time.  We submit this is a

9    second shot at this line of argument, that it's relevant, and

10   the jury's now heard about it, continuing operations of the

11   Himalaya Exchange and continued operations of G Fashion.  The

12   Court's recognized that every sidebar we've had on this issue

13   it's not been relevant.  It's not appropriate, so we just renew

14   our request for that instruction.

15            MS. SHROFF:  The government is the one who brought up

16   the Himalaya Exchange, not us.  They asked if the Himalaya

17   Exchange had moved to Abu Dhabi.  That was not us.  We never

18   brought out where Himalaya Exchange moved to.  All of our

19   questioning about Himalaya Exchange was limited to the time

20   period of 2021 and 2022.  The government also brought out the

21   fact that this company was shotty, their work product was bad,

22   their work product was refunded, and it was more than that.

23   They tried to imply that this company got the product from

24   China and sold it as non-Chinese product, so we're entitled to

25   go into all of that.  All of it is completely relevant only

1   because the government crossed on it.  If the government hadn't

2   crossed on the fact that Himalaya Exchange had moved to Abu

3   Dhabi, why would I care where Himalaya Exchange has moved to?

4          MS. MURRAY:  One point.  Mr. Horton was referring to

5   the Himalaya Exchange evidence that came in previously with one

6   of the defense witnesses who testified about the video that he

7   had made about accessing the account, not about the comments

8   that were made today.  With respect to Ms. Shroff's claim that

9   the government has opened the door.  On direct Mr. Shroff asked

10  a series of questions about recent visits that Ms. Li made to

11  different warehouses that were located in Italy and ask where

12  she's going after her testimony, and she testified she's going

13  back to Milan, Italy to continue working at G Fashion.  The

14  government did not open the door on cross examination.  The

15  scope and extent Ms. Shroff is suggesting to introduce about

16  G Fashion operations is entirely irrelevant and inappropriate

17  and prejudicial.  And with respect to things like products

18  being made in China, Mr. Guo himself said that in evidence that

19  has been admitted.

20         MS. SHROFF:  That's not what Mr. Guo said.  What

21  Mr. Guo said was, he had contracted with a company that

22  subcontracted and brought the products in China, and they

23  didn't know, and that's in the text and that is something I'm

24  clearly entitled to clean up.  Her visits to the factory were

25  in 2021 and 2022, while the defendant covers that time period,

O79BGUO2                    Leanne Li - Redirect

1    long her visits to those factories are before May 15 of 2023

2    when he gets arrested.  Her visits to those factories show an

3    ongoing enterprise which is legitimate which is G Fashion that

4    is why those questions were asked, not because we are trying to

5    show anything post-2023 or 2024.  That was the relevance of

6    that.  I'm going to let Mr. Schirick --

7         MR. SCHIRICK:  Briefly, your Honor, if I might add.

8    With respect to the Exchange part of what the government is

9    arguing here, we did go out of our way to make sure when

10   Mr. Dai testified about the Exchange and the videos that were

11   being watched that we pointed out that it was the same as in

12   2022.  We clearly tied it back to that period of time

13   specifically for the reason that the government stated.

14        MR. HORTON:  For the completeness of the record, that

15   happened after your Honor had a sidebar asking me why I hadn't

16   objected to the relevance of the contemporary use of the app.

17   After an extensive record was made, I was trying to hold back,

18   including because I'm trying to get this trial done.  I held

19   back.  There was an extensive record made about how the witness

20   had made that recording the night before he testified.  I think

21   the record on that speaks for itself.

22        MR. SCHIRICK:  The point is, we did tie it back to

23   2022, so there's not prejudice.

24        MS. SHROFF:  And more importantly, you didn't object.

25   That's on you.

1           MR. SCHIRICK:  I think the Court has --

2           THE COURT:  Ms. Shroff, please do not address the

3     other attorneys.  Just address me.

4           MS. SHROFF:  They had an opportunity to object.  They

5     didn't object.  The evidence didn't come over their objection.

6     It came in on their consent.  Nothing we have done here has

7     been other than in response to the questions they put to this

8     witness.  They're trying to argue that G Fashion lost 23

9     million.  I'm entitled to answer that.

10          THE COURT:  Let's go to that first.  That G Fashion

11    lost that money during the charged period is relevant, what

12    happened afterwards whether it lost even more or whether it was

13    wildly successful is not relevant.

14          MS. SHROFF:  Whether it lost value, successful or lost

15    more money up until May 15 of 2023, it's relevant, right,

16    because that's the charge conspiracy.

17          THE COURT:  The charged period.

18          MS. SHROFF:  Right. I'm happy to stop at the charge

19    period.  What I'm trying to show is about the hats and the

20    companies all of which the government brought out, I'm entitled

21    to go back and clean that up to show that the way they read

22    those documents is completely wrong.  That during that time

23    period G Fashion had problems, they addressed those problems

24    and they moved forward.  How is that not relevant?

25          THE COURT:  What exactly were you getting at?

```
 1              MS. MURRAY:  On the objection, your Honor?

 2              THE COURT:  No, I'm confused as to --

 3              MS. MURRAY:  I think what Ms. Shroff is referring to

 4      is when I pulled up a document in evidence and I read as

 5      written the statement that Miles Guo made about certain

 6      products that were made in China, and I confirm with the

 7      witness that G Fashion had paid for those products.

 8              THE COURT:  Right.  So that's perfectly appropriate to

 9      bring that out, and I just don't know what more you want to do

10      with that.

11              MS. SHROFF:  What she read wasn't in fact what it

12      said, and then the witness tried to explain it and the witness

13      explained that the contract between G Fashion was not with the

14      Chinese product giver.  They had contract with an American

15      company.  The American company unbeknownst to G Fashion

16      subcontracted with Chinese vendor and the product came from

17      China.

18              THE COURT:  So both Miles Guo in his quote as well as

19      the witness have already said that, so there's no more on that.

20      No more, Ms. Shroff.  So what is open at this point?

21              MS. MURRAY:  Your Honor, I think we would just note

22      that we would renew our request for a jury charge on continuing

23      operations.  Other than that, we believe the Court has ruled on

24      everything.  We believe a lot of testimony has been covered and

25      we're ready to move on.
```

 1            THE COURT:  Are you asking for an instruction at this

 2   time?

 3            MS. MURRAY:  I misspoke.  That limiting instruction, I

 4   think given the fact that these two different schemes are now

 5   in front of the jury with most recent post-indictment,

 6   post-arrest operation, we would renew that request.

 7            THE COURT:  I'm going to think about that.

 8            (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  Sustained.  Go ahead.

3   BY MS. SHROFF:

4   Q.  Ms. Li, you were asked questions by the government about

5   the poor quality of products by G Fashion, correct?

6   A.  Correct.

7   Q.  When you received complaints about products for G Fashion,

8   did you endeavor to fix those problems?

9   A.  Yes.

10  Q.  Could I show the witness GXZ993.

11       Do you recall being asked questions about this

12  document?

13  A.  Yes.

14  Q.  And after you heard about the complaints for certain

15  products, did you stop hiring or doing business with those

16  vendors?

17  A.  Yes.

18  Q.  We can take that down.  You were shown GC0801, correct?  If

19  I could just have that pulled up.

20       While it's being pulled up, this is your Gettr handle;

21  is that correct?

22  A.  Yes.

23  Q.  If I could scroll down, please.

24       You were asked questions about these post that you

25  made, do you recall that?

1   A.  Yes.

2   Q.  Could you scroll down a little bit more.  And you see those

3   emojis?

4   A.  Yes.

5   Q.  And do you see the emoji on the next picture?

6   A.  Yes.

7   Q.  Are you a frequent emoji user?

8   A.  Absolutely.

9   Q.  You were asked questions about lightsabers, correct?

10  A.  Correct.

11  Q.  In the videos, correct?

12  A.  Yes.

13  Q.  Was the video supposed to be an artistic display of

14  something?

15  A.  Yes.

16          MS. MURRAY:  Objection.

17          THE COURT:  Sustained.  Don't lead.

18  Q.  What was the video suppose to do, do you know?

19          Can you explain it?  It's okay.  I'll move on.  Don't

20  worry about it.

21          Could I show her Z9, please.

22          You were shown page 15 of this document, correct?

23  A.  Yes.

24  Q.  Ms. Li, had you seen this document before today?

25  A.  No.

1    Q.  And you were directed to language by the prosecutor where

2    it says quasi-political, correct?

3    A.  Yes.

4    Q.  Could I show her the language, please.  Do you know what

5    quasi-political means?

6    A.  No.

7    Q.  Do you know what it means when it says no substantial

8    connections?

9    A.  No.

10    Q.  We can take that down.  You were shown C0802, correct, and

11    let's show it to the jury as well.

12          What is that?

13    A.  New Federal State of China flag.

14    Q.  What's in the center?

15    A.  It's a seven point star.

16    Q.  Why seven points?

17    A.  So let me explain this.  Okay.  So in seven and three,

18    these two numbers are very mysterious in Taoism.  So seven,

19    that means that you're connecting can with the universe.  It's

20    almost like channels, and then we call it belief stars.

21          MS. SHROFF:  I have nothing further.

22          THE COURT:  Recross.

23    RECROSS EXAMINATION

24    BY MS. MURRAY:

25    Q.  Ms. Li, Miles Guo is also known as Brother Seven or Seventh

O79BGUO2                          Leanne Li - Redirect

1   Brother, correct?

2   A.  Correct.

3   Q.  And you want to help Miles Guo, right?

4   A.  Yes, because --

5   Q.  Just the question.

6   A.  Sorry.

7   Q.  You want to help Miles Guo, correct?

8   A.  Yes.

9           MS. MURRAY:  Nothing further.

10  REDIRECT EXAMINATION

11  BY MS. SHROFF:

12  Q.  If he were brother 27, would there be 27 stars on the NFSC

13  flag?

14          MS. MURRAY:  Objection, your Honor.

15  A.  No.

16          THE COURT:  All righty.  We heard enough about the

17  stars.

18  Q.  Ms. Li, you were asked by the government if you want to

19  help Miles Guo, correct?

20  A.  Yes.

21  Q.  Would you lie for Mr. Guo under oath?

22  A.  No.

23          MS. SHROFF:  Thank you, I'm done.

24          MS. MURRAY:  Nothing further.

25          THE COURT:  Thank you.  You may step out of the

 1   courtroom.

 2              (Witness excused)

 3              THE COURT:  You may call your next witness.

 4              MR. SCHIRICK:  Your Honor, the defense calls George

 5   Higginbotham.

 6   GEORGE HIGGINBOTHAM,

 7        called as a witness by the Defendant,

 8        having been duly sworn, testified as follows:

 9              THE COURT:  If you please state your name and spell

10   it.  You can be seated and bring the mic close to you so we can

11   hear you.

12              THE WITNESS:  My name is George, G-E-O-R-G-E,

13   Higginbotham, H-I-G-G-I-N-B-O-T-H-A-M.

14              THE COURT:  You may inquire.

15              MR. SCHIRICK:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. SCHIRICK:

18   Q.  Good afternoon, Mr. Higginbotham.

19   A.  Good afternoon.

20   Q.  Were you once employed by the US department of justice?

21              THE COURT:  It's a yes or no question.

22   A.  Yes, I was.

23   Q.  And when was that?

24   A.  I was employed from August of 2016 through August of 2018.

25   Q.  And why was your employment ended in August of 2018?

1    A.  I was terminated because of my involvement in a conspiracy

2    having to do with a influence scheme with a number of other

3    co-defendants.

4    Q.  And have you ever spoken with any of the lawyers --

5    withdrawn.

6           Aside from discussing travel arrangements, have you

7    ever spoken with any of the lawyers on Mr. Guo's defense team

8    prior to your testimony?

9    A.  No, all communications were through my own counsel.

10   Q.  And have you -- again same question, aside from discussing

11   travel arrangements, have you met with any of Mr. Guo's lawyers

12   to prepare for your testimony hear today?

13   A.  No, I haven't.  All communications were through my counsel.

14   Q.  Now, have you ever met Miles Guo before?

15   A.  No, I have not.

16   Q.  And have you ever spoken with him before?

17   A.  No, I have not.

18   Q.  And, sir, why are you here today?

19   A.  I was subpoenaed to testify by the defense.

20   Q.  Now, Mr. Higginbotham, have you ever pleaded guilty to a

21   crime?

22   A.  Yes, I have.

23   Q.  And what crime did you plead guilty to?

24   A.  Conspiracy to make a false statement or false statements to

25   a bank, one count.

1   Q.  And when did you plead guilty to that conspiracy count?

2   A.  November of 2018.

3   Q.  Were you working as a lawyer for the DOJ at the time of

4   your conduct that resulted in the guilty plea?

5   A.  Yes, I was.

6   Q.  And, sir, with whom did you conspire?

7   A.  Praz Michel as well as Elliot Broidy and I believe Nickie

8   Lum Davis were the co-conspirators as well as Jho Low.

9   Q.  And who is Elliot Broidy?

10  A.  Elliot Broidy was a an influential figure in the Republican

11  party.

12  Q.  And who was Mr. Pras Michel?

13  A.  Pras Michel was my client at the time.  He was an

14  entertainer rapper/musician, and I met him through my work in

15  the music industry.

16  Q.  And I believe you referred to someone as Jho Low; is that

17  correct?

18  A.  Yes, Jho Low.

19  Q.  Is the spelling J-H-O, last name; L-O-W, for the court

20  reporter?

21  A.  Yes.

22  Q.  And who is Jho Low?

23  A.  Jho Low is a financier who has been implicated in the 1MDB

24  embezzlement scheme that took place earlier a number of years

25  ago.

1   Q.  And what is your understanding of what the 1MDB scheme was?

2   A.  My understanding is that there was a sovereign wealth fund

3   established in Malaysia established by Jho Low in association

4   with other government officials.  Sovereign wealth fund is

5   basically where the government of a country backs a particular

6   financial instrument.  It's my understanding that or allegedly

7   Jho Low was the mastermind behind -- was the mastermind behind

8   embezzling billions of dollars from that sovereign wealth fund

9   that is name 1MDB.

10  Q.  At the time of the conspiracy, to your knowledge was

11  Mr. Low the subject of an asset forfeiture claim that was

12  brought by the department of justice?

13  A.  Yes, he was.

14  Q.  And those asset forfeiture claims related to Mr. Low's role

15  in the 1MDB scandal?

16  A.  Yes, it was.

17  Q.  Did you meet ever meet Jho Low?

18  A.  I did meet Mr. Jho Low in Macao somewhere around the

19  timeframe of September of 2017.

20  Q.  We'll come back to that in a second.

21          When did you join the conspiracy to which you've

22  pleaded guilty, approximately month and year?

23  A.  I was first approached about Mr. Michel assisting Jho Low I

24  would say the first two or three months of 2017.

25  Q.  And how did you become involved in the conspiracy during

1    that first few months of 2017?

2    A.  My relationship with Mr. Michel went back a number of

3    years, probably to early 2002, 2003, and I had represented him

4    on a number of matters.  He approached me and ask me whether or

5    not I knew someone that might be able to assist in a matter

6    that was in front of DOJ, and then I came to find out that it

7    was the Jho Low forfeiture matter.

8    Q.  And what did Mr. Michel discuss with you about the Jho Low

9    matter?

10   A.  He said that there was this forfeiture matter which is a

11   civil matter in front of DOJ and that Jho Low was in need of an

12   attorney that had, not only legal gravitas, but also I would

13   say influence within the government because he felt that part

14   of the resolution of the matter would be somewhat political,

15   and someone with political connection might be able to assist

16   in resolving the 1MDB matter.

17   Q.  And what did you do to help with this issue?

18   A.  My primary responsibility was to draft contracts.

19   Q.  Well, maybe, let me try it this way.

20        What did you do first to help with this issue?

21   A.  Mr. Michel approach me and ask me if I knew any influential

22   lawyers that could potentially assist Jho Low.  As it turned

23   out, there was a neighbor in the building that I was living at

24   the time in Washington D.C. that operated a very high level

25   powerful headhunting firm for lawyers.  I approached her.  She

O79BGUO2                        Higginbotham- Direct

1    suggested two firms.  I believe one of the firms was conflicted
2    out, and the other firm looked to be of some promise to
3    Mr. Michel.
4    Q.  And ultimately was someone brought in to help Jho Low with
5    the 1MDB asset forfeiture issue?
6    A.  Not from either of the two attorneys that were suggested
7    through my neighbor.
8    Q.  Was someone else, not an attorney, ultimately brought --
9    A.  Yes.
10   Q.  Who is that?
11   A.  Mr. Michel was able to gain an introduction to Elliot
12   Broidy through Nickie Lum Davis, and Elliot Broidy was willing
13   to assist in this matter.
14   Q.  And Elliot Broidy you testified before was someone of
15   reputed influence in Republican politics?
16   A.  I believe he was a large Republican bundler in term of
17   election funds.
18   Q.  And what administration did Mr. Broidy purportedly have
19   influence with?
20   A.  The Republicans.
21   Q.  And what year is this again, this is 2017?
22   A.  This is 2017.
23   Q.  Now, aside from the 1MDB aspect of the conspiracy, was
24   there a second goal of the conspiracy as well?
25   A.  Towards the beginning of the summer of 2017, Mr. Michel

```
 1  told me that there was an opportunity that could potentially be
 2  lucrative for -- lucrative to us in terms of working through
 3  the same people, and that was the extradition of Guo Wengui.
 4  Q.  Could you just bring the microphone a little closer to your
 5  face.
 6  A.  Sure.
 7  Q.  You have a deep voice.  Sometimes it trails off.  Could you
 8  repeat that last answer.  I'm sorry.
 9  A.  Yes.  He told me about an opportunity that he had been
10  discussing which was the extradition of Guo Wengui.
11  Q.  And is Guo Wengui, Mr. Guo sitting here at the defense
12  table?
13  A.  I believe so.  I was introduced to him through Praz or
14  through Mr. Michel as Guo Wengui.
15  Q.  By name?
16  A.  By name, yes.
17  Q.  Now, where were you when you Mr. Michel first made this
18  request?
19  A.  I was here in New York City.
20  Q.  Were you at Mr. Michel's apartment at the time?
21  A.  Yes, I was.
22  Q.  And when was this approximately?
23  A.  I would say --
24  Q.  Month and year again if you can?
25  A.  Yeah.  I would say late June.  I would say June timeframe
```

O79BGUO2                          Higginbotham- Direct

1   of 2017.

