**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

--------------------------------------------------------------------X
                                                                    :
In re:                                                              :   Chapter 11
                                                                    :
      Ho Wan Kwok,                    :   Case No. 22-50073 (JAM)
                                                                    :
                                                                    :
           Debtor. :
                                                                    :
--------------------------------------------------------------------X

## DECLARATION OF MR. HO WAN KWOK IN SUPPORT
## OF THE CHAPTER 11 CASE AND CERTAIN MOTIONS

I, Ho Wan Kwok, being duly sworn, depose and say:

        1.     On February 15, 2022, I commenced the above-captioned Chapter 11 case. I am over the age of 18 and competent to testify.

        2.     I submit this Declaration to provide the Bankruptcy Court and all parties-in-interest background information about me and a description of the circumstances leading up to the commencement of my Chapter 11 case. I go into some length in this Declaration to provide context for the nature of the claims against me, my unique financial circumstances, and the reasons I commenced this Chapter 11 case.

        3.     As discussed more fully below, I filed this Chapter 11 case to: (a) create a single forum to orderly address the various competing claims asserted against me; (b) afford stakeholders an efficient opportunity to investigate my assets, liabilities, and financial affairs, given what I perceive to be misunderstandings in that regard; (c) establish what assets are estate property and, in turn, available for distribution to holders of allowed claims; and, hopefully (d) reach consensus

Confidential

with my creditors on a fair and equitable resolution of claims and distribution of assets pursuant to a Chapter 11 plan.

4.      In filing this Chapter 11 case and preparing this Declaration, I am cognizant that the Court may have concerns over Justice Ostrager's February 9 Contempt Order (defined below), adverse statements made about me by PAX (also defined below), and perhaps even the political views that I have expressed publicly. There are, of course, two or more sides to every story, and this Declaration will offer my views. For reasons that will become clear, I live in continuous fear of retribution by the Chinese Communist Party (the "CCP") for my outspoken criticism of its corruption and human rights abuses. Over the years, I have endured relentless attacks through meritless litigation in the United States court system funded by the CCP and its proxies and agents. My Chapter 11 case can only address the financial harm the CCP seeks to exact upon me and my family. But, the CCP wants to cause me far more than just financial harm and public embarrassment. I believe the CCP would have me assassinated at the earliest possible opportunity if imprisoned, extradited, or if my family could no longer provide me with physical security. I do not suggest that the Court or any party-in-interest now accept my views about the underlying case facts. To the contrary, this Chapter 11 case is expected to be sufficiently funded by an *unsecured* post-petition loan *with repayment priority below all prepetition creditors* – to allow a fair investigation and stakeholders to present whatever admissible evidence they deem appropriate, as part of the typical Chapter 11 process. This bankruptcy is, in other words, intended to allow a reasoned vetting of all pertinent demonstrable case facts, without prejudicing any creditor's economic rights – except to the extent that any unsecured creditor hoped to jump ahead in payment priority via a "race to the courthouse" which would be necessarily unfair to some.

Confidential

SEC-SEC-E-0000394

USAO-REL_2482524

5.      This Declaration is in two parts.  Part I provides background information about me, including a summary description of my assets and liabilities.  Part II provides testimonial support for certain motions.

## PART I – BACKGROUND

### I.      My Background

6.      I was born in Shandong Province, China.  I currently reside in Greenwich, Connecticut, at 373 Taconic Road, with my wife of 37 years, Hing Chi Ngok.  We moved from an apartment at the Sherry-Netherland in New York to the current address in Connecticut in March 2020.  My wife and I have two adult children.  My son's name is Qiang Guo and he lives in London.  My daughter's name is Mei Guo and she splits her time between New York City and Connecticut.

7.      My family and I grew up poor.  My seven brothers and I worked hard and combined our earnings – mine from a radio repair shop and my brothers' from their own small businesses – to invest in real estate development.  Following the pro-democracy Tiananmen Square protests in 1989, I spent approximately twenty months in jail, where I was tortured, for providing financial support to student protestors.  I was in my early twenties at the time of my arrest.  At the same time, I witnessed the brutality of two policemen – agents of the CCP – as they shot my younger brother and left him to die.  The murder of my brother, and my arrest and torture in prison affected me profoundly.  While in jail, I developed many meaningful personal connections with other prisoners of conscience who had similarly been jailed for supporting the Tiananmen Square pro-democracy movement.  We shared the same passion for pursuing freedom in China and I continued to maintain these relationships after my release from prison in 1991.

Confidential

SEC-SEC-E-0000395
USAO-REL_2482525

8. In or around 1991, the Chinese government began to loosen certain rules governing society, including rules enabling private citizens to start to achieve a sort of "quasi-private" ownership of real property in China. While my extended family benefitted from this change, I personally could not due to my prior politically motivated arrest and detention. Any assets in China listed under my name would likely have been seized by the CCP. My extended family used the wealth it amassed to support me, which has continued to this day.

9. My extended family began working with Yuda Property Company ("Yuda"), a company focused on commercial real estate development in the Henan Province of China. Together, the Guo family and Yuda developed the Henan Yuda Hotel and, thereafter, the Yuda International Trade Center in Henan Province's capital city of Zhengzhou. These were successful ventures that allowed the Guo family to start amassing significant wealth. My family then developed other properties in China, including the Pangu Plaza – a 7-star hotel, convention center, and residential apartment complex in Beijing. Americans may recognize the Pangu Plaza as the primary backdrop to the 2008 and 2022 Olympics in Beijing.

10. The Guo family's fortune continued to grow through diversification, as it invested in finance, technology, and other business sectors. My son, in particular, played a key role in expanding the family's wealth by establishing and managing investment opportunities, including the introduction of global luxury brands to China and Hong Kong. My son is, as a result, an independent, successful, and wealthy entrepreneur in his own right.

11. I left mainland China for Hong Kong in or around 2000, and became a Hong Kong citizen. While the extended family was continuing to accumulate great wealth in China, under Chinese law, as a citizen of Hong Kong, I could neither keep my Chinese citizenship, nor would I have been permitted to own assets in China.

4

Confidential

SEC-SEC-E-0000396
USAO-REL_2482526

12. My extended family's financial success did not go unnoticed by the CCP. In 2002, my extended family acquired large tracts of land in Beijing, which became significantly more valuable when China was named the host country for the 2008 Olympics. CCP officials attempted to appropriate this land for their own personal benefit, and I reported the attempted seizure to higher-up government officials. After a lengthy fight, the land was recovered, enabling the development of the Pangu Plaza.

13. In or around 2015, I began to more publicly criticize and expose the CCP's corruption, and the CCP retaliated against me as a result. On January 10, 2015, Wu Zheng (a/k/a "Bruno Wu") advised me that my brothers, my wife, and my daughter had all been arrested in China. Brunu Wu is closely associated with top CCP officials and is a registered foreign agent of the CCP; his media companies partnered with Pacific Alliance Group ("PAG") – the parent company of Pacific Alliance Asia Opportunity Fund ("PAX") – on the attempted purchase of a significant Hollywood studio;[1] and he is personally bankrolling (on behalf of the CCP) the litigation efforts of numerous plaintiffs against me. In early 2015, Brunu Wu, speaking on behalf of senior members of the CCP, called me to relay that my family would be released if I stopped publicly exposing CCP corruption and threatened that, if I did not comply, INTERPOL "Red Notices" would be issued for both me and my son and that I would be killed. I rejected the CCP's attempt, through Brunu Wu, to silence me and continued to speak out against the CCP.

14. In 2017, I significantly increased my anti-CCP campaign by using social media and U.S.-based news outlets as platforms to expose the corruption of certain high-level CCP officials.

---

[1] Nancy Tartaglione, *Chinese Create $800M Fund To Invest In Global, Local Entertainment*, Deadline, February 6, 2012 (https://deadline.com/2012/02/chinese-create-800m-fund-to-invest-in-entertainment-companies-report-226260/).

