# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 7581

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in US Bank
account 157525208185, held by G Fashion, and
all funds traceable thereto, including accrued
interest (the "Target Account").

Defendant-in-rem.

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I.  Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.  Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.     This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, all monies and funds contained in US Bank account 157525208185, held by G Fashion, and all funds traceable thereto, including accrued interest (the "Target Account").

3.      The Target Account constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.      This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth below, there is probable cause to believe that the Target Account is

subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane"). As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the Investment Schemes to the Target Account.

## II.  Statutory Basis for Forfeiture

7.      The statutory provisions pursuant to which the Target Account is subject to civil seizure and forfeiture are as follows:

### *Money Laundering Offenses*

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

        (B)    knowing that the transaction is designed in whole or in part—

        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Bank and Wire Fraud Offenses*

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344. *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

*Seizure Warrants*

14.     The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.     With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

    (A)     it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

    (B)     it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

  (2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)     No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

**III. Probable Cause**

**A. Probable Cause Regarding Commission of the Subject Offenses**

<u>Overview of the Fraudulent Investment Schemes</u>

16.     Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes"). To date, the investigation ("Investigation") has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars. GUO and JE are leaders of the Investment Schemes.

17.     The Investment Schemes are conducted through various, interrelated offerings, all of which exhibit features that are consistent with fraud. For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

18.     While certain of the interrelated Investment Schemes are ongoing, others are historical. Specifically:

a.     The GTV stock offering and the G Coin offering described below (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July 2020. As a result of the Unregistered Stock Offerings, whose proceeds were commingled, companies affiliated with GUO, JE, and others collectively raised at least

approximately $487 million from more than 5,000 investors, including individuals in the United States.

b.      Starting at least in or about July 2020, the leaders of the scheme began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed "Himalaya Farm Alliance," which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.

c.      GUO, JE, and others continue to conduct the Investment Schemes, including relating to G Club (which has been operating since in or about October 2020) and the Himalaya Exchange (which has been operating since in or about April 2021).

### *Background on GUO and JE*

19.      Based on my participation in this investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.      GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.      GUO is involved with various entities relevant to the Investment Schemes, as described in greater detail below, including GTV, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr").  GUO does not hold formal titles or positions at these entities.

c.      In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and Rule of Law Society ("ROLS").  Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by December 2018.[1]  ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP").  At times, the board members for ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass").  GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson" and a sponsor.

d.      JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various other entities relevant to the Investment Schemes, as described in greater detail below.  Specifically:

i.      JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[2]  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.    JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.      JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[3] that was incorporated in the United Kingdom on or about July 10, 2020.

iii.      JE is listed as the founder and Chairman of Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is the 100% beneficial owner of various entities that

---

[1]    *See*    https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

[2] *See* https://hamilton-im.com/

[3] *See* https://www.aca-capital.com/

operate Himalaya Exchange, including Himalaya International Clearing Ltd. ("Himalaya Clearing"), Major Lead International Ltd., Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

<u>*GTV Stock Offering*</u>

20.     Between approximately April 20, 2020 and June 2, 2020, GTV, its parent company Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG"; collectively, the "Companies") solicited thousands of individuals to invest in an offering of GTV common stock (the "GTV Stock Offering").  During that time period, more than approximately 5,000 investors (including many in the United States) collectively paid approximately $452 million for purported GTV common stock.

21.     Based on my review of the GTV Stock Offering's information memorandum dated April 20, 2020 (the "Memorandum"), interviews of witnesses, and review of public source information, as well as documents and records obtained during the course of the investigation, I have learned the following, among other things:

a.      GTV was founded on or about April 17, 2020, as a Delaware corporation and a wholly owned subsidiary of Saraca.  GTV's principal place of business was located in the Southern District of New York, in a townhouse located at 162 E. 64th St., New York, NY, 10065 (the "Townhouse").

b.      According to the Memorandum, GUO was the "sponsor" of both Saraca and GTV, as well as the "adviser[sic]" and "key host" of GTV.  The Memorandum also stated that GUO was a billionaire, successful businessman, and dissident in China.  According to various witnesses, as well as social media content, GUO consistently presented himself as the founder and face of GTV.

c.      The Memorandum and a separate letter to prospective investors outlining "Investment Procedures Guidelines" listed GUO's phone number as the contact number for inquiries from potential investors.

