# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in Silvergate
Bank account 5090042853, held by Hamilton
Opportunity Fund SPC ("Target Account-1"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in FV Bank
account 7801000589, held by Himalaya
International Financial Group, Ltd. ("Target
Account-2"), and all funds traceable thereto,
including accrued interest;

All monies and funds contained in FV Bank
account 7801000590, held by Himalaya
International Reserves, Ltd. ("Target Account-
3"), and all funds traceable thereto, including
accrued interest; and

All monies and funds contained in FV Bank
account 7801000254, held by Himalaya
International Clearing, Ltd. ("Target Account-
4"), and all funds traceable thereto, including
accrued interest (collectively, the "Target
Property").

Defendants-in-rem.

# 22 MAG 7684

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I. Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI" or

"Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.

Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad. During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants. In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.    This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, for:

a.    All monies and funds contained in Silvergate Bank account 5090042853, held by Hamilton Opportunity Fund SPC ("**Target Account-1**"), and all funds traceable thereto, including accrued interest;

b.    All monies and funds contained in FV Bank account 7801000589, held by Himalaya International Financial Group, Ltd. ("**Target Account-2**"), and all funds traceable thereto, including accrued interest;

c.    All monies and funds contained in FV Bank account 7801000590, held by Himalaya International Reserves, Ltd. ("**Target Account-3**"), and all funds traceable thereto, including accrued interest; and

d.    All monies and funds contained in FV Bank account 7801000254, held by Himalaya International Clearing, Ltd. ("**Target Account-4**"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

3.    The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.    This affidavit is based on, among other sources of information: (i) my personal

knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth herein, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to

several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.       Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the Investment Schemes to the Target Property.

**II.  Statutory Basis for Forfeiture**

7.       The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

<u>*Money Laundering Offenses*</u>

8.       Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.       18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B)       knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### Bank and Wire Fraud Offenses

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

### Seizure Warrants

14.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as

provided for a search warrant under the Federal Rules of Criminal Procedure." In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b). Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.     With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

> (a)(1)   In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

>> (A)      it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

>> (B)      it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

> (2)   Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

> (b)      No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

16.     On or about September 17, 2022, I submitted an affidavit in support of seizure warrants for approximately 11 bank accounts, including approximately one Metropolitan Commercial Bank ("MCB") account, held at For Benefit Of FV Bank, and approximately nine

Silvergate Bank ("Silvergate") accounts, held by William JE in the name of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd. (the "September 17 Affidavit"). The September 17 Affidavit is incorporated herein as Exhibit A. On or about September 18, 2022, the Honorable Stewart D. Aaron issued seizure warrants for those 11 accounts, including a warrant to Silvergate for the nine Silvergate accounts (the "Silvergate Warrant") and a warrant to MCB for the one MCB account held For Benefit Of FV Bank (the "MCB Warrant").

17.     In coordinating with Silvergate in anticipation of the service and execution of the Silvergate Warrant, Silvergate provided updated account balances for all Silvergate accounts in the name of Hamilton Opportunity Fund SPC and/or Hamilton Investment Management Ltd. Based on my review of account balance summaries, additional documents provided by Silvergate Bank, open-source information, and my conversations with the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.      Silvergate operates an intra-bank network called the Silvergate Exchange Network, or "SEN." Active bank clients with Silvergate can participate in SEN, which enables Silvergate clients themselves to transfer money between their Silvergate accounts and the accounts of other Silvergate clients.

b.      The Silvergate business deposit account master agreement for the Hamilton Opportunity Fund SPC relationship at Silvergate lists **Target Account-1** as a SEN account. Based on information provided by Silvergate, I have learned that the account balance of **Target Account-1** as of on or about August 31, 2022 was $0.

c.      As reflected in the September 17 Affidavit, the balance of the Hamilton Investment Opportunity Fund SPC account at Silvergate ending in -2762 (*i.e.*, "Target Account-6" in the September 17 Affidavit, or the "2762 Account") was approximately $76,690,856.60. On or about September 8, 2022, the 2762 Account received incoming transfers from HCHK

Technologies Inc. and HCHK Property Management Inc., respectively, each in the amount of $5 million.

        d.      On or about September 15, 2022, the Target Subjects transferred approximately $85,899,889.20—nearly the entire balance—from the 2762 Account to **Target Account-1**. As described in the September 17 Affidavit, the nature of the transfers of funds into the 2762 Account had been consistent with money laundering, including layering funds through different entities and concealing their true source and/or purpose. *See* Sept. Aff. at ¶ 56(b)(v), (f).

18.     In coordinating with MCB and counsel for FV Bank in anticipation of the service and execution of the MCB Warrant, counsel for both MCB and FV Bank advised law enforcement of the following, in sum and substance:

        a.      The funds held in the pooled MCB account FBO FV Bank (*i.e.*, "Target Account-11" in the September 17, 2022 Affidavit) include funds belonging to all FV Bank's customers, not only the Himalaya entities. *See* Sept. Aff. at ¶¶ 59(i)(3), 62.

        b.      The funds that were the target of the MCB Warrant, held in the MCB pooled account, were also identified by three particular FV Bank account numbers: **Target Account-2** (*i.e.,* FV Bank account 7801000589, held by Himalaya International Financial Group, Ltd.), **Target Account-3** (*i.e.*, FV Bank account 7801000590, held by Himalaya International Reserves, Ltd., and **Target Account-4** (*i.e.,* FV Bank account 7801000254, held by Himalaya International Clearing, Ltd.).

19.     Based on the foregoing information, law enforcement will not execute the MCB Warrant and instead seeks to direct the warrant to FV Bank.

## III. Conclusion

20.     Based on the information set forth in the September 17 Affidavit and the foregoing, I submit that there is probable cause to believe that funds held in the Target Property are subject

to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

21.    Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.


/s/ Anthony Alecci, by SDA with permission
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
20 day of September, 2022


THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

9

# EXHIBIT A

# 22 MAG 7580

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in Silvergate
Bank account 5090037739, held by Hamilton
Opportunity Fund SPC ("Target Account-1"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037705, held by Hamilton
Opportunity Fund SPC ("Target Account-2"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037754, held by Hamilton
Opportunity Fund SPC ("Target Account-3"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037713, held by Hamilton
Opportunity Fund SPC ("Target Account-4"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042770, held by Hamilton
Opportunity Fund SPC ("Target Account-5"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042762, held by Hamilton
Opportunity Fund SPC ("Target Account-6"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042820, held by Hamilton
Opportunity Fund SPC ("Target Account-7"),

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042747, held by Hamilton
Opportunity Fund SPC ("Target Account-8"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090030288, held by Hamilton
Investment Management Ltd. ("Target Account-
9"), and all funds traceable thereto, including
accrued interest;

Any and all monies and funds up to and
including the sum of $16,000,000.00 contained
in Manufacturers & Traders Trust Co. account
9878904409, held by GETTR USA, Inc.
("Target Account-10"), and all funds traceable
thereto, including accrued interest; and

All monies and funds contained in Metropolitan
Commercial Bank account 0299006891, held
For Benefit Of FV Bank ("Target Account-11"),
and all funds traceable thereto, including
accrued interest (collectively, the "Target
Property").

Defendant-in-rem.

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn,
deposes and says:

## I. Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI" or
"Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.
Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes

2

squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.      This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984:

a.      All monies and funds contained in Silvergate Bank account 5090037739, held by Hamilton Opportunity Fund SPC ("Target Account-1"), and all funds traceable thereto, including accrued interest;

b.      All monies and funds contained in Silvergate Bank account 5090037705, held by Hamilton Opportunity Fund SPC ("Target Account-2"), and all funds traceable thereto, including accrued interest;

c.      All monies and funds contained in Silvergate Bank account 5090037754, held by Hamilton Opportunity Fund SPC ("Target Account-3"), and all funds traceable thereto, including accrued interest;

d.      All monies and funds contained in Silvergate Bank account 5090037713, held by Hamilton Opportunity Fund SPC ("Target Account-4"), and all funds traceable thereto, including accrued interest;

e.      All monies and funds contained in Silvergate Bank account 5090042770, held by Hamilton Opportunity Fund SPC ("Target Account-5"), and all funds traceable thereto, including accrued interest;

f.      All monies and funds contained in Silvergate Bank account 5090042762, held by Hamilton Opportunity Fund SPC ("Target Account-6"), and all funds traceable thereto,

including accrued interest;

g.    All monies and funds contained in Silvergate Bank account 5090042820, held by Hamilton Opportunity Fund SPC ("Target Account-7"), and all funds traceable thereto, including accrued interest;

h.    All monies and funds contained in Silvergate Bank account 5090042747, held by Hamilton Opportunity Fund SPC ("Target Account-8"), and all funds traceable thereto, including accrued interest; and

i.    All monies and funds contained in Silvergate Bank account 5090030288, held by Hamilton Investment Management Ltd. ("Target Account-9"), and all funds traceable thereto, including accrued interest;

j.    Any and all monies and funds up to and including the sum of $16,000,000.00 contained in Manufacturers & Traders Trust Co. account 9878904409, held by GETTR USA, Inc. ("Target Account-10"), and all funds traceable thereto, including accrued interest; and

k.    All monies and funds contained in Metropolitan Commercial Bank account 0299006891, held For Benefit Of ("FBO") FV Bank ("Target Account-11"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

3.    The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.    This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my

4

review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.    As set forth below, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton

Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane

Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent

investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and

William Je, a/k/a Je Kin Ming ("JE").

6.    Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds

from victims of the Investment Schemes to the Target Property.

## II.  Statutory Basis for Forfeiture

7.    The statutory provisions pursuant to which the Target Property is subject to civil

seizure and forfeiture are as follows:

<u>*Money Laundering Offenses*</u>

8.    Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in
violation of section 1956, 1957 or 1960 of this title, or any property traceable to such
property.

9.    18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction
involves the proceeds of some form of unlawful activity, conducts
or attempts to conduct such a financial transaction which in fact
involves the proceeds of specified unlawful activity –

(B)    knowing that the transaction is designed in whole or in
part—

(i)  to conceal or disguise the nature, the location, the
source, the ownership, or the control of the proceeds
of specified unlawful activity [shall be guilty of a
crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit,
or transfer a monetary instrument or funds from a place in the
United States to or through a place outside the United States or to a
place in the United States from or through a place outside the

United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Bank and Wire Fraud Offenses*

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

### *Seizure Warrants*

14.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any

district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b). Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.    With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

(A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

#### <u>Overview of the Fraudulent Investment Schemes</u>

16.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes"). To date, the investigation ("Investigation")

has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

17.     The Investment Schemes are conducted through various, interrelated offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

18.     Certain of the interrelated Investment Schemes are historical, while others are ongoing.  Specifically:

a.     The GTV stock offering and the G Coin offering described below (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July 2020.  As a result of the Unregistered Stock Offerings, whose proceeds were commingled, companies affiliated with GUO, JE, and others collectively raised at least approximately $487 million from more than 5,000 investors, including individuals in the United States.

b.     Starting at least in or about July 2020, the leaders of the scheme began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.

9

c.    GUO, JE, and others continue to conduct the Investment Schemes, including relating to G Club (which has been operating since in or about October 2020) and the Himalaya Exchange (which has been operating since in or about April 2021). As described below, G Club and the Himalaya Exchange have raised at least approximately $664 million between in or about September 2020 and the present.

*Background on GUO and JE*

19.    Based on my participation in this investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.    GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.    GUO is involved with various entities relevant to the Investment Schemes, as described in greater detail below, including GTV, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr"). GUO does not hold formal titles or positions at these entities.

c.    In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and Rule of Law Society ("ROLS"). Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by December 2018.[1] ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP"). At times, the board members for

---

[1]    *See*   https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass"). GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson" and a sponsor.

        d.     JE, a close associate of GUO, has been described as a financier and entrepreneur. JE is involved with various other entities relevant to the Investment Schemes, as described in greater detail below. Specifically:

        i.     JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[2] Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018. JE was formally appointed Director of Hamilton on or about March 20, 2019.

        ii.     JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[3] that was incorporated in the United Kingdom on or about July 10, 2020.

        iii.     JE is listed as the founder and Chairman of Himalaya Exchange, a purported cryptocurrency "ecosystem." JE is the 100% beneficial owner of various entities that operate Himalaya Exchange, including Himalaya International Clearing Ltd. ("Himalaya Clearing"), Major Lead International Ltd., Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

*GTV Stock Offering*

20.     Between approximately April 20, 2020 and June 2, 2020, GTV, its parent company Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG"; collectively, the

---

[2] *See* https://hamilton-im.com/

[3] *See* https://www.aca-capital.com/

"Companies") solicited thousands of individuals to invest in an offering of GTV common stock (the "GTV Stock Offering"). During that time period, more than approximately 5,000 investors (including many in the United States) collectively paid approximately $452 million for purported GTV common stock.

21.     Based on my review of the GTV Stock Offering's information memorandum dated April 20, 2020 (the "Memorandum"), interviews of witnesses, and review of public source information, as well as documents and records obtained during the course of the investigation, I have learned the following, among other things:

        a.      GTV was founded on or about April 17, 2020, as a Delaware corporation and a wholly owned subsidiary of Saraca. GTV's principal place of business was located in the Southern District of New York, in a townhouse located at 162 E. 64th St., New York, NY, 10065 (the "Townhouse").

        b.      According to the Memorandum, GUO was the "sponsor" of both Saraca and GTV, as well as the "adviser[sic]" and "key host" of GTV. The Memorandum also stated that GUO was a billionaire, successful businessman, and dissident in China. According to various witnesses, as well as social media content, GUO consistently presented himself as the founder and face of GTV.

        c.      The Memorandum and a separate letter to prospective investors outlining "Investment Procedures Guidelines" listed GUO's phone number as the contact number for inquiries from potential investors.

        d.      At the time of the GTV Stock Offering, the Companies had recently launched a news-focused social media platform called GTV, including the website www.gtv.org. The Memorandum claimed GTV would be "the first ever platform which w[ould] combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial

intelligence, block-chain technology and real-time interactive communication" and that GTV would be "the only uncensored and independent bridge between China and the Western world." The Memorandum also claimed that GTV would "be a bridge between China and the Western world . . . allowing for free and open communication, business transactions and trading, uncensored by the Chinese government." The Memorandum boasted that GTV's platform would be so powerful as to "expos[e] corruption, obstruction, illegality, brutality, harassment, and inhumanity in China." The Memorandum also indicated that GTV would compete with companies such as Zoom, WeChat, TikTok, YouTube, Cisco, Citrix, Alibaba, Amazon, and eBay.

e.    The Memorandum listed Yvette Y. Wang, Max Krasner, and Daniel Podhaskie as GTV's Executive Directors.

f.    The Memorandum highlighted the credentials of GTV's Non-executive Directors, including, among others, Bannon, Bass, and Darren Blanton ("Blanton"). As described above, Bannon and Bass were also board members of the ROLF and/or ROLS.

g.    The Memorandum stated that investor funds would be used for the following, among other purposes: acquisition of companies; upgrading GTV technology and security; and marketing. The Memorandum did not contemplate that investor funds would be used to invest in hedge funds or any similar type of financial investment, or that investor funds would be given to other companies, such as Saraca.

h.    Based on my conversations with a source of information ("SOI[4]") involved with the ROLF, the Companies, the GTV Stock Offering, and the Phoenix Farm, as well as my

---

[4] The SOI is providing information to law enforcement in hopes of entering into a cooperation agreement and receiving leniency at sentencing. The SOI has provided reliable information that has been corroborated by, among other things, electronic evidence, videos, cellphone records, and subpoena and search warrant returns.

review of the metadata of the Memorandum, I have learned that JE was a primary author of the Memorandum.

### G Coin Offering

22.     During the same period of April 2020 through June 2020, GTV and Saraca also solicited GTV Investors to invest in a companion digital asset security that was referred to as either G-Coins or G-Dollars (the "G Coin Offering").

23.     Based on my participation in this investigation, training, experience, review of law enforcement reports, review of bank records and videos that were posted on social media platforms, as well as my review of reports of interviews with GTV Investors and conversations with others, including law enforcement, I have learned the following, among other things, about the G Coin Offering:

        a.      From approximately in or about April 2020, through at least in or about June 2020, I have learned that the Companies, as well as representatives for the Companies, such as GUO, marketed the sale of G-Coins and G-Dollars to the public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.

        b.      The Companies' online promotions set forth that G-Coins (which the Companies indicated would eventually be merged into G-Dollars, forming a single digital asset), and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on an online platform.  As part of its solicitation of G-Coin and G-Dollar investors, the Companies did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a whitepaper or private placement memorandum.

        c.      The Companies collected at least approximately $31 million from the G-Coin and G-Dollar Investors, pooling the proceeds in bank accounts associated with the

Companies and commingling them with proceeds from the GTV Stock Offering. As part of the G Coin Offering, many investors received a purported 20% discount on the $.01 purchase price for G-Coins and G-Dollars. Investors participated in the G Coin Offering by transferring funds directly to the Companies' U.S. bank accounts, by making payments to the Companies' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.

24.     Based on my participation in this Investigation, training, experience, and review of translations of statements that were made by GUO regarding the G Coin Offering, as well as my conversations with others, I have learned that GUO made numerous false statements in order to solicit investments for the G Coin Offering. Examples of some those statements are described below, in substance and in part:

        a.     In a statement contained within a video by GUO on or about May 9, 2020, Guo stated that G-Coins could be exchanged into U.S. dollars or physical gold.

        b.     In another statement contained within a video on or about May 16, 2020, GUO stated that the G-Coin and G-Dollar currencies could be exchanged with gold.

25.     Based on my participation in this investigation, I believe that the above-described statements regarding G-Coins and G-Dollar are false. In particular, during the course of the investigation, I have not found any evidence that there is or has ever been an exchange where G-Coins or G-Dollars could be exchanged for U.S. dollars or gold.

26.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records, and review of videos that were posted on social media platforms, as well as my review of reports of interviewed individuals who invested in GTV (the "GTV Investors") and my conversations with others, including other law enforcement officers, I have learned the following, among other things, about the solicitation of investments for the GTV Stock Offering and G Coin Offering:

a.    GTV disseminated information about the two offerings to the general public through publicly-available videos on websites affiliated with the Companies, including www.gtv.org and www.gnews.org, as well as on social media platforms such as YouTube and Twitter.  The first solicitation video, posted on YouTube on April 21, 2020, was entitled, as translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the GTV Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering.  The Launch Video has had over 3,000 views.  None of the GTV Stock Offering solicitation videos, including the Launch Video, were password protected or placed any restriction on who could view them or any limitations on their ability to be shared.  As a result, the general public, including prospective U.S. investors, were able to access the online marketing videos about the GTV Stock Offering through, for example, independent online research, social media, or referrals from other investors.

b.    GUO led the effort to solicit investors for the GTV Stock Offering.  GUO, who is a prolific user of social media and has an enormous social media following, used various social media platforms to attract followers and to solicit investors for the GTV Stock Offering. Those social media platforms included WhatsApp and Discord, both of which have end-to-end encrypted chat services.[5]  Among other things, the Companies sent the Launch Video via phone messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering material for the GTV Stock Offering, including the subscription agreement and investment instructions.  GUO also assured potential investors that they would

---

[5] End-to-end encryption is a system of communication where only the communicating users can read the messages.  End-to-end encryption prevents law enforcement authorities from intercepting such communications through wiretaps or through search warrants on the service provider, such as WhatsApp.

realize enormous returns, at one point suggesting that they would receive 1,000 times their investment, *see infra* ¶ 40(c). In another statement, in or about June 2020, GUO stated in substance and in part that GTV stock was worth 30 times what it had been worth before.

        c.    Based on my review of a GTV confidentiality agreement, I have learned that in order to participate in the GTV Stock Offering, GTV Investors were required to sign a confidentiality agreement that required them to keep all information concerning GTV confidential, including the existence of the confidentiality agreement.

        d.    The GTV Stock Offering was structured as a private placement offering of 10% into GTV, with the remaining 90% of GTV to be controlled by Saraca, which was its parent company. According to due diligence records from an investment fund, Saraca is a wholly-owned subsidiary of Hudson Diamond Holding, Inc. ("Hudson BVI"), a British Virgin Islands company. Hudson is in turn wholly owned by Qiang Guo ("QIANG GUO"). Based on my review of open-source material, I have learned that QIANG GUO is GUO'S son.

        e.    By early June 2020, banks began to suspect that the Companies were engaged in potentially unlawful activity and started to close accounts that were linked to Saraca, GTV, and GUO. Around that same time period, GTV Investors began to express concerns about GTV's use of their money, and the legitimacy of their investments. Some of those investors expressed their concerns directly to GUO and many investors requested that their money be returned. In response, GUO and his associates often attempted to shun and ostracize the investors. For example, GUO suggested that one investor was a spy for the CCP and that other investors should not interact with that investor

### *Misappropriation of Unregistered Stock Offering Funds*

27.    A significant portion of the investor funds collected through the Unregistered Stock Offerings (collectively, "Offering Funds") were misappropriated through investments.

28.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.    GUO, JE, and others arranged for approximately $100 million of the Offerings Funds to get invested on behalf of GTV's parent company, Saraca, in a high-risk hedge fund investment managed by a firm named Hayman Capital Management L.P. ("Hayman"). According to its website, Hayman is an SEC-registered asset management firm that was founded by Bass, who was a non-executive director of GTV at the time of the transfer.

b.    In or about May 2020, Bass facilitated GUO's and JE's investment in a high-risk investment fund called the Hayman Hong Kong Opportunities Fund (the "Hayman Fund"), which was operated by Hayman.

c.    JE coordinated with Hayman regarding the investment. For example, in a May 29, 2020 email from JE to a Hayman representative ("Hayman Rep-1"), JE wrote, in substance and in part:  "We will have one onshore and one offshore vehicle. The onshore one will invest USD100m and the offshore one will invest USD1m. The address of the onshore vehicle is: 162 E64th St., New York, NY 10065 United States."  On or about May 31, 2020, JE wrote, in substance and in part, "The $1m will come from my personal account and I owned[sic] 100% of Hamilton Investment Management Ltd."

i.    The address JE provided for the "onshore" vehicle is the address of the Townhouse.  *See supra* ¶ 21(a).

ii.    Based on my participation in this Investigation, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned that the Townhouse has been listed on corporate documents and/or

bank account documentation as the business address for at least seven GUO-affiliated entities; specifically: Saraca, GTV, Golden Spring, Hudson Diamond NY, Greenwich Land, ROLF (until approximately May 2022), and ROLS (until approximately May 2022).

d.      Three days after the close of the GTV Stock Offering, on or about June 5, 2020, $100 million of the Offering Funds were transferred from a particular JP Morgan Chase bank account to an onshore bank account associated with Hayman for the purpose of investing in the Hayman Fund. The funds were transferred on behalf of Saraca; as noted above, Saraca was the parent company to GTV and was 100% owned by GUO's son, QIANG QUO.

e.      Three days later, on or about June 8, 2020, $1 million was transferred on behalf of Hamilton,[6] JE's company, from a bank account in the name of JE to an offshore bank account associated with Hayman, also for the purpose of investing in the Hayman Fund.

f.      The transfer of Offering Funds to Hayman was completely inconsistent with GTV's representations to the GTV Investors about how their funds would be used.

29.      Based on my participation in this Investigation, training, experience, review of documents and records, as well as my conversations with others, including law enforcement, I have learned that on or about September 13, 2021, the SEC announced settled charges against the Companies, based on their violations of the registration requirements for the Unregistered Stock Offerings (*i.e.*, the GTV Stock Offering and the associated digital asset G Coin Offering). The SEC's settlement required the Companies to pay more than $539 million in disgorgement and penalties.

*The Convertible Loan Offering*

---

[6] In April 2018, JE submitted on behalf of Hamilton an account opening document to a U.K. bank that claimed that he owns 100% of Hamilton and that the company "does not involve itself in investments."

30.     After the Unregistered Stock Offerings described above were discovered by banks and numerous bank accounts were frozen, leaders of the schemes began to pitch investors on a new set of investment opportunities.  One new investment scheme launched in or about July 2020 was marketed to prospective investors as an opportunity to convert their existing investments in GTV into a "loan" to GTV.  The Convertible Loan Offering was carried out by the "Himalaya Farm Alliance," a collective of informal groups—known as "Farms"—of Chinese expatriates located in various cities around the world, including New York and Phoenix.  The Himalaya Farm Alliance's purported purpose was to assist the Chinese pro-democracy movement; the Himalaya Farm Alliance existed primarily as private groups on social media platforms such as Discord.  The Farms were typically referred to by the names of preexisting companies that they affiliated themselves with for banking purposes; *e.g.*, Mountains of Spices LLC and Davy & Tony International Limited for the New York Farm, and Maywind Trading LLC, Medical Supply System International LLC and Santel LLC for the Phoenix Farm.

31.     In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that disclosed that the loan would be made to the individual Farm (*e.g.*, "Phoenix Farm (Maywind Trading LLC)") and that the loaned funds would be used by that specific Farm for "general working capital purposes."  Investors executed the Loan Agreement and sent it to their Farm leaders after transferring their funds to the Farm, but were not provided counter-executed copies of the agreement.

32.     Between in or about August 2020 and in or about March 2021, the U.S.-based Farms collectively raised approximately $148 million from the Convertible Loan Offering (the "Loan Funds").  Investors agreed to provide loans to the Farms for the purpose of acquiring GTV shares (once the three-year note had matured).  Once the funds were collected by the U.S. Farms, they were transferred to domestic and foreign accounts owned by different legal entities, including

an Abu Dhabi bank account in the name of ACA Capital (the "UAE ACA Capital Account"), which is owned and controlled by JE.

*Misappropriation of Convertible Loan Offering Funds*

33.    A significant portion of the Loan Funds collected through the Convertible Loan Offering were misappropriated, as described below.

34.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.    JE was sole signatory of the UAE ACA Capital Account.  JE wired approximately $33.3 million of the Loan Funds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ring Rong), and his company, Hamilton. The wires to his and his wife's personal accounts—which amounted to more than approximately $10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities.

b.    JE arranged for approximately $34 million in transfers from UAE ACA Capital Account to U.S. bank accounts in the names of three companies that are each 100% owned by GUO's family members; specifically:

i.    Approximately $5 million to Greenwich Land LLC, which is owned by GUO's wife, Hing Chi Ngok;

ii.    Approximately $18 million to Hudson Diamond NY LLC, which is owned by Guo's daughter, Mei Guo; and

iii.    Approximately $11 million to Lamp Capital LLC, which is owned by Guo's son, QIANG GUO.

c.  The $34 million was commingled with other investor funds, including GTV Offering Funds.  Based on my review of bank account records, I have learned that much of this GTV Investor money was used to fund lavish lifestyle expenses (*e.g.*, approximately $2.3 million in expenses relating to GUO's yacht, and approximately $600,000 for the purchase of luxury automobiles).

d.  JE also arranged for large transfers from UAE ACA Capital Account to other companies with ties to GUO; specifically:

i.  Approximately $19 million to Lexington Property and Staffing, Inc. ("Lexington Property"), which is owned by former GTV Treasurer, Anthony DiBattista ("DiBattista").  The registered address of Lexington Property is 750 Lexington Avenue, New York, NY;

ii.  Approximately $32 million to Savio Law LLC (as escrow agent), pursuant to a purported loan agreement between ACA Capital and Saraca (which is owned by GUO's son, QIANG GUO); and

iii.  Approximately $1 million to Bannon Film Industries, Inc., a company owned by Steve Bannon.  As described above, Bannon was listed in the Memorandum as a non-executive GTV Director and was a Director of the ROLF / ROLS.

### The G Club Operations LLC Scheme

35.  Some of the Farms recruited investors to invest in GTV through the purchase of "G Club" memberships.  As described in greater detail below, law enforcement believes G Club is an ongoing fraudulent scheme operated by GUO, JE, and others.

36.  Based on my participation in this Investigation, training, experience, review of the websites, subpoena returns, records and documents, including operating agreements and articles

of incorporation, open-source research I have conducted on the Internet, and my conversations with others, including law enforcement, I have learned the following, among other things:

      a.      In or about October 2020, G Club Operations LLC ("G Club") was registered in Puerto Rico. According to the Operating Agreement, the purpose of G Club is to "provide[] Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market."

      b.      An image from the G Club website ("G Club Website"), viewable at https://gclubs.com/en/, is shown below:



37.      G Club purportedly offers five membership tiers: Tier 5 Membership ($50,000 annually); Tier 4 Membership ($40,000 annually); Tier 3 Membership ($30,000 annually); Tier 2 Membership ($20,000 annually); and Tier 1 Membership ($10,000 annually). According to the G Club Membership Agreement, "A Member may subsequently elect a higher tier of membership," but "may not subsequently elect a lower tier of Membership." The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and

absolute discretion. The Membership Agreement further states: "If an Application is rejected and membership denied, G Clubs shall return the Membership Fee within ten (10) calendar days of such rejection . . . in the form of the original payment of the Membership Fee or, at the option of G Clubs, by check."

38.     One photograph posted to the G Club Website depicted GUO living a lavish lifestyle; specifically, he is shown standing on top of what appears to be a large yacht smoking a cigar. The G Club Website also states that:

> G Clubs memberships provide its members with access to a concierge customer service with Mandarin and English access and support. G Clubs members will have the opportunity to attend the annual G Summit meeting which may occur in person or virtually. G Clubs members will also get exclusive early access to the latest fashion collections and special member pricing on purchases made on the G Fashion website.

39.     In a video summary posted on GNews on or about July 8, 2021, Guo claimed that G Club had approximately 25,000 members, and predicted that G Club would grow to at least 100 million users, attracting $16 trillion of investment.

40.     Despite the representations on the G Club Website about purported membership benefits, law enforcement believes that G Club is being used, at least in part, to perpetuate the fraud schemes, including by soliciting and receiving investments while evading regulatory requirements. Specifically, based on my review of an interview report of an August 2, 2021 interview (the "August 2, 2021 Interview") conducted by others of a GTV investor ("Investor-1"), I have learned that Investor-1 stated the following, in substance and in part, during that interview:

a.     Investor-1 invested $200,000 USD in GTV in or around May 2020. Investor-1's money came from Investor-1's savings.

b.     Investor-1 came to believe that GTV was a scam because Investor-1 did not receive any GTV shares, and when Investor-1 asked for a refund, no one responded to Investor-1.

    c.     Investor-1 invested in GTV because: 1) there were a lot of American politicians supporting Guo; (2) Guo said it was original stock and there would be at least 1,000x growth; and (3) Investor-1 thought Investor-1 would make money on the GTV stock because Guo said this in videos. Investor-1 did not think Investor-1 would lose money because Guo promised the GTV investment would make money.

    d.     Investor-1 thought that GTV would use the money to build a website like YouTube, Facebook and Twitter, but did not know for certain what it would be used for.

    e.     Investor-1 subsequently invested in the Convertible Loan Program through the "Canada Farm" in or around August 2020. Specifically, Investor-1 sent approximately $71,019 to "Canada Himalayan Club Medica Inc." as a loan. Investor-1 believed that the loan was for 3-5 years, with 3% interest and that at the end of that period Investor-1 would receive the money or GTV stock. Investor-1 never received an executed copy of the investment contract. The money Investor-1 sent was frozen by the Canadian SEC.

    f.     Investor-1 attempted to invest in GTV again in or around March 2021 through G Club. Specifically, Investor-1 was instructed to send Investor-1's investment funds to "Crane Advisory Group," who in turn would send the money to G Club. Investor-1 sent approximately $100,015 to Crane Advisory Group for the purchase of GTV shares at the price of $1 per ten shares.

    g.     In or around July 2021, Investor-1 attempted to initiate a refund by contacting G Club online customer service department. In response to Investor-1's refund request, G Club, through "notices@gclubs.com," sent the following email:

> You recently made a payment with respect to your G|CLUBS membership through Crane. Your wire payment transfer exceeded the amount of a single membership and you have not applied for multiple memberships. We received $100,015.00 via wire. You had applied for one Tier 5 membership and filled out the KYC package indicating the total amount was for multi membership of G|CLUBS (see attached).

To credit the total amount to you, you must apply for additional memberships. Please fill and sign the attached, advising how many memberships you wish to purchase and their tier.

If sending the excess funds was an error and you wish an immediate return of $50,015, please immediately advise. We sincerely apologize for any inconvenience caused.

h.   In response, Investor-1 informed G Club that Investor-1 had sent the $100,015.00 in funds not to purchase a G Club membership, but rather to invest in GTV.  Investor-1 requested that all of Investor-1's funds be returned.  In a subsequent email, Investor-1 also noted that it would not have made sense for Investor-1 to send a sum of $100,015.00, given that the most expensive G Club membership cost $50,000.  Investor-1 also explained in another email that, in a phone conversation with a representative of G Club, the representative had made it clear that Investor-1's funds were going to be used for an investment in GTV, not for the purchase of a G Club membership.

i.   Investor-1 had not received any of Investor-1's $100,015 investment back as of the date of the interview.

41.   Based on my participation in this Investigation, training, experience, my review of documents, records, and email search warrant returns, as well as my conversations with others, including witnesses, I have learned the following, among other things:

a.   An individual named Alex Hadjicharalambous ("Hadjicharalambous"), whose title was the Financial Controller for G Club, was the authorized signer listed on multiple bank accounts in the name of G Club.  On July 13, 2021, Hadjicharalambous received an email at his G Club email account (alexh@gclubs.com) from a G Fashion IT Manager entitled "HCHKTech email" that read, in substance and in part:  "Hello Alex, As you know we now work for HCHK Technologies.  Use the credentials in this email and follow the steps below to log into your new email account."

b.   Based on my review of open-source material on the Internet and subpoena returns, I have learned the following, among other things:

i.   On or about April 29, 2021, HCHK Technologies, Inc. ("HCHK Technologies") was incorporated in the State of Delaware.  At the time of incorporation, Anthony DiBattista was director of HCHK Technologies.  Between on or about May 27, 2021 and November 10, 2021, DiBattista was Treasurer of HCHK Technologies.  On or about December 13, 2021, DiBattista resigned as President, CEO, and Director of HCHK Technologies.

c.   On or about August 18, 2021, HCHK Property Management, Inc. ("HCHK Property") was incorporated in Delaware.  Yvette Wang was elected as the initial director of HCHK Property.  *See* ¶ 21(e).  On or about December 15, 2021, by written consent of the Board of Directors of HCHK Property (*i.e.*, Wang), DiBattista was appointed Treasurer of HCHK Property.  On or about January 1, 2022, Wang resigned and DiBattista was appointed as President, CEO, and Director of HCHK Property.

d.   DiBattista's roles with various of the other GUO-affiliated entities included, among others, Treasurer of GTV, authorized signatory of Lexington Property bank accounts, and Treasurer of G Music LLC.

e.   Based on my review of subpoena returns and my conversations with others, I have learned that on or about July 18, 2021, a G Fashion HR employee sent a "transition memo" to Alex Hadjicharalambous that, "[e]ffective as of July 19, 2021, all GFashion employees will have the option to transfer to GFashion's staffing company, HCHK Technologies, Inc.," which would "thereafter serve the role of staffing company for GFashion and other enterprises."  The transition memo further reflected that an employee's failure to execute the transition memo that same day would result in termination.

27

f.    Based on my review of open-source Internet research and subpoena returns, I have learned that one of the Directors of HCHK Technologies is also the Director and Chairman of the Audit Committee of Gettr,[7] a social media platform that reportedly evolved from GTV Media.  I have further learned that JE's company, Hamilton, owns 95% of Gettr and contributed $35 million to Gettr in capital contribution.

g.    Based on the foregoing, I have learned that starting on or about July 19, 2021, certain employees of G Fashion, Gettr, and other GUO-affiliated entities began to operate under the company names HCHK Technologies and/or HCHK Property.

*The Himalaya Exchange Scheme*

42.    As described above, JE founded a purported cryptocurrency exchange platform called Himalaya Exchange, available at https://himalaya.exchange (the "Himalaya Exchange Website").  Similar to the link between G-Coin / G-Dollar and the Unregistered Stock Offerings, Himalaya Coin (ticker: HCO or HCN) and Himalaya Dollar (ticker: HDO) (together, the "Himalaya Assets") were initially offered as a companion digital asset security for investors in the Convertible Loan Program.

43.    Based on my participation in this investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

---

[7] *See*  https://www.politico.com/news/2021/07/01/maga-app-bannon-chinese-billionaire-497767 (*last visited* July 6, 2022).  Based on my conversations with others, I have learned that Gettr is one of the companies for which HCHK Technologies provides purported staffing services.

a.     The Himalaya Exchange is described as a global digital exchange with a full ecosystem, that includes (or will include) a stablecoin (Himalaya Dollar),[8] a trading coin (Himalaya Coin), and a blockchain payment application called "Himalaya Pay."

b.     JE is described as the founder and Chairman of the Himalaya Exchange.

c.     As described above, JE is also the founder and CEO of BVI-based Hamilton and the Director of Hong Kong-based ACA Capital.

d.     An image from the Himalaya Exchange Website, viewable at https://himalaya.exchange, is shown below:



44.     Based on my participation in this Investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned, among other things, that investors

---

[8] A stablecoin is a cryptocurrency that seeks to peg itself to a stable currency, typically the U.S. dollar.

were misled about how and when they would be able to trade their cryptocurrency assets. Specifically:

a.    When the Himalaya Exchange Website was launched, investors were told that, as of June 2021, they would be able to exchange and withdraw their cryptocurrency. An image of the website from May 2021 depicting this representation is shown below:



b.    The Himalaya Exchange Website later changed its "trade" date to September 2021. Based on my training, experience, and participation in this investigation, I have learned that it is common for fraudulent cryptocurrencies to use similar tactics to those used here; specifically it is common for fraudulent cryptocurrencies to: (1) not be tradable on a public exchange; and (2) induce investors to purchase the cryptocurrencies through false promises that the cryptocurrency will be available to trade on a public exchange soon.

c.    The initial coin offering ("ICO") of the Himalaya Assets purportedly took place on the Himalaya Exchange Website or about November 1, 2021. According to data on the Himalaya Exchange Website, the price of a Himalaya Asset increased from 10 cents at the time of the ICO to $27 approximately two weeks later, resulting in a purported $27 billion valuation by mid-November 2021, as reflected in the graph below from the Himalaya Exchange Website:



d.  According to Himalaya Exchange's promotional materials, the value of the Himalaya Dollar is pegged to the U.S. Dollar.   "Credits" are used to secure positions within the Himalaya Ecosystem, which positions correspond to a particular type of crypto asset.  Promotional materials also state that "[c]redits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem, representing a right to participating in trading on the Himalaya Exchange and do not carry any right to require their exchange for fiat currency or crypto-assets." Promotional materials clarify that references to Himalaya Coin, Himalaya Dollar, "or any other type of asset on an account at the Himalaya Exchange or through the Himalaya Pay App are references to Credits corresponding to that asset."

e.  According to the Himalaya Dollar whitepaper dated April 2021 (the "Whitepaper"), available on the Himalaya Exchange Website, Himalaya Dollar is an Ethereum-based token "structured with the aim of maintaining its value 1-to-1 to the United States Dollar.

Himalaya Dollar Credits benefit from potential liquidity support which may be provided through the [Himalaya] Reserve which will be managed with the aim of maintaining its value at a level equal in value in U.S. dollars to the value of Himalaya Dollars in circulation as described below."

f.    The Whitepaper further states that Himalaya Reserves, the issuer of Himalaya Dollar, "intends to create and hold in the Reserve a mix of United States dollars or other currencies in cash and cash equivalents," and further states, "it is intended to make the Reserve transparent to the public.  The Issuer intends to have the Reserve audited annually by independent auditors. The results of those audits will be made publicly available with details of the then-current composition of the Reserve and the market value of the assets as at[sic] the time of publication." To date, no such audit results have been published.

g.    As described above, the Himalaya Assets have never traded on an open exchange, and instead purport to trade only on the private Himalaya Exchange.  Himalaya Exchange restrains the flow of real currency out of the Himalaya Exchange by its members, as described above.  Thus, the ability to convert Himalaya Dollars and Himalaya Coins back into U.S. currency was limited.

45.    Based on my participation in this investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.    As described above, Himalaya Dollar purports to be a "stablecoin" that is pegged 1-to-1 to the value of the U.S. dollar.  Other major stablecoins include TerraUSD, Tether, and USD Coin.

b.    In a video summary posted on GNews in November 2021, GUO represented, in sum and substance, that Himalaya Coin was backed by the U.S. dollar through

stablecoin Himalaya Dollar, and further stated that Himalaya Coin is backed by a reserve of 20% of the proceeds in gold.

> c.    In or about May 2022, there was a global stablecoin collapse that began when a particular stablecoin called TerraUSD lost its peg (*i.e.*, no longer had sufficient hard-asset reserves to back its cryptocurrency at a 1-to-1 ratio to the U.S. dollar). As a result, the cryptocurrency market lost approximately $300 billion in value. The valuation of TerraUSD through May 10, 2022 is reflected in the graph below:



> d.    In contrast, data on the Himalaya Exchange Website reflects very little fluctuation or decrease in the purported value of the Himalaya Assets during the same time period, as reflected in the graph below from the Himalaya Exchange Website:



46.     I have reviewed the graph displayed above in paragraphs 44(c), showing the value of the Himalaya Assets' purported value between approximately November 1, 2021 and December 31, 2021.  The graph is consistent with the purported price of the Himalaya Assets being falsified—specifically, it reflects a steep increase in price over the first two weeks and then an apparent fluctuation in price, but all within a narrow band.

47.     I have also reviewed the graphs displayed above in paragraphs 45(c) and (d), reflecting the price of stablecoin TerraUSD and the purported price of a Himalaya Asset between April 2021 and May 10, 2021.  The data reflected in the Himalaya Asset graph is inconsistent with the valuation of other stablecoins, including TerraUSD, during the stablecoin crash.[9]

---

[9] On or about June 15, 2022, it was reported that William Je said the following: "Despite the cryptocurrency market's recent dip, HDO has constantly remained stable with the US dollar 1:1 without fluctuation. Impressively, this makes HDO the only stable coin in the world to maintain 100% during this time-period of uncertainty."     *See* https://www.newswire.ca/news-releases/iconic-ferrari-f1-car-sold-by-rm-sotheby-s-using-cryptocurrency-himalaya-dollar-883914213.html (*last visited* July 6, 2022)

**Overview of the Scheme to Launder Fraud Proceeds**

48.    As described in greater detail herein, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, Crane, Lamp Capital LLC, Hudson Diamond NY, Greenwich Land LLC, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

49.    As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 18. Records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, G Club has generated more than approximately $221 million in purported G Club membership fees.

50.    As detailed below, the evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

51.    As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.04 billion, as described in greater detail below.

52.    As a further part of the money laundering scheme, at least approximately $252 million of the Investment Scheme Funds were remitted, either directly or indirectly, to bank accounts in the United States and the Bahamas held in the name of JE's companies—Hamilton, ACA Capital, and Himalaya Exchange—or otherwise controlled by JE.

53.     In particular, as described below, JE opened certain of the Target Accounts and other bank accounts at Silvergate Bank, a bank in La Jolla, California that markets itself as "the leading bank for innovative business in fintech and cryptocurrency." **Target Accounts-1** through **-8** are in the name of a Cayman Islands-registered hedge fund, Hamilton Opportunity Fund SPC; **Target Account-9** is in the name of JE's company, Hamilton Investment Management Ltd., which company is the investment manager of the Hamilton Opportunity Fund SPC.  JE is the principal of Hamilton Investment Management Ltd. and an authorized signer on the Silvergate Target Accounts.

54.     As further described below, JE opened three accounts at FV Bank, a bank in Puerto Rico that markets itself as "The Global Digital Bank."   The FV Bank accounts are in the names of various legal entities through which JE and others operate the Himalaya Exchange—Himalaya Clearing, Himalaya Financial, and Himalaya Reserves.  JE is the ultimate beneficial owner of those Himalaya legal entities, *see supra* ¶ 19(d), and is an authorized signer on the FV accounts.

55.     Investment Scheme Funds have been traced into and among the Target Accounts in ways that, based on my training and experience, are indicative of money laundering. Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas (including the UAE and the Bahamas) in high risk jurisdictions that are frequent havens for money laundering; (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; (c) investments in real estate or other business interests that have no apparent connection with the stated purposes of the businesses controlling the bank accounts; and (d) the transfer of Investment Scheme Funds between multiple banks, as well as among multiple accounts within the same bank, in a single day.

36

**<u>Use of Multiple Banks and Financial Institutions to Conceal Investment Scheme Funds</u>**

56.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    To date, law enforcement has identified more than at least 80 bank accounts being used by GUO, JE, and others to process Investment Scheme Funds, which include, among others:

i.    At least approximately 19 bank accounts in the name of G Club entities (*i.e.*, G Club International Limited or G Club Operations LLC) at approximately seven different financial institutions;

ii.    At least approximately 16 bank accounts in the name of Crane (*i.e.*, Crane Advisory Group LLC) at approximately six different financial institutions;

iii.    At least approximately 28 bank accounts in the name of Farm entities at approximately six different financial institutions;

iv.    At least approximately eight bank accounts in the name of G Fashion at approximately six different financial institutions;

v.    At least approximately 14 bank accounts in the name of Hamilton entities (*e.g.*, Hamilton Investment Management Inc. or Hamilton Opportunity Funds SPC) at Silvergate Bank in California; and

vi.    At least approximately three bank accounts in the name of Himalaya entities (*i.e.*, Himalaya Reserve, Himalaya Financial, and Himalaya Clearing) at FV Bank in Puerto Rico.

b.  In addition to utilizing bank accounts held in the names of entities owned or controlled by JE and others directly involved in the Investment Schemes, GUO, JE, and others layer Investment Scheme Funds through accounts at other financial institutions and third-party payment management entities to conceal the nature and source of the funds.  For example, and as described in greater detail herein:

i.    BSI Group LLC ("BSI Group") is a Missouri-based company that offers payment agreement services.  Based on my conversations with others, I have learned that BSI Group effectively operates as a wholesaler and opens bank accounts at U.S.-based financial institutions for its customers.  U.S. banks that BSI Group contracts with include Capital One, The Reserve Trust Company ("Reserve Trust"), Prime Trust LLC ("Prime Trust"), and a Puerto Rico-based financial institution called Mercantile Bank International Corp. and its affiliated entities ("Mercantile Bank" or "MBI").  BSI Group is a client of Capital One, Reserve Trust, and Prime Trust, among other entities, while MBI is one of BSI Group's customers.

ii.    BSI Group manages transactions on behalf of its own customers, including MBI.  BSI Group's customers direct the movement of their funds—which are held in accounts in the name of BSI Group and/or Reserve Trust and Prime Trust—by requesting transactions through BSI Group's website (*e.g.*, indicating the originator, payee, and amount for a specific transaction).

iii.    GUO, JE, and others have laundered more than approximately $300 million in Investment Scheme Funds through bank accounts held in the names of various financial intermediary companies, including BSI Group, Reserve Trust, and Prime Trust. GUO, JE, and others have also layered Investment Scheme Funds through bank accounts held at various different financial institutions.

iv.      For example, on or about May 20, 2021, G Club's financial controller, Alex Hadjicharalambolous, exchanged emails with employees at Puerto Rico-based financial institutions Medici Bank and MBI regarding a $15 million wire transfer of G Club Investment Scheme Funds from a bank account in the name of BSI Group to a bank account in the name of Hamilton Opportunity Fund SPC at Deltec Bank & Trust ("Deltec"), which is located in the Bahamas (the "Hamilton Bahamas Account").  The next day, David Fallon (the President of Hamilton) emailed Hajicharalmbous to advise that Hamilton could not credit the wire to G Club, because the wire reflected that the sender was "BSI Group."

v.      Hadjicharalambous forwarded the email to an MBI employee, who then responded to Hadjicharalmbous (copying Fallon) with the following explanation, in substance and in part:

HI guys, so flow of funds is as follows. It's a little detailed here so apologies.

The wire comes from BSI group ( MBIs corresponding bank partner)to Deltec (Hamilton)

The accounts are as follows

BSI/MBI have an account at Capital one, it is an MBI Bank escrow account owned by MBI. BSI does the processing for us.

Medici is a client of MBI for this 15mm dollar transaction, Medici has an account with MBI at Capital one

GCLUB is a client of Medici.

Gclubs clients send money to the MBI account at Capital one denoted for GClub (through medici). Medici ledgers each wire as they come into the bank.

To solve below request, what exactly do you need to show the fund admin? Proof of account ownership or money inflow (source of funds)

For going forward activity, GClub is now a direct client of MBI, so wires will be sent from GClubs account at MBI, but the wires will always come from BSI as the MBI corresponding bank . We (MBI bank) will have the flow of funds from GClub client to the account, so we will have the ability to trace the full flow of funds in and out of the GCLUB account.

vi.        Similarly, on or about July 1, 2021, Hadjicharalambolous sent an email to an employee at Medici Bank, directing Medici Bank to transfer approximately $4 million from a G Club Medici Bank account to a G Club MBI account. The wire instructions attached to the email identify MBI as the beneficiary entity, but list Reserve Trust as the beneficiary bank.

vii.      Based on my participation in this Investigation, I believe that the foregoing explanation is an example of the manner in which GUO, JE, and others launder Investment Scheme Funds through multiple financial institutions in an effort to, among other things, conceal their source. *See* ¶ 56(b)(3).

### Tracing of Fraudulent Proceeds

57.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.       Investors participate in the Investment Schemes by either wiring money directly to a bank account controlled or used by entities affiliated with GUO, JE, and others (including the Farms, G Club, or the Himalaya Exchange), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects (including, for example, Crane, BSI Group, Reserve Trust, or Prime Trust), which funds are then transmitted to bank accounts ultimately controlled by GUO, GUO's associates, and JE. I have discovered accounts located in the UAE, the United Kingdom, the United States, the Bahamas, and the British Virgin Islands, which GUO, JE, and other Target Subjects have used for the purpose of receiving investment funds from investors in the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange.

b.      To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.04 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

*Fraud Proceeds are Combined in Hamilton Bahamas Account Before Transfer to Certain of the Silvergate Target Accounts*

58.      Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.      Between in or about May 2021 and June 2021, approximately $100 million in Investment Scheme Funds were transferred from G Club bank accounts into the Hamilton Bahamas Account.   Before the approximately $100 million was combined in the Hamilton Bahamas Account, the Investment Scheme Funds were layered through a series of entities at various different banks in a manner that, based on my training and experience, is indicative of money laundering.  Specifically:

i.      As described above, certain prospective Investment Scheme investors were instructed to send funds intended as an investment in GTV (for example) to a bank account in the name of Crane.  *See supra* at ¶ 40(f). Approximately $78.2 million of Investment Scheme Funds was sent from individual or institutional investors in China and elsewhere to two Crane Advisory bank accounts (the "Crane Citibank Accounts") between in or about November 2020 and April 2021.

ii.        Approximately $60 million of those Investment Scheme Funds were then transferred from the Crane Citibank Accounts to approximately five different bank accounts at MSSB held in the name of Crane (together, the "Crane MSSB Accounts").

iii.        The approximately $60 million in Investment Scheme Funds from the Crane MSSB Accounts was combined with approximately $49 million in other Investment Scheme Funds that had been transferred into the Crane MSSB Accounts from two Crane accounts at a different bank, Capital One (together, the "Crane Capital One Accounts"), raising the total combined balance in the Crane MSSB Accounts to approximately $109 million.

iv.        Approximately $79 million of those approximately $109 million in Investment Scheme Funds in the Crane MSSB Accounts were then transferred to accounts at the same bank (*i.e.*, MSSB), but in the name of G Club (*i.e.*, the G Club MSSB Accounts).  The approximately $79 million was combined with approximately $79.7 million in other Investment Scheme Funds that had been transferred into the G Club MSSB Accounts from individual G Club Investors and from G Club bank accounts at Signature Bank, First Bank of Puerto Rico, and City National Bank, raising the total combined balance of Investment Scheme Funds in the G Club MSSB Accounts to more than approximately $158 million.

v.        Approximately $85 million of Investment Scheme Funds was transferred from the G Club MSSB Accounts to the Hamilton Bahamas Account, and combined with approximately $15 million in other Investment Scheme Funds (relating to G Club and the Himalaya Assets) sourced from a bank account in the name of BSI Group. *See* ¶ 56(b)(v). Thus, the $100 million of Investment Scheme Funds in the Hamilton Bahamas Account consisted of

funds transferred from the G Club MSSB Accounts and other accounts containing Investment Scheme Funds.

*Fraud Proceeds are Transferred to Silvergate Bank*

59.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

    a.      On or about July 5, 2021, JE submitted a business bank account application to Silvergate Bank (the "Silvergate Application") in the name of Hamilton Opportunity Funds SPC.  JE's company, Hamilton, is the investment manager of the Cayman Islands-registered hedge fund, Hamilton Investment Opportunity SPC.  Between in or about July 2021 and the present, JE opened more than approximately 14 bank accounts at Silvergate Bank in the name of various Hamilton-affiliated hedge funds or entities, including Hamilton Investment Opportunity SPC and Hamilton Digital Assets Fund SP, and at least four bank accounts at Silvergate Bank in the name of Himalaya International Clearing Ltd.  *See* ¶ 19(d)(iii).

    b.      Between on or about September 1, 2021 and on or about July 5, 2022, JE-controlled Silvergate Bank accounts received approximately $664 million in Investment Scheme Funds.  Specifically:

        i.      In or about September 2021, approximately $85 million of the Investment Scheme Funds was transferred from the Hamilton Bahamas Account, *see supra* at ¶ 56(b)(iv), to a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 9306 (the "9306 Silvergate Account").  The approximately $85 million was combined with approximately $25 million in Investment Scheme Funds sourced from a bank account in the name

of Himalaya International Clearing Ltd. at a bank in the Bahamas (the "Himalaya Bahamas Account"). Thus, as of in or about late September 2021, the 9306 Silvergate Account held at least approximately $110 million in Investment Scheme Funds.

      ii.      On or about October 27, 2021, approximately $59 million of the approximately $110 million in Investment Scheme Funds was transferred from the 9306 Silvergate Account to a Silvergate Bank account in the name of Hamilton Digital Assets, ending in 7747 (the "7747 Silvergate Account"). Later that same day, the approximately $59 million was transferred from the 7747 Silvergate Account to **Target Account-1** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7739).

      iii.      Also on or about October 27, 2021, approximately $25 million of the approximately $110 million was transferred from the 9306 Silvergate Account to **Target Account-2** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7705). As described in greater detail below, once received in **Target Account-2**, the monies were combined with approximately $50 million in Himalaya Asset Investor Funds sourced from an FV Bank account in the name of Himalaya International Clearing Ltd., ending in 3763 (the "3763 FV Account").

      1.      Approximately $30 million of the $50 million transferred from the 3763 FV Account into **Target Account-2** can be traced to the approximately $110 million in Investment Scheme Funds that had been held in the 9306 Silvergate Account. That is, while approximately $25 million of the $110 million was transferred directly to **Target Account-2** on or about October 27, 2021, an additional $30 million of the approximately $110 million was transferred into **Target Account-2** only after passing through three other bank accounts: the 7747 Silvergate Account (held in the name of Hamilton Digital Assets), then **Target Account-1** (held

44

in the name Hamilton Opportunity Fund SPC), and finally the 3763 FV Account (held in the name of Himalaya International Clearing Ltd.).

     iv.   Also on or about October 27, 2021, approximately $26 million of the approximately $110 million was transferred from the 9306 Silvergate Account to a Silvergate Bank account in the name of Hamilton Diversified Trading Fund, ending in 7762 (the "7762 Silvergate Account").  Later that same day, the approximately $26 million was transferred from the 7762 Silvergate Account to **Target Account-3** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7754).  Approximately two months later, on or about January 4, 2022, approximately $26 million was transferred from **Target Account-3** to the UAE ACA Capital Account (*i.e.*, an offshore bank account controlled by JE).  *See* ¶¶ 32, 34.

     c.   On or about December 2, 2021, approximately $46.5 million in Investment Scheme Funds was transferred from **Target Account-1** to **Target Account-4** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7713).  Once received in **Target Account-4**, the monies were combined with approximately $5.6 million in Investment Scheme Funds sourced from the Himalaya Bahamas Account (which funds passed through a Silvergate Bank account in the name of Hamilton PE Fund SP, ending in 7721), raising the combined balance of **Target Account-4** to approximately $52.1 million.

     d.   On or about December 17, 2021, approximately $24.5 million of the approximately $52.1 million in Investment Scheme Funds was transferred from **Target Account-4** to a bank account in the name of Insight Title Services LLC Trust AC; the stated purpose of the transaction was for the purchase of residential property in Mahwah, New Jersey on behalf of an entity called Taurus Fund SP.  Based on my review of a corporate resolution signed by JE, I have learned that Taurus Fund SP is a segregated portfolio of Hamilton Opportunity Fund SPC (*i.e.*, that JE controls Taurus Fund SP).

e.    Between at least on or about January 24, 2022 and on or about April 4, 2022, approximately $73.8 million of Investment Scheme Funds was transferred into **Target Account-5** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2770). The incoming transfers into **Target Account-5** consisted primarily of wires ranging between approximately $1,100 to approximately $3 million from Chinese individuals, with some individuals sending multiple incoming wires. Based on my participation in this investigation and my training and experience, I believe the transfers into **Target Account-5** are consistent with money laundering, including layering funds through different entities—for example, directing investor funds into a bank account in the names of an entity other than the intended investment vehicle, which here would be G Club or Himalaya Exchange. I further believe that the incoming transfers are consistent with G Club investors purchasing multiple memberships, and therefore are fraud proceeds. *See* ¶ 40(g).

f.    Between on or about March 10, 2022 and on or about April 1, 2022, approximately $77,998,889.20 million in Investment Scheme Funds was transferred from bank accounts in the name of HCHK Technologies or HCHK Property into **Target Account-6** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2762). As described above, starting in or about July 2021, various GUO-affiliated entities began to operate under the newly-formed companies HCHK Technologies and HCHK Property. *See* ¶ 41. Based on my participation in this investigation and my training and experience, and as described above, I believe the nature of the transfers into **Target Account-6** are consistent with money laundering, including layering funds through different entities and concealing their true source and/or purpose. *See, e.g.,* ¶ 56(b)(v).

g.    The Investment Scheme Funds were traced into **Target Account-7** and **Target Account-8** in the following manner:

i.       On or about January 31, 2022, approximately $5.1 million in Investment Scheme Funds was transferred from a bank account in the name of a particular Chinese investor ("Investor-2") into **Target Account-7** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2820).

ii.      Between on or about January 31, 2022 and on or about February 4, 2022, approximately $1 million in Investment Scheme Funds was transferred from bank accounts in the names of two particular Chinese investors ("Investor-3" and "Investor-4") into **Target Account-8** (*i.e.,* a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2747).

iii.     Based on my review of subpoena returns and search warrant returns, I have learned that Investor-2 through -4 had previously invested in the GTV Stock Offering and/or the other Investment Schemes.  Specifically:

1.      According to a spreadsheet GTV maintained of more than approximately 1,200 investors in the GTV Stock Offering, Investor-2, Investor-3, and Investor-4 each purchased GTV stock; Investor-2 purchased approximately 3.3 million shares, Investor-3 purchased approximately 2 million shares, and Investor-4 purchased approximately 800,000 shares.

2.      On or about January 25, 2021, the President of Crane emailed "onboarding profiles" for Investor-2, Investor-3, and Investor-4 to MSSB.  As described above, *see* ¶ 40(f), potential investors in the Investment Schemes were directed to send their investments to Crane, which purportedly served as payment processor for GTV, G Club, and/or Himalaya Exchange.

3.      On or about June 15, 2021, Investor-2 emailed a wire transfer request to MSSB that stated the following, in substance and in part: "I'd like to invest [in]

47

a company called Himalaya International Clearing Ltd." The email requested a wire of approximately $3.4M to a Himalaya International Clearing Ltd. account at Metropolitan Commercial Bank. *See infra* ¶ 59(h).

       h.     Based on my participation in this Investigation and my training and experience, and as described above, I believe the approximately $5.1M in transfers from Investor-2 into **Target Account-7** and the approximately $1 million in transfers from Investor-3 and Investor-4 into **Target Account-8** are the proceeds of wire fraud and money laundering, because they are funds Investors-2 through-4 paid with the intent to purchase additional G Club memberships and/or Himalaya Assets, but which GUO, JE and others instead directed into JE's hedge fund bank account to conceal their true source and/or purpose. *See, e.g.,* ¶ 56(b)(v).

       i.     On or about June 11, 2021, JE opened **Target Account-9** (*i.e.*, a Silvergate Bank account in the name of JE's company, Hamilton Investment Management Ltd., ending in 0288). Between at least in or about January 2022 and in or about June 2022, at least approximately $50.4 million of Investment Scheme Funds was transferred into **Target Account-9** over the course of approximately five incoming wire transfers; specifically:

       1.     On or about January 13, 2022, **Target Account-9** received an incoming wire of approximately $10.8 million in Investment Scheme Funds from a Signature Bank account in the name of Prime Trust, ending in 6126 (the "Prime Trust Signature Account"). *See* ¶ 56(b)(i)-(iii).

       2.     On or about February 10, 2022, **Target Account-9** received an incoming wire of approximately $11.7 million in Investment Scheme Funds from the Prime Trust Signature Account.

       3.     On or about June 13, 2022, **Target Account-9** received an incoming wire of approximately $8 million in Investment Scheme Funds from a particular bank account at

Metropolitan Commercial Bank ("MCB"), ending in 6891 (the "6891 MCB Account"). Transaction details provided by Silvergate Bank list "FV Bank – Himalaya International" as the Payer on the transaction, and identify MCB as the name of the "Payer" financial institution. FV Bank records, in turn, reflect that the transfer was from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction. Based on information provided by MCB, I have learned that the 6891 MCB Account was a pooled funds account for FV Bank, and have further learned that MCB processes transactions for FV Bank's account holders (as relevant here, the Himalaya entities) in USD.

       j.      On or about June 14, 2022, **Target Account-9** received an incoming wire of approximately $10 million in Investment Scheme Funds from the 6891 MCB Account. FV Bank account records reflect that the transfer was actually from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction.

       k.      On or about June 22, 2022, **Target Account-9** received an incoming wire of approximately $10 million in Investment Scheme Funds from the 6891 MCB Account. FV Bank account records reflect that the transfer was from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction.

<em><u>Fraud Proceeds are Used to Fund GUO-Affiliated Companies</u></em>

      60.      Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

       a.      As described above, JE's company owns approximately 95% of Gettr. *See supra* at ¶ 41(f).

b.      On or about June 30, 2022, approximately $3 million was transferred from **Target Account-4** to **Target Account-10** (*i.e.*, a Manufacturers & Traders Trust Co. bank account held in the name of GETTR USA, Inc., ending in 4409). The wire details reflect that the transfer was for "CAPITAL CALL JUNE 3M USD."

c.      On or about July 27, 2022, approximately $3 million was transferred from **Target Account-4** to **Target Account-10.** The wire details reflect that the transfer was for "CAPITAL CALL JULY 3M USD."

d.      On or about August 29, 2022, approximately $5 million was transferred from **Target Account-4** to **Target Account-10**. The wire details reflect that the transfer was for "CAPITAL CALL AUGUST 10M USD (X2 5M)."

e.      On or about August 30, 2022, an additional approximately $5 million was transferred from **Target Account-4** to **Target Account-10**. The wire details reflect that the transfer was for "CAPITAL CALL AUGUST 5M USD (10M TRA NSFER 2 of 2)."

f.      Based on the foregoing, I believe that JE and others are using fraud proceeds to fund Gettr.

### *Fraud Proceeds are Layered Through Various Banking Institutions*

61.      Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.      As described herein, GUO, JE, and others have layered fraud proceeds through accounts at various entities, including, among others: certain accounts at MCB maintained

FBO FV Bank's account holders (*i.e.*, the Himalaya entities); and accounts held by BSI Group in the name of various entities.  *See* ¶ 56(b).

        b.      As further described herein, FV Bank holds Investment Scheme Funds in correspondent bank accounts, or FBO accounts, at MCB.

        62.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned that, starting at least in or about February 2022, JE and others began to layer more than approximately $300 million in Investment Scheme Funds through certain bank accounts.  Specifically:

        a.      Between on or about February 15, 2022 and on or about March 29, 2022, approximately $160 million in Investment Scheme Funds was transferred from the 3763 FV Account to a Royal Business Bank account in the name of Prime Trust LLC, ending in 6050 (the "Prime Trust RBB Account") in the course of approximately 16 wire transactions.

        b.      On or about March 21, 2022, JE opened an FV Bank account in the name of Himalaya International Financial Group, ending in 2119 (the "2119 FV Account") and an FV Bank account in the name of Himalaya International Reserves Ltd., ending in 8239 (the "8239 FV Account").

        c.      Between on or about March 21, 2022 and on or about May 13, 2022, approximately $190 million in Investment Scheme Funds was transferred from the 3763 FV Account (*i.e.*, the Himalaya Clearing FV Bank account ending in 3763) to the 2119 FV Account and the 8239 FV Account in the course of approximately 12 wire transactions.  For example:

i.        Between on or about March 21, 2022 and on or March 29, 2022, approximately $100 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 2119 FV Account and/or the 8239 FV Account in the course of approximately 10 wire transactions.

ii.        On or about May 13, 2022, approximately $30 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 2119 FV Account in a single wire transaction, and approximately $60 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 8239 FV Account in a single wire transaction.

d.        On or about May 24, 2022, approximately $44.6 million in Investment Scheme Funds was transferred from the 2119 FV Account to the 8239 FV Account in a single wire transaction.

i.        The approximately $44.6 million was part of approximately $80 million that had been transferred from the 3763 FV Account to the 2119 FV Account. *See* ¶ 62(c)(i)(ii).

ii.        That is, while approximately $110 million was transferred directly from the 3763 FV Account to the 8239 FV Account, an additional approximately $44.6 million of the approximately $190 million was transferred into the 8239 FV Account only after passing through the 2119 FV Account.

e.        On or about August 15, 2022, an employee of MCB sent email correspondence confirming MCB's relationship with FV Bank regarding **Target Account-11**, which is an MCB account FBO FV Bank customers.  The MCB employee confirmed that **Target Account-11** is a pooled account that contains funds for the Himalaya entities (*i.e.*, the 3763 FV Account, the 2119 FV Account, and the 8239 FV Account).

63.     Based on my review of information provided by Silvergate, I have learned that **Target Account-1** through **Target Account-9** held a combined total of approximately $292,407,029.22 as of on or about August 31, 2022, as reflected in the table below:

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-1 | 5090037739 | $1,800,000.00 |
| Target Account-2 | 5090037705 | $75,000,000.00 |
| Target Account-3 | 5090037754 | $467,343.00 |
| Target Account-4 | 5090037713 | $167,826.87 |
| Target Account-5 | 5090042770 | $83,872,761.75 |
| Target Account-6 | 5090042762 | $76,690,856.60 |
| Target Account-7 | 5090042820 | $5,106,100.00 |
| Target Account-8 | 5090042747 | $1,026,000.00 |
| Target Account-9 | 5090030288 | $48,276,141.00 |
| **Total** | | **$292,407,029.22** |

64.     Based on my review of information from Silvergate, I have learned that **Target Account-10** received a total of approximately $16,000,000.00 from **Target Account-4** between on or about June 30, 2022 and on or about August 30, 2022.

65.     Based on my review of information provided by FV Bank and MCB, I have learned that **Target Account-11** held a combined total of approximately $13,613,172.71 as of on or about August 15, 2022.

## III. Conclusion

66.     Based on the foregoing, I submit that there is probable cause to believe that funds held in the accounts constituting the Target Property are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

67.    Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.

/s/ Anthony Alecci, by SDA with permission
_____
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 18th day of September, 2022

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

54