# Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**22 MAG 8279**

UNITED STATES OF AMERICA

    -v.-

All monies and funds contained in Mercantile Bank International account MBI10103-0000, held by G Club International Ltd. ("Target Account-1"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10133-0000, held by Himalaya International Clearing Ltd. ("Target Account-2"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10137-0000, held by Hamilton Capital Holding Ltd. ("Target Account-3"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10138-0000, held by Himalaya International Reserves Ltd. ("Target Account-4"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10139-0000, held by Himalaya International Financial Group Ltd. ("Target Account-5"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10171-0000, held by Hamilton Investment Management Ltd. ("Target Account-6"), and all funds traceable thereto, including accrued interest;

All monies and funds contained in Mercantile Bank International account MBI10172-0000, held by G Fashion International Limited

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

("Target Account-7"), and all funds traceable thereto, including accrued interest; and

All monies and funds contained in Mercantile Bank International account MBI10183-0000, held by Himalaya Currency Clearing Pty Ltd. ("Target Account-8"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

Defendants-in-rem.

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I.  Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.  Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.     This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, for:

a.     All monies and funds contained in Mercantile Bank International account MBI10103-0000, held by G Club International Ltd. ("**Target Account-1**"), and all funds traceable

thereto, including accrued interest;

b.      All monies and funds contained in Mercantile Bank International account MBI10133-0000, held by Himalaya International Clearing Ltd. ("**Target Account-2**"), and all funds traceable thereto, including accrued interest;

c.      All monies and funds contained in Mercantile Bank International account MBI10137-0000, held by Hamilton Capital Holding Ltd. ("**Target Account-3**"), and all funds traceable thereto, including accrued interest;

d.      All monies and funds contained in Mercantile Bank International account MBI10138-0000, held by Himalaya International Reserves Ltd. ("**Target Account-4**"), and all funds traceable thereto, including accrued interest;

e.      All monies and funds contained in Mercantile Bank International account MBI10139-0000, held by Himalaya International Financial Group Ltd. ("**Target Account-5**"), and all funds traceable thereto, including accrued interest;

f.      All monies and funds contained in Mercantile Bank International account MBI10171-0000, held by Hamilton Investment Management Ltd. ("**Target Account-6**"), and all funds traceable thereto, including accrued interest;

g.      All monies and funds contained in Mercantile Bank International account MBI10172-0000, held by G Fashion International Limited ("**Target Account-7**"), and all funds traceable thereto, including accrued interest; and

h.      All monies and funds contained in Mercantile Bank International account MBI10183-0000, held by Himalaya Currency Clearing Pty Ltd. ("**Target Account-8**," together with Target Account-1 through -7, the "Target Accounts"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

3.      The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343

(wire fraud) and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.      This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (x) my review of documents provided by counsel for, among other entities, G Club, HCHK Technologies Inc., Hamilton Investment Management Ltd., and Major Lead International ROM (the parent entity of the "Himalaya Exchange"); (xi) my conversations with other law enforcement officers; and (xi) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4

5.    As set forth herein, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. § 1343, or property traceable thereto.  In summary, the evidence reveals a series of fraudulent investment schemes that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc. ("GTV"), G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), the Himalaya Exchange ("Himalaya"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.    Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the investment schemes to the Target Property.

## II.  Statutory Basis for Forfeiture

7.    The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

### *Money Laundering Offenses*

8.    Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.    18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

5

(B)    knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Wire Fraud Offenses*

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. § 1343.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

*Seizure Warrants*

14.     The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any

property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2)

provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as

provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section

981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure

41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any

district in which a forfeiture action against the property may be filed under Title 28, United States

Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be

brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.

As set forth below, the offenses underlying the requested seizure warrant included acts or

omissions occurring in the Southern District of New York.

15.     With respect to fungible property, including cash and funds deposited in a financial

institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary
instruments in bearer form, funds deposited in an account in a financial institution . . . , or
precious metals:

    (A)    it shall not be necessary for the Government to identify the specific property
involved in the offense that is the basis for the forfeiture; and

    (B)    it shall not be a defense that the property involved in such an offense has
been removed and replaced by identical property.

  (2)  Except as provided in subsection (b), any identical property found in the same place
or account as the property involved in the offense that is the basis for the forfeiture shall
be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the
offense that is the basis for the forfeiture may be commenced more than 1 year from the
date of the offense.

### III. Probable Cause

#### A. Probable Cause Regarding Commission of the Subject Offenses

<u>The Prior Seizure Warrants</u>

16.    On or about September 17, 2022, I submitted (under seal) an affidavit in support of seizure warrants for funds held in 11 bank accounts, including all funds in one Metropolitan Commercial Bank ("MCB") account, held For Benefit Of FV Bank, and all funds in nine Silvergate Bank ("Silvergate") accounts, held by William JE in the names of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd. (the "September 17 Affidavit[1]").   The September 17 Affidavit is incorporated herein as Exhibit A.  On or about September 18, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for those 11 accounts, including a warrant to Silvergate for the nine Silvergate accounts ("Silvergate Warrant-1") and a warrant to MCB for the one MCB account held For Benefit Of FV Bank (the "MCB Warrant").

17.    Also on or about September 17, 2022, I submitted (under seal) an affidavit in support of a seizure warrant for approximately one U.S. Bank account, held in the name of G Fashion (the "G Fashion Affidavit").  The G Fashion Affidavit is incorporated herein as Exhibit B.  On or about September 18, 2022, Judge Aaron issued a seizure warrant for that U.S. Bank account (the "U.S. Bank Warrant").

18.    On or about September 20, 2022, I submitted (under seal) an affidavit in support of seizure warrants for four additional bank accounts, specifically, one Silvergate account, held in the name of Hamilton Opportunity Fund SPC, and three FV Bank accounts, held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and

---

[1] The September 17 Affidavit also supported the seizure of up to $16 million contained in a Manufacturers & Traders Trust Co. held by GETTR USA, Inc.

Himalaya International Clearing, Ltd. (the "September 20 Affidavit.")   The September 20 Affidavit is incorporated herein as Exhibit C.  On or about September 20, 2022, Judge Aaron issued seizure warrants for (a) that Silvergate account ("Silvergate Warrant-2"), and (b) those three FV Bank accounts (the "FV Warrant," together with Silvergate Warrant-1, Silvergate Warrant-2, and the U.S. Bank Warrant, the "Prior Seizure Warrants").

Overview of the Fraudulent Investment Schemes

19.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes").  To date, the investigation ("Investigation") has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

20.    The Investment Schemes are conducted through various, interrelated investment offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

21.    Certain of the interrelated Investment Schemes are historical, while others are ongoing.  Specifically:

a.    The GTV stock offering and the G Coin offering (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July

2020.  As a result of the Unregistered Stock Offerings, the proceeds of which were commingled, companies affiliated with GUO, JE, and others (the "Target Subjects") collectively raised at least approximately $487 million from more than 5,000 investors, including individuals in the United States.  The Unregistered Stock Offerings are described in greater detail in the September 17 Affidavit.  *See* Ex. A at ¶¶ 20-29.

   b. Starting at least in or about July 2020, the leaders of the Investment Schemes began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.  The Convertible Loan Offering is described in greater detail in the September 17 Affidavit.  *See* Ex. A at ¶¶ 30-34.

   c. Starting in or about October 2020, the leaders of the Investment Schemes began to pitch investors on a purported luxury, exclusive concierge service called G Club (the "G Club Membership Offering").  The G Club Website, viewable at https://gclubs.com/en, advertises "An Exclusive Membership to a First-Class Tomorrow."  G Club purportedly offers five membership tiers, ranging from $10,000 to $50,000 annually.  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and absolute discretion.  According to the G Club Website, G Club memberships provide, among other things, "access to a concierge customer service with Mandarin and English access and support" and "exclusive early access to [the] latest fashion collections, including special member pricing on

purchases, extended video blogging time and early access to select music." The G Club Membership Offering is described in greater detail in the September 17 Affidavit. *See* Ex. A at ¶¶ 35-41. G Club is an ongoing investment scheme.

d. In or about 2021, JE founded and began to market a purported cryptocurrency exchange platform called the Himalaya Exchange, available at https://himalaya.exchange. Similar to the link between G-Coin / G-Dollar and the Unregistered Stock Offerings, the purported cryptocurrencies Himalaya Coin ("HCO" or "HCN") and Himalaya Dollar ("HDO") (together, the "Himalaya Assets") were initially offered as purported companion digital asset securities for investors in the Convertible Loan Program. When the Himalaya Exchange Website was launched, prospective investors were told that they would be able to exchange and withdraw their Himalaya cryptocurrency as of June 2021. However, the initial coin offering ("ICO") of the Himalaya Assets was delayed several times, with the ICO taking place on November 1, 2021. The Himalaya Exchange is described in greater detail in the September 17 Affidavit, *see* Ex. A ¶¶ 42-47, and herein. *See infra* at ¶¶ 41-47. The Himalaya Exchange is an ongoing investment scheme.

22. As described in the September 17 Affidavit, JE and others have raised at least approximately $664 million between in or about September 2020 and the present through G Club and the Himalaya Exchange.

<u>Background on GUO and JE</u>

23. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.    GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.    GUO is involved with various entities relevant to the Investment Schemes, including GTV, G News, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr").  GUO does not hold formal titles or positions at these entities. However, Guo publicly promotes these entities, including in videos he posts for his "followers" on GTV, G News, and GETTR.[2]

c.    In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and the Rule of Law Society ("ROLS").  Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by in or about December 2018.[3]  ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP").  At times, the board members for ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass").  GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson," and a sponsor.

d.    JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various entities relevant to the Investment Schemes, as described in greater detail below.  Specifically:

---

[2] *See, e.g.*, gnews.org/articles/992 and https://gettr.com/post/pwxhs34326.

[3] *See* https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

i.      JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[4]  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.    JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.     JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[5] that was incorporated in the United Kingdom on or about July 10, 2020.

e.     JE is listed as the founder and Chairman of the Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is the 100% beneficial owner of various entities that operate the Himalaya Exchange, including Major Lead International Ltd., Himalaya International Clearing Ltd. ("Himalaya Clearing"), Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

<u>Overview of the Scheme to Launder Fraud Proceeds</u>

24.    As described in greater detail herein and in the September 17 Affidavit, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

25.    As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 21.

---

[4] *See* https://hamilton-im.com/ (*last visited* October 11, 2022).

[5] *See* https://www.aca-capital.com/ (*last visited* October 11, 2022).

Moreover, records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, the G Club Membership Offering has generated more than approximately $221 million in purported G Club membership fees. As described herein, records that I or others have reviewed in the court of the Investigation further show that, between in or about April 2021and October 2022, the Himalaya Exchange scheme has generated more than approximately $500 million in purported cryptocurrency investments.

26.    As detailed below and in the September 17 Affidavit, the evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, the G Club Membership Offering, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

27.    As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.5 billion, as described in greater detail below and in the September 17 Affidavit.

28.    As a further part of the money laundering scheme, and as set forth below, *see infra* ¶¶ 51-53, at least approximately $626 million of the Investment Scheme Funds were remitted, either directly or indirectly, to the Target Accounts between on or about July 2, 2021 and October 6, 2022.

<u>Mercantile Bank and the Target Accounts</u>

29.    The Target Accounts are all held at Mercantile Bank.

a.    Mercantile Bank is a payments and digital asset custody bank based in Puerto Rico.[6]  Mercantile Bank was incorporated on or about July 16, 2018.

---

[6] https://mercantile-bank.com.

b.    Counsel for Mercantile Global Holdings, Inc. ("MGH")—the parent holding company of Mercantile Bank—has described Mercantile Bank as "a startup bank." Specifically, because Mercantile Bank does not have direct access to the Federal Reserve payment system via a Federal Reserve master account, it has sought to partner with other bank(s) that have such an account (*i.e.*, correspondent banking partners).[7]

30.    Based on my review of materials provided by MGH in response to a grand jury subpoena, I have learned that six of the eight Target Accounts are held in the name of companies that are wholly owned by JE and are associated with the operations of the Himalaya Exchange or its managing entity, Hamilton.  The other two Target Accounts are held in the name of G Fashion and G Club (*i.e.*, two of the other ongoing Investment Schemes).

31.    As described in the September 17 Affidavit and herein, JE and others have layered Investment Scheme Funds into and through the Target Accounts at Mercantile Bank, among other financial institutions, to conceal the nature and source of the funds.  *See* Ex. A at ¶ 56(b).

32.    Between on or about October 7, 2022 and October 11, 2022, Mercantile Bank sent letters to representatives of the U.S. Attorney's Office advising, in substance and in part, that if the Government "publicly seizes the funds in" the Target Accounts, "there is a high probability that [Mercantile Bank] will have no choice but to permanently cease operations in the near future."[8]

---

[7] For example, in or about January 2021, Mercantile Bank announced that it had reached a definitive agreement for a reverse merger with a publicly traded company, in which Mercantile Bank would itself become a publicly traded entity.  *See, e.g.*,  https://www.nasdaq.com/press-release/mercantile-bank-international-corp.-announces-reverse-merger-transaction-with-crucial (*last visited* October 13, 2022).  However, that reverse merger fell through.

[8] As described in paragraph 38 below, Hamilton had sought to purchase Mercantile Bank just prior to the execution of the Prior Seizure Warrants.  The funds apparently earmarked for the purchase were seized pursuant to the Prior Seizure Warrants, and the acquisition fell through.

Execution of the Prior Seizure Warrants and the Target Subjects' Liquidation Efforts

33.    On or about September 20, 2022, the FBI served Silvergate Warrant-1 and the U.S. Bank Warrant, among others.[9]    On or about September 21, 2022, the FBI served Silvergate Warrant-2 and the FV Warrant.

34.    As described in greater detail herein, since the execution of the Prior Seizure Warrants and the Government's seizure of more than approximately $320 million in Investment Scheme Funds contained in Hamilton and/or Himalaya Exchange accounts at Silvergate Bank and FV Bank pursuant to those warrants, *see supra* at ¶¶ 16 and 18, JE and other Target Subjects have attempted to move more than approximately $58 million in Investment Scheme Funds held at Mercantile Bank.

*JE's Attempted Transfer of Funds on September 22, 2022 and September 23, 2022*

35.    In response to a grand jury subpoena issued on or about September 23, 2022, MGH provided certain documents and information to the Government, including account balances for all Mercantile Bank accounts held in the names of various entities affiliated with William JE, including G Club, G Fashion, Himalaya (in the name of Himalaya Clearing, Himalaya Financial, Himalaya Reserves, and Himalaya Currency Clearing Pty Ltd.) and Hamilton (in the name of Hamilton Capital Holding and Hamilton Investment Management Ltd.), as well as certain communications among MGH, JE, and others.

36.    Based on my review of documents and information provided by MGH, and as described in greater detail below, I have learned that between on or about September 22, 2022 and September 23, 2022 (*i.e.*, within days of the Government's seizure), JE attempted to move funds

---

[9] As described in the September 20 Affidavit, *see* Ex. B at ¶ 19, in light of clarification regarding where certain funds were held, the FBI did not serve the MCB Warrant and instead obtained a new warrant (*i.e.*, the FV Warrant).

out of **Target Account-2** at Mercantile Bank (*i.e.*, the Himalaya International Clearing account), purportedly to liquidate approximately $46 million of what JE claimed to be his own Himalaya Exchange digital assets.

37.     Based on my review of account balance summaries, account monthly statements, and additional documents provided by MGH, including notes of calls between employees of MGH, Mercantile Bank, and Hamilton, my review of documents provided by Silvergate, open-source research, and my conversations with representatives of the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.     Before execution of the Prior Search Warrants, Hamilton had engaged in negotiations to purchase Mercantile Bank.  Specifically, between in or about December 2021 and in or about September 2022, Hamilton conducted due diligence on Mercantile Bank and prepared to acquire Mercantile Bank.  On or about September 16, 2022, MGH and the Hamilton Opportunity Fund entered into a stock purchase agreement, pursuant to which Hamilton agreed to pay $49,695,000 to acquire Mercantile Bank.

b.     That same day, on or about September 16, 2022, Hamilton initiated an outgoing wire of approximately $49.695 million in Investment Scheme Funds from one of its Silvergate accounts to MGH ("Wire-1").  The beneficiary was listed as "Mercantile Global Holding Inc.," and the stated purpose of the wire transfer request was: "Bank Purchase Hamilton MA Fund SP."  Those funds—which appear to have been related to Hamilton's attempted purchase of Mercantile Bank—were never transferred to Mercantile Bank, and instead were seized pursuant to Silvergate Warrant-1.

c.     According to MGH, MGH employees had multiple conversations with Hamilton employees about the status of Wire-1. During a FaceTime audio call initiated at approximately 7:55 p.m. GMT / 2:55 p.m. ET on or about September 22, 2022 between Priya Patel

("Patel") (Internal Litigation and Regulatory Counsel for Hamilton Capital Holding) and MGH's Global Head of Legal and Compliance ("MGH Employee-1"), Patel advised MGH Employee-1, in sum and substance, that Hamilton's funds at Silvergate—including Wire-1—had been seized, and that Hamilton may need to transfer money out of its accounts at Mercantile Bank.

  d. Approximately 18 minutes later, at approximately 8:13 p.m. GMT / 3:13 p.m. ET on or about September 22, 2022, JE called the CEO of MGH ("MGH Employee-2") via WhatsApp. During the call, JE stated, in substance and in part, that Hamilton needed to transfer approximately $30 million[10] for an unnamed "VIP" client and for G Club to a bank in Abu Dhabi, UAE. In response, MGH Employee-2 advised JE, in substance and in part, that MGH would require all such transfer requests to be submitted in writing. Based on information provided by MGH, I have learned that JE did not disclose identifying information about the "VIP" client to MGH Employee-2 during that call.

  e. Hours later, at approximately 11:30 p.m. GMT / 6:30 p.m. ET on or about September 22, 2022, Ehsan Masud (Hamilton's CFO) sent MGH Employee-2 a WhatsApp message that read, in substance and in part: "We are likely to have a large VIP corporate redemption tomorrow of approx. $50m USD[.] Happy to jump on a call tomorrow to discuss. Many thanks". Minutes later, MGH Employee-2 responded and advised Masud, in sum and substance, that a transfer of that size would "require detailed documentation and [ ] take more than a day to process." In subsequent WhatsApp communications between Masud and MGH Employee-2 over approximately the next hour, Masud expressed urgency regarding the timing of

---

[10] As reflected herein and in MGH records, the stated amount of the outgoing transfer(s) appears to have ranged from approximately $30 million to approximately $50 million over the course of communications among JE, Masud, and MGH Employee-2. Ultimately, the written outgoing wire requests reflect requested transfers totaling approximately $46 million between two transactions. *See* ¶ 37(j)(v).

the outgoing transfer; for example, when MGH Employee-2 advised Masud that MGH Employee-2 had scheduled a meeting among MGH compliance personnel and Hamilton employees for on or about September 24, 2022, Masud wrote, in substance and in part: "But this would mean we will miss USD cut off for tomorrow" and "we need to get the ball rolling tomorrow soonest".

   f. At approximately 3:01 a.m. GMT on or about September 23, 2022 / 10:01 p.m. ET on or about September 22, 2022, JE sent MGH Employee-2 WhatsApp messages that read, in substance and in part: "Hi, as discussed, my company would like to redeem some money so that we could continue to support the operation of your bank and other entities."

   g. MGH Employee-2 responded to JE at approximately 9:38 a.m. GMT / 4:38 a.m. ET on or about September 23, 2022, advising JE, in sum and substance, that MGH Employee-2 would be speaking to Masud at approximately 11:00 a.m. and asking JE whether Masud was aware of "what is happening?"  In response, JE wrote, in substance and in part: "[Masud] only knows FV bank is frozen.  He did not know the fund nor the transaction issues", and "[w]e are just doing normal redemption of a client."

   h. During a WhatsApp call between MGH Employee-2 and Masud at approximately 11:01 a.m. GMT / 6:01 a.m. ET on or about September 23, 2022, Masud again expressed urgency regarding the timing of the outgoing $50 million wire request for the "VIP" client (whose identity had not yet been disclosed to MGH).  According to MGH, MGH Employee-2 insisted on learning the identity of the client requesting the transfer; in response, Masud advised, in sum and substance, that the client was ACA Capital (*i.e.*, JE's Hong Kong-based investment firm, *see* ¶ 23(d)(ii)), and that the wire would be sent to a particular bank in Abu Dhabi, UAE. Masud also advised that Hamilton had a plan to move most of its assets out of the United States.

i.     In WhatsApp messages between JE and MGH Employee-2 hours later on or about September 23, 2022, JE wrote, in substance and in part: "I could send you all documents to show that I own ACA", and "[w]e need the execution today or it is meaningless."

j.     In WhatsApp messages starting at approximately 5:03 p.m. GMT / 12:03 p.m. ET on or about September 23, 2022, JE wrote the following to MGH Employee-2, in substance and in part:  "Sent you all the ACA stuff", "We are just redeeming", and "Masud does not know about ACA."  Based on my review of documents provided by MGH, I have learned that JE sent several documents to MGH that day, including, among others, the following:

i.     A letter on Himalaya Exchange letterhead from Masud (who is identified in the letter as CFO of the Himalaya Exchange) addressed to "ACA Capital Group Limited," purportedly dated October 29, 2021, reflecting a purported "Reservation of Himalaya Coin" and containing the following, in sum and substance:

> The Himalaya International Financial Group Ltd., through the Himalaya Exchange, has reserved Forty Million Himalaya Coin (HCN) for you at the price of $0.10 U.S. Dollars per coin.  As agreed, you can call on this Reservation as and when required.
>
> We will credit your HCN on request, provided you have sufficient HDO position to cover the above mentioned HCN purchase.

ii.     A "Himalaya Exchange OTC Transaction Form" on Himalaya Exchange letterhead, addressed to "Himalaya International Clearing Ltd.," purportedly reflecting transaction execution details regarding the sale by "william.k.je@acacap.com" of approximately 1,308,044.47 HCN at the price of $24.464 per HCN, for a total of 32 million HDO.  The form reflected an effective transaction date and time of 9:35 p.m. GMT on or about September 22, 2022, and was signed by JE on or about September 22, 2022.

iii.     A second "Himalaya Exchange OTC Transaction Form" on Himalaya Exchange letterhead, addressed to "Himalaya International Clearing Ltd.," purportedly

reflecting transaction execution details regarding the sale by "william.k.je@acacap.com" of approximately 572,269.46 HCN at the price of $24.464 per HCN, for a total of 14 million HDO. The form reflected an effective transaction date and time of 9:35 p.m. GMT on or about September 22, 2022 (*i.e.*, the same minute as the transaction reflected above in ¶ 37(j)(ii)), and was signed by JE on or about September 22, 2022.

        iv.      A blurry screenshot on Himalaya Exchange letterhead reflecting what purports to be the Himalaya Exchange Website's Order Book page, which screenshot was purportedly taken at approximately 9:35 p.m. on or about September 22, 2022, as shown below:



        v.      A "Himalaya Exchange Redemption Request Form" on Himalaya Exchange letterhead, reflecting the name "ACA Capital Group Limited" and the Himalaya

Exchange Login Email Address "william.k.je@acacap.com," authorizing the "redemption of my Himalaya Dollar to USD from my Himalaya Exchange account" in the amount of approximately 46 million HDO, for a total outgoing transfer of approximately $46 million.  The purported redemption request form, which was signed by JE on or about September 23, 2022, provided bank account information for an account in the name of ACA Capital Group Limited at First Abu Dhabi Bank in the United Arab Emirates ("UAE").

k.      In a WhatsApp message from JE to MGH Employee-2 at approximately 9:12 p.m. GMT / 4:12 p.m. ET on or about Friday, September 23, 2022, JE wrote the following to MGH Employee-2, in substance and in part:  "pls let me know if you need further information. We are redeeming and need to be done today.  Otherwise, it is meaningless."   At approximately 9:29 p.m. GMT / 4:29 p.m. ET, JE wrote to MGH Employee-2, in substance and in part:  "We could divide into 2 tranches," and then, "On a call with the lawyer now."   Approximately 30 minutes later, JE wrote to MGH Employee-2:  "Hi, pls hold until Mon." (*i.e.*, September 26, 2022).

38.    Based on my participation in this Investigation, training, experience, and review of documents and records, and in light of the nature and circumstances of JE's purported redemption requests, for the following reasons, among others, I believe that JE was attempting to move approximately $46 million in Investment Scheme Funds to bank accounts beyond the reach of U.S. law enforcement:

a.      Based on the timing of the attempted outgoing transfers—shortly after the Government's seizure of approximately $320 million in other JE-controlled accounts held at other banks—I believe that JE attempted to move the funds offshore in anticipation of potential future Government seizure of funds (such as the requested seizure of the Target Accounts).

b.      As described above, the transfers were requested from Target Accounts at Mercantile Bank to JE-controlled accounts at a bank in Abu Dhabi, UAE.  Based on my training

and experience, I am aware that UAE authorities are unlikely to provide timely responses to formal requests for information from U.S. authorities, and that UAE authorities are unlikely to enforce U.S. seizure warrants or forfeiture orders for funds held in the UAE.

c.    Based on my review of the nature and circumstances of the attempted transfers, including the repeated urgency regarding the timing of those transfers (*e.g.*, JE's repeated statements that the transfers would be "meaningless" if not completed quickly) as contrasted with the claim that the redemption was merely the "normal redemption of a client," as well as the fact that Hamilton did not initially disclose that JE was, in fact, the client (through his ownership of ACA Capital), I believe that Hamilton provided false or misleading information to Mercantile Bank for the purpose of convincing Mercantile Bank to release the approximately $46 million quickly.

*The Attempted Account Closing on October 7, 2022*

39.    Based on my review of written communications from G Club's attorneys to Mercantile Bank, I have learned that, following Hamilton's unsuccessful attempt to move approximately $46 million in Investment Fund Schemes out of Mercantile Bank, on or about October 7, 2022, G Club (through its attorneys) attempted to close **Target Account-1** (*i.e.*, the G Club Mercantile Bank account).  G Club did not provide instructions regarding where the account balance of approximately $12 million should be transferred once **Target Account-1** was closed.

<u>Pending Litigation Regarding the Prior Seizure Warrants</u>

40.    Based on my participation in this Investigation, training, experience, my review of records and documents, including court documents, and my conversations with representatives of the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.     On or about September 29, 2022, following the execution of the Prior Seizure Warrants, an external counsel for Major Lead International Ltd. (*i.e.*, the parent entity of the Himalaya Exchange), Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC ("Williams & Connolly") filed a letter under seal in the U.S. District Court for the Southern District of New York ("Letter-1"), requesting an "emergency pre-motion conference in advance of a forthcoming motion under Fed. R. Crim. Pro. 41(g) that will seek the immediate release of certain accounts and the return of funds seized from" certain accounts that were subject to the Prior Seizure Warrants.  Letter-1 included the following representations, among others:

i.     JE, the UBO of the Himalaya Exchange, "directly or indirectly holds Himalaya Dollars and Coins, but those holdings represent a minority of the issued currencies. . . . Most currency is owned by the other nearly 18,000 [Himalaya] Exchange customers."

ii.     The freezing of the Himalaya Exchange operating accounts at FV Bank "placed the Himalaya Exchange and associated customer holdings in serious jeopardy" and, "[w]hen [Himalaya] Exchange participants learn that they can *no longer readily redeem* their stable-coin Himalaya Dollars for cash, that almost certainly will lead to a massive, *artificial* devaluation of the market-traded Himalaya Coins." (emphasis added).

b.     On or about October 3, 2022, Williams & Connolly filed a motion for return of property under seal (the "Motion") on behalf of Major Lead International Ltd. ("the "Himalaya Group"), Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC (collectively, the "Movants").  22 Misc. 275 (VSB), Dkts. 8 through 8-18 (under seal).

c.   The Motion included the following representations, among others:

iii.     The Himalaya Group, through various subsidiaries, "owns and operates an innovative cryptocurrency exchange known as the Himalaya Exchange."

iv.     The Himalaya Exchange "has more than 18,000 customers and a market capitalization of $25 billion."

v.      The Himalaya Exchange "facilitates the buying and selling of two types of digital assets"—the Himalaya Dollar (or "HDO"), which the Movants described as "*a 'stable coin' token* that is fixed to the U.S. dollar and backed by reserves consisting of dollar-for-dollar cash or cash-equivalent assets"; and the Himalaya Coin (or "HCN"), which the Movants described as "a trading *cryptocurrency* valued by supply and demand." (emphasis added).

vi.     "Customers can participate in the [Himalaya] Exchange *by buying Himalaya Dollars*, using that *currency* to *buy and sell Himalaya Coin*, and ultimately redeeming Himalaya Dollars back into U.S. dollars." (emphasis added).

vii.    The Himalaya Exchange's "pioneering model" combines "pure cryptocurrency trading with 'stable coin' backed by traditional currency."

viii.   JE, the UBO of the Himalaya Exchange, "is also a customer of the [Himalaya] Exchange and owns a substantial amount of Himalaya Dollars and Himalaya Coin through other entities" and "will be negatively impacted" by the seizures, like other Himalaya Exchange customers.

ix.     JE "is prepared to consider reasonable restrictions on his ability to redeem Himalaya Dollars," to the extent the Government has concerns about the UBO's (*i.e.*, JE's) treatment of his substantial holdings.

x.      Two of the Himalaya Group's primary operating accounts at FV Bank are the "Clearing Account," which is used to process Himalaya Exchange customer deposits and redemption, and the "Reserve Account," which holds customer funds.

xi.     When a customer "purchases Himalaya Dollars," the customer's cash payment is deposited into the Clearing Account, and the customer receives "a credit" for an

equivalent number of Himalaya Dollars. Mot. at 3. Funds spent to "purchase[] Himalaya Dollars" are "often sent to the Reserve Account, where they back the Himalaya Dollars."

    xii.  The customer can use Himalaya Dollar "credits" to "buy and sell Himalaya Coins, the [Himalaya] Exchange's market-traded cryptocurrency."

    xiii.  When customers "seek to redeem their Himalaya Dollars back to hard currency," customer money in the "Reserve Account travels back to the Clearing Account to meet the redemption request."

    xiv.  The freezing of the FV Bank accounts—including the Clearing and Reserve Accounts—has resulted in the Himalaya Exchange's inability to process 142 pending customer redemption requests (as of the date the Motion was filed), despite the Himalaya Exchange having a "back-up processing bank, Mercantile Bank."

    xv.  The Himalaya Exchange's alleged inability to process redemption requests would "precipitate the loss of confidence" of customers, "resulting in billions of dollars in market losses."

The Himalaya Exchange Scheme

  41.  The Himalaya Exchange is marketed and described as a cryptocurrency[11] exchange. As detailed herein, however—and contrary to claims made in Letter-1 and the Motion, described above—the evidence demonstrates that the Himalaya Exchange does not appear to be a functional cryptocurrency exchange; that HDO does not appear to reside on the blockchain (contrary to representations by the Himalaya Exchange, *see infra* ¶ 46(f)); and that the "customers" or

---

[11] Based on my training and experience, I know that "cryptocurrency" describes digital currency in which transactions are verified, and records maintained, by a decentralized system using cryptography (generally referred to as the "blockchain"), rather than by a centralized authority such as a bank.

"members" of the Himalaya Exchange appear, in fact, to be investors in (and victims of) the interrelated Investment Schemes—including the Himalaya Exchange, as described more fully in the September 17 Affidavit. *See, e.g.*, Ex. A at ¶¶ 50-52, 54-55.

42.     Statements by the Himalaya Exchange and the Movants—including the Himalaya Dollar Whitepaper[12] ("HDO Whitepaper") and the Himalaya Coin Whitepaper[13] ("HCN Whitepaper," together, the "Whitepapers"), information posted on the Himalaya Exchange website, JE's publicly-reported statements, Letter-1, and the Motion—are inconsistent regarding, among other things: (a) what "Himalaya Dollars" and "Himalaya Coins" actually are; (b) the liquidity of Himalaya Dollars and Himalaya Coins; (c) how the purported "market price" of Himalaya Coin is determined; and (d) whether the purported Himalaya cryptocurrencies exist on the blockchain.

### *Himalaya Dollar and Himalaya Coin*

43.     Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.     The Himalaya Exchange markets itself as a cryptocurrency exchange, or "true crypto ecosystem."  In the Whitepapers, the "Himalaya Exchange" is defined as a "crypto asset exchange on which members can buy, sell and trade *their crypto assets*."  HDO Whitepaper

---

[12] Available for download at https://hch-hex-pub-lon-p5-compli-01.s3.eu-west-2.amazonaws.com/hedocs/hdo_whitepaper_eng_v6e.pdf (*last visited* October 12, 2022).

[13] Available for download at https://hch-hex-pub-lon-p5-compli-01.s3.eu-west-2.amazonaws.com/hedocs/hcn_whitepaper_eng_v7e.pdf (*last visited* October 12, 2022).

at 3 (emphasis added). An image from the Himalaya Exchange Website, viewable at https://himalaya.exchange, is shown below:



b.      Himalaya Dollar is described in the Motion papers and the HDO Whitepaper as a "'stable coin' token" or "a new stablecoin pegged to the U.S. Dollar." *See, e.g.,* HDO Whitepaper at 7. JE is reported to have described HDO as "the only *stable coin* in the world to maintain" a 1-to-1 stability with the U.S. dollar following the global stablecoin crash in or about May 2022. *See* Ex. A at 34 n.9 (emphasis added).

c.      Himalaya Coin is described in the Motion papers and the HCN Whitepaper as a "trading cryptocurrency valued by supply and demand," a "market-traded cryptocurrency," or the "official coin issued" by the Himalaya Exchange. *See, e.g.*, HCN Whitepaper at 4.

d.    Elsewhere, however, it is stated that the Himalaya Exchange operates not through the use of cryptocurrency, but rather through the use of "Credits," as reflected in the Structural Considerations portion of the HDO Whitepaper shown below:

**STRUCTURAL CONSIDERATIONS**

The operation of the Himalaya Exchange, the Himalaya Ecosystem and associated applications and infrastructure will be facilitated through the use of "Credits". Credits within the Himalaya Ecosystem will correspond to a particular type of crypto asset.

Members will initially be able to purchase Himalaya Dollar Credits from the Himalaya Exchange with U.S. Dollars and may purchase Credits corresponding to a particular type of crypto asset supported by the Himalaya Exchange by transferring corresponding crypto assets to the Himalaya Exchange wallet.

Credits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem, representing a right to participate in trading on the Himalaya Exchange and do not carry any right to require their exchange for fiat currency or crypto-assets. A member may make a request to the Himalaya Exchange to exchange Credits on their account and receive a transfer of corresponding crypto assets to their external wallet address.

Additionally, a Member may make a request to the Himalaya Exchange to accept a transfer of Himalaya Dollar Credits in exchange for an equivalent payment in U.S. Dollars to be paid to the bank account of the Member. However, such exchanges are at the discretion of the Himalaya Exchange, and the Himalaya Exchange is not obliged to fulfil any such requests. References in this document to HCN (the Himalaya Coin, a new coin issued by Himalaya International Financial Group, "HCN" or "Himalaya Coin"), HDO or any other type of asset on an account at the Himalaya Exchange or through the Himalaya Pay App are references to Credits corresponding to that asset.

*See* HDO Whitepaper at 10 (emphasis added); HCN Whitepaper at 11; *see also* Ex. A at ¶ 44(d). That is, as reflected in the language above, the Himalaya Exchange operates through the use of "credits" (not cryptocurrency), and those credits (a) can only be used within the Himalaya Ecosystem, and (b) do not carry any right to require their exchange for fiat currency or crypto-assets.  Moreover, while a Himalaya Exchange member may request to exchange that member's HDO credits for an equivalent payment in U.S. dollars, the Himalaya Exchange has the "discretion" to deny any such request.

e.    The January 2022 version of the HDO Whitepaper contains approximately 135 references to "credits."  *See generally* HDO Whitepaper.  By contrast, the HDO Whitepaper contains only six references to "stablecoin" or "stablecoins."  *See id.*

f.      The January 2022 version of the HCN Whitepaper contains approximately 131 references to "credits."  *See generally* HCN Whitepaper.  By contrast, the HCN Whitepaper contains only 15 references to "token" or "tokens."  *See id.*

g.      Images  from  the  Himalaya  Exchange  Website,  viewable  at https://himalaya.exchange, are shown below:



The above descriptions of Himalaya Dollar and Himalaya Coin on the Himalaya Exchange Website make no mention of "credits."

h.      I submit that the foregoing establishes that, contrary to claims that HDO and HCN are cryptocurrencies, HDO and HCN are not in fact cryptocurrencies.  Rather, individuals who purportedly "buy" HDO and use their HDO to "buy" HCN have simply sent money to bank accounts controlled by JE and others in exchange for what are described as "credits."

***Valuation of Himalaya Coin***

44.    Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.    The Movants have represented that Himalaya Coin is "valued by supply and demand."

b.    In a declaration submitted by Ehsan Masud, the CFO of Hamilton, in support of the Motion, Masud represented that the market capitalization of HCN exceeded $25 billion as of October 2, 2022.

c.    The purported historical price of HCN is reflected in data on the Himalaya Exchange Website. *See, e.g.*, Ex. A at ¶¶ 44(c), 45(d).

d.    Contrary to representations that the price of HCN is determined by market supply and demand, the HCN Whitepaper states the following regarding Subsequent Issuances (*i.e.*, issuances of HCN after the initial coin offering, or ICO), in substance and in part:

> To preserve the value of HCN already in circulation and corresponding Credits at the time of a Subsequent Issuance, the issue price of each future issuance will be determined as follows:
>
> a. The issue price for each future issuance (the "Issue Price") will be calculated in U.S. Dollars based on the weighted average price paid per HCN Credit in respect of all HCN Credit trades settled on the Himalaya Exchange in the immediately preceding 30 days prior to the date on which an announcement of a further issuance of HCN is made (the "Weighted Average Price"). The U.S. Dollar price of each trade used to calculate the Weighted Average Price will be calculated based on the spot price for exchange of the Credit type traded for the HCN Credits to HDO Credits on the Himalaya Exchange at or around the time at which the relevant trade was executed with the value of each HDO Credit being deemed to be 1 U.S. Dollar.
>
> b. The Issue Price per HCN Credit will be set by the Issuer, subject to paragraph (c) below, and must not be greater than 115 percent of the Weighted Average Price or less than 85 percent of the Weighted Average Price.
>
> c. Notwithstanding paragraph (b) above, where the Issuer determines, in its sole and absolute discretion, that an Issue Price could not practicably be calculated in accordance with the foregoing or the Issue Price so calculated does not constitute a fair market price, it shall be entitled to make such adjustments in the calculation of the Issue Price as it deems necessary in order to achieve an Issue Price which it deems to be a fair market price. In making such a determination, the Issuer may consider all information which it deems relevant including, without limitation, the occurrence of a significant trade or series of trades where the price paid per HCN Credit was substantially different than the price paid in respect of other trades used to calculate the Weighted Average Price.
>
> Members should note that the value of HCN Credits is independent from the value of any other assets, including HCN tokens.

HCN Whitepaper at 16. That is, as reflected in the language above, the Issuer has "sole and absolute discretion" to decide that the Issue Price, as calculated by the methodology described above, "does not constitute a fair market price," in which case the Issuer is "entitled to make such adjustments in the calculation of the Issue Price as it deems necessary in order to achieve an Issue Price which it deems to be a fair market price." *Id.* (emphasis added).

      e. The HCN Whitepaper also states the following: "Members should note that the value of HCN Credits is independent from the value of any other assets, including HCN tokens." *Id.*

      f. Based on my participation in this Investigation, training, experience, I submit that the foregoing reflects that—contrary to representations that the price of "HCN" (and therefore the value of HCN Credits) is determined by market supply and demand—the Himalaya

Exchange has absolute discretion to set a "price" for the issuance of future HCN without any regard for the purported market value of any purportedly issued HCN.

### *Liquidity of Himalaya Assets*

45.     Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.     The Movants have made certain statements regarding the liquidity of the Himalaya Dollar.  For example, Masud represented that Himalaya Dollar can be redeemed back to fiat US dollar "at any time."  *See also supra* at ¶ 40(a)(ii).

b.     By contrast, as described above, the HDO Whitepaper states that a Himalaya Exchange member's request to exchange Himalaya Dollar Credits into U.S. Dollars is "at the discretion of the Himalaya Exchange."  *See supra* at ¶ 43(d).

c.     The HDO Whitepaper further states, in substance and in part:  "While it is intended that the Himalaya Exchange should provide good levels of liquidity, the maintenance of the Reserve is intended to provide an additional layer of potential liquidity as a barrier to unexpected market events.  It provides the Issuer [*i.e.*, Himalaya Financial] with the discretionary ability to take action to support liquidity where it deems necessary."  HDO Whitepaper at 12.  And:  "The Issuer is not obliged to provide liquidity support and the Himalaya Exchange is not obliged to agree to any request from a Member to exchange HDO Credits for U.S. Dollars and such actions are at the sole discretion of the Issuer and the Himalaya Exchange respectively. Members do not have any direct or indirect claim on the Issuer or the Reserve."  *Id.*

d.     In his declaration in support of the Motion, Masud has also made certain statements regarding the liquidity of Himalaya Coin, including, among others, that "[a]ll HCN are

held by customers of the Exchange," and that "[c]ustomers use HDO to purchase HCN and customers sell HCN to obtain HDO, which can be redeemed back to fiat US dollar."

   e. By contrast, the HCN Whitepaper states the following, in substance and in part:

> Members are advised that neither crypto assets or fiat currency may be held by Members within the Himalaya Ecosystem, and the Himalaya Ecosystem does not provide . . . any type of custody or other arrangements to facilitate this. The Himalaya Exchange intends to hold in its *own name* and for its *own account*, crypto assets which it *may elect* to use at the request of a Member to complete an exchange of a Member's Credits for corresponding crypto assets. . . . where such request from a Member is approved by the Himalaya Exchange.

HCN Whitepaper at 11 (emphasis added).

   f. Despite representations by the Movants about the purported liquidity of HDO and HCN, evidence gathered during this Investigation (including the language from the Whitepapers cited above) demonstrates that Himalaya Exchange customers' ability to convert Himalaya Assets into fiat currency is limited and lies within the sole discretion of the Himalaya Exchange. Based on my review of bank records and subpoena returns, I have learned that some Himalaya Exchange customers have purportedly executed successful "redemptions" (*i.e.*, received back fiat currency from bank accounts controlled by Hamilton and/or Himalaya entities). However, based on my participation in this Investigation, training, and experience, it appears that the Himalaya Exchange granted certain purported "redemption" requests and returned Investments Scheme Funds to certain members' bank accounts in an effort to perpetuate the fraud; that is, to create the appearance that Himalaya Exchange cryptocurrencies are liquid.

### *Analysis of the Blockchain*

   46. Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial

analysts at the FBI and SEC, open-source research that I have conducted on the Internet, and my conversations with others, I have learned the following, among other things:

a.    The Movants have represented that "the Himalaya Dollar is backed by reserves consisting of dollar-for-dollar cash or cash-equivalent assets."

b.    The Movants stated that an outside accountant "[p]eriodically . . . examines the books and records of the Exchange and provides reports confirming this dollar for dollar backing."  In connection with the Motion, the Movants submitted an Independent Accountant's Report, dated August 10, 2022 (the "Accountant's Report"), prepared by a particular accounting firm headquartered in California (the "Accounting Firm").[14]  The Accountant's Report is attached hereto as Exhibit D.

c.    The Accountant's Report indicates that Himalaya Dollars "are cryptographic digital tokens residing on the Ethereum blockchain at the smart contract address [0x7C197afcd8D36884309ed731424985E3ed17F018]" (the "Blockchain Address"), and further references "collateralized HDO Credits, which are HDO-denominated liabilities issued and purchased for dollars on Himalaya Ecosystem Platforms."  Ex. D. at 1.

d.    The Himalaya Dollar Bank & Funds Holding Report, which is a report that was provided by the Himalaya International Reserve to the Accounting Firm, states, among other things, that approximately 401,047,298.15 HDO Tokens "have been minted on the Ethereum

_____

[14] As reflected in Exhibit D, the Accountant's Report is approximately one page long, with an attachment of the Himalaya Dollar Bank & Funds Holding Report, which is signed by Himalaya International Reserve CEO Jesse Brown on or about August 10, 2022.  *See* Ex. D.  On or about October 10, 2022, the FBI received a voluminous subpoena response from the Accounting Firm consisting of, among other things, what appears to be documentation supporting the Accountant's Report.  The FBI's review of that subpoena response is ongoing.

blockchain at the smart contract address" (*i.e.*, the Blockchain Address) as of on or about July 31, 2022.  *See* Ex. D at 2 n.1.

e.      Based on my conversations with others, including a member of the FBI's virtual currency response team, I have learned the following, in substance and in part:

i.      Neither the Whitepapers nor the Himalaya Exchange Website provide the smart contract address[15] for the Himalaya cryptocurrencies.  Without a smart contract address, it is difficult for potential or current investors to conduct due diligence regarding the Himalaya cryptocurrencies.

ii.      Based on the FBI's review of the Blockchain Address (*i.e.* that Movants provided to the Government in the Accountant's Report (which does not appear to be publicly available) on an open-source block explorer (the "Explorer"), it appears that the Blockchain Address first appeared on the Ethereum blockchain on or about March 16, 2021.  As described in the September 17 Affidavit, the Himalaya Exchange has been operating (pre-ICO) since in or about April 2021.  *See* Ex. A at ¶ 18(c).

f.      Based on the FBI's review of the Blockchain Address on the Explorer, it appears that the Blockchain Address is affiliated with HDO.  It further appears that there are there approximately 24 holders of HDO; that approximately 70 transactions appear on the Blockchain Address between on or about March 16, 2021 and on or about October 14, 2022; and that market capitalization is not tracked within the Explorer for HDO.[16]

---

[15] Based on my training and experience and my conversations with others, I am aware that a contract address hosts a smart contract, which is a set of code stored on a blockchain that runs when predetermined conditions are met.  I am further aware that a contract address could be responsible for deploying a particular cryptocurrency (*e.g.*, a token or coin) on a blockchain.

[16] By comparison, and as an example, I and others searched the smart contract address of a stablecoin called "Gemini Dollar" (the "Gemini Blockchain Address") on the Explorer.  *See*

g.    Based on the foregoing, I submit that (i) the purported Himalaya Exchange "cryptocurrency" HDO does not, in fact, appear to reside within the Blockchain Address, and (ii) "HDO Tokens" have not, in fact, been minted on the Blockchain Address, contrary to the Himalaya Dollar Bank & Funds Holding Report.  *See* Ex. D at 2 n.1.

47.    As described above, the Himalaya Exchange is marketed to investors as a cryptocurrency exchange where individuals can hold and trade cryptocurrency assets, including stablecoin and trading coins.  In fact, as detailed above, the evidence demonstrates that members of the Himalaya Exchange do not hold, own, or control cryptocurrency or digital assets.  Rather, Himalaya Exchange members who send money to bank accounts controlled by JE and others (including the **Target Accounts**) receive "credits," which purportedly give them an option to buy cryptocurrency (in the form of HDO stablecoins or HCN trading coins).  While members may believe they have effectively exercised that option and are in possession of cryptocurrency or digital assets, the Himalaya Exchange is a closed cryptocurrency platform, and members (like the public) do not have transparency into the purported market for HDO or HCN, beyond the data that is reflected on the Himalaya Exchange Website.  Moreover, it is the Himalaya Exchange (and not members) that holds the money that members have paid for the purpose of "buying" HDO (*i.e.*, Investment Scheme Funds), and the Himalaya Exchange holds those funds "in its own name and for its own account."  *See supra* at ¶ 45(e).

---

https://gemini.com/dollar (*last visited* October 13, 2022).  Based on that search, I am aware that that that there are approximately 9,927 holders of Gemini Dollar; that approximately 520,188 transactions were recorded on the Gemini Blockchain Address between its ICO in or about February 2022 and approximately 9:17 p.m. on or about October 13, 2022; and that Gemini Dollar has a current market capitalization of approximately $329 million.

**B. Tracing of Fraudulent Proceeds to the Target Accounts**

48.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

>   a.     Investors participate in the Investment Schemes by either wiring money directly to a bank account controlled or used by entities affiliated with GUO, JE, and others (including the Farms, G Club, or the Himalaya Exchange), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects, which funds are then transmitted to bank accounts ultimately controlled by JE and other Target Subjects.  *See* Ex. A at ¶ 57(a).

>   b.     To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.6 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

49.     As described in the September 17 Affidavit, prospective Investment Scheme investors were instructed to send funds intended as an investment in GTV, G Club, or the Himalaya Exchange (for example) to certain bank accounts.  *See, e.g.*, Ex. A at ¶¶ 40(g), 57, 61-62.

>   a.     Those Investment Scheme Funds were transferred into and among more than at least 80 bank accounts being used by JE and others in ways that, based on my training and experience, are indicative of money laundering.  *See* Ex. A at ¶ 55.

>   b.     Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas (including the UAE and the Bahamas) in high risk jurisdictions that are frequent havens

for money laundering; (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; (c) investments in real estate or other business interests that have no apparent connection with the stated purposes of the businesses controlling the bank accounts; and (d) the transfer of Investment Scheme Funds between multiple banks, as well as among multiple accounts within the same bank, in a single day. *See* Ex. A at ¶¶ 56-57.

<u>Fraud Proceeds are Layered Through Various Banking Institutions</u>

50.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    Approximately $60 million of Investment Scheme Funds (including, in particular, funds raised through the GTV Stock Offering and the Convertible Loan Offering) were transferred into the Crane MSSB Accounts between in or about May 2021 and June 2021, after being layered through a series of entities at various different banks in a manner that, based on my training and experience, is indicative of money laundering. *See* Ex. A at ¶¶ 58(a), 61-62.

b.    The approximately $60 million in Investment Scheme Funds from the Crane MSSB Accounts was combined with approximately $49 million in other Investment Scheme Funds that had been transferred into the Crane MSSB Accounts from two Crane accounts at a different bank, Capital One (together, the "Crane Capital One Accounts"), raising the total combined balance in the Crane MSSB Accounts to approximately $109 million.   Ex. A at ¶ 58(a)(iii).

c.    Approximately $79 million of those approximately $109 million in Investment Scheme Funds in the Crane MSSB Accounts were then transferred to accounts at the same bank (*i.e.*, MSSB), but in the name of G Club (*i.e.*, the G Club MSSB Accounts). The approximately $79 million was combined with approximately $79.7 million in other Investment Scheme Funds that had been transferred into the G Club MSSB Accounts from individual G Club Investors and from G Club bank accounts at Signature Bank, First Bank of Puerto Rico, and City National Bank, raising the total combined balance of Investment Scheme Funds in the G Club MSSB Accounts to more than approximately $158 million.

<u>Fraud Proceeds are Transferred to the Target Accounts at Mercantile Bank</u>

51.    Investment Scheme Funds have been traced into and among the Target Accounts in ways that, based on my training and experience, are indicative of money laundering. Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas in high-risk jurisdictions that are frequent havens for money laundering (including the Bahamas, Hong Kong, the Cayman Islands, and the British Virgin Islands); (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; and (c) the transfer of Investment Scheme Funds among the Target Accounts in a single day.

52.    Based on my review of information provided by MGH, I have learned that the **Target Accounts** held a combined total of approximately $305,196,589.12 as of on or about October 6, 2022, as reflected in the table below (the "Account Balances Table"):

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-1 | MBI10103-0000 | $12,887,977.68 |
| Target Account-2 | MBI10133-0000 | $10,312,965.97 |

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-3 | MBI10137-0000 | $3,196,001.32 |
| Target Account-4 | MBI10138-0000 | $277,000,000.00 |
| Target Account-5 | MBI10139-0000 | $356,460.30 |
| Target Account-6 | MBI10171-0000 | $1,211,105.79 |
| Target Account-7 | MBI10172-0000 | $52,078.06 |
| Target Account-8 | MBI10183-0000 | $180,000.00 |
| **Total** | | **$305,196,589.12** |

53.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, my review of court filings and evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

### *Target Account-1*

a.     On or about May 5, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of G Club Operations LLC (the "Target Account-1 Application").  The Target Account-1 Application described G Club's business as, in substance and in part, "holding the securities of (or other equity interests in) companies and enterprises."

b.     Alex Hadjicharalambous ("Hadjicharalambous"), the Financial Controller for G Club, is an authorized signer on **Target Account-1**.  *See* Ex. A at ¶ 41(a).

c.     As shown in the Account Balances Table above, **Target Account-1** had an account balance of $12,887,977.68 as of October 6, 2022.

d.     Investment Scheme Funds have been traced into **Target Account-1**; for example:

i.      The initial deposit of funds into **Target Account-1** consisted of an approximately $4 million transfer of Investment Scheme Funds from a G Club account held at Medici Bank.

ii.      Between on or about August 23, 2021 and November 19, 2021, approximately $74 million of the aforementioned Investment Scheme Funds was transferred from the G Club MSSB Accounts to **Target Account-1**.

iii.      On or about December 24, 2021, approximately $10 million of the Investment Scheme Funds was transferred from a Silvergate bank account ending in -7739, held in the name of Hamilton Opportunity Fund SPC (identified as "Target Account-1" in the September 17 Affidavit, *see* Ex. A) to **Target Account-1**.

### *Target Account-2*

e.      On or about November 11, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya International Clearing Ltd. (the "Target Account-2 Application").  The Target Account-2 Application reflected that Himalaya Clearing did <u>not</u> plan to engage in digital currency activity.

f.      JE is an authorized signer on **Target Account-2** and is listed as the ultimate beneficial owner and 100% shareholder of Himalaya International Clearing Ltd.

g.      As shown in the Account Balances Table above, **Target Account-2** had an account balance of $10,312,965.97 as of October 6, 2022.

h.      Investment Scheme Funds have been traced into **Target Account-2**; for example:

i.      Between on or about November 29, 2021 and December 6, 2021, approximately $100 million of the Investment Scheme Funds was transferred from bank accounts

at Metropolitan Commercial Bank and Reserve Trust into **Target Account-2**. *See* September 17 Affidavit at ¶¶ 56(b)(i), 59(g)(iii)(3).

        ii.      On or about December 2, 2021, approximately $50 million of the aforementioned Investment Scheme Funds was transferred from **Target Account-1** into **Target Account-2**.

### *Target Account-3*

        i.      On or about December 6, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Hamilton Capital Holdings Ltd. (the "Target Account-3 Application"). The Target Account-3 Application described Hamilton Capital Holdings Ltd.'s business as, in substance and in part, "[c]onsultancy services company offering back office support." The Target Account-3 Application described the source of assets used to fund **Target Account-3** as "loan proceed(s)."

        j.      JE is an authorized signer on **Target Account-3** and is listed as the ultimate beneficial owner and 100% shareholder of Hamilton Capital Holding Ltd.

        k.      As shown in the Account Balances Table above, **Target Account-3** had an account balance of $3,196,001.32 as of October 6, 2022.

        l.      Investment Scheme Funds have been traced into **Target Account-3** via internal Mercantile Bank transfers from **Target Account-2** and **Target Account-6**. Specifically:

        i.      Between approximately on or about December 7, 2021 and August 5, 2022, approximately $42 million in Investment Scheme Funds was transferred from **Target Account-2** into **Target Account-3**.

        ii.      Between approximately on or about August 10, 2022 and September 16, 2022, approximately $8 million in Investment Scheme Funds was transferred from **Target Account-6** into **Target Account-3**.

### *Target Account-4*

  m.  On or about December 2, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya International Reserves Ltd. (the "Target Account-4 Application"). The Target Account-4 Application described the nature of Himalaya International Reserves Ltd.'s business as "investment management." While the application information relates to "Himalaya International Reserves Ltd.," in the Acknowledgment section of the application, the legal entity name was (apparently inaccurately) entered as Himalaya *Investment* Reserves Ltd.

  n.  JE is an authorized signer on **Target Account-4** and is listed as the CEO, ultimate beneficial owner, and 100% shareholder of Himalaya International Reserves Ltd.

  o.  Based on my review of email communications, dated between on or about February 17, 2022 and March 3, 2022, among Mercantile Bank's Deputy Chief Compliance Officer ("MB Employee-1") and Hamilton's General Counsel, Georgette Adonis-Roberts, relating to the opening of certain of the Target Accounts, I have learned that Hamilton made the following representations to Mercantile Bank, among others:

    i.  Himalaya Reserves is "the Himalaya Dollar Issuer."

    ii.  Himalaya Reserves has "[n]o direct customers."

    iii.  The stated purpose of **Target Account-4** is "[t]o maintain the reserves of the proceeds of the Himalaya Dollar."

    iv.  The anticipated **Target Account-4** activity would consist of "hold[ing] the proceeds of Himalaya Dollar redemptions."

    v.  As shown in the Account Balances Table above, **Target Account-4** had an account balance of $277,000,000.00 as of October 6, 2022.

p.    Investment Scheme Funds have been traced into **Target Account-4**; for example:

i.    Between on or about March 25, 2022 and on or about August 5, 2022, approximately $115 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Clearing (identified as "Target Account-4" in the September 20 Affidavit, *see* Ex. C) into **Target Account-4**.

ii.    On or about May 16, 2022, an additional approximately $150 million in Investment Scheme Funds was transferred from **Target Account-2** (*i.e.*, Himalaya Clearing) into **Target Account-4**.

iii.    On or about June 27, 2022, an additional approximately $10 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Reserves (identified as "Target Account-3" in the September 20 Affidavit, *see* Ex. C) into **Target Account-4**. While the Mercantile Bank records reflect that the transfer originated at FV Bank, the originator bank account number is listed as "*6891," which I understand to refer to the pooled MCB account held FBO FV Bank. *See* Ex. A at ¶¶ 2(k), 62(e); *see also* Ex. C at ¶ 18(b).

### *Target Account-5*

q.    On or about December 2, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya Financial Group Ltd. (the "Target Account-5 Application"). The Target Account-5 Application described the nature of Himalaya Financial's business as "managing investments."

r.    Based on my review of email communications, dated between on or about February 17, 2022 and March 3, 2022, among MB Employee-1 and Hamilton employees (including CFO Ehsan Masud and General Counsel Georgette Adonis-Roberts) relating to the

opening of certain of the Target Accounts, I have learned that Hamilton employees made the following representations to Mercantile Bank, among others:

  i.  Himalaya Financial is the "Himalaya Coin Issuer."

  ii.  Himalaya Financial "does not have direct customers as the coins are listed on the Himalaya Exchange as a broker."

  iii.  The anticipated **Target Account-5** activity would consist of "transactions from HICL [*i.e.*, Himalaya Clearing] to realize profits and payments for investments."

  s.  JE is an authorized signer on **Target Account-5** and is listed as the CEO, ultimate beneficial owner, and 100% shareholder of Himalaya Financial Group Ltd.

  t.  As shown in the Account Balances Table above, **Target Account-5** had an account balance of $356,460.30 as of October 6, 2022.

  u.  Investment Scheme Funds have been traced into **Target Account-5**; for example:

  i.  On or about March 25, 2022, approximately $10 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Clearing (identified as "Target Account-4" in the September 20 Affidavit, *see* Ex. C) into **Target Account-5**.

  ii.  On or about March 30, 2022, an additional approximately $10 million in Investment Scheme Funds was transferred from the same FV Bank account into **Target Account-5**.

  iii.  On or about April 15, 2022, approximately $20 million in Investment Scheme Funds was transferred from **Target Account-2** (*i.e.*, the Mercantile Bank Himalaya Clearing account) into **Target Account-5**.

*Target Account-6*

v.      On or about April 19, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of Hamilton Investment Management Limited (the "Target Account-6 Application").  The Target Account-6 Application described the nature of Hamilton Investment Management Limited's business as "consulting" and described the source of assets used to fund **Target Account-6** as "loan proceed(s)."

w.      JE is an authorized signer on **Target Account-6** and is listed as the President, ultimate beneficial owner, and 100% shareholder of Hamilton Investment Management Limited.

x.      Based on my review of email communications, dated on or about April 22, 2022, among MB Employee-1 and Gentjana Hysi, the CFO of Hamilton Investment Management Limited (the "Hamilton CFO") relating to the opening of **Target Account-6**, I have learned the following, in substance and in part:

i.      MB Employee-1 identified inconsistencies between the stated nature of Hamilton Investment Management Limited's business as provided in the Target Account-6 Application ("Professional Organization offering Consulting Services"), and the stated nature of Hamilton's business as reflected in: (a) the UK Government's registrar of companies ("Financial Intermediation"); and (b) the company's website ("investment management platform specializing in Private Equity and Digital Asset Management.").  In response, the Hamilton CFO wrote the following:

> Totally understand your confusion, the website that you see relates to Hamilton Investment Management Limited (B.V.I.) not the UK entity. To answer your question, HIM Limited (UK) is not regulated and does not handle customer funds, only provides consulting services to third parties and some of its affiliated companies.  Our IT team is working to resolve the website issue and confusion. Once completed we'll share with you the link.

ii.    MB Employee-1 requested loan documentation relating to the "loan proceed" source of funds for **Target Account-6**.  In response, the Hamilton CFO emailed MB Employee-1 a loan agreement (the "HIML Loan Agreement") and wrote, in substance and in part: "HIML has provided a loan facility to one of its affiliates . . . and is expected the borrower will make regular payments to reduce the loan balance."

y.    Based on my participation in this Investigation and my review of documents and records, including the HIML Loan Agreement, I am aware of the following, among other things:

i.    The HIML Loan Agreement is dated July 7, 2020.

ii.    Hamilton Investment Management Limited is listed as the "Lender," and Hamilton Capital Holding Ltd. is listed as the "Borrower."

iii.    The registered office address listed for both Lender and Borrower is the same address in London, England.

iv.    Pursuant to the terms of the HIML Loan Agreement, the Lender agreed to lend the Borrower up to approximately $25 million to apply "towards the costs incurred . . . whilst identifying and advising on potential corporate investment opportunities globally for the Lender" and to cover "operating, fixed and recurring costs."

v.    JE signed the HIML Loan Agreement on behalf of Hamilton Capital Holding Ltd. (*i.e.*, the Borrower).

z.    As described above, JE is the 100% owner of both Hamilton Capital Holding Ltd. (*see supra* at ¶ 52(h)) and Hamilton Investment Management Limited. *See supra* at ¶ 52(s).

aa.    As shown in the Account Balances Table above, **Target Account-6** had an account balance of $1,211,105.79 as of October 6, 2022.

bb.    Investment Scheme Funds have been traced into **Target Account-6**; for example:

i.    On or about July 13, 2022, approximately $8 million of Investment Scheme Funds was transferred from **Target Account-3** (*i.e.*, the Hamilton Capital Holding account) into **Target Account-6**.  The description of the transfer was "HCH Loan Repayment."

ii.    On or about August 10, 2022, approximately $4 million of Investment Fraud Funds was transferred from **Target Account-6** back into **Target Account-3** (*i.e.*, the Hamilton Capital Holding account).  The description of the transfer was: "HIM will loan/transfer $4M to HCH account."

iii.    On or about September 16, 2022, an additional approximately $4 million of Investment Scheme Funds was transferred from **Target Account-6** back into **Target Account-3** (*i.e.*, the Hamilton Capital Holding account).  The description of the transfer was: "Loan facility."

cc.    Based on my participation in this Investigation and my training and experience, and as described above, I believe the transfer of $8 million into **Target Account-6** (which is a JE-controlled account) from **Target Account-3** (which is a JE-controlled account) as a purported loan repayment, and the subsequent transfer of $8 million from **Target Account-6** back into **Target Account-3** as a purported loan, reflects the laundering of funds through the use of layering of Investment Scheme Funds in a manner consistent with concealment of the nature, source, or origin of the funds.

### *Target Account-7*

dd.    On or about April 27, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of G Fashion International Limited (the "Target Account-7 Application").  The Target Account-7 Application described the nature of G

Fashion International Limited's business as "Equity Holding Company." The stated purpose of **Target Account-7** was "[c]urrent relationship with other affiliates." The company email address provided in the Target Account-7 Application for the General Counsel of G Fashion (the "G Fashion GC") was a particular "@hchktech.com" email address. *See* Ex. A at ¶¶ 41, 59(f).

ee.      Based on my review of email communications, dated between on or about April 7, 2022 and June 8, 2022, among MB Employee-1, MGH Employee-2, the G Fashion GC, and Hadjicharalambous, among others, relating to the opening of **Target Account-7**, I have learned the following, in substance and in part:

i.      Hadjicharalambous (who is listed as the Financial Controller of G Club, *see supra* at ¶ 52(b)) introduced MGH Employee-2 to the G Fashion GC by email on or about April 7, 2022, and asked for MGH Employee-2's assistance in "fast track[ing]" the opening of an account for "G FASHION INTERNATIONAL LIMITED, a BVI entity." In the email, Hadjicharalambous stated, in substance and in part, that G Fashion "need[s] an account opened ASAP."

ii.      In an email to MB Employee-1, the G Fashion GC described G Fashion as "a high-end fashion company established in 2021 which solely operates through its e-commerce website. The company is headquartered in NYC and has clients all over the world. Further, the company's products are exclusively manufactured in Italy due to the high-end and pristine reputation of Italian manufacturers in the fashion industry. The company's vision is to become a high-end fashion brand and compete head-to-head with the biggest in the industry."

iii.      On or about May 5, 2022, Hadjicharalambous emailed MGH Employee-2 and MB Employee-1, among others, to advise that Hadjicharalambous would "be handling the account moving forward from a financial perspective very similarly to how I manage the GCLUB BVI account."

iv.      As shown in the Account Balances Table above, **Target Account-7** had an account balance of $52,078.06 as of October 6, 2022.

ff.      Investment Scheme Funds have been traced into **Target Account 7** via four internal Mercantile Bank transfers from **Target Account-2** (*i.e.*, the Himalaya Clearing account), totaling approximately $3.35 million between on or about May 5, 2022 and August 19, 2022.  The descriptions for two of the four incoming transfers reference, in substance and in part, "HDO Redemption."

### *Target Account-8*

gg.      On or about August 30, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya Currency Clearing Pty Ltd (the "Target Account-8 Application").  The Target Account-8 Application described the nature of Himalaya Currency Clearing Pty Ltd's business as "Outsourced Customer Service Center and Compliance Consulting."  The stated purpose of opening **Target Account-8** was as follows:  "We would like to receive service fees from our clients in USD and then send them in AUD to our Australian bank account.  Unfortunately, our Australian bank does not provide FX conversion and can only receive AUD."

hh.      JE is listed as the ultimate beneficial owner and 100% shareholder (via his wholly-owned entity, Major Lead International Ltd.) of Himalaya Currency Clearing Pty Ltd.

ii.      Based on my review of email communications, dated between on or about August 8, 2022 and August 31, 2022, among MB Employee-1, MGH Employee-2, and Masud (*i.e.*, Hamilton's CFO), among others, relating to the opening of **Target Account-8**, I have learned the following, in substance and in part:

i.      On or about August 24, 2022, Masud sent an email to MB Employee-1, MGH Employee-2, and others with information about an entity called Himalaya

Currency Clearing, which Masud described, in substance and in part, as "an important entity within the Group, as it is one of the few which holds regulatory licenses." In the email, Masud requested that Mercantile Bank set up a bank account for Himalaya Currency Clearing "ASAP please."

        ii.      In subsequent email communications on or about August 29, 2022, Heeseup Shin, Hamilton's Head of Legal and Compliance, Australia ("Shin"), advised MB Employee-1 and others, in substance and in part, that "William Je is the ultimate beneficiary/ individual shareholder (100%) of Himalaya Currency Clearing Pty Ltd (Australia)."

        iii.     As shown in the Account Balances Table above, **Target Account-8** had an account balance of $180,000.00 as of October 6, 2022.

        jj.     Investment Scheme Funds have been traced into **Target Account-8** via an internal Mercantile Bank transfer from **Target Account-2** (*i.e.*, the Himalaya Clearing account), on or about September 13, 2022, totaling approximately $180,000.

### III. Request for Non-Disclosure and Sealing

54.    The nature and scope of this ongoing criminal investigation—including the identities of Target Subjects of the Investigation—is not publicly known. As described herein, the affidavits supporting the Prior Seizure Warrants were filed under seal and remain under seal. Premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, as set forth above, the targets of this investigation appear to have the financial means that would facilitate their flight from prosecution, and have traveled internationally in the past to jurisdictions where extradition to the United States for purposes of prosecution is unlikely or impossible.

55.     For these reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**IV.Conclusion**

56.     Based on the information set forth in the September 17 Affidavit, the G Fashion Affidavit, the September 20 Affidavit, and the foregoing, I submit that there is probable cause to believe that funds held in the Target Property are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and, and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

57.     Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.

ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
_____ day of October, 2022

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK