# Exhibit H

Original

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 23 MAG 2096

UNITED STATES OF AMERICA

-v.-

Green Carbon Bugatti Chiron Super Sport, VIN
VF9SW3V3XNM795047 ("Target Vehicle-1");

2021 Red Lamborghini Aventador SVJ Roads,
VIN ZHWUN6ZD2MLA10393 ("Target
Vehicle-2");

2021 Infinity Black Rolls Royce Phantom EWB,
VIN SCATT8C08MU206445 ("Target Vehicle-
3") (collectively, the "Target Property");

Defendants-in-rem.

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. § 981**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Zachary Effting, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I. Introduction

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or

"Investigating Agency").  I have been a Special Agent with the FBI since in or about February

2020.  Since in or about October 2020, I have been assigned to the FBI's Complex Financial

Crimes squad.  During my time with the FBI, I have participated in investigations of securities and

wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted

or participated in debriefings of witnesses, reviews of financial records, and the execution of search

warrants.  In particular, I have participated in the execution of search warrants involving physical

premises, property used in connection with crime, electronic devices, and other electronic

evidence.

2.     This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. § 981, to seize the following property:

a.     Green Carbon Bugatti Chiron Super Sport, Vehicle Identification Number ("VIN") VF9SW3V3XNM795047 ("Target Vehicle-1");

b.     2021 Red Lamborghini Aventador SVJ Roads, VIN ZHWUN6ZD2MLA10393 ("Target Vehicle-2"); and

c.     2021 Infinity Black Rolls Royce Phantom EWB, VIN SCATT8C08MU206445 ("Target Vehicle-3") (collectively, the "Target Property").

3.     The Target Property was purchased with the proceeds of, and property involved in, violations of 18 U.S.C. §§ 1349 (conspiracy to commit wire fraud); 1343 (wire fraud); 1956 (money laundering and conspiracy to commit money laundering); 1957 (unlawful monetary transactions); 371 (conspiracy to commit wire, bank and securities fraud and money laundering); and 2 (aiding and abetting) (together, the "Target Offenses"), as described below.

4.     This affidavit is based on, among other sources of information: (i) my review of documents and other evidence; (ii) my conversations with other law enforcement personnel and review of law enforcement reports, including reports of surveillance; (iii) my review of publicly available information, including digital videos posted on the Internet and other open source research conducted on the Internet; (iv) my participation and the participation of other law enforcement officers in various witness interviews; (v) my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, including emails, cellphone location data, and cellphone toll records; (vi) my review and analysis of various bank account records; and (vii) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures,

2

and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth below, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1957, and 1956(h); and/or the proceeds of violations of 18 U.S.C. §§ 1343, 1349, 371, or property traceable thereto. In summary, the evidence reveals a scheme to fraudulently obtain more than approximately $1 billion from victims through false statements and misrepresentations and to launder and misappropriate victim funds from in or about 2018 through the present through various interrelated companies and their affiliated entities, including GTV Media Group Inc. ("GTV"), Saraca Media Group ("Saraca"), the Himalaya Farm Alliance (the "Farms"), entities that operate the Himalaya Exchange, G Club Operations LLC ("G|CLUBS"), G|Fashion, Hamilton Investment Management Ltd. ("Hamilton"), and ACA Capital Group Ltd. ("ACA Capital"). As set forth in more detail below, the leaders of the scheme are Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("KWOK") and Kin Ming Je, a/k/a "William Je" ("JE").

6.      Forensic accountants and analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the fraud scheme to the purchase of the Target Property.

## II.  Statutory Basis for Forfeiture

7.      The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

### *Money Laundering Offenses*

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.      18 U.S.C. § 1956(a)(2)(A) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A)      with the intent to promote the carrying on or specified unlawful activity—

[shall be guilty of a crime.]

10.      18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)      knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.      18 U.S.C. § 1957 provides that any person who knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity [shall be guilty of a crime.]

12.      18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Sections 1956 and 1957] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

*Wire Fraud Offenses*

13.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. § 1343.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

14.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

*Seizure Warrants*

15.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.  As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

### III.  Probable Cause

#### A.  Probable Cause Regarding Commission of the Subject Offenses

Indictment

16.     On March 6, 2023, the Government filed under seal a 12-count Indictment, captioned *United States v. Ho Wan Kwok and Kin Ming Je*, 23 Cr. 118 (the "Indictment"), charging KWOK and JE with violations of 18 U.S.C. §§ 371 (conspiracy to commit wire, bank and securities fraud and money laundering), 1343 (wire fraud), 1956(a)(2)(A) (international promotional money laundering), 1956(a)(2)(B)(i) (international concealment money laundering), 1957 (unlawful monetary transactions), and 2 (aiding and abetting); and 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 (securities fraud).  The Indictment also charged JE with a violation of 18 U.S.C. § 1512(c)(2) (obstruction of justice).  The Indictment is attached hereto as Exhibit 1 and is incorporated by reference herein.

The Prior Seizure Warrants

17.     On or about September 17, 2022, the FBI submitted (under seal) an affidavit in support of seizure warrants for funds held in 11 bank accounts, including all funds in one Metropolitan Commercial Bank ("MCB") account, held For Benefit Of FV Bank, and all funds in nine Silvergate Bank ("Silvergate") accounts, held by JE in the names of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd. (the "September 17 Affidavit[1]").   On or about September 18, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for those 11 accounts, including a warrant to MCB for one MCB account held For Benefit Of FV Bank (the "MCB Warrant"), and a warrant to Silvergate for the nine Silvergate accounts ("Silvergate Warrant-1").

---

[1] The September 17 Affidavit also supported the seizure of up to $16 million contained in a Manufacturers & Traders Trust Co. held by GETTR USA, Inc.

6

18.    Also on or about September 17, 2022, the FBI submitted (under seal) an affidavit in support of a seizure warrant for approximately one U.S. Bank account, held in the name of G Fashion (the "G Fashion Affidavit").  On or about September 18, 2022, Judge Aaron issued a seizure warrant for that U.S. Bank account (the "U.S. Bank Warrant").

19.    On or about September 20, 2022, the FBI submitted (under seal) an affidavit in support of seizure warrants for four additional bank accounts, specifically, one Silvergate account, held in the name of Hamilton Opportunity Fund SPC, and three FV Bank accounts, held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and Himalaya International Clearing, Ltd. (the "September 20 Affidavit").  On or about September 20, 2022, Judge Aaron issued seizure warrants for (a) that Silvergate account ("Silvergate Warrant-2"), and (b) those three FV Bank accounts (the "FV Warrant").

20.    On or about October 14, 2022, the FBI submitted (under seal) an affidavit in support of a seizure warrant for eight additional bank accounts at Mercantile Bank International ("Mercantile Bank," or "MBI"), specifically, an account held in the name of G Club International Ltd., an account held in the name of G Fashion International Limited, three accounts held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and Himalaya International Clearing, Ltd., an account held in the name of Himalaya Currency Clearing Pty Ltd., an account held in the name of Hamilton Capital Holding Ltd., and an account held in the name of Hamilton Investment Management Ltd. (the "October 14 Affidavit.")  On or about October 14, 2022, Judge Aaron issued a seizure warrant for those eight Mercantile Bank accounts (the "Mercantile Bank Warrant") (together with Silvergate Warrant-1, Silvergate Warrant-2, the MCB Warrant, the U.S. Bank Warrant, and the FV Warrant, the "Prior Seizure Warrants").

Overview

21.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a fraud scheme (the "Fraud Scheme") that pertains to several companies that are owned or operated by, or otherwise affiliated with, KWOK, JE, and other Target Subjects.  To date, the Investigation has revealed that the Fraud Scheme involved the solicitation of more than $1 billion from victim-investors and the subsequent money laundering and/or misappropriation of hundreds of millions of those funds.  KWOK is the leader of, and directed, the Fraud Scheme.  JE is the financial architect and key money launderer for the Fraud Scheme.

22.    KWOK and JE have conducted the Fraud Scheme through various interrelated offerings, all of which exhibit features that are consistent with fraud.  For example, investors were promised unrealistic, outsized returns on their investments; investors were induced to invest on the basis of numerous misrepresentations; a portion of the investment money was misappropriated and laundered; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

23.    Based on my participation in this investigation ("Investigation"), training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned that the Fraud Scheme includes, among other means and methods, the following:

a.    The GTV private placement (the "GTV Private Placement") operated between in or about April 2020 and in or about June 2020.  WANG was identified as an Executive Director of GTV in the private placement offering document.  Through the GTV Private

Placement, companies affiliated with KWOK, JE, and others collectively raised at least approximately $450 million from more than 5,000 investors, including individuals in the United States. *See* Ex. 1 at ¶ 12.

   b. Starting at least in or about July 2020, the leaders of the Fraud Scheme began to pitch investors on a new set of investment opportunities, fraudulently marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Farm Loan Program"). The Farm Loan Program was carried out by the KWOK-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world. KWOK represented that individuals who participated in the Farm Loan Program would be eligible to receive stock in KWOK-affiliated companies, including GTV. Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $150 million from the Farm Loan Program. Those funds, which were commingled with other fraud proceeds, were used to promote the Fraud Scheme and were misappropriated for the benefit of KWOK, JE, and their families. *See* Ex. 1 at ¶ 13.

   c. Starting at least in or about June 2020, KWOK began promoting G|CLUBS, a purported high-end membership club. G|CLUBS, which launched in or about October 2020, claimed to provide "Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market" through the sale of purported memberships. In soliciting G|CLUBS membership funds, KWOK and others represented that G|CLUBS membership would be a mechanism to obtain stock in KWOK-affiliated companies, including GTV and a company called G|FASHION. These representations were false. G|CLUBS raised at least approximately $250 million in purported membership fees, which funds were commingled with other fraud proceeds and used to promote the Fraud Scheme and/or misappropriated. *See* Ex. 1 at ¶¶ 14-15.

d.      Starting in or about April 2021, the leaders of the Scheme announced the Himalaya Exchange, a purported cryptocurrency platform that offered cryptocurrencies called H Coin (a trading coin) and H Dollar (an alleged stablecoin), both traded exclusively on the Himalaya Exchange.  In videos distributed via social media, KWOK falsely stated, among other things, that H Coin's value is "linked to gold . . . clear gold directly.  No matter how much it raises, 20% will turn into gold."  *See* Ex. 1 at ¶ 17(a), (b).  The Himalaya Exchange's initial coin offering took place on November 1, 2021.  The Himalaya Exchange has raised at least approximately $380 million.  *See* Ex 1 at ¶ 16.

24.      Based on my participation in this Investigation and my training and experience, I am aware that each of these means and methods of the Fraud Scheme bears the hallmarks of fraud. For example, the investors were promised unrealistic outsized returns on their investments; investors were induced to invest on the basis of numerous misrepresentations; and more than approximately $300 million in fraud proceeds has been misappropriated, including an approximately $100 million investment in a high-risk hedge fund for the benefit of KWOK's son; the purchase of an approximately 50,000-square-foot mansion in Mahwah, New Jersey for approximately $26.5 million in or about December 2021 through an entity owned and controlled by JE, on behalf of KWOK; and the transfer of approximately $13 million in fraud proceeds to an escrow account, which funds were subsequently used to pay for extravagant renovations to, and furnishings for, KWOK's Mahwah mansion.  *See* Ex. 1 at ¶¶ 12(h), 13(f), 15.  Based on my review of documents and records, and tracing analysis conducted by me and others, I am aware that specific assets have been purchased with fraud proceeds.  *See* Ex. 1 at ¶¶ 4, 15(b), (c), (e), 54(v)-(ii).

25.      Based on my participation in this investigation and my review of documents, reports, and open-source information, I have learned that KWOK and JE are involved with various

entities relevant to the Fraud Scheme, including GTV, G Music LLC ("G Music"), G|CLUBS, G|FASHION, and GETTR USA, Inc. ("Gettr"). Gettr is a social media platform that reportedly evolved from GTV Media's predecessor, Guo Media. KWOK posts near-daily broadcasts on Gettr, most of which are linked to G News posts.

<u>Financial Investigation of Fraud Scheme Funds</u>

26.     Financial tracing analysis conducted by the FBI and the SEC (which is engaged in a parallel investigation) uncovered extensive layering of Fraud Scheme funds through more than 500 accounts at financial institutions, held in the names of more than 80 individuals or entities, including various of the KWOK-controlled and dozens of other affiliated entities that KWOK, JE, and other Target Subjects appear to have established as money laundering vehicles, *i.e.*, as accounts used to move and layer proceeds of the Fraud Scheme. Financial tracing identified large transfers of Fraud Scheme proceeds to, through, and among domestic and international bank accounts, including accounts that JE controlled in the UAE and the Bahamas, some of which were held in the names of third-party nominees. *See, e.g.* Ex. 1 at ¶¶ 3, 4, 31(e), 31(g).

27.     In addition to utilizing bank accounts held in the names of entities owned or controlled by JE and others directly involved in the Fraud Scheme, KWOK, JE, and others have layered Fraud Scheme proceeds through accounts at other financial institutions and third-party payment management entities to conceal the nature and source of the funds. For example:

        a.     BSI Group LLC ("BSI Group") is a Missouri-based company that offers payment agreement services. Based on my conversations with others, I have learned that BSI Group effectively operates as a wholesaler and opens bank accounts at U.S.-based financial institutions for its customers. U.S. banks that BSI Group contracted with include Capital One, The Reserve Trust Company ("Reserve Trust"), Prime Trust LLC ("Prime Trust"), and the Puerto Rico-

based Mercantile Bank, or MBI.  BSI Group was a client of Capital One, Reserve Trust, and Prime Trust, among other entities, while MBI was one of BSI Group's customers.

        b.      BSI Group managed transactions on behalf of its own customers, including MBI.  BSI Group's customers directed the movement of their funds—which were held in accounts in the name of BSI Group and/or Reserve Trust and Prime Trust—by requesting transactions through BSI Group's website (*e.g.*, indicating the originator, payee, and amount for a specific transaction).

        c.      KWOK, JE, and others have laundered more than approximately $300 million in Fraud Scheme funds through bank accounts held in the names of various financial intermediary companies, including BSI Group, Reserve Trust, and Prime Trust.  KWOK, JE, and others have also layered Fraud Scheme funds through bank accounts held at various different financial institutions.

        d.      For example, on or about May 20, 2021, G|CLUBS's financial controller, Alex Hadjicharalambous ("Hadijcharalambous"), exchanged emails with employees at Puerto Rico-based financial institutions Medici Bank and MBI regarding a $15 million wire transfer of G|CLUBS fraud proceeds from a bank account in the name of BSI Group to a bank account in the name of Hamilton Opportunity Fund SPC at Deltec Bank & Trust ("Deltec"), which is located in the Bahamas (the "Hamilton Bahamas Account").  The next day, David Fallon (the President of Hamilton) emailed Hajicharalmbous to advise that Hamilton could not credit the wire to G|CLUBS, because the wire reflected that the sender was "BSI Group."

        e.      Hadjicharalambous forwarded the email to an MBI employee, who then responded to Hadjicharalmbous (copying Fallon) with the following explanation, in substance and in part:

        HI guys, so flow of funds is as follows. It's a little detailed here so apologies.

The wire comes from BSI group ( MBIs corresponding bank partner)to Deltec (Hamilton)

The accounts are as follows

BSI/MBI have an account at Capital one, it is an MBI Bank escrow account owned by MBI. BSI does the processing for us.

Medici is a client of MBI for this 15mm dollar transaction, Medici has an account with MBI at Capital one

GCLUB is a client of Medici.

Gclubs clients send money to the MBI account at Capital one denoted for GClub (through medici). Medici ledgers each wire as they come into the bank.

To solve below request, what exactly do you need to show the fund admin? Proof of account ownership or money inflow (source of funds)

For going forward activity, GClub is now a direct client of MBI, so wires will be sent from GClubs account at MBI, but the wires will always come from BSI as the MBI corresponding bank . We (MBI bank) will have the flow of funds from GClub client to the account, so we will have the ability to trace the full flow of funds in and out of the GCLUB account.

      f.      Similarly, on or about July 1, 2021, Hadjicharalambolous sent an email to an employee at Medici Bank, directing Medici Bank to transfer approximately $4 million from a G|CLUBS Medici Bank account to a particular G|CLUBS account at Mercantile Bank (the "G|CLUBS Mercantile Account"). The wire instructions attached to the email identified MBI as the beneficiary entity, but listed Reserve Trust as the beneficiary bank.

      g.      Based on my participation in this Investigation, I believe that the foregoing explanation is an example of the manner in which KWOK, JE, and others launder Fraud Scheme funds through multiple domestic and foreign financial institutions, including Medici Bank and MBI, in an effort to, among other things, conceal their source.

<u>Tracing of Fraud Scheme Proceeds</u>

28.      Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review

of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.      Investors participated in the Fraud Scheme by either wiring money directly to a bank account controlled or used by entities affiliated with KWOK, JE, and others (including the Farms, G Club, or the Himalaya Exchange), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects (including, for example, a company called Crane Advisory Group ("Crane"),  BSI Group, Reserve Trust, or Prime Trust), which funds are then transmitted to bank accounts ultimately controlled by KWOK, JE, and their associates.  I have discovered accounts located in the UAE, the United Kingdom, the United States, the Bahamas, and the British Virgin Islands, which KWOK, JE, and other Target Subjects have used for the purpose of receiving investment funds from investors in the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

b.      For example, between in or about May 2021 and June 2021, approximately $100 million in Fraud Scheme funds were transferred from G|CLUBS bank accounts into the Hamilton Bahamas Account.  Before the approximately $100 million was combined in the Hamilton Bahamas Account, the Fraud Scheme funds were layered through a series of entities at various different banks in a manner that, based on my training and experience, is indicative of money laundering.  Specifically:

i.      Certain prospective investors were instructed to send funds intended as an investment in GTV (for example) to bank accounts in the name of Crane.  Approximately $78.2 million of Fraud Scheme funds was sent from individual or institutional investors in China and elsewhere to two Crane bank accounts (the "Crane Citibank Accounts") between in or about November 2020 and April 2021.

14

   ii. Approximately $60 million of those Fraud Scheme funds were then transferred from the Crane Citibank Accounts to approximately five different bank accounts at Morgan Stanley Smith Barney ("MSSB") held in the name of Crane (together, the "Crane MSSB Accounts").

   iii. The approximately $60 million in Fraud Scheme funds from the Crane MSSB Accounts was combined with approximately $49 million in other Fraud Scheme funds that had been transferred into the Crane MSSB Accounts from two Crane accounts at a different bank, Capital One (together, the "Crane Capital One Accounts"), raising the total combined balance in the Crane MSSB Accounts to approximately $109 million.

   iv. Approximately $79 million of those approximately $109 million in Investment Scheme Funds in the Crane MSSB Accounts were then transferred to accounts at the same bank (*i.e.*, MSSB), but in the name of G|CLUBS (*i.e.*, the G|CLUBS MSSB Accounts). The approximately $79 million was combined with approximately $79.7 million in other Fraud Scheme funds that had been transferred into the G|CLUBS MSSB Accounts from individual G|CLUBS investors and from G|CLUBS bank accounts at Signature Bank, First Bank of Puerto Rico, and City National Bank, raising the total combined balance of Fraud Scheme funds in the G|CLUBS MSSB Accounts to more than approximately $158 million.

   v. Approximately $85 million of Fraud Scheme funds was transferred from the G|CLUBS MSSB Accounts to the Hamilton Bahamas Account, and combined with approximately $15 million in other Fraud Scheme funds (relating to G|CLUBS and the Himalaya Exchange) sourced from a bank account in the name of BSI Group. Thus, the $100 million of

Fraud Scheme funds in the Hamilton Bahamas Account consisted of funds transferred from the G|CLUBS MSSB Accounts and other accounts containing Fraud Scheme funds.

29.    As described above, between in or about September 2022 and October 2022, law enforcement served the Prior Seizure Warrants on several U.S. banks for the funds located in approximately 21 bank accounts, into which I and forensic accountants and analysts at the FBI and SEC traced proceeds of the Fraud Scheme.  The bank accounts subject to seizure were held in the names of various entities associated with KWOK and JE, or entities under JE's control, including G|CLUBS, G|Fashion, and the Hamilton entities that control the Himalaya Exchange.  The Government seized approximately $609 million in fraud proceeds pursuant to the seizure warrants, including approximately $11,538,579.87 from the G|CLUBS Mercantile Account.  *See* Ex. 1 at ¶¶ 23-24; *supra* ¶ 27(f).

30.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and forensic accountants and analysts at the FBI and SEC, my review of court filings and evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    On or about May 5, 2021, a business bank account application was submitted to Mercantile Bank for the G|CLUBS Mercantile Account.  *See supra* at ¶ 27.  The application for the G|CLUBS Mercantile Account described G|CLUBS's business as, in substance and in part, "holding the securities of (or other equity interests in) companies and enterprises."

b.    Hadjicharalambous, the Financial Controller for G|CLUBS, was an authorized signer on the G|CLUBS Mercantile Account.

c.    Proceeds of the Fraud Scheme have been traced into G|CLUBS Mercantile Account.  For example:

16

i.    The initial deposit of funds into G|CLUBS Mercantile Account consisted of an approximately $4 million transfer of Fraud Scheme proceeds from the G|CLUBS account held at Medici Bank, as described above.

ii.    Between on or about August 23, 2021 and November 19, 2021, approximately $74 million of Fraud Scheme proceeds was transferred from the G|CLUBS MSSB Accounts at Morgan Stanley bank into the G|CLUBS Mercantile Account.

iii.    On or about December 24, 2021, approximately $10 million of Fraud Scheme proceeds was transferred from a Silvergate bank account ending in -7739, held in the name of Hamilton Opportunity Fund SPC (which account was seized pursuant to the Government's Silvergate-1 Warrant) to the G|CLUBS Mercantile Account.

### KWOK's Greenwich Residence

31.    Based on my review of documents, subpoena and search warrant returns, law enforcement reports, my conversations with witnesses and other law enforcement officers, and my training and experience, I am aware of the following, among other things:

a.    KWOK appears to have three residences in the tri-state area—a penthouse apartment spanning the full 18th floor of the Sherry-Netherland Hotel in Manhattan, New York, which KWOK bought in or about 2015 for approximately $67.5 million (the "Sherry Netherland Apartment"), an approximately 12,200-square foot residence located at 373 Taconic Road, Greenwich, Connecticut, 06831 (the "Greenwich Residence"), and a mansion in Mahwah, New Jersey that JE purchased for approximately $26.5 million in or about December 2021 for KWOK's benefit, using proceeds traceable to the Fraud Scheme (the "Mahwah Mansion").

b.    A deed dated February 20, 2020 reflects the purchase of the Greenwich Residence by "Greenwich Land, LLC," at a particular address on E. 64th Street in New York, New York (the "Townhouse"). The Townhouse was listed on corporate documents and/or bank account

documentation as the business address for at least eight KWOK-affiliated entities or organizations during the time period of the Fraud Scheme; specifically: purported media companies involved in the GTV Private Placement (Saraca Media Group, Inc. and GTV Media Group, Inc.), KWOK-family offices (Golden Spring NY Ltd., Hudson Diamond NY LLC, and Greenwich Land LLC), KWOK's purported charities (Rule of Law Foundation and Rule of Law Society), and the KWOK-backed grassroots collective, the Himalaya Farm Alliance.

c.      On or about February 12, 2022, KWOK filed for Chapter 11 bankruptcy in Connecticut; that case is pending.  *See Pacific Alliance Asia Opportunity Fund L.P. v. Ho Wan Kwok* (the "KWOK Bankruptcy Case") 22-5032 (D. Ct. Bank. 2022) (Manning, J.).  Filings in the KWOK Bankruptcy Case reflect that KWOK lives at the Greenwich Residence.  For example, on or about November 23, 2022, a temporary restraining order was legally served on KWOK via overnight deliveries "to (i) Kwok's home address in Connecticut [*i.e.*, the Greenwich Residence], [and] (ii) Kwok's address at the Sherry Netherland Hotel in New York City [*i.e.*, the Sherry Netherland Apartment]."  *See* KWOK Bankruptcy Case, Dkt. 40, at ¶ 21.

d.      Based on my review and comparison of photos of the Greenwich Residence from a real estate website[2] and videos and images posted to KWOK's Gettr account,[3] I am aware that, within approximately the past two weeks, KWOK has recorded at least four of his near-daily videos from the Greenwich Residence, including a March 12, 2023 video, as shown in the photographs below:

---

[2] Source:  https://www.compass.com/listing/373-taconic-road-greenwich-ct-06831/29445146894498257/ (*last visited* Mar. 12, 2023)

[3] Source:  https://gettr.com/user/milesguo (*last visited* Mar. 12, 2023)

**March 12, 2023:**



<u>**Target Property**</u>

32.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, subpoena returns, and search warrant returns, public source research that I have conducted on the Internet, tracing analysis conducted by me and others, as well as my conversations with witnesses and other law enforcement officers, and my training and experience, I have learned the following, among other things:

a.      On or about October 28, 2021, G|CLUBS entered into a contract with the French luxury hyper-sports car manufacturer Bugatti Automobiles S.A.S. ("Bugatti") for the purchase of Target Vehicle-1 at a base price of $3.825 million and a total price (based on custom configuration specifications) of approximately $4,429,600.  The contract was signed by Limarie Reyes Molinaris ("Molinaris") on behalf of G|CLUBS.  Moliaris is the CEO of G|CLUBS and a Target Subject of this Investigation.

b.      Based on my review of documents, I am aware that the initial specifications documentation for Target Vehicle-1—which was dated October 25, 2021 and which an employee of a particular Bugatti retailer located in Houston, Texas (the "Bugatti Retailer") emailed to Molinaris on or about November 1, 2021—listed the "Customer name" for the Target Vehicle as "MILESON GUO."

i.      Based on my involvement in this Investigation, I am aware that Mileson Guo (a/k/a "Qiang Guo") ("Mileson") is KWOK's son.  Mileson is the ultimate beneficial owner of various entities involved in the Fraud Schemes (including Lamp Capital LLC and Saraca) and a Target Subject of this Investigation.

ii.      Based on my review of G|CLUBS records, including payroll records, I have learned that Mileson does not appear to hold or to have held any title or role at G|CLUBS.

c.      On or about November 8, 2021, Hadjicharalambous, the Financial Controller of G|CLUBS, sent an email to Molinaris, the CEO of G CLUBS, and other G|CLUBS employees advising, in substance and in part, that "G CLUB INTERNATIONAL LIMITED has purchased several assets *for use of our members*" (emphasis added).  Hadjicharalambous is a Target Subject of this Investigation.  The November 8, 2021 email listed several physical assets and indicated how many payments had been made toward the purchase of each asset from the G|CLUBS Mercantile Account, including the following, in substance and in part:

- LAMBORGHINI AVENTADOR (*i.e.*, Target Vehicle-2) – OWNED BY BVI
- 4 Payments have been made so far

- BUGATTI (*i.e.*, Target Vehicle-1) – OWNED BY BVI
- 1 Deposit payment has been made so far

d.      In or about November 2021, G|CLUBS paid approximately $2.9 million toward the purchase price of Target Vehicle-1 from the G|CLUBS Mercantile Account. Specifically, an initial payment of approximately $1.75 million was wired from the G|CLUBS Mercantile Account to the Bugatti Retailer for Target Vehicle-1 on or about November 2, 2021, and a second payment of approximately $1.15 million was wired from the G|CLUBS Mercantile Account to the Bugatti Retailer on or about November 22, 2021.  Between on or about December 8, 2022 and December 12, 2022, G|CLUBS wired the balance of approximately $1,529,800 to the Bugatti Retailer from an account at a particular U.K.-based FinTech company.

e.      On or about January 4, 2023, Molinaris emailed a Bugatti Retailer employer regarding delivery arrangements for Target Vehicle-1 and advised, in substance and in part, that G|CLUBS's Haoran He (at a particular @protonmail.com email address) was the G|CLUBS point of contact for Target Vehicle-1.  Based on my review of records pertaining to entities involved in the Fraud Scheme, I am aware that Haoran He is listed as the beneficial owner of various entities involved in the Fraud Scheme, including G|CLUBS, and I am further aware that Haoran He appears to be a U.K. resident.  Haoran He is a Target Subject of this Investigation.

f.      On or about January 8, 2023, Target Vehicle-1 arrived at George Bush Intercontinental Airport in Houston, Texas on a cargo airplane operated by a particular shipping company.  Target Vehicle-1 then cleared customs and was delivered to the Bugatti Retailer on or about January 11, 2023.

g.      On or about January 13, 2023, pursuant to a judicially authorized warrant and based on, among other things, evidence that Target Vehicle-1 was purchased using proceeds of the Fraud Scheme, the Government installed a GPS tracking device on Target Vehicle-1. However, as of on or about March 12, 2023, G|CLUBS had not retrieved Target Vehicle-1 from the Bugatti Retailer.

h.     Based on my review of documents, records, and communications, and my conversations with others, I am aware that between in or about January 2023 and February 2023, Haoran He exchanged emails with a Bugatti Retailer employee regarding Target Vehicle-1.  I am further aware that G|CLUBS and/or He have not made specific arrangements with the Bugatti Retailer for the pickup or delivery of Target Vehicle-1 as of the present.  However, I am aware that G|CLUBS contacted Bugatti's corporate office to inquire into the possibility of shipping Target Vehicle-1 offshore to, among other possible locations, the UAE or Switzerland.

i.     Based on the foregoing, I believe that—contrary to representations that Target Vehicle-1 was purchased "for use of" G|CLUBS members—Target Vehicle-1 was purchased for the benefit of KWOK and/or Mileson, KWOK's son, using misappropriated and laundered Fraud Scheme funds.

33.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, subpoena returns, and search warrant returns, public source research that I have conducted on the Internet, tracing analysis conducted by me and others, as well as my conversations with witnesses and other law enforcement officers, and my training and experience, I have learned the following, among other things:

a.     On or about September 13, 2021, G|CLUBS purchased Target Vehicle-2 (*i.e.*, the Lamborghini Aventador) from a particular car retailer located in Dallas, TX (the "Lamborghini Retailer").

b.     On or about September 14, 2021, approximately $832,000.75 was wired from the G|CLUBS Mercantile Account to the Lamborghini Retailer as payment for the purchase of Target Vehicle-2.

c.     Delivery information for Target Vehicle-2 reflects the following, in substance and in part:  "Name: Max (G Club International) / 373 Taconic Rd / greenwich, CT

06831." Based on my review of documents and records and my involvement in this investigation, I believe "Max" refers to Max Krasner ("Krasner"), a New York-based individual who has worked with the KWOK entities (including family office entities Golden Spring New York Ltd. ("Golden Spring"), Hudson Diamond NY LLC, and Greenwich Land LLC) since at least in or about June 2018; Krasner is a Target Subject of this Investigation. I further believe that the delivery information reflects that Target Vehicle-2 was to be delivered to Krasner at the Greenwich Residence (*i.e.*, KWOK's residence).

        d.     Based on the foregoing, I believe that—contrary to representations that Target Vehicle-2 was purchased "for use of" G|CLUBS members—Target Vehicle-2, which was delivered to the Greenwich Residence (*i.e.*, one of KWOK's residences), was purchased for the benefit of KWOK and/or his family members using misappropriated and laundered Fraud Scheme funds.

        34.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, subpoena returns, and search warrant returns, public source research that I have conducted on the Internet, tracing analysis conducted by me and others, as well as my conversations with witnesses and other law enforcement officers, and my training and experience, I am aware of the following, among other things:

        a.     On or about May 27, 2021, Golden Spring (*i.e.*, one of KWOK's family office entities) purchased Target Vehicle-3 (*i.e.*, a custom-built 2021 Rolls Royce) from a particular luxury car dealership in Greenwich, Connecticut (the "Connecticut Dealership").

        b.     The listed contact at Golden Spring for the purchase of Target Vehicle-3 was "Defeng Cao" ("Cao"), and the documentation listed the Greenwich Residence as the address for Golden Spring.

c.       The listed purchase price of Target Vehicle-3 was $726,304.15.  An invoice reflects that Target Vehicle-3 was paid for with a combination of cash and the trade-in value of two vehicles:  a 2015 Rolls Royce Phantom, bearing VIN SCA681L58FUX72075 (the "2015 Rolls"), and a 2019 Lamborghini, bearing VIN ZPBUA1ZL0KLA02228 (the "2019 Lamborghini").  According to title documentation and bills of sale, both the 2015 Rolls and the 2019 Lamborghini were owned by Golden Spring, and both were sold to the Connecticut Dealership on or about January 27, 2021.  The 2015 Rolls was sold for approximately $210,000.00; the 2019 Lamborghini was sold for approximately $225,000.00.

d.       On or about May 27, 2021, approximately $294,306.00 was wired from a bank account at a particular bank in New York, New York held in the name of Lamp Capital LLC (the "Lamp Account") to a bank account in the name of a particular luxury car dealership in Greenwich, Connecticut (the "Connecticut Dealership").  Based on my review of documents and my participation in this Investigation, I am aware that the approximately $294,306.00 transferred from Lamp Capital LLC represented the balance due for the purchase of Target Vehicle-3, after the trade-ins.

i.       As described above, *see supra* at ¶ 32(b)(i), KWOK's son, Mileson, is the ultimate beneficial owner of Lamp Capital LLC.

ii.       In or about January 2021, the Lamp Account received approximately $11 million in Fraud Proceeds traced to the Farm Loan Program from a particular UAE bank account controlled by JE.  *See* Ex. 1 at ¶ 13(f).

e.       Based on my review of documents, I am aware that the order specification confirmation document for Target Vehicle-3, which was dated May 19, 2021, reflected a production date of approximately April 14, 2021.  I am further aware that custom options selected for Target Vehicle-3 included, among others, "Serenity Seats with Fixed Centre Console" (for an

added cost of approximately $24,555.00) and a "Smoker's package." Based on my review of videos that KWOK distributes, or causes to be distributed, on the Internet—including videos promoting the various offerings that constitute the Fraud Scheme, such as KWOK's music video called "H Coin to the Moon," which was published on the day of the Himalaya Exchange's initial coin offering—I am aware that KWOK is frequently depicted smoking cigars.

       f.     Based on my review of records from the State of Connecticut Department of Motor Vehicles, I am aware that Cao submitted a title application for Target Vehicle-3 on or about May 29, 2021. In that application, Cao listed the Greenwich Residence as his mailing address.

       g.     An invoice dated on or about May 22, 2022, directed to Cao at the Greenwich Residence, reflected an outstanding balance of approximately $6,855.47 for travelers' insurance relating to Target Vehicle-3. The invoice was signed by Molinaris (*i.e.*, G|CLUBS's CEO) on or about June 17, 2022.

       h.     Based on my review of documents provided by the Greenwich Dealership, I am aware that a Greenwich Dealership employee emailed another employee a photograph of Cao's New York State Driver's License on or about May 27, 2021 with the subject line: "Max dl." As referenced above, based on the foregoing and my participation in this investigation, I believe that "Max" refers to Krasner (*i.e.*, a New York-based Target Subject who has worked for KWOK-affiliated entities since in or about 2018), and I believe that "dl" refers to "driver's license" for the named purchaser of Target Vehicle-3 (*i.e.*, Cao). *See* ¶ 34(b), (f).

       i.     Based on my review of documents, including payroll records, I am aware that Cao held no formal position or title at Golden Spring, Lamp Capital, or G|CLUBS.

j.      Based on the foregoing, I believe that Target Vehicle-3 was delivered to the Greenwich Residence (*i.e.*, one of KWOK's residences) and was purchased for the benefit of KWOK and/or his family members using misappropriated and laundered Fraud Scheme funds.

## III. Conclusion

35.      Based on the foregoing, I submit that there is probable cause to believe that the Target Property is subject to forfeiture as property involved in violations of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(h), and 1957; and/or the proceeds of violations of 18 U.S.C. §§ 1343, 1349, and 371, or property traceable thereto.

36.      Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.


/s/ Zachary Effting w/ permission
ZACHARY EFFTING
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
14 day of March, 2023


THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

26

# Ex. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 23 Cr. ____ |
| HO WAN KWOK,<br>    a/k/a "Miles Guo,"<br>    a/k/a "Miles Kwok,"<br>    a/k/a "Guo Wengui,"<br>    a/k/a "Brother Seven,"<br>    a/k/a "The Principal,"<br><br>KIN MING JE,<br>    a/k/a "William Je," | **23 CRIM 118** |
| Defendants. | |

**COUNT ONE**
**(Conspiracy to Commit Wire Fraud, Securities Fraud, Bank Fraud, and Money Laundering)**

The Grand Jury charges:

**Overview**

1.      From at least in or about 2018 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, conspired to defraud thousands of victims of more than approximately $1 billion, including victims located in the Southern District of New York. KWOK, JE, and their co-conspirators operated through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds.

2.      HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui,"
a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the
defendants, and their co-conspirators, took advantage of KWOK's prolific online presence and
hundreds of thousands of online followers to solicit investments in various entities and programs
by promising outsized financial returns and other benefits.  The entities and programs used in the
scheme included those known as GTV, G|CLUBS, G|MUSIC, G|Fashion, and the Himalaya
Exchange, among others.  In truth and in fact, and as KWOK and JE well knew, the entities were
instrumentalities that KWOK and JE created and used to perpetrate their fraud and exploit
KWOK's followers.  The scheme allowed KWOK and JE to enrich themselves, their family
members, and their co-conspirators, and to fund KWOK's extravagant lifestyle.

3.      As part of the scheme, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok,"
a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a
"William Je," the defendants, and their co-conspirators, laundered hundreds of millions of dollars
of fraud proceeds.  To conceal the illegal source of the funds, KWOK and JE transferred, and
directed the transfer of, money into and through more than approximately 500 accounts held in the
names of at least 80 different entities or individuals.  Hundreds of millions of dollars of the
fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in
the United States, Bahamas, and United Arab Emirates ("UAE"), among other places, and held in
the name of companies owned or otherwise controlled by JE.

4.      HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui,"
a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the
defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for
their and their families' benefit.  For example, KWOK used fraudulently-obtained victim money

2

to purchase, fund, or finance a $26.5 million purchase of an approximately 50,000-square-foot mansion in New Jersey for KWOK and his family; luxury vehicles, including an approximately $3.5 million Ferrari for one of KWOK's close family members ("Relative-1"); an approximately $37 million luxury yacht that was used by KWOK and his family and purchased in the name of one of KWOK's close family members ("Relative-2"); a piano valued at approximately $140,000; an approximately $36,000 mattress; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things. For his part, , among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts.

5.     HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so at least through the date of this Indictment. They did so, among other things, by continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States, and by retaliating against individual victims who complained or demanded the return of invested funds.

**Relevant Persons and Entities**

6.     At all relevant times, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, was the leader of, and directed, the scheme.

a. KWOK is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million. Starting at least in or about 2017, KWOK, who then purported to be a billionaire,

garnered a substantial online following. KWOK granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.

b. In or about 2018, KWOK founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society. The Rule of Law Society's website lists KWOK as its "founder, a promot[e]r, and a spokesperson." Both organizations feature photographs of KWOK on their websites. KWOK used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe KWOK's statements regarding investment and money-making opportunities. In truth and in fact, and as KWOK well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud KWOK's followers and other victims.

7.    At all relevant times, KIN MING JE, a/k/a "William Je," the defendant, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while traveling to the United States and elsewhere. JE owned and operated numerous companies and investment vehicles central to the scheme and served as its financial architect and key money launderer.

8.    At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York. Relative-1 was its ultimate beneficial owner.

9.    At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York. GTV was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at GTV. KIN MING JE, a/k/a "William Je," the defendant,

4

likewise held no formal position or title at GTV, but in fact exercised control over its finances. Saraca was the parent company of GTV.

10.    At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, although KWOK held no formal position or title at G|CLUBS.  KIN MING JE, a/k/a "William Je," the defendant, likewise held no formal position or title at G|CLUBS, but in fact exercised control over its finances.

11.    At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," the defendant, founded and operated through various entities he owned, which were based abroad.  Entities functionally owned and controlled by HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange. KWOK promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although KWOK held no formal position or title at the Himalaya Exchange.

**The Fraud**

*The GTV Private Placement*

12.    Between in or about April 2020 and in or about June 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and

unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement").

a. On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement. In that video, KWOK described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement. The video and GTV Private Placement materials—including the written "Confidential Information Memorandum" (the "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

b. The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

c. According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified KWOK as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither KWOK nor JE held any formal management position with GTV.

d. The PPM also contained the following representations, in substance and in part, among others:

i. The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

ii. GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

iii. The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
| --- | --- |
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was purportedly sold to more than 5,500 investors located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

f. The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

g. The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering

was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, KWOK, and others under his control, used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not qualify to participate in the GTV Private Placement.

   h. In or about early June 2020, and only days after the GTV Private Placement closed, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used. Indeed, the $100 million investment into Fund-1 was not made for the benefit of GTV, but rather for the benefit of Saraca. The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca. Ultimately, the investment into Fund-1 lost approximately $30 million in value.

   i. After directing $100 million of GTV victim funds into Fund-1, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

*The Farm Loan Program*

13. Beginning in or about June 2020—the same month that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The

Principal," and KIN MING JE, a/k/a "William Je," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—KWOK, JE, and their co-conspirators fraudulently obtained more than approximately $150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which KWOK organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. KWOK, JE, and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program").

      a.  Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

      b.  These bank account closures frustrated the ability of KWOK, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

      c.  On or about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program. According to KWOK and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

      d.  After launching the Farm Loan Program, KWOK continued to promote GTV and to falsely represent the value of GTV. For example, on or about August 2, 2020, in a video distributed via social media, KWOK falsely stated, in substance and part, "How much is

9

GTV? . . . a market value of 2 billion US dollars."[1]  In truth and in fact, and as KWOK well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

e. Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV).  According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

f. KWOK and JE misappropriated funds that were raised through the Farm Loan Program.  For example:

i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

ii. Approximately $5 million was transferred to an entity owned by KWOK's spouse;

iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by KWOK; and

iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

### G|CLUBS

14. While making misrepresentations regarding the Farm Loan Program, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English, unless otherwise noted.

and unknown, fraudulently induced KWOK's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about October 2020 through at least in or about March 2023, KWOK, JE, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS.

a. Starting at least on or about June 20, 2020, in a video distributed via social media, KWOK promoted and encouraged individuals to purchase what KWOK referred to as a "G Club . . . membership card."

b. Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

c. To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member: Tier 5 Membership cost $50,000; Tier 4 Membership cost $40,000; Tier 3 Membership cost $30,000; Tier 2 Membership cost $20,000; and Tier 1 Membership cost $10,000.

d. On or about July 5, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

e. In truth and in fact, and as KWOK and JE well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively

11

small number of employees and provided its members few to no discernable membership benefits. Indeed, G|CLUBS did not even make good on prizes it offered members for participating in contests. On or about February 14, 2021, G|CLUBS held a webcast and sweepstakes during which members were promised luxury prizes. On at least one occasion, instead of providing a BMW to a member who purportedly won a sweepstakes, G|CLUBS claimed to the member that the member had requested that the value of the BMW be applied toward an upgrade from a Tier 1 G|CLUBS Membership to a Tier 4 G|CLUBS Membership and partially credited toward annual membership fees for the next three years. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

    f. KWOK and JE also used G|CLUBS as a mechanism to continue fraudulent private placement offerings. KWOK, and others known and unknown, told KWOK's online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion.

    i. In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

    ii. On or about July 30, 2021, KWOK stated in a video distributed via social media, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%. Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is

exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

      g. KWOK, JE, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling KWOK and JE to increase the amount of money solicited. In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as KWOK and JE well knew, multiple memberships did not provide members with additional benefits.

    15. All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships. However, most of this money did not fund the business of G|CLUBS. Rather, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships," using, among other things, a complex web of entities and bank accounts to do so. For example:

      a. G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for KWOK and his family, including luxury purchases of an approximately $2.6 million yacht and luxury automobiles that together cost more than $5 million.

      b. In or about November 2021, JE directed approximately $26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of KWOK's 50,000 square foot New Jersey mansion.

13

c. JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account. The funds were subsequently used to pay for extravagant renovations to KWOK's New Jersey mansion, including to a wing for Relative-1 and to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

d. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

e. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

*The Himalaya Exchange*

16. From at least in or about April 2021 through at least in or about March 2023, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value

backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand.  JE was the founder and Chairman of the Himalaya Exchange.

17.    In videos distributed via social media, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies.  For example, in a video posted on the Internet on or about October 20, 2021, KWOK falsely stated the following, among other things, and in substance and in part:

      a.    "I am talking about your H Coins, 'Brother Seven' [*i.e.*, KWOK] designed it . . . .[I]t has the attribute of currency, why?  It has 20% gold.  Awesome[.]  [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly.  No matter how much it raises, 20% will turn into gold."

      b.    "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money.  Or take all the value of 20% gold and ask everyone to unify it and make it yours."

      c.    "If anyone loses money, I can say that I will compensate 100%.  I give you 100%.  Whoever loses money, I will bear it."

      d.    "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

18.    The initial coin offering of HCN and HDO occurred on or about November 1, 2021.  HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value.  That is, approximately two weeks after the initial coin

offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

19.     At the time of the Himalaya Exchange launch, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, marketed HCN to his online followers and others.  For example, on or about November 1, 2021—the day of the initial coin offering—KWOK released an official music video for an original song called "HCoin To the Moon" via social media.  The phrase "to the moon" is popularly associated with cryptocurrencies and implies a sharp increase in value.  The music video depicted KWOK in various luxurious locations and depicted imagery of gold and wealth.

20.     At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," the defendant, misleadingly marketed the Himalaya Exchange.  For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO.  JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO."  Contrary to JE's claim, the Ferrari was not purchased using HDO.  In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

21.     Contrary to representations of HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, HCN and HDO could not be

traded anywhere other than (purportedly) on the Himalaya Exchange. Moreover, unlike cryptocurrencies, HCN could not be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly only could be converted to or from fiat currency (and only on the Himalaya Exchange).

a. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to KWOK's representations, HCN and HDO were not cryptocurrencies. Rather, according to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets." Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

22. In or about April 2022, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, arranged for the transfer of approximately $37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The $37 million was structured as a purported "loan" to cover the cost of a luxury yacht that KWOK had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Government Seizure of Fraud Proceeds*

23. On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized

approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants.  Following the September 2022 judicially authorized seizures, JE attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

       a.  Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts.  JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important client of the Himalaya Exchange).

       b.  In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself.  JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO, which JE was attempting to "convert" into $46 million.  JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

    24.  On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which JE requested the $46 million transfer.

a. As a result of the judicially authorized September and October 2022 seizures, U.S. authorities seized more than approximately $609 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities, including accounts that purported to hold its HDO cash reserves.

b. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

c. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined through the date of this Indictment.

## STATUTORY ALLEGATIONS

25.     From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) wire fraud, in violation of Title 18, United States Code, Section 1343; (2) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (3) bank fraud, in violation of Title 18, United States Code, Section 1344; (4) international promotional money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and (5) international concealment money laundering, in violation of Title 18, United States Code Section 1956(a)(2)(B)(i).

26.     It was a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal,"

and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KWOK and JE agreed to obtain victims' money by causing materially false information and misrepresentations to be transmitted over interstate wires, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

27.    It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE agreed to fraudulently induce investors to participate in the GTV Private

Placement, the Farm Loan Program, and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

28.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, as defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, KWOK and JE agreed to participate in a scheme to mislead U.S. financial institutions through false and fraudulent pretenses, representations, and documents, in connection with the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, in order to obtain money of, or under the custody and control of, at least one financial institution.

29.     It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the

21

offenses alleged in Counts Two through Eight of this Indictment in violation of Title 18, United States Code, Section 1956(a)(2)(A)(i).

30.    It was further a part and an object of the conspiracy that HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer is designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Two through Eight of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

<u>Overt Acts</u>

31.    In furtherance of the conspiracy and to effect its illegal objects, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about April 21, 2020, KWOK posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

22

b.      On or about June 5, 2020, a co-conspirator not named herein ("CC-1"), while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

c.      On about July 22, 2020, in a video distributed via social media, KWOK promoted the Farm Loan Program.

d.      On or about August 2, 2020, in a video distributed via social media, KWOK stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

e.      On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.

f.      On or about July 30, 2021, in a video distributed via social media, KWOK stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that [to] anyone who buys G-Clubs membership before September 17 [they] must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g.      On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

h.      On or about October 20, 2021, in a video distributed via social media, KWOK stated, in substance and in part, that KWOK "designed" HCN, that "[n]o matter how much it raises, 20% will turn into gold," and that "[i]f anyone loses money" on HCN, "I can say that I will compensate 100%."

23

i.    On or about September 22, 2022, JE texted a U.S. bank's management, in substance and in part, that a $46 million transfer to a JE-controlled bank account in the UAE needed to happen "today or it is meaningless."

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Wire Fraud – GTV Private Placement)

The Grand Jury further charges:

32.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

33.    From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

34.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

35.     From at least in or about April 2020 up to and including at least in or about March 2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud – Farm Loan Program)

The Grand Jury further charges:

36.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

37.    From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE conducted the Farm Loan Program to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Securities Fraud – Farm Loan Program)

The Grand Jury further charges:

38.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

39.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE conducted the Farm Loan Program to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Wire Fraud – G|CLUBS)

The Grand Jury further charges:

40.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

41.     From at least in or about June 2020 up to and including at least in or about March

2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo,"

a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN

MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise

a scheme and artifice to defraud, and for obtaining money and property by means of false and

fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by

means of wire, radio, and television communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit,

KWOK and JE promoted and marketed G|CLUBS to fraudulently obtain money from victims

through false statements and misrepresentations, which scheme was furthered through electronic

communications and monetary transfers to and from the Southern District of New York and

elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT SEVEN**
**(Securities Fraud – G|CLUBS)**

The Grand Jury further charges:

42.     The allegations contained in paragraphs 1 through 24 of this Indictment are

repeated and realleged as if fully set forth herein.

43.     From at least in or about June 2020 up to and including at least in or about March

2021, in the Southern District of New York, and elsewhere, HO WAN KWOK, a/k/a "Miles Guo,"

a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN

MING JE, a/k/a "William Je," the defendants, willfully and knowingly, directly and indirectly, by

use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a

national securities exchange, used and employed, in connection with the purchase and sale of a

28

security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, KWOK and JE promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

44.     The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

45.     From at least in or about April 2021 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, KWOK and JE operated the Himalaya Exchange to fraudulently obtain money from victims through false statements and misrepresentations, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT NINE
**(International Promotional Money Laundering)**

The Grand Jury further charges:

46.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

47.    From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, KWOK and JE directed and made international transfers of funds into, out of, and through the United States, with the intent to promote the fraud offenses in Counts Two through Eight of the Indictment.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

30

## COUNT TEN
### (International Concealment Money Laundering)

The Grand Jury further charges:

48. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

49. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, namely, the fraud offenses alleged in Counts Two through Eight of this Indictment, to wit, KWOK and JE conducted international financial transactions into, and out of, and through the United States involving fraud proceeds, including, among other transactions, transactions involving bank accounts held in the names of entities nominally owned by other individuals and by entities not overtly associated with the defendants, in order to conceal the ownership, control, and/or receipt of the proceeds of the fraud and the illegal nature and source of such proceeds.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

**COUNT ELEVEN**
**(Unlawful Monetary Transactions)**

The Grand Jury further charges:

50.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

51.    On or about June 5, 2020, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, KWOK and JE made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Two and Three to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

**COUNT TWELVE**
**(Obstruction of Justice)**

The Grand Jury further charges:

52.    The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as if fully set forth herein.

53.    From at least on or about September 20, 2022 through the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to the UAE, beyond the jurisdiction of the United States, to impede and interfere with a federal grand jury investigation in the Southern

District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and proceedings before the United States District Court for the Southern District of New York concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE ALLEGATIONS

54.    As a result of committing the offenses alleged in Counts One through Eight of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE, a/k/a "William Je," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and, and the following specific property:

a.  $64,826.87 in United States currency formerly on deposit in Account Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

b.  $75,000,000.00 in United States currency formerly on deposit in Account Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

c.  $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

33

     d.  $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

     e.  $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

     f.  $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

     g.  $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

     h.  $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

     i.  $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

     j.  $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

k.  $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

l.  $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

m.  $9,451,170.54 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government on or about October 16, 2022;

n.  $2,823,642.39 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government on or about October 16, 2022;

o.  $249,000,115.46 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya International Reserves Ltd.," seized by the Government on or about October 16, 2022;

p.  $283,965.11 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya International Financial Group Ltd.," seized by the Government on or about October 16, 2022;

q.  $1,085,623.67 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government on or about October 16, 2022;

r.  $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

s.  $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

t.  $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

u.  $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

v.  All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP

w.  A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

x.  A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

y.  A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

z. A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

aa. A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

bb. A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

cc. A Hästens 2000T md mattress, purchased for approximately $36,590.00;

dd. A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

ee. A Wembe watch storage box, purchased for approximately $59,392.91;

ff. A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV – 8K, purchased for approximately $62,787.54;

gg. A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

hh. A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

ii. A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(a) through (ii), collectively, the "Specific Property."

55. As a result of committing the money laundering offenses alleged in Counts One, Nine, Ten and Eleven of this Indictment, HO WAN KWOK, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," and KIN MING JE,

a/k/a "William Je," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the Specific Property.

### Substitute Assets Provision

56.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third person;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON
3/6/2023

DAMIAN WILLIAMS
United States Attorney