

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 11, 2025

**BY ECF**
Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY

    Re:    *United States v. Miles Guo*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

    The Government writes in opposition to the defendant's *fifth* request to adjourn sentencing, which was initially scheduled for November 1, 2024—more than a year ago.

    None of the reasons the defendant offers in support of his request has merit, particularly given that thousands of victims harmed by the defendant remain in limbo because of the defendant's continued efforts to delay sentencing. As further explained below, it appears the defendant seeks to postpone his sentencing for as long as possible—but it is time for this case to reach its conclusion. Indeed, on November 26, 2025, the Second Circuit observed the need for this Court to "expeditiously" address "the large number of submissions" in this case. Dkt. 767. Those third-party petitions, which largely pertain to forfeitable property are conclusively addressed once a post-sentencing ancillary proceeding has concluded disposing of all these claims. *See* 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(c)(1). For the good of the thousands of victims throughout the United States and abroad, this Court should end the defendant's apparent campaign to delay sentencing and provide just closure to victims and to the public.

    A.  The Defendant's Reasons for a Fifth Sentencing Adjournment Are Meritless

    The defendant's primary justifications for his latest adjournment request are recycled complaints regarding the volume of discovery and the complexity of this case. Neither is a new issue. Following the appointment of current defense counsel—three highly experienced attorneys—in April 2025, the Court scheduled sentencing for September 8, 2025, based on the current defense team's request for five months to review discovery and prepare a sentencing submission. Then, in July 2025, the defendant requested an *additional* four-month adjournment to "at least December 2025," Dkt. 715, which the Court granted by adjourning sentencing to January 20, 2026, Dkt. 719. Another adjournment is not justified.

    The defendant's current counsel team first raised the issue of voluminous discovery on the date they were appointed—April 8, 2025. That day the defense team requested, and received, a

sentencing date in September 2025, given the volume of materials in this matter. *See* 4/8/25 Hr'g Tr. ("Ex. A") at 6 ("I think the transcript is over 6,000 pages or thereabouts. The exhibits are quite voluminous."). The defendant again complained about the volume and complexity of materials—four months ago—in July 2025. It was then, when the defendant again asked for, and received, another sentencing adjournment (his fourth). *See* Dkt. 715, at 1 (citing "sheer volume of materials"); *id*. at 2 ("trial [exhibits] are themselves voluminous and complex"). This Court can reasonably assume that the defendant and his three attorneys have used the past eight months to prepare for sentencing. And it appears that they have. In conversations with the Government, the defense team appears versed in the record of this case. That comes as no surprise because, in July, the defense team reported to the Court that it had then "begun to make progress reviewing the massive discovery in the case." *Id*. at 2. That progress has apparently continued apace.[1]

The Court has twice given the defendant and his counsel the length of time they requested (and then some) to meet the challenges they are complaining of (again). It is no surprise then, that the defendant's justifications for "approximately three [more] months" of delay, collapse under just cursory inspection. Dkt. 768. It is worth noting that the defendant's prior counsel, Sidhardha Kamaraju, filed his notice of appearance on July 11, 2023, and proceeded to *trial* on this matter *ten* months later. *See* Dkt. 103; Dkt. entry dated May 22, 2024. As of January 2026, the current sentencing date, the defendant's current counsel team will have been engaged in this matter for approximately *nine* months. Particularly given that the current counsel team has the benefit of consulting with prior counsel, and a trial record that synthesized the most pertinent issues, there is no reasonable basis why the current counsel team needs a full year to prepare for sentencing, which would be *more* time than the defendant's prior counsel had to prepare for the trial.

Indeed, it appears that the defendant's current counsel team has been able to navigate through most, if not all, of the discovery materials. In the motion for a fifth adjournment, the defendant made it known to the Government that his current counsel team filed an *ex parte* motion for a subpoena seeking more materials. The Government does not know what that subpoena seeks, or the justification for it, but presumably the defendant would not have filed that motion without first reviewing discovery sufficiently to confirm that the materials they seek (or ones similar) are not already in their possession. *See United States v. Avenatti*, No. (S1) 19 CR. 373 (PGG, 2020 WL 86768, at *4 (S.D.N.Y. Jan. 6, 2020) (*quoting United States v. Nixon*, 418 U.S. 683, 699-700 (1974)) ("a party seeking a Rule 17(c) subpoena 'must show . . . [requested materials] are not otherwise procurable reasonably in advance of trial by exercise of due diligence").[2]

---

[1] The defense's adjournment request references 64 terabytes of discovery. Dkt. 768 at 1. The Government notes, however, that discovery included the images of several dozen electronic devices and other materials—including numerous device images from a search in 2018, which was not part of this fraud investigation—that are not relevant for sentencing. In other words, in order to prepare for sentencing, the defense need not review every page of discovery produced, and has the benefit of the trial record, trial exhibits, the Government's discovery index, prior counsel who presumably reviewed the materials, and the PSR, among other resources, to efficiently prepare for sentencing. *United States v. Fullwood*, 86 F.3d 27, 32 (2d Cir. 1996) ("A sentencing hearing is not the proper forum to re-litigate factual issues resolved at trial").

[2] There does not appear to be any basis why this post-trial motion for a subpoena was made *ex parte*. Courts have permitted *ex parte* motions for a subpoena upon a finding of "good cause."

Against this backdrop, it is unpersuasive for the defendant's current counsel team to cite, for example, long ago litigated matters like "the many issues presented in the *in limine* motions filed by the parties" as justification for *another three months of delay* for sentencing. Dkt. 768 at 1. In advance of trial, the parties filed *in limine* motions on April 9, 2024. The parties responded to those motions (while continuing to prepare for trial) on April 17, 2024—*just eight days later*. Dkts. 230, 284. The Court ruled on the full set of *in limine* motions in about two weeks, more than a year and a half ago. *See* Dkts. 311, 319. It simply cannot be the case that the current experienced counsel team of three attorneys needs one full year to *review* briefing that this Court and trial counsel considered, analyzed, researched, and wrote in about one month (while at the same time preparing for a trial). Sentencing presents issues narrower than a trial, and requires less preparation time, not more. *See* Ex. A, Tr. 5-6 ("[The Court:] I would like to remind you, Mr. Guo, and I want you to listen very carefully, that the purpose of sentencing is to determine the type and extent of punishment after the issue of guilt has been determined. *Williams v. New York*, 337 U.S. 241, 247 (1949). The issue of guilt has been determined here.  It will not be relitigated at sentencing.").[3]

Even giving the defendant the benefit of the doubt, and assuming that his current counsel team is managing some inefficiencies from their later entry into this case, that is a problem of the defendant's own making. The Court explicitly warned the defendant that he would be "at a significant disadvantage" if he terminated his prior counsel, and he would have to bear those drawbacks. Dkt. 700, Ex. 1 at 12-13 ("Mr. Guo, what I want you to understand is that you will be at a significant disadvantage by hiring an attorney or being appointed an attorney . . . who is not familiar with what was a complicated case."). Despite this Court's caution, the defendant made his choice. The defendant should not be permitted to use a predictable consequence of his eleventh-hour decision to fire his former counsel as reason for a fifth sentencing adjournment.

The defendant also asserts that he needs an additional three months because the sentencing submission will need to be translated into Mandarin for the defendant's review, despite the

---

*United States v. Ray*, 337 F.R.D. 561, 572 (S.D.N.Y. 2020). There is no good cause here. Now that the trial has concluded, there is no danger that disclosing that motion to the Government would reveal "trial strategy or witness list." *Id.* The Government should be permitted access to this motion to evaluate its merits. Notably, "Rule 17 (c) 'was not intended to provide an additional means of discovery' for a criminal defendant, and thus may not be used to conduct a 'general fishing expedition.'" *United States v. Xu*, No. 23 Cr. 133-5 (JMF), 2024 WL 4504352, at *2 (S.D.N.Y. Oct. 16, 2024) (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) and *United States v. Nixon*, 418 U.S. 683, 700 (1974)). Moreover, "Federal Rule of Criminal Procedure 17(c), [is] a discovery provision that relates solely to pretrial matters." *United States v. Martin*, 141 F.3d 1152 (2d Cir. 1998).

[3] Sentencing issues are even narrower here than would be typical because current counsel has the benefit of gaining efficiencies from prior counsel's work with respect to, *inter alia*, the PSR. Prior counsel submitted objections to the presentence report in a 19-page letter to Probation on October 16, 2024—*i.e.*, more than one year ago. This strongly indicates that the defendant reviewed the draft PSR, and worked with prior counsel on those objections. Probation issued the final PSR just before Thanksgiving, in 2024.

defendant's apparent English ability.[4] This too is an issue that counsel has long known about, and should have been built into the two extended schedules that the current counsel team previously requested. *See* Dkt. 321 (this Court denying the defendant's request for a two-week *trial adjournment,* which the defendant sought largely on the basis of claimed translation difficulties). Indeed, in July 2025, translation difficulties were explicitly raised as a reason to adjourn sentencing to December 2025. *See* Dkt. 715, at 2 (the defendant claiming that "Guo's English language limitations necessitate translation"). Further, given automated translation software and translators that the defendant is known to have access to, it should not take several weeks to translate a document. Dkt. 704 (May 12, 2025 order granting defense request to engage the services of a certified interpreter).

Finally, defense counsel alludes to the notion that they have prioritized other clients due to delays of CJA voucher payments. Defense counsel said the same thing in July. *See* Dkt. 715 (noting "payments pursuant to the Criminal Justice Act have been suspended until at least October 2025 . . . there is some pressure upon counsel to devote more time to retained cases"). Accordingly, in July, when the Court afforded counsel more time than they requested it should have been sufficient to manage this issue. The Government assumes, and defense counsel has not stated otherwise, that counsel have abided by their obligations and are acting as "lead counsel" to the defendant since they were appointed by this Court in April. *See* Revised Plan for Furnishing Representation Pursuant to The Criminal Justice Act, at 9, dated June 7, 2023, available at https://www.nysd.uscourts.gov/attorney/cja (last accessed Dec. 3, 2025); *see also* Ex. A, at 5 (counsel each confirming to the Court that they are "willing to accept appointment").

The defendant offers no compelling reasons to support a fifth adjournment. His attempt to rehash the rational underlying previous adjournment requests should be rejected. *See United States v. Booth*, 996 F.2d 1395, 1397-98 (2d Cir. 1993) (finding no abuse of discretion in denial of further continuance, where proceedings had already been adjourned two times).

## B. The Ongoing Delay Is Harming the Defendant's Victims

The defendant's ongoing delay continues to harm his thousands of victims. It prolongs their financial agony, and the defendant is leveraging the delay to further deceive them.

*First*, following the filing of the instant adjournment request, one victim told the Government via email that the defendant's fifth adjournment request was "utterly disgraceful. We have been without our funds for 3 years." A second victim wrote that there have been "500 days of post-conviction delay. Each postponement has compounded victims' suffering—financially,

---

[4] The defendant appears to have substantial comfort with the English language. In October 2025, the defendant wrote a letter, in English, in support of another criminal defendant, Sean Combs, who was sentenced by Judge Subramanian on October 3, 2025. The defendant's English-language letter stated that he "had multiple conversations with [Combs]." *United States v. Combs*, No. 24 Cr. 542 (AS), Dkt. 523, at 6 (S.D.N.Y. Oct. 1, 2025). The Government assumes those conversations were not in Mandarin. In fact, the defendant's English abilities were raised at trial when the defendant's prior translator testified that the defendant "became fluent" in English over time. Trial Tr. at 536-37.

emotionally, and medically." Indeed, the Government's intent to seek a final order of forfeiture and initiate the process of remitting forfeited assets to victims is on pause while the defendant's delays continue unabated. Post-sentencing ancillary proceedings disposing of third-party claims to forfeitable property typically occur after the defendant has been sentenced and his rights to seized assets are extinguished. *See* 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(c)(1).

*Second*, the defendant is using delay as a tool of further harm. In early 2025, during the several month delay caused by the defendant's sudden request for new, court-appointed counsel, the Government was contacted by several victims regarding the delay of the ongoing case. On March 24, 2025, one victim explained that, following the defendant's trial conviction, there are

> two distinct groups of individuals who lost money due to the fraudulent schemes of Miles Kwok, William Je, and Yanping Wang. One group recognizes the fraud for what it is and believes the defendants deliberately deceived them. The other group does not believe they were defrauded (either because they are complicit in the conspiracy, or they have been misled by it). . . . The sentencing of Miles Guo was initially scheduled for four months after the verdict. [As of March 24, 2025] [i]t has [ ] been eight months [and now it has been 16 months], and sentencing still has not occurred. This prolonged delay sends a misleading signal to the second group, allowing them to remain under the influence of racketeering conspirators and to believe the false narratives being promoted: such as claims of meetings with Kwok and Kwok's messages or assurances that the case will be dismissed and he will soon return to lead them. The absence of timely justice fuels further misinformation and deepens the suffering of those who have already endured so much.

Dkt. 511, at 1, 2.

Plainly, the defendant, and the devotees he cultivated, are using the "absence of timely justice," *id.*, to suggest the case that this Court presided over was unjust. This Court knows that it was not. This Court should not permit the defendant and his remaining adherents to use delay as a weapon to further mislead the defendant's victims. Therefore, when assessing this fifth adjournment request, the Court should weigh the defendant's stated rationale against the interests of the defendant's victims, who have a "right to proceedings free from unreasonable delay." 18 U.S.C. § 3771(a)(6)-(7). After sixteen months, the defendant's victims, and the public, have "a significant interest in the finality of the verdict and in getting [the defendant] sentenced." *United States v. Sabir*, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007).

C.   The Court Should End the Defendant's Campaign of Delay

An examination of the defendant's actions since the trial concluded, as well as the defendant's history of frustrating timely judicial process in other matters, indicate that the

defendant wants to delay these proceedings, and will continue to do so. The Court should not let him.

Trial ended on July 17, 2024, and the Court set sentencing for four months later, on November 19, 2024. On September 8, 2024, the defendant sought his first adjournment—a "one-time, 60-day extension." Dkt. 466. The Court granted a three-week adjournment, which moved sentencing to December 9, 2024. *Id.* The defendant requested his second adjournment on October 10, 2024. The Court agreed to move sentencing to January 6, 2025, and ordered the defendant to file his sentencing submission by December 16, 2024. Dkt. 472. The defendant did not file a sentencing submission on that date. Instead, after the defendant's counsel contacted the Court, on December 20, 2024, the Court held a substitution-of-counsel hearing. There, the defendant expressed a sudden desire to fire his handpicked trial team and obtain a third set of counsel, which would invariably delay this case that was just weeks from conclusion. To justify his abrupt request, the defendant complained about his retained-counsel's trial strategies. Dkt. 700 Ex. A, at 10. These complaints about trial strategy were apparently first raised with the Court five months *after* trial had ended, *after* post-trial motions were filed, and *after* litigation regarding the PSR. For his part, former counsel Mr. Kamaraju stated that it was the defendant who caused a communication breakdown: "[it] seemed clear that he [*i.e.* the defendant] does not want to communicate with me." Dkt. 700 Ex. A, at 13.[5] The Court granted the defendant's request (thereby delaying the matter), and adjourned sentencing *sine die. See* Dkt. 483. Four months later, on April 8, 2025, the Court held a conference to formally relieve the defendant's prior retained counsel (the second team of counsel that the defendant hired) and appoint the current counsel team. At the defendant's current counsel team's request, sentencing was set for September 2025. Then, in July 2025, the defendant sought—and was granted—a fourth adjournment. As described above, that request was primarily based on complaints about the complexity and volume of material that the defense needed to wade through prior to sentencing (issues which the current counsel knew of when they requested sentencing in September 2025). The Government opposed that fourth adjournment, but the Court granted it and set sentencing for January 20, 2026.

Next, on September 4, 2025, the defendant filed a motion asking this Court to order the Government to initiate forfeiture proceedings against the Bankruptcy Trustee managing the defendant's bankruptcy estate. Dkt. 724. The defendant's motion seeks unprecedented relief. It is not a surprise, then, that the defendant identified no legal basis for that relief, and indeed there is none. *See* Dkt. 750. That unusual motion feints that the defendant seeks such relief to satisfy the defendant's forfeiture obligations and help his victims. Dkt. 724 at 8. But that stated motivation is incompatible with: (i) the extraordinary harm that the defendant imposed on his victims for years; (ii) the defendant's June 27, 2025 decision not to take a position regarding the specific property that the Government has seized and seeks to forfeit, Dkt. 710; (iii) the defendant's decision not to contest the Government's July 28, 2025 motion for a preliminary order of forfeiture, which the

---

[5] Whatever breakdown in communication between Mr. Kamaraju and the defendant may have occurred, it appears to have at least somewhat been resolved. In August 2025, Mr. Kamaraju contacted the U.S. Attorney's Office, stating that he was retained by one of the defendant's supporters to advocate for the defendant. (The Government declined to communicate with Mr. Kamaraju about this matter given that he is no longer the defendant's counsel of record.)

Court granted, Dkts. 716, 720[6]; and (iv) the fact that the defendant is bankrupt, and claims to be effectively judgement proof. Dkt. 700 Ex. A at 13 (the defendant claiming no financial resources to this Court); *id*. at 17 (former counsel listing civil judgements and bankruptcy as debits).

It is not a coincidence that the practical effect of granting the defendant's September 4, 2025 motion could essentially end the defendant's bankruptcy by transferring the assets of the estate to the Government. Not only could that cause additional delay to this case, but, more to the point, the September motion appears to be a tool of the defendant to achieve his longstanding goal to frustrate his bankruptcy proceedings. *See e.g.*, Dkts. 120 (defendant motion to stay bankruptcy cases), 218 (defendant second motion to stay bankruptcy cases and for reconsideration); GX VI194 (photograph of protests aimed at the bankruptcy trustee); *e.g.*, Trial Tr. 4257 (witness testimony describing protests by the defendant's followers in front of a school where the bankruptcy trustee's daughter worked). It is notable that, on one hand, the current defense team complains about limited time to accomplish tasks for sentencing and their need to spend time on retained clients, while on the other hand, they devoted their resources in this case to an unusual motion for unprecedented relief that targets the bankruptcy that the defendant has long sought to stop. That the defendant directed his court-appointed defense team to spend their time preparing a motion to hinder his bankruptcy is one thing. But the defendant's choice to do so, should not also be allowed to justify his twin aim to delay his criminal case. The defendant's court-appointed criminal defense team are not his bankruptcy attorneys. The defendant's choice to direct his court-appointed counsel's resources toward that September motion, rather than prepare for sentencing consistent with previously order court deadlines, is not a basis for a fifth adjournment. *See United States v. Arslanouk*, 853 F. App'x 714, 722 (2d Cir. 2021) (affirming district court denial of defendant's sentencing adjournment where defendant had a "history of counsel substitutions . . . resulting in multiple adjournments," and the adjournment request was "yet another effort to delay").

In addition to the five adjournment requests, a last-minute change of counsel, and his unusual September 2025 motion, the defendant's desire to cause additional delay is exemplified by his stated intent to seek to reopen issues that were already decided. For instance, in his July adjournment request, the defendant indicated that he would seek to re-litigate issues related to the Court's decision to enter a protective order pursuant to the Classified Information Procedures Act ("CIPA"). Dkt. 715 at 2 ("We anticipate making a comprehensive discovery request of the government pursuant (at least in part) to the Classified Information Procedures Act."). Five months later, the defendant once again dangles that possibility. *See* Dkt. 768 ("we believe there are classified materials . . . which most certainly are appropriate to present to the court at sentencing"). This Court—after several rounds of briefing and several Section 2 conferences with each party— already addressed such matters and issued its CIPA ruling more than a year and a half ago. Dkt. 294 (April 18, 2024 order). That issue has been decided. There is no basis to revisit it. Entertaining the defendant's request to do so would simply provide the defendant the ongoing delay he desires.

As this Court is aware, the defendant's efforts to delay or hinder court proceedings are not unique to this case. After the defendant was ordered to pay $116 million for an overdue loan that he had personally guaranteed (and not honored), a private plaintiff sought to identify the defendant's assets to collect on that judgment. In response, the defendant arranged to move one of

---

[6] The defendant now seeks to relitigate this order. Dkt. 724.

his assets—a yacht—to a foreign jurisdiction. As a result, in March 2021, Justice Barry Ostrager issued a conditional order of civil contempt, which directed the defendant to return the yacht to the jurisdiction of the New York civil court. The defendant's delays continued, and after a year of the defendant hiding his assets and failing to pay as ordered, on February 9, 2022, Judge Ostrager entered a final Order of Civil Contempt against the defendant. That order imposed a total judgment of $254 million arising from what Judge Ostrager described as the defendant's "shell game" to shield his assets from the plaintiff. The February 9, 2022 decision and contempt order directed the defendant to pay the $134 million contempt fine within five days. *See id.*, Dkt. 1183, at 2. Six days later, in a (largely successful) gambit to avoid making that payment, and to the frustration of those court proceedings, the defendant filed for bankruptcy. In his initial bankruptcy filings, the defendant claimed to have as much as $500 million in debt and claimed to have no more than $100,000 in assets, despite living in expensive properties, surrounded by luxury cars and lavishly expensive furniture. *See In Re Ho Wan Kwok*, Case No. 22-50073 (JAM).

The defendant also delayed and hindered his bankruptcy case. In bankruptcy court filings, the defendant represented that specified assets were not his, but rather were properties belonging to family members, shell companies, and other financial entities. Text messages introduced during trial showed the defendant's key co-conspirator and co-defendant Yvette Wang coaching the defendant's daughter to lie during a bankruptcy deposition to maintain this subterfuge. The defendant also encouraged his followers to flood the bankruptcy docket with claims in an effort to force the Trustee to incur unnecessary costs and expense as well as obstruct the proceedings. *See* Dkt. 51, at 9 (this Court finding that "Two days after Judge Manning's order, Defendant posted a message on one of his social media accounts, encouraging followers to file claims in his bankruptcy proceeding. Defendant later posted a video encouraging his followers to file claims in order to drive up the trustee's attorneys' fees." (citations omitted).).

The defendant's history of frustrating, obstructing, and delaying courts puts in proper context his actions in this matter since trial concluded: the defendant sought five adjournments of his sentencing; the defendant cut off communication with his handpicked retained trial counsel just weeks before his scheduled sentencing; the defendant terminated his trial counsel shortly before his sentencing date (and despite a purported breakdown in their relationship, his lead trial counsel has since resurfaced to attempt to advocate for the defendant again); the defendant appears to have directed his current court appointed counsel to focus resources on hindering the bankruptcy case as opposed to, perhaps, directly preparing for the defendant's sentencing; the defendant has stated an intent to re-litigate long dormant issues, but appears to be waiting to do so; and the defendant's ongoing delays in this case are being leveraged to further harm his victims. Simply put, the defendant appears to want to delay his sentencing for the foreseeable future. The Court should not let him. *See* Fed. R. Crim. Pro. 32(b)(1) ("The court must impose sentence without unnecessary delay"). [7]

---

[7] In response to the defendant's intent to seek an adjournment, the Government offered to discuss a reasonable, limited adjournment if the defense would agree to stop seeking seriatim adjournments. Tellingly, the defense did not accept the Government's proposal.

D.  Conclusion

The defendant's request for a fifth sentencing adjournment should be denied,[8] and the Court should require the defendant to disclose his *ex parte* motion for a Rule 17(c) subpoena to the Government.

Respectfully submitted,

SEAN S. BUCKLEY
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515.

by:  ____/s/_____
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314

cc:    Counsel of Record (by ECF)

---

[8] To the extent that the Court is inclined to grant the defendant's fifth adjournment request, the Government respectfully requests that the Court make clear that this will be the final adjournment granted, because the public, the parties, and the thousands of victims need finality. Further, the Government respectfully requests that any sentencing adjournment be modest. For example, a two-week adjournment would accommodate defense counsel's work over the holiday season, while also enabling this Court to address the outstanding submissions on the docket "expeditiously." *See* Dkt. 767 (Second Circuit Order).