# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 25 MAG 1266

| |
|---|
| UNITED STATES OF AMERICA |
| -v.- |
| All monies and funds contained in Barclays Bank plc (Jersey) portfolio account 96172701, held by Kin Ming Je ("Target Account-1"), and all funds traceable thereto, including accrued interest; and |
| All monies and funds contained in Barclays Bank plc (Jersey) portfolio account 96195503, held by Sin Ting Rong ("Target Account-2"), and all funds traceable thereto, including accrued interest (collectively, the "Target Accounts"). |
| Defendants-in-rem. |

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure Warrant *In Rem***

**Pursuant to 18 U.S.C. §§ 981, 982, 984, 21 U.S.C. § 853, 28 U.S.C. § 2461**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Zachary Effting, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. Introduction

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency"). I have been a Special Agent with the FBI since in or about September 2019. Since in or about October 2020, I have been assigned to the FBI's Complex Financial Crimes squad. During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants. In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.    This affidavit is submitted in support of the United States of America's application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 982, 28 U.S.C. § 2461, and 21 U.S.C. § 853, for:

a.    All monies and funds contained in Barclays Bank plc (Jersey) portfolio account 96172701, held by Kin Ming Je, and all funds traceable thereto, including accrued interest ("**Target Account-1**"); and

b.    All monies and funds contained in Barclays Bank plc (Jersey) portfolio account 96195503, held by Sin Ting Rong, and all funds traceable thereto, including accrued interest ("**Target Account-2**," and collectively with Target Account-1, the "Target Accounts").

3.    The Target Accounts constitute the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud) and the proceeds of and property involved in violations of 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.    This affidavit is based on, among other sources of information: (i) my review of documents and other evidence; (ii) my conversations with other law enforcement personnel and review of law enforcement reports, including reports of surveillance; (iii) my review of publicly available information, including digital videos posted on the Internet and other open source research conducted on the Internet relating to, among other ventures, the "Rule of Law Society," the "Rule of Law Foundation," "G|NEWS," "GTV," "G|CLUBS," "G|FASHION," and the "Himalaya Exchange," (iv) my participation and the participation of other law enforcement officers in various witness interviews; (v) my review of evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants, including emails, cellphone location data, and cellphone toll records; (vi) my review and analysis of various bank account records; (vii) my review of the evidence

presented during the jury trial in *United States v. Miles Guo*, S3 23 Cr. 118 (AT); (viii) my training and experience concerning the commission of financial crimes; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (x) my review of documents provided by counsel for, among other entities, G Club, HCHK Technologies Inc., Hamilton Investment Management Ltd., and Major Lead International ROM (the parent entity of the "Himalaya Exchange"); and (xi) my conversations with other law enforcement officers.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth herein, there is probable cause to believe that the Target Accounts are subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (C), 981(b), and 982(a)(1) & (b)(1) as property involved in violations of 18 U.S.C. § 1956 and/or the proceeds of violations of 18 U.S.C. § 1343, or property traceable thereto.  In summary, the evidence reveals a series of fraudulent investment schemes that pertain to several interrelated companies and their affiliated entities (collectively, the "Guo Enterprise"), including GTV Media Group Inc. ("GTV"), G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), the Himalaya Exchange ("Himalaya"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming

("JE").

6.      The Indictment captioned *United States v. Miles Guo, Kin Ming Je, and Yanping Wang*, S3 23 Cr. 118 (the "Indictment") (attached as Exhibit A to Exhibit 1, and incorporated by reference herein), charged conspiracy to commit racketeering, conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, and various substantive wire fraud and securities fraud charges relating to online fraud schemes, including those connected to GTV, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

7.      On or about May 3, 2024, WANG pleaded guilty to Counts One and Two of an Information captioned *United States v. Yvette Wang*, S4 23 Cr. 118 (AT), which charged conspiracy to commit wire fraud and conspiracy to commit money laundering, relating to the schemes, including GTV, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

8.      On or about July 16, 2024, following a seven-week jury trial, GUO was convicted on Counts One through Four and Counts Seven through Eleven of the Indictment.[1]

9.      As set forth in the Indictment, and as presented in the form of evidence admitted during trial, the Guo Enterprise collected victim proceeds and used entities, including ROLS, ROLF, G|NEWS, GTV, G|CLUBS, G|FASHION, and the Himalaya Exchange, in furtherance of the Guo Enterprise, to engage in transactions for GUO's personal benefit, and to launder the proceeds of the G Enterprise fraud schemes.  (*See* Ex. A ¶ 3(a).)

10.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the investment schemes to the Target Accounts.

---

[1] The jury found GUO not guilty on Counts Five, Six, and Twelve of the Indictment, which charged substantive wire fraud, securities fraud, and unlawful monetary transaction charges relating to GTV.  As charged in the Indictment, the conspiracy charges in Counts One through Four encompass conduct related to GTV, which is a member of the G Enterprise, among other entities.

## II. Statutory Basis for Forfeiture

11.     The statutory provisions pursuant to which the Target Accounts are subject to civil and criminal seizure and forfeiture are as follows:

### *Money Laundering Offenses*

12.     Title 18, United States Code, Section 981(a)(1)(A) subjects to civil forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A); *see also* 28 U.S.C. § 2461(c) (authorizing criminal forfeiture for persons convicted of an offense for which Congress has provided civil or criminal forfeiture of property).

13.     Title 18, United States Code, Section 982(a)(1) subjects to criminal forfeiture "any property, real or personal, involved in [a violation of 18 U.S.C. §§ 1956, 1957, or 1960] . . . , or any property traceable to such property."

14.     18 U.S.C. § 1956(a)(1)(B)(i) impose a criminal penalty on any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (B)     knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

15.     18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

> (B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

16.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, racketeering activity as defined in 18 U.S.C. §1961(1). Section 1961(1), in turn, defines racketeering activity to include wire fraud, 18 U.S.C. § 1343.

17.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

18.    Forfeiture pursuant to violations of the above money laundering statutes is not limited to proceeds of the crimes being committed. Rather, forfeiture based on money laundering violations includes all property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds).

## *Wire Fraud Offenses*

19.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). As set forth above,

6

wire fraud constitutes such a specified unlawful activity.

20.     The federal wire fraud statute, 18 U.S.C. § 1343, imposes a criminal penalty on any person of "having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purposes of executing such scheme or artifice."  In addition, 18 U.S.C. § 1349  provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

21.     In addition, Title 28, United States Code, Section 2461(c) provides that "If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and Section 3554 of Title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. § 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act."

22.     Accordingly, with respect to an individual charged with wire fraud offenses, the procedures set forth in 21 U.S.C. § 853 (with the exception of subsection (d)), authorize issuance of a criminal seizure warrant to seize property for which there is probable cause to believe constitute the proceeds of a wire fraud offense.

23.     Finally, as to the Subject Offenses, with respect to respect to fungible property,

7

including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

> (a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:
>
> > (A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> > 1.
> > (B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2)    Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
>
> (b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

### *Seizure Warrants*

24.    With respect to the money laundering offenses described above, the Court is empowered by 18 U.S.C. § 982(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 982(a).  As relevant here, section 982(b) provides that such "seizure and disposition of the property and any related judicial . . . proceeding, shall be governed by" 21 U.S.C.§ 853 (other than subsection (d) of that section). 21 U.S.C. § 853(f), in turn, provides in relevant part that a seizure warrant for property subject to forfeiture may be sought in the same manner in which a search warrant may be issued.  A court shall issue a criminal seizure warrant if it "determines that the property to be seized would, in the event of a conviction, be subject to forfeiture" and that a restraining order pursuant to 21 U.S.C. § 853(e) would be inadequate to assure the availability of the property for forfeiture.

25.    Funds in a bank account are inherently fungible and easily transferrable.  And, as

described below, the members of the conspiracy are familiar with moving criminal proceeds, layering such proceeds, and otherwise conducting transactions in a manner that conceals the source and nature of the funds involved.

26.    Accordingly, based on my participation in this investigation, my training and experience, and my personal knowledge, I submit that a restraining order prohibiting the Subject Account from moving, transferring, using, or dissipating assets would not be sufficient to guarantee the availability of the Target Assets for forfeiture.

27.    With respect to all the Subject Offenses, the Court is also empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C). Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b).

28.    Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As described below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

<u>The Charges</u>

29.    On April 24, 2024, the Government filed the 12-count Indictment, charging Miles Guo, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven,"

9

a/k/a "The Principal," a/k/a "Boss"; Kin Ming Je, a/k/a "William Je" ("JE"), and Yanping Wang, a/k/a "Yvette" with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349 (Count Two); money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (Count Three); conspiracy to commit securities fraud in violation of 18 U.S.C. §371 (Count Four); four counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Five, Seven, Nine, and Eleven); three counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2 (Counts Six, Eight, and Ten); and unlawful monetary transactions in violation of 18 U.S.C. § 1957 (Count Twelve)). [2]  In addition, the Indictment charged JE with a violation of 18 U.S.C. § 1512(c)(2) (obstruction of justice) (Count Thirteen).  As set forth above, the Indictment is attached hereto as Exhibit A and is incorporated by reference herein.

30.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a fraud (the "Fraud") that pertains to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, WANG, and other Target Subjects.  The investigation revealed that the Fraud involved the solicitation of more than $1 billion from victims and the subsequent money laundering and/or misappropriation of hundreds of millions of dollars.  GUO was the leader of, and directed, the Fraud.  JE was the financial architect and key money launderer for the Fraud.  WANG operated as GUO's "chief of staff" and managed the day-to-day operations of the entities used to perpetrate the Fraud.

31.    GUO, JE, and WANG have conducted the Fraud, which occurred between at least in or about 2018 through in or about March 2023, through various interrelated offerings.  For

_____

[2] As noted *supra* n.1, the jury found GUO not guilty on Counts Five, Six, and Twelve of the Indictment.

example, as described further below and in the Indictment, investors were promised unrealistic, outsized returns on their investments; investors were induced to invest on the basis of numerous misrepresentations; a large portion of the investment money was misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

32.    Based on my conversations with other law enforcement officers who have participated in this investigation and my review of the Indictment, WANG's plea agreement and change-of-plea hearing, and the *United States v. Guo* trial record, I have learned that the Fraud includes, among other means and methods, the following:

a.    Starting at least in or about June 2020, GUO began promoting G|CLUBS, a purported high-end membership club.  G|CLUBS, which launched in or about October 2020, claimed to provide Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for high net worth individuals from the Asian market through the sale of purported memberships.  In soliciting G|CLUBS membership funds, GUO and others represented that G|CLUBS membership would be a mechanism to obtain stock in GUO-affiliated companies, including GTV and G|FASHION.  G|CLUBS raised at least approximately $250 million in purported membership fees, which funds were commingled with other fraud proceeds and used to promote the Fraud and/or misappropriated.  (*See* Ex. A at ¶¶ 14-15.)

b.    GUO and others announced the establishment of the Himalaya Exchange, a purported cryptocurrency exchange, starting in or about April 2021, in videos distributed via social media, including on G|NEWS and GTV, in which GUO falsely stated, among other things, that the value of a token on the Himalaya Exchange, H Coin, was "linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."  (*See* Ex. A at ¶ 19(a), (b).)  The Himalaya Exchange's initial coin offering for H Coin took place on November 1, 2021.  The Himalaya

Exchange has raised at least approximately $400 million from victims. In or about August 2024, the FBI seized domains for various arms of the Fraud, including G|CLUBS and the Himalaya Exchange, pursuant to judicially authorized seizure warrants. Despite those seizures, victims have reported that JE and others continue to operate new versions of G|CLUBS and the Himalaya Exchange from Abu Dhabi, to which GUO, JE, WANG, and others started to move much of the operating framework for the Fraud in or about 2022, around the time the Government executed seizure warrants. For example, even at present, the fraud appears to be continuing through, among other things, a rebranded version of G|Fashion called "G|Forever."[3]

33.    Based on my training and experience and my conversations with other law enforcement officers who have participated in this investigation, I am aware that more than approximately $200 million in fraud proceeds has been misappropriated in the course of the Fraud, including the direction of approximately $100 million in victim funds designed for investment in a GUO entity to be invested, instead, in a high-risk hedge fund for the benefit of GUO's son; the purchase of a mansion in Mahwah, New Jersey for approximately $26.5 million in or about December 2021 through an entity owned and controlled by JE on behalf of GUO; the transfer of approximately $13 million in fraud proceeds to an escrow account, which funds were subsequently used to pay for extravagant renovations to, and furnishings for, the Mahwah Mansion, for the benefit of GUO and his family; and the transfer of approximately $37 million in Himalaya Exchange funds that was structured as a purported "loan" to personally guarantee the cost of a luxury yacht that GUO had previously purchased and used. (*See* Ex. A at ¶¶ 16(h), 17(f), 18.)

<u>Background on JE</u>

---

[3] *See* https://gforever.store (*last visited* April 2, 2025)

34.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.     JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various entities relevant to the Fraud, as described in greater detail below.  Specifically:

i.     JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.   JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.     JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[4] that was incorporated in the United Kingdom on or about July 10, 2020.

iii.     JE was listed as the founder and Chairman of the Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is or was the 100% beneficial owner of various entities that operate the Himalaya Exchange, including Major Lead International Ltd., Himalaya International Clearing Ltd. ("Himalaya Clearing"), Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

iv.     As described herein and reflected in Exhibit A, JE was charged for his participation in the Fraud.  In addition, JE was charged (in Count Thirteen) with obstruction of

---

[4] *See* https://www.aca-capital.com/ (*last visited* April 2, 2025).

justice, in connection with his attempt on or about September 20, 2022 to transfer money to a bank account at First Abu Dhabi Bank in the United Arab Emirates ("UAE"), ending in 0026, held in the name of ACA Capital Group Ltd. (the "UAE ACA Capital Account")—which is owned and controlled by JE—in an attempt to impede and interfere with the federal investigation in this case. JE is currently a fugitive and is believed to be living in the UAE.

The Prior JE Seizure Warrants

35.     On or about September 18, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for all funds in 11 bank accounts, including all funds in one Metropolitan Commercial Bank ("MCB") account, held For Benefit Of FV Bank, and all funds in nine Silvergate Bank ("Silvergate") accounts, held by JE (*i.e.*, Kin Min Je, a/k/a "William Je") in the names of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd.

36.     On or about September 20, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for an additional Silvergate account, held in the name of Hamilton Opportunity Fund SPC, and three FV Bank accounts, held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and Himalaya International Clearing, Ltd.  JE was the authorized signatory on all four accounts.

37.     On or about October 14, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for eight Mercantile Bank accounts; six of those accounts were held in the names of various Hamilton and/or Himalaya Exchange entities, and JE was the authorized signatory on those six accounts.

38.     On or about October 29, 2024, the Honorable Barbara C. Moses, United States Magistrate Judge for the Southern District of New York, issued a seizure warrant for two Barclays

14

Bank plc (OIM) accounts, held in the names of JE and Sin Ting Rong ("RONG") (collectively, the "Prior JE Seizure Warrants"). The affidavit for the October 29, 2024 seizure warrant is attached hereto as Exhibit 1 and incorporated by reference herein.

39.    Based on my participation in this investigation, including my tracing of Fraud proceeds, I am aware that the Government seized approximately $634.8 million in Fraud proceeds through the prior seizure warrants, approximately $608.9 million of which was seized from bank accounts controlled by JE pursuant to the Prior JE Seizure Warrants.

<u>The Scheme to Launder Fraud Proceeds</u>

40.    As described in greater detail in Exhibit 1 (the Prior JE Seizure Warrant Affidavit) and at the *United States v. Miles Guo* trial, GUO, JE, WANG, and others operated the Fraud through the G Enterprise, which was comprised of entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

41.    As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.3 billion, as described in greater detail during the *Guo* trial. *See, e.g.,* Trial Exhibit Financial Flows Summary Charts, GX Z-26 (attached as Exhibit C to Exhibit 1).

42.    As a further part of the money laundering scheme, and as described in greater detail in Exhibit 1, hundreds of millions of dollars of Fraud proceeds were transferred to an Abu Dhabi bank account (the "UAE ACA Capital Account"). A significant portion of the Fraud proceeds transferred into the UAE ACA Capital Account were misappropriated. For example, JE wired approximately $33.3 million of Fraud proceeds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ting Rong), and his company, Hamilton. The wires to his and his wife's personal accounts—which amounted to more than approximately

15

$10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities associated with the Farm Loan Program or G|CLUBS.

<u>The Target Accounts</u>

43.    The Target Accounts are held at Barclays Bank plc in Jersey.  Target Account-1 is held in the name of Kin Ming Je, a/k/a "William JE" (JE).  Target Account-2 is held in the name of Sin Ting Rong (RONG), JE's wife.

44.    Based on my participation in this investigation and my tracing of Fraud proceeds, and as described in the Prior JE Seizure Warrant Affidavits and reflected in GX Z-26, GUO, JE, and others have layered Fraud proceeds into and through various bank accounts, including the UAE ACA Capital Account, to conceal the nature and source of the funds.  *See, e.g.,* Ex. A at ¶¶ 31-35.

<u>Fraud Proceeds are Transferred to the Target Accounts</u>

45.    Based on my involvement in this investigation, my tracing of funds, and my training and experience, I am aware that fraud proceeds have been traced into the Target Accounts in ways that, based on my training and experience, are indicative of money laundering.  Specifically, the tracing of the funds reflects, among other things: (a) transfers of Fraud proceeds from U.S. bank accounts to the UAE ACA Capital Account, which is located overseas in a jurisdiction that is beyond the reach of U.S. law enforcement and regulators; (b) transfers of Fraud proceeds into bank accounts located in high-risk jurisdictions that are frequent havens for money laundering (including the Bahamas, Hong Kong, the Cayman Islands, and the British Virgin Islands); (c) transfers of Fraud proceeds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with

concealment of the nature, source, or origin of the funds; and (d) misappropriation of Fraud proceeds to GUO, JE, and their family members. *See, e.g.*, Ex. A at ¶¶ 4-5, 32-35.

46.    Based on information provided by law enforcement authorities in Jersey, I have learned that law enforcement authorities in Jersey obtained domestic Restraint Orders for funds held in the Target Accounts.

47.    Based on my review and analysis of documents and bank records, including records for the UAE ACA Capital Account and other bank accounts owned or controlled by JE, my review of court filings and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my conversations with others, and my involvement in this investigation, I have learned the following, among other things:

### Target Account-1 (JE)

a.    Target Account-1 was opened in or about January 2021 and is held in the name of JE.

b.    Fraud proceeds have been traced into **Target Account-1**. Specifically, on or about February 4, 2021, **Target Account-1** was funded with approximately $500,000 in fraud proceeds from Barclays Bank plc (Isle of Man ("IOM")) account ending in -1744, which is JE's Isle of Man bank account that was defined as Target Account-1 in the October 29, 2024 seizure warrant affidavit at Exhibit 1.

### Target Account-2 (RONG)

a.    Target Account-2 was opened in or about April 2020 and is held in the name of RONG.

b.    Fraud proceeds have been traced into **Target Account-2**. Specifically, on or about July 9, 2021, a wire of approximately $2 million was sent to **Target Account-2** from

Barclays Bank plc (IOM) account ending in -6277, which is RONG's Isle of Man bank account that was defined as Target Account-2 in the October 29, 2024 seizure warrant affidavit at Exhibit 1.

### III. Conclusion

48.     Based on the information set forth in Exhibits A-C, and the foregoing, I submit that there is probable cause to believe that funds held in the Target Accounts are subject to forfeiture as property involved in violations of 18 U.S.C. § 1956, and is subject to forfeiture as property constituting or derived from proceeds traceable to violations of, 18 U.S.C. §§ 1343 and 1349.

49.     Accordingly, pursuant to 18 U.S.C. §§ 981(b), 982(b), and 984, 28 U.S.C. § 2461(c), and 21 U.S.C. § 853, I respectfully request that the Court issue a warrant authorizing the seizure of the Target Accounts.


/s/ sworn telephonically
_____
ZACHARY EFFTING
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
<u>17</u> day of April, 2025

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 3805

UNITED STATES OF AMERICA

    -v.-

All monies and funds contained in Barclays
Bank plc (IOM) account
GB61BARC20268062461744, held by Kin
Ming Je ("Target Account-1"), and all funds
traceable thereto, including accrued interest; and

All monies and funds contained in Barclays
Bank plc (IOM) account
GB86BARC20268184646277, held by Sin Ting
Rong ("Target Account-2"), and all funds
traceable thereto, including accrued interest
(collectively, the "Target Property").

                    Defendants-in-rem.

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981, 982, and
21 U.S.C. § 853**

SOUTHERN DISTRICT OF NEW YORK) ss.:

    Zachary Effting, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I.  Introduction

    1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or

"Investigating Agency").  I have been a Special Agent with the FBI since in or about September

2019.  Since in or about October 2020, I have been assigned to the FBI's Complex Financial

Crimes squad.  During my time with the FBI, I have participated in investigations of securities and

wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted

or participated in debriefings of witnesses, reviews of financial records, and the execution of search

warrants.  In particular, I have participated in the execution of search warrants involving physical

premises, electronic devices, and other electronic evidence, as well as the execution of seizure warrants involving crime proceeds and financial accounts.

2.     This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981, 982, and 21 U.S.C. § 853, for:

a.     All monies and funds contained in Barclays Bank plc (Isle of Man, or "IOM") account GB61BARC20268062461744, held by Kin Ming Je ("**Target Account-1**"), and all funds traceable thereto, including accrued interest; and

b.     All monies and funds contained in Barclays Bank plc (IOM) account GB86BARC20268184646277, held by Sin Ting Rong ("**Target Account-2**"), and all funds traceable thereto, including accrued interest (collectively, with "Target Account-1," the "**Target Property**").

3.     The **Target Property** constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Subject Offenses"), as described below.

4.     This affidavit is based on, among other sources of information: (i) my review of documents and other evidence; (ii) my conversations with other law enforcement personnel and review of law enforcement reports, including reports of surveillance; (iii) my review of publicly available information, including digital videos posted on the Internet and other open source research conducted on the Internet relating to, among other ventures, the "Rule of Law Society," the "Rule of Law Foundation," "G|NEWS," "GTV," "G|CLUBS," "G|FASHION," and the "Himalaya Exchange," (iv) my participation and the participation of other law enforcement officers in various witness interviews; (v) my review of evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants, including emails, cellphone location data, and cellphone toll records;

(vi) my review and analysis of various bank account records; (vii) my review of the evidence presented during the jury trial in *United States v. Miles Guo*, S3 23 Cr. 118 (AT), in the United States District Court for the Southern District of New York; (viii) my training and experience concerning the commission of financial crimes; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (x) my review of documents provided by counsel for, among other entities, G Club, HCHK Technologies Inc., Hamilton Investment Management Ltd., and Major Lead International ROM (the parent entity of the "Himalaya Exchange"); and (xi) my conversations with other law enforcement officers.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.    As set forth herein, there is probable cause to believe that the **Target Property** is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C),  and 18 U.S.C. § 981(b), 18 U.S.C. § 982(a)(1) & (b)(1) as property involved in violations of 18 U.S.C. § 1956and/or property constituting or derived from proceeds traceable to violations of 18 U.S.C. § 1343..  In summary, the evidence reveals a series of fraudulent investment schemes that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc. ("GTV"), G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), the Himalaya Exchange ("Himalaya"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC

("Crane"). As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.      The Indictment captioned *United States v. Miles Guo, Kin Ming Je, and Yanping Wang*, S3 23 Cr. 118 (the "Indictment") (attached as Exhibit A and incorporated by reference herein), filed in the United States District Court for the Southern District of New York, charged Miles Guo, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss" (*i.e.*, GUO); Kin Ming Je, a/k/a "William Je" ("JE"), and Yanping Wang, a/k/a "Yvette" (*i.e.*, WANG), conspiracy to commit racketeering, conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, and various substantive wire fraud and securities fraud charges relating to online fraud schemes, including those connected to GTV, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

7.      On or about May 3, 2024, WANG pleaded guilty to Counts One and Two of an Information captioned *United States v. Yvette Wang*, S4 23 Cr. 118 (AT), which charged conspiracy to commit wire fraud (in violation of 18 U.S.C. § 371) and conspiracy to commit money laundering (in violation of 18 U.S.C. § 371), relating to the schemes, including GTV, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange. The object of the conspiracy charged in Count One of the S4 Information was a violation of 18 U.S.C. § 1343. The object of the conspiracy charged in Count Two of the S4 Information was a violation of 18 U.S.C. § 1956(a)(1)(b)(i).

8.      On or about July 16, 2024, following a seven-week jury trial, GUO was convicted on Counts One through Four and Counts Seven through Eleven of the Indictment.[1]

---

[1] The jury found GUO not guilty on Counts Five, Six, and Twelve of the Indictment, which charged substantive wire fraud, securities fraud, and unlawful monetary transaction charges relating to GTV. As charged in the Indictment, the conspiracy charged in Counts One through Four encompass conduct related to GTV, which is a member of the G Enterprise, among other entities.

9.      As set forth in the Indictment, and as presented in the form of evidence admitted during trial, the G Enterprise collected victim proceeds and used entities, including ROLS, ROLF, G|NEWS, GTV, G|CLUBS, G|FASHION, and the Himalaya Exchange, in furtherance of the GUO racketeering enterprise, to engage in transactions for GUO's personal benefit, and to launder the proceeds of the G Enterprise fraud schemes.  (*See* Ex. A ¶ 3(a).)

10.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the investment schemes to the Target Property.

## II.  Statutory Basis for Forfeiture

11.      The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

### *Money Laundering Offenses*

12.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

13.      28 U.S.C. § 2461(c) likewise authorizes criminal forfeiture for personas convicted of an offense for which Congress has provided civil or criminal forfeiture of property.

14.      18 U.S.C. § 982 subjects to criminal forfeiture "any property, real or personal, involved in [a violation of 18 U.S.C. §§ 1956, 1957, or 1960] . . . , or any property traceable to such property."

15.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B)      knowing that the transaction is designed in whole or in part—

5

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

16.   For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, racketeering activity as defined in 18 U.S.C. § 1961(1). Section 1961(1), in turn, defines racketeering activity to include wire fraud, in violation of 18 U.S.C. § 1343.

17.   18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

18.   Forfeiture pursuant to violations of the above money laundering statutes is not limited to proceeds of the crimes being committed. Rather, forfeiture based on money laundering violations includes all property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See, e.g., United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds.[2]

---

[2] Property "involved in" a money laundering offense includes not only the illegal proceeds themselves, but also any property used to facilitate the laundering of such proceeds, such as business, business premises, untainted funds comingled with criminal proceeds, and bank accounts of corrupt businesses. *See United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995) (affirming forfeiture of all assets of corporation that "served as a conduit for the proceeds of the illegal transactions"); *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (summary order) (same); *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 567 (S.D.N.Y. 2011) ("The ability to forfeit a business entity which is used to facilitate the offense of money laundering

*Wire Fraud Offenses*

19.    18 U.S.C. § 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." As set forth above, wire fraud constitutes such a specified unlawful activity.

20.    The federal wire fraud statute, 18 U.S.C. § 1343, imposes a criminal penalty on any person of "having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings . . . for the purposes of executing such scheme or artifice."

21.    In addition, 28 U.S.C. § 2461(c) provides that "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and 18 U.S.C. § 3554. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. § 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only

---

is well established." (internal quotation marks omitted)); *United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of N.Y.*, 769 F. Supp. 80,84 (E.D.N.Y. 1991) ("[18 U.S.C. § 981(a)(l)(A)] has been construed by the district courts as authorizing the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money in violation of 18 U.S.C. § 1956." (citing cases)).

in cases in which the defendant is convicted of a violation of such Act." Accordingly, with respect to an individual charged with wire fraud offenses, the procedures set forth in 21 U.S.C. § 853 (with the exception of subsection (d)), authorize issuance of a criminal seizure warrant to seize property for which there is probable cause to believe constitute the proceeds of a wire fraud offense.

*Seizure Warrants*

22.     With respect to the money laundering offense described above, the Court is empowered by 18 U.S.C. § 982(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 982(a). As relevant here, section 982(b) provides that such "seizure and disposition of the property and any related judicial . . . proceeding, shall be governed by" 21 U.S.C. § 853 (other than subsection (d) of that section). 21 U.S.C. § 853(f), in turn, provides in relevant part that a seizure warrant for property subject to forfeiture may be sought in the same manner in which a search warrant may be issued. A court shall issue a criminal seizure warrant if it determines that the property to be seized would, in the event of a conviction, be subject to forfeiture and that a restraining order would be inadequate to assure the availability of the property for forfeiture.

23.     With respect to all the Subject Offenses, the Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C). Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b). Under Section 1355(b)(1)(A), a

forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York. Moreover, pursuant to 18 U.S.C. § 1956(i)(1), venue for a money laundering charge is proper either in "any district in which the financial or monetary transaction is conducted" or in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1). With respect to a money laundering conspiracy, "a prosecution for an attempt or conspiracy offense under [section 1956] may be brought in the district where venue would lie for the completed offense under [18 U.S.C. § 1956(i)(1)], or in any other district where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2).

24.    With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)   In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

(A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)   Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## III. Probable Cause

### A. Probable Cause Regarding Commission of the Subject Offenses

<u>The Charges</u>

25.    On April 24, 2024, the Government filed the 12-count Indictment, charging GUO, JE, and WANG with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349 (Count Two); money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (Count Three); conspiracy to commit securities fraud in violation of 18 U.S.C. §371 (Count Four); four counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Five, Seven, Nine, and Eleven); three counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2 (Counts Six, Eight, and Ten); and unlawful monetary transactions in violation of 18 U.S.C. § 1957 (Count Twelve). [3]    In addition, the Indictment charged JE with a violation of 18 U.S.C. § 1512(c)(2) (obstruction of justice) (Count Thirteen).    As set forth above, the Indictment is attached hereto as Exhibit A and is incorporated by reference herein.

26.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a fraud (the "Fraud") that pertains to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, WANG, and other Target Subjects.    To date, the investigation has revealed that the Fraud involved the solicitation of more than $1 billion from victims and the subsequent money laundering and/or misappropriation of hundreds of millions of dollars.    GUO is the leader of, and directed, the Fraud.    JE is the financial architect and key money

---

[3] As noted *supra* n. 1, the jury found GUO not guilty on Counts Five, Six, and Twelve of the Indictment.

launderer for the Fraud.  WANG operated as GUO's "chief of staff" and managed the day-to-day operations of the entities used to perpetrate the Fraud.

27.     GUO, JE, and WANG perpetrated the Fraud, which occurred between at least in or about 2018 through in or about March 2023, through various interrelated offerings.  For example, as described further below and in the Indictment, investors were promised unrealistic, outsized returns on their investments; investors were induced to invest on the basis of numerous misrepresentations; a large portion of the investment money was misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

28.     Based on my conversations with other law enforcement officers who have participated in this investigation and my review of the Indictment, WANG's plea agreement and change-of-plea hearing, and the *United States v. Guo* trial record, I have learned that the Fraud included, among other means and methods, the following:

          a.     Starting at least in or about June 2020, GUO began promoting G|CLUBS, a purported high-end membership club.  G|CLUBS, which launched in or about October 2020, claimed to provide Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for high net-worth individuals from the Asian market through the sale of purported memberships.  In soliciting G|CLUBS membership funds, GUO and others represented that G|CLUBS membership would be a mechanism to obtain stock in GUO-affiliated companies, including GTV and G|FASHION.  G|CLUBS raised at least approximately $240 million in purported membership fees, which funds were commingled with other fraud proceeds and used to promote the Fraud and/or misappropriated.  (*See* Ex. A at ¶¶ 14-15.)

          b.     GUO and others announced the establishment of the Himalaya Exchange, a purported cryptocurrency exchange, starting in or about April 2021, in videos distributed via social

media, including on G|NEWS, GTV, in which GUO falsely stated, among other things, that H Coin's value is "linked to gold . . . clear gold directly.  No matter how much it raises, 20% will turn into gold."  (*See* Ex. A at ¶ 19(a), (b).)  The Himalaya Exchange's initial coin offering took place on November 1, 2021.  The Himalaya Exchange has raised at least approximately $400 million from victims.  In or about August 2024, the FBI seized domains for various arms of the Fraud, including G|CLUBS and the Himalaya Exchange, pursuant to judicially authorized seizure warrants.  Despite those seizures, victims have reported that JE and others continue to operate new versions of G|CLUBS and the Himalaya Exchange from Abu Dhabi, to which GUO, JE, WANG, and others started to move much of the operating framework for the Fraud in or about 2022, around the time the Government executed seizure warrants.

29.     Based on my training and experience and my conversations with other law enforcement officers who have participated in this investigation, I am aware that more than approximately $200 million in fraud proceeds has been misappropriated in the course of the Fraud, including the direction of approximately $100 million in victim funds designed for investment in a GUO entity to be invested, instead, in a high-risk hedge fund for the benefit of GUO's son; the purchase of a mansion in Mahwah, New Jersey for approximately $26.5 million in or about December 2021 through an entity owned and controlled by JE on behalf of GUO; the transfer of approximately $13 million in fraud proceeds to an escrow account, which funds were subsequently used to pay for extravagant renovations to, and furnishings for, the Mahwah Mansion, for the benefit of GUO and his family; and the transfer of approximately $37 million in Himalaya Exchange funds that was structured as a purported "loan" to personally guarantee the cost of a luxury yacht that GUO had previously purchased and used.  (*See* Ex. A at ¶¶ 16(h), 17(f), 18.)

<u>Background on JE</u>

30.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.    JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various entities relevant to the Fraud, as described in greater detail below.  Specifically:

i.    JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.    JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.    JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[4] that was incorporated in the United Kingdom on or about July 10, 2020.

iii.    JE was listed as the founder and Chairman of the Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is or was the 100% beneficial owner of various entities that operate the Himalaya Exchange, including Major Lead International Ltd., Himalaya International Clearing Ltd. ("Himalaya Clearing"), Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

iv.    As described herein and reflected in Exhibit A, JE was charged for his participation in the Fraud.  In addition, JE was charged (in Count Thirteen) with obstruction of

---

[4] *See* https://www.aca-capital.com/ (*last visited* October 25, 2024).

13

justice, in connection with his attempt on or about September 20, 2022 to transfer money to a bank account at First Abu Dhabi Bank in the United Arab Emirates ("UAE"), ending in 0026, held in the name of ACA Capital Group Ltd. (the "UAE ACA Capital Account")—which is owned and controlled by JE—in an attempt to impede and interfere with the federal investigation in this case.

<u>The Prior JE Seizure Warrants</u>

31.     On or about September 18, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants (the "September 18, 2022 Seizure Warrants") for all funds in 11 bank accounts, including all funds in one Metropolitan Commercial Bank ("MCB") account, held For Benefit Of FV Bank, and all funds in nine Silvergate Bank ("Silvergate") accounts, held by JE (*i.e.*, Kin Min Je, a/k/a "William Je") in the names of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd.

32.     On or about September 20, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants (the "September 20, 2022 Seizure Warrants") for an additional Silvergate account, held in the name of Hamilton Opportunity Fund SPC, and three FV Bank accounts, held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and Himalaya International Clearing, Ltd.  JE was the authorized signatory on all four accounts.

33.     On or about October 14, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for eight Mercantile Bank accounts (the "October 14, 2022 Seizure Warrants," and together with the September 18, 2022 Seizure Warrants and the September 20, 2022 Seizure Warrants, the "Prior JE Seizure Warrants"); six of those accounts were held in the names of various Hamilton and/or Himalaya Exchange entities, and JE was the authorized signatory on those six accounts.  The

affidavit filed in connection with the October 14, 2022, Seizure Warrants is attached hereto as Exhibit B and incorporated by reference herein.

34.    Based on my participation in this investigation, including my tracing of Fraud proceeds, I am aware that the Government seized approximately $634.8 million in Fraud proceeds through the prior seizure warrants, approximately $608.9 million of which was seized from bank accounts controlled by JE pursuant to the Prior JE Seizure Warrants.

<u>The Scheme to Launder Fraud Proceeds</u>

35.    As described in greater detail in Exhibit B (*i.e.*, the affidavit in support of the October 14, 2022 Seizure Warrants) and at the *United States v. Miles Guo* trial, GUO, JE, WANG, and others operated the Fraud through the G Enterprise, which was comprised of entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

36.    As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.3 billion, as described in greater detail during the *Guo* trial.  *See, e.g.,* Government Exhibit ("GX") Z-26 (attached as Exhibit C and incorporated as if fully referenced herein).

37.    As a further part of the money laundering scheme, and as described in greater detail in Exhibit B, hundreds of millions of dollars of Fraud proceeds were transferred to an Abu Dhabi the UAE ACA Capital Account.  A significant portion of the Fraud proceeds transferred into the UAE ACA Capital Account were misappropriated.  For example, JE wired approximately $33.3 million of Fraud proceeds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ting Rong), and his company, Hamilton.  The wires to his and his wife's personal accounts—which amounted to more than approximately $10 million—were

described as dividends, salary or director fees. However, JE was not a director or employee of GTV, Saraca, or other affiliated entities associated with the Farm Loan Program or G|CLUBS.

The Target Property

38.     The Target Property is held at Barclays Bank plc in the IOM. Target Account-1 is held in the name of Kin Ming Je, a/k/a "William JE" (JE). Target Account-2 is held in the name of Sin Ting Rong (RONG), JE's wife.

39.     Based on my participation in this investigation and my tracing of Fraud proceeds, and as described in the Prior JE Seizure Warrant Affidavits and reflected in Exhibit C (*i.e.*, GX Z-26), GUO, JE, and others have layered Fraud proceeds into and through various bank accounts, including the UAE ACA Capital Account, to conceal the nature and source of the funds. *See, e.g.,* Ex. A at ¶¶ 31-35.

Fraud Proceeds are Transferred to the Target Property

40.     Based on my involvement in this investigation, my tracing of funds, and my training and experience, I am aware that Fraud proceeds have been traced into the Target Accounts in ways that, based on my training and experience, are indicative of money laundering. Specifically, the tracing of the funds reflects, among other things: (a) transfers of Fraud proceeds from U.S. bank accounts to the UAE ACA Capital Account, which is located overseas in a jurisdiction that is beyond the reach of U.S. law enforcement and regulators; (b) transfers of Fraud proceeds into bank accounts located in high-risk jurisdictions that are frequent havens for money laundering (including the Bahamas, Hong Kong, the Cayman Islands, and the British Virgin Islands); (c) transfers of Fraud proceeds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; and (d) misappropriation of Fraud proceeds to GUO, JE, and their family members. *See, e.g.*, Ex. A at ¶¶ 4-5, 32-35.

16

41.     Based on conversations with law enforcement authorities in the IOM, I have learned that law enforcement authorities in the IOM obtained domestic Restraint Orders for funds held in the Target Accounts.

42.     Based on my review and analysis of documents and bank records, including records for the UAE ACA Capital Account and other bank accounts owned or controlled by JE, my review of court filings and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my conversations with others, and my involvement in this investigation, I have learned the following, among other things:

### *Target Account-1 (JE)*

a.     **Target Account-**1 is held in the name of JE.

b.     Fraud proceeds have been traced into **Target Account-1**; for example:

i.     In or about March 2020, a Citibank Savings NA account ending in 0926 (the "0926 Citibank Account"), held in the name of JE, reflected a balance of approximately $4.177 million.  On or about March 6, 2020, the 0926 Citibank Account received an incoming wire of approximately $62,180.00 from the Rule of Law Foundation (*i.e.*, one of the G Enterprise entities named in the Indictment, *see* Ex. A at ¶¶ 3(a), 9(b)).  On or about June 8, 2020, JE's approximately $1 million investment in the Hayman Hong Kong Opportunity Fund (which was combined with GUO's approximately $100 million investment of GTV Private Placement fraud proceeds in the HHKOF, *see* Ex. A at ¶ 16(h)), was transferred from the 0926 Citibank Account.

ii.     On or about July 13, 2020, **Target Account-1** received an incoming wire of approximately $950,000.00 from the 0926 Citibank Account.  Between on or about September 28, 2020 and January 21, 2021, approximately $3,075,000.00 in Fraud proceeds was transferred from the UAE ACA Capital Account into **Target Account-1** in the course of four transactions.  The wire descriptions for the four incoming transfers described the purpose of the

incoming wires as, in sum and substance, "Salary" or "Director Fee" for "WJ" (*i.e.*, William JE). While the source of funds *into* the UAE ACA Capital Account prior to September 28, 2020 was the Fraud—specifically, money raised from victims through GTV, the Farm Loan Program, and G|CLUBS—JE was never a director or employee of GTV, its parent Saraca, or the entities associated with the Farm Loan Program or G|CLUBS, as described above in paragraph 36.

### Target Account-2 (RONG)

      a.      **Target Account-2** is held in the name of RONG.

      b.      Fraud proceeds have been traced into **Target Account-2.** Between in or about January and February 2021, **Target Account-2** received approximately $3 million from JE's UAE ACA Capital Account. Specifically, on or about January 25, 2021, **Target Account-2** received an incoming wire of approximately $2 million from the UAE ACA Capital Account; the purpose of the wire included the description "WJ DIVIDEND," which I understand, based on my participation in this investigation, to refer to a dividend payment for "William JE." On or about February 22, 2021, **Target Account-2** received an incoming wire of approximately $1 million from the UAE ACA Capital Account; the purpose of the wire included the description "Transfer to Ms. S T Rong," which I understand, based on my participation in this investigation, to refer to JE's wife, RONG (*i.e.*, the accountholder of **Target Account-2**).

## IV. Conclusion

      43.      Based on the information set forth in Exhibits A, B, and C, and the foregoing, I submit that there is probable cause to believe that funds held in the Target Property are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and, and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i)and 1956(h) (money laundering and conspiracy to commit money laundering).

44.    Accordingly, I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.

s/ Zachary Effting by the Court with permission

_____
ZACHARY EFFTING
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit
by reliable electronic means (telephone), pursuant to Federal
Rules of Criminal Procedure 41(d)(3) and 4.1, this
29th day of October, 2024

_____
THE HONORABLE BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

19

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SUPERSEDING INDICTMENT** |
| v. | S3 23 Cr. 118 (AT) |
| MILES GUO, | |
| a/k/a "Ho Wan Kwok," | |
| a/k/a "Miles Kwok," | |
| a/k/a "Guo Wengui," | |
| a/k/a "Brother Seven," | **ORIGINAL** |
| a/k/a "The Principal," | |
| a/k/a "Boss," | |
| KIN MING JE, | |
| a/k/a "William Je," | |
| a/k/a "Yu Jianming," and | |
| YVETTE WANG, | |
| a/k/a "Yanping," | |
| a/k/a "Y," | |
| Defendants. | |

## COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury charges:

### Overview of the "G Enterprise"

1.      From at least in or about 2018 through at least in or about March 2023, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, conspired to defraud thousands of victims of more than approximately $1 billion, including victims located in the Southern District of New York.  KWOK, JE, WANG, and their co-conspirators operated the G Enterprise through a series of complex fraudulent and fictitious businesses and

investment opportunities that connected dozens of interrelated entities, which allowed the defendants and their co-conspirators to solicit, launder, and misappropriate victim funds (collectively, the "G Enterprise" as defined in paragraph 3b. below).

2.     MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping YVETTE WANG," a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, took advantage of GUO's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits.  In truth and in fact, and as GUO, JE, and WANG well knew, the entities were instrumentalities that GUO, JE, and WANG created and used to perpetrate their fraud, strengthen the G Enterprise, and exploit GUO's followers.  The scheme allowed GUO, JE, and WANG to enrich themselves, their family members, and their co-conspirators, and to fund GUO's extravagant lifestyle.

3.     To effectuate their scheme, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, created and maintained several interrelated and overlapping entities—*i.e.*, the G Enterprise.  The G Enterprise obtained fraud proceeds, laundered those proceeds, spent fraud proceeds on expensive and luxury items, vehicles, and property for the benefit of GUO and his family, used fraud proceeds to promote the G Enterprise, and used fraud proceeds to operate and manage the G Enterprise.

a.   The interrelated and overlapping entities that form the G Enterprise include: ACA Capital Group Limited, ACA Investment Management Limited, Freedom Media Ventures

2

Limited, G Club International Limited, G Club Operations LLC, G Fashion LLC, G Fashion International Limited, GF Italy, LLC, GFNY, Inc., G Music LLC, GETTR USA, Inc., Golden Spring (New York) Limited, Greenwich Land, LLC, GTV Media Group, Inc., Guo Media, G News LLC, Hamilton Capital Holding Limited, Hamilton Investment Management Limited, Hamilton Opportunity Fund SPC, HCHK Property Management, Inc., HCHK Technologies, Inc., the Himalaya Exchange, the Himalaya Farm Alliance, Himalaya Currency Clearing Pty Ltd., Himalaya International Clearing Limited, Himalaya International Financial Group Limited, Himalaya International Reserves Limited, Holy City Hong Kong Ventures Ltd., Hudson Diamond NY LLC, Infinity Treasury Management, Inc., Jovial Century International Limited, Lamp Capital LLC, Leading Shine NY Limited, Lexington Property and Staffing Inc., Major Lead International Limited, Mountains of Spices LLC (d/b/a New York Farm), the New Federal State of China, O.S.C. Orbit Service Company LLC, Rule of Law Foundation III, Inc., Rule of Law Society IV, Inc., Saraca Media Group, Inc., Taurus Fund LLC, Taurus Management LLC, and Voice of Guo Media Inc., among others.

      b.  The defendants and the entities set forth in paragraph 3a., together with others known and unknown, were members and associates of a criminal organization (the "G Enterprise") that engaged in criminal activity, to include wire fraud, bank fraud, money laundering, and securities fraud. The G Enterprise, including its leaders, members, and associates, constituted an enterprise as defined in Title 18, United States Code Section 1961(4); that is, a group of entities and individuals associated in fact, consisting of GUO, JE, WANG, the entities set forth in paragraph 3a., and others known and unknown. The G Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. The G Enterprise operated in the Southern District of New York

and elsewhere. The G Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

4.     To further effectuate their scheme, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, laundered hundreds of millions of dollars of fraud proceeds. To conceal the illegal source of the funds, GUO, JE, and WANG transferred, and directed the transfer of, money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals, including entities that are part of the G Enterprise. Hundreds of millions of dollars of the fraudulent scheme's proceeds were transferred, either directly or indirectly, to bank accounts in the United States, the Bahamas, Switzerland, and the United Arab Emirates ("UAE"), among other places, and held in the name of entities owned or otherwise controlled by JE, including ACA Capital, Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC.

5.     MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, used more than approximately $300 million of the fraudulent scheme's proceeds for their and their families' benefit. For example, GUO used fraudulently-obtained victim money to purchase, fund, or finance: a $26.5 million approximately 50,000-square-foot mansion in New Jersey for GUO and his family; luxury vehicles, including an approximately $3.5 million Ferrari and an approximately $4.4 million custom Bugatti for one of GUO's close family members and co-conspirators ("Relative-1"); an approximately $37 million luxury yacht that was used by GUO and his family and purchased in the name of one of GUO's

4

close family members ("Relative-2"); a piano valued at approximately $140,000; two approximately $36,000 mattresses; and a $100 million investment in a high-risk hedge fund for the ultimate benefit of Relative-1, among other things. For his part, among other things, JE transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts. For her part, among other things, YVETTE WANG, a/k/a "Yanping," a/k/a "Y," was paid at least approximately $500,000 per year, was gifted an approximately $1.1 million-dollar Manhattan condominium, and was promised millions of dollars' worth of a purported cryptocurrency.

6.    MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, operated the scheme for years, and continued to do so through at least March 2023. They did so by, among other things, expanding the G Enterprise to include additional entities and individuals; continually adapting the scheme's means and methods to evade the enforcement of investor-protection, anti-money laundering, and bankruptcy laws in the United States; and retaliating against individual victims, and others, who complained, requested return of invested funds, or criticized the G Enterprise.

Purposes of the Enterprise

7.    The purposes of the G Enterprise included, but were not limited to, the following:

    a.    Enriching the members and associates of the enterprise;

    b.    Obtaining the money and property of victims;

    c.    Concealing and laundering fraud proceeds;

d.   Purchasing, with fraud proceeds, expensive and luxury items, vehicles, and property for the benefit of the defendants and their co-conspirators; and

e.   Promoting, increasing, and preserving the standing of the G Enterprise, entities that are part of the G Enterprise, and members of the G Enterprise, including MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," in order to solicit additional victims, as well as to exert influence over, or to intimidate, those who criticized or threatened the G Enterprise.

<u>Means and Methods of the Enterprise</u>

8.      The means and methods by which the members and the associates of the G Enterprises conducted their affairs included, but were not limited to, the following:

a.   Causing the G Enterprise to amass significant assets through false and fraudulent misrepresentations;

b.   Obstructing and circumventing law enforcement and civil regulatory authorities;

c.   Obstructing and ignoring court orders;

d.   Concealing fraud proceeds through, among other things, monetary transfers between entities within the G Enterprise; and

e.   Harassing, threatening, and silencing critics of MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, and the G Enterprise.

## Relevant Persons and Entities

9.     At all relevant times, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, was the leader of, and directed, the G Enterprise.

a.   GUO is an exiled Chinese businessman who fled to the United States in or about 2015 and purchased a penthouse apartment at a New York City hotel for approximately $67.5 million.  Starting at least in or about 2017, GUO, who then purported to be a billionaire, garnered a substantial online following.  GUO granted numerous media interviews and posted on social media, claiming to advance a movement against the Chinese Communist Party.

b.   In or about 2018, GUO founded two purported nonprofit organizations, namely, the Rule of Law Foundation and the Rule of Law Society.  The Rule of Law Society's website listed GUO as its "founder, a promot[e]r, and a spokesperson."  Both organizations feature photographs of GUO on their websites.  GUO used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe GUO's statements regarding investment and money-making opportunities.  In truth and in fact, and as GUO well knew, he and others provided false and materially misleading information to promote these "opportunities" and to defraud GUO's followers and other victims.  GUO directed others to create and maintain a variety of corporate entities that would come to make up the G Enterprise over which GUO was in charge.

10.    At all relevant times, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, was a dual citizen of Hong Kong and the United Kingdom who principally resided in the United Kingdom, while traveling to the United States and elsewhere.  JE owned and operated

numerous companies and investment vehicles central to the scheme and served as the financial architect and key money launderer for the G Enterprise.

11.     At all relevant times, YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was a citizen of China who principally resided in New York, New York and has had a close relationship with MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant.  In particular, WANG has worked for GUO and GUO's family for several years, since at least in or about 2018, and has operated as a "chief of staff" for GUO and the G Enterprise.  In that capacity, WANG has held titles in, and exercised control over, a variety of entities that were part of the G Enterprise and instrumentalities of the fraud described herein.  For example, WANG has served as the President, Treasurer, and Secretary of entities that purportedly managed GUO's money, and exercised control over other entities within the G Enterprise, even where she held no formal position or title.

12.     At certain times relevant to this Indictment, Saraca Media Group, Inc. ("Saraca") was a corporation based in New York, New York.  Relative-1 was its ultimate beneficial owner.

13.     At certain times relevant to this Indictment, GTV Media Group, Inc. ("GTV") was a purported news-focused social media platform based in New York, New York.  GTV was functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, although GUO held no formal position or title at GTV. KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, likewise held no formal position or title at GTV, but in fact exercised control over its finances.  Saraca was the parent company of GTV.  YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was an "Executive Director" of GTV.

14.     At certain times relevant to this Indictment, G Club Operations, LLC ("G|CLUBS") was a purported membership organization based in Puerto Rico and in New York, New York. G|CLUBS was functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, although GUO held no formal position or title at G|CLUBS.  KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, likewise held no formal position or title at G|CLUBS, but exerted influence over its finances and laundered its proceeds.  YVETTE WANG, a/k/a "Yanping," a/k/a "Y," similarly held no formal position or title at G|CLUBS, but in fact exercised control over its day-to-day operations and ensured that GUO's instructions were implemented across the organization.  G|CLUBS was formally owned by a coconspirator ("CC-1") who worked in concert with GUO, WANG, Relative-1, and others known and unknown to further the goals of the G Enterprise.

15.     At certain times relevant to this Indictment, the "Himalaya Exchange" was a purported cryptocurrency "ecosystem" that KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, founded and operated through various entities he owned, which were based abroad. Entities functionally owned and controlled by MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, such as G|CLUBS and G|Fashion, had purported business relationships with the Himalaya Exchange.  GUO promoted the Himalaya Exchange and claimed to be the designer of its purported cryptocurrency, although GUO held no formal position or title at the Himalaya Exchange.  WANG likewise held no formal position or title at the Himalaya Exchange but, among other things, was allocated millions of dollars in its purported cryptocurrencies, assisted in the

9

recruitment of Himalaya Exchange personnel, and worked to transfer fraud proceeds to the Himalaya Exchange.

### The G Enterprise's Fraud

*The GTV Private Placement*

16.     Between in or about April 2020 and in or about June 2020, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, fraudulently obtained more than $400 million in victim funds through an illegal private stock offering related to GTV (the "GTV Private Placement"). The GTV Private Placement scheme included, but was not limited to, the following:

a.     On or about April 21, 2020, GUO posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV common stock via a private placement. In that video, GUO described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement. The video and GTV Private Placement materials—including the written "Confidential Information Memorandum" (the "Private Placement Memorandum" or "PPM"), Subscription Agreement, and Investment Procedure Guidelines—were transmitted to thousands of potential investors, including those in the Southern District of New York, via mobile messaging applications, social media, and text messages.

b.     The PPM promoted GTV as the "first ever platform which will combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication."

10

c. According to the PPM's metadata, JE was the "author" of the PPM. The PPM disclosed the terms of the GTV Private Placement and identified GUO as GTV's "Sponsor and Adviser." According to the PPM, among other GTV materials, neither GUO nor JE held any formal management position with GTV. YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendant, was identified in the PPM as an "Executive Director" of GTV.

d. The PPM also contained the following representations, in substance and in part, among others:

i. The GTV Private Placement was for investors who were "interested in evaluating an opportunity to invest capital into GTV;"

ii. GTV planned to use the proceeds raised from the GTV Private Placement "to expand and strengthen the business;" and

iii. The PPM included a chart itemizing the "contemplated use of proceeds" raised from the GTV Private Placement:

| Description | Percentage of Proceeds |
| --- | --- |
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

e. Between on or about April 20, 2020 and on or about June 2, 2020, approximately $452 million worth of GTV common stock was sold to more than 5,500 investors

11

located in the United States, including in the Southern District of New York, and abroad. Investors participated in the GTV Private Placement based, in part, on the belief that their money would be invested into GTV to develop and grow that business, as the PPM promised.

f.  The vast majority of the proceeds derived from investors in the GTV Private Placement were not used to develop and grow the GTV business, but instead were deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by Relative-1.

g.  The GTV Private Placement was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission ("SEC"). Rather, the offering was purportedly made pursuant to SEC regulations that permit the sale of unregistered securities subject to limitations on the type of investors to whom the securities are offered and the manner in which their investments may be solicited. To evade these limitations, however, GUO and others under his control used at least one intermediary entity to purchase GTV stock on behalf of pools of investors who did not individually qualify to participate in the GTV Private Placement.

h.  In or about early June 2020, and only days after the GTV Private Placement closed, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators, misappropriated approximately $100 million raised from investors in the GTV Private Placement and directed that those funds be placed with a high-risk hedge fund ("Fund-1") for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used. Indeed, the $100 million investment into Fund-1 was not made "to strengthen

12

and grow" GTV's business or to benefit GTV, but rather was made for the benefit of Saraca and Relative-1. The victims who supplied the $100 million invested into Fund-1 did not own any shares of Saraca. Ultimately, the investment into Fund-1 lost approximately $30 million in value.

        i.   After directing $100 million of GTV victim funds into Fund-1, HO WAN GUO, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," the defendant, continued to promote GTV using false and misleading representations.

*The Farm Loan Program*

17.    Beginning in or about June 2020—the same month that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and their co-conspirators misappropriated money from the GTV Private Placement for the benefit of Saraca and Relative-1—GUO, JE, and their co-conspirators fraudulently obtained more than approximately $150 million in victim funds through the "Himalaya Farm Alliance." The Himalaya Farm Alliance, which GUO organized and promoted, was a collective of informal groups (each known as a "Farm") located in various cities around the world. GUO, JE, WANG and others working on their behalf and at their direction, obtained these funds by making further misrepresentations to the investors in the GTV Private Placement and fraudulently soliciting further investments, this time in the form of "loans" to a Farm, and promising that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned (the "Farm Loan Program"). The Farm Loan Program scheme included, but was not limited to, the following:

13

a. Starting in or about June 2020, domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV-associated bank accounts because, among other reasons, the accounts had received dozens of large incoming wire transfers, some of which referenced an unregistered stock offering.

b. These bank account closures frustrated the ability of GUO, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV.

c. On or about July 22, 2020, in a video distributed via social media, GUO promoted the Farm Loan Program, stating, in substance and in part, "the money has been changed to a new way of cooperation, signing a loan contract with a local farm, with 6% interest, giving you equity. . . . [i]n this case, it is a loan, and then you can ask for stocks . . ." According to GUO and those working on his behalf, individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program.

d. After launching the Farm Loan Program, GUO continued to promote GTV and to falsely represent the value of GTV. For example, on or about August 2, 2020, in a video distributed via social media, GUO falsely stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars." [1]  In truth and in fact, and as GUO well knew, GTV's market value was far less because, among other things, GTV was a new business that generated no revenue.

e. Thousands of victims "loaned" money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV). According to the "Loan Agreements," which the Farms frequently did not countersign, these funds were to be used for a Farm's "general working capital purposes."

---

[1] All statements attributed herein to KWOK have been translated from Mandarin to English.

f. GUO and JE misappropriated funds that were raised through the Farm Loan Program. For example:

    i. Approximately $20 million was transferred to Relative-1, approximately $950,000 of which was used to pay for flight crew services on a private jet;

    ii. Approximately $5 million was transferred to an entity owned by GUO's spouse;

    iii. Approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Relative-2 and used by GUO; and

    iv. Approximately $10 million was transferred to personal bank accounts in the name of JE and/or JE's spouse.

*G|CLUBS*

18. While making misrepresentations regarding the Farm Loan Program, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, fraudulently induced GUO's followers to transfer additional funds to a purported online membership club called G|CLUBS. From at least in or about June 2020 through at least in or about March 2023, GUO, JE, WANG, and others known and unknown, fraudulently obtained more than approximately $250 million in victim funds through G|CLUBS. The G|CLUBS scheme included, but was not limited to, the following:

a. Starting at least on or about June 20, 2020, in a video distributed via social media, GUO promoted and encouraged individuals to purchase what GUO referred to as a "G Club . . . membership card."

b. Formally launched in or about October 2020, G|CLUBS claimed, on its website, to be "an exclusive, high-end membership program offering a full spectrum of services" and "a gateway to carefully curated world-class products, services and experiences."

c. To join G|CLUBS, a member was required to make a one-time payment to purchase a "membership," in addition to an annual membership fee. The cost of the membership varied based on the membership tier selected by the prospective member: a Tier 5 Membership cost $50,000; a Tier 4 Membership cost $40,000; a Tier 3 Membership cost $30,000; a Tier 2 Membership cost $20,000; and a Tier 1 Membership cost $10,000.

d. On or about July 5, 2021, in a video distributed via social media, GUO stated, in substance and in part, that there were "25,000 [G|CLUBS] member[s] . . . $100 million dollars, the cash [in] the bank account. Then we have the 111 million . . . [who] want to join." By contrast, G|CLUBS internal documents reflected approximately 5,900 active members as of in or about August 2021.

e. In truth and in fact, and as GUO, JE, and WANG well knew, G|CLUBS provided nothing close to "a full spectrum of services" and "experiences" to its members. Despite collecting hundreds of millions of dollars in purported membership fees, G|CLUBS maintained a relatively small number of employees and provided its members few to no discernable membership benefits. As of on or about March 8, 2021—months after G|CLUBS launched and began to collect "membership" fees—G|CLUBS did not have a business plan or a board of directors.

f.  GUO, JE, and WANG also used G|CLUBS as a mechanism to continue fraudulent private placement stock offerings.  GUO, and others known and unknown, told GUO's online followers that their purchase of G|CLUBS memberships would entitle them to stock in GUO-affiliated entities, such as GTV and G|Fashion.

i.  In a conversation regarding G|CLUBS membership funds on or about May 4, 2021, JE stated, in substance and in part, that "first of all, [prospective members] are buying the G|CLUBS membership, but they are expecting they would probably receive some shares, you know, on, on, on the future GTV, I think this is their expectation."

ii.  On or about July 30, 2021, in a video distributed via social media, GUO stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G|CLUBS membership?' 100%.  Because I said that I have to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Club before September 17, G-Club and the stock shares. You'll get both."

g.  GUO, JE, WANG, and others known and unknown, asked investors to purchase multiple memberships in G|CLUBS, enabling GUO, JE, and WANG to increase the amount of money solicited.  In this regard, the G|CLUBS website stated, in substance and in part, that members with multiple memberships would "receive additional benefits" when, in truth and in fact, and as GUO, JE, and WANG well knew, multiple memberships did not provide members with commensurate additional benefits.

h.  All told, investors purchased hundreds of millions of dollars' worth of G|CLUBS memberships.  However, most of this money did not fund the business of G|CLUBS.  Rather, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a

"Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, misappropriated a substantial portion of the funds victims had paid G|CLUBS for "memberships" using, among other things, a complex web of entities and bank accounts to do so. For example:

       i. G|CLUBS funds, which had been funneled through bank accounts in other entities' names, were used to pay personal expenses for GUO and his family, including luxury purchases of an approximately $2.6 million yacht and luxury automobiles that together cost more than $5 million.

       ii. In or about November 2021, JE directed approximately $26.5 million of G|CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of GUO's 50,000-square-foot New Jersey mansion.

       iii. JE directed the transfer of an additional $13 million of G|CLUBS membership payments to an escrow account. The funds were subsequently used to pay for extravagant renovations to GUO's New Jersey mansion, including to a wing for Relative-1 and to a wing for Relative-2, and to purchase various furniture and decorative items including, among other items, Chinese and Persian rugs worth approximately $978,000, a $62,000 television, and a $53,000 fireplace log cradle holder.

       iv. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of G|CLUBS membership payments into a bank account that JE controlled.

       v. G|CLUBS used membership fees to purchase luxury automobiles, including a custom-built Bugatti sports car for approximately $4.4 million. While the car's signed

purchase agreement listed G|CLUBS as the customer, the initial specifications documentation for the custom-built car named Relative-1 as the customer. Relative-1 had no official position with G|CLUBS.

### *The Himalaya Exchange*

19.     From at least in or about April 2021 through at least in or about March 2023, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, and others known and unknown, fraudulently obtained more than approximately $262 million in victim funds through the Himalaya Exchange, a purported cryptocurrency "ecosystem" accessible on the internet. The Himalaya Exchange included a purported stablecoin called the Himalaya Dollar ("HDO" or "H Dollar") and a trading coin called Himalaya Coin ("HCN" or "H Coin"). The Himalaya Exchange claimed that the "stablecoin" was a digital asset with a fixed 1-to-$1 value backed by reserves, and that the "trading coin" was a cryptocurrency with valuation based on supply and demand. JE was the founder and Chairman of the Himalaya Exchange. The Himalaya Exchange scheme included, but was not limited to, the following:

a.  In videos distributed via social media, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, trumpeted the prospects and valuation of the Himalaya Exchange and both HCN and HDO, which he publicly described as cryptocurrencies. For example, in a video posted on the Internet on or about October 20, 2021, GUO falsely stated the following, among other things, and in substance and in part:

i. "I am talking about your H Coins, 'Brother Seven' [*i.e.*, GUO] designed it . . . .[I]t has the attribute of currency, why? It has 20% gold. Awesome[.] [I]t was born as currency on the first day, so it has value and it is linked to gold . . . clear gold directly. No matter how much it raises, 20% will turn into gold."

ii. "If the H Coin is worthless, [the issuer of H coin] can sell all 20% of the gold, exchange it to you, and become your money. Or take all the value of 20% gold and ask everyone to unify it and make it yours."

iii. "If anyone loses money, I can say that I will compensate 100%. I give you 100%. Whoever loses money, I will bear it."

iv. "I can sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit. . . . [A]nd you can buy anything immediately."

b. The initial coin offering of HCN and HDO occurred on or about November 1, 2021. HCN began trading at 10 cents and, within approximately two weeks, the Himalaya Exchange website claimed that each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in value. That is, approximately two weeks after the initial coin offering, the Himalaya Exchange website indicated that HCN purportedly had an approximately $27 billion valuation.

c. At the time of the Himalaya Exchange launch, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, marketed HCN to his online followers and others. For example, on or about November 1, 2021—the day of the initial coin offering—GUO released an official music video for an original song called "HCoin To the Moon" via social media. The phrase "to the

moon" is popularly associated with cryptocurrencies and implies a sharp increase in value. The music video depicted GUO in various luxurious locations and depicted imagery of gold and wealth.

d. At times, including following the Himalaya Exchange launch, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, misleadingly marketed the Himalaya Exchange. For example, in or about June 2022, JE attempted to create the impression that a €3,561,127 purchase of a Ferrari (the "Ferrari") from a particular auction house was completed with HDO. JE stated, in substance and in part, that he was "extremely pleased that [a] buyer decided to purchase [a] world-class car using HDO." Contrary to JE's claim, the Ferrari was not purchased using HDO. In truth and in fact, and as JE well knew, a Himalaya Exchange employee sent the auction house an international bank wire to cover the cost of the Ferrari, while also processing a corresponding "transaction" on the Himalaya Exchange to create the false appearance that the purchase had taken place using HDO. JE's statement was also misleading in that, among other things, the unidentified "buyer" of the Ferrari was, in fact, Relative-1.

e. Contrary to representations of MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, and others known and unknown, HCN and HDO were not cryptocurrencies. In particular, and contrary to the defendants' representations that HCN and HDO were cryptocurrencies, transactions using HCN and HDO were—unlike real cryptocurrencies—not recorded on a "blockchain," which is an electronic, publicly accessible, decentralized ledger that uses cryptography to record cryptocurrency transactions  Instead of using a publicly accessible blockchain, transactions in HCN and HDO were recorded in an internal database, which was not subject to public review.

f. Moreover, HCN and HDO could not be traded anywhere other than (purportedly) on the Himalaya Exchange. Nor could HCN be traded for, or converted into, other currencies. HCN purportedly could be traded for only HDO (and only on the Himalaya Exchange), and HDO purportedly could be converted only to or from fiat currency (and only on the Himalaya Exchange).

i. Indeed, the HDO and HCN Whitepapers, available on the Himalaya Exchange website, provided in fine print that, contrary to GUO's representations, HCN and HDO were merely "Credits." According to the HCN Whitepaper, the "operation of the Himalaya Exchange and associated applications and infrastructure will be facilitated through the use of 'Credits.'" Those credits (i) could "only be used on the Himalaya Exchange or within the Himalaya Ecosystem," and (ii) did "not carry any right to require their exchange for fiat currency or crypto-assets."

ii. Moreover, while Himalaya Exchange members could request to exchange their "HDO" credits for an equivalent payment in U.S. dollars, the HDO Whitepaper stated that the Himalaya Exchange had the "discretion" to deny any such request.

g. In or about April 2022, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendants, arranged for the transfer of approximately $37 million in Himalaya Exchange funds from a Himalaya Exchange bank account to a particular escrow account. The $37 million was structured as a purported "loan" to personally guarantee the cost of a luxury yacht that GUO had previously purchased and used, which yacht was then-owned by an entity held in the name of Relative-2.

*Concealment of Ownership and Control*

20.　　Despite his extravagant lifestyle and his control of hundreds of millions of dollars in fraud proceeds, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," the defendant, filed for bankruptcy on or about February 15, 2022. GUO's claim of bankruptcy was based on years-long efforts to obscure the funds used and controlled by GUO, which was a means and method of the G Enterprise. For example, GUO, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, regularly moved funds within the G Enterprise and for the benefit of GUO, his family, and his associates, by disguising the money movements as "loans" or "investments." As another example, the defendants installed figurehead executives and/or straw owners at the entities within the G Enterprise, while the entities within the G Enterprise were, in reality, owned and/or controlled by GUO, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown.

*Government Seizure of Proceeds of the G Enterprise*

21.　　On or about September 20, 2022 and September 21, 2022, U.S. authorities served judicially-authorized seizure warrants on several domestic banks, and subsequently seized approximately $335 million of proceeds from bank accounts held in the names of Himalaya Exchange entities and other entities associated with the G Enterprise. Following the September 2022 judicially authorized seizures, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, attempted to transfer approximately $46 million from domestic bank accounts associated with the Himalaya Exchange, which had not yet been seized by the United States, to a bank account in the UAE that JE controlled.

a.   Within approximately two days of the first judicially authorized seizures of Himalaya Exchange-related funds, on or about September 22, 2022, JE contacted the management of a domestic bank that held Himalaya Exchange bank accounts.  JE sought to implement a wire transfer, which he and a Himalaya Exchange executive claimed to the domestic bank was needed to effectuate a "redemption" from HDO to U.S. dollars for an unnamed "VIP" (*i.e.*, very important) client of the Himalaya Exchange.

b.   In subsequent communications with the domestic bank, JE revealed that the VIP was, in fact, JE himself.  JE provided the domestic bank with documents reflecting two purported HCN sales by JE on or about September 22, 2022—totaling 46 million HDO—which JE was attempting to "convert" into $46 million.  In an attempt to protect the assets of the G Enterprise from a judicially authorized seizure, JE twice emphasized to the domestic bank's management, in substance and in part, that the $46 million transfer needed to happen "today or it is meaningless."

22.   On or about October 16, 2022, pursuant to a judicially authorized warrant, U.S. authorities seized an additional approximately $274 million of proceeds from several Himalaya Exchange and G|CLUBS accounts at the domestic bank from which KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant,  requested the $46 million transfer.

23.   As a result of the judicially-authorized seizures, U.S. authorities seized more than approximately $634 million of fraud proceeds, including approximately $278 million from bank accounts held in the names of the Himalaya Exchange entities that purported to hold the Himalaya Exchange's HDO cash reserves.

24

a. Following the seizures, the Himalaya Exchange website continued to represent that HDO was backed by a "Reserve consisting of USD and cash-equivalent assets" when, in truth and in fact, it was not.

b. Despite the seizure of the Himalaya Exchange's cash reserves, the purported price of HCN had not suddenly and sharply declined as of in or about March 2023.

## STATUTORY ALLEGATIONS

24. From at least in or about 2018 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, being persons employed by and associated with the enterprise described above, namely, the G Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18 , United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the G Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

a. Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud);

b. Acts indictable under Title 18, United States Code, Section 1344 (relating to financial institution fraud);

25

c.  Acts indictable under Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments);

d.  Acts indictable under Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and

e.  Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

25.  It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

26.  MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, sought to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the G Enterprise, through various unlawful means and methods, including:

a.  The defendants caused the G Enterprise to amass significant assets through false and fraudulent misrepresentations.

b.  The defendants caused the G Enterprise to conceal its fraud proceeds through, among other things, monetary transfers between entities within the G Enterprise.

c.  The defendants caused the G Enterprise to silence its critics through threats and intimidation directed at its opponents.

d.  The defendants obstructed, influenced, and interfered with an official proceeding.

26

e. The defendants obstructed and interfered with court orders.

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud and Bank Fraud)

The Grand Jury further charges:

27. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

28. From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

29. It was a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GUO,

JE, WANG, and others known and unknown, fraudulently induced victims to send money by providing materially false and misleading information and representations.

30.     It was further a part and an object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, GUO, JE, WANG, and others known and unknown, made false representations, and caused others to make false representations, to financial institutions to, among other things, open and maintain bank accounts used in furtherance of their fraud and obtain funds under the custody and control of those financial institutions.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
### (Money Laundering Conspiracy)

The Grand Jury further charges:

31.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

32.     From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss,"

KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(2)(A), and 1956(a)(2)(B)(i).

33.     It was a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, Counts Five through Eleven of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

34.     It was further a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown would and did transport, transmit, and transfer, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United

States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represent the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, the offenses alleged in Counts Five through Eleven of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

35.     It was further a part and object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on specified unlawful activity, to wit, the offenses alleged in Counts Five through Eleven of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

## COUNT FOUR
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

36.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

30

37. From at least in or about 2018, up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, (1) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (2) making false statements to a financial institution, in violation of Title 18, United States Code, Section 1014.

38. It was a part and an object of the conspiracy that MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of a national securities exchange, used and employed, in connection with the purchase and sale of securities registered on a national securities exchange and any security not so registered, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG agreed to fraudulently induce investors to participate in the GTV Private Placement, the Farm Loan Program,

31

and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV.

Overt Acts

39.    In furtherance of the conspiracy and to effect its illegal objects, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about April 21, 2020, GUO posted, and caused to be posted, a video on social media announcing the unregistered offering of GTV stock via the GTV Private Placement.

b.   On or about May 20, 2020, WANG opened a particular bank account in the name of GTV and, in documents submitted to the bank, indicated that the intended balance of the account would be between $25,000 to $50,000.  On or about June 2, 2020, WANG transferred approximately $200,000,000 into that account.

c.   On or about June 5, 2020, WANG, while located in the Southern District of New York, authorized a wire transfer of $100 million from Saraca to Fund-1.

d.   On or about July 22, 2020, in a video distributed via social media, GUO promoted the Farm Loan Program, stating, in substance and in part, "the money has been changed to a new way of cooperation, signing a loan contract with a local farm, with 6% interest, giving you equity. . . . [i]n this case, it is a loan, and then you can ask for stocks . . .".

32

e. On or about August 2, 2020, in a video distributed via social media, GUO stated, in substance and part, "How much is GTV? . . . a market value of 2 billion US dollars."

f. On or about July 30, 2021, in a video distributed via social media, GUO stated, in substance and in part, "Some of the comrades in arms asked, '[w]ill I still get a free stock offer when I buy a G-Clubs membership?' 100%. Because I said that I have to promise that anyone who buys G-Clubs membership before September 17 must be allotted shares, which is exactly the same. Because we said that anyone can choose whether to use your money to buy G-Clubs before September 17, G-Clubs and the stock shares. You'll get both."

g. On or about August 5, 2021, JE directed the transfer of approximately $1.1 million consisting of funds victims had sent to G|CLUBS in exchange for "memberships" to a bank account that JE controlled.

(Title 18, United States Code, Section 371.)

**COUNT FIVE**
**(Wire Fraud – GTV Private Placement)**

The Grand Jury further charges:

40. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

41. From at least in or about April 2020 up to and including at least in or about September 2021, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted

33

by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG conducted the GTV Private Placement to sell GTV stock and fraudulently obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SIX
### (Securities Fraud – GTV Private Placement)

The Grand Jury further charges:

42.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

43.     From at least in or about April 2020 up to and including at least in or about September 2021, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in

order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG conducted the GTV Private Placement to sell GTV stock and obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (Wire Fraud – Farm Loan Program)

The Grand Jury further charges:

44.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

45.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG conducted the Farm Loan Program to fraudulently obtain money from victims

through false statements and misrepresentations, including regarding, among other things, the

purpose and use of victims' money, which scheme was furthered through electronic

communications and monetary transfers to and from the Southern District of New York and

elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT EIGHT
### (Securities Fraud – Farm Loan Program)

The Grand Jury further charges:

46.     The allegations contained in paragraphs 1 through 23 of this Indictment are

repeated and realleged as if fully set forth herein.

47.     From at least in or about June 2020 up to and including at least in or about March

2023, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok,"

a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a

"Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a

"Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of

a means and instrumentality of interstate commerce and of the mails, and of a facility of a national

securities exchange, used and employed, in connection with the purchase and sale of a security

registered on a national securities exchange and any security not so registered, a manipulative and

deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section

240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue

statement of material fact and omitting to state a material fact necessary in order to make the

statement made, in light of the circumstances under which it was made, not misleading; and

(c) engaging in an act, practice and course of business which operated and would operate as a fraud

and deceit upon a person, to wit, GUO, JE, and WANG conducted the Farm Loan Program to

36

obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT NINE
### (Wire Fraud – G|CLUBS)

The Grand Jury further charges:

48.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

49.     From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, GUO, JE, and WANG promoted and marketed G|CLUBS to fraudulently obtain money from victims through false statements and misrepresentations, to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money which scheme was furthered through electronic communications and monetary transfers to and from the Southern District of New York and elsewhere.

37

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TEN
### (Securities Fraud – G|CLUBS)

The Grand Jury further charges:

50.    The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

51.    From at least in or about June 2020 up to and including at least in or about March 2023, in the Southern District of New York, and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, GUO, JE, and WANG promoted and marketed G|CLUBS to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the purpose and use of victims' money, which scheme was

furthered through electronic communications and monetary transfers to and from the Southern

District of New York and elsewhere.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT ELEVEN
### (Wire Fraud – The Himalaya Exchange)

The Grand Jury further charges:

52.     The allegations contained in paragraphs 1 through 23 of this Indictment are

repeated and realleged as if fully set forth herein.

53.     From at least in or about April 2021 up to and including at least in or about March

2023, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok,"

a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a

"Boss," and KIN MING JE, a/k/a "William Je," a/k/a "Yu Jiaming," the defendants, knowingly

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of false and fraudulent pretenses, representations, and promises, transmitted

and caused to be transmitted by means of wire, radio, and television communication in interstate

and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing

such scheme and artifice, to wit, GUO and JE operated the Himalaya Exchange to fraudulently

obtain money from victims through false statements and misrepresentations, including regarding,

among other things, the purpose and use of victims' money, which scheme was furthered through

electronic communications and monetary transfers to and from the Southern District of New York

and elsewhere.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWELVE
### (Unlawful Monetary Transactions)

The Grand Jury further charges:

54.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

55.     On or about June 5, 2020, in the Southern District of New York and elsewhere, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, within the United States, knowingly engaged and attempted to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, GUO, JE, and WANG made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Five and Six to Fund-1.

(Title 18, United States Code, Sections 1957 and 2.)

## COUNT THIRTEEN
### (Obstruction of Justice)

The Grand Jury further charges:

56.     The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

57.     From at least on or about September 20, 2022 through at least the date of the filing of this Indictment, in the Southern District of New York and elsewhere, KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," the defendant, corruptly obstructed, influenced, and impeded an official proceeding and attempted so to do, to wit, JE attempted to transfer money to

the UAE, beyond the jurisdiction of the United States, to impede and interfere with a federal grand jury investigation in the Southern District of New York of the offenses alleged in Counts One through Eleven of this Indictment, and proceedings before the United States District Court for the Southern District of New York concerning the seizure and forfeiture of criminally derived proceeds.

(Title 18, United States Code, Sections 1512(c)(2) and 2.)

## FORFEITURE ALLEGATIONS

58. As a result of committing the offense alleged in Count One of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a. any interest acquired or maintained in violation of Section 1962;

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise the defendants and their co-conspirators established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and

c. any property constituting , or derived from, any proceeds obtained, directly or indirectly, from the racketeering activity charged in Count One including the following specific property:

(1) $64,826.87 in United States currency formerly on deposit in Account Number 5090037713 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(2)      $75,000,000.00 in United States currency formerly on deposit in Account Number 5090037705 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(3)      $467,343.00 in United States currency formerly on deposit in Account Number 5090037754 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(4)      $89,992,861.75 in United States currency formerly on deposit in Account Number 5090042770 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(5)      $1,683,077.40 in United States currency formerly on deposit in Account Number 5090042762 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(6)      $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

(7)      $48,230,709.62 in United States currency formerly on deposit in Account Number 5090030288 at Silvergate Bank held in the name of "Hamilton Investment Management" Ltd., seized by the Government on or about September 18, 2022;

(8)      $1,800,000.00 in United States currency formerly on deposit in Account Number 5090037739 at Silvergate Bank held in the name of "Hamilton Opportunity Fund SPC," seized by the Government on or about September 18, 2022;

(9)     $85,899,889.20 in United States currency formerly on deposit in Account Number 5090042853 at Silvergate Bank held in the name of "Hamilton Opportunity Funds SPC," seized by the Government on or about September 18, 2022;

(10)     $4,643,744.70 in United States currency formerly on deposit in Account Number 7801000590 at FV Bank held in the name of "Himalaya International Reserves, Ltd.," seized by the Government on or about September 20, 2022;

(11)     $14,599,257.25 in United States currency formerly on deposit in Account Number 7801000254 at FV Bank held in the name of "Himalaya International Clearing, Ltd.," seized by the Government on or about September 20, 2022;

(12)     $11,538,579.87 in United States currency formerly on deposit in Account Number MBI10103-0000 at Mercantile Bank International held in the name of "G Club International Ltd.," seized by the Government on or about October 16, 2022;

(13)     $10,008,284.04 in United States currency formerly on deposit in Account Number MBI10133-0000 at Mercantile Bank International held in the name of "Himalaya International Clearing Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(14)     $3,090,856.54 in United States currency formerly on deposit in Account Number MBI10137-0000 at Mercantile Bank International held in the name of "Hamilton Capital Holding Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(15)     $272,350,313.76 in United States currency formerly on deposit in Account Number MBI10138-0000 at Mercantile Bank International held in the name of "Himalaya

International Reserves Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(16)    $310,594.31 in United States currency formerly on deposit in Account Number MBI10139-0000 at Mercantile Bank International held in the name of "Himalaya International Financial Group Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(17)    $1,187,278.87 in United States currency formerly on deposit in Account Number MBI10171-0000 at Mercantile Bank International held in the name of "Hamilton Investment Management Ltd.," seized by the Government between on or about October 16, 2022 and on or about March 10, 2023;

(18)    $43,782.71 in United States currency formerly on deposit in Account Number MBI10172-0000 at Mercantile Bank International held in the name of "G Fashion International Limited," seized by the Government on or about October 16, 2022;

(19)    $7,715.00, in United States currency formerly on deposit in Account Number 7801000589 at FV Bank held in the name of "Himalaya International Financial Group, Ltd.," seized by the Government on or about September 20, 2022;

(20)    $161,809.47 in United States currency formerly on deposit in Account Number MBI10183-0000 at Mercantile Bank International held in the name of "Himalaya Currency Clearing Pty Ltd.," seized by the Government on or about October 16, 2022;

(21)    $2,745,377.75 in United States currency formerly on deposit in Account Number 9878904409 at Manufacturers & Traders Trust Co. held in the name of "GETTR USA, Inc.," seized by the Government on or about September 18, 2022;

(22)     $9,899,659.19 in United States currency formerly on deposit in Account Number 157525208185 at US Bank held in the name of "G Fashion," seized by the Government on or about September 18, 2022;

(23)     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments, and easements, located at 675 Ramapo Valley Road, Mahwah, New Jersey 07430, Parcel No. 3300021-03-00001-02 and described as Lot Number: 1.02 Block: 21.03 District: 33 City, Municipality, Township: MAHWAH TWP;

(24)     A Bugatti Chiron Super Sport, bearing Vehicle Identification Number VF9SW3V3XNM795047;

(25)     A Lamborghini Aventador SVJ Roads, bearing Vehicle Identification Number ZHWUN6ZD2MLA10393;

(26)     A Rolls Royce Phantom EWB, bearing Vehicle Identification Number SCATT8C08MU206445;

(27)     A 46m 2014 Feadship superyacht "Lady May" (ex Como), bearing IMO Number 112359, MMSI Number 319059500, and Callsign ZGDQ9;

(28)     A Bösendorfer 185VC Porsche #49539 piano with custom bench, purchased for approximately $140,938.69;

(29)     A Railis Design Iceland Contemporary Poseidon Bed with Nightstands, Ebony Veneer, Brass, Velvet, purchased for approximately $31,413.71;

(30)     A Hästens 2000T md mattress, purchased for approximately $36,590.00;

(31)     A Hästens 2000T sf mattress, purchased for approximately $36,210.00;

(32)     A Wembe watch storage box, purchased for approximately $59,392.91;

(33)     A Samsung Q900 Series QN98Q900RBF 98" QLED Smart TV – 8K, purchased for approximately $62,787.54;

(34)     A Louis XV Style French Ormolu-Mounted Mahogany Commode by Joseph Émmanuel Zweiner;

(35)     A "K'ang Hsi" extension table in etched and patinated pewter and bronze with hand-painted enamel colors by Philip & Kelvin LaVerne, purchased for approximately $180,000.00; and

(36)     A "Punto '83" table in stainless steel with mesh tabletop with adjustable height and adjustable petals by Gabriella Crespi, Italy 1982, purchased for approximately $180,000.00.

(1) through (36), collectively, the "Specific Property."

59.     As a result of committing the wire fraud and securities fraud offenses alleged in Counts Two, Four, and Five through Eleven of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the Specific Property.

60. As a result of committing the money laundering offenses alleged in Counts Three and Twelve of this Indictment, MILES GUO, a/k/a "Ho Wan Kwok," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," a/k/a "Boss," KIN MING JE, a/k/a "William Je," a/k/a "Yu Jianming," and YVETTE WANG, a/k/a "Yanping," a/k/a "Y," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offenses and the Specific Property.

## Substitute Assets Provision

61. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to

seek forfeiture of any other property of the defendants up to the value of the above forfeitable

property.

(Title 18, United States Code, Sections 981, 982, and 1963;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


_____
FOREPERSON

4/24/24


_____
DAMIAN WILLIAMS
United States Attorney

48

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 8279

UNITED STATES OF AMERICA

    -v.-

All monies and funds contained in Mercantile
Bank International account MBI10103-0000,
held by G Club International Ltd. ("Target
Account-1"), and all funds traceable thereto,
including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10133-0000,
held by Himalaya International Clearing Ltd.
("Target Account-2"), and all funds traceable
thereto, including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10137-0000,
held by Hamilton Capital Holding Ltd. ("Target
Account-3"), and all funds traceable thereto,
including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10138-0000,
held by Himalaya International Reserves Ltd.
("Target Account-4"), and all funds traceable
thereto, including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10139-0000,
held by Himalaya International Financial Group
Ltd. ("Target Account-5"), and all funds
traceable thereto, including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10171-0000,
held by Hamilton Investment Management Ltd.
("Target Account-6"), and all funds traceable
thereto, including accrued interest;

All monies and funds contained in Mercantile
Bank International account MBI10172-0000,
held by G Fashion International Limited

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

("Target Account-7"), and all funds traceable thereto, including accrued interest; and

All monies and funds contained in Mercantile Bank International account MBI10183-0000, held by Himalaya Currency Clearing Pty Ltd. ("Target Account-8"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

**25 MAG 1266**

Defendants-in-rem.

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

**I.  Introduction**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.  Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.      This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, for:

a.      All monies and funds contained in Mercantile Bank International account MBI10103-0000, held by G Club International Ltd. ("**Target Account-1**"), and all funds traceable

2

thereto, including accrued interest;

   b. All monies and funds contained in Mercantile Bank International account MBI10133-0000, held by Himalaya International Clearing Ltd. ("**Target Account-2**"), and all funds traceable thereto, including accrued interest;

   c. All monies and funds contained in Mercantile Bank International account MBI10137-0000, held by Hamilton Capital Holding Ltd. ("**Target Account-3**"), and all funds traceable thereto, including accrued interest;

   d. All monies and funds contained in Mercantile Bank International account MBI10138-0000, held by Himalaya International Reserves Ltd. ("**Target Account-4**"), and all funds traceable thereto, including accrued interest;

   e. All monies and funds contained in Mercantile Bank International account MBI10139-0000, held by Himalaya International Financial Group Ltd. ("**Target Account-5**"), and all funds traceable thereto, including accrued interest;

   f. All monies and funds contained in Mercantile Bank International account MBI10171-0000, held by Hamilton Investment Management Ltd. ("**Target Account-6**"), and all funds traceable thereto, including accrued interest;

   g. All monies and funds contained in Mercantile Bank International account MBI10172-0000, held by G Fashion International Limited ("**Target Account-7**"), and all funds traceable thereto, including accrued interest; and

   h. All monies and funds contained in Mercantile Bank International account MBI10183-0000, held by Himalaya Currency Clearing Pty Ltd. ("**Target Account-8**," together with Target Account-1 through -7, the "Target Accounts"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

   3. The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343

3

(wire fraud) and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.     This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (x) my review of documents provided by counsel for, among other entities, G Club, HCHK Technologies Inc., Hamilton Investment Management Ltd., and Major Lead International ROM (the parent entity of the "Himalaya Exchange"); (xi) my conversations with other law enforcement officers; and (xi) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth herein, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. § 1343, or property traceable thereto.  In summary, the evidence reveals a series of fraudulent investment schemes that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc. ("GTV"), G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), the Himalaya Exchange ("Himalaya"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the investment schemes to the Target Property.

**II.  Statutory Basis for Forfeiture**

7.      The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

<em><u>Money Laundering Offenses</u></em>

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

> Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

> knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B)    knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Wire Fraud Offenses*

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. § 1343.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

6

### *Seizure Warrants*

14.     The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.     With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

    (A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

    (B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

    (2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

### III.  Probable Cause

#### A.  Probable Cause Regarding Commission of the Subject Offenses

<u>The Prior Seizure Warrants</u>

16.     On or about September 17, 2022, I submitted (under seal) an affidavit in support of seizure warrants for funds held in 11 bank accounts, including all funds in one Metropolitan Commercial Bank ("MCB") account, held For Benefit Of FV Bank, and all funds in nine Silvergate Bank ("Silvergate") accounts, held by William JE in the names of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd. (the "September 17 Affidavit[1]").  The September 17 Affidavit is incorporated herein as Exhibit A.  On or about September 18, 2022, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued seizure warrants for those 11 accounts, including a warrant to Silvergate for the nine Silvergate accounts ("Silvergate Warrant-1") and a warrant to MCB for the one MCB account held For Benefit Of FV Bank (the "MCB Warrant").

17.     Also on or about September 17, 2022, I submitted (under seal) an affidavit in support of a seizure warrant for approximately one U.S. Bank account, held in the name of G Fashion (the "G Fashion Affidavit").  The G Fashion Affidavit is incorporated herein as Exhibit B.  On or about September 18, 2022, Judge Aaron issued a seizure warrant for that U.S. Bank account (the "U.S. Bank Warrant").

18.     On or about September 20, 2022, I submitted (under seal) an affidavit in support of seizure warrants for four additional bank accounts, specifically, one Silvergate account, held in the name of Hamilton Opportunity Fund SPC, and three FV Bank accounts, held in the names of Himalaya International Financial Group, Ltd., Himalaya International Reserves, Ltd., and

---

[1] The September 17 Affidavit also supported the seizure of up to $16 million contained in a Manufacturers & Traders Trust Co. held by GETTR USA, Inc.

Himalaya International Clearing, Ltd. (the "September 20 Affidavit.")  The September 20 Affidavit is incorporated herein as Exhibit C.  On or about September 20, 2022, Judge Aaron issued seizure warrants for (a) that Silvergate account ("Silvergate Warrant-2"), and (b) those three FV Bank accounts (the "FV Warrant," together with Silvergate Warrant-1, Silvergate Warrant-2, and the U.S. Bank Warrant, the "Prior Seizure Warrants").

Overview of the Fraudulent Investment Schemes

19.     Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes").  To date, the investigation ("Investigation") has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

20.     The Investment Schemes are conducted through various, interrelated investment offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

21.     Certain of the interrelated Investment Schemes are historical, while others are ongoing.  Specifically:

a.     The GTV stock offering and the G Coin offering (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July

9

2020.  As a result of the Unregistered Stock Offerings, the proceeds of which were commingled, companies affiliated with GUO, JE, and others (the "Target Subjects") collectively raised at least approximately $487 million from more than 5,000 investors, including individuals in the United States.  The Unregistered Stock Offerings are described in greater detail in the September 17 Affidavit.  *See* Ex. A at ¶¶ 20-29.

    b.  Starting at least in or about July 2020, the leaders of the Investment Schemes began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.  The Convertible Loan Offering is described in greater detail in the September 17 Affidavit.  *See* Ex. A at ¶¶ 30-34.

    c.  Starting in or about October 2020, the leaders of the Investment Schemes began to pitch investors on a purported luxury, exclusive concierge service called G Club (the "G Club Membership Offering").  The G Club Website, viewable at https://gclubs.com/en, advertises "An Exclusive Membership to a First-Class Tomorrow."   G Club purportedly offers five membership tiers, ranging from $10,000 to $50,000 annually.  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and absolute discretion.  According to the G Club Website, G Club memberships provide, among other things, "access to a concierge customer service with Mandarin and English access and support" and "exclusive early access to [the] latest fashion collections, including special member pricing on

purchases, extended video blogging time and early access to select music." The G Club Membership Offering is described in greater detail in the September 17 Affidavit. *See* Ex. A at ¶¶ 35-41. G Club is an ongoing investment scheme.

d. In or about 2021, JE founded and began to market a purported cryptocurrency exchange platform called the Himalaya Exchange, available at https://himalaya.exchange. Similar to the link between G-Coin / G-Dollar and the Unregistered Stock Offerings, the purported cryptocurrencies Himalaya Coin ("HCO" or "HCN") and Himalaya Dollar ("HDO") (together, the "Himalaya Assets") were initially offered as purported companion digital asset securities for investors in the Convertible Loan Program. When the Himalaya Exchange Website was launched, prospective investors were told that they would be able to exchange and withdraw their Himalaya cryptocurrency as of June 2021. However, the initial coin offering ("ICO") of the Himalaya Assets was delayed several times, with the ICO taking place on November 1, 2021. The Himalaya Exchange is described in greater detail in the September 17 Affidavit, *see* Ex. A ¶¶ 42-47, and herein. *See infra* at ¶¶ 41-47. The Himalaya Exchange is an ongoing investment scheme.

22. As described in the September 17 Affidavit, JE and others have raised at least approximately $664 million between in or about September 2020 and the present through G Club and the Himalaya Exchange.

<u>Background on GUO and JE</u>

23. Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.     GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.     GUO is involved with various entities relevant to the Investment Schemes, including GTV, G News, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr").  GUO does not hold formal titles or positions at these entities. However, Guo publicly promotes these entities, including in videos he posts for his "followers" on GTV, G News, and GETTR.[2]

c.     In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and the Rule of Law Society ("ROLS").  Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by in or about December 2018.[3]  ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP").  At times, the board members for ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass").  GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson," and a sponsor.

d.     JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various entities relevant to the Investment Schemes, as described in greater detail below.  Specifically:

---

[2] *See, e.g.*, gnews.org/articles/992 and https://gettr.com/post/pwxhs34326.

[3]   *See*   https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

i.      JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[4]  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.    JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.      JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[5] that was incorporated in the United Kingdom on or about July 10, 2020.

e.      JE is listed as the founder and Chairman of the Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is the 100% beneficial owner of various entities that operate the Himalaya Exchange, including Major Lead International Ltd., Himalaya International Clearing Ltd. ("Himalaya Clearing"), Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

<u>Overview of the Scheme to Launder Fraud Proceeds</u>

24.    As described in greater detail herein and in the September 17 Affidavit, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

25.    As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 21.

---

[4] *See* https://hamilton-im.com/ (*last visited* October 11, 2022).

[5] *See* https://www.aca-capital.com/ (*last visited* October 11, 2022).

Moreover, records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, the G Club Membership Offering has generated more than approximately $221 million in purported G Club membership fees.  As described herein, records that I or others have reviewed in the court of the Investigation further show that, between in or about April 2021and October 2022, the Himalaya Exchange scheme has generated more than approximately $500 million in purported cryptocurrency investments.

26.     As detailed below and in the September 17 Affidavit, the evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, the G Club Membership Offering, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

27.     As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.5 billion, as described in greater detail below and in the September 17 Affidavit.

28.     As a further part of the money laundering scheme, and as set forth below, *see infra* ¶¶ 51-53, at least approximately $626 million of the Investment Scheme Funds were remitted, either directly or indirectly, to the Target Accounts between on or about July 2, 2021 and October 6, 2022.

<u>Mercantile Bank and the Target Accounts</u>

29.     The Target Accounts are all held at Mercantile Bank.

a.     Mercantile Bank is a payments and digital asset custody bank based in Puerto Rico.[6]  Mercantile Bank was incorporated on or about July 16, 2018.

---

[6] https://mercantile-bank.com.

b.    Counsel for Mercantile Global Holdings, Inc. ("MGH")—the parent holding company of Mercantile Bank—has described Mercantile Bank as "a startup bank." Specifically, because Mercantile Bank does not have direct access to the Federal Reserve payment system via a Federal Reserve master account, it has sought to partner with other bank(s) that have such an account (*i.e.*, correspondent banking partners).[7]

30.    Based on my review of materials provided by MGH in response to a grand jury subpoena, I have learned that six of the eight Target Accounts are held in the name of companies that are wholly owned by JE and are associated with the operations of the Himalaya Exchange or its managing entity, Hamilton.  The other two Target Accounts are held in the name of G Fashion and G Club (*i.e.*, two of the other ongoing Investment Schemes).

31.    As described in the September 17 Affidavit and herein, JE and others have layered Investment Scheme Funds into and through the Target Accounts at Mercantile Bank, among other financial institutions, to conceal the nature and source of the funds.  *See* Ex. A at ¶ 56(b).

32.    Between on or about October 7, 2022 and October 11, 2022, Mercantile Bank sent letters to representatives of the U.S. Attorney's Office advising, in substance and in part, that if the Government "publicly seizes the funds in" the Target Accounts, "there is a high probability that [Mercantile Bank] will have no choice but to permanently cease operations in the near future."[8]

---

[7] For example, in or about January 2021, Mercantile Bank announced that it had reached a definitive agreement for a reverse merger with a publicly traded company, in which Mercantile Bank would itself become a publicly traded entity.  *See, e.g.*,  https://www.nasdaq.com/press-release/mercantile-bank-international-corp.-announces-reverse-merger-transaction-with-crucial (*last visited* October 13, 2022).  However, that reverse merger fell through.

[8] As described in paragraph 38 below, Hamilton had sought to purchase Mercantile Bank just prior to the execution of the Prior Seizure Warrants.  The funds apparently earmarked for the purchase were seized pursuant to the Prior Seizure Warrants, and the acquisition fell through.

Execution of the Prior Seizure Warrants and the Target Subjects' Liquidation Efforts

33.    On or about September 20, 2022, the FBI served Silvergate Warrant-1 and the U.S. Bank Warrant, among others.[9]    On or about September 21, 2022, the FBI served Silvergate Warrant-2 and the FV Warrant.

34.    As described in greater detail herein, since the execution of the Prior Seizure Warrants and the Government's seizure of more than approximately $320 million in Investment Scheme Funds contained in Hamilton and/or Himalaya Exchange accounts at Silvergate Bank and FV Bank pursuant to those warrants, *see supra* at ¶¶ 16 and 18, JE and other Target Subjects have attempted to move more than approximately $58 million in Investment Scheme Funds held at Mercantile Bank.

*JE's Attempted Transfer of Funds on September 22, 2022 and September 23, 2022*

35.    In response to a grand jury subpoena issued on or about September 23, 2022, MGH provided certain documents and information to the Government, including account balances for all Mercantile Bank accounts held in the names of various entities affiliated with William JE, including G Club, G Fashion, Himalaya (in the name of Himalaya Clearing, Himalaya Financial, Himalaya Reserves, and Himalaya Currency Clearing Pty Ltd.) and Hamilton (in the name of Hamilton Capital Holding and Hamilton Investment Management Ltd.), as well as certain communications among MGH, JE, and others.

36.    Based on my review of documents and information provided by MGH, and as described in greater detail below, I have learned that between on or about September 22, 2022 and September 23, 2022 (*i.e.*, within days of the Government's seizure), JE attempted to move funds

---

[9] As described in the September 20 Affidavit, *see* Ex. B at ¶ 19, in light of clarification regarding where certain funds were held, the FBI did not serve the MCB Warrant and instead obtained a new warrant (*i.e.*, the FV Warrant).

out of **Target Account-2** at Mercantile Bank (*i.e.*, the Himalaya International Clearing account), purportedly to liquidate approximately $46 million of what JE claimed to be his own Himalaya Exchange digital assets.

37.    Based on my review of account balance summaries, account monthly statements, and additional documents provided by MGH, including notes of calls between employees of MGH, Mercantile Bank, and Hamilton, my review of documents provided by Silvergate, open-source research, and my conversations with representatives of the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.    Before execution of the Prior Search Warrants, Hamilton had engaged in negotiations to purchase Mercantile Bank. Specifically, between in or about December 2021 and in or about September 2022, Hamilton conducted due diligence on Mercantile Bank and prepared to acquire Mercantile Bank. On or about September 16, 2022, MGH and the Hamilton Opportunity Fund entered into a stock purchase agreement, pursuant to which Hamilton agreed to pay $49,695,000 to acquire Mercantile Bank.

b.    That same day, on or about September 16, 2022, Hamilton initiated an outgoing wire of approximately $49.695 million in Investment Scheme Funds from one of its Silvergate accounts to MGH ("Wire-1"). The beneficiary was listed as "Mercantile Global Holding Inc.," and the stated purpose of the wire transfer request was: "Bank Purchase Hamilton MA Fund SP." Those funds—which appear to have been related to Hamilton's attempted purchase of Mercantile Bank—were never transferred to Mercantile Bank, and instead were seized pursuant to Silvergate Warrant-1.

c.    According to MGH, MGH employees had multiple conversations with Hamilton employees about the status of Wire-1. During a FaceTime audio call initiated at approximately 7:55 p.m. GMT / 2:55 p.m. ET on or about September 22, 2022 between Priya Patel

17

("Patel") (Internal Litigation and Regulatory Counsel for Hamilton Capital Holding) and MGH's Global Head of Legal and Compliance ("MGH Employee-1"), Patel advised MGH Employee-1, in sum and substance, that Hamilton's funds at Silvergate—including Wire-1—had been seized, and that Hamilton may need to transfer money out of its accounts at Mercantile Bank.

        d.      Approximately 18 minutes later, at approximately 8:13 p.m. GMT / 3:13 p.m. ET on or about September 22, 2022, JE called the CEO of MGH ("MGH Employee-2")  via WhatsApp.  During the call, JE stated, in substance and in part, that Hamilton needed to transfer approximately $30 million[10] for an unnamed "VIP" client and for G Club to a bank in Abu Dhabi, UAE.  In response, MGH Employee-2 advised JE, in substance and in part, that MGH would require all such transfer requests to be submitted in writing.  Based on information provided by MGH, I have learned that JE did not disclose identifying information about the "VIP" client to MGH Employee-2 during that call.

        e.      Hours later, at approximately 11:30 p.m. GMT / 6:30 p.m. ET on or about September 22, 2022, Ehsan Masud (Hamilton's CFO) sent MGH Employee-2 a WhatsApp message that read, in substance and in part:  "We are likely to have a large VIP corporate redemption tomorrow of approx. $50m USD[.]  Happy to jump on a call tomorrow to discuss. Many thanks".  Minutes later, MGH Employee-2 responded and advised Masud, in sum and substance, that a transfer of that size would "require detailed documentation and [ ] take more than a day to process."  In subsequent WhatsApp communications between Masud and MGH Employee-2 over approximately the next hour, Masud expressed urgency regarding the timing of

---

[10] As reflected herein and in MGH records, the stated amount of the outgoing transfer(s) appears to have ranged from approximately $30 million to approximately $50 million over the course of communications among JE, Masud, and MGH Employee-2.  Ultimately, the written outgoing wire requests reflect requested transfers totaling approximately $46 million between two transactions.  *See* ¶ 37(j)(v).

the outgoing transfer; for example, when MGH Employee-2 advised Masud that MGH Employee-2 had scheduled a meeting among MGH compliance personnel and Hamilton employees for on or about September 24, 2022, Masud wrote, in substance and in part: "But this would mean we will miss USD cut off for tomorrow" and "we need to get the ball rolling tomorrow soonest".

      f.     At approximately 3:01 a.m. GMT on or about September 23, 2022 / 10:01 p.m. ET on or about September 22, 2022, JE sent MGH Employee-2 WhatsApp messages that read, in substance and in part: "Hi, as discussed, my company would like to redeem some money so that we could continue to support the operation of your bank and other entities."

      g.     MGH Employee-2 responded to JE at approximately 9:38 a.m. GMT / 4:38 a.m. ET on or about September 23, 2022, advising JE, in sum and substance, that MGH Employee-2 would be speaking to Masud at approximately 11:00 a.m. and asking JE whether Masud was aware of "what is happening?"  In response, JE wrote, in substance and in part: "[Masud] only knows FV bank is frozen.  He did not know the fund nor the transaction issues", and "[w]e are just doing normal redemption of a client."

      h.     During a WhatsApp call between MGH Employee-2 and Masud at approximately 11:01 a.m. GMT / 6:01 a.m. ET on or about September 23, 2022, Masud again expressed urgency regarding the timing of the outgoing $50 million wire request for the "VIP" client (whose identity had not yet been disclosed to MGH).  According to MGH, MGH Employee-2 insisted on learning the identity of the client requesting the transfer; in response, Masud advised, in sum and substance, that the client was ACA Capital (*i.e.*, JE's Hong Kong-based investment firm, *see* ¶ 23(d)(ii)), and that the wire would be sent to a particular bank in Abu Dhabi, UAE. Masud also advised that Hamilton had a plan to move most of its assets out of the United States.

i.    In WhatsApp messages between JE and MGH Employee-2 hours later on or about September 23, 2022, JE wrote, in substance and in part: "I could send you all documents to show that I own ACA", and "[w]e need the execution today or it is meaningless."

j.    In WhatsApp messages starting at approximately 5:03 p.m. GMT / 12:03 p.m. ET on or about September 23, 2022, JE wrote the following to MGH Employee-2, in substance and in part:  "Sent you all the ACA stuff", "We are just redeeming", and "Masud does not know about ACA."  Based on my review of documents provided by MGH, I have learned that JE sent several documents to MGH that day, including, among others, the following:

i.    A letter on Himalaya Exchange letterhead from Masud (who is identified in the letter as CFO of the Himalaya Exchange) addressed to "ACA Capital Group Limited," purportedly dated October 29, 2021, reflecting a purported "Reservation of Himalaya Coin" and containing the following, in sum and substance:

> The Himalaya International Financial Group Ltd., through the Himalaya Exchange, has reserved Forty Million Himalaya Coin (HCN) for you at the price of $0.10 U.S. Dollars per coin.  As agreed, you can call on this Reservation as and when required.

> We will credit your HCN on request, provided you have sufficient HDO position to cover the above mentioned HCN purchase.

ii.    A "Himalaya Exchange OTC Transaction Form" on Himalaya Exchange letterhead, addressed to "Himalaya International Clearing Ltd.," purportedly reflecting transaction execution details regarding the sale by "william.k.je@acacap.com" of approximately 1,308,044.47 HCN at the price of $24.464 per HCN, for a total of 32 million HDO.  The form reflected an effective transaction date and time of 9:35 p.m. GMT on or about September 22, 2022, and was signed by JE on or about September 22, 2022.

iii.    A second "Himalaya Exchange OTC Transaction Form" on Himalaya Exchange letterhead, addressed to "Himalaya International Clearing Ltd.," purportedly

20

reflecting transaction execution details regarding the sale by "william.k.je@acacap.com" of approximately 572,269.46 HCN at the price of $24.464 per HCN, for a total of 14 million HDO. The form reflected an effective transaction date and time of 9:35 p.m. GMT on or about September 22, 2022 (*i.e.*, the same minute as the transaction reflected above in ¶ 37(j)(ii)), and was signed by JE on or about September 22, 2022.

    iv.  A blurry screenshot on Himalaya Exchange letterhead reflecting what purports to be the Himalaya Exchange Website's Order Book page, which screenshot was purportedly taken at approximately 9:35 p.m. on or about September 22, 2022, as shown below:



    v.  A "Himalaya Exchange Redemption Request Form" on Himalaya Exchange letterhead, reflecting the name "ACA Capital Group Limited" and the Himalaya

Exchange Login Email Address "william.k.je@acacap.com," authorizing the "redemption of my Himalaya Dollar to USD from my Himalaya Exchange account" in the amount of approximately 46 million HDO, for a total outgoing transfer of approximately $46 million.  The purported redemption request form, which was signed by JE on or about September 23, 2022, provided bank account information for an account in the name of ACA Capital Group Limited at First Abu Dhabi Bank in the United Arab Emirates ("UAE").

        k.      In a WhatsApp message from JE to MGH Employee-2 at approximately 9:12 p.m. GMT / 4:12 p.m. ET on or about Friday, September 23, 2022, JE wrote the following to MGH Employee-2, in substance and in part:  "pls let me know if you need further information.  We are redeeming and need to be done today.  Otherwise, it is meaningless."  At approximately 9:29 p.m. GMT / 4:29 p.m. ET, JE wrote to MGH Employee-2, in substance and in part:  "We could divide into 2 tranches," and then, "On a call with the lawyer now."  Approximately 30 minutes later, JE wrote to MGH Employee-2:  "Hi, pls hold until Mon." (*i.e.*, September 26, 2022).

        38.      Based on my participation in this Investigation, training, experience, and review of documents and records, and in light of the nature and circumstances of JE's purported redemption requests, for the following reasons, among others, I believe that JE was attempting to move approximately $46 million in Investment Scheme Funds to bank accounts beyond the reach of U.S. law enforcement:

        a.      Based on the timing of the attempted outgoing transfers—shortly after the Government's seizure of approximately $320 million in other JE-controlled accounts held at other banks—I believe that JE attempted to move the funds offshore in anticipation of potential future Government seizure of funds (such as the requested seizure of the Target Accounts).

        b.      As described above, the transfers were requested from Target Accounts at Mercantile Bank to JE-controlled accounts at a bank in Abu Dhabi, UAE.  Based on my training

and experience, I am aware that UAE authorities are unlikely to provide timely responses to formal requests for information from U.S. authorities, and that UAE authorities are unlikely to enforce U.S. seizure warrants or forfeiture orders for funds held in the UAE.

c.    Based on my review of the nature and circumstances of the attempted transfers, including the repeated urgency regarding the timing of those transfers (*e.g.*, JE's repeated statements that the transfers would be "meaningless" if not completed quickly) as contrasted with the claim that the redemption was merely the "normal redemption of a client," as well as the fact that Hamilton did not initially disclose that JE was, in fact, the client (through his ownership of ACA Capital), I believe that Hamilton provided false or misleading information to Mercantile Bank for the purpose of convincing Mercantile Bank to release the approximately $46 million quickly.

*The Attempted Account Closing on October 7, 2022*

39.    Based on my review of written communications from G Club's attorneys to Mercantile Bank, I have learned that, following Hamilton's unsuccessful attempt to move approximately $46 million in Investment Fund Schemes out of Mercantile Bank, on or about October 7, 2022, G Club (through its attorneys) attempted to close **Target Account-1** (*i.e.*, the G Club Mercantile Bank account).  G Club did not provide instructions regarding where the account balance of approximately $12 million should be transferred once **Target Account-1** was closed.

<u>Pending Litigation Regarding the Prior Seizure Warrants</u>

40.    Based on my participation in this Investigation, training, experience, my review of records and documents, including court documents, and my conversations with representatives of the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.      On or about September 29, 2022, following the execution of the Prior Seizure Warrants, an external counsel for Major Lead International Ltd. (*i.e.*, the parent entity of the Himalaya Exchange), Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC ("Williams & Connolly") filed a letter under seal in the U.S. District Court for the Southern District of New York ("Letter-1"), requesting an "emergency pre-motion conference in advance of a forthcoming motion under Fed. R. Crim. Pro. 41(g) that will seek the immediate release of certain accounts and the return of funds seized from" certain accounts that were subject to the Prior Seizure Warrants.  Letter-1 included the following representations, among others:

i.      JE, the UBO of the Himalaya Exchange, "directly or indirectly holds Himalaya Dollars and Coins, but those holdings represent a minority of the issued currencies. . . . Most currency is owned by the other nearly 18,000 [Himalaya] Exchange customers."

ii.      The freezing of the Himalaya Exchange operating accounts at FV Bank "placed the Himalaya Exchange and associated customer holdings in serious jeopardy" and, "[w]hen [Himalaya] Exchange participants learn that they can *no longer readily redeem* their stable-coin Himalaya Dollars for cash, that almost certainly will lead to a massive, *artificial* devaluation of the market-traded Himalaya Coins." (emphasis added).

b.      On or about October 3, 2022, Williams & Connolly filed a motion for return of property under seal (the "Motion") on behalf of Major Lead International Ltd. ("the "Himalaya Group"), Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC (collectively, the "Movants").  22 Misc. 275 (VSB), Dkts. 8 through 8-18 (under seal).

c.   The Motion included the following representations, among others:

iii.      The Himalaya Group, through various subsidiaries, "owns and operates an innovative cryptocurrency exchange known as the Himalaya Exchange."

24

iv.    The Himalaya Exchange "has more than 18,000 customers and a market capitalization of $25 billion."

v.    The Himalaya Exchange "facilitates the buying and selling of two types of digital assets"—the Himalaya Dollar (or "HDO"), which the Movants described as "*a 'stable coin' token* that is fixed to the U.S. dollar and backed by reserves consisting of dollar-for-dollar cash or cash-equivalent assets"; and the Himalaya Coin (or "HCN"), which the Movants described as "a trading *cryptocurrency* valued by supply and demand." (emphasis added).

vi.    "Customers can participate in the [Himalaya] Exchange *by buying Himalaya Dollars*, using that *currency* to *buy and sell Himalaya Coin*, and ultimately redeeming Himalaya Dollars back into U.S. dollars." (emphasis added).

vii.    The Himalaya Exchange's "pioneering model" combines "pure cryptocurrency trading with 'stable coin' backed by traditional currency."

viii.    JE, the UBO of the Himalaya Exchange, "is also a customer of the [Himalaya] Exchange and owns a substantial amount of Himalaya Dollars and Himalaya Coin through other entities" and "will be negatively impacted" by the seizures, like other Himalaya Exchange customers.

ix.    JE "is prepared to consider reasonable restrictions on his ability to redeem Himalaya Dollars," to the extent the Government has concerns about the UBO's (*i.e.*, JE's) treatment of his substantial holdings.

x.    Two of the Himalaya Group's primary operating accounts at FV Bank are the "Clearing Account," which is used to process Himalaya Exchange customer deposits and redemption, and the "Reserve Account," which holds customer funds.

xi.    When a customer "purchases Himalaya Dollars," the customer's cash payment is deposited into the Clearing Account, and the customer receives "a credit" for an

equivalent number of Himalaya Dollars.  Mot. at 3.  Funds spent to "purchase[] Himalaya Dollars" are "often sent to the Reserve Account, where they back the Himalaya Dollars."

        xii.      The customer can use Himalaya Dollar "credits" to "buy and sell Himalaya Coins, the [Himalaya] Exchange's market-traded cryptocurrency."

        xiii.     When customers "seek to redeem their Himalaya Dollars back to hard currency," customer money in the "Reserve Account travels back to the Clearing Account to meet the redemption request."

        xiv.     The freezing of the FV Bank accounts—including the Clearing and Reserve Accounts—has resulted in the Himalaya Exchange's inability to process 142 pending customer redemption requests (as of the date the Motion was filed), despite the Himalaya Exchange having a "back-up processing bank, Mercantile Bank."

        xv.      The Himalaya Exchange's alleged inability to process redemption requests would "precipitate the loss of confidence" of customers, "resulting in billions of dollars in market losses."

The Himalaya Exchange Scheme

41.     The Himalaya Exchange is marketed and described as a cryptocurrency[11] exchange. As detailed herein, however—and contrary to claims made in Letter-1 and the Motion, described above—the evidence demonstrates that the Himalaya Exchange does not appear to be a functional cryptocurrency exchange; that HDO does not appear to reside on the blockchain (contrary to representations by the Himalaya Exchange, *see infra* ¶ 46(f)); and that the "customers" or

---

[11] Based on my training and experience, I know that "cryptocurrency" describes digital currency in which transactions are verified, and records maintained, by a decentralized system using cryptography (generally referred to as the "blockchain"), rather than by a centralized authority such as a bank.

"members" of the Himalaya Exchange appear, in fact, to be investors in (and victims of) the interrelated Investment Schemes—including the Himalaya Exchange, as described more fully in the September 17 Affidavit. *See, e.g.*, Ex. A at ¶¶ 50-52, 54-55.

42.    Statements by the Himalaya Exchange and the Movants—including the Himalaya Dollar Whitepaper[12] ("HDO Whitepaper") and the Himalaya Coin Whitepaper[13] ("HCN Whitepaper," together, the "Whitepapers"), information posted on the Himalaya Exchange website, JE's publicly-reported statements, Letter-1, and the Motion—are inconsistent regarding, among other things: (a) what "Himalaya Dollars" and "Himalaya Coins" actually are; (b) the liquidity of Himalaya Dollars and Himalaya Coins; (c) how the purported "market price" of Himalaya Coin is determined; and (d) whether the purported Himalaya cryptocurrencies exist on the blockchain.

### *Himalaya Dollar and Himalaya Coin*

43.    Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.    The Himalaya Exchange markets itself as a cryptocurrency exchange, or "true crypto ecosystem."  In the Whitepapers, the "Himalaya Exchange" is defined as a "crypto asset exchange on which members can buy, sell and trade *their crypto assets*."  HDO Whitepaper

---

[12] Available for download at https://hch-hex-pub-lon-p5-compli-01.s3.eu-west-2.amazonaws.com/hedocs/hdo_whitepaper_eng_v6e.pdf (*last visited* October 12, 2022).

[13] Available for download at https://hch-hex-pub-lon-p5-compli-01.s3.eu-west-2.amazonaws.com/hedocs/hcn_whitepaper_eng_v7e.pdf (*last visited* October 12, 2022).

at 3 (emphasis added).    An image from the Himalaya Exchange Website, viewable at https://himalaya.exchange, is shown below:



b.    Himalaya Dollar is described in the Motion papers and the HDO Whitepaper as a "'stable coin' token" or "a new stablecoin pegged to the U.S. Dollar."  *See, e.g.,* HDO Whitepaper at 7.  JE is reported to have described HDO as "the only *stable coin* in the world to maintain" a 1-to-1 stability with the U.S. dollar following the global stablecoin crash in or about May 2022.  *See* Ex. A at 34 n.9 (emphasis added).

c.    Himalaya Coin is described in the Motion papers and the HCN Whitepaper as a "trading cryptocurrency valued by supply and demand," a "market-traded cryptocurrency," or the "official coin issued" by the Himalaya Exchange.  *See, e.g.*, HCN Whitepaper at 4.

     d.     Elsewhere, however, it is stated that the Himalaya Exchange operates not through the use of cryptocurrency, but rather through the use of "Credits," as reflected in the Structural Considerations portion of the HDO Whitepaper shown below:

**STRUCTURAL CONSIDERATIONS**

The operation of the Himalaya Exchange, the Himalaya Ecosystem and associated applications and infrastructure will be facilitated through the use of "Credits". Credits within the Himalaya Ecosystem will correspond to a particular type of crypto asset.

Members will initially be able to purchase Himalaya Dollar Credits from the Himalaya Exchange with U.S. Dollars and may purchase Credits corresponding to a particular type of crypto asset supported by the Himalaya Exchange by transferring corresponding crypto assets to the Himalaya Exchange wallet.

Credits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem, representing a right to participate in trading on the Himalaya Exchange and do not carry any right to require their exchange for fiat currency or crypto-assets. A member may make a request to the Himalaya Exchange to exchange Credits on their account and receive a transfer of corresponding crypto assets to their external wallet address.

Additionally, a Member may make a request to the Himalaya Exchange to accept a transfer of Himalaya Dollar Credits in exchange for an equivalent payment in U.S. Dollars to be paid to the bank account of the Member. However, such exchanges are at the discretion of the Himalaya Exchange, and the Himalaya Exchange is not obliged to fulfil any such requests. References in this document to HCN (the Himalaya Coin, a new coin issued by Himalaya International Financial Group, "HCN" or "Himalaya Coin"), HDO or any other type of asset on an account at the Himalaya Exchange or through the Himalaya Pay App are references to Credits corresponding to that asset.

*See* HDO Whitepaper at 10 (emphasis added); HCN Whitepaper at 11; *see also* Ex. A at ¶ 44(d). That is, as reflected in the language above, the Himalaya Exchange operates through the use of "credits" (not cryptocurrency), and those credits (a) can only be used within the Himalaya Ecosystem, and (b) do not carry any right to require their exchange for fiat currency or crypto-assets. Moreover, while a Himalaya Exchange member may request to exchange that member's HDO credits for an equivalent payment in U.S. dollars, the Himalaya Exchange has the "discretion" to deny any such request.

     e.     The January 2022 version of the HDO Whitepaper contains approximately 135 references to "credits." *See generally* HDO Whitepaper. By contrast, the HDO Whitepaper contains only six references to "stablecoin" or "stablecoins." *See id.*

f.     The January 2022 version of the HCN Whitepaper contains approximately 131 references to "credits."  *See generally* HCN Whitepaper.  By contrast, the HCN Whitepaper contains only 15 references to "token" or "tokens."  *See id.*

g.     Images from the Himalaya Exchange Website, viewable at https://himalaya.exchange, are shown below:



The above descriptions of Himalaya Dollar and Himalaya Coin on the Himalaya Exchange Website make no mention of "credits."

h.     I submit that the foregoing establishes that, contrary to claims that HDO and HCN are cryptocurrencies, HDO and HCN are not in fact cryptocurrencies.  Rather, individuals who purportedly "buy" HDO and use their HDO to "buy" HCN have simply sent money to bank accounts controlled by JE and others in exchange for what are described as "credits."

*Valuation of Himalaya Coin*

44.    Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.    The Movants have represented that Himalaya Coin is "valued by supply and demand."

b.    In a declaration submitted by Ehsan Masud, the CFO of Hamilton, in support of the Motion, Masud represented that the market capitalization of HCN exceeded $25 billion as of October 2, 2022.

c.    The purported historical price of HCN is reflected in data on the Himalaya Exchange Website. *See, e.g.*, Ex. A at ¶¶ 44(c), 45(d).

d.    Contrary to representations that the price of HCN is determined by market supply and demand, the HCN Whitepaper states the following regarding Subsequent Issuances (*i.e.*, issuances of HCN after the initial coin offering, or ICO), in substance and in part:

> To preserve the value of HCN already in circulation and corresponding Credits at the time of a Subsequent Issuance, the issue price of each future issuance will be determined as follows:
>
> a.  The issue price for each future issuance (the "Issue Price") will be calculated in U.S. Dollars based on the weighted average price paid per HCN Credit in respect of all HCN Credit trades settled on the Himalaya Exchange in the immediately preceding 30 days prior to the date on which an announcement of a further issuance of HCN is made (the "Weighted Average Price"). The U.S. Dollar price of each trade used to calculate the Weighted Average Price will be calculated based on the spot price for exchange of the Credit type traded for the HCN Credits to HDO Credits on the Himalaya Exchange at or around the time at which the relevant trade was executed with the value of each HDO Credit being deemed to be 1 U.S. Dollar.
>
> b.  The Issue Price per HCN Credit will be set by the Issuer, subject to paragraph (c) below, and must not be greater than 115 percent of the Weighted Average Price or less than 85 percent of the Weighted Average Price.
>
> c.  Notwithstanding paragraph (b) above, where the Issuer determines, in its sole and absolute discretion, that an Issue Price could not practicably be calculated in accordance with the foregoing or the Issue Price so calculated does not constitute a fair market price, it shall be entitled to make such adjustments in the calculation of the Issue Price as it deems necessary in order to achieve an Issue Price which it deems to be a fair market price. In making such a determination, the Issuer may consider all information which it deems relevant including, without limitation, the occurrence of a significant trade or series of trades where the price paid per HCN Credit was substantially different than the price paid in respect of other trades used to calculate the Weighted Average Price.
>
> Members should note that the value of HCN Credits is independent from the value of any other assets, including HCN tokens.

HCN Whitepaper at 16. That is, as reflected in the language above, the Issuer has "sole and absolute discretion" to decide that the Issue Price, as calculated by the methodology described above, "does not constitute a fair market price," in which case the Issuer is "entitled to make such adjustments in the calculation of the Issue Price as it deems necessary in order to achieve an Issue Price which it deems to be a fair market price." *Id.* (emphasis added).

       e.     The HCN Whitepaper also states the following: "Members should note that the value of HCN Credits is independent from the value of any other assets, including HCN tokens." *Id*.

       f.     Based on my participation in this Investigation, training, experience, I submit that the foregoing reflects that—contrary to representations that the price of "HCN" (and therefore the value of HCN Credits) is determined by market supply and demand—the Himalaya

Exchange has absolute discretion to set a "price" for the issuance of future HCN without any regard for the purported market value of any purportedly issued HCN.

*Liquidity of Himalaya Assets*

45.     Based on my participation in this Investigation, training, experience, open-source research that I have conducted on the Internet, my review of documents and evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of court filings, and my conversations with others, I have learned the following, among other things:

a.     The Movants have made certain statements regarding the liquidity of the Himalaya Dollar.  For example, Masud represented that Himalaya Dollar can be redeemed back to fiat US dollar "at any time."  *See also supra* at ¶ 40(a)(ii).

b.     By contrast, as described above, the HDO Whitepaper states that a Himalaya Exchange member's request to exchange Himalaya Dollar Credits into U.S. Dollars is "at the discretion of the Himalaya Exchange."  *See supra* at ¶ 43(d).

c.     The HDO Whitepaper further states, in substance and in part:  "While it is intended that the Himalaya Exchange should provide good levels of liquidity, the maintenance of the Reserve is intended to provide an additional layer of potential liquidity as a barrier to unexpected market events.  It provides the Issuer [*i.e.*, Himalaya Financial] with the discretionary ability to take action to support liquidity where it deems necessary."  HDO Whitepaper at 12.  And: "The Issuer is not obliged to provide liquidity support and the Himalaya Exchange is not obliged to agree to any request from a Member to exchange HDO Credits for U.S. Dollars and such actions are at the sole discretion of the Issuer and the Himalaya Exchange respectively. Members do not have any direct or indirect claim on the Issuer or the Reserve."  *Id.*

d.     In his declaration in support of the Motion, Masud has also made certain statements regarding the liquidity of Himalaya Coin, including, among others, that "[a]ll HCN are

33

held by customers of the Exchange," and that "[c]ustomers use HDO to purchase HCN and customers sell HCN to obtain HDO, which can be redeemed back to fiat US dollar."

      e.     By contrast, the HCN Whitepaper states the following, in substance and in part:

> Members are advised that neither crypto assets or fiat currency may be held by Members within the Himalaya Ecosystem, and the Himalaya Ecosystem does not provide . . . any type of custody or other arrangements to facilitate this.   The Himalaya Exchange intends to hold in its *own name* and for its *own account*, crypto assets which it *may elect* to use at the request of a Member to complete an exchange of a Member's Credits for corresponding crypto assets. . . .   where such request from a Member is approved by the Himalaya Exchange.

HCN Whitepaper at 11 (emphasis added).

      f.     Despite representations by the Movants about the purported liquidity of HDO and HCN, evidence gathered during this Investigation (including the language from the Whitepapers cited above) demonstrates that Himalaya Exchange customers' ability to convert Himalaya Assets into fiat currency is limited and lies within the sole discretion of the Himalaya Exchange.  Based on my review of bank records and subpoena returns, I have learned that some Himalaya Exchange customers have purportedly executed successful "redemptions" (*i.e.*, received back fiat currency from bank accounts controlled by Hamilton and/or Himalaya entities). However, based on my participation in this Investigation, training, and experience, it appears that the Himalaya Exchange granted certain purported "redemption" requests and returned Investments Scheme Funds to certain members' bank accounts in an effort to perpetuate the fraud; that is, to create the appearance that Himalaya Exchange cryptocurrencies are liquid.

### *Analysis of the Blockchain*

46.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial

analysts at the FBI and SEC, open-source research that I have conducted on the Internet, and my conversations with others, I have learned the following, among other things:

a.    The Movants have represented that "the Himalaya Dollar is backed by reserves consisting of dollar-for-dollar cash or cash-equivalent assets."

b.    The Movants stated that an outside accountant "[p]eriodically . . . examines the books and records of the Exchange and provides reports confirming this dollar for dollar backing."  In connection with the Motion, the Movants submitted an Independent Accountant's Report, dated August 10, 2022 (the "Accountant's Report"), prepared by a particular accounting firm headquartered in California (the "Accounting Firm").[14]  The Accountant's Report is attached hereto as Exhibit D.

c.    The Accountant's Report indicates that Himalaya Dollars "are cryptographic digital tokens residing on the Ethereum blockchain at the smart contract address [0x7C197afcd8D36884309ed731424985E3ed17F018]" (the "Blockchain Address"), and further references "collateralized HDO Credits, which are HDO-denominated liabilities issued and purchased for dollars on Himalaya Ecosystem Platforms."  Ex. D. at 1.

d.    The Himalaya Dollar Bank & Funds Holding Report, which is a report that was provided by the Himalaya International Reserve to the Accounting Firm, states, among other things, that approximately 401,047,298.15 HDO Tokens "have been minted on the Ethereum

---

[14] As reflected in Exhibit D, the Accountant's Report is approximately one page long, with an attachment of the Himalaya Dollar Bank & Funds Holding Report, which is signed by Himalaya International Reserve CEO Jesse Brown on or about August 10, 2022. *See* Ex. D.  On or about October 10, 2022, the FBI received a voluminous subpoena response from the Accounting Firm consisting of, among other things, what appears to be documentation supporting the Accountant's Report.  The FBI's review of that subpoena response is ongoing.

blockchain at the smart contract address" (*i.e.*, the Blockchain Address) as of on or about July 31, 2022.  *See* Ex. D at 2 n.1.

e.    Based on my conversations with others, including a member of the FBI's virtual currency response team, I have learned the following, in substance and in part:

i.    Neither the Whitepapers nor the Himalaya Exchange Website provide the smart contract address[15] for the Himalaya cryptocurrencies.  Without a smart contract address, it is difficult for potential or current investors to conduct due diligence regarding the Himalaya cryptocurrencies.

ii.    Based on the FBI's review of the Blockchain Address (*i.e.* that Movants provided to the Government in the Accountant's Report (which does not appear to be publicly available) on an open-source block explorer (the "Explorer"), it appears that the Blockchain Address first appeared on the Ethereum blockchain on or about March 16, 2021.  As described in the September 17 Affidavit, the Himalaya Exchange has been operating (pre-ICO) since in or about April 2021.  *See* Ex. A at ¶ 18(c).

f.    Based on the FBI's review of the Blockchain Address on the Explorer, it appears that the Blockchain Address is affiliated with HDO.   It further appears that there are there approximately 24 holders of HDO; that approximately 70 transactions appear on the Blockchain Address between on or about March 16, 2021 and on or about October 14, 2022; and that market capitalization is not tracked within the Explorer for HDO.[16]

---

[15] Based on my training and experience and my conversations with others, I am aware that a contract address hosts a smart contract, which is a set of code stored on a blockchain that runs when predetermined conditions are met.  I am further aware that a contract address could be responsible for deploying a particular cryptocurrency (*e.g.*, a token or coin) on a blockchain.

[16] By comparison, and as an example, I and others searched the smart contract address of a stablecoin called "Gemini Dollar" (the "Gemini Blockchain Address") on the Explorer.  *See*

g.    Based on the foregoing, I submit that (i) the purported Himalaya Exchange "cryptocurrency" HDO does not, in fact, appear to reside within the Blockchain Address, and (ii) "HDO Tokens" have not, in fact, been minted on the Blockchain Address, contrary to the Himalaya Dollar Bank & Funds Holding Report. *See* Ex. D at 2 n.1.

47.    As described above, the Himalaya Exchange is marketed to investors as a cryptocurrency exchange where individuals can hold and trade cryptocurrency assets, including stablecoin and trading coins.  In fact, as detailed above, the evidence demonstrates that members of the Himalaya Exchange do not hold, own, or control cryptocurrency or digital assets.  Rather, Himalaya Exchange members who send money to bank accounts controlled by JE and others (including the **Target Accounts**) receive "credits," which purportedly give them an option to buy cryptocurrency (in the form of HDO stablecoins or HCN trading coins).  While members may believe they have effectively exercised that option and are in possession of cryptocurrency or digital assets, the Himalaya Exchange is a closed cryptocurrency platform, and members (like the public) do not have transparency into the purported market for HDO or HCN, beyond the data that is reflected on the Himalaya Exchange Website.  Moreover, it is the Himalaya Exchange (and not members) that holds the money that members have paid for the purpose of "buying" HDO (*i.e.*, Investment Scheme Funds), and the Himalaya Exchange holds those funds "in its own name and for its own account."  *See supra* at ¶ 45(e).

---

https://gemini.com/dollar (*last visited* October 13, 2022).  Based on that search, I am aware that that that there are approximately 9,927 holders of Gemini Dollar; that approximately 520,188 transactions were recorded on the Gemini Blockchain Address between its ICO in or about February 2022 and approximately 9:17 p.m. on or about October 13, 2022; and that Gemini Dollar has a current market capitalization of approximately $329 million.

**B.  Tracing of Fraudulent Proceeds to the Target Accounts**

48.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.      Investors participate in the Investment Schemes by either wiring money directly to a bank account controlled or used by entities affiliated with GUO, JE, and others (including the Farms, G Club, or the Himalaya Exchange), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects, which funds are then transmitted to bank accounts ultimately controlled by JE and other Target Subjects.  *See* Ex. A at ¶ 57(a).

b.      To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.6 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

49.     As described in the September 17 Affidavit, prospective Investment Scheme investors were instructed to send funds intended as an investment in GTV, G Club, or the Himalaya Exchange (for example) to certain bank accounts.  *See, e.g.*, Ex. A at ¶¶ 40(g), 57, 61-62.

a.      Those Investment Scheme Funds were transferred into and among more than at least 80 bank accounts being used by JE and others in ways that, based on my training and experience, are indicative of money laundering.  *See* Ex. A at ¶ 55.

b.      Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas (including the UAE and the Bahamas) in high risk jurisdictions that are frequent havens

for money laundering; (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; (c) investments in real estate or other business interests that have no apparent connection with the stated purposes of the businesses controlling the bank accounts; and (d) the transfer of Investment Scheme Funds between multiple banks, as well as among multiple accounts within the same bank, in a single day. *See* Ex. A at ¶¶ 56-57.

<u>Fraud Proceeds are Layered Through Various Banking Institutions</u>

50.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    Approximately $60 million of Investment Scheme Funds (including, in particular, funds raised through the GTV Stock Offering and the Convertible Loan Offering) were transferred into the Crane MSSB Accounts between in or about May 2021 and June 2021, after being layered through a series of entities at various different banks in a manner that, based on my training and experience, is indicative of money laundering. *See* Ex. A at ¶¶ 58(a), 61-62.

b.    The approximately $60 million in Investment Scheme Funds from the Crane MSSB Accounts was combined with approximately $49 million in other Investment Scheme Funds that had been transferred into the Crane MSSB Accounts from two Crane accounts at a different bank, Capital One (together, the "Crane Capital One Accounts"), raising the total combined balance in the Crane MSSB Accounts to approximately $109 million.  Ex. A at ¶ 58(a)(iii).

c.      Approximately $79 million of those approximately $109 million in Investment Scheme Funds in the Crane MSSB Accounts were then transferred to accounts at the same bank (*i.e.*, MSSB), but in the name of G Club (*i.e.*, the G Club MSSB Accounts).  The approximately $79 million was combined with approximately $79.7 million in other Investment Scheme Funds that had been transferred into the G Club MSSB Accounts from individual G Club Investors and from G Club bank accounts at Signature Bank, First Bank of Puerto Rico, and City National Bank, raising the total combined balance of Investment Scheme Funds in the G Club MSSB Accounts to more than approximately $158 million.

<u>Fraud Proceeds are Transferred to the Target Accounts at Mercantile Bank</u>

51.     Investment Scheme Funds have been traced into and among the Target Accounts in ways that, based on my training and experience, are indicative of money laundering. Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas in high-risk jurisdictions that are frequent havens for money laundering (including the Bahamas, Hong Kong, the Cayman Islands, and the British Virgin Islands); (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; and (c) the transfer of Investment Scheme Funds among the Target Accounts in a single day.

52.     Based on my review of information provided by MGH, I have learned that the **Target Accounts** held a combined total of approximately $305,196,589.12 as of on or about October 6, 2022, as reflected in the table below (the "Account Balances Table"):

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-1 | MBI10103-0000 | $12,887,977.68 |
| Target Account-2 | MBI10133-0000 | $10,312,965.97 |

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-3 | MBI10137-0000 | $3,196,001.32 |
| Target Account-4 | MBI10138-0000 | $277,000,000.00 |
| Target Account-5 | MBI10139-0000 | $356,460.30 |
| Target Account-6 | MBI10171-0000 | $1,211,105.79 |
| Target Account-7 | MBI10172-0000 | $52,078.06 |
| Target Account-8 | MBI10183-0000 | $180,000.00 |
| **Total** | | **$305,196,589.12** |

53.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, my review of court filings and evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

*Target Account-1*

a.     On or about May 5, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of G Club Operations LLC (the "Target Account-1 Application").  The Target Account-1 Application described G Club's business as, in substance and in part, "holding the securities of (or other equity interests in) companies and enterprises."

b.     Alex Hadjicharalambous ("Hadjicharalambous"), the Financial Controller for G Club, is an authorized signer on **Target Account-1**.  *See* Ex. A at ¶ 41(a).

c.     As shown in the Account Balances Table above, **Target Account-1** had an account balance of $12,887,977.68 as of October 6, 2022.

d.     Investment Scheme Funds have been traced into **Target Account-1**; for example:

i.        The initial deposit of funds into **Target Account-1** consisted of an approximately $4 million transfer of Investment Scheme Funds from a G Club account held at Medici Bank.

ii.        Between on or about August 23, 2021 and November 19, 2021, approximately $74 million of the aforementioned Investment Scheme Funds was transferred from the G Club MSSB Accounts to **Target Account-1**.

iii.        On or about December 24, 2021, approximately $10 million of the Investment Scheme Funds was transferred from a Silvergate bank account ending in -7739, held in the name of Hamilton Opportunity Fund SPC (identified as "Target Account-1" in the September 17 Affidavit, *see* Ex. A) to **Target Account-1**.

### *Target Account-2*

e.        On or about November 11, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya International Clearing Ltd. (the "Target Account-2 Application"). The Target Account-2 Application reflected that Himalaya Clearing did <u>not</u> plan to engage in digital currency activity.

f.        JE is an authorized signer on **Target Account-2** and is listed as the ultimate beneficial owner and 100% shareholder of Himalaya International Clearing Ltd.

g.        As shown in the Account Balances Table above, **Target Account-2** had an account balance of $10,312,965.97 as of October 6, 2022.

h.        Investment Scheme Funds have been traced into **Target Account-2**; for example:

i.        Between on or about November 29, 2021 and December 6, 2021, approximately $100 million of the Investment Scheme Funds was transferred from bank accounts

at Metropolitan Commercial Bank and Reserve Trust into **Target Account-2**. *See* September 17 Affidavit at ¶¶ 56(b)(i), 59(g)(iii)(3).

        ii.      On or about December 2, 2021, approximately $50 million of the aforementioned Investment Scheme Funds was transferred from **Target Account-1** into **Target Account-2**.

### Target Account-3

        i.      On or about December 6, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Hamilton Capital Holdings Ltd. (the "Target Account-3 Application"). The Target Account-3 Application described Hamilton Capital Holdings Ltd.'s business as, in substance and in part, "[c]onsultancy services company offering back office support." The Target Account-3 Application described the source of assets used to fund **Target Account-3** as "loan proceed(s)."

        j.      JE is an authorized signer on **Target Account-3** and is listed as the ultimate beneficial owner and 100% shareholder of Hamilton Capital Holding Ltd.

        k.      As shown in the Account Balances Table above, **Target Account-3** had an account balance of $3,196,001.32 as of October 6, 2022.

        l.      Investment Scheme Funds have been traced into **Target Account-3** via internal Mercantile Bank transfers from **Target Account-2** and **Target Account-6**. Specifically:

        i.      Between approximately on or about December 7, 2021 and August 5, 2022, approximately $42 million in Investment Scheme Funds was transferred from **Target Account-2** into **Target Account-3**.

        ii.      Between approximately on or about August 10, 2022 and September 16, 2022, approximately $8 million in Investment Scheme Funds was transferred from **Target Account-6** into **Target Account-3**.

***Target Account-4***

m.      On or about December 2, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya International Reserves Ltd. (the "Target Account-4 Application").  The Target Account-4 Application described the nature of Himalaya International Reserves Ltd.'s business as "investment management."  While the application information relates to "Himalaya International Reserves Ltd.," in the Acknowledgment section of the application, the legal entity name was (apparently inaccurately) entered as Himalaya *Investment* Reserves Ltd.

n.      JE is an authorized signer on **Target Account-4** and is listed as the CEO, ultimate beneficial owner, and 100% shareholder of Himalaya International Reserves Ltd.

o.      Based on my review of email communications, dated between on or about February 17, 2022 and March 3, 2022, among Mercantile Bank's Deputy Chief Compliance Officer ("MB Employee-1") and Hamilton's General Counsel, Georgette Adonis-Roberts, relating to the opening of certain of the Target Accounts, I have learned that Hamilton made the following representations to Mercantile Bank, among others:

i.      Himalaya Reserves is "the Himalaya Dollar Issuer."

ii.      Himalaya Reserves has "[n]o direct customers."

iii.      The stated purpose of **Target Account-4** is "[t]o maintain the reserves of the proceeds of the Himalaya Dollar."

iv.      The anticipated **Target Account-4** activity would consist of "hold[ing] the proceeds of Himalaya Dollar redemptions."

v.      As shown in the Account Balances Table above, **Target Account-4** had an account balance of $277,000,000.00 as of October 6, 2022.

p.      Investment Scheme Funds have been traced into **Target Account-4**; for example:

i.      Between on or about March 25, 2022 and on or about August 5, 2022, approximately $115 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Clearing (identified as "Target Account-4" in the September 20 Affidavit, *see* Ex. C) into **Target Account-4**.

ii.      On or about May 16, 2022, an additional approximately $150 million in Investment Scheme Funds was transferred from **Target Account-2** (*i.e.*, Himalaya Clearing) into **Target Account-4**.

iii.      On or about June 27, 2022, an additional approximately $10 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Reserves (identified as "Target Account-3" in the September 20 Affidavit, *see* Ex. C) into **Target Account-4**.  While the Mercantile Bank records reflect that the transfer originated at FV Bank, the originator bank account number is listed as "*6891," which I understand to refer to the pooled MCB account held FBO FV Bank. *See* Ex. A at ¶¶ 2(k), 62(e); *see also* Ex. C at ¶ 18(b).

### Target Account-5

q.      On or about December 2, 2021, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya Financial Group Ltd. (the "Target Account-5 Application").  The Target Account-5 Application described the nature of Himalaya Financial's business as "managing investments."

r.      Based on my review of email communications, dated between on or about February 17, 2022 and March 3, 2022, among MB Employee-1 and Hamilton employees (including CFO Ehsan Masud and General Counsel Georgette Adonis-Roberts) relating to the

45

opening of certain of the Target Accounts, I have learned that Hamilton employees made the following representations to Mercantile Bank, among others:

      i.      Himalaya Financial is the "Himalaya Coin Issuer."

      ii.      Himalaya Financial "does not have direct customers as the coins are listed on the Himalaya Exchange as a broker."

      iii.      The anticipated **Target Account-5** activity would consist of "transactions from HICL [*i.e.*, Himalaya Clearing] to realize profits and payments for investments."

      s.      JE is an authorized signer on **Target Account-5** and is listed as the CEO, ultimate beneficial owner, and 100% shareholder of Himalaya Financial Group Ltd.

      t.      As shown in the Account Balances Table above, **Target Account-5** had an account balance of $356,460.30 as of October 6, 2022.

      u.      Investment Scheme Funds have been traced into **Target Account-5**; for example:

      i.      On or about March 25, 2022, approximately $10 million in Investment Scheme Funds was transferred from an FV Bank account held in the name of Himalaya Clearing (identified as "Target Account-4" in the September 20 Affidavit, *see* Ex. C) into **Target Account-5**.

      ii.      On or about March 30, 2022, an additional approximately $10 million in Investment Scheme Funds was transferred from the same FV Bank account into **Target Account-5**.

      iii.      On or about April 15, 2022, approximately $20 million in Investment Scheme Funds was transferred from **Target Account-2** (*i.e.*, the Mercantile Bank Himalaya Clearing account) into **Target Account-5**.

*Target Account-6*

v.       On or about April 19, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of Hamilton Investment Management Limited (the "Target Account-6 Application").  The Target Account-6 Application described the nature of Hamilton Investment Management Limited's business as "consulting" and described the source of assets used to fund **Target Account-6** as "loan proceed(s)."

w.       JE is an authorized signer on **Target Account-6** and is listed as the President, ultimate beneficial owner, and 100% shareholder of Hamilton Investment Management Limited.

x.       Based on my review of email communications, dated on or about April 22, 2022, among MB Employee-1 and Gentjana Hysi, the CFO of Hamilton Investment Management Limited (the "Hamilton CFO") relating to the opening of **Target Account-6**, I have learned the following, in substance and in part:

i.       MB Employee-1 identified inconsistencies between the stated nature of Hamilton Investment Management Limited's business as provided in the Target Account-6 Application ("Professional Organization offering Consulting Services"), and the stated nature of Hamilton's business as reflected in: (a) the UK Government's registrar of companies ("Financial Intermediation"); and (b) the company's website ("investment management platform specializing in Private Equity and Digital Asset Management.").  In response, the Hamilton CFO wrote the following:

> Totally understand your confusion, the website that you see relates to Hamilton Investment Management Limited (B.V.I.) not the UK entity. To answer your question, HIM Limited (UK) is not regulated and does not handle customer funds, only provides consulting services to third parties and some of its affiliated companies.  Our IT team is working to resolve the website issue and confusion. Once completed we'll share with you the link.

ii.       MB Employee-1 requested loan documentation relating to the "loan proceed" source of funds for **Target Account-6**.  In response, the Hamilton CFO emailed MB Employee-1 a loan agreement (the "HIML Loan Agreement") and wrote, in substance and in part: "HIML has provided a loan facility to one of its affiliates . . . and is expected the borrower will make regular payments to reduce the loan balance."

y.       Based on my participation in this Investigation and my review of documents and records, including the HIML Loan Agreement, I am aware of the following, among other things:

i.       The HIML Loan Agreement is dated July 7, 2020.

ii.       Hamilton Investment Management Limited is listed as the "Lender," and Hamilton Capital Holding Ltd. is listed as the "Borrower."

iii.       The registered office address listed for both Lender and Borrower is the same address in London, England.

iv.       Pursuant to the terms of the HIML Loan Agreement, the Lender agreed to lend the Borrower up to approximately $25 million to apply "towards the costs incurred . . . whilst identifying and advising on potential corporate investment opportunities globally for the Lender" and to cover "operating, fixed and recurring costs."

v.       JE signed the HIML Loan Agreement on behalf of Hamilton Capital Holding Ltd. (*i.e.*, the Borrower).

z.       As described above, JE is the 100% owner of both Hamilton Capital Holding Ltd. (*see supra* at ¶ 52(h)) and Hamilton Investment Management Limited. *See supra* at ¶ 52(s).

aa.       As shown in the Account Balances Table above, **Target Account-6** had an account balance of $1,211,105.79 as of October 6, 2022.

bb.    Investment Scheme Funds have been traced into **Target Account-6**; for example:

i.    On or about July 13, 2022, approximately $8 million of Investment Scheme Funds was transferred from **Target Account-3** (*i.e.*, the Hamilton Capital Holding account) into **Target Account-6**.  The description of the transfer was "HCH Loan Repayment."

ii.    On or about August 10, 2022, approximately $4 million of Investment Fraud Funds was transferred from **Target Account-6** back into **Target Account-3** (*i.e.*, the Hamilton Capital Holding account).  The description of the transfer was: "HIM will loan/transfer $4M to HCH account."

iii.    On or about September 16, 2022, an additional approximately $4 million of Investment Scheme Funds was transferred from **Target Account-6** back into **Target Account-3** (*i.e.*, the Hamilton Capital Holding account).  The description of the transfer was: "Loan facility."

cc.    Based on my participation in this Investigation and my training and experience, and as described above, I believe the transfer of $8 million into **Target Account-6** (which is a JE-controlled account) from **Target Account-3** (which is a JE-controlled account) as a purported loan repayment, and the subsequent transfer of $8 million from **Target Account-6** back into **Target Account-3** as a purported loan, reflects the laundering of funds through the use of layering of Investment Scheme Funds in a manner consistent with concealment of the nature, source, or origin of the funds.

### *Target Account-7*

dd.    On or about April 27, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of G Fashion International Limited (the "Target Account-7 Application").  The Target Account-7 Application described the nature of G

Fashion International Limited's business as "Equity Holding Company." The stated purpose of **Target Account-7** was "[c]urrent relationship with other affiliates." The company email address provided in the Target Account-7 Application for the General Counsel of G Fashion (the "G Fashion GC") was a particular "@hchktech.com" email address. *See* Ex. A at ¶¶ 41, 59(f).

        ee.    Based on my review of email communications, dated between on or about April 7, 2022 and June 8, 2022, among MB Employee-1, MGH Employee-2, the G Fashion GC, and Hadjicharalambous, among others, relating to the opening of **Target Account-7**, I have learned the following, in substance and in part:

        i.    Hadjicharalambous (who is listed as the Financial Controller of G Club, *see supra* at ¶ 52(b)) introduced MGH Employee-2 to the G Fashion GC by email on or about April 7, 2022, and asked for MGH Employee-2's assistance in "fast track[ing]" the opening of an account for "G FASHION INTERNATIONAL LIMITED, a BVI entity." In the email, Hadjicharalambous stated, in substance and in part, that G Fashion "need[s] an account opened ASAP."

        ii.    In an email to MB Employee-1, the G Fashion GC described G Fashion as "a high-end fashion company established in 2021 which solely operates through its e-commerce website. The company is headquartered in NYC and has clients all over the world. Further, the company's products are exclusively manufactured in Italy due to the high-end and pristine reputation of Italian manufacturers in the fashion industry. The company's vision is to become a high-end fashion brand and compete head-to-head with the biggest in the industry."

        iii.    On or about May 5, 2022, Hadjicharalambous emailed MGH Employee-2 and MB Employee-1, among others, to advise that Hadjicharalambous would "be handling the account moving forward from a financial perspective very similarly to how I manage the GCLUB BVI account."

iv.     As shown in the Account Balances Table above, **Target Account-7** had an account balance of $52,078.06 as of October 6, 2022.

ff.     Investment Scheme Funds have been traced into **Target Account 7** via four internal Mercantile Bank transfers from **Target Account-2** (*i.e.*, the Himalaya Clearing account), totaling approximately $3.35 million between on or about May 5, 2022 and August 19, 2022.  The descriptions for two of the four incoming transfers reference, in substance and in part, "HDO Redemption."

### *Target Account-8*

gg.     On or about August 30, 2022, a business bank account application was submitted to Mercantile Bank for an account in the name of Himalaya Currency Clearing Pty Ltd (the "Target Account-8 Application").  The Target Account-8 Application described the nature of Himalaya Currency Clearing Pty Ltd's business as "Outsourced Customer Service Center and Compliance Consulting."  The stated purpose of opening **Target Account-8** was as follows:  "We would like to receive service fees from our clients in USD and then send them in AUD to our Australian bank account.  Unfortunately, our Australian bank does not provide FX conversion and can only receive AUD."

hh.     JE is listed as the ultimate beneficial owner and 100% shareholder (via his wholly-owned entity, Major Lead International Ltd.) of Himalaya Currency Clearing Pty Ltd.

ii.     Based on my review of email communications, dated between on or about August 8, 2022 and August 31, 2022, among MB Employee-1, MGH Employee-2, and Masud (*i.e.*, Hamilton's CFO), among others, relating to the opening of **Target Account-8**, I have learned the following, in substance and in part:

i.     On or about August 24, 2022, Masud sent an email to MB Employee-1, MGH Employee-2, and others with information about an entity called Himalaya

Currency Clearing, which Masud described, in substance and in part, as "an important entity within the Group, as it is one of the few which holds regulatory licenses." In the email, Masud requested that Mercantile Bank set up a bank account for Himalaya Currency Clearing "ASAP please."

        ii.      In subsequent email communications on or about August 29, 2022, Heeseup Shin, Hamilton's Head of Legal and Compliance, Australia ("Shin"), advised MB Employee-1 and others, in substance and in part, that "William Je is the ultimate beneficiary/ individual shareholder (100%) of Himalaya Currency Clearing Pty Ltd (Australia)."

        iii.     As shown in the Account Balances Table above, **Target Account-8** had an account balance of $180,000.00 as of October 6, 2022.

        jj.     Investment Scheme Funds have been traced into **Target Account-8** via an internal Mercantile Bank transfer from **Target Account-2** (*i.e.*, the Himalaya Clearing account), on or about September 13, 2022, totaling approximately $180,000.

## III. Request for Non-Disclosure and Sealing

        54.     The nature and scope of this ongoing criminal investigation—including the identities of Target Subjects of the Investigation—is not publicly known. As described herein, the affidavits supporting the Prior Seizure Warrants were filed under seal and remain under seal. Premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Specifically, as set forth above, the targets of this investigation appear to have the financial means that would facilitate their flight from prosecution, and have traveled internationally in the past to jurisdictions where extradition to the United States for purposes of prosecution is unlikely or impossible.

55.     For these reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**IV. Conclusion**

56.     Based on the information set forth in the September 17 Affidavit, the G Fashion Affidavit, the September 20 Affidavit, and the foregoing, I submit that there is probable cause to believe that funds held in the Target Property are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and, and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

57.    Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court

issue a warrant authorizing the seizure of the Target Property.

ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
____ day of October, 2022

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

54

**22 MAG 8279**

# EXHIBIT A

# 22 MAG 7580

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in Silvergate
Bank account 5090037739, held by Hamilton
Opportunity Fund SPC ("Target Account-1"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037705, held by Hamilton
Opportunity Fund SPC ("Target Account-2"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037754, held by Hamilton
Opportunity Fund SPC ("Target Account-3"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090037713, held by Hamilton
Opportunity Fund SPC ("Target Account-4"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042770, held by Hamilton
Opportunity Fund SPC ("Target Account-5"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042762, held by Hamilton
Opportunity Fund SPC ("Target Account-6"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042820, held by Hamilton
Opportunity Fund SPC ("Target Account-7"),

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090042747, held by Hamilton
Opportunity Fund SPC ("Target Account-8"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in Silvergate
Bank account 5090030288, held by Hamilton
Investment Management Ltd. ("Target Account-
9"), and all funds traceable thereto, including
accrued interest;

Any and all monies and funds up to and
including the sum of $16,000,000.00 contained
in Manufacturers & Traders Trust Co. account
9878904409, held by GETTR USA, Inc.
("Target Account-10"), and all funds traceable
thereto, including accrued interest; and

All monies and funds contained in Metropolitan
Commercial Bank account 0299006891, held
For Benefit Of FV Bank ("Target Account-11"),
and all funds traceable thereto, including
accrued interest (collectively, the "Target
Property").

Defendant-<u>in</u>-<u>rem</u>.

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I. Introduction

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI" or

"Investigating Agency"). I have been a Special Agent with the FBI since in or about August 2020.

Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes

squad.  During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants.  In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.      This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984:

a.      All monies and funds contained in Silvergate Bank account 5090037739, held by Hamilton Opportunity Fund SPC ("Target Account-1"), and all funds traceable thereto, including accrued interest;

b.      All monies and funds contained in Silvergate Bank account 5090037705, held by Hamilton Opportunity Fund SPC ("Target Account-2"), and all funds traceable thereto, including accrued interest;

c.      All monies and funds contained in Silvergate Bank account 5090037754, held by Hamilton Opportunity Fund SPC ("Target Account-3"), and all funds traceable thereto, including accrued interest;

d.      All monies and funds contained in Silvergate Bank account 5090037713, held by Hamilton Opportunity Fund SPC ("Target Account-4"), and all funds traceable thereto, including accrued interest;

e.      All monies and funds contained in Silvergate Bank account 5090042770, held by Hamilton Opportunity Fund SPC ("Target Account-5"), and all funds traceable thereto, including accrued interest;

f.      All monies and funds contained in Silvergate Bank account 5090042762, held by Hamilton Opportunity Fund SPC ("Target Account-6"), and all funds traceable thereto,

including accrued interest;

       g.     All monies and funds contained in Silvergate Bank account 5090042820, held by Hamilton Opportunity Fund SPC ("Target Account-7"), and all funds traceable thereto, including accrued interest;

       h.     All monies and funds contained in Silvergate Bank account 5090042747, held by Hamilton Opportunity Fund SPC ("Target Account-8"), and all funds traceable thereto, including accrued interest; and

       i.     All monies and funds contained in Silvergate Bank account 5090030288, held by Hamilton Investment Management Ltd. ("Target Account-9"), and all funds traceable thereto, including accrued interest;

       j.     Any and all monies and funds up to and including the sum of $16,000,000.00 contained in Manufacturers & Traders Trust Co. account 9878904409, held by GETTR USA, Inc. ("Target Account-10"), and all funds traceable thereto, including accrued interest; and

       k.     All monies and funds contained in Metropolitan Commercial Bank account 0299006891, held For Benefit Of ("FBO") FV Bank ("Target Account-11"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

     3.     The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

     4.     This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my

review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      As set forth below, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton

Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane

Advisory Group LLC ("Crane"). As set forth in more detail below, the leaders of the fraudulent

investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and

William Je, a/k/a Je Kin Ming ("JE").

6.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds

from victims of the Investment Schemes to the Target Property.

## II. Statutory Basis for Forfeiture

7.      The statutory provisions pursuant to which the Target Property is subject to civil

seizure and forfeiture are as follows:

### *Money Laundering Offenses*

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in
violation of section 1956, 1957 or 1960 of this title, or any property traceable to such
property.

9.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction
involves the proceeds of some form of unlawful activity, conducts
or attempts to conduct such a financial transaction which in fact
involves the proceeds of specified unlawful activity –

(B)     knowing that the transaction is designed in whole or in
part—

(i) to conceal or disguise the nature, the location, the
source, the ownership, or the control of the proceeds
of specified unlawful activity [shall be guilty of a
crime.]

10.      18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit,
or transfer a monetary instrument or funds from a place in the
United States to or through a place outside the United States or to a
place in the United States from or through a place outside the

United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### Bank and Wire Fraud Offenses

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

### Seizure Warrants

14.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any

district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b). Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.    With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

(A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

#### Overview of the Fraudulent Investment Schemes

16.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes"). To date, the investigation ("Investigation")

has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

17.    The Investment Schemes are conducted through various, interrelated offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

18.    Certain of the interrelated Investment Schemes are historical, while others are ongoing.  Specifically:

a.    The GTV stock offering and the G Coin offering described below (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July 2020.  As a result of the Unregistered Stock Offerings, whose proceeds were commingled, companies affiliated with GUO, JE, and others collectively raised at least approximately $487 million from more than 5,000 investors, including individuals in the United States.

b.    Starting at least in or about July 2020, the leaders of the scheme began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed Himalaya Farm Alliance, which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.

c.    GUO, JE, and others continue to conduct the Investment Schemes, including relating to G Club (which has been operating since in or about October 2020) and the Himalaya Exchange (which has been operating since in or about April 2021). As described below, G Club and the Himalaya Exchange have raised at least approximately $664 million between in or about September 2020 and the present.

*Background on GUO and JE*

19.    Based on my participation in this investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.    GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.    GUO is involved with various entities relevant to the Investment Schemes, as described in greater detail below, including GTV, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr"). GUO does not hold formal titles or positions at these entities.

c.    In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and Rule of Law Society ("ROLS"). Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by December 2018.[1] ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP"). At times, the board members for

---

[1]    *See*  https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass"). GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson" and a sponsor.

          d.      JE, a close associate of GUO, has been described as a financier and entrepreneur. JE is involved with various other entities relevant to the Investment Schemes, as described in greater detail below. Specifically:

             i.      JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[2] Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018. JE was formally appointed Director of Hamilton on or about March 20, 2019.

             ii.      JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[3] that was incorporated in the United Kingdom on or about July 10, 2020.

             iii.      JE is listed as the founder and Chairman of Himalaya Exchange, a purported cryptocurrency "ecosystem." JE is the 100% beneficial owner of various entities that operate Himalaya Exchange, including Himalaya International Clearing Ltd. ("Himalaya Clearing"), Major Lead International Ltd., Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

### *GTV Stock Offering*

20.      Between approximately April 20, 2020 and June 2, 2020, GTV, its parent company Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG"; collectively, the

---

[2] *See* https://hamilton-im.com/

[3] *See* https://www.aca-capital.com/

"Companies") solicited thousands of individuals to invest in an offering of GTV common stock (the "GTV Stock Offering"). During that time period, more than approximately 5,000 investors (including many in the United States) collectively paid approximately $452 million for purported GTV common stock.

21.    Based on my review of the GTV Stock Offering's information memorandum dated April 20, 2020 (the "Memorandum"), interviews of witnesses, and review of public source information, as well as documents and records obtained during the course of the investigation, I have learned the following, among other things:

a.    GTV was founded on or about April 17, 2020, as a Delaware corporation and a wholly owned subsidiary of Saraca. GTV's principal place of business was located in the Southern District of New York, in a townhouse located at 162 E. 64th St., New York, NY, 10065 (the "Townhouse").

b.    According to the Memorandum, GUO was the "sponsor" of both Saraca and GTV, as well as the "adviser[sic]" and "key host" of GTV. The Memorandum also stated that GUO was a billionaire, successful businessman, and dissident in China. According to various witnesses, as well as social media content, GUO consistently presented himself as the founder and face of GTV.

c.    The Memorandum and a separate letter to prospective investors outlining "Investment Procedures Guidelines" listed GUO's phone number as the contact number for inquiries from potential investors.

d.    At the time of the GTV Stock Offering, the Companies had recently launched a news-focused social media platform called GTV, including the website www.gtv.org. The Memorandum claimed GTV would be "the first ever platform which w[ould] combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial

12

intelligence, block-chain technology and real-time interactive communication" and that GTV would be "the only uncensored and independent bridge between China and the Western world." The Memorandum also claimed that GTV would "be a bridge between China and the Western world . . . allowing for free and open communication, business transactions and trading, uncensored by the Chinese government." The Memorandum boasted that GTV's platform would be so powerful as to "expos[e] corruption, obstruction, illegality, brutality, harassment, and inhumanity in China." The Memorandum also indicated that GTV would compete with companies such as Zoom, WeChat, TikTok, YouTube, Cisco, Citrix, Alibaba, Amazon, and eBay.

        e.      The Memorandum listed Yvette Y. Wang, Max Krasner, and Daniel Podhaskie as GTV's Executive Directors.

        f.      The Memorandum highlighted the credentials of GTV's Non-executive Directors, including, among others, Bannon, Bass, and Darren Blanton ("Blanton"). As described above, Bannon and Bass were also board members of the ROLF and/or ROLS.

        g.      The Memorandum stated that investor funds would be used for the following, among other purposes: acquisition of companies; upgrading GTV technology and security; and marketing. The Memorandum did not contemplate that investor funds would be used to invest in hedge funds or any similar type of financial investment, or that investor funds would be given to other companies, such as Saraca.

        h.      Based on my conversations with a source of information ("SOI[4]") involved with the ROLF, the Companies, the GTV Stock Offering, and the Phoenix Farm, as well as my

---

[4] The SOI is providing information to law enforcement in hopes of entering into a cooperation agreement and receiving leniency at sentencing. The SOI has provided reliable information that has been corroborated by, among other things, electronic evidence, videos, cellphone records, and subpoena and search warrant returns.

review of the metadata of the Memorandum, I have learned that JE was a primary author of the Memorandum.

*G Coin Offering*

22.    During the same period of April 2020 through June 2020, GTV and Saraca also solicited GTV Investors to invest in a companion digital asset security that was referred to as either G-Coins or G-Dollars (the "G Coin Offering").

23.    Based on my participation in this investigation, training, experience, review of law enforcement reports, review of bank records and videos that were posted on social media platforms, as well as my review of reports of interviews with GTV Investors and conversations with others, including law enforcement, I have learned the following, among other things, about the G Coin Offering:

a.    From approximately in or about April 2020, through at least in or about June 2020, I have learned that the Companies, as well as representatives for the Companies, such as GUO, marketed the sale of G-Coins and G-Dollars to the public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.

b.    The Companies' online promotions set forth that G-Coins (which the Companies indicated would eventually be merged into G-Dollars, forming a single digital asset), and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on an online platform.  As part of its solicitation of G-Coin and G-Dollar investors, the Companies did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a whitepaper or private placement memorandum.

c.    The Companies collected at least approximately $31 million from the G-Coin and G-Dollar Investors, pooling the proceeds in bank accounts associated with the

Companies and commingling them with proceeds from the GTV Stock Offering.  As part of the G Coin Offering, many investors received a purported 20% discount on the $.01 purchase price for G-Coins and G-Dollars.  Investors participated in the G Coin Offering by transferring funds directly to the Companies' U.S. bank accounts, by making payments to the Companies' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.

24.    Based on my participation in this Investigation, training, experience, and review of translations of statements that were made by GUO regarding the G Coin Offering, as well as my conversations with others, I have learned that GUO made numerous false statements in order to solicit investments for the G Coin Offering.  Examples of some those statements are described below, in substance and in part:

a.    In a statement contained within a video by GUO on or about May 9, 2020, Guo stated that G-Coins could be exchanged into U.S. dollars or physical gold.

b.    In another statement contained within a video on or about May 16, 2020, GUO stated that the G-Coin and G-Dollar currencies could be exchanged with gold.

25.    Based on my participation in this investigation, I believe that the above-described statements regarding G-Coins and G-Dollar are false.  In particular, during the course of the investigation, I have not found any evidence that there is or has ever been an exchange where G-Coins or G-Dollars could be exchanged for U.S. dollars or gold.

26.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records, and review of videos that were posted on social media platforms, as well as my review of reports of interviewed individuals who invested in GTV (the "GTV Investors") and my conversations with others, including other law enforcement officers, I have learned the following, among other things, about the solicitation of investments for the GTV Stock Offering and G Coin Offering:

15

a.       GTV disseminated information about the two offerings to the general public through publicly-available videos on websites affiliated with the Companies, including www.gtv.org and www.gnews.org, as well as on social media platforms such as YouTube and Twitter.   The first solicitation video, posted on YouTube on April 21, 2020, was entitled, as translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the GTV Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering.   The Launch Video has had over 3,000 views.   None of the GTV Stock Offering solicitation videos, including the Launch Video, were password protected or placed any restriction on who could view them or any limitations on their ability to be shared.   As a result, the general public, including prospective U.S. investors, were able to access the online marketing videos about the GTV Stock Offering through, for example, independent online research, social media, or referrals from other investors.

b.       GUO led the effort to solicit investors for the GTV Stock Offering.   GUO, who is a prolific user of social media and has an enormous social media following, used various social media platforms to attract followers and to solicit investors for the GTV Stock Offering. Those social media platforms included WhatsApp and Discord, both of which have end-to-end encrypted chat services.[5]   Among other things, the Companies sent the Launch Video via phone messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering material for the GTV Stock Offering, including the subscription agreement and investment instructions.   GUO also assured potential investors that they would

---

[5] End-to-end encryption is a system of communication where only the communicating users can read the messages.  End-to-end encryption prevents law enforcement authorities from intercepting such communications through wiretaps or through search warrants on the service provider, such as WhatsApp.

16

realize enormous returns, at one point suggesting that they would receive 1,000 times their investment, *see infra* ¶ 40(c).  In another statement, in or about June 2020, GUO stated in substance and in part that GTV stock was worth 30 times what it had been worth before.

        c.     Based on my review of a GTV confidentiality agreement, I have learned that in order to participate in the GTV Stock Offering, GTV Investors were required to sign a confidentiality agreement that required them to keep all information concerning GTV confidential, including the existence of the confidentiality agreement.

        d.     The GTV Stock Offering was structured as a private placement offering of 10% into GTV, with the remaining 90% of GTV to be controlled by Saraca, which was its parent company.  According to due diligence records from an investment fund, Saraca is a wholly-owned subsidiary of Hudson Diamond Holding, Inc. ("Hudson BVI"), a British Virgin Islands company. Hudson is in turn wholly owned by Qiang Guo ("QIANG GUO").  Based on my review of open-source material, I have learned that QIANG GUO is GUO'S son.

        e.     By early June 2020, banks began to suspect that the Companies were engaged in potentially unlawful activity and started to close accounts that were linked to Saraca, GTV, and GUO.  Around that same time period, GTV Investors began to express concerns about GTV's use of their money, and the legitimacy of their investments.  Some of those investors expressed their concerns directly to GUO and many investors requested that their money be returned.  In response, GUO and his associates often attempted to shun and ostracize the investors. For example, GUO suggested that one investor was a spy for the CCP and that other investors should not interact with that investor

*Misappropriation of Unregistered Stock Offering Funds*

    27.     A significant portion of the investor funds collected through the Unregistered Stock Offerings (collectively, "Offering Funds") were misappropriated through investments.

28.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.     GUO, JE, and others arranged for approximately $100 million of the Offerings Funds to get invested on behalf of GTV's parent company, Saraca, in a high-risk hedge fund investment managed by a firm named Hayman Capital Management L.P. ("Hayman"). According to its website, Hayman is an SEC-registered asset management firm that was founded by Bass, who was a non-executive director of GTV at the time of the transfer.

b.     In or about May 2020, Bass facilitated GUO's and JE's investment in a high-risk investment fund called the Hayman Hong Kong Opportunities Fund (the "Hayman Fund"), which was operated by Hayman.

c.     JE coordinated with Hayman regarding the investment.  For example, in a May 29, 2020 email from JE to a Hayman representative ("Hayman Rep-1"), JE wrote, in substance and in part:  "We will have one onshore and one offshore vehicle. The onshore one will invest USD100m and the offshore one will invest USD1m. The address of the onshore vehicle is: 162 E64th St., New York, NY 10065 United States."  On or about May 31, 2020, JE wrote, in substance and in part, "The $1m will come from my personal account and I owned[sic] 100% of Hamilton Investment Management Ltd."

i.     The address JE provided for the "onshore" vehicle is the address of the Townhouse.  *See supra* ¶ 21(a).

ii.     Based on my participation in this Investigation, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned that the Townhouse has been listed on corporate documents and/or

18

bank account documentation as the business address for at least seven GUO-affiliated entities; specifically: Saraca, GTV, Golden Spring, Hudson Diamond NY, Greenwich Land, ROLF (until approximately May 2022), and ROLS (until approximately May 2022).

         d.      Three days after the close of the GTV Stock Offering, on or about June 5, 2020, $100 million of the Offering Funds were transferred from a particular JP Morgan Chase bank account to an onshore bank account associated with Hayman for the purpose of investing in the Hayman Fund. The funds were transferred on behalf of Saraca; as noted above, Saraca was the parent company to GTV and was 100% owned by GUO's son, QIANG QUO.

         e.      Three days later, on or about June 8, 2020, $1 million was transferred on behalf of Hamilton,[6] JE's company, from a bank account in the name of JE to an offshore bank account associated with Hayman, also for the purpose of investing in the Hayman Fund.

         f.      The transfer of Offering Funds to Hayman was completely inconsistent with GTV's representations to the GTV Investors about how their funds would be used.

29.     Based on my participation in this Investigation, training, experience, review of documents and records, as well as my conversations with others, including law enforcement, I have learned that on or about September 13, 2021, the SEC announced settled charges against the Companies, based on their violations of the registration requirements for the Unregistered Stock Offerings (*i.e.*, the GTV Stock Offering and the associated digital asset G Coin Offering). The SEC's settlement required the Companies to pay more than $539 million in disgorgement and penalties.

*The Convertible Loan Offering*

---

[6] In April 2018, JE submitted on behalf of Hamilton an account opening document to a U.K. bank that claimed that he owns 100% of Hamilton and that the company "does not involve itself in investments."

30.     After the Unregistered Stock Offerings described above were discovered by banks and numerous bank accounts were frozen, leaders of the schemes began to pitch investors on a new set of investment opportunities.  One new investment scheme launched in or about July 2020 was marketed to prospective investors as an opportunity to convert their existing investments in GTV into a "loan" to GTV.  The Convertible Loan Offering was carried out by the "Himalaya Farm Alliance," a collective of informal groups—known as "Farms"—of Chinese expatriates located in various cities around the world, including New York and Phoenix.  The Himalaya Farm Alliance's purported purpose was to assist the Chinese pro-democracy movement; the Himalaya Farm Alliance existed primarily as private groups on social media platforms such as Discord.  The Farms were typically referred to by the names of preexisting companies that they affiliated themselves with for banking purposes; *e.g.*, Mountains of Spices LLC and Davy & Tony International Limited for the New York Farm, and Maywind Trading LLC, Medical Supply System International LLC and Santel LLC for the Phoenix Farm.

31.     In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that disclosed that the loan would be made to the individual Farm (*e.g.*, "Phoenix Farm (Maywind Trading LLC)") and that the loaned funds would be used by that specific Farm for "general working capital purposes."  Investors executed the Loan Agreement and sent it to their Farm leaders after transferring their funds to the Farm, but were not provided counter-executed copies of the agreement.

32.     Between in or about August 2020 and in or about March 2021, the U.S.-based Farms collectively raised approximately $148 million from the Convertible Loan Offering (the "Loan Funds").  Investors agreed to provide loans to the Farms for the purpose of acquiring GTV shares (once the three-year note had matured).  Once the funds were collected by the U.S. Farms, they were transferred to domestic and foreign accounts owned by different legal entities, including

an Abu Dhabi bank account in the name of ACA Capital (the "UAE ACA Capital Account"), which is owned and controlled by JE.

*Misappropriation of Convertible Loan Offering Funds*

33.    A significant portion of the Loan Funds collected through the Convertible Loan Offering were misappropriated, as described below.

34.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.    JE was sole signatory of the UAE ACA Capital Account.  JE wired approximately $33.3 million of the Loan Funds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ring Rong), and his company, Hamilton. The wires to his and his wife's personal accounts—which amounted to more than approximately $10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities.

b.    JE arranged for approximately $34 million in transfers from UAE ACA Capital Account to U.S. bank accounts in the names of three companies that are each 100% owned by GUO's family members; specifically:

i.    Approximately $5 million to Greenwich Land LLC, which is owned by GUO's wife, Hing Chi Ngok;

ii.    Approximately $18 million to Hudson Diamond NY LLC, which is owned by Guo's daughter, Mei Guo; and

iii.    Approximately $11 million to Lamp Capital LLC, which is owned by Guo's son, QIANG GUO.

c.  The $34 million was commingled with other investor funds, including GTV Offering Funds.  Based on my review of bank account records, I have learned that much of this GTV Investor money was used to fund lavish lifestyle expenses (*e.g.*, approximately $2.3 million in expenses relating to GUO's yacht, and approximately $600,000 for the purchase of luxury automobiles).

d.  JE also arranged for large transfers from UAE ACA Capital Account to other companies with ties to GUO; specifically:

i.  Approximately $19 million to Lexington Property and Staffing, Inc. ("Lexington Property"), which is owned by former GTV Treasurer, Anthony DiBattista ("DiBattista").  The registered address of Lexington Property is 750 Lexington Avenue, New York, NY;

ii.  Approximately $32 million to Savio Law LLC (as escrow agent), pursuant to a purported loan agreement between ACA Capital and Saraca (which is owned by GUO's son, QIANG GUO); and

iii.  Approximately $1 million to Bannon Film Industries, Inc., a company owned by Steve Bannon.  As described above, Bannon was listed in the Memorandum as a non-executive GTV Director and was a Director of the ROLF / ROLS.

### *The G Club Operations LLC Scheme*

35.  Some of the Farms recruited investors to invest in GTV through the purchase of "G Club" memberships.  As described in greater detail below, law enforcement believes G Club is an ongoing fraudulent scheme operated by GUO, JE, and others.

36.  Based on my participation in this Investigation, training, experience, review of the websites, subpoena returns, records and documents, including operating agreements and articles

of incorporation, open-source research I have conducted on the Internet, and my conversations with others, including law enforcement, I have learned the following, among other things:

a.      In or about October 2020, G Club Operations LLC ("G Club") was registered in Puerto Rico.  According to the Operating Agreement, the purpose of G Club is to "provide[] Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market."

b.      An image from the G Club website ("G Club Website"), viewable at https://gclubs.com/en/, is shown below:



37.      G Club purportedly offers five membership tiers:  Tier 5 Membership ($50,000 annually); Tier 4 Membership ($40,000 annually); Tier 3 Membership ($30,000 annually); Tier 2 Membership ($20,000 annually); and Tier 1 Membership ($10,000 annually).  According to the G Club Membership Agreement, "A Member may subsequently elect a higher tier of membership," but "may not subsequently elect a lower tier of Membership."  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and

absolute discretion.  The Membership Agreement further states:  "If an Application is rejected and membership denied, G Clubs shall return the Membership Fee within ten (10) calendar days of such rejection . . . in the form of the original payment of the Membership Fee or, at the option of G Clubs, by check."

38.    One photograph posted to the G Club Website depicted GUO living a lavish lifestyle; specifically, he is shown standing on top of what appears to be a large yacht smoking a cigar.  The G Club Website also states that:

> G Clubs memberships provide its members with access to a concierge customer service with Mandarin and English access and support.  G Clubs members will have the opportunity to attend the annual G Summit meeting which may occur in person or virtually.  G Clubs members will also get exclusive early access to the latest fashion collections and special member pricing on purchases made on the G Fashion website.

39.    In a video summary posted on GNews on or about July 8, 2021, Guo claimed that G Club had approximately 25,000 members, and predicted that G Club would grow to at least 100 million users, attracting $16 trillion of investment.

40.    Despite the representations on the G Club Website about purported membership benefits, law enforcement believes that G Club is being used, at least in part, to perpetuate the fraud schemes, including by soliciting and receiving investments while evading regulatory requirements.  Specifically, based on my review of an interview report of an August 2, 2021 interview (the "August 2, 2021 Interview") conducted by others of a GTV investor ("Investor-1"), I have learned that Investor-1 stated the following, in substance and in part, during that interview:

a.    Investor-1 invested $200,000 USD in GTV in or around May 2020. Investor-1's money came from Investor-1's savings.

b.    Investor-1 came to believe that GTV was a scam because Investor-1 did not receive any GTV shares, and when Investor-1 asked for a refund, no one responded to Investor-1.

24

   c. Investor-1 invested in GTV because: 1) there were a lot of American politicians supporting Guo; (2) Guo said it was original stock and there would be at least 1,000x growth; and (3) Investor-1 thought Investor-1 would make money on the GTV stock because Guo said this in videos. Investor-1 did not think Investor-1 would lose money because Guo promised the GTV investment would make money.

   d. Investor-1 thought that GTV would use the money to build a website like YouTube, Facebook and Twitter, but did not know for certain what it would be used for.

   e. Investor-1 subsequently invested in the Convertible Loan Program through the "Canada Farm" in or around August 2020. Specifically, Investor-1 sent approximately $71,019 to "Canada Himalayan Club Medica Inc." as a loan. Investor-1 believed that the loan was for 3-5 years, with 3% interest and that at the end of that period Investor-1 would receive the money or GTV stock. Investor-1 never received an executed copy of the investment contract. The money Investor-1 sent was frozen by the Canadian SEC.

   f. Investor-1 attempted to invest in GTV again in or around March 2021 through G Club. Specifically, Investor-1 was instructed to send Investor-1's investment funds to "Crane Advisory Group," who in turn would send the money to G Club. Investor-1 sent approximately $100,015 to Crane Advisory Group for the purchase of GTV shares at the price of $1 per ten shares.

   g. In or around July 2021, Investor-1 attempted to initiate a refund by contacting G Club online customer service department. In response to Investor-1's refund request, G Club, through "notices@gclubs.com," sent the following email:

> You recently made a payment with respect to your G|CLUBS membership through Crane. Your wire payment transfer exceeded the amount of a single membership and you have not applied for multiple memberships. We received $100,015.00 via wire. You had applied for one Tier 5 membership and filled out the KYC package indicating the total amount was for multi membership of G|CLUBS (see attached).

To credit the total amount to you, you must apply for additional memberships. Please fill and sign the attached, advising how many memberships you wish to purchase and their tier.

If sending the excess funds was an error and you wish an immediate return of $50,015, please immediately advise. We sincerely apologize for any inconvenience caused.

      h.   In response, Investor-1 informed G Club that Investor-1 had sent the $100,015.00 in funds not to purchase a G Club membership, but rather to invest in GTV.  Investor-1 requested that all of Investor-1's funds be returned.  In a subsequent email, Investor-1 also noted that it would not have made sense for Investor-1 to send a sum of $100,015.00, given that the most expensive G Club membership cost $50,000.  Investor-1 also explained in another email that, in a phone conversation with a representative of G Club, the representative had made it clear that Investor-1's funds were going to be used for an investment in GTV, not for the purchase of a G Club membership.

      i.   Investor-1 had not received any of Investor-1's $100,015 investment back as of the date of the interview.

      41.   Based on my participation in this Investigation, training, experience, my review of documents, records, and email search warrant returns, as well as my conversations with others, including witnesses, I have learned the following, among other things:

      a.   An individual named Alex Hadjicharalambous ("Hadjicharalambous"), whose title was the Financial Controller for G Club, was the authorized signer listed on multiple bank accounts in the name of G Club.  On July 13, 2021, Hadjicharalambous received an email at his G Club email account (alexh@gclubs.com) from a G Fashion IT Manager entitled "HCHKTech email" that read, in substance and in part:  "Hello Alex, As you know we now work for HCHK Technologies.  Use the credentials in this email and follow the steps below to log into your new email account."

26

b.    Based on my review of open-source material on the Internet and subpoena returns, I have learned the following, among other things:

i.    On or about April 29, 2021, HCHK Technologies, Inc. ("HCHK Technologies") was incorporated in the State of Delaware.  At the time of incorporation, Anthony DiBattista was director of HCHK Technologies.  Between on or about May 27, 2021 and November 10, 2021, DiBattista was Treasurer of HCHK Technologies.  On or about December 13, 2021, DiBattista resigned as President, CEO, and Director of HCHK Technologies.

c.    On or about August 18, 2021, HCHK Property Management, Inc. ("HCHK Property") was incorporated in Delaware.  Yvette Wang was elected as the initial director of HCHK Property.  *See* ¶ 21(e).  On or about December 15, 2021, by written consent of the Board of Directors of HCHK Property (*i.e.*, Wang), DiBattista was appointed Treasurer of HCHK Property.  On or about January 1, 2022, Wang resigned and DiBattista was appointed as President, CEO, and Director of HCHK Property.

d.    DiBattista's roles with various of the other GUO-affiliated entities included, among others, Treasurer of GTV, authorized signatory of Lexington Property bank accounts, and Treasurer of G Music LLC.

e.    Based on my review of subpoena returns and my conversations with others, I have learned that on or about July 18, 2021, a G Fashion HR employee sent a "transition memo" to Alex Hadjicharalambous that, "[e]ffective as of July 19, 2021, all GFashion employees will have the option to transfer to GFashion's staffing company, HCHK Technologies, Inc.," which would "thereafter serve the role of staffing company for GFashion and other enterprises."  The transition memo further reflected that an employee's failure to execute the transition memo that same day would result in termination.

27

f.    Based on my review of open-source Internet research and subpoena returns, I have learned that one of the Directors of HCHK Technologies is also the Director and Chairman of the Audit Committee of Gettr,[7] a social media platform that reportedly evolved from GTV Media.  I have further learned that JE's company, Hamilton, owns 95% of Gettr and contributed $35 million to Gettr in capital contribution.

g.    Based on the foregoing, I have learned that starting on or about July 19, 2021, certain employees of G Fashion, Gettr, and other GUO-affiliated entities began to operate under the company names HCHK Technologies and/or HCHK Property.

*The Himalaya Exchange Scheme*

42.    As described above, JE founded a purported cryptocurrency exchange platform called Himalaya Exchange, available at https://himalaya.exchange (the "Himalaya Exchange Website").  Similar to the link between G-Coin / G-Dollar and the Unregistered Stock Offerings, Himalaya Coin (ticker: HCO or HCN) and Himalaya Dollar (ticker: HDO) (together, the "Himalaya Assets") were initially offered as a companion digital asset security for investors in the Convertible Loan Program.

43.    Based on my participation in this investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

---

[7]  *See*  https://www.politico.com/news/2021/07/01/maga-app-bannon-chinese-billionaire-497767 (*last visited* July 6, 2022).  Based on my conversations with others, I have learned that Gettr is one of the companies for which HCHK Technologies provides purported staffing services.

a. The Himalaya Exchange is described as a global digital exchange with a full ecosystem, that includes (or will include) a stablecoin (Himalaya Dollar),[8] a trading coin (Himalaya Coin), and a blockchain payment application called "Himalaya Pay."

b. JE is described as the founder and Chairman of the Himalaya Exchange.

c. As described above, JE is also the founder and CEO of BVI-based Hamilton and the Director of Hong Kong-based ACA Capital.

d. An image from the Himalaya Exchange Website, viewable at https://himalaya.exchange, is shown below:



44. Based on my participation in this Investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, bank records and subpoena returns, and open-source research that I have conducted on the Internet, as well as my conversations with others, including law enforcement and witnesses, I have learned, among other things, that investors

---

[8] A stablecoin is a cryptocurrency that seeks to peg itself to a stable currency, typically the U.S. dollar.

were misled about how and when they would be able to trade their cryptocurrency assets. Specifically:

      a.    When the Himalaya Exchange Website was launched, investors were told that, as of June 2021, they would be able to exchange and withdraw their cryptocurrency. An image of the website from May 2021 depicting this representation is shown below:



      b.  The Himalaya Exchange Website later changed its "trade" date to September 2021. Based on my training, experience, and participation in this investigation, I have learned that it is common for fraudulent cryptocurrencies to use similar tactics to those used here; specifically it is common for fraudulent cryptocurrencies to: (1) not be tradable on a public exchange; and (2) induce investors to purchase the cryptocurrencies through false promises that the cryptocurrency will be available to trade on a public exchange soon.

      c.  The initial coin offering ("ICO") of the Himalaya Assets purportedly took place on the Himalaya Exchange Website or about November 1, 2021. According to data on the Himalaya Exchange Website, the price of a Himalaya Asset increased from 10 cents at the time of the ICO to $27 approximately two weeks later, resulting in a purported $27 billion valuation by mid-November 2021, as reflected in the graph below from the Himalaya Exchange Website:



d.  According to Himalaya Exchange's promotional materials, the value of the Himalaya Dollar is pegged to the U.S. Dollar.   "Credits" are used to secure positions within the Himalaya Ecosystem, which positions correspond to a particular type of crypto asset.  Promotional materials also state that "[c]redits can only be used on the Himalaya Exchange or within the Himalaya Ecosystem, representing a right to participating in trading on the Himalaya Exchange and do not carry any right to require their exchange for fiat currency or crypto-assets." Promotional materials clarify that references to Himalaya Coin, Himalaya Dollar, "or any other type of asset on an account at the Himalaya Exchange or through the Himalaya Pay App are references to Credits corresponding to that asset."

e.  According to the Himalaya Dollar whitepaper dated April 2021 (the "Whitepaper"), available on the Himalaya Exchange Website, Himalaya Dollar is an Ethereum-based token "structured with the aim of maintaining its value 1-to-1 to the United States Dollar.

Himalaya Dollar Credits benefit from potential liquidity support which may be provided through the [Himalaya] Reserve which will be managed with the aim of maintaining its value at a level equal in value in U.S. dollars to the value of Himalaya Dollars in circulation as described below."

      f.   The Whitepaper further states that Himalaya Reserves, the issuer of Himalaya Dollar, "intends to create and hold in the Reserve a mix of United States dollars or other currencies in cash and cash equivalents," and further states, "it is intended to make the Reserve transparent to the public.  The Issuer intends to have the Reserve audited annually by independent auditors. The results of those audits will be made publicly available with details of the then-current composition of the Reserve and the market value of the assets as at[sic] the time of publication." To date, no such audit results have been published.

      g.   As described above, the Himalaya Assets have never traded on an open exchange, and instead purport to trade only on the private Himalaya Exchange.  Himalaya Exchange restrains the flow of real currency out of the Himalaya Exchange by its members, as described above.  Thus, the ability to convert Himalaya Dollars and Himalaya Coins back into U.S. currency was limited.

      45.   Based on my participation in this investigation, training, experience, review of the Himalaya Exchange Website, videos posted on GNews, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

      a.   As described above, Himalaya Dollar purports to be a "stablecoin" that is pegged 1-to-1 to the value of the U.S. dollar.  Other major stablecoins include TerraUSD, Tether, and USD Coin.

      b.   In a video summary posted on GNews in November 2021, GUO represented, in sum and substance, that Himalaya Coin was backed by the U.S. dollar through

stablecoin Himalaya Dollar, and further stated that Himalaya Coin is backed by a reserve of 20% of the proceeds in gold.

      c.     In or about May 2022, there was a global stablecoin collapse that began when a particular stablecoin called TerraUSD lost its peg (*i.e.*, no longer had sufficient hard-asset reserves to back its cryptocurrency at a 1-to-1 ratio to the U.S. dollar). As a result, the cryptocurrency market lost approximately $300 billion in value. The valuation of TerraUSD through May 10, 2022 is reflected in the graph below:



      d.     In contrast, data on the Himalaya Exchange Website reflects very little fluctuation or decrease in the purported value of the Himalaya Assets during the same time period, as reflected in the graph below from the Himalaya Exchange Website:

46.     I have reviewed the graph displayed above in paragraphs 44(c), showing the value of the Himalaya Assets' purported value between approximately November 1, 2021 and December 31, 2021.  The graph is consistent with the purported price of the Himalaya Assets being falsified—specifically, it reflects a steep increase in price over the first two weeks and then an apparent fluctuation in price, but all within a narrow band.

47.     I have also reviewed the graphs displayed above in paragraphs 45(c) and (d), reflecting the price of stablecoin TerraUSD and the purported price of a Himalaya Asset between April 2021 and May 10, 2021.  The data reflected in the Himalaya Asset graph is inconsistent with the valuation of other stablecoins, including TerraUSD, during the stablecoin crash.[9]

---

[9] On or about June 15, 2022, it was reported that William Je said the following: "Despite the cryptocurrency market's recent dip, HDO has constantly remained stable with the US dollar 1:1 without fluctuation. Impressively, this makes HDO the only stable coin in the world to maintain 100% during this time-period of uncertainty."  *See* https://www.newswire.ca/news-releases/iconic-ferrari-f1-car-sold-by-rm-sotheby-s-using-cryptocurrency-himalaya-dollar-883914213.html (*last visited* July 6, 2022)

## Overview of the Scheme to Launder Fraud Proceeds

48.     As described in greater detail herein, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, Crane, Lamp Capital LLC, Hudson Diamond NY, Greenwich Land LLC, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

49.     As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 18. Records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, G Club has generated more than approximately $221 million in purported G Club membership fees.

50.     As detailed below, the evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

51.     As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.04 billion, as described in greater detail below.

52.     As a further part of the money laundering scheme, at least approximately $252 million of the Investment Scheme Funds were remitted, either directly or indirectly, to bank accounts in the United States and the Bahamas held in the name of JE's companies—Hamilton, ACA Capital, and Himalaya Exchange—or otherwise controlled by JE.

35

53.    In particular, as described below, JE opened certain of the Target Accounts and other bank accounts at Silvergate Bank, a bank in La Jolla, California that markets itself as "the leading bank for innovative business in fintech and cryptocurrency." **Target Accounts-1** through **-8** are in the name of a Cayman Islands-registered hedge fund, Hamilton Opportunity Fund SPC; **Target Account-9** is in the name of JE's company, Hamilton Investment Management Ltd., which company is the investment manager of the Hamilton Opportunity Fund SPC.  JE is the principal of Hamilton Investment Management Ltd. and an authorized signer on the Silvergate Target Accounts.

54.    As further described below, JE opened three accounts at FV Bank, a bank in Puerto Rico that markets itself as "The Global Digital Bank."   The FV Bank accounts are in the names of various legal entities through which JE and others operate the Himalaya Exchange—Himalaya Clearing, Himalaya Financial, and Himalaya Reserves.  JE is the ultimate beneficial owner of those Himalaya legal entities, *see supra* ¶ 19(d), and is an authorized signer on the FV accounts.

55.    Investment Scheme Funds have been traced into and among the Target Accounts in ways that, based on my training and experience, are indicative of money laundering. Specifically, the tracing of the funds reflects, among other things: (a) transfers of Investment Scheme Funds from U.S. bank accounts to bank accounts located overseas (including the UAE and the Bahamas) in high risk jurisdictions that are frequent havens for money laundering; (b) layering of Investment Scheme Funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements, in a manner consistent with concealment of the nature, source, or origin of the funds; (c) investments in real estate or other business interests that have no apparent connection with the stated purposes of the businesses controlling the bank accounts; and (d) the transfer of Investment Scheme Funds between multiple banks, as well as among multiple accounts within the same bank, in a single day.

**Use of Multiple Banks and Financial Institutions to Conceal Investment Scheme Funds**

56.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.     To date, law enforcement has identified more than at least 80 bank accounts being used by GUO, JE, and others to process Investment Scheme Funds, which include, among others:

i.     At least approximately 19 bank accounts in the name of G Club entities (*i.e.*, G Club International Limited or G Club Operations LLC) at approximately seven different financial institutions;

ii.     At least approximately 16 bank accounts in the name of Crane (*i.e.*, Crane Advisory Group LLC) at approximately six different financial institutions;

iii.     At least approximately 28 bank accounts in the name of Farm entities at approximately six different financial institutions;

iv.     At least approximately eight bank accounts in the name of G Fashion at approximately six different financial institutions;

v.     At least approximately 14 bank accounts in the name of Hamilton entities (*e.g.*, Hamilton Investment Management Inc. or Hamilton Opportunity Funds SPC) at Silvergate Bank in California; and

vi.     At least approximately three bank accounts in the name of Himalaya entities (*i.e.*, Himalaya Reserve, Himalaya Financial, and Himalaya Clearing) at FV Bank in Puerto Rico.

b.   In addition to utilizing bank accounts held in the names of entities owned or controlled by JE and others directly involved in the Investment Schemes, GUO, JE, and others layer Investment Scheme Funds through accounts at other financial institutions and third-party payment management entities to conceal the nature and source of the funds.  For example, and as described in greater detail herein:

i.      BSI Group LLC ("BSI Group") is a Missouri-based company that offers payment agreement services.  Based on my conversations with others, I have learned that BSI Group effectively operates as a wholesaler and opens bank accounts at U.S.-based financial institutions for its customers.  U.S. banks that BSI Group contracts with include Capital One, The Reserve Trust Company ("Reserve Trust"), Prime Trust LLC ("Prime Trust"), and a Puerto Rico-based financial institution called Mercantile Bank International Corp. and its affiliated entities ("Mercantile Bank" or "MBI").  BSI Group is a client of Capital One, Reserve Trust, and Prime Trust, among other entities, while MBI is one of BSI Group's customers.

ii.     BSI Group manages transactions on behalf of its own customers, including MBI.  BSI Group's customers direct the movement of their funds—which are held in accounts in the name of BSI Group and/or Reserve Trust and Prime Trust—by requesting transactions through BSI Group's website (*e.g.*, indicating the originator, payee, and amount for a specific transaction).

iii.    GUO, JE, and others have laundered more than approximately $300 million in Investment Scheme Funds through bank accounts held in the names of various financial intermediary companies, including BSI Group, Reserve Trust, and Prime Trust. GUO, JE, and others have also layered Investment Scheme Funds through bank accounts held at various different financial institutions.

iv.      For example, on or about May 20, 2021, G Club's financial controller, Alex Hadjicharalambolous, exchanged emails with employees at Puerto Rico-based financial institutions Medici Bank and MBI regarding a $15 million wire transfer of G Club Investment Scheme Funds from a bank account in the name of BSI Group to a bank account in the name of Hamilton Opportunity Fund SPC at Deltec Bank & Trust ("Deltec"), which is located in the Bahamas (the "Hamilton Bahamas Account").  The next day, David Fallon (the President of Hamilton) emailed Hajicharalmbous to advise that Hamilton could not credit the wire to G Club, because the wire reflected that the sender was "BSI Group."

v.      Hadjicharalambous forwarded the email to an MBI employee, who then responded to Hadjicharalmbous (copying Fallon) with the following explanation, in substance and in part:

HI guys, so flow of funds is as follows. It's a little detailed here so apologies.

The wire comes from BSI group ( MBIs corresponding bank partner)to Deltec (Hamilton)

The accounts are as follows

BSI/MBI have an account at Capital one, it is an MBI Bank escrow account owned by MBI. BSI does the processing for us.

Medici is a client of MBI for this 15mm dollar transaction, Medici has an account with MBI at Capital one

GCLUB is a client of Medici.

Gclubs clients send money to the MBI account at Capital one denoted for GClub (through medici). Medici ledgers each wire as they come into the bank.

To solve below request, what exactly do you need to show the fund admin? Proof of account ownership or money inflow (source of funds)

For going forward activity, GClub is now a direct client of MBI, so wires will be sent from GClubs account at MBI, but the wires will always come from BSI as the MBI corresponding bank . We (MBI bank) will have the flow of funds from GClub client to the account, so we will have the ability to trace the full flow of funds in and out of the GCLUB account.

vi.        Similarly, on or about July 1, 2021, Hadjicharalambolous sent an email to an employee at Medici Bank, directing Medici Bank to transfer approximately $4 million from a G Club Medici Bank account to a G Club MBI account.  The wire instructions attached to the email identify MBI as the beneficiary entity, but list Reserve Trust as the beneficiary bank.

vii.        Based on my participation in this Investigation, I believe that the foregoing explanation is an example of the manner in which GUO, JE, and others launder Investment Scheme Funds through multiple financial institutions in an effort to, among other things, conceal their source.  *See* ¶ 56(b)(3).

## Tracing of Fraudulent Proceeds

57.        Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.        Investors participate in the Investment Schemes by either wiring money directly to a bank account controlled or used by entities affiliated with GUO, JE, and others (including the Farms, G Club, or the Himalaya Exchange), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects (including, for example, Crane,  BSI Group, Reserve Trust, or Prime Trust), which funds are then transmitted to bank accounts ultimately controlled by GUO, GUO's associates, and JE.  I have discovered accounts located in the UAE, the United Kingdom, the United States, the Bahamas, and the British Virgin Islands, which GUO, JE, and other Target Subjects have used for the purpose of receiving investment funds from investors in the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange.

b.      To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.04 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

### *Fraud Proceeds are Combined in Hamilton Bahamas Account Before Transfer to Certain of the Silvergate Target Accounts*

58.      Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.      Between in or about May 2021 and June 2021, approximately $100 million in Investment Scheme Funds were transferred from G Club bank accounts into the Hamilton Bahamas Account.  Before the approximately $100 million was combined in the Hamilton Bahamas Account, the Investment Scheme Funds were layered through a series of entities at various different banks in a manner that, based on my training and experience, is indicative of money laundering.  Specifically:

i.      As described above, certain prospective Investment Scheme investors were instructed to send funds intended as an investment in GTV (for example) to a bank account in the name of Crane.  *See supra* at ¶ 40(f). Approximately $78.2 million of Investment Scheme Funds was sent from individual or institutional investors in China and elsewhere to two Crane Advisory bank accounts (the "Crane Citibank Accounts") between in or about November 2020 and April 2021.

ii.      Approximately $60 million of those Investment Scheme Funds were then transferred from the Crane Citibank Accounts to approximately five different bank accounts at MSSB held in the name of Crane (together, the "Crane MSSB Accounts").

iii.      The approximately $60 million in Investment Scheme Funds from the Crane MSSB Accounts was combined with approximately $49 million in other Investment Scheme Funds that had been transferred into the Crane MSSB Accounts from two Crane accounts at a different bank, Capital One (together, the "Crane Capital One Accounts"), raising the total combined balance in the Crane MSSB Accounts to approximately $109 million.

iv.      Approximately $79 million of those approximately $109 million in Investment Scheme Funds in the Crane MSSB Accounts were then transferred to accounts at the same bank (*i.e.*, MSSB), but in the name of G Club (*i.e.*, the G Club MSSB Accounts).  The approximately $79 million was combined with approximately $79.7 million in other Investment Scheme Funds that had been transferred into the G Club MSSB Accounts from individual G Club Investors and from G Club bank accounts at Signature Bank, First Bank of Puerto Rico, and City National Bank, raising the total combined balance of Investment Scheme Funds in the G Club MSSB Accounts to more than approximately $158 million.

v.      Approximately $85 million of Investment Scheme Funds was transferred from the G Club MSSB Accounts to the Hamilton Bahamas Account, and combined with approximately $15 million in other Investment Scheme Funds (relating to G Club and the Himalaya Assets) sourced from a bank account in the name of BSI Group. *See* ¶ 56(b)(v). Thus, the $100 million of Investment Scheme Funds in the Hamilton Bahamas Account consisted of

funds transferred from the G Club MSSB Accounts and other accounts containing Investment Scheme Funds.

*Fraud Proceeds are Transferred to Silvergate Bank*

59. Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a. On or about July 5, 2021, JE submitted a business bank account application to Silvergate Bank (the "Silvergate Application") in the name of Hamilton Opportunity Funds SPC. JE's company, Hamilton, is the investment manager of the Cayman Islands-registered hedge fund, Hamilton Investment Opportunity SPC. Between in or about July 2021 and the present, JE opened more than approximately 14 bank accounts at Silvergate Bank in the name of various Hamilton-affiliated hedge funds or entities, including Hamilton Investment Opportunity SPC and Hamilton Digital Assets Fund SP, and at least four bank accounts at Silvergate Bank in the name of Himalaya International Clearing Ltd. *See* ¶ 19(d)(iii).

b. Between on or about September 1, 2021 and on or about July 5, 2022, JE-controlled Silvergate Bank accounts received approximately $664 million in Investment Scheme Funds. Specifically:

i. In or about September 2021, approximately $85 million of the Investment Scheme Funds was transferred from the Hamilton Bahamas Account, *see supra* at ¶ 56(b)(iv), to a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 9306 (the "9306 Silvergate Account"). The approximately $85 million was combined with approximately $25 million in Investment Scheme Funds sourced from a bank account in the name

of Himalaya International Clearing Ltd. at a bank in the Bahamas (the "Himalaya Bahamas Account"). Thus, as of in or about late September 2021, the 9306 Silvergate Account held at least approximately $110 million in Investment Scheme Funds.

        ii.      On or about October 27, 2021, approximately $59 million of the approximately $110 million in Investment Scheme Funds was transferred from the 9306 Silvergate Account to a Silvergate Bank account in the name of Hamilton Digital Assets, ending in 7747 (the "7747 Silvergate Account"). Later that same day, the approximately $59 million was transferred from the 7747 Silvergate Account to **Target Account-1** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7739).

        iii.      Also on or about October 27, 2021, approximately $25 million of the approximately $110 million was transferred from the 9306 Silvergate Account to **Target Account-2** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7705). As described in greater detail below, once received in **Target Account-2**, the monies were combined with approximately $50 million in Himalaya Asset Investor Funds sourced from an FV Bank account in the name of Himalaya International Clearing Ltd., ending in 3763 (the "3763 FV Account").

        1.      Approximately $30 million of the $50 million transferred from the 3763 FV Account into **Target Account-2** can be traced to the approximately $110 million in Investment Scheme Funds that had been held in the 9306 Silvergate Account. That is, while approximately $25 million of the $110 million was transferred directly to **Target Account-2** on or about October 27, 2021, an additional $30 million of the approximately $110 million was transferred into **Target Account-2** only after passing through three other bank accounts: the 7747 Silvergate Account (held in the name of Hamilton Digital Assets), then **Target Account-1** (held

in the name Hamilton Opportunity Fund SPC), and finally the 3763 FV Account (held in the name of Himalaya International Clearing Ltd.).

             iv.      Also on or about October 27, 2021, approximately $26 million of the approximately $110 million was transferred from the 9306 Silvergate Account to a Silvergate Bank account in the name of Hamilton Diversified Trading Fund, ending in 7762 (the "7762 Silvergate Account"). Later that same day, the approximately $26 million was transferred from the 7762 Silvergate Account to **Target Account-3** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7754). Approximately two months later, on or about January 4, 2022, approximately $26 million was transferred from **Target Account-3** to the UAE ACA Capital Account (*i.e.*, an offshore bank account controlled by JE). *See* ¶¶ 32, 34.

             c.      On or about December 2, 2021, approximately $46.5 million in Investment Scheme Funds was transferred from **Target Account-1** to **Target Account-4** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 7713). Once received in **Target Account-4**, the monies were combined with approximately $5.6 million in Investment Scheme Funds sourced from the Himalaya Bahamas Account (which funds passed through a Silvergate Bank account in the name of Hamilton PE Fund SP, ending in 7721), raising the combined balance of **Target Account-4** to approximately $52.1 million.

             d.      On or about December 17, 2021, approximately $24.5 million of the approximately $52.1 million in Investment Scheme Funds was transferred from **Target Account-4** to a bank account in the name of Insight Title Services LLC Trust AC; the stated purpose of the transaction was for the purchase of residential property in Mahwah, New Jersey on behalf of an entity called Taurus Fund SP. Based on my review of a corporate resolution signed by JE, I have learned that Taurus Fund SP is a segregated portfolio of Hamilton Opportunity Fund SPC (*i.e.*, that JE controls Taurus Fund SP).

e.      Between at least on or about January 24, 2022 and on or about April 4, 2022, approximately $73.8 million of Investment Scheme Funds was transferred into **Target Account-5** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2770). The incoming transfers into **Target Account-5** consisted primarily of wires ranging between approximately $1,100 to approximately $3 million from Chinese individuals, with some individuals sending multiple incoming wires. Based on my participation in this investigation and my training and experience, I believe the transfers into **Target Account-5** are consistent with money laundering, including layering funds through different entities—for example, directing investor funds into a bank account in the names of an entity other than the intended investment vehicle, which here would be G Club or Himalaya Exchange. I further believe that the incoming transfers are consistent with G Club investors purchasing multiple memberships, and therefore are fraud proceeds. *See* ¶ 40(g).

f.      Between on or about March 10, 2022 and on or about April 1, 2022, approximately $77,998,889.20 million in Investment Scheme Funds was transferred from bank accounts in the name of HCHK Technologies or HCHK Property into **Target Account-6** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2762). As described above, starting in or about July 2021, various GUO-affiliated entities began to operate under the newly-formed companies HCHK Technologies and HCHK Property. *See* ¶ 41. Based on my participation in this investigation and my training and experience, and as described above, I believe the nature of the transfers into **Target Account-6** are consistent with money laundering, including layering funds through different entities and concealing their true source and/or purpose. *See, e.g.,* ¶ 56(b)(v).

g.      The Investment Scheme Funds were traced into **Target Account-7** and **Target Account-8** in the following manner:

i.        On or about January 31, 2022, approximately $5.1 million in Investment Scheme Funds was transferred from a bank account in the name of a particular Chinese investor ("Investor-2") into **Target Account-7** (*i.e.*, a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2820).

ii.        Between on or about January 31, 2022 and on or about February 4, 2022, approximately $1 million in Investment Scheme Funds was transferred from bank accounts in the names of two particular Chinese investors ("Investor-3" and "Investor-4") into **Target Account-8** (*i.e.,* a Silvergate Bank account in the name of Hamilton Opportunity Fund SPC, ending in 2747).

iii.        Based on my review of subpoena returns and search warrant returns, I have learned that Investor-2 through -4 had previously invested in the GTV Stock Offering and/or the other Investment Schemes.  Specifically:

1.        According to a spreadsheet GTV maintained of more than approximately 1,200 investors in the GTV Stock Offering, Investor-2, Investor-3, and Investor-4 each purchased GTV stock; Investor-2 purchased approximately 3.3 million shares, Investor-3 purchased approximately 2 million shares, and Investor-4 purchased approximately 800,000 shares.

2.        On or about January 25, 2021, the President of Crane emailed "onboarding profiles" for Investor-2, Investor-3, and Investor-4 to MSSB.  As described above, *see* ¶ 40(f), potential investors in the Investment Schemes were directed to send their investments to Crane, which purportedly served as payment processor for GTV, G Club, and/or Himalaya Exchange.

3.        On or about June 15, 2021, Investor-2 emailed a wire transfer request to MSSB that stated the following, in substance and in part:  "I'd like to invest [in]

a company called Himalaya International Clearing Ltd." The email requested a wire of approximately $3.4M to a Himalaya International Clearing Ltd. account at Metropolitan Commercial Bank. *See infra* ¶ 59(h).

        h.     Based on my participation in this Investigation and my training and experience, and as described above, I believe the approximately $5.1M in transfers from Investor-2 into **Target Account-7** and the approximately $1 million in transfers from Investor-3 and Investor-4 into **Target Account-8** are the proceeds of wire fraud and money laundering, because they are funds Investors-2 through-4 paid with the intent to purchase additional G Club memberships and/or Himalaya Assets, but which GUO, JE and others instead directed into JE's hedge fund bank account to conceal their true source and/or purpose. *See, e.g.,* ¶ 56(b)(v).

        i.     On or about June 11, 2021, JE opened **Target Account-9** (*i.e.*, a Silvergate Bank account in the name of JE's company, Hamilton Investment Management Ltd., ending in 0288). Between at least in or about January 2022 and in or about June 2022, at least approximately $50.4 million of Investment Scheme Funds was transferred into **Target Account-9** over the course of approximately five incoming wire transfers; specifically:

        1.     On or about January 13, 2022, **Target Account-9** received an incoming wire of approximately $10.8 million in Investment Scheme Funds from a Signature Bank account in the name of Prime Trust, ending in 6126 (the "Prime Trust Signature Account"). *See* ¶ 56(b)(i)-(iii).

        2.     On or about February 10, 2022, **Target Account-9** received an incoming wire of approximately $11.7 million in Investment Scheme Funds from the Prime Trust Signature Account.

        3.     On or about June 13, 2022, **Target Account-9** received an incoming wire of approximately $8 million in Investment Scheme Funds from a particular bank account at

Metropolitan Commercial Bank ("MCB"), ending in 6891 (the "6891 MCB Account"). Transaction details provided by Silvergate Bank list "FV Bank – Himalaya International" as the Payer on the transaction, and identify MCB as the name of the "Payer" financial institution. FV Bank records, in turn, reflect that the transfer was from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction. Based on information provided by MCB, I have learned that the 6891 MCB Account was a pooled funds account for FV Bank, and have further learned that MCB processes transactions for FV Bank's account holders (as relevant here, the Himalaya entities) in USD.

j.     On or about June 14, 2022, **Target Account-9** received an incoming wire of approximately $10 million in Investment Scheme Funds from the 6891 MCB Account. FV Bank account records reflect that the transfer was actually from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction.

k.     On or about June 22, 2022, **Target Account-9** received an incoming wire of approximately $10 million in Investment Scheme Funds from the 6891 MCB Account. FV Bank account records reflect that the transfer was from the 3763 FV Account, but do not reflect any involvement of MCB as an intermediary for the transaction.

### *Fraud Proceeds are Used to Fund GUO-Affiliated Companies*

60.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.     As described above, JE's company owns approximately 95% of Gettr. *See supra* at ¶ 41(f).

49

b.    On or about June 30, 2022, approximately $3 million was transferred from **Target Account-4** to **Target Account-10** (*i.e.*, a Manufacturers & Traders Trust Co. bank account held in the name of GETTR USA, Inc., ending in 4409).  The wire details reflect that the transfer was for "CAPITAL CALL JUNE 3M USD."

c.    On or about July 27, 2022, approximately $3 million was transferred from **Target Account-4** to **Target Account-10.**  The wire details reflect that the transfer was for "CAPITAL CALL JULY 3M USD."

d.    On or about August 29, 2022, approximately $5 million was transferred from **Target Account-4** to **Target Account-10**.  The wire details reflect that the transfer was for "CAPITAL CALL AUGUST 10M USD (X2 5M)."

e.    On or about August 30, 2022, an additional approximately $5 million was transferred from **Target Account-4** to **Target Account-10**.  The wire details reflect that the transfer was for "CAPITAL CALL AUGUST 5M USD (10M TRA NSFER 2 of 2)."

f.    Based on the foregoing, I believe that JE and others are using fraud proceeds to fund Gettr.

### *Fraud Proceeds are Layered Through Various Banking Institutions*

61.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    As described herein, GUO, JE, and others have layered fraud proceeds through accounts at various entities, including, among others: certain accounts at MCB maintained

FBO FV Bank's account holders (*i.e.*, the Himalaya entities); and accounts held by BSI Group in the name of various entities.  *See* ¶ 56(b).

b.       As further described herein, FV Bank holds Investment Scheme Funds in correspondent bank accounts, or FBO accounts, at MCB.

62.       Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned that, starting at least in or about February 2022, JE and others began to layer more than approximately $300 million in Investment Scheme Funds through certain bank accounts.  Specifically:

a.       Between on or about February 15, 2022 and on or about March 29, 2022, approximately $160 million in Investment Scheme Funds was transferred from the 3763 FV Account to a Royal Business Bank account in the name of Prime Trust LLC, ending in 6050 (the "Prime Trust RBB Account") in the course of approximately 16 wire transactions.

b.       On or about March 21, 2022, JE opened an FV Bank account in the name of Himalaya International Financial Group, ending in 2119 (the "2119 FV Account") and an FV Bank account in the name of Himalaya International Reserves Ltd., ending in 8239 (the "8239 FV Account").

c.       Between on or about March 21, 2022 and on or about May 13, 2022, approximately $190 million in Investment Scheme Funds was transferred from the 3763 FV Account (*i.e.*, the Himalaya Clearing FV Bank account ending in 3763) to the 2119 FV Account and the 8239 FV Account in the course of approximately 12 wire transactions.  For example:

i.        Between on or about March 21, 2022 and on or March 29, 2022, approximately $100 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 2119 FV Account and/or the 8239 FV Account in the course of approximately 10 wire transactions.

ii.        On or about May 13, 2022, approximately $30 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 2119 FV Account in a single wire transaction, and approximately $60 million in Investment Scheme Funds was transferred from the 3763 FV Account to the 8239 FV Account in a single wire transaction.

d.        On or about May 24, 2022, approximately $44.6 million in Investment Scheme Funds was transferred from the 2119 FV Account to the 8239 FV Account in a single wire transaction.

i.        The approximately $44.6 million was part of approximately $80 million that had been transferred from the 3763 FV Account to the 2119 FV Account.  *See* ¶ 62(c)(i)(ii).

ii.        That is, while approximately $110 million was transferred directly from the 3763 FV Account to the 8239 FV Account, an additional approximately $44.6 million of the approximately $190 million was transferred into the 8239 FV Account only after passing through the 2119 FV Account.

e.        On or about August 15, 2022, an employee of MCB sent email correspondence confirming MCB's relationship with FV Bank regarding **Target Account-11**, which is an MCB account FBO FV Bank customers.  The MCB employee confirmed that **Target Account-11** is a pooled account that contains funds for the Himalaya entities (*i.e.*, the 3763 FV Account, the 2119 FV Account, and the 8239 FV Account).

52

63.    Based on my review of information provided by Silvergate, I have learned that **Target Account-1** through **Target Account-9** held a combined total of approximately $292,407,029.22 as of on or about August 31, 2022, as reflected in the table below:

| Target Account | Account Number | Balance |
|---|---|---|
| Target Account-1 | 5090037739 | $1,800,000.00 |
| Target Account-2 | 5090037705 | $75,000,000.00 |
| Target Account-3 | 5090037754 | $467,343.00 |
| Target Account-4 | 5090037713 | $167,826.87 |
| Target Account-5 | 5090042770 | $83,872,761.75 |
| Target Account-6 | 5090042762 | $76,690,856.60 |
| Target Account-7 | 5090042820 | $5,106,100.00 |
| Target Account-8 | 5090042747 | $1,026,000.00 |
| Target Account-9 | 5090030288 | $48,276,141.00 |
| **Total** | | **$292,407,029.22** |

64.    Based on my review of information from Silvergate, I have learned that **Target Account-10** received a total of approximately $16,000,000.00 from **Target Account-4** between on or about June 30, 2022 and on or about August 30, 2022.

65.    Based on my review of information provided by FV Bank and MCB, I have learned that **Target Account-11** held a combined total of approximately $13,613,172.71 as of on or about August 15, 2022.

## III. Conclusion

66.    Based on the foregoing, I submit that there is probable cause to believe that funds held in the accounts constituting the Target Property are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

67.    Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court

issue a warrant authorizing the seizure of the Target Property.


/s/ Anthony Alecci, by SDA with permission
_____
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 18th day of September, 2022


_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

54

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 7581

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in US Bank account 157525208185, held by G Fashion, and all funds traceable thereto, including accrued interest (the "Target Account").

Defendant-in-rem.

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. Introduction

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI" or "Investigating Agency"). I have been a Special Agent with the FBI since in or about August 2020. Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad. During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants. In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.     This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, all monies and funds contained in US Bank account 157525208185, held by G Fashion, and all funds traceable thereto, including accrued interest (the "Target Account").

3.     The Target Account constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.     This affidavit is based on, among other sources of information: (i) my personal knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.     As set forth below, there is probable cause to believe that the Target Account is

subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane").  As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the Investment Schemes to the Target Account.

**II.  Statutory Basis for Forfeiture**

7.      The statutory provisions pursuant to which the Target Account is subject to civil seizure and forfeiture are as follows:

*Money Laundering Offenses*

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

3

(B)   knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.   18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)   knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.   18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Bank and Wire Fraud Offenses*

12.   For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.   Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

4

*Seizure Warrants*

14.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."  In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).  Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.    With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

(A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

5

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

#### Overview of the Fraudulent Investment Schemes

16.    Since in or around May 2020, the United States Attorney's Office for the Southern District of New York ("SDNY") and the FBI, among other law enforcement agencies, have been investigating a series of interrelated fraudulent investment schemes that pertain to several companies that are owned or operated by, or otherwise affiliated with, GUO, JE, and their associates (collectively, the "Investment Schemes").  To date, the investigation ("Investigation") has revealed that the Investment Schemes involve the solicitation and subsequent investment and/or misappropriation of hundreds of millions of dollars.  GUO and JE are leaders of the Investment Schemes.

17.    The Investment Schemes are conducted through various, interrelated offerings, all of which exhibit features that are consistent with fraud.  For example, investors are promised unrealistic, outsized returns on their investments; investors are induced to invest on the basis of numerous misrepresentations; a large portion of the investment money is misappropriated; and with respect to the sale of digital asset securities, those currencies have never been tradable on a public exchange, despite representations that they would be.

18.    While certain of the interrelated Investment Schemes are ongoing, others are historical.  Specifically:

a.    The GTV stock offering and the G Coin offering described below (collectively, the "Unregistered Stock Offerings") operated between in or about April 2020 and in or about July 2020.  As a result of the Unregistered Stock Offerings, whose proceeds were commingled, companies affiliated with GUO, JE, and others collectively raised at least

approximately $487 million from more than 5,000 investors, including individuals in the United States.

b.      Starting at least in or about July 2020, the leaders of the scheme began to pitch investors on a new set of investment opportunities, marketed as an opportunity to convert their existing investments in GTV into a "loan" to GTV (the "Convertible Loan Offering").  The Convertible Loan Offering was carried out by the Guo-backed "Himalaya Farm Alliance," which consists of informal groups, or "Farms," of Chinese expatriates located in various cities around the world.  Between in or about August 2020 and March 2021, the U.S.-based Farms raised approximately $148 million from the Convertible Loan Offering.

c.      GUO, JE, and others continue to conduct the Investment Schemes, including relating to G Club (which has been operating since in or about October 2020) and the Himalaya Exchange (which has been operating since in or about April 2021).

### *Background on GUO and JE*

19.     Based on my participation in this investigation, training, experience, review of law enforcement reports, review of documents, records, videos that were posted on social media platforms, and public source research that I have conducted on the Internet, as well as my conversations with others, I have learned the following, among other things:

a.      GUO is a purported billionaire and a Chinese national who allegedly fled China for the United States in 2014, after learning that an associate had been arrested on corruption charges.

b.      GUO is involved with various entities relevant to the Investment Schemes, as described in greater detail below, including GTV, G Music LLC ("G Music"), G Club, G Fashion ("G Fashion"), and GETTR USA, Inc. ("Gettr").  GUO does not hold formal titles or positions at these entities.

c.      In or about 2018, GUO founded organizations named the Rule of Law Foundation ("ROLF") and Rule of Law Society ("ROLS").  Based on my review of publicly available information, I have learned that the Rule of Law projects were underway by December 2018.[1]  ROLF and ROLS are purportedly organizations dedicated to exposing and combatting corruption in China by the Chinese Communist Party ("CCP").  At times, the board members for ROLF and/or ROLS have included Stephen K. Bannon ("Bannon") and Kyle Bass ("Bass").  GUO does not hold a formal position at ROLF or ROLS; however, on the ROLS website, GUO is described as "the founder, a promoter and a spokesperson" and a sponsor.

d.      JE, a close associate of GUO, has been described as a financier and entrepreneur.  JE is involved with various other entities relevant to the Investment Schemes, as described in greater detail below.  Specifically:

i.      JE is the CEO of Hamilton Investment Management Ltd. ("Hamilton"), a purported global fund management company.[2]  Hamilton is headquartered in the British Virgin Islands and was incorporated on or about February 5, 2018.    JE was formally appointed Director of Hamilton on or about March 20, 2019.

ii.      JE is the Director of ACA Capital Group Ltd. ("ACA Capital"), a purported Hong Kong-based investment firm[3] that was incorporated in the United Kingdom on or about July 10, 2020.

iii.      JE is listed as the founder and Chairman of Himalaya Exchange, a purported cryptocurrency "ecosystem."  JE is the 100% beneficial owner of various entities that

---

[1]    *See*   https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html (describing Guo and Bannon's involvement in the "Rule of Law Fund").

[2] *See* https://hamilton-im.com/

[3] *See* https://www.aca-capital.com/

operate Himalaya Exchange, including Himalaya International Clearing Ltd. ("Himalaya Clearing"), Major Lead International Ltd., Himalaya International Financial Group Ltd. ("Himalaya Financial"), and Himalaya International Reserves Ltd. ("Himalaya Reserves").

*GTV Stock Offering*

20.    Between approximately April 20, 2020 and June 2, 2020, GTV, its parent company Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG"; collectively, the "Companies") solicited thousands of individuals to invest in an offering of GTV common stock (the "GTV Stock Offering").  During that time period, more than approximately 5,000 investors (including many in the United States) collectively paid approximately $452 million for purported GTV common stock.

21.    Based on my review of the GTV Stock Offering's information memorandum dated April 20, 2020 (the "Memorandum"), interviews of witnesses, and review of public source information, as well as documents and records obtained during the course of the investigation, I have learned the following, among other things:

a.    GTV was founded on or about April 17, 2020, as a Delaware corporation and a wholly owned subsidiary of Saraca.  GTV's principal place of business was located in the Southern District of New York, in a townhouse located at 162 E. 64th St., New York, NY, 10065 (the "Townhouse").

b.    According to the Memorandum, GUO was the "sponsor" of both Saraca and GTV, as well as the "adviser[sic]" and "key host" of GTV.  The Memorandum also stated that GUO was a billionaire, successful businessman, and dissident in China.  According to various witnesses, as well as social media content, GUO consistently presented himself as the founder and face of GTV.

c.    The Memorandum and a separate letter to prospective investors outlining "Investment Procedures Guidelines" listed GUO's phone number as the contact number for inquiries from potential investors.

d.    At the time of the GTV Stock Offering, the Companies had recently launched a news-focused social media platform called GTV, including the website www.gtv.org. The Memorandum claimed GTV would be "the first ever platform which w[ould] combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-chain technology and real-time interactive communication" and that GTV would be "the only uncensored and independent bridge between China and the Western world." The Memorandum also claimed that GTV would "be a bridge between China and the Western world . . . allowing for free and open communication, business transactions and trading, uncensored by the Chinese government." The Memorandum boasted that GTV's platform would be so powerful as to "expos[e] corruption, obstruction, illegality, brutality, harassment, and inhumanity in China." The Memorandum also indicated that GTV would compete with companies such as Zoom, WeChat, TikTok, YouTube, Cisco, Citrix, Alibaba, Amazon, and eBay.

e.    The Memorandum listed Yvette Y. Wang, Max Krasner, and Daniel Podhaskie as GTV's Executive Directors.

f.    The Memorandum highlighted the credentials of GTV's Non-executive Directors, including, among others, Bannon, Bass, and Darren Blanton ("Blanton"). As described above, Bannon and Bass were also board members of the ROLF and/or ROLS.

g.    The Memorandum stated that investor funds would be used for the following, among other purposes: acquisition of companies; upgrading GTV technology and security; and marketing. The Memorandum did not contemplate that investor funds would be used

10

to invest in hedge funds or any similar type of financial investment, or that investor funds would be given to other companies, such as Saraca.

h.    Based on my conversations with a source of information (the "SOI[4]") involved with the ROLF, the Companies, the GTV Stock Offering, and the Phoenix Farm, as well as my review of the metadata of the Memorandum, I have learned that JE was a primary author of the Memorandum.

*G Coin Offering*

22.    During the same period of April 2020 through June 2020, GTV and Saraca also solicited GTV Investors to invest in a companion digital asset security that was referred to as either G-Coins or G-Dollars (the "G Coin Offering").

23.    Based on my participation in this investigation, training, experience, review of law enforcement reports, review of bank records and videos that were posted on social media platforms, as well as my review of reports of interviews with GTV Investors and conversations with others, including law enforcement, I have learned the following, among other things, about the G Coin Offering:

a.    From approximately in or about April 2020, through at least in or about June 2020, I have learned that the Companies, as well as representatives for the Companies, such as GUO, marketed the sale of G-Coins and G-Dollars to the public through online videos on YouTube, Twitter, and other video-sharing and social media platforms.

b.    The Companies' online promotions set forth that G-Coins (which the Companies indicated would eventually be merged into G-Dollars, forming a single digital asset),

---

[4] The SOI is providing information to law enforcement in hopes of entering into a cooperation agreement and receiving leniency at sentencing. The SOI has provided reliable information that has been corroborated by, among other things, electronic evidence, videos, cellphone records, and subpoena and search warrant returns.

and G-Dollars would be usable to purchase goods or services or exchange for gold or fiat currency on an online platform.  As part of its solicitation of G-Coin and G-Dollar investors, the Companies did not provide investors with financial information about the plan to develop any digital asset or platform, or any written offering materials, including, for example, a whitepaper or private placement memorandum.

      c.    The Companies collected at least approximately $31 million from the G-Coin and G-Dollar Investors, pooling the proceeds in bank accounts associated with the Companies and commingling them with proceeds from the GTV Stock Offering.  As part of the G Coin Offering, many investors received a purported 20% discount on the $.01 purchase price for G-Coins and G-Dollars.  Investors participated in the G Coin Offering by transferring funds directly to the Companies' U.S. bank accounts, by making payments to the Companies' accounts on online payment platforms, by making purchases via the Apple App Store, or by writing checks.

24.    Based on my participation in this Investigation, training, experience, and review of translations of statements that were made by GUO regarding the G Coin Offering, as well as my conversations with others, I have learned that GUO made numerous false statements in order to solicit investments for the G Coin Offering.  Examples of some those statements are described below, in substance and in part:

      a.    In a statement contained within a video by GUO on or about May 9, 2020, Guo stated that G-Coins could be exchanged into U.S. dollars or physical gold.

      b.    In another statement contained within a video on or about May 16, 2020, GUO stated that the G-Coin and G-Dollar currencies could be exchanged with gold.

25.    Based on my participation in this investigation, I believe that the above-described statements regarding G-Coins and G-Dollar are false.  In particular, during the course of the

investigation, I have not found any evidence that there is or has ever been an exchange where G-Coins or G-Dollars could be exchanged for U.S. dollars or gold.

26.    Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records, and review of videos that were posted on social media platforms, as well as my review of reports of interviewed individuals who invested in GTV (the "GTV Investors") and my conversations with others, including other law enforcement officers, I have learned the following, among other things, about the solicitation of investments for the GTV Stock Offering and G Coin Offering:

a.    GTV disseminated information about the two offerings to the general public through publicly-available videos on websites affiliated with the Companies, including www.gtv.org and www.gnews.org, as well as on social media platforms such as YouTube and Twitter.  The first solicitation video, posted on YouTube on April 21, 2020, was entitled, as translated into English, "GTV Private Placement Subscription Instructions" (the "Launch Video"). The Launch Video described the investment terms for the GTV Stock Offering and provided a mobile phone number for potential investors to use for inquiries about the offering.  The Launch Video has had over 3,000 views.  None of the GTV Stock Offering solicitation videos, including the Launch Video, were password protected or placed any restriction on who could view them or any limitations on their ability to be shared.  As a result, the general public, including prospective U.S. investors, were able to access the online marketing videos about the GTV Stock Offering through, for example, independent online research, social media, or referrals from other investors.

b.    GUO led the effort to solicit investors for the GTV Stock Offering.  GUO, who is a prolific user of social media and has an enormous social media following, used various social media platforms to attract followers and to solicit investors for the GTV Stock Offering. Those social media platforms included WhatsApp and Discord, both of which have end-to-end

encrypted chat services.[5]  Among other things, the Companies sent the Launch Video via phone messages to hundreds of prospective individual investors with a link to a Google Drive folder that contained additional offering material for the GTV Stock Offering, including the subscription agreement and investment instructions.  GUO also assured potential investors that they would realize enormous returns, at one point suggesting that they would receive 1,000 times their investment, *see infra* ¶ 40(c).  In another statement, in or about June 2020, GUO stated in substance and in part that GTV stock was worth 30 times what it had been worth before.

        c.        Based on my review of a GTV confidentiality agreement, I have learned that in order to participate in the GTV Stock Offering, GTV Investors were required to sign a confidentiality agreement that required them to keep all information concerning GTV confidential, including the existence of the confidentiality agreement.

        d.        The GTV Stock Offering was structured as a private placement offering of 10% into GTV, with the remaining 90% of GTV to be controlled by Saraca, which was its parent company.  According to due diligence records from an investment fund, Saraca is a wholly-owned subsidiary of Hudson Diamond Holding, Inc. ("Hudson BVI"), a British Virgin Islands company. Hudson is in turn wholly owned by Qiang Guo ("QIANG GUO").  Based on my review of open-source material, I have learned that QIANG GUO is GUO'S son.

        e.        By early June 2020, banks began to suspect that the Companies were engaged in potentially unlawful activity and started to close accounts that were linked to Saraca, GTV, and GUO.  Around that same time period, GTV Investors began to express concerns about

---

[5] End-to-end encryption is a system of communication where only the communicating users can read the messages.  End-to-end encryption prevents law enforcement authorities from intercepting such communications through wiretaps or through search warrants on the service provider, such as WhatsApp.

GTV's use of their money, and the legitimacy of their investments. Some of those investors expressed their concerns directly to GUO and many investors requested that their money be returned. In response, GUO and his associates often attempted to shun and ostracize the investors. For example, GUO suggested that one investor was a spy for the CCP and that other investors should not interact with that investor

*Misappropriation of Unregistered Stock Offering Funds*

27.     A significant portion of the investor funds collected through the Unregistered Stock Offerings (collectively, "Offering Funds") were misappropriated through investments.

28.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.     GUO, JE, and others arranged for approximately $100 million of the Offerings Funds to get invested on behalf of GTV's parent company, Saraca, in a high-risk hedge fund investment managed by a firm named Hayman Capital Management L.P. ("Hayman"). According to its website, Hayman is an SEC-registered asset management firm that was founded by Bass, who was a non-executive director of GTV at the time of the transfer.

b.     In or about May 2020, Bass facilitated GUO's and JE's investment in a high-risk investment fund called the Hayman Hong Kong Opportunities Fund (the "Hayman Fund"), which was operated by Hayman.

c.     JE coordinated with Hayman regarding the investment. For example, in a May 29, 2020 email from JE to a Hayman representative ("Hayman Rep-1"), JE wrote, in substance and in part: "We will have one onshore and one offshore vehicle. The onshore one will invest USD100m and the offshore one will invest USD1m. The address of the onshore vehicle is:

162 E64th St., New York, NY 10065 United States." On or about May 31, 2020, JE wrote, in substance and in part, "The $1m will come from my personal account and I owned[sic] 100% of Hamilton Investment Management Ltd."

       i.     The address JE provided for the "onshore" vehicle is the address of the Townhouse. *See supra* ¶ 21(a).

       ii.     Based on my participation in this Investigation, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned that the Townhouse has been listed on corporate documents and/or bank account documentation as the business address for at least seven GUO-affiliated entities; specifically: Saraca, GTV, Golden Spring, Hudson Diamond NY, Greenwich Land, ROLF (until approximately May 2022), and ROLS (until approximately May 2022).

       d.     Three days after the close of the GTV Stock Offering, on or about June 5, 2020, $100 million of the Offering Funds were transferred from a particular JP Morgan Chase bank account to an onshore bank account associated with Hayman for the purpose of investing in the Hayman Fund. The funds were transferred on behalf of Saraca; as noted above, Saraca was the parent company to GTV and was 100% owned by GUO's son, QIANG QUO.

       e.     Three days later, on or about June 8, 2020, $1 million was transferred on behalf of Hamilton,[6] JE's company, from a bank account in the name of JE to an offshore bank account associated with Hayman, also for the purpose of investing in the Hayman Fund.

       f.     The transfer of Offering Funds to Hayman was completely inconsistent with GTV's representations to the GTV Investors about how their funds would be used.

---

[6] In April 2018, JE submitted on behalf of Hamilton an account opening document to a U.K. bank that claimed that he owns 100% of Hamilton and that the company "does not involve itself in investments."

29.     Based on my participation in this Investigation, training, experience, review of documents and records, as well as my conversations with others, including law enforcement, I have learned that on or about September 13, 2021, the SEC announced settled charges against the Companies, based on their violations of the registration requirements for the Unregistered Stock Offerings (*i.e.*, the GTV Stock Offering and the associated digital asset G Coin Offering). The SEC's settlement required the Companies to pay more than $539 million in disgorgement and penalties.

*The Convertible Loan Offering*

30.     After the Unregistered Stock Offerings described above were discovered by banks and numerous bank accounts were frozen, leaders of the schemes began to pitch investors on a new set of investment opportunities.  One new investment scheme launched in or about July 2020 was marketed to prospective investors as an opportunity to convert their existing investments in GTV into a "loan" to GTV.  The Convertible Loan Offering was carried out by the "Himalaya Farm Alliance," a collective of informal groups—known as "Farms"—of Chinese expatriates located in various cities around the world, including New York and Phoenix.  The Himalaya Farm Alliance's purported purpose was to assist the Chinese pro-democracy movement; the Himalaya Farm Alliance existed primarily as private groups on social media platforms such as Discord.

a.     The Farms were typically referred to by the names of preexisting companies that they affiliated themselves with for banking purposes.  That is, the Farms opened and operated bank accounts in the names of various corporate entities.

b.     The Phoenix Farm was affiliated with Maywind Trading LLC ("Maywind"), Medical Supply System International LLC ("Medical Supply System") and Santel LLC ("Santel"), while the New York Farm was affiliated with Mountains of Spices LLC ("Mountains of Spices") and Davy & Tony International Limited ("Davy & Tony").

31.     In connection with the Convertible Loan Offering, the Farms provided prospective investors with a "Loan Agreement" that disclosed that the loan would be made to the individual Farm (*e.g.*, "Phoenix Farm (Maywind Trading LLC)") and that the loaned funds would be used by that specific Farm for "general working capital purposes."  Investors executed the Loan Agreement and sent it to their Farm leaders after transferring their funds to the Farm, but were not provided counter-executed copies of the agreement.

32.     Between in or about August 2020 and in or about March 2021, the U.S.-based Farms collectively raised approximately $148 million from the Convertible Loan Offering (the "Loan Funds").  Investors agreed to provide loans to the Farms for the purpose of acquiring GTV shares (once the three-year note had matured).  Once the funds were collected by the U.S. Farms, they were transferred to domestic and foreign accounts owned by different legal entities, including an Abu Dhabi bank account in the name of ACA Capital (the "UAE ACA Capital Account"), which is owned and controlled by JE.

*Misappropriation of Convertible Loan Offering Funds*

33.     A significant portion of the Loan Funds collected through the Convertible Loan Offering were misappropriated, as described below.

34.     Based on my participation in this Investigation, training, experience, review of law enforcement reports, review of bank records and subpoena returns, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

a.     JE was sole signatory of the UAE ACA Capital Account.  JE wired approximately $33.3 million of the Loan Funds out of the UAE ACA Capital Account to Swiss and UK accounts belonging to himself, his wife (Sin Ring Rong), and his company, Hamilton.  The wires to his and his wife's personal accounts—which amounted to more than approximately

18

$10 million—were described as dividends, salary or director fees.  However, JE was not a director or employee of GTV, Saraca, or other affiliated entities.

      b.     JE arranged for approximately $34 million in transfers from UAE ACA Capital Account to U.S. bank accounts in the names of three companies that are each 100% owned by GUO's family members; specifically:

      i.     Approximately $5 million to Greenwich Land LLC, which is owned by GUO's wife, Hing Chi Ngok;

      ii.     Approximately $18 million to Hudson Diamond NY LLC, which is owned by Guo's daughter, Mei Guo; and

      iii.     Approximately $11 million to Lamp Capital LLC, which is owned by Guo's son, QIANG GUO.

      c.     The $34 million was commingled with other investor funds, including GTV Offering Funds.  Based on my review of bank account records, I have learned that much of this GTV Investor money was used to fund lavish lifestyle expenses (*e.g.*, approximately $2.3 million in expenses relating to GUO's yacht, and approximately $600,000 for the purchase of luxury automobiles).

      d.     JE also arranged for large transfers from UAE ACA Capital Account to other companies with ties to GUO; specifically:

      i.     Approximately $19 million to Lexington Property and Staffing, Inc. ("Lexington Property"), which is owned by former GTV Treasurer, Anthony DiBattista ("DiBattista").  The registered address of Lexington Property is 750 Lexington Avenue, New York, NY;

ii.      Approximately $32 million to Savio Law LLC (as escrow agent), pursuant to a purported loan agreement between ACA Capital and Saraca (which is owned by GUO's son, QIANG GUO); and

iii.      Approximately $1 million to Bannon Film Industries, Inc., a company owned by Steve Bannon. As described above, Bannon was listed in the Memorandum as a non-executive GTV Director and was a Director of the ROLF / ROLS.

*The G Club Operations LLC Scheme*

35.      Some of the Farms recruited investors to invest in GTV through the purchase of "G Club" memberships. As described in greater detail below, law enforcement believes G Club is an ongoing fraudulent scheme operated by GUO, JE, and others.

36.      Based on my participation in this Investigation, training, experience, review of the websites, subpoena returns, records and documents, including operating agreements and articles of incorporation, open-source research I have conducted on the Internet, and my conversations with others, including law enforcement, I have learned the following, among other things:

a.      In or about October 2020, G Club Operations LLC ("G Club") was registered in Puerto Rico. According to the Operating Agreement, the purpose of G Club is to "provide[] Membership Concierge services with exclusive offers and discounts for luxury hotels and retailers for High Net Worth individuals from the Asian market."

b.      An image from the G Club website ("G Club Website"), viewable at https://gclubs.com/en/, is shown below:



37.    G Club purportedly offers five membership tiers:  Tier 5 Membership ($50,000 annually); Tier 4 Membership ($40,000 annually); Tier 3 Membership ($30,000 annually); Tier 2 Membership ($20,000 annually); and Tier 1 Membership ($10,000 annually).  According to the G Club Membership Agreement, "A Member may subsequently elect a higher tier of membership," but "may not subsequently elect a lower tier of Membership."  The annual fee for the desired membership tier must be paid in full with the submission of the G Club membership application, and G Club reserves the right to reject any membership application within 30 days at its sole and absolute discretion.  The Membership Agreement further states:  "If an Application is rejected and membership denied, G Clubs shall return the Membership Fee within ten (10) calendar days of such rejection . . . in the form of the original payment of the Membership Fee or, at the option of G Clubs, by check."

38.    One photograph posted to the G Club Website depicted GUO living a lavish lifestyle; specifically, he is shown standing on top of what appears to be a large yacht smoking a cigar.  The G Club Website also states that:

> G Clubs memberships provide its members with access to a concierge customer service with Mandarin and English access and support.  G Clubs members will have

the opportunity to attend the annual G Summit meeting which may occur in person or virtually. G Clubs members will also get exclusive early access to the latest fashion collections and special member pricing on purchases made on the G Fashion website.

39.    In a video summary posted on GNews on or about July 8, 2021, Guo claimed that G Club had approximately 25,000 members, and predicted that G Club would grow to at least 100 million users, attracting $16 trillion of investment.

40.    Despite the representations on the G Club Website about purported membership benefits, law enforcement believes that G Club is being used, at least in part, to perpetuate the fraud schemes, including by soliciting and receiving investments while evading regulatory requirements. Specifically, based on my review of an interview report of an August 2, 2021 interview (the "August 2, 2021 Interview") conducted by others of a GTV investor ("Investor-1"), I have learned that Investor-1 stated the following, in substance and in part, during that interview:

a.    Investor-1 invested $200,000 USD in GTV in or around May 2020. Investor-1's money came from Investor-1's savings.

b.    Investor-1 came to believe that GTV was a scam because Investor-1 did not receive any GTV shares, and when Investor-1 asked for a refund, no one responded to Investor-1.

c.    Investor-1 invested in GTV because: 1) there were a lot of American politicians supporting Guo; (2) Guo said it was original stock and there would be at least 1,000x growth; and (3) Investor-1 thought Investor-1 would make money on the GTV stock because Guo said this in videos. Investor-1 did not think Investor-1 would lose money because Guo promised the GTV investment would make money.

d.    Investor-1 thought that GTV would use the money to build a website like YouTube, Facebook and Twitter, but did not know for certain what it would be used for.

e.      Investor-1 subsequently invested in the Convertible Loan Program through the "Canada Farm" in or around August 2020.  Specifically, Investor-1 sent approximately $71,019 to "Canada Himalayan Club Medica Inc." as a loan.  Investor-1 believed that the loan was for 3-5 years, with 3% interest and that at the end of that period Investor-1 would receive the money or GTV stock.  Investor-1 never received an executed copy of the investment contract.  The money Investor-1 sent was frozen by the Canadian SEC.

f.      Investor-1 attempted to invest in GTV again in or around March 2021 through G Club.  Specifically, Investor-1 was instructed to send Investor-1's investment funds to "Crane Advisory Group," who in turn would send the money to G Club.  Investor-1 sent approximately $100,015 to Crane Advisory Group for the purchase of GTV shares at the price of $1 per ten shares.

g.      In or around July 2021, Investor-1 attempted to initiate a refund by contacting G Club online customer service department.  In response to Investor-1's refund request, G Club, through "notices@gclubs.com," sent the following email:

> You recently made a payment with respect to your G|CLUBS membership through Crane. Your wire payment transfer exceeded the amount of a single membership and you have not applied for multiple memberships. We received $100,015.00 via wire. You had applied for one Tier 5 membership and filled out the KYC package indicating the total amount was for multi membership of G|CLUBS (see attached).
>
> To credit the total amount to you, you must apply for additional memberships. Please fill and sign the attached, advising how many memberships you wish to purchase and their tier.
>
> If sending the excess funds was an error and you wish an immediate return of $50,015, please immediately advise. We sincerely apologize for any inconvenience caused.

h.      In response, Investor-1 informed G Club that Investor-1 had sent the $100,015.00 in funds not to purchase a G Club membership, but rather to invest in GTV.  Investor-1 requested that all of Investor-1's funds be returned.  In a subsequent email, Investor-1 also noted that it would

not have made sense for Investor-1 to send a sum of $100,015.00, given that the most expensive G Club membership cost $50,000. Investor-1 also explained in another email that, in a phone conversation with a representative of G Club, the representative had made it clear that Investor-1's funds were going to be used for an investment in GTV, not for the purchase of a G Club membership.

       i.   Investor-1 had not received any of Investor-1's $100,015 investment back as of the date of the interview.

    41.   Based on my participation in this Investigation, my review of law enforcement reports, court filings, review of bank records, subpoena returns, and search warrant returns, my training and experience, as well as my conversations with others, including law enforcement and witnesses, I have learned the following, among other things:

       a.   Based on my review of an informal translation and transcription of a voice message that GUO sent to the SOI and others via WhatsApp in or about 2020, which was provided pursuant to a subpoena, I have learned that GUO directed the Phoenix Farm to send its "40 million loan money" (*i.e.*, Convertible Loan Offering funds) "in different wires, on different days, to GFashion in Los Angeles, and then use a loan agreement to legalize the wires. Leanne [Li] and Tiantian [Hao] have already coordinated with banks in California. You three together please figure out how the money goes into these accounts and solve this issue, OK?"

       b.   On or about July 31, 2020, the following entities were registered for incorporation in the State of California: "G Club," "G Club One," "G Club Two," "G Club Three," and "G Fashion" (the "California G Entities"). The registration filings for the California G Entities all had the same registered address (800 N Harper Ave, Los Angeles, California 90046) and officers (Leanne Li ("LI") as CEO and Secretary, and Tian Hao ("HAO") as CFO and Director). The type of business listed for each of the California G Entities was "Fashion." Based on my

open-source research, I have learned that the listed address appears to be a residential address, which, based on my training and experience, is an indicia of money laundering.

42.    Based on my participation in this Investigation, training, experience, my review of documents, records, and email search warrant returns, as well as my conversations with others, including witnesses, I have learned the following, among other things:

a.    An individual named Alex Hadjicharalambous ("Hadjicharalambous"), whose title was the Financial Controller for G Club, was the authorized signer listed on multiple bank accounts in the name of G Club.  On July 13, 2021, Hadjicharalambous received an email at his G Club email account (alexh@gclubs.com) from a G Fashion IT Manager entitled "HCHKTech email" that read, in substance and in part:  "Hello Alex, As you know we now work for HCHK Technologies.  Use the credentials in this email and follow the steps below to log into your new email account."

b.    Based on my review of open-source material on the Internet and subpoena returns, I have learned the following, among other things:

i.    On or about April 29, 2021, HCHK Technologies, Inc. ("HCHK Technologies") was incorporated in the State of Delaware.  At the time of incorporation, Anthony DiBattista was director of HCHK Technologies.  Between on or about May 27, 2021 and November 10, 2021, DiBattista was Treasurer of HCHK Technologies.  On or about December 13, 2021, DiBattista resigned as President, CEO, and Director of HCHK Technologies.

c.    On or about August 18, 2021, HCHK Property Management, Inc. ("HCHK Property") was incorporated in Delaware.  Yvette Wang was elected as the initial director of HCHK Property.  *See* ¶ 21(e).  On or about December 15, 2021, by written consent of the Board of Directors of HCHK Property (*i.e.*, Wang), DiBattista was appointed Treasurer of HCHK

Property.  On or about January 1, 2022, Wang resigned and DiBattista was appointed as President, CEO, and Director of HCHK Property.

d.  DiBattista's roles with various of the other GUO-affiliated entities included, among others, Treasurer of GTV, authorized signatory of Lexington Property bank accounts, and Treasurer of G Music LLC.

e.  Based on my review of subpoena returns and my conversations with others, I have learned that on or about July 18, 2021, a G Fashion HR employee sent a "transition memo" to Alex Hadjicharalambous that, "[e]ffective as of July 19, 2021, all GFashion employees will have the option to transfer to GFashion's staffing company, HCHK Technologies, Inc.," which would "thereafter serve the role of staffing company for GFashion and other enterprises."  The transition memo further reflected that an employee's failure to execute the transition memo that same day would result in termination.

f.  Based on my review of open-source Internet research and subpoena returns, I have learned that one of the Directors of HCHK Technologies is also the Director and Chairman of the Audit Committee of Gettr,[7] a social media platform that reportedly evolved from GTV Media.  I have further learned that JE's company, Hamilton, owns 95% of Gettr and contributed $35 million to Gettr in capital contribution.

g.  Based on the foregoing, I have learned that starting on or about July 19, 2021, certain employees of G Fashion, Gettr, and other GUO-affiliated entities began to operate under the company names HCHK Technologies and/or HCHK Property.

---

[7] *See*  https://www.politico.com/news/2021/07/01/maga-app-bannon-chinese-billionaire-497767 (*last visited* July 6, 2022).  Based on my conversations with others, I have learned that Gettr is one of the companies for which HCHK Technologies provides purported staffing services.

**Overview of the Scheme to Launder Fraud Proceeds**

43.     As described in greater detail herein, since at least in or about 2020, GUO, JE, and others have operated the Investment Schemes, *i.e.*, various interrelated fraudulent investment schemes.  The Investment Schemes involve entities affiliated with GUO and/or JE, including GTV, G Fashion, G Club, Crane, Lamp Capital LLC, Hudson Diamond NY, Greenwich Land LLC, HCHK Technologies, the Himalaya Farms, the Himalaya Exchange, Hamilton, and ACA Capital, among others.

44.     As described above, between in or about April 2020 and June 2020, GUO, JE, and others fraudulently obtained more than approximately $635 million in purported investments through the Unregistered Stock Offerings and Convertible Loan Offering.  *See supra* ¶ 18. Records that I or others have reviewed in the course of the Investigation show that, between in or about November 2020 and June 2022, G Club has generated more than approximately $221 million in purported G Club membership fees.

45.     The evidence demonstrates that between at least approximately April 2020 and the present, GUO, JE, and others have been engaged in a scheme to launder fraud proceeds from the Investment Schemes (which include the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange) (collectively, the "Investment Scheme Funds").

46.     As part of the money laundering scheme, JE and others have conducted financial transactions totaling more than approximately $1.04 billion, as described in greater detail below.

47.     Investment Scheme Funds (specifically, Convertible Loan Offering funds), have been traced into the **Target Account** in ways that, based on my training and experience, are indicative of money laundering.  Specifically, the tracing of the funds reflects, among other things, the layering of Convertible Loan Offering funds through a series of entities and bank accounts, in some cases pursuant to purported loan agreements or other financial arrangements.

27

**Use of Multiple Banks and Financial Institutions to Conceal Investment Scheme Funds**

48.     Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.     To date, law enforcement has identified more than at least 80 bank accounts being used by GUO, JE, and others to process Investment Scheme Funds, which include, among others:

i.     At least approximately 19 bank accounts in the name of G Club entities (*i.e.*, G Club International Limited or G Club Operations LLC) at approximately seven different financial institutions;

ii.     At least approximately 16 bank accounts in the name of Crane (*i.e.*, Crane Advisory Group LLC) at approximately six different financial institutions;

iii.     At least approximately 28 bank accounts in the name of Farm entities at approximately six different financial institutions;

iv.     At least approximately eight bank accounts in the name of G Fashion at approximately six different financial institutions;

v.     At least approximately 14 bank accounts in the name of Hamilton entities (*e.g.*, Hamilton Investment Management Inc. or Hamilton Opportunity Funds SPC) at Silvergate Bank in California; and

vi.     At least approximately three bank accounts in the name of Himalaya entities (*i.e.*, Himalaya Reserve, Himalaya Financial, and Himalaya Clearing) at FV Bank in Puerto Rico.

28

## Tracing of Fraudulent Proceeds

49.    Based on my participation in this Investigation, training, experience, review and analysis of various bank account records and financial analyses performed by me and financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, and my conversations with others, I have learned the following, among other things:

a.    Investors have participated in the Investment Schemes (including the Convertible Loan Offering) by sending money to bank accounts controlled or used by GUO, JE, and others (including bank accounts in the names of the Farms's entities, G Club, or Hamilton), or by wiring or otherwise transferring money to other entities at the direction of the Target Subjects. For example, investors sent money to entities affiliated with a specific Farm (for example, to bank account(s) in the name of Maywind  for the Phoenix Farm), which funds are then transmitted to bank accounts ultimately controlled by GUO, GUO's associates, and JE.  I have discovered accounts located in the UAE, the United Kingdom, the United States, the Bahamas, and the British Virgin Islands, which GUO, JE, and other Target Subjects have used for the purpose of receiving investment funds from investors in the Unregistered Stock Offerings, the Convertible Loan Offering, G Club, and the Himalaya Exchange.

b.    To date, I and analysts at the FBI and SEC have identified and attempted to trace more than approximately $1.04 billion in Investment Scheme Fund transactions, a substantial part of which has been laundered through financial institutions located in at least four different countries, including the United States, the Bahamas, the British Virgin Islands, and the UAE.

*Convertible Loan Offering Proceeds are Transferred to the Phoenix Farm Accounts*

50.    Based on my participation in this Investigation, my training and experience, my review and analysis of various bank account records and financial analyses performed by me and

financial analysts at the FBI and SEC, open-source research that I have conducted on the Internet, my review of evidence obtained pursuant to subpoenas and judicially authorized search warrants, my review of an interview with a witness who worked at the Phoenix Farm ("Witness-1"), and my conversations with others, I have learned the following, among other things:

a.    The Phoenix Farm began operating in or about September 2020.  In or about late September 2020, Yvette Wang and others visited individuals who operated the Phoenix Farm in Phoenix, Arizona.  During the visit, Wang stated to Witness-1 and others, in sum and substance, that GUO directed that "loan" investments sent to the Phoenix Farm entities (*i.e.*, Maywind, Medical Supply, and Santel) should be moved around among bank accounts to avoid suspicion. *See also* ¶ 41(a).

b.    Based on my review of an informal translation and transcription of a voice message that GUO sent to the SOI via WhatsApp, which was provided pursuant to a subpoena, I have learned that GUO stated the following to the SOI, in substance and in part:  "As for the three companies (Maywind, Santel, Medical supply), [SOI], you can discuss with [Yvette Wang] where to transfer the money to."

c.    In or about August 2020, LI opened the **Target Account** under the name "G Fashion."  On or about August 13, 2020, LI added HAO as an authorized signer on the **Target Account**.

d.    Between in or about September 2020 and on or about December 31, 2020, the **Target Account** received approximately $9.9 million in Investment Scheme Funds from the Phoenix Farm bank accounts.  Specifically:

i.    On or about September 30, 2020, approximately $1 million was transferred from a JP Morgan Chase bank account in the name of Medical Supply System International LLC, ending in 9002, to the **Target Account**.

ii.      On or about November 19, 2020, approximately $2.9 million was transferred from a Bank of America bank account in the name of Medical Supply System International LLC, ending in 3775, to the **Target Account**.  Based on my review of the funds transfer request authorization for the wire transfer, I have learned that the purpose of the payment was listed as "Other / Additional Support Loans."

iii.      On or about December 1, 2020, approximately $3 million was transferred from a JP Morgan Chase bank account in the name of Maywind Trading LLC, ending in 0414, to the **Target Account**.

iv.      On or about December 10, 2020, approximately $3 million was transferred from a JP Morgan Chase bank account in the name of Maywind Trading LLC, ending in 4311, to the **Target Account**.

v.      Aside from the above deposits, activity in the **Target Account** consisted of *de minimis* service charges.

vi.      Based on my review of information provided by US Bank, I have learned that the **Target Account** held approximately $9,899,785.06 as of on or about February 28, 2022.

## III. Conclusion

51.      Based on the foregoing, I submit that there is probable cause to believe that funds held in the Target Account are subject to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

52.     Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the funds held in the Target Account.

/s/ Anthony Alecci, by SDA with permission
_____
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
this 18th day of September, 2022

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

32

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 7684

UNITED STATES OF AMERICA

-v.-

All monies and funds contained in Silvergate
Bank account 5090042853, held by Hamilton
Opportunity Fund SPC ("Target Account-1"),
and all funds traceable thereto, including
accrued interest;

All monies and funds contained in FV Bank
account 7801000589, held by Himalaya
International Financial Group, Ltd. ("Target
Account-2"), and all funds traceable thereto,
including accrued interest;

All monies and funds contained in FV Bank
account 7801000590, held by Himalaya
International Reserves, Ltd. ("Target Account-
3"), and all funds traceable thereto, including
accrued interest; and

All monies and funds contained in FV Bank
account 7801000254, held by Himalaya
International Clearing, Ltd. ("Target Account-
4"), and all funds traceable thereto, including
accrued interest (collectively, the "Target
Property").

Defendants-in-rem.

**TO BE FILED UNDER SEAL**

**Affidavit in Support of Seizure
Warrant**

**Pursuant to 18 U.S.C. §§ 981 and 984**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Anthony Alecci, Special Agent, Federal Bureau of Investigation, being duly sworn,
deposes and says:

## I.  Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI" or
"Investigating Agency").  I have been a Special Agent with the FBI since in or about August 2020.

Since in or about September 2021, I have been assigned to the FBI's Complex Financial Crimes squad. During my time with the FBI, I have participated in investigations of securities and wire fraud schemes, bank fraud, and money laundering, and have, among other things, conducted or participated in debriefings of witnesses, reviews of financial records, and the execution of search warrants. In particular, I have participated in the execution of search warrants involving physical premises, electronic devices, and other electronic evidence.

2.    This affidavit is submitted in support of the United States of America's Application for the issuance of a seizure warrant, pursuant to 18 U.S.C. §§ 981 and 984, for:

    a.    All monies and funds contained in Silvergate Bank account 5090042853, held by Hamilton Opportunity Fund SPC ("**Target Account-1**"), and all funds traceable thereto, including accrued interest;

    b.    All monies and funds contained in FV Bank account 7801000589, held by Himalaya International Financial Group, Ltd. ("**Target Account-2**"), and all funds traceable thereto, including accrued interest;

    c.    All monies and funds contained in FV Bank account 7801000590, held by Himalaya International Reserves, Ltd. ("**Target Account-3**"), and all funds traceable thereto, including accrued interest; and

    d.    All monies and funds contained in FV Bank account 7801000254, held by Himalaya International Clearing, Ltd. ("**Target Account-4**"), and all funds traceable thereto, including accrued interest (collectively, the "Target Property").

3.    The Target Property constitutes the proceeds of violations of 18 U.S.C. §§ 1343 (wire fraud); 1344 (bank fraud); and 1956 (money laundering and conspiracy to commit money laundering) (together, the "Target Offenses"), as described below.

4.    This affidavit is based on, among other sources of information: (i) my personal

knowledge; (ii) information provided by personnel at the U.S. Securities & Exchange Commission ("SEC") participating in a parallel investigation; (iii) my review of publicly available promotional materials relating to, among other ventures, "G Club" and the "Himalaya Exchange;" (iv) my review of the publicly available websites for GTV Media Group, Inc. ("GTV"), the Himalaya Exchange, and "G Club," and materials available on those websites; (v) open-source research that I have conducted on the Internet; (vi) my review of digital videos posted on www.gnews.org ("GNews") by GTV Media Group, Inc. and its employees and agents; (vii) my participation in various witness interviews; (viii) my review of electronic evidence obtained pursuant to subpoenas, orders issued pursuant to 18 U.S.C. § 2703(d) for non-content information, and judicially authorized search warrants; (ix) the review and analysis of various bank account records, including financial records obtained from financial institutions pursuant to subpoenas and other requests, conducted by myself and financial analysts at the FBI and SEC; (xi) my conversations with other law enforcement officers; and (x) my training and experience concerning the commission of financial crimes. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where dates, figures, and calculations are set forth herein, they are approximate. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.       As set forth herein, there is probable cause to believe that the Target Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (C) & (D) and 18 U.S.C. § 981(b) as property involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) and/or the proceeds of violations of 18 U.S.C. §§ 1343 and 1344, or property traceable thereto. In summary, the evidence reveals a series of fraudulent investment schemes (the "Investment Schemes") that pertain to

several interrelated companies and their affiliated entities, including GTV Media Group Inc., G Fashion ("G Fashion"), the Himalaya Farm Alliance (the "Farms"), Himalaya International Clearing Ltd. ("Himalaya International Clearing"), G Club Operations LLC ("G Club"), Hamilton Investment Management Ltd. ("Hamilton"), ACA Capital Group Ltd. ("ACA Capital"), and Crane Advisory Group LLC ("Crane"). As set forth in more detail below, the leaders of the fraudulent investment schemes are Miles Guo, a/k/a "Guo Wengui," a/k/a "Miles Kwok" ("GUO") and William Je, a/k/a Je Kin Ming ("JE").

6.      Analysts at the FBI and SEC and I have traced the flow of certain fraud proceeds from victims of the Investment Schemes to the Target Property.

## II. Statutory Basis for Forfeiture

7.      The statutory provisions pursuant to which the Target Property is subject to civil seizure and forfeiture are as follows:

### *Money Laundering Offenses*

8.      Title 18, United States Code, Section 981(a)(1)(A), subjects to civil forfeiture:

Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

9.      18 U.S.C. § 1956(a)(1)(B)(i) provides that any person who:

knowing that the property involved in a financial transaction involves the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B)      knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

10.    18 U.S.C. § 1956(a)(2)(B)(i) provides that any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(B)    knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of a crime.]

11.    18 U.S.C. § 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

### *Bank and Wire Fraud Offenses*

12.    For purposes of Section 1956, "specified unlawful activity," defined in 18 U.S.C. § 1956(c)(7), includes, among other things, violations of 18 U.S.C. §§ 1343 and 1344.  *See* 18 U.S.C. §§ 1956(c)(7) and 1961(1).

13.    Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

### *Seizure Warrants*

14.    The Court is empowered by 18 U.S.C. § 981(b) to issue a seizure warrant for any property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) & (C).  Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as

provided for a search warrant under the Federal Rules of Criminal Procedure." In addition, Section 981(b)(3) provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b). Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred. As set forth below, the offenses underlying the requested seizure warrant included acts or omissions occurring in the Southern District of New York.

15.    With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

(a)(1)  In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or precious metals:

(A)    it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B)    it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)  Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## III.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

16.    On or about September 17, 2022, I submitted an affidavit in support of seizure warrants for approximately 11 bank accounts, including approximately one Metropolitan Commercial Bank ("MCB") account, held at For Benefit Of FV Bank, and approximately nine

Silvergate Bank ("Silvergate") accounts, held by William JE in the name of Hamilton Opportunity Fund SPC or Hamilton Investment Management Ltd. (the "September 17 Affidavit"). The September 17 Affidavit is incorporated herein as Exhibit A. On or about September 18, 2022, the Honorable Stewart D. Aaron issued seizure warrants for those 11 accounts, including a warrant to Silvergate for the nine Silvergate accounts (the "Silvergate Warrant") and a warrant to MCB for the one MCB account held For Benefit Of FV Bank (the "MCB Warrant").

17.    In coordinating with Silvergate in anticipation of the service and execution of the Silvergate Warrant, Silvergate provided updated account balances for all Silvergate accounts in the name of Hamilton Opportunity Fund SPC and/or Hamilton Investment Management Ltd. Based on my review of account balance summaries, additional documents provided by Silvergate Bank, open-source information, and my conversations with the U.S. Attorney's Office for the Southern District of New York, I have learned the following, among other things:

a.    Silvergate operates an intra-bank network called the Silvergate Exchange Network, or "SEN." Active bank clients with Silvergate can participate in SEN, which enables Silvergate clients themselves to transfer money between their Silvergate accounts and the accounts of other Silvergate clients.

b.    The Silvergate business deposit account master agreement for the Hamilton Opportunity Fund SPC relationship at Silvergate lists **Target Account-1** as a SEN account. Based on information provided by Silvergate, I have learned that the account balance of **Target Account-1** as of on or about August 31, 2022 was $0.

c.    As reflected in the September 17 Affidavit, the balance of the Hamilton Investment Opportunity Fund SPC account at Silvergate ending in -2762 (*i.e.*, "Target Account-6" in the September 17 Affidavit, or the "2762 Account") was approximately $76,690,856.60. On or about September 8, 2022, the 2762 Account received incoming transfers from HCHK

Technologies Inc. and HCHK Property Management Inc., respectively, each in the amount of $5 million.

d.      On or about September 15, 2022, the Target Subjects transferred approximately $85,899,889.20—nearly the entire balance—from the 2762 Account to **Target Account-1**.  As described in the September 17 Affidavit, the nature of the transfers of funds into the 2762 Account had been consistent with money laundering, including layering funds through different entities and concealing their true source and/or purpose.  *See* Sept. Aff. at ¶ 56(b)(v), (f).

18.     In coordinating with MCB and counsel for FV Bank in anticipation of the service and execution of the MCB Warrant, counsel for both MCB and FV Bank advised law enforcement of the following, in sum and substance:

a.      The funds held in the pooled MCB account FBO FV Bank (*i.e.*, "Target Account-11" in the September 17, 2022 Affidavit) include funds belonging to all FV Bank's customers, not only the Himalaya entities.  *See* Sept. Aff. at ¶¶ 59(i)(3), 62.

b.      The funds that were the target of the MCB Warrant, held in the MCB pooled account, were also identified by three particular FV Bank account numbers:  **Target Account-2** (*i.e.,* FV Bank account 7801000589, held by Himalaya International Financial Group, Ltd.), **Target Account-3** (*i.e.*, FV Bank account 7801000590, held by Himalaya International Reserves, Ltd., and **Target Account-4** (*i.e.*,  FV Bank account 7801000254, held by Himalaya International Clearing, Ltd.).

19.     Based on the foregoing information, law enforcement will not execute the MCB Warrant and instead seeks to direct the warrant to FV Bank.

## III.  Conclusion

20.     Based on the information set forth in the September 17 Affidavit and the foregoing, I submit that there is probable cause to believe that funds held in the Target Property are subject

8

to forfeiture as proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and § 1344 (bank fraud), and/or as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h) (money laundering and conspiracy to commit money laundering).

21.    Accordingly, pursuant to 18 U.S.C. § 981(b), I respectfully request that the Court issue a warrant authorizing the seizure of the Target Property.


_/s/ Anthony Alecci, by SDA with_ permission
ANTHONY ALECCI
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
20 day of September, 2022


_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT D



Independent Accountant's Report


To Management and Himalaya Dollar ("HDO") Token and HDO Credit Holders
Himalaya International Reserve
Tortola, British Virgin Islands

We have examined the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm Greenwich Mean Time ("GMT") in accordance with the measurement and disclosure criteria presented in the accompanying Notes to the Bank & Fund Holdings Report. Management of Himalaya International Reserve (the "Company") is responsible for presenting the Bank & Fund Holdings Report in accordance with the measurement and disclosure criteria in the accompanying Notes to the Bank & Fund Holdings Report. Our responsibility is to express an opinion on the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT based on our examination.

Our examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants. Those standards require that we plan and perform the examination to obtain reasonable assurance about whether the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT is presented in accordance with the measurement and disclosure criteria in the accompanying Notes to the Bank & Fund Holdings Report, in all material respects. An examination involves performing procedures to obtain evidence about the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT and the accompanying Notes to the Bank & Fund Holdings Report. The nature, timing, and extent of the procedures selected depend on our judgment, including an assessment of the risks of material misstatement of the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT and the accompanying Notes to the Bank & Fund Holdings Report, whether due to fraud or error. We believe the evidence we obtained is sufficient and appropriate to provide a reasonable basis for our opinion.

We are required to be independent of the Company and to meet our ethical responsibilities in accordance with the relevant ethical requirements related to the engagement.

The Bank & Fund Holdings information in the accompanying Bank & Fund Holdings Report relates to collateralized Himalaya Dollar ("HDO"), which are cryptographic digital tokens residing on the Ethereum blockchain network at the smart contract address [0x7C197afcd8D36884309ed731424985E3ed17F018], and collateralized HDO Credits, which are HDO-denominated liabilities issued and purchased for dollars on Himalaya Ecosystem Platforms.

Digital assets are an evolving area of technology subject to changing regulatory oversight and marketplace activity. Anyone who acquires, trades, and utilizes HDO tokens, HDO Credits, and other digital assets is responsible for informing themselves of the general risks and uncertainties.

In our opinion, the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT is presented in accordance with the measurement and disclosure criteria in the accompanying Notes to the Bank & Fund Holdings Report in all material respects.

*Armanino*

Armanino LLP
San Jose, California
August 10, 2022



An independent firm associated with Moore Global Network Limited

Himalaya International Reserve
Wickhams Cay 1
Road Town
Tortola, British Virgin Islands

## Himalaya Dollar
## BANK & FUND HOLDINGS REPORT
July 31, 2022 at 3:00pm GMT

| | |
|---|---:|
| **US Dollars held in Himalaya-owned Bank Account(s)** | **$401,163,865.60** |
| **Total HDO-denominated Liabilities Issued**[1] | **401,047,298.15** |
| -   Collateralized HDO Tokens on the Ethereum Blockchain[2] | 0 |
| -   Collateralized HDO Credits[3] on Himalaya Ecosystem Platforms[4] | 401,047,298.15 |

**NOTES**

1. The issued and collateralized Himalaya Dollar ("HDO") Tokens on the Ethereum blockchain network and the HDO Credits ("HDOC") on the Himalaya Ecosystem Platforms as of July 31, 2022 at 3:00pm Greenwich Mean Time ("GMT") do not exceed the balance of US Dollars held at bank and fund account(s) owned by Himalaya International Reserve and affiliated entities. The issuance of collateralized HDO Tokens and Credits can be reconciled to transactions within the bank and fund account(s).

2. The USD balance held in bank and fund account(s) are composed of USD cash balances in accounts owned by the Himalaya International Reserve and affiliated entities at depository and fund institutions.

3. There are no resignation proceedings in process by the bank and fund agents.

4. Himalaya International Reserve has evaluated subsequent events through the date the report is available to be issued and has determined that there are no subsequent events that require disclosure.

   To the best of the knowledge and belief of the undersigned, the information contained in the Bank & Fund Holdings Report as of July 31, 2022 at 3:00pm GMT is accurate and complete.


*Jesse Brown*
_____
Jesse Brown, CEO
Himalaya International Reserve
August 10, 2022

---

[1] HDO-denominated liabilities represent the HDO Tokens that have been minted on the Ethereum blockchain at the smart contract address [0x7C197afcd8D36884309ed731424985E3ed17F018], deposited into the Himalaya Exchange Account ("The HDO Issuer Account") and subsequently sold for U.S. dollars to customers.

[2] Collateralized HDO Tokens on the Ethereum Blockchain represent HDO Tokens sold to customers on the Himalaya Ecosystem Platforms that have subsequently been withdrawn and redeemed for HDO Tokens circulating on the Ethereum blockchain and is calculated as all circulating HDO Tokens on the Ethereum blockchain less HDO Tokens held by HDO Smart Contract Address [0x7C197afcd8D36884309ed731424985E3ed17F018], Company Treasury Address [0xf7faac1dadb956afaab4fb5fae35790e554ee338], and Company Issuer Addresses custodied at BitGo.

[3] HDO Credits on Himalaya Ecosystem Platforms represent HDO tokens sold to customers being held on the Himalaya Ecosystems Platforms.

[4] Himalaya Ecosystem Platforms includes the Himalaya Exchange and the Himalaya Pay mobile application.

# EXHIBIT C

# Bank Record Summaries

1





**GTV / VOG**

# GTV / VOG: Overview



# GTV / VOG: Select Flows



# VOG: Select Flows



# FARMS

# Farms: Select Flows



# Farms: Select Flows



# Farms: Select Flows



# Farms: Select Flows



# Farms: Select Flows



**FARMS**

**$77.0M**
8/6/20 – 9/29/21

**ACA Capital**
FAB Account

**$18.0M**
2/2/21 –
2/10/21

**$13.0M**
1/25/21 –
9/21/21

**Hudson Diamond Holding Inc**
(IDB 7438)

**$16.0M**
5/28/21 – 7/30/21

**Lamp Capital LLC**
(SIG 5379, 5387, 5395, 5409,
5417, 5425, 5433, 6367)

12

# Farms: Select Expenses from Lamp Capital Accounts



13

**G Club** **Crane**



# G Club and Crane: Select Flows

15

# G Club and Crane: Select Flows



## G Club and Crane: Select Flows



# G Club and Crane: Select Flows



18



## G Club and Crane: Select Flows

19

# G Club and Crane: Select Flows



# G Club and Crane: Select Flows



# G Club and Crane: Select Flows



22



# G Club and Crane: Select Flows

23



## G Club and Crane: Select Flows

24

# G Club: Select Flows and Expenses



# Himalaya Exchange

# Himalaya Exchange: Select Flows



# Himalaya Exchange: Select Flows



**Yachtzoo LLC Expenses**

# Yachtzoo LLC Expenses Summary



# SOURCES OF FUNDS









Cumulative Sources of Funds Inflows by Category

| Slide Number | Source GXs |
|---|---|
| 4 | GXBOA39, GXBOA40, GXBOA92, GXCAP472, GXCAP573, GXCAP588, GXJPM104, GXJPM122, GXJPM124, GXJPM125, GXWFB58 |
| 5 | GXCAP472, GXCAP474, GXCAP573, GXCAP588, GXCAP622, GXCIT20, GXJPM104, GXJPM122, GXJPM124, GXJPM125, GXJPM19, GXWFB58, GXWFB59; GXSM2 |
| 6 | GXBOA286, GXBOA39, GXBOA40, GXBOA91, GXBOA92, GXJPM123, GXNXB226, GXUSB1, GXWFB37, GXWFB50, GXWFB58, GXWFB59, GXWFB63, GXVAN11, GXVAN12 |
| 8-12 | GX3211, GX605, GXBAR43, GXBAR47, GXBAR48, GXBAR49, GXBAR50, GXBAR55, GXBAR56, GXBOA32, GXBOA36, GXBOP10, GXBOP12, GXBOP8, GXBOP9, GXBR932, GXCIT62, GXCOM13, GXCOM14, GXCOM15, GXDCB59, GXDCB60, GXFBA18, GXFBA19, GXIDB10, GXIDB23, GXIDB5, GXJPM134, GXJPM136, GXJPM137, GXJPM138, GXJPM2, GXJPM41, GXJPM47, GXJPM57, GXJPM73, GXMFB9, GXPNC10, GXPNC14, GXPNC16, GXPNC26, GXSIG19, GXSIG35, GXSIG83, GXPNC47 |
| 13 | GXSIG102, GXSIG117, GXSIG121, GXSIG129, GXSIG19, GXSIG33, GXSIG83, GXSIG97 |
| 15-24 | GXTDB9, GXTDB11, GXBOA32, GXBOA204, GXBOA24, GXJPM134, GXFBA2, GXCIT50, GXCIT5, GXTDB17, GXTDB8, GXFBA1, GXCNB7, GXMSS135, GXTDB12, GXMSS138, GXBOA301, GXTDB5, GXTDB4, GXWFB62, GXCAP628, GXJPM2, GXTDB2, GXBOA372, GXCAP46, GXIDB3, GXCAP5, GXTDB70, GXMSS134, GXMSS137, GXMSS136, GXSCB13, GXSCB12, GXMSS82, GXMSS83, GXMSS84, GXMSS141,GXCAP589, GXIDB4, GXMER531, GXMER430, GXBOA316, GXMER86, GXMER94, GXMER745, GXTDB15, GXMER72, GXSIG110, GXVNB3, GXMER204, GXMER76, GXTDB72, GXCIT64, GXTDB118, GXMER96, GXMER84, GXTDB119, GXMTB116, GXMTB115, GXMER90, GXMER80, GXMER675, GXMTB127, GXMTB123, GXMTB122, GXMTB130, GXMTB132, GXCAP6, GXCAP635, GXCAP636, GXCAP637 |
| 25 | GXMER1132, GXMER160, GXMER204, GXMER209, GXMER279, GXMER281, GXMER282, GXMER315, GXMER324, GXMER328, GXMER52, GXMER54, GXMER56, GXMER60, GXMER64, GXMER66, GXMER70, GXMER744, GXMER745, GXTDB30, GXTDB38, GXTDB39 |
| 27-28 | GXFV, GXFVB11, GXFVB13, GXFVB16, GXFVB18, GXFVB2, GXFVB3, GXFVB4, GXFVB6, GXFVB7, GXFVB8, GXMER1132, GXMER1133, GXMER160, GXMER204, GXMER209, GXMER210, GXMER279, GXMER281, GXMER282, GXMER315, GXMER324, GXMER328, GXMER52, GXMER54, GXMER56, GXMER60, GXMER64, GXMER6 |
| 30 | GXDCB19, GXDCB32, GXDCB33, DCB36, DCB37, GXIVB2, GXIVB8, GXSIG19, GXSIG83, GXSIG102, GXSIG121, GXMTB83, GXMER80, GXMER82, GXMER88, GXMER96, GXMER150, GXMER195, GXMER204, GXMER242, GXMER244, GXMER247, GXMER249, GXMER310, GXMER319, GXMER452, GXMER453, GXMER507, GXMER512, GXMER618, GXMER621, GXMER635, GXMER674, GXMER675, GXMER685, GXMER687, GXMER693, GXMER714, GXMER716, GXMER745, GXMER745, GXMER795, GXMER797, GXMER802, GXMER803, GXMER854, GXMER857, GXMER859, GXMER971, GXMER988, GXMER1049, GXMER1089, GXMER1091, GXMER1109, GXMER1109, GXMER1127, GXMER1186, GXMER1189, GXMER1199, GXMER1200 |