

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 17, 2026

**BY ECF**
Honorable Analisa Torres
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Miles Guo*, S3 23 Cr. 118 (AT)

Dear Judge Torres:

    The Government writes in response to the defendant's belated objections to the already entered, and previously unopposed, preliminary order of forfeiture. Dkt. 720 ("POF"). As explained below, the defendant previously waived any objections to the POF. In addition, his untimely objections are without merit and should be rejected on that basis as well.

    **A.**    **Relevant Background**

    On July 17, 2024, a jury convicted Guo of nine counts following a nearly eight-week trial. After the defendant was granted two sentencing adjournments, on April 8, 2025, this Court appointed the defendant's present counsel team (his third set of attorneys) to represent him. On that date, the Court ordered the parties to file a letter by April 29, 2025, which was to include when the defendant would provide the Court his position on forfeiture. *See* 4/8/25 Tr. at 10.

    On April 29, 2025, the parties requested that the Court permit an update regarding the defendant's position on forfeiture by May 9, 2025. Dkt. 697. The Court granted that request. Dkt. 698. On May 9, 2025, the defendant requested until May 23, 2025 to "sort out the forfeiture issue." Dkt. 701. The Court granted the request. Dkt. 704. On May 23, 2025, the defendant requested until June 13, 2025 "to do further due diligence . . . to arrive at an appropriate factual and legal position" regarding the issue of forfeiture. Dkt. 705. The Court granted the request. On June 13, 2025, the defendant filed a letter seeking until June 27, 2025, to provide a position regarding forfeiture. Dkt. 708. That request was granted. *Id*.

    On June 27, 2025, the defendant filed a letter and stated he "is unable to take a position with respect to issues regarding potential forfeiture and remission of money and property seized by the Government." Dkt. 711. On July 14, 2025, the Government filed a letter in response, which stated "[w]hile Guo is not consenting to a preliminary order of forfeiture, the Court can enter a preliminary order of forfeiture that imposes a money judgment and forfeits Guo's personal interest

in specific property." Dkt. 713. The Government stated it would file a motion for a preliminary order of forfeiture within two weeks. The defendant did not respond.

On July 25, 2025, the defendant moved to adjourn sentencing for the fourth time because, *inter alia*, the defendant claimed his counsel "initially was required to spend significant time addressing the forfeiture issues . . . As a result, many of [counsels'] early meetings with [the defendant] were devoted either primarily or entirely to discussing the forfeiture issue." Dkt. 715. The Court granted the defendant's fourth adjournment request over the Government's opposition. Dkt. 719.

On July 28, 2025, the Government filed a motion for a preliminary order of forfeiture (*i.e.*, the POF). Dkt. 716. The proposed POF sought to impose a money judgment of $1.3 billion. *Id*. at 3. It also sought to forfeit the defendant's interest in certain specific property. *Id*. at 4. The defendant chose not to object to the POF or file a response.

On August 11, 2025, the Court entered the POF with respect to the defendant, which imposed a $1.3 billion money judgment and forfeited the defendant's right, title and interest, to certain specific property. Dkt. 720. Among other things, the POF stated:

> As a result of the offenses charged in Counts One through Four, Seven through Eleven of the Indictment, to which the Defendant was found guilty, a money judgment in the amount of approximately $1.3 billion in United States currency (the "Money Judgment"), representing the amount of proceeds traceable to the offense charged in Counts One, Two, Four, and Seven through Eleven of the Indictment that the Defendant personally obtained and property involved in the offense charged in Count Three of the Indictment, for which the Defendant is jointly and severally liable with the Co-defendant, to the extent a forfeiture money judgment is entered against the Co-defendant in this case, shall be entered against the Defendant. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture as to Specific Property/Money Judgment is final as to the Defendant, MILES GUO, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

*Id.* at 12.

Three weeks after the Court entered the POF, on September 4, 2025, the defendant filed a motion, "seek[ing] discrete and pressing relief regarding a matter directly related to the government's July 28, 2025, letter application for a preliminary order of forfeiture." Dkt. 724, at 1. That motion did *not* object to the POF. Instead, the September 4, 2025 motion asked this Court for unprecedented relief: to order the Government to initiate forfeiture proceedings against the Bankruptcy Trustee managing the defendant's bankruptcy estate. Dkt. 724. With respect to the POF, the defendant's September 4, 2025 motion included a vague statement that the defendant

would address, in the future, "deficiencies" in the Government's motion for a preliminary order of forfeiture, *id*., even though, by this time, the POF was entered and was "final as to the Defendant," Dkt. 72, at 12. On September 19, 2025, the Government filed its opposition to the defendant's motion, Dkt. 750, and after obtaining an extension, the defendant filed a reply on October 6, 2025, Dkt. 754. Among other things, the defendant's October 6, 2025 reply asserted that the defendant has "standing" to challenge a forfeiture order. Dkt. 754, at 3. But the reply did not challenge the POF. To the contrary, and although the defendant asserted he could challenge the POF through sentencing, the defendant's reply explained that Guo had made a strategic choice to *not* oppose the POF's entry: "Guo elected not to stand in the way of the Government taking the steps necessary to move the forfeiture process forward through entry of a preliminary order of forfeiture." *Id*.

Nearly four months after the POF was entered by this Court, on December 3, 2025, the defendant requested a fifth sentencing adjournment. In connection with the fifth adjournment, the defendant claimed that the "the imposition of any forfeiture money judgment against [him] is subject to challenge." Dkt. 768, at 2. But the defendant did not challenge the POF on this date either.

On January 8, 2026, the Court entered an order directing the defendant to "file any objections he maintains to the POF in a written submission to the Court" by January 29, 2026. Dkt. 784. Then the defendant requested an extension of that deadline, which the Court granted. Finally, on February 3, 2026, approximately six months after it was entered by the Court, the defendant filed objections to the previously unopposed POF. The defendant objects only to the money judgment in the POF. Without citing any newly obtained information or developments that arose after the Court's entry of the POF, Guo asserts that any money judgment should be no more than $164,003,920.07. Dkt. 799 at 21.

### B. The Defendant's Unreasonable and Unexplained Delay Constitutes Waiver

Under Second Circuit precedent, a defendant waives their right to assert a challenge when "a defendant[ ] intentional[ly] deci[ded] not to assert a right." *United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015). This includes instances in which a defendant "made a considered decision *not* to object" in order to secure "a significant tactical benefit." *United States v. Bodnar*, 37 F.4th 833, 844 (2d Cir. 2022); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) ("If . . . [a] party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver.'"). Although tactical waiver is most often applicable in the context of appeals, district courts have applied that concept when confronted with tactical delays by defendants in challenging forfeiture orders. *See United States v. Pierre-Louis*, No. 16 Cr. 541 (CM), 2025 WL 3035171, at *3 (S.D.N.Y. Oct. 30, 2025) (denying post-conviction motion objecting to final order of forfeiture).

Here, the defendant does not even offer a reason why he never opposed the Government's motion for the POF despite numerous opportunities to do so, and did not file objections to the POF until six months after it was entered. There is no acceptable reason why the defendant waited this long. Indeed, according to his counsel, forfeiture issues have been the defendant's priority for months. Just three days before the Government filed its motion for a POF, the defendant told the Court that his counsel was "initially [ ] required to spend significant time addressing the forfeiture

issues . . . As a result, many of [counsels'] early meetings with [the defendant] were devoted either primarily or entirely to discussing the forfeiture issue." Dkt. 715.

The defendant's attention to forfeiture continued through September 2025, when the defendant filed an unprecedented and meritless motion to require the Government to seize property from a non-party bankruptcy trustee. That motion did not challenge the POF either. Instead, the defendant explained *why* he made a strategic decision *not* to challenge the POF. *See* Dkt. 754, at 3 ("Guo elected not to stand in the way of the Government taking the steps necessary to move the forfeiture process forward through entry of a preliminary order of forfeiture."). Guo therefore appears to have concluded that, as of at least September 2025, advancing the POF served his interests. Where a defendant receives a perceived benefit, he cannot later seek even more at the cost of judicial economy. *See United States v. Roque*, 421 F.3d 118, 124 (2d Cir. 2005) (denying defendant request to undo a plea agreement where he received a benefit because "[c]ontractual principles simply do not support his attempt to have his cake and eat it, too." (quotation omitted)). Guo should not be permitted to revisit that decision four months later because his tactics have shifted.

When viewed in the broader context of this case, the defendant's decision not to oppose the POF, and then decide to oppose it post-entry after six months of delay, appears connected to another perceived strategic aim: the defendant's campaign to delay his sentencing. The Government previously described numerous examples evidencing the defendant's intent to delay his sentencing, and that delaying this case is consistent with his *modus operandi* of delaying (and obstructing) other court cases. *See e.g.* Dkt. 773, at 5-8. That Guo does not even attempt to justify why he delayed filing objections to the POF until so long after its entry is further indication that his decision not to object for six months was a strategic choice.

The defendant did not challenge the POF when the Government asked the Court to enter it because, in his words, he wanted "to move the forfeiture process forward." Then, six months later, he brought a challenge to the POF only when the Court inquired. Case law is clear that if a defendant lies in wait with potential arguments to strategically obtain a perceived benefit, that constitutes waiver. *See United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("A finding of true waiver applies with even more force when . . . defendants not only failed to object to what they now describe as error, but they actively solicited it, in order to procure a perceived sentencing benefit."). Accordingly, and due to the defendant's unjustified six-month delay, his objections to the POF should be denied on the basis that they are waived.

### C. The Defendant's Objections to the POF Are Without Merit

Regardless, the defendant's objections to the POF's $1.3 billion Money Judgment are without merit.

#### 1. The Subjective View of Certain Individuals' Victim Status Is Irrelevant

The defendant objects to the entry of the Money Judgment because he claims that the Government has not proved the "scope" of the fraud because some individuals do not consider themselves to be "victims" of the defendant's conduct. Dkt. 799, at 3-9.

Forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995). Therefore, "[s]entencing courts determine forfeiture amounts by a preponderance of the evidence." *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). "The calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). The Court is only required to "make a reasonable estimate," based on "the available information." *Id.* (quotation marks omitted). Courts may use "general points of reference as a starting point" and "make reasonable extrapolations from the evidence." *Id.* Where, as here, forfeiture is ordered in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). "The court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). As "an aspect of sentencing," *Libretti*, 516 U.S. at 49, forfeiture amounts are determined by a preponderance of the evidence, *Capoccia*, 503 F.3d at 116. The purpose of forfeiture, as opposed to restitution, is "punitive rather than restitutive." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011).

With respect to the defendant's "scope" objection, Guo is mistaken and misinterprets the applicable law. There are three independent bases for forfeiture in this case: racketeering forfeiture, fraud forfeiture, and money laundering forfeiture. Accordingly, the defendant is required to forfeit, "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity," 18 U.S.C. § 1963(a), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" fraud, 18 U.S.C. § 981(a)(1)(C), and "any property, real or personal, involved in [money laundering], or any property traceable to such property," 18 U.S.C. § 982(a)(1). A money judgement therefore is a reasonable estimation of the "proceeds" obtained from fraud and/or racketeering activity, as well as property "involved in" money laundering. There is no requirement to "identify" everyone who was defrauded. Here, the $1.3 billion Money Judgment is proper because it reflects a reasonable calculation of the proceeds from racketeering activity, proceeds from fraud offenses, and/or funds that were involved in money laundering.

Indeed, the $1.3 billion figure represents a conservative estimate of the amount of funds sent by individual victims to entities that are part of the G Enterprise (*i.e.* racketeering activity), as a result of fraudulent misrepresentations, and/or involved in money laundering. The calculation underlying the $1.3 billion figure is outlined in detail in Government Exhibit GXZ26, which was admitted at trial and attached hereto. *See also* Trial Tr. 4330-32. GXZ26 summarizes thousands of pages of bank records, which were also admitted as exhibits. GXZ26 at 36 (citing source exhibits). GXZ26 establishes, by at least a preponderance of evidence, that $1.3 billion flowed into bank accounts associated with the racketeering enterprise, which the jury's verdict demonstrates were the result of fraud. That exhibit, and the maze of bank accounts it summarizes, also demonstrates the involvement of $1.3 billion in money laundering.

The defendant does not offer evidence to contradict the $1.3 billion figure, nor does he question its reliability. Rather, he asks the Court to ignore it, and require the Government to provide evidence as to each victim's subjective belief to satisfy "scope." But it is sufficient for a court to calculate a money judgment based on a total of fraudulent inflows. *See United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016) (calculating forfeiture based on "an amount

representing the total client investment"); *United States v. Kenner*, 443 F. Supp. 3d 354, 378 (E.D.N.Y. 2020) (defining proceeds forfeiture as amount "received . . . as a result of the fraud."). Indeed, when ordering forfeiture in *United States v. Bankman-Fried*, Judge Kaplan did not require the Government to provide evidence of the subjective view of thousands of victims. No. 22 Cr. 673 (LAK), Dkt. No. 426, at 59 (ordering approximately $11 billion forfeiture). Rather, the court relied on figures from trial evidence that reflected the inflow of funds due to the defendant's fraud. *See Bankman-Fried*, Dkt. 410, at 104-105.

Related to his meritless "scope" objection, the defendant also asks the Court to require the Government to identify every victim, and prove that each subjectively viewed themselves as victims. The defendant points to no authority, and the Government is aware of none, which stand for the proposition that, in seeking forfeiture from a convicted defendant, the Government is required to prove that each victim subjectively considered themselves to be a "victim."[1] Indeed, the defendant's contention that this Court should examine whether each victim "claim[s] either reliance on the alleged misrepresentations or that such misrepresentations were material to" them misunderstands the law and baselessly seeks to relitigate attempted defenses that the Court rejected before and during trial. Dkt. 799, at 3. "[R]eliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017); *see also* Trial Tr. at 5794 ("[The Court:] it is irrelevant whether a victim might have discovered the fraud if he, she, or it had looked more closely or probed more extensively. A victim's negligence or gullibility in failing to discover a fraudulent scheme is not a defense to wire fraud."). While materiality is an element of criminal fraud, it is measured by an objective standard. *See, e.g.*, *United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (affirming instruction that did not require jury to consider materiality "from the subjective perspective of the victim" because "materiality for purposes of wire fraud, mail fraud, and bank fraud, . . . a matter is material if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (quotation and citation omitted)); *see also* Trial Tr. at 5793 ("[The Court:] A material fact is one which would be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision."). The defendant's argument is therefore baseless.

Further, altering a forfeiture money judgment amount on the subjective views of certain nonparties would stand in sharp contrast to the purpose of forfeiture, which is aimed at the defendant's gain from his criminal conduct. *See United States v. Torres*, 703 F.3d 194, 203 (2d Cir. 2012) (describing that because "restitution is loss based, while forfeiture is gain based," the measures are different and the purposes distinct and their respective amounts may vary (quotation omitted)). While restitution's purpose is intended to compensate victims, and is thus focused on their loss, forfeiture is aimed at a defendant, because its purpose is to "a punitive measure that serves a deterrent function" through disgorgement of criminal proceeds. *United States v. Milton*, No. 21-CR-00478 (ER), 2024 WL 779210, at *6 (S.D.N.Y. Feb. 26, 2024). Accordingly, the

---

[1] The defendant cites two cases, but both are inapposite. *United States v. Miller* has nothing to do with criminal forfeiture at all. 997 F.2d 1010 (2d Cir. 1993). *United States v. Rainford* vacated and remanded a forfeiture order because it was based on facts averred by a Government proffer. 110 F.4th 455, 488 (2d Cir. 2024). This case has a robust trial record.

subjective view of any individual as to whether they were victimized by Guo should not be used to lower the calculation of Guo's ill-gotten gains from the fraud scheme.[2] Thus, this objection should be denied.

### 2. *Honeycutt* Does Not Disturb the $1.3 Billion Money Judgment

Next, the defendant objects to the $1.3 billion Money Judgment because he claims it is disallowed under *United States v. Honeycutt*, 581 U.S. 443 (2017). But courts, including the Second Circuit, have made clear both before and after *Honeycutt*, that proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but "must have, at some point, been under the defendant's control . . . in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (emphasis added) (citation and internal quotation marks omitted); *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019). Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *See Tanner*, 942 F.3d at 68; *Rajaratnam v. United States*, 736 F. App'x 279, 284 (2d Cir. 2018) (although proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, defendant acquired those proceeds for forfeiture purposes where he "had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point'" (quoting *Contorinis*, 692 F.3d at 147)). For the same reasons, an individual defendant must forfeit proceeds received by a corporate entity where the "money paid to the corporation was effectively under the control of the individual." *United States v. Peters*, 732 F.3d 93, 104 (2d Cir. 2013).

The trial evidence demonstrated that the defendant was the "Boss" in control of all of the entities in the G Enterprise (which entities are described in GXZ26), and in control of those entities' assets.[3] Indeed, Guo directed that these entities spend assets for his benefit and the benefit

---

[2] As this Court is aware, there are scores of victims and their families who recognize that Guo and his co-conspirators preyed on them, lied to them, stole from them, and caused them tremendous hardship. *See e.g.* Dkts. 477 (containing 126 victim statements); 482 (additional victim statements); 486 (same); 487 (same). That there are some who disclaim their victim status is not a new development. There are "two distinct groups of individuals who lost money due to the fraudulent schemes of Miles Kwok, William Je, and Yanping Wang. One group recognizes the fraud for what it is and believes the defendants deliberately deceived them. The other group does not believe they were defrauded (either because they are complicit in the conspiracy, or they have been misled by it)." *See* Dkt. 511, at 1-2. That Guo still has followers allied with him has no bearing on calculating a money judgment.

[3] *See, e.g.*, Trial Tr. 424 (Karin Maistrello testimony that "Boss"—*i.e.*, Guo—"was in charge of the Rule of Law organizations"); *id.* at 472 (Maistrello testimony that "G" in "GTV" stands for Guo); GXC-63 and GXC-63-T (Guo statement that an investment in GTV was his personal commitment); GXHN33 and GXZ1 (demonstrating GTV proceeds used for Guo's personal investment); Trial Tr. 2379 (Guo describing Farm Loan Program); GXZ-26, at 7-13 (demonstrating farm loan proceeds used to finance Guo family expenses); Trial Tr. at 1999 (Khaled testimony that Guo had decisive control over G Clubs); *id.* at 2975, 2999-3000 (Reyes testimony that as CEO she was not in charge of G Clubs and could not fire Guo); GXGC415 (email from H. He to L. Reyes stating "[w]e have green light from Mr. Guo for the loan," which "loan"

of his family. Accordingly, because Guo controlled these entities sufficiently to direct their funds to his own personal expenditures, he had control over the $1.3 billion in proceeds, and he is required to forfeit those proceeds. To be clear, the principle that a defendant "obtained" funds if he at some point had control over them remains the law even after *Honeycutt*. *See United States v. Rhodes*, No. 21 Cr. 2236, 2023 WL 2194529, at *1 (2d Cir. Feb. 24, 2023) ("Since *Honeycutt*, . . . [w]e have also held that a defendant 'acquires' the proceeds of a crime when they are 'under [his] control.'" (quoting *Contorinis*, 692 F.3d at 147)); *United States v. Costanzo*, No. 24 Cr. 1310, 2025 WL 2628399, at *10 (2d Cir. Sept. 12, 2025). In *Rhodes,* the Second Circuit affirmed a forfeiture judgment where, like here, the Government established that the defendant had authority to control disbursements. Accordingly, because Guo had control over $1.3 billion of fraud proceeds, they are subject to forfeiture.[4]

      3.    The Money Judgment Should Include Proceeds Generated from the GTV Offering

The defendant objects to including $411 million in the Money Judgment because Guo was acquitted of certain substantive counts pertaining to the GTV offering. This objection is meritless because the law does not require the exclusion of acquitted conduct when calculating forfeiture for a defendant convicted of RICO and other scheme offenses. *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that they can."); *United States v. Jafari*, 663 F. App'x 18, 24 (2d Cir. 2016) (affirming forfeiture of "uncharged and acquitted conduct found by a preponderance to have been committed in furtherance of the proved health-care scheme"). This is because

> the defendant 'is not being punished [under 18 U.S.C. § 1963(a)] for committing the substantive acts found to be 'not proven.' He is being punished for conducting the affairs of an enterprise through a

---

was used to finance a Ferrari for Guo's son, *see* GXZ14 and GZ802); GXZ-12 (use of G Club money to purchase Guo's mansion); GX1B125K (Guo text message directing that others use "G-Club or another private company" to finance an expensive coffee table); GXZ9 at 121-122 (Guo stating that he "designed" H coin); Trial Tr. at 3264 (Brown testimony that as CEO of Himalaya Exchange he was not in control); *id.* at 2793 and GXMER138 (using Himalaya funds to "loan" money to Guo).

[4] In addition, *Honeycutt*'s limitation on assets "personally obtained" does not extend to forfeiture premised on money laundering, which is more expansive, and also applies to Guo. *See United States v. Hanratty* (Hanratty II), No. 1:24-cr-00153-LGS, 2025 WL 89297, *2 (S.D.N.Y. Jan. 14, 2025) (rejecting defendant's argument that assets need to be owned by defendant for forfeiture under 18 U.S.C. § 982(a); "the statutory wording of § 982 'makes sufficiently clear that criminal forfeiture is not a measure restricted to property owned by the criminal defendant; it reaches any property that is involved in the offense'" (quotation omitted)); *United States v. Kenner*, 443 F. Supp. 3d 354, 358 (E.D.N.Y. 2020); *United States v. Waked Hatum*, 969 F.3d 1156, 1165 (11th Cir. 2020) (noting that because § 982(a)(1) contains neither a "proceeds" nor an "obtained" limitation, *Honeycutt*'s "tainted property" requirement does not apply).

pattern of racketeering activity.' So long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment.

*Fruchter*, 411 F.3d at 384 (quoting *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir. 2002)).

Here, Guo was convicted at trial of Count One, racketeering conspiracy. The Court has an ample record to find that, by a preponderance of the evidence, the GTV offering constituted criminal conduct that was part of the charged G Enterprise, and that the $411 million reflects the criminal proceeds of that conduct foreseeable to and obtained by Guo. Concisely stated, the GTV offering was a component of what Guo himself termed the "G series"—*i.e.* a component of the fraud activities that were a part of the racketeering enterprise. *See e.g.* GXVI151 (Guo video: "[i]f you invest in any G-series and lose the cost, I will be 100% responsible . . . . Remember what I said in today's video the GTV (stocks) you invested, the G-Club (card) you bought I they depreciate, as long as they depreciate or lose money, I will compensate you!" Although, and as proven at trial, those promises were lies).[5] Accordingly, the defendant's objection to inclusion of the $411 million related to the GTV offering in the Money Judgment should be denied.

---

[5] That GTV was a component of the G Enterprise was proven in several other respects. *See e.g.*, Trial Tr. at 472 (Maistrello testimony that "G" in "GTV" stands for Guo); GXC-63 and GXC-63T (Guo statement that an investment in GTV was his personal commitment); GXHN33 and GXZ1 (demonstrating GTV proceeds used for Guo's personal investment). Following GTV's settlement with the SEC, *see* GXSTIP 19, Guo continued to lie to his victims, through his enterprise, by claiming that their money would purchase GTV shares, when it did not, and those promises included trumpeting the value of GTV when Guo knew it was worthless. This continued reliance on the GTV offering to continue fraud by the G Enterprise further demonstrates that the $411 million was part of Guo's racketeering conspiracy. *See e.g.*, Trial Tr. 2379 (victim testimony that Guo told farm members to "led money to the farm to get the GTV stock"); *id*. at 1388 (Li testimony that farm loan program contracts were for "GTV shares"); GXC322-V6 and GXZ9, at 11 (video of Guo stating "What is G club? G club is not a membership. G club is for you to get the original stocks. The comrades who have not invested in GTV original stocks this time to be given a channel, so that you can get legal G club, G fashion stocks, and that's it. Simple."); GX504-V2, GX504-V4 and GXZ9, at 101-103 (video of Guo stating that "[a]ll G-Club cardholders are entitled to 1:10 of the new GTV stock for the amount of the card . . . . take your membership, take your shares, don't lose a single share. . . . Oh my, this is big money. Think about the value of GTV"); GXVI155 and GXVI155-T (video of Guo stating that "[t]he most, you give $50,000, or $100,000, buy 2 or 3 cards. . . . you want card or you want stocks); GXC126 (G Club email authorizing multiple membership purchases); GXVI167 and GXVI167-T (video of Guo explaining the A10 fraud ("5% of G Club's shares were lost due to you. But what did you get, you know? Beyond the expectation of the comrades, any of you, if you invest in A10, you'll hold the same card, which need not to be paid. Similarly, if you use the card, you can own the same stock. You don't have to pay any more, right? In fact, you are not investing in the A10 project. You are, strictly speaking, investing in an enlarged version of A15").

    4.    <u>The Defendant's Claim that the Money Judgment Should Be Offset Against the Value of Other Government Recoveries is Not Ripe</u>

Finally, the defendant contends that the Court should subtract the value of assets in the Government's possession when calculating the Money Judgment. The POF already accounts for the need to offset the value of forfeited specific property from the Money Judgment. Paragraph 7 of the POF states that "[u]pon adjudication of all third-party interests this Court will enter a Final Order of Forfeiture . . . . All Specific Property forfeited to the United States under a Final Order of Forfeiture shall be applied towards the satisfaction of the Money Judgment." POF ¶ 7. But this offset occurs *after* adjudicating ancillary claims, and *after* forfeiture of the specific property is finalized because, to the extent that third party interests are determined to be superior to the Government's interest, the Government will not obtain the full value of those assets. *See* Fed. R. Crim. P. 32.2(c)(2) ("When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights."). In such an instance, the defendant does—and should—remain liable for the full value of the illicit proceeds. Thus, the Money Judgement should not be offset by the estimated recoverable value to the Government of specific property reflected in the POFs, which have yet to be fully determined. Accordingly, this objection is not ripe because offset has not yet occurred nor should it at this time.[6]

---

[6] The defendant also asserts that Court should offset the Money Judgment against the value of assets *not* in the Government's possession and that the Government has *not* sought to forfeit. The defendant offers no precedent for this nor is the Government aware of any. If courts were to adopt such an approach it would have the effect of limiting forfeiture only to proceeds in the defendant's possession when forfeiture is ordered. That is not the law. *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "[w]hether or not Uddin shared the cash he received").

**D. Conclusion**

      The defendant's belated objections to the POF should be rejected both because they were previously waived, and because they lack any merit. The defendant's motion to challenge the POF should therefore be denied in its entirety.

      Respectfully submitted,

      SEAN S. BUCKLEY
      Attorney for the United States, Acting Under
      Authority Conferred by 28 U.S.C. § 515
      Southern District of New York

By:      /s/
      Micah F. Fergenson
      Ryan B. Finkel
      Justin Horton
      Juliana N. Murray
      Assistant United States Attorneys
      (212) 637–6612/2314/2190/2276

Case 1:23-cr-00118-AT    Document 803    Filed 02/17/26    Page 11 of 11