**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                          **:**

**UNITED STATES OF AMERICA**     **:**

                          **:**

     **v.**                 **:**       **23-CR-118 (AT)**

                          **:**

**MILES GUO,**               **:**

                          **:**

          **Defendant.**     **:**

                          **:**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br>

### SENTENCING MEMORANDUM SUBMITTED
### ON BEHALF OF MILES GUO

<br>

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
Tel: 212-619-373

Joshua L. Dratel
Law Offices of Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
Tel: 212-732-0707

Melinda Sarafa
SARAFA ZELLAN PLLC
43 West 43rd Street, Suite 370
New York, NY 10036
Tel: 212-785-7575

*Attorneys for Defendant Miles Guo*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

I.    MR. GUO'S PERSONAL BACKGROUND AND THE
      POLITICAL CONTEXT OF THIS CASE .......................................................... 5

      A.    *Mr. Guo's Early Upbringing During the Cultural Revolution* ........................... 5

      B.    *The Tiananmen Square Protests, Witnessing His Brother's Death
            by Police Shooting, and Mr. Guo's Political Imprisonment* ............................... 7

      C.    *Mr. Guo Achieves Economic Prosperity, Forms Political Alliances,
            and Encounters Political Exposure* ................................................................... 8

      D.    *Increasing Business Success and Friction with the Chinese Government* ......................... 10

      E.    *Mr. Guo Becomes a Prominent and Vocal Critic of the CCP from Abroad* ..................... 13

      F.    *Intensification of CCP Targeting Following
            Mr. Guo's Relocation to the United States* ...................................................... 15

            1.    *INTERPOL Red Notice, Interference with VOA Interview,
                  Direct Intimidation* ................................................................................. 16

            2.    *Recruitment of Influential U.S. Political and Business Figures
                  to Lobby for Mr. Guo's Repatriation to China* ...................................... 17

            3.    *The 912 Project – A Centrally Coordinated Operation
                  to Discredit Mr. Guo Online* ................................................................... 20

            4.    *Interference with Mr. Guo's Social Media Accounts* ........................... 23

            5.    *Hacking Into Computer Systems of Mr. Guo's Lawyers* ..................... 24

            6.    *Weaponizing the Civil Legal System with a False Rape Lawsuit* ......... 24

      G.    *The CCP's Targeting of Mr. Guo Converges with the Conduct in this Case* ................... 25

      H.    *Political Conditions in the United States Set the Stage for a
            New Administration to Turn Against Mr. Guo* ................................................. 32

      I.    *Affirmative Disavowal of Victim Status by Investors and Customers* ............................. 34

II.   DETERMINING A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN
      NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING ......................................... 38

      A.    *Applicable Sentencing Considerations* ............................................................. 38

      B.    *The Sentencing Guidelines Calculations in the PSR are in Error* ................................... 40

1.    No "Loss Amount" Exists in this Case ................................................................. 41

    a.    *The Fundamental Legal Framework for Calculating "Loss Amount"* ... 42

    b.    *The Government's Reliance Solely on Inflows to the G-Series Entities is Fundamentally Flawed* .......................................... 43

    c.    *The Government's "Loss Amount" Improperly Includes Amounts Attributable to Conduct for Which Mr. Guo Was Acquitted* .................. 45

    d.    *The Government's "Loss Amount" Fails to Account for the Volume of Purported "Victims" Who Affirmatively Deny They Are "Victims"* ...... 45

        i.    *The Himalaya Exchange* ............................................................ 47

        ii.    *The Hamilton Petitioners* ........................................................... 49

        iii.    *The Investors Who Have Either Filed Petitions Pursuant to 21 U.S.C. § 853(n) or Written the Government Disclaiming Victim Status* ........................................................................................ 50

        iv.    *The Investors Who Have Contacted Defense Counsel* ............... 51

        v.    *The Unknown Number of Investors Who Deny They are Victims* ................................................................................ 51

    e.    *The Government Fails to Account for Other Offsets That Substantially Reduce Any "Loss Amount"* ................................................................. 52

    f.    *A Fatico Hearing is Consistent with the Court's Rulings, and the Government's Position, That in this Case "Speculation" and "Extrapolation" Based on Limited Investor Experience is Inappropriate* ................................................................................... 54

2.    *Additional Legal Doctrine Supports a Finding of No Loss* ................................. 55

    a.    *Acquitted Conduct Cannot Be Used to Calculate Mr. Guo's Guidelines Level* ................................................................. 56

        i.    *Using Acquitted Conduct Here Would Violate Mr. Guo's Fifth and Sixth Amendment Rights* ............................................ 57

        ii.    *The Impact of the 2024 Sentencing Guidelines Amendment* ...... 58

        iii.    *The Reservations Expressed by Supreme Court Justices Regarding Use of Acquitted Conduct for Sentencing Purposes* 60

    b.    *Specific Legal Principles Significantly Reduce the "Loss Amount" in this Case* ................................................................... 63

ii

    c. *Multi-Level Guidelines Enhancements Require*
     *a Higher Burden of Proof* ........................................................... 66

    d. *The 30-Point Enhancement Pursuant to 2B1.1 Irrationally Influences*
     *Mr. Guo's Applicable Sentencing Guidelines Range* ............................. 70

   3. *Objections to Other Guidelines Enhancements* .................................................. 79

  C. *Additional Objections to the PSR* ...................................................................... 82

  D. *Statistical Analysis of Data from the U.S. Sentencing Commission and Other Sources*
   *Demonstrates that a Below-Guidelines Sentence for Mr. Guo Would be Consistent with*
   *Current Sentences for the Conduct of Conviction and Would Avoid Unwarranted*
   *Sentence Disparities* ......................................................................................... 92

   1. *Sentencing Commission Publications and Data* ................................................. 93

   2. *Judiciary Sentencing Information Database (JSIN)* ........................................... 96

   3. *Courts Have Relied on Data in Fashioning Sentences* ....................................... 96

   4. *The Data Establishes that in Practice the Guidelines are*
    *Not the Predominant Factor at Sentencing* ...................................................... 97

  E. *Mr. Guo's Medical History and Treatment at the MDC* ...................................... 98

  F. *Mr. Guo Has Endured 37 Months' Confinement at MDC*
   *During Its Most Violent and Chaotic Period* ...................................................... 98

  G. *The BOP is in Crisis in Multiple Facets of its Operations Beyond MDC Brooklyn* ......... 99

  H. *Issues Following Conclusion of Mr. Guo's Sentence* ......................................... 100

III. FINANCIAL PENALTIES ................................................................................................. 100

  A. *Restitution* ...................................................................................................... 100

  B. *Forfeiture* ........................................................................................................ 100

  C. *Fine* ................................................................................................................ 100

CONCLUSION ................................................................................................................. 101

# TABLE OF AUTHORITIES

**Cases**

*Blakely v. Washington*, 542 U.S. 296 (2004) .................................................................. 60

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ....................................................................... 61

*Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 598 (2007) ............................... 43, 82

*Gall v. United States*, 552 U.S. 48 (2007) ..................................................................... 101

*Griffin v. United States*, 502 U.S. 46 (1992).................................................................. 63

*In re GTV Media Group, Inc. et al.*, Order, Admin. Proc. File No. 3-20537 (Sept. 13, 2021)..... 35

*In re Winship*, 397 U.S. 358 (1970) ................................................................................ 60

*Irizarry v. United States*, 553 U.S. 708 (2008) .............................................................. 81

*Jones v. United States*, 526 U.S. 227 (1999) .................................................................. 62

*Jones v. United States*, 574 U.S. 948 (2014) .................................................................. 64

*Kimbrough v. United States*, 552 U.S. 85 (2007) ....................................................... 79, 80

*Koon v. United States*, 518 U.S. 81 (1996)................................................................. 43, 81

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................... 80

*McClinton v. United States*, 600 U.S. ___, 143 S. Ct. 2400 (2023) ............................... 64

*Nelson v. United States*, 129 S.Ct. 890 (2010)............................................................... 42

*People v. Beck*, 939 N.W.2d 213 (Mich. 2019) ............................................................. 61

*Rita v. United States,* 551 U.S. 338 (2007)..................................................................... 46

*Rui Ma v. Guo Wengui et al.*, Sup Ct, NY County, Sept. 11, 2017, Index No. 158140/2017)..... 29

*SEC v. Ho Wan Kwok et al.*, No. 23-CV-2200-PGG (SDNY, Mar. 15, 2023)............................ 35

*Spears v. United States*, 555 U.S. 261 (2009).................................................................. 80

*United  States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)................................... 75

*United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006),
   *aff'd* 301 Fed. App'x. 93 (2d Cir. 2008) ............................................................... 75, 77

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016)............................................... 78

*United States v. Allen*, 644 F. Supp.2d 422  (S.D.N.Y. 2009)................................... 72, 73

*United States v. Alptunaer*, 23-CR-188 (AT) (S.D.N.Y. April 10, 2023) ............................. 5, 102

*United States v. Avenatti*, 2024 WL 4553810 (9th Cir. October 23, 2024) ...................... 67, 68, 69

*United States v. Bai et al.*, No. 23-MJ-334-SJB (E.D.N.Y., April 6, 2023) ............... 17, 24, 26, 31

*United States v. Bell*, 808 F. 3d 926 (D.C. Cir. 2015) ................................................... 64

*United States v. Booker*, 543 U.S. 220 (2005)........................................................... 42, 61, 70, 79

*United States v. Buesing*, 615 F.3d 971  (8th Cir. 2010........................................... 100

*United States v. Byors*, 586 F.3d 222 (2d Cir. 2009)................................................. 66, 67

*United States v. Canania*, 532 F.3d 764 (8th Cir. 2008) ............................................. 62, 65

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) ................................. 43

*United States v. Chavez*, 710 F.Supp. 3d 227 (S.D.N.Y. 2024 ................................... 102

*United States v. Coleman*, 138 F.4th 489, 511-512 (7th Cir.),
   *cert. denied*, 146 S. Ct. 275 (2025) ...................................................................... 65

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ....................................... 71, 72

*United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008), ............................................................ 67

*United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000) ........................................... 71, 72

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ..................................................... 77, 78, 80

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ............................................................... 42

*United States v. Desimone,* 119 F.3d 217 (2d Cir. 1997) ........................................................... 47

*United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010),

   *amended* 616 F.3d 174, 186 (2d Cir. 2010) .................................................................... 76

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ......................................... 75

*United States v. Faibish*, No. 12-CR-265 (E.D.N.Y., March 10, 2016) ...................................... 76

*United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978) ............................................................ 8, 46

*United States v. Ferguson*, 584 F. Supp.2d 447 (D. Conn. 2008 ................................................. 76

*United States v. Frias*, 39 F.3d 391 (2d Cir. 1994) ................................................................... 66

*United States v. Gagarin*, 950 F.3d 596 (9th Cir. 2020) ............................................................ 69

*United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996) ................................................................. 71

*United States v. Gupta*, 904 F. Supp.2d 349, 351 (S.D.N.Y. 2012),

   *aff'd*, 747 F.3d 111 (2d Cir. 2014) .................................................................... 78, 79, 82

*United States v. Hundley*, 02-CR- 441 (LAP) (S.D.N.Y. 2005) .................................................... 76

*United States v. Jackson*, 364 F.3d 22 (2d Cir. 2003) ................................................................ 77

*United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) ............................................................. 100

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. April 27, 2018) ................................... 78

*United States v. Johnson*, 754 F. Supp.3d 305 (E.D.N.Y. 2024) ................................................. 66

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ....................................................... 43, 73, 81

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ................................................................. 72

*United States v. Kamper*, 860 F. Supp.2d 596 (E.D. Tenn. 2012) ....................................... 66, 100

*United States v. Lauerson*, 348 F.3d 329 (2d Cir. 2003) ........................................................... 77

*United States v. Lauerson*, 362 F.3d 160 (2d Cir. 2004) ........................................................... 77

*United States v. Leonard*, 529 F.3d 83 (2d Cir.2008) ............................................................... 67

*United States v. Litvak*, 3:13-CR-19 (D. Conn. July 23, 2014) .................................................. 76

*United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993) .............................................................. 49

*United States v. Musgrave*, 647 Fed. App'x 529 (6th Cir. 2016) .............................................. 100

*United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024) ...................................................... 69, 70

*United States v. Russo*, 643 F. Supp.3d 325 (E.D.N.Y. 2022) ................................................... 100

*United States v. Sabillon-Umana*, 772 F. 3d 1328 (10th Cir. 2014) ........................................... 64

*United States v. Salazar*, 489 F.3d 555 (2d Cir. 2007) .............................................................. 73

*United States v. Schneider*, 930 F.2d 555(7th Cir.1991) ............................................................ 68

*United States v. Segura-Genao*, 18 Cr. 219 (AT) (S.D.N.Y. February 5, 2019) ........................ 102

*United States v. Settles*, 530 F.3d 920 (D.C. Cir. 2008) ............................................................ 62

*United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997) ........................................................... 73

*United States v. Singh*, 390 F.3d 168 (2d Cir.2004) .................................................................. 68

*United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) ............................................................... 100

*United States v. Stephen A. Wynn*, No. 22-CV-1372 (D.D.C., May 17, 2022)................ 21, 22, 23
*United States v. Stock*, 685 F.3d 631(6th Cir. 2012)................................................... 100
*United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005)................................................. 72
*United States v. Watts*, 519 U.S. 148 (1997) (*per curiam* ........................................... 60
*United States v. White*, 551 F.3d 381(6th Cir. 2008)................................................... 61
*United States v. White*, 96 Cr. 1123 (SHS), 2022 WL 18276933 (December 8, 2022).............. 101
*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)............................................. 73, 74
*Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) ................................ 80

## Statutes

15 U.S.C. § 78j(b) ..................................................................................... 60
18 U.S.C. § 2............................................................................................. 60
18 U.S.C. § 1343 ...................................................................................... 60
18 U.S.C. § 1956(h) .................................................................................. 63
18 U.S.C. § 1957....................................................................................... 60
18 U.S.C. § 3553(a) ............................................................................. passim
18 U.S.C. § 3553(a)(2)......................................................................... passim
18 U.S.C. § 3553(a)(6)........................................................................ 8, 101
18 U.S.C. § 3553(b)(1) ............................................................................. 42
18 U.S.C. § 3582...................................................................................... 100
18 U.S.C. § 3663A(c)(3).......................................................................... 103
21 U.S.C. § 853......................................................................................... 53
21 U.S.C. § 853(n) ............................................................................... passim

## Other Authorities

U.S.S.G. §1B1.3........................................................................................ 62
U.S.S.G. §1B1.3(c) ................................................................................... 62
U.S.S.G. § 2B1.1.................................................................................. passim
U.S.S.G. § 2B1.1(b)(1) .............................................................................. 47
U.S.S.G. § 2B1.1(b)(2)(A)......................................................................... 77
U.S.S.G. § 2B1.1(b)(10) ............................................................................ 84
U.S.S.G. § 2S1.1(b)(2)(B) .......................................................................... 77
U.S.S.G. § 2S1.1(b)(3)............................................................................... 84
U.S.S.G. § 3B1.1(a) ............................................................................ 77, 84
U.S.S.G. § 3C1.1....................................................................................... 84
U.S.S.G. § 5K1.1. ...................................................................................... 99
U.S.S.G. § 6A1.3 ....................................................................................... 73

## INTRODUCTION

This sentencing submission is respectfully submitted on behalf of defendant Miles Guo. For the reasons set forth below, it is respectfully submitted that the Court should impose a sentence dramatically below the applicable Guidelines level, which would constitute a sentence "sufficient, but not greater than necessary" to achieve the objectives of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

As this Court has recognized,

> If there ever is a day in a person's life when [he] is entitled to be judged on the basis of the entirety of [his] background [and] contributions, it is at sentencing, and Section 3553(a), in directing the Court to consider the history and characteristics of the offender, is consistent with that.

Transcript of February 18, 2025, Proceedings, *United States v. Alptunaer*, 23-CR-188 (AT) (S.D.N.Y. April 10, 2023) (ECF No. 85 at 37).

That conception of sentencing, encompassing a defendant's positive qualities balanced against the offense conduct, is particularly pertinent here, because, as detailed below, Mr. Guo's numerous admirable qualities and important, estimable accomplishments, clearly outweigh the offense conduct by an overwhelming margin.

Certainly an examination of Mr. Guo's multidimensional life experience and sacrifices, beyond what was presented at trial, demonstrate that he is not defined by the offense conduct, or by a simple, single narrative. As detailed herein, his early personal history, from his family's political ostracism during China's Cultural Revolution, through his arrest in connection with the protests culminating in the Tiananmen Square massacre, and his subsequent detention and torture, is as compelling and defining as his subsequent phenomenal success in business as private enterprise in China began to flourish.

Mr. Guo's contributions to the aspirations of his Chinese compatriots is unrivaled, as is his commitment to a better future for his country. Recognizing the importance of economic resources to building the infrastructure of a diaspora political movement, he has built and dedicated a financial fortune, and the public profile that has afforded him, toward that singular objective which he has pursued with the utmost vigor for decades.

███████████████████████████████████████████████████████

█████████████████████████████████████████████

In return, Mr. Guo has endured persecution from the People's Republic of China ("PRC") and its ruling Chinese Communist Party ("CCP") on a grand, pervasive, and life-threatening scale. As discussed herein, those unrelenting, multifaceted attacks included recruitment of U.S. elites in business, entertainment, and politics to conspire against Mr. Guo, and have contributed tangibly to the allegations in this case.[1] In fact, as set forth below, the CCP engaged in a saturation social media campaign to discredit Mr. Guo, and compelled investors to file with U.S. law enforcement authorities and media outlets false complaints against Mr. Guo.

In light of that indisputable evidence, a lengthy prison term herein would only validate the CCP's campaign against Mr. Guo, seriously undermine his and his supporters' objectives for China – which align entirely with U.S. interests – and embolden further efforts to eliminate Chinese dissidents from public life.

Another critical factor in this sentencing is the Guidelines calculation and, in particular, determination of the "loss amount." Indeed, there is no "loss amount," and the jury's verdict does not establish any. Additionally, as detailed below, and explained in prior submissions regarding

---

[1] Mr. Guo, as he must, acknowledges the jury's verdict for purposes of sentencing. The positions set forth herein do not challenge that verdict, but instead are directed at specific issues relevant to sentencing, and should not be regarded otherwise.

2

forfeiture (*see* ECF Nos. 799, 804), the circumstances of this case are novel, if not entirely unique in that so many investors in and customers of the entities involved in this case affirmatively reject the contention that they have been victimized by Mr. Guo.

Indeed, a significant number of sophisticated investors, comprising two separate groups, and represented by counsel, insist the actions of the *Government*, and not Mr. Guo, have jeopardized the value of their investments (and investment assets, such as the Himalaya Exchange cryptocurrency). In addition, hundreds of individuals have petitioned the Court, or contacted the Government and/or defense counsel directly, disclaiming victim status and instead seeking return of their seized investment property.

The Government's alleged "loss amount" consists of pure speculation, is unsupported by any reliable evidence, and is directly contradicted by the unprecedented legion of investors and customers who deny that Mr. Guo defrauded them. There are also offsets – redemptions, refunds, settlement payments, double counting, and assets of residual value still possessed by investors – that the Government ignores as well, but which should be taken into account under the law governing "loss amount."

There are additional facts and legal principles which undermine the Government's purported "loss amount." The Government and Probation, as set foth in the Presentence Report ("PSR") would include acquitted conduct in calculating loss, which the Fifth and Sixth Amendments, as well as a 2024 amendment to the Guidelines (effective after preparation of the PSR), do not permit..

Also, pursuant to longstanding Second Circuit instruction, the extent of the "loss amount" enhancement – a staggering 30 points – requires that the Government prove any alleged "loss

amount" by a more demanding standard of proof than mere preponderance of the evidence. The Government cannot meet that burden.

In that context, Mr. Guo seeks an evidentiary hearing, pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), to resolve any and all disputed issues of fact with respect to the alleged "loss amount," other Guidelines enhancements to which Mr. Guo objects, and any other contested factual issues relevant to sentencing.

Courts have also repeatedly recognized that the "loss amount" in financial offense cases drive the Guidelines range to an inordinate, unfair, and irrational extent. Consequently, those courts have relied on other § 3553(a) considerations to correct the disproportionate impact of "loss amount" enhancements that artificially increase a sentence by multipliers.

That recognition accounts for the mean and median sentences imposed in fraud cases, which, as the statistical analysis discussed herein establishes, are considerably below the Guidelines level in this case, and which more accurately, and fairly, represent an appropriate sentence here, while avoiding the unwarranted disparities proscribed by § 3553(a)(6).

Three other factors relevant to Mr. Guo's sentence have traditionally mitigated terms of imprisonment demonstrably in this District: (1) the grueling 37 months Mr. Guo has been confined at the Metropolitan Detention Center ("MDC"), including the two most violent and chaotic years in that facility's history; (2) the substandard and continually deteriorating conditions within the U.S. Bureau of Prisons ("BOP") system where he would be confined to serve any additional term of imprisonment; and (3) considerations relevant to conditions Mr. Guo is likely to encounter once he completes his sentence. Discussion of these elements is augmented by separate, detailed exhibits appended to this submission.

4

Accordingly, it is respectfully submitted that examination and evaluation of all of the sentencing factors listed in § 3553(a) compels the conclusion that only a sentence dramatically below the applicable Guidelines range would satisfy § 3553(a)'s directive that the Court impose a sentence "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in § 3553(a)(2).

## I.    MR. GUO'S PERSONAL BACKGROUND AND THE POLITICAL CONTEXT OF THIS CASE

This case cannot be understood, and Mr. Guo cannot be fairly sentenced, without a full appreciation of the personal, historical, and political context in which the events leading up to this day unfolded. By no means is this a routine case, and by no means is Mr. Guo a typical defendant. His personal background, the political and economic conditions that motivated him and fueled public interest in his Whistleblower Movement, the CCP's relentless and overwhelmingly powerful targeting of him – which has reached fruition in the jury's verdict in this case – and even domestic political affairs in the United States all combined to create the conditions in which the underlying conduct and this prosecution occurred, and the lens through which it must be viewed.

### A.  *Mr. Guo's Early Upbringing During the Cultural Revolution*

Guo Wengui (郭文贵), also known by the Cantonese name Ho Wan Kwok (郭浩云) and the English name Miles Guo,[2] was born in 1968 in Jilin, a northeastern province of the People's Republic of China ("PRC") bordering North Korea and Russia. He was the seventh of eight brothers born to his father, a miner, and his mother, a homemaker. PSR ¶ 129.

---

[2] The Chinese surnames Guo and Kwok are represented by the same Chinese character (郭) but have different pronunciations and Romanization. Mr. Guo's birth name is Guo Wengui (郭文贵). He adopted the given name Ho Wan (浩云, literally, "noble cloud") in 2000 when he obtained a Hong Kong passport (see PSR ¶ 137). He began using the English name Miles, an homage to musician Miles Davis, in 1991 during travels in the United States and Europe to facilitate interactions with Westerners unfamiliar with Chinese names.

Mr. Guo's early life was not one of privilege or abundance. He was born two years into the Cultural Revolution launched in May 1966 by Mao Zedong, which lasted until Mao's death in 1976 and during which Mr. Guo's parents were viewed as enemies of the state. As such, they were treated essentially as exiles in the mountains of Jilin Province where they struggled to provide for their eight children. During Mr. Guo's childhood, the family lived in a one-room shack with a dirt floor, no electricity, and no indoor plumbing. PSR ¶ 131. He typically ate one meal per day. *Id.* These conditions were not uncommon in China at that time, particularly for those ostracized as enemies of the ruling Communist Party.

Mr. Guo attended the local public primary school, Northeastern Nickel Mine School, from which he graduated in July 1979. PSR ¶ 150. The family thereafter moved to Shandong Province, a coastal province on the Yellow Sea located between Beijing and Shanghai, where Mr. Guo attended the local public middle school, Gu Cheng #3. He quit school in July 1984, at age 15, in order to earn money and help support his family. *Id.*

As a child Mr. Guo witnessed his parents and brothers suffer at the hands of the CCP due to his father's support for democracy. PSR ¶ 132. His father was at times physically beaten, his brothers were beaten and stabbed by CCP supporters while trying to help their father, and his father would often go into hiding from the CCP for days at a time. *Id.* Amidst this trauma, Mr. Guo's mother suffered a breakdown, at times also disappearing for multiple days and leaving Mr. Guo and his brothers to fend for themselves. *Id.* These experiences, along with the CCP's prohibition on any public expression of the family's Buddhist faith, left an early and indelible impression on Mr. Guo of state-sponsored oppression and injustice. *Id*.

Still in his teens, Mr. Guo married Hing Chi Ngok, the younger sister of a childhood friend, in Shandong Province in 1985. PSR ¶ 133. The union was officially registered in 1987, and the

6

couple remain married to this day. They have two children born during the late 1980s, a son named Qiang and a daughter named Mei. PSR ¶ 134.

**B.** ***The Tiananmen Square Protests, Witnessing His Brother's Death by Police Shooting, and Mr. Guo's Political Imprisonment***

By 1989, when Mr. Guo was approximately 20 years old, he and his wife were living with their son and newborn daughter in Puyang City, Henan Province, when the upheaval that spring in Beijing's Tiananmen Square profoundly altered their lives. In April, following the death of former CCP General Secretary Hu Yaobang – revered by many and reviled by others for his economic and political reforms – tens of thousands of students began gathering in Beijing's Tiananmen Square to honor Hu's legacy and demand pro-democracy reform.

In support of the demonstrators, Mr. Guo sold his motorcycle and donated the proceeds to the student protestors. Two police officers subsequently visited him at his office in Puyang, where his wife, infant daughter, and younger brother were at the time, for questioning. At one point an officer pointed a gun at Mr. Guo, prompting his 17-year-old brother, Guo Wenbin, to jump in front of the officer. The officer shot Wenbin in the arm and leg, then arrested both brothers. Wenbin was denied medical treatment and died of his wounds, while Mr. Guo was imprisoned and charged with inciting counter-revolutionary activities.

Mr. Guo spent the next 22 months detained in a facility for political prisoners. He was beaten and tortured both physically and psychologically, including witnessing the execution of more than 50 prisoners. PSR ¶ 127. These experiences, combined with the death of his brother and the abuses he witnessed as a child during the Cultural Revolution, solidified his resolve to fight government oppression and corruption.

7

**C.** ***Mr. Guo Achieves Economic Prosperity, Forms Political Alliances, and Encounters Political Exposure***

Mr. Guo's real estate development career began following his release from detention in 1991. PSR ¶ 154. Mr. Guo understood that he needed a certain measure of personal success and influence in order to be an effective advocate for government reform. The 1990s were a period of rapid economic expansion in China as capital markets were established, private sector enterprises multiplied and grew, and state-controlled sectors gradually reduced their share of national output. In this environment, Mr. Guo and his family built a thriving commercial enterprise, beginning with the development of a high-end commercial complex in Zhengzhou, the capital of Henan Province.

The crown jewel of the family's real estate empire ultimately was Pangu Plaza, a mixed-use complex planned in conjunction with Beijing's preparation to host the 2008 Summer Olympics. Consisting of five separate towers incorporating a hotel, offices, residential and retail space, Pangu Plaza was situated next to the National Stadium ("Bird's Nest") and enjoyed high visibility during the 2008 Olympic Games. Mr. Guo's family company had purchased the property in 1999, and benefited from its substantial increase in value in connection with Beijing's hosting of the 2008 Summer Olympic Games. Pangu Plaza became a hub for VIP guests, including a host of foreign dignitaries who circulated through the hotel over a period of several years, and Mr. Guo made connections around the globe at the highest levels of government and business.

Their success in real estate development enabled Mr. Guo and his family to expand their business activities into various investments, propelling them to extraordinary wealth. See PSR ¶ 154. His phenomenal business success also gave Mr. Guo greater and greater access to elite political circles and more insight into political corruption among some of the highest officials of the Chinese government, as well as officials visiting from abroad.

In 2000, notwithstanding the business success he enjoyed, Mr. Guo continued to view the Chinese government as fundamentally corrupt. That year, as an initial step toward distancing himself from his home country and its central government regime, Mr. Guo obtained a Hong Kong passport in the name of Ho Wan Kwok. *See* PSR ¶ 137.

In 2003, Mr. Guo blew the whistle on the corrupt activities of a prominent Beijing city official. This resulted in officials from the Ministry of State Security ("MSS"), the preeminent civilian intelligence agency in China, approaching Mr. Guo for additional information and cooperation, which he provided.

The fallout from Mr. Guo's exposure of that official, however, was significant and enduring. In September 2004, then age 36 with two teenagers at home, Mr. Guo was arrested by dozens of police officers upon his arrival at the Beijing Airport. They took him to a hotel where he was detained for 15 days. He was interrogated, beaten, and tortured in myriad ways. He was deprived of sleep as officers took shifts watching him, using pepper spray to jolt him awake if he nodded off. He was forced to stand for long periods of time, causing his legs to swell up from the pressure. He was hung upside down and beaten. Officers cut his hair, put it in a plastic bag, and placed the bag over his head so he was forced to breathe in the tiny particles. He was stabbed in the back with a corkscrew.[3]

The officers detaining Mr. Guo repeatedly ordered him to stop exposing the corruption of Chinese government officials, which he refused to do. They asked him whether he had bribed the

---

[3] In describing Mr. Guo's physical condition in the PSR, the Probation Officer wrote that "Guo exhibited various scars and disfigurements as a result of the physical torture he experienced while imprisoned in his native China, as well as subsequent surgeries and operations which he underwent between 1993 and 2022, that were required to repair residual injuries." PSR ¶ 141. Mr. Guo's medical condition – both physical and mental – are addressed in more detail in Exhibit 1, submitted to the Court under seal.

mayor of Zhengzhou, where his first commercial development was located, and he truthfully replied that he had not. They demanded to know if he was spying for the United States, and he truthfully replied that he was not. After 15 days they took him to a hospital where he remained for three days before being released to his home.



Not surprisingly, his relationship with certain U.S. officials in China invited scrutiny and suspicion by the CCP that he was spying on behalf of the United States.

In approximately 2006, Mr. Guo developed a relationship with China's Deputy Minister of State Security, who was responsible for, among other things, domestic anti-corruption efforts and foreign intelligence collection. This Deputy Minister offered Mr. Guo a measure of protection against the local official seeking revenge for Mr. Guo's exposure of corruption, while also enabling Mr. Guo to gain deeper insight into the workings of the highest levels of the CCP.

### D. *Increasing Business Success and Friction with the Chinese Government*

Mr. Guo and his family's business success and wealth continued to grow. Between 2012 and 2014, the family became the largest shareholder of Haitong International Securities, which at the time was China's largest publicly traded securities company. PSR ¶ 154. The family also established – outside of China – the ACA Family Fund Investment Company ("ACA"). PSR ¶ 154.

---

At the same time, tensions continued to mount with Chinese officials whom Mr. Guo exposed as corrupt. In December 2013, Mr. Guo left mainland China and relocated to Hong Kong where he resided with his wife and daughter.

The following October, Mr. Guo received a call that permanently altered his relationship with mainland China. The caller, a highly placed central government official, notified Mr. Guo that he was suspected of spying for the United States and had to return to mainland China for questioning. Knowing that this portended certain imprisonment and potentially torture, which Mr. Guo was not willing to endure further, Mr. Guo left Hong Kong for London, where he joined his son who was living there.

In or around January 2015, Mr. Guo and his family established a family office named Golden Spring New York, Ltd., with an office in Manhattan. PSR ¶ 154. Also within this time frame, the family purchased an apartment in Manhattan's Sherry-Netherland hotel, which became Mr. Guo's primary residence when he later relocated permanently to the United States in 2017. The family also purchased, with approximately €28 million in family funds from ACA, the Lady May yacht.

Mr. Guo's sense that hostilities between his family and the Chinese government were on the verge of erupting proved accurate. While in New York on business in January 2015, Mr. Guo received a number of calls from Zheng ("Bruno") Wu. Purportedly acting on behalf of the Special Investigative Team of the Central Commission for Discipline and Inspection of the CCP ("CCDI"), Wu implored Mr. Guo to stop exposing corruption among Chinese officials and to not reveal any information that he may have received from the Deputy Minister of State Security.

According to Wu, the Special Investigative Team wanted Mr. Guo to cooperate with China and return any evidence he had of corruption among senior leaders. In exchange, the CCP would

11

refrain from seizing Mr. Guo family's assets, not arrest Mr. Guo's family members, and not physically harm or kill Mr. Guo. Mr. Guo refused.

Later that month, on January 10, 2015, Chinese authorities conducted a raid on an event at the Pangu Hotel in Beijing where many of Mr. Guo's close family members and employees were gathered. Hundreds of armed police officers entered the hotel and arrested Mr. Guo's family members, including his wife, daughter, his five brothers,[5] two sisters-in-law, and one niece.

Police ordered all employees onto the ground and arrested approximately 270 of them. Mr. Guo's family members were forcibly masked and taken to a detention center. Mr. Guo's wife and daughter, who endured abuse and torture while detained (*see* PSR ¶¶ 135, 140), were released after 10 days but not permitted to return to their home for nearly two years. Instead, they were placed in temporary housing and required to report in person each day to a local intelligence office. PSR ¶ 135.

Mr. Guo's sisters-in-law were held for three months and his brothers were taken to Dalian City, more than 800km from Beijing, where they were detained for two years. Among the employees, approximately 30 were officially detained and underwent beatings, interrogation, and torture. No formal charges were instituted except for unknown charges against two of Mr. Guo's brothers.

Beginning in late January 2015, Chinese authorities began seizing China-based property and stock holdings owned by Mr. Guo's family companies, and valued at approximately $10 billion. These included key buildings and other components of the Pangu Plaza development in Beijing, and numerous other office towers. Authorities released these assets in or around December 2016 and January 2017, only to seize them again weeks later.

---

[5] Mr. Guo lost a second brother, who had been a police officer, to suicide in 1996. PSR ¶ 130.

### E. *Mr. Guo Becomes a Prominent and Vocal Critic of the CCP from Abroad*

Mr. Guo remained undeterred from his overriding goal of becoming a visible and forceful advocate for democracy and the rule of law in China. Following his departure from China to the West he was able to utilize Twitter, Facebook, and YouTube – all of which are blocked by the "Great Firewall of China"[6] – to publicly expose systemic corruption in, and abuses of, the CCP. *See* PSR ¶ 153.

Through thousands of hours of broadcasts, Mr. Guo has disclosed human rights abuses in China, such as the crackdown on human rights lawyers and illegal organ harvesting from prisoners for use by family members of high-ranking political figures. He has denounced Chinese state suppression of democratic movements in China and Hong Kong. He has publicly revealed China's strategy of infiltration into Taiwan, Hong Kong, and the United States, and worked to expose China's covert operations in the United States in political, economic, cultural, and intelligence arenas, to cite but a handful of examples. Notwithstanding the Government's theory that Mr. Guo is masquerading as a dissident for his own personal gain, indisputable facts – including those drawn from cases brought by DOJ – establish that Mr. Guo has undertaken his whistleblowing activities at tremendous personal cost and risk.

Concurrent with that activity, Mr. Guo amassed a massive social media following, with hundreds of thousands if not more than one million followers at times. Millions of members of the

---

[6] The U.S. Department of Justice has described the "Great Firewall of China" ("GFW") as follows: "Operated an enforced primarily by the Cyberspace Administration of China and the PRC's Ministry of Public Security ("MPS"), the GFW has the capability to block Internet access within the PRC to particular servers and applications and is used to monitor and prevent PRC citizens from accessing Internet platforms and services that might allow for the dissemination and discussion of information that runs afoul of messaging approved by the PRC government and the CCP." Ex. 2 ¶ 7 (Complaint and Affidavit in Support of Application for Arrest Warrants in *United States v. Bai et al.*, No. 23-MJ-0334 (SJB) (E.D.N.Y., April 6, 2023) ("*Bai* Complaint").

Chinese diaspora, disaffected by the CCP's oppressive tactics – most indelibly represented by the massacre of student protestors in Tiananmen – found resonance in Mr. Guo's messages. Within China, those with access to a VPN could break through the "Great Firewall" and access Mr. Guo's broadcasts, which for many were their first concrete exposure to events such as Tiananmen and other evidence of CCP abuses. [7] It may be difficult to fathom from a U.S. perspective, where we enjoy broad First Amendment freedoms, but for many in China, Mr. Guo's broadcasts were beyond eye opening – they shattered fundamental beliefs about the world in which they lived. *See, e.g.*, Ex. 3 (Declaration of Wansheng Cheng).[8] At the same time, the Whistleblower Movement that Mr. Guo started offered genuine hope for a more democratic future for the Chinese people. *Id.*

The scope and power of Mr. Guo's influence represented and continues to represent a threat that the CCP emphatically wants to eliminate. The CCP seeks not only to suppress Mr. Guo's pro-democracy advocacy and critiques of publicly known abuses and corruption involving the CCP, but also to prevent disclosure of any non-public information he may possess concerning high-level corruption, intelligence operations, or other sensitive matters.

---

[7] By June 2017, the *New York Times* Beijing office was reporting that even though Mr. Guo's broadcasts were officially banned in China, unofficially "many people here in Beijing are riveted." Chris Buckley, "Tycoon's Claims Reverberate in China Despite Censorship and Thin Evidence," *New York Times*, June 27, 2017, https://www.nytimes.com/2017/06/27/world/asia/guo-wengui-china-corruption-xi-jinping.html.

[8] During our time representing Mr. Guo, defense counsel have received more than 1,000 unsolicited statements of support for Mr. Guo from followers, investors, and/or customers of the G-Series entities. The statements continue to pour in. Given the volume of statements as well as privacy concerns, we intend to provide the Court and the Government with a sealed supplement containing a representative sample of these statements, as they provide significant perspective on the meaning of Mr. Guo's work to his supporters, the nature and circumstances of the offenses of conviction, as well as the issue of loss in this case. For illustrative purposes, we include and cite to a few letters in this Memorandum, from individuals who have either testified in this case or expressed willingness to do so.

14

The tactics employed by the CCP to silence Mr. Guo have included coercion, threats to family, asset seizures, lawsuits, payments to influence U.S. government officials, deployment of a vast network of operatives to discredit Mr. Guo globally using social media, interrogating, arresting, and prosecuting supporters of his in China, and forcing supporters to file false claims of fraud against him. The scale and ferocity of the CCP's campaign against Mr. Guo is staggering.

**F.  *Intensification of CCP Targeting Following Mr. Guo's Relocation to the United States***

Mr. Guo moved from London to the United States in April 2017, entering on a non-immigrant tourist visa. PSR ¶ 137. Between January 2016 and May 2017, Chinese officials had contacted Mr. Guo approximately 30 times to urge him to cooperate with them. They urged him to: (1) stop exposing and publicizing corruption among Chinese government officials; (2) not cooperate with the U.S. government or talk to the FBI; and (3) not oppose the CCP, advocate for democratic reform in China, or talk about justice and the rule of law.

In exchange, they offered to release Mr. Guo's family members and employees from custody and release billions of dollars' worth of family assets that authorities had frozen in China. Mr. Guo refused.[9] The CCP pressure campaign against Mr. Guo became increasingly aggressive and far-reaching, eventually overlapping directly with the allegations in this case. These events provide crucial context for understanding the nature and circumstances of the conduct that brings Mr. Guo before this Court.

---

[9] In May 2017, however, Mr. Guo was able to negotiate for his wife and daughter to leave China and join him in the United States, in exchange for his agreement not to testify against former Chinese state security officials who had been arrested in New York and charged in federal court.

### 1.  *INTERPOL Red Notice, Interference with VOA Interview, Direct Intimidation*

On April 19, 2017, nine days after Mr. Guo arrived in the United States, the Chinese government requested that INTERPOL issue a "red notice" identifying Mr. Guo as a fugitive wanted for extradition. This occurred just hours before Mr. Guo was to appear on a live televised interview on the Mandarin-language service of Voice of America ("VOA") – which reaches an audience of millions in China and elsewhere – in which Mr. Guo planned to disclose corruption allegations against family members of senior CCP officials. *See* Sasha Gong, "How China Managed to Muffle the Voice of America," *Wall Street Journal*, May 23, 2017 ("Gong *WSJ* Op-Ed").[10]

Mr. Guo went forward with the VOA interview as planned, but shortly into the second hour of what had been billed as a three-hour session, VOA abruptly ended the broadcast. As later explained by Sasha Gong, Chief of VOA's Mandarin Service and the journalist who conducted the interview, two days before the broadcast China's Foreign Ministry summoned VOA's Beijing-based correspondent and told him that China would view the interview as interference with China's internal affairs and could have serious repercussions if it went forward.

That admonition sent a chill through VOA's top management in Washington, but management eventually permitted a truncated interview to take place. *Id.; see also* Michael Forsythe, "China Seeks Arrest of Billionaire Who Accused Officials' Relatives of Graft," *New York Times*, April 19, 2017;[11] U.S.-China Economic and Security Review Commission, *2017 Report to Congress*, November 2017, at 472 ("UCESRC Report") (excerpt attached as Exhibit 4).

---

[10] Available at https://www.wsj.com/articles/how-china-managed-to-muffle-the-voice-of-america-1495580183?st=EgyHCa&reflink=desktopwebshare_permalink.

[11] Available at https://www.nytimes.com/2017/04/19/world/asia/china-guo-wengui-interpol-voice-of-america.html.

Millions of viewers saw the broadcast as well as its abrupt end, which for many was their first introduction to Mr. Guo.

In May 2017 the CCP again attempted to silence Mr. Guo and threaten him more directly, by sending the Secretary of the CCDI and three other agents to New York to speak with him in person. Mr. Guo refused to yield to their demands. Instead, he disclosed a broad network of CCP spies operating in the United States.

The following month, the Chinese government began public criminal proceedings against some of Mr. Guo's associates in China. *See* Ex. 4 (UCESRC Report) at 472-73. Authorities posted videos and transcripts of the proceedings, in which three employees of Beijing Pangu Investment, one of the Guo family companies, were convicted of fraud. *Id.*

### 2. *Recruitment of Influential U.S. Political and Business Figures to Lobby for Mr. Guo's Repatriation to China*

As confirmed by the U.S. Government through a series of federal prosecutions, the Chinese government's increasingly charged campaign against Mr. Guo proceeded to reach directly into the highest levels of United States government. In approximately May 2017, Low Taek Jho, a Malaysian businessman, coordinated a meeting during which Sun Lijun, China's former Vice Minister for Public Security, enlisted former finance chair of the Republican National Committee ("RNC") Elliot Broidy, hip-hop artist Prakazrel Michel, and businessperson Nickie Lum Davis to lobby then-President Trump and the Trump Administration to cancel Mr. Guo's visa or otherwise remove Mr. Guo from the United States. See Ex. 5 ¶ 16 (Complaint in *Attorney General of the United States v. Stephen A. Wynn*, No. 22-CV-1372 (D.D.C., May 17, 2022)). This request was made expressly on behalf of the PRC. *Id.*

These efforts – which were extremely well-compensated – took off in multiple directions. Broidy turned to Steve Wynn, an American real estate developer and owner of multiple luxury

casinos and resorts, including the Wynn Macau – billed on Wynn's website as "the largest gambling location in Asia"[12] – and the Wynn Palace, a massive luxury hotel opened in Macau in 2016.

Broidy was acquainted with Wynn through the RNC, and believed that the combination of Wynn's RNC work, business interests in China, and friendship with then-President Trump would help facilitate access to administration officials. Ex. 5 ¶ 17; *see also* Niraj Chokshi, "U.S. Accuses Steve Wynn of Lobbying Trump on Behalf of China," *New York Times*, May 17, 2022.[13]

Wynn spoke directly with Sun in June 2017 and agreed to raise the matter with the President, while also engaging in numerous communications with Broidy during that time about having Mr. Guo placed on the No Fly List and ensuring that when Mr. Guo's visa expired at the end of June any renewal application would be denied. Ex. 5 ¶¶ 20-21.

In one message sent by Broidy to Wynn via Wynn's wife, Broidy stated that Chinese President Xi Jinping had told President Trump personally at Mar-a-Lago that he wanted Mr. Guo returned to China, and that in exchange President Xi was willing to return certain U.S. citizens held hostage in China, accept a large number of Chinese illegal immigrants for deportation back to China, and assist the United States with North Korea. *Id.* ¶ 21(c).

During a dinner in Washington, D.C., in late June 2017, Wynn personally communicated to the President the PRC's desire to have Mr. Guo returned to China. *Id.* ¶ 22. During the next two months, Wynn had multiple telephone calls with Sun during which they discussed Mr. Guo's visa renewal, the importance of the matter to the PRC, and Wynn's business interests in Macau. *Id.* ¶ 23. Wynn made several efforts during this time frame to organize meetings about Mr. Guo with

---

[12] See https://steve-wynn.com/career/.
[13] Available at https://www.nytimes.com/2022/05/17/business/doj-steve-wynn-trump-china.html.

senior officials of the National Security Council and the White House. *Id.* ¶ 25. Ultimately these efforts – motivated by Wynn's desire to protect his business interests in Macau, over which the Chinese government exerted tight control – were unsuccessful. *Id.* ¶¶ 26, 28, 29.[14]

Wynn's efforts, however, were just one component of this scheme. In late June 2017 Prakazrel Michel, having himself already participated in multiple meetings in the United States and Asia with the goal of persuading Trump Administration officials to repatriate Mr. Guo to China,[15] reached out to George Higginbotham, who at the time was serving as a lawyer for the United States Department of Justice, Tr. 5727, to solicit his assistance. Tr. 5733-34.

Mr. Higginbotham met that summer with the Chinese ambassador to the United States at the Chinese Embassy in Washington, D.C.. Tr. 5735-36. During the meeting he relayed the message that "there were successful efforts being made for the extradition of Mr. Guo Wengui and that there would be additional information forthcoming from General MicMaster [sic]." Tr. 5738.[16] Approximately two months later, Mr. Higginbotham traveled to Macau to personally inform Mr. Low that steps were still being taken to persuade the administration to repatriate Mr. Guo, as well as to accomplish a separate, unrelated goal. Tr. 5740-41. Mr. Higginbotham received approximately $100 million for his efforts in connection with the scheme to repatriate Mr. Guo and achieve the other goal. Tr. 5745.[17]

---

[14] Elliott Broidy pleaded guilty in October 2020 to conspiring to violate foreign lobbying laws in connection with these events. He admitted that he had accepted $9 million from Jho Low to lobby the Trump Administration to repatriate Mr. Guo. *See* Kenneth P. Vogel, "Elliott Broidy Pleads Guilty in Foreign Lobbying Case," *New York Times*, Oct. 20, 2020, https://www.nytimes.com/2020/10/20/us/politics/elliott-broidy-foreign-lobbying.html.

[15] *See* Ex. 6 ¶¶ 136-149 (Indictment in *United States v. Prakazrel Michel et al.*, No. 19-CR-148-CKK (D.D.C., May 2, 2019)).

[16] That was obviously a reference to Gen. H.R. McMaster, who served as U.S. National Security Advisor from 2017 to 2018.

[17] Mr. Higginbotham pleaded guilty in November 2018 to a conspiracy charge in connection with his participation in these unregistered lobbying affairs. See

### 3. *The 912 Project – A Centrally Coordinated Operation to Discredit Mr. Guo Online*

The U.S. Government has also confirmed the contemporaneous social media and Internet campaign the PRC launched against Mr. Guo during the same period. While the CCP was paying hundreds of millions of dollars to recruit Washington insiders for a covert lobbying campaign to influence the actions of the President of the United States, it also was deploying a sophisticated team of operatives to launch what ultimately grew into a massive social media campaign with the aim of discrediting Mr. Guo. This campaign was aggressive, extensive, effective, and ongoing for years. Its significance, power, and relevance to this case cannot be overstated.

A detailed description of the overarching PRC operation to use social media to disseminate and amplify messages to discredit and undermine its political adversaries – including targeting of specific individuals critical of the CCP – is set forth in the 89-page Complaint and Affidavit in Support of Application for Arrest Warrants in *United States v. Bai et al.*, No. 23-MJ-334-SJB (E.D.N.Y., April 6, 2023) ("*Bai* Complaint"), attached hereto as Ex. 2; *see also* Ex. 7 (EDNY USAO Press Release in *Bai*).

It is undisputed that a primary focus of this operation, referred to in the *Bai* Complaint as "Victim-1," was  Mr. Guo. *See* Ex. 2 ¶¶ 89-108. As explained in the *Bai* Complaint, which brought interstate harassment conspiracy charges against 34 officers of the Chinese Ministry of Public

---

https://www.justice.gov/archives/opa/pr/former-justice-department-employee-pleads-guilty-conspiracy-deceive-us-banks-about-millions. Nickie Lum Davis, who was paid at least $3 million for her role in the scheme, pleaded guilty in August 2020 to aiding and abetting violation of the Foreign Agents Registration Act. See https://www.justice.gov/archives/opa/pr/hawaii-businesswoman-pleads-guilty-facilitating-back-channel-lobbying-campaign-drop-1mdb. Prakazrel Michel proceeded to trial in 2023 and was convicted in connection with the scheme to repatriate Mr. Guo. *See* Hannah Ziegler, "Pras of the Fugees Gets 14 Years for Illegal Foreign Influence Scheme," *New York Times*, https://www.nytimes.com/2025/11/20/us/pras-michel-fugees-campaign-finance-prison.html.

Security ("MPS"),[18] this operation (the "912 Project") was coordinated by a group known as the "912 Special Project Working Group" (hereinafter the "912 Group") within the MPS in Beijing and directly targeted Mr. Guo from at least 2017 through the filing of the *Bai* Complaint on April 6, 2023, three weeks after Mr. Guo's arrest in this case. Ex. 2 ¶ 89.

Utilizing thousands of fake online personas across social media sites such as Twitter, Facebook, and YouTube, the 912 Group's campaign against Mr. Guo specifically sought to brand him as a liar, swindler, a con, and more, and demanded government action against him. As discussed in more detail *infra*, this long-running apparatus effectively sowed widespread public doubt about Mr. Guo's credibility, including the validity of the entities involved in this case.

To appreciate the scale of the online operation against Mr. Guo, consider studies undertaken by independent third parties about just the Twitter component of this campaign:

- The Australian Strategic Policy Institute ("ASPI") found that from April 24, 2017 (five days after the PRC requested an INTERPOL red notice for Mr. Guo), and July 31, 2019, at least 38,732 tweets from 618 Twitter accounts linked to the Chinese government directly targeted Mr. Guo.[19] "These tweets consist largely of vitriolic attacks on [Guo's] character, ranging from highly personal criticisms to accusations of criminality, treachery against China and criticisms of his relationship with controversial U.S. political figure Steve Bannon." Tom Uren et al., "Tweeting through the Great Firewall: Preliminary analysis of PRC-linked information operations against the Hong Kong protests," Australian Strategic Policy Institute, Report No. 25/2019, at 14.[20]

---

[18] As explained in the *Bai* Complaint, "[a]lthough the MPS is generally identified as the PRC's primary domestic law enforcement agency – responsible for public safety, general criminal investigation, national security and Internet security – its mission extends beyond law enforcement and into functions more associated with an intelligence service." Ex. 2 ¶ 8.

[19] In August 2019 Twitter took down 936 accounts that it determined were part of a coordinated state-backed effort by China to sow disinformation and discord related to pro-democracy protests in Hong Kong. Kate Cooper, "Facebook and Twitter Say China Is Spreading Disinformation in Hong Kong," *New York Times*, Aug. 19, 2019, https://www.nytimes.com/2019/08/19/technology/hong-kong-protests-china-disinformation-facebook-twitter.html.

[20] The full report is available at https://www.aspi.org.au/report/tweeting-through-great-firewall/.

21

- In a follow-up report, ASPI found that from January 2018 to April 17, 2020, there were 70,584 tweets, 11,832 images, and 580 videos associated with Mr. Guo from PRC-linked accounts.[21] They characterized the three central narratives emerging from this dataset as: (1) Mr. Guo and Steve Bannon are colluding against the PRC; (2) Mr. Guo is a discredited liar; and (3) Mr. Guo is immoral and a rapist. Dr. Jake Wallis et al., "Retweeting Through the Great Firewall: A persistent and undeterred threat actor," Australian Strategic Policy Institute, Report No. 33/2020, at 38-41 (hereinafter "Retweeting").[22]

- The Stanford Internet Observatory also analyzed the activity from January 2018 to April 17, 2020, of the 23,750 Twitter accounts taken down by the platform in June 2020 for spreading disinformation. Of the 348,608 tweets, the overwhelming majority (78.8%) of which were in Chinese, tweets about Mr. Guo made up the second largest topic in the dataset, after the Hong Kong protests. The study found that "[a]s with the prior 2019 takedown, the campaign targeting Guo was sustained across the timeline of the operation." Carly Miller et al., "Sockpuppets Spin COVID Yarns: An Analysis of PRC-Attributed June 2020 Twitter takedown," Stanford Internet Observatory (June 17, 2020), at 16.[23]

In addition to Twitter, the campaign made extensive use of Facebook and YouTube to target Mr. Guo as well as his supporters, often posting videos about Mr. Guo from YouTube on Facebook and then layering comments onto the posts. *Bai* Complaint ¶¶ 93-108. To take just one example, a post in mid-September 2021 featured a video about Mr. Guo with the caption (in Chinese) "brags and cheats every day." Within the next thirty minutes, a series of comments appeared in both Chinese and English, describing Mr. Guo as "a real liar" and "a consummate swindler," and asking "Why isn't he in jail? What is the government doing?" *Id.* at 98.

---

[21] In June 2020, Twitter announced the takedown of 23,750 core accounts that it determined were part of a coordinated effort by China to spread disinformation, along with 150,000 additional accounts dedicated to amplifying the disinformation campaign through retweets and likes. Kate Cooper, "Twitter Removes Chinese Disinformation Campaign," *New York Times*, June 11, 2020, https://www.nytimes.com/2020/06/11/technology/twitter-chinese-misinformation.html.

[22] The full report is available at https://www.aspi.org.au/report/retweeting-through-great-firewall/.

[23] The full report is available at https://purl.stanford.edu/zf032rd0838.

22

### 4. *Interference with Mr. Guo's Social Media Accounts*

Not content with posting content to harass and discredit Mr. Guo, the Chinese government also actively sought to disrupt Mr. Guo's own social media accounts. In April 2017, Mr. Guo's Facebook and Twitter accounts were briefly suspended, raising concerns about Chinese government pressure. The U.S.-China Economic and Security Review Commission ("UCESRC") heard testimony in September 2017 that Chinese government targeting of Mr. Guo's Twitter account was ongoing. Ex. 4 at 471. The U.S. Department of Justice likewise recognized in the *Bai* Complaint the PRC's efforts to "pressur[e] U.S. social media companies to remove [Guo] and U.S.-based associates of [Guo] from social media platforms." Ex. 2 ¶ 89.

Mr. Guo's social media accounts were indeed suspended shortly before China's 19th National Congress commenced on October 18, 2017. On October 17, 2017, it was reported that YouTube, in response to an allegation of harassment by an unidentified complainant, removed one of Mr. Guo's videos and suspended him from posting any new live-stream videos for 90 days. Bill Gertz, "YouTube Suspends Account of Chinese Dissident," *The Washington Free Beacon*, October 17, 2017, https://freebeacon.com/national-security/youtube-suspends-account-chinese-dissident/.[24]

The YouTube suspension came on the heels of restrictions on Mr. Guo's Facebook account. *Id.* In testimony before the U.S. Senate Judiciary Committee, Subcommittee on Crime and Counterterrorism, during a hearing on April 9, 2025, the former Director of Global Public Policy at Facebook testified that Facebook had indeed acted at the direct behest of the CCP when it took down Mr. Guo's Facebook profile in April 2017 and subsequently banned him permanently from

---

[24] Gertz also reported in the same article that according to "a U.S. official," the Chinese case underlying the INTERPOL red notice against Guo was "political and not legal."

Facebook in September 2017. *See* Cristiano Lima-Strong, "Transcript: Former Exec Sarah Wynn-Williams Testifies on Facebook's Courtship of China," *Tech Policy Press*, April 9, 2025.[25]

### 5. *Hacking Into Computer Systems of Mr. Guo's Lawyers*

On September 5, 2017, Mr. Guo filed an application for asylum with the U.S. Department of Homeland Security based on his fear of retribution from the CCP for his exposure of political corruption. PSR ¶ 136. One week later, on September 12, 2017, the computer system of the law firm that filed the application, Clark Hill PLC, was hacked.[26] The hacker stole, at a minimum, Mr. Guo's asylum application and supporting affidavit, which together contained substantial confidential and sensitive information about the reasons Mr. Guo feared retribution by the CCP should he return to China.

A week after the hack, the law firm abruptly terminated its representation of Mr. Guo. Then, beginning around September 23, 2017, Mr. Guo's personal information and confidential portions of his asylum application and affidavit began to appear on Twitter, causing reputational harm and putting Mr. Guo, his family, and his employees at risk.

### 6. *Weaponizing the Civil Legal System With a False Rape Lawsuit*

On September 11, 2017, a former employee of Mr. Guo filed a civil complaint against him in New York State court falsely alleging that he had raped her on multiple occasions and effectively held her captive for nearly three years, even though Mr. Guo himself had not even been in the

---

[25] Video of the full hearing is available at https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress.

[26] ███████████████████████████████████

United States for three years at that time.[27] The initial complaint did not allege when the supposed sexual assaults occurred – not which year, month, day, or even season – but did make a point at the outset of lodging unrelated allegations against Mr. Guo, namely, that his public persona as a Chinese dissident was crafted for the purpose of obtaining political support for asylum, and that he had a "checkered past rife with allegations of economic fraud." Ex. 8 ¶¶ 17, 18 (Complaint in *Rui Ma v. Guo Wengui et al.*).

Not long after the civil complaint was filed, organized demonstrations against Mr. Guo began to take place outside his Manhattan apartment building. Demonstrators lined up in formation and held uniform preprinted signs calling Mr. Guo a rapist and a liar and urging him to leave the United States. Images of these protests subsequently appeared in tweets from CCP-linked Twitter accounts. *See* "Retweeting" at 39-40. Consistent with the *Ma* case complaint, these demonstrations and online dissemination of related photos had all the markings of being coordinated by the CCP.

### G. *The CCP's Targeting of Mr. Guo Converges with the Conduct in this Case*

In this context, where Mr. Guo had become a prominent public critic of the CCP, millions of Chinese individuals in China and abroad found resonance and hope in his messages, and the CCP was waging a fierce campaign to discredit, silence, and repatriate Mr. Guo, the events giving rise to the charges in this case took shape. The CCP itself was an active participant in shaping these events.

One key element underlying this prosecution was the relationship that Mr. Guo developed with Steve Bannon beginning in late 2017. After Mr. Bannon, a staunch believer that China

---

[27] The case is *Rui Ma v. Guo Wengui et al.*, Sup Ct, NY County, Sept. 11, 2017, Index No. 158140/2017). An interlocutory appeal of a 2023 order entered in the matter remains pending in the Appellate Division, where plaintiff – who returned to China shortly after filing the complaint – now appears to be unrepresented.

represented the greatest long-term threat to the United States,[28] was forced out of his White House role as an advisor to then-President Trump, a shared acquaintance introduced him to Mr. Guo.[29] The mutual disdain Mr. Guo and Mr. Bannon had for the Chinese government led to a natural alliance.[30]

Mr. Guo engaged Bannon as a paid consultant in January 2018. In November 2018, following considerable planning throughout the year (Tr. 469-70), the two announced the launch of the Rule of Law Foundation ("ROLF"). The Rule of Law Foundation, and accompanying Rule of Law Society ("ROLS") were nonprofit organizations focused on promoting democracy and the rule of law in China, in tandem with Mr. Guo's Whistleblower Movement. On June 4, 2020, Mr. Bannon and Mr. Guo announced creation of the New Federal State of China ("NFSC").[31]

Meanwhile, the PRC government seized additional Guo family assets in late October 2018,[32] and the 912 Project actively continued to publicly discredit Mr. Guo. In January 2018 the

---

[28] *See* https://www.nytimes.com/2017/09/08/us/politics/steve-bannon-china-trump.html.

[29] Mr. Guo had been scheduled to be interviewed by journalist Bill Gertz at the Hudson Institute in Washington, D.C., on October 4, 2017, but the event was abruptly postponed in the wake of a cyberattack that the Institute traced to Shanghai. *See* https://www.wsj.com/articles/chinese-governments-battle-against-fugitive-guo-wengui-spills-into-washington-1507260255; https://www.hudson.org/node/41042. Gertz thereafter connected Bannon with Mr. Guo.

[30] *See* https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html.

[31] ███████████████████████████████████████████████████████████████

[32] The Government has characterized the October 2018 asset seizure as the motive for Mr. Guo's creation of the Rule of Law entities and later other G-Series entities – namely, as vehicles through which he could defraud followers and enrich himself after being stripped of assets (*see* Tr. 5959) – but considerable trial testimony contradicted that theory, including testimony from Government witness Karen Maistrello, who stated that Mr. Bannon was actively involved *throughout* 2018 in planning for the launch of the Rule of Law organizations. Tr. 469-70.

26

912 Group created a Twitter account specifically to "like" other derogatory Tweets about Mr. Guo. *Bai* Complaint ¶ 105.

For  example, one Tweet in Chinese stated, "I would like to ask all netizens not to be exploited by the media controlled by rumors, gossip, and the rapist, plague ghost [Guo Wengui]! Plague ghost [Guo Wengui] is the biggest 'national thief' on the Internet. Spreading rhetoric on the Internet every day, using netizens to satisfy his own desires, plague ghost [Guo Wengui]'s crimes are too numerous to mention." *Id.*

As the ASPI and Stanford studies confirmed, *tens of thousands* of Twitter accounts were engaged in coordinated anti-Guo messaging throughout 2018 and beyond, including targeting Mr. Guo's work with Bannon. The 912 Group also used Facebook to attack Mr. Guo's credibility, with one account posting at least nine times in November and December 2018, often referring to Mr. Guo as a "big liar." *Id.* ¶ 104. The Facebook activity was pointed in its criticism and ongoing for years, *see id* ¶¶ 94-103, as was 912 Group activity on YouTube. *Id.* ¶¶ 106-108.

Given the disruption to Mr. Guo's own social media accounts, as well as the popularity of his broadcasts, creation of his own online media platform was a logical and feasible step for Mr. Guo. To that end, GTV Media was established in April 2020 by Saraca Media Group, Inc., a Guo family entity, and the GTV private placement was announced later that month. Tr. 4542. The private placement raised hundreds of millions of dollars from thousands of investors.

The Farm Loan program began shortly thereafter, in June 2020, to create additional opportunities for small-scale supporters of the Movement to contribute to its operations and eventually obtain shares in GTV.[33] For those who contributed to the Farm Loan program, the

---

[33] As addressed by defense counsel during trial, the time horizon for conversion had not elapsed by the time of Mr. Guo's arrest. *See, e.g.* Tr. 6038.

contributions demonstrated a meaningful degree of commitment to the Movement and its volunteering and broadcast activities. It was important to Mr. Guo that owners of shares in GTV have a genuine commitment to the Movement given the powerful forces in play trying to undermine him.

G Club, which officially launched in October 2020, similarly provided a way for individuals to support the Movement, find fellowship with like-minded people, and enjoy the benefits that G Club offered, such as discounts on G Fashion. Thousands of individuals purchased G Club memberships for fees ranging from $10,000 (for a Tier 1 membership) to $50,000 (for a Tier 5 membership).

Finally, the Himalaya Exchange ("HEX"), a cryptocurrency ecosystem, enabled customers to purchase two types of tokens, Himalaya dollar ("HDO") and Himalaya Coin ("HCN"). HDO was a stablecoin, pegged 1:1 to the U.S. dollar and backed by reserves, and HCN was a token with a floating value. Potential customers had access to separate whitepapers about HDO and HCN on the HEX website in both English and Chinese. Customers could purchase HDO with fiat currency and HCN with HDO. HEX proved to be extremely popular, issuing hundreds of millions of dollars in HDO, and with active trading of HCN leading to significant increases in value. HEX, and its accompanying app, Himalaya Pay (H Pay), were widely used up until HEX was shut down following the jury verdict in this case.

During the same period of time that these entities were active, the CCP was assiduously continuing its online campaign to discredit Mr. Guo through the 912 Project while also taking increasingly aggressive measures within China to undermine support of Mr. Guo. These measures included interrogations, threats, criminal prosecutions, coerced statements of regret, coerced filing

of false complaints with U.S. authorities and media outlets in connection with the entities, and even templates for a social media smear campaign.

During trial, Government witness Ya Li testified that the CCP called her parents in China and asked them to tell her to cease her activities with the Whistleblower Movement because they threatened national security. Tr. 1535. According to Li, the CCP called other relatives as well, trying to locate her, and her parents warned her not to return to China because she would be arrested. *Id.* Also during trial, defense witness Jianhu Yi testified that in October 2020, after he had invested in GTV, two plainclothes MSS officers took him from his workplace in Shanghai to a separate location where three officers interrogated him for 11 hours during which he was not free to leave. Tr. 5042-46. Officers confiscated his phone and told him he was facing three to five years' imprisonment for investing in an organization hostile to the Chinese government. Tr. 5048-53. They asked him about family members in China, made sure he understood that he could not hide from them, and tried to persuade him to cooperate. Tr. 5050-51

Yi testified to five subsequent meetings with these officers between October 2020 and January 2021. During the second meeting, officers took his GTV stock certificates and told him he would lose all his money because the investments were bogus. Tr. 5052. During the third meeting, they told him to file a lawsuit against Mr. Guo. Tr. 5053. During the fourth meeting, they forced him to write a letter seeking to withdraw his investments in GTV, G Dollar, and G Club, and to send photos of the letters to the police. Tr. 5054-55.

During the fifth meeting, they told Yi they would provide him with a lawyer, forced him to document all of his investments, and provided him with email addresses for sending complaints. Tr. 5055-56. During the sixth meeting, they required Yi to bring his computer with a VPN installed so he could show them the false complaints he had been forced to file. Tr. 5056. Defense Exhibit

29

60704, admitted at trial and attached hereto as Exhibit 9, is a copy of the (false) complaint that Yi filed with the FBI. Tr. 5057.

Yi also filed false complaints with the New York State Attorney General, the *New York Times*, and the *Wall Street Journal*, all to protect his family. Tr. 5058-59. The lawyer the Chinese government provided to Yi did in fact file a lawsuit against Mr. Guo on behalf of Yi, without Yi's authorization. Tr. 5066.

Yi's testimony is recounted here in some detail not simply to illustrate the lengths to which the CCP has gone to undermine Mr. Guo and lay the groundwork for precisely the type of charges in this case, but also because it is entirely consistent with the experiences recounted in unsolicited statements defense counsel has received from multiple other sources, many of whom provided documentary evidence in support.

One such source, Wansheng Cheng, whom undersigned counsel interviewed and whose Declaration is attached hereto as Exhibit 3, described a similar series of interrogations by MSS officers who ultimately forced him to file false complaints about his G-Series investments. The interrogations took place from January 2021 to May 2021, with officers continuing to contact him through November 2021. Ex. 3 ¶¶ 19-46. Terrified that he might be imprisoned or more seriously harmed, Sheng at one point privately swore out a "non-suicide declaration," which he shared only with close friends and family, as a precaution and testament. *Id.* ¶ 28 & Ex. A.

Sheng provided counsel with photographs of the original Chinese language instructions the officers provided to him. *See id.* ¶ 37 & Ex. B (with English translations). These documents provide instructions for filing complaints with the FBI – citing the same website officers had Yi use to file his false complaint, https://ic3.gov – as well as with the New York State Attorney General's Office, the SEC, and JPMorgan Chase Bank. *Id.* Further mirroring Yi's testimony, the

30

site encouraged contacting mainstream media such as the *New York Times* and the *Wall Street Journal*, and provided a mobile phone number, email address, and Twitter handle for the *Wall Street Journal* reporter covering Mr. Guo and his "suspicious" activities. *Id.*[34]

Not surprisingly, the SEC began investigating the GTV securities offerings, including offerings through Voice of Guo Media and the marketing of opportunities to invest in what were then referred to as G-Coins and G-Dollars, in or around July 2020. GTV Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc., cooperated with the investigation, which resulted in settlement of a *civil* administrative proceeding based on failures to register the offerings, which did not qualify for registration exemptions. *See* Ex. 10 (*In re GTV Media Group, Inc. et al.*, Order, Admin. Proc. File No. 3-20537 (Sept. 13, 2021)).

As part of the settlement, the parties agreed to disgorgement of $486,745,063, along with $17,688,365 in prejudgment interest and $35,000,000 in civil penalties. As evidenced at trial, the SEC thereafter established a Fair Fund to return funds to investors, each of whom received approximately 92% of their initial investment after administrative fee deductions. *See* Tr. 708, 1358, 2377.[35]

---

[34] In addition to coercing him to file false complaints, Cheng reported that one of the MSS officers sent him a handwritten template of "smear campaign" content for him to post online in order to disparage and discredit Mr. Guo. A photo of the handwritten Chinese-language template, along with a typed version and English translation, are attached to Cheng's declaration. *See* Ex. 3 ¶ 43 & Ex. C.

[35] On March 15, 2023, the date of Mr. Guo's arrest, the SEC filed a civil complaint against Mr. Guo and others alleging fraud in connection with the GTV private placement, farm loans, and G Club memberships. *SEC v. Ho Wan Kwok et al.*, No. 23-CV-2200-PGG (SDNY, Mar. 15, 2023). The case has been stayed and remains pending. As discussed below, the jury acquitted Mr. Guo of wire fraud and securities fraud in connection with the GTV private placement.

**H.** *Political Conditions in the United States Set the Stage for a New Administration to Turn Against Mr. Guo*

Mr. Guo's close association with Steven Bannon, as well as his creation of the GTV platform, collided with domestic politics in the United States during the run-up to the 2020 presidential election. The path to Mr. Guo's prosecution proceeded from there.

Bannon served for a time on the board of the Rule of Law Society, and was also listed in the GTV offering documents as a member of GTV's Board. He had come under scrutiny by the Southern District of New York for his unrelated "We Build the Wall" crowdfunding campaign not long after he and Mr. Guo announced formation of the Rule of Law entities in November 2018. That investigation came to fruition in August 2020, when Mr. Bannon was arrested in dramatic fashion while aboard the Lady May yacht with Mr. Guo. News coverage during that time, informed by government sources, touted investigations of their affiliated undertakings, [36] and SEC subpoenas issued to GTV Media and Saraca in July 2020 sought information about ROLS and ROLF as well as about the GTV private placement.

On October 24, 2020, a GTV user posted salacious videos of Hunter Biden on the platform, sparking a national media firestorm just days before the presidential election. Mr. Guo did not insist that the posts be removed, and he found himself engulfed in the ensuing political maelstrom. That only intensified after Joseph Biden prevailed in the 2020 election, Mr. Guo publicly supported efforts to overturn the election results, and Hunter Biden sought retribution for disclosure of the videos.

---

[36] *See, e.g.*, Aruna Viswanatha, et al., "FBI Probes Chinese Exile, Including Work With Former Trump Aide Steve Bannon," *Wall Street Journal*, July 8, 20202 (http://bit.ly/4oPRpiB); Brian Spegele, et al., "Fundraising at Company Tied to Steve Bannon and Guo wengui Faces Probe," *Wall Street Jonrnal*, Aug. 19, 2020 (https://bit.ly/47QV6yD).

In February 2023, *Mother Jones* reported that Hunter Biden's counsel had recently sent a series of letters asking state and federal agencies, including the Department of Justice, to launch investigations into alleged crimes by people thought to have played a role in distributing material from Hunter Biden's laptop.[37] The article specifically mentioned Mr. Guo. Two days later, the same magazine reported that Hunter Biden had threatened to sue Mr. Guo as well as Bannon in connection with disclosure of material from the laptop.[38]

Mr. Guo was arrested the following month, on March 15, 2023. The central allegation against him in the initial indictment concerned the private placement for the GTV platform on the which the Hunter Biden videos were initially posted. The Government added a RICO conspiracy count in its second superseding indictment filed on January 3, 2024 (ECF No. 215), and renamed the alleged RICO enterprise as the "G Enterprise" in a third superseding indictment filed on April 24, 2024 (ECF No. 307).

Mr. Guo proceeded to trial in late May 2024. Steve Bannon's name and image were placed before the jury more than one hundred times during the seven-week proceedings. On July 16, 2024, the jury found Mr. Guo not guilty of wire fraud and securities fraud in connection with the GTV private placement (Counts Five and Six), and not guilty of engaging in an unlawful money transaction (Count Twelve). The jury found Mr. Guo guilty of racketeering conspiracy (Count One), conspiracy to commit wire fraud or bank fraud (Count Two), conspiracy to commit money laundering (Count Three), conspiracy to commit securities fraud (Count Four), substantive wire

---

[37] Dan Friedman, "Why Twitter Was Right to Suppress (Some of) the Material From Hunter's Laptop," *Mother Jones*, Feb. 8, 2023 (http://bit.ly/3PqUgle).

[38] Dan Friedman, "Hunter Biden Threatens to Sue Steve Bannon and Exiled Mogul Guo Wengui," *Mother Jones*, Feb. 10, 2023 (https://bit.ly/4uxd0Ql).

fraud and securities fraud in connection with the Farm Loan program and G Club (Counts Seven through Ten), and wire fraud in connection with the Himalaya Exchange (Count Eleven).

There was no special verdict form and the jury made no determination as to any "loss amount."

## I. *Affirmative Disavowal of Victim Status by Investors and Customers*

Notwithstanding the conviction, thousands of individuals who invested in G-Series entities have expressly stated that they were not victimized by Mr. Guo. As defense counsel has previously detailed (*see* ECF No. 799 at 5-9), these individuals include: (a) more than 6,500 HEX customers who have filed petitions pursuant to 21 U.S.C. § 853(n) for return of seized funds (*see, e.g.,* ECF Nos. 759, 761 at 3); (b) hundreds of investors in the Hamilton Opportunity Fund SPC who have also filed § 853(n) petitions (*see, e.g.,* ECF Nos. 674, 756); (c) investors who have filed individual § 853(n) petitions or contacted the Government disclaiming victim status, such as those disclosed in discovery at USAO_00112534-USAO_00112564; and (d) several hundred individuals who have written directly to defense counsel. As previously noted, we will provide the Court with a separate submission under seal containing a representative sample of the more than 1,000 statements sent to defense counsel disclaiming victim status.

To be clear, we present these perspectives not to challenge the jury verdict, which we accept for purposes of sentencing, but to place that verdict in its proper context and frame its limitations. While the Government presented testimony from a handful of witnesses who identified themselves as victims and claimed that certain statements by Mr. Guo were material to their decisions to send money for particular investments or undertakings, thousands of other individuals sent funds to the same entities for reasons unrelated to the alleged misrepresentations that formed the core of the Government's case. For these individuals the alleged misrepresentations simply were not material.

34

In addition, while discussed to some extent *supra,* Part I.G, the CCP campaign of intimidation and coerced complaints against Mr. Guo was considerably more extensive than presented at trial or in this memo. As it calls into question the validity of any written victim statements that may have been provided to the Government or other law enforcement authorities, it is important at this stage of the case for the Court to have a more complete picture of its scope.

To date, defense counsel has received approximately 60 statements that reference CCP interrogation, threats, or detention of the writer based on alleged interactions with Mr. Guo or entities involved in this case. At least five of these individuals indicated that they were forced to file false complaints against Mr. Guo, and many more note that they have left China and either seek or have been granted asylum elsewhere.

Testimony offered during trial and accounts provided in statements to defense counsel provide insight into the value that the G-Series entities provided to investors and customers. These narratives are voluminous, credible, and directly at odds with the Government's theory that certain alleged misrepresentations materially induced individuals to part with their money.

Defense witness Jianhu Yi, for instance, testified that he purchased a G Club memberhip because of the camaraderie, friendship, and services G Club offered. Tr. 5072. Countless others who purchased G Club memberships have written to defense counsel expressing similar sentiments. Wansheng Cheng, for instance, states that he purchased a G Club membership in April 2022 for $20,000, funded from proceeds of trading activity on the Himalaya Exchange. He writes: "I see G|Club as a recognition of identity – a group where people share the same values. Initially I understand that we would [be] provided discounts on certain purchases, then later benefits would be added, which I expected would take some time. I have not tried to get my G|Club membership money back and I am not interested in getting it back." Ex. 3 ¶16.

35

Defense witness Lai Dai, who invested $155,000 in GTV, bought a $50,000 G Club membership, and invested $300,000 in HEX, testified that his decision to get a G Club membership had nothing to do with any connection between G Club membership and receiving GTV shares (Tr. 5248). To the contrary, he described G Club as a "symbol of identity" (Tr. 5244) that enabled him to join with people who share a common faith and enjoy other benefits (Tr. 5244-45). With respect to HEX, Dai testified that it was immaterial to him whether HDO was backed by gold (Tr. 5379) or whether it was currently on the Ethereum blockchain (Tr. 5252). He found value in HEX regardless of these features, as did thousands of other HEX customers who maintain that they were not victims of any fraud perpetrated by Mr. Guo. The same is true for countless contributors to the Farm Loan program, G Club members, and GTV investors.

Mr. Dai submitted a sentencing letter to the Court that provides further perspective on this aspect of the case:

> The matter most directly related to me in this case concerns my own investment experience involving companies commonly referred to as the "G-Series." In this context, I participated as an ordinary investor with some relevant experience. My investment decision was not based on blind trust but on my own investment experience and commercial judgment. After reviewing relevant materials and business plans, I made my decision while fully understanding that any investment inherently involves risk. Based on the information available to me, the relevant businesses did exist and were operating.

> Among the investors I personally know, I have not personally encountered anyone who considers themselves to have been harmed. Of course, I understand that different individuals may have had different experience, and there may be circumstances of which I am not aware. However, based on my own observations, my experience does not fully align with certain narratives presented during the trial. I do not intend to deny others' experiences; I simply wish to explain that, as a real participant in these investments, my own experiences and judgment formed the context in which I made my decision.

Ex. 11.

36

Given the scale of support Mr. Guo has amassed, he clearly is not alone in his fervor to bring democratic reform to China. The power of the Chinese government to control the affairs of its people and target its enemies, whether they live in China or elsewhere, is overwhelming. This fact is central to the appeal of the Whistleblower Movement and the G-Series entities to an untold number of individuals.\ To cite just one of the hundreds of letters counsel has received addressing the considerations deemed significant by investors and customers:

> Mr. Guo repeatedly and emphatically warned all of his followers that opposing the CCP is the most dangering undertaking in the world, and that anyone with the slightest hesitation, or anyone motivated by money or fame, should not participate.

> This was the consensus among all committed participants: our investments were not financial speculation – they were votes. Votes to dismantle the CCP, to end the human tragedies it has inflicted for generations, to secure the safety of our own lives and the lives of our children. I chose to invest, chose to follow Mr. Guo, and chose to join the New Federal State of China. I regard thse as the most important and most correct decisions of my life.

Ex. 12 (Statement of ███████████, March 10, 2026).

Indeed, many HEX customers made a considerable profit from their HCN purchases. Wansheng Cheng, for instance, states that he put approximately $22,000 in HEX, which he used in part to purchase 3,000 HCN. Ex. 3 ¶ 15. At its peak, his HCN holdings had a value of approximately $160,000, and it was the funds he maintained in HEX that he used to support himself during his nearly two-year journey from China to the United States following multiple interrogations. *Id.*

As discussed in more detail in the following section, in these unusual circumstances where there has been an extensive disavowal of victim status, and where the jury made no finding as to the scope of any fraud for which they returned a guilty verdict, the Government's calculation of a $1.3 billion fraud in this case is entirely speculative, and no "loss amount" can be assessed absent a *Fatico* hearing.

37

## II.    DETERMINING A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING

### A.  *Applicable Sentencing Considerations*

Pursuant to the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's interpretation of *Booker* in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), this Court's sentencing decision must be based upon the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

The Court is no longer required to impose a sentence within the range specified by the Guidelines. *Crosby*, 397 F.3d at 111. Indeed, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* The Supreme Court has confirmed that "[t]he Guidelines are not only *not mandatory* on sentencing courts, they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2010) (emphasis in original).

Also, as Justice Scalia noted in his dissent from the "remedial" opinion in *United States v. Booker,* 543 U.S. 220 (2005):[t]he statute provides no order of priority among all those factors, but since the three just mentioned [§§ 3553(a)(2)(A), (B) & (C)] are the fundamental criteria governing penology, the statute – absent the mandate of § 3553(b)(1) – authorizes the judge to apply his own perceptions of just punishment, deterrence, and protection of the public even when

38

these differ from the perceptions of the Commission members who drew up the Guidelines. 543

U.S. at 304-305 (Scalia, J., *dissenting in part*).

The factors the Court must consider in determining how to satisfy the enumerated goals of

sentencing are the nature and circumstances of the offense, the history and characteristics of the

defendant, the kinds of sentences available, the sentencing range set forth in the U.S. Sentencing

Guidelines, any policy statements issued by the Sentencing Commission, the need to avoid

unwarranted sentencing disparities, and the need to provide restitution to any victims of the

offense. 18 U.S.C. § 3553(a).[39]

The Second Circuit has reaffirmed these sentencing principles while emphasizing that "[a]

sentencing judge has very wide latitude to decide the proper degree of punishment for an individual

offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en

banc*). Sentencing must be undertaken with due consideration of the particular circumstances of

any given case and the background and character of any particular defendant. As the Supreme

Court observed in *Koon v. United States*, 518 U.S. 81 (1996), and reaffirmed in *Gall v. United

States*, 552 U.S. 38, 128 S.Ct. 586, 598 (2007):

> It has been uniform and constant in the federal judicial tradition for the sentencing
> judge to consider every convicted person as an individual and every case as a
> unique study in the human failings that sometimes mitigate, sometimes magnify,
> the crime and the punishment to ensue.

518 U.S. at 113; *see also United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("in every case,

the district court 'must make an individualized assessment' of the appropriate sentence 'based on

---

[39] The Government, per its letter to the Court dated January 9, 2026, does not seek restitution in this case given its impracticability, and instead seeks to return funds to investors and customers through a remission process. *See* ECF No. 785 at 4-5. Mr. Guo concurs. ECF No. 789 at 3.

the facts presented' and the factors detailed in § 3553(a)") (quoting *Gall v. United States*, 128 S.Ct. 586, 597 (2007)).

### B. *The Sentencing Guidelines Calculations in the PSR are in Error*

The Presentence Report ("PSR") at ¶¶ 112-123 calculates an advisory Guidelines sentencing offense level of 43 for Mr. Guo. The PSR calculates the Guidelines as follows:

| PSR ¶ | Description | USSG Section | Levels |
|---|---|---|---|
| ¶ 114 | Base offense level | 2B1.1(a)(1) | 7 |
| ¶ 114 | Loss in excess of $550,000,000 | 2B1.1 (b)(1)(P) | +30 |
| ¶ 114 | 10 or more victims | 2B1.1(b)(2)(A)(i) | +2 |
| ¶ 114 | Acted on behalf of a charitable, educational, religious, or political organization, or a government agency, etc. | 2B1.1(b)(9)(A)-(C) | +2 |
| ¶ 114 | Relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials, and the offense otherwise involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting sophisticated means | 2B1.1(b)(10)(A) & (C) | +2 |
| ¶ 114 | Derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense | 2B1.1(b)(17) | +2 |
| **¶ 114** | **Total Base Offense Level** | | **45** |
| ¶ 115 | Conviction under 18 U.S.C. 1956(h) | 2S1.1(b)(2)(B) | +2 |
| ¶ 116 | 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering | 2S1.1(b)(3) | +2 |
| ¶ 118 | Organizer or leader of criminal activity that involved 5 or more participants | 3B1.1(a) | +4 |
| ¶ 119 | Obstruction of justice | 3C1.1 | +2 |
| **¶ 120** | **Adjusted Offense Level (Subtotal)** | | **55** |
| **¶ 123** | **TOTAL OFFENSE LEVEL** | | **43** |

The PSR recommends a sentence of 300 months' imprisonment (*see* PSR Sentencing Recommendation at 58), a term that, in our respectful view, exceeds what is sufficient in this case and far greater than necessary for this Criminal History Category I defendant.

### 1. No "Loss Amount" Exists in this Case

As a threshold matter, Mr. Guo continues to maintain that he is not guilty of any of the charges, and intends to appeal his conviction on numerous grounds. Thus, Mr. Guo does not concede that there is *any* "loss amount."

Nor did the trial establish any "loss amount." The jury was not asked to determine the amount of loss or the identity of any alleged "victims." In fact, the Court's jury charge was explicit in that regard. For example, regarding the wire fraud counts, the Court instructed the jury that it did *not* "need to find that the defendant profited from the fraud." Tr. 5793. Similarly, regarding securities fraud, the jury was instructed that it was *not* required to find "that anyone suffered any loss or that the Defendant realized any gain." Tr. 5802.

However, because the sentencing stage requires acceptance of the jury's verdict solely for the abstract calculation of a Guidelines level, this submission engages in that evaluation as an essential component of sentencing.

Among the important reasons why the recommendation is far too high is that the Guidelines calculation is erroneous, principally because the $1.3 billion "loss amount" alleged is unsupported for a number of reasons:  (1)  the Government based the $1.3 billion figure solely on inflows to the G-Series entities and not on any rigorious tracing analysis or other evidence establishing loss; (2) the "loss amount" improperly includes acquitted conduct, which violates both the Sixth Amendment and a 2024 Guidelines amendment; (3) the "loss amount" erroneously includes funds from individuals who explicitly deny they were defrauded; and (4)  the "loss amount" incorrectly includes amounts that should be excluded based on other controlling legal principles, such as offsets for redemptions, refunds, residual value, or double counting.

While forfeiture and "loss amount" are doctrinally distinct, many of the issues relevant to forfeiture, and discussed in Mr. Guo's submissions with respect to forfeiture (ECF Nos. 799, 804), apply equally to "loss amount."

This case is extremely unusual, if not unique, in that it does not present a categorical fraud in which every investor claims that misrepresentations were material to the specific investor's decision to contribute or that every investor actually was defrauded. Instead, unlike nearly all fraud cases, many investors in and customers of the G-Series entities affirmatively deny that they are, in fact, *victims* of any fraud by Mr. Guo.

As discussed below, in some instances the investors assert that they have suffered economically from *the Government's* conduct, and not Mr. Guo's. [40] This novel posture, considering the number and variety of investors who have disclaimed victim status, requires scrutiny and precision before any "loss amount" can be determined.

If the Government attempts to establish *any* "loss amount," or disputes any of the grounds set forth herein for reducing the "loss amount," Mr. Guo respectfully submits that a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), is necessary to adjudicate this essential component of his Guidelines calculation. Due Process and the Sixth Amendment do not permit any less.

### a.  *The Fundamental Legal Framework for Calculating "Loss Amount"*

The Government argues that the "loss" for Guidelines purposes is $1.3 billion dollars, and the PSR, adopts that number. PSR ¶¶ 109, 113-14. The PSR's and the Government's arithmetic,

---

[40] This is not a sufficiency argument, or an attempt to relitigate the jury's verdict, which Mr. Guo acknowledges for purposes of sentencing, and for the Guidelines calculation within that context. Rather, it involves examining the elements of that calculation.

however, based solely on the amount of money flowing into the various entities set forth in GX Z-26, is fundamentally and fatally flawed.

Analysis commences with the proposition stated in *Rita v. United States,* 551 U.S. 338, 351 (2007), that the district court should begin all sentencing proceedings by correctly calculating the applicable sentencing range. An incorrect calculation interferes with the court's duty to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing as outlined in 18 U.S.C. § 3553(a)(2).

U.S.S.G. § 2B1.1 and related case law provide guidance into the sometimes complex task of accurately determining loss amount in financial crimes such as fraud. Note A to the Loss Table in § 2B1.1(b)(1) provides that "loss" is "the greater of actual loss or intended loss." Note C(i) defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and Note C(ii) defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict[,]" including "intended pecuniary harm that would have been impossible or unlikely to occur."[41] The Government bears the burden of proving loss by a preponderance of the evidence. *United States v. Desimone,* 119 F.3d 217, 228 (2d Cir. 1997).

In arriving at its loss determination, the Court does not need to be exact. However, its estimate of loss must still be a *reasonable* estimate, *based upon the evidence*. U.S.S.G. § 2B1.1, comment. n. B. Additional legal principles that apply to specific aspects of loss are detailed below.

### b. *The Government's Reliance Solely on Inflows to the G-Series Entities is Fundamentally Flawed*

The Government asks the Court to adopt a $1.3 billion loss figure based almost entirely on its trial exhibit GX Z-26,[42] a summary chart derived from analysis performed by the Government's

---

[41] Note C(iii) defines "pecuniary harm" as monetary harm or harm that is "readily measurable in money."

[42] GX Z-26 was received in evidence at Tr. 4329. A copy is attached hereto as Ex. 13.

retained expert, Paul Hinton of the Brattle Group. The problem with this reliance is that the Brattle Group's work consisted of little more than processing bank records and related documents provided by the Government in order to chart the transactions of interest to the Government. The work product, culminating in GX Z-26, was not an independent forensic analysis of investor harm, but a presentation of prosecutorial selections.

Hinton testified that GX Z-26 essentially "was the result of summing up the value of all the transactions in the database, so that's all the transactions we processed and categorized according to the categories that the government gave us for GTV, Farms, G Club, and Himalaya." Tr. 4330. The Brattle Group had no independent understanding of the sources of funds for these entities, nor did it have any discretion to deviate from instructions provided by the Government about defining sources of funds. Tr. 4331. It just added up the inflows to each of the categories defined by the Government, based on sources defined by the Government. Tr. 4331, 4355-56.

Hinton was not asked to do any tracing in connection with his analysis. Tr. 4356, 4430. He did not do any detailed flow-of-fund analysis, and thus could not testify how much flowed through specific accounts. Tr. 4458. He did not perform any transaction-level analysis of alleged fraud proceeds, or conduct an investor-level accounting of deposits, withdrawals, redemptions, or value received.

There was no evidence, moreover, of the source of "other inflows" of funds that went into one key account belonging to ACA Capital, a Guo family entity, at First Abu Dhabi Bank. This in turn meant that there was no evidence at trial from which any finder of fact could reliably conclude that any alleged fraud proceeds – much less $77 million or $110 million in supposed proceeds attributed to the Farm Loans – ever flowed out of that account. *See* Tr. 4428-30; Ex. 13 at 8. The source of those outflows remains entirely unproven.

The Government's attribution of $517 million in loss to the Himalaya Exchange is similarly impaired. That $517 million figure aggregates gross account inflows without distinguishing investor deposits from secondary-market trading activity or transfers to other categories such as G Club. The Government's calculation reflects transactional volume only, not any pecuniary loss.

### c. *The Government's "Loss Amount" Improperty Includes Amounts Attributable to Conduct for which Mr. Guo was Acquitted*

As detailed *infra*, at Part II.B.2, the Fifth and Sixth Amendments, as well as a 2024 Guidelines amendment, preclude inclusion of funds attributable to conduct for which Mr. Guo was acquitted in any "loss amount" calculation. That alone excludes the $411 million that the Government attributes to GTV from inclusion in any "loss amount."

### d. *The Government's "Loss Amount" Fails to Account for the Volume of Purported "Victims" Who Affirmatively Deny They Are "Victims"*

As noted above, this case is markedly dissimilar from the vast majority of fraud cases because a significant number of investors and customers have come forward to attest that they were *not* deprived of money or property by fraud. In turn, their investments do not qualify for inclusion in any "loss amount." Among that diverse group are some individuals and entities that have filed petitions pursuant to 21 U.S.C. §853(n).

The impact of those investors' position is illustrated in *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), in which the defendants, two lawyers, were accused of deceiving investors they represented for the purpose of purchasing apartments available during a co-op conversion. The alleged fraud consisted of securing for themselves certain opportunities to purchase other apartments in the building without informing the investors.[43]

As the Court summarized in *Miller*, while

---

[43] A more extended discussion of *Miller* is included in Mr. Guo's letter regarding forfeiture, ECF No. 799, at 4-5.

the government contend[ed] that [defendants] diverted to their own benefit property intended for the Group; to wit, the Apartments and the profits resulting from their resale . . . the government does not surmount the obstacle posed by [the witness's] uncontradicted testimony, which undercuts any understanding as to this specific agency relationship that precluded parallel investments by [defendants] in [the apartment complex's] apartments in general, or the eight Apartments in particular.

*Id*. at 1020.

Thus, while materiality ordinarily would be subject to a "reasonable person" standard, *Miller* establishes otherwise when – as here with so many of the investors and customers – the purported "victim" specifically and affirmatively disavows that element, thereby vitiating the allegations of fraud with respect to that particular person's investment. By definition, if an investor is not a victim of fraud, then that investor's investment funds cannot be considered part of any "loss amount."

As a result, any "loss amount" herein is diminished in material respects by several categories of persons (or entities) who expressly disavow any status as "victims" of any fraud:

(1)     the 6,512 persons maintaining cryptocurrency accounts with the Himalaya Exchange. *See, e.g.*, Response of 6.512 Claimants as Members of the Himalaya Exchange and Their Counsel to Individual Motions, October 22, 2025 (ECF No. 761) ("*HEX Response*");

(2)     the 324 investors in the Hamilton Opportunity Fund SPC ("Hamilton"). *See, e.g.*, Supplemental Third-Party Petition to Adjudicate Petitioner's Interest in Forfeited Property and to Amend the Prelminary Order of Forfeiture Entered as to Defendant Miles Guo, October 22, 2025 (ECF No. 756) ("*Hamilton Supplemental*"); Third-party Petition to Adjudicate Petitioner's Interest in Forfeited Property and to Amend the Preliminary Order of Forfeiture, April 7, 2025 (ECF No. 674) ("*Hamilton Petition*");

(3)     the investors who wrote the Government disclaiming victim status, provided in part as discovery at USAO_00112534-USAO_00112564;

(4)     the investors who have contacted defense counsel disclaiming victim status.

Added to that significant number are those purported victims whom the Government has failed to identify, but who may be included in any of those four classes of *non*-victims. Given the abundant proof that a considerable number of supposed "victims" reject that classification, it is

46

incumbent upon the Government to establish any "loss amount" with sufficient specificity to permit the Court to conclude with the requisite confidence that there is any "loss amount" *at all*. That evaluation requires a *Fatico* hearing because Mr. Guo disputes the contention that there is any loss.

### i. *The Himalaya Exchange*

The Himalaya Exchange ("HEX") was a viable and popular cryptocurrency exchange, used by its investors and users to exchange and make money, which they did. HEX was a commercially active platform and trading HCN was a source of income and profit for many investors who traded in HCN.

Government witness Wei Chen testified that she invested more than $500,000 in HCN even after the SEC had seized the money she invested in GTV. Tr. 4499, 4634. In fact, she sold and purchased HCN in numerous transactions, sometimes on a seconardary market. Tr. 4671-72. YOU ARE HERE – add cites from JK The sworn declaration of Wansheng Cheng also documents active – and highly profitable – use of HEX. *See* Ex. 3. Cheng invested approximately $22,000 in HEX, purchased 3,000 HCN when they became available, and saw his investment swell to a value of $160,000 at its peak. *Id.* ¶ 15. He relied on HDO and HCN while living in Turkey and Thailand after fleeing China in the wake of persistent CCP interrogations, as well as during further travel en route to the United States, selling 500 HCN at $19 each just prior to HEX being shut down on July 16, 2024 after the jury verdict in this case. *Id.* ¶¶ 15, 17, 48. Cheng does not view himself as a victim of any fraud perpetrated by Mr. Guo. *Id.* ¶ 55.

Also, through their counsel, 6,512 members of the Himalaya Exchange – representing approximately two-thirds of Himalaya Exchange members, *see HEX Response*, at 3 – have objected to forfeiture of their accounts (and the assets within them) as proceeds of any fraud – a position that vitiates any claim that it can be considered part of any "loss amount." As the *HEX*

47

*Response* states, "[m]any investors in the Himalaya Exchange (HEX) have expressed frustration at being labeled as victims." *Id*. at 2.

Elaborating, the HEX petitioners explicitly reject the Government's theory of prosecution: "[t]he criminal case against [Mr. Guo and his co-defendants] rests on the assertion that they defrauded investors, yet many of these investors insist they were not defrauded and reject the victim label." *Id*.

In addition, these HEX petitioners effectively concur with Mr. Guo that "[p]rosecutors have not identified specific victims or quantified their alleged losses, which is critical in this context to substantiate fraud claims." *Id*. at 3.

These HEX petitioners, moreover, maintain that the only economic harm they suffered was due to the Government's inappropriate intervention: "[t]here is no evidence in the record showing that HEX investors suffered losses, except for reputational and financial harm to HEX caused by the government's actions . . ." in seizing petitioners' accounts. *Id*. at 2.

Indeed, "[t]here is consensus among investors that they were not defrauded by [Guo], Je, or Wang, but rather harmed by the U.S. government's actions, which seized their investments." *Id*. at 3. As they put it, it was the Government that "ironically caused the very financial harm it aimed to prevent." *Id*.

HCN, moreover, retained value, so investors who held (and continue to hold) HCN were provided assets that retain value, which, as explained *infra*, at Part II.B.1.e, must be discounted from any "loss amount." Upon information and belief, the total number of HCN issued was 930,222,521, and the closing price the day the Government seized certain HEX accounts (September 18, 2022) was $25.30 USD. Subsequently, the closing price on March 15, 2023, the

day of Mr. Guo's arrest, was $17.81 USD, and $19.77 USD on July 16, 2024, the day Mr. Guo was convicted.

The following day, July 17, 2024, trading in HCN was paused, and the closing price was $13.77. *See* October 22, 2025, Updated and Final Entry of Appearance for Counsel's 6,512 Clients, at 2 (ECF No. 759). Bradford L. Geyer, Esq., the attorney for those 6,512 HCN account-holders, states in that filing that his cllients hold 433,992,619.55 HCN, estimating that *the Government's* interference in the HEX, disrupting the HCN market, has cost his clients $5,976,051,078. *Id*.

It is respectfully submitted that the closing price on the day of seizure should be utilized to determine the value of HCN holdings – $23,534,604,000 – because that event clearly affected the price (a decrease of 30%) more than Mr. Guo's arrest (since the price had recovered somewhat – by 11% – by the time of conviction).

That $23.5 *billion* capitalization of HCN eclipses by nearly 20 times the Government's alleged "loss amount." Even at the capitalization figures for the date of arrest, or the date of conviction, or the next day when trading ceased, the remaining value surpasses the alleged "loss amount" by orders of magnitude.

### ii.    *The Hamilton Petitioners*

The Hamilton petitioners advance a similar position. The Hamilton petitioners' property – totaling $89,992,861.75, *see Hamilton Petition* at 8 ¶ 20 – "is comprised solely of funds that were lawfully invested by the M&A Fund Investors, has no nexus to the conduct charged in either criminal case, and therefore lies wholly outside the scope of property subject to forfeiture in either proceeding." *Hamilton* Supplemental at 4-5; *see also id*. ¶ 19 n.6 (investment was "legitimate" and "regulated"); *id.* ¶ 25 (petitioner invested their own funds in a vehicle "wholly unrelated to the fraudulent schemes alleged in the [Indictment]").

49

Thus, the Hamilton investment cannot constitute a "loss." The Hamilton petitioners' funds were not used to commit any of the crimes charged, *id*. ¶ 26, and "there is no evidence that any of the funds in Account 2770 belonged to Defendant Guo or were ever commingled with tainted funds, such that the Government can argue that seizing Petitioner's Property satisfies the requirements of 21 U.S.C. § 853." *Id*. ¶ 22; *see also id*. ¶ 27 ("[t]here is no evidence that Defendant Guo ever used, directed, or exercised any control over these funds, nor that the funds were part of, or the proceeds of, any of Defendant Guo's criminal activities").

Moreover, like the HEX petitioners, the Hamilton petitioners' position is that they have suffered financially not because of Mr. Guo, but because of the Government's interference in the transaction for which the Hamilton petitioners' funds were invested. As the *Hamilton Supplement* recounts, "[w]hile the transaction did close (Guo Trial, 6/17/2024, 2794:25-2795:4), [the seller] never received the investment money because '[t]he money was seized in transit by the U.S. Marshals.' Guo Trial, 6/17/2024, 2796:14-23." *Id*. ¶ 26 (footnote omitted).[44]

### iii.    *The Investors Who Have Either Filed Petitions Pursuant to 21 U.S.C. §853(n) or Written the Government Disclaiming Victim Status*

The public electronic docket in this case includes petitions pursuant to 21 U.S.C. §853(n) from at least 126 individuals (not including the Hamilton or Himalaya Exchange petitioners) involving claims totaling more than $28 million. Those petitions, and that total, casts further doubt on the "loss amount" alleged by the Government.

---

[44] A substantial part of the alleged losses testified to by the Government's witnesses resulted not from actual losses but from the Government's seizure of funds in accounts related to GTV, G Club, G Bank and Himalaya Exchange. For example, as a result of the GTV seizure, GTV investors lost at least 8% of their GTV investments, as 8% was the amount retained by the SEC before distribution pursuant to the SEC's Fair Fund. Regarding the Farm Loans, payment on those loans was not due until December 1, 2023, and had not been due and payable at the time of seizure by the Government.

In addition, discovery produced by the Government included at least one folder containing 31 emails setting forth complaints by investors that Mr. Guo *did not* defraud them. That folder is denominated by Bates numbers USAO_00112534-USAO_00112564. Most of the emails do not specify the amount of each individual investment, so a total is impossible to derive from them. However, those communications should further diminish the potential "loss amount" total even if the amount of investment cannot be quantified.

### iv.    *The Investors Who Have Contacted Defense Counsel*

Defense counsel continues to receive communications from persons who identify themselves as investors in or customers of G-Series entities, and who deny they were victimized. The total number of such statements received currently exceeds 1,000.

Also, some have informed counsel that to the extent they lodged complaints to U.S. or other authorities regarding Mr. Guo, those complaints were coerced by – and in some instances wholly authored by – agents of the CCP. *See, e.g.,* Ex. 3 ¶¶ 36-42 (Declaration of Wansheng Cheng). Many of the correspondents suffered interrogations and detention by PRC authorities in the process.[45]

### v.    *The Unknown Number of Investors Who Deny They Are Victims*

The discussion above raises the question of how many more persons do not consider themselves victims of any fraud by Mr. Guo. Some may be unaware of the sentencing (and attendant forfeiture or remission) proceedings; some may be afraid to come forward because they fear retribution from the CCP if they contradict the CCP's narrative that has endeavored to

---

[45] As noted *supra*, Part I n. 8, Mr. Guo plans to provide the Court with a supplemental submission containing represetantive samples of the hundreds of statements received by defense counsel, including those recounting CCP interrogation and coercion.

discredit Mr. Guo for political reasons; and some may not have the means or sophistication to understand their rights pursuant to 21 U.S.C. §853(n).

Regardless the reason, it is logical and reasonable to conclude that in this most unusual case the categories listed above do not represent *all* of the persons in each category (except, perhaps, for the Hamilton investors). That "unknown" renders it even more imperative that the Government be held to its burden to prove the existence of any "loss amount."

At the very least, the amounts attributable to those investors in the categories described above must be eliminated from consideration of any "loss amount." In turn, given the unprecedented nature of the circumstances in this case, the Government must establish with precision any "loss amount" attributable to specific investors. Again, that requires a *Fatico* hearing.[46]

### e. *The Government Fails to Account for Other Offsets That Substantially Reduce Any "Loss Amount"*

The $1.3 billion "loss amount" alleged by the Government also fails to account for specific offsets that further reduce any "loss amount." Applicable deductions include redemptions, refunds, settlement payments, the residual value of property that investors retain, and double-counting of certain funds.

For example, upon information and belief, HEX made at least $200,000,000 in customer redemptions, possibly as much as $268,000,000.. Also, the approximately $487,000,000 obtained

---

[46] Unsurprisingly, for this same reason, the Government has chosen not to seek restitution in the case under the Mandatory Victim Restitution Act but rather proceed by way of remission and § 853(n) petitions. The simple and undeniable fact is that the Government cannot identify alleged "victims," or any corresponding "loss amount," with the requisite precision needed to establish "loss."

by the SEC in connection with the GTV private placement settlement (also excluded because it is based on acquitted conduct) must be deducted from any loss calculation.

In addition, the Government's erroneous "inflow" theory caused it to double-count money that was subject to account-to-account transfers, which the Government appears never to have attempted to parse. As discussed, Government witness Paul Hinton, who conducted certain financial analysis for the prosecution, testified that he was not asked to, and did not, perform a detailed flow-of-fund analysis, rendering him unable to provide an accounting of funds moving from one entity or account to another entity or account. Tr. 4458.

So, for instance, if an investor used money in a HEX account to buy items through G Club, the Government included in its loss calculations *the same money* when it was deposited in that investor's HEX account, and then again when the same money was transferred to G Club to pay for whatever merchandise the investor had purchased.

G Club provides a specific example. While G Club may have issued $255 million worth of memberships, not all memberships were paid with fiat currency. G Club accepted HDO and HCN as payment methods for G Club membership. Approximately $70 million worth of G Club memberships were issued in exchange for HDO, and approximately $25 million of memberships were issued in exchange for HCN.

Accordingly, any amount that the Government lists for money sent by individuals to G Club is incorrect by approximately $70 million in HDO equivalent purchases as well as at least $25 million in HCN equivalent purchases which G Club accepted as payment for memberships. Therefore, at least $95 million in account-to-account transfers has been double-counted, and must be removed from any "loss amount."

Moreover, other refunds to investors also must be deducted, including G Club refunds totaling at least $1 million. These various payments and accounting errors also require a *Fatico* hearing to resolve.

### f. A **Fatico** *Hearing is Consistent with the Court's Rulings, and the Government's Position, That in this Case "Speculation" and "Extrapolation" Based on Limited Investor Experience is Inappropriate*

Mr. Guo's position is wholly consistent with, and reinforced by, the position advanced by the Government and endorsed by the Court during trial with respect to the inferences properly drawn from the experience of a limited quantum of investors.

When addressing the plausible inference to be drawn from the testimony of  defense witness Jianhu Yi, who had testified regarding the pressure and threat campaign that the CCP exerted on him, the Government argued strenuously, repetitively, and at length, that the jury should not be allowed to infer from Mr. Yi that what happened to him happened to others.

AUSA Finkel argued that the Court should not allow argument (and inference) about CCP threats to others because "[t]hat is using speculation to make an argument." Tr. 5568. The Court sustained the Government's objection, ruling that "[y]ou cannot generalize from Mr. Yi's individual experience. You cannot speculate that he represents the majority of the complainants, because we have no evidence about any complainants other than the ones who testified here*."* Tr. 5571. The Court continued, "[d]on't invite them to speculate." Tr. 5571.

When the issue was raised again, AUSA Horton reiterated the argument that the defense could not argue an inference beyond Mr. Yi's own personal circumstances. AUSA Horton contended that "what they're [the defense] trying to do, and what your Honor ruled on, is to take a single victim's, a single investor's testimony limited to his own experience – and I can go through specific cites in the transcript to show how limited it was – and extrapolate from that to really

54

unfortunate innuendo against the victim witnesses in the case, and your Honor said it was a very hard no, and that was absolutely correct." Tr. 5852.

Again the Court agreed with the Government's limiting principle, ruling that the defense could not "generalize and speculate based on the testimony in this case, and so I adhere to my decision." Tr. 5855.   Yet, that is precisely what the Government seeks to do now at sentencing regarding the "loss amount": "speculate" and "extrapolate" that thousands of investors were defrauded, *even though thousands have expressly disclaimed that status*.

The Government cannot have it both ways. If speculation, extrapolation, and conjecture were not allowed with respect to the inference sought by the defense, it cannot be allowed to support the unsubstantiated inference proffered by the Government with respect to the "loss amount." The same principles must apply here to any "loss amount," particularly when it could account for such an outsized portion of Mr. Guo's ultimate Guidelines level.

Indeed,  at this stage, the defense position  is far less speculative, and far more credible and reliable given the thousands of investors who have come forward and filed petitions pursuant to 18 U.S.C. § 853(n), and vigorously rejected the claim that they were lied to at all, or that they were induced to make their investments by materially false statements.

### 2.  *Additonal Legal Doctrine Supports a Finding of No Loss*

In addition to the analysis above, there are four independent aspects of the legal doctrine that combine to eliminate any loss in this case:

(1)    acquitted conduct – in this case, the conduct alleged in Counts 5, 6, and 12 – cannot be considered for purposes of computing the "loss amount";

(2)    contrary to the Government's incorrect position that the "loss amount" is indivisible, the Court must evaluate what portions of the funds invested are properly categorized as part of the "loss amount";

(3)    Second Circuit jurisprudence establishes that a 30-point sentencing enhancement – the amount both the PSR and the Government calculate – requires an enhanced

55

burden of proof, borne by the Government, beyond mere preponderance of the evidence; and

(4)    many courts have correctly, and for a variety of reasons, concluded that the Guidelines' focus on "loss amount" is disproportionate, not based on empirical evidence or experience, and not a valid metric for sentencing purposes.

In the event the Government maintains that there is some "loss amount," Mr. Guo respectfully demands a *Fatico* hearing at which the Government bears the burden of proof to provide *evidence* in an attempt to establish exactly what that loss is.

### a.  *Acquitted Conduct Cannot Be Used to Calculate Mr. Guo's Guidelines Level*

Mr. Guo was acquitted of Counts 5, which charged wire fraud in violation of 18 U.S.C. §1343 and § 2 and Count 6, which charged securities fraud in violation of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2, in relation to the GTV Private Placement investment, and Count 12, which charged engaging in and attempting to engage in an unlawful monetary transaction, in violation of 18 U.S.C. § 1957 and § 2. Yet the Government, and the PSR, would include the conduct for which Mr. Guo was acquitted in arriving at the "loss amount" for purposes of determining the Guidelines offense level.

While the Government relies on *United States v. Watts*, 519 U.S. 148, 151 (1997) (*per curiam*), for the proposition that "the Court may consider at sentencing the GTV-related facts from the trial record[,]" (*See* ECF No. 716 at 3), in the nearly 30 years since *Watts* was decided the landscape regarding the treatment of acquitted conduct at sentencing has changed considerably.

That is true specifically with respect to the Sentencing Guidelines, as reflected in Guidelines amendments as well as doubts expressed by Supreme Court Justices, both of which manifest appreciation of the constitutional dissonance in sentencing a defendant for conduct for which the jury acquitted.

56

### i.    *Using Acquitted Conduct Here Would Violate Mr. Guo's Fifth and Sixth Amendment Rights*

As the Supreme Court reaffirmed in *Blakely v. Washington*, 542 U.S. 296 (2004), the Sixth Amendment's right to trial by jury is among the most "fundamental reservation[s] of power in our constitutional structure." *Id*. at 305-306. In addition, that Sixth Amendment right operates in combination with the Fifth Amendment's right to due process, which "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

In that context, *Watts* decided a narrow issue – "the interaction of the Guidelines with the Double Jeopardy Clause," *United States v. Booker*, 543 U.S. 220, 240 n.4 (2005) – and did not endorse ""sentencing enhancement[s]" that exceed the punishment "authorized by the jury verdict." *Id*. at 240. *See also United States v. White*, 551 F.3d 381, 392 (6th Cir. 2008) (Merritt, J., *dissenting*) ("reliance on *Watts* as authority for enhancements based on acquitted conduct is obviously a mistake"); *People v. Beck*, 939 N.W.2d 213, 224 (Mich. 2019) (finding "*Watts* unhelpful in resolving whether the use of acquitted conduct at sentencing violates due process" because "*Watts* addressed only a double-jeopardy challenge").

Also, the Court in *Booker* specifically cautioned against overreliance on *Watts*, which "did not even have the benefit of full briefing or oral argument." *Booker*, 543 U.S. at 240 n.4; *see also, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1, 12 n.4 (1991) (summary dispositions do "not enjoy the full precedential value of a case argued on the merits").

Nor are the Sixth Amendment and Due Process implications limited to sentences that exceed the statutory maximum because of facts determined by the sentencing court. As Justice Scalia pointed out in his concurring opinion in *Rita*, neither *Booker* nor prior precedent foreclosed "as-applied Sixth Amendment challenges to sentences that would not have been upheld as

57

reasonable on the facts encompassed by the jury verdict or guilty plea." *Rita*, 551 U.S. at 375 (Scalia, J., joined by Thomas, J., *concurring in part and concurring in the judgment*); *see also White*, 551 F.3d at 389 (Merritt, J., *dissenting*) ("it is clear that the post-*Booker* development of reasonableness review has opened the door for Sixth Amendment challenges" even "to sentences within the statutory range authorized by the jury's verdict").

Systemic considerations also mandate exclusion of acquitted conduct at sentencing. In the common-law era, juries deliberately, albeit "indirectly checked" the "severity of sentences" by issuing "what today we would call verdicts of guilty to lesser included offenses." *Jones v. United States*, 526 U.S. 227, 245 (1999). For example, juries would "often * * * bring in larceny to be under the value of twelvepence" to avoid a mandatory death sentence." 4 William Blackstone, Commentaries 248.

No doubt juries continue to perform that function, even in a non-capital context in which they are not aware of the specific sentences available (although often they are through cross-examination of cooperating witnesses). Disregarding a jury's conscious choice by re-introducing acquitted conduct at sentencing "undermines respect for the law and the jury system." *United States v. Settles*, 530 F.3d 920, 924 (D.C. Cir. 2008) (Kavanaugh, J.). *See also United States v. Canania*, 532 F.3d 764, 778 n.4 (8th Cir. 2008) (Bright, J., *concurring*) (quoting letter from juror to judge calling the use of acquitted conduct a "tragedy" that denigrates "our contribution as jurors").

### ii.    *The Impact of the 2024 Sentencing Guidelines Amendment*

The U.S. Sentencing Commission, as part of its 2024 amendments cycle, revised §1B1.3 to add subsection (c), eliminating acquitted conduct from consideration in calculating a U.S.

Sentencing    Guidelines    range.    *See*    Amendment    826,    available    at https://www.ussc.gov/guidelines/amendment/826.

Amendment 826, effective November 1, 2024, provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. §1B1.3(c).

As Judge Carlton W. Reeves, Chair of the Sentencing Commission declared in announcing the amendment, "Not guilty means not guilty[.]"Sentencing Commission News Release, "Commission Votes Unanimously to Pass Package of Reforms Including Limit on Use of Acquitted Conduct in Sentencing Guidelines," April 17, 2024, available at https://www.ussc.gov/about/news/press-releases/april-17-2024.

When the Amendment was first circulated, Judge Reeves remarked that "'[w]hat conduct judges can consider when using the guidelines' is . . . 'of foundational and of fundamental importance to the operation of the entire federal justice system.'" *Id.* (quoting Prof. Douglas Berman), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-andmeetings/20230405/20230405_transcript.pdf.

Nor can any other offense of conviction in this case serve as a "backdoor" for including acquitted conduct in any "loss amount" calculation. Not only would that completely defeat the purpose of the 2024 Guidelines amendment, and subvert *Booker* and the Sixth and Fifth Amendments, but it would be contrary to longstanding doctrine that when a jury convicts on a multi-object conspiracy, the insufficiency of evidence with respect to one prong does not warrant reversal of a conviction because the jury is presumed to have returned its verdict on the objective for which there was sufficient evidence. *Griffin v. United States*, 502 U.S. 46 (1992).

59

Here, *Griffin* counsels that the jury, finding the GTV prong insufficient, would not have considered it sufficient for the other counts in which (for purposes of sentencing analysis only) it determined that other objects were sufficient to justify a conviction. That applies not only to conspiracy, but also to the RICO charges, which require predicate acts of racketeering. The jury's acquittal precludes any conclusion that the GTV private placement could have served as a RICO predicate.

Similarly, regarding money laundering, the jury could not have considered money raised through GTV to constitute the predicate "specified unlawful activity" required by 18 U.S.C. §1956(h), because the jury *acquitted* on the GTV-related counts.

Accordingly, inclusion of the acquitted conduct in this case in any "loss amount" calculation is precluded by the Fifth and Sixth Amendments.

### iii.    *The Reservations Expressed by Supreme Court Justices Regarding Use of Acquitted Conduct for Sentencing Purposes*

The Sentencing Commission's action also removed an obstacle to the Supreme Court's consideration of the issue. *See McClinton v. United States*, 600 U.S. ___, 143 S. Ct. 2400 (2023) (Sotomayor, J., *statement respecting the denial of certiorari*); *id*. at 2403 (Kavanaugh, J., joined by Gorsuch, J., and Barrett, J., *statement respecting the denial of certiorari*).

In *McClinton*, in denying the petition for *certiorari*, both Justice Sotomayor and Justice Kavanaugh expressed interest in revisiting *Watts*. For example, Justice Sotomayor pointed out that "[a]s many jurists have noted, the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence[] raises important questions that go to the fairness and perceived fairness of the criminal justice system." 143 S. Ct. at 2401  (citing  *Jones v. United States*, 574 U.S. 948, 949-950 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., *dissenting from denial of certiorari*)); *United States v. Bell*, 808 F. 3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J.,

60

*concurring in denial of reh'g en banc*); *United States v. Sabillon-Umana*, 772 F. 3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.); *Watts*, 519 U. S. at 170 (Kennedy, J., *dissenting*) (footnotes omitted).[47]

Justice Sotomayor also explained that "[t]he Court's denial of certiorari today should not be misinterpreted[]" because "[t]he Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted-conduct sentencing in the coming year." 143 S. Ct. at 2403. Justice Sotomayor added that "[i]f the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented." *Id; see also United States v. Coleman*, 138 F.4th 489, 511-512 (7th Cir.), *cert. denied*, 146 S. Ct. 275 (2025) ("In denying the petition for certiorari in *McClinton*, four Supreme Court justices encouraged the United States Sentencing Commission to resolve questions around the use of acquitted conduct at sentencing . . . Ten months later, the Sentencing Commission heeded the call").[48]

Justice Sotomayor elaborated that "[t]here are also concerns about procedural fairness and accuracy when the State gets a second bite at the apple with evidence that did not convince the

---

[47] In *Bell*, Justice Kavanaugh, while serving on the District of Columbia Court of Appeals, recognized that "[a]llowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial." 808 F. 3d at 928 (Kavanaugh, J., *concurring in denial of reh'g en banc*). Likewise, in *United States v. Sabillon-Umana*, Justice Gorsuch, while serving on the U.S. Court of Appeals for the Tenth Circuit, questioned the assumption "that a district judge may either decrease or increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent." 772 F. 3d at 1331.

[48] Justice Kavanaugh echoed that "the Court's denial of certiorari today should not be misinterpreted[,]" 143 S. Ct. at 2403, adding that "[t]he use of acquitted conduct to alter a defendant's Sentencing Guidelines range raises important questions." *Id.* Again, though, Justice Kavanaugh noted that because "the Sentencing Commission is currently considering the issue[,]" it would be "appropriate for this Court to wait for the Sentencing Commission's determination before the Court decides whether to grant *certiorari* in a case involving the use of acquitted conduct." *Id.*

jury coupled with a lower standard of proof." 143 S. Ct. at 2402. Justice Sotomayor also noted that

"[m]any other state and federal judges have questioned the practice." 143 S. Ct. at 2401 n.2

(citations omitted).

> In addition, in *McClinton*, Justice Sotomayor observed that
>
> acquitted-conduct sentencing also raises questions about the public's perception
> that justice is being done, a concern that is vital to the legitimacy of the criminal
> justice system. Various jurists have observed that the woman on the street would
> be quite taken aback to learn about this practice. *See, e.g., United States v. Canania*,
> 532 F. 3d 764, 778 (8th Cir. 2008) (Bright, J., *concurring*).

*Id.*, at 2402-03.

*Watts*, of course, was decided without the benefit of these subsequent developments.[49]

Amendment 826 reflects the resolution of the issue and clearly prohibits the use of acquitted

conduct in determing the applicable Guidelines level. *See United States v. Johnson*, 754 F. Supp.3d

305, 312-13 (E.D.N.Y. 2024) (noting, in light of the promulgation of Amendment 826, and citing

*McClinton*, that "[t]he practice of sentencing defendants based on acquitted conduct is now firmly

disfavored").

Here, in seeking to include the GTV Private Placement funds in the "loss amount" for

purposes of the Guidelines calculation, the Government attempts to circumvent not only both the

letter and spirit of Amendment 826, and the constitutional protections it vindicates, but also the

clear and consistent momentum undermining *Watts*.[50] Consequently, the acquitted conduct cannot

contribute to the "loss amount" determined for Guidelines purposes.

---

[49] Even *Watts* did not *mandate* consideration of acquitted conduct at sentencing; rather, it held only that there existed "no prohibition against considering . . . acquitted conduct[.]" 519 U.S. at 152-155.

[50] Even prior to *Watts* Judge Oakes noted in reluctant concurrence (bound by prevailing Circuit law) the incongruity of permitting acquitted conduct to contribute to a defendant's punishment:

> we hold that a person's sentence for crimes of which he has been convicted may
> be multiplied fourfold by taking into account conduct of which he has been

### b. *Specific Legal Principles Significantly Reduce the "Loss Amount" in this Case*

Several principles developed by the courts in assessing "loss amount" also apply here, and require a *Fatico* hearing. For example, in *United States v. Byors*, 586 F.3d 222 (2d Cir. 2009), the Court applied Application Note 3(E), which "provides that the loss should be reduced, or offset, by '[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected." 586 F.3d at 226 (quoting U.S.S.G. § 2B1.1 cmt. n. 3(E)(I)).

Consistent with that Application Note, the Court credited the amounts repaid to the victims. *Id.*; *see also United States v. Avenatti*, 2024 WL 4553810 at *2 (9th Cir. October 23, 2024) (Guidelines require sentencing courts to credit against loss the money defined in § 2B1.1 cmt. n.3(E)(I)).

However, the defendant in *Byors* also argued that other "amounts should not be counted towards the loss because investors received something of value in exchange for their money – according to Byors these investors received what they were promised." *Byors*, 586 F.3d at 226. The Court agreed in principle but noted that "[u]nlike the cases defendant relies upon, however, defendant's victims [in *Byors*] were left with nothing of value when the fraud was uncovered." *Id.*

Thus, the Court in *Byors* distinguished the circumstances from those in *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir.2008), in which, as the Court in *Byors* described, the Second Circuit ruled that "the District Court erred in calculating loss based on the total value investors paid for securities . . . noting that 'investors did obtain an interest in a company engaged in

---

acquitted. This is jurisprudence reminiscent of Alice in Wonderland. "Acquittal first, sentence afterwards."

*United States v. Frias*, 39 F.3d 391, 392-394 (2d Cir. 1994) (Oakes, J., *concurring*).

producing and distributing a motion picture' and that the securities likely had some 'actual value.'" 586 F.3d at 226.

Similarly, in *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008), the Court, analyzing an Application Note relating to the determination of "loss amount" in cases involving loan fraud, concluded that the "amended Note 7(b) [to U.S.S.G. § 2F1.1] gives the defendant credit for objective facts – payments prior to discovery of fraud and assets pledged to secure the loan – that might alter a loss calculation if based solely on face amounts of loan applications." *Id*. at 151; *see also United States v. Schneider*, 930 F.2d 555, 558–59 (7th Cir.1991) (describing it as "simple" but "irrational" to treat all frauds as equivalent to thefts, and opting instead to consider whether the defendant intended in fact to retain the face value of the amount he had obtained through the misrepresentation).[51]

In *Confredo*, the Court also discussed *United States v. Singh*, 390 F.3d 168 (2d Cir.2004), in which, according to the Court in *Confredo*,

> a doctor caused his office to submit to medicare and medicaid insurers bills that were higher than the fixed rates established by the Government for the services provided. *See id*. at 176-77, 193. The district court determined intended loss based on the combined total of the face value of the bills. *See id*. at 193. The defendant argued that he never intended to receive full reimbursement because he knew the rate schedules were carved in stone.

528 F.3d at 152. The Court in *Singh* went on to rule that the defendant ""should have a further opportunity on remand to show, if he can, that the total amount he expected to receive from the insurers was indeed less than the amounts he actually billed." 390 F.3d at 194; *see also Confredo*, 528 F.3d at 152.

---

[51] In *Confredo*, the Court noted that "[a]lthough the dispute concerns only one level of enhancement, the difference between the resulting maximums of the two arguably applicable ranges is 27 months." 528 F.3d at 149. Here, of course, the difference is significantly larger.

In *Avenatti*, which involved a 20-point "loss amount" enhancement, in addition to requiring credit for monies returned to the clients defrauded by defendant, a lawyer who pilfered case settlement funds, the Ninth Circuit also pointed out that "even if Avenatti acted lawfully, his clients would not have received the full settlement amounts." 2024 WL 4553810 at *1.

Consequently, "[b]y finding that Avenatti's victims 'lost' the full settlement value without accounting for Avenatti's fees and costs, the district court enhanced Avenatti's sentence based on pecuniary harm that did not occur, and did not 'result[ ] from [Avenatti's] offense.'" *Id*. (quoting U.S.S.G. §2B1.1 cmt. n.3(A)(I)). The Ninth Circuit concluded that "[s]uch services rendered to the victim must be deducted from the restitution owed."*Id.* at *2 (citing *United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020)).

The Court in *Avenatti* added that the over-inclusion in the "loss amount" "was contrary to the purpose of the loss enhancement, which is to ensure that a defendant's sentence is proportional to the harm he caused." *Id.* at *1 (citing § 2B1.1 cmt. Background).[52]

More recently, in the forfeiture context, in *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024), the Second Circuit expressed the same reservations with respect to blanket assertions of forfeiture based on a universe of transactions that were not uniformly fraudulent. In *Rainford*, the Government's position was based on a witness's statement that 40 percent of defendant's law firm's cases were of the "slip and fall" variety, but the Court determined that even that 40 percent should have been reduced by another 20 percent  because only 80 percent of those cases were fraudulent. Id. at 489.

---

[52]  In *Avenatti*, the Court also distinguished between "loss amount" and forfeiture. 2024 WL 4553810, at *2 (remanding and directing "the district court to account for the fair market value of Avenatti's legal services and costs in its 'actual loss' calculation, without any reliance on forfeiture").

Thus, the Court in *Rainford* vacated the forfeiture judgment in part because "even if the government's allegations about [the witness's] statements had been corroborated, the government arrived at the forfeiture amount by crediting only part of [that] statement." *Id.* As the Court stated, "[n]either the government nor the district court has explained why the initial forfeiture request of $1.6 million should be cut by 60 percent but the resulting $644,000 should not be cut by another 20 percent to account for slip-and-fall claims that were not fraudulent." *Id.*

In addition, in calculating forfeiture, the Court in *Rainford* declared that the "Government's word is not evidence." *Id.* Thus, in this case, the Government's assertions that "Guo then continued to defraud his followers with a series of interconnected schemes, including the GTV private placement in 2020," and that "the GTV placement was connected with and integral to the other arms of the G Enterprise," ECF No. 716 at 3, are neither evidentiary nor conclusive.

Nor are they substantiated. As a result, they are as unpersuasive for purposes of "loss amount" as they are for forfeiture. *See Rainford*, 110 F.4th at 489 (while a "district court may take 'general points of reference as a starting point for calculating the losses or gains,' [] an unsubstantiated government claim is not a 'point[ ] of reference'") (internal citation omitted).

All these factors – money returned to investors (including redemptions), the value of the investment an investor retained regardless of the fraud, the fair market value of fees, costs, and services, and whether sufficient evidence established that Mr. Guo intended to retain *all* of an investor's contribution – all serve to reduce the "loss amount" considerably in this case.

### c.  *Multi-Level Guidelines Enhancements Require a Higher Burden of Proof*

During the era prior to *United States v. Booker*, 543 U.S. 220 (2005), the Second Circuit, as a remedial measure designed to soften the impact of the mandatory Sentencing Guidelines, established a process through which sentencing courts could ensure that dramatic increases in a

defendant's offense level, imposed by either adjustments or inclusion of relevant conduct, could be alleviated by a secondary level of analysis that subjected the facts to a more demanding standard of proof. If those facts did not meet that standard, a downward departure (or, in the post-*Booker* era, a downward variance) from the Guidelines range would be appropriate.

In addressing the burden of proof issue in the pre-*Booker* environment, the Second Circuit several times grappled with the inexorable tension between a defendant's Due Process and Sixth Amendment rights at sentencing, and the preponderance of the evidence standard. For example, in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000), the Second Circuit clarified its various opinions on the issue, explaining that

> the enhancement of a sentence based upon a defendant's "relevant conduct," if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines.

*Id.* at 708.

The Court in *Cordoba-Murgas* cited and quoted from *United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996), which included adjustments within that framework:

> the preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range.

94 F.3d at 56; *see also United States v. Concepcion*, 983 F.2d 369, 390 (2d Cir. 1992) and 983 F.2d at 393-95 (Newman, J., *concurring*).

> Under such circumstances, the Court in *Gigante* instructed that in making its determination,the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond a reasonable doubt where appropriate.

94 F.3d at 56.

The Court in *Gigante* added, "[w]here a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly." *Id*. In *Cordoba-Murgas*, the Court similarly declared that "the factual finding by a preponderance of the evidence is a preliminary step susceptible to adjustment." 233 F.3d at 709. The Court also authorized downward departures when the appropriate standard of proof was not satisfied, *id.* at 708, and provided the following direction to sentencing courts after finding such enhancements or relevant conduct by a preponderance of the evidence:

> under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward from the scheduled adjustment by reason of the extraordinary combination of circumstances.

*Id.* at 708 (citing *United States v. Concepcion*, 983 F.2d at 389); *see also United States v. Allen*, 644 F. Supp.2d 422, 435 (S.D.N.Y. 2009) (footnote omitted).

Since *Booker*, that doctrine has not been disturbed. *See United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005) (citing both *Cordoba-Murgos* and *Gigante* in addressing whether acquitted conduct could be used in calculating a Guidelines range); *United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) (citing *Cordoba-Murgas* in holding that allegations in an indictment were by themselves *in*sufficient to justify an enhanced sentence).

Indeed, the *Cordoba-Murgas* doctrine was applied in *United States v. Allen*, 644 F. Supp.2d 422 (S.D.N.Y. 2009), in which the Court found certain relevant conduct by the preponderance standard, yet noted that "the Guidelines are not mandatory[,]" *id*. at 434 (footnote omitted), and that "were defendants to be sentenced in accordance with the Guidelines, a downward departure might be appropriate." *Id*. at 435.

68

In examining the conduct – which the Court concluded it had "no doubt that [it] in fact occurred," although adding that it was equally "skeptical that any rational jury could make this finding beyond a reasonable doubt," *id*. (footnote omitted) – the Court in *Allen* remarked that "[t]he situation in *Cordoba-Murgas* exactly parallels that of these defendants" because "[t]he related conduct increases their sentencing exposure *at least five-fold* for conduct proven only by a preponderance of the evidence." *Id*. at 435 (emphasis in original) (footnote omitted).

In addition, the Court in *Allen* reasoned that "[w]ere the Guidelines mandatory, and no downward departure available, this situation would present serious constitutional problems. Due process of law has little meaning if it does not protect citizens from such arbitrary exercises of power." *Id*. at 434.

The discretion *Cordoba-Murgas* and its successors in the post-*Booker* environment afford sentencing courts for the purpose of ameliorating disproportionate enhancements and/or relevant conduct has been amplified since *Booker* by the Guidelines' status as merely advisory, and the added consideration of § 3553(a)'s sentencing factors that are balanced against the Guidelines' severity. *See, e.g., United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008) (noting that question of standard of proof is less compelling because *Booker* makes *all* Guidelines findings "in the end, only advisory") ; *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) ("the discretion afforded district judges by *Booker* applies only to their consideration of a Guidelines range as one of the § 3553(a) factors *after* that range has been calculated").[53]

---

[53] The panel's statement in *Jones* that "[i]n light of this Court's continual application of the preponderance of the evidence standard, it is incorrect to construe the [] language [in *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997)] as authorizing the use of a higher standard of proof[,]" 531 F.3d at 176, which would appear to deprive the Court of discretion to follow *Cordoba-Murgas* and *Gigante*, are at best confusing and inconsistent. Neither *Cordoba-Murgas* nor *Gigante* has ever been overruled; indeed, the cases that reassert the preponderance standard – *i.e.*, *Vaughn*, and even *Jones* itself – all cite *Cordoba-Murgas* as authority while inexplicably

69

Consequently, it is respectfully submitted that the formulation in *Cordoba-Murgas* should be applied here to "loss amount.[54] Such a potential drastic increase in Mr. Guo's sentence – 30 points – requires attendant safeguards regarding the burden of proof in order to protect Mr. Guo's Fifth and Sixth Amendment rights.

Indeed, Due Process places constraints on the information a court can consider and/or rely upon, and what measure of reliability is required before it can do so. Here, the "loss amount" alleged by the Government fails to surpass any applicable burden of proof, and at the very least requires a *Fatico* hearing, with an appropriately exacting burden of proof. Due Process and the Sixth Amendment do not permit any less.

### d. *The 30-Point Enhancement Pursuant to § 2B1.1 Irrationally Influences Mr. Guo's Applicable Sentencing Guidelines Range*

Even if all the foregoing arguments did not eliminate the "loss amount," the extraordinary impact of the 30-point enhancement for loss amount pursuant to § 2B1.1 on Mr. Guo's applicable

---

ignoring the remainder of *Cordoba-Murgas*'s instruction to the District Court – namely, that it is at least permissible, and even appropriate, to calibrate the burden of proof proportionately with the effect a particular adjustment or set of facts exerts on a defendant's Guidelines level, and depart downward accordingly. In addition, the comment in *Jones* that the language in *Shonubi* was merely *dictum*, 531 F.3d at 176, is perplexing because the relevant passage in *Shonubi* declares "though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence." 103 F.3d at 1085.

[54] Nor does the opinion in *United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008), alter the analysis. In *Yannotti*, the jury convicted the defendant of RICO conspiracy but deadlocked on the substantive RICO count. *Id*. at 118. The jury also deadlocked on an alleged kidnaping conspiracy, *id*. at 119, and the Court made the unremarkable determination that it "could be factored into Yannotti's sentence as relevant conduct pursuant to §1B1.3." *Id*. at 128. The Court did not address *Cordoba-Murgas* or *Gigante*, or whether the effect of the relevant conduct could be moderated by imposition of a higher burden of proof and a downward departure, as those cases authorize.

Interestingly, too, in *Yannotti*, while the jury had marked on the verdict sheet "not proven" with respect to murders and attempted murders, *id*. at 118-19, apparently that conduct was *not* included in the Guidelines calculation or sentence as relevant conduct (but only the kidnaping conspiracy was in dispute). *Id*. at 127-28.

Guidelines range has, in similar cases, been rejected by courts because it is disproportionate, distorts the sentencing process, and merits amelioration by greater reliance on other § 3553(a) factors.

The Guidelines levels in financial fraud cases are driven principally by the "loss amount" adjustment. Yet Courts have criticized the rigid and arbitrary nature of the Guidelines in this context, recognizing the injustice "that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006), *aff'd* 301 Fed. App'x. 93 (2d Cir. 2008); *see also United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (describing "Sentencing Guidelines for white-collar crimes" as "a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("[t]he Guidelines place undue weight on the amount of loss involved in the fraud").

Scholars and commentators, too, have recognized the inordinate impact of "loss amount" on sentencing in fraud cases. *See, e.g.*, Derek R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentence Regime in White-Collar Criminal Case*, 59 Duke L.J. 1001, 1025 (2010) ("Guidelines fail to achieve justice in white-collar criminal cases. Their sentencing recommendations are irrationally high and, due to the Guidelines' overemphasis on the loss calculation, fail to accurately reflect a defendant's culpability"); Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008) ("since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too

71

high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of § 3553(a) that judges impose sentences 'sufficient but not greater than necessary' to comply with its objectives").

Indeed, other examples abound. In *United States v. Faibish*, Judge Vitaliano remarked that "the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table." Transcript of Sentencing Proceedings, *United States v. Faibish*, No. 12-CR-265 (E.D.N.Y., March 10, 2016) (ECF No. 271 at 23-27). In *Faibish* Judge Vitaliano sentenced a defendant convicted of fraud, with a Guidelines level of life, and with a "cap" of 80 years to a prison term of 63 months. *Id*. at 54; *see also* Robert J. Anello and Richard F. Albert, "Rise of ABA Task Force's 'Shadow Sentencing Guidelines,'" *New York Law Journal*, April 5, 2016, available at https://www.law.com/article/almID/1202754015602/ ("*Shadow Sentencing*") (noting that in *United States v. Litvak*, 3:13-CR-19 (D. Conn. July 23, 2014), Chief Judge Janet C. Hall sentenced a defendant to 24 months' imprisonment for securities fraud even though the Guidelines recommendation in the PSR was 108-135 months).[55]

---

[55] *See* Transcript of Sentencing Proceeding, *United States v. Litvak*, 3:13-CR-19 (D. Conn. July 23, 2014) (ECF No. 298 at 135-136, 141-47, 158). In *Litvak*, Judge Hall expressed the concern that the Guidelines "loss" table "overwhelms" all the other factors to be considered. As Judge Hall noted further, "I think 60 percent of the total offense is attributable to just sheer dollars without any regard for any other characteristics of the offense. Therefore, I don't find the Guidelines helpful at all." *Id.* at 142.

On appeal, Litvak's conviction was reversed in part, vacated in part and remanded. *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015). On remand, Litvak was retried and again convicted on the securities fraud count. On May 2, 2017, Judge Hall again sentenced Litvak, , to 24 months imprisonment. ECF No. 542.

Similarly, in *United States v. Ferguson*, 584 F. Supp.2d 447 (D. Conn. 2008), the Court imposed sentences on five defendants ranging from one-year-and-one-day to four years for their roles in a $500 million fraud, notwithstanding an advisory Guidelines range of life in prison.

In *United States v. Hundley*, 02-CR- 441 (LAP) (S.D.N.Y. 2005), four defendants were convicted at trial of conspiracy, bank fraud (involving a loss of approximately $100 million) and tax fraud (for evading approximately $29 million in taxes). Two of the defendants additionally were convicted of making false statements and one was convicted of perjury. Yet Judge Preska sentenced the defendants well below their Guidelines ranges. For example, the defendant convicted of making false statements, but not perjury, faced a Guidelines range of 78 to 97 months; he was sentenced to prison for one-year-and-one-day.

In *Adelson*, a case involving a conviction at trial for accounting fraud at a publicly traded company that resulted in a $260 million loss to shareholders, and in which the Court imposed a 42-month prison sentence despite a Guidelines Total Offense Level of 46 (with a range of 360 months to life imprisonment), Judge Rakoff elaborated on the absence of an underlying rationale for the Guidelines' fraud loss table:

> [a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective", tend to place great weight on putatively measurable quantities, such as weight of drugs in narcotics cases or *the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. See generally* Kate Stith & Jose Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

441 F.Supp.2d at 509 (emphasis added).[56]

---

[56] In addition, when, as here, as in many fraud cases, the "loss" amount is alleged to exceed $1 billion and additional enhancements are added, those enhancements necessarily overlap because enhancements already are baked into a high loss figure. *See United States v. Lauerson*, 362 F.3d 160 (2d Cir. 2004); *United States v. Lauerson*, 348 F.3d 329 (2d Cir. 2003); *United States v. Jackson*, 364 F.3d 22 (2d Cir. 2003)*. For instance, the PSR in this case includes a two-point

73

The absence of an empirical rationale for the dominance of the loss table, and/or the lack of an explanation "why it is appropriate to accord such huge weight to" the table, in sentencing in fraud cases has troubled courts. In *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), Judge Underhill, concurring, commented that "[t]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Id*. at 379 (Underhill, J., *concurring*); *see also United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider").

In fact, the loss Guidelines suffer from an original, fundamental, and material flaw that compromises its capacity to provide an empirical basis:  in calculating the "average" pre-Guidelines sentence for fraud cases, the Sentencing Commission included *only* sentences of imprisonment, and *excluded* all sentences of probation, thereby distorting the Guidelines not only in favor of imprisonment, but also in favor of longer terms of imprisonment. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements*, Table 1(a), p. 22, 34 (1987), at 22, 24 (referring to Table 1(a) at 27), available at https://bit.ly/3AON9fL.

---

Guidelines enhancement for more than ten victims, pursuant to § 2B1.1(b)(2)(A) (PSR ¶ 114), which is essentially automatic in modern financial fraud cases. In *United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010), *amended* 616 F.3d 174, 186 (2d Cir. 2010), the Court cautioned that Guidelines enhancements "that are all but inherent to the crime of conviction" can inappropriately and disproportionately increase a Guidelines level beyond the point of reasonableness, and that in such instances, because "adherence to the Guidelines" can lead to a result "fundamentally incompatible with § 3553(a)," a sentencing court could correct that imbalance through analysis of other § 3553(a) factors. 604 F.3d at 96. That is true with respect to the two-point "sophisticated money laundering" enhancement under § 2S1.1(b)(2)(B) (PSR ¶ 116) and the four-point enhancement for "organizer or leader of criminal activity that involved 5 or more participants" under § 3B1.1(a) (PSR ¶ 118).

That was no small omission, since in 1984 nearly 40% of all defendants were sentenced to straight probation. Due to that original bias in favor of imprisonment, "the Sentencing Commission's loss enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018).

Instead, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice." *United States v. Gupta*, 904 F. Supp.2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). As the Court noted in *Gupta*, in focusing largely on the amount of monetary gain or loss occasioned by an offense, the Sentencing Commission "effectively ignored the statutory requirements that federal sentencing take many factors into account, *see* 18 U.S.C. §3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Id.*; *see also Johnson*, 2018 WL 1997975, at *4 (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

Commentators, too, have expressed reservations. *See* Mark H. Allenbaugh, *"Drawn from Nowhere:" A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013); Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018, 1025 (2016) (concluding that review of the post-[*United States v. Booker*, 543 U.S. 220 (2005)] sentencing data "empirically corroborate[d] scholarly criticism that the loss table often vastly overstates the seriousness of an offense").

Indeed, some have termed the Sentencing Guidelines "fundamentally broken" in high-loss cases. *See* Frank O. Bowman, III, "Comment on Proposed Amendments to Economic Crime Guideline, § 2B.1.1," Feb. 19, 2015, at 2 (citing remarks of Judge Patti B. Saris, Jan. 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf); *see also Shadow Sentencing*.

Thus, the amount of loss is often "a kind of accident[,]" and thus a "relatively weak indicator of [] moral seriousness . . . or the need for deterrence." *Emmenegger*, 329 F.Supp.2d at 427. As the Supreme Court instructed in *Kimbrough v. United States*, 552 U.S. 85 (2007), when the Sentencing Commission has failed to base its formulation of a guideline upon empirical evidence of pre-Guidelines practice and/or review and revision based on judicial decisions and sentencing data, or when a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" because the Commission "did not take account of empirical data and national experience," the sentencing court is free to conclude that the guideline "yields a sentence greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case" and "may vary [from Guidelines ranges] based solely on policy considerations." *Id*. at 101, 109-110; *see also Spears v. United States*, 555 U.S. 261, 264-66 (2009).[57]

Thus, in *Corsey*, Judge Underhill counseled that "the low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines." 723 F.3d at 380. The Court in *Corsey* additionally

---

[57] That judicial deference is not required in this instance has been reinforced by the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)*; see also Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) (applying *Loper-Bright* to the Office of Foreign Assets Control's interpretation of statutory language in the International Emergency Economic Powers Act).

noted that the loss Guidelines are "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Id.*

Here, the distortion generated by the alleged loss amount's impact on Mr. Guo's Guidelines level is aggravated by the uncertainty with respect to determining an accurate and reliable loss amount. In turn, the questions regarding a verifiable loss amount reinforce the need for a *Fatico*.

Written in another time and for a different purpose, Albert Einstein's observation that "Not everything that can be counted counts, and not everything that counts can be counted," has particular application to this case. A man's life and the measure of that life cannot simply be reduced to a box on a sentencing grid propelled by an equally mechanistic slot on a "loss" table.

Sentencing is not only not an exact science, but not a science at all, given its essentially human dimension. Rather it is a "fluid and dynamic process[,]" *Irizarry v. United States*, 553 U.S. 708 (2008), the aim of which is to impose a sentence that is reasonable, that is tailored to the facts of the particular case and particular individual being sentenced, and that achieves the statutory objective of a punishment that is "sufficient, but not greater than necessary" to accomplish the goals enumerated in § 3553(a)(2).

As the Supreme Court reminded over 25 years ago, even in the Guidelines era, the "uniform and constant . . . tradition for the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensure." *Koon v. United States*, 518 U.S. 81, 113 (1996); *see also United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008).

In *Gupta*, a stock fraud case involving insider trading, in which the defendant was a financial titan near the pinnacle of global economic wealth and power, Judge Rakoff repeated his concerns expressed earlier in *Adelson* regarding the disproportionate and unrealistic effect that the

77

Guidelines' loss table has on the measure of an appropriate sentence in that case. Evaluating the full range of factors pertinent to sentencing, Judge Rakoff philosophized on a court's duty at sentencing:

> [i]mposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

904 F. Supp.3d at 350.

Rather than impose the enormous sentence dictated by the Guidelines, Judge Rakoff sentenced the defendant in *Gupta* to two years' incarceration. What Judge Rakoff characterized as the "irrationality of this approach" that would have hewed to the Guidelines is present here as well, and threatens to create, as Judge Rakoff recognized in *Gupta*, "in the name of uniformity, a sentencing disparity of the most unreasonable kind." *Id*. at 351.

Thus, courts in this District have on multiple occasions recognized that a "loss amount" that increases a Guidelines level by several orders of magnitude distorts the sentencing process and requires amelioration through increased consideration of the other § 3553(a) sentencing factors.

Here, the 30-point enhancement for "loss amount" computed in the PSR comprises more than *half* the total offense level. *See* PSR ¶ 114. As Judge Rakoff commented in *Gupta*, "this [loss amount] is a very rough surrogate" for determining an appropriate sentence. 904 F. Supp.3d at 351.

Accordingly, it is respectfully submitted that the Court should, consistent with other courts considering this issue, exercise its discretion to remedy the distorting effect of any "loss amount,"

and concentrate instead on other § 3553(a) factors in order to, as the Supreme Court counseled in *Gall v. United States*, 552 U.S. 38 (2007) "make an individualized assessment based on the facts presented." *Id*. at 50.

### 3.  *Objections to Other Guidelines Enhancements*

In addition to his objection to the 30-level increase in the Guidelines level for loss, Mr. Guo also objects to the following enhancements.

PSR ¶ 114:  We object to the 2-level enhancement for 10 or more victims. There was no evidence of any victims other than the five witnesses who claimed to have lost money on their G-Series investments..

PSR ¶ 114:  We object to the 2-level enhancement for allegedly acting on behalf of a charitable, educational, religious, or political organization or a government agency. There was nothing fraudulent about either The Rule of Law Foundation or the Rule of Law Society.  Both ROLF and ROLS were operating non-profits in compliance with non-profit tax requirements, with their own leadership and staff. Witnesses called by the Government testified that each entity had a board of directors, held board meetings and voted on initiatives, and that Mr. Guo was not part of either of those boards. Accordingly, that Mr. Guo acted on behalf of a charitable organization, specifically in the context of the alleged fraud scheme, is unfounded. Further, as reflected in testimony at trial, ROLF and the ROLS promoted human rights and democracy in China and assisted Chinese nationals who wanted to flee China.

PSR ¶ 114:  We object to the 2-level enhancement for relocating or participating in relocating  fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials, and the offense otherwise involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting sophisticated means. The G-Series entities were

79

international in scope, and Mr. Guo is a Chinese national whose family, like many wealthy families. has financial holdings in a number of different jurisdictions. There is no evidence to support the notion that the location of any business entities or accounts was selected for the purpose of evading law enforcement or regulatory officials. This is purely speculative.

PSR ¶ 114:  We object to the 2-level enhancement for deriving more than $1 million in gross receipts from one of more financial institutions as a result of the offense. Mr. Guo did not personally receive more than $1 million in gross receipts from any financial institution as a result of the offense.

PSR ¶ 114:  For the foregoing reasons, as well as our objection to the 30-point increase for loss amount, we object to the Total Base Offense Level calculated in this paragraph.

PSR ¶ 116:  We object to the 2-level enhancement for "sophisticated laundering" pursuant to § 2S1.1(b)(3) for essentially the same reasons we object to the enhancement for relocating the fraudulent scheme to another jurisdiction. The multi-jurisidictional nature of the G-Series entities, and the attendant use of multiple bank accounts, does not render the conduct in this case "sophisticated laundering." The entities involved were not fictitious, there were no shell corporations, and there was no layering of transactions for the purpose of concealment. Furthermore, this enhancement cannot apply if the sophisticated means enhancement under § 2B1.1(b)(10)(A) & (C) is applied, because any conduct that the Court may deem sufficient to support that enhancement is the same as any conduct that could be found to support this enhancement, an outcome expressly precluded by Application Note 5(B) to § 2S1.1.[58]found to support that enhancm

---

[58] Application Note 5(B) to U.S.S.G. § 2S1.1 provides: "If subection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying

PSR ¶ 118:  We object to the 4-level enhancement pursuant to § 3B1.1(a) for being an organizer or leader of criminal activity. While Mr. Guo was a leader of the Whistleblower Movement, he was not an organizer or leader of any criminal activity.  In this regard, we note that co-defendants Je and Wang had operational control of the relevant businesses and controlled the relevant bank accounts.

PSR ¶ 119:  We object to the 2-level enhancement for obstruction of justice pursuant to § 3C1.1. There is no evidence to support the purported grounds for this enhancement as set forth in PSR ¶ 110. First, there was no evidence that Mr. Guo conspired with others to evade applicable laws or retaliate against anyone who sought return of funds. Second, any signs supporters may have affixed in the Mahwah mansion cannot be attributed to Mr. Guo and the notion that such signage constitutes obstruction is wild speculation. Third, the suggestion that Mr. Guo "and a co-conspirator" may have started the fire that engulfed the Sherry-Netherland apartment on the day of Mr. Guo's arrest is beyond preposterous, for reasons set forth in the following section. Fourth, the notion that Mr. Guo "lied in forms related to his bankruptcy proceedings in a manner that was also designed to thwart the investigation of this case" is also based on nothing more than pure speculation. Fifth, there is no evidence to support Mr. Guo's purported involvement in the purported solicitation of a false declaration from Government witness Ya Li for the purpose of thwarting the investigation. Sixth, any conduct undertaken by co-defendant Wang cannot be attributed to Mr. Guo, and the alleged conduct appears to constitute ordinary business activity. Seventh, there is no evidence of any direction by Mr. Guo to destroy evidence. Finally, to the extent that this enhancement is based on any protest activities of Movement supporters, there was

---

offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline."

no assaultive conduct, no arrests were made, and any protest activity constituted First Amendment-protected free speech on the part of supporters.

PSR ¶ 123:  For the foregoing reasons, we object to the Total Offense Level calculated in this paragraph.

### C.  *Additional Objections to the PSR*

While accepting the jury's verdict for purposes of sentencing, Mr. Guo disagrees with it and, in addition to the objections above to the Guidelines calculation, presents and preserves for appeal his objection to any paragraphs of the PSR that purport to allege or conclude that Mr. Guo is guilty of any offense, committed any wrongdoing or illegal acts, or attempted to, conspired to, or committed any wrongdoing, fraud, money laundering, or obstruction of justice, or is responsible for alleged losses, much less in the amount of $1.3 billion dollars, and forfeiture of the same.

These general objections apply to each of the specific objections set forth both above and below, as well as to paragraphs 25, 26, 29, 33, 47, and 50 of the PSR.

¶ 24  The business entities at issue were not fictitious entities "created" to perpetrate a fraud or to commit any offense.  Each entity had payrolls, operated publicly, offered services to clients and the public, and/or operated pursuant to its business mission(s). GETTR continues to operate as a social media platform. It is available to the public. Government witness Limarie Reyes testified to the benefits provided to G-Club members and to the entity's daily business operations, including the significant efforts and travel to secure additional member benefits. With respect to the Rule of Law Society ("ROLS") and Rule of Law Foundation ("ROLF"), neither organization sold or promoted the sale of securities, and neither misappropriated any funds.

¶ 27  Mr. Guo did not interact with "approximately 500 accounts" or any accounts to conceal the illegal source of funds. Mr. Guo did not control the bank accounts of the entities; they were controlled by co-defendants Je and Wang. None of the funds were illegal or illegally obtained.

¶ 28  All expenditures were made to support the pro-democracy movement, and to project an image of its wealth and power. The $100 million sent to Hayman Capital should be removed based on the jury's acquittal for fraud in connection with the GTV private placement. Specific items listed in ¶ 28 were purchased for use by customers or members of the entities that paid for the items, and some of the items were purchased and paid for before the period of the alleged fraud. The Lady May, for instance, was purchased in February 2015 with family funds from ACA. Also,

the investors and supporters were not "victims" (because they were not defrauded), and many of them have stated as such.

¶ 30  The purchase of an apartment in NYC in 2015 and the price for it is not relevant and should be deleted. The Sherry-Netherland apartment was purchased years before the period of the alleged fraud. At a minimum, this fact should be added to this paragraph.

Mr. Guo also objects to ROLF and ROLS being characterized as "purported" non-profit organizations. ROLF and ROLS were operating non-profits in compliance with non-profit tax requirements.

Mr. Guo objects to the remainder of the paragraph's allegations that false and materially misleading information was provided to investors.

¶ 31  Mr. Guo objects to the reference in this paragraph to a "scheme."

¶ 32  Yanping Wang worked for the pro-democracy movement and never managed any funds for Miles Guo.

¶ 34  The word "purported" should be deleted as the jury's acquittal on the GTV counts reflects its recognition of the fact that GTV was a genuine news-focused social media platform to further the aims of the pro-democracy movement.

¶ 35  The word "purported" should be deleted. Further, Government witness Limarie Reyes testified that G Club was owned and controlled by Haoran He, and that Haoran He approved financial decisions.

¶ 36  There was nothing "purported" about the Himalaya Exchange and the other entities noted, and it is inaccurate to describe them as "functionally" owned" and "controlled" by Miles Guo. The HEX accounts were owned by the individual account holders.

¶¶37-38  Miles Guo did not say he would use his "own" money to finance any charities. He said his family fund would, and bank records for ROLF and ROLS show at least $500,000 from the Guo family funds being donated to the ROLF.

¶ 38  This paragraph should be stricken in its entirety, as it reflects statements made by Steve Bannon and not Mr. Guo. Also, Mr. Bannon was paid to serve as a consultant for GTV and Mr. Guo was acquitted of all GTV related conduct.

¶ 39  There was nothing "purported" about either organization. ROLF was not used to promote Miles Guo. As reflected in testimony at trial, ROLF and the ROLS promoted human rights and democracy in China and assisted Chinese nationals who wanted to flee China.

N-95 mask donations were not sent to Mr. Guo's home for his personal use. Cross examination of Karen Maistrello made clear that she did not work for ROLF and lacked any basis to assert that the masks were delivered to Mr. Guo's home.

83

Further, N-95 masks were donated to several agencies in New York City (including hotels, the NYPD, and hospitals) as well as individuals across the United States and in China. Even if masks were delivered to Mr. Guo's residence during the pandemic, that would be consistent with the majority of organizations, which took steps to ensure that their people were  adequately protected from the virus. For the pro-democracy movement, it was essential that Mr. Guo maintain his health and be able to continue his public campaign.

¶¶ **40-46**  Mr. Guo was acquitted of this conduct. These paragraphs should either be stricken or, at a minimum, reflect that fact.

¶ **48**  The sentence stating: "Those bank account closures frustrated the ability of GUO, JE, and their co-conspirators to collect proceeds from victims seeking to invest in GTV" should be deleted because it states nothing more than the Government's opinion. Further, the jury found all of Mr. Guo's GTV-related conduct to be lawful. Additionally, these bank seizures occurred *after* the GTV private placement was completed, meaning that, logically and for formal purposes, the closures could not have frustrated investors' ability to invest in the GTV private placement.

¶ **49**  The first two sentences in this paragraph should be deleted. Mr. Guo's statement that GTV had a market value of $2 billion was correct and, in fact, was an undervaluation of GTV's market value. The Government obtained an appraisal by Alvarez & Marsal Valuation Services, LLC, that determined GTV's enterprise value to range from $1.4 billion to $2.6 billion. Thus, the reference that Guo "well knew" that "GTV's market value was far less because among other things, GTV was a new business that generated no revenue" is incorrect. Mr. Guo believed GTV's market value to be in excess of $2 billion, which is supported by Alvarez & Marsal's expert valuation. It was further supported by the GTV's private placement memorandum's calculation of GTV's value, which Mr. Guo did not author and which was vetted by counsel, as well as the fact that at that valuation, GTV raised nearly half a billion dollars in a month. Defense expert Raymond Dragon testified to both facts at trial as items to consider in determining valuation, which was not contradicted.

¶ **51**  The word "purported" should be deleted. G Club was a real business and people did make purchases.

¶¶ **52-53**  Limarie Reyes testified to the benefits offered by G Club, and to the millions in dollars of prizes awarded to G Club members. Ms. Reyes also testified that G Club hired two independent companies to properly manage G Club's prize giveaways. Her trial testimony contradicts statements in this paragraph including "G Club did not even make good on prizes it offered members for participating in contests." Regarding the BMW, there was no evidence of fraud and no evidence or testimony supporting the narrative in the PSR.

Mr. Guo did not run or manage G Club; he was not its CEO. Further, on March 8, 2021, the world was in the midst of the pandemic, and many companies were hampered by performance deficits as a result. G Club was not a fictitious company, nor do these facts relate to Miles Guo.

84

¶ **54**  Statements by William Je should not be attributed to Mr. Guo. In addition, the video excerpt referenced should include the entire broadcast of Mr. Guo on that date, not just excerpts taken out of context.

¶ **55**  There was no evidence at trial that Miles Guo asked investors to purchase multiple memberships in G Club.

Trial witnesses testified that the items noted in sub-paragraphs (a) through (f) were purchased for the benefit of G Club members and were not purchased for Mr. Guo's personal use.

The "yacht" referenced in paragraph (a) was utilized by G Club members prior to Mr. Guo's arrest, and before it was sold off by G Club owner Haoran He. The proceeds from the sale of the "yacht" went to G Club.

With respect to the Lamborghini referenced in subparagraph (b), a Government exhibit shows Mr. Guo, in a promotional video, state that the Lamborghini was for G Club members. The Government had no evidence to refute Mr. Guo's statements. There was no evidence of any personal use of that car; in fact, Miles Guo did not have a valid driver's license and did not drive. His son, moreover, was banned from the United States and neither his daughter nor his wife drives an automobile.

The Bugatti referenced in subparagraph (c) never left the showroom and was never received by Mr. Guo.

FBI agents at the direction of SDNY prosecutors placed "undercover" calls with Haoran He, pretending to be buyers for the Bugatti. Mr. He, who was unaware he was speaking to undercover agents, repeatedly confirmed that the Bugatti and any proceeds from its sale would go to G Club. This evidence was not presented.

The Mahwah "mansion" was for use by G Club members to serve as a secret base for the pro-democracy movement. While the Government tried to claim that each of the Guo family members had a wing at Mahwah, it had no explanation for  why there would be a wing at Mahwah for "son" when Mr. Guo's son was banned from travel to the United States per the U.S. government's denial of his visa renewal request. The Government, moreover, objected when the defense tried to elicit such evidence.

The need for such a facility was confirmed by Paul Doran, an Operation Fox Hunt expert called by the defense. The stipulation  between the parties conceded that Mr. Guo was the target of a widespread campaign by the Chinese government to silence him, including through kidnapping, coercion, and physical harassment. The Government adduced no evidence that Mr. Guo or his family was to live at Mahwah. They presented no surveillance evidence (which they conducted on Mahwah) of Mr. Guo and his family residing at Mahwah. That there was a "wing" for "son" makes clear that those were titles simply an easy way to note space. Mr. Guo's son was banned by ICE from entering the US and would have no ability to use a wing in any home in the United States. When the defense sought to elicit the testimony at trial, the Government objected.

Nor did the Government call ICE agents to testify that Mileson Guo's (son) visa to enter the United States had been revoked.

For these reasons ¶ 55 should be stricken in its entirety or these objections noted.

¶ **56**   The word "purported" should be deleted. Government witnesses Jesee Brown and Mr. Roberts testified that the Himalaya Exchange issued a cryptocurrency on the blockchain. Defense witness Ms. Sklar, the only cryptocurrency expert to testify in the trial, and auditing firm Armino testified that the HCN was a cryptocurrency and that the HDOs in circulation were in fact a digital asset with a 1-to-1 value backed by currency. Further records reflect that the cryptocurrency was traded, and people made money buying, selling, or holding the cryptocurrency.

¶ **57**   See response to ¶ 56. Further, the Government witness Jesee Brown testified that there were plans by the Himalaya Exchange to buy gold. Witness Tom Bishop testified that in March 2022 the Himalaya Exchange paid $5 million to Sharps Pixley, a London-based gold broker. Mr. Brown also testified that the Himalaya Exchange was owned and controlled by William Je. Accordingly, this paragraph should reflect the above and the fact that while Mr. Guo knew of the Himalaya Exchange's goal to purchase gold, Mr. Guo did not know the total amount of gold the Exchange had purchased at the time of the statements, and that the statements were not made with fraudulent intent.

¶ **60**   Actions by William Je, the owner of the Himalaya Exchange, should not be attributed to Mr. Guo. No evidence was presented indicating Mr. Guo's involvement. In addition, the Government possesses information that the auctioneer of the vehicle did in fact open and maintain a wallet on the Himalaya Exchange, did received payment of the vehicle purchase in HDOs, and that the HDOs were subsequently redeemed for fiat. This paragraph is misleading.

¶ **61**   The Himalaya Exchange White Paper, publicly available on its website, speaks for itself regarding the Exchange and how it operated. Bank statements admitted at trial demonstrated that Himalaya Exchange customers were able to redeem at least $70 million HDOs into fiat (upon information and belief, the redemptions were at least roughly $268 million). Government witness Ya Li, an HDO holder, testified that she had successfully redeemed HDOs into fiat.

¶ **62**   This paragraph should be stricken as it relates to actions taken by Mr. Je and not Mr. Guo. The Government witness and Himalaya Exchange CEO Jesee Brown testified that the Board of the Himalaya Exchange reviewed and approved by unanimous vote the issuance of the loan. Mr. Brown did not testify that Mr. Guo was involved in this decision, and no evidence was presented showing Mr. Guo's involvement.

¶ **63**   As noted in this paragraph, the A10 program was launched in February 2023, less than two months before Mr. Guo's arrest and before any aspect of the program could be completed. There was no "scheme," and there were no false statements. Accordingly, it is misleading to state that Mr. Guo's statements about the program were not true, as he was incapable of doing anything to conclude the program once he was detained.

86

¶ 64 Mr. Guo did not "control" millions of dollars in fraud proceeds and he did not "regularly move funds." That sentence should be stricken.

Further, the first sentence of paragraph 64 does not contain facts but instead reads as a Government advocacy piece and should be deleted. There is no evidence as to why Mr. Guo filed for bankruptcy. It was filed on February 15, 2022, a fact properly noted in the PSR.

Further, Mr. Guo is entitled to a lifestyle of his choosing, and one supported by his family wealth which existed for many years prior to the conduct alleged in this case. To the pro-democracy movement, wealth meant power to face and to confront the CCP. The "despite" reference suggests that Mr. Guo filed for bankruptcy for nefarious reasons, which is argument and not fact.

Similarly, the language despite "his control of hundreds of millions of dollars in fraud proceeds" is gratuitous and does not undermine Mr. Guo's filing for bankruptcy. In fact, the Government's argument in this regard undercuts its own theory that Mr. Guo committed fraud because he needed money.

¶ 65 This section should only reference the case agent's sworn testimony in court as supported by the trial transcripts.

¶¶ 66-79 The Government's allegations regarding Mr. Guo and the GTV private placement were rejected by the jury's acquittal on counts 5, 6 and 12.

Additionally, what Ms. Wang did or did not know is not relevant to Mr. Guo. Therefore, that language "WANG well knew that the funds raised from the GTV Private Placement could not be invested in a high-risk hedge fund held for the benefit of Relative-1" is irrelevant and was rejected by the jury in acquitting on the GTV counts. Much of what is in these paragraphs represents suppositions by the Government rather than facts.

¶ 80 The first sentence of paragraph 80 should stand, and the rest of the paragraph should be deleted because it describes actions by William Je.

¶ 81 The paragraph should be stricken because it describes actions by William Je.

¶ 82 The monies referenced were not fraud proceeds.

¶ 83 This paragraph should clarify that PAX "claimed" that Mr. Guo had personally guaranteed the loan. Further, all statements following the second sentence are entirely speculative and should be stricken.

¶ 84 Mr. Guo denies that he hid assets and he disputes the findings of the Court in the PAX litigation and related findings in the Bankruptcy Court.

¶ 85 Mr. Guo does not object to the date of the filing of the bankruptcy petition. However, he does object to the remainder of the paragraph because it is argument and not fact. Further, in

87

his initial bankruptcy filing Mr. Guo stated that his lifestyle and all personal expenses were paid for by his family through a long-established family fund based outside the United States. This fact was in Mr. Guo's bankruptcy filing and should be included to provide a complete picture.

¶ 86  We object to the use of the terms "formally" and "Guo enterprise." Prior to its sale by the Trustee, Mei Guo was the legal owner of Lady May. Further, the term "Guo enterprise" was invented by the Government and does not appear anywhere except in the indictment.

¶ 87  This paragraph should be stricken. First, the encrypted communications are communications on WhatsApp – an application available for download on every cell phone. It is used by individuals worldwide and uses encryption by default for its communications.

Second, at the time of communications between Mr. Guo's daughter and Ms. Wang regarding the Lady May's ownership, the Lady May was in fact registered under Mei Guo's name and had been under her name for years. It was purchased before the period of the alleged fraud charged. Third, whatever coaching Ms. Wang purportedly undertook, is more appropriately reflected in her PSR and not here. There is no evidence that Ms. Wang statements regarding the Lady May's ownership were made at Mr. Guo's bidding, or that he acted upon them.

¶ 88  The text after the first sentence should be stricken. Mr. Guo believed that the CCP had the ability to influence the bankruptcy trustee, who earns approximately $2,000 dollars per hour, and that belief was reasonable given the CCP's ability to enlist assets such as George Higginbotham, a DOJ employee, and other prominent professionals in its efforts to target him. Further, supporters of Mr. Guo enjoy First Amendment protection and are allowed to voice their opinions within the bounds of the law.

¶ 89  Miles Guo believed, and as the Operation Fox Hunt expert noted during trial, the CCP has engaged in many similar practices to harass those who oppose its goals. Mr. Guo had no reason to believe that the SEC could be dissuaded because its decisions were influenced by the CCP's coercion in forcing investors to file false claims against Mr. Guo.

¶ 90  The PAX litigation came on the heels of Mr. Guo's interview on Voice of America. We object to the entirety of paragraph 90 except for the second sentence which acknowledges that PAX won a civil judgment. Further, supporters of Mr. Guo enjoy First Amendment protection, and are allowed to voice their opinions within the bounds of the law.

Additionally, any protest against the bankruptcy trustee, his family, or the SEC was deemed a lawful exercise of the First Amendment. Despite law enforcement being called, no one was arrested or charged with a crime. The Trustee and his family members were advised by law enforcement that no laws were broken. No individual was punched in the eye by anyone involved in the protests against PAX or the Trustee. Further, the "well done" statement attributed to Mr. Guo, if accurate, would be an excerpt that is being taken completely out of context. The full statements of Mr. Guo should be included to give full context to any "well done" reference in the PSR.

¶ 91  Mahwah was not purchased with fraud proceeds. It was purchased for use by G Club members. Footnote 6 merely repeats the text of ¶ 91 and should be stricken as incorrect and duplicative.

¶ 92  Mr. Guo objects to "meticulously" to describe the search as unnecessary and conclusory without factual support and irrelevant to the PSR. Whether or not the search was meticulous need not be decided here. Regarding the "custom-designed Brioni" suits, there is no evidence that these items were purchased with fraud proceeds.

¶ 93  We object to any suggestion that the use of Mahwah by NFSC members was a "perpetuation" of "Guo's criminal enterprise." The use of Mahwah by members of the NFSC after Mr. Guo's arrest was neither new nor staged. Had the Government not seized Mahwah, NFSC members might be using it still  as it had in the past, and would have commemorated June 4, 2024, and 2025, to mark the Tiananmen Square massacre. Upon information and belief, the last such commemoration was attended by several members of the United States Congress, G Club members, and community leaders.

¶ 95  Acts by NFSC members on the Mahwah grounds (such as hanging of small paper placards next to doors in Mahwah) after Mr. Guo's arrest are not properly attributable to Mr. Guo. There is no evidence that Mr. Guo directed such conduct. Conduct undertaken by unknown members of the community is not obstructive or properly attributed to Mr. Guo and should be struck from the PSR.

¶¶ 96-97  This conduct does not pertain to Mr. Guo and should be stricken.

¶ 100  Upon information and belief, the prosecutors have spoken with counsel for William Je, who informed them that Mr. Je  has declined to return voluntarily to the United States.

¶ 101  Mr. Guo objects to this paragraph in its entirety. The Government's view should be reflected in its sentencing submission, and not in the PSR. The PSR should contain facts determined by the Probation Department and the record. It is also noted here that Mr. Guo was the founder and promoter of ROLS and ROLF. Each entity carved its  own mission and had its own staff and Board of Directors. Witnesses called by the Government testified that each entity conducted Board meetings and voted on initiatives, and that Mr. Guo was not part of either Board. Accordingly, the notion that Mr. Guo acted on behalf of a charitable organization to perpetrate a fraud is unfounded and should be stricken.

Similarly, Mr. Guo has not made a misrepresentation or undertaken fraudulent action or violated orders during the course of his bankruptcy proceeding. He filed for bankruptcy on February 15, 2022, is represented by counsel in that matter, and those proceedings continue. Accordingly, the paragraph's reference to Mr. Guo's bankruptcy should be stricken. Similarly, Mr. Guo denies the Government's characterization of the alleged criminal activity, his alleged role, or that the alleged scheme was moved to another jurisdiction to evade law enforcement or regulatory officials, or that the alleged offense involved sophisticated means, more than 10 alleged victims and 5 or more participants, or that Mr. Guo illegally received gross receipts from a financial institution in an amount more than $1million.

89

¶ 102  The Government should be required to detail the specific role it attributes to William Je. Its refusal to do so is clearly strategic, as an accurate characterization of Mr. Je's role would make clear that Mr. Je engaged in independent activity of which Mr. Guo was unaware, and in which Mr. Guo did not participate. For example, defense witness Leanne Li testified that Mr. Je and his staff at the Himalaya Exchange refused to grant her access to conduct an audit of the exchange as requested by Mr. Guo. Likewise, direct intervention by Mr. Guo with Mr. Je to allow the audit to occur, in order to account for all of the community's funds, also was rejected. This testimony makes clear the independence with which Mr. Je operated over financial matters and the Himalaya Exchange.

¶¶ 103-105  Mr. Guo objects to these paragraphs as irrelevant; HEX was an ongoing entity with its own leadership and structure. Further, Mr. Guo objects to use of the terms "Guo's enterprise businesses" and the "Guo Enterprise." These terms are Government inventions and there was no testimony that the various business entities were called "Guo's enterprise businesses" or the "Guo Enterprise" by anyone other than the Government.

The second sentence in paragraph 103 is factually incorrect. Since 2020, prior to Mr. Guo's arrest, Qidong Xia was the leader of the Himalaya Alliance, elected by the Global Alliance Committee to serve as Secretary General of the Alliance. Mr. Guo could not "appoint or announce" Qidong Xia as the "new" leader. This point is supported by the many on-line videos posted (predating Mr. Guo's arrest) in which Qidong Xia speaks as the leader of the Himalaya Alliance.

There is some further context for the call referenced in ¶ 103. Mr. Guo had a meeting with senior representatives from the United Arab Emirates' sovereign fund scheduled for March 17, 2023, two days after his arrest. Chats between William Je and Yanping Wang confirm the scheduling and coordination of this meeting with UAE representatives. The meeting was to finalize an investment by the UAE into the Himalaya Exchange and the issuance of government licenses to the Himalaya Exchange by the UAE. The UAE was to issue a banking license permitting payments and transactions in Euros for the Himalaya Exchange and members of the pro-democracy movement. Partnership and investment by the UAE sovereign fund would undoubtedly have increased the value of the Himalaya Exchange and its cryptocurrency. That Mr. Guo encouraged continuation of efforts to partner and negotiate with the UAE as well as applications for UAE banking licenses post-arrest is lawful and proper.

The suggestion in PSR ¶ 104 that Mr. Guo used "coded language" during any calls is entirely speculative and that reference should be stricken.

More generally, statements from Mr. Guo to Qidong Xia to continue supporting the leaders of the Himalaya Alliance and to keep ongoing overseas Movement operations running well are consistent with the pro-democracy movement and are neither unlawful nor obstructive. Similarly, Mr. Guo's statements to fellow freedom fighters on the circumstances surrounding his arrest or business negotiations are not improper, and do not bear on any of the charges in the indictment.

Finally, none of these "jail calls" show control by Miles Guo. Rather, it shows the Alliance had a structure similar to independent organizations and was led by community members who had

the "final say" in operations for their respective organizations. Advising people to be alert that their conversations are being recorded is common sense and not nefarious.

¶¶ 106-108  These paragraphs as written must be stricken as they do not describe conduct by Mr. Guo, other than the Government's supposition and inuendo in these paragraphs that Mr. Guo started the fire. Any intimation or suggestion that the fire was caused by Mr. Guo while he was already in custody and incommunicado is not supported by *any* evidence. Moreover, both the ATF and the FBI concluded that  the cause of the fire could not be determined and there is no evidence to the contrary. Nor can it be ignored that at the time of the fire, Mr. Guo was in the custody of federal agents and that the other person – Individual-1 - in the apartment at the time of the FBI search also was not free to roam through the premises. He too was confined and under the watchful eyes of the FBI.

Should these paragraphs remain, the following information should be added:

Mr. Guo's arrest occurred on March 15, 2023. More than 12 agents from the FBI armed with a drone chose to enter Mr. Guo's Sherry-Netherland apartment at 6:00 a.m. through the service elevator. Mr. Guo's bedroom is nowhere close to the service elevator, and everyone in the apartment was asleep. Mr. Guo was handcuffed and not free to leave. Individual-1, a person who as far as we are aware was never interviewed or by the FBI on this issue, was almost simultaneously searched and handcuffed. A search of his person and that of the apartment did not lead to the discovery of any explosives or remote device capable of igniting a fire. CCTV cameras in the apartment, in the sole possession and control of the Government, reveal Individual-1 doing nothing nefarious. Neither the FBI nor the DOJ chose to have its agents wear individual body cameras. It was the FBI who chose to unplug CCTV cameras in the apartment, which would have recorded actions undertaken during their time in the apartment. The manner of the search was chosen by the FBI, not Miles Guo. The Government's evidence of the search shows wallboards torn from the walls exposing studs and electrical wiring; all the tear down was done with the use of sharp metal objects and without consultation of the New York Fire Department.

Further, the fire started at least several hours after both Mr. Guo and Individual-1 had been removed from the Sherry-Netherland. Only law enforcement remained and only law enforcement had access to the apartment during the several hours before the fire started and after the fire was extinguished.

This was a planned arrest; the Government chose to enter through the service elevator and now expresses surprise no one heard their banging for entry. Logic tells you that service elevators are at the back of the apartment and designed to be as far from the resident as possible.

Because the apartment was ultimately seized by the bankruptcy Trustee, the defense had only limited access to the grounds well after it had been cleared. As a result, Mr. Guo could not effectively challenge the conclusions of the ATF and the Fire Department; as noted, ATF concluded that the cause of the fire could not be determined.

¶¶ **107-108**  These paragraphs and subparagraphs have no relevance to the issues in the case and only seek to foster the Government's unsubstantiated inuendo that Mr. Guo was somehow responsible for the fire. Accordingly, they should be stricken.

¶¶ **109, 114**  Mr. Guo objects to the adjustments and offense level set forth in these paragraphs. Further, the parties have agreed that restitution in this case is impracticable. *See* ECF Nos. 785, 789.

¶ **110**  This paragraph is not supported by the trial evidence and should be stricken. Should the Court be inclined to credit any of these arguments, Mr. Guo requests a *Fatico* hearing.

¶¶ **114-123**  The objections set forth above as to ¶¶ 88-97 and ¶¶101-114 are repeated herein. Mr. Guo objects to each of the adjustments and enhancements noted in these paragraphs and the adjusted and total offense levels set forth in ¶¶ 120, 123.

¶ **129**  Mr. Guo was born under the name "Guo Wengui" in Jilin Province, China.

¶ **130**  For clarification, Mr. Guo's brother was shot by police during a visit to Mr. Guo's office to question Mr. Guo, not in the midst of the protests at Tiananmen Square.

¶¶ **173-175**  Because of the advisory nature of the Guidelines, Mr. Guo is eligible for a sentence of Probation.

¶¶ **179-180**  The parties have agreed that restitution in this case is not practical. *See* ECF Nos. 785, 789.

¶ **181**  The issue of forfeiture has been the subject of briefing by the parties. *See* ECF Nos. 799, 803, 804. The money and assets in the Government's possession and control, the GTV money (acquitted conduct), the refunds and redemptions given to investors, the criminal proceeds in the possession of the Trustee, and other amounts all must be offsets against any forfeiture judgment to be entered against Mr. Guo. Mr. Guo requests a *Fatico* hearing on the amount of any order of forfeiture in this case.

**D.** *Statistical Analysis of Data from the U.S. Sentencing Commission and Other Sources Demonstrates that a Below-Guidelines Sentence for Mr. Guo Would be Consistent with Current Sentences for the Conduct of Conviction and Would Avoid Unwarranted Sentence Disparities*

Data from the United States Sentencing Commission and other sources establishes that a

sentence dramatically below the applicable Guidelines range for Mr. Guo conforms generally with

the majority of sentences for Mr. Guo's offense conduct in this District.

92

The analysis below, mirroring PSR ¶¶ 112-14, focuses on convictions for money laundering (applying § 2S1.1) and fraud/theft (applying § 2B1.1). While there are differences in the data set forth below for those respective offenses, they still point decidedly in one direction: a sentence for Mr. Guo decisively below the advisory Guidelines level set forth in the PSR (corresponding to Level 43, which we challenge, and Criminal History Category I). *See* PSR ¶¶ 114, 126.

### 1. *Sentencing Commission Publications and Data*

The Sentencing Commission publishes each quarter an abstract of federal sentencing statistics entitled U.S. Sentencing Commission Preliminary Quarterly Data Report. The most recent quarterly figures are contained in the United States Sentencing Commission Quarterly Data Report, 4th Quarter Release, Preliminary Fiscal Year 2025 Data, Through September 30, 2025 ("*Q4 Preliminary Data Report FY 2025*"), which covers sentences imposed between October 1, 2024 and September 30, 2025 ("Q4 2025").[59]

Annually, the Sentencing Commission publishes a comprehensive Sourcebook of Federal Sentencing Statistics, the most recent of which includes data for Fiscal Year 2024 ("*2024 Sourcebook*"). The *2024 Sourcebook* is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/2024_Sourcebook.pdf.

A third category of data that can be extracted from the Sentencing Commission's publicly available information is found in the Commission's "Individual Datafiles" for Fiscal Years 2019-

---

[59]  The *Q4 Preliminary Data Report FY 2025* is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_FY25.pdf. Prior Quarterly Data Reports are also available on the Sentencing Commission's web site, at https://www.ussc.gov/sites/default/files/pdf/researchandpublications/federal-sentencing-statistics/quarterly-sentencing-updates/.

2023, which can be downloaded from its website. *See* U.S. Sentencing Commission Datafiles, available at https://www.ussc.gov/research/datafiles/commission-datafiles.

The data regarding federal sentences generally demonstrates that the Guidelines no longer constitute the predominant factor in approximately half of sentences nationally, and a decisive majority of sentences in SDNY. For example, nationally, the *Q4 Preliminary Data Report FY 2025* reveals that 51.4% of sentences are within the Guidelines range, and only 0.4% of sentences are above the Guidelines. *Id.* at 14.

In the Second Circuit more specifically, only 31.3% of sentences were within the calculated Guidelines range, and in SDNY only 23.8% of sentences were within the advisory Guidelines range, and no court imposed a sentence based on an upward departure. *Id.*

The *2024 Sourcebook* establishes that nationwide in 2024, defendants in federal court convicted of money laundering were sentenced to an average of 54 months' imprisonment and a median of 28 months, and of wire fraud, 21 months and 12 months, respectively. *See 2024 Sourcebook* at Table 15.

For Mr. Guo, in Criminal History Category I, the mean and median for money laundering were lower than the overall average, at 41 and 21 months, respectively, as were the fraud/theft/ embezzlement, at 18 and 7 months respectively. *Id.* at Table 27. The sentences for money laundering were between 416 and 442 months lower than the 470 months the Sentencing Commission assigns to sentences of life imprisonment. *See id.* at Table 15 n.1.

Moreover, even those defendants sentenced for money laundering within the applicable Guidelines range were sentenced to the lower half of the range 21.6% of the time, and sentenced to the minimum of the range 51.8% of the time. *Id.* at Table 34. Similarly, those sentenced for fraud were sentenced to the minimum range 53.4% of the time. *Id.*

The data from the *Q4 Preliminary Data Report FY 2025* are similar. The mean sentence for money laundering for 2025 nationally was 61 months, with the median at 30 months. *See* Table 6 ("Sentence Length By Type of Crime") at 9. Less than a majority – 28% – of money laundering sentences imposed were within the applicable Guidelines range. *See* Table 10 ("Sentence Imposed Relative to the Guideline Range by Type of Crime") at 17.

In the SDNY, in 2024 the mean sentence for money laundering convictions was 34 months, 20 months fewer than the national average. U.S. Sentencing Commission, Statistical Information Packet Fiscal Year 2024 Southern District of New York, at Table 7, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/nys24.pdf. Similarly, the median SDNY sentence for money laundering was 18 months, 10 months fewer than the national average. *Id.* at Table 7.

The Sentencing Commission's "Interactive Data Files,"[60] which provides the ability to review "Individual Datafiles" offer additional support for the conclusion that sentencing Mr. Guo's to life would create disparate result relative to current sentences. The Interactive Data Files reflect the sentences imposed in SDNY on similarly situated defendants spanning a seven-year period. The parameters chosen were: money laundering and fraud crime types with the Guidelines § 2B1.1, a Criminal History Category of I, Sentencing Zone D, a defendant between the ages of 51 and 60, and within SDNY. Career offenders were omitted from the pool.

That profile yielded 183 sentences imposed, with an average length of 27 months. In fact, 56.3% of defendants received a sentence of less than 2 years, with only 2.2% receiving a sentence of 10 to less than 15 years.

---

[60] The U.S. Sentencing Commission's "Interactive Data Analyzer" is available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard

### 2. *Judiciary Sentencing Information Database (JSIN)*

Another database, the Judiciary Sentencing Information ("JSIN," available at https://jsin.ussc.gov/), provides data for a specific set of criteria: those defendants nationally who, between Fiscal Years 2020-2024, were assigned a primary Guidelines of § 2B1.1, had a Final Offense Level of 43 (which, as discussed *supra*, is grossly inflated by the unjustified 30-point "loss amount" enhancement), and were in Criminal History Category I.

Of the 31 defendants nationally in that particular data subset who were not the subject of a § 5K1.1 motion, representing a fraction of the total of 1,345 federal money laundering cases during Q4 2025 (*see Q4 Preliminary Data Report FY 2025*, at 17 [Table 10]), JSIN reports that the average sentence was 158 months, with the median at 138 months – 312 months shy of the length utilized for life imprisonment.

### 3. *Courts Have Relied on Data in Fashioning Sentences*

Courts have increasingly endorsed and relied upon the data in imposing sentence. In *United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) and *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), the Second Circuit employed statistical comparison as a key element in determining whether a sentence would represent an unwarranted disparity. Indeed, in both cases, the Court held that sentences significantly above the national norm for persons in the same CHC who committed the same offense were substantively unreasonable.[61]

---

[61] Other courts have also relied upon statistics in reviewing and crafting sentences. *See United States v. Stock*, 685 F.3d 631, 629-30 (6th Cir. 2012) (observing sentence was "by far the longest" imposed for an offense such as the one at bar, and that this might affect the reasonableness of the sentence on remand); *United States v. Musgrave*, 647 Fed. App'x 529, 538 (6th Cir. 2016) (sentence reasonable in part because district court "studied sentencing statistics nationally and in the Southern District of Ohio"); *United States v. Buesing*, 615 F.3d 971, 974 (8th Cir. 2010) (affirming sentence arrived at in part through analysis of Sentencing Commission statistics); *United States v. Kamper*, 860 F. Supp.2d 596, 608 (E.D. Tenn. 2012) ("[t]he Commission's statistical work is invaluable to district court judges");*see also* Alan Ellis & Mark Allenbaugh, *Unwarranted Disparity: Effectively Using Statistics in Federal Sentencing*. 101 Crim. L. Rptr. 71

Statistical comparison to mean and median sentences has also been a feature of courts reviewing prior sentences in the context of motions pursuant to 18 U.S.C. § 3582, and particularly when the nature of the offense (often homicide) resulted in a life sentence. For example, in *United States v. Russo*, 643 F. Supp.3d 325 (E.D.N.Y. 2022), the Court, noting how the sentences imposed pursuant to guilty pleas coincided with national averages while those imposed after trial were longer, listed a series of cases in which the average sentences were instructive, and illustrated the disparity:

> *See, e.g., Graham v. Florida*, 560 U.S. 48, 93 (2010) (Roberts, J., *concurring*) (noting that a life-without-parole sentence was "far more severe than the average sentence imposed on those convicted of murder or manslaughter, who typically receive under 25 years in prison"); *United States v. Qadar*, No. 00 Cr. 603 [(ARR), 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021)] (noting that the average federal murder sentence in fiscal year 2020 was approximately 21 years); *United States v. Tellier*, No. 92 Cr. 869 [(LGS), 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022)] (noting that according to U.S. Sentencing Commission statistics, for fiscal years 2015-2021, the median sentence and length of imprisonment for murder was 240 months, and the mean sentence and length of imprisonment for murder was 262 and 263 months, respectively).

643 F. Supp.3d at 335-36; *see also United States v. White*, 96 Cr. 1123 (SHS), 2022 WL 18276933, at *4 (December 8, 2022) (citing United States Sentencing Commission, *Interactive Data Analyzer*, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (viewed December 8, 2022)).

### 4. *The Data Establishes that in Practice the Guidelines are Not the Predominant Factor at Sentencing*

The data set forth above demonstrate that the clear and prevalent practice within SDNY is sentencing below the Guidelines range, and that a sentence within the applicable Guidelines range – notwithstanding that the Guidelines remain the benchmark for sentencing, *see Gall v. United*

---

(Apr. 26, 2017), available at https://alanellis.com/wp-content/uploads/2017/04/effectively-using-statistics-in-federal-sentencing.pdf.

*States*, 552 U.S. 48, 56 (2007) – is the rather limited exception, and not the rule. Thus, the norm now is for Courts to consider § 3553(a) factors other than the Guidelines as more important when fashioning a sentence "sufficient, but not greater than necessary" to achieve the statutory objectives of sentencing enumerated in 18 U.S.C. § 3553(a)(2)(A)-(D).

Also, defendants convicted of similar conduct may vary in culpability, risk of recidivism, dangerousness and other variations that judges must now take into account. *See Kimbrough*, 552 U.S. at 108 ("some departures from uniformity were a necessary cost of the remedy we adopted").

Mr. Guo compares favorably for each of these touchstones.

The data firmly establish that a sentence for Mr. Guo well below the Guidelines would be consistent with many other sentences for this class of offense conduct, and that a longer sentence would create the type of disparity proscribed by 18 U.S.C. § 3553(a)(6).

### E.  *Mr. Guo's Medical History and Treatment at MDC*

Mr. Guo's medical history is set forth in Exhibit 1, which is respectfully submitted under seal to maintain confidentiality of health-related material as mandated by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191.

### F.  *Mr. Guo Has Endured 37 Months' Confinement at MDC During Its Most Violent and Chaotic Period*

MDC has been a dysfunctional institution for years. As detailed in Exhibit 14, attached hereto, MDC has suffered from staffing problems, violence, physical problems with maintenance and operations, safety vulnerabilities, leadership issues, and negligence with respect to medical and mental health care.

This Court is of course quite familiar with the serious, multiple, and systemic problems at the institution. *See* Transcript, *United States v. Segura-Genao*, 18 Cr. 219 (AT) (S.D.N.Y. February 5, 2019) (ECF # 211). Indeed, in 2019 this Court visited MDC, followed by an

98

evidentiary hearing that identified many of the problems that currently remain, and remain resistant to remediation. *Id.*

More recently, during a sentencing proceeding in February 2025, this Court remarked that

[t]he conditions of confinement at MDC are uniquely difficult. Courts in this district have recognized that MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates. And physical conditions within the facility include mold and contaminated drinking water.

Transcript of February 25, 2025, Sentencing, *United States v. Alptunaer*, 23-CR-188 (AT) (S.D.N.Y. April 10, 2023) (ECF No. 86 at 36) (citing *United States v. Chavez*, 710 F.Supp. 3d 227, 234- 35 (S.D.N.Y. 2024)).

Unfortunately, since the Court's inspection of MDC in 2019, the facility's dysfunction has, in many respects, worsened even further. As the Court is aware, as a result of those conditions, courts in SDNY and the Eastern District of New York have as a matter of course reduced the length of sentences they would otherwise impose. That standard should apply as well to Mr. Guo, whose tenure at MDC has corresponded to a particularly violent, volatile, and extraordinarily difficult period for the institution.

Exhibit 14 provides an updated, comprehensive review, prepared by counsel, describing the conditions at MDC during Mr. Guo's 37 months confined there.

### G. *The BOP is in Crisis in Multiple Facets of its Operations Beyond MDC Brooklyn*

The U.S. Bureau of Prisons ("BOP") has been in crisis for years, a situation documented repeatedly by the Department of Justice Inspector General  in detailed reports issued for the past two decades. In addition, as discussed below, certain current developments will exacerbate the problems confronted by BOP, and, inexorably, those imprisoned within its facilities.

99

Mr. Guo will be subject to the deteriorating conditions in BOP facilities. That decay involves both physical infrastructure as well as chronic insufficient staffing. Both imperil the health and safety of inmates like Mr. Guo, and staff as well. A detailed examination of the crises confronting BOP, and the discouraging portents for the future, is presented in Exhibit 15 hereto.

### H.  *Issues Following Conclusion of Mr. Guo's Sentence*

Mr. Guo will confront other issues after expiration of his sentence in this case. Those issues are addressed in sealed Exhibit 16.

### III.    FINANCIAL PENALTIES

#### A.  *Restitution*

The Government has moved for entry of an order finding that restitution would be impracticable in this case, pursuant to 18 U.S.C. § 3663A(c)(3). ECF No. 785 at 5. Mr. Guo concurs. ECF No. 789 at 3. Accordingly, no order of restitution should be imposed.

#### B.  *Forfeiture*

Mr. Guo has submitted considerable briefing on the issue of forfeiture. *See* ECF Nos. 799, 804. Should the Court be inclined to impose a forfeiture money judgment against Mr. Guo, we request a *Fatico* hearing prior to entry of any such order.

#### C.  *Fine*

Given that Mr. Guo has Court-appointed counsel and a bankruptcy proceeding pending, no fine should be imposed because he lacks the ability to pay.

## **CONCLUSION**

Miles Guo is a complex individual and this is a complex and unique case. For all of the reasons discussed in this memorandum and accompanying exhibits, as well as the supplemental materials provided and to be provided by counsel, Miles Guo respectfully submits, on the unique and complex facts of his life and of this case, and considering all of the sentencing factors which the Court must consider, that a sentence substantially below the applicable Guidelines range and the sentencing recommendation in the PSR will be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Dated: March 20, 2026
          New York, New York

Respectfully submitted,

_____/s/_____
John F. Kaley
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007
Tel: 212-619-3730

_____/s/_____
Joshua L. Dratel
Law Offices of Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
Tel: 212-732-0707

_____/s/_____
Melinda Sarafa
SARAFA ZELLAN PLLC
43 West 43rd Street, Suite 370
New York, NY 10036
Tel: 212-785-7575

To:    All Counsel via ECF

101