UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

MILES GUO,
 a/k/a/ "Ho Wan Kwok,"
 a/k/a "Miles Kwok,"
 a/k/a "Guo Wengui,"
 a/k/a "Brother Seven,"
 a/ka/ "The Principal,"
 a/ka/ "The Boss,"

                    Defendant.

S3 23 Cr. 118 (AT)

# SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

SEAN BUCKLEY
Attorney for the United States
Acting Under Authority Conferred by
28 U.S.C. § 515.
Southern District of New York
26 Federal Plaza
New York, New York 10278

Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................................. 1

II. PROCEDURAL HISTORY .................................................................................................... 2

III. OFFENSE CONDUCT PROVEN AT TRIAL...................................................................... 4

    A. Rule of Law ....................................................................................................................... 4

    B. GTV Private Placement..................................................................................................... 7

    C. The Farm Loan Program ................................................................................................... 9

    D. G|CLUBS ........................................................................................................................ 12

    E. Himalaya Exchange......................................................................................................... 17

    F. A10 ................................................................................................................................... 20

    G. Obstruction of Justice...................................................................................................... 20

IV. VICTIM STATEMENTS .................................................................................................... 28

V. APPLICATION OF THE SENTENCING GUIDELINES..................................................... 29

    A. Applicable Law ............................................................................................................... 29

    B. Probation's Guidelines Calculation and Sentencing Recommendation ........................... 30

    C. The Offense Involved an Actual Loss in Excess of $550 Million ................................... 31

        1.    The Trial Record and Tracing Affidavits Prove the Loss Amount Exceeded $550 Million.................................................................................................................................... 31

        2.    The GTV Private Placement Fraud Should Be Included in the Loss Amount Calculation ............................................................................................................................ 35

        3.    Whether an Investor Subjectively Regards Oneself as a "Victim" Is Irrelevant to the Guidelines Calculation.................................................................................................. 38

        4.    The Preponderance Standard Applies ....................................................................... 40

        5.    Guo's Guidelines Sentence Remains 175 Years Even if the Court Found the Loss Amount Was Merely Over $3.5 Million......................................................................... 41

    D. Responses to Guo's Other Guidelines Objections ........................................................... 41

VI. THE COURT SHOULD IMPOSE A SENTENCE OF AT LEAST 30 YEARS' IMPRISONMENT .................................................................................................................. 45

    A. The Nature, Circumstances, and Seriousness of the Offense Warrant a Lengthy Sentence .................................................................................................................................................. 45

        1.    Guo Caused Immense Pain and Suffering to Thousands of Victims......................... 45

        2.    Guo Led a Five-Year Scheme to Defraud with Serial Efforts to Evade and Obstruct Justice.................................................................................................................................... 48

        3.    Guo Preyed on the Aspirations of a Community ...................................................... 51

4.     The CCP's Conduct Is Irrelevant to Guo's Convictions ........................................... 56

5.     Guo's Extraordinary Personal Enrichment ............................................... 59

B. Specific Deterrence and Protection of the Public Is Necessary ..................................... 63

C. A Substantial Term of Imprisonment is Necessary for General Deterrence and to Promote Respect for the Law ............................................................................................ 69

D. Guo's History and Characteristics .................................................................................... 70

1.     Guo's Background as a Purportedly Powerful Billionaire Aggravates, Not Mitigates, His Culpability ................................................................................................................ 71

2.     ███████████████████████████████████ ............................ 73

3.     Guo's Immigration Status ................................................................................. 74

4.     MDC Arguments ............................................................................................... 76

E. The Need to Avoid Unwarranted Sentencing Disparities ............................................... 78

VII. FORFEITURE AND RESTITUTION ............................................................................ 83

CONCLUSION ....................................................................................................................... 84

## I.  **PRELIMINARY STATEMENT**

Defendant Miles Guo's crimes were of extraordinary dimensions. Through daily repetition of insidious lies recorded on video, he obtained over a billion dollars and misappropriated hundreds of millions of dollars for himself. He developed a cult-like following of thousands of people and manipulated their hopes and aspirations, and the trust they placed in him, to extract their money. He used his victims' money—victims' personal savings, their family's money, their retirement accounts, the money from the sale of their homes—to fund a lifestyle of extraordinary excess and indulgence, a gilded life of mansions, yachts, race cars, designer clothes, and luxury furnishings. In the wake of his investor-funded extravagances, Guo destroyed hundreds of lives. He has left a wreckage of victims and families who have been devastated financially, emotionally, and psychologically.

And Guo made, and continues to make, extraordinary efforts to avoid any accountability. He used trusted lieutenants and a maze of shell companies and bank accounts around the world to try to hide his wrongdoing and his overarching control of the sprawling criminal enterprise he directed from this country. His extraordinary contempt for the laws of the United States is difficult to overstate. He undertook his continuous and flagrant violations of the laws of the United States, victimizing Americans, after immigrating to the United States and seeking the beneficence of its laws for asylees. He perjuriously declared bankruptcy to avoid court-imposed contempt sanctions, and then attempted to obstruct and intimidate a court-appointed bankruptcy trustee, using the same bullying tactics he deploys against victims who complain about his frauds. His sustained efforts to evade and obstruct law enforcement prior to his arrest, and the continuation of his criminal enterprise's frauds and deception even after his arrest and detention, underscore the risks that Guo poses to the public absent an extremely substantial sentence of imprisonment and incapacitation.

Indeed, even after being convicted of operating a racketeering enterprise by a unanimous jury, Guo is entirely unrepentant. He does not even offer the lip service of remorse or acceptance of any responsibility for the harms he caused so many individuals and their loved ones, some of whom have been pushed to consider suicide as a result of his crimes, and some of whom confronted him directly by bravely testifying at trial about how he brainwashed, cheated, and harmed them. Faced with the overwhelming record of his extraordinarily egregious crimes, Guo refuses, even on the eve of his sentencing, to acknowledge that he has done *anything* wrong, or caused *any* harm to *anyone*. Instead, as he stands atop a mountain of destroyed lives, Guo has the gall to tell this Court, with a straight face, that *he* is the only real victim in this case. Guo's absurd position, which has no grounding in reality, only serves to render his conduct all the more offensive.

Guo's extraordinarily vast and harmful criminal conduct, his extraordinary contempt for the laws of the United States, and the extraordinary likelihood that Guo will seek (and is seeking) to continue his racketeering enterprise, all warrant a proportionately substantial sentence. To protect the public from further harm, to deter and disrupt Guo's criminal enterprise, and to afford just punishment for the astonishing scope of Guo's crimes, the Government respectfully submits a sentence of at least 30 years' imprisonment is appropriate.

## II.  PROCEDURAL HISTORY

### A.  The Charges, the Arrest, and Pretrial Detention

On March 6, 2023, a grand jury returned a sealed indictment charging Guo and Kin Ming Je, a/k/a "William Je," with various fraud and money laundering counts. (Dkt. 2). On March 15, 2023, Guo was arrested at his $67.5 million penthouse apartment at the Sherry-Netherland Hotel in Manhattan, and presented in this District. (Dkt. 8). Guo has been detained since his arrest.

That same day of Guo's arrest, the FBI conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment; his Greenwich, Connecticut residence; and his Mahwah, New Jersey mansion, which was purchased with fraud proceeds. During those searches, the FBI recovered, among other things, dozens of electronic devices, more than approximately $400,000 in U.S. currency, evidence of Guo's foreign travel documents, and luxury clothing, jewelry, and vehicles that had been purchased with fraud proceeds.

### B. Superseding Indictments

The Government filed several superseding indictments after Guo's arrest, adding charges as to Guo and charging co-defendant Yanping "Yvette" Wang. (*See* Dkt. 19; Dkt. 215). On April 24, 2024, the Government filed superseding indictment S3 23 Cr. 118 (AT), charging Guo, Je, and Wang with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349 (Count Two); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three); conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count Four); wire fraud, in violation of 18 U.S.C. § 1343, in connection with the GTV Private Placement (Count Five), Farm Loan Program (Count Seven), G|CLUBS (Count Nine), and the Himalaya Exchange (Count Eleven); and securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, in connection with the GTV Private Placement (Count Six), Farm Loan Program (Count Eight), and G|CLUBS (Count Ten), and unlawful monetary transactions, in violation of 18 U.S.C. § 1957 (Count Twelve). (Dkt. 307). Guo proceeded to trial on the S3 Indictment.[1]

---

[1] Wang pled guilty prior to trial. A third defendant, William Je, remains at large.

### C. Trial

Jury selection began on May 22, 2024. *See* 5/22/2024 Minute Entry. The Government called 34 witnesses, and the defense called nine witnesses. Guo elected not to testify. On July 16, 2024, the jury returned a verdict finding Guo guilty on Counts One, Two, Three, Four, Seven, Eight, Nine, Ten, and Eleven of the S3 Indictment, and finding him not guilty on Counts Five, Six, and Twelve. (Dkt. 395).

## III.  OFFENSE CONDUCT PROVEN AT TRIAL

### A.  Rule of Law

Guo's schemes began on the heels of a series of extraordinary personal financial setbacks. In 2017, one of Guo's creditors—an investment firm called the Pacific Alliance Asia Opportunity Fund (or "PAX")—filed suit against Guo, with claims that Guo had failed to deliver on a promise to repay a debt, which claim ultimately resulted in an award of over $100 million. (*See* PSR ¶ 83; *see also* Tr. 4014). The next year—on October 23, 2018—a Hong Kong court entered an order seizing "billions of dollars' worth" of Guo's assets in Hong Kong and elsewhere. (Guo Sub. 15; DXSTIP_0001 ¶ 8).

Guo launched his first fraudulent scheme in New York just weeks after Chinese authorities seized his assets, on November 21, 2018. (Tr. 423, 470; PSR ¶ 37). At a flashy event at The Pierre Hotel in Manhattan, Guo announced the founding of two nonprofits and purported charities—the Rule of Law Society and the Rule of Law Foundation. (Tr. 424). Guo's pitch to his supporters was simple: "he would donate the first $100 million as a first donor or sponsor," (Tr. 471), and his followers' money would be used to further the mission of "helping the Chinese people." (*Id.* 423; *see also* GXVI-192T (Guo's broadcast statement that "I bear legal responsibility for what I said today. In other words, for every U.S. dollar donated by comrades in arms, $2 come from Wengui.

4

After donating the 100 million U.S. dollars, Wengui is coordinating a donation of $1 billion to the Rule of Law fund")).  But as the Rule of Law Society's former president and treasurer testified at trial, Guo's organizations did "nothing" to help the Chinese people. (Tr. 423; *see also* PSR ¶ 39 (finding that while "the Rule of Law [organizations] were established purportedly to help people in China[,] [i]n actuality this was not true, and the Foundation was used to promote Guo, contrary to its promises otherwise")). And while Guo's supporters ultimately donated approximately $36 million to the Rule of Law entities that Guo controlled, (*see* GX WA30), Guo never made the $100 million donation he and his spokespeople had promised. (Tr. 471).

The Rule of Law organizations were a prelude to the more massive fraud that was yet to come. In one instance, Guo organized a telecast fundraiser to mark the purported charities' one-year anniversary, broadcast from his offices and online over his GTV media platform. (Tr. 471-72). To help his solicitation of supporters' donations, Guo's aides received instructions to make "donations" from various entities under Guo's control, so that these purported contributions could be shown on the screen as Guo urged his followers to add their own money to the coffers. (*Id.* 473 (testimony from Rule of Law Society's president and treasurer that "the final purpose was to have these big amounts of money shown on screen so that people would see that others were donating, and we were able to solicit more money this way.")).

Funds raised from Rule of Law's donors were misappropriated in a manner that would echo throughout the course of his "G Enterprise" schemes. (*See, e.g.*, PSR ¶ 39). Guo spent money that donors believed would be used for charitable purposes on himself, his family, and his own self-promotion. COVID-19 N95 masks, purchased with donor money, "went to boss's house," *i.e.*, Guo's mansion in Greenwich. (Tr. 480). Still other donor-financed masks were contributed to the New York Police Department—but Guo, through his right-hand assistant and convicted co-

5

defendant Yvette Wang, insisted that a letter be sent, falsely characterizing the donation as Guo's personal gift to the police. (*See id.* at 480-81). When a Guo aide declined to write the false cover letter, Wang told the aide that she "was being paid to execute orders and not to think." (*Id.* 481). As was his *modus operandi*, Guo facilitated his theft of donors' funds by hiding behind a superficial organizational legal structure that purported to exclude him from the nonprofits' governance while he, in truth and in fact, controlled them. (*See* Tr. 475 (Rule of Law Society's president and treasurer's testimony that "Boss"—*i.e.*, Guo—controlled the organizations despite not sitting on their boards)).

Beyond Guo's misappropriation of fraudulently solicited donations, the Rule of Law scheme solidified Guo's relationship with his victims—that is, Guo locked his supporters in as "donors," before promising them special access to a series of purportedly guaranteed investment opportunities. Guo "used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe Guo's statements regarding investment and moneymaking opportunities." (PSR ¶ 30). Victim Jenny Li donated to Rule of Law after trusting Guo's promise to put up $100 million of his own money and his statements that many other supporters were making their own contributions. (Tr. 1170-72). Ms. Li—a Nevada resident who took out a second mortgage on her home to finance her Guo investments (Tr. 1212)—described how her $6,000 donation to the Rule of Law led to $100,000 in follow-on investments that she believed would buy her stock in Guo's media ventures. (*See* Tr. 1170-75). Victim Le Zhou donated to Rule of Law for the same reasons. When he later invested in G|CLUBS, he—like other victims—was told that he had to show proof of his prior Rule of Law donations in order to access the GTV stock and other benefits promised to investors. (Tr. 194, 232-33).

6

The Rule of Law scheme acted as a gateway: an entry point for victims of the G Enterprise frauds that continued to adapt and evolve over the five years following Guo's launch of these purported charities.

### B.  GTV Private Placement

Following the ironically named "Rule of Law" announcement and solicitation for "donations," Guo doubled down and expanded his solicitation through false pretenses in the GTV Private Placement. On April 20, 2020, Guo offered common stock to his followers in an online video announcing the (unregistered) GTV Private Placement. (GX C26, C26-T). Preying on his supporters' affinity for him, Guo misrepresented the meaning of "private placement" and claimed it simply meant that "we are friends." (*Id.*). Guo, and those working for him, distributed a "confidential information memorandum" that claimed that investor proceeds would be used to "expand and strengthen the business" of GTV Media Group. (GX VK5). Guo also personally guaranteed all investor funds. He made that clear in personal appeals to potential investors via phone calls, text messages, and video messages. (*See* Tr. 4465; GX VB36). Guo also broadcasted his personal guarantee through his social media channels in which he stated, by way of example, "[t]his is a serious and solemn commitment and responsibility of Wengui Guo to you—to be responsible for this investment forever, this is a legally valid commitment." (GX C63, C63-T (June 2, 2020 video); *see also* GX Z9 at 37 ("I will be responsible. If there is one of your pennies that's missing, I, Guo Wengui will be responsible."). Those guarantees were instrumental in attracting hundreds of millions of investments in GTV. (Tr. 4466; 2375).

Guo's personal guarantees were lies, as was the representation that he would spend investor money only on GTV business opportunities. In fact, just one day after the "private placement" closed, on June 3, 2020, Guo ordered Wang to transfer $100 million dollars from a J.P. Morgan

Saraca bank account, which account held $291 million of victim investments, to another Saraca bank account at J.P. Morgan, which, prior to that transfer, had a $0 balance. (GX Z1). That internal transfer had no business purpose; rather, it was designed to obscure the source of the $100 million, to wit, victim investments. On June 5, 2020, the $100 million was transferred to Hayman Capital so that Guo could invest $100 million in the "HHKOF," which is a "very high-risk" investment that bet the Hong Kong dollar peg would break. (Tr. 790-791, 848).

These transfers were executed as part of Guo's plan. Indeed, in the run up to the closing of the Private Placement, beginning on at least May 23, 2020, Guo and his underlings had been negotiating with Hayman regarding Guo's investment. (Tr. 762; GX HN26). Although that investment was ultimately made in the name of Guo's son (and co-conspirator) Mileson, it was always clear that the investment was for Guo and his family—not Guo's victims, or even GTV. (*See* GX HN33 ("these are the two entities that William and Miles [Kwok] will be investing through"); Tr. 806 (explaining that the investment terms were "[b]eneficial to Miles Kwok and Saraca"); Tr. 811-12 ("I understood that it was Miles Kwok family office that was interested in making the investment . . . it is typical for family offices to have members of the family be the beneficial owners of the entities that they invest in.")).

The next month, the Securities and Exchange Commission ("SEC") began investigating the source of the $100 million HHKOF investment. On July 15, 2020, Hayman's external counsel messaged Wang and other co-conspirators involved in the G Enterprise—William Je, Max Krasner, and Aaron Mitchell—to inquire whether the $100 million used for the HHKOF was from the GTV private placement. (Tr. 833-36). In the next week, Je informed Hayman that "there might have been some money borrowed [from GTV] but they were going to put it back." (Tr. 838). Moreover, Guo and his associates did not provide assurances that the $100 million was *not* GTV

8

money, which ultimately caused Hayman's founder and chief investment officer to message Je on August 22, 2020, to confirm that the $100 million "money is not tainted in any way, including that it does not represent assets from the GTV offering but that it is a *bona fide* investment made by Saraca and Miles." (GX HN221). Hayman never received a response to that email. (Tr. 844).

This silence from Guo and his associates makes plain that Guo and his associates knew it was wrong to transfer $100 million to the HHKOF sourced from GTV Private Placement money that had been raised from investors.[2] Even worse, the approximately $30 million loss that investment sustained was not reimbursed by Guo, at all, despite his promises to his investors that they would not lose their money, and that he would make them whole if they did. (Tr. 848; GX STIP19). Through a settlement with the SEC, the entities involved in the GTV Private Placement transferred the remainder of the victim investor funds to the SEC, which has since distributed it to victims through a "fair fund," less the approximately $30 million Guo lost in the HHKOF. (GX STIP19).

## C.  The Farm Loan Program

After conducting the misleading GTV Private Placement stock offering, which promptly drew the scrutiny of civil and criminal U.S. authorities, Guo sought to evade law enforcement by raising money from investors through other schemes that were again fraudulent stock offerings, and the proceeds of which Guo again stole for his personal benefit. One of these schemes was the

---

[2] Indeed, co-conspirator Yvette Wang pleaded guilty to precisely this conduct. (*See, e.g.*, Wang Plea Tr. at 25-26 ("In about June 2020, I was directed by others to wire approximately 100 million U.S. dollars from a bank account in New York to Hayman Capital Management, a hedge fund in Texas.  I knew these funds had been received from investors in the GTV offering. . . . I knew what I was doing was wrong.")).

9

so-called "Farm Loan Program," through which Guo fraudulently obtained over $100 million. And Guo used that money from his followers to fund his own lavish lifestyle. (PSR ¶ 47; GX Z26).

Established by Guo in the spring of 2020, shortly after the GTV private placement, the Farms were a collective of groups of Guo's followers located in various countries around the world and organized into a hierarchical structure. (PSR ¶ 47; Tr. 1373). Guo was at the top. (Tr. 1316-17, 1373 (Guo "told the farms what to do")). Beneath Guo was a leadership group called the Iron Blood Group, which consisted of Guo plus a handful of leaders of prominent Farms, including trial witness Ya Li. (Tr. 1374-75). Each individual Farm also had a leader, who received instructions from the Iron Blood Group and from Guo. (Tr. 1373). This organization of Guo's followers was at times also called the Himalaya Farm Alliance and the New Federal State of China. (Tr. 1373, 1376). Similar to a multi-level marketing pyramid scheme, Guo used the Farms to amplify his fraud, to collect and bundle funds from victims, and to evade detection and disruption by law enforcement.

The Farm Loan Program was one of Guo's scams that used the Farms to collect money from Guo's victims and transfer it to companies controlled by Guo, which Guo referred to as "headquarter companies." (Tr. 1377). Guo announced the Farm Loan Program in a video broadcast on July 22, 2020:



(GX Z9 at 28; GX C40-V). Guo told his followers that, to get shares of GTV common stock, a Farm member would sign a loan contract with the local Farm and send money to the Farm, then the Farm would sign a loan contract with and send money to GTV—ultimately resulting, supposedly, in the individual receiving GTV shares. (*Id.*; Tr. 1377). Not only were those "loans" fake loans, in fact, the victims did not receive stock shares, and their money was instead used for the personal enrichment of Guo and his family.[3] (Tr. 1386-88).

As an example, Ya Li testified that, as the leader of her Farm, she signed loan contracts with, and collected $3 million from, the members of her Farm as part of the Farm loan program. At Guo's direction, Ms. Li sent $2 million to the U.S. bank account of a company called Medical Supply; and other loan money was being sent by other Farms to a bank account in Abu Dhabi in the name of ACA Capital. (Tr. 1388-89). Ms. Li's farm did not have a loan contract with either Medical Supply or ACA Capital. Instead, Ms. Li was sent and signed a loan contract with a different company, called Alfa Global Ventures, which was one of Guo's "headquarter

---

[3] Nor was interest paid on the loans, except to the New York-based farm, Mountain of Spices, in an effort to obscure Guo's illegal stock offering from the SEC. (Tr. 1386-88).

companies," but that contract was never countersigned.[4] (Tr. 1381-82, 1385-86). Ms. Li did not know what ultimately happened to the $2 million that she transferred to Medical Supply. (Tr. 1408).

Financial records confirm that Guo stole Farm Loan Program money for his personal benefit. Huge sums of Farm Loan Program money, including money from Medical Supply and at least 84 other bank accounts, were laundered through ACA Capital's bank account in Abu Dhabi and then sent to Guo's family office entities, such as Lamp Capital LLC, Greenwich Land LLC, and Leading Shine NY Ltd., where the money was used to fund Guo's lavish lifestyle and enrich his family members. (GXZ26; Tr. 4310). For example, approximately $20 million was transferred to Guo's son[5]; approximately $5 million was transferred to an entity owned by Guo's spouse; approximately $2.3 million was used to cover maintenance expenses associated with an approximately 145-foot luxury yacht worth approximately $37 million, nominally owned by Guo's son and used by Guo; and funds were used to pay for luxury cars and private jet travel. (PSR ¶ 50; GX Z26).[6]

### D. G|CLUBS

Around the same time, Guo fraudulently induced his followers to send money to a "purported online membership club called G|CLUBS"—"as a mechanism to continue fraudulent stock offerings." (PSR ¶ 51, 54). Much like prior schemes in furtherance of his criminal enterprise,

---

[4] Other Farm loans were not even countersigned by the Farm. (*See* GX Z29 (686 loan agreements for the Phoenix Farm, worth approximately $23 million, were not signed by the Farm)).

[5] On March 21, 2022, Guo testified in his bankruptcy proceedings that "[w]henever I need any expenses for my basic living, I talk to my son and he will tell his office to give it to me." (Tr. 4049).

[6] In addition, approximately $10 million was transferred to the personal bank accounts of Je and his spouse.

Guo used G|CLUBS as a vehicle to attract hundreds of millions from those who trusted him most, and then spent those millions on himself and his family.

The conceit of G|CLUBS was straightforward: victims purchased memberships believing, based on Guo's personal assurances, that they would receive stock in various G entities such as GTV, G|CLUBS, and G|Fashion. (GX Z9 at 11 ("[6/20/20 Guo video:] "G club is not a membership. G club is for you to get the original stocks . . . you can get legal G club, G fashion stocks, and that's it. Simple.") [7]; GX Z9 at 101-103 ("[6/21/21 Guo Video:] "All G-Club cardholders are entitled to 1:10 of the new GTV stock for the amount of the card. . . . Oh my, this is big money. Think about the value of GTV"); GX Z9 at 111 ("[7/5/21 Guo Video:] When paying 50 thousand dollars for the membership card, you will have 10 thousand shares of G-Fashion in the future"); GX Z9 at 116 ("[8/11/21 Guo Video:]  why if you have bought the G-Club membership card, you would have stocks now. Why would you lose money? What risks are you taking? Is there such a good opportunity in the world? Will there be such a good opportunity again? Will you have such a good opportunity again?")). "Memberships" in G|CLUBS ranged in price from $10,000 to $50,000 (Tr. 2977), a price that—as Guo himself acknowledged—only made sense if one believed they were purchasing valuable stocks. (GX Z9 at 57). Guo also used his network of Farms to promote the G|CLUBS offering of stock sales. (Tr. 3001-02).

Guo's promises of stock and, with the stock, wealth, caused his followers to part with hundreds of millions of their dollars. In total, G|CLUBS generated at least approximately $240 million for Guo's personal slush fund (GX Z26), from its approximately 8,000 members. (Tr. 3001). But that membership number underrepresents the perniciousness of the G|CLUBS

---

[7] Trial exhibits and the official transcript use variations of "G|CLUBS," "G club," and "G-Club."

scheme, because Guo encouraged his victims to purchase *multiple* memberships each so that, he claimed, they could buy even more stock. (PSR ¶ 55). Of course, Guo's promises of stock were utter lies. (Tr. 2977). Indeed, Guo had been warned by others *not* to claim G|CLUBS offered stock as a benefit of membership. (*See* GX CT172; Tr. 3026). But Guo was quick to assure his followers that any G|CLUBS disclaimer that disassociated G|CLUBS from stock ownership was "to put it bluntly, . . . nonsense." (GX Z9 at 57). Rather, those general disclaimers and warnings that no stock was attendant to G|CLUBS membership were "what we need to have to legally avoid 'Me Too.'" (*Id.*).

Fully aware of the blatant illegality of falsely promising stock to victims, Guo and his co-conspirators draped G|CLUBS with features apparently designed to conceal its fraudulent nature from law enforcement. For example, G|CLUBS claimed to offer its members G|Fashion discounts, a temporary opportunity to upload content to GTV, access to Guo's music, access to a "G|Talks" steaming event, a purported "sweepstakes," and limited discounts to selected hotels and a London restaurant. (Tr. 3005-06). Those picayune benefits did not comport with the steep price of membership, and Guo himself acknowledged as much. (GX Z9 at 57 ("I don't think you'd buy G-Club for something like the free music. If you were, why would you buy it, right? My suggestion would be don't buy it.").) Indeed, the minimal discounts were essentially worthless.[8]  Even worse,

---

[8] The discounts were extremely narrow and virtually unused by any of the 8,000 members. For example, the available hotel benefit applied a 10% discount that could be used only at three hotels in Puerto Rico. (Tr. 3008). The available one-time-use restaurant benefit applied only to a single restaurant in London on a specific evening. (Tr. 3009). The available boat service charter benefit was only usable in Puerto Rico. (Tr. 3010).  None of these "benefits" cost G|CLUB anything, and they all fall criminally short of anything remotely worth the five-figure cost of membership. (Tr. 3008-3010).

the "sweepstakes" was fixed to award a Lamborghini to one of Guo's attorneys, a co-conspirator. (Tr. 3030; GX 121).

Similar to features of other parts of his enterprise, Guo hid his leadership of G|CLUBS behind figureheads. On paper, Guo was a mere "spokesperson" for G|CLUBS, but he could not be terminated (Tr. 3000), and the membership agreement prohibited members from making disparaging statements about him. (Tr. 3021). The "spokesperson" title was a smokescreen. In the case of G|CLUBS, its named CEO, Limarie Reyes, had no functional control of the organization— she simply signed documents, as directed, to transfer membership funds so they could be misappropriated. (Tr. 2975, 2990). Indeed, Ms. Reyes did not speak Mandarin, had no association the purported democracy movement, and had no knowledge of Chinese culture. (Tr. 2983-84). This all despite the fact that G|CLUBS was marketed toward the Mandarin-speaking Chinese diaspora. (*See* Tr. 3002-03).

Ms. Reyes' obliviousness was not a flaw in the organizational setup of G|CLUBS, it was a feature of the fraud that facilitated G|CLUBS vacuuming of hundreds of millions from Guo's victims to transfer that wealth to Guo and his family. G|CLUBS victim proceeds were used to purchase:

- A $26.5 million mansion in Mahwah, New Jersey, which was then custom renovated at great expense and included with wings designed and tailored to the specifications of Guo, his wife, his son, and his daughter. (GX Z12).

15



- Millions of dollars spent to furnish the Mahwah mansion including, by way of example: $1,050,000 for a set of four Louis VXI Gilt Bronze Lantern chandeliers; $1,185,000 for a jewelry box, cabinet, and candlesticks; $300,000 for Persian rugs; $250,000 for an antique Chinese rug; $120,000 for two Baccarat chandeliers; $104,000 for a television and surround sound system; two mattresses, which *each* cost $36,000; a $24,000 "eternal forest" coffee table; $19,200 for a small walnut bench; and a $53,000 Napoleon III fireplace log holder. (*E.g.* GX BUCK1 – BUCK1296; GX 1B125K).

- A $832,000 red Lamborghini that Guo parked in his Greenwich garage. (GX GC276).

- A $4.4 million Bugatti Chiron Super Sport custom designed by and for Guo's son, Mileson. (GX 218).

- A $3.5 million Ferrari race car. (GX Z14; GX802).

- A $2,130,000 yacht for Guo. (GX GC309).

- Cash transfers to Guo's family. (GX GC415).

These lavish displays of wealth were, in many cases, personally selected and directed by Guo. (*See, e.g.*, GX 1B125M-8; GX 1B125M8-T (video of Guo directing Mahwah mansion renovation and describing the bedrooms for his daughter and her boyfriend); GX PRO466 ("the assistant of Mr. Miles Kwok" directing the Mahwah mansion designs on Guo's behalf); Tr. 2926 (realtor testimony regarding Guo's search for the Mahwah mansion); GX 1B125K (a Guo text message directing that "G-Club or another private company [be used] for payment" for a coffee table ordered from Shenzhen, China); GX 1B125F (Guo text messages regarding the shipment of a yacht purchased with G|CLUBS funds); GX 1B125I (a Guo text message selecting the font to use for the purchased yacht)).

### E. Himalaya Exchange

In November 2021, Guo and Je launched the Himalaya Exchange ("HEX" or the "Exchange") with a broadcast on GTV. (*See* Tr. 3669-70, 3675). Guo marketed HEX as a cryptocurrency "ecosystem" where investors in his prior schemes could purchase and trade two digital assets of Guo's creation. (*See* Tr. 3669-70; PSR ¶¶ 56-57). Guo's purported cryptocurrencies—H Coin and H Dollar (originally G Coin and G Dollar)—were fraudulent. Indeed, Wang—Guo's chief lieutenant, whose compensation package purportedly included H Dollar—admitted in her own sentencing proceedings after pleading guilty that "the cryptocurrency Wang was promised by Guo was worthless and illiquid." (PSR ¶ 28 n.2). As described below, the lies that Guo told to solicit investment in these sham coins included that they were backed by gold and cash; that they were real cryptocurrencies held and traded on the blockchain when instead they existed only on an offline spreadsheet controlled by William Je's investment fund; that their price was set by a real market; and that Guo would personally guarantee HEX investors against losses.

17

Guo made these false promises personally. In a music video designed for HEX's launch, Guo appeared in the same Lamborghini that was bought with G CLUBS members' money and kept in Guo's garage in Greenwich. (*See, e.g.*, GX GC276; GX C370).

Guo repeatedly told his followers that H Coin was backed by "20% gold." (*See* PSR ¶ 57(a), (b); *see also* GX Z9 at 121-122, GX C459-V1, GX C459-2). At trial, HEX's figurehead CEO—who testified that he "was in control of nothing" (Tr. 3634)—explained that Guo's "20% gold" claim was false: none of H Coin's value was tied to gold, nor was H Dollar secured by gold reserves (another of Guo's lies). (*See* Tr. 3694; *see also* Tr. 2653-54). Victims testified that Guo's representations about his coins' gold reserves were material to their decisions to purchase his purported cryptocurrencies. (*See, e.g.*, Tr. 2425).

Guo and Je told investors that his coins were created and "[a]ll the transactions are recorded in distributed ledger, a public ledger, called blockchain." (GX Z9 at 125; *see also* GX Z9 at 88 (Guo's statement that the blockchain has "an important function: absolute fairness!")). In fact, HEX "wasn't a blockchain"—it was "just a database." (Tr. 3658; *see also id.* 2670). The lie was necessary, the Exchange's CEO testified, because the truth that Guo's coins were not on the blockchain could have caused their price to crater. (*See id.* at 3679).

The price of Guo's coins was also a mirage. Rather than the product of a market accessible on a public ledger, H Coin and H Dollar were held almost entirely in wallets controlled by Je's entities. (Tr. 2646). That allowed Guo and his co-conspirators to stage-manage the purported cryptocurrencies and give them the illusion of reality. In June 2022, for example, Je publicly shared the news that "a buyer decided to purchase a world-class car" using H Dollar. (PSR ¶ 60). The car was a Ferrari purchased for Guo's son using victims' money, (*see* PSR ¶ 28), and the transaction was actually executed using a bank wire—with a fig-leaf H Dollar "transaction"

18

created after the fact. (PSR ¶ 60). HEX's purported investors could not use H Dollar or H Coin, either, or even take custody of the purported cryptocurrencies in accounts or wallets of their own. Instead, Guo's investors got "credits" that "represented" the sham assets, and that could not be used outside of Guo's HEX ecosystem and could not be converted into "fiat currency or crypto-assets" at all. (PSR ¶ 61).

The obscured centralized control of Guo's purported cryptocurrencies permitted their price to be manipulated by Guo's co-conspirators. Shortly after their initial public offering, HEX reported that the price of Guo's H Coin had increased from $0.10 to $27—a 26,900% increase within just a few weeks. (PSR ¶ 58). The allure of the coins' value "going to the moon"—a phrase Guo used to market the coins, and one that "implies a sharp increase in value" (PSR ¶ 59)—was combined with Guo's false promise that he would personally guarantee HEX's investors against losses: "It's all on Brother Seven if we lose money." (*E.g.*, GX Z9 at 64; GX C302-V7.)

Guo ultimately collected more than $260 million in victims' money through HEX. (PSR ¶ 56). That money played a vital role in his ongoing fraud, as both a source of personal enrichment and as yet another means of perpetuating and expanding Guo's racketeering enterprise. In April 2022, Guo and Je transferred $37 million from HEX "to cover the cost of a luxury yacht that Guo had previously purchased and used." (PSR ¶ 62). Later that year, Guo and his co-conspirators planned to use HEX investors' money to purchase a bank that would have afforded the G Enterprise an increased ability to launder and misappropriate victim funds and to obstruct law enforcement investigations—a plan that was only thwarted by the seizure of HEX's funds by the Government pursuant to seizure warrants. (*See, e.g.*, GX GC552; Tr. 2796). After HEX's fraud-funded coffers were depleted by those seizures, Guo continue to lie about the safety and stability of his HEX investors' money, telling them months after those seizures that "the issue and

19

redemption of HCoin and its stability, are all under the extremely strictest supervision by regulations." (GX Z9 at 184).

### F. A10

Following the Government's seizure of more than $600 million of Guo's fraud proceeds in late 2022 and early 2023, Guo sought one more cash grab through a purported investment opportunity that he called "A10." A10 was designed to raise additional victim proceeds and secure them offshore, in Abu Dhabi, outside of the jurisdiction of the United States. (Tr. 1460, 2810). G|CLUBS was the inspiration and foundation for A10, which involved Guo offering his victims an opportunity to buy A10 stock that was, according to Guo, "a completely independent G Club company established in Abu Dhabi." (GX VI189, GX VI189-T). At other times, Guo claimed that A10 purported to offer victims an opportunity to purchase ownership interest in Guo's Gettr social media platform and the Himalya Exchange. (GX Z10).

As Ms. Chen, a victim, explained during her trial testimony, A10 was another example of Guo "asking us to give money to investment, just keep draining out our pocket[s] . . . but where is the return?" (Tr. 4503). There was none.

### G. Obstruction of Justice

#### 1. *Obstruction Relating to the Offense Conduct*

Guo's conduct and his (often successful) efforts at obstruction display an utter contempt for the law. His obstructive conduct has taken many forms—from the complexity of the investment schemes described above, to the constant evolution of those investment opportunities after detection or disruption by criminal and civil authorities and other third parties, to moving both the enterprise's operations and fraud proceeds offshore so they would be beyond the jurisdictional

reach of both the Bankruptcy Trustee and U.S. law enforcement, to his intimidation of those who complained or criticized him or otherwise threatened the continuation of his criminal enterprise.

Guo's money launderer, William Je, sought to frustrate the Government's further seizure of fraud proceeds by transferring the remaining funds to bank accounts in the UAE (PSR ¶¶ 80-81), and even after Guo's arrest, the G Enterprise relocated to Dubai and redirected victim funds to accounts there. (Tr. 1472-77, 1481-87 ("Q: What's your understanding of why they didn't want to use US dollar? A: Because US dollar will be traced. Q: Traced by whom? A: Traced by US government."); *see also* PSR ¶¶ 96-97 (Wang's attempts to coordinate the retrieval of $7.1 million in fraud proceeds even after her arrest and detention)).

Guo also repeatedly labeled those who requested investment refunds as "CCP spies" and directed his thousands of followers to bully and harass them. That harassment took place both online and in person, in the form of paid protests at individuals' personal family homes. (Tr. 1487-89). Guo maintained a "black list" of former supporters who criticized Guo or his organizations. (Tr. 1489). Guo shared the personally identifiable information of people on his black list and directed his supporters to post and broadcast it online. (Tr. 1489-90). This intimidated and terrified many investors, who feared the consequences both for themselves and their families back in China were the CCP to learn that they had supported what they had previously believed to be an anti-CCP movement. Guo would also refuse to issue refunds to followers who were critical of him or the enterprise. (Tr. 1409-10). In at least two instances, Guo's protest targets were physically assaulted and injured. What was Guo's response to his loyal followers when he learned of those physical assaults? "Well done." (Tr. 1488).

21

2. *Obstruction Relating to the Bankruptcy Proceedings*

In addition to the obstruction directly related to the investment scams, and while they were ongoing, a slew of Guo's obstructive conduct occurred in connection with his bankruptcy proceeding and earlier civil litigation where Guo faced contempt sanctions. (*See* PSR ¶¶ 64, 83-90).

In 2017, the investment fund Pacific Alliance Asia Opportunity Fund L.P. ("PAX") filed a civil lawsuit against Guo in New York Superior Court, seeking the repayment of an overdue loan that Guo had personally guaranteed. In September 2020, PAX secured a judgment against Guo in the amount of approximately $114 million. (Tr. 4018). After PAX secured its judgment, it undertook efforts to enforce the judgment by identifying and then attempting to levy upon Guo's assets in the United States. However, "PAX encountered difficulty identifying assets over which Guo exercised control because Guo, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members." PAX Lawsuit, Index 652077/2017, Dkt. 1181, at 7-8 (N.Y. Sup. Ct. Feb. 9, 2022). PAX obtained a restraining order in October 2020 that covered Guo's yacht, the "Lady May," and ordered it not be moved outside the jurisdiction. (Tr. 4020; GX 1416). Yet the Lady May was moved outside the jurisdiction. As a result, on February 9, 2022, New York State Supreme Court Justice Ostrager entered a final order of contempt against Guo. (Tr. 4022-27; GX 1413). The court's order required Guo to pay $134 million in contempt fees in five business days. (Tr. 4027).

Instead of paying his contempt fees, on February 15, 2022, Guo filed for Chapter 11 bankruptcy in the District of Connecticut. (Tr. 4027). In his bankruptcy filings, Guo claimed to have as much as $500 million in debt and, despite living in expensive properties, surrounded by luxury cars and exorbitantly expensive furniture, declared under penalty of perjury that he had

essentially no assets. (Tr. 4039-42; GX 1407; GX 1420). While Guo's bankruptcy filings made note of his residences in Greenwich and at the Sherry Netherland hotel, they omitted any reference to Guo's mansion in Mahwah, New Jersey. (Tr. 4044). In sworn testimony in connection with his bankruptcy proceedings, Guo obstructed and lied under oath. As one example, Guo preposterously claimed, under oath, and in a spurious attempt to distance himself from GTV, that the "G" in "GTV" did not stand for "Guo":

> Q. What does the G in GTV stand for?
> A. God, the goal, like in G-O-A-L.
> Q. The English word "goal?"
> A. Yeah, goal or God.

(Tr. 4083).

Yet Guo's obstructive conduct in the bankruptcy went far beyond his own false declarations and perjurious testimony. Guo engineered a campaign of harassment against the Trustee and his family members in the form of protests after labeling the Trustee and others involved in the bankruptcy as "CCP spies." As noted, this form of intimidation was part of Guo's playbook and he used it to continue and facilitate his investment scams.[9] In the bankruptcy, the Trustee and his family, including his daughters, were the subject of protests, which lasted for 90 days. (Tr. 4091). Guo targeted the Trustee and the law firm where he worked, Paul Hastings, with protestors carrying signs like the following:

---

[9] Guo even directed protests of the SEC on the false pretense that the CCP had infiltrated the SEC. (PSR ¶ 89).



(GX VI 194). Guo also targeted the Trustee personally via his family members, protesting outside their personal homes, and even targeting the public elementary school where the Trustee's daughter, a teacher, worked. Guo's paid protestors held signs like this at the Trustee's daughter's apartment and the elementary school where she worked:



(DX 7007). The Trustee and his family were accused of being CCP "running dogs," "supporters of genocide," and having blood on their hands. Those allegations, as Guo well knew, were false and designed to rile up his supporters and deter the Bankruptcy Trustee (and others who contemplated action against Guo) from both seizing Guo's property and investigating his finances. (Tr. 4214 (the Trustee's son-in-law testifying that "prior to them showing up at our apartment, they'd show[n] up at Luc's work and Luc's house, so we had kind of understood by then that they—that this has been a pattern and that they were there because—to put pressure on Luc and his family in order to stop working on this case for the government.")).

There is no doubt that it was Guo who was directing this violence, because evidence of the harassment and targeting was recovered from one of his cellphones, which had the device name "Boss." (Tr. 4716-17). That evidence includes a truly chilling photograph of the Trustee and his

family at the wedding of one of his daughters, where the Trustee's three daughters were circled in red[10]:



(GX 1B124F; *see also* Tr. 4717).

Beyond the targeting and attempted intimidation of the Trustee and his family, Guo ordered others to obstruct the court proceedings in other ways. When Ya Li received a subpoena from the bankruptcy trustee, Guo told her to "throw it in the rubbish bin," and she complied because she believed Guo when he said that the U.S. Department of Justice had been "weaponized by the CCP." (Tr. 1498-99). In connection with the G Enterprise's efforts to keep assets outside the reach of the bankruptcy trustee even after Guo's arrest, Yongbing Zhang—the attorney and co-conspirator who "won" a Lamborghini in the G|CLUBS "sweepstakes," and with whom Guo who has continued to

---

[10] The red circles highlighting Despins's daughters appeared on the photograph that was recovered from Guo's cellphone. The Government added only the black redactions, to protect the privacy of victims and/or third parties in this public filing.

meet in the MDC following his arrest and detention—asked Ya Li to sign a false affidavit for filing in one of the bankruptcy litigations. (Tr. 1523-29; GX VI 66). When she refused, Zhang threatened Ms. Li with $38 million in liability. (Tr. 1530). After this threat from Guo's attorney, Ms. Li contemplated suicide. (Tr. 1530-31).

More recently, Guo's enterprise continues to harass and threaten those that oppose it. On March 10, 2026, in a video provided to the Government by a victim, Guo's NFSC presenters requested that Guo's remaining followers provide statements to Guo's court appointed counsel. In addition, the presenter indicated that the 126 victims who previously provided statements "will all have to bear the consequences." (Dkt. 832, Stmt. 206-B (translated)).



That appears to be a reference to the 126 victim statements filed with the Court on November 22, 2024. (Dkt. 477).

3. *Guo's Post-Arrest Obstruction*

Even after his arrest Guo has engaged in obstructive conduct. Guo's criminal Enterprise continued to operate following his arrest and Guo continued to direct it as it relocated to the UAE, outside the reach of U.S. law enforcement. (PSR ¶¶ 103-105). Following his arrest, Guo's

followers sought to fabricate evidence at the Mahwah Mansion to make it appear as if it were a

G|CLUBS property, rather than Guo's personal family home. (PSR ¶¶ 91-95). Similarly, following

Guo's arrest, one of Guo's top lieutenants, Brother Long Island, instructed Ya Li and others to

delete evidence from their phones in case they were arrested.[11] (Tr. 1500-02).

## IV.  <u>VICTIM STATEMENTS</u>

To date, the Government has received and provided to the Court a total of approximately

225 victim impact statements.  These statements reflect the extreme harm perpetrated by Guo on

hundreds of victims located throughout the United States, harm that included extreme financial

hardships, mental anguish, broken family bonds, and contemplation of self-harm including suicide.

Specifically, on November 22, 2024, the Government filed a letter attaching approximately

126 victim statements. (Dkt. 477). On December 11, 2024, the Government filed seven additional

victim statements that it had received. Dkt. 482. On January 2, 2025 and January 3, 2025, the

Government filed a total of 16 additional victim statements. (Dkts. 486, 487). The Court has sealed

dockets 477, 482, 486, and 487, which entries contain the aforementioned statements. On April 7,

2026, the Government filed an additional 74 statements under seal. (Dkt. 832). These cover letters

are provided to the Court as an Exhibit, under seal, in light of the Court's prior ruling.[12]

For the Court's convenience, the Government will provide a hard copy of all of these victim

impact statements to the Court's chambers.

---

[11] Prior to Guo's arrest, Guo himself instructed Ya Li and others to delete evidence from their phones. (Tr. 1500-02).

[12] The Government believes that the cover letter at Docket 477, which is attached under seal as Exhibit A to this filing, should be filed on the docket. That cover letter does not contain any personally identifying information for any victims. It merely summarizes certain statements received as of that date. Accordingly, the Government respectfully requests permission to file that letter on the docket.

## V.  **APPLICATION OF THE SENTENCING GUIDELINES**

### A.  **Applicable Law**

In calculating the applicable Sentencing Guidelines range, the Court must either rule on the parties' factual disputes or "determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B); *see also* Gleeson *et al.*, Second Circuit Criminal Handbook § 42-39 ("[T]he sentencing judge need not resolve every single dispute a party raises regarding the presentence report."). "[P]recise calculation of the applicable Guidelines range may not be necessary" if, among other things, the Court "decide[s] to impose a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). In that circumstance, the Court has "leeway" to "avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters, for example, determination of monetary loss." *Id.*

If a "factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." *United States v. Berndt*, 127 F.3d 251, 257 (2d Cir. 1997) (quoting U.S.S.G. § 6A1.3(a)). But the Court also has wide discretion in how to resolve such disputes—and evidentiary hearings are not required. *United States v. Ghailani*, 733 F.3d 29, 54 (2d Cir. 2013). In choosing whether to resolve material sentencing disputes by hearing or a more summary procedure, courts consider "the nature of the dispute, its relevance to the sentencing determination, and the applicable case law." *United States v. Brinkworth*, 68 F.3d 633, 640 (2d Cir. 1995). Disputed sentencing factors need only be proven by a preponderance of the evidence. *See, e.g.*, *Crosby*, 397 F.3d at 112; *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir. 1989).

### B.  Probation's Guidelines Calculation and Sentencing Recommendation

In the Presentence Investigation Report ("PSR"), the Probation Department calculates an adjusted offense level of 55—which exceeds the maximum offense level set forth in the U.S.S.G. sentencing table and is therefore "treated as a level 43" as Guo's case is one of "those rare instances where the total offense level is calculated in excess of that number"—and a criminal history category of I. (PSR ¶¶ 120, 123, 126).  Pursuant to U.S.S.G. § 5G1.2(b), Guo's Guidelines sentence is the maximum statutorily authorized length of imprisonment, which is 2,100 months, or 175 years. (PSR ¶ 167). The Government agrees with Probation's calculation of the Guidelines and submits that the Court should adopt it.

After describing Guo's personal circumstances, interviewing Guo, reviewing the trial record, and considering the offense conduct, the Probation Department recommended that Guo be sentenced to 25 years' imprisonment—20 years on Counts One, Two, Three, Seven, Eight, Nine, Ten, and Eleven (to run concurrently), and 5 years on Count Four (to run consecutively). (PSR at 58). The Probation Department pointed out that, although Guo declined to discuss the offense conduct during his interview, "he noted that he maintains his innocence." (PSR at 59). The Probation Department emphasized that Guo's criminal conduct "resulted in astronomical losses totaling more than $1 billion to thousands of victims" and that Guo "played a pivotal role in the offense as the leader of the scheme." (*Id.* at 61).  While mindful of Guo's personal circumstances— which are sourced almost entirely from Guo—including the "personal losses that [Guo] has reportedly suffered at the hands of the CCP [Chinese Communist Party], as well as the potential danger he would face if returned to his native country"—the Probation Department "do[es] not believe that the personal history and characteristics of the defendant outweigh the need for *significant* punishment and deterrence in this case." (*Id.*) (emphasis added).

30

## C.   The Offense Involved an Actual Loss in Excess of $550 Million

As the Court saw at trial, Guo's offenses caused losses to thousands of investors. Whatever reasonable estimate the Court may choose to employ to compute the harm of Guo's schemes, the total losses exceed $550 million and, in fact, exceed a billion dollars. Because Guo's offense resulted in losses exceeding $550 million, his Guidelines offense level increases 30 levels. U.S.S.G. § 2B.1(b)(2)(P).

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i). And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, cmt. 3(A)(iii), (iv). "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," and includes any "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.*, cmt. 3(A)(ii). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt. 3(c); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

1.   *The Trial Record and Tracing Affidavits Prove the Loss Amount Exceeded $550 Million*

The record before the Court amply supports a loss amount exceeding $550 million. In fact, the trial evidence shows that $1.3 billion is a conservative estimate of the amount of funds sent by

individual victims to certain arms of the G Enterprise's frauds: GTV, the Farms, G|CLUBS, and the Himalaya Exchange. (*See* GX Z26; Tr. 4330-32). GX Z26 summarizes thousands of pages of bank records, which were also admitted as exhibits. (GX Z26 at 36 (citing source exhibits)). GX Z26 establishes, by at least a preponderance of evidence, that $1.3 billion flowed into bank accounts associated with the racketeering enterprise, which the jury's verdict demonstrates were the result of fraud. That exhibit, and the maze of bank accounts it summarizes, also demonstrates the involvement of $1.3 billion in money laundering.

Guo argues that the Government's summary witness at trial, Paul Hinton, who testified about his analysis of financial records for the entities that comprise the G Enterprise, does not provide a sufficient basis for the Court to find "any" loss amount. (Guo Sentencing Submission ("Guo Sub.") 44). Guo's arguments can be dispensed with easily. Guo appears to argue that the Court cannot use the money that flowed into the bank accounts of the G Enterprise as a reasonable estimate of the loss amount because Hinton did not perform a "tracing" analysis.[13] (Guo Sub. 44). But there is no legal requirement that a district judge's loss estimate for purposes of calculating the Guidelines be based on any kind of meticulous tracing analysis. *See Coppola*, 671 F.3d at 250 (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information"). In any event, even if there were such a requirement, the Court already has

---

[13] At trial, the Government specifically proved, via other witnesses who did perform tracing analyses, the misappropriation of well over $100 million by Guo and his conspirators. For example, the Government walked through summary charts showing how investor funds were used: (1) to purchase the Mahwah Mansion and the lavish furnishing and renovation of the mansion for Guo and his family (GX Z12A), (2) to purchase a $4 million Ferrari for Guo's son (GX Z14), and (3) to place a highly speculative $100 million bet with a hedge fund for the benefit of Guo's son (GX Z1).

32

before it tracing analyses for $634,827,401.97 of fraud proceeds—*i.e.*, an amount exceeding $550 million—that were seized by the Government pursuant to court-authorized seizure warrants. (Dkt. 716 (Gov't motion for preliminary order of forfeiture)).   In connection with its motion for a preliminary order of forfeiture against Guo, the Government submitted the sworn warrant affidavits that trace that amount of fraud proceeds, and indeed the Court has already relied on those affidavits when entering a preliminary forfeiture order against Guo. (Dkt. 720 (preliminary order of forfeiture against Guo)). Moreover, because the amount of fraud proceeds *actually seized* from the Guo Enterprise indisputably exceeds $550 million, Guo's arguments related to any purported double-counting, and any redemptions or refunds back to investors, are immaterial and can also be easily dismissed.[14]  (Guo Sub. 44-45, 52-54, 63-66).

Relatedly, Guo's suggestion that the loss amount should be offset by "the value of the investment an investor retained regardless of the fraud" (Guo Sub. 66) is baseless. On top of the fact that no material value was conveyed to the victim investors and customers,[15] the principle does not apply to calculation of the Guidelines loss amount. The Guidelines provide for "credits

---

[14] In arguing, incorrectly, that the victims' losses were caused by the Government's seizures, Guo makes a wholly unsupported claim that appears intended to mislead his victims and misdirect the blame for their losses.  Regarding the SEC's Fair Fund distribution for the GTV Private Placement, Guo asserts, without any citation: "For example, as a result of the GTV seizure, GTV investors lost at least 8% of their GTV investments, as 8% was the amount retained by the SEC before distribution pursuant to the SEC's Fair Fund." (Guo Sub. 50 n.44). That is not correct. The SEC does not, and did not, retain victim investor funds for itself (nor did it "seize" any funds, which were in fact received through a voluntary settlement). Guo's victims lost 8% of their investment because *Guo misappropriated their funds* for a $100 million hedge fund bet that *lost $30 million* before U.S. authorities intervened and saved the remainder. (*See* GX STIP 19). And then Guo lied to his followers about it afterwards, on video. (Tr. 1370-73; GX VI 158, 158-T).

[15] At trial, victims testified about how they did not receive stock, or how they received token items like "a cup and also some cookies," in exchange for tens or hundreds of thousands of dollars. (*E.g.*, Tr. 409, 1179, 1211-12, 1386-87).

against loss" in two specific circumstances, neither of which apply here.  First, where the defendant returns the victim's money or property before the offense was detected, and, second, in cases where the defendant pledged collateral to the victim.  U.S.S.G. § 2B1.1 cmt. n. 3(D)(i), (ii). Neither applies here.[16] Moreover, the defendant's offense involved fraudulent inducement. The Second Circuit has specifically rejected the argument that there should be a reduction of loss based on the value of a victim's equity stake in a business—assuming, *arguendo*, that any victim here actually received such an equity stake, which they did not in this case—where the defendant's offense was to fraudulently induce the victim to acquire that equity in the first place.  *See United States v. Komar*, 529 F. App'x 28, 29 (2d Cir. 2013) (noting that the § 2B1.1(b)(1) "application notes significantly omit any direction to apply the value of an equity stake as a credit against actual loss," and holding that "[t]he 'loss' was the money that the investors were fraudulently induced to invest . . . irrespective of the value of the [property]"); *see also United States v. Paul*, 634 F.3d 668, 677–78 (2d Cir. 2011) (rejecting need to consider non-fraud factors that may have reduced a stock's value, because "[i]n the instant case . . . the loss to [the victim banks] was not caused by the decline" in stock value, but by the victim banks being fraudulently induced into "the making of the loans in the first instance"); *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010) (rejecting defendant's contention that loss amount is zero "because the properties in which her victims thought they were investing arguably had some market value," and emphasizing that the victims'

---

[16] Additionally, Guo was convicted of money laundering, and the Section 2S1.1 Guideline groups with Section 2B1.1. There is no "credit against loss" in the money laundering context: under Section 2S1.1, defendants who launder money are accountable for the "offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1); *United States v. Eckstein*, No. CR 12-3182 JB, 2016 WL 546663, at *7 (D.N.M. Feb. 3, 2016) (no "credit against loss" in money laundering case because that credit "would not reflect a money laundering scheme's full impact.").

34

loss is the "principal value of the loans they made to [defendant]"); *United States v. Stitsky*, 536 F. App'x 98, 110–12 (2d Cir. 2013) ("the district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because [the victim] investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance."); *United States v. Shkreli*, No. 15 Cr. 637 (KAM), 2018 WL 9539774, at *18 (E.D.N.Y. Feb. 26, 2018), *aff'd*, 779 F. App'x 38 (2d Cir. 2019) ("Consistent with Second Circuit precedent, the appropriate calculation of loss for Count Three is [the] amount 'that the investors were fraudulently induced to invest' and keep invested in MSMB Capital, based on Mr. Shkreli's many misrepresentations relating to the size, investing strategy, and performance of his MSMB Capital fund." (quoting *Komar*, 529 F. App'x at 29)); *United States v. Bryson*, 101 F. Supp. 3d 147, 155–56 (D. Conn. 2015) (holding that the loss to "investors who were fraudulently induced to invest" was "the total value of their investment" because "[t]he loss to these investors was caused not by the decline in value of [their investment], but by their having invested in the first place").

Accordingly, given the substantial record before the Court, including the evidence presented at a two-month trial over which the Court personally presided and the amount of fraud proceeds actually seized, there is absolutely no need for a *Fatico* hearing in order for the Court to make a reasonable estimate of the loss amount. The loss amount plainly exceeds $550 million. (*See* GX Z26; Tr. 4330-32).

2. *The GTV Private Placement Fraud Should Be Included in the Loss Amount Calculation*

Guo argues that the Court must exclude the GTV Private Placement loss amount of approximately $411 million from the loss calculation under the Guidelines because the jury acquitted Guo of the substantive wire fraud and securities fraud related to the GTV Private

Placement. (Guo Sub. 56-62). As an initial matter, even if it were excluded, the applicable loss still would exceed $550 million. In any event, it is black-letter law that a "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam). That is because "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *Id.* at 155. Accordingly, "[a]cquitted conduct may be considered by the sentencing court so long as it is based on reliable information and is proven by a preponderance of the evidence," *United States v. Willis*, 14 F.4th 170, 188 (2d Cir. 2021), and "district courts may find facts relevant to sentencing—as opposed to elements of the offense—by a preponderance of the evidence and in so doing may take into account acquitted conduct when sentencing defendants," *United States v. Johnson*, 507 F.3d 793, 797 (2d Cir. 2007).

The amendment to U.S.S.G. § 1B1.3(c), effective November 1, 2024, does not call for a different result here. Section 1B1.3(c) provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court *unless such conduct also establishes, in whole or in part, the instant offense of conviction*." U.S.S.G. § 1B1.3(c) (emphasis added). The last clause of Section 1B1.3(c) is applicable here. Guo was convicted of racketeering conspiracy (Count One), wire fraud conspiracy (Count Two), securities fraud conspiracy (Count Three), and money laundering conspiracy (Count Four), which were established, in whole or in part, by the conduct of the GTV Private Placement. And in cases where "certain conduct underlies both an acquitted charge and the instant offense[s] of conviction," "the court is in the best position to determine whether such overlapping conduct establishes, in whole

36

or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3(c), App. Note 10.

That is the case here. As previously laid out (Dkt. 716), extensive trial evidence established, as alleged in the Indictment, that the RICO enterprise began well prior to the 2020 GTV private placement, with the Rule of Law fraud. Guo then continued to defraud his followers with a series of interconnected schemes, including the GTV Private Placement in 2020. Multiple investors testified as to how Guo fraudulently induced them into investing in GTV by purporting to guarantee investors against loss, claiming their funds would be used to grow GTV's business, and instead sending $100 million of investor funds to a high-risk hedge fund bet for the benefit of Guo's son.  (*See* Tr. 209 (Le Zhou); *id.* at 701 (Patrick Chin); *id.* at 2376-77 (Minran Wu); *id.* at 4465-67, 4471-72 (Wei Chen); *id.* at 1350-58, 1365-73 (Ya Li)). Further, the GTV Private Placement was connected with and integral to the other arms of the G Enterprise.  Indeed, the Farm loan and G Clubs schemes were ways to conceal issuances of GTV stock—and they were promoted on the GTV platform itself.  (*See, e.g.*, GX Z9 (summary chart of Guo videos, including those posted preserved from the GTV website, and including videos where Guo falsely promises GTV stock in exchange for Farm loans and G Clubs memberships)). Even the H Coin-related schemes were interconnected with the GTV Private Placement. (*See, e.g.*, Tr. 244 (allocation of H Coin based on prior investment, including in GTV); *id.* at 1358 (Ya Li testifying that the "[r]einvestment rule is once you received the refund from SEC [for the GTV private placement], within 45 days you should invest this money back to the investment project and then you can get five percent of H Coin.")).

Accordingly, the Court should include the approximately $411 million loss amount for the GTV Private Placement in its Guidelines calculation.

3.  *Whether an Investor Subjectively Regards Oneself as a "Victim" Is Irrelevant to the Guidelines Calculation*

Guo next argues that funds from any investors who do not regard themselves as "victims" cannot count towards this Court's estimate of the loss amount for purposes of the Guidelines calculation.[17] (Guo Sub. 45-52). Guo is wrong as a matter of law. Guo appears to present his argument as one of materiality, seeming to claim that if a particular investor claims that Guo's lies were immaterial to their decision to invest, that investor's investment amount cannot be considered for purposes of calculating the loss amount under the Guidelines. It is black-letter law, however, that materiality is not a subjective standard, but rather an objective standard relating to what would be important to a reasonable person. *See, e.g.*, *United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (affirming instruction that did not require jury to consider materiality "from the subjective perspective of the victim" because "a matter is material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question"); *see also* Tr. 5793 ("[THE COURT:] A material fact is one which would be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision."). That is because the focus of the criminal law is on *the defendant*'s *intent*, not that of the victim, and the same is true of the Guidelines, which treat actual loss and *intended* loss equivalently. U.S.S.G. § 2B1.1, note (A). Guo's criminal intent to deceive his victims about material information was proven at trial by overwhelming evidence that showed him, indisputably, lying over and over to execute a cascading series of scams that betrayed the trust of an affinity

---

[17] In the course of making this argument, Guo repeats quotations from a forfeiture petition claiming that the seizure of funds that were going to be used to purchase Mercantile Bank had nothing to do with this case. That is wrong. For example, the "digital bank" project was one of the investment scams that Ya Li testified about and, in fact, helped organize. (Tr. 1342-43, 1430-32).

group whom he conned to the tune of over a billion dollars. Guo's video-recorded lies were obviously material to any reasonable investor. He lied, for example, about how he would *never* steal his investors' money, when he was in fact doing exactly that.

In the face of settled law showing his argument is baseless, Guo acknowledges that "materiality ordinarily would be subject to a 'reasonable person' standard," but contends that a single Second Circuit case from over three decades ago, *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), establishes that if a victim disavows materiality then the victim is no longer a victim and his loss is not a loss amount under the Guidelines. (Guo Sub. 45-46). *Miller* does no such thing. That opinion had nothing to do with materiality. It concerned the "money or property" element of mail fraud. *Miller*, 997 F.2d at 1017 (reversing convictions because the government "fail[e]d to establish a § 1341 property interest"). Nor does the portion of *Miller* excerpted in the defendant's submission contain dicta relating to materiality. (Guo Sub. 46). In that excerpt, the Circuit was considering whether the defendants (who were lawyers) and a group of investors purchasing apartments in an apartment building had an agency relationship that prohibited the defendants from also purchasing, in parallel to the group, apartments in the same apartment building, such that the putative agency relationship might have established a constructive trust that could be considered the investor group's proprietary interest under the mail fraud statute. 997 F.2d at 1020. The head of the investor group's testimony, *see id.* at 1014, however, repudiated the existence of such an agency relationship and thus there was no constructive trust and no proprietary interest, only a breach of "honest and faithful service" by the defendants. [18] *Id.* at 1020.

---

[18] While Congress had amended the federal fraud statutes to encompass honest services fraud in 1988, the conduct in *Miller* occurred prior to 1988 and thus the amendment could not be applied retroactively to the defendants' conduct. *See Miller*, 997 F.2d at 1016 n.5.

Accordingly, and contrary to Guo's assertions, *Miller* did not involve a victim who "specifically and affirmatively disavow[ed]" the materiality of lies told to him (Guo Sub. 46), and has no bearing on the well-settled rule that materiality is an objective standard.

To the extent Guo may be seeking to offer investors' subjective views as a mitigation argument, the Court can consider that, for whatever it's worth, in its assessment of the Section 3553(a) factors. But whatever its merits as a purported mitigation argument—and it is not mitigating, in the Government's view, that Guo successfully convinced some of his fraud victims they were not harmed when he took their money under false and fraudulent pretenses, *see infra*, Section VI.B—the issue is legally irrelevant to the Guidelines and provides no basis for a *Fatico* hearing or further delay of Guo's sentencing.

4. *The Preponderance Standard Applies*

Guo's argument that a higher burden of proof applies to the Guidelines loss amount calculation (Guo Sub. 66-70) is foreclosed by long-settled precedent, including the cases cited by Guo. Indeed, the case that Guo appears to principally rely on, in fact, rejected the use of a higher burden of proof at sentencing "i[n] light of this Court's continual application of the preponderance of the evidence standard" and reversed the district court's use of the clear and convincing standard. *United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000). To the extent Guo argues that the Court should vary downward from the Guidelines sentence of 175 years' imprisonment (*see* Guo Sub. 67 (referring to the use of "downward departure (or, in the post-*Booker* era, a downward variance)")), that has no bearing on the Court's reasonable estimate of what the loss amount is, nor, more specifically, on the standard of proof that applies at sentencing to factual determinations and Guidelines enhancements under well-established law. Indeed, if the Court "decide[s] to impose a non-Guidelines sentence"—as both the Government and the Probation

40

Office recommend—the Court need not "make precise determinations of some complicated matters" including the "determination of monetary loss." *Crosby*, 397 F.3d at 112.

5.  *Guo's Guidelines Sentence Remains 175 Years Even if the Court Found the Loss Amount Was Merely Over $3.5 Million*

Lastly, while not an argument about the calculation of the loss amount, Guo argues that large loss amounts irrationally influence the applicable Guidelines sentence. (Guo Sub. 70-79). Whatever the Court may think of this argument in the abstract, it lacks force as to Guo's Guidelines calculation. As correctly calculated by Probation, Guo's offense level with a loss amount of $550 million would be 55—well above the maximum offense level of 43, which already advises a sentence of life imprisonment (adjusted to account for the 175-year statutory maximum for Guo's counts of conviction per U.S.S.G. § 5G1.2(b))—so Guo's offense level is automatically reduced to 43.  Notably, if this Court were to find a loss amount merely of more than $3.5 million, *see* U.S.S.G. § 2B1.1(b)(1)(J), Guo's offense level would still be 43 and his Guidelines sentence would still be 175 years' imprisonment, because of the other enhancements that apply to Guo's egregious conduct.  As a result, while the evidence clearly supports a finding that the loss amount exceeded $550 million in this case, virtually all of Guo's arguments regarding loss are immaterial to the ultimate Guidelines calculation.

D.  **Responses to Guo's Other Guidelines Objections**

Guo's "[o]bjections to [o]ther [g]uidelines [e]nhancements," (Guo Sub. 79-82), amount to denials of facts proven at trial or otherwise apparent from the record. These objections are meritless and should be rejected.

Guo objects to the enhancement for the offense involving 10 or more victims, on the ground that there is "no evidence of any victims other than the five witnesses who claimed to have lost money on their G-Series investments." (Guo Sub. 79). The victims who testified at trial were just

41

several of the many people who watched Guo's broadcasts and sent millions and millions of their own money to Guo because they trusted his false promises. Indeed, more than 200 of Guo's victims have written the Court to be heard at sentencing. Guo's continuing denial of their existence is offensive, and his objections premised on the erasure of the many people he stole from should be denied.

Guo objects to the enhancement for committing fraud while "acting on behalf of a charitable, educational, religious, or political organization or a government agency," on the purported grounds that "there was nothing fraudulent about either The Rule of Law Foundation or the Rule of Law Society." (Guo Sub. 79). The objection is similarly premised on an unwillingness to acknowledge the facts proven at trial. Guo's first count of conviction is for a racketeering conspiracy that included both Rule of Law organizations among "[t]he interrelated and overlapping entities that form[ed] the G Enterprise." (S3 Indictment ¶ 3(a); PSR ¶ 25). At trial, the Rule of Law Society's former president and treasurer Karin Maistrello testified that the organization did "nothing" to support its purported charitable mission. (Tr. 424.) Additional trial evidence established that Rule of Law donors' money was used to fund protests against Guo's critics, purchase N95 masks for Guo and his family, and promote Guo's celebrity. (Tr. 476, 481, 1488 ("[protestors] paid by Rule of Law Foundation").) Indeed, the Rule of Law organizations were a critical instrumentality of the fraud in this case. (*See* PSR ¶ 30 (finding that Guo "used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe Guo's statements regarding investment and moneymaking opportunities")).

Guo objects to enhancements for committing fraud by sophisticated means and through sophisticated laundering because, among other things, the factual basis is "purely speculative" and

42

"there were no shell corporations" involved in his crimes. (Guo Sub. 79-80). Guo's objection denies not only reality but the Court's prior determinations: at Wang's sentencing, the Court found in relevant part that "the conspirators created shell companies . . . and moved their victims' money across hundreds of bank accounts held in various names" at "Guo and Wang's direction." (Dkt. 491 at 56). That finding drew on extensive trial evidence of Guo's use of shell entities to commit his fraud and launder its proceeds. (*E.g.*, Tr. 2904-05 (testimony and documentary evidence regarding Guo's personal lawyer's purported representation of a company owned by Mei Guo, his daughter, to purchase the Mahwah Mansion); *see also, e.g.*, PSR ¶ 62 (finding that Guo and Je transferred Himalaya Exchange funds held by an offshore entity to an escrow account and "structured [the transaction] as a purported 'loan' to cover the cost of a luxury yacht that Guo had previously purchased and used, which yacht was then-owned by an entity held in the name" of his daughter)). The enhancement has a basis independent from the defense's erroneous arguments. For example, the defendant invented a false cryptocurrency to enhance his fraud. Such conduct is fairly considered "sophisticated." *See* U.S.S.G. § 2B1.1, app. note 9 (defining "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" including, for example, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts"). Guo's objection to enhancements premised on using sophisticated means and sophisticated laundering are not serious challenges in the face of the trial record, and should be rejected.

Guo objects to the enhancement for deriving more than $1 million from at least one financial institution because he "did not personally receive more than $1 million" as a result of his crimes. (Guo Sub. 80). The objection is baseless. Guo's counts of conviction included Count

Two's conspiracy to commit wire fraud and bank fraud. All the Court must do to apply this enhancement is to "reasonably conclude[]" by a preponderance of the evidence "that [Guo] must have profited at least $1 million" from one or more financial institutions over the course of his billion-dollar racketeering and fraud conspiracy. *United States v. Constantinescu*, 147 F.4th 299, 316 (2d Cir. 2025). The record is replete with such evidence. (*See, e.g.*, PSR ¶ 55(a) (G CLUBS funds, "funneled through bank accounts in other entities' names, were used to pay personal expenses for Guo and his family, including luxury purchases of an approximately $2.6 million yacht"); *id.* ¶ 55(b) (describing Je's use of "approximately $26.5 million of G CLUBS funds, which had been funneled through bank accounts in other entities' names, toward the purchase of Guo's 50,000 square foot New Jersey mansion")).

Guo's objection to the enhancement for obstruction of justice is based on his inaccurate assertion that "[t]here is no evidence to support the purported grounds." (Guo Sub. 81). That evidence is laid out in detail in Section III.G above ("Obstruction of Justice"), and paragraphs 91-97 of the PSR.

Guo's objection to the four-level enhancement for serving as an organizer or leader of the crime is another unserious effort to deny the reality of the jury's verdict. (Guo Sub. 81 (asserting that Guo "was not an organizer or leader of any criminal activity"). Guo was convicted of, among other things, a count that alleged that Guo "was the leader of, and directed, the G Enterprise." (S3 Indictment ¶ 9).[19]

---

[19] Guo's submission includes an additional section enumerating "[a]dditional [o]bjections to the PSR" that are all premised on his "disagree[ment] with . . . the jury's verdict." (Guo Sub. 82-92). Guo objects to much of the PSR in this section on the grounds that it "conclude[s] that Mr. Guo is guilty of any offense." (*Id.* at 82). The Government need not respond to Guo's objections that are premised on a wholesale rejection of the jury's verdicts of his guilt.

## VI.  THE COURT SHOULD IMPOSE A SENTENCE OF AT LEAST 30 YEARS' IMPRISONMENT

### A.  The Nature, Circumstances, and Seriousness of the Offense Warrant a Lengthy Sentence

#### 1.  *Guo Caused Immense Pain and Suffering to Thousands of Victims*

Guo caused staggering financial losses to thousands of victims. His victims were primarily ordinary citizens and retail investors, and Guo tricked them out of money they needed for their financial futures and security. It is rare for a fraud case to cause harm exceeding a billion dollars. And when that has occurred, the loss often stems from corporate malfeasance, such as accounting fraud that causes the decline of a stock price.  The astronomical loss here was caused by Guo's use of lies to take money from thousands of his victims. Guo told lies to take a billion dollars from victims, and he supervised and created a large international organization to help him execute that fraud every step of the way.

While the billion-dollar loss figure is enormous on a macrolevel, it is important to appreciate the harm inflicted on an individual level as well. As victims recounted during Guo's trial, they lost retirement savings, incurred debt, and suffered deeply because of this fraud. Hundreds of additional victim statements corroborate that trial testimony:

- "I have no job, and I gave all my money to Miles Guo. Now, I have no idea how I will sustain myself for the rest of my life or how to face my family." Dkt. 832, Stmt. 158.

- "I was forced to sell our only home, and my wife liquidated her life insurance investment of nearly 15 years, pouring all the funds into [the defendants] bogus projects. These decisions dealt a devastating blow to our family's finances and future security." Dkt. 477, Stmt. 1.

- "[M]y family and I were defrauded of around $500,000, most of which came from selling our home. Now, this entire amount has been lost. This has pushed us from a stable middle-class life to living on borrowed money." Dkt. 477, Stmt. 11.

45

- "This has not only severely impacted on our family's immediate financial security, but has also had a significant shock to our long-term retirement plans, our children's education, and other important aspects of our lives." Dkt. 477. Stmt. 113.

- "This case destroyed everything I had—my family's savings, our ability to support each other, and even our emotional connection. I involved my mother and brother, thinking I was helping them, only to see all of us dragged into financial ruin. My children's futures were deeply affected. The stability and dignity I dreamed of giving them were shattered." Dkt. 832, Stmt. 200.

Guo's malicious activity permeated beyond significant financial calamity, it caused sheer devastation:

- "This fraud has devastated my life." Dkt. 832, Stmt. 152.

- "I am in a very bad state of mind and unable to work, I have no money for treatment." Dkt. 477. Stmt. 42.

- "This scam has seriously damaged our physical and mental health. We cannot sleep properly every day and are in extreme pain. Now we hardly afford the rent of our apartment and our son's tuition fees." Dkt. 477, Stmt. 27.

- "This fraud has also shattered my worldview. I once believed the world was a good place where people could trust one another. Now, I don't know how to trust anyone, not even my closest family members. My paranoia and mood swings have strained my relationship with my loved ones." Dkt. 477, Stmt. 11.

- "Loneliness, helplessness and self-blame accompany me every second" Dkt. 477, Stmt. 37.

- "Since discovering the fraud, I have experience intense anxiety, fear, and emotional breakdowns. I suffer from chronic insomnia and depression, and my daily life has been significantly disrupted. The psychological damage caused by this incident is deep and long-lasting, and I am currently undergoing counseling and therapy to cope with the aftermath." Dkt. 832, Stmt. 210.

- "It stripped away a significant portion of [my mother's] life savings—$500,000 intended to secure my future and that of my family. This loss exacerbated her health conditions, robbing her of peace in her final years. The scam preyed on her trust, undermining the financial legacy she worked tirelessly to build." Dkt. 832, Stmt. 198.

- "Each day is spent in agonizing regret and self-reproach, and every night is consumed by endless nightmares. I honestly don't know how much longer I can endure living under such a heavy cloud." Dkt. 832, Stmt. 163A.

- "After being defrauded, we fell into severe financial hardship, were forced to cut back on daily expenses, and even considered selling assets to maintain basic living standards. More painfully, this scam has inflicted serious emotional trauma on me and my family. I have suffered from long-term anxiety and insomnia. Trust within my family has been badly damaged." Dkt. 832, Stmt. 190B.

Guo's harm affected many so deeply that some considered suicide and self-harm:

- o "I lost my money, I lost my passion, my whole body was depressed, I suffered from severe depression and want to kill myself every day." Dkt. 832, Stmt. 202.

- "Guo Wengui deceived and insulted our beliefs under the guise of democracy and the rule of law. I felt so miserable that I thought about suicide many times. This is a complete nightmare for me and my family. This is not a simple scam, it is a form of brainwashing. They encourage their followers to harass judges and attack people who oppose Miles Guo." Dkt. 477, Stmt. 59.

- "This fraud has left me feeling helpless and in despair, even leading me to consider suicide at one point. The damage caused by this scam to me and my family is lifelong and irreparable." Dkt. 477, Stmt. 85.

- Trial Tr. at 1531-32 (Ya Li's testimony that, upon discovering that Guo's movement was a scam, she felt "very angry, desperate, I feel guilty, I feel regret, and I'm very depressed, and I thought—thought about suicide").

- "The material losses were catastrophic—we lost nearly everything. But the psychological collapse was even more profound. My entire moral compass, built around truth, compassion, and community, was manipulated and shattered. I had trusted blindly. When the truth became undeniable, I was overwhelmed with shame, guilt, and despair. I struggled with recurring suicidal thoughts. I lost my will to live, to hope, to believe in anything again." Dkt. 832, Stmt. 200.

In addition to the more than 200 statements submitted for sentencing, the FBI interviewed dozens upon dozens of victims who recounted the sometimes-excruciating losses they suffered—but many remain afraid to speak publicly, for fear of retribution by Guo and his remaining supporters. The victims in this case were individuals who believed in Guo's schemes in the misleading way they were marketed—as a grand opportunity to become rich. Guo knew that was

a colossal lie (or, more precisely, a torrent of lies). Indeed, Guo himself claimed to personally guarantee that none of his victims would suffer loss, that their money was safe, and that he would never use it for himself. But he knew these claims were lies, as he misappropriated victims' money and conned them into investing more and more of their savings. (*See* Tr. 279, 2430, 1177).

The seriousness of Guo's offenses also is exemplified by the geographic reach of the scheme, which literally spanned the globe. Victims could be found in nearly every corner of the earth, and throughout the United States. The operations of the fraud were also global in scale, with companies, entities, and bank accounts in an array of jurisdictions including the British Virgin Islands, Australia, Switzerland, the United Arab Emirates, and Kyrgyzstan.

2. *Guo Led a Five-Year Scheme to Defraud with Serial Efforts to Evade and Obstruct Justice*

The G Enterprise was a massive, sprawling, and complex universe of fraudulent solicitation, receipt, laundering, and expenditure. (*See* PSR ¶ 24 (finding that it operated "through a series of complex and largely fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities")). But Guo was its namesake—and its singular and indispensable leader. As this Court has found—and as Guo's own blinkered version of events begins—the G Enterprise "[r]el[ied] on Guo's massive online presence." (Dkt. 491 at 55). His submission concurs, describing how Guo "amassed a massive social media following, with hundreds of thousands if not more than one million followers at times. Millions of members of the Chinese diaspora . . . found resonance in Guo's messages." (Guo Sub. 13). And while Guo's enterprise was served by various of his lieutenants (*see* PSR ¶¶ 31-32 (describing Je as the G Enterprise's "financial architect" and Wang as Guo's effective "chief of staff")), it was always Miles Guo who, as this Court has put it, "had the final say." (Dkt. 491 at 57). Put simply, there could have been no GTV, no G|CLUBS, no G Coin (which became H Coin)—there could have

48

been no G Enterprise—without Miles Guo. As one victim said, Guo "had videos every day." (Tr. 4616). The same victim's experience was typical in another respect: Guo was not only a figure on his followers' computer and television screens, broadcasting from his GTV studios for hours a day. (*See* Tr. 1330 (testimony of Ya Li that she watched "[a]ll" of Guo's videos "everyday")). Guo was also personally in contact with dozens if not hundreds of his victims—an unusual degree of intimacy for the leader and organizer of a mass fraud. Ya Li testified that after becoming a follower of Guo's through his daily broadcasts, she and another supporter sent Guo a picture of a birthday cake she made for him—and was soon added to a WhatsApp group chat with Guo himself. (Tr. 1331-32). Victim Wei Chen testified that Guo communicated with her family personally via WhatsApp chat, where he "sent the GTV investment information including wire instruction to my husband." (Tr. 4689).

Guo commanded loyalty from his deputies, and awe and respect from his followers. His chief of staff, Wang, called Guo "the Principal." (Tr. 426). A security official in the G Enterprise called him just "P," shorthand for the same title at the top of the hierarchy. (Tr. 5484). "A lot of people" called him, simply, "Boss." (Tr. 5484; *see also id.* at 421). The enterprise's takings were divided accordingly. To be sure, Guo was not the only person to profit from the G Enterprise's fraud proceeds. But he took more than the lion's share of its ill-gotten gains for himself and his immediate family. While Je "transferred at least $10 million of the fraud proceeds into his and his spouse's personal bank accounts," (PSR ¶ 28), Guo took the rest of "more than approximately $300 million of the fraudulent scheme's proceeds for [his] and [his] family's benefit." (PSR ¶ 28). For her part, Wang—the G Enterprise's chief of staff—was rewarded with far less: a six-figure cash salary and an entitlement to Guo's purported cryptocurrency that her counsel later conceded "was worthless and illiquid." (PSR ¶ 28 & n.2).

49

With his supporters, Guo encouraged the creation of a cult of personality. "[W]e all use[d] [to] call Miles Guo 'seven brothers'" or Brother Seven, one victim testified, explaining that the New Federal State of China's seven-sided star banner was "a flag that represents . . . Miles, the seven." (Tr. 223). And Guo, in turn, allowed others a form of access to his cult of personality by bestowing titles on a select group of dedicated followers he called "the Iron Blood group." (Tr. 196). These were "individuals selected by Miles, to give titles . . . Miles Guo said, those are brothers because those brothers are willing to sacrifice for him and shed the blood with him and for this movement." (*Id.* at 196-97; *see also* Tr. 1315 (Guo called Ya Li, an Iron Blood leader, "sister")).

When victims granted an audience with Guo raised questions or offered criticisms, Guo made a performance of attacking their disloyalty and kicking them out of the group of supporters. (*See, e.g.*, Tr. 1199-1200, 1214 (testimony of Jenny Li that when an investor asked Guo for a refund on a Discord "audio meeting," Guo told the group that "if you ask refund again, you will be kicked out")). He organized protests targeting his critics. (*See, e.g.*, Tr. 1195). When victims sought refunds of their sham investments, Guo would rely on other supporters—including the Iron Bloods—to vet the requests before Guo personally decided on whether to return their money. His decision would "depend[] on the supporter's attitude," Ya Li explained: "If it's normal, we'll give them the refund. If—if the supporter's public criticize him or criticize—criticize the New Federal State of China, then we not refund." (Tr. 1409-10).

Guo's personal and intimate leadership of the G Enterprise meaningfully aggravates his culpability for his racketeering and fraud convictions. His cultivation of an aura of extraordinary leadership was a critical instrumentality of the scheme. *See United States v. Raniere*, No. 18 Cr. 204 (NGG), Dkt. 966 (Court's Sent'g Mem.) at 10-11 (E.D.N.Y. Oct. 27, 2020) (describing unique

culpability of a fraudulent organization's charismatic founder who "made members of" the group "call him 'The Vanguard'" and who exercised control through, among other proxies, "a secret society" of high-level supporters that he "created").

In addition to manipulating his followers, Guo manipulated U.S. courts and obstructed justice to protect and perpetuate his schemes. This conduct is described in detail in Section III.G above. It consisted of removing fraud proceeds beyond the reach of United States authorities; organizing and funding protests of critics and dissident former supporters; initiating a bankruptcy to evade a New York court judgment and turning that proceeding into a vehicle for the attempted protection of his ill-gotten gains; targeting the homes and workplaces of the bankruptcy's Trustee and his family members; personally directing a prominent supporter to refuse to comply with a bankruptcy subpoena before sending one of his lawyers to tell her to submit a false affidavit; and continuing these acts through his lieutenants after his arrest by, for example, instructing followers to delete evidence from electronic devices. *See supra* Section III.G. Guo's "attempts to silence his critics and maintain control of his criminal enterprise," including by "repeatedly obstruct[ing] justice and demonstrat[ing] a disregard for the rule of law," underscore the need for a significant sentence. *Raniere*, Dkt. 966 at 17; *see also id.* (citing as particular example that defendant "worked to silence" victims when they "began to speak out publicly").

3. *Guo Preyed on the Aspirations of a Community*

Exacerbating the deep financial and physical suffering, an aggravating factor present here is that Guo preyed on the hopes and aspirations of a particular community—he carried out an affinity fraud against the Chinese diaspora who sought to promote democracy in China.[20]  (*See*

---

[20] An "'affinity fraud' [is a] 'securities and investment fraud that targets members of an identifiable group perpetrated by a member within the group or someone claiming a desire to assist group members.'" *United States v. Hawkins*, 796 F.3d 843, 853 (8th Cir. 2015) (quoting Lisa M. Fairfax,

Tr. 1355 (Ya Li explaining that she believed what Guo said in his broadcasts about investments because she had "already follow[ed] Miles Guo for three years" regarding the CCP "so I trust him, everything"); Tr. 1367 (Ya Li did not even read investment documents before signing "[b]ecause [she] trust[ed] Miles Guo 100 percent"). As one victim put it: "Miles Guo not only deceived us financially but also exploited our ideals of democracy and freedom. He claimed to be a fighter for China's democratic freedom, but in reality, he used this lie to deceive those who genuinely care about China's future." Dkt. 832, Stmt. 170. In so doing, Guo's actions strike harder than even a serious financial crime because Guo relied on "an entirely different way of persuading people to turn over their money because they had such deep hopes that the political system in China, which is repressive, that that system would be challenged and possibly changed. It's very different from having the motivation of doubling your dollar." Dkt. 491 at 34-35 (Comments from the Court during sentencing of Yanping Wang).

Not only did Guo exploit the hopes of thousands, simply so he could live in outrageous luxury, he (falsely) portrayed himself as a hero, and a "freedom fighter," of a movement that he severely damaged:

- "The criminal actions of Miles Guo and Wang Yanping have severely damaged the reputation of Chinese people and caused irreparable harm to the future efforts of Chinese individuals fighting against the CCP's tyranny. Guo and Wang are, in fact, the true Communists." Dkt. 832, Stmt. 153.

- "While loudly proclaiming his goal to defeat the CCP, he actually served their interests by discrediting the very cause he claimed to support. By betraying us—the true believers in ending the CCP's tyranny—he has tarnished the fight against the CCP itself. Now, whenever someone hears about efforts to oppose the CCP, they may question whether it is just another scam." Dkt. 832, Stmt. 157.

---

"With Friends Like These ...": *Toward a More Efficacious Response to Affinity–Based Securities and Investment Fraud,* 36 Ga. L Rev. 63, 70 (2001)).

- "Their actions did more than steal money; they destroyed the faith and goodwill of countless individuals and damaged the unity and trust among those truly pursuing democracy. The pain of this betrayal far outweighs the monetary loss." Dkt. 832, Stmt. 203.

Guo's actions show that he used talk of pro-democracy ideals as bait. Guo drew his victims in by professing to fight on their behalf for lofty goals of a democratic China, but instead, he collected, and spent to an outrageous degree, their money on himself and his family. Guo's actions harmed the pro-democracy movement he professes to support by erecting an empire of fraud that sucked money from those who actually desired a democratic China. The Court observed as much at Wang's sentencing last year, acknowledging that "there are many Chinese people both in China and elsewhere who have passionate feelings against the Chinese government and who support a change, who support democracy, and who were inspired by the messaging of Mr. Guo, and that that was a significant reason that they turned over their money to this fraud scheme." (Dkt. 491 at 34). The Court recognized that Guo took advantage of his victims' "such deep hopes that the political system in China . . . would be changed and possibly challenged," and used this as "a way of persuading people to turn over their money." (*Id.*).

Indeed, even the actions Guo took to allegedly promote democracy in China demonstrate his selfishness and focus on fostering his own cult of personality. He made self-aggrandizing videos of himself rapping, dancing, driving exotic cars, and sailing on expensive yachts:

53





 

(*See, e.g.*, GX C281-V; GX C370; GX C322-V6).

GX C281-V is particularly notable. It is an approximately four-minute music video titled "Hero," in which Guo appears in every single frame. In "Hero," Guo dances, at times in a leather coat with tassels, surrounded by choreographed backup dancers, in front of a private jet, luxury cars, and, at times, holding a lightsaber. The camera angles, editing, and song lyrics portray Guo

as the leader of a hagiarchy. The "Hero" video's self-adulation is of a piece with the mythology that Guo fed his supporters, that he was "Brother Seven," selected to advance their cause. That mythology worked because Guo preyed on a group of like-minded individuals that had been victimized by a repressive regime. But Guo's actions did not help his followers. Indeed, other than a few lines in "Hero" that pay lip service to "taking down the CCP," the music video—much like all of Guo's videos and livestreams—just promoted himself. (*See also* Tr. 1508 (Ya Li Testimony) ("Q. Ms. Li, does buying a multimillion-dollar house, $26 million house, in your view, help fight the CCP? A. No. Q. Does buying a red Lamborghini, in your view, help fight the CCP? A. No." (objections omitted)).[21]

Guo tricked and stole from the people he called his "brothers and sisters" and his "fellow fighters" against the CCP. Far from treating them like family or comrades, Guo deceived and preyed on those seeking to promote democracy in China. Despite Guo's loud pronouncements, in reality, his actions and those of his enterprise advanced Guo's personal wealth, not the cause of freedom in China. Indeed, by robbing from the adherents of that movement, Guo thwarted the progress of the anti-CCP cause by sowing distrust and diverting its potential funding into his own pockets.

4. *The CCP's Conduct Is Irrelevant to Guo's Convictions*

Rather than accept any responsibility for years of his own fraudulent conduct, approximately 25% of Guo's sentencing memorandum recounts activities Guo claims were done to him by the CCP. Even if it is all true, none of it excuses Guo's criminal conduct. As Guo's retained "Fox Hunt" expert Paul Doran made clear during trial, the CCP's activities, including

---

[21] Nor do Bugattis, Lamborghinis or $35,000 mattresses protect one against CCP activities. (Tr. 5145-46 (Doran testimony)).

"Operation Fox Hunt," have "nothing to do with the business opportunities that Miles Guo promoted." (Tr. 5190). Nor does, as Doran further agreed, being "targeted by the CCP . . . give [one] license to" raise money by "making false promises online." (Tr. 5142). The CCP's actions have no bearing on whether thousands were victimized by Guo and his enterprise, and provide no reason for the Court to mitigate the serious punishment that Guo justly deserves. (*See, e.g.*, Tr. 1534-35 (Ya Li testimony)[22]; 2429-30 (Minran Wu testimony)).[23]

To be sure, the Government stipulated that from 2017 to 2018, the PRC engaged in certain conduct aimed at the defendant. *See* DX STIP 1. But whether Chinese officials, in 2017, paid some to protest against Guo, or sought to repatriate him so that he could answer to criminal conduct for which he was accused in China, fails to excuse the extremely serious nature of the brazen and massive financial frauds he perpetrated on his victims. Whatever mitigating value the CCP's targeting may offer, it is sharply outweighed by the remarkable magnitude of Guo's years-long criminal conduct: outrageous self-enrichment, harassment of others, obstruction of the judicial

---

[22] "Q. If it were true he was targeted by the CCP, how does that change your view of Miles Guo's movement? A. No change. Q. If it were true he was targeted by the CCP, how does that change your view of his investment projects? A. No change. Q. Why doesn't it change your view, Ms. Li? A. Even being targeted by CCP, doesn't mean you can scam people's money. I'm also being targeted by CCP. I won't cheat any people's money. That's wrong. Q. How were you targeted by the CCP, Ms. Li? A. My——my parents in China, the CCP police called them and asked them to tell me stop what I'm doing because my activities is threatened the national security; and they also called my parents and other relatives to try to find me, ask them if I'm back to China, how they contact me; and my parents tell me don't go back to China, they will arrest me, but I'm the only child. Q. Ms. Li, after being targeted by the CCP, did you spend supporter money on yourself? A. No. Q. Did you spend investor money on yourself? A. No. Q. Why not? A. Because that's not my money. It's investment money, supporters' money. And those monies should be used to fight against the CCP, not for myself."

[23] "Q. Ms. Wu, if it were true that Miles Guo was targeted by the CCP, does that change your view of the investment projects? A. No. Q. Does it change your view of the movement? A. No. Q. Why doesn't it change your view? A. This movement just a scam. I don't think it's related anything to the CCP. Also if somebody is anti-CCP, it doesn't mean this guy could scam somebody else. That's different things. You cannot use this anti-CCP to do something illegal."

system, and unrestrained fraud that he perpetrated against thousands, so he could buy himself million-dollar chandeliers and surround himself in luxury.

Indeed, the record shows that Guo himself used CCP-like tactics against those who opposed him. (*Compare* Tr. 5149 (Doran Testimony) ("Q. So standing outside someone's home and filming them whether surreptitiously or overtly is a CCP tactic, right? A. Yes. Q. Especially if you do it at their place of work to and their home, right?); *with* Tr. 4221 (Copeland testimony) (describing harassment perpetrated by Guo's followers who "would livestream from outside our home, so that was a big reason we wanted to keep the blinds down all the time is because they would kind of like videotape us. If not, they'd be videotaping us moving around our home"). And it was Guo who created his own cult of personality that, like the CCP, attacked critics.[24] It is the height of hypocrisy for Guo to ask this Court for mercy by citing the same conduct he unleashed on his victims.

Last, Guo asks the Court to consider his claimed personal history, which is the same mythology he espoused to his victims: a humble upbringing, family trauma (at the hands of the CCP), Guo's self-reported support for the Tiananmen Square protests, political imprisonment, unexplained real estate financial success, shortly followed by "whistleblowing," detention, an

---

[24] *See* Tr. 5168 (Doran conceding that "one of the ways to promote that cult of personality in China is that if the Chinese people express views contrary to President Xi, they're retaliated against. Q. People criticize the leader, they're retaliated against, right? A. Yes. Q. Those are the rules of the Chinese Communist Party, right? A. Yes."); Tr. 1410 (Ya Li testimony) ("Q: Ms. Li, what are the rules and ideology of the Himalaya Farm? A: . . . have to support Miles Guo, support Himalaya Alliance, and not to criticize Miles Guo and criticize New Federal State of China publicly."); Tr. 1489 (Ya Li testimony) ("Black list is the member of the farm, if they start publish, criticize Alliance or New Federal State of China or Miles Guo, they will become CCP and a traitor, so their name go to black list. Q. What happened to some of the people on the black list? A. Some of their personal information will be post online. Q. Where would that personal information come from? A. From Miles Guo. (objections omitted)).

58

escape to Hong Kong, immigration to the U.S., and launch of his purported anti-CCP activity. (Guo Sub. 5-15). Those pages in the defendant's sentencing submission are sourced to Guo's statements to the Probation Office.[25] The Court need not resolve the truth regarding Guo's upbringing, claimed political imprisonment, and his "mythology," since it is all immaterial to an appropriate sentence. But, suffice to say, the Court should afford little weight to the words of an unrepentant serial liar who used that same "legendary" personal history as a weapon to brainwash, and rob, thousands of innocent victims.

5. *Guo's Extraordinary Personal Enrichment*

As described above, Guo profited handsomely from the massive, years' long scheme that he led at the substantial, and devastating, expense of others. He destroyed the lives of people who believed he could free them from an oppressive Communist regime so he could buy more than $700,000 worth of bespoke Brioni suits (GX CT201); so he could tool around in a Lamborghini (GX CT38; Tr. 143), and buy a $4 million Ferrari for his son (*see* Tr. 1873-1885); so he could sleep on $35,000 mattresses (*see* Tr. 3914-16; GX BUCK375); and so he could bounce around between his $69 million Manhattan penthouse, his Greenwich estate (GX CT133), and his $26.5 million New Jersey mansion (GX NJ134).

As presented at trial, Guo flaunted his immense wealth and, in fact, used it to market and perpetrate his fraud scheme. Guo publicly announced and aggressively marketed the Rule of Law charities on social media, including in videos where he represented that he would personally fund

---

[25] Probation also relied on a letter that purports to have been submitted by Guo's wife. (PSR ¶ 140). Probation did not interview her when preparing the PSR. Additionally, the Probation Department "attempted to conduct a collateral telephone interview with the defendant's daughter, Mei Guo; however, the contact telephone number furnished appears to now be an inactive account and the call could not be completed."

the charities with $100 million of his own fortune. (GX VI 192; Tr. 694-95). Guo's victims testified at trial that they had the impression that Guo was a "very wealthy" person. (*See*, *e.g.*, Tr. 191-92 (Le Zhou); Tr. 692-93 (Patrick Chin, noting Guo's "luxury apartment, yacht, and the cars"); Tr. 2372 (Minran Wu, testifying that Guo said he was a "rich, very rich, billionaire")). Wei Chen testified that Guo's portrayal of his staggering wealth "played a critical influence in" her decision to invest in the GTV Private Placement, because it made her "believe that he is a wealthy person and he has resources." (Tr. 4468-71). Ya Li testified that Guo was a billionaire in China who was included on China's "rich list," and that her understanding of his vast wealth led her to believe that her investments in Guo's fraud vehicles were safe, because Guo could afford to repay any investor losses. (Tr. 1330, 1347-48).

Guo used the staggering fraud proceeds to fund his ultra-luxury lifestyle—even after filing for bankruptcy—while falsely representing to victims that the purchases were for the benefit of the very followers whose money he was stealing, including G|CLUBS members and Himalaya Exchange investors. (Tr. 3081, 3266-67).

As this Court observed to counsel during trial, Guo "appear[ed] in a number of videos in extravagant settings," and it was "Guo who put[] himself next to the Lamborghini and the jet and in a living room with gilded objects." (Tr. 1363-64). He enjoyed a life of excess while robbing his victims of their livelihoods and safety. For example, Guo bought his Lamborghini with G|CLUBS members' money (*see* GX Z26 at 25; Tr. 3072), and he drove the Lamborghini in the H Coin to the Moon music video (GX 370-V), where he promoted the launch of the Himalaya Exchange (*see also* GX C370, GX Z9 at 140):



The FBI recovered that very Lamborghini from inside the garage of Guo's Greenwich, Connecticut home when he was arrested there on March 15, 2023:



(GX CT38). Guo bought his $26.5 million Mahwah, New Jersey mansion with fraud proceeds, and spent an additional $14 million in fraud proceeds to renovate and customize the mansion to his precise specifications and desires. (*See, e.g.*, Tr. 1510-11, 3893-94).

As described above, Guo extended the shell game that he used to operate his racketeering enterprise to his treatment of own personal assets, including his designer cars and his mansion. He titled his Mahwah mansion under the Taurus Fund, which was registered to Guo's bodyguard, Scott Barnett, unbeknownst to him (Tr. 5452-53); he titled his Sherry-Netherland penthouse under Genever Holdings LLC, which his son owns (Tr. 4043-44); he titled his Greenwich, Connecticut residence shown below under the family office Greenwich Land LLC, whose sole member is his wife (Tr. 4043); he registered his red Lamborghini in the name of his daughter's boyfriend, Defeng Cao (Tr. 5435-36, 5528); and on and on for all his assets.



(GX 133). Guo's unrepentant personal use of tens of millions of dollars in fraud proceeds—money he had led his victims to believe would be invested for them, or used to advance their chosen

cause—demonstrates that Guo acted out of greed and was driven to defraud his victims by his insatiable, selfish desire for excess wealth.

## B.  Specific Deterrence and Protection of the Public Is Necessary

Under Section 3553(a), the need for the sentence to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct" must be considered. 18 U.S.C. § 3553(a)(2)(B), (C).  A serious and lengthy sentence is warranted to protect the public and promote the needs of both general and specific deterrence.

*First*, Guo's conduct evinces a complete and utter contempt for the laws of the United States, despite his choosing to immigrate to this country and seek asylum under its legal system. His sustained criminal and obstructive actions demonstrate that neither civil sanctions nor the threat or impositions of criminal or civil penalties deterred him from operating a gargantuan global fraud that has injured thousands. Indeed, only a lengthy sentence of incarceration can attempt to protect the public from Guo.  The threat posed by Guo is especially pernicious because the scope of his fraud was so vast, so varied, and because Guo consistently adapted his criminality to thwart criminal and civil regulatory authorities when he was at liberty.

After establishing the fraudulent purported dual charities (the Rule of Law Society and the Rule of Law Foundation) in April 2020, Guo's enterprise raised money in connection with the fraudulent offering of GTV stock. Given that this offering was not registered with the SEC, investors were required to meet a series of requirements to ensure they were qualified to participate. Guo and others flouted those requirements and pooled victim money from unqualified investors, through vehicles such as Voice of Guo (*i.e.*, VOG, the company that former Phoenix Farm leader Sara Wei ran at Guo's direction, as described during trial). The SEC investigated the offering, put a stop to it, and ultimately entered into an agreement pursuant to which the money

63

raised (to the extent it was not unlawfully spent) would be redistributed to investors. (GX STIP19). Of course, $100 million of the money Guo's enterprise raised in the GTV Private Placement was not for GTV—it was for Guo and his family.[26]

After Guo's actions drew regulatory attention—after the SEC required Guo and GTV to disgorge the money it collected, aside from the $30 million of victim funds lost in the HHKOF investment—Guo's conspiracy adapted. This time, Guo used "Farm Loans"—as opposed to direct sales of stock—to sell shares in GTV. That money was routed through a complex web of sophisticated monetary transactions before being funneled back to Guo's family. Then Guo changed tactics again. Now he sold GTV (and other Guo-linked entities') shares through the guise of "memberships" in G|CLUBS. But G|CLUBS money was not used to fund a media company, or even to fund any real member benefits. Rather, G|CLUBS money was used to purchase luxury assets, fancy sports cars, and a literal mansion for the Guo family. G|CLUBS further tried to hide its criminality through a figurehead CEO, while Guo's co-defendant Yvette Wang acted as its *de facto* CEO. When Guo's G|CLUBS and the broader enterprise ran into banking difficulties, Guo and his acolytes engineered yet another solution: a fake cryptocurrency called H-Coin and H-Dollar. In service of those phony cryptocurrencies, Guo and William Je promoted the Himalaya Exchange, which operated both as a fraud scheme and a money laundering operation to draw victim money into "cryptocurrency" that Guo and the G Enterprise fully controlled.

In the summer of 2022, the Government sent a criminal grand jury subpoena to G|CLUBS, and in September and October 2022, the U.S. Government seized $630 million from the G

---

[26] Wang Plea Tr. at 25-26 ("In about June 2020, I was directed by others to wire approximately 100 million U.S. dollars from a bank account in New York to Hayman Capital Management, a hedge fund in Texas. I knew these funds had been received from investors in the GTV offering. . . . I knew what I was doing was wrong.")

Enterprise, including hundreds of millions from accounts linked to the Himalaya Exchange. Rather than be dissuaded from criminal activity, Guo's enterprise adapted yet *again*; this time, with Guo's launch of "A10" and "A15" schemes that collected money by claiming to sell stock in Gettr, G|CLUBS, and other Guo-linked entities. Except this money, this time, was to be sent to the Middle East to place it beyond the reach of the U.S. Government.

Guo's ability to adapt his criminal schemes to evade civil enforcement, and the threat of criminal enforcement, makes plain that a very lengthy term of incarceration is required to protect the public and specifically deter Guo from future criminal conduct.

*Second*, the risk of recidivism here is acute because Guo continues to claim he did nothing wrong. He is not even feigning to the Court that he will reform his ways—he effectively concedes that he will keep doing the same.[27] The Court should assume as much because Guo's is singularly motivated by a desire to live luxuriously and promote himself. He is compelled to seek material wealth without regard to honesty or consequence. That fixation will not change, and it presents an unacceptable risk that his criminality will continue once released from prison. Indeed, as an immigrant seeking asylum, Guo was highly incentivized to abide by all laws while in the United

---

[27] Also, the fact that a past fraud conviction does not necessarily deter a future one is evidenced by the number of first-time fraud defendants in this District who have become recidivists. *See, e.g., United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having served a prior two-year sentence for bank and wire fraud); *United States v. Vitaly Borker*, No. 22 Cr. 273 (JSR) (defendant convicted of wire fraud for operation of fraudulent eyeglasses website after two prior federal convictions for the same conduct); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning a new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. John Galanis*, No. 15 Cr. 643 (PKC) (defendant convicted of securities fraud after 1973 and 1988 convictions for mail fraud and securities fraud).

States. Clearly, that incentive did not matter. *See Raniere*, Dkt. 966 at 16-17 ("Ultimately, [the defendant's] lack of remorse, coupled with his view that that the conduct for which he was convicted was actually 'noble,' strongly suggests the need for a significant sentence.").

Guo has never accepted responsibility for what he has done. At no point has he shown any willingness to admit culpability for fraud and deceit or show any remorse whatsoever for his conduct. Guo has lied, obfuscated, obstructed, manipulated, and harassed with utter impunity. Despite his trial conviction, Guo maintained to the Probation Office "that he is innocent of all of the charges in the Indictment." (PSR ¶ 111). He "disagrees with" the jury's verdict. (Guo Sub. at 82). According to Guo, as in the case of Nxium founder Keith Raniere, "the brave victims who have spoken out . . . are liars," and "[d]espite everything that has happened and despite the countless victims who have given voice to their great pain, [he] remains unmoved. Indeed, he maintains his innocence." *Raniere*, Dkt. 966 at 16.

Guo's offensive claim that his prosecution was in some way politically motivated does not withstand an iota of scrutiny and is yet another of his transparent efforts to cast himself as a victim, rather than a perpetrator. (*See* Guo Sub. at 32-33). The criminal investigation into Guo began in July 2020, parallel to the SEC's investigation into the GTV Private Placement that had closed its fundraising the month prior. The decision to open that investigation had nothing to do with politics. Guo's relationship with Steve Bannon was not a "key element underlying this prosecution." (Guo Sub. at 25). Rather, the key element underlying this prosecution was the billion dollars Guo stole from innocent victims through fraud after fraud. Desperate to distract the Court and the public from the actual evidence of his crimes, Guo seeks to manufacture conspiracy theories about this case. (Guo Sub. at 32). But none of these distractions, nor politics, have anything to do with the investigation into, and the prosecutions of, Guo and his co-conspirators for the crimes they

66

committed through Guo's complex fraud, money laundering, and racketeering enterprise—or the verdict rendered by an impartial jury during the trial presided over by this Court.

In assessing specific deterrence and protection of the public, the Court should weigh heavily that the defendant has never accepted responsibility for his truly offensive and blatant fraud. But Guo's rejection of responsibility is worse than just that. A defendant is entitled to claim innocence but Guo goes further: he falsely claims victimhood.  He attempts to denigrate the rule of law that brought him to justice. Such indignancy coupled with Guo's baseless suggestion of impropriety in the prosecution of this case warrants a substantial sentence. *See, e.g.*, *Raniere*, Dkt. 966 at 16 ("To make matters worse, [the defendant] and his counsel . . . are engaged in a public relations campaign to cast doubt on the integrity of the judicial system and the jury verdict.").

*Third*, perhaps most troubling is that Guo, and his enterprise, have continued criminal activities for the three years that Guo has been incarcerated. Following his arrest and detention, Guo continued to direct his enterprise as it relocated to the United Arab Emirates (UAE), outside the reach of U.S. law enforcement. (PSR ¶¶ 103-105). Victims who have monitored the online musings of Guo and his remaining acolytes further illustrate how Guo continues to operate his enterprise, and uses it stifle victims from speaking out against him:

- "According to Yue Zhou, the Secretary-General of the New Federal State of China (NFSC), in the weekly 'Until We Meet Again' program every Friday, he and several other key members visit Ho Wan Kwok every week. Many of the orders currently being executed by NFSC have been approved by Kwok." Dkt. 832, Stmt. 214.

- "Despite the arrest of Guo Wengui, the fraud group has not been dismantled. The farms related to it are still operating, and Guo Wengui is still directing members in prison, instructing them to continue to defraud and threaten victims. In addition, members of the fraud gang are lurking in different countries and are still continuing to defraud, launder money and cover up crimes." Dkt. 832, Stmt. 188.

- "I am deeply shocked and disappointed that Guo Wengui continues to orchestrate new fraudulent activities directly from prison." Dkt. 832, Stmt. 183B.

- "From within MDC detention, he continues directing the NFSC organization, spreading misinformation through Gettr livestreams, promoting false narratives such as 'Guo will be acquitted' and 'U.S. justice is controlled by the CCP.' He actively promotes new fraudulent schemes including TDCCP and MEME tokens, leading to fresh victims." Dkt. 832, Stmt. 213.

- "Even while in custody, he continues to deceive, having created a so-called digital currency called TDCCP, which has scammed more people. The money he has obtained is being used to pay for legal fees and other expenses." Dkt. 832, Stmt. 180.

- Guo has shown absolutely no remorse. Instead, he and his group have continued to attack victims, spread lines, and even tried to force victims to write statements to help him avoid punishment. His recent behavior has made it crystal clear that he believes he is above the law." Dkt. 832, Stmt. 184.

Guo's ongoing criminal activity is consistent with his apparent belief that the laws of society do not apply to him. This is exemplified by Guo's remarkable pattern of obstruction of court proceedings (*see* Dkt. 51 at 7-10 (this Court listing instances of the defendant's obstruction)), including these proceedings, which provides yet more reason to doubt Guo will respect this Court's sentence, seek to reform, or be willing to abide by the law. (*See* Dkt. 51 at 11 ("Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released.")).

*Lastly*, the defense makes much of the claim that certain individuals deny their status as "victims." (Guo Sub. 46 – 51). But the import of this fact is lost on the defense. That Miles Guo has successfully convinced many individuals that they are *not* his victims underscores the danger Guo continues to pose to the community. No matter what the defense claims, the Government proved at trial, beyond a reasonable doubt, that Guo knowingly and intentionally defrauded thousands. *Guo intended to commit crimes, and did so for years*. Guo is a gifted conman, with an

innate ability to persuade thousands to do as he wishes. That Guo is so good at robbing people he is able to convince them that they are not his victims, is not a mitigating factor. It is an aggravating one. That Guo has marshalled letters from those who claim they still believe in him, even after his conviction for this massive fraud, only underscores the risk that Guo will rally such supporters in service of a future scheme. Guo's preternatural abilities to commit fraud on a global scale, and destroy or harm the lives of so many, requires this Court to impose a lengthy sentence to protect the public by incapacitating Guo, a protection which only this Court can provide.

### C. A Substantial Term of Imprisonment is Necessary for General Deterrence and to Promote Respect for the Law

A substantial term of imprisonment is also necessary to deter others from engaging in similar acts of criminal deception and to promote respect for the law.

In enacting Section 3553(a), "Congress viewed deterrence as 'particularly important in the area of white-collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

Here, a substantial term of imprisonment is necessary to telegraph the serious consequences that await would-be criminals who attempt a fraud as massive as Guo's. Guo's crimes have attracted significant public attention, and substantial efforts have been undertaken to recompense victims of those crimes. That notoriety counsels in favor of a 30-year term of imprisonment for the purpose of promoting general deterrence. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity"). Should Guo receive the leniency he seeks, others may be emboldened to engage in similarly audacious crimes, believing that such schemes are hard to unravel and, even if they are detected, are unlikely to result in significant repercussions, as compared to the potential upside of becoming one of the richest men in the world. *Cf. United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("It is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence."). If anything, an insubstantial sentence for Guo would encourage—rather than deter—would-be criminals, inviting them to live large by building global, billion-dollar fraud schemes that carry minimal consequences.

### D.  Guo's History and Characteristics

Miles Guo chose to commit sprawling financial crimes from a platform of wealth and privilege.  Guo had the opportunity to make vastly different choices with his resources and his apparent personal charisma. Instead, he repeatedly chose to use those advantages to exploit, for years, a community of people who followed and trusted him so that he could use their money to continue to live a life of ultra-luxury unknown to all but the world's most wealthy individuals.

Guo cannot, and does not, claim his conduct was the product of youthful indiscretion or an aberrational bad decision. Guo's personal circumstances do not call for anything other than a substantial term of imprisonment, and Guo's arguments that his background and experience mitigate his offenses are meritless.

1. *Guo's Background as a Purportedly Powerful Billionaire Aggravates, Not Mitigates, His Culpability*

Guo's submission spends nearly eight pages describing how he "achieve[d] economic prosperity," enjoyed "business success" and was a "prominent" person before overseeing the five-year, billion-dollar fraud scheme for which he was convicted at trial. (*See* Guo Sub. 8-15). At sentencing, Guo mobilizes his "extraordinary wealth" and "phenomenal business success" as mitigation. (*See id.* at 87 ("To the pro-democracy movement, [Guo's] wealth meant power to face and to confront the CCP.")). Guo has made different arguments about his wealth at different times and for different purposes. He has argued that his "vast wealth" and lavish lifestyle was exculpatory because "[h]e had no reason to steal." (Tr. 5986). But at other times, Guo has argued that he is indifferent to money, a person so unfocused on material matters that he could hardly have been interested in a scheme to defraud. (*See* Tr. 6050-51 (arguing that Guo "barely thought about his finances" and asking jury if they "think a man like Mr. Guo, who doesn't even have a credit card, is going over bank statements and telling people to take money out of the farm loans program to make a random maintenance payment on his yacht"); *but see* GX 417 (recording of Guo personally ordering the transfer of $100 million of G|CLUB members' funds to an entity controlled by Je)).

The truth is that Guo's purported billionaire status was a key instrumentality of his fraud—a feature Guo used to lure victims toward him, to earn their trust, and to create the impression that he was able to help them become as rich as him one day, too. Guo's serial claims to have billions

71

of dollars also underwrote his constant promises to personally protect his investors against the risk of loss. A February 28, 2021 broadcast on GTV provides just one example. "There will never be a chance like the one that we have today, where you can be involved in GTV and G Coin. You have my words. . . . Brother Seven has worked all his life. I know what politics is, I know what finance is, and I know what earning big money is. You won't even understand. You don't even——you don't understand even when I explain it to you. Brothers and sisters, you have to trust Brother Seven. None of you will pay for this if you lost money. I'll be the one who pays for it." (GXZ-9 at 67). Guo also invoked his wealth to anticipate and resist questions about whether his promises could be too good to be true, suggesting to his investors that he had no motive to rip them off because he already had so much money of his own: "So my brothers in arms, I don't need money. . . . What I want is the love from my brothers in arms." (Tr. 1035).

At trial, victim after victim testified to the central role these kinds of promises played in their decision to invest so much of their money in Guo's purported opportunities. Le Zhou recalled his first time watching Guo's broadcast, and "learn[ing] he's a self-made billionaire" who "seemed very knowledgeable, well spoken" and who "mentioned" that "he will bear the legal responsibility for what he talk about." (Tr. 180; *see also id.* at 209 (describing how Guo "mentioned all the money we invested, that principal would never lose, lost even a cent" because "[h]e will pay—personally pay back"). Ya Li had a similar first impression, coming away from her first exposure to Guo understanding that "[h]e's a billionaire in China" on the "who in China rich list." (Tr. 1330). Minran Wu recalled that Guo "said he was rich, very rich, billionaire," (Tr. 2372), and invested in GTV (and later in other Guo schemes) because "Guo said . . . [y]ou cannot imagine how great it will be, how profitable it will be." (Tr. 2375). Wei Chen explained that Guo's purported wealth "played a critical influence in [her] decision" to invest  her family's money in Guo's schemes:

"That made me believe that he is a wealthy person and he has resources . . . that will make it successful." (Tr. 4468).

Guo cultivated an image as a billionaire with expertise in politics, media, and moneymaking. He sold his victims not only shares in fraudulent ventures, but the chance to have an ownership interest in the kind of opulent lifestyle he showed off for years in his daily broadcasts. Guo's wealth and prior business success, whatever they amount to, are aggravating factors because they facilitated his fraud and enlarged its scope.

2. ████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

73

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████    That logical fallacy, though, is beside the

point: Guo's *lack* of remorse could not be clearer. *See, e.g.*, Guo Sub. at 41, 45, 46 (referring to

"alleged 'victims,'" "purported 'victims,'" and "supposed 'victims'"); *id.* at 79 ("There was no

evidence of any victims other than the five witnesses who claimed to have lost money on their G-

Series investments."); *id.* at 82-83 ("Also, the investors and supporters were not 'victims' (because

they were not defrauded), and many of them have stated as such."); *id.* at 82 (Guo "disagrees with"

the jury's verdict and objects to everything in PSR "that purport[s] to allege or conclude that Mr.

Guo is guilty of any offense, committed any wrongdoing or illegal acts, or attempted to, conspired

to, or committed any wrongdoing, fraud, money laundering, or obstruction of justice, or is

responsible for alleged losses").

3.  *Guo's Immigration Status*

Neither Guo's immigration status—nor the prospect of civil immigration detention in the

event he is released from criminal custody—calls for a lower sentence.[28] *First*, Guo seeks leniency

---

[28] Guo advanced these arguments in a submission that he filed under seal.  The sole purported reason for sealing was ████████████████████████████████████████████
████████████████████████████████████████████████ Guo does not explain or elaborate on this concern in his filing. Instead, the remainder of its eight pages consist of citations to matters of public record and a discussion of relevant case law that could be found in any noncitizen defendant's sentencing submission. Indeed, his co-defendant Wang's sentencing submission made a virtually identical argument in its unredacted public filing. (*See* Dkt. 469 at 28-31). Guo does not even bother addressing the *Lugosch* factors, *see generally Lugosch v. Pyramid Co. of Onandaga*, 435 F.3d 110, 119 (2d Cir. 2006), or otherwise make a legal argument for sealing this part of his submission. The Government asked Guo's counsel to provide the basis for, and authority in support of, filing its

on account of his immigration status after abusing the privileges of the asylum process. That system permitted Guo to live safely and freely in the United States. Rather than respect the rule of law that offered him refuge, Guo used the shelter and security provided by this country's immigration laws to establish and oversee a years-long fraud scheme. Not only that: Guo cynically abused the same institutions that could have safeguarded his family and protected any legitimately earned wealth by manipulating the U.S. bankruptcy system and obstructing justice in various U.S. courts. *See infra* Section III.G. Having taken advantage of the U.S. immigration system, Guo cannot now be heard to offer its functioning as a ground for leniency.

*Second*, Guo's immigration argument relies almost exclusively on cases where courts were considering whether to sentence a defendant to *any* term of imprisonment, *United States v. Connolly (Black)*, No. 16 Cr. 370 (CM), Sent'g Tr. 87, 91-92 (S.D.N.Y. 2023) (declining to impose custodial sentence to avoid "very minor participant" defendant going into immigration custody "a short term of imprisonment"), or release a defendant who had completed almost all of his sentence, *United States v. Diaz*, 07 Cr. 387 (CM), 2024 WL 4891908 at *5 (S.D.N.Y. November 26, 2024). Guo's other cited case involved a Court's decision whether to impose a 10-year or a 14-year sentence on a 40-year-old defendant. *United States v. Wedd*, 15 Cr. 616 (KBF), Dkt. 688 Sent'g Tr. at 60 (S.D.N.Y. 2018). In other words, in all of Guo's cited cases, the defendant's post-release immigration consequences factored into the court's sentence because the defendant was all but certain to be released in the relative near term. But there is no just punishment that would result in

---

immigration-related argument under seal. Guo's counsel provided no additional basis—and no authority—for sealing this filing. Because "rights of public access extend to criminal sentencing" and "the documents used in conjunction with those proceedings," *United States v. Sehgal*, No. 24 Cr. 46 (AT), 2026 WL 539650, at *1 (S.D.N.Y. Feb. 26, 2026), the Court should deny Guo's implicit sealing motion and require that his Exhibit 16 be filed on the public docket.

Guo's release from criminal custody on anything like that timeline. The Court therefore has little reason to consider this circumstance as having a meaningful impact on its sentence in this case.

### 4. *MDC Arguments*

The Court should not be swayed by the defense's argument that Guo should receive a lighter sentence than he otherwise deserves because he has been detained at the MDC during the pendency of this case, since his arrest on March 15, 2023. (*See* Def. Br. at 99 (stating that the "MDC has been a dysfunctional institution for years")). First, but for Guo's eight sentencing adjournment requests, he would have been sentenced and designated to a different BOP facility more than 17 months ago. To the extent he argues that his 37 months at the MDC somehow justifies a shorter sentence, he is wrong, and he should not be permitted to manufacture his own allegedly mitigating circumstances. In advancing their MDC argument, the defense does not acknowledge recent improvements to the conditions at MDC. However, as numerous judges in this District have observed, conditions at the MDC improved greatly in 2025 (the exact time during which the defendant was detained there). *See, e.g.*, *United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing); *United States v. Clinton McCullum*, 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing); *United States v. Jean Carlos Burgos*, 24 Cr. 650 (LTS) (May 21, 2025 plea); *United States v. Kevin Reshard*, 24 Cr. 392 (JMF) (May 14, 2025 sentencing); *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) (Jan. 16, 2025 bail argument).

As the Honorable Jesse M. Furman, United States District Judge, Southern District of New York, noted in sentencing a defendant in May 2025 (during which time Guo was detained at the MDC):

> With respect to other arguments made in the defense's submission, on the MDC front, I'm certainly more than familiar with the circumstances at the MDC, and the place has still much need for improvement, but it is also a lot better

> than it was in January of last year when I wrote my opinion in *United States v. Chavez* that is cited in the defense's submission.  As it happens, I just came from a meeting involving representatives of the MDC and got latest statistics, which is that staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction.

*United States v. Kevin Reshard*, 24 Cr. 392 (JMF) (May 14, 2025 sentencing).

And as the Honorable John P. Cronan, United States District Judge, Southern District of New York, remarked at a sentencing in August 2025 (also during the time Guo was detained at the MDC):

> I also mentioned I have considered the conditions at the MDC. Mr. McCullum was arrested federally on November 19 of last year. I do note that conditions at the jail have improved considerably, with increased staffing levels. Mr. McCullum talked about lockdowns at the jail.  And while lockdowns are inevitable at a jail, the number of times when inmates are experiencing extended lockdowns is rare. As Judge Caproni, who has been involved in overseeing conditions at the MDC, remarked at a bail hearing earlier this year in *United States v. Alexander*, 24 Cr. 676, there have been a lot of improvements at the MDC.  "There's a more staffing at the MDC. The number of defendants who end up in lockdowns for substantial periods of time are minimal."  The prison has put a lot more staff on, including more medical staff. The conditions at the MDC are not ideal, but there certainly have been improvements, and regardless. Regardless, I have considered those conditions.

*United States v. Clinton McCullum*, 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing); *see also United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing:  materially same as *McCullum*).

77

In sum, none of the defense's arguments support leniency based on Guo's incarceration at the MDC. The Section 3553(a) factors compel a significant incarceratory sentence in line with the Government's recommendation.

### E.   The Need to Avoid Unwarranted Sentencing Disparities

A sentence of at least 30 years' imprisonment is necessary and appropriate in this case to provide just punishment while avoiding unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(2)(A), (a)(6). Guo was the singular leader of the G Enterprise and the architect of its fraudulent aims.  He caused tremendous losses in excess of a billion dollars, placing him in the Guidelines' highest tier of harm, and was the primary beneficiary reaping the profits of his frauds. He preyed upon thousands of victims worldwide and enlisted a hierarchy of lieutenants to carry it out, including co-conspirator Yvette Wang, who herself is serving a 10-year sentence for her role in these crimes.  And he stands before the Court unrepentant, defiant, and actively propagating misinformation to undermine the jury's verdict in this case, and public trust in criminal justice.

The severity of Guo's crimes, and the risk of harm to the public he presents, leaves him with few peers among fraud defendants and distinguishes his conduct even among recent high-profile fraud cases in this District. The exceptional loss amount is just one metric of culpability that alone justifies a substantial sentence in this case.[29] While a select few other fraud defendants

---

[29] "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009). Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. See Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained that the resulting

have caused for even larger financial losses, Guo's scheme was especially cynical: he rallied supporters fervently interested in the cause of democracy promotion in China, and then abused their trust to pitch them phony investment after phony investment. This meaningfully aggravates the harm that Guo caused. As the Court noted at Wang's sentencing, "in the Holmes scheme and the Madoff scheme," investors were not falsely "told that money would go toward the promotion of democracy." (Dkt. 491 at 31-32). Using deception to steal other people's money is always wrong. But Guo's fraud is distinct from some of history's worst Ponzi schemes and investment scams because of how its mastermind fostered a purported social movement for the purpose of preying on its followers—turning them into unwitting victims of fraudulent scheme after fraudulent scheme. Guo's fraud is also distinct from recent precedents in its scope and complexity. It began with a philanthropic appeal; moved on to an unregistered offering of securities in a supposed media venture; transitioned into a purported community lending program designed to evade the SEC's remedial measures; morphed into a private membership club that also offered shares of stock; and evolved yet again into a phony pair of fake cryptocurrencies joined with a fraudulent purported crypto exchange. It involved years of coordination between dozens of aides and lieutenants, operating the machinery of Guo's fraud empire all over the world. For these reasons, sentences like the 25 years imposed in *United States v. Bankman-Fried* or the 20 years

---

amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

imposed in *United States v. Greenwood* should be viewed as a low floor, not as sentences imposed on "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Exceptional fraud crimes have been met with exceptional sentences. For masterminding a decades-long Ponzi scheme with losses measured in the dozens of billions of dollars, Bernard Madoff was sentenced to 150 years in prison. While the scope and duration of Madoff's fraud was "unprecedented," *United States v. Madoff*, No. 09 Cr. 213 (DC), Sent'g Tr. at 43, Judge Chin's sentencing decision noted that "more [was] at stake than money" because, as with Guo, "[t]he victims put their trust in" the defendant and "[t]hat trust was broken in a way that has left many" of them "doubting… themselves." *Id.* at 49.  While few cases could be "comparable . . . in terms of the scope, duration and enormity of the fraud, and the degree of the betrayal," *Madoff*, Sent'g Tr. at 46, this common element of exploitation and broken trust speaks to the exceptional harm also caused by Guo's crimes.

Across the country, other particularly predatory fraud defendants have received outsized sentences for conduct more comparable in scope to Guo's. Tom Petters, age 52 when convicted by a jury in 2009, was sentenced to 50 years' imprisonment for a $3.7 billion fraud scheme in large part because the sentencing judge was "not satisfied that if he were released at an early sentence that he would not reoffend." *United States v. Petters*, No. 08 Cr. 364 (RHK), Dkt. 431 at 46 (D. Minn. 2010). Scott Rothstein pleaded guilty to conspiracies to commit racketeering, money laundering, wire fraud, and mail fraud in connection with a fraud scheme he ran through his Florida law firm that "caus[ed] approximately 400 investors to lose more than $400 million." *United States v. Rothstein*, No. 09 Cr. 60331 (JIC), Dkt. 334 at 57-58 (S.D. Fla. 2010). The Government described the 47-year-old Rothstein's "post-offense conduct" as "extraordinary," including by

voluntarily returning from Morocco to turn himself in and providing extraordinary cooperation. *See id.*, Dkt. 277 at 2-3. Nonetheless, the Court imposed a sentence of 50 years' imprisonment in view of Rothstein's "sophisticated . . . marketing" of his complex scheme, including by trading on "all of the trappings of success," donations to philanthropic institutions to "endear[]" the defendant as a "prolific benefactor," and other extensive efforts to exploit "an appearance of legitimacy." *Id.*, Dkt. 334 at 56-57. In 2019, Edwin Fujinaga, a 70-year-old defendant, was sentenced to 50 years' imprisonment after trial convictions for a $1.5 billion scheme to defraud thousands of victims in Japan into making investments in purported medical claims that were spent largely instead on Fujinaga's personal enrichment. *See United States v. Fujinaga*, No. 15 Cr. 198 (GMN), Dkt. 346 at 74-75 (D. Nev. 2019). And in 2009, Judge Richard J. Sullivan sentenced James Nicholson to 40 years' imprisonment in this District for leading a $133 million scheme to defraud victims he selected because they placed extraordinary trust in him—emphasizing that the defendant, like Guo, "played on those relationships" with his victims "and cultivated them" and "encouraged them." *See United States v. Nicholson*, No. 09 Cr. 414 (RJS), Sent'g Tr. 71:11–20 (S.D.N.Y. 2009).

The nature and scope of Guo's crimes, and his leadership of a racketeering enterprise to carry them out, calls for a greater sentence than those recently imposed on high-profile fraud defendants in this District whose schemes caused extraordinary losses but whose conduct lacked Guo's sustained personal appeal of a charismatic leader to thousands of victims who were led to believe they were investing not only in failure-proof financial opportunities, but also in their common aspiration of democracy in China. Samuel Bankman-Fried's crimes involving the FTX cryptocurrency exchange were egregious. He spent "large sums of FTX customer funds on risky investments, political contributions, Bahamas real estate, and other things in circumstances in which FTX was seriously exposed to downside of market deterioration, loan calls, and other risks."

*United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), Dkt. 426 (Sent'g Tr.) at 53 (S.D.N.Y. 2024). This was outright theft on a grand scale, and Bankman-Fried was sentenced to 25 years' imprisonment. While Guo's loss amount is lower, Guo's crimes involved an unparalleled personal intimacy between the perpetrator of a mass-scale fraud and his victims. He personally guaranteed his investors against *any* risk of loss—not only in his daily, hours-long broadcasts (*see, e.g.*, GX Z9 at 37 ("I will be responsible. If there is one of your pennies that's missing, I, Guo Wengui, will be responsible.")), but in direct, individual communications cultivating his victims through phone calls, text messages, and video chats. (*See, e.g.*, Tr. 4465, GX VB36). And as this Court recognized at the sentencing of Guo's co-defendant, his scheme was distinct from other high-profile frauds because of its cynical manipulation of his victims' "deep hopes that the political system in China . . . would be challenged and possibly changed"—"an entirely different way of persuading people to turn over their money." (Dkt. 491 at 34–35).

This combination of charismatic personal leadership and manipulating victims' deep social and political aspirations to evolve and sustain a years-long fraud sets Guo's conduct above and apart from financial crimes that involved massive losses but lacked these extraordinary—and uniquely harmful—features. Karl Sebastian Greenwood was sentenced to 20 years' imprisonment for co-creating and selling a fraudulent cryptocurrency in a scheme that saddled victims with billions in losses. *United States v. Greenwood*, No. 17 Cr. 630 (ER) (S.D.N.Y. 2023). Unlike Guo, Greenwood shared primary culpability for his fraud with his scheme's co-founder—and their OneCoin scheme lacked the intentional manipulation of victims' aspirations to participate in a social and political movement. Nor can Guo be meaningfully compared to other recent defendants who accepted responsibility by pleading guilty for their operation of fraudulent crypto-related scams. *See United States v. Do Kwon*, No. 23 Cr. 151 (PAE) (S.D.N.Y. 2024) (15-year sentence,

where defendant also faced prospect of future criminal prosecution in another country); *United States v. Mashinsky*, No. 23 Cr. 347 (JGK) (12-year sentence).  Indeed, in contrast to Bankman-Fried, Greenwood, Kwon, and Mashinsky, Guo's operation of fraudulent cryptocurrency and related exchange was just *one part* of Guo's multi-scheme, five-year racketeering and fraud conspiracy. *See supra*, Section III.

Just three years ago, this Court sentenced a fraud defendant who pleaded guilty in advance of trial to nearly 18 years' imprisonment for "operat[ing] four separate fraud schemes" over less than two years "with hundreds of victims." *United States v. Ray*, No. 22 Cr. 228 (AT), Dkt. 105 (Sent'g Tr.) at 36 (S.D.N.Y. 2023). Franklin Ray's serial frauds raked in just north of $40 million from retail investors he personally pitched, and his culpability was aggravated by his continuing to solicit fraudulent "investments" while on pretrial release. *Id.* at 40. But his crimes—deserving, in this Court's judgment, of almost 20 years' imprisonment—pale in comparison to the complexity, duration, and manipulation brought to bear by Miles Guo in his execution of the five-year, $1.3 billion G Enterprise fraud and racketeering conspiracy.  Guo's sentence should include a far greater period of incarceration to account for the comparative severity and scope of his crimes, his persistent denial responsibility, and the threat he continues to pose to the public.

## VII.  <u>FORFEITURE AND RESTITUTION</u>

On August 11, 2025, the Court entered a preliminary order of forfeiture ("POF") against Guo, which forfeited his interest in specific property and entered a money judgment of $1.3 billion that is joint and several with Yvette Wang. (Dkt. 720). Approximately six months later, on February 3, 2026, Guo filed objections to the POF's money judgment. (Dkt. 799). On February 17, 2026, the Government filed its response to Guo's objections. (Dkt. 803).  For the reasons stated in that opposition, Guo's objections are meritless. Additionally, on January 19, 2026, the

Government submitted a supplemental preliminary order of forfeiture, which seeks to forfeit additional specific property constituting criminal proceeds of the G Enterprise that the Government has seized abroad and additional G|CLUBS funds. (Dkt. 790). Consistent with Federal Rule of Criminal Procedure 32.2, the Court should enter the Government's supplemental preliminary order of forfeiture prior to sentencing, and at sentencing orally announce that it is imposing forfeiture consistent with the August 11, 2025 preliminary order of forfeiture, and the proposed supplemental order of forfeiture.

With respect to restitution, for the reasons previously set forth in the Government's January 9, 2026 filing (Dkt. 785), and as the Court already found in connection with Yvette Wang's sentencing, the Court should make a finding at Guo's sentencing that restitution would be impracticable in this case and allow for compensation through a remission process.

## CONCLUSION

Miles Guo claimed to lead a movement. But he did not. Instead, he robbed thousands of people who believed in his message, trusted his promises about investments, and relied on his commitment to guarantee them against losses. Guo's crimes will forever stand out among this nation's worst and most rampant frauds. There can be no justice in this extraordinary case without an extraordinary sentence.

In view of the immense toll of Guo's crimes, the Government respectfully requests that the

Court impose a sentence of at least 30 years' imprisonment.

Respectfully submitted,

SEAN BUCKLEY
Attorney for the United States Acting Under
Authority Conferred by 28 U.S.C. § 515.

By: _____/s/_____
Micah F. Fergenson
Ryan B. Finkel
Justin R. Horton
Juliana N. Murray
Assistant United States Attorneys
212-637-2190/-6612 /-2276/ -2314

CC: Counsel of record

85