UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

UNITED STATES OF AMERICA       :

                  :

    v.               :         23-CR-118 (AT)

                  :

MILES GUO,             :

                  :

         Defendant.    :

                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF MILES GUO

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
Tel: 212-619-373

Joshua L. Dratel
Law Offices of Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
Tel: 212-732-0707

Melinda Sarafa
SARAFA ZELLAN PLLC
43 West 43rd Street, Suite 370
New York, NY 10036
Tel: 212-785-7575

*Attorneys for Defendant Miles Guo*

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................................1

I.  PRELIMINARY NOTE ON THE GOVERNMENT'S RHETORICAL
    STRATEGIES...................................................................................................................2

II. THE GOVERNMENT HAS NOT ESTABLISHED ANY RELIABLE LOSS
    AMOUNT, AND A *FATICO* HEARING IS REQUIRED.............................................6

    A.  *The Government's $1.3 Billion Figure Reflects Transactional Volume,
        Not Actual Loss*.................................................................................................6

    B.  *The Government's Reliance on Seizure Warrant Affidavits Does Not
        Obviate the Need for a Fatico Hearing* ...................................................7

    C.  *The Government's Position on Restitution Reflects the Challenges
        of Ascertaining Loss*........................................................................................9

III. ACQUITTED CONDUCT MUST BE EXCLUDED FROM THE LOSS
     CALCULATION .............................................................................................................10

    A.  *The Government's Reading of § 1B1.3(c) Would Nullify Amendment 826* ...........10

    B.  *The GTV Private Placement Conduct Does Not "Establish"
        the Offenses of Conviction* .......................................................................11

IV. THE DISAVOWAL OF VICTIM STATUS BY THOUSANDS OF INVESTORS
    IS DIRECTLY RELEVANT TO LOSS ....................................................................12

V.  THE MAGNITUDE OF THE LOSS ENHANCEMENT REQUIRES
    HEIGHTENED SCRUTINY ......................................................................................16

VI. THE GOVERNMENT'S SENTENCING COMPARABLES SUPPORT
    A SENTENCE WELL BELOW 30 YEARS ..........................................................18

VII. THE GOVERNMENT'S REMAINING ARGUMENTS DO NOT SUPPORT
     A 30-YEAR SENTENCE .........................................................................................20

    A.  *The CCP's Campaign Against Mr. Guo Is Relevant to Sentencing*.......................20

    B.  *The Government's Claims of Ongoing Criminal Activity Are Unsupported* .........22

    C.  *The Government's Arguments that Mr. Guo Obstructed Justice are
        Unsupported and Unavailing*.................................................................22

D. *The Government's Wealth Argument Is Internally Contradictory* ........................23

██████████ ██████████████████████████████████████████████████████████████

███████████████████████████ .................................................................................24

CONCLUSION ............................................................................................................. 26

ii

**INTRODUCTION**

The Government asks this Court to impose a sentence of at least 30 years' imprisonment — a sentence that would rank among the longest ever imposed for financial fraud in this District, exceeding even the sentences imposed in cases involving losses many times greater than those alleged here. The Government's request rests on a foundation of sand: an unverified, wildly inflated loss figure of $1.3 billion that conflates gross transactional volume with actual pecuniary harm; a legally untenable attempt to include $411 million in acquitted conduct in the loss calculation; and a systematic refusal to account for redemptions and refunds and for the thousands of investors who affirmatively deny they were victimized.

This all stems from the Government's stubborn denial of the undeniable: Miles Guo, having already amassed a tremendous fortune, began his whistleblowing activities in a deeply repressive political environment long before the conduct at issue in this case, prompting the CCP's aggressive and well-documented retaliaton against him. That retaliation, which included, among other things, social media attacks, pressure to ban Mr. Guo from major media platforms, and asset freezes, did not deter Mr. Guo from his mission to promote democratic reform in China. Had Mr. Guo been motivated solely by wealth, as the Government insists, he could have and would have accepted any number of offers by the CCP to cease his whistleblowing activities in exchange for the release of billions of dollars in seized assets (*see, e.g.,* Def. Corr. Mem. at 15, 17). To avoid confronting this fundamental flaw in its theory of prosecution, the Government refuses to acknowledge the historical and political context of this case, suggests contrary to all evidence that Mr. Guo's wealth may have been illusory (while simultaneously arguing that Mr. Guo used his wealth to attract followers), and relentlessly attacks Mr. Guo as a cult leader and con man,

sounding very much like the CCP itself. Taken together, these contradictions and inconsistencies are used by the Government to prop up its case and sidestep the weakness of its arguments.

This reply addresses the principal arguments in the Government's Sentencing Memorandum (ECF No. 833) (the "Government Memorandum" or "Gov. Mem."). As discussed below, the Government's arguments regarding the loss amount, acquitted conduct, the standard of proof, sentencing comparables, and sentence enhancements are each fundamentally flawed. The Court should reject the Government's request for a 30-year sentence and impose a sentence dramatically below the advisory Guidelines range, consistent with the § 3553(a) factors and the sentencing practices in this District.

## I.   PRELIMINARY NOTE ON THE GOVERNMENT'S RHETORICAL STRATEGIES

Before we directly turn to the substantive sentencing arguments, we must take a moment to identify and address the rhetorical strategies employed throughout the rather histrionic Government Memorandum. Legal discourse typically is grounded in fact-based argument supported by binding or persuasive legal authority. In this case, however, the Government Memorandum adopts a tenor so extreme that its building blocks must be deconstructed to facilitate a fair and accurate assessment of the Government's position.

The rhetorical strategies used throughout the Government Memorandum include the following:

1.     **Emphasis on emotion rather than fact or reason**. The Government Memorandum repeatedly references Mr. Guo's wealth (*e.g.,* Gov. Mem. at 2, 59, 62) and "lavish lifestyle" (*id.* at 10, 12, 71) as suggestive of criminal activity, without regard to when or how specific assets, such as his Sherry-Netherland apartment, Greenwich, CT, residence, or Brioni suits, were acquired. Lines such as "he destroyed the lives of people who believed he could free

them from an oppressive Communist regime so he could buy more than $700,000 worth of bespoke Brioni suits" (*id.* at 59) deliberately – and unfairly – obscure the fact that Mr. Guo acquired vast wealth and its trappings long before the alleged conduct in this case. In so doing, the Government relieves itself of any accountability for factual precision in favor of rhetorical flourish.

2.      **Fact laundering**. The Government repeatedly cites its own version of the offense conduct, supplied to the Probation Department in connection with the Presentence Investigation Report ("PSR"), as neutral third-party "findings" whose Government origins are effectively masked. By relying on the PSR's intermediation and bold use of the word "finding" in its parentheticals, the Government bolsters its own language with the veneer of independent factfinding. *See, e.g.,* Gov. Mem. at 5, 42, 43, 48.

3.      **Gratuitous repetition**. The Government incessantly repeats its key themes (*e.g.*, extraordinary wealth, unrestrained fraud, countless victims, astronomical loss), including casual repetition of disputed facts – such as the scale of the alleged fraud – as if undisputed. For instance, the Government references "thousands" of victims no fewer than 17 times, when only a handful of self-professed "victims" testified at trial and thousands of investors affirmatively disclaim victim status. Similarly, while itself unrestrained by factual rigor, the Government speaks of "unrestrained fraud that [Guo] perpetrated against thousands, so he could buy himself million-dollar chandeliers and surround himself in luxury" (*id.* at 58), a "gargantuan global fraud that has injured thousands" (*id.* at 63), "the billion dollars Guo stole from innocent victims through fraud after fraud" (*id.* at 66), "[Guo]'s truly offensive and blatant fraud" (*id.* at 67), "this massive fraud" (*id.* at 69), "fraud on a global scale" (*id.*), "a fraud as massive as Guo's" (*id.* at 70), "global, billion-dollar fraud schemes" (*id.*), "the five-year, billion-dollar fraud scheme" (*id.* at 71), "a years-long fraud scheme" (*id.* at 75), "Guo's fraud empire all over the world" (*id.* at 79), "a mass-scale fraud"

(*id.* at 82), "a years-long fraud" (*id.*), and "the complexity, duration, and manipulation brought to bear by Miles Guo in his execution of the five-year, $1.3 billion G Enterprise fraud and racketeering conspiracy" (*id.* at 83), to cite just some of the Government's repeated stylistic assertions about the scale of the alleged fraud.

4.      **Reliance on speculation for baseless allegations**. In support of its argument for specific deterrence, the Government contends that Mr. Guo "and his enterprise" have "continued criminal activities" throughout Mr. Guo's three years of incarceration, without citing a single specific crime. Gov. Mem. at 67-68. The Government relies on two sources for these assertions. The first is Mr. Guo's phone calls from the MDC during the period immediately after his arrest, during which he did nothing more than encourage continuation of ongoing business operations, including a potential investment in the burgeoning Himalaya Exchange by the United Arab Emirates sovereign wealth fund. Any suggestion of criminal activity is purely speculative. The second is letters from purported victims, who make vague, unfounded, and unproven allegations that Mr. Guo is directing criminal activities while incarcerated. *Id.*

5.      **Quoting material out of context to suggest malevolence**. In its excruciating efforts to saddle Mr. Guo with an enhancement for obstruction of justice, the Government offers an ominous video still framing two presenters from the New Federal State of China ("NFSC") and an English subtitle stating "these individuals will all have to bear the consequences[.]" Gov. Mem. at 27. The Government states that the reference to "these individuals" refers to the 126 individuals who provided victim impact statements to the Government, and characterizes the video as evidence that "Guo's enterprise continues to harass and threaten those that oppose it." What the Government does not offer, however, is the presenter's full statement that it is *false statements* - whether to the government or other attorneys – that inevitably lead to *legal* consequences. This is presented in

4

the video as a caution to all. With respect to any *falsehoods* in the 126 victim impact statements, the presenter states: "As time goes on, as evidence emerges, these individuals will all have to bear the consequences, the legal consequences they must bear – that is the consequence of lying." ECF No. 832, Stmt. 206-B.

6.      **Guilt by association**. The NFSC video discussed above is but one of numerous instances in which the Government seeks to discredit Mr. Guo based on the actions or statements of his supporters, even without evidence of Mr. Guo's direction or participation. *See, e.g.*, Gov. Mem. at 21 (citing actions of William Je and unnamed supporters), 23-25 (citing supporter protests against the bankruptcy Trustee), 27-28 (citing actions of supporters following Mr. Guo's arrest).

In addition to the above, the Government mischaracterizes defense arguments in order to diminish them (*e.g.*, characterizing CCP targeting of Mr. Guo as offered solely for mitigation) (*id.* at 56-57), brushes aside or ignores important facts (*e.g.*, assertions of non-victim status), describes investors as "brainwashed" to discredit them (*id.* at 2, 40, 59) and Mr. Guo as a "cult" leader to discredit him (*id.* at 1, 50, 53, 58), baselessly refers to Mr. Guo's personal history as "mythology" (*id.* at 56, 58-59), and frames the CCP's persecution of Mr. Guo and seizure of his assets solely as motives for criminal conduct, with no recognition whatsoever of these facts as foundational context for political resistance.

Having relieved itself of accountability for many of the assertions upon which it relies to justify the extraordinary sentence it seeks, and having elected not to seek a special verdict from the jury, the Government usurps the role of factfinder as it proclaims loudly and repeatedly that Mr. Guo caused a $1.3 billion loss and inflicted harm on thousands of victims. We respectfully submit that a high degree of rhetorical awareness is warranted when reviewing the Government Memorandum.

## II. THE GOVERNMENT HAS NOT ESTABLISHED ANY RELIABLE LOSS AMOUNT, AND A *FATICO* HEARING IS REQUIRED

### A. *The Government's $1.3 Billion Figure Reflects Transactional Volume, Not Actual Loss*

The Government's loss calculation suffers from a fundamental methodological defect: it equates the total amount of money that "flowed into bank accounts associated with the racketeering enterprise" (Gov. Mem. at 32) with "loss." But inflows are not loss, and the jury made no finding of such. The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1), n. (C)(i). The Government's own financial analyst, Paul Hinton, testified that his work "was the result of summing up the value of all the transactions in the database" according to "categories that the government gave us." Tr. 4330. He performed no tracing, no detailed flow-of-fund analysis, and no investor-level accounting of deposits, withdrawals, redemptions, or value received. Tr. 4356, 4430, 4458.

The Second Circuit has recognized that where the precise amount of investor loss is difficult to determine, a sentencing court may — and should — use alternative measures rather than defaulting to gross inflows. In *United States v. Illarramendi*, 642 Fed. Appx. 64 (2d Cir. 2016), for instance, the court affirmed a sentence where the district court declined to use the estimated investor loss of $275 to $380 million and instead relied on the defendant's gain of over $20 million to calculate the Guidelines range, as permitted by U.S.S.G. § 2B1.1 cmt. n. 3(B). The court imposed a sentence of 156 months — effectively a below-Guidelines sentence — which the Second Circuit affirmed. *Id.* at 65.

Here, the Government has not even attempted to calculate Mr. Guo's actual gain from the alleged fraud. Instead, it asks the Court to treat every dollar that entered any bank account associated with any entity in the alleged enterprise as "loss" — regardless of whether those funds were returned to investors, used for legitimate business purposes, or moved between accounts (and

6

thus counted multiple times). This approach is not a "reasonable estimate" of loss; it is entirely speculative and an abdication of the Government's burden.

In so doing, the Government also ignores entirely the settled case law, in the Second Circuit and elsewhere, establishing recognized principles for offsetting loss. These are set forth in Mr. Guo's initial sentencing submission ("Def. Corr. Mem.") at 63-66, and they are indeed integral to calculating "loss" for Guidelines purposes. *See, e.g., United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (applying Guidelines Application Note 3(D), which "provides that the loss should be reduced, or offset, by '[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected'") (quoting U.S.S.G. § 2B1.1 cmt. n. 3(D)(i)).

### B. *The Government's Reliance on Seizure Warrant Affidavits Does Not Obviate the Need for a Fatico Hearing*

The Government argues that because it seized $634 million pursuant to court-authorized seizure warrants, the loss amount "plainly exceeds $550 million" and no *Fatico* hearing is needed. Gov. Mem. at 35. This argument conflates seizure with loss and ignores the adversarial process. Seizure warrant affidavits are *ex parte* submissions prepared to establish probable cause — a standard far lower than the preponderance of the evidence standard required at sentencing, let alone the enhanced standard that the magnitude of the enhancement warrants here. While the Government now attempts to rely on the affidavits to support its loss calculation, the Government notably did not offer the supposed tracing analysis contained therein during trial, nor did it offer any detail in its sentencing submission. The defense has never had the opportunity to cross-examine the FBI agents who prepared these affidavits, to challenge the tracing methodology, or to present evidence of offsets, redemptions, and non-victim investors. The Court's prior reliance on these affidavits for purposes of entering a preliminary forfeiture order does not establish the loss

7

amount for Guidelines purposes, because the seizure warrant proceedings involve different issues and legal standards and different procedural protections than are required when determining loss for Guidelines purposes.

The seizure warrant affidavits, moreover, confirm the double-counting problem. The FBI agent who prepared the affidavits acknowledged that "Investment Scheme Funds" were "layered" through multiple accounts — transferred from one entity's account to another, and then another, in a manner the agent described as "indicative of money laundering." ECF No. 716-2 ¶ 55(b). But the same layering that the Government characterizes as evidence of money laundering also means that the same dollars were counted each time they moved. Further, in the purported tracing analyses in some of the affidavits in support of the seizure warrants, it is apparent that money from the GTV Private Placement – of which Mr. Guo was acquitted – was commingled with other monies, so it is not at all clear which money was moved to which account. *See id.* ¶ 34(c). On this point also, the analyses provided in the affidavits in many instances fail to provide for an account "starting" point. As a result, the source of any money transfers is not at all clear, particularly if there was money from other sources in the account to begin with or money from other sources were deposited into an account along the way.

As an example, as discussed in Mr. Guo's initial sentencing memorandum , at least $95 million in G Club membership payments were made using HDO or HCN — funds that had already been counted as Himalaya Exchange inflows. *See* Def. Corr. Mem. 53-54. The Government has never addressed this double-counting, and its analyst was never asked to parse it. Tr. 4458.

Moreover, the amount *seized* is not equivalent to the amount of *loss*. The Government seized funds from accounts held in the names of Hamilton, Himalaya Exchange, G Club, and other entities. But many of those funds belonged to investors who affirmatively deny they were

defrauded — including the 6,512 Himalaya Exchange customers who have filed § 853(n) petitions (ECF Nos. 759, 761) and the 324 Hamilton investors who assert that their funds have "no nexus to the conduct charged" (ECF No. 756 at 4). The seizure of their funds does not transform those funds into "loss." As a result, the Government's reliance on the seizure affidavits requires resolution through a *Fatico* hearing before it can be considered sufficiently dependable to form the basis for any loss amount.

Due process requires that Mr. Guo have the opportunity to challenge the Government's loss calculation through an evidentiary hearing. *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978). The Government's position – that the Court should simply adopt the Government's number without adversarial testing – is inconsistent with the fundamental requirements of fair sentencing and does not satisfy Second Circuit or the Guidelines' standards of reliability.

## C. *The Government's Position on Restitution Reflects the Challenges of Ascertaining Loss*

The Government has moved for a finding that restitution is "impracticable" because it cannot quantify specific victim losses – including amounts invested in G Series entities and any refunds from those entities or compensation provided through the SEC or other means – with the precision required by the Mandatory Victim Restitution Act. ECF No. 785 at 4-5. Yet the Government simultaneously asks the Court to find, for Guidelines purposes, that the loss exceeds $1.3 billion.

If the Government cannot quantify victim losses for restitution purposes, it cannot credibly claim to have established a $1.3 billion loss for Guidelines purposes. The Guidelines require a "reasonable estimate" of loss "based upon the evidence." U.S.S.G. § 2B1.1, cmt. n. 3(B). An estimate that the Government itself concedes it cannot support with victim-specific data is not reasonable.

9

### III. ACQUITTED CONDUCT MUST BE EXCLUDED FROM THE LOSS CALCULATION

#### A. *The Government's Reading of § 1B1.3(c) Would Nullify Amendment 826*

The Government argues that the $411 million it attributes to the GTV Private Placement should be included in the loss calculation under the exception in U.S.S.G. § 1B1.3(c) for acquitted conduct that "also establishes, in whole or in part, the instant offense of conviction." Gov. Mem. at 36. The Government's reading of this exception would swallow the rule.

Under the Government's expansive interpretation, any acquitted conduct that was also charged as part of a broader conspiracy would automatically qualify for the exception – because conspiracy counts, by their nature, encompass all alleged objects. If that were the law, then Amendment 826 would be a nullity in virtually every multi-count case involving conspiracy charges. The Sentencing Commission could not have intended such a result when it unanimously adopted Amendment 826 with the express purpose that, as Commission Chair Judge Carlton W. Reeves declared, "Not guilty means not guilty[.]" *See* Sentencing Commission News Release, "Commission Votes Unanimously to Pass Package of Reforms Inlcuding Limit on Use of Acquitted Conduct in Sentencing Guidelines," April 17, 2024, available at https://www.ussc.gov/about/news/press-releases/april-17-2024.

The Commission's Application Note 10 to § 1B1.3 does not support the Government's position. That Note states that "the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3, cmt. n. 10. This is a *limiting* instruction – it asks the Court to make a particularized, fact-specific determination, not to accept the Government's blanket assertion that *everything* is connected. The Note's reference to "overlapping conduct" contemplates situations where the *same specific acts* underlie both the acquitted charge and the

10

convicted offense, not situations where the acquitted conduct is merely part of the same broader scheme.

### B. *The GTV Private Placement Conduct Does Not "Establish" the Offenses of Conviction*

The jury's acquittal on Counts 5 and 6 – the GTV wire fraud and securities fraud counts – was a specific determination that the Government failed to prove those charges beyond a reasonable doubt. The GTV Private Placement was a discrete offering that occurred from April to June 2020, involved a separate set of investor funds, and was the subject of a separate SEC enforcement action that resulted in a settlement involving payment of more than $539 million in disgorgement, interest, and penalties, along with the return of approximately 92% of investor funds through a Fair Fund. Tr. 708, 1358, 2377; *see also* Def. Corr. Mem. Ex. 10 at 8-9.[1]

The Government's assertion that the GTV Private Placement was "connected with and integral to the other arms of the G Enterprise" (Gov. Mem. at 37) proves too much. Under that logic, every component of a multi-scheme enterprise would "establish" every other component, and no acquittal on any individual scheme would have meaning. The exception in § 1B1.3(c) requires that the acquitted conduct itself *establish* the convicted offense — not merely that it be part of the same narrative.

Moreover, as discussed in Mr. Guo's intial sentencing submission, the principle established in *Griffin v. United States*, 502 U.S. 46 (1992), counsels that when a jury convicts on a multi-

---

[1] The Government contends that the approximately 8% of GTV Private Placement funds that investors did not receive back through the SEC Fair Fund is attributable to the $30 million loss from the $100 million hedge fund investment. Gov. Mem. at 33 n.14. This is absurd. In addition to disgorgement of nearly $487 million, the SEC collected more than $52 million in interest and penalties alone, the latter far exceeding the $30 million hedge fund investment loss. Per a September 18, 2023, order, moreover, the SEC expressly reserved $19,919,250 for taxes and administrative expenses, along with $82,000,000 for a future disbursement. *See In re GTV Media Group, Inc. et al.*, Release No. 98415 (Sept. 18, 2023).

11

object conspiracy but acquits on a substantive count, the jury is presumed to have returned its verdict on the objectives for which there was sufficient evidence. Def. Corr. Mem. at 60. The jury's acquittal on the GTV counts precludes any conclusion that the GTV Private Placement served as a predicate for the RICO or conspiracy convictions. The same is true for money laundering. The money allegedly laundered must come from "specified unlawful activity." Here, the GTV Private Placement funds cannot constitute the proceeds allegedly laundered because the jury determined that the GTV Private Placement was not specified unlawful activity.

Again, as with other portions of Mr. Guo's initial sentencing memorandum that the Government is unable to confront, the Government Memorandum inexplicably ignores *Griffin* altogether.

## IV.    THE DISAVOWAL OF VICTIM STATUS BY THOUSANDS OF INVESTORS IS DIRECTLY RELEVANT TO LOSS

The Government argues that whether an investor "subjectively regards oneself as a 'victim' is irrelevant to the Guidelines calculation" because materiality is an objective standard. Gov. Mem. at 38. This mischaracterizes the defense position.

The defense argument is not about the subjective materiality of misrepresentations. It is about *actual loss* – specifically, whether "pecuniary harm . . . resulted from the offense" as to investors who affirmatively deny they were harmed. U.S.S.G. § 2B1.1(b)(1) n. (C)(i). If an investor states that the alleged misrepresentations were not material to their decision to invest – that they invested for reasons unrelated to the representations the Government identifies as fraudulent – then no pecuniary harm "resulted from" the offense as to that investor. This is a question of causation, not subjective materiality.

The Government attempts to distinguish *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), cited by the defense, by noting that in *Miller* the court couched its decision in terms of the

12

lack of "property" and/or an "agency" relationship. *See* Gov. Mem. at 39-40. Yet that wholly mischaracterizes the *factual* context in *Miller*, which is entirely relevant here in evaluating any loss amount.

In *Miller*, which was a case centered on omissions rather than misrepresentations, the reason the apartments the defendants obtained surreptitiously – without offering them to their investor clients – and/or the investors' deposit money that funded defendants' purchase of apartments for themselves did not constitute "property" for mail or wire fraud purposes (and why an "agency" relationship was not established), was because of the *subjective expectation of the investors that the government denominated as victims.*

For example, the Court in *Miller* pointed out that the investors' representative "testified that the purchase of the Apartments by [defendants and the cooperating witness] was *never disclosed to him*; his *consent to that purchase was never requested*; he *never saw a list* of the 122 apartments prior to the investigation that resulted in the Indictment; the [investor] Group had ample funds to have acquired the Apartments; and the Group *would have been interested in acquiring them had he been apprised of their availability*." 997 F.2d at 1014 (emphasis added).

The investors' representative "also testified, however, that he never asked to invest more money in the Philip Howard than that expended for the 114 apartments purchased by the Group; *there was nothing wrong* with [the cooperating witness and one of the defendants] making a personal investment in the Philip Howard apartments; *he had no expectation* regarding the possibility of such a personal investment by [defendants]; and 'it was very much within Mr. Miller's cards to do a deal, and if it wouldn't be with my group, it would be with a European group out there.'" *Id*. (emphasis added); s*ee also id*. at 1013 (investors' representative "testified that the size of [defendants'] fee was *immaterial to him*") (emphasis added); Def. Corr. Mem. at at 45-46

13

& n.43. Because the purported "victims" disavowed any expectation of an agency relationship that would have precluded the allegedly fraudulent investment, the government's fraud theory collapsed. 997 F.2d at 1020.

In this case, the scale of investor disavowal of victim status is unprecedented. More than 6,500 Himalaya Exchange customers have filed § 853(n) petitions asserting their funds are not fraud proceeds. ECF Nos. 759, 761. Three hundred twenty-four Hamilton investors have filed petitions asserting their investments have "no nexus to the conduct charged." ECF No. 756. Several investors wrote to the Government disclaiming victim status. *See, e.g.,* USAO_00112534-USAO_00112564. And more than 1,200 individuals have sent letters of support for Mr. Guo to defense counsel, of whom 1,192 expressly disclaim victim status.[2]

As made clear by the 100 representative statements provided in full in the Supporter Supplement filed in conjunctin with this memorandum, the investors who have expressly disclaimed victim status are not nameless, faceless victims of brainwashing or manipulation, as the Government self-servingly – and offensively – suggests. *See* Gov. Mem. at 1, 2, 51, 59, 82, 83. To the contrary, the statements submitted represent individuals from a vast range of personal and professional backgrounds who offer detailed, thoughtful perspectives on their decisions to invest in various G Series entities. The Government has never attempted to quantify the investment amounts attributable to these non-victim investors, or to exclude those amounts from its loss figure. Nor has the Government attempted to address the arguments set forth in Mr. Guo's initial sentencing memorandum with respect to this subject.

---

[2] A master list of supporter statements received by defense counsel is included in a sealed supplement (hereinafter "Supporter Supp.") filed in conjunction with this reply memorandum.

The Government's attempt to dismiss these investors as victims who have been "successfully convinced" they are not victims (Gov. Mem. at 40, 68) is both condescending and circular. At best, the Government proved at trial that *some* investors (the handful who testified) were defrauded. It did not prove – and the jury was never asked to find – that *all* investors were defrauded, or that the total loss was $1.3 billion. The existence of thousands of investors who deny victimization is powerful evidence that the Government's aggregate inflow figure vastly overstates the actual loss.

Indeed, the Government's refusal to acknowledge the existence, much less the scope, of purported "victims" who disclaim that status, provides an additional reason why a *Fatico* hearing is necessary.

The Government, moreover, wholly ignores its own admonition at trial about extrapolating from the testimony of a single witness. *See* Def. Corr. Mem. at 54-55. At trial, the Government objected strenuously to allowing the defense to argue and the jury to infer based on the testimony of one defense witness who had been coerced by the CCP to submit false accusations against Mr. Guo that it was reasonable to assume that others (possibly even the prosecution victim witnesses) had also been coerced. The Government called this type of inference "speculation" and "extrapolation." Tr. 5568, 5852. The Court agreed and precluded the defense from making such an argument. Tr. 5571, 5855.

In our initial sentencing submission, we maintained that by the same logic and reasoning, any losses beyond those testified to by the Government's victim witnesses are also speculative and should not be allowed. Def. Corr. Mem. at 55. In its 85-page responsive submission, however, the Government neither addressed this point nor put forward any reason why it should be permitted to "speculate" and "extrapolate" for purposes of establishing a loss amount. As the Court stated with

15

respect to an objection made during trial, "What's good for the goose." Tr. 1219. There is no reason why that rationale should not apply now.

The Government cannot have it both ways. It cannot curtail the defense from arguing a broader inference based on the testimony of its witness while at the same time arguing that the Government can prove a $1.3 billion loss amount by a preponderance of the evidence based on the testimony of only five alleged victims. If it would be speculation or extrapolation for the defense, then it must likewise be speculation and extrapolation for the Government.

Further, the Government's argument rests on the unproven assumption that all investors heard all of Mr. Guo's broadcasts and ignored the Farm Loan documents, the Himalaya Exchange white papers, and the G Club documents, all of which speak for themselves and were available to all investors. Numerous investors – including trial witness Lai Dai and many more who sent statements to defense counsel – have emphasized their reliance on these written materials and their exercise of independent judgment.

## V.    THE MAGNITUDE OF THE LOSS ENHANCEMENT REQUIRES HEIGHTENED SCRUTINY

The Government dismisses the doctrine set forth in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000), as "foreclosed by long-settled precedent" and claims that *Cordoba-Murgas* itself "rejected the use of a higher burden of proof." Gov. Mem. at 40. This is a misreading of the case.

The Second Circuit stated in *Cordoba-Murgas* that "the enhancement of a sentence based upon a defendant's 'relevant conduct,' if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under the Sentencing Guidelines." 233 F.3d at 708.

16

The court authorized downward departures when the appropriate standard of proof was not satisfied, and provided that "under the combination of circumstances that may be present here, including (i) an enormous upward adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found by only a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding, the Court would be authorized to depart downward." *Id.* at 708.

In this case, the 30-point loss enhancement constitutes an enormous upward adjustment in Mr. Guo's offense level, accounting for more than half of the total points. It is based in significant part on acquitted conduct (the GTV Private Placement), as well as on conduct that was not proven at trial (causing losses to thousands of investors who deny victimization). Again, the jury made no finding as to loss amount and, as demonstrated above, there are substantial grounds to doubt the accuracy of the Government's figure.

The Government's fallback argument – that even a loss of $3.5 million would yield an offense level of 43 due to other enhancements (Gov. Mem. at 41) – actually undermines its position. First, the Government has not established even a $3.5 million loss, because certainly that was not proven at trial. [3]

Second, if the loss amount is truly immaterial to the ultimate Guidelines calculation, then the Government should have no objection to a *Fatico* hearing to determine the actual loss. The

---

[3] A loss of $3.5 million is not supported by the trial testimony of the Government's alleged victim witnesses, even if fully credited and accepted. At best, the prosecution's five witnesses's alleged "losses" (even including the GTV Private Placement investments on which Mr. Guo was acquitted) total less than $1.5 million. Further, and not surprisingly, the Government never asked its witness Ya Li whether she lost money on her investments in the various G Series ventures. The logical inference from this omission is that Ya Li profited from her investments; had she actually lost money and not made money, the Government surely would have been quick to elicit her "loss" amount during direct examination.

Government's resistance to a hearing suggests it recognizes that its $1.3 billion figure cannot withstand adversarial scrutiny.

## VI.    THE GOVERNMENT'S SENTENCING COMPARABLES SUPPORT A SENTENCE WELL BELOW 30 YEARS

The Government's sentencing comparables are carefully selected to inflate expectations, but they actually demonstrate that a sentence well below 30 years is appropriate.

While specific other cases present facts and postures that render them difficult for comparison (as opposed to the entirety of a data set with a similar profile; *see* Def. Corr. Mem. at 92-96), the Government's reference to *United States v. Bankman-Fried*, No. 22-CR-673 (LAK) (S.D.N.Y Mar. 15, 2024), and the 25-year prison term to which he was sentenced, prove inescapably that particular aspects of that case demonstrate that a much *lower* sentence is appropriate herein.

For example, while the Government cites *Bankman-Fried* as a comparable, the defendant's fraud in that case involved $8 billion in customer funds — more than six times the Government's alleged loss here — and included the misappropriation of customer deposits from a regulated exchange. In addition, Bankman-Fried testified falsely at trial (ECF No. 410 at 31-32), and the Government was required to extradite him to gain personal jurisdiction over him (*id.* at 18-22) (Bankman-Fried also used the Rule of Speciality to eliminate certain counts against him).

In addition, Bankman-Fried spent millions of dollars leveraging his financial success into political influence, attempting to achieve bipartisan corruption through his extensive political contributions. *Id.* Morover, even with a 25-year sentence, "good time" and other programming credits will result in Bankman-Fried's release from custody at an age *15 years younger than Mr. Guo is right now*.

Accordingly, reference to *Bankman-Fried* only strengthens Mr. Guo's positon that his sentence should be dramatically shorter than 25 years.

The cases the Government conspicuously omits are more instructive. In *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020), the Second Circuit affirmed a 120-month sentence where the Guidelines called for life imprisonment based on a $49 million loss. In *United States v. Rivernider*, 828 F.3d 91 (2d Cir. 2016), the Second Circuit affirmed a 144-month sentence – a significant downward variance from a Guidelines range of 324 to 405 months – where the district court found that the loss amount "overstated the seriousness of the offense."

In this District, courts repeatedly have imposed sentences dramatically below the advisory Guidelines level in high-loss fraud cases: *Adelson* (42 months, $260 million loss, Guidelines level 46, affirmed by the Second Circuit); *Gupta* (24 months, insider trading, affirmed); *Ferguson* (one to four years, $500 million fraud, Guidelines life); *Faibish* (63 months, Guidelines life). *See* Def. Corr. Mem. at 72-75. While the amount of loss in those cases does not reach the dollar amount that the Government alleges here, those cases occurred years and even decades ago, when the numbers in those cases were functionally equivalent to those alleged herein.

The Sentencing Commission's own data confirms that the norm in this District is sentencing below the Guidelines range. As detailed in Mr. Guo's sentencing memorandum, only 23.8% of sentences in SDNY fall within the advisory Guidelines range. Def. Corr. Mem. at 94. The mean sentence for money laundering convictions in SDNY in 2024 was 34 months, not even close to the 360 months the Government suggests is appropriate here. *See* Def. Corr. Mem. at 95.

Finally, the Government's reference to Yvette Wang's guilty plea (Gov. Mem. at 78) does not bind either Mr. Guo or the Court in making the individualized sentencing determination that the Fifth Amendment guarantees to Mr. Guo. As Courts regularly instruct juries, one defendant's

19

decision to plead guilty is personal, and should not have any impact on deliberations with respect to a defendant at trial. Also, while the Federal Rules of Evidence and certain trial-oriented constitutional protections do not necessarily apply at sentencing, it is noteworthy that in *Crawford v. Washington*, 541 U.S. 36 (2004), the very practice of introducing a co-defendant's guilty plea to establish a conspiracy and its scope was among the tactics that the Court expressly found violated the Sixth Amendment. Here, reliance on Ms. Wang's guilty plea – which all persons familiar with the federal legal system know is the product of a negotiation in which the Government exercises extraordinary leverage in dictating terms – would violate the Fifth Amendment in the sentencing context.

## VII. THE GOVERNMENT'S REMAINING ARGUMENTS DO NOT SUPPORT A 30-YEAR SENTENCE

### A. *The CCP's Campaign Against Mr. Guo Is Relevant to Sentencing*

The Government devotes barely three pages to the CCP's targeting of Mr. Guo, mischaracterizes it as nothing more than a mitigation argument, and dismisses it as "irrelevant." Gov. Mem. at 56-58. The Government does not even acknowledge the CCP actions against Mr. Guo that its own Department of Justice saw fit to prosecute criminally in the cases of Elliot Broidy, Prakazrel Michel, George Higginbotham, Nicki Lum Davis, and the thirty-four defendants in *Bai*, and civilly in the case of Steve Wynn. *See* Def. Corr. Mem. at 17-22. To do so would mean reckoning with the implications of the CCP's aggression against Mr. Guo, which is directly relevant to sentencing in at least two respects.

First, the CCP's coercion of investors to file false complaints – testified to at trial by Jianhu Yi (Tr. 5042-59) and corroborated by the Declaration of Wansheng Cheng (Def. Corr. Mem., Ex. 3) and other statements discussed in the Supporter Supplement – directly undermines the reliability

20

of the Government's loss figure. If an unknown number of "victim" complaints were fabricated by CCP agents, then the Government's loss calculation is built on a contaminated foundation.

Contrary to the Government's contention, CCP coercion was directly related to the scope of the offense conduct and the loss amount, and reinforces the need to attempt *some* verification of the integrity of the complaints through a *Fatico* hearing because it appears the Government has not attempted *any* of the vetting that the peculiar facts in this case require.

Indeed, of the 225 victim impact statements submitted by the Government with its memorandum, at least 45 appear to be duplicates or supplements submitted by individuals otherwise represented in the collection, bringing the number of unique "victims" closer to 180 than 225. This raises questions about both the provenance of the letters and the Government's unquestioning reliance on them.

The Government stipulated that the CCP targeted Mr. Guo (DX STIP 1), and the DOJ's own prosecution in *United States v. Bai et al.* confirmed a massive CCP social media campaign to discredit Mr. Guo using thousands of fake online personas. Def. Corr. Mem., Ex. 2. The Court cannot ignore this context when evaluating the Government's specious claim that every dollar directed toward a G Series entity represents "loss."

Second, the CCP's targeting of Mr. Guo is directly relevant to the § 3553(a) factors, including the "history and characteristics of the defendant" and the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). The conduct in this case cannot fairly be assessed outside of its personal, historical, and political context, all of which are entangled with the CCP's oppressive regime and targeting of Mr. Guo. A lengthy prison term would validate the CCP's campaign against Mr. Guo, satisfy the CCP's goal of silencing Mr. Guo, and embolden further efforts by the

21

CCP to eliminate Chinese dissidents from public life — a result that is contrary to the geopolitical and national interests of the United States.

**B.  *The Government's Claims of Ongoing Criminal Activity Are Unsupported***

The Government's assertion that Mr. Guo has "continued criminal activities for the three years that Guo has been incarcerated" (Gov. Mem. at 67) is based entirely on unsworn victim statements repeating hearsay about what NFSC presenters allegedly said on broadcasts. The Government offers no direct evidence that Mr. Guo personally directed any post-arrest criminal activity from the MDC.

The continuation of the NFSC as an organization – which has its own elected leadership structure – is not evidence that Mr. Guo has directed any criminal conduct while detained. Again, the Government's unsupported allegations regarding this subject demand a *Fatico* hearing before they can be considered.

The Government's reliance on a March 10, 2026, video (Gov. Mem. at 27) in which an NFSC presenter stated that individuals who provided victim statements "will all have to bear the consequences" is not only taken entirely out of context, as discussed in Part I above, but more importantly proves nothing about Mr. Guo's personal involvement. The Government does not allege that Mr. Guo directed this statement, and the statement itself is not evidence of ongoing criminal activity by Mr. Guo.

**C.  *The Government's Allegations that Mr. Guo Obstructed Justice are Unsupported and Unavailing***

The Government devotes eight pages to arguing that Mr. Guo engaged in a range of allegedly obstructive conduct. Gov. Mem. at 20-28. None of the allegations withstands scrutiny.

First, the Government's attempts to cast the supposed "complexity" of the investment "schemes" as inherently obstructive is preposterous. *Id.* at 20. Likewise, characterizing the

supposed "evolution" and "relocation" of various investment opportunities as obstructive is entirely speculative and ignores longstanding business relationships that predate the alleged fraud, including those tied to the UAE.

Second, the Government repeatedly and improperly attributes the conduct of others to Mr. Guo. This is true with respect to alleged conduct of William Je as well as of supporters of Mr. Guo. *Id.* at 21, 23-24, 27-28. Efforts to cast Mr. Guo as the orchestrator of certain conduct fall short; for instance, the existence on a cell phone belonging to Mr. Guo of a photo identifying relatives of an individual whose home protestors visited is a far cry from an order directing "harassment" or "targeting" of such individual or the relatives. *Id.* at 25-26. The attenuation between this photo and any supposed obstructive conduct that could be attributed to Mr. Guo underscores the Government's strained efforts in this regard. In other instances, such as the supposed "threats" issued in the NFSC video discussed in Part I, the Government does not even attempt to attribute the (ultimately benign) conduct to Mr. Guo, relying entirely on supposition and innuendo. *Id.* at 27.

Third, the Government attempts to characterize as "obstruction of justice" for purposes of this case events in wholly unrelated litigation (*id.* at 22) and other conduct that took place prior to Mr. Guo's arrest (*id.* at 28 n. 11), which cannot constitute obstruction in this proceeding.

For these reasons as well as those addressed in Mr. Guo's intial sentencing submission (Def. Corr. Mem. at 81-82), Mr. Guo maintains that any enhancement of his sentence based on purported obstruction of justice is unwarranted.

### D.  *The Government's Wealth Argument Is Internally Contradictory*

The Government argues that Mr. Guo's "purported" billionaire status is an *aggravating* factor because he used it to lure victims. Gov. Mem. at 71. But this argument is in tension with the Government's own theory of the case. If Mr. Guo was already a billionaire – which the

23

Government cannot seriously dispute – then the Government's narrative that he committed fraud because he needed money after the 2018 Hong Kong asset seizure is undermined. Hence the Government makes efforts to hedge by referring to Mr. Guo as a "purported" billionaire and his personal background as "mythology." The Government cannot simultaneously argue that (a) Guo was a genuine billionaire whose wealth lured victims, and (b) Guo was desperate for money and committed fraud to fund his lifestyle. These narratives are irreconcilable, and the contradiction further illustrates why the Court should not only approach the Government's sentencing arguments with skepticism, but also require *evidence* sufficient to satisfy due process over mere rhetoric and generalized assertions lacking adequate factual support.



25



25



## CONCLUSION

For all of the reasons set forth herein and in Mr. Guo's Sentencing Memorandum, we respectfully submit that the Government's request for a sentence of at least 30 years' imprisonment should be rejected, and that a sentence dramatically below the advisory Guidelines range — consistent with the § 3553(a) factors, the sentencing practices in this District, and the unique circumstances of this case — is the only sentence that would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Mr. Guo respectfully renews his request for a *Fatico* hearing to resolve all disputed issues of fact with respect to the alleged loss amount, other Guidelines enhancements, and any other contested factual issues relevant to sentencing.

Dated: April 17, 2026
New York, New York

26

Respectfully submitted,

_____/s/_____

John F. Kaley
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007
Tel: 212-619-3730

_____/s/_____

Joshua L. Dratel
Law Offices of Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
Tel: 212-732-0707

_____/s/_____

Melinda Sarafa
SARAFA ZELLAN PLLC
43 West 43rd Street, Suite 370
New York, NY 10036
Tel: 212-785-7575

To:     All Counsel via ECF

27