O5TVGUO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

          v.                    23 Cr. 118 (AT)

MILES GUO,

          Defendant.        Trial
------------------------------x

                              New York, N.Y.
                              May 29, 2024
                              9:00 a.m.

Before:

                  HON. ANALISA TORRES,

                              District Judge
                             -and a Jury-

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  MICAH F. FERGENSON
    RYAN B. FINKEL
    JUSTIN HORTON
    JULIANA N. MURRAY
    Assistant United States Attorneys

SABRINA P. SHROFF
    Attorney for Defendant

PRYOR CASHMAN LLP
    Attorneys for Defendant
BY:  SIDHARDHA KAMARAJU
    MATTHEW BARKAN

ALSTON & BIRD LLP
    Attorneys for Defendant
BY:  E. SCOTT SCHIRICK

O5TVGUO1

ALSO PRESENT:
Isabel Loftus, Paralegal Specialist, USAO
Michael Gartland, Paralegal Specialist, USAO
Geoffrey Mearns, Paralegal Specialist, USAO
Robert Stout, Special Agent, FBI
Ruben Montilla, Defense Paralegal
Tuo Huang, Interpreter (Mandarin)
Shi Feng, Interpreter (Mandarin)
Yu Mark Tang, Interpreter (Mandarin)

O5TVGUO1

(Trial resumed; jury not present)

THE COURT:  Good morning.

Please make your appearances.

MR. FINKEL:  Good morning, your Honor.  Ryan Finkel, Juliana Murray, Micah Fergenson, and Justin Horton for the government.  We're joined at counsel table by Isabel Loftus, who's a paralegal in our office.

MR. KAMARAJU:  Good morning, your Honor.  Sid Kamaraju and Scott Schirick on behalf of Mr. Guo.  And Mr. Guo is with us here at counsel table.

THE COURT:  Please be seated.

On May 27th, 2024, the government submitted a motion to admit certain exhibits consisting of preserved copies of online posts to G News and Gettr, ECF No. 352.

Defendant filed opposition papers on May 28th, 2024, ECF 361.

I've also reviewed the underlying documents the government seeks to admit, relying principally on *Anderson v. United States*, 417 U.S. 211 (1974).  The government argues that it is not offering the posts for the truth of the matters asserted therein; instead, it states that it is offering the posts "for the fact that they exist, i.e., that they were made on media websites created and controlled by the defendant."

I agree with the government that this anticipated use falls outside the definition of hearsay.  In *Anderson,* the

court determined that a statement was not hearsay because it was not offered to "prove the truth of anything asserted therein," but "to prove that the statements were made so as to establish a foundation for later showing through other admissible evidence that they were false." *Id.* at 220.

Further, to the extent that witnesses viewed the posts at issue, they are admissible as nonhearsay to show their effect on the viewer. *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 737 (S.D.N.Y. 2022).

Accordingly, I will not exclude the posts on hearsay grounds.

I also find that under Federal Rules of Evidence 401 and 403, the posts on G News and Gettr, media organizations that the government alleges were created and controlled by the defendant, are relevant as proof of the G Enterprise and is evidence of defendant's scheme to defraud.

Accordingly, the government's motion is granted.

Are there any further applications at this time?

MR. FERGENSON:  Not with respect to that, your Honor.

MR. SCHIRICK:  No, your Honor.

MR. FINKEL:  Your Honor, I just wanted to place something on the record, if I may.

After reviewing yesterday's transcript and with the Court's comments to counsel in the robing room in mind, which the government took very seriously and takes very seriously,

Ms. Shroff had flagged something for the government yesterday which I just want to put on the record for the Court.

Yesterday morning, as the Court knows, Ms. Shroff indicated that she needed more time to review a victim's 3500 material. And I indicated that that victim was originally set to testify yesterday, but that we would not call her yesterday, and this would provide the defense with more time to review that new 3500.

Looking at the transcript, I wasn't clear in that moment that the decision not to call the victim was made that morning, just before your Honor took the bench, just before your Honor called us into the robing room. In any event, the reordering decision seemed responsive to Ms. Shroff's request for more time and that's why I raised it.

To the extent I caused any misimpression with your Honor, with the parties, I certainly apologize for that. I did not intend to do so. We will continue to work with defense counsel and continue to take very seriously and follow the Court's instruction to conduct this trial in an efficient and responsible manner.

THE COURT: I did not have a negative impression yesterday morning, and I'm so glad to see that everyone is working well together.

MR. FINKEL: Me too. Thank you.

MR. FERGENSON: I'm sorry, your Honor.

O5TVGUO1

THE COURT:  Go ahead.

MR. FERGENSON:  I had one related point, another quick point to put on the record.

We've been working very productively with defense counsel on a handful of stipulations related to Shamel Medrano's testimony as a summary witness regarding these G News and Gettr posts and other videos.  We have made video clips of longer videos.

The defense may seek to offer additional portions of the longer videos under the rule of completeness.  We have agreed that the government may have substantive objections to those under the hearsay rules, for example, but we're not going to object under, you know, timeliness or something like that. So that the defense has additional time to consider what, if any, other portions they'd like to offer.

And I just wanted to put that on the record so it's clear the defense has comfort we're not going to object on that basis at a later date.

THE COURT:  I'm glad to hear that.

MR. FERGENSON:  Thank you, your Honor.

THE COURT:  Is there anything else?

MR. KAMARAJU:  Not from us, your Honor.

THE COURT:  So I'd like to have the witness back on the stand by, say, 9:29, so that he is here when the jurors come in.  Thank you.

O5TVGUO1                    Le Zhou – Cross

MR. FINKEL:  Thank you.

MR. KAMARAJU:  Thank you, your Honor.

(Recess)

THE COURT:  Good morning.  Please be seated.

Would you have the jurors brought in.

(Jury present)

THE COURT:  Good morning, jurors.

THE JURY:  Good morning.

THE COURT:  Please be seated.

We are going to continue this morning with the cross-examination of Mr. Zhou.

Remember that you're still under oath.

You may inquire.

MR. KAMARAJU:  Thank you, your Honor.

LE ZHOU,

     called as a witness by the Government,

     having been previously duly sworn, testified as follows:

CROSS-EXAMINATION (continued)

BY MR. KAMARAJU:

Q.  Good morning, Mr. Zhou.

A.  Good morning.

Q.  Yesterday do you recall testifying about certain G Fashion items that you purchased?

A.  Yes.

Q.  Okay.  And one of them were these pajamas; correct?

O5TVGUO1                        Le Zhou - Cross

A.   Correct.

Q.   And then there was the whistle, right?

A.   Correct.

Q.   The shirt?

A.   Yes.

Q.   And the hat, right?

A.   Yes.

Q.   Okay.  That's not all the items that you purchased from G Fashion, right?

A.   Correct.

Q.   You purchased several more than that, right?

A.   Correct.

Q.   When you met with the prosecutor, you went over the items that you purchased; correct?

A.   Correct.

Q.   And you went through pictures of the items; correct?

A.   Correct.

Q.   And that was of all the items you had purchased, right?

A.   No.

Q.   No?

A.   No.

Q.   How many items did you go over with them?

A.   About 20 items.

Q.   Sorry?

A.   Twenty items.

Q.  About 20?

A.  Correct.

Q.  Okay.  And when you were going through these 20 items, who decided on bringing these to court?

A.  I decided.

Q.  Okay.  So you're the one who chose which items were introduced as these exhibits?

A.  Correct.

Q.  Okay.  Did you discuss that with the prosecutors?

A.  Yes.

Q.  Okay.  Did they give you suggestions as to which items should be brought in?

A.  They mentioned not a particular item, but in the category.

Q.  Okay.  Like what kind of categories?

A.  Hats, shirts, pants, and what I did jewelry.

Q.  Sorry, I didn't hear the last part.

A.  No, no.  Jewelry.  Sorry.

Q.  Okay.  So they didn't ask you to bring in jewelry?

A.  No.

Q.  You picked the whistle.  Do you consider the whistle to be jewelry?

A.  I picked whistles, two whistles, yes.

Q.  Okay.  So you picked two whistles to show?

A.  Yes.

Q.  Okay.  But they only asked you about one, right?

A. Correct.

Q. So they did make some decisions --

A. No, they kept one.

Q. Okay. But in court they only showed you one, right?

A. Yes.

Q. So they did make some decisions about what to show here in court, right?

THE COURT: He cannot testify as to what they were thinking. He can testify as to whether he made the decision.

MR. KAMARAJU: Okay.

Q. You decided that you would bring two whistles to show to court; correct?

A. Yes.

Q. Okay. And the prosecutors only showed you one here in court, right?

A. Correct.

Q. Thank you.

Now, the approximately 20 items or so that you purchased from G Fashion, did you discuss all of them with the prosecutors?

A. I purchased more than 20 items.

Q. Okay. I'm sorry. Roughly how many items did you purchase?

A. About 30 items.

Q. Thirty items. Okay.

Remember yesterday you testified about the whistle;

correct?

A.   Correct.

Q.   And that was the gold whistle, right?

A.   Correct.

Q.   It was a commemorative item of some sort?

A.   I'm sorry?

Q.   It was a commemorative item of some sort?

A.   It was a limited edition, was only 77 made.

Q.   Okay.  Sorry.  Limited edition.

        MR. KAMARAJU:  Could we bring up just for the witness,
the Court, and the parties GX VO-67, please.

        Your Honor, after conferring with the government, it
seems this is in, so I'm going to ask to publish it to the jury
as well.

        THE COURT:  Go ahead.

Q.   All right.  So, Mr. Zhou, do you see the date of this
email?

A.   Yes.

Q.   All right.  It's February 28, 2021; is that right?

A.   Correct.

Q.   All right.  And this is when you -- this is the order
confirmation for when you bought the limited edition whistle;
correct?

A.   Correct.

Q.   Now, you testified, I believe, that when you received the

whistle, there was something that made you suspicious about it, right?

A.  Correct.

Q.  That's why you weighed it, right?

A.  I weighed it, yes.

Q.  Okay.  And you weighed it because you thought there might be something wrong with it?

A.  When I receive it, when I first opened it, the packaging inside, it was a little bit of gold dust on it.  And, of course, I pick up the whistle.  The craftsmanship, it looked to me a little bit rough.  Because this is a limited edition, that's collectible items, as the G Fashion promoted, this is a best, best craftsmanship items, so that's why I had concerns.

Q.  Okay.  So you were dissatisfied with it; is that right?

A.  Not dissatisfied.  Because still as advertised, this is a limited edition — only 77 in the world.  I understand that value itself, it's there.  But what it is when I receive it, it's what I received.

        THE COURT:  Mr. Kamaraju, would you draw the microphone closer to you, please.

        MR. KAMARAJU:  Sorry, your Honor.  Yes.

        Is that better?

        THE COURT:  Yes.

        MR. KAMARAJU:  Okay.

Q.  And please let me know if you can't hear me.

O5TVGUO1                         Le Zhou - Cross

A.   I hear you.

Q.   Thank you.

          MR. KAMARAJU:  Could we show for the witness and the parties and the Court GX V0-33 -- sorry, VO-33.

Q.   Mr. Zhou, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   This is screenshot I capture of the G Fashion website.

Q.   Okay.  And what does the screenshot reflect?

A.   Reflect my previous order and item dates, the amount paid.

Q.   Okay.  And the amount paid for what?

A.   All the item -- most of item purchased.  This is not all of it.

Q.   Okay.  So this is most of the items you purchased, but from G Fashion; is that right?

A.   Correct.

          MR. KAMARAJU:  Okay.  Your Honor, I'm going to offer Government Exhibit VO-33 into evidence.

          THE COURT:  No objection?

          MS. MURRAY:  No objection.

          THE COURT:  It is admitted.

          (Government's Exhibit VO-33 received in evidence)

          MR. KAMARAJU:  Could we publish it, please.

Q.   All right.  So previously we looked at the order confirmation for the whistle purchase; correct?

A.   Correct.

Q.   And that was February 28, 2021; correct?

A.   Yes.

Q.   Okay.  So if you look down at the fifth row from the bottom, so February 12th, 2021; correct?

A.   Correct.

Q.   Okay.  So after that date --

          MR. KAMARAJU:  And we can pull that down.

Q.   After that date, you made a number of purchases of G Fashion clothing, right?

A.   Correct.

Q.   And I believe you testified that this doesn't even reflect all of the G Fashion purchases that you've made, right?

A.   Correct.

Q.   So despite your concerns about the craftsmanship of the whistle, you continued to buy G Fashion, right?

A.   Yes.

Q.   And you continued to spend a significant amount of money on G Fashion, right?

A.   To spend the money also was towards to help the G Fashion grow.  Because my understanding, I'm part of the G Fashion stock shareholder.  I will contribute as much any way I can, even by purchasing items.

Q.   So you were trying to contribute to the growth of G Fashion by purchasing these items, right?

A.   Correct.

Q.   And you believe that G Fashion was -- withdrawn.

You believe that the growth of G Fashion was important to the movement's goals; correct?

A.   Because Miles Guo mentioned G Fashion valuation was tremendous high, also reach billions dollars.

Q.   Right.  But I asked you if you understood that the growth of G Fashion was important to the movement, sir?

A.   Yes.

Q.   Okay.  So you were trying to -- in addition to whatever you just testified to, you were trying to also help the movement by purchasing G Fashion wear; is that right?

A.   That's correct.

Q.   Okay.  So you continued to buy G Fashion wear, right?

A.   Correct.

Q.   Now, you had previously -- withdrawn.

Prior to buying a G Clubs membership, you had also purchased G Fashion, right?

A.   Correct.

Q.   Now, after you purchased your G Clubs membership, you started receiving discounts on your G Fashion wear, right?

A.   Correct.

Q.   How much -- what percentage discount were you receiving?

A.   Fifty percent.

Q.   Okay.  And so each time you bought one of these items you

got 50 percent off, right?

A.   Not every time.

Q.   After you bought the G Clubs membership, right, sir?

A.   Correct.

Q.   So how much in total discounts did you get, sir?

A.   If estimated, the discount -- I'm sorry, I couldn't get accurate discount on the amount of numbers.

Q.   Well, how much of a refund did you ask for, sir?

A.   Refund from which --

Q.   G Fashion.

A.   I ask for over $12,000 refund from G Fashions.

Q.   Okay.  And $12,000 is what you spent after receiving the 50 percent discount?

A.   Also includes nondiscount items.

Q.   It also includes nondiscounted items?

A.   Correct.

Q.   Okay.  So would it be fair to say that your discount amount was in the thousands of dollars, sir?

          MS. MURRAY:  Objection to form.

          THE COURT:  Overruled.  You may answer.

A.   Yes.

Q.   It was over $10,000, right, sir?

A.   Yes.

Q.   Okay.  So you paid $50,000 for the membership, right?

A.   Yes.

Q.   And in the course of a year and a half or so, you earned more than $10,000 in discounts, right?

        MS. MURRAY:  Objection.  Form.

        THE COURT:  Overruled.  You may answer.

A.   Yes.

Q.   And those were for products that you were also buying because you wanted to help the movement, right?

        MS. MURRAY:  Objection.

        THE COURT:  Overruled.  You may answer.

A.   Could you repeat the question, please.

Q.   Sure.

        MR. KAMARAJU:  Could we have it read back please?

        THE COURT:  Go ahead.

        (Record read)

A.   Not just help, but also towards to -- to help this company grow and to get the stock value high.

Q.   Right.  But, sir, didn't you just testify a few minutes ago that one of the reasons why you were buying G Fashion was to help the movement?

        MS. MURRAY:  Objection, your Honor.

        THE COURT:  Sustained.  Asked and answered.

Q.   When did you ask for your refund, sir?

A.   I couldn't remember the dates.

Q.   Was it after you started talking to the prosecutors?

A.   No.

O5TVGUO1                          Le Zhou - Cross

Q.  So you requested your refund prior to speaking with the

prosecutors, is that your testimony?

A.  Yes.

Q.  And that's for G Fashion, sir; is that right?

A.  Yes.

Q.  What about your G Clubs refund, when did you ask for that?

A.  I filed it July 15, 2023.

Q.  So you remember the date of the -- so the G Clubs refund

was July 15, 2023; is that right?

A.  Correct.

Q.  Okay.  Was the G Fashion refund request made after that?

A.  I don't recall that.

Q.  So you don't remember if the G Fashion one was before or

after the G Clubs?

            MS. MURRAY:  Objection.

            THE COURT:  Asked and answered.

Q.  Now, if you look at GX VO-33, there's a line for March 1st,

2021; correct?

A.  Correct.

Q.  Okay.  The first line there.  Do you see that?

A.  I see the highlighted, yes.

Q.  Right.  Okay.  So that reflects a column for which you

received a refund for an item, right?

A.  Yes.

Q.  Okay.  So at any point if you were dissatisfied with

something, you could request a refund; correct?

A.   This particular item was out of stock.

Q.   Okay.  So you were dissatisfied with -- you didn't receive the item, so you got a refund, right?

A.   It was out of stock.  I never received.

Q.   I'm sorry, sir, I'm just asking if you received a refund?

A.   Was credit to the credit store.

Q.   Now, you spoke a minute ago about the G Clubs membership. And I believe you testified on direct that you paid for both of those memberships by check, right?

A.   Correct.

        MR. KAMARAJU:  Could we have GX VO-26, please, which is in evidence.  Bring that up for the jury as well.

Q.   So these are the checks, right?

A.   Correct.

Q.   Okay.

        MR. KAMARAJU:  And if we could scroll to page 10, please.

Q.   All right.  Now, this is -- this is your member page, is that fair to say?

A.   Correct.

Q.   All right.  So it reflects your name with your Tier 5 membership, right?

A.   Correct.

Q.   And it lists membership benefits there?  It's on the left

side.

A. Yes.

Q. Could you just read what it says there?

A. "G Fashion 50 percent off, G Club brochure."

MR. KAMARAJU: Okay. And could we go to page 12 of that exhibit, please.

Okay. Sorry, this is the check again, right? Okay. Sorry. This is the right one.

Q. All right. This is the membership page for the Tier 2 membership that you purchased, right?

A. Correct.

Q. Okay. Now, this you purchased on behalf of your sister, right?

A. No, at the moment was introduced as we purchase; in the future we can transfer to the family.

Q. Okay. Could you explain that please, sir.

A. Yes. Miles Guo mentioned the G Club, the membership, the Tier 1 to Tier 5. The follower, we can purchase, but that was offered the passport. But my sister doesn't have to -- I don't need to put her name first. I have the right to transfer to my directed family members.

Q. So if I understand correctly, sir, the idea was that you could purchase the membership in your name so that eventually you could transfer it to a family member if you wanted, right?

A. Correct.

O5TVGUO1                        Le Zhou - Cross

Q.  Okay.  And was that benefit -- in your mind, was that benefit particularly useful for family members who are located in China?

A.  Only to the direct family members; doesn't matter if in China or other countries.

Q.  Okay.  So anywhere, right?

A.  Yes.

Q.  Now, you filled out a G Clubs membership agreement; correct?

A.  There's no agreement.  I never signed it or received.

MR. KAMARAJU:  So can we go to page 8, please.  Can we just blow up the -- that email.

A.  This is a payment received confirmation emails.

Q.  Right.  I was just asking if you could read the first line of the email, sir.

A.  Yes.

"Dear Le Zhou, on 2021 August 25 at 0:47:10, you submitted your completed and executed application to become a Tier 5 member of G Clubs.  We received your membership fee in the amount of $50,000.  Your application is under review and we may contact you for additional information.  We will email you confirmation of our decision within 30 days."

Q.  Okay.  So I just want to make sure I understand correctly, sir.  You said you never submitted a G Clubs application; is that right?

MS. MURRAY:  Objection, your Honor.

THE COURT:  Sustained.

MR. KAMARAJU:  Okay.

Q.  So you received this email without having submitted that application; is that right?

MS. MURRAY:  Objection, your Honor.

THE COURT:  Sustained.

MR. KAMARAJU:  We can take that down.  Thank you.

Q.  Now, on direct you testified that Mr. Guo ultimately gave you the opportunity to purchase H Coin, right?

A.  He mention the H Coin would be offered to followers.

Q.  Okay.  But there is a point at which H Coin could not be purchased by U.S. residents, right?

A.  Correct.

Q.  And so I believe you testified on direct that there came a point where U.S. residents could purchase H Coin; correct?

A.  Not a -- well, he said in the future will expand the H Himalaya exchange territory by once a proper license acquired.

Q.  Okay.  So once the proper license is acquired, then U.S. residents may be able to purchase it, right?

A.  Yes.

MR. KAMARAJU:  Could we have GX VO-78, please, which is in evidence.

Q.  Okay, sir.  Can you just remind us what this is?

A.  Yes.  This is a nominee shareholder agreement provided to

me from UK London Club.

MR. KAMARAJU:  Okay.  And the first line under letter of agreement, can we just blow that up.

Q.  All right.  Do you see the line that starts:  "I am pleased to inform you that"?

A.  Yes.

Q.  And do you see where it says:  "In recognition of the contributions made by you"?

A.  Yes.

Q.  That's a reference to your contributions to the farm, right?

A.  No, the contribution I understand is all of the previous G Series investments.

Q.  Okay.  So your understanding is that the contributions that are referred to here are the G Series of investments, not the work that you did on behalf of the farm?

A.  Some contributions for volunteer works towards contributions, donation contributions.

Q.  So it all goes together in figuring out the contribution, right?

A.  The work, the time, effort put into it and the donations.

Q.  Yes.  That's what I was referring to, the work and the contributions; they all play in together in determining your -- what benefit you receive, right?

MS. MURRAY:  Objection, your Honor.

THE COURT:  Overruled.  You may continue.

A.  At that time, yes, the contribution, I understand it as the donations and the time and effort put into it.

MR. KAMARAJU:  Now, could we go to page 8, please. I'm sorry, could we scroll back to page 7 quickly.

Q.  Do you see the subparagraph there that starts C?

A.  Yes.

Q.  All right.  You see the part that says:  "You hereby consent to not performing the following"?

A.  Yes.

Q.  And it goes on to say "to allow you to benefit and continue," do you see that language?

A.  Yes.

Q.  Okay.  So this is telling you things that you should not do if you want to keep the preferential H Coin allotment, right?

A.  I'm sorry?

Q.  This provision is talking about things that you should not do in order to maintain the beneficial H Coin offering you were getting, right?

A.  Yes.

MR. KAMARAJU:  Okay.  If we could go to the next page and just blow up No. 3, please.

Q.  Could you read that, sir?

A.  Yeah.

"You undertake to not demonstrate, whether directly or

indirectly, or otherwise facilitate in any form, any support or benefit in any form, to the Chinese Communist Party, CCP, quote, or any CCP officials."

Q. Okay. So one of the things that you should refrain from doing is supporting the CCP, right?

A. I'm sorry, referring --

Q. Well, you testified previously that this is talking about things you shouldn't do to keep your H Coin allotment, right?

A. Correct.

Q. And one of the things is not support the CCP, right?

A. Correct.

Q. Because the movement is anti CCP, right?

A. Correct.

Q. So if you supported the CCP, obviously that would be anti the movement, right?

A. Not me support, but --

Q. Anyone, sir. I'm not referring to you specifically.

A. Correct.

Q. Now, you talked a little bit about the work that you did on behalf of the farms, right?

A. Correct.

Q. So you actually did a substantial amount of work for the farms, right?

A. Yes.

Q. Tell us again what kind of work you did.

O5TVGUO1                      Le Zhou - Cross

A.  Transcripts, reviewing translation, and we did editing and streamings.

Q.  Okay.  So is it fair to say that the work you just described is targeted to disseminating the movement's message?

A.  Help to spread the words, yes.

Q.  Okay.  And you knew that broadcasting was a significant part of the movement's efforts, right?

A.  I will say equal to other informations, other type of work.

Q.  Okay.  And I'm not asking you to say what's more or not, I'm just saying it was a big part of what the movement did was broadcasting, right?

A.  No, it's not big part.  I say it's equal to other work.

Q.  Okay.  Well, you first learned of Mr. Guo by watching online videos that have been posted; correct?

A.  Yes.

Q.  Okay.  And did you first see him on YouTube?

A.  Yes.

Q.  When was that again?

A.  February 2017.

Q.  So you saw Mr. Guo -- withdrawn.

        Was that on Mr. Guo's YouTube account?

A.  No.

Q.  Okay.  So you saw him being rebroadcast on somebody else's YouTube account?

A.  Not a rebroadcast.  He appear on an interview on someone's

broadcast channels.

Q.   Which interview was that?

A.   The channel was called Mirror Media.

Q.   All right.  And in the video he expressed some criticism of the Chinese Communist Party, is that fair?

A.   Yes.

Q.   Okay.  And subsequently after you became involved with the movement, the movement also put out broadcasting that was critical of the Chinese Communist Party, right?

A.   Yes.

Q.   In fact, that was the goal of GTV, was to be able to broadcast that kind of --

        MS. MURRAY:  Objection.

        THE COURT:  Overruled.  You can express your understanding of the goal of GTV.

        MR. KAMARAJU:  I'll phrase it that way, your Honor.

        THE COURT:  Okay.

Q.   It was your understanding that the goal of GTV was to be able to broadcast messages that were critical of the CCP to people in China; correct?

A.   Yes.

Q.   Now, there were some people in the movement who appeared in the broadcast; correct?

A.   Yes.

Q.   And there were some people who did work for the movement

who did not appear on the broadcast; correct?

A.  Yes.

Q.  And did you ever appear in a broadcast?

A.  I appeared just by voicing, not appears as physically, like appearances.

Q.  So you only used your voice, you didn't show your face; is that right?

A.  Correct.

Q.  Why didn't you show your face?

A.  Because I want to keep it just not -- I just decide not to show my face.

Q.  Was there any reason?

A.  Well, so I don't want to --

            MS. MURRAY:  Objection.

            THE COURT:  Overruled.  You may answer.

A.  Yeah.  Because I also don't want to be target by the CCP.

Q.  Sorry.  Did you say you didn't want to be targeted by the CCP; is that right?

A.  Correct.

Q.  Okay.  Thank you.

            Now, you also testified on direct about the fact that farm members used Discord, right?

A.  Yes.

Q.  What is your understanding of why they used Discord instead of, you know, text messaging, for example?

A.   The reason I don't know.

Q.   And you also testified on direct about WebEx, right?

A.   Yes.

Q.   Do you have an understanding as to why they chose WebEx?

A.   This part of reason I know.

Q.   Whatever you know, sir.

A.   Is because WebEx has a feature allow over 100 participants to be online at the same time.

Q.   Were you on WebExes that had over 100 participants?

A.   Yes.

Q.   Okay.  So those were large gatherings of movement members?

A.   Yes.

Q.   Was Mr. Guo part of any of those?

A.   Yes.

Q.   Okay.  And everybody who was on that WebEx could speak if they wanted to, right?

A.   No.

Q.   No?

A.   No.

Q.   Why?

A.   Because it was some people muted; there was only have a speaker allowed to speak.

Q.   Okay.  So someone would have to recognize the speaker, right?

A.   Yes.

Q.  Okay.  Now, you also used a Discord name.  I believe it was Coffee Cantana, do I have that right?

A.  Coffee Cantata.

Q.  Cantata.  Okay.  Thank you, sir.

Is there a reason why you picked that name?

A.  Yes.

Q.  What's that?

A.  I personally like to drink coffee.  I play the classic music.  Cantata is a piece of the classic music.

Q.  So it was related to your interests, right?

A.  Correct.

Q.  Okay.  And you interacted with other movement members who were also using Discord names, right?

A.  Correct.

Q.  And even some people who appeared in broadcasts used, I'll say, pseudonyms, right?

A.  I'm sorry?

Q.  They used different names than their real names, right, some people who appeared in broadcasts?

A.  Correct.

Q.  Like Mulan, for example, right?

A.  Correct.

Q.  That's not -- do you know somebody named Octopus?

A.  Yes.

Q.  Okay.  That's not Octopus's real name either, right?

A.   That's not.

Q.   Did Octopus ever appear in a broadcast?

A.   I do not recall that.

Q.   Okay.  How about Nebula?

A.   Yes.

Q.   You know somebody who went by the name "Nebula"?

A.   Yes.

Q.   Okay.  And that wasn't that person's real name either?

A.   Correct.

Q.   Did that person appear in a broadcast?

A.   I do not recall that.

Q.   Do you have an understanding as to why they were using different names?

          MS. MURRAY:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   Now, in addition to doing kind of the video streaming work that you talked about, right, you also opened bank accounts on behalf of the farms, right?

A.   Correct.

Q.   So you were entrusted with receiving the money from other farm members, right?

A.   I don't know what's from other farm members.

Q.   Okay.  Let me put it this way:  You were entrusted with the money that the UK farm was receiving, right?

A.   I cannot make that entrust because that's something someone

has to say if they entrust me or not, but I didn't receive that type of --

Q.   Okay.  You were given authority over the bank account that contained the money, right?

A.   Under authority, I'm sorry?

Q.   You were given the authority over the bank account that received the money, right?

A.   I was instructed to open account.

Q.   Okay.  Was it your name on the account, sir?

A.   The account I was a signer.

Q.   Okay.

          MR. KAMARAJU:  Could we show for just the parties, the Court, and the witness, DX 60476, please.

Q.   While that's being pulled up, how many different bank accounts did you open up, sir?

A.   Three.

Q.   Three.  And were those all in the same name?

A.   No.

Q.   They were in different companies' names, right?

A.   Correct.

Q.   And some of those companies you started, right?

A.   No, I didn't start a company.

Q.   You didn't start any companies?

A.   That's not my company.

Q.   Well, okay.  I'm just asking whether you -- did your name

appear on any formation documents for one of the companies, sir?

A. Yes.

Q. Okay. And when you opened those accounts, I think you testified on direct that you told the banks that they were for your real estate business, right?

A. I was instructed to tell them that.

Q. Okay. But that is what you told them, right?

A. Yes.

Q. And you told them that, right?

A. Yes.

Q. Okay. And that wasn't true, right?

A. Correct.

Q. Because in reality, you were receiving the money from -- that the farm was taking in, right?

A. I would say not say the farm, because all the wire to me didn't tell me which one was farm, which farm or individual, the person's relation. I know -- I know was farm the follower wanted to invest in G Series.

Q. Yeah. Sorry, sir, I wasn't asking about where the money came from. I was saying this was the money that the UK farm was receiving, right?

A. Yes.

Q. The money wasn't going to your real estate business, right?

A. No.

Q.   Okay.  So you misrepresented the nature of the account to the bank, right?

A.   Yes.

Q.   Okay.  And you did that because you were trying to help the movement, right?

A.   Help the followers.

Q.   Right.  Help the followers, right?

A.   Yes.

Q.   And help the UK farm, right?

A.   Just help the followers.

Q.   I'm sorry, sir, maybe I'm not understanding.  Could you explain the distinction that you're drawing there.

A.   Yes.  My intention help the farm because the UK London farm leader tell me that -- ask me my help to help the followers, but didn't specify if the follower was all from the UK London Club or other farms.

Q.   Okay.  So how much money would you say came into the bank accounts that you opened?

A.   About $2 million.

Q.   About $2 million.

     And do you remember from roughly how many recipients it came in from?  Or, sorry, withdrawn.

     Do you remember from approximately how many senders it came in from?

A.   Approximately 50.

O5TVGUO1                          Le Zhou - Cross

Q.   Approximately 50, sir?  Sorry, is that what you said?

A.   Correct.

Q.   All right.  I think DX 60476 is on your screen now.

          Could you just take a look at that, please.

A.   Yes.

          MR. KAMARAJU:  Okay.  Maybe we can scroll to the next page.

Q.   Do you recognize this document, sir?

A.   Yes.

Q.   Okay.  Does your signature appear on it?

A.   Yes.

Q.   What's the date next to your signature?

A.   February 24th, 2021.

Q.   Okay.  And what is this document, sir?

A.   Oh, yeah.  This is -- Florida, state of Florida business status.  I think it's certifications.

Q.   Certification.  Okay.

          MR. KAMARAJU:  Let's go to page 2.  Sorry, page 2.

Q.   Do you recognize this?

A.   Yes.

Q.   What's this?

A.   This is from IRS about the EIN numbers.

Q.   And do you see the name of a company listed in the first sentence, sir?

A.   Yes.

Q.   Okay.  Is that one of the companies that you used to open bank accounts for the UK farm?

A.   This name was created by the UK farm, I use to open account.

MR. KAMARAJU:  Your Honor, the government -- I did it again.  The defense is going to offer DX 60476 into evidence.

MS. MURRAY:  No objection.

THE COURT:  It is admitted.

(Defendant's Exhibit 60476 received in evidence)

MR. KAMARAJU:  Thank you.  Could we publish to the jury?  I promise I won't do it three times.

Q.   So this is the formation documents for one of those companies; correct?

A.   Yes.

MR. KAMARAJU:  Could we go to the next page, please.  Page after that, please.  Thanks.  And just blow up the signature line.

Q.   Do you see where it says "incorporator," sir?

A.   Yes.

Q.   Whose signature is that?

A.   Mine.

Q.   So you began this company on February 24th, 2021, right?

A.   I registered it myself, but the director was still listed as the UK leaders.

Q.   Okay.  I was just -- you registered it on this day, right?

A.   Yes.

Q.   All right.  So you first started opening bank accounts to receive the money for the UK farm in 2021, right?

A.   Correct.

Q.   Now, as part of your work receiving the money, did you also account for how the money was being spent?

A.   I documented, yes.

Q.   So you looked at the bank statements to see where the money was going?

A.   The money was only instructed to wire out.

Q.   I'm sorry, could you say that again?

A.   All the money was instructed to wire out.

Q.   All the money was instructed to wire out.

A.   Correct.

Q.   Right.  So you never received any instructions to wire money to Mr. Guo, right?

A.   Not to him.

Q.   Okay.  Now, we talked a little bit about the volunteer work that you did for the farm.  The farm more broadly did volunteer work as well, right?

A.   Yes.

Q.   There was a project in the Ukraine; is that right?

A.   That's a farm Himalaya Global Alliance, not just one farm.

Q.   Okay.  So several farms united in that effort?

A.   All farms participated.

Q.   Okay.  And what were they doing?

A.   There was the Ukraine.

MS. MURRAY:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.  You may answer.

A.   It was Ukraine, humanitarian missions.  They were be called to the borderline between Poland and the Ukraine.  The mission was to rescue Chinese nationals and to do other humanitarian works.

THE COURT:  Rescue them from where?

THE WITNESS:  Between the borderline at Poland and the Ukraine.

Q.   Okay.  Thank you.

Now, you testified on direct that you became concerned about the way some of the money was being spent that had come into those bank accounts; is that right?

A.   Not a concern to those accounts.

Q.   So you never had any concern about those accounts; is that right?

A.   There were meetings, private meetings, between Miles Guo and UK London Club.  There were things mentioned just from the UK London Club financials, status, and province.  There were -- misproper used funds was addressed.

Q.   Okay.  Who was misusing the funds?

A.   At the time the meeting, David Dai, the leader of UK London Club, was accused misused global donation, global foundation

funds.

Q. So he was -- he was accused -- withdrawn.

David Dai was accused of misusing Rule of Law Foundation funds at this meeting?

A. At that meeting, yes.

Q. Okay. But that meeting was a meeting of the UK farm?

A. Yes.

Q. So they were discussing misuse of the foundation's money at the farm meeting, right?

MS. MURRAY: Objection. 401, 403.

THE COURT: You may answer.

A. That was mentioned in the meeting, yes.

Q. Okay. Now, I think you just said Mr. Guo was part of that meeting, right?

A. Yes.

Q. So he was part of this discussion about these accusations, right?

A. Yes. He was there.

Q. Okay. And the topic was -- or one of the topics at least were these accusations, right?

A. Yes.

Q. So you heard Mr. Guo discuss those accusations, right?

A. Yes.

Q. Okay. And it was resolved to look into those accusations, right, figure out if they were real?

A.   I don't know if they were resolved.

Q.   It was decided at the meeting, sir?

A.   It wasn't decided; it was just brought it out, the accusations.

Q.   Okay.  Did anybody reach a decision as to what to do about the accusations at that meeting?

A.   At a meeting Miles Guo even ask one person from the Rule of Law Foundations.  To my knowledge, the person keeps track of the funds, Miles Guo personally ask that person about the David Dai's accusations.

Q.   Okay.  So Mr. Guo asked that person about the accusations, right?

A.   Yes.

Q.   And the accusations were that UK David — that's David Dai, right?

A.   Yes.

Q.   — was misusing the funds; correct?

A.   Yes.

Q.   Were there any other accusations made against UK David of misappropriating funds?

A.   Yes.

Q.   How many times did that happen?

          MS. MURRAY:  Objection.

          THE COURT:  You can step up.

          (Continued on next page)

(At sidebar)

MS. MURRAY:  Your Honor, as an initial matter, this is hearsay that he's trying to elicit.  In addition, the accusations that there was a misuse of funds is being introduced and offered for the truth, for the fact that there was, in fact, misuse of funds and this 403 problem.

MR. KAMARAJU:  Well, first of all, any introduction of a defendant's out-of-court statement is not automatically hearsay.  We're simply eliciting his testimony to show when there were accusations, they were taken seriously and people were investigated, including Mr. Guo.  So you have to at least establish that the accusations were made.  Whether they are true or not, we don't know; we're not asking the witness to opine on whether they are true.  We're just saying they wanted to look into it.

MS. MURRAY:  Your Honor, I don't see how they are not being offered for their truth here.

THE COURT:  They are being offered for their truth.

MR. KAMARAJU:  But I didn't even ask him if the accusations were true, your Honor.

THE COURT:  You want to use those accusations to make the argument that Mr. Guo had a legitimate interest in guarding the funds for the cause.

MR. KAMARAJU:  Yes.  And so the only relevant fact there is that there were accusations made, not whether the

accusations are true or not, which is all I'm trying to elicit. And that's all I've elicited so far.

MS. SHROFF:  In fact, Mr. Kamaraju could ask:  You don't know if these accusations were true or false.  We are not trying to introduce them for their truthfulness.

MS. MURRAY:  He's already established the fact that there were accusations.  So the additional line of questioning into "there were other accusations, weren't there," is leading into, again, trying to indicate and imply the truth of a fact that there were accusations of misuse of funds.  I don't see any other purpose for it to come in and it's unduly prejudicial.

MR. KAMARAJU:  The purpose is the same no matter how many times I ask the question about accusations.

MS. MURRAY:  Right.  And it's already in evidence now.

THE COURT:  So it seems that there are two purposes, both for the fact of the accusation and for the truth of the accusation, because you want to portray Mr. Guo as guarding these funds for his political cause.

MR. KAMARAJU:  But I don't believe that the second point requires the accusations to be true or false.

If the U.S. Attorney's Office investigates somebody and responds to a victim complaint, that's not a statement of the victim complaint is true or it's false; it's simply evidence that the U.S. Attorney's Office took the victim

complaint seriously.  You don't have to have the truth of the victim complaint in order to establish that they took it seriously.

MS. MURRAY:  I think at bottom, your Honor, Mr. Kamaraju is saying what he wants to get in is the fact that there were accusations.  That's already in.  So there's no additional line of questioning that would be fruitful unless it's going to something improper.

MR. KAMARAJU:  No, because we're allowed to point out the fact that it happened more than once.  That goes to how serious they took it.

MS. SHROFF:  And that each time the accusation was addressed, not whether the accusation was true or false.  You are free to elicit on redirect that the accusations were, in fact, false.  Of course that's your prerogative.  But that does not make Mr. Kamaraju's questioning improper or unduly prejudicial.  In fact, that was the whole point of your direct. Your whole point of the direct was to show that Mr. Guo did nothing.  So we're entitled to show that what you did on direct was improper.

MS. MURRAY:  Your Honor, again, it's hearsay.  They are focusing on what Mr. Guo did and what Mr. Guo said.  Here they are asking this witness with respect to how seriously the accusations were taken or not.  I think we've established this witness said he didn't know what decision was made or whether

O5TVGUO1                         Le Zhou - Cross

there was a resolution to take certain action or not.

THE COURT:  So you can ask whether there were any other accusations, but it's going to stop there.

MR. KAMARAJU:  Okay, your Honor.

(Continued on next page)

(In open court)

BY MR. KAMARAJU:

Q.   There came a point where the UK farm was dissolved; correct?

A.   Correct.

Q.   Why was that?

A.   Because there were -- at the time Himalaya Global Alliance started doing statistical work to gather all the farms' financial balance sheets, and also at the time to have all the farms to wire all the balance each farm held to the Himalaya Global Alliance.  And at the time because accusation made it to David Dai, and also he has some unwired balance, it was quite a big amount of balance that Miles Guo ask him also provide him a deadline to wire.  He failed that.

Q.   What was the -- I think you referred to it as an unwired balance.  What was that?

A.   Because there's some funds the farm held.  The fund has to be transferred to the Himalaya Global Alliance, designated accounts.  And a couple other meetings, there were -- Miles Guo gave David Dai a deadline to wire the balance which he failed to do that.  So that impact dissolving the whole farms, and also Miles Guo strip his title and he was terminated from this -- sorry, not terminated, he was removed from the farm and from the movement.

Q.   Was there a reason given for his termination from the farm

and the movement?

A.   That I don't know.

Q.   So you weren't privy to any of those reasons?

A.   I was in the meeting.

Q.   Now, I'd like to talk a little bit about the refunds that you requested, okay?

A.   Sure.

Q.   You asked for a refund from G Fashion, right?

A.   Yes.

Q.   Okay.  And you asked for a refund from G Clubs, right?

A.   Correct.

Q.   Now, when you asked for the refund from G Clubs, did you go to the company and ask for a refund?

A.   Yes, I did email them.

Q.   Okay.  So you emailed G Clubs for a refund?

A.   Yes.

Q.   Did you get a response?

A.   Only email I was received, just acknowledgment they received my request.  After that, no more response.

Q.   And that response -- withdrawn.

        That refund request was made, I think you testified, in July of 2023, right?

A.   I can't remember the dates.

Q.   You don't remember testifying earlier today that it was July 2023?

A.   The whole other refund which, I mean, July 15, 2023, was started, initiated to the Washington, D.C. farms.

Q.   Oh, I'm sorry.  I misunderstood.  The July 15 date is when you applied to the farms for the refunds?

A.   Yes.

Q.   Approximately how long before you went to the farms did you submit the G Clubs request?

A.   That I don't remember.

Q.   Well, not asking for a specific date, but months, years, weeks?

A.   Months.

Q.   Months.  Okay.

         And it was several months after you had purchased your G Club membership initially, right?

A.   Yes.

Q.   Why did you go to the farms to get a refund from G Clubs?

A.   Because Miles Guo instructed any follower, any problem, issues will first contact the farm leaders, which at the time I was associated with Washington, D.C. farm.  So, as instructed, that is what I did.

Q.   But you went to G Clubs first, right?

A.   No, I don't remember if went to G Club first.

Q.   Sir, I thought you just testified a moment ago that you went -- months prior to submitting a farm request --

         MS. MURRAY:  Objection, your Honor.

Mischaracterizes the testimony.

THE COURT:  Sustained.

Q.  Okay.  So do you remember?  Did you go to G Clubs first or the farms first?

A.  I don't remember --

MS. MURRAY:  Objection, asked and answered.

THE COURT:  Sustained.

Q.  Okay.  I'm sorry, sir.  You said that you went to the farms because Mr. Guo said you should go there first, right?

A.  Not first.  You have any issues, we will go to the farm leader.

Q.  And what did you think it was that the farm leader could do for you with respect to G Clubs?

A.  Miles Guo mention the farm leader roles.  Leader roles only to serve the followers.  There's no class or underling.  Every follower and the leader are equal.

Q.  Okay.  I was just asking what you thought that the farms could do for you with respect to G Clubs?

A.  Because that's a rule, which farm you're associated with.  And you only can associate with one farm.  So at the time I was with Washington, D.C. farm.  That's only farm I can go to.

Q.  I understand, sir, you went to the Washington farm because that's -- that was your farm, right?

A.  At that time, yes.

Q.  Okay.  I'm just understanding -- I'm just trying to

O5TVGUO1                      Le Zhou - Cross

understand why you thought the farm could help you out with a G

Clubs problem?

A.   Because that's -- Miles Guo stated anything, if it's

related to the movement, G Series, we can go to the leaders of

the farm.

Q.   Okay.  And what were the farm leaders supposed to do, sir?

A.   To help with my request.

Q.   Okay.  Were you expecting the farms to pay the money back

to you that you had spent on G Clubs?

A.   That I didn't expect.

Q.   What kind of help were you expecting?

A.   My hope was to have the farm leader first to acknowledge

that and for my request.  Then the second was I just -- going

to just wait for the answer, but I don't expect what will be

the next.  But my ultimate goal was to get a refund.

(Continued on next page)

BY MR. KAMARAJU:

Q.  Okay.  And you did ultimately get a refund; is that right?

A.  Yes, I received a G/CLUBS refund.

Q.  Okay.  And prior to getting the G/CLUBS refund, they made a request that you returned some equipment, right?

A.  Correct.

Q.  What was that equipment?

A.  It was streaming equipment.

Q.  Okay.  And why did you have that equipment?

A.  Because the Washington, DC Farm send it to me for the streaming, for the farm streaming, to use for the farm streaming; also, the equipment was used during the protest streamings, for the Himalaya Global Alliance.

Q.  Okay.  So it was used to broadcast farm business, basically?

A.  And for the Himalaya Global Alliance.

Q.  Was it expensive equipment?

A.  To my knowledge, yes.

Q.  Did you send the equipment back, sir?

A.  Yes.

Q.  Who did you send it to?

A.  I sent it to Washington, DC Farm.  They provided the address.

Q.  Okay.  And do you have any knowledge as to what they did with that once you returned it?

A.   After I returned it, they had one person inspect it, and then once inspected everything thoroughly, I had a confirmation, item was received, inspected.

Q.   Okay.  And then you received your refund after that; is that right?

A.   Correct.

Q.   Okay.  About how long was it after that that you got your refund?

A.   I got my refund on December 1, 2023.

Q.   And when was the inspection?

A.   That was in—about October.

Q.   Of 2023?

A.   2023.

Q.   Okay.  Thank you, sir.

        MR. KAMARAJU:  If I could just have one moment, your Honor.

Q.   Now, sir, you testified on direct about protests, right?

A.   Yes.

Q.   And you testified that your role in the protests was helping to stream them, correct?

A.   Yes.

Q.   How many protests did you stream?

A.   Personally stream, about dozens.

Q.   Dozens?

A.   Yes, personally streamed.

Q.   Okay.  Yeah, I'm just talking about the ones that you streamed.

A.   Yes.

Q.   Okay.  Now the ones that you testified on direct I believe were in connection to a man named Luc Despins; is that right?

A.   Correct.

Q.   Okay.  And he was the bankruptcy trustee, correct?

A.   Correct.

Q.   Were all of the streams that you personally participated in against——sorry.  Withdrawn.

Were all of the streams that you personally participated in of protests involving the bankruptcy trustee?

A.   Not all of the streams.

Q.   Okay.  So there were some that were not that, right?

A.   Correct.

Q.   What were those other ones about?

A.   Other ones about protesting Capitol Hill.

Q.   Okay.  You were protesting at Capitol Hill?  The protests occurred at Capitol Hill, the one you're talking about?

A.   Yes.

Q.   What were they protesting?

MS. MURRAY:  Objection.  Lacks personal knowledge.

THE COURT:  If he observed the streaming, he may know what they were protesting.

If you know.

THE WITNESS:  Yes, your Honor.

A.  Yes.  At Capitol Hill was—protest was also for Miles Guo.

Q.  Okay.  But what were they protesting against, sir?

A.  It was against persecution against Miles Guo.  There were protests, unfair justice against Miles Guo.

Q.  When was this protest?

A.  This was in November 2022 to—lasted about a month.

Q.  Sorry.  You said it lasted about a month, sir?

A.  Correct.

Q.  And was there any specific group of people they were protesting?

A.  Yes.

Q.  Who was that?

A.  Mostly followers from Washington, DC Farm.

Q.  Okay.  So those were the people who were mostly participating in the protest, right?

A.  Yes.

Q.  Okay.  Were the protests aimed at any particular group of people?

A.  The Capitol one didn't aim any particular people, no.

Q.  Okay.  Was it targeted at any particular government agency?

MS. MURRAY:  Objection.  403.

THE COURT:  I'll allow the question.

THE WITNESS:  Yes, your Honor.

A.  The first, the Chinese Communist Party, and also there

were—US Justice were mentioned during the protest.

Q.  Okay.  And when you say the Chinese Communist Party, the protests were against the CCP, right?

A.  Yes.

Q.  And you testified on direct that the protests of the bankruptcy trustee involved—and I wrote it down but I may have it wrong so correct me, please—CCP running dogs, right?

A.  That's what I—yes.

Q.  Okay.  Was any similar language used during the Capitol Hill protest?

A.  He was at a—the protest called 90 Days Protest for Luc Despins wasn't at the Capitol.

Q.  I understand.  I'm asking about the Capitol Hill protests.

A.  His name weren't mentioned at the Capitol Hills.

Q.  Okay.  Did you hear anybody at the Capitol Hill protests talk about CCP spies?

A.  Yes.

Q.  Okay.  Have you heard Mr. Guo refer to people as CCP spies before?

A.  Yes, he did refer.

Q.  Have you heard other movement members refer to people as CCP spies?

A.  I never participated in other—other movements.

Q.  Sorry, sir.  I was talking about other NFSC movement members refer to people as CCP spies.

A.   Yes.

Q.   What is your understanding of that phrase?

A.   Just CCP spies, just a name to those—acquisition to the people.

Q.   So it doesn't have any particular meaning to you?

A.   Just CCP spies.

Q.   Okay.  And when you heard that, you didn't have any evidence one way or the other as to whether those people were actually CCP spies, right?

         MS. MURRAY:  Objection, your Honor.

         THE COURT:  You may answer.

A.   That I don't.

Q.   Sorry.  You said you don't, right?

A.   I don't.

Q.   Okay.  And you testified on direct that at the time of the protests of the bankruptcy trustee, you didn't have any evidence with respect to whether the trustee was working on behalf of the CCP, right?

A.   That I don't.

Q.   You just didn't know one way or the other, right?

A.   At the time I believed it, but I don't have the evidence to prove it.

Q.   Okay.  And because you believed it, you participated in those protests, right?

A.   Yes.

Q.   You streamed them, right?

A.   Yes.

Q.   You wanted to get the word out, right?

A.   Yes.

Q.   You wanted other people to hear what was happening, right?

A.   Yes.

Q.   Because you believed an injustice was happening, right?

A.   At the time I believed it.

MR. KAMARAJU:  Okay.  Your Honor, at this time the defense would like to read and enter into evidence a stipulation between the parties.

THE COURT:  Go ahead.

MR. KAMARAJU:  It's DX Stip 0001.  And it reads:

"It is hereby stipulated and agreed by the United States of America and Miles Guo, the defendant, through their attorneys of record, that:

"1.  The FBI has investigated individuals who, working at the direction of the government of the People's Republic of China (the "PRC government") have engaged in an international campaign, known as "Operation Fox Hunt," to coerce individuals located in the United States and elsewhere to return to China to face charges brought by the PRC government or to otherwise reach financial settlements with the PRC government.

"2.  In 2017, a US law enforcement agency assessed that Mr. Miles Guo was the highest priority of China's

repatriation efforts.

"3.  In 2017, a US law enforcement agency received information that Chinese officials were paying and providing food and signs to protestors of Mr. Guo.

"4.  In 2018, a US law enforcement agency received information that the PRC government had established a special investigative group in China to manage China's investigation of, and actions against, Mr. Guo.

"5.  To carry out some of the objectives of Fox Hunt, in 2017, the PRC government tasked a specially designated group of operatives ("the Group") with discrediting and harassing individuals, including Mr. Guo, by using interactive computer services and electronic communication systems.  The Group is based out of the Beijing Municipal Public Security Bureau at a facility in Beijing's Dong Cheng District.  The Group was previously referred to as the "Cyber Investigation Team" and was later referred to as the 9112 Special Project Working Group.  The Group's tactics aimed at Mr. Guo included using anonymized social media accounts operated by the Group and by pressuring US social media companies to remove Mr. Guo and US-based associates of Mr. Guo from social media platforms. These efforts were part of the PRC government's broader effort to prevent, disrupt, and harass Mr. Guo's use of social media and other online platforms to disseminate and discuss disfavored content.  In or about December 2018, officers of the

Group were directed to post three videos or posts daily with YouTube and Facebook accounts, with one of the posts required to be anti-Mr. Guo.  On February 3, 2020, a PRC government official issued a tasking requirement that every member of the Group shall write an original article with content related to targeting Mr. Guo, the COVID pandemic, or Hong Kong.  The FBI investigated the Group's activities, including its activities aimed at Mr. Guo, and the US government has charged many of the Group's members with violations of US law.

"6.    Since Mr. Guo fled the PRC, the PRC government has sought his return for prosecution in the PRC and has employed numerous methods to effect Mr. Guo's capture or arrest.  In May 2017, the PRC government sent four undeclared agents from the PRC's Ministry of State Security ("MSS") to the United States to attempt to cause Mr. Guo's coerced repatriation to the PRC as part of the Fox Hunt initiative. The US government disrupted the PRC government's efforts to forcefully repatriate Mr. Guo and Mr. Guo continued to reside in the United States.

"7.    Between May 2017 and January 2018, at least four individuals, including George Higginbotham, Elliot Broidy, Nickie Lum Davis, and Prakazrel Michel, never disclosed that they were actually acting on behalf of foreign actors, including the PRC government, to lobby officials in the Trump administration in an effort to cause Mr. Guo's extradition to

China.  Higginbotham, Broidy, Davis, and Michel were each convicted of violating US law regarding their lobbying efforts. The efforts of these individuals were not successful, and Mr. Guo was never extradited at the request of the PRC government.  Instead, and since approximately 2015, Mr. Guo has been able to reside in the United States with his family.

"8.  On October 23, 2018, a court in Hong Kong entered an order seizing and restraining Mr. Guo's assets in Hong Kong and elsewhere under the court's jurisdiction.

"It is further stipulated and agreed that this stipulation may be admitted into evidence."

And your Honor, I would offer DX Stip 0001.

THE COURT:  It is admitted.

(Defendant's Exhibit Stip 0001 received in evidence)

MR. KAMARAJU:  Thank you, your Honor.

BY MR. KAMARAJU:

Q.  So just one question, sir.  Prior to hearing me read that information out, had you heard any of that before?

A.  Yes, I heard Miles Guo mentioned it, some of it.

Q.  What did you hear him mention?

MS. MURRAY:  Objection.  Hearsay.

THE COURT:  Sustained.

Q.  Okay.  Other than Miles Guo's statements, did you hear it anywhere else?

MS. MURRAY:  Objection.

THE COURT:  The fact of having heard it, he can answer.  It's that you can't state what you heard.

A.  Just from Miles Guo.

MR. KAMARAJU:  No further questions at this time, your Honor.

THE COURT:  Redirect?

MS. MURRAY:  Yes, your Honor.  Thank you.

REDIRECT EXAMINATION

BY MS. MURRAY:

Q.  Mr. Zhou, you were asked questions on cross-examination about the hierarchy of the Himalaya Global Alliance.  Do you recall those questions?

A.  Yes.

Q.  Who appointed the farm leaders?

A.  The farm leaders, beginning will be only appointed by Miles Guo, but later, once the Himalaya Global Alliance Farm, especially the Iron group, Iron Blood group farm, it will be jointly—jointly appoint the leaders.

Q.  And who appointed the members of the Iron Blood group?

A.  Miles Guo.

Q.  Who was the ultimate highest leader of the farms?

MR. KAMARAJU:  Objection.

THE COURT:  Overruled.  You may answer.

A.  Well, Miles Guo.

Q.  And who was the ultimate highest leader of the Himalaya

Global Alliance?

A.   Miles Guo.

Q.   You were asked questions on cross-examination yesterday and again today about the purposes of the G series investments.  Do you recall those?

A.   Yes.

Q.   Your understanding that GTV was a social media company was based on whose statements?

A.   Based on Miles Guo's statements.

Q.   Your understanding that G/CLUBS was a membership service was based on whose statements?

A.   Miles Guo's statements.

Q.   Your understanding that the Himalaya Exchange was a cryptocurrency platform was based on whose statements?

A.   Miles Guo's statements.

Q.   Who announced the G series investments?

A.   I'm sorry?

Q.   Who announced the G series investments?

A.   Miles Guo.

Q.   Who promoted the G series offerings?

A.   Miles Guo.

Q.   You were also asked questions about how the GTV private placement funds were to be used.  Do you recall those?

A.   Yes.

Q.   Did Guo say he was going to send GTV investor funds to a

O5T1GUO2                            Le Zhou - Redirect

hedge fund?

A.  No.  I don't——I don't recall that.

Q.  You were also asked questions about your own GTV investment through Voice of Guo, or VOG.  Do you recall that?

A.  Yes.

Q.  Who identified Sara Wei as the point of contact for a GTV investment below a hundred thousand dollars?

A.  Miles Guo.

Q.  You were asked some questions about what you expected to receive in exchange for your G/CLUBS membership money.  Do you remember those questions?

A.  Yes.

Q.  Did you ever receive an NFSC passport for your $70,000 G/CLUBS payment?

A.  No.

Q.  Did you ever receive any G/CLUBS stock for your $70,000 G/CLUBS payment?

            MR. KAMARAJU:  Objection, your Honor.

            THE COURT:  You may answer.

A.  No.

Q.  Did you ever receive any G Fashion stocks for your $70,000 G/CLUBS payment?

            MR. KAMARAJU:  Same objection.

            THE COURT:  You may answer.

A.  No.

Q.  Aside from discounts on G Fashion items, did you receive benefits for your $70,000 G/CLUBS payment?

A.  I would not say benefits, but I received small souvenir items, the mug and a bag of coffee.

Q.  A mug and a bag of coffee; is that correct?

A.  Yes.

Q.  Did you ever receive GTV stock for your $31,300 investment in GTV through Voice of Guo?

A.  No.

Q.  Would you have sent money to G/CLUBS if you knew that you would not get any stock?

A.  No.

Q.  Would you have loaned money to the UK Farm if you knew you would not get any stock?

A.  No.

Q.  You made the choice to invest in a G series offering based on whose statements?

A.  Could you repeat that question, ma'am.

Q.  Sure.  You made the choice to invest in a G series offering based on whose statements about those offerings?

A.  Miles Guo's.

Q.  And how much money did you lose in the G series investment?

A.  As the money, because I—there was coin involved, I—even until this day, I didn't receive the full refund, but the coins, at the time, for—if I requested at the time, the value

of the coins' value still added, I believe it estimated about $10.  So for that value, it's also—I will consider that, so also additional value, but in the dollar, from the investment, the principal parts, I still didn't receive near $30,000.

Q.  And at the time that you participated in G series offerings, it was your understanding that Miles Guo personally guaranteed that you wouldn't lose any of your principal; is that correct?

A.  That's correct.

MS. MURRAY:  May I have a moment, your Honor.

THE COURT:  Yes.

MS. MURRAY:  Nothing further, your Honor.

THE COURT:  Recross?

MR. KAMARAJU:  Just briefly, your Honor.

RECROSS EXAMINATION

BY MR. KAMARAJU:

Q.  You were asked a series of questions about who was the leader of the—the ultimate leader of the farms, correct?

A.  Yes.

Q.  And you testified it was Miles Guo, right?

A.  Correct.

Q.  Okay.  In connection with the money that you took in as the bank accounts, did you ever receive a single instruction from Miles Guo?

A.  Not direct from him, no.

Q.   Mr. Guo never reached out to you and said do X with the money, right?

A.   He did.

Q.   Mr. Guo reached out directly to you and said send the money here?

A.   No.  In a meeting happened, took place with UK Farm, the part of the meeting, Miles Guo asked not just David Dai to return all the money, he asked all the member from UK London Club who, direct or indirect, has the money from followers, will do the same, by the deadline, to wire all the remaining balance to those accounts.

Q.   Okay.  And he gave that direction to everybody, right?

A.   Yes.

Q.   Now you testified on redirect that you had lost $30,000, correct?

A.   Yes.

Q.   Okay.  What is that based on?

A.   The principals.

Q.   But the principal of what, sir?

A.   The principal from—there's a portion from the VOG investments.

Q.   Okay.

A.   There were a portion from the coins I purchased.  There were parts of the money from farm loan.

Q.   How much of the money came from the farm loans?

A.  I invested $21,000 for my farm loans.

Q.  Okay.  So of the $30,000 that you lost, $21,000 you say is from the farm loans, right?

A.  Part of it.

Q.  I'm sorry.  I don't understand.

A.  It's—you asked the $30,000, the principal.  The $21,000 to the farm loan, that's principal.  The VOG investment towards the GTV, that was also invest $31,000 and $300, but I do receive reimbursement from the fair funds.  I got—there were about 7 percent loss.  Then adding together, that's estimated about $30,000.

Q.  Now your farm loan principal was due to be returned at the end of the term of the loan, right?

A.  The contract stated that, yes.

Q.  Okay.  And the term of the loan was extended in August of 2023, correct?

A.  It was force extended, without my consent.

Q.  They didn't need your consent, though, right?  They had the right to do it under the contract, right?

A.  That I don't recall if it's their right to do that.

Q.  So you don't remember one way or the other.

A.  I receive a notice just purely for extension 24 hours—months, without any option to opt out.

Q.  Okay.  So 24 months from August of 2023, right?

A.  Yes.

O5T1GUO2                    Le Zhou - Recross

Q.   Okay.  So your farm loan is not actually due to be repaid until next year, right?

          MS. MURRAY:  Objection, your Honor.  Scope.

          THE COURT:  Sustained.

          MR. KAMARAJU:  Your Honor, could we have a sidebar on that quickly.

          THE COURT:  Yes.

          (Continued on next page)

(At the sidebar)

THE COURT:  Your objection?

MS. MURRAY:  Yes, your Honor.  So objection to scope but also objection on 403 grounds.  There is an implication here that the witness could have contracted out of being defrauded.  He just said that he was forced to extend the loan.  He had no consent; it was just given to him.  And Mr. Kamaraju is now suggesting that there was a provision in the original loan that permitted that.  But there's not an ability to explain what this witness knew.  And it also calls for him to bring a legal conclusion that he is not equipped to make.

THE COURT:  Certainly on the grounds of legal conclusion, he's not a lawyer.  He can't interpret a contract.

MR. KAMARAJU:  I can ask him what his understanding is, right?

THE COURT:  You could ask what his understanding is.

MR. KAMARAJU:  Okay.  I'll ask that question.

MS. MURRAY:  He can't contract himself out of a fraud, and that's the 403 basis for the objection.

MR. KAMARAJU:  They brought up the idea of the refund, your Honor, and allowed him to say that.  They can allege it's a fraud; we're allowed to allege that it's not.

MS. MURRAY:  And your Honor, I would just note, he said he didn't recall what was in the contract.  So he's already asked a question that Mr. Kamaraju answered, or Mr. —

THE COURT:  Was that the testimony?  Can you go back and see?

MS. MURRAY:  Regarding the——if this is the regarding the extension.

THE COURT:  You want to first find out whether he recalled if it's a term of the loan or the fact of the extension?

MS. MURRAY:  The fact of the ability of the counterparty to require an extension without consent.  That——

MR. KAMARAJU:  That was not what my question went to.  My question just said simply——and I didn't ask the understanding, but if I were to ask, I'd say, so your understanding is that your loan is due to be repaid a year from now.

MR. FERGENSON:  No.

THE COURT:  I want to go back to the testimony, if you wouldn't mind.

(Record read)

MS. MURRAY:  Your Honor, he's established what this witness knew and what he understood at the time, and he's implying to the jury that he can contract out of the fraud, and that's clearly impermissible under 403 and under black letter law.

MR. KAMARAJU:  I'm not saying anything whether he can contract out of the fraud.  They asked what his loss was.  They

brought that out, not us.  And I'm simply saying that he received a notice, he understands he received a notice, and is it his understanding that under the notice, the loan will be repaid a year from now.

MS. MURRAY:  Your Honor, there's no other probative purpose for this other than to imply he can contract out of the fraud.  He said he wanted a refund of his money.  He's speaking to his losses.  That is what he has testified to.

MR. KAMARAJU:  Then they didn't need to bring up the losses.  I'm entitled to respond.  They put it in issue, your Honor, not me.

MS. MURRAY:  Your Honor, the fraud is complete as soon as the misrepresentation is made.

THE COURT:  His own understanding, that was it?

MR. KAMARAJU:  If his losses are relevant.  Ms. Murray just said that the fraud is complete at the time of the misrepresentation.  If that's true, then the actual losses he suffered are irrelevant.  The government nonetheless elicited it, so I'm entitled to say, that number is wrong, you testified to an incorrect number, sir.

MS. MURRAY:  Your Honor, there's no accounting.  He's asked his understanding, he's given a summary of his understanding of how much money he put in and how much money he was not repaid, which was the guarantee that Miles Guo made and did not follow through on.

MR. KAMARAJU:  This is a summation, your Honor. That's fine.  It can be presented to the jury in summation. But prior to that we get to attack the very specific things they elicit.

THE COURT:  I'm going to allow what was your understanding.

MR. KAMARAJU:  Okay.  So the question I'll ask, just to make sure I'm complying:  So under the notice you received, what is your understanding as to when you will be paid back, or when you should be paid back?

MS. MURRAY:  And your Honor, we would ask that it go no further than that because we still maintain our objection that he's trying to elicit improper implications with this witness, that it's a 403 problem.

MR. KAMARAJU:  All of those implications that they keep arguing at sidebar can be dealt with by your Honor when you instruct the jury as to the law.

MS. MURRAY:  No.  It's confusing the jury now with respect to this witness's testimony.

MR. KAMARAJU:  We had this argument just yesterday.

THE COURT:  I'm going to allow the question.

(Continued on next page)

(In open court)

BY MR. KAMARAJU:

Q.  Sir, when we paused, we were talking about the extension notice.  Do you remember that?

A.  Yes.

Q.  Okay.  Based on your receipt of that notice, what is your understanding as to when you should be paid back your farm loan principal?

A.  The notice——I think it's invalid, because my previous contract signed with two entities, was both established by David Dai.  Since David Dai was terminated and removed by the farm, and I believe those two entities both dissolved, automatically, the contract is void.

Q.  That's your legal conclusion, sir?

        MS. MURRAY:  Objection, your Honor.

        THE COURT:  Overruled.  Is that your legal conclusion?

A.  Yes.

Q.  Where did you go to law school?

        MS. MURRAY:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  Okay.  So your view is that the farm loan contract is null and void now.

A.  It's void.

Q.  Okay.  So if you were to sue somebody, you'd have nobody to sue.

MS. MURRAY:  Objection.

THE COURT:  Overruled.  You may answer.

A.  Could you repeat the question, please.

MR. KAMARAJU:  Could you read it back, please.

(Record read)

A.  Yes.

MR. KAMARAJU:  No further questions, your Honor.

THE COURT:  All righty.  Thank you, sir.  You may step out.

(Witness excused)

THE COURT:  And the prosecution can call its next witness.

MR. HORTON:  The government calls Karin Maistrello.

THE LAW CLERK:  Please raise your right hand.

(Witness sworn)

THE LAW CLERK:  You may be seated.

THE COURT:  Please state your name and spell it.

THE WITNESS:  Karin Maistrello.  K-A-R-I-N, M-A-I-S-T-R-E-L-L-O.

THE COURT:  You may inquire.

MR. HORTON:  Thank you, your Honor.

 KARIN MAISTRELLO,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HORTON:

Q.   Good morning, Ms. Maistrello.

A.   Good morning.

Q.   What state do you live in?

A.   New Jersey.

Q.   What languages do you speak?

A.   English, German, Italian, French, Spanish, and Chinese.

Q.   And where do you currently work?

A.   I work for Google.

Q.   Turning back to 2018, who did you work for then?

A.   I was an employee of Golden Spring.

Q.   And——

          MS. SHROFF:  Your Honor, I'm sorry.  We're having trouble hearing the witness.

          THE COURT:  If you'd draw the microphone closer to you and speak up.

          THE WITNESS:  Of course, yes.

Q.   Who is Guo Wengui?

A.   He was my boss at Golden Spring.

Q.   And how long did you work for Guo Wengui?

A.   From 2018 to 2020.

Q.   What are other names, Ms. Maistrello, if any, does Guo Wengui use?

A.   Miles Kwok.

MS. SHROFF:  Objection to the form of the question, your Honor.

THE COURT:  Overruled.  You may answer.

A.  Guo Wengui.  I used to call him "Boss."

Q.  Could you please spell Guo Wengui.

A.  G-U-O, W-E-N, G-U-I.

Q.  You said Guo Wengui also goes by Miles Kwok.  Could you spell Kwok.

A.  K-W-O-K.

Q.  Ms. Maistrello, who is Ho Wan Kwok?

A.  Go Wengui.

Q.  When you worked for Miles Guo, what did you call him?

A.  I used to call him Boss, in Chinese.

Q.  Do you see Boss here in the courtroom today?

A.  Yes, I do.

Q.  Could you please point him out and identify him by something he's wearing.

A.  He's wearing glasses and a blue suit, with a blue tie.

MS. SHROFF:  Your Honor, I'll stipulate that she's identified Mr. Miles Guo.

THE COURT:  All righty.

Q.  Ms. Maistrello, during the two years you worked for Boss, how many days a week did you work for him?

A.  It varied.  Sometimes it was six, sometimes it was seven.

Q.  And during those six or seven days a week working for Boss,

what were your hours like?

MS. SHROFF:  Objection to the leading and the form of the question.

THE COURT:  Overruled.  You may answer.  You may answer.

A.  It depended on the work that we had to do, so usually I would be in the office quite early, around 8, all the way until 8 p.m.  If I had any other projects, it could be as early as 4 a.m. or as late as midnight.  It depended.

Q.  And how much of that time, Ms. Maistrello, did you spend with Boss?

A.  Every day.

Q.  And when you worked with Boss, how, if at all, did you communicate with him?

A.  All day long in one way or another.

MR. HORTON:  Ms. Loftus, can you please pull up for the witness what's been marked as GX 141.

Q.  Ms. Maistrello, what is this?

A.  It's a photo.

Q.  And what is it a photo of?

A.  There are two people in the photo.  One is me and one is Boss.

MR. HORTON:  Government offers Government Exhibit 141.

MS. SHROFF:  No objection, your Honor.

THE COURT:  It is admitted.

(Government's Exhibit 141 received in evidence)

MR. HORTON:  Ms. Loftus, can you please publish it.

Q.  About when was this photo taken, Ms. Maistrello?

A.  This photo was taken in 2018.

Q.  And when did you start working for Boss?

A.  In 2018.

Q.  Was there a time that you enjoyed working for Boss, Ms. Maistrello?

A.  Yes.

Q.  And what did you enjoy about working for him?

A.  It was definitely very challenging.  No day was alike.  You definitely had to learn a lot and do it quickly.

Q.  Ms. Maistrello, what were the Rule of Law organizations?

A.  Rule of Law Society and Rule of Law Foundation were two nonprofit organizations that were founded in 2018, in November of 2018, that had the mission of helping Chinese people.

Q.  And who founded the Rule of Law organizations in 2018?

A.  Boss did.

Q.  What title, if any, did you have at Rule of Law, Ms. Maistrello?

A.  I was president and treasurer of Rule of Law Society.

Q.  Who gave you those titles at Rule of Law?

A.  Boss did.

Q.  As president and treasurer of the Rule of Law Society, Ms. Maistrello, were you in charge of that organization?

A.   No, I wasn't.

Q.   Who was in charge of the Rule of Law organizations?

A.   Boss was.

Q.   You said the purpose was to help people in China.  What, if anything, did Rule of Law do to help people in China?

A.   While I was there, nothing.

Q.   We'll come back to that.

         MS. SHROFF:  Objection to the commentary.

         THE COURT:  You may continue.

Q.   Ms. Maistrello, where did you work before you worked for Boss?

A.   In China.

Q.   And who did you work for in China?

A.   I worked at an oil company, and I was also teaching at university.

Q.   Who owned the oil company you worked for in China?

A.   In theory, the company was privately owned, but as everything in China, it was government owned and backed.

Q.   And how long were you working in China?

A.   Five years.

Q.   When did you move to the United States?

A.   In 2017.

Q.   How did you first hear about the opportunity to work for Miles Guo?

A.   I was contacted directly by a recruiter.

Q.   Who was that recruiter?

A.   His name was, is, Steve Weber.

Q.   And after you first heard about the opportunity to work for Miles Guo from Steve Weber, who did you speak with next?

A.   He arranged a meeting, so a first interview, where I met Yvette Wang.

Q.   Who is Yvette Wang?

A.   At the time she introduced herself as Boss's assistant.

Q.   And where did she introduce herself to you?

A.   We met for our interview at the Plaza Hotel.

          MR. HORTON:  Ms. Loftus, can you please display for Ms. Maistrello what's been marked as Government Exhibit 102.

Q.   Ms. Maistrello, what is Government Exhibit 102?

A.   It's a photo.

Q.   Who or what is it a photo of?

A.   Yvette.

          MR. HORTON:  Your Honor, government offers Government Exhibit 102.

          MS. SHROFF:  No objection, your Honor.

          THE COURT:  It is admitted.

          (Government's Exhibit 102 received in evidence)

          MR. HORTON:  Please publish it, Ms. Loftus.  Thank you.

BY MR. HORTON:

Q.   Ms. Maistrello, in your interview with Yvette Wang, what,

if anything, did she call Miles Guo?

A.   In that interview she called him the principal.

Q.   And what questions did Yvette ask you in that interview to work for the principal?

A.   She asked me a few personal questions, so she asked questions about my family, she asked whether I was married, I had kids; she also asked me if I had any connection to the CCP, so to the party.

Q.   How did you respond to Yvette Wang's question whether you had any connections to the CCP?

A.   I told her that I knew people who were party members but that was all of it.

Q.   How did Yvette Wang respond to that?

          MS. SHROFF:   Objection as to the hearsay.

          THE COURT:   Sustained.

Q.   What, if anything, was Yvette's reaction when you said you had connections to CCP members?

          THE COURT:   So you need to repeat her words.

          MR. HORTON:   Can I have one moment, your Honor.

          THE COURT:   Yes.

          MR. HORTON:   Thank you, your Honor.

Q.   Ms. Maistrello, after Yvette Wang interviewed you for the job with Boss, what happened next?

A.   I got a call from Steve Weber, who told me that the interview went well and he called me in for another interview.

O5T1GUO2                    Maistrello - Direct

Q.  And with whom was that next interview?

A.  That was with Boss.

        MR. HORTON:  Ms. Loftus, can you please take down the exhibit.  Thank you.

Q.  Where did Boss interview you?

A.  At his home.

Q.  Where was his home?

A.  The Sherry-Netherland.

Q.  What is the Sherry-Netherland?

A.  The Sherry-Netherland is a luxury residential hotel that overlooks Central Park.

        MR. HORTON:  Ms. Loftus, can you please display for the witness what's been marked as Government Exhibit 130.

Q.  Ms. Maistrello, what is Government Exhibit 130?

A.  It's a photo.

Q.  What is it a photo of?

A.  The Sherry-Netherland.

        MR. HORTON:  Government would offer Government Exhibit 130.

        MS. SHROFF:  I have no objection, your Honor.

        THE COURT:  It is admitted.

        (Government's Exhibit 130 received in evidence)

Q.  Ms. Maistrello, where is the Sherry-Netherland located?

A.  It's between 57th and Fifth Ave.

Q.  And where in the Sherry did Boss interview you?

A. Do you mean which room?

Q. Where in the building was your interview?  Where did it take place?

A. On the 18th floor.

Q. What's on the 18th floor of the Sherry?

A. That was his home.

Q. Who met you when you arrived for the interview with Boss?

A. Yvette did.

Q. What happened first when Yvette met you at Boss's apartment?

A. When I first arrived, she showed me around a little bit, just one area of the penthouse, and then we waited for Boss.

Q. Please describe to the jury what that part of Boss's penthouse looked like.

A. That specific part had various different rooms, so you can imagine like a corridor, a dining area, a tea room, a library, a gym, a movie room, and a piano room.

Q. And what happened after Yvette showed you around Boss's penthouse?

A. We sat down and we waited for him.

Q. What happened next?

A. He arrived.

Q. And did Boss interview you when he arrived?

A. Yes, he did.

Q. What happened after your interview with Boss that day?

A.  I went home, and I believe I received an offer on the same night.

Q.  Did you accept that offer?

A.  I did.

MR. HORTON:  Ms. Loftus, can you please show the witness what's marked as GX BR871.

You can enlarge it just a little bit, Ms. Loftus. Thank you.

Q.  Ms. Maistrello, what is this document?

A.  This is the offer letter I received.

MR. HORTON:  Your Honor, the government would offer GX BR871.

MS. SHROFF:  No objection, your Honor.

THE COURT:  It is admitted.

(Government's Exhibit BR871 received in evidence)

MR. HORTON:  Could you please publish it, Ms. Loftus.

BY MR. HORTON:

Q.  Ms. Maistrello, the top of your accepted job offer says Golden Spring, New York.  What was Golden Spring, New York?

A.  Golden Spring was my employer.

Q.  What was the business of Golden Spring, New York?

A.  It was presented to me on my very first day as an asset management company.

Q.  In your two years of working for Boss, what, if anything, did you come to understand Golden Spring did?

A.   Golden Spring was a company that took care of Boss's wishes and desires, so it was the company through which we would purchase things for Boss, or take care of his things.

MR. HORTON:  Ms. Loftus, can you scroll down towards the bottom of this page, please.  Thank you.

Q.   Ms. Maistrello, there's a signature on the page over a line that says Yvette Wang, COO, Golden Spring, New York.  What is COO?

A.   Chief operating officer.

Q.   When you worked for Boss, how often, if ever, did you work with Yvette?

A.   Every day.

Q.   And who did Yvette work for?

A.   Golden Spring.

MR. HORTON:  Ms. Loftus, can you please show the witness what's been marked as Government Exhibit UK723.

Q.   Ms. Maistrello, what is this?

A.   It's a photo.

Q.   And who is it a photo of?

A.   There are four people in the photo.  Boss is one of them, his wife, daughter——

MS. SHROFF:  Objection, your Honor.

THE COURT:  If you'll step up.

(Continued on next page)

O5T1GUO2                    Maistrello - Direct

(At the sidebar)

THE COURT:  What's the objection?

MS. SHROFF:  There's no relevance to the photo.  She didn't take the photo, she doesn't know——there's no indication when this photo was taken, we don't know the year, we don't know how she would know anything about this photo.  The government is using the photo to introduce people they want to put into evidence.  This is——it has no relevance to the testimony.

THE COURT:  Go ahead.

MR. HORTON:  So the people in the photo, as Ms. Maistrello is about to establish, that she can recognize them from the photo.  They're people who will feature in this case; they're already featured in this case.  You don't have to take a photo to be able to authenticate it.  It's black letter authentication.  And I'm laying a foundation.  I think she's almost there, if she's not there already.  I'd ask to have the photo admitted.

MS. SHROFF:  What's the relevance of the photo? There's no relevance of the photograph to this witness's testimony.  She's not going to testify about any——

THE COURT:  He has said that these individuals will play a part in the prosecution's case.

MS. SHROFF:  Right, but not any part of her testimony. So it may be down the road, if she wants——so that's my first

objection, your Honor.  I didn't object to the photo of Yvette because she's going to testify about Yvette.  That's relevant because it pertains to some part of her testimony.  She's not going to testify about any of these people.

THE COURT:  She can authenticate the photo by identifying these individuals.  Let's see if she does.  Overruled.

MS. SHROFF:  Your Honor, while we're at the sidebar, though, I did have an objection to the government lawyers constant looping of facts into each question.  So each question adds in a response from the witness, instead of just simply asking the next question, there are facts baked in.  The looping theory of asking questions, I object to it.

And number two, your Honor, it's improper to refer to the defendant as "Boss" by the government.  If she wants to use that in the answer, that's one thing, but to perpetuate that by asking the question and framing it as "Boss," I object to that as well.

THE COURT:  All right.  So you'll call him Mr. Guo.

I have overruled your objections with respect to the form of the question.

MS. SHROFF:  Thank you.

THE COURT:  Let's go back.

(Continued on next page)

(In open court)

THE COURT:  You may continue.

BY MR. HORTON:

Q.  Ms. Maistrello, do you recognize the people in this photograph?

A.  I do.

MR. HORTON:  Government would move to offer Government Exhibit UK723.

THE COURT:  She needs to identify the individuals.

MR. HORTON:  Oh, okay.

Q.  Can you identify——can you say who the people are in the photograph, left to right.

A.  Yes.  Boss; his wife; Yvette; and their daughter.

MR. HORTON:  Government offers Government Exhibit UK723.

THE COURT:  It is admitted.

(Government's Exhibit UK723 received in evidence)

MR. HORTON:  Please publish it, Ms. Loftus.

Q.  Ms. Maistrello, where was this photograph taken?

A.  In the dining room of the Sherry.

Q.  Turning back to Yvette Wang, what exactly did Yvette do for Mr. Guo?

A.  Everything.

Q.  What do you mean by everything?

A.  She was his right hand.

MS. SHROFF:  Your Honor, I apologize, but I am having trouble hearing the witness.  If you could just ask for her voice to be——

THE COURT:  So you can bring the microphone closer and also speak up.

THE WITNESS:  I'll try, your Honor.

BY MR. HORTON:

Q.  Ms. Maistrello, you said that Yvette Wang did everything for the defendant, was his right-hand person.  What do you mean by that?

MS. SHROFF:  Objection to the testifying by the government, your Honor.

THE COURT:  Overruled.  You may answer.

A.  So I said that she was his right hand.

Q.  And my question is:  What exactly did that entail?

A.  From payments to giving directions to the staff.

Q.  And who else besides Mr. Guo, if anybody, did Yvette Wang report to?

A.  Only to Boss.

MR. HORTON:  Ms. Loftus, you can please take the picture down.

Q.  By the way, Ms. Maistrello, when you worked for the defendant, where did you work?

A.  Our office was located at 800 Fifth Ave.

Q.  And where else, if anywhere, did you work for Mr. Guo?

A.   In 2019, we moved to another office on Lexington and, whenever it was needed, in his home.

THE COURT:  All righty.  It's now 11:30, and so we're going to take our half-hour break.

Members of the jury, remember that you're not permitted to discuss the case amongst yourselves.  Don't permit anyone to discuss it in your presence.

We will start promptly at noon.

Ma'am, you may step down, but do not discuss the case.

(Continued on next page)

(Jury not present)

THE COURT:  Counsel, is there anything before we return?

MR. HORTON:  Yes, your Honor.  Just one matter the government wishes to raise for efficiency's sake.  There was an objection early in Ms. Maistrello's testimony about hearsay with respect to a statement that Yvette Wang made.  Yvette Wang is a co-conspirator of Miles Guo.  The Court knows she was charged with Miles Guo.  The testimony that was just elicited made clear that she was also an agent of Miles Guo.  I believe Ms. Maistrello described her as doing everything for him and his right hand.  So we submit that statements made by Yvette Wang in her capacity as Miles Guo's agent and in her capacity as a co-conspirator in this case are admissible.

MS. SHROFF:  Your Honor, I don't believe the government has shown the existence——I can't see the Court.  I apologize.  But I don't believe that the government has met its burden under the hearsay rules of having established a conspiracy with Ms. Yvette Wang and Miles Guo.  There may have been an employer-employee relationship that they've established so far, but there is no indication that they've established a co-conspiratorial agreement between those two individuals.

Additionally, your Honor, the evidence that the government was trying to elicit——and I apologize if I have this wrong, but I believe there were questions about what she was

asked during an employment interview, which certainly are not in furtherance of a conspiracy. They are employment-related questions.

Finally, your Honor, even if the government is said to have established a conspiracy here, there is no relevance to what interview questions she is asked. The government has clearly established she got a job, and there's no allegation here that she got a job based on fraudulent pretenses.

So for all those reasons, your Honor, I don't think that the government's argument is properly made. Thank you.

MR. HORTON: Your Honor, there isn't a more paradigmatic agency situation than interviewing somebody to work for somebody else. Yvette Wang was there for Miles Guo to interview somebody who was hired to work directly with Miles Guo. If that's not agency, it doesn't exist.

MS. SHROFF: She was not hired to work for Miles Guo, one, she was hired to work for Golden Spring.

THE COURT: One moment. Did Ms. Wang plead guilty to conspiracy?

MR. HORTON: Yes.

THE COURT: All right. You may ask questions that elicit statements from Ms. Wang.

MR. HORTON: Thank you.

THE COURT: We will reconvene at noon.

(Luncheon recess)

AFTERNOON SESSION

12:00 p.m.

(Jury present)

THE COURT:  Please be seated.

Remember that you're still under oath.

THE WITNESS:  Yes, your Honor.

THE COURT:  You may continue your direct examination.

MR. HORTON:  Thank you, your Honor.

BY MR. HORTON:

Q.  Ms. Maistrello, when you worked for Guo, how often, if ever, did Guo tell you to buy things?

A.  Quite often.

Q.  And what things did Guo tell you to buy?

A.  It could be equipment for his media room, it could be suits, it could be furniture.

Q.  Let's talk about the furniture.  What's Promemoria?

A.  Promemoria is a furniture brand.

Q.  And where is Promemoria based?

A.  They're based in Italy.

Q.  When, if at all, did you deal with Promemoria when you worked for Guo?

A.  All throughout the two years I worked there.

Q.  And what did Guo have you do at Promemoria?

A.  Sometimes buy furniture.  Their furniture is custom made, so connect with—with the people from Promemoria to design

certain——certain furniture.

Q.   And where would that furniture that you bought for Guo go?

A.   That would go either to the office or to his home.

Q.   You said you bought suits.  What kind of suits did you buy for Guo?

A.   Bespoke, tailored suits.

Q.   What do you mean by bespoke?

A.   Custom made.

Q.   What brand, if any, of suits did you buy for Guo?

A.   Mainly two.  Brioni was one, and Stefano Ricci was the other.

Q.   And what was the process of buying those suits?

A.   So I would get in touch with the manager, for instance, at Brioni, choose some fabrics, then take them to Boss; he would choose the fabrics for his next batch of suits; the tailor would come either to the office or his home, measure him; then they would make the suit and come back with the delivery.

Q.   And how often would that happen during the two years you worked for him?

A.   That happened I would say twice a year.  Once definitely when it was Chinese New Year and one more time.

Q.   How many suits were you buying for Guo each time?

          MS. SHROFF:  Objection.  Mischaracterizes her testimony.

          THE COURT:  On his behalf.

O5T1GUO2                    Maistrello - Direct

Q.  How many suits were you buying on Guo's behalf each time?

A.  I would say approximately a dozen.

Q.  How much did those suits cost, Ms. Maistrello?

A.  About 10,000 each.

Q.  And what did those suits look like?

A.  They had, of course, pants and a jacket; they were, well, in different colors or different fabrics, depending on the season or depending on what he wanted; they had his name on the interior pocket.

Q.  And what name was on the interior pocket?

A.  Miles Kwok.

        MS. SHROFF:  I'm sorry.  I didn't hear that.

        THE WITNESS:  Miles Kwok.

Q.  Ms. Maistrello, what, if anything, did Guo tell you about cars he owned in China?

A.  He talked a little bit about his cars.  He was very—well, he liked cars.  He was very proud of his fleet of cars in China.

Q.  And what, if anything, did Guo ask you to do with those cars?

        MS. SHROFF:  Objection.  Is this all cars, some cars?

        THE COURT:  With his cars in China?

        MR. HORTON:  Yes, your Honor.

        THE COURT:  Go ahead.

A.  He had a few favorite cars that he wanted to import to the

US.

Q. And what kinds of cars were those?

A. It was definitely a Lamborghini and a Rolls Royce.

Q. And what exactly did Guo ask you to do with the Lamborghini and the Rolls Royce?

A. To import them into the US.

Q. And ultimately were you able to do that?

A. No.

Q. Why not?

A. Because of import laws on—on cars.

Q. What year did Guo ask you to import his Lamborghini?

A. I think it was 2018.

Q. Ms. Maistrello, what is a *hutong*?

A. It's a traditional architectural structure, typical of the capital of China, Beijing, which has a courtyard and then houses surrounding the three sides of the courtyard.

Q. What, if anything, did Guo tell you about his house in Beijing?

A. He—well, he was very proud of it. He showed some photos, mainly of the interior, he showed photos of his artwork. Everything was custom made in the home.

Q. And what did that property in Beijing look like?

A. Luxury property, like a traditional Beijing home but luxury—a luxury one.

Q. And how many buildings were on that property?

A.   There were like more buildings attached to one another.

Q.   And what, if anything, did he tell you about who lived in his house in Beijing?

A.   He and his family.

Q.   What was Chateau Ridge?

A.   Chateau Ridge was a property located in Connecticut that he wanted to purchase.

Q.   And what, if anything, did you have to do with Chateau Ridge?

          MS. SHROFF:  Objection as to the form of the question.

          THE COURT:  Overruled.  You may answer.

          THE WITNESS:  Can I answer?

          THE COURT:  Yes.

A.   There was a lot of back-and-forth for that property.  I think I started working on it in 2018, where he first wanted to purchase it, so there were a lot of talks with the owner of the property.  We went there several times to check the property itself and all the rooms and all the art that—that was in the house.  Some of it he wanted to keep, some of it he didn't want it or he didn't need it.  It was a quite long process.

Q.   You said that "we" went there a few times.  Who was "we"?

A.   I went there a few times with him.  Sometimes other colleagues tagged along.

Q.   And who were those other colleagues who went with you to Chateau Ridge?

A.   In several instances——in several different instances, Yvette came once; I believe Hank also came.  These are the people I remember.

Q.   What kind of property is Chateau Ridge?

A.   I guess the easiest way to describe it is like a castle. That's what "chateau" means.  So it's——it looks like a French castle.  The interior——like, the interior of the rooms are actually based off Versailles in France.

Q.   What, if anything, did Guo tell you about why he was looking to buy Chateau Ridge?

A.   He liked it.

Q.   What, if anything, did Guo tell you he was going to do with the property if he bought it?

A.   He was going to live there.

Q.   Did Guo ultimately buy Chateau Ridge?

A.   No, he did not.

Q.   When you were working for Guo between 2018 and 2020, what house, if any, did he buy?

A.   He ended up buying a property in Connecticut.

Q.   Now what did the Connecticut house that Guo bought look like?

A.   It was a very big house.  I would call it a villa or a mansion.

Q.   And who, if anyone, lived in the mansion in Connecticut?

A.   He did, with the family.

MS. SHROFF:  I'm sorry.  I just continue to have difficulty hearing the witness, your Honor.

THE WITNESS:  I'm sorry.  I'm trying, and this is the highest I can get.

THE COURT:  One moment, please.

Okay.  So I'm being told that the volume is at the highest, and so I'm just going to ask you to be very careful about speaking as loudly as you can.

THE WITNESS:  I will.

THE COURT:  Thank you.

BY MR. HORTON:

Q.  Ms. Maistrello, who is Qiang Guo?

A.  Boss's son.

Q.  And can you please spell Qiang Guo.

A.  G-U-O, Q-I-A-N-G.

Q.  What other names, if any, does Boss's son go by?

MS. SHROFF:  Objection.

THE COURT:  Overruled.  You may answer.

A.  Mileson.

Q.  What, if anything, did Guo tell you about Mileson's interests?

A.  He also had an interest in motors, so cars, motorbikes.

Q.  When you say he had an interest in cars and motorbikes, who are you referring to?

A.  His son.

Q.   Did there come a time that Guo asked you to buy something for Mileson?

A.   Yes.

Q.   What did Guo ask you to buy for Mileson?

A.   It was a motorbike.

Q.   Ms. Maistrello, when Guo told you to buy suits for him or a motorcycle for his son, how would you pay for these things?

A.   It depended on the amount, so it could be either a wire transfer or a check.

Q.   And how would you get those checks?

A.   I would ask Yvette.

Q.   What would happen when you asked Yvette for a check for a particular purchase?

A.   She would give it to me.

Q.   Where did those checks come from?

A.   Golden Spring.

Q.   Ms. Maistrello, you said that you bought computer equipment for Guo.  How did he pay for that equipment?

A.   The big bulk of the payments for media and broadcast equipment was paid through Saraca.

Q.   What was Saraca?

A.   Saraca was an entity that we used mainly for media and tech-related expenses.

Q.   Who was in charge of Saraca?

A.   I don't know.

Q.  How would you know whether something should be paid for by Golden Spring or Saraca?

A.  I learned with experience, so I knew that certain expenses would be paid with one company and certain others with another company.

Q.  And who did you learn that from?

A.  By working there, or Yvette would tell me, oh, this expense would go under Saraca or under Golden Spring.

Q.  And what other companies, if any, paid for some of the things you bought?

A.  There was another entity called Genever.

Q.  What was Genever?

        MS. SHROFF:  Objection.

        THE COURT:  You may answer.

A.  It was an entity that was—was used mainly for personal purchases or for personal expenses that related to the Sherry.

Q.  And whose personal expenses was Genever used to pay for?

A.  Boss's.

Q.  Ms. Maistrello, who was in charge of Genever?

A.  I don't know.

Q.  Where was Golden Spring's office located?

A.  When I started working, it was located at 800 Fifth Ave.

Q.  And where is Saraca's office located?

A.  So the official address, I don't know, but it was operating from the same office, so 800 Fifth Ave.

Q.   And what do you mean by official address?

A.   The one that was, for instance, filed in the official paperwork.  I've never seen that.

Q.   Who, if anybody, would you speak with to authorize an expense from one of the companies that Guo——that you've just testified about?

MS. SHROFF:  Asked and answered.

THE COURT:  You may answer.

A.   So whenever Boss used to ask me to buy something, I would——at a certain point I understood where the money should——should be coming from, and I——and I asked Yvette directly for a certain amount of money from a certain company.

Q.   Who was Max Krasner?

A.   Max was my colleague at Golden Spring.

MR. HORTON:  Ms. Loftus, can you please pull up for the witness what's been marked as Government Exhibit SM62.

Q.   Ms. Maistrello, what is this?

A.   It's a document.

Q.   And what is this document?

A.   It's a payment request form.

Q.   Is your name on this form?

A.   Yes.

Q.   And what does this form indicate?

A.   Being a payment request form, it looks like a purchase was made or it was about to——to be made and I requested it.

MR. HORTON:  Your Honor, government would offer Government Exhibit SM62.

THE COURT:  No objection?

MS. SHROFF:  None, your Honor.

THE COURT:  It is admitted.

(Government's Exhibit SM62 received in evidence)

MR. HORTON:  Could you please publish it, Ms. Loftus.

Ms. Loftus, can you zoom in on the line that says Approved by Max Krasner.

BY MR. HORTON:

Q.  Ms. Maistrello, what did Max Krasner do for Boss——excuse me——for Mr. Guo?

A.  He was an employee of Golden Spring and he worked in accounting.

Q.  And what did his job entail?

A.  A lot of payments.  I know he was working on tax forms.

Q.  And how often, if ever, did you interact with Max Krasner at work?

A.  Every day.

Q.  And what would you go to him about?

A.  Well, we——we were very close in——in the office, meaning that we——we worked together, but whenever I needed something, I needed a payment to be done, for instance, by Saraca, I would go to him.

Q.  Who was Max Krasner's Boss?

A.   Go Wengui.

Q.   Who else, if anybody, did Max report to?

A.   Yvette.

          MR. HORTON:  Ms. Loftus, can you please go to the top
of this page that we're on and highlight what's up top there.

Q.   Ms. Maistrello, can you describe what's at the very top of
your payment request form.

A.   Do you want me to read, like, the title?

Q.   If you could just describe what we're seeing at the very
top of this page.

A.   Okay.  So there is the company name at the top and then
there are—there is a payment request form, and then there are
a few lines that indicate the payee for this payment, the
street and address and the form of payment, with the amount of
the payment and the purpose of the expense.

          MR. HORTON:  Ms. Loftus, can you please take the
exhibit down and show the witness what's marked as Government
Exhibit 110.

Q.   Ms. Maistrello, who's this?

A.   This is Max.

          MR. HORTON:  Government offers Government Exhibit 110.

          MS. SHROFF:  We have no objection, your Honor.

          THE COURT:  It is admitted.

          (Government's Exhibit 110 received in evidence)

          MR. HORTON:  Ms. Loftus, please publish it.

BY MR. HORTON:

Q. Now which of Guo's companies did Max work with?

A. Golden Spring and Saraca, mainly.

Q. In the two years you worked for Guo, how much, if ever, were you with Guo and Max at the same time?

A. Definitely a few times a week.

Q. And when, if ever, did Guo tell Max to buy things?

A. About—can you repeat the question.

Q. Sure. When, if ever, did Guo tell Max to buy things?

A. It happened if Max was around him. It usually happened at—when Boss had an idea and he wanted to buy something, then he would ask the person he had in front in that very moment.

Q. And who, if anybody, would Max need to go to after that for permission?

        MS. SHROFF: Objection as to personal knowledge.

        THE COURT: If you know, you may answer.

A. Yvette.

        MR. HORTON: Okay. Thank you, Ms. Loftus. You can take this down.

Q. Ms. Maistrello, who is Defeng Cao?

A. He was a colleague for the first few months while I was at Golden Spring.

Q. And what did Defeng Cao do?

A. He would do security, security work.

Q. Who else, if anybody, did security work?

A.  I would say that we had two separate teams, so we had Chinese team and we had an American team.

Q.  And how often, if at all, did you speak with the people on these security teams?

A.  Every day.

Q.  What exactly did the security teams do?

A.  They were doing a little bit of everything, so from driving, handiwork, assembling, disassembling furniture, receiving packages, these things.

Q.  What kind of security work did these teams do?

A.  Not much, really, in the sense that there was no need for security, like, for bodyguard in this true sense of the term.

Q.  And why do you say that there was no need for security?

A.  I believe that there was no danger or threat posed to Boss.

Q.  In the two years working for Guo, what makes you say that?

A.  Nothing has ever happened in terms of security.

Q.  How did you know what those teams were doing all day?

A.  They were telling me.

Q.  What was your understanding, if any, about why they were called security teams?

A.  I assumed that the word——

        MS. SHROFF:  Objection to what she assumed.

        THE COURT:  Sustained.

Q.  Do you have an understanding of why they were called security teams?

A.   Yes.

Q.   What is that understanding?

A.   The term security, security team, or bodyguard is better than handyman.

Q.   What do you mean it's better?

A.   Well, it definitely sounds better when you need to hire someone.

Q.   And who, if anybody——withdrawn.

     Turning specifically to Defeng Cao, what kinds of assignments did Guo give him?

A.   So at the very beginning, when we were still setting up the office, there was a lot of furniture moving.  He was taking furniture from several storage places to the office.  He was sometimes painting the office too.

Q.   And how long had Defeng Cao worked for Guo?

A.   I don't know the number of years.

Q.   And what, if anything, did you understand about how Defeng Cao came to work for Guo?

A.   From China.

Q.   And what, if anything, do you understand about Defeng Cao's relationship with Guo's family?

A.   They were in good terms.

     MR. HORTON:  And Ms. Loftus, if you could please show the witness what's marked as Government Exhibit UK728.

Q.   Who is this a photograph of?

A.   There are three people in the photo.  Boss is one, his wife is the other, and Cao is the other.

MR. HORTON:  Your Honor, government moves to admit Government Exhibit GX UK——pardon me.

MS. SHROFF:  Your Honor, we have the same objection as before.  And I believe that the 403 analysis here would be higher.

THE COURT:  It is admitted.

(Government's Exhibit UK728 received in evidence)

MR. HORTON:  And it's 728, just so it's clear.

Could you please publish it, Ms. Loftus.

BY MR. HORTON:

Q.   Ms. Maistrello, who is the person kneeling in the photo?

A.   That's Ho.

Q.   And is the name you said the same as Defeng Cao?

A.   Yes.

Q.   And who are the two people in the right of the photograph?

A.   The man is Boss and the woman is his wife.

Q.   And what, if anything, was Defeng Cao's relationship with Guo's daughter?

A.   They were together.

MR. HORTON:  Ms. Loftus——actually, please leave it up.

Q.   What understanding, if any, did you have about why Guo hired those security teams?

MS. SHROFF:  Objection.  It's not based on personal

knowledge, your Honor.  Also, may we approach?

THE COURT:  Yes.

(At the sidebar)

THE COURT:  I suppose that it's the government's contention that they did not work in a traditional security role because Mr. Guo did not indeed fear that he was in any kind of danger; is that your contention?

MR. HORTON:  We're trying to elicit——so she worked with Mr. Guo six, seven days a week for two years.  She also spoke often with the people who were on these so-called security teams.  I'd like to ask——I did ask if she understood why they were there.  And I think the different question is, did she understand, speaking almost every day with Mr. Guo, why he had hired them, particularly when their tasks were different than what the label might suggest if people were hearing this for the first time.

THE COURT:  You asked a question like that before.

MR. HORTON:  So your Honor, I did ask if she knew why they were there, sort of what was her understanding from interacting with them almost every day for two years, and a lot of the questions in this testimony are about what Mr. Guo told her, right?  She was working by his side almost all week, almost all day for two years.  I think it's relevant, if he said anything to her why he had these teams, for the jury to know why he told her that.

THE COURT:  I agree it could come in.  I just thought it might have already been asked.

MS. SHROFF:  Many times.

MR. HORTON:  Well, with respect, I do think I was asking a different question, which was from her own observations, setting aside what anybody told her, what did she see them doing.  And now I'd like to elicit:  Did he ever tell you why he hired them?

THE COURT:  Okay.  That's fine.

MS. SHROFF:  Your Honor, the security team was not hired after she took the job.  The security team was in place for years before that.  And there's no evidence that she's the one who had anything to do with them being hired.  It's also very amorphous to say a security team.  There's no indication of who——

MR. HORTON:  I didn't mean any disrespect to Ms. Shroff.  I was just trying to——

THE COURT:  Go ahead.

MS. SHROFF:  ——of who she's referring to.

Thirdly, your Honor, what Mr. Guo said to her about why they hired a specific person would be also irrelevant.  It's not in furtherance of any conspiracy, so I don't know how it could even fall under a hearsay exception.

But most important, your Honor, this is cumulative, it is in fact not quite relevant to any issues here, and if he's

trying to make the point that this was all a big farce, I believe the point has been made.

I just have to add one thing, your Honor. I'm completely deaf in my left ear. I'm not only having trouble hearing her, I'm also having trouble hearing him, even though he's standing right next to me, so if you could please ask him to use the microphone, I would really appreciate it.

THE COURT: Of course. Speak into the microphone. I have checked with the AV.

MS. SHROFF: I know. It's my problem. I can hear fine from here. It's this part.

MR. HORTON: I'll do my best to keep it up.

THE COURT: I will ask if there's any way of amplifying the sound going beyond the equipment that we already have.

MS. SHROFF: I understand, your Honor. I know you've tried. I just am having——I didn't want you to think——I want you to understand why I'm having trouble.

THE COURT: I will continue to try.

But I will permit the question. The objection is overruled.

(Continued on next page)

(In open court)

THE COURT:  So in order to better hear you, I'd like to try the handheld microphone and see how that works.

You may continue.

MR. HORTON:  Thank you, your Honor.

BY MR. HORTON:

Q.  Ms. Maistrello, what, if anything, did Guo tell you about why he hired these security teams?

A.  What he said is that it was for security purposes.

Q.  Turning to the exhibit in front of you, can you—looking at the exhibit that's in front of you, Ms. Maistrello, you identified the person on the right as Guo's wife.  What is her name?

A.  I don't remember it right now.

Q.  And can you please spell Defeng Cao.

A.  D-E-F-E-N-G, C-A-O.

Q.  What was Guo's relationship like with Defeng Cao?

A.  It was good.

Q.  And what sorts of assignments did you see Guo give to Defeng Cao?

A.  Again, at the very beginning, it was really about setting up the office, so there was a lot of storage moving, furniture moving, assembling, painting.

Q.  And you said that there were Chinese team and American team.  What differences, if any, were there between the work

they did?

A.   The——the Chinese team was in a way more trusted and closer to Boss than the American one.  The American teams were also coming and going.

Q.   And you said the Chinese teams were closer and more trusted.  What did that mean?

A.   So there were things that maybe Boss didn't feel comfortable sharing with the American team, or he wanted to go somewhere he didn't want people to know, so he would definitely——

MS. SHROFF:  Objection, your Honor.

THE COURT:  Overruled.

You may continue.

A.   So he would definitely ask the——the Chinese team to help him with those.

MR. HORTON:  Ms. Loftus, you can please take the exhibit down.

Q.   Ms. Maistrello, who is William Je?

A.   William Je was Boss's friend and finance person.

Q.   And what does finance person mean?

A.   He was the person who would handle the investments and financing for Boss.

Q.   When, if ever, did you meet William Je?

A.   Several times over the course of two years.

Q.   And where did you meet him?

A.   Mainly at the office.

Q.   And when, if ever, did you sit in meetings with William Je?

A.   Several times during both 2018 and 2019.

Q.   And what were the topics of those meetings?

A.   So in 2018, the main topics were Guo Media and also Rule of Law, so Rule of Law Society and Foundation.  In 2019, it was mainly the same thing.

Q.   What was Guo Media?

A.   Guo Media was a platform, a social media platform that Boss started to broadcast――for his broadcasts.

Q.   During your two years working for Guo, when, if ever, did you work on Guo Media?

A.   All along in one capacity or another.

Q.   We'll come back to that.

         What other names, if any, do you know William Je by?

A.   Only his――his Chinese or Cantonese name.

Q.   What is his Cantonese name?

A.   Kin Ming Je.

Q.   Could you please spell that.

A.   K-I-N, M-I-N-G, G-E.

         MR. HORTON:  Ms. Loftus, for Ms. Maistrello only, can you please display GX UK764.

Q.   Ms. Maistrello, who is in this photograph?

A.   It's William.

         MR. HORTON:  Thank you, Ms. Loftus.  You can take that

down.

And Ms. Loftus, can you please display what's been marked as GX 103.

Q.  Who is in this photograph?

A.  It's William.

MR. HORTON:  Government would offer Government Exhibit 103, your Honor.

MS. SHROFF:  No objection, your Honor.

THE COURT:  It is admitted.

(Government's Exhibit 103 received in evidence)

MR. HORTON:  Please publish it, Ms. Loftus.

BY MR. HORTON:

Q.  Ms. Maistrello, did there come a time that William Je asked you to take a position with another company?

A.  Yes.

Q.  And what exactly did William Je ask you to do?

A.  He asked me to sit on the board of directors of one of his companies.

Q.  What was that company called?

A.  ACA Capital.

Q.  Where were you when William Je asked you to sit on the board of ACA Capital?

A.  I was at the office.

Q.  And what, if anything, did William Je say about why he was asking you to sit on the board of ACA Capital?

A.  He mentioned——

MS. SHROFF:  Objection as to hearsay.

THE COURT:  If he gave you an explanation, you may answer.

A.  He told me that they were looking for investments in New York and in the US.  That was the reason.

Q.  And what experience, if any, had you had with investments?

A.  None.

Q.  What experience, if any, had you had serving as a corporate director?

A.  None.

Q.  Who introduced you to William Je before he asked you to sit as a director at that company?

A.  We were introduced by Boss.

Q.  Did you agree to serve as a director of ACA Capital?

A.  Yes.

Q.  And why did you agree to take that position at ACA Capital?

A.  I trusted William.  He——he was asking for it, and I saw no reason to——to decline.

Q.  Why did you trust him?

A.  I trusted him as I trusted Boss.  He was an extremely kind person; in my opinion, trustworthy.

Q.  For about how long did you serve as a director of ACA Capital?

A.  A few months.

Q.   And what is ACA Capital?

A.   I don't know.

Q.   What work, if any, did you do at ACA Capital?

A.   I didn't do anything.

Q.   Did there come a time, Ms. Maistrello, that you had to sit for a deposition in your role as a director at ACA Capital?

A.   Yes, I sat at a deposition, but I had already resigned.

Q.   And what is a deposition?

A.   A deposition is a legal procedure where an individual offers sworn evidence.

Q.   How did you find out you were going to have to sit for a deposition as a director at ACA Capital?

A.   I was subpoenaed.

Q.   And after you were subpoenaed, what did you do?

A.   The next day, I went to the office and I asked our counsel to explain what it was.

            (Continued on next page)

BY MR. HORTON:

Q.   And what was the name of the person you asked for an explanation?

A.   Daniel Podhaskie.

MR. HORTON:   Ms. Loftus, can you please display for the witness what has been marked as Government Exhibit 105.

Q.   Ms. Maistrello, who's in this photograph?

A.   That's Daniel.

MR. HORTON:   The government offers Government Exhibit 105.

MS. SHROFF:   No objection, your Honor.

THE COURT:   It is admitted.

(Government's Exhibit 105 received in evidence)

MR. HORTON:   Would you please publish it, Ms. Loftus.

Q.   Ms. Maistrello, what did you do after you took the subpoena to Dan Podhaskie?

A.   I told Yvette.

MR. HORTON:   Ms. Loftus, you can please take the exhibit down.

Q.   And how did Yvette respond when you told her about the subpoena?

A.   We never spoke about the subpoena itself, but she arranged counsel for me.

Q.   And when, if ever, did you meet with those lawyers?

A.   I believe it was July.

Q.  Ms. Maistrello, when you met with those lawyers that Yvette arranged for you, had you ever seen them before?

A.  Yes.

Q.  And where had you seen them?

A.  At our office.

Q.  And what understanding, if any, do you have about why you had seen them before at your office?

A.  They came to the office several times for other lawsuits.

Q.  On the day of your deposition, who accompanied you?

A.  Yvette did.

Q.  What kind of room was your deposition in?

A.  It was a meeting room.

Q.  And where were you sitting?

A.  So there was a long table, and I was sitting almost in the middle.

        THE COURT:  One moment, please.

        You may continue.

        MR. HORTON:  Thank you, your Honor.

Q.  Was Yvette the only person who accompanied you to the deposition?

A.  Yes.

Q.  Ms. Maistrello, was Yvette there as your lawyer?

A.  No.

Q.  Was there a lawyer there to represent you at the deposition?

MS. SHROFF:  Objection.

THE COURT:  Overruled.  You may answer.

A.  Yes, the lawyer was already there at the office.

Q.  I see.  And where with respect to you was Yvette sitting during your deposition?

A.  Two seats to my right.

Q.  Where did you go after the deposition ended?

A.  We went and had lunch.

Q.  And where did you go after lunch?

A.  Back to the office.

Q.  Who did you have lunch with, by the way?

A.  With Yvette.

Q.  And what happened when you got back to the office with Yvette?

A.  We went to boss's office and talked to him.

Q.  And what did you and Yvette talk to boss about after your deposition?

A.  Yvette told boss how it went.

Q.  How did you think it went?

MS. SHROFF:  Objection as to relevance.

THE COURT:  Overruled.  You may answer.

A.  It was my first deposition, so I didn't really have an idea of how it went.

Q.  What did Yvette say to boss about how it went?

A.  She said it went really well.

Q.  And what, if anything, did Yvette say to you in that meeting with Guo about how your deposition went?

A.  She said I was very good.  I did good.

Q.  What, if anything, did Yvette call you in that meeting?

A.  She referred to me as a person who, like, does the right thing or does things the right way.

Q.  What language did she say that in?

A.  In Chinese.

Q.  And what is the translation in English of what she called you?

A.  The literal translation would be like a little flute or something along those lines.

Q.  By the way, Ms. Maistrello, in your two years working for Guo, what language did you speak with him?

A.  In Chinese.

          THE COURT:  Do you mean Mandarin?

          THE WITNESS:  Yes.

Q.  Ms. Maistrello, what month and year was your deposition for ACA Capital?

A.  July of 2019.

Q.  You said you had -- you said you were no longer director at ACA Capital.  How did you leave your director position at ACA Capital?

A.  I sent an email to William telling him that I would like to resign.

Q.  And why did you want to resign from ACA Capital?

A.  I wasn't doing anything for the company.  I had overheard that there were, like, some sort of legal troubles.  And not knowing the company and not knowing the role I had in the company, I just didn't want to be involved in any of it.

Q.  Ms. Maistrello, as you sit here today, what's your understanding of what the purpose was of your deposition in 2019?

        MS. SHROFF:  Objection to what her understanding is today.  It's not relevant, your Honor.

        THE COURT:  Overruled.  You may answer.

A.  I don't have an understanding of that deposition.

Q.  Ms. Maistrello, turning back to the Rule of Law organizations, when did you first hear that Guo was starting the Rule of Law organizations?

A.  That was in the summer of 2018.

Q.  How long had you been working for Guo at that point?

A.  Several months.

Q.  When you first heard that Guo was starting the Rule of Law organizations, what did you think about it?

A.  I was really, really happy.

Q.  Why were you really happy?

A.  Those two organizations were -- were a step further in what boss wanted.  And I felt that at that point we could really put things from theory into practice.

Q.  What, if anything, did you donate to the Rule of Law

organizations?

A.  I donated $500.

Q.  And why did you donate?

A.  I believed in the organizations.  I was president of one of

them; so if I don't donate, who would?  Who does?

Q.  And what year did you donate?

A.  It was either 2018 or early 2019.

Q.  Did the Rule of Law organizations have boards of directors?

A.  Yes.

Q.  And what role, if any, did you have on the board of

directors?

A.  I was a member.

Q.  Who else served on that board with you?

A.  So on the board of Rule of Law Society, we had Steve

Bannon, who was chair; initially, Sasha Gong, Bill Gertz, and

Jennifer Mercurio.

Q.  Who was Steve Bannon?

A.  Steve Bannon was the former political adviser of former

president Donald Trump.

Q.  And how did Steve Bannon get involved with the Rule of Law

organization?

A.  He was very much involved in all the work at the office

around 2018.

Q.  Who got Mr. Bannon involved with the work around the

office?

A.  Boss did.

Q.  And what exactly did Mr. Bannon do around the office?

A.  Whenever he was at the office, he was there for meetings with boss.

Q.  What kind of meetings?

A.  So initially in 2018, there was a lot of planning around the Rule of Law organizations.  Later on it was more strategic meetings about CCP and China -- U.S./China relations.

Q.  What exactly did Steve Bannon do with the Rule of Law organizations?

A.  He didn't really do anything.

Q.  What, if anything, was Mr. Bannon paid for the work he was doing at the office?

            MS. SHROFF:  Objection.

            Assumes facts not in evidence.

            THE COURT:  Overruled.  You may answer.

A.  He was paid over a million dollars divided in four installments.

Q.  Where did you learn that?

A.  I was at the office.

Q.  How was Mr. Bannon paid that money?

A.  Via check.

Q.  Where did those checks come from?

A.  I don't remember the entity they came from; it might have

been Saraca.

Q.   Who decided that Mr. Bannon would get paid that money?

A.   I don't know.

Q.   Ms. Maistrello, what role, if any, did you have in planning the launch of the Rule of Law organizations?

A.   There was a lot of planning that year, so we launched in November of 2018.  We had a pretty big press conference on November 21st of 2018.  So there was a lot of coordination for people to come into New York City for the conference, presentations for the keynote speakers, just a few months really of organizing.

Q.   When did that planning begin?

A.   Late September 2018.

Q.   When was the press conference you just referenced, when did that take place?

A.   November 21st of 2018.

Q.   During that planning phase, what, if anything, did Guo say about how the Rule of Law organizations would be funded?

A.   He said that he would be --

        MS. SHROFF:  Your Honor, are we referring to private conversations between the two of them?  It's an open-ended question.

        THE COURT:  What time?  When?

        MR. HORTON:  Well, Ms. Maistrello testified that there was a planning phase for some period of months before the

launch; and that she participated in it; and that Mr. Guo did too; Mr. Bannon did too.  I was asking her about conversations in that planning phase between the three people.

MS. SHROFF:  All of them over all these months.

MR. HORTON:  Sounded like it was one or two months.

THE COURT:  You may answer.

A.  Can you repeat the question please?

Q.  Yes.  During the planning phase, planning for the Rule of Law organizations, what, if anything, did Mr. Guo say about how the Rule of Law organizations would be funded?

A.  So he said that he would donate the first $100 million as a first donor or as a sponsor.

Q.  Ms. Maistrello, as president and treasurer of the Rule of Law Society, did Mr. Guo ultimately make $100 million donation?

A.  No.

Q.  And how was Rule of Law actually funded?

A.  It was funded through donations that were coming from followers.

Q.  What do you mean by "followers"?

A.  So boss had a pretty huge following, following base.  And those followers donated starting from 2018.

Q.  Did there come a time that Rule of Law broadcast a fundraiser?

A.  Yes, that was the one-year anniversary.

Q.  And where were you during that broadcast fundraiser?

A.   At the office.

Q.   Where was the fundraiser broadcast?

A.   When or where?

Q.   I'm sorry, where was the fundraiser broadcast?

A.   At the office.

Q.   And on what outlet, if any, was the fundraiser broadcast?

A.   On Guo Media.

Q.   What was GTV?

A.   GTV was a platform for -- I'm sorry.  I'm thinking about something else.  When I was there, GTV and Guo Media were actually the same thing.

Q.   And what, if anything, did the "G" in GTV stand for?

A.   Guo.

        THE COURT:  When you refer to "the office," what location?

        THE WITNESS:  So the first office we were at in 2018 and early 2019 was 800 Fifth Ave.  Well, in 2019, we moved to 64th and Lex.

Q.   Ms. Maistrello, what, if anything, did you do to plan the fundraiser?

A.   Nothing.

Q.   And were you present when the fundraiser was being broadcast?

A.   I was.

Q.   What, if anything, was Mr. Guo's role in the fundraiser?

A.   He was broadcasting over the course of several hours.

Q.   And who were you with when you were at the fundraiser?

A.   Initially, at the office I was on the second floor.  And then -- so with a couple of colleagues.  And then I moved to the first floor, where the actual broadcast was happening.

Q.   Which colleagues were you with?

A.   I was with Melissa, Max, and Yvette.

Q.   And what, if anything, were you asked to do during the Rule of Law fundraiser on Guo Media?

A.   So we were asked to transfer money from one company or one entity to the other so that we could take screenshots of these money movements and broadcast them live on TV.

Q.   And what companies were you asked to move money from during the Rule of Law telecast?

A.   It was mainly Saraca and Golden Spring.

Q.   Who asked you to move money from Saraca and Golden Spring's accounts during the Rule of Law fundraiser?

A.   Yvette did.

Q.   What, if anything, did Yvette say was the purpose of moving money from Saraca and Golden Spring's accounts during the Rule of Law fundraiser?

A.   So the final purpose was to have these big amounts of money shown on screen so that people would see that others were donating, and we were able to solicit more money this way.

Q.   Where did the Saraca and Golden Spring money that you were

asked to move that day come from?

A.  I don't know.

Q.  And where were you asked to transfer the Saraca and Golden Spring money during the Rule of Law fundraiser?

A.  At the office.

Q.  I'm sorry.  Where were you asked to transfer those funds, from Saraca and Golden Spring to where?

A.  Oh, sorry.  To Rule of Law.

Q.  What was your reaction to the request from Yvette to move the Saraca and Golden Spring money during the fundraiser?

A.  I didn't want to do it.

Q.  Why didn't you want to do it?

A.  Because those transfers were not real; those were internal transfers.  It was not real money coming in, so I didn't agree with that.

Q.  And what was Yvette's response when you told her that you didn't agree with moving that money during the fundraiser?

A.  She saw that I was upset.  And she told me that, Okay, don't do it; somebody else is going to do it.

Q.  Did somebody else do it?

A.  Yes.

Q.  And who was that?

A.  Melissa and Max were doing it.

Q.  You said earlier that Rule of Law ultimately did nothing to help people in China.  What happened when the Rule of Law board

met?

A.  We only met once as a board meeting in January of 2020. And in that occasion, we discussed things to do or to be done. But prior to that, we never really sat down as board members.

Q.  Other than that in-person meeting, how often would you communicate with other Rule of Law board members?

A.  Not too often.

Q.  What, if anything, did the board vote on?

A.  Nothing really.

Q.  Did there ever come a time that you cast a vote as a board member in Rule of law?

A.  Yes.

Q.  What was Mr. Guo's title at Rule of Law?

A.  He was sponsor.

Q.  And what position did he have, if any, on the Rule of Law board?

A.  He didn't have any.

Q.  Who was in charge of the Rule of Law board?

A.  Boss was.

Q.  You said there came a time that you cast a vote as a board member.  What was the subject of that vote?

A.  It was in 2020.  So after COVID hit, there was like a proposal to purchase PPE and ship it to China.

Q.  You said there was a proposal to purchase PPE.  What is PPE?

A.   In this very case it was masks.

Q.   What kind of masks?

A.   N95 masks for COVID masks.

Q.   Whose proposal was it for Rule of Law to purchase N95 masks?

A.   Boss's.

Q.   And where in that proposal were the masks?  What was to be done with the masks in that proposal?

A.   So they were to be shipped to China.

Q.   How did you vote in that proposal?

A.   I voted no.

Q.   And, Ms. Maistrello, after you voted no on Mr. Guo's proposal for Rule of Law to ship N95 masks to China, what happened next?

A.   Our paralegal came --

          MS. SHROFF:  Objection.

          THE COURT:  Overruled.  You may answer.

          MS. SHROFF:  Your Honor, the government is eliciting hearsay.  We have an objection.

          THE COURT:  If you'll step up, please.

          (Continued on next page)

(At sidebar)

THE COURT:  So I need a ruling that co-conspirator hearsay could come in.  Isn't that what you're asking for?

MR. HORTON:  It comes in under that exception, your Honor; it comes in under the agency exception.  She's testifying about official business, the Rule of Law organizations.  Paralegal is a classic agent.

MS. SHROFF:  The paralegal is in a conspiracy with this witness and with Miles Guo to send PPE masks to China without having established how that falls within the scope of this conspiracy.

The statement they want to elicit is the paralegal asking this lady if it was, in fact, a mistake that the masks are being in China.  Through that statement they want the jury to conclude, of course, that there would be no reason to send these masks to China.  How the paralegal becomes a participant in this conspiracy is unclear to me; nor is it clear to me how this person becomes a member of that conspiracy.

THE COURT:  I don't know that they're holding her out as a co-conspirator.

Go ahead.

MR. HORTON:  I would just say set aside the co-conspirator exception for one moment.  Paralegal is an agent of the organization.  The paralegal is also asking a question. A question is not hearsay; it's not a substantive statement.

It's black letter that a question is not offered for its truth, so it's not hearsay.

Setting that aside, this fills in the context of testimony that's already been elicited that there was a proposal to a specific thing by a specific person, and there was a vote on that proposal. This detail is about what happened at the conclusion of that vote and it completes the story.

MS. SHROFF: Completing the story does not help the argument that it is hearsay. She is not an agent of Mr. Guo. It should be very clear. She is an employee of Rule of Law Foundation. They have, in fact, established that he had no position at Rule of Law. She's testifying as an agent of the Rule of Law Foundation. And therefore, if they want to bring this out when Rule of Law is part of a criminal action, then her statement would fall within a hearsay exception. Here, it would not.

MR. HORTON: Rule of Law is in the indictment.

Second thing is that she -- it's true that the witness testified that Mr. Guo had a title at Rule of Law; it's also true that she testified that despite that, he controlled it.

MS. SHROFF: She is not an agent of --

THE COURT: Here's my ruling: The objection is overruled.

(Continued on next page)

(In open court)

BY MR. HORTON:

Q. Ms. Maistrello, you said that Mr. Guo did not have a title at the Rule of Law Foundation?

MS. SHROFF: I believe she's asked and answered that question several times, your Honor.

THE COURT: We've already established that.

Move forward, please.

Q. Did Mr. Guo have a title at Saraca?

A. No.

Q. Did Mr. Guo have a title at Golden Spring?

A. No.

Q. Why not?

MS. SHROFF: Objection.

THE COURT: Overruled. You may answer.

A. I don't know.

Q. Did Mr. Guo have -- withdrawn.

Turning back to your vote against the proposal to send the N95 masks to China, you said that after you voted no, a paralegal asked you a question. What was the question that the paralegal asked you?

A. She asked me whether it was a typo.

Q. How did Rule of Law pay for those N95 masks that were sent to China?

A. With the money from Rule of Law.

Q.   Where did that money come from?

A.   From donations.

Q.   Ms. Maistrello, when else, if ever, did Rule of Law buy N95 masks with donor funds?

A.   In 2020, so when COVID hit.

Q.   And what did Rule of Law do with those other N95 masks that it bought with donor funds?

A.   So part of it went to boss's house, we kept a couple of boxes at the office, and another part of it was distributed to NYPD precincts around the city.

Q.   Why did you vote against the proposal to send N95 masks to China with donor money?

A.   Well, because N95 masks were manufactured and produced in China; so it didn't make any sense to me that we bought them from China and then we would ship them back to China.

Q.   And you said that masks were also sent to Mr. Guo's home. Which home was that?

A.   To the one in Connecticut.

Q.   And when were those masks sent to Mr. Guo's home?

A.   Around March of 2020.

Q.   Who made the decision to use Rule of Law donor money to send those N95 masks to Mr. Guo's home?

A.   Boss did.

Q.   You said that Rule of Law donor money was also used to send masks to the NYPD.  What role, if any, did you have in sending

those masks to the NYPD?

A.  I was asked by Yvette to draft a letter to accompany those masks.  The letter should have read something along the lines of:  This is a gift from Miles Kwok.

Q.  And what did you do when you were asked to write a letter saying that those masks were a gift from Miles Kwok?

A.  I told her that I could write the letter, but that I wouldn't sign it with the name of -- with boss's name.

Q.  And why wouldn't you sign it with Mr. Guo's name?

A.  Well, because it was not discussed with the other members of the board and it was not a direct gift from him, but it was -- those masks were paid with Rule of Law money.

Q.  And what, if anything, did Yvette say when you said you wouldn't write a letter that said those masks came from Miles Guo?

A.  She told me that I was being paid to execute orders and not to think.

Q.  How much were you paid a year when you worked for Mr. Guo?

A.  60.

Q.  What amount, if any, was listed as your salary on your offer letter?

A.  That was 90.

Q.  And what, if anything, explains the difference there?

A.  I was told by Yvette that the company preferred to pay a lower salary on a monthly basis and a higher bonus at the end

of the year, that it would top it up.

Q.   Including your bonus, what was your total pay at the end of the year?

A.   I believe my bonus on January of 2019 was 5,000.

Q.   And including that amount, how much did you make in a year working for Mr. Guo?

A.   65.

MR. HORTON:  May I have one moment, your Honor?

THE COURT:  Yes.

(Counsel conferred)

MR. HORTON:  Thank you, your Honor.

Q.   Ms. Maistrello, in your two years working for him, what, if anything, did Mr. Guo tell you about his lifestyle in China?

A.   In China, he had a lot of connections.  He knew a lot of people.  When he talked about China, he usually -- he was very proud of his achievements.  He would -- he would often talk about his hotel, he would talk about the staff there, he would talk about the design, how he designed it.  He was generally very proud of it.

Q.   And what did you understand Mr. Guo to mean when he told you about his connections in China?

A.   When he talked about his connections in China, he knew a lot people, and so he would sometimes talk about what these people did.  He knew a lot about them.

Q.   And who were these people?

A.   All sorts of people really.  Businesspeople, ministers.  He knew a lot of people.

Q.   And what do you mean by "minister"?

A.   So government ministers.  It could be the minister of the interior, minister for development, for education.  Various ministries.

Q.   You said he talked to you about his hotel in China.  What did he tell you about it?

A.   He described the hotel, the interior, the exterior; he talked about his staff there, how things were run.  He was generally very, very proud of it.

Q.   And what, if anything, did he tell you about the status of the hotel during the time you were working with him?

A.   Can you repeat the question?

Q.   Yes.  What, if anything, did Mr. Guo tell you about the status of his hotel in China during the time you were working with him?

A.   The status of the hotel while he was in the U.S.?

Q.   Yes.

A.   The hotel was still running.

Q.   What, if anything, did Mr. Guo tell you about when he came to the United States?

A.   Well, before coming to the United States, he went to Hong Kong, so he was there first.

Q.   And what, if anything, did he tell you about when he came

from Hong Kong to the United States?

A.   He left Hong Kong in 2015 and he relocated to New York.

Q.   And what, if anything, did Mr. Guo tell you he was doing in the period between when he got to New York in 2015 and when you started working for him a few years later?

A.   He was -- what he said is that he was preparing or getting ready for his fight against the Chinese government.

Q.   And what, if anything, did Mr. Guo tell you that getting ready meant?  What did that entail?

A.   Mainly, he broadcast.  That's what he did.

Q.   And what, if anything, Ms. Maistrello, did you observe about how Mr. Guo's lifestyle changed in the United States?

        MS. SHROFF:  Assumes facts not in evidence, your Honor.

        MR. HORTON:  I can lay a foundation for it.

        THE COURT:  All right.  One moment, please.

        Go ahead.  The objection is sustained.

        MR. HORTON:  Thank you, your Honor.

BY MR. HORTON:

Q.   Ms. Maistrello, other than the broadcasting, what actions, if any, did Mr. Guo take while you were working for him for that fight against the CCP?

A.   Nothing really, other than putting together people for his fight.

Q.   You said that Mr. Guo asked you to buy things -- withdrawn.

Ms. Maistrello, you said that you donated $500 to the Rule of Law Society. If you could do that again, would you have donated your money to Rule of Law?

A. With the knowledge I have today, no.

Q. And why not?

A. Because that money wasn't used for anything that I believed in really.

MR. HORTON: Can I have one moment, your Honor? I'm sorry, could I have just one moment, your Honor?

THE COURT: Yes, yes.

MR. HORTON: Thank you.

(Counsel conferred)

MR. HORTON: Thank you, your Honor.

No further questions.

THE COURT: Cross-examination.

MS. SHROFF: May I, your Honor?

THE COURT: You may.

MS. SHROFF: Thank you.

CROSS-EXAMINATION

BY MS. SHROFF:

Q. Ms. Maistrello, where did you go to college?

A. College in Rome, Italy.

Q. Okay. And after you studied in Rome, where did you study next?

A. In China.

Q.   And you were in China for almost five or more years; correct?

A.   From 2012 to 2017.

Q.   And you were working while you were in China; correct?

A.   Yes.

Q.   And you were there with your husband; correct?

A.   No.

Q.   Did you get married after you left China?

A.   Yes.

Q.   And what do you do for a living now?

A.   I work for Google.

Q.   I'm sorry?

A.   I work for Google.  Google.  Google Search.

Q.   You work for Google?

A.   Yes.

Q.   Okay.  And your husband is a professor; correct?

A.   That's correct.

Q.   And he's a professor at a university in New York; correct?

A.   NYU, yes.

Q.   And is it fair to say that when you accepted a job at Golden Springs, part of the reason you were hired is because you spoke Mandarin; correct?

A.   Yes.

Q.   Right.

     And you were first initially hired as a translator,

right?

A.   Yes.

Q.   And it came a point where there was some unhappiness with your level of translation, so they brought in outside translators to translate for meetings; correct?

A.   No.

Q.   Well, you didn't translate at formal meetings; correct?

A.   I did.

Q.   I really can't hear you.  You did not.  The answer is you did not, right?

A.   The answer is I did.

Q.   The answer is you did translate for formal meetings; correct?  That's your testimony?

A.   Yes.

Q.   Who's Una Wilkinson?

A.   She was hired as an external translator in late 2019.

Q.   Right.

     And she was brought in then to translate meetings where other people were present; correct?

A.   Yes.

Q.   Right.

     And you were not used during those meetings for your translation skills; correct?

A.   Correct.

Q.   Right.

Now, you testified that you were an employee of Golden Springs New York, right?

A.   Golden Spring, not springs.  But yes.

Q.   Okay.  Golden Spring New York, right?

A.   Golden Spring New York.

Q.   And there is an entity called Golden Spring Hong Kong; correct?

A.   Right.

Q.   And Golden Spring Hong Kong is the entity above Golden Spring New York, right?

A.   I don't know if it's above.

Q.   You don't know if it's above.

Are you aware as to where the funds into Golden Spring came from?

A.   No.

Q.   Do you know who put money into the Golden Spring New York account?

A.   Yes.

Q.   Who?

A.   Yvette did.

Q.   You think Yvette put her personal money into the Golden Spring New York account?

MR. HORTON:  Objection.

THE COURT:  Overruled.  You may answer.

A.   Not her personal money, no.

Q.  Okay.  My question was whose money was in Golden Springs New York?

A.  I don't know.

Q.  Okay.  And you certainly don't know whose money was in Golden Spring Hong Kong; correct?

A.  Correct.

Q.  And you don't know how many billions of dollars there was in Golden Spring Hong Kong; correct?

A.  I don't know.

Q.  And you don't know how many millions or billions or hundreds of thousands of dollars --

MR. HORTON:  Objection, your Honor.

Q.  -- that was in Golden Spring New York; correct?

THE COURT:  Overruled.  You may answer.

A.  Can you repeat the question, please.

Q.  Sure.  You do not know how many billions, millions or hundreds of thousands of dollars there was in Golden Spring New York; correct?

A.  I don't know.

Q.  Now, you heard about Mr. Guo when you worked in China; correct?

A.  Yes.

Q.  You worked for an oil company, you testified, right?

A.  That's correct.

Q.  And did you work there as a translator or did you work for

the oil company or something else?

A.   No, I was working as something else.

Q.   And what was that something else?

A.   I had several titles.  I left as director of communications.

Q.   Director of communications; correct?

A.   Yes.

Q.   And in your job in China, you socialized; correct?

A.   Yes.

Q.   You socialized with people who had money; correct?

A.   I socialized with people.

Q.   And some of them had money, right?

A.   That I don't know.

Q.   Some of them were rich; correct?

A.   I don't know.

Q.   Well, you went to parties, did you not?

A.   No.

Q.   You didn't go to a single party while you were in China?

A.   What do you mean by "party"?

Q.   A party, a social gathering, an event.

A.   I went to dinners.

Q.   Right.

          And you went to dinners with well-heeled people in your business field; correct?

          MR. HORTON:  Objection, your Honor.

THE COURT:  Overruled.  You may answer.

A.  I went to dinners with my colleagues.

Q.  Right.

And when you went to dinners with your colleagues, you had work-related dinners with people who were working with you in the oil company; correct?

A.  Yes, colleagues.

Q.  Right.

And at that time, you had heard of something called Pangu, right?

A.  Yes.

Q.  Tell the jury, please, what is Pangu?

A.  Pangu is a building in Beijing, in the capital.  It's a Dragon-shaped building that was built around the Beijing Olympics in 2008.

Q.  It's a huge building, right?

A.  It's quite big.

Q.  It's a hotel, right?

A.  Pangu Hotel is a hotel, yes.

Q.  Seven-star hotel; correct?

A.  It is called Seven Star Hotel.  In fact, on the world ranking it's five.

Q.  It's in the world ranking of five out of seven, is that your testimony?

A.  Yes.  So the name reads Seven-Star Hotel, but, in fact, due

to, I don't know, hotel star ranking, it is a five-star hotel.

Q.  It's a five-star hotel now.  Back then it was a seven-star hotel?

A.  I don't know about now.

Q.  Okay.  So you know who owned Pangu, right?

A.  When?

Q.  When you were living in China, who did you think owned Pangu?

A.  I did not know at that time who owned Pangu.

Q.  You did not know that Miles Guo's family owned Pangu?

A.  When I was in China, no.

Q.  Your testimony is when you were in China, you were unaware of the owner of the Pangu hotel?

A.  When I was in China, I knew he was a developer and he developed the Pangu Hotel, but I did not know who the owner was.

Q.  Okay.  So you at least knew he was the developer; correct?

A.  I knew that, yes.

Q.  Right.

And you testified on direct, did you not, that there came a time when Mr. Guo showed you pictures of his homes in China; correct?

A.  Yes.

Q.  And each home was affluent; correct?

A.  I saw one.

Q.  You only saw one home?

A.  I saw -- yes.  Correct.

Q.  And it was a humongous property; correct?

A.  I can't say.

Q.  It's a traditional Chinese property that has a courtyard; correct?

A.  Yes.

Q.  And alongside the courtyard are different homes; correct?

A.  Different structures, yes.

Q.  And each structure is for one part of the family; correct?

A.  Traditionally, yes.

Q.  And traditionally, that's the culture; each brother had a home around the courtyard.  Correct?

        MR. HORTON:  Objection, your Honor.

        THE COURT:  Overruled.  You may answer if you know.

A.  Traditionally, so parents live together with the son and the family.  And then other family members, if any, would be in the surrounding properties.

Q.  Right.  And he told you that's how he and his family lived in China; correct?

A.  Yes.

Q.  And when he told you that, he was talking nostalgically about his life in China when he lived there; correct?

A.  I wouldn't say nostalgically.

Q.  Really.  Was it with hatred?

MR. HORTON:  Objection.

THE COURT:  Overruled.  You may answer.

A.  He was just talking about it.

Q.  He was talking about his family, right?

A.  He was talking about his home.

Q.  Right.

And when he was talking to you about his home, he was in his office, right?

A.  Sometimes in the office, sometimes in his home.

Q.  And he was just having a regular employer/employee conversation with you, right?

A.  Yes.

Q.  Okay.  Your employment, am I correct, was with Golden Spring.

MS. SHROFF:  If I could just have her employment contract up, please.

Q.  Is that correct, ma'am?

A.  Can you repeat the question, please?

Q.  Sure.  You had an employment contract, did you not, with Golden Spring?

A.  Yes.

Q.  Okay.  And part of that employment contract -- the government showed it to you on direct, right?

A.  Yes.

Q.  And it's a one-page contract; is that correct?

MS. SHROFF:  It's GX B-871.  There you go.  Thank you so much.

Q.  If I could just have you take a look at the document, please.

MS. SHROFF:  May I also have it published for the jurors, please.

Q.  That was the contract; is that right?

A.  This was the offer letter.

MS. SHROFF:  Okay.  And if you could just scroll down, all the way down.

Q.  And you signed it; correct?

A.  Yes.

Q.  You signed it on February 13 of 2018; correct?

A.  Yes.

Q.  And the letter says, of course, that you've reviewed it, you agree to the terms and conditions, and then you signed it, right?

A.  Yes.

Q.  I mean, you read it, right?

A.  I did.

Q.  Okay.  Let's just go back up for a minute, okay?

You picked your own start date, I'm assuming, or you arrived at a start date that was convenient for you, which was February 19, right?

A.  I don't remember that.

Q.   Okay.  Your title was to be project assistant and interpreter, remember that?

A.   I can see that, yes.

Q.   Right.  I didn't ask you whether you saw it, I asked you if you remember that.  You remember that's what you were hired for; correct?

A.   I remember that I was hired as an interpreter.

Q.   Okay.  It says project assistant and interpreter, right?

A.   Yes.

Q.   Okay.  You didn't scratch out project assistant, right?

A.   I did not.

Q.   Okay.  And it said clearly that you were going to be employed by Golden Spring New York Limited, right?

A.   Yes.

Q.   And then it tells you a couple of bullet points down, the offer letter is for employment at will; correct?

A.   Yes.

Q.   And employment at will is explained to you in this document, right?

A.   Yes.

Q.   And, in fact, it tells you right there that you are free to terminate your employment with them as you see fit; correct?

A.   Yes.

Q.   Doesn't even tell you you have to give two weeks' notice; correct?

A.   It does not.

Q.   Right.

You could have walked out of that job any day you felt like, right?

A.   Yes.

Q.   Right.

You didn't like something that was going on, you could have left, right?

A.   Yes.

Q.   Okay.  And you met with these prosecutors how many times to prepare for your testimony here?

A.   I don't remember the number of times.

Q.   You don't remember the number of times that you met with them?

A.   No.

Q.   And do you remember who you met with?

A.   Yes.

Q.   Who did you meet with?

A.   Do you want the names?

Q.   Sure.

A.   Justin Horton, Ryan Finkel, Juliana Murray, and Micah Fergenson.

Q.   And the gentleman who asked you the questions today, he reviewed this document with you to prepare you, right?

A.   He showed me this document.

Q.  Well, he didn't just show it to you, right, he went over it with you, right?

A.  He showed it to me.

Q.  He didn't review the terms of the document with you?

A.  No.

Q.  You were first contacted by the government in August of 2023, remember that?

A.  I do.

Q.  And then you were contacted again on August 14, remember that?

A.  I don't remember the dates.

Q.  How about January 16th?

A.  I don't remember the dates.

Q.  January 25th?

        MR. HORTON:  Objection, your Honor.

        THE COURT:  Overruled.  You may continue.

A.  I don't remember the dates.

Q.  May 24th?

A.  I don't remember the dates.

Q.  May 15th?

        MR. HORTON:  Objection, your Honor.

        THE COURT:  Overruled.  You may continue.

A.  I don't remember the exact dates.

Q.  May 9th?

A.  I don't remember the dates.

Q.  May 20th?

A.  I don't remember the dates.

Q.  How about yesterday?  Do you remember yesterday?

A.  Yesterday I was here.

Q.  And you met with them, right?

A.  Yes.

Q.  With Mr. Horton sitting right there, the man who asked you questions, right?

A.  Yes.

Q.  How many hours?

A.  A few minutes.

Q.  Okay.  How about the day before?

A.  On Monday?

Q.  I'm sorry?

A.  Are you referring to Monday?

Q.  Am I referring to me?

A.  Monday, are you referring to Monday?

Q.  Yes.

A.  We met on Monday.

Q.  You met on Monday, right?  Monday was a federal holiday?

A.  It was.

Q.  Right.

        Where did you meet?

A.  We met at 26 Fed.

Q.  They picked you up at the train station?

A.  No.

Q.  Okay.  You got to 26 Federal Plaza and you sat down and met with them, right?

A.  Correct.

Q.  They went over your testimony?

A.  No.

Q.  No?  They didn't tell you what questions they were going to ask you?

A.  They asked me some questions.

Q.  Right.

They went through a whole series of questions, just like they did in court today, right?

A.  Not exactly.

Q.  Well, no, not exactly.  But they sat down and asked you a whole bunch of questions, right?

A.  They asked me questions.

Q.  Right.

And then they took notes, right?

A.  They did.

Q.  They took -- they showed you photographs, right?

A.  They showed me some photographs, yes.

Q.  They showed you the same photographs here today; correct?

A.  I don't remember exactly.

Q.  And did they then tell you how somebody like me would cross-examine you?

A.   They explained how it works, yes.

Q.   They did, right?   They told you what questions would come at you on cross-examination; correct?

A.   No.

Q.   They didn't tell you what questions would come, what you should anticipate at cross?

A.   They explained to me how it works.

Q.   Right.

They told you that a lawyer for Mr. Guo would ask you questions, right?

A.   Yes.

Q.   And they helped you prepare on how to answer, right?

A.   No.

MS. SHROFF:   Okay.   Let's see if we can pull up Government Exhibit 141.

Q.   They showed you this photograph, did they?

A.   One time they did.

Q.   Right.

I won't ask you which one of the many preps they showed you the photograph in, but they showed you this photograph, right?

A.   Yes.

Q.   And this photograph was taken by whom, ma'am?

A.   We had about seven, between photographers and videographers, for a photo shoot.

Q.  Right.

    And you were not the only person in the photo shoot, right?

A.  No.

Q.  There were other people in the photo shoot, right?

A.  Yes.

Q.  And it was a professional agency that took the photos, right?

A.  Yes.

Q.  And the photos was -- they were going to be used for a particular launch; correct?

A.  Correct.

Q.  And this was not unusual, right?

A.  A photo shoot only happened once, in fact.

Q.  It's only happened once while you were working there, right?

A.  Can you repeat the question?

Q.  Sure.  It only happened once, as far as you know, during the time you were working there, right?

A.  During the time I was working there it happened once.

Q.  Right.

    And you worked there, all told, how much?  About two years?

A.  More than two years.

Q.  How many more?  Two and a half years?

A.   Approximately.

Q.   Approximately two and a half years.

          And it's fair to say, right, you correct me if I'm wrong, you left because of medical reasons, right?

A.   That is correct.

Q.   Right.

          And you decided COVID was coming and you did not feel well, right?

A.   No.

Q.   Well, COVID was coming, right, when you quit?

A.   COVID hit in February of 2020.

Q.   Right.

          You think COVID hit in February of 2020 or March of 2020?

A.   It was either February or March.

Q.   And you quit the month after, right?

A.   Yes.

Q.   Okay.  And the reason you gave for quitting is because you thought microwaves had attacked you, right?  That's what you told someone at Golden Springs?

A.   No.

Q.   Okay.

          And you then stated that you had been hospitalized; is that correct?

A.   I was about to be.

Q. Right.

And Yvette responded to you being sick; correct?

A. What do you mean by that?

Q. She sent you flowers, did she?

A. No, she did not.

Q. She did not.

And did she extend your insurance coverage to help you while you were sick?

A. No, she did not.

Q. She did not provide you with COBRA benefits while you were sick?

A. COBRA benefits were included, but she did not extend those personally.

Q. She did not offer to you to extend them personally, is that your testimony here today?

A. Correct.

Q. Okay. And you were in touch, were you not, with other people who worked for Mr. Guo; correct?

A. When?

Q. Throughout your time after you quit working at Golden Springs, right?

A. A few people reached out to me.

Q. Right.

And they reached out to you making sure you were well, right?

A.   They asked me how I was doing.

Q.   Right.

And included in that list is Melissa; correct?

A.   Yes.

(Continued on next page)

BY MS. SHROFF:

Q.  A lawyer named Victor Cerda said you should get medical help and feel better, correct?

A.  I don't remember that.

Q.  Okay.  And Max Krasner reached out to you, correct?

A.  Yes, he asked me how I was.

Q.  And somebody named Dan Podhaskie also reached out to you, correct?

A.  Yes.

Q.  Now these are all people that you knew from working there, correct?

A.  Yes.

Q.  Okay.  So you knew——let's just go through the list. Yvette; is that right?

A.  Yes.

Q.  You knew Dan Krasner, correct?

A.  Max.

Q.  Max Krasner.

A.  Max Krasner.

Q.  Sorry.  I mix up names all the time.

        Max Krasner, correct?

A.  Yes.

Q.  Dan Podhaskie, correct?

A.  Yes.

Q.  You don't like Dan Podhaskie, right?

A.   That's not true.

Q.   Really?  Didn't you complain about him hitting on you one day?

A.   No, I did not.

Q.   You did not complain to Yvette Wang that he had hit on you during a trip to Washington, DC?

          MR. HORTON:  Objection, your Honor.  Asked and answered.

          THE COURT:  Sustained.

Q.   Did you take a trip with Dan Podhaskie to Washington, DC?

A.   No.

Q.   You did not take a trip with Dan Podhaskie to Washington, DC for business; that's your testimony?

          MR. HORTON:  Objection, your Honor.  Asked and answered.

          THE COURT:  Sustained.

Q.   It's fair to say you didn't like Dan Podhaskie, right?

          MR. HORTON:  Objection, your Honor.  Asked and answered.

          THE COURT:  Sustained.

Q.   Did you have a positive working relationship with Mr. Podhaskie?

          MR. HORTON:  Objection your Honor.  Asked and answered.

          MS. SHROFF:  I did not ask that.

THE COURT:  You may answer that.

A.  We had a good working relationship.

Q.  I'm sorry?

A.  We had a good working relationship.

Q.  What was your working relationship with him?

A.  We were colleagues.

Q.  Okay.  And as colleagues, how did you interact with each other?

A.  We talked.

Q.  Okay.  Talked about what?

A.  Work.

Q.  What work?

A.  Work at the office.

Q.  Work at the office.  What work at the office?

A.  He would come to me to ask for something, or whenever he needed a translation, I would help him out.  Work-related talk.

Q.  And you've testified at great length about your relationship with Yvette, correct?

A.  I didn't testify to great length.  I answered questions that I was asked.

Q.  Okay.  And Yvette's full name is—did you call her Yvette or did you call her Ms. Wang or how did you refer to her?

A.  I—I used her first name.

Q.  You called her Yvette, right?

A.  Her Chinese first name.

Q.   And was that?

A.   Yanping.

Q.   You referred to her as Yanping when you talked to her?

A.   Yes.

Q.   Okay.   But when you talked to the government about her, you called her Yvette, right?

A.   I don't remember.

Q.   Okay.   Well, let's talk about your interactions with her, okay?

You testified that she was the one who conducted the first job interview, right?

A.   Yes.

Q.   And when she interviewed with you, where were you located?

A.   The first interview happened at the Plaza Hotel.

Q.   Okay.   And no reason was given to you as to why the interview was at the Plaza Hotel, correct?

A.   No.

Q.   It was an everyday job interview, correct?

A.   It was a job interview.

Q.   Right.   And you had been sent there by somebody named Steve Weber, right?

A.   Yes.

Q.   And Steve Weber is a headhunter, correct?

A.   I don't know if he is today.   He was at that time.

Q.   Right.   And you filled out a job—or an application to get

a job through his company and that's what happened, right?

A.  He had reached out to me.

Q.  Right.  And you testified about the second interview was with Mr. Guo, correct?

A.  Correct.

Q.  Now when you went to that second interview, they didn't send you a memo or a notice saying you have a job interview with Boss, right?

A.  I don't remember that.

Q.  They told you you had a job interview and the interview was with a person named Mr. Guo, right?

A.  I don't remember the specific name they used.

Q.  So you don't remember if they referred to him as Mr. Kwok, correct?

A.  I don't remember, no.

Q.  You don't know if they referred to him as Mr. Guo, correct?

A.  I don't remember.

Q.  Is it fair to say that they did not refer to you──refer to him as Boss when they set up the interview?

A.  I don't remember.

Q.  Okay.  You sent out emails as part of your job, correct?

A.  Yes.

Q.  Internal emails, correct?

A.  Yes.

Q.  And external emails, correct?

A.   Yes.

Q.   And you sent out external emails to agencies, correct?

A.   What do you mean by agencies?

Q.   Businesses, right?  You sent out external emails to businesses, right?

A.   Yes.

Q.   Okay.  And you referred to Mr. Guo as either Mr. Guo or Mr. Kwok in your emails, correct?

A.   No.  I would never refer to him as Mr. Kwok.

Q.   Well, if you were emailing with that fancy place in Italy about the furniture, how would you refer to him?

A.   Mr. Guo.

Q.   Mr. Guo, right?  You wouldn't call him Boss in your email, right?

A.   I——I would definitely call him Mr. Guo.

Q.   Right.  And when you advertised your past job experience at Golden Spring, you don't say, I worked for Boss, right, you say, I worked for a man named Miles Guo, correct?

A.   I don't really advertise.  I never advertise his name.

Q.   How about on LinkedIn?  Do you say, I worked for a man named Boss?

A.   No.

Q.   Okay.  So the only time you consistently referred to him as Boss is when you're testifying here or when you are talking internally at the office, correct?

A.   So I would call him Boss in Chinese when I talked to him directly and Boss when I referred to him with my colleagues.

Q.   And this courtroom setting is neither you talking to Mr. Guo nor you talking to any of your colleagues, correct?

A.   That's correct.

Q.   This is a formal proceeding, correct?

A.   It is.

Q.   And you referred to him throughout your testimony as Boss, correct?

A.   Yes.

Q.   Okay.   Now if I could have you recall your testimony about Government Exhibit 102, please.

         This is Yvette, correct?

A.   It is.

Q.   Right.   And according to you, during your interview with Yvette, she, Yvette Yanping Wang, asked you what your connection was to CCP; is that right?

A.   Yes.

Q.   Right.   It's fair to say, right, you cannot be part of the CCP because you are simply not a Chinese national, correct?

A.   That's correct.

Q.   You cannot be part of the CCP without being a Chinese national, correct?

A.   That is correct.

Q.   And Ms. Wang of all people would most certainly know that

basic fact, correct?

A.   Yes.

Q.   There is no way Ms. Wang ever asked you during a job interview if you belonged to the CCP; isn't that correct?

MR. HORTON:  Objection, your Honor.

THE COURT:  I'll let you answer.  Go ahead.

A.   She never asked me if I was a party member.  She asked me if I knew people who were party members.

Q.   She asked you if you knew anyone who was a party member; is that your testimony?

A.   She asked me if I knew people who were party members.

Q.   Did she explain to you what "knew" means?

A.   What do you mean "knew"?

Q.   Well, I know you now.  That doesn't mean I actually know you, right?

MR. HORTON:  Objection, your Honor.

THE COURT:  Don't testify.

MS. SHROFF:  I'll move on.

Could you show her Government Exhibit 130, please.

Q.   You testified about this building, correct?

A.   Yes.

Q.   This is the Sherry-Netherland, right?

A.   It is.

Q.   They showed you this photograph during your preparation, correct?

A.   I don't remember.

Q.   Okay.  Mr. Guo lived on the 18th floor of this building, correct?

A.   Yes.

Q.   Penthouse, correct?

A.   Yes.

Q.   It's gigantic; isn't that true?

A.   It's big.

Q.   Right.  It has a recording studio in there, correct?

A.   What do you mean by recording studio?

Q.   A place from where he broadcast, correct?

A.   That was an office.

Q.   Right.  There was a—there was an actual office set up in that home, correct?

A.   Yes.

Q.   Okay.  Could you try and keep your voice up.  That would really help me out, please.

A.   I'll do my best.

Q.   Thank you.

        And there was security in that building, correct?

A.   The building has staff that lets people in and out.

Q.   Right.  24-hour staff that lets people in and out, correct?

A.   Yes.

Q.   You couldn't go up to that 18th floor unless somebody in that floor said you could come up, correct?

A.   Yes.  My name was on the list.

Q.   Exactly.  And the only reason you could go up is because your name was on that list, correct?

A.   Yes.

Q.   And that was because Mr. Guo wanted to have security for himself and his family, correct?

A.   The security apparatus belongs to the hotel.

Q.   And he's the one who puts your name on that security apparatus, correct?

A.   I don't know if he is the one, but my name was there.

Q.   Okay.  And is it fair to say that there is security apparatus in that building 24/7?

A.   I believe so.

Q.   And there's security apparatus in the garage 24/7, correct?

A.   That I don't know.

Q.   Okay.  And sitting here today, you have no idea, do you, whether or not he picked that building because he wanted to make sure that he lived in a building with 24-hour security; you simply don't know, correct?

A.   The reasons why he picked that building, he knows.

Q.   Exactly.  You don't know, right?

A.   I do not.

          MS. SHROFF:  You may take that down.  Thank you.

          If somebody could show her UK723, please.

Q.   You testified about this photograph, correct?

A.  Yes.

Q.  Okay.  Let's go through them.

You see Mr. Guo seated there, correct?

A.  I do.

Q.  And who is to his left?

A.  His wife.

Q.  And do you know for how many years she was held in prison because she was married to Mr. Guo?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Do you see the person seated to her left?

A.  I do.

Q.  Who is that?

A.  That's Yvette.

Q.  And do you know how many years Yvette was held in prison in China?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  And who is the person seated right across from Mr. Guo?

A.  His daughter.

Q.  Okay.  And his daughter now lives in the United States, correct?

A.  Until I was working, so in 2020, she was in the United States.

Q.  And you knew her from work, right?

A.   She came to the office.

Q.   She sent you a Christmas gift each Christmas, right?

A.   She bought Christmas gifts for all of us at the office.

Q.   Every employee, correct?

A.   I don't know if every employee got it.

Q.   Okay.  Mr. Guo got you gifts, right, while you worked for him?

A.   For Chinese New Year.

Q.   Your testimony is that the only gift you got from Mr. Guo was on Chinese New Year?

A.   Twice.  On two separate Chinese New Years.

Q.   Okay.  Do you remember getting a gift of an Hermès puffer jacket?

A.   Yes.

Q.   That was from him, right?

A.   Correct.

Q.   You accepted the gift, right?

A.   I did.

Q.   Where is Hermès, by the way?  Where is it located?

A.   The headquarters, you mean?

Q.   No.  I mean just the store.

         MR. HORTON:  Objection, your Honor.

         THE COURT:  Overruled.  If you know where it is, let us know.

A.   On Madison.

Q.  Madison and what?

A.  I don't remember the cross street.

Q.  67th?

A.  I don't remember.

Q.  How much do you think that puffer jacket cost?

A.  I don't know.

Q.  You'd agree with me, would you not, ma'am, that Hermès is a very high-end store, correct?

          MR. HORTON:  Objection, your Honor.  401.

          THE COURT:  Overruled.  You may answer.

A.  Can you repeat the question, please.

Q.  Sure.  You would agree with me, would you not, that Hermès is an extremely high-end store?

A.  I agree.

          MS. SHROFF:  You may take that down.

Q.  You now you testified, did you not, on direct about a store—and forgive me, I don't remember the name.  Promemoria, or something like that?

A.  Promemoria?  Yes.

Q.  Correct.  Do you remember that store?

A.  They don't have a store here.

Q.  It's a company in Italy, correct?

A.  Correct.

Q.  It's a supplier, right; supplies leather, correct?

A.  It's a furniture company.

Q.  And you can call them and get yourself some very expensive furniture, correct?

A.  Anybody can call them, yes.

Q.  Right.  Right.  And you placed several orders with that company, correct?

A.  Yes.

Q.  Right.  And they were orders for furniture, correct?

A.  Yes.

Q.  And you would place the order, correct?

A.  Correct.

Q.  Who chose it, the furniture?

A.  Boss did.

Q.  Mr. Guo, right?

A.  Yes.

Q.  Okay.  And Mr. Guo would choose the furniture and he'd ask you to place the order, correct?

A.  Yes.

Q.  Okay.  And you would place the order, right?

A.  I would.

Q.  Sometimes he'd change his mind about the order, right?

A.  All the time.

Q.  All the time; isn't that true?

A.  Yes.

Q.  Very frustrating, correct?

A.  It was part of the job.

O5T1GUO4                    Maistrello - Cross

Q.  It was part of the——frustrating part of the job for you, right?

A.  It was part of the job.

Q.  He would pick something, have you place the order, and then have you cancel it, correct?

A.  That happened.

Q.  He would change his mind, correct?

A.  Yes.

Q.  He did that with that place, whatever it's called, Chateau Ridge or something, right?

A.  He initially wanted to purchase it and then he didn't.

Q.  Right.  And you spent a lot of time testifying about, you know, that it was a palace and it had art and it had all of this stuff.  End of the day, he never bought it, correct?

A.  He did not.

Q.  Now let's talk about the Brioni suits that you ordered for him, according to you.  Did you order them for him?

A.  Yes.

Q.  Okay.  Do you know how long he had been a customer of Brioni, whether it had been for a decade or two decades?

A.  Close to two decades.

Q.  Two decades, right?  It's 20 years?

A.  Approximately.

Q.  Right.  So they knew him, correct?

A.  They did.

Q.   Right?  Because they'd been doing his suits for 20 years, right?

A.   They knew him.

Q.   Okay.  Who paid his bills 20 years ago; do you know?

A.   I do not.

Q.   Who paid his bills 10 years ago; do you know?

A.   I do not.

Q.   Who paid his bills for the suits now; do you know?

A.   You mean today?

Q.   Well, today you certainly don't know because you don't work for him anymore, right?

A.   That's correct.

Q.   Right.  So when you worked for him, who paid those bills?

A.   Golden Spring.

Q.   Golden Spring belonged to whom?

     Sitting here today, you don't know whose money was Golden Spring, right?

A.   I know the name of the president, I know the name of the chief operating officer.

Q.   Okay.  You don't know whose money went in there, right?

A.   I do not.

Q.   Right.  And certainly you were never on the board when Rule of Law Foundation put any money in there, correct?

A.   What do you mean by that?

Q.   You don't know any instance when any money from Rule of Law

Foundation went into Golden Spring, correct?

A.  I don't know that money from Rule of Law ever went to Golden Spring.  I don't know.

Q.  I just wanted to make sure.

Now you said that they paid all of this money for his suits, Golden Spring New York did, correct?

A.  Yes.

Q.  Okay.  And they paid by what, check or transfer; do you know?

A.  It was usually a check.

Q.  Okay.  But you don't know, right?

A.  I do.

Q.  You do know, that it was paid by check.

A.  Yes.

Q.  Who was the check made out to, Brioni New York, Brioni France, where?

A.  Brioni New York on Madison.

Q.  Okay.  Now you also testified about cars, correct?

A.  Yes.

Q.  This man doesn't know how to drive, right?

A.  He knows how to drive.

Q.  You've seen Miles Guo drive a car.

A.  Yes.

Q.  On the streets of New York.

A.  Just outside of New York.

Q.  Outside of New York.  Your testimony is you know this man to have driven a car outside, on a street.

MR. HORTON:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  Do you know if he has a driver's license?

A.  When I worked there, he did not.  He only had a Hong Kong driver's license yes.

Q.  He didn't even have a learner's permit, right?

A.  Do you mean a US learner's permit?

Q.  Yes, ma'am.

A.  At that time he did not.

Q.  Okay.  He was driven to work, correct?

A.  Yes.

Q.  He was driven from work, correct?

A.  That's correct.

Q.  And he was driven everywhere he went; he never drove a car ever on a New York City street, correct?

A.  He did once.

Q.  Okay.  Putting aside this once that you keep referring to, he was driven back and forth everywhere he went, correct, while you worked for him?

MR. HORTON:  Objection, your Honor.  Asked and answered.

MS. SHROFF:  I'll move on, your Honor.

THE COURT:  You may answer.

Q.  True?

A.  He was driven.

Q.  Okay.  And you talked about how he was talking about some Rolls Royce that he had in China, correct?

A.  Yes.

Q.  He never got that Rolls Royce from China to the United States, correct?

A.  Not that I know of.

Q.  I'm sorry.  What?

A.  Not that I know of.

Q.  Exactly.  He would talk about it and then he would just abandon the project, correct?

A.  It just wasn't possible to import that car so——

Q.  Right.  And same for the Lamborghini, right?  No Rolls Royce or Lamborghini was ever imported here, correct?

A.  Not to my knowledge.

Q.  You could only testify to your knowledge.  So the answer is no?

A.  The answer is no.

Q.  Okay.  Now you also testified about a person named Hank, correct?

A.  Yes.

Q.  Now Hank came from China with Mr. Guo, correct?

A.  That's correct.

Q.  Right.  And Mr.——and Hank speaks absolutely no English,

O5T1GUO4                    Maistrello - Cross

correct?

A.   He does not.

Q.   Right.  And Hank used to live with Mr. Guo and his family, correct?

A.   They lived separately.

Q.   You think Hank lived separately from the Guo family.

          MR. HORTON:  Objection.  Asked and answered.

          THE COURT:  Sustained.

Q.   You testified about Mr. Guo's son named Mileson, correct?

A.   Yes.

Q.   You've never personally met Mileson, correct?

A.   I did.

Q.   Where did you meet him?

A.   At the office.

Q.   At the office where?

A.   800 Fifth.

Q.   And what year was that?

A.   The first time I met him was 2018.

Q.   And when was the second time you met him?

A.   Can you repeat the question, please.

Q.   When was the—take your time.

A.   Thank you.

Q.   You're welcome.

          When was the second time?

A.   In 2019.

Q.   And you haven't met him since, right?

A.   I believe the last time we met was 2019.

Q.   Okay.  And he didn't ask you to buy him any motorbikes, right?

A.   Not directly, no.

Q.   The question was whether Mileson asked you to buy any motorbike.  The answer is no, correct?

MR. HORTON:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.

Q.   Mr. Guo didn't ask you to buy any motorbikes for his son, correct?

MR. HORTON:  Objection.

THE COURT:  You may answer.

A.   He did.

Q.   He asked you to buy motorbikes for his son?

A.   One specific——

Q.   I cannot hear you.

A.   One, one time.

Q.   One time.  And you never bought the bike, right?

A.   I believe he bought it himself.

Q.   I asked you if you bought the bike.

A.   I did not.

Q.   Okay.  And when you say you believe he bought the bike, you actually do not know if he ever bought a bike for his son,

correct; that's just your belief?

MR. HORTON:  Objection, your Honor.

THE COURT:  You may answer as to whether you know or you believe.

A.  I do not know.

Q.  You would ask Yvette for payment, correct, on things that Mr. Guo wanted you to buy?

A.  For bigger amounts, yes.

Q.  And it would be Yvette who would have to authorize the payments, correct?

A.  Yes.

Q.  You had no ability to authorize any payment from any entity, correct?

A.  No, I only had a company's credit card.

Q.  Right.  My question was:  You had no ability to authorize payment at all, correct?

A.  Authorize?

Q.  Yes.

A.  No.

Q.  You could not say, Golden Spring is going to pay this bill, correct?

A.  It depended on the amount.

Q.  Your testimony is that if it was a small amount from Golden Spring that was being spent, you could have that paid through Golden Spring?

MR. HORTON:  Objection, your Honor.  Mischaracterizes her testimony.

THE COURT:  Overruled.  You may answer.

A.  I placed orders through my company's credit card, so for smaller amounts, yes.

Q.  You would place the order, correct?  Right?

A.  Yes.

Q.  The bill would go to Golden Spring, correct?

A.  Yes.

Q.  You don't know if it was paid or not, right?

A.  Well, payments go through immediately, through the credit card.

Q.  You don't know if it was paid or not, correct?

A.  I'm not——

MR. HORTON:  Objection, your Honor.

THE COURT:  Are you asking whether a transaction was consummated or whether the credit card bill was paid?

MS. SHROFF:  Whether the credit card bill was paid.

A.  The credit card bill was always paid because I had the money available.

Q.  You mean the Golden Spring credit card has the money available.

A.  Yes.

Q.  It's not your credit card, right?

A.  My corporate credit card.

Q.  Not your credit card, correct?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Could you buy yourself something off that credit card?

A.  Personal expenses?

Q.  Yes.

A.  No.

Q.  Okay.  Now you've talked about several entities while you were testifying on direct, correct?  We've already covered Golden Spring, right?  So let's talk about Saraca.

Do you have any understanding what Saraca was?

A.  What I knew about Saraca was that all the expenses related to tech or media went to Saraca.

Q.  Okay.  You don't know if Saraca was a holding company, correct?

A.  I do not.

Q.  You don't know if it's a private company, correct?

A.  I don't.

Q.  You don't know where it's licensed or incorporated, correct?

A.  I do not.

Q.  And then they asked you all these questions about some other company called Genever, correct?

A.  Genever?

Q.  Sure.  Do you remember your testimony about that?

A.   Yes.

Q.   Okay.  You don't know anything about that company either,
right?

A.   Structurally, no.

Q.   Correct.  You don't know who owns that company, correct?

A.   I do not.

Q.   You don't know if there's a board of directors of that
company, correct?

A.   I don't.

Q.   And you don't know where the money into that company comes
from, correct?

A.   I do not.

Q.   Only reason you could testify about it is because you
talked to the government about it in your preparation, correct?

          MR. HORTON:  Objection.  Objection, your Honor.

          THE COURT:  Overruled.  You may answer.

A.   Can you repeat the question, please.

Q.   It's okay.  I'll move on.

          Now you testified, did you not, that there were times
when you accompanied Mr. Guo and he would decide to purchase
something, correct?

A.   Accompany him where?

Q.   Well, you two worked together, correct?

A.   I did not say that.

Q.   Well, didn't you testify on direct that whoever was in

front of him would pay, right?

A.  What I said is whenever Boss wanted to buy something—it could be a TV, it could be a screen, it could be a monitor, it could be a camera—the person Boss had in front of him in that very moment, he would ask them.

Q.  Okay.  He would ask them to pay, correct?

A.  He would ask them to buy.  He wouldn't use the word "pay."  He would just say buy it.

Q.  Right.  And 30 minutes later he may change his mind, correct?

A.  He may.

Q.  Okay.  And when that happened, Golden Spring would pay, correct?

A.  Well, when he changed his mind, if he changed his mind, maybe there was no need to purchase at all.

Q.  Okay.  Fair enough.

        Now one of the other people you testified about on direct was a person named Cao, correct?

A.  Oh, Cao?

Q.  Right.  Is that right?

A.  That's correct.

Q.  Okay.  And you testified—

        MS. SHROFF:  If you could just show her UK728, please.

Q.  You testified about this photograph, correct?

A.  I did.

Q.  Okay.  Do you know when this photograph was taken, by the way?

A.  When?

Q.  Yes.

A.  I don't.

Q.  Do you know who took it?

A.  I do not.

Q.  You didn't take it, right?

A.  I didn't.

Q.  So the only way you could testify about this photograph is because they showed it to you during your preparation?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  Did you see this photograph ever before the government showed it to you?

A.  No.

Q.  No, right?  What's the answer?

A.  I've never seen——

MR. HORTON:  Objection.

THE COURT:  Asked and answered.  Let's go.

Q.  You've never seen it before, right?

MR. HORTON:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.

Q.  This photograph is taken at Chinese New Year, right?

MR. HORTON:  Objection.

THE COURT:  You may answer.  If you know.

A.  I don't know.

Q.  Look at that red envelope in their hands.  That's the envelope given out at Chinese New Year, correct?

A.  It could be.

Q.  Right.  And that's the traditional pose, right, when you're before your elders in Chinese culture?

A.  Yes.

Q.  Okay.  So that's a young man in a traditional pose getting the red envelope from his elders, correct?

MR. HORTON:  Object to the testifying, your Honor.

MS. SHROFF:  It's a question.

THE COURT:  You may answer.

A.  You see exactly what you see, so you see two people sitting on a chair and another person kneeling.

Q.  And both people having red envelopes in their hand, right?

A.  They do.

Q.  Right.  How many years did you live in China?

A.  Five.

Q.  Would you say you have some familiarity with the Chinese culture?

A.  Yes.

Q.  And could you tell me what that experience of yours with Chinese culture would lead you to conclude about this

photograph.

A.   The first thing I would say is respect.

Q.   Mm-hmm.

          MR. HORTON:   Is there a question pending?

          MS. SHROFF:   Well, her answer was "the first," so I assumed she had a second point.

          THE COURT:   Is there anything else you want to say?

          THE WITNESS:   There isn't.

Q.   And you testified about this gentleman who is seated on his—I guess whatever posture that is, his—what is his American name, by the way?

A.   Wayne.

Q.   Okay.   And you testified that Wayne is dating Mr. Guo's daughter; is that correct?

A.   Right now, I don't know.

Q.   Well, when you were part of the employment circle, he was dating, according to you, Mr. Guo's daughter, correct?

A.   Yes.

Q.   And he did work for the company, correct?

A.   For a period of time, yes.

Q.   He painted—

          MS. SHROFF:   You can take that down.   Thank you.

Q.   You testified that he painted, moved furniture, and did all kinds of handyman work, correct?

A.   In 2018, yes.

Q.  Right.  And what about in 2019?

A.  He went back to school.

Q.  Right.  And where did he go to school; do you know?

A.  I don't remember.

Q.  Do you remember if it was Baruch College?

A.  I don't remember.

Q.  Do you remember what he was studying?

MR. HORTON:  Objection, your Honor.

THE COURT:  You may answer, if you remember what he was studying.

A.  I don't remember.

Q.  He was polite to you, correct?

A.  He was.

Q.  He drove Mr. Guo around, correct?

A.  Correct.

Q.  And when Mr. Guo was being driven around, is it fair to say that there would always be two cars?

A.  No.

Q.  No?  Could you describe for any one of—could you describe for the jury what a car would look like in which he was being driven around?

A.  There were several cars.

Q.  And each one of them had tinted glasses, correct?

A.  Not each one.

Q.  Not each one.  Okay.  And when he was driven around, you

said he had two teams, right?  According to you, he had a Chinese security team and an American security team; that was your testimony?

A.  Yes.

Q.  And it was your testimony that you really thought, in your opinion, that it was not a security team at all, correct?

A.  That's correct.

Q.  Okay.  So let's start with the American team, okay?

Do you know how many people were on the American team?

A.  The number varied 'cause people were coming and going.

Q.  So you don't know.

A.  It could be as little as two, up to six—

Q.  You don't know if there were ex-NYPD employees or not, correct?

A.  I know.

Q.  You do know.

A.  I do.

Q.  Okay.  And how many were ex-NYPD employees?

A.  All of them.

Q.  All of them were ex-NYPD employees, correct?

A.  Yes.

Q.  Let's move to the Chinese team, as you called it.  And you said he was closer to them, correct, according to you?

A.  Yes.

Q.  That man is not fluent in English, right?

A.  He became fluent.

Q.  Really.  You think Mr. Guo spoke English fluently in 2018?

A.  Not in 2018.

Q.  How about 2019?

A.  A lot better.

Q.  A lot better, right?  And you're claiming under oath that he went from 2018 of not speaking English to fluency in 2019?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  He spoke to you, when he spoke to you, in Mandarin, correct?

A.  Yes.

Q.  He never spoke in English even though you are bilingual, correct?

A.  He never spoke English to me.

Q.  Right.  And when he spoke to his daughter, who also speaks English, he spoke in Mandarin, correct?

A.  That's correct.

Q.  When he spoke to his wife, he spoke in Mandarin, correct?

A.  Yes.

Q.  And when he got messages in English, he would come to you and play them and tell you to translate, correct?

A.  Yes.

Q.  He did not know how to email, correct?

A.  That I don't know.

Q. Did you ever get a singular email from this man, in all the time you worked for him?

A. No.

Q. And when he spoke to people around him, he spoke in Chinese, right?

A. He spoke Chinese to Chinese people.

Q. The reason you were hired as a translator is because he didn't speak English, correct?

A. In 2018, yes, correct.

Q. And you continued to work, according to you, for him as a translator in 2019, correct?

A. That's correct.

Q. Okay. Now you also testified, did you not, about a person called William Je? Am I pronouncing that correctly?

A. Yes.

Q. Okay. And you liked William Je, right?

A. I did.

Q. You had a good working relationship with him, right?

A. He was not around a lot, but whenever he was at the office, yes.

Q. You liked talking to him, right?

A. Yes.

Q. And he talked to you, correct?

A. Yes.

Q. And he's the one who invited you to be on some board,

correct?

A. Yes.

Q. Mr. Guo didn't invite you, right?

A. That's correct.

Q. Okay. And Mr. Je is the one who talked to you about what you would be doing on the board, correct?

A. Yes.

Q. And you had a choice, you could have been on the board, correct?

A. Correct.

Q. Or you could have told him and said, gee, I'm not interested, correct?

A. That is correct.

Q. Okay. And you decided that William Je's offer sounded interesting to you so you accepted and you were on the board, correct?

A. Yes.

Q. Okay. Mr. Je didn't tell you what he wanted you to do on the board, correct?

A. He briefly mentioned investments, but nothing more than that.

Q. Okay. And he didn't tell you anything about the investment, correct?

A. He did not.

Q. He didn't tell you what type of investments they were,

correct?

A.   That's correct.

Q.   He didn't know if the investments were coming from Abu Dhabi, correct?

A.   Not specifically, correct.

Q.   You didn't know if the investments were in the billions of dollars; according to you, you knew nothing, correct?

         MR. HORTON:  Objection.

         THE COURT:  Sustained.

Q.   Did you know if the investments were in the billions of dollars?

A.   I do not.

Q.   And you decided you were going to be on the board anyway, correct?

A.   That's correct.

Q.   Okay.  And William Je did email people, right, unlike Mr. Guo?

A.   Can you repeat the question.

Q.   Sure.  William Je emailed about questions he had, right?

         MR. HORTON:  Object to form.

         THE COURT:  Did he email you?

A.   Possibly.

Q.   Well, you knew his email address, right?

A.   Yes.

Q.   Okay.  You didn't email him and ask him any questions about

serving on this board, right?

A.  No.

Q.  Okay.  And you decided that you were going to go ahead and serve on the board, right?

A.  Yes.

Q.  Okay.  And the only reason you decided you didn't want to serve on the board is because that company got civilly sued, correct?

A.  I was not aware of that at the time.

Q.  Right.  But once you became aware, you were like, I'm out, right?

A.  I heard something, so I didn't have the details, but I heard—if you want to call them rumors.

Q.  Right.  And when you heard, you wanted out, right?

A.  That's correct.

Q.  Okay.  And nobody stopped you, right, from leaving the board?

A.  No one did.

Q.  Nobody said you have to stay on, correct?

A.  That's correct.

Q.  Not Yvette, correct?

A.  That's correct.

Q.  Not Guo, right?

A.  Right.

Q.  And certainly not William Je, right?

A.   That's correct.

Q.   Okay.  You continued to work there, correct, at Golden Spring?

A.   After——

Q.   Resigning from the board, you continued to work, right?

A.   Yes.

Q.   Zero repercussions to stepping off from that board, right?

A.   That is correct.

Q.   Okay.  Now you testified that you had responsibility at the Rule of Law Foundation, correct?

A.   I was president and treasurer.

Q.   I'm sorry?

A.   I was president and treasurer of Rule of Law Society.

Q.   Okay.  And what about Rule of Law Foundation, or are you using them interchangeably?

A.   No.  That was a separate entity.

Q.   So let's talk about Rule of Law Foundation, okay?  For them, did you take a trip to France?

A.   Not——so I took a trip to France, but not for Rule of Law Foundation.

Q.   And who did you take the trip for?

A.   I took the trip because Boss asked me to.

Q.   Mr. Guo asked you to.

A.   Correct.

Q.   And he didn't ask you alone, right, to take a trip?

A.  I was not alone.

Q.  Right.  There was an entire team that was put together, correct?

A.  Yes.  Yes.

Q.  Okay.  And the team that was put together consisted of you, right, because you spoke several languages, I'm assuming, correct?

A.  I was one of them, yes.

Q.  Right.  And who else was on that team, by the way?

A.  There were four other people.

Q.  Okay.

A.  Four other security guys.

Q.  Four other security guys; is that how you would describe them?

A.  That's what we called them.

Q.  That's what you called them, right?

A.  Four colleagues.

Q.  Right.  And these were all experienced ex-NYPD officers, correct?

A.  They were ex-NYPD officers.

Q.  Did you know them to not be experienced NYPD officers?

A.  I can't judge as to they are experienced or not.

Q.  Well, you talked to them, right, according to you on direct testimony?

A.  I did.

Q.  Right.  And they told you about their experience as NYPD officers, correct?

A.  Sometimes.

Q.  Right.  And they told you what they did when they were with the NYPD, correct?

A.  They said some things.

Q.  Right.  And they told you they were investigators with the NYPD, correct?

        MR. HORTON:  Objection.

        THE COURT:  Overruled.  You may answer.

A.  I believe some of them were detectives.  I don't remember their exact titles.

Q.  And these detectives accompanied you on the trip to France, correct?

A.  We went together.

Q.  Right.  And what was the trip to France for?

A.  So in the summer, in July of 2018, a Chinese national died in France.  Boss, Mr. Guo, believed that it was not an accident; he believed that he may have been murdered.  And so he asked us to go there and find out what happened.

Q.  And Mr. Guo thought he had been murdered by the CCP, correct?

A.  Yes.

Q.  Okay.  And you went on this investigative trip, correct?

A.  Yes.

Q.  You, four detectives, and then you went to France and you
met a lawyer in France, correct?

MR. HORTON:  Objection.  401.

THE COURT:  You may answer.

A.  I don't remember.

Q.  You don't remember the French lawyer?

A.  I don't re——

MR. HORTON:  Objection.

MS. SHROFF:  I'm sorry.  I didn't hear.

MR. HORTON:  Objection.  The question has been asked
and answered.

THE COURT:  Sustained.

Q.  And there was a whole investigation into the issue of
whether this man was killed, correct?

MR. HORTON:  Objection to form.

THE COURT:  Could you step up, please.

(Continued on next page)

(At the sidebar)

MS. SHROFF:  Sorry about that, your Honor.  I'm having a little trouble today with the hearing, so I will apologize. I really am.

THE COURT:  No need to apologize.

Why are we in France?

MS. SHROFF:  I think she can hear me.

Thank you.

THE COURT:  Okay.  So——

MS. SHROFF:  I think we're in France because she says Rule of Law Foundation and Society didn't do any work, so I'm trying to show they did do work.  They investigated the death of somebody they believed was killed by the CCP, so that the truth would be told to the world.  That's why.  And she took the trip.  She translated on the trip.  And I'm pretty sure——and Mr. Schirick can jump in——that the government is going to seek to introduce an entire video on the subject.

MR. SCHIRICK:  Well, it's the Bannon video.

MR. HORTON:  So the problem with the argument, your Honor, is that she didn't testify——she didn't testify that this trip was done under the auspices of Rule of Law.  That's the proposition that they want to establish, but it's not there. And everything about this trip, all of the details that we're hearing, are hearsay.

THE COURT:  Did you ask the question whether she went

in connection with Rule of Law Foundation?

MS. SHROFF:  I asked her if she——I'm pretty sure I did, and I asked her who paid, and she said Miles Guo paid. And anyway, it doesn't matter if it's Rule of Law Foundation or Miles Guo paid.  I'm not introducing any of it for whether this man was or was not murdered.  I really do not care about this trip.  There is no hearsay problem.  And I'm not asking about any statements she made.  I'm asking about what she actually did in France.  That's——so——

THE COURT:  If your claim is that the Rule of Law Foundation carried out work in France——

MS. SHROFF:  Mr. Guo also carried out work in France. Mr. Guo had an interest in his capacity to show that what the CCP was doing worldwide was problematic, and Mr. Guo worked towards that.  It doesn't matter——

THE COURT:  So these are Mr. Guo's good acts.

MS. SHROFF:  No, not good.  Not good.  Good is immaterial.

Sorry.  Go ahead.

MR. SCHIRICK:  Your Honor, the factual narrative is that this investigation precedes the founding of the Rule of Law Foundation, and it's the work that they started that they talked about during that launch video that the government introduced into evidence yesterday, and the defense ought to be able to argue that Mr. Guo, using his own resources, using

O5T1GUO4                    Maistrello - Cross

Golden Spring's resources, began the work of the Rule of Law Foundation even before its founding.  That's what this goes to. It's relevant to the origin story of the Rule of Law——

MR. HORTON:  Your Honor, if I may.  I'm——I am confused, and I think the jury might be too.  I heard Ms. Shroff say at the beginning of the sidebar that this was a Rule of Law investigation and that's what——

MS. SHROFF:  It was Rule of Law——

MR. HORTON:  Excuse me, Ms. Shroff.  I didn't interrupt you.

I heard Ms. Shroff say at the beginning of the sidebar that this was a Rule of Law investigation and then I just heard Mr. Schirick say it preceded the Rule of Law.  It's confusing. The jury is going to be confused about why this testimony is being elicited.  I think that's reason enough to not elicit it.

MS. SHROFF:  Your Honor, that's the pre——as he put it, predecessor, predecessor steps to the formation of the Rule of Law Foundation.  This is the first step.

THE COURT:  So once the Rule of Law Foundation was formed, did they do anything in connection with an investigation in France?

MR. SCHIRICK:  That is the subject of the Bannon video which is launch——the announcement of the launch of the Rule of Law.  It is a direct factual connection.  They talk about it extensively in the Bannon video that the government put into

evidence.

THE COURT:  But did they do anything?

MS. SHROFF:  They ran the investigation.  And then they publicized what they believed happened as a result of their findings of the investigation.  I really——

THE COURT:  So you're saying after the founding of Rule of Law Foundation, there was work in connection with the French investigation; that's your representation?

MS. SHROFF:  That's not what I'm saying.  Not——there was——I wouldn't call it the French investigation.  What I'm saying is, this guy was murdered.  Mr. Guo took his own money, started this investigation, and as a result of the start of this investigation, it morphed into the establishing of the Rule of Law Foundation, which they claim in the indictment is part and parcel of the racketeering enterprise which is an entity formed for no reason other than to fleece money, and what we're trying to show is, this is how it started, this is how Rule of Law got developed and what else it did.  It's a natural progression.  And also it is because they are putting in the video of Mr. Bannon——

THE COURT:  Does Mr. Bannon say that the Rule of Law Foundation is undertaking work having to do with this investigation in France?

MR. KAMARAJU:  Yes.

MR. SCHIRICK:  Yes.

MR. KAMARAJU:  But also, your Honor, the witness on direct testified about preparatory steps taken to start the Rule of Law.  That's why they elicited it, when they had that discussion, in order to elicit her statement that Mr. Guo supposedly said, we're going to need a hundred million dollars.  So again, they already brought the preparation into it.  This completes the narrative.

MR. HORTON:  First, her testimony was that she undertook this preparation in September, consistent with the representation, one of the two representations that this event predated the Rule of Law, not that it originally started that it was a Rule of Law investigation.  But I think more fundamentally, that this is a fraud case and this is now coming in as he had this money before that he used on this investigation to do good works looking into a murder.

MS. SHROFF:  Not good works.

MR. KAMARAJU:  I'm sorry.  It's not a fraud case, it's a racketeering case, at their insistence.  Your Honor's already ruled on this, when your Honor rejected their motion *in limine* to preclude the defense from talking about any of the positive activities of these organizations.  Under RICO law, they have to prove continuity, and if the organization was a legitimate enterprise, then the test for continuity is different.  So in any speaking of the law, the fact that these institutions had legitimate origin stories and had legitimate business afterward

is directly relevant to the racketeering charges that the government chose to bring.

MS. SHROFF:  It's not to the——

MR. FINKEL:  May I respond, your Honor.  At most, there might be a question, which Ms. Shroff has already elicited, about whether she traveled to France for an activity, but what Ms. Shroff is endeavoring to do, it appears, is to get into the details of an investigation about a murder of someone who's completely irrelevant to anything alleged in the indictment, that happened in Europe.  So I think we're very far afield of what the gravamen of this entire trial is about.  And while there might be a probative purpose for activities that either predated or are part of the Rule of Law——which, by the way, this witness says it wasn't under the Rule of Law.  But in any case, your Honor, that's already been elicited, and it's time to move on.  And that's our argument.

THE COURT:  What more is it that you want to elicit?

MS. SHROFF:  I've actually completely lost track of the question.  I don't remember the question anymore.  I'm telling you very candidly.

But again, what we're trying to show is the issue of the enterprise that the government charged.  We do not care if this guy was murdered or not.  Nobody cares.  Right?  And——

MR. FINKEL:  So why ask the question?

MS. SHROFF:  Because you have alleged——can you help me

out here.  I'm sorry.

MR. FINKEL:  If they want to ask, did you take a trip to France as part of the Rule of Law, okay, but getting into the details of the investigation is completely far afield.

MR. KAMARAJU:  First of all, they've already introduced the details of the investigation; not us, them. They did it with the Steve Bannon video in evidence.

THE COURT:  The Steve Bannon video, what is that going to say?

MR. KAMARAJU:  The Steve Bannon video, which is in evidence already, through a stipulation that they put in yesterday, says that Miles Guo launched this investigation; as a result of that investigation, they are going to publicize the results of that investigation; they're going to go after financial institutions that enabled the CCP, and that that is part of the mission of the Rule of Law Foundation.  And that's why it's been started.  And they can say it's not in evidence. They admitted it, your Honor.

MR. FINKEL:  That's not our argument.

MR. KAMARAJU:  Hold on.  That's not the point. Whether it's your argument or not, we get to have an argument also, and our argument is that the Rule of Law Foundation is a legitimate enterprise that has a legitimate beginning, it has a legitimate purpose, it has legitimate operations.  And if we can show that, your Honor, then that changes their burden.

THE COURT:  So what I want to understand, though, is: Exactly what is it that you're trying to bring out right now?

MR. KAMARAJU:  Ms. Shroff.

I think it's simply——your Honor, I think it's simply this is a real endeavor; this witness went on a real endeavor, they went to conduct an investigation, it was real, it was funded by Mr. Guo and the enterprise, that enterprise ultimately culminates in the Rule of Law Foundation.  The work that is done prior becomes the work of the Rule of Law Foundation.

THE COURT:  So——

MS. SHROFF:  How about this, your Honor.  Maybe I can answer the question.  Mr. Guo funded this trip; Mr. Go funded the investigation.  And this was the precursor to the establishing of the Rule of Law Foundation.  How about those three questions?

MR. FINKEL:  She doesn't have any personal knowledge.

MS. SHROFF:  If she doesn't, then she can say no.

THE COURT:  If she does not know, she can say no. They have a good-faith basis to ask the question, and so I'm going to permit the question.

MR. HORTON:  If I could just say one more thing, your Honor.

THE COURT:  Yes.  One more thing.

MR. HORTON:  I just want to clarify that the question

is close to one—it's quite close to one that was asked and answered, which is: Was this done through the Rule of Law? So if there's a question that comes in that's close to asking her to try again on that, essentially, we will object to it's asked and answered.

MR. KAMARAJU: This is not the same, though.

MS. SHROFF: Really we should stop sustaining asked and answered objections. It's not going to hurt the jury to hear about that, your Honor.

THE COURT: Okay. All right. Let's go.

(Continued on next page)

(In open court)

THE COURT:  Go ahead.

BY MS. SHROFF:

Q.  Mr. Guo funded the trip, correct?

A.  He did.

Q.  Okay.  And after the trip was the start of the Rule of Law Foundation, correct?

A.  That's correct.

Q.  Okay.  And the Rule of Law Foundation was what we call colloquially an NGO, correct?

A.  It was a nonprofit organization.

Q.  Okay.  And you at one point were part and parcel of Rule of Law Foundation's efforts, correct?

A.  Rule of Law Society and Foundation, yes.

Q.  Okay.  And as part of that responsibility, you were involved in the launch of Rule of Law; is that correct?

A.  Correct.

Q.  Right.  And there were several meetings that were held as to how the Rule of Law Foundation should be announced, correct?

A.  Yes.

Q.  There were agendas drafted up, correct?

A.  I don't remember that.

Q.  Okay.  There were meetings, correct?

A.  There were.

Q.  And people discussed what was the best way to bring this

forward, right?

A.  Yes.

Q.  And who was involved in those meetings; do you know?

A.  Usually it was Boss, Steve Bannon, William whenever he was in New York, Yvette was there.

Q.  And who else was present?

A.  I was there.

Q.  Were you there for all of the meetings?

A.  Most of them.

Q.  Most of them.  But there were some meetings to which you were simply not privy, correct?

A.  If they had a meeting that I don't know about, then I—I don't know.

Q.  Right.  But there were discussions about who would be in what meeting, and you were left out of some of the meetings, correct?

A.  I don't know.

Q.  Okay.  Fair enough.

    And you talked about Steve Bannon being present at some of these meetings, right?

A.  Yes.

Q.  Fair to say Mr. Bannon is a controversial figure, correct?

    MR. HORTON:  Objection, your Honor.

    THE COURT:  You may answer.

A.  What do you mean by controversial?

Q.  You know what?  Fair enough.

MS. SHROFF:  I'll move on, your Honor.

Q.  Steve Bannon was part of these meetings, correct?

A.  Yes.

Q.  Steve Bannon's position, at least on China, is pretty public, correct?

A.  It is.

Q.  Right.  And you understood Steve Bannon, regardless of all the other problems the man has, he was against the CCP, correct?

MR. HORTON:  Objection, your Honor.

THE COURT:  Overruled.  You may answer.

A.  He claimed to be against CCP.

Q.  Right.  And he was vocal about the fact that he was against the CCP, correct?

A.  He shared his opinion.

Q.  Okay.  And is it fair to say that you——did you not believe his opinion about the CCP?

A.  I——I never said that.

Q.  No.  I'm asking you.  You sound like you disbelieved that he was anti-CCP.  Do you believe he was anti-CCP?

A.  I only know what he said, and he said he was against.

Q.  Okay.  So you took him at face value that he was anti-CCP, correct?

MR. HORTON:  Objection, your Honor.

THE COURT:  Sustained.

Q.  And Mr. Bannon was part and parcel of these conversations as to how to launch the Rule of Law Foundation, correct?

A.  Yes.

Q.  Okay.  And Yvette was part and parcel of this, correct?

A.  Yes.

Q.  And part of the discussions was what projects Rule of Law Foundation would undertake, correct?

A.  At the very beginning, no.

Q.  Okay.  You tell me.  What was discussed at the very beginning?

A.  At the very beginning, so from July of 2018 to November of 2018, a lot of the discussion was around what happened in France and the alleged or possible involvement of the CCP in what happened.

Q.  Right.  And then there were——there were a lot of discussions about whether or not CCP was involved in the murder in France, but then it moved on and started the Rule of Law Foundation, correct?

A.  This was in November.

Q.  Right.

A.  Yes.

Q.  In November there were discussions whether or not——as to what the Rule of Law Foundation would have as its aims and its objectives, correct?

A. Yes.

Q. Okay. And the aims and objectives——and you please correct me if I'm wrong——was to help those who were the victims, so to speak, of the CCP, correct?

A. That's correct.

Q. And everybody in that room agreed, right, that the CCP was a very separate entity than the People's Republic of China, correct?

MR. HORTON: Objection, your Honor.

THE COURT: Sustained. It's not clear that she can speak for what the group believed.

Q. Okay. Well, you believed, did you not, that the CCP is very different from the people of China, correct?

A. Yes.

Q. Okay. And the goal was to help the people of China, right?

A. That's correct.

Q. Right. And whether the people of China now lived in the United States or elsewhere, the goal was to help the dissidents as well, correct?

MR. HORTON: Objection, your Honor.

THE COURT: Overruled. You may answer.

A. Yes.

Q. And the goal was to make sure they felt supported, correct?

A. Yes.

Q. And part of the——part of the support system would involve

helping them with their asylum applications, correct?

A.  Also.

Q.  Right.  Helping them navigate when they couldn't speak the language, correct?

A.  I don't remember this point specifically.

Q.  Okay.  Well, you tell me.  You were there.  So you tell me what the goals and objectives were of the Rule of Law Foundation.

A.  Everything you said is correct, so the goal and mission of Rule of Law Society and Foundation was to help Chinese people in various forms.  It could be from a legal perspective to help—they just needed—and it was also to—excuse me—to educate the public on—on China.

Q.  Okay.  And there were proposals made on how to educate people on what was going on in China, correct?

A.  Yes.

Q.  Okay.  And some of the proposals were accepted and some of the proposals were rejected, correct?

A.  All of them were rejected.

Q.  Well, all of yours were rejected.

A.  Not mine specifically, but proposals that came in.

Q.  I'm sorry.  Your testimony is that every proposal ever made for the Rule of Law Foundation was rejected?

A.  While I was there, yes.

Q.  Okay.  So there would be board meetings, correct?

A.   There was one board meeting in January of 2020, yes.

Q.   Okay.  You were part of that board meeting, correct?

A.   Yes.

Q.   And you didn't take any notes of that board meeting; is that true?

A.   No.  Someone else did.

Q.   Someone else took minutes of that board meeting.  You didn't take them, correct?

A.   That's correct.

Q.   Okay.  And——

THE COURT:  We're going to stop here.  It's 2:45.

So members of the jury, remember that you're not allowed to discuss the case amongst yourselves or with anyone else.  Don't permit anyone to discuss the case in your presence.

Please return on time, as you have in the last couple of days, so that you can walk right through that door at 9:30 and we can get going on time.

Have a good evening.

THE LAW CLERK:  Jury exiting.

THE COURT:  Don't discuss your testimony.

(Jury not present)

THE COURT:  We will return tomorrow for the continuation of Ms. Maistrello's cross-examination.  Is there anything before we break?

O5T1GUO4

MR. KAMARAJU:  Not from us, your Honor.

MR. FERGENSON:  Nothing we can't take up in the morning, your Honor.

THE COURT:  All righty then.  Thank you.  See you tomorrow.

ALL COUNSEL:  Thank you, your Honor.

(Adjourned to May 30, 2024, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 LE ZHOU

Cross By Mr. Kamaraju  . . . . . . . . . . . . 353

Redirect By Ms. Murray . . . . . . . . . . . . 406

Recross By Mr. Kamaraju  . . . . . . . . . . . 410

 KARIN MAISTRELLO

Direct By Mr. Horton . . . . . . . . . . . . . 420

Cross By Ms. Shroff  . . . . . . . . . . . . . 485

GOVERNMENT EXHIBITS

Exhibit No.                                              Received

 VO-33    . . . . . . . . . . . . . . . . . . . . . 359

 SM62     . . . . . . . . . . . . . . . . . . . . . 448

 102      . . . . . . . . . . . . . . . . . . . . . 425

 103      . . . . . . . . . . . . . . . . . . . . . 460

 105      . . . . . . . . . . . . . . . . . . . . . 463

 110      . . . . . . . . . . . . . . . . . . . . . 449

 130      . . . . . . . . . . . . . . . . . . . . . 427

 141      . . . . . . . . . . . . . . . . . . . . . 423

 UK723    . . . . . . . . . . . . . . . . . . . . . 433

 UK728    . . . . . . . . . . . . . . . . . . . . . 453

 BR871    . . . . . . . . . . . . . . . . . . . . . 429

DEFENDANT EXHIBITS

Exhibit No.                                              Received

 60476    . . . . . . . . . . . . . . . . . . . . . 382

 Stip 0001 . . . . . . . . . . . . . . . . . . . . 405