UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MILES GUO,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/29/2026__

23 Cr. 118-1 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant, Miles Guo, objects to the preliminary order of forfeiture ("POF") entered by the Court on August 11, 2025. *See* Objs., ECF No. 799; POF, ECF No. 720; Gov't Mot., ECF No. 716; Resp., ECF No. 803; *see also* Reply, ECF No. 804. For the reasons stated below, the Court SUSTAINS IN PART and OVERRULES IN PART Guo's objections to the POF.

**BACKGROUND**

The Court presumes familiarity with the factual background of the case and recounts only a summary of forfeiture-related proceedings and submissions here.

A.  Jury Verdict

On July 16, 2024, a jury convicted Guo of nine counts of various financial crimes: (1) one count of racketeering conspiracy (Count One of the third superseding indictment); (2) one count each of conspiracy to commit wire fraud or bank fraud, money laundering, and securities fraud (Counts Two, Three, and Four); (3) one count each of wire fraud and securities fraud in connection with the Farm Loan Program (Counts Seven and Eight); (4) one count each of wire fraud and securities fraud in connection with G|CLUBS ("G Clubs") (Counts Nine and Ten); (5) and one count of wire fraud in connection with the Himalaya Exchange (Count Eleven). The jury acquitted Guo of one count each of wire and securities fraud in connection with the GTV Private Placement and one count of committing an unlawful monetary transaction (Counts Five, Six, and Twelve). *See* Jury Verdict, ECF No. 395; S3 Superseding Indictment,

ECF No. 307.  Each of these activities—the Farm Loan Program, G Clubs, the Himalaya

Exchange, and the GTV Private Placement—were alleged to be components of the "G

Enterprise," a series of investment schemes comprising the racketeering conspiracy detailed in

Count One.  *See* S3 Superseding Indictment ¶¶ 16–19.

B.    Applicable Forfeiture Provisions

As a result of Guo's convictions, he is subject to three distinct provisions of the United

States Code which call for forfeiture of certain assets to the Government:

1)  18 U.S.C. § 1963(a), which requires a defendant to forfeit any property "constituting, or derived from, any proceeds which the person obtained . . . from racketeering activity" (Count One);

2)  18 U.S.C. § 981(a)(1)(C), which requires a defendant to forfeit all property "which constitutes or is derived from proceeds traceable to" fraud or a conspiracy to commit fraud (Counts Two, Four, Seven, Eight, Nine, and Ten, and Eleven);[1] and

3)  18 U.S.C. § 982(a)(1), which requires a defendant to forfeit all property "involved" in money laundering, or "traceable to such property [involved in money laundering]" (Count Three).

*See id.* ¶¶ 58–61.

C.    Prior Submissions

On April 8, 2025, the Court appointed Guo's present counsel and ordered the parties to

provide a joint letter stating the date when Guo would provide his position with respect to

forfeiture.  *See* Apr. 8 Tr. at 10:14–23, ECF No. 684.  The Court subsequently granted four

extensions, at the parties' and at Guo's request, for Guo to articulate his position on the forfeiture

of various assets.  *See, e.g.*, ECF Nos. 698, 704, 706, 708.  Then, on June 27, 2025, Guo filed a

letter claiming that he was "unable to take a position with respect to issues regarding potential

---

[1] The Indictment also cites 28 U.S.C. § 2461(c) in this forfeiture allegation, which specifies further rules and procedures related to forfeiture.  *See* S3 Superseding Indictment ¶ 59.

forfeiture and remission of money and property seized by the Government." ECF No. 710 at 1–2. The letter stated Guo "[did] not waive any of [his] rights, including his appellate rights, in this case." *Id.* at 1. In response, the Government wrote that although "Guo is not consenting to a preliminary order of forfeiture, the Court can enter a preliminary order of forfeiture that imposes a money judgment and forfeits Guo's personal interest in specific property." ECF No. 713.

A month later, by motion dated July 28, 2025, the Government asked the Court to "enter a preliminary order of forfeiture setting forth . . . [a] money judgment" in the amount of $1.3 billion. *See* Fed. R. Crim. P. 32(b)(2)(A); Gov't Mot.[2] The Government characterized the $1.3 billion as "the proceeds traceable to the commission" of the racketeering and fraud counts (Counts One, Two, Four, Seven, Eight, Nine, and Ten, and Eleven) and "the property involved" in the money laundering offense (Count Three). *See* POF at 3. The Government argued that $1.3 billion is a "conservative estimate of the . . . funds sent by individual victims to certain arms of the G Enterprise," which included the Farm Loan Program, GTV, G Clubs, and the Himalaya Exchange. Gov't Mot. at 3; *see* Fed. R. Crim. P. 32.2(b)(1)(A) ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.").

The Government also sought the forfeiture of certain property listed in the POF (the "Listed Property"), Gov't Mot. at 4; POF at 3–11: "cash seized from several bank accounts . . . used in furtherance of [Guo's] crimes and his racketeering enterprise," which,

---

[2] Courts may impose money judgments in cases where criminal forfeiture is required. Where a defendant's assets or identifiable property may not cover the full amount of the proceeds that a forfeiture statute requires the defendant to forfeit, money judgments may be used to ensure that the defendant is held liable for the full amount of those proceeds. *See, e.g., United States v. Kenner*, 443 F. Supp. 3d 354, 362 (E.D.N.Y. 2020) ("If the defendant lacks the assets to satisfy the order, the court can award the government a forfeiture money judgment."); *United States v. Peters*, 732 F.3d 93, 98–99, 104 (2d Cir. 2013) (affirming entry of a money judgment in a case alleging forfeiture under 18 U.S.C. § 982(a)(2)); *United States v. Kalish*, 626 F.3d 165, 168–69 (2d Cir. 2010) (affirming entry of a money judgment in a case alleging forfeiture under 28 U.S.C. § 2461).

according to the Government, represent "proceeds of the G Enterprise [(the racketeering enterprise defined in Count One)] and property involved in money laundering" (Count Three). Gov't Mot. at 4–5. The Government categorized these bank accounts based on the date they were seized by the Government and the names in which the accounts were held; each of the account holders "was named in the [superseding] [i]ndictment as a member of the RICO enterprise." *Id.* at 4; *see* S3 Superseding Indictment ¶ 3(a). The Government attached several seizure warrant affidavits related to these accounts. *See* Gov't Mot. Exs. B–E, ECF Nos. 716-2 through 716-5; *see also* Proposed POF ¶¶ a–u, bb (listing bank accounts), ECF No. 716-1.

The Listed Property included a mansion located at 675 Ramapo Valley Road in Mahwah, New Jersey, "its contents," including, for example, an "Italian giltwood mirror with rococo crest with cross-hatched panels," and several other luxury items, such as a Bugatti, Lamborghini, and Rolls-Royce. *See* Gov't Mot. at 5–7; *see also* Proposed POF ¶ aa (listing "personal property seized by the Government from the [Mahwah] property"). The Government argued that the Mahwah property, the personal property therein, and the luxury items were purchased with funds traceable to G Clubs, the G Enterprise, or money laundering. *See* Gov't Mot. at 5–7.

Guo did not respond to the Government's motion, and given that he had represented to the Court that he was "unable to take a position with respect to issues regarding" forfeiture, on August 11, 2025, the Court entered the POF. *See* POF. Nearly a month later, on September 4, 2025, Guo requested an opportunity "to address" "deficiencies" in the Government's motion, such as "whether certain property is forfeitable," "the issue of offsets," and "the accuracy of the total amount the government seeks." *See* ECF No. 724 at 1. By order dated January 8, 2026, the Court directed Guo to file any objections and to specify "whether [Guo] claims a personal

interest in any of" the Listed Property.  ECF No. 784.[3]  Before the Court is Guo's February 3,

2026 submission.  *See* Objs.

## LEGAL STANDARD

When the Government seeks forfeiture in the form of a money judgment, the Court "must

determine the amount of money that the defendant will be ordered to pay," Fed. R. Crim. P.

32.2(b)(1)(A), using "evidence already in the record," *id.* 32.2(b)(1)(B), including the trial

record.  *See United States v. Mathieu*, 853 F. App'x 739, 742 (2d Cir. 2021).  The calculation of

a forfeiture amount, however, "is not an exact science."  *United States v. Treacy*, 639 F.3d 32, 48

(2d Cir. 2011).  As a result, the Court need only make a "reasonable estimate" based on

"available information" concerning the appropriate amount of forfeiture.  *Id.*; *see id.* (noting,

additionally, that a court may "use general points of reference as a starting point" and "may

make reasonable extrapolations from the evidence established by a preponderance of the

evidence" in evaluating a proposed money judgment); *see also United States v. Uddin*, 551 F.3d

176, 180 (2d Cir. 2009).

The Court must determine forfeiture—both the proper money judgment amount and

whether forfeiture applies to the Listed Property—by a preponderance of the evidence.  *United*

*States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

## DISCUSSION

Guo raises several objections to the POF:  (1) the "scope" of his alleged fraud is

overbroad and includes those who were not victims of his crimes; (2) he "can only be ordered to

---

[3] The Government argues that Guo has waived any challenges to the POF due largely to his statement in his June 27, 2025 letter that he was not taking a position as to forfeiture.  *See, e.g.*, Resp. at 3–4.  The Court's January 8 order did not address waiver, and, because the Court largely concludes in this order that Guo's challenges to the POF lack merit and prefers to decide the issues on the merits, the Court expresses no view on whether Guo waived his objections.

forfeit assets that he personally obtained"; (3) forfeiture should not cover any alleged proceeds from the GTV Private Placement because he was acquitted of two fraud counts related to GTV; and (4) the money judgment should be offset by certain amounts. *See* Objs. at 3, 9, 11, 17.

The Court finds that the Government has demonstrated by a preponderance of the evidence that approximately $889 million is a reasonable estimate of the gross inflows of cash into the Farm Loan Program, G Clubs, and the Himalaya Exchange—all either components of the racketeering conspiracy of which Guo was convicted or enterprises which formed the basis of his fraud convictions—and that $889 million is, therefore, the proper money judgment amount in this case. *See* Gov't Mot. at 3; GXZ26, ECF No. 803-1; Trial Tr. at 4330–32;[4] Fed. R. Crim. P. 32(b)(1)(A).

A.    Scope

The Court rejects Guo's argument that the POF should not include property traceable to "proceeds" from individuals who claim they "were not victimized" by his fraud. *See* Objs. at 3–4, 5.

As an initial matter, Guo assumes that forfeiture distinguishes between "investors who were defrauded, and those who insist they were not." Objs. at 4. It does not. Forfeiture, in this case, applies to proceeds "from racketeering activity," proceeds from "fraud," and property "involved in" money laundering. *See* Resp. at 5 (citing 18 U.S.C. §§ 1963(a), 981(a)(1)(C), and 982(a)(2)). Contrary to Guo's claims, the scope of his crimes of conviction is not defined by the

---

[4] In his sentencing submission, Guo argues that exhibit GXZ26 does not account for the possible double-counting of inflows across various components of the G Enterprise. *See, e.g.*, ECF No. 822 at 41,53 (claiming that individuals could use Himalaya Exchange funds to purchase a G Club membership); *see also* ECF No. 826 (correcting sentencing submission). Guo does not cite *any* evidence showing that this occurred, or suggesting that the Government's inflow calculation in fact improperly included contributions made from Himalaya Exchange accounts to G Clubs. *Id.* The Court, therefore, makes this determination on the evidence available in the record, which demonstrates that the Government's calculation is correct. And, in any event, this argument was not raised in Guo's objections to the forfeiture order. As such, the Court will not address this objection.

"expectations and reliance" of individual victims on his statements. *Cf.* Objs. at 5 (claiming that "individual investors' expectations and reliance are critical to distinguishing between victims of fraud and those who were not victimized").

Indeed, the Second Circuit has held that "reliance is not an element of criminal fraud" and that "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *United States v. Weaver*, 860 F.3d 90, 95–96 (2d Cir. 2017). In other words, even if an alleged "investor" in a fraudulent scheme disclaims that they relied on the false statements which underpinned the fraud, a fraudulent scheme may nonetheless exist, and all proceeds obtained from such a scheme would be subject to forfeiture. Relatedly, an "investor['s]" subjective views as to whether they are victims of the scheme have no bearing on whether their contributions to the scheme are "proceeds" that a defendant has obtained from fraud. All that matters is "materiality"—that the statements alleged to be fraudulent have the "natural tendency to influence the decisionmakers to whom they were addressed." *Weaver*, 860 F.3d at 96. And materiality is evaluated under an objective test, "rather than from the subjective perspective of the victim." *United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017).

The Court's conclusion is confirmed by the statutory definitions of the fraud crimes of conviction. Wire fraud criminalizes the knowing participation in any "scheme or artifice to defraud" and the transmittal by wire of certain communications for "the purpose of executing such scheme or artifice [to defraud]." 18 U.S.C. § 1343; *see* July 9, 2024 Trial Tr. at 5791:25–5794:6, ECF No. 450. As for securities fraud, the Securities and Exchange Commission ("SEC") rule violated in this case, *see* S3 Superseding Indictment ¶¶ 47, 51, prohibits using a "scheme . . . to defraud," "mak[ing] an untrue statement of material fact" or omitting a material fact in certain circumstances, or "engaging in an act, practice, or course of business which

operates *or would operate* as a fraud or deceit *upon any person*," 17 C.F.R. § 240.10b-5(a)–(c) (emphasis added). *See also Neder v. United States*, 527 U.S. 1, 24–25 (1999) (observing that Congress prohibited the "'scheme to defraud,' rather than the completed fraud," in the fraud statutes). In other words, the "scope" of Guo's fraudulent schemes does not depend on whether each individual making contributions to those schemes believed they were defrauded. Their beliefs as to whether their individual "investments" had material value, or as to whether they in fact relied on any material misrepresentations, do not affect whether those investments were made in a fraudulent scheme.[5]

The cases cited by Guo, *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), and *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024), are inapposite. In *Miller*, the Second Circuit held that the Government failed to prove that the defendants intended to deprive a victim of a property interest on the facts shown at a trial for mail fraud because the property that the defendants had allegedly diverted "to their own benefit" from the victims was not, in fact, "a specific, identifiable property interest" belonging to the victims in the first place. *Id.* at 1017–1021. *Miller*, in other words, turned ultimately on the scope of the alleged victims' contractual property interests, not on their expectations or beliefs, and, therefore, has no bearing here. *See id*. *Rainford* vacated and remanded a forfeiture order where a district court based its order solely on "the government's word." 110 F.4th at 489. Here, by contrast, there is ample evidence supporting the POF filed in this case.

Guo further argues that there is "abundant proof that a considerable number of supposed 'victims' reject that classification." Objs. at 6–7. He claims that "6,512 members of the

---

[5] Guo does not argue otherwise—he neither discusses, nor even cites, the elements of his fraud convictions in the portion of his submission making this argument. *See* Objs. at 4–9.

Himalaya Exchange" (the enterprise for which Guo was convicted of wire fraud in Count Eleven) "have objected to forfeiture of their accounts" and "express[] frustration at being labeled as victims." *Id.* at 6. These complaints, as well as those from the "Hamilton petitioners" and various other third parties, do not affect this order, which addresses solely whether the properties identified by the Government are, in fact, either proceeds of racketeering activity, proceeds of fraud, or traceable to funds involved in money laundering, and whether the $1.3 billion money judgment is a reasonable estimate of the value of Guo's forfeiture obligations.[6] Third-parties' alleged claims to the property identified in the POF shall be assessed through ancillary proceedings under 18 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2.

B.      Possession

Guo argues that he "can only be held liable to forfeit the value of tainted proceeds to the extent that he at some point *personally* obtained them," and that, for various reasons, there is insufficient evidence that he "obtained" the property listed in the POF. Objs. at 10–11 (emphasis in original).

Guo misunderstands the nature of forfeiture. For proceeds of a defendant's crime to be forfeitable, the property "need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (citation omitted). Instead, the property need only "have, at some point, been under the defendant's control." *Id.* Further, property may be forfeited even when the defendant's control over the property is temporary. *See United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019).

---

[6] The Court acknowledges the voluminous petitions filed under 18 U.S.C. § 853(n) seeking to assert a third-party's legal interest in property forfeited to the United States, and the Court expresses no opinion as to whether any petitioner's claim, properly made and submitted under § 853(n), is meritorious.

At trial, the Government proved by a preponderance of the evidence that Guo was the "Boss" in control of all of the entities in the G Enterprise and those entities' assets.  Resp. at 7.[7] For example, testimony from several witnesses shows that Guo exercised control over assets involved in the G Enterprise:  Karin Maistrello testified that Guo was in control of the Rule of Law organizations' funds, a scheme involved in the G Enterprise (*see* Trial Tr. at 424); multiple witnesses testified that Guo had control over G Clubs (*see* Trial Tr. at 1941 (describing Guo as the "top boss"), 1995:3–15, 1996:2–5 (clarification at sidebar), 1999:4–7, 2975:8–2976:10, 2980:11–22, 2999:20–3000:6 (testimony concerning G Clubs)); and abundant documentary evidence supports the conclusion that Guo exercised control over the funds involved in his crimes (*see* GXC415; Resp. at 7 n.3 (citing trial exhibits depicting Guo exercising control over funds involved in the G Enterprise)).[8]

The documentary evidence introduced at trial, *see, e.g.*, GXZ26 (showing cash flows from certain G Enterprise bank accounts into other bank accounts which are listed in the POF), also establishes that the particular accounts that the Government argues are subject to forfeiture contain funds derived from proceeds of the G Enterprise and property involved in money laundering.  *See* Mot. at 4–5.  Notably, Guo does not argue that the funds in these accounts hold

---

[7] Additionally, under each statute serving as the basis for forfeiture in this case, the Court need only find that Guo obtained the proceeds "directly or indirectly." *See* 18 U.S.C. §§ 1963(a)(3), 981(a)(2)(A), 982(a)(2).

[8] Guo's sole argument regarding the trial record is that one witness "testified that . . . Guo was not the ultimate beneficial owner of G Clubs, nor was he the source of funds for G Clubs or G Fashion." Objs. at 10–11.  That witness, James R. Collins Jr., was an employee at Mercantile Global Holdings, a company which owned a bank that maintained client relationships with G Clubs, G Fashion, and the Himalaya Exchange.  *See* Trial Tr. at 2753:8–2756:15.  But Collins only testified that Mercantile Bank *believed* that Guo was not the ultimate beneficial owner of G Clubs and that G Clubs had represented as much to him.  *See* Trial Tr. at 2758:23–2762:12.  He did not testify as to any personal knowledge of the inner workings of G Clubs, or whether Guo, in fact, exercised control over G Clubs funds.  The Court, therefore, accords Collins' testimony minimal weight.  Guo also attempts to incorporate by reference arguments made by third parties who have filed ancillary claims to assets subject to forfeiture under 21 U.S.C. § 853(n).  *See* Objs. at 11.  The Court will consider those arguments as part of the ancillary proceedings that shall be conducted after sentencing pursuant to §853(n) and Federal Rule of Criminal Procedure 32.2.  The Court expresses no opinion as to whether any third party has a superior legal interest in any forfeited property.

money which is not derived from entities involved in the G Enterprise.  *See* POF ¶¶ a–z, bb; Objs. at 9–11 (instead arguing solely that he did not personally obtain or exercise control over these funds).

Guo relies in substantial part on *Honeycutt v. United States*, 581 U.S. 443 (2017), to support his argument that he cannot be ordered to "forfeit assets that he [did not] personally obtain[]."  Obj. at 9.  In that case, the Supreme Court held that 21 U.S.C. § 853, which requires forfeiture of any property derived from proceeds of certain drug crimes, does not automatically impose joint and several liability on all convicted parties of a conspiracy.  *See* 581 U.S. at 443.

In *Honeycutt*, the government sought a money judgment against a defendant, arguing that he was liable for the entirety of a conspiracy's profits, even though the defendant was merely a salaried employee who had assisted his store's participation in a drug crime, and never benefited from, let alone exercised control over, the extent of the store's tainted profits.  *See id.* at 445–47. Here, however, the Court finds by a preponderance of the evidence that Guo benefitted from and exercised control over the funds that the Government maintains are subject to forfeiture.  *See, e.g.*, Resp. at 7–8 n.3 (citing trial evidence noting, for example, that Guo directed his co-conspirators to use "G-Club or another private company" to finance the purchase of an expensive coffee table).  Indeed, since *Honeycutt*, the Second Circuit has reiterated that the Government need not show that a defendant personally retained or directly possessed property for forfeiture to apply.  *See, e.g.*, *Rajaratnam v. United States*, 736 F. App'x 279, 284 (2d Cir. 2018) (holding that a forfeiture order could be imposed against a defendant for funds over which the defendant only had temporary authority and which had subsequently been disbursed).

The Court, therefore, finds that the Government has demonstrated by a preponderance of the evidence that the Listed Property is subject to forfeiture.

C.      GTV Private Placement and SEC Disgorgement

Guo argues that funds derived from the GTV Private Placement should not be included in the forfeiture order and that the money judgment against Guo should be reduced by the amount of funds the Government alleges were involved in GTV. *See* Objs. at 17.[9] Guo contends that because he was acquitted of wire and securities fraud in connection with the GTV Private Placement, $411 million in funds derived from the GTV Private Placement that the Government seeks to forfeit should be excluded from the order. *Id.* at 11–12; Resp. at 8.

The Court need not resolve this in light of another issue raised by the parties: whether the money judgment against Guo should be reduced by the amount already recovered by the SEC in administrative proceedings. *See* SEC Order, ECF No. 799-2. Guo states that GTV has already disgorged in excess of $411 million as part of an administrative proceeding initiated by the SEC. *See* Objs. at 17–18. The Government concedes this, in part, stating that "[t]he actual funds derived from the GTV [P]rivate [P]lacement were recovered by the SEC, which established a fair fund for distribution to victims," and that "[i]f the Court were to deduct the GTV [P]rivate [P]lacement funds from the forfeiture amount, approximately $411 million would be deducted." Mot. at 4 n.2.

However, the parties' figures diverge. Guo argues that GTV, along with Saraca Media Group, Inc. and Voice of Guo Media, Inc., has disgorged over $486 million to the SEC and that the full $486 million should be deducted from the money judgment because it relates to conduct charged in this case. *See* Objs. at 18. The Government, however, contends that only $411

---

[9] Guo does not claim that a specific bank account, or item of personal property, solely constitutes proceeds from the GTV Private Placement, *see generally* Objs. The Government maintains that all of the relevant funds are proceeds of the G Enterprise and property involved in money laundering. *See* Mot. at 4–5. Guo does not argue that any of the Listed Property should be excluded from forfeiture on this basis, and the Court, therefore, only examines how the disgorgement affects the money judgment.

million of the $1.3 billion figure derives from the GTV Private Placement and that the remaining $889 million derives from proceeds traceable to the Farm Loan Program, G Clubs, or the Himalaya Exchange. *See* GXZ26. The fact that GTV and other entities disgorged $75 million more than $411 million is relevant to the money judgment only if the excess $75 million is traceable to proceeds from the fraudulent schemes involved in this case, namely, the Farm Loan Program, G Clubs, or the Himalaya Exchange.

The Court rejects Guo's arguments that the purported $75 million disgorged in excess of $411 million is traceable to his crimes of conviction. First, he claims that $34 million of the total disgorged funds relate to sales of "G-Coins and G-Dollars," early precursors to the Himalaya Exchange. *See* Objs. at 17–18. However, the sale of G-Coin and G-Dollars from April to June of 2020 is not covered by the Indictment, which targets the Himalaya Exchange enterprise transactions that took place from 2021 to 2023. *See* S3 Superseding Indictment ¶ 53.

Moreover, Guo provides no evidence that the $115 million in disgorged funds attributable to Voice of Guo Media, Inc. ("VOG") "overlaps with the so-called Farm Loan Program." Objs. at 17–18. The SEC Order reports that VOG pooled funds from "prospective investors" who wanted to invest less than $100,000 in GTV. *See* Objs. at 17–18; SEC Order ¶¶ 15–21, ECF No. 799-2. The Indictment's description of the Farm Loan Program, however, differs substantially from the SEC Order's description of VOG's fundraising efforts. *Compare, e.g.*, S3 Superseding Indictment ¶ 17 (describing "The Himalaya Farm Alliance" as "a collective of informal groups (each known as a 'Farm') located in various cities around the world" which obtained investments "in the form of 'loans' to a Farm" and "promising that such loans would be convertible into GTV common stock" via a "Loan Agreement") *with* SEC Order ¶¶ 16–18 (describing how VOG would provide an investor a one-page "Limited Purpose Agency

Agreement," stating that, for minimal consideration, a representative of VOG would act as an "agent" for investors and purchase GTV stock on their behalf).

Although Guo is correct that the SEC obtained $75 million more than $411 million from GTV and related companies, he has not shown that this surplus coincides with any of the proceeds that the Government has demonstrated are related to Guo's crimes of conviction—that is, the Farm Loan Program, G Clubs, and the Himalaya Exchange.

The Court concludes, therefore, that only $411 million may be deducted from the proposed money judgment, because the record reflects—and the Government does not contest—that $411 million in funds traceable to the GTV Private Placement has already been disgorged by entities related to the G Enterprise in separate proceedings prior to the commencement of this criminal case.  This deduction does not affect the forfeiture of any of the Listed Property.

D.    Offsets

Guo argues that the money judgment should be "already offset by the more than $1 billion already in the Government's possession in connection with this case" and by the "funds and assets in the Bankruptcy Trustee's possession that are among the items the Government deems forfeitable in this case."  Objs. at 18–20.  In response, the Government notes that the value of property "forfeited to the United States under a Final Order of Forfeiture" will, indeed "be applied towards the satisfaction of the [m]oney [j]udgment" once all third-party interests are adjudicated, and that there is no authority to order an offset for any assets not

14

covered by the POF. *See* Resp. at 10 & n.7; POF ¶ 7.[10]  Accordingly, the Court will not deduct

the value of any of the Listed Property from the money judgment at this time.[11]

    E.    <u>Ancillary Matters</u>

Guo also seeks an order directing the Government to take possession of certain assets (the

"bankruptcy assets") from the Chapter 11 Trustee of Guo's estate in bankruptcy proceedings,

which were commenced on February 15, 2022, in the District of Connecticut. *See* Seizure Mot.,

ECF No. 724, at 1; *see generally In re Kwok,* No. 22 Bk. 50073 (D. Conn. Bankr. February 15,

2022); *In re Kwok*, 172 F.4th 145 (2d Cir. 2026).  Guo argues that the Government's interest in

the forfeited assets is "superior to that of any creditor in the bankruptcy proceeding," Seizure

Mot. at 5, that ordering the Government to seize the bankruptcy assets will both "make them

available to investors in the various entities involved in this case, and for whom restitution will

be ordered" and "halt the accumulation of considerable fees and expenses incurred by the

Trustee" in the bankruptcy proceeding. *See id.* at 5–7.

The Court does not have the power to grant the relief Guo requests.[12]  Guo merely cites

Federal Rule of Criminal Procedure 32.2(b)(3) for the proposition that the Court "may include

. . . conditions reasonably necessary to preserve the property's value pending any appeal" in a

preliminary order of forfeiture. *See* Seizure Reply at 4, ECF No. 754.  Rule 32.2(b)(3) limits the

---

[10] Guo also argues that if the Court finds, in ancillary proceedings, that any property belongs to a third party, the value of that property should be deducted from the money judgment. Objs. at 18. Not so. Third-party forfeiture proceedings are designed to determine if a third party possesses a superior legal interest in the property subject to forfeiture. *See* 21 U.S.C. § 853(n)(6); Gov't Forfeiture Ltr. at 1–2, ECF No. 785. That is a separate question from whether the assets are forfeitable. Property may well have come under Guo's control due to, for example, fraud, even though a third party possessed a superior legal interest in that property. Therefore, if the Court finds that any property belongs to a third party under 21 U.S.C. § 853(n)(6), it will not deduct the value of that property from the money judgment.

[11] The Court denies Guo's request to reduce the money judgment "to the extent the Government has declined to pursue other potentially forfeitable assets in this case," and to reduce the money judgment by the amount forfeited by Haithem Khaled. *See* Objs. at 19–21. Guo offers no legal basis for either of these requests.

[12] The Court expresses no opinion on the Government's argument that Guo lacks standing on this issue.

Court's authority to conditions required to preserve the property's value on "appeal," rather than conditions required to preserve value pending related, separate proceedings—like the bankruptcy proceeding here.

Furthermore, several other procedural features of the forfeiture rules indicate that such an order would exceed the Court's power.  For example, Rule 32.2(b)(3) "authorizes" the Government "to seize the specific property subject to forfeiture" upon entry of a preliminary order but does not require that the Government do so.  Fed. R. Crim. P. 32.2(b)(3).  Nor does Rule 32.2 state when, or how, the Government may seize property listed in a forfeiture order once it is authorized to do so under Rule 32.2(b)(3).  Likewise, 21 U.S.C. § 853(e) and (f) empower the Court to take certain protective measures concerning assets potentially subject to forfeiture, but do not authorize the Court to compel the Government to enact a seizure.  *See* Resp. at 4.

Moreover, Guo's request lacks merit.  Guo argues that the Court *may* impose conditions "reasonably necessary to preserve the property's value pending any appeal," Seizure Reply at 4, but nothing in Rule 32.2 requires the Court to do so.  Although the Court acknowledges that the Chapter 11 Estate in the bankruptcy proceeding has incurred fees owed to the Trustee and various other professionals, *see* Seizure Mot. at 7, such fees are not unusual given the remarkable complexity of that proceeding.  *See id.* (claiming that 300 adversary proceedings have been filed in the bankruptcy proceeding).

F.      Restitution

The Government requests that the Court find that imposing a restitution order would be impracticable and authorize a remission process.  *See* Gov't Ltr. at 4–5, ECF No. 785; ECF No. 784 (January 8, 2026 order).  Guo agrees.  ECF No. 789 at 3.  The Court agrees and finds,

16

based on the extensive record in this case, that given the "complexity of the case and the number of victims involved," awarding restitution to victims in accordance with 18 U.S.C. § 3663A would be impractical and would complicate or prolong the sentencing process. *See* 18 U.S.C. § 3663(c)(3)(A)–(B).

## CONCLUSION

For the foregoing reasons, the Court concludes that the Government has demonstrated that forfeiture applies to the Listed Property due to Guo's convictions for racketeering conspiracy, wire and securities fraud, and conspiracy to commit money laundering. The Court SUSTAINS Guo's objections to the extent that the Court shall deduct $411 million from the $1.3 billion proposed money judgment, such that the money judgment in the final order of forfeiture shall be $889 million.

The Court DENIES Guo's motion at ECF No. 724 seeking an order compelling the Government to seize assets in the bankruptcy proceedings. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 724.

Finally, the Court finds that restitution is impracticable in this case and authorizes the Government to compensate victims through a remission process.

SO ORDERED.

Dated:  June 29, 2026
        New York, New York

_____
ANALISA TORRES
United States District Judge

17