2   Q.  Now, what did you understand the Chinese government was

3   willing to give in return for the successful extradition of

4   Mr. Guo?

5   A.  Well, Mr. Michel presented a very fantastic story to me at

6   the apartment at the time that he brought up this particular

7   matter.

8            MS. MURRAY:  Objection, your Honor, hearsay.

9            THE COURT:  Don't say what he said.

10  Q.  The question is your understanding.

11  A.  My understanding?

12  Q.  Yes.

13  A.  My understanding is that there were -- the Chinese

14  government would potentially -- if my memory serves

15  correctly -- offer a prisoner exchange.  There was purchase of

16  high ticket or high ticket items like planes from US industry

17  improved relations.  There was a number of things, but I think

18  those stand out in my mind.

19  Q.  I believe you said before that your understanding was that

20  to you and Mr. Michel and the others it could be potentially

21  very lucrative?

22  A.  Yes.

23  Q.  Now, what was Mr. Broidy's role in securing Mr. Guo's

24  extradition to China?

25  A.  Mr. Broidy, given his position in the Republican party had

O79BGUO2                        Higginbotham- Direct

1    a number of contacts that he was purportedly or allegedly going

2    to use in order to help resolve the 1MDB matter as well as the

3    extradition.

4              THE COURT:  What do you mean by "resolve?"

5              THE WITNESS:  Well, it's my understanding that the

6    1MDB matter was a forfeiture matter, and so it was Jho Low who

7    wanted that matter to be resolved.

8              THE COURT:  What do you mean by "resolved?"

9              THE WITNESS:  He wanted to gain access back to the US,

10   and he wanted to come to some kind of agreement with the

11   department of justice so he could continue his actions and

12   dealings with the US.

13             THE COURT:  Go ahead.

14             MR. SCHIRICK:  Thank you, your Honor.

15   Q.  Now, did there come a time that agreed to meet with the

16   ambassador -- withdrawn.

17             Did there come a time when you agreed to meet with the

18   US ambassador from China?

19   A.  Yes, there was.

20   Q.  And this was in connection with the conspiracy, correct?

21   A.  Yes, it is.

22   Q.  And when approximately was that?

23   A.  That would have been late June, early July of 2017.

24   Q.  And why were you meeting with the US ambassador from China?

25   A.  It's the Chinese ambassador to the US.

1   Q.  Thank you for that correction.  The Chinese ambassador to

2   the US, why were you meeting with the Chinese ambassador to the

3   US?

4   A.  Mr. Michel ask me to communicate a message to the

5   ambassador.

6   Q.  Did you in fact go to the Chinese Embassy in Washington and

7   meet with China's ambassador to the US?

8   A.  Yes, I did.

9   Q.  And when was that?

10          MS. MURRAY:  Asked and answered, your Honor.

11          MR. SCHIRICK:  The first question was with respect to

12   when the request came.

13          THE COURT:  You may answer.

14   A.  I met with the ambassador on a Sunday.  I believe the

15   request came in on a Friday for Mr. Michel.  He told me he

16   would give me more instruction.  He was on his way to D.C., and

17   I met with him earlier on the Sunday before I met with the

18   ambassador.

19   Q.  Now, aside from Mr. Michel, did you speak with anyone

20   else -- withdrawn.

21          Did you speak with anyone at the Chinese Embassy prior

22   to your visit with the ambassador?

23   A.  I believe I spoke with one of the ambassador's assistants

24   to just coordinate the meeting.

25   Q.  And what did the ambassador's assistant instruct you to do?

O79BGUO2                          Higginbotham- Direct

1  A.  We agreed on a time for the meeting on that particular

2  Sunday and come to the embassy.

3  Q.  And what did he instruct you to do when you got to the

4  embassy?

5  A.  I'm not sure I understand the question.

6  Q.  The embassy is presumably a large building?

7  A.  Yes.

8  Q.  What was his instruction to you as to how to gain access to

9  the embassy?

10  A.  I went to the front door so to speak.

11       MR. SCHIRICK:  If we could please pull up just for the

12  witness and parties DX60763.

13  Q.  Mr. Higginbotham, when you went to the embassy, did you

14  meet a couple of individuals from the embassy staff before

15  being introduced to the ambassador himself?

16  A.  Yes, I did.

17  Q.  Did those individuals present you with business cards?

18  A.  Yes, as I was leaving.

19  Q.  Can you see the screen in front of you?

20  A.  I can.

21  Q.  Do you recognize those business cards?

22  A.  I believe these are the business cards that I turned over

23  to DOJ when I was approached about the matter.

24  Q.  Are these the business cards that were given to you by the

25  Chinese embassy staff?

O79BGUO2                    Higginbotham- Direct

1   A.  Yes.

2   Q.  In July 2017?

3   A.  Yes, I believe so.

4           MR. SCHIRICK:  Your Honor, we move Defense Exhibit

5   60763 into evidence.

6           MS. MURRAY:  No objection.

7           THE COURT:  It is admitted.

8           (Defendant's Exhibit 60763 received in evidence)

9   BY MR. SCHIRICK:

10  Q.  Now, Mr. Higginbotham, could you please tell the jury what

11  happened at your meeting with the Chinese ambassador?

12  A.  It was a relatively quick meeting. I was brought in by the

13  assistant to the ambassador.  I was ushered into a very, very

14  large conference.  I believe that they had tea available there

15  for me.

16          The ambassador came in a short time later.  We

17  exchange pleasantries.  And he said in effect, okay, what is

18  the message.  And the message was that there were successful

19  efforts being made for the extradition of Mr. Guo Wengui and

20  that there would be additional information forthcoming from

21  General Mic Master.

22  Q.  And who is General Mic Master?

23  A.  I do not remember what his exact position in the

24  administration was at the time, but I believe he was involved

25  in the national security aspect of the Trump administration.

1   Q.   So a senior official in the Trump administration?

2   A.   Yes.

3   Q.   Now, what was the Chinese ambassador's reaction to the

4   message you delivered?

5   A.   I remember him being quite stoic.  There wasn't any

6   particular emotion.  He asked additional questions.

7   Unfortunately I did not have any additional answers, and the

8   meeting ended almost as quickly as it began.

9   Q.   Now, after the meeting with the Chinese ambassador, did

10  Jho Low send money into the United States to you?

11  A.   Yes, but that wasn't until I believe the October timeframe.

12  There was a significant amount of money that was sent to my

13  firm IOLTA account.

14  Q.   Maybe we can just back up a half step to talk about the

15  money.  how were you and the others compensated for the work

16  that was taking part as part of the conspiracy?

17  A.   Well, Jho Low was funneling tens of millions of dollars

18  into the US into accounts that were maintained by Mr. Michel,

19  and I was paid by Mr. Michel for my services.

20  Q.   And after the July 2017 meeting with the ambassador, do you

21  recall whether there was a payment that came from Jho Low in

22  August of 2017?

23  A.   Please understand that at this particular time there was a

24  significant amount of money that was coming in from a number of

25  Jho Low's shell companies.  So, yes, money was still flowing

1    in, but at that time Mr. Michel had a business manager and it

2    was responsible for that money.  And I wasn't directly involved

3    in seeing, overseeing that money coming in, or in any way --

4    there was just a tremendous amount of money coming in at that

5    time.

6    Q.  And when you say a tremendous amount of money, just for the

7    benefit of the jury in terms of quantifying that, tens of

8    millions of dollars?

9    A.  Yes, I think that the final count was somewhere plus or

10   minus a hundred million.

11   Q.  Now, did there come a time when you took any trips abroad

12   as part of the conspiracy?

13   A.  Yes.  I traveled to Hong Kong and then immediately to Macao

14   in September of 2017.

15   Q.  And this was approximately two months after your July 2017

16   meeting with the Chinese ambassador?

17   A.  That is correct.

18   Q.  And why were you going to Hong Kong?

19   A.  It wasn't immediately revealed to me why I was going to

20   Hong Kong.  But when I met Mr. Michel in Los Angeles, he told

21   me that I was going to be playing the role of an advocate up

22   for Elliot Broidy; and that because a significant amount of

23   money had come in up until that point, and neither the 1MDB

24   matter was resolved, nor the extradition had taken place, it

25   was a meeting to assuage Jho Low into believing that actions

1    were still being taken to resolve -- resolve the 1MDB matter as
2    well as the extradition of Guo Wengui.
3    Q.  And I should have asked this before, do you -- do you have
4    an understanding as to why the Chinese government wanted
5    Mr. Guo extradited to China?
6                MS. MURRAY:  Objection, your Honor.
7                THE COURT:  Sustained.
8                MR. SCHIRICK:  His understanding.
9                THE COURT:  What do you understand the word
10   "extradition" to mean?
11               THE WITNESS:  I understand the word "extradition" to
12   mean that the United States government would formally extradite
13   or formally remove an individual and return them to the state
14   that is -- or the country that is requesting, that is
15   requesting them to be returned.
16               THE COURT:  Go ahead.
17               MR. SCHIRICK:  Thank you, your Honor.
18   Q.  How did you get to Hong Kong?
19   A.  We flew from Los Angeles.
20   Q.  Please tell the jury what happened when you landed in Hong
21   Kong?
22   A.  We landed in Hong Kong.  I exited the plane off the jetway.
23   Mr. Michel and a couple of other people that were with us when
24   I got to the top of the jetway were on a golf cart.  He ask me
25   to jump on the golf cart.  I jumped on the golf cart with him,

1   and we were pretty readily whisk through the airport.

2   Q.  Were you required to go through Immigration?

3   A.  Not that I recall, no.

4   Q.  Were you required to go through Customs?

5   A.  No, not that I recall.

6   Q.  Were your passports stamped?

7   A.  I do not believe so, no.

8   Q.  Were your passports taken from you?

9   A.  I believe so.

10  Q.  Now, how did you get from Hong Kong to Macao?

11  A.  By ferry.

12  Q.  And were you originally supposed to travel by a ferry if

13  you recall?

14  A.  We were originally supposed to travel by helicopter, but

15  the weather did not permit helicopter flights on that day.

16  Q.  Now, what is Macao?

17  A.  I believe Macao is a protectorate of the Chinese nation.  I

18  do not know it's exact distinction.

19  Q.  But it's part of China?

20  A.  Yes, I believe so.

21  Q.  Or at least governed by China?

22  A.  I believe so, yes.

23  Q.  What happened when you got to Macao?

24  A.  I was given keys to a quite nice hotel suite and instructed

25  to wait for further instructions really.

O79BGUO2                         Higginbotham- Direct

1   Q.  And were you given anything to use to communicate while you

2   were in Macao, any device with which to communicate when you

3   were in Macao?

4   A.  I believe I was given a cell phone, but I do not recall

5   immediately.

6   Q.  Was the hotel reservation at this hotel in your name?

7   A.  No, it was not.

8   Q.  Now, did you meet with Jho Low in Macao?

9   A.  Yes, I did.

10  Q.  And where did you meet him?

11  A.  The first time I met him was for dinner at a restaurant in

12  a hotel, and the second time that I met him was I believe the

13  next day in one of the hotel suites.

14  Q.  And at the dinner the first time you met with him, what, if

15  anything, was discussed about the progress being made on the

16  extradition of Mr. Guo?

17  A.  I don't believe that that topic came up specifically.

18  Q.  What topics did come up?

19           MS. MURRAY:  Objection, your Honor, hearsay.

20           MR. SCHIRICK:  I'm asking about the discussion.

21           THE COURT:  The general subject matter, you can

22  testify as to that.

23  A.  The general subject matter resolved more specifically

24  around the movement of money and the difficulties moving such

25  large sums of money in such rapid fashion were presenting.

1   Q.  And do you recall was Mr. Low pleased with the pace of the

2   progress?

3           MS. MURRAY:  Objection.

4           THE COURT:  So he can't speak to how another

5   individual felt.

6   Q.  How long were you in Macao?

7   A.  Approximately four days, five days I believe.

8   Q.  And how many total meetings did you have with Jho Low?

9   A.  Two.

10  Q.  And did you later return to the US?

11  A.  Yes, I did.

12  Q.  And after you returned to the US, did Jho Low continue to

13  send funds as part of this conspiracy?

14  A.  Yes.  It's my understanding that he did, yes.

15  Q.  And do you recall whether he sent you funds after you

16  returned from the trip to Macao?

17  A.  Yes, he did.

18  Q.  And approximately how much did he send you upon return?

19  A.  I believe the number was 35 million Euro which translated

20  to roughly 41 million US that was deposited into my IOLTA

21  account.

22  Q.  And why was it deposited into -- withdrawn.

23          You referred to an IOLTA account; is that right?

24  A.  An attorney escrow account.

25  Q.  And why was it sent to your attorney escrow account?

1    A.  When we were in Macao, there were discussions about ways in

2    which additional money could be sent to the US and a number of

3    ideas were circulated.  One idea involved me being made a

4    trustee or a member of an organization that had one of Jho

5    Low's companies that had sufficient funds.  Ultimately that was

6    not the way that they decided to move forward with it, and

7    money was then put in my escrow account making me the escrow

8    agent so that monies could be distributed from that account.

9    Q.  And was any part of the money that you just referred to

10   intended to be a success fee for the extradition of Mr. Guo?

11   A.  I wouldn't be able to say specifically that it was a

12   success fee for the extradition of Mr. Guo.  I would be able to

13   say that lots and lots of money were coming in as I've already

14   testified to.

15           I wasn't privy to what exactly what payments were

16   going to be made to whom and for what reason.  Understand that

17   there were two simultaneous projects that were going on in the

18   same time.

19   Q.  In total you said there were about $100 million for these

20   two project?

21   A.  I believe it was plus or minus a hundred million.

22   Q.  Now, was Mr. Michel ultimately convicted as part of this

23   conspiracy?

24   A.  Yes, he was.

25   Q.  And was -- did Mr. Broidy plead guilty as part of this

O79BGUO2                        Higginbotham- Direct

1     conspiracy?

2     A.  Yes, he did.

3     Q.  And you refer to someone name Ms. Lum Davis?

4     A.  Yes.

5     Q.  Did Ms. Lum Davis plead guilty as part of this conspiracy?

6     A.  I believe that she did.  I did not know what the outcome of

7     that particular trial was.  I heard that that may have been

8     rescinded, but I do not want to testify to that in terms of

9     what the outcome of that case was.

10    Q.  As you testified to before you too pled guilty to a

11    conspiracy count?

12    A.  Yes, I did.

13              MR. SCHIRICK:  Now, your Honor, at this time I'd like

14    to read a stipulation between the parties.

15              THE COURT:  All righty.

16              MR. SCHIRICK:  This is what's been marked Defendant's

17    Exhibit stip 2, and if everyone will just be patient with me

18    for a moment.

19              It is hereby stipulated and agreed by the United

20    States of America and Miles Guo, the defendant, through their

21    attorney of record that:  One, defense Exhibits DX40017,

22    DX40019, DX40021, DX40024 and DX40037, are true and correct

23    copies of portions of recordings of telephone calls between

24    Mr. Guo and Liu Yanping, L-I-U, last name, Y-A-N-P-I-N-G,

25    occurring on the following dates.

1              With respect to DX40017, the date of the conversation

2    was May 2, 2017.  With respect to DX40019, the date of the

3    conversation was May 4, 2017; DX40021, the date of the

4    conversation was May 10, 2017; for DX40024, the date of the

5    conversation was May 12, 2017; for DX40037, the date of the

6    conversation was January 27, 2017.

7              Defense exhibits DX40017-T, 40019-T, DX40021-T,

8    DX40024-T and DX40037-T are accurate translations respectively

9    of the underlying exhibits.  Defense exhibits DX40052 and

10   DX40053 are true and correct copies of recordings respectively

11   of the May 23, 2017 and May 24, 2017 meetings between, among

12   others, Mr. Guo and Liu Yanping.

13             Defense Exhibit DX40052-T and DX40053T are accurate

14   English translations respectively of portion of DX40052 and

15   DX40053.  This stipulation and the defense exhibits referenced

16   herein may be received into evidence as defense exhibits at

17   trial signed by the parties.  Your Honor, we move the

18   stipulation into evidence at this time.

19             MS. MURRAY:  Your Honor, with respect to the

20   stipulation, we have no objection.  With respect to the

21   exhibits that are cited in the stipulation, we also have no

22   objection to their being admitted as redacted.

23             THE COURT:  So you're seeking the admission of both

24   the stipulation and the referenced exhibits, correct?

25             MR. SCHIRICK:  What Ms. Murray says is correct.  We're

O79BGUO2                          Higginbotham- Direct

1    seeking the admission of the stipulation, and then the redacted

2    transcripts which, in the interest of time, I'm happy to just

3    refer to these and not read them all into the record.  They're

4    quite lengthy, your Honor.  Alternatively, I'm happy to read

5    them into the record.

6              THE COURT:  That's all right.  That's all right.  So I

7    will admit both the stipulation and the exhibits.

8              MR. SCHIRICK:  Thank you your Honor.

9              (Defendant's Exhibits  Stip-1, 40017, 40017-T, 40019,

10   40019-T, 40021, 40021-T, 40024, 40024-T, 40037, 40037-T, 40052,

11   40052-T, 40053, 40053-T received in evidence)

12   BY MR. SCHIRICK:

13   Q.  If we can please pull up defense stip, DX Stip 0001, if we

14   could please blow up paragraph two.  It reads, "In 2017, a US

15   law enforcement agency assessed that Mr. Miles Guo was the

16   highest priority of China repatriation efforts."

17             If we can go to paragraph six on the following page.

18   Please blow up paragraph six if you would.  Paragraph six

19   reads:  "Since Mr. Guo fled the PRC, the PRC government has

20   sought his return for prosecution in the PRC and has employed

21   numerous methods to effect Mr. Guo's capture or arrest.  In May

22   of 2017, the PRC government sent for undeclared agents from the

23   PRC's Ministry of State Security (MSS) to the United States to

24   attempt to cause Mr. Guo's coerced repatriation to the PRC as

25   part of the Fox Hunt initiative."

1              If we could please pull up DX40019-T and publish to

2    the jury.  And if we could please go to page four.  Now

3    pursuant to the stipulation that was just entered into

4    evidence, these transcripts were from recordings that were made

5    on May 4, 2017.

6              "Mr. Secretary LIU:  Let me tell you, one thing is

7    about them, the matter of Qingzhi mother and daughter going to

8    your place.  You must be sure not to disclose that.  Did you

9    hear me?  Okay.  Okay.  Okay.

10             Secretary Liu: Another thing is about your fourth

11   brother and sixth brother.  You must not tell anyone about your

12   fourth brother and sixth brother.  No matter who talks about it

13   or ask you about it.  You must not give them any direct answer.

14   Okay.  Okay.

15             Mr. Guo:  Look, why are you so confused secretary?

16   Maybe you don't know.  Let me finish what I'm saying.  We are

17   recording some thank you videos everyday now, right.  I won't

18   talk about the leaders anymore.  I'll just record some videos.

19   Probably less than half an hour, after my fourth and sixth

20   brother have boarded a plan in Dalian."

21             If we could please pull up what is now in evidence as

22   DX40021-T and please go to the page two.  Pursuant to the

23   stipulation that was just entered into evidence, this is a

24   transcript of a call recording dated May 10, 2017.

25             "Mr. Guo:  My Twitter and my website were completely

hacked by hackers.  Oh, I been in meetings all day and suddenly
it's been a mess.  I won't say anymore.  How can these people
still keep doing this?

        Secretary Liu:  Well, let me tell you.  I've already
ask about it today, really asked about it.  Over here
everything is now following the agreement.  Everything stopped.
You understand what I mean?  Ah, do you understand?  You should
trust me on this, you know.  You should believe what I say.

        Mr. Guo:  Understood.  I absolutely trust you.  Ah,
the authorities definitely should be like this.

        Secretary Liu:  And now, now, you know, about this
matter.  I'm telling you, you really should say less.  If you
keep talking like this, you'll offend too many people."

        Can we please pull up what's in evidence as DX40024-T,
and go to pages eight and nine pursuant to the stipulation
that's now in evidence.  This is a transcript of a recording
between Mr. Guo and Secretary Liu that took place on May 24,
2017.

        "Secretary Liu:  I suggest you think big picture, not
small picture.  If you only focus on the immediate concerns, I
think you're being short-sighted.  You should think big
picture.  Plan your entire future life.  Seriously consider
what to do about this matter, even if we meet, I want to talk
about you -- I want to talk to you about this, you know,
including your immediate concerns.  How are you going to deal

1      with them.  Your immediate concerns, your family, employees,

2      your business, these domestic enterprises.  You must consider

3      all these factors.  Understand?"

4              Moving to the next page.

5              "Secretary Liu continues:  It's unrealistic to say you

6      shouldn't consider them.  Furthermore, I suggest you also do

7      the math for your future life, understand?  Once you have these

8      two aspects sorted out, I think you can find a suitable path

9      for us to move forward together, okay.  Otherwise I think

10     sometimes you're too easily emotionally impulsive.  You're

11     eloquent.

12              Mr. Guo:  That's my fault.

13              Secretary Liu: Exactly.  You're eloquent.  You speak

14     without restraint, say whatever comes to your mind, but

15     afterwards you know this approach can only offend people.

16     Understand?  Trying to solve your problems.  If what you say

17     only backfires, what else can you expect?  I'm earnestly

18     advising you now.  So I'm telling you, Guo Wengui, you are

19     already in your 40s, age of no doubt, and about to enter your

20     50s, which is the age of understanding your fate."

21              If we can go to page 12.  We're still on the

22     transcript of a recording from May 24, 2017.

23              Secretary Liu: Is that okay?  I'm saying this entirely

24     for your own good.  Furthermore, you said we need to move

25     forward.  Well, moving forward has conditions.  Right.  You

1  can't just say you're moving forward without considering the

2  basic conditions for it.  We need a path to move forward, don't

3  we?  I can only move forward when we have a path.  By doing

4  what you're doing, you're blocking and cutting off our path

5  forward.  How can we move forward like this?"

6          He continues.  "ah, Guo Wengui, you're a smart person.

7  I've said my peace.  You should understand.  Okay.  All right.

8          Mr. Guo:  Okay.  I understand.  Yes.

9          Secretary Liu: I'm calling you to convey this message.

10  That's all.  all right.

11          Mr. Guo:  Okay.  Starting from today, as you just

12  mentioned, you don't allow it.  Let me reiterate again, I

13  promised absolutely not to discuss these two leaders.

14          Secretary Liu:  Yes, yes, yes."

15          THE COURT:  Is that the end of this particular

16  excerpt?

17          MR. SCHIRICK:  One more, your Honor, and we're done.

18          THE COURT:  Okay.

19          MR. SCHIRICK:  If we can go to page 15, please.

20          "Mr. Guo:  Do you understand when I meet you later

21  I'll tell you more about it.  What this person has brought to

22  you and then about this, they're involved in real estate in

23  Australia, in United States, in Hong Kong.  I found out about

24  their funds.  They just spent three or four hours with one of

25  my friends who returned to Hong Kong, just like what I told you

1    the day before yesterday, that if Guo Wengui dears to mention

2    this, his family will be done for.  I hate him so much for

3    threatening me with my family.  I hate him."

4            Mr. Guo continues.  "Then saying it's not safe, saying

5    so much, secretary, you must consider my perspective.

6            Secretary Liu:  Let me tell you, hello.  Let me tell

7    you.  This is like you punching someone and then they kick you

8    back.  Do you understand what I mean?  If you keep fighting

9    this, when will it end?

10           Mr. Guo:  You didn't understand.  It's not like that

11   secretary.  You didn't get it.  Um, this is deputy secretary

12   and this (Panrui and Panshiyi matter.  It started from the time

13   of Liu Zhihuaa.  It started from the matter of Liu Zhihuaa. I

14   totally forgot about this matter. He's been putting so much

15   effort into it.  It's all nonsense. He's threatening my whole

16   family, using my family to threat me.  Honestly, secretary,

17   think about it?  What does he want by threatening my family?

18   If it weren't for you I would yesterday. I tell you again

19   secretary I will accept what you say.

20           MR. SCHIRICK:  No further questions at time.

21           THE COURT:  All righty.  Members of the jury, it's

22   2:32.  We will resume at 3:02.  Don't permit anyone to discuss

23   the case in your presence, don't read, watch or listen to

24   anything from any source that touches upon the subject matter

25   of this trial.

1              Mr. Higginbotham, you are not to discuss your

2    testimony.  You may step out of the courtroom.

3              (Jury not present)

4              (Continued on next page)

O79BGUO2                          Higginbotham- Direct

1                    (Jury not present)

2                    THE COURT:  Please be seated.  So how much more do you

3         think you have, Mr. Schirick?

4                    MR. SCHIRICK:  Your Honor, we've turned over the

5         witness.  That's it on direct.

6                    THE COURT:  That's it?

7                    MR. SCHIRICK:  Yes.

8                    THE COURT:  How long do you expect the cross will be?

9                    MS. MURRAY:  I think it will be pretty brief, maybe 15

10        minutes or so.

11                   THE COURT:  Okay.  So then my instructions, I don't

12        know that I'll be able to get through the amount of pages that

13        we discussed earlier, but I can go as long as I can go.

14                   MS. MURRAY:  Before we break, your Honor.  Just with

15        respect to limiting instruction we discussed this morning.

16        Perhaps when we come back and we begin cross, we propose that

17        the Court give the instruction regarding his employment at DOJ,

18        something to the effect of, you heard testimony that this

19        witness was employed by the department of justice during the

20        period he conspired to commit violations of US law.  And then

21        you can give the instruction, I instruct you that this

22        prosecution is lawfully brought by the United States of

23        America.

24                   THE COURT:  So did you want to prompt me or do you

25        want me to just start with that?

O79BGUO2                    Higginbotham- Direct

1          MS. MURRAY:  Happy to have you start with that, your

2     Honor.  And so again, just kind of lead in regarding the

3     testimony they have heard from this witness, and then the

4     request, I instruct you that this prosecution is lawfully

5     brought by the United States of America against Miles Guo.

6          THE COURT:  Okay.

7          MS. MURRAY:  One more point, your Honor.  We wanted to

8     note that we reserve the right to request, again depending how

9     defense uses the recordings that were just read into the record

10    during summations, we reserve the right to request a duress

11    instruction for the jury.

12         MR. SCHIRICK:  Just for the record, we maintain our

13    objection to that, but we understand.

14         THE COURT:  But you're not making a duress argument,

15    are you?

16         MR. SCHIRICK:  Your Honor, I was referring to the

17    instruction that the government is requesting be given during

18    this witness's testimony.

19         THE COURT:  Yes, I understand that, what about the

20    whole duress issue?

21         MR. SCHIRICK:  Your Honor, the defense has no

22    intention of making a duress argument as we stated.

23         MS. MURRAY:  Yes, your Honor.  I'm noting subject to

24    what happens during summation, the government may renew that

25    request.

1          THE COURT:  So in addition to my giving the

2    instruction at this time, you're looking for that to be added

3    to the charge?

4          MS. MURRAY:  At this time, your Honor, I think we'll

5    see how the remainder of this witness goes with respect to

6    cross examination and redirect, but I know that we put this in

7    front of the Court.  The Court has made a decision subject to

8    what happens and how the defense uses the recordings that it

9    now read into evidence, we think that a duress argument or

10   instruction might be appropriate.  There's no specific request

11   at this time.  The evidence just came in through this witness,

12   but we're just noting that potential --

13         THE COURT:  My question was as to the legality of the

14   prosecution.  You're asking me to give that instruction now.

15   I'm asking whether or not you're looking to have it included in

16   the final charge?

17         MS. MURRAY:  Yes, your Honor.  Excuse me, we're asking

18   for that instruction to be given now and included in the final

19   charge.

20         THE COURT:  All righty.  We will return then at --

21         MR. KAMARAJU:  Your Honor, one minor housekeeping

22   matter.  After the defense rest, which we anticipate being

23   after this witness, we're going to renew our Rule 29 motion for

24   the record.

25         THE COURT:  Of course.  All righty.

1              THE COURT:  Ready?  All righty.

2              Please have the jurors come in.

3              (Jury present)

4              THE COURT:  Please be seated.

5              Members of the jury, you have heard that the witness,

6   Mr. Higginbotham, was employed by the Department of Justice.  I

7   want you to understand that this prosecution, this case that is

8   on trial now, was lawfully brought by the United States of

9   America.

10             You may continue the inquiry.

11             Sir, remember that you're under oath.

12  CROSS-EXAMINATION

13  BY MS. MURRAY:

14  Q.  Mr. Higginbotham, your job at DOJ was as an attorney

15  adviser and congressional liaison; correct?

16  A.  That is correct.

17  Q.  You had zero involvement in criminal investigations in that

18  role, right?

19  A.  Zero involvement, that is correct.

20  Q.  And you had zero involvement in criminal prosecutions in

21  that role; correct?

22  A.  That is correct.

23  Q.  You had zero involvement in asset forfeiture claims in that

24  role; correct?

25  A.  That is correct, yes.

1   Q.  And while you were working at DOJ, you were not permitted

2   to do legal work for private clients outside of DOJ; correct?

3   A.  That is correct.

4   Q.  You had no involvement at all with this case against Miles

5   Guo for fraud; correct?

6   A.  Zero involvement.  No involvement at all.

7   Q.  Mr. Higginbotham, you've never met me before, right?

8   A.  No, I have not.

9   Q.  You've never met any of the other prosecutors on this case;

10  correct?

11  A.  I do not believe so, no.

12  Q.  None of the prosecutors in this case was involved in

13  prosecuting you; correct?

14  A.  No, they were not.

15  Q.  You're not a follower of Miles Guo, are you?

16  A.  No, I am not.

17  Q.  You didn't watch his broadcasts in 2018, right?

18  A.  No, I did not.

19  Q.  You didn't watch his broadcasts between 2019 and 2023;

20  correct?

21          MR. SCHIRICK:  Asked and answered.

22          THE COURT:  Overruled.  You may answer.

23  A.  No, I did not.  No, I did not.

24  Q.  You've never followed Miles Guo's accounts on Twitter,

25  right?

O79VGUO3                         Higginbotham - Cross

1    A.  No, I have not.

2    Q.  Or on Gettr?

3    A.  No, I have not.

4    Q.  You weren't aware of the GTV Media private placement in

5    April of 2020; correct?

6    A.  I was not.

7    Q.  You've never invested in GTV Media, right?

8    A.  No, I have not.

9    Q.  You've never received GTV stock in exchange for any

10   investment, have you?

11   A.  No, ma'am, I have not.

12   Q.  You've never loaned money to any of the Himalaya Farms; is

13   that correct?

14   A.  No, ma'am, I have not.

15   Q.  You've never bought a G/CLUBS membership, right?

16   A.  No, ma'am, I have not.

17   Q.  You've never even heard of G/CLUBS before today?

18   A.  I have not, no.

19   Q.  You've never invested in any of the G Series offerings;

20   correct?

21   A.  No, I've never heard of them before.

22   Q.  And you've never purchased credits on the Himalaya

23   Exchange; isn't that right?

24   A.  That is correct.

25   Q.  You pled guilty to bank fraud conspiracy, right?

1    A.  Yes, I did.

2    Q.  You misrepresented the true source and purpose of transfers

3    of tens of millions of dollars; correct?

4    A.  That is accurate, yes.

5    Q.  You did not tell banks that the money was for, among other

6    things, effort to lobby to have Guo sent to China, right?

7    A.  That is true.

8    Q.  And you created fake loan agreements in the course of your

9    conduct, right?

10   A.  Yes, I did.

11   Q.  The purpose of those fake loan agreements was to paper the

12   money transfers; correct?

13   A.  Yes, it was to provide a cover, so to speak, yes.

14   Q.  To make the transfers seem legitimate, right?

15   A.  That is accurate.

16   Q.  To deceive the banks; correct?

17   A.  Yes, that is true.

18   Q.  And there were no actual loans, isn't that right?

19   A.  No, there were not.

20   Q.  You also created fake contracts; correct?

21   A.  Yes, I did.

22   Q.  And you did not mention, for example, Jho Low by name in

23   those contracts, right?

24   A.  No, I did not.

25   Q.  Even though he was the one sending the money?

1    A.  Yes, that is true.

2    Q.  Because you knew that Jho Low's name would raise red flags

3    with the banks, isn't that right?

4    A.  Yes.

5    Q.  And you created fake consulting contracts; correct?

6    A.  That is true.

7    Q.  You created those documents to justify transfers of money

8    to co-conspirators, right?

9    A.  Yes.

10   Q.  To paper the transactions to make them appear to be

11   legitimate; correct?

12   A.  That is accurate, yes.

13   Q.  There were no actual consulting services that were

14   provided, isn't that right?

15   A.  No, there were none.

16           MS. MURRAY:  May I have a moment, your Honor?

17           THE COURT:  Yes.

18           MS. MURRAY:  If we could please pull up what's now in

19   evidence as Defense Exhibit 4017.

20   Q.  Mr. Higginbotham, on direct examination, Mr. Schirick read

21   certain texts from transcripts, do you recall that?

22   A.  Yes, I do.

23           MS. MURRAY:  If we could go to page 10, please,

24   Ms. Loftus.  And if we could zoom in on the text a little

25   better.  We could start with the top half and then the bottom

O79VGUO3                          Higginbotham - Cross

half.

Q.  Mr. Higginbotham, I'd appreciate if you could help me out
here.  I'm going to read certain of this language, and I'll
have you play the role of Secretary Liu.  I'll play the role of
Miles Guo.  I'll start at the top:

        From now on, I need to continue to maintain
appropriate communication with them, but I will talk about what
I have told you without any mention of Secretary Wang,
Secretary Meng, or any other central leaders.  I'll just talk.
I have to talk about Fu Zhenghua.  I have to talk about Fu
Zhenghua.  Do you understand?

        And then skipping to the next portion of the
transcript, again, Miles Guo:  You just have to wait a little
bit and pause.  It should be like this:  I'll say five
sentences today and four sentences tomorrow.  Then you and I
(unintelligible) from today on will no longer mention Secretary
Wang, Secretary Meng ever again.

        And then Mr. Higginbotham, what does Secretary Liu
respond?

A.  Okay.  Okay.

Q.  Miles Guo:  Do you understand what I mean?  I won't mention
other leaders either, only Lao Fu.  Please allow me time to get
off the ramp.

A.  What you mean is that Lao Fu will serve as a ramp to allow
us to step down slowly, is that what you mean?

1   Q.  Miles Guo:  Yes, yes, yes, yes, that's what I mean.  Then

2   when you come, when you come, I will say what I want to do now.

3   When you come, what I hope for is that I will no longer act

4   like a villain anymore, doing things only in the darkness,

5   because that will lead to major events in the future, and I

6   will just need a formal excuse.  When I joined, I said at the

7   time that I just wanted to protect my money, my life, and my

8   wealth.

9   A.  Uh-huh.

10  Q.  Now, the leaders have officially said that a fair and legal

11  solution will be given to the Wengui Guo case.

12          And then the next entry, again, Miles Guo:  I say,

13  isn't that just telling everyone that I have achieved my goal.

14  I am grateful to the country, and I still love the country and

15  the party.

16  A.  Okay, okay.

17          MS. MURRAY:  Ms. Loftus, if we could go to page 17 of

18  this exhibit, please.

19          THE COURT:  And, sir, if you'll speak into the

20  microphone, please.

21  Q.  We're going to start at the first full entry here,

22  Mr. Higginbotham, which is Secretary Liu.  If you could read

23  the Secretary Liu part begin for me.

24  A.  Uh-huh.

25  Q.  The third thing I tell you, Secretary, I hope we don't talk

1    about concepts when you come.

2    A.   Uh-huh.

3    Q.   We should discuss major matters.  I just want us to sit

4    down and discuss these specific things, how to solve my

5    problems.

6    A.   You huh.

7    Q.   Well, how not to hold the press conference?

8    A.   Uh-huh.

9    Q.   How to turn it into the greatness of our Chairman Xi, to

10   turn it into an important turning point event before the 19th

11   National Congress of the Communist Party of China, to promote

12   the rule of law and turn it into such a thing.

13              MS. MURRAY:  And Ms. Loftus, if we could go to page 30

14   of this exhibit, please.  And zoom in on the text.

15   Q.   And this one is going to start with you, Mr. Higginbotham.

16   A.   That's it then.  We are both gentlemen who are men of our

17   word, brother.

18   Q.   Oh, oh, just watch for the action, just watch for the

19   action.

20   A.   All right, all right.  Okay, okay, okay.  Uhm.

21   Q.   Okay, okay, okay.

22   A.   Well, okay.  That is very good.

23   Q.   Okay.

24   A.   Okay.

25   Q.   Okay.  Thank you, Secretary.  Thank you, secretary.  Uhm,

1     thank you.  Thanks.  Bye-bye.

2              MS. MURRAY:  All right, Ms. Loftus.  Can we please now

3     pull up Defense Exhibit 4021 and go to page 4.

4     Q.  Here again, Mr. Higginbotham, same roles.

5              I'll start with Miles Guo:  I'm not kidding, I did it

6     for you, Secretary.  I was really upset.  I'm telling you, I

7     did it for you.

8     A.  Let me tell you, don't ever say you did it for me.  We did

9     it to resolve this matter to solve it, understand?  Okay, huh?

10    Is that okay?  Hello?

11    Q.  Okay.

12    A.  Well, that's it then.  You should also take care of

13    yourself, you should rest more.  Can't keep staying up late

14    like this, okay?  All right then, bye.

15             MS. MURRAY:  Let's scroll to the next page, please,

16    Ms. Loftus.

17    Q.  Okay.  Thank you, Secretary.

18    A.  All right.  Good-bye, good-bye.

19    Q.  Okay.  Thanks, thanks.

20             MS. MURRAY:  Finally, Ms. Loftus, Defense Exhibit

21    4037, page 23, please.  If we could zoom in on the text.

22    Q.  Again, I'll start as Miles Guo:  Then 100 percent he's the

23    one for sure who took our money, from us and our family.  And

24    also the police station chief and several others were all

25    present.

1    A.  All right.  Whether you meet him or not, it's up to you.  I

2    can't say much about this matter, understand?  Because...

3    Q.  Let's talk after the holiday, after the fifth day of the

4    Chinese New Year.

5    A.  After the fifth day, after the fifth day of the Chinese New

6    Year.

7    Q.  The fifth day of the Chinese New Year.

8            MS. MURRAY:  We can zoom out of that, Ms. Loftus, and

9    go to the next page.  Zoom in on the text, please.

10   Q.  And it picks up with you, Mr. Higginbotham.

11   A.  Okay after that.  So about this, uh, these two days.  I'll

12   turn off my phone at night Beijing time and London time, and

13   turn it on in the morning.  Generally speaking, well, as long

14   as it aligns with your time, our time, all right?  If there's

15   anything, just send a message first.

16   Q.  Okay.  My phone is always on.

17   A.  Right.  If there's anything, send a message first and then

18   we can talk.  All right?

19   Q.  Okay, okay.

20   A.  All right.  Let's leave it at that, okay?

21   Q.  Okay.  Happy Chinese New Year.

22   A.  All right.  Take care of yourself.  Happy Chinese New Year.

23   Happy Chinese New Year.  All right.  Good-bye, good-bye.

24   Q.  Okay.  Good-bye, Secretary.  Good-bye.

25           MS. MURRAY:  And we can take that down, Ms. Loftus.

```
1              May I have a moment, your Honor?

2              THE COURT:  Yes.

3              (Counsel conferred)

4              MS. MURRAY:  Nothing further.  Thank you.

5              THE COURT:  Redirect.

6              MR. SCHIRICK:  Thank you, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. SCHIRICK:

9    Q.  Briefly, Mr. Higginbotham.  Do you understand that you were

10   subpoenaed here today to testify about the conspiracy you were

11   involved in to extradite Mr. Guo?

12   A.  Yes.

13             MS. MURRAY:  Objection.

14   Q.  Do you understand --

15             MR. SCHIRICK:  I'm sorry.

16             THE COURT:  Was that an objection?

17             MS. MURRAY:  Yes, your Honor.

18             MR. SCHIRICK:  Asking his understanding of why he's

19   here today?

20             MS. MURRAY:  He's testified on direct he's here

21   because he received a subpoena.

22             THE COURT:  Sustained.

23             MR. SCHIRICK:  It's redirect.

24   BY MR. SCHIRICK:

25   Q.  You don't know anything one way or the other about the
```

1    facts of this case, right, Mr. Higginbotham?

2    A.  No, I do not.

3    Q.  Okay.  Now, Ms. Murray read some portions of transcripts to

4    you, do you recall that?

5    A.  Yes, I do.

6    Q.  Okay.  Did you understand that Mr. Guo was negotiating with

7    a CCP representative for his life in these transcripts?

8              MS. MURRAY:  Objection, your Honor.

9              THE COURT:  Overruled.

10   A.  No, I did not.

11   Q.  Did you understand that Secretary Liu was a representative

12   of the CCP who was trying to lure Mr. Guo back to China?

13             MS. MURRAY:  Objection to the testifying, your Honor.

14             THE COURT:  You may answer.

15   A.  No, I did not.

16   Q.  Did you understand that ultimately Mr. Guo never returned

17   to China?

18   A.  Yes.

19   Q.  Thank you.

20             MR. SCHIRICK:  No further questions.

21             MS. MURRAY:  Nothing further.  Thank you.

22             THE COURT:  Thank you, sir.

23             You may step out of the courtroom.

24             (Witness excused)

25             MR. SCHIRICK:  Sorry, your Honor, one moment.

1          MR. KAMARAJU:  Thank you, your Honor.

2          The defense rests.

3          THE COURT:  Please step up.

4          MS. MURRAY:  Your Honor, briefly, before we step up.

5          THE COURT:  Oh.

6          MS. MURRAY:  Just for the record, the government does

7     not have a rebuttal case.

8          THE COURT:  Okay.

9          (At sidebar)

10         THE COURT:  First, I want to give my ruling on two

11    outstanding motions.

12         The government's motion with respect to an instruction

13    that the operation of continuing businesses, the requested

14    instruction with respect to ongoing businesses, as well as the

15    request that I include the instruction that the prosecution is

16    lawful in the jury charge, both of those are denied.

17         MR. KAMARAJU:  Okay.

18         MS. MURRAY:  Your Honor, one additional request that

19    we have, in light of the redirect that just took place.

20         The government again requests a duress instruction,

21    because Mr. Schirick just clearly asked whether in the evidence

22    that they've introduced, Mr. Guo was negotiating for his life

23    with a China Chinese Communist Party official.

24         MR. KAMARAJU:  A duress defense requires that the

25    proffered evidence be offered as an explanation for the

O79VGUO3

1    underlying criminal activity.  That's not what we're doing.

2    We're not saying that he was doing it out of a threat for his

3    life that he engaged in GTV or G/CLUBS or any of those things.

4    So there's no duress defense that's being offered.

5         MR. FINKEL:  Your Honor, that's exactly why it's

6    appropriate for your Honor to tell the jury that.  The jury

7    does not know what defense counsel just said.  The jury does

8    not know the law.  There is no duress defense here.  But the

9    jury might think there is, because they are laypeople and they

10   don't know the law.

11        The defense has said numerous times that they are not

12   making a duress defense.  It would be very simple.  I don't

13   think why they would even object to it if they are not making a

14   duress defense for your Honor to tell the jury that Miles Guo's

15   actions were not done under duress.  There's no duress defense

16   here.  Why is that objectionable?

17        MR. KAMARAJU:  Because it's confusing to the jury to

18   inject an issue like duress that they've heard nothing about

19   from either the Court, the government, or the parties into the

20   jury deliberations for no reason.

21        A duress defense is an affirmative defense which we

22   have to proffer pretrial.  We did not do that.  Duress is not

23   an issue at trial.  So I don't know why we would inject that

24   issue into the jury's mind.  They are going to hear what I say.

25   If after I say it, the government thinks that I've brought up a

1    duress defense, then they have the option to ask again.

2         MR. FINKEL:  Just to be clear about what the

3    government is requesting, it's not requesting a charge on how

4    to prove the affirmative defense of duress, that's not what we

5    want.  There is no duress defense here.

6         What we are asking for is your Honor to tell the jury

7    there is no duress defense, which is to say Guo's actions were

8    not taken out of necessity, they can't be justified as a result

9    of the fact that he was, as Mr. Schirick put it, negotiating

10   for his life.  The jury might not know how to deal with that.

11   So we ask your Honor to just simply tell the jury there is no

12   duress defense.

13        THE COURT:  So I don't think that it is appropriate

14   and necessary, so the application is denied.

15        MR. KAMARAJU:  Thank you, your Honor.

16        Your Honor, at this time, after the close of the

17   defense case, the defense would renew its Rule 29 motion on the

18   same basis as previously asserted, in the interest of time.

19        MR. FINKEL:  We oppose it.  We're happy to provide

20   additional information.  But I believe there's more than

21   sufficient evidence for this case to go to the jury.  It's

22   consistent with your Honor's ruling at the close of our case

23   that the Rule 29 application should be denied.  We're happy to

24   explain more, if your Honor would like.

25        THE COURT:  So I denied the application, but permitted

O79VGUO3

1  the defense to submit papers within the time allowed under the

2  rules.

3          MS. SHROFF:  Your Honor, the time is seven days.  May

4  we have like, I don't know, 30 days?

5          MR. KAMARAJU:  Right.  I think also we have to renew

6  it after the defense case in order for the defense case to be

7  part of the appeal, in the event of a conviction.  So I think

8  that's the reason why we're renewing it now orally.  And then I

9  assume, if there is a jury verdict of guilt on any of the

10 counts, then we would ask for that verdict to be set aside at

11 that point and ask for a briefing schedule.

12         THE COURT:  So you're not looking for anything at this

13 point.

14         MR. KAMARAJU:  Well, I'm renewing the Rule 29, so I am

15 making that motion.

16         THE COURT:  No, but I'm saying you're not --

17         MR. KAMARAJU:  I'm not asking for a briefing schedule

18 or anything at this point.  I think we'll wait to see if

19 there's a verdict.  If there's a verdict, then we're going to

20 ask your Honor for a briefing schedule, when we renew that

21 motion again.  That's all.

22         THE COURT:  Okay.  Anything further?

23         MS. MURRAY:  No, your Honor.

24         MR. FINKEL:  No.

25         THE COURT:  Okay.

O79VGUO3

1          MR. FINKEL:  We did it.  Sort of.

2          (In open court)

3          THE COURT:  Members of the jury, both sides have

4    rested and have finished presenting evidence.  Before the

5    government and the defense deliver their closing arguments, I

6    will instruct you as to the laws, rules, and principles of law

7    that will guide you during your deliberations and rendering

8    your verdict.  Tomorrow the government will make its summation

9    first and the defense will follow.  After the parties'

10   summations, I will provide you with my final instructions on

11   deliberations.

12         Please turn to page 4 of the jury charge.  As I read

13   aloud, I would like you to read silently to yourselves.  We

14   will start with Section 1, titled "Role of the Court."

15         Members of the jury, we are now approaching the most

16   important part of this case, your deliberations.  It has been

17   obvious to me and to counsel that until now, you have

18   faithfully discharged your duty to listen carefully and to

19   observe each witness who testified.  I ask that you give me

20   that same careful attention as I read these instructions.

21         You have now heard all the evidence in the case, as

22   well -- well, no, you have not yet heard the final arguments of

23   the lawyers, but you will be hearing them.  My duty at this

24   point is to instruct you on the law.  It is your duty as jurors

25   to follow the law as I state it and to apply the law to the

1    facts as you find them from the evidence presented.

2         On these legal matters, you must take the law as I

3    give it to you.  If an attorney has stated a legal principle

4    different from any that I state to you in my instructions, it

5    is my instructions that you must follow.  Moreover, you should

6    not single out any instruction as alone stating the law;

7    instead, you should consider my instructions as a whole when

8    you retire to deliberate in the jury room.

9         You should not, any of you, be concerned about the

10    wisdom of any rule that I state.  Regardless of any opinion

11    that you may have as to what the law may be or what it should

12    be, it is your sworn duty to base your verdict upon the law as

13    I give it to you.

14         Your final role is to pass upon and decide the factual

15    issues in this case.  You, the members of the jury, are the

16    sole and exclusive judges of the facts.  You pass upon the

17    weight of the evidence; you determine the credibility of the

18    witnesses; you resolve such conflicts as there may be in the

19    testimony; and you draw whatever reasonable inferences you

20    decide to draw from the facts as you have determined them.

21         I shall later discuss with you how to determine the

22    credibility or believability of the witnesses.

23         In determining the facts, you must rely upon your own

24    recollection of the evidence.  What the lawyers have said in

25    their opening statements, what they will say in their closing

O79VGUO3

1    arguments, and in their objections is not evidence.  Nothing

2    that I may have said during the trial or may say during these

3    instructions constitutes evidence.

4          Questions asked by the attorneys or even myself are

5    not, in and of themselves, evidence.  Only questions coupled

6    with answers are evidence.  Therefore, you may not infer any

7    fact from the mere asking of a question.  Moreover, you may not

8    consider any answer that I directed you to disregard or that I

9    directed struck from the record.

10          The evidence in this case consists of the sworn

11    testimony of the witnesses on both direct and

12    cross-examination, the exhibits received in evidence, and the

13    stipulations of the parties.

14          By contrast, you may not consider exhibits that were

15    marked for identification or any other document you may have

16    seen but not received as evidence.  Only those exhibits

17    actually received may be considered as evidence.

18          Similarly, testimony that has been excluded, stricken,

19    or that you have been instructed to disregard is not evidence

20    and must be ignored.  Some evidence has been received for

21    limited purposes only.  When I have given you a limiting

22    instruction as to such evidence, you must follow that

23    instruction and consider such evidence for only the limited

24    purpose that I allowed.

25          Obviously, anything you may have seen or heard outside

O79VGUO3

the courtroom is not evidence.  Nothing I said or did should be
used by you to determine whether the government has met its
burden of proof.  I have no view as to whether the government
has met its burden, and you should not infer that I do from
anything that I said or did.

You should draw no inference or conclusion for or
against any party by reason of lawyers making objections.
Counsel have not only the right — but the duty — to make legal
objections when they think that such objections are
appropriate.

Also, do not draw any inference from any of my
rulings.  The rulings I make during trial are not an indication
of my views of what your decision should be as to whether or
not the defendant has been proven guilty beyond a reasonable
doubt.  You should draw no inference or conclusion of any kind,
favorable or unfavorable, with respect to any witness or any
party in the case, by reason of any comment, question, or
instruction of mine.

One moment.

The defendant has pleaded not guilty to the charges in
the indictment.  The indictment itself is not evidence; it
merely contains the charges that the government must prove
beyond a reasonable doubt.  The government is not required to
prove each and every allegation in the indictment.  The
government is required to prove only the elements of the

O79VGUO3

1    charges contained in the indictment, which I will explain to

2    you shortly.

3        Because the defendant has pleaded not guilty, the

4    burden is on the prosecution to prove guilt beyond a reasonable

5    doubt.  This burden always remains with the government and

6    never shifts to the defendant.  Indeed, the law never imposes

7    upon a criminal defendant the burden of proving his innocence

8    or even the duty of calling any witnesses or producing any

9    evidence at all.

10        The law presumes a defendant innocent of all charges

11   against him.  I therefore instruct you that you must presume

12   the defendant innocent throughout your deliberations until such

13   time, if ever, that you as a jury are unanimously satisfied

14   that the government has proven the defendant's guilt beyond a

15   reasonable doubt.

16        The defendant began the trial with a clean slate.

17   This presumption of innocence alone is sufficient to acquit

18   unless you are unanimously convinced beyond a reasonable doubt

19   of the defendant's guilt, after careful and impartial

20   consideration of all the evidence against him.  If the

21   government fails to overcome the presumption of innocence and

22   does not sustain its burden of proving guilt beyond a

23   reasonable doubt with respect to the defendant, you must find

24   the defendant not guilty.

25        The presumption of innocence was with the defendant

1    when the trial began and remains with him even now as I speak.

2    It will continue into your deliberations, unless and until you

3    are convinced that the government has proven the defendant's

4    guilt beyond a reasonable doubt.

5        In determining whether the government has satisfied

6    its burden of proving the defendant's guilt beyond a reasonable

7    doubt, you may consider all the evidence presented, whether by

8    the government or the defense.  In doing so, remember, that

9    even though the defendant may have introduced evidence, the

10   burden of proof remains on the government.

11       I said that the government must prove the defendant's

12   guilt beyond a reasonable doubt.  The question then is:  What

13   is reasonable doubt?  The words almost define themselves.  It

14   is doubt based upon reason and common sense.  It is doubt that

15   a reasonable person has after carefully weighing all of the

16   evidence.  It is doubt which would cause a reasonable person to

17   hesitate to act in a matter of importance in his or her

18   personal life.  Proof beyond a reasonable doubt must,

19   therefore, be proof of such a convincing character that a

20   reasonable person would not hesitate to rely and act upon it in

21   the most important of his or her own affairs.  A reasonable

22   doubt is not a caprice or whim.  It is not a speculation or

23   suspicion.  It is not an excuse to avoid the performance of an

24   unpleasant duty.  And it is not sympathy.

25       In a criminal case, the burden is at all times on the

 1    government to prove guilt beyond a reasonable doubt.  The law

 2    does not require that the government prove guilt beyond all

 3    possible doubt or to a mathematical certainty.  On the other

 4    hand, it is not sufficient to prove that the defendant is

 5    probably guilty.  Proof of guilt beyond a reasonable doubt is

 6    proof that leaves you so firmly convinced of the defendant's

 7    guilt that you have no reasonable doubt of the existence of any

 8    element of the crime or of the defendant's identity as the

 9    person who committed the crime.

10        A reasonable doubt may arise from evidence or lack of

11    evidence.  If, after fair and impartial consideration of all

12    the evidence, you are satisfied of the defendant's guilt beyond

13    a reasonable doubt as to the charge you are considering, you

14    must find the defendant guilty.  On the other hand, if, after

15    fair and impartial consideration of all the evidence, you have

16    a reasonable doubt, you must find the defendant not guilty of

17    that charge.

18        There are two types of evidence which you may properly

19    use in deciding whether the defendant is guilty or not guilty

20    of the charged crimes:  Direct and circumstantial evidence.

21        Direct evidence is evidence that proves a disputed

22    fact directly.  For example, where a witness testifies to what

23    he saw or heard or observed, that is called direct evidence.

24        Circumstantial evidence, by contrast, is evidence that

25    tends to prove a disputed fact by proof of other facts.  To

1    remind you of the example that I gave you at the beginning of

2    the trial, suppose that when you came into the courthouse today

3    the sun was shining and it was a nice day, but the courtroom

4    shades were drawn and you could not look outside.  Then later,

5    as you were sitting here, someone walked in with a dripping wet

6    umbrella; and soon after, someone else walked in with a

7    dripping wet raincoat.  Now, on our assumed facts, you cannot

8    look outside of the courtroom and you cannot see whether or not

9    it is raining.  So you have no direct evidence of that fact.

10   But on the combination of the facts about the umbrella and the

11   raincoat, it would be reasonable for you to conclude that it

12   had been raining.

13           That is all there is to circumstantial evidence.

14   Using your reason and experience, you infer from established

15   facts the existence or nonexistence of some other fact.  Many

16   material facts, such as a person's state of mind, are not

17   easily proved by direct evidence.  Usually, such facts are

18   established by circumstantial evidence and the reasonable

19   inferences you draw.

20           Circumstantial evidence is of no less value than

21   direct evidence; for, it is a general rule that the law makes

22   no distinction between direct and circumstantial evidence, but

23   simply requires that before convicting a defendant, the jury

24   must be satisfied of the defendant's guilt beyond a reasonable

25   doubt from all of the evidence in the case.

O79VGUO3

1          Now, whether the circumstantial evidence leads you

2     inevitably to a particular inference is another matter.  Let me

3     give you another example.

4          Let's say that one evening, you go into a subway

5     station.  It's a local stop and it's not rush hour.  You arrive

6     at the platform and you are surprised to find a large crowd of

7     people waiting on the platform.  You didn't expect there to be

8     so many people, but there are lots of people waiting.  Now, you

9     might infer from this fact that there must not have been a

10     train for quite some time.  But is that an inference you must

11     draw from the circumstantial evidence of a crowded subway

12     platform?

13          It is certainly a weaker inference than the one about

14     the umbrella and the raincoat.  Because if you think more about

15     it, maybe there are other equally plausible explanations.

16     Maybe there was a train just a minute ago that went out of

17     service and they said, Everybody off the train.  Or maybe it's

18     10:30 p.m. and you're waiting at the 50th Street stop of the

19     No. 1 train, and a Broadway show has just let out.  There is

20     more than one plausible explanation.  So in this example, you

21     wouldn't have as strong a basis for drawing any one particular

22     inference.

23          It must be clear to you by now that counsel for the

24     parties are asking you to draw very different conclusions about

25     some of the factual issues in this case.  An important part of

O79VGUO3

1    that decision will involve making judgments about the testimony

2    of the witnesses you listened to and observed.  In making these

3    judgments, you should carefully scrutinize all of the testimony

4    of each witness, the circumstances under which each witness

5    testified, and any other matter in evidence that may help you

6    to decide the truth and the importance of each witness's

7    testimony.

8            Your decision whether or not to believe a witness may

9    depend on how that witness impressed you.  Was the witness

10   candid, frank, and forthright, or did the witness seem to be

11   evasive or suspect in some way?  How did the way the witness

12   testified on direct examination compare with how the witness

13   testified on cross-examination?  Was the witness consistent or

14   contradictory?  Did the witness appear to know what he or she

15   was talking about?  Did the witness strike you as someone who

16   was trying to report his or her knowledge accurately?  What was

17   the witness's demeanor like?  These are examples of the kinds

18   of common-sense questions you should ask yourselves in deciding

19   whether a witness is or is not truthful.

20           In addition, you may consider whether a witness had

21   any possible bias or relationship with a party or any possible

22   interest in the outcome of the case.  Such a bias or

23   relationship does not necessarily make the witness unworthy of

24   belief.  These are simply factors that you may consider.  If a

25   witness made statements in the past that are inconsistent with

his or her testimony during the trial concerning facts that are
at issue, you may consider that fact in deciding how much of
the testimony, if any, to believe.

In making this determination, you may consider whether
the witness purposefully made a false statement and whether it
was -- or whether it was an innocent mistake.  You may also
consider whether the inconsistency concerns an important fact
or merely a small detail, as well as whether the witness had an
explanation for the inconsistency and, if so, whether that
explanation appealed to your common sense.

If you find that a witness has testified falsely as to
any material fact or if you find that a witness had previously
been untruthful when testifying under oath or otherwise, you
may reject that witness's testimony in its entirety, or you may
accept only those parts that you believe to be truthful or that
are corroborated by other independent evidence in the case.

You should also consider whether the witness had an
opportunity to observe the events he or she testified about and
whether the witness's recollection of the facts stands up in
light of other evidence in the case.  In other words, what you
must try to do in deciding credibility is to size up a person,
just as you would in any important matter where you are trying
to decide if a person is truthful, straightforward, and
accurate in his or her recollection.

Now, a witness may be discredited or impeached by

O79VGUO3

contradictory evidence or by evidence that at some other time
the witness had said or done something that is inconsistent
with the witness's present testimony.  The earlier inconsistent
or contradictory statements are admissible only to discredit or
impeach the credibility of a witness, not to establish the
truth of earlier statements made somewhere else.  You may also
consider a witness's earlier silence or inaction that is
inconsistent with his or her courtroom testimony to determine
whether the witness is impeached.  If you believe that any
witness has been impeached and, thus, discredited, then it is
for you to give the testimony of that witness as much or as
little weight, if any, as you think it deserves.

        You are not required to accept testimony even though
the testimony is uncontradicted and the witness's testimony is
not challenged.  You may reject it because of the witness's
bearing or demeanor or because of the apparent improbability of
the testimony or for other reasons sufficient for you to
conclude that the testimony is not worthy of belief.

        It is for you, the jury, and for you alone — not the
lawyers or the witnesses or me as the judge — to decide the
credibility of witnesses who appeared here and the weight that
their testimony deserves.

        I referred to the two separate decisions that the jury
must make in evaluating witnesses:  Credibility and weight.
When you decide whether you believe what a witness says, you

decide credibility.  When you decide how much to allow that
evidence to affect your decision on any issue, you decide the
weight to give the testimony.

In evaluating the credibility of the witnesses, you
should take into account any evidence that the witness who
testified may benefit in some way from the outcome of this
case.  Such an interest in the outcome may create a motive to
testify falsely and may sway the witness to testify in a way
that advances his or her interests.  Therefore, if you find
that any witness whose testimony you are considering may have
an interest in the outcome of this trial, then you should bear
that factor in mind when evaluating the credibility of his or
her testimony and accept it with great care.

This is not to suggest that a witness who has an
interest in the outcome of a case will testify falsely.  It is
for you to decide to what extent, if at all, the witness's
interest has affected or colored his or her testimony.

You are to perform the duty of finding the facts
without bias or prejudice as to any party.  You are to perform
your final duty in an attitude of complete fairness and
impartiality.

The case is important to the government, for the
enforcement of United States criminal laws is a matter of prime
concern to the community.  Equally, it is important to the
defendant, who is charged with serious crimes.

O79VGUO3

1          The fact that the prosecution is brought in the name

2     of the United States of America entitles the government to no

3     greater consideration than that accorded to any other party to

4     a litigation.  By the same token, it is entitled to no less

5     consideration.  The parties, whether the government or an

6     individual, stand as equals at the bar of justice.

7          Under your oath as jurors, you are not to be swayed by

8     sympathy.  You are to be guided solely by the evidence in this

9     case, and the crucial question that you must ask yourselves as

10    you sift through the evidence is:  Has the government proven

11    the guilt of the defendant beyond a reasonable doubt?

12         It is for you, and you alone, to decide whether the

13    government has proven that the defendant is guilty of the

14    crimes charged, solely on the basis of the evidence and subject

15    to the law as I instruct you.  It must be clear to you that

16    once you let fear, prejudice, bias or sympathy interfere with

17    your thinking, there is a risk that you will not arrive at a

18    true and just verdict.

19         If you have a reasonable doubt as to the defendant's

20    guilt, you should not hesitate to find the defendant not

21    guilty.  But, on the other hand, if you find that the defendant

22    has met its burden of proving the defendant's guilt beyond a

23    reasonable doubt, you should not hesitate to find the defendant

24    guilty.

25         Under your oath as jurors, you cannot allow a

O79VGUO3

1    consideration of possible punishment that may be imposed upon

2    the defendant, if convicted, to influence you in any way or to

3    enter into your deliberations.  The duty of imposing sentence

4    is mine, and mine alone.  Your function is to weigh the

5    evidence and to determine whether the defendant is or is not

6    guilty based on the evidence and the law.  Therefore, I

7    instruct you to not consider punishment or possible punishment

8    during your deliberations.

9         The defendant, Miles Guo, also known as Ho Wan Kwok

10   and Guo Wengui, has been charged in an indictment.  The

11   indictment is a document containing the charges or counts

12   against the defendant.  It is not evidence or proof of the

13   defendant's guilt.  You are directed to not consider or discuss

14   how the indictment was obtained.

15        Before you begin your deliberations, you will be

16   provided with a copy of the indictment.  Therefore, I will not

17   read the entire indictment to you at this time.  Instead, I

18   will summarize in general terms the offenses charged.  Then, I

19   will explain in detail the elements of those offenses.

20        An element is an essential component of an offense.

21   You must find that the government established all elements of

22   an offense beyond a reasonable doubt to find the defendant

23   guilty of that offense.

24        The indictment contains 12 charges or counts against

25   the defendant, each of which is alleged to have occurred

1   between 2018 and March 2023.

2          The government alleges that the defendant operated

3   four fraudulent investment schemes as part of a criminal

4   enterprise.  The term "criminal enterprise" is also referred to

5   as a racketeering or RICO enterprise.

6          Count One charges the defendant with conspiracy to

7   operate a criminal enterprise.

8          Counts Two, Three, and Four charge the defendant with

9   conspiracy to commit wire fraud, bank fraud, securities fraud,

10  and money laundering.

11         Counts Five and Six charge the defendant with

12  securities fraud and wire fraud in connection with a private

13  stock offering for the media company known as GTV.

14         Counts Seven and Eight charge the defendant with wire

15  fraud and securities fraud in connection with the Farm Loan

16  Program.

17         Counts Nine and Ten charge the defendant with wire

18  fraud and securities fraud in connection with G/CLUBS.

19         Count Eleven charges the defendant with wire fraud in

20  connection with the Himalaya Exchange.

21         Finally, Count Twelve charges the defendant with

22  making a $100 million wire transfer using money derived from a

23  crime.

24         In a moment, I will instruct you on each of these

25  charges in more detail.  As I said, the indictment contains a

O79VGUO3

1  total of 12 counts against the defendant.  Each count

2  constitutes a separate alleged crime.  You must consider each

3  count of the indictment separately, and you must return a

4  separate verdict on each count in which the defendant is

5  charged.  Whether you find the defendant guilty or not guilty

6  as to one offense should not affect your verdict as to any

7  other offense charged.

8          As I just described, certain counts in the indictment

9  are conspiracy counts, and others are what are referred to as

10  substantive counts.  A conspiracy charge, generally speaking,

11  alleges that two or more persons agreed to commit a crime.  The

12  focus of a conspiracy count, therefore, is on whether there was

13  an unlawful agreement.  So even if a conspiracy fails and the

14  crime is not actually committed, the conspiracy is still

15  punishable as a crime.

16          A substantive charge, by contrast, is based on the

17  actual commission of an offense.  A substantive offense,

18  therefore, may be committed by a single person and it need not

19  involve an agreement with anyone else.

20          If a defendant both agrees to commit a crime and then

21  actually commits the crime, that defendant may be guilty of

22  both the conspiracy and the substantive crime.

23          Let me first turn to the substantive counts, which are

24  listed as Counts Five through Twelve in the indictment.  Then I

25  will address the conspiracy counts.

O79VGUO3

1          Counts Five, Seven, Nine, and Eleven charge the

2     defendant with committing wire fraud, in violation of Title 18,

3     United States Code, Section 1343.  Each wire fraud count

4     relates to a separate alleged scheme.

5          Count Five alleges that the defendant conducted the

6     GTV Private Placement to sell GTV stock and fraudulently obtain

7     money from individuals by making false statements and

8     misrepresentations, including, among other things, about how

9     their money would be used.

10          Count Seven alleges that the defendant conducted the

11     Farm Loan Program to fraudulently obtain money from individuals

12     by making false statements and misrepresentations, including,

13     among other things, about how the farm loans participants'

14     money would be used.

15          Count Nine alleges that the defendant promoted and

16     marketed G/CLUBS to fraudulently obtain money from individuals

17     by making false statements and misrepresentations, including,

18     among other things, about how the money individuals sent to

19     G/CLUBS would be used.

20          And Count Eleven alleges that the defendant operated

21     the Himalaya Exchange to fraudulently obtain money from

22     individuals through false statements and misrepresentations,

23     including, among other things, about how money sent to the

24     Himalaya Exchange would be used.

25          In order to find the defendant guilty of wire fraud,

O79VGUO3

the government must prove the following three elements beyond a reasonable doubt:

First, that there existed a scheme or artifice to defraud or to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises.

Second, that the defendant knowingly, willfully, and with the intent to defraud, devised or participated in the scheme or artifice.

And third, that an interstate or foreign wire communication was used in furtherance of the scheme or artifice.

I'll describe each of these elements in greater detail now.

The first element of wire fraud that the government must prove beyond a reasonable doubt is that there was a scheme or artifice to defraud or to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises. A scheme or artifice is just a plan to accomplish an objective. So a scheme or artifice to defraud is any plan to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.

A pretense, representation, or promise is false if it is untrue when made and was at the time known to be untrue by the person making it. And it is fraudulent if it was made with intent to deceive.

1           A representation, statement, claim, or promise may

2     also be false or fraudulent if it contains half-truths or if it

3     deliberately conceals material facts in a manner that makes

4     what is said or represented misleading or deceptive.

5           The false or fraudulent representation must relate to

6     a material fact or matter.  A material fact is one which would

7     be expected to be of concern to a reasonable and prudent person

8     in relying upon the representation or statement in making a

9     decision.  That means that if you find that a particular

10    statement or representation was false, you must determine

11    whether that statement or representation was one that a

12    reasonable person would have considered important in making his

13    or her decision.

14          The same principle applies to fraudulent half-truths

15    or omissions, that is, failures to disclose facts.  The

16    government does not have to prove that any person actually

17    relied on or suffered damages as a consequence of any

18    fraudulent representation or concealment of facts.

19          Nor do you need to find that the defendant profited

20    from the fraud.  It is enough that a false statement,

21    half-truth or omission was made as part of a fraudulent scheme

22    with the expectation that it would be relied on.  You must

23    concentrate on whether there was such a scheme, not on whether

24    the scheme succeeded.  Of course, proof that the scheme

25    succeeded may be the most persuasive evidence of the existence

1    of the scheme itself.

2              In determining whether a scheme to defraud existed, it

3    is irrelevant whether a victim might have discovered the fraud

4    if he, she, or it had looked more closely or probed more

5    extensively.  A victim's negligence or gullibility in failing

6    to discover a fraudulent scheme is not a defense to wire fraud.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  A scheme to defraud need not be shown by

2     direct evidence, but may be established by the circumstances

3     and facts in the case.

4              b.Second Element: Knowledge and Intent to Defraud

5          The second element that the Government must prove

6     beyond a reasonable doubt for the wire fraud counts is that the

7     Defendant devised or participated in the scheme to defraud

8     knowingly, willfully, and with the specific intent to defraud.

9     I will now define these terms.

10         To "devise" a scheme to defraud is to concoct or plan

11    it.  To "participate" in a scheme to defraud means to associate

12    oneself with it, with the intent to making it succeed.

13    Although a mere onlooker is not a participant in a scheme to

14    defraud, it is not necessary that a participant be someone who

15    personally and visibly executes the scheme.

16         To act "knowingly" means to act voluntarily and

17    deliberately, rather than mistakenly or inadvertently.

18         To act "willfully" means to act voluntarily and with a

19    wrongful purpose.

20         An act is done knowingly and willfully if it is done

21    purposefully and deliberately.  That is, the Defendant's act

22    must have been the product of the Defendant's conscious

23    determination rather than the product of a mistake, accident,

24    mere negligence, or some other innocent reason.

25         To act with a "specific intent to defraud" requires

1    that the Defendant engaged or participated in the fraudulent

2    scheme with awareness of its fraudulent or deceptive character,

3    with an intention to be involved in the scheme to defraud and

4    to help it succeed, and with a purpose of obtaining money or

5    property from another.

6           Now, science has not yet devised a manner of looking

7    into a person's mind and knowing what that person is thinking.

8    However, you have before you evidence of certain acts,

9    conversations, and statements alleged to have been made by,

10   with, or in the presence of the Defendant and others.  The

11   ultimate facts of knowledge and criminal intent may be

12   established by words, conduct, and all the surrounding

13   circumstances, as well as the rational or logical inferences

14   that may be drawn from the words and conduct.  The Defendant

15   need not have participated in or had knowledge of all of the

16   operations of the scheme in order to have acted with knowledge

17   and intent.  It is for you to determine whether the Government

18   has established beyond a reasonable doubt such knowledge and

19   intent on the part of the Defendant.

20          Direct proof of knowledge and fraudulent intent is

21   almost never available.  It would be a rare case where it could

22   be shown that a person wrote or stated that, as of a given time

23   in the past, he committed an act with fraudulent intent.  Such

24   direct proof is not required.   Instead, the ultimate facts of

25   knowledge and criminal intent, though subjective, may be

established by circumstantial evidence, based upon a person's

outward manifestations, his words, conduct, and acts, and all

the surrounding circumstances disclosed by the evidence and the

rational or logical inferences that may be drawn from them.

Additionally, it is not necessary for the Government to prove

that the Defendant was motivated solely by improper

considerations. A defendant may have the required intent to

defraud even if the defendant was motivated by other lawful

purposes as well.

        Because an essential element of the crime charged is

intent to defraud, it follows that good faith on the part of a

defendant is a complete defense to a charge of substantive wire

fraud.  A defendant acts in good faith when he honestly

believed at the time that the representations he was making

were true, even if they turned out to be inaccurate or false.

However, in considering good faith, the fact that a defendant

believes (rightly or wrongly) that he will ultimately be able

to work things out so that no individual suffers a loss is no

excuse for the real and immediate loss resulting from the

defendant's fraudulent conduct.  The burden is on the

Government to prove fraudulent intent and the consequent lack

of good faith beyond a reasonable doubt.

        c.Third Element: Interstate Wires

        The third and final element of substantive wire fraud

is that an interstate wire was used in furtherance of the

scheme to defraud or to obtain money or property by means of

materially false or fraudulent pretenses, representations, or

promises.

A "wire" can be, for example, a phone call, email

communication, text message, social media or website post, or a

bank wire transfer.  The wire must be an interstate wire-that

is, it must pass between two or more states or a state and a

foreign country.  The use of the wire need not itself be a

fraudulent representation.  It must, however, further or assist

in some way in carrying out the scheme.  A wire communication

can also include a communication made after an individual's

funds were obtained.

It is not necessary for the Defendant to have been

directly or personally involved in a wire, as long as the wire

was reasonably foreseeable in the execution of the scheme to

defraud. In this regard, it is sufficient to establish this

element of the crime if the evidence justifies a finding that

the Defendant caused the wire to be used by others.  The wire

requirement can be satisfied even if the wire was used by the

person being defrauded or some other party.  When one does an

act with knowledge that the use of a wire will follow in the

ordinary course of business or where such use of a wire

reasonably can be foreseen, even though not actually intended,

then he causes a wire to be used.  Thus, there is no

requirement that the Defendant specifically authorize others to

1    use a wire.

2              Only the use of a wire must be reasonably foreseeable,

3    not its interstate or foreign component.  Thus, if you find

4    that the wire that occurred was reasonably foreseeable, then

5    this element is satisfied even if it was not foreseeable that

6    the wire would cross state or national lines.

7              17.Elements of Counts Six, Eight, and Ten: Securities

8    Fraud

9              Counts Six, Eight, and Ten of the indictment charge

10   the Defendant with securities fraud in violation of Section

11   10(b) of the Securities Exchange Act and the related Rule

12   10b-5.  In particular:

13             Count Six alleges that the Defendant conducted the GTV

14   Private Placement to sell GTV stock and obtain money from

15   victims through false statements and misrepresentations,

16   including, among other things, about how the GTV investors'

17   money would be used.

18             Count Eight alleges that the Defendant conducted the

19   Farm Loan Program to obtain money from victims through false

20   statements and misrepresentations, including, among other

21   things, about how the Farm Loans participants' money would be

22   used and that such loans would be convertible into GTV common

23   stock.

24             Count Ten alleges that the Defendant promoted and

25   marketed G|CLUBS to obtain money from victims through false

1    representations and misrepresentations, including, among other

2    things, about how the G|CLUBS members' money would be used and

3    that their purchase of G|CLUBS memberships would entitle them

4    to stock in Guo-affiliated entities.

5              To prove these charges, for each of the three

6    securities fraud counts (GTV, the Farm Loans Program, and

7    G|CLUBS), the Government must prove each of the following three

8    elements beyond a reasonable doubt:

9              First, that in connection with the purchase or sale of

10   shares in GTV, G|Fashion, or some other purported security, the

11   Defendant did any one or more of the following:

12             (1)employed a device, scheme, or artifice to defraud,

13             (2)made an untrue statement of a material fact or

14   omitted a material fact which made what was said, under the

15   circumstances, misleading, or

16             (3)engaged in an act, practice, or course of business

17   that operated, or would operate, as a fraud or deceit upon a

18   purchaser or seller;

19             Second, that in doing so, the Defendant acted

20   knowingly, willfully, and with the intent to defraud; and

21             Third, that in doing so, the Defendant used, or caused

22   to be used, any instrumentality of interstate commerce.

23             I will discuss each of these elements in greater

24   detail now.

25             a.First Element: Fraudulent Act

O79BGUO4                        Charge

The first element of securities fraud is that, in connection with the purchase or sale of a security, the Defendant did any one or more of the following:

(1)employed a device, scheme, or artifice to defraud,

(2)made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3)engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.

It is not necessary for the Government to prove that the scheme involved all three types of unlawful conduct. Any one will be sufficient to satisfy this element of the offense. You must, however, be unanimous as to which type of unlawful conduct, if any, occurred.

When we talked about the elements of wire fraud, I instructed you on what constitutes a scheme or artifice to defraud, and what constitutes a false or fraudulent statement (see pages 17-18).  You should apply those same instructions here.  I will now tell you more about several definitions that are specific to the securities fraud context.

i.Materiality

In the securities fraud context, a statement or

1    omission may be "material" if a reasonable investor would have

2    viewed the information as having significantly altered the

3    total mix of information then available.  Material facts

4    include those which may affect the desire of investors to buy

5    or sell a security.  Material facts also include facts which,

6    viewed objectively, might affect the value of a security.

7    Materiality is judged as of the time the information was

8    disclosed or omitted.

9          The Government does not need to establish that anyone

10   actually relied on the misrepresentation.  The Government is

11   also not required to prove that the scheme or artifice actually

12   succeeded-that is, that anyone suffered any loss or that the

13   Defendant realized any gain.  It is the scheme that the law

14   condemns.

15         ii."Security"

16

17         There are two additional components to the first

18   element of securities fraud.  They are that the alleged

19   fraudulent content-here with respect to GTV, the Farm Loans and

20   G|CLUBS-was "in connection with" the purchase or sale of a

21   "security."

22         The term "security" is defined in the statute that

23   makes securities fraud a crime.  It includes, among other

24   things, any stock, investment contract, participation in any

25   profit-sharing agreement, or, in general, any instrumentality

1    commonly known as a security.  It also includes any right to

2    purchase any of the instruments I just named.  An "investment

3    contract" means a contract, transaction, or scheme involving an

4    investment of money in a common enterprise with the expectation

5    that profits will be derived solely from the efforts of the

6    promoter or a third party.

7            iii. "In Connection With"

8

9            Finally, a scheme to defraud is "in connection with" a

10    security if you find that the conduct "touched upon" a purchase

11    or sale of securities.  It is not necessary for you to find

12    that the Defendant actually purchased or sold securities.  Nor

13    is it necessary that any security was ever issued or sold.  It

14    is sufficient if the Defendant participated in a scheme that

15    involved the purchase or sale of securities by another person

16    or entity.

17            The Government need not prove that the Defendant

18    agreed to personally make a misrepresentation or omit a

19    material fact.  It is sufficient if the Government establishes

20    that the Defendant intended to cause the statement to be made

21    or the fact to be omitted.  Likewise, you need not find that

22    the Defendant actually participated in any specific purchase or

23    sale of a purported security if you find that the Defendant

24    participated, or agreed to participate, in the fraudulent

25    conduct that was in connection with a purchase or sale of

securities.

b.Second Element: Knowledge, Intent, and Willfulness

The second element of securities fraud that the Government must establish is that the Defendant acted knowingly, willfully, and with intent to defraud.

I defined these terms for you when we discussed the wire fraud charges (see pages 19- 20), so I will not discuss them at length here. Briefly:

"Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.  To act "willfully" means to act voluntarily and with a wrongful purpose.  "Intent to defraud" means to act knowingly and with intent to manipulate or deceive.

In order for you to find the Defendant guilty of securities fraud, the Government needs to prove that the Defendant acted with an intent to deceive, manipulate, or defraud.  But, the Government need not show that the Defendant acted with an intent to cause harm.

Because an essential element of the crime charged is intent to deceive or intent to manipulate, good faith on the part of the Defendant is a complete defense to the charge of securities fraud.  A defendant acts in good faith when he honestly believed at the time that the representations he was making were true, even if they turned out to be inaccurate or

 1   false. However, the fact that a defendant believes (rightly or

 2   wrongly) that he will ultimately be able to work things out so

 3   that no individual suffers a loss is no excuse for the real and

 4   immediate loss resulting from the defendant's fraudulent

 5   conduct.

 6           A defendant has no burden to establish a defense of

 7   good faith.  It is the Government's burden to prove a lack of

 8   good faith by establishing, beyond a reasonable doubt, that the

 9   Defendant acted knowingly, willfully, and with intent to

10   defraud.

11           c.Third Element: Instrumentality of Interstate

12   Commerce

13

14           The third and final element of securities fraud is

15   that the Defendant knowingly used, or caused to be used, an

16   instrumentality of interstate commerce in furtherance of the

17   scheme to defraud.

18           This element may be established if the Government

19   proves beyond a reasonable doubt that any means or

20   instrumentality of interstate commerce or communication,

21   including the mails, an interstate or international telephone

22   call or email, or an interstate or international wire

23   transaction, were used in furtherance of the scheme to defraud.

24   The Government need not prove that the Defendant was directly

25   or personally involved in the use.  Instead, it is enough if

the Defendant was an active participant in the scheme and took
steps or engaged in conduct that he knew or could reasonably
foresee would naturally and probably result in the use of an
instrumentality of interstate or foreign commerce.

The use of an instrumentality of interstate or foreign
commerce need not be central to the execution of the scheme or
even incidental to it.  All that is required is that the use
has some relation to the object of the scheme or fraudulent
conduct.

18.Count Twelve: Unlawful Monetary Transaction

Count Twelve charges the Defendant with engaging in a
monetary transaction over $10,000 in property derived from
specified unlawful activity-here, a transaction of
approximately $100 million derived from the GTV Private
Placement to a private investment fund-in violation of Title
18, United States Code, Section 1957.  For the Defendant to be
found guilty of that charge, the Government must prove each of
the following elements beyond a reasonable doubt:

First, that the Defendant knowingly engaged or
attempted to engage in a monetary transaction in or affecting
interstate commerce;

Second, that the monetary transaction involved
criminally derived property of a value greater than $10,000;

Third, that the Defendant knew that the transaction
involved proceeds of a criminal offense; and

1          Fourth, that the transaction took place in the United

2   States.

3          a.First Element: Monetary Transaction

4          The first element is that the Defendant knowingly

5   agreed to engage in a monetary transaction in or affecting

6   interstate commerce.

7          The term "monetary transaction" means the deposit,

8   withdrawal, transfer, or exchange, in or affecting interstate

9   or foreign commerce, of funds or a monetary instrument by,

10  through, or to a financial institution.  The term "interstate

11  or foreign commerce" means commerce between any combination of

12  states, territories or possessions of the United States, or

13  between the United States and a foreign country.

14         You must find that the transaction affected interstate

15  commerce in some way, however minimal.  The effect on

16  interstate commerce can be established in several ways,

17  including but not limited to that the source of the funds used

18  in the transaction affected interstate commerce, or that the

19  transaction itself involved an interstate transfer of funds.

20         Moreover, you must find that the Defendant knowingly

21  engaged, or attempted to engage, in the monetary transaction.

22  I remind you that "knowingly" means to act voluntarily and

23  deliberately, rather than mistakenly or inadvertently.  That

24  is, the act of the Defendant must have been the product of his

25  conscious objective rather than the product of force, mistake,

1  accident, mere negligence, or some other innocent reason.

2          b.Second Element: Criminally Derived Property

3          The second element of this offense is that the

4  monetary transaction involved criminally derived property

5  having a value in excess of $10,000.

6          The term "criminally derived property" means any

7  property constituting, or derived from, proceeds obtained from

8  a criminal offense. The term "proceeds" means any property

9  derived from, obtained, or retained, directly or indirectly,

10 through a "specified unlawful activity."  The statute defines

11 which crimes can be a "specified unlawful activity."  I

12 instruct you that both wire fraud and securities fraud are

13 specified unlawful activities.  Specifically, the indictment

14 alleges that the property at issue was derived from the wire

15 fraud and securities fraud alleged in Counts Five and Six of

16 the indictment, which concern the GTV Private Placement.

17         The Government is not required to prove that all of

18 the property involved in the transaction was criminally derived

19 property.  However, the Government must prove that more than

20 $10,000 of the property involved was criminally derived

21 property.

22         c.Third Element: Knowledge

23         The third element of the offense is that the Defendant

24 engaged in the transaction knowing that the transaction

25 involved proceeds of unlawful activity.  However, the

Government is not required to prove that the Defendant knew the

particular offense from which the criminally derived property

was derived.

           d.Fourth Element: In the United States

           The fourth element of this offense is that the

transaction took place in the United States.

           19. Other Theories of Guilt

           With respect to all of the substantive counts, that

is, Counts Five through Twelve, the first theory on which the

Defendant can be guilty of the substantive offenses is by

committing them directly.  I just provided those instructions

to you.  There are also two theories on which the Defendant can

be guilty of the substantive offenses indirectly-(1) by

willfully causing another to commit the offense, or (2) by

aiding and abetting the commission of the offense.

           a.Willful Causation

           First, I will talk about willful causation.  Under

Title 18, United States Code, Section 2, a defendant commits an

offense if he possessed the requisite criminal intent and

willfully caused someone else to engage in the actions

necessary to commit the crimes.

           Now, what does the term "willfully caused" mean?  It

does not mean that the Defendant himself needs to have

physically committed the crimes or supervised or participated

in the actual criminal conduct charged in the indictment.

O79BGUO4                        Charge

1          The meaning of the term "willfully caused" can be

2     found in the answers to the following questions:

3          First, did the Defendant have the mental state

4     necessary to commit the substantive offense?

5          And second, did the Defendant intentionally cause

6     another person to engage in the commission of the substantive

7     offense?

8          If you are persuaded beyond a reasonable doubt that

9     the answer to both of these questions is "yes," then the

10    Defendant is guilty of the crime charged just as if he himself

11    had actually committed it.

12         For example, if a defendant intentionally causes

13    someone else to take a step in furtherance of a scheme to

14    defraud, such as by transmitting money, that defendant is

15    guilty if the Government proves beyond a reasonable doubt that

16    he acted knowingly, willfully, and with the specific intent to

17    defraud and satisfies the other elements of the substantive

18    fraud count.  This is so even if the individual who was caused

19    to make the false statement, or undertake a step in furtherance

20    of the scheme, had no criminal intent.

21              b.Aiding and Abetting

22         Second, aiding and abetting.  It is unlawful for a

23    person to aid, abet, counsel, command, induce, or procure

24    someone else to commit a criminal offense.  A person who does

25    that is just as guilty of the offense as someone who actually

1    commits the offense.

2                 In order to convict the Defendant as an aider and

3    abettor, the Government must prove two elements beyond a

4    reasonable doubt:

5                 First, the Government must prove that a person other

6    than the Defendant committed the crime charged; and

7                 Second, the Government must prove that the Defendant

8    willfully and knowingly associated himself in some way with the

9    crime and that he willfully and knowingly engaged in some

10   affirmative conduct or some overt act for the specific purpose

11   of bringing about the crime.

12                The mere presence of the Defendant in a place where a

13   crime is being committed, even with knowledge that a crime is

14   being committed, is not enough to make him an aider and

15   abettor. Nor is the Defendant's acquiescence in criminal

16   conduct by others, even with guilty knowledge, enough to

17   establish aiding and abetting.  An aider and abettor must know

18   that a crime is being committed and act in a way that is

19   intended to bring about the success of the criminal venture.

20                III.CONSPIRACY COUNTS

21                20.Elements of Count One, Two, Three, and Four:

22   Conspiracy

23                Now that I have explained the indictment's substantive

24   counts, I am going to explain its conspiracy counts.  Here,

25   there are four conspiracy offenses charged.  They are: in Count

1    One, a conspiracy to violate the Racketeer Influenced and

2    Corrupt Organizations Act, commonly referred to as the "RICO

3    Act"; in Count Two, a conspiracy to commit wire fraud and bank

4    fraud; in Count Three, a conspiracy to commit money laundering;

5    and in Count Four, a conspiracy to commit securities fraud.

6    Because Counts One through Four charge conspiracy offenses, let

7    me explain to you what a conspiracy is.  These instructions

8    about conspiracy apply to all four counts.

9          A conspiracy is a kind of criminal partnership-a

10   combination or agreement of two or more persons to join

11   together to accomplish some unlawful purpose.  The crime of

12   conspiracy to violate a federal law is an independent offense.

13   It is separate and distinct from the violation of any specific

14   federal laws, which I referred to as "substantive crimes."

15         If a conspiracy exists, even if it should fail in its

16   purpose, it is still punishable as a crime.  Indeed, you may

17   find the Defendant guilty of conspiracy to commit an offense

18   even if the substantive crime which was the object of the

19   conspiracy was not actually committed.  Congress has deemed it

20   appropriate to make conspiracy, standing alone, a separate

21   crime even if the conspiracy is not successful.

22         In order for the Defendant to be guilty of conspiracy,

23   the Government must prove beyond a reasonable doubt the

24   following two elements:

25         First, that the charged conspiracy existed; and

1              Second, that at some point during the conspiracy's

2     existence, the Defendant knowingly and willfully joined the

3     conspiracy.

4              Now let us separately consider the two elements.

5              a.First Element: Existence of a Conspiracy

6              Starting with the first element, what is a conspiracy?

7     A conspiracy is an agreement or an understanding between two or

8     more people to accomplish by concerted action one or more

9     unlawful purposes.  For example, the unlawful purpose alleged

10    to be one of the objects of the conspiracy charged in Count Two

11    is to commit wire fraud, and the unlawful purpose alleged to be

12    the object of the conspiracy charged in Count Three is to

13    commit money laundering.  I will give you instructions on each

14    of these unlawful purposes-or objects-of the conspiracies later

15    on.

16             The essence of the crime of conspiracy is the unlawful

17    agreement of two or more people to commit a crime.  The

18    ultimate success of the conspiracy, or the actual commission of

19    the crime that is the object of the conspiracy, is not required

20    for a conspiracy to have existed.  Rather, the Government is

21    required to prove beyond a reasonable doubt only that two or

22    more people came to an agreement to accomplish the unlawful

23    object.

24             To prove the existence of a conspiracy, the Government

25    is not required to show that two or more people sat around a

1   table and entered into an express or formal agreement, orally

2   or in writing, stating that they had formed a conspiracy to

3   commit a crime.  Similarly, you need not find that the alleged

4   co-conspirators stated (in words or writing) what the scheme

5   was, its object or purpose, every precise detail of the scheme,

6   or the means by which its object or purpose was to be

7   accomplished.  What the Government must prove is that there was

8   a mutual understanding, either spoken or unspoken, between two

9   or more people, to cooperate with each other to accomplish an

10  unlawful act.

11          It is rare that a conspiracy can be proven by direct

12  evidence of an explicit agreement. Rather, in determining

13  whether there has been an unlawful agreement as alleged in the

14  indictment, you may consider the actions and conduct of all the

15  alleged co-conspirators that were meant to carry out the

16  apparent criminal purpose.  The old adage, "actions speak

17  louder than words," applies here.  Often, the only evidence

18  that is available with respect to the existence of a conspiracy

19  is that of disconnected acts and conduct on the part of the

20  individual co-conspirators.  When taken all together and

21  considered as a whole, however, these acts and conduct may

22  warrant the inference that a conspiracy existed just as

23  conclusively as more direct proof, such as evidence of an

24  express agreement.

25          Further, although the indictment alleges that the

conspiracies began in or around 2018, and continued up to in or

around March 2023, it is not essential that the Government

prove that the conspiracy in question started and ended on

those specific dates or that it existed throughout that entire

period.  Rather, it is sufficient to satisfy the first element

if you find that the charged conspiracy was formed and that it

existed for any time within the charged period.

        b.Second Element: Participation

        If you conclude that the Government has proven beyond

a reasonable doubt that a charged conspiracy existed, then you

must consider the second element: whether the Defendant

participated in the conspiracy knowingly and willfully, with

knowledge of its unlawful purpose or purposes, and in

furtherance of its unlawful object or objects.

        To act "knowingly" means to act voluntarily and

deliberately rather than mistakenly or inadvertently.  To act

"willfully" means to act voluntarily and with a wrongful

purpose.  An act is done knowingly and willfully if it is done

purposefully and deliberately.  In other words, the Defendant's

act must have been the product of the Defendant's conscious

determination rather than the product of a mistake, accident,

mere negligence, or some other innocent reason.

        It is not necessary for the Government to show that

the Defendant was fully informed as to all the details of the

conspiracy in order for you to infer knowledge on his part.

 1    Nor does the Defendant need to know the full extent of the
 2    conspiracy or all of its participants.  Indeed, it is not
 3    necessary that the Defendant knew more than one other member of
 4    the conspiracy.  It is also not necessary that the Defendant
 5    received any monetary benefit from participating in the
 6    conspiracy.  It is enough if he participated in the conspiracy
 7    knowingly and willfully, as I defined those terms.  Although
 8    proof of a financial interest in the outcome of the scheme is
 9    not essential, if you find that the Defendant had such an
10    interest, that is a factor you may properly consider in
11    determining whether he was a member of the conspiracy.
12    Conversely, if you find that the Defendant did not have a
13    financial interest in the outcome of the scheme, that is also a
14    factor you may properly consider in determining whether or not
15    the Defendant was a member of the conspiracy.

16            If you determine that the Defendant became a member of
17    the conspiracy, the duration and extent of the Defendant's
18    participation has no bearing on the issue of the Defendant's
19    guilt.  Some co-conspirators play major roles, while others
20    play minor roles.  An equal role is not what the law requires.
21    In fact, even a single act may be sufficient to draw the
22    Defendant within the ambit of the conspiracy if it meets the
23    elements I described.  The Defendant also need not have joined
24    the conspiracy at the outset.  The Defendant may have joined it
25    at any time-at the beginning, in the middle, or at the end-and

1    the Defendant will still be held responsible for all that was

2    done before he joined, as well as all that was done during the

3    conspiracy's existence when the Defendant was a member.

4    However, I want to caution you that mere association with a

5    member of a conspiracy does not make a person a member of the

6    conspiracy, even when that association is coupled with

7    knowledge that the second person is committing a crime.  Mere

8    presence at the scene of a crime, even coupled with knowledge

9    that a crime is taking place, is not sufficient to support a

10   conviction.  In other words, knowledge without participation is

11   not sufficient to satisfy the second element.  What is

12   necessary is that the Defendant participated in the conspiracy

13   with knowledge of its unlawful purpose and with the intent to

14   aid in the accomplishment of its unlawful object or objects.

15         In sum, if you find that the Defendant, with an

16   understanding of the unlawful nature of the charged conspiracy,

17   intentionally engaged, advised, or assisted in the conspiracy

18   for the purpose of furthering the illegal undertaking, you

19   should conclude that the Defendant became a knowing and willing

20   participant in the unlawful agreement-that is to say, a

21   conspirator.

22         21.Liability for Acts and Declarations of

23   Co-Conspirators

24         You will recall that I admitted into evidence against

25   the Defendant the acts and statements of others because these

O79BGUO4                           Charge

acts and statements were committed or made by people who, the

Government alleges, were co-conspirators of the Defendant.

The reason for allowing this evidence to be received

against the Defendant has to do, in part, with the nature of

the crime of conspiracy.  As I said, a conspiracy is often

referred to as a partnership in crime: as in other types of

partnerships, when people enter into a conspiracy, each and

every member becomes an agent for the other conspirators in

carrying out the conspiracy.

Therefore, the reasonably foreseeable declarations,

statements, and omissions of any member of the conspiracy made

in furtherance of the common purpose of the conspiracy, are

deemed, under the law, to be the acts of all of the members,

and all of the members are responsible for such acts,

declarations, statements, and omissions.

If you find, beyond a reasonable doubt, that the

Defendant was a member of a conspiracy charged in the

indictment, then any acts done or statements made in

furtherance of the conspiracy by a person also found by you to

have been a member of the same conspiracy may be considered

against the Defendant.  This is so even if such acts were

committed or such statements were made in the Defendant's

absence, and/or without his knowledge.

22.Count Two: Conspiracy to Commit Wire Fraud and Bank

Fraud

1          Because it will be easier to explain, I am going to go

2    through the conspiracy counts out of order and start with Count

3    Two, which charges the Defendant with conspiracy to commit wire

4    fraud and bank fraud.

5          In order to prove the Defendant guilty of Count Two,

6    the Government must establish the following two elements beyond

7    a reasonable doubt:

8          First, that the conspiracy charged in Count Two of the

9    indictment existed; that is, that there was an agreement or

10   understanding between two or more people to commit wire fraud

11   and bank fraud, and

12         Second, that the Defendant knowingly and willfully

13   became a member of the conspiracy.

14         You should follow the instructions that I previously

15   provided to you about conspiracies in general (see pages

16   31-35).  However, the conspiracy charged in Count Two has a

17   different object or criminal goal than the other conspiracy

18   counts.  Remember, the objects of a conspiracy are the illegal

19   goals that the conspirators agree on.  The objects of Count

20   Two's conspiracy are wire fraud and bank fraud.

21         It is not necessary for the Government to prove that

22   the Defendant conspired to commit both objects of the

23   conspiracy.  You must, however, be unanimous as to the object

24   or objects of the conspiracy, if any.

25         I will now describe these two illegal objects in

1    greater detail.

2            a.Object One: Wire Fraud

3

4            I described the elements of wire fraud during my

5    discussion of Counts Five, Seven, Nine, and Eleven, and you

6    should apply that description here to the wire fraud object of

7    the conspiracy charged in Count Two.  In other words, to find

8    the Defendant guilty of conspiracy to commit wire fraud, you

9    must find that the unlawful purpose of the conspiracy was to

10   commit wire fraud as previously defined (see pages 16-21).

11           b.Object Two: Bank Fraud

12           I will now describe the elements of bank fraud.  Bank

13   fraud has the following three elements.

14           First, that there was either (1) a scheme to defraud a

15   bank or (2) a scheme to obtain money owned by or under the

16   custody or control of a bank by means of false or fraudulent

17   pretenses, representations, or promises;

18           Second, that the Defendant executed or attempted to

19   execute the scheme with intent either (1) to defraud the bank

20   or (2) to obtain money or funds owned by or under the custody

21   or control of a bank; and

22           Third, that at the time of the execution of the

23   scheme, the bank involved had its deposits federally insured.

24           Now, I will explain each of the three elements of bank

25   fraud in more detail.

 1          The first element of bank fraud is that there was

 2     either a scheme to defraud a bank or a scheme to obtain money

 3     owned by or under the custody or control of a bank, by means of

 4     false or fraudulent pretenses, representations, or promises.

 5     This element requires proof of the existence of only one of

 6     these theories.  That is, either that there existed a scheme to

 7     defraud a bank, or that there existed a scheme to obtain

 8     property under the custody or control of a bank by means of

 9     fraudulent pretenses, representations, or promises.  You must

10     be unanimous on which theory was proved beyond a reasonable

11     doubt.

12          In order to prove the first theory of bank fraud-that

13     there was a scheme to defraud a bank-the Government must prove

14     beyond a reasonable doubt that there was a pattern or course of

15     conduct concerning a material matter designed to deceive a

16     federally insured bank into releasing money or property.

17          I already instructed you on the definition of "scheme

18     to defraud," and you should apply those instructions here (see

19     pages 17-18).  As with wire fraud, which I instructed you on

20     earlier, a fraudulent representation must relate to a material

21     fact or matter.  This means that if you find a particular

22     statement of fact to have been false, you must determine

23     whether that statement was one that a reasonable person would

24     have considered important in making his or her decision.  The

25     same principle applies to fraudulent half-truths or omissions

1    of material facts.

2            In order to prove the second theory of bank fraud, the

3    Government must prove beyond a reasonable doubt that there was

4    a scheme to obtain money or property owned by or under the

5    custody or control of a bank or credit union by means of false

6    and fraudulent pretenses, representations or promises.  It is

7    not necessary that the false or fraudulent pretenses,

8    representations, or promises were made directly to the bank

9    itself.  It is sufficient if they were made to any person, so

10   long as the false or fraudulent pretenses, representations or

11   promises were the mechanism naturally inducing the bank (or

12   custodian of bank property) to part with money in its control.

13           In considering this element of bank fraud, it is

14   unimportant whether a bank actually relied on a

15   misrepresentation.  It is sufficient if the misrepresentation

16   is one that is merely capable of influencing the bank's

17   decision.  Further, it is not necessary for the Government to

18   prove that the financial institutions actually lost money or

19   were deprived of property as a result of the scheme.  It also

20   does not matter whether any of the banks involved might have

21   discovered the fraud had the bank probed further.  If you find

22   that a scheme existed, it is irrelevant whether you believe

23   that any of the banks involved were careless, gullible, or even

24   negligent.

25           The second element of bank fraud is about the

1    Defendant's intent.  There are two ways that this element can

2    be met:

3            The first way is if the Defendant executed, attempted

4    to execute, or participated in the scheme or artifice

5    knowingly, willfully, and with the intent to defraud a bank or

6    credit union. I've already provided you with the definitions of

7    knowingly and willfully, and you should apply those same

8    definitions here (see pages 19-20). To act with a "specific

9    intent to defraud" requires that the Defendant intended, at

10   least in part, to deceive one or more banks or credit unions.

11   The Defendant need not intend to cause the banks or credit

12   unions any financial loss.

13           The second way this element can be met is if the

14   Defendant executed or attempted to execute the scheme knowingly

15   and willfully and with the intent to obtain money or funds

16   owned or under the custody or control of the bank. It is not

17   necessary that the Defendant intended to defraud a bank.  It is

18   also not necessary that the Defendant intended to cause harm to

19   the issuing bank or credit union (such as by causing them to

20   lose money), or to anyone else.  This element requires that the

21   Defendant engaged in, or participated in, the scheme with an

22   understanding of its fraudulent or deceptive character and with

23   an intention to help it succeed.  It is not required that the

24   Defendant participated in or had knowledge of all the

25   operations of the scheme.

O79BGUO4                        Charge

1          The third element of bank fraud is that at least one

2     of the financial institutions in question was federally insured

3     at the time of the scheme. This simply means that the financial

4     institution was a bank insured by the Federal Deposit Insurance

5     Corporation (or FDIC) during the time frame alleged in the

6     indictment.  The Government need not show that the Defendant

7     knew the identity of the particular financial institution or

8     that the Defendant knew that the financial institution was

9     federally insured to satisfy this third element.

10         23.Count Three: Money Laundering Conspiracy

11         Count Three charges the Defendant with conspiracy to

12    commit money laundering.  In order to prove the Defendant

13    guilty of Count Three, the Government must establish the

14    following two elements beyond a reasonable doubt:

15         First, that the conspiracy charged in Count Three of

16    the indictment existed; that is, that there was an agreement or

17    understanding between two or more people to commit money

18    laundering, and

19         Second, that the Defendant knowingly and willfully

20    became a member of the conspiracy.

21         You should follow the instructions that I previously

22    provided to you about conspiracies in general (see pages

23    31-35).  However, the conspiracy charged in Count Three has a

24    different object than the conspiracy charged in Count Two or

25    the other conspiracy counts.  The object of Count Three's

1    conspiracy is money laundering.

2              The primary federal money laundering statute can be

3    violated in several ways.  Three such violations are alleged to

4    be the objects of the money laundering conspiracy charged in

5    Count Three: (1) domestic concealment money laundering, (2)

6    international concealment money laundering, and (3)

7    international promotion money laundering.  You need not find

8    that the Defendant agreed to accomplish all three types of

9    money laundering; an agreement to accomplish any one of the

10   objects is sufficient.  You must, however, be unanimous as to

11   which type of money laundering, if any, occurred.

12             Each of these money laundering violations has unique

13   elements, which I will now explain.

14             a.Object One: Domestic Concealment

15

16             First, it is a violation of the money laundering

17   statute to engage in domestic concealment-that is, to

18   participate in a domestic financial transaction that involves

19   the proceeds of a specified unlawful activity, knowing that the

20   transaction was designed to conceal or disguise the nature,

21   location, source, ownership or control of the proceeds of

22   specified unlawful activity.  This type of money laundering is

23   known as "domestic concealment" money laundering.

24             There are three elements to domestic concealment money

25   laundering:

O79BGUO4                        Charge

1          First, that the Defendant conducted or attempted to

2    conduct a financial transaction involving property constituting

3    the proceeds of specified unlawful activity, specifically, wire

4    fraud and securities fraud;

5          Second, that the Defendant knew that the property

6    involved in the financial transaction was the proceeds of some

7    form of unlawful activity; and

8          Third, that the Defendant knew that the transaction

9    was designed, in whole or in part, either to conceal or

10   disguise the nature, location, source, ownership, or control of

11   the proceeds of specified unlawful activity.

12         I will now explain each element of domestic

13   concealment money laundering in greater detail.

14         i.First Element: Financial Transaction Involving

15   Proceeds of Specified Unlawful Activity

16

17         The first element of domestic concealment money

18   laundering is that the Defendant conducted a financial

19   transaction involving property constituting the proceeds of

20   specified unlawful activity, specifically, wire fraud and

21   securities fraud.

22         The term "conducts" includes initiating, concluding,

23   or participating in initiating or concluding a transaction.

24         The term "financial transaction" means (1) a

25   transaction involving a financial institution that is engaged

1    in, or the activities of which affect, interstate or foreign

2    commerce in any way or degree, or (2) a transaction that in any

3    way or degree affects interstate or foreign commerce and

4    involves the movement of funds by wire or other means, or

5    involves one or more monetary instruments.  I instruct you that

6    a federally insured bank constitutes a "financial institution."

7         A "transaction involving a financial institution"

8    includes a deposit, withdrawal, transfer between accounts,

9    exchange of currency, loan, extension of credit, purchase or

10   sale of any stock, bond, certificate of deposit, or other

11   monetary instrument, use of a safe deposit box, or any other

12   payment, transfer, or delivery by, through, or to a financial

13   institution by whatever means.

14        The term "interstate or foreign commerce" means

15   commerce between any combination of states, territories, or

16   possessions of the United States, or between the United States

17   and a foreign country.  In determining whether someone is

18   engaged in, or whether his activities affect, interstate or

19   foreign commerce, the involvement in interstate or foreign

20   commerce can be minimal.  Any involvement at all will satisfy

21   this element.

22        The term "monetary instrument" includes, among other

23   things, coin or currency of the United States or any other

24   country, personal checks, traveler's checks, cashier's checks,

25   bank checks, money orders, and investment securities or

1   negotiable instruments in bearer form or otherwise in such form

2   that title thereto passes upon delivery.

3           The term "proceeds" means any property derived,

4   directly or indirectly, from some form of unlawful activity,

5   including the gross receipts of such activity. Proceeds can be

6   any kind of property, not just money.

7           I already described the meaning of "specified unlawful

8   activity." In this case, the Government has alleged that the

9   funds in question were the proceeds of wire fraud and

10  securities fraud-that is, the conduct alleged in Counts Five

11  through Eleven that I already described to you.  I instruct you

12  that, as a matter of law, wire fraud and securities fraud fall

13  within the definition of "specified unlawful activity."

14          However, it is for you to determine whether the funds

15  here were in fact the proceeds of wire fraud and securities

16  fraud.  The Government does not need to prove both of these

17  specified unlawful activities.  It is sufficient if you find

18  that the Government has proven beyond a reasonable doubt that

19  the financial transaction involved the proceeds of wire fraud

20  or the proceeds of securities fraud. But, you must agree

21  unanimously as to which of these specified unlawful activities

22  the Government has proven, and you must agree unanimously that

23  a financial transaction involved the proceeds of that specified

24  unlawful activity.

25          ii.Second Element: Knowledge

1          The second element of domestic concealment money

2    laundering is that the Defendant knew that the property

3    involved in the financial transaction was the proceeds of some

4    form of unlawful activity, specifically activity that

5    constitutes a felony under state, federal, or foreign law.

6    Thus, to satisfy this element, the Government does not have to

7    prove that the Defendant specifically knew that the property

8    involved in the transaction represented the proceeds of wire

9    fraud, securities fraud, or any other specific offense.  The

10   Government only has to prove that the Defendant knew it

11   represented the proceeds of some illegal activity that was a

12   felony.  I instruct you that, as a matter of law, wire fraud

13   and securities fraud are felonies under federal law.

14          iii.Third Element: Designed to Conceal or Disguise

15          The third element of domestic concealment money

16   laundering concerns the purpose of the transaction.

17   Specifically, the Government must prove beyond a reasonable

18   doubt that the Defendant acted with knowledge that the

19   transaction was designed to conceal or disguise the proceeds'

20   nature, location, source, ownership, or control.  Thus, if the

21   Defendant knew that a transaction was designed, at least in

22   part, either to conceal or disguise the true nature, location,

23   source, ownership, or control of the property in question, this

24   element is satisfied.  However, if the Defendant knew of the

25   transaction, but did not know that it was designed, at least in

O79BGUO4                         Charge

1  part, either to conceal or disguise, this element has not been

2  satisfied.

3         b.Object Two: International Concealment

4         Second, it is a violation of the money laundering

5  statute to engage in international concealment-that is, to

6  participate in a foreign financial transaction that involves

7  the proceeds of a specified unlawful activity, knowing that the

8  transaction was designed to conceal or disguise the nature,

9  location, source, ownership, or control of the proceeds of

10  specified unlawful activity.

11         There are three elements to international concealment

12  money laundering:

13         First, that the Defendant knowingly transported,

14  transmitted, or transferred a monetary instrument or funds from

15  a place in the United States to or through a place outside the

16  United States or to a place in the United States from or

17  through a place outside the United States;

18         Second, that the Defendant did so with knowledge that

19  the monetary instrument or funds involved represent the

20  proceeds of some form of unlawful activity; and

21         Third, that the Defendant knew that the

22  transportation, transmission, or transfer was designed, in

23  whole or in part, to conceal or disguise the nature, location,

24  source, ownership, or control of the proceeds of specified

25  unlawful activity.

1          The second and third elements are the same as the

2     second and third elements for domestic concealment money

3     laundering, and you should follow the instructions I previously

4     provided as to those elements (see pages 44-45).  I will now

5     describe the first element in greater detail.

6          The first element that the Government must prove

7     beyond a reasonable doubt is that the Defendant transported,

8     transmitted, or transferred, or attempted to transport,

9     transmit, or transfer a monetary instrument or funds (1) from a

10    place in the United States to or through a place outside the

11    United States, or (2) to a place in the United States from or

12    through a place outside the United States.

13         I previously defined the term "monetary instrument,"

14    and you should use the same definition here (see page 43).  The

15    term "funds" refers to money or negotiable paper that can be

16    converted into currency.

17         "Transport," "transmit," and "transfer" are not words

18    that require a definition; you should give them their ordinary,

19    everyday meaning.  The Government need not prove that the

20    Defendant physically carried funds or monetary instruments in

21    order to prove that he is responsible for transferring,

22    transporting, or transmitting.  All that is required is proof

23    that the Defendant caused the funds or monetary instrument to

24    be transported, transferred, or transmitted by another person

25    or entity.

c.Object Three: International Promotion

Third, it is a violation of the money laundering statute to engage in international promotion-that is, to participate in a foreign financial transaction with the intent to promote the carrying on of specified unlawful activity.

There are three elements to international promotion money laundering:

First, that the Defendant conducted (or attempted to conduct) a financial transaction involving property constituting the proceeds of specified unlawful activity, specifically, wire fraud and securities fraud;

Second, that the Defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity; and

Third, that the Defendant acted with the intent to promote the carrying on of specified unlawful activity.

I already described the first and second elements to you, in connection with domestic concealment money laundering, and you should apply those same instructions here (see pages 42-44).

The third element that the Government must prove beyond a reasonable doubt is that the Defendant acted with intent to promote the carrying on of specified unlawful activity, specifically, wire fraud and securities fraud.

1         To act intentionally means to act willfully, not by

2    mistake or accident, with the deliberate purpose of promoting,

3    facilitating, or assisting the carrying on of wire fraud and

4    securities fraud.  If you find that the Defendant acted with

5    the intention or deliberate purpose of promoting, facilitating,

6    or assisting in the carrying on of wire fraud and securities

7    fraud, then the third element is satisfied.

8         24.Elements of Count Four: Securities Fraud Conspiracy

9         Count Four charges the Defendant with conspiracy to

10   commit securities fraud.  The indictment alleges that the

11   Defendant conspired to commit securities fraud by agreeing to

12   fraudulently induce investors to participate in the GTV Private

13   Placement, the Farm Loan Program, and G|CLUBS by providing

14   materially false and misleading information and representations

15   in connection with purported shares of GTV common stock and

16   purported companies affiliated with GTV.

17        In order to prove the Defendant guilty of Count Four,

18   the Government must establish the following three elements

19   beyond a reasonable doubt:

20        First, that the conspiracy charged in Count Four of

21   the indictment existed; that is, that there was an agreement or

22   understanding between two or more people to commit the crime of

23   securities fraud;

24        Second, that the Defendant knowingly and willfully

25   became a member of the conspiracy; and

1          Third, that one of the members of the conspiracy-it

2     does not have to be the Defendant-knowingly committed at least

3     one overt act for the purpose of furthering some object of the

4     conspiracy.

5          a.First and Second Elements: Existence of Conspiracy

6     and Participation

7

8          The first two elements-that the conspiracy existed,

9     and that the Defendant knowingly joined it-are the same as the

10    first two elements for the wire fraud and bank fraud conspiracy

11    alleged in Count Two and the money laundering conspiracy

12    alleged in Count Three (see pages 31-35).  Accordingly, you

13    should follow the instructions I previously provided to you

14    about conspiracies in general.

15         The conspiracy charged in Count Four has a different

16    object or criminal goal from the conspiracies charged in Count

17    Two or Three.  The object of Count Four's conspiracy is to

18    commit securities fraud.  I already described the elements of

19    securities fraud, and you should use that description here.  In

20    other words, to find the Defendant guilty of conspiracy to

21    commit securities fraud, you must find that the unlawful

22    purpose of the conspiracy was to commit securities fraud as I

23    previously explained (see pages 22-27).

24         I will explain the third element-requiring an overt

25    act-next.

1                    b.Third Element: Overt Act

2                The third element that the Government must prove

3       beyond a reasonable doubt is that at least one overt act was

4       committed in furtherance of the conspiracy by at least one of

5       the co-conspirators-not necessarily the Defendant.

6                An overt act is any act that is done to further an

7       object of the conspiracy.  An overt act may be a criminal act

8       or the crime that is the object of the conspiracy, but it need

9       not be.  It may even be a seemingly innocent act so long as it

10      is a step in carrying out the conspiratorial scheme.

11               In simple language, the overt act element is a

12      requirement that the agreement went beyond the mere discussion

13      stage.  The overt act requirement means that you must find that

14      one of the co-conspirators took some action during the life of

15      the conspiracy to further the conspiracy.

16               In order for the Government to satisfy the overt act

17      requirement, it is not necessary for the Government to prove

18      the overt acts alleged in the indictment.  That is, you might

19      find that overt acts were committed that were not alleged at

20      all in the indictment.  It is sufficient for the Government to

21      show that the Defendant, or one of his alleged co-conspirators,

22      knowingly committed any overt act in furtherance of the

23      conspiracy during the life of the conspiracy.

24               You need not reach unanimous agreement on which

25      particular overt act was committed in furtherance of the

1    conspiracy; you just need to all agree that at least one overt

2    act was so committed.

3            THE COURT:  It's 5:01, so we're going to stop our

4    instructions here.  Now that you know that the parties have

5    rested, it's very tempting to start discussing the case.

6    Either with someone at home or even when you're back in the

7    jury room or in the elevator, but it's absolutely prohibited.

8    You cannot discuss the case until I tell you, now is the time

9    to deliberate.  I have to finish my instructions on the law.

10   The lawyers must give their summations, so the same old rules

11   apply.  These instructions that were handed out to you earlier

12   are going to be collected.  We'll have them for you in the

13   morning.  You're not allowed to discuss the case amongst

14   yourselves or with anyone else.  Don't permit anyone to discuss

15   the case in your presence, don't read, watch, or listen to

16   anything from any source about anything that has to do with

17   this case.  Have a good evening.

18           THE LAW CLERK:  Jury exiting.

19           (Jury not present)

20           (Continued on next page)

21

22

23

24

25

1              THE COURT:  Please be seated.  All right.  So I need

2     tomorrow morning to finish pages 50 to 68 of the charge and

3     then we will start with the summation of the prosecution.  Who

4     will be summing up?

5              MS. MURRAY:  AUSA Finkel, your Honor.

6              THE COURT:  And for the defense?

7              MS. SHROFF:  Your Honor, Mr. Kamaraju is going to give

8     the defense summation.  Your Honor, I was wondering if we could

9     possibly make -- the defense would ask the Court to consider,

10    since the tail end of the jury instructions are not specific to

11    the law, would the Court consider allowing the summations to

12    begin first thing in the morning and then give the instruction

13    at the end so that all three summations are done in one day?  I

14    hadn't had a chance to confer with the government.  The last

15    part of the jury instruction are also sort of the non-statute

16    related ones, the general instructions, and then the marshal is

17    given the oath.  And I just thought that it might flow in a

18    sense better and allow everybody to start in the morning and

19    sum up.

20             THE COURT:  So my understanding is that I would finish

21    the substantive charges and then there would be the summations,

22    and then I would give the more general instructions that are in

23    section six of the charge.  You're saying that you want me to

24    do it in a different order?

25             MS. SHROFF:  I was just suggesting that all three

1    summations could be finish.  We could start with the summation

2    and finish all of it, and all the remaining instruction could

3    be at the end.  It's just a suggestion.  But if the Court

4    prefers not to, that's fine too.  I was just trying to get all

5    three summation in, in the morning.

6              THE COURT:  I'll hear from the government.

7              MS. MURRAY:  We defer to the Court.  We do think it

8    makes sense to complete the law portion that your Honor has

9    started.  There are very little pages left, then move to

10   summation, and then as your Honor said move to section six of

11   the instructions.

12             THE COURT:  I think that because I've told them that I

13   was going to do it one way, if I leave out substantive charges

14   that it could be confusing when the lawyers start to talk about

15   charges that I have not gone over, so I'm going to finish up

16   pages 50 to 68 to the charge tomorrow morning, and you can go

17   right into summations.

18             MS. SHROFF:  Okay, your Honor.

19             THE COURT:  But also consider that one of the jurors

20   had said that he needs a break at 11:30.  So no matter what,

21   we'll break at 11:30, and we're going to have to break again at

22   2:30.  It could be a ten-minute break at 11:30.  I understand

23   what he needs is a bathroom break.  At some point we need to

24   break at lunch.  You might want to discuss what you consider to

25   be the optimal break time for lunch.

O79BGUO4                          Charge

1              MS. MURRAY:  Your Honor, we're happy to do that, and

2     we can follow-up by email with the Court with ideally a

3     proposed joint suggestion.

4              THE COURT:  Okay.  Thank you.  Have a good evening.

5              (Adjourned to July 10, 2024 at 9 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                               Page

 3     GERALD SCOTT BARNETT

 4    Redirect By Ms. Shroff . . . . . . . . . . .5577

 5    Recross By Ms. Murray  . . . . . . . . . . .5600

 6    Redirect By Ms. Shroff . . . . . . . . . . .5609

 7     LEANNE LI

 8    Direct By Ms. Shroff . . . . . . . . . . . .5617

 9    Cross By Ms. Murray  . . . . . . . . . . . .5688

10    Redirect By Ms. Shroff . . . . . . . . . . .5714

11    Recross By Ms. Murray  . . . . . . . . . . .5725

12    Redirect By Ms. Shroff . . . . . . . . . . .5726

13    GEORGE HIGGINBOTHAM

14    Direct By Mr. Schirick . . . . . . . . . . .5727

15    Cross By Ms. Murray  . . . . . . . . . . . .5758

16    Redirect By Mr. Schirick . . . . . . . . . .5768

17                       GOVERNMENT EXHIBITS

18    Exhibit No.                               Received

19     SB217   . . . . . . . . . . . . . . . . . .5603

20     NJ252   . . . . . . . . . . . . . . . . . .5600

21     CO801   . . . . . . . . . . . . . . . . . .5707

22     CO802   . . . . . . . . . . . . . . . . . .5713

23                       DEFENDANT EXHIBITS

24    Exhibit No.                               Received

25     60760A, 60760A-T . . . . . . . . . . . . .5645
```

1        Stip-1, 40017, 40017-T, 40019, . . . . . . .5748

2                  40019-T, 40021, 40021-T,

3                  40024, 40024-T, 40037,

4                  40037-T, 40052, 40052-T,

5                  40053, 40053-T

6     60727    . . . . . . . . . . . . . . . . . . . .5659

7     60728    . . . . . . . . . . . . . . . . . . . .5655

8     60729    . . . . . . . . . . . . . . . . . . . .5655

9     60730    . . . . . . . . . . . . . . . . . . . .5653

10    60734    . . . . . . . . . . . . . . . . . . . .5652

11    60738-X  . . . . . . . . . . . . . . . . . . . .5677

12    60763    . . . . . . . . . . . . . . . . . . . .5738

13    60764    . . . . . . . . . . . . . . . . . . . .5678

14    72661-R  . . . . . . . . . . . . . . . . . . . .5650

15    SB212    . . . . . . . . . . . . . . . . . . . .5581

16

17

18

19

20

21

22

23

24

25