5

Confidential
SEC-SEC-E-0000397
USAO-REL_2482527

My public statements exposing the corruption of the CCP received widespread coverage, in the United States and abroad. In addition to using social media to more readily and pervasively expose CCP corruption, I also provided information to U.S. authorities regarding CCP officials and their crimes. Out of fear for my life, I filed for political asylum protection in the United States in September 2017, and my asylum application remains pending.

15. In retaliation for my whistleblowing, the CCP unleashed a multifaceted campaign to try to gain leverage over, discredit,[2] threaten, and silence me.[3] Those actions, described below, ultimately have driven me into this bankruptcy case. For example, on April 19, 2017, I was scheduled to do an interview with Voice of America ("VOA") during which I planned to expose

---

[2] Stanford University and the Hoover Institute, the NGO Australian Strategic Policy Institute (ASPI), and Alphabet's Google have all separately reported that I have been a primary target of the CCP in its global social media disinformation campaign, driven by CCP agents and thousands of China's state-controlled websites and social media accounts. *See* Carly Miller, Vanessa Molter, Isabella Garca-Camargo, Rene DiResta, David Thiel and Alex Zaheer, *Sockpuppets Spin COVID Yarns: An Analysis of PRC-Attributed June 2020 Twitter takedown, Stanford Internet Observatory,* June 17, 2020 (https://stanford.app.box.com/v/sio-twitter-prc-june-2020); Dr. Jake Wallis, Tom Uren, and Elise Thomas, *Tweeting through the great firewall: Preliminary Analysis of PRC-linked information operations against the Hong Kong protests,* October 2019 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2019-12/Tweeting%20through%20the%20great%20fire%20wall.pdf?VersionId=TRGkGXh8FPY5KXLSc_4SfDUy7sMfNkw0) (indicating that the CCP's disinformation campaign against me began in April 2017); Dr. Jake Wallis, Tom Uren, Elise Thomas, Albert Zhang, Dr. Samantha Hoffman, Lin Li, Alex Pascoe and Danielle Cave, *Retweeting through the great firewall: A persistent and undeterred threat actor,* June 2020 (http://ad-aspi.s3.ap-southeast-2.amazonaws.com/2020-06/Retweeting%20through%20the%20great%20firewall_1.pdf?VersionId=ZzW5dIyqlOOgG5m9oHj9DWsjgtXD6TCA) (presenting data reflecting "a persistent, large-scale influence campaign linked to Chinese state actors on Twitter and Facebook . . . [which] largely targeted Chinese-speaking audiences outside of the Chinese mainland (where Twitter is blocked) . . . with the intention of influencing perceptions on . . . Guo Wengui"); Joseph Menn, *Pro-China social media campaign hits new countries, blames U.S. for COVID,* Reuters, September 9, 2021 (https://www.reuters.com/world/pro-china-social-media-campaign-expands-new-countries-blames-us-covid-2021-09-08/) (reporting that security experts at FireEye and Alphabet's Google have observed a coordinated, misinformation campaign on social media in support of Chinese government interests targeting me). As these independent sources confirm, no person in the world has been the target of more attacks by the CCP's social media warfare.

[3] The abusive tactics employed by the CCP against me, as a Chinese dissident living in the United States, are not unqiue. Recently, federal prosecutors alleged that "[a] Chinese spy hired a private investigator to use violence if necessary to end a candidate's run for Congress, instructing him to 'beat him until he cannot run for election.'" *See* Aruna Viswanatha and Kate O'Keeffe, *Chinese Agent Proposed Violent Means to End Dissident's Congress Run, DOJ Says,* Wall Street Journal, March 16, 2022 (https://www.wsj.com/articles/chinese-agents-charged-with-harassing-dissidents-in-u-s-11647455520?mod=article_inline).

6

SEC-SEC-E-0000398
Confidential
USAO-REL_2482528

the CCP's ownership interest in HNA Group Co. The CCP took a number of actions to try to prevent me and VOA from proceeding with the interview. First, two days before my scheduled VOA interview – and just as Brunu Wu threatened – the CCP had an INTERPOL "Red Notice" based upon fabricated criminal charges issued seeking my arrest and extradition to China. Second, the CCP threatened retaliation against VOA and its reporters in China if VOA proceeded with my interview, asserting that the interview constituted interference in China's internal affairs. Third, the day before the interview, PAX (a subsidiary of PAG) filed a meritless lawsuit against me in New York for breach of contract. I proceeded with the interview, but VOA (succumbing to the pressures of the CCP) ordered it be cut short.

16. When the CCP's early efforts to silence me failed, it resorted to trying to get me extradited to China, where I would be killed. An FBI investigation revealed that during the summer of 2017, I was the target of lobbying attempts by the CCP in the United States, utilizing a corrupt government official and a number of prominent individuals, including Macao casino owner Steve Wynn, to directly lobby President Trump and his administration to extradite me to China.[4] The CCP's scheme resulted in the federal indictments and guilty pleas of the former Finance Chairman of the Republican National Committee Elliot Broidy (who has since, like Brunu Wu,

---

[4] *See* Aruna Viswanatha, *Steve Wynn May Face Justice Department Action for Role in China's Push to Expel Businessman*, Wall Street Journal, May 26, 2021 (https://www.wsj.com/articles/justice-department-wants-casino-mogul-steve-wynn-to-register-as-foreign-lobbyist-11622054103).

Confidential

SEC-SEC-E-0000399
USAO-REL_2482529

funded litigation for other parties against me),[5] lobbyist Nicki Lum Davis,[6] and former DOJ official George Higginbotham,[7] all of whom admittedly took payments in exchange for lobbying top U.S. government officials for my extradition. China's campaign included the bribery and corruption of a senior DOJ Headquarters official (George Higginbotham) who was found with almost $75 million in bank accounts that he controlled – making it one of the biggest espionage and corruption scandals in DOJ history. The CCP also targeted me in various other ways starting that same year, including by: hacking the server of the law firm that filed my asylum application in September 2017, extracting my highly sensitive information from that application, and then publicly disseminating it across the internet; bringing and funding (including several through Brunu Wu) numerous spurious litigations against me, some of which remain active today; and detaining, torturing, and imprisoning many of my family members and former colleagues.

---

[5] United States Department of Justice Press Release: Elliott Broidy Pleads Guilty for Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Chinese Foreign National, October 20, 2020 (https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdb-investigation-and) (stating that "Broidy also agreed to lobby the Administration and DOJ on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A – a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Elliott Broidy is attached hereto as Exhibit A.

[6] United States Department of Justice Press Release: Hawaii Businesswoman Pleads Guilty to Facilitating Back-Channel Lobbying Campaign to Drop 1MDB Investigation and Remove a Foreign National to China, August 31, 2020 (https://www.justice.gov/opa/pr/hawaii-businesswoman-pleads-guilty-facilitating-back-channel-lobbying-campaign-drop-1mdb) (stating that "Lum Davis and others also agreed to lobby the Administration and Justice Department on behalf of Foreign National A and People's Republic of China (PRC) Minister A, to arrange for the removal and return of PRC National A — a dissident of the PRC living in the United States"; I am "PRC National A"). A copy of the "Criminal Information" as to Nicki Lum Davis is attached hereto as Exhibit B.

[7] United States Department of Justice Press Release: Former Justice Department Employee Pleads Guilty to Conspiracy to Deceive U.S. Banks about Millions of Dollars in Foreign Lobbying Funds, November 30, 2018 (https://www.justice.gov/opa/pr/former-justice-department-employee-pleads-guilty-conspiracy-deceive-us-banks-about-millions) (stating that "Higginbotham further admitted that another purpose of the lobbying campaign was an attempt to persuade high-level U.S. government officials to have a separate foreign national, who was residing in the United States on a temporary visa at the time, removed from the United States and sent back to his country of origin"; I am that "separate foreign national"). A copy of the "Factual Basis for Plea" as to George Higginbotham is attached hereto as Exhibit C.

Confidential

SEC-SEC-E-0000400
USAO-REL_2482530

17.     Since 2017, the CCP has also frozen and seized family assets and purported assets in China and Hong Kong, making it impossible for me even to maintain a bank account.[8] The CCP has made it its mission to destroy anything I create and to block me from dealing with financial institutions.  I spend much of my time serving as an unpaid informal advisor or spokesperson to various entities, including entities that expose the CCP's corruption and human rights abuses.  My family, and particularly my son, provides for my needs.  Prior to the Petition Date, my son's family office, Golden Spring (New York) Ltd. ("GSNY" or the "Family Office"), purchased, among many other things, my clothing, food, and sundries.  I do not have access to a GSNY credit card or to a GSNY bank account.  My family retains ownership of nearly everything I use, aside from my clothing and mobile phones.  I do not own the Greenwich, Connecticut residence; it is owned by my wife through Greenwich Land, LLC.  I hold the interest in the Sherry-Netherland apartment in trust for my son.

18.     My family has advanced me loans (some documented, others not) to fund my significant litigation costs which allows me to defend myself against the many suits initiated by, or at the behest of, the CCP.  As of the Petition Date, GSNY has extended to me approximately $21 million in loans to pay for my litigation costs.  As discussed below and described in my Statement of Financial Affairs (the "SOFA"), I am a defendant and/or claimant in over 30 lawsuits pending in the United States and abroad.  It is publicly known that the CCP utilizes its proxies to

---

[8]   On October 23, 2018, the High Court of the Hong Kong Special Administrative Region, Court of First Instance (the "HK High Court"), entered the *Restraint Order Prohibiting Disposal of Assets In Hong Kong and Elsewhere* (the "HK Restraint Order"), dated October 18, 2018.  The HK Restraint Order targeted HK$3.7 million of funds on deposit at the Hongkong and Shanghai Banking Corporation Limited (HSBC Bank) allegedly belonging to me.  Billions more of funds and property, including real estate in Hong Kong, of individuals and entities purportedly subject to my "effective control" (according to the HK Restraint Order) were also frozen and/or seized.  The HK Restraint Order prohibits all dispositions of assets by the named "respondents" (which includes me).  Anyone coming into receipt of my assets following entry of the HK Restraint Order is supposedly in violation of it and is subject to fines and imprisonment.

SEC-SEC-E-0000401
Confidential
USAO-REL_2482531

file lawsuits, even in U.S. courts, to coerce individuals sought for political reasons to return to China.[9] The cost of retaining lawyers, experts, vendors, interpreters, and other professionals in connection with such litigations has been extraordinary.

## II. My Liabilities

19. I have, to the best of my knowledge, reflected the current state of my liabilities in my filed Schedules of Assets and Liabilities (the "Schedules") and SOFA. The Family Office assisted me in preparing these documents, as did Verdolino & Lowey, P.C., an independent financial advisory firm with considerable experience preparing bankruptcy schedules and statements of financial affairs. As reflected in those documents and described further below, I am named as a defendant in 21 lawsuits and owe considerable amounts for litigation costs.

### A. PAX Litigation.

20. PAX, a Hong Kong investment fund – whose parent PAG partnered with CCP agent Brunu Wu's media companies to purchase a Hollywood studio – commenced actions against me in New York and the British Virgin Islands ("BVI"). As I mentioned before, PAX's New York Supreme Court action was filed on April 18, 2017, the day before my VOA interview to expose CCP corruption. PAX's claim principally concerns collection on a disputed debt.

21. In 2008, PAX made a $100 million loan (the "PAX Loan") to a Chinese entity called Spirit Carter. The $100 million loan came in two tranches: (1) a $30 million initial loan secured by a personal guaranty made by me, and (2) a second $70 million dollar loan secured by a 49% interest in the company that owns the land/development that eventually became the Pangu Plaza.

---

[9] *See* Aruna Viswanatha and Kate O'Keeffe, *China's New Tool to Chase Down Fugitives: American Courts*, Wall Street Journal, July 29, 2020 (https://www.wsj.com/articles/china-corruption-president-xi-communist-party-fugitives-california-lawsuits-us-courts-11596032112).

Confidential

SEC-SEC-E-0000402
USAO-REL_2482532

22.     In 2009, PAX received repayment of $100 million, acknowledged satisfaction of the loan, and further acknowledged that my obligation under the 2008 personal guaranty had been satisfied. PAX disputes that an "accord and satisfaction" actually occurred, and now asserts claims against me under a subsequent-dated personal guaranty that is a forgery. Prior to showing me this guaranty, my prior litigation counsel submitted it to the court in support of certain motions. When I subsequently learned of the document's existence, I stated that I believe it to be a forgery; but the court ruled that, by its prior submission, I no longer had the ability to challenge its authenticity. Consequently, on September 15, 2020, the court entered summary judgement in PAX's favor, without either allowing me to testify or conducting an evidentiary trial before a jury. The judgment, with interest, amounts to approximately $125 million as of today. I timely appealed this judgment to the New York Appellate Division, and that appeal remains pending.[10]

23.     A few weeks later (on October 15, 2020), the Court issued a restraining order respecting my assets (the "NYS Restraining Order"). PAX, in enforcement of the judgment, focused primarily on a yacht named the "Lady May," which is described further below. I do not own the Lady May; it is owned by my daughter. The boat's maintenance has always been paid for by my son. Nevertheless, on March 16, 2021, Justice Ostrager directed *me* to return the boat to New York by May 15, 2021 or face a massive daily fine of $500,000 for every day the boat remained outside the jurisdiction. I did have access to the boat, but I did not have the authority to order it back to New York. The Lady May never returned to New York and, as of earlier this year, the accrued contempt fine exceeded the amount of the judgment that had been entered in PAX's favor and was five or six times the stated value of the yacht. I have no ability to pay this fine.

---

[10]   My Schedules include a potential malpractice claim against my historical litigation counsel.

Confidential

SEC-SEC-E-0000403
USAO-REL_2482533

24.     On February 9, 2022, Justice Ostrager issued a *Final Order of Civil Contempt* (the "February 9 Contempt Order") against me.  In the February 9 Contempt Order, Justice Ostrager found that I hold a beneficial interest in and control the Lady May and ordered me to pay a $134 million fine to PAX within five business days or risk incarceration for civil contempt.  I believe that the February 9 Contempt Order was wrongfully issued against me and have separately appealed this order to the Appellate Division.  Regardless, I do not have the means to satisfy the order.  I firmly believe the CCP is orchestrating the PAX case.  The PAX litigation, so far, has been one of the CCP's few successes in its relentless campaign against me, by exposing me to potential imprisonment[11] and forcing me into bankruptcy.

## B.     Securities Litigation.

25.     I am named as a defendant in seven actions related to my promotion of the sale of securities in a company called GTV Media Group, Inc ("GTV") and virtual currency referred to as "G Coin" and "G Dollar."  In addition to two putative investor classes, several individual investors have asserted claims against me related to losses they allegedly suffered following their alleged investments.  The plaintiffs in these actions generally allege that I participated in a scheme to sell unregistered securities to unsophisticated investors in violation of applicable U.S. securities laws.  The complaints, in the aggregate, are seeking more than $100 million in damages from me

---

[11]    On March 1, 2022, PAX filed its *Motion Of Pacific Alliance Asia Opportunity Fund L.P. For Entry Of An Order Confirming The Inapplicability Of The Automatic Stay Or, In The Alternative, Relief From The Automatic Stay Pursuant To Section 362(D)(2) Of The Bankruptcy Code* [Docket No. 57] (the "Lift Stay Motion").  I believe that granting the relief requested by the Lift Stay Motion would cause me significant harm and materially prejudice my estate and its creditors.  As indicated by PAX in the Lift Stay Motion, enforcement of the February 9 Contempt Order could result in my imprisonment in New York, which would materially impair my ability to achieve the objectives of this Chapter 11 case.  Chiefly, if incarcerated, I will be unable to adequately and appropriately administer my estate, participate in this bankruptcy case, negotiate with creditors, appear and be heard before this Court, consult with and direct counsel, investigate and marshal the assets of the estate, or formulate and negotiate a Chapter 11 plan.  Further, I believe that PAX is under the misplaced belief that my family will pay PAX's ransom if I face the risk of incarceration; my family will not.

SEC-SEC-E-0000404

Confidential

USAO-REL_2482534

and various co-defendants, including GTV and its parent entity Saraca Media Group, Inc. ("Saraca"). I believe that those claims are without merit.[12]

### C. Defamation Claims.

26.     Since 2017, I have maintained a very active social media presence and posted content that is critical of the CCP, its agents, and others within its sphere of influence. Against this backdrop, certain people allegedly identified in my social media content have asserted defamation claims against me. As identified in my SOFA, I am currently named as a defendant in several defamation suits, a number of which are being funded by Brunu Wu, an admitted CCP agent and business partner of PAX's parent company. The plaintiffs in these actions have alleged, in aggregate, substantial damages.

### D. Litigation Funding Costs.

27.     The costs of my prosecution of claims with monetary relief have been funded through loans provided pursuant to litigation funding agreements (the "Litigation Funding Agreements"). In the instances where I have to defend claims, the Family Office has advanced me loans to cover my litigation costs. In either case, the loan proceeds were directly disbursed to the law firms and service providers retained by me. Through the Petition Date, GSNY has advanced approximately $21 million to me for litigation-related expenses.

28.     In the instances in which a Litigation Funding Agreement is in place, GSNY is entitled to a premium if I am ultimately successful in asserting and recovering on my claim and

---

[12]  These matters related to a certain settled enforcement proceeding. Specifically, in September 2021, GTV and Saraca entered into publicly announced "no admit/no deny" settlements with the SEC regarding the SEC's contention that the GTV offering ran afoul of Section 506 of the 33 Act (the "SEC Entity Settlements"). *In the Matter of GTV Media Corp., et al.*, Admin. Proc. File, File No. 3-20537 (Sept 13, 2021). A parallel settlement involving GTV and Saraca was also reached with the New York State Office of the Attorney General. Assurance of Continuance No. 21-062, *In the Matter of Investigation by Letitia James, Attorney General of the State of New York, of GTV Media Group, Inc., and Saraca Media Group, Inc., Respondents* (Sept 13, 2021).

SEC-SEC-E-0000405
Confidential                                                                                    USAO-REL_2482535

has asserted a security interest against certain of my litigation recoveries to secure that repayment and return on investment.

### III.   My Assets

29.    I am advised that, upon the commencement of my Chapter 11 case, an estate was formed consisting of all legal or equitable interests that I have in property as of the filing date, wherever located and by whomever held.  I am also advised that my estate and all property of my estate is subject to the Court's jurisdiction and oversight.  I, of course, accept that.

30.    My assets, to the best of my knowledge, are identified in my Schedules.  These assets are principally clothing, food, and other minor household goods, along with litigation claims.

31.    As noted earlier, my family has long supported me.  My family has furnished me with clothing and other sundries.  Everything else I have access to – including vehicles, my residences (past and current), furniture, artwork, and electronics (except for my mobile phones) – are owned by my family members.  I have use of these assets, with their permission, but I do not have any authority to dispose of any material assets without their permission.

32.    I am also a claimant in several cases pending in the United States, the United Kingdom, and Switzerland.  The particulars of such litigation are disclosed in my Statements of Financial Affairs.  Two pieces of litigation are worthy of note here:

      a.   **UBS Claims**.  Before the Royal Courts of Justice in the United Kingdom, I and certain co-plaintiffs have asserted a claim against UBS AG (London Branch) ("UBS") seeking more than $500 million of damages related to negligent misrepresentation and advice by UBS in connection with my attempt to cause the acquisition of, and acquire certain shares issued by, a Chinese financial institution,

14

Confidential

Haitong, back in 2015. As recently as February 9, 2022, I received a favorable ruling establishing the jurisdiction of my claims over UBS before the courts of the United Kingdom – and not Switzerland, as advocated by UBS. Given that UBS disputed jurisdiction, a parallel litigation had to be brought before the Civil Court of Basel City, Conciliation Authority, in Switzerland, to ensure that the litigation could proceed in the event that jurisdiction was found to be lacking in the United Kingdom (it was not found to be lacking). That action in Switzerland is currently stayed pending the outcome of UBS's appeal to the Court of Appeal in the United Kingdom on this jurisdictional issue.

b. **Clark Hill Claims**. In addition, I have asserted claims against Clark Hill PLC and one of its members, Thomas K. Ragland (together, "Clark Hill"). This lawsuit is currently pending in the United States District Court for the District of Columbia. I am seeking $50 million in compensatory damages, and additional punitive damages, against Clark Hill for breach of its duties of legal representation. Specifically, as a result of Clark Hill's failure to adequately protect the highly sensitive information contained in my asylum application, the CCP hacked Clark Hill's server during September 2017, extracted that highly sensitive information, and then disseminated it across the internet. To make matters worse, Clark Hill succumbed to the CCP hackers' threats and withdrew as my immigration counsel. As a result, I have suffered and continue to suffer harm.

33. Two other assets that I do not own warrant special discussion: (a) the Lady May; and (b) an apartment at the Sherry-Netherland in New York City (the "Apartment").

15

Confidential

a. **Lady May**.  As mentioned above, I do not own the Lady May, though I did have permission to board and enjoy the vessel.  My daughter, through HK International Funds Investments (USA) Limited, LLC, owns and controls the yacht.  Despite the state court's findings in the February 9 Contempt Order, it was not within my power to direct the Lady May to stay in, or return to, New York.

b. **Sherry-Netherland Apartment**.  Cooperative shares in the Sherry-Netherland apartment are held by Genever Holdings LLC ( "Genever US").[13]  The membership interests in Genever US are, in turn, held by Genever Holdings Corporation ("Genever BVI").  I hold all of the equity of Genever BVI.  However, pursuant to a Declaration of Trust and Agreement, dated February 17, 2015 (the "Trust Date"), I hold such equity in trust for Bravo Luck Limited (the "Apartment Owner").  My son owns the equity of the Apartment Owner.  On or about the Trust Date, the Apartment Owner funded Genever US with the purchase price for the Apartment.  These funds came from entities owned or controlled by my son and not from me.  It also bears noting that any interest I have in Genever BVI has been ordered, by Justice Ostrager, to be turned over to PAX, provided that such a turnover does not interfere with pending litigation in the British Virgin Islands or the Genever US bankruptcy.

34.  As mentioned at the beginning of this Declaration, I believe that Justice Ostrager, PAX, and perhaps others believe I have greater financial wherewithal than is reflected here and in my Schedules and Statements of Financial Affairs.  The wealth they believe is mine, however, actually belongs to my son, daughter, wife, and extended family, not me.  But, as also noted above,

---

[13]  On October 12, 2020, Genever US filed Chapter 11 in the Southern District of New York (Case No. 20-12411).

16

Confidential

this bankruptcy will allow parties-in-interest to investigate that assertion and present any countervailing evidence. Importantly, and as discussed below, the adversarial process will be funded in such a way as to avoid harm to any creditor's economic interest in the estate.

**III.    Proposed DIP Financing**

35.     As set forth in my Schedules, I do not have resources of my own to fund the expenses of this Chapter 11 case. However, my son has expressed a willingness to fund certain costs of this Chapter 11 case. Specifically, GSNY is proposing to lend the estate $8 million (the "DIP Financing") on the terms set forth in the DIP Financing credit agreement (the "DIP Credit Agreement") attached to the motion to approve the DIP Financing. The DIP Financing will be used to pay for, among other things, the costs of the estate's retained professionals (both mine, and the professionals retained by an official committee of unsecured creditors and/or an examiner, if appointed) and the quarterly fees assessed by the Office of the United States Trustee. Of the $8 million budget, up to $4 million would be made available to fund the work of an Official Creditors Committee and/or Examiner.

36.     GSNY is offering to extend this loan on an unsecured basis, with repayment priority subordinated to all allowed general unsecured claims. Stated differently, the DIP Financing is not secured by any assets of the estate, does not require an administrative or priority claim, and will not be repaid from estate assets until all allowed prepetition claims are fully paid. This loan thus costs my creditors nothing and provides a fair opportunity for an investigation into my affairs. I do not believe that any loan provided by another lender would be on superior terms. Accordingly, obtaining this loan is in the best interest of my estate.

37.     I will not be given access to any of the borrowed funds. All of the DIP Financing proceeds will be deposited into a segregated deposit account (the "Debtor Account") established

17

SEC-SEC-E-0000409
USAO-REL_2482539

for the estate's benefit. Craig Jalbert of V&L (as defined below) shall be the sole authorized signatory. Disbursements from the Debtor Account will only be at the direction of V&L, solely to the extent necessary to pay the items set forth in the DIP Budget, and as authorized in the proposed DIP Financing orders, the DIP Financing documents, and other relevant orders of the Court (including orders approving professional fee applications).

38.     There is only one "milestone" covenant in the DIP Credit Agreement: Bankruptcy Court final approval of the proposed DIP Financing order within 45 days of the date that the DIP Credit Agreement is approved on an interim basis. *See* DIP Credit Agreement at ¶ 6.01(a). There is only one atypical Event of Default in the DIP Credit Agreement, which is the entry of an order granting PAX relief from the automatic stay to pursue litigation against me outside of this Court. *See* DIP Credit Agreement at ¶ 8.01(e). The only purpose of such litigation would be to seek my incarceration under the February 9 Contempt Order. Obviously, if such relief is granted, then I will not be able to meaningfully direct and participate in an orderly claims resolution and plan process. In such as case, my son – through GSNY – has no interest in continuing to fund the costs of this Chapter 11 case.

## IV.     **Objectives of My Chapter 11 Case**

39.     My ultimate objective is to arrive at a fully consensual Chapter 11 plan that finally resolves all issues with my creditors. I hope to achieve this outcome through reasoned and reasonable dialogue, after providing creditors a fair opportunity to conduct diligence and present their views through fiduciary representatives paid for by the DIP Financing. I hope that my creditors will be solely motivated to effect repayment of valid claims, and that they will put aside the use of litigation as a means of restricting my free speech and criticisms of political abuse. I

SEC-SEC-E-0000410
Confidential                                                                                                                          USAO-REL_2482540

further hope that, if there is thoughtful creditor engagement, my family will be willing to contribute funding to ensure a fair recovery for creditors under a plan.

40.     My assets, as discussed above, are principally litigation claims and I believe those claims have substantial merit and are valuable (perhaps valuable enough to pay all creditors in full). But, again, all stakeholders will be given a fair opportunity to investigate them.

41.     I understand that my Chapter 11 case will provide a forum to conclusively determine which other assets potentially comprise my bankruptcy estate. Certain of my creditors have alleged that I own assets that I believe are owned and controlled by my family members or their affiliated entities. I do not believe that the New York Supreme Court, which issued an order regarding my "beneficial" ownership and control of the Lady May, ever determined that I have actual legal title to the vessel or that it is now an asset of my Chapter 11 estate. These issues will be presented squarely and fairly to this Court for appropriate resolution.

42.     I have been defending myself against litigation brought by purported creditors for years. As noted above, GSNY – owned and controlled by my son - has lent me millions to fund my defense costs. This Chapter 11 case will provide a forum to determine, once and for all, the extent of allowed claims against my estate. Creditors will be afforded an opportunity to assert claims against my Chapter 11 estate, and the process should yield a fair allocation of whatever assets are in the estate across all equally situated creditors (without, for example, PAX jumping ahead of others in the same creditor class). I will work with my professionals to achieve an appropriate claims reconciliation process.

43.     In the end, I hope for a rational, value-maximizing plan that frees me of litigation and will help facilitate a "fresh start" under the Bankruptcy Code.

SEC-SEC-E-0000411
Confidential                                                                                      USAO-REL_2482541

## PART II – BASIS FOR RELIEF REQUESTED BY MOTIONS

44.     I have reviewed each of the following motions and the facts set forth in them are true and correct to the best of my knowledge, information, and belief.

45.     **Motion to Approve DIP Financing**. The DIP Financing is necessary to fund the costs associated with the Chapter 11 case and to provide sufficient runway for me, with the aid of my highly capable and experienced advisors, to negotiate and achieve confirmation of a plan of reorganization.

46.     Given that it was the adversarial and litigious relationship with my creditors, most notably PAX, that drove me to seek chapter 11 relief, I requested, and GSNY agreed, that the DIP Financing would be for the benefit of all estate professionals, without imposing any lien or priority rights that could potentially prejudice the interests of my creditors. The DIP Financing is offered on an unsecured basis, subordinated to the rights of my prepetition creditors, and without any administrative or other priority repayment rights. My understanding is that the DIP Loan shall be repaid if and only if all of my other creditors are paid in full. Given these generous terms, I believe that any attempt to obtain financing from another source on competitive or similar terms would be a waste of estate resources and would be futile.

47.     Also, as set forth above and in my Schedules, I anticipate that the proceeds of recoveries or settlements in litigations in which I am a plaintiff will be used to fund a Chapter 11 plan. Without access to the DIP Financing, I will be unable to retain and compensate the counsel currently prosecuting actions on my behalf. Similarly, my liabilities may substantially increase if I am unable to defend, settle, and/or litigate these claims (either within this proceeding or, if stay relief is granted, in other venues).

20

Confidential

48.     For these reasons, I believe that the proposed DIP Financing is extended in good faith, does not prejudice any of my creditors' rights or interests, is in the best interests of my estate, and should therefore be approved.

49.     **Application to Retain Stretto, Inc. as Claims and Noticing Agent**. I need a claims and noticing agent to help provide notice to the estate's creditors and parties-in-interest throughout the pendency of the Chapter 11 case. I have chosen Stretto, Inc. ("Stretto") to serve as my claims and noticing agent. Stretto has substantial experience serving as a claims and noticing agent in various chapter 11 cases throughout the United States, including in this District. Stretto has agreed to render consulting services to: (a) serve as the noticing agent to mail notices to the estate's creditors and other parties-in-interest; (b) maintain an electronic platform for filing proofs of claim, plan solicitation, balloting, tabulation of votes, disbursements, and administrative support in preparation of schedules of assets and liabilities and statements of financial affairs; and (c) provide other administrative services, as necessary, with respect to this Chapter 11 case.

50.     **Application to Retain Brown Rudnick LLP as Restructuring Counsel**. I need highly capable and experienced restructuring counsel to advise and help structure my exit from Chapter 11, potentially in the form of a confirmed plan of reorganization. I have chosen Brown Rudnick LLP ("Brown Rudnick") as my restructuring counsel for the Chapter 11 case. Brown Rudnick has extensive experience and knowledge in the fields of debtors' and creditors' rights and reorganizations under chapter 11 of the Bankruptcy Code, having represented debtors, official and unofficial committees and other prominent parties in many Chapter 11 cases in this Circuit, this District, and other districts across the country. Brown Rudnick also has familiarity with my affairs and the legal issues to be contested in the Chapter 11 case, and has agreed to: (a) prepare all necessary motions, responses, answers and other legal papers, including trial preparation as may

SEC-SEC-E-0000413
Confidential                                                                                    USAO-REL_2482543

be necessary; (b) prepare and take action as necessary for approval of a disclosure statement and confirmation of a plan of reorganization; and (c) perform all other legal services as may be necessary during the pendency of the Chapter 11 case.

51.     Prior to the Petition Date, on each of February 14, 2022 and February 15, 2022, Brown Rudnick was paid a retainer of $500,000.  The source of the $1 million in retainer payments (the "BR Retainer") was Lamp Capital LLC ("Lamp"), which is a company owned by my son. Lamp loaned me $1 million on an unsecured basis, and I directed Lamp to remit the proceeds of the loan directly to Brown Rudnick.  Brown Rudnick applied $51,835.20 in pre-Petition Date fees and disbursements against the BR Retainer, leaving Brown Rudnick with a prepetition BR Retainer Balance of $948,164.80.  Going forward, I have asked Brown Rudnick to apply its allowed fees and disbursements against the BR Retainer until the BR Retainer balance is $250,000, after which Brown Rudnick will seek payment of its allowed fees and expenses from me through the proceeds of the DIP Financing.

52.     **Application to Retain Verdolino & Lowey, P.C. as Financial Advisor**. I need a financial advisory firm to prepare, review, and analyze the necessary financial disclosures mandated under the Bankruptcy Code and the ongoing monthly and quarterly reporting requirements during the pendency of the Chapter 11 case.  I have chosen Verdolino & Lowey, P.C. ("V&L") to serve as my financial advisor.  V&L has extensive experiencing working with distressed individual chapter 11 debtors, and provides tailored services, including, but not limited to, financial advisory, consulting, accounting services, tax, and other related services.  V&L has agreed to render services regarding: (a) the preparation and review of my SOFA and the Schedules and other periodic reporting requirements; (b) the preparation and/or review of cash flow and related budget projections; (c) maintaining the DIP account, and effectuating disbursements when

SEC-SEC-E-0000414
Confidential                                                                USAO-REL_2482544

necessary and providing accounting of all cash activity; (d) claims review and administration; (e) plan of reorganization formulation and review; (f) the rendering of any necessary litigation support; and (g) the providing of general consulting and assistance with any other matters and tasks that may arise during the pendency of the Chapter 11 case.

53.     **Motion to Authorize Employment and Payment of Professionals Utilized in the Ordinary Course**.  I am a named plaintiff or named defendant in numerous cases pending at the state and federal levels in the United States, as well as in foreign jurisdictions.  In connection with these litigations and certain ongoing government investigations, prepetition, I retained various law firms, accountants, and other non-attorney professionals (together, my "Ordinary Course Professionals"), which rendered services in connection with my prepetition litigation and provided other services in a variety of matters unrelated to this Chapter 11 case.  I intend to use the DIP Financing, subject to the Court's approval, to continue employing and compensating these Ordinary Course Professionals because they each have a great deal of knowledge, expertise, and familiarity with my affairs (prepetition) and my pending litigation, much of which has been ongoing for years.

54.     Among the reasons I am seeking emergency interim relief for the DIP Financing is to ensure that the professionals representing me continue working.  Certain professionals may withdraw from representing me unless I am able to assure them that they will be paid for their prepetition and post-Petition Date work.  Such a withdrawal, depending on the status of the case and the services provided by the applicable professional, could cause cause me and my estate clear and irreparable harm.  The UBS, Clark Hill, and other pending litigation claims are assets that I anticipate relying on to help formulate and potentially confirm a plan of reorganization.  Any disruption to my prosecution of these claims would undoubtedly be value destructive.

23

Confidential

55.     In sum, without my Ordinary Course Professionals' knowledge, expertise, and familiarity in connection with their prepetition work, my estate will incur substantial additional and unnecessary expenses in educating and retaining replacement professionals necessary to preserve, and potentially continue prosecuting these valuable litigation claims.  Accordingly, I believe that the continued retention of my Ordinary Course Professionals is in the best interests of this estate, my creditors, and other parties-in-interest.

24

SEC-SEC-E-0000416
USAO-REL_2482546

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.

Dated: March 20, 2022
     Greenwich, Connecticut

By: _____
Name:   Ho Wan Kwok

25

SEC-SEC-E-0000417
USAO-REL_2482547

**EXHIBIT A**

Confidential

SEC-SEC-E-0000418
USAO-REL_2482548

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| ELLIOTT BROIDY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## CRIMINAL INFORMATION

The United States of America charges:

### INTRODUCTION

1.     At all times relevant to this Information:

2.     From no later than March 2017 to at least in or about January 2018, ELLIOTT
BROIDY agreed with Nickie Lum Davis and Person A to act as agents of Foreign National A in
exchange for millions of dollars which was not disclosed. BROIDY specifically agreed to lobby
the Administration of the President of the United States ("Administration") and the United States
Department of Justice ("DOJ") to drop or otherwise favorably resolve its matters against Foreign
National A for his role in the embezzlement of billions of dollars from 1Malaysia Development
Berhad ("1MDB"), a strategic investment and development company wholly owned by the
Government of Malaysia. As part of their efforts, BROIDY, Davis, and Person A willfully failed
to disclose to the Administration and DOJ officials that BROIDY was acting on behalf of Foreign
National A. Ultimately, BROIDY, Davis, and Person A were unsuccessful in their efforts to have
the 1MDB matters dropped or otherwise favorably resolved for Foreign National A.

3.     During the same approximate period, BROIDY, Davis, and Person A also agreed
to lobby the Administration and DOJ to arrange for the removal and return of People's Republic

SEC-SEC-E-0000419

Confidential                                                                                    USAO-REL_2482549

of China ("PRC") National A—a citizen of the PRC living in the United States—all on behalf of Foreign National A. This involved, among other things, advocating for meetings between PRC Minister A and United States government officials. Here too, BROIDY, Davis, and Person A were ultimately unsuccessful.

4.      To further the interests of Foreign National A, BROIDY, aided by Davis and Person A, attempted to facilitate a meeting between Malaysian Prime Minister A and the President in September 2017, in part to allow Malaysian Prime Minister A to raise the resolution of the 1MDB matter with the President.

5.      BROIDY, Davis, and Person A also met with PRC Minister A in the PRC and agreed that BROIDY, assisted by Davis and Person A, would lobby the Administration to return PRC National A to the PRC. BROIDY, Davis, and Person A, for the express purpose of providing PRC Minister A an opportunity to discuss the removal of PRC National A with high-level United States officials, also agreed to and attempted to facilitate meetings between PRC Minister A and top officials in the Administration, at DOJ, and at the United States Department of Homeland Security ("DHS"), during PRC Minister A's visit to the United States in May 2017.

<u>Criminal Prohibitions on Acting as an Agent of a Foreign Principal or Government</u>

6.      The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, was and is a disclosure statute that requires any person acting in the United States as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts or lobbying on behalf of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit ("FARA Unit") within DOJ. It is a crime to knowingly and willfully fail to register, and to make

SEC-SEC-E-0000420
Confidential                                                                                                  USAO-REL_2482550

false and misleading statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

7.      The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the United States government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

## RELEVANT PARTIES & ENTITIES

8.      The defendant, ELLIOTT BROIDY, served as Deputy Finance Chair of a national political committee from approximately 2017 to April 2018.  BROIDY raised large political contributions from donors, organized political fundraising events, and coordinated fundraising strategies with the campaign of a candidate for the Office of the President of the United States during the 2016 election cycle.  In his role as Deputy Finance Chair, BROIDY maintained access to, and contact with, high-ranking officials in the Administration, including the President himself. Over the same period, BROIDY owned and operated several domestic and international businesses.

9.      Nickie Mali Lum Davis was and is a United States citizen, businesswoman, and consultant with personal and business relationships with BROIDY and Person A.  On August 31, 2020, Davis pleaded guilty in the United States District Court for the District of Hawaii to a one-count Information charging aiding and abetting a violation of FARA.

3

Confidential

SEC-SEC-E-0000421
USAO-REL_2482551

10.     Person A was and is a United States citizen, businessperson, and entertainer with international ties, including ties to Foreign National A.

11.     Foreign National A was a wealthy businessperson living in East Asia who has been charged separately for his role in orchestrating and executing a multi-billion-dollar embezzlement scheme from 1MDB.

12.     Company A was a limited liability company formed by Person A to receive wire transfers from Foreign National A, and was used by Person A to pay BROIDY, Davis, and others for their lobbying efforts.

13.     George Higginbotham was an associate of Person A and was a licensed attorney employed by DOJ. On November 20, 2019, Higginbotham pleaded guilty in the United States District Court for the District of Columbia to a one-count Information charging conspiracy to make false statements to a financial institution.

14.     Law Firm A was a law firm operated by Person C and controlled by BROIDY and Person C.

15.     PRC National A was a citizen of the PRC, living in the United States on a temporary visa. The government of the PRC, including PRC Minister A and the President of the PRC, were seeking the removal of PRC National A from the United States back to the PRC.

16.     In late 2016 through 2019, DOJ was actively investigating transactions of Foreign National A allegedly associated with laundered proceeds of the 1MDB embezzlement scheme. In July 2016, DOJ filed multiple civil forfeiture complaints seeking the forfeiture of millions of dollars in assets allegedly purchased with 1MDB laundered proceeds. On November 1, 2018, DOJ filed a criminal indictment charging Foreign National A and others with conspiring to launder

4

Confidential

billions of dollars embezzled from 1MDB and conspiring to violate the Foreign Corrupt Practices

Act by paying bribes to various Malaysian and United Arab Emirates ("UAE") officials.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy to Serve as an Unregistered Agent of a Foreign Principal)**

17. Paragraphs 1 through 16 are realleged and incorporated herein by reference.

18. From no later than March 2017 to at least in or about January 2018, the defendant,

**ELLIOTT BROIDY,**

knowingly conspired with others known and unknown, to:

  a. knowingly and willfully act as an agent of a foreign principal, specifically, Foreign National A with respect to the 1MDB matters and the removal of PRC National A, without registering with the Attorney General, in violation of 22 U.S.C. §§ 612 and 618.

**Objects of the Conspiracy**

19. It was an object of the conspiracy for BROIDY, Davis, Person A, and Foreign National A to orchestrate back-channel, unregistered campaigns to lobby the Administration and DOJ to: (1) end the 1MDB matters or otherwise resolve the matters favorably for Foreign National A; and (2) remove PRC National A from the United States and send him back to the PRC.

20. It was an object of the conspiracy for BROIDY, Davis, and Person A to make millions of dollars by leveraging BROIDY's access to and perceived influence with the President and his Administration in order to secure payments from Foreign National A.

21. It was an object of the conspiracy for BROIDY, Davis, and Person A to conceal BROIDY's contacts with and payments from Foreign National A to maintain BROIDY's credibility with United States officials and to further the illegal advocacy scheme.

5

Confidential

## Manner and Means of the Conspiracy

22.     The manner and means by which BROIDY and others carried out the conspiracy included, but were not limited to, the following:

### International Travel to Meet with Foreign Principals and Government Officials

23.     BROIDY, Davis, Person A, and Higginbotham, in various combinations, traveled to Thailand, Malaysia, and the PRC for the purpose of meeting with Foreign National A, PRC Minister A, and others to negotiate and discuss the arrangement by which BROIDY would lobby the Administration and DOJ—outside of official channels—in exchange for millions of dollars.

### Meetings and Contacts with United States Officials

24.     BROIDY, both directly and through intermediaries, facilitated and attempted to facilitate meetings and other efforts to influence officials at the highest levels of the United States government, including the President and the Attorney General, for the benefit of PRC Minister A and Foreign National A.

25.     BROIDY, both directly and through intermediaries, contacted high-level officials in the United States government to arrange meetings for foreign government officials, including PRC Minister A and the Malaysian Prime Minister A, to provide opportunities for these foreign officials to formally request favorable governmental action, including the favorable resolution of the 1MDB matters and the removal of PRC National A.

### Concealment

26.     BROIDY, Davis, and Person A agreed to conceal BROIDY's agreement to lobby on behalf of Foreign National A, in his individual capacity and as an intermediary for PRC Minister A. BROIDY, Davis, and Person A did not disclose and agreed not to disclose to United States government officials and the public BROIDY's financial arrangement with and payments from

6

SEC-SEC-E-0000424
USAO-REL_2482554

Foreign National A. In extensive contacts, communications, and documents drafted in furtherance of the conspiracy, BROIDY, Davis, Person A, and Higginbotham were secretive and anonymized references to Foreign National A. Further, BROIDY, Davis, and Person A often used encrypted applications when communicating about Foreign National A and PRC National A to conceal their conduct and connection to Foreign National A. Finally, BROIDY, Davis, and Person A agreed, implicitly or explicitly, not to register under FARA to conceal their arrangement with Foreign National A.

## Overt Acts

27.     In furtherance of the conspiracy, BROIDY and others committed the following overt acts, among others, in the District of Columbia and elsewhere.

### I.     Campaign to Resolve 1MDB Civil Forfeiture Cases

#### A. BROIDY Agrees to Lobby for Foreign National A for $8 Million Retainer

28.     In or about March 2017, Person A contacted Davis in an effort to locate someone with close ties to the Administration to help a foreign client. Davis in turn told BROIDY that she had a possible client in Malaysia who could use help with a forfeiture matter.

29.     On or about March 7, 2017, Person A requested that Davis send him BROIDY's biography describing BROIDY's relationship with high-level officials in the Administration and photographs of BROIDY and the President. On or about March 7, 2017, BROIDY's assistant, at Davis's request, emailed photographs to Davis featuring BROIDY and the President. Person A said that he wanted the photographs so that Person A could highlight for Foreign National A BROIDY's close access to the Administration.

7

Confidential

30. On or about March 8, 2017, Davis texted BROIDY, "Are you in la to meet on the 16th w [Person A] prior to his travel that weekend to Asia?" BROIDY responded, "I think so. Let's speak later."

31. On or about March 13, 2017, BROIDY met with Davis and Person A to discuss Foreign National A and 1MDB. At the meeting, Person A described his relationship with Foreign National A to BROIDY, and asked if BROIDY could help with the civil forfeiture cases involving Foreign National A. Person A said he would speak with Foreign National A about the possibility of BROIDY helping with the civil forfeiture cases. That same day, BROIDY texted Davis in part, "I'm excited about our business prospects."

32. On or about March 13, 2017, Davis forwarded to Person A a "Retainer and Fee Agreement – Litigation Services" between Law Firm A and Foreign National A so that Person A could present the agreement to Foreign National A. The "Retainer and Fee Agreement" stipulated that Foreign National A would pay an $8 million retainer fee upfront, and an additional $75 million success fee if the "matter" was resolved within 180 days, or $50 million if the "matter" was resolved within 365 days. The draft agreement included an Exhibit A explaining that the "matter" referred to the 1MDB forfeiture proceedings. BROIDY, Davis, Person A, Law Firm A, and Person C provided no litigation services or legal advice to Foreign National A. The true purpose of the retention agreement was to secure BROIDY's services to lobby the Administration and DOJ on Foreign National A's behalf based on BROIDY's political connections.

33. Despite their knowledge of the requirement to register as agents of a foreign principal, at no time did BROIDY, Davis, or Person A register with the FARA Unit regarding their work as agents of Foreign National A.

8

Confidential
SEC-SEC-E-0000426
USAO-REL_2482556

## B. BROIDY, Person A, and Davis Meet Foreign National A in Bangkok

34. In or about April 2017, Davis relayed Person A's request for BROIDY to travel to Bangkok, Thailand to meet with Foreign National A. BROIDY told Davis to tell Person A that he would go only if he were paid $1 million, and that he wanted to be paid by Person A from "untainted" funds. BROIDY was assured that Person A would personally pay $1 million in exchange for BROIDY traveling to Bangkok.

35. On or about April 28, 2017, BROIDY texted Davis advising, "I would like the funds to go to [Law Firm A.]" That same day, Davis responded, "Ok[.]"

36. On or about April 29, 2017, BROIDY and Davis exchanged text messages regarding their upcoming meeting with Foreign National A and Person A. Among those text messages, BROIDY asked in reference to Foreign National A, "Does the principal want us in a particular hotel in either location?" Davis responded, "Call me when u can talk[.]"

37. On or about May 1, 2017, Davis emailed BROIDY and his assistant a link to the Shangri-La Hotel in Bangkok, and wrote, in part, "Please send me the hotel confirmation for both Elliott's room and mine once you get it online and I will forward." That same day, Davis separately emailed Person A telling him to book a room at the Shangri-La Hotel and to send her the confirmation. Person A responded, "[Foreign National A] is booking our hotel," and later followed up with, "Also send me Elliott's wire info." Davis replied by providing the wire information for an account in the name of Law Firm A.

38. On or about May 2, 2017, Davis emailed BROIDY stating in part, "Since u land earlier – [Person A] and I will see you at arrivals. . . . Thanks and bon voyage – here's to the start of an exciting and prosperous adventure!"

9

39.     On or about May 2, 2017, BROIDY, Davis, and Person A arrived in Bangkok. During the trip, BROIDY, Davis, and Person A met with Foreign National A in a hotel suite. BROIDY and Foreign National A spoke about the 1MDB matters. BROIDY agreed to help Foreign National A attempt to resolve the matter. Foreign National A agreed to pay BROIDY an $8 million retainer and wanted BROIDY to contact the Attorney General of the United States to get DOJ to drop the 1MDB matter. BROIDY agreed to lobby the Administration and DOJ for a favorable result for Foreign National A while concealing the fact that he was working on Foreign National A's behalf. During the meeting or shortly thereafter, Davis and BROIDY discussed the possibility of assisting in getting PRC National A removed from the United States. With respect to payment, BROIDY stated that the money should not come directly from Foreign National A and should be "clean." Foreign National A identified a friend who could pay BROIDY and others. BROIDY, Person A, and Davis agreed that the money would first be routed through Person A and then be paid to BROIDY through Law Firm A. BROIDY and Davis agreed that BROIDY would pay Davis a percentage of what BROIDY received. Person A also agreed to pay Davis a percentage of the funds that Person A received. Person A told BROIDY and Davis that Person A's friend, Higginbotham, was verifying the legitimacy of the funds. Higginbotham did not actually perform any such review. BROIDY never met or spoke with Higginbotham.

### C.     Person A Receives $8.5 Million from Foreign National A; BROIDY is Paid $6 Million; Davis is Paid $1.7 Million

40.     Following the meeting with Foreign National A in Thailand, on or about May 8, 2017, Company A received a wire transfer directed by Foreign National A for approximately $2.8 million from an entity in Hong Kong. That same day, Person A obtained a cashier's check from the Company A account for $702,000 payable to Law Firm A, which was immediately credited to Law Firm A's account. Person A also made a separate wire transfer of $48,000 to Law Firm A

10

SEC-SEC-E-0000428
USAO-REL_2482558

from the Company A account. Also that same day, a third-party company transferred $250,000 to the Law Firm A account at Person A's direction, bringing the total amount deposited into the Law Firm A account to $1 million. Within several days, approximately $900,000 of the $1 million transferred into the Law Firm A account on or about May 8, 2017, was transferred from the Law Firm A account to one of BROIDY's business accounts.

41.     On or about May 8, 2017, Davis texted BROIDY, "Both wires in [Law Firm A] are from [Person A]. The remaining balance was dropped to your office 20 minutes ago -". Davis then added, "702 total cashier check[.]"

42.     On or about May 17, 2017, Foreign National A caused an international wire to be sent to Company A from a Hong Kong company. That same day, Person A transferred $3 million from Company A to Law Firm A. On or about May 18, 2017, Law Firm A transferred $600,000 to one of BROIDY's business accounts and $900,000 to an account for a business entity associated with Davis. On or about May 18, 2017, Law Firm A transferred $500,000 to one of BROIDY's business accounts. Within approximately one week, Law Firm A transferred an additional $950,000 in two separate transfers to one of BROIDY's business accounts.

43.     On or about May 17, 2017, BROIDY and Davis exchanged text messages regarding the payments from Foreign National A to BROIDY through Person A and BROIDY's payment of a percentage to Davis. Among the text messages, Davis asked, "Did you get it?" BROIDY responded, "Yes. Sent you Wickr[.] Sending wire to you in morning." Wickr is a messaging application that allows for end-to-end encryption and content expiration. BROIDY later added, "Did you get 2nd confirm?" Davis responded, "When Asia opens. . . . Baby steps at least moving forward now." BROIDY responded, "Yes. Hammer them for the next 2 wires." BROIDY later

11

SEC-SEC-E-0000429
USAO-REL_2482559

added in part, "Assuming second 3 is in and confirmation that last 2 is being sent. Please ask [BROIDY's assistant]."

44.     On or about May 25, 2017, Foreign National A caused a third transfer to be made to Company A, this time in the amount of approximately $2.7 million. On or about May 26, 2017, Person A transferred $2 million from Company A to Law Firm A in partial satisfaction of the $8 million retainer to which BROIDY and Foreign National A agreed in return for BROIDY's assistance with the 1MDB civil forfeiture cases. That same day, $600,000 was transferred from Law Firm A's account to a business account associated with Davis. On or about May 26, 2017, Law Firm A transferred $1 million to an account controlled by Person C. In or about early June 2017, Law Firm A transferred $650,000 to one of BROIDY's business accounts.

### D. BROIDY Facilitates and Attempts to Facilitate Meetings for Malaysian Prime Minister A and Efforts to Resolve the 1MDB Cases

45.     On or about June 5, 2017, BROIDY texted Person D, a political consultant and former campaign aide for the President, and requested that Person D work with the Administration to set up a visit for Malaysian Prime Minister A: "Asian country is very motivated re July meeting. Hoping we can confirm date etc asap." Pursuant to a consulting agreement, BROIDY had agreed to pay Person D $25,000 per month for advice and guidance with respect to navigating the Administration.

46.     The same day, BROIDY and Davis exchanged text messages regarding Foreign National A. Among those messages, Davis wrote, "Please call before u go to bed … [Foreign National A] keeps calling for news[.]" BROIDY responded, "Yes. Will call you. I am heading to D.C. Tonight to work on [Foreign National A] and Asian country[.]"

12

SEC-SEC-E-0000430
USAO-REL_2482560

47. On or about June 15, 2017, at Person A's request, Davis texted BROIDY, "Hey he'd like to speak w you this evening. Are u able?" Davis added, "Principal", which was a reference to Foreign National A. That same day, BROIDY responded, "Yes[.]"

48. On or about June 17, 2017, BROIDY and Davis discussed Malaysian Prime Minister A. In or about June 2017, BROIDY asked the President if he would play golf with Malaysian Prime Minister A. BROIDY and Davis believed that this would please Foreign National A and would allow Malaysian Prime Minister A to attempt to resolve the 1MDB matter. BROIDY also hoped to secure additional business with the government of Malaysian Prime Minister A and hoped that arranging golf with the President would further his business interests.

49. On or about June 19, 2017, Davis texted BROIDY a link to an article about the Malaysian Prime Minister A's office criticizing the 1MDB forfeiture action in the United States.

50. On or about June 29, 2017, BROIDY sent a text message to a high ranking official in the White House in an effort to arrange a golf outing between Malaysian Prime Minister A and the President: "Hi [Person E], As I mentioned, POTUS agreed to play a round of golf in DC or Bedminster in late July or early August with [Malaysian Prime Minister A]. Thank you very much for getting back to me with the date. Also a letter went to the state dept. for a meeting some weeks ago."

51. On or about June 30, 2017, BROIDY sent another text message to Person E regarding the golf outing: "Hope we can speak this morning on [PRC National A] and golf date with POTUS for [Malaysian Prime Minister A]." Later that day, BROIDY followed up with, "[Person E], as discussed, hoping we can get these items completed today. Please call me anytime."

13

Confidential