d.      At the time of the GTV Stock Offering, the Companies had recently launched a news-focused social media platform called GTV, including the website www.gtv.org. The Memorandum claimed GTV would be "the first ever platform which w[ould] combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and that GTV would be "the only uncensored and independent bridge between China and the Western world." The Memorandum also claimed that GTV would "be a bridge between China and the Western world . . . allowing for free and open communication, business transactions and trading, uncensored by the Chinese government." The Memorandum boasted that GTV's platform would be so powerful as to "expos[e] corruption, obstruction, illegality, brutality, harassment, and inhumanity in China." The Memorandum also indicated that GTV would compete with companies such as Zoom, WeChat, TikTok, YouTube, Cisco, Citrix, Alibaba, Amazon, and eBay.

e.      The Memorandum listed Yvette Y. Wang, Max Krasner, and Daniel Podhaskie as GTV's Executive Directors.

f.      The Memorandum highlighted the credentials of GTV's Non-executive Directors, including, among others, Bannon, Bass, and Darren Blanton ("Blanton"). As described above, Bannon and Bass were also board members of the ROLF and/or ROLS.

g.      The Memorandum stated that investor funds would be used for the following, among other purposes: acquisition of companies; upgrading GTV technology and security; and marketing. The Memorandum did not contemplate that investor funds would be used

to invest in hedge funds or any similar type of financial investment, or that investor funds would be given to other companies, such as Saraca.

       h.     Based on my conversations with a source of information (the "SOI[4]") involved with the ROLF, the Companies, the GTV Stock Offering, and the Phoenix Farm, as well as my review of the metadata of the Memorandum, I have learned that JE was a primary author of the Memorandum.

<em>G Coin Offering</em>

    22.    During the same period of April 2020 through June 2020, GTV and Saraca also solicited GTV Investors to invest in a companion digital asset security that was referred to as either G-Coins or G-Dollars (the "G Coin Offering").

    23.    Based on my participation in this investigation, training, experience, review of law enforcement reports, review of bank records and videos that were posted on social media platforms, as well as my review of reports of interviews with GTV Investors and conversations with others, including law enforcement, I have learned the following, among other things, about the G Coin Offering:

       a.     From approximately in or about April 2020, through at least in or about June 2020, I have learned that the Companies, as well as representatives for the Companies, such as GUO, marketed the sale of G-Coins and G-Dollars to the public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.

       b.     The Companies' online promotions set forth that G-Coins (which the Companies indicated would eventually be merged into G-Dollars, forming a single digital asset),

---

[4] The SOI is providing information to law enforcement in hopes of entering into a cooperation agreement and receiving leniency at sentencing. The SOI has provided reliable information that has been corroborated by, among other things, electronic evidence, videos, cellphone records, and subpoena and search warrant returns.

11

and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on an online platform.  As part of its solicitation of G-Coin and G-Dollar investors, the Companies did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a whitepaper or private placement memorandum.

        c.      The Companies collected at least approximately $31 million from the G-Coin and G-Dollar Investors, pooling the proceeds in bank accounts associated with the Companies and commingling them with proceeds from the GTV Stock Offering.  As part of the G Coin Offering, many investors received a purported 20% discount on the $.01 purchase price for G-Coins and G-Dollars.  Investors participated in the G Coin Offering by transferring funds directly to the Companies' U.S. bank accounts, by making payments to the Companies' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.

        24.      Based on my participation in this Investigation, training, experience, and review of translations of statements that were made by GUO regarding the G Coin Offering, as well as my conversations with others, I have learned that GUO made numerous false statements in order to solicit investments for the G Coin Offering.  Examples of some those statements are described below, in substance and in part:

        a.      In a statement contained within a video by GUO on or about May 9, 2020, Guo stated that G-Coins could be exchanged into U.S. dollars or physical gold.

        b.      In another statement contained within a video on or about May 16, 2020, GUO stated that the G-Coin and G-Dollar currencies could be exchanged with gold.

        25.      Based on my participation in this investigation, I believe that the above-described statements regarding G-Coins and G-Dollar are false.  In particular, during the course of the

investigation, I have not found any evidence that there is or has ever been an exchange where G-Coins or G-Dollars could be exchanged for U.S. dollars or gold.

26.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records, and review of videos that were posted on social media platforms, as well as my review of reports of interviewed individuals who invested in GTV (the "GTV Investors") and my conversations with others, including other law enforcement officers, I have learned the following, among other things, about the solicitation of investments for the GTV Stock Offering and G Coin Offering:

a.    GTV disseminated information about the two offerings to the general public through publicly-available videos on websites affiliated with the Companies, including www.gtv.org and www.gnews.org, as well as on social media platforms such as YouTube and Twitter. The first solicitation video, posted on YouTube on April 21, 2020, was entitled, as translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the GTV Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering. The Launch Video has had over 3,000 views. None of the GTV Stock Offering solicitation videos, including the Launch Video, were password protected or placed any restriction on who could view them or any limitations on their ability to be shared. As a result, the general public, including prospective U.S. investors, were able to access the online marketing videos about the GTV Stock Offering through, for example, independent online research, social media, or referrals from other investors.

b.    GUO led the effort to solicit investors for the GTV Stock Offering. GUO, who is a prolific user of social media and has an enormous social media following, used various social media platforms to attract followers and to solicit investors for the GTV Stock Offering. Those social media platforms included WhatsApp and Discord, both of which have end-to-end

encrypted chat services.[5]  Among other things, the Companies sent the Launch Video via phone messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering material for the GTV Stock Offering, including the subscription agreement and investment instructions.  GUO also assured potential investors that they would realize enormous returns, at one point suggesting that they would receive 1,000 times their investment, *see infra* ¶ 40(c).  In another statement, in or about June 2020, GUO stated in substance and in part that GTV stock was worth 30 times what it had been worth before.

       c.      Based on my review of a GTV confidentiality agreement, I have learned that in order to participate in the GTV Stock Offering, GTV Investors were required to sign a confidentiality agreement that required them to keep all information concerning GTV confidential, including the existence of the confidentiality agreement.

       d.      The GTV Stock Offering was structured as a private placement offering of 10% into GTV, with the remaining 90% of GTV to be controlled by Saraca, which was its parent company.  According to due diligence records from an investment fund, Saraca is a wholly-owned subsidiary of Hudson Diamond Holding, Inc. ("Hudson BVI"), a British Virgin Islands company. Hudson is in turn wholly owned by Qiang Guo ("QIANG GUO").  Based on my review of open-source material, I have learned that QIANG GUO is GUO'S son.

       e.      By early June 2020, banks began to suspect that the Companies were engaged in potentially unlawful activity and started to close accounts that were linked to Saraca, GTV, and GUO.  Around that same time period, GTV Investors began to express concerns about

---

[5] End-to-end encryption is a system of communication where only the communicating users can read the messages.  End-to-end encryption prevents law enforcement authorities from intercepting such communications through wiretaps or through search warrants on the service provider, such as WhatsApp.

GTV's use of their money, and the legitimacy of their investments. Some of those investors expressed their concerns directly to GUO and many investors requested that their money be returned. In response, GUO and his associates often attempted to shun and ostracize the investors. For example, GUO suggested that one investor was a spy for the CCP and that other investors should not interact with that investor

### Misappropriation of Unregistered Stock Offering Funds

27. A significant portion of the investor funds collected through the Unregistered Stock Offerings (collectively, "Offering Funds") were misappropriated through investments.

28. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

    a. GUO, JE, and others arranged for approximately $100 million of the Offerings Funds to get invested on behalf of GTV's parent company, Saraca, in a high-risk hedge fund investment managed by a firm named Hayman Capital Management L.P. ("Hayman"). According to its website, Hayman is an SEC-registered asset management firm that was founded by Bass, who was a non-executive director of GTV at the time of the transfer.

    b. In or about May 2020, Bass facilitated GUO's and JE's investment in a high-risk investment fund called the Hayman Hong Kong Opportunities Fund (the "Hayman Fund"), which was operated by Hayman.

    c. JE coordinated with Hayman regarding the investment. For example, in a May 29, 2020 email from JE to a Hayman representative ("Hayman Rep-1"), JE wrote, in substance and in part: "We will have one onshore and one offshore vehicle. The onshore one will invest USD100m and the offshore one will invest USD1m. The address of the onshore vehicle is:

162 E64th St., New York, NY 10065 United States."  On or about May 31, 2020, JE wrote, in substance and in part, "The $1m will come from my personal account and I owned[sic] 100% of Hamilton Investment Management Ltd."

        i.      The address JE provided for the "onshore" vehicle is the address of the Townhouse.  *See supra* ¶ 21(a).

        ii.      Based on my participation in this Investigation, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned that the Townhouse has been listed on corporate documents and/or bank account documentation as the business address for at least seven GUO-affiliated entities; specifically:  Saraca, GTV, Golden Spring, Hudson Diamond NY, Greenwich Land, ROLF (until approximately May 2022), and ROLS (until approximately May 2022).

        d.      Three days after the close of the GTV Stock Offering, on or about June 5, 2020, $100 million of the Offering Funds were transferred from a particular JP Morgan Chase bank account to an onshore bank account associated with Hayman for the purpose of investing in the Hayman Fund.  The funds were transferred on behalf of Saraca; as noted above, Saraca was the parent company to GTV and was 100% owned by GUO's son, QIANG QUO.

        e.      Three days later, on or about June 8, 2020, $1 million was transferred on behalf of Hamilton,[6] JE's company, from a bank account in the name of JE to an offshore bank account associated with Hayman, also for the purpose of investing in the Hayman Fund.

        f.      The transfer of Offering Funds to Hayman was completely inconsistent with GTV's representations to the GTV Investors about how their funds would be used.

---

[6] In April 2018, JE submitted on behalf of Hamilton an account opening document to a U.K. bank that claimed that he owns 100% of Hamilton and that the company "does not involve itself in investments."

29.     Based on my participation in this Investigation, training, experience, review of documents and records, as well as my conversations with others, including law enforcement, I have learned that on or about September 13, 2021, the SEC announced settled charges against the Companies, based on their violations of the registration requirements for the Unregistered Stock Offerings (*i.e.*, the GTV Stock Offering and the associated digital asset G Coin Offering). The SEC's settlement required the Companies to pay more than $539 million in disgorgement and penalties.

### *The Convertible Loan Offering*

30.     After the Unregistered Stock Offerings described above were discovered by banks and numerous bank accounts were frozen, leaders of the schemes began to pitch investors on a new set of investment opportunities.  One new investment scheme launched in or about July 2020 was marketed to prospective investors as an opportunity to convert their existing investments in GTV into a "loan" to GTV.  The Convertible Loan Offering was carried out by the "Himalaya Farm Alliance," a collective of informal groups—known as "Farms"—of Chinese expatriates located in various cities around the world, including New York and Phoenix.  The Himalaya Farm Alliance's purported purpose was to assist the Chinese pro-democracy movement; the Himalaya Farm Alliance existed primarily as private groups on social media platforms such as Discord.

a.     The Farms were typically referred to by the names of preexisting companies that they affiliated themselves with for banking purposes.  That is, the Farms opened and operated bank accounts in the names of various corporate entities.

b.     The Phoenix Farm was affiliated with Maywind Trading LLC ("Maywind"), Medical Supply System International LLC ("Medical Supply System") and Santel LLC ("Santel"), while the New York Farm was affiliated with Mountains of Spices LLC ("Mountains of Spices") and Davy & Tony International Limited ("Davy & Tony").

17

31.    In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that disclosed that the loan would be made to the individual Farm (*e.g.*, "Phoenix Farm (Maywind Trading LLC)") and that the loaned funds would be used by that specific Farm for "general working capital purposes." Investors executed the Loan Agreement and sent it to their Farm leaders after transferring their funds to the Farm, but were not provided counter-executed copies of the agreement.

32.    Between in or about August 2020 and in or about March 2021, the U.S.-based Farms collectively raised approximately $148 million from the Convertible Loan Offering (the "Loan Funds"). Investors agreed to provide loans to the Farms for the purpose of acquiring GTV shares (once the three-year note had matured). Once the funds were collected by the U.S. Farms, they were transferred to domestic and foreign accounts owned by different legal entities, including an Abu Dhabi bank account in the name of ACA Capital (the "UAE ACA Capital Account"), which is owned and controlled by JE.

*Misappropriation of Convertible Loan Offering Funds*

33.    A significant portion of the Loan Funds collected through the Convertible Loan Offering were misappropriated, as described below.

34.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.    JE was sole signatory of the UAE ACA Capital Account. JE wired approximately $33.3 million of the Loan Funds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ring Rong), and his company, Hamilton. The wires to his and his wife's personal accounts—which amounted to more than approximately

$10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities.

        b.      JE arranged for approximately $34 million in transfers from UAE ACA Capital Account to U.S. bank accounts in the names of three companies that are each 100% owned by GUO's family members; specifically:

        i.      Approximately $5 million to Greenwich Land LLC, which is owned by GUO's wife, Hing Chi Ngok;

        ii.      Approximately $18 million to Hudson Diamond NY LLC, which is owned by Guo's daughter, Mei Guo; and

        iii.      Approximately $11 million to Lamp Capital LLC, which is owned by Guo's son, QIANG GUO.

        c.      The $34 million was commingled with other investor funds, including GTV Offering Funds.  Based on my review of bank account records, I have learned that much of this GTV Investor money was used to fund lavish lifestyle expenses (*e.g.*, approximately $2.3 million in expenses relating to GUO's yacht, and approximately $600,000 for the purchase of luxury automobiles).

        d.      JE also arranged for large transfers from UAE ACA Capital Account to other companies with ties to GUO; specifically:

        i.      Approximately $19 million to Lexington Property and Staffing, Inc. ("Lexington Property"), which is owned by former GTV Treasurer, Anthony DiBattista ("DiBattista").  The registered address of Lexington Property is 750 Lexington Avenue, New York, NY;

ii.    Approximately $32 million to Savio Law LLC (as escrow agent), pursuant to a purported loan agreement between ACA Capital and Saraca (which is owned by GUO's son, QIANG GUO); and

iii.    Approximately $1 million to Bannon Film Industries, Inc., a company owned by Steve Bannon.  As described above, Bannon was listed in the Memorandum as a non-executive GTV Director and was a Director of the ROLF / ROLS.

### *The G Club Operations LLC Scheme*

35.    Some of the Farms recruited investors to invest in GTV through the purchase of "G Club" memberships.  As described in greater detail below, law enforcement believes G Club is an ongoing fraudulent scheme operated by GUO, JE, and others.

36.    Based on my participation in this Investigation, training, experience, review of the websites, subpoena returns, records and documents, including operating agreements and articles of incorporation, open-source research I have conducted on the Internet, and my conversations with others, including law enforcement, I have learned the following, among other things:

a.    In or about October 2020, G Club Operations LLC ("G Club") was registered in Puerto Rico.  According to the Operating Agreement, the purpose of G Club is to "provide[] Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market."

b.    An image from the G Club website ("G Club Website"), viewable at https://gclubs.com/en/, is shown below:



37.     G Club purportedly offers five membership tiers:  Tier 5 Membership ($50,000 annually); Tier 4 Membership ($40,000 annually); Tier 3 Membership ($30,000 annually); Tier 2 Membership ($20,000 annually); and Tier 1 Membership ($10,000 annually).  According to the G Club Membership Agreement, "A Member may subsequently elect a higher tier of membership," but "may not subsequently elect a lower tier of Membership."  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and absolute discretion.  The Membership Agreement further states:  "If an Application is rejected and membership denied, G Clubs shall return the Membership Fee within ten (10) calendar days of such rejection . . . in the form of the original payment of the Membership Fee or, at the option of G Clubs, by check."

38.     One photograph posted to the G Club Website depicted GUO living a lavish lifestyle; specifically, he is shown standing on top of what appears to be a large yacht smoking a cigar.  The G Club Website also states that:

> G Clubs memberships provide its members with access to a concierge customer service with Mandarin and English access and support.  G Clubs members will have

the opportunity to attend the annual G Summit meeting which may occur in person or virtually.  G Clubs members will also get exclusive early access to the latest fashion collections and special member pricing on purchases made on the G Fashion website.

39.      In a video summary posted on GNews on or about July 8, 2021, Guo claimed that G Club had approximately 25,000 members, and predicted that G Club would grow to at least 100 million users, attracting $16 trillion of investment.

40.      Despite the representations on the G Club Website about purported membership benefits, law enforcement believes that G Club is being used, at least in part, to perpetuate the fraud schemes, including by soliciting and receiving investments while evading regulatory requirements.  Specifically, based on my review of an interview report of an August 2, 2021 interview (the "August 2, 2021 Interview") conducted by others of a GTV investor ("Investor-1"), I have learned that Investor-1 stated the following, in substance and in part, during that interview:

a.      Investor-1 invested $200,000 USD in GTV in or around May 2020. Investor-1's money came from Investor-1's savings.

b.      Investor-1 came to believe that GTV was a scam because Investor-1 did not receive any GTV shares, and when Investor-1 asked for a refund, no one responded to Investor-1.

c.      Investor-1 invested in GTV because: 1) there were a lot of American politicians supporting Guo; (2) Guo said it was original stock and there would be at least 1,000x growth; and  (3) Investor-1 thought Investor-1 would make money on the GTV stock because Guo said this in videos.  Investor-1 did not think Investor-1 would lose money because Guo promised the GTV investment would make money.

d.      Investor-1 thought that GTV would use the money to build a website like YouTube, Facebook and Twitter, but did not know for certain what it would be used for.

e.      Investor-1 subsequently invested in the Convertible Loan Program through the "Canada Farm" in or around August 2020.  Specifically, Investor-1 sent approximately $71,019 to "Canada Himalayan Club Medica Inc." as a loan.  Investor-1 believed that the loan was for 3-5 years, with 3% interest and that at the end of that period Investor-1 would receive the money or GTV stock.  Investor-1 never received an executed copy of the investment contract.  The money Investor-1 sent was frozen by the Canadian SEC.

f.      Investor-1 attempted to invest in GTV again in or around March 2021 through G Club.  Specifically, Investor-1 was instructed to send Investor-1's investment funds to "Crane Advisory Group," who in turn would send the money to G Club.  Investor-1 sent approximately $100,015 to Crane Advisory Group for the purchase of GTV shares at the price of $1 per ten shares.

g.      In or around July 2021, Investor-1 attempted to initiate a refund by contacting G Club online customer service department.  In response to Investor-1's refund request, G Club, through "notices@gclubs.com," sent the following email:

> You recently made a payment with respect to your G|CLUBS membership through Crane. Your wire payment transfer exceeded the amount of a single membership and you have not applied for multiple memberships. We received $100,015.00 via wire. You had applied for one Tier 5 membership and filled out the KYC package indicating the total amount was for multi membership of G|CLUBS (see attached).
>
> To credit the total amount to you, you must apply for additional memberships. Please fill and sign the attached, advising how many memberships you wish to purchase and their tier.
>
> If sending the excess funds was an error and you wish an immediate return of $50,015, please immediately advise. We sincerely apologize for any inconvenience caused.

h.  In response, Investor-1 informed G Club that Investor-1 had sent the $100,015.00 in funds not to purchase a G Club membership, but rather to invest in GTV.  Investor-1 requested that all of Investor-1's funds be returned.  In a subsequent email, Investor-1 also noted that it would

not have made sense for Investor-1 to send a sum of $100,015.00, given that the most expensive G Club membership cost $50,000. Investor-1 also explained in another email that, in a phone conversation with a representative of G Club, the representative had made it clear that Investor-1's funds were going to be used for an investment in GTV, not for the purchase of a G Club membership.

      i.    Investor-1 had not received any of Investor-1's $100,015 investment back as of the date of the interview.

41.    Based on my participation in this Investigation, my review of law enforcement reports, court filings, review of bank records, subpoena returns, and search warrant returns, my training and experience, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

      a.    Based on my review of an informal translation and transcription of a voice message that GUO sent to the SOI and others via WhatsApp in or about 2020, which was provided pursuant to a subpoena, I have learned that GUO directed the Phoenix Farm to send its "40 million loan money" (*i.e.*, Convertible Loan Offering funds) "in different wires, on different days, to GFashion in Los Angeles, and then use a loan agreement to legalize the wires. Leanne [Li] and Tiantian [Hao] have already coordinated with banks in California. You three together please figure out how the money goes into these accounts and solve this issue, OK?"

      b.    On or about July 31, 2020, the following entities were registered for incorporation in the State of California: "G Club," "G Club One," "G Club Two," "G Club Three," and "G Fashion" (the "California G Entities"). The registration filings for the California G Entities all had the same registered address (800 N Harper Ave, Los Angeles, California 90046) and officers (Leanne Li ("LI") as CEO and Secretary, and Tian Hao ("HAO") as CFO and Director). The type of business listed for each of the California G Entities was "Fashion." Based on my

open-source research, I have learned that the listed address appears to be a residential address, which, based on my training and experience, is an indicia of money laundering.

42.     Based on my participation in this Investigation, training, experience, my review of documents, records, and email search warrant returns, as well as my conversations with others, including witnesses, I have learned the following, among other things:

a.    An individual named Alex Hadjicharalambous ("Hadjicharalambous"), whose title was the Financial Controller for G Club, was the authorized signer listed on multiple bank accounts in the name of G Club.  On July 13, 2021, Hadjicharalambous received an email at his G Club email account (alexh@gclubs.com) from a G Fashion IT Manager entitled "HCHKTech email" that read, in substance and in part:  "Hello Alex, As you know we now work for HCHK Technologies.  Use the credentials in this email and follow the steps below to log into your new email account."

b.    Based on my review of open-source material on the Internet and subpoena returns, I have learned the following, among other things:

i.    On or about April 29, 2021, HCHK Technologies, Inc. ("HCHK Technologies") was incorporated in the State of Delaware.  At the time of incorporation, Anthony DiBattista was director of HCHK Technologies.  Between on or about May 27, 2021 and November 10, 2021, DiBattista was Treasurer of HCHK Technologies.  On or about December 13, 2021, DiBattista resigned as President, CEO, and Director of HCHK Technologies.

c.    On or about August 18, 2021, HCHK Property Management, Inc. ("HCHK Property") was incorporated in Delaware.  Yvette Wang was elected as the initial director of HCHK Property.  *See* ¶ 21(e).  On or about December 15, 2021, by written consent of the Board of Directors of HCHK Property (*i.e.*, Wang), DiBattista was appointed Treasurer of HCHK

Property.  On or about January 1, 2022, Wang resigned and DiBattista was appointed as President, CEO, and Director of HCHK Property.

      d.  DiBattista's roles with various of the other GUO-affiliated entities included, among others, Treasurer of GTV, authorized signatory of Lexington Property bank accounts, and Treasurer of G Music LLC.

      e.  Based on my review of subpoena returns and my conversations with others, I have learned that on or about July 18, 2021, a G Fashion HR employee sent a "transition memo" to Alex Hadjicharalambous that, "[e]ffective as of July 19, 2021, all GFashion employees will have the option to transfer to GFashion's staffing company, HCHK Technologies, Inc.," which would "thereafter serve the role of staffing company for GFashion and other enterprises."  The transition memo further reflected that an employee's failure to execute the transition memo that same day would result in termination.

      f.  Based on my review of open-source Internet research and subpoena returns, I have learned that one of the Directors of HCHK Technologies is also the Director and Chairman of the Audit Committee of Gettr,[7] a social media platform that reportedly evolved from GTV Media.  I have further learned that JE's company, Hamilton, owns 95% of Gettr and contributed $35 million to Gettr in capital contribution.

      g.  Based on the foregoing, I have learned that starting on or about July 19, 2021, certain employees of G Fashion, Gettr, and other GUO-affiliated entities began to operate under the company names HCHK Technologies and/or HCHK Property.

---

[7] *See*  https://www.politico.com/news/2021/07/01/maga-app-bannon-chinese-billionaire-497767 (*last visited* July 6, 2022).  Based on my conversations with others, I have learned that Gettr is one of the companies for which HCHK Technologies provides purported staffing services.

## Overview of the Scheme to Launder Fraud Proceeds

43.    As described in greater detail herein, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, Crane, Lamp Capital LLC, Hudson Diamond NY, Greenwich Land LLC, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

44.    As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 18. Records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, G Club has generated more than approximately $221 million in purported G Club membership fees.

45.    The evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

46.    As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.04 billion, as described in greater detail below.

47.    Investment Scheme Funds (specifically, Convertible Loan Offering funds), have been traced into the **Target Account** in ways that, based on my training and experience, are indicative of money laundering.  Specifically, the tracing of the funds reflects, among other things, the layering of Convertible Loan Offering funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements.

**Use of Multiple Banks and Financial Institutions to Conceal Investment Scheme Funds**

48.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.     To date, law enforcement has identified more than at least 80 bank accounts being used by GUO, JE, and others to process Investment Scheme Funds, which include, among others:

i.     At least approximately 19 bank accounts in the name of G Club entities (*i.e.*, G Club International Limited or G Club Operations LLC) at approximately seven different financial institutions;

ii.     At least approximately 16 bank accounts in the name of Crane (*i.e.*, Crane Advisory Group LLC) at approximately six different financial institutions;

iii.     At least approximately 28 bank accounts in the name of Farm entities at approximately six different financial institutions;

iv.     At least approximately eight bank accounts in the name of G Fashion at approximately six different financial institutions;

v.     At least approximately 14 bank accounts in the name of Hamilton entities (*e.g.*, Hamilton Investment Management Inc. or Hamilton Opportunity Funds SPC) at Silvergate Bank in California; and

vi.     At least approximately three bank accounts in the name of Himalaya entities (*i.e.*, Himalaya Reserve, Himalaya Financial, and Himalaya Clearing) at FV Bank in Puerto Rico.

### Tracing of Fraudulent Proceeds

49.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.     Investors have participated in the Investment Schemes (including the Convertible Loan Offering) by sending money to bank accounts controlled or used by GUO, JE, and others (including bank accounts in the names of the Farms's entities, G Club, or Hamilton), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects. For example, investors sent money to entities affiliated with a specific Farm (for example, to bank account(s) in the name of Maywind  for the Phoenix Farm), which funds are then transmitted to bank accounts ultimately controlled by GUO, GUO's associates, and JE.  I have discovered accounts located in the UAE, the United Kingdom, the United States, the Bahamas, and the British Virgin Islands, which GUO, JE, and other Target Subjects have used for the purpose of receiving investment funds from investors in the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange.

b.     To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.04 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

*Convertible Loan Offering Proceeds are Transferred to the Phoenix Farm Accounts*

50.     Based on my participation in this Investigation, my training and experience, my review and analysis of various bank account records and financial analyses performed by me and

financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of an interview with a witness who worked at the Phoenix Farm ("Witness-1"), and my conversations with others, I have learned the following, among other things:

a.     The Phoenix Farm began operating in or about September 2020.  In or about late September 2020, Yvette Wang and others visited individuals who operated the Phoenix Farm in Phoenix, Arizona.  During the visit, Wang stated to Witness-1 and others, in sum and substance, that GUO directed that "loan" investments sent to the Phoenix Farm entities (*i.e.*, Maywind, Medical Supply, and Santel) should be moved around among bank accounts to avoid suspicion. *See also* ¶ 41(a).

b.     Based on my review of an informal translation and transcription of a voice message that GUO sent to the SOI via WhatsApp, which was provided pursuant to a subpoena, I have learned that GUO stated the following to the SOI, in substance and in part:  "As for the three companies (Maywind, Santel, Medical supply), [SOI], you can discuss with [Yvette Wang] where to transfer the money to."

c.     In or about August 2020, LI opened the **Target Account** under the name "G Fashion."  On or about August 13, 2020, LI added HAO as an authorized signer on the **Target Account**.

d.     Between in or about September 2020 and on or about December 31, 2020, the **Target Account** received approximately $9.9 million in Investment Scheme Funds from the Phoenix Farm bank accounts.  Specifically:

i.     On or about September 30, 2020, approximately $1 million was transferred from a JP Morgan Chase bank account in the name of Medical Supply System International LLC, ending in 9002, to the **Target Account**.

ii.      On or about November 19, 2020, approximately $2.9 million was transferred from a Bank of America bank account in the name of Medical Supply System International LLC, ending in 3775, to the **Target Account**.  Based on my review of the funds transfer request authorization for the wire transfer, I have learned that the purpose of the payment was listed as "Other / Additional Support Loans."

iii.      On or about December 1, 2020, approximately $3 million was transferred from a JP Morgan Chase bank account in the name of Maywind Trading LLC, ending in 0414, to the **Target Account**.

iv.      On or about December 10, 2020, approximately $3 million was transferred from a JP Morgan Chase bank account in the name of Maywind Trading LLC, ending in 4311, to the **Target Account**.

v.      Aside from the above deposits, activity in the **Target Account** consisted of *de minimis* service charges.

vi.      Based on my review of information provided by US Bank, I have learned that the **Target Account** held approximately $9,899,785.06 as of on or about February 28, 2022.

## III.  Conclusion

51.      Based on the foregoing, I submit that there is probable cause to believe that funds held in the Target Account are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

52.     Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court

issue a warrant authorizing the seizure of the funds held in the Target Account.


/s/ Anthony Alecci, by SDA with permission
_____
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 18th day of September, 2022